# TABLE OF CONTENTS (INTERACTIVE)

| LLLLLLLLLLL | |
|---|---|
| PART 11 | Petitioner's Appendix to Petition for Review |

# EXHIBIT LLLLLLLLLL
# PART 11

DB: WENDI,

WA: HOW AHH....

DB: YOU NOT ONLY TOLD

WA: HE, THAT SO I'M SITTING HERE THINKING OKAY WELL ....

DB: WENDI HE DIDN'T JUMP ON THE KNIFE AND COMMIT SUICIDE.

WA: NO, OH NO I KNOW THAT. I OH THAT SOUNDS GROSS. I DON'T KNOW I CAN'T SEE, I CAN'T SEE IT. I CAN'T SEE IT.

DB: THE OTHER THING IS....

WA: COULD MY MIND MAKE ME NOT SEE IT? I MEAN I DON'T KNOW.

DB: WENDI WHAT I BELIEVE IS THAT YOU, THAT YOUR WORRIED ABOUT WHAT'S GOING TO HAPPEN TO YOU AND I UNDERSTAND THAT. I COMPLETELY UNDERSTAND THAT BUT WHEN YOU CONTINUE TO LIE ABOUT IT, LIKE I SAID ANYBODY CAN SAY THEIR SORRY AT THE END OF THINGS, I DON'T MEAN A THING. (UI)

WA: CAUSE I DIDN'T, I DIDN'T MEAN TO KILL HIM. I JUST WANTED HIM TO STOP.

DB: BUT YOU STABBED HIM WHEN HE'S SITTING THERE AND HE CAN'T GET UP. HE CAN'T HURT YOU ANYMORE AT THAT POINT.

WA: I WAS STILL SO AFRAID.

DB: BUT HE CAN'T HURT YA.

200

000011699

WA:     I AHHH. THAT'S NOT WHAT YOUR THINKING, THAT'S NOT WHAT I'M THINKING WHEN YOUR

SITTING IN THE MIDDLE OF IT. I DON'T KNOW WHAT TO, I'M JUST PANICKING AND FREAKED OUT. I

DON'T KNOW.

DB:     BUT YOU COULD'VE GOTTEN UP AND WALKED AWAY AT THAT POINT AND HE WOULDN'T HAVE

BEEN ABLE TO GET UP AND FOLLOW. YOU COULD'VE WALKED IN THERE AND CALLED THE POLICE. YOU

COULD'VE GOT UP AND WALKED OUT OF THE APARTMENT. YOU COULD'VE STOPPED THIS AT ANY

POINT TONIGHT, THAT YOU WANTED TO AND YOU DIDN'T.

WA:     I DON'T KNOW, I DON'T THINK SO.

DB:     WELL I THINK YOU COULD. I THINK YOU COULD'VE STOPPED IT WHEN CHRIS CAME OVER. I

THINK YOU COULD'VE STOPPED WHEN THE FIRE DEPARTMENT WAS THERE.

WA:     HE DIDN'T WANT ME TO. HE DIDN'T WANT ME TO TELL ON HIM.

DB:     BUT YOU HAD THE CHANCE TO STOP EVERYTHING GOING ON.

WA:     WHY IS IT MY FAULT? I'M JUST TRYING TO....

DB:     IT'S YOUR FAULT CAUSE YOU STABBED HIM WHEN YOU COULD'VE STOPPED. IT'S YOUR FAULT

BECAUSE HE, HE WAS ON THE GROUND AT THAT POINT UNABLE TO HURT YOU AND YOU STABBED HIM.

MY ONLY QUESTION IS DID IT HAPPEN IN A FIT OF RAGE OR DID YOU PLAN THIS?

WA:     OH GOD NO.

DB:     YOU TELL ME.

WA:     (UI) HOW COULD YOU EVEN SAY PLAN SOMETHING LIKE THIS?

201

000011700

DB:     WELL BECAUSE WENDI....

WA:     I MEAN I (UI)

DB:     YOU'VE CHANGED YOUR STORY OF WHAT YOU TOLD ME. I DON'T KNOW WHAT TO BELIEVE FROM YOU RIGHT NOW.

WA:     OKAY. I UNDERSTAND. I MEAN YOU ARE SITTING HERE ASKING ME QUESTIONS AFTER QUESTIONS AND I JUST DON'T UM ....

DB:     WE JUST WANT THE TRUTH THAT'S ALL.

WA:     I KNOW.

DB:     DON'T YOU BELIEVE THAT YOU COULD'VE GOTTEN UP AND WALKED AWAY AT THAT POINT?

WA:     I DON'T KNOW WHY I NEVER....

DB:     HE COULDN'T HAVE MOVED.

WA:     HE WAS MOVING THOUGH. OH MY GOD.

DB:     HE WASN'T GONNA GET UP AFTER YOU HIT HIM IN...

WA:     YOU KNOW WHAT ...

DB:     AFTER HIS HEAD'S SMASHED IN.

WA:     WHEN YOU HAVE, WHEN YOU HAVE SOMEBODY LIKE THAT YOU DON'T THINK. I WAS NOT THINKING. I DON'T KNOW. I JUST WANTED TO STOP HIM FROM GETTING ME THAT'S ALL.

202

000011701

DB:     THAT COULD'VE BEEN STOPPED AT ANY POINT IN THERE PRIOR TO HIM BEING STABBED.  OKAY.

I CAN'T MAKE YOU TELL ME THE TRUTH, YOU KNOW THAT SO WERE ALL DONE UNLESS THERE'S

SOMETHING ELSE YOU WANT TO TELL ME?

WA:     NO I.

TRANSCRIBED BY B. HILTERBRANT

203

000011702

5

**EXHIBIT "D-1"**

# SUPERIOR COURT OF ARIZONA
## COUNTY OF MARICOPA
### Forensic Services Unit

March 28, 2001

The Honorable Daniel A. Barker
Maricopa County Superior Court
222 East Javelina Avenue
Mesa, AZ 85210-6201

RE:   **Wendi Elizabeth Andriano**
      **Competency Screening Evaluation**
      **CR# 2000-096032**

Dear Judge Barker:

This is in reference to the above-named individual. On March 9, 2001 your court ordered the Forensic Services Unit to evaluate the competency of Ms. Andriano. I had an opportunity of visiting with the defendant for this evaluation on March 21, 2001. At that time the defendant was housed within the general population of the Estrella Jail Facility, which is under the jurisdiction of the Maricopa County Sheriff. When I saw the defendant for this evaluation in the Medical Dispensary of that unit, I informed her of the nature of our conversation and the fact it would not be privileged. I also told the defendant the information she provided could not be used against her in further proceedings unless she were to enter a plea of Guilty Except Insane. She understood the reason for the evaluation and agreed to continue. Prior to completing my report I reviewed:

1)   The Court's order;
2)   Defense counsel's Motion;
3)   A copy of a letter from counselor, Ms. Rohde;
4)   A copy of the grand jury transcripts.

I appreciate having received the information I did in a timely fashion. I also had an opportunity of discussing the case at length with Dr. Leonardo Garcia-Bunuel. Dr. Garcia-Bunuel is a psychiatrist with Correctional Health Services.

Ms. Andriano is a 30-year-old widowed Caucasian female who is the mother of two preschool children. When seen, she was dressed in routine jailhouse garb and had

201 West Jefferson • Phoenix, AZ 85003 • (602) 506-1509 • FAX (602) 506-2342   010625

SP&A 01408

PCRDIS-P000886

The Honorable Daniel A. Barker
Wendi Elizabeth Andriano/Competency Screening Evaluation/CR# 2000-096032
March 28, 2001
Page 2

good hygiene. She was fully alert and oriented to her name, the date, our location, and the reason for my evaluation. The defendant's thought processes were goal-directed and intact throughout our conversation. There was no evidence she was suffering from perceptual disturbances, such as auditory or visual hallucinations. She adamantly denied having such experiences. The defendant denied being on any psychiatric medications at the present time. Her affect was generally appropriate, but at times she seemed quite depressed and was tearful. She denied any previous history of psychiatric hospitalizations. She denied any known family history of psychiatric hospitalizations. Apparently her family history is significantly positive for two paternal cousins having successfully suicided. The defendant denies abuse of alcohol or other illicit substances. Apparently Ms. Andriano was reared in Pinal County, where her parents presently reside. She has worked in Phoenix for a number of years, and was working in the field of property management when arrested. Her cognitive abilities are quite likely consistent with that of the general population. She maintains she attended classes at the University of Phoenix in "business management." I would estimate her I.Q. as being within the average range. Her abilities to abstract and conceptualize, as tested by having her interpret relatively common sayings/proverbs, were intact. Her memory seemed to be grossly intact for both recent and remote events. She did complain of having some lacunae in her memory. She was able to remember three out of three unrelated items after a few minutes of intervening conversation. She was neither suicidal nor homicidal at the time of my evaluation. She maintains that she is religious and is a non-denominational Christian.

Ms. Andriano is very well aware of being charged with First Degree Murder. She also understands the adversarial nature of the proceedings she is facing. She realizes that she has certain Constitutional rights, and that if she is to enter a plea of Guilty, she will waive those rights. She was able to talk in a coherent fashion about her various rights, including her right not to testify, as well as her right to call witnesses on her own behalf and confront the witnesses against her in a court of law. She was able to independently identify her attorney. She maintains she has a lot of respect and confidence in Mr. Delozier, Jr. The defendant maintains she has not been offered a plea agreement in the charges she is facing.

In summary, I do not believe that grounds exist to further question the competency of Ms. Andriano. It would be my opinion, within a reasonable degree of psychiatric certainty, that she has a factual, as well as a rational understanding of the proceedings she is facing. I also would opine that she can effectively assist her attorney in her defense. Whether or not she has "amnesia" for the time around the alleged offense is something I cannot determine. Defense counsel may wish to independently retain an expert to evaluate his client's state of mind around the time of the offense. Certainly

010626

PCRDIS-P000887

SP&A 01409

The Honorable Daniel A. Barker
Wendi Elizabeth Andriano/Competency Screening Evaluation/CR# 2000-096032
March 28, 2001
Page 3

there is something quite bizarre about what allegedly occurred.   If Ms. Rhode is
accurate in her diagnostic assessment, then the criminal culpability of the defendant
and her state of mind at the time of the alleged offense should be evaluated
independently, outside the scope of a Rule 11 evaluation.

If the Court has any further questions regarding my opinions, I will remain available.  (I
would also note that apparently previous Defense counsel instructed Ms. Andriano not
to talk to Dr. Garcia-Bunuel.  I think this is a mistake, as I believe Dr. Garcia-Bunuel is
trying to treat the defendant for what he believes is a Depressive Disorder.  If such
treatment is indicated, I would hope that Defense counsel would be supportive of his
client receiving the necessary treatment from Dr. Garcia-Bunuel, who is a respected,
ethical, and competent psychiatrist.)

Respectfully,

Jack Potts, M.D.
Chief, Forensic Services Unit

010627

SP&A 01410

PCRDIS-P000888

**EXHIBIT "D-2"**

# Richard J. Rosengard, D.O.

Mailing Address:  5501 N. 7th Ave., PMB # 219
Phoenix, Arizona 85013-1755
(602) 843-0035 • FAX (602) 843-8963

Diplomate, American Board of Psychiatry and Neurology
Diplomate of the American Board of Forensic Medicine
Diplomate, American Board of Forensic Examiners



August 27, 2002

Dan Patterson, Deputy Public Defender
Office of the Public Defender
Southeast Facility
1750 South Mesa Drive, Suite 150
Mesa, Arizona  85210-6211

**Fax Number 506-2865**

RE:    State of Arizona v. Wendi Elizabeth Andriano
CR#:   2000-096032
DATE OF EVALUATION:  June 23, 2002
DATE OF DICTATION:  August 25, 2002
EVALUATION LOCATION: Estrella Jail

**IDENTIFICATION:**  Wendi Andriano was seen on a referral from the Office of the Public Defender and chief trial deputy, Larry Grant and presented as a 31-year-old, Caucasian female who prior to her detention in the Estrella Jail, where she had been since October of 2000, had been employed as a property manager. She was married and resided with her spouse and two children.

**INFORMANT:**  The Defendant understood the extent and limitation of this evaluation and consented for me to release information herewith obtained, knowing full well that I was not establishing a physician/patient relationship with her. She also signed a Release of Information indicating that I could review the records in the Estrella Jail Clinic. Those records indicated that she had been on Seroquel 100 mg h.s. and that previously Remeron, trazodone, and Prozac had been used and discontinued. A note from November 3, 2000, indicated that the psychiatrist felt that she was labile.

I reviewed a cover letter written by Patricia Moncada, who was a legal assistant to Daniel Patterson, Deputy Public Defender, listing the reports which were reviewed and included a Phoenix Police Department narrative report, transcripts from 911 calls from the Phoenix Fire Department and Phoenix Police Department, medical records regarding the victim from Dr. Kellogg, and the medical examiner's report regarding the victim. The supplemental Phoenix Police Department Report reviewing the 911 call, showed how the Defendant had apparently admitted that her husband was stabbed, indicating that she possibly had done it and that she and her husband were fighting to the point of him strangling her. She denied doing the action purposefully and appeared to be upset by the situation. She indicated that her husband went into rages. She went on to indicate that she had previously hit her husband over the head, and his rage simmered down and then started once again. She indicated that she sent away the paramedics because she did not want to get her husband in trouble. She indicated that her husband had episodes of rage and personality changes, secondary to the chemotherapy that he was going through. She indicated that her husband had wrapped a cell

019044

PCRDIS-P001448

SP&A 01411

Dan Patterson, Deputy Public Defender
Office of the Public Defender                                                    Page 2
RE:     State of Arizona v. Wendi Elizabeth Andriano                  August 27, 2002

phone cord around her throat, and she grabbed a knife in order to cut that cord; thereafter, they
wrestled around.

There was contact between Patricia Moncada and my office, indicating the charge against the
Defendant who indicated that she did not recall what had happened and was not involved with drugs
or alcohol. She reported that she had called the paramedics one to two hours earlier but sent them
away and then called the police thereafter. The victim apparently had a lot of outstanding business
loans. He also had terminal cancer with less than a year survival rate, according to the medical
examiner. She was seen to have superficial scrapes with a fake nail ripped off and redness around
her neck.

**PRESENTING SITUATION ACCORDING TO THE DEFENDANT:** The Defendant indicated
that she had not pleaded as of yet and knew that she was charged with first degree murder. She
indicated that she read the police report accusation synopsis, as well as a newspaper where it was
alleged that she had slit her husband's throat and had given him poison over a period of time. She
indicated, though, that her husband had been on chemotherapy and was no longer working. She
indicates that he took sodium azide and an overdose of pills and wanted to kill himself. She
indicates that her husband got mad when a friend, Chris, was called and vacillated about what he
wanted to do. She indicates that in March of 2000, she had an affair, predominantly for
companionship but did consummate the relationship sexually. She felt that her husband sensed what
was going on and asked her about that, and she answered honestly. He got angry and had a physical
fight with her regarding that on the night that the incident happened. The next thing that the
Defendant recalled was sitting on the living room floor with her husband. Thereafter, she called her
parents and told her father and then called the police. She indicated that she could not recall calling
the paramedics earlier. She also admitted to making calls to buy sodium azide a few weeks prior
to the incident. Her husband wanted that. At first, he apparently wanted cyanide; and then the
Defendant had convinced a friend to assist in getting the sodium azide. She indicated that her
husband had suicidal thoughts in the past and went through therapy but did not want to go through
therapy again. He did have some family therapy in 1997 and 1998. Apparently, therapy was set up
but her husband did not want to go.

**STRESSORS:** The Defendant indicated that her husband's cancer had been getting worse, since
they found out about it in March of 2000. He had had adeno cystic carcinoma since 1994, and was
diagnosed in 1996 or 1997. The Defendant was obviously now going through legal repercussions
of her alleged behavior and going through continued remorse and grief regarding the death of her
husband. Her husband had been going through chemotherapy, and they had two young children.
She worked, as her husband no longer did or could work.

**MOOD DISORDER SYMPTOMS:** The Defendant was depressed for six to seven months prior
to coming into detention. While in detention, she was doing better with the level of depression, as

019045

PCRDIS-P001449

SP&A 01412

Dan Patterson, Deputy Public Defender
Office of the Public Defender                                          Page 3
RE:    State of Arizona v. Wendi Elizabeth Andriano              August 27, 2002

there was relief from some of the stressors that existed previously.  Nevertheless, the symptoms still included:  insomnia and feeling depressed, helpless, and anhedonic.  She had lost weight and had a reduced appetite with crying episodes.  In the past, she felt particularly helpless, as she could not help her husband, particularly when he got irritable in the last few months of his life.

The Defendant denied symptoms that would be consistent with manic episodes but did admit to panic attacks since childhood.  These happened at night on attempts to go to sleep and occurred less than a few times a year.  During these episodes, she would have an increase in heart rate, dyspnea, dizziness, lightheadedness, shakes, sweats, and like a lump in her throat.  She would have gastrointestinal upset, a fear of dying and losing control, and a sense of impending doom.  She indicated that it was like having a heart attack.  She also had symptoms of anxiety but would hide these feelings and focus in on somebody else when she had them.

The Defendant denied any history of suicidal attempts or homicidal ideation, intent, or actions.  She had thoughts of hurting herself when she first came into detention for a few months but indicated that they were "Not serious."

**OTHER PSYCHIATRIC CONDITIONS:**  The Defendant denied symptoms consistent with phobias, obsessive-compulsive disorder, organicity, eating disorders, or thought process disorders.  She denied having paranoia or hallucinations that were auditory or visual.

The Defendant indicated that her mother and therapist say that her biological grandfather sexually abused her when she under the age of 3; although, she could not recall that and had no dreams or flashbacks.  She had difficulties in trusting others sexually but was able to enjoy herself with the exception of intercourse, and she did not like that.  She got easily upset in dealing with others who were in abusive relationships; and with the aid of therapy, she felt that she was in an abusive relationship with her husband.  She was particularly upset in finding out about and dealing with children that were sexually abused.

**SUBSTANCE ABUSE HISTORY:**  The Defendant denied use of cocaine, speed, cannabis, IV drugs, heroin, PCP, LSD, inhalants, or alcohol.

**PAST PSYCHIATRIC HISTORY:**  The Defendant had no history of acting out in violence, treatment with psychiatric medications, or placement in a psychiatric facility.  She went for three to four appointments in 1996, to an EAP therapist but did not enjoy that therapy, indicating that they had blamed her husband and told her to leave him.  In the year 2000, her husband's doctor gave her medication for anxiety and sleep; but she could not recall, the name of the medication and it was used for two to three months.  She was out of that medication, I believe, for a week prior to being detained.

019046

SP&A 01413

Dan Patterson, Deputy Public Defender
Office of the Public Defender                                                    Page 4
RE:     State of Arizona v. Wendi Elizabeth Andriano                   August 27, 2002

**FAMILY PSYCHIATRIC HISTORY:** The Defendant's father and grandfather abused alcohol
and there was no familial history of suicides, psychiatric illnesses, or drug abuse.

**PAST PERSONAL HISTORY:** The Defendant was born in Groom, Texas, and raised in Arizona
and California. She indicated that her childhood was "Different," as her mother and stepfather were
married when she was 4 years old. They travelled around on bus, being involved in a street ministry.
Until the age of 10, she was raised at home; and from 10 and on, she was in a private school. She
did well in school but indicated that she did get in trouble as she was "Being really hardheaded,"
even to the point of getting expelled. She could not recall what she did to merit that expulsion. She
always got honors in her grades. She was the only child from her biological father who lived with
her for a few years; and thereafter, her stepfather lived with her. She saw her biological father when
she was 8 years old and did not really know him. She indicated that she had no involvement with
the military or the law, except for some speeding tickets. In the last two years of high school, she
did junior college work, as well; and after high school, she went to Mexico, doing missionary work
for seven to eight months. Thereafter, she worked for a few months answering phones but
apparently had a temper and quit. Then, she worked in property management as a leasing agent for
a couple of years and ended that work to be an AP clerk accountant at Casa Grande Regional
Hospital. She left that job after less than four years to go into property management. While she had
been working at Casa Grande Regional Hospital, she attended college and indicates that she is two
classes shy of a BA. degree. She met her husband in March of 1992, and they were married in
January of 1994. They have two children who are now being cared for by their paternal aunt. She
indicated that she had no relationships with other people and that her relationship with her husband
was difficult as he yelled at her daily. That is why she sought out the company of another man for
moral support. She indicated that, at that time, she got into alcohol, as well; but she ended the
relationship with that other man prior to the incident at hand.

**PAST MEDICAL HISTORY:** The Defendant denied any history of allergies to medications,
surgeries, seizures, fractures, head traumas, or other major medical problems. She denied any use
of tobacco. She used alcohol with peers, approximately four to five drinks at a time, drinking that
every other week in the year 2000, and a lot less prior to that time. She had been on Seroquel at the
time of the evaluation, 100 mg h.s. and had been on that for a couple of months. That was used to
help sleep. She indicated that her bunkmate took that medication. She had tried other medications
prior to the use of Seroquel, as I indicated above under informant.

**OBJECTIVE MENTAL STATUS EXAMINATION:** The Defendant appeared clean in jail garb
and was well-groomed. She wore glasses and was less than average in her build. She appeared her
stated age with a normal degree of alertness, posture, and gait. Her eye contact was good, and her
attention span was satisfactory. Her motor level was normal, and she appeared good and
cooperative as a historian. Her speech was normal. Her affect was labile, tearful, and sad; although,

019047

SP&A 01414

PCRDIS-P001451

Dan Patterson, Deputy Public Defender
Office of the Public Defender                                          Page 5
RE:    State of Arizona v. Wendi Elizabeth Andriano              August 27, 2002

she was able to smile a few times. She denied and showed no psychotic thought processes. She denied suicidal or homicidal ideation or intent. She indicated that her mood was "Fine." She was friendly, trustful, and cordial in her interpersonal style and fair in her insight and judgement. She was oriented to her own name, the day of the week, month, and year and knew the street and address of the jail and the city, county, and state where it was located. She knew that the date was somewhere in the twenties but did not know the exact date. Immediately, she was able to repeat three out of three items that I asked her to repeat; and after five minutes, she was able to recall one of them. She knew the name of the current and previous president of the United States and felt that she did not know the one prior to Clinton but indicated that prior to Clinton was possibly Reagan. She was able to do serial sevens accurately to 72 from 100 and accurately multiply six times eight and nine times seven. She was able to spell the word "world" backwards and abstractly interpret a proverb of moderate difficulty. She was thought to have an IQ that was above average.

**DIAGNOSTIC IMPRESSION:**

AXIS I:          (a)  Major affective disorder, depression.
                 (b)  Probable posttraumatic stress disorder.
                 (c)  Panic disorder.
AXIS II:         None.
AXIS III:        None.
AXIS IV:         Stressors:  1) dealing with her husband's cancer that was getting worse; 2) dealing
                 with the legal repercussions, as well as personal repercussions, of the loss of her
                 husband; 3) currently being a single parent.
AXIS V:          Current GAF: 62.  Highest GAF in last 12 months: 70.

**SUMMARY, OPINIONS, AND RECOMMENDATIONS:** The Defendant was going through a considerable amount of stress in dealing with not only the eventual loss of her husband at a very early age and being the sole parent of her two young children but dealing with the slow and painful demise of her husband, while her husband was becoming inappropriately irritable and mistreating her emotionally and physically. She had seen a deterioration in their relationship; and apparently, she had killed him. Perhaps no one will know exactly what occurred in the incident; and several potentials exist, including the potential that she was defending herself to some extent. Questions could arise as to how somebody who had a sound mind prior to and after the event could now have blocked what had occurred, specifically at that juncture; and the issue of amnesia for the subject appears all too convenient. I do not believe that there is any evidence that would conclude that what had occurred was premeditated; and certainly, the actions were regretted from the very beginning, as witnessed by the Defendant's response when answering questions posed to her when she called the emergency numbers. Because of what she saw, she surmised that she actually had killed her husband and admitted to feeling badly about it. An individual who goes through a traumatic event

019048

SP&A 01415

PCRDIS-P001452

Dan Patterson, Deputy Public Defender
Office of the Public Defender                                              Page 6
RE:    State of Arizona v. Wendi Elizabeth Andriano                   August 27, 2002

will often forget that extreme situation, because an individual is unable to deal with the thoughts
on an emotional basis. This occurs in both children and adults who have been physically or sexually
attacked and more than explains the Defendant's response, particularly in light of the fact that she
had a past history, apparently, of being abused and symptoms consistent with posttraumatic stress
disorder. That situation and the emotional responses that she has had from that situation make it
more likely that she would have had such an amnestic response to her apparent actions. That is true
whether her actions were a matter of self-defense or whether they were purposeful attacks in the
heat of a momentary aggressive outburst. The former appears more probable and the latter less
probable, based on the Defendant's statements currently and to the emergency crew that she dealt
with.

The Defendant certainly should receive appropriate therapeutic treatment, which would include
individual therapy and a strong consideration of an antidepressant, which could be beneficial both
for her depression and traits of posttraumatic stress disorder.

Should there be further questions regarding this Defendant or my report, I would be happy to answer
them at your earliest convenience.

Respectfully submitted,


Richard J. Rosengard, D.O.
RJR/mw/TMHT

019049

SP&A 01416

PCRDIS-P001453

**EXHIBIT "D-3"**

**Sharon B. Murphy, Ph.D., CISW**
AZ Certification No.  SW-3428I
Domestic Violence Consultant

Ph: (602) 369-0192   Email: sbmurphyaz@yahoo.com

**Domestic Violence Assessment**

**Confidential**

Client's Name:      Wendi Andriano
Case No.:           CR2000-096032
Assessment Date(s): 3/25/03; 3/26/03; 3/29/03; 3/30/03; 4/8/03; 4/11/03; 4/22/03,
                    6/4/03; total interview time = 20 hours
Date of Report:     9/22/03


Daniel Patterson, JD, Deputy Public Defender made a request for a Domestic Violence Assessment of Wendi Andriano to this writer.

**The purpose of this Assessment is:**

1. to determine if Wendi Andriano was a victim of domestic violence/abuse by her husband Joseph Andriano consistent with generally accepted definitions of domestic violence,
2. if said claim is true then this assessment will determine the level of severity of the violence/abuse suffered by Ms Andriano,
3. to assist the court in understanding the circumstances of the death of Joseph Andriano

**This Assessment includes the following:**

1. Review of the following records:
   - Photographs of the crime scene provided by Daniel Patterson, J.D.
   - Autopsy report of Joe Andriano
   - Psychiatric evaluation of Wendi Andriano by Dr R. Rosengard
   - Videotape of Wendi Andriano's interview by Phoenix police detective
   - All Documents and photographs contained in Discovery Vol. I & II provided by Daniel Patterson, JD
   - Mental Health case notes from H. Kandy Rohde, MA, CPC

2. Unstructured Interview with Wendi Andriano – Purpose of this part of the assessment was to obtain Wendi's story of the pattern of abuse/victimization. This includes documentation of:

   a. Childhood history

007159

1

SP&A 01426

b. Education
c. Dating history
d. History of relationship with Joseph Andriano

3. Structured Interview with Wendi Andriano - Purpose of this part of the assessment was to obtain scores on tests of physical and non-physical abuse and to describe power and control tactics as well as abusive acts used by Joe Andriano against Wendi. Additionally, this section reports ways in which Wendi tried to survive the abuse by Joe and reports the level of lethality of Joe's abuse of Wendi. The following assessment tools were used:

   a. Power and Control Wheel (Duluth Domestic Abuse Intervention Project)
   b. Partner Abuse Scale: Non-physical (Hudson, 1992)
   c. Partner Abuse Scale: Physical (Hudson, 1992)
   d. Response to Violence Inventory: Strategies to Escape, Avoid, and Survive Abuse (Dutton, 1992)
   e. Abusive Observation Checklist (Dutton, 1992)
   f. Lethality Checklist (Arizona Coalition Against Domestic Violence)

4. Summary of Findings

5. Recommendations

**2. Unstructured Interview with Wendi Andriano:**

   a. **Childhood History**: Wendi's earliest memory is of her grandmother. Wendi states that she remembers living with grandma and mom (Donna) in Phoenix as a very young child and that grandma was the primary caretaker because mom was a single parent and had to work. She also remembers when mom began dating Alejo Ochoa. She has only one memory of her biological father, Skip (no other name available). She remembers around age 8 or 9 Skip took her to Tucson.

   Donna married Alejo in 1976 and he adopted Wendi. They lived in Casa Grande, AZ where mom worked as a counselor with Terros for a while and now works in the Human Resources Dept of the Casa Grande Regional Hospital. Dad works in the family's tortilla factory in Casa Grande.

   Wendi recalls that as a child/teen dad's temper was a part of her and mom's life. She reports that dad did a lot of screaming and yelling, however, he did not swear or use physical violence. Wendi reported that she would go into her bedroom and close the door, as would mom, when the screaming began. If dad left the house then when he returned she and mom would be very nurturing toward him, making

2

067168

SP&A 01427

sure he was happy so that the screaming would not begin again.
Wendi also states that mom told her that when Wendi was a very
young child she may have been sexually molested by her biological
father who is currently serving a prison term for sexual molestation of
a mentally disabled female. Mom does not have any proof that this
happened to Wendi but has thought it might have been a possibility.

b.   **Education**: Wendi was home-schooled for a while as a young child
while her parents worked as street ministers for a church called 91st
Psalms, a non-denominational Christian Church. Wendi attended
Evergreen School a public school in Casa Grande for kindergarten.
Wendi recalls at approximately age 5 or 6 there were two men who
traveled with her family as ministers. One of the men attempted to
expose himself to Wendi and she reports being frightened of him.
This church is now known as Harvest Family Church and is located in
Casa Grande. After Wendi and her parents stopped traveling as church
ministers, they settled in Casa Grande, AZ and she was enrolled in a
church-affiliated school called 91st Psalms. Wendi reports that her
religion was very strict and extreme. She further reports running away
with the pastor's daughter several times as young children. She states
that she just wanted to be like other kids, allowed to play at the park
etc. The 4th and final time Wendi reports running away she was about
15 years old and she recalls staying at a friend's home.

Wendi reports doing well in school, graduating from high school with
honors, and taking a few courses from Central Arizona College while
in high school. Wendi competed in music and poetry recitation and
achieved a 1st place trophy for memorization of the Book of Proverbs
from the Bible.

After marriage to Joe Andriano, Wendi took additional college courses
in Accounting at the University of Phoenix. Wendi had wanted to
finish her education (she was about 5-6 courses away from completing
a B.S. in Business) but Joe always had a reason why she couldn't
return to school.

**c. Dating History:** During high school Wendi did not date formally.
Her social group consisted of her peers at the church-affiliated high
school. Wendi reports that "for fun" most of the kids came to her
house where they played games, or rented movies. Sometimes they
went bowling, or ice-skating at Metro Center. Wendi's father was the
youth pastor for her church. Wendi did not begin dating until after
high school. Her first boyfriend was the pastor's son.

It is noteworthy that following high school Wendi went to work in
Mexico to perform missionary work. When she returned from Mexico

. 007161

3

SP&A 01428

she decided to break-up with the pastor's son because she wanted to experience more of the world. **During the meeting in which she told him she wanted freedom to date others, the pastor's son pulled the ring he had given Wendi off of her finger, bit the ring causing the stone in the ring to fall out. He then smashed 2 of her car's windows with a rock. She did not report this incident to the police.**

**d. History of Relationship with Joe Andriano:** Wendi met Joe Andriano on St Patrick's Day 1992 while at Dell's Pizza in Casa Grande. Wendi was 21 years old at the time. Wendi states that Joe was part of the "in crowd" in Casa Grande, which consisted of kids from farm families. She was not part of this group and states that during the entire time they dated, his crowd did not like Joe to date someone from outside their group. Wendi reports not feeling accepted by Joe's friends and not feeling good enough for Joe.

Wendi states that her relationship with Joe began as a friendship. They quickly became good friends and spent a lot of time together. Very early in their relationship, Joe told Wendi that she was the only one who really understood him. He described to her an unsatisfying family life in which his father was alcoholic. Joe talked to Wendi about how poorly he felt life had treated him. One of the biggest problem areas that Joe described was his relationship with his father. He told Wendi that he felt his dad was willing to help Joe's friends but not Joe.

Wendi reports that she enjoyed being with Joe and felt like he needed her. Each time they were together she felt like she got to know him better and saw how "rotten" his home life had been. She reports feeling "driven" to make his life better. During their 3rd month of dating Joe moved in with Wendi stating that he couldn't stand living with his parents any longer. At this time Wendi and Joe did not have a sexual relationship but that changed around their 4th or 5th month of dating. Wendi reports that during their early days of dating, Joe helped her get caught up on her bills. She said that at the time she was 2 months late in making her car payment. During this time Wendi was employed as an Assistant Manager at an apartment complex and Joe had a welding business. Later she went to work in the Accounting Department at Casa Grande Regional Hospital and enrolled in accounting classes at the University of Phoenix. During the time that they were dating, Joe drank at least 10-12 bottles of beer in a night, and frequently became intoxicated when they were out. She reports that Joe was never emotionally available to her except when he had been drinking. When drinking Joe would cry about the loss of his grandfather (died by suicide) with whom he had been very close.

4

867162

PCRDIS-P000628

SP&A 01429

While they were dating Joe always wanted to keep up with his crowd and wanted a full-sized pick-up truck like the trucks owned by his buddies. Wendi felt badly for him so she gave him her car to use as a trade-in so he could buy the truck he wanted. At that point Wendi no longer had a vehicle so she would get rides home from work and then have to call around to find Joe so that she could join him after work.

Wendi reports that Joe was not romantic and not very communicative. He was a "screamer" according to Wendi, frequently yelling at others or about others. In October 1993 Joe gave up the welding business after a bad accident and went to Oklahoma to learn how to replace automobile windows. He wanted to start his own business. A few months after moving in with Wendi, Joe said, "lets get married". Wendi's mother took care of the plans for Wendi and Joe's wedding because Wendi was working full-time and taking accounting classes. Wendi reports as she looks back at that time in her life she really did not have a tremendous desire to marry Joe but felt that she had to because she had been living with Joe and felt dad's disapproval about living with a man without being married. Joe bought Wendi a fake diamond and had it set in a gold band. Wendi reports that Joe was "big on appearances" and asked her if she would mind wearing it and that someday he would buy her a real diamond. Wendi and Joe were married in January 1994. Joe's sister and her husband paid for a 3-day honeymoon for Joe and Wendi in Las Vegas.

Wendi recalls the first time she and Joe engaged in sexual relations. She states that she cried but couldn't really describe why she cried. She believed that sex was something that men enjoyed and women endured. Wendi states that Joe demanded sex daily and she, at first, pretended to enjoy it. She thought that she was supposed to give a man what he wanted. She states that all she really wanted was hugs and signs of affection but Joe was unable to provide her with affection.

A few months after their marriage, Joe and Wendi attended a friend's wedding. While at the wedding they saw Joe's ex-fiancé, Shelly, who had cheated on Joe while they were engaged. Joe told Wendi when they began dating about Shelly and what she had done to him (cheated). He also told Wendi that he had become enraged when he discovered her infidelity, and that he had wanted to hurt Shelly. In order to prevent this from happening, his parents sent him to California to cool off. Joe warned Wendi to never cheat on him.

Additionally, Joe's friends warned Wendi not to make Joe angry. They told her about a time when a man kicked Joe's truck tire and

007163

5

SP&A 01430

P-App. 004589

Joe ran him over. According to Joe's friends, the man was taken to the hospital following that incident. Wendi also was told about a time that Joe was at his parent's home for a party when Joe became enraged at his father and it took 2 men to pull him off of his father. Joe's friends also told Wendi that Joe would chase his sister's boyfriends with a baseball bat. She was also told that he had broken windows when he was mad. Wendi stated that there was a joke around Casa Grande that Joe had a charge account at a local glass shop because he would spin out his truck in the parking lot of the Circle K causing gravel and stones to fly breaking the windows in the store.

Wendi understood Joe's anger as being focused on his dad who was an active alcoholic during Joe's youth. She said he would often swear about his parents. Wendi believed that with enough love from her Joe's anger would dissipate.

<u>Beginning of Marriage</u>: During the first few months of their marriage Joe began to notice a lump in his jaw but didn't tell Wendi. After the 1st six months when they could no longer afford the rent on the townhouse they had been living in, they moved to a building on Joe's family's farm. Wendi described this building as having been used as a farm shop at one time with low ceilings and 3 rooms. One of the rooms was filled with machinery parts. Shortly after moving to the farm, Joe showed Wendi the lump and sought medical attention. Prior to his first surgery they bought a car but a few months later they were unable to afford the payments so Joe had a friend of his steal the car so the insurance company would paid off the car. Joe liked keeping up with "the Joneses" by trading in his truck every year for a new model. All the while Wendi drove a 1974 Dodge Dart, which had belonged to her grandmother.

From the early days of their marriage Joe began to isolate Wendi from her friends. She worked and went to school and took care of him and was careful not to upset him. As long as Joe wasn't upset, things went along fairly smoothly.

Wendi states that Joe was often like a spoiled child who expected her to take care of him no matter what the cost. He always felt the world owed him because of his difficult home life. Wendi felt like she owed Joe a better life and performed numerous care taking tasks throughout their marriage. For example, Wendi chose Joe's clothes daily and laid them out for him. She clipped his toenails, did his washing and ironing, worked throughout their marriage supporting their household as well as Joe's very expensive hobby with his racing boat.

6

067164

SP&A 01431

PCRDIS-P000630

She states that during this time, other than not enjoying sex, things were OK. They were buddies; she took care of him. Joe would sometimes cry on Wendi's mom's shoulder about his home life with his parents. Wendi asked Joe to accompany her to church, which he did along with Wendi's family.

**1st Physical Assault**: Wendi reports that others saw Joe as the life of the party and that he could be very charming. There were numerous good times with Joe but there was also another side of Joe. The first physical assault of Wendi by Joe occurred in 1994, approximately 8-9 months into their marriage. Joe was angry and yelling at Wendi so she ran into their bedroom and shut the door. Joe threw his body against the door shattering the door with his body and scratching his arms and shoulders with the wood from the door. He got inside the bedroom, grabbed Wendi by the neck and pinned her against the wall. He then grabbed a stone pot and smashed it into the wall next to her head. He then let her go and smashed a coffee table. Finally, exhausted from his rage, he lie down on the bed and fell asleep. Wendi recalled the things that others had told her about Joe and his rages and the stories now began to make sense to her. Prior to this, she thought they were stories intended to frighten her.

The morning after the first physical assault, Joe bought a new bedroom door and they never talked about the incident. He also hung a picture over the hole in the wall that he had made by smashing a pot into the wall next to her head. Wendi states that she never talked about the attack with him because she was afraid to bring it up to him.

**Wendi reports that during Joe's rages he would scream at her that things were her "fucking fault".** She said that she would never say anything back to him because it would fuel his fire. She states that she had seen him "throwing fits" before by throwing his tools around or at an engine he was working on but previously he had not directed his rage at her directly.

**Joe's Health**: In 1995 Joe had his first surgery. The doctor told them that the tumor was benign and that Joe would be fine. At this point Joe took a lot of time off from his auto glass business so another man took over the business. Less than 6 months after surgery the lump began growing back, Wendi became pregnant and Joe had surgery again in 1997. Again he was told that the tumor was benign. Between surgery #1 and #2, Joe took a job working for people he used to buy his glass from. Wendi estimated that they were approximately $100,000 in debt. She was employed at the Casa Grande Regional Hospital at the time earning about $13-$14 an hour. Wendi took money from the hospital for the first time in 1995. She stated that she always felt

007165

PCRDIS-P000631

SP&A 01432

pressured by Joe to take care of him and all the household expenses even when he was spending a great deal of money on his boat, a very expensive toy. She said that Joe resented any constructive criticism about his spending habits but that "I'm not one who likes arguments so I just let it go." She said that she took money from the hospital a few times but does not know how much she took. She said that Joe never asked where she got the money to pay their bills. While still working at the hospital, she was experiencing enormous stress and her boss encouraged her to talk with an Employee Assistance person which she did. The EAP sent Wendi to seek counseling services at Casa Grande Counseling Services. Wendi states that she did not continue with this counselor for very long because the counselor blamed all of Wendi's problems on Joe and Wendi did not want to hear that.

<u>Work</u>
In order to begin his own automobile glass replacement business Joe borrowed the maximum allowable amount on their credit cards, obtained loans from his parents, borrowed money from a bank (loan co-signed by Brad's sister and her husband) and was given money by Wendi's parents. Joe had no income while trying to get the glass business operating. July 1996 Joe acquired AccuGlass and Wendi worked there also. Debt began to mount during this time often due to Joe's spending habits. Wendi states sometime in 1996 she was confronted by her boss and her boss's supervisor about the money. She states that she told them the truth and that they knew about Joe and what life was like with him so they did not press charges against her but she was forced to leave her job at the hospital. She states that she told Joe about taking money from the hospital and he became angry at her, yelling at her about how she would get money to support them.

Wendi went to Jerry Robles to ask for a loan and he gave them approximately $75,000 and became a partner in the glass business. Everything went well for a few months and then the pain began in Joe's neck again. At that point he was unable to keep up with the workload; he began drinking and playing more. Wendi became pregnant with Nicholas, the business was going downhill and Jerry needed to put in more money just to keep the business afloat. Joe had instructed Wendi from the beginning days of the business to only show a certain amount of work on the books. When Jerry wanted more information about the business Wendi was unable to give it to him. Jerry told Joe that he was going to take over the business because it was failing. Jerry and Joe argued about it. Wendi felt like she was in the middle of it. Joe contacted the man who stole his vehicle so that the insurance company would pay off on the vehicle and asked that man to "take care of Jerry". Wendi understood that to mean, "kill"

8                                                    007166

PCRDIS-P000632

SP&A 01433

Jerry. Joe had a collection of approximately 20 guns, which included AK 47's, handguns, and rifles. He kept them in the closet except the handgun was kept either in the nightstand or under the mattress.

Joe had gotten possession of a gun that had the ID numbers sawed off that Wendi believed he planned to have his friend use on Jerry. Wendi knew that they had made a mess out of the business and that Jerry had a right to take over the business. Wendi told her dad what Joe planned to do to Jerry. Mr Ochoa warned Joe not to do it. Joe also warned Wendi not to tell Jerry and he pulled out the handgun, pointing it at Wendi from across the room and said: "If you even think about doing that (telling Jerry about his plan to kill him) I'll use this on you instead of him." Despite Joe's threat, Wendi relayed the information to Jerry. Jerry chose to "disappear" so nothing more happened with Joe's plan.

On another occasion a man came to repossess Joe's van because he had fallen behind in making payments on the vehicle. Joe kept a gun in the van which he grabbed as it was being towed away. Joe put the gun to the driver's head to make him stop and forced him to drive it back to their apartment. The driver followed Joe's orders. Later Joe was laughing about it as he told other's the story.

Joe bought a 2nd racing boat with a $10,000 loan from a credit union. At that point, Wendi estimated that they owed approximately $70,000 in credit card loans, $10,000 to the credit union, $25,000 to the bank in Casa Grande which was borrowed to start the business, $10,000 to Joe's parents, approximately $550 a month in payments on their vehicle, $600-700 a month on their cell phones and $400 per month on life insurance. Wendi states that both Joe and his dad carried a lot of life insurance. As their debt increased and the business was going under Wendi felt like Joe was leaning more and more heavily on her. She stated that she felt like Joe was becoming depressed. Joe now had his third surgery and they had did not have any medical insurance to cover the cost. The hospital wanted the bill paid prior to the surgery so her parents gave her $2500 to give to the hospital. Each surgery was more intense than the previous one.

Wendi reported that Joe's mother gave her a baby shower and bought a lot of things for the first grandson. Nicholas was born June 1997 and Joe seemed to be recovering. Both Wendi and Joe were unemployed at this point and Wendi's parents were taking care of their bills. Joe began working for a boat shop in Tucson where he used to hang out and brought home approximately $200-$300 a week. He bought things for his boats on account so the owners took money from Joe's paycheck to cover his purchases. Wendi's parents continued to assist them with their living expenses. Wendi states that she continues to

007167

SP&A 01434

PCRDIS-P000633

believe that Joe needs love and acceptance so is non-confrontational with him. She also never said anything negative about Joe to her parents.

Joe never helped with the baby but would hold him or carry him to the car for Wendi. Shortly after Nicholas's birth Joe had an argument with his boss at the boat shop and did not want to go back to work. He began pressuring Wendi to go back to work while he continued "playing" at the lake with his boats. Joe was fully recovered from his most recent surgery and able to work but refused to do so. Joe continued to purchase more things on the credit card and had Wendi call an uncle to borrow $2500. He also insisted that Wendi call his sister in Tennessee to ask to borrow $1500 and had her tell his sister that she was unable to work at the time.

Wendi reports that if friends came over to see the baby Joe would become angry. He made demands on Wendi in front of visitors and was rude so that the visitor would leave. At one point in front of one visitor Joe stated: "What are you doing here right now? I need Wendi to iron my shirt right now."

**At 3 weeks postpartum Joe told Wendi that he wanted sex and she refused saying that she was not healed yet from the birth. Wendi reports that Joe swore at her saying: "It can't be that fuckin' bad." He pulled her off of the couch while she was saying "No, Joe, not yet" and their dog, Max, started growling at Joe. Joe became furious and released Wendi. Joe grabbed the dog pinning him down by the neck with one hand while holding his mouth shut with the other hand. Wendi reports trying to pull Joe off the dog while Joe was screaming: "If you don't start doing what I tell you to do I'm gonna kill this fuckin' dog." Wendi reports that she was sobbing and saying "Please stop; I'll do whatever you want; Please stop". Joe released the dog and shoved him into the bathroom. Nicholas was crying so Wendi breastfed him and when she was finished Joe forced Wendi to have sex. She reports crying because of the discomfort but she reports that it was very quick, no affection or foreplay, just sexual intercourse.**

In a short time the money borrowed from an uncle and Joe's sister was gone and once again Wendi had to ask her parents for help. A friend convinced Wendi to take a break from Joe by going to live with her in another state. Wendi went to Jerry Robles to ask for money again but this time so that she could leave Joe. Jerry gave her $1000. Joe was going to be away for 3 days so Wendi wrote Joe a letter saying she was leaving him and left it on his desk. Joe came home unexpectedly early one morning and discovered the letter. He shook her awake and

10                                        007168

PCRDIS-P000634

SP&A 01435

was screaming: "Why are you doing this to me?" Wendi reports that Joe was crying and begging her not to leave him and she felt so badly for him that she decided she couldn't go through with her plan. Things improved for a while. Wendi reports that Joe was nicer helped her with the baby and around the house. She thought that things had finally changed with Joe. She became pregnant again when Nicholas was 6 months old. She stopped breastfeeding and Joe convinced her to get a job. She got a job working for a former boss as an apartment manager.

Joe was happy that Wendi was working and they were able to move into one of the apartments where Wendi was employed. They moved out of the little building on the farm in the middle of the night because Joe didn't want his parents to know they were moving. Wendi reports that Joe used to hide things from them. For example he told his dad that he only owned 1 boat so that his dad would not expect him to use the money he spent on the 2nd boat to pay him back.

Around this time Joe began experiencing pain in his neck again and a lump quickly grew. Wendi now had medical insurance and a lung biopsy was performed. They were told that Joe had an aggressive benign tumor that was traveling to his neck. The doctor sent samples to Walter Reed Hospital in Washington DC for further testing and a report confirmed that Joe had adenoid cystic carcinoma. A physician at the Mayo Clinic recommended radical neck surgery with chemotherapy and radiation. They were told that there was a 30% chance that the tumor would not grow and that Joe had 1-2 years to live. The couple felt that there were many unknowns and not many studies conducted on this particular type of cancer and accompanying treatment. At this point Joe, Wendi and Nicholas were going to church regularly and praying for healing.

Joe had his 4th surgery on Wendi's birthday, August 1998 while Wendi was 8 months pregnant. A tracheotomy was performed and Joe became very angry and belligerent post op. Wendi reports that she stayed at the hospital with Joe and acted as a mediator between Joe and the nurses. At one point Joe threw a clipboard at a nurse who came in to assist them with something. Joe had a large section of his neck removed as part of the surgery to remove the tumor. When Joe came home from the hospital Wendi returned to work. Her parents came to their apartment 3x a day to care for the huge gaping wound on his neck. Joe had a feeding tube for about 2 weeks and he became increasingly angry and belligerent.

Joe had to decide on a course of treatment. He was told that the side effects of treatment were that the salivary glands would be burned, his

11                                    007169

teeth would become badly decayed and would most likely need to be extracted, he would lose a great deal of weight and would be nauseous. He was told that radiation would protect the carotid artery from becoming cancerous.

Joe chose not to pursue radiation or chemotherapy because of the side effects and because he believed that he still had only a 30% chance of survival. Wendi reports that Joe's parents were very upset with Joe's decision. She also reports that many people from their church visited them and that her church believes in healing by God. A nurse from the hospital brought him a book on homeopathic remedies so they went to Colorado for 10 days of holistic treatments (diet, herbs, vitamins). Joe's sister offered to have a benefit to help pay for Joe's treatment. During the Fall 1998 a dinner dance was held at the Elks Club in Casa Grande in Joe's behalf. Wendi reports that this was very shaming for Joe. The benefit paid for the trip to Colorado. When Joe returned from Colorado he felt better physically and emotionally. The old pattern of daily sex also resumed.

Wendi encouraged Joe to resume life and she reports that he was fairly positive about recovery. Joe hired an attorney to assist with a medical malpractice case. They had been informed by the doctor at Walter Reed Hospital that the correct diagnosis should have been made right away. At this point (1999) Joe was eating healthily, and participating in Church. But by August of 1999 things began getting crazy again. They went on vacation with Wendi's parents and when they returned Wendi discovered that a new property management company had taken over and she no longer had a job and no place to live. She found another job managing but was not given an apartment as part of the job. Wendi states that Joe hounded her constantly about that so she gave up that job and found another one managing the San Riva Apartments in September 1999. They moved into an apartment at San Riva in October 1999.

Joe stopped eating healthily and stopped going to church, resumed partying and drinking all weekend. However he was still feeling good and seemed to have normal energy levels. Wendi continued working full-time and caring for the 2 babies. Wendi reports that Joe began giving her a difficult time if she didn't have time in the morning to pick out his clothing for him.

Joe would become very angry if Wendi wore black clothing even though one of her employers often required her to wear a black suit. She recalls Joe saying: "Those mother fuckin' bastards making you wear that shit...." He would not allow her to wear black socially.

007170

SP&A 01437

PCRDIS-P000636

Just prior to having a CT Scan in the Fall 1999, Joe had been having terrible mouth pain. He sought the help of a dentist who took an x-ray which revealed a tumor. They went to a church event and the speaker put his hands over Joe's mouth and prayed for him. A few days later the pain disappeared. This event convinced Joe and Wendi that prayer would work but the CT Scan in the fall showed that the cancer had grown and by spring 2000 the tumors had doubled in size. Wendi reports that the "floor dropped out" for Joe with this news. He began taking out his rage on Wendi, saying it was her fault that God had failed him since she was the one who introduced him to God. Wendi reports her devastation that Joe was blaming her for his declining health as though the cancer's growth was her fault. She also stated that her bookkeeper, Chris, was beginning to realize Joe's treatment of Wendi. Wendi reported that she could no longer do anything right for Joe. Wendi came home from work to cook his dinner which he would dump in the trash. He told her that she didn't keep the kids quiet enough, that she didn't make enough money. Wendi reports that nothing she did was good enough. She states that he had given up on himself and seemed to be trying to make her miserable like him. Wendi also reports that he began pulling away from the children at this time also. Wendi reported that while working for San Riva her boss, Janice, encouraged her to seek counseling services because during weekly meetings Wendi would cry. Wendi stated that she did not seek counseling fearful that another counselor would just blame Joe like the first one did. Wendi believed that she wanted help making things better in her marriage, as a Christian wife, not heaping blame on her husband. She did not feel that would be helpful and would only contribute to the sense of abandonment Joe had felt from his family his entire life. She also recalled being told by Joe that Joe's family had sought counseling to patch things up and had wanted Joe to participate. He did go and was very upset by it and said that all they did was heap blame onto him so Joe left the session and did not return. Wendi did not want to repeat that experience for Joe.

During the Spring of 2000 Wendi met Rick Freeland who was renting an apartment at San Riva. Wendi reports that at the time she met Rick things were at a very low point for her. Her friend and co-worker, Chris, was encouraging her to give Joe an ultimatum about his behavior toward Wendi, her boss was encouraging her to seek counseling, her husband was incredibly mean and dying of cancer, and her job required a smiling face while at home she was very tearful.

Wendi recalls that Rick always found a reason to talk with her either in the office, or he would call her at work. One Sunday while Joe took the children to his parents home, Rick invited Wendi to a barbeque. Initially she said no but after a difficult telephone conversation with

007171

PCRDIS-P000637

SP&A 01438

Joe, she agreed to go with Rick. She left Joe a note and following the barbeque she and Rick went to Rock 'n Rodeo. Wendi reports that this was the first time she had ever done what she wanted to do. All of her life she had been following someone else's orders/wishes, her parents, her church, and Joe's orders. She recalls dancing with Rick, something that Joe wouldn't do with her, and having a great time. She felt that Rick was compassionate, again something completely different from Joe's behavior. Wendi returned home very late and lied to Joe about where she had been and with whom she had been. After that night, Wendi reports that Joe was always suspicious. A few weeks later Joe was planning a trip to Oklahoma. Wendi convinced Joe to take Nicholas with him and Wendi kept Ashley. Wendi reports that Joe had always favored Nicholas over Ashley and Nicholas enjoyed spending time with his dad. Wendi reports that while Joe was away she and Ashley had fun together. Wendi also saw Rick during that time and a sexual relationship developed. Wendi states: "Knowing men, you know that's what they want. If he hadn't wanted to have intercourse I would have been OK with that. For me, it was in exchange for what I really wanted. Someone who really listened and cared about me and showed me affection." Wendi reports that Rick helped her mentally and emotionally. The affair lasted approximately 6 weeks and Wendi reports feeling like she lost her best friend. Joe began chemotherapy in May 2000, became very ill from the chemo and his rage was on the surface constantly. He'd blow-up and then apologize which was not typical behavior (the apology). One time following a blow-up, Joe bought flowers and balloons. Wendi states that he would blow-up every few days over anything so the gifts did not mean anything. She recalls both of them sitting on their bed crying about what was happening and then Wendi would go to work and be told that she should leave him, Joe's sister would call and talk to them about a new expensive treatment that she had heard about knowing that they had no money for experiments. Her peers at work would invite Wendi for a night out so that she could take a break from the constant care giving and stress.

Wendi recalls asking her mother why she never left her dad after their fights. Mom told her that she had already left 1 marriage and couldn't do that again or she'd feel like a failure "making a habit of failing at marriage." Wendi also asked her mother-in-law why she had never left Joe's father and she said that she didn't want the stigma of being divorced and because her religion didn't recognize divorce. Wendi in response to "Why didn't you just leave him" states that she did not want anyone to talk badly about Joe because she felt like it was a reflection on her. She also states that she was the one who chose to marry him and if it's a bad decision then it was her fault. She also said that when she was walking down the aisle on her wedding day she had

14

007172

SP&A 01439

doubts but she went through with the marriage and now had to deal with it. Wendi also has talked repeatedly about her strong religious beliefs/convictions and that she believed that it was her job as a woman to make the marriage work.

By June 2000, Wendi was out of the relationship with Rick living on a daily basis with Joe's rage. She became increasingly fearful of his blow-ups since she has seen them increase over time. She would walk into the apartment from work wondering what she would find, what kind of mood Joe would be in that day. She learned to ask him many times what he wanted her to fix for him to eat that day so that she would cook the right thing and he wouldn't be upset with her. Her actions/decisions became ruled by: Is this going to upset Joe? Even the noise from the washing machine would set him off and he'd insist that she do laundry in the middle of the night if it interfered with his ability to hear the television.

With the 2nd chemotherapy treatment Joe began to lose his hair. He was a very vain man and so he asked Wendi to cut all of his hair off. After Wendi finished his hair cut Nicholas asked Joe what happened to his hair and he said: "Your mommy did this to me".

Shortly afterward Joe became ill, had difficulty moving and turned very pale. Wendi wanted to call 911 but Joe wouldn't let her. Instead she called her parents and got him into bed. He recovered but Wendi recalls this being the first big scare about his mortality.

Sometime during the summer of 2000, Joe's good friend was killed in a boat race accident that was supposed to be against Joe. Soon after his friend's death Joe began talking about not wanting to be hooked up to machines. By July 2000 Joe had contacted a medical malpractice attorney, Jeff Miller, about the misdiagnosis at the beginning of his cancer.

Now on a daily basis Joe was asking Wendi who she was sleeping with. Wendi does think that her behavior changed because she began going out in the evening after work with her girlfriends as a break from her life with Joe who was constantly demeaning, raging and belittling her. Wendi would ventilate to Chris whom Joe hated but who listened to her.

On her birthday, Joe refused to take Wendi out so she went out with her friends from work. She was 10 minutes late returning to the apartment and found Joe waiting for her in the office. He had left the children alone and asleep in the apartment so that he could wait for her in the office. Wendi had a cell phone and a wine cooler in her hands.

007173

PCRDIS-P000639

SP&A 01440

He grabbed the bottle and smashed it while screaming in her face and then smashed her phone on the ground with his foot and then dragged her home. Wendi reports that she felt tremendous shame. In the past his abusive behavior had been done in the privacy of their home (she thinks that there may have been a few times when he acted out in front of her parents but to a lesser extent) but this time he did it in front of her employees.

On other occasions, Joe would call her at the office and if she was too busy at the time to talk with him he'd get in the car and park in front of her office laying on the horn until she'd come out to talk with him.

Wendi reports that the last few months prior to Joe's death were like a pressure cooker; she was on pins and needles waiting for the next explosion. She reports that she felt like she was walking on eggshells all the time. She states that when she opened the door to their apartment she never knew what would be awaiting her. She says that she always took responsibility for Joe's happiness but she no longer knew what to do to make him happy.

Also during the summer of 2000 Joe used credit to order parts for his boats. He asked Wendi for $6000 to pay for the parts. In the past Wendi would have found a way to get the money but this time she refused. Wendi reports that this was the 1st time she had said no to Joe about helping him out of a financial bind. She believes that Joe sensed she was distancing herself by refusing and reacted very angrily.

During early fall 2000 Joe began talking about wanting to end it all. Wendi reports that he talked about suicide a lot and wanted her to get on the internet to find a way to purchase cyanide. At first Wendi didn't believe Joe was serious and she saw this as one more crazy scheme. Wendi began to see that Joe was serious and contacted Sean King a friend from high school who had had a near death experience and was a computer whiz. Sean found information on the internet which he sent to her via email. Wendi ordered sodium azide which she and Joe picked up at the address she had provided.

Approximately one month prior to Joe's death, he told Wendi to be home by 11:00 PM from watching a softball game. Wendi's friend, Chris, picked her up to take her to the game. Joe called Wendi's cell phone and he wanted her to go to the store to get him a cheese crisp. She asked him to get it himself because she was always interrupting her own schedule to do what he wanted. He kept calling her cell phone and started screaming at her to come home. She returned home and he started screaming at her about why did it take so long for her to get home and accused her of being with a man. She went into the

16

007174

PCRDIS-P000640

SP&A 01441

bedroom to get away from the yelling but he followed her continuing the barrage of screaming and accusations. She tried to pacify him by saying: "I'm sorry, what do you want me to do." Meanwhile Wendi had gotten into bed and a few minutes later Joe dumped a pitcher of Kool Aid over her while continuing to yell at her. He began pounding on the dresser with his fists and punched holes in it breaking some of the drawers. He also broke the post on the bed and broke the footboard in half causing the bed to crash to the floor with her in it. Wendi became very fearful of what he would do next and tried to call Joe's sister for help. Joe grabbed the phone away from Wendi and told his sister that Wendi "was tripping". He became very calm as he talked on the phone but immediately afterward began screaming at Wendi again. Wendi reports that everything she did made him angry so she was afraid to speak.

**Ongoing Sexual Abuse:** Joe insisted on daily sex even though Wendi let him know that she did not want to participate. If she did not consent to have sex daily he would pout and complain that it was the least she could do for him. During the last year of their marriage Joe began bringing home sex toys and forced Wendi to engage in sex in ways that she was very uncomfortable. He forced her to perform oral sex until she began to gag. One night sometime during 1999-2000, Wendi told Joe that she wanted to go out with friends. He told her the only way she could go out was if he picked her up in 3 hours and that he would have a surprise waiting for her. She agreed and when they got home she discovered that he had purchased $130 worth of sex toys including objects, which he inserted into her vagina against her will.

### 3. Structured Interview:

**a**. The following section illustrates the tactics that an abuser uses toward his victim through the **Power and Control Wheel** (developed by the Duluth, MN Domestic Abuse Intervention Program).

There is no score associated with using this wheel. The purpose of showing the wheel to the individual being assessed for domestic violence is to get a basic understanding of the types and tactics of control that the individual's partner may have used against her. Once that is determined, a clear rationale is followed for choice of instruments to be used by the assessor.

The Power and Control Wheel contains 8 tactics of control that an abuser can use against his/her partner. Wendi was shown this wheel without any explanation and asked to read the descriptions of each of the 8 sections. Next, she was asked to write any comments she might have about those 8 sections as they pertained to her relationship with her spouse. Wendi gave

17

007175

examples for 7 of the 8 tactics which include: Emotional Abuse, Economic Abuse, Sexual Abuse, Threats, Using Male Privilege, Intimidation, and Isolation.

Examples of each of the 7 ways in which Joe tried to maintain power and control over Wendi are clearly stated in the section labeled "d" below.

**b. Partner Abuse Scale – Non-Physical (Hudson, 1992) SCORE = 60**
SCORE INTERPRETATION: Evidence to date indicates that the clinical cutting score could be as low as 15. Therefore a score of 60 is well above the estimated clinical cutting score suggesting that there was a **severe level of non-physical abuse** of Wendi by Joe.
Definition of non-physical abuse used in this scale includes:
1. verbal abuse
2. emotional abuse
3. sexual abuse

The following are some examples of areas in which Wendi scored the highest (7 on a scale of 1-7 where 7 equals All of the Time):
    A. My partner demands obedience to his whims.
    B. My partner demands that I perform sex acts that I do not enjoy or like.
Using the same scale as above, Wendi scored a 6 (with 6 equal to Most of the Time) on the following statements:
    C. My partner belittles me
    D. My partner does not want me to have any male friends.
    E. My partner acts like I am his personal servant.
    F. My partner does not want me to socialize with my female friends.
    G. My partner demands sex whether I want it or not.

**c. Partner Abuse Scale – Physical (Hudson, 1992)   SCORE = 16.666**
This scale measures the degree or magnitude of perceived physical abuse by a partner. A clinical cutting score may be as low as 15, which would be the smallest score in which a finding of physical abuse could be made. A score of 11 indicates that there was not a significant finding of physical violence in this relationship. However, this does **NOT** mean that there was an absence of physical violence. Rather it indicates that there was a **low level of physical violence.** Wendi indicated on the Abusive Observation Checklist that Joe "pushed, grabbed or shoved her" 10-49 times, and punched her 10-49 times. Generally, speaking the less frequently the acts occurred the lower the score the participant will receive indicating less violence.

Definition of physical abuse used in this scale includes:
1. partner physically forces sex

007176

SP&A 01443

PCRDIS-P000642

2.  partner hits, punches, kicks, beats, breaks bones etc
3.  partner uses intimidation to the point of making person fear for her life
4.  partner injures sexual parts of the body

On a scale of 1-7 with 7 equal to All of the Time, Wendi's highest score was a 4 which is equal to Some of the Time.  Wendi gave a "4" in response to the following statements:

    A.  My partner pushes and shoves me around violently.
    B.  My partner physically throws me around the room.
    C.  My partner twists my fingers, arms or legs.
    D.  My partner tries to suffocate me with pillows, towels, or other objects.

Using the same scale as above, Wendi assigned a "3" which is equal to A Little of the Time in response to the following statements:

    A.  My partner beats me when he or she drinks.
    B.  My partner makes me afraid for my life.
    C.  My partner tries to choke or strangle me.
    D.  My partner badly hurts me while we are having sex.
    E.  My partner injures my breasts or genitals.

**d. Response to Violence Inventory:  Strategies to Escape, Avoid, and Survive Abuse (Dutton, 1992)**

The questions in this assessment are designed to report the ways in which the victim responded to the violence/abuse and to explain those behaviors.  It is important to note that many victims of violence and abuse DO NOT use the systems currently in place to assist battered and abused women.  Those systems typically include:  calling police, obtaining Orders of Protection, using domestic violence shelters, seeking counseling etc.

This is the case for Wendi.  Of the 17 items listed in this assessment, Wendi used 3 ways to try to escape, avoid and survive Joe's abuse.  They were:

A.  Escaping threatening/violent situation (11-20 times).  Wendi wrote: "I would hide in the bathroom until my husband's temper cooled."

B.  Hiding/Disguising (11-20 times).  Wendi wrote: "As long as I wasn't in his view, he would destroy furniture instead of putting his hands on me."

C.  Compliance with demands/anticipation of demands (more than 20 times).  Wendi wrote:  "As long as I did everything he wanted, including sex, he wouldn't get upset."

D.  When asked if there were any other strategies to escape, avoid, protect against abuse, Wendi wrote:  "I would always try to pacify him and keep him calm.  I would do my best to come up with a solution to whatever was bothering him."

007177

SP&A 01444

PCRDIS-P000643

P-App. 004603

In Summary, it appears that Wendi used several ways
REPEATEDLY to protect self from Mr. Andriano's rages and mood
swings.  However, nothing worked for any length of time.

c.  Abusive Observation Checklist (Dutton, 1992)
This checklist attempts to quantify the types and number of abusive and
violent acts.

<u>Physical Abuse</u>:

| | |
|---|---|
| Pushed, grabbed or shoved you | 10-49 times |
| Punched you somewhere on the body | |
| not the face | 10-49 times |
| Pulled your hair | 10-49 times |
| Physically restrained you by holding | 10-49 times |
| Dragged you or pulled you | 10-49 times |
| Threw something at you | 3-10 times |
| Slapped you | 3-10 times |
| Hit or tried to hit you with something | 3-10 times |
| Wrestled you | 3-10 times |
| Attempted to smother, strangle | |
| or hang you with an object | 3-10 times |
| Minor bruises | 3-10 times |

<u>Sexual Abuse:</u>

| | |
|---|---|
| Vaginal intercourse | more than 50 times |
| Unwanted objects were inserted | |
| Into your vagina/rectum | 3-10 times |
| Threat of negative consequences | 10-49 times |
| Social pressure to comply sexually | more than 50 times |

<u>Psychological Abuse</u>
   <u>Coercion and threats</u>:

| | |
|---|---|
| Attempted to get you to engage | |
| in illegal activities | 3-10 times |

   <u>Intimidation:</u>

| | |
|---|---|
| Instilled fear in you by looks, gestures, | |
| actions | 10-49 times |
| Smashed objects | 10-49 times |
| Destroyed your property | 10-49 times |
| Abused family pets | 1-3 times |
| Displayed weapons | 1-3 times |

   <u>Emotional Abuse:</u>

| | |
|---|---|
| Insulted you or used put downs | 10-49 times |
| Humiliated you with words or | |
| gestures | 10-49 times |
| Attempted to make you feel guilty | 10-49 times |
| Verbally raged at you | 10-49 times |

20

007178

SP&A 01445

PCRDIS-P000644

| | |
|---|---|
| Called you names | 3-10 times |
| Attempted to make you feel crazy | 3-10 times |
| _Isolation:_ | |
| Attempted to control what you did | 10-49 times |
| Attempted to limit your involvement with others | more than 50 times |
| Restricted your use of the phone | 3-10 times |
| Restricted your leaving the house | 10-49 times |
| _Minimization, Denial, Blaming:_ | |
| Minimized abuse and not take your concerns about it seriously | 10-49 times |
| Denied that the abuse happened | 10-49 times |
| Blamed you for the abuse | 10-49 times |
| Shifted responsibility for abusive behavior onto someone else | 10-49 times |
| _Use of Male Privilege:_ | |
| Treated you like a servant | 10-49 times |
| Made major decisions without your equal participation | 10-49 times |
| Acted like the "master of the castle" | 10-49 times |
| Unilaterally defined male/female roles | 10-49 times |
| _Economic/Resource Abuse:_ | |
| Required you to ask for money | 10-49 times |
| Controlled the money by giving you an allowance | 10-49 times |
| Took money from you | 10-49 times |
| Controlled your use of money | 10-49 times |
| Restricted your access to transportation | 10-49 times |
| Locked you out of the house | 10-49 times |

**f. Lethality Assessment "Assessing Dangerousness Questions" (AZ Coalition Against Domestic Violence)** Of the 14 items on this assessment, Wendi responded "Yes" to 10 of the 14. A "Yes" response indicates a measure of dangerousness. Wendi answered "Yes" to the following measures:

    **a.** Does the abuser seem preoccupied or obsessed with the victim (following, monitoring her whereabouts, stalking, very jealous)?

    **b.** Does the abuser own, carry, or have ready access to a gun?

    **c.** Have the abuser's assaults become more violent, brutal and/or dangerous?

    **d.** Has the abuser ever choked the victim?

    **e.** Has the abuser ever injured or killed a pet?

21

007179

SP&A 01446

PCRDIS-P000645

   f.  Does the victim believe the abuser may seriously injure or kill her?

   g.  Is the victim extremely protective of the abuser (trying to change or withdraw statement to police, reduce bail, charges, etc)?

   h.  Has the victim separated or tried to separate from the abuser in the past 12 months? (only 1x about 3 years prior to Joe's death)

   i.  Does the abuser drink excessively?

   j.  Has the abuser ever threatened to kill the victim?

**Determining the veracity of the findings of this assessment**: Wendi was interviewed for 20 hours by this writer. The findings of each of the assessment tools are fully consistent with the interview data. Additionally, Wendi's story, and responses to the assessment tools were fully consistent with each of the collateral interviews conducted by this writer (an additional 5 hours of interviews). Results of those interviews are also attached to this document.

**4. Summary**

In response to the purpose of the assessment written on page 1:

1. Wendi Andriano was a victim of domestic violence/abuse by Joseph Andriano as determined by generally accepted definitions. A definition of domestic violence taken from the National Council of Juvenile and Family Court Judges, 1998 follows: "Domestic Violence is a pattern of assaultive and coercive behaviors, often including physical, sexual, and psychological attacks, as well as economic coercion, that adults and adolescents use against their intimate partners."

2. Wendi Andriano suffered from severe levels of emotional abuse (score was 60 – cutting score is 15) and a significant level of physical violence (score was 16.66 – cutting score is 15). Multiple examples of each type of abuse are documented within this report.

3. Joseph Andriano appears to have died as a result of a struggle over the knife. Whether that happened as a result of Wendi's attempt at defending herself or as she struggled to stop him from killing himself is not clear.

Wendi Andriano clearly was a victim of abuse/violence at the hands of her husband, Joseph Andriano. Wendi was able to articulate why that night was more frightening than others. This case, like many others, shows the increase in frequency and severity of the violence/abuse over time.

As in most domestic violence cases, there were numerous opportunities for intervention into the lives of this couple that perhaps may have averted

007180

SP&A 01447

PCRDIS-P000646

the final outcome.  It is highly probable that numerous individuals had the opportunity to witness Joe's treatment of Wendi.  It appears that Wendi herself had not identified Joe's treatment of her as domestic violence. This also is not uncommon.  Until the community-at-large is educated about what constitutes domestic violence and what can be done about it, domestic violence will continue to proceed at an alarming rate.

<u>4.  Recommendation</u>
The death of Joseph Andriano appears to have occurred either in the act of self-defense of Wendi Andriano or during her failed attempt at stopping Joseph from killing himself.  In either case it does not appear that Wendi should be held responsible for the death of Joseph Andriano.

Respectfully submitted,


Sharon B. Murphy, PhD

23

007181

SP&A 01448

PCRDIS-P000647

**EXHIBIT "D-4"**



**MICHAEL B. BAYLESS & ASSOCIATES**
**3620 NORTH THIRD STREET**
PHOENIX, ARIZONA 85012
PHONE: 602-230-7373
FAX: 602-230-5105



MICHAEL B. BAYLESS, PH.D.
LETICIA AMICK, PH.D.
CRISTY LOPEZ, PH.D.

August 4, 2004

## PSYCHOLOGICAL REPORT
## RE: WENDY ANDRIANO

**Reason for Referral:**
Wendy Andriano entered a plea of not guilty to first-degree murder. She is currently charged with the murder of her husband, Joe Andriano. According to the police reports Joe Andriano's death occurred on or about October 8, 2000. The purpose of this evaluation is to exam Wendy Andriano's intellect, personality, and overall emotional stability.

**Observations:**
Wendy Andriano is a relatively short, thinly-built 33-year-old female of Caucasian descent. At the time of the interview, Ms. Andriano was wearing jail attire and her hygiene appeared to be good. She was in relatively good mood and was very open and cooperative with this examiner. Her affect was normal to content. She did not exhibit any abnormal motor activity or mannerisms. She denied having any tattoos or identifying physical marks. She was alert, exhibited good eye contact, and maintained satisfactory attention span. Her thoughts and communications were coherent and seemed to follow logical sequence. There were no obvious deficits in her short or long-term memory.

**Consent to Evaluation:**
Wendy Andriano signed Bayless and Associates 's Forensic Consent Form indicating she read and understood the purpose of the evaluation and limits of confidentiality. She was aware that information from this evaluation would be reported to the court and may be disseminated to interested parties. Ms. Andriano consented to the evaluation and voluntarily answered all questions.

**Documents Reviewed:**
1. Photographs of the crime scene
2. Phoenix Police Department departmental Reports
3. Autopsy Report
4. Sharon B. Murphy, Ph.D. Report and Domestic Violence Data

006550

SP&A 01470

Andriano
Page 2

**Procedures:**
1. The Shipley Institute of Living Scale.
2. The Williamson Sentence Completion Test.
3. The Minnesota Multiphasic Personality Inventory – II.
4. Clinical interview.

**Background:**
Wendy Andriano was born Groom, Texas and is an only child. Wendy did not know her biological father. Her mother remarried when she was approximately four years of age to Alejo Ochoa. Her stepfather raised her as his own daughter and was basically the only father she has ever known. Her father worked as an assistant pastor and managed a tortilla factory and restaurant. Her mother is a human resource person and both of her parents are described as being workaholics. However, she also states that they were very caring, outgoing, and very loving. Her father was the main disciplinarian in the family. She reports that she has always had a very loving and open relationship with her parents. She was raised as a Christian and states as a young girl she participated in a lot of church activities. When asked whether or not she had ever been physically or sexually abused, she reported that she was sexually abused by her biological father and her grandfather. She believes that she was less than two years of age and can barely remember what happened. She states that she remembers parts but not all of the things that happened. Noteworthy, her biological father is in prison for child molestation. Wendy has a vague memory of the molestation and states she can only remember it when she is dreaming.

Although she states that she was happy as a young girl, she did have a number of anxiety-related problems. During her childhood she was a sleepwalker, experienced night terrors, bed wet, and suffered from separation anxiety from her mother. Noteworthy, she continues to have night terrors to this day.

As a teenager, Wendy enjoyed music, playing the piano, and swimming. She went to a very small high school, such that there were only 15 kids in her high school class. She got along quite well with her peer group. The most significant event that happened to her during her teenage years was her participation in the church social group. She did not date during her high school years.

**Education:**
Wendy graduated from high school with honors and reports that she has always been a very good student and really enjoyed her education. She went to a small Christian school and reports that everyone was best friends. She has also completed approximately three years of college.

**Employment:**
Wendy's last job was working as a property manager for the San Riva apartments. She worked there from September 1999 through October 8, 2000. She earned approximately $32,000 a year. Before she was arrested, her goals were to work in real estate but now she simply wants to have her children back and go back to having a normal life. Noteworthy, after Wendy was arrested for the murder of her husband it was learned that there were some financial irregularities at the apartment complex. It was found that in apartment #229, a man had been allowed to live rent free without documentation in that apartment. There was also a full audit being done due to irregularities which had come to light. On a previous job, Wendy stole approximately $18,000 from her employer. She reported that she stole the money because her husband had created so much debt that she had to do something. She felt overwhelmed by the debt and felt responsible for the family's happiness. Consequently, she was forced to steal $18,000.

006551

SP&A 01471

PCRDIS-P000572

Andriano
Page 3

**Relationships:**
Wendy has been married once and has two children.  She was married from 1994 to 2000.  Wendy's deceased husband had cancer and the last year of her marriage was very hard.  She admitted to having an extra-marital affair during her last year of marriage,  When asked about her affair, she reported that she had an affair with Rick Freeman.  She met Rick at the apartment complex and they became friends.  He was aware that her husband had cancer and he had told her that his fiancé had recently died.  On one evening she went to Rockin' Rodeo, which is a local bar, with Rick and as they were coming home he kissed her.  She stated that after they had kissed their relationship deepened and it became sexual.  Noteworthy, Wendy reported to this examiner that she did not enjoy having sex and actually sex was quite painful for her.  When asked about this, she stated "you can't just kiss on someone and not have sex with them, that's teasing".  He was comforting me and as a trade I had sex with him".   She reports she had sex with Rick Freeman five or six times.  She claims he was quite gentle and although it wasn't painful for her, it was very uncomfortable.  She stated "I don't know why my brain just clicks off.  A lot of it is I was scared and thinking what do I do, how do I act.  Joe was dying; life was going to be different".

**Psychological History:**
Wendy reports that she was treated by Candy Rhode in May once a week for three years.  She denies receiving any other inpatient or outpatient treatment.  This examiner did not receive copies of those records to review. Currently, while incarcerated, Wendy is taking Ativan, Zoloft and Seroquel.  When asked if she had anyone in her family who had a history of mental illness or substance abuse, she reported her grandfather was an alcoholic and her aunt had a drug problem.  She denies having a bad temper and states when she gets angry she would typically cry.  She stated "I always see the best in people.  Anger is a sin.  I practice forgiveness and love".

Wendy denies having a frequent headaches, backaches, stomachaches, dizziness, heart palpitations, and fatigue.  When she is under a great deal of stress she sometimes has difficulty sleeping and she used to have frequent nightmares.  She reports her appetite is normal and she has not experienced any weight loss or weight gain.

Wendy denies experiencing hallucinations and/or delusions.  She admitted that at times she does become depressed and has had suicidal ideations and one suicidal attempt.  After being served papers about severing her parental rights she intentionally cut her arm.  Further, she reported that she has a lot of fear and basic dislike of sexual intercourse due to it causing her pain.

Wendy is in relatively good physical condition and has not had any major operations or serious illnesses.  She denies any neurological injuries.

**Alcohol/Drug Use:**
Wendy reported that she began drinking alcohol when she was 21 years of age.  She typically drinks wine coolers and rarely if ever becomes intoxicated.  She reports that she has been intoxicated maybe three or four times in her entire life.  She denies using any illicit drugs.  She does not drink coffee nor does she smoke cigarettes.

**Arrest Record:**
Wendy does not have a juvenile arrest record.  She reports that this is the first time she has ever been arrested or charged with a crime.  As noted earlier, Wendy is currently charged with first-degree murder.  When asked how she is handling incarceration, she reported "I have adjusted.  Either you sink or swim".

006552

SP&A 01472

Andriano
Page 4

**Defendant Statements:**
In 1994 Wendy married Joe Andriano. They were married in Casa Grande, Arizona. Initially, there was some conflict over their church and beliefs but that quickly resolved and their marriage was basically okay. After the marriage, Wendy reported that she and her husband Joe both felt as if they had changed and they did not have to any longer "put on any airs". Through their marriage they learned who they both were and everything was fine. Wendy initially hung out with Joe and his friends and eventually lost touch with her own friends. Joe was working as a welder but quit that and went into his own business, auto glass replacement. They got a loan and started Joe's Windshield Repair. In the process of obtaining a new business, Wendy and Joe moved to her parent's farm and basically renovated the old shack and lived there until March of 1998. She reported she had her first child in the old farmhouse. Approximately seven months into the marriage it was discovered that Joe had a tumor, which supposedly the doctor removed successfully. However, in 1996 it came back, which started to wreck havoc in their lives. They both were upset and under a lot of stress. Joe was not a very good businessman and spent most of his money on pleasurable activities. As a result, Wendy felt as though she had to put money back into the business from her job and eventually became overwhelmed by debt. She stated, "I felt responsible for my family's happiness". As a result, Wendy over a period of four year's, stole approximately $18,000 from her employer. She was fired from her job.

When Wendy first met Joe, he was dating this very wealthy girl and would say to her quite often that if he had stayed with his rich girlfriend his life would not be as miserable as it is today. Wendy reported this really hurt and here she was working full-time, stealing money from her company, attempting to go to school, making dinner, cooking, doing the clothes, and everything else around the house but that was not good enough. She stated, "What could I do, how could I make him happy".

At this point during the marriage, she was only around members of Joe's family. She felt isolated, alone and decided to go back to church. She tried to teach Joe how to love and forgive but was not very successful. Wendy was pregnant with her first child and Joe was not working. At this point, she was taking care of the baby, working and her parents were also helping do almost everything. Then she found out that she was pregnant again and that was just totally overwhelming. In October 1997 she decided that she was going to leave Joe because she did not want her son to grow up like this. She went to Jerry, the man who had loaned them the money for the business, and he gave her $2,000 and told her that if she wanted to leave, for her to leave. Noteworthy, Wendy did not leave Joe and instead reported that she actually gave the $2,000 to Joe. She reported that she wrote Joe a letter telling him that she was going to leave and later that evening he came in, in the middle of the night, and had apparently found the letter. He was angry and was screaming at her "what does this mean". She stated by the time it was all done he was begging her to stay and for some reason he was able to talk her into not leaving. Joe had a way with words and also she was very much afraid of his temper. She stated she remembers the first time she asked Joe about living on the farm, just that she thought they were living there so that they could save money to buy a house. She stated Joe became extremely angry, grabbed her and shook her, which made her very much afraid. Previously Joe told her about catching his ex-girlfriend sleeping with another man and he became so upset that he had to move to California to keep him from hurting the guy with whom his girlfriend was having an affair. She believes one of the reasons Joe told this story was so that she would be afraid of him.

Wendy reported that she really was not angry with Joe and actually always felt bad for him. Joe, in her mind, was angry at the world because of his cancer. Wendy stated, "It was the worse thing you could go through. You expect it when you are old, not when you are young". Wendy also reported that Joe would feel very bad when he had his episodes of anger. The cancer was overwhelming and basically consumed him. She told this examiner it was Joe who asked her to order the poisons because he wanted to take it and end it all.

006553

SP&A 01473

Andriano
Page 5

**Police Interviews:**
In witness interviews conducted by the Phoenix Police Department, Chris Hashisaki reported that Wendy had asked both Eric Vallante and James Yost to pose as Joe so she could a life insurance policy on Joe. She believed that they both were offered $50,000 to do this. Chris is also aware of an incident in which Wendy made an inquiry into a poison website. Apparently this occurred on Jerry Sentell's computer. Noteworthy, on the night of the incident in which the murder occurred, Chris described Wendy at the time as having no observable injuries.

Shannon Sweeney was also interviewed by the police and is one of Wendy's friends. Shannon and Wendy would often go to bars and hang out. Wendy apparently told Shannon that she had been having problems with Joe for a long time and would have left him if he had not become ill. Shannon believed that Joe was very possessive of Wendy. On one night, Shannon reported they took Wendy out for her birthday and they arrived home late. As they arrived home, Joe was very angry and threw Wendy's cellular phone and a glass bottle across the parking lot.

Shannon was also aware that Wendy had an affair with Rick Freeman. Apparently Wendy did not tell Rick that she was married and when Rick found out and wanted to end the relationship, Wendy did not want to end and became very persistent. Rick described this to Shannon as Wendy refusing to leave her alone. As an indicator of Wendy's persistence, there was a situation in which they ran into Rick and Eric at a club and after Rick initially said hello to them, he attempted to avoid Wendy. Wendy attempted to follow Rick around the bar and after which Rick left. Wendy later attempted to call Rick on the phone. When he would not answer, she began banging on his door and when he would not answer she threatened to get a passkey to his apartment. Shannon and Eric talked Wendy out of doing this. Later, Wendy also had a one night affair with a young man by the name of Travis whom she met at Rockin' Rodeo Bar.

Noteworthy, Wendy told Shannon about Joe screaming and would often break things. Wendy never told her about any incident in which Joe touched her. Shannon had never observed any injuries on Wendy. Apparently, Joe had a pending malpractice suit. Shannon was told that Wendy had told both James Yost and Eric that the lawsuit would be worth more if Joe were to die prior to settlement. Eric told Shannon that Wendy had asked him to pose as Joe to get a life insurance policy. Wendy told Eric there was no way the insurance company would find out about him posing as Joe. She also told Eric that Joe would most likely die of a heart attack due to his condition and treatment and that this would not be investigated. He also told Shannon that Wendy offered him $50,000 to pose at Joe. As to the poison ordered over the Internet, Wendy used a fictitious business license in order to order the poison. Noteworthy, Wendy gave an address to a company that she had no connection to. The poison Wendy ordered has the effect of mimicking a heart attack in its victim. Noteworthy, Wendy ordered poison from the website under the name of Anne Newton.

Ray Ortega, who was part of the management team that managed San Riva Apartments, found out that a man was living apartment 229 rent-free. Additionally, on October 10, 2000 Ray found in Wendy's office while he was cleaning the office, an envelope under Wendy's desk. Ray observed a pieced-together certificate from the City of Phoenix and a receipt for a chemical as well as several pages of information on cyanide. Two to three months prior to Joe's death, Ray was contacted by William Sentinel. William told him that while working on the office computer, he discovered where somebody had looked up a website containing information on cyanide as well as a point of reference site. Ray contacted Janice Lord and advised her of what William found. Ray, along with Janice, confronted Wendy about this. Wendy did not deny looking up this information but stated that she was helping a friend with a college report.

Eric Vaillent is a friend of Rick Freeman who was dating Wendy. He reported that Wendy would often pursue Eric and be at Rick's door at 2 or 3 o'clock in the morning. He would observe Wendy yelling and kicking his door asking Rick to let her in. He said this occurred several times over the summer. He also

Andriano
Page 6

observed Wendy at nightclubs drinking excessively and would flirt and kiss on guys she knew at the bar. He observed Joe yelling at Wendy for coming home late but never saw him lay a hand on her. Wendy never told Eric about any of the domestic violence or any situation in which she was physically hurt. Noteworthy in August, Wendy had called Eric and asked him to find Voigt on the Internet. Noteworthy, Voigt is a place on the Internet where you can buy poisons. Wendy told this examiner that it was Joe's idea to buy poison.

Wendy told Eric about the malpractice lawsuit and told him that when Joe died they were going to be awarded $20,000,000. She told Eric that she had researched things and that most people do not live past their third chemo treatment. Eric stated he got upset with Wendy and called her a money hungry bitch. Eric described Joe as being a nice guy who basically was fighting for his life. He believed Wendy did not really care for Joe any longer and she told him that she no longer had sex with Joe. This is quite interesting considering the fact that Wendy told this examiner that Joe demanded sex with her on a daily basis.

Rick Freeman admitted that he used to date Wendy and when he found out she was married he tried to break off the relationship. Wendy pursued him and often would come to his door in the middle of the night and bang on his door and call him incessantly. Wendy had told Rick that she often argued with Joe but she never told him anything about Joe being physically abusive.

Ted Bennett, who is a neighbor at the San Riva Apartments, reported that he last spoke to Joe approximately one week prior to his death. He described Joe as looking very sick. Wendy told Ted about their malpractice lawsuit but never told him how much money they expected to be awarded. Ted reported that Joe did not appear to have given up or want to die and in fact, Joe appeared to be very positive. He was unaware of any domestic problems. He never observed any injuries to Wendy. Noteworthy, while living at San Riva Apartments Ted had never been aware of any rodent problems that would require poison.

Debra Lewis was employed as a housekeeper for the San Riva Apartment complex. She is aware that Wendy and Joe were having some problems and was aware that Joe was questioning Wendy about where she was all the time and was checking up on her. Wendy was somewhat upset about Joe's continued checking up on her and Wendy also complained to Debra in the past about Joe not working. She also complained about having to take care of the kids and doing everything for Joe. Debra was unaware of any alligations of domestic violence between Wendy and Joe. She describes Joe as being a real pussy cat. Debra often observed Wendy talking to young male tenants and there were rumors about Wendy flirting with the men at the complex pool. Debra stated that Wendy acted as if she had already written off Joe and she believed Wendy acted as though Joe did not matter anymore. She described Wendy as acting as if she was not married.

Travis Black is a young man that Wendy met at a night club called the Rockin' Rodeo. She met Travis on September 27, 2000 and asked him to dance. They danced at the bar and were together. After dancing they went to breakfast and then went to Wendy's apartment and had sex. Wendy talked to Travis over the phone the following week and during these conversations Wendy told Travis that her husband had died of cancer.

On August 28, 2000 Wendy contacted Amica Life Insurance Company in reference to purchasing a life insurance policy on her husband Joe. Wendy talked to Carolyn Statalano and told her that Joe was staying out of town at his sister's house and had not set a date to return to Phoenix. In Carolyn's notes she stated this was a strange conversation. Noteworthy, no actual policy was ever taken out by Wendy. Also, on the application for a life insurance policy, the policy asks if Joe had cancer to which Wendy entered "no" on the application.

006555

SP&A 01475

PCRDIS-P000576

Andriano
Page 7

Based on the above-mentioned interviews, it appears clear that Wendy in more than one situation had a tendency to be less than truthful. She has the ability to be manipulative and attempted to encourage others to get involved in fraudulent schemes to collect money from an insurance company. Additionally, for a woman who did not enjoy sex, she clearly was sexually aggressive with one of her male boyfriends and on one occasion met a man at a bar one night and took him home and had sex with him. She seemed to become somewhat obsessed with Rick and seemed to have extreme difficulty accepting the fact that he no longer wanted to date her. Additionally, Wendy told this examiner that Joe asked her to buy the poison. Yet in her overall quest to buy the poison, she attempted to hide her identity, have the poison mailed to a business address, and seemed to want to hide her connection to the poison.

**Intellectual Functioning:**
Wendy Andriano's performance on the Shipley Institute of Living Scale yielded a total IQ score of 110 which places her in the above-average range of intellectual functioning. Ms. Andriano was oriented to reality and had a capacity to appreciate the difference between right and wrong. At the time of the testing her memory, judgment, and decision making ability were intact. Although she was mildly anxious during the testing her test scores appear to be an accurate representation of her abilities. She did not report nor did the test data indicate the presence of neurological impairment.

Wendy Andriano's performance on the Minnesota Multiphasic Personality Inventory yielded a valid and interpretable profile. Her scores on the Validity Scales indicate that she tends to be defensive, lack insight, and be slightly more conforming and moralistic than usual. Typically, these individuals have a tendency to repress or deny problems and unfavorable traits. She is prone to minimize and disregard problems with herself. Self-insight and self-understanding are usually lacking. She is very concerned about how she is perceived by others and typically views emotional problems as weaknesses.

Ms. Andriano's performance on the Clinical Scales reveals an individual who has a very mild level of emotional distress that is characterized by a general dissatisfaction with life rather than by any specific mood. She is so unaware of this dissatisfaction that she can say that she is happy most of the time and very seldom has "spells" of the "blues". Yet she frequently worries about something. She will use indirect means of expressing her anger.

Ms. Andriano sees herself as quite capable and able to make decisions easily. Her memory and concentration skills are good. She does not analyze her or others feelings and behavior. She daydreams very little. She believes that it is safe to trust others and that they are willing to help. She is very direct and comfortable in stating her opinions to others.

Although she is concerned about her health, she does not report any specific symptoms other than dizzy spells. Individuals with similar scores report that they do not wake up fresh and rested most mornings. They typically have behavioral problems in school and are likely to have been in trouble with the law. Although she may abuse substances, she is unlikely to have suicidal ideation. Typically individuals with similar profiles have a very poor prognosis. This is due to their problems being more characterological and not readily amenable to change. She is experiencing minimal emotional distress and has little concern about her behavior, limiting her motivation for treatment.

Noteworthy, clients with this profile tend to be defensive, and unwilling to acknowledge psychological problems even when they are readily apparent to others. They report little psychological emotional distress and describe themselves as less depressed and anxious than do most psychiatric patients. Behavioral problems are more likely to occur in this code type than in any other code type that includes Scale 3. Further, clients of this profile are characterized by poorly controlled anger and hostility that it is expressed in cyclic fashion. Often these clients are eventually incarcerated for their violent acts.

096556

SP&A 01476

Andriano
Page 8

Typically, these clients are quiet, withdrawn individuals, and their sudden outbursts come as a surprise to others. They display poor judgment under stress, but their emotional or violent outbursts may be only minimally related to external stress or provocation. The cyclic pattern of violent outbursts with intermittent periods of appropriate behavior represents a chronic and stable personality disorder that is extremely difficult to change.

Ms. Andriano's performance on the Williamson Sentence Completion Test substantiates the findings noted above. Again we see an individual who has very little anxiety and who tends to be very superficial in her overall responses. This examiner finds this to be somewhat surprising considering what Ms. Andriano is being charged with and the fact that she is in jail. She tends to have very strict rules in which she expects herself and others to live up to. Further, she has a strong need to be needed and desperately wants to be seen in the eyes of others as being worthy. She has a rather naïve viewpoint of life such as she wants/desires a perfect existence. When she cannot get all her needs met she tends to feel guilty and has a tendency to externalize blame onto others for her own shortcomings. Her primary defense mechanism is denial.

**Summary:**
Wendy Andriano was raised in a very religious home environment in which there were very strict rules and regulations. She was well protected and was sent to private Christian schools from elementary to high school. After meeting her husband and working out their religious differences, they were married in 1994. Initially, Wendy hung out with her husband's friends and basically lost touch with her own. She claims that her husband was a very sexual person and although it was quite painful for her, she would always comply with his requests. In 1994, after several months of marriage, Joe Andriano found out that he had cancer and after an operation believed that it was all removed. However, the cancer came back in 1996. During this time period, Ms. Andriano reported that they had significant financial problems due to her husband not working. She stated "I felt responsible for our happiness. I was overwhelmed by debt". Consequently, to relieve some of that pressure she stole, over a period of four years, approximate $18,000 from her employer. She was fired from her job as a result of this.

According to witness statements, Ms. Andriano apparently became angry about her responsibility, believing that she did everything and that her husband was doing nothing. She took care of the kids, earned the money, took care of the house, cooked, cleaned, basically did everything. After a failed business attempt (windshield repair), Ms. Andriano seemed to become increasingly resentful and claims she decided to divorce her husband. Apparently her husband was able to talk her out of this. As her disappointment grew and as her husband became increasingly ill, Ms. Andriano seemed to look to other sources for enjoyment and support. She began going out with her friends, acting as if she were not married, and had an affair with Rick Freeman. Noteworthy, when Mr. Freeman found out that Ms. Andriano was married, he wanted to end the relationship. According to witness statements, Ms. Andriano became somewhat obsessed with Mr. Freeman and would call him incessantly, go to his door at all hours of the night and bang on his door and at one point threatened to get a passkey and go into his apartment without permission. It is unclear from the documents but it seems as though Mr. Freeman was living free at the apartment complex, which Ms. Andriano was managing.

As her discontent and resentment increased, Ms. Andriano began to scheme such that she asked a couple of her friends to pose as her husband so as to take out a life insurance policy. It was noted that on the life insurance policy she indicated that her husband did not have cancer. Additionally, she began to research poison and how to obtain it without her name being attached to it. She ordered the poison from the Internet through a fictitious name and had it sent to a separate business. Noteworthy, according to Ms. Andriano, her husband wanted her to get the poison because he wanted to commit suicide.

006557

SP&A 01477

Andriano
Page 9

Although Ms. Andriano claims that she was physically and psychologically abused by her husband, none of her friends ever witnessed any marks or evidence of the abuse. Her husband apparently was suspicious and somewhat upset about her staying out late and not coming home when she was supposed to. It was reported that he would throw things, yell and sort of go on a tirade about her inappropriate behavior but at no time did he become physically violent. The examiner notes that this is understandable considering Ms. Andriano's behavior and general response toward her husband. During this time period in which Ms. Andriano's husband was very suspicious of her behavior, she was, in fact, having an affair. As a matter of fact, she admits to having actually two affairs. This examiner finds this is quite interesting in light of the fact that Ms. Andriano reports that she did not enjoy sex and that it was quite painful.

In an interview with the police, Ms. Andriano reported that on the night of the offense she and her husband were engaged in a physical fight. She alleged that he had attempted to choke her with a telephone cord and had earlier pushed her into the dresser and onto her bed. He also pushed her into their wedding display case, shattering it, grabbed her in a bear hug and they both were wrestling around in the house. As her husband began to reach for a belt to hit her, she was able to wiggle away from him, grab the barstool and hit him on the back of his head. Apparently Joe was knocked unconscious and was severely injured. She gave him a pillow and blanket. She called Chris and told her Joe was having a heart attack. While she was waiting for Chris to come, she covered the blood on the carpet with a towel. Chris came over and told Wendy to call 911. Wendy told the 911 operator Joe was having a heart attack. The Fire Department came and Wendy sent them away. She also told Chris to go home. When she returned to the apartment and Joe was standing up. At this time he wrapped the charging cord from his cell phone around her neck and as they struggled and moved toward the kitchen she grabbed a knife and cut the cord from around her neck. She reported that the next thing she remembers was struggling with her husband in the living room. She still had the knife in her hand and the next thing she knew she had blood all over her. Noteworthy, after her husband was cut severely on the neck and appeared to be unconscious on the floor, she waited until he stopped making noises to call her father.

Previously, she calmly talked to the firemen that were there because of her 911 call and calmly told them that she did not need their help. During this time her husband was on the floor bleeding from his injuries. It was also noted that based on Chris's report, it appeared that Wendy had taken a shower and changed when she went out to meet the firemen. Based on the amount of blood noted and the physical condition of her husband, it is unreasonable to believe that Ms. Andriano did not know that her husband was severely injured and in need of help. It is also noteworthy that the firemen and her friend Chris did not report that Wendy appeared to have been attacked or injured in any way.

Further this examiner could not find any evidence to support Wendy Andriano's claim the she was a victim of domestic violence.

**Diagnosis:**

| | |
|---|---|
| Axis I: | Depressive disorder NOS. |
| Axis II: | Personality disorder NOS with antisocial and borderline traits. |
| Axis III: | None. |
| Axis IV: | Marital conflict, financial problems. |
| Axis V: | GAF = 65. |

Michael B. Bayless, Ph.D.
Clinical and Forensic Psychologist

006558

PCRDIS-P000579

SP&A 01478

**EXHIBIT "D-5"**

**MYLA H. YOUNG, Ph.D., ABN**
Diplomate – American Board of Professional Neuropsychology
PSY 11916

July 11, 2011

CONFIDENTIAL NEUROPSYCHOLOGICAL TESTING

In response to your request, following is a report of neuropsychological and psychological testing for Wendi Andriano. Information includes a description of neuropsychological and psychological tests administered, information about those tests, neuroanatomical descriptions of brain functioning and results of her neuropsychological testing.

Name:  Wendi Elizabeth Andriano
Date of Birth:  08/24/70
Dates of Evaluation:  12/06/10; 12/07/10; 2/15/11; and 2/16/11
Education:  14 estimated
Ethnicity:  White
Handedness:  R
Date of Report:  04/21/11

Wendi Andriano was seen for neuropsychological evaluation on 12/06; 12/07; 12/08/2010 and on 2/15 and 2/16/ 2011 for a total of 25 hours of evaluation.   The evaluation was completed in a private contact room at Arizona State Prison, Perryville, Arizona. She was not restrained, there were no interruptions, the room was reasonably quiet, she was provided lunch and frequent breaks with food, and she was not directly viewed by any other individuals, including custody staff.   Limitations to her confidentiality were explained, understood and agreed upon.  Third party observers were not present.

Information Relied Upon:

Transcripts of testimony by Wendi Andriano – 2004
Consultations with legal and medical professionals associated with her legal defense

Review of records associated with her developmental, educational, work, social, medical, psychiatric, criminal, prison and jail records.

SP&A 08636

1
000000663

<u>Procedures Completed</u>:

The following neuropsychological tests were administered to Wendi Andriano:

Effort on Neuropsychological Testing
    15 Item Test
    Test of Malingering Memory (TOMM)
    Green Word Memory Test
    Structured Inventory of Malingered Symptomatology (SIMS)
    California Verbal Learning Test Forced Choice (CVLT-II)
    Rorschach Bolder Validity Index

Intellectual Functioning
    Wechsler Adult Intelligence Scale-IV

Neuropsychological Functioning
    Sensory and Motor Coordination
        Smell Identification Test (SIT)
        Klove-Reitan Sensory Perception Examination
        Grooved Pegboard
        Finger Tapping Test

    Attention and Concentration
        Conners' Continuous Performance Test (CPT)
        Paced Auditory Serial Attention Test (PASAT)
        Visual Search and Attention Test (VSAT)
        Conners' Adult ADHD Rating Scales (CAARS-Self Report)
        Seashore Rhythm Test
        Sensory Perception Test

    Memory and Learning
        California Verbal Learning Test (CVLT II)
            Trial Learning
            Interference Learning
            Short Delay-Free
            Short Delay-Cued
            Long Delay-Free
            Long Delay-Cued
            Recognition
            Forced Choice

        Wechsler Memory Scale (WMS-IV)
            Auditory Memory Subtests
            Visual Memory Subtests
            Working Memory Subtests
            Immediate Memory
            Delayed Memory

2

SP&A 08637

Rey Complex Figure Test (REY)
 Immediate Recall
 Delayed Recall
 Recognition

Tactual Performance Test
 Memory Trial
 Location Trial

Secondary Language
 Wechsler Individual Achievement Test (WIAT II)
  Word Recognition
  Reading Comprehension
  Pseudoword Decoding
  Numerical Operations
  Math Reasoning

Visual Perception
 Rey Complex Figure Test Copy Trial
 WAIS-IV Perceptual Organization Scales
 WAIS-IV Processing Speed Scales

Executive Functioning
 Executive Functioning Test
  Trail Making Tests
  Verbal Fluency Tests
  Design Fluency Tests
  Color-Word Interference Tests
  Sorting Tests
  Twenty Questions
  Tower Test
  Motor Speed

Wisconsin Card Sorting Test
Category Test
Iowa Gambling Test (IGI)
Comprehensive Affect Testing System (CATS)

Behavior Rating Scale – Self Report (BRIEF-A)

Halstead-Reitan Neuropsychological Battery
Reitan-Klove Sensory-Perceptual Examination
Finger Tapping Test (FTT)
Tactile Form Recognition
Trail Making A and B
Tactual Performance Test (TPT)
Seashore Rhythm Test
Speech Sounds Perception Test

SP&A 08638

3

000000665

Category Test

Emotional Testing:
  Rorschach Test
  Dissociative Experience Scale (DES)
  Multi-score Depression Inventory (MDI)
  Detailed Assessment of Posttraumatic Stress (DAPS)

Interview – Wendi Andriano:

Accommodations for testing were private, in an environmentally comfortable place, uninterrupted, and not directly observed by other viewers. She was advised, understood, and signed consent to complete this evaluation. Interviews with Wendi Andriano were limited to only that information that was needed to understand her brain and psychiatric functioning. She was not asked to provide information about her early developmental history and possibility of childhood victimization. I am aware that Wendi Andriano has had unusual childhood experiences which included being raised in a Fundamental Christian ministry/church and having minimal interaction with the general community. Most of her education was provided by a school program within the ministry church. The group moved and relocated frequently. She was at times homeless.

Interviews with Wendi were conducted on December 6, 7, and 8 2010 and on 2/15/11 and 2/16, 2011. Although she reported previously being prescribed antidepressants (Seroquel;Zoloft;Elavil) as well as Ativan, she had not been taking any psychotropic medications at this time. She indicated that she had not used alcohol and/drug in close proximity to testing.

She reported that she did not have a prior major medical disability and did not have any medical problem at the time of evaluation. She indicated that she was not currently receiving psychiatric treatment. She reported that she had received some counseling in 1996 and had previously received therapy while in jail.

She reported that she had never used or abused drugs or smoked tobacco. She reported a history of limited adult alcohol use. Her first drink of alcohol was when she was 18 years old. She reported that since 2000 she had used alcohol with friends, with alcohol use characterized as drinking wine coolers. She used alcohol most when was 21 years old, using alcohol at least once a week and overusing alcohol on some limited occasions. She indicated that she was not smoking tobacco at the time of the evaluation and had never smoked.

When she was 13 years old she was involved in a moving vehicle accident (MVA). Documented information describing this MVA was not currently available. She, however, reported repeated head injuries throughout her childhood ("I have a lot of traumas in my life. As a kid life was hard, real hard."). She described also having repeated head injuries throughout her marriage. She was not sure whether or not she experienced loss of consciousness, but indicated that "would see stars" and be "blank." When her head was hit particularly hard, she would "just go to sleep".

Other than the conviction for which she was given the death penalty, to my knowledge she does not have prior criminal offenses. She reported that she had received three disciplinary reports

4

SP&A 08639

000000666

while in prison—two for "using make up" and one for having tobacco on her food tray. She reported that she did not put the tobacco on the food tray because she had never had tobacco while in prison. It is her belief that the tobacco was placed on her food tray by a cafeteria worker or another inmate.

Reports indicate that her childhood was unusual. She reportedly did not have contact with her biological father after she was 5 years old. She was adopted by Alejo Ochoa when she was 5-6 years old. His occupation is described as construction, but primarily as "ministry activities" where he is described as "fundamental Christian." Elements of early childhood abuse are not fully described. *Although details not known to me, it is reported that she was sexually abused as a "very small child,"* before three years of age. As indicated, her early childhood was unusual, and would be considered abusive. Although family life as a Christian family is not considered "abusive," elements in her family life would be considered abusive. Her family was described as "fundamentally Christian." Her adoptive father is described as a "street minister" and part of a traveling ministry. They reported lived predominantly in a trailer, moving frequently. Her education was provided exclusively in a Christian school which apparently had somewhat limited typical educational experience, with biblical topics incorporated into educational subjects that were taught.

She was reportedly not allowed to dance or listen to "secular music." Her social activities were strictly limited. Her friends were permitted only to children of other Christian preachers, and her social interactions were permitted to be associated only with other individuals who were known to be Christian. Her first heterosexual date was when she was 18 years old, and that date was chaperoned by her parent(s).

Her discipline at home was described by her parents as atypical. She reportedly was "spanked with a wooden paddle," the severity of which is not known to me. Consequence of discipline was, however, described as being of such severity that she reportedly occasionally ran away from home with friends to avoid punishment. *Another incidence is described as her father yelling at her, grabbing her by the shoulders and shaking her and telling her to "get out of sight."* No further information about disciplinary procedures is known to me.

Wendi Andriano was married to the victim in this offense, Joe Andriano, in 1994. Her father reportedly disapproved of her relationship with him and at one point had refused to speak to her for at least one year because of the relationship. She and her husband initially lived with his parents. They have two children, Nicofas who was born in 1997 and Ashley who was born in 1998. Their marriage is described as often troublesome, with descriptions of frequent arguments, threats of harm to her, being hit on several occasions, and incidences of retreating to the bathroom and locking the door. On one occasion her husband is described as becoming so angered that he banged on the bathroom door until the door was broken and had to be replaced. She described being hit several times by him and on another occasion being squeezed "until it was hard to breathe."

In 1994 Joe Andriano was diagnosed with a "lump" in his neck which was surgically removed and diagnosed as benign. In 1995 and again in 1997 a lesion was again diagnosed, surgically removed and described as benign. In 1998, when a lesion again appeared and was again surgically removed, the lesion was identified as positive for cancer. He received extensive surgery, followed by radiation and chemotherapy and he sought what is described as "holistic"

5

SP&A 08640

treatment . While hospitalized he is described as uncooperative and aggressive with nursing staff, with at least one incidence of throwing a medical chart at nursing staff. Following hospitalization he is described as experiencing severe nausea, hair loss, anger and depression. In testimony, Wendi Andriano indicated that "he blamed me for God not healing him."

In 2000 he reportedly talked about suicide, sought cyanide but purchased sodium azide rather than cyanide. She testified that he believed that this method of suicide would be quick and painless. These actions were either quick or painless but resulted in more severe symptoms which left him "sick and scared." She testified that they then participated in "assisted suicide."

Brain Functioning and Neuropsychological Assessment

Neuropsychological testing is guided by understanding of the phylogenetic structure of brain structures and brain connecting systems. One such developmental understanding was proposed by Ivan Yakovlev in 1967 and is currently supported and relied upon by contemporary neuroscientists in understanding brain function (Bear, Connors & Paradiso, 2001).

Yakovlev described the brain as organized in three separate but related systems, with three primary connecting systems. There is a primitive nuclear core of the brain, the allocortex, which includes the brain stem, reticular activating system, pons, medulla and cranial nerves, and functions to main ain consciousness, metabolism, respiration, and circulation and to filter stimuli received from the environment. The middle system, the neocortex, includes limbic system structures including the hypothalamus, hippocampus, thalamus, basal ganglia and amygdala, serves primary functions of motivation, memory, arousal, emotion and mood. The outer layer, the isocortex, includes the sensory and motor cortices, corpus callosum, cerebrum (occipital, parietal, temporal, and prefrontal lobes) and cerebellum. Orbitofrontal-paralimbic, hippocampal-paralimbic and subcortical-limbic connection circuits provide a "flow" of information throughout the brain (Yakovlev & Lacours, 1964/1967; Bear, Connors & Paradiso, 2001).

In addition to knowledge of the phylogenetic development of the brain, neuroscientists have known for many years that the normal brain develops in a specific and predictable sequence. Brain regions responsible for arousal, filtering information, auditory, visual, and tactile/kinesthetic abilities develop first; brain regions responsible for analyzing and integrating information sequentially develop next; and brain regions responsible for simultaneously analyzing and integrating information develop last, with the brain continuing to develop through adolescence and into young adulthood.

In early childhood, the primary portions of the brain that function for motor, sensory, attention filtering, visual dimension and color, and analyzing language sounds undergo the greatest maturation. In middle childhood, the secondary portions of the brain that function to develop abilities for reading, writing, spelling, arithmetic and other secondary language academic skills undergo the greatest maturation. In adolescence and into young adulthood, the tertiary portions of the cerebrum, particularly the temporal and prefrontal cortices undergo the greatest maturation (Luria, 1966/1973/1986).

Neuroscientists have known for many years that the prefrontal cortex and networks of connections to and from the prefrontal cortex are the last brain region to mature, undergoing

SP&A 08641

6

000000668

profound brain growth and change through adolescence and into young adulthood.  It has been well established that the region of the brain that is undergoing the greatest maturation, is also the brain region that is most vulnerable to damage.  Development and maturation of the prefrontal cortex is most vulnerable to damage during adolescence.  As the prefrontal cortex develops and matures, the individual's abilities for executive functioning also mature.  Prenatal neurodevelopmental abnormality and brain insult(s) as a child interfere with further development of all other brain systems and structures (Pfefferhan, 1994; Gied, 1999; Sowell, 2000/2001/2003; Adelman, 2002; Casey, 2000/2005; Durston, 2001; Gogtay, 2004).

Neuroscientists are also now aware of the consequences to brain development of childhood abuse and/or neglect.  It is believed that when a child experiences persistent abuse or lives in a highly anxiety producing environment the brain noradrenic system is over stimulated leaving the child in a state of increased norepinehrine and dopamine production resulting in damage particularly to the prefrontal, temporal, hippocampus, amygdala, cerebellum and neuropathways throughout the brain results.  If that abuse continues from childhood into adulthood, the brain damage continues with consequence of attention deficit, executive functioning deficiency, memory impairment, emotional dysfunction and psychiatric disorder, particularly depression and acute anxiety disorders (Teicher, 2002; Van der Kolk, 2003).

Neuroscientists are also aware of the consequences of brain damage associated with persistent fear or anxiety that is initiated during childhood and continues in adulthood but continues into adulthood.   Prefrontal, temporal cortex, limbic system, hippocampus, amygdala, cerebellum, and neuropathways among these brain regions as previously described continue.  Additionally, diminished right-left hemisphere integration in exchange between the right and left brain hemispheres across the corpus callosum and structured damage to the cerebellum, particularly the cerebellar vermis, and integration of information from the cerebellum to other brain region intensify.  Abnormality of neurotransmitters, particularly norepinephrine and dopamine, as well as electrical activity particularly from the cerebellar vermis though pathways through the cortex continue and are demonstrated in individuals who experience one of several psychiatric disorders, including  depression disorders and acute anxiety disorders.

As a result, degeneration and smaller brain structural size, neuropathway immaturity, abnormal neurotransmitter production, abnormal neural activity particularly electrical stimulation of neuron movement, and impaired postsynaptic receptors  have been found  in several psychiatric disorders, and particularly in depression and overwhelming anxiety disorders.   Prefrontal, temporal, hippocampus, amygdala, cerebellum, neuropathway and abnormal communication of information across the corpus callosum have been shown.

Results of Neuropsychological Evaluation:

Wendi Andriano's performance on neuropsychological testing is summarized in the following sections of this report.  A detailed description of her abilities on neuropsychological testing is described in greater detail in an addendum to this report.

*Attitude Towards and Effort on Testing.*  Wendi's attitude towards and effort on neuropsychological testing was evaluated using tests specifically developed to assess her effort on testing and possible attempt to manipulate her testing ability, or to malinger.  These tests included 15 Item Test, *Test of Malingering (TOMM)*, *California Verbal Learning Test (CVLT*

II) Forced Choice, Green Word Memory Test, Bolder Index of the Rorschach Test, and Structured Inventory of Malingered Symptoms (SIMS). Wendi Andriano's responses to all these tests of effort and potential manipulation indicate that she was cooperating with testing, was putting forth an appropriate level of effort on testing, and was not attempting to "fake" or "malinger" her test performance.

Wendi's attitude towards and effort on neuropsychological testing was also consistently evaluated through my observations of her abilities throughout the testing, through patterns of her abilities on individual neuropsychological tests. This is achieved through assessment of the consistency both within and across her neuropsychological testing, and through evaluation of patterns of abilities on neuropsychological tests that are known to be associated with specific neurological disorders. All indications are that Wendi Andriano was cooperating with testing, was putting forth substantial effort to complete all neuropsychological tests, and was not attempting to malinger or to manipulate the testing results. Wendi's abilities as described in this evaluation are considered a valid assessment of her functioning.

_Intellectual Functioning_: Wendi Andriano's general mental ability was evaluated using the Wechsler Adult Intelligence Scale (WAIS-IV). Her abilities on the WAIS-IV place her general mental ability in the Average Range of intellectual functioning (Full Scale =104, 61st %ile; 95% Confidence = 100 - 108). Her verbal abilities that require reasoning, comprehension and conceptualization using verbal information was in the High Average range (VCI =110, 75th %ile Confidence =104 – 115). Her nonverbal reasoning and visual-perceptual organization were in the High Average range (PRI = 115, 84th %ile Confidence = 108 – 120). Her simultaneous and sequential processing of information, attention and concentration was substantially lower but within the Average range (WMI = 102, 55th %ile Confidence = 95 - 109 ). Her speed of mental processing and visual-perceptual skills were, however, significantly lower and in the Borderline Range (PSI = 76, 5th %ile Confidence = 70 – 87).

_Sensory Perception_: Wendi's sensory perception was evaluated using the Smell Identification Test (SIT) and bilateral primary and secondary sensory perception. On the SIT she had four errors (26th %ile) indicating Normosia to Mild Microsmia. Although she did not experience impairment on primary tactile, auditory or visual perception, her secondary sensory perception was significantly impaired with impairment in the moderate range. This pattern of impairment implicates reasonable normality of the primary sensory perception strip, but significant impairment when more complex information has to be integrated among the sensory strip and other brain regions. Prefrontal cortex, orbitofrontal pathway and frontal-subcortical pathway impairments are primarily indicated.

_Motor Coordination_: Wendi's motor coordination was evaluated using the Grooved Pegboard Test and Finger Tapping Test. On the Grooved Pegboard Test she had mild dominant (right) impairment and mild-moderate non-dominant (left) impairment (Grooved Pegboard Right = 56, SS -1; Left = 84 -1.5; Finger Tapping Right =36.7, SS -2; Left 33, SS-2).

Sustained fine motor ability is primarily mediated by the posterior motor region of the prefrontal cortex, in coordination with other brain regions. Her abilities on these tests of motor coordination indicate overall impairment within the motor strip, prefrontal cortex, orbitofrontal pathway, frontal-subcortical pathways, and corpus callosum.

SP&A 08643

8

000000670

*Attention and Concentration:* Wendi's attention and concentration was evaluated using the Conners' Continuous Performance Test (CPT), Paced Auditory Serial Attention Test (PASAT), Visual Perception Test (VSPT), Seashore Rhythm Test and Sensory Perception Test. With the exception of the quick and simple VSPT and simple Sensory Perception Test, her abilities on all other measures of attention and concentration were significantly impaired.

Motor strip, prefrontal cortex and orbitofrontal and frontal subcortical pathways impairments are indicated.

Her ability on the VSPT and Sensory Perception Test was within the average range (VSP = 95th %ile; Sensory Perception Test = Average Range). Her abilities on the more complex CPT and PSAT, however, were significantly impaired.

On the CPT her performance demonstrated significantly impaired attention and concentration with an equal chance that her attention and concentration is like that of individuals who experience Attention Deficit Hyperactivity Disorder and attention disorder associated with other Neurological Disorder(s). Her reaction times were slowed and inconsistent. Her ability to change her response time as the time of the target stimuli changed was significantly impaired. When the target stimuli slowed, her abilities were most impaired. She also was impaired in her ability to sustain her attention to the test, with her abilities becoming more impaired the longer the test progressed. Poor performance indicates potential attention problems with several significantly elevated and impaired attention measures. Co-existing, poor performance indicates potential neurological deficit(s) other than attention problems, with several neurological measures also significantly elevated and like those of individuals who experience a neurological disorder.

The PASAT requires the individual to listen to numbers paired together and remember the last number heard, adding the number last heard to the number previously heard. There are four separate trials. The numbers do not change, but each successive trial presents the information more rapidly. Of all tests of attention, her abilities on the PASAT were the most impaired, with classification of ability persistently in the inferior range. Her impairment ranged from mild to severe. Observing her attempt to complete this test was uncomfortable to observe. She was obviously expending extraordinary effort to be successful on the test. She simply was not able to accomplish the task. She was unable to successfully remember and manipulate simple numbers from the time the test was initiated and until the test was completed. Her abilities throughout this test were severely impaired, but became more impaired as the test progressed.

Both the CPT and PASAT are complex tests of attention and the VSAT is a simple test of attention requiring less than one minute to complete. As the tests of attention became more complex, her abilities became more impaired.

In addition to completing tests which were directly administered, she independently responded to the Connors' CAARS. This is a self-report test in which the individual is asked to respond to thirty questions describing behaviors or problems that are experienced by adults. Their responses are then compared to the responses of individuals who have known attention deficit disorders and those who do not experience attention deficits. Each question is ranked on a scale of 0 to 3, with 0 = Not at All and 3 = Very Much, Very Frequently. Wendi's responses to this

SP&A 08644

000000671

self-report measure were significantly like those of individuals who are diagnosed with Attention Deficit Hyperactivity Disorder (ADHD).

Attention is process that allows awareness of a part or aspect of the environment and allows selective responsiveness to one class of stimuli while simultaneously being able to filter out or ignore information which is not essential or simply confusing to understanding a situation or environment. Attention is not a single ability, but rather includes multiple aspects including arousal, perception, divided attention, selective attention, sustaining attention and shifting attention. The entire brain is involved in attention and concentration. Primary neural regions include the prefrontal cortex, reticular activating system, cerebellum and frontosubcortical and orbitofrontal pathways. Attention forms the basis for all cognitive abilities. Her disabilities on tasks of attention and concentration, combined with descriptions of her daily functioning indicate impairment of these brain regions and structures.

*Memory and Learning:* Wendi's memory and learning of verbal and visual information were evaluated using the California Verbal Learning Test (CVLT-II), Rey Complex Figure Test (Rey), Wechsler Memory Scale IV (WMS-IV), Tactual Performance Test Memory and Location trials. Her abilities on the WMS-IV and Rey memory trials were in the average range.

Motor strip, prefrontal cortex and orbitofrontal and frontal subcortical pathways impairments are indicated. Her abilities on the WMS-IV and on the Rey immediate memory were in the average range. Her abilities on all other measures of memory and learning were, however, mild – moderately impaired.

The CVLT-II requires the individual to learn verbal information that is repeated several times, recall that same information both immediately and again after a 30 minute delay, and recognize information when a choice of information is provided. The CVLT-II also has one subtest that was developed specifically to identify individuals who are attempting to manipulate their testing abilities or are *not providing sufficient effort to complete neuropsychological testing to the best of their ability.* This CVLT-II subtest has been demonstrated to identify with 96% the accuracy those individuals who were not putting forth appropriate effort and/or were attempting to manipulate their abilities (Millis, Putnam, Adams & Ricker, 1995).

On CVLT-II, her ability to learn information after the information had be repeated five items was significantly impaired. Her ability to learn information the first time the information was heard was mild-moderately impaired (Trial 1 = SS-1.5). Her ability to learn new information was mild-moderately impaired. She had a significant error, remembering information that had never been presented (Intrusion = SS -1). There were a significant number of instances when she remembered information that had never been presented (Intrusion Errors = SS -1). On the Wechsler Memory Scale IV (WMS-IV) her abilities were within the average range.

The Rey Complex Figure Test requires the individual to copy a complex figure; recall the figure they had just copied after a one minute delay; recall the figure again after a 30 minute delay; and distinguish between accurate and inaccurate portions of the figure after a 30 minute delay. Her ability to recall the information immediately was in the average range (Immediate Recall = T = 50, 50th %ile) . Her ability on all other measures was moderately – severely impaired (Total Recognition T = 33, 4th %ile; Recognition True Positive 2-5th %ile; Recognition False Negative 2-5th %ile). It is noteworthy that memory errors occurred even after requiring significantly

longer to copy the figure, which should have enhanced the probability of recalling the information  (Copy = 7 minutes 3 seconds <1ˢᵗ%ile).

Memory and learning are primarily mediated by the brain's neocortex (thalamo–limbic system, hippocampus, amygdala, basal ganglia), the brain's mesocortex (temporal and prefrontal cortices), and all brain connecting systems (frontal-subcortical, hippocampal, orbitofrontal) connections to and from these brain structures. Memory and learning are also strongly impacted by the brain's ability to transfer information across the corpus callosum to and from the right and left brain hemispheres as well as transfer of information from the cerebellum vertex to the prefrontal cortex. *Her disabilities across these tasks of memory and learning indicate impairment within all of these brain structures and pathways).*

   *Language*:  Wend's secondary language was evaluated using the Wechsler Individual Achievement Test (WIAT II) Word Reading, Reading Comprehension, Pseudoword Decoding, Numerical Operations and Math Reasoning subtests.  Although her Pseudoword Decoding and Math Reasoning abilities were in the mild range of impairment, her abilities on other WIAT-II subtests were in the average range.    For her, primary parietal and occipital brain structures are strengths for her and within the average range.  Connecting region between these structures, particularly the angular gyrus region is significantly impaired.

   *Visual-Perceptual*:  Wendi's visual perception was primarily evaluated using the copy trial of the Rey Complex Figure Test (Rey) and the WAIS-IV Perceptual Organization and Processing Speed Indices.  The Rey is a test evaluating the individual's ability to copy a complex design while the figure can be seen.  The WAIS-IV Perceptual Organization Index is a measure of the ability to analyze and synthesize abstract visual stimuli and the WIAS-IV Processing Speed Index is a measure of sort-term visual memory, cognitive flexibility, visual discrimination, psychomotor speed, speed of mental operation, attention and concentration.

   The Rey Complex Figure Copy trial requires the individual to copy a figure while viewing the stimulus.  Her ability to copy this figure was within the average range.  It is noteworthy, however, that it required significantly more time for her to complete this task. Whereas most individuals required less than five minutes to copy the figure, she required 7 minutes 20 seconds (<1ˢᵗ %ile) to complete this task.  As previously demonstrated on the WIAT II her visual-perception is brain strength.  When required to coordinate information from these brain structures to the prefrontal cortex, however, her ability is severely impaired.

   *Executive Functioning*:  Executive functioning is an umbrella construct that describes processes responsible for guiding, directing, and managing thinking and emotional regulation. Mature executive functioning provides for purposeful, considered, goal directed actions. Executive functioning also is the ability to problem solve, and includes abilities to initiate, attend, inhibit, shift, monitor, organize, and control thinking and actions.

Executive functioning is mediated by the brain prefrontal cortex, but also requires interconnection among the prefrontal cortex and other cortical and subcortical regions of the brain, comprising a prefrontal *system*.  As previously described, the developmental course of executive functioning is sequential and prolonged, beginning as a child, continuing through adulthood, and with the greatest maturation occurring during adolescence (12 – 18 years of age). Adequate and mature prefrontal cortex development is required for just about every aspect of

11

000000673

SP&A U8646

adult functioning—judgment, self-awareness, decision making, planning, organizing, flexible thinking, and initiating, monitoring, and controlling impulses and actions.

The prefrontal cortex is the largest brain structure in the human brain, comprising 20-25% of total brain tissue. The prefrontal cortex is divided into four regions—motor, mesial, dorsolateral and orbitofrontal. Each of these pre-frontal cortex regions mediates executive functioning, but each of these regions also is predominantly responsible for different aspects of executive functioning. For example, the motor region primarily regulates motor coordination and integration of motor coordination and sensory perception. The mesial region primarily regulates emotion, motivation, drive, and the ability to monitor actions. The dorsolateral region primarily regulates organization, initiation, planning, flexible thinking, problem solving, the ability to categorize and organize memory, and—in combination with the mesial region—the ability to monitor and change actions. The orbitofrontal region primarily regulates judgment, insight into deficits, irritability and emotional liability, olfaction, disinhibition, and control of actions. The orbitofrontal region also plays a primary interactive role with the limbic system, assessing and altering emotion.

Wendi Andriano's executive functioning was evaluated using subtests of the Executive Functioning Test (EFT), Wisconsin Card Sorting Test (WCST), Comprehensive Affect Testing System (CATS) and Iowa Gambling Test (IGI). The Executive Functioning Test is a series of tests which systematically evaluate functioning of each region of the prefrontal cortex as well as connecting systems to and from the prefrontal cortex and all other brain regions. The Wisconsin Card Sorting Test is one of the oldest tests of prefrontal cortex functioning, and requires the individual to develop a rule, consistently apply that rule, and respond to information provided by the test by flexibly changing their thinking and actions as signaled by the test. The Comprehensive Affect Testing System (CATS) is one of the newest tests of executive functioning (2003), and systematically evaluates the prefrontal cortex, temporal cortex (including extended limbic system), and connection between these brain regions. The Iowa Gambling Test (IGT) evaluates the individual's ability to think ahead, plan, organize, and weight the consequences making decisions.

Although she he was successfully able to complete some EFT subtests, her abilities were predominantly impaired. On the 25 EFT Primary Measures, her abilities were significantly impaired on 72% of EFT measures. On WCST, her abilities were significantly impaired on 88% of the measures. Her abilities on all CAT Subtests (Affect Recognition; Prosody Recognition; Emotional Recognition) were significantly impaired. On the IGT her ability to think about the task was within the average range. Any IGT measures which required decision making, however, were significantly impaired (Deck A Decision Making = 2-5th %ile; Deck D Decision Making – 11 – 16th %ile).

Although Wendi Andriano's abilities on tests of executive functioning were quite severely impaired, within these tests, those executive functioning tests which required rapid processing of information, flexible thinking, decision making, and/or inhibition were the most severely impaired. The ability to rapidly process information allows the individual to face a new or different situation, take in information that is relevant to that situation while ignoring information which is not relevant to that situation, and put that thinking into actions. Flexible thinking is a "hallmark" of executive functioning and is the ability to abandon a previous response to generate a new response when demands of the situation require a change. It is also the ability to move freely from one situation to another, one aspect of a problem to another, make transitions to new

12

000000674

SP&A 08647

thinking and actions, and consequently to effectively solve problems. Inhibition is the inability to stop responding to the immediate physical environment (what is happening at this moment and not beyond) in order to think, consider and plan alternate ways of solving a problem and responding accordingly to that situation. Inhibition also is the inability to disengage involvement in the immediate in order to organize, plan, problem solve and act in ways that are appropriate to the situation. Executive functioning is mediated by the prefrontal cortex. These particular executive functioning abilities are predominantly mediated by dorsolateral and orbitofrontal prefrontal cortex regions, as well as pathways among the prefrontal cortex and all other brain structures, particularly the hippocampus, temporal, limbic amygdala, and cerebellum.

Wendi had a range of abilities across measures of executive functioning, indicating a pattern of brain normalcy and abnormality. Her abilities across measures of executive range ranged from within average range to severely impaired, depending on which brain region within the prefrontal cortex was required to complete the specific test. In the interest of some brevity, Wendi's abilities on all of these measures of executive functioning are described in detail in the addendum to this report. If further information is needed, please advise me.

Psychological Functioning:
Wendi Andriano's emotional functioning was evaluated using the Rorschach Test, Dissociative Experience Scale (DES), Multi-score Depression Inventory (MDI) and Detailed Assessment of Posttraumatic Stress (DAPS). Her responses to each of these tests indicate that she was not attempting to exaggerate her feelings and was providing a valid description of her emotional experience.

On the Rorschach Test her responses are like those of individuals who have experienced mild depression for much of their lives. Her Rorschach responses suggest that she is pervasively introverted. She would expend much effort looking inside her own feelings and attempting to understand them without the help of others. Unfortunately for Wendi, when she looks inside herself she experiences much pain and negative feelings about herself. Her responses are like those of individuals who have limited emotional resources, are extremely emotionally vulnerable and consequently are emotionally dependent. Her responses are like those of individuals who have experienced themselves as "damaged," and take a passive role in their interactions with others. They are individuals who attempt to avoid emotion because they have some awareness of their emotional vulnerability. Overall, her responses are like those of individuals who have been diagnosed with Dysthymia or Mood Disorder. The possibility of Bipolar Disorder would not be ruled out.

On the Dissociative Association Scale (DAS) Wendi acknowledged several experiences consistent with the experience of dissociation. Of particular note, she acknowledged some out of ordinary experiences of listening to someone talk and suddenly realizing that she did not hear part or all of what was said; of someone approaching her that she does not know and the individual calls her by name or insists that they have met previously. She acknowledged having no memory of some important event in her life (for example a wedding or graduation). Of particular concern she indicated that she had experienced times when she was not sure whether things that she remembered had really happened or whether she just dreamed them; that sometimes when she is alone she talks out loud to herself; and that she had experienced hearing voices inside her head that tell her to do things or comment on things that she is doing.

SP&A 08648

13
000000675

On the Multiscore Depression Inventory (MDI) Wendi acknowledged extreme fatigue, overwhelming feelings of pessimism and hopelessness, extreme feelings of guilt and that she experiences overwhelming feelings of sadness. Overall, her responses to the MDI would satisfy the diagnosis of a Mood Disorder.

On the Detailed Assessment of Posttraumatic Stress (DAPS) she described her life as having experienced multiple situations of fearfulness and overwhelming anxiety dating back to childhood and continuing into adulthood. She described herself as frequently bothered by intrusive recollections of her experiences, as having upsetting memories, dreams and flashbacks of the experiences, and as regularly being bothered by intrusive recollections of these experiences of fear. She indicates that she has a tendency to withdraw or "shut down", particularly when her experience is of recalling her fear. Overall, her responses to the DAPS would satisfy the diagnosis of PTSD or of Acute Anxiety Disorder.

## Summary

Wendi Andriano's abilities across neuropsychological tests are like those of individuals who experience serious neurological and psychiatric disorders. From a neuropsychological perspective, early childhood mistreatment and early childhood fear and anxiety are likely brain impairment consequences of Cognitive Disorder. From a psychiatric perspective these same factors of serious early childhood mistreatment, fear and anxiety, as well as continuing experiences of fear and anxiety into adulthood are likely psychiatric consequences of Depression Disorder and/or Anxiety Disorder.

Disabilities in thinking, reasoning, planning, making decisions, anticipating consequences of plans and actions, maintaining impulse control, attending and concentrating, remembering important information, recognizing emotional problem, seeking help for emotional problems, and consistently communicating information in accurate and meaningful ways would need to be considered.

*[signature]*

Myla H. Young, Ph.D., ABN


Clinical Neuropsychology
Office:                                    Mailing:
1475 North Broadway, Suite 335            1630 North Main Street #357
Walnut Creek, CA 94596                    Walnut Creek, CA 94596
(925) 952-4350

SP&A 08649

14
000000676

**EXHIBIT "D-6"**

**GWW** GEORGE  W.  WOODS,  JR., M.D.
A PROFESSIONAL CORPORATION
DIPLOMATE OF THE AMERICAN BOARD OF PSYCHIATRY AND NEUROLOGY

1-866-646-0509
E-mail:gwoods@georgewoodsmd.com
Oakland Atlanta

Stephan Nickels, Esq.
Foley and Lardner, LLP
Madison, Wisconsin

> Re: Wendi Elizabeth Andriano

Mr. Nickels,

In accordance with your request to provide the government with a summary and outline of my testimony, I submit the following report. The purpose of this report is to outline my expert opinion regarding whether Ms. Andriano had any mental defects or impairments at the time of the crime and/or throughout her lifetime.

## MATERIALS RELIED UPON

The data or other information considered by me in forming opinions in this case are listed in **Appendix A**, attached. The substance of my opinions as expressed in this report can be summarized in a PowerPoint should you desire one as an Exhibit for court proceedings.

In order to complete my neuropsychiatric examination, I interviewed Wendi on 11/23/2010, 1/18/2011, and 4/26/2011.  I also interviewed her mother, Ms. Donna Ochoa, on 4/27/2011. I reviewed Wendi's academic history, employment history, and medical/mental health history.

In addition, I reviewed Wendi's paternal and maternal family history, including available medical, school, and prison records and declarations from persons who knew Wendi,

1

SP&A 08265

000000289

including Donna Ochoa, Alejo Ochoa, Shelby Wayne Robertson, family members, church members, pastors, classmates from Wendi's elementary and high school years, and persons who knew Wendi as an adult.  The social history of Ms. Andriano created as a part of this report is attached as **Appendix B** and incorporated herein.  Much of the comprehensive social history information is summarized in the report of James Hopper, Ph.D., which supplements this report as to the matters contained therein.

I reviewed the police investigation, including Wendi's interrogation, trial transcripts and jail and prison records.

A complete list of records reviewed is included in Appendix A.

## QUALIFICATIONS, EXPERT WITNESS EXPERIENCE, AND COMPENSATION RATE IN THIS CASE

My qualifications, publications, and expert witness experience are fully set forth in my Statement of Qualifications and C.V., attached as **Appendix C**. My compensation rate in this case is $350 per hour.

I am a licensed physician specializing in neuropsychiatry. I am in private practice focusing on neuropsychiatry, psychopharmacology, workplace safety, and forensic consultations. My business addresses are 4200 Park Boulevard, #545, Oakland, California 94602, and 220 Renaissance Parkway, #1220, Atlanta, Georgia 30308.

My qualifications, background, experience and expert witness experience are set out in full and attached as **Appendix D** and incorporated herein.

I maintain a private clinical practice in neuropsychiatry, psychopharmacology, and psychotherapy in Oakland, California.

2

SP&A 08266

000000290

## SUMMARY OF FINDINGS

In combination with a familial history of mental illness and a multi-generational history of trauma and abuse, while growing up, Wendi was subjected to emotional and physical neglect, sexual abuse, beatings, isolation, extreme poverty, cultish indoctrinations, exploitation, extraordinarily traumatic events, and marginalization. As a result, Wendi developed neurocognitive deficits, environmental impairments, and psychiatric illnesses, including: (1) bipolar disorder; (2) complex posttraumatic stress disorder; (3) dependent personality disorder; (4) cognitive disorder not otherwise specified; and (5) caregiver burden.

These illnesses are co-morbid in Wendi, with their effects and symptoms intensified in combination and in aggregate. The amalgam of Wendi's neurological impairments and psychiatric illnesses, combined with her social, religious, familial and cultural upbringing, resulted in significantly impaired judgment, extremely limited ability to recognize, understand, and appreciate context in the world around her, and a limited and circumscribed ability to respond self-protectively. These deficits were and are most pronounced in times of extreme stress and novel circumstances.

Wendi's mother, biological father, and adoptive father exhibited symptoms of mental illnesses, addictions, and impairments that were severely damaging to Wendi at every developmental stage from infancy to young adult.[1] Mental illness, alcoholism, drug addiction and cognitive impairments are common in varying presentations and combinations within Wendi's family, extended family, and the insular, isolated communities in which she grew up.[2]

---

[1] School records of Alejo Ochoa; Military Records of Shelby Robertson; Mental Health Records of Shelby Robertson; Criminal History and ADOC records of Shelby Robertson; Mental Health Record of Donna Ochoa; Tabs 10, 12, 16, 24, 27, 30, 32, 36.

[2] School records of Alejo Ochoa; Military Records of Shelby Robertson; Mental Health Records of Shelby Robertson; Criminal History and ADOC records of Shelby Robertson; Mental Health Record of

SP&A 08267

000000291

Family and community members report a range of symptoms and behaviors including psychotic episodes, depression, mania, suicidal tendencies and attempts, delusional disorders, polysubstance abuse, and many others.[3] These symptoms and behaviors impacted the Ochoa family's daily life and basic functioning, compromised caregiving and parenting, continued unchecked due to a lack of education and awareness among their sufferers, and, for Wendi's caregivers, were never ameliorated by medical or psychiatric treatment until after she was incarcerated, and then only to a limited extent, primarily through medication.[4] While Wendi was growing up, these symptoms and behaviors were intensified by long periods of extreme isolation, poverty, and transience.[5]

Wendi's neurological and cognitive impairments that resulted from her multigenerational and transgenerational[6] family history of mental illness, abuse, trauma, and addiction, as well as the psychological, emotional, physical and sexual abuse, and isolation to which Wendi was subjected for her entire childhood. These impairments manifested themselves more severely after Wendi met and married Joe Andriano in a succession of poor choices that ever more deeply embroiled her in a pattern of alternating dependence and self-sacrificing caregiving.

---

Donna Ochoa; Medical and Mental Health Records of Nadine Bednorz, Clark Bednorz, Jr., Kathy Worsham, LaVerne Ann Worsham, Tabs 10-14, 16, 18, 24, 27, 30, 32-35.

[3] Ibid.

[4] Mental Health Record of Donna Ochoa, Tabs 24, 27.

[5] Address History of Donna Ochoa, Social Security Earnings Records of Shelby Robertson, Arizona Social Services Records; Tabs 24, 27, 36, Tab 10 at ¶ 37, Tab 35, at ¶ 6.

[6] As used in this declaration, "multigenerational" means across multiple generations of ancestors and descendants, while "transgenerational" means across multiple individuals of various parentage within the same generation.

4

SP&A 08268

000000292

By reviewing the trial court proceedings,[7] including testimony presented by Wendi and witnesses, I determined that the nature, severity, and ramifications of Wendi's mental illness, of her family's extensive history of mental illness, and the consequences of the extreme trauma, abuse, and neglect that she survived, were not presented to the jury. The evidence, arguments, and inferences that *were* presented to the jury failed to represent Wendi's biopsychosocial history and her mental state prior to and during the time of the offense for which she was sentenced to death. Further, Wendi's mental state after she was arrested and during the time she was incarcerated in the Maricopa County Jail prior to her sentencing was also mischaracterized and misdiagnosed.

This report is divided into two sections: (1) Clinical Findings, Mental Status Examination, and Diagnostic Conclusion for Wendi Elizabeth Andriano and (2) Forensic Analysis and Formulation of How Wendi Andriano's Mental Disorders Impacted her Behavior in Relation to the Offense, which supports and contributes to my diagnoses.  For a complete social history of Wendi Andriano, please see the full report of James Hopper, Ph.D.

1. **Clinical Findings, Mental Status Examination, and Diagnostic Conclusion for Wendi Elizabeth Andriano**

Wendi Elizabeth Andriano suffers from multiple mental disorders that were present before the offense for which she has been charged and convicted.

   a. **Clinical Findings**

*First*, Wendi suffers from Bipolar Disorder, a prevalent disorder within her maternal extended family. Many individuals, including Wendi's mother, Donna; maternal aunt, Nadine; grandmother, Ann; and multiple cousins have been diagnosed, treated, or have exhibited symptoms for bipolar disorder.

---

[7] See Appendix A.

5

SP&A 08269

000000293

Wendi manifested symptoms of bipolar disorder during the months prior to her husband's death, including hypersexuality, impaired judgment, depression, irritability, increased alcohol use, impaired contextual understanding, and poor mental flexibility. She was treated with medications used in the treatment of bipolar depression for years after her arrest and incarceration.

*Second*, Wendi suffered from Complex Post-Traumatic Stress Disorder ("PTSD"), resulting from ongoing sexual coercing by her father and neglect by her mother. Symptoms of affective dysregulation, anger, dissociation, affective numbing, avoidance, acquiescence, and hyperreactivity mark much of Wendi's life, particularly during her marriage to Joe Andriano. Wendi also meets the criteria for Type I PTSD. She suffered from irritability, rumination, hypervigilance, and hopelessness.

*Third*, Wendi meets the criteria of Dependent Personality Disorder. She was pathologically subservient in relationships, unable to tolerate the loss of relationships, and became emotionally impaired when unable to discern her role in intimate relationships. Her personality structure was formed by the ongoing sexual coercion and neglect of her father and mother during her formative years.

*Fourth*, Myla Young, PhD, documented cognitive deficits in processing speed and understanding social context, as well as impaired decision making. Dr. Young's neuropsychological findings support the diagnosis of Cognitive Disorder Not Otherwise Specified (Cognitive Disorder NOS).

*Fifth*, Wendi suffered from Caregiver Burden, the tremendous emotional strain imposed upon those who take care of the terminally ill. Wendi was the financial, emotional, psychological, and day-to-day functional caregiver for not only her dying husband, but her

6

SP&A 08270

000000294

children as well, in the years leading up to Joe's death. The clinical literature documents the destruction of resiliency that caregiver burden can cause, especially in the face of an emotionally fragile person like Wendi.

Symptoms of each of these disorders include stealing money from her employer, lying on employment applications, becoming sexually provocative, creating false documents in the presence of employees and others, drinking to excess, extreme and spontaneous anger. Each of these symptoms could have been identified at the time of trial by a comprehensive social, medical, and psychiatric history. Many of these symptoms were identified and treated after she was incarcerated.

All were in play at the time of the offense, a synergy of trauma, cognitive deficits, and mood defects, impairing her ability to conform her behavior to the requirements of the law. Below is a discussion of Wendi Andriano's mental status examination and diagnostic impressions, followed by a more detailed description of each of the five symptom complexes and their role in Wendi Andriano's mental state before, during, and after the offense for which she has been tried, convicted, and sentenced to death.

      b.    **Mental Status Examination and Diagnostic Impressions of Wendi Elizabeth Andriano**

Wendi Andriano is a white female who looked younger than her stated age. She was regularly dressed in orange prison garb during my evaluations. She was oriented to person, place, date, and circumstances. Her movements were fluid. She used and gestured with her hands a great deal.

Wendi denied perceptual disorders such as hallucinations, illusions, and delusions. She did display occasional thinking which bordered on magical thinking, as well as

SP&A 082/1

000000295

P-App. 004640

significant denial. This thinking was specifically around her current adjustment to prison, and is discussed below.

Wendi dissociated on several occasions. Wendi appeared to look away, and did not respond. There were no indications of epileptiform disorder, such as her looking only in one direction or motor involvement. Her dissociation was related to discussions of traumatic events, both in her family, during her marriage, and at the time of the offense.

The first instance was during our first discussion about the sexual coercion by her stepfather, Alejo Ochoa. She dissociated when she was told about sexually provocative photographs taken of her by her father, as reported by Brandon Ochoa and Cynthia Schaider,[8] and when she was shown a picture of herself taken by Alejo ("Lightning Photo"). (*See* Tabs 72 – 74.)

When told about the photos described by Cynthia Schaider, Wendi did not recall them having been taken, and did not recall ever having seen them. When I showed her the Lightning Photo, taken when she was a teen, Wendi had no independent recollection of this photo prior to her father giving it to her a couple of years ago. Wendi did remember going to the mountains during a thunderstorm with her father so he could take pictures of her. She also then recalled going to a motel room for the purpose of taking other photographs, but Wendi did not recall the actual taking of these pictures. When questioned further about the photographs, Wendi reported that she did not recall ever seeing them.

Wendi's speech was normal in volume and fluid. She was articulate.

Wendi's insight was impaired. She saw herself currently in the best circumstances of her life, and felt she had learned more on Death Row than she could have experienced in the

---

[8] Tab 34, at ¶7: Tab 26, at ¶ 18.

SP&A 08272

000000296

outside world. There was some insight, however, in that Wendi had some recognition of her dependency needs and acquiescence prior to her incarceration, and felt that she has overcome some of these symptoms.

Wendi's judgment remains impaired by her profound trauma and dependency needs, which continue to guide much of her behavior. This impaired judgment was evident during her early incarceration, and her constant desire to please significantly impairs clear thinking.

Wendi described situations in her early jail experiences when she was very gullible. Although she claimed to have become less gullible, her judgment remained impaired during our conversations. Her insight into herself and her trauma history remained impaired over the period of my evaluations. Her understanding of her mental disorders was just beginning to develop. This is particularly true about her early traumatic experiences such as her family's traveling and her mother's early neglect. As part of beginning to cope with the history of her father's sexual coercing and molestation, she has withdrawn from him to an extent.

Neurovegetative signs included sleep disruption, anhedonia (loss of pleasure), and cognitive confusion. She described periods when she would stay in bed for days. These periods would be accompanied by heaviness in her limbs, as though it were difficult to move. She also described periods of not sleeping, without any associated tiredness. Problems with sleep have occurred since childhood.

Wendi denied changes in appetite. She has decreased activity, consistent with her mood disorder, as well as her incarceration. There is no agitation, pain, or alterations in consciousness.

9

SP&A 082/3

000000297

She said that aside from the pain of losing her children, coming to prison has been the best thing that had ever happened to her. She said that she has been able to "find herself" while in prison, and had grown in ways that had not been possible for her when she was a child or during her marriage.

Wendi resisted my suggestion that being incarcerated and on Death Row, awaiting her execution, by definition could not be "the best time" in her life. She presented significant denial of her circumstances, consistent with the mood elevation of bipolar disorder.

Her thought processes displayed circumstantiality, the filling in of extraneous details, and flight of ideas, moving from one idea to another without a logical flow, as if the ideas were going from trapeze to trapeze. When under stress, her ability to follow instructions was impaired. This was also captured in Dr. Young's neuropsychological interview.

When she attempted to discuss traumatic events, Wendi's thought processes were often disrupted by dissociative experiences. She would stop talking, often taking a moment or two to respond. She was able to renew the conversation at the point of departure, which is consistent with dissociation, and also consistent with her inability to recall emotionally conflicted circumstances that had nothing in common with the time of the offense, other than the quality of stress Wendi was experiencing.

Wendi's mood was generally apprehensive and anxious. She displayed anticipatory anxiety which persisted throughout my evaluations of her, but which abated somewhat over the course of my time with her. She was always physically tense. Wendi's mood was also labile, ranging from extreme sadness to near euphoria. Wendi's mood was fragile. She described her process for attempting to keep herself together emotionally and not becoming suicidal after discussions of the trauma she experienced in her personal history. Her current

10

SP&A 08274

process for keeping herself together after these visits consisted of going to her cell, isolating herself and not talking with anyone, and reading until she fell asleep. This process reminded her of going into the closet when she was a child.

While generally apprehensive, Wendi's affect was often extremely—and inappropriately—bright. Her affective range was extremely wide in spite of her anxiety.

In addition to being inappropriately bright in general, given her position on Death Row, Wendi's affect was often inappropriately bright compared to the specific content of our conversations. She smiled when talking about her father buying her a negligee or taking her into pornography shops when she was a teen.

Wendi exhibited strong dependency needs. It was obviously very, very important to her to be both liked and correct in the responses she provided to any questions. When I did not reassure her that any given response from her was acceptable or any given answer was correct, she became anxious and ruminative, going over the issue again and again.

Wendi's thought content reflected significant denial and thought repression. Her belief that Death Row was the best circumstances she has ever had is both grandiose and reflects pathological denial. However, it is also a barometer for the impact of her previous life, an impact that was not truly understood at the time of trial for its significant pathology. She denied experiencing homicidal and suicidal ideation at the time of my interviews with her.

c.   **Clinical and Diagnostic Conclusions**

Wendi was born into a family that suffered from mood disorders, alcohol abuse, sexual abuse, and violence. She suffered for years from sexual coercion and molestation at the hands of her stepfather, causing both trauma and dependency.

Wendi has demonstrated a broad range of co-morbid, interrelated symptoms and clinical disorders, resulting from trauma and abuse, from the familial mental illness as shown in

11

SP&A U8275

her personal history, and from her multigenerational and transgenerational family history. What follows is a discussion of Wendi's symptoms that are the most relevant contributing factors in Wendi being arrested, charged, convicted and sentenced. These symptoms were not investigated or presented to the jury at any time during her trial, or offered as mitigating factors in her defense or sentencing.

Wendi's clinically identifiable disorders include: (1) Bipolar Disorder, (2) Complex PTSD, (3) Dependent Personality Disorder, and (4) Cognitive Disorder NOS. Additionally, Wendi suffers from the well-documented strain of providing for someone with chronic, in this case terminal, illness. This overwhelming condition is documented in the medical literature as Caregiver Burden.

The Diagnostic and Statistical Manual-Fourth Edition, Text Revised (DSM-IVTR), is the current classification system used in American psychiatry to increase interrater reliability, meaning a set of criteria for each disorder that is felt by treating clinicians to reflect the most common symptoms of a disorder. The DSM-IVTR notes that its use in forensic settings must be taken cautiously. This caveat is especially true, since the DSM-IVTR is over 15 years old, and DSM-V is rapidly approaching, which has shown significant evolution in the diagnoses of Wendi's disorders.

i.   **Wendi Elizabeth Andriano Suffers from Bipolar Disorder**

(1)   **Diagnostic Criteria of Bipolar Disorder**

Bipolar disorder is a disruption of mood. The DSM-IVTR criteria for Bipolar disorder are:

Table 14.6-7. DSM-IVTR Criteria for Manic Episode

- A distinct period of abnormally and persistently elevated, expansive, or irritable mood, lasting at least 1 week (or any duration if hospitalization is necessary).

12

SP&A 08276

000000300

- During the period of mood disturbance, three (or more) of the following symptoms have persisted (four if the mood is only irritable) and have been present to a significant degree:

  o  inflated self-esteem or grandiosity

  o  decreased need for sleep (e.g., feels rested after only 3 hours of sleep)

  o  more talkative than usual or pressure to keep talking

  o  flight of ideas or subjective experience that thoughts are racing

  o  distractibility (i.e., attention too easily drawn to unimportant or irrelevant external stimuli)

  o  increase in goal-directed activity (either socially, at work or school, or sexually) or psychomotor agitation

  o  excessive involvement in pleasurable activities that have a high potential for painful consequences (e.g., engaging in unrestrained buying sprees, sexual indiscretions, or foolish business investments)

- The symptoms do not meet criteria for a mixed episode.

- The mood disturbance is sufficiently severe to cause marked impairment in occupational functioning or in usual social activities or relationships with others, or to necessitate hospitalization to prevent harm to self or others, or there are psychotic features.

- The symptoms are not due to the direct physiological effects of a substance (e.g., a drug of abuse, a medication, or other treatment) or a general medical condition (e.g., hyperthyroidism).

Note: Manic-like episodes that are clearly caused by somatic antidepressant treatment (e.g., medication, electroconvulsive therapy, light therapy) should not count toward a diagnosis of bipolar I disorder.

**(2)    Evidence of Wendi Elizabeth Andriano Having Bipolar Disorder**

Wendi's family is what is known as an "affectively laden family," meaning there are multiple generations of symptoms and diagnoses of mood disorder. Wendi's father, Skip

13

SP&A U8217

000000301

Robertson, was a hypersexual alcoholic. Chemical dependency has a high co-morbidity with bipolar disorder, meaning the two disorders occur together frequently.[9]

Donna Ochoa, Wendi's mother, has had bouts of psychotic depression since she was a child, the latest occurring during Wendi's incarceration. She has a history of hypersexuality, impaired judgment, and currently displays flight of ideas and inappropriate affect. She describes both flight of ideas and inappropriate affect as family traits that have been commented upon over the years.

Donna's oldest half-sister, Nadine, was diagnosed with bipolar disorder and treated with Lithium and other anti-manic drugs for much of her adult life. She functioned successfully as a nurse for many years.

Donna's younger half-sister, Kathie, has also been diagnosed with mood disorders, and has a long-term history of chemical dependency.

Wendi manifested symptoms of depression early in life. On one missionary trip to Mexico while a teenager, Wendi spent several weeks in bed, for no apparent reason.

Wendi was diagnosed with depressive symptoms by the Casa Grande Counseling Services. She was treated, ineffectively, with antidepressants that caused her "increased anxiety," consistent with the manic switch which may be induced in persons suffering from the depressive phase of bipolar disorder.[10]

---

[9] Brady, K. T. & Sinha, R. (2005). Co-Occurring Mental and Substance Use Disorders: The neurological effects of chronic stress. *American Journal of Psychiatry, 162*(8), 1483-1493.

[10] Ghaemi, S. N., Rosenquist, K. J., Ko, J. Y., Baldassano, C. F., Kontos, N. J. & Baldessarini, R. J. (2004). Antidepressant treatment in bipolar versus unipolar depression. *American Journal of Psychiatry*, *161*(1), 163-165.

SP&A U82/8

000000302

Wendi has also complained of "panic attacks," episodes of increased anxiety and energy that do not meet the criteria for true panic disorders. Panic-like attacks are found in bipolar disorder.[11]

The clinical literature clearly identifies a strong relationship between traumatic stress and the manifestation of bipolar disorder.[12]

Wendi's behavior prior to her offense reflects ongoing manic behavior. She had significant irritable mood and mood lability. She increased her alcohol intake, in response to her overwhelming mood disruption.

Wendi also manifested hypersexuality and an increase in goal-directed activity. She became involved in two sexual relationships (one at the apartment complex she managed). Both of these relationships were known to her employees. Wendi also created false business licenses on the business computer in plain sight of her employees.

An excessive involvement in activities with a high potential for negative consequences was also seen during this extraordinarily stressful period, coupled with the other symptoms of her mood disorder.

These symptoms—including irritable mood, impaired judgment, chemical dependency, denial, and impaired decision making[13]—continued for an extended period, and did not only occur during her alcohol use, meeting the criteria for bipolar disorder.

---

[11] MacKinnon, D. F., Zandi, P. P., Cooper, J., Potash, J. B., Simpson, S. G., Gershon, E., Nurnberger, J., Reich, T., & DePaulo, J. R. (2002). Comorbid bipolar disorder and panic disorder in families with a high prevalence of bipolar disorder. *American Journal of Psychiatry, 159*(1), 30-35.

[13] Kim, E.Y., D.J. Miklowitz, A. Biuckians, K. Mullen. (2006). Life stress and the course of early onset bipolar disorder. *Journal of Affective Disorders, 99*(1-3), 37-44.

SP&A U82/9

000000303

P-App. 004648

Wendi's acute mood disorder symptoms, although always apparent, became increasingly obvious during the period surrounding the offense, and extended for years after.

ii.    **Wendi Elizabeth Andriano Suffers from Post-Traumatic Stress Disorder (PTSD)**

(1)    **Diagnostic Criteria of PTSD**

Wendi suffers from Type II, or complex, post-traumatic stress disorder.  Complex PTSD is characterized by ongoing, chronic exposure to one or more traumatic stressors, as opposed to Type I PTSD, which is characterized by exposure to a singular traumatic incident. Complex PTSD differs in significant ways from the single-incident version. Below are criteria for Complex Trauma:

Alterations in:

- Regulation of affect and impulses

- Attention or consciousness

- Self-perception

- Relations to others

- Body functioning and integrity (somatization)

- Systems of meaning[14]

Complex PTSD is a diagnosis that does not appear in the DSM-IVTR, although it was actively studied and the subsequent body of literature has supported an independent diagnosis. The symptoms noted above "result[] from lasting traumatic experiences in which the

---

[13] Murphy, F. C., Rubinsztein, J. S., Michael, A., Rogers, R. D., Robbins, T. W., Paykel, E. S., & Sahakian, B. J. (2001). Decision-making cognition in mania and depression. *Psychological Medicine, 31*(4), 679-693.

[14] Roth, S., Newman, E., Pelcovitz, D., van der Kolk, B., & Mandel, F. S. (1997). Complex PTSD in victims exposed to sexual and physical abuse: Results from the DSM-IV field trial for posttraumatic stress disorder. *Journal of Traumatic Stress, 10*, 539-556.

16

SP&A 08280

000000304

victim felt-or was-captive and unable to escape."[15]   Wendi's experienced two chronic stressors that would create symptoms of complex PTSD. The first is her upbringing, particularly the ongoing sexual coercing of her stepfather and neglect of her mother. The second chronic stressor is her caregiver burden in taking care of her dying husband and just-born children.

(2)     **Evidence of Wendi Elizabeth Andriano Having Complex PTSD**

Numbing of affect is common in both Complex Trauma and Type I PTSD. The emotional numbing, the self-protective shell, limits emotional connectedness. Wendi has had both an external shell, her closet as a child, and an internal shell, her overwhelming numbing and dissociation.

Wendi also suffers from many of the motor symptoms of traumatic stress. She constantly scans the environment and the person, looking to pick up cues. She is hyperreactive and easily overwhelmed in stressful situations, even when those situations are artificial testing circumstances.

The core symptoms of Wendi's traumatic presentation are avoidance, affective numbing, acquiescence, and dissociation. She has pathological avoidance and denial, and these symptoms, coupled with her active dissociation, impaired her judgment at the time of the offense and continue to do so.

Wendi displays a number of symptoms that are related to or arise from affective dysregulation, including: generally poor coping skills; an inability to recognize her own needs, emotionally and otherwise; and an inability to effectively weigh, deliberate, and formulate options for choices she might make, particularly in circumstances of high stress.  All of these are

---

[15] Tab 3, at p. 22.

SP&A U8281

000000305

expected clinical symptoms resulting from the trauma and abuse Wendi suffered while growing up.

Wendi exhibits patterns of extreme acquiescence, which means a constant, overriding inability to stand up to or overcome the emotional control of others in intimate relationships. The functional result of this in Wendi's life has been that she has given in to the demands, needs, requirements, and control of others from childhood to the present. Her pattern of acquiescence is the clinically expected and logical result of the sexual coercion, abuse, and molestation, and the other complex and compounded abuse and trauma that Wendi suffered beginning in infancy or very early childhood and throughout her childhood and adolescence. This degree of acquiescence requires the unhinging or disconnecting of emotions to actions, which results in the emotional dysregulation of PTSD.

Wendi's acquiescence to her stepfather's sexual coercion over years set the stage for her difficulty making effective judgments in response to events in the world around her, particularly for novel, stressful, and difficult events, and her inability to protect herself in those circumstances. The patterns of acquiescence that Wendi demonstrated as a young adult and adult in her relationship with Joe are also consistent with dependent personality disorder.

Throughout her life, Wendi has displayed a lack of self-identity, meaning acquiescence to the needs of others to such an extent that she reforms herself in the image others wanted for her, rather than maintaining a consistent identity.

Wendi exhibits affective dysregulation, which means an inability to accurately modulate her emotional reactivity, both in failing to register a self-protective emotional response in situations in which a normal person would do so, a result of years of sexual coercion and molestation; and in overreacting emotionally in situations in which a normal person would be

18

SP&A 08282

000000306

able to respond appropriately.  During times of stress, Wendi's capacity to rely on the normal emotional processes that are necessary for effective decision-making is limited.

Affective dysregulation generally arises from poor or nonexistent modeling of appropriate coping mechanisms by parents. Wendi's affective dysregulation is the clinically expected and logical result of the traumatic stress and the neglect she suffered from her mother, biological father, and adoptive father. The denial by Alejo and Donna of Alejo's ongoing coercion and sexual molestation of Wendi while she was growing up illustrates the poor insight and coping skills demonstrated by Wendi's parents, and highlights the poor insight and coping skills that were modeled for Wendi.

In addition to failing to model appropriate behaviors and coping mechanisms, Wendi's parents actively modeled inappropriate behavior.

The extensive abuse and trauma that Wendi experienced growing up are seen in the degree to which Wendi has normalized violence and abuse. Wendi describes events which objectively are extreme and traumatic, as being "normal" and "not unusual" compared to the chronic violence she suffered growing up.  She states that even though losing her children has been incredibly difficult, coming to prison as an inmate on Death Row is the best thing that has ever happened to her. "Normalization" of violence and trauma is part of the typical numbing seen in cases of chronic traumatic stress, and, in Wendi, contributes to her emotional disconnect and affect.

Finally, because the trauma  is ongoing, neglect can be as damaging as direct trauma. We see this in Wendi's case, with the neglect of Donna Ochoa, Wendi's mother, who, due to her own mental illness, could not marshal the emotional responsibility to protect her daughter from ongoing sexual coercion and intimidation by Wendi's step father, Alejo Ochoa.

19

SP&A U8283

000000307

### iii.    Wendi Andriano Suffers from Cognitive Disorder NOS

#### (1)    Diagnostic Criteria for Cognitive Disorder NOS

The DSM-IVTR describes Cognitive Disorder NOS as:

**Cognitive Disorder Not Otherwise Specified**

This category is for disorders that are characterized by cognitive dysfunction presumed to be due to the direct physiological effect of a general medical condition that do not meet criteria for any of the specific deliriums, dementias, or amnestic disorders listed in this section and that are not better classified as Delirium Not Otherwise Specified, Dementia Not Otherwise Specified, or Amnestic Disorder Not Otherwise Specified. For cognitive dysfunction due to a specific or unknown substance, the specific Substance-Related Disorder Not Otherwise Specified category should be used.

Mild neurocognitive disorder: impairment in cognitive functioning as evidenced by neuropsychological testing or quantified clinical assessment, accompanied by objective evidence of a systemic general medical condition or central nervous system dysfunction (see Appendix B in DSM-IV-TR for suggested research criteria).

#### (2)    Evidence of Wendi Elizabeth Andriano Having Cognitive Disorder NOS

Dr. Young identified areas of cognitive impairment in Wendi's brain functioning. Wendi did well on much of the neuropsychological testing.  However, there were areas of cognitive dysfunction that relate directly to her mood and trauma symptoms.

Decision making, particularly under stressful circumstances, was tested on the Iowa Gambling Task. Wendi's ability to develop problem-solving strategies is impaired, when those problem-solving strategies are made under novel, stressful or new conditions.

Dr. Young also found cognitive deficits in Wendi's processing speed, the speed with which she is able to understand, synthesize, and respond effectively. Her understanding of

20

SP&A 08284

000000308

the big picture, as identified by her difficulty with the Reyes Complex Figure instrument, is also impaired.

Wendi's behavior during testing was acquiescent, in the extreme. Dr. Young reported Wendi regularly asked for direction, and became stressed when Dr. Young could not, as part of the testing protocol, provide Wendi feedback on her performance. Her test taking behavior was consistent with the difficulties attending and focusing evident through much of her adult life, especially after her marriage. These problems attending are more consistent with mood disruption than disorders of attention.

Wendi therefore meets the criteria for Cognitive Disorder, Not Otherwise Specified.

<ol type="i" start="4">
<li><u>**Wendi Elizabeth Andriano Suffers from Dependent Personality Disorder**</u></li>
</ol>

(1) **Diagnostic Criteria for Dependant Personality Disorder**

Dependent personality disorder is characterized by pervasive psychological dependence upon and acquiescence to other people, to the loss of the sufferer's own identity. Diagnostic criteria for 301.6 Dependent Personality Disorder include:

- A pervasive and excessive need to be taken care of that leads to submissive and clinging behavior and fears of separation, beginning by early adulthood and present in a variety of contexts, as indicated by five (or more) of the following:

  o has difficulty making everyday decisions without an excessive amount of advice and reassurance from others

  o needs others to assume responsibility for most major areas of his or her life

  o has difficulty expressing disagreement with others because of fear of loss of support or approval. Note: Do not include realistic fears of retribution

21

SP&A 08285

000000309

- o has difficulty initiating projects or doing things on his or her own (because of a lack of self-confidence in judgment or abilities rather than a lack of motivation or energy)

- o goes to excessive lengths to obtain nurturance and support from others, to the point of volunteering to do things that are unpleasant

- o feels uncomfortable or helpless when alone because of exaggerated fears of being unable to care for himself or herself

- o urgently seeks another relationship as a source of care and support when a close relationship ends

- o is unrealistically preoccupied with fears of being left to take care of himself or herself

(2)   **Evidence of Wendi Elizabeth Andriano Having Dependent Personality Disorder**

Wendi's presentations for this disorder, beginning in childhood, include abnormal efforts to please others, extreme obedience and acquiescence, impaired self-control within relationships, lack of self-confidence, naiveté, gullibility, and willingness to accept mistreatment. For people suffering from dependent personality disorder, the desire to please others is forefront in their minds and a significant amount of time and of energy is expended trying to achieve this goal. Disagreeing with others may be so unbearable that they will go to great lengths to win people over. The sufferer is prone to being taken advantage of as they consistently place others' needs and desires before their own and will abdicate their own safety and well-being for that of others.

People with dependent personality disorder often experience pathological anger when their dependency needs are thwarted. Malmquist discusses the seemingly paradoxical phenomena:

> Many defects in basic ego function are present, which is what leaves DPD individuals vulnerable to spiraling into a homicidal state and thwarts them from acting on the basis of their sensed needs. Their dependence, with the inability to step out of such

22

SP&A 08286

000000310

destructive relationships, reveals a limited perspective and narrow
focus to their existence....[I]t is a prominent awareness of the
limitations existing in the degrees of freedom they have in their
lives....They have a sense of being caught in the grips of powerful
forces with which they cannot deal.[16]

### v.  Wendi Elizabeth Andriano Suffered From Caregiver Burden

### (1)  Manifestations of Caregiver Burden

Caregiver burden is a well-documented stressor, with a set of severe

manifestations that magnify underlying preexisting psychiatric conditions.[17]  Caregiver stress

was initially studied in connection with care for those suffering from Alzheimer's disease and

severe mental illnesses like schizophrenia. Only in the last two decades has the literature on

caregiver stress in chronic medical illnesses and terminal conditions like cancer been extensively

reviewed.  As noted in this recent research:

> A cancer diagnosis has a significant impact on the patient and the
> spouse caregiver. Patients are confronted with a life-threatening
> diagnosis and a difficult treatment regimen, while their partners are
> often required to fulfill the demanding role of a spouse caregiver.
> These difficulties are amplified during the terminal phase of cancer
> when patients experience more disease-related factors. Individuals
> with cancer are at an increased risk for persistent depressive
> symptoms when compared with the general population. Feelings of
> hopelessness are also common in patients approaching end-stage
> cancer. A general feeling of hopelessness may reflect end-of-life
> despair, or in extreme cases, may develop into a desire for
> hastened death or suicidal ideation, loss of dignity, and intimate
> dependency. A reported 15–50% of adult cancer patients and their
> spouses present with clinically significant psychological distress,

---

[16]Malmquist, C. (1996). Dependent Personality Disorders and Killing. In *Homicide: A Psychiatric Perspective (157-159)*. Washington, DC: American Psychiatric Press.

[17] Biegel, D. E., Milligan, S. E., Putnam, P. L., &Song, L. Y. (1994). Predictors of burden among lower socioeconomic status caregivers of persons with chronic mental illness. *Community Mental Health Journal, 30*(5), 473-494; Caregiver Burden Assessment, Erie County Department of Senior Services, Caregiver Resource Center, 95 Franklin St., Rm. 1301, Buffalo, NY 14202

SP&A U828/

000000311

including depression and hopelessness, and this increases as death approaches.

The majority of studies report that patients and their spouse caregivers have similar levels of distress over time, consistent with the view that common factors impact both partners, and affect the entire family system.[18]

Sales et al. describe the objective as well as the subjective burdens of caregiving, listed below:

1) Objective burden

    a) Direct tasks of care

        i) Helping patient with ADLs

        ii) Supervising the patient

    b) Indirect tasks

        i) Dealing with emotional needs of patient

        ii) Encouraging the patient

        iii) Effects of caregiving on other aspects of life

        iv) Family interaction

        v) Family routine

        vi) Leisure

        vii) Work/employment

---

[18]McClean, L. M., Walton, T., Matthew, A., & Jones, J. M. (2001). Examination of couples' attachment security in relation to depression and hopelessness in maritally distressed patients facing end-stage cancer and their spouse caregivers: A buffer or facilitator of psychosocial distress. *Support Cancer Care*, *19*, 1539-1548 (internal citations omitted).

24

SP&A 08288

000000312

       viii)    Mental health

       ix)    Physical health

       x)    Social network

       xi)    Others outside household

       xii)    Children

       xiii)    Financial consequences

2)    Subjective burden

    a)    Personal reactions to caregiving Distress

    b)    Stigma

    c)    Worrying

    d)    Shame

    e)    Guilt[19]

      **(2)    Evidence of Wendi Elizabeth Andriano Having Caregiver Burden**

Wendi's symptoms of mental disorder were amplified by the strains of her caregiving. She, almost singlehandedly, was responsible for each of the objective burdens described by Sales.

It was Wendi who was primarily responsible, particularly in the last few months, of taking care of her husband's daily care. As Joe became increasingly despondent and withdrawn, refusing to share his plight with others, it was Wendi who became his main emotional outlet, bearing the brunt of his despair, anger, and fear of death.

Jeffrey B. Miller, Joe and Wendi's malpractice attorney, worked with the couple during the 2000 period. He discusses, in his declaration of August 8, 2011, how a distraught

---

[19] Sales, E. (2003). Family burden and quality of life. *Quality of Life Research, 12*(Suppl. 1), 33–41 (internal citations omitted).

SP&A 08289

000000313

Wendi called him, concerned about the suicidal urges Joe was having. Mr. Miller talked with

Joe, who acknowledged suicidal ideation.

> In the months prior to Joe's October 2000 death, I received two or
> three distressed phone calls from Wendi relating to her
> observations of Joe. In each of these phone calls, Wendi stated that
> she was feeling very concerned and frightened for Joe. Wendi said
> that she had perceived Joe becoming more depressed, and that he
> had recently expressed a desire to die and an intent to take his own
> life. Wendi told me that she was worried that Joe would hurt
> himself, and asked me to speak with him regarding his mental state
> and recommend a counselor for Joe. Wendi also asked me to
> remind Joe that, from a legal perspective, he would be hurting his
> family by committing suicide because the malpractice claim would
> be dismissed.

> I subsequently spoke with Joe regarding these concerns. I told Joe
> that his family was concerned about his mental state and worried
> that he was contemplating suicide. Joe acknowledged these
> concerns and did not deny that they were accurate. Joe said he
> understood that the malpractice claim would not continue if he
> died from something other than cancer, and told me not to worry. I
> recommended a counselor to Joe, but I do not know if Joe
> ultimately received treatment from that counselor.[20]

Wendi was the primary financial provider, working her full time job and, at times,

being forced to leave her work to change her children's diapers or attend to both her husband's

and her children's needs. Wendi was also responsible for family interaction, which became

increasingly tense as the needs of the children and the needs of her dying husband complicated

her ability to satisfy these often contradictory circumstances.

Wendi's leisure activities reflected the stress of her caregiving and amplified her

mood and trauma symptoms. She drank heavily, became involved in sexual behavior, and

became isolated from her family and any true support system she might have had. Rather than

---

[20] Tab 19, at ¶¶ 4-5.

SP&A 0829U

000000314

P-App. 004659

reflecting a lack of caring, these behaviors, actually symptoms of her acute mental illness, clearly illustrate how impaired Wendi had become, and illustrates what little resiliency she had was undermined by the extraordinarily stressful strain of her attempt to provide care to her husband and children.[21]

Sales describes the effects of caregiver strain on other aspects of the caregiver's life as perhaps the most difficult impact of the illness on the caregiver.[22]

Wendi's psychiatric symptoms from her bipolar disorder, dependent personality disorder, and complex trauma were magnified by the stress and novel circumstances of her role during most of her marriage, that of caregiver. Although Wendi had been placed in the role of soother and pacifier during her childhood and adolescence in her sexual interactions with her stepfather, but it was not until her marriage to Joe and his terminal diagnosis that she found herself as a caregiver.

Within a very short time, Wendi experienced an additional stressor, watching her husband become ill, with repeated failures to correctly diagnose cancer. There is extensive documentation of Wendi's multiple interventions to save her husband's life, as well as to care for her children that were born during this tumultuous period.

The overwhelming emotional burden of Wendi's attempts to live, grow, understand, empathize, support, and resolve were never recognized nor presented at her trial. The

---

[21] Sales, E. (2003). Family burden and quality of life. *Quality of Life Research, 12* (Suppl. 1), 33–41.

[22] "In some ways, the impact of caregiving on other central life roles may be its most pervasive and pernicious consequence. The degree to which caregiving demands truncate or create conflict in other role sectors may vary, but most researchers attempt to measure the broad range of impact commonly felt. These include changes in family interactions, family routines, leisure, work, social network involvement, contacts with others outside the household, as well as the financial consequences of illness. These role ramifications are most commonly viewed as additional objective consequences of caregiving, although Braithwaite places them in the subjective burden category." Sales, *supra*, at 37 (internal citations omitted).

27

SP&A 08291

000000315

P-App. 004660

interaction between her re-traumatization through her role as caregiver for her husband and children, and her emerging symptoms of affective dysregulation, impaired judgment, anger, affective numbing, and slowed realization of her circumstances is the foundation for her inability, due to mental disorder and environmental trauma, to conform her behavior to the law. The behaviors seen in the months before her husband's death were fueled by the destruction of all resiliency and support Wendi had known in her life.

### d.   Conclusion of Clinical and Diagnostic Findings and Mental Status Examination

Wendi suffers from multiple mental disorders. She suffers from bipolar disorder, and clearly comes from an affectively laden family, with her father, sister, and mother manifesting symptoms of alcoholism, hypersexuality, impaired judgment, mood swings, chemical dependency, psychosis, suicidality, and depression.

Wendi suffers from complex PTSD, with at least two sources of chronic trauma. The first is the ongoing sexual coercing and abuse by her step-father, which led to her acquiescence, anger, affective numbing, hyperreactivity, and emotional dysregulation. She also underwent the extreme, ongoing trauma of her caregiver strain, while attempting to find ways to help her husband, raise her children, and maintain her family.

Wendi has cognitive impairments that slow down her ability to effectively size up and respond to social situations. In spite of the structure of prison, her cognitive deficit continues to this day.

She also suffers from a longstanding dependent personality disorder, created and coerced by the sexual abuse of her stepfather and neglect and abuse of her mother. Dependent personality disorder has been well documented as a source of anger and self destructive behavior.

28

SP&A 08292

000000316

Each of these disorders was acute during the months before her husband's death. Symptoms of each disorder were synergistic, creating a maelstrom of instability and emotional disruption. This was the mental state Wendi was suffering from at the time of her husband's death, and for some time afterwards, as captured in jail and prison medical records.

It is against this emotional and cognitive backdrop that her behavior at the time of the offense must be considered, and her behavior examined forensically.

### 2. Forensic Analysis and Formulation: How Wendi Andriano's Mental Disorders Impacted Her Behavior in Relation to the Offense

This section includes my forensic analysis of Wendi's history, specifically from the time she met Joseph Andriano ("Joe") on March 17, 1992 until Joe's death on October 8, 2000, and her incarceration following Joe's death from 2000 to the present. This section analyzes how Wendi's mental disorders impacted her behavior in relation to the offense.

In this formulation and analysis, when I describe statements in the present verb tense, such as "Wendi states" or "Donna describes," this indicates that I received the information directly from the person involved during firsthand evaluations conducted during 2010 and 2011. Other statements come from the trial transcripts, declarations, or other sources identified in Appendix A.

### a. Adulthood from Meeting Joe to the Night of the Offense

### i. The Beginning of Wendi and Joe's Relationship

Wendi was twenty-one years old when she met Joe on March 17, 1992, at Dell's Pizza in Casa Grande, Arizona.[23]  While Wendi maintained steady, regular employment, Joe was having a hard time earning money as a welder and found himself without a place to live. Within weeks of meeting Joe, Wendi (the caregiver and unable to turn anyone away) offered to let Joe

---

[23] Interview of Wendi Andriano by George Woods, MD at ASP Perryville on January 18, 2011.

29

SP&A 08293

000000317

sleep on the couch in her apartment. As underscored by Dr. Hopper, Wendi was coerced from

her childhood to feel safe and loved when she was taking care of others, especially during times

when they were angry and abusive:

> If someone is angry – whether that anger is caused by her, directed
> at her for no good reason, or directed elsewhere and has nothing to
> do with her – Wendi feels *driven* to make that person feel better,
> because she believes, "then they will like me." If someone likes
> her and is nice to her, Wendi strives to be even nicer to them and to
> take care fo them, because this is the only way she knows to avoid
> them getting angry at her or abandoning her. . . . In short, the very
> ways she attempts to avoid negelect and abuse in adult
> relationships leave her feeling neglected and used.[24]

In the year prior to meeting Joe, Wendi's relationship ended with Shawn King,

her childhood sweetheart. Shawn broke up with Wendi in the fall of 1991 and he punctuated the

breakup by smashing the windows of Wendi's car.[25] In the year prior to Joe moving into

Wendi's apartment, Wendi's paternal cousin, Barbara Mitchell stayed most nights at Wendi's

apartment with her. Barbara was still in high school at the time and largely resided with Wendi

for about ten months. It was just around this time that Wendi met Joe. One of the defining

symptoms of people suffering from dependent personality disorder is the intolerance of being

alone. When they are alone they feel helpless and uncomfortable. As soon as a relationship has

ended, or even before, they will desperately seek out a new one. Joe Andriano came into

Wendi's life at a time when she was most vulnerable to the discomfort and helplessness that she

otherwise faced in being alone.

Shortly after Joe began staying with Wendi, he moved in permanently and they

officially became a couple. During 1992, the year that Wendi and Joe met, Wendi earned over

---

[24] Tab 4, at ¶ 548.

[25] Tab 15.

SP&A 08294

000000318

$15,000 and received her apartment at Quail Gardens as part of her compensation package. Joe, on the other hand, had reported income of just over $2,200. The economic disparity in the earnings between Joe and Wendi continued throughout their relationship and into their marriage with Wendi providing the main financial support.[26] Only one time in their history together did Joe earn more than Wendi and that was in the time frame just after their first child, Nicholas, was born. Wendi's parents provided additional financial support so Wendi could stay home with her infant child.

Joe's inability to provide financial or emotional support for the family reinforced Wendi's self-deprecating behavior and enabled her dependent personality. Wendi's early relationship with Joe was characterized by her acquiescence, the result of both her trauma history and the conditioning she received from the earliest moments of her life to abdicate herself to men in positions of authority while being unprotected by the women in her family.[27] When Wendi first met Joe, he was unlike any of the young men she had previously been acquainted with. He was from a different social group in Casa Grande and compared to Wendi, was much more adept

---

[26] Tab 69 (Social Security Earnings Statements of Wendi and Joe Andriano: 1993 – Wendi - $19,128; Joe - $3,404; 1994 – Wendi - $22,447; Joe - $0; 1995 – Wendi - $24,234; Joe - $0; 1996 – Wendi - $6,648; Joe - $0; 1997 – Wendi - $0; Joe - $5,576; 1998 – Wendi - $17,064; Joe - $11,529; 1999 – Wendi - $31,943; Joe - $0; 2000 – Wendi - $38,682; Joe - $0).

[27] Tab 27, Tab 34 at ¶¶ 8-9, 15, 25 ("Wendi grew up in a male-dominated environment. Tom King frequently preached that a woman's place was in submission to her husband. He often said that women should quit their jobs and stay at home. He was sexist. There were certain roles that men and women were expected to fulfill, and this was embedded in the culture of the church. According to Tom, if a girl wore a bathing suit and a boy got aroused it was the girl's fault. As parents, we were encouraged by the pastor to use corporal punishment on our children. This was presented as the Biblical way to raise children. Wendi had domineering daddy and grew up in a church with a domineering pastor. . . . Tom King used ridicule, humiliation, strong statements, and the fear of God to influence his congregation. . . . Discipline at that school centered around scolding, humiliation, corporal punishment, extreme work punishment, and social isolation.").

SP&A U8295

000000319

at navigating the social circles of young adults in the small town of Casa Grande.[28]   Unlike the

Ochoa family, who lived on the periphery of social acceptance and flew far under the radar in

their desire to remain religiously segregated and isolated,[29] the Andriano family was part of the

landholding farming class in Casa Grande, an influential segment of the population that

possessed social status and clout in the community of Casa Grande.

Given her history of being coerced and acquiescent behavior, her relatively

newfound social freedom beyond the boundaries of the church, and her natural curiosity, Wendi

found Joe's attention desirable. Wendi was "surprised" that Joe "loved me."[30] Although Wendi

reports that she "did not want a rigid, religious man who controlled my life," and that her

decision to date Joe was based, in part, on the fact that he was not part of the church,[31] she

discovered over time that Joe and her stepfather, Alejo were similar in terms of their requirement

for her caregiving.[32]

Wendi allowed Joe to move in without a defined commitment or clear agreement

between them about their status as a romantically partnered couple, or any real understanding of

_____

[28] In 1990, Casa Grande had a population of 19,954 residents in an area covering 48.2 square miles, making it an extremely low-density population. http://www.census.gov/epcd/www/92profiles/county/04021.TXT

[29] Tab 27, Tab 34, at ¶¶ 3-4 ("Wendi's parents, Donna and Alejo, had nothing, meaning they were always very poor. They told me that before I knew them, they were part of a street ministry in Northern California. They followed another strong-willed, 'turn or burn' pastor there. It was a different time; the Jesus-freak movement was in full swing: It consisted of born again hippies who traveled around spreading 'Jesus power.' This was in the mid-1970s. Donna and Alejo told me that while they were in the ministry, Wendi panhandled for them. They lived out of a bus and walked the streets preaching and handing out tracts. . . . When we began going to the church in 1980, Donna and Alejo lived in a rental house on the south side of the tracks in Casa Grande. It was a low-income area. Later, Donna, Alejo and Wendi moved to a house in another housing project called 'Hopi Hills,' or 'Indian Hills,' or something like that.")

[30] Interview of Wendi Andriano by George Woods, MD at ASP Perryville on November 23, 2010.

[31] Ibid.

[32] Ibid.

32

SP&A 08296

000000320

the direction in which the relationship was headed. After Joe moved in, Wendi quickly allowed
Joe to take a position of increasing control over her. Initially, Wendi was attracted to Joe because
she could take care of him and because he was a connection to life outside of the church.[33]
Wendi persevered in acquiescing to Joe, and expressed her pathological dependence by allowing
him a progressively greater position of control over her. Joe began to dictate how she dressed,
and he required her to wear her hair in a different style and color than she had ever used before,
specifically blond and short, much different than her naturally brown and historically long hair.[34]
Wendi soon started disengaging with her friends and they felt unwelcome in her apartment. As
noted by Barbara Mitchell in her interview with Sharon Murphy prior to trial, "Joe isolated
Wendi making it very difficult for her to retain her previous relationships."[35] Wendi's
interactions were limited to Joe's crowd, even though many of the women in that group rejected
her. Even this early in their relationship, Wendi was unable to stand up to Joe and went along
with these changes.[36]

Wendi's behavior in her relationship with Joe mirrored, in many ways, the
compliant behavior required of her in her relationship with her father and with the adults at 91st
Psalm and Harvest Church and School.  In both the home and at school, Wendi was coerced to
behave in compliance under the threat of severe punishment.  She was also required to dress in
certain ways. Photographs of Wendi early in life depict her as a miniature version of Donna, with
matching hairstyles and outfits. Donna was dying Wendi's hair to match her own by the time

---

[33] Tab 26, at ¶21.

[34] Interview with Donna Ochoa by Woods, G.; Interview with Barbara Mitchell by Sharon
Murphy on May 20, 2003.

[35] Interview with Barbara Mitchell by Murphy S. on May 20, 2003.

[36] Interview by Woods, G. on May 26, 2011.

SP&A 0829/

000000321

Wendi was nine to eleven years old.  Alejo preferred Wendi to dress provocatively, and began buying her age-inappropriate attire before she had even reached her teens.[37]

Wendi reports that passion was not a part of her relationship with Joe. She appreciated his laughter and his initial attentiveness to her as opposed to being in love with him. She describes her sexual relationship with Joe during their entire relationship as not satisfying, which is consistent with how she describes all of her sexual encounters throughout her life. She felt that if her partner wanted sex, it was her responsibility to have sex, without considering at all her own feelings, preferences, or concerns about sexuality and having sex with that partner[38]— the automatic behavior created through traumatic sexual coercion and molestation during childhood and adolescence. "Wendi and Joe had a very structured romantic life . . . It was so regimented and controlled. Wendi told me that she wanted her relationship with Joe to be more affectionate and intimate. She told me that Joe refused to kiss her at all."[39]

Despite Wendi's yearning for affection, she was unable to enjoy a fully developed sexual relationship and instead repeated the learned sexual behaviors of submission in her marriage with Joe. Wendi's relationship with her father mirrors this acquiescence without intimacy, the basis of a dependent personality disorder in many cases. Donna describes Wendi and Alejo going into adults-only novelty stores, triple-X pornography stores, and making special family trips to Frederick's of Hollywood, a store with primarily extremely revealing clothing. Even though both Wendi and Donna were conflicted by this behavior, Alejo's intimidation and coercion "normalized" this behavior for Wendi.

---

[37] Tab 27.

[38] Interview by Woods, G. on November 23, 2010; Interview with Barbara Mitchell by Murphy, S. on May 20, 2003.

[39] Tab 31, at ¶11.

SP&A 08298

000000322

## ii.   Wendi and Joe Get Married

Wendi's mother and father, with whom Wendi maintained regular contact and who lived close by, were uncertain enough of her interest in and passion for Joe that, as late as Wendi's wedding day, they asked her if the marriage to Joe was really what she wanted, and assured her that she could say "no" to the marriage. Despite their relationship being emotionally disconnected, Wendi married Joe on January 22, 1994. By the time they were married, Wendi had left her employment at Quail Gardens. In May of 1993, she started working at the Casa Grande Regional Medical Center in the accounting department.[40] Wendi and Joe had each moved into the homes of their respective parents prior to their marriage.[41] In deciding to marry Joe, Wendi manifested symptoms of her dependent personality disorder: her inability to recognize her own needs, her inability to recognize options in making decisions, her lack of coping skills, and lack of self-identity in her relationship with Joe.

Donna Ochoa documented difficulties beginning very early between Joe and Wendi. Donna recalls Joe calling Wendi a "fucking bitch," and other instances when Wendi called her parents after sequestering herself in the bedroom, after Joe had become angry and physically intimidating. Wendi felt that the traumatic events occurring between her and Joe were "normal" and "not unusual" compared to the chronic violence she suffered growing up.[42] Wendi's actions and choices from the time she met Joe in 1992 until his death in 2000 demonstrate affective dysregulation, numbing of her own affect responses, her sense of

---

[40] Tabs 69, 69.B. (Employment and Social Security Earnings Records of Wendi Andriano).

[41] Interview by Woods, G on April 26, 2011.

[42] Interview by Woods, G. on April 26, 2011.

35

SP&A 08299

000000323

helplessness, and her increasing inability to respond normally or appropriately to stressful, difficult situations.  These are all symptoms of her PTSD.

Wendi states that, "The first part of the marriage was within the bounds of acceptability. I had grown up with an angry father. For the first six months, we lived in a rented townhouse then we moved to Andriano farm property." After that, Joe was "yelling and yelling and yelling and breaking things . . . I did not leave. In the morning, I got up and we did not talk about it." Wendi states that she had and still has no way to determine how to behave or what to do absent demands or requests from others. In characterizing her general behavior, she states, "I need to know what you want from me. If I don't, I don't know how to function or what to do."[43]

The experience of prolonged and severe trauma, particularly trauma that occurs early in the life cycle, as experienced by Wendi, can lead to complex clinical pictures that include disturbances of regulation of affective arousal, an impaired capacity for cognitive integration of experience (as in dissociation), and impairment in the capacity to differentiate relevant from irrelevant information.  Research shows that people who suffer from PTSD are prone to suffer from problems with affect regulation, decision making, difficulty modulating anger, chronic self-destructive and suicidal behaviors, impulsive and risk-taking behaviors, and difficulty modulating sexual involvement.  Like findings are found in child development literature: as many as 80% of abused infants and children develop disorganized/disoriented attachment patterns. These are associated with an inability to utilize caregivers for soothing and with the emergence of pathological self-regulatory behaviors such as, in Wendi's case, hiding in the closet, obsessive caregiving and later, heavy alcohol consumption. A substantial body of

---

[43] Mental Status evaluation of Wendi Andriano by Woods G., M.D., January 18, 2011.

SP&A 0800

000000324

research has shown that early and prolonged trauma in childhood affects the capacity to regulate the intensity of affective responses.[44]

Yet, it was more than Wendi's traumatic environment alone that affected Wendi's responses to stress. Myla Young, PhD's neuropsychological testing documents Wendi's cognitive deficits, specifically her difficulties organizing and processing her thoughts in stressful circumstances.

Dr. Young describes a number of cognitive impairments, including Wendi's inability to effectively attend, and to recall verbal information. The cognitive deficits that most directly impact Wendi's ability to weigh and deliberate, to make good decisions, were her executive functions. Dr. Young describes these executive functions as "an umbrella construct that describes processes responsible for guiding, directing, and managing thinking and emotional regulation. Mature executive functioning provides for purposeful, considered, goal directed

---

[44] Walker, E. A., Katon, W. J., Neraas, K., Jemelka, R. P., & Massoth, D. (1992). Dissociation in women with chronic pelvic pain. *American Journal of Psychiatry, 149*(4), 534-537;

Saxe, G.N., Chinman, G., Berkowtiz, R., Hall, K., Lieberg, G., Schwartz, J., & van der Kolk B. A. (1994). Somatization in patients with dissociative disorders. *American Journal of Psychiatry, 151*(9), 1329-1334;

Cole, P. & Putnam, F. W. (1992). Effect of incest on self and social functioning: A developmental psychopathology perspective. *Journal of Consulting and Clinical Psychology, 60*(2), 174-184;

Adams-Tucker, C. ( 1982). Proximate effects of sexual abuse: A report on 28 children. *American Journal of Psychiatry, 139*(10), 825-837;

Browne, A. & Finkelhor, D. (1986). Impact of child sexual abuse: A review of the research. *Psychology Bulletin, 99*(1), 66-77;

Green, A. H. (1983). Dimensions of psychological trauma in abused children. *American Journal of Psychiatry, 22*(3), 231-237;

Pynoos, R. S. & Nader, K. (1988). Children who witness the sexual assaults of their mothers. *Journal of the American Academy of Child and Adolescent Psychiatry, 27*(5), 567-572.

37

SP&A 08301

000000325

P-App. 004670

actions. Executive functioning also is the ability to problem solve, and include abilities to initiate, attend, inhibit, shift, monitor, organize, and control thinking and actions."[45]

Wendi did well on some executive functioning tests, reflecting a lack of malingering as well as illustrating intact areas of brain functioning. But Dr Young also found that "...her abilities were predominantly impaired."[46] Her cognitive abilities were specifically impaired in those areas that "...required rapid processing of information, flexible thinking, decision making, and/or inhibition...the ability to stop responding to the immediate physical environment...in order to think, consider and plan alternative ways of solving a problem and respond according to the situation."[47]

### iii.   Joe Gets Sick

Once they were married, Wendi and Joe moved to "the shop," a structure located on the Andrianos' farm.  It was a small workshop that had been converted for habitation. Joe had learned windshield repair and hoped to make a go of having his own business, "Joe's Windshield Repair."  Joe's sister and brother-in-law co-signed for a loan to start the business. Business did not go well for Joe and the young couple faced ongoing financial difficulties.

Within several months of their marriage, Joe noticed a lump on his neck and his neck pathology was discovered.  In September 1994 he underwent the first of his surgeries, an outpatient surgery to remove what the doctor noted to be s a benign tumor. Doctors told Wendi

---

[45] Tab 5, at p. 11.

[46] Tab 5, at p. 12.

[47] Tab 5, at p. 13.

SP&A 08302

000000326

and Joe that his tumors were not malignant. Wendi reports that she and Joe were obviously relieved to learn that Joe's condition wasn't expected to be serious.[48]

After marrying Joe, in June of 1994, Wendi returned to Central Arizona College where she continued to take classes until June of 1995. She also enrolled at the University of Phoenix in April of 1995 to commence business classes. Even though Joe was minimally ill during this initial period of medical evaluation, he, nevertheless, was not supportive of Wendi's efforts to continue her education or secure more stable employment. Wendi reports that Joe ridiculed her attempts to continue her education and did not see value in it. Wendi acquiesced to Joe's preferences, and ultimately stopped going to school. The pervasiveness of Wendi's dependency needs is apparent in how completely she allowed Joe to control her life, from her appearance to her professional future, from what she ate to whom she befriended.[49]

Within six months of Joe's first surgery in September of 1994, he experienced pain in his neck in the area of the surgery as the result of another lump forming. Wendi reports that, by early 1995, Joe's neck was painful and swollen. Together, Wendi and Joe pursued further medical treatment for Joe. The second surgery, also an outpatient surgery, was performed at the University Medical Center in Tucson, Arizona in August 1995. Joe was required to spend a night in a hotel, but, again, the couple did not yet understand the terminal nature of Joe's illness and the enormity of the effect it would have on their lives. They were again reassured that the tumor removed was benign.

---

[48] Interview of Wendi Andriano by George Woods, MD at ASP Perryville on January 18, 2011

[49] Ibid.

SP&A 08303

000000327

Despite Wendi's income from the hospital and monetary assistance from Donna, Joe and Wendi were unable to manage the glass business or their finances well enough to stay afloat financially as Joe continued to deteriorate physically and emotionally.

### iv.    Pressure on Wendi Increases as Joe Worsens

With mounting financial pressures, and Wendi desperate to provide the care and support for her young family, she took money from her employer. In January 1996, Wendi's doctor placed her on a medical leave of absence during which time Wendi acknowledged that she took $2,000 from her employer, an uncharacteristic act considering her lack of criminal history prior to her experiencing such extreme stress levels about her family's circumstances. The manifestation of trauma and mood symptoms like impaired judgment, impulsivity, numbing of affect, and depression speaks to the increased pressures of Wendi's caregiver burden as well.[50] Wendi's increasing caregiver pressures exposed her vulnerabilities that result from her history of trauma, dependent personality disorder, and bipolar disorder.

In connection with the theft, Wendi was referred for counseling and psychological treatment and was seen at Casa Grande Valley Counseling Service, Inc. ("CGVCSI"). Treatment notes from CGVCSI indicate that Wendi's day-to-day functioning was impaired. She was not sleeping, was unable to focus, and felt unsupported by her husband. It was recommended that she receive anti-depressant medication to "help her sleep better and cope with the stresses she is

---

[50] McClean, L.M., Walton, T., Matthew, A., & Jones, J. M. *Examination of couples' attachment security in relation to depression and hopelessness in maritally distressed patients facing end-stage cancer and their spouse caregivers: A buffer or facilitator of psychosocial distress.* 19 SUPPORT CANCER CARE, 1539-1548 (2001) ("The diagnosis of cancer has profound consequences for both patients and their family members, and its progression brings further challenges for couples that include imposed changes in responsibilities and the threat of mortality. Distress, including depression and hopelessness, is very common in both partners when facing a diagnosis of metastatic cancer . . . Spouses who are less satisfied with the marital relationship may experience more caregiving burden. Caregiver burden refers to both objective caregiving, including care-related tasks and time involved in caregiving, as well as subjective caregiving, including the caregiver's experience and feelings about their role as caregiver.") (internal citations omitted).

SP&A 08304

000000328

facing at work and at home."[51] Her therapist notes that, "Wendi appears to be very depressed and very angry at her husband although she has not reported this to him." Wendi was overwhelmed, depressed, and becoming increasingly isolated.[52]

Although Wendi received anti-depressant medication, her therapist noted that Wendi "has had a bad reaction to [the anti-depressants], so plans to recontact her doctor." The therapist also advised Wendi to seek credit-counseling services, but by March of 1996, Wendi reported that she had not followed through with that recommendation because "her husband does not want them to lose their credit cards."

There is a note by Wendi's therapist, Beverly Nichols, MFT, from March 6, 1996. Wendi was taking anti-depressants but reported that "she's having *more* difficulties sleeping." Antidepressants are well known to induce manic episodes, called the "manic switch," in patients that are bipolar, rather than unipolar and merely depressed.[53]

The manic switch is a chemically-induced elevation of mood, most often caused by antidepressants. Bipolar disorder is a chronic, enduring, severe, and often crippling illness that, as we see in Wendi's case, exerts a crushing toll on the individual and the family. Women with bipolar disorder present most commonly with depressive moods, particularly in the early stages of the disorder. Depression appears most commonly before manic symptoms in bipolar disorder, and appears more frequently in women.

---

[51] Tab 46 (Medical Records of Wendi Andriano – Casa Grande Valley Counseling Service Inc., March 1, 1996).

[52] *Ibid.*

[53] Boerlin, H.L., Gitlin, M. J., Zoellner, L. A., & Hammen, C. L. (1998). Bipolar Depression and Antidepressants induced mania: A naturalistic study. *Journal of Clinical Psychiatry, 59*(7), 374-379.

41

SP&A 08305

000000329

In early 1996, Wendi lost her job at the Medical Center. Joe Wendi tried to keep Joe's Windshield Repair going and Wendi began seeking employment. Meanwhile, Joe began working at a boat shop owned by friends. The money Joe made working there, however, appears to have been used to support his boating hobby and no additional income entered into the family home. Social Security Earnings Reports verify the grave state of financial affairs with Wendi earning just over $6600 in tax year 1996 and Joe with no reported earnings. When Wendi lost her job, she and Joe lost their medical insurance.

By late September 1996, Wendi was pregnant with no way to afford medical care. Her mother, Donna assisted in paying for prenatal care. Joe took out another loan, for $10,000, and purchased another speedboat.

Joe experienced more pain and swelling and had a third surgery with no postoperative care recommended in February 1997. The pathology report again noted "benign pleomorphic adenoma."[54]

In 1997, Wendi continued to scramble to earn enough money to provide for her now growing family. It must be remembered that, in addition to her medically ill husband, Wendi and Joe had a child (and she would soon be pregnant with another) at a time of great emotional and financial insecurity.

Wendi became involved in an at-home marketing program in attempt to earn extra money. In the initial phases of this endeavor, she wrote to Pat Hyduk, a woman associated with the marketing program, "I need to get $5,000 in one week or the bank is repossessing my car, my

---

[54] Medical Records of Joseph Andriano – Mayo Clinic Revised Report of August 18, 1998

SP&A 08306

000000330

P-App. 004675

phone will be shut off and God knows what else. I am really desperate. Is there something you can do to help me? I [sic] going insane."[55]

This cry for help, to an almost complete stranger, is more than the desperate cry from someone who is just angry. Wendi was overwhelmed, and unable to function effectively. Her own life was unraveling, her husband was seriously ill, she was having to care for her children, and she was beginning to experience symptoms of mental illness to greater and greater degrees.

Joe's glass repair business was hampered by local competition and poor financial management skills. After recovering from his surgery in February 1997, he was never able to regain his footing in the business. Wendi considered leaving Joe in early 1997, and asked her parents for money to move. However, after Joe's surgery, because of his clearly failing health, Wendi was emotionally unable to leave him. She borrowed money from her parents for basic items, such as food.

Nicholas was born on June 20th, 1997. Wendi and Joe were deeply in debt, and Donna and Alejo bought most of Nicholas's clothes, diapers, and furniture.

When Joe was offered the opportunity to purchase an already established business, Accu-Glass, a successful company that Joe had once worked for, Wendi and Joe thought that might be a good option. Already deeply in debt, Wendi and Joe had no independent financial resources or credit to secure conventional business financing to purchase Accu-Glass.

Wendi wanted—and needed—Joe to succeed. She sought help from her father, Alejo, which led to Jerry Robles, an old friend. Jerry had cash from his various enterprises. According to Alejo, Donna, and Wendi, Jerry Robles became partners with Wendi and Joe.

---

[55] Letter from Wendi Andriano to Pat Hyduk , c. 1997 .

SP&A 0830/

000000331

P-App. 004676

Jerry put up $85,000 in cash and retained 51% ownership. The remainder of the purchase price of Accu-Glass—an additional $100,000—was to be paid to the sellers, over a five-year period.

Wendi began working with Joe at Accu-Glass, handling the accounting and office functions. They were not effective business people, and Joe once again began experiencing pain and swelling in his neck in September 1997. Jerry Robles was not receiving revenues from Accu-Glass, and, amid turmoil with him regarding the business's financial condition, Wendi and Joe signed the business over to Robles. The high hopes Wendi held for Joe and a successful business venture collapsed. The young couple continued to depend on others for financial support.

In March 1998, Wendi obtained a job at the Courtyard Apartments in Casa Grande. She noted on her application that she had completed a bachelor's degree, even though she had not completed her education. She secured a good compensation package, which included health insurance and a free apartment. Wendi was pregnant again.

In July 1998, with the birth of their second child, Ashlee just two months away, Joe was diagnosed with cancer and a report from the Armed Forces Institute of Pathology confirmed that all of the tumors dating back to the first mass removed in September of 1994 were, indeed, malignant cancers.[56]

Joe had his fourth surgery in the summer of 1998. Shortly thereafter, on September 16, 1998, Ashlee was born. Joe was becoming increasingly depressed, isolated, bitter, and withdrawn. Wendi was the sole financial provider for the family. Because Joe was sick, Wendi had no choice but to return to work right after Ashlee was born. Joe was unable to care for the children so they were in left in the care of a neighbor at the apartment complex. Wendi

---

[56] Medical Records of Joseph Andriano – Armed Forces Institute of Pathology Report dated August 12, 1998.

SP&A 08308

000000332

returned to the apartment at lunch to feed Joe through a feeding tube that had been inserted after the surgery. Alejo came over three times a day to change his bandage.

Overwhelming financial pressures, the increasing pressures of her marriage, and the continuing illness of her husband began to weigh heavily on Wendi, undermining her resiliency and exposing her fragile homeostasis. Holding on by acquiescing no longer worked to keep the effects of Wendi's mood dysregulation and poor coping skills—coupled with the impaired judgment and impulsivity of her mood disorder—from completely disintegrating her ability to rise above her dependence.  She had long since abandoned school and had eliminated all social contacts other than with Joe's friends. Her life became dedicated to Joe, her children, and their support and needs.

As noted by Gia Palicki who provided day care for Nicholas and Ashlee in the year before Joe died:

> Wendi and Joe told me that Joe's job was the kids, and Wendi's job was work, but really Joe spent his time doing whatever he wanted. Wendi was responsible for taking care of all the bills as long as Joe made sure that the children were dropped off for daycare. He loved to go boating, and that's what he spent most of his time doing. Wendi encouraged that hobby, and she was glad to have me care for her children so that Joe was free to go have fun. This arrangement was mutually agreed between Wendi and Joe. This was how their family worked.[57]

Though Wendi may have encouraged Joe to "go have fun" after his diagnosis, her tacit permission for Joe to avoid responsibility further worsened Wendi's emotional state.  As noted by one study addressing issues related to caregiver burden, female caregivers' level of

---

[57] Tab 31, at ¶3.

SP&A 08309

000000333

P-App. 004678

marital distress increases as the male patient avoidance subscale score increases, such that the more avoidant the male patients are, the more the female caretakers' marital distress increases.[58]

Wendi became even more committed to helping Joe recover. She researched and found a Christian-based alternative naturopathic facility, Health Quarters Ministries in Colorado Springs, Colorado.[59] Joe's family and friends held a benefit dinner to raise money so Joe could go to Health Quarters. The program was based on nutrition. Upon his return, Wendi attempted to support a radical change in the way the young couple ate. She worked during the day and then cared for her children and Joe in the evenings, attempting to follow a strict vegetarian nutritional program that incorporated the use of vitamins, supplements, and fresh juice extracts. Despite Wendi's good intentions, encouragement and support, Joe was unable to maintain the diet and soon returned to his former eating habits.

### v. Wendi's Symptoms Worsen as Joe's Physical and Mental Condition Deteriorates

On the heels of Joe's diagnoses, Wendi was informed that she was losing her job at Courtyard. For the Andriano family, not only did this mean the loss of income but the loss of their home and health insurance. Wendi once again scrambled to find employment. She obtained a well-paying job at an upscale apartment complex, the Meridian at the Biltmore, in Scottsdale.

---

[58] McClean, L. M., Walton, T., Matthew, A., & Jones, J. M. (2001). Examination of couples' attachment security in relation to depression and hopelessness in maritally distressed patients facing end-stage cancer and their spouse caregivers: A buffer or facilitator of psychosocial distress. *Support Cancer Care, 19*, 1539-1548.

[59] According to its Web site, "The mission of Health Quarters is to help facilitate both physical and spiritual health in the lives of God's people. We focus on building better health by presenting nutritional choices and the principles of nutrition through body cleansing and the rebuilding of the immune system. We firmly believe that illness and disease are caused by toxicity, stress, an inefficient digestive system, biochemical imbalances, mal-absorption of vital nutrients in the body, etc. We also believe that the human body has been designed by God for self-healing of degenerative conditions, given the right dietary and lifestyle changes."
https://www.healthquarters.org/index.php?option=com_content&view=article&id=43&Itemid=2

SP&A U8310

000000334

However, housing was not provided. Joe and Wendi returned to live at the Andriano farm property. Wendi worked full days, leaving at six-thirty or seven in the morning and returning home to Casa Grande late at about seven or eight in the evening after a long commute. Joe transported the kids to the babysitter and picked them up each day that Wendi worked.

Wendi's emotional leak was gradual, but unrelenting. She was crumbling under the stress of her marriage and Joe's ever growing discontent at living with his parents. When Joe and Wendi learned of a new apartment complex—San Riva—being opened in the Ahwatukee Foothills in south Phoenix, Wendi applied. She went through three interviews and obtained yet another position at an even higher scale. She received not only an excellent salary and benefits, including health insurance, but a three bedroom, two bath apartment. The young family moved to San Riva in November 1999.

When Wendi started working at San Riva, she initially worked double shifts every day to try and catch up on her family's expenses. Once their health insurance took effect, Joe returned to have a CT Scan of his lungs. In the ten months since the last scan, the tumors had doubled and the prognosis was poor. Joe was, literally, suffocating to death.

During the year leading up to Joe's death, the caregiver burden Wendi experienced and the weight Wendi bore crushed her. As noted by Gia Palicki, Wendi and Joe's babysitter:

> When I met Joe, he was a free spirit, but towards the end he was not that way anymore. His attitude completely changed. Joe changed drastically over the year that I knew him. In the beginning, things were so different. He was all about the kids, having fun, and being happy. As the illness progressed, Wendi became the sole caregiver for the children. She also was the only one working. It got so that Joe was always pissed off, and he was hardly ever at home. Eventually he was almost never around at all

47

SP&A 08311

000000335

and I hardly saw him anymore. I even started picking the kids up in the morning instead of Joe dropping them off if Wendi couldn't.[60]

Wendi's dependence, her need to not be alone and maintain a dependent relationship, was turned upside down. She could not get praise. Her financial, emotional, physical, and familial life was deteriorating in front of her eyes.

In addition, symptoms of Wendi's bipolar disorder began to further disrupt her ability to modulate her affect and behavior. She started to drink more.[61] She then became involved in a romantic relationship with Rick Freeland, a resident at San Riva, and spoke openly to her employees and tenants about the affair. An open affair with someone in her apartment complex, while she continues as manager, is a manifestation of both dysregulation and bipolar disorders. In Wendi's case, her condition was compounded by her dependent personality. When Rick met Joe and Rick said he could not continue the relationship, Wendi fell apart, consistent with the symptoms seen in dependent personality disorder. Gia Palicki observed:

> If it is true that Wendi had an affair, I can understand that. She was afraid to be alone. She did not know anyone different than Joe, and towards the end he was not very affectionate with her, which is about all she would have asked for from him. He was dying, and later on he was always angry even though she was doing everything she could to make his remaining time as comfortable and happy as possible. She was young, and her relationship with Joe was cold physically. If she had an affair, it was not because she did not love Joe.[62]

Then what were her affairs? The very symptoms of trauma and dependence, acquiescence, aiming to please, denial, emotional dyscontrol, and numbing of affect that had

---

[60] Tab 31, at ¶18.

[61] Testimony of Wendi Andriano, October 27, 2004

[62] Tab 31, at ¶21.

48

SP&A 08312

000000336

P-App. 004681

driven and shaped Wendi's life were undermined. She was increasingly unable to maintain the facade of normality, of possible triumph, and she was feeling to blame. Traumatic stress, real life caregiver burden, and mood disorder began to undermine Wendi's identity as the pleaser and fixer she had been coerced to be. Her affairs, her drinking, and her impaired judgment were the products of her emerging bipolar disorder, symptoms augmented by her longstanding trauma and pathological dependency.[63]

The burden of giving care added to the weight of always trying to keep up. As Joe became increasingly sick, the weight of caring not only for her husband, but her two children, eviscerated Wendi's ability to make reasoned choices.

Wendi suffers co-morbid disorders, disorders that occur in combination or at the same time. Among all mental disorders, alcohol and substance use is highest in people suffering from bipolar disorder and PTSD.[64] Alcohol is the most common "self-medication" used by people suffering from bipolar and PTSD disorders and PTSD is highly correlated with substance abuse. In one study, 24% of persons with PTSD also suffered from alcohol abuse.[65]

---

[63] Malmquist (1996), *supra*, p.159 ("A person involved in an intense relationship is disappointed when his or her expectations are not fulfilled. Resentment and anger is inevitably experienced. However, it is the presence of deep and unresolved ambivalence that prevents a DPD person from objectively examining his or her shortcomings in search of the answer as to why a relationship with a friend, employer, lover, spouse, or other is not going well. Only when the ambivalence is not too prominent can the anger be expressed and the processes of detachment begin. However, when anger or hate surface in a relationship between a person with DPD and his or her partner, it is more difficult for that person to step back than it is for others. The lack of sufficient distancing keeps the intensity of his or her ambivalence at a high level as not possible without this other person, no matter what the price . . . .").

[64] Brady, K.T. & Sinha, R. (2005). Co-Occurring Mental and Substance Use Disorders: The neurological effects of chronic stress. *American Journal of Psychiatry, 162*(8), 1483-1493.

[65] Mills, K.L., Teesson, M., Ross, J., & Peters, L. *Trauma, PTSD, and Substance Use Disorders: Findings from the Australian National Survey of Mental Health and Well-Being.* 163(4) AMERICAN JOURNAL OF PSYCHIATRY, 652-658 (2006).

49

SP&A 08313

000000337

When a person with bipolar disorder is subjected to stress, mood symptoms of mania or depression may become increasingly prevalent. Since alcohol is both a stimulant at low levels and a depressant at higher levels, it serves to anesthetize both poles, while also causing impaired cognitive functioning. The combination of trauma and mood symptoms in co-morbid disorders creates atypical and more severe behavior than would be seen in a given disorder alone. Wendi's co-morbid disorders were intensified by the trauma of her husband's terminal illness, and unleashed her mood symptoms. As discussed, Wendi' symptoms were openly displayed and rarely covered.

Wendi's underlying dependency needs, present since childhood and fostered by her father's coercion, kept her teetering toward the pathological anger seen in dependent personality when those needs are thwarted.

Wendi describes conversations with Joe about his unwillingness to continue to live given his terminal condition and his fear of dying via suffocation, as had been predicted due to the proliferation of the cancer in his lungs. In fact, Wendi reports that Joe did not want anyone to know about his desire to end his life, as his minimization to Jeffrey Miller illustrates.

As a result, Wendi investigated, on her *office computer*, lethal drugs, used primarily for suicide. Wendi reports conversations with Shawn King about types of drugs and places to buy these drugs online.[66] Under the best of circumstances, Wendi's investigation into lethal substances reflects impaired judgment. She had little knowledge of these compounds, and her only computer was at her desk at work in an office shared by other people.

Wendi frequently talked with co-workers about the tremendous pressure she was under, and they saw it. Her family recognized the loss of emotional control and attempted to take

---

[66] Interview of Wendi Andriano by George Woods, MD at ASP Perryville, January 26, 2011.

SP&A 08314

000000338

care of the children, pay for medical care, or provide Joe with outlets like paying for him to spend time on his boat.

### vi.   Wendi Becomes More Erratic

As Wendi's stress increased, her behavior became more erratic. Her relative openness at work, particularly about her relationship with Joe, her affairs, her use of the office computer, and her investigation into lethal drugs and substances in a location where she could easily be seen doing so reflects Wendi's impaired decision making and ability to understand context as seen in people suffering from bipolar disorder.[67] As a 2001 study noted:

> This is possibly the first study to have directly compared decision-making performance in manic and depressed patients. The results showed manic and depressed patients' to be impaired on a computerized decision-making task. While the most general indicators of performance showed similarities between these two groups, close examination of the individual components of the task revealed distinct patterns of impairment: although both manic and depressed patients demonstrated similarly delayed deliberation times and altered betting strategies, impairments in the quality of decisions were confined to manic patients.[68]

An impaired mental flexibility to effectively understand social context and make good decisions is reflected in Wendi's open research into lethal drugs and substances on her office computer and in the fact that others' open awareness of Joe's condition might lead them to discern the purpose of her research. This decision making impairment is also captured in Dr. Young's testing.

---

[67] Murphy, F. C., Rubinsztein, J. S., Michael, A., Rogers, R. D., Robbins, T. W., Paykel, E. S., & Sahakian, B. J. (2001). Decision-making cognition in mania and depression. *Psychological Medicine*, *31*(4), 679-693.

[68] Murphy, F. C., Rubinsztein, J. S., Michael, A., Rogers, R. D., Robbins, T. W., Paykel, E. S., & Sahakian B. J. (2001). Decision-making cognition in mania and depression. *Psychological Medicine*, *31*(4), 679-693.

SP&A 08315

000000339

Cognitive dysfunction is common in bipolar disorder.[69] Problems with attention and focus, leading to a slower processing of events and circumstances, have been found in persons suffering from bipolar disorder, regardless of mental status and mood state. So, a person with bipolar disorder, even in a euthymic (stable) state, may still manifest symptoms of cognitive impairment.

In the period leading up to Joe's death, Wendi was acutely symptomatic. Symptoms consistent with bipolar disorder began to manifest. The most prominent were her expansive mood, distractibility, increased psychomotor activity, impaired judgment, and willingness to engage in activities with a high risk for problematic endings.

Wendi became inappropriately involved with fellow workers in a way that was historically uncharacteristic for her. Once married to Joe, she limited her social contacts to his friends and activities related to boating and events at the lake. Even though she was responsible for various social events at Quail Gardens and the Courtyard Apartments, she did not become personally involved with the residents and staff. At San Riva, Wendi became a part of the San Riva community. To some degree this may have served as a supportive measure for her, but, in fact, her involvement was inappropriate, showed little ability to judge her role, either as wife or manager, and was much more consistent with mental disease.

Wendi worked at San Riva. She was the boss. Nevertheless, she socialized with co-workers and renters at San Riva. She used her only computer at her office at San Riva, often in plain view of other employees and renters. She had affairs with tenants. She went to parties and barbeques at San Riva, and drank more and more.

---

[69] Martínez-Arán, A., Eduard, V., Reinares, M., Colom, F., Torrent, C., Sánchez-Moreno, J., Benabarre, A...& Salamero, M. *Cognitive Function Across Manic or Hypomanic, Depressed, and Euthymic States in Bipolar Disorder.* 161(2) AMERICAN JOURNAL OF PSYCHIATRY, 262-270 (2004).

SP&A 08316

000000340

Deficits in understanding social circumstances, and the impaired ability to respond appropriately to social circumstances are hallmarks of children and adults with bipolar disorder.[70]

Dr. Young's findings are consistent with the social history and Wendi's behavior. Dr. Young found Wendi has difficulty with decision-making, particularly with decisions that were novel and stressful. Wendi's Iowa Gambling Task demonstrated poor strategies for decision making.

Dr. Young also found that Wendi's ability to process novel information is slowed. Both Wendi and Donna describe this difficulty with understanding context and responding to it in multiple ways. Wendi described developing relationships early in her prison years that indicate decision-making that was impaired beyond mere naiveté.

We see the correlation between Dr. Young's findings of slow processing speed, and Wendi's own impaired judgment, particularly under tremendous stress, stress that had become much greater than the "normal" stress of violence and anger she had grown up with.

Wendi became involved with two men (one of whom, Rick Freeland, a tenant at the apartment complex she managed). Consistent with the need to be loved, Wendi described herself in her testimony as falling in love with Freeland within months. When they separated, she

---

[70] "Children and adults with bipolar disorder perform differently from comparison subjects and individuals with other disorders on social-cognitive measures, particularly facial expression processing tasks. Symptomatic adults with bipolar disorder also have difficulty using contextual cues to infer others' mental states. Less research has focused on expressive aspects of social cognition; clinical observation of youths with pediatric bipolar disorder, however, suggests that language pragmatics (i.e., appropriate social use of verbal/nonverbal language) may be problematic. This pattern of aberrant social-cognitive skill suggests dysfunction in neural structures thought to mediate social, emotional, and possibly pragmatic linguistic processing. These structures include the ventrolateral and medial prefrontal cortices and the amygdala, which exhibit structural and/or functional anomalies in bipolar disorder." McClure et al. (2005). *Deficits in Social Cognition and Response Flexibility in Pediatric Bipolar Disorder* (internal citations omitted).

SP&A 0831/

000000341

was overwhelmed, feeling as though she had lost a close friend, someone she could talk with, an interaction of classic symptoms of bipolar disorder and dependent personality disorder.

Wendi was the manager of the San Riva apartments. She not only lived there, with her husband and children, but San Riva was her place of business. She manifested multiple behaviors that portended increasing mental illness, as she continued to work there. These symptoms of elevated mood, poor judgment, impaired impulse control, increased alcohol intake, and increased sexuality, were temporally and causally related to the onset of her extreme level of traumatic stress and subsequent manifestation of bipolar symptoms. There was a change in Wendi.

The extreme stress rent the fabric of Wendi's fragile mental state, already bombarded by affective dysregulation, self-medication, impaired cognitive tools, and defective judgment. Many of the symptoms that were previously subclinical, meaning less obvious, were amplified by Wendi's loss of control, and the destruction of all that she knew, and as a result of the need to keep herself, her children, and her dying husband going.

It is unclear whether Joe participated in a suicide decision, although he had clearly entertained suicide and talked with his malpractice lawyer about his suicidal ideation. Wendi, however, on her office computer, created a false business license, using the address of her actual business office. She found a company that sold lethal compounds. She brought those compounds to her office.

Wendi's competent facade was just that, a facade that quickly crumbled in the face of coercion by her dad, the vulnerabilities of her own mental illnesses, the neglect of her mother, and, now, the extraordinary burdens of caregiving she faced. From childhood, she was isolated from others, unable to effectively socialize, and subject to peer pressure. The series of

SP&A 08318

000000342

P-App. 004687

behaviors prior to the night of the offense captures the range and severity of the mental illnesses Wendi was suffering from, especially when under tremendous stress before the current offense, at the time of the offense, and while being treated in jail after the offense.

### vii.   Wendi's Symptoms on the Night of the Offense

Chris Hashisaki's testimony gives some insight into Wendi's mental symptoms and mental state at the time of the offense. When asked, during cross examination, if Wendi was creating fictitious business licenses on the job, in plain view of other employees, Ms. Hashisaki said "Yes."[71] Ms. Hashisaki acknowledged seeing the package in Wendi's office. When asked by Mr. Martinez to describe Wendi's mental state at the time of the offense, Ms. Hashisaki describes Wendi as "confused."[72]

Ms. Hashisaki made it clear that Wendi was overwhelmed by Joe's illness, not just Wendi and Joe's relationship.[73]

When the emergency medical technicians came the first time, Wendi said her husband was dying and did not want any services.  They asked her if she had a DNR (Do not

---

[71] Hashisaki testimony, Page 48 ("Q: In the office set up there, she openly was in the process of creating fictitious business license, correct? A: Yes. Q: You observed that? A: Yes. Q: She made no effort to hide that fact from you in doing it, correct? A: To point. Q: Right. And then when you inquired of it, she basically said it's none of your business, leave me alone? A: Correct. Q: But she did it at time during business hours, correct? A: She did yes. Q: When you were witness to it? A: Yes.").

[72] Hashisaki testimony, Page 11 ("Q: How would you describe her demeanor? A: Confused. Q: And did she have telephone in her hand? A: She did.").

[73] Hashisaki testimony, Page 40 ("Q: The marriage had some problems? A. They were having trouble with his illness, yes. Q: Beyond the illness, they were having other problems? A: Such as what? Q: Such as -- don't know how else to describe it. Difficulty between man and wife in husband and wife kind of relationship? A: She expressed difficulty in the relationship, yes. Q: And she attributed those problems to the conduct of Mr. Andriano correct? A: More so towards his illness. Q: Illness was one of the problems, but there were other items that were causing marital discord between these two individuals, correct? A: That don't know of.  Q: Are you telling me that she never suggested that she was having problems with Mr. Andriano? A: No I'm not suggesting that.  I'm suggesting that it was more so due to the illness. . .").

SP&A 08319

000000343

resuscitate) order.[74] Wendi's executive functioning, her impaired sequencing and understanding of specific social context, had fallen apart. She was suddenly surrounded by people she had called without knowing what to do, the very antithesis of planning, if that were the case.

Again, the emotional disconnect grounded in trauma was documented. Wendi's range of emotions and the quality of the symptoms at play included traumatic dissociation, where she lost and was unable to recollect much of the time during the incident. Wendi's dissociation has a strong foundation in the trauma and neglect of her childhood. As noted above and in the Hopper report, Wendi's father coerced her sexually for many years during her childhood and early adolescence. There are at least two incidents of Wendi being photographed by her father, once in a motel, in sexually-provocative poses and see-through nightgowns. Wendi does not recall either of the photographs, although she does recall going to each place these photographs were taken, and recalls reluctantly agreeing to let Alejo Ochoa, her father, take these pictures.

Wendi's dissociation underlies much of what we know about the actual offense. Studies consistently report a high degree of dissociation in patients who suffer from pathological forms of affective dysregulation as discussed above.[75] Indeed, Wendi was experiencing pronounced symptoms of her mental illness during the period leading up to Joe's death, and the

---

[74] Hashisaki testimony, Page 37 ("A: She walked past the fire department and myself and stood by the front door and explained that she did not want any service, that her husband was dying and this was not the way that he wanted to go, and that she would like us to leave. Q: And what did the fire department people do? A: The fire department said that if you're refusing treatment that was something they understood. They asked her if he had a 'DNR'. She asked them what a 'DNR' was and they said 'DNR' was 'do not resuscitate.'").

[75] Lewis, D. O. (1992). From abuse to violence: Psychophysiological consequences of maltreatment. *Journal of the American Academy of Child and Adolescent Psychiatry, 31*(3), 383-391;

van der Kolk, B. A., Perry, J. C., & Herman, J. L. (1991). Childhood origins of self-destructive behavior. *American Journal of Psychiatry, 148*(12), 1665-1671;

Terr, L. (1991). Childhood traumas: An outline and overview. *American Journal of Psychiatry, 148*, 10-20.

SP&A 08320

000000344

night of the offense involved the convergence of severe symptoms of each of Wendi's disorders, which, because of their co-morbid nature, would have fed off each other to exponentially worsen their collective severity. The manifestations of her psychiatric disorders, including dissociation, likely played a substantial role in the events that caused Joe's death. A person in Wendi's state would have been unable to control and manage her emotions and responses to the events as they unfolded. Moreover, those disorders in conjunction – and particularly dependent personality disorder when the sufferer's dependency needs are thwarted in the profound manner at issue here – likely would have substantially impaired Wendi's ability to accurately judge how to "help" her terminally ill husband, who was the focus of Wendi's pathological dependence needs. Her ability to judge whether her behavior was right was marred by her multiple mental and cognitive symptoms.

Wendi's post-arrest therapy sessions with private counselor Kandy Rohde provide our best glimpse into her mental state.

> She felt angry and hit him twice with a chair. She believes she
> continued to hit him with the chair but her recollection is that she
> watched herself do that. [A classic description of dissociation.]
> The next memory is of Wendi sitting on the ground next to Joe's
> body. She thinks she had her hand on him and she knew he was
> dead. She said they were in the middle of a pool of blood. She got
> up to wash her face and glasses because they were so bloody she
> could not see. She said that she does not know how much time
> passed or what happened. She did not hear the paramedics. The
> children did not wake up. Chris did not return. She called her
> parents and her father told her to call the police. She did. Her most
> chilling memory is that of Joe asking her to help him as she hit him
> with the chair. In her head she said that she was helping him. She
> said that she felt relief when she found him dead. She was glad her
> old life was over.[76]

---

[76] Tab 45 (Kandy Rohde Notes dated February 23, 2001).

57

SP&A 08321

000000345

Consistent with her multiple, interrelated, co-morbid disorders, Wendi describes dissociative symptoms at the time of here greatest stress. Her loss of time, emotional numbing, hyper-reactivity, and anger are all part and parcel of her traumatic disorder. Augmenting her traumatic response, however, is her Dependent Personality Disorder, created from the long term sexual coercion that led to both acquiescence and the anger that comes from overwhelming stress.

Dr. Carl Malmquist describes how individuals with dependent personality disorders are often led to violence.[77] This was certainly the case with Wendi. Her history with men, starting with her sexual coercion by Alejo Ochoa, her stepfather, to her affair with Rick Freeland and subsequent one-night stand with Travis Black, had always been one of dependence. In the impending death of Joe Andriano, Wendi was suffering from emotional abuse, dissociation, affective numbing, anger, hyper reactivity, and the foreshortened sense of the future one sees in complex trauma. She had already become unhinged, displaying manic symptoms of increased drinking, incredibly poor judgment, and sexual dalliances. The multiplicity and interplay of symptoms eroded what little ability she had shown in the past, to maintain cohesive functioning.

Symptoms of dependent personality disorder, acquiescence, difficulty being alone, and extreme neediness, permeated the early years of Wendi's and Joe's marriage. With the introduction of Joe's terminal illness, Wendi began to show new, acute trauma symptoms like numbing of affect, hyper reactivity, anger, irritability, and avoidance. These symptoms are common in caregivers, particularly those who have few resources for support.

---

[77] Malmquist, C. (1996). Dependent personality disorders and killing, in *Homicide: a psychiatric perspective* (p. 145). Washington, DC: American Psychiatric Press.

SP&A 08322

000000346

P-App. 004691

Pearlin has investigated the role implications of life stressors, including family illness. He suggests that concepts such as role captivity, which is viewed as being placed in a role involuntarily and unwillingly, and role overload, help us to understand many dilemmas of caregiving. He also acknowledges the impact of caregivers' coping and social support resources on their ability to deal with caregiving demands.[78]

Wendi reported many symptoms of traumatic stress when describing the night of the offense to counselor Kandy Rohde. She described affective numbing, dissociation, and the overreaction seen when trauma, both acute and chronic, impairs the ability to modulate feelings and behaviors.

Tragically, the dependent underpinnings of her façade were also crushed, and her ability to conform her behavior was thwarted.[79] Wendi's mental disorders and the role they played in the deterioration of her mental state were never examined before or during her trial. A thorough social history would have pointed out the multigenerational history of mental illness. A social history would have also chronicled the sexual coercion of her stepfather and neglect of her mother which led to a lack of coping skills, acquiescence, and lack of appropriate affective control and response.

---

[78] Sales, E. (2003). Family burden and quality of life. *Quality of Life Research, 12*(Suppl. 1), 33–41.

[79] "A question arises as to why a DPD (Dependent Personality Disorder) cannot simply act more rationally and give up the past relationship and look for a new one. Given that the relationship has had a good deal of pain attached to it, this would seem a logical step. Such a solution would also be parsimonious if available. A person involved in an intense relationship is disappointed when his or her expectations are not fulfilled. Resentment and anger is inevitably experienced. However, it is the presence of deep and unresolved ambivalence that prevents a DPD person from objectively examining his or her shortcomings in search of the answer as to why a relationship with a friend, employer, lover, spouse, or other is not going well. Only when the ambivalence is not too prominent can the anger be expressed and the processes of detachment begin. However, when anger or hate surface in a relationship between a person with DPD and his or her partner, it is more difficult for that person to step back than it is for others. The lack of sufficient distancing keeps the intensity of his or her ambivalence at a high level." Malmquist, C. (1996). Dependent personality disorders and killing. In, *Homicide: a psychiatric perspective* (p. 145). Washington, DC: American Psychiatric Press.

SP&A 08323

000000347

In addition, research has consistently demonstrated a connection between affective dysregulation and experiences of early childhood neglect, trauma and attachment failure. Without adequate regulation of the infant's distress states, the nervous system and affect-regulating brain structures fail to respond optimally. Affective dysregulation is a core symptom of post-traumatic stress disorder. Methods to increase self-regulation are crucial to the effectiveness of any treatment for these problems. Traditional therapeutic modalities that address distorted cognitions or focus on emotional expression, attempt to address affect regulation but fail to modify its underlying basis in the nervous system. When Wendi sought and first received psychological treatment in 1996, no historical information was provided to the therapist and there was no treatment recommended to appropriately approach affect dysregulation as a caregiver stress and trauma symptom, and address the underlying causes of Wendi's dysregulation.

The significance of Wendi's affective dysregulation, dissociation, numbing of affect, and other symptoms of PTSD can only be determined by a careful investigation of the total context of a patient's life, and the totality of the patient's functioning. In Wendi's case, the substantiation of many of Wendi's symptoms of bipolar disorder, cognitive dysfunction, dependent personality, and complex trauma rest upon a social history that was not sought nor found by her trial attorneys.

The lack of this social history prevented mental health specialists from understanding the multiple disorders in play as well as the environmental pressures of caregiver burden.

**b.** **Post Offense Treatment for Mental Illness**

After Wendi was arrested and charged with Joe's murder, jail mental-health practitioners recognized Wendi's mood disorder, trauma, and personality symptoms. She began

SP&A 08324

000000348

P-App. 004693

to complain of problems sleeping early in her incarceration. Within weeks of her incarceration, she was placed on Prozac, Remeron, and Trazadone; all three antidepressants. Remeron and Trazadone are particularly sedative, and are used to aid in sleep.

On November 3, 2000, Dr. Garcia-Bunel reported that Wendi was extremely depressed, and that she had been depressed for over a year. This year corresponds to Wendi's most illogical, mood-driven acts.

Within months, her medication was changed to Remeron solely. Wendi's attorneys advised her not to talk with Dr. Garcia-Bunel, and those visits were discontinued.

Wendi was first placed on Seroquel, an atypical antipsychotic commonly used in bipolar depression, in April 2002. She was started on 100mg. at night. Seroquel is also highly sedative and an excellent sleep aid in persons that have a psychotic disorder or bipolar disorder.

By November 2002, Wendi was described as still having ongoing insomnia. Dr. Vickie Ayers increased Wendi's Seroquel to 200mg at night. Dr. Ayers also prescribed Ativan, an anti-anxiety agent, and Elavil, a very sedating antidepressant. Over the next months, Wendi was consistently prescribed Seroquel, the atypical antipsychotic, and Elavil, the sedating antidepressant. There is an important clinical question of whether Wendi was actually switched into hypomania by the Elavil. She certainly continued to manifest anxiety and problems sleeping, symptoms that could have been compounded by the very treatment she is receiving.

Vincent Stuart, MD, saw Wendi on October 23, 2003. He felt that she was anxious due to the upcoming trial and, in addition to her Seroquel, he increased her Ativan to a total of 4mg per day.[80]

---

[80] MCCHSD Progress Notes, October 23, 2003.

SP&A 08325

000000349

On November 27, 2003, in spite of treatment with antidepressants and medications for her bipolar depression, Wendi attempted suicide. She cut her left wrist, and was taken to the Durango Psych. Unit.  D. Anderson, the evaluating nurse, described Wendi's thoughts as "irrational" and felt she was minimizing her attempt.[81] Wendi was placed in four-point restraints.

By the afternoon of November 28th, Wendi was logical. She had been reduced to two-point restraints. K. Hoffert, MD, made the diagnosis of "Adjustment Disorder with mixed features," and continued her medications.

Wendi's discharge criteria, developed on November 29, 2003, were that she not be a danger to herself or others, and that she develop a 25% increase in coping skills.[82] Wendi's pathological dependency needs appear at her most vulnerable times, as Counselor L. King recognized.

King evaluated Wendi on November 29, 2003. King determined that Wendi should remain on the Psychiatric Unit, where she stayed for two more years, through her trial, an extremely unusual occurrence for someone not grossly psychotic. It speaks to Wendi's mental fragility during this period, the result of multiple, overlapping psychiatric symptoms.

King believed that Wendi's need for stabilization justified her stay on the Durango Psych. Unit. Wendi's instability had, as Wendi said, started long before her incarceration. The treatment she needed came too late.

---

[81] Progress notes, MCCHSD, November 27, 2003.

[82] Progress note, MCCHSD, September 29, 2003.

62

SP&A 08326

000000350

c.    <u>**Wendi's Trial**</u>

Wendi's trial testimony was fashioned by extremely poor investigation, and a limited understanding of mental health. Mitigation was not effectively presented, since there was such a limited social history, and the attorneys relied upon incomplete data. Consequently, the symptoms of her trauma—the early childhood and adolescent trauma, the trauma of the years of marriage and her husband's impending death, and the events of his death—were not discussed as mental health symptoms. The events were discussed, but not their impact on her life. A comprehensive explanation of the multiple mental-health symptoms affecting Wendi could not be undertaken, since the social history preparation was so limited.

Many of the witnesses, particularly those from San Riva, accurately describe Wendi's symptoms of increased alcohol intake, sexual acting out, depression, and poor judgment. This behavior was not contextualized into a mental health framework to explain that Wendi was in fact suffering from several acute mental disorders, rather than merely a reaction to abusive behavior by Joe.

Due to the absence of an in-depth understanding of Wendi's family dynamic, a remarkably inaccurate and incomplete picture of Alejo and Donna Ochoa was painted. Rather than the complex, abusive, neglectful, sexually charged atmosphere that led to Wendi's dissociative states in her adolescence, Wendi's upbringing was painted as a good Christian home. Without the proper factual foundation, her attorneys were unaware of the depth of her mental disorder. They could not, therefore, discuss the depth and impact of her mental disorders, since that time treated in prison, on her life as well as at the time of the offense.

Since there was no mental health framework for her behaviors, these symptoms of dissociation, affective numbing, emotional dysregulation, and anger that are so much a part of the trauma symptom constellation were not identified as mental illness.

63

SP&A 08327

000000351

Her dependency needs were used to portray Joe in a negative light when, in fact, her dependency contributed to the instability of the relationship, and limited, as L. King reported, Wendi's coping mechanisms. This dependency was a lifelong personality disorder.

Wendi's attorneys could not effectively prepare or confront Wendi because they knew so little about her, her family, and her mental illnesses.

## CONCLUSION

It is my professional opinion, which I hold to a reasonable degree of medical certainty, that these symptoms were present at the time of offense, impairing Wendi's capacity to conform her behavior to the law, control and manage her emotions and responses to the events as they unfolded, and judge right from wrong in determining how to "help" her terminally ill husband.

64

SP&A 08328

000000352

P-App. 004697

Date: __February 14, 2012__

George W. Woods, Jr., M.D.

65

SP&A 08329

000000353

**EXHIBIT "D-7"**

## EXPERT REPORT OF JAMES HOPPER, Ph.D.

**I.      QUALIFICATIONS**

I am a clinical psychologist licensed to practice in the Commonwealth of Massachusetts.  In 1997, I earned a Doctoral degree (Ph.D.) in clinical psychology from the University of Massachusetts at Boston. Most of my research and clinical work over the past 20 years has focused on the long-term effects of childhood abuse.

From 1997 to 1999, I completed a post-doctoral psychology fellowship at the Trauma Center of HRI Hospital, in Brookline, Massachusetts, an internationally recognized clinic affiliated with Boston University School of Medicine.  I was also the Assistant Director of Research at the Trauma Center during the same period.  In these capacities, I received training in and provided intensive psychotherapy for severely traumatized clients and co-designed and managed several research projects on traumatic memory characteristics and psychological and biological treatments of Posttraumatic Stress Disorder (PTSD).

I have conducted research at Harvard Medical School, Boston University School of Medicine and the University of Western Ontario on various aspects of psychological trauma and PTSD, including characteristics of traumatic memories, emotional and behavioral effects of child abuse, brain bases of emotion regulation problems in psychological trauma, and psychological and pharmacological treatments for PTSD caused by child abuse trauma.  I have conducted assessments and provided therapy to adults suffering from the effects of childhood neglect and abuse in several different outpatient settings, including hospital clinics, college counseling and mental health centers, and private practice. Since 2003 I have also worked as an independent consultant

SP&A 083/4

000000399

in clinical and forensic psychology, including as an expert witness on psychological

trauma and its effects for eight capital cases.

From 1995 to 2000 I was an adjunct instructor with the Department of

Psychology at the University of Massachusetts at Boston, where I taught undergraduate

courses in personality theory, abnormal psychology, and psychological trauma. From

2000 to the present I have given numerous invited teaching presentations, on topics

including the diagnosis, clinical phenomenology and treatment of PTSD; the long-term

effects of childhood abuse, including sexual abuse; the biology of trauma and PTSD; and

the implications of research on traumatic memory characteristics and the biology of

PTSD for various lines of work, including psychotherapy and police crime investigations.

In addition, I have given talks at numerous conferences of professional psychological and

psychiatric associations, as well as to the United States military.

I have authored or co-authored sixteen papers published in peer reviewed

journals, on various aspects of psychological trauma and PTSD, including perpetration

outcomes in adults with histories of child abuse, characteristics of traumatic memories,

and neurobiological aspects of PTSD and reactions to trauma-related stimuli.

In 2007 I was a founding board member of 1in6, Inc., a non-profit organization

serving men with histories of child sexual abuse, and from 2008 through 2011 I was a

1in6 Advisory Board member and paid consultant writing the content for 1in6.org, the

most comprehensive website in the world on the issue.

From 2006 to 2011, I was an Instructor of Psychology in the Department of

Psychiatry of Harvard Medical School. In July of 2001 my appointment with Harvard

Medical School became Clinical Instructor of Psychology and I began my current

2

SP&A 08375

000000400

position as psychological trauma consultant for the Outpatient Addictions Service of the Cambridge Health Alliance.

A copy of my curriculum vitae is attached to this report as Exhibit A.

## II.     SCOPE OF ASSIGNMENT

I was asked by counsel for Wendi Elizabeth Andriano to examine psychologically traumatic aspects of Ms. Andriano's development from birth to age eighteen.  Of particular focus were (1) experiences of neglect, abuse and other potentially traumatic mistreatment by her parents and other adults, and (2) harmful effects of such traumatic experiences and relationships on her mental health and ways of relating to others.

## III.    MATERIALS REVIEWED

I conducted numerous interviews and reviewed thousands of pages of documents. My interviews included six visits with Wendi, totaling 52 hours, and one interview each with the following individuals:

- Wendi's mother, Donna Ochoa;

- Wendi's biological father, Shelby Robertson;

- Wendi's adoptive father, Alejo Ochoa;

- Martha England, an adult member of Ms. Andriano's church when Wendi was a child and adolescent; and

- Jeri Lynn Cunningham, a childhood friend who reports being sexually abused by Alejo Ochoa while Wendi laid next to her in bed

My document review included a copy of Ms. Andriano's videotaped interrogation by detectives shortly after she was arrested, a transcript of that interrogation, hundreds of pages of trial testimony and numerous affidavits obtained by counsel and others throughout the course of Ms. Andriano's post-conviction relief proceedings, including affidavits from Wendi's direct family,

3

SP&A 08376

000000401

several friends and acquaintances, and many extended family members. A complete list of the documents I reviewed is attached as Exhibit B.

## IV.   CONCLUSIONS

Wendi Andriano lived a childhood characterized by substantial neglect and abuse – emotional, physical, and sexual. The most destructive traumas were her mother's constant emotional neglect and her adoptive father's years of sexual abuse.

As a result, Wendi entered adulthood as a severely traumatized and damaged person with a greatly increased likelihood of developing – as she has – deficits in cognitive functioning, psychiatric disorders, deficits in emotional functioning, and trauma-based patterns of relating to others.

## V.   EVIDENCE AND ANALYSIS

The following is a summary of the evidence and analysis which support my conclusions. Given the large volume of information and the complexity of this matter, I am providing this summary to highlight the most significant traumatic experiences and relationships that shaped Wendi's childhood development and adult life. A full presentation of the evidence and my analysis is attached as an appendix to this report, and I will refer to that appendix as I summarize the evidence and analysis below.

### A.   Wendi Andriano's Neglect and Abuse by Her Parents and Other Adults

The most important people in Wendi's life were themselves severely damaged individuals incapable of providing the caring and nurturing necessary for normal human development. Wendi's mother, biological father and adopted father all suffered neglect and abuse in their own childhoods and repeated that pattern with Wendi. When not being

4

SP&A 0831/

000000402

neglected or abused by one of her parents, Wendi was turned over to other adults who likewise subjected Wendi to extremely harmful environments.

The neglect and abuse falls into five categories: (1) neglect by Wendi's mother; (2) physical abuse, including Wendi being "beaten into submission;" (3) emotional abuse by Wendi's adoptive father; (4) sexual abuse by her adoptive father and others; and (5) traumatizing relationship patterns. Each category is addressed below.

### 1.    Neglect by her Mother.

Wendi's mother, Donna Ochoa, emotionally neglected her from birth until she left home at age 18. Donna often handed Wendi off to others, including emotionally, physically and sexually abusive men, starting with her first husband, Skip Robertson. Looking back on various phases and traumatic events of Wendi's childhood, Donna repeatedly comments on not knowing and not even wanting to know where Wendi was, who she was with, or whether she was being abused. And when it came to the most abusive relationship of Wendi's life, with Donna's second husband Alejo Ochoa, Donna was *relieved* to have Wendi be the one to deal with Alejo's anger and sexual perversion.

Donna was herself severely neglected by both of her parents. Donna reports that while her mother made sure she was fed and clothed, "I had no emotional connection with her, no hugging, no cuddling, no warmth, no affection, no bond." Donna's father was usually absent -- either working, drinking, or with other women and his parallel family. When he did give her attention, he took her to bars (beginning at age 10) or went drinking with Donna and her teenage friends. Donna also reports being told that her father took showers with her until she was six or seven years old, suggesting he may have sexually abused her, although she does not have access to those memories. (Appendix, Section III.B.)

5

SP&A U8378

000000403

The neglect Donna experienced was particularly devastating, and rendered her unable to cope with the traumatic experiences of her childhood or to effectively parent Wendi. Donna's parents had brutal fights with screaming, breaking glass, and physical assaults. A particular low point occurred when Donna's mother brought her along when searching for her father (with other women) in local hotels, and Donna heard her mother fire a gun at him and believed he may have been killed. Throughout all of this Donna's parents never helped Donna deal with the emotional effects on her or expressed any concern about her wellbeing. Donna responded by pretending not to notice and acting like everything was OK – just as she would when Wendi was in harm's way and being abused.

The following are representative samples of the ways in which Donna neglected Wendi. A full discussion of Donna's neglect can be found throughout the appendix to this report, particularly in sections IV and VIII.

Immediately after Wendi's birth, Donna made no effort to visit her in the hospital nursery, and "did not bond with Wendi at all." Donna was more worried about her dog, which had gone missing while she was in the hospital, and "couldn't attend to Wendi at all," including to breast feed her. After bringing Wendi home, Donna went into depression and "completely shut down," unable to feed herself, get on her feet, or communicate. After that, nursing was the *only* way that Donna cared for her baby. She otherwise avoided her, and was unable to sooth her colicky baby even when she tried. Almost every night for the first several months of her life, infant Wendi was left to cry in her room for hours, with no contact from her parents.

6

SP&A 08379

000000404

P-App. 004705

Decades of research have shown that infant brain development depends as much on emotional nurturance as physical care. Maternal neglect is known to exert substantial deleterious effects on developing infants' brains. Experiences like those of Wendi's infancy can have lasting effects on neurotransmitter systems, on circuits involved in attachment to parents, emotion and mood, as well as other brain systems, through a variety of mechanisms including altered gene expression.

Donna did not merely neglect her daughter's emotional needs. She remembers feeling, from the beginning, "I didn't know what to do with Wendi... and I didn't interact with her... My mom had the patience to sit and rock her, but I was like 'No way.'" Donna often handed Wendi over to others, including men likely to abuse her. Her neglect always occurred in the context of triangular relationships, in which Donna's attitude and actions as a mother can be summed up: "I can't handle her. I don't want her. YOU take her."

Until Wendi was four, Donna often handed Wendi over to Wendi's biological father, Skip Robertson. Skip's childhood was also full of neglect and abuse. His family produced at least five sons who sexually abused young girls, with Skip and one brother ultimately serving long sentences for abusing Skip's step-daughter. (Appendix, Section III.A.) Skip imposed harsh discipline on Wendi, including potty training her by 10 months of age with punishments and threats. (Appendix, Section IV.) Donna made no attempt to protect her. At Robertson family gatherings, the women cooked, the men got drunk, and Donna had no idea where Wendi was or who she was with, which put Wendi at risk of sexual abuse by Skip's brothers and father, who was notorious among Robertson family women as a "dirty old man." (*Id.*)

7

SP&A 08380

000000405

P-App. 004706

When Wendi was four years old, day care workers reported that Wendi was initiating unusual and concerning sexual interactions with other children. Donna made no attempt to get Wendi help. Soon thereafter, Donna let Wendi wander the dangerous neighborhood around the drug and alcohol clinic where she worked. She let Wendi spend time alone with the director of the clinic, even after discovering evidence that he had sexually abused girls.

Donna divorced Skip when Wendi was four years old.  Donna then became sexually involved with Alejo Ochoa, an extremely limited and disturbed man with a history of sexual abuse by family members and neighbors, as well as emotional neglect and emotional and physical abuse by both parents. (Appendix, Section V.)  From the start Alejo was more interested in Wendi than Donna, and soon he was sleeping in the same bed with them. (Appendix, Section VI.) Then Wendi began wetting the bed for the first time in her life. Donna did not want to know, or even to think about whether Alejo was sexually abusing Wendi.  Within months Donna married Alejo, and he took primary responsibility for parenting Wendi. For the next 13 years, Donna mostly withdrew, looked away and tried not to notice as Wendi was emotionally, physically and sexually abused by Alejo. (Appendix Sections VI-VIII.)

### 2. Physical Abuse.

Donna's abdication of her parenting duties was not limited to neglect; it included physical abuse as well. Starting when she was a toddler and lasting into her teens, Wendi was regularly subjected to physical beatings by her mother. She was also beaten by her biological and adoptive fathers and authority figures in two religious cults who taught that God wants children beaten into submission. The beatings were not just for bad behavior, but for failure to instantly and automatically obey. The children were even

8

SP&A 08381

000000406

P-App. 004707

beaten for displaying a "bad attitude," that is, insufficient submissiveness as expressed by facial expression, body language or tone of voice.

Skip proudly reported a time Wendi stopped crying after he beat her. As a toddler Wendi was regularly beaten by Donna and Skip, with their hand or a wooden spoon. Donna recalls beating Wendi for not coming immediately when called. (Appendix, Section IV.) When Alejo assumed the primary parental role, he applied the same "beat into submission" philosophy until Wendi was around 13 years old. (Appendix, Sections VI-VIII.)

Donna and Alejo joined a traveling religious cult when Wendi was 7, in which the leaders gave God's imprimatur to their philosophy of beating children into submission. (Appendix, Section VII.) When Wendi was nine, her family left the traveling cult and joined a stationary one, in which attempts to beat children into total submission were even more extreme. Wendi attended a school controlled by the cult, where children were constantly beaten for any infraction, including having a bad attitude. (Appendix, Section VIII.) An audio recording captures the cult's leader saying things like, "You beat 'em 'til they cry, and you keep on beatin' 'til they cry <u>softly</u>," because if they cry loudly, "it's rebellion, and you gotta get 'em until their spirit is broken" (emphasis in spoken language). By then Wendi had learned to obey and put on a façade of obedience. Rarely beaten outside of her home, she normalized the violence to which children around her were continually subjected.

A complete discussion of the physical abuse suffered by Wendi is included in Sections IV and VI to VIII of the appendix to this report.

SP&A 08382

000000407

P-App. 004708

### 3.    Emotional Abuse by her Adoptive Father.

Alejo Ochoa entered Wendi's life when she was four and a half years old. He immediately became Wendi's primary caretaker. Alejo was a damaged, limited and confused man, with a history of emotional abuse that included sadistic and sexual elements as well as emotional neglect, physical and sexual abuse. He began emotionally abusing Wendi almost immediately. This abuse escalated over the years. By the time Wendi was about 10 years old, Alejo was routinely teasing and attempting to degrade and humiliate her, primarily in sexualized ways.

For example, Alejo proudly recalls forcing Wendi, when she was four years old, to clean crayon from a door for an hour and a half straight – despite her not having known that coloring on the door was forbidden (i.e., she didn't even know she had done anything wrong) and despite her crying the entire time. He told this story as an example of her innocence and his allegedly effective parenting. (Appendix, Section VI.)

Donna reports that Alejo "constantly teased, picked at, and provoked Wendi" throughout her childhood and adolescence. He did so "ruthlessly," despite the obvious suffering it caused her, "almost as though he was intentionally trying to break her down and trying to be hurtful and malicious." He pounced on naïve or "clueless" comments she made by saying she was "another dumb blond." (Appendix, Section VIII.)  A parent in the community recalls that Alejo "was real harsh with Wendi and frequently humiliated her in front of everyone, just screamed at her. Wendi reminded me of a whipped pup."

When Wendi was about 10 years old, Alejo's verbal abuse became predominantly sexual in nature. He tried to embarrass and shame her about sexual issues, including commercials for feminine products. If Wendi or Donna protested, Alejo denied their experiences and reality itself, insisting that Wendi *liked* what he was doing.

SP&A 08383

000000408

A full discussion of Alejo's emotional abuse of Wendi is included in Sections VI to VIII of the appendix to this report.

### 4.    Sexual Abuse by Her Adoptive Father and Others.

There is evidence that Wendi was sexually abused from infancy through age nine and strong evidence that such abuse occurred from ages 9 to 18.  It was during this latter time that Alejo sexualized Wendi in an incestuous relationship that included buying and dressing her in lingerie, making her look at pornographic and "adult" paraphernalia with him, and making her scratch and rub his legs and head for hours while both Wendi and Alejo were barely dressed and with Alejo doing things like putting his head in Wendi's crotch and exposing his genitals. The following is a summary of the evidence that Wendi was sexually abused; a full discussion is included in Sections IV and VI to VIII of the appendix to this report.

The evidence that Wendi was sexually abused before age nine is indirect but suggestive. Given Donna's well-established and acknowledged neglect and that Skip, his brothers and father are well-known child sexual abusers, it is likely Wendi was sexually abused during numerous Robertson family cookouts, parties and camping trips when she was one to four years old. During these events Donna left Wendi unsupervised with drunken men who were known sexual abusers of young girls. (Appendix, Section IV.) Wendi exhibited typical sexual abuse-reactive behaviors at day care when she was four years old.

Donna let Wendi wander alone in a dangerous neighborhood where she worked at a clinic frequented by drug addicts and criminals, and left Wendi alone with the clinic's boss, despite Donna's knowledge of his prior sexual abuse of girls. Around the same

SP&A 08384

000000409

P-App. 004710

time, Alejo began sleeping with Donna and Wendi and she started wetting the bed, not an uncommon reaction of a four year old to sexual abuse. (Appendix, Section VI.)

Once the family left the traveling cult when Wendi was nine years old, they settled in Casa Grande and joined another cult, the 91st Psalm/Harvest Family Church. Alejo's sexual abuse became more obvious and extended to Wendi's friends. He routinely made Wendi spend literally hours scratching and rubbing his legs and head. (Appendix, Section VIII.) He bought her lingerie and sexy nightgowns and other clothing, even when she said it was uncomfortable. He had Wendi wear such clothing while engaged in scratching and rubbing, also known as "babying" and "touching on" him, and over time he progressively wore less and less clothing, including no underwear so that his genitals were exposed.

Beginning when Wendi was 9 or 10, Donna witnessed Alejo engage in many sexualizing and sexually abusive behaviors with Wendi. She saw the night-time "touching on" ritual between scantily clad Alejo and Wendi. She saw and heard Alejo routinely subject Wendi to verbal sexual abuse, just as Alejo's aunts, uncles and parents had done to him beginning when he was the same age. Donna was along on outings when Alejo took Wendi shopping for lingerie and other revealing clothing, and saw much more they had purchased on numerous outings without her. She watched Alejo coerce Wendi into joining him in stores devoted to pornography and "adult" paraphernalia.

Adults and children from the cult community also recall that Wendi wore lingerie around the house and said that Alejo had bought it for her and liked her to wear it. Jeri Lynn Cunningham, a close friend of Wendi's from ages 9 to 13, often slept over at her house. She recalls Alejo forcing her and Wendi to get into their nightgowns well before

12

SP&A U8385

000000410

bedtime. Alejo also demanded that both girls engage in the nightly routine of scratching his legs and head. During one instance of this ritual, Alejo put his face by Jeri Lynn's crotch. Numerous times over about two years, Alejo got into bed with Wendi and Jeri Lynn late at night and fondled Jeri Lynn's breasts. He feigned sleep and returned his hands to her breasts after every time she removed them.

In the 91st Psalm/Harvest community, several witnesses cited examples of how Alejo and Wendi did not have a typical father-daughter relationship and acted more like a "couple." It was commonly known that Alejo routinely subjected other girls and women to verbal sexual harassment and abuse. He frequently engaged in sexually inappropriate behavior such as pretending microphones were penises and making gestures of sexual intercourse in front of the entire congregation, including young children. Alejo was widely viewed as a "sexual pervert."

The principals of Wendi's school report that when Wendi was 17 years old, she approached them privately in a room at the school. She did so with great trepidation and the principals are convinced Wendi intended to disclose Alejo's sexual abuse. Alejo suddenly appeared, Wendi recoiled in fear, and she never attempted to speak to them again about whatever she had intended to that day.

One parent reports confronting Alejo about his sexual behavior at the time, apparently including his sexual abuse of Wendi, and says that Alejo admitted it. It was a purely personal confrontation; Alejo was not held accountable and continued to act with impunity. There is no evidence that pastor of the church, Tom King did anything to stop Alejo from using his "Youth Pastor" role and power within the church to sexually abuse women and children.

13

SP&A 08386

000000411

P-App. 004712

More important than the exact forms of sexual abuse Alejo perpetrated is the nature of the incestuous relationship Alejo had with Wendi, how it occurred within an incestuous family in which Donna's role was critical, and how being abandoned and subjected to such incestuous sexual abuse harmed Wendi.

Donna recalls that by age 11 Wendi "was more partnered with Alejo than I was, almost like she was his spouse." Alejo had no adult friends and little emotional connection with Donna. Donna seldom ate dinner with Alejo and Wendi or spent time with them, either singly or together. Wendi was Alejo's only playmate, and he often imposed himself on her and her friends, especially when they slept over at the house.

Alejo Ochoa exemplifies what is known, in the sex offender literature, as a "regressed pedophile." That is, he is an extremely immature man who, even if married, is incapable of a healthy intimate relationship with an adult, and instead seeks emotional intimacy, partnership and sexual pleasure from children – who he experiences, compared to potential adult partners, as innocent and safe, thus the best match for his own child-like immaturity. Alejo appears to truly believe – while unwilling to admit it to others for obvious reasons – that for him to have a sexual relationship with a child is a good thing, and that, all evidence to the contrary, he is actually helping and even loving the child.

In their classic incestuous family dynamic, Donna played a typical neglectful mother role. Because of her own childhood of neglect and trauma, Donna responded to their troubled family by withdrawing from all non-work relationships and retreating into a private world of reading books or sleeping. The angrier Alejo got over Donna's refusal to have sex with him, the more she retreated, resulting in Wendi being Alejo's intimate partner. In Donna's words, "It was easier for me to let Wendi spend so much time with

14

SP&A 08387

000000412

Alejo because I got to ignore him, avoid the unpleasantness of being around him and his anger, and go into my room to read."

Donna also ignored the sexually inappropriate clothes Alejo bought for Wendi. "Wendi had sexy teddies and camisoles as a fourteen or fifteen-year-old that I tried not to notice or think about. ... I don't know exactly what they looked at or bought in those stores and didn't care to know. I just know that they weren't buying for me." In typical incestuous family fashion, Donna's relationship with Wendi and Alejo went from "I can't handle her. I don't want her. YOU take her," when Wendi was under 10, to "I can't handle your constant sexualizing and anger. You take HER," and "I can't handle his constant sexualizing and anger. YOU take him." The incestuous relationship between Wendi and Alejo relieved Donna from having to parent Wendi or deal with Alejo. In a perverse way, it was exactly what she wanted.

### 5.   Traumatizing Relationship Patterns.

The neglect and abuse to which Wendi's parents and others subjected her is summarized above; here the focus is on key *relationship patterns* in which their neglect and abuse was embedded. These relationship patterns, involving the most important relationships and most emotionally significant events of her life, are those that shaped how Wendi experienced, thought about, and behaved in the significant relationships of her adulthood.

Wendi's mother neglected her by ignoring her and handing her off to others. Wendi's biological father Skip was usually neglectful (e.g., on the road or out drinking), and when he did focus on Wendi was often coercive and abusive (e.g., demands, threats, beatings, and perhaps sexual abuse). Wendi may have been sexually abused by Skip's father and brothers, by the director of an alcohol and drug treatment clinic where Donna

15

SP&A 08388

000000413

P-App. 004714

worked, and possibly by drug addicts and criminals who frequented the clinic as well as a traveling cult leader. If Wendi's maternal grandmother and some day care workers were positive influences, those relationships were not reliable or enduring.

These early life relationships established ingrained patterns for Wendi's future relationships – especially with significant people in her life, including her husband – which can be understood as three principal "lessons" she learned. First, do whatever the easily-angered people in her life want and avoid making them unhappy. Second, do not seek help from others, including for what abusive people are doing to you, because they will not help and probably do not even care. Third, the only reliable ways to get attention and affection are to *take care of others and do what they want*. Repeatedly engaging in these relationship patterns was another traumatizing characteristic of Wendi's childhood, related to but distinct from the traumas described elsewhere in this report.

The most important and impactful relationship in Wendi's life was with her adoptive father Alejo. It began when she was four and half, and reinforced the relationship "lessons" she had already absorbed. Alejo was a near constant, imposing and intrusive presence in Wendi's life: her emotionally, physically and sexually abusive parent, her "youth pastor," and her primary playmate. For years Wendi repeatedly went through the cycle of Alejo getting angry, screaming and yelling, then requiring hours of "babying" or "touching on." She learned to prevent Alejo from getting angry by habitually and automatically anticipating and responding to his needs and wishes – which included providing him with sexual stimulation.

Section II of the appendix provides an explanation of the relationship patterns Wendi experienced at a young age. Sections IV, VI, VII, and VIII discuss the manner in

16

SP&A 08389

000000414

which these patterns "trained" Wendi and repeated themselves on other relationships, most notably with Alejo.

**B.     Wendi's Childhood of Neglect and Abuse Left Her a Severely Traumatized and Damaged Adult**

The analysis below is based on my experience and knowledge as a researcher and therapist who has for 20 years studied and worked with adults subjected to neglect and abuse in childhood. As noted above, my analysis draws upon the evidence directly available to me (i.e., my interviews with Wendi, her parents and other witnesses; thousands of pages of documents; and media files); it also relies on findings by the two other experts on this case, neuropsychologist Myla Young, Ph.D., and psychiatrist George Woods, M.D.

From birth until age 18, Wendi Andriano experienced a great deal of neglect and abuse. This included severe emotional neglect by her mother and biological father; physical abuse in which pain was used to compel complete and automatic obedience by her mother, biological father, adoptive father and other adults in her communities; emotional abuse by her biological father, adoptive father and adults in the 91st Psalm/Harvest church/community; likely sexual abuse by a variety of men including her biological father and his father and brothers, her mother's boss at an alcohol and drug services center, and definite sexual abuse by her adoptive father.

In addition, as addressed by Dr. Woods, Wendi inherited a genetic vulnerability to bipolar disorder. By adolescence she suffered from manic and depressive symptoms. Wendi's worst depressive episodes are remarkable for the way her brain appears to "shut down" as she engages in excessive sleep, at times in excess of 36 continuous hours.

17

SP&A 08390

000000415

Wendi's history of childhood neglect and trauma, combined with her biological vulnerability to bipolar disorder, resulted in her leaving home and entering adulthood a severely traumatized and damaged person – which she remains to this day. The damage includes brain-based deficits in cognitive functioning; psychiatric illnesses and symptoms; problems regulating emotions; and posttraumatic patterns of relating to others.

### 1.     Brain-based deficits in cognitive functioning.

The damage to Wendi's brain from a childhood of neglect and abuse involves the functioning of a variety of brain circuits. However, such damage does not typically manifest as obvious and well-established changes to the size or shape of particular brain regions, which have not been assessed for in this case. Rather, brain damage resulting from chronic childhood neglect and abuse is primarily *functional* (as opposed to grossly anatomical). That damage is most clearly revealed, in a formal way, via neuropsychological assessment like that Dr. Young conducted on Wendi.

Wendi's most significant areas of impairment were attention and concentration, as well as processing speed. As Dr. Young notes, "With the exception of [two simple test of attention and concentration], her abilities on all other measures of attention and concentration were significantly impaired." (Tab 5, at 9)  On some of these tests, Wendi "simply was not able to accomplish the task.... Her abilities throughout this *test were severely impaired, but became more impaired as the test progressed.*" (*Id.*) In addition, on a self-report questionnaire that inquired about behaviors known to be associated with attention problems, Wendi's responses were "significantly like those of individuals who are diagnosed with Attention Deficit Hyperactivity Disorder (ADHD)." As Dr. Young explains, "The entire brain is involved in attention and concentration. Primary neural

18

SP&A 08391

000000416

regions include the prefrontal cortex, reticular activating system, cerebellum and frontosubcortical and orbitofrontal pathways. Attention forms the basis for all cognitive abilities. Her disabilities on tasks of attention and concentration, combined with descriptions of her daily functioning, indicate impairment of these brain regions and structures." (*Id.* at 10)

Dr. Young also found several impairments on test of learning and memory. For example, on a test of verbal learning, "Her ability to learn new information was mild-moderately impaired," and Wendi inaccurately believed that she remembered information that had never been presented. (Tab 5, at 10)  On a test requiring Wendi to copy a complex figure, recall it one minute later, recall it again 30 minutes later and then distinguish between accurate and inaccurate portions, Wendi's 30-minute delayed recall and her ability to distinguish accurate and inaccurate portions 30 minutes later were moderately to severely impaired. (*Id.*) Based on these and other findings, Dr. Young concluded that Wendi has impairment within "all of [the] brain structures and pathways" involved in memory and learning. (*Id.* at 11)

Finally, a third area of significant brain-based impairment Dr. Young's testing revealed was "executive functioning." As Dr. Young explains, "Executive functioning is an umbrella construct that describes processes responsible for guiding, directing, and managing thinking and emotional regulation. Mature executive functioning provides for purposeful, considered, goal directed actions. Executive functioning also is the ability to problem solve, and includes abilities to initiate, attend, inhibit, shift, monitor, organize, and control thinking and actions." (Tab 5, at 11) Executive functions depend on the prefrontal cortex and its interactions with various other brain regions, and "adequate

19

SP&A 08392

000000417

mature prefrontal cortex functioning is required for just about every aspect of adult functioning – judgment, self-awareness, decision making, planning, organizing, flexible thinking, and initiating, monitoring, and controlling impulses and actions." (*Id.* at 11-12.) Dr. Young reports that "Although she was successfully able to complete some EFT [Executive Functioning Test] subtests, her abilities were predominantly impaired." (*Id.* at 12)  In addition, Dr. Young notes, "Although Wendi Andriano's abilities on tests of executive functioning were quite severely impaired," she was most severely impaired on those "which required rapid processing of information, flexible thinking, decision making, and/or inhibition." (*Id.*) Inhibition is ability "to stop responding to the immediate physical environment... in order to think, consider and plan alternative ways of solving a problem and respond accordingly in that situation." (*Id.* at 13.)

In summary, neuropsychological testing revealed significant to severe impairments in attention and concentration, learning and memory, and executive functioning, all of which reflect deficient brain functioning in multiple regions and circuits. Neuropsychological findings like these are expected in an adult who was subjected to the chronic neglect and abuse that Wendi experienced throughout her childhood. Indeed, while it is possible that some of these deficits are partly genetically based, severe childhood neglect and abuse can damage the brain regions and circuits underlying attention, concentration, learning and memory, and executive functioning. For example, high levels of stress hormones are known to be toxic to the hippocampus, a region critical for memory and learning. And capacities for attention, concentration and executive functioning are known to develop *in the context of relationships with*

20

SP&A 08393

000000418

*caregivers,* and are particularly vulnerable to damage by neglectful and abusive relationships.

### 2.   Psychiatric disorders and symptoms.

As assessed and reported by Dr. Woods, Wendi Andriano suffers from several psychiatric disorders. Specifically, Wendi meets the diagnostic criteria for bipolar I disorder, posttraumatic stress disorder (PTSD) and complex PTSD, and dependent personality disorder.

Bipolar disorder runs in Wendi's maternal family, including her mother Donna and her aunt Nadine. Wendi's bipolar depressive symptoms include depressed mood, hypersomnia (i.e., excessive sleeping), fatigue, and feelings of worthlessness. Her most common manic symptoms include grandiosity, flight of ideas (i.e., tangential thinking), and "excessive involvement in pleasurable activities that have a high potential for painful consequences," e.g., sexual indiscretion.

As explained above, the emotional neglect Wendi experienced is known to evoke extreme emotional and physiological states in young children, including depressive states that would have been exacerbated by her inherited predisposition for bipolar disorder. Similarly, Wendi's manic symptoms would have worsened the impaired judgment already caused by her parents' neglect and abuse, and her tendencies for hyper-sexuality caused by years of sexual abuse.

As discussed by Dr. Woods, Wendi suffers from PTSD and Complex PTSD secondary to her history of extensive childhood abuse. PTSD includes symptoms of reexperiencing, avoidance, numbing and physiological hyperarousal. In terms of re-experiencing the trauma, Wendi becomes emotionally distressed when reminded of the abuse she experienced, especially the sexual abuse, and she suffers from nightmares of

21

SP&A 08394

000000419

having sex with her father. She avoids anything that might remind her of Alejo's sexual abuse, including television shows, conversations, memories and trains of thought. Wendi is often emotionally numb, especially with respect to unpleasant feelings associated with troubling memories and relationships, and tends to alternate between feeling nothing at all and being overwhelmed by fear, sadness, shame and guilt. Her main PTSD hyper-arousal symptoms are irritability and difficulty concentrating, both of which overlap with the symptoms of bipolar disorder, and hyper-vigilance, which manifests as Wendi's hyper-attunement to any signs of displeasure in the facial expressions, body language, words or tone of voice in others. All of these PTSD symptoms were constantly on display in each of my interviews with Wendi.

Complex PTSD does not appear in the *Diagnostic and Statistical Manual of Mental Disorders*, but is widely accepted and used by therapists and researchers who work with and study people who have suffered severe and chronic trauma, especially in childhood. Complex PTSD involves a set of symptoms resulting from lasting traumatic experiences in which the victim felt -- or was -- captive and unable to escape. The symptoms include problems with the following: regulating emotions, consciousness and identity (e.g., dissociation), self-perceptions (e.g., extreme shame, helplessness), preoccupation with the perpetrator (e.g., focus on keeping happy at one's own expense), relationships (e.g., distrust, attempting to rescue others), and one's view of the world (e.g., loss of faith in people, hopelessness). The available evidence indicates that Wendi has suffered from severe complex PTSD at least since adolescence.

For example, to this day Wendi has emotion regulation problems, including a great deal of difficulty tolerating or modulating feelings of sadness and anger. Her main

SP&A 08395

000000420

strategy for dealing with these feelings is to hide them from herself and others. When that fails Wendi becomes overwhelmed, ashamed, withdrawn, or once again dissociated or consciously disconnected from awareness of those feelings. I repeatedly witnessed Wendi's emotional dysregulation in our interviews. In terms of self-perception, long before she ever met her husband, Wendi recalls being convinced she was a "bad" and "rebellious" person who was unworthy of love, "deserved" every bad thing that happened to her, and was going to hell. Such unshakable feelings of inner badness and un-lovability are common in severely neglected and abused children and the adults they become.

Wendi's Complex PTSD symptoms involving pathological alterations of consciousness and identity consist primarily of her dissociative symptoms, including her inability to remember many childhood experiences. Her memory deficits include almost everything she experienced while in the traveling cult, sexually abusive behaviors by her adoptive father, and disturbing sexual behaviors of her own that were witnessed by multiple people in her church community. Wendi's dissociative symptoms also include her tendency to "space out" when confronted with memories of traumatic experiences or other potentially upsetting information. In our interviews she often spoke of spacing out such that her mind temporarily went blank and she was unable to feel any emotions or even sensations in her body.

As discussed in detail by Dr. Woods, Wendi suffers from dependent personality disorder. By definition the onset of personality disorders is before age 18, and Wendi's dependent personality disorder is clearly rooted in the childhood of neglectful, abusive and exploitive relationships summarized above. She is afraid to disagree with others, pathologically subservient in relationships, terrified of losing relationships, and

SP&A 08396

000000421

immediately seeks new relationships when a previous one ends or threatens to end. Importantly, only by understanding Wendi's neglect- and abuse-based relationship patterns can we understand how her dependent personality disorder, combined with traumatizing caregiver burden and psychiatric deterioration in the final year of her husband's life, contributed to her actions and role in Joe's death. Those pathological relationship patterns are addressed below.

### 3.   Deficits in emotional functioning.

Psychiatric diagnoses and symptoms cannot capture the complexity of unique human beings, or the myriad potential effects of chronic and severe childhood neglect and abuse. For example, while the diagnosis of complex PTSD includes problems with emotion regulation, Wendi's problems with emotion regulation cannot be reduced to symptoms of complex PTSD. That is, Wendi has major, long-standing deficits in the following areas: emotional awareness, including awareness of the bodily correlates of emotions; when she is aware of unwanted emotions, tolerating them without becoming immediately overwhelmed; modulating the intensity of her emotions, as opposed to emotions being all-or-nothing affairs; putting her emotions into words and sharing them with other people in order to calm herself and connect with others, understand the situations and interactions that give rise to emotions, and come up with constructive solutions. Importantly, emotion regulation problems are based in the dysfunction of multiple interwoven brain circuitries – including the circuitries that underlie Wendi's memory and executive functioning deficits and her bipolar and dissociative symptoms. All of those circuitries are known to be damaged by childhood neglect and abuse, especially when the neglect and abuse are severe and chronic and perpetrated by parents.

24

SP&A 08397

000000422

### 4.   Trauma-based ways of relating to others.

The neglect and abuse to which Wendi's parents and many other adults subjected her, and some key relationship patterns in which their neglect and abuse was embedded, are summarized above. As a result of those traumatic childhood relationships, Wendi habitually relates to others in specific ways. Critically, these ways of relating to others are *symptoms* of the extreme trauma she suffered. They are also *re-enactments* – of roles she was forced to play in relationships of neglect, abuse and domination; and of how she tried to cope in the midst of those traumatic relationships.

As described above, in those relationships Wendi learned three key principles: Do whatever easily angered people want and avoid making them unhappy. Do not seek help from others, including for what abusive people are doing to you, because they will not help and probably do not even care. The only reliable ways to get attention and affection are to *take care of others and do what they want*. As described above, Wendi's relationship with Alejo reinforced those "lessons" by continually repeating – over years, on a daily basis – the pattern of responding to Alejo's anger by "babying" and "touching on" him, and the pattern of preventing Alejo's anger from arising by habitually and automatically anticipating and responding to his needs and wishes, including sexual stimulation.

All of those relationship patterns created trauma-based ways of relating to others that have manifested throughout Wendi's life. If someone is angry – whether that anger is caused by her, directed at her for no good reason, or directed elsewhere and has nothing to do with her – Wendi feels *driven* to make that person feel better, because she believes, "then they will like me." If someone likes her and is nice to her, Wendi strives to be even nicer to them and to take care of them, because this is the only way she knows to avoid

25

SP&A 08398

000000423

P-App. 004724

them getting angry at her or abandoning her. Yet these ways of relating leave Wendi feeling, usually implicitly and without reflecting on it, that the other person does not really know or care about her needs and is just using her. In short, the very ways she attempts to avoid neglect and abuse in adult relationships leave her feeling neglected and used.

These are not uncommon childhood trauma-based ways of relating by people whose chronic neglect and abuse entailed being forced to sacrifice their own needs and wants to those of their abusers.

SP&A 08399

000000424

P-App. 004725

Date: _February 14, 2012_                        _James W. Hopper, Ph.D._

James W. Hopper, Ph.D.

SP&A 08400

000000425

4

SP&A 08401

000000426

## APPENDIX TO THE EXPERT REPORT OF JAMES W. HOPPER, PH.D.

### I.      INTRODUCTION

PROFESSIONAL QUALIFICATIONS

1.     I am a clinical psychologist licensed to practice in the Commonwealth of Massachusetts, Clinical Instructor of Psychology in the Department of Psychiatry of Harvard Medical School, consultant on psychological trauma to the Outpatient Addictions Service of the Cambridge Health Alliance, and an independent consultant in clinical and forensic psychology. Most of my work has focused on the long-term effects of childhood abuse. I have conducted research on various aspects of psychological trauma and PTSD, including characteristics of traumatic memories, emotional and behavioral effects of child abuse, brain bases of emotion regulation problems in psychological trauma, psychological and pharmacological treatments for PTSD caused by child abuse trauma, and the use of alcohol and drugs by those abused in childhood. My qualifications are otherwise set forth in my curriculum vitae attached as Exhibit A. (*See* Tab 4.A.)

SCOPE OF ASSIGNMENT

2.     I was asked by counsel for Wendi Elizabeth Andriano to examine psychologically traumatic aspects of Wendi's development from birth to age eighteen. Of particular focus were (1) experiences of neglect, abuse and other potentially traumatic mistreatment by her parents and other adults, and (2) harmful effects of such traumatic experiences and relationships on her mental health and ways of relating to others.

MATERIALS REVIEWED

3.     I conducted numerous interviews and reviewed thousands of pages of

1

SP&A 08402

000000427

documents. My interviews included six visits with Wendi, totaling 52 hours, and one interview each with the following individuals:

- Wendi's mother, Donna Ochoa;

- Wendi's biological father, Shelby Robertson;

- Wendi's adoptive father, Alejo Ochoa;

- Martha England, an adult member of Wendi's church when she was a child and adolescent; and

- Jeri Lynn Cunningham, a childhood friend who reports being sexually abused by Alejo Ochoa while Wendi laid next to her in bed

4.    My document review included a copy of Wendi's videotaped interrogation by detectives shortly after she was arrested, a transcript of that interrogation, hundreds of pages of trial testimony and numerous affidavits obtained by counsel and others throughout the course of Wendi's post-conviction relief proceedings, including affidavits from Wendi's direct family, several friends and acquaintances, and many extended family members. A complete list of the documents I reviewed is attached as Exhibit B. (*See* Tab 4.B.)

5.    Throughout our interviews, Wendi exhibited deficits in her ability to remember, and/or to feel safe remembering and reporting, experiences involving sexual content, including incidents witnessed by others and documented in witness declarations. Also, from the outset she expressed a fear that she might remember things from her past, including possible unwanted sexual experiences involving her step-father Alejo Ochoa, that might not be accurate, and she expressed great concern about the possibility of upsetting or causing harm to Alejo, as well as to her mother or anyone else who might become a focus of the investigation and presentation of mitigation evidence.

2

SP&A 08403

000000428

6.    I conducted in-person interviews with Wendi's mother, Donna Ochoa, for two hours on September 1st, 2010; with her biological father, Shelby Robertson, for 2.5 hours on August 15th, 2011; with her adoptive father, Alejo Ochoa, for three hours on August 15th, 2001; with Martha England, who was an adult member of Wendi's church when she was a child and adolescent, for three hours on November 3rd, 2010; and with Jeri Lynn Cunningham, a childhood friend who reports being sexually abused by Alejo while Wendi laid next to her in bed, for 1.5 hours on January 4th, 2011.

7.    Finally, I had several phone conversations with Dr. George Woods, who also spent many hours interviewing Wendi and other witnesses.

## II.    INTRODUCTION TO WENDI ANDRIANO'S CHILDHOOD

8.    The traumatic – and psychologically and morally destructive – childhood of Wendi Andriano was rooted in the traumatic childhoods of her mother, biological father, and adoptive step-father.  She was born to profoundly disturbed parents who were incapable of providing her with the love and nurturing that every child needs to become an emotionally healthy and morally uncorrupted adult.  From birth until her teenage years, Wendi was subjected to neglect and abuse, first by her mother and biological father and his family; then by her mother, adoptive father and two insular religious cults.

9.    Wendi's biological father, Shelby Wayne ("Skip") Robertson, grew up in a disturbed family. In addition to emotional neglect and physical abuse, Skip's father and several brothers engaged in sexual abuse of girls. Skip and his brother Tommie would eventually go to jail for sexual abuse of his step-daughter, and Skip speaks of his father and brother AV sexually abusing children in the extended Robertson family. By the time Wendi was born, all of Skip's five brothers were men, and over the first four years of

3

SP&A 08404

000000429

Wendi's life they had repeated access to her under conditions that would permit sexual abuse.

10.   Wendi's mother, born Donna Worsham, was neglected by both parents. Her family moved constantly the first ten years of her life, living nowhere more than a year at a time, which prevented her from having any enduring relationship with a caring adult. Her mother kept the house clean but showed no love for, or interest in, her daughter. When Donna's heavy-drinking and womanizing father did give her attention, it was often unhealthy and immoral. By age ten, when the family had settled in Tucson, her father was bringing her to bars, and when she was a teenager he got drunk with her and her friends. From ages twelve to fifteen, Donna overheard violent fights between her parents on almost a nightly basis. Her mother dragged her along on Sunday hunts for her father at local hotels, and once went into a hotel and fired shots that Donna was left for hours to fear had killed her father. Donna's peers, to whom she looked for guidance, were from similarly troubled homes.

11.   Wendi's mother was never able – from birth through Wendi's adult life – to emotionally connect with her daughter or to provide her with maternal nurturing and care. Instead, beginning days after Wendi was born, Donna literally handed her over to men, starting with Skip, who Donna knew – but was unwilling or unable to acknowledge – were emotionally, physically and sexually abusive.

12.   When Wendi was four years old, Donna divorced Skip, removing Wendi from the toxic influence of his family. Her mother soon married Alejo Ochoa, a disturbed man who grew up in a family where adults amused themselves by bullying and shaming children and teenagers with sexualized "teasing," and at age fifteen was "taught about

4

SP&A 08405

000000430

girls and sex" by an adult neighbor. Donna was relieved to hand Wendi over to Alejo, who would go on to sexually abuse Wendi and at least one of her friends into her teens.

13.    Over the next thirteen years of ongoing neglect by her mother and sexual (as well as physical and emotional) abuse by her stepfather, layer upon layer of abuse and trauma would be heaped upon Wendi. From ages seven to nine, Wendi and her parents were caught up in a small "traveling ministry" – in reality, a religious cult – in which they experienced poverty, brainwashing and totalitarian control.

14.    After, the family joined another religious cult with even greater moral confusion and hypocrisy, in which children's entire lives revolved around the cult's church and school.  In that church and that school, physical and emotional abuse of children were preached as God's will, and the sexual abuse of children was tolerated, condoned, and even blamed on the children themselves. It was an encapsulated cult community in which Alejo soon became the "Youth Pastor" and engaged in an incestuous relationship with Wendi. Familial and genetically-based vulnerabilities to mental illness, including bipolar disorder, compounded the effects of Wendi's childhood of neglect and abuse at the hands of profoundly morally confused adults.

15.    The effects of that chronic neglect and abuse included severely limited capacities for emotional awareness, regulation of emotions and impulses, decision making, and managing interpersonal conflicts, especially in close relationships. The effects also included an unshakable sense of herself as a bad and unlovable person, almost certainly going to Hell, who could find approval and love only by devoting herself to caring for others.  This neglect- and abuse-based experience of herself, along with the relationship patterns she learned in neglectful and abusive relationships with her parents,

5

SP&A 08406

000000431

would propel Wendi through repetitions of the same basic cycle in her friendships and relationships with men: taking care of the other person, making that other person feel that he is the center of her world, until she suddenly feels exploited and overwhelmed, which leads her to withdraw and the other person to feel abandoned and confused, which in turn leads Wendi to feel bad and guilty, to which she responds by seeking to regain love and redeem herself by devoting herself to the same person or someone new, starting the cycle all over again.

### III.   WENDI ANDRIANO'S TRAUMATIC FAMILY BACKGROUND

16.   The psychological and physical harm of childhood neglect and abuse are increasingly recognized by scientists and public health experts as causes not only of many psychiatric disorders, addictions, and violent behavior, but also of the leading chronic and fatal diseases in our society, including heart disease and cancer. Furthermore, evidence is accumulating that an individual's "cumulative burden" of "adverse childhood experiences," that is, just how many traumatic experiences they endured – especially abuse and neglect – is the most predictive of psychiatric and behavioral disorders and physical diseases, more than any particular type of trauma.

17.   In the case of Wendi Andriano, there is evidence of extreme neglect and abuse in the generations preceding hers, in all three of her parents' families. Given limits of time and investigational resources, as well as the deaths of many people involved, these stories are necessarily limited both in scope and corroboration by witnesses. However, as we shall see, the evidence is sufficient to paint a picture of not only extreme neglect and abuse, but extreme moral confusion and hypocrisy as well, in the childhoods of her mother, biological father and adoptive father.

6

SP&A 08407

000000432

## A.   WENDI'S BIOLOGICAL FATHER AND PATERNAL BACKGROUND

18.   Wendi's biological father, Shelby Wayne ("Skip") Robertson was born on April 11, 1948 in Fort Stockton, Texas. He was the youngest of eight children born to Flora Pearl Harrison and Boyd Gravely ("BG") Robertson. Skip reports that until twelve years of age he lived with his parents and progressively fewer of his older siblings, moving from Fort Stockton to San Angelo, Texas when he was four years old, where he lived until he was in fifth grade, and then to Chandler, Arizona when he was in sixth grade.

19.   **Mother dies suddenly at age thirteen, no support in aftermath.** Soon thereafter, on Christmas night of 1961 when Skip was thirteen years old, his mother suffered a massive stroke right in front of him and died several hours later. Witnessing the sudden and fatal injury of one's own mother is one of the most devastating and traumatic experiences a child can have. That trauma is compounded when, as was the case for young Skip, the child fails to receive immediate or sustained support and nurturing from other family members. In his declaration, Skip refers to the aftermath of his mother's death in understated language that belies the extreme emotional pain associated with that time in his life: "It was a hard time for me. I was booted around a lot and felt very alone for quite a while." (Tab 32, at ¶ 6.)

20.   Skip recalls continuing to live with his father and two siblings, Tommy and Myrna, for another year or so in Chandler, then the four of them going to live in Tucson "for a while" until his father moved back to Chandler and his siblings moved out, Tommy by joining the army and Myrna by getting married. At that point, when about fourteen or fifteen years old, Skip went to live with his brother Burl Boyd ("Buck") Robertson and his wife Faye McGuffee, as well as three girls and one boy of Faye's from a previous

7

SP&A 08408

000000433

marriage. One of Faye's daughters was Alice McGuffee, the childhood best friend of Wendi Andriano's mother.

21.   **A victim of the Robertson men and boys.** Deblen Oke (named Bonita McGuffee in childhood) is Faye's middle daughter and three years younger than Alice. She was ten when her mother married Skip's brother Buck, and her nightmarish memories provide a window into Skip's disturbed and sexually violent family. Even before her mother married Buck, Deblen recalls never feeling safe as a child and not talking until she was five years old, when she finally wanted to talk with her younger sister Debbie but no one else, including her own mother. When Buck entered Deblen's life, and brought along his brothers and father, things got worse: "He was a truck driver. Right after my mom and Buck got married, they went on the road for six weeks. As soon as they got back, Buck raped me for the first time. The rape continued for the next eight years, until I got out of the house." (Tab 30, at ¶ 3.)

22.   Buck was not the only one. Deblen's mother allowed Buck's brothers and father to spend months living in her house, where they had easy access to her daughters on a daily and nightly basis. Deblen recalls how "My stepfather, his father, and all of his brothers, including Skipper, his youngest brother, raped me from the time I was ten until I moved out of my mother's house at the age of eighteen." (Tab 30, at ¶ 1.)  She goes on to elaborate:

> "On a regular basis, one of the brothers or Buck's father stayed at our house.
> Skipper was a teenager at the time, and he came around quite often.
> Sometimes both Skipper and his father stayed with us.... It was a revolving
> door, and it seemed like one of the Robertsons was always around. They

8

SP&A 08409

000000434

stayed for three, four, six months at a time.... At one point, Buck's father got

an apartment about a block away from our house." (Tab 30, at ¶ 4.)

23.    Though Deblen remembers Buck as a "monster" who walked around the house

naked when her mother was at work and "cut the pockets out of his pants to play with

himself," she also has specific memories of how other Robertson brothers and their

father, BG, molested and raped her when they stayed in her house.

"It seemed that every night one of the Robertson brothers came into my

room. Sometimes they raped or molested me in there. But I was tiny, so I

could be moved, and so sometimes the rape and molestation occurred in other

parts of the house.... It was a nightly ordeal when Buck or his brothers were

around, and I lived in absolute terror..." (Tab 30, at ¶ 6.)

24.    Deblen's brother Kelsey Leon ("Leon") McGuffee, the family's oldest child and

about fourteen when Buck moved in, though at the time unaware of the Robertson's

sexual abuse, otherwise corroborates Deblen's account. He remembers never liking being

at home once Buck moved in, due to the constant harsh criticism Buck directed at him.

(Tab 17, at ¶ 4.) He remembers Buck's brothers living at their house a lot, so much that

"it seemed that one of them was always there at any given time... they were constantly in

and out of the house." (Tab 17, at ¶ 6.) Leon reports that Skip lived in their house for

about a year, sharing a room with him (Tab 17, at ¶ 5), and that Skip, like his brothers,

constantly criticized and teased Leon for being "to 'straight-laced' and not wanting to go

to bars and get drunk with them. (Tab 17, at ¶ 6.) Leon recalls that Buck and Skip's

father, BG, also "stayed at our house quite a bit," and that he was a "weird duck" who

9

SP&A 08410

000000435

"always talked strangely about women." That is, BG "talked down about them" and "said they were playthings." (Tab 17, at ¶ 8.)

25.    Leon reports that he enlisted in the Marines largely to escape from living around Buck and his father and brothers. When he returned from Vietnam in 1970, Deblen told him that "our stepfather and his brothers, including Skip, were all child molesters" who had abused her and her sisters Charlotte and Debbie. (Tab 17, at ¶ 13.) More than a decade later, Charlotte (now deceased) independently confirmed to Leon that Buck and "all of his brothers" had sexually abused her. Leon recalls Charlotte telling him that she disclosed this publically at the time, when she took her mother and Buck to court for violently assaulting her (see below), though Buck said she was lying and their mother "backed him up." (Tab 17, at ¶ 14.)

26.    Deblen recounts that a common form of punishment for her was spending a day or weekend being raped by Buck or his brother Jerry. "Most of the time, when I got in trouble, it felt like I then had to go somewhere with one of the Robertsons. I had to go on hunting trips with Buck or Jerry Don, or on some other errand. In reality, they just took me somewhere to rape me." (Tab 30, at ¶ 12.)

27.    Finally, Deblen reports a still vivid and upsetting memory of physical violence perpetrated by Buck against her older sister Charlotte. Deblen witnessed Buck severely beat her older sister Charlotte. She remembers fearing that Buck would kill Charlotte and watching, from under a bed with her younger sister Debbie, while Buck "hit Charlotte with his fists to where you could not recognize her face any longer." (Tab 30, at ¶ 10.) Leon too recalls this incident. Though he did not witness the assault, he did see Charlotte's wounds the following day, including "a black eye and bruises all over her

10

SP&A 08411

000000436

cheeks." (Tab 17, at ¶ 11.)  And as noted above, Leon reports that Charlotte took Faye and Buck to court for the assault. (Tab 17, at ¶ 14.)

28.    Wendi's mother Donna also provides corroboration of the Robertson brothers' and father's sexual abuse of the McGuffee girls. Donna recalls learning of the abuse in 1974 or 1975, around the time she divorced Skip Robertson, Wendi's biological father. Charlotte was the one who told Donna that "many of the adult Robertson brothers sexually abused her and her sisters when they were children," and "talked the most about AV, Jerry Don, and Tommie." (Tab 27, at ¶ 165.)  Although Donna did not ask for details, she recalls a particularly disturbing story told by Charlotte. One day when she was about fourteen or fifteen years old, she came home to find one of the Robertson brothers stretched out on the couch, and he "held his hand up and told Charlotte that he had female juices on his hand from one of her sisters." (Tab 28, at ¶ 10.)

29.    Finally, Donna was also told by Alice McGuffee, in conversations they had "a couple of times in the past ten years," that Alice and her sisters were sexually abused by the Robertson brothers. (Tab 28, at ¶¶ 12-13.) Donna also reports that Skip told her, in early 2011, that he had "messed around" and experimented sexually with Alice when both of them were around thirteen years old, which is during the time the McGuffee girls were being sexually abused by Robertson brothers. (Tab 28, at ¶ 11.) Thus three of the McGuffee girls have reported being sexually abused by the Robertson brothers after Buck became their step-father, and Donna says that Skip himself has admitted to sexual activity with Alice.

30.    **A mother who looked the other way.** As would be true for Wendi Andriano as a child, Deblen's mother made no effort to protect her daughters from continual sexual

11

SP&A 08412

000000437

exploitation by men she brought into her home, nor to protect them from physical violence. Leon recalls that Deblen and Charlotte both told him their mother "knew what was going on" because they had "told her what was happening" at the time, but that she "denied the whole thing." (Tab 17, at ¶ 15.)  Charlotte also told Leon that she disclosed the sexual abuse when she took her parents to court over the brutal physical assault, only to have her mother support Buck's denial and claim that Charlotte was lying. (Tab 17, at ¶ 14.)  When Deblen confronted her mother years later with the reality of the repeated molestations and rapes and her failure to protect her daughters, Faye reportedly replied that it was "just part of life." When Deblen responded by asking "why it had to be that way," her mother threw her out of her house and it was nearly thirty years before they spoke again. (Tab 30, at ¶ 15.)

31.  **Possibility that Skip sexually abused young girls as a teenager.** Deblen explicitly names Skip as one of the sexual tormentors responsible for her "nightly ordeal" and living "in absolute terror" whenever "Buck or his brothers were around."  Leon reports that both Deblen and Charlotte independently told him about being sexually abused by "all" of the Robertson brothers.

32.  However, Donna reports that Charlotte told her it was the "adult" Robertson brothers who sexually abused her and her sisters. (Tab 28, ¶ 9.) If only Charlotte's account of which brothers sexually abused her sisters, as remembered by Donna, is true, this would mean that Skip, who was a teenager at the time, did not sexually abuse them, including Deblen.  However, it is possible that Skip *was* a perpetrator, and (a) Charlotte did not know, which could have been the case if Skip did so less often than his older brothers; (b) Skip only abused the second-youngest Deblen (and possibly the youngest

12

SP&A 08413

000000438

sister, who would have been too young to remember and report it later); or (c) Charlotte knew Skip had done so but did not want to tell Donna (e.g., to protect Donna from becoming overwhelmed by the potential implications for Skip's relationship with Wendi). The available evidence does not allow us to know for sure whether Wendi's father was already sexually abusing girls as a teenager.

33.    Not surprisingly, Skip never mentions anything about Deblen and her sisters being sexually abused when he lived there.  However, when Skip refers to having sex with his own twelve year old step-daughter many years later in 1992, he blames his abusive actions on having at the time felt "isolated and depressed" – the exact same pair of unwanted feelings he recalls experiencing while living in Deblen's house as a teenager. (Skip also claims, as many men who sexually abuse children do, and as if it excuses his crimes, that he was always intoxicated when he had sex with his step-daughter, and that he "felt like I loved her in the way I felt love for an adult woman" – which begs the question of just what sort of love he was even capable of feeling for an adult woman). (Tab 32, at ¶ 64.)  In short, there is strong evidence that Skip sexually abused the prepubescent Deblen (and perhaps the youngest sister) during the time he was living in her house and struggling with the same feelings that he says triggered his sexual abuse of a twelve year old girl more than twenty years later.

34.    **Sexual abuse in Skip's family.** It is important to consider how Skip (and his brothers) ended up sexually abusing children.

35.    As noted above, Leon McGuffee recalls Skip's father BG as a "weird duck" who set an example for his sons when he "talked down" about women, including referring to them as sexual "playthings."(Tab 17, at ¶ 8.)  Leon goes on to say that the

SP&A U8414

000000439

P-App. 004740

father's attitude toward women "was pretty much standard with all the Robertson men," and that whenever the brothers got together, for example to boat on the lake, "all they talked about all the time was their conquests of women, by which they meant the women who they had sex with." (Tab 17, at ¶ 9.) Deblen reports that Skip's father repeatedly molested and raped her for several years; it is likely that his sons knew what he was doing, even learned such behavior from him.

36.     There was also sexual abuse in the Robertson's own home. For example, Skip reports that Buck "tried to dry hump" him when he was eight or nine years old. Buck was an adult at the time, and had already left home, married and divorced, then returned to live at home for a while. Skip and Buck were sharing a bed with their brother "AV," which was not uncommon given the size of their family, and Skip "woke up with [Buck] moving his pelvis against me. I did not know what was going on." Confused and frightened by what his brother had done, Skip told his mother. Her response? To tell him that "Buck was just having a bad dream." (Tab 32, at ¶ 15.) Here, as with Faye McGuffee and her daughters, we see a classic pattern in incestuous and sexually abusive families: the mother does not want to know, looks the other way, and then, when both of those strategies fail and she finds herself confronted with an incident of sexual abuse, resorts to denying reality, pretending it did not really happen, and encouraging the victim to do the same.

37.     Thus even before the tragedy of his mother's death, Skip grew up with parents who perpetrated and tolerated the sexual abuse of children. His father viewed women and girls as sexual "playthings," saw neglected and vulnerable children of other families as ideal targets for repeated sexual assault, and had no concern or empathy for the terror and

14

SP&A 08415

000000440

suffering he inflicted. For his mother, as for Faye McGuffee, the sexual abuse of children was apparently just "part of life," albeit a part of life she thought best to deny and ignore, along with its consequences for the victims.

38.   **Physical abuse in Skip's Family.** A father like BG Robertson – who is reported to have routinely molested and raped young girls, with utter indifference to their experience or well-being – is an unlikely candidate for exercising compassionate discipline strategies, as opposed to simply relying on fear of violence to compel his children's obedience. In my interview with Skip, he said that his father, after being informed by his mother of a child's bad behavior, would hit the child "eight or nine times" with his belt after making them lie across the bed in their bedroom. Skip added that he seldom got in trouble because he spent little time in the home where his mother could know if he had broken any rules. As he put it, "We never was in the house that much to get in trouble." Skip did tell me of his brothers beating him with belts for misbehavior, and that whenever he told his mother about such beatings she told him that he deserved it.

39.   Skip also told me a story that revealed his mother's potential for physical violence. Once his brother Jerry, an older teenager at the time, drove up to the house with a friend, to ask if he could spend the night at his friend's house. Their mother said he needed to ask their father, and soon Jerry emerged from the house and said to his friend, "My old man won't let me go."  Skip remembers his mother jumping from her chair on the porch, where she had been crocheting, to grab Jerry and "throw him to the ground." Skip explained that his mother's behavior was totally appropriate and justified, because he and his siblings were raised to only speak of their parents with respect.

15

SP&A 08416

000000441

40.   Recall Deblen's account of how Buck treated her and her sister Charlotte – using rape as punishment and nearly beating Charlotte to death when she dared to challenge Faye and Buck's authority. It is likely that Buck learned such brutality toward children in his own home. In addition, Buck's son from his marriage to Faye, Stuart Wade Robertson (known as "Wade"), describes how he was beaten with a belt for any and all violations of his parents' rules, including when he "stayed out too late" or went "somewhere I wasn't supposed to be." (Tab 33, at ¶ 3.) Though Wade excuses and even embraces his parents' beatings of him, he also implicitly acknowledges what it was: "I suppose today it would be called abuse, but I think of it as discipline." (Tab 33, at ¶ 3.)

41.   **Neglect in Skip's family.** In my interview with Skip, when asked of his earliest memory of his father, he responded, "I was probably six or seven years old before I got to know my father at all." His father worked all day, and when he came home all he wanted to do was sit down for the dinner that his wife had prepared and not hear or see the children, then go off to bed. He described his mother (of eight children, consumed by cooking and otherwise tending the house and chickens) as "always too busy" to spend time with him, and remembered it as "only every once in a while" that she would even let him sit next to her. Skip described a family situation where the children were out of the home as much as possible, with him and his brothers (and youngest sister Myrna) playing far from his mother's view. As long as they were home by dark, they could do whatever they wanted – or at least whatever they could get away with without their mother finding out. And so he and his siblings, who his mother referred to as "wild Indians," would routinely "disappear all day."

16

SP&A 08417

000000442

42.   In his declaration Skip conveys, in general terms and with some poignant examples, a barren emotional landscape that included disconnection between parents and children in his family. After recalling how he and his father "never really spoke" when they lived together during his tenth year of school, Skip continues, "I was brought up that way. Grown ups and kids did not speak to each other much." He then goes on to link this form of neglect to another one found in his family: "You only talked if you were talked to and the kids ate last. The grown-ups all ate first and us kids had to wait and we got the leftovers from what the grownups didn't finish. Sometimes we had to wait hours, especially if there were aunts and uncles over… We stayed outside and went in when they were done." (Tab 32, at ¶ 9.)

43.   Wade Robertson describes a similar situation in his home, with Buck and his mother neglecting him as a child: "My dad was on the road driving trucks most of the time and my mom was working. I was easy to raise and I pretty much raised myself." In families with such parental neglect and abandonment, and so little nurturance, care and love, children are indeed left to their own devices and, as Wade puts it, to raise themselves.

44.   **Sexual violence against others, including by Skip.** Tragically, in such families the children often turn to sexual behaviors, including the sexual abuse of other children, in misguided attempts to find some kind of gratification and to sooth briefly the anxiety, loneliness and depression from which they inevitably suffer.  Because the human body and brain are hard-wired for sexual stimulation to feel good and for orgasm to produce not only intense pleasure but a state of soothing satisfaction and relief, severely neglected and abused children – especially those who have been sexually abused themselves and/or

17

SP&A 08418

000000443

have witnessed the sexual abuse of others – are highly vulnerable to becoming perpetrators of sexual abuse. For boys and young men, who have learned from many sources that females are sexual objects for males to use, that achieving sexual conquest means being a "real man," and that domination and aggression, even violence, are acceptable ways to ward off vulnerable feelings like sadness and loneliness, the risk is much higher.

45.    This appears to have been the case in the Robertson family. As Deblen Oke describes, all of the Robertson brothers, including Skip, raped and molested her. Deblen's brother Leon affirms that their sister Charlotte reported sexual abuse at the hands of every Robertson brother including Skip. Skip himself reports that his brother AV molested his oldest step-daughter, Beverly (Tab 32, at ¶ 60.)  And both Tommie and Skip were arrested in December of 1992, and ultimately imprisoned, for sexual assaults on Skip's step-daughter than spanned three or four years. Tommie had taken sexually explicit photographs of Skip's twelve year old step-daughter while she was asleep in his truck (apparently after he had been fondling her, which he often did while taking her on cross country trips). The discovery of Tommie's photographs led to the victim's disclosure of sexual abuse by Skip, including repeated sexual intercourse, with the last incident only weeks before his arrest.

46.    Certain details of the police investigator's initial report merit consideration here, for they shed light on how those who sexually abuse vulnerable and neglected children are able to get away with it, sometimes for years on end, without it ever being reported to the police or child protective services. More specifically, they provide a window into how the Robertson brothers, especially Skip – like so many who sexually abuse children –

18

SP&A 08419

000000444

manipulated their victims into *blaming themselves* for the abuse and fearing that revealing the truth would only get *themselves* in trouble.

47.   When the investigating sheriff's deputy asked the victim why she had waited three weeks after discovering the photographs of herself to tell her counselor, she said that "her step-father [Skip] made her feel responsible for what occurred [sic] to her." The investigator continued, "Julie told me that she was tired of keeping everything a secret… [and that Skip] had known of the photographs for over a year and did nothing." The investigator then spoke to James, the victim's brother who first found the photographs. James told him that when he told Skip about the photographs Skip's response was "everything's under control."

48.   The investigator then spoke to the victim again, and explicitly asked her "if any other sexual activity was occurring in the home." At that point she told him that "over the past three to four years [that is, beginning at age eight or nine], her step-father, Shelby Wayne Robertson, had sexual intercourse on at least (25) twenty-five occasions." She went on to explain that Skip had also done "other sexual things to her." Asked again why she had "waited so long" to tell anyone, this time about Skip's abuse, the young girl told the investigator that "she thought it was her fault, after a while she said, she just consented. [Skip] told her that if she ever did speak out that she would be in trouble because she had consented." (Upon further investigation, days later, the victim clarified that when she was eight years old, soon after Skip met her and before he married her mother, Skip fondled her breasts; beginning at age nine, he made her perform oral sex on him and performed oral sex on her; and finally, when she was twelve years old in June of 1992, Skip asked her if she wanted to "make love," and when she said no "he got mad"

19

SP&A 08420

000000445

and became "so mad that she finally gave in and said, 'Well do whatever you want to do, I really don't want to do this, but you're going to do it anyway.'" (Deputy L. Lignoski, Maricopa Sherriff's Office, Follow Up Investigation Report, December 8, 1992, page 6.).)

49.     The officer confronted the victim's mother, Crystal Robertson, with Skip's sexual abuse of her daughter. (Crystal later reported her own history of sexual abuse by an uncle. (Jeffrey D. Harrison, Ph.D., Report of Paraphilic Assessment, p. 6 July 1993.)). After acknowledging that her daughter "did complain" in March of 1992 that Skip had touched her breasts and "on one occasion got into bed" with her, Crystal "excused Shelby for his actions because he's a drunk" (Deputy L. Lignoski, Maricopa Sherriff's Office, Continuation Report.) With a mother so easily resigned, even dismissive about her being sexually abused, it is no wonder that the young girl had resigned herself to the fondling, then the oral sex and finally the sexual intercourse perpetrated by her step-father.

50.     This young girl's experience is not uncommon. Every day vulnerable and neglected children like her are manipulated and threatened into progressively more intrusive sexual abuse, and manipulated into believing that they are to blame for each and every violation. Every day many children sexually abused by step-fathers know their mothers would rather not know and will probably blame them for the abuse (as Crystal did in subsequent interviews, saying her daughter had been "seductive," (e.g., Jeffrey D. Harrison, Ph.D., Report of Paraphilic Assessment, pp. 6-7, July 1993.)). And the younger a child is, due to the cognitive and other limitations of younger children, the more vulnerable that child is to such sexual manipulation and maternal abandonment, even once the abuse is revealed.

20

SP&A 08421

000000446

51.    **Bizarre behaviors, psychopathology, and psychiatric problems.** Skip reports

several examples of severe psychiatric problems in his siblings.  For example, as a

teenager his brother Tommie suffered from depression, had no friends, and engaged in

bizarre behaviors including building model ships and then lighting them on fire or

shooting them with a bb gun. (Tab 32, at ¶ 49.)

52.    Only once in Skip's life, as part of the presentence investigation for his 1992

crimes against his step-daughter, did he undergo a psychological assessment that included

measures of his own psychopathology. He was administered the Minnesota Multiphasic

Personality Inventory (MMPI), a multiple choice instrument for which it is impossible for

the person completing the measure to know the meaning of the questions, and where an

attempt to present oneself in a favorable light is easily detected (none was in Skip's case).

Also, as a personality inventory, the MMPI is designed to reveal characteristics that,

barring major brain damage, are preserved from late adolescence throughout adulthood.

53.    Dr. Jeffrey Harrison administered the MMPI and summarized the findings.

These include that Skip had "significant elevations" on a scale that measures "personality

traits of reactivity, naivete and egocentricity." Harrison continues, "He can be described

as an individual that is perhaps alienated from others and may have an eccentric or

atypical view of the world. A schizoid orientation [i.e., inability to feel emotionally

connected to others] is suggested. There is a moderate degree of suspiciousness, distrust

and paranoia which he acknowledges frequently occurring, particularly when he was

drinking." (Jeffrey D. Harrison, Ph.D., Report of Paraphilic Assessment, p. 7, July 1993.)

The qualities reveal by Skip's MMPI are entirely consistent with growing up in a family

SP&A 08422

000000447

that (as described above) was extremely neglectful, emotionally disconnected, sexually perverted and physically abusive.

54.    Skip's admissions to Dr. Harrison of problems in his family during childhood were very limited. He described his father as "not having much involvement with anyone in the family" and mentioned the time Buck attempted to sexually abuse him when he was around eight years old. He told of his mother suffering a stroke and dying in his presence at age twelve. And he reported that growing up he was "closest" to an uncle who taught him many things but became bizarre and violent when drunk, including chasing Skip with a knife, and that this uncle eventually "disappeared," which was very distressing to him. He denied that there was any physical abuse or other problems in his family, and denied any juvenile arrest history (though military records document his arrest and probation at age fifteen for charges of fighting and carrying a knife, as noted above). (Jeffrey D. Harrison, Ph.D., Report of Paraphilic Assessment, pp. 2-3, July 1993.)

55.    Skip did report to Dr. Harrison some of his early sexual experiences besides the incident with Buck, including first exposure to soft-core pornography at age eight or nine. He reported first drinking beer at age five and becoming a "regular user" of beer on weekends at age fifteen. He also told Dr. Harrison of his suicide attempt (described below) at age sixteen.  (Jeffrey D. Harrison, Ph.D., Report of Paraphilic Assessment, pp. 3, 5, July 1993.)

56.    Yet despite Skip's overall inability to recognize, and unwillingness to acknowledge, how troubled his family and childhood were, Dr. Harrison writes: "the highest scale elevation occurred on a scale measuring rebelliousness, resentfulness of authority, nonconformity, a potential for testing limits, and potential for acting out

22

SP&A 08423

000000448

behaviors." He then continues, "This elevation is consistent with his alcoholism and is likely the result of family of origin dysfunction and negative childhood experiences affecting character development." Referring to Skip's entire MMPI profile, Harrison states, "This pattern of clinical scale scores is consistent with the etiology of child molest behavior and suggestive of an underlying antisocial personality disorder. That diagnosis is not supported in its entirety due to the absence of supportive childhood history." (Jeffrey D. Harrison, Ph.D., Report of Paraphilic Assessment, p. 8, July 1993.) In short, this assessment revealed that, even though Skip was not entirely forthcoming about his family and childhood, his severe psychopathology scores on the MMPI clearly indicate that he (a) grew up in an extremely disturbed family and (b) had a long-standing pattern, dating at least from adolescence, of both disturbed "character" (i.e, psychopathology associated with moral corruption) and antisocial behavior (e.g., sexual abuse of children).

57.   **Skip's teenage suicide attempt.** Indicative of how depressed and miserable Skip was as a teenager, he has reported making a serious attempt to kill himself when he was fifteen or sixteen years old. Knowing that his father had lots of pills in the medicine cabinet and that his brothers had left behind pills they used to stay awake as truckers, Skip raided the medicine cabinet, searched the house for more, and "took as many pills as I could find." (Tab 32, at ¶ 11.)

58.   **Disconnection and denial.** After unsuccessfully attempting to kill himself, Skip awoke in the house of his brother Glen and his wife, who, Skip reports, "nursed me back." The fact that he tried to commit suicide, however, was never talked about with Glen or anyone else in Skip's family. Reflecting on how his suicide attempt was never discussed or even mentioned in his family, and consistent with his previously noted

23

SP&A 08424

000000449

observation that parents and children never spoke about anything of emotional significance, Skip commented, "In my family, we do not discuss things."

59.    As we shall see, Skip's daughter Wendi, thanks to her neglectful mother, would during the first four years of her life repeatedly be left in situations where Skip's father and brothers had opportunities to sexually abuse her.  When this possibility is addressed by Skip, he acknowledges that "During the time Donna [Wendi's mother] and I were together, my dad and brothers were often around."  Yet he then claims – implausibly, if Deblen Oke and Wendi's mother are to be believed on this issue – that "over the years" he had been "told about my father and brothers sexually molesting or abusing children in the family," but that he had only learned this "long since the time had passed that the acts had occurred." (Tab 32, at ¶ 47.)  As if he did not know full well about such sexual abuse from witnessing or overhearing it, for example while he lived with his father at Deblen's house, where his father apparently stayed for the *purpose* of sexually abusing the girls there; or from hearing his brothers bragging about it; or when he knew of Tommie's pictures of his step-daughter while he continued to abuse her himself and escalated to sexual intercourse.

60.    Similarly, it is hard to believe that Skip's sexual abuse of his twelve year old step-daughter, a crime for which he was caught and imprisoned, was the only child sexual abuse that he perpetrated in his life.  More likely, it was the only sexual abuse that he admitted to having committed, and only because it was public knowledge and there was no option of not talking about it.

61.    **Troubled teenage years: Pre-Vietnam.** In addition to living with his father and Buck at times, Skip spent time with his brother AV and his wife Betty, which meant

SP&A 08425

000000450

P-App. 004751

joining them for travels around South Dakota, Idaho and Colorado with their racehorses, and lived with his sister Janey in Chandler, Arizona. (Tab 32, at ¶ 10.) Skip was arrested at ages fourteen and fifteen in Tucson, first for fighting and carrying a switchblade, then for running a stop sign. The latter charge was dropped but for the former Skip remained on probation until his seventeenth birthday (military personnel records). In eleventh grade he quit school by dropping out of Deer Valley High School in Glendale, Arizona (records). Around that time, in 1965 when Skip was sixteen or seventeen years old, Skip attempted suicide (as described above) and contracted gonorrhea (military records). Skip claims that he contracted the venereal disease from his first sexual experience with an adult woman, when "my brothers took me down to Nogales, Mexico and sent me to a prostitute." (Tab 32, at ¶ 16.)

62.     Donna knew Skip during his teenager years, beginning when he lived with Buck and Faye's children, including Deblen and Alice, who was Donna's best friend. He was someone from whom Donna wanted to keep her distance: "In high school Skip was one of the hoodlums or bad boys... I had nothing in common with him at that time. He ditched class, went out with wild girls, and was not someone I hung around with during high school." (Tab 32, at ¶ 66.)  Alice's brother Leon also remembers Skip as "always in trouble," and recalls hearing about Skip "stealing, ditching school, and drinking. (Tab 17, at ¶ 3.)  Using the same word as Donna, Leon says that Skip was one of the "hoodlums" and that he and his buddies not only drank and did drugs, but "huffed gasoline." Leon himself witnessed Skip and his friends "take the cap off of a motorcycle cap and breath in the fumes." (Tab 17, at ¶ 5.)  Inhalation of solvents is extremely dangerous and harmful, and gasoline, among the most hazardous, can cause severe and lasting brain damage.

SP&A 08426

000000451

P-App. 004752

63.    **Troubled teenage years: Vietnam.** Upon turning eighteen in April of 1966, just ten months after the first Marines had been dispatched to Vietnam and five months following Johnson's December 1965 major escalation to 200,000 U.S. troops, Skip enlisted with the Marines.  According to Leon, Skip was "forced to choose between the Marine Corps and jail time" after he and his friends were caught stealing a vending machine from a gas station.  (Tab 17, at ¶ 3.)  By October of 1966, Skip had twice gone AWOL; for the second offense his punishment included having his pay docked $25 per month for two months. (Military records, CCP SWR 006-007.) On December 13 of 1966, Skip landed at Da Nang and began a 12.5-month tour of duty in Vietnam, where he served as a Private First Class and participated in 27 combat operations as an infantry mortar man. (Military records, CCP SWR 0015)

64.    Skip succinctly summarizes his own progressive traumatization in Vietnam, which is typical of those who endured combat there: "Everything was face-to-face and very close. The first time that I was out there on an operation and I saw guys getting shot up, I got sick and vomited. After about five months, I was numb. I had to relate the shooting to hunting an animal, like shooting a deer, because I couldn't handle shooting a human being." (Tab 32, at ¶ 20.) He recounts the terror of nights in the jungle:

"[W]e holed up in dugouts covered with ponchos. The Vietnamese had sachel charges with pull pins that had a twenty second delay. So they could pull the pin and throw it a long way before it detonated. As we lay there in the night, I thought any little movement or sound was a satchel charge. I was always on alert and very jumpy." (Tab 32, at ¶ 21.)

26

SP&A 08427

000000452

Skip also recalls the commonly described "high" and "rush" of combat, which he experienced when being "ambushed or under attack and afterwards checking to make sure I was not hit and still alive." (Tab 32, at ¶ 23.) He was also injured in battle, though not seriously, by what he refers to as a "ricochet shot in the leg," and returned to his unit the following day (Tab 32, at ¶ 21.)

65. Not surprisingly, given the intensity of his combat experiences and the lack of psychological resilience expected of someone who has gone to war straight from a childhood of extreme neglect and abuse, Skip developed severe posttraumatic stress disorder (PTSD), as addressed in some detail below.

66. **Beginning his relationship with Donna Worsham.** Upon completing his combat tour and returning from Vietnam, within days he was having a welcome-home party, just before Christmas of 1967. Donna was at the party, having drunk vodka in the back seat with Tommie Robertson on the drive there with Buck and Faye (Tab 27, at ¶ 90.) Skip was pleased to discover that "Donna had grown up from the skinny girl we all used to tease." (Tab 32, at ¶ 17.) He was eager to start a (sexual) relationship with Donna, and they did so immediately. At the time Skip, coming straight from Vietnam, was the more traumatized and disturbed of the two. But Donna at eighteen was also entering adulthood emotionally crippled from a childhood of pervasive neglect and violence and untreated bipolar disorder (as documented in Dr. George Wood's report). The tragic consequences of this toxic mixture – for their ill-fated relationship and marriage, and for their future child – would be catastrophic.

27

SP&A 08428

000000453

## B.    WENDI'S MOTHER AND MATERNAL BACKGROUND

67.    Donna Ochoa was born Donna Elizabeth Worsham on September 20, 1949 to Laverne Ann ("Ann") Worsham (nee Tilly) and Henry Mason Worsham in Livermore, California (Notification of Birth Registration of Donna Worsham, California Department of Health Services).

68.    **Wendy's maternal grandmother.** Ann was born in 1915 in South Dakota. According to Donna, her mother's mother, Ina Rebecca Roberts, had three children with her husband, Sanford Tilley, of whom Ann was the oldest.  When Ann was about twelve or thirteen years old, her mother suddenly left her family behind, never to return. To this day Donna is astounded by the magnitude and bizarreness of her grandmother's actions: "It's freaky that she just suddenly walked out on her kids one day, but what's even freakier is that she wasn't even involved with another man and didn't have anywhere to go. She just left her family suddenly and never returned to them. She didn't even communicate with her kids again until they were adults." (Tab 27, at ¶ 6.) Instead, Ina made her way to California, where she created and refined recipes for Betty Crocker. Ina would eventually go on to have three more husbands, remarkable for a woman at any time but especially so in the first half of the 20th century. (Tab 27, at ¶ 9.)

69.    Donna reports that within two years of Ina leaving her husband and children, Sanford remarried. Then, because his new wife wanted nothing to do with Donna's mother or her siblings, "he rejected his own kids and sent them away" to live, separated from each other, with different family members. Thus Donna's mother Ann had suffered the ultimate neglect, abandonment and betrayal by her own mother and father.

SP&A 08429

000000454

P-App. 004755

70.   Ann married "as fast as she could right out of high school," because she wanted to be free of the extended family she'd been sent to live with. She quickly married Theodore Edward ("Ted") Zens, without really knowing him. He turned out to be an alcoholic who routinely beat her for more than eight years, until he suddenly died in a drunk driving accident by crashing his own vehicle into a bus. Ann and Ted had one child, Nadine Ann "Deannie" Zens. Deannie was seven or eight years old when her father died, and Ann immediately began going out to bars, bringing Deannie along and leaving her alone in the car, sometimes for hours at a time, while she drank inside. This was during World War II, and Ann typically went to bars frequented by military men, where she met Henry Mason ("Hank") Worsham, Jr., who was in the Navy. (Tab 27, at ¶¶ 12-14.)

71.   Upon getting involved with Hank, Ann and he continued to go to bars and leave Deannie in the car. As Donna recalls, Deannie said that's how she was able to spend time with their mother and Donna's father at the beginning of their relationship. Yet just as Ann's own mother and father had done to her, Ann found Deannie inconvenient and abruptly abandoned her. She did so after bringing Deannie along on a drive across the country to rejoin Hank after his transfer to the East Coast. Deannie was about thirteen years old, the same age Ann was when her mother left her, when Ann put her, by herself, on the first bus of a cross-country, several-day, multiple-bus trip to South Dakota, where Deannie would live with relatives, just as Ann had to do when her father abandoned her after finding his new spouse. As Donna notes, this ended up being a "milder version" of what Ann's parents had done to her, because Deannie was allowed to move back to her mother and Hank's home a year or two later, though before becoming an adult Deannie

SP&A 08430

000000455

lived with them "on and off," as well as with her grandmother Ida and one of Ida's husbands. (Tab 27, at ¶¶ 14-15.)

72.    This intergenerational pattern of parental abandonment would continue in the childhood of Donna, who would ultimately abandon her own daughter, Wendi, by failing to love or care for her and instead handing her over to deeply disturbed men who abused, exploited, and corrupted her.

73.    **Wendi's maternal grandfather.** Donna knew very little of her father, Hank Worsham's childhood or family. Donna recalls that her grandfather, Henry Mason Worsham, Sr., was a farmer and a barber, and "a big drinker and an alcoholic who was given a successful tobacco farm by his own father but "drank it all away." (Tab 27, at ¶ 4.) Of her grandmother, Mary Elizabeth Fortner, Donna says that she "put up with my... grandfather's drinking just like my mom put up with my dad's drinking." (Tab 27, at ¶ 5.) Indeed, Hank's inadequacy and incompetence as a father, his many irresponsible and harmful behaviors toward his daughter, and his betrayals and even violence toward his wife – these are indications of a childhood troubled enough to leave him totally unprepared and unequipped to be a father or husband.

74.    **Donna's childhood of sickness, instability, neglect and trauma.** By the time Donna was born, in September of 1949 in Livermore, California, Ann and Hank were married and living in the Bay Area. Her father continued to be in the Navy and the family moved "constantly" from when she was an infant until she was in 4th grade, mostly because the Navy sent her father to learn at various schools. A residence history created by her and her half-sister Deannie shows them moving back and forth between various parts of California and other states including Virginia, Hawaii, Rhode Island, Kentucky,

30

SP&A 08431

000000456

Florida (CCP DO 000692-000694). In addition, Donna's father was often out to sea and away from her and her mother for months at a time. (Tab 27, at ¶ 19.) Donna spent her 2nd grade of elementary school living with her parents in Panama. (Tab 27, at ¶ 20.)

75.   During these years of constant moving, Donna was often sick, debilitated or otherwise physically unwell. Her parents told her that she suffered from a severe case of rheumatic fever when she was two years old, including suffering a fever-induced "attack of paralysis" and her childhood teeth being "rotted and burned out." From the time of that illness until she was about twelve years old, Donna says she was a "weak, tired, inactive" and "sickly" child. (Tab 27, at ¶ 21.) She had a heart murmur, repeated episodes of extremely high fevers (she was allergic to aspirin and eventually participated in military research on Tylenol or acetaminophen), and multiple hospitalizations from ages two or three to eight or nine. (Tab 27, at ¶ 22.)

76.   **Donna's neglectful mother.** No one can remember much before they are five years old; that's when the hippocampus, the region of the brain responsible for encoding "episodic" memories of particular events and experiences, matures sufficiently to do so. Thus Donna's memories of her childhood begin around that time.

77.   As far back as she can remember, Donna's mother terribly neglected her. This comes as no surprise from a woman who was neglected and then completely abandoned by both of her own parents. Donna recalls how, though her mother did the laundry and the house was clean, "I had no emotional connection with her, no hugging, no cuddling, no warmth, no affection, no bond." (Tab 27, at ¶ 46.) As an adult looking back and struggling to make sense of her own failures as Wendi's mother, Donna observes, "My mom spent a lot of time reading and ignoring me while I was growing up, which I

31

SP&A 08432

000000457

repeated when raising Wendi and other kids." Like Skip and his brothers, Donna was left to her own devices, to raise herself: "My mom never talked to me about anything important... For the most part I learned what I needed to know about life from my peers because my mom wasn't parenting me and wasn't telling me anything." (Tab 27, at ¶ 45.)

78.    The memories Donna reports of her father become clearer and more detailed from age ten on, after her family finally settled in one place (covered below). However, Donna does report that her father "drank a lot" during her "whole childhood," so much that "that's where most of his money went" and like his father he wasted his potential for a successful career. (Tab 27, at ¶ 29.) Hank was "drunk a lot" at home, and hid pint bottles of hard alcohol around the house which, because he was usually drunk when he hid them, he constantly forgot where they were.

79.    For the first ten years of her life, as an only child whose family continually moved from place to place, little Donna was not only sickly and debilitated, but a loner with no friends. (Tab 27, at ¶ 25.) Like other children in that predicament, she may have given up on making friends as a young child. Yet even more importantly, the constant moving deprived Donna of any lasting relationship with an adult she could count on to love and care for her.  For some children with a cold, neglectful mother and heavy drinking, largely absent father, there is a saving grace: a sustained relationship with a loving grandparent, aunt or uncle, parent of a friend, neighbor or adult church member. For Donna, never living anywhere for more than a year, it was simply impossible to have even one adult in her life who she could count on to provide lasting love, support and guidance. Even if Donna was ever lucky enough to find an adult who genuinely took an interest and looked out for her, she knew it would not be long before she must leave

32

SP&A 08433

000000458

them. Therapists have long recognized that during a childhood otherwise pervaded by abuse and neglect, the enduring presence of just one loving adult can be an emotional lifeline that prevents some of the worst potential psychological damage. For the first ten years of her life, this was not an option for Wendi's mother.

80.    Indeed, the exception proves the rule: For a few years starting when she was twelve to fourteen years old, Donna spent a month each summer with her maternal grandparents. Ida was unloving, uninterested, harsh and rejecting. She was "just like my mom... wasn't going to talk about anything with me." Her Grandpa Pete, however, was "calm and stable." Knowing he was safe, Donna would open up and talk about the troubles in her life. Only for a month each year, and only as a teenager, Donna had the experience of being truly listened to and cared about, by "the only adult I was ever able to talk to while growing up." (Tab 27, at ¶ 42.)

81. Major emotional neglect can have equally or greater devastating effects on emotional and relational functioning than physical or sexual abuse, though the latter "get more press." Infants and young children are incapable of regulating and modulating their emotional states without the empathic and responsive help of caregivers. Children whose emotional needs and states are ignored or not responded to with supportive and soothing bodily contact, tones of voice and words, find themselves repeatedly cycling – both experientially and biologically – through intense and extremely distressing states of emotional and physiological arousal. Their brains resort to automatic and radical attempts to curtail such terrifying and traumatic experiences, such as "shut down" states including depression and withdrawal, and "hyper-aroused" states including aggressive behaviors or pathologically repetitive self-stimulation (e.g., incessant thumb sucking, rocking, etc.).

33

SP&A 08434

000000459

82. In short, the deleterious psychological effects of extreme emotional neglect, though often overlooked except in the most extreme cases (e.g., Romanian orphans), are profound and devastating. Both of Wendi's biological parents suffered such neglect as children and into their teen years. And for Donna, there was the additional contribution of her genetic vulnerability to bipolar disorder (as documented by Dr. Woods). Although Donna cannot remember and no witnesses can tell us, during the first five years of her life she would almost certainly have repeatedly cycled though the following brain-based states: extreme depressive lows, which may have largely accounted for her being "weak, tired, [and] inactive;" mania or hypo-mania characterized by runaway thoughts and emotions and disorganized behavior, or less extreme but still quite disturbed irritability and agitation; and "in-between" states involving emotionally numb disconnection from herself and others (as an adolescent and adult, in this state she could come across to others as "ditsy" and a "space cadet").

83. **Family settles in Tucson.** Before Donna started fourth grade, her family moved to Tucson, where they would remain through her high school years. (Tab 27, at ¶ 23.) During her first two years there, Donna remained physically unhealthy and was not permitted to go outside for gym class, but after age twelve her health began to improve. (Tab 27, at ¶ 24.) Though Donna's physical health improved over the next few years, her parents' mental health and their relationship with each other progressively deteriorated, with increasingly traumatic and destructive effects on their daughter.

84. **Continued parental neglect, new corrupting and abusive actions.** Donna notes that her father Hank was a "smart guy" who at times "had a full staff under him," and "should have been an officer by then." Indeed, her father's career and personal life

34

SP&A 08435

000000460

were derailed by alcohol addiction, hypersexual and violent behaviors – all of which were no doubt partly fueled by his own troubled childhood.  Hank never became a Navy officer. Instead he was constantly demoted for drinking and getting into fights, and spent time jailed in the brig of a Navy ship. (Tab 27, at ¶ 23.) Donna recalls him drinking heavily "during my whole childhood" and throughout her adulthood too, "until the end of his life." (Tab 27, at ¶ 29.)  One consequence of her father's drinking, which continually frightened her as a child and teenager – though nothing like the violence between her parents described below – was knowing he could burn the house down. She recalls several times that her father set his mattress on fire by passing out drunk with a lit cigarette, a few times coming home to find his mattress smoldering out in the backyard, and once hearing fire engines and looking out a door of her high school to see smoke billowing from her house. (Tab 27, at ¶ 65.)

85.   Not surprisingly, after his career stalled and the family stopped moving, her father continued to drink heavily and neglect Donna. By age ten, when he did spend time with Donna it was by bringing her along while he went drinking in bars. "That's how we spent time together after we moved to Tucson," Donna recalls. She remembers drinking lots of Shirley Temples while sitting with him at the bar. Looking back now, she recognizes how "pathetic" it was, "preparing a child to drink alcohol by taking her around to bars and giving her an adult-sounding cocktail when she's not even a teen yet." (Tab 27, at ¶ 30.)

86.   Donna euphemistically refers to Hank as her "more permissive parent." Starting when she was fifteen and throughout high school, she routinely went out drinking with him and her friends.  Often she would pick up her drunken father late at night, after the

35

SP&A 08436

000000461

P-App. 004762

restaurant and bars had closed, and they would drive around drinking with him in the car. He would even let her and her friends drink his wine (though not if they were driving). Donna sums up her attitude at the time about these escapades: "He let me go out with my friends and on dates while he was with us in the car drunk, which I liked a lot." (Tab 27, at ¶ 69.) Indeed, trying to make the best of her father's alcoholism and wanton irresponsibility as a parent, Donna "turned it into a way to make friends in high school." In addition to driving around drinking with him and other teenagers, she would tell them at school, "I have booze and hard liquor at my house if you want to come over." (Tab 27, at ¶ 68.)

87.    Such rampant neglect, reckless behavior, irresponsibility and bad judgment on the part of adults – with a lot of sexual and physical violence thrown into the mix – was a familiar theme of Donna's childhood, as it was for Skip's childhood and eventually that of Wendi Andriano. These problems are not uncommon in families with parents who experienced significant trauma in their own childhoods and suffer from untreated bipolar disorder.

88.    In terms of neglect, Donna's mother was even worse. "My mother neglected me so badly when I was growing up and sometimes took things out on me so severely that she actually made my dad's parenting look good." (Tab 27, at ¶ 44.) The neglect she remembered from before moving to Tucson only continued. As described above, Donna had "no emotional connection" with her mother – "no warmth, no affection, no bond" – and she "never talked to me about anything important, especially not the difficulties between her and my dad." (Tab 27, at ¶ 45.) Donna was also physically abused by her mother, and this abuse worsened during the years in Tucson. Donna's recalls that her

36

SP&A 08437

000000462

mother often "lashed out at and slapped or smacked me for no reason that I could see, just because I was nearby and she was angry." (Tab 27, at ¶ 44.) Like her own mothers' neglect, such unpredictable and physically abusive lashing out would be something Donna did to Wendi throughout her childhood as well. (Tab 27, at ¶ 44.)

89.   **Parental conflicts spiral out of control.** Soon after moving to Tucson, Ann and Hank settled into a daily routine that ended with Hank coming home late and drunk. Over the following two years his late night returns would be followed by increasingly frequent and increasingly violent fights, which got even worse once he began an affair with a woman he would eventually go on to marry.

90.   Ann worked nine to five managing a restaurant she and Hank owned. During the day Hank worked as a Navy recruiter; at five o'clock he took over from Ann managing the restaurant. Between nine and ten, as the workers cleaned up, Hank drank at a bar attached to their restaurant (Hank and Ann did not own the bar). From there he went out "drinking and carousing with waitresses," sometimes having sex and even carrying on affairs, with multiple women, before returning home sometime after midnight. Ann struck back at her husband in passive aggressive ways at first, for example, knowing he was often "too drunk to find or use his keys," by locking the doors. Hank would respond by breaking a window to get inside, and screaming at Ann in a drunken rage, to which she responded by screaming back. Each night Donna lay in bed waiting with full of fear and dread to hear the breaking glass, hateful screaming, and increasingly common physical violence between her parents. Eventually, Donna feared for her own safety:

"It got really ugly, so when I was in 6th or 7th grade I started keeping a butcher knife by my bed. There was so much anger, ugliness and violence between my

37

SP&A 08438

000000463

mom and dad, with things getting out of hand all the time, that I felt a need to protect myself.... I either blanked it out of my memory or didn't actually see much of their physical fighting, but I heard plenty of it. At the time I didn't form the words or realize that I needed to protect myself from my parents and their ugliness, but that's how I felt." (Tab 27, at ¶ 37.)

91.    When Donna was in 6th or 7th grade, her father began a sustained affair with one particular waitress, Virgie, with whom he would eventually have a separate and parallel family. At that point the screaming and physical fighting got even worse, and it would remain out of control and very traumatic for Donna throughout her teenage years. It also began extending beyond their home, and including more terrifying violence. As Donna recalls, "After my mom learned about the affair, when I was about twelve or thirteen years old, she dragged me along with her on Sundays while she went around to different hotels looking for my dad." During the first two years of the affair, Donna and her mother went through this awful hotel-searching ritual nearly every Sunday. Sometimes her mother brought a gun with her, and Donna vividly recalls the time Ann actually used it:

> "Once when I was with her we went to some old-time, single-story motels on old Benson Highway along the I-10. She said something like, 'Stay here. Don't move,' and left me in the car. She took the gun with her into the hotel when she went in after him. Somehow she got the hotel manager to tell her which room my dad was in. I was still sitting in the car when I heard shots, at least two. Then here comes my mom. She was crying. We took off zooming in the car. There was no conversation. I was scared, wondering if someone got

38

SP&A 08439

000000464

shot, and my mom said nothing. We drove fast all the way home. I later

learned from my dad that my mom had busted into the room he was in with

Virgie and started shooting. He said Mom was trying to shoot Virgie, but she

wasn't a good shot…" (Tab 27, at ¶ 35.)

92.   It would be impossible to over-estimate the terror of a child who believes that

she may have just heard her mother shoot and possibly kill her father, who she deeply

loves despite his failings. To then have her mother return crying and not tell her what had

actually just happened would only prolong and compound the terror and suffering. Also

clear from Donna's telling of the story is how she *knew* – after years of experience that

had conditioned her into to resignation about ever talking to her mother about anything of

significance – not to bother asking her mother any questions, not even whether or not she

had shot her father.

93.   Equally remarkable is how Donna finishes telling this story: "He said Mom was

trying to shoot Virgie, but she wasn't a very good shot and hit a booze bottle on the

headboard and the wall by the bed instead of Virgie. And then he told me: 'Be nice to

your mom. She's a really good person.' What I wanted to say was, 'Then why do you

treat her like crap?' But I didn't." (Tab 27, at ¶ 35.) Donna's memory is consistent with

the minimal and bizarre ways her father communicated with her, and with her own

implicit understanding of the futility of trying to communicate her own experiences and

needs.

94.   Finally, Donna says that much of her parents' fighting, and her father's spiteful

justification for the affair with Virgie, "centered on the fact that my father wanted more

kids, especially a son." (Tab 27, at ¶ 39.) When Donna was thirteen years old, in

39

SP&A U8440

000000465

September of 1961, Virgie gave birth to a son, Stevie, who Virgie insisted was Hank's child and who was given his last name at his Catholic baptism; years later Hank denied to Donna his paternity of Stevie, saying the boy was a "hook" Virgie used to keep Hank with her because he so wanted a son. Either way, Donna's father went on to father two daughters with Virgie, including Kathie Worsham, who was born in August of 1964 when Donna was fifteen years old (Kathy was a neglected, traumatized and disturbed child who grew up to suffer from extreme mental illness, including bipolar disorder with debilitating symptoms of mania, hallucinations and delusions).

95.   Even with all of the violence and pain between them, Donna recalls that her mother "said she loved my dad and would never leave him no matter what he did." Looking back, Donna views it as "an impossible situation" in which "they couldn't work out their problems and they couldn't move on," that went on for about ten years. (Tab 27, at ¶ 39.) Her parents would not finally divorce until 1969, when Donna was twenty years old and embroiled in her own horrible and doomed marriage to Skip Robertson.

96.   In summary, Donna's memories of her childhood and teenage years in Tucson are dominated by those of violence between her parents and her own attempts to pretend everything was OK.  Missing entirely – with the exception of the one-month-a-year supportive ear of her Grandpa Pete – are any memories of any genuine support or help from the adults in her life. Donna recalls, "My parents did nothing to help me emotionally," which was of course impossible given how disturbed and confused they were themselves. (Tab 27, at ¶ 46.) Her mother continued to have no relationship with her, while her father "talked to me a little more than my mom but didn't do much to help me cope." (Tab 27, at ¶ 46.)  In response to these overwhelming realities, Donna

40

SP&A 08441

000000466

attempted to cope in the same ways she would years later as she began her relationship

with Skip, and as she would when handing over her daughter Wendi to men who sexually

and physically abused and exploited her: "I just learned to ignore the constant ugliness,

and became really good at not noticing bad traits in people I cared about..." (Tab 27, at

¶ 46.)

97.    **Traumatized and troubled peers, beginning drug use, getting by at school.**

Heading into her teenage years, with her parents' neglect continuing and their fights

escalating, Donna turned to other teenagers in attempt to make sense of her life and

respond to the challenges that overwhelmed her. It was the blind leading the blind. The

peers from whom she "learned what I needed to know about life" were also neglected,

abused, and disturbed.  Totally at sea themselves, they could never teach Donna what she

actually needed to be emotionally healthy and happy in life, with safe and loving

relationships – let alone how to constructively cope with the trauma, suffering and moral

confusion in which they were all immersed.

98.    Donna has not had any "best" or "close" friends as an adult, which makes sense

given her childhood and lack of help overcoming its emotionally destructive effects. As

Donna notes, however, from age ten until sometime after marrying Skip at age eighteen,

she did have friends who were influential in her life.  Among the most influential through

her high school years, and the best and closest friend she ever had, was Alice McDuffee,

the oldest sister of Deblen Oke and Charlotte and Leon McGuffee.  Alice was Donna's

age and they became friends shortly after Donna arrived in Tucson.  Her brother Leon

remembers Donna being at their house a lot, sometimes coming over for breakfast and

spending the whole day. Indeed, Leon describes Donna and Alice as "inseparable" and

41

SP&A 08442

000000467

recalls Donna as "like [a] sister" to him. (Tab 17, at ¶ 2.)  Like Donna, Alice was neglected by her mother, Faye – the same mother who looked the other way when Deblen, Charlotte and her other daughters were molested or raped by Buck, his brothers and their father.  As Donna recalls, in a matter-of-fact tone and without elaboration, "After Faye McGuffee, Alice's mom, married into the Robertson family [when she and Alice were in 6th grade], some of the men in Skip's family… sexually abused the McGuffee girls." (Tab 27, at ¶ 27.)

99.   Not surprisingly, with everything going on at home and the troubled peers to whom she looked for companionship and guidance, Donna started smoking cigarettes and marijuana when she was only ten years old, in fifth grade. Of starting to smoke cigarettes, Donna recalls doing so not to rebel, which did not appeal to her, but "because my parents did and it seemed cool and grown-up to be smoking." (Tab 27, at ¶ 32.) Though Donna does not say so, it is likely that she smoked marijuana both to fit in with her troubled peers and to escape from the overwhelming bad feelings and memories stemming from the neglect and violence she experienced at home.

100.  As Donna moved through her teenage years she was increasingly traumatized and overwhelmed. By 8th or 9th grade she "lost it and had a breakdown" because she "had witnessed too much ugliness and violence between my parents." Donna recalls that she "couldn't stop crying and didn't respond when people talked to me," was taken to a doctor briefly and then "stayed home from school and everything else to recover for a week or two." Looking back she says, "It was all too much for me as a child, especially my parents' fighting. I took it until I couldn't take it anymore, and then had the breakdown." (Tab 27, at ¶ 48.)

42

SP&A 08443

000000468

101.  Yet as noted above, Donna and her family never sought or received any real help with their emotional problems, with her father's alcoholism and mental illness, with her mother's mental illness, or with the conflicts between her parents and their utter inability to care for their daughter – let alone the extremely negative effects all of this was having on Donna. And so, like so many other children in similar circumstances, Donna simply put on a happy façade. "Despite the intense fighting late at night, I pretended with my parents that things were normal and okay; we never talked about the fights and for the most part during the day we acted like nothing was wrong." (Tab 27, at ¶ 38.)  Deblen Oke, one of the sexually abused McGuffee girls (whose ordeal is described above), remembers how Donna, who was "at our house a lot," was viewed by her and her sisters and their peers throughout Donna's teenage years: "She reminded me of Goldie Hawn from the Laugh-In days. She was ditzy, funny, outgoing. Everyone loved her." (Tab 30, at ¶ 13.)

102.  Similarly, despite all that she was going through and the lasting damage it was causing her, Donna got by at school. She appears not to have generated any special concern or attention from her teachers. Most of her elementary school grades were "average" or "above average," (Education Records of Donna Ochoa, Obtained by Capital Case Project), and she graduated 63rd of 184 in her class at Flowing Wells Junior-Senior High School (Education Records of Donna Ochoa, Obtained by Capital Case Project).

103.  **Distorted perceptions and diminished expectations of people, relationships and sex.** As Donna's primary method of coping with the insanity and violence of her home life, she "just learned to ignore the constant ugliness, and became really good at not noticing bad traits in people I cared about, like my dad." (Tab 27, at ¶ 46.) Following that

43

SP&A 08444

000000469

statement Donna continues, "Despite his drunkenness, disloyalty to my mom, and neglect of me, I worshipped my dad. He seemed like a happy, charismatic figure because he wasn't always irritable and complaining." Perhaps more than anything, these statements show how the young Donna had no adults in her life that truly warranted admiration or emulation (with the partial exception of Grandpa Pete, who was capable of supportive listening).

104.  Given the experiences of other girls she knew, including the McGuffee girls, perhaps Donna "worshipped" her father in part because he directed his sexual obsession at adult women rather than her and other young girls.  However, that may not actually be the case, at least not earlier in her life: Donna reports that her mother and sister Deannie both told her, though she has no memories herself, that her father took baths and showers with her until she was six or seven years old.

105.  Regardless, Donna's description of how she saw her father – especially in comparison to her constantly miserable, irritable, and coldly rejecting mother – suggests that Donna may have learned from her father, and attempted to emulate, his happy-go-lucky façade.

106.  Donna says that her mother "had a lot to do" with how she related to men and viewed sex.  She recalls that her mother "made everything feel dirty or cheap, even something as simple as holding hands."  She tells the story of her mother, upon finding her sitting on the couch holding hands with a high school boyfriend, having "a fit" and caustically saying, "Why are you letting him crawl all over you?"  And in a pattern Donna would repeat with her daughter, refusing to talk to Wendi about sex or even her

SP&A 08445

000000470

first menstruation, her mother's comment about holding hands was "the only thing she ever said to me about sex." (Tab 27, at ¶ 71.)

107.  Not surprisingly, Donna denied and disavowed her own sexual interest and pleasure with her first high school boyfriend. When he "started messing around sexually, like touching my breasts... I pretended I was asleep. That was the only way I liked sex. If I had to take responsibility for sex or admit what was happening, I didn't want to be involved and left the situation." (Tab 27, at ¶ 73.) After breaking up with that boyfriend, Donna decided she was "cute" and "told myself I was going to do my own thing." That meant indiscriminately going out with boys, "partying and drinking more alcohol... anything hard," and eventually having sex. Consistent with her disconnected and disavowed experience of sex, Donna recalls, "By halfway through my senior year I was having sex. It wasn't a big deal. I was never that thrilled about sex." (Tab 27, at ¶ 74.)

108.  The clinical term "dissociation" refers to ways that some people, especially those subjected to extreme neglect and abuse in childhood, "split-off" or "dis-associate" from their conscious awareness any perceptions, thoughts, feelings, memories and other experiences that they find disturbing, threatening or overwhelming. Neglected and abused children are subjected to extreme emotions and physiological states. When no adult helps them tolerate such experiences and sooths their distress, their brains resort to extreme methods to prevent such experiences from entering conscious awareness. There are brain regions which evolved to regulate emotional and physiological states. But in the absence of caring and supportive people required to bring those regulatory capacities "on line" in childhood, those same brain regions instead block out the feelings and bodily sensations

45

SP&A 08446

000000471

associated with fear, anxiety, disgust – even forms of pleasure that threaten to be overwhelming, like sexual feelings associated with being exploited, abused or "dirty."

109. Donna learned to block out feelings evoked by her parents' violent fights, to "ignore the constant ugliness" and pretend during the day that "things were normal and okay." She became "really good at not noticing bad traits" of the people in her life, including the ways they hurt her and others with massive betrayals, corrupting behaviors, and outright abuse and violence. Donna also learned to disconnect from her sexual experiences and desires so she would not have to "take responsibility for sex or admit what was happening." These are all examples of Donna's propensity for extreme dissociation, as would be expected of someone who grew up so neglected and traumatized. And the constellation of things that Donna was capable of dissociating – and motivated to ignore and deny – would lead her to neglect her own daughter and then turn a blind eye to the abuse Wendi suffered. As she had done throughout her life, Donna continued to "ignore the constant ugliness."

110. Donna reports that her father, despite his own hyper-sexuality, virtually threatened to kill Donna if she had sex before getting married, and that he had his friends around town keeping tabs on her. She recalls, "My dad always said while I was in high school, 'if you're not a virgin when you get married, I'll get a shotgun'…. It wasn't that he intended to make me get married; he intended to shoot me." (Tab 27, at ¶ 72.) The first time Donna ever stayed at a motel to have sex with a boy, Hank was immediately informed. (Tab 27, at ¶ 76.) Again, sexual desire and experience were not safe but threatening, needing to be hidden not only from herself but her father – though neither

46

SP&A 08447

000000472

was really possible and this only fueled her fears and her motivation to deny and disavow her sexuality.

111. **After high school, drinking out of control.** Donna graduated from high school in 1967 and in the fall of that year, with the financial support of her sister Deannie, began attending Eastern Arizona College. (Tab 27, at ¶ 81.) She reports drinking so much in her first semester of college that she was almost kicked out of school (Tab 27, at ¶ 85.) It was at the end of that semester, Christmas of 1967, that she began a sexual relationship with Skip Robertson, who had just returned from a tour of duty as a Marine in Vietnam.

**C.      DONNA AND SKIP'S RELATIONSHIP BEFORE WENDI'S BIRTH**

112. Donna's courtship with Skip was brief and misguided. They were married within two months of beginning a romantic relationship, based on Donna's mistaken belief that she was pregnant. In Donna's reflections on why she began a relationship with Skip and within two months married him, we see on full display the dissociation described above and the willful ignorance and wishful thinking that Donna sees as her main coping strategies.

113. Donna recalls how – despite knowing that Skip had been a "hoodlum and bad boy" before going to Vietnam, despite knowing that he and his brothers "had mouths like sailors" and were "all about sex, alcohol, Levis, and driving trucks," and despite having the sense that "all of Skip's brothers had been in jail" (Tab 27, at ¶ 98) – she focused her attention and thoughts on other, more positive things about him: that he attended church when he was younger and had taught Sunday school at one point, and that he claimed to have "prayed on the beach and read the Bible" in Vietnam. Donna also remembers thinking, in a naïve and magical way that can still characterize her thinking today, "it

47

SP&A 08448

000000473

seemed obvious to me that God gave him a second chance by allowing him to survive

when many others around him were killed in 'Nam, and that also attracted me to him."

(Tab 27, at ¶ 92.)

114. More pressing and determinative, however, were these two facts: they had sex

almost immediately over that Christmas break, and Donna believed (incorrectly it turned

out) that she was pregnant. As Donna sums up, "Skip and I had no real courtship and we

never dated.... We just had sex and I thought I was pregnant so we got married." (Tab 27,

at ¶ 93.) Once she thought she was pregnant, Donna believed she had no choice but to

marry Skip. The belief was based in fear: as noted above, her father had always

threatened to come after her with a "shotgun" if she was not a virgin when she married,

which meant to her that "he would kill me or someone I was dating," and in this case

made her "worried about what he might do if he found out that I was pregnant [by Skip]."

(Tab 27, at ¶ 94.)

115. After Christmas leave, Skip went to Camp Pendleton in California and she soon

called to tell him she was pregnant. When they spoke, Donna says, Skip made a (soon-

broken) promise that he would not drive trucks like his brothers, and they agreed to wed.

Neither of their parents wanted them to marry or thought the marriage would last. But

marry they did, as soon as Skip could get leave from his base, on February 21, 1968 in

Silver City, New Mexico, where no blood tests or waiting period were required. (Tab 27,

at ¶ 93.)

116. In short, Donna's marriage to Skip was the result of a remarkable and rapidly

unfolding sequence of bad choices, poor judgment, substance use, reckless sexual

48

SP&A 08449

000000474

behavior, dissociative pathology, willful ignorance, wishful thinking, mistaken belief, and fear.

117.  In Skip's brief account of beginning their relationship and marrying, he focuses on his immediate pleasure at discovering, when he came home for Christmas of 1967, that Donna was no longer "the skinny girl we all used to tease," and on how she "nursed him" when he was sick with the flu at the time.  Donna fit Skip's apparent vision of an acceptable woman and wife: worth having sex with and willing to take care of him. Perhaps also, unlike Donna, Skip did not forget or discount the other widely held perceptions of Donna that her current behavior did nothing to contradict; that is, as Deblen Oke described Donna, she was "ditzy, funny, outgoing." When Skip mentions their marriage, it is literally in passing, and he says nothing about why they married so quickly, including nothing about a mistaken belief that she was pregnant. (Tab 32, at ¶ 24.)

118.  The marriage day was not auspicious. Donna recalls "waiting in front of the court house, where I threw up and fainted. I woke up and we still got married." She was "scared and sick" but also "relieved" because she would no longer have to worry about what her father would do if he found out she was pregnant before getting married. (Tab 27, at ¶¶ 96-97.) Afterward they had no wedding party and could not even find a hotel room (thanks to a golf tournament in town).  They ended up spending the night at one of Skip's brother's houses, where the Robertsons were having a drunken celebration party.

119.  **Legacy of severe childhood neglect: Donna the "chameleon."** Then Donna joined Skip in California, where they moved into an apartment in San Clemente, near his

49

SP&A 08450

000000475

P-App. 004776

military base. Donna remembers immediately adopting Skip and his brother's "lifestyle and ways." Looking back now, Donna says,

> "It was almost like I was a chameleon. I just went along with it and tried to fit in. I have done that all my life with whatever group I was with…. My first reaction when I'm part of a new group is always to get similar clothes as they have, so that I'll be liked. I morph well to be part of whatever group I'm with. Now in retrospect I think that I never wanted to make a decision about who and what I was, exactly, so I shifted to fit in…" (Tab 27, at ¶ 98.)

Donna's self-diagnosis of the roots of her "chameleon" problem, which focuses on what she "wanted" and her "decisions," does not begin to capture the actual and well-understood roots of such behavior. Children who are severely emotionally neglected by their parents miss out on many things crucial for developing the capacities to recognize their own needs, wishes, unique perspectives and abilities. Parents who are too disturbed to care about their child's experiences, who are oblivious to their child's feelings, needs, abilities, wishes and dreams, and who never talk about anything of significance to the child -- such parents do not mirror back their child's excitement, or respond with attention and affection to pleas for recognition and pride, or support their child's attempts to identify and achieve goals meaningful for herself. They do not share pride in their child's successes, help her to tolerate disappointments, or help her make sense of either. And they do not help their child figure out how to negotiate the challenges of life and human relationships.

120. The extreme emotional neglect of Donna's childhood meant that she *could not develop her own identity* and thus *changed to fit in with others*. She lacked the

SP&A 08451

000000476

psychological capacities, and the mental or emotional foundations, to know who she was, what she really wanted in life, and how to be her own person while in relationship with others. Donna knew many things that she did *not* want, including (continued) neglect, abandonment, betrayal and abuse by an alcoholic-truck-driving-womanizing-money-wasting husband.  And she had vague ideas about what she did want, to be loved and to have a happy marriage and family. But Donna had never seen anyone else with any of those things, and she he had no idea who she was as a unique person or how to relate to her husband or anyone else to bring loving relationships and real happiness into her life. At that time (and apparently until very recently) Donna had learned little more than this: she could do her best to put on a happy face and act in ways that would not lead others to reject her; she could withdraw from others when, thanks to bouts of depression and her inability to truly connect with others, she was unable to implement those rudimentary strategies; and she could try to ignore and deny others' bad qualities and harmful behaviors, even when they hurt her and her own child, while hoping for the best. As Donna puts it, even now: "I really don't know who I am. I know some of my attributes. I can be kind, compassionate, and generous, but I don't really know what I want. Who I am is defined by who I'm with, or it's defined by who or what I need to fit in with or give in to." (Tab 27, at ¶ 356.)

121.  And so it went for Donna's relationship and marriage to Skip. In addition to adopting the clothing and mannerisms of his family and acquaintances, Donna joined Skip in drinking heavily and taking the amphetamines he got from his trucker brothers. (Tab 27, at ¶ 99.) Donna also quickly adopted behaviors shared by women in the Robertson family's sick culture, behaviors for which she had long been in training as a

51

SP&A U8452

000000477

P-App. 004778

teenage friend of the McGuffee girls: Looking away and staying silent as the men ran amok with drunkenness, fighting, womanizing, and sexually abusing each others' daughters.

122.  **Nightly traumas.** Donna also did her best to cope with Skip's combat-related PTSD, which by both her and Skip's descriptions was severe and disturbing.  They both note that he was, as Donna puts it, "very jumpy and easily startled," and there were several incidents in San Clemente where Skip "hit the ground" in response to a loud noise like car backfiring. (Tab 27, at ¶ 102.) This is one of the physiological "hyper-arousal" symptoms of PTSD, which is one of three "symptom clusters" associated with the disorder, and one that Skip continued to suffer from throughout his nineteen years in prison (Tab 32, at ¶¶ 22-23.)

123.  Most disturbing of all were Skip's PTSD "re-experiencing" symptoms. These included nightmares of combat from which he would wake up yelling, swinging, even attacking Donna. "I remember laying in bed with Donna in San Clemente and throwing her out of bed, thinking I was under attack. I had nightmares. Another time, I woke up to find myself on top of her on the floor." (Tab 32, at ¶ 21.)  Throughout their years together, Donna recalls Skip having "bad nightmares about four or five nights a week where he thrashed around in bed and called out to people," from which he "woke up swinging or woke up violently." Donna remembers in the mornings having "to be very careful when waking him up. I crouched at the end of the bed and touched his toes to wake him because he came out of his dreams swinging his fists hard enough to really hurt me if a punch connected." (Tab 27, at ¶ 101.)

SP&A 08453

000000478

124.  Skip's middle-of-the-night nightmares and attacks on her also resembled Donna's most traumatic experiences from her childhood: being awakened in the middle of the night by screaming, smashing glass and other sounds of violence between her parents, and fearing for her own safety. Skip's PTSD would have caused Donna to re-experience many of her own traumatized reactions to the violence between her parents, which also happened several nights a week from when she was ten to sixteen years old. Experiencing and fearing such nightly terrors and violence was a source of severe stress throughout Donna and Skip's marriage.

125.  **Legacy of severe childhood neglect and war: Skip the addict and "good ole boy."** Just as Donna had been horribly neglected as a child and never developed a sense of her unique identity, needs and capacities, the same was true for Skip.  Like Donna, Skip had never known what it was like to be truly talked to, understood, and loved by another human being. But he responded in a very different way.  Donna was an only child who put on a happy face and attempted to fit in with changing groups of peers. As the sixth son of the Robertson family, rather than being a chameleon and molding himself to fit changing constellations of people around him, Skip rigidly clung to his family members and the culture and behaviors of his father and brothers.

126.  It was a culture of relentless addiction – to alcohol, sex and violence – driven by desperation to escape from the severe and chronic experiences of depression, anxiety, fear, disconnection, and powerlessness from which all severely neglected and abused children and adults suffer.  It was a culture of corrupt, macho values and a veritable worship of extreme drunkenness, sexual conquest (including the abuse and rape of women and girls viewed as objects of pleasure and domination), and aggression against

53

SP&A 08454

000000479

P-App. 004780

other men. As described above, it was a culture in which men believed they were entitled to get away with crimes, including rape and even murder, so long, as Skip learned from his father, they could keep such "private business" to themselves.

127. The work life of the Robertson boys, long-distance truck driving, fit well with that culture and its destructive addictions. Indeed, with its mix of social isolation, drinking and carousing with similar men, and ample opportunities to pursue women and girls in places far from home, the long-distance trucking perpetuated and fueled those addictions and their destructive consequences.

128. In behaving like his brothers, Skip was not "being himself" in any meaningful sense of the phrase. Like Donna, he did not really know who he was. Psychologically speaking, Skip was an ignorant and unreflective man, without genuine understanding, empathy or compassion for himself or anyone else; a bundle of posttraumatic suffering and destructive, addictive attempts to escape that suffering. As noted above, after Skip's arrest for sexually abusing his step-daughter, testing revealed Skip's personality as a collection of extreme pathologies – including "reactivity, naiveté and egocentricity," emotional disconnection and alienation from others, and "rebelliousness, resentfulness of authority, and nonconformity" – all consistent with an "underlying antisocial personality disorder." (Jeffrey D. Harrison, Ph.D., Report of Paraphilic Assessment, pp. 7-8, July 1993). In contrast, Skip's view of himself (one shared with many severely traumatized antisocial men) as a "good ole boy" who just wanted to be free, not tied down, and having a good time, was at best a self-deluding half-truth. As revealed by his own words, used to explain his suicide attempt as a teenager, being a "good ole boy," aside from all the harm and destruction it caused to others, was ultimately a failure when it came to

54

SP&A 08455

000000480

warding off his own misery: "Ninety percent of the time I am a good ole boy and the rest

of the time, I get depressed and things build up." (Tab 32, at ¶ 11.)

129.  All of these childhood- and family-based pathologies and behavior patterns

were super-charged by a year in Vietnam that immersed Skip in killing, death and

constant fear of being killed himself. By the time Skip married Donna he was already

spiraling out of control, and beginning work as a truck driver less than a year into their

marriage only accelerated the process.

130.  **Skip and marriage heading down hill fast.** Donna recalls that just before and

for a little while after they married, Skip could be "well mannered or even nice," but only

when he was not drinking – which was not very often. Even when he was sober and

pleasant, from the beginning they "didn't have normal conversations or discussions about

things like common interests." She quickly learned that having such interactions "just

wasn't possible" because Skip "had a short attention span and was mostly interested in

having sex and drinking alcohol." (Tab 27, at ¶ 108.)

131.  And drink he did: "Skip drank steadily and was drunk much of the time I was

around him for the whole time we were married." (Tab 27, at ¶ 103.) Donna's

recollections are consistent with Wade Robertson's childhood memories of Skip only

drinking to get very drunk and then becoming aggressive, and provide additional details

of who and what Donna was living with soon after the marriage:

> "He started out happy when he was first drinking, then the more he drank the
>
> more ugly, mean and verbally abusive he became. When drunk he was vicious
>
> with his words. There was nothing I could see that caused him to act that way
>
> and nothing in particular that happened to set him off. He just turned mean all

55

SP&A 08456

000000481

by himself.... He tended to break laws and get into trouble when drunk.
Sometimes he stayed out or was gone all night or for multiple days and nights
while drinking." (Tab 27, at ¶ 103.)

132.   After a few months and a few different jobs for Skip at Camp Pendleton, in
mid-1968 Skip and Donna moved to San Diego.  Skip worked as a military policeman
and Donna as a receptionist at a hair salon. (Tab 32, at¶  25; Tab 27, at ¶ 105; Military
Personnel Records of Shelby Robertson, Obtained by Capital Case Project.) At that time
Skip began combining alcohol with amphetamines that he got from his brothers. They
remained in San Diego until moving back to Arizona in April of 1969.  In the meantime,
they made many weekend trips between California and Arizona, and often took "uppers"
to stay awake for the long drives. (Tab 27, at ¶ 106.)

133.   Donna reports learning years later from Linda Robertson, the wife of Skip's
brother AV, that Skip had sexually abused Linda and AV's daughters during one of those
Arizona-California trips. His nieces were six to eight years old at the time, and Skip
molested them in the car, in the presence of their mother and Donna, who were sleeping
or otherwise unaware at the time. (Tab 27, at ¶ 104.)

134.   Skip and Donna remained in San Diego for nine months, until Skip decided to
leave the military and received his discharge, when they moved to Phoenix.  Looking
back Donna says, "We were still in California in 1968 or 1969 when I realized the
marriage wasn't working but it took me as long as it did, until 1974, to have the courage
to leave him for good."  (Tab 27, at ¶ 103.)

135.   **Back in Arizona, Skip starts driving trucks.** Upon moving to Phoenix, Skip
used V.A. funding to go to "refrigeration school." Donna was afraid Skip would start

56

SP&A 08457

000000482

driving trucks like his brothers, and hoped that he would instead stick with school and work in refrigeration installation and maintenance. It was not to be. In Skip's telling, he tried a refrigeration job but quickly realized it was "boring" and it would take years to "move up through the union" and "be able to go out into the field on my own," where he would have more freedom and make more money. (Tab 32, at ¶ 40.) By late 1969 Skip was driving trucks, first short-haul runs, and then cross-country in teams with his brothers Glen, Jerry, and AV. By early 1970 he was driving cross-country on his own, and often gone for two to four weeks at a time, and sometimes longer. (Tab 32, at ¶ 26.)

136. On the one hand, Donna was unhappy with Skip driving trucks and being gone so much. When they agreed to marry she had extracted the promise that he would never drive trucks for a living. On the other hand, Donna was relieved to have breaks from Skip's drunkenness, hostility, and demands for sex. "When he was around we fought a lot about money and sex. A typical fight... included him coming home late, drunk, and wanting to have sex with me." With him drunk and reeking of "booze and cigarettes," Donna found him utterly unappealing, "so he yelled at me until I gave in." (Tab 27, at ¶ 109.) (Donna's words echo those of Skip's step-daughter, who more than twenty years later, as described above, would say she first gave in to sexual intercourse with Skip, despite not wanting to, because he was "so mad" at her for resisting.) Donna also reports that Skip had by then started "running around with other women." (Tab 27, at ¶ 109.) And just as Donna's father had always done, Skip was blowing most of the money he did make on drinking and those other women.

137. By the middle of 1969, not long after moving back to Arizona, this ongoing ordeal was becoming too much for even Donna to tolerate. She recalls how, growing up,

57

SP&A 08458

000000483

she had always told herself she would never marry a man like her father. But there she was, finding herself married to Skip, who was "even worse when it came to drinking, being irresponsible, being disloyal with other women, and not supporting me in any way whatsoever." (Tab 27, at ¶ 112.) In July of 1969 she left him and went to Tucson to live with a friend from high school. Linda and her husband Jack were "hippies" who grew marijuana in their yard (though they did not smoke it in front of Donna). (Tab 27, at ¶ 112.)

138. **Skip promises to change and Donna gets pregnant.** After a few weeks in Tucson Skip showed up and promised, in Donna's words, to "clean up, stop drinking, and stay away from his brothers." Skip's radical behavior change lasted no more than a few days. Yet they were back together and living in an apartment in Tucson, where Donna got a job while Skip went back to driving trucks and the hard-drinking and womanizing lifestyle he shared with his brothers. Tab 27, at ¶¶ 113-114.) Then Donna decided she wanted a baby and stopped taking her birth control pills. Like so many confused young women who were neglected as children themselves and have no clue what it means to be a parent – let alone a loving and nurturing one – Donna believed that having a baby would "help my marriage and solve problems between Skip and me." Looking back now, she see that she believed "everything would be okay after I got pregnant because I was the person who tried to make everyone else happy and I believed that if I made Skip happy that everything would work out." (Tab 27, at ¶ 116.)

139. By November Donna was pregnant with Wendi, which she confirmed around Christmas of 1969. Donna recalls having no information about pregnancy while carrying Wendi, and constantly fighting with Skip as it dawned on her that being pregnant did not

SP&A 08459

000000484

magically lead Skip to "settle down and be home more." Instead, Skip was out driving

trucks, drinking and partying away his income with other women, and giving her little or

no money for basic living expenses. She bitterly remembers "constantly struggling to get

by and survive" throughout the pregnancy. (Tab 27, at ¶ 120.) For the first six or seven

months of being pregnant with Wendi, "I almost never knew where Skip was, who he

was with, or when I'd see him next, and when he was with me, we were usually

fighting." (Tab 27, at ¶ 121.)

140.  In the midst of this – Skip's wholesale abdication of his responsibilities as the

husband of a pregnant wife, and Donna's extreme day-to-day stress – Wendi was

growing inside her mother's womb. There is significant research on the effects of severe

maternal stress during pregnancy, including deleterious consequences for prenatal central

nervous system development, which is mediated primarily by high levels of stress

hormones. The repeated but unpredictable and uncontrollable prolonged abandonments

by her husband, punctuated by fights over money and sex whenever Skip briefly

appeared back home, constitute extreme and chronic stress – enough to cause significant

negative biological effects on both mother and fetus. At a minimum, adverse impacts on

Wendi's prenatal brain development would be expected.

141.  **From bad to worse: Pregnant in Groom, Texas.** Around June of 1970, six or

seven months into Donna's pregnancy with Wendi, she moved to Groom, Texas, where

Skip had gotten a job fixing truck tires and pumping gas that, in Skip's telling, "put me

home every night."  This was Skip's selling point to Donna and, as he self-servingly

recalls, "At the time, it seemed like she was all for it." (Tab 32, at ¶ 28.)  Donna

remembers only agreeing to the move – to a town of under 500 people in middle of

SP&A 08460

000000485

P-App. 004786

nowhere, i.e., in the Texas panhandle and twelve hours drive from Phoenix and Tucson – because his job was "supposed to be permanent, in one place, so that he could stop driving trucks." (Tab 27, at ¶ 122.)  Within a month or so, the cruel truth was revealed: Skip only wanted to live in Groom because he was having an affair with a waitress there, and living and working in Groom meant having his cake and eating it too. (Tab 27, at ¶ 123.)  That Donna's father had fooled around with waitresses, and had a parallel family with one, could only have made Skip's betrayal feel all the more cruel and painful.

142.  From when Donna learned of Skip's affair in July until Wendi's birth in late August, she was utterly miserable. Donna had no friends in Groom and was terribly homesick for Phoenix and Tucson.  Every day she confronted the reality of Skip cheating with the waitress right there where they lived, in that extremely small town. Many nights Skip came home for only a few hours, or not at all. Not surprisingly, Skip paints himself as a paragon of husbandly virtue at this time: working long hours during the day, coming home immediately – except for the times he had "a beer or two after work with the boss" – then having dinner and going to sleep. (Tab 32, at ¶ 28.)

143.  Donna's overwhelming distress at her predicament may have contributed to the premature uterine contractions that began in early July and continued for nearly two solid months before Wendi was born. Donna remembers the contractions being the worst late at night when she was alone, wondering where Skip was, guessing he was having sex with another woman. The contractions became so frequent – five-to-eight minutes apart, sometimes only four minutes as typically occurs just before birth – that Donna and her doctor feared the baby would be born prematurely. The intense and frequent nightly contractions also meant little sleep, and Donna became extremely sleep-deprived, greatly

SP&A U08461

000000486

compounding her distress and deteriorating her always-fragile mental health. (Tab 27, at ¶ 127.)

144.  After the contractions began Donna's mother came to live with her. She helped with chores and gave Donna advice and financial support (Skip continued to spend his wages on alcohol and other women). (Tab 27, at ¶¶ 126, 129.)  It was Ann who alerted her daughter to Skip's affair and motivation for moving to Texas. (Tab 27, at ¶ 130.) But as had always been the case, Ann was incapable of giving her daughter any emotional warmth or support, or helping her deal with the emotional impact of Skip's betrayals. (Tab 32, at ¶ 31.)  Consistent with her mood disorder, her past relationship with her mother, and Donna's miserable and sleep-deprived state, Donna recalls treating her mother "badly" by being "irritable, impatient, and short with her."  Indeed, Donna recalls that despite being angry at Skip, she mostly blamed herself, including for Skip's affair. Beating up on herself in this way, in what must have been an extreme depressive episode for the bipolar Donna, could only have compounded her suffering and pumped more stress hormones into her baby. (Tab 27, at ¶¶ 124, 129.)

145.  Adding final insult to injury – and no doubt worsening Donna's stress and the cascade of stress hormones impacting her developing baby – her doctor at the time, an osteopathic naturalist, had Donna take cod-liver oil to induce birth.  It did not have the desired effect. Instead, it made her sick, with both vomiting and diarrhea. Donna recalls that this experience made her hate her doctor, who should have been a helpful and supportive influence, and led to her seeing him, just when she most needed him, as incompetent and harmful. (Tab 27, at ¶ 133.)

61

SP&A 08462

000000487

## IV.   BIRTH TO AGE 4½ – INFANCY AND EARLY CHILDHOOD

146.   Wendi was born on August 26, 1970, in Groom, Texas. At 7 pounds 11 ounces, Wendi was a normal weight.  (Certificate of Birth, State Registrar, State of Texas, Country of Travis, Obtained by Capital Case Project.) Donna reports that she did not find the birth very difficult physically.

147.   **Donna's immediate panic, depression, and neglect of Wendi.** Psychologically, however, Donna "freaked out" immediately after Wendi was born, first in a panic that she was not being spanked to make her breath and second because she knew that, like her own father, Skip wanted a boy and she had pinned her hopes for the marriage on giving him one. (Tab 27, at ¶ 137.)

148.   Donna also recalls that Wendi was immediately taken from her and put in the nursery.  In her first non-acts as the neglectful mother she would be throughout Wendi's entire childhood, Donna made no effort to visit her baby in the nursery during their time in the hospital. She comments, "The nurses must have played with her more than I did while we were in the hospital" – even now betraying her ignorance about how a mother actually relates to a newborn infant, not by "playing" but by holding, feeding and soothing. (Tab 27, at ¶ 138.) Donna herself recognizes now that she "did not bond with Wendi at all after she was born." Instead, she was focused on her dog that had gone missing when she went into the hospital: "My gosh, when Wendi was born I had a closer bond to that cockapoo dog… than to my kid." (Tab 27, at ¶ 141.)

149.   Arriving home four days post-birth, with her dog still missing, Donna became "hysterical" and "couldn't attend to Wendi at all," including to breast feed her. She went into a depression and "completely shut down," unable to feed herself, get on her feet, or

SP&A 08463

000000488

communicate or respond to anyone. She had no interaction with Wendi for the first two or three days upon arriving home. (Tab 27, at ¶ 142.) When Donna emerged from her depressive shut-down it was not too late to resume nursing Wendi, which she did for the first two months of her life. (Tab 27, at ¶ 144.)

150.  Nursing Wendi was, by Donna's own admission, literally the *only* way that she cared for her infant daughter: "I didn't know what to do with Wendi after she was born, and I didn't interact with her. All I did was go in where she was sleeping and poke her once in a while to make sure she was still breathing... My mom had the patience to sit and rock her, but I was like 'No way.'" (Tab 27, at ¶ 145.) And so, as she would do for the rest of Wendi's childhood, she abandoned Wendi and handed her over to others, in this case her mother and Skip, who stuck around for a few days after the birth.

151.  Although Donna emerged from her severe shut-down depression state, she remained overwhelmed and depressed. She recalls, "I had enough going on with losing my favorite dog, my husband almost never being there [or] providing money... and my mom telling me 'I told you so' about marrying Skip." Making matters worse, Wendi was "colicky for the first few weeks." Donna's default response was to avoid Wendi. When she did hold her crying baby, she was never able to sooth her, and sometimes cried along with her – not in empathy for her child, but in the misery of her own incompetence, helplessness and hopelessness. (Tab 27, at ¶ 148.)  Already predisposed to emotionally and physically neglect her new baby – thanks to her own history of childhood neglect and failure to ever bond with her own mother – Donna was additionally overwhelmed by her ongoing miserable and stressful marriage and a major postpartum depression.

SP&A 08464

000000489

P-App. 004790

152. Such depression and high maternal stress are known to exert major deleterious effects on developing infants. This is particularly true for their brains, which decades of research have shown depend as much for healthy development on emotional nurturance as physical care. Indeed, emotional bonding and nurturance – and lack thereof – can have large and lasting negative effects on neurotransmitter systems, circuits involved in emotion and mood, and other brain systems; this occurs through a variety of mechanisms including altered gene expression, with the quality of early relationships literally controlling which genes are turned on or off. Baby Wendi and her brain were not off to a good start, and what appears from the outside as "neglect" was, for her brain, nothing less than an intense and sustained assault by the very person from whom she was biologically programmed to receive vital nurturance. Fortunately, Donna's mother was able to calm Wendi down, and this almost certainly reduced the damage caused by her mother's depression, disconnection, incompetence and neglect. (Tab 27, at ¶ 149.) However, this was only for a short time.

153. **Donna's basic relationship to Wendi: Handing her off.** Only briefly did Wendi's grandmother give her at least some of the nurturing and soothing she needed but would never get from her mother or father. Donna's pattern of literally handing off her daughter to others – including men who emotionally, physically and sexually abused her – would continue for Wendi's entire childhood. Given how emotionally damaged and traumatized Donna was, an emotionally vulnerable and needy child was just too much for her – at least without intensive and competent support from the kinds of people (e.g., therapist, maternal-infant intervention specialist) who could help Donna develop the emotional and relational capacities required merely to be a *good enough* parent.

64

SP&A 08465

000000490

P-App. 004791

154. Donna conveys this just-too-much theme in recollections of her thoughts and feelings at the time, including her "No way" at the prospect of sitting and rocking her newborn, and her overall "didn't want to deal with her" attitude. To these disturbing anti-maternal statements we can add another that, even if never explicitly stated by Donna, sums up what can be understood as the "handing off" relationship that Donna always had with Wendi. That relationship necessarily was a triangular one, in which there was always another person to whom Wendi was handed, and in which Donna's thoughts, feelings and actions can be summed up: "I can't handle her. I don't want her. YOU take her."

155. **An infant's nightly terror and trauma.** Although Donna's mother often calmed Wendi down during the day, she did not protect Wendi from the nightly consequences of her parents' rigid interpretation and implementation of one particular piece of their doctor's advice. Donna recalls being told it was best for infants to go sleep early each night, so the parents could have "time for themselves." No matter where Wendi was in the sleeping-eating-wakeful-alertness cycles though which all infants continually go (based on their own internal clock), Donna and Skip put her in bed between seven and eight in the evening and, no matter what, left her there alone. Thus infant Wendi was left alone to "cry herself to sleep" every night.

156. After fifteen minutes or so of Wendi's cries, even Donna wanted to go to her. Skip said no. Although like Donna he had been neglected as a child, Skip was even more hardened and numb to others' suffering, perhaps due to the harsh Robertson family ethos and his combat-related PTSD. According to Donna, Skip would say no, she should not go to Wendi, who "just needs to cry." Donna, having no faith in whatever maternal

SP&A 08466

000000491

intuitions she could access, complied. Looking back Donna recalls, "From the time she was born until she was about a year old, it seemed to me that she regularly cried for hours before she went to sleep." (Tab 27, at ¶ 152.)

157. Parents cannot protect their children from all distress. Infants sometimes cannot be soothed, and parents sometimes reach their limits, especially at the end of the day. But being left to cry for hours on end, night after night, with no parental response or soothing of any kind – not even brief contact – constitutes destructive trauma for a developing infant's brain. Human infants and toddlers are incapable of regulating any but the mildest of their emotional and physiological states. That's what parents and caregivers are for. It's something they must consistently do for their babies, albeit imperfectly at times, if brain development is to proceed along a healthy trajectory. Like emotional neglect in general, discussed above, being left to cry for hours leads to cycles of overwhelming terror and disorganizing physiological arousal that give way not only to exhaustion (i.e., "crying herself to sleep") but also to extreme biological "shut-down" mechanisms and associated pathological states, including depression.

158. For an infant like Wendi, already genetically vulnerable to the depressive states of bipolar disorder, those states must have been extreme. When repeatedly subjected to the almost night trauma Wendi experienced, any infant will learn – through indelible conditioning of brain circuitries that mediate fear, attachment to parental figures and related processes – that contrary to millions of years of evolutionarily hard-wired expectancies, even panicked and sustained distress cries will often be met with no response at all. Although for infants such knowledge is not available in words or for conscious reflection (as it could be for an older child), it is no less devastating. In fact, as

66

SP&A 08467

000000492

decades of research on humans and other mammals has shown, because such knowledge is etched into evolutionarily older and more "primitive" brain regions, and because it comes before words or reflective awareness, it has large and permanent negative effects on emotional and relational functioning.

159. Donna also reports that, because Skip was not out on the road trucking when they lived in Groom, many days and nights infant Wendi was exposed to screaming fights between her and Skip. And like Donna as a child, Wendi also overheard or witnessed occasional though not severe physical violence between her parents, usually with Skip pushing Donna or throwing Donna down as she tried to stop him from leaving in the midst of a verbal altercation. (Tab 27, at ¶ 151.)

160. **Return to Phoenix.** Donna remained depressed and miserable in Groom, and recalls that when it snowed there in September, a few weeks after Wendi's birth, she put her foot down and insisted they go back to Phoenix. They moved into a tract house in a Phoenix suburb. Skip returned to truck driving and wasting his earnings on heavy drinking and womanizing. Donna's mother went back to work, but continued living with Donna and Wendi and paying the bills for a few more months. (Tab 27, at ¶ 153.)

161. Being back in Phoenix was a big relief for Donna. She remembers that Wendi "stopped being colicky" and "calmed down" as well. Donna attributes this to the lifting of her own extreme stress and misery, and to Wendi no longer being exposed to Skip "in my face yelling at me all the time" because he was on the road again (Tab 27, at ¶¶ 153-155.)

162. Such changes were relative, however. Thanks to her own history of neglect and trauma and ongoing stressors, Donna remained emotionally disconnected from her baby.

SP&A 08468

000000493

She was still uncomfortable giving Wendi baths, which she left to her mother and Skip when he was home. (Tab 27, at ¶ 155.) And although Skip was not around to scream in her mother's face, several of Skip's brothers and his father lived nearby, which for Wendi meant ongoing exposure to a new and much more serious threats – from which her mother would not protect her.

163. **Ongoing neglect by mother.** For the first few months back in Phoenix, Donna did not work and had primary responsibility for Wendi. (Tab 27, at ¶ 154.) This meant that most of the time Wendi was stuck with her emotionally disconnected and neglectful mother. In December of 1970 Donna got an office job and started working full time, five days a week (Tab 27, at ¶ 158; Tab 68; Tab 68B.) With Donna's income, which unlike Skip's would not be wasted on alcohol and other women, they could afford their own home. Donna, Skip and Wendi moved into a house on the west side of Phoenix just before Christmas, and Donna's mother Ann moved into her own place a few blocks away. They would live there until Wendi was about two years old, when they moved because their home was to be demolished for a highway expansion. Donna asked for and was granted a transfer to the Tempe office of her company and they moved there. Donna's mother did not follow them and never came to Tempe to care for Wendi, who went to a Montessori preschool during the day and a 24-hour day care many nights during the week and on weekends. (Tab 28 at ¶¶ 22-23, 25)

164. Indeed, in a pattern that would continue until Wendi started kindergarten, Donna worked full-time during the days and in the evenings was almost always volunteering, working, taking classes or going out to bars. This meant that on weekdays Wendi was in preschool and on nights and weekends she was either with a baby sitter, in

68

24-hour day care (sometimes days at a time), or with random people who happened to be working or hanging around where Donna was volunteering or working. (Tab 28 at ¶¶ 22, 25, 32, 41, 42.) Looking back on the first five years of Wendi's life, Donna describes herself as "overwhelmed and distanced" from Wendi and "absent a lot." She usually spent no more than an hour or two a day with her daughter, and even then spent little time actually focused on Wendi or interacting with her. Donna acknowledges that during this time she "didn't really think about Wendi." She blames her attitude and behavior then on "trying to help my marriage" and "working so much to try to get by" – with some justification, but also in denial of her limitations as mother stemming from her own neglectful and traumatic childhood. (Tab 27, at ¶¶ 160, 178.)

165.  Despite her emotional and physical neglect of her daughter, Donna recalls being pained that Wendi called her grandmother "Mom" long before ever addressing Donna that way. But given how damaged Donna was, and the absence of support for becoming a competent mother, that pain would not motivate a change of heart or behavior.

166.  Consistent with Donna's account of neglect so severe that she failed to "really think about" her daughter, when I interviewed Donna what was most striking, and most disturbing, was this: When asked for memories of Wendi as a baby and young child, Donna almost exclusively reported memories of Wendi being with *other* people (e.g., her mother Ann, a co-worker, an elderly male owner of a furniture store near where Donna worked, even strangers from whom Wendi panhandled as young as four years old). It was something I had never encountered in ten years of interviewing mothers of people on death row. Yet it was totally consistent with the way Donna always handed off Wendi to others, including people who could be, or definitely were, dangerous to her daughter.

69

SP&A 0847U

000000495

167. **"Mental" father, alternately absent and harshly controlling.** Although Skip was around far less than Donna, his mental state and behavior during Wendi's first years of life had direct and indirect effects on her well-being, even when he was on the road. Donna continually refers to Skip as "mental" – that is, crazy – during their time together. She recalls that after Wendi's birth Skip was still "out drinking all the time," even when he was back from trucking runs. Also, although his PTSD was not as bad after Wendi was born, he still regularly had nightmares and woke up "sweating, all tangled up in the sheets and bedding from thrashing around" while dreaming of war. (Tab 27, at ¶ 163.)

168. What Donna means by Skip being "mental" is conveyed by things he did in the year or so after Wendi's birth, both at home and on the road. Donna recalls that Skip was often "creepy" around her. She recounted a specific incident in which he stared through the keyhole in the bathroom door as she used the toilet and through the door asked what she was doing in there; and how, in classic Donna fashion, she tried to ignore him, did not respond, and never asked him about what *he* was doing. (Tab 27, at ¶ 163.)

169. In May of 1971, when Wendi was eight months old, Skip was arrested in Ohio for an episode of drunken, hapless and bizarre criminal behavior. Indeed, the local Ohio newspaper's account of the crime, entitled "If... if...if..." (with such descending font sizes), provides some comic relief in this otherwise serious report:

> "If Shelby Robertson, 23, of Phoenix, Ariz., hadn't parked the truck he was
>
> driving in Garfiend Heights last Thursday and met some friends in a bar
>
> and...

SP&A U84/1

000000496

P-App. 004797

"If they hadn't dropped him off near Union and Broadway in Bedford, and…

"If he hadn't opened the unlocked back door of the Tilman Goad home at 11 Taylor Road and taken $4 from a purse on the kitchen table, and…

"If he hadn't wakened the husband and wife while continuing through the house, and…

"If Tilman Goad hadn't chased him out of the house with a baseball bat, and…

"If the car Robertson flagged down hadn't been a police cruiser…

"Then he would not now be charged with a night burglary of an inhabited dwelling.

"Robertson told Bedford Police that he sometimes 'does screwy things' when he drinks. To this, police who saw him trying to eat dollar bills (the evidence) in the patrol car, can attest."  (Ohio Newspaper Article, Obtained by Capital Case Project.)

170.  In Skip's implausible and also (although less) amusing telling, it was all just a big misunderstanding on his part: He was duped by some guys he had been drinking with, who dropped him at the house and told him to go inside because they would be coming in to have something to eat with him; and only *after* the man came after him with a baseball bat, but *before* he took off running in fear, did he grab some dollar bills that happened to be laying on the kitchen table and that he innocently believed he had left there himself. (Tab 32, at ¶ 38.)

171.  When Skipped returned from Ohio and Wendi was around eleven to fourteen months old, he tried working a nine-to-five job at the same company as Donna, Stewart

000000497

SP&A 0841/2

Title & Trust. As Skip recalls, he took the job "trying to please Donna.... but it just was not for me. I was not a nine-to-five guy. I had to be outside, doing something." (Tab 32, at ¶ 34.) Skip lasted a week or so (making $150.60) before going back to trucking. (Social Security Earnings Records of Shelby Robertson.). Although Skip was not a daily presence in Wendi's life, when home he implemented the Robertson brand of parenting on his daughter. Donna remembers Skip as extremely hard on Wendi, both physically and emotionally, harshly dominating and controlling her with violence and fear throughout her infancy and early childhood:

> "Whether he was drunk or not, Skip was tough on Wendi when she was an infant and toddler. When he wanted her to do something, she did it. If she was fussy he used a rough voice with her and she stopped it. He trained her like a dog, not a baby. He spanked her from the time she as an infant and toddler, including when he was potty training her from the time she was a few months old until she was ten months old. If she didn't obey or so something when he told her to, for example if she was crying and he told her to stop, he spanked her, a good smack with his hand on her butt." (Tab 27, at ¶ 164.)

172. When I asked Skip whether he "had any role" in Wendi's potty training, he categorically replied, "No. Her mom did all that. Women raised kids, the dad didn't. I just wanted to play with her." But just five minutes later, when asked, with acknowledgment that early potty training was not unusual in those days, how it came about that Wendi was potty trained by twelve months, Skip proudly gave a detailed description of what he had done whenever he was home: whenever he saw "that look on her face" that indicated she was urinating or defecating, he immediately picked her up, took her to the bathroom and

SP&A 08473

000000498

put her on the toilet; every time he realized that she had already urinated or defecated in her diaper, he took her to the toilet, made her sit on it, and pointed from the diaper to the toilet to reinforce the message. Skip not only described in detail his potty training behavior with Wendi, but said he had learned these methods by helping to care for his nieces in Texas while living with them for a while as a teenager.

173.   Left out of Skip's account, but elaborated upon by Donna, is the tone of voice Skip used to potty train Wendi and otherwise control her: "He used a rough, angry, harsh voice with her when ordering her or training her while she was younger than a year old. It was more than just a stern voice; it was a voice you would be afraid of." (Tab 27, at ¶ 161.)

174.   Skip himself told a story of getting Wendi to stop crying by spanking her when she was only an infant. As Donna described, Skip was unmoved by baby Wendi's hours of crying and suffering once she was in bed for the night; indeed, he prevented Donna from going to her even briefly, and said that Wendi "needed" to cry herself to sleep. In the story Skip told me, Wendi's crying was a problem for him, but only because he and Donna had brought her to a drive-in movie. They could not hear over her cries, and were forced to go back home without watching the film. Skip recounted with pride how, after they returned home and baby Wendi continued to cry, he harshly said to her, "I'll give you something to cry about" and slapped her behind. He then mimicked her surprised facial expression as she suddenly looked at him in shock, and proudly declared, "That got her attention." He then continued, saying that she stopped crying immediately and did not cry again that night. Skip ended this story with a demeanor of complete confidence, even smugness, about his allegedly highly effective parenting skills.

73

SP&A U84/4

000000499

175. Such treatment by a parent has negative effects on any young child. The effects on little Wendi were shaped by her mother's almost complete neglect of her, which created a powerful longing for whatever scraps of love – or at least of attention and affection – she could get. The result was a compliant little girl who sought to please adults who might be sources of attention, affection, or harsh punishment. As Donna recalls, "She was a compliant child and he didn't have to tell her or spank her more than once or twice at any given time to get her to obey. Even at that age Wendi was already trying to make everybody happy." Tab 27, at ¶ 164.) In Donna's interview with me too, she described young Wendi as "very accommodating" and doing whatever Donna said as well. There was, however, one exception, which will be returned to below: "She wouldn't go to sleep in anyone else's bed." Indeed, in Donna's recollection, "That was the only thing she didn't want to do," and "the one thing she wasn't easy with."

176. Here the focus is on Wendi's father's harsh control and dominance and how, along with her mother's neglect, it powerfully shaped her personality and behavior, laying down patterns that would shape her emotional life and relationships into adulthood. From infancy until she was four years old (and through her entire childhood), three powerful messages or "lessons" were conditioned into Wendi's brain: First, do what the easily angered and potentially violent people want, and don't do anything to make them unhappy. Second, you are on own with such people, because your mother – if she even notices – will not protect you, and would rather not know what you are going through. Third, if you do *not* do what others want, i.e., take care of them and meet their needs, then you are bad child, a bad person, and unworthy of love. Such neglect and fear-based domination also cause – by damaging multiple brain circuits – life-long problems

74

with anxiety, social and emotional awareness, regulation of emotions, and management of interpersonal intimacy, including both caring and conflict.

177.  Whenever asked for his memories of Wendi during this time, Skip describes her in his typical superficial way. For instance, "I remember Wendi as a beautiful baby and a good kid. She walked by the time she was a year or less and we took her bottle away when she was a year old.  She was completely toilet trained by fifteen or sixteen months. She jabbered all the time and by two years old she was a pretty good talker. She was a smart kid." (Tab 32, at ¶ 33.)  Another example, which he offered when remembering times that he, Donna and Wendi went boating and fishing when she was three or four years old: She was "a quick learner and never cried," and, strangely, "I loved the devil out of her." (Tab 32, at ¶ 43.)

178.  Although little Wendi had disturbed, neglectful and abusive parents, as well as a genetic vulnerability to depressive states, Donna's and Skip's comments also reveal that like all children Wendi had innate needs – and abilities – to connect with others, to play, and to feel happiness.  Donna recalls that after they moved from Groom to Phoenix Wendi became a "happy baby," and that Skip's brothers, who saw her "every couple of weeks or so," nicknamed her "Happy Jack." (Tab 27, at ¶ 155.) When living in Phoenix for several months neither of Wendi's parents spent much time with her, and she was cared for by others. Although this constituted neglect by her parents, it was not the worst, Romanian-orphanage level of neglect (i.e., being left alone in a crib). Also, it meant Wendi was lucky enough to spend time with some benign and perhaps even positive adults (at least in relationship to her), as well as other playful children.

75

SP&A U84/6

000000501

179. **Cruelty by the Robertson men.**  By two years of age, on top of the neglect and abuse within Wendi's immediate family, there was repeated exposure to another psychologically toxic environment: the extended Robertson family. It was a family where children were seldom loved or nurtured, especially in any emotional ways. As Skip, Wade Robertson and Deblen Oke have revealed, it was a family where children always "ate last," both literally and figuratively. For adults who had grown up in that family being severely neglected and abused themselves, the emotional needs of children were unfathomable, even threatening.  Thus children's feelings – especially vulnerable ones like sadness, fear or shame – were met not with concern, understanding or empathy but with indifference, irritation, scorn, violence, or uncaring bemusement.

180. As Skip recalls, once they moved to Tempe, when Wendi was two years old, her maternal grandmother was not around much and the family "spent a lot of time with my dad and brothers." Skip then indicates, in vague terms, what this meant: "When we all got together, we had backyard cookouts and did lots of drinking." (Tab 32, at ¶ 36.) For little children like Wendi, spending time with the Robertson family meant being surrounded by drunken adults who, even when sober and at their best, were dangerous to children – the men, predatory seekers of sexual and aggressive thrills, the women emotionally disconnected, neglectful and largely resigned to their children being abused by those men.

181. Donna recalls an incident when Wendi was about two years old, where Skip and his brothers took Wendi and her swimming at a mobile home park, and their thrill-seeking took a particularly cruel and heartless turn. In her interview with me, Donna recounted how Skip's brothers, precisely because they knew Wendi could not swim,

76

SP&A U84/1

000000502

P-App. 004803

repeatedly "taunted" and "goaded" Skip to throw Wendi into the middle of the pool. Knowing full well this would terrify Wendi, they kept saying things like "she's gotta learn to swim sometime." Indeed, the very nickname the brothers had given Wendi, "Happy Jack," betrays their bemused sadism. "Happy Jack" was at the time a popular song by "The Who," a big rock and roll band of the late 60s and early 70s. It had this chorus:

> "The kids couldn't hurt Jack,
>
> They tried and tried and tried.
>
> They dropped things on his back,
>
> They lied and lied and lied and lied and lied.
>
> But they couldn't stop Jack, or the waters lapping,
>
> And they couldn't prevent Jack from feeling happy."

Apparently, Skip's brother's thought it would be funny to see if little "Happy Jack" would not be so happy when she suddenly found herself in the middle of the pool.

182.  Skip obligingly threw her in. Donna still vividly remembers Wendi "screaming, flailing, and going under the water." (Tab 27, at ¶ 176.)  She also remembers passively witnessing the entire scene, saying nothing to Skip or his brothers – not as they goaded him into throwing her in, not as they laughed at Wendi's terrified response to what her brain could only process as threat of death by drowning, and not after Wendi was fished out.  Still, even Donna could not help but respond with fear and anger to this sadistic abuse of her child right before her eyes. Yet she did nothing. "I didn't dare confront them, especially all of them together at one time, so I didn't intervene to stop them…" (Tab 27, at ¶ 176.) When I asked Donna if she talked with Skip about this incident later,

77

SP&A U84/8

000000503

she said no. She then elaborated, revealing another key factor that accounted for her neglect of Wendi, specifically her inability to talk about such things, or any sources of conflict in the marriage, with any competence or effectiveness. Donna explained: "We didn't discuss things, we never knew anyone who discussed things. We just screamed, or pretended it didn't happen, or forgot about it."

183. **Sexual abuse by the Robertson men.** The pool of the mobile home park was a public place, and the brother's abuse of Wendi was out in the open. Cookouts and other events at a Robertson brother's house were an entirely different matter, and much more perilous for little Wendi. As Skip recalls, when Wendi was two to four years old she, Donna and he "spent a lot of time with my dad and brothers," including at "backyard cookouts" that involved "a lot of drinking." (Tab 32, at ¶ 36.) Donna too says they "spent a lot of time around Skip's brothers and dad," including watching ball games at a brother's house and getting together on holidays. Also consistent with Skip, Donna remembers that "the women cooked and the men drank alcohol." (Tab 28, at ¶ 17)

184. For most of the three years Wendi attended these family events, she was the youngest child of the Robertson clan, thus the most vulnerable. Looking back now, Donna acknowledges her neglect and oblivion at the time: "When Wendi was around the Robertson brothers, I usually cooked in the kitchen or talked with the other wives, and didn't pay much attention to Wendi or provide much supervision over what was going on with her. Skip's dad and brothers could easily have had sexual access to Wendi." (Tab 28, at ¶ 17.)

185. Donna recalls going on hunting or fishing trips with Wendi and Skip, on which they were sometimes joined by one or more of Skip's wives and brothers. These trips

78

SP&A 084/9

took place "from time to time" when Wendi was about two to four years old. Looking back now, Donna says, "Again, there were plenty of times while camping or fishing that Skip's brothers could easily have had sexual access to Wendi." (Tab 28, at ¶ 19)

186. Donna also admits to having heard and seen, despite not wanting to know, plenty of evidence of the danger to Wendi. "Sexual abuse of kids was part of the culture of the Robertson family…. The women in the family, myself included, talked about it on occasions when the men weren't there." (Tab 27, at ¶ 165.) The women were especially aware that Skip's father sexually abused girls, even infants:

> "[I]t was treated as common knowledge in the Robertson family that Skip's dad touched babies and toddlers sexually when there was an opportunity. The Robertson family considered Skip's dad a dirty old man. This came up in the family in early 1971, when I was twenty-two years old and Wendi was still less than a year old, when there was talk among the wives and women in the Robertson family that Skip's dad was touching Glen and Ophelia's baby. Within the first few months of moving to Phoenix, while Wendi was still a baby, Ophelia told me, 'Don't ever leave Wendi with her grandpa because he's a dirty old man and you don't know what he'll do with her.'" (Tab 27, at ¶ 165.)

Donna also remembers that from when Wendi was an infant to about two years old, Skip's father frequently asked her to let him babysit Wendi. (Tab 28, ¶ 20.) From her statements it appears that, after having been warned so forcefully by Ophelia, Donna did not allow him to, and that this was the *only* thing Donna did to protect Wendi from sexual abuse during those years.

000000505

187. Donna also recalls that she personally witnessed "inappropriate incidents and behaviors" by Skip's father and brothers, including "how [they] regularly hugged and kissed girl children on the mouth" and engaged in "inappropriate grasping or touching" when they held or picked up girl children. She adds, "Even with me being mostly oblivious and trying not to notice anything I considered creepy, I knew that the ways the adult Robertson men treated girl children in their family were definitely not kosher." (Tab 28, ¶ 18)

188. Yet Donna repeatedly left Wendi with no supervision in the Robertson brother's houses. She often had no clue where Wendi was or what she was doing, sometimes for hours at a time, during parties and other events where those same men were drinking heavily. As Donna herself says – and as we shall see, consistent with her behavior throughout Wendi's childhood and adolescence – her *modus operandi* as a neglectful mother was "trying not to notice." In short, she did almost nothing to protect Wendi from being sexual abused in situations where such neglect virtually guaranteed that such abuse would happen, at least sometimes.

189. Indeed, in Donna's recollections there was *only one time* that she actually became concerned Wendi may have been sexually abused by a man in the Robertson family. It occurred around February of 1971, when Wendi was about six months old. Donna joined Skip for a trucking run to Los Angeles and left Wendi behind with Ida Mae, the wife of Skip's brother Jerry Don. As addressed above, Jerry Don has been named as a repeat molester and rapist by both Deblen Oke and Charlotte McGuffee. Thus had Jerry Don been home or returned from the road at the time, Wendi would have been at risk for sexual abuse by him. Donna reports that when she and Skip returned three

SP&A 08481

000000506

P-App. 004807

days later, "we went to pick up Wendi from Ida Mae but found out that Wendi was with Skip's dad." (Tab 27, at ¶ 167.) She recalls that Ophelia told her that Skip's father "would have touched Wendi sexually while he watched her" that time. (Tab 28, ¶ 20). It was too much for Donna to ignore, at least initially, but not too much for her to rapidly push from her awareness: "I was concerned about Skip's dad having touched Wendi sexually while we were gone in LA but couldn't really focus on it." (Tab 27, at ¶ 167.)

190.  Skip recalls that "a few times" Donna joined him on trips to Southern California and other parts of Arizona and they left Wendi with his brothers. (Tab 32, at ¶ 34.)  Thus Skip's father and brothers could have abused Wendi during those times too, as well as during the numerous Robertson family cookouts, parties, and holiday get-togethers. There is no evidence that Donna ever considered the risks to Wendi at those times, or did anything to protect her.

191.  Donna recalls, "it was a foregone conclusion among the women within the Robertson family that Skip's dad had touched Wendi sexually while she was an infant and toddler." (Tab 27, at ¶ 167.) Donna also admits:

> "I did not think of it in those terms at the time or have any way to respond because I was doing everything I could to avoid having to deal with it and not noticing what was happening. I was part of the culture of the Robertson family in which the women strongly suspected that the men sexually abused girls and the women considered themselves helpless to do anything about it." (Tab 27, at ¶ 167.)

SP&A 08482

000000507

P-App. 004808

Similarly, in my interview with Donna, when I asked if she had ever attempted to protect Wendi from sexual abuse by the Robertson men, Donna's response was one of resignation: "In that family, they're just gonna take 'em."

192. Even so, Donna reports that eventually, without saying so explicitly to herself, she came to believe that Skip's father and brothers, even Skip himself, had sexually abused Wendi. "I remember that at one point I knew I did not want Skip, his brothers, or their dad to be around Wendi at all. I felt that she wasn't safe with them. With Skip and his dad, I strongly suspected without really saying it clearly to myself that they were touching babies and kids sexually. I didn't let the thought form at the time, but I felt that they had abused Wendi sexually. Many of Skip's brothers were so creepy that way, and I felt that they also touched Wendi sexually when she was a toddler or little girl." (Tab 27, at ¶ 177.)

193. Finally, Skip reports that he brought Wendi along with him and his brother Tommie on a trucking trip. He says Wendi was three or four years old at the time, which was while he and Donna were going through their divorce or soon thereafter. (Tab 32, at ¶ 50.) As presented above, Tommie is the same brother who later sexually abused the same step-daughter that Skip did, and like Skip was imprisoned for it. In fact, it was sexually explicit photographs of Skip's step- daughter that Tommie had taken as she slept in the sleeper compartment of his truck which led to the abuse being discovered. On the trip when Wendi was three or four years old, Tommie and Skip had Wendi for "a few days." Skip then adds, "I did not think anything of it at the time but Wendi… was in the sleeper compartment of the truck, in bed with Tommie. Looking back on it, I would not be surprised if Tommie molested her." (Tab 32, at ¶ 50.)

SP&A 08483

000000508

P-App. 004809

194.  **Behavioral evidence suggesting sexual abuse by age four.** As noted above, in our interview Donna described little Wendi as always "very accommodating," with one exception: "She wouldn't go to sleep in anyone else's bed." In Donna's recollection, "That was the only thing she didn't want to do," and "the one thing she wasn't easy with." This behavior is consistent with Wendi having been sexually abused in the bedrooms of Skip's father's or brothers' houses, including after being left by Donna to nap in those rooms.

195.  Stronger evidence is Donna report that just after she divorced Skip, around the time Wendi turned four, she was almost kicked out of daycare for sexual behavior with other children. There were two separate incidents in which daycare staff reported to Donna that Wendi was in the bathroom with other children and "comparing and showing off their private parts in a way that was very unusual for kids of that age." Even after the first incident, Donna recalls that the daycare staff were "really upset" when they called to report what had happened. After the second incident, the daycare staff concluded that Wendi was the instigator, and threatened to expel her from the program. (Tab 27, at ¶ 168.)

196.  In children who have been sexually abused, these are known as "abuse-reactive" inappropriate sexual behaviors. This is a common outcome of sexual abuse in young children, and it is not uncommon for the behavior to emerge after the abuse has ended, which would have been the case with here Wendi. In addition, that Wendi appears to have stopped engaging in those behaviors after being admonished by daycare staff and her mother (and perhaps beaten by her mother), would be consistent with sexual abuse of Wendi having ended, at least for a time, once the men of Skip's family no longer had

SP&A 08484

000000509

access to her, after the divorce.  Either way, Wendi's behavior is consistent with her

having been sexually abused, and Donna made no attempt to have Wendi assessed for a

history of such abuse and resulting psychological consequences, let alone any attempt to

get Wendi any psychological treatment.

197.  **Not just physical punishment, but beatings and pain to compel instant and**

**automatic obedience.**  Donna acknowledges using physical pain to discipline and control

Wendi from when she was a toddler into her teenage years, and says "Wendi was

spanked regularly while she grew up."  Donna also says that, thanks to Wendi's general

obedience and compliance, she did not "need" to be spanked every day or even every

week.  When Wendi was a toddler, as punishment Donna gave her "one or two swats" on

her buttocks with a wooden spoon.  When Wendi was three or four, Donna spanked her

with her hand.  (Tab 27, at ¶¶ 235, 236.)

198.  From Donna's description so far, there's nothing to suggest that her physical

disciplining of Wendi was unusual, abusive, or particularly harmful. But then Donna

reveals this: Behavior that was met with spanking, and the infliction of physical pain,

included "if she didn't obey me or didn't come when I called." (Tab 27, at ¶¶ 235, 236.)

199.  As research amply documents and parents of young children know, toddlers and

three or four year olds get quite absorbed in games and other activities, and it is

completely unrealistic to expect them to come immediately every time they are called.

Similarly, it is developmentally appropriate – and necessary – for toddlers and young

children to experiment with asserting their developing will, and this includes sometimes

disobeying their parents or "testing limits." Indeed, normal and healthy children cannot

even come close to meeting the unrealistic expectations Donna held and imposed on

84

SP&A 08485

000000510

Wendi; instead, the compliant behavior Donna describes is that seen in children *conditioned to live in fear* of being punished for not instantly obeying whatever parents say. Among the most important developmental tasks for young children, with which they need help and support from adults, is how to gain more autonomous control over their own attention and behavior while internalizing the rules imposed on them by parents. Parents who demand instant obedience and force children to comply with their rules and wishes by inflicting physical punishment and pain – even if it's not physical abuse involving bodily injury, of which there is no evidence here – actually *thwart* their children's abilities to develop internal regulation of their own behavior and *prevent* their children from internalizing the very rules and values they most want them to learn. Instead, the children learn only to obey and comply, out of fear, including the fear-based wish to please their parents.

200.  Wendi's parents' domination of her with the use and threat of physical punishment and pain would become more extreme in Wendi's later childhood and pre-teen years. But even in the first several years of Wendi's life, long before her parents as well as church and school staff began beating her regularly with wooden paddles, the pattern was set: Adults used physical force, violence and pain to control her behavior and command obedience, all the while making it harder for Wendi to internalize the very rules and values (other than "might makes right," which she no doubt learned) that her parents were ostensibly imparting to her.

201.  **Donna lost in alcohol, drugs and sex.** For much of the first five years of Wendi's life, Donna's tendency to grossly neglect her daughter was exacerbated by a descent into irresponsible sexual behavior and substance abuse, consistent with her

85

SP&A U8486

000000511

P-App. 004812

childhood trauma history and bipolar disorder. Donna describes how, from ages 22 to 24, when Wendi was one to three years old, she "drank frequently" and smoked marijuana with a neighbor. (Tab 27, at ¶ 87.) Then, just before and after her divorce from Skip, starting when Wendi was three and continuing until she was five, Donna "drank constantly," including throughout the week while she was working full time. Donna reports often drinking so much that she threw up. (Tab 27, at ¶ 88.)

202. During the period of constant drinking, when Wendi was three to five years old, Donna says she was also "very sexually active, terribly inappropriately so in my own opinion," and had sex "with at least ten different men, and there might have been a few more." (Tab 27, at ¶ 180.) For the most part they were men she met "casually," and the sex was mostly casual too. Indeed, with the exception of one brief boyfriend, Donna recalls that, like sex throughout her life, it was without emotional connection, or pleasure. "I didn't even like most of the men who I slept with," she says, and "I never really enjoyed sex, including during the entire marriage to Skip." Being so sexual was inconsistent with how Donna saw herself, and with how she was seen by people who knew her before that time. To this day Donna wonders how she had so much sex despite not enjoying it. (Tab 27, at ¶¶ 181, 182.)

203. Yet Donna unwittingly hints at what was going on: "Most of the time it was almost like it was going on without me." This speaks to the automatic and disconnected qualities of dissociative behaviors and experiences, which are common among adults severely neglected and traumatized as children. Just as she said, referring to her high school sexual experiences, that she did not want to "take responsibility for sex or admit what was happening," the same dissociative process was going on when Wendi was a

SP&A U8481

000000512

young child. It was the same dissociative way of coping that led, in the face of all the evidence that Skip's father and brothers were sexually abusing little Wendi, to Donna's response of "doing everything I could to avoid having to deal with it and not notice what was happening."

204.   The one person with whom Donna ever felt emotionally connected while having sex was a boyfriend she had for several months in 1973 or 1974. Still married to Skip but having decided to leave him, Donna had a romantic relationship with Ron and experienced him as her "soul mate and soul companion, the only romantic partner I've ever had who I felt really close to and trusted." Donna would never learn whether this was another example of naïve and wishful thinking on her part, and her one taste of feeling genuinely loved was short lived: Several months into their relationship Ron died in a plane crash. (Tab 28, ¶¶ 26-27.)

205.   **Overhearing fights between her parents.** Repeatedly witnessing and overhearing screaming between one's parents is disturbing and traumatic for children. The younger the child, the more confusing, overwhelming and traumatic it is. Donna reports that from Wendi's infancy until she and Skip divorced when Wendi was three years old, whenever Skip was not on the road Wendi regularly overheard fights between her parents. (Tab 27, at ¶ 170.) As noted above, Skip was seldom physically violent toward her, but they both "yelled a lot." (Tab 27, at ¶ 150.) However, Donna describes what Skip said when he screamed as "vicious and verbally abusive," and how she "usually retreated into the bedroom before too long into a fight because I didn't want to say something I might regret," either because it was too "hateful" or because it would "push Skip over the edge to the point that he would hit me." (Tab 27, at ¶¶ 150, 170.) By

SP&A 08488

000000513

the time Wendi was born Donna had already learned "what I could get away with in fights without him getting so mad that he snapped and hit me." (Tab 27, at ¶ 151.)

206.  According to Donna, a common precipitant of the fights was Skip coming home drunk and wanting to have sex and her not being interested. However, she recalls, in words almost identical to those of the step-daughter Skip would sexually abuse twenty years later, "Most of the time I just did it with him anyway because that's what he wanted and if he didn't get it then he became extremely abusive with words and threats." These fights became worse after they moved to Tempe when Wendi was about two years old. (Tab 27, at ¶ 169.)  Apparently one of the reasons Donna was less interested in having sex with Skip then was because she was often having sex with other men, including men she met through her neighbors with whom she was drinking heavily and smoking marijuana.

207.  Skip's recollections of this time are consistent with Donna's: "We had a hard time communicating. We were also growing apart. She was going to potluck dinners and socializing with people who I did not like back then.... I thought of them as hippies and draft dodgers." (Tab 32, at ¶¶ 35, 44.)  Of their sex life, Skip recalls, "I knew things were not good in our sex life anymore because Donna always seemed like she just wanted to get it over with." (Tab 32, at ¶ 45.)

208.  Put differently: Donna's chameleon-like conformity to her social surroundings (which in Tempe meant drinking, drugging and casual sex with her early-1970s "hippy" neighbors) clashed with Skip's rigid clinging to his older brothers and their culture of heavy drinking, sexual conquest of women, and sexual abuse of young girls. But it was

88

SP&A 08489

000000514

little Wendi who paid the greatest price for her parents' constant conflicts and screaming fights, in addition to their more direct neglect and abuse of her.

209. **Divorce.** In May of 1974, when Wendi was three years and eight months old, her parents divorced. Donna and Skip both claim to have initiated the divorce. Contemporaneous legal documentation shows that Donna petitioned for it. (Petition for Dissolution, Superior Court of the State of Arizona, May 2, 1974, Obtained by Capital Case Project; Decree of Dissolution of Marriage, Superior Court of the State of Arizona, May 28, 1974, Obtained by Capital Case Project.)

210. Looking back, Skip provides a typically superficial yet revealing summary of why they divorced. In addition to the comments about her hanging out with hippy friends and not wanting to have sex with him, Skip acknowledges that he was "drinking too much" and "generally dissatisfied." He recalls that they both "had a hard time communicating" and that Donna "held things inside for too long." More importantly, it appears, was the fact that he "was itchy" and "wanted to get out and live life" when "things became routine and I felt like we were eighty years old." (Tab 32, at ¶¶ 44, 45.)

211. Given his traumatic childhood and the resulting ongoing addictive and antisocial behavior he shared with his brothers, Skip never had it in him to be a physically present, caring and competent parent. Neither did Donna, thanks to her own awful childhood and the resulting ongoing emotional and behavioral pathologies.

212. But once the divorce happened, Skip ceased trying or pretending. Although he claims, "if it was not for Wendi, I would have been gone sooner," within a year of the divorce, after Donna and Wendi moved to Casa Grande, Skip says he "signed my rights away" when Donna asked him to give up any claim to custody. Skip says he realized at

89

SP&A 08490

000000515

the time that "being on the road all the time was no way to raise a kid," and that when he gave up on being a father to Wendi he thought he was "doing the right thing." (Tab 32, at ¶¶ 45, 46.) Indeed, Skip reports that he only visited Wendi on two occasions after the divorce, when she was five and six years old, in 1976 and early 1977. He never made another attempt, and blames this on Donna, saying that because Donna made him feel unwelcome the last time he spent time with Wendi, he never came again. (Tab 32, at ¶¶ 53, 54.)

213. **Mother's neglect in workplace environments dangerous for unsupervised children.** When Wendi was almost four years old, around the time of the divorce, her mother got a job at Comcare, Inc., a program of Community Organization for Drug and Alcohol Counseling (CODAC), after they had moved from Tempe back to Phoenix and were living with Donna's mother again. (Tab 68; Tab 68.B.; Residence Chronology provided by Donna Ochoa, Obtained by Capital Case Project.)

214. Since Wendi was two Donna had volunteered at Terros House, another CODAC program. In her interview with me, Donna spoke of feeling much more comfortable with the drug counselors and recovering addicts in these programs than with Skip and his family. She remembers feeling, for the first time in her life, "These people love me." When Wendi was two and three years old, Donna volunteered and worked on weekends. During Donna's time working in paid positions at CODAC (not at Terros), she would bring Wendi along on weekends and leave her in the care of the recovering addicts on the premises. Donna remembers not paying attention to where Wendi was, although she knew that the clients, especially the prostitutes, many of whom had lost custody of their own children, "loved Wendi."

90

SP&A 08491

000000516

P-App. 004817

215. No doubt many of the clients at the drug and alcohol treatment programs felt very affectionate toward little Wendi. Some may have been protective of her. That Donna would bring her daughter to such places and not even attempt to keep track of her whereabouts is just one more example of how neglectful she was as a mother. Looking back now, Donna says "I wasn't really paying attention to what she did and wasn't concerned about her safety with the hookers and drug addicts." At the time Donna rationalized this by focusing on how "there was always a CODAC employee supervising rehab," but looking back now, she says, "I think I was an idiot or very naïve to let Wendi hang out with those people, but at the time I had no clue that it wasn't appropriate." (Tab 28, ¶ 42).

216. Just as Donna had repeatedly given Skip's father and brothers access to Wendi, soon after finally divorcing Skip in the spring of 1974, Donna would give another man she came to know was a pedophile virtually unfettered private access to Wendi. His name was Rick Barnes, and he was the director of the Pinal County Alcohol and Drug Abuse Corporation (PADAC) in Casa Grande.

217. Soon after Wendi turned four years old, in the fall of 1974, Donna met Rick at a conference and he recruited her to work at PADAC. (Tab 28, at ¶ 46) In November and December of 1974 Donna commuted between Phoenix and Casa Grande working for PADAC (Tab 28, at ¶ 50). Because Rick paid her under the table, as he would for most of her work there over the coming year and a half, there is no Social Security Administration record of those months or most of her other months at PADAC. Donna's work for PADAC only exacerbated her chronic neglect of Wendi: She worked 60-hour straight weekend shifts in which she received, monitored, and helped drunken alcoholics,

SP&A 08492

000000517

P-App. 004818

with no more than a couple of hours of sleep and sometimes no sleep at all. Then Donna "crashed" and slept most of Monday and Tuesday. She also wrote PADAC grant applications on Tuesdays, Wednesdays and Thursdays, and otherwise slept a lot, right through Friday mornings before the cycle started over again. Inevitably, as Donna recalls, she "had very little energy, time, focus or other personal resources to give to Wendi during this time." (Tab 28, at ¶¶ 51 and 52.)

218.  By January of 1975, Donna and Wendi had moved to Casa Grande and were living with Rick's ex-wife Nicki Barnes and her daughter Tascha, who was two years younger than Wendi and quickly her best friend.  Both Nicki and Donna were "so busy and overwhelmed that neither of us paid much attention to the girls," who were mostly on their own but sometimes looked after by an older woman neighbor, though Donna was so oblivious that she did not realize this for several months. (Tab 28, at ¶¶ 54, 59.) As had been the case at CODAC, after moving to Casa Grande Donna sometimes brought Wendi along to PADAC on weekdays and weekends and pretty much forgot about her once she started working. Again Wendi was left to wander among the drug addicts and prostitutes hanging around the center, as well as the nearby streets, where she often begged for change – all unbeknownst to her mother until months later, in April. (Tab 27, at ¶ 183; Tab 28, ¶ 56)  Looking back now, Donna recognizes just how neglectful she was: "It never dawned on me that having Wendi out there alone, begging in the streets or going over to [the nearby furniture store]… might be dangerous to her because of car traffic or any number of things, or that she might be molested by a stranger or someone she met in the neighborhood." (Tab 28, ¶ 56). (Apparently it did not dawn on her on Donna before Wendi graduated from high school, as indicated by an entry in a "Treasured Memories"

92

SP&A 08493

000000518

booklet she gave Wendi as a graduation present, in which Donna characterized her four year old daughter's roaming and panhandling alone on dangerous streets as endearingly "precocious." In the booklet's first entry, Donna completes "Remember when" with a hand-written "you used to go out from the Drug Center and 'panhandle' on the streets of Casa Grande. You were such a precocious child!" (Treasured Memories booklet, obtained by Capital Case Project.)).

219.  Rick Barnes, her boss and the director of PADAC, was a pedophile, as Donna had discovered before even moving to Casa Grande. While commuting to work weekends during November and December, Donna sometimes slept at Rick's house on Monday mornings. On one of those Mondays she rummaged through Rick's things and found paperwork from a school in Thailand where he had lived and worked the prior year, teaching English to children of Americans. The documents explicitly stated that Rick had been fired after multiple accusations that he had sexually abused preteen girl students. (Tab 28, ¶ 62). Donna recalls her response: "I just ignored the whole situation and stopped thinking about it, like I've done throughout my life when I've known something bad or unsavory about another person." (Tab 28, ¶ 63). She also discovered that Rick had a box full of bottles of amphetamines and benzodiazepines, common prescription drugs of abuse, all prescribed to people who were not PADAC clients, which meant Rick was illegally obtaining and selling them on the street. (Tab 28, ¶ 61.)

220.  Despite these discoveries, Donna decided to continue working for this dangerous man, moved to Casa Grande with Wendi, and proceeded to bring her four year old daughter to work, where "Wendi was regularly alone with Rick and spent time alone with him in his office on weekdays and weekends." (Tab 28, ¶ 65). Wendi also spent time

93

SP&A U8494

000000519

alone with Rick at his house, while Donna slept on Monday mornings after her 60-hour weekend shift or was "otherwise busy and not paying attention." (Tab 28, ¶ 66). Did Wendi being alone with Rick concern Donna? No. Despite what she knew about him being fired for sexually abusing girls in Thailand, "It didn't occur to me that he might abuse her sexually.... I didn't really think about it, but to the extent that I did, I assumed that he wouldn't abuse Wendi sexually because she was so young." (Tab 28, ¶ 65).

221.   By then Wendi knew that her mother was not interested in her, let alone any of her experiences or problems; and by then, thanks her mother's neglect and her father's complete departure from her life, Wendi was vulnerable to sexual predation by adult men who gave her *some kind* of attention and affection.  Indeed, as suggested by ample research on the re-victimization of sexually abused children, as a maternally neglected child who had already manifested signs of sexual abuse, including age-inappropriate sexual behavior, Wendi would likely have been a particularly vulnerable and compliant victim.

222.   Soon after moving to Casa Grande, Wendi caught the attention another deeply disturbed, sexually perverted, pedophilic man.  His name was Alejo Ochoa, and he served on the PADAC Board of Directors.  Within a few months, Alejo would be sleeping in the same bed as Wendi.  Within six months Donna would marry him.

223.   **Wendi's memories from before age five.** The region of the brain responsible for encoding long-term memories of specific events (i.e., the hippocampus) does not develop sufficiently to reliably encode such memories until around age five.  Thus Wendi Andriano should not be expected to have any autobiographical memories (also known as

SP&A 08495

000000520

explicit episodic memories because they are self-consciously recognized as memories of prior episodes or experiences) for experiences before she was four and a half years old.

224. Consistent with this, in my interviews with Wendi, when asked for her "earliest memory" she reported a memory from about age four and a half. Wendi remembered her grandmother, Donna's mother Ann, sharing her milk and toast with her one morning. She then added, "If I try to remember a mother figure, I remember her and not my mom," and "I know she loved me."

225. Wendi's comments are also consistent with her mother's severe emotional neglect of her. When asked for early memories of her mother, Wendi remembered her mother sewing clothing for her when she was in kindergarten, but the memory had none of the emotional warmth and feeling of connection associated with the early memory of her grandmother. Sewing her clothes was like keeping her clean, reminiscent Donna's observation that her own mother kept the house clean but "I had no emotional connection with her, no hugging, no cuddling, no warmth, no affection, no bond." (Tab 27, at ¶ 46.) Indeed, when Wendi attempted to remember things she did with her mother, she spontaneously commented, "I don't believe my mom was too emotionally available" and "I don't have that feeling that she loved me," then began crying. Wendi also remembered being very sad when she seldom saw her grandmother after they moved to Casa Grande when she was four year old (see below). Wendi reported no memories at all of her father, who, by the time Wendi was four years old, had divorced from her mother and almost never visited her.

226. Thus consistent with the development of the brain's memory capacities, from before age five Wendi has few explicit, autobiographical memories of the most

SP&A 08496

000000521

P-App. 004822

psychologically important people in her life during that time period, i.e., her parents and grandmother. However, the brain regions and circuits that encode *implicit* memories, of emotional experiences and automatic emotion-related behaviors, are operational from infancy. Those brain regions lay down memories that, although not recognized as memories by the person having them (i.e., this is why they are called "implicit" rather than "explicit" memories), constitute patterns of feeling and responding to others' behavior that shape psychological, emotional and relational functioning for the rest of one's life.

227. To clarify: Implicit memory is a type of memory that people do not consciously experience or recognize as "memory" when it is present. This includes the memories of previous experiences that allow us to perform a current task without having conscious awareness of those previous experiences. For example, riding a bike requires remembering where, when and how to move all four limbs; but we do not remember learning those specific procedures, or even think consciously about most or all of those movements. Importantly, implicit memory also includes bodily and emotional responses to incoming stimuli and situational contexts. Such implicit memories/responses (a) are not consciously experienced or recognized as "memories" and (b) are not consciously associated with memories of past experiences or autobiographical episodes; they may also (c) alter current processing of sensory information, (d) alter the contents and nature of one's current thoughts, and (e) evoke simple and/or complex emotions and behaviors that one has no idea are related to past experiences and memories. For example, as her mother and numerous other witnesses report, Wendi tended to automatically respond to others' anger or displeasure — and even a hint that displeasure or anger might be

SP&A 0849/

000000522

forthcoming, especially from a man – by placating, submitting or otherwise doing whatever might help that person feel better or at least stop being irritated or angry.

228.  Sometimes all of us, in response to other people's behaviors (as well as their actual and imagined thoughts, emotions and motivations), have reactions (and over-reactions) that are driven by implicit memories associated with past experiences of feeling vulnerable or hurt in important relationships (especially with childhood caregivers). For people with histories of repeated emotional, physical and/or sexual abuse in childhood, such implicit memories of being hurt tend to be triggered often; those implicit memories are also more likely to be extreme in their intensity, and to elicit to behaviors that bring suffering upon themselves and others. And like the rest of us, but to a greater degree, in such situations where implicit memories of a past hurt are triggered, people with histories of major childhood trauma are unaware that they are responding not merely (or even primarily) to the current situation or interaction, but instead are responding mostly to an implicit memory of a past painful (and sometimes traumatic) experience.

229.  Indeed, many of the painful emotions that people experience – or go to great lengths to avoid experiencing, often without realizing it as they reach for a bottle, or in Wendi's case go into automatically appeasement mode – are merely the "tip of the iceberg." That is, many painful emotions we all experience are manifestations of implicit memories of emotions that were first experienced during painful and formative experiences in our pasts. The same is true for many of the avoidance efforts people engage in: these are implicit memories of avoidance strategies first engaged in long before.  In both cases, people are having emotional reactions and engaging in behaviors

97

SP&A U8498

000000523

based on implicit memories of experiences that may or may not (at least at the time) have any corresponding explicit, episodic or autobiographical memories.

230. A good example is Wendi's habit, observed by her co-workers, of responding to her husband Joe's frequent workday calls to her office by (1) listening in an emotionally disconnected way to his complaints and demands and (2) then uttering a few words and immediately going home to fix his problem. Her colleagues came to see this behavior in two different ways: as Wendi's subservience to Joe, and as Wendi dismissing Joe and "blowing things off," with the latter interpretation appearing to fully replace the former over the weeks and years following Joe's death. (9/15/04 Trial Testimony at 95-97, 103.) However, with knowledge of Wendi's traumatic childhood of neglect and abuse by important adults in her life, and of how implicit memory operates, we can understand these more clearly: They are childhood-conditioned, deeply-ingrained, and automatic habitual responses governed by non-conscious implicit memories of (a) being abused and dominated and (b) avoiding awareness of vulnerable and angry feelings by placating others while emotionally distancing herself from them.

## V.  WENDI'S ADOPTIVE FATHER AND HIS FAMILY BACKGROUND

231. Alejo Lorenzana Ochoa was born August 1, 1952 in Torrance, California to Alejo Molina Ochoa and Natalia Lorenzana. He has one sibling, Delia Rose Rascon Alvarez, who is about three years old than him. (Tab 24, at ¶ 1.)

232. Alejo reports that his father had one brother and five sisters who survived infancy, and that his father's brother died in high school after being injured playing football. He reports that his maternal grandparents were both orphans and were "older" when his mother was born. Alejo is not sure of his grandmother's first name but knows

98

SP&A U8499

000000524

that his mother's parents took their surname, Lorenzana, from the name of the orphanage in Mexico City where they grew up. Similarly, Alejo is unsure how many siblings his mother had, but says he knows of three brothers and two sisters.

233.  When Alejo was three years old his family moved to Casa Grande, Arizona, where Alejo spent the remainder of his childhood and has lived much of his adult life. When Alejo was born in California his father worked for a company that makes toilets, and when they moved to Casa Grande his father was self-employed, selling dry good to migrant workers from his own truck; he also delivered newspapers, worked as a meat cutter, and eventually owned a restaurant with Alejo's mother. (Tab 24, at ¶¶ 3, 5; Interview with Alejo Ochoa.)

234.  **Poverty, emotional neglect and physical abuse.**  None of his father's work paid much, and Alejo's family was poor, especially when he was younger. In our interview Alejo recalled that his parents could seldom afford toys for him. In a poignant example of their poverty, Alejo told of substituting dead mice for toy cars, which his parents could not afford to buy for him.  He pushed them around a pretend race track he had created, until his mother found out and he "got in so much trouble." Asked what it meant to get in trouble like that, at first Alejo said, in a deflecting and minimizing tone, "they grounded me, stuff like that."

235.  In a recurring pattern, when talking about his relationship with his mother Alejo said one thing, in abstract and vague terms, and then went on to give an example or tell a story that completely contradicted what he had just said. For example, asked to describe his mother before she was very depressed during and after his parents' divorce, Alejo first said three things: "I thought she was a pretty happy lady," "She was easy to talk to,"

SP&A 08500

000000525

P-App. 004826

and "We talked about school." But then, immediately after the "talked about school"

comment, ostensibly to give an example, Alejo added, "I'd come home and tell her 'I got

spanked today' and she'd say, 'Good – you need another one.'" He went on to describe

how his mother, for small infractions or annoyances, would hit him with a fly swatter or

whatever she could reach that would sting but not bruise or cause welts. Mostly,

however, when his mother was angry she gave him the silent treatment, refusing to speak

to him, "at times for an hour and at times for the whole day." Alejo still recalls "how

much that hurt me." (Tab 24, at ¶ 10.)

236.  His father was the main dispenser of corporal punishment. If Alejo had done

something "bad" during the day, his mother would make Alejo confess to father when he

got home from work that night.  Alejo recalled his father's beatings, which consisted of

several lashes across his rear end with a folded belt, as extremely painful, much more so

than beatings with paddles at school: "They didn't hold back at school, but the belt hurt a

lot more." Also, beatings like those his father gave him can cause painful bruising and

welts that last for days.

237.  Like Wade Robertson, who viewed the physical abuse meted out in his family

as "discipline," Alejo told me that "every time" he got beaten at home or at school, he

"deserved it." (The only exceptions, in his eyes, were beatings at the school he attended

in first grade, where he was spanked for speaking Spanish.)  A few minutes later,

however, Alejo acknowledged that his father's mood was a "big factor" that determined

whether or not he was beaten. In his declaration, he succinctly states, "We got our

whippings when Dad was angry." (Tab 24, at ¶ 10.)  In our interview Alejo also recalled

a time when, just by luck, he narrowly escaped the "beating of my life" from his father,

100

SP&A 08501

000000526

because another child improbably confessed to having provoked Alejo into accidentally shooting out a neighbor's window.

238. The trauma associated with Alejo's father's beatings was not limited to their painfulness and their arbitrary dependence upon his father's mood on any particular night. Until Alejo's parents divorced when he was around twelve years old, anticipation of his father's beatings was a source of considerable fear and dread on a regular basis. Alejo remembered vividly how his mother would say, "Wait 'til your dad gets home" and how from that moment on he would "think about it all day long." While punishing children by hitting them with a belt and the wait 'til your dad gets home" threat are still practiced in some subcultures of this country, this does not change the emotional trauma experienced by a child on the receiving end of such childrearing practices. When the beatings are severe enough to cause intense and lasting physical pain, a child will often attempt to cope with the emotional pain by internalizing his parents' message that they "deserved" such violence. The trauma is considerable, despite being banished from awareness. Like many other children subjected to such abuse, Alejo would grow up to inflict it upon Wendi, her cousin Brandon, and many children whose families were caught in the religious cult where Alejo was a "youth pastor," in which relentless and harsh physical abuse of children was seen as God's will and as every adult's duty.

239. That Alejo was also emotionally neglected by his parents is suggested by the fact that he never provided, in his declaration or interview with me, despite questioning specifically designed to elicit such information, any examples of his mother or father truly listening to him or empathizing with his feelings. There was no indication in anything he said about his parents – except for the vague and immediately contradicted

SP&A 08502

000000527

P-App. 004828

"easy to talk to comment" about his mother – that he felt understood by them, emotionally supported by them, or safe to share his concerns or fears with them. When it came to the youthful fears and insecurities Alejo did discuss in our interview, about "girls and dating," he explicitly said that he knew his parents would use whatever he said against him (by revealing it to his aunts and uncles, who would surely use the information to torment him).

240.  **Emotional and sexual abuse by aunts, uncles, and parents.** Alejo recalls spending most of his "family time" in his childhood and early teen years with his mother and his paternal aunts (he seldom saw his maternal aunts).  He reports that "all" of his aunts, but particularly Lupe and Celia, were "very harsh in the way they constantly made jokes and teased, primarily about sexually related things." (Tab 24, at ¶¶ 7, 22.) From as early as he can remember, even before he became a focus, "sex talk and sexual jokes were always in my awareness." (Tab 24, at ¶ 22.) When they were eventually directed at him, as he entered puberty at eleven or twelve, his aunts continually teased him – about his alleged sexual desires and designs, and especially about masturbation. (Tab 24, at ¶ 7.)  In his interview with me, he gave the example of innocently asking an aunt the question, "how is my niece related to me?" and getting the response, "If you mess with her your uncle will cut it off!"  Another example: His aunts asking to check and see if his palm had grown hairs from too much masturbating. (Tab 24, at ¶ 7.)

241.  Alejo remembers this constant sexualized teasing – bullying, actually – as "unbearable."  It was especially unbearable because no adult even attempted to protect him from this verbal sexual abuse, let alone helped him deal with its effects.  His mother and father often joined in, as did his aunts' husbands.  Alejo is still pained to remember

SP&A 08503

000000528

his early teenage years – the embarrassment of being around his aunt's hyper-sexual conversations and constant teasing, the horror of his own mother joining in the laughter at his expense. (Tab 24, at ¶ 7.)

242.  Although this behavior of his aunts, uncles and parents did not involve physical contact, it was not only emotional abuse but *sexual* abuse.  It was adults exploiting children, purely for their own twisted pleasure, as unwilling recipients of their own perverted sexuality. As Alejo makes clear in his declaration and did in his interview with me, their behavior was aggressive and cruel, disrespectful and shaming. In our interview Alejo recalled, "I found out if you get mad it would just go on and on. It's like a bully on the playground: if you react he's on you." Although Alejo describes learning to walk away as soon as they started in on him, those opening – and often humiliating – attacks were still uncontrollable and inescapable.

243.  The uncontrollable and inescapable aspects are important to highlight, because ample research has shown that abuse (and significant stressors of any kind) with those two characteristics is quite traumatic and can lead to posttraumatic symptoms or full-blown PTSD.  Another critical variable that determines the nature and severity of the effects of sexual abuse is the identity of the perpetrator(s). The more dependent the victim is upon the perpetrators, and more the abuse constitutes a betrayal of trust, which is always the case with family members and most extreme when parents commit the abuse, the greater the negative psychological and biological effects. Obviously, if the variables of controllability, potential for escape, and relationship to perpetrator are "held constant," sexual abuse involving physical contact will be more harmful than noncontact sexual abuse. Nonetheless, noncontact sexual abuse, including the verbal forms to which

103

SP&A U8504

000000529

young Alejo was repeatedly subjected, can be quite harmful to prepubescent children and teenagers, in a variety of lasting ways. Alejo Ochoa constitutes an excellent case study of such harmful effects, including obsession with sexual thoughts and fantasies, compulsive and impulsive sexual comments and behaviors, and repeating against others the same kinds of sexual abuse he experienced as a child.

244. **Sexual abuse by a neighbor.**  Sexualized verbal bullying was not the only sexual abuse Alejo has acknowledged experiencing as a child. He was also sexually abused, at around sixteen years old, by an adult neighbor who disguised it as "teaching." Like many men who have gone through such abuse, Alejo still has trouble recognizing what happened as abuse. Yet Alejo's relationship with his older neighbor was a template for his exploitive sexualizing of teenagers entrusted to his "youth ministry," and for his sexual abuse of Wendi.

245. In a common pattern for sexually re-victimized children, the verbal sexual abuse by Alejo's aunts, uncles and parents made him vulnerable to his neighbor's predation. Although he probably did not reflect on it consciously, Alejo learned from his relatives' abuse that he, and children in general, could be treated by adults as objects of sexual exploitation.  What he did reflect upon, however, was that adults could be very cruel and sadistic in their sexual abuse of children – and this also made him vulnerable to future sexual abuse, especially if it was more manipulative and cunning, with the perpetrator taking advantage of his fears of sexualized cruelty to lure him into more intrusive and exploitive yet "wanted" sexual activities. Looking back on the beginning of the relationship with his neighbor, Alejo recalls, "I felt like I could talk to her." That was

SP&A U8505

000000530

definitely not the case with his uncles, and it was his longing for someone to talk to about sex that his neighbor leveraged to use him for her own sexual gratification.

246. Before going into the details of that abuse and how it progressed, it is worth noting two other experiences, mentioned in Alejo's declaration, which also contributed to his vulnerability to his neighbor's abuse. Alejo's first sexual experience involving physical contact occurred when he was thirteen or fourteen years old. A friend's older sister, who was around seventeen years old at the time, directed Alejo and her younger sixteen-year-old sister to have sexual intercourse, and they did. Alejo recalls, "I was so scared not knowing what was going on. The older sister told me not to say anything to anybody. I ran home. The experience was exciting, scary, and confusing." About a year later, the same sisters told him to take his penis out of his pants, then the older sister directed the younger one to perform oral sex on Alejo. Again the experience was extremely unpleasant and frightening: "The older one was laughing and the younger one did not like what she was doing. I recall a lot of laughing and again being told not to say anything to anybody. After that, I would not go over there." (Tab 24, at ¶ 20.)

247. These confusing, disturbing and frightening initial sexual experiences of Alejo's, which involved sudden and intrusive acts of oral and genital intercourse under the orders of an older and more knowledgeable person, were experiences that he had no chance to sort though and understand. He could not tell his parents or adult relatives, who would have ridiculed him and added another layer of abuse and humiliation. At the same time, these experiences made Alejo more vulnerable to sexual predation that involved a kinder and gentler, more gradual and "teaching" approach – just what his late-20s female neighbor employed when Alejo was about sixteen years old.

105

SP&A U85U6

000000531

248.  Indeed, in classic pedophile fashion, Alejo's neighbor carefully "groomed" him. She began by talking to him about how to talk to a girl he was interested in, how to ask her out on a date. She then moved on to teaching him how to hold hands and put his arm around a girl, then how to kiss. (Tab 24, at ¶ 21.) As Alejo recalled in our interview, within several months he found himself regularly engaging in oral sex and genital intercourse with his neighbor.  Alejo said that he eventually ended the relationship, after feeling increasingly awkward when the neighbor visited his house and spoke to his mother.

249.  Looking back in our interview, Alejo was unable to acknowledge that his neighbor abused his trust to sexually exploit and abuse him. He did say that he believes sexual relationships between adults and teenagers are "not a good idea," and that the relationship with his neighbor "probably" was not good for him in some ways. What Alejo is unable to admit, and probably even to recognize, is how that abusive relationship – disguised as "teaching" and "helping," against the backdrop of an emotionally neglectful and verbally sexually abusive family and upbringing – shaped his sexual identity and behavior. Indeed, the parallels to his eventual sexual abuse of Wendi and her friends are striking.

250.  **Pathways to becoming an adult perpetrator of child sexual abuse.** Children need to be *protected* from the sexuality of adults, and not to have it used against them in exploitive and abusive ways.  Children also need to be protected from situations – including major emotional neglect – that can lead them to become focused on sexual stimulation as a substitute for more healthy and age-appropriate pleasures, or focused on sexualized attention as a substitute for healthy affection, caring and love.

SP&A 08507

000000532

P-App. 004833

251.  Comparing Alejo's childhood with those of Skip Robertson and his brothers shows two different pathways by which children can be prematurely sexualized by adults and then grow up to become adults who sexually abuse children themselves.  As discussed above, because the human brain responds to stimulation of the body's sexual organs as pleasurable, there is great risk that neglected children, like those in the Robertson family, can latch onto sex as a substitute for emotional connection with others, and as an addictive way to sooth themselves. And as was true for Skip and his brothers, to this premature and pathological focus on the pursuit of sexual pleasure can be added layers of hyper-masculine gender socialization, including fixation on sexual conquest and physical aggression, which can lead to sexual exploitation and sexual violence. That was the pathway to becoming a perpetrator of child sexual abuse in the Robertson family.

252.  In Alejo's family the pathway was different, and appears to have unfolded in stages. In the first phase, little Alejo learned that sex was something he did not understand but that adults used against children – by teasing, humiliating and otherwise abusing them with harsh words. He implicitly came to understand that sex was a part of him which was somehow important, and something adults imposed on children as a way to make them objects of ridicule. In the second phase, as a pre-teen whose hormones were starting to kick in and who was becoming aware of sexual interests and desires, Alejo became a direct target of the adults' relentless, aggressive and humiliating sexualized comments.  His own sexuality became infused with fear and shame, as well as a realization that he had no one to defend him from such attacks and help him feel safe in his changing body and mind – let alone to help him make sense of those changes and their implications for his relationships with peers. In the third phase, early in his teens,

107

SP&A 08508

000000533

Alejo was coerced by older teenagers into confusing, frightening and humiliating sexual experiences with peers, and explicitly told, in a threatening way, that he must never tell anyone what had happened. By then he had already despaired of any adults helping him understand and navigate sexuality, and now teenage girls, to whom he was feeling sexually attracted, were simultaneously experienced as dangerous, threatening and potentially sources of even greater humiliation and shame than his aunts, uncles and parents.

253.  Those first three phases paved the way for the fourth phase, in which an adult woman took advantage of Alejo's lack of adult support or guidance on sexual matters and of his fear of the very girls to whom he was sexually attracted. His neighbor used both of those vulnerabilities to gradually seduced Alejo -- under the guise of caring, helping and teaching him -- into an exploitive sexual relationship that culminating in repeated episodes of sexual intercourse.  For his whole childhood Alejo had longed for a relationship with an adult who truly listened to him, cared about his problems, helped him through his confusion and taught him things that helped him navigate relationships with his peers.  As a teenager, especially given his history of prior abusive and exploitive sexual experiences, Alejo felt particularly desperate for adult understanding and guidance with regard to his sexuality. He seemed to get just what he had been looking for from his sexually abusive neighbor. And in that relationship Alejo learned, as he still partly believes today, that it is OK, and even good, for adults to engage in self-gratifying sexual conversations and acts with children, even to have ongoing sexual relationships with them, so long as the adult is "teaching" the child and not being physically violent. Indeed, Alejo falls into what is known, in the sex offender literature, as the "regressed pedophile"

108

SP&A 08509

000000534

P-App. 004835

type. That is, he can be understood as a profoundly emotionally immature man who, even though married, is incapable of having a healthy intimate relationship with an adult partner, and instead seeks emotional intimacy, partnership and sexual pleasure from children – who he experiences, compared to potential adult partners, as innocent and safe, thus the best match for his own child-like immaturity. In short, Alejo believes that for him to have a sexual relationship with a child is a good thing, and that, all evidence to the contrary, he is actually helping and even loving the child.

254.  Like some other adults who were sexually abused as children, however, Alejo would also become a man who compulsively reenacted, in the role of the perpetrator, sexual abuse which he acknowledges is not caring or helpful in any way to those on the receiving end, especially children.  That is, as an adult Alejo regularly engaged in the same kinds of verbal sexual abuse that his aunts, uncles and parents had inflicted on him. As we shall see, several witnesses consistently describe how Alejo – as fellow a church member, youth minister, and parent – constantly made sexualized comments and innuendos, and constantly imposed sexual interpretations on innocuous objects and non-sexual behaviors of others.

255.  Indeed, in adulthood Alejo repeatedly cycled through re-enacting all of the forms of sexual abuse to which he was subjected as a child and teenager.  Alejo's path to becoming a sexually abusive adult was different from that of Skip Robertson. But the conditioning was, in its own way, just as powerful; and the absence of any help averting that developmental trajectory, just as complete.

256.  **Father's affair, parents' ugly divorce, family split in two.** When Alejo reflects on formative negative experiences in his childhood, he puts his parents' "ugly"

SP&A 08510

000000535

divorce, which unfolded when he was thirteen or fourteen years old, at the top of the list. The impetus was his mother's discovery of his father's affair with another woman, who his father went on to marry. (Tab 24, at ¶¶ 13, 14.) For months Alejo overheard and directly witnessed "yelling and a lot of fighting with physical violence," and he "spent a lot of time outside our home crying" as his parents battled inside. (Tab 24, at ¶ 14.) Alejo recalls feeling like he could not talk with either parent, and utterly alone with his anguish, fear and confusion.

257.  Eventually he was able to reconnect with his mother, but not his father. Alejo lost respect for his father and felt like he no longer loved him. They even had a physical fight, at a family picnic after his father slapped his mother and Alejo responded by punching his father in the mouth.  (Tab 24, at ¶¶ 14, 15.)  Alejo only saw his father a few times after the divorce, and completely lost touch with him for many years starting when he was eighteen years old. Both children felt forced to take sides and the family was split in two. Alejo aligned with his mother and lived with her.  His sister became estranged from their mother, lived with their father and his new wife for awhile, then returned to live with Alejo and their mother but constantly fought with her. (Tab 24, at ¶¶ 16, 17.) Although Alejo continued to feel connected to his mother, at least to the extent possible within the context of their always emotionally neglectful family, he describes his mother as becoming "depressed and bitter" and developing "a drinking problem" after the divorce, first drinking after work and then "all the time." (Tab 24, at ¶ 18.)

258.  For Alejo too, the divorce was a "big turning point" that he sees as starting him on a downward spiral.  Like many children of divorce, he felt deeply ashamed and blamed himself.  Feeling even more alone than he always had, Alejo recalls that he

SP&A 08511

000000536

P-App. 004837

"fended for myself and started getting into trouble," including abusing alcohol and drugs. Previously there were parts of his experience, including his sexuality, which he knew it was pointless and even perilous to share with his parents and adult relatives. After the divorce he learned, in general, "to hold things in and not show how I was truly feeling." This became particularly true as he got deeper into using and then trafficking illegal drugs. (Tab 24, at ¶ 19.)

259. **Teenage alcohol and drug abuse.** In junior high school, even before his parents' divorce, Alejo brought miniature bottles of hard alcohol to junior high school. He drank one during lunch one day, which got the attention of other kids, to whom he started selling the little bottles of whiskey that his father had bought at a liquor store in Nogales, Mexico. (Tab 24, at ¶ 23.) He recalls starting to drink heavily during the divorce, and then using marijuana and, by freshman year of high school, cocaine and hallucinogens. After the divorce there were about thirty large bottles of whiskey that Alejo's father had left behind in the house, and Alejo poured that whiskey into the small bottles, which he then sold, refilled and resold to other kids. (Tab 24, at ¶ 23.)

260. Alejo reported trying marijuana for the first time at about fifteen years old, while on a trip to Mexico with one of his aunts. With the experience of selling little bottles of whiskey from Mexico under his belt, the enterprising (albeit foolish and reckless) teenage Alejo got phone numbers from people he met in Mexico, with whom he "later connected with to arrange deals for the sale of marijuana." He also acquired phony documents and papers claiming he was 21 years old, which allowed him to cross the border on his own, and made his first trip alone at age sixteen. Alejo then learned "how to be the go-between guy and get part of the cut on marijuana deals," a role he continued to

SP&A 08512

000000537

P-App. 004838

play all through high school (Tab 24, at ¶¶ 24, 25), and which, as described below, would end with the most violently traumatic experience of his life.

261.  Early in high school Alejo turned to harder drugs, including cocaine and two powerful hallucinogens, LSD and mescaline.  Barry Lorts, a friend of Alejo's in high school who would later found the fundamentalist Christian church and school where Alejo would become a youth pastor and Wendi would experience totalitarian control and routine beatings, corroborates Alejo's memories. "We hung out together, and we were druggies. We did our share of acid and smoked marijuana." (Tab 16, at ¶ 3.)

262.  Like many cocaine abusers, Alejo liked it because "It felt good and made me confident." Within two years his cocaine use dramatically escalated, to "two or three times a week," and he maintained such frequent use for "a two-to-three year period" from around age sixteen until senior year of high school. (Tab 24, at ¶ 32.)  Alejo recalls taking "about thirty hits of LSD" and using mescaline many times as well.  These are extremely powerful drugs known to cause not only hallucinations but severe cognitive and emotional disorganization, often associated with intense confusion and fear in what are known as "bad trips."  Yet Alejo insists "I had all good trips on acid," and says it was his "drug of choice," that is, his preferred drug because he liked its effects on him more than those of any other drug. What those effects were, and why he liked them so much, are very telling: "When I did acid, I was in my own little world and I liked that. I did not have to be around people and everything was calm.  It felt like an out of body experience. I never did it in a group setting." (Tab 24, at ¶¶ 33, 34.)

263.  It appears Alejo is still in his own little world when it comes to those experiences. In our interview he professed, with evident sincerity, that he still believes he

SP&A U8513

000000538

walked on top of eucalyptus trees during an LSD trip. Alejo has always been very limited in his capacities to emotionally connect with others and negotiate relationships. So it makes sense that, while Alejo liked the confidence of the cocaine high, he much preferred the LSD-induced experience of being completely in his "own little world," that is, disconnected from reality, including other people and relationships.

264. Alejo reports that during senior year of high school he "started trying to clean up my drug use," which meant quitting cocaine and hallucinogens but still regularly drinking and smoking marijuana. He recalls drinking the most soon after graduating from high school, when he was nineteen years old, but also that year deciding he did not like being drunk and no longer drinking such large quantities, and then cutting down further until he quit drinking altogether when he was 21 years old. (Tab 24, at ¶ 35.)

265. Cross-border drug running, caught by Mexican police, beaten and raped. Alejo made several trips to Mexico to pick up marijuana and bring it across the border for drug dealers. When he was eighteen years old, one of these missions went terribly wrong and he was beaten by Mexican police and raped in a prison cell. His handlers had told him the police were paid off and given him the number of someone he could have the police call were he ever stopped. But when the police did stop him, they ignored his pleas to call the person and beat him until he was unconscious. He awoke in a jail, tied to a chair, and was beaten again. Alejo was in extreme pain, terrified and convinced he would be killed or die of his injuries. He was then untied and thrown in a prison cell, where he was raped. Inexplicably, several hours later he was released by the police, who took him back to his car, let him go near the U.S. border, and told him never to come back. (Tab 24, at ¶¶ 26, 27.)

SP&A 08514

000000539

266. As would be expected, these severe physical and sexual assaults traumatized Alejo. He reports common posttraumatic reactions, including having nightmares for "a couple of years," sometimes waking up "thinking it was happening again," and sleeping with a gun. To this day, Alejo cannot bear to witness interrogation scenes in war movies. Like many men who have had such experiences, Alejo also felt that, despite being outnumbered by several men with guns, he had been a "wimp." (Tab 24, at ¶ 28.) Being raped by men was also a major blow to a masculine identity already on very shaky ground, thanks to his aunts' and mother's verbal sexual abuse and the two incidents of coerced and shaming sexual activity by an older teenage neighbor and her sister. Indeed, thanks to intense shame that he continues to feel about what happened, Alejo never told anyone about the incident until recently, more than forty years later, while speaking with investigators about his own past.

267. **Limited intelligence, competence, and motivation to achieve in school or work.** Alejo's school records indicate that, from the very beginning in first grade, he exhibited limited abilities and motivation either to learn or to apply himself. His adult work history reflects the same pattern.

268. Alejo's first grade report card has Ds and Fs in arithmetic, language, reading and penmanship. Though he received satisfactory ratings for "conduct" in all four quarters of first grade, the second half of the year he received "unsatisfactory' marks for "effort." Across all four quarters of first grade Alejo received check marks for "lacks interest" and "work carelessly done" or "no work done" (with the latter being a hand-written category added by his teacher). Lack of effort, however, was not seen as Alejo's main problem: his teacher checked off "work of grade too difficult" for every quarter.

114

SP&A 08515

000000540

Alejo was held back and repeated first grade. (Casa Grande Public Schools, Report to Parents, 1958-1959, Obtained by Capital Case Project.)

269. In his second round of first grade (i.e., the 1959-1960 school year) Alejo was able to achieve Bs in all graded subjects throughout the year. He was rated as showing interest but "unsatisfactory" for "effort" in two of the four quarters, and as "capable of doing better" in three of the four. (Casa Grande Public Schools, Report to Parents, 1959-1960, Obtained by Capital Case Project.) Upon moving on to second grade the following year, however, Alejo's grades were almost entirely Cs and Ds. In three of four quarters that year he got check marks for "lacks interest," "work carelessly done," and "capable of doing better." (Casa Grande Public Schools, Report to Parents, 1960-1961, Obtained by Capital Case Project.) On the next available report card, for 5th grade, Alejo's grades ranged from Cs to Bs (and two A-minuses out of 39 recorded grades). Finally, on a comprehensive transcript document covering the school years from 1958 to 1967, Cs and Ds dominate the reported grades and selected teacher comments taken from those years include the following statements from years for which report cards are unavailable: "dreams and plays, has little interest," "no desire to learn," and "needs constant push to do work." (Transcript from Casa Grande Elementary School District, June 2, 1967, Obtained by Capital Case Project.)

270. Records beyond the elementary school years have not been found. However by all indications – including Alejo's reports of being overwhelmed and distressed during junior high, when his parents were divorcing and he had already begun regularly drinking alcohol, and his corroborated report of spending his high school years heavily abusing marijuana, cocaine and hallucinogens – his academic effort was almost always negligible

115

SP&A U8516

and his academic performance poor. In addition, Alejo's chronic use of cocaine and hallucinogens could only have further eroded whatever limited intellectual capacities he would have possessed under the best of circumstances. As Cynthia Schaider, a core member of Harvest Family Church from 1980 to 2001 and someone who works for drug treatment programs, commented, "The first words that come to mind when I think of Alejo are 'drug burn-out.'" (Tab 34, at ¶ 6.)

271.  Not surprisingly, Alejo's adult work history is spotty and unimpressive.  Aside from a string of years in the mid 1990s to 2000s when relatives gave him work in the family's tortilla business, Alejo's history of paid work consists largely of short-lived, part-time jobs in landscaping and construction, including some where he was cheated out of wages by an unscrupulous manager or small business owner. (Tab 24, at ¶¶ 46, 59, 64; Tab 68; Tab 68.A.)

272.  As someone relatively unmotivated and unable to find and sustain productive and profitable work, until 1997 at age 45, Alejo spent much of his work life in volunteer capacities – first in nonprofit drug treatment, in the early 1970s at PADAC, where he met Donna and Wendi, and then for fundamentalist Christian (cult) groups with whom he, Donna and Wendi were involved beginning in 1977.

273.  **A profoundly limited and disturbed man.**  The above account of Alejo Ochoa's childhood and work history does not capture him as a unique and complex human being.  It focuses on his intellectual and emotional limitations; on the neglect, abuse and other traumas he experienced as a child and teenager, especially sexual abuse; and on how those limitations and traumatizing experiences derailed him from any

116

SP&A 08517

000000542

possibility of normal or healthy human development, especially in the realms of emotional intimacy and sexuality.

274.  As detailed below, several witnesses who knew Alejo in his 20s and 30s refer to him as a "pervert" and as a sexually "perverted" man who constantly and compulsively subjected women and girls to unwanted sexual comments and physical contact.  One of his favorite things to do was to suddenly lick his finger and rub it against a woman's or girl's ear.  He repeatedly fondled the breasts of a teenage friend of Wendi.  He dressed and photographed Wendi in lingerie, and forced her to look at "adult" toys and pornographic material.  More recent examples of Alejo's sexual perversion, from his 50s, are two Valentine's Day cards he sent to his incarcerated daughter (the exact years that he sent them in the 2000s are unknown).

275.  The cards are perverted and disturbing – to anyone, although Wendi reports that she has only been able to acknowledge this to herself in the past two years, in the context of the investigation and evaluation leading to this report.  Just how perverted and disturbing the cards are can only be conveyed by showing the cards and quoting in full Alejo's hand-written notes on each. Here is the entirety of the first card:

 

117

SP&A 08518

(Obtained by Capital Case Project)

276. Below is the second card. On the inside Alejo has written, "This is the first riddle. I'll send the answer with the next riddle. Have fun!! Dad." Under that is the text that came written on the card, "These are just a few of the things we have in common!" And under that Alejo has written:

"• I sometimes get balls caught in my throat.

• My box smells.

• I can have a little pussy."

 

(Obtained by Capital Case Project, copy attached at Tab 75)

277. A few observations from my August 2011 interview with Alejo are also illustrative, and confirm the much more detailed picture painted by others (presented below). As described earlier, Alejo would often say something in abstract terms only to completely contradict his statement, literally in the next breath, with an example or story. Similarly, Alejo repeatedly averred something about himself in words only to demonstrate that just the opposite was true via compulsive and impulsive behaviors.

118

SP&A 08519

000000544

P-App. 004845

278. For example, on the one hand Alejo had defensive radar exquisitely attuned to any question that probed for sexual interest in Wendi or her friends. He would, as Shakespeare put it, "protest too much," denying any and all such motives or behavior whenever a question implied or barely hinted at them. When a question *was* explicit, as when I asked if he ever felt attracted teenager girls in his youth ministry and, if so, how he coped with that, Alejo flatly denied *ever* having felt *any* sexual attraction to those girls. On the other hand, despite himself – and thanks to the sexual obsessions and compulsions that dominate his thoughts and motives to this day, at age 59 – in the span of three hours Alejo made several inappropriate and provocative sexual comments to the female investigator who accompanied me on the interview. For instance, when asked whether he felt awkward the day after having sex with Donna the first time (in a PADAC office), and how they "ended the night" if such awkwardness was present, Alejo mentally latched onto the "ended the night" phase, yanked it out of context and blurted out, "breathing hard, ha ha ha!" He then immediately and excitedly looked for a reaction on the female investigator's face.

279. Such automatic, excited, and pleasure-seeking sexualized behaviors – and not his forced, tense, and implausible denials of ever having felt any attraction at all to Wendi, her friends or other girls in his youth ministry – reveal Alejo's true thoughts, motives, and behaviors with respect to sex. They are also consistent with the reports (detailed below) from several people who witnessed and were subjected to Alejo's compulsive and abusive sexual behavior in the church community where Wendi spent her older childhood and teenager years.

SP&A U8520

000000545

280. As shown below, such behaviors by Alejo Ochoa were probably the most powerful and destructive force in the childhood and adolescence of Wendi Andriano.

## VI.    AGES 4½ TO 7 – DOMINATED AND ADOPTED BY A PEDOPHILE

281. **Donna and Alejo have sex, Alejo moves in, and they marry.** Alejo and Donna both tell the story of how Alejo, on the PADAC board of directors when Donna was hired, decided he did not like Donna after finding remnants of marijuana "joints" under a mattress while helping her move to Casa Grande. (Tab 24, at ¶ 44; Tab 28, ¶¶ 47, 53) Yet within weeks of Donna's arrival, in February of 1975, after having no more than work-related conversations devoid of personal interest or attraction, Alejo and Donna suddenly had sex one night. As mentioned above, it happened in a PADAC office where Donna was working as Wendi slept in a nearby office. According to Alejo, "Late one night I went to the PADAC offices.... Donna and I started talking. The next thing I knew, we were kissing." (Tab 24, at ¶ 48.)

282. Within weeks Alejo was living with Wendi and Donna, and sleeping with them in the same bed, a mattress on the living room floor. (Tab 28, ¶ 69.) Donna recalls, "We never dated or had a courtship; we just had sex and moved in together." (Tab 27, at ¶ 184.) Alejo agrees: "We never really dated. We went from no relationship to being physically intimate in one night and then continued to see each other after that." (Tab 24, at ¶ 48.) On June 6, 1975, less than five months after first having sex, Donna and Alejo were married in a small ceremony. (Marriage License, Pinal County, Obtained by Capital Case Project) According to Donna, they got married "because Rick Miller and Al Farmer, who were part of our Christian group... told us it wasn't right for us to be Christian and living together without being married." (Tab 27, at ¶ 184.)

SP&A 08521

000000546

283. **Alejo's initial relationship with Wendi: More focused on her than Donna, evidence of sexual and emotional abuse.** Alejo says that by the time he first had sex with Donna, he "already had a relationship with Wendi," based on several interactions with her around the PADAC offices where Donna let her four year old daughter roam. (Tab 24, at ¶ 49.) When asked during our interview how Wendi "fit into" his early relationship with Donna, Alejo responded, "I didn't marry Donna <u>for</u> Wendi. That didn't enter my mind" (underline denotes emphasis in his speech). As we shall see, in great detail, from the testimony of several witnesses, it appears that Alejo "doth protest too much." All available evidence suggests that then, and for the rest of Wendi's childhood, Alejo was not only more interested in a relationship with Wendi than with her mother, but that he was focused on having a sexualized relationship with Wendi.

284. Indeed, Donna recalls:

> "Alejo was absolutely fascinated with Wendi as we were getting together, and once we were married Alejo's focus was mostly on Wendi. He was so much more interested in spending time with Wendi both before and after I married him than he was in spending time with me that it was almost like he married me to be with my daughter." (Tab 27, at ¶ 246.)

285. Donna also reports that Alejo began sleeping in the same bed with her and Wendi "shortly after they met," and that shortly after that Wendi began wetting the bed, which she had never done before. (Tab 27, at ¶ 244.) Wetting the bed is not an uncommon reaction of young children who are being sexually abused, and for Wendi's it may have been one of her only ways to resist unwanted contact from Alejo in the bed. Donna also recalls that when she awoke in the middle of the night to find that Wendi had

121

000000547

wet the bed, "sometimes Alejo was already awake" (Tab 27, at ¶ 244.) That Alejo had

been awake even before Wendi wet the bed, perhaps pretending to be asleep while doing

things that led Wendi to wet the bed, would be consistent with the account of Alejo's

behavior by a teenage friend of Wendi's, who reports that Alejo repeated fondled her

breasts as she and Alejo slept in Wendi's bed, and that Alejo always pretended to be

sleeping when abused her.

286.   Looking back on the first several months of 1975, Alejo says he remembers

little Wendi as a "sweet, outgoing child" who begged for money after being taught how

to panhandle by a 60 or 70 year old man who owned a furniture store next to the PADAC

offices. (Tab 24, at ¶ 50.) Donna also notes that even before she and Alejo married,

"Alejo spent time with Wendi and knew a lot more about her than I did... He's the one

who knew that she was panhandling and going around to beg for money..." (Tab 27, at

¶ 245.) In his interview with me, recalling his first impressions of Wendi as a young

child, Alejo exclaimed, "Once she liked you, she could melt your heart. Everybody loved

her." Asked for examples of this quality, Alejo spoke of "a lot of innocence in what she

did," then went on to tell a story. The story he told reveals Alejo's psychological and

moral confusion (at the time and now), and how, as young Wendi's new and – thanks to

Donna's ongoing neglect – *primary* parent and disciplinarian, Alejo almost immediately

began inflicting his confusion on Wendi in abusive and destructive ways.

287.   The story: Not long after getting involved with Donna and sleeping at their

house, Alejo discovered that Wendi had been drawing (apparently for weeks) with

crayons on back of a bedroom door.  He called her into the room, pointed at the door and

asked her to explain, to which she responded by proudly declaring, "Isn't it beautiful!"  It

122

SP&A 08523

000000548

was indeed the response of an innocent child, one who had been – in the absence of adult supervision – simply creating a work of art in a spot that felt right to her. As Alejo himself commented, "She didn't know. She didn't think it was a big deal." He told her that crayons could not be used on doors or walls and that she would need to clean the door, to which she did not object. Alejo then gave her a cleaning rag and stood over her, monitoring her progress until, after about five minutes of enjoyably cleaning the door, Wendi declared, as any four year old child would, that she was tired and did not want to clean any more. Alejo's response? He "made her stay there an hour and a half," forcing her to continue cleaning, unmoved by the fact that "she was crying" almost the entire time. For four year olds, being forced to do *anything* they do not like for more than fifteen or twenty minutes is very distressing. A full hour and a half, with constant crying that evokes no compassion in the adult, could only be traumatic. Yet Alejo clearly believed – just as Skip did when proudly telling me of spanking his infant daughter to make her stop crying – that I would be impressed by the wisdom and effectiveness of this example of his parenting.

288.  In summary, within weeks of Wendi and her mother moving to Casa Grande in early 1975 Donna had, once again, handed her daughter over to a very confused and disturbed man.  Donna was, once again, basically saying, "I don't want her. YOU take her." Alejo was more than happy to do so, and started what from then on would be the most important relationship in his life – and the most destructive one in Wendi's life, in which she would be subjected to Alejo's psychological, sexual and physical abuses for years to come.

SP&A 08524

000000549

P-App. 004850

289. **Donna and Alejo's early relationship, focused on religious fanaticism.** To the extent that Alejo had any interest in Donna, and that Donna and Alejo were connected to each other, their focus was not on their relationship with each other, let alone their shared responsibilities as Wendi's parents. Instead, Donna and Alejo were focused on their increasingly fanatical absorption in a small religious cult led by two men they had met in Casa Grande, Rick Miller and Allen ("Al") Farmer. Right after commenting that they never courted, "just had sex and moved in together," and got married because others told them too, Donna observes, "After I was married to Alejo, we became strict Christians. Rick and Al encouraged us to have meetings at our home..." (Tab 27, at ¶ 184.)

290. Rick and Al may have seen Donna and Alejo as the best candidates to create the local infrastructure for another small group of believers that they could indoctrinate, command and control. For example, Donna recalls, "it was common for Rick or Al to tell someone, 'I've got a Word. God says you have to break off from your family to join the ministry,' or 'God told me you are going into the ministry." (Tab 27, at ¶ 202.) In my interview with her, Donna shared a particularly sad early instance of such control and its potential to harm important relationships, in which Rick and Al ordered their followers to bring all of their family photographs and throw them into a fire. Donna dutifully complied, thereby destroying every picture she had of Wendi, as well as pictures of her sister and parents.

291. Like so many people who are vulnerable to being swept up in a cult, Donna and Alejo longed for someone or something truly and ultimately *good* – to love and care for them, to give them a sense of specialness and value as human beings, to rescue them from

124

SP&A U8525

the deeply ingrained feelings of un-lovability, unworthiness, and meaninglessness that were enduring legacies of childhoods of neglect, abuse, and demoralizing trauma. Like so many swept up in cults, for a time Donna and Alejo apparently believed they had been "saved" in those ways by the God and the Jesus of their imaginations, thanks to the beliefs they were taught and the "revelations" they experienced under the tutelage of their zealous and hyper-controlling cult leaders.

292. Donna recalls that on many occasions throughout her life, beginning when she and Alejo followed Rick and Al, she received "direct communication from God" while praying and speaking in tongues, and "healing and Gifts of the Spirit" in the forms of "being euphoric or held in a euphoric peacefulness." (Tab 27, at ¶ 192.) She describes how speaking in tongues can involve extremely intense positive or negative emotions, depending on what is being channeled through the person. She also notes "It's possible to say the wrong things or have things translated incorrectly, so that's why it's best to be in a gathering of 'saints' [true believers] when you exercise the gift…," and soon thereafter adds, "The pastors and elders of a church are more often the ones both speaking in tongues and translating." (Tab 27, at ¶ 195.) Whether or not speaking in tongues can be a valid religious experience involving revelations from God, Donna and Alejo were extremely confused and limited people, and highly vulnerable to manipulation by the leaders of their religious group.

293. Alejo describes how, about two years before meeting Wendi and Donna when he was 22 years old, he came to "make Christ my Lord and Savior" with the encouragement of Calvin ("Cal") Lorts, with whom he had drank and used drugs in high school. Alejo's story of his first baptism is bizarre. The story includes Alejo, Cal and

125

SP&A U8526

000000551

Cal's brother Barry picking up a hitchhiker who claimed to be from another world, which Alejo apparently interpreted as a sign from God. (Tab 24, at ¶ 37.) Like Donna, Alejo also glowingly describes speaking in tongues. While Donna highly valued the euphoria and "euphoric peacefulness" she experienced, for Alejo one of the best parts was speaking "a heavenly language that is between God and me." (Tab 24, at ¶ 38.)  This fits with what Alejo most loved about his drug of choice, LSD: being in his "own little world" and not having to be "around people." When speaking in tongues, Alejo is in his own little world, albeit while imagining God in there with him. Even more telling is Alejo's account of his first time speaking in tongues: "I felt like a well had opened up... I was freaking out. I could not stop and I did not want to. The feeling was unbelievable. I got scared and went out on the road to pray. It felt like a sexual experience started and I began to feel excited and it felt more and more like I was having an orgasm." (Tab 24, at ¶ 40.)

294.  Despite what Alejo saw as a very auspicious beginning, his initial sexually-charged religious fervor was short lived.  Not long after Alejo's orgasmic speaking in tongues experience, Cal Lorts left Casa Grande to study to be a minister. Alejo stopped going to church well before he moved in with Donna and Wendi in early 1975. It was Donna who introduced Alejo to Rick and Al. (Tab 24, at ¶ 62.)

295.  In May of 1975, the month before Donna and Alejo were married, Donna quit her job because of what she saw as a "conflict of interest" between her work at PADAC and her Christian faith. She became convinced that, given the high recidivism rates of the drug abusers treated there, that "only Christian programs and finding God actually

SP&A U8521

000000552

P-App. 004853

worked to help drug addicts break free of their addictions and recover from drug use."
(Tab 28, ¶ 71)

296. **Wendi attends kindergarten and first grade in public schools, is adopted by Alejo.** A couple of months after marrying Donna and Alejo left the apartment with Nicki Barnes and her daughter Tascha and moved in with Alejo's mother; in September they moved into newly built low-income housing in Indian Hills, on the outskirts of Casa Grande. (Tab 28, ¶ 72)  Wendi attended public schools for kindergarten and first grade, and Donna reports that Wendi got along well with her peers at school and continued to have Tascha as her "main friend." (Tab 28, ¶¶ 72, 73)  Reports by Wendi's kindergarten and first grade teachers document that she did well in school and progressed in her learning over each year.  Her kindergarten teacher commented that Wendi was "stubborn but likes to help peers" and her first grade teacher gave her "satisfactory" or "excellent" ratings in all academic and social categories. (Saguaro Elementary School, 1975-1976 Kindergarten Report Card, Obtained by Capital Case Project; Evergreen Elementary School, 1976-1977 First Grade Report Card, Obtained by Capital Case Project.)

297. On July 30, 1976 Donna and Alejo filed papers for him to become Wendi's adoptive father. On January 31, 1977 the adoption was granted, and to his de facto authority over Wendi's life, thanks to Donna's neglect, were added legal sanction and rights. (Superior Court of the State of Arizona, Decree of Adoption, January 31, 1977, Obtained by Capital Case Project.)

298. **Wendi absorbs religious beliefs of her parents, to her detriment.** Donna reports that she and Alejo "didn't seek medical treatment" when Wendi was growing up, because they "believed that God would heal us when we became sick." As Donna

127

SP&A 08528

000000553

acknowledges, this meant that Wendi almost never saw a doctor, even when she was quite sick. (Tab 27, at ¶ 186.)

299.  Donna recalls one instance, when Wendi was about five years old and "so sick that she had been crying and couldn't get up or move around." Already sick for a day or two, her fever started spiking and became "very, very high."  Donna and Alejo had no medicine, not even aspirin. Looking back Donna is aghast at their ignorance and recklessness: "Heaven forbid that we might have had any of the Devil's stuff, which at that time for us meant anything like a thermometer to measure a child's fever or an aspirin to help bring it down." (Tab 27, at ¶ 187.) Wendi's condition worsened over the next few hours, Donna finally got scared enough to break free of her "God will heal us" delusion and finally declared, "I'm taking her to the doctor," to which Wendi replied, "No, I don't want to go to the doctor. Jesus is going to heal me." (Tab 27, at ¶ 188.) Alejo was content to go along with what Wendi said, and Donna did not take her. They prayed together instead, and eventually the fever passed.

300.  Looking back now, Donna notes, "It's hard to believe in retrospect that we listened to a five-year-old and prayed instead of seeking medical attention, but that's how we were at the time." (Tab 27, at ¶ 189.)

301.  **Wendi's autobiographical memory impairments and minimal memories of age five to seven.**  As noted previously, before age five the region of the human brain necessary for encoding long-term memories of specific life events has not sufficiently matured to reliably do so, except for highly emotional events that are discussed with others over time (as that part of the brain matures). After age five, however, such memories are continually being encoded, and those with heightened emotional and

128

SP&A 08529

000000554

personal significance will generally be accessible for retrieval for the rest of one's life. Importantly, those memories are not like videotaped representations, or totally accurate renditions of what happened that do not change over time. Rather, the central or most significant details tend to be accurate and resistant to change over time, but in general the memories are malleable and, every time they are retrieved, subject to "editing" processes -- based on current emotions, self-understandings, etc. Thus normally an adult will have a large store of personally significant memories beginning at age five, including memories of events that were particularly emotionally significant when the events occurred and that remain emotionally significant, though perhaps in different ways thanks to new adult understandings and interpretations. Finally, although every emotionally significant autobiographical memory may not be easily and instantly accessible under all circumstances, with the right "retrieval cues," including non-suggestive probes from a skilled interviewer, a person should be able to retrieve them into awareness.

302.   In my interviews with Wendi, she had remarkably few memories of her *entire* childhood, not just before age five. When Wendi did remember something from those years, she tended to remember in generalities, not in specific episodes. A significant body of research has shown that such "over-general autobiographical memories," or difficulty recalling specific events, is common in people who suffer from depression and/or PTSD. The latest research suggests that the person's brain automatically and prematurely aborts the "strategic search" processes necessary to retrieve such specific "episodic" memories, and does so out of (automatically-arising and usually non-conscious) fear that retrieving such memories will release unwanted, unpleasant, disruptive, and potentially overwhelming emotions.

SP&A 08530

000000555

303. Another well-established explanation of the inability to recall specific memories, particularly ones involving traumatic experiences of abuse and betrayal by parents and caregivers, is that the brain "dissociates" or disconnects such memories and related representations (e.g., images of and beliefs about oneself and others) from representations that constitute more typical and safe ways of perceiving, thinking and remembering in daily life. This dissociation, like the premature aborting of strategic search for memories, includes automatic attempts at self-protection in the moment; it also can involve chronic disconnections from each other of whole realms of experience and identity, such that personality and identity are highly fragmented. That is, all of us have different ways of thinking, feeling, remembering and relating to others, and some of them — those associated with intense emotions like fear, shame, or anger, or an intoxicated state, for example when one's had too much to drink — are very different from the ones we embody and identify with on a day to day basis. That's why we look back on embarrassing emotional outbursts or other extreme behaviors and think, "I can't believe I did that," or "That's not how I want to be." For highly traumatized people who experienced chronic neglect and abuse in childhood — and never had loving and supportive relationships to help them deal with the feelings and memories — those extreme "not-me" or "another-me-I-don't-like" states can include whole realms of memory (e.g., experiences of sexual abuse by a father) and feeling (e.g., fear, anger); can be much more frightening; and, when they do emerge, can be much more disruptive of thinking and behavior. When this is the case, the person is "highly fragmented" and ordinarily lacks conscious access to feelings and memories associated with childhood neglect and abuse, especially those of fear, shame, sadness or anger.

SP&A U8531

000000556

304. Based on my multiple interviews with Wendi Andriano, it is my assessment that she is extremely traumatized from childhood neglect and abuse, and suffers from an extremely fragmented personality. In the constrained context of our interviews, this manifested most clearly in Wendi's remarkably limited ability to retrieve specific autobiographical memories, especially from childhood; in her extreme difficulty accessing specific memories of unpleasant experiences, especially (though not only) from childhood; and in her extreme fear of accessing such memories, including her fear, stated from the outset of our interviews, that such memories might not be accurate and might cause harm to others, especially her adoptive father Alejo. Even when it comes to Wendi's over-general autobiographical memories, she is often unable to access any visual images. She repeatedly said "I feel like" this or that used to happen, but was unable to call up any images or other memory representations (e.g., words spoken) of what she "feels" was said or done. Wendi appeared to be making genuine and concerted attempts recall images and words, but simply drawing blanks. She often apologized and spoke of feeling bad about failing to remember more than such feelings. I have never before encountered a patient or defendant with such a severe disturbance of the capacity to recall autobiographical memories, not only of specific incidents but over-general memories of the kinds of experiences she typically had.

305. With this assessment of Wendi's memory dysfunction and personality fragmentation in mind, we can consider the few memories Wendi does report from the time in her life between first meeting Alejo (at four and a half years old) and completing first grade in Casa Grande. As noted above, she recalls almost nothing of her mother, except of her mother sewing clothing for her when she was in kindergarten, a memory

SP&A 08532

000000557

P-App. 004858

which has no sense of emotional connection to her mother and led to the associated sad recognition, "I don't have that feeling that she loved me." Wendi also recalls feeling sad about not seeing her grandmother any more after the move to Casa Grande. Asked for her earliest memories of Alejo, Wendi replied, "Nothing specific," then added, "I do know that my Grandma didn't like him, and I was aware of that." She also recalls, in general terms, that from as early as she can remember she "always knew his background, that he was not from the church," and that he told her stories of having done drugs and being a "drug mule." Wendi also reported general but not specific memories of kindergarten, specifically of being "motherly" toward the other children and really liking it "because I always had a lot of them around me and got a lot of attention there."

306. Finally, Wendi reported general memories that, since her arrest and before examinations by defense experts, had led her to wonder about sexual abuse by her biological father or other members of his family. From as early as she could remember, she said, "I always had that awareness of sexuality, but you're not supposed to as a child, so why did I have that in my head all the time?" She elaborated further, looking back over her entire childhood, though again, the memories cover from age five on up: "Being aware of that extra something that always comes from men.... Growing up I always used to think that men were always so sexual about everything. Along with the disgust would come this need, because I was always pretty flirtatious to men. It was really important to me that I had their attention. But then, when I would get their attention, I felt like I was nasty. It doesn't make sense to me." These are classic symptoms exhibited by girls sexually exploited and abused from an early age, before their brains could encode specific autobiographical memories that could be retrieved later in childhood or

132

SP&A 08533

000000558

adulthood. Indeed, what Wendi describes – the inexplicable yet ever-present awareness of men's sexual attention, the automatic yet disturbing responses to that attention – are well-known among child abuse researchers and therapists as *implicit* memories of sexual abuse and *procedural* memories of how the child was conditioned to respond to that abuse.

## VII.   AGES SEVEN TO NINE – POVERTY AND FANATICAL CONTROL OF A "TRAVELING MINISTRY" CULT

307.  In the first decade of their adult lives and the early years of Wendi's, Donna and Alejo were particularly confused, and often deluded. This manifested most clearly in their being swept up into the religious cult led by Rick Miller and Al Farmer, and their bringing Wendi along for the ride while never stopping to think seriously about her needs for stability and well-being.

308.  Looking back now, Donna acknowledges just how desperate she and Alejo were to be good, and to serve and be loved by God – and how their desperation was matched by their confusion:

"We were young in the Lord at the time when we entered the traveling ministry and very zealous Christians. In those days after we received revelations from speaking in tongues, we pulled out scriptures to make them match what we wanted to believe or make them mean what we wanted them to mean…. we went over the edge because we were so intent on doing everything right, the way we felt God wanted us to do everything." (Tab 27, at ¶ 203.)

133

SP&A 08534

000000559

309. **Joining the "Fishers of Men Traveling Ministry."** As noted above, Donna remembers Rick and Al telling people God wanted them to leave their families and otherwise follow Rick and Al's mixture of self-serving and self-deluded visions and demands. Sometime around June of 1977, Donna and Alejo heeded that call. They believed it had first come "from God through prayer in tongues" (Tab 27, at ¶ 204) and that they had received "confirmation while praying in tongues with Rick and Al translating." (Tab 28, ¶ 77.) Donna recounts how she and Aljeo "gave up our house and possessions except for a couple of boxes... and departed to go on the road with Rick Miller and Al Farmer..." (Tab 27, at ¶ 204.) Not only did they leave their few remaining possessions behind, but they "cut off all contact with family and everyone else we had known and stayed out of contact for the entire time, from about June of 1977 until about September of 1979." (Tab 27, at ¶ 204.)

310. Donna also acknowledges that she and Alejo never considered Wendi's needs when making their decision. "Alejo and I never thought about what Wendi wanted or what might be good for her in our decision to join the traveling ministry." As Donna recalls, by that time "Wendi was so obedient, and used to being around adults... that when we told her we were doing what God wanted us to do, she fully and unconditionally accepted that." (Tab 28, ¶ 78)

311. The group's plan or mission was to travel from Arizona to California, teaching their version of the gospel along the way, and recruiting others into their group, until reaching California where they would join Rick and Al, who had another church there. (Tab 24, at ¶ 63.)

SP&A 08535

000000560

P-App. 004861

312.  Not surprisingly, their fellow travelers in this "traveling ministry" were apparently as wounded and confused as they were, and those with children were equally incapable as parents. For example, Donna and Alejo report that the group's first stop was Wilcox, Arizona, where Donna recalls staying for a few weeks until they left suddenly, in the middle of the night, "because Child Protective Services [CPS] had been called and a report made about Rick and Rosalie [a woman in the group] abusing Rosalie's baby son and her daughter, who was about two or three years old." (Tab 27, at ¶ 205.)  After the CPS visit Rosalie left with the group, abandoning her children to her own mother and, as far as Donna knows, Rosalie never regained custody. (Tab 27, at ¶ 205.)

313.  Next they went to Tucson and, for about ten months of 1977 and 1978, stayed in the home of another woman in the group "while trying to get the traveling ministry together." (Tab 27, at ¶ 207.)  From that point on the group had a core of nine people including Donna, Alejo and Wendi; others would join temporarily but not continue on to the next destination along the route to California.  In Tucson the goal was to amass resources for the journey to California. Alejo and the other men painted houses and did temporary odd jobs to pay for living expenses.  (Tab 27, at ¶ 208; Tab 24, at ¶ 64.) Alejo reports that a painting business owner fled to Mexico without paying $12,000 in wages owed to Alejo and another man from the traveling group. (Tab 24, at ¶ 64.)  The women did cooking and cleaning and other home-based tasks, including schooling Wendi.

314.  **The traveling cult on the road: Poverty, totalitarian control and brainwashing.**  Eventually the group left Tucson, in a caravan consisting of a converted school bus pulling a VW van and a pick-up truck pulling a fifth-wheel trailer. (Tab 24, at ¶ 66; Tab 27, at ¶ 207.)  The school bus had a kitchen and a "toilet-type thing, like a

135

SP&A U08536

000000561

portapotty." (Tab 27, at ¶ 207.) From then on, for at least another year, the group would live in extreme poverty. John Shaddle, who joined and traveled with the group while Wendi's family did, for about five months in 1979, recounts how poor the group was. "There wasn't much food around, for one. A meal consisted of tortillas and fried tomatoes." (Tab 36, at ¶ 6) Donna remembers often being so hungry that they "ate old food out of the trash or searched for pennies on streets to try to collect enough money to buy a bag of beans." (Tab 27, at ¶ 213.) Stephen Shaider, who would come to know Wendi's family after they left the traveling cult, recalls Donna telling him the group depended on Wendi's panhandling to support themselves, and that "no one could resist a cute girl begging for money." (Tab 35, at ¶ 6.)

315. The poverty of freedom and personal autonomy was just as extreme, and perhaps even more harmful to Rick and Al's followers, including young Wendi. Donna recalls how Rick exerted constant dictatorial control over the group's resources and his followers' behavior and thinking – over all money; over who could do what, and when, including who they were allowed to talk to; and over regimented daily routines that caused chronic sleep deprivation.

316. As John Shaddle recounts, Rick was "a very charismatic person… the 'big hook,' appealing to many people who took interest in the ministry." (Tab 36, at ¶ 2.) At the time, John was nineteen years old and, having just separated from his wife, vulnerable to being swept up in the group. John notes that Rick and Al were older than their followers, who aside from him were, like Alejo and Donna, in their early to mid-twenties. Looking back, he says, "In hindsight, the group was pretty far out there and today I would describe it as a cult." (Tab 36, at ¶ 3) Donna goes into some detail:

136

SP&A U8537

000000562

"We woke up at a set time, five o'clock in the morning, when Rick and Al decided we should get up, and the adults and Wendi were expected to wake up singing, 'Glory, glory, rise and shine and give God glory,' and continue singing until everyone was up…. [E]ventually we all just hated to hear them singing and having them wake us up…. We didn't get much sleep for most of the time… It was really a lot like brainwashing. We studied scriptures every day before we ate, washed up, or did anything else other than maybe going to the bathroom. Rick and Al kept us on a very tight routine all day." (Tab 27, at ¶ 210.)

317.  Donna recalls how, in classic cult fashion, "other than the people we ministered to and the occasional prospective members of the ministry, we did not associate or talk to other people or outsiders because Rick and Al did not allow it." (Tab 28, ¶ 84.) Donna also recalls how Rick and Al "always assigned plenty of chores to keep us busy at all times… Everyone was always so busy that we never had a chance to just sit and relax. With extremely rare exceptions, there was zero leisure or personal time during our years with the traveling ministry…. It got so that we never really thought about anything, just did what we were told all day, from one day to the next. I can see in retrospect how it got to be like a cult." (Tab 27, at ¶ 212.) Indeed, everything Donna describes is consistent with how cults are run, with the leaders exerting totalitarian control over their followers, including when they can eat or sleep. And the chronic imposition of sleep deprivation and indoctrination, in this case constantly reading scriptures interpreted for them by Rick and Al, are standard mind control techniques used by cult leaders.

137

SP&A U8538

000000563

318. This totalitarian control was applied to Wendi too, the only child in the group. She was always assigned chores when she wasn't being schooled. These included washing dishes, cleaning up the living area, helping to wash the vehicles, and being a gofer for the seemingly unending stream of construction projects. (Tab 27, at ¶ 212.) For two years, Wendi had little or no time to simply *play*. Instead, she was forced to serve others, and to make sure the adults, especially the men who ordered everyone else around, were happy.

319. As described above, Wendi had been conditioned to obey and serve adults from the beginning of her life, when Skip harshly imposed his potty training regime on her. When Donna handed Wendi over to Alejo, before the traveling cult, he picked up where Skip had left off. The traveling cult was an extension and intensification of the domination and subservience to which Wendi had always been subjected by her mother's husbands. Before the traveling cult, if no controlling and abusive men were around, Wendi could play with her friend Tascha; when in day care, as well as kindergarten and first grade, Wendi could play with other children in classrooms and on the playground. Before the traveling cult, she had always had opportunities to be free from controlling adults and (often) abusive men. For those two years in the traveling cult, however, there was virtually no escape from control by Rick and Al. There was little or no time for play. This could only have a dispiriting and depressing effect on Wendi – as it would on any child – no matter how much her innate temperament may have inclined toward cheerfulness and playfulness.

320. Finally, Donna and John Shaddle both describe how members of the group, when not doing chores or working to support the group, would go out preaching and

138

SP&A 08539

000000564

"ministering" on the streets, which meant singing, reading scripture and preaching their interpretations of scripture. (Tab 36, at ¶ 6; Tab 27, at ¶ 211.) John recalls that Rick and Al, who sent the younger men to work every day and controlled every penny they made, never worked themselves. Instead, they would stay back with the women and Wendi, reading scripture all day as the females did chores and Wendi was schooled. (Tab 36, at ¶ 7; Tab 27, at ¶ 216.)

321. **Wendi's home and on-the-road schooling.**  Wendi was the only child in the traveling group. When she would otherwise have been in second and third grade of formal schooling, she was home-schooled by her mother and other women in the group, who used teaching materials from a private school organization and old textbooks. Donna recalls teaching Wendi English in the mornings, and two other women teaching her Spanish, as well as science (sans evolution) from the textbooks. A man in California briefly taught Wendi math. (Tab 27, at ¶ 215.)

322. **Increased physical abuse of Wendi.**  As described above, from when Wendi was a toddler Donna had used spanking and physical pain not only to discipline Wendi in the traditional sense, but whenever she "didn't obey" or "didn't come when I called." (Tab 27, at ¶¶ 235, 236.)  And as explained above, this infliction of physical force and pain to command and enforce obedience – obedience that must be instantaneous, unquestioning, and complete – hindered Wendi's development of self-regulation capacities and her internalization of the very rules and values (aside from mindless obedience based in fear) that Donna was trying to teach her. To the extent a child's behavior is governed by force, pain and fear, she will have trouble regulating her own behavior and experiencing the rules and values parents teach as belonging to her, rather

139

SP&A U8540

000000565

than simply *obeying and complying to get her parents' approval and to avoid their rejection and attacks*.

323.  When all of the adults in a child's life responsible for teaching rules and values are punishing and controlling her in this way, the conditioning is more powerful and the negative effects more pervasive. Wendi's entry into the traveling religious cult marked the beginning of near total immersion in fanatical and totalitarian religious micro-cultures where children were constantly dominated and controlled through physical violence, pain and fear – and robbed of their innate potentials to develop healthy self-control, critical thinking, and other essential capacities for growing into emotionally healthy and morally unconfused adults.

324.  Donna describes her own mindless obedience to the commands of church and cult leaders to instill mindless obedience in her own child:

> "Since Wendi was born, I've always been to-the-letter, black-and-white when it comes to following church rules, including rules about disciplining kids, by which we meant spanking or swatting them.  If the church authorities say to spank the kids, I spank them, and I do it how I'm told to do it.  You have to spank them hard enough so they're not just angry; it has to go beyond that so you break them. They have to stop being angry and learn to obey." (Tab 27, at ¶ 237.)

325.  Donna reports that it was after becoming followers of Rick and Al, when Wendi was six or seven year old, that she and Alejo began beating her with a wooden paddle. (Tab 27, at ¶ 237.) Alejo confirms this and explains that, in his mind, beating with a paddle and then reading scriptures together and hugging at the end, which he calls

140

SP&A 08541

000000566

"spanking with instruction," was far better than simply screaming at Wendi when she broke a rule or failed to instantly obey. (Tab 24, at ¶ 126.) As with Alejo's account of forcing a sobbing little Wendi to wash crayon off the bedroom door for an hour and a half, it is notable that Alejo does not consider any other options for discipline, besides screaming at her or "spanking with instruction," that would have been appropriate to Wendi's developmental capacities and needs.

326. To this day Donna, Alejo, Wendi and many members of the still more violent church/cult they joined later, refer to beating children with a wooden paddle as "swatting" and as each blow as a "swat." Compared to the traditional word, "spank," the euphemistic "swat" sounds innocuous. Yet the violence of hitting a child's body repeatedly with a wooden paddle, the pain inflicted, and the resulting emotional harm are greater than those of hitting a child with one's hand.

327. Donna recalls how during the traveling ministry, she and Alejo beat Wendi with a wooden paddle about once per week, but Rick and Al "expected us to swat her more often than we wanted to." (Tab 27, at ¶ 238.) In addition, when parents were not around Rick and Al beat Wendi and other children (who lived in houses the group stayed in but did not travel with them). Donna witnessed Rick and Al beating other parents' children, including how "they swatted really hard, a lot harder than Alejo or I did, and harder than I liked Wendi to be hit." Because Rick and Al thought Wendi should be beaten more than her parents did, and Donna and Alejo were "gone a lot and left Wendi with Rick and Al or other adults frequently," it is likely that Wendi received many painful beatings from Rick and Al during the two years she was in their cult. (Tab 27, at ¶ 238.)

SP&A U8542

000000567

328. The results of all the beatings were predictable. As Donna recalls, "during the traveling ministry and afterward, Wendi was always a good kid. She acted like a kid who has been adopted, knows it, and is afraid of being turned out. With very few exceptions, she was always trying to please, be nice, give in, and fit in with whatever authority figures around her expected." (Tab 27, at ¶ 219.) That is, if Wendi was a "good kid" in her behavior, it was not because her innate goodness as an innocent child had been supported and nurtured in loving relationships with adults who helped her to assert her own will and think for herself while internalizing those adults' positive values. Wendi was a different kind of "good kid." She was a child whose parents and other adults had beaten down much of her innate goodness, beaten out much of her innate potential to think and act for herself in healthy and age-appropriate ways.

329. Donna continues: "By the end of our time with Rick, Al, and the traveling ministry, by the time Wendi was nine years old, she had changed a lot. She wasn't the same energetic little girl she had been. She didn't want to get up in the morning and she didn't have the same spunk and independence. She didn't talk to me, and she wasn't affectionate with me anymore." (Tab 27, at ¶ 220.) Wendi was depressed after two years of immersion in an impoverished, totalitarian cult where her brain-washed parents and the cult leaders repeatedly beat her into fearful submission. And she was withdrawn, at least from her mother, who – unlike her immature and pedophilic adoptive father, who increasingly forced himself upon Wendi as a playmate and sexualized partner – had always neglected her daughter and yet took for granted that Wendi would keep being affectionate toward her. Sometime during the traveling ministry, "by age eight," Donna reports, Wendi "wasn't cuddly anymore and didn't let me hold her or hug her anymore."

142

SP&A 08543

000000568

P-App. 004869

Donna says this refusal to be affectionate applied specifically to her (e.g., during the traveling cult Wendi would hug strangers and "cuddled up to Rick a lot"), and it continued through Wendi's teen years. (Tab 27, at ¶ 218.)

330. Alejo, in contrast, to this day appears oblivious to the harmful effects of the traveling cult experiences on Wendi. When Alejo looks back on this period, he says, "Thinking of Wendi during this time and later on, when we returned from the ministry, when she was eight, nine, and ten years old, she was a bubbly, outgoing, friendly kid." Then he adds: "Wendi always wanted to please me and please others." (Tab 24, at ¶ 70.) In short, as long as Wendi's fear and compliance served his needs, and her depression caused no problems for him, she seemed perfectly fine to him.

331. **Leaving the traveling cult.** John Shaddle tells the story of when the traveling cult began to dissolve. When the group arrived in Costa Mesa, California, "things changed philosophically." A local pastor there, Chuck Smith, inspired Rick to reconsider traditional organized religion, and as John remembers it, Rick then said to the group, "We have a problem. We have to submit to somebody." Yet when Rick wanted to fold his group into Chuck's church, "Chuck told us that the best thing we could do is split up and go our own ways because we had all been brainwashed." John recalls, "That was enough for me." Already fed up with the "hypocrisy and all of the confidentiality about money," he left the group. (Tab 36, at ¶ 11.)

332. Neither Donna nor Alejo explain why they decided to leave the traveling cult. Alejo does mention that the plan to start a church was never fulfilled, and says cryptically, "Our decision to travel with the ministry and to return when we did was inspired by God." (Tab 24, at ¶ 69.) Donna mentions that "it did get very weird at times"

143

SP&A U8544

000000569

and that another member of the group told her that, after she and Alejo left, "Rick and Al kept trying to raise people from the dead," even "toting dead people around with them" and "keeping a body with the group for a period of time while they intended to raise it from the dead." (Tab 27, at ¶ 217.) Perhaps things eventually got too bizarre even for Donna and Alejo. Whatever the reasons, Donna, Alejo and Wendi left the traveling cult around September of 1979 and returned to Arizona.

333. Looking back and thinking about the effect the traveling cult had on Wendi, Donna once again reveals how much she neglected her daughter. Donna says that although the hunger and lack of clothing for Wendi "bothered" her,

"it never even entered my mind that the hunger, always working and having little or no relaxation and playtime, getting very little sleep, most of the time having no other children to play with, and the disciplining we did by swatting Wendi, might be damaging to her. The way we saw it was that it was good for her because we were living the life God wanted for us and Wendi had attention from all the adults in the ministry." (Tab 28, ¶ 86).

334. **Wendi's memories of the traveling ministry.** Consistent with Wendi's generally impaired memory for childhood experiences, in our interviews she reported no memories of Alejo during this time, and only one memory of her mother, in which Donna intentionally broke her own glasses "as an act of faith" and claimed that God would heal her eyes. (Donna continued to need corrective lenses.) The only positive memory Wendi had of the traveling cult was of playing the guitar and singing, which was part of Bible reading and prayer. Otherwise Wendi reported very little memory, even of a very general or schematic kind.

SP&A 08545

000000570

P-App. 004871

335.  In some ways, the traveling cult may have protected Wendi from Alejo, since she and the women were typically separated from the men besides Rick and Al. After leaving the traveling cult Wendi's family joined another cult – one with equal or greater confusion, brain-washing, and violent attempts to enforce mindless obedience – and Alejo increasingly imposed his compulsive, perverted and pedophilic sexuality on Wendi and her friends.

## VIII.   AGES NINE TO EIGHTEEN -- NO ESCAPE FROM NEGLECT AND EMOTIONAL, PHYSICAL AND SEXUAL ABUSE IN HER HOME, CHURCH AND SCHOOL

336.  Upon leaving the traveling cult and returning to Arizona, Donna, Alejo and Wendi lived for a few months in Tuscon, with Donna's father. Donna continued to home school Wendi, who would never again attend public school except for a few community college classes in high school. By the end of 1979 they had moved back to Casa Grande. (Tab 27, at ¶ 221; Tab 24, at ¶ 71.)

337.  Alejo had a hard time finding work in Casa Grande, according to him because he was "not well connected" and could not get union jobs. (Tab 24, at ¶ 74.) Donna's source of minimal income was babysitting the children of two friends, paid for by a state babysitting program. (Tab 28, ¶ 87.) For a year or so, Wendi was reunited with her friend Tascha Barnes, with whom she had lived when her mother first moved to Casa Grande, until Donna and Alejo got married and moved out. (Tab 28, ¶ 87.) Although Wendi was finally able to play regularly with other children again, Alejo recalls that, upon their return to Arizona, "it seemed like she was a little adult. As a child, Wendi was always mothering, even me and kids her own age." (Tab 24, at ¶ 73.)

145

SP&A U8546

000000571

338.  Soon after arriving in Casa Grande, Donna and Alejo began attending a local church named "91st Psalm Church," led by Cal Lorts, an old high school friend of Alejo, with whom he had done lots of drugs. As described above, along with his brother Barry, Cal was intimately involved in Alejo's conversion to fundamentalist and evangelical Christianity – which had morphed from something akin to a few psychedelic and sexually supercharged trips with Cal and Barry (e.g., hitchhiker from another world, orgasmic first speaking in tongues) into an embrace of cults led by charismatic, deluded and authoritarian leaders.  Donna recalls that, after the traveling cult, 91st Psalm seemed "less involved and engaged" and "not strict enough," with church members who were "undisciplined in their faith." Yet she and Alejo decided it was "the best option we could find. Alejo and I were still very young and zealous. If it wasn't for 91st Psalm, I don't know what we would have done because there were no other churches that seemed at all serious to us in or near Casa Grande." (Tab 27, at ¶ 222.) At least, Donna thought, 91st Psalm was a "full gospel church" that included speaking in tongues "to receive direct revelation from God, raising the dead, and everything else that's in the Bible." (Tab 27, at ¶ 223.)

339.  Snapshots of Donna and Alejo's zealotry and confusion at the time are contained in letters Donna sent to Alejo while he attended a "Laborer's Union School" in Prescott, Arizona. (Tab 24, at ¶ 72.)  While Alejo was away Donna moved from Tucson to Case Grande and began attending 91st Psalm.  In one letter Donna describes a Bible study group attended by Alejo's mother and sister, bitterly recounting how a woman in attendance asserted that a verse on the Trinity, which Donna was quite attached to, had been added by English writers and was not in the original text. She criticizes the woman,

146

SP&A U854/

says she does not want to go back to the group, even though its members are expecting her to, and asks Alejo, "Should I get in touch with Calvin or what?" (Letters from Donna to Alejo, Obtained by Capital Case Project.)  A letter from a few days later appears to document her first visit to 91st Psalm, although Cal is away for a preachers' meeting in California, which prompts Donna's comment, "Guess the Lord has it in control." (Letter from Donna to Alejo, Obtained by Capital Case Project.)  Donna's letters are sprinkled with non sequiturs like, "Praise the Lord. He'll get the glory. Jesus loves you, babe!" and "Jesus is the God over the way we feel!"  (Letters from Donna to Alejo, Obtained by Capital Case Project.)  The margins often have scripture citations.

340.  Other passages reveal Donna's longings for recognition as a special person, which she never experienced as a child. In one she tells a story of receiving some special treatment at the DMV and ends, "they were real nice to me. Must've thought I was somebody – and I am – a child of the King!!!" (Letter from Donna to Alejo, Obtained by Capital Case Project.)  In another Donna reveals how she saw herself and Alejo as not merely special to God, but an extra-special and extra-powerful team that God was using in the world:

> "I was thinking how people would be expecting me to be out doing lots for the
> Lord and stuff while you're gone. I mean like they would say I have a mind &
> life of my own. But I'm part of a team. You and me together are in God's
> plan. We can both still minister the Lord and do for God, but like a high wire
> team – they can each do tricks but without the other one there they can't do
> the big stunts. They need each other. That's how we are – together we can be
> and should be one of God's big guns! Hallelujah!" (underline in original;

147

SP&A 08548

000000573

Letter from Donna to Alejo Ochoa, Thursday November 15, 1979, Obtained

by Capital Case Project.)

341. **Family joins 91ˢᵗ Psalm Church, Wendi goes to the church's school.** Soon

Donna and Wendi were attending 91ˢᵗ Psalm. Alejo recalls that, upon his return, Cal

asked him to "teach teens on Sunday mornings." (Tab 24, at ¶ 75.) By early 1980 Wendi

was attending the small, church-run 91ˢᵗ Psalm School. For the rest of Wendi's childhood,

that church and its school would constitute almost the entirely of Wendi's social life

outside of her immediate family, and thanks to Alejo's roles in the church, the boundaries

between family and church were often blurred.

342. There are many witness reports of the culture of 91ˢᵗ Psalm Church and the

school, from when Wendi's family joined right through her teenage years, especially

during its later years, when it was lead by a very disturbed and destructive man, Tom

King. The accounts of these many witnesses, who were themselves parents or children at

the time, are consistent with those of Donna and Wendi, and provide many additional

stories and details.

343. **91ˢᵗ Psalm/Harvest Family Church and school: Power-hungry, charismatic**

**leader followed by power-hungry, non-charismatic leader.** The 91ˢᵗ Psalm church

was led by Cal Lorts from 1975 until sometime in 1983, when Tom King became its

leader and re-named it Harvest Family Church. There were continuities across Cal's and

Tom's leadership, but differences too. What members liked about Cal and the

community was generally lost with him, and Tom exacerbated the negatives – already

numerous – and added many new ones of his own.

148

SP&A 08549

000000574

344. Donna describes how Cal Lorts "tended to be very dictatorial, and that at least fit right in with what we were used to." He was also "very charismatic" and the kind of person who got people "excited about bringing other people into the church." Looking back Donna sees Cal as "exactly the kind of man you drink punch for, like Jim Jones." Indeed, more than one witness has compared Cal Lorts and his successor Tom King either to Jim Jones, an infamous murderous cult leader from the time, or Warren Jeffs, from more recent headlines. Donna recalls that Cal created "God's Special Forces," which involved married men quitting their jobs, leaving their families, and traveling the country for a year to recruit others into their church/cult. (Tab 27, at ¶¶ 224, 225.)

345. Most cult leaders have good intentions intertwined with their desires to control and dominate others. Those with charisma can be very engaging and charming people, even lots of fun. As George Carlin, who joined the church when it was in Cal's living room and helped build it, remembers: "The teachings of the church at that time focused on proselytizing, bringing others into the church. Pastor Cal Lorts was a very charismatic figure. The congregation just loved him. He had a very magnetic personality." Jasper Neace was around twelve years old when he became a member of the church and student of the school, around the time Wendi arrived. He recalls Cal's charisma too, and compares him to Tom King when it came to laying on hands to heal someone during a church service: "Calvin could make you believe anything. He was charismatic." In contrast, when Tom laid on hands, "I saw people pass out. I thought they were faking it." (Tab 11, at ¶ 17.)

346. Tom King is universally described as not only dictatorial and power-hungry – like Cal – but also as cold, harsh, mean, vindictive, humorless, and joyless. Each former

149

SP&A 08550

000000575

church member has their own particular perspective based on their personal experience, with some saying Tom was positive at first and then went downhill, and others recalling him as a nightmare from the start. But every witness agrees that Tom King quickly – and increasingly over time – became a terribly destructive force in their own lives and the lives of others in the church/cult community, especially the children. Parents and their now-grown children, looking back on their years under his domination, tell of being unable, to this day, to speak with each other about their experiences during that time; either the grown child explodes in rage or the adult collapses into tears of remorse.

347. In the recollection of Jeri Lynn Cunningham, a friend of Wendi's until she was about thirteen years old, after Cal's announcement that he was leaving, "Pastor Tom stood up and said, 'I'm glad he's leaving,' and proceeded to tell the congregation that Pastor Cal's leaving provided him with the freedom to do what the Lord called him to do. It was a very memorable statement." (Tab 12, at ¶ 9.) Cynthia Schaider, who remembers Cal as charismatic and liked by everyone, recalls, "When Cal left, there were dramatic changes. I remember people saying that all the good people left with Cal." (Tab 34, at ¶ 12.) She describes how Tom, lacking Cal's charisma, tried to put a positive spin on his shortcomings by seeing himself as a "teacher" rather than a preacher, as a "common man." (Tab 34, at ¶¶ 12, 13.) Ms. Schaider recounts: "Over time, Tom King became more rigid and oppressive, almost tyrannical. He did not preserve the sanctity of the pulpit.... It became a 'bully pulpit' that he used to control the lives of church members. He tried to put the weight of God behind everything he said, even when it was obviously his own opinion." (Tab 34, at ¶ 13.)

SP&A U8551

000000576

P-App. 004877

348. Ms. Schaider provides an example of Tom's public cruelty and sadism: When Wendi's adoptive brother Brandon dyed his hair orange, Tom responded, from the pulpit during a sermon, by saying that the twelve or thirteen year old boy looked like a "faggot." Tom then "instructed" everyone in the congregation to ridicule Brandon. (Tab 34, at ¶ 13.) Alejo confirms that Tom used to call Brandon a "faggot." (Tab 24, at ¶ 138.) Recalling this incident and innumerable others, Ms. Schaider notes that "Tom was socially inept and did or said whatever came to his mind. There was not any social filter in his brain.... Tom King used ridicule, humiliation, strong statements, and the fear of God to influence his congregation." (Tab 34, at ¶¶ 14, 15.)

349. Similarly, George Carlin recalls there being a "major shift" when Tom took over:

"It became something completely different under Pastor Tom's rule. Pastor Tom was very controlling. He was condemning – literally condemning. He had a number of rules that if broken, meant you were going to Hell. Just the way he looked at me and other members of the church, it was as if he had the ability to say 'you're not living right,' or 'you're not doing right,' just with his gaze. He was scary and the children were scared of him as well." (Tab 11, at ¶¶ 4, 5.)

Though Carlin himself could not bear to pay attention to Tom's sermons, and often slept through them, he remembers "someone saying, 'What has gotten in to Pastor Tom,'" referring to how extreme his sermons had become." (Tab 11, at ¶ 6.)  Looking back now Mr. Carlin muses, "Pastor Tom had some of his congregation brainwashed. It reminded me of the cult leader Jim Jones, but on a smaller scale." (Tab 11, at ¶ 7.)

151

SP&A 08552

350. His memory is consistent with that of his ex-wife, Constance Boys: "When Cal Lorts left, the church was different, but not dramatically so. In the beginning Tom's sermons were pretty typical, but they became so harsh over time. The church became very cultish, though it didn't start that way. Everything became so warped." (Tab 10, at ¶ 5.) In recent years, when Ms. Boys saw a television documentary on Warren Jeffs, she thought "that there were many parallels between that religious cult and our own. It was definitely the same type of control." (Tab 10, at ¶ 33.)

351. As many witnesses recall, Tom created a terribly oppressive environment. Jasper Neace remembers how Cal was "more positive and optimistic," and "could make you feel good" with his "shorter and more exciting" sermons. In contrast, Tom revealed himself as a "negative person" who "preached damnation" in sermons that were "long and drawn out and boring" and embedded in church services that typically lasted 2 to 2½ hours. (Tab 23, at ¶¶ 19, 20.) Neace offers other snapshots of the totalitarian control and brainwashing that intensified under Tom King's leadership. "All television was forbidden. They called it the Devil's box…. We didn't watch or hear any news from the world outside, and I knew nothing of politics or world events." (Tab 23, at ¶ 10.) Church members were told that even normal behaviors were sins and would send them to hell: "Thinking negative thoughts was a sin. Gossip was a sin. Engaging in romantic relationships was a sin…. I can still hear the words, 'Sin is pleasure for a season but the end thereof is death.'" (Tab 23, at ¶ 10.) Neace sums up, "Upon reflection, it seemed that as long as Pastor Tom was happy, we were all going to heaven. But, if Tom was not happy for some reason or if he did not like you, anything you did was a sin." (Tab 23, at ¶ 10.)

SP&A 08553

000000578

P-App. 004879

352. George Carlin recalls that whereas Cal had focused on bringing people into the church, Tom wanted to keep the community isolated and insular – and under his control. Like other former church members, Carlin tells a story of his daughter bringing friends to church and Tom condemning her for it. (Tab 11, at ¶ 8.) Recalling the same experience in more detail, their daughter's mother Ms. Boys recalls that Tom "seemed very uncomfortable with having new people in his church. I remember that Tom King referred to my daughter, Sarah, and some other students at the school as 'worldly,' because they participated in activities, and had friends, outside the church. In Tom's mind, this was a sin." (Tab 10, at ¶ 17.)

353. And so, under Tom's influence the church/cult community became increasingly closed in upon itself, to the detriment of everyone involved – most of all those children who, like Wendi, also attended the school. As in totalitarian societies, church/cult members spied on one another to enforce Tom's edicts of domination. Neace recalls:

"[W]e were not permitted to associate with anyone who did not attend the church. Harvest was our whole world; we spent our days there, then we went home. The only recreational activities we were permitted were those put on by the church. For example, if I went to hang out with my neighbor buddy, and someone from the church found out, they reported to my mother that I was hanging out with 'bad people.' A 'bad person' was anyone who did not subscribe to Tom King's way of thinking. Kids who did not attend our church and school were branded this way. They were called bad influences, and to spend time hanging out with them was to 'tempt the Devil.' We were told that they were ungodly and that we would become that way too if we spent our

153

SP&A 08554

time with them. In this way, the church tried to control every aspect of our lives." (Tab 23, at ¶ 9.)

354. There are many more such stories in the witness declarations submitted by people who were caught up in this cult, as adults or children. Many are heartbreaking to read, especially those in which family members are turned against each other. The sampling contained in this report cannot do justice to the nature of the isolated cult community, controlled by increasingly disturbed and dictatorial men, in which Wendi grew up from age nine through her adolescence. There are, however, some aspects of the community's leadership and culture that warrant highlighting as particularly destructive influences on Wendi Andriano. We turn to those now.

355. **91st Psalm/Harvest Family Church and school: Men dominating women, and sexually abusing girls.** Donna recalls that at 91st Psalm/Harvest, as with "all the churches and ministries that I've been a part of throughout my life," it was the men who had religious authority. "There were never women pastors, and the woman's role was basically to be a doormat to her husband and do whatever he told her to do." (Tab 27, at ¶ 191.) Cynthia Shaider remembers, "Tom King frequently preached that a woman's place was in submission to her husband. He often said that women should quit their jobs and stay at home." (Tab 34, at ¶ 8.)  And he set an example with his own behavior. Several witnesses describe Tom's wife as totally submissive to him.

356. This culture of male domination, along with the sexual perversions of several prominent men in the church, including Tom King and Alejo, created a culture in which some men sexually exploited and abused girls – including their own daughters – with impunity.  Three witnesses tell the story of Tom King's own niece being sexually abused

154

SP&A U8555

000000580

by a man who was Tom's friend, his brother in law's business partner, and a major donor to the church. It was a major scandal in the community, and Tom King's behavior at the time was so egregious that the other witnesses could no longer keep their heads in the sand. The girl was seven years old at the time, known to all in the community as a sweet and happy little girl. Ms. Boys personally witnessed Tom blame the girl for her own abuse, saying she was "flirty" or something along those lines and had been "asking for it." Looking back, she remembers his comments as "outrageously shocking…. This was not only a seven-year-old girl he was talking about, but it was his own niece. That really sent me over the edge." (Tab 10, at ¶ 20.)

357. Mark and Nancy Keating, the only two formally trained educators who worked at the Harvest Family Church School from 1983 to 1988, were deeply disturbed by this girl's abuse and what they heard about Tom's reaction — which came to their attention as they struggled with their shared strong suspicion that Wendi was being sexually abused by Alejo (see below) (Tab 13, at ¶ 10; Tab 14, at ¶ 11.) According to Nancy, it was then that she decided to leave the school, the church/cult community, and Casa Grande altogether: "When all of this came to light, I just knew that Mark and I could not start a family in Casa Grande. Not in that environment. It was not healthy there." (Tab 14, at ¶ 11.)

358. **91ˢᵗ Psalm/Harvest Family Church and its school: Monitoring and beating children.** Donna recalls, "We put Wendi into 91ˢᵗ Psalm Christian School in January, 1980 when she was nine years old, and it was a relief to know that she was getting a good Christian education and not having to worry that as a homeschooler I wasn't teaching her

SP&A 08556

000000581

everything she needed to learn." (Tab 27, at ¶ 227.) It was another example of Donna's

neglect and wishful thinking, if not willful ignorance, which so harmed her daughter.

359.   Cal Lorts' own brother, Barry Lorts, acknowledges that the school had no

teachers, only monitors. Consistent with Wendi's recollections and those of every witness

who had been a student in the school, Barry reports:

> "The curriculum used at 91st Psalm was called Accelerated Christian
>
> Education, or ACE. Learning was mostly independent and students were
>
> taught by completing PACE booklets… Each book had a test in the back, and
>
> each classroom had a monitor… who graded it. The monitors weren't really
>
> teachers, they were mostly to keep order in the classroom and to grade the
>
> tests… I think the monitors were all volunteers." (Tab 16, at ¶ 6.)

Several parents and former students consistently describe the school environment as

isolating, boring and oppressive. Students worked alone in cubicles, and were not

allowed to speak to each except during lunch, recess and other non-academic activities.

The monitors were volunteers who received no training and often could not answer even

basic questions from the students. (e.g., Tab 35, at ¶ 8; Tab 23, at ¶ 22.) Jasper Neace

recalls that there was "no formal group instruction except when we were instructed in the

Bible, sewing, cooking, welding, physical education ('PE'), or photography. The

remainder of our education was self-taught using ACE booklets." (Tab 23, at ¶ 23.)

360.   This would remain the case until Nancy and Mark Keating, who both had a

Masters degree in education, were hired as principals in 1983, three years after Wendi

arrived. (Tab 13, at ¶ 2; Tab 14, at ¶ 2.)  However, by all reports the Keatings mostly

SP&A 08557

000000582

focused on integrating sports into the curriculum; the academic curriculum and the school's operation were essentially unchanged.

361. With one exception, that is: Tom King took over the church just as the Keatings arrived, and he took a much more active role than Cal Lorts had. This meant that any benefit from the Keatings was more than offset by Tom's dictatorial style and dramatic escalation of corporal punishment, that is, beatings of the children, which had always been practiced in the school.

362. Not surprisingly, former students are uniformly negative in their accounts. Kimberly Wilson, who only spent three years at the school, from 1986 through 1988, recalls,

> "It was like a cult, in that, if you were a part of the church you had to be in the school. When I started going to school there [at age fifteen], I was not allowed to talk to my old friends from the public high school anymore, because they were 'bad.' Kids of my age, meaning fifteen to eighteen, were still getting 'the rod of correction,' meaning that they were still being hit with wooden paddles. I was intimidated by Tom. He acted as if he was God, or at least as if he had special direction from God." (Tab 38, at ¶ 12.)

Ms. Wilson then notes that, coming from public school at age fifteen, she knew things were different elsewhere, but Wendi and the other children there had never known otherwise.

363. Jasper Neace had the misfortune of attending for many years, beginning in 1979 when he was twelve years old. He has vivid and detailed memories of the physical abuse:

157

SP&A U8558

000000583

"There were several main principles and guiding scriptures that were taught at the school and to which the school and church adhered. One that sticks out for me referred to us children, 'Beat them when they are young and when they are old, they won't depart from it.' …. Corporal punishment was standard at Harvest. If there was one thing the adults enjoyed, it was beating the hell out of kids. That was the number one thing adults did at the school. Kids at school got whooping for nearly everything; disobeying, not following orders, being unable or unwilling to memorize the scripture assignment… and incomplete homework." (Tab 23, at ¶ 28.)

Neace goes on to describe the beatings children received in the office, including the wooden paddles with scriptures written on them, and how the children had to lean over to receive the beatings, which typically consisted of three to five very hard blows to their behinds. (Tab 23, at ¶ 29.) Neace also recalls the public exposure and humiliation: "After the kids were swatted, they returned to the main classroom. Everyone knew what had happened. There were no opportunities to hide what happened and we were not permitted to have any secrets. The kid came back to the classroom and you could see it on their face. Sometimes they were just red and embarrassed, sometimes they were crying." (Tab 23, at ¶ 29.)

364.  Constance Boys, a parent at the time, recalls how fanatical Tom King was about physical punishment, and his repeated exhortations to beat their children: "I remember that Tom King frequently preached that children should be spanked. He encouraged us to spank our children often…. Nearly every transgression warranted a spanking in Tom King's mind. He quoted scriptures about it, such as, 'Foolishness is born in the heart of a

158

SP&A 08559

000000584

child and the rod of correction will drive it far from him.'" (Tab 10, at ¶ 6.) Ms. Boys

also remembers an incident in which Tom rounded up and spanked about fifteen

teenagers for some minor rule violation. (Tab 10, at ¶ 32.)

365.  In addition to multiple witness reports, there is an audio recording of a sermon

Tom King delivered in the midst of these events, when Wendi was a teenager. Consistent

with Jasper Neace's recollection of Tom's sermons, it is long and rambling, and includes

Tom responding to questions from congregants. For the first eight minutes, Tom appears

to free associate: he reads from scripture that he says refers to Jesus; he talks about the

form of human "spirit bodies" in heaven, about spirits impregnating humans and creating

a race of giants and, during the Salem witch trials, babies born with chicken feet and

other bizarre features, which he says "are just a manifestation of a spirit being." (Tom

King sermon, 7:53, Obtained by Capital Case Project.) He continues, locking onto one of

his favorite topics: "They're a higher order than us. We're a low order. Just the natural

man. OK?  We're made liken to God, but until our spirit is recreated in the likeness of

God, we are [pause] prone [pause] to evil. (7:54 – 8:12, emphasis in spoken language)

He continues:

> "And I know that gets over on somebody's problem of inherent sin, and uh,
>
> somebody tries to say man is absolutely good and, and, his environment and
>
> situation produces evil in him. But explain to me then, how can a two year old
>
> – not a two year old, how can a two year old? – how can a two month old
>
> throw a screaming fit and rebel against his parents when nothing's wrong –
>
> when his diaper's changed, his bottle's fed, his bed's made, everything's cool,
>
> accept he wants some attention and 'you're not giving me enough and I'm

159

SP&A 08560

000000585

gonna <u>let you know</u> about it.' See that's a sin nature. [pause] Now is he

conscious of that? No. No. I don't think so. But he knows how to <u>get his</u>

<u>way</u>." (8:12 – 9:05, emphasis in spoken language)

366. In the world according to the confused and abusive cult leader Tom King, a two

month old who needs attention and affection from a parent is "rebelling" against that

parent. For those who, so to speak, "drank the Kool-Aid" in Tom King's cult, a two

month old who is expressing the most basic human need for affectionate physical contact

with a parent (a need that research has shown is as great or greater than the need for

food), and expressing that need through vocal signals, is manifesting his "sin nature."

367. Of course it can be stressful, as a parent, when you feel you've done all you can,

when you feel physically and emotionally spent, to have your infant cry for more

attention, especially if frustration is in his or her voice. Feelings of helplessness and

frustration, even anger, may naturally arise in parents. Sometimes they may feel their

baby is "rebelling" against them or even "tormenting" them. This is all very human, and

understandable. Nonetheless, such attributions are not reality, and sane and healthy

parents quickly realize this when the crisis has passed. To call the infant's behavior

"rebellion," and to cling to this mistaken belief long after the crying has stopped, is

delusion; for the ability to "rebel" is far beyond that of any infant.

368. By all reports Tom King was able to reinforce such delusions already present in

some parents among his followers, and to impose them on others who were well-intention

but vulnerable. In addition, Tom instructed parents to literally *beat* this alleged sin and

rebellion out of their children. He told them it was God's will. Indeed, later in the same

sermon he gives detailed instructions, sometimes in response to a congregant's question,

SP&A U8561

000000586

P-App. 004887

on how to beat children of different ages, including two month old infants (with a wooden spoon).

369. But before Tom gets to that, right after the passage quoted above, he condemns and mocks the toddler who says "mine" in an angry tone, then free associates to memories of beating the young children of his followers:

"How come he clenches his [pause] lips, and this six-foot, two-hundred pound pastor beats him on the behind and he's a little forty-pound, two-foot high kid, [pause] clenches his lips – [whispered aside, likely inaudible to congregation] just defiant – 'I <u>shall</u> not cry.' [long pause] And what happens if you just beat him a couple times, couple swats, and let that defiance and rebellion stay? You produce more in him. [long pause] One preacher says, 'You beat 'em 'til they cry, and you keep on beatin' 'til they cry <u>softly</u>.' Because if they go [lets out a long wail], it's rebellion, and you gotta get 'em until their spirit is broken. And it's one – and that happens – and you know when they're spirit is broken – you know what they do? They come by my office, wherever I'm at, they know, and they say, [in whispered, meek tone, as a congregant laughs at his facial expression] 'Hi Pastor Tom.' And they say, 'I'm doin' good.' It changes their <u>spirit</u>. It changes from the inside. It [Old Testament scripture] says, 'The rod will drive foolishness far from them.' If you beat him with a rod, he won't die. You'll beat him with a rod and [voice rising almost to a shout] deliver his <u>soul</u> from <u>Hell</u>.'" (9:25 – 10:42; emphases in spoken language)

370. This insanity is what Donna and Alejo, well into Wendi's teenage years, completely bought into. As Donna puts it, at the time she believed such "punishment" of

161

SP&A U8562

000000587

children was "necessary to drive sin from them and bring them up properly." (Tab 27, at

¶ 231.)

371. As discussed above, Donna and then Alejo had been beating Wendi for even the

smallest acts of disobedience (real and imagined) since she was a toddler. In contrast,

Jasper Neace's parents never beat him until they began attending 91st Psalm. "I believe

my mother thought she was doing the right thing. She was brainwashed by the church's

teachings, and she acknowledges that now. Every time I talk to her, she apologizes for

what she put us through. I have to be careful not to bring it up, because she cries and cries

and feels so badly about it." (Tab 23, at ¶ 30.) Neace notes that, perhaps because he did a

lot of work for the school and Tom and Alejo felt they needed him, he was seldom beaten

at school. His brother and sister, however, "were some of the hardest hit, both physically

and mentally. They were whooped about three times a week." (Tab 23, at ¶ 33.) His

brother was deaf and had a hard time memorizing scripture, which in the school meant

being "punished hard and beaten severely because of his disability." (Tab 23, at ¶ 34.)

As for his sister, an unattractive and awkward girl who never fit in, who was not only

beaten but at age sixteen raped by a church member: "The church destroyed Sherry."

(Tab 23, at ¶ 35.)

372. Some parents, like Martha England, could not bring themselves to beat their

own children, but remained silent as Tom and others attempted to beat them into

submission. Mrs. England told me that she now realizes her children, who constantly

pleaded with her to leave the church/cult and take them out of the school, in part because

of the beatings, were right all along. Constance Boys reports that her son Lonnie cannot

even talk to her about his time at the church and school: "[H]e is too traumatized. He is

162

SP&A 08563

000000588

really bitter…. To this day, I rarely speak to my son. We don't have a great relationship." (Tab 10, at ¶ 25)

373. **Alejo in the church/cult community: Emotional and physical cruelty, sexual perversion and harassment.** As a friend of Cal and Barry invited to be youth pastor, Alejo quickly became one of the church/cult "leaders." In that community, this meant having the authority – or at least claiming it and imposing it whenever he could – to present his own confusion as God's truth and his own cruelty as God's will. As youth pastor Alejo had many opportunities to beat children into submission, and to humiliate those whose "rebellion" he could not stamp out. Youth pastor was also a perfect position from which to inflict his sexual perversions and compulsions on captive children. And when not with the children, he was sexually harassing women throughout the community. Alejo's ability to get away with such behavior was only strengthened over the years, as he became assistant pastor and Tom's "right hand man," while remaining youth pastor. (Tab 23, at ¶ 24; Tab 11, at ¶ 10.)

374. Jasper Neace remembers Alejo as "particularly abusive to the children and to my brother Michael, beating them both during the school week and during Sunday school." (Tab 23, at ¶ 33.) Cynthia Schaider, a parent at the time, gives a more detailed picture of how Alejo related to the children, and the fear and confusion he caused them. She describes his immaturity and childishness, which could be playful and fun but also inappropriate and confusing, and how such behavior unpredictably alternated with harshness and cruelty.

"Alejo was unpredictable and temperamental. As youth pastor, he could be silly, irreverent and playful with the children and they enjoyed him at times

SP&A 08564

000000589

P-App. 004890

because, in many respects, he was a big kid himself. He was goofy. On the other hand, he created loose and unsteady boundaries with them. Some days the children could get away with almost anything. The next day, however, the same behavior wasn't permissible and was punished. He used his authority at school to bully the children. If they did something to make him angry, he made sure that they were humiliated. He was so harsh on them." (Tab 34, at ¶ 6.)

375.   Another parent, Constance Boys, also recalls Alejo's unpredictability and harshness and their effect on the children. "Members of the church were scared of Alejo, especially the children…. [Y]ou never knew how he was going to be. Sometimes he was happy-go-lucky and such a goof-off, and other times he got in these black moods…. One minute he was joking around and having fun… and the next moment he was dark and moody and anyone around him was afraid to do or say anything." (Tab 10, at ¶ 10.) It was the same unpredictable mix of immaturity, childishness, ignorance, harshness and cruelty that Wendi experienced every day at home.  But there was more in the mix, in both the community and the home: sexual perversion, compulsivity, and pedophilia.

376.   Jasper Neace recalls Alejo's sexualization of the girls in his youth ministry services and classes on scripture. "Alejo put most of his attention on the girls in the class. I remember feeling that he was more interested in them. I remember him licking his finger and touching their ears and acting real flirty. None of the guys liked Alejo; we all talked about it." (Tab 23, at ¶ 25)  Neace remembers talking to the girls as well about Alejo's unwanted sexual attention and contact. "On numerous occasions I heard many different girls complain about being alone with Alejo… As I understood it, Alejo…

SP&A 08565

000000590

P-App. 004891

459. As we can see from the sampling of memories above, the regular beatings from Alejo involved all kinds of painful emotions and relationship dynamics. Thanks to the craziness of the 91st Psalm/Harvest cult, unlike many physically abused children, Wendi's experiences were additionally freighted with extremes of condemnation and attributions of "evil" upon any perceived rebellion against adults' authority and power (recall Tom King's sermon). Like most abused children, though, Wendi had no one to help her safely acknowledge and feel, let alone make sense of, the confusing and contradictory emotions and relationship dynamics – emotions of fear, sadness, shame, and anger; dynamics of domination, submission, resistance, dishonesty, hypocrisy, and isolation. Given her temperament and personality, Wendi blocked all that out as best she could, and pretended everything was OK. She acted "extra-smiley" and "extra-cheerful." She focused on taking care of others – especially Alejo but also other children. And like most abused children, who want more than anything to be loved and happy, Wendi did her best to do well in school and have fun with her friends.

460. As Alejo himself has reported, and consistent with Donna's recollections, his most common (non-sexual) abusive behaviors in the home were yelling and screaming at Donna and Wendi. Recall Alejo's accounts of feeling, from when Wendi was ten years old, sexually rejected and frustrated by Donna pretty much every day, and of responding to that frustration with building anger that led to explosions of rage at Wendi and Donna. Wendi remembers that Alejo "had a very short fuse" and that it was "scary" and upsetting when he screamed at her. Wendi also remembers that her mother never attempted to comfort her, and when recalling this added, "In fact, it was our job to help him calm down." She also remembers working with her mother to calm a raging Alejo as the only

SP&A 08566

000000591

P-App. 004892

times she felt at all close to her mother. Otherwise, Wendi recalls, "It was me and my Dad together and my Mom over there."

461. Wendi also remembers – as does her mother, who admits to increasingly abandoning Wendi to Alejo during these years – that it was increasingly Wendi's job alone to pacify Alejo, especially after an explosive outburst had passed. Wendi recalls that Alejo would often rage at her and her mother, abruptly storm out of the house and go for a ride in the car, and then come back expecting and demanding to be, as Wendi put it, "babied." When Wendi accessed these memories in our interview, she continued, with a look and tone of amazement: "I spent *so much time* babying him." She recalled, "He'd lie on the couch and I'd rub his legs.... I remember my mother doing it a few times. But she didn't want to. She'd say, 'Wendi, you do it.'" Wendi's memories her are consistent with those of her mother and Alejo, and with Donna handing Wendi to Alejo and pushing Alejo toward Wendi while she retreated into working, reading and sleeping.

462. Reflecting further on her mother's perspective at the time, Wendi remembered, "She was displeased with him. She was the responsible one [working and bringing in the money]. She didn't want to be catering to him." Reflecting on the lessons she herself absorbed from years of repeating, on nearly a daily basis, this cycle of Alejo getting angry, screaming and yelling, then requiring literally hours of "babying," Wendi said: "If I get you angry, you care, and I can soothe you." (Indeed, even from Donna's account alone it is clear that Wendi would have experienced Donna as not caring enough to get angry or feeling much of anything toward her.) Furthermore, it was not just a matter of soothing Alejo after he got angry, but attending to his needs and wishes so preemptively and subserviently that he might not get angry in the first place. Wendi reflected, "You get

SP&A 08567

000000592

put in the position of helping him not be mad any more, creating an environment where he won't get mad." In addition, even when Alejo was ostensibly paying attention to her, or doing things for her – whether it was shopping, playing with her and her friends, watching TV together – it was really about *him* and getting *his* needs met, which mostly meant his needs for sexual stimulation and gratification. As Wendi once succinctly put it, a common experience growing up was "getting attention but feeling ignored."

463.  These repeated experiences, Wendi recognizes now, gave rise to patterns of relating to others that have manifested throughout her life, in all of her relationships, large and small, including in prison to this day. If someone is angry – whether that anger is caused by her, directed at her for no good reason, or directed elsewhere and has nothing to do with her – Wendi feels *driven* to make that person feel better, because she believes, "then they will like me." If someone likes her and is nice to her, Wendi strives to be even nicer to them and to take care of them, because this is the only way she knows to avoid them getting angry at her or abandoning her. Yet these ways of relating leave Wendi feeling, usually implicitly and without reflecting on it, that the other person does not really know or care about her needs and is just using her. In short, the very ways she attempts to avoid neglect and abuse in adult relationships leave her feeling neglected and used.

464.  These are not uncommon patterns of relating in people who have suffered chronic childhood neglect and abuse that included being forced to sacrifice their own needs and wants to those of their abuser.

465.  Several times in our interview, consistent with the primarily associative nature of human memory recall, talking about "babying" Alejo elicited unwanted memories of

SP&A 08568

000000593

P-App. 004894

what Wendi now recognizes were his sexually inappropriate behaviors. (Wendi never used the phrase "sexual abuse" to describe any of Alejo's behaviors toward her, though many certainly were.) It is to those sexually abusive experiences – at least those that Wendi can remember, and to the extent she can, that we turn now.

466. After talking about "babying" Alejo, Wendi continued: "I hated scratching his legs... My father would never wear underwear... sometimes you could see his penis." She then recalled how she tried to avoid seeing his genitals: "I could usually end up scratching his head." Asked if Alejo ever had an erection, she replied, "Oh my goodness! I don't recall...." Her comment reveals several things: How she simultaneously submitted to Alejo's demands to do things he found sexually gratifying and attempted to minimize her awareness of the sex involved; how she has blocked herself from remembering the most disturbing and conspicuous sexual aspects of these experiences; and how she hopes others might remember and save her from having to "betray" her father.

467. Wendi then added that she remembers Alejo walking around the house with his robe open, and how "you'd have to look the other way" not to see his genitals. She also recalled that whenever she complained to her mother, the response was inevitably something like, "Well, that's your father." Similarly, when asked about her earliest memory of something "sexual" with father, Wendi recalled how, when they lived in the house of Cedar St. (from ages nine to eleven), although Alejo had his own bathroom and she and her mother had theirs, Alejo often came in when she was talking a shower. "I remember screeching, 'What are you doing in here?!' and him being like, 'What's wrong with you? The shower curtain is closed.'" She continued, "I even have a memory of telling my mother, complaining about my father coming into the bathroom when I was in

210

SP&A 08569

000000594

the shower, and her saying, 'Well, you know your father.' I can hear her saying that to me. And she's just saying it in passing, continuing to do what she was doing and just brushing me off."

468.  As described above, in the section on Donna's and Alejo's recollections of this time, there were several factors that contributed to the incestuous family dynamics and Wendi's increasing subjection to Alejo's sexual abuse. These include Donna and Alejo's social isolation; Donna pulling away from Alejo, both emotionally and sexually; Alejo's sexual frustration and anger; Donna pushing Wendi, explicitly to sooth and prevent Alejo's anger, and implicitly to tend to Alejo's sexual wishes; Donna avoiding being in Alejo and Wendi's presence to avoid witnessing his sexual abuse and, when such avoidance was not possible, looking the other way. Although Donna did not report having minimized and dismissed Alejo's behavior when confronted with Wendi's complaints, Wendi's memories of such "brushing off" are consistent with Donna's many other acknowledged behaviors that contributed to the incestuous family dynamic and sexual abuse.

469.  Wendi also recalled her parents' social isolation after Cal left the church, and how this, when combined with her mother's withdrawal from her and Alejo, left him "starved for affection," which it became her job to provide. Referring to her mother's withdrawal during this time, Wendi said, "I feel like Mom would come home from work, go into her bedroom to eat and read," and that she and Alejo would eat in the living room and spend the rest of the night together, including hours after her mother fell sleep early.

470.  Another big contributor to the incestuous dynamic and abuse: Donna did not want to hear from Wendi anything upsetting or anything about sex. Wendi recalled

211

SP&A 08570

learning early on not to tell her mother anything potentially upsetting, because "she couldn't deal with it." Whenever she did tell her mother something that was "too much for her," Donna would "disappear into her room." Wendi remembers once asking her mother about dating, "and she just wouldn't answer. Then I'd have to go to my father and I'd get more than I wanted, probably too much information." When Wendi had her first period, she was shocked and went to her mother, who responded not by explaining anything but by telling Alejo to go to the store to get pads and tampons. "She seemed very embarrassed, very uncomfortable, like she said, 'Alejo, you tell her.'" In another interview Wendi recalled, "Everything I know about sex I learned from my dad. My mom was too embarrassed to talk about anything." She then continued, "And now, everything sexual I talk about is linked back to him, and that's what I freak out about, because it gets so twisted in my head. I don't mean to be dramatic, but I feel like if I sit down to write a letter in a romantic way [to her pen-pal boyfriend], he's that shadow in the room."

471. In the interview specifically focused on eliciting memories of sexually inappropriate or abusive behaviors by Alejo, conducted in April of 2011 according to strict procedures to avoid leading questions and anything that could lead to false or distorted memories, Wendi was able to access several memories of Alejo being sexually inappropriate. Importantly, she recalled none of the more serious incidents reported by others, such as her wearing lingerie around the house, Alejo in bed with her and Jeri Lynn, or being in the adults-only section of Spencer's gifts. This was even the case when, at the end of the interview, those witness reports were explicitly communicated to her. Nor did Wendi ever remember an incident involving undeniably sexual contact, although

SP&A U85/1

000000596

P-App. 004897

she did recall – as did Donna and Alejo – how Alejo would "wrestle" with her, Jeri Lynn

and Laura when they wore their nightgowns during sleepovers at her house.

472. After the memory of Alejo coming into the bathroom as she showered (and her

mother dismissing her complaints), the next memory to surface was of there always being

a Frederick's of Hollywood catalog behind the couch. Wendi spontaneously associated to

this memory, of which neither I nor the investigators had heard at that point.  Wendi said,

"In the living room behind the couch he would keep Frederick's of Hollywood catalogs –

it's lingerie, more risqué." She then laughed nervously and added, "There seemed to

always be one there…. I remember showing Jerry Lynn and Laura." After reporting that

memory, Wendi continued:

> "I have to go where my mind's taking me. I remember my parents buying me
>
> two pairs of pajamas, one with footies and one not, one blue and one cream,
>
> one loose and one tight. I remember being uncomfortable in the tight one, and
>
> my father really wanting me to wear the tight one, trying to convince me, and
>
> I always felt really uncomfortable…. [Alejo's] comments and compliments
>
> were supposed to make me want to wear it more, but I remember in the back
>
> of my head, it was too revealing, too much…. I was just starting to wear
>
> training bras, and with the tight pajamas every little thing was showing."

Wendi remembers expressing her discomfort to her father, and him telling her, although

she cannot remember the specific words, that her concerns were "not valid, not a worry,

not an issue, or whatever you want to call it."

473. This memory parallels one Wendi had reported in an earlier interview – a

memory that had also emerged spontaneously, following her recollection of Donna

213

SP&A 08572

000000597

sending her to Alejo when she had her first period.  It was of being out shopping with Alejo and him buying a bathing suit that she did not want. Wendi wanted a yellow one and he wanted her to get a white see-through one that felt physically uncomfortable on her body. Wendi made her dislike of the revealing suit perfectly clear, but Alejo insisted on buying both. When they got home and Donna asked why they had bought the see-through one, Alejo replied, "We couldn't decide."

474.  In the later interview, Wendi went on to remember how, in general, her father often bought and pressured her to wear clothing that was physically uncomfortable and revealing. However, she reported no memory of wearing lingerie – even at the end of the interview, after being explicitly asked about this, and after being told a childhood friend had reported that she frequently wore lingerie at home in front of other children and said that Alejo liked her to "dress up" and wanted her to "look her best." Indeed, when told of those reports Wendi said, "My reaction to that is: Go away, that's ridiculous. I can't even relate to that." (At that point Donna had not yet reported all the lingerie that Alejo had bought Wendi, the trips to Frederick's of Hollywood, etc.)

475.  The next memory to emerge in that interview, again spontaneously and without specific prompting: "Did he or my mom ever tell you how he always called me 'BBW'?" After the investigator present and I replied that no, they had not, Wendi explained that BBW stands for "baggy butt Wendi." She continued, "No matter what I was wearing he would say that. Even everyone at the church knew." Asked what she understood the phrase to mean, she replied, "I didn't know, but it just made me cry." Wendi then said "BBW" was a name Alejo constantly called her. She also spoke, as Donna has and is described above, of Alejo's "Constant sexual teasing – ten times a day." Consistent with

214

SP&A 08573

a classic dynamic in incestuous families, in which the perpetrator tells the victim and others that she actually *likes* and *wants* his abuse, and when that tactic fails, claims he is doing nothing wrong and the problem is with them, Wendi commented, "I remember my father always telling my mother and me that we were uptight. Even now I wonder, was it me or him? It was always so hard to know because he denied everything and blamed us." Indicative of how Alejo had brainwashed Wendi and she had come to identify with a humiliating nickname that made her cry when she was a pre-teen and teenager, when Wendi created an email address to communicate with Shawn King in the summer of 2000, it was "Wendi.bbw@usa.net."

476. Asked about a comment she had made during a prior interview, about things she "considered telling Kandy" (her therapist while jailed before trial) but never did, Wendi responded, "I didn't really have specific things, but I felt like the topic we were going down I should bring up my dad, but I guess I just wasn't ready to do all that." She continued, "My hesitation, part of my hesitation, I don't have a specific event. It's more emotions and feelings and things that seem to be over the line... everything with sexual overtones on it, always." This was at the beginning of the second of three days of interviews specifically focused on eliciting potential memories of sexually inappropriate or abusive behavior by Alejo. Wendi continued by saying that during the interview on the prior day, and that night in her cell, after having searched her memory, "I can't think of any times my father touched me."

477. However, Wendi then said that for years she has suffered from nightmares in which her father is having sex with her. She reported having to tell her pen-pal boyfriend to stop putting any sexual references in his letters to her, because it was causing dreams

SP&A 0857/4

000000599

P-App. 004900

of sex with her father.  Asked about the dreams, Wendi replied, "I was trying to find one, but I can't – can't even pull up the details. I don't usually have those dreams because I know how to limit what I watch on TV, what I read. I had to put my friend on hold 'til I get through this [appeal process]. So I know how to make it stop."  Asked later in that interview for a sexual dream image or "movie" she can remember, Wendi again said she had no details, and "Most of the stuff that I can see in my head right now is being freaked out and angry when waking up, and being desperate to get that out of my head."

478.  The memories that were most clear and numerous, and evoked the strongest emotions and most tears from Wendi, were memories of how Alejo constantly forced his sexual obsessions, compulsions and perversions on her through things he said. As explained above, Wendi could not talk to her mother about sex. Also, Tom King and the church/cult community strictly forbid healthy teaching or conversations about human sexuality, and any talk of teenagers and sex was framed in terms of sin, evil and temptation, and laced with condemnation and threats.  When it came to getting their questions answered, Wendi and her friends were stuck with Alejo – and he took full advantage of his self-appointed role. Wendi remembered how, when she and a friend would bring up a sexual topic to Alejo, "it was like, 'I'm your buddy and let's talk about sex.'"  Saying this Wendi portrayed the eager excitement in his voice, and I commented on that. Wendi responded, "Yes, absolutely," and spoke of the "excitement in his eyes" at such times. Indeed, she added, she can think of nothing else about which Alejo ever expressed such excitement.

479.  Asked how often those sexual conversations happened, and how often Alejo initiated them, Wendi replied, "That's just his nature. It comes out in everything."

SP&A 085/5

000000600

P-App. 004901

Watching a movie, reading a book, something someone would say… Someone would say, "Let's go play with the balls today, and he'd be smirking." She continued, "Whatever could be taken in a sexual way, he made sure that awareness was there, so everything was always about sex." Asked what she meant with the balls example, she responded, "He'd say, 'Oh, you're going to go play with the *balls*,' so no one could escape the awareness of his sexual perspective." Consistent with the reports of several witnesses, detailed above, Wendi recalled Alejo doing this constantly, around not just adults and teenagers but children of all ages. Asked how she used to respond to such comments, Wendi said, "It's always been like when someone tells a joke that's not funny and you laugh anyway. With this it was always like that. I tried to pacify him."

480. In the midst of sharing these memories, Wendi expressed anger and hurt, which she rarely did in our interviews. At one point she said, with searing clarity: "He should have *protected* that part of me, not *used* it. It was not for him to use. He should have protected me." Indeed, like all adults who sexually abuse children, and parents most of all, Alejo terribly betrayed her.

481. Another summarizing comment of Wendi's on the effects Alejo's constant sexualizing had on her, which reduced her to tears: "I feel like my dad, because he freely talked about sex my whole life, he's ruined sex for me. Whenever I was interested in a guy, I would think of my dad and feel disgusting." Recovering from crying, Wendi then reflected on how, if somebody was to confront Alejo with what he had done, "He'd say he wasn't doing anything wrong, it was normal. But it wasn't. It got everything mixed up in my head." These are classic dynamics and effects of the incestuous relationship that

SP&A 08576

000000601

Alejo (with Donna's acquiescence and even relief) imposed on Wendi, with progressively greater intensity when she was nine to thirteen years old.

482. As addressed above, Jeri Lynn Cunningham has reported being sexually touched by Alejo as a child, from ages eleven to thirteen. When I first asked Wendi about what Jeri Lynn had reported, I did so only implicitly, and without revealing Jeri Lynn's identity, by asking Wendi if she had any memories of Alejo ever being in bed with her and a friend. Wendi replied that she has no memory of her father ever being in her bed at night. She continued, "I remember him wrestling around with us a lot" on the "bed, couch, and floor," just as Donna and Alejo had reported, then said, "But sleeping in the bed, no." When finally told, at the end of the interview, exactly what Jeri Lynn reported, Wendi responded, "What disturbs me is that, in my logical mind, I know Jeri Lynn wouldn't lie or make something like that up, but I can't link it to anything in my mind."

483. Finally, in our last interview, I reviewed with Wendi many of the recollections of her mother's covering those years when she was nine to thirteen years old (as well as ages fourteen to eighteen, covered below). These included Donna's reports, reviewed above, of Alejo buying Wendi lingerie and other inappropriate sexy clothing, of Wendi having an entire drawer full of lingerie by the time she was thirteen, and of Alejo routinely forcing Wendi to look at things in the adults-only section of Spencer's gifts. Wendi had three main responses to this information – all three common responses among adult women who were subjected to repeated sexual abuse in an incestuous family where the mother, as Donna had, essentially handed her daughter over to the perpetrator. First, Wendi said that she genuinely did not remember those things. Second, she said that, despite not remembering herself, she had no trouble believing that those things had

218

SP&A 08577

000000602

P-App. 004903

happened – given what she has always known, what she has recently been able to admit, and what she has recently learned about Alejo; and given that her mother is, like Jeri Lynn, not the kind of person to make up such things, especially not in such detail. Third, Wendi expressed both amazement and intense anger that her mother had actually known, and thus been complicit in, so much more of Alejo's sexual abuse than Wendi had ever realized or could have imagined.

484. **Wendi ages fourteen to eighteen: Observations of adults and children in community.** When Wendi was fourteen, Donna began working full-time at Ak-Chin farms. As Donna herself reports, covered below, this precipitated her final withdrawal from Wendi and Alejo and left Wendi even more vulnerable to Alejo's sexual exploitation and abuse. At the same time, after turning fourteen Wendi increasingly thought and acted like a teenager – though certainly not a normal one given her continued immersion in the cult community and her incestuous relationship with Alejo. Nonetheless, Wendi tried to achieve some freedom and power, in the church and school systems and her relationship with Alejo.

485. Several witnesses' recollections of Wendi during this time include positive qualities and behaviors that had always distinguished her as a child at the cult's church and school. For example, Stephen Shaider recalls entrusting Wendi to babysitting his young daughter Bree, who liked Wendi a lot, and how Stephen and his wife Cindy always felt their daughter was safe with Wendi. (Tab 35, at ¶ 18.) Mr. Shaider also remembers Wendi as a teenager who was "not afraid to work" to make money and did household chores for his family as well (Tab 35, at ¶ 19.) The school principals, Mark

SP&A 08578

000000603

and Nancy Keating, continued to have positive views of Wendi as a student and athlete, as described above, as did other children like Jeri Lynn and Jasper Neace.

486.   Once Wendi reaches fourteen, however, there are more reports of great concern about her well-being, particularly that she was being sexually abused by Alejo. But it was not so simple, and the available evidence indicates that as Wendi progressed beyond age thirteen she simultaneously gained power and freedom *and* lost them. Furthermore, the gains were partly "benefits" of her losses.

487.   This requires some explaining. By all reports, as Donna withdrew even further while working full-time at Ak-Chin farms, Wendi *lost* by being used by Alejo for intimacy and sexual gratification. At the same time, Wendi *gained* freedom and power, in two ways. First, like all teenagers, her cognitive development during that time provided more capacities to negotiate, and at times turn to her advantage, the church/school/cult system and her pathological relationship with Alejo.  Second, being Alejo's partner, even in a very subordinate role, meant that Wendi could get things *she* wanted from him by withholding or providing what *he* wanted from her, which was access to her attention, her affection, and most of all, her *body* – which Alejo was obsessed with looking at, dressing in sexy lingerie and clothing, touching, and being touched by in prolonged "touching on" sessions.  In summary, like many children caught in a sexually abusive intimate relationship with an adult and no hope of anyone helping them escape it – especially an incestuous relationship with one parent while the other looks away and feels relief – Wendi learned to "make the best of it," though certainly at a high cost. Let us now consider the recollections of several witnesses from outside the family that support this assessment of Wendi's main predicament from ages fourteen to eighteen.

220

SP&A 08579

488.  As addressed above, even before Wendi reached age fourteen, Mark and Nancy Keating and Jeri Lynn Cunningham had all observed that Wendi's relationship with Alejo was "not a father-daughter" one (they even used that same phrase).  Nancy calls it "more of a teasing relationship," Mark refers to "things about Alejo's dynamic with Wendi that did not sit right" with him, including a "weird" and disturbing kiss he witnessed, and Jeri Lynn called the relationship "flirty." (Tab 14, at ¶ 7; Tab 13, at ¶ 6; Tab 12, at ¶ 14.) In addition, both Nancy and Jeri Lynn repeatedly witnessed Wendi, as an older teenager, exerting some power over Alejo. Nancy Keating recalls:

> "A couple of times when Wendi was a teenager, I observed Alejo trying to get Wendi to pull weeds or do some kind of manual labor on the church grounds. Like a typical teenager, Wendi rolled her eyes or expressed a desire not to do what was asked of her. Instead of telling Wendi not to talk back, Alejo did something very strange with Wendi. He *begged* her to do what was asked of her, sometimes in exchange for something else. He said, 'Please, Wendi. Please...' I cannot recall what he offered her in exchange for performing her required tasks, but it was as if Wendi was his little princess and he needed to entice her to get her to do what he wanted." (Tab 14, at ¶ 9, italics in original.)

Given what is known about how Wendi often spent hours "touching on" Alejo while dressed in skimpy and sexy clothes in their home, and how when Wendi was younger Alejo would, from a position of power, only drive Wendi and Jeri Lynn to the desert if they wore their nightgowns and scratched his head and legs, it is inconceivable that Wendi did not eventually learn to turn the tables. It is inconceivable that Wendi did not sometimes, especially in their home rather than a public place like the church grounds,

221

SP&A 08580

000000605

make Alejo beg to be granted the titillating and sexually gratifying experiences of Wendi's body with which he was so obsessed and addicted.

489.   As Wendi's close friend who spent lots of time with Wendi and Alejo, including at their home for sleepovers, Jeri Lynn was well positioned to see Wendi's increasing assertion of power in her relationship with Alejo: "Sometimes when Wendi spoke to Alejo, the tone of her voice changed and she gave him these flirtatious looks, especially if she wanted or needed something from him. Wendi switched between calling Alejo 'dad' and 'Alejo.'" (Tab 12, at ¶ 14.) Jeri Lynn observed these behaviors throughout her relationship with Wendi. She saw Wendi use sexually-charged flirting to get things she wanted from Alejo up until she and Wendi lost connection, when they were both about sixteen years old (three years after Jeri Lynn's family had followed Cal Lorts to Tempe).

490.   Lonnie Carlin reports witnessing an older-teenage Wendi demonstrate – graphically and publicly – her ability to manipulate Alejo by sexually stimulating him. Lonnie is the fellow student who says that, when they were ten or eleven and children visited her house, Wendi frequently wore lingerie that she said Alejo had bought and wanted her to wear to "look her best." As noted previously, and consistent with his mother's report that he is "too traumatized" to talk with her about his time in the cult (Tab 10, at ¶ 25), Lonnie spoke to investigators but did not sign a declaration. He told the investigator of the following disturbing interaction between Wendi and Alejo, which he says that he and other children witnessed "a lot" at school when Wendi was fourteen or fifteen. "Wendi sat on Alejo's lap, wiggled back and forth, and commented aloud that it 'made him get hard.'" Lonnie said that Alejo would just look away, sometimes pushed Wendi off, and seemed "embarrassed" when this happened. However, Lonnie made it

222

SP&A 08581

000000606

clear that he "did not get the impression at all that Alejo thought it was bad that his step-daughter was grinding on his crotch. He just did not want other children to know."

491.  It is important to recognize however, that the ability to embarrass Alejo, by doing in public the kinds of things that he trained her to do in private, does not constitute real power. Rather, Wendi was reenacting an abusive interaction into which she had been manipulated and coerced into repeatedly engaging at least since she was nine or ten years old. Indeed, most witnesses do not report seeing Wendi take what might be perceived as an active and assertive role in Alejo's incestuous abuse during these years. They simply recall evidence of Alejo's ongoing sexual abuse of Wendi, and mostly in terms of Wendi as a victim whose sexual exploitation was recognized but never stopped by a community of beaten-down cult members.

492.  Looking back on Wendi's teenage years overall, Constance Boys reports, "I recall that when Wendi was a teenager, something in her changed. Something just wasn't right. I recall my daughter, Sarah, telling me that Wendi had shown Sarah some negligees and lingerie that her father had bought for her.  Sarah said, 'Isn't that weird?'" (Tab 10, at ¶ 24.) Ms. Boys also recalls, "For years there were rumors abounding that Alejo was molesting Wendi. Wendi complained about it to other members of the church. I don't remember who specifically knew what, but I do remember it was generally discussed." (Tab 10, at ¶ 7.) Ms. Boys goes on to report one rumor she had heard, that Wendi told Mark Keating Alejo was sexually abusing her, and Mark told Tom King, who refused to believe it. (Tab 10, at ¶ 7.) However, Mark Keating says only that Wendi appeared about to disclose to him sexual abuse by Alejo but was cut short (by Alejo entering the room), and does not say he spoke to Tom King about the issue. (Tab 13, at ¶ 7.) Whether or not

223

Wendi disclosed sexual abuse by Alejo to any adults in the church, Ms. Boys'
recollections (and those of others, covered above and below) do indicate a general
awareness and concern in the community that it was happening.

493.  Ms. Boys then focuses on how, aside from getting "the cutest clothes and
shoes," Wendi lost power and freedom in those final years of living at home and
attending the church and school, from about ages sixteen to eighteen:

> "Those last couple of years, it was as if Wendi came to the realization that she
> just couldn't fight it. She completely gave in, and became 'Daddy's little girl'
> and was always hanging on her father. She always seemed like a free-thinking
> little girl before that, and suddenly she was a model student. She became quiet
> and withdrawn.  I remember that she had the cutest clothes and shoes – all that
> her dad had purchased for her. He just lavished her with things like that. Of
> course, everyone at the church said, 'Praise God, Wendi finally learned.' They
> said that she had finally 'repented' and had 'got her life right with God,' but I
> feel that they had finally broken her. She had no one to turn to…. I believe she
> must have realized that no one was going to help her, and she finally gave in
> to it – she just threw in the towel, so to speak." (Tab 10, at ¶ 24.)

494.  Mark Keating recalls once seeing Wendi dressed in a "Playboy Bunny workout
outfit" in the Casa Grande fitness center. He continues, "She was just a teenager. Wendi
said that Alejo bought [it] for her. I did not think it was right for her to be walking around
in an outfit like that, but since it appeared that her parents were aware of how Wendi was
dressed and even encouraged it, there was not much I could do." (Tab 13, at ¶ 8.) Both
Nancy and Mark Keating recall how, when Wendi was a junior in high school, Alejo and

224

SP&A 08583

000000608

P-App. 004909

Donna pulled her from the swim team because she was losing weight and her breasts were becoming smaller. Nancy recalls, "It was another thing about Wendi and her parents that made me suspect that something was terribly wrong at home." (Tab 13, at ¶ 4; Tab 14, at ¶ 12.)

495. Cynthia Schaider, a parent at the time, recalls that Alejo showed her a series of photographs he took of Wendi when she was fifteen or sixteen years old. Alejo was into modeling, and the pictures were "part of his portfolio, examples of 'modeling shots.'" (Tab 34, at ¶ 7.) Ms Schaider continues:

> "They were part of his portfolio, examples of 'modeling shots.' In the pictures, Wendi was dressed in lingerie, a white teddy, and posing in the desert. I always took issue with that. I felt it was inappropriate for a stepfather to take his beautiful, curvy daughter out into the desert in her underwear and take sexy photographs of her. It was unseemly to me, but it was not my place to comment on the behavior of one of the pastors of the church." (Tab 34, at ¶ 7.)

496. One of those photographs has been preserved and is shown below. Although this particular image shows Wendi's body in silhouette, it is clear that she is scantily clad. Alejo admits to having taken the picture, even expresses pride in having done so: "I enjoy long exposure photography and like taking pictures in the desert electrical storms. I photographed Wendi and was able to capture lightning from an electric storm about fifty miles away…" (Tab 24, at ¶ 165.)

SP&A 08584

000000609



497. A number of adult witnesses recall seeing and hearing evidence that Alejo was sexually abusing of Wendi, yet feeling powerless to do anything about it. Ms. Schaider explains the subservience and isolation of cult members that let Alejo abuse Wendi with impunity and left Wendi to her own devices. "We lived in a culture where we were expected to obey. At the church, we were taught that bad things would befall us if we didn't 'toe the line.' As a result, no one discussed negative aspects of their lives. It kept us isolated from one another." Ms. Schaider continues, describing her later realization that cult members experienced a false sense of family in which "none of us really knew each other," "everyone ran around pretending life was wonderful," and many "lived a double life." Community members were also taught that, should they speak negatively of

226

SP&A 08585

000000610

their pastors, including Alejo, "the 'wrath of God' would come upon us." (Tab 34, at ¶¶ 30, 31.)

498.  As mentioned above, Jasper Neace was abruptly expelled from the school when he was seventeen or eighteen (and Wendi was fourteen or fifteen), after confronting Alejo and Tom King about Alejo's possession of pornographic magazine and his sexual harassment and abuse of Wendi and other children in the community.

> "Wendi brought the cover of a pornographic magazine to school and told me that it belonged to her father, Alejo Ochoa. She gave it to me and I put it in my locker, and then I told the pastor, Tom King, that I needed to talk to him about something important. My intention was to tell Tom King about the magazine. All the other kids were too afraid to say anything. I wanted Alejo to face the consequences for all the damage he was doing. I was angry about what I saw to be extreme hypocrisy. I was in trouble for buying a motorcycle, and my mother got kicked out for getting married, but Alejo faced no consequences for his sexual behavior with children, for whooping on kids, and for looking at dirty magazines. Tom King called me into his office and asked me what I had to say. I told Tom King about the magazine, but Alejo was right there and he flatly denied it." (Tab 23, at ¶ 51.)

499.  Jasper reports that Tom then asked him, "Are you sure you have the magazine? I'd like to see it." The three of them went to the locker, and it was gone. When they returned to the office, Jasper recalls, Tom and Alejo "looked so smug," which provoked a long-suppressed rage in Jasper, who proceeded to point his finger at Tom and say, "I've always wanted to tell you this: Fuck you, Tom." As Jasper remembers it, Tom then

227

SP&A 08586

000000611

threatened to call the police and "started rattling off scriptures and said that he was rebuking me in the name of Jesus and…turning me over to the devil." A physical altercation followed, and Jasper ran out the door. Looking back on the explosive confrontation that resulted in his expulsion from the school and community, Jasper recalls, "I had intended on telling Tom King about Alejo's inappropriate behavior with Wendi, but I never got the opportunity." (Tab 23, at ¶ 51.)

500.  Mark Keating remembers learning at the time of Jasper's confrontation with Alejo and Tom about the pornography magazine. (Tab 13, at ¶ 5.) So does Constance Boys, who, as noted above, reports that "many people went to Tom about Alejo's behavior, and Tom refused to believe it." (Tab 10, at ¶ 23.)  Ms. Boys reports details of the incident that she heard at the time, including that it was not "*Playboy* or something like that – it was really hardcore porn," and that Alejo made up a story of having found the magazines, picked them up so the children would not see them and taken them home, then forgotten about them. (Tab 10, at ¶ 16.)

501.  The available evidence indicates only one time that Alejo was confronted over his sexual abuse of Wendi, privately by George Carlin, father of Lonnie Carlin. George recalls that, at about the same time his wife and daughter told him of inappropriate sexual comments Alejo had made to them, "I was concerned that Alejo had been sexually molesting Wendi." Mr. Carlin called Alejo on the phone, told him why he was calling, and asked Alejo to meet him at the church to discuss it further.  They spoke outside of the church, and Mr. Carlin recalls, at the beginning, "Alejo denied everything. He denied it several times until he finally confessed to his inappropriate behavior and admitted he had a problem sexually." As reported above, Mr. Carlin remembers that Alejo then asked

228

SP&A 08587

000000612

what he should do, and whether he should resign from the church. Mr. Carlin told the sexually obsessive, compulsive and addictive Alejo to simply "ask for forgiveness and stop his inappropriate behavior."

502.   Finally, Mark and Nancy Keating report an incident that took place not long before they left the school in 1988, when Wendi was seventeen or eighteen years old, in which Wendi appears to have decided to disclose to them Alejo's sexual abuse – only to be thwarted by a sudden and unexpected appearance by Alejo.   Mark remembers that Wendi approached them "on the heels of a sermon that a guest-minister named Kevin McNulty made about sexual sins and sexual abuse." He and Nancy were alone in a small classroom at the time.

> "Wendi came in and said, 'Can I talk to you?' She looked very anxious and concerned. Just as Wendi prepared to tell us what was heavy on her heart, Alejo walked in. Within the classroom was a closet and Wendi backed right into it, very affected by Alejo's presence. Wendi never did tell us what was on her mind. It seemed to be related to the porno Alejo was accused of bringing by JC Neace.   I was afraid it had something to do with sexual abuse, having observed Alejo's inappropriate behavior and strange dynamic with Wendi."

(Tab 13, at ¶ 7.)

503.   Nancy Keating's account of the incident is almost identical, including her strong belief that Wendi had planned to disclose that Alejo was sexually abusing her:

> "Wendi came in and said she had something she wanted to tell us, but she could not get much out. She was very nervous and swallowing a lot. Alejo came into the room just as Wendi was about to reveal whatever it was she

SP&A U8588

000000613

wanted to talk to us about, and she just shut down. Her eyes got really big. She looked like she had been caught saying something bad. I think Alejo's presence scared Wendi. I thought at the time that maybe she was going to tell us that she was being molested." (Tab 14, at ¶ 10.)

504.  Soon thereafter, Mark and Nancy Keating decided to leave the school, as well as the cult community and Casa Grande altogether, after learning that Tom "did not do much" when his own niece was sexually abused by his friend (see above; Tab 14, at ¶ 11). Mark recalls, "Before I left Harvest, I pulled Wendi into my office because I needed to tell her something. I told Wendi that if something was going on with her at home, if there was anything that was going wrong in her life, she needed to find someone she trusted to share it with. That person did not need to be me, necessarily. I just wanted Wendi to know that if something was not okay with her, there was help." (Tab 13, at ¶ 9.) It may be that Mr. Keating was, without intending to, giving Wendi a mixed message. The evidence suggests that she had *already* attempted to tell him such a thing, and had *already* indicated that she trusted him and his wife enough to do so. Wendi had only been stopped by Alejo's unexpected entrance into the room. Sadly, most adults who suspect sexual abuse of children do not know how to respond appropriately. Whatever exactly transpired in that conversation between Wendi and Mark Keating, all of the evidence indicates that by then Wendi had concluded, correctly, that there was no one she could trust to save her from Alejo's sexual abuse. Indeed, the only adults she had hoped might be able to help were themselves jumping ship – escaping the cult community where such sexual abuse occurred, and leaving her behind.

SP&A 08589

000000614

P-App. 004915

505. **Wendi ages fourteen to eighteen: Recollections of Donna and Alejo.** As noted previously, when Donna started working full-time at Ak-Chin Farm in late 1984, when Wendi had recently turned fourteen, it was Donna's final big withdrawal, both physically and emotionally, from both Wendi and Alejo. Donna recalls, "Beginning in 1984 after I was working full-time outside the church, Alejo and Wendi had dinner together more often than Alejo and I had dinner together or the three of us [did] for the rest of the time Wendi was growing up." As quoted above, and worth repeating here, about each of her progressively greater withdrawals, including this one, Donna said: "It was easier for me to let Wendi spend so much time with Alejo because I got to ignore him, avoid the unpleasantness of being around him and his anger, and go into my room and read." (Tab 27, at ¶ 248.)

506. As discussed above, what Donna most wanted to escape were Alejo's constant pushing for sex (that she did not want, before her hysterectomies and especially after them), and his constant anger over her sexual rejection, which Alejo says caused "ninety percent" of their arguments – until, by all indications, he gave up on Donna and sought sexual gratification primarily from Wendi and her friends. And as discussed above, what Donna did – most of all in her final turning away when Wendi was fourteen years old – with actions that spoke much louder than words, was say to Wendi, "I can't handle his constant sexualizing and anger. YOU take him," and to Alejo, "I can't handle your constant sexualizing and anger. You take HER." It was a classic incestuous family pattern, and it reached a peaked when Wendi was fourteen to eighteen years old.

507. Most Donna's and Alejo's recollections of these years are the same as when Wendi was ten to thirteen. As Donna reports, consistent with other witnesses, Alejo

231

SP&A 08590

000000615

continued his verbal abuse of Wendi, especially verbal sexual abuse; his demands that Wendi scratch and rub his head and legs, sometimes for hours each night, often with his head by her genitals, with each of them dressed in less and less clothing during this "touching on" ritual; his buying Wendi lingerie and other skimpy and sexy clothing; his insistence that Wendi and her friends who slept over wear their nightgowns and "snuggle" and "wrestle" with him; his pulling Wendi into the adults-only section of Spencer's gifts and forcing her to look at sexually explicit greeting cards, games, toys and other paraphernalia. Yet Donna also recalls escalations and new twists on many of these sexually exploitive and abusive behaviors after Wendi turned fourteen and how, facing further abandonment by Donna and increased pressure from Alejo, Wendi resigned herself to the role of Alejo's intimate partner.

508.   Donna reports that Alejo verbally abused and "degraded" Wendi throughout her childhood and adolescence, and that these attacks dramatically escalated when Wendi became a pre-teen. As described above, at that point – and just as his aunts, uncles and parents had done when he became a pre-teen – Alejo became especially relentless and cruel with his sexualized teasing of Wendi, and this form of sexual abuse continued until Wendi left home after high school. (Tab 27, at ¶¶ 256-57.)  Added to the mix during Wendi's teenage years, Donna recalls, was the way Alejo would jump on any "clueless" comment by Wendi and use it against her, often telling her she was "another dumb blond" or having "another blonde moment." (Tab 28, ¶ 89) In short, Donna recalls Alejo unleashing a steady stream of emotional abuse against Wendi, with a new form added but most of it still sexualized, throughout these years.

SP&A 08591

000000616

P-App. 004917

509.  Furthermore, Donna reports that Alejo's targeted, predominantly sexualized verbal abuse of Wendi occurred against a backdrop of Alejo's constant yelling at Donna and Wendi.  Donna recalls, "To me, it felt like he was continually yelling at us, almost every day. For all those years he was – and he continues to the present – extremely explosive in his anger. I never know what will set him off…. There's just no warning, then suddenly he's extremely upset, yelling, and even literally screaming." (Tab 27, at ¶ 291)  Donna also recalls that Wendi eventually became inured and numbed to Alejo's abusive verbal outbursts. "When Alejo was on his tirades throughout her teens, Wendi told me, 'It's going to be okay, Mom. He'll come back eventually and things will be okay." (Tab 27, at ¶ 294.)  Donna then notes that Wendi was "always the middle person, trying to make things better for me and Alejo." (Tab 27, at ¶ 294.)  In these situations, as both Donna and Wendi recall, that meant not only verbally reassuring Donna when Alejo had stormed off after a tirade and gone for a drive, but hours of rubbing and scratching Alejo's legs and head – "babying" and "touching on" him, often while scantily dressed – once he returned home again.

510.  With respect to Alejo's physical abuse of Wendi, Donna reports, "After about age thirteen, Wendi didn't need swatting very often, only once or twice year. That was after she finally acquiesced, completely gave in, and obeyed almost all the rules at school, church, and home." (Tab 27, at ¶ 241.) Alejo too recalls that "Wendi got fewer swats as she got older." He says beatings were replaced by "pulling weeds or having to do extra chores or being grounded," because he eventually "did not want to be associated with the kind of pain that was inflicted by paddling children." (Tab 24, at ¶ 127.)  Thus Donna's comments appear to accurately reflect a decreasing frequency of physical

233

SP&A 08592

000000617

beatings. However, her comment that Wendi "completely gave in," like the views of women in the community who perceived Wendi as wholly beaten down and defeated during her teenage years, is an oversimplification. As we have seen, others recall Wendi being "flirty" with Alejo to get things she wanted, and at times even reducing Alejo to begging her. Alejo himself acknowledges, "When Wendi became a teenager, she started relating to me in many of the ways Donna did. She told me what shirts to wear and what ties went with them. If I grumbled at something Donna made for dinner, Wendi might retort by telling me, 'Just eat it – there is nothing wrong with it.'" (Tab 24, at ¶ 116.)

511. Donna's recollections of Alejo's sexual abuse of Wendi during this time are of it becoming even more pervasive and intense, and of her responding by pulling away even more, often in denial and sometimes in disgust. For example, Donna recalls, "Wendi had sexy teddies and camisoles as a fourteen or fifteen-year-old that I tried not to notice or think about." (Tab 27, at ¶ 269.) She remembers how, when Alejo showed Wendi things in the adults-only section of Spencer's, "I always gave him a disgusted look and took off to look at something else." (Tab 27, at ¶ 272.) Donna recalls that, in general, "I was working and paying so little attention to what was going on with Wendi that they could have shopped five days a week and I wouldn't have known about it," and "I didn't care to know where they went or what they did while they were shopping without me." (Tab 27, at ¶¶ 265, 275  Such responses of withdrawal and abandonment only provided Alejo with more opportunities to focus his sexual obsessions, compulsions and perversions onto Wendi and to seek sexual gratification from her.

512. However, when the three of them went on family vacations, Donna could not avoid learning of Alejo's escalating abuses during these years. Donna recalls,

234

SP&A 08593

000000618

"As Wendi got older, by age fourteen and at ages fifteen, sixteen, and older, Alejo took Wendi into hardcore, triple-X, adult porno stores and sex stores. It was actually more like Alejo dragged Wendi into the hardcore porn stores.... She said she didn't want to go, but he insisted. It was just like earlier on with Spencer's.... He said, 'We'll just go in for a minute,' but then they spent longer than a minute, actually fifteen to twenty minutes or even more." (Tab 27, at ¶ 280.)

Donna then explains, "The shopping at hardcore porn stores came into my awareness mostly on vacations because I'd be with them while they were shopping.... I wasn't really invited when Alejo and Wendi shopped at home." (Tab 27, at ¶ 281.) Thus Donna went into these stores with Alejo and Wendi "only occasionally, about once or twice per year," and even then, she only "hung around by the entrance and never went past the front section where the clothes and less hardcore items are." Donna then describes how different the experience always was for Wendi – and that just how different, she preferred not to know:

"Alejo always took Wendi right into the main part of the store where the triple-x and hardcore sex magazines, videos, toys, and other hardcore items were displayed and sold. I don't know exactly what they looked at or bought in those stores and didn't care to know. I just know that they weren't buying for me." (Tab 27, at ¶ 281.)

513.  And so, once again, Donna sacrificed Wendi to such abuse in order to spare herself from dealing with Alejo's sexual perversion. Donna now frankly acknowledges this is true: "I let Wendi be the one who looked at the hardcore porn stuff in those shops

SP&A 08594

000000619

with Alejo instead of having me be the one who had to deal with it." (Tab 27, at ¶ 282.)

Finally, she explains that Alejo got away with bringing Wendi into those shops because

Wendi, "with her hair and makeup done," looked older than the young teenager she

actually was. (Tab 27, at ¶ 282.)

514. Looking back on all of this, Donna reflects on how it was that she could have

stood by and let her own daughter be so sexually exploited and abused by Alejo:

> "While Wendi was growing up I lived by the old adage, 'What you don't
> know isn't going to hurt you,' and while I knew Alejo was shopping with
> Wendi for explicit, adults-only items by the time she was ten years old and
> taking her into hardcore porn stores by the time she was fourteen years old...,
> I didn't see myself as being able to do anything about it and I never let myself
> aware that it might be a problem. Alejo was the head of our household and
> one of the main tenants of our religion was that as the head of the household
> he set the rules and it was our place to obey the rules, so that's what we did."

(Tab 27, at ¶ 283.)

515. While these reflections certainly ring true, Donna here leaves out another factor

that she elsewhere acknowledges: Thanks to her own profound limitations, both

psychological and moral, resulting largely from her own mother's neglect of her and

other major childhood traumas, she was *motivated* to hand Wendi over to Alejo, a man

himself terribly limited and damaged from a childhood of neglect and abuse, especially

sexual abuse, so that Wendi and not she would be the primary object of Alejo's sexual

obsessions, compulsions and perversions. Indeed, as we have seen, Donna was *relieved* to

do so.

236

SP&A 08595

000000620

516. **Wendi's memories of ages fourteen to eighteen.** As reported above, I assessed Wendi's memory for most of the incidents of physical and sexual abuse – or strong evidence of sexual abuse – reported by witnesses in the community and by her mother. Most but not all of the incidents and evidence reported by others were addressed in three days of interviews specifically focused on potential memories of sexual abuse; in those interviews I used well-established, research-based methods specifically designed to avoid memory fabrication or distortion.

517. Wendi confirmed her mother's report that she was seldom physically beaten during this period. When Wendi recalled being made to pull weeds as punishment at school, she said this was because "they realized it was hopeless to just keep spanking me." She also recalled not minding pulling weeds, especially if Alejo wasn't angry at her for whatever had gotten her in trouble at school. Indeed, Wendi said that she often enjoyed pulling weeds with Alejo more than being in school. Asked why she was punished at school during those years, she said, "Me not listening, not doing what I was supposed to." She added that "Tom King's scripture for me," which he was always saying to her, in a tone of judgment and condemnation, was "rebellion is as the sin of witchcraft" (1 Samuel 15:23). She also remembers Tom often saying her rebellion would "send you to hell."

518. When told that one witness had said she seemed to lose her will to rebel at some point, Wendi responded that she had "*always* felt rebellious," from childhood through adulthood, including at work. Of course, growing up in a family and community where children were supposed to automatically, instantly and mindlessly obey their parents and other adults, and to believe whatever church/cult leaders say (no matter how crazy, brutal

SP&A 08596

000000621

P-App. 004922

or hateful), any child would feel rebellious, but especially one who did not completely give up on some independence of thought and action. Wendi added that she also always felt that she "deserved the bad things that happened" to her, and that she believed she deserved them *because* she was rebellious. Again, this is totally consistent with the messages she got in the traveling cult and the 91st Psalm/Harvest church/cult. Wendi did remember that she "put up the façade" of total obedience and submission in high school, but Tom and other adults at the church/cult continued to say she "didn't have the spirit of meekness" (i.e., the meekness Tom King depicted in his sermon, of the children he had beaten into submission). Wendi also remembers how, when she was on swim team and saw kids from Casa Grande Union High School, she thought, "I want that," by which she meant a life with some fun and freedom from the church/cult and her father.

519. Most of Wendi's memories — and lack thereof — of sexually exploitive and abusive behavior by Alejo are addressed above, because Alejo's behavior and other's observations of it were fairly consistent throughout Wendi's time in Casa Grande from ages nine to eighteen. As reported above, Wendi discussed Alejo's constant sexual comments and innuendos; his watching sexually explicit movies with her and her friends; his open invitation to her and her friends to ask him questions about sex and his visible excitement whenever they did. It was this constant sexualizing of her and everything around them that Wendi recalls vividly and now finds extremely disturbing. She became very upset and cried when commenting that Alejo should have "protected" that sexual part of her, not "used" it, and that he had "ruined" sex for her.

520. Also as described above, Wendi remembers "babying" Alejo by scratching his legs and head, sometimes for hours at a time. She recalls that Alejo often wore no

SP&A 08597

000000622

underwear when she did this, that his robe was often open, exposing his genitals, and for that reason she hated to scratch his legs and whenever possible only scratched his head.

521. Wendi also remembered Alejo looking in her bedroom window when friends did sleepovers, which was almost every weekend with Laura for a year or two. At the time he said and she believed that he was only interested in playfully trying to scare her and her friends, but looking back now she believes he may have been trying to see them naked. Indeed, she remembered an incident where Alejo hid behind her water bed as she and a friend changed into their nightgowns, and how upset she was to discover he had been there all along.

522. Wendi remembered Alejo taking photographs of her in lingerie when she was age sixteen or seventeen years old. These were apparently the same photographs seen and found so disturbing by Cynthia Schaider, as described above. Wendi was able to recall some details of one lingerie photography incident, which was very unusual for her:

"I remember going out of town, checking into a hotel room… I remember sitting on top of the bed, and him pulling things out of a bag for me to wear, and me freaking out about it. I have absolutely no memory of taking the actual pictures and all that…. It had taken so long for him to get me to agree, more than a week at least…. I remember [he said] that it was a money issue [i.e., he could not afford to pay a model]. I do remember that I seriously didn't want to…. It's almost like you're embarrassed to do it but you're obligated to do it."

523. Wendi's final comment there, about feeling "obligated" to do what Alejo pressured, cajoled and demanded of her, is consistent with Donna's reports (above) of

239

SP&A 08598

000000623

P-App. 004924

Alejo forcing Wendi too look at sexual materials and toys at Spencer's Gifts, which Wendi also remembers. Only when asked about Alejo taking photographs of her in the desert, including with lightning from an electrical storm in the background, did Wendi say she recalled that experience. She did not remember any details of posing and being photographed. However, in contrast to the lingerie photo shoot in the hotel room, Wendi said, "I don't remember thinking, 'I don't want to do this.'"

524. Similarly, Wendi only spoke of the Spencer's Gifts experiences when asked about them. She referred to these experiences as "the sexual gag stuff," and said she had remembered them on her own but had not thought Alejo's behavior was significant or "a big deal." Wendi said that on her own she had also remembered going into Fredericks of Hollywood with Alejo, which she again had not seen as significant. But as noted above, Wendi said she did *not* recall ever buying any lingerie there (or anywhere else), or having any lingerie at home when she was a child or teenager.

525. Indeed, when asked about having lingerie at home, and told that more than one witness had reported seeing her dressed in lingerie at home, with one reporting that she had said her father bought it and liked her to wear it so she could "look her best," Wendi said she had no memories. Appearing genuinely surprised and baffled, she added, "I don't know, because I don't own any lingerie, only flannel pajamas."

526. There were several other reported recollections by her mother and other witnesses of incidents and evidence during this fourteen to eighteen year old period, detailed above, that Wendi was asked about in our interviews and explicitly stated that she could not remember, not even as a vague feeling. For example, she had no memory of giving Jasper Neace a pornography magazine (or magazine cover) that belonged to Alejo

240

SP&A 08599

000000624

– as was not only reported by Jasper, but remembered by Mark Keating and Constance Boys as something they had heard about at the time, either directly from Jasper or from someone else in the community. (I did not ask Wendi about Mark and Nancy Keating's recollections of her approaching them to tell them something of clearly great emotional significance to her, which they believed was sexual abuse by Alejo, only to be cut short by Alejo's sudden appearance. I did not receive the Keatings' declarations until after the interviews focused on potential memories of sexual abuse, and did not inquire about that story during our final interview in August of 2011.)

527. Finally, and further illustrating the incestuous family dynamic repeatedly explained above, in our final interview Wendi commented that she had "always assumed [her mother] didn't know things, and to find out she did" was very disturbing. I then asked what specifically had Wendi always assumed her mother did not know. Wendi could not name anything in particular, but said, "I thought that my mother had the same memory that I did," by which she meant the kind of memory that did not allow knowing one's most painful and hurtful experiences, and that she was amazed that her mother actually remembered so many details. From these reflections Wendi returned, once again, to the feelings of anger and hurt that all children of incestuous families feel about the non-abusing parent having abandoned them and allowed the abuse to go on.

## IX.   WENDI ENDS CHILDHOOD WITH MAJOR, BRAIN-BASED DEFICITS IN EMOTIONAL, COGNITIVE, AND RELATIONSHIP FUNCTIONING

528. The analysis below is based on my experience and knowledge as a researcher and therapist who has for twenty years studied and worked with adults subjected to neglect and abuse in childhood. As noted above, my analysis draws upon the evidence

241

SP&A U8600

000000625

directly available to me (i.e., my interviews with Wendi, her parents and other witnesses; thousands of pages of documents; and media files); it also relies on findings by the two other experts on this case, neuropsychologist Myla Young, Ph.D., and psychiatrist George Woods, M.D.

529. From birth until age eighteen, Wendi Andriano experienced a great deal of neglect and abuse. This included severe emotional neglect by her mother and biological father; physical abuse in which pain was used to compel complete and automatic obedience by her mother, biological father, adoptive father and other adults in her communities; emotional abuse by her biological father, adoptive father and adults in the 91st Psalm/Harvest church/community; likely sexual abuse by a variety of men including her biological father and his father and brothers, her mother's boss at an alcohol and drug services center, and definite sexual abuse by her adoptive father.

530. In addition, as addressed by Dr. Woods, Wendi inherited a genetic vulnerability to bipolar disorder. By adolescence she suffered from manic and depressive symptoms. Wendi's worst depressive episodes are remarkable for the way her brain appears to "shut down" as she engages in excessive sleep, at times in excess of 36 continuous hours.

531. Wendi's history of childhood neglect and trauma, combined with her biological vulnerability to bipolar disorder, resulted in her leaving home and entering adulthood a severely traumatized and damaged person – which she remains to this day. The damage includes brain-based deficits in cognitive functioning; psychiatric illnesses and symptoms; problems regulating emotions; and posttraumatic patterns of relating to others.

242

SP&A 08601

000000626

532. **Brain-based deficits in cognitive functioning.** The damage to Wendi's brain from a childhood of neglect and abuse involves the functioning of a variety of brain circuits. However, such damage does not typically manifest as obvious and well-established changes to the size or shape of particular brain regions, which have not been assessed for in this case. Rather, brain damage resulting from chronic childhood neglect and abuse is primarily *functional* (as opposed to grossly anatomical). That damage is most clearly revealed, in a formal way, via neuropsychological assessment like that Dr. Young conducted on Wendi.

533. Wendi's most significant areas of impairment were attention and concentration, as well as processing speed. As Dr. Young notes, "With the exception of [two simple test of attention and concentration], her abilities on all other measures of attention and concentration were significantly impaired." (Tab 5, at p.9.) On some of these tests, Wendi "simply was not able to accomplish the task.... Her abilities throughout this *test were severely impaired, but became more impaired as the test progressed.*" (Tab 5, at p.9, italics in original.) In addition, on a self-report questionnaire that inquired about behaviors known to be associated with attention problems, Wendi's responses were "significantly like those of individuals who are diagnosed with Attention Deficit Hyperactivity Disorder (ADHD)." As Dr. Young explains, "The entire brain is involved in attention and concentration. Primary neural regions include the prefrontal cortex, reticular activating system, cerebellum and frontosubcortical and orbitofrontal pathways. Attention forms the basis for all cognitive abilities. Her disabilities on tasks of attention and concentration, combined with descriptions of her daily functioning, indicate impairment of these brain regions and structures." (Tab 5, at p.10.)

243

SP&A 08602

000000627

534. Dr. Young also found several impairments on test of learning and memory. For example, on a test of verbal learning, "Her ability to learn new information was mild-moderately impaired," and Wendi inaccurately believed that she remembered information that had never been presented. (Tab 5, at p.10.) On a test requiring Wendi to copy a complex figure, recall it one minute later, recall it again thirty minutes later and then distinguish between accurate and inaccurate portions, Wendi's thirty-minute delayed recall and her ability to distinguish accurate and inaccurate portions thirty minutes later were moderately to severely impaired. (Tab 5, at p.10.) Based on these and other findings, Dr. Young concluded that Wendi has impairment within "all of [the] brain structures and pathways" involved in memory and learning. (Tab 5, at p.11.)

535. Finally, a third area of significant brain-based impairment Dr. Young's testing revealed was "executive functioning." As Dr. Young explains, "Executive functioning is an umbrella construct that describes processes responsible for guiding, directing, and managing thinking and emotional regulation. Mature executive functioning provides for purposeful, considered, goal directed actions. Executive functioning also is the ability to problem solve, and includes abilities to initiate, attend, inhibit, shift, monitor, organize, and control thinking and actions." (Tab 5, at p.11.) Executive functions depend on the prefrontal cortex and its interactions with various other brain regions, and "adequate mature prefrontal cortex functioning is required for just about every aspect of adult functioning – judgment, self-awareness, decision making, planning, organizing, flexible thinking, and initiating, monitoring, and controlling impulses and actions." (Tab 5, at pp.11-12.) Dr. Young reports that "Although she was successfully able to complete some EFT [Executive Functioning Test] subtests, her abilities were predominantly impaired."

244

SP&A U8OU3

000000628

meets the diagnostic criteria for bipolar I disorder, posttraumatic stress disorder (PTSD) and complex PTSD, and dependent personality disorder.

538.  Bipolar disorder runs in Wendi's maternal family, including her mother Donna and her aunt Nadine. Wendi's bipolar depressive symptoms include depressed mood, hypersomnia (i.e., excessive sleeping), fatigue, and feelings of worthlessness. Her most common manic symptoms include grandiosity, flight of ideas (i.e., tangential thinking), and "excessive involvement in pleasurable activities that have a high potential for painful consequences," e.g., sexual indiscretion.

539.  As explained above, the emotional neglect Wendi experienced is known to evoke extreme emotional and physiological states in young children, including depressive states that would have been exacerbated by her inherited predisposition for bipolar disorder. Similarly, Wendi's manic symptoms would have worsened the impaired judgment already caused by her parents' neglect and abuse, and her tendencies for hyper-sexuality caused by years of sexual abuse.

540.  As discussed by Dr. Woods, Wendi suffers from PTSD and Complex PTSD secondary to her history of extensive childhood abuse. PTSD includes symptoms of reexperiencing, avoidance, numbing and physiological hyperarousal. In terms of re-experiencing the trauma, Wendi becomes emotionally distressed when reminded of the abuse she experienced, especially the sexual abuse, and she suffers from nightmares of having sex with her father. She avoids anything that might remind her of Alejo's sexual abuse, including television shows, conversations, memories and trains of thought. Wendi is often emotionally numb, especially with respect to unpleasant feelings associated with troubling memories and relationships, and tends to alternate between feeling nothing at

SP&A 08605

000000630

P-App. 004930

all and being overwhelmed by fear, sadness, shame and guilt. Her main PTSD hyper-arousal symptoms are irritability and difficulty concentrating, both of which overlap with the symptoms of bipolar disorder, and hyper-vigilance, which manifests as Wendi's hyper-attunement to any signs of displeasure in the facial expressions, body language, words or tone of voice in others. All of these PTSD symptoms were constantly on display in each of my interviews with Wendi.

541.  Complex PTSD does not appear in the *Diagnostic and Statistical Manual of Mental Disorders*, but is widely accepted and used by therapists and researchers who work with and study people who have suffered severe and chronic trauma, especially in childhood. Complex PTSD involves a set of symptoms resulting from lasting traumatic experiences in which the victim felt – or was – captive and unable to escape.  The symptoms include problems with the following: regulating emotions, consciousness and identity (e.g., dissociation), self-perceptions (e.g., extreme shame, helplessness), preoccupation with the perpetrator (e.g., focus on keeping happy at one's own expense), relationships (e.g., distrust, attempting to rescue others), and one's view of the world (e.g., loss of faith in people, hopelessness). The available evidence indicates that Wendi has suffered from severe complex PTSD at least since adolescence.

542.  For example, to this day Wendi has emotion regulation problems, including a great deal of difficulty tolerating or modulating feelings of sadness and anger. Her main strategy for dealing with these feelings is to hide them from herself and others. When that fails Wendi becomes overwhelmed, ashamed, withdrawn, or once again dissociated or consciously disconnected from awareness of those feelings. I repeatedly witnessed Wendi's emotional dysregulation in our interviews. In terms of self-perception, long

247

SP&A 08606

000000631

before she ever met her husband, Wendi recalls being convinced she was a "bad" and "rebellious" person who was unworthy of love, "deserved" every bad thing that happened to her, and was going to hell. Such unshakable feelings of inner badness and un-lovability are common in severely neglected and abused children and the adults they become.

543.  Wendi's Complex PTSD symptoms involving pathological alterations of consciousness and identity consist primarily of her dissociative symptoms, including her inability to remember many childhood experiences. Her memory deficits include almost everything she experienced while in the traveling cult, sexually abusive behaviors by her adoptive father, and disturbing sexual behaviors of her own that were witnessed by multiple people in her church community. Wendi's dissociative symptoms also include her tendency to "space out" when confronted with memories of traumatic experiences or other potentially upsetting information. In our interviews she often spoke of spacing out such that her mind temporarily went blank and she was unable to feel any emotions or even sensations in her body.

544.  As discussed in detail by Dr. Woods, Wendi suffers from dependent personality disorder. By definition the onset of personality disorders is before age eighteen, and Wendi's dependent personality disorder is clearly rooted in the childhood of neglectful, abusive and exploitive relationships summarized above. She is afraid to disagree with others, pathologically subservient in relationships, terrified of losing relationships, and immediately seeks new relationships when a previous one ends or threatens to end. Importantly, only by understanding Wendi's neglect- and abuse-based relationship patterns can we understand how her dependent personality disorder, combined with traumatizing caregiver burden and psychiatric deterioration in the final year of her

248

SP&A 08607

000000632

husband's life, contributed to her actions and role in Joe's death. Those pathological

relationship patterns are addressed below.

545. **Deficits in emotional functioning.** Psychiatric diagnoses and symptoms

cannot capture the complexity of unique human beings, or the myriad potential effects of

chronic and severe childhood neglect and abuse. For example, while the diagnosis of

complex PTSD includes problems with emotion regulation, Wendi's problems with

emotion regulation cannot be reduced to symptoms of complex PTSD. That is, Wendi has

major, long-standing deficits in the following areas: emotional awareness, including

awareness of the bodily correlates of emotions; when she is aware of unwanted emotions,

tolerating them without becoming immediately overwhelmed; modulating the intensity of

her emotions, as opposed to emotions being all-or-nothing affairs; putting her emotions

into words and sharing them with other people in order to calm herself and connect with

others, understand the situations and interactions that give rise to emotions, and come up

with constructive solutions. Importantly, emotion regulation problems are based in the

dysfunction of multiple interwoven brain circuitries – including the circuitries that

underlie Wendi's memory and executive functioning deficits and her bipolar and

dissociative symptoms. All of those circuitries are known to be damaged by childhood

neglect and abuse, especially when the neglect and abuse are severe and chronic and

perpetrated by parents.

546. **Trauma-based ways of relating to others.** The neglect and abuse to which

Wendi's parents and many other adults subjected her, and some key relationship patterns

in which their neglect and abuse was embedded, are summarized above. As a result of

those traumatic childhood relationships, Wendi habitually relates to others in specific

249

SP&A 08608

000000633

ways. Critically, these ways of relating to others are *symptoms* of the extreme trauma she suffered. They are also *re-enactments* – of roles she was forced to play in relationships of neglect, abuse and domination; and of how she tried to cope in the midst of those traumatic relationships.

547.  As described above, in those relationships Wendi learned three key principles: Do whatever easily angered people want and avoid making them unhappy. Do not seek help from others, including for what abusive people are doing to you, because they will not help and probably do not even care. The only reliable ways to get attention and affection are to *take care of others and do what they want*. As described above, Wendi's relationship with Alejo reinforced those "lessons" by continually repeating – over years, on a daily basis – the pattern of responding to Alejo's anger by "babying" and "touching on" him, and the pattern of preventing Alejo's anger from arising by habitually and automatically anticipating and responding to his needs and wishes, including sexual stimulation.

548.  All of those relationship patterns created trauma-based ways of relating to others that have manifested throughout Wendi's life. If someone is angry – whether that anger is caused by her, directed at her for no good reason, or directed elsewhere and has nothing to do with her – Wendi feels *driven* to make that person feel better, because she believes, "then they will like me." If someone likes her and is nice to her, Wendi strives to be even nicer to them and to take care of them, because this is the only way she knows to avoid them getting angry at her or abandoning her. Yet these ways of relating leave Wendi feeling, usually implicitly and without reflecting on it, that the other person does not really know or care about her needs and is just using her. In short, the very ways she

250

SP&A 08609

000000634

P-App. 004934

attempts to avoid neglect and abuse in adult relationships leave her feeling neglected and used.

549. These are not uncommon childhood trauma-based ways of relating by people whose chronic neglect and abuse entailed being forced to sacrifice their own needs and wants to those of their abusers.

## X.    CONCLUSIONS

550. Wendi Andriano lived a childhood characterized by substantial neglect and abuse – emotional, physical, and sexual. The most destructive traumas were her mother's constant emotional neglect and her adoptive father's years of sexual abuse.

551. As a result, Wendi entered adulthood as a severely traumatized and damaged person with a greatly increased likelihood of developing – as she has – deficits in cognitive functioning, psychiatric disorders, deficits in emotional functioning, and trauma-based patterns of relating to others.

251

SP&A U8610

000000635

Date: February 14, 2012

_____
James W. Hopper, Ph.D.

252

SP&A 08611

000000636

6

**EXHIBIT "E"**



**STEVEN PITT & ASSOCIATES**
FORENSIC PSYCHIATRY, NURSING,
PSYCHOLOGY & NEUROPSYCHOLOGY
www.stevenpittassociates.com

Date: 12-26-2013
To: Steven Pitt, DO
From: Kiran Amin, Ph.D.

## RE: WENDI ANDRIANO, CR-2000-096032

I initially interviewed the defendant with you on 11/26/2013. I then administered the following selected neuropsychological and personality tests on 12/13/2013:

California Verbal Learning Test-2nd Edition (CVLT-2)
Halstead Finger Tapping Test
Grooved Pegboard Test
Minnesota Multiphasic Personality Test-2 (MMPI-2)
Structured Inventory of Malingered Symptoms (SIMS)
Rey-Osterrieth Complex Figure Test (ROCFT)
Validity Indicator Profile (VIP)

Records reviewed included:

Certified Contact Visit Letter dated 11/22/2013 from Arizona Superior Court,
        Maricopa County
Certified Contact Visit Letter dated 12/09/2013 from Arizona Superior Court,
        Maricopa County
Neuropsychological report dated 04/21/2011 by Myla Young, Ph.D.
Order Authorizing Filing of Documents under Seal dated 03/06/2012 from
        Arizona Superior Court, Maricopa County
Psychiatric report dated 08/27/2002 by Richard Rosengard, DO
Psychiatric report dated 02/14/2012 by George Woods, M.D.
Psychological report dated 08/04/2004 by Michael Bayless, Ph.D.
Psychological report dated 02/14/2012 by James Hopper, Ph.D.
Referral Letter dated 12/05/2013 from Lacey Gard
Transcript of Forensic Psychiatric Evaluation (Wendi Andriano) dated
        11/26/2013 (Drs. Pitt & Amin)
(Note: I am aware that you are listing all of the discovery documents that you provided me in your report.)

Corporate: 15849 N. 71st Street Suite 100 Scottsdale, AZ 85254 p480-281-1638 SEPitt@aol.com

1901 Avenue of the Stars Suite 200 Los Angeles, CA 90067 p310-777-7806 SEPitt@aol.com

The defendant was on time for the testing session.  She had been brought by correctional officers to a large visiting room made available for interviewing and testing in the Lumley Unit at Arizona State Prison, Perryville.  The testing conditions were relatively quiet with few distractions.  An untaped testing session lasting 2 hours and 44 minutes followed.  A short break punctuated the testing session.

She was oriented to person, place and date.  She was alert and fully cooperative during the testing session.  Her mood and affect were within normal limits.  She did not evidence any major thought disturbance in the form of delusions, hallucinations, looseness of associations or autistic behavior.

The defendant confirmed that she is still taking only one prescription medication, Buspar.

On the VIP, a measure of effort, the defendant's performance was consistent with having put forth her best effort.  By contrast, on an inventory designed to detect feigning or symptom exaggeration of psychiatric and cognitive symptoms (SIMS), the defendant's overall score did meet criteria for likely feigning.  Specifically, she did endorse inconsistent, illogical, or atypical characteristics of psychosis, amnestic disorders and affective disorders to an extent significantly above the recommended cut-off scores.  Furthermore, she obtained moderately elevated scores for the amnestic disorders scale.  Therefore, on this scale she endorsed some items that were atypical of, or highly inconsistent with, the presentation of genuine patients with these disorders.

On the CVLT-2, a test of verbal list learning over repeated trials, the defendant's overall performance was in the above average range. On the ROCFT, a test of visual memory, the defendant's overall performance also was in the above average range.

On two motor tests her performance ranged from the low average (Grooved Pegboard Test) to the average range (Halstead Finger Tapping Test).

On the MMPI-2, an objective test of personality functioning, while the defendant produced a generally valid and interpretable profile, there were indications that she had responded inconsistently at times and had disproportionately endorsed items as "False."  Furthermore, on the MMPI-2 Symptom Validity Scale, FBS, her score was elevated to a clinically significant extent, indicating exaggeration of some symptoms. Her clinical

Page **2** of **5**

scale profile was elevated on 8 of the 10 scales. The profile is consistent with individuals with chronic psychological maladjustment with histories of acting out behavior. There are also indications of emotional alienation, unusual thinking, and strange perceptions of others.

In reviewing the psychological report dated 08/04/2004 by Michael Bayless, Ph.D., a MMPI-2 was also administered by him at that time. When comparing the two MMPI-2 profiles the following observations are pertinent:

1) The defendant's MMPI-2 Clinical Scale Profile at that time also was valid and interpretable.
2) It is noteworthy, however, that while the overall pattern of the Clinical Scale Profile was similar to the one obtained during the current assessment, it was significantly less elevated than the current profile almost 9½ years later.

In reviewing the neuropsychological report dated 04/21/2011 by Myla Young, Ph.D. there also are some relevant comparisons and observations to be made:

1) The defendant was not on any prescription medications according to Dr. Young's report.
2) Dr. Young also administered the SIMS on 12-07-2010. The results at that time were within normal limits and did not indicate any possibility of feigning of symptoms.
3) Dr. Young administered the ROCFT on 12-07-2010. Dr. Young's omits to mention in her report that the defendant scored in the average range when recalling the visual information after a 30 minute delay (T=49; long delayed free recall). Furthermore, Dr. Young has overlooked the finding that the defendant's delayed recall is superior to her recognition trials for the same material (T=33; mildly to moderately impaired performance). This is a noteworthy finding indicating that the defendant was not putting forth her best effort. Four years later the defendant performed in the above average range with respect to her long delayed recall of the same material.
4) On the CVLT-2, administered on 12-08-2012, Dr. Young reported that "her ability to learn information after the information had been repeated five items (sic) was significantly impaired...." The level of impairment is misstated as "mildly to moderately" impaired. In fact

Page **3** of **5**

P-App. 004941

it is mildly impaired using Heaton's (1991) criteria. Dr. Young omits to mention that the defendant's overall ability for list learning was in the average range and her long delayed free recall was in the above average range.  Furthermore, Dr. Young omits to mention that her rate of learning over the repeated trials, Total Learning Slope, also was in the above average range.

5) On the Halstead Finger Tapping Test, administered on 02-15-2011, Dr. Young reported finger tapping speeds as 36.4 taps (Dominant Hand) and 33 taps (Nondominant Hand).  In contrast, the present evaluation, 33 months later, found finger tapping speeds of 46.2 and 41.8 taps, respectively.

6) On the Grooved Pegboard Test, administered on 02-08-2011 and also on 02-15-2011, Dr. Young reports incorrect results in her report as compared to her raw protocols for these two administrations: Dominant Hand times of 76 seconds and 60 seconds for 02-08-201 and 02-15-2011 respectively; Non-dominant Hand speeds of 81 seconds for both 02-08-201 and 02-15-2011. Furthermore, the date for the first administration was incorrectly given as 02-08-2010 instead of 02-08-2011.  Her report states these speeds as 56 seconds and 84 seconds, respectively.

7) On the Connors Continuous Performance Test II (CCPT-II), administered on 12-08-2010, Dr. Young reports that the defendant's attention and concentration were "significantly impaired."  However, Dr. Young omits to emphasize that the confidence levels for both the Attention Deficit Hyperactivity Disorder Assessment and the Neurological Assessment on this test were "borderline" and indicative only of "potential" attention problems and neurological deficit.

8) Dr. Young reported that, with respect to executive functioning, the defendant's abilities were "quite significantly impaired."  In the opinion of the present examiner this conclusion is imprecise and overstates the actual level of impairment.

9) Regarding the defendant's history of head injuries prior to 10/08/2000 Dr. Young reported that "She, however, reported repeated head injuries throughout her childhood...She described also having repeated head injuries throughout her marriage.  She was not sure whether or not she lost consciousness, but indicated that "would see stars" and be "blank."  When her head was hit

Page 4 of 5

particularly hard, she would "just go to sleep."" By contrast, during her videotaped interview on 11/26/2013, such claims of head injuries were denied by the defendant.

In conclusion the review of the defendant's current and past neuropsychological and personality testing reveals some serious inconsistencies and the possibility of malingered amnesia. Specifically, there are indications that, on some tests, the defendant was either exaggerating her amnestic and psychiatric symptoms (SIMS and MMPI-2 administered by myself) or not putting forth her best effort (ROCFT administered by Dr. Young).

**FORENSIC OPINIONS**

It is my opinion, to a reasonable degree of psychological probability, that at the time of the offense, Wendi Andriano did not suffer from a cognitive impairment.

It is my opinion, to a reasonable degree of psychological probability, that at the time of the offense, Wendi Andriano did not suffer from a cognitive impairment that significantly impaired her capacity to appreciate the wrongfulness of her conduct or conform her conduct to the requirements of the law.

It is my opinion, to a reasonable degree of psychological probability, that since I believe that at the time of the offense Wendi Andriano did not have a cognitive impairment, there is no causal connection between such an impairment and the murder.

I reserve the right to modify, amend, or alter the opinions expressed above in the light of additional information.

Kiran Amin, Ph.D.
Arizona License Number 1578

Page **5** of **5**

7

**EXHIBIT "F"**

# DSM-IV-TR CRITERIA FOR ADJUSTMENT DISORDERS

A.   The development of emotional or behavioral symptoms in response to an identifiable stressor(s) occurring within 3 months of the onset of the stressor(s).

B.   These symptoms or behaviors are clinically significant as evidenced by either of the following:

   1.   marked distress that is in excess of what would be expected from exposure to the stressor

   2.   significant impairment in social or occupational (academic) functioning

C.   The stress-related disturbance does not meet the criteria for another specific Axis I disorder and is not merely an exacerbation of a preexisting Axis I or Axis II disorder.

D.   The symptoms do not represent Bereavement.

E.   Once the stressor (or its consequences) has terminated, the symptoms do not persist for more than an additional 6 months.

Specify if:

   Acute: if the disturbance lasts less than 6 months
   Chronic: if the disturbance lasts for 6 months or longer

Adjustment Disorders are coded based on the subtype, which is selected according to the predominant symptoms. The specific stressor(s) can be specified on Axis IV.

| | |
|---|---|
| 309.0 | With Depressed Mood |
| 309.24 | With Anxiety |
| 309.28 | With Mixed Anxiety and Depressed Mood |
| 309.3 | With Disturbance of Conduct |
| 309.4 | With Mixed Disturbance of Emotions and Conduct |
| 309.9 | Unspecified |

**8**

**EXHIBIT "G"**

P-App. 004949

Age 30   Ⓢ  Ⓢ 4.9  ⟵ START 8:43  10:46  11:10 or 11:37
      Ⓢ 1:46 - 7:55    STOP 13:36
                        ADMIN 13:36 - 1:46
WENO1 ELIZABETH OCHOA ANDRIANO                 OCHOA

D.O.B.: 08.26.70 (44)   2 CHILDREN: NICHOLOS (AGE 3 @ TIME) BORN 1997)
05.18.89 H.S. GRAD            ASHLEY (AGE 2C X: BORN 1998)

01.22.94 MARRIES JOE ANDRIANO                    PERSONAL HX
                                      Mother  Ⓐ DOB/POB/BFO
10.08.00 OFFENSE + ARREST          → Alive Ⓑ TRAILED BY
10.18.00 INDICTMENT (ONE COUNT 1ST DEGREE MURDER)
                                      Ⓐ OPINION RE: TRIAL   Ⓓ DISC. PLNTS
12.21.02 NOTICE TO SEE DP          Ⓑ OPINION RE: OUTCOME Ⓔ CHILD HOOD INT.
12.27.00 TOX ④ SODIUM AZIDS       Ⓒ OPINION RE: TRIAL COUNSEL Ⓕ TRAILED BY
09.01.04 - 11.17.04 TRIAL          Ⓐ ADJUSTMENT TO DOC.  Ⓖ TRANSPORT EX,
11.18.04 - VERDICT                 Ⓐ ILTS C DOC         Ⓗ TEL UPBRINGING
12.08.04 - 12.16.04 PENALTY PHASE                        Ⓘ Present Physical
12.22.04 - VERDICT RE: DEATH       Ⓐ FAMILY HX?            offic.
07.09.07 DP AFFIRMED               Ⓐ FATHER DOB/GO/GMWOY/MED/4/12/CHILD/
                                      RLT GROWING UP / PRESENT DAY RLT.
                                      DESCRIBE
INTRO REMARKS Ⓢ  ✓OFFENSE  Ⓐ MUTUAL      Ⓐ FAMILY MED HX
NON-CONT Ⓢ      ✓ PRE-OFFENSE Ⓐ PARENTS RLT.  Ⓒ FAMILY 4 HX
I.O. INFO.       ✓ PNT-OFFENSE  Ⓐ RIBS
UNDERSTAND RE: GUILT Ⓢ · SA PRIOR TO OFFENSE

P-App. 004950

SAYS CHILDHOOD
✓ WAS NOT APPROPRIATE          WAS not really healthy ready
✓ WAS pretty STRESSFUL          to be HEALTHY ADULT TO
WAS abusive                     Make GOOD DECISIONS ON OWN

| PERSONAL HX (cont.) | MED HX | · EMPLOYMENT HX |
| JUVENILE BEH. HX | PRIOR TO 10.08.00 | · ADULT INTERESTS |
| EDUC. HX | SUBSEQUENT TO 10.08.00 | · HABITS |
| CHILDHOOD INTERESTS | SA HX | · CURRENT MEDS |
| SOCIOECONOMIC UPBRINGING | Ψ HX — PRIOR / SUBSEQUENT | · MEDS AT TIME of |
| CD HX | TYPICAL DAY — PRIOR / SUBSEQUENT | EVAL |
| WEAPONS HX | MILITARY HX | · ALLERGIES |
| LEGAL HX | ENDURING CHARACTER TRAITS | · FUTURE PLANS |
| CIVIL | ADULT BEHAVIORAL ISSUES | · STRESS OF PROBLEMS |
| CRIMINAL | SOURCE OF INCOME | · REED TO COPING |
| RLT HX | | |
| PHYSICAL ABUSE/SEXUAL/INCEST | · # OF SEXUAL RLTS. | · ORIENTATION |
| DV                    meet- sh is 21 | · CURRENT | |
| MARRIAGE              He was 24 | · PREG | TX HX |
| ORIENTATION | · TERM/DB. | PRESENT DAY |
| AGE OF INTEREST       23/26 | · STD | LIVING SIT. |
| # OF PARTNERS | · PROCLIVITIES | · ANYTHING ELSE |
| | | I NEED TO KNOW |

9

**EXHIBIT "H"**

## CURRICULUM VITAE
## (Updated February 1, 2013)

### Steven E. Pitt, D.O.

**Address:**

15849 North 71st Street
Suite 100
Scottsdale, Arizona  85254-2179
Telephone: (480) 281-1638
Facsimile:   (480) 281-1639
E-Mail:       SEPitt@aol.com

1901 Avenue of the Stars
Suite 200
Los Angeles, California  90067
Telephone: (310) 777-7806
E-Mail:       SEPitt@aol.com

**Education:**

Doctor of Osteopathic Medicine, Michigan State University, College of Osteopathic Medicine, East Lansing, Michigan, 1986

Bachelor of Science (Psychology), Michigan State University, East Lansing, Michigan, 1982

**Training:**

Fellowship in Forensic Psychiatry, University of Maryland School of Medicine, Baltimore, Maryland, July 1, 1990 through June 30, 1991

Psychiatry Residency, The University of Michigan Hospitals, Ann Arbor, Michigan, July 1, 1987 through June 30, 1990

Internship, Oakland General Hospital, Madison Heights, Michigan, July 1, 1986 through June 30, 1987

**Specialized Education:**

Criminal Procedure (Audit), University of Maryland Law School, Fall Term, 1990

Center for Forensic Psychiatry, Ann Arbor, Michigan, Elective Rotation, July, 1989 through December, 1989

**Academic and Teaching Appointment:**
Clinical Associate Professor, Department of Psychiatry, The University of Arizona College of Medicine – Phoenix

**Licensure:**
State of Arizona (2703)
State of California (20A 12040)
State of Colorado (30823)
State of Maryland (H40097)
State of Michigan (51-01-009617)

**Certification:**
Diplomate, American Board of Psychiatry and Neurology with Subspecialty Certification in forensic Psychiatry, 1998 and 2008

Diplomate, American Board of Psychiatry and Neurology, 1993

**Honors:**
Cooperative Law Enforcement Award– Arizona Response Crisis Team; "In recognition of meritorious service and acts that have materially contributed to the attainment of the highest standards of cooperative Law Enforcement and Justice in the State of Arizona." Presented by the Law Enforcement Coordinating Committee, U.S. Department of Justice, District of Arizona, 2003

"Physician of the Year," Arizona Osteopathic Medical Association, 2003

Michigan State University College of Osteopathic Medicine "Dean's Award for Meritorious Contribution," 2002

American Osteopathic Association "Hero Medal," 2002

"Co-Peer of The Year," Arizona State Hospital Medical Staff, 1997

"Peer of The Year," Arizona State Hospital Medical Staff, 1996

Completed Senior Year of Residency Training in Psychiatry at The University of Michigan Hospitals "With Distinction"

2

The University of Michigan's Department of Psychiatry Representative at CIBA-GEIGY'S MED Start IV, Aspen, Colorado, 1989

**Memberships:** American Academy of Psychiatry and the Law, 1995-Present
American Psychiatric Association, 1989-Present
American Osteopathic Association, 1988-Present
American Medical Association, 1991-Present
Arizona Psychiatric Society, 1992-Present
Arizona Osteopathic Medical Association, 1992-Present
Michigan Association of Osteopathic Physicians and Surgeons, 1989-Present

American College of Neuropsychiatrists, 1987-92
Colorado Psychiatric Society, 1991-92
Colorado Society of Osteopathic Medicine, 1991-92
Colorado Springs Osteopathic Foundation and Family Medical Center, 1991-92
Michigan Psychiatric Society, 1987-91
Michigan State Medical Society, 1987-90

**Associate:** Park Dietz & Associates, Inc., Newport Beach, California, June, 1998 – Present

**Consulting Positions:** Phoenix Police Department – Missing Persons Unit, Phoenix, Arizona, November, 2008 – Present

Threat Assessment Group, Inc., Newport Beach, California, April, 2000 – Present

Boulder Police Department, Boulder, Colorado, June, 1999 – Present

**Past Consulting Positions:** Phoenix Police Department – Family Investigations Bureau – Re: Domestic Violence Suspect Grouping Protocols, 2011 - 2012

Phoenix Police Department – Homicide Unit, Phoenix, Arizona, August, 2001 – November, 2008

Arizona Humane Society, Phoenix, Arizona, April 2007-April 2008

3

Baseline Killer Task Force, Phoenix Police Department, Homicide Unit, July 17, 2006-December 7, 2006

Physician Advisor, Magellan Behavioral Health, MBC TriCare Central Region, Phoenix, Arizona, July, 2000 – October, 2005

Board Examiner: American Board of Psychiatry and Neurology, April, 1994 – January, 2004

Director, Columbine Psychiatric Autopsy Project, Threat Assessment Group, Inc., Newport Beach, California, August, 1999 – April, 2002

Advisory Panel, Legalvote.com, New York, N.Y., October, 2000 – March, 2002

Maricopa County Attorney's Office
Re:  Installation of Videotape Equipment for Psychiatric Interview Room at New County Jail, April, 1999.

DWL Architects Re:  Design of Arizona State Hospital's Proposed 174 Bed Forensic Psychiatric Facility, August, 1996 – March, 1997

**Past Legislative Work:**

Working Member of Committee to Modify and Improve Criminal Rule 11 Procedure (Competency to Stand Trial) in the State of Arizona. Senate Bill 1273, Passed, 42nd Legislative Session, 1995

**Past Hospital Affiliations:**

Maricopa Integrated Health System, Phoenix, Arizona; June, 1998 – February, 2000

Courtesy Staff Member, Paradise Valley Hospital, Phoenix, Arizona; December, 1992 – February, 1999

Arizona State Hospital, Phoenix, Arizona; March, 1994 – May, 1998

4

Moonlighting Privileges, Maricopa Medical Center; January, 1994 – January 1997

Provisional Medical Staff Member, Desert Vista Hospital, Mesa; Arizona, September, 1992 – November, 1994

Colorado Mental Health Institute at Pueblo, Institute for Forensic Psychiatry; July, 1991 – July, 1992

**Committee Appointments**   Law Enforcement Liaison Committee, American Academy of Psychiatry and the Law, October, 2007 – Present

**Past Committee Appointments:**   Private Practice Committee, American Academy of Psychiatry and the Law, October, 1995 – October, 2007

Law Enforcement Liaison Committee, American Academy of Psychiatry and the Law, February 2001 – October, 2006

Paradise Valley Hospital Institutional Review Board, September, 2000 –September, 2004

Public Affairs Representative, Arizona Psychiatric Society, June, 1997 – June, 2004

Program Committee, American Academy of Psychiatry and the Law, October, 1995 – 2001

Public Information Committee, American Academy of Psychiatry and the Law, October, 1991 – October, 1998

Chairperson, Forensic Psychiatry Committee, Arizona Psychiatric Society, June, 1997 – June, 1998

Family Medicine Program Advisory Committee, Arizona Graduate Medical Education Consortium, May 1995 – May, 1998

5

Peer Review of Psychiatric Testimony Committee, American Academy of Psychiatry and the Law, October, 1994 – October, 1997

Acting Chairperson, Special Class Committee, Arizona State Hospital, January, 1997 – December, 1997

Early Career Development Committee, American Academy of Psychiatry and the Law, October, 1994 – October, 1996

Court Appointed Advisory Group Member: Development of Mental Health Expert Qualifications and Training Program for Conducting Competency to Stand Trial Evaluations. Maricopa County Superior Court, June, 1995 – August, 1995

Adjunct Member, Program Committee, American Academy of Psychiatry and the Law 1995 Annual Meeting, Seattle, Washington, October, 1994 – October, 1995

Learning Resources Center Committee, American Academy of Psychiatry and the Law, October, 1991 – October, 1993

Clinical Risk Management Committee, Colorado Mental Health Institute at Pueblo, December, 1991 – July, 1992

Public Information Committee, Michigan Psychiatric Society, 1989-90

Faculty and Staff Assistance Program, University of Michigan Hospitals, 1989-90

**Past Academic and Teaching Appointments:**

Clinical Associate Professor, Department of Psychiatry, The University of Arizona Health Sciences Center, Tucson, Arizona, 1995 – 2009

Faculty Member – <u>2003 Training Mental Health Experts in Legal Competency and Restoration Conference</u>. Arizona Supreme Court; Phoenix, Arizona, September 24-25, 2003

6

Clinical Teaching Faculty, Department of Psychiatry, Maricopa Integrated Health System, Phoenix, Arizona, June, 1998 – June, 1999

Clinical Teaching Faculty, Department of Psychiatry, Good Samaritan Regional Medical Center, Phoenix, Arizona, January, 1995 – May, 1998

Faculty Member – <u>Training Mental Health Experts in Legal Competency and Restoration in the Criminal and Juvenile Courts</u>. Superior Court of Arizona; Tucson, Arizona, April 17, 1998

Faculty Member – <u>Mental Health Expert Training</u>: <u>Examinations with Regard to Competency</u>. Superior Court of Arizona, Maricopa County, Criminal Department; Phoenix, Arizona, November 10, 1995 and November 11, 1995

Assistant Clinical Lecturer, Department of Psychiatry, The University of Arizona Health Sciences Center, Tucson, Arizona, 1993 – 1995

Senior Instructor in Psychiatry, The University of Colorado Health Sciences Center, Department of Psychiatry, Denver, Colorado, July, 1991 – July, 1992

Consulting Psychiatrist (Instructor), The University of Michigan Law School, Clinical Law Program, Clinical Law 1, Winter Term, 1990

**Past Administrative And Clinical Positions:**

Chief, Outpatient Evaluations and Forensic Services, Department of Psychiatry, Maricopa Integrated Health System, June, 1998 – June, 1999

Director, Forensic Psychiatric Services, Arizona State Hospital, March, 1994 – May, 1998

Chairperson, Medical Education Committee, Arizona State Hospital, July, 1995 – May, 1998

Consulting Psychiatrist, ComCare, Tempe, Arizona, September, 1992 – March, 1994

7

Chairperson, Judicial Review Committee, Colorado Mental Health Institute at Pueblo, October, 1991 – July, 1992

Chairperson, Medical Education Committee, Colorado Mental Health Institute at Pueblo, July, 1991 – July, 1992

Director, Forensic Education Series, Colorado Mental Health Institute at Pueblo, Institute for Forensic Psychiatry, July, 1991 – July, 1992

Staff Psychiatrist, Colorado Mental Health Institute at Pueblo, Institute for Forensic Psychiatry, July, 1991 – July, 1992

Consulting Psychiatrist, Washtenaw County Community Mental Health Center, Ann Arbor, Michigan, July, 1989 – January, 1990

**Presentations:**   Pitt, S.E., Zick, J.A.: Using Mental Health Experts to Rebut Mitigation, 2012 Association of Government Attorneys in Capital Litigation – Summer Conference, San Francisco, California, July 26, 2012

Pitt, S.E., Zick, J.A.: Understanding and Meeting Mental Defenses, 2012 Arizona Prosecuting Attorneys' Advisory Council Summer Conference, Tucson, Arizona, August 3, 2012

Pitt, S.E., Nelson, E.M.: Child Abduction and Murder: What Happens After The Arrest?  Arizona Missing Persons Association; Glendale, Arizona, November 17, 2011

Pitt, S.E., Collins, N., Humphrey, M., Metzner, J., Dvoskin, J. Kolsrud, R.: Foreseeability, Lethal Violence and Risk Assessment: You Be The Judge, American Academy of Psychiatry and the Law 41st Annual Meeting; Tucson, Arizona, October 21, 2010

8

Pitt, S.E., Nelson, E.M.: Information Gathering: The Forensic Psychiatric Evaluation and Beyond ... Strategies to Maximize Success, <u>Forensic Trends: Psychiatric and Behavioral Issues</u>; Las Vegas, Nevada, May 6, 2010

Pitt, S.E., Nelson, E.M.: Media and Forensic Psychiatry: Practical Considerations, <u>Forensic Trends: Psychiatric and Behavioral Issues</u>: Las Vegas, Nevada, May 7, 2010

Pitt, S.E., Nelson, E.M.: The Forensic Psychiatric Evaluation: Civil and Criminal Case Applications, <u>Arizona Paralegal Association</u>; Phoenix, Arizona, May 21, 2010

Nelson, E.M., Pitt, S.E.: Forensic Psychiatric and Psychological Expert Consultation in Criminal Cases, <u>Maricopa County Bar Association</u>; Phoenix, Arizona, March 19, 2010

Pitt, S.E., Nelson, E.M.: Behind Closed Doors: Understanding the Human Side of Hoarding. <u>Petsmart® Charities Feline Forum</u>, Chicago, Illinois, September 2009

Stefan, S., Joyce, M., Dvoskin, J.A., Nelson, E.M., and Pitt, S.E." Right to Refuse Medication Hearings. <u>National Association for Rights Protection and Advocacy Conference</u>, Phoenix, Arizona, September, 2009

Pitt, S.E., Spiers, E.M., Difficult Physician Behavior: The Role of the Forensic Psychiatric Evaluation. <u>Arizona Health Care Lawyers Association</u>, Phoenix, Arizona, May 2009

Pitt, S.E., Spiers, E.M., Hayes, J., Back to Basics: The Independent Forensic Evaluation. <u>Office of the Arizona Attorney General</u>, Phoenix, Arizona, March 2009

9

Perrin, G., Pitt, S.E. <u>Arizona Supreme Court 2007 Legal Competency and Restoration Training for Mental Health Experts</u>; Arizona Supreme Court; Tucson, Arizona, May 4, 2007

Pitt, S.E.; Spiers, E.M.; Hayes, J.; Back to Basics: The Art of Interviewing. <u>Arizona Psychiatric Society 2007 Spring Scientific Conference</u>, Scottsdale, Arizona, April 21, 2007

Pitt, S.E., Hayes, J., Spiers, E.M., Links between animal cruelty and violence toward people. <u>Arizona Humane Society, Law Enforcement Animal Protection program</u>, Phoenix, Arizona, March 12, 2007

Pitt, S.E.. Hayes, J., Forensic Psychiatric Evaluations in Personal Injury Litigation. <u>American Association of Legal Nurse Consultants -- Phoenix Chapter</u>, Phoenix, Arizona, July 11, 2006

Pitt, S.E., DOphilia: Treatment strategies toward maximizing your practice of Osteopathic Medicine – A Forensic Psychiatrist speaks out. <u>Arizona Osteopathic Medical Association Eighty-Fourth Annual Convention,</u> Scottsdale, Arizona, April 4, 2006

Lewis, D., Rubin, P., Pitt, S.E., Murder City – The Art of the Interview. <u>Judicial Education Day. Maricopa County Superior Court</u>, Mesa, Arizona, October 27, 2006

Pitt, S.E., Ínterview and Interrogation Techniques. <u>Boulder Police Department Looking Beyond the Obvious Training Program</u>, Boulder, Colorado, October 30, 2006

Pitt, S.E., Ballentine, J., Murder for Hire. <u>American College of Osteopathic Neurologists and Psychiatrists Mid-Year Meeting & Scientific Seminar</u>, Scottsdale, Arizona, April 15, 2005

P-App. 004962

Pitt, S.E., Domestic Homicide: Clinical Considerations. <u>American Osteopathic Association 109th Annual Convention and Scientific Seminar</u>, San Francisco, California, November 8, 2004

Pitt, S.E., Dietz, P.E., Dvoskin, J.A., Spiers, E.M., The Importance of Video Recording Forensic Examinations. <u>American Academy of Psychiatry and the Law 35th Annual Meeting</u>; Scottsdale, Arizona, Ocober 22, 2004

Spiers, E.M., Dvoskin, J.A., Pitt, S.E., Dietz, P.E., and Walker, R.P.: Columbine: Understanding Why – Implications for Psychologists. <u>American Psychology-Law Society Annual Conference</u>, Scottsdale, Arizona, March, 2004

Pitt, S.E.  Assessing the Risk for Interpersonal Violence in Your Patient Population. <u>Maricopa Integrated Health System Department of Psychiatry Fall Resident Retreat</u>; Phoenix, Arizona, November 21, 2003 *and* <u>Michigan State University College of Osteopathic Medicine Fall Kaleidoscope: CME For Osteopathic Physicians</u>; East Lansing, Michigan, September 18, 2004

Pitt, S.E., Dietz, P.E., Dvoskin, J.A., Spiers, E.M., Walker, R.P., Kurtis, B. Columbine: Understanding Why. <u>American Academy of Psychiatry and the Law 34th Annual Meeting;</u> San Antonio, Texas, October, 2003

Pitt, S.E.  The Value of Videotape.  <u>Arizona Supreme Court 2003 Training Mental Health Experts in Legal Competency and Restoration Conference</u>; Arizona Supreme Court; Phoenix, Arizona, September 25, 2003

11

Dvoskin, J.A., Grisso, T., Pitt, S.E.  Ethical Issues in conducting Competency to Stand Trial Evaluations and Restoration to Competency.  <u>Arizona Supreme Court 2003 Training Mental Health Experts in Legal Competency and Restoration Conference</u>; Arizona Supreme Court; Phoenix, Arizona, September 24, 2003

Pitt, S.E.  Fasten your seat belt and enjoy the ride. <u>Keynote speaker – Michigan State University College of Osteopathic Medicine Hooding and Commencement Ceremony</u>; MSU Wharton Center for Performing Arts, East Lansing, Michigan, May 1, 2003

Pitt, S.E., Columbine Massacre: Cause and Effect. <u>American College of Osteopathic Neurologists and Psychiatrists Mid-year Meeting & Scientific Seminar</u>; Scottsdale, Arizona, April 11, 2003

Pitt, S.E.  Emotional Distress Claims In Employment Litigation. <u>State Bar of Arizona Employment and Labor Law Section, Continuing Legal Education</u>; Phoenix, Arizona, January 27, 2003 and Tucson, Arizona, March 26, 2003

Pitt, S.E., Spiers, E.M., Dvoskin, J.A. What has been learned from Columbine: The signs that were missed and how this can be avoided in our own backyards. <u>Mental Health Association of Arizona, Arizona Department of Health Services – Division of Behavioral Health, 15th Annual Seeds of Success Symposium</u>; Phoenix, Arizona, October 7, 2002

Ballentine, J., Bickart, A.B., Pitt, S.E. The Art and Science of Murder Conspiracy. <u>State Bar of Arizona Continuing Legal Education</u>; Scottsdale, Arizona, September 19, 2002

Pitt, S.E.  Investigative Forensic Psychiatry and the Insanity Defense. <u>State Bar of Arizona Continuing Legal Education</u>; Scottsdale, Arizona, September 19, 2002

12

Ballantine, J., Pitt, S.E., Schoon, S., Rubin, P.  Can Offenders be Rehabilitated?  <u>Sociology 446 – Sociology of Crime – Arizona State University</u>; November, 2001

Pitt, S.E., Sasak, K., Jenkins, W.J.J.  Mental Defenses – The Importance of the Forensic Examination.  <u>Colorado District Attorneys' Council 30th Annual Training Conference</u>; Steamboat Springs, Colorado, October 2, 2001

Pitt, S.E.  The JonBenet Ramsey Homicide Investigation: Lessons Learned.  <u>Arizona Osteopathic Medical Association 79th Annual Conference Luncheon Speaker</u>; Scottsdale, Arizona, April, 2001

Pitt, S.E.  Interview/Interrogation Techniques; <u>Phoenix Police Department Homicide Unit;</u> Phoenix, Arizona, January, 2001

Pitt, S.E., Spiers, E.M.. Assessing the Risk for Domestic Violence: <u>Arizona School of Professional Psychology – Survey of Forensic Psychology</u>; Phoenix, Arizona, November, 2000

Pitt, S.E., Spiers, E.M.  Dangerousness and Firearms: Assessing the Risk for Violence in Teens and Adults.  <u>Midwestern University (Glendale Campus)</u>; Glendale, Arizona, November, 2000

Pitt, S.E., Spiers, E.M.  Necrophilia and Necrosadism: Identifying and Assessing the Offender. <u>The Mortician as an Integral Part of the Community – Mortuary Science for the Present and the Future</u>; Mesa Community College, Mesa, Arizona, October, 2000

Dvoskin, J.S., Hollebeek, J., Morenz, B., Pitt, S.E. Practical Perspectives. <u>Training Mental Health Experts in Legal Competency and Restoration Conference</u>; Supreme Court of Arizona, State of Arizona; Tucson, Arizona, August, 2000

13

**P-App. 004965**

Counts, W., Dvoskin, J.A., Fell, H., Jones, M., Pitt, S.E., Potts, J.L., Ethical Issues and other Hot Topics. <u>Training Mental Health Experts in Legal Competency and Restoration Conference</u>; Supreme Court of Arizona, State of Arizona; Tucson, Arizona, August, 2000

Pitt, S.E.  Anticipating and Investigating the Insanity Defense.  <u>Maricopa County Attorney's Office Advanced Trial Advocacy Course</u>; Phoenix, Arizona, June 2000 and Mesa, Arizona, October, 2000

Potts, J.L., Pitt, S.E.  Recognizing Lethality in Investigations from a Psychiatric Viewpoint; <u>Threat Management Seminar</u>. Maricopa County Attorney's Office; Phoenix, Arizona, November, 1999

Pitt, S.E.  Possible Solutions – Assessing the Dangerousness of Offenders and Fashioning Appropriate Dispositions. <u>The Mentally Ill and the Criminal Justice System (Panel) – State Bar of Arizona 66th Annual Convention</u>; Phoenix, Arizona, June, 1999

Pitt, S.E.  Addressing Mental Defenses. <u>Maricopa County Attorney's Office Advanced Trial Advocacy Course</u>; Maricopa County Attorney's Office; Phoenix, Arizona, June, 1999.

Pitt, S.E.  Conducting a Mental State at the Time of the Offense Evaluation: From Beginning to End. <u>Maricopa County Adult Probation Department</u>; Phoenix, Arizona, December, 2000 and <u>Continuing Education Programs for Mental Health Professionals – Arizona School of Professional Psychology</u>; Phoenix, Arizona, May, 1999

Ballantine, J., Pitt, S.E.  Murder for Hire.  <u>Maricopa County Legal Assistant Division Training Retreat</u>; Phoenix, Arizona, April, 1999

14

Pitt, S.E., Spiers, E.M.  Searching for Mental Illness in Firesetters. <u>Maricopa County Attorney's Office Arson Investigations Seminar</u>; Mesa, Arizona, February, 1999

Pitt, S.E.  Advanced Interviewing Workshop for Law Enforcement Officers. <u>Boulder Police Department</u>; Boulder, Colorado, January, 1999; with Wickman, T.J. <u>Reno Police Department</u>, Reno, Nevada, January, 1999; and <u>Florida Polygraph Association</u>, Key West, Florida, June, 1999

Pitt, S.E., Spiers, E.M.  Toward an Understanding of Infant Murder. <u>Northern New Jersey Maternal Child Health Consortium Hot Topics in Obstetrics and Pediatrics V</u>; West Orange, New Jersey, November, 1998

Deprato, D.K., Phillips, R.T.M., Dietz, P.E., Capo, L.L., Capo, B., Pitt, S.E.  Interaction with the Media: Advanced Workshop.  <u>American Academy of Psychiatry and the Law 29th Annual Meeting</u>; New Orleans, Louisiana, October, 1998

Pitt, S.E.  Introduction to Interviewing Mentally Ill Suspects.  <u>Phoenix Police Department Investigators Training/Criminal Investigation Course – Rio Salado Community College</u>; Phoenix, Arizona, October, 1999; March, 1999; October, 1999; March, 2000; October, 2000; March, 2001; October, 2001; March, 2002; March, 2003; November, 2003; March, 2004; October, 2004; March, 2005; October, 2005; March,2006; February 2007, August, 2007; October, 2008; March, 2009; November, 2009; March, 2010; July 2012; and December 2012.

Pitt, S.E., Whitback, T., O'Dell, A.  Aggressive Investigative Techniques for Law Enforcement. <u>Arizona Communities United Against Abuse – First Annual Statewide Conference on Domestic Violence</u>; Tucson, Arizona, October, 1998

15

Pitt, S.E., Potts, J.L. Risk Assessment in Stalking and Erotomania. <u>Arizona Association for Marriage and Family Therapy Fall 1998 Conference</u>; Phoenix, Arizona, September 1998

Pitt, S.E.  Sane or Insane: You be the Judge; <u>Good Samaritan Regional Medical Center. Department of Psychiatry, Grand Rounds Presentation</u>; Phoenix, Arizona, May, 1998 and <u>Maricopa County Adult Probation Department</u>; Phoenix, Arizona, August, 1998

Pitt, S.E.  Arizona State Hospital's Restoration to Competency to Stand Trial Program: <u>Training Mental Health Experts in Legal Competency and Restoration in the Criminal and Juvenile Courts. Supreme Court of Arizona</u>; Tucson, Arizona, April, 1998

Pitt, S.E.  Assessing Sociopathy and Mental Illness in Gang Members. <u>B.F.F. Consultants Arizona Gang Seminar</u>; Phoenix, Arizona, October, 1997

Pitt, S.E., Deprato, D.K., Dietz, P.E., Phillips, R.T.M., Anfang, S.E.  Forensic Psychiatry and the Media. <u>American Academy of Psychiatry and the Law 28th Annual Meeting</u>; Denver, Colorado, October, 1997

Pitt, S.E., Weir, P.A., Randall, M.M.  Insanity. <u>Colorado District Attorneys Council 26th Annual Training Conference</u>; Steamboat Springs, Colorado, October, 1997

Blair, J., Pitt, S.E.  Cross Examination of Mitigation Expert Demonstration.  <u>New York Prosecutors Training Institute, Inc., Statewide Conference on Capital Prosecution</u>; Albany, New York, September, 1997

16

Pitt, S.E.  Arizona State Hospital's Restoration to Competency to Stand Trial Program: What we do and how we do it.  Arizona Psychiatric Society 1997 Fall Scientific Conference; Apache Junction, Arizona, September, 1997 and Maricopa County Adult Probation Department; Phoenix, Arizona, March, 1999

Pitt, S.E. Assessing the Presence or absence of Mental Illness in a Suspect. Florida Polygraph Association; Fort Lauderdale, Florida, June, 1997

Pitt, S.E. Serial Rape, Dissociative Identity Disorder and the Insanity Defense. Arizona Osteopathic Medical Association 75th Annual Meeting; Scottsdale, Arizona, April 1997

Pitt, S.E. Introduction to Forensic Psychiatry. Midwestern University's (Glendale Campus) Lecture Series in Psychiatry; Glendale, Arizona, April, 1997; February, 1998; February, 1999; January, 2000; January, 2001; January, 2002; January, 2003; January, 2004; January, 2005; January, 2006; January, 2007; January, 2009; November, 2009; and December, 2010.

Bacal, E.B., Bowers, B.W., Jones, M.D., Pitt, S.E., Potts, J.L., Spencer, B.  Competency to Stand Trial: Evaluation, Restoration, and the New Amendments to Rule 11. Maricopa County Bar Association; Phoenix, Arizona, April, 1997

Arnold, C.L., Davidson, V., Franks, P.J., Pitt, S.E. Reaction Panelist – The MacArthur Treatment Competence Study. ComCare's Pivotal Issues in Mental Health Law Program; Phoenix, Arizona, January, 1997

Wettstein, H.C., Resnick, P.J., Rappeport, J.R., Griffith, E.E.H., Zonana, H.V., Pitt, S.E.  Peer Review of Expert Psychiatric Testimony. American Academy of Psychiatry and the Law 27th Annual Meeting; San Juan, Puerto Rico, October, 1996

17

Pitt, S.E.  The Forensic Psychiatric Assessment of a Criminal Defendant.  Office of the District Attorney, First Judicial District; Golden, Colorado, August, 1996

Pitt, S.E.  Investigator's Update: Mental Issues in Criminal Cases.  Office of the District Attorney, 18th Judicial District; Englewood, Colorado, July, 1996

Harrison, J.A., Karp, C., Morenz, B., Pitt, S.E.  Does Your Memory Serve You Well?  Debating False Memory Syndrome.  The University of Arizona Extended University Behavioral Health Continuing Education Program; Tucson, Arizona, May, 1996

Hirsh, B., Pitt, S.E.  The Insanity Defense in Arizona; A Legislative Response to High Profile Cases. Sandra Day O'Connor Inn of Court; Phoenix, Arizona, December, 1995

Pitt, S.E., Potts, J.L., Youngjohn, J., Boyer, C.  The Evaluation Process, Part One: How to do the Evaluation. Mental Examinations with Regard to Competency; Superior Court of Arizona, Maricopa County, Criminal Department; Phoenix, Arizona, November, 1995

Boyer, C., Pitt, S.E.  Writing the Report. Mental Health Expert Training: Examinations with Regard to Competency; Superior Court of Arizona, Maricopa County, Criminal Department; Phoenix, Arizona, November, 1995

Kenney, L., Pitt, S.E., Arnold, C.L.  Competing Agencies in Law and Mental Health.  Mental Health Expert Training: Examinations with Regard to Competency; Superior Court of Arizona, Maricopa County, Criminal Department; Phoenix, Arizona, November, 1995

18

Pitt, S.E., Bale, E.M.  Neonaticide, Infanticide, and Filicide: Two Case Reports and a Review of the Literature. Good Samaritan Regional Medical Center, Department of Psychiatry, Grand Rounds Presentation; Phoenix, Arizona, May, 1995

Pitt, S.E.  Components of a Forensic Psychiatric Examination: Competency to Stand Trial and Sanity Evaluations. The Maricopa County Office of the Public Defender Continuing Legal Education Seminar Re: Forensic Sciences and the Criminal Defense Team; Phoenix, Arizona, May, 1995

Pitt, S.E., Bale, E.M.  Women Who Murder Their Children. American College of Neuropsychiatrists' Mid-Year Meeting and Scientific Seminar; Phoenix, Arizona, April, 1995

Morenz, B., Harrison, J.A., Pitt, S.E.  Say "No" to Crimes of Passion: Arizona's New NGRI Law. American Academy of Psychiatry and the Law 25th Annual Meeting; Maui, Hawaii, October, 1994

Pitt, S.E.  DSM-IV and the Legal System: An Update on the Changes in the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, and conducting Forensic Psychiatric Evaluations and Preparing Reports for the Court. Colorado District Attorneys Council 23rd Annual Training Conference; Snowmass, Colorado, September, 1994

Beck, J.T., Pitt, S.E., Wilkinson, W.E.  Differential Diagnosis and Therapeutic Jurisprudence. Worker's Compensation Seminar, 61st Annual Arizona State Bar Convention; Tucson, Arizona, June, 1994

Pitt, S.E., Bale, E.M.  Post-Traumatic Stress Disorder and DSM-IV: For Better or For Worse? Arizona Trial Lawyers Association; Medical Experts Speak: A Mélange of Riveting Medical Topics; Phoenix, Arizona, December, 1993

19

Pitt, S.E., Bale, E.M.  The Diagnosis and Treatment of Depression for the Family Practitioner. <u>Phoenix General Hospital and Medical Center</u>; Phoenix, Arizona, September, 1993

Pitt. S.E., Bale, E.M.  Confidentiality and Privilege: Are You Protecting Your Patient's Rights? <u>71st Annual Arizona State Osteopathic Medical Association Convention</u>; Phoenix, Arizona, April, 1993

Pitt, S.E., Bale, E.M.  Preparing for Courtroom Testimony. <u>71st Annual Arizona State Osteopathic Medical Association Convention</u>; Phoenix, Arizona, April, 1993

Olin, J.A., Ball, E.M., Pitt, S.E.  The Validity of Colorado NGRI Findings. <u>American Academy of Psychiatry and the Law 23rd Annual Meeting</u>; Boston, Massachusetts, October, 1992

Aspinwall, W., Fisher, H., Pitt, S.E.  Mental Incapacity: A Round Table Discussion of Diagnoses and Symptoms which Support a Finding of Not Guilty by Reason of Insanity. <u>Colorado District Attorneys Council 21st Annual Training Conference</u>; Estes Park, Colorado, September, 1992

Pitt, S.E.  Neonaticide: A Case Presentation and Review of the Literature.  <u>Colorado Springs Osteopathic Foundation and Family Medicine Center</u>; Colorado Springs, Colorado, May, 1992

Pitt, S.E.  Introduction to Forensic Psychiatry and The Malingering Patient. <u>Colorado Society of Osteopathic Medicine, Continuing Medical Education Program</u>; Keystone, Colorado, February, 1992

Pitt, S.E.  The Mental Status Examination. <u>Colorado Springs Osteopathic Foundation and Family Medicine Center</u>; Colorado Springs, Colorado, November, 1991

20

Pitt, S.E., Brandt, J.D., Cohen, M.E., Janofsky, J.S., Tellefsen, C.  Group Dynamics in Forensic Pre-Trial Decision Making. <u>American Academy of Psychiatry and the Law 22nd Annual Meeting</u>; Lake Buena Vista, Florida, October, 1991

Pitt, S.E.  Diagnosis and Management of Panic Disorder and Management of Insomnia.  <u>Colorado Society of Osteopathic Medicine, Continuing Medical Education Program</u>; Larkspur, Colorado, September, 1991

Pitt, S.E.  Malingering and Forensic Psychiatry. <u>The University of Maryland Medical Center. Series on Forensic Psychiatry</u>; Baltimore, Maryland, February, 1991

Pitt, S.E.  Malingering and Malingered Psychosis. <u>The University of Michigan Hospitals, Department of Psychiatry, Consultation Liaison Service</u>; Ann Arbor, Michigan, April, 1990

Pitt, S.E.  An Evolutionary Explanation of Self-Esteem. <u>The University of Michigan Hospitals, Department of Psychiatry, Core Seminar Series on Evolution and Psychiatry</u>; Ann Arbor, Michigan, March, 1990

Pitt, S.E.  Risk Taking Behavior. <u>Ann Arbor Veterans Administration Hospital. Department of Psychiatry, Grand Rounds Presentation</u>; Ann Arbor, Michigan, January, 1988

**TAG® School Violence Presentation Course(s):**

School Violence Presentation; <u>East Penn School District</u>, Emmaus, Pennsylvania, June 26, 2003

P-App. 004973

**Research Assistant:**   Tellefsen, C., Cohen, M.E., Silver, S.B., Dougherty, C., "Predicting Success on Conditional Release for Insanity Acquittees: Regionalized Versus Nonregionalized Hospital Patients." <u>Bull Am Acad Psychiatry Law</u>; 20:87-100, 1992

**Reviewer:**   <u>The Journal of the American Academy of Psychiatry and The Law</u>, 2000-2006

**Publications:**

<u>Articles</u>:   Dvoskin, J.A.; Pitt. S.E., Dietz, P.E.; Spiers, E.M.; Walker, R.P.: Making America's Schools Safer. www.TeachSafeSchools.Org, 2008

Miller, R.D.; Olin, J.; Ball, E.M.; Bennett, C.; Beven, G. F.; Pitt, S.E.: The Validity of Colorado Not Criminally Responsible Findings. <u>J Psychiatry and Law</u>. 34(1) Spr. 2006, 37-49

Glancy, G.D., Spiers, E.M., Pitt, S.E., Dvoskin, J.A., Commentary on Chen, Y-H, Arria, A.M., Anthony, J.C., Firesetting in adolescents and being aggressive, shy, and rejected by peers: New epidemiologic evidence from a national sample survey. Models and correlates of firesetting behavior. <u>J Am Acad Psychiatry Law</u>; 31(1):53-57, 2003

Pitt, S.E., Spiers, E.M., Dietz, P.E., Dvoskin, J.A., Preserving the integrity of the interview: The value of videotape. <u>J Forensic Sciences</u>; 44(6):1287-1291, 1999

Pitt, S.E., Brandt, J.D., Tellefsen, C., Janofsky, J.S., Cohen, M.E., Bettis, E.D., Rappeport, J.R., Group dynamics in forensic pre-trial decision making. <u>J Am Acad Psychiatry Law</u>; 25(1):95-104, 1997

Pitt, S.E., Bale, E.M., Neonaticide, Infanticide, and Filicide: A Review of the Literature. <u>Bull Am Acad Psychiatry Law</u>; 23(3):375-386, 1995

22

Pitt, S.E., Bale, E.M., Neonaticide: Mothers who Kill Their Newborn – A Case Report and Preliminary Review of the Literature. <u>AOMA Digest</u>; 8:6-7, 16; 1993

<u>Book Chapters:</u>

Kane, A.W., Nelson, E.M., Dvoskin, J.A., & Pitt, S.E. Evaluation for Personal Injury Claims.  In R. Roesch & P.A. Zapf (Eds.). <u>Forensic assessments in criminal and civil law:  A handbook for lawyers</u>. New York: Oxford University Press, 2013.

Spiers, E.M., Pitt, S.E., Dvoskin, J.A.  Psychiatric Intake Screening. *In* Puisis, Michael (Ed.), <u>Clinical Practice in Correctional Medicine, Second Edition</u>. Philadelphia: Elsevier Health Sciences, 2006

Dvoskin, J.A., Spiers, E.M., Metzner, J.L., Pitt, S.E. The Structure of Correctional Mental Health Services. *In* Rosner, Richard (Ed.), <u>Principles and Practice of Forensic Psychiatry</u>, Second Edition, London: Arnold Publishing, 2003

Spiers, E.M., Dvoskin, J.A., Pitt, S.E.  Mental Health Professionals as Institutional Consultants and Problem-Solvers. *In* Fagan, T., Ax, B. (Eds.), <u>The Correctional Mental Health Handbook</u>, Lanham, MD: American Correctional Association, 2002

<u>Letters To the Editor:</u>

"Pinal deputy story a work in progress," <u>The Arizona Republic</u>, September 29, 2010

"Campus security is no cure-all," <u>The Arizona Republic</u>, April 30, 2004

"False view of insanity defense," <u>The Arizona Republic</u>, August 28, 1995

Insanity plea is not rich man's defense," <u>The Arizona Republic</u>, July 2, 1994

23

**10**

**EXHIBIT "I"**



WENDI ELIZABETH ANDRIANO
FORENSIC PSYCHIATRIC EVALUATION
STEVEN PITT & ASSOCIATES
NOVEMBER 26, 2013
DVD-R
DISC 1 OF 4



WENDI ELIZABETH ANDRIANO
FORENSIC PSYCHIATRIC EVALUATION
STEVEN PITT & ASSOCIATES
NOVEMBER 26, 2013
DVD-R
DISC 2 0F 4



P-App. 004980





**STEVEN PITT & ASSOCIATES**
FORENSIC PSYCHIATRY, NURSING,
PSYCHOLOGY & NEUROPSYCHOLOGY
www.stevenpittassociates.com

Date: 12-26-2013
To: Steven Pitt, DO
From: Kiran Amin, Ph.D.

### RE: WENDI ANDRIANO, CR-2000-096032

I initially interviewed the defendant with you on 11/26/2013. I then administered the following selected neuropsychological and personality tests on 12/13/2013:

California Verbal Learning Test-2nd Edition (CVLT-2)
Halstead Finger Tapping Test
Grooved Pegboard Test
Minnesota Multiphasic Personality Test-2 (MMPI-2)
Structured Inventory of Malingered Symptoms (SIMS)
Rey-Osterrieth Complex Figure Test (ROCFT)
Validity Indicator Profile (VIP)

Records reviewed included:

Certified Contact Visit Letter dated 11/22/2013 from Arizona Superior Court,
    Maricopa County
Certified Contact Visit Letter dated 12/09/2013 from Arizona Superior Court,
    Maricopa County
Neuropsychological report dated 04/21/2011 by Myla Young, Ph.D.
Order Authorizing Filing of Documents under Seal dated 03/06/2012 from
    Arizona Superior Court, Maricopa County
Psychiatric report dated 08/27/2002 by Richard Rosengard, DO
Psychiatric report dated 02/14/2012 by George Woods, M.D.
Psychological report dated 08/04/2004 by Michael Bayless, Ph.D.
Psychological report dated 02/14/2012 by James Hopper, Ph.D.
Referral Letter dated 12/05/2013 from Lacey Gard
Transcript of Forensic Psychiatric Evaluation (Wendi Andriano) dated
    11/26/2013 (Drs. Pitt & Amin)
(Note: I am aware that you are listing all of the discovery documents that
you provided me in your report.)

Corporate: 15849 N. 71st Street Suite 100 Scottsdale, AZ 85254 p480-281-1638 SEPitt@aol.com

1901 Avenue of the Stars Suite 200 Los Angeles, CA 90067 p310-777-7806 SEPitt@aol.com

The defendant was on time for the testing session. She had been brought by correctional officers to a large visiting room made available for interviewing and testing in the Lumley Unit at Arizona State Prison, Perryville. The testing conditions were relatively quiet with few distractions. An untaped testing session lasting 2 hours and 44 minutes followed. A short break punctuated the testing session.

She was oriented to person, place and date. She was alert and fully cooperative during the testing session. Her mood and affect were within-normal limits. She did not evidence any major thought disturbance in the form of delusions, hallucinations, looseness of associations or autistic behavior.

The defendant confirmed that she is still taking only one prescription medication, Buspar.

On the VIP, a measure of effort, the defendant's performance was consistent with having put forth her best effort. By contrast, on an inventory designed to detect feigning or symptom exaggeration of psychiatric and cognitive symptoms (SIMS), the defendant's overall score did meet criteria for likely feigning. Specifically, she did endorse inconsistent, illogical, or atypical characteristics of psychosis, amnestic disorders and affective disorders to an extent significantly above the recommended cut-off scores. Furthermore, she obtained moderately elevated scores for the amnestic disorders scale. Therefore, on this scale she endorsed some items that were atypical of, or highly inconsistent with, the presentation of genuine patients with these disorders.

On the CVLT-2, a test of verbal list learning over repeated trials, the defendant's overall performance was in the above average range. On the ROCFT, a test of visual memory, the defendant's overall performance also was in the above average range.

On two motor tests her performance ranged from the low average (Grooved Pegboard Test) to the average range (Halstead Finger Tapping Test).

On the MMPI-2, an objective test of personality functioning, while the defendant produced a generally valid and interpretable profile, there were indications that she had responded inconsistently at times and had disproportionately endorsed items as "False." Furthermore, on the MMPI-2 Symptom Validity Scale, FBS, her score was elevated to a clinically significant extent, indicating exaggeration of some symptoms. Her clinical

Page **2** of **5**

scale profile was elevated on 8 of the 10 scales. The profile is consistent with individuals with chronic psychological maladjustment with histories of acting out behavior. There are also indications of emotional alienation, unusual thinking, and strange perceptions of others.

In reviewing the psychological report dated 08/04/2004 by Michael Bayless, Ph.D., a MMPI-2 was also administered by him at that time. When comparing the two MMPI-2 profiles the following observations are pertinent:

1) The defendant's MMPI-2 Clinical Scale Profile at that time also was valid and interpretable.
2) It is noteworthy, however, that while the overall pattern of the Clinical Scale Profile was similar to the one obtained during the current assessment, it was significantly less elevated than the current profile almost 9½ years later.

In reviewing the neuropsychological report dated 04/21/2011 by Myla Young, Ph.D. there also are some relevant comparisons and observations to be made:

1) The defendant was not on any prescription medications according to Dr. Young's report.
2) Dr. Young also administered the SIMS on 12-07-2010. The results at that time were within normal limits and did not indicate any possibility of feigning of symptoms.
3) Dr. Young administered the ROCFT on 12-07-2010. Dr. Young's omits to mention in her report that the defendant scored in the average range when recalling the visual information after a 30 minute delay (T=49; long delayed free recall). Furthermore, Dr. Young has overlooked the finding that the defendant's delayed recall is superior to her recognition trials for the same material (T=33; mildly to moderately impaired performance). This is a noteworthy finding indicating that the defendant was not putting forth her best effort. Four years later the defendant performed in the above average range with respect to her long delayed recall of the same material.
4) On the CVLT-2, administered on 12-08-2012, Dr. Young reported that "her ability to learn information after the information had been repeated five items (sic) was significantly impaired...." The level of impairment is misstated as "mildly to moderately" impaired. In fact

Page **3** of **5**

it is mildly impaired using Heaton's (1991) criteria. Dr. Young omits to mention that the defendant's overall ability for list learning was in the average range and her long delayed free recall was in the above average range.  Furthermore, Dr. Young omits to mention that her rate of learning over the repeated trials, Total Learning Slope, also was in the above average range.

5) On the Halstead Finger Tapping Test, administered on 02-15-2011, Dr. Young reported finger tapping speeds as 36.4 taps (Dominant Hand) and 33 taps (Nondominant Hand).  In contrast, the present evaluation, 33 months later, found finger tapping speeds of 46.2 and 41.8 taps, respectively.

6) On the Grooved Pegboard Test, administered on 02-08-2011 and also on 02-15-2011, Dr. Young reports incorrect results in her report as compared to her raw protocols for these two administrations: Dominant Hand times of 76 seconds and 60 seconds for 02-08-201 and 02-15-2011 respectively; Non-dominant Hand speeds of 81 seconds for both 02-08-201 and 02-15-2011. Furthermore, the date for the first administration was incorrectly given as 02-08-2010 instead of 02-08-2011.  Her report states these speeds as 56 seconds and 84 seconds, respectively.

7) On the Connors Continuous Performance Test II (CCPT-II), administered on 12-08-2010, Dr. Young reports that the defendant's attention and concentration were "significantly impaired."  However, Dr. Young omits to emphasize that the confidence levels for both the Attention Deficit Hyperactivity Disorder Assessment and the Neurological Assessment on this test were "borderline" and indicative only of "potential" attention problems and neurological deficit.

8) Dr. Young reported that, with respect to executive functioning, the defendant's abilities were "quite significantly impaired."  In the opinion of the present examiner this conclusion is imprecise and overstates the actual level of impairment.

9) Regarding the defendant's history of head injuries prior to 10/08/2000 Dr. Young reported that "She, however, reported repeated head injuries throughout her childhood...She described also having repeated head injuries throughout her marriage.  She was not sure whether or not she lost consciousness, but indicated that "would see stars" and be "blank."  When her head was hit

Page 4 of 5

particularly hard, she would "just go to sleep."" By contrast, during her videotaped interview on 11/26/2013, such claims of head injuries were denied by the defendant.

In conclusion the review of the defendant's current and past neuropsychological and personality testing reveals some serious inconsistencies and the possibility of malingered amnesia. Specifically, there are indications that, on some tests, the defendant was either exaggerating her amnestic and psychiatric symptoms (SIMS and MMPI-2 administered by myself) or not putting forth her best effort (ROCFT administered by Dr. Young).

## FORENSIC OPINIONS

It is my opinion, to a reasonable degree of psychological probability, that at the time of the offense, Wendi Andriano did not suffer from a cognitive impairment.

It is my opinion, to a reasonable degree of psychological probability, that at the time of the offense, Wendi Andriano did not suffer from a cognitive impairment that significantly impaired her capacity to appreciate the wrongfulness of her conduct or conform her conduct to the requirements of the law.

It is my opinion, to a reasonable degree of psychological probability, that since I believe that at the time of the offense Wendi Andriano did not have a cognitive impairment, there is no causal connection between such an impairment and the murder.

I reserve the right to modify, amend, or alter the opinions expressed above in the light of additional information.

Kiran Amin, Ph.D.
Arizona License Number 1578

Page **5** of 5

PHOENIX POLICE DEPARTMENT REPORT

ORIGINAL          PAGE NUMBER:   1        DR NUMBER: 2000 01797849

REPORT DATE: 20001010    TIME: 0915

TYPE OF REPORT:  HOMICIDE                              OFFENSE: 451

PROSECUTION DESIRED: YES                      SUSPECT[S]:   BOOKED

BOOKING VICTIM NOTIFIED: NO

LOCATION: 002155 E LIBERTY LANE 132           BEAT: 0444  GRID: JD32

DATE/TIME OF OCCURRENCE:    SUN    100800   0225  /  SUN    100800   0338

REPORTING OFFICER[S]: DAVE LUCERO                 4913    UNIT: C33
                      THOMAS KULESA               3550

PREMISES: APARTMENT                              OCCUPIED: YES

OFFENSE INVOLVED:  DOMESTIC VIOLENCE  - MINORS PRESENT
                   BIAS -

PHOTOGRAPHS TAKEN: NO     BY:

SCENE PROCESSED FOR LATENTS: NO      BY:

REPORT DISPOSITION: CLEARED BY ARREST            OVER AGE 18: YES

                 ****  SUSPECT INFORMATION  ****

   ARRESTED PERSON-01:
                 NAME: ANDRIANO, WENDI ELIZABETH

      RACE: W  SEX: F  AGE: 30    DOB: 082670  HT: 504      WT: 110
      HAIR: BLN      EYES: BRO    SSN: 527659703
      OLN:                           R&I: NEG
      HOME: 002155 E  LIBERTY LANE   APT/SUITE: 132
            PHOENIX        AZ         ZIP CODE:
      RES.NAME: SAN RIVA              PHONE: (480)659-2630
      WORK: 002155 E  LIBERTY LANE   APT/SUITE:
            PHOENIX        AZ         ZIP CODE:
      BUS.NAME: SAN RIVA             PHONE: (480)283-8488 EXT.
      OCCUPATION: MANAGER            EMPLOYED:
      LEVEL OF FORCE : OFFICER PRESENCE

      ARREST:
            DATE: 100800    TIME: 0935      DAY: SUN    GRID: JD32
            LOC: 002155 E LIBERTY LANE 132            PHOENIX      AZ

              ****  VICTIM INFORMATION  ****

   VICTIM -01:
                 NAME: ANDRIANO, JOSEPH D [**DECEASED**]

2000 01797849                                   Continued.

000009256

PHOENIX POLICE DEPARTMENT REPORT

ORIGINAL          PAGE NUMBER:   2      DR NUMBER: 2000 01797849


RACE: W  SEX: M  AGE: 33     DOB: 081867   HT: 510      WT: 195
HAIR: BRO        EYES: BLU   SSN: 527718252
HOME: 002155 E  LIBERTY ROAD              APT/SUITE: 132
     PHOENIX         AZ                   ZIP CODE:
RES.NAME: SAN RIVAS                       PHONE: (480)659-2630

** PRE INCIDENT CONTACT WITH AP-01: VICTIM KNOWS SUSPECT

    RELATIONSHIP TO AP-01: HUSBAND OR WIFE/SPOUSE


    VICTIM DECLINES NOTIFICATION

              **** WITNESS INFORMATION ****

WITNESS -01:
              NAME: HASHISAKI, CHRIS

    RACE: W  SEX: F  AGE:       DOB: 092760   HT: 000      WT: 000
    HOME: 002155 E  LIBERTY LANE          APT/SUITE: 385
         PHOENIX         AZ               ZIP CODE:
    RES.NAME: SAN RIVA                    PHONE: (480)659-8070
    WORK: 002155 E  LIBERTY LANE          APT/SUITE:
         PHOENIX         AZ               ZIP CODE:
    BUS.NAME: SAN RIVA                    PHONE: (480)283-8488 EXT.
    OCCUPATION: BOOK KEEPER
    WILL TESTIFY: YES                     MISC.


WITNESS -02:
              NAME: SWEENEY, SHANNON

    RACE: W  SEX: F  AGE: 26    DOB: 122373   HT: 000      WT: 000
    HAIR:            EYES:      SSN: 272786243
    HOME: 002155 E  LIBERTY LANE          APT/SUITE: 381
    RES.NAME: SAN RIVA                    PHONE: (   )   -
    MORE PHONE:CELLULAR: (602)570-3394
    WORK: 002155 E  LIBERTY LANE          APT/SUITE:
    BUS.NAME: SAN RIVA                    PHONE: (480)283-8488 EXT.
    OCCUPATION: ASSISTANT MANAGER


WITNESS -03:
              NAME: KOEPPEN, STEPHANIE

    RACE: W  SEX: F  AGE:       DOB: 081076   HT: 000      WT: 000
    HAIR:            EYES:      SSN: 392989045
    HOME: 002155 E  LIBERTY LANE          APT/SUITE: 337
         PHOENIX         AZ               ZIP CODE:

2000 01797849                            Continued.


000009257


P-App. 004988

PHOENIX POLICE DEPARTMENT REPORT

ORIGINAL                PAGE NUMBER:   3        DR NUMBER: 2000 01797849

```
RES.NAME: SAN RIVA                          PHONE: (480)659-2821
WORK: 002155 E  LIBERTY LANE                APT/SUITE:
      PHOENIX         AZ                     ZIP CODE:
BUS.NAME: SAN RIVA                          PHONE: (480)283-8488 EXT.
OCCUPATION: LEASING CONSULTANT
WILL TESTIFY: YES                           MISC.
```

WITNESS -04:
                    NAME: MCKINNON, BENJAMIN

```
RACE: W SEX: M  AGE:         DOB:           HT: 000       WT: 000
WORK: 015402 S  MARKET PLACE WAY            APT/SUITE:
      PHOENIX         AZ                     ZIP CODE:
BUS.NAME: PHOENIX FIRE DEPT                 PHONE: (602)262-6346 EXT.
OCCUPATION: FIREFIGHTER
WILL TESTIFY: YES                           MISC.
```

WITNESS -05:
                    NAME: GROENVELD, ANDREW

```
RACE: W SEX: M  AGE:         DOB:           HT: 000       WT: 000
WORK: 015402 S  MARKET PLACE WAY            APT/SUITE:
      PHOENIX         AZ                     ZIP CODE:
BUS.NAME: PHOENIX FIRE DEPARTMENT           PHONE: (602)262-6346 EXT.
OCCUPATION: FIREFIGHTER
WILL TESTIFY: YES                           MISC.
```

WITNESS -06:
                    NAME: LAMBETH, JEANNA

```
RACE: W  SEX: F  AGE:         DOB: ▆▆▆▆     HT: 000       WT: 000

CLOTHING DESC & MISC:
VICTIM'S SISTER
HOME: ▆▆▆▆▆▆▆▆▆                              APT/SUITE:
                                            ZIP CODE: ▆▆▆▆
RES.NAME:                                   PHONE: ▆▆▆▆▆
```

WITNESS -07:
                    NAME: YOST, JAMES WADE

```
RACE: W  SEX: M  AGE:         DOB: 072270   HT: 000       WT: 000
HOME: 018330 N  79TH AVENUE                 APT/SUITE: 2152
```

2000 01797849                                              Continued.

000009258

PHOENIX POLICE DEPARTMENT REPORT

ORIGINAL          PAGE NUMBER:   4       DR NUMBER: 2000 01797849


          PHOENIX        AZ              ZIP CODE: 85308
RES.NAME:                               PHONE: (602)628-6768
WORK: 010350 W  MCDOWELL ROAD           APT/SUITE:
          PHOENIX        AZ             ZIP CODE:
BUS.NAME: AVENTURA APARTMENTS           PHONE: (623)536-6888 EXT.
OCCUPATION: APARTMENT MANAGER
WILL TESTIFY: YES                       MISC.



WITNESS -08:
          NAME: DUNCAN, LESLIE HERB

    RACE: B  SEX: M  AGE:       DOB: 121865   HT: 000      WT: 000
    HAIR:        EYES:          SSN: ██████████
    HOME: 002155 E  LIBERTY LANE         APT/SUITE: 382
          PHOENIX        AZ             ZIP CODE:
    RES.NAME: SAN RIVA                  PHONE: (480)659-7003



WITNESS -09:
          NAME: OCHOA, ALEJO L

    RACE: H  SEX: M  AGE:       DOB: 080152   HT: 000      WT: 000
    HAIR:        EYES:          SSN: ██████████

CLOTHING DESC & MISC:
WENDI ANDRIANO'S STEP FATHER
HOME: 001104 N  PARK                    APT/SUITE:
      CASA GRANDE    AZ                 ZIP CODE:
RES.NAME:                               PHONE: (520)836-6829
MORE PHONE:CELLULAR: (520)709-1200



WITNESS -10:
          NAME: SENTELLE, WILLIAM
          AKA: JERRY,

    RACE: W  SEX: M  AGE:       DOB: 101261   HT: 000      WT: 000
    HOME: 002418 E  COTTONWOOD LANE      APT/SUITE:
          PHOENIX        AZ             ZIP CODE: 85048
    RES.NAME:                           PHONE: (480)699-6096
    WORK: 002155 E  LIBERTY LANE        APT/SUITE:
          PHOENIX        AZ             ZIP CODE:
    BUS.NAME: SAN RIVA                  PHONE: (480)283-8488 EXT.
    OCCUPATION: MAINT.SUPERVISOR
    WILL TESTIFY: YES                   MISC.



2000 01797849                                        Continued.

PHOENIX POLICE DEPARTMENT REPORT

ORIGINAL                 PAGE NUMBER:   5        DR NUMBER: 2000 01797849

WITNESS -11:
                    NAME: ORTEGA, RAY

    RACE: H  SEX: M  AGE: 36      DOB: 102764    HT: 000        WT: 000

    CLOTHING DESC & MISC:
    WORKS FOR PARENT COMPANY OF SAN RIVA
    WORK: 000711 N  EVERGREEN                   APT/SUITE:
          MESA            AZ                    ZIP CODE: 85201
    BUS.NAME: FAIRFIELD PROPERTIES              PHONE: (480)695-4294 EXT.
    OCCUPATION: REGIONAL TRAINER
    WILL TESTIFY: YES                           MISC.


WITNESS -12:
                    NAME: VAILLANT, ERIK

    RACE: W  SEX: M  AGE: 29      DOB: 071071   HT: 000        WT: 000
    HAIR:        EYES:        SSN: ███████
    HOME: 002551 E  LIBERTY LANE                APT/SUITE: 382
          PHOENIX         AZ                    ZIP CODE:
    RES.NAME: SAN RIVA                          PHONE: (480)659-7003
    MORE PHONE:CELLULAR: (480)570-0925
    WORK:                                       APT/SUITE:
    BUS.NAME: FAT TUESDAYS                      PHONE: (480)967-3806 EXT.
    WILL TESTIFY: YES                           MISC.


WITNESS -13:
                    NAME: FREELAND, RICK

    RACE: W  SEX: M  AGE: 35      DOB: 050165   HT: 000        WT: 000
    HAIR:        EYES:        SSN: ███████

    CLOTHING DESC & MISC:
    BOYFRIEND OF SUSPECT WENDI ANDRIANO
    HOME: 002551 E  LIBERTY LANE                APT/SUITE: 384
          PHOENIX         AZ                    ZIP CODE:
    RES.NAME: SAN RIVA                          PHONE: (480)699-6681
    BUS.NAME: CSW CONSTRUCTION                  PHONE: (   )  -     EXT.


WITNESS -14:
                    NAME: BENNETT, TED

    RACE: W  SEX: M  AGE:         DOB: 121235   HT: 000        WT: 000
    HOME: 001821 W  HAVASA WAY                  APT/SUITE:
          CHANDLER        AZ                    ZIP CODE: 85248

2000 01797849                                              Continued.


000009260

PHOENIX POLICE DEPARTMENT REPORT

ORIGINAL              PAGE NUMBER:   6        DR NUMBER: 2000 01797849

RES.NAME:                                PHONE: (480)883-1166
WORK: 002155 E  LIBERTY LANE             APT/SUITE:
      PHOENIX          AZ                ZIP CODE:
BUS.NAME: SAN RIVA                       PHONE: (480)283-8488 EXT.
OCCUPATION: PORTER
WILL TESTIFY: YES                        MISC.


WITNESS -15:
              NAME: MOSNAY, TIMOTHY A

    RACE: W  SEX: M  AGE:        DOB: 051078   HT: 000      WT: 000
    HOME: 002155 E  LIBERTY LANE             APT/SUITE: 330
          PHOENIX          AZ                ZIP CODE:
    RES.NAME: SAN RIVA                       PHONE: (480)659-4323
    WORK: 002155 E  LIBERTY LANE             APT/SUITE:
          PHOENIX          AZ                ZIP CODE:
    BUS.NAME: SAN RIVA                       PHONE: (480)283-8488 EXT.
    OCCUPATION: ASSIST MAINT. SUPERV
    WILL TESTIFY: YES                        MISC.


WITNESS -16:
              NAME: LEWIS, DEBORAH

    RACE: W  SEX: F  AGE:        DOB: 010364   HT: 000      WT: 000
    HOME: 002155 E  LIBERTY LANE             APT/SUITE: 216
          PHOENIX          AZ                ZIP CODE:
    RES.NAME: SAN RIVA                       PHONE: (480)659-4535
    WORK: 002155 E  LIBERTY LANE             APT/SUITE:
          PHOENIX          AZ                ZIP CODE:
    BUS.NAME: SAN RIVA                       PHONE: (480)283-8488 EXT.
    OCCUPATION: HOUSE KEEPER
    WILL TESTIFY: YES                        MISC.


WITNESS -17:
              NAME: MCCOURT, JEANETTE

    RACE: W  SEX: F  AGE:        DOB: 060669   HT: 000      WT: 000
    HOME: 002155 E  LIBERTY LANE             APT/SUITE: 205
          PHOENIX          AZ                ZIP CODE:
    RES.NAME: SAN RIVA                       PHONE: (480)659-4465


WITNESS -18:
              NAME: MILLER, JEFFREY


2000 01797849                                      Continued.



000009261



**P-App. 004992**

PHOENIX POLICE DEPARTMENT REPORT

ORIGINAL          PAGE NUMBER:   7      DR NUMBER: 2000 01797849

RACE: W  SEX: M  AGE:      DOB:        HT: 000      WT: 000

CLOTHING DESC & MISC:
JOE AND WENDI ANDRIANO'S MALPRACTICE ATTORNEY
WORK: 000650 N  3 AVENUE          APT/SUITE:
     PHOENIX          AZ          ZIP CODE:
BUS.NAME: ROUSH,MCCRACKEN,GUERRERO&MILLE PHONE: (602)253-3554 EXT.
OCCUPATION: ATTORNEY


WITNESS -19:          NAME: BLACK, TRAVIS CLINTON

RACE: W  SEX: M  AGE:      DOB: 022875  HT: 000      WT: 000
HAIR:          EYES:        SSN: ██████████

CLOTHING DESC & MISC:
BOYFRIEND OF SUSPECT WENDI ANDRIANO
HOME: 000725 W  PARK AVENUE          APT/SUITE:
     CHANDLER          AZ          ZIP CODE: 85225
RES.NAME:                    PHONE: (480)963-0953
MORE PHONE:CELLULAR: (480)570-2752
BUS.NAME: BLACK DIAMOND COMPANY    PHONE: (   )   -   EXT.
OCCUPATION: CONSTRUCTION


WITNESS -20:          NAME: VOIGT, WADE ALLEN

RACE:    SEX: M  AGE:      DOB:        HT: 000      WT: 000

CLOTHING DESC & MISC:
P.O. BOX 4455 TOPEKA, KANSAS
WORK:                         APT/SUITE:
BUS.NAME: VOIGT GLOBAL DISTRIBUTION  PHONE: (785)554-0757 EXT.
OCCUPATION: OWNER


WITNESS -21:          NAME: HODGE, PETE

RACE: W  SEX: M  AGE:      DOB:        HT: 000      WT: 000
WORK: 003001 W  INDIANSCHOOL ROAD    APT/SUITE:
     PHOENIX          AZ          ZIP CODE:
BUS.NAME: ABCO FOODS              PHONE: (602)222-1590 EXT.
OCCUPATION: ACCOUNTING MANAGER


2000 01797849                              Continued.



000009262

PHOENIX POLICE DEPARTMENT REPORT

ORIGINAL        PAGE NUMBER:   8      DR NUMBER: 2000 01797849

WITNESS -22:
              NAME: SANDIDGE, EDWARD

    RACE: W  SEX: M  AGE:        DOB:          HT: 000      WT: 000
    WORK: 006900 E  CAMELBACK ROAD           APT/SUITE: 300
          PHOENIX        AZ                  ZIP CODE: 85251
    BUS.NAME: EDWARD SANDIDGE & ASSOC LTD   PHONE: (480)424-6332 EXT.
    OCCUPATION: INSURANCE AGENT


WITNESS -23:
              NAME: DEANGELIS, DONNA M

    RACE: W  SEX: F  AGE: 34   DOB: 020866  HT: 000      WT: 000
    HAIR:         EYES:        SSN: ██████████

    CLOTHING DESC & MISC:
    SUSPECT WENDI ANDRIANO'S HAIR DRESSER
    HOME: 003318 E  MUIRWOOD DRIVE           APT/SUITE:
          PHOENIX        AZ                  ZIP CODE: 85048
    RES.NAME:                                PHONE: (480)706-1759
    BUS.NAME: CRIMPERS                       PHONE: (   )  -     EXT.
    OCCUPATION: HAIR DRESSER


WITNESS -24:
              NAME: KELLOGG, CHRISTOPHER M

    RACE: W  SEX: M  AGE:        DOB:          HT: 000      WT: 000

    CLOTHING DESC & MISC:
    VICTIM JOSEPH ANDRIANO'S DOCTOR
    WORK: 001875 W  FRYE ROAD                APT/SUITE:
          CHANDLER       AZ                  ZIP CODE: 85224
    BUS.NAME: CLINICAL HEMATOLOGY-ONCOLOGY A PHONE: (480)821-2838 EXT.
    OCCUPATION: DOCTOR
    WILL TESTIFY: YES                        MISC.


              **** NEXT OF KIN INFORMATION ****

NEXT OF KIN -01:
              NAME: ANDRIANO, JOSEPH SR

    RACE: W  SEX: M  AGE:        DOB:          HT: 000      WT: 000

    CLOTHING DESC & MISC:
    VICTIM'S FATHER

2000 01797849                                    Continued.


000009263

PHOENIX POLICE DEPARTMENT REPORT

ORIGINAL              PAGE NUMBER:    9      DR NUMBER: 2000 01797849

HOME: ██████████████████         APT/SUITE:
                                          ZIP CODE:
RES.NAME:                                  PHONE: ████████████


**** CRIME AGAINST PERSON M.O. ****

VICTIM: V-01      M.O. FOR SUSPECT: AP-01

ACTIONS/CONDITION: ALONE
SUSPECT:
      PRIMARY FORCE/MEANS OF ATTACK: KNIFE/CUTTING OBJECT
      INFLICTED/ACTIONS:
          CUT/STABBED VICTIM

**** NARRATIVE ****

SERIAL NUMBER: 4913

NEXT OF KIN:        JOSEPH ANDRIANO SR.
                    VICTIM'S FATHER
                    


PATROL:             SERGEANT RICHARDS #5046
                    PATROL 400
                    PATROL SUPERVISOR ON SCENE
                    CONDUCTED BRIEFING

                    OFFICER MARRINER #7149
                    PATROL 400
                    FIRST OFFICER ON SCENE
                    INITIAL CONTACT WITH WENDI ANDRIANO

                    OFFICER WENNES #7107
                    PATROL 400
                    SECOND OFFICER ON SCENE

                    OFFICER STEVENS #6690
                    PATROL 400
                    SCENE SECURITY

HOMICIDE UNIT:

                    DETECTIVE SERGEANT SMALLMAN #3142
                    HOMICIDE UNIT
                    CASE SUPERVISOR

                    DETECTIVE LUCERO #4913
                    HOMICIDE UNIT

2000 01797849                                    Continued.


000009264


P-App. 004995

PHOENIX POLICE DEPARTMENT REPORT

ORIGINAL        PAGE NUMBER:  10        DR NUMBER: 2000 01797849

CASE AGENT
INTERVIEWED SUSPECT WENDI ANDRIANO
INTERVIEWED WITNESS CHRIS HASHISAKI
INTERVIEWED WITNESS SHANNON SWEENEY
INTERVIEWED WITNESS LESLIE DUNCAN
INTERVIEWED WITNESS OLEJO OCHOA
INTERVIEWED WITNESS WILLIAM SENTELLE
INTERVIEWED WITNESS RAY ORTEGA
INTERVIEWED WITNESS ERIK VAILLANT
INTERVIEWED WITNESS RICK FREELAND
INTERVIEWED WITNESS TED BENNETT
INTERVIEWED WITNESS TIMOTHY MOSNAY
INTERVIEWED WITNESS DEBORAH LEWIS
INTERVIEWED WITNESS JEANETTE MCCOURT
INTERVIEWED WITNESS JEFFREY MILLER
INTERVIEWED WITNESS TRAVIS BLACK
INTERVIEWED WITNESS WADE VOIGT
INTERVIEWED WITNESS PETE HODGE
INTERVIEWED WITNESS EDWARD SANDIDGE
INTERVIEWED WITNESS DONNA DEANGELIS
INTERVIEWED WITNESS CHRISTOPHER KELLOGG

DETECTIVE KULESA #3550
HOMICIDE UNIT
SCENE AGENT

DETECTIVE OLSON #2979
HOMICIDE UNIT
ASSISTANT SCENE AGENT

DETECTIVE DILLIAN #4689
HOMICIDE UNIT
INTERVIEWED WITNESS JOSEPH ANDRIANO SR
INTERVIEWED WITNESS JEANETTE ANDRIANO
INTERVIEWED WITNESS JEANNA LAMBETH
INTERVIEWED WITNESS STEPHANIE KOEPPEN
AUTHORED SECOND SEARCH WARRANT FOR ANDRIANO'S APT

DETECTIVE BALLENTINE #3495
HOMICIDE UNIT
INTERVIEWED WITNESS CHRIS HASHISAKI
AUTHORED ORIGINAL SEARCH WARRANT FOR SAN RIVA OFFICE

DETECTIVE JEWELL #3526
HOMICIDE UNIT
INTERVIEWED WITNESS BENJAMIN MCKINNON
INTERVIEWED WITNESS ANDREW GROENVELD
INTERVIEWED WITNESS JAMES YOST
ASSISTED WITH SECOND SEARCH WARRANT

DETECTIVE GALBARI #4107

2000 01797849                                    Continued.

000009265

P-App. 004996

PHOENIX POLICE DEPARTMENT REPORT

ORIGINAL                    PAGE NUMBER:  11       DR NUMBER: 2000 01797849


                    HOMICIDE UNIT
                    SERVED SECOND SEARCH WARRANT ON ANDRIANO RESIDENCE

                    DETECTIVE HILL #3727
                    HOMICIDE UNIT
                    ASSISTED IN SERVICE OF SECOND WARRANT ON ANDRIANO RES

                    DETECTIVE LANNING #5568
                    HOMICIDE UNIT
                    SERVED WARRANT ON ANDRIANO'S VEHICLES

OTHER DETECTIVE
UNITS:              DETECTIVE ALLINICH #5185
                    FAMILY INVESTIGATIONS UNIT
                    ASSISTED WITH SEARCH WARRANTS
                    INTERVIEWED WITNESS WILLIAM SENTELLE

                    DETECTIVE GUZMAN #3980
                    COMPUTER SERVICES
                    ASSISTED WITH SEARCH WARRANTS

PHOENIX FIRE
DEPARTMENT:         ENGINE 46
                    PARAMEDIC BENJAMIN MCKINNON
                    EMT ANDREW GROENVELD

HOMICIDE
BUREAU:             JOHN DITSWORTH
                    DEPUTY MARICOPA COUNTY ATTORNEY
                    301 WEST JEFFERSON STREET
                    (602) 506-5780
                    CASE ATTORNEY

SEARCH WARRANTS:    #1:  CR00-04101SW
                         JUDGE PEARCE
                         NORTH MESA JUSTICE COURT
                         AUTHORED BY DETECTIVE KULESA #3550

                    #2:  CR00-02478SW
                         JUDGE PEARCE
                         NORTH MESA JUSTICE COURT
                         AUTHORED BY DETECTIVE BALLENTINE #3495

                    #3:  CR00-04726SW
                         JUDGE DEMARS (PRO TEM)
                         EAST PHOENIX #1 JUSTICE COURT
                         AUTHORED BY DETECTIVE DILLIAN #4689

                    #4:  CR00-04727SW
                         JUDGE DEMARS (PRO TEM)
                         EAST PHOENIX #1 JUSTICE COURT

2000 01797849                                          Continued.

PHOENIX POLICE DEPARTMENT REPORT

ORIGINAL                 PAGE NUMBER:  12        DR NUMBER: 2000 01797849

AUTHORED BY DETECTIVE DILLIAN #4689

#5:  CR00-04728SW
     JUDGE DEMARS (PRO TEM)
     EAST PHOENIX #1 JUSTICE COURT
     AUTHORED BY DETECTIVE DILLIAN #4689

#6:  CR00-01527SW
     JUDGE MELTON (PRO TEM)
     CENTRAL PHOENIX JUSTICE COURT
     AUTHORED BY DETECTIVE LUCERO #4913

O.M.E. CASE:     00-3022

=========================================================================

ON 100800, AT APPROXIMATELY 0445 HOURS, I WAS CONTACTED BY DETECTIVE
SERGEANT SMALLMAN OF THE HOMICIDE UNIT. SERGEANT SMALLMAN REQUESTED I
RESPOND TO 2155 E. LIBERTY LANE APARTMENT 132 IN REFERENCE TO A HOMICIDE
INVESTIGATION.

ON 100800, AT 0555 HOURS, I ARRIVED ON SCENE AND FOUND THE AREA
SURROUNDING BUILDING #5 CORDONED OFF WITH YELLOW CRIME SCENE TAPE.
UNIFORMED OFFICERS WERE POSITIONED BOTH IN FRONT AND TO THE REAR OF
APARTMENT #132 TO PREVENT UNAUTHORIZED INTRUSION.

I ATTENDED A BRIEFING CONDUCTED BY SERGEANT RICHARDS OF THE SOUTH MOUNTAIN
PRECINCT. SERGEANT RICHARDS RELATED THAT ON 100800 AT APPROXIMATELY 0225
HOURS, THE PHOENIX FIRE DEPARTMENT RESPONDED TO APARTMENT #132 IN
REFERENCE TO A PERSON HAVING A HEART ATTACK. WHEN THE FIRE DEPARTMENT
ARRIVED, THEY WERE MET OUTSIDE BY WENDI ANDRIANO WHO TOLD THEM EVERYTHING
WAS OK AND THAT THEY WERE NOT NEEDED. UPON BEING TOLD THIS, FIRE PERSONELL
LEFT.

ON 100800, AT 0338 HOURS, WENDI ANDRIANO CALLED 911 TO REPORT THAT HER
HUSBAND JOE ANDRIANO WAS DEAD. WENDI STATED THAT SHE AND HER HUSBAND HAD
BEEN INVOLVED IN A FAMILY FIGHT. SHE STATED THAT JOE WAS ON CANCER
MEDICATION WHICH ALTERS HIS PERSONALITY. DURING THE FAMILY FIGHT, JOE
BEGAN CHOKING HER WITH BOTH HANDS. WENDI WAS ABLE TO BREAK FREE FROM JOE'S
GRASP AT WHICH TIME SHE BROKE A CHAIR OVER HIS HEAD. JOE THEN GRABBED A
PHONE CORD WHICH HE WRAPPED AROUND HER THROAT AND USED TO CHOKE HER. WENDI
WAS ABLE TO OBTAIN A KITCHEN KNIFE WHICH SHE STABBED JOE WITH PRIOR TO
CUTTING THE CORD OFF OF HER NECK. WENDI THEN CALLED HER FATHER PRIOR TO
CALLING THE POLICE.

WHEN UNIFORMED PATROL OFFICERS ARRIVED, WENDI WAS OBSERVED SITTING IN THE
LIVING ROOM HOLDING A PHONE IN HER HAND. JOE WAS FOUND DEAD LYING ON THE
LIVING ROOM FLOOR IN A LARGE POOL OF BLOOD.

WENDI'S THREE YEAR OLD SON NICHOLAS AND TWO YEAR OLD DAUGHTER ASHLEY WHO
WERE ASLEEP INSIDE THE APARTMENT WHEN THIS INCIDENT OCCURRED WERE REMOVED

                                                          Continued.

   2000 01797849

PHOENIX POLICE DEPARTMENT REPORT

ORIGINAL          PAGE NUMBER:  13      DR NUMBER: 2000 01797849

FROM THE APARTMENT BY OFFICERS AND TURNED OVER TO HER PARENTS.

FOLLOWING THE BRIEFING, SERGEANT SMALLMAN ASSIGNED ME AS CASE AGENT AND
DETECTIVE KULESA AS SCENE AGENT. OTHER DETECTIVES FROM THE HOMICIDE UNIT
WERE ASSIGNED TO CONDUCT WITNESS INTERVIEWS AND OTHER VARIOUS TASKS.

FOLLOWING THE INITIAL PREVIEW OF THE SCENE AND GATHERING THE INITIAL
INFORMATION WITH REGARDS TO THIS INVESTIGATION, I BEGAN SUSPECT AND
WITNESS INTERVIEWS. REFER TO APPROPRIATE SUPPLEMENT FOR DETAILS.

REFER TO THE CASE INVESTIGATION DETECTIVES' REPORT ON THEIR PARTICIPATION
IN THIS INVESTIGATION

INVESTIGATION CONTINUING.


  VICTIM RECEIVED RIGHTS INFORMATION:  NO        MAIL-IN SUPPLEMENT: NO

INVOICES:

  DR ENTERED BY : 4913    DR FINALIZED BY : 4913

                        END OF REPORT       DR NO: 2000 01797849

000009268

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT           PAGE NUMBER:   1        DR NUMBER: 2000 01797849        1

REPORT DATE: 20001009   TIME: 1206

TYPE OF REPORT:  HOMICIDE                          OFFENSE: 451

PROSECUTION DESIRED: YES

BOOKING VICTIM NOTIFIED: NO

LOCATION: 002155 E LIBERTY LANE              BEAT: 0444   GRID: JD32

REPORTING OFFICER[S]: SALLIE DILLIAN              4689     UNIT: C33

PREMISES: APARTMENT                          OCCUPIED:

OFFENSE INVOLVED:  BIAS -

PHOTOGRAPHS TAKEN: YES   BY: A3815

SCENE PROCESSED FOR LATENTS: NO      BY:

LATENTS SUBMITTED TO CRIME LAB: NO

***   PROPERTY/EVIDENCE   ***

RECOVERY LOCATION: 000620 W WASHINGTON ST
DATE: 100800                  SEARCH WARRANT INVOLVED: YES

0001  PKG 000 CODE:CI   AP01
              ITEM: PCLOTHE BRAND: XHILER MODEL: SHIRT        COLOR: WHI
      SIZE: L        QUANTITY: 0001   SERIAL/ACCT/ID:
      DESCRIPTION: SHORT SLEEVED WHITE COTTON TEE SHIRT WITH A LARGE
      AMOUNT OF BLOOD SPATTER.  PLAIN WITH NO DESIGN.
      REMOVED FROM AP1 WENDI ANDRIANO AT 620 WEST WASHINGTON AT THE TIME OF THE
      INTERVIEW.

0002  PKG 000 CODE:CI   AP01
              ITEM: PCLOTHE BRAND: GUESS  MODEL: SHORTS        COLOR: BLK
      SIZE: 30       QUANTITY: 0001   SERIAL/ACCT/ID:
      DESCRIPTION: ONE PAIR OF BLACK JEAN STYLE SHORTS.  SOME BLOOD
      PRESENT.
      REMOVED FROM AP1 WENDI ANDRIANO AT 620 WEST WASHINGTON AT THE TIME OF THE
      INTERVIEW.

0003  PKG 000 CODE:CI   AP01
              ITEM: PSPECIM BRAND:        MODEL: BLOOD        COLOR:
      SIZE:          QUANTITY: 0001   SERIAL/ACCT/ID:
      DESCRIPTION: PURPLE TOP VIAL OF AP 1 WENDI ADRIANO'S BLOOD
      DRAWN FROM AP1 WENDI ANDRIANO AT 620 WEST WASHINGTON AT THE TIME OF THE
      INTERVIEW BY HOLMER E. SHAULIS M.A., FORENSIC PHLEBOTOMIST, IMMEDIATELY
      TURNED OVER TO MY CUSTODY.

   2000 01797849      1                                    Continued.

000009269

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT          PAGE NUMBER:    2          DR NUMBER: 2000 01797849      1

0004   PKG 000 CODE:CI    AP01
                ITEM: PSPECIM BRAND:              MODEL: HEAD HAIR    COLOR:
        SIZE:              QUANTITY: 0001    SERIAL/ACCT/ID:
        DESCRIPTION: SMALL ENVELOPE CONTAINING HEAD HAIRS PULLED FROM
        AP1 WENDI ANDRIANO'S HEAD.
        PULLED FROM AP1 WENDI ANDRIANO'S HEAD FROM SEVERAL DIFFERENT LOCATIONS BY
        HOLMER SCHAULIS M.A. AT 620 WEST WASHINGTON AT THE TIME OF HER INTERVIEW.
        IMMEDIATELY TURNED OVER TO MY CUSTODY.

                            ****  NARRATIVE  ****

    SERIAL NUMBER: 4689

ON 10-08-00 I ASSISTED DETECTIVE DAVE LUCERO #4913 WITH THE COLLECTION OF
BOTH CLOTHING AND BIOLOGICAL EVIDENCE FROM AP1 WENDI ANDRIANO.  I HAD BEEN
ADVISED BY DETECTIVE TOM KULESA THAT HE HAD AUTHORED A SEARCH WARRANT THAT
HAD BEEN SIGNED JUDGE PIERCE OF NORTH MESA JUSTICE COURT THAT INCLUDING
CLOTHING, BLOOD AND HAIR FROM WENDI ELIZABETH ANDRIANO.

WENDI WAS VERY COOPERATIVE DURING THE COLLECTION PROCESS.  HER SHIRT AND
SHORTS WERE REMOVED AND PLACED INTO SEPARATE PACKAGES.  I DID NOT REMOVE
HER BRA OR PANTIES.

DURING THE INTERVIEW BY DETECTIVE LUCERO 35 MM COLOR PHOTOGRAPHS WERE
TAKEN OF AP1 WENDI ANDRIANO.  PHOTOGRAPHS WERE TAKEN SHORTLY AFTER THE
START OF THE INTERVIEW BY ID TECH AYALA #A3894 AT APPROXIMATELY 0745
HOURS.  THE PHOTOS WERE TAKEN BOTH WITH AND WITHOUT A COLOR CHART.  WHILE
THE PHOTOGRAPHS WERE BEING TAKEN EITHER DETECTIVE LUCERO OF I WERE
PRESENT.  WENDI HAD SEVERAL SUPERFICIAL SCRATCHES TO BOTH SIDES OF HER
NECK WITH SOME REDNESS PRESENT.  THE SCRATCHES DID NOT BREAK THE SKIN
SURFACE AND THERE WAS NO BLEEDING.  THERE WAS NO SIGN OF ANY SCRATCHES OF
BRUISING THE THE BACK OF HER NECK.  I EXAMINED WENDI'S OVERALL BODY FOR
INJURIES.  I SAW NO INDICATION OF INJURIES, NO SCRATCHES, BRUISING OR
REDNESS ON THE FRONT OF BACK OF HER TORSO.  WENDI SAID HER RIBS HURT BUT I
COULD SEE NO REDNESS OR BRUISING.  WENDI DID HAVE INJURIES TO HER HANDS
AND FINGERS.  SEVERAL OF HER ACRYLIC NAILS HAD BEEN BROKEN OFF.  I OFFERED
WENDI MEDICAL ATTENTION FOR HER FINGERS AND SHE SAID SHE WAS CERTAIN THAT
THEY WERE NOT BROKEN AND DID NOT NEED OR WANT MEDICAL ATTENTION.

AT THE CONCLUSION OF THE INTERVIEW ADDITIONAL 35MM PHOTOGRAPHS WERE TAKEN
AGAIN OF WENDI'S INJURIES.  THESE PHOTOGRAPHS WERE TAKEN BY P.J. THOMPSON
A3815 AT 1048 HOURS.  THIS WAS TO DOCUMENT ANY DEVELOPMENT OF INJURIES.

AT MY REQUEST HOLMER SHAULIS RESPONDED TO 620 WEST WASHINGTON.  SHAULIS IS
A FORENSIC PHLEBOTOMIST AND IS OFTEN USED BY PHOENIX POLICE DEPARTMENT TO
COLLECT BIOLOGICAL EVIDENCE.

A BLOOD SAMPLE (PURPLE TOP VIAL) WAS TAKEN FROM THE RIGHT ARM OF WENDI
ANDRIANO ON 10-08-00 AT 1243 HOURS.  SHAULIS INITIALED AND COMPLETED HIS
NOTES ON THE VIAL WHICH HE PLACED INTO A PLASTIC STORAGE TUBE.  THE TUBE
WAS THEN TURNED OVER TO ME.

    2000 01797849      1                                 Continued.

000009270

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT                PAGE NUMBER:   3        DR NUMBER: 2000 01797849        1

HEAD HAIR SAMPLES WERE ALSO OBTAINED.  THE HAIRS WERE PULLED FROM THE
FRONT, BACK AND EACH SIDE OF THE HEAD BY SHAULIS.  SHAULIS PLACED THE HAIR
INTO A SMALL YELLOW ENVELOPE WHICH HE INITIALED AND COMPLETED HIS
DOCUMENTATION.  THE ENVELOPE WAS SEALED AND THEN TURNED OVER TO ME.

WHILE SHAULIS WAS PRESENT TO DRAW THE BLOOD I ASKED HIM TO CHECK WENDI'S
HANDS.  SHAULIS THOUGHT THERE WAS A GOOD CHANCE THE FINGERS MAY BE BROKEN
AND THE INJURY TO ONE OF THE NAIL BEDS WOULD NEED ATTENTION.  I DIRECTED
THE BOOKING OFFICER TO OBTAIN AS MEDICAL RELEASE FOR WENDI PRIOR TO TAKING
HER TO MADISON STREET JAIL.

ALL ITEMS TAKEN DURING THE INTERVIEW AND COLLECTION PROCESS WERE IMPOUNDED
AT 620 W. WASHINGTON ANNEX.

   VICTIM RECEIVED RIGHTS INFORMATION:  NO          MAIL-IN SUPPLEMENT: NO

INVOICES:     2778375

   DR ENTERED BY : 4689     DR FINALIZED BY : 4689

                         END OF REPORT          DR NO: 2000 01797849    001

000009271

P-App. 005002

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT                PAGE NUMBER:   1        DR NUMBER: 2000 01797849        2

REPORT DATE: 20001009    TIME: 1229

TYPE OF REPORT:  HOMICIDE                              OFFENSE: 451

LOCATION: 002155 E LIBERTY LANE                 BEAT: 0444   GRID: JD32

REPORTING OFFICER[S]: KAYE KALINA                  A2760      UNIT: LAB

PREMISES: APARTMENT                                   OCCUPIED:

OFFENSE INVOLVED:  BIAS -

                    ***   PROPERTY/EVIDENCE   ***

RECOVERY LOCATION: 000000
DATE: 000000                    SEARCH WARRANT INVOLVED:

0001  PKG 001 CODE:EI    UK00
        ITEM: IPHOTO  BRAND:        MODEL:          COLOR:
      SIZE: 35MM    QUANTITY: 0004   SERIAL/ACCT/ID:
      DESCRIPTION: 4 ROLLS 35MM COLOR FILM, APX 119 EXPOSURES
      OF SCENE AT 2155 E. LIBERTY LANE #132 TAKEN ON 10-08-00.

  VICTIM RECEIVED RIGHTS INFORMATION:  NO          MAIL-IN SUPPLEMENT:

INVOICES:    2777503

   DR ENTERED BY : A2760    DR FINALIZED BY : A2760

                         END OF REPORT          DR NO: 2000 01797849    002

000009272

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT            PAGE NUMBER:   1        DR NUMBER: 2000 01797849        3

REPORT DATE: 20001009   TIME: 1231

TYPE OF REPORT:  HOMICIDE                              OFFENSE: 451

LOCATION: 002155 E LIBERTY LANE              BEAT: 0444   GRID: JD32

REPORTING OFFICER[S]: KAYE KALINA            A2760        UNIT: LAB

PREMISES: APARTMENT                                  OCCUPIED:

OFFENSE INVOLVED:  BIAS -

***   PROPERTY/EVIDENCE   ***

RECOVERY LOCATION: 000000
DATE: 000000                  SEARCH WARRANT INVOLVED:

0001  PKG 001 CODE:EI   UK00
            ITEM: IPHOTO  BRAND:        MODEL:           COLOR:
      SIZE: 35MM    QUANTITY: 0001    SERIAL/ACCT/ID:
      DESCRIPTION: 1 ROLL 35MM BLACK/WHITE FILM, APX 8
      EXPOSURES OF BLOODY FINGERPRINTS ON FRONT DOOR AT 2155 E. LIBERTY LA
      TAKEN ON 10-08-00.

   VICTIM RECEIVED RIGHTS INFORMATION:  NO           MAIL-IN SUPPLEMENT:

INVOICES:    2777504

   DR ENTERED BY : A2760    DR FINALIZED BY : A2760

                           END OF REPORT        DR NO: 2000 01797849    003

000009273

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT          PAGE NUMBER:   1        DR NUMBER: 2000 01797849      4

REPORT DATE: 20001009   TIME: 1236

TYPE OF REPORT:  HOMICIDE                          OFFENSE: 451

LOCATION: 002155 E LIBERTY LANE              BEAT: 0444   GRID: JD32

REPORTING OFFICER[S]: KAYE KALINA             A2760     UNIT: LAB

PREMISES: APARTMENT                              OCCUPIED:

OFFENSE INVOLVED:  BIAS -

***   PROPERTY/EVIDENCE   ***

RECOVERY LOCATION: 000000
DATE: 000000                   SEARCH WARRANT INVOLVED:

0001  PKG 001 CODE:EI   UK00
        ITEM: IPRINT  BRAND:        MODEL:           COLOR:
    SIZE:       QUANTITY: 0018   SERIAL/ACCT/ID:
    DESCRIPTION: 18 LIFTS FROM THE FRONT DOOR AT 2155 E.
    LIBERTY LANE,,ACQUIRED ON 10-08-00.

  VICTIM RECEIVED RIGHTS INFORMATION:  NO          MAIL-IN SUPPLEMENT:

INVOICES:     2777506

  DR ENTERED BY : A2760    DR FINALIZED BY : A2760

                        END OF REPORT        DR NO: 2000 01797849    004

000009274

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT            PAGE NUMBER:   1       DR NUMBER: 2000 01797849      5

REPORT DATE: 20001009   TIME: 2009

TYPE OF REPORT:  HOMICIDE                              OFFENSE: 451

LOCATION: 002155 E LIBERTY LANE              BEAT: 0444   GRID: JD32

REPORTING OFFICER[S]: ELAINE FINLAY           A3835     UNIT: LAB

PREMISES: APARTMENT                              OCCUPIED:

OFFENSE INVOLVED:  BIAS -

                *** PROPERTY/EVIDENCE   ***

RECOVERY LOCATION: 000000
DATE: 000000            SEARCH WARRANT INVOLVED:

0001  PKG 001 CODE:EI   UK00
          ITEM: IPHOTO  BRAND:        MODEL:           COLOR:
      DESCRIPTION: 7 ROLLS  224 COLOR EXPOSURES OF:
      SCENE AND EVIDENCE AT  2155 E.LIBERTY LANE #132  ON  10-08-00.

   VICTIM RECEIVED RIGHTS INFORMATION:  NO          MAIL-IN SUPPLEMENT:

 INVOICES:     2777622

   DR ENTERED BY : A3835    DR FINALIZED BY : A3835

                        END OF REPORT           DR NO: 2000 01797849    005

000009275

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT          PAGE NUMBER:   1          DR NUMBER: 2000 01797849       6

REPORT DATE: 20001010    TIME: 0459

TYPE OF REPORT:  HOMICIDE                              OFFENSE: 451

LOCATION: 002155 E LIBERTY LANE                BEAT: 0444  GRID: JD32

REPORTING OFFICER[S]: ROSA MORAN                 A3328     UNIT: LAB

PREMISES: SINGLE FAMILY HOUSE                      OCCUPIED:

OFFENSE INVOLVED:  BIAS -

                    ***   PROPERTY/EVIDENCE   ***

RECOVERY LOCATION: 000000
DATE: 000000              SEARCH WARRANT INVOLVED:

0001  PKG 001 CODE:EI   UK00
          ITEM: IPHOTO  BRAND:        MODEL:            COLOR:
     SIZE:        QUANTITY: 0494    SERIAL/ACCT/ID:
     DESCRIPTION: 494 PHOTO NEGATIVES OF THE SCENE AT 2155 E.
     LIBERTY #132.  TAKEN ON 100800.

  VICTIM RECEIVED RIGHTS INFORMATION:  NO          MAIL-IN SUPPLEMENT:

INVOICES:     2777752

   DR ENTERED BY : A3328    DR FINALIZED BY : A3328

                    DR FINALIZED BY : A3328    END OF REPORT          DR NO: 2000 01797849    006

000009276

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT             PAGE NUMBER:   1         DR NUMBER: 2000 01797849        7

REPORT DATE: 20001010    TIME: 0554

TYPE OF REPORT:  HOMICIDE                          OFFENSE: 451

LOCATION: 002155 E LIBERTY LANE                BEAT: 0444   GRID: JD32

REPORTING OFFICER[S]: PAMELA THOMPSON          A3815     UNIT: LAB

PREMISES: SINGLE FAMILY HOUSE                     OCCUPIED:

OFFENSE INVOLVED:  BIAS -

***   PROPERTY/EVIDENCE   ***

RECOVERY LOCATION: 000000
DATE: 000000                    SEARCH WARRANT INVOLVED:

0001  PKG 001 CODE:EI   UK00
           ITEM: IPHOTO  BRAND:        MODEL:           COLOR:
      DESCRIPTION: 20 COLOR EXPOSURES OF WENDI ELIZABETH ANDRIANO-
      DOB. 8/26/70 WERE TAKEN ON 10/8/00. LOCATION AT 620 W. WASHINGTON.

   VICTIM RECEIVED RIGHTS INFORMATION:   NO          MAIL-IN SUPPLEMENT:

INVOICES:      2777777

  DR ENTERED BY : A3815     DR FINALIZED BY : A3815

                        END OF REPORT        DR NO: 2000 01797849    007

000009277

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT             PAGE NUMBER:   1        DR NUMBER: 2000 01797849       8

REPORT DATE: 20001010   TIME: 0702

TYPE OF REPORT:  HOMICIDE                              OFFENSE: 451

PROSECUTION DESIRED: YES

LOCATION: 002155 E LIBERTY LANE              BEAT: 0444   GRID: JD32

REPORTING OFFICER[S]: DENNIS OLSON             2979      UNIT: C81

PREMISES: APARTMENT                              OCCUPIED:

OFFENSE INVOLVED:  DOMESTIC VIOLENCE
                   BIAS -

PHOTOGRAPHS TAKEN: YES   BY: A3328

SCENE PROCESSED FOR LATENTS: YES     BY: A3328

LATENTS SUBMITTED TO CRIME LAB: YES

***  PROPERTY/EVIDENCE  ***

RECOVERY LOCATION: 002155 E LIBERTY AV
DATE: 100900                    SEARCH WARRANT INVOLVED: YES

0001  PKG 000 CODE:IE   UK00
              ITEM:  MISC  BRAND:            MODEL:            COLOR:
       SIZE:          QUANTITY: 0001   SERIAL/ACCT/ID:
       DESCRIPTION: FORK-BLOODSTAINED-
       LIVING ROOM FLOOR

0002  PKG 000 CODE:IE   UK00
              ITEM: PCLOTHE BRAND:          MODEL:          COLOR: BRO
       SIZE:          QUANTITY: 0001   SERIAL/ACCT/ID:
       DESCRIPTION: BLOODSTAINED BELT
       LIVING ROOM FLOOR

0003  PKG 000 CODE:IE   UK00
              ITEM: HKNIFE  BRAND:          MODEL:          COLOR:
       SIZE:          QUANTITY: 0001   SERIAL/ACCT/ID:
       DESCRIPTION: BLOODSTAINED KNIFE
       LIVING ROOM FLOOR

0004  PKG 000 CODE:IE   UK00
              ITEM: PCLOTHE BRAND:          MODEL:          COLOR: WHI
       SIZE:          QUANTITY: 0001   SERIAL/ACCT/ID:
       DESCRIPTION: BLOODSTAINED GIRLS PANTS
       LIVING FLOOR FLOOR

0005  PKG 000 CODE:IE   UK00

       2000 01797849      8                        Continued.

000009278

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT          PAGE NUMBER:   2       DR NUMBER: 2000 01797849      8

```
              ITEM: *MISC   BRAND:          MODEL:              COLOR:
         SIZE:          QUANTITY: 0001    SERIAL/ACCT/ID:
         DESCRIPTION: BROKEN BLOODSTAINED SEAT OF STOOL (LARGER SECTION)
         LIVING ROOM FLOOR

0006  PKG 000 CODE:IE    UK00
              ITEM: *MISC   BRAND:          MODEL:            COLOR:
         SIZE:          QUANTITY: 0001    SERIAL/ACCT/ID:
         DESCRIPTION: LEG PORTION OF BLOODSTAINED STOOL (BROKEN)
         LIVING ROOM FLOOR

0007  PKG 000 CODE:IE    UK00
              ITEM: *MISC   BRAND:          MODEL:            COLOR:
         SIZE:          QUANTITY: 0001    SERIAL/ACCT/ID:
         DESCRIPTION: SMALLER PORTION OF BLOODSTAINED SEAT OF STOOL
         LIVING ROOM FLOOR

0008  PKG 000 CODE:IE    UK00
              ITEM: PCLOTHE BRAND:          MODEL:          COLOR: RED WHI
         SIZE:          QUANTITY: 0001    SERIAL/ACCT/ID:
         DESCRIPTION: BLOODSTAINED BLANKET
         LIVING ROOM FLOOR

0009  PKG 000 CODE:IE    UK00
              ITEM: *MISC   BRAND:          MODEL:          COLOR: TAN
         SIZE:          QUANTITY: 0001    SERIAL/ACCT/ID:
         DESCRIPTION: BLOODSTAINED PLASTIC GARBAGE CAN AND LID
         LIVING ROOM FLOOR

0010  PKG 000 CODE:IE    UK00
              ITEM: *MISC   BRAND:          MODEL:            COLOR:
         SIZE:          QUANTITY: 0001    SERIAL/ACCT/ID:
         DESCRIPTION: BLOODSTAINED SECTION OF STOOL BRACE
         LIVING ROOM FLOOR

0011  PKG 000 CODE:IE    UK00
              ITEM: PSPECIM BRAND:          MODEL:          COLOR:
         DESCRIPTION: SAMPLE OF BLOODSTAIN
         LIVING ROOM CARPET FLOOR

0012  PKG 000 CODE:IE    UK00
              ITEM: PSPECIM BRAND:          MODEL:          COLOR:
         DESCRIPTION: SAMPLE OF BLOODSTAIN
         LIVING ROOM CARPET FLOOR

0013  PKG 000 CODE:IE    UK00
              ITEM: PSPECIM BRAND:          MODEL:          COLOR:
         DESCRIPTION: SAMPLE OF BLOODSTAIN
         LIVING ROOM CARPET FLOOR

0013A PKG 000 CODE:IE    UK00
```

2000 01797849      8                                Continued.

000009279

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT          PAGE NUMBER:   3          DR NUMBER: 2000 01797849        8

```
              ITEM: *MISC   BRAND:          MODEL:            COLOR:
         DESCRIPTION: BLOODSTAINED CARPET
         NORTH OF BLOODSTAINED CARPET #13

0014  PKG 000 CODE:IE   UK00
              ITEM: PSPECIM BRAND:          MODEL:            COLOR:
         DESCRIPTION: SAMPLE OF VOMIT
         LIVING ROOM CARPET FLOOR

0015  PKG 000 CODE:IE   UK00
              ITEM: PSPECIM BRAND:          MODEL:            COLOR:
         SIZE:          QUANTITY: 0001   SERIAL/ACCT/ID:
         DESCRIPTION: BLOODSTAINED WHITE NAPKIN
         LIVING ROOM FLOOR

0016  PKG 000 CODE:IE   UK00
              ITEM: FLAMP   BRAND:          MODEL:            COLOR:
         SIZE:          QUANTITY: 0001   SERIAL/ACCT/ID:
         DESCRIPTION: BLOODSTAINED BROKEN PIECE OF LAMP
         LIVING ROOM FLOOR

0017  PKG 000 CODE:IE   UK00
              ITEM: PCLOTHE BRAND:          MODEL:            COLOR: GRN
         SIZE:          QUANTITY: 0001   SERIAL/ACCT/ID:
         DESCRIPTION: VICTIM'S SHORTS (WEARING AT TIME OF DEATH)

0018  PKG 000 CODE:IE   UK00
              ITEM: FLAMP   BRAND:          MODEL:            COLOR:
         SIZE:          QUANTITY: 0001   SERIAL/ACCT/ID:
         DESCRIPTION: BLOODSTAINED BROKEN PIECE OF LAMP
         LIVING ROOM FLOOR

0019  PKG 000 CODE:IE   UK00
              ITEM: PCLOTHE BRAND:          MODEL:            COLOR: WHI
         SIZE:          QUANTITY: 0001   SERIAL/ACCT/ID:
         DESCRIPTION: BLOODSTAINED PILLOW CASE
         SEAT OF GREEN CHAIR

0020  PKG 000 CODE:IE   UK00
              ITEM: FLAMP   BRAND:          MODEL:            COLOR:
         SIZE:          QUANTITY: 0001   SERIAL/ACCT/ID:
         DESCRIPTION: BLOODSTAINED BROKEN PIECE OF LAMP
         LIVING ROOM FLOOR

0021  PKG 000 CODE:IE   UK00
              ITEM: PSPECIM BRAND:          MODEL:            COLOR:
         DESCRIPTION: HAIR FROM VICTIM'S LEFT HAND

0022  PKG 000 CODE:IE   UK00
              ITEM: PSPECIM BRAND:          MODEL:            COLOR:
         DESCRIPTION: HAIR FROM RIGHT HAND OF VICTIM
```

2000 01797849        8                                    Continued.

000009280

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT            PAGE NUMBER:   4      DR NUMBER: 2000 01797849      8

0023  PKG 000 CODE:IE   UK00
            ITEM: YDOOR   BRAND:        MODEL:             COLOR:
      SIZE:        QUANTITY: 0001   SERIAL/ACCT/ID:
      DESCRIPTION: BLOODSTAINED DOOR HANDLE
      INTERIOR OF FRONT DOOR

0024  PKG 000 CODE:IE   UK00
            ITEM: PSPECIM BRAND:       MODEL:             COLOR:
      DESCRIPTION: SAMPLE OF BLOODSTAIN
      OUTSIDE FRONT DOOR

0024A PKG 000 CODE:IE   UK00
            ITEM: PSPECIM BRAND:       MODEL:             COLOR:
      DESCRIPTION: CONTROL SAMPLE-OUTSIDE FRONT DOOR

0025  PKG 000 CODE:IE   UK00
            ITEM: PSPECIM BRAND:       MODEL:             COLOR:
      DESCRIPTION: SAMPLE OF BLOODSTAIN
      LOWER DEAD BOLT LOCK OF FRONT DOOR

0026  PKG 000 CODE:IE   UK00
            ITEM: PSPECIM BRAND:       MODEL:             COLOR:
      DESCRIPTION: SAMPLE OF BLOODSTAIN
      UPPER DEAD BOLT OF FRONT DOOR

0027  PKG 000 CODE:IE   UK00
            ITEM: PSPECIM BRAND:       MODEL:             COLOR:
      DESCRIPTION: SAMPLE OF BLOODSTAIN
      INTERIOR OF FRONT DOOR

0027A PKG 000 CODE:IE   UK00
            ITEM: PSPECIM BRAND:       MODEL:             COLOR:
      DESCRIPTION: CONTROL SAMPLE-INTERIOR FRONT DOOR

0028  PKG 000 CODE:IE   UK00
            ITEM: PSPECIM BRAND:       MODEL:             COLOR:
      DESCRIPTION: SAMPLE OF BLOODSTAIN
      INTERIOR OF FRONT DOOR

0029  PKG 000 CODE:IE   UK00
            ITEM: PSPECIM BRAND:       MODEL:             COLOR:
      DESCRIPTION: SAMPLE OF BLOODSTAIN
      OUTSIDE WALL BY FRONT DOOR

0030  PKG 000 CODE:IE   UK00
            ITEM: PSPECIM BRAND:       MODEL:             COLOR:
      SIZE:        QUANTITY: 0001   SERIAL/ACCT/ID:
      DESCRIPTION: SAMPLE OF BLOODSTAIN-HAIR BARRETT AND PLASTIC BAG
      CONTAINED POPCORN-POPCORN DISPOSED OF PRIOR TO IMPOUNDING

0031  PKG 000 CODE:IE   UK00

   2000 01797849      8                                Continued.

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT          PAGE NUMBER:  5     DR NUMBER: 2000 01797849     8

ITEM: PCLOTHE BRAND:        MODEL:          COLOR:
SIZE:        QUANTITY: 0001    SERIAL/ACCT/ID:
DESCRIPTION: THROW RUG-BLOODSTAINED

0031A PKG 000 CODE:IE   UK00
ITEM: *MISC   BRAND:        MODEL:          COLOR:
DESCRIPTION: BLOODSTAINED CARPET NORTH OF ITEM #31.

0032  PKG 000 CODE:IE   UK00
ITEM: FCOUCH  BRAND:        MODEL:          COLOR:
SIZE:        QUANTITY: 0001    SERIAL/ACCT/ID:
DESCRIPTION: NORTH SIDE CUSHION COVER ON EAST SIDE COUCH
BLOODSTAINED

0033  PKG 000 CODE:IE   UK00
ITEM: FCOUCH  BRAND:        MODEL:          COLOR:
SIZE:        QUANTITY: 0001    SERIAL/ACCT/ID:
DESCRIPTION: SOUTH SIDE CUSHION COVER FROM EAST COUCH-BLOOD
STAINED

0034  PKG 000 CODE:IE   UK00
ITEM: FPILLOW BRAND:        MODEL:          COLOR:
SIZE:        QUANTITY: 0001    SERIAL/ACCT/ID:
DESCRIPTION: FLOWERED COLORED PILLOW-BLOODSTAINED FROM EAST
COUCH

0035  PKG 000 CODE:IE   UK00
ITEM: FPILLOW BRAND:        MODEL:          COLOR:
SIZE:        QUANTITY: 0001    SERIAL/ACCT/ID:
DESCRIPTION: FLOWERED PILLOW FROM COUCH AGAINST EAST WALL-
BLOODSTAINED

0036  PKG 000 CODE:IE   UK00
ITEM: FPILLOW BRAND:        MODEL:          COLOR: TAN
SIZE:        QUANTITY: 0001    SERIAL/ACCT/ID:
DESCRIPTION: BLOODSTAINED ARM COVER FROM NORTH ARM OF COUCH
AGAINST EAST WALL

0037  PKG 000 CODE:IE   UK00
ITEM: FCOUCH  BRAND:        MODEL:          COLOR:
SIZE:        QUANTITY: 0001    SERIAL/ACCT/ID:
DESCRIPTION: FRONT DUST COVER NORTH SIDE OF COUCH AGAINST
EAST WALL-BLOODSTAINED

0038  PKG 000 CODE:IE   UK00
ITEM: FCOUCH  BRAND:        MODEL:          COLOR:
SIZE:        QUANTITY: 0001    SERIAL/ACCT/ID:
DESCRIPTION: FRONT DUST COVER ON SOUTH SIDE OF COUCH AGAINST
EAST WALL-BLOODSTAINED

0039  PKG 000 CODE:IE   UK00

2000 01797849     8                          Continued.

000009282

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT              PAGE NUMBER:   6        DR NUMBER: 2000 01797849        8

```
          ITEM: PSPECIM BRAND:        MODEL:          COLOR:
     DESCRIPTION: SAMPLE OF BLOODSTAIN
     EAST LIVING ROOM WALL

0040  PKG 000 CODE:IE   UK00
          ITEM: PSPECIM BRAND:        MODEL:          COLOR:
     DESCRIPTION: SAMPLE OF BLOODSTAIN
     EAST LIVING ROOM WALL

0040A PKG 000 CODE:IE   UK00
          ITEM: PSPECIM BRAND:        MODEL:          COLOR:
     DESCRIPTION: CONTROL SAMPLE-EAST LIVING ROOM WALL

0041  PKG 000 CODE:IE   UK00
          ITEM: PSPECIM BRAND:        MODEL:          COLOR:
     DESCRIPTION: SAMPLE OF BLOODSTAIN
     EAST LIVING ROOM WALL

0041A PKG 000 CODE:IE   UK00
          ITEM: PSPECIM BRAND:        MODEL:          COLOR:
     DESCRIPTION: CONTROL SAMPLE-EAST LIVING ROOM WALL

0042  PKG 000 CODE:IE   UK00
          ITEM: FCOUCH  BRAND:        MODEL:          COLOR:
     SIZE:         QUANTITY: 0001   SERIAL/ACCT/ID:
     DESCRIPTION: SEAT CUSHION FROM CHAIR AGAINST SOUTH WALL
     BLOODSTAINED

0043  PKG 000 CODE:IE   UK00
          ITEM: FPILLOW BRAND:        MODEL:          COLOR:
     SIZE:         QUANTITY: 0001   SERIAL/ACCT/ID:
     DESCRIPTION: FLOWERED PILLOW FROM CHAIR AGAINST SOUTH WALL
     BLOODSTAINED

0044  PKG 000 CODE:IE   UK00
          ITEM: PSPECIM BRAND:        MODEL:          COLOR:
     DESCRIPTION: SAMPLE OF BLOODSTAIN
     SOUTH LIVING ROOM WALL

0044A PKG 000 CODE:IE   UK00
          ITEM: PSPECIM BRAND:        MODEL:          COLOR:
     DESCRIPTION: CONTROL SAMPLE-SOUTH LIVING ROOM WALL

0045  PKG 000 CODE:IE   UK00
          ITEM: PSPECIM BRAND:        MODEL:          COLOR:
     DESCRIPTION: SAMPLE OF BLOODSTAIN
     SOUTH LIVING ROOM WALL

0046  PKG 000 CODE:IE   UK00
          ITEM: PSPECIM BRAND:        MODEL:          COLOR:
     DESCRIPTION: SAMPLE OF BLOODSTAIN
```

2000 01797849      8                                    Continued.

000009283

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT          PAGE NUMBER:  7      DR NUMBER: 2000 01797849      8

WEST LIVING ROOM WALL

0046A PKG 000 CODE:IE   UK00
            ITEM: PSPECIM BRAND:        MODEL:          COLOR:
      DESCRIPTION: CONTROL SAMPLE-WEST LIVING ROOM WALL

0047  PKG 000 CODE:IE   UK00
            ITEM: PSPECIM BRAND:        MODEL:          COLOR:
      DESCRIPTION: SAMPLE OF BLOODSTAIN
      WEST LIVING ROOM WALL

0048  PKG 000 CODE:IE   UK00
            ITEM: PSPECIM BRAND:        MODEL:          COLOR:
      DESCRIPTION: SAMPLE OF BLOODSTAIN
      SOUTH LIVING ROOM WALL

0049  PKG 000 CODE:IE   UK00
            ITEM: PSPECIM BRAND:        MODEL:          COLOR:
      DESCRIPTION: SAMPLE OF BLOODSTAIN
      T.V. STAND

0050  PKG 000 CODE:IE   UK00
            ITEM: PSPECIM BRAND:        MODEL:          COLOR:
      DESCRIPTION: SAMPLE OF BLOODSTAIN
      SOUTH LIVING ROOM WALL

0050A PKG 000 CODE:IE   UK00
            ITEM: PSPECIM BRAND:        MODEL:          COLOR:
      DESCRIPTION: CONTROL SAMPLE-SOUTH LIVING ROOM WALL

0051  PKG 000 CODE:IE   UK00
            ITEM: PSPECIM BRAND:        MODEL:          COLOR:
      DESCRIPTION: SAMPLE OF BLOODSTAIN
      WEST LIVING ROOM WALL

0051A PKG 000 CODE:IE   UK00
            ITEM: PSPECIM BRAND:        MODEL:          COLOR:
      DESCRIPTION: CONTROL SAMPLE-WEST LIVING ROOM WALL

0052  PKG 000 CODE:IE   UK00
            ITEM: *MISC   BRAND:        MODEL:          COLOR:
      SIZE:          QUANTITY: 0001    SERIAL/ACCT/ID:
      DESCRIPTION: FRAMED PICTURE BLOODSTAINED AGAINST WEST WALL

0053  PKG 000 CODE:IE   UK00
            ITEM: PSPECIM BRAND:        MODEL:          COLOR:
      DESCRIPTION: SAMPLE OF BLOODSTAIN
      NORTH LIVING ROOM WALL

0053A PKG 000 CODE:IE   UK00
            ITEM: PSPECIM BRAND:        MODEL:          COLOR:

 2000 01797849      8                              Continued.

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT          PAGE NUMBER:   8        DR NUMBER: 2000 01797849        8

DESCRIPTION: CONTROL SAMPLE-NORTH LIVING ROOM WALL

0054  PKG 000 CODE:IE   UK00
                ITEM: PSPECIM BRAND:        MODEL:            COLOR:
      DESCRIPTION: SAMPLE OF BLOODSTAIN
      CERAMIC TILE FLOOR BY FRONT DOOR

0054A PKG 000 CODE:IE   UK00
                ITEM: PSPECIM BRAND:        MODEL:            COLOR:
      DESCRIPTION: CONTROL SAMPLE-CERAMIC FLOOR

0055  PKG 000 CODE:IE   UK00
                ITEM: PJEWELR BRAND:        MODEL:            COLOR: YEL
      SIZE:          QUANTITY: 0001   SERIAL/ACCT/ID:
      DESCRIPTION: WEDDING RING WITH CLEAR STONE AND GREEN STONES
      KITCHEN COUNTER

0056  PKG 000 CODE:IE   UK00
                ITEM: *MISC  BRAND:        MODEL:            COLOR:
      DESCRIPTION: PRESCRIPTION BOTTLES-KITCHEN COUNTER
      1-CHLORPROMAZINE 25 MG, QNTY-40 AND 36 IN VIAL DATED 8-24-00
      1-DEXAMETHASONE 4 MG, QNTY-20 AND 32 IN VIAL DATED 8-1-00
      1-PROCHLORPERAZINE 10 MG, QNTY-60 AND 51 IN VIAL DATED 7-11-00
      VICTIM'S NAME ON BOTTLES

0057  PKG 000 CODE:IE   UK00
                ITEM: OTELEPH BRAND:        MODEL:            COLOR:
      SIZE:          QUANTITY: 0001   SERIAL/ACCT/ID:
      DESCRIPTION: BROKEN CELL PHONE
      KITCHEN COUNTER

0058  PKG 000 CODE:IE   UK00
                ITEM: *MISC  BRAND:        MODEL:            COLOR:
      SIZE:          QUANTITY: 0001   SERIAL/ACCT/ID:
      DESCRIPTION: PRESCRIPTION BOX-KITCHEN COUNTER
      ZOFRAN 8 MG, QNTY-9 AND 3 IN BOX DATED 8-22-00
      VICTIM'S NAME ON PRESCRIPTION

0059  PKG 000 CODE:IE   UK00
                ITEM: PCLOTHE BRAND:        MODEL:            COLOR: GRN WHI
      SIZE:          QUANTITY: 0001   SERIAL/ACCT/ID:
      DESCRIPTION: DAMP TOWEL
      KITCHEN FLOOR

0059A PKG 000 CODE:IE   UK00
                ITEM: PCLOTHE BRAND:        MODEL:            COLOR: WHI
      SIZE:          QUANTITY: 0001   SERIAL/ACCT/ID:
      DESCRIPTION: MULTI COLOR DAMP TOWEL
      KITCHEN FLOOR

0059B PKG 000 CODE:IE   UK00

      2000 01797849       8                                   Continued.

000009285

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT           PAGE NUMBER:   9        DR NUMBER: 2000 01797849      8

        ITEM: PCLOTHE BRAND:          MODEL:              COLOR: GRN PNK
     SIZE:        QUANTITY: 0001   SERIAL/ACCT/ID:
     DESCRIPTION: DAMP TOWEL
     KITCHEN FLOOR

0060   PKG 000 CODE:IE    UK00
        ITEM: OTELEPH BRAND:          MODEL:              COLOR:
     SIZE:        QUANTITY: 0002   SERIAL/ACCT/ID:
     DESCRIPTION: CUT CELL PHONE CORD
     KITCHEN FLOOR

0061   PKG 000 CODE:IE    UK00
        ITEM: PSPECIM BRAND:          MODEL:              COLOR:
     DESCRIPTION: SAMPLE OF BLOODSTAIN
     NORTH SIDE OF KITCHEN COUNTER

0061A  PKG 000 CODE:IE    UK00
        ITEM: PSPECIM BRAND:          MODEL:              COLOR:
     DESCRIPTION: CONTROL SAMPLE-KITCHEN COUNTER

0062   PKG 000 CODE:IE    UK00
        ITEM: *MISC   BRAND:          MODEL:              COLOR:
     SIZE:        QUANTITY: 0001   SERIAL/ACCT/ID:
     DESCRIPTION: BROKEN PICTURE AND FRAME
     KITCHEN FLOOR

0063   PKG 000 CODE:IE    UK00
        ITEM: *MISC   BRAND:          MODEL:              COLOR:
     SIZE:        QUANTITY: 0001   SERIAL/ACCT/ID:
     DESCRIPTION: BROKEN FLOWER POT
     KITCHEN FLOOR

0064   PKG 000 CODE:IE    UK00
        ITEM: *MISC   BRAND:          MODEL:              COLOR:
     SIZE:        QUANTITY: 0001   SERIAL/ACCT/ID:
     DESCRIPTION: BLOODSTAINED SILVER WARE DRAWER

0065   PKG 000 CODE:IE    UK00
        ITEM: PSPECIM BRAND:          MODEL:              COLOR:
     DESCRIPTION: SAMPLE OF BLOODSTAIN
     KITCHEN FLOOR

0065A  PKG 000 CODE:IE    UK00
        ITEM: PSPECIM BRAND:          MODEL:              COLOR:
     DESCRIPTION: CONTROL SAMPLE-KITCHEN FLOOR

0066   PKG 000 CODE:IE    UK00
        ITEM: PSPECIM BRAND:          MODEL:              COLOR:
     DESCRIPTION: SAMPLE OF BLOODSTAIN
     KITCHEN FLOOR

   2000 01797849      8                            Continued.

000009286

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT          PAGE NUMBER:  10     DR NUMBER: 2000 01797849      8

0067  PKG 000 CODE:IE   UK00
          ITEM: PSPECIM BRAND:          MODEL:          COLOR:
      DESCRIPTION: SAMPLE OF BLOODSTAIN-MANILLA FOLDER
      DINING ROOM FLOOR

0068  PKG 000 CODE:IE   UK00
          ITEM: PSPECIM BRAND:          MODEL:          COLOR:
      SIZE:          QUANTITY: 0001    SERIAL/ACCT/ID:
      DESCRIPTION: SAMPLE OF BLOODSTAIN-PAPER
      DINING ROOM FLOOR

0069  PKG 000 CODE:IE   UK00
          ITEM: PSPECIM BRAND:          MODEL:          COLOR:
      SIZE:          QUANTITY: 0001    SERIAL/ACCT/ID:
      DESCRIPTION: SAMPLE OF BLOODSTAIN-PAPER
      DINING ROOM FLOOR

0070  PKG 000 CODE:IE   UK00
          ITEM: EKEY     BRAND:          MODEL:          COLOR:
      DESCRIPTION: SET OF CAR KEYS WITH ALARM
      DINING ROOM FLOOR

0071  PKG 000 CODE:IE   UK00
          ITEM: PSPECIM BRAND:          MODEL:          COLOR:
      DESCRIPTION: SAMPLE OF BLOODSTAIN-FREEZER DOOR

0071A PKG 000 CODE:IE   UK00
          ITEM: PSPECIM BRAND:          MODEL:          COLOR:
      DESCRIPTION: CONTROL SAMPLE-REFRIDGRATOR DOOR

0072  PKG 000 CODE:IE   UK00
          ITEM: PSPECIM BRAND:          MODEL:          COLOR:
      DESCRIPTION: SAMPLE OF BLOODSTAIN-FREEZER DOOR

0073  PKG 000 CODE:IE   UK00
          ITEM: PSPECIM BRAND:          MODEL:          COLOR:
      DESCRIPTION: SAMPLE OF BLOODSTAIN-DOOR HANDLE OF REFRIDGERATOR

0074  PKG 000 CODE:IE   UK00
          ITEM: EKEY     BRAND:          MODEL:          COLOR:
      DESCRIPTION: SET OF KEYS WITH ALARM FROM WALL HOOK
      SOUTH KITCHEN WALL

0075  PKG 000 CODE:IE   UK00
          ITEM: PSPECIM BRAND:          MODEL:          COLOR:
      SIZE:          QUANTITY: 0001    SERIAL/ACCT/ID:
      DESCRIPTION: SAMPLE OF BLOODSTAIN-PAPER
      DINING ROOM TABLE

0076  PKG 000 CODE:IE   UK00
          ITEM: PSPECIM BRAND:          MODEL:          COLOR:

    2000 01797849      8                              Continued.

000009287

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT                PAGE NUMBER:  11        DR NUMBER: 2000 01797849      8

DESCRIPTION: SAMPLE OF BLOODSTAIN-CHILDREN'S CHAIR
DINING ROOM

0076A PKG 000 CODE:IE   UK00
              ITEM: PSPECIM BRAND:        MODEL:              COLOR:
        DESCRIPTION: CONTROL SAMPLE-PLASTIC CHILDREN'S CHAIR

0077  PKG 000 CODE:IE   UK00
              ITEM: PSPECIM BRAND:        MODEL:              COLOR:
     DESCRIPTION: SAMPLE OF BLOODSTAIN
     NORTH WALL OF DINING ROOM WALL

0077A PKG 000 CODE:IE   UK00
              ITEM: PSPECIM BRAND:        MODEL:              COLOR:
        DESCRIPTION: CONTROL SAMPLE-NORTH WALL OF DINING ROOM WALL

0078  PKG 000 CODE:IE   UK00
              ITEM: PSPECIM BRAND:        MODEL:              COLOR:
     DESCRIPTION: SAMPLE OF BLOODSTAIN
     NORTH WALL OF DINING ROOM WALL

0079  PKG 000 CODE:IE   UK00
              ITEM: PSPECIM BRAND:        MODEL:              COLOR:
     DESCRIPTION: SAMPLE OF BLOODSTAIN-
     NORTH WALL OF DINING ROOM WALL

0080  PKG 000 CODE:IE   UK00
              ITEM: PSPECIM BRAND:        MODEL:              COLOR:
     DESCRIPTION: SAMPLE OF BLOODSTAIN-
     NORTH WALL OF DINING ROOM WALL-MIRROR

0080A PKG 000 CODE:IE   UK00
              ITEM: PSPECIM BRAND:        MODEL:              COLOR:
        DESCRIPTION: CONTROL SAMPLE-MIRROR

0081  PKG 000 CODE:IE   UK00
              ITEM: PSPECIM BRAND:        MODEL:              COLOR:
     DESCRIPTION: SAMPLE OF BLOODSTAIN-
     NORTH WALL OF DINING ROOM WALL-MIRROR

0082  PKG 000 CODE:IE   UK00
              ITEM: PSPECIM BRAND:        MODEL:              COLOR:
     DESCRIPTION: SAMPLE OF BLOODSTAIN-
     NORTH WALL OF DINING ROOM WALL-MIRROR

0083  PKG 000 CODE:IE   UK00
              ITEM: *MISC   BRAND:        MODEL:              COLOR:
        SIZE:        QUANTITY: 0001   SERIAL/ACCT/ID:
     DESCRIPTION: STOOL FROM DINING ROOM

0084  PKG 000 CODE:IE   UK00

   2000 01797849      8                              Continued.

000009288

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT          PAGE NUMBER: 12     DR NUMBER: 2000 01797849      8

          ITEM: PSPECIM BRAND:        MODEL:        COLOR:
DESCRIPTION: SAMPLE OF BLOODSTAIN-NORTH WALL OF HALLWAY

0084A PKG 000 CODE:IE   UK00
          ITEM: PSPECIM BRAND:        MODEL:        COLOR:
DESCRIPTION: CONTROL SAMPLE-NORTH HALLWAY WALL

0085 PKG 000 CODE:IE   UK00
          ITEM: PSPECIM BRAND:        MODEL:        COLOR:
DESCRIPTION: SAMPLE OF BLOODSTAIN-CEILING

0085A PKG 000 CODE:IE   UK00
          ITEM: PSPECIM BRAND:        MODEL:        COLOR:
DESCRIPTION: CONTROL SAMPLE-CEILING

0086 PKG 000 CODE:IE   UK00
          ITEM: PSPECIM BRAND:        MODEL:        COLOR:
DESCRIPTION: SAMPLE OF BLOODSTAIN-CEILING

0087 PKG 000 CODE:IE   UK00
          ITEM: PSPECIM BRAND:        MODEL:        COLOR:
DESCRIPTION: SAMPLE OF BLOODSTAIN-CEILING

0088 PKG 000 CODE:IE   UK00
          ITEM: PSPECIM BRAND:        MODEL:        COLOR:
DESCRIPTION: SAMPLE OF BLOODSTAIN-CEILING FAN

0088A PKG 000 CODE:IE   UK00
          ITEM: PSPECIM BRAND:        MODEL:        COLOR:
DESCRIPTION: CONTROL SAMPLE-CEILING FAN

0089 PKG 000 CODE:IE   UK00
          ITEM: PCLOTHE BRAND:        MODEL:        COLOR: BLK
     SIZE:         QUANTITY: 0001    SERIAL/ACCT/ID:
DESCRIPTION: PAIR OF BLOODSTAINED LADIES SHOES
HALLWAY FLOOR

0090 PKG 000 CODE:IE   UK00
          ITEM: EKEY     BRAND:        MODEL:        COLOR:
DESCRIPTION: SET OF KEYS TO BUICK WITH ALARM
BATHROOM COUNTER

0091 PKG 000 CODE:IE   UK00
          ITEM: PCLOTHE BRAND:        MODEL:        COLOR: BLU WHI
     SIZE:         QUANTITY: 0001    SERIAL/ACCT/ID:
DESCRIPTION: PLAID SHORTS-BATHROOM CLOSET

0092 PKG 000 CODE:IE   UK00
          ITEM: PCLOTHE BRAND:        MODEL:        COLOR: RED GRN
     SIZE:         QUANTITY: 0001    SERIAL/ACCT/ID:
DESCRIPTION: PLAID SHORTS-BATHROOM CLOSET

2000 01797849      8                              Continued.

000009289

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT            PAGE NUMBER:  13        DR NUMBER: 2000 01797849      8

0093  PKG 000 CODE:IE   UK00
            ITEM: IPHOTO  BRAND:          MODEL:          COLOR:
DESCRIPTION: STACK OF 35 MM PHOTOS OF SUSPECT AND FRIENDS
TOP OF DRESSER IN BEDROOM

0094  PKG 000 CODE:IE   UK00
            ITEM: PCLOTHE BRAND:          MODEL:          COLOR: BLU WHI
      SIZE:          QUANTITY: 0001    SERIAL/ACCT/ID:
DESCRIPTION: CHECKERED SHORTS-UNDER SOUTH END OF BED

0095  PKG 000 CODE:IE   UK00
            ITEM: PCLOTHE BRAND:          MODEL:          COLOR:
      SIZE:          QUANTITY: 0001    SERIAL/ACCT/ID:
DESCRIPTION: MULTI COLORED FLOWERED SHORTS-NORTH OF BED

0096  PKG 000 CODE:IE   UK00
            ITEM: YDOCUME BRAND:          MODEL:          COLOR:
      SIZE:          QUANTITY: 0001    SERIAL/ACCT/ID:
DESCRIPTION: LETTER AND COURT DOCUMENTS REFERENCE LAWSUIT

            ****  CRIME AGAINST PERSON M.O.  ****

VICTIM: V-01      M.O. FOR SUSPECT: AP-01
SUSPECT:
      PRIMARY FORCE/MEANS OF ATTACK: KNIFE/CUTTING OBJECT
                          CLUB/CLUB TYPE OBJECT
      INFLICTED/ACTIONS:
            CUT/STABBED VICTIM

   VICTIM RECEIVED RIGHTS INFORMATION:  NO        MAIL-IN SUPPLEMENT:

INVOICES:    2777913

   DR ENTERED BY : 2979    DR FINALIZED BY : 2979

                          END OF REPORT        DR NO: 2000 01797849   008

000009290

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT          PAGE NUMBER:   1          DR NUMBER: 2000 01797849          9

REPORT DATE: 20001010    TIME: 1211

TYPE OF REPORT:  HOMICIDE                                    OFFENSE: 451

LOCATION: 002155 E LIBERTY LANE                   BEAT: 0444   GRID: JD32

REPORTING OFFICER[S]: JACK BALLENTINE                3495      UNIT: C31

OFFENSE INVOLVED:  BIAS -

**** NARRATIVE ****

SERIAL NUMBER: 3495

NARRATIVE
**********

ON OCTOBER 8, 2000 AT 0635 HRS. I, DET. BALLENTINE, WAS CONTACTED BY SGT. MIKE SMALLMAN OF THE PHOENIX POLICE HOMICIDE UNIT.  SGT. SMALLMAN REQUESTED THAT I RESPOND TO 2155 E. LIBERTY LANE TO ASSIST IN THE HOMICIDE INVESTIGATION BEING CONDUCTED BY DET. DAVE LUCERO.  I WAS TOLD BY SGT. SMALLMAN THAT THE MANAGER OF THE SAN RIVA APARTMENT COMPLEX AT 2155 E. LIBERTY LANE IS WENDI ANDRIANDO AND IN CUSTODY AT 620 W. WASHINGTON.  HER HUSBAND, JOSEPH ANDRIANDO, IS DECEASED AND AT APARTMENT #132.

SGT. SMALLMAN REQUESTED THAT I CONTACT THE SURROUNDING NEIGHBORS TO APARTMENT #132 AND LOCATE ANYONE WHO MIGHT HAVE HEARD OF SEEN ANY SUSPICIOUS ACTIVITY INVOLVING WENDI OR JOSEPH ANDRIANDO.

ON OCTOBER 8, 2000 AT 0745 HRS. I ARRIVED AT THE SAN RIVA APARTMENT COMPLEX LOCATED 2155 E. LIBERTY LANE AND BEGAN MAKING CONTACT WITH THE NEIGHBORS OF APARTMENT #132 AND THE ANDRIANDO FAMILY.

BELOW IS LISTED THE INFORMATION OF NEIGHBORS THAT WERE CONTACTED AND A SUMMARY OF THEIR STATEMENTS.

```
******************************
2155 E. LIBERTY LANE APT #132
******************************
```

(1) BARNEY HALSTEAD
    W/M 03-13-48
    DISABLED VET
    (480) 659-6862

(2) LOIS HALSTEAD
    W/M 02-22-47
    UNEMPLOYED
    (480) 659-6862

2000 01797849        9                                    Continued.

000009291

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT          PAGE NUMBER:   2      DR NUMBER: 2000 01797849        9

BOTH BARNEY AND LOIS HALSTEAD SAID THEY WENT TO BED AT 11:00 P.M. AND DID
NOT WAKE UP UNTIL WOKEN BY THE POLICE AT 4:45 A.M.  THEY SAID THAT THEY
DIDN'T HEAR ANYTHING SUSPICIOUS FROM APARTMENT #132 OR ANYWHERE ELSE
DURING THE NIGHT.  BARNEY SAID THEY HAVE LIVED IN THE APARTMENT SINCE MAY
2000, BUT DIDN'T KNOW THE ANDRIANDO'S VERY WELL.  HE SAID THEY KNEW THAT
JOE WAS BEING TREATED FOR CANCER AND THAT WENDI WAS THE PROPERTY MANAGER,
BUT KNEW NOTHING ELSE.

BARNEY AND LOIS SAID THEY HAVE NEVER SEEN JOE OR WENDI FIGHT AND RARELY
SAW THEM TOGETHER.  BARNEY SAID THE ONLY WAY THEY CAN TELL THEY ARE HOME
IS THE NOISE FROM THEIR TWO YOUNG CHILDREN.

*******************************
2155 E. LIBERTY LANE APT #126
*******************************

(1)  JOHN DAVIS
     W/M 09-2-61
     EMPLOYER- CREATIVE LEATHER FURNITURE
          2601 E. WASHINGTON (602) 275-8000
     HM: (480) 699-1060

(2)  CHERYL DAVIS
     W/F 08-19-60
     EMPLOYER- KYRENE SCHOOL DISTRICT (SPEECH PATHOLOGIST)
          (480) 783-3420
     HM: (480) 783-3420

(3)  TAYLOR DAVIS
     W/M 1-21-90
     CERRITOS ELEMENTARY (4TH GRADE)

JOHN AND CHERYL DAVIS SAID THEY ARE CURRENTLY LIVING IN THE SAN RIVA
APARTMENT COMPLEX UNTIL THEIR NEW HOME AT 531 E. MOUNTAIN SAGE IN PHOENIX
IS BUILT.  THEY BOTH SAID THEY HAD BEEN HOME SINCE 6:30 P.M. ON OCTOBER 7,
2000 AND HADN'T HEARD ANY SUSPICIOUS NOISES FROM THE ANDRIANDO APARTMENT
OR DURING THE NIGHT.  CHERYL SAID SHE WENT TO BED AT 9:00 P.M. AND JOHN
AND TAYLOR WENT TO BED AT 10:00 P.M.

ACCORDING TO JOHN AND CHERYL, THEY SAW WENDI, JOE , THEIR TWO SMALL
CHILDREN, AND WHAT APPEARED TO BE GRANDPARENTS COME HOME ON THE 7TH AT
ABOUT 12:30 P.M.  THEY ARRIVED IN A BLUE CAR THAT WAS PARKED OUTSIDE IN
THE PARKING LOT.  CHERYL SAID THAT WENDI AND JOE ARE NORMALLY NOT TOGETHER
AND SHE KNEW THAT JOE WAS SUFFERING FROM CANCER.  SHE HAD ALSO HEARD WENDI
SPEAKING ON THE PHONE ONE DAY AND TELLING SOMEONE THAT JOE WAS TAKING
LARGE DOSES OF MEDICATION AND ALSO CHEMOTHERAPY.

BOTH JOHN AND CHERYL THOUGHT THAT WENDI AND JOE WERE GETTING DIVORCED
BECAUSE THEY NEVER SAW THEM TOGETHER.  THEY SAID THAT WENDI AND JOE DIDN'T

2000  01797849     9                                     Continued.

000009292

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT          PAGE NUMBER:   3      DR NUMBER: 2000 01797849      9

SEEM LIKE A HAPPY COUPLE AND THAT WENDI DIDN'T APPEAR TO BE CLOSE TO
ANYONE.


**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***
2155 E. LIBERTY LANE APT. 125
**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

(1) NESTOR PADILLA
    H/M 01-03-71
    EMPLOYER- PADILLA DISTRIBUTING
              7500 MAPLEWOOD DR. N/W
              NEW MEXICO
              (505) 839-9577
    HM: (480) 659-3370

(2) JOSEPH ABEYTA
    H/M 01-11-74
    EMPLOYEE- MCMURRAY PUBLISHING
              (602) 395-5850
              1010 E. MISSOURI
    HM: (480) 659-3370

WHEN I SPOKE WITH NESTOR AND JOSEPH, THEY SAID THEY WENT OUT THE NIGHT
BEFORE AT 11:25 P.M. AND DIDN'T RETURN HOME UNTIL 4:20 A.M.  UPON ARRIVAL
THEY WERE GREETED BY POLICE AND TOLD ABOUT THE INVESTIGATION INVOLVING
WENDI AND JOE ANDRIANDO.  NESTOR SAID THAT HE AND JOSEPH ABEYTA HAVE LIVED
IN THE APARTMENT SINCE NOVEMBER OF 1999.  HE SAID THEY WERE THE SECOND
RESIDENTS AND WENDI WAS THE FIRST.

BOTH NESTOR AND JOSEPH SAID THEY ONLY KNOW WENDI ON A BUSINESS
RELATIONSHIP AND DON'T KNOW JOE ANDRIANDO.  THEY DID ADD THAT THEY HAVE
NEVER HEARD THE ANDRIANDO'S FIGHT.


**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***
2155 E. LIBERTY LANE APT #225
**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

(1) JACOB LOUIS
    H/M 01-31-79
    EMPLOYER- AUDIO EXPRESS
              550 N. SCOTTSDALE RD.
              (480) 968-3078
    CELL: (602) 750-6419

JACOB LOUIS SAID HE WENT TO BED AT 1:30 A.M. AND DIDN'T WAKE UP UNTIL I
WOKE HIM.  HE SAID HE DIDN'T HEAR ANYTHING DURING THE NIGHT AND DOESN'T
KNOW WENDI OR JOE ANDRIANDO.


2000 01797849      9                                    Continued.

000009293

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT        PAGE NUMBER:   4       DR NUMBER: 2000 01797849       9

```
********************************
2155 E. LIBERTY LANE APT #232
********************************
```

NO ANSWER AT 0850 HRS. OR ANY TIME DURING THE DAY.

```
********************************
2155 E. LIBERTY LANE APT #231
********************************
```

(1) MARK LUBLINER
    W/M 05-31-51
    EMPLOYER- THOROBRED CHEVROLET
              ARIZONA AND WARNER
              (480) 899-0131
    HM: (480) 659-0309

(2) BEVERLY LUBLINER
    W/M 04-12-54
    EMPLOYER- HONDA OF TEMPE
              79 S. AUTOPLEX LOOP
              (480) 321-3772
    HM: (480) 659-0309

MARK AND BEVERLY LUBLINER ARE LIVING IN THE SAN RIVA APARTMENT COMPLEX
UNTIL THEIR NEW HOME IN GOLD CANYON RANCH IS BUILT. THEY SAID THEY HEARD
NOTHING DURING THE NIGHT AND DON'T KNOW EITHER WENDI OR JOE ANDRIANDO.

```
********************************
2155 E. LIBERTY LANE APT #226
********************************
```

(1) HELEN PENSKA
    W/F 02-15-59
    EMPLOYER- KPMG CONSULTING
              400 E. VAN BUREN SUITE 1100
              (602) 250-8173
    HM: (480) 699-5152

HELEN PENSKA MOVED INTO APARTMENT #226 ONLY A WEEK AGO.  SHE ONLY KNEW
THAT JOE ANDRIANDO WAS DYING OF CANCER, BUT HEARD THAT FROM THE RESIDENTS.
SHE SAID THAT SHE WENT TO BED BETWEEN 12:30 AND 1:00 A.M. AND HEARD
NOTHING SUSPICIOUS DURING THE NIGHT.

HELEN SAID THAT A FRIEND OF HERS BY THE NAME OF ARRON AND LIVING IN
APARTMENT #114 MIGHT KNOW MORE ABOUT WENDI AND JOE ANDRIANDO.

2000 01797849      9                                    Continued.

000009294

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT          PAGE NUMBER:  5       DR NUMBER: 2000 01797849      9

```
*****************************
2155 E. LIBERTY LANE APT #114
*****************************
```

(1) ARRON BUGASH
    W/M 04-29-44
    SELF EMPLOYED FREELANCE WRITER AND ANIMAL SITTER
    HM: (480) 659-5989

(2) SHERRI WILSON
    W/F 12-28-53
    EMPLOYER- INTERGROUP OF ARIZONA
             2800 N. 44TH ST.
             (602) 381-3406
    HM:  (480) 659-5989

UPON MAKING CONTACT WITH ARRON BUGASH AND SHERRI WILSON I FOUND THAT ARRON
KNEW WENDI BECAUSE SHE ALLOWED HIM TO HAVE HIS ANIMAL SITTING BUSINESS IN
THE COMPLEX.  SHERRI DIDN'T KNOW EITHER JOE OR WENDI WELL ENOUGH TO TALK
ABOUT THEM.

ARRON SAID THEY HAD LIVED ON THE PROPERTY SINCE JUNE 2000 AND NEVER HEARD
WENDI SAY JOE WAS VIOLENT.  HE SAID THAT JOE WAS VERY GOOD WITH THE KIDS,
BUT WAS SUFFERING FROM WHAT HE SAID WAS TERMINAL CANCER.  ARRON SAID THAT
WENDI TOLD HIM JOE WAS MOODY FROM THE CHEMOTHERAPY AND RECEIVED TREATMENT
EVERY THREE WEEKS.  WENDI HAD ALSO TOLD ARRON THAT JOE WOULD GET MAD AT
HER BECAUSE THE APARTMENT WAS A MESS AND SHE DIDN'T COOK EVERY DAY.

ARRON FELT THAT WENDI AND JOE ANDRIANDO DIDN'T GET ALONG, BECAUSE THEY
WERE NEVER SEEN TOGETHER.  THIS WAS EVEN AT PARTIES PUT ON BY THE SAN RIVA
APARTMENT COMPLEX.

VICTIM RECEIVED RIGHTS INFORMATION:  NO          MAIL-IN SUPPLEMENT:

INVOICES:

DR ENTERED BY : 3495    DR FINALIZED BY : 3495

                        END OF REPORT        DR NO: 2000 01797849    009

000009295

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT          PAGE NUMBER:   1        DR NUMBER: 2000 01797849      10

REPORT DATE: 20001010   TIME: 1215

TYPE OF REPORT:  HOMICIDE                                OFFENSE: 451

LOCATION: 002155 E LIBERTY LANE                  BEAT: 0444  GRID: JD32

REPORTING OFFICER[S]: JACK BALLENTINE               3495      UNIT: C31

OFFENSE INVOLVED:  BIAS -

**** SUSPECT INFORMATION ****

INVESTIGATIVE LEAD-01:
                NAME: HASHISAKI, CHRIS

     RACE: W  SEX: F  AGE: 40     DOB: 092760   HT: 000       WT: 000
     HAIR: BRO        EYES: BRO   SSN:
     HOME: 002155 E  LIBERTY LANE            APT/SUITE: 385
           PHOENIX        AZ               ZIP CODE:
     RES.NAME: SAN RIVA APARTMENTS          PHONE: (480)659-8070
     LEVEL OF FORCE :/UNKNOWN USED FORCE CODE

*** PROPERTY/EVIDENCE ***

RECOVERY LOCATION: 002155 E LIBERTY LA
DATE: 100800                    SEARCH WARRANT INVOLVED: NO

0001  PKG 000 CODE:ET  IL01
                ITEM: RATAPE  BRAND:       MODEL:        COLOR:
     DESCRIPTION: AUDIO CASSETTE TAPE OF INTERVIEW WITH CHRIS
     HASHISAKI BY DET. BALLENTINE ON 10-08-00.

**** NARRATIVE ****

SERIAL NUMBER: 3495

NARRATIVE
*********

ON OCTOBER 8, 2000 I, DET. BALLENTINE, WAS ASKED TO ASSIST DET. DAVE
LUCERO WITH HIS INVESTIGATION INTO THE DEATH OF JOSEPH ANDRIANDO AT 2155
E. LIBERTY LANE #132.  SGT. SMALLMAN OF THE PHOENIX POLICE HOMICIDE UNIT
REQUESTED MY ASSISTANCE.  MY RESPONSIBILITY IN THIS INVESTIGATION WAS TO
CONDUCT INTERVIEWS OF THE NEIGHBORING APARTMENTS AROUND AND NEAR THE
ANDRIANDO APARTMENT.  MY PURPOSE OF THE INTERVIEWS WAS TO FIND ANYONE WHO
MIGHT HAVE HEARD A DISTURBANCE THE NIGHT BEFORE COMING FROM THE ANDRIANDO
APARTMENT.

DURING MY CONTACTS WITH THE NEIGHBORS, I FOUND THAT CHRIS HASHISAKI WAS
THE BOOKKEEPER FOR THE SAN RIVA APARTMENTS AND ALSO LIVED ON THE PROPERTY

2000 01797849    10                                    Continued.

000009296

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT            PAGE NUMBER:   2      DR NUMBER: 2000 01797849    10

IN APARTMENT #385.  I WAS ALSO TOLD THAT CHRIS WAS A FRIEND OF WENDI
ANDRIANDO AND MIGHT BE ABLE TO GIVE ME SOME INSIGHT INTO THE PERSONAL SIDE
OF WENDI ANDRIANDO.

ON OCTOBER 8, 2000 AT APPROXIMATELY 1030 HRS. I MADE CONTACT WITH CHRIS
HASHISAKI AT 2155 E. LIBERTY LANE APT #385.  I TOLD CHRIS THAT I WANTED TO
SPEAK TO HER ABOUT WENDI ANDRIANDO AND ANY KNOWLEDGE SHE MIGHT HAVE ABOUT
THE DEATH OF JOSEPH ANDRIANDO.  IT WAS AT THIS TIME THAT CHRIS QUESTIONED
IF "JOE" HAD DIED AND SAID SHE WAS WAS WITH BOTH HE AND WENDI DURING THE
EARLY MORNING HOURS.  I ASKED CHRIS WHEN WAS THE LAST TIME SHE SAW JOSEPH
ALIVE AND SHE SAID IT WAS ON THIS DAY (10-08-00) AT AROUND 2:30 A.M.

I ASKED CHRIS IF SHE WOULD TELL ME HER STORY ON TAPE AND SHE SAID SHE
WOULD BE NERVOUS DOING IT ON TAPE, BUT WOULD TELL ME OFF TAPE.  I TOLD HER
I WOULD AGREE TO DO IT OFF TAPE FIRST, IF SHE WOULD CONSIDER TELLING ME
THE SAME STORY AGAIN ON TAPE.  CHRIS SAID SHE WOULD CONSIDER TALKING ON
TAPE AFTER OUR INTERVIEW.

WHEN CHRIS COMPLETED HER STORY OF THE EVENTS SHE WITNESSED DURING THE
EARLY MORNING HOURS, I AGAIN INQUIRED ABOUT MY DESIRE TO HAVE HER TELL ME
THE STORY ON TAPE.  CHRIS AGREED TO DO THIS AND I MADE ARRANGEMENTS TO
ACQUIRE A TAPE RECORDER AND COPY THE INTERVIEW.

ON OCTOBER 8, 2000 AT 1145 HRS. I CONDUCTED THE TAPE RECORDED INTERVIEW
WITH CHRIS HASHISAKI.  BELOW IS A SUMMARY OF THAT INTERVIEW.  THE
INTERVIEW WAS CONDUCTED IN CHRIS'S APARTMENT AT 2155 E. LIBERTY LANE #385.


                          SUMMARY OF TAPE
                          ---------------

CHRIS HASHISAKI SAID THAT ON SUNDAY OCTOBER 8, 2000 AT 2:16 A.M. SHE WAS
ASLEEP IN BED WHEN SHE RECEIVED A PHONE CALL FROM WENDI ANDRIANDO.  WENDI
ASKED CHRIS IF SHE WOULD COME OVER AND WATCH HER KIDS, BECAUSE SHE HAS TO
TAKE JOE (JOSEPH ANDRIANDO) TO THE DOCTORS.  CHRIS KNEW THAT JOE WAS
SERIOUSLY ILL FROM CANCER AND WAS BEING TREATED WITH CHEMOTHERAPY.
BECAUSE OF THIS, CHRIS SAID SHE WOULD BE RIGHT OVER.  BEFORE CHRIS COULD
LEAVE HER APARTMENT, SHE WAS AGAIN CALLED BY WENDI TO SEE IF SHE WAS ON
HER WAY.  CHRIS SAID THAT SHE GOT TO WENDI'S APARTMENT IN NO MORE THAN TEN
MINUTES FROM THE TIME WENDI PLACED HER ORIGINAL CALL.

AS CHRIS APPROACHED THE APARTMENT FOR WENDI AND JOE ANDRIANDO, SHE
OBSERVED WENDI SITTING IN THE PARKING LOT ON THE PARKING CURB AND HOLDING
A PHONE IN HER HAND.  WENDI TOLD CHRIS THAT SHE HAD A PROBLEM AND NOT TO
ASK QUESTIONS.  SHE ALSO SAID THAT SHE HAD A HUSBAND INSIDE THAT WAS
DYING.  WENDI TOLD CHRIS THAT SHE HADN'T CALLED 911 YET BECAUSE HER PHONE
DIDN'T WORK OUTSIDE AND WHAT SHE REALLY NEEDED WAS A HUG.  CHRIS SAID THAT
SHE GAVE WENDI A HUG AND TOLD HER TO GO INSIDE AND CALL 911.  THEY BOTH
WENT INSIDE APARTMENT #132 AND THIS IS THE FIRST TIME THAT CHRIS SAW JOE.

2000 01797849    10                                        Continued.


000009297

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT          PAGE NUMBER:   3      DR NUMBER: 2000 01797849     10

SHE BELIEVED THE TIME TO BE APPROXIMATELY 2:30 A.M.

WHEN CHRIS WALKED INSIDE THE APARTMENT, SHE OBSERVED JOE ANDRIANDO LAYING
ON THE LIVING ROOM FLOOR IN A FETAL POSITION, ON HIS SIDE, AND NEAR A POOL
OF VOMIT.   SHE SAID THAT HE WAS LAYING IN THE MIDDLE OF THE FLOOR AND HAD
HEAVY BREATHING, BUT LOOKED O.K..   SHE WENT ON TO SAY THAT SHE ASKED HIM
IF HE WAS ALRIGHT AND HE SAID THAT HE NEEDED HELP AND THAT HE HAS NEEDED
HELP FOR A LONG TIME.   CHRIS SAID THAT WHILE THIS WAS GOING ON, WENDI WAS
IN THE BEDROOM CALLING 911.

WHILE CHRIS WAS WITH JOE, SHE SAID THAT SHE NOTICED NO INJURIES TO HIS
HEAD OR OTHER PARTS OF HIS BODY.   HE ALSO NEVER SAID WHETHER OR NOT HE AND
WENDI HAD BEEN IN A FIGHT.   WENDI TOLD CHRIS THAT THE 911 OPERATOR TOLD
HER TO PUT JOE IN THE CAR AND TAKE HIM TO THE HOSPITAL.   JOE SAID HE
DIDN'T WANT TO GO IN THE CAR AND BECAME AGITATED THAT THE EMERGENCY
SERVICES HADN'T ARRIVED YET.   CHRIS SAID THAT WENDI ALSO TRIED TO LIFT
JOE, BUT HE WOULD NOT COOPERATE.   CHRIS SAID SHE TOLD WENDI TO CALL BACK
AND GET AN ESTIMATED TIME OF ARRIVAL FOR THE EMERGENCY SERVICES.   WENDI
DID THIS AND FOUND OUT THEY WERE ABOUT ONE MINUTE AWAY.   CHRIS DECIDED TO
WAIT FOR THE ARRIVAL OF THE SERVICES, BUT WENDI CONTINUED TO TRY AND GET
JOE UP TO TAKE IN THE CAR.   AT ONE POINT WENDI BECAME FRUSTRATED WITH JOE
AND TOLD HIM TO GET HIS ASS UP.

CHRIS SAID THAT SHE COULD HEAR THE FIRE ENGINE COMING SO SHE WENT OUTSIDE
AND WAITED FOR THE FIRE DEPARTMENT TO ARRIVE AND SHOW THEM THE WAY TO THE
APARTMENT.   AS SHE WAITED OUTSIDE, WENDI RAN OUT INTO THE HALLWAY AND
YELLED SOMETHING TO CHRIS. CHRIS WENT BACK INSIDE TO SEE WHAT SHE WANTED
AND WAS TOLD BY WENDI TO TELL THE FIRE DEPARTMENT TO GO AWAY.   WENDI ALSO
TOLD CHRIS TO GO AWAY, BUT CHRIS REFUSED.   THIS IS HAPPENING WHILE CHRIS
IS IN THE HALLWAY OUTSIDE AND WENDI IS INSIDE.   WENDI THEN THREW CHRIS'S
PURSE OUTSIDE INTO THE HALLWAY AND CLOSED THE DOOR.   CHRIS CONTINUED TO
WAIT FOR THE FIRE DEPARTMENT.   ONCE THEY ARRIVED, THEY TRIED TO KNOCK ON
THE DOOR, BUT GOT NO RESPONSE.

THE FIRE DEPARTMENT THEN HAD THEIR OPERATOR CALL THE APARTMENT AND ASK
WENDI TO COME OUT.   SHE AGREED TO COME OUT, BUT THIS TIME SHE CAME FROM
THE BACK PATIO AND INTO THE APARTMENT COMMON BREEZEWAY.   AT THIS TIME
WENDI HAD CHANGED HER CLOTHES AND ALSO HAD WET HAIR.   SHE HAD TO EXIT THE
PATIO AND CLIMB THE PATIO WALL TO WALK FROM THE BACK TO GREET CHRIS AND
THE FIRE FIGHTERS.   THIS ACTION WAS TAKEN INSTEAD OF COMING OUT THRU THE
FRONT DOOR.   CHRIS SAID THAT WENDI BEGAN TO TELL THE FIREFIGHTERS ABOUT
JOE'S CANCER CONDITION AND THAT THEY HAD A "DO NOT RESUSCITATE" FORM
FILLED OUT AND WANTED TO BE LEFT ALONE.   SHE APPEARED TO CHRIS AS IF SHE
WAS EXTREMELY CONFUSED AND "NOT THERE".

CHRIS SAID THAT WENDI'S HAIR WAS WET AND SHE HAD CHANGED FROM ONE PAIR OF
DARK COLORED SHORTS TO ANOTHER PAIR OF DARK COLORED SHORTS.   CHRIS SAID
THAT WENDI HAD CHANGED FROM A WHITE T-SHIRT INTO A WHITE AND DARK COLORED
T-SHIRT THAT HAD AN OPENED BACK WITH STRING STRAPS CROSSING THE SHOULDER
BLADES.   ALSO ON ONE OF HER EYE BROWS WAS A PARTICLE THAT CHRIS DESCRIBED
AS VOMIT.

2000  01797849    10                                        Continued.

000009298

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT          PAGE NUMBER:   4      DR NUMBER: 2000 01797849     10

THE AMOUNT OF TIME THAT CHRIS SAID ELAPSED BETWEEN WHEN SHE WENT TO MEET
THE FIRE FIGHTERS AND WHEN WENDI CAME FROM THE BACK PATIO WAS NO MORE THAN
TEN MINUTES.  SHE SAID DURING THAT TIME SHE HEARD NO SCREAMING OR FIGHTING
COMING FROM THE ANDRIANDO APARTMENT.  WENDI TOLD THE FIREFIGHTERS THAT SHE
WOULD CONTACT JOE'S DOCTOR AND LET HIM DEAL WITH THIS.  SHE THEN ASKED
THEM TO LEAVE AGAIN AND THEY DID.  CHRIS ASKED WENDI WHAT WAS SHE DOING
AND IF EVERYTHING WAS ALRIGHT.  WENDI TOLD HER TO JUST GO HOME AND SHE
WOULD CONTACT HER IN THE MORNING.  CHRIS TOLD WENDI SHE WOULD BE UP IF SHE
NEEDED ANYTHING AND WENDI SAID THAT SHE WAS SURE SHE WOULD ALSO BE UP.
WENDI THEN RETURNED TO HER APARTMENT BY GOING TO THE BACK PATIO AND THEN
INSIDE.  THIS WAS DONE INSTEAD OF USING THE FRONT DOOR SHE WAS STANDING
NEXT TO.

CHRIS SAID THAT SHE WALKED BACK HOME AND WAS HOME NO MORE THAN FIVE
MINUTES WHEN WENDI CALLED AGAIN.  WENDI SAID THAT SHE HAD CALLED HER DAD,
BECAUSE JOE HAD ASKED HER DO SO.  SHE SAID SHE ALSO NEEDED HER DAD TOO.
WENDI SAID SHE WOULD CALL TOMORROW AND TOLD CHRIS SHE DIDN'T NEED HER TO
STAY WITH HER UNTIL HER FATHER CAME OVER.

CHRIS THEN WENT TO BED AND RECEIVED ANOTHER PHONE CALL FROM WENDI ABOUT
THIRTY MINUTES LATER.  WENDI TOLD CHRIS SHE NEEDED TO TELL HER WHAT REALLY
HAPPENED.  SHE SAID JOE FOUND OUT SHE WAS CHEATING AND HE LOST IT AND
BECAME VERY VERY ANGRY.  SHE SAID HE TRIED TO STRANGLE HER AND KILL HER SO
SHE HIT HIM IN THE BACK OF THE HEAD.  SHE SAID THIS IS WHY HE WAS LAYING
ON THE LIVING ROOM FLOOR.  CHRIS ASKED IF SHE HAD CALLED THE POLICE AND
WENDI SAID THAT SHE HAD.  CHRIS ALSO ASKED IF WENDI'S DAD WAS ON HIS WAY
AND WENDI SAID HE WAS TEN MINUTES AWAY.  CHRIS THEN HEARD THE POLICE SIREN
AND FELT SINCE WENDI'S DAD WAS ON HIS WAY TO PROVIDE HER SUPPORT,
EVERYTHING WOULD BE FINE.

WENDI CONTINUED THE PHONE CONVERSATION AS THE POLICE WERE ARRIVING.  SHE
SAID THAT JOE HAD GOT MAD AT HER AGAIN, GOT UP AND CAME AFTER HER AGAIN.
WHEN HE CAME AFTER HER THE SECOND TIME SHE HIT HIM AGAIN.  WENDI SAID SHE
HIT HIM WITH THE BAR STOOL FROM THE KITCHEN.  THE PHONE CONVERSATION ENDED
AND WENDI HUNG UP THE PHONE AFTER TELLING CHRIS SHE WOULD CALL HER IN THE
MORNING.

I QUESTIONED CHRIS AS TO WHETHER OR NOT SHE NOTICED ANY TOWELS ON THE
FLOOR THAT MIGHT HAVE BEEN USED TO COVER BLOOD.  SHE SAID THAT SHE NOTICED
A SMALL WASH RAG ON THE LIVING ROOM FLOOR THAT WAS USED TO COVER WHAT SHE
BELIEVED TO BE VOMIT.  SHE ALSO SAID THAT JOE VOMITED PRIOR TO HER GOING
TO GREET THE FIRE FIGHTERS.

CHRIS SAID THAT SHE DIDN'T THINK ANYTHING ABOUT THE CONDITION OF JOE
BECAUSE SHE THOUGHT IT WAS TYPICAL OF SOMEONE BEING TREATED FOR CANCER AND
ON CHEMOTHERAPY.  SHE SAID THAT WENDI TOLD HER SHE HAD COVERED THE SPOT
WHERE JOE HAD THROWN UP BY COVERING IT WITH THE WASH RAG.  CHRIS DID FIND
IT ODD THAT WENDI DIDN'T HAVE A BUCKET FOR JOE TO THROW UP IN AND THAT
WENDI WASN'T DISTRESSED OVER HER HUSBAND DYING ON THE LIVING ROOM FLOOR.

2000 01797849    10                                        Continued.

000009299

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT          PAGE NUMBER:   5     DR NUMBER: 2000 01797849    10

ACCORDING TO CHRIS, SHE DIDN'T NOTICE ANYTHING OUT OF THE NORMAL OR A
BROKEN BAR STOOL WHEN SHE WAS IN THE APARTMENT.  SHE SAID THAT SHE WAS
THERE TO PROVIDE SUPPORT FOR WENDI AND JOE, WHO SHE THOUGHT WAS DYING OF
CANCER.

WENDI HAD TOLD CHRIS THAT HER RELATIONSHIP WITH JOE WAS EXTREMELY
DIFFICULT AND JOE WAS VERY DEMANDING.  HE ALSO HAD A BAD TEMPER, BUT CHRIS
NEVER SAW WENDI BRUISED OR STRUCK BY JOE.  WENDI DID TELL CHRIS THAT SHE
WAS HAVING A RELATIONSHIP WITH ANOTHER MAN BY THE NAME OF TRAVIS.  CHRIS
ALSO SAID THAT SHE HAD BEEN OUT FOR A DRINK WITH THE TWO OF THEM RECENTLY.
SHE DIDN'T KNOW ANY OTHER INFORMATION ABOUT TRAVIS EXCEPT THAT HE DRESSES
LIKE A COWBOY.

THE INTERVIEW WITH CHRIS HASHISAKI WAS CONCLUDED AT 1207 HRS. ON 10-08-00.
THE TAPE WAS IMPOUNDED AS EVIDENCE.

VICTIM RECEIVED RIGHTS INFORMATION:  NO          MAIL-IN SUPPLEMENT:

INVOICES:     2778537

DR ENTERED BY : 3495     DR FINALIZED BY : 3495

END OF REPORT          DR NO: 2000 01797849    010

000009300

P-App. 005031

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT          PAGE NUMBER:   1      DR NUMBER: 2000 01797849    11

REPORT DATE: 20001010   TIME: 1218

TYPE OF REPORT:  HOMICIDE                              OFFENSE: 451

LOCATION: 002155 E LIBERTY LANE          BEAT: 0444  GRID: JD32

REPORTING OFFICER[S]: JACK BALLENTINE            3495     UNIT: C31

OFFENSE INVOLVED:  BIAS -

REPORT DISPOSITION: CLEARED BY ARREST            OVER AGE 18: YES

**** SUSPECT INFORMATION ****

  ARRESTED PERSON-01:
              NAME: ANDRIANDO, WENDI ELIZABETH

      RACE: W SEX: F AGE: 30    DOB: 082670  HT: 504       WT: 115
      HAIR: BLN      EYES: BRO  SSN: 527659703
      HOME: 002155 E  LIBERTY LANE              APT/SUITE:
            PHOENIX          AZ                 ZIP CODE:
      LEVEL OF FORCE : OFFICER PRESENCE

      ARREST:
            DATE: 100800      TIME: 0935      DAY: SUN    GRID: JD32
            LOC: 002155 E LIBERTY LANE              PHOENIX       AZ
           .PHX.P.D. BOOKING NO: 000000282060

            *** PROPERTY/EVIDENCE ***

RECOVERY LOCATION: 002155 E LIBERTY LA
DATE: 100800              SEARCH WARRANT INVOLVED: YES

0001 PKG 000 CODE:EI   AP01
            ITEM: YDOCUME BRAND:        MODEL:          COLOR:
     DESCRIPTION: TYPED LETTERS BETWEEN RICK FREELAND AND WENDI
     ANDRIANDO.  A TOTAL OF (5) PAGES.

0002 PKG 000 CODE:EI   AP01
            ITEM: YDOCUME BRAND:        MODEL:          COLOR:
     DESCRIPTION: BANK OF AMERICA BANK STATEMENT AND CANCELLED
     CHECKS FOR WYNDSTAR ENTERPRISES AND WENDI E. ANDRIANO.

0003 PKG 000 CODE:EI   AP01
            ITEM: YDOCUME BRAND:        MODEL:          COLOR:
     DESCRIPTION: SAN RIVA ENVELOPE FOR "WENDY" (EMPTY)

0004 PKG 000 CODE:EI   AP01
            ITEM: YDOCUME BRAND:        MODEL:          COLOR:
     DESCRIPTION: GREEN ENVELOPE WITH CARD FROM "YOU" TO "ME".
     THANKING "YOU" FOR ALL THE HELP.

    2000 01797849    11                           Continued.

000009301

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT          PAGE NUMBER:   2        DR NUMBER: 2000 01797849     11

0005  PKG 000 CODE:EI    AP01
              ITEM: YDOCUME BRAND:          MODEL:            COLOR:
      DESCRIPTION: NOTEBOOK PAPER PAPER WITH WRIITEN WORDS, "THANK
      YOU! ME!

0006  PKG 000 CODE:EI    AP01
              ITEM: IPHOTO  BRAND:          MODEL:            COLOR:
      DESCRIPTION: (22) MISCELLANEOUS PHOTOGRAPHS OF MALES AND
      FEMALES THAT ALSO INCLUDE WENDI ANDRIANDO, SHANNON SWEENEY AND RICK
      FREELAND.

                         ****  NARRATIVE  ****
      SERIAL NUMBER: 3495

SEARCH WARRANT ISSUED:
                         JUDGE LESTER PEARCE
                         NORTH MESA JUSTICE COURT
                         OCTOBER 8, 2000 @ 1512 HRS.
                         #CR00-02478SW

SEARCH WARRANT SERVED:
                         2155 E. LIBERTY LN.
                         SAN RIVA APARTMENT MANAGERS OFFICE
                         OCTOBER 8, 2000 @ 1550 HRS.

SEARCH WARRANT RETURNED:
                         JUDGE PRO TEM WALTER BROWN
                         WEST PHOENIX JUSTICE COURT
                         527 W. MCDOWELL
                         OCTOBER 10, 2000 @ 0830 HRS.

INVESTIGATIVE LEAD:
                         SHANNON SWEENEY
                         W/F 12-23-73
                         CELL PHONE: (602) 570-3394
                         RESIDENCE AND EMPLOYMENT
                         SAN RIVA APARTMENT COMPLEX
                         2155 E. LIBERTY LN., PHOENIX AZ.
                         ASSISTANT MANAGER


****************
NARRATIVE
****************

ON OCTOBER 8, 2000 AT 1220 HRS. I WAS CONTACTED BY SGT. MIKE SMALLMAN OF
THE PHOENIX POLICE HOMICIDE UNIT TO PREPARE A SEARCH WARRANT FOR THE
PAPERWORK ON THE DESK OF WENDI ANDRIANDO AT THE SAN RIVA APARTMENTS
MANAGER'S OFFICE LOCATED 2155 E. LIBERTY LN.  SGT. SMALLMAN SAID THAT DET.
DAVE LUCERO HEARD WENDI ANDRIANDO TELL A FRIEND, OVER THE PHONE, TO REMOVE
HER PERSONAL PAPERWORK FROM HER OFFICE.  THIS OCCURRED WHILE DET. LUCERO

  2000 01797849    11                                        Continued.


                         000009302

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT          PAGE NUMBER:   3        DR NUMBER: 2000 01797849     11

WAS PREPARING TO BOOK WENDI ANDRIANDO INTO THE MADISON JAIL ON A CHARGE OF MURDER, A CLASS 2 FELONY.

SGT. SMALLMAN SAID THAT AS HE ARRIVED AT THE SAN RIVA APARTMENTS MANGER'S OFFICE, HE OBSERVED SHANNON SWEENEY LOOKING THROUGH PAPERWORK AT THE DESK IN THE OFFICE OF WENDI ANDRIANDO.  THE SAN RIVA APARTMENTS PROPERTY MANAGEMENT OFFICES OPENED AT NOON FOR NORMAL BUSINESS.  SGT. SMALLMAN SAID HE TOLD SHANNON TO LEAVE THE PAPERWORK ON THE DESK AND LEAVE THE OFFICE. HE THEN HAD UNIFORMED OFFICER BAKER STAND BY THE OFFICE UNTIL A WARRANT COULD BE SERVED TO RECOVER THE DESCRIBED PERSONAL PAPERWORK.

AT 1235 HRS. I SPOKE WITH SHANNON SWEENEY WHO IS THE ASSISTANT MANAGER FOR THE SAN RIVA APARTMENT COMPLEX.  SHE TOLD ME THAT AT 0900 HRS. SHE HAD RECEIVED A CALL FROM A MAN WHO SAID HE WAS THE FATHER OF WENDI ANDRIANDO AND ASKED IF SHE WOULD COVER FOR WENDI BECAUSE SHE WOULD NOT BE IN TO WORK.  SHE SAID THAT AT NOON SHE WAS CALLED AT THE OFFICE BY WENDI WHO ASKED THAT SHE REMOVE "WENDI'S" PERSONAL PROPERTY FROM THE WICKER BASKET ON THE BACK DESK IN THE MANGERS OFFICE.  SHANNON SAID THIS WAS THE PAPERWORK SHE WAS LOOKING AT WHEN CONTACTED BY SGT. SMALLMAN.

SHANNON SWEENEY SAID THAT WENDI ANDRIANDO TOLD HER SHE WAS BEING BOOKED AND THAT HER FATHER WAS GETTING HER A LAWYER.  SHE ALSO ASKED THAT SHANNON COVER FOR HER WHILE SHE IS GONE OR UNTIL A TEMPORARY MANAGER IS IN PLACE. SHANNON FELT THAT SHE WAS ASKED TO REMOVE THE PERSONAL PROPERTY TO MAKE ROOM FOR THE TEMPORARY MANAGER.  SHE DID NOT SUSPECT ANYTHING SUSPICIOUS. WENDI ENDED THEIR CONVERSATION BY SAYING SHE HAD EXPERIENCED A HORRENDOUS NIGHT.  SHE GAVE NO OTHER INFORNMATION AND/OR EXPLANATION.

ON OCTOBER 8, 2000 I PREPARED A WARRANT TO RECOVER THE ABOVE DESCRIBED "PERSONAL" PAPERWORK.  THE WARRANT WAS SIGNED BY NORTH MESA JUDGE LESTER PEARCE AND SERVED ON OCTOBER 8, 2000 AT 1550 HRS.  THE "PERSONAL" PAPERWORK DESCRIBED IN THIS REPORT WAS RECOVERED AND IMPOUNDED AS EVIDENCE.  ON OCTOBER 10, 2000 THE WARRANT WAS RETURNED TO WEST PHOENIX JUDGE PRO TEM WALTER BLOOM AT 0830 HRS.

THE WARRANT WAS ISSUED ON A SUNDAY AFTERNOON AND THE FREEWAY LEADING FROM 2155 E. LIBERTY TO PHOENIX WAS CLOSED FOR REPAIR.  BECAUSE OF TRAFFIC PROBLEMS THE WARRANT WAS PRESENTED TO THE CLOSEST MESA JUDGE.  THE WARRANT WAS RETURNED TO THE WEST PHOENIX JUSTICE COURT FOR CONVENIENCE AND THIS IS THE COURT THAT ISSUED THE SEARCH WARRANT NUMBER CR00-02478SW.  A WRITTEN LIST OF THE ITEMS TAKEN WAS GIVEN TO SHANNON SWEENEY AT THE CONCLUSION OF THIS WARRANT.

THE ITEMS RECOVERED IN THIS SEARCH WARRANT WERE FOUND ON TOP OF THE DESK IN THE MANAGERS OFFICE AT THE SAN RIVA APARTMENT COMPLEX 2155 E. LIBERTY LANE, PHOENIX ARIZONA.  ON THE DESK OF THIS OFFICE WERE BUSINESS CARDS FOR WENDI ANDRIANDO LISTING HER AS THE MANAGER.

VICTIM RECEIVED RIGHTS INFORMATION:  NO          MAIL-IN SUPPLEMENT:

2000 01797849     11                                Continued.

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT          PAGE NUMBER:    4        DR NUMBER: 2000 01797849    11

INVOICES:    2777903

  DR ENTERED BY : 3495      DR FINALIZED BY : 3495

END OF REPORT          DR NO: 2000 01797849    011

000009304

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT          PAGE NUMBER:    1        DR NUMBER: 2000 01797849      12

REPORT DATE: 20001011   TIME: 0113

TYPE OF REPORT:  HOMICIDE                              OFFENSE: 451

LOCATION: 002155 E LIBERTY LANE              BEAT: 0444  GRID: JD32

REPORTING OFFICER[S]: CAROLYN IRWIN           A3656     UNIT: LAB

OFFENSE INVOLVED:  BIAS -

***    PROPERTY/EVIDENCE    ***

RECOVERY LOCATION: 000000
DATE: 000000              SEARCH WARRANT INVOLVED:

0001  PKG 001 CODE:EI   UK00
        ITEM: IPHOTO  BRAND:        MODEL:          COLOR:
    SIZE:          QUANTITY: 0005   SERIAL/ACCT/ID:
    DESCRIPTION: 5 ROLLS OF 35MM FILM WITH 28,36,36,36 AND 36
    EXPOSURES. PHOTOS OF SCENES AT 2155 E. LIBERTY LANE TAKEN ON 10-10-00.


  VICTIM RECEIVED RIGHTS INFORMATION:  NO          MAIL-IN SUPPLEMENT:

INVOICES:     2778065

  DR ENTERED BY : A3656    DR FINALIZED BY : A3656

                        END OF REPORT        DR NO: 2000 01797849   012

000009305

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT            PAGE NUMBER:   1        DR NUMBER: 2000 01797849     13

REPORT DATE: 20001011   TIME: 0918

TYPE OF REPORT:  HOMICIDE                              OFFENSE: 451

LOCATION: 002155 E LIBERTY LANE               BEAT: 0444   GRID: JD32

REPORTING OFFICER[S]: KATHI GALBARI                4107     UNIT: C33
                      SALLIE DILLIAN               4689

PREMISES: APARTMENT                                OCCUPIED:

OFFENSE INVOLVED:  BIAS -

                  ***   PROPERTY/EVIDENCE   ***

RECOVERY LOCATION: 002155 E LIBERTY  #132
DATE: 101000              SEARCH WARRANT INVOLVED: YES

0001  PKG 000 CODE:EI   AP01
            ITEM: *MISC   BRAND:        MODEL:           COLOR:
      DESCRIPTION: 2-YELLOW ENVELOPS WITH E-MAILS CONCERNING THE SHIP
      MENT OF CHEMICAL, AIRBORNE SHIPPING LABEL AND TRACKING # FOR SHIPMENT TO
      AP WENDI ANDRIANO USING AKA OF ANNE NEWTON. SHIPMENT OF SODIUM AZID SHIP
      PED TO AZTEC CREATIONS/ANNE NEWTON, 2442 S. 24TH ST. PHOENIX ON 9/28/00.
      TRACKING #6802739090
      FOUND IN WENDI ANDRIANO'S OFFICE AT APT RENTAL OFFICE WHERE SHE WORKED

0002  PKG 000 CODE:EI   AP01
            ITEM: IPHOTO BRAND:        MODEL:         COLOR:
      DESCRIPTION: DEVELOPED COLOR PHOTOGRAPHS OF THE FAMILY
      ON THE KITCHEN COUNTER

0003  PKG 000 CODE:EI   AP01
            ITEM: IPHOTO BRAND:        MODEL:         COLOR:
      DESCRIPTION: DEVELOPED PHOTOGRAPHS OF THE FAMILY
      ON THE KITCHEN COUNTER

0004  PKG 000 CODE:CI   AP01
            ITEM: CMISC   BRAND:        MODEL:         COLOR:
      DESCRIPTION: PLASTIC BAGGIE CONTAINING 3-KODAK MAX FLASH
      CAMERAS AND 5-ROLLS OF UNDEVELOPED FILM
      FOUND ON THE KITCHEN COUNTER

0005  PKG 000 CODE:EI   AP01
            ITEM: *MISC   BRAND:        MODEL:          COLOR:
      DESCRIPTION: DOCUMENTS FROM ALMA JENNINGS HAUGHT, CLERK OF
      COURTS, P.O. BOX 2730, FLORENCE, AZ.   85232
      FOUND ON THE KITCHEN COUNTER

0006  PKG 000 CODE:EI   AP01
            ITEM: *MISC   BRAND:        MODEL:          COLOR:

   2000 01797849    13                                 Continued.

                        000009306

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT          PAGE NUMBER:   2      DR NUMBER: 2000 01797849     13

DESCRIPTION: NOTES WITH PHONE NUMBERS, NAMES AND ADDRESSES
ON THEM
FOUND ON THE KITCHEN COUNTER

0007  PKG 000 CODE:EI   AP01
            ITEM: *MISC   BRAND:        MODEL:            COLOR:
      DESCRIPTION: PAMPHLET-GUIDE TO PROPER NUTRITION FOR THE
      PATIENT UNDERGOING CANCER THERAPY
      FOUND ON THE KITCHEN COUNTER

0008  PKG 000 CODE:EI   AP01
            ITEM: *MISC   BRAND:        MODEL:            COLOR:
      SIZE:         QUANTITY: 0032    SERIAL/ACCT/ID:
      DESCRIPTION: DOCUMENTS-SAN RIVA AT THE FOOTHILLS (PAPERS) FOR
      NOTICE OF INTENT TO TERMINATE RENTAL AGREEMENT FOR NON-PAYMENT OF RENT
      (32 PAGES) INDICATING A DIFFERENT TENANT ON EACH PAGE
      FOUND ON THE KITCHEN TABLE

0009  PKG 000 CODE:EI   AP01
            ITEM: *MISC   BRAND:        MODEL:            COLOR:
      DESCRIPTION: CLINICAL HEMATOLOGY BUSINESS CARD INDICATING
      APPOINTMENT TIMES
      FOUND ON THE KITCHEN COUNTER

0010  PKG 000 CODE:EI   AP01
            ITEM: *MISC   BRAND:        MODEL:            COLOR:
      SIZE:         QUANTITY: 0001    SERIAL/ACCT/ID:
      DESCRIPTION: PLASTIC MEASURING SPOON 1/2 TSP.
      FOUND ON THE KITCHEN COUNTER

0011  PKG 000 CODE:EI   AP01
            ITEM: *MISC   BRAND:        MODEL:            COLOR:
      SIZE:         QUANTITY: 0001    SERIAL/ACCT/ID:
      DESCRIPTION: STENO PAD INDICATING THE "BRANTS CO." AT
      817-336-3030 (AN INSURANCE COMPANY)
      FOUND IN AP'S OFFICE AT APARTMENT MANAGERS RENTAL OFFICE

0012  PKG 000 CODE:EI   AP01
            ITEM: YFOOD   BRAND:        MODEL:            COLOR:
      DESCRIPTION: SAMPLE OF GATORADE LEMON-LIME FLAVOR (POWDER)
      FROM CONTAINER
      FOUND IN THE KITCHEN CUPBOARD

0013  PKG 000 CODE:EI   AP01
            ITEM: YFOOD   BRAND:        MODEL:            COLOR:
      DESCRIPTION: SAMPLE OF POPPED CORN
      FROM TUPPERWARE STYLE DISH ON THE LIVING ROOM CHAIR BY HALLWAY

0014  PKG 000 CODE:EI   AP01
            ITEM: YFOOD   BRAND:        MODEL:            COLOR:
      DESCRIPTION: SAMPLE OF LOWRY SEASON SALT

 2000 01797849     13                                   Continued.

000009307

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT          PAGE NUMBER:  3      DR NUMBER: 2000 01797849    13

FROM ORIGINAL CONTAINER ON KITCHEN COUNTER

0015  PKG 000 CODE:EI    AP01
              ITEM: *MISC    BRAND:         MODEL:            COLOR:
       SIZE:          QUANTITY: 0001    SERIAL/ACCT/ID:
       DESCRIPTION: PLASTIC MEASURING SPOON
       FOUND ON THE KITCHEN COUNTER

0016  PKG 000 CODE:EI    AP01
              ITEM: *MISC    BRAND:         MODEL:            COLOR:
       SIZE:          QUANTITY: 0001    SERIAL/ACCT/ID:
       DESCRIPTION: PLASTIC MEASURING SPOON
       FOUND IN KITCHEN DRAWER NEXT TO REFRIGERATOR

0017  PKG 000 CODE:EI    AP01
              ITEM: YFOOD    BRAND:         MODEL:            COLOR:
       DESCRIPTION: SAMPLE OF WATER
       TAKEN FROM "SAN RIVA" PLASTIC WATER BOTTLE ON THE KITCHEN COUNTER

0018  PKG 000 CODE:EI    AP01
              ITEM: YFOOD    BRAND:         MODEL:            COLOR:
       DESCRIPTION: SAMPLE OF "SCHWEPPES" GINGERALE
       TAKEN FROM ORIGINAL GREEN ALUMINUM CAN ON KITCHEN COUNTER

0019  PKG 000 CODE:EI    AP01
              ITEM: YFOOD    BRAND:         MODEL:            COLOR:
       DESCRIPTION: SAMPLE OF FOOD SCRAPPINGS
       TAKEN FROM A BAKING PAN ON THE KITCHEN STOVE

0020  PKG 000 CODE:EI    AP01
              ITEM: YFOOD    BRAND:         MODEL:            COLOR:
       DESCRIPTION: SAMPLE OF BUTTERY TOFFEE
       TAKEN FROM ORIGINAL CONTAINER ON KITCHEN COUNTER

0021  PKG 000 CODE:EI    AP01
              ITEM: YFOOD    BRAND:         MODEL:            COLOR:
       DESCRIPTION: SAMPLE OF BUTTERY SALT
       TAKEN FROM ORIGINAL CONTAINER ON THE KITCHEN COUNTER

0022  PKG 000 CODE:EI    AP01
              ITEM: YFOOD    BRAND:         MODEL:            COLOR:
       DESCRIPTION: SAMPLE OF UNKNOWN LIQUID
       TAKEN FROM INSIDE A LARGE PLASTIC "INSIGHT.COM BOWL" DRINKING CUP ON
       KITCHEN COUNTER

0023  PKG 000 CODE:EI    AP01
              ITEM: DCPU    BRAND:         MODEL:            COLOR:
       SIZE:          QUANTITY: 0001    SERIAL/ACCT/ID:
       DESCRIPTION: COMPUTER "COMPAQ PRESARIO" LAP TOP
       FCC# CNTTA1-24639-TTE
       TAKEN FROM THE MASTER BEDROOM

2000 01797849    13                                      Continued.

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT          PAGE NUMBER:   4        DR NUMBER: 2000 01797849     13

0024  PKG 000 CODE:EI    AP01
          ITEM: HDISH    BRAND:        MODEL:           COLOR:
      DESCRIPTION: LARGE PLASTIC "INSIGHT.COM BOWL" DRINKING CUP
      *(RELATED TO ITEM #22 LIQUID)
      TAKEN FROM THE KITCHEN COUNTER

0025  PKG 000 CODE:EI    AP01
          ITEM: YFOOD    BRAND:        MODEL:        COLOR:
      DESCRIPTION: SAMPLE OF LIQUID FROM TALL DRINKING GLASS
      *(RELATED TO ITEM #26)
      TAKEN FROM THE KITCHEN COUNTER

0026  PKG 000 CODE:EI    AP01
          ITEM: HDISH    BRAND:        MODEL:           COLOR:
      SIZE:        QUANTITY: 0001    SERIAL/ACCT/ID:
      DESCRIPTION: TALL DRINKING GLASS
      *(RELATED TO ITEM #25 LIQUID)
      TAKEN FROM THE KITCHEN SINK

0027  PKG 000 CODE:EI    AP01
          ITEM: YFOOD    BRAND:        MODEL:        COLOR:
      DESCRIPTION: SAMPLE OF UNKNOWN FOOD ITEM
      TAKEN FROM PYREX DISH ON KITCHEN COUNTER

0028  PKG 000 CODE:EI    AP01
          ITEM: YFOOD    BRAND:        MODEL:        COLOR:
      DESCRIPTION: SAMPLE OF UNKNOWN FOOD ITEM
      TAKEN FROM ANOTHER PYREX DISH ON THE KITCHEN COUNTER

0029  PKG 000 CODE:EI    AP01
          ITEM: YFOOD    BRAND:        MODEL:        COLOR:
      DESCRIPTION: SAMPLE OF CLEAR LIQUID
      TAKEN FROM A PLASTIC "DASANI" BOTTLE ON KITCHEN COUNTER

0030  PKG 000 CODE:EI    AP01
          ITEM: YFOOD    BRAND:        MODEL:        COLOR:
      DESCRIPTION: SAMPLE OF UNKNOWN FOOD ITEM
      TAKEN FROM A KETTLE ON THE KITCHEN STOVE

0031  PKG 000 CODE:EI    AP01
          ITEM: *MISC    BRAND:        MODEL:        COLOR:
      SIZE:        QUANTITY: 0001    SERIAL/ACCT/ID:
      DESCRIPTION: PLASTIC SEA WORLD PAIL
      TAKEN FROM THE KITCHEN COUNTER

0032  PKG 000 CODE:EI    AP01
          ITEM: HDISH    BRAND:        MODEL:        COLOR:
      SIZE:        QUANTITY: 0001    SERIAL/ACCT/ID:
      DESCRIPTION: DIRTY CASSEROLE DISH
      TAKEN FROM THE KITCHEN COUNTER

      2000 01797849    13                              Continued.

000009309

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT          PAGE NUMBER:   5      DR NUMBER: 2000 01797849    13

0033  PKG 000 CODE:EI    AP01
            ITEM: HDISH   BRAND:         MODEL:              COLOR:
      SIZE:         QUANTITY: 0001   SERIAL/ACCT/ID:
      DESCRIPTION: DIRTY BLUE PLASTIC DRINKING CUP
      TAKEN FROM THE KITCHEN COUNTER

0034  PKG 000 CODE:EI    AP01
            ITEM: YFOOD   BRAND:         MODEL:              COLOR:
      DESCRIPTION: SAMPLE OF UNKNOWN FOOD ITEM (POSSIBLE CEREAL &
      MILK)
      TAKEN FROM TUPPERWARE STYLE CONTAINER ON THE KITCHEN COUNTER

0035  PKG 000 CODE:EI    AP01
            ITEM: YFOOD   BRAND:         MODEL:              COLOR:
      DESCRIPTION: SAMPLE OF UNKNOWN FOOD ITEM (POSSIBLE CEREAL &
      MILK)
      TAKEN FROM A DISH ON THE KITCHEN COUNTER

0036  PKG 000 CODE:EI    AP01
            ITEM: YFOOD   BRAND:         MODEL:              COLOR:
      DESCRIPTION: SAMPLE OF MUS-L BLAST 2000+ BODY BUILDING
      FORMULA (POWDER)
      FROM ORIGINAL CONTAINER FROM KITCHEN CUPBOARD RIGHT SIDE OF KITCHEN SINK
      (UPPER CABINET)

0037  PKG 000 CODE:EI    AP01
            ITEM: HDISH   BRAND:         MODEL:              COLOR:
      SIZE:         QUANTITY: 0001   SERIAL/ACCT/ID:
      DESCRIPTION: DIRTY PINK TUPPERWARE BOWL
      *(RELATED TO ITEM #38 CAPSULES)
      LOWER CUPBOARD NEXT TO REFRIGERATOR PUSHED ALL THE WAY TO THE BACK

0037A PKG 000 CODE:EI    AP01
            ITEM: YMEDICI BRAND:         MODEL:              COLOR:
      DESCRIPTION: UNKNOWN TYPE OF CAPSULES
      *(FROM ITEM #37 THE PINK BOWL)
      SAME AS ITEM #37

0038  PKG 000 CODE:EI    AP01
            ITEM: YFOOD   BRAND:         MODEL:              COLOR:
      DESCRIPTION: SAMPLE OF UNKNOWN FOOD ITEM
      TAKEN FROM SOUP BOWL ON KITCHEN COUNTER

0039  PKG 000 CODE:EI    AP01
            ITEM: YFOOD   BRAND:         MODEL:              COLOR:
      DESCRIPTION: SAMPLE OF UNKNOWN FOOD ITEM
      TAKEN FROM A SOUP BOWL ON THE KITCHEN COUNTER

0040  PKG 000 CODE:EI    AP01
            ITEM: HDISH   BRAND:         MODEL:              COLOR:
      SIZE:         QUANTITY: 0001   SERIAL/ACCT/ID:

   2000 01797849    13                                    Continued.

000009310

P-App. 005041

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT          PAGE NUMBER:  6      DR NUMBER: 2000 01797849      13

DESCRIPTION: EMPTY PLASTIC CUP WITH "BAJA FRESH" LOGO ON IT
TAKEN FROM THE KITCHEN COUNTER

0041  PKG 000 CODE:EI    AP01
          ITEM: HDISH    BRAND:          MODEL:              COLOR:
      SIZE:          QUANTITY: 0001    SERIAL/ACCT/ID:
      DESCRIPTION: EMPTY PLASTIC CUP WITH "BAJA FRESH" LOGO ON IT
      TAKEN FROM THE KITCHEN COUNTER

0042  PKG 000 CODE:EI    AP01
          ITEM: YFOOD    BRAND:          MODEL:              COLOR:
      DESCRIPTION: SAMPLE OF FRYS PREMIUM COFFEE
      FROM ORIGINAL CONTAINER IN UPPER CUPBOARD NEXT TO REFRIGERATOR

0043  PKG 000 CODE:EI    AP01
          ITEM: HDISH    BRAND:          MODEL:              COLOR:
      SIZE:          QUANTITY: 0001    SERIAL/ACCT/ID:
      DESCRIPTION: DIRTY GLASS BOWL WITH A FLORAL DESIGN
      TAKEN FROM THE KITCHEN COUNTER

0044  PKG 000 CODE:EI    AP01
          ITEM: YFOOD    BRAND:          MODEL:              COLOR:
      DESCRIPTION: SAMPLE OF NUTS
      TAKEN FROM ORIG. CONTAINER IN UPPER KITCHEN CUPBOARD TO THE RIGHT OF SINK

0045  PKG 000 CODE:EI    AP01
          ITEM: HDISH    BRAND:          MODEL:              COLOR:
      SIZE:          QUANTITY: 0001    SERIAL/ACCT/ID:
      DESCRIPTION: PLASTIC CUP WITH FLORAL DESIGN
      TAKEN FROM THE KITCHEN COUNTER

0046  PKG 000 CODE:EI    AP01
          ITEM: HDISH    BRAND:          MODEL:              COLOR:
      SIZE:          QUANTITY: 0001    SERIAL/ACCT/ID:
      DESCRIPTION: PLASTIC TUPPERWARE STYLE BOWL
      TAKEN FROM THE KITCHEN COUNTER

0047  PKG 000 CODE:EI    AP01
          ITEM: YFOOD    BRAND:          MODEL:              COLOR:
      DESCRIPTION: SAMPLE OF SALT
      TAKEN FROM ORIGINAL "HAIN" BRAND CONTAINER/UPPER CUPBOARD RIGHT OF SINK

0048  PKG 000 CODE:EI    AP01
          ITEM: YFOOD    BRAND:          MODEL:              COLOR:
      DESCRIPTION: SAMPLE OF PEPPER
      TAKEN FROM SHAKER IN UPPER CABINET LEFT OF STOVE

0049  PKG 000 CODE:EI    AP01
          ITEM: YFOOD    BRAND:          MODEL:              COLOR:
      DESCRIPTION: SAMPLE OF SALT
      TAKEN FROM SHAKER IN UPPER CABINET LEFT OF STOVE

2000 01797849    13                                        Continued.

000009311

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT          PAGE NUMBER:   7      DR NUMBER: 2000 01797849    13

```
0050  PKG 000 CODE:EI    AP01
            ITEM: *MISC   BRAND:          MODEL:          COLOR:
      SIZE:          QUANTITY: 0001    SERIAL/ACCT/ID:
      DESCRIPTION: YELLOW DISHWASHING GLOVE
      TAKEN FROM THE KITCHEN COUNTER NEXT TO THE SINK

0051  PKG 000 CODE:EI    AP01
            ITEM: YFOOD   BRAND:          MODEL:          COLOR:
      DESCRIPTION: SAMPLE OF ONION SALT
      TAKEN FROM ORIGINAL CONTAINER IN UPPER CABINET LEFT OF STOVE

0052  PKG 000 CODE:EI    AP01
            ITEM: YFOOD   BRAND:          MODEL:          COLOR:
      DESCRIPTION: SAMPLE OF GARLIC SALT
      TAKEN FROM ORIGINAL CONTAINER IN UPPER CABINET LEFT OF STOVE

0053  PKG 000 CODE:EI    AP01
            ITEM: HDISH   BRAND:          MODEL:          COLOR:
      SIZE:          QUANTITY: 0001    SERIAL/ACCT/ID:
      DESCRIPTION: DIRTY WHITE PLASTIC SPOON
      TAKEN FROM KITCHEN COUNTER

0054  PKG 000 CODE:EI    AP01
            ITEM: YFOOD   BRAND:          MODEL:          COLOR:
      DESCRIPTION: SAMPLE OF GATORADE
      TAKEN FROM THE REFRIGERATOR

0055  PKG 000 CODE:EI    AP01
            ITEM: YFOOD   BRAND:          MODEL:          COLOR:
      DESCRIPTION: SAMPLE OF UNKNOWN FOOD ITEM (POSSIBLE POTATO
      SALAD)
      TAKEN FROM A CONTAINER IN THE REFRIGERATOR

0056  PKG 000 CODE:EI    AP01
            ITEM: YFOOD   BRAND:          MODEL:          COLOR:
      DESCRIPTION: SAMPLE OF UNKNOWN FOOD ITEM
      TAKEN FROM A CONTAINER IN THE REFRIGERATOR

0057  PKG 000 CODE:EI    AP01
            ITEM: YFOOD   BRAND:          MODEL:          COLOR:
      DESCRIPTION: SAMPLE OF UNKNOWN FOOD ITEM
      TAKEN FROM A CONTAINER IN THE REFRIGERATOR

0058  PKG 000 CODE:EI    AP01
            ITEM: YFOOD   BRAND:          MODEL:          COLOR:
      DESCRIPTION: SAMPLE OF UNKNOWN FOOD ITEM
      TAKEN FROM A CONTAINER IN THE REFRIGERATOR

0059  PKG 000 CODE:EI    AP01
            ITEM: YFOOD   BRAND:          MODEL:          COLOR:
      DESCRIPTION: SAMPLE OF UNKNOWN FOOD ITEM
```

 2000 01797849    13                                    Continued.

000009312

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT            PAGE NUMBER:   8      DR NUMBER: 2000 01797849    13

TAKEN FROM A CONTAINER IN THE REFRIGERATOR

0060  PKG 000 CODE:EI   AP01
            ITEM: YFOOD   BRAND:        MODEL:            COLOR:
DESCRIPTION: SAMPLE OF UNKNOWN FOOD ITEM
TAKEN FROM A CONTAINER IN THE REFRIGERATOR

0061  PKG 000 CODE:EI   AP01
            ITEM: YFOOD   BRAND:        MODEL:            COLOR:
DESCRIPTION:  SAMPLE OF WATER
TAKEN FROM A CONTAINER IN THE REFRIGERATOR

0062  PKG 000 CODE:EI   AP01
            ITEM: YFOOD   BRAND:        MODEL:            COLOR:
DESCRIPTION: SAMPLE OF UNKNOWN LIQUID
FROM A CONTAINER IN THE REFRIGERATOR

0063  PKG 000 CODE:EI   AP01
            ITEM: YFOOD   BRAND:        MODEL:            COLOR:
DESCRIPTION: SAMPLE OF UNKNOWN YELLOW LIQUID
FROM A CONTAINER IN THE REFRIGERATOR

0064  PKG 000 CODE:EI   AP01
            ITEM: YFOOD   BRAND:        MODEL:            COLOR:
DESCRIPTION: SAMPLE OF MILK
TAKEN FROM ORIGINAL CONTAINER IN THE REFRIGERATOR

0065  PKG 000 CODE:EI   AP01
            ITEM: YFOOD   BRAND:        MODEL:            COLOR:
DESCRIPTION: SAMPLE OF "BRAGG LIQUID AMINOS"
TAKEN FROM ORIGINAL CONTAINER INSIDE THE REFRIGERATOR

0066  PKG 000 CODE:EI   AP01
            ITEM: YFOOD   BRAND:        MODEL:            COLOR:
DESCRIPTION: SAMPLE OF ALMONDS
TAKEN FROM A PLASTIC BAGGIE IN THE PANTRY OF KITCHEN

0067  PKG 000 CODE:EI   AP01
            ITEM: YFOOD   BRAND:        MODEL:            COLOR:
DESCRIPTION: SAMPLE OF HONEY
TAKEN FROM ORIGINAL CONTAINER IN PANTRY OF KITCHEN

0068  PKG 000 CODE:EI   AP01
            ITEM: YFOOD   BRAND:        MODEL:            COLOR:
DESCRIPTION: SAMPLE OF QUAKER MEDIUM BARLEY
TAKEN FROM ORIGINAL CONTAINER IN PANTRY OF KITCHEN

0069  PKG 000 CODE:EI   AP01
            ITEM: YFOOD   BRAND:        MODEL:            COLOR:
DESCRIPTION: SAMPLE OF COOKING OIL
TAKEN FROM ORIGINAL CONTAINER IN PANTRY OF KITCHEN

2000 01797849    13                              Continued.

000009313

P-App. 005044

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT          PAGE NUMBER:   9        DR NUMBER: 2000 01797849      13

0070  PKG 000 CODE:EI   AP01
         ITEM: YFOOD   BRAND:          MODEL:           COLOR:
      DESCRIPTION: SAMPLE OF MULLED WINE & CIDER SPICE TEA
      TAKEN FROM ORIGINAL CONTAINER IN PANTRY OF KITCHEN

0071  PKG 000 CODE:EI   AP01
         ITEM: YFOOD   BRAND:          MODEL:           COLOR:
      DESCRIPTION: SAMPLE OF CEREAL
      FROM ORIGINAL CONTAINER IN PANTRY OF KITCHEN

0072  PKG 000 CODE:EI   AP01
         ITEM: YFOOD   BRAND:          MODEL:           COLOR:
      DESCRIPTION: SAMPLE OF CHIPS
      TAKEN FROM ORIGINAL CONTAINER IN PANTRY OF KITCHEN

0073  PKG 000 CODE:EI   AP01
         ITEM: YFOOD   BRAND:          MODEL:           COLOR:
      DESCRIPTION: SAMPLE OF FLOUR
      TAKEN FROM GLASS CANISTER IN PANTRY OF KITCHEN

0074  PKG 000 CODE:EI   AP01
         ITEM: YFOOD   BRAND:          MODEL:           COLOR:
      DESCRIPTION: SAMPLE OF VINEGAR
      TAKEN FROM ORIGINAL CONTAINER IN PANTRY OF KITCHEN

0075  PKG 000 CODE:EI   AP01
         ITEM: YFOOD   BRAND:          MODEL:           COLOR:
      DESCRIPTION: SAMPLE OF CRUNCHY CORN BRAN
      TAKEN FROM THE ORIGINAL CONTAINER IN PANTRY OF KITCHEN

0076  PKG 000 CODE:EI   AP01
         ITEM: YFOOD   BRAND:          MODEL:           COLOR:
      DESCRIPTION: SAMPLE OF SUNFLOWER SEEDS
      TAKEN FROM PACKAGE LYING ON THE KITCHEN FLOOR

0077  PKG 000 CODE:EI   AP01
         ITEM: YFOOD   BRAND:          MODEL:           COLOR:
      DESCRIPTION: SAMPLE OF HONEY BUNCHES OF OATS
      TAKEN FROM THE ORIGINAL CONTAINER IN PANTRY OF KITCHEN

0078  PKG 000 CODE:EI   AP01
         ITEM: YFOOD   BRAND:          MODEL:           COLOR:
      DESCRIPTION: SAMPLE OF WHOLE WHEAT & HONEY
      TAKEN FROM THE ORIGINAL CONTAINER IN PANTRY OF KITCHEN

0079  PKG 000 CODE:EI   AP01
         ITEM: YFOOD   BRAND:          MODEL:           COLOR:
      DESCRIPTION: SAMPLE OF APPLE CINNAMON CHEERIOS
      TAKEN FROM ORIGINAL CONTAINER IN PANTRY OF KITCHEN

0080  PKG 000 CODE:EI   AP01

   2000 01797849   13

                                              Continued.

000009314

P-App. 005045

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT          PAGE NUMBER:  10       DR NUMBER: 2000 01797849    13

```
              ITEM: YFOOD    BRAND:         MODEL:           COLOR:
    DESCRIPTION: SAMPLE OF RICE
    TAKEN FROM ORIGINAL CONTAINER IN PANTRY OF KITCHEN

0081  PKG 000 CODE:EI    AP01
              ITEM: YFOOD    BRAND:         MODEL:           COLOR:
    DESCRIPTION: SAMPLE OF WHEAT FLOUR
    TAKEN FROM THE ORIGINAL CONTAINER IN PANTRY OF KITCHEN

0082  PKG 000 CODE:EI    AP01
              ITEM: *MISC    BRAND:         MODEL:           COLOR:
    DESCRIPTION: SAMPLE OF "JOULE GOLD WEAVER, THE FABRIC OF LIFE"
    FABRIC CLEANER
    TAKEN FROM ORIGINAL CONTAINER UNDERNEATH THE SINK

0083  PKG 000 CODE:EI    AP01
              ITEM: *MISC    BRAND:         MODEL:           COLOR:
    DESCRIPTION: SAMPLE OF SUAVE SHAMPOO
    TAKEN FROM ORIGINAL CONTAINER UNDERNEATH KITCHEN SINK

0084  PKG 000 CODE:EI    AP01
              ITEM: *MISC    BRAND:         MODEL:           COLOR:
    DESCRIPTION: SAMPLE OF HOT POT LIQUID POTPOURRI
    TAKEN FROM ORIGINAL BOTTLE FROM UNDERNEATH THE KITCHEN SINK

0085  PKG 000 CODE:EI    AP01
              ITEM: YFOOD    BRAND:         MODEL:           COLOR:
    DESCRIPTION: SAMPLE OF CRACKERS/CHIPS
    TAKEN FROM ORIGINAL CONTAINER IN PANTRY OF KITCHEN

0085A PKG 000 CODE:EI    AP01
              ITEM: YFOOD    BRAND:         MODEL:           COLOR:
    DESCRIPTION: SAMPLE OF CRACKERS/CHIPS
    TAKEN FROM ORIGINAL CONTAINER IN PANTY OF KITCHEN

0085B PKG 000 CODE:EI    AP01
              ITEM: YFOOD    BRAND:         MODEL:           COLOR:
    DESCRIPTION: SAMPLE OF CRACKERS/CHIPS
    TAKEN FROM ORIGINAL CONTAINER IN PANTRY OF KITCHEN

0085C PKG 000 CODE:EI    AP01
              ITEM: YFOOD    BRAND:         MODEL:           COLOR:
    DESCRIPTION: SAMPLE OF CRACKERS/CHIPS
    TAKEN FROM ORIGINAL CONTAINER IN PANTRY OF KITCHEN

0085D PKG 000 CODE:EI    AP01
              ITEM: YFOOD    BRAND:         MODEL:           COLOR:
    DESCRIPTION: SAMPLE OF CRACKERS/CHIPS
    TAKEN FROM ORIGINAL CONTAINER IN PANTRY OF KITCHEN

0085E PKG 000 CODE:EI    AP01
```

 2000 01797849    13                                    Continued.

000009315

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT          PAGE NUMBER:  11          DR NUMBER: 2000 01797849     13

          ITEM: YFOOD    BRAND:          MODEL:               COLOR:
DESCRIPTION: SAMPLE OF CRACKERS/CHIPS
TAKEN FROM ORIGINAL CONTAINER IN PANTRY OF KITCHEN

0086  PKG 000 CODE:EI    AP01
          ITEM: YMEDICI BRAND:          MODEL:               COLOR:
DESCRIPTION: BAG 1=MISC. CAPSULES OF MEDICATION, BAG 2=MISC.
LIQUID MEDICINES AND A HANDWRITTEN CHART TO DISPENSE MEDICATIONS
FROM INSIDE THE CUPBOARD TO THE RIGHT OF KITCHEN SINK

0087  PKG 000 CODE:EI    AP01
          ITEM: YMEDICI BRAND:          MODEL:               COLOR:
DESCRIPTION: VARIETY OF OVER-THE-COUNTER LIQUID MEDICATIONS
TAKEN FROM THE LEFT CUPBOARD ABOVE THE KITCHEN STOVE

0088  PKG 000 CODE:EI    AP01
          ITEM: YFOOD    BRAND:          MODEL:               COLOR:
DESCRIPTION: SAMPLE OF SUNFLOWER SEEDS
TAKEN FROM ORIGINAL CONTAINER IN PANTRY OF KITCHEN

0089  PKG 000 CODE:EI    AP01
          ITEM: YFOOD    BRAND:          MODEL:               COLOR:
DESCRIPTION: SAMPLE OF FISH CRACKERS
TAKEN FROM ORIGINAL CONTAINER ON KITCHEN COUNTER

0090  PKG 000 CODE:EI    AP01
          ITEM: *MISC    BRAND:          MODEL:               COLOR:
DESCRIPTION: SAMPLE OF LIME AWAY CLEANER
FROM ORIGINAL CONTAINER UNDERNEATH THE KITCHEN SINK

0091  PKG 000 CODE:EI    AP01
          ITEM: *MISC    BRAND:          MODEL:               COLOR:
DESCRIPTION: SAMPLE OF "OVITROL FLEA SPRAY"
TAKEN FROM ORIGINAL CONTAINER UNDERNEATH KITCHEN SINK

0092  PKG 000 CODE:EI    AP01
          ITEM: *MISC    BRAND:          MODEL:               COLOR:
DESCRIPTION: SAMPLE OF SWIMWEAR CLEANER
TAKEN FROM ORIGINAL CONTAINER UNDERNEATH KITCHEN SINK

0093  PKG 000 CODE:EI    AP01
          ITEM: *MISC    BRAND:          MODEL:               COLOR:
DESCRIPTION: SAMPLE OF "AMERICAN FARE KITCHEN CLEANER"
TAKEN FROM ORIGINAL CONTAINER UNDERNEATH KITCHEN SINK

0094  PKG 000 CODE:EI    AP01
          ITEM: *MISC    BRAND:          MODEL:               COLOR:
DESCRIPTION: SAMPLE OF RESOLVE SPOT/STAIN CLEANER
TAKEN FROM ORIGINAL CONTAINER UNDERNEATH KITCHEN SINK

0095  PKG 000 CODE:EI    AP01

 2000 01797849     13                                    Continued.

000009316

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT          PAGE NUMBER:  12       DR NUMBER: 2000 01797849    13

```
                 ITEM: *MISC    BRAND:          MODEL:            COLOR:
     DESCRIPTION: SAMPLE OF CASCADE DISHWASHING LIQUID
     FROM ORIGINAL CONTAINER UNDERNEATH THE KITCHEN SINK

0096  PKG 000 CODE:EI    AP01
                 ITEM: *MISC    BRAND:          MODEL:            COLOR:
     DESCRIPTION: SAMPLE OF UNKNOWN SUBSTANCE
     UNLABELED CONTAINER UNDERNEATH KITCHEN SINK

0097  PKG 000 CODE:EI    AP01
                 ITEM: YFOOD    BRAND:          MODEL:            COLOR:
     DESCRIPTION: SAMPLE OF WATER
     TAKEN FROM 5-GALLON PLASTIC JUG OF WATER IN THE CLOSET AT THE FRONT DOOR
     OF THE APARTMENT

0098  PKG 000 CODE:EI    AP01
                 ITEM: *MISC    BRAND:          MODEL:            COLOR:
     DESCRIPTION: ELDERBERRY HERBAL SUPPLEMENTS
     TAKEN FROM THE LIVING ROOM CLOSET AT THE FRONT DOOR OF THE APARTMENT

0099  PKG 000 CODE:EI    AP01
                 ITEM: *MISC    BRAND:          MODEL:            COLOR:
     DESCRIPTION: HANDWRITTEN LETTER TO PAT FROM WENDI
     FOUND IN THE LIVING ROOM CLOSET ON THE TOP SHELF

0100  PKG 000 CODE:EI    AP01
                 ITEM: ACZG     BRAND:          MODEL:            COLOR:
      SIZE:           QUANTITY: 0001   SERIAL/ACCT/ID: 00000
     DESCRIPTION: COLT 32 CAL. SEMI AUTOMATIC PISTOL IN A BROWN
     CASE **WEAPON HAS SERIAL NUMBER FILED OFF**
     FOUND ON SHELF IN MASTER BEDROOM CLOSET

0101  PKG 000 CODE:EI    AP01
                 ITEM: *MISC    BRAND:          MODEL:            COLOR:
      SIZE:           QUANTITY: 0001   SERIAL/ACCT/ID:
     DESCRIPTION: BIRTHDAY CARD TO WENDI FROM JOE
     FOUND IN MASTER BEDROOM CLOSET ON TOP SHELF

0102  PKG 000 CODE:EI    AP01
                 ITEM: *MISC    BRAND:          MODEL:            COLOR:
     DESCRIPTION: BROWN GLASS BOTTLE CONTAINING A LIQUID AND A
     DROPPER
     FOUND IN THE MASTER BEDROOM CLOSET ON SHELF

0103  PKG 000 CODE:EI    AP01
                 ITEM: *MISC    BRAND:          MODEL:            COLOR:
     DESCRIPTION: CHECK BOOK TO WYNDSTAR ENTERPRISES FROM B OF A
     BANK ACCOUNT #235390260
     FOUND IN THE MASTER BEDROOM CLOSET ON SHELF

0104  PKG 000 CODE:EI    AP01
```

2000 01797849    13                                    Continued.

000009317

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT          PAGE NUMBER:  13        DR NUMBER: 2000 01797849    13

             ITEM: *MISC   BRAND:        MODEL:           COLOR:
DESCRIPTION: BOX OF LATEX RUBBER GLOVES, ABOUT 3/4 EMPTY
FOUND UNDERNEATH THE SINK IN THE MASTER BATHROOM

0105  PKG 000 CODE:EI   AP01
             ITEM: RVTAPE  BRAND:        MODEL:           COLOR:
SIZE:          QUANTITY: 0005    SERIAL/ACCT/ID:
DESCRIPTION: 8MM VIDEO TAPES
(5 TAPES AND 1 EMPTY PLASTIC CONTAINER)
FOUND IN THE MASTER BEDROOM CLOSET

0106  PKG 000 CODE:EI   AP01
             ITEM: IAIRTIC BRAND:        MODEL:           COLOR:
DESCRIPTION: NORTHWEST AIRLINE TICKET STUBS FROM PHX TO MEM
DATED SEPT. 22, 2000
FOUND IN THE MASTER BEDROOM CLOSET

0107  PKG 000 CODE:EI   AP01
             ITEM: *MISC   BRAND:        MODEL:           COLOR:
DESCRIPTION: TELEPHONE BILL (THIS ADDRESS/OCCUPANTS)
FOUND UNDERNEATH THE BED IN MASTER BEDROOM

0108  PKG 000 CODE:EI   AP01
             ITEM: *MISC   BRAND:        MODEL:           COLOR:
DESCRIPTION: TELEPHONE DAY MINDER
FOUND IN THE TOP DRAWER OF NIGHTSTAND OF MASTER BEDROOM (S/E CORNER)

0109  PKG 000 CODE:EI   AP01
             ITEM: *MISC   BRAND:        MODEL:           COLOR:
DESCRIPTION: "VAX PURE AUSTRALIAN MEDICINAL OIL
FOUND ON TOP OF NIGHTSTAND IN MASTER BEDROOM (S/E CORNER)

0110  PKG 000 CODE:EI   AP01
             ITEM: YMEDICI BRAND:        MODEL:           COLOR:
DESCRIPTION: PACKAGE OF BENADRYL TABLETS
FOUND ON THE NIGHTSTAND IN MASTER BEDROOM (S/E CORNER)

0111  PKG 000 CODE:EI   AP01
             ITEM: YMEDICI BRAND:        MODEL:           COLOR:
DESCRIPTION: PLASTIC ZIPLOCK BAG CONTAINING MISC OVER-THE-
COUNTER MEDICATION
ON TOP OF THE CHEST OF DRAWERS ALONG THE NORTH WALL OF MASTER BEDROOM.

0112  PKG 000 CODE:EI   AP01
             ITEM: *MISC   BRAND:        MODEL:           COLOR:
SIZE:          QUANTITY: 0001    SERIAL/ACCT/ID:
DESCRIPTION: PLASTIC MEASURING SPOON
FOUND ON THE FLOOR ALONG THE NORTH WALL OF THE MASTER BEDROOM

0113  PKG 000 CODE:EI   AP01
             ITEM: PWALLET BRAND:        MODEL:           COLOR:

 2000 01797849    13                                    Continued.

000009318

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT            PAGE NUMBER:  14        DR NUMBER: 2000 01797849     13

        SIZE:          QUANTITY: 0001    SERIAL/ACCT/ID:
        DESCRIPTION: BROWN WALLET WITH MISCELLANEOUS PAPERS AND ID TO
        THE VICTIM JOE D. ANDRIANO, DOB 8/18/67
        FOUND ON THE MIRRORED DRESSER IN MASTER BEDROOM (WEST WALL)

0114  PKG 000 CODE:EI    AP01
              ITEM: *MISC  BRAND:        MODEL:            COLOR:
        DESCRIPTION: LARGE FLORAL PERSONAL PHONE BOOK
        FOUND UNDER THE BED IN MASTER BEDROOM (SOUTH SIDE)

0115  PKG 000 CODE:EI    AP01
              ITEM: *MISC  BRAND:        MODEL:            COLOR:
        DESCRIPTION: MISC INTERNET GENERATED PAPERS DEALING WITH
        TUMOR VACCINES
        FOUND ON THE MIRRORED DRESSER IN MASTER BEDROOM ALONG WEST WALL

0116  PKG 000 CODE:EI    AP01
              ITEM: *MISC  BRAND:        MODEL:            COLOR:
        SIZE:          QUANTITY: 0001    SERIAL/ACCT/ID:
        DESCRIPTION: LATEX GLOVE
        FOUND ON THE FLOOR UNDER THE FOOT OF THE BED IN MASTER BEDROOM

0117  PKG 000 CODE:EI    AP01
              ITEM: YMEDICI BRAND:        MODEL:            COLOR:
        SIZE:          QUANTITY: 0001    SERIAL/ACCT/ID:
        DESCRIPTION: BOTTLE OF PEPTO BISMOL
        FOUND ON THE MIRRORED DRESSER ALONG WEST WALL OF MASTER BEDROOM

0118  PKG 000 CODE:EI    AP01
              ITEM: HDISH  BRAND:        MODEL:            COLOR:
        DESCRIPTION: DIRTY PLASTIC PITCHER
        FOUND ON THE KITCHEN COUNTER

0119  PKG 000 CODE:EI    AP01
              ITEM: *MISC  BRAND:        MODEL:            COLOR:
        DESCRIPTION: RESUME FOR WENDI E. ANDRIANO
        FOUND IN THE MASTER BEDROOM

0120  PKG 000 CODE:EI    AP01
              ITEM: *MISC  BRAND:        MODEL:            COLOR:
        DESCRIPTION: MISC COLOR PHOTOGRAPHS AND A RECEIPT TO THE
        APACHE LAKE MARINA & RESORT
        FOUND ON A DESK IN THE CHILDRENS ROOM ALONG THE WEST WALL

0121  PKG 000 CODE:EI    AP01
              ITEM: *MISC  BRAND:        MODEL:            COLOR:
        DESCRIPTION: CELLULAR PHONE BILLS FROM VERIZON WIRELESS TO JOE
        ANDRIANO (ACCT# 1001-6749181/ACCT NAME: JEANETTE ANDRIANO)
        FOUND ON THE 2ND SHELF OF THE DESK IN THE CHILDRENS ROOM ALONG WEST WALL

0122  PKG 000 CODE:EI   AP01

 2000 01797849    13                                    Continued.

000009319

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT          PAGE NUMBER:  15      DR NUMBER: 2000 01797849    13

```
                ITEM: *MISC   BRAND:        MODEL:           COLOR:
DESCRIPTION: WELLS FARGO BANK STATEMENTS
FOUND ON THE TOP SHELF OF DESK IN NICHOLAS' ROOM ALONG THE WEST WALL

0123  PKG 000 CODE:EI   AP01
                ITEM: *MISC   BRAND:        MODEL:           COLOR:
      SIZE:         QUANTITY: 0002   SERIAL/ACCT/ID:
DESCRIPTION: ROLO DEXES WITH PHONE NUMBERS
IN TOP DRAWER OF DESK IN NICHOLAS' ROOM ALONG WEST WALL

0124  PKG 000 CODE:EI   AP01
                ITEM: *MISC   BRAND:        MODEL:           COLOR:
DESCRIPTION: LETTER FROM ATTORNEYS ROUSH, MCCRACKEN,
GUERRERO & MILLER TO JOSEPH AND WENDI ANDRIANO DATED 8/30/00
ON TOP OF DESK IN NICHOLAS' ROOM ALONG THE WEST WALL

0125  PKG 000 CODE:EI   AP01
                ITEM: IPHOTO BRAND:        MODEL:           COLOR:
      SIZE:         QUANTITY: 0001   SERIAL/ACCT/ID:
DESCRIPTION: LARGE FAMILY PHOTOGRAPH OF VICTIM'S FAMILY
FOUND IN THE MASTER BEDROOM

0126  PKG 000 CODE:EI   AP01
                ITEM: YBOOK   BRAND:        MODEL:           COLOR:
      SIZE:         QUANTITY: 0001   SERIAL/ACCT/ID:
DESCRIPTION: MOSBY MEDICAL ENCYCLOPEDIA
FOUND IN THE MASTER BEDROOM NEAR NORTH NIGHTSTAND

0127  PKG 000 CODE:EI   AP01
                ITEM: YFOOD   BRAND:        MODEL:           COLOR:
DESCRIPTION: SAMPLE OF POPCORN
FOUND ON THE FLOOR NEXT TO THE SOUTH NIGHTSTAND IN MASTER BEDROOM

0128  PKG 000 CODE:EI   AP01
                ITEM: YFOOD   BRAND:        MODEL:           COLOR:
DESCRIPTION: SAMPLE OF SUNFLOWER SEEDS
FOUND ON THE SOUTH NIGHTSTAND IN THE MASTER BEDROOM

0129  PKG 000 CODE:EI   AP01
                ITEM: IPHOTO BRAND:        MODEL:           COLOR:
DESCRIPTION: COLOR PHOTOGRAPHS OF THE VICTIM'S CHILDREN
FOUND IN A PLASTIC BOX UNDERNEATH THE BED IN MASTER BEDROOM

0130  PKG 000 CODE:EI   AP01
                ITEM: *MISC   BRAND:        MODEL:           COLOR:
      SIZE:         QUANTITY: 0001   SERIAL/ACCT/ID:
DESCRIPTION: SPA OIL
ON NIGHTSTAND IN MASTER BEDROOM, NORTH SIDE

0131  PKG 000 CODE:EI   AP01
                ITEM: YFOOD   BRAND:        MODEL:           COLOR:
```

 2000 01797849    13                                        Continued.

000009320

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT          PAGE NUMBER: 16      DR NUMBER: 2000 01797849    13

DESCRIPTION: SAMPLE OF PISTACHIOS
FOUND IN A CUP IN THE MASTER BEDROOM NEAR THE BED

0132  PKG 000 CODE:EI    AP01
              ITEM: *MISC   BRAND:        MODEL:          COLOR:
DESCRIPTION: BLUE ENVELOP AND PIECE OF PAPER WITH NAMES ON IT
FOUND IN THE MASTER BEDROOM AMONG PHOTOGRAPHS UNDER THE BED

0133  PKG 000 CODE:EI    AP01
              ITEM: FLIGHT  BRAND:        MODEL:          COLOR:
     SIZE:          QUANTITY: 0001    SERIAL/ACCT/ID:
DESCRIPTION: NIGHTSTAND LAMP
FROM THE SOUTH NIGHTSTAND IN THE MASTER BEDROOM

0134  PKG 000 CODE:EI    AP01
              ITEM: YFOOD   BRAND:        MODEL:          COLOR:
DESCRIPTION: SAMPLE OF WATER
FROM A 1-GALLON JUG IN THE MASTER BEDROOM (NORTH- EAST CORNER)

0135  PKG 000 CODE:EI    AP01
              ITEM: *MISC   BRAND:        MODEL:          COLOR:
     SIZE:          QUANTITY: 0001    SERIAL/ACCT/ID:
DESCRIPTION: BOTTLE OF RETREAT AROMATHEAPY OIL
FOUND ON THE NIGHTSTAND IN THE MASTER BEDROOM, SOUTH SIDE

0136  PKG 000 CODE:EI    AP01
              ITEM: *MISC   BRAND:        MODEL:          COLOR:
     SIZE:          QUANTITY: 0001    SERIAL/ACCT/ID:
DESCRIPTION: BROKEN PIECE OF LAMP
FOUND IN THE LIVING ROOM CLOSET NEAR THE FRONT DOOR

0137  PKG 000 CODE:EI    AP01
              ITEM: *MISC   BRAND:        MODEL:          COLOR:
DESCRIPTION: AN ASSORTMENT OF SOAPS, LOTIONS AND GENERAL
GROOMING PRODUCTS
FROM THE MASTER BATHROOM

0138  PKG 000 CODE:KI    UK01
              ITEM: ACZG    BRAND: RUGER MODEL:          COLOR:
     SIZE:          QUANTITY: 0001    SERIAL/ACCT/ID: 189-54802
     OAN:                                    VALUE:      $500.00
DESCRIPTION: STURM RUGER & COMPANY 7.62 X 39 MM RIFLE WITH
ATTACHED BUSHNELL SPORTVIEW SCOPE
FOUND INSIDE 1990 VAN, AZ. MMY-987 REGISTERED TO JOE ANDRIANO

0139  PKG 000 CODE:KI    UK01
              ITEM: ACZG    BRAND: RUGER MODEL:          COLOR:
     SIZE: 10/22   QUANTITY: 0001    SERIAL/ACCT/ID: 242-08009
     OAN:                                    VALUE:      $235.00
DESCRIPTION: RUGER MODEL 10/22 CARBINE 22 CAL. LR WITH
ATTACHED ARMSPORT SCOPE

2000 01797849    13                                   Continued.

000009321

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT          PAGE NUMBER:  17        DR NUMBER: 2000 01797849      13

FOUND INSIDE 1990 VAN AZ. MMY-987 REGISTERED TO JOE ANDRIANO

0140   PKG 000 CODE:KI    UK01
              ITEM: ACZG     BRAND: NORINC MODEL: MAK-90        COLOR:
       SIZE:          QUANTITY: 0001    SERIAL/ACCT/ID: 9375199
       OAN:                                    VALUE:      $175.00
       DESCRIPTION: NORINCO MAK-90 SPORTER RIFLE CAL 7.62 X 39MM
       IN TWO-TONE BROWN CASE
       FOUND IN 1990 VAN AZ. MMY-987 REGISTERED TO JOE ANDRIANO

                    ****  NARRATIVE  ****
SERIAL NUMBER: 4107

SUPPLEMENT IS CREATED TO GENERATE AN INVOICE FOR IMPOUNDING PURPOSES.
ITEMS SEIZED ON 10/10/00 FROM 2155 E. LIBERTY, APT #132.


VICTIM RECEIVED RIGHTS INFORMATION:  NO            MAIL-IN SUPPLEMENT:

INVOICES:      2778372    2778373    2778374

   DR ENTERED BY : 4107    DR FINALIZED BY : 4689

                         END OF REPORT       DR NO: 2000 01797849    013

000009322

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT          PAGE NUMBER:   1          DR NUMBER: 2000 01797849      14

REPORT DATE: 20001011   TIME: 1036

TYPE OF REPORT:  HOMICIDE                              OFFENSE: 451

LOCATION: 002155 E LIBERTY LANE                  BEAT: 0444  GRID: JD32

REPORTING OFFICER[S]: SHERRI MOUGH              A3113     UNIT: LAB

OFFENSE INVOLVED:  BIAS -

                    ***   PROPERTY/EVIDENCE   ***

RECOVERY LOCATION: 000000
DATE: 000000              SEARCH WARRANT INVOLVED:

0001  PKG 001 CODE:EI   UK00
             ITEM: IPHOTO  BRAND:        MODEL:          COLOR:
       SIZE:          QUANTITY: 0046   SERIAL/ACCT/ID:
       DESCRIPTION: 46 COLOR 35MM NEGATIVES OF JOSEPH ANDRIANO
       DOB 081867 TAKEN AT OME ON 101100


   VICTIM RECEIVED RIGHTS INFORMATION:  NO          MAIL-IN SUPPLEMENT:

INVOICES:     2778201

   DR ENTERED BY : A3113    DR FINALIZED BY : A3113

                              END OF REPORT       DR NO: 2000 01797849    014

000009323

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT          PAGE NUMBER:   1          DR NUMBER: 2000 01797849     15

REPORT DATE: 20001011    TIME: 1037

TYPE OF REPORT:  HOMICIDE                              OFFENSE: 451

LOCATION: 002155 E LIBERTY LANE                 BEAT: 0444   GRID: JD32

REPORTING OFFICER[S]: SHERRI MOUGH                 A3113      UNIT: LAB

OFFENSE INVOLVED:  BIAS -

                    ***   PROPERTY/EVIDENCE   ***

RECOVERY LOCATION: 000000
DATE: 000000               SEARCH WARRANT INVOLVED:

0001  PKG 001 CODE:EI   UK00
            ITEM: IPRINT  BRAND:         MODEL:          COLOR:
         DESCRIPTION: 1 SET OF MAJOR CASE PRINTS OF JOSEPH ANDRIANO
         DOB 081867 TAKEN AT OME ON 101100


  VICTIM RECEIVED RIGHTS INFORMATION:  NO          MAIL-IN SUPPLEMENT:

INVOICES:      2778203

  DR ENTERED BY : A3113     DR FINALIZED BY : A3113

                         END OF REPORT            DR NO: 2000 01797849   015

000009324

P-App. 005055

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT             PAGE NUMBER:   1        DR NUMBER: 2000 01797849      16

REPORT DATE: 20001011   TIME: 1038

TYPE OF REPORT:  HOMICIDE                              OFFENSE: 451

LOCATION: 002155 E LIBERTY LANE                  BEAT: 0444   GRID: JD32

REPORTING OFFICER[S]: GREGORY ALLINICH               5185      UNIT: C23

OFFENSE INVOLVED:  BIAS -

***   PROPERTY/EVIDENCE   ***

RECOVERY LOCATION: 000000
DATE: 000000              SEARCH WARRANT INVOLVED:

0001  PKG 000 CODE:EI    W 01
             ITEM: DCOMPUT BRAND: MICRON MODEL:           COLOR:
      SIZE:          QUANTITY: 0001   SERIAL/ACCT/ID: 1733592-0001
      DESCRIPTION: ONE MICRON MID TOWER COMPUTER REMOVED FROM OFFICE
      OF "CHRIS HASHISAKI" AT THE "SAN RIVA" APARTMENTS DURING SEARCH WARRANT.
      THIS WAS LISTED AS "ITEM NUMBER 2" (TWO) ON THE SEARCH WARRANT SUPPLEMENT
      FOR THIS LOCATION.

0002  PKG 000 CODE:EI    SP01
             ITEM: DCOMPUT BRAND: COMPAQ MODEL: PRESARIO    COLOR:
      SIZE:          QUANTITY: 0001   SERIAL/ACCT/ID:
      DESCRIPTION: ONE "COMPAQ PRESARIO" LAPTOP COMPUTER FOUND IN
      APARTMENT #132, IN MASTER BEDROOM ON TOP OF CLOTHES DRESSER.
      "FCC ID#CNTTA1-24639-TT-E." REMOVED FROM APARTMENT #132 OF THE
      "SAN RIVA" APARTMENT COMPLEX. THIS IS LISTED AS "ITEM #23" ON THE
      SEARCH WARRANT SUPPLEMENT FOR THIS LOCATION.

0003  PKG 000 CODE:EI    W 02
             ITEM: DCOMPUT BRAND:          MODEL:           COLOR:
      SIZE:          QUANTITY: 0001   SERIAL/ACCT/ID:
      DESCRIPTION: ONE MID TOWER COMPUTER, "GENERIC BRAND." REMOVED
      FROM APARTMENT #382 OF THE "SAN RIVA" APARTMENTS. THIS COMPUTER WAS
      LOCATED IN THE LIVING ROOM AREA ON TOP OF A COMPUTER DESK. THIS COMPUTER
      IS LISTED AS "ITEM #2" ON THE SEARCH WARRANT SUPPLEMENT FOR THIS LOCATION.

****  NARRATIVE  ****

   SERIAL NUMBER: 5185

THE PURPOSE OF THIS SUPPLEMENT IS TO IMPOUND THE LISTED ITEMS SEIZED
DURING THE LISTED SEARCH WARRANT.

   VICTIM RECEIVED RIGHTS INFORMATION:  NO          MAIL-IN SUPPLEMENT:

INVOICES:     2778218

   2000 01797849    16                                    Continued.

000009325

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT          PAGE NUMBER:    2       DR NUMBER: 2000 01797849     16

DR ENTERED BY : 5185      DR FINALIZED BY : 5185

END OF REPORT          DR NO: 2000 01797849    016

000009326

P-App. 005057

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT          PAGE NUMBER:   1       DR NUMBER: 2000 01797849    17

REPORT DATE: 20001011    TIME: 1048

TYPE OF REPORT:  HOMICIDE                                OFFENSE: 451

LOCATION: 002155 E LIBERTY LANE              BEAT: 0444  GRID: JD32

REPORTING OFFICER[S]: DAVE LUCERO             4913       UNIT: C33

OFFENSE INVOLVED:  BIAS -

***   PROPERTY/EVIDENCE   ***

RECOVERY LOCATION: 000120 S 6 AV
DATE: 101100                    SEARCH WARRANT INVOLVED:

0001  PKG 001 CODE:CI    V 01
          ITEM: PSPECIM BRAND:          MODEL:           COLOR:
      SIZE:          QUANTITY: 0001   SERIAL/ACCT/ID:
      DESCRIPTION: VIAL OF VICTIM'S BLOOD.

0002  PKG 002 CODE:CI    V 01
          ITEM: PSPECIM BRAND:          MODEL:           COLOR:
      SIZE:          QUANTITY: 0001   SERIAL/ACCT/ID:
      DESCRIPTION: FINGERNAIL FROM RIGHT INDEX FINGER OF VICTIM

0003  PKG 003 CODE:EI    V 01
          ITEM: PSPECIM BRAND:          MODEL:           COLOR:
      SIZE:          QUANTITY: 0001   SERIAL/ACCT/ID:
      DESCRIPTION: TRACE EVIDENCE FROM RIGHT HAND OF VICTIM

0004  PKG 004 CODE:CI    V 01
          ITEM: PSPECIM BRAND:          MODEL:           COLOR:
      SIZE:          QUANTITY: 0001   SERIAL/ACCT/ID:
      DESCRIPTION: TRACE EVIDENCE FROM LEFT HAND OF VICTIM

0005  PKG 005 CODE:CI    V 01
          ITEM: PSPECIM BRAND:          MODEL:           COLOR:
      SIZE:          QUANTITY: 0001   SERIAL/ACCT/ID:
      DESCRIPTION: TRACE EVIDENCE FROM VICTIM'S BODY

0006  PKG 006 CODE:CI    V 01
          ITEM: PSPECIM BRAND:          MODEL:           COLOR:
      SIZE:          QUANTITY: 0001   SERIAL/ACCT/ID:
      DESCRIPTION: BAG USED TO COVER VICTIM'S RIGHT HAND

0007  PKG 007 CODE:CI    V 01
          ITEM: PSPECIM BRAND:          MODEL:           COLOR:
      SIZE:          QUANTITY: 0001   SERIAL/ACCT/ID:
      DESCRIPTION: BAG USED TO COVER VICTIM'S LEFT HAND

0008  PKG 008 CODE:EI    V 01

   2000 01797849    17                              Continued.

000009327

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT          PAGE NUMBER:   2        DR NUMBER: 2000 01797849   17

          ITEM: PCLOTHE BRAND:         MODEL:          COLOR:
     SIZE:        QUANTITY: 0001    SERIAL/ACCT/ID:
     DESCRIPTION: RED AND WHITE STRIPED BOXER SHORTS WORN BY VICTIM
     AT TIME OF INCIDENT.

                    ****  NARRATIVE  ****
   SERIAL NUMBER: 4913

THIS SUPPLEMENT WAS GENERATED TO IMPOUND THE EVIDENCE OBTAINED DURING
AUTOPSY.

INVESTIGATION CONTINUING.


   VICTIM RECEIVED RIGHTS INFORMATION:  NO          MAIL-IN SUPPLEMENT:

INVOICES:     2778215   2778214

   DR ENTERED BY : 4913    DR FINALIZED BY : 4913

                    END OF REPORT          DR NO: 2000 01797849   017

000009328

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT          PAGE NUMBER:  1      DR NUMBER: 2000 01797849    18

REPORT DATE: 20001011   TIME: 1104

TYPE OF REPORT:  HOMICIDE                          OFFENSE: 451

LOCATION: 002155 E LIBERTY LANE              BEAT: 0444  GRID: JD32

REPORTING OFFICER[S]: DAVE LUCERO             4913      UNIT: C33

OFFENSE INVOLVED:  BIAS -
    ==========================================================
    =                                                        =
    =      ***  REQUEST FOR SCIENTIFIC ANALYSIS  ***          =
    =                                                        =
    ==========================================================
CURRENT DR IS: 2000 01797849   018   BIOLOGICAL EVID (BLOOD,SEMEN,TISSUE): Y
NAM: ANDRIANO           WENDI
NAM:                                        OFF:HOMICIDE
LOCATION: 002155 E   LIBERTY         RD              JAILED: Y
OFCR REQ OF ANALYSIS:LUCERO, DAVE           DATE OCC:100800 TIME:0338
(LAST,FIRST,MIDDLE) FIRM NAME USE BUS.      DATE REQ:101100 TIME:1110
VIC: ANDRIANO         JOSEPH               DUI RELATED:N
BUS:

 MARIJUANA:  DRUGS:   BLOOD ALC:    BREATH ALC:   OTHER: Y PER INVOICE: N

 INVOICE     ITEM # SFX   TYPE          INVOICE    ITEM #  SFX    TYPE

 0002778214   0001        PSPECIM

BLOOD DRAWN BY:                      1.DATE/TIME DRAW:000000 / 0000
LOC OF DRAWING:                      2.DATE/TIME DRAW:000000 / 0000
                    ****  NARRATIVE  ****
 SERIAL NUMBER: 4913

PLEASE PRESERVE SAMPLE OF VICTIM'S BLOOD FOR FUTURE COMPARISON.

 VICTIM RECEIVED RIGHTS INFORMATION:  NO        MAIL-IN SUPPLEMENT:

INVOICES:

 DR ENTERED BY : 4913    DR FINALIZED BY : 4913

                    END OF REPORT        DR NO: 2000 01797849   018

000009329

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT             PAGE NUMBER:   1        DR NUMBER: 2000 01797849      19

REPORT DATE: 20001011    TIME: 1110

TYPE OF REPORT:  HOMICIDE                          OFFENSE: 451

LOCATION: 002155 E LIBERTY LANE                BEAT: 0444  GRID: JD32

REPORTING OFFICER[S]: DENNIS OLSON              2979      UNIT: C81

OFFENSE INVOLVED:  BIAS -

***   PROPERTY/EVIDENCE   ***

RECOVERY LOCATION: 002155 E LIBERTY
DATE: 101000                   SEARCH WARRANT INVOLVED: YES

0031B PKG 000 CODE:IE   UK00
           ITEM: *MISC   BRAND:        MODEL:            COLOR:
     DESCRIPTION: BLOODSTAINED CARPET FROM ITEM #31

 VICTIM RECEIVED RIGHTS INFORMATION:  NO          MAIL-IN SUPPLEMENT:

INVOICES:    2778223

 DR ENTERED BY : 2979    DR FINALIZED BY : 2979

                         END OF REPORT        DR NO: 2000 01797849    019

000009330

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT          PAGE NUMBER:   1      DR NUMBER: 2000 01797849    20

REPORT DATE: 20001011   TIME: 1337

TYPE OF REPORT:  HOMICIDE                         OFFENSE: 451

LOCATION: 002155 E LIBERTY LANE              BEAT: 0444  GRID: JD32

REPORTING OFFICER[S]: CLIFTON JEWELL          3526     UNIT: C33
                      PAUL HILL               3727

OFFENSE INVOLVED:  BIAS -

                    ****  NARRATIVE  ****

   SERIAL NUMBER: 3526

SEARCH WARRANT #:CR00-04726SW

DATE/TIME OF ENTRY:          10-10-00, 1629 HRS.
DATE/TIME OF EXIT:           10-10-00, 1810 HRS.

LOCATIONS SEARCHED:          LOCATION #1:    STORAGE SHED MARKED #323.
                                             STORAGE SHED MARKED #315.

========================================================================

ON 10-10-00 AT 1500 HRS., I ATTENDED A BRIEFING CONDUCTED BY SGT. SMALLMAN
#3142 AND DET. LUCERO #4913 IN THE HOMICIDE UNIT CONFERENCE ROOM REGARDING
THE SERVING OF SEARCH WARRANTS AT 2155 E. LIBERTY LN.  AFTER THE BRIEFING
WE DROVE TO 2155 E. LIBERTY LN.  THERE I WAS DIRECTED TO SERVE A SEARCH
WARRANT ON THE TWO STORAGE UNITS THAT HAD BEEN UNDER THE CONTROL OF AP1
WENDI ANDRIANO.  THE STORAGE UNITS WERE MARKED #323 AND #315.

DET. HILL #3727 AND I BEGAN WITH STORAGE UNIT #323 AT 1629 HRS.  THIS
STORAGE UNIT CONTAINED MISC. TOOLS, CLOTHING AND TOYS AND WE FOUND NOTHING
OF EVIDENTIARY VALUE INSIDE.  WE SECURED THIS STORAGE UNIT AT 1640 HRS.

WE THEN BEGAN A SEARCH OF STORAGE UNIT #315 AT 1645 HRS.  ALSO PRESENT WAS
SGT. SMALLMAN.  THIS UNIT CONTAINED BOXES OF MISC. PERSONAL PROPERTY, TOYS
AND BOXES OF PAPERWORK.  I LOCATED A CARDBOARD BOX NEAR THE CENTER OF THE
UNIT WHICH CONTAINED THE FOLLOWING ITEMS THAT WERE SIEZED:

ITEM #1:  LIFE INSURANCE POLICY FOR WENDI OCHOA
ITEM #2:  MASSMUTUAL LIFE INSURANCE RECEIPT OF PAYMENT ON A POLICY FOR
          JOSEPH ANDRIANO.
ITEM #3:  IRS DOCUMENT TO JOSEPH AND WENDI ANDRIANO DATED 1996.
ITEM #4:  LETTER FROM "WENDI" TO DONNA OCHOA WHICH CONTAINED A NEWSPAPER
          CLIPPING ABOUT A MALPRACTICE SUIT.
ITEM #5:  A BANK ONE DOCUMENT TO COYOTE ENTERPRISES.
ITEM #6:  A BANK OF AMERICA BANK STATEMENT AND CHECK #1161 FOR THE ACCOUNT
          OF WYNDSTAR ENTERPRISES.
ITEM #7:  MISC. MEDICAL DOCUMENTS FOR JOSEPH ANDRIANO FROM DIFFERENT
          FACILITIES.

   2000 01797849    20                                    Continued.

000009331

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT            PAGE NUMBER:    2       DR NUMBER: 2000 01797849      20

ITEM #8 WAS FOUND ALONG THE NORTH WALL OF THE STORAGE UNIT AND IS
DESCRIBED AS CARDBOARD SHIPPING CONTAINER CONTAINING A BROWN GLASS BOTTLE
WITH A WHITE POWDERY SUBSTANCE.  THE BOTTLE WAS MARKED "SODIUM AZIDE".
ALSO IN THE BOX WAS AT LEAST ONE LATEX GLOVE AND A SPOON.  DUE TO THE
POSSIBLE HAZARD FROM THE CHEMICAL IN THE BOX, THE CONTENTS WERE NOT
DISTURBED.  ALONG WITH THE SHIPPING CARTON WAS A SILVER COLORED,
FOIL TYPE WRAPPER.  THESE ITEMS WERE SUBSEQUENTLY TRANSPORTED TO 620 W.
WASHINGTON ST. AND SECURED IN A TEMPORARY EVIDENCE LOCKER UNTIL THE PROPER
METHOD OF PERMANENT IMPOUND COULD BE DETERMINED.  WE SECURED FROM THIS
STORAGE UNIT AT 1820 HRS.

COPIES OF THE SEARCH WARRANT AND AN INVENTORY OF THE PROPERTY TAKEN WERE
LEFT AT THE COMPLEX.

  VICTIM RECEIVED RIGHTS INFORMATION:   NO            MAIL-IN SUPPLEMENT:

INVOICES:

  DR ENTERED BY : 3526     DR FINALIZED BY : 3526

                          END OF REPORT        DR NO: 2000 01797849    020

000009332

P-App. 005063

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT      PAGE NUMBER:  1     DR NUMBER: 2000 01797849   21

REPORT DATE: 20001011   TIME: 2017

TYPE OF REPORT:  HOMICIDE              OFFENSE: 451

LOCATION: 002155 E LIBERTY LANE        BEAT: 0444  GRID: JD32

REPORTING OFFICER[S]: SALLIE DILLIAN      4689     UNIT: C33

OFFENSE INVOLVED: BIAS -
```
==============================================================
=                                                            =
=        ***  REQUEST FOR SCIENTIFIC ANALYSIS  ***           =
=                                                            =
==============================================================
```

CURRENT DR IS: 2000 01797849   021  BIOLOGICAL EVID (BLOOD,SEMEN,TISSUE): Y
NAM: ANDRIANO       WENDI
NAM:                         OFF:HOMICIDE
LOCATION: 002155 E  LIBERTY       LA         JAILED: Y
OFCR REQ OF ANALYSIS:DILLIAN, SALLIE      DATE OCC:100800 TIME:0338
(LAST,FIRST,MIDDLE) FIRM NAME USE BUS.    DATE REQ:101100 TIME:2018
VIC: ANDRIANO       JOSEPH    D      DUI RELATED:N
BUS:

MARIJUANA: DRUGS:  BLOOD ALC:   BREATH ALC:  OTHER: Y PER INVOICE: N

INVOICE    ITEM # SFX  TYPE       INVOICE    ITEM #  SFX   TYPE

0002778375  0003    PSPECIM    0002778375  0004      PSPECIM

BLOOD DRAWN BY:             1.DATE/TIME DRAW:000000 / 0000
LOC OF DRAWING:              2.DATE/TIME DRAW:000000 / 0000

**** NARRATIVE ****

SERIAL NUMBER: 4689

ITEM #3 IS A BLOOD SAMPLE TAKEN FROM AP1 WENDI ANDRIANO. PLEASE PRESERVE
SAMPLE FOR FUTURE DNA ANALYSIS.

ITEM #4 ARE HEAD HAIR SAMPLES TAKEN FROM AP1 WENDI ANDRIANO. PLEASE
PRESERVE SAMPLE FOR FUTURE DNA ANALYSIS.

THANKS.

VICTIM RECEIVED RIGHTS INFORMATION: NO      MAIL-IN SUPPLEMENT:

INVOICES:

DR ENTERED BY : 4689   DR FINALIZED BY : 4689

2000 01797849   21                Continued.

000009333

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT          PAGE NUMBER:   2        DR NUMBER: 2000 01797849      21

                         END OF REPORT          DR NO: 2000 01797849    021

000009334

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT          PAGE NUMBER:   1        DR NUMBER: 2000 01797849    22

REPORT DATE: 20001012   TIME: 0528

TYPE OF REPORT:  HOMICIDE                          OFFENSE: 451

LOCATION: 002155 E LIBERTY LANE               BEAT: 0444   GRID: JD32

REPORTING OFFICER[S]: THOMAS KULESA            3550      UNIT: C33

OFFENSE INVOLVED:  BIAS -

**** NARRATIVE ****

SERIAL NUMBER: 3550


PHOENIX POLICE DETECTIVES:

SERGEANT M. SMALLMAN # 3142 - HOMICIDE UNIT
(CASE SUPERVISOR) - ENTERED SCENE

DETECTIVE D. LUCERO # 4913 - HOMICIDE UNIT
(CASE AGENT) - ENTERED SCENE

DETECTIVE D. OLSON # 2979 - HOMICIDE UNIT
(SCENE AGENT) - ENTERED SCENE

DETECTIVE T. KULESA # 3550 - HOMICIDE UNIT
(SCENE AGENT) - ENTERED SCENE

DETECTIVE S. DILLIAN # 4689 - HOMICIDE UNIT
(ASSISTING CASE AGENT) - ENTERED SCENE

DETECTIVE J. BALLENTINE # 3495 - HOMICIDE UNIT
(INTERVIEWS) - DID NOT ENTER SCENE


PHOENIX POLICE OFFICERS:

SERGEANT B. RICHARDS # 5046 - SOUTH MOUNTAIN PRECINCT
(RESPONDING SUPERVISOR)

OFFICER P. MARRINER # 7149 - SOUTH MOUNTAIN PRECINCT
(FIRST RESPONDING OFFICER)

OFFICER J. WENNES # 7107 - SOUTH MOUNTAIN PRECINCT
(SECOND RESPONDING OFFICER)

OFFICER B. STEVENS # 6690 - SOUTH MOUNTAIN PRECINCT
(RESPONDING OFFICER)

2000 01797849   22                              Continued.



000009335


P-App. 005066

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT          PAGE NUMBER:   2      DR NUMBER: 2000 01797849     22

OFFICER M. WOOD # 7148 - SOUTH MOUNTAIN PRECINCT
(SHIFT ONE SCENE SECURITY RELIEF OFFICER)

OFFICER J. DEYOUNG # 6726 - SOUTH MOUNTAIN PRECINCT
(SHIFT ONE SCENE SECURITY RELIEF OFFICER)

OFFICER P. OHLAND # 7167 - SOUTH MOUNTAIN PRECINCT
(SHIFT TWO SCENE SECURITY RELIEF OFFICER)


PHOENIX POLICE CIVILIANS:

LATENT TECH R. MORAN # A3328 - ENTERED SCENE

LATENT TECH K. KALINA # A2760 - ENTERED SCENE

LATENT TECH E. FINLAY # A3835 - ENTERED SCENE


PHOENIX FIRE DEPARTMENT PERSONNEL:

ENGINE 46

CAPTAIN PERROTT - PRONOUNCED VICTIM DECEASED AT APPROXIMATELY 0345 HOURS


MEDICAL EXAMINER'S OFFICE PERSONNEL:

T. CLATTERBUCK # 20 - ENTERED SCENE

S. STIVAKTAKIS - ENTERED SCENE


MEDICAL EXAMINER'S SEAL # 1059117


SEARCH WARRANT # CR00-04101SW

SIGNED ON OCTOBER 8, 2000 AT APPROXIMATELY 0826 HOURS BY THE HONORABLE
JUDGE LESTER PEARCE OF THE NORTH MESA JUSTICE COURT.

TIME OF ENTRY: OCTOBER 8, 2000 AT APPROXIMATELY 1010 HOURS

TIME OF EXIT: OCTOBER 9, 2000 AT APPROXIMATELY 0240 HOURS

RETURNED ON OCTOBER 10, 2000 TO THE HONORABLE JUDGE WILLIAM DEMARS

2000 01797849     22                                        Continued.


000009336


P-App. 005067

PHOENIX POLICE DEPARTMENT REPORT

SUPPLEMENT          PAGE NUMBER:   3      DR NUMBER: 2000 01797849      22

(PRO-TEM) OF THE EAST PHOENIX # 1 JUSTICE COURT.


NARRATIVE:

ON OCTOBER 8, 2000 AT APPROXIMATELY 0445 HOURS SERGEANT SMALLMAN OF THE
PHOENIX POLICE DEPARTMENT'S HOMICIDE UNIT CONTACTED ME. HE REQUESTED THAT
I PROCEED TO THE LOCATION OF 2155 EAST LIBERTY # 132 TO ASSIST IN A DEATH
INVESTIGATION.

AT APPROXIMATELY 0539 HOURS I ARRIVED AT THIS LOCATION. I NOTED THE
FOLLOWING.

IT WAS DARK OUTSIDE. THE WEATHER WAS PARTLY CLOUDY WITH A SLIGHT BREEZE.

THE LOCATION OF 2155 EAST LIBERTY WAS THE SAN RIVA APARTMENT COMPLEX. THIS
COMPLEX WAS LOCATED SOUTH OF EAST CHANDLER BOULEVARD AND WEST OF SOUTH
24TH STREET. THIS WAS A MULTI-BUILDING APARTMENT COMPLEX. THE BUILDINGS
CONSISTED OF MOSTLY THREE STORY APARTMENT BUILDINGS. THE OUTSIDE PARKING
FOR THE TENANTS WAS BOTH COVERED AND NON-COVERED. THERE WERE ALSO SEVERAL
ONE-CAR GARAGE TYPE BUILDINGS FOR SOME OF THE TENANTS.

APARTMENT # 132 WAS LOCATED IN A THREE STORY BUILDING THAT WAS IN THE
SOUTHEAST CORNER OF THE COMPLEX. THIS BUILDING WAS NUMBERED WITH THE
NUMERAL "5". THIS APARTMENT WAS ON THE BOTTOM FLOOR IN THE SOUTHEAST
CORNER OF THE BUILDING. THE FRONT DOOR TO THE APARTMENT WAS LOCATED IN AN
ENCLOSED HALLWAY. THIS HALLWAY WAS SITUATED TO THE WEST OF THE APARTMENT
AND SERVED AS AN ENTRY HALLWAY TO FOUR SEPARATE APARTMENTS. THE HALLWAY
RAN IN A NORTH/SOUTH DIRECTION AND HAD ACCESS ON BOTH THE NORTH AND SOUTH
SIDES VIA DOORWAYS. THE NORTH SIDE DOOR OPENED OUTWARD AND HAD THE HINGES
ON THE WEST SIDE OF THE DOOR. THIS DOOR LED TO THE PARKING LOT THAT WAS
NORTH OF THE BUILDING. THE SOUTH SIDE DOORWAY OPENED OUTWARD AND HAD THE
HINGES ON THE WEST SIDE OF THE DOOR. THIS DOOR LED TO A GRAVEL YARD AREA
THAT HAD A BLOCK WALL JUST SOUTH OF IT. THERE WAS ACCESS TO THE PARKING
AREA THROUGH THIS GRAVEL YARD BY TRAVELLING AROUND THE OUTSIDE OF
BUILDING.

THERE WERE STAIRWELLS LOCATED ON BOTH THE NORTH AND SOUTH SIDES OF THE
EAST END OF THE BUILDING. THESE STAIRWELLS WERE OUTSIDE OF THE HALLWAY
AREA AND LED UP TO EACH LEVEL OF THE BUILDING. THERE WAS CRIME SCENE TAPE
ACROSS THE NORTH SIDE ENTRY INTO THE HALLWAY THAT LED TO APARTMENT # 132.
THIS TAPE WAS ON THE OUTSIDE OF THE STAIRWELL AND DOORWAY. THERE WAS A
UNIFORMED PHOENIX POLICE OFFICER STATIONED AT THE FRONT DOOR AREA TO
APARTMENT # 132. THIS OFFICER ALSO CONTROLLED ENTRY INTO THE HALLWAY FROM
THE SOUTH SIDE DOOR OF THE HALLWAY.

THE FRONT DOOR TO APARTMENT # 132 WAS PARTIALLY OPEN. THERE WAS CRIME
SCENE TAPE ACROSS THE FRONT DOOR TO THE APARTMENT. THERE WAS A STAIN THAT

2000 01797849     22                                        Continued.


000009337