# TABLE OF CONTENTS (INTERACTIVE)

| LLLLLLLLLLL | |
|---|---|
| PART 13 | Petitioner's Appendix to Petition for Review |

# EXHIBIT LLLLLLLLLLL
# PART 13

| | | |
|---|---|---|
| 01:43:03 | 1 | people who knew how to develop mitigation.  Okay?  So I |
| 01:43:07 | 2 | relied on those people.  So -- yeah.  And -- so we |
| 01:43:12 | 3 | learned how to present it differently, and it's an |
| 01:43:16 | 4 | ongoing education.  To this day I'm still learning how |
| 01:43:18 | 5 | to do it. |
| 01:43:19 | 6 | Q.  And in terms of this case, did you follow what |
| 01:43:22 | 7 | you learned in those trainings in terms of front |
| 01:43:24 | 8 | loading mitigation and researching at the beginning? |
| 01:43:27 | 9 | A.  To the best of my belief, yeah. |
| 01:43:29 | 10 | Q.  Okay. |
| 01:43:29 | 11 | A.  I mean, we had the spouse abuse defense.  We |
| 01:43:33 | 12 | presented it fully and fairly, I believe, in Phase 1, |
| 01:43:37 | 13 | intending that that should have some mitigating impact |
| 01:43:40 | 14 | even though it was present in Phase 1. |
| 01:43:42 | 15 | Q.  Okay.  So your -- then is it fair to stay that |
| 01:43:46 | 16 | in the guilt phase your strategy was twofold; it was to |
| 01:43:48 | 17 | present the affirmative defense as self-defense and |
| 01:43:51 | 18 | then if that didn't succeed, then you'd lay the |
| 01:43:56 | 19 | groundwork to come back in sentencing and present |
| 01:43:58 | 20 | battered women -- |
| 01:43:58 | 21 | A.  Yes. |
| 01:43:58 | 22 | Q.  -- as mitigation? |
| 01:43:59 | 23 | A.  Yes. |
| 01:43:59 | 24 | Q.  Okay. |
| 01:43:59 | 25 | A.  We didn't duplicate the presentation, although |

**Coash & Coash, Inc.,  602-258-1440**

Daniel Patterson - November 26, 2013                    17

01:44:01  1   some thought was given should I call Sharon Murphy
01:44:03  2   back, Mindi McKenna back and have them testify again?
01:44:07  3   I made the decision that it wasn't necessary; that it
01:44:10  4   would just, perhaps, dull the impression the jurors had
01:44:13  5   taken or come to.  It would be redundant in great deal.
01:44:18  6   So I chose not to present them again even though they
01:44:22  7   were available.
01:44:22  8       Q.  Okay.  I thought that Sharon Murphy had come
01:44:24  9   back at sentencing.
01:44:25 10       A.  You know, you may be right.
01:44:27 11       Q.  Okay.
01:44:28 12       A.  I didn't care about bringing Dr. McKenna back,
01:44:31 13   but I don't recall a protracted discussion with Sharon
01:44:36 14   Murphy in Phase 3 that we had in Phase 1.  But I would
01:44:39 15   defer to your recollection there.
01:44:40 16       Q.  Okay.  But, in general, you know, you would plan
01:44:44 17   ahead, so to speak, at the guilt phase that if this
01:44:48 18   doesn't work out then we've got all this evidence now
01:44:51 19   for sentencing?
01:44:51 20       A.  Yes.
01:44:52 21       Q.  Okay.
01:44:52 22       A.  And I'm certain the judge -- we had the judge
01:44:54 23   instruct that everything they heard doing any phase of
01:44:57 24   the proceeding can be the basis to extend mercy to the
01:45:02 25   client.

01:45:02  1      Q.   Okay.  And when you -- when Ring came out, you

01:45:05  2  mentioned your caseload of eight to ten cases.

01:45:08  3           I'm assuming that was reduced since you --

01:45:10  4      A.   Yes.

01:45:10  5      Q.   Okay.  So --

01:45:12  6      A.   By one half, I think.  I think I kept four.

01:45:15  7      Q.   Okay.

01:45:16  8      A.   Roque, Andriano.  I had Silva, but he was either

01:45:24  9  in his second or third placement in the state hospital.

01:45:28 10  He had some competency issues, and I can't recall -- I

01:45:31 11  tried to think of the names of the cases I may have

01:45:34 12  kept, but -- I know I got rid of Albert Carreon's case.

01:45:38 13  And I'm certain I got rid of a couple of other ones,

01:45:41 14  but I can't give you specifics at this time.  But I

01:45:43 15  made a conscious effort to pare my caseload.

01:45:46 16      Q.   Okay.  So Roque went to trial first.

01:45:49 17           Right?

01:45:49 18      A.   Yes, ma'am.

01:45:49 19      Q.   That one was first and then this case

01:45:51 20  immediately after Roque?

01:45:53 21      A.   Wendi Andriano was my first capital case after

01:45:57 22  the change in the law by statute and after the Ring's

01:46:02 23  decision.

01:46:02 24      Q.   Now, Roque I don't remember.

01:46:04 25           Was that -- that was not a jury sentencing?

Daniel Patterson - November 26, 2013                19

01:46:06  1      A.   It was.

01:46:07  2      Q.   It was jury sentencing?

01:46:07  3      A.   Yes, ma'am.

01:46:07  4      Q.   So you had already tried that one by the time

01:46:16  5  you tried this one?

01:46:16  6      A.   Yes, ma'am.

01:46:16  7      Q.   Okay.  So this is your second jury sentencing --

01:46:16  8      A.   Correct.

01:46:16  9      Q.   -- case.  Okay.

01:46:16 10           And Roque ended up getting life.

01:46:18 11           Right?

01:46:18 12      A.   The verdict was a death sentence from the

01:46:21 13  jurors.  It was set aside on independent review by the

01:46:24 14  State Supreme Court.

01:46:25 15      Q.   Okay.

01:46:26 16      A.   It was at a time when the date of the offense

01:46:30 17  was dispositive of what rule to apply.  The Supreme

01:46:33 18  Court had the prerogative of independent review because

01:46:35 19  it occurred before the change in the statute.  Now it's

01:46:40 20  very capricious --

01:46:41 21      Q.   Abuse of discretion?

01:46:42 22      A.   Abuse of discretion.  There you go.  There you

01:46:44 23  go.

01:46:44 24      Q.   Okay.  Okay.  We talked about your death penalty

01:46:51 25  experience, but what about your other felony defense

**Coash & Coash, Inc.,  602-258-1440**

Daniel Patterson - November 26, 2013                    20

| | | |
|---|---|---|
| 01:46:56 | 1 | experience prior to this case? |
| 01:46:57 | 2 | A.  I've been nothing, really, but a criminal |
| 01:46:59 | 3 | defense attorney since the day I started. |
| 01:47:01 | 4 | Q.  About how many trials would you estimate you -- |
| 01:47:03 | 5 | just a general estimate? |
| 01:47:04 | 6 | A.  Oh, geez.  Quite a few.  I mean, I haven't tried |
| 01:47:10 | 7 | a case in the last three years.  I've been an |
| 01:47:13 | 8 | administrator in my office.  I'm a supervisor for the |
| 01:47:18 | 9 | folks in the capital unit.  So I haven't tried a case |
| 01:47:20 | 10 | in three years, but -- let's see.  '79 through 2010, |
| 01:47:24 | 11 | that's, what, 31 years?  At least ten or 12 trials per |
| 01:47:33 | 12 | anum for that period because I did some city court |
| 01:47:36 | 13 | work, DUI.  I did bench trials down there.  I've had a |
| 01:47:41 | 14 | felony contract. |
| 01:47:42 | 15 | I was one of the chartered members of the felony |
| 01:47:46 | 16 | contract group in the early '80s when they set up the |
| 01:47:48 | 17 | alternative to the public defender system.  I could |
| 01:47:51 | 18 | never get a plea out of this guy, so I wound up trying |
| 01:47:54 | 19 | more cases than I should have.  No, I jest.  I've tried |
| 01:47:59 | 20 | a number of cases. |
| 01:48:00 | 21 | Q.  So in the hundreds maybe? |
| 01:48:02 | 22 | A.  Probably. |
| 01:48:03 | 23 | Q.  Low to mid hundreds? |
| 01:48:04 | 24 | A.  Probably if you count bench trials and jury |
| 01:48:06 | 25 | trials. |

**Coash & Coash, Inc.,  602-258-1440**

Daniel Patterson - November 26, 2013                    21

01:48:07   1        Q.   Okay.   So when you were first appointed to this
01:48:12   2    case, what had already been done by Mr. DeLozier?
01:48:16   3        A.   Very little.   In fact, I can't think of anything
01:48:19   4    that was actually done.   No, there was a gentleman,
01:48:31   5    Leon Thikoll, who had a notice of appearance in the
01:48:35   6    file.   That was superceded by Mr. DeLozier's notice of
01:48:42   7    appearance.   We're in Acre's court.   I'm essentially
01:48:46   8    just buying time because I know Roque is going before.
01:48:53   9    Yeah, I can't recall anything of great consequence that
01:48:56  10    was in the file when I inherited it from Mr. Gavin.
01:49:00  11        I don't know if we had any -- Linderman may have
01:49:05  12    been assigned initially, but I don't recall anything
01:49:09  13    that he did of consequence or anything in the early
01:49:14  14    months that Mr. Mac Leod did of consequence.
01:49:17  15             MR. MARTINEZ:   I don't mean to interrupt
01:49:18  16    and I promise not to.
01:49:20  17        When you took the case over, was John
01:49:23  18    Fitzworth still the prosecutor or was I the prosecutor?
01:49:26  19    I can't remember.
01:49:26  20             MR. PATTERSON:   Oh, wow.   I think John had
01:49:31  21    already been on the bench.
01:49:32  22             MR. MARTINEZ:   Okay.
01:49:33  23             MR. PATTERSON:   At or around that time,
01:49:35  24    wasn't he appointed to the bench?
01:49:36  25             MR. MARTINEZ:   I just can't remember.

**Coash & Coash, Inc., 602-258-1440**

| | |
|---|---|
| 01:49:38 1 | That's why I was asking. |
| 01:49:40 2 |     MR. PATTERSON:  Yeah, I don't have an |
| 01:49:41 3 | independent recollection, Juan, as to who the |
| 01:49:43 4 | prosecution was at the time.  I can't see a prosecutor |
| 01:49:47 5 | in court, but it was -- in the early moments of the |
| 01:49:50 6 | case, we're not really doing a whole lot of substantive |
| 01:49:53 7 | stuff, anyway.  So the prosecutor of the day at the |
| 01:49:57 8 | counsel table may have filled in because they were |
| 01:50:00 9 | aware I was putting this case on idle until I took care |
| 01:50:05 10 | of other cases that had either date of offense priority |
| 01:50:10 11 | or trial -- firm trial date priority. |
| 01:50:13 12 |     I mean, there's always the juggling |
| 01:50:16 13 | involved.  I can't give you a good answer.  I don't |
| 01:50:18 14 | know who the prosecutor was at the time. |
| 01:50:20 15 |     MR. MARTINEZ:  I can't remember either. |
| 01:50:21 16 |     MR. PATTERSON:  No.  Huh-uh.  No. |
| 01:50:23 17 |     But to answer your question directly, no, |
| 01:50:24 18 | there wasn't a whole lot of things in the file when I |
| 01:50:28 19 | acquired it. |
| 01:50:28 20 | BY MS. GARD: |
| 01:50:29 21 |   Q.  Okay.  The Rule 11, though, had been done |
| 01:50:31 22 | already. |
| 01:50:31 23 |     Right? |
| 01:50:31 24 |   A.  I think it was a pre-screen. |
| 01:50:32 25 |   Q.  It was a pre-screen. |

**Coash & Coash, Inc.,  602-258-1440**

Daniel Patterson - November 26, 2013                23

01:50:33  1      A.   Yeah, that had been done.  Yes, exactly.

01:50:35  2      Q.   Okay.  And you reviewed that report when you got

01:50:37  3  the file?

01:50:38  4      A.   Yeah.

01:50:39  5      Q.   Dr. Potts?

01:50:40  6      A.   That was Potts?

01:50:41  7      Q.   Yeah.

01:50:41  8      A.   Yeah.  Right.  Potts didn't -- I don't recall

01:50:44  9  Potts seeing any competency issues, but I think he was

01:50:48 10  there for that narrow purpose, not for mental health in

01:50:51 11  general but just competency.

01:50:53 12      Q.   Okay.  How did you get along with Mr. DeLozier?

01:50:56 13      A.   We had a good relationship.  He's an affable

01:50:59 14  man.  I never had any difficulty getting a hold of him.

01:51:02 15  He always returned my phone calls.  I've been to his --

01:51:06 16  he has like a horse farm right off of Cave Creek Road

01:51:11 17  on the north side of town where his office is.  I've

01:51:14 18  been there.  He was more than willing to shoulder

01:51:20 19  responsibility if I asked him to do something.  Yeah,

01:51:23 20  we had a good relationship.

01:51:24 21      Q.   He's offered the opinion in these proceedings

01:51:26 22  that he was kind of frozen out in terms of representing

01:51:29 23  her, given very few tasks and not kept updated.

01:51:34 24           Is that consistent with your memory?

01:51:36 25      A.   I wouldn't categorize our relationship as I

**Coash & Coash, Inc.,  602-258-1440**

01:51:40   1   froze him out, no.

01:51:41   2       Q.   When I say froze him out, I mean that he felt

01:51:44   3   that he was not being involved in the defense very much

01:51:49   4   or very often and not being kept apprised of what was

01:51:52   5   going on in the case.

01:51:54   6       A.   Yeah.  Well, we had kind of defined roles.  I

01:51:59   7   did all of the pretrial interview of witnesses in

01:52:03   8   Mr. Martinez's office, all the government witnesses.  I

01:52:08   9   had all of the connection with Sharon Murphy.  I had

01:52:10  10   all of the connection with Dr. McKenna.  I had contact

01:52:22  11   with Kandy Rohde, but I was led to believe that she had

01:52:22  12   constant contact with DeLozier, too.

01:52:25  13       He had primary and continuing contact with Donna

01:52:29  14   Ochoa and Alejo Ochoa.  He met with the client on a

01:52:34  15   weekly basis or at least it was represented to me that

01:52:38  16   he was there on a weekly basis, and it was represented

01:52:40  17   to me that they were having substantive discussions

01:52:43  18   about defending the case.  So I didn't delegate to him

01:52:47  19   those responsibilities that had to do with the spousal

01:52:50  20   abuse defense or the pretrial interview of government

01:52:55  21   witnesses.

01:52:56  22       I shouldered that responsibility completely, but

01:52:59  23   my expectation was that Knapp counsel retained by the

01:53:03  24   parents -- that he had a working relationship with the

01:53:05  25   parents and would have brought to my attention anything

01:53:08  1    that was relevant to the defense of Wendi Andriano.

01:53:12  2        Q.  When you say it was represented to you that they

01:53:16  3    were having substantive discussions, who represented

01:53:18  4    that?

01:53:18  5        A.  Well -- okay.  Even though it was affirmatively

01:53:23  6    represented to me that that was the case, it was -- the

01:53:26  7    true facts were never told to me.  I had contact

01:53:30  8    regularly with Wendi.  I had contact regularly with

01:53:33  9    David, and nobody said to me pretrial -- well, because

01:53:37 10    at pretrial I did discovery, but during the early parts

01:53:40 11    of the workup, during the middle parts of the workup of

01:53:44 12    the se, I assumed that David was talking to Wendi about

01:53:49 13    the specifics of the homicide.

01:53:52 14        On the eve of trial, months in advance of trial,

01:53:56 15    I was attempting to allocate responsibilities, and I

01:53:59 16    thought because David had such a wonderful relationship

01:54:02 17    with Wendi that he would be the logical attorney to do

01:54:06 18    the direct of her because we had decided that because

01:54:10 19    of the nature of the defense she had to testify.  There

01:54:13 20    was a panic look on Wendi's face.  She pulled me aside,

01:54:17 21    and she said, He doesn't know anything about the case.

01:54:19 22        I said, What do you mean he doesn't know

01:54:21 23    anything about the case?

01:54:23 24        He's my spiritual advisor, that's what she told

01:54:26 25    me, and she thought it was part of God's plan that she

01:54:30  1   would have a competent defense attorney who knew

01:54:32  2   criminal law and an attorney who also could serve as a

01:54:37  3   spiritual advisor.  She thought she had the best of all

01:54:40  4   possible worlds.

01:54:40  5       Q.  So when did you --  you learned this before

01:54:42  6   trial but --

01:54:43  7       A.  Three months, four months.

01:54:46  8       Q.  So then she asked you -- I think in your

01:54:49  9   affidavit she asked you to do her examination?

01:54:51 10       A.  Yeah.  She said, He can't do the direct exam.

01:54:53 11   He doesn't know anything about the case.  You know far

01:54:55 12   more about the case than he does.

01:54:56 13            And so I took the task of -- I went to see her

01:55:00 14   more frequently and we went over very, very diligently

01:55:06 15   her testimony, her proposed testimony.

01:55:07 16       Q.  How frequently did you see her prior to that

01:55:10 17   point?

01:55:11 18       A.  Pull the jail records.  I mean, I recall going a

01:55:15 19   number of times, many times to sit down and go through

01:55:19 20   chapter and verse because when we actually did the

01:55:21 21   trial, she was on the stand for probably a week minimum

01:55:26 22   direct and then another week with Mr. Martinez on

01:55:30 23   cross.  So we knew that it was a task that needed to be

01:55:34 24   accomplished and we took pains to prep.

01:55:36 25       Q.  Is there a reason that you decided that you

**Coash & Coash, Inc., 602-258-1440**

| | | |
|---|---|---|
| 01:55:37 | 1 | would handle Dr. Murphy and that aspect of the case |
| 01:55:42 | 2 | instead of DeLozier? |
| 01:55:42 | 3 | A.  I was the one that enlisted their help.  I was |
| 01:55:46 | 4 | the one that had discussions with Wendi about the |
| 01:55:50 | 5 | relationship she had with Joe.  Yes.  I thought it |
| 01:55:56 | 6 | was -- and because it was Phase 1 kind of stuff, then, |
| 01:55:59 | 7 | yeah, it was logical that I should be the attorney on |
| 01:56:03 | 8 | direct for those folks, those witnesses. |
| 01:56:06 | 9 | Q.  Okay.  In paragraph 8 of your declaration you |
| 01:56:08 | 10 | said that DeLozier -- |
| 01:56:10 | 11 | MR. ARNTSEN:  You can look at it if you |
| 01:56:11 | 12 | want. |
| 01:56:11 | 13 | MS. GARD:  Sorry.  Exhibit 1. |
| 01:56:14 | 14 | MR. PATTERSON:  Paragraph 8? |
| 01:56:14 | 15 | BY MS. GARD: |
| 01:56:16 | 16 | Q.  Yeah, paragraph 8.  You remark that DeLozier had |
| 01:56:21 | 17 | no experience or training in death penalty cases and |
| 01:56:27 | 18 | you couldn't rely on him for substantial assistance on |
| 01:56:27 | 19 | issues relating to capital jurisprudence. |
| 01:56:28 | 20 | A.  Absolutely. |
| 01:56:29 | 21 | Q.  Okay.  Can you explain that a little more? |
| 01:56:31 | 22 | A.  Well, obviously, ten years later we have better |
| 01:56:35 | 23 | defined teams.  Okay?  And both lawyers, even though |
| 01:56:39 | 24 | you may call one co-counsel and one lead counsel, they |
| 01:56:43 | 25 | are both lawyers experienced in capital jurisprudence |

**Coash & Coash, Inc.,  602-258-1440**

| | |
|---|---|
| 01:56:47 1 | issues.  They've read Pharma.  Okay?  I mean, I don't |
| 01:56:50 2 | know if DeLozier has ever read Pharma.  Okay?  You |
| 01:56:54 3 | know, it's axiomatic now when you do this that both |
| 01:56:57 4 | counsel have those competencies. |
| 01:57:00 5 | Okay?  So in the current teams, you know, a |
| 01:57:05 6 | lawyer can say to his partner or her partner, you know, |
| 01:57:08 7 | we need a motion to dismiss the death penalty because |
| 01:57:11 8 | it doesn't comply with -- blah, blah, blah, blah and |
| 01:57:13 9 | each party -- each lawyer is competent to fashion that |
| 01:57:17 10 | motion.  I don't think Mr. DeLozier to this day is |
| 01:57:21 11 | probably not competent to do that kind of assignment, |
| 01:57:24 12 | okay, but he was Knapp counsel.  And back then we all |
| 01:57:29 13 | had what I now believe is a mistaken belief as to the |
| 01:57:34 14 | function of Knapp counsel. |
| 01:57:36 15 | Back then we thought that Knapp counsel was a |
| 01:57:38 16 | defendant's right.  Currently that's not the popular |
| 01:57:43 17 | thinking and, you know, Knapp counsel is not the right |
| 01:57:47 18 | of the defendant; it's a privilege and that the |
| 01:57:50 19 | appointed attorney has the prerogative of saying, I |
| 01:57:53 20 | don't want Knapp counsel; judge, I'm not going to |
| 01:57:56 21 | accept his buy in here.  Back then I didn't have that |
| 01:58:01 22 | appreciation of Knapp counsel.  I never tried a case |
| 01:58:03 23 | with Knapp counsel. |
| 01:58:04 24 | He had a good relationship with Donna and Alejo. |
| 01:58:17 25 | He had a very good relationship with Wendi.  He was |

**Coash & Coash, Inc.,  602-258-1440**

01:58:17  1    accessible.  He wasn't so overwhelmed with his other

01:58:17  2    business that I couldn't get a hold of him if I needed

01:58:18  3    him, but I would not have given him capital-specific

01:58:21  4    responsibilities.

01:58:23  5        Q.  Okay.

01:58:24  6        A.  Because I don't think he had the background.

01:58:25  7        Q.  He says that he was given the primary

01:58:28  8    responsibility of preparing the mitigation case.

01:58:30  9            Is that your recollection?

01:58:31 10        A.  That's not my recollection.  I mean, the primary

01:58:37 11    person assigned that task was Scott Mac Leod.  Scott

01:58:41 12    Mac Leod was represented to me to be a competent

01:58:44 13    mitigation specialist.

01:58:45 14        Q.  Represented by who?

01:58:47 15        A.  By my office.  Okay?  I was led to believe there

01:58:51 16    was a process by which they interviewed these folks;

01:58:54 17    that he had the credentials and that he was assigned to

01:58:57 18    my case.  I mean, I didn't pick -- I didn't go out and

01:58:59 19    say, I want Scott to help.  Scott was the Mesa guy and

01:59:04 20    then when we went all downtown, Scott came back to

01:59:07 21    downtown and remained on the case.

01:59:10 22            I assumed he was developing the mitigation, the

01:59:14 23    themes that we talked about, that she had a great

01:59:16 24    childhood; that she had, you know, good parental

01:59:18 25    support; that -- you know, these are things that Scott

**Coash & Coash, Inc.,  602-258-1440**

| | | |
|---|---|---|
| 01:59:21 | 1 | was developing.  He showed me pictures of the yearbook. |
| 01:59:25 | 2 | She was Number 1 in her class, as I recall.  That she |
| 01:59:29 | 3 | was a good mom; that there was no adverse information |
| 01:59:32 | 4 | out there that she abused her children or that her |
| 01:59:36 | 5 | coworkers felt that she was a hard worker.  I mean, it |
| 01:59:40 | 6 | was positive virtues that we were using as a theme |
| 01:59:43 | 7 | rather than the negative thing because nobody told me |
| 01:59:48 | 8 | there was any negative in her history. |
| 01:59:50 | 9 | Q.  Okay.  So let me just clarify. |
| 01:59:53 | 10 | So who decided on these themes?  Was that your |
| 01:59:56 | 11 | decision that these would be the themes of sentencing |
| 01:59:58 | 12 | phase? |
| 01:59:58 | 13 | A.  It was -- Scott, David and I all participated in |
| 02:00:06 | 14 | the decision to present those positive virtues as Phase |
| 02:00:09 | 15 | 3 mitigation. |
| 02:00:10 | 16 | Q.  What was your thought process choosing those |
| 02:00:13 | 17 | themes? |
| 02:00:14 | 18 | A.  Well, it's not like I chose those themes. |
| 02:00:17 | 19 | Nobody ever presented me with an alternative theme or |
| 02:00:20 | 20 | theory.  I had contact with Donna.  I had contact with |
| 02:00:25 | 21 | Alejo.  I had constant contact with Wendi.  Nobody |
| 02:00:28 | 22 | suggested to me that she had a horrible childhood. |
| 02:00:31 | 23 | Nobody suggested to me that she had mental health |
| 02:00:32 | 24 | issues. |
| 02:00:32 | 25 | Okay?  So all I had was the positive themes; |

**Coash & Coash, Inc.,  602-258-1440**

02:00:37  1   that she was a good student; that she was a Christian,

02:00:40  2   okay, that she went to a Christian school; that she

02:00:47  3   was -- that she developed Christian virtue, you know,

02:00:50  4   that she was a good husband (sic) to Joe; that her

02:00:53  5   decision to participate in the suicide pact was part of

02:00:57  6   her desire to help her husband through this painful

02:01:00  7   death experience because we had talked to doctors who

02:01:03  8   said he would essentially suffocate to death.

02:01:06  9          So that was -- she was a compassionate, positive

02:01:09  10  woman.  Okay?  That was the theme of mitigation because

02:01:13  11  I didn't have anything that was contrary to that.

02:01:13  12          Ms. Gard:  Okay.

02:01:13  13

02:01:13  14                    EXAMINATION

02:01:13  15  BY MR. MARTINEZ:

02:01:18  16      Q.  Do you know whether or not Mr. DeLozier was

02:01:22  17  upset when you were brought on the case?  Do you know

02:01:25  18  if he was upset?  Did he ever tell you he was upset

02:01:27  19  about it?

02:01:28  20      A.  No.  He never had a harsh word.  No.

02:01:33  21      Q.  Did he ever tell you that he felt blind-sided by

02:01:37  22  Judge Ishikawa?  Did he ever tell you anything like

02:01:39  23  that?

02:01:39  24      A.  No.  He never used that term with me.  In what

02:01:42  25  context, now, that he felt blind-sided?

Daniel Patterson - November 26, 2013                    32

| | | |
|---|---|---|
| 02:01:46 | 1 | Q.   By bringing you on the case.   You know what I |
| 02:01:48 | 2 | mean? |
| 02:01:49 | 3 | A.   Well, that would surprise me because Akers was |
| 02:01:52 | 4 | the judge when I first became involved. |
| 02:01:55 | 5 | Q.   Maybe I have that judge wrong, but when you came |
| 02:01:57 | 6 | on, did he ever express anything, like, I felt like I |
| 02:02:02 | 7 | was blind-sided by the judge or really upset that you |
| 02:02:04 | 8 | were brought on? |
| 02:02:05 | 9 | A.   And that's just the contrary:   thanks for -- |
| 02:02:07 | 10 | finally there's somebody here that may have done this |
| 02:02:10 | 11 | before that could be helpful. |
| 02:02:12 | 12 | Q.   Did he ever complain that, you know, the only |
| 02:02:15 | 13 | reason you are on here is because we can't get any |
| 02:02:18 | 14 | money to -- or we have to go through the process to get |
| 02:02:21 | 15 | money to get experts or anything?   Did he ever complain |
| 02:02:24 | 16 | to you about that? |
| 02:02:26 | 17 | Remember back then they used to have a process |
| 02:02:28 | 18 | where if you were private, that you would have to file |
| 02:02:33 | 19 | something or request money from somebody?   I don't |
| 02:02:36 | 20 | remember exactly from whom. |
| 02:02:37 | 21 | Do you remember that? |
| 02:02:38 | 22 | A.   Well, there's always been a difficulty for truly |
| 02:02:41 | 23 | private counsel who are being retained and given a fee |
| 02:02:44 | 24 | to defend death cases because of the attendant costs of |
| 02:02:48 | 25 | experts, the ABA requirement that you had need two |

**Coash & Coash, Inc., 602-258-1440**

| | |
|---|---|
| 02:02:52 1 | lawyers, that kind of thing, that you needed, you know, |
| 02:02:54 2 | an investigator.  So it's always been very difficult |
| 02:02:57 3 | for private -- truly private lawyers to do this. |
| 02:03:00 4 | That's why it's defaulted to the agency is the way it |
| 02:03:04 5 | has, but no.  No. |
| 02:03:07 6 | Q.  Okay. |
| 02:03:12 7 | A.  I would suggest the opposite.  He was grateful |
| 02:03:16 8 | that there was finally somebody who had access to |
| 02:03:18 9 | resources who could assist in defending Wendi Andriano. |
| 02:03:24 10 | He was very, very zealous of defending Wendi.  I mean, |
| 02:03:29 11 | he took his responsibilities seriously. |
| 02:03:36 12 | Q.  When you were brought on, did he ever say |
| 02:03:38 13 | anything negative about the judge, whether it's Akers |
| 02:03:41 14 | or Ishikawa, that they blind-sided -- things like they |
| 02:03:47 15 | blind-sided me in them bringing you on, things like |
| 02:03:49 16 | that? |
| 02:03:50 17 | A.  No.  I don't recall that, anything of that ilk |
| 02:03:53 18 | in discussions with David and, like I say, just the |
| 02:03:56 19 | opposite.  He was -- he welcomed my participation, |
| 02:04:00 20 | welcomed the resources that we had access to, was |
| 02:04:09 21 | willing to contribute some resources as well because he |
| 02:04:09 22 | was the one that encouraged us to use the former |
| 02:04:11 23 | Phoenix crime lab guy to talk -- |
| 02:04:15 24 | Q.  Joe Collier? |
| 02:04:17 25 | A.  Collier to talk about sodium azide and the |

**Coash & Coash, Inc.,  602-258-1440**

| | | |
|---|---|---|
| 02:04:20 | 1 | consequences of ingesting sodium azide. |
| 02:04:24 | 2 | MR. MARTINEZ:  Okay.  Sorry. |
| 02:04:25 | 3 | MR. PATTERSON:  And he may have paid for |
| 02:04:27 | 4 | Joe completely.  So, no, I don't recall that attitude. |
| 02:04:33 | 5 | MR. MARTINEZ:  Okay. |
| 02:04:34 | 6 | MR. PATTERSON:  Because, quite frankly, had |
| 02:04:36 | 7 | he manifested that attitude, I probably would have |
| 02:04:39 | 8 | brought it to somebody's attention and I didn't.  No, I |
| 02:04:41 | 9 | thought we had a good relationship. |
| 02:04:42 | 10 | MR. MARTINEZ:  Okay. |
| 02:04:42 | 11 | |
| 02:04:42 | 12 | FURTHER EXAMINATION |
| 02:04:43 | 13 | BY MS. GARD: |
| 02:04:43 | 14 | Q.  It sounds like from what you just said that he |
| 02:04:45 | 15 | may have recognized that he wasn't -- that this was a |
| 02:04:48 | 16 | little over his head, did he? |
| 02:04:50 | 17 | A.  He never said that, but he was always quick to |
| 02:04:55 | 18 | admit that he had never done this before and that he |
| 02:05:00 | 19 | was grateful that he had somebody working for Wendi |
| 02:05:02 | 20 | that had done this before.  That was always his |
| 02:05:06 | 21 | attitude. |
| 02:05:07 | 22 | Q.  So he was fine with you picking up things that |
| 02:05:09 | 23 | maybe he didn't know how to do? |
| 02:05:11 | 24 | A.  Absolutely.  He never -- no.  He never |
| 02:05:16 | 25 | questioned me saying, you know, hey, you are getting |

**Coash & Coash, Inc., 602-258-1440**

Daniel Patterson - November 26, 2013                35

02:05:19  1    all the neat interviews in Juan Martinez's office; I'd
02:05:23  2    like to participate more in that; I'd like to sit down
02:05:26  3    with Sharon Murphy and fill her in on what I know.  No,
02:05:29  4    never, nor did I think that he had anything of value to
02:05:33  5    lend to the discussion because he never brought it to
02:05:35  6    my attention that there may have been some difficulties
02:05:37  7    in this family.
02:05:38  8          MR. MARTINEZ:  I know we did the interview
02:05:40  9    of the parents, Donna and Alejo Ochoa at your office.
02:05:44 10          MR. PATTERSON:  It may have been, yeah.
02:05:46 11          MR. MARTINEZ:  Yeah, when you guys were out
02:05:48 12    there.
02:05:50 13          MR. PATTERSON:  Yes, because I think it was
02:05:51 14    a logistical issue.
02:05:51 15          MR. MARTINEZ:  Right.
02:05:52 16          MR. PATTERSON:  Yeah, we didn't want to go
02:05:53 17    way up to --
02:05:53 18          MR. MARTINEZ:  To Casa Grande.
02:05:54 19          MR. PATTERSON:  Exactly.
02:05:54 20          MR. MARTINEZ:  Right.
02:05:55 21          MR. PATTERSON:  Or go down to Casa Grande
02:05:56 22    and go up north to Cave Creek, exactly.
02:05:58 23          MR. MARTINEZ:  Right.  Did he want to ever
02:06:00 24    participate in that interview?  Did he ever ask about
02:06:02 25    participating in that interview?

Daniel Patterson - November 26, 2013                36

02:06:04  1        MR. PATTERSON:  Was it -- refresh my

02:06:05  2   recollection.  Was it just you and I with Donna?

02:06:08  3        MR. MARTINEZ:  It was you, me and then the

02:06:09  4   Ochoas.

02:06:10  5        MR. PATTERSON:  Yeah, okay.  Now I recall

02:06:10  6   that.

02:06:11  7        MR. MARTINEZ:  And what happened is it was

02:06:12  8   right off of Lewis, and that's when you had those --

02:06:15  9   the buildings that were right there, not where the

02:06:17 10   courthouse was.

02:06:19 11        MR. PATTERSON:  Right, right, right.  And

02:06:20 12   that was a conference room probably.

02:06:22 13        MR. MARTINEZ:  Right.

02:06:22 14        MR. PATTERSON:  Yeah.  And he wasn't

02:06:23 15   present.  No, I don't recall him saying, set it at a

02:06:28 16   time when I can be there; I need to have -- I need to

02:06:32 17   be there when you are talking to them.  No.

02:06:34 18        MR. MARTINEZ:  Okay.

02:06:35 19        MR. PATTERSON:  Never, never.

02:06:35 20   BY MS. GARD:

02:06:40 21   Q.   The Ochoas -- I guess we need to talk about the

02:06:43 22   Ochoas.

02:06:43 23        What was your impression of them as a family?

02:06:46 24   A.   Loving family, obviously, very concerned about

02:06:53 25   the welfare of their daughter.  I've been to their

**Coash & Coash, Inc.,  602-258-1440**

Daniel Patterson - November 26, 2013                    37

| | |
|---|---|
| 02:06:56 | 1 |
| 02:07:01 | 2 |
| 02:07:06 | 3 |
| 02:07:13 | 4 |
| 02:07:15 | 5 |
| 02:07:22 | 6 |
| 02:07:25 | 7 |
| 02:07:28 | 8 |
| 02:07:32 | 9 |
| 02:07:44 | 10 |
| 02:07:47 | 11 |
| 02:07:49 | 12 |
| 02:07:53 | 13 |
| 02:07:54 | 14 |
| 02:07:55 | 15 |
| 02:08:02 | 16 |
| 02:08:05 | 17 |
| 02:08:11 | 18 |
| 02:08:17 | 19 |
| 02:08:20 | 20 |
| 02:08:22 | 21 |
| 02:08:22 | 22 |
| 02:08:23 | 23 |
| 02:08:25 | 24 |
| 02:08:25 | 25 |

1  house on at least two, maybe three occasions in Casa
2  Grande.  Well-kept house, nothing to suggest that there
3  was any problem in the house, very gracious people,
4  always returned my phone call when I needed to speak
5  with them, were in constant contact with me, had more
6  contact with David than with me, had more of a
7  spiritual connection with David than with me because
8  I'm certainly, by no stretch of the imagination, a
9  spiritual person like David.  Helpful, except maybe too
10  helpful at times -- Alejo.
11      Q.  Too helpful?  What do you mean by too helpful?
12      A.  Well, I mean, I'm certain Mr. Martinez will tell
13  you about the photograph incident.
14              MR. MARTINEZ:  Right.
15              MR. PATTERSON:  That was kind of curious.
16  Yeah.  I mean, that was problematic, but that was the
17  first indication that I had that Mr. -- that Alejo may
18  be doing some things as a witness that maybe he
19  shouldn't be doing.  Okay?  And I didn't follow up on
20  it.  I didn't investigate it further.
21  BY MS. GARD:
22      Q.  And the photograph, that's the incident
23  involving the furniture being broken.
24      Right?
25      A.  Yes.  He came running in, I finally found the

**Coash & Coash, Inc., 602-258-1440**

02:08:28   1   photograph I told you about.  I looked at it quickly

02:08:32   2   and I will not repeat this mistake, not against a

02:08:35   3   competent adversary like Mr. Martinez.  I looked at it.

02:08:39   4   I said, okay, yeah, that squares with what you told me.

02:08:42   5   I introduced it.  Mr. Martinez had the guy on cross and

02:08:48   6   pointed out that there was stuff in the photograph that

02:08:50   7   could not have been there had it been taken at the time

02:08:54   8   it was claimed to have been taken.

02:08:56   9        I learned a lesson, and that was the only

02:09:01  10   indication I had from Alejo that -- by his conduct that

02:09:06  11   he may have done some things that I should have

02:09:09  12   investigated further.

02:09:10  13        Q.   Okay.

02:09:10  14        A.   But I think that was in the middle of trial.  It

02:09:13  15   was right at trial and so my ability to further

02:09:15  16   investigate was somewhat limited.

02:09:18  17        Q.   You're aware of the allegations now against

02:09:21  18   Alejo.

02:09:21  19        Right?

02:09:22  20        A.   We didn't go into great depth about it.  In

02:09:26  21   cursory fashion, that he may have taken some

02:09:29  22   photographs of Wendi when she was younger that were

02:09:32  23   inappropriate; that he may have touched her

02:09:35  24   inappropriately in general in a massage sense and that

02:09:40  25   he may have touched other students in a massage sense.

Daniel Patterson - November 26, 2013                    39

| 02:09:47 | 1 | And I don't have any specific information that he may |
| 02:09:51 | 2 | have touched them vaginally or that kind of thing, but |
| 02:09:55 | 3 | that he may have engaged in some improper touching with |
| 02:09:58 | 4 | other 12, 13-year-old schoolmates of Ms. Andriano. |
| 02:10:02 | 5 | Q.  Did she ever disclose anything about that to |
| 02:10:04 | 6 | you? |
| 02:10:04 | 7 | A.  No.  Never. |
| 02:10:05 | 8 | Q.  Did Donna Ochoa ever disclose anything? |
| 02:10:07 | 9 | A.  Never. |
| 02:10:08 | 10 | Q.  And Alejo never? |
| 02:10:16 | 11 | A.  Never. |
| 02:10:16 | 12 | Q.  What about Brandon Ochoa? |
| 02:10:16 | 13 | A.  Brandon Ochoa?  Brother? |
| 02:10:16 | 14 | Q.  Yes, brother. |
| 02:10:16 | 15 | A.  No, no, nothing.  I had absolutely no suggestion |
| 02:10:20 | 16 | prior to trial that there was any discord in the family |
| 02:10:25 | 17 | or that there was any inappropriate conduct visited |
| 02:10:29 | 18 | upon Wendi by Alejo or upon her friends. |
| 02:10:33 | 19 | Q.  Okay. |
| 02:10:34 | 20 | A.  The only thing I did have is that -- it was |
| 02:10:36 | 21 | described to me as a quirky kind of childhood when they |
| 02:10:40 | 22 | were living out of the back of a VW van and that he was |
| 02:10:45 | 23 | a street preacher.  Alejo was a street preacher and |
| 02:10:48 | 24 | they traveled from place to place, but I'll be candid |
| 02:10:52 | 25 | with you.  The way they portrayed it to me, Scott and |

**Coash & Coash, Inc.,  602-258-1440**

| | | |
|---|---|---|
| 02:10:55 | 1 | David, it was just kind of a, you know, this is what |
| 02:10:59 | 2 | happened in the '60s, you know.  It was just one of |
| 02:11:01 | 3 | those things, and it was not evil or suspicious the way |
| 02:11:06 | 4 | it was portrayed to me. |
| 02:11:08 | 5 | Q.  Just more of a free-spirited kind of -- |
| 02:11:10 | 6 | A.  Yeah, street preacher spreading the word of |
| 02:11:13 | 7 | Jesus Christ and, you know, that's just the way they |
| 02:11:17 | 8 | survived and lived at time. |
| 02:11:18 | 9 | Q.  Okay.  Was Scott Mac Leod and then before him |
| 02:11:23 | 10 | Patrick Linderman, your mitigation specialists -- were |
| 02:11:25 | 11 | they assigned the task of interviewing her family and |
| 02:11:28 | 12 | her friends and deciding who would be -- |
| 02:11:31 | 13 | A.  They were tasked with developing mitigation.  I |
| 02:11:34 | 14 | mean, I didn't impose any structure or stricture on |
| 02:11:37 | 15 | them.  Again, I mean, in retrospect would I like to |
| 02:11:43 | 16 | have been more hands on?  Probably, but at that time |
| 02:11:46 | 17 | we're still learning how to deal with this post-Ring |
| 02:11:50 | 18 | landscape and Scott was represented to me as a |
| 02:11:52 | 19 | competent mitigation person.  So I allowed him to make |
| 02:11:55 | 20 | unilateral decisions. |
| 02:11:57 | 21 | Q.  But you believe that he was adequately trained |
| 02:12:00 | 22 | and experienced? |
| 02:12:00 | 23 | A.  It was represented to me that he did have the |
| 02:12:03 | 24 | credentials to serve as a mitigation specialist. |
| 02:12:05 | 25 | Q.  So do you know who he spoke to outside of the |

**Coash & Coash, Inc.,  602-258-1440**

Daniel Patterson - November 26, 2013                    41

02:12:08  1    immediate family?  Do you know who he may have

02:12:10  2    interviewed?

02:12:10  3        A.  He didn't report to me Monday I went to see

02:12:14  4    Johnny Jones; Johnny Jones did not have anything.  Now

02:12:17  5    is that a good conduct, a good practice?  Absolutely,

02:12:20  6    absolutely, but back then in '04, '03, he was not

02:12:25  7    reporting to me on a regular basis as to what he had

02:12:28  8    accomplished in the immediate weeks preceding.

02:12:30  9        Q.  And that was standard practice back then?

02:12:32  10       A.  That was -- yes, that -- well, standard

02:12:34  11   practice?  It was the practice.

02:12:36  12       Q.  The practice.

02:12:36  13       A.  I don't know if it was ABA-sanctioned practice,

02:12:40  14   but it was my practice.  And in retrospect maybe I

02:12:45  15   shouldn't have deferred to his judgment in the manner I

02:12:47  16   did, but I did.

02:12:48  17       Q.  Okay.  Did Wendi tell you -- ask you to speak to

02:12:59  18   anyone in particular or to look at anything in

02:13:01  19   particular for mitigation?

02:13:02  20       A.  Yes.  She directed me to a gentleman by the name

02:13:05  21   of Shawn King, and I think that's his name.  It was a

02:13:09  22   guy that had both legs cut off in a railway accident,

02:13:13  23   and I interviewed him in Casa Grande in the presence of

02:13:16  24   his lawyer, Jung, Bob.  J-U-N-G is the last name.

02:13:23  25       Q.  She was implicating him, right, in this in some

**Coash & Coash, Inc., 602-258-1440**

Daniel Patterson - November 26, 2013                     42

| | | |
|---|---|---|
| 02:13:26 | 1 | way? |
| 02:13:26 | 2 | A.  No.  What -- can I go into this?  I mean, I |
| 02:13:33 | 3 | guess it's within the scope.  It had more to do with |
| 02:13:36 | 4 | the Phase 1 investigation. |
| 02:13:40 | 5 | MR. ARNTSEN:  I'm just concerned about the |
| 02:13:42 | 6 | privilege waiver here. |
| 02:13:44 | 7 | MS. GARD:  Well, let me ask you.  I have a |
| 02:13:46 | 8 | letter that you disclosed to us that I'd like to mark |
| 02:13:54 | 9 | as Exhibit 2. |
| 02:13:57 | 10 | (Whereupon, Exhibit Number 2 was marked for |
| 02:13:58 | 11 | identification.) |
| 02:13:58 | 12 | BY MS. GARD: |
| 02:13:58 | 13 | Q.  And I was just wonder if you -- we've never seen |
| 02:14:01 | 14 | that letter before or I haven't, and I was wondering if |
| 02:14:04 | 15 | you knew how that came about.  It was in your file. |
| 02:14:27 | 16 | A.  Okay. |
| 02:14:28 | 17 | MR. ARNTSEN:  Again, the privilege waiver |
| 02:14:32 | 18 | doesn't extend to pure guilt-related things. |
| 02:14:38 | 19 | MS. GARD:  You've disclosed this letter, |
| 02:14:40 | 20 | though. |
| 02:14:40 | 21 | MR. ARNTSEN:  So what?  It's a letter from |
| 02:14:42 | 22 | Wendi to Shawn.  I'm just instructing him on the |
| 02:14:45 | 23 | privilege still. |
| 02:14:46 | 24 | MS. GARD:  Okay.  Well, object as you find |
| 02:14:48 | 25 | relevant. |

**Coash & Coash, Inc., 602-258-1440**

Daniel Patterson - November 26, 2013                43

| | | |
|---|---|---|
| 02:14:48 | 1 | BY MS. GARD: |
| 02:14:49 | 2 | Q.  But can you just tell me what the story is of |
| 02:14:52 | 3 | this? |
| 02:14:52 | 4 | A.  Well, I'm in a box here.  I mean, I don't want |
| 02:14:54 | 5 | to do something unethical by violating Wendi's |
| 02:14:58 | 6 | privilege. |
| 02:14:58 | 7 | Q.  Did she ask you to give this letter to Shawn or |
| 02:15:02 | 8 | is this -- |
| 02:15:02 | 9 | A.  That I don't recall specifically. |
| 02:15:04 | 10 | Q.  You don't recall? |
| 02:15:05 | 11 | A.  But she said to me that Mr. King is somebody who |
| 02:15:08 | 12 | has information that bears upon the issues in the case. |
| 02:15:14 | 13 | We had difficulty locating him.  We finally found him. |
| 02:15:17 | 14 | He indicated that he wished to have an attorney present |
| 02:15:20 | 15 | when we spoke, so we coordinated the meeting with a |
| 02:15:23 | 16 | Mr. Jung -- J-U-N-G -- was his attorney.  I think it |
| 02:15:27 | 17 | was in Casa Grande.  I'm trying to think where we were. |
| 02:15:34 | 18 | I was given an opportunity to speak with Mr. King, but |
| 02:15:39 | 19 | upon advice of counsel he did not answer all of my |
| 02:15:43 | 20 | questions. |
| 02:15:46 | 21 | We concluded that interview.  The information I |
| 02:15:51 | 22 | did derive in that interview was not helpful in the |
| 02:15:53 | 23 | case.  He expressed an unwillingness to assist in |
| 02:15:59 | 24 | defending Wendi, and that's the last and only meeting I |
| 02:16:04 | 25 | had with him.  I did not call him as a witness. |

**Coash & Coash, Inc.,  602-258-1440**

Daniel Patterson - November 26, 2013                    44

| | | |
|---|---|---|
| 02:16:06 | 1 | Q.  Did she ask you to discuss her childhood with |
| 02:16:11 | 2 | Shawn King or anything like that? |
| 02:16:13 | 3 | A.  Just boyfriend/girlfriend.  He was represented |
| 02:16:16 | 4 | to me to be a former boyfriend.  The purpose of our |
| 02:16:22 | 5 | meeting was not so much the former boyfriend angle but |
| 02:16:28 | 6 | that he had information that beared upon Phase 1 |
| 02:16:35 | 7 | issues.  Okay? |
| 02:16:37 | 8 | Q.  And that's all you're willing to say without -- |
| 02:16:40 | 9 | A.  Well -- |
| 02:16:40 | 10 | Q.  -- more of a waiver? |
| 02:16:50 | 11 | A.  If you violate a client's privilege -- |
| 02:16:50 | 12 | Q.  If you had a court order, could you, if we -- |
| 02:16:50 | 13 | A.  If the court declares I have no obligation to |
| 02:16:50 | 14 | abide by her privilege and on this issue she's waived |
| 02:16:53 | 15 | it, that would make me feel a whole lot more |
| 02:16:55 | 16 | comfortable. |
| 02:16:56 | 17 | Q.  Okay.  So maybe we can come back another day and |
| 02:16:59 | 18 | ask more questions about this letter. |
| 02:17:03 | 19 | A.  Well, it's not about the letter so much because |
| 02:17:05 | 20 | I don't recall independently that that is what -- I |
| 02:17:08 | 21 | recall we had a difficult time finding the guy and that |
| 02:17:13 | 22 | this letter may have been sent in an effort to get him |
| 02:17:16 | 23 | to become more cooperative because we couldn't get him |
| 02:17:19 | 24 | to sit down and interview with us.  And, in fact, when |
| 02:17:22 | 25 | he finally agreed to do that, he was accompanied by a |

**Coash & Coash, Inc.,  602-258-1440**

Daniel Patterson - November 26, 2013                    45

| | | |
|---|---|---|
| 02:17:25 | 1 | lawyer, okay, because he was -- can I talk with this |
| 02:17:30 | 2 | gentleman to see if there is a waiver of this |
| 02:17:32 | 3 | particular -- because I don't think he knows where I'm |
| 02:17:33 | 4 | going with this. |
| 02:17:34 | 5 | MS. GARD:  Do you want to just take a |
| 02:17:36 | 6 | break?  I actually have to use the rest room, anyway. |
| 02:17:38 | 7 | MR. ARNTSEN:  Sure.  Let's just go into |
| 02:17:41 | 8 | that conference room. |
| 02:17:43 | 9 | (Whereupon, a recess was taken in the |
| 02:23:23 | 10 | proceedings.) |
| 02:23:23 | 11 | MR. ARNTSEN:  We're asserting a privilege. |
| 02:23:25 | 12 | MS. GARD:  On any questions or what -- |
| 02:23:28 | 13 | MR. ARNTSEN:  Yeah, we're asserting the |
| 02:23:30 | 14 | privilege on this conversation he had with Shawn King |
| 02:23:35 | 15 | to the extent it relates to -- |
| 02:23:36 | 16 | MR. PATTERSON:  Just to embellish, as I |
| 02:23:38 | 17 | understand the issues that have been certified for the |
| 02:23:40 | 18 | evidentiary hearing, none of the conversation I had |
| 02:23:43 | 19 | with Mr. King bears upon that or those issues.  The |
| 02:23:47 | 20 | discussions I had with Mr. King had to do with Phase 1 |
| 02:23:50 | 21 | issues and, based upon what he told me, I elected not |
| 02:23:56 | 22 | to call him as a witness, but there were no -- there |
| 02:23:58 | 23 | may have been something like you dated? |
| 02:24:01 | 24 | Yeah, I dated her.  But there was no |
| 02:24:03 | 25 | substance derived from my interview with him that bears |

**Coash & Coash, Inc.,  602-258-1440**

Daniel Patterson - November 26, 2013          46

| | | |
|---|---|---|
| 02:24:06 | 1 | upon mitigation. |
| 02:24:08 | 2 | BY MS. GARD: |
| 02:24:08 | 3 | Q.  Okay.  Were they Phase 1 issues related to |
| 02:24:10 | 4 | domestic violence?  Can you answer that question? |
| 02:24:13 | 5 | A.  No, no. |
| 02:24:15 | 6 | MR. ARNTSEN:  Yeah, you can. |
| 02:24:16 | 7 | MR. PATTERSON:  No.  Huh-uh. |
| 02:24:18 | 8 | MS. GARD:  Okay.  I think what my position |
| 02:24:19 | 9 | is -- and we'll probably file a motion -- |
| 02:24:21 | 10 | MR. ARNTSEN:  That's fine. |
| 02:24:22 | 11 | MS. GARD:  -- if he's refusing to answer, |
| 02:24:23 | 12 | period, because my position is that you -- you know, |
| 02:24:25 | 13 | he's already said today that his strategy during the |
| 02:24:29 | 14 | guilt phase informed his strategy during the sentencing |
| 02:24:32 | 15 | phase.  He set up the sentencing strategy through the |
| 02:24:33 | 16 | guilty phase, so my position is that the conversations |
| 02:24:36 | 17 | that Shawn King may have had with him were relevant in |
| 02:24:40 | 18 | that capacity.  It was all intertwined. |
| 02:24:44 | 19 | MR. PATTERSON:  Well, just so you don't |
| 02:24:45 | 20 | waste your time unnecessarily, there was the abuse |
| 02:24:48 | 21 | strategy, obviously, in Phase 1, but there was also the |
| 02:24:52 | 22 | suicide pact. |
| 02:24:53 | 23 | BY MS. GARD: |
| 02:24:53 | 24 | Q.  Right. |
| 02:24:53 | 25 | A.  Okay?  And without going any further, those |

**Coash & Coash, Inc.,  602-258-1440**

| | |
|---|---|
| 02:24:57 1 | aren't necessarily intertwined.  And so the information |
| 02:25:00 2 | I derived from Mr. King, I have to prospectively |
| 02:25:04 3 | disagree with you.  I don't think it necessarily bears |
| 02:25:06 4 | upon the mitigation issue at all even though it was |
| 02:25:09 5 | presented in Phase 1. |
| 02:25:11 6 | MR. ARNTSEN:  But still if you need to file |
| 02:25:12 7 | a motion, you can file a motion. |
| 02:25:12 8 | MS. GARD:  Okay. |
| 02:25:15 9 | BY MS. GARD: |
| 02:25:15 10 | Q.  Can I ask, did you ask any questions about her |
| 02:25:19 11 | personality from Shawn King? |
| 02:25:21 12 | A.  No, no.  Other than, you know, you dated; how |
| 02:25:27 13 | was your dating relationship? |
| 02:25:28 14 | You know, we were both 16 at the time.  Her |
| 02:25:31 15 | father -- Shawn King's father was a pastor, as was |
| 02:25:34 16 | Alejo.  They had that common kind of Christian |
| 02:25:39 17 | spiritual interest one in each other but, no, I did not |
| 02:25:42 18 | discuss with him any mental health issue or any of the |
| 02:25:47 19 | issues that, you know, the privilege -- the bar |
| 02:25:51 20 | complaint, that kind of conflict issue, we didn't talk |
| 02:25:54 21 | about that. |
| 02:25:54 22 | Q.  What bar complaint issue with Shawn King? |
| 02:25:56 23 | A.  Well, as I understand the issues for the |
| 02:25:58 24 | evidentiary hearing, one of the -- |
| 02:26:00 25 | Q.  Oh, the conflict subject, yeah. |

**Coash & Coash, Inc.,  602-258-1440**

Daniel Patterson - November 26, 2013          48

02:26:00  1      A.   -- allegations is that Mr. DeLozier's conflict

02:26:03  2  of interest precluded him from developing the

02:26:06  3  mitigation that was necessary.   Okay?

02:26:07  4      Q.   Uh-huh.

02:26:08  5      A.   We didn't talk about that nor did we talk about

02:26:11  6  her mental health nor did we talk about her abuse

02:26:15  7  history with Joe Andriano.

02:26:17  8      Q.   Okay.

02:26:17  9      A.   The topics that I discussed with Mr. King had

02:26:20 10  nothing to do with those topics.

02:26:22 11      Q.   Okay.   And, then, when you discussed her

02:26:25 12  relationship with him, their relationship together

02:26:28 13  which I agree is relevant -- he's been deposed -- her

02:26:35 14  relationship with him, did you discuss or did Shawn

02:26:38 15  King tell you that she had been with other men while

02:26:43 16  she was with him?

02:26:44 17      A.   No, I don't recall that.

02:26:45 18      Q.   That short of general topic didn't come up?

02:26:48 19      A.   No.   I don't recall that, any discussion in that

02:26:50 20  regard.

02:26:50 21      Q.   Did he describe her to you or did he give you

02:26:52 22  the impression that she was able to convince people to

02:26:59 23  believe things, that she was very convincing and

02:27:02 24  manipulative?

02:27:03 25      A.   No, no, definitely not.

**Coash & Coash, Inc.,  602-258-1440**

Daniel Patterson - November 26, 2013          49

| | | |
|---|---|---|
| 02:27:07 | 1 | Q.   That didn't come up? |
| 02:27:08 | 2 | A.   No. |
| 02:27:08 | 3 | Q.   Okay. |
| 02:27:09 | 4 | A.   Huh-uh. |
| 02:27:09 | 5 | Q.   Okay.  Without talking about your discussion |
| 02:27:17 | 6 | with Shawn King, was this letter given to you by Wendi |
| 02:27:21 | 7 | to give to Shawn King? |
| 02:27:24 | 8 | MS. GARD:  Are you objecting to that, too? |
| 02:27:27 | 9 | MR. PATTERSON:  That could be the way -- |
| 02:27:32 | 10 | MR. ARNTSEN:  I guess I'd ask you not to |
| 02:27:33 | 11 | speculate.  If you remember something, you remember. |
| 02:27:36 | 12 | BY MS. GARD: |
| 02:27:36 | 13 | Q.   Yeah, I don't want you to speculate, but if you |
| 02:27:38 | 14 | don't remember you don't remember. |
| 02:27:39 | 15 | A.   No, I can give you an alternative theory. |
| 02:27:41 | 16 | MR. ARNTSEN:  That's speculation. |
| 02:27:43 | 17 | MR. PATTERSON:  Okay.  All right. |
| 02:27:44 | 18 | BY MS. GARD: |
| 02:27:44 | 19 | Q.   Is it an informed theory?  Is it a -- |
| 02:27:46 | 20 | MR. ARNTSEN:  Don't speculate.  If you |
| 02:27:47 | 21 | remember something, go ahead. |
| 02:27:48 | 22 | MR. PATTERSON:  Okay.  Well, I'm not |
| 02:27:50 | 23 | speculating.  We had a difficult time finding this guy. |
| 02:27:53 | 24 | Okay?  Wendi was helpful sometimes in assisting us in |
| 02:27:57 | 25 | locating witnesses that we felt needed to be talked to. |

**Coash & Coash, Inc.,  602-258-1440**

Daniel Patterson - November 26, 2013                    50

| | | |
|---|---|---|
| 02:28:02 | 1 | It may have been in that context.  I'm not speculating. |
| 02:28:05 | 2 | I'm just saying that she is -- generally speaking, she |
| 02:28:08 | 3 | knew the witnesses better than we did and she was, at |
| 02:28:11 | 4 | times, helpful in helping us locate them. |
| 02:28:19 | 5 | BY MS. GARD: |
| 02:28:19 | 6 | Q.  Okay.  So you weren't looking at Shawn King as a |
| 02:28:24 | 7 | mitigation witness. |
| 02:28:25 | 8 | Is that -- |
| 02:28:26 | 9 | A.  No, no. |
| 02:28:28 | 10 | Q.  Okay. |
| 02:28:28 | 11 | A.  My purposes in contacting Mr. King were for |
| 02:28:32 | 12 | issues other than mitigation. |
| 02:28:34 | 13 | Q.  Okay.  How did you -- how would you describe |
| 02:28:40 | 14 | Wendi personally?  What's her personality like? |
| 02:28:43 | 15 | A.  Oh, wow.  What is her personality like?  She was |
| 02:28:52 | 16 | always in jail when I met with her.  She was open.  She |
| 02:29:02 | 17 | was, I believe, candid with me.  She had good recall of |
| 02:29:06 | 18 | the facts and circumstances of the day of the homicide. |
| 02:29:08 | 19 | She had accurate recall of the relevant facts with |
| 02:29:15 | 20 | regard to the suicide compact.  She had -- she was |
| 02:29:21 | 21 | active in the medical malpractice issues.  She gave me |
| 02:29:26 | 22 | a lot of information in that regard.  Just a friendly, |
| 02:29:36 | 23 | likable person. |
| 02:29:40 | 24 | I mean, I had no suspicion in my contacts with |
| 02:29:46 | 25 | her -- and I have no training, no specialized training, |

**Coash & Coash, Inc.,  602-258-1440**

02:29:49  1   but I had no suspicion that she had mental health

02:29:54  2   issues, other than those that derive from being in

02:29:57  3   custody and being accused of a capital offense and

02:30:01  4   possibly losing her children and having lost her

02:30:04  5   husband.  I mean, there was kind of a general malaise

02:30:09  6   or depression that I dealt with with her, but I had no

02:30:15  7   sense that there was a mental illness at work here.

02:30:18  8        Q.  You've represented mentally-ill clients before?

02:30:20  9        A.  I have.

02:30:21 10        Q.  What about clients who have PTSD?  Have you

02:30:23 11   represented clients with PTSD?

02:30:25 12        A.  PTSD?  Specifically PTSD?  You know, I can't --

02:30:31 13   I can't give you an example of a PTSD client, but I

02:30:39 14   have had clients declared to be incompetent.  I have

02:30:42 15   had clients diagnosed with Axis I and Axis II

02:30:47 16   disabilities.  So I'm familiar in general with mental

02:30:52 17   health issues, but I don't have any advanced training

02:30:56 18   in that regard.  I rely upon the experts.

02:30:59 19        Q.  Okay.  Did you find her to be -- did you find

02:31:02 20   her believable when she was talking to you?  Did you

02:31:04 21   feel like she was pulling a role of her own?

02:31:06 22        A.  I felt that she was being honest with me and

02:31:09 23   candid when she described the events of the homicide

02:31:12 24   and the events leading up to the homicide and all of

02:31:16 25   the collateral events, the acquisition of the sodium

**Coash & Coash, Inc.,  602-258-1440**

Daniel Patterson - November 26, 2013                52

02:31:19  1   azide, the life insurance contact that she had on the
02:31:23  2   phone with that person, the acquisition of the life
02:31:25  3   insurance policy.  There were some 404(b) kinds of
02:31:32  4   incidents that she wasn't totally candid with me that
02:31:35  5   were brought to my attention by Mr. Martinez and
02:31:38  6   Ms. Ashasaki, but in general I had a good working
02:31:44  7   relationship with her and I felt that she was an
02:31:46  8   accurate and reliable reporter.
02:31:50  9       Q.  Okay.  Did she -- was she -- did she try to
02:31:57 10   control the defense to a certain extent?
02:31:59 11       A.  No, just the opposite.
02:32:00 12       Q.  She left it to your direct discretion?
02:32:03 13       A.  Made no demands, unlike some clients who want to
02:32:06 14   take a more active role in their defense.  I had to, in
02:32:12 15   fact, extract from her information that related to the
02:32:15 16   abusive behavior of Joseph.  She wasn't initially
02:32:19 17   forthcoming with that.  We had some suspicion that
02:32:24 18   there was a problem.  I brought in Sharon Murphy, and
02:32:26 19   Sharon Murphy is the one that developed that
02:32:28 20   information.  It wasn't she ran up to me and said, I'm
02:32:33 21   an abused spouse and that's going to be our defense.
02:32:36 22   Never.  It didn't happen like that.
02:32:37 23       Q.  Okay.  So Sharon Murphy.
02:32:39 24           So you brought her in because you suspected
02:32:42 25   Wendi was abused?

**Coash & Coash, Inc., 602-258-1440**

P-App. 005636

Daniel Patterson - November 26, 2013                    53

02:32:43  1      A.   Yes.   There was some indicia -- and I can't give
02:32:47  2   you the specifics -- but that he was controlling; that
02:32:51  3   it was his idea of the suicide compact; that he
02:32:56  4   compelled her to do that; that he compelled her to do a
02:32:59  5   number of things that she didn't find pleasant.   I had
02:33:03  6   a meeting then with Sharon Murphy and just in general
02:33:06  7   because I had no experience with the domestic violence
02:33:09  8   defense.   I had asked Sharon to investigate and see if
02:33:12  9   there was something there, and she is the one that
02:33:15 10   confirmed that there was evidence of spousal abuse.
02:33:19 11      We then went back to Wendi and said, you know,
02:33:22 12   you've got to tell us more about this and then we got
02:33:25 13   more into her sexual history.   She was reluctant to
02:33:28 14   disclose that initially.   So, yeah, it was -- she
02:33:33 15   was -- I had to pull things from her to develop the
02:33:37 16   defense.   She wasn't forthcoming which, from what I
02:33:40 17   understand, is normative behavior for abused people
02:33:43 18   that that's not the kind of thing they talk about
02:33:46 19   easily.
02:33:46 20      Q.   Was it you who selected Murphy or DeLozier?
02:33:49 21      A.   Yes.
02:33:50 22      Q.   It was you?
02:33:50 23      A.   Me.
02:33:50 24      Q.   Okay.   How did you select her in particular?
02:33:54 25      A.   Let's see.   I got -- back in that time, it

**Coash & Coash, Inc.,  602-258-1440**

Daniel Patterson - November 26, 2013          54

| | | |
|---|---|---|
| 02:33:57 | 1 | was -- there were very few domestic violence cases.  I |
| 02:34:01 | 2 | guess you had the burning bed with Farrah Fawcett.  It |
| 02:34:06 | 3 | was a new -- relatively new statute of a new defense, |
| 02:34:12 | 4 | and Sharon Murphy was about the only expert locally |
| 02:34:16 | 5 | that had any kind of experience in developing that |
| 02:34:20 | 6 | defense.  And I think she was recommended to me -- I |
| 02:34:25 | 7 | had some contact with a clearing house, an abused and |
| 02:34:30 | 8 | battered women group out of Philadelphia that were |
| 02:34:35 | 9 | helpful in giving me names of experts. |
| 02:34:40 | 10 | And I think they were the ones that may have |
| 02:34:42 | 11 | recommended Mindi McKenna, but I think Sharon Murphy |
| 02:34:46 | 12 | was somebody who had done it before for somebody in the |
| 02:34:49 | 13 | office.  And the fact that she was an ASU professor |
| 02:34:57 | 14 | made her the logical candidate, and I think that's how |
| 02:34:57 | 15 | I contacted her. |
| 02:34:57 | 16 | Q.  Okay.  You mentioned Mindi McKenna. |
| 02:35:00 | 17 | What was the reason for bringing her on? |
| 02:35:01 | 18 | A.  Mr. Martinez retained the services of |
| 02:35:05 | 19 | Dr. Bayless, over objection administered an MMPI and |
| 02:35:10 | 20 | that kind of thing and those kinds of instruments, and |
| 02:35:13 | 21 | I brought Mindi McKenna in to refute specifically his |
| 02:35:17 | 22 | MMPI kind of evaluation in that she had more of a |
| 02:35:23 | 23 | psychologist credential for spouse abuse than did |
| 02:35:28 | 24 | Sharon Murphy.  Sharon Murphy, I think, was a social |
| 02:35:31 | 25 | worker.  And so when he brought in Bayless, it gave me |

**Coash & Coash, Inc.,  602-258-1440**

Daniel Patterson - November 26, 2013                    55

| | | |
|---|---|---|
| 02:35:37 | 1 | the opportunity to bring in a surrebuttal or a rebuttal |
| 02:35:41 | 2 | kind of expert. |
| 02:35:41 | 3 | And that's why I brought McKenna in and to |
| 02:35:45 | 4 | corroborate the findings of Murphy and to -- if you |
| 02:35:48 | 5 | didn't like Murphy, then maybe you'd like McKenna.  So, |
| 02:35:51 | 6 | I mean -- |
| 02:35:53 | 7 | Q.  Okay.  What about Dr. Rosengard?  You had her |
| 02:35:55 | 8 | evaluated by Dr. Rosengard. |
| 02:35:57 | 9 | A.  He was -- did the initial evaluation.  He was an |
| 02:36:03 | 10 | osteopathic physician, a psychiatrist, I believe, who |
| 02:36:06 | 11 | had done some work in Roque.  He was my primary expert |
| 02:36:12 | 12 | in the guilty except insane defense for Mr. Roque.  I |
| 02:36:17 | 13 | worked with him in other cases, and we enlisted him to |
| 02:36:21 | 14 | see if there was any kind of baseline problem that |
| 02:36:24 | 15 | needed further evaluation. |
| 02:36:25 | 16 | Q.  And according to the email that is attached to |
| 02:36:30 | 17 | your declaration -- Exhibit 1 is your declaration and |
| 02:36:34 | 18 | the email, I think, is -- I think it's Exhibit D.  Is |
| 02:36:44 | 19 | it D?  Yes, Exhibit D to the declaration.  It looks |
| 02:36:48 | 20 | like one of the -- no, that's not D.  That's the wrong |
| 02:36:51 | 21 | one.  Sorry.  You know, we may have marked this |
| 02:36:58 | 22 | separately. |
| 02:36:58 | 23 | MR. VIDAL:  I think it's B. |
| 02:37:01 | 24 | MS. GARD:  Yes, it's B. |
| 02:37:02 | 25 | MR. PATTERSON:  B, okay. |

**Coash & Coash, Inc.,  602-258-1440**

Daniel Patterson - November 26, 2013                    56

| | | |
|---|---|---|
| 02:37:03 | 1 | BY MS. GARD: |
| 02:37:03 | 2 | Q.  Yeah, Exhibit B.  It's an email between you and |
| 02:37:07 | 3 | Patrick Linderman.  I'll let you get there. |
| 02:37:11 | 4 | A.  Okay.  Here we go. |
| 02:37:12 | 5 | Q.  And in this email it looks like you are saying |
| 02:37:14 | 6 | that you are retaining him for -- in part, at least, |
| 02:37:18 | 7 | for mitigation investigation. |
| 02:37:20 | 8 | Right? |
| 02:37:20 | 9 | A.  Okay.  Now, this is B, so it's from me to |
| 02:37:24 | 10 | Patrick. |
| 02:37:25 | 11 | Q.  Uh-huh. |
| 02:37:26 | 12 | A.  Let's see.  The two clients are redacted -- dah, |
| 02:37:37 | 13 | dah, dah.  Yeah, exactly.  I mean, for want of a better |
| 02:37:40 | 14 | term, it is the drive-by where we just get a sense of |
| 02:37:45 | 15 | the present status of the client and whether there's |
| 02:37:48 | 16 | any history that needs to be further investigated. |
| 02:37:51 | 17 | Q.  Okay.  So when you got Dr. Rosengard's report, |
| 02:37:56 | 18 | what did you do next?  What did you think of the |
| 02:37:59 | 19 | report? |
| 02:37:59 | 20 | A.  My recollection is that it didn't -- no bells |
| 02:38:02 | 21 | went off.  I mean -- let me see.  Okay.  As he |
| 02:38:05 | 22 | explained, the major effective disorder, the |
| 02:38:07 | 23 | depression, I thought it was circumstantial; it was |
| 02:38:10 | 24 | situational; posttraumatic stress disorder, yeah, the |
| 02:38:14 | 25 | facts and circumstances of the homicide, panic |

**Coash & Coash, Inc., 602-258-1440**

Daniel Patterson - November 26, 2013                    57

02:38:16  1    disorder; no Axis II, no Axis III; significant Axis IV
02:38:21  2    stressors and her performance scale -- again, I forget
02:38:26  3    what that baseline is but, again, there was nothing in
02:38:29  4    Dr. Rosengard's report that set off in my mind a need
02:38:35  5    to actively develop a mental health mitigation plan.
02:38:42  6        Q.  Okay.  And in your affidavit or your declaration
02:38:45  7    on paragraph -- paragraph 30 --
02:38:54  8        A.  Okay.  30.  Okay.
02:38:58  9        Q.  All right.  So you say that there was no
02:38:59 10    strategic reason that you didn't investigate further
02:39:03 11    into her mental health and her personal and family
02:39:05 12    mental health history, or engage an additional
02:39:07 13    psychiatrist or neuropsychologist to evaluate Wendi's
02:39:09 14    mental health.
02:39:10 15        A.  Right.  As I understand strategic reason, was I
02:39:13 16    concerned about developing something that was adverse
02:39:17 17    that would do more harm than good, if that's what
02:39:21 18    strategic means, yes, I didn't -- I didn't -- I didn't
02:39:25 19    not pursue it because I was afraid of what I'd find.
02:39:29 20    Okay?  There was nothing in Dr. Rosengard's report that
02:39:33 21    led me to believe that there was a history of mental
02:39:36 22    illness here that might have proven significant as a
02:39:41 23    basis for mitigation or for mercy.
02:39:45 24        Q.  Okay.  So with that knowledge, then you decided
02:39:47 25    to go with the other themes we've talked about today?

**Coash & Coash, Inc.,  602-258-1440**

Daniel Patterson - November 26, 2013                    58

02:39:50  1      A.   Right.   Well -- and, again, this is in context.
02:39:54  2  I didn't just rely on Rosengard.   I had contact with
02:39:58  3  Wendi.   Kandy Rohde was meeting with her on a regular
02:40:01  4  basis.   Sharon Murphy, the abuse expert, gave me no
02:40:08  5  reason to investigate mental illness.   Mindi McKenna,
02:40:11  6  no reason.   Brad Bayless, you know, even though he says
02:40:15  7  there's some antisocial personality, as I recall, which
02:40:18  8  is not something you really want to go to anyway, but
02:40:20  9  that being said, every person that knew Wendi or had
02:40:23 10  contact with Wendi, her parents, the mental health
02:40:25 11  people I was working with, nobody said to me, there's a
02:40:27 12  problem here with this woman.
02:40:29 13      Q.   Okay.
02:40:30 14      A.   Now, there was some reference in a Kandy Rohde
02:40:33 15  email to me or a telephone call or something about some
02:40:36 16  kind of diagnoses, and she had, you know, the 300, the
02:40:40 17  dot --
02:40:41 18      Q.   I think that's Exhibit D to your -- or
02:40:45 19  summarized in Exhibit D to your declaration.
02:40:48 20      A.   Yeah.   Obviously, I got this Exhibit D.   I
02:40:51 21  looked at it.   What I can't recall is whether I believe
02:40:59 22  this to be a diagnosis that occurred prior to the
02:41:03 23  homicide or something that Kandy came upon during the
02:41:09 24  period of time that she was -- I don't think she was a
02:41:13 25  counselor.   That's too strong.   She was a friend of

**Coash & Coash, Inc., 602-258-1440**

Daniel Patterson - November 26, 2013                    59

02:41:22  1    Wendi or something that she happened upon while -- and
02:41:22  2    she developed while she was in custody.  That's what
02:41:24  3    I'm unclear on, but this is the closest thing to any
02:41:29  4    suggestion from anybody that there was some mental
02:41:31  5    health problems there.
02:41:32  6        Q.  Okay.  And is that what you mean, then, in that
02:41:35  7    same paragraph of your declaration, paragraph 30:
02:41:38  8    "Based on the information then known to me, I did not
02:41:41  9    believe that there was a viable mitigation theme based
02:41:42  10   on Wendi's mental health"?
02:41:44  11       A.  Yes.
02:41:44  12       Q.  That just means --
02:41:46  13       A.  Nobody -- Scott didn't.  Patrick didn't.  David
02:41:49  14   didn't.  Wendi didn't.  Alejo didn't.  Donna didn't.
02:41:56  15   Bayless didn't.  Nobody brought to my attention that
02:42:00  16   there was a fertile mental health gold mine of
02:42:07  17   mitigation, and so I didn't explore it.  And we went
02:42:11  18   with the alternative themes that, you know, she's an
02:42:13  19   abused woman who was -- and otherwise led an exemplary
02:42:19  20   life and don't kill her.
02:42:20  21       Q.  Why didn't you -- the State at one point tried
02:42:23  22   to get disclosure of Rosengard's report and you
02:42:26  23   resisted that.
02:42:27  24           Was there a reason why you --
02:42:29  25       A.  Well, I think it's only discoverable if I do

**Coash & Coash, Inc.,  602-258-1440**

02:42:31  1    mental health an issue and, like the visit that she had

02:42:36  2    this morning, you know, when we place that at issue

02:42:38  3    then the government has the right to interview and

02:42:42  4    evaluate.  I didn't -- by not going with Rosengard as a

02:42:47  5    potential witness, I didn't think it was discoverable.

02:42:52  6    So that's probably why I actively resisted it.

02:42:55  7        Q.  Okay.  But, then, there was nothing particularly

02:42:57  8    in the report you didn't want seen?

02:42:58  9        A.  Not that I specifically recall.

02:43:00 10        Q.  Okay.

02:43:01 11        A.  No.  It was more of a Phillips v. Rinetic

02:43:06 12    (phonetic) kind of thing where, you know, if I put

02:43:07 13    mental health at issue, then I've got to pull me up all

02:43:10 14    of my reports.  I wasn't putting it at issue so I

02:43:13 15    didn't -- it wasn't discoverable under Rule 15.

02:43:18 16            MR. HAZARD:  Well -- and I hate do this.  I

02:43:19 17    don't mean to double team, but along those same

02:43:21 18    lines --

02:43:21 19            MR. ARNTSEN:  Triple team.

02:43:23 20            MR. HAZARD:  -- along those same lines, you

02:43:25 21    could also open the door to the State's expert having

02:43:27 22    to examine and evaluate Wendi, your client.

02:43:31 23            Correct?

02:43:31 24            MR. PATTERSON:  Absolutely.

02:43:33 25            MR. HAZARD:  And that's the concern.

Daniel Patterson - November 26, 2013                    61

02:43:34   1          MR. PATTERSON:  That's the central concern

02:43:35   2   when you -- you need to -- you need to make a

02:43:40   3   well-reasoned decision when you make the choice to put

02:43:42   4   the client's mental health at issue for mitigation

02:43:45   5   because they will hire the Brad Baylesses of the world

02:43:49   6   who will suggest that your client has nothing more than

02:43:52   7   antisocial personality disorder.  So it's a concern and

02:43:56   8   we avoid it if necessary, and I didn't think anything

02:44:01   9   that I saw in Rosengard's report provided a

02:44:06  10   well-rounded, well-reasoned mental health mitigation

02:44:09  11   defense.

02:44:12  12   BY MS. GARD:

02:44:12  13      Q.  Jumping off of that question, when -- because

02:44:16  14   Brad Bayless made some diagnoses that were -- that you

02:44:20  15   were able to preclude and part of the argument was that

02:44:24  16   you had presented psychological testimony.

02:44:27  17      A.  Absolutely.

02:44:29  18      Q.  So was that one of the reasons why?

02:44:30  19      A.  Well, I mean, that was a consistent position.

02:44:33  20   Our position was that we weren't -- we didn't put her

02:44:35  21   mental health -- the client's mental health at issue

02:44:38  22   into the case.  Mr. Martinez was successful in bringing

02:44:42  23   in Brad Bayless ostensibly as an expert on spousal

02:44:49  24   abuse even though his resume didn't support that

02:44:53  25   contention.

**Coash & Coash, Inc.,  602-258-1440**

Daniel Patterson - November 26, 2013                    62

02:44:54  1        That being said -- that being said, Brad Bayless

02:44:58  2   said it's essential that I give her a battery of

02:45:02  3   tests -- the MMPI being one of them -- in order for me

02:45:05  4   to testify because I believe, based upon the literature

02:45:08  5   that I know, that a person who is an abused spouse

02:45:12  6   would score higher on the traumatic scales on the

02:45:17  7   abuse -- it's the PTSD, those scales.  And, you know,

02:45:22  8   I'm sorry.  My MMPI knowledge, I haven't used it in a

02:45:25  9   while.

02:45:26 10        But his position was, I can tell if you've been

02:45:29 11   abused by looking at an MMPI because you should have

02:45:32 12   elevated scores in certain scales, and we had this

02:45:35 13   argument.  And I said, that's bullshit.  Sharon Murphy

02:45:38 14   said that's bullshit.  Okay?  Sorry.  But,

02:45:44 15   unfortunately, the one man's opinion that counted said

02:45:47 16   it's not BS and he allowed it to come in.  Okay?

02:45:52 17        So, yeah, I mean, I think we were consistent

02:45:54 18   throughout saying mental health is not the issue here,

02:45:57 19   it's spousal abuse, and you can't bring in this foe

02:46:01 20   spouse abuse expert to wedge in this antisocial

02:46:06 21   personality stuff under the context of being the expert

02:46:10 22   on spousal abuse.

02:46:11 23        Q.  But to the extent he diagnosed that, though, I

02:46:13 24   think that was kept out, wasn't it?

02:46:14 25        A.  It may have been.  It may have been.  I mean, I

**Coash & Coash, Inc., 602-258-1440**

Daniel Patterson - November 26, 2013          63

| | |
|---|---|
| 02:46:18 | 1 |

think Ishikawa may have given each of us half the baby.
Okay?  I'll keep out the bad mental health stuff but
you can still talk to him about his opinions on whether
she's an abused woman here.

    Q.  Yeah.

        Were you worried at all about what -- even
before Bayless was retained, were you worried at all
about what may come out with a rebuttal evaluation in
terms of her background and things like that; that she
might have been found to be antisocial?

    A.  I think it comes with the territory.  Knowing
Brad Bayless, who for a number of years was on the side
of truth and justice and defense and changed career
paths, it was not a surprise that he came out with an
evaluation of the MMPI that was not advantageous to
Wendi.  That's certainly not a surprise.  So, you know,
did I try to keep him out completely, yeah.  Did Juan
try to get him in completely because he knew it was
advantageous to his case, of course.  He's a good
lawyer.

        That being said, no.  Once the oki-doke was
given to allow her to be evaluated by Brad Bayless, you
knew a bad report was coming, period.  Period.

    Q.  Along those same lines, you were aware of -- and
some of it came in and some of it didn't, but she had

**Coash & Coash, Inc.,  602-258-1440**

**P-App. 005647**

| | | |
|---|---|---|
| 02:47:39 | 1 | engaged in a number of acts that might be considered |
| 02:47:42 | 2 | antisocial, like acts of theft, you know, infidelity, |
| 02:47:46 | 3 | those kinds of -- there was some thing in the prison |
| 02:47:48 | 4 | with Cynthia Edwards. |
| 02:47:50 | 5 | Did those factor into your decision-making |
| 02:47:53 | 6 | process at all? |
| 02:47:54 | 7 | A.   Well, no, because as I understand antisocial |
| 02:47:58 | 8 | personality disorder, you have to have a juvenile onset |
| 02:48:01 | 9 | component and there was no juvenile onset.   Just |
| 02:48:03 | 10 | because she did things that were in the conventional |
| 02:48:07 | 11 | definition of antisocial -- theft and, you know, that |
| 02:48:10 | 12 | kind of thing -- Brad Bayless certainly wouldn't |
| 02:48:13 | 13 | support a diagnosis without juvenile onset. |
| 02:48:16 | 14 | Q.   Right. |
| 02:48:17 | 15 | A.   There was no anecdotal evidence that she was a |
| 02:48:21 | 16 | disruptive child, that she did -- you know, set cats on |
| 02:48:24 | 17 | fire, did that kind of stuff.   So I certainly didn't |
| 02:48:27 | 18 | think that Brad Bayless could go all the way with that |
| 02:48:30 | 19 | diagnosis.   And that may have been why, as I recall, |
| 02:48:33 | 20 | Ishikawa precluded the actual diagnosis because he |
| 02:48:36 | 21 | didn't have the underpinning for antisocial |
| 02:48:39 | 22 | personality, but what's problematic when you let Brad |
| 02:48:42 | 23 | Bayless testify is this MMPI is like an astrological |
| 02:48:45 | 24 | chart.   Okay?   If you're a Gemini you're going to have |
| 02:48:48 | 25 | a good day today. |

**Coash & Coash, Inc.,  602-258-1440**

Daniel Patterson - November 26, 2013                    65

02:48:49  1          And that's basically what these doctors do.

02:48:51  2   They look at the scales and they say, in my opinion,

02:48:54  3   this looks like she has antisocial traits.  And then

02:48:57  4   they put the NOS, not otherwise specified, which when

02:49:01  5   the jurors hear that kind of verbiage from an

02:49:05  6   acknowledged expert, okay, or a self-proclaimed expert,

02:49:08  7   it's problematic.  It's an excuse to kill your client.

02:49:11  8          So we're always -- and, like I said,

02:49:14  9   Mr. Martinez knows this.  He's an astute adversary.  He

02:49:18 10   knows what's compelling to the jurors in terms of

02:49:20 11   making the execution decision and, yeah, Brad Bayless

02:49:23 12   is good at it.  So, no, I wasn't concerned about the

02:49:27 13   diagnosis because I didn't think the factual

02:49:29 14   underpinning was there, but he would send enough of the

02:49:32 15   bad buzz words to give the jurors permission to kill my

02:49:36 16   client.

02:49:37 17      Q.   Okay.  In terms of the difference Ring made to

02:49:41 18   making mental health -- presenting mental health

02:49:43 19   evidence, prior to Ring had you presented a mental

02:49:46 20   health defense to a judge in a capital case at

02:49:49 21   sentencing?

02:49:49 22      A.   I don't know about a defense.

02:49:51 23      Q.   Well, mental health mitigation.  I'm sorry.

02:49:52 24   Mental health mitigation.

02:49:52 25      A.   Well, yeah, but it was a different structured

**Coash & Coash, Inc.,  602-258-1440**

02:49:55  1   presentation.  Again, you knew who your audience was.

02:49:58  2   You knew who the judge favored in terms of mental

02:50:01  3   health evaluators.  It was seldom a knock down, drag

02:50:07  4   out, fully contested proposition, okay, because the

02:50:11  5   County Attorney had a better sense of what a true death

02:50:16  6   case was.

02:50:17  7        And while many of my adversaries actually tried

02:50:22  8   it as a death case because they were given marching

02:50:25  9   orders from their superiors, after the guilt decision

02:50:29  10  we would have a discussion, you know, is this truly a

02:50:32  11  death case?

02:50:33  12       Nah, but that's what my boss wanted me to do.

02:50:34  13  And we had these discussions in chambers where, hey, he

02:50:38  14  doesn't think it's a death case; I certainly don't

02:50:40  15  think it's a death case.  And I've had judges say, give

02:50:43  16  me a strength report that gives me something to pin the

02:50:46  17  life decision on or hook the life decision on.  That

02:50:49  18  happened.  That's the way we did business around here.

02:50:51  19  So you seldom had a truly knock down, drag out he's

02:50:56  20  seeking death, death, death, death, death and I'm

02:50:58  21  fighting my damndest to get the judge to go life, life,

02:51:01  22  life.  That was rare.  That was rare.

02:51:03  23       Q.  Okay.  Well, Roque was a heavy mental health

02:51:07  24  defense.

02:51:08  25            Right?

Daniel Patterson - November 26, 2013                    67

02:51:08  1    A.  Well --

02:51:09  2    Q.  To the jury, in the jury context.

02:51:11  3        Right?

02:51:12  4    A.  Yes, but in that regard, I did the development

02:51:15  5   of the GEI which was, obviously, integrated far better

02:51:20  6   with the mitigation in the case.  Okay?  So I had to

02:51:24  7   force myself to develop the mitigation by virtue of the

02:51:27  8   fact I was going GEI.  Okay?  I didn't have that

02:51:30  9   dilemma with Wendi.  Okay?  The spousal abuse is not

02:51:35 10   contingent upon mental health issues necessarily.  A

02:51:40 11   suicide compact is not a mental health defense.

02:51:43 12    Q.  Right.

02:51:43 13    A.  So they're two separate areas that needed

02:51:48 14   development.  I developed the Phase 1 and Phase 2

02:51:51 15   issue.  I relied upon Mr. DeLozier and Mr. Mac Leod

02:51:57 16   and, at an early time, Mr. Linderman to develop that

02:52:00 17   she's a wonderful human being theory.

02:52:03 18    Q.  Okay.

02:52:05 19    A.  Does that make sense?

02:52:06 20    Q.  Yeah.

02:52:06 21        Did you -- so Roque happened before a jury and

02:52:10 22   that was your first sentencing before a jury.

02:52:13 23    A.  Yes, ma'am.

02:52:13 24    Q.  Capital sentencing.

02:52:15 25    A.  Uh-huh.

**Coash & Coash, Inc.,  602-258-1440**

Daniel Patterson - November 26, 2013                    68

02:52:15   1      Q.   Did you learn anything from Roque that you

02:52:17   2   applied to Wendi's case, anything that you improved?

02:52:20   3      A.   No, because I don't know that I had a chance to

02:52:24   4   kind of sit and determine what had happened in Roque,

02:52:30   5   the good, the bad and then reflect and then change my

02:52:35   6   practices in accordance.  It just -- you did one.  You

02:52:40   7   started to work on the other one, and you just did

02:52:42   8   them.  I mean, no, I didn't -- I don't recall

02:52:48   9   intelligently applying any of the lessons I learned in

02:52:58  10   the Roque case in the Andriano case.

02:52:58  11      Q.   Okay.  The last thing on Rosengard report,

02:52:58  12   paragraph 25 in your declaration, you referred to it as

02:53:01  13   a competency assessment.

02:53:03  14           Is that an error?

02:53:04  15      A.   I think the report speaks for itself.  If I

02:53:08  16   categorized it as a -- paragraph 25?

02:53:10  17      Q.   Paragraph 25.

02:53:11  18      A.   Yeah, I think the competency assessment was

02:53:16  19   Potts.

02:53:16  20      Q.   Correct.

02:53:16  21      A.   I think we need to change that.  It's more of --

02:53:19  22   I mean, he was a psychiatrist.  He's an osteopathic

02:53:23  23   physician.  I believe he had the credentials and, no,

02:53:27  24   he was -- he was evaluating her for mental health

02:53:30  25   issues, not for competency to stand trial.  That was

| | | |
|---|---|---|
| 02:53:33 | 1 | Potts. |
| 02:53:34 | 2 | Q.  Okay.  Kandy Rohde -- |
| 02:53:37 | 3 | A.  Never met her. |
| 02:53:38 | 4 | Q.  You never met her? |
| 02:53:39 | 5 | A.  Never met her.  She was a voice on the |
| 02:53:41 | 6 | telephone, and I'll be candid with you.  I don't know |
| 02:53:46 | 7 | what her function was, quite frankly.  She was on board |
| 02:53:49 | 8 | when I got there.  DeLozier had a good relationship |
| 02:53:54 | 9 | with her.  I think Mommy and -- Alejo and Donna paid |
| 02:53:58 | 10 | her fees.  She certainly wasn't represented to me as |
| 02:54:06 | 11 | any kind of mental health expert, but she was |
| 02:54:10 | 12 | represented to me as the person who would go and sit |
| 02:54:14 | 13 | with her and talk with her and ease her mind with the |
| 02:54:19 | 14 | child issues and just be a friend, a companion for her |
| 02:54:24 | 15 | while she was in jail. |
| 02:54:25 | 16 | Q.  So was she not even a real mental health |
| 02:54:28 | 17 | professional or was she -- |
| 02:54:30 | 18 | A.  I don't think she had any kind of a Ph.D.  She |
| 02:54:35 | 19 | may have had some social work background.  I don't |
| 02:54:39 | 20 | think she was a credentialed mental health evaluator |
| 02:54:42 | 21 | and she was certainly not represented to me in that |
| 02:54:45 | 22 | capacity.  She was more of a companion that would help |
| 02:54:49 | 23 | Wendi get through the difficulties of being |
| 02:54:51 | 24 | incarcerated, having little contact with her children |
| 02:54:55 | 25 | and a liaison between Alejo and Donna and Wendi. |

**Coash & Coash, Inc.,  602-258-1440**

Daniel Patterson - November 26, 2013                    70

| | | |
|---|---|---|
| 02:55:01 | 1 | Q.   Did you consider her to be part of the defense |
| 02:55:03 | 2 | team or not? |
| 02:55:04 | 3 | A.   No. |
| 02:55:04 | 4 | Q.   No? |
| 02:55:04 | 5 | A.   No.   Huh-uh.   No.   And I was specifically |
| 02:55:08 | 6 | concerned that the client, Wendi, may have relayed to |
| 02:55:12 | 7 | her some confidences that if I were to put her on the |
| 02:55:15 | 8 | stand, that she would have to betray those confidences |
| 02:55:19 | 9 | and it would not be in Wendi's best interest. |
| 02:55:20 | 10 | Q.   When you say "she," you are talking about Kandy |
| 02:55:23 | 11 | Rohde and putting her on the stand? |
| 02:55:23 | 12 | A.   Kandy Rohde, yes.   Yes.   There was never any |
| 02:55:25 | 13 | thought of putting Kandy Rohde on the stand. |
| 02:55:27 | 14 | Q.   Okay.   And the reason is because you don't -- |
| 02:55:29 | 15 | you didn't want to pierce the confidentiality with |
| 02:55:33 | 16 | Wendi? |
| 02:55:33 | 17 | A.   Yes, because I was never present when she was |
| 02:55:36 | 18 | having discussions with Wendi, but Wendi alluded to |
| 02:55:38 | 19 | some kind of heartfelt deep kind of things that I |
| 02:55:44 | 20 | was -- and that beared upon the homicide that I was |
| 02:55:47 | 21 | concerned that if she were put on the stand, a deputy |
| 02:55:51 | 22 | county attorney might inquire.   And I didn't want her |
| 02:55:53 | 23 | to take that risk. |
| 02:55:55 | 24 | Q.   Okay. |
| 02:55:56 | 25 | A.   Now, did I debrief her at length?   No.   I didn't |

**Coash & Coash, Inc.,  602-258-1440**

| | | |
|---|---|---|
| 02:56:00 | 1 | investigate what she knew or what she would have |
| 02:56:03 | 2 | testified to, but I saw no value to having Kandy Rohde |
| 02:56:07 | 3 | testify. |
| 02:56:07 | 4 | Q.  Okay.  Mr. DeLozier felt that she could have |
| 02:56:10 | 5 | been called at sentencing, perhaps, and I believe he |
| 02:56:13 | 6 | may have said perhaps also to rebut Bayless. |
| 02:56:17 | 7 | Is that -- you don't share that opinion? |
| 02:56:19 | 8 | A.  I don't recall any discussions with David.  I |
| 02:56:22 | 9 | don't recall him bringing it to my attention.  He was a |
| 02:56:25 | 10 | big supporter of Kandy.  I've got to admit that.  He |
| 02:56:31 | 11 | thought that she was playing a valuable role in |
| 02:56:36 | 12 | maintaining Wendi's peace of mind, but I don't recall a |
| 02:56:44 | 13 | sit-down strategy discussion where we decided to call |
| 02:56:47 | 14 | her or not call her. |
| 02:56:49 | 15 | Q.  Okay. |
| 02:56:50 | 16 | A.  But it would not surprise me if he thought that |
| 02:56:52 | 17 | she would have been a good witness because he did have |
| 02:56:55 | 18 | a very positive relationship with Kandy. |
| 02:56:59 | 19 | Q.  How -- do you know how they knew her? |
| 02:57:01 | 20 | A.  She was on board when I got there.  My sense was |
| 02:57:06 | 21 | that she was of some value to Wendi, and so I didn't -- |
| 02:57:11 | 22 | didn't nip it and I didn't -- it was -- she wasn't part |
| 02:57:17 | 23 | of the defense team.  She wasn't there to develop |
| 02:57:20 | 24 | anything.  She was there to keep Wendi -- well, and |
| 02:57:24 | 25 | there was some -- yeah, I do recall Wendi had some |

**Coash & Coash, Inc., 602-258-1440**

Daniel Patterson - November 26, 2013                72

| | | |
|---|---|---|
| 02:57:27 | 1 | suicide issue.  Whether it was actual or just -- I |
| 02:57:34 | 2 | don't know.  I don't know the extent of her suicide |
| 02:57:36 | 3 | issue, but my recollection is that Kandy played a role |
| 02:57:42 | 4 | in assisting Wendi in maintaining kind of an even keel |
| 02:57:50 | 5 | while she was incarcerated.  That was her function. |
| 02:57:53 | 6 | Q.  Were you concerned -- you mentioned the suicide |
| 02:57:55 | 7 | issue. |
| 02:57:55 | 8 | Were you concerned at all that that may not have |
| 02:57:58 | 9 | been a true suicide attempt? |
| 02:58:01 | 10 | A.  I was told that happened; that she had been |
| 02:58:03 | 11 | moved to a separate location.  A week later I was told |
| 02:58:06 | 12 | everything is fine; nothing to worry about.  I recall |
| 02:58:09 | 13 | meeting with Wendi, you know, what happened here? |
| 02:58:11 | 14 | Oh, don't worry about it; it's not important. |
| 02:58:14 | 15 | She minimized the important of it, but that was Wendi. |
| 02:58:17 | 16 | I mean, Wendi -- Wendi never, never thought anything |
| 02:58:22 | 17 | was a big deal.  I mean, I don't know how to put that |
| 02:58:27 | 18 | in context.  She wasn't a drama queen.  She wasn't, oh, |
| 02:58:31 | 19 | my God, I'm going to kill myself kind of a person.  I |
| 02:58:36 | 20 | was told -- I was concerned.  I saw her, and she just |
| 02:58:40 | 21 | said, don't worry about it; I'm fine, which was, like I |
| 02:58:43 | 22 | say, customary for Wendi.  That's just who she was. |
| 02:58:48 | 23 | Q.  So Mr. DeLozier went on a fast at some point. |
| 02:58:55 | 24 | Right? |
| 02:58:56 | 25 | A.  He sure did. |

**Coash & Coash, Inc., 602-258-1440**

Daniel Patterson - November 26, 2013                73

| | | |
|---|---|---|
| 02:59:05 | 1 | Q.  Okay. |
| 02:59:05 | 2 | MR. MARTINEZ:  I have to intercede. |
| 02:59:05 | 3 | MS. GARD:  Okay. |
| 02:59:05 | 4 | MR. MARTINEZ:  I understood that you joined |
| 02:59:05 | 5 | in on that fast. |
| 02:59:05 | 6 | MR. PATTERSON:  Yeah, and to this day I'm |
| 02:59:05 | 7 | still part of the fasting crowd. |
| 02:59:08 | 8 | It was curious.  He always wore a suit, and |
| 02:59:13 | 9 | he favored the gray suit that Juan is wearing today.  I |
| 02:59:18 | 10 | just remember on a sidebar I'm talking to the clerk and |
| 02:59:23 | 11 | doing something, and he comes in the back of the |
| 02:59:25 | 12 | courtroom.  And he's kind of silhouetted in the door |
| 02:59:28 | 13 | because there's light coming from behind, and I look at |
| 02:59:31 | 14 | him and his suit is ill fitting.  It's just -- it's |
| 02:59:37 | 15 | just draped on him, which was not Dave DeLozier.  He |
| 02:59:41 | 16 | was always a natty dresser, I mean, and I look at him |
| 02:59:46 | 17 | and I went to Wendi.  I said, is he sick? |
| 02:59:50 | 18 | And she goes, No, he's just fasting. |
| 02:59:55 | 19 | I'm, like, we're in the middle of a capital |
| 02:59:57 | 20 | trail and he's fasting.  Why is he fasting? |
| 02:59:58 | 21 | To get closer to God.  I mean, that's his |
| 03:00:01 | 22 | connection.  He does it.  Don't worry about it.  It's |
| 03:00:03 | 23 | no big deal.  That was Wendi.  It's not big deal. |
| 03:00:05 | 24 | Don't worry about it.  It's all part of the plan here. |
| 03:00:07 | 25 | So I confronted him and, yeah, he was on a juice fast. |

**Coash & Coash, Inc.,  602-258-1440**

03:00:12  1   The only thing he consumed, I think, was apple juice,

03:00:17  2   but he confirmed that that was his means and manner of

03:00:23  3   connecting with the higher authority which he thought

03:00:27  4   was essential when he was defending a capital case.  It

03:00:31  5   wasn't by accident.  It was by desire.

03:00:33  6   BY MS. GARD:

03:00:33  7       Q.  You mentioned an incident in your affidavit

03:00:37  8   where he became ill and I think you had to adjourn.

03:00:40  9           Was there any other time during the trial that

03:00:44 10   you perceived him as being ill or not with it?

03:00:47 11       A.  Not that I can recall.  I mean, he lost a

03:00:53 12   significant -- a noticeable amount of weight.  I can't

03:00:57 13   tell you how much weight he lost, but it was -- it was

03:01:00 14   palpable.  You could see it.  And then after his

03:01:04 15   associate was killed by random gunfire, he called me

03:01:09 16   that morning, Sunday morning.  I was at Home Depot

03:01:14 17   getting something for the house.  I had a cell phone,

03:01:18 18   obviously, and he's crying inconsolably on the phone.

03:01:23 19   He just wiped out.  And I said, calm down, calm down,

03:01:30 20   David.  What's going on?

03:01:31 21           And he mentioned, Justin is dead, and I don't

03:01:33 22   know that I recall at the time who Justin was.  Justin

03:01:40 23   is dead; this is horrible; I don't know the facts; they

03:01:44 24   just told me he was dead; he's dead; Justin is dead.

03:01:47 25   He just kept saying it over and over and over again.

**Coash & Coash, Inc.,  602-258-1440**

Daniel Patterson - November 26, 2013                    75

| | | |
|---|---|---|
| 03:01:47 | 1 | I said, Who is Justin? |
| 03:01:51 | 2 | He said, My associate.  Well, I got on the |
| 03:01:55 | 3 | phone, I think, that day and called Ishikawa's court |
| 03:01:58 | 4 | and left a message, and I may have probably left a |
| 03:02:01 | 5 | message on Juan's machine describing the details as I |
| 03:02:05 | 6 | knew them and saying that I don't think we can convene |
| 03:02:07 | 7 | on Monday; he's just -- he can't -- he's out of -- he |
| 03:02:13 | 8 | lost it.  And I think Ishikawa gave us a couple, three |
| 03:02:16 | 9 | days and then we came back. |
| 03:02:20 | 10 | And I had discussions with him afterwards |
| 03:02:22 | 11 | about -- I mean, Justin was like a son to him.  And he |
| 03:02:27 | 12 | was a sole practitioner, so Justin was a resource that |
| 03:02:31 | 13 | allowed him as a sole practitioner to perpetuate his |
| 03:02:34 | 14 | practice while he was in trial with Wendi because I |
| 03:02:39 | 15 | don't think he recognized the time obligation in a |
| 03:02:44 | 16 | capital case; that as a sole practitioner it can kill |
| 03:02:47 | 17 | your practice.  So Justin was there to go to Glendale |
| 03:02:50 | 18 | Municipal Court and do the DUI and answer the phone |
| 03:02:53 | 19 | when a client had a problem and, you know, just keep |
| 03:02:56 | 20 | certain his practice was going. |
| 03:02:57 | 21 | So it was playing with him on a number of |
| 03:03:00 | 22 | levels, you know.  He's in the middle of a capital |
| 03:03:03 | 23 | case.  His son has been randomly killed under |
| 03:03:05 | 24 | circumstances that he has no understanding of what |
| 03:03:08 | 25 | happened.  His practice is going down the drain because |

**Coash & Coash, Inc.,  602-258-1440**

03:03:10  1    of it.  He was a mess.  He was an absolute mess.  So we

03:03:15  2    came back and when we did finally reconvene -- and,

03:03:18  3    again, I probably should have asked for more time, but

03:03:20  4    there's always those pressures.

03:03:22  5         So he's doing the direct exam, I think, on

03:03:26  6    Collier at the time and I'm here at counsel table.

03:03:30  7    Wendi is in the middle and he's sitting there in the

03:03:33  8    position closest to the jury box and I'm taking notes

03:03:37  9    because Collier is testifying, and I look over and he's

03:03:40 10    just -- he's just vacantly staring at counsel table.

03:03:44 11         I said, David, what's up?  Nothing.  I finally

03:03:49 12    went kind of, David, what's going on?  Nothing.  He

03:03:51 13    didn't respond.  I called time out.  I think I grabbed

03:03:56 14    Juan and went on a sidebar and I said -- it was a

03:03:58 15    reported conversation.  I'm sure there's a

03:04:01 16    transcript -- something is wrong here; he can't

03:04:03 17    function.  And we recessed that afternoon.  I don't

03:04:07 18    know if we came back the following day.  When we did

03:04:11 19    come back, he represented to me that all was fine and

03:04:13 20    that he could go on, but he was never the same after

03:04:16 21    that.  It was devastating to him.

03:04:22 22         Q.  He told you at the time he was fine to proceed,

03:04:25 23    though?

03:04:26 24         A.  Oh, yeah.  Yeah.  I think he soldiered up and

03:04:30 25    said, yeah, I'm fine; I can do this, yeah.

Daniel Patterson - November 26, 2013                    77

03:04:32  1        Q.  Were you concerned about going forward or did
03:04:35  2    you consider trying to get a mistrial?
03:04:44  3        A.  You know, I didn't go through intellectually my
03:04:49  4    remedies at that point.  I didn't think it was grounds
03:04:55  5    for a mistrial because, you know, we didn't really have
03:04:59  6    6.8 at the time so that two lawyers were essential for
03:05:06  7    the defense of a capital case.  And if you talk to the
03:05:11  8    judges, the ABA guidelines were kind of aspirational,
03:05:15  9    you know, instructive, you know.  So I don't think I
03:05:29 10    went through the analysis and said this is a predicate
03:05:29 11    for a mistrial or I need to make a motion for a
03:05:29 12    mistrial at this time, and I didn't, certainly.
03:05:29 13        I thought if he was given a little time to
03:05:30 14    recover he might have been able to, but I certainly
03:05:34 15    didn't recognize the depth of his despair at the time.
03:05:37 16    He was -- I think -- I don't know.  You spoke with him
03:05:41 17    yesterday.  I'm certain it still brings a tear to his
03:05:44 18    eye when he talks about it.  He was severely impacted
03:05:49 19    to an extent that I really wasn't completely cognizant
03:05:52 20    of at the time.  In retrospect I know now but, wow,
03:05:57 21    this was a tough, tough week for him.
03:06:01 22        Q.  Did you know that he had Donna and a family
03:06:05 23    friend write the opening statement for the penalty?
03:06:10 24        A.  You know, now that you mention that, I do recall
03:06:13 25    him enlisting their support.  Whether they completely

**Coash & Coash, Inc.,  602-258-1440**

03:06:18  1  authored the presentation, I wasn't led to believe

03:06:21  2  that, but I think -- yeah, I think he did tell me

03:06:24  3  because I think he told me he went down to their house

03:06:27  4  before he gave it and went over it with them.  Yeah, I

03:06:31  5  was aware that they had a part in preparing the

03:06:35  6  presentation, yeah.  Yeah.

03:06:38  7      Q.  Oh, Patrick Linderman, he left the office.

03:06:53  8          Right?

03:06:53  9      A.  Yes.

03:06:53  10     Q.  That's how Scott Mac Leod came on?

03:06:55  11     A.  Yes.

03:06:56  12     Q.  Do you know where he is?

03:06:57  13     A.  He went to -- where he's currently, no.  I don't

03:07:01  14  know, but the history is he apparently -- this is when

03:07:05  15  the inter-tubes was just kind of invented.  He

03:07:10  16  apparently happened upon an online romance with a woman

03:07:14  17  in Indiana, and so he dropped everything and relocated

03:07:19  18  to Indiana.  Whether he's living happily ever after

03:07:23  19  today, I can't tell you, but that's why he gave up his

03:07:25  20  career as a mitigation specialist here in Maricopa

03:07:34  21  County.

03:07:34  22     Q.  You have not seen Larry Hammond's affidavit.

03:07:39  23         Right?

03:07:40  24     A.  No.  Huh-uh.

03:07:40  25     Q.  What about any of the current mental health

**Coash & Coash, Inc.,  602-258-1440**

Daniel Patterson - November 26, 2013          79

| | | |
|---|---|---|
| 03:07:42 | 1 | reports?  Have you seen -- |
| 03:07:43 | 2 | A.   No, I have not by design.  I mean, I didn't want |
| 03:07:48 | 3 | to have them color my recollection and I didn't want |
| 03:07:51 | 4 | them to upset me. |
| 03:07:53 | 5 | Q.   Okay.  Oh, the custody thing, you said you |
| 03:08:03 | 6 | weren't aware that DeLozier was involved in that. |
| 03:08:06 | 7 | A.   I was aware that he was helping in general with |
| 03:08:10 | 8 | a contest between Brad Lambert and Brad's wife.  I |
| 03:08:13 | 9 | forget her name. |
| 03:08:14 | 10 | Q.   Jinnay? |
| 03:08:15 | 11 | A.   Jinnay.  Right.  Yeah, it was Joseph and Jinnay, |
| 03:08:18 | 12 | exactly.  And -- because there was some controversy as |
| 03:08:23 | 13 | to who should be the guardian for the kids.  The |
| 03:08:26 | 14 | grandparents wanted it.  That's -- the Andrianos were |
| 03:08:29 | 15 | not, obviously, in favor -- in the favor of the Ochoas. |
| 03:08:33 | 16 | So I understood that there was some litigation, but I |
| 03:08:37 | 17 | never -- I never learned of the particulars of the |
| 03:08:42 | 18 | litigation.  I didn't realize there was a venue issue |
| 03:08:46 | 19 | or that there were competing petitions in separate |
| 03:08:49 | 20 | jurisdictions. |
| 03:08:50 | 21 | The first I became aware of it was when |
| 03:08:51 | 22 | Mr. Martinez came in and said there's a bar complaint |
| 03:08:54 | 23 | out there and -- not a bar complaint; that the judge |
| 03:08:57 | 24 | had sanctioned David for his misconduct, okay, and that |
| 03:09:03 | 25 | somehow Donna had been complicit in the |

**Coash & Coash, Inc.,  602-258-1440**

Daniel Patterson - November 26, 2013                    80

| | |
|---|---|
| 03:09:06 1 | misrepresentation and he thought it was relevant to her |
| 03:09:09 2 | truth-telling capabilities, now that you mention it. |
| 03:09:13 3 | That's what -- I first became aware of that when Juan |
| 03:09:17 4 | brought that to the attention of Judge Ishikawa because |
| 03:09:20 5 | he thought it was relevant to his cross-exam. |
| 03:09:23 6 | Q.   Okay.  But, otherwise, you didn't know the |
| 03:09:25 7 | specifics of what was going on? |
| 03:09:26 8 | A.   No. |
| 03:09:27 9 | Q.   Would you have been concerned about him being |
| 03:09:31 10 | involved in the custody case or not? |
| 03:09:34 11 | A.   Well, no, not -- because I didn't think it |
| 03:09:38 12 | presented an obvious ethical conflict because I |
| 03:09:42 13 | think -- my understanding was he was acting in the |
| 03:09:45 14 | kids' best interest and I had no indication that Alejo |
| 03:09:53 15 | or Donna were bad custodians or bad candidates to be |
| 03:09:57 16 | guardians.  And, I mean, Mr. Arntsen has brought to my |
| 03:10:02 17 | attention that one of the significant allegations is |
| 03:10:05 18 | that Alejo may have engaged in inappropriate conduct |
| 03:10:07 19 | with the children.  Okay?  That was certainly never |
| 03:10:11 20 | brought to my attention. |
| 03:10:11 21 | Q.   With the Andrianos or the -- Wendi's children? |
| 03:10:15 22 | A.   Well, that the grandparents, Alejo and Donna, |
| 03:10:18 23 | were weekend custodians of the children; when they |
| 03:10:23 24 | returned them to Brad and Jinnay, their bottoms were |
| 03:10:27 25 | messed up; that they inquired of the kids, how did this |

**Coash & Coash, Inc.,  602-258-1440**

| | | |
|---|---|---|
| 03:10:30 | 1 | happen?  And they said, Grandpa did this, and then the |
| 03:10:35 | 2 | follow-up investigation led them to the declaration by |
| 03:10:40 | 3 | Donna that we have secrets in this family and you're |
| 03:10:44 | 4 | not supposed to tell.  I never heard that until it was |
| 03:10:48 | 5 | brought to my attention by Mr. Arntsen in a discussion |
| 03:10:52 | 6 | we had -- when was that?  Weeks ago?  Three weeks ago? |
| 03:10:56 | 7 | Four weeks ago? |
| 03:11:02 | 8 | MS. GARD:  Okay.  I don't have any. |
| 03:11:03 | 9 | Juan, do you have any questions? |
| 03:11:03 | 10 | |
| 03:11:03 | 11 | EXAMINATION |
| 03:11:03 | 12 | BY MR. MARTINEZ: |
| 03:11:05 | 13 | Q.  During the mitigation phase of the proceeding, |
| 03:11:07 | 14 | what would be the custom after you guys -- or we would |
| 03:11:12 | 15 | be done?  Would you guys sit down and talk about it? |
| 03:11:15 | 16 | Would you sit down and talk to Mr. DeLozier about what |
| 03:11:18 | 17 | had happened and what was going to happen the next day |
| 03:11:20 | 18 | or how was that handled? |
| 03:11:21 | 19 | A.  Oh, in terms of presentation?  No.  Scott had |
| 03:11:24 | 20 | worked it up.  He had gone over it with David.  David |
| 03:11:28 | 21 | was delegated expressly the responsibility of Phase 3. |
| 03:11:33 | 22 | You know, I was tired.  It was a very contentious case |
| 03:11:38 | 23 | that you and I were involved in.  Because of the two |
| 03:11:40 | 24 | adverse verdicts, guilty and aggravated, I was |
| 03:11:44 | 25 | concerned that I'd lost credibility with the jury.  And |

03:11:50  1    believing that David had a better handle for all of the

03:11:52  2    issues in mitigation, I suggested that he do it and he

03:12:02  3    agreed to do it.

03:12:02  4        We didn't have any kind of daily strategic

03:12:02  5    discussion about what would be presented, and I think I

03:12:05  6    did limited direct exam of somebody, the brother,

03:12:07  7    maybe, Brandon.  As I recall, I did something, but my

03:12:12  8    participating was far more limited than David's in

03:12:14  9    Phase 3.

03:12:15 10        Q.  Did you know who was going to be presented the

03:12:17 11    next day or anything like that?  Would he let you know,

03:12:19 12    anything like that?

03:12:20 13        A.  I'm certain -- yeah, I had no reason to believe

03:12:22 14    that we had witness problems or that witnesses weren't

03:12:26 15    going to be there.  It was -- you know, it was the

03:12:29 16    usual suspects:  Mom, dad, brother.  I don't know if we

03:12:33 17    called any co-workers.  We had the life story that we

03:12:39 18    played in the PowerPoint.  He gave the opening.  He

03:12:46 19    gave the closing, and I didn't really edit or direct

03:12:54 20    his presentation in any fashion.

03:12:56 21        Q.  Any indication that there were witnesses that he

03:12:58 22    wanted that he couldn't get hold of or anything like

03:13:02 23    that?

03:13:03 24        A.  No.  Huh-uh, there was some scrambling of -- I

03:13:08 25    don't know if it's just because of the time constraints

Daniel Patterson - November 26, 2013                    83

03:13:11  1    that we had to do it but, no, my overall impression of

03:13:16  2    the presentation was that Scott presented everybody

03:13:19  3    that was relevant.  We had access to everybody we

03:13:23  4    wanted to present and everybody was presented.

03:13:27  5        Q.  At the time that the -- I think it was the

03:13:31  6    opening or, actually, it may have been the closing --

03:13:33  7    there were some photographs that were added anew for

03:13:37  8    the first time that had not been provided to anybody up

03:13:41  9    until probably closing.

03:13:43  10       A.  What do they specifically --

03:13:45  11       Q.  The upbringing, involving her upbringing.

03:13:47  12       A.  Okay.  We were scrambling trying to get

03:13:50  13   something there at the 11th hour.  It may have been the

03:13:53  14   photographs.

03:13:53  15       Q.  Do you know how that came about?  Where did

03:13:56  16   these photographs come from at the very end?  I know

03:13:59  17   that we had an issue with Judge Ishikawa and he

03:14:01  18   basically said just deal with it, you know.

03:14:03  19       A.  Again, I don't have a specific recollection,

03:14:06  20   Juan.  I do recall there was some difficulty in

03:14:09  21   acquiring something in the mitigation phase.  That may

03:14:13  22   very well have been those photographs.

03:14:15  23       Q.  Where did the photographs, all -- do you know

03:14:18  24   the source of the photographs?

03:14:20  25       A.  Donna and Alejo, I was led to believe.  All of

**Coash & Coash, Inc.,  602-258-1440**

Daniel Patterson - November 26, 2013                    84

| 03:14:23 | 1 | the -- all of the relevant mitigation information was |
| 03:14:27 | 2 | provided by Donna and Alejo. |
| 03:14:28 | 3 | Q.  During the mitigation -- |
| 03:14:30 | 4 | A.  And Brandon.  Brandon gave us some insights. |
| 03:14:32 | 5 | Q.  During the mitigation phase, did you ever see -- |
| 03:14:37 | 6 | just the mitigation phase. |
| 03:14:40 | 7 | The issue involving Justin or the colleague that |
| 03:14:46 | 8 | was killed, that occurred, if I remember right, during |
| 03:14:50 | 9 | the guilt phase of the case when John Collier was |
| 03:14:54 | 10 | testifying which was the guilt phase. |
| 03:14:55 | 11 | A.  Yeah, exactly, because we would have called |
| 03:14:56 | 12 | Collier in Phase 1 when he was talking about what |
| 03:14:59 | 13 | sodium azide does to a human being. |
| 03:15:01 | 14 | Q.  Right. |
| 03:15:01 | 15 | A.  Yes. |
| 03:15:02 | 16 | Q.  And during the -- and that's when you said that |
| 03:15:09 | 17 | he was in a haze or whatever else you said? |
| 03:15:09 | 18 | A.  Yes, very pronounced. |
| 03:15:11 | 19 | Q.  During the mitigation phase, there was -- was |
| 03:15:15 | 20 | there any time that you felt that he was in the same |
| 03:15:17 | 21 | sort of haze as he was with the Joe Collier thing? |
| 03:15:20 | 22 | A.  I can't give you any specific episodes where I |
| 03:15:22 | 23 | looked up and I said, oh, here we go again, and I had |
| 03:15:25 | 24 | nothing to compare it to in terms of performance.  I |
| 03:15:28 | 25 | had never seen him try a case before.  My recollection |

**Coash & Coash, Inc.,  602-258-1440**

| | | |
|---|---|---|
| 03:15:33 | 1 | is that he did an accomplished job of presenting the |
| 03:15:36 | 2 | mitigation theories and themes.  I was comfortable with |
| 03:15:42 | 3 | his opening and his closing mitigation.  I thought that |
| 03:15:47 | 4 | he presented sufficient information to spare Wendi's |
| 03:15:51 | 5 | life.  I had no reservations about his performance in |
| 03:15:55 | 6 | Phase 3 that I can specifically point to. |
| 03:15:58 | 7 | MR. MARTINEZ:  I don't have any other |
| 03:15:59 | 8 | questions. |
| 03:16:02 | 9 | MS. GARD:  Greg? |
| 03:16:03 | 10 | MR. HAZARD:  No. |
| 03:16:03 | 11 | MR. ARNTSEN:  We're done? |
| 03:16:04 | 12 | MS. GARD:  We're done.  Thank you. |
| | 13 | (Whereupon, the proceedings concluded at |
| | 14 | 3:16 p.m.) |
| | 15 | |
| | 16 | |
| | 17 | |
| | 18 | |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |

**Coash & Coash, Inc.,  602-258-1440**

Daniel Patterson - November 26, 2013                86

```
 1    STATE OF ARIZONA      )
 2    COUNTY OF MARICOPA    )
 3              BE IT KNOWN the foregoing proceedings were
 4    taken by me; that I was then and there a Certified
 5    Reporter of the State of Arizona, and by virtue thereof
 6    authorized to administer an oath; that the proceedings
 7    were taken down by me in shorthand and thereafter
 8    transcribed into typewriting under my direction; that
 9    the foregoing pages are a full, true, and accurate
10    transcript of all proceedings and testimony had and
11    adduced upon the taking of said proceedings, all done to
12    the best of my skill and ability.
13              I FURTHER CERTIFY that I am in no way
14    related to nor employed by any of the parties thereto
15    nor am I in any way interested in the outcome hereof.
16              DATED at Phoenix, Arizona, this _____ day of
17    _____, 2013.
18                         _____
19                         LILIA MONARREZ, RPR, CR #50699
20
21
22
23
24
25
```

**Coash & Coash, Inc.,  602-258-1440**

P-App. 005670

State of Arizona vs.
Andriano

Daniel Patterson
November 26, 2013

## A

**ABA (2)** 32:25;77:8
**ABA-sanctioned (1)** 41:13
**abide (1)** 44:14
**ability (1)** 38:15
**able (3)** 48:22;61:15; 77:14
**absolute (1)** 76:1
**Absolutely (7)** 27:20; 34:24;39:15;41:5,6; 60:24;61:17
**abuse (15)** 16:11; 19:21,22;24:20; 46:20;48:6;53:10; 54:23;58:4;61:24; 62:7,19,20,22;67:9
**abused (9)** 30:4; 52:21,25;53:17;54:7; 59:19;62:5,11;63:4
**abusive (1)** 52:16
**accept (1)** 28:21
**access (4)** 8:4;33:8, 20;83:3
**accessible (1)** 29:1
**accident (2)** 41:22; 74:5
**accompanied (2)** 5:18;44:25
**accomplished (3)** 26:24;41:8;85:1
**accordance (1)** 68:6
**according (1)** 55:16
**accurate (3)** 8:20; 50:19;52:8
**accused (1)** 51:3
**acknowledge (1)** 8:1
**acknowledged (1)** 65:6
**acquired (1)** 22:19
**acquiring (1)** 83:21
**acquisition (2)** 51:25; 52:2
**Acre's (1)** 21:7
**acting (1)** 80:13
**action (1)** 9:24
**active (2)** 50:21; 52:14
**actively (2)** 57:5;60:6
**acts (2)** 64:1,2
**actual (3)** 4:25;64:20; 72:1
**actually (7)** 13:5,6; 21:4;26:20;45:6; 66:7;83:6
**added (1)** 83:7
**additional (1)** 57:12
**adequately (1)** 40:21
**adjourn (1)** 74:8
**administered (1)** 54:19

**administrator (1)** 20:8
**admission (2)** 10:22; 11:8
**admit (2)** 34:18;71:10
**admitted (2)** 10:19; 11:7
**advance (1)** 25:14
**advanced (1)** 51:17
**advantageous (2)** 63:15,19
**adversaries (1)** 66:7
**adversary (1)** 38:3; 65:9
**adverse (4)** 14:9; 30:3;57:16;81:24
**advice (1)** 43:19
**advise (1)** 4:9
**advised (1)** 8:7
**advisor (2)** 25:24; 26:3
**affable (1)** 23:13
**affected (1)** 5:1
**affidavit (4)** 26:9; 57:6;74:7;78:22
**affidavits (2)** 6:19;7:7
**affirmative (1)** 16:17
**affirmatively (1)** 25:5
**afford (1)** 14:10
**afraid (1)** 57:19
**afternoon (1)** 76:17
**afterwards (1)** 75:10
**again (13)** 13:25; 17:2,6;40:15;42:17; 57:2,3;58:1;66:1; 74:25;76:3;83:19; 84:23
**against (2)** 38:2,17
**agency (2)** 12:23; 33:4
**aggravated (1)** 81:24
**ago (3)** 81:6,6,7
**agree (2)** 7:24;48:13
**agreed (2)** 44:25; 82:3
**agreement (1)** 13:9
**ahead (3)** 14:2; 17:17;49:21
**Akers (2)** 32:3;33:13
**Albert (1)** 18:12
**Alejo (20)** 24:14; 28:24;30:21;35:9; 37:10,17;38:10,18; 39:10,18,23;47:16; 59:14;69:9,25;80:14, 18,22;83:25;84:2
**allegation (1)** 4:17
**allegations (3)** 38:17; 48:1;80:17
**Allen (1)** 6:17
**allocate (1)** 25:15
**allow (1)** 63:22
**allowed (4)** 8:5; 40:19;62:16;75:13

**alluded (1)** 70:18
**along (5)** 15:7;23:12; 60:17,20;63:24
**alternative (4)** 20:17; 30:19;49:15;59:18
**although (1)** 16:25
**always (12)** 22:12; 23:15;32:22;33:2; 34:17,20;37:4;50:16; 65:8;73:8,16;76:4
**amount (1)** 74:12
**analysis (1)** 77:10
**Andriano (9)** 9:6; 10:12;18:8,21;25:1; 33:9;39:4;48:7;68:10
**Andrianos (2)** 79:14; 80:21
**Andriano's (1)** 4:20
**anecdotal (1)** 64:15
**anew (1)** 83:7
**angle (1)** 44:5
**antisocial (9)** 58:7; 61:7;62:20;63:10; 64:2,7,11,21;65:3
**anum (1)** 20:12
**apparently (2)** 78:14, 16
**appearance (2)** 21:5, 7
**appears (1)** 10:7
**appended (4)** 7:11, 19,20;8:16
**appendices (1)** 7:23
**apple (1)** 74:1
**applied (1)** 68:2
**apply (1)** 19:17
**applying (1)** 68:9
**appointed (4)** 8:8; 21:1,24;28:19
**apportioned (1)** 12:11
**appreciation (1)** 28:22
**apprised (1)** 24:4
**approval (1)** 6:8
**approved (1)** 6:8
**April (1)** 11:7
**areas (1)** 67:13
**argument (2)** 61:15; 62:13
**Arizona (3)** 4:1;10:21, 22
**ARNTSEN (30)** 4:8; 5:7,17;6:2,3,22;7:1, 12;8:13,23;9:8;10:7, 18;27:11;42:5,17,21; 45:7,11,13;46:6,10; 47:6;49:10,16,20; 60:19;80:16;81:5; 85:11
**Arntsen's (1)** 8:7
**around (2)** 21:23; 66:18
**Ashasaki (1)** 52:6

**aside (2)** 19:13;25:20
**aspect (1)** 27:1
**aspirational (1)** 77:8
**asserting (2)** 45:11,13
**assessment (2)** 68:13,18
**assigned (4)** 21:12; 29:11,17;40:11
**assignment (1)** 28:11
**assist (2)** 33:9;43:23
**assistance (1)** 27:18
**assisting (2)** 49:24; 72:4
**associate (6)** 5:19,25; 9:22;11:12;74:15; 75:2
**assumed (2)** 25:12; 29:22
**assuming (1)** 18:3
**astrological (1)** 64:23
**astute (1)** 65:9
**ASU (1)** 54:13
**attached (2)** 7:12; 55:16
**attempt (1)** 72:9
**attempting (1)** 25:15
**attend (1)** 15:12
**attendant (1)** 32:24
**attention (10)** 24:25; 34:8;35:6;52:5; 59:15;71:9;80:4,17, 20;81:5
**attest (1)** 7:14
**attitude (3)** 34:4,7,21
**Attorney (13)** 4:8; 9:12;12:15;20:3; 25:17;26:1,2;27:7; 28:19;43:14,16;66:5; 70:22
**audience (1)** 66:1
**authored (1)** 78:1
**authority (1)** 74:3
**available (1)** 17:7
**avoid (1)** 61:8
**aware (9)** 10:10;22:9; 38:17;63:24;78:5; 79:6,7,21;80:3
**Axis (5)** 51:15,15; 57:1,1,1
**azide (4)** 33:25;34:1; 52:1;84:13

## B

**baby (1)** 63:1
**back (24)** 10:13; 11:18;12:10;16:19; 17:2,2,9,12;28:12,15, 21;29:20;32:17; 39:22;41:6,9;44:17; 53:11,25;73:11;75:9; 76:2,18,19

**background (3)** 29:6; 63:9;69:19
**bad (7)** 15:5;63:2,23; 65:15;68:5;80:15,15
**bailiff (2)** 11:8,11
**bar (9)** 9:16,23;10:1; 11:6,12;47:19,22; 79:22,23
**based (7)** 6:6;14:23, 23;45:21;59:8,9;62:4
**baseline (1)** 55:14; 57:3
**basically (2)** 65:1; 83:18
**basis (6)** 17:24; 24:15,16;41:7;57:23; 58:4
**battered (2)** 16:20; 54:8
**battery (1)** 62:2
**Bayless (15)** 54:19, 25;58:6;59:15;61:14, 23;62:1;63:7,12,22; 64:12,18,23;65:11; 71:6
**Baylesses (1)** 61:5
**beared (2)** 44:6; 70:20
**bears (4)** 43:12; 45:19,25;47:3
**became (8)** 10:10; 11:12,20;12:7;32:4; 74:8;79:21;80:3
**become (1)** 44:23
**bed (1)** 54:2
**began (1)** 10:24
**beginning (1)** 16:8
**behavior (2)** 52:16; 53:17
**behind (1)** 73:13
**belief (2)** 16:9;28:13
**believable (1)** 51:20
**believing (1)** 82:1
**bells (1)** 56:20
**bench (4)** 20:13,24; 21:21,24
**benefit (1)** 15:4
**best (4)** 16:9;26:3; 70:9;80:14
**betray (1)** 70:8
**better (6)** 27:22;50:3; 56:13;66:5;67:5;82:1
**big (4)** 71:10;72:17; 73:23,23
**Bishop (1)** 11:18
**blah (3)** 28:8,8,8,8
**Blair (1)** 9:22
**blind-sided (5)** 31:21, 25;32:7;33:14,15
**board (2)** 69:7;71:20
**Bob (1)** 41:24
**boss (2)** 15:15;66:12
**both (5)** 27:23,25;

28:3;41:22;47:14
**bottoms (1)** 80:24
**box (2)** 43:4;76:8
**boyfriend (2)** 44:4,5
**boyfriend/girlfriend (1)**
44:3
**Brad (13)** 58:6;61:5,
14,23;62:1;63:12,22;
64:12,18,22;65:11;
79:8;80:24
**Brad's (1)** 79:8
**Brandon (5)** 39:12,
13;82:7;84:4,4
**break (1)** 45:6
**brief (1)** 13:11
**bring (3)** 14:25;55:1;
62:19
**bringing (6)** 17:12;
32:1;33:15;54:17;
61:22;71:9
**brings (1)** 77:17
**broken (1)** 37:23
**Brother (4)** 39:13,14;
82:6,16
**brought (17)** 24:25;
31:17;32:8;33:12;
34:8;35:5;52:5,18,
24;54:21,25;55:3;
59:15;80:4,16,20;
81:5
**BS (1)** 62:16
**buildings (1)** 36:9
**bullshit (2)** 62:13,14
**burning (1)** 54:2
**business (2)** 29:2;
66:18
**buy (1)** 28:21
**buying (1)** 21:8
**buzz (1)** 65:15

**C**

**call (8)** 17:1;27:24;
37:4;43:25;45:22;
58:15;71:13,14
**called (7)** 15:14;71:5;
74:15;75:3;76:13;
82:17;84:11
**calls (1)** 23:15
**calm (2)** 74:19,19
**came (17)** 6:3;15:7,
11;18:1;29:20;32:5;
37:25;42:15;58:23;
63:14,25;75:9;76:2,
18;78:10;79:22;
83:15
**can (28)** 6:18;7:1;
11:3,8,9;13:15;
15:15;17:24;27:11,
21;28:6;36:16;42:2;
43:2;44:17;45:1;
46:4,6;47:7,10;
49:15;62:10;63:3;

74:11;75:6,16;76:25;
85:6
**candid (6)** 6:13;
39:24;50:17;51:23;
52:4;69:6
**candidate (1)** 54:14
**candidates (1)** 80:15
**capabilities (1)** 80:2
**capable (1)** 14:18
**capacity (2)** 46:18;
69:22
**capital (25)** 9:11;
10:12;11:25;12:3,6,8,
15,18,20,23;13:5,12,
16;18:21;20:9;27:19,
25;51:3;65:20;67:24;
73:19;74:4;75:16,22;
77:7
**capital-specific (1)**
29:3
**capricious (1)** 19:20
**care (2)** 17:12;22:9
**career (2)** 63:13;
78:20
**Carreon's (1)** 18:12
**carry (2)** 14:6;15:16
**Casa (5)** 35:18,21;
37:1;41:23;43:17
**case (56)** 11:5;12:20,
22;13:11,12,13,18;
15:22;16:6;18:12,19,
21;19:9;20:1,7,9;
21:2,17;22:6,9;24:5,
18;25:6,21,23;26:11,
12;27:1;28:22;29:8,
18,21;31:17;32:1;
43:12,23;61:22;
63:19;65:20;66:6,8,
11,14,15;67:6;68:2,
10,10;74:4;75:16,23;
77:7;80:10;81:22;
84:9,25
**caseload (6)** 12:8,9,
16;14:7;18:2,15
**caseloads (1)** 12:11
**cases (20)** 11:25;
12:3,6,18,25;13:1,5,
5,8,16;14:6;18:2,11;
20:19,20;22:10;
27:17;32:24;54:1;
55:13
**catastrophic (2)** 9:14,
21
**categorize (1)** 23:25
**categorized (1)** 68:16
**cats (1)** 64:16
**Cave (2)** 23:16;35:22
**cell (1)** 74:17
**central (1)** 61:1
**certain (8)** 17:22;
18:13;37:12;52:10;
62:12;75:20;77:17;
82:13

**certainly (10)** 37:8;
63:16;64:12,17;
66:14;69:10,21;
77:12,14;80:19
**certified (1)** 45:17
**chambers (1)** 66:13
**chance (1)** 68:3
**chances (1)** 7:16
**change (4)** 18:22;
19:19;68:5,21
**changed (3)** 6:14;
9:13;63:13
**changes (1)** 6:10
**chapter (1)** 26:20
**charge (2)** 4:24;11:18
**chart (1)** 64:24
**chartered (1)** 20:15
**checked (1)** 12:20
**Cheryl (1)** 11:13
**child (2)** 64:16;69:14
**childhood (5)** 4:22;
29:24;30:22;39:21;
44:1
**children (6)** 30:4;
51:4;69:24;80:19,21,
23
**choice (1)** 61:3
**choosing (1)** 30:16
**chose (2)** 17:6;30:18
**Christ (1)** 40:7
**Christian (4)** 31:1,2,3;
47:16
**circumstances (3)**
50:18;56:25;75:24
**circumstantial (1)**
56:23
**city (1)** 20:12
**claimed (1)** 38:8
**clarify (1)** 30:9
**class (1)** 30:2
**clear (1)** 9:25
**cleared (2)** 6:14;7:11
**clearing (1)** 54:7
**Clearly (1)** 6:4
**clerk (1)** 73:10
**client (12)** 12:8;
15:21;17:25;24:14;
51:13;56:15;60:22;
61:6;65:7,16;70:6;
75:19
**clients (8)** 15:16;51:8,
10,11,14,15;52:13;
56:12
**client's (3)** 44:11;
61:4,21
**closer (1)** 73:21
**closest (2)** 59:3;76:8
**closing (2)** 82:19;
83:6,9;85:3
**co-counsel (1)** 27:24
**cognizant (1)** 77:19
**collateral (1)** 51:25
**colleague (1)** 84:7

**Collier (7)** 33:24,25;
76:6,9;84:9,12,21
**color (1)** 79:3
**comfortable (2)**
44:16;85:2
**coming (1)** 11:23;
63:23;73:13
**commencement (1)**
4:6
**common (1)** 47:16
**compact (3)** 50:20;
53:3;67:11
**companion (2)** 69:14,
22
**compare (1)** 84:24
**compassionate (1)**
31:9
**compelled (2)** 53:4,4
**compelling (1)** 65:10
**competencies (1)**
28:4
**competency (6)**
18:10;23:9,11;68:13,
18,25
**competent (5)** 26:1;
28:9,11;29:12;38:3;
40:19
**competing (1)** 79:19
**complain (2)** 32:12,15
**complaint (7)** 9:16,23;
10:1;47:20,22;79:22,
23
**completely (6)** 24:22;
34:4;63:17,18;77:19,
25
**complicit (1)** 79:25
**comply (1)** 28:8
**component (1)** 64:9
**compound (1)** 7:8
**concern (4)** 14:16;
60:25;61:1,7
**concerned (12)**
36:24;42:5;57:16;
65:12;70:6,21;72:6,8,
20;77:1;80:9;81:25
**concluded (2)** 43:21;
85:13
**conduct (4)** 38:10;
39:17;41:5;80:18
**conference (2)** 36:12;
45:8
**confidences (2)** 70:7,
8
**confidentiality (1)**
70:15
**confirmed (2)** 53:10;
74:2
**conflict (5)** 4:25;
47:20,25;48:1;80:12
**confronted (1)** 73:25
**connecting (1)** 74:3
**connection (4)** 24:9,
10;37:7;73:22

**conscious (1)** 18:15
**consequence (3)**
21:9,13,14
**consequences (1)**
34:1
**consider (2)** 70:1;
77:2
**considered (1)** 64:1
**consistent (3)** 23:24;
61:19;62:17
**constant (3)** 24:12;
30:21;37:5
**constraints (1)** 82:25
**consumed (1)** 74:1
**contact (15)** 24:10,12,
13;25:7,8;30:20,20,
21;37:5,6;52:1;54:7;
58:2,10;69:24
**contacted (1)** 54:15
**contacting (1)** 50:11
**contacts (1)** 50:24
**contention (1)** 61:25
**contentious (1)** 81:22
**contest (1)** 79:8
**contested (1)** 66:4
**context (9)** 12:24;
13:20,21;31:25;50:1;
58:1;62:21;67:2;
72:18
**contingent (1)** 67:10
**continuing (1)** 24:13
**contract (3)** 12:4;
20:14,16
**contrary (1)** 31:11;
32:9
**contribute (1)** 33:21
**control (1)** 52:10
**controlling (1)** 53:2
**controversy (1)** 79:12
**convene (1)** 75:6
**conventional (1)**
64:10
**conversation (4)** 6:20;
45:14,18;76:15
**conversations (1)**
46:16
**convince (1)** 48:22
**convincing (1)** 48:23
**cooperative (1)** 44:23
**coordinated (1)** 43:15
**copies (2)** 6:10,18
**copy (2)** 6:12,15
**corrections (2)** 6:5,7
**corroborate (1)** 55:4
**costs (1)** 32:24
**counsel (18)** 4:18,24;
8:18;22:8;24:23;
27:24;28:4,12,14,15,
17,20,22,23;32:23;
43:19;76:6,10
**counselor (1)** 58:25
**count (1)** 20:24
**counted (1)** 62:15

State of Arizona vs.
Andriano

Daniel Patterson
November 26, 2013

**County (6)** 10:2,5,11;
66:5;70:22;78:21
**couple (2)** 18:13;75:8
**course (1)** 63:19
**Court (9)** 19:14,18;
20:12;21:7;22:5;
44:12,13;75:3,18
**courthouse (1)** 36:10
**courtroom (1)** 73:12
**coworkers (1)** 30:5
**co-workers (1)** 82:17
**credence (1)** 14:20
**credential (1)** 54:23
**credentialed (1)**
69:20
**credentials (4)** 12:5;
29:17;40:24;68:23
**credibility (1)** 81:25
**Creek (2)** 23:16;
35:22
**crime (1)** 33:23
**criminal (2)** 20:2;26:2
**cross (2)** 26:23;38:5
**cross-exam (2)** 10:8;
80:5
**cross-examination (1)**
10:6
**crowd (1)** 73:7
**crying (1)** 74:18
**curious (2)** 37:15;
73:8
**current (2)** 28:5;78:25
**Currently (2)** 28:16;
78:13
**cursory (1)** 38:21
**custodians (2)** 80:15,
23
**custody (4)** 51:3;
59:2;79:5;80:10
**custom (1)** 81:14
**customary (1)** 72:22
**cut (1)** 41:22
**Cynthia (1)** 64:4

**D**

**dad (1)** 82:16
**dah (3)** 56:12,13,13
**daily (1)** 82:4
**damndest (1)** 66:21
**D'Angelo (1)** 14:19
**Danny (1)** 13:10
**Danny's (1)** 13:10
**date (3)** 19:16;22:10,
11
**dated (3)** 45:23,24;
47:12
**dating (1)** 47:13
**daughter (1)** 36:25
**Dave (1)** 73:15
**David (18)** 25:9,12,
16;30:13;33:18;37:6,
7,9;40:1;59:13;71:8;

74:20;76:11,12;
79:24;81:20,20;82:1
**David's (1)** 82:8
**day (12)** 16:4;20:3;
22:7;28:10;44:17;
50:18;64:25;73:6;
75:3;76:18;81:17;
82:11
**days (1)** 75:9
**dead (5)** 74:21,23,24,
24,24
**deal (8)** 6:18;7:2;
17:5;40:17;72:17;
73:23,23;83:18
**dealt (1)** 51:6
**death (20)** 9:22;
14:15,18;19:12,24;
27:17;28:7;31:17,8;
32:24;66:5,8,11,14,
15,20,20,20,20,20
**debrief (1)** 70:25
**decided (5)** 25:18;
26:25;30:10;57:24;
71:13
**deciding (1)** 40:12
**decision (12)** 9:12,13;
17:3;18:23;30:11,14;
31:5;61:3;65:11;
66:9,17,17
**decision-making (1)**
64:5
**decisions (1)** 40:20
**declaration (21)** 5:12,
13,15,16;7:11,21;8:5,
14,16,19;9:5,7;27:9;
55:17,17,19;57:6;
58:19;59:7;68:12;
81:2
**declarations (1)** 9:2
**declared (1)** 51:14
**declares (1)** 44:13
**deep (1)** 70:19
**defaulted (1)** 33:4
**defend (1)** 32:24
**defendant (1)** 28:18
**Defendant's (2)** 4:17;
28:16
**defender (1)** 11:17,
20;12:7;20:17
**defending (5)** 24:18;
33:9,10;43:24;74:4
**defense (29)** 4:23;
9:12;12:15;16:11,17;
19:25;20:3;24:3,20;
25:1,19;26:1;52:10,
14,21;53:8,16;54:3,6;
55:12;61:11;63:13;
65:20,22;66:24;
67:11;70:1;71:23;
77:7
**defer (1)** 17:15
**deferred (1)** 41:15
**defined (1)** 24:6;

27:23
**definitely (1)** 48:25
**definition (1)** 64:11
**delegate (1)** 24:18
**delegated (1)** 81:21
**DeLozier (22)** 4:24;
9:4,18,19;10:5;21:2;
23:12;24:12;27:2,10,
16;28:2,10;31:16;
53:20;67:15;69:8;
71:4;72:23;73:15;
79:6;81:16
**DeLozier's (3)** 9:15;
21:6;48:1
**demands (1)** 52:13
**Depending (1)** 12:11
**deposed (1)** 48:13
**deposition (1)** 4:6
**Depot (1)** 74:16
**depression (2)** 51:6;
56:23
**depth (2)** 38:20;77:15
**deputy (1)** 70:21
**derive (2)** 43:22;51:2
**derived (2)** 45:25;
47:2
**describe (2)** 48:21;
50:13
**described (2)** 39:21;
51:23
**describing (1)** 75:5
**design (1)** 79:2
**desire (2)** 31:6;74:5
**despair (1)** 77:15
**destroyed (1)** 6:14
**details (1)** 75:5
**determination (1)**
14:6
**determine (1)** 68:4
**devastating (1)** 76:21
**develop (8)** 14:10;
15:17;16:1;53:15;
57:5;67:7,16;71:23
**developed (4)** 31:3;
52:19;59:2;67:14
**developing (6)** 29:22;
30:1;40:13;48:2;
54:5;57:16
**development (3)**
14:17;67:4,14
**diagnosed (2)** 51:15;
62:23
**diagnoses (2)** 58:16;
61:14
**diagnosis (5)** 58:22;
64:13,19,20;65:13
**difference (1)** 65:17
**different (7)** 6:11;
10:2;13:20,21,25;
14:4;65:25
**differently (1)** 15:10;
16:3
**difficult (3)** 33:2;

44:21;49:23
**difficulties (2)** 35:6;
69:23
**difficulty (4)** 23:14;
32:22;43:13;83:20
**dilemma (1)** 67:9
**diligently (1)** 26:14
**direct (8)** 25:18;
26:10;22:27:8;52:12;
76:5;82:6,19
**directed (1)** 41:20
**directly (1)** 22:17
**disabilities (1)** 51:16
**disagree (1)** 47:3
**disclose (3)** 39:5,8;
53:14
**disclosed (2)** 42:8,19
**disclosure (1)** 59:22
**discord (1)** 39:16
**discoverable (3)**
59:25;60:5,15
**discovered (1)** 9:23
**discovery (1)** 25:10
**discretion (3)** 19:21,
22;52:12
**discuss (4)** 9:8;44:1;
47:18;48:14
**discussed (4)** 10:16,
18;48:9,11
**discussion (8)** 17:13;
35:5;48:19;49:5;
66:10;71:13;81:5;
82:5
**discussions (9)**
24:17;25:3;27:4;
33:18;45:20;66:13;
70:18;71:8;75:10
**dismiss (1)** 28:7
**disorder (5)** 56:22,24;
57:1;61:7;64:8
**dispositive (1)** 19:17
**disruptive (1)** 64:16
**doctors (2)** 31:7;65:1
**document (1)** 6:6
**domestic (3)** 46:4;
53:7;54:1
**done (15)** 14:7;
15:21;21:2,4;22:21;
23:1;32:10;34:18;20;
38:11;54:12;55:11;
81:15;85:11,12
**Donna (17)** 10:8;
24:13;28:24;30:20;
35:9;36:2;39:8;
59:14;69:9,25;77:22;
79:25;80:15,22;81:3;
83:25;84:2
**door (2)** 60:21;73:12
**dot (1)** 58:17
**double (2)** 13:15;
60:17
**Dougherty (1)** 14:16
**down (13)** 20:13;

26:19;35:2,21;44:24;
66:3,19;74:19,19;
75:25;78:3;81:15,16
**downtown (2)** 12:14;
29:20,21
**Dr (10)** 17:12;23:5;
24:10;27:1;54:19;
55:7,8;56:17;57:4,20
**draft (2)** 6:4,5,7,9,10,
19;7:11
**drafts (1)** 6:11
**drag (2)** 66:3,19
**drain (1)** 75:25
**drama (1)** 72:18
**draped (1)** 73:15
**drawer (2)** 8:12,13
**dresser (1)** 73:16
**drive-by (1)** 56:14
**dropped (1)** 78:17
**DUI (2)** 20:13;75:18
**dull (1)** 17:4
**duplicate (1)** 16:25
**during (14)** 8:2;9:15;
25:10,11;46:13,14;
58:23;74:9;81:13;
84:3,5,8,16,19

**E**

**early (5)** 20:16;21:13;
22:5;25:10;67:16
**ease (1)** 69:13
**easily (1)** 53:19
**east (1)** 12:16
**eastern (1)** 12:13
**edit (1)** 82:19
**editions (1)** 6:7
**education (1)** 16:4
**Edwards (1)** 64:4
**effect (1)** 13:22
**effective (1)** 56:22
**effort (2)** 18:15;44:22
**eight (10)** 11:16;12:5,
17,18,24;13:4,13;
14:6;15:16;18:2
**either (3)** 18:8;22:10,
15
**elected (1)** 45:21
**elevated (1)** 62:12
**else (3)** 5:18;10:16;
84:17
**email (7)** 7:15,16;
55:16,18;56:2,5;
58:15
**embellish (1)** 45:16
**employment (3)**
10:23;11:4,7
**encouraged (2)** 15:1;
33:22
**end (15)** 15:18,23;
83:16
**ended (1)** 19:10
**endorsed (1)** 8:14

P-App. 005673

State of Arizona vs.
Andriano

Daniel Patterson
November 26, 2013

engage (1) 57:12
engaged (4) 15:23;
  39:3;64:1;80:18
enlisted (2) 27:3;
  55:13
enlisting (1) 77:25
enough (2) 14:8;
  65:14
ensure (1) 4:12
entire (1) 8:4
episodes (1) 84:22
error (1) 68:14
essential (3) 62:2;
  74:4;77:6
essentially (3) 4:12;
  21:7;31:8
estimate (2) 20:4,5
ethical (1) 80:12
evaluate (3) 57:13;
  60:4,22
evaluated (2) 55:8;
  63:22
evaluating (1) 68:24
evaluation (5) 54:22;
  55:9,15;63:8,15
evaluator (1) 69:20
evaluators (1) 66:3
eve (1) 25:14
even (10) 16:14;17:6;
  25:5;27:23;47:4;
  58:6;61:24;63:6;
  69:16;72:4
events (3) 51:23,24,
  25
everybody (3) 83:2,3,
  4
evidence (5) 4:21;
  17:18;53:10;64:15;
  65:19
evidentiary (6) 4:14,
  23;5:3;8:24;45:18;
  47:24
evil (1) 40:3
exactly (7) 23:1;
  32:20;35:19,22;
  56:13;79:12;84:11
exam (3) 26:10;76:5;
  82:6
EXAMINATION (5)
  5:9;26:9;31:14;
  34:12;81:11
examine (1) 60:22
example (1) 51:13
except (2) 37:9;55:12
excuse (1) 65:7
execution (1) 65:11
exemplary (1) 59:19
Exhibit (11) 4:5;
  27:13;42:9,10;55:17,
  18;19;56:2;58:18,19,
  20
exhibits (2) 7:5;8:15
exist (1) 6:21

expectation (1) 24:23
experience (9) 11:23;
  13:18;15:4;19:25;
  20:1;27:17;31:7;
  53:7;54:5
experienced (2)
  27:25;40:22
expert (12) 4:19;54:4;
  55:2,11;58:4;60:21;
  61:23;62:20,21;65:6,
  6;69:11
experts (4) 32:15,25;
  51:18;54:9
explain (1) 27:21
explained (1) 56:22
explore (1) 59:17
express (1) 32:6
expressed (1) 42:23
expressly (1) 81:21
extend (2) 17:24;
  42:18
extent (6) 4:11;45:15;
  52:10;62:23;72:2;
  77:19
extract (1) 52:15
eye (1) 77:18

**F**

face (1) 25:20
fact (11) 7:6;10:4;
  11:21;14:12,13;
  15:20;21:3;44:24;
  52:15;54:13;67:8
factor (1) 64:5
factored (1) 15:6
facts (5) 25:7;50:18,
  19;56:25;74:23
factual (1) 65:13
failing (1) 4:19,20
fair (1) 16:15
fairly (1) 16:12
fairness (1) 4:23
familiar (2) 5:24;
  51:16
family (9) 35:7;36:23,
  24;39:16;40:11;41:1;
  57:11;77:22;81:3
far (3) 26:11;67:5;
  82:8
farm (1) 23:16
Farrah (1) 54:2
fashion (3) 28:9;
  38:21;82:20
fast (3) 72:23;73:5,25
fasting (4) 73:7,18,20,
  20
father (2) 47:15,15
favor (2) 79:15,15
favored (2) 66:2;73:9
Fawcett (1) 54:2
February (1) 11:6
fee (1) 32:23

feel (2) 44:15;51:21
fees (1) 69:10
felony (3) 19:25;
  20:14,15
felt (10) 24:2;30:5;
  31:21,25;32:6;49:25;
  51:22;52:7;71:4;
  84:20
fertile (1) 59:16
few (3) 20:6;23:23;
  54:1
fighting (1) 66:21
file (11) 8:4;12:20;
  21:6,10;22:18;23:3;
  32:18;42:15;46:9;
  47:6,7
filed (4) 7:6;8:25;
  10:1;12:21
fill (1) 35:3
filled (1) 22:8
final (1) 6:6
finally (7) 32:10;33:8;
  37:25;43:13;44:25;
  76:2,11
find (5) 42:24;51:19,
  19;53:5;57:19
finder (2) 14:12;15:19
finding (2) 44:21;
  49:23
findings (1) 55:4
fine (8) 6:6;34:22;
  46:10;72:12,21;
  76:19,22,25
finish (1) 10:16
fire (1) 64:17
firm (4) 5:19;8:7;
  11:14;22:11
first (17) 4:17;9:23;
  10:10,19;11:7;12:3;
  15:11;18:16,19,21;
  21:1;32:4;37:17;
  67:22;79:21;80:3;
  83:8
first-degree (2) 15:5,5
fitting (1) 73:14
Fitzworth (1) 21:18
foe (1) 62:19
folks (3) 20:9;27:8;
  29:16
follow (2) 16:6;37:19
following (1) 76:18
follow-up (1) 81:2
force (1) 67:7
forget (2) 57:2;79:9
former (3) 33:22;44:4,
  5
forthcoming (2)
  52:17;53:16
forward (1) 77:1
found (4) 15:20;
  37:25;43:13;63:10
four (3) 18:6;26:7;
  81:7

frankly (3) 34:6;69:7
free-spirited (1) 40:5
frequently (2) 26:14,
  16
friend (3) 58:25;
  69:14;77:23
friendly (1) 50:22
friends (2) 39:18;
  40:12
front (3) 15:18,19;
  16:7
froze (2) 24:1,2
frozen (1) 23:22
fully (2) 16:12;66:4
function (4) 28:14;
  69:7;72:5;76:17
furniture (1) 37:23
FURTHER (8) 34:12;
  37:20;38:12,15;
  46:25;55:15;56:16;
  57:10

**G**

gage (1) 13:24
Gallotti (1) 14:18
GARD (38) 5:6,10;
  6:17,25;7:3,4;22:20;
  27:13,15;31:12;
  34:13;36:20;37:21;
  42:7,12,19,24;43:1;
  45:5,12;46:2,8,11,23;
  47:8,9;49:8,12,18;
  50:5;55:24;56:1;
  61:12;73:3;74:6;
  81:8;85:9,12
gave (11) 8:8;14:20;
  50:21;54:25;58:4;
  75:8;78:4,19;82:18,
  19;84:4
Gavin (2) 12:15;
  21:10
Gavin's (1) 12:8
geez (1) 20:6
GEI (2) 67:5,8
Gemini (1) 64:24
general (12) 5:3;
  10:17;17:16;20:5;
  23:11;38:24;48:18;
  51:5,16;52:6;53:6;
  79:7
generally (2) 9:9;50:2
gentleman (3) 21:4;
  41:20;45:2
geographically (1)
  12:10
George (1) 11:12
given (14) 8:4,18;
  12:7;17:1;23:23;
  29:3,7;32:23;43:18;
  49:6;63:1,22;66:8;
  77:13
gives (1) 66:16

giving (2) 14:18;54:9
Glendale (2) 12:14;
  75:17
Glick (1) 25:25
God (2) 72:19;73:21
God's (1) 25:25
goes (1) 73:18
gold (1) 59:16
good (5) 11:9;15:5;
  22:13;23:13,20;
  28:24,25;29:24;30:3;
  31:1,4;34:9;41:5,5;
  50:17;52:6;71:17;
  63:19;64:25;65:12;
  68:5;69:8;71:17
government (3) 24:8,
  20;60:3
grabbed (1) 76:13
gracious (1) 37:3
Grande (5) 35:18,21;
  37:2;41:23;43:17
Grandpa (1) 81:1
grandparents (2)
  79:14;80:22
granting (1) 8:24
grateful (2) 33:7;
  34:19
gray (1) 73:9
great (5) 14:20;17:5;
  21:9;29:23;38:20
Greg (1) 85:9
grounds (1) 77:4
groundwork (1) 16:19
group (2) 20:16;54:8
guardian (1) 79:13
guardians (1) 80:16
guess (4) 36:21;42:3;
  49:10;54:2
guidelines (1) 77:8
guilt (6) 16:16;17:17;
  46:14;66:9;84:9,10
guilt-related (1) 42:18
guilty (5) 14:9;15:21;
  46:16;55:12;81:24
gunfire (1) 74:15
guy (9) 11:9;14:22;
  20:18;29:19;33:23;
  38:5;41:22;44:21;
  49:23
guys (3) 35:11;81:14,
  15
guy's (1) 13:11

**H**

Haas (1) 15:15
half (2) 18:6;63:11
Hammond's (1) 78:22
handle (3) 11:24;
  27:1;82:1
handled (1) 81:18
hands (1) 40:16
happen (5) 52:22;

P-App. 005674

81:1,17
happened (12) 8:11;
36:7;40:2;59:1;
66:18;67:21;68:4;
72:10,13;75:25;
78:16;81:17
happily (1) 78:18
hard (2) 6:2;30:5
harm (1) 57:17
harsh (1) 31:20
hate (1) 60:16
HAZARD (4) 60:16,
20,25;85:10
haze (2) 84:17,21
head (1) 34:16
health (37) 14:20;
23:10;30:23;47:18;
48:6;51:1,17;57:5,11,
12,14;58:10;59:5,10,
16;60:1,13;61:4,10,
21,21;62:18;63:2;
65:18,18,20,23,24;
66:3,23;67:10,11;
68:24;69:11,16,20;
78:25
hear (1) 65:5
heard (2) 17:23;81:4
hearing (6) 4:15,23;
5:3;8:24;45:18;47:24
heartfelt (1) 70:19
heavy (1) 66:23
help (4) 27:3;29:19;
31:6;69:22
helpful (1) 32:11;
37:9,10,11,11;43:22;
49:24;50:4;54:9
helping (2) 50:4;79:7
Hendricks (1) 11:13
heroine (1) 4:22
hey (2) 34:25;66:13
higher (2) 62:6;74:3
Hill (1) 11:12
hire (2) 14:21;61:5
history (9) 9:11;11:4;
30:8;48:7;53:13;
56:16;57:12,21;
78:14
hold (3) 23:14;29:2;
82:22
Holly (1) 11:9
Home (1) 74:16
homicide (8) 12:12;
25:13;50:18;51:23,
24;56:25;58:23;
70:20
honest (1) 51:22
hook (1) 66:17
horrible (2) 30:22;
74:23
horse (1) 23:16
hospital (1) 18:9
hour (1) 83:13
house (6) 37:1,2,3;

54:7;74:17;78:3
Huh-uh (6) 22:16;
46:7;49:4;70:5;
78:24;82:24
human (2) 67:17;
84:13
hundreds (2) 20:21,
23
husband (3) 31:4,6;
51:5

**I**

idea (1) 53:3
identification (2) 7:14;
42:11
idle (1) 22:9
II (2) 51:15;57:1
III (1) 57:1
ilk (1) 33:17
ill (3) 73:14;74:8,10
illness (4) 4:20;51:7;
57:22;58:5
imagination (1) 37:8
immediate (2) 41:1,8
immediately (2)
15:14;18:20
impact (1) 16:13
impacted (1) 77:18
implicating (1) 41:25
important (2) 72:14,
15
impose (2) 14:15;
40:14
impression (4) 17:4;
36:23;48:22;83:1
improper (1) 39:3
improved (1) 68:2
inappropriate (1)
38:23;39:17;80:18
inappropriately (1)
38:24
incarcerated (2)
69:24;72:5
incident (3) 37:13,22;
74:7
incidents (1) 52:4
Including (2) 9:4,6
incompetent (1) 51:14
inconsolably (1)
74:18
incrementally (1) 14:7
independent (3)
19:13,18;22:3
independently (2)
7:13;44:20
Indiana (2) 78:17,18
indicated (1) 43:14
indication (4) 37:17;
38:10;80:14;82:21
indicia (1) 7:14;53:1
ineffective (1) 4:18
infidelity (1) 64:2

information (12) 30:3;
39:1;43:12,21;44:6;
47:1;50:22;52:15,20;
59:8;84:1;85:4
informed (2) 46:14;
49:19
ingesting (1) 34:1
inherited (3) 12:8,16;
21:10
initial (1) 55:9
initially (3) 21:12;
52:16;53:14
inquire (1) 70:22
inquired (1) 80:25
insane (1) 55:12
insights (1) 84:4
instead (1) 27:2
instruct (1) 17:23
instructing (1) 42:22
instructive (1) 77:9
instrumental (1) 5:21
instruments (1) 54:20
insurance (2) 52:1,3
integrated (1) 67:5
intellectually (1) 77:3
intelligently (1) 68:9
intending (1) 16:13
intercede (1) 73:2
interest (5) 5:1;47:17;
48:2;70:9;80:14
interested (1) 15:3
interrupt (1) 21:15
inter-tubes (1) 78:15
intertwined (2) 46:18;
47:1
interview (10) 24:7,
20;35:8,24,25;43:21,
22;44:24;45:25;60:3
interviewed (3) 29:16;
41:2,23
interviewing (1) 40:11
interviews (3) 5:21;
6:20;35:1
into (9) 4:15;11:18;
38:20;42:2;45:7;
53:13;57:11;61:22;
64:5
introduced (1) 38:5
invented (1) 78:15
investigate (8) 4:19,
21;37:20;38:16;53:8;
57:10;58:5;71:1
investigated (2)
38:12;56:16
investigating (1)
13:19
investigation (4) 4:24;
42:4;56:7;81:2
investigator (1) 33:2
involved (6) 22:13;
24:3;32:4;79:6;
80:10;81:23
involving (4) 9:18;

37:23;83:11;84:7
Ishikawa (8) 4:14;
31:22;33:14;63:1;
64:20;75:8;80:4;
83:17
Ishikawa's (2) 8:23;
75:3
issue (2) 9:24;
10:11;35:14;44:14;
47:4,18,20,22;60:1,2,
13,14;61:4,21;62:18;
67:15;72:1,3,7;
79:18;83:17;84:7
issues (23) 4:14,22;
18:10;23:9;27:19;
28:1;30:24;43:12;
44:7;45:17,19,21;
46:3;47:19,23;50:12,
21;51:2,17;67:10;
68:25;69:14;82:2
IV (1) 57:1

**J**

jail (3) 26:18;50:16;
69:15
Jerry (1) 11:13
jest (1) 20:19
Jesus (1) 40:7
Jim (1) 15:15
Jinnay (4) 79:10,11,
11;80:24
job (1) 85:1
Joe (6) 27:5;31:4;
33:24;34:4;48:7;
84:21
John (4) 11:13;21:17,
20;84:9
Johnny (2) 41:4,4
joined (1) 73:4
Jones (2) 41:4,4
Joseph (2) 52:16;
79:11
Juan (8) 22:3;35:1;
63:17;73:9;76:14;
80:3;81:9;83:20
Juan's (1) 75:5
Judge (27) 4:14;8:23;
10:1;11:8;12:24;
14:5,10,14,14,17,25;
15:3,4;17:22,22;
28:20;31:22;32:4,5,
7;33:13;65:20;66:2,
21;79:23;80:4;83:17
judges (2) 66:15;77:8
judge-specific (1)
14:11
judgment (1) 41:15
juggling (1) 22:12
juice (1) 73:25;74:1
July (2) 10:24;11:20
Jumping (1) 61:13
Jung (2) 41:24;43:16

J-U-N-G (2) 41:24;
43:16
junior (1) 5:18
jurisdictions (1) 79:20
jurisprudence (2)
27:19,25
jurors (5) 17:4;19:13;
65:5,10,15
jury (13) 15:12,20,20;
18:25;19:2,7;20:24;
67:2,2,21,22;76:8;
81:25
justice (1) 63:13
Justin (9) 74:21,22,
24,24;75:1,11,12,17;
84:18
juvenile (3) 64:8,9,13

**K**

Kandy (12) 24:11;
58:3,14,23;69:2;
70:10,12,13;71:2,10,
18;72:3
keel (1) 72:4
keep (5) 6:10;63:2,
17;71:24;75:19
kept (6) 18:6,12;
23:23;24:4;62:24;
74:25
kid (1) 13:9
kids (2) 79:13;80:25
kids' (1) 80:14
kill (5) 59:20;65:7,15;
72:19;75:16
killed (3) 74:15;
75:23;84:8
kind (41) 9:14;11:1;
12:22;13:22;15:19;
23:22;24:6;27:6;
28:11;33:1;37:15;
39:2,21;40:1,5;47:16,
20;51:5;53:18;54:5,
20,22;55:2,14;58:16;
60:12;64:12,17;65:5;
68:4;69:11,18;70:19,
19;72:4,19;73:12;
76:12;77:8;78:15;
82:4
kinds (3) 52:3;54:20;
64:3
King (17) 41:21;
43:11,18;44:2;45:14,
19,20;46:17;47:2,11,
22;48:9,15;49:6,7;
50:6,11
King's (1) 47:15
Knapp (8) 24:23;
28:12,14,15,17,20,22,
23
knew (14) 15:4;16:1;
26:1,23;42:15;50:3;
58:9;63:18,23;66:1,

State of Arizona vs.
Andriano

Daniel Patterson
November 26, 2013

2;71:1,19;75:6
knock (2) 66:3,19
Knowing (1) 63:11
knowledge (3) 8:2;
57:24;62:8
known (1) 59:8
knows (3) 45:3;65:9,
10

**L**

lab (1) 33:23
Lambert (1) 79:8
landscape (1) 40:18
Larry (1) 78:22
last (6) 5:20;13:10;
20:7;41:24;43:24;
68:11
late (1) 12:4
later (4) 6:18;7:2;
27:22;72:11
law (4) 8:7;11:14;
18:22;26:2
lawyer (6) 12:4;28:6,
9;41:24;45:1;63:20
lawyers (6) 12:23;
27:23,25;33:1,3;77:6
lay (1) 16:18
lead (1) 27:24
leading (1) 51:24
learn (1) 68:1
learned (7) 15:9;16:3,
7;26:5;38:9;68:9;
79:17
learning (2) 16:4;
40:17
least (5) 12:5;20:11;
24:15;37:1;56:6
led (7) 24:11;29:15;
57:21;59:19;78:1;
81:2;83:25
left (4) 52:12;75:4,4;
78:7
legs (1) 41:22
lend (1) 35:5
length (1) 70:25
Leod (7) 15:24;
21:14;29:11,12;40:9;
67:15;78:10
Leon (1) 21:5
less (1) 14:23
lesson (1) 38:9
lessons (1) 68:9
letter (9) 42:8,14,19,
21;43:7;44:18,19,22;
49:6
letters (1) 15:2
levels (1) 75:22
Lewis (1) 36:8
liaison (1) 69:25
life (13) 9:15;15:4;
19:10;52:1,2;59:20;
66:17,17,21,21,22;

82:17;85:5
light (1) 73:13
likable (1) 50:23
limited (4) 4:11;
38:16;82:6,8
Linderman (6) 15:24;
21:11;40:10;56:3;
67:16;78:7
lines (3) 60:18,20;
63:24
literature (1) 62:4
litigation (2) 79:16,18
little (5) 21:3;27:21;
34:16;69:24;77:13
lived (1) 40:8
living (3) 39:22;78:18
loading (2) 15:19;
16:8
locally (1) 54:4
locate (1) 50:4
locating (2) 43:13;
49:25
location (1) 72:11
logical (3) 25:17;
27:7;54:14
logistical (1) 35:14
look (7) 25:20;27:11;
41:18;65:2;73:13,16;
76:9
looked (6) 6:9;8:15;
38:1,3;58:21;84:23
looking (2) 50:6;
62:11
looks (3) 51:9;56:5;
65:3
losing (1) 51:4
lost (5) 51:4;74:11,
13;75:8;81:25
lot (5) 13:8;22:6,18;
44:15;50:22
Loving (1) 36:24
Low (1) 20:23
Lynch (3) 5:22,22,23

**M**

ma'am (4) 18:18;
19:3,6;67:23
Mac (7) 15:24;21:14;
29:11,12;40:9;67:15;
78:10
machine (1) 75:5
maintaining (2)
71:12;72:4
major (1) 56:22
making (3) 14:5;
65:11,18
malaise (1) 51:5
malpractice (1) 50:21
man (1) 23:14
manifested (1) 34:7
manipulative (1)
48:24

manner (3) 9:13;
41:15;74:2
man's (1) 62:15
manuscript (1) 13:11
many (8) 12:2,4;13:1,
1;15:8;20:4;26:19;
66:7
marching (1) 66:8
Maricopa (2) 15:8;
78:20
mark (1) 42:8
marked (3) 4:5;42:10;
55:21
Martinez (36) 10:4;
12:19;13:9,12;21:15,
22,25;22:15;26:22;
31:15;34:2,5,10;35:8,
11,15,18,20,23;36:3,
7,13,18;37:12,14;
38:3,5;52:5;54:18;
61:22;65:9;73:2,4;
79:22;81:12;85:7
Martinez's (2) 24:8;
35:1
massage (2) 38:24,25
Matthew (3) 5:20,22,
23
Matt's (1) 5:24
may (43) 6:12,21;
7:15;10:8;15:1;
17:10;18:11;21:11;
22:8;27:24;32:10;
34:3,15;35:6,10;
37:17;38:11,21,23,
25;39:1,3;41:1;
44:22;45:23;46:17;
50:1;54:10;55:21;
62:25,25;63:1,8;
64:19;69:19;70:6;
71:6;72:8;75:4;
80:18;83:6,13,21
maybe (11) 7:23;
20:21;32:5;34:23;
37:1,9,18;41:14;
44:17;55:5;82:7
McKenna (9) 17:2,12;
24:10;54:11,16,21;
55:3,5;58:5
mean (41) 9:21;
16:11;20:6;21:15;
22:12;24:2;25:22;
26:18;28:1;29:10,18;
30:5;32:2;33:10;
37:11,12,16;40:14,
15;42:2;43:4;50:24;
51:5;55:6;56:13,21;
59:6;60:17;61:19;
62:17,25;68:8,22;
72:16,17;73:16,21;
74:11;75:11;79:2;
80:16
meaning (1) 14:24
means (3) 57:18;

59:12;74:2
medical (1) 50:21
meeting (6) 43:15,24;
44:5;53:6;58:3;72:13
meetings (1) 5:17
members (1) 20:15
memory (1) 23:24
men (1) 48:15
mental (41) 4:20;
14:19;23:10;30:23;
47:18;48:6;51:1,7,
16;57:5,11,12,14,21;
58:5,10;59:4,10,16;
60:1,13;61:4,10,21,
21;62:18;63:2;65:18,
18,19,23,24;66:2,23;
67:10,11;68:24;
69:11,16,20;78:25
mentally-ill (1) 51:8
mention (2) 77:24;
80:2
mentioned (5) 18:2;
54:16;72:6;74:7,21
mercy (2) 17:24;
57:23
Mesa (2) 12:12;29:19
mess (2) 76:1,1
message (2) 75:4,5
messed (1) 80:25
met (5) 24:14;50:16;
69:3,4,5
Meyers (2) 11:10,11
Michael (1) 11:16
mid (2) 12:3;20:23
middle (6) 10:3;
25:11;38:14;73:19;
75:22;76:7
might (5) 57:22;
63:10;64:1;70:22;
77:14
mind (4) 14:1;57:4;
69:13;71:12
Mindi (1) 17:2;54:11,
16,21;58:5
mine (1) 59:16
minimized (1) 72:15
minimum (1) 26:21
misconduct (1) 79:24
misrepresentation (1)
80:1
mistake (1) 38:2
mistaken (1) 28:13
mistrial (4) 77:2,5,11,
12
mitigating (1) 16:13
mitigation (47) 4:25;
13:19;14:11,11,17;
15:17,23;16:1,8,22;
29:8,13,22;30:15;
31:10;40:10,13,19,
24;41:19;46:1;47:4;
48:3;50:7,12;56:7;
57:5,23;59:9,17;61:4,

10;65:23,24;67:6,7;
78:20;81:13;82:2;
83:21;84:1,3,5,6,19;
85:2,3
MMPI (7) 54:19,22;
62:3,8,11;63:15;
64:23
mom (2) 30:3;82:16
moments (1) 22:5
Mommy (1) 69:9
Monday (2) 41:3;75:7
money (3) 32:14,15,
19
months (5) 11:21;
21:14;25:14;26:7,7
more (27) 14:23;
20:19;23:18;26:12,
14;27:21;35:2;37:5,
6;40:5,16;42:3;
44:10,15,18,23;
52:14;53:12,13;
54:22;57:17;60:11;
61:6;68:21;69:22;
76:3;82:8
morning (3) 60:2;
74:16,16
motion (3) 28:7,10;
46:9;47:7,7;77:11
moved (1) 72:11
much (4) 24:3;44:5,
19;74:13
Municipal (1) 75:18
murder (2) 15:5,6
Murphy (19) 17:1,8,
14;24:9;27:1;35:3;
52:18,19,23;53:6,20;
54:4,11,24,24;55:4,5;
58:4;62:13
myself (2) 67:7;72:19

**N**

Nah (1) 66:12
name (8) 5:19,20;
9:22;13:10;41:20,21,
24;79:9
names (2) 18:11;54:9
narrow (1) 23:10
natty (1) 73:16
nature (2) 4:10;25:19
neat (1) 35:1
necessarily (3) 47:1,
3;67:10
necessary (4) 4:12;
17:3;48:3;61:8
need (11) 28:7;
32:25;36:16,16,21;
47:6;57:4;61:2,2;
68:21;77:11
needed (2) 26:23;
29:2;33:1;37:4;
49:25;55:15;67:13
needs (2) 56:16

State of Arizona vs.
Andriano

Daniel Patterson
November 26, 2013

**negative** (3) 30:7,8;
33:13
**neuropsychologist** (1)
57:13
**new** (5) 15:7,16;54:3,
3,3
**next** (3) 56:18;81:17;
82:11
**nine** (2) 12:18,18
**nip** (1) 71:22
**nobody** (8) 25:9;30:7,
19,21,23;58:11;
59:13,15
**non-capital** (1) 12:22
**none** (1) 45:18
**nor** (5) 8:25;9:2;35:4;
48:5,6
**normative** (1) 53:17
**north** (2) 23:17;35:22
**NOS** (1) 65:4
**notes** (3) 6:4,19;76:8
**notice** (3) 12:21;21:5,
6
**noticeable** (1) 74:12
**November** (1) 4:2
**Number** (9) 4:5;
20:20;26:19;30:2;
42:10;53:5;63:12;
64:1;75:21

**O**

**object** (1) 42:24
**objecting** (1) 49:8
**objection** (1) 54:19
**obligation** (2) 44:13;
75:15
**obvious** (1) 80:12
**obviously** (7) 27:22;
36:24;46:21;58:20;
67:5;74:18;79:15
**occasions** (1) 37:1
**occurred** (5) 9:14;
12:12;19:19;58:22;
84:8
**occurrences** (1) 9:14
**Ochoa** (7) 10:8;
24:14,14;35:9;39:8,
12,13
**Ochoas** (4) 36:4,21,
22;79:15
**off** (6) 23:16;36:8;
41:22;56:21;57:4;
61:13
**offense** (3) 19:16;
22:10;51:3
**offered** (1) 23:21
**office** (12) 8:9;10:24;
11:24;12:13;20:8;
23:17;24:8;29:15;
35:1,9;54:13;78:7
**often** (1) 24:4
**oki-doke** (1) 63:21

**old** (1) 15:9
**Once** (1) 63:21
**one** (27) 4:22;6:15;
7:10;18:6,19;19:4,5;
20:15;27:3,4,24,24;
33:22;40:2;47:17,24;
52:19;53:9;55:20,21;
59:21;61:18;62:3,15;
66:6,7;80:17
**O'Neil** (1) 10:1
**ones** (3) 13:17;18:13;
54:10
**ongoing** (1) 16:4
**online** (1) 78:16
**only** (11) 10:22;
12:15;13:3;15:3;
32:12;38:9;39:20;
43:24;54:4;59:25;
74:1
**onset** (3) 64:8,9,13
**open** (2) 50:16;60:21
**opening** (4) 77:23;
82:18;83:6;85:3
**operating** (1) 12:23
**opinion** (5) 14:21;
23:21;62:15;65:2;
71:7
**opinions** (1) 63:3
**opportunity** (2) 43:18;
55:1
**opposite** (3) 33:7,19;
52:11
**order** (3) 8:23;44:12;
62:3
**ordered** (1) 4:14
**orders** (1) 66:9
**original** (1) 11:11
**ostensibly** (1) 61:23
**osteopathic** (2) 55:10;
68:22
**otherwise** (1) 59:19;
65:4;80:6
**out** (24) 15:11;17:18;
18:1;20:18;23:22;
24:1,2;29:18;30:4;
35:11;38:6;39:22;
54:8;62:24;63:2,8,14,
17;66:4,19;74:19;
75:7;76:13;79:23
**outside** (1) 40:25
**over** (10) 21:17;
26:14;34:16;54:19;
74:25,25,25;76:9;
78:4;81:20
**overall** (1) 83:1
**overly** (1) 14:16
**overstate** (1) 12:5
**overwhelmed** (1) 29:1
**own** (1) 11:15;51:21

**P**

**pact** (2) 31:5;46:22

**paid** (2) 34:3;69:9
**painful** (1) 31:6
**pains** (1) 26:24
**palpable** (1) 74:14
**panic** (2) 25:20;56:15
**paragraph** (1) 27:9,
14,16;57:7,7;59:7,7;
68:12,16,17
**pare** (1) 18:15
**parental** (1) 29:24
**parents** (4) 24:24,25;
35:9;58:10
**part** (9) 25:25;31:5;
56:6;61:15;70:1;
71:22;73:7,24;78:5
**participate** (3) 31:5;
35:2,24
**participated** (1) 30:13
**participating** (2)
35:25;82:8
**participation** (1) 33:19
**particular** (4) 41:18,
19;45:3;53:24
**particularly** (1) 60:7
**particulars** (2) 10:17;
79:17
**partner** (2) 28:6,6
**partnered** (1) 11:15
**parts** (2) 25:10,11
**party** (1) 28:9
**passed** (2) 11:6,12
**pastor** (1) 47:15
**paths** (1) 63:14
**Patrick** (6) 15:24;
40:10;56:3,10;59:13;
78:7
**Patterson** (31) 4:8;
5:5;6:23;21:20,23;
22:2,16;27:14;34:3,
6;35:10,13,16,19,21;
36:1,5,11,14,19;
37:15;45:16;46:7,19;
49:9,17,22;55:25;
60:24;61:1;73:6
**pawn** (1) 8:11
**PCR** (1) 7:6
**PD's** (2) 10:23;11:24
**peace** (1) 71:12
**penalty** (4) 4:18,25;
14:15,18;19:24;
27:17;28:7;77:23
**pending** (1) 9:24
**people** (7) 15:25;
16:1,2;37:3;48:22;
53:17;58:11
**per** (1) 20:11
**perceived** (1) 74:10
**performance** (3) 57:2;
84:24;85:5
**perhaps** (4) 15:18;
17:4;71:5,6
**period** (7) 8:3;9:15;
20:12;46:12;58:24;

63:23,23
**permission** (1) 65:15
**perpetuate** (1) 75:13
**person** (10) 7:16;
29:11;37:9;40:19;
50:23;52:2;58:9;
62:5;69:12;72:19
**personal** (1) 57:11
**personality** (8) 47:11;
50:14,15;58:7;61:7;
62:21;64:8,22
**personally** (1) 50:14
**persons** (1) 9:3
**persuasive** (1) 14:12
**pet** (1) 14:19
**petition** (2) 7:6;8:25
**petitions** (1) 79:19
**Pharma** (2) 28:1,3
**phase** (35) 4:18,25;
15:18;16:12,14,16;
17:14,14,17,23;27:6;
30:12,14;42:4;44:6;
45:20;46:3,14,15,16,
21;47:5;67:14,14;
81:13,21;82:9;83:21;
84:5,6,9,10,12,19;
85:6
**PhD** (1) 69:18
**Philadelphia** (1) 54:8
**Phillips** (1) 60:11
**Phoenix** (3) 4:1;
12:14;33:23
**phone** (7) 23:15;
37:4;52:2;74:17,18;
75:3,18
**phonetic** (1) 60:12
**photograph** (3) 37:13,
22;38:1,6
**photographs** (7)
38:22;83:7,14,16,22,
23,24
**physician** (2) 55:10;
68:23
**pick** (1) 29:18
**picking** (1) 34:22
**pictures** (1) 30:1
**pierce** (1) 70:15
**pin** (1) 66:16
**Pinal** (1) 10:1
**pipe** (1) 11:10
**place** (3) 39:24,24;
60:2
**placement** (1) 18:9
**plan** (4) 17:16;25:25;
57:5;73:24
**played** (2) 72:3;82:18
**playing** (2) 71:11;
75:21
**plea** (2) 13:9;20:18
**pleasant** (1) 53:5
**pm** (2) 4:3;85:14
**point** (6) 8:11;26:17;
59:21;72:23;77:4;

85:6
**pointed** (1) 38:6
**policy** (1) 52:3
**popular** (1) 28:16
**portrayed** (2) 39:25;
40:4
**position** (7) 46:8,12,
16;61:19,20;62:10;
76:8
**positive** (5) 30:6,14,
25;31:9;71:18
**possible** (1) 26:4
**possibly** (1) 51:4
**post-Ring** (1) 40:17
**posttraumatic** (1)
56:24
**potential** (1) 60:5
**Potts** (5) 23:5,6,8,9;
68:19;69:1
**PowerPoint** (1) 82:18
**practice** (13) 10:19;
11:18;41:5,9,11,11,
12,13,14;75:14,17,
20,25
**practices** (1) 68:6
**practitioner** (5) 11:19;
12:6;75:12,13,16
**preacher** (3) 39:23,
23;40:6
**preceding** (1) 41:8
**preclude** (1) 61:15
**precluded** (2) 48:2;
64:20
**predicate** (1) 77:10
**preliminaries** (1)
10:15
**prep** (1) 26:24
**prepare** (2) 5:11;8:21
**prepared** (1) 6:6
**preparing** (2) 29:8;
78:5
**pre-Ring** (1) 12:17
**prerogative** (2) 19:18;
28:19
**pre-screen** (2) 22:24,
25
**presence** (1) 41:23
**present** (14) 4:19,21;
15:18;16:3,14,17,19;
17:6;30:14;36:15;
43:14;56:15;70:17;
83:4
**presentation** (7)
16:25;66:1;78:1,6;
81:19;82:20;83:2
**presented** (11) 16:12;
30:19;47:5;61:16;
65:19;80:12;82:5,10;
83:2,4;85:4
**presenting** (2) 65:18;
85:1
**pressures** (1) 76:4
**pretrial** (4) 24:7,20;

State of Arizona vs.
Andriano

Daniel Patterson
November 26, 2013

25:9,10
**primary (4)** 24:13;
29:7,10;55:11
**prior (8)** 4:6;10:23;
11:23;20:1;26:16;
39:16;58:22;65:19
**priority (2)** 22:10,11
**prison (1)** 64:3
**private (5)** 11:18;
32:18,23;33:3,3
**privilege (12)** 4:10;
5:4;28:18;42:6,17,
23;43:6;44:11,14;
45:11,14;47:19
**probably (14)** 12:17;
13:15;20:22,24;
26:21;28:11;34:7;
36:12;40:16;46:9;
60:6;75:4;76:3;83:9
**problem (5)** 37:3;
52:18;55:14;58:12;
75:19
**problematic (3)**
37:16;64:22;65:7
**problems (3)** 10:5;
59:5;82:14
**procedure (1)** 12:23
**proceed (1)** 76:22
**proceeding (4)** 4:10,
13;17:24;81:13
**proceedings (3)**
23:21;45:10;85:13
**process (5)** 29:16;
30:16;32:14,17;64:6
**product (1)** 5:16
**professional (2)**
14:20;69:17
**professionals (1)**
15:23
**professor (1)** 54:13
**promise (1)** 21:16
**pronounced (1)** 84:18
**proposed (2)** 7:23;
26:15
**proposition (1)** 66:4
**prosecution (1)** 22:4
**prosecutor (5)** 21:18,
18;22:4,7,14
**prospectively (1)** 47:2
**protracted (1)** 17:13
**proven (1)** 57:22
**provided (3)** 61:9;
83:8;84:2
**psychiatrist (5)** 15:2,
2;55:10;57:13;68:22
**psychiatrist's (1)**
14:24
**psychological (1)**
61:16
**psychologist (2)**
14:19;54:23
**PTSD (6)** 51:10,11,
12,12,13;62:7

**public (4)** 11:17,20;
12:7;20:17
**Pull (3)** 26:18;53:15;
60:13
**pulled (1)** 25:20
**pulling (1)** 51:21
**pure (1)** 42:18
**purpose (2)** 23:10;
44:4
**purposes (1)** 50:11
**pursue (1)** 57:19
**put (7)** 60:12;61:3,20;
65:4;70:7,21;72:17
**putting (4)** 22:9;
60:14;70:11,13

**Q**

**queen (1)** 72:18
**quick (1)** 34:17
**quickly (1)** 38:1
**quirky (1)** 39:21
**quit (1)** 12:16
**Quite (3)** 20:6;34:6;
69:7

**R**

**railway (1)** 41:22
**ran (1)** 52:20
**random (1)** 74:15
**randomly (1)** 75:23
**rare (2)** 66:22,22
**rather (1)** 30:7
**read (6)** 4:15;8:23,24,
25;28:1,2
**Ready (1)** 5:6
**real (1)** 69:16
**realize (1)** 79:18
**realized (1)** 15:17
**really (8)** 14:16;20:2;
22:6;32:7;58:8;77:5,
19;82:19
**reason (10)** 26:25;
32:13;54:17;57:10,
15;58:5,6;59:24;
70:14;82:13
**reasons (1)** 61:18
**rebut (1)** 71:6
**rebuttal (2)** 55:1;63:8
**recall (39)** 5:17,20;
6:23;7:13,25;17:13;
18:10;21:9,12;23:8;
26:18;30:2;33:17;
34:4;36:5,15;43:9,
10;44:20,21;48:17,
19;50:17,19;58:7,21;
60:9;64:19;68:8;
71:8,9,12,25;72:12;
74:11,22;77:24;82:7;
83:20
**recalled (1)** 7:15
**recess (1)** 45:9

**recessed (1)** 76:17
**recognize (1)** 77:15
**recognized (2)** 34:15;
75:15
**recollection (10)**
17:15;22:3;29:9,10;
36:2;56:20;72:3;
79:3;83:19;84:25
**recommended (2)**
54:6,11
**reconvene (1)** 76:2
**record (1)** 4:16
**recording (1)** 6:24
**recordings (2)** 6:21,
22
**records (1)** 26:18
**recover (1)** 77:14
**redacted (1)** 56:12
**reduced (1)** 18:3
**redundant (1)** 17:5
**reference (1)** 58:14
**referred (1)** 68:12
**refine (1)** 13:4
**reflect (1)** 68:5
**refresh (1)** 36:1
**refused (1)** 8:1
**refusing (1)** 46:11
**refute (1)** 54:21
**regard (5)** 48:20;
50:20,22;51:18;67:4
**regarding (4)** 4:20,21
**regular (2)** 41:7;58:3
**regularly (1)** 25:8,8
**related (3)** 8:9;46:3;
52:15
**relates (1)** 45:15
**relating (1)** 27:19
**relationship (16)**
23:13,20,25;24:24;
25:16;27:5;28:24,25;
34:9;47:13;48:12,12,
14;52:7;69:8;71:18
**relatively (1)** 54:3
**relayed (1)** 70:6
**relevance (1)** 10:11
**relevant (5)** 21:5;
42:25;46:17;48:13;
50:19;80:1,5;83:3;
84:1
**reliable (1)** 52:8
**relied (3)** 15:8;16:2;
67:15
**relocated (1)** 78:17
**reluctant (1)** 53:13
**rely (3)** 27:18;51:18;
58:2
**remained (1)** 29:21
**remark (1)** 27:16
**remedies (1)** 77:4
**remember (14)** 18:24;
21:19,25;22:15;
32:17,20,21;49:11,
11,14,14,21;73:10;

84:8
**repeat (1)** 38:2
**report (16)** 14:23,25;
15:3;23:2;41:3;
56:17,19;57:4,20;
59:22;60:8;61:9;
63:23;66:16;68:11,
15
**reported (1)** 76:15
**reporter (1)** 52:8
**reporting (1)** 41:7
**reports (2)** 60:14;79:1
**representation (3)**
5:1;8:10;9:10
**represented (18)** 8:3;
15:25;24:15,16;25:2,
3,6;29:12,14;40:18,
23;44:3;51:8,11;
69:10,12,21;76:19
**representing (1)**
23:22
**reputation (1)** 14:14
**request (2)** 6:17;
32:19
**requirement (1)** 32:25
**researching (1)** 16:8
**reservations (1)** 85:5
**resisted (2)** 59:23;
60:6
**resolved (2)** 13:8,13
**resource (1)** 75:12
**resources (3)** 33:9,20,
21
**respond (1)** 76:13
**response (2)** 6:13;
8:25
**responsibilities (4)**
24:19;25:15;29:4;
33:11
**responsibility (4)**
23:19;24:22;29:8;
81:21
**rest (1)** 45:6
**resume (1)** 61:24
**retain (1)** 14:21
**retained (4)** 24:23;
32:23;54:18;63:7
**retaining (1)** 56:6
**retrospect (3)** 40:15;
41:14;77:20
**returned (3)** 23:15;
37:4;80:24
**review (9)** 5:11,14;
7:23;8:6,14,15,18;
19:13,18
**reviewed (7)** 7:5,20;
8:18;9:2,5,7;23:2
**rid (2)** 18:12,13
**right (42)** 6:1;7:3;
13:4;17:10;18:17;
19:11;22:23;23:8,16;
28:16,17;35:15,20,
23;36:8,9,11,11,11,

13;37:14,24;38:15,
19;41:25;46:24;
49:17;56:8;57:9,15;
58:1;60:3;64:14;
66:25;67:3,12;72:24;
78:8,23;79:11;84:8,
14
**Rinetic (1)** 60:11
**Ring (9)** 9:12,12;
13:21,22;15:7,11;
18:1;65:17,19
**Ring's (1)** 18:22
**risk (1)** 70:23
**Road (1)** 23:16
**Robert (2)** 11:9,11
**Rohde (8)** 24:11;
58:3,14;69:2;70:11,
12,13;71:2
**role (4)** 51:21;52:14;
71:11;72:3
**roles (1)** 24:6
**romance (1)** 78:16
**room (3)** 36:12;45:6,8
**Roque (13)** 18:8,16,
20,24;19:10;21:8;
55:11,12;66:23;
67:21;68:1,4,10
**Rosengard (1)** 55:7,
8;58:2;60:4;68:11
**Rosengard's (5)**
56:17;57:4,20;
59:22;61:9
**Rule (4)** 8:8;19:17;
22:21;60:15
**running (1)** 37:25

**S**

**same (8)** 9:25;15:20;
59:7;60:17,20;63:24;
76:20;84:20
**sanctioned (1)** 79:24
**sat (1)** 6:3
**Savoy (1)** 11:13
**saw (3)** 61:9;71:2;
72:20
**saying (8)** 28:19;
34:25;36:15;50:2;
56:5;62:18;74:25;
75:6
**scale (1)** 57:2
**scales (4)** 62:6,7,12;
65:2
**scheme (1)** 12:24
**school (1)** 31:2
**schoolmates (1)** 39:4
**scope (4)** 4:13;5:3;
9:10;42:3
**score (1)** 62:6
**scores (1)** 62:12
**Scott (15)** 15:24;
29:11,11,19,19,20,
25;30:13;39:25;40:9,

P-App. 005678

State of Arizona vs.
Andriano

Daniel Patterson
November 26, 2013

18;59:13;78:10;
81:19;83:2
**Scottsdale (1)** 12:12
**scrambling (2)** 82:24;
83:12
**se (1)** 25:12
**second (4)** 10:25;
12:7;18:9;19:7
**secrets (1)** 81:3
**seeing (1)** 23:9
**seeking (1)** 66:20
**seldom (2)** 66:3,19
**select (1)** 53:24
**selected (1)** 53:20
**self-defense (1)** 16:17
**self-proclaimed (1)**
65:6
**seminars (1)** 15:14
**send (2)** 15:2;65:14
**sense (7)** 38:24,25;
51:7;56:14;66:5;
67:19;71:20
**sent (4)** 6:4;7:16;
8:13;44:22
**sentence (1)** 19:12
**sentencing (17)**
12:24;13:2;14:5;
15:13;16:19;17:9,19;
18:25;19:2,7;30:11;
46:14,15;65:21;
67:22,24;71:5
**separate (3)** 67:13;
72:11;79:19
**separately (2)** 13:22;
55:22
**seriously (1)** 33:11
**serve (2)** 26:2;40:24
**services (1)** 54:18
**set (6)** 19:13;20:16;
36:15;46:15;57:4;
64:16
**setting (1)** 5:21
**setup (1)** 12:13
**seven (1)** 12:18
**several (1)** 5:16
**severely (1)** 77:18
**sexual (1)** 53:13
**share (1)** 71:7
**Sharon (16)** 17:1,8,
13;24:9;35:3;52:18,
19,23;53:6,8;54:4,11,
24,24;58:4;62:13
**Shawn (13)** 41:21;
42:22;43:7;44:2;
45:14;46:17;47:11,
15,22;48:14;49:6,7;
50:6
**short (1)** 48:18
**shoulder (1)** 23:18
**shouldered (1)** 24:22
**showed (2)** 7:25;30:1
**sic (1)** 31:4
**sick (1)** 73:17

**side (4)** 12:14,16;
23:17;63:12
**sidebar (1)** 73:10;
76:14
**sign (1)** 6:15
**signed (1)** 6:8
**significant (4)** 57:1,
22;74:12;80:17
**silhouetted (1)** 73:12
**Silva (1)** 18:8
**sit (7)** 26:19;35:2;
44:24;68:4;69:12;
81:15,16
**sit-down (1)** 71:13
**sitting (1)** 76:7
**situational (1)** 56:24
**small (1)** 11:13
**smoked (1)** 11:10
**smokes (1)** 11:9
**social (2)** 54:24;
69:19
**sodium (4)** 33:25;
34:1;51:25;84:13
**soldiered (1)** 76:24
**sole (5)** 11:19;12:6;
75:12,13,16
**somebody (8)** 32:10,
19;33:8;34:19;43:11;
54:12,12;82:6
**somebody's (1)** 34:8
**somehow (1)** 79:25
**sometimes (1)** 49:24
**somewhat (1)** 38:16
**son (2)** 75:11,23
**Sorry (6)** 27:13;34:2;
55:21;62:8,14;65:23
**sort (1)** 84:21
**sounds (2)** 5:24;
34:14
**source (1)** 83:24
**spare (1)** 85:4
**speak (4)** 17:17;37:4;
41:17;43:18
**speaking (1)** 50:2
**speaks (1)** 68:15
**specialist (3)** 29:13;
40:24;78:20
**specialists (1)** 40:10
**specialized (1)** 50:25
**specific (3)** 39:1;
83:19;84:22
**specifically (9)** 7:15;
8:1;43:9;51:12;
54:21;60:9;70:5;
83:10;85:6
**specifics (1)** 18:14;
25:13;53:2;80:7
**specified (1)** 65:4
**speculate (3)** 49:11,
13,20
**speculating (2)** 49:23;
50:1
**speculation (1)** 49:16

**spiritual (5)** 25:24;
26:3;37:7,9;47:17
**spoke (4)** 10:7;40:25;
43:15;77:16
**spoken (1)** 8:21
**spousal (6)** 24:19;
53:10;61:23;62:19,
22;67:9
**spouse (5)** 16:11;
52:21;54:23;62:5,20
**spreading (1)** 40:6
**squares (1)** 38:4
**stand (6)** 26:21;
68:25;70:8,11,13,21
**standard (3)** 12:22;
41:9,10
**staring (1)** 76:10
**started (3)** 12:3;20:3;
68:7
**state (3)** 18:9;19:14;
59:21
**statement (1)** 77:23
**State's (1)** 60:21
**status (1)** 56:15
**statute (3)** 18:22;
19:19;54:3
**stay (1)** 16:15
**still (8)** 16:4;21:18;
40:17;42:23;47:6;
63:3;73:7;77:17
**stolen (1)** 13:11
**stop (1)** 9:17
**story (2)** 43:2;82:17
**strategic (4)** 57:10,15,
18;82:4
**strategy (6)** 16:16;
46:13,14,15,21;71:13
**street (3)** 39:23,23;
40:6
**strength (1)** 66:16
**stress (1)** 56:24
**stressors (1)** 57:2
**stretch (1)** 37:8
**stricture (1)** 40:14
**strong (1)** 58:25
**structure (1)** 40:14
**structured (1)** 65:25
**student (1)** 31:1
**students (1)** 38:25
**stuff (6)** 22:7;27:6;
38:6;62:21;63:2;
64:17
**subject (1)** 47:25
**subjects (1)** 5:2
**submitted (1)** 6:7
**substance (1)** 45:25
**substantial (1)** 27:18
**substantive (3)** 22:6;
24:17;25:3
**succeed (1)** 16:18
**successful (1)** 61:22
**sufficient (1)** 85:4
**suffocate (1)** 31:8

**suggest (3)** 33:7;
37:2;61:6
**suggested (3)** 30:22,
23;82:2
**suggestion (2)** 39:15;
59:4
**suicide (9)** 31:5;
46:22;50:20;53:3;
67:11;72:1,2,6,9
**suit (3)** 73:8,9,14
**summarized (1)** 58:19
**Sunday (1)** 74:16
**superceded (1)** 21:6
**superiors (1)** 66:9
**supervisor (1)** 20:8
**supplemented (1)**
8:10
**support (4)** 29:25;
61:24;64:13;77:25
**supporter (1)** 71:10
**supposed (1)** 81:4
**Supreme (2)** 19:14,17
**Sure (3)** 45:7;72:25;
76:15
**surprise (4)** 32:3;
63:14,16;71:16
**surrebuttal (1)** 55:1
**survived (1)** 40:8
**suspected (1)** 52:24
**suspects (1)** 82:16
**suspicion (3)** 50:24;
51:1;52:17
**suspicious (1)** 40:3
**system (2)** 15:16;
20:17

**T**

**table (3)** 22:8;76:6,10
**talk (17)** 10:17;13:21;
15:1;33:23,25;36:21;
45:1;47:20;48:5,5,6;
53:18;63:3;69:13;
77:7;81:15,16
**talked (6)** 6:4;19:24;
29:23;31:7;49:25;
57:25
**talking (7)** 25:12;
36:17;49:5;51:20;
70:10;73:10;84:12
**talks (1)** 77:18
**task (4)** 26:13,23;
29:11;40:11
**tasked (1)** 40:13
**tasks (1)** 23:23
**team (5)** 9:11;60:17,
19;70:2;71:23
**teams (2)** 27:23;28:5
**tear (1)** 77:17
**telephone (2)** 58:15;
69:6
**Tempe (2)** 12:12;
13:10

**ten (9)** 11:16;12:6,25;
13:5,13;14:6;18:2;
20:11;27:22
**term (2)** 31:24;56:14
**terms (11)** 13:15;
14:21;16:6,7;23:22;
63:9;65:10,17;66:2;
81:19;84:24
**Terraville (1)** 11:16
**territory (1)** 63:11
**Terry (1)** 12:8
**testified (1)** 71:2
**testify (5)** 17:2;25:19;
62:4;64:23;71:3
**testifying (2)** 76:9;
84:10
**testimony (4)** 4:19;
26:15,15;61:16
**tests (1)** 62:3
**thanks (1)** 32:9
**theft (2)** 64:2,11
**theme (4)** 30:6,19;
31:10;59:9
**themes (9)** 29:23;
30:10,11,17,18,25;
57:25;59:18;85:2
**theories (1)** 85:2
**theory (4)** 30:20;
49:15,19;67:17
**thereafter (1)** 11:22
**Thikoli (1)** 21:5
**thinking (1)** 28:17
**third (1)** 18:9
**though (11)** 16:14;
17:6;22:21;25:5;
27:23;42:20;47:4;
58:6;61:24;62:23;
76:23
**thought (21)** 12:20;
14:12;17:1,8;25:16,
25;26:3;27:5;28:15;
30:16;34:9;56:23;
70:13;71:11,16;
72:16;74:3;77:13;
80:1,5;85:3
**three (7)** 11:21;20:7,
10;26:7;37:1;75:8;
81:6
**three-person (1)**
11:14
**throughout (1)** 62:18
**times (4)** 26:19,19;
37:10;50:4
**tired (1)** 81:22
**today (9)** 5:11;8:21;
9:9;10:7;46:13;
57:25;64:25;73:9;
78:19
**together (1)** 48:12
**told (13)** 6:5;25:7,24;
30:7;38:1,4;45:21;
72:10,11,20;74:24;
76:22;78:3

**took (7)** 6:4;13:18; 21:17;22:9;26:13,24; 33:11
**topic (1)** 48:18
**topics (2)** 48:9,10
**total (1)** 13:15
**totally (1)** 52:4
**touched (3)** 38:23,25; 39:2
**touching (1)** 39:3
**tough (2)** 77:21,21
**tour (1)** 10:25
**town (1)** 23:17
**trail (1)** 73:20
**trained (1)** 40:21
**training (4)** 27:17; 50:25,25;51:17
**trainings (3)** 15:12, 14;16:7
**traits (1)** 65:3
**transcript (1)** 76:16
**traumatic (1)** 62:6
**traveled (1)** 39:24
**trial (19)** 4:18;9:15; 10:3,12;13:2;14:8; 18:16;22:11,11; 25:14,14;26:6,21; 38:14,15;39:16; 68:25;74:9;75:14
**trials (7)** 13:13,14; 20:4,11,13,24,25
**tried (13)** 12:21;13:5, 6;15:22;18:11;19:4, 5;20:6,9,19;28:22; 59:21;66:7
**Triple (1)** 60:19
**true (4)** 8:1;25:7; 66:5;72:9
**truly (4)** 32:22;33:3; 66:10,19
**truth (1)** 63:13
**truth-telling (1)** 80:2
**try (4)** 52:9;63:17,18; 84:25
**trying (5)** 13:24; 20:18;43:17;77:2; 83:12
**Tuesday (1)** 4:2
**two (9)** 5:2;11:21; 14:10;32:25;37:1; 56:12;67:13;77:6; 81:23
**twofold (1)** 16:16
**two-person (1)** 11:14

**U**

**unclear (1)** 59:3
**under (4)** 15:16; 60:15;62:21;75:23
**underpinning (2)** 64:21;65:14
**understood (2)** 73:4;

79:16
**unethical (1)** 43:5
**unfortunate (1)** 14:8
**unfortunately (1)** 62:15
**unilateral (1)** 40:20
**unit (1)** 20:9
**unlike (1)** 52:13
**unnecessarily (1)** 46:20
**unwillingness (1)** 43:23
**up (22)** 5:21;6:14; 19:10;20:16,18; 34:22;35:17,22; 37:19;46:15;48:18; 49:1;51:24;52:20; 60:13;76:11,24; 78:19;80:25;81:20; 83:8;84:23
**upbringing (2)** 83:11, 11
**updated (1)** 23:23
**upon (19)** 6:7;12:11; 39:18,18;43:12,19; 44:6;45:19,21;46:1; 47:4;51:18;58:23; 59:1;62:4;67:10,15; 70:20;78:16
**upset (5)** 31:17,18, 18;32:7;79:4
**use (3)** 10:4;33:22; 45:6
**used (3)** 31:24;32:17; 62:8
**using (1)** 30:6
**usual (1)** 82:16
**usually (1)** 14:19

**V**

**vacantly (1)** 76:10
**vaginally (1)** 39:2
**valuable (1)** 71:11
**value (3)** 35:4;71:2, 21
**van (1)** 39:22
**venue (1)** 79:18
**verbiage (1)** 65:5
**verdict (3)** 14:9,9; 19:12
**verdicts (1)** 81:24
**verse (1)** 26:20
**viable (1)** 59:9
**VIDAL (1)** 55:23
**violate (1)** 44:11
**violating (1)** 43:5
**violence (3)** 46:4; 53:7;54:1
**virtue (2)** 31:3;67:7
**virtues (2)** 30:6,14
**visit (1)** 60:1
**visited (1)** 39:17

**voice (1)** 69:5
**VW (1)** 39:22

**W**

**waived (1)** 44:14
**waiver (8)** 4:9,11,13; 5:4;42:6,17;44:10; 45:2
**walks (1)** 10:4
**wants (1)** 10:4
**warrantied (1)** 15:25
**waste (1)** 46:20
**way (12)** 15:7,9,15; 33:4;35:17;39:25; 40:3,7;42:1;49:9; 64:18;66:18
**wearing (1)** 73:9
**wedge (1)** 62:20
**week (4)** 26:21,22; 72:11;77:21
**weekend (1)** 80:23
**weekly (2)** 24:15,16
**weeks (4)** 41:8;81:6, 6,7
**weight (2)** 74:12,13
**welcomed (2)** 33:19, 20
**welfare (1)** 36:25
**Well-kept (1)** 37:2
**well-reasoned (2)** 61:3,10
**well-rounded (1)** 61:10
**Wendi (51)** 8:3,10; 10:12;18:21;25:1,8, 12,17;27:4;28:25; 30:21;33:9,10;34:19; 38:22;39:18;41:17; 42:22;43:24;49:6,24; 50:14;52:25;53:11; 58:3,9,10;59:1,14; 60:22;63:16;67:9; 69:23,25;70:6,16,18, 18;71:21,24,25;72:4, 13,15,16,16,22; 73:17,23;75:14;76:7
**Wendi's (9)** 25:20; 43:5;57:13;59:10; 68:2;70:9;71:12; 80:21;85:4
**weren't (4)** 50:6; 61:20;79:6;82:14
**west (1)** 12:14
**What's (6)** 50:14; 64:22;65:10;74:20; 76:11,12
**Whereupon (4)** 4:5; 42:10;45:9;85:13
**whole (4)** 15:7;22:6, 18;44:15
**wife (1)** 79:8
**Wilkinson (1)** 14:15

**willing (3)** 23:18; 33:21;44:8
**wiped (1)** 74:19
**Wisconsin (1)** 6:3
**wished (1)** 43:14
**within (1)** 42:3
**without (4)** 44:8; 46:25;49:5;64:13
**witness (10)** 7:7;10:6; 14:23;37:18;43:25; 45:22;50:7;60:5; 71:17;82:14
**witnesses (9)** 15:1; 24:7,8,21;27:8; 49:25;50:3;82:14,21
**woman (5)** 31:10; 58:12;59:19;63:4; 78:16
**women (2)** 16:20; 54:8
**wonder (1)** 42:13
**wonderful (2)** 25:16; 67:17
**wondering (1)** 42:14
**word (2)** 31:20;40:6
**words (1)** 65:15
**wore (1)** 73:8
**work (7)** 6:2;17:18; 20:13;51:7;55:11; 68:7;69:19
**worked (2)** 55:13; 81:20
**worker (2)** 30:5;54:25
**working (4)** 24:24; 34:19;52:6;58:11
**works (1)** 5:19
**workup (2)** 25:11,11
**world (1)** 61:5
**worlds (1)** 26:4
**worried (2)** 63:6,7
**worry (5)** 72:12,14, 21;73:22,24
**wound (1)** 20:18
**wow (3)** 21:20;50:15; 77:20
**write (3)** 5:14;8:19; 77:23
**wrong (3)** 32:5;55:20; 76:16
**wrote (1)** 8:5

**Y**

**year (2)** 11:15;14:10
**yearbook (1)** 30:1
**years (7)** 11:16; 14:10;20:7,10,11; 27:22;63:12
**yesterday (1)** 77:17
**young (1)** 13:9
**younger (1)** 38:22

**Z**

**zealous (1)** 33:10

**0**

**03 (1)** 41:6
**04 (1)** 41:6

**1**

**1 (17)** 4:5;15:18; 16:12,14;17:14;27:6, 13;30:2;42:4;44:6; 45:20;46:3,21;47:5; 55:17;67:14;84:12
**1:22 (1)** 4:3
**11 (1)** 22:21
**11th (1)** 83:13
**12 (2)** 20:11;39:4
**13-year-old (1)** 39:4
**15 (1)** 60:15
**16 (1)** 47:14

**2**

**2 (3)** 42:9,10;67:14
**2001 (4)** 10:24;11:19, 20,24
**2010 (1)** 20:10
**2013 (1)** 4:2
**25 (3)** 68:12,16,17
**26 (1)** 4:2

**3**

**3 (5)** 17:14;30:15; 81:21;82:9;85:6
**3:16 (1)** 85:14
**30 (3)** 57:7,8;59:7
**300 (1)** 58:16
**31 (1)** 20:11
**32 (1)** 8:8

**4**

**404b (1)** 52:3
**47 (1)** 15:1

**6**

**6.8 (1)** 77:6
**60s (1)** 40:2

**7**

**79 (5)** 10:20,21;11:6, 7;20:10

**8**

**8 (3)** 27:9,14,16

**80S (3)** 12:3,4;20:16

**9**

**9/11 (2)** 11:19,21
**90 (1)** 11:19
**91 (1)** 11:17
**93 (1)** 11:17

ARIZONA SUPERIOR COURT

COUNTY OF MARICOPA

STATE OF ARIZONA,                    )
                                     )
        Plaintiff/Respondent,        )
                                     )
    vs.                              )   No.
                                     )   CR-2000-096032-A
WENDI ELIZABETH ANDRIANO,            )
                                     )
        Defendant/Petitioner.        )
_____)

INTERVIEW OF DAVID DeLOZIER, ESQ.

Phoenix, Arizona

November 25, 2013

1:28 p.m.

BY:  LILIA MONARREZ, CSR, RPR
     Certified Reporter
     Certificate No. 50699

**Coash & Coash, Inc., 602-258-1440**

```
 1                      I N D E X

 2    DAVID DeLOZIER, ESQ.

 3                    EXAMINATION
                                              Page
 4
      BY MS. GARD                               5
 5    BY MR. MARTINEZ                          78

 6

 7

 8                  E X H I B I T S
                                              Page
 9
      Exhibit 1    Declaration of G. David DeLozier      5
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              INTERVIEW OF DAVID DeLOZIER, ESQ.,

 2   was taken on November 25, 2013, commencing at 1:28 p.m.

 3   at COPPERSMITH SCHERMER & BROCKELMAN, PLC, 2800 North

 4   Central Avenue, Suite 1200, Phoenix, Arizona, before

 5   Lilia Monarrez, a Certified Reporter of the State of

 6   Arizona.

 7

 8                          *    *    *

 9   APPEARANCES:

10       For the Plaintiff/Respondent:
         ARIZONA ATTORNEY GENERAL'S OFFICE
11       By:  Lacey Gard, Esq.
              Juan Martinez, Esq.
12            Gregory Hazard, Esq.
         400 West Congress
13       South Building
         Suite 315
14       Tucson, Arizona 85701
         (520) 628-6504
15       Email:  Lacey.gard@azag.gov

16

17       For the Defendant/Petitioner:
         FOLEY & LARDNER LLP
18       By:  Allen A. Arntsen, Esq.
         150 East Gilman Street
19       Madison, Wisconsin 53701
         (608)  258-4293
20       Email:  Aarntsen@foley.com

21       Also Present:
             Daniel Vidal, Paralegal
22

23

24

25
```

1                      Phoenix, Arizona

2              Monday, November 25, 2013

3                        1:28 p.m.

01:28:33  4

01:28:36  5          MR. ARNTSEN:  Attorney DeLozier, I just

01:28:38  6  want to instruct you in terms of the scope of privilege

01:28:41  7  waiver here, while there is a limited waiver of

01:28:44  8  privilege by Ms. Andriano because of her commencing

01:28:49  9  these proceedings, what the privilege waiver relates to

01:28:53  10  are the issues that are the subject of the evidentiary

01:28:56  11  hearing that Judge Ishikawa has ordered.  And I'm

01:29:00  12  really paraphrasing here his decision.

01:29:05  13          There are two topics for the evidentiary

01:29:07  14  hearing.  One is that trial counsel was ineffective in

01:29:11  15  the penalty phase by failing to investigate and present

01:29:14  16  expert testimony regarding Ms. Andriano's mental

01:29:18  17  illness and by failing to investigate and present

01:29:21  18  evidence regarding her heroine childhood.  That's one

01:29:25  19  area of privilege waiver.  And then the other is that

01:29:30  20  you had an actual conflict of interest that affected

01:29:33  21  your representation of Ms. Andriano and, again, that's

01:29:39  22  the scope of the privilege waiver and just bear that in

01:29:41  23  mind in answering the questions.

01:29:44  24          MR. DeLOZIER:  Okay.

01:29:45  25          MS. GARD:  Okay.  Can we go ahead and mark

David DeLozier - November 25, 2013                                    5

| | | |
|---|---|---|
| 01:29:46 | 1 | your affidavit, also, just for the purpose of this |
| 01:29:50 | 2 | interview? |
| 01:29:51 | 3 | MR. DeLOZIER:  Is this what you're |
| 01:30:03 | 4 | referring to as an affidavit? |
| 01:30:03 | 5 | MS. GARD:  Yes. |
| 01:30:04 | 6 | MR. DeLOZIER:  It isn't an affidavit.  It's |
| 01:30:04 | 7 | a declaration. |
| 01:30:05 | 8 | MS. GARD:  Declaration, yes. |
| 01:30:07 | 9 | MR. DeLOZIER:  Just to clarify the record. |
| 01:30:09 | 10 | MS. GARD:  Right. |
| 01:30:09 | 11 | (Whereupon, Exhibit Number 1 was marked for |
| 01:30:09 | 12 | identification.) |
| 01:30:09 | 13 | |
| 01:30:09 | 14 | EXAMINATION |
| 01:30:11 | 15 | BY MS. GARD: |
| 01:30:11 | 16 | Q.  Okay.  So what did you review to prepare for |
| 01:30:14 | 17 | today? |
| 01:30:16 | 18 | A.  (Indicating.) |
| 01:30:17 | 19 | Q.  Just that? |
| 01:30:17 | 20 | A.  That's it. |
| 01:30:18 | 21 | Q.  Were you given access to your file at all? |
| 01:30:20 | 22 | MR. MARTINEZ:  I'm taking a step back and |
| 01:30:21 | 23 | just indicate that he meant his declaration. |
| 01:30:21 | 24 | BY MS. GARD: |
| 01:30:23 | 25 | Q.  Just the declaration, right, Exhibit 1? |

**Coash & Coash, Inc.,  602-258-1440**

David DeLozier - November 25, 2013                                    6

01:30:24   1       A.   Yeah.

01:30:24   2       Q.   Okay.

01:30:26   3       A.   No, I don't have a file anymore.

01:30:27   4       Q.   You've turned it all over to them?

01:30:28   5       A.   No.  I turned it over to the appellate counsel,

01:30:31   6   I think.

01:30:32   7       Q.   Okay.  But you haven't -- did you review your

01:30:34   8   file before you wrote the declaration?

01:30:38   9       A.   I don't have a file.

01:30:39  10       Q.   Well, you had a file at one point and you turned

01:30:42  11   it over.

01:30:42  12       A.   Right.

01:30:43  13       Q.   Were you given access to it before you authored

01:30:45  14   this?

01:30:45  15       A.   No.  No.  I do have some stuff in the computer

01:30:48  16   that's been scanned in.

01:30:48  17       Q.   Okay.

01:30:49  18       A.   I may have looked at that.  I don't know.

01:30:50  19       Q.   How much stuff is that?

01:30:52  20       A.   I don't know.

01:30:53  21       Q.   What documents are in there --

01:30:54  22       A.   I don't know.

01:30:54  23       Q.   -- that you don't know?

01:30:55  24            You don't have a list or anything like that?

01:30:57  25       A.   Not with me.

**Coash & Coash, Inc.,  602-258-1440**

David DeLozier - November 25, 2013                    7

| | | |
|---|---|---|
| 01:30:58 | 1 | Q.   Okay. |
| 01:30:58 | 2 | A.   I mean, this is silly.   Okay? |
| 01:31:00 | 3 | Q.   It's not silly because we need to know what you |
| 01:31:03 | 4 | looked at to -- |
| 01:31:03 | 5 | A.   I don't know what I looked at. |
| 01:31:05 | 6 | Q.   Okay.   So you -- |
| 01:31:05 | 7 | A.   I've already said that four times now. |
| 01:31:06 | 8 | Q.   So when you wrote this, did you write it from |
| 01:31:09 | 9 | memory?   How did you write this, then?   I mean -- |
| 01:31:12 | 10 | A.   I don't remember how I wrote it. |
| 01:31:14 | 11 | Q.   All right.   Did you review anything else, any |
| 01:31:19 | 12 | other affidavits, at any point before today?   Have you |
| 01:31:24 | 13 | reviewed any affidavits from any other witnesses that |
| 01:31:27 | 14 | have been submitted for the PCR? |
| 01:31:29 | 15 | A.   No. |
| 01:31:29 | 16 | Q.   Have you reviewed the PCR petition? |
| 01:31:32 | 17 | A.   No. |
| 01:31:32 | 18 | Q.   Nothing? |
| 01:31:32 | 19 | A.   No. |
| 01:31:33 | 20 | Q.   So just this?   This is it? |
| 01:31:34 | 21 | A.   Yeah. |
| 01:31:35 | 22 | Q.   All right.   Have you spoken to anyone to prepare |
| 01:31:38 | 23 | for today?   Who did you speak to? |
| 01:31:39 | 24 | A.   Allen. |
| 01:31:40 | 25 | Q.   Okay.   What did you speak about? |

**Coash & Coash, Inc.,  602-258-1440**

David DeLozier - November 25, 2013                    8

01:31:42  1      A.   What's in there.

01:31:43  2      Q.   Okay.

01:31:44  3      A.   And the limited privilege or whatever it's

01:31:46  4  called.

01:31:47  5      Q.   What he just instructed you with?

01:31:47  6      A.   Yeah.

01:31:50  7      Q.   The scope of the waiver?

01:31:50  8      A.   Yeah.   He went over that with me.

01:31:52  9      Q.   All right.   In your prior conversations with

01:31:56 10  them, I assume you had an interview with her counsel

01:31:59 11  before you prepared this?

01:32:00 12      A.   Yeah.

01:32:01 13      Q.   Okay.   Did they draft this or did you draft it?

01:32:03 14      A.   I don't remember.

01:32:04 15      Q.   You don't remember.

01:32:05 16           Do you remember how many drafts --

01:32:07 17      A.   It looks like they did it because there's the

01:32:10 18  MADL at the bottom and that's not anything that's on my

01:32:12 19  computer.

01:32:12 20      Q.   Okay.   Do you recall how many drafts you went

01:32:15 21  through?

01:32:15 22      A.   (No audible response.)

01:32:15 23      Q.   You don't recall?

01:32:19 24      A.   No, I don't have any recollection if I looked at

01:32:20 25  drafts and they were changed later on.   I don't know.

**Coash & Coash, Inc., 602-258-1440**

David DeLozier - November 25, 2013                    9

01:32:23  1    Q.  Do you recall how many conversations you had
01:32:25  2  with them?
01:32:26  3    A.  No, I don't remember.
01:32:28  4    Q.  Okay.  Do you remember --
01:32:29  5    A.  It's more than one, less than 20.
01:32:31  6    Q.  More than one, less than 20.
01:32:32  7        Were they recorded conversations?
01:32:33  8    A.  No.
01:32:34  9    Q.  Okay.
01:32:35 10        MS. GARD:  Allen, do you have any
01:32:36 11  recordings of the conversations?
01:32:37 12        MR. ARNTSEN:  No.
01:32:37 13  BY MS. GARD:
01:32:42 14    Q.  Okay.  So in terms of your experience, you were
01:32:44 15  admitted in 1978 here is my understanding.
01:32:47 16        Right?
01:32:48 17    A.  I believe that's the year.
01:32:49 18    Q.  Okay.  But prior to that you were admitted
01:32:51 19  somewhere else.
01:32:51 20        Where was that?
01:32:52 21    A.  Yes.  First admitted in Texas in, I think, '74,
01:32:56 22  '75, then Pennsylvania in '75 or '76.  I took the bar
01:32:59 23  in New Jersey and passed it, but I didn't get admitted
01:33:03 24  there.  I moved here.
01:33:04 25    Q.  Okay.  So in your affidavit you talk about

**Coash & Coash, Inc., 602-258-1440**

| | | |
|---|---|---|
| 01:33:06 | 1 | having criminal defense starting in the mid '90s, |
| 01:33:11 | 2 | second-degree murders experience in the late '90s. |
| 01:33:14 | 3 | Was that your most recent experience prior to |
| 01:33:16 | 4 | this case? |
| 01:33:16 | 5 | A.  I don't remember. |
| 01:33:17 | 6 | Q.  You don't remember? |
| 01:33:18 | 7 | A.  No.  Probably. |
| 01:33:20 | 8 | Q.  Probably? |
| 01:33:20 | 9 | A.  But, you know, I'm a general practitioner. |
| 01:33:23 | 10 | Q.  Okay.  Well, tell me about that then. |
| 01:33:24 | 11 | How much of your practice is -- |
| 01:33:26 | 12 | A.  It never was, except during trials, more than |
| 01:33:30 | 13 | the 25, 30 percent. |
| 01:33:31 | 14 | Q.  Okay.  What's your primary practice? |
| 01:33:33 | 15 | A.  I don't have a primary practice. |
| 01:33:35 | 16 | Q.  Okay.  What other areas do you practice in? |
| 01:33:38 | 17 | MR. DeLOZIER:  Is that beyond the scope of |
| 01:33:40 | 18 | this? |
| 01:33:40 | 19 | MR. ARNTSEN:  No, I think it's fair. |
| 01:33:42 | 20 | MR. DeLOZIER:  Okay.  Personal injury, |
| 01:33:46 | 21 | everything from traffic accidents to medical |
| 01:33:49 | 22 | malpractice, I've done. |
| 01:33:50 | 23 | BY MS. GARD: |
| 01:33:50 | 24 | Q.  Okay. |
| 01:33:51 | 25 | A.  Okay?  Child sex abuse cases against the |

| | |
|---|---|
| 01:33:57 | 1 | Catholic church. |

01:33:57 1 Catholic church.

01:33:57 2     Q.  Okay.

01:33:58 3     A.  I did 20-some of those.  Wills and trusts,

01:34:05 4 general civil litigation, meaning everything from

01:34:10 5 contract disputes to -- and on.  This is -- you know,

01:34:17 6 I'm a general practitioner.

01:34:18 7     Q.  Okay.

01:34:18 8     A.  Okay?  I know that's probably foreign to most

01:34:23 9 younger lawyers today but, you know, us old guys, you

01:34:26 10 know, when you have a client that's a business client

01:34:36 11 who comes in and says his kid needs a divorce and you

01:34:36 12 say you don't know how to do them, he says learn.

01:34:36 13 Okay?  So that's how you do it.

01:34:36 14     Q.  Okay.

01:34:37 15     A.  By learning.

01:34:37 16     Q.  But this was your first first-degree murder

01:34:39 17 case?

01:34:40 18     A.  Yes.

01:34:40 19     Q.  And it was your first, obviously, capital case

01:34:43 20 then?

01:34:43 21     A.  Yes.

01:34:44 22     Q.  Since then have you had handled any capital

01:34:46 23 cases?

01:34:46 24     A.  Yes.

01:34:47 25     Q.  Which ones?

David DeLozier - November 25, 2013                    12

| 01:34:47 | 1 | A.  The most recent was Patrick Barrett. |
| 01:34:51 | 2 | Q.  Barrett? |
| 01:34:52 | 3 | A.  Yes. |
| 01:34:52 | 4 | Q.  As second chair or first chair? |
| 01:34:54 | 5 | A.  First. |
| 01:34:54 | 6 | Q.  First chair. |
| 01:34:55 | 7 | Any others? |
| 01:34:55 | 8 | A.  I don't remember.  Those are my two -- these are |
| 01:34:58 | 9 | the two that are still troubling. |
| 01:35:01 | 10 | Q.  Okay.  And at the time you represented |
| 01:35:05 | 11 | Ms. Andriano, had you been to any trainings about |
| 01:35:07 | 12 | capital defense? |
| 01:35:08 | 13 | A.  No. |
| 01:35:08 | 14 | Q.  Okay.  Were you familiar with the ABA |
| 01:35:11 | 15 | guidelines? |
| 01:35:11 | 16 | A.  No. |
| 01:35:11 | 17 | Q.  Were you familiar with investigating mitigation? |
| 01:35:14 | 18 | A.  We had done mitigation in the other cases; |
| 01:35:20 | 19 | capital mitigation, no. |
| 01:35:21 | 20 | Q.  Okay. |
| 01:35:22 | 21 | A.  Is that your question? |
| 01:35:23 | 22 | Q.  Yes. |
| 01:35:23 | 23 | A.  Yeah. |
| 01:35:24 | 24 | Q.  Well, when you say mitigation in the other |
| 01:35:26 | 25 | cases, are you referring -- you're referring to the |

**Coash & Coash, Inc.,  602-258-1440**

David DeLozier - November 25, 2013                    13

01:35:27  1    second-degree murders or just --

01:35:29  2        A.  Any kind of criminal case that regarded -- that

01:35:33  3    needed some presentation of mitigating factors.

01:35:35  4        Q.  And what's your understanding of what mitigation

01:35:38  5    is?

01:35:39  6        A.  There is this scale of aggravating and

01:35:47  7    mitigating factors.  Okay?

01:35:47  8        Q.  Yeah.

01:35:48  9        A.  And the prosecution puts on the aggravating

01:35:52 10    factors and the defense puts on mitigating factors and

01:35:57 11    if they're equally balanced, it's a presumptive

01:36:01 12    sentence, generally, in non-capital cases.

01:36:01 13        Q.  Okay.

01:36:02 14        A.  Okay?  And if one outweighs the other, then, of

01:36:05 15    course, it's increased or decreased proportionally

01:36:08 16    within the sentencing range.

01:36:09 17        Q.  What about in capital cases?  What is your

01:36:11 18    understanding of the term "mitigation" and what it

01:36:14 19    means?

01:36:14 20        A.  Anything that goes to weigh on the scale.

01:36:22 21        Q.  Okay.

01:36:22 22        A.  It can be as broad as was attempted in this case

01:36:28 23    of spousal abuse, I guess, is the best word for it,

01:36:32 24    domestic violence, mental capacity.

01:36:38 25        Q.  Okay.

**Coash & Coash, Inc., 602-258-1440**

| 01:36:39 | 1 | A.  Et cetera, et cetera. |
| 01:36:40 | 2 | Q.  Let me just ask this way:  At the time, did you |
| 01:36:44 | 3 | understand mitigation to be any aspect of the |
| 01:36:47 | 4 | defendant's character or propensities that would weigh |
| 01:36:50 | 5 | in favor of a lesser sentence, a sentence less than |
| 01:36:53 | 6 | death? |
| 01:36:53 | 7 | A.  Probably. |
| 01:36:54 | 8 | Q.  You would agree with that? |
| 01:36:54 | 9 | A.  Probably. |
| 01:36:55 | 10 | Q.  Okay.  When you joined this case it was in |
| 01:37:02 | 11 | December of 2000. |
| 01:37:03 | 12 | Correct? |
| 01:37:03 | 13 | A.  I don't remember, but it sounds right. |
| 01:37:05 | 14 | Q.  All right.  And so how did -- my understanding |
| 01:37:08 | 15 | is, I think, from your affidavit that you were referred |
| 01:37:11 | 16 | to the case by Pastor -- yes, Pastor Andrew Cunningham. |
| 01:37:14 | 17 | A.  Right. |
| 01:37:15 | 18 | Q.  How do you know him? |
| 01:37:15 | 19 | A.  I don't remember how I know him. |
| 01:37:17 | 20 | Q.  Do you still know him? |
| 01:37:18 | 21 | A.  I haven't had any contact with him in years. |
| 01:37:20 | 22 | Q.  Do you know why he referred you? |
| 01:37:22 | 23 | A.  No. |
| 01:37:22 | 24 | Q.  You don't remember? |
| 01:37:24 | 25 | A.  I probably handled somebody's divorce from |

David DeLozier - November 25, 2013                    15

| | | |
|---|---|---|
| 01:37:28 | 1 | somebody in his church.  I don't know. |
| 01:37:29 | 2 | Q.  Did you know the Ochoas before -- |
| 01:37:33 | 3 | A.  No. |
| 01:37:33 | 4 | Q.  You met them for the first time in this case? |
| 01:37:35 | 5 | A.  Yes. |
| 01:37:36 | 6 | Q.  Okay.  So how did it come about?  Did you meet |
| 01:37:39 | 7 | with the Ochoas and then they decided to retain you? |
| 01:37:42 | 8 | What was the story of how you became retained here? |
| 01:37:45 | 9 | A.  I don't know the specifics. |
| 01:37:48 | 10 | Q.  Okay. |
| 01:37:49 | 11 | A.  I can tell you what the general practice would |
| 01:37:51 | 12 | be. |
| 01:37:51 | 13 | Q.  Okay. |
| 01:37:52 | 14 | A.  Okay?  And I tend to do the same thing with |
| 01:37:56 | 15 | everybody. |
| 01:37:56 | 16 | Q.  Okay. |
| 01:37:57 | 17 | A.  And that is, have a personal meeting with the |
| 01:38:00 | 18 | people and if the person is in jail, I go see them.  I |
| 01:38:05 | 19 | typically will talk to them on -- to the person in jail |
| 01:38:08 | 20 | on the phone first, not always, and at some point |
| 01:38:15 | 21 | people decide we're going to work together or we're not |
| 01:38:18 | 22 | going to work together. |
| 01:38:18 | 23 | Q.  Okay. |
| 01:38:19 | 24 | A.  That's the general practice. |
| 01:38:20 | 25 | Q.  Okay. |

**P-App. 005696**

David DeLozier - November 25, 2013                    16

| | | |
|---|---|---|
| 01:38:20 | 1 | A.   I don't remember in this case specifically. |
| 01:38:23 | 2 | Q.   So did you meet independently with the Ochoas |
| 01:38:25 | 3 | and Ms. Andriano? |
| 01:38:27 | 4 | A.   No.  She was in the county jail at the time. |
| 01:38:29 | 5 | Q.   She was in county jail? |
| 01:38:30 | 6 | A.   Yeah. |
| 01:38:31 | 7 | Q.   So her parents paid you. |
| 01:38:32 | 8 | Correct? |
| 01:38:32 | 9 | A.   Yes. |
| 01:38:32 | 10 | Q.   And my understanding from looking at your |
| 01:38:36 | 11 | billing records is that was a flat fee? |
| 01:38:38 | 12 | A.   Right. |
| 01:38:38 | 13 | Q.   Of, I think, 30,000. |
| 01:38:38 | 14 | A.   Right. |
| 01:38:38 | 15 | Q.   Does that sound right to you? |
| 01:38:39 | 16 | A.   Right. |
| 01:38:40 | 17 | Q.   Okay.  When you started, there was a second |
| 01:38:47 | 18 | attorney -- there was a second attorney when you first |
| 01:38:49 | 19 | came on the case, Leon Thikoll?  Is that how you say |
| 01:38:51 | 20 | it? |
| 01:38:51 | 21 | A.   Thikoll. |
| 01:38:52 | 22 | Q.   Thikoll?  Why did he leave the case? |
| 01:38:53 | 23 | A.   He became ill. |
| 01:38:55 | 24 | Q.   Okay.  And so that's the reason?  That's the |
| 01:38:58 | 25 | only reason -- |

**Coash & Coash, Inc., 602-258-1440**

David DeLozier - November 25, 2013                    17

01:38:58   1   A.   Yeah.

01:38:59   2   Q.   -- that he left?

01:38:59   3   A.   Yes.

01:38:59   4   Q.   Okay.  And then that left you as the only

01:39:02   5   attorney for a while.

01:39:03   6        Correct?

01:39:03   7   A.   That's correct.

01:39:03   8   Q.   Okay.  I want to talk about your request for the

01:39:09   9   Rule 11 examination.

01:39:10  10   A.   Okay.

01:39:10  11   Q.   It seems that was based in part on Kandy Rohde.

01:39:14  12        Right?

01:39:14  13   A.   Rohde, yes.

01:39:15  14   Q.   Rohde?  Is that how you say it, Rohde?

01:39:17  15   A.   Uh-huh.

01:39:17  16   Q.   Was there any other reason that you asked for

01:39:21  17   that, anything you saw in your interactions with her?

01:39:24  18   A.   I don't remember if there were.  It's possible,

01:39:36  19   but I don't remember.

01:39:37  20   Q.   Okay.  Do you have any memory of -- did you

01:39:42  21   observe anything in her early on that made you think

01:39:45  22   she might have a mental illness or some sort of --

01:39:48  23   A.   Well, she attempted suicide at some point.  And

01:39:50  24   I don't remember when that was, but obviously that's --

01:39:51  25   when that happens, you know, you -- she was on a lot of

01:39:54  1    medication as well but, you know, the issue that you

01:40:05  2    have when folks are in that position, i.e., charged

01:40:10  3    with capital murder, husband dead, no longer around her

01:40:14  4    children, you know, et cetera, et cetera, et cetera, if

01:40:15  5    you're not depressed there's something wrong with you,

01:40:17  6    okay, in my opinion.

01:40:17  7        Q.  Okay.

01:40:19  8        A.  Okay?  So to have her behave in that form was

01:40:24  9    not necessarily that unusual, but as part of what you

01:40:28 10    do when you recognize those things and you are being

01:40:31 11    told by someone like Rohde then that she's concerned

01:40:34 12    about her, you ask the Court to take a look at it and

01:40:44 13    see if -- and have somebody appointed to do that Rule

01:40:44 14    11.

01:40:44 15        Q.  And that was Dr. Potts that was appointed.

01:40:44 16            Right?

01:40:44 17        A.  I think -- I don't know.  I think it's in here

01:40:49 18    somewhere.

01:40:49 19        Q.  Yes, Dr. Potts.

01:40:50 20        A.  Yeah.  Okay.

01:40:51 21        Q.  You gave Dr. Potts Ms. Rohde's letter to you.

01:40:57 22            Right?

01:40:57 23        A.  I don't remember.

01:40:58 24        Q.  Okay.  Let's talk about Ms. Rohde a little bit.

01:41:02 25    She was retained personally by the Ochoas.

David DeLozier - November 25, 2013          19

| | | |
|---|---|---|
| 01:41:05 | 1 | Is that right? |
| 01:41:05 | 2 | A.  That's my understanding. |
| 01:41:07 | 3 | Q.  Okay.  Do you know how much they were paying |
| 01:41:08 | 4 | her? |
| 01:41:08 | 5 | A.  No.  I have no idea.  I don't know when she |
| 01:41:10 | 6 | started, you know. |
| 01:41:11 | 7 | Q.  Okay. |
| 01:41:12 | 8 | A.  Other than from her notes. |
| 01:41:13 | 9 | Q.  Okay.  Did you consider her a member of your -- |
| 01:41:15 | 10 | the defense team? |
| 01:41:16 | 11 | A.  I did. |
| 01:41:17 | 12 | Q.  You did?  In what capacity?  As an expert or |
| 01:41:21 | 13 | as -- |
| 01:41:21 | 14 | A.  Well, if I had still been involved in the case |
| 01:41:24 | 15 | when it went to trial, other than the limited role that |
| 01:41:27 | 16 | I had, I would have used her to explain, yes. |
| 01:41:30 | 17 | Q.  Okay.  Can you tell me why and how -- how you |
| 01:41:33 | 18 | would have used her? |
| 01:41:34 | 19 | MR. DeLOZIER:  Is this still okay? |
| 01:41:35 | 20 | MR. ARNTSEN:  This would be, yeah. |
| 01:41:37 | 21 | MR. DeLOZIER:  Okay.  I didn't know if |
| 01:41:37 | 22 | there was -- |
| 01:41:39 | 23 | MS. GARD:  I understand. |
| 01:41:39 | 24 | MR. ARNTSEN:  It's fair.  No, thank you for |
| 01:41:41 | 25 | asking. |

David DeLozier - November 25, 2013                    20

```
01:41:41   1              MR. DeLOZIER:  I suppose at that point my
01:41:49   2   understanding was that if anybody knew Wendi it was
01:41:53   3   her, much better than, perhaps, even I.  Okay?  And,
01:42:00   4   obviously, I'm not going to testify, so I would have
01:42:05   5   had her included in a presentation.  I don't know -- I
01:42:09   6   probably would have on both phases, guilt and penalty.
01:42:13   7   Now, why would I have done that?  Well, Bayless said
01:42:18   8   that she was -- he didn't see any domestic violence in
01:42:21   9   that family.  Well, you had to have blinders on not to
01:42:24  10   see domestic violence in that family.
01:42:26  11   BY MS. GARD:
01:42:26  12        Q.  When you say "that family," do you mean the
01:42:27  13   Ochoas or Wendi?
01:42:27  14        A.  The -- Andriano, Wendi and Joseph.
01:42:31  15        Q.  Okay.
01:42:32  16        A.  You had to have blinders on not to see it, in my
01:42:36  17   opinion.
01:42:36  18        Q.  Okay.
01:42:36  19        A.  So we didn't have -- they didn't have anybody to
01:42:40  20   testify, in my opinion, other than -- what's her name?
01:42:43  21   Murphy, Sharon Murphy, about -- and Sharon didn't know
01:42:48  22   her like Kandy did.  Okay?  I don't know.
01:42:52  23        Q.  Was that because Sharon -- because Sharon had
01:42:55  24   gone to see her.
01:42:55  25            Right?
```

**Coash & Coash, Inc., 602-258-1440**

01:42:55  1    A.   Yes.  She did --

01:42:56  2    Q.   And had met with her?

01:42:57  3    A.   She did the normal, you know, things that

01:42:59  4   experts do but, you know, she didn't see her on a

01:43:04  5   weekly basis for two or three or four years either.

01:43:07  6    Q.   Okay.  So when you say that you would have used

01:43:10  7   Ms. Kandy Rohde at sentencing, what would you have

01:43:14  8   presented from her there?

01:43:15  9    A.   What she has -- her experience.

01:43:18 10    Q.   Her experience with the defendant?

01:43:20 11    A.   Yeah.

01:43:21 12    Q.   Her diagnoses, too?  Would you have presented

01:43:24 13   that as well?

01:43:24 14    A.   Sure, assuming she's qualified.  I don't know.

01:43:25 15   I never thought about qualifications.  She apparently

01:43:28 16   had a master's in psychology or something so I assume

01:43:31 17   she'd probably pass muster.

01:43:32 18    Q.   By the way, she's dead.

01:43:34 19         Is that correct?

01:43:34 20    A.   Yes.

01:43:35 21    Q.   Okay.  Did you talk to Dan Patterson about

01:43:39 22   calling her?

01:43:40 23    A.   He knew everybody that I had indicated that I

01:43:43 24   thought we ought to include.

01:43:44 25    Q.   Okay.

David DeLozier - November 25, 2013                22

| | | |
|---|---|---|
| 01:43:45 | 1 | A.   Do I remember telling Patterson to use Rohde? |
| 01:43:49 | 2 | No.   Did I said Rohde's stuff to Patterson?   Yes. |
| 01:43:53 | 3 | Q.   Do you remember -- and you don't remember any |
| 01:43:55 | 4 | discussion with Patterson about Rohde? |
| 01:43:57 | 5 | A.   No. |
| 01:43:57 | 6 | Q.   Or why he may have decided not to call her? |
| 01:44:00 | 7 | A.   No. |
| 01:44:00 | 8 | Q.   And along that same line, did he make the |
| 01:44:04 | 9 | decisions of who was going to be called and who wasn't? |
| 01:44:06 | 10 | A.   Yes. |
| 01:44:07 | 11 | Q.   Exclusively?   Did you have input in that? |
| 01:44:10 | 12 | A.   I got told who they were going to be. |
| 01:44:11 | 13 | Q.   Okay.   Did he consult you at all? |
| 01:44:13 | 14 | A.   No. |
| 01:44:13 | 15 | Q.   Okay.   And he delegated to you tasks as |
| 01:44:19 | 16 | appropriate. |
| 01:44:19 | 17 |      Right? |
| 01:44:21 | 18 | A.   I got told what he thought I ought to do.   Let's |
| 01:44:25 | 19 | put it that way. |
| 01:44:25 | 20 | Q.   And other than -- you said in your affidavit |
| 01:44:27 | 21 | investigating mitigation was one task. |
| 01:44:29 | 22 |      Right? |
| 01:44:31 | 23 | A.   That was the assignment -- |
| 01:44:33 | 24 | Q.   Okay. |
| 01:44:35 | 25 | A.   -- that I was told that I would be doing. |

**Coash & Coash, Inc.,  602-258-1440**

David DeLozier - November 25, 2013                    23

01:44:40  1        Q.   Okay.   Other than that, did you have other

01:44:42  2   assignments that you were --

01:44:43  3        A.   Yeah, I did the -- I was told during the trial

01:44:47  4   who I was going to ask questions of on direct and who I

01:44:52  5   was going to ask questions of on cross.   I'd usually

01:44:55  6   find out a day ahead of time.

01:44:57  7        Q.   Had you been present for the interviews of those

01:44:59  8   people and reviewed their interview transcripts,

01:45:02  9   anything like that?

01:45:06 10        A.   I don't recall reviewing anybody's transcript.

01:45:08 11   I never participated in anybody's interviews, other

01:45:11 12   than my own.

01:45:12 13        Q.   So Kandy Rohde told you that she believed that

01:45:20 14   Ms. Andriano suffered from depersonalization disorder,

01:45:27 15   dissociative amnesia and potentially one of the cluster

01:45:29 16   C personality disorders?

01:45:30 17        A.   Yeah.   I think that's in her paperwork.

01:45:32 18        Q.   Right.   And in your file there's excerpts from

01:45:34 19   the DSM regarding those illnesses.

01:45:38 20             So did you look into potentially presenting

01:45:42 21   those?

01:45:42 22        A.   In my file there's what?

01:45:44 23        Q.   There's excerpts from the DSM.   There's copies

01:45:46 24   from the DSM.

01:45:47 25        A.   Oh, you mean in this declaration?

**Coash & Coash, Inc., 602-258-1440**

01:45:48  1    Q.  No, no, no.  In your file, your case file which
01:45:50  2  has been closed to us.
01:45:52  3    A.  I have no idea what's in my case file.
01:45:54  4    Q.  You don't recall.
01:45:54  5        Do you recall looking -- researching those
01:45:56  6  illnesses, considering whether to present evidence of
01:45:59  7  them?
01:45:59  8    A.  You are asking me something that I didn't have
01:46:04  9  any control over.
01:46:04 10    Q.  Well, I'm asking you if you, yourself, looked at
01:46:06 11  it.
01:46:08 12    A.  I didn't have any control over what Scott Mac
01:46:11 13  Leod did for mitigation.  He was in charge of
01:46:13 14  mitigation.  He gave me what they wanted presented.
01:46:16 15    Q.  Okay.
01:46:17 16    A.  I presented what they gave me to present.
01:46:19 17    Q.  So we have Scott Mac Leod investigating and then
01:46:22 18  we have you in charge of mitigation by Patterson.
01:46:25 19        Right?
01:46:26 20    A.  Well, I guess you can call it in charge by
01:46:28 21  title, but I never was in charge of it other than this
01:46:30 22  is what you're going to do at the trial.
01:46:40 23    Q.  Okay.  Let's talk about Mac Leod then.  So Mac
01:46:40 24  Leod was a mitigation specialist with the P.D.'s
01:46:40 25  office.

David DeLozier - November 25, 2013                    25

01:46:40  1          Right?

01:46:40  2      A.  Well, that's what I was told.  He came on

01:46:41  3  sometime in -- I don't know -- April or May of 2004.

01:46:45  4      Q.  Did you give him any specific tasks to look

01:46:48  5  into, any specific areas to go through?

01:46:50  6      A.  (No audible response.)

01:46:51  7      Q.  Did he report back to you regularly about what

01:46:53  8  he was looking at?

01:46:54  9      A.  No, no, no.

01:46:55  10     Q.  Did you tell him about what Kandy Rohde had told

01:46:59  11 you?

01:46:59  12     A.  I gave it to Patterson.  I don't know what

01:47:01  13 Patterson did with it.

01:47:02  14     Q.  Okay.  So you don't give it directly to Mac

01:47:04  15 Leod?

01:47:04  16     A.  No.

01:47:04  17     Q.  What about Mac Leod's predecessor, Linderman,

01:47:07  18 Patrick Linderman.

01:47:07  19     A.  I met him one time.

01:47:08  20     Q.  Okay.  Did you -- you met him face to face one

01:47:11  21 time?

01:47:11  22     A.  I think so.

01:47:11  23     Q.  Did you speak to him by email or the phone or

01:47:14  24 anything else?

01:47:14  25     A.  No.

01:47:14   1      Q.   No?

01:47:17   2      A.   Not that I recall.

01:47:17   3      Q.   Okay.

01:47:19   4      A.   Let me tell you -- let me tell you my practice,

01:47:20   5   okay, again.

01:47:20   6      Q.   Okay.

01:47:21   7      A.   Okay?  I hire a mitigation expert.  That person

01:47:26   8   does their investigation.  We have conversations

01:47:29   9   generally about the direction they're going, okay, but

01:47:34  10   I don't get involved in doing the mitigation.

01:47:37  11      Q.   So you rely on the mitigation specialist --

01:47:39  12      A.   Exactly.

01:47:39  13      Q.   -- to do the investigation?

01:47:40  14      A.   Exactly.

01:47:41  15      Q.   Okay.

01:47:42  16      A.   Now, that's historically the pattern.  This time

01:47:46  17   I'm out of the loop even more, okay, because people

01:47:49  18   don't return my phone calls, don't return my emails,

01:47:52  19   et cetera.  So whatever they were doing, they were

01:47:55  20   doing, and I was handed what they did for mitigation.

01:47:58  21      Q.   When you first -- when Dan first came back on

01:48:01  22   the case, did you and he have any sort of discussion

01:48:06  23   about how you were going to divide labor, what your

01:48:09  24   role was going to be?

01:48:10  25      A.   Okay.  Let me back up a little further.  Okay?

David DeLozier - November 25, 2013                    27

01:48:14  1    Q.   Uh-huh.

01:48:15  2    A.   Part of the reason that the Public Defender's

01:48:20  3  Office was involved was because every time I asked for

01:48:22  4  an expert, okay, OPDS or whatever they were called in

01:48:27  5  those days sent their lawyer over and made us go

01:48:31  6  through a hearing on whether we should get that expert.

01:48:35  7  It was a royal pain in the behind, okay, for everybody.

01:48:42  8  Ishikawa got tired of it.  He -- Ishikawa and the

01:48:47  9  Public Defender's Office apparently got together and

01:48:49 10  decided -- and told me and told the family that they

01:48:52 11  were going to go out and hire a private lawyer to

01:48:54 12  handle this case.

01:48:56 13       Okay?  And when that private lawyer came on and

01:49:01 14  the public defender took over after, in my opinion,

01:49:05 15  lying to me, lying to the Ochoas, lying to

01:49:09 16  Ms. Andriano, et cetera, okay -- because we didn't know

01:49:12 17  that that wasn't going to be true.  Okay?  So they were

01:49:17 18  all very relieved that I no longer had a role,

01:49:20 19  essentially, in deciding who was going to do what

01:49:23 20  because the Public Defender's Office had to budget for

01:49:26 21  all these things that I'm over there wasting their time

01:49:29 22  on, okay, and they're in charge now, David, and you sit

01:49:34 23  back and you do whatever they ask you to do.

01:49:36 24    Q.   You do what's delegated to you?

01:49:39 25    A.   Yeah.

P-App. 005708

| | | |
|---|---|---|
| 01:49:39 | 1 | Q.   Right.   Okay. |
| 01:49:40 | 2 | Prior to the P.D.'s office being reappointed, |
| 01:49:43 | 3 | did you consult with any mental health expert, other |
| 01:49:47 | 4 | than -- well, assuming that Ms. Rohde can be considered |
| 01:49:49 | 5 | an expert, other than her? |
| 01:49:51 | 6 | A.   Yeah.   I would have talked to Sharon Murphy. |
| 01:49:54 | 7 | Q.   That was before the -- |
| 01:49:55 | 8 | A.   Oh, yeah. |
| 01:49:55 | 9 | Q.   The P.D.?   All right. |
| 01:49:56 | 10 | A.   Yeah, definitely.   She was at ASU at that time. |
| 01:50:09 | 11 | Prior to the P.D.'s office had I talked to another |
| 01:50:13 | 12 | psychologist-type person, right, mental health person? |
| 01:50:16 | 13 | Q.   Yes. |
| 01:50:16 | 14 | A.   I'm trying to remember.   They came on board in |
| 01:50:25 | 15 | about the summer of 2001, is that right? |
| 01:50:29 | 16 | Q.   Looks like fall 2001, September of 2001. |
| 01:50:32 | 17 | A.   Okay.   September?   So I would have only been on |
| 01:50:34 | 18 | six or seven months.   It's unlikely.   I don't know for |
| 01:50:39 | 19 | sure, but I doubt it. |
| 01:50:40 | 20 | Q.   Did you have -- and forgive me if I've asked |
| 01:50:43 | 21 | this or we covered this, but before the P.D.'s office |
| 01:50:46 | 22 | came on, did you have a mitigation person that you were |
| 01:50:48 | 23 | using? |
| 01:50:49 | 24 | A.   I don't recall.   I don't know.   I don't know.   I |
| 01:51:05 | 25 | don't know.   Sorry. |

David DeLozier - November 25, 2013                29

01:51:05  1      Q.   Okay.  Let me ask some specific questions.

01:51:06  2           In your file, the file that's been disclosed,

01:51:09  3   I've seen emails and references to someone named Mary

01:51:12  4   Margaret.

01:51:13  5           Is that Mary Margaret Kelly?

01:51:15  6      A.   I don't know.

01:51:16  7      Q.   She's an investigator here in the Valley?  You

01:51:18  8   don't remember?

01:51:19  9      A.   I don't know.

01:51:19  10     Q.   What about Rich Robertson?

01:51:21  11     A.   Yeah.

01:51:22  12     Q.   You used Rich Robertson?  What did you use him

01:51:24  13  for?

01:51:25  14     A.   I don't remember.

01:51:25  15     Q.   Okay.  But -- you don't remember if it was for

01:51:27  16  mitigation purposes or --

01:51:30  17     A.   I don't think I've ever used Robertson for that

01:51:32  18  role.

01:51:33  19     Q.   Okay.

01:51:34  20     A.   He's a private investigator --

01:51:36  21     Q.   Right.

01:51:36  22     A.   -- typically, and his office does process

01:51:39  23  serving for me now.  That's about the only thing they

01:51:41  24  do.

01:51:42  25     Q.   Okay.

David DeLozier - November 25, 2013                    30

01:51:43  1      A.   Because I don't have much in that kind of -- but

01:51:47  2   I don't think I've ever used him for mitigation.   Mary

01:51:52  3   Margaret?   There was a lady that worked for the P.D.'s

01:51:55  4   office that was an investigator, paralegal, whatever.

01:51:58  5   I can't remember her name, a Spanish --

01:52:02  6      Q.   Michelle-something?   And I don't remember her

01:52:04  7   last name, but I've seen it.

01:52:05  8      A.   Maybe.   Maybe that's who it was.   I was trying

01:52:08  9   to see if that Mary Margaret who you were asking me

01:52:08 10   about might have been her.   I don't remember a Mary

01:52:11 11   Margaret.   Sorry.

01:52:12 12      Q.   Okay.   Do any --

01:52:13 13      A.   If you've got my records, it might refresh my

01:52:16 14   recollection.

01:52:16 15      Q.   Okay.

01:52:17 16      A.   I don't know.

01:52:18 17      Q.   All right.   Donna Ochoa, you had her gather

01:52:25 18   information, right, it looks like?

01:52:26 19      A.   I ask the family in every case to do that.

01:52:36 20      Q.   Okay.

01:52:36 21      A.   Give me everything you can on what's going on,

01:52:36 22   you know, anything you think that might be helpful,

01:52:36 23   anything you think might be harmful, you know.

01:52:37 24      Q.   Would you agree that she provided you a good bit

01:52:39 25   of information here?

**Coash & Coash, Inc., 602-258-1440**

David DeLozier - November 25, 2013                    31

| | | |
|---|---|---|
| 01:52:41 | 1 | A.   I'm sure she did. |
| 01:52:42 | 2 | Q.   Okay.  Did she seem to you to be motivated to do |
| 01:52:46 | 3 | whatever she could to help Wendi? |
| 01:52:49 | 4 | A.   Yeah. |
| 01:52:49 | 5 | Q.   Okay.  What about Alejo?  What do you -- |
| 01:52:53 | 6 | A.   I didn't have any problem with either one of |
| 01:52:55 | 7 | them. |
| 01:52:55 | 8 | Q.   Okay. |
| 01:52:55 | 9 | A.   As far as their desire to help their daughter. |
| 01:53:00 | 10 | Q.   What about the family dynamic there?  Did you |
| 01:53:03 | 11 | get a sense of what that was like? |
| 01:53:07 | 12 | A.   They were more conservative, I guess, and |
| 01:53:13 | 13 | fundamentalists, sort of how I am or was, but I grew up |
| 01:53:15 | 14 | in a somewhat fundamentalist background.  So it didn't |
| 01:53:19 | 15 | harm me too much, but I'm not very -- but now or then, |
| 01:53:25 | 16 | during this trial, but I know a lot of people that are. |
| 01:53:33 | 17 | And they seemed to be the kind of people that did the |
| 01:53:39 | 18 | things that those people do, you know, loving, caring, |
| 01:53:46 | 19 | generous, giving, you know, all the normal good human |
| 01:53:50 | 20 | traits.  I didn't -- I did not feel anything out of the |
| 01:53:54 | 21 | ordinary. |
| 01:53:55 | 22 | Alejo is a photographer as a hobby, at least.  I |
| 01:53:58 | 23 | think at one time he -- so, for example, my kids were |
| 01:54:01 | 24 | in the horse business, and he'd come out to the horse |
| 01:54:04 | 25 | shows and make photographs and give them to us of all |

**Coash & Coash, Inc., 602-258-1440**

David DeLozier - November 25, 2013                    32

01:54:07  1    the, you know, various things going on there and stick

01:54:11  2    around there all day, you know, which is pretty unusual

01:54:14  3    in a lot of ways.

01:54:14  4         Okay?  I've been down to Florence with Alejo,

01:54:19  5    and he's told me -- and had lunch with him, for

01:54:22  6    example.  And he told me about his family being in the

01:54:25  7    Valley since the 1850s and that Florence could have

01:54:27  8    been the capital at one time but they turned it down

01:54:28  9    and they didn't want it -- of the state, you know, dah,

01:54:30  10   dah, dah.  You know, so we had friendly conversations

01:54:35  11   as well as business-type conversations, if you will,

01:54:38  12   and so I felt like I got to know them fairly well.

01:54:42  13        Is that what you're asking?

01:54:43  14   Q.  Yeah.  I'm just trying to get a sense of what

01:54:46  15   you as an outsider thought of their sort of family

01:54:48  16   interactions.

01:54:48  17   A.  Yeah.

01:54:49  18   Q.  And it's interesting you mention photography.

01:54:52  19        Were you aware of Alejo -- that Alejo may have

01:54:57  20   taken photographs of Wendi when she was scantily clad?

01:55:02  21   A.  No, not until recently.

01:55:03  22   Q.  You weren't aware of that?

01:55:04  23   A.  I don't think so.  I don't remember it.

01:55:06  24   Q.  No one in the family told ever told you that?

01:55:08  25   A.  Huh-uh.

**Coash & Coash, Inc.,  602-258-1440**

David DeLozier - November 25, 2013                    33

| | | |
|---|---|---|
| 01:55:09 | 1 | Q.   And she didn't -- Wendi didn't tell you that? |
| 01:55:11 | 2 | A.   Huh-uh. |
| 01:55:11 | 3 | Q.   Okay.  Did Wendi ever tell you anything -- did |
| 01:55:14 | 4 | Wendi ever claim that she had been molested by Alejo or |
| 01:55:18 | 5 | otherwise sexually abused? |
| 01:55:20 | 6 | A.   No. |
| 01:55:20 | 7 | Q.   She never -- |
| 01:55:21 | 8 | A.   No. |
| 01:55:21 | 9 | Q.   -- said anything about that? |
| 01:55:22 | 10 | Did she talk to you about what her dynamic was |
| 01:55:25 | 11 | or what her relationship was with Alejo? |
| 01:55:28 | 12 | A.   Adopted daughter. |
| 01:55:30 | 13 | Q.   But, I mean, in terms of how she got along with |
| 01:55:32 | 14 | him in terms of -- |
| 01:55:33 | 15 | A.   They seemed to be -- all I knew was they were |
| 01:55:36 | 16 | close. |
| 01:55:36 | 17 | Q.   Okay. |
| 01:55:36 | 18 | A.   But as father and daughter close. |
| 01:55:39 | 19 | Q.   But she never alleged any impropriety or |
| 01:55:42 | 20 | anything along those lines? |
| 01:55:43 | 21 | A.   No, not to me.  And even Rohde's stuff is all |
| 01:55:46 | 22 | about some grandfather, I think it is. |
| 01:55:49 | 23 | Q.   Right, her biological grandfather and her |
| 01:55:53 | 24 | biological father? |
| 01:55:54 | 25 | A.   I don't remember what label.  It was her |

**Coash & Coash, Inc.,  602-258-1440**

David DeLozier - November 25, 2013                    34

| | | |
|---|---|---|
| 01:55:57 | 1 | grandfather.  I have to look at it again. |
| 01:55:59 | 2 | Q.  So you weren't aware from Rohde either of any |
| 01:56:03 | 3 | kind of allegation against Alejo? |
| 01:56:05 | 4 | A.  No. |
| 01:56:05 | 5 | Q.  Okay. |
| 01:56:05 | 6 | A.  No. |
| 01:56:05 | 7 | Q.  What would you -- how would you describe -- you |
| 01:56:07 | 8 | talked about her seeming depressed and said it wasn't |
| 01:56:11 | 9 | an unusual-type depression, but how would you describe |
| 01:56:13 | 10 | her generally in terms of was she outgoing with you? |
| 01:56:18 | 11 | Was she trusting of you? |
| 01:56:19 | 12 | A.  Yes. |
| 01:56:20 | 13 | Q.  Did you have -- |
| 01:56:21 | 14 | A.  By the way, I don't know that I used the same |
| 01:56:24 | 15 | phrase about her depression as being normal. |
| 01:56:27 | 16 | Q.  Well -- |
| 01:56:27 | 17 | A.  Okay?  I don't want you to put words in my |
| 01:56:31 | 18 | mouth, please. |
| 01:56:31 | 19 | Q.  For the circumstances. |
| 01:56:32 | 20 | A.  Yeah.  Okay.  But, yeah, she was always glad to |
| 01:56:34 | 21 | see me and we always had good conversations and I would |
| 01:56:36 | 22 | really talk about whatever she wanted to talk about. |
| 01:56:39 | 23 | Q.  Okay.  Which brings me to my next sort of area. |
| 01:56:42 | 24 | You said in your affidavit that you talked to |
| 01:56:44 | 25 | her primarily about matters of faith and religion? |

**Coash & Coash, Inc.,  602-258-1440**

David DeLozier - November 25, 2013                    35

01:56:47   1    A.    Yeah.

01:56:47   2    Q.    Okay.   Was there a reason for that?

01:56:49   3    A.    Yes.   There's a reason for that.   I believe it's

01:56:52   4  important for people that are in trouble, regardless of

01:56:54   5  the level of trouble they're in -- and that can be

01:56:57   6  people that are depressed as well -- to straighten out

01:57:00   7  whatever they believe so that they get out of that

01:57:02   8  because it's self-perpetuating.   If I stay depressed,

01:57:06   9  I'm going to be depressed.   If I start negative, I'm

01:57:08  10  going to be negative.   If I hurt people, I'm going to

01:57:10  11  hurt people.   You follow me?

01:57:10  12    Q.    Uh-huh?

01:57:13  13    A.    Okay.   So part of my mission, if you will, being

01:57:15  14  a lawyer is to get people to not get into the same

01:57:19  15  negative behavior pattern that brought them to wherever

01:57:21  16  they are.   Okay?

01:57:21  17    Q.    Okay.

01:57:23  18    A.    So that is what I do with everybody.   So if you

01:57:28  19  don't want me as your lawyer, you know it up front, in

01:57:31  20  other words, okay, because I'm going to talk to you

01:57:33  21  about how not to get a divorce next time, how not to

01:57:36  22  get a speeding ticket, how not to get a DUI, how not to

01:57:40  23  be involved in whatever you are coming to me for.   We

01:57:45  24  as a society have put labels on the kinds of things.

01:57:48  25  It's all people problems.   Okay?

David DeLozier - November 25, 2013                    36

01:57:48  1    Q.   Uh-huh.

01:57:51  2    A.   I don't care whether it's civil or it's criminal

01:57:54  3    or whatever, domestic violence or whatever it is.  So

01:57:56  4    it's all people problems.  People problems are caused

01:57:59  5    because people think negatively.  Okay?  They do

01:58:09  6    negative things when they think negatively.  Okay?  So

01:58:09  7    part of my job, in my opinion, is to help people get

01:58:12  8    out of that rut that got them wherever they are.  You

01:58:15  9    know, the difference between a rut and a grave.  Right?

01:58:19 10    One of them is just a little deeper.  Okay?

01:58:21 11    Q.   Okay.  So what did you think was the rut that

01:58:25 12    she was in that got her into prison?

01:58:28 13    A.   Well, my impression was that -- and this is

01:58:36 14    really what was presented -- is that living with that

01:58:39 15    man was detrimental to her health.  She was relieved to

01:58:44 16    be in jail and away from him.  Now, some people found

01:58:47 17    that to be unusual, but if you live in constant

01:58:53 18    torment, okay, and that torment is gone you've got a

01:58:57 19    sense of relief.  Okay?

01:59:00 20    Q.   Did she tell you she was relieved to be in jail?

01:59:04 21    A.   Sure.

01:59:04 22    Q.   How many times did she tell you that?

01:59:06 23    A.   Oh, I don't know.

01:59:08 24    Q.   And that's the reason why she was relieved to be

01:59:10 25    in jail?

**Coash & Coash, Inc.,  602-258-1440**

**P-App. 005717**

01:59:10  1      A.   It was -- she's safe now was more correctly her

01:59:14  2  words.   I'm safe.   He can't hurt me anymore.   He can't

01:59:18  3  make me do things anymore.   Okay?

01:59:22  4      Q.   Okay.

01:59:22  5      A.   She spent her time while she was with this man

01:59:26  6  making sure that he didn't get upset.   How would you

01:59:29  7  like to live your life that way?   Okay?   Constantly on

01:59:34  8  guard worried about whatever happens in his life is

01:59:37  9  going to be so bad that he's going to yell and scream

01:59:40 10  and beat on me.   That's not the way I want to live.

01:59:45 11      Q.   And this is what you counseled her about was --

01:59:50 12      A.   I don't understand the question.

01:59:51 13      Q.   Well, when you went to talk to her and tried to,

01:59:56 14  you know, discuss religion with her so she doesn't keep

01:59:59 15  going down the same path, it was her interpersonal

02:00:02 16  relations or it was --

02:00:04 17      A.   She ended up where she is because of her

02:00:11 18  inability to get away from that situation.   Okay?   So

02:00:16 19  anytime I don't have the strength to move myself out of

02:00:21 20  a bad situation, you know, I have been thinking

02:00:25 21  incorrectly for a long time.   Okay?   She perpetuated

02:00:32 22  that circumstance to the point where she couldn't

02:00:35 23  handle it anymore.   Okay?   So at some point in time,

02:00:40 24  you've got to start saying, okay, this is where I am; I

02:00:43 25  can't change where I am right now, okay, because I'm in

**Coash & Coash, Inc., 602-258-1440**

David DeLozier - November 25, 2013                    38

02:00:47   1    prison for the rest of my life or whatever, death
02:00:49   2    penalty, okay, but what am I going to do to make this
02:00:53   3    period at least tolerable to the point where I am not
02:00:58   4    destroying myself every day?  Okay?
02:01:01   5        Q.  Okay.
02:01:02   6        A.  So, obviously, that was part of what we talked
02:01:04   7    about.
02:01:04   8        Q.  Did you ever talk about her case?  I mean, did
02:01:07   9    you have any discussions about what she wanted
02:01:09  10    presented, what she didn't want presented?
02:01:11  11        A.  Sure.  Sure.
02:01:12  12        Q.  Okay.
02:01:12  13        A.  Especially when, you know, the P.D. came on
02:01:14  14    board.
02:01:14  15        Q.  So what kind of things did she want presented?
02:01:16  16        A.  Oh, I don't remember.  Just -- you know, I was
02:01:19  17    telling her that we had a crime scene investigator
02:01:23  18    which was not used, for example.
02:01:25  19        Q.  You retained one?
02:01:26  20                MR. DeLOZIER:  Am I beyond the thing now?
02:01:28  21                MR. ARNTSEN:  I think you've got to be
02:01:30  22    careful here because, again, the guilt -- the
02:01:34  23    evidentiary hearing is not concerning with the guilt
02:01:35  24    phase part.
02:01:36  25                MR. DeLOZIER:  Right.  So I don't know if I

**Coash & Coash, Inc.,  602-258-1440**

02:01:38 can answer that. So that's what I was concerned about.
02:01:40 MS. GARD: Okay. The part about retaining
02:01:41 the guilt phase investigator? That's the part you are
02:01:43 objecting to?
02:01:43 MR. ARNTSEN: Right, right.
02:01:45 BY MS. GARD:
02:01:45 Q. What about in terms of sentencing? Was there
02:01:48 anything that she asked you to look at, asked you not
02:01:50 to look at?
02:01:51 A. No.
02:01:53 Q. Did she ask you to have an investigation into
02:01:56 her mental health?
02:01:58 A. Not that I recall.
02:02:00 Q. Did she talk to you about any kind of family
02:02:03 history of mental health problems?
02:02:04 A. I don't recall any.
02:02:07 Q. Or personal history either?
02:02:08 A. Huh-uh, no. I don't recall any.
02:02:11 Q. But she did talk to you about the domestic
02:02:15 violence?
02:02:16 A. Oh, sure.
02:02:16 Q. And is that something she -- that's something
02:02:18 she asked you to pursue, I assume?
02:02:19 A. I don't know that she -- I can't recall her
02:02:21 saying, David, do this or, David, take over this. We

David DeLozier - November 25, 2013                    40

02:02:24  1    had general conversations about her life and -- you
02:02:29  2    know, and whether -- Wendi, I don't think, would have
02:02:31  3    said, David, you need to focus on this.  That's just
02:02:34  4    not -- that's just not the kind of conversations that
02:02:37  5    we had.
02:02:37  6        Q.  Is that just not her personality or it wasn't
02:02:40  7    the way you guys interacted?
02:02:42  8        A.  I think it's broader than your question, if it's
02:02:48  9    okay.
02:02:48 10        Q.  That's fine.
02:02:49 11        A.  Okay.  I think that most of the people who come
02:02:51 12    into my world don't know what they need.  Okay?
02:02:54 13        Q.  In terms of representation?
02:02:56 14        A.  In terms of what they want, what they want as a
02:02:59 15    result.  You know, if you get a DUI is there any
02:03:01 16    defense for it?  No.  Okay?  You know, that's the
02:03:04 17    answer.  You see what I'm saying?  So when you're
02:03:07 18    involved in this kind of a complex case, you don't jump
02:03:10 19    to conclusions about I've got to do this or I've got to
02:03:14 20    do that, in my opinion.  You try to put your arms
02:03:16 21    around the whole picture and, obviously, part of the
02:03:18 22    problem in this case, in my opinion, is that I was
02:03:22 23    either misled or blinded.
02:03:23 24        Q.  By?
02:03:24 25        A.  By the whole situation.

**Coash & Coash, Inc., 602-258-1440**

02:03:27  1      Q.   By her?

02:03:28  2      A.   I don't know that I would blame her for what I

02:03:33  3   considered to be my blindness, no.

02:03:35  4      Q.   Who do you think misled you and blinded you?

02:03:38  5      A.   I don't know that I can cast a rock at anybody,

02:03:43  6   okay, by saying this particular one or this particular

02:03:46  7   person.   The whole matrix was -- you know, you are

02:03:50  8   familiar with Ring, right?

02:03:53  9      Q.   Yes.

02:03:53 10      A.   Well, that was brand new for all of us,

02:04:02 11   including Patterson.   You know, none of us had ever

02:04:02 12   done that kind of thing so we had to learn what we had

02:04:02 13   to do, and you typically were waiting three months, six

02:04:05 14   months, a year for a mitigation hearing, you know, and

02:04:08 15   you did it in front of a judge -- at the penalty phase,

02:04:11 16   I mean.   You know, and now we were told the same jury

02:04:14 17   had to do the same thing and you had to do it all at

02:04:17 18   the same time, you know, which was quite a chore to

02:04:21 19   re-tool yourself, but I don't think I can throw rocks

02:04:27 20   at anybody.   I believe it was a whole -- a whole set of

02:04:31 21   circumstances, okay, and I dealt with some of those

02:04:36 22   circumstances in this document.

02:04:37 23      Q.   Okay.   I guess I'm still not understanding why

02:04:40 24   you feel mislead.   That seems to suggest there's some

02:04:42 25   sort of affirmative, you know, dishonesty that you are

David DeLozier - November 25, 2013                    42

02:04:47  1    relying on.

02:04:48  2        A.   No.   That's not -- I didn't -- did I use the

02:04:51  3    word "misled"?   I meant blinded, I think.

02:04:53  4        Q.   Blinded.

02:04:54  5        A.   Yeah.

02:04:54  6        Q.   By just the circumstances of the case or how

02:04:56  7    complex it was going to be?   Is that --

02:05:01  8        A.   None of the people that were involved in the

02:05:05  9    preparation for trial developed some of the things that

02:05:11 10    I now know as apparently being the matrix in that

02:05:15 11    family.

02:05:16 12        Q.   You are referring to Alejo and that dynamic or

02:05:19 13    what are you referring to?

02:05:20 14        A.   Yeah, yeah.

02:05:20 15        Q.   Okay.

02:05:21 16        A.   Yeah.   Not only Alejo, Donna is living with it.

02:05:24 17        Q.   Okay.

02:05:24 18        A.   I mean, how blind can you be?   Pardon me, you

02:05:27 19    know, I just don't understand that, that you can allow

02:05:30 20    that kind of behavior and you still live with that

02:05:35 21    behavior.

02:05:35 22        Q.   Okay.

02:05:35 23        A.   So I didn't know anything about that.   I don't

02:05:38 24    know how we -- the folks that were involved didn't get

02:05:42 25    it.   Now, the trial in this case started, what, three

**Coash & Coash, Inc.,  602-258-1440**

David DeLozier - November 25, 2013                    43

| | | |
|---|---|---|
| 02:05:45 | 1 | months after Mac Leod was on the case.  So perhaps it |
| 02:05:50 | 2 | was because we shouldn't have started it that soon.  I |
| 02:05:54 | 3 | don't know, but I didn't pick up on it at all. |
| 02:05:57 | 4 | Q.  And she didn't disclose it to you? |
| 02:05:58 | 5 | A.  No. |
| 02:05:59 | 6 | Q.  And Donna didn't disclose it to you? |
| 02:06:01 | 7 | A.  No. |
| 02:06:01 | 8 | Q.  And Alejo didn't disclose it to you? |
| 02:06:03 | 9 | A.  No. |
| 02:06:03 | 10 | Q.  What about Brandon Ochoa?  Did he close anything |
| 02:06:06 | 11 | to you? |
| 02:06:06 | 12 | A.  No. |
| 02:06:07 | 13 | Q.  Okay. |
| 02:06:10 | 14 | A.  This was a revelation that I didn't want when I |
| 02:06:18 | 15 | heard about it. |
| 02:06:18 | 16 | Q.  That you didn't want?  Why? |
| 02:06:20 | 17 | A.  I didn't want it.  I thought differently of that |
| 02:06:22 | 18 | family.  I didn't think that kind of behavior was |
| 02:06:26 | 19 | happening in that family. |
| 02:06:27 | 20 | Q.  You thought they were a good family? |
| 02:06:28 | 21 | A.  Yeah. |
| 02:06:28 | 22 | Q.  Outstanding family? |
| 02:06:30 | 23 | A.  Absolutely. |
| 02:06:30 | 24 | Q.  Okay.  You thought -- and that's part of what |
| 02:06:32 | 25 | you presented or what you and Dan -- or, from what you |

P-App. 005724

David DeLozier - November 25, 2013                    44

02:06:35   1    said, Dan presented about her having a good upbringing?

02:06:38   2        A.   Yeah.

02:06:39   3        Q.   And positive role models?

02:06:40   4        A.   Certainly.

02:06:41   5        Q.   And so forth.

02:06:41   6             Right?

02:06:42   7        A.   Exactly.

02:06:42   8        Q.   But that was -- that was the theme that you all

02:06:45   9    went with.

02:06:45  10             Right?

02:06:46  11        A.   Right.

02:06:46  12        Q.   That she had a good upbringing?

02:06:46  13        A.   Certainly.

02:06:48  14        Q.   And that part was strategic.

02:06:50  15             Right?

02:06:50  16        A.   In my opinion?

02:06:53  17        Q.   Yes.

02:06:54  18        A.   Certainly it was.

          19             THE REPORTER:   I'm sorry.

          20             MR. DeLOZIER:   I'm sorry.   Yes.

          21    BY MS. GARD:

          22        Q.   Yes?

          23        A.   Yes.

02:06:54  24        Q.   It was strategic?

02:06:55  25        A.   Certainly.

P-App. 005725

David DeLozier - November 25, 2013          45

| | | |
|---|---|---|
| 02:06:56 | 1 | Q.   And it was based on what you knew at the time. |
| 02:06:58 | 2 | Right? |
| 02:06:59 | 3 | A.   It's what was -- that's what was developed at |
| 02:07:03 | 4 | the time by the people involved, yes. |
| 02:07:05 | 5 | Q.   And you personally had no reason to believe |
| 02:07:08 | 6 | anything other than that, right, based on what you had |
| 02:07:11 | 7 | seen? |
| 02:07:11 | 8 | A.   Correct. |
| 02:07:13 | 9 | Q.   Okay. |
| 02:07:14 | 10 | A.   If I had any -- if I had had anything different, |
| 02:07:18 | 11 | I would have behaved differently. |
| 02:07:20 | 12 | Q.   Okay.   Now, in terms of -- it was alluded to at |
| 02:07:24 | 13 | trial that it was -- that some people suspected that |
| 02:07:27 | 14 | she may have been abused by her biological father's |
| 02:07:30 | 15 | family, and we talked about that a little bit here. |
| 02:07:32 | 16 | Did you all try to corroborate that at all, find |
| 02:07:35 | 17 | anyone who could corroborate that allegation? |
| 02:07:37 | 18 | A.   It seems like somebody confirmed that one of |
| 02:07:41 | 19 | these people was in prison. |
| 02:07:43 | 20 | Q.   Right, the father. |
| 02:07:44 | 21 | A.   I don't know who it was. |
| 02:07:45 | 22 | Q.   I think. |
| 02:07:45 | 23 | A.   But beyond that, I don't -- I didn't do anything |
| 02:07:51 | 24 | with it. |
| 02:07:51 | 25 | Q.   Okay.   And you don't know what Dan's people may |

**Coash & Coash, Inc., 602-258-1440**

| | | |
|---|---|---|
| 02:07:54 | 1 | have done? |
| 02:07:54 | 2 | A.  No, I don't know. |
| 02:07:55 | 3 | Q.  So tell me why you fasted at trial. |
| 02:08:01 | 4 | A.  It's a -- it's a pattern of behavior that I have |
| 02:08:04 | 5 | done over the years.  This just happens to be one of |
| 02:08:08 | 6 | the longest ones. |
| 02:08:08 | 7 | Q.  And for what purpose, if you are willing to say? |
| 02:08:11 | 8 | Is it a religious purpose or is it a personal? |
| 02:08:14 | 9 | A.  Fasting is -- from my research has been around |
| 02:08:17 | 10 | since man first started writing down what they were |
| 02:08:21 | 11 | doing.  Okay? |
| 02:08:22 | 12 | Q.  Okay. |
| 02:08:25 | 13 | A.  There are a variety of benefits to it. |
| 02:08:31 | 14 | Different people classify fasting in different ways. |
| 02:08:35 | 15 | Some people say if they don't eat breakfast today |
| 02:08:38 | 16 | that's fasting, fasting of breakfast.  Some people have |
| 02:08:42 | 17 | meat -- no meat days, okay, and that's fasting, but |
| 02:08:46 | 18 | they'll eat everything else.  My friends that are |
| 02:08:48 | 19 | Muslim have 30 days when they don't eat during the |
| 02:08:52 | 20 | daylight, but they eat like pigs at night.  Sorry.  I |
| 02:08:55 | 21 | shouldn't use that analogy of a pig but, you know, it's |
| 02:09:01 | 22 | common. |
| 02:09:02 | 23 | There's a lot of people who do it for health |
| 02:09:04 | 24 | reasons.  Okay?  It is a huge benefit for cleansing |
| 02:09:09 | 25 | your intestinal tract.  Okay?  After about 18 to 24 |

David DeLozier - November 25, 2013                    47

| | | |
|---|---|---|
| 02:09:14 | 1 | hours, you will lose everything in your tract quite |
| 02:09:20 | 2 | forcefully.  Okay?  Some of us have incorporated an |
| 02:09:28 | 3 | additional element, and that's called a spiritual fast. |
| 02:09:32 | 4 | A spiritual fast is one where you are seeking insight |
| 02:09:36 | 5 | into -- I knew this case was in trouble.  So I started |
| 02:09:38 | 6 | fasting to try to see if I could kind -- because I had |
| 02:09:42 | 7 | no control over what was being presented and things |
| 02:09:44 | 8 | that were being done and not done were not something |
| 02:09:47 | 9 | that I thought was the way it ought to flow. |
| 02:09:49 | 10 | Q.  Okay.  So that's what you mean by when you knew |
| 02:09:58 | 11 | something was in trouble?  The case was in trouble? |
| 02:09:58 | 12 | A.  Right. |
| 02:09:58 | 13 | Q.  Okay. |
| 02:09:58 | 14 | A.  Well, I mean, you know, let's put it this way. |
| 02:09:58 | 15 | Any case like this is in trouble, okay, Number 1. |
| 02:10:01 | 16 | Number 2, when you have been sort of left out of the |
| 02:10:04 | 17 | loop and you don't know what's going to be presented |
| 02:10:08 | 18 | and you are getting told the day before, I don't know |
| 02:10:11 | 19 | about you, but that's scary. |
| 02:10:13 | 20 | Q.  What do you mean by any case like this is in |
| 02:10:15 | 21 | trouble? |
| 02:10:15 | 22 | A.  Well, any murder case is difficult. |
| 02:10:18 | 23 | Q.  Okay. |
| 02:10:18 | 24 | A.  Whether it's second degree or first degree or |
| 02:10:20 | 25 | capital. |

**Coash & Coash, Inc.,  602-258-1440**

David DeLozier - November 25, 2013                48

| | | |
|---|---|---|
| 02:10:21 | 1 | Q.   Would you consider -- |
| 02:10:22 | 2 | A.   Oh, I forgot.   There's another case that I did, |
| 02:10:25 | 3 | too, that was -- I was first chair on.   It was a little |
| 02:10:29 | 4 | black girl who was charged with killing her baby.   They |
| 02:10:33 | 5 | changed it from capital to first degree.   What the heck |
| 02:10:36 | 6 | is her name?   I'll think of it in a minute.   You asked |
| 02:10:38 | 7 | me the others. |
| 02:10:39 | 8 | Q.   Yeah. |
| 02:10:39 | 9 | A.   That was after this one, of course.   I can't |
| 02:10:44 | 10 | think of the name right now, but it will come to me. |
| 02:10:45 | 11 | Q.   Did you think that this was a difficult -- |
| 02:10:47 | 12 | particularly difficult case to try?   Was that your |
| 02:10:50 | 13 | assessment at the time? |
| 02:10:51 | 14 | A.   When I was involved in it myself, I went about |
| 02:10:58 | 15 | preparing as if I would any other case, basically, as |
| 02:11:02 | 16 | far as guilt.   And we're back to the point where I |
| 02:11:05 | 17 | don't think I can say much else. |
| 02:11:06 | 18 | Q.   Okay.   Let's talk about sentencing, then, and |
| 02:11:08 | 19 | how -- what would you have done differently at |
| 02:11:10 | 20 | sentencing than Dan did? |
| 02:11:14 | 21 | A.   You have to have somebody to counter Bayless, in |
| 02:11:22 | 22 | my opinion.   They didn't have anybody.   Bayless was so |
| 02:11:27 | 23 | grotesque on the witness stand, it was just almost |
| 02:11:33 | 24 | like, you know, you want to throw up. |
| 02:11:35 | 25 | Q.   And by "grotesque" you mean what by that? |

P-App. 005729

02:11:37  1      A.  He said that Wendi made a pass at him, okay,

02:11:43  2  when he was interviewing her.

02:11:44  3      Q.  But you weren't there when he was interviewing

02:11:47  4  her, were you?  So, I mean, that's his perception?

02:11:53  5  Were you there when he interviewed her?

02:11:55  6      A.  No.

02:11:55  7      Q.  No?

02:11:56  8      A.  No.  That's -- that was just beyond the scope,

02:12:02  9  so beyond the scope.

02:12:02  10      Q.  But you were able to limit Bayless's scope,

02:12:05  11  though, you guys were by not presenting mental health

02:12:09  12  evidence.

02:12:09  13          Right?

02:12:10  14          I recall that from the record that --

02:12:11  15      A.  I don't have any memory of that.

02:12:13  16      Q.  So you don't know if that's the reason why you

02:12:15  17  may not have presented mental health evidence or Dan

02:12:19  18  may not have?

02:12:19  19      A.  I don't have any control over who got used as

02:12:22  20  witnesses.

02:12:22  21      Q.  But you had no discussions on that point?

02:12:24  22      A.  No.

02:12:24  23      Q.  Back to what else you would have done

02:12:24  24  differently.

02:12:27  25          So someone to counter Bayless?

**Coash & Coash, Inc., 602-258-1440**

02:12:31  1      A.   I would have used Rohde.

02:12:33  2      Q.   To counter Bayless?

02:12:34  3      A.   To do whatever Rohde was allowed to do.

02:12:37  4      Q.   Okay.

02:12:38  5      A.   You know, she had been seeing her for four

02:12:41  6  years, so she would have had some ability to testify.

02:12:45  7  What else would I have done?  Well, you know, that's a

02:12:52  8  difficult question because I wasn't in control.

02:12:55  9      Q.   Uh-huh.

02:12:56 10      A.   Are you asking the question since I was not in

02:12:59 11  control or if I was in control?

02:13:00 12      Q.   I'm asking if you were in control.

02:13:02 13           Presuming you were in control, how would you

02:13:04 14  have handled the sentencing?

02:13:04 15           MR. DeLOZIER:  Is that still okay?

02:13:06 16           MR. ARNTSEN:  In terms of the penalty

02:13:07 17  phase, the sentencing mitigation.

02:13:10 18           MR. DeLOZIER:  Yeah.  Okay.

02:13:12 19           My people would have found out about Alejo

02:13:17 20  and the whole ship would have been different because

02:13:21 21  that's -- in my opinion, that's what we -- we would

02:13:23 22  have found out about it.

02:13:24 23  BY MS. GARD:

02:13:24 24      Q.   Why do you think that?  How do you think you

02:13:26 25  would have found out if you hadn't found out --

David DeLozier - November 25, 2013          51

02:13:27  1      A.   Because I always hire a mitigation expert and

02:13:30  2   they always investigate that kind of stuff.

02:13:32  3      Q.   Who do you think you would have found it out

02:13:34  4   from?

02:13:35  5      A.   I don't know.  There's several people that could

02:13:37  6   have been hired, you know --

02:13:40  7      Q.   Okay.

02:13:41  8      A.   -- locally, I mean, and we probably would have

02:13:44  9   had one of those people that had a contract with OPDS.

02:13:47  10  I can think of one lady who is now deceased -- I can't

02:13:51  11  think of her name -- would have been very good at it.

02:13:58  12  In the Barrett case she did it, although she still

02:14:00  13  didn't find out some of the stuff that I found out

02:14:02  14  later on that one but, anyway, that's neither here nor

02:14:06  15  there.  But I believe we probably would have been able

02:14:10  16  to know more about the family dynamics than we did.

02:14:14  17  You know, we got painted a rosy picture, okay, and we

02:14:18  18  bought it.

02:14:20  19     Q.   By who?  By the family?

02:14:21  20     A.   I don't know whether they intended to do that or

02:14:23  21  not, but that's what it was.  You've got this scenario

02:14:28  22  that you believe is accurate that gets painted by

02:14:31  23  everybody involved and, you know, each person has a

02:14:34  24  role in it.

02:14:39  25          There were -- starting in 2003 before this trial

**Coash & Coash, Inc., 602-258-1440**

David DeLozier - November 25, 2013                                    52

02:14:47  1    after I was no longer lead counsel, I started
02:14:50  2    representing people who had been molested by Catholic
02:14:53  3    priests.  So for me to not know somebody that could
02:14:57  4    have been utilized in those roles would have been very
02:15:00  5    remote because that's one of the things we had to do;
02:15:05  6    was the person molested; did he completely forget about
02:15:08  7    it and so forth.  You know, so I learned a lot about
02:15:11  8    repressed memory, suppressed memory and false memories
02:15:15  9    and all of those other classifications that go with
02:15:18  10   that kind of behavior in people.
02:15:20  11       Okay?  So by the time this trial was on board,
02:15:25  12   those were things that were reasonably well known to
02:15:30  13   me.  Now, you've got to remember, too, I'm not playing
02:15:33  14   an active role and I've got a busy practice.  Okay?
02:15:39  15       Q.  Did you suggest to Dan to hire any of those
02:15:41  16   people that will look into that?
02:15:43  17       A.  I don't have any idea whether I made any
02:15:46  18   suggestions or not.  I gave him who we thought were on
02:15:53  19   the list, I guess, is the right word, when we first
02:15:57  20   met.  I don't think we did it by way of is this penalty
02:16:07  21   phase or is this guilt phase or what.  You know, it was
02:16:07  22   just here's what we've developed up to this point; do
02:16:08  23   what you will with it.
02:16:09  24       Q.  Dan has said in his affidavit -- and we haven't
02:16:12  25   talked to him yet, but in his affidavit he says he did

**Coash & Coash, Inc., 602-258-1440**

David DeLozier - November 25, 2013                53

| | | |
|---|---|---|
| 02:16:15 | 1 | not believe that there was a viable mitigation theme |
| 02:16:17 | 2 | based on her mental health. |
| 02:16:19 | 3 | Do you agree with that or disagree with that, |
| 02:16:21 | 4 | based on what was known to you at the time? |
| 02:16:23 | 5 | A.   Yeah.  I think I agree with that. |
| 02:16:25 | 6 | Q.   You don't think there was a viable -- |
| 02:16:27 | 7 | A.   No. |
| 02:16:27 | 8 | Q.   Based on what you knew then? |
| 02:16:29 | 9 | A.   No, not even -- not even what we knew then |
| 02:16:32 | 10 | because look at Rohde's stuff, you know.  It's a |
| 02:16:38 | 11 | chockfull of it, and I didn't even know about somebody, |
| 02:16:40 | 12 | Rosengard or whatever his name was. |
| 02:16:41 | 13 | Q.   Rosengard. |
| 02:16:42 | 14 | A.   I still haven't seen his report, I don't think. |
| 02:16:45 | 15 | So I don't know what his conclusions were. |
| 02:16:46 | 16 | Q.   Well, let's stick with Rohde for right now |
| 02:16:48 | 17 | because I'm confused now. |
| 02:16:50 | 18 | When you say her report is chockfull of it, are |
| 02:16:53 | 19 | you saying that you do think there's a viable |
| 02:16:55 | 20 | mitigation theme or there was not? |
| 02:16:57 | 21 | A.   There was one that was not developed. |
| 02:16:58 | 22 | Q.   That was not developed.  Okay. |
| 02:16:59 | 23 | A.   Yeah.  Sorry.  I thought -- that's what I |
| 02:17:02 | 24 | intended. |
| 02:17:02 | 25 | Q.   Okay.  So you believe that based on Rohde you |

**Coash & Coash, Inc.,  602-258-1440**

| | | |
|---|---|---|
| 02:17:04 | 1 | could have developed a mitigation theme? |
| 02:17:05 | 2 | A.   Yes. |
| 02:17:06 | 3 | Q.   Okay.  All right.   Now, Rosengard you said |
| 02:17:10 | 4 | you're not -- you had never seen his report at all? |
| 02:17:12 | 5 | A.   Right. |
| 02:17:12 | 6 | Q.   So you weren't involved in any kind of meetings |
| 02:17:17 | 7 | with him or anything like that? |
| 02:17:19 | 8 | A.   I didn't even know he was involved until, I |
| 02:17:23 | 9 | think, Allen told me about him. |
| 02:17:25 | 10 | Q.   Were you present for any -- obviously, I assume, |
| 02:17:29 | 11 | you were not present for any discussion of why he would |
| 02:17:31 | 12 | not be presented as a witness. |
| 02:17:32 | 13 | That would have been Dan's call? |
| 02:17:34 | 14 | A.   I didn't even know his name until they brought |
| 02:17:37 | 15 | it up. |
| 02:17:37 | 16 | Q.   So after -- other than Rosengard, which you say |
| 02:17:52 | 17 | you weren't aware of, are you aware of anyone else that |
| 02:17:55 | 18 | you all consulted with, other than Murphy, when the |
| 02:17:59 | 19 | P.D. was on the case? |
| 02:18:03 | 20 | MR. ARNTSEN:  That's kind of vague. |
| 02:18:04 | 21 | MS. GARD:  Well -- |
| 02:18:05 | 22 | MR. DeLOZIER:  You are talking about a |
| 02:13:07 | 23 | mental health person, I'm assuming, a psychologist. |
| 02:18:09 | 24 | BY MS. GARD: |
| 02:18:09 | 25 | Q.   So we were talking about the period of time |

David DeLozier - November 25, 2013                    55

| | |
|---|---|
| 02:18:10 1 | where you represented her alone and I asked you, you |
| 02:18:12 2 | know, did you consult with anyone. |
| 02:18:14 3 | Did you as a team, once the P.D. was on the |
| 02:18:16 4 | case, did you consult with anyone, other than |
| 02:18:19 5 | Rosengard, Murphy, McKenna, Rohde? |
| 02:18:21 6 | A.  Who is -- McKenna? |
| 02:18:23 7 | Q.  Yeah. |
| 02:18:23 8 | A.  I don't -- |
| 02:18:24 9 | Q.  She testified.  Mindi. |
| 02:18:28 10 | Right? |
| 02:18:29 11 | A.  I don't know.  I don't remember the name. |
| 02:18:31 12 | Q.  You don't remember? |
| 02:18:31 13 | A.  I don't remember the name. |
| 02:18:32 14 | Q.  You don't remember that name. |
| 02:18:33 15 | Can you think of anyone else you may have |
| 02:18:35 16 | consulted with? |
| 02:18:36 17 | A.  I didn't consult with any of those people. |
| 02:18:37 18 | Q.  That the team may have consulted with, that |
| 02:18:40 19 | you're aware of. |
| 02:18:40 20 | A.  I don't know what everybody else did. |
| 02:18:41 21 | Q.  Did you ever have team meetings at all? |
| 02:18:43 22 | A.  I think we had one one time, maybe two.  Okay? |
| 02:18:50 23 | Q.  Do you remember the discussion there or the time |
| 02:18:52 24 | period or anything about that? |
| 02:18:54 25 | A.  Yeah, April -- right about the same time as the |

**Coash & Coash, Inc.,  602-258-1440**

David DeLozier - November 25, 2013                    56

| | | |
|---|---|---|
| 02:18:57 | 1 | first mitigation guy was leaving and the second guy was |
| 02:19:00 | 2 | coming in, whenever that was, April of 2004 or |
| 02:19:03 | 3 | something like that.  Yeah, when Dan -- when the public |
| 02:19:09 | 4 | defender was first appointed, I can't even remember |
| 02:19:10 | 5 | when I first heard from Patterson that he was the guy |
| 02:19:13 | 6 | that they were going to use because up to that point in |
| 02:19:16 | 7 | time, we were meeting -- we had the P.D.'s head person |
| 02:19:22 | 8 | from southeast coming in.  I can't remember his name |
| 02:19:24 | 9 | know.  Peterson, Patterson, something like that, and he |
| 02:19:30 | 10 | was the one who was making all the promises to the |
| 02:19:32 | 11 | Court and really nobody else. |
| 02:19:33 | 12 | Q.  Oh, Wess Peterson? |
| 02:19:34 | 13 | A.  Yeah.  You know, and I don't even remember from |
| 02:19:37 | 14 | there when I first had a conversation or met with -- I |
| 02:19:41 | 15 | don't think I met with him, with Patterson.  Okay?  I |
| 02:19:46 | 16 | don't remember.  I know there was something in |
| 02:19:48 | 17 | September, and I might have met him the first time when |
| 02:19:50 | 18 | we were in court. |
| 02:19:51 | 19 | Q.  Okay. |
| 02:19:52 | 20 | A.  You know, but I don't have a recollection of |
| 02:19:55 | 21 | the -- I'd have to look at my -- at all my entries from |
| 02:19:57 | 22 | those days. |
| 02:19:58 | 23 | Q.  And he was involved with the rowing trial there |
| 02:20:01 | 24 | for a while, though, so he wasn't -- |
| 02:20:02 | 25 | A.  I don't know.  See, that's the thing that I |

**Coash & Coash, Inc., 602-258-1440**

David DeLozier - November 25, 2013                    57

02:20:04  1    believe now that we were misled.  The Ochoas were

02:20:09  2    misled and Wendi was misled.  We were all led to

02:20:12  3    believe that they were bringing in somebody, a

02:20:14  4    specialist, just to handle this case and then to find

02:20:17  5    out later on that he had four or five other cases and

02:20:19  6    they dumped eight or nine -- eight or ten on him when

02:20:21  7    he first -- you know, it's just mind-boggling that --

02:20:25  8    you know.  So there's another blinded, if you will.

02:20:28  9    Okay?  We talked about blinded a minute ago?

02:20:30 10       Q.   Uh-huh.

02:20:32 11       A.   You know, and this got -- this got dumped this

02:20:38 12    way because Ishikawa didn't want to keep having OPDS

02:20:41 13    show up every other week to argue and waste his time

02:20:45 14    over me asking for experts.

02:20:48 15       Q.   Well, didn't Wendi -- Wendi agreed to all this.

02:20:50 16            Right?  I understand you --

02:20:51 17       A.   Yeah.

02:20:51 18       Q.   -- believe that she was blinded but she --

02:20:54 19       A.   All of us were.

02:20:55 20       Q.   Okay.

02:20:55 21       A.   I was, the Ochoas were and so was Wendi.  We

02:20:58 22    were all told that this was the way to go.

02:21:02 23       Q.   To get -- to be able to get experts.

02:21:05 24            Right?

02:21:06 25       A.   To be able to get a person who was not currently

**Coash & Coash, Inc.,  602-258-1440**

David DeLozier - November 25, 2013                    58

| | | |
|---|---|---|
| 02:21:10 | 1 | then a public defender, okay, that they were bringing a |
| 02:21:15 | 2 | special off the street, basically, out of private |
| 02:21:17 | 3 | practice to handle this case.  That's the bill of goods |
| 02:21:21 | 4 | we were all sold. |
| 02:21:22 | 5 | Q.  Were you told that on the record? |
| 02:21:24 | 6 | A.  I'm sure it was but, anyway, that's neither here |
| 02:21:30 | 7 | nor there.  I don't know what it has to do with what |
| 02:21:31 | 8 | we're here for. |
| 02:21:31 | 9 | Q.  Well, in terms of -- in terms of Dan Patterson |
| 02:21:35 | 10 | taking the lead, which I understand that a large part |
| 02:21:43 | 11 | of it was because P.D.'s office wanted to drive the |
| 02:21:43 | 12 | bus, so to speak, but did it also have anything to do |
| 02:21:46 | 13 | with him having relevant capital experience that he was |
| 02:21:49 | 14 | given the lead? |
| 02:21:49 | 15 | A.  That's what we were all led to believe is they |
| 02:21:50 | 16 | were having somebody come in that had done -- that had |
| 02:21:53 | 17 | capital experience, yes. |
| 02:21:54 | 18 | Q.  But Dan did. |
| 02:21:55 | 19 | Right? |
| 02:21:55 | 20 | A.  I don't know what his experience was. |
| 02:21:57 | 21 | Q.  You don't know what his experience was? |
| 02:21:58 | 22 | A.  No. |
| 02:21:59 | 23 | Q.  Do you want to take -- |
| 02:22:00 | 24 | A.  We were told that that's what it was. |
| 02:22:04 | 25 | Q.  Okay.  But you don't believe that that's true. |

**Coash & Coash, Inc.,  602-258-1440**

| | | |
|---|---|---|
| 02:22:08 | 1 | I'm getting a sense that -- |
| 02:22:09 | 2 | A.   In practice that was not what happened what we |
| 02:22:13 | 3 | were led to believe was going to happen. |
| 02:22:15 | 4 | Q.   I'm talking just about Dan's capital experience. |
| 02:22:17 | 5 | A.   Oh, I don't know that.  I don't know anything. |
| 02:22:18 | 6 | I still don't know anything about his capital |
| 02:22:20 | 7 | experience.  I never looked him up. |
| 02:22:21 | 8 | Q.   And you haven't worked with him since then. |
| 02:22:23 | 9 | Right? |
| 02:22:23 | 10 | A.   I haven't worked with him since. |
| 02:22:25 | 11 | Q.   Back to your fast.  Your comments seemed to |
| 02:22:31 | 12 | indicate that you had fasted previously. |
| 02:22:32 | 13 | A.   Oh, sure. |
| 02:22:33 | 14 | Q.   And is it a routine thing that you do?  How |
| 02:22:36 | 15 | often do you do it? |
| 02:22:36 | 16 | A.   Are you familiar with a guy named Bragg? |
| 02:22:48 | 17 | Q.   No. |
| 02:22:48 | 18 | A.   Okay.  Bragg -- Bragg's family -- now he's |
| 02:22:52 | 19 | deceased and his daughter, who is now running the |
| 02:22:56 | 20 | company, I guess, make a variety of products.  They |
| 02:23:01 | 21 | also -- he and she have written books.  Okay? |
| 02:23:09 | 22 | Typically when I have a need or feel like I need to do |
| 02:23:13 | 23 | a lengthy fast, I'll go to one of their books because |
| 02:23:16 | 24 | it has enough things that it says that gets you in the |
| 02:23:23 | 25 | right frame of mind to be able to take a lengthy fast. |

**Coash & Coash, Inc.,  602-258-1440**

David DeLozier - November 25, 2013                60

| | |
|---|---|
| 02:23:27 | 1 |

    02:23:27   1          Okay?  Now, most people think in terms of I'm
    02:23:30   2     going to get hungry, okay, and if you start thinking in
    02:23:33   3     terms of getting hungry, you can't do one, okay,
    02:23:37   4     period.  So you have to get yourselves, if you will,
    02:23:40   5     psyched up for it, for a lengthy fast.  Okay?
    02:23:40   6          Q.  Uh-huh.
    02:23:45   7          A.  How often do I do them today?  Not very often,
    02:23:49   8     but I have had occasions where I go a day or two, you
    02:23:54   9     know.  The longest recently was probably seven days.
    02:23:57  10          Q.  So seven.  How -- I mean, in terms of your
    02:24:00  11     average length of your fast, how many --
    02:24:02  12          A.  Back in those days, I would -- I easily did 40
    02:24:04  13     days, okay, and for the first week, ten days it would
    02:24:08  14     be just water and after about the 15th day I'd start
    02:24:13  15     adding some favoring to the water.
    02:24:15  16          Q.  And then juice at some point?
    02:24:17  17          A.  That's the flavoring.
    02:24:18  18          Q.  That's the flavoring?
    02:24:19  19          A.  Yeah.  So you put the glass about this full and
    02:24:22  20     then put the rest of it in some kind of juice.
    02:24:24  21          Q.  And that's what you were consuming during the
    02:24:26  22     trial?
    02:24:26  23          A.  Yeah, yeah.
    02:24:27  24          Q.  So no, you know, like -- you didn't have a
    02:24:30  25     juicer or would grind up carrots or anything like that?

**Coash & Coash, Inc., 602-258-1440**

David DeLozier - November 25, 2013                    61

| | | |
|---|---|---|
| 02:24:33 | 1 | A.  Huh-uh. |
| 02:24:33 | 2 | Q.  No? |
| 02:24:33 | 3 | A.  Huh-uh. |
| 02:24:34 | 4 | Q.  Are you accustomed to -- can you typically |
| 02:24:40 | 5 | function when you're a fast? |
| 02:24:41 | 6 | A.  Oh, sure.  Most of the time you function better. |
| 02:24:44 | 7 | Q.  Really? |
| 02:24:44 | 8 | A.  Sure. |
| 02:24:44 | 9 | Q.  Why is that? |
| 02:24:45 | 10 | A.  Yeah.  Your brain is not burdened by digestive |
| 02:24:49 | 11 | and your energy levels are extremely heightened.  You |
| 02:24:53 | 12 | are clear in mind and body.  It's almost like euphoria. |
| 02:24:59 | 13 | Okay? |
| 02:25:00 | 14 | Q.  Really? |
| 02:25:01 | 15 | A.  It's a high.  You develop a high. |
| 02:25:07 | 16 | Q.  All right.  Other than the time you note in your |
| 02:25:10 | 17 | affidavit during the examination of Collier, did you |
| 02:25:14 | 18 | feel ill at any other point or lightheaded? |
| 02:25:17 | 19 | A.  Do you know when that was? |
| 02:25:19 | 20 | Q.  It says it was October 20th, 2004. |
| 02:25:21 | 21 | A.  Okay.  October 20th, if you are familiar with |
| 02:25:24 | 22 | it, was three days after my lawyer was murdered. |
| 02:25:27 | 23 | Q.  Right.  Justin Blair? |
| 02:25:29 | 24 | A.  Yeah. |
| 02:25:29 | 25 | Q.  I see that here, yeah. |

**Coash & Coash, Inc., 602-258-1440**

David DeLozier - November 25, 2013                    62

| | | |
|---|---|---|
| 02:25:31 | 1 | A.   So which one was it? |
| 02:25:32 | 2 | Q.   So it could have been emotional or |
| 02:25:35 | 3 | stress-related as well? |
| 02:25:36 | 4 | A.   It's still an emotional. |
| 02:25:38 | 5 | Q.   Okay. |
| 02:25:38 | 6 | A.   Okay?  He was like a son to my wife. |
| 02:25:40 | 7 | Q.   Okay. |
| 02:25:41 | 8 | A.   Okay?  We lost -- here's a prime, young, |
| 02:25:46 | 9 | aggressive lawyer, 29 years old killed in the -- he |
| 02:25:52 | 10 | wasn't doing anything wrong.  He was just driving down |
| 02:25:54 | 11 | the road. |
| 02:25:54 | 12 | Q.   Yeah. |
| 02:25:55 | 13 | A.   And some idiot kept shooting the gun and it |
| 02:25:58 | 14 | happened to hit him.  He wasn't even shooting at him. |
| 02:26:01 | 15 | Okay?  Here we are on TV.  We got the Glendale Police |
| 02:26:04 | 16 | Department.   Okay?  We got -- I don't know why somebody |
| 02:26:08 | 17 | didn't stop this trial and get somebody else instead of |
| 02:26:11 | 18 | me. |
| 02:26:11 | 19 | Q.   Well, they stopped the trial for a few days. |
| 02:26:11 | 20 |      Right? |
| 02:26:14 | 21 | A.   Yeah, two or three days, big deal.  You know, I |
| 02:26:16 | 22 | still worked with the cops and the Glendale Police |
| 02:26:18 | 23 | Department and the TV for a month to help them solve |
| 02:26:23 | 24 | this case.  Okay? |
| 02:26:25 | 25 | Q.   You were working with them while you were |

**Coash & Coash, Inc.,  602-258-1440**

David DeLozier - November 25, 2013          63

| | | |
|---|---|---|
| 02:26:26 | 1 | working on this case -- |
| 02:26:27 | 2 | A. Yeah. |
| 02:26:27 | 3 | Q. -- to solve the case? |
| 02:26:28 | 4 | A. Yeah. They used to come out to my house all the |
| 02:26:31 | 5 | time and photograph and put us on the TV news because |
| 02:26:34 | 6 | they were still trying to catch this guy. |
| 02:26:36 | 7 | Q. Okay. So when you became ill on the 20th, it |
| 02:26:40 | 8 | very likely was stress-related because of Mr. Blair? |
| 02:26:47 | 9 | A. Yeah. |
| 02:26:47 | 10 | Q. Okay. All right. Who, if anyone, did you talk |
| 02:27:00 | 11 | to from her church besides her family, immediate |
| 02:27:05 | 12 | family? |
| 02:27:05 | 13 | A. It seemed like we might have had a talk with the |
| 02:27:08 | 14 | pastor early on. |
| 02:27:10 | 15 | Q. Is that Tom King? |
| 02:27:12 | 16 | A. Yeah, that sounds right. |
| 02:27:13 | 17 | Q. Okay. |
| 02:27:14 | 18 | A. And I know that there were people from the |
| 02:27:18 | 19 | church that came to the trial. I'm pretty sure there |
| 02:27:24 | 20 | were because at one point, I had asked Wendi's mom -- |
| 02:27:29 | 21 | what's her name? -- Donna to do something, and she |
| 02:27:33 | 22 | said, why don't I get Cindy to do it. It's on Number |
| 02:27:36 | 23 | 13. I think Cindy was involved in the church. I'm not |
| 02:27:38 | 24 | sure, though. |
| 02:27:39 | 25 | Q. Okay. You all talked to Shawn King. |

David DeLozier - November 25, 2013                    64

| | | |
|---|---|---|
| 02:27:41 | 1 | Right? |
| 02:27:41 | 2 | A.   Yes.  It seemed like -- it seemed like somebody |
| 02:27:45 | 3 | talked to him. |
| 02:27:45 | 4 | Q.   Were you there when you -- |
| 02:27:47 | 5 | A.   I don't remember whether I was present or not, |
| 02:27:55 | 6 | but I know. |
| 02:27:56 | 7 | Q.   Do you remember what he had to say or what he |
| 02:27:56 | 8 | told you? |
| 02:27:56 | 9 | A.   No. |
| 02:27:56 | 10 | Q.   What he told whoever? |
| 02:27:56 | 11 | A.   I don't have any independent recollection.  I do |
| 02:27:57 | 12 | recognize the name.  That's basically all I can tell |
| 02:27:59 | 13 | you. |
| 02:27:59 | 14 | Q.   Okay.  And you haven't seen his deposition that |
| 02:28:02 | 15 | he gave in this proceeding? |
| 02:28:03 | 16 | A.   No, no.  I didn't know he did one. |
| 02:28:08 | 17 | Q.   He did. |
| 02:28:09 | 18 | A.   Okay. |
| 02:28:09 | 19 | Q.   What about -- we talked about Andrew Cunningham. |
| 02:28:19 | 20 | How is Jerry Cunningham related to him?  Is that |
| 02:28:22 | 21 | his wife? |
| 02:28:23 | 22 | A.   I don't know that name. |
| 02:28:23 | 23 | Q.   You never spoke to her at all? |
| 02:28:25 | 24 | A.   I don't know.  I just don't remember the name, |
| 02:28:27 | 25 | Jerry Cunningham. |

**Coash & Coash, Inc.,  602-258-1440**

P-App. 005745

David DeLozier - November 25, 2013                    65

02:28:28  1    Q.  Jerry Lynn Cunningham?

02:28:30  2    A.  No.

02:28:31  3    Q.  So why did you have Donna and Cindy write the

02:28:38  4  opening script?

02:28:38  5    A.  Because I wasn't able to.

02:28:39  6    Q.  Because of -- why?

02:28:40  7    A.  I couldn't handle it.

02:28:47  8    Q.  Because of Mr. Blair?  Because of the fast?  Was

02:28:49  9  there a reason?

02:28:49 10    A.  I'm sure it was Blair.

02:28:52 11    Q.  Stress from Blair?

02:28:53 12    A.  Yeah.

02:28:53 13    Q.  So they wrote it and you read it?  Is that how

02:28:57 14  it worked?

02:28:57 15    A.  Yeah.

02:28:58 16    Q.  And am I understanding correctly that Mac Leod

02:29:01 17  played some role in that as well?

02:29:02 18    A.  Right.  He prepared the PowerPoint which was new

02:29:10 19  coming from me.

02:29:11 20    Q.  Do you recall why you -- or did Dan ever tell

02:29:23 21  you why he was pursuing at sentencing this theory of

02:29:27 22  her being a good person and then continuing the

02:29:28 23  domestic violence theme into sentencing as mitigation?

02:29:32 24  Did he ever tell you why he was going with that theory

02:29:34 25  instead of a different one?

**Coash & Coash, Inc.,  602-258-1440**

David DeLozier - November 25, 2013                    66

| | | |
|---|---|---|
| 02:29:36 | 1 | A.   Did he?   He ever told me why, no. |
| 02:29:37 | 2 | Q.   No?   You never had a discussion with him about |
| 02:29:37 | 3 | that? |
| 02:29:39 | 4 | A.   Huh-uh. |
| 02:29:40 | 5 | Q.   The custody case with the Ochoas -- |
| 02:29:40 | 6 | A.   Uh-huh. |
| 02:29:47 | 7 | Q.   So, from what I can tell looking at that court |
| 02:29:49 | 8 | file, it was June 2011 you started -- or 2001 you |
| 02:29:54 | 9 | started appearing for them? |
| 02:29:55 | 10 | A.   I don't know. |
| 02:29:55 | 11 | Q.   But it was within that time period? |
| 02:29:56 | 12 | A.   That sounds right. |
| 02:29:57 | 13 | Q.   So after this criminal case? |
| 02:29:59 | 14 | A.   After I had become involved in the criminal |
| 02:30:02 | 15 | case, yes. |
| 02:30:03 | 16 | Q.   Right. |
| 02:30:05 | 17 | A.   Because it was over those two -- her two |
| 02:30:06 | 18 | children. |
| 02:30:07 | 19 | Q.   Her two children.   Right. |
| 02:30:08 | 20 | How did you become involved?   How did you come |
| 02:30:10 | 21 | to be retained in the custody case? |
| 02:30:13 | 22 | A.   Well, let's see.   The best I recall is that |
| 02:30:19 | 23 | somebody -- they had a deal worked out with the |
| 02:30:23 | 24 | Lamberts -- or the Andrianos/Ochoas did, I mean -- that |
| 02:30:29 | 25 | they would alternate having the children, and there |

David DeLozier - November 25, 2013                    67

| | | |
|---|---|---|
| 02:30:32 | 1 | came a time when the Lamberts or the Andrianos -- one |
| 02:30:37 | 2 | of them said, you're not going to have them anymore or |
| 02:30:40 | 3 | we're not going to bring them back.  Okay?  And I'm |
| 02:30:45 | 4 | sure Donna called me and said, what are we going to do? |
| 02:30:49 | 5 | I said, I'll help you if you want me to.  So |
| 02:30:55 | 6 | that's my recollection of how the string of things |
| 02:30:59 | 7 | happened. |
| 02:30:59 | 8 | Q.  Okay.  So they retained you. |
| 02:31:00 | 9 | Did they pay you separately for -- |
| 02:31:02 | 10 | A.  I don't remember. |
| 02:31:02 | 11 | Q.  You don't remember what the fee arrangement |
| 02:31:04 | 12 | would have been for that? |
| 02:31:05 | 13 | A.  No. |
| 02:31:06 | 14 | Q.  Did you discuss -- did you perceive yourself as |
| 02:31:10 | 15 | having a conflict of interest there? |
| 02:31:11 | 16 | A.  No.  I thought I was presenting the same |
| 02:31:13 | 17 | information both places. |
| 02:31:15 | 18 | Q.  Expand on that.  Is that -- |
| 02:31:17 | 19 | A.  I thought that was a good family and, you know, |
| 02:31:20 | 20 | I've done grandparents' rights before and, you know, so |
| 02:31:25 | 21 | forth.  Not involving this kind of situation but, you |
| 02:31:28 | 22 | know, historically I've handled grandparents' rights, |
| 02:31:30 | 23 | the statute for that kind of thing that goes on and, |
| 02:31:34 | 24 | you know, so forth.  So it was not something that was |
| 02:31:36 | 25 | foreign to me, so I didn't see a real problem because I |

**Coash & Coash, Inc.,  602-258-1440**

David DeLozier - November 25, 2013                    68

02:31:43 1   perceived at that time that whatever was good for one

02:31:47 2   is going to be good for other one because I was telling

02:31:50 3   what I believed was the truth --

02:31:52 4       Q.  Okay.

02:31:52 5       A.  -- about this family.  And, also, frankly, I

02:31:56 6   have this idea that children are better off with

02:31:59 7   multiple people loving them, assuming that's

02:32:04 8   constructive love and not pedophilic love.  Okay?

02:32:06 9   Sorry.  I have to clarify that.  The more people you

02:32:11 10  have loving a child, the more healthy they generally

02:32:13 11  are when they are a teenager and then a young adult,

02:32:16 12  and there's too many people in prison now because they

02:32:19 13  had terrible experiences when they were children.

02:32:21 14      Q.  Okay.

02:32:21 15      A.  That I know about.  So it was one of those

02:32:25 16  situations where I didn't see that there was an issue

02:32:29 17  and didn't develop an issue.

02:32:31 18      Q.  Okay.  Because you didn't know about the other

02:32:34 19  stuff?

02:32:34 20      A.  I didn't know, yeah.

02:32:34 21      Q.  So did your representation of the Ochoas in the

02:32:40 22  custody, did that have any impact on the investigation

02:32:42 23  that you did in the criminal?  I mean, did that prevent

02:32:44 24  you from digging deeper into her history?

02:32:47 25      A.  I don't -- I didn't feel like it did at the

David DeLozier - November 25, 2013                69

| | |
|---|---|
| 02:32:52 | 1 |
| 02:32:53 | 2 |
| 02:32:54 | 3 |
| 02:32:58 | 4 |
| 02:33:03 | 5 |
| 02:33:07 | 6 |
| 02:33:12 | 7 |
| 02:33:16 | 8 |
| 02:33:20 | 9 |
| 02:33:20 | 10 |
| 02:33:21 | 11 |
| 02:33:21 | 12 |
| 02:33:25 | 13 |
| 02:33:28 | 14 |
| 02:33:30 | 15 |
| 02:33:36 | 16 |
| 02:33:40 | 17 |
| 02:33:45 | 18 |
| 02:33:52 | 19 |
| 02:33:55 | 20 |
| 02:34:00 | 21 |
| 02:34:03 | 22 |
| 02:34:05 | 23 |
| 02:34:14 | 24 |
| 02:34:14 | 25 |

1    time.  Okay?  Let's put it that way.

2      Q.  Okay.

3      A.  But I guess if -- now knowing what I've been

4 told was the truth, it was -- it would have been

5 significant to not know it then because the kinds of

6 things that we did in both cases were tainted by the

7 lack of knowledge about the truth, assuming what we now

8 believe is the truth.  You follow me?  Does that make

9 sense?

10      Q.  Yes.

11      A.  Okay.

12      Q.  So you had false information from the beginning

13 is what you're saying and that colored everything or

14 you may have had false information?

15      A.  From what I understand today, the information I

16 had at the time wasn't truthful, okay, or wasn't

17 complete, however you want to word it.  Okay?  It

18 lacked -- it lacked flushing out completely.  Okay?

19 And had we been -- had we known then what apparently we

20 know today, you know, I would have told Donna and Alejo

21 to go somewhere else for their grandparents because he

22 probably shouldn't be around -- especially the little

23 girl that was part of that family.

24      Q.  Right?

25      A.  Okay?  So I would have done something

**Coash & Coash, Inc., 602-258-1440**

David DeLozier - November 25, 2013                    70

02:34:14  1    differently there.   And would we have done something

02:34:14  2    differently in the criminal case, too?   I assume

02:34:16  3    everybody would have handled it differently because the

02:34:19  4    way it was presented is what you just said.

02:34:22  5        Q.   It was based on the information you knew at the

02:34:24  6    time?

02:34:24  7        A.   Yeah.

02:34:25  8        Q.   Okay.

02:34:25  9        A.   And that was developed at that time by whomever

02:34:28 10    was responsible for developing it.

02:34:30 11        Q.   Okay.   But you -- okay.   So because you didn't

02:34:35 12    perceive a potential conflict, you wouldn't have asked

02:34:38 13    for any kind of written waiver of a conflict or

02:34:40 14    anything like that?

02:34:41 15        A.   I'm sure Wendi asked me to help them.

02:34:43 16        Q.   She wanted the children with her parents.

02:34:45 17             Right?

02:34:45 18        A.   Well, she wanted them to have time with her

02:34:48 19    parents, yes.

02:34:49 20        Q.   Okay.

02:34:49 21        A.   I'm sure she asked me to help them.

02:34:49 22        Q.   So why did --

02:34:52 23        A.   I forgot that little piece.

02:34:53 24        Q.   Sorry.

02:34:54 25        A.   I forgot that she probably had a role in that

**Coash & Coash, Inc.,  602-258-1440**

David DeLozier - November 25, 2013                71

| | | |
|---|---|---|
| 02:34:57 | 1 | happening. |
| 02:34:58 | 2 | Q.  Okay. |
| 02:34:58 | 3 | A.  Because I certainly know that we discussed it, |
| 02:35:01 | 4 | and I think she asked me to help them because I would |
| 02:35:03 | 5 | have gone to her to ask her, what do you want me to do? |
| 02:35:06 | 6 | You know, or if the parents had come to me first, okay, |
| 02:35:10 | 7 | I would have gone to her.  And so if she asked me |
| 02:35:13 | 8 | first -- because they were talking on the phone and |
| 02:35:16 | 9 | visiting and so forth, too, so I don't know which one |
| 02:35:19 | 10 | came first.  Okay?  I don't have a memory of how that |
| 02:35:23 | 11 | unfolded. |
| 02:35:23 | 12 | Q.  So were you -- okay. |
| 02:35:26 | 13 | Just as an aside, have you spoken to any of the |
| 02:35:30 | 14 | Ochoas since the criminal case was over, ended? |
| 02:35:34 | 15 | A.  Donna and I used to exchange emails periodically |
| 02:35:37 | 16 | and, I think, my wife and she have had some |
| 02:35:41 | 17 | communication.  I haven't gotten anything from Donna |
| 02:35:45 | 18 | in -- I don't know -- four or five years now. |
| 02:35:47 | 19 | Q.  So you wouldn't have spoken to her about these |
| 02:35:49 | 20 | allegations now against -- |
| 02:35:50 | 21 | A.  No, no, no, definitely not. |
| 02:35:51 | 22 | Q.  Okay. |
| 02:35:52 | 23 | A.  I don't -- you know, these are -- this is |
| 02:35:53 | 24 | something I didn't develop it.  I have no -- I don't |
| 02:35:56 | 25 | see or feel like I have any responsibility to talk to |

**Coash & Coash, Inc., 602-258-1440**

02:35:59   1   her about something someone else has discovered.  I

02:36:03   2   assume that those people who have done that will handle

02:36:06   3   that.

02:36:06   4       Q.  Okay.  So you withdrew from the custody case in

02:36:10   5   July 2002.

02:36:12   6           Do you remember why that was?

02:36:13   7       A.  I don't remember why, no.

02:36:15   8       Q.  Okay.  Daphne Budge substituted in?

02:36:18   9       A.  Yeah, I remember that.

02:36:19  10       Q.  And then, eventually, according to the court

02:36:21  11   file, the Ochoas ended up going pro per in January of

02:36:26  12   2004?

02:36:26  13       A.  Yeah.  Daphne, I believe, took a job in the

02:36:28  14   P.D.'s office or somebody's.

02:36:28  15       Q.  Is that reason why they --

02:36:30  16       A.  Yeah.

02:36:31  17       Q.  Okay.  So in the materials that were disclosed

02:36:34  18   to me from by Mr. Arntsen, it looks like you have some

02:36:37  19   of Daphne -- you were receive some of Daphne Budge's

02:36:41  20   file on this?  Do you remember anything about that?

02:36:43  21       A.  I don't.

02:36:43  22       Q.  Were you using any of the -- since you all were

02:36:48  23   presenting information at sentencing about her positive

02:36:51  24   upbringing, did you use any of what you had developed

02:36:52  25   in the custody case for that?

David DeLozier - November 25, 2013                     73

| | | |
|---|---|---|
| 02:36:54 | 1 | A.   I didn't have any role in the mitigation, other |
| 02:37:00 | 2 | than them -- somebody playing the PowerPoint and me |
| 02:37:03 | 3 | reading what Cindy had drafted. |
| 02:37:04 | 4 | Q.   Did you give Dan any of the information you had |
| 02:37:06 | 5 | developed? |
| 02:37:06 | 6 | A.   No. |
| 02:37:08 | 7 | Q.   All right. |
| 02:37:09 | 8 | A.   No, not that I recall.  I don't know.  You know, |
| 02:37:12 | 9 | it's been too long ago.  I don't know what I gave to |
| 02:37:15 | 10 | Dan. |
| 02:37:15 | 11 | Q.   All right.  So you haven't -- okay. |
| 02:37:22 | 12 | What was the resolution of the thing in Pinal |
| 02:37:26 | 13 | County with -- when you were fined by O'Neil?  What was |
| 02:37:31 | 14 | the resolution? |
| 02:37:32 | 15 | And this may be a sticky issue for you. |
| 02:37:35 | 16 | A.   It's not sticky to me.  I'm just looking at |
| 02:37:37 | 17 | Allen to see if it fits whatever -- |
| 02:37:38 | 18 | MR. ARNTSEN:  What's the relevance to it? |
| 02:37:40 | 19 | MS. GARD:  Well, you -- I mean, you used |
| 02:37:42 | 20 | the appeal -- the appellate decision as part of your -- |
| 02:37:46 | 21 | MR. ARNTSEN:  I'm just -- |
| 02:37:47 | 22 | MS. GARD:  -- exhibits. |
| 02:37:47 | 23 | MR. ARNTSEN:  I mean, again, if there's |
| 02:37:49 | 24 | something of public record or something, you can |
| 02:37:49 | 25 | answer. |

**Coash & Coash, Inc.,  602-258-1440**

David DeLozier - November 25, 2013                    74

| | | |
|---|---|---|
| 02:37:52 | 1 | MR. DeLOZIER:  Oh, I don't have any problem |
| 02:37:53 | 2 | with it.  I'm just wondering whether it is or not. |
| 02:37:53 | 3 | MR. ARNTSEN:  My only thing is privilege. |
| 02:37:53 | 4 | BY MS. GARD: |
| 02:37:56 | 5 | Q.  Well, was there any bar action against you is |
| 02:37:58 | 6 | what I'm trying to get to? |
| 02:37:59 | 7 | A.  Oh, absolutely. |
| 02:37:59 | 8 | Q.  There was? |
| 02:38:00 | 9 | A.  Yeah.  O'Neil turned me into the bar. |
| 02:38:02 | 10 | Q.  Did they take any action? |
| 02:38:03 | 11 | A.  Yeah.  I went to a three-judge panel and they |
| 02:38:05 | 12 | held me not responsible. |
| 02:38:07 | 13 | Q.  Not responsible? |
| 02:38:07 | 14 | A.  Yeah.  They said I didn't do anything wrong. |
| 02:38:10 | 15 | Q.  Okay.  Do you have any other bar action against |
| 02:38:12 | 16 | you? |
| 02:38:12 | 17 | A.  Yeah.  I bounced a check one time. |
| 02:38:14 | 18 | Q.  Okay.  And that's it? |
| 02:38:15 | 19 | A.  Uh-huh. |
| 02:38:16 | 20 | Q.  Have you been found ineffective in a criminal |
| 02:38:18 | 21 | case ever? |
| 02:38:19 | 22 | A.  No. |
| 02:38:19 | 23 | Q.  Never before? |
| 02:38:20 | 24 | A.  Huh-uh. |
| 02:38:20 | 25 | Q.  Have you been alleged to be ineffective? |

**Coash & Coash, Inc.,  602-258-1440**

David DeLozier - November 25, 2013                    75

02:38:24   1    A.   Not that I recall.  I think there's the -- the

02:38:26   2   Barrett case is going to use something -- there's

02:38:30   3   something happening with them -- in they're post

02:38:33   4   conviction relief thing for him, but I suppose I should

02:38:40   5   stop there.  I don't know what they're going to do.

02:38:43   6            MR. ARNTSEN:  I can't advise you on that.

02:38:44   7            MS. GARD:  Yeah, we don't need to go there.

02:38:46   8            MR. DeLOZIER:  Yeah.

02:38:47   9   BY MS. GARD:

02:38:47  10    Q.   Okay.  And so you haven't seen Larry Hammond's

02:38:51  11   affidavit here in this case?

02:38:51  12    A.   No.

02:38:52  13    Q.   Commenting on your performance?

02:38:53  14    A.   I did get fined $300 -- I forgot about that

02:38:58  15   one -- because I was with a judge and my client and the

02:39:03  16   prosecutor in chambers one time, and he ranted and

02:39:07  17   raved for 30 minutes about how he hated defense

02:39:10  18   lawyers.

02:39:10  19    Q.   The judge?

02:39:11  20    A.   Yeah.  And, finally -- I'm there for 30 days

02:39:17  21   continuous.  I'm brand-new on the case but, anyway,

02:39:22  22   when we finished, I asked -- and he granted my motion

02:39:25  23   to continue, I asked him what part of his anatomy would

02:39:28  24   he like for me to kiss.  And I would do it again today.

02:39:32  25   It was worth the $300 to tell that son of a bitch to

**Coash & Coash, Inc.,  602-258-1440**

David DeLozier - November 25, 2013                    76

| | | |
|---|---|---|
| 02:39:36 | 1 | get off his fucking high horse.  Pardon me. |
| 02:39:45 | 2 | Q.  All right.  I'm not going to ask what judge it |
| 02:39:45 | 3 | was. |
| 02:39:45 | 4 | MR. MARTINEZ:  I am. |
| 02:39:45 | 5 | Who was it? |
| 02:39:45 | 6 | MR. DeLOZIER:  I don't remember and I don't |
| 02:39:46 | 7 | want to remember. |
| 02:39:48 | 8 | MR. MARTINEZ:  What county? |
| 02:39:48 | 9 | MR. DeLOZIER:  Here. |
| 02:39:49 | 10 | MR. MARTINEZ:  What was the client's name? |
| 02:39:51 | 11 | MR. DeLOZIER:  Oh, boy.  I don't -- I can't |
| 02:39:55 | 12 | recall.  I really can't.  I can see him, but I can't |
| 02:39:59 | 13 | recall.  This was in -- God, I don't remember now.  It |
| 02:40:05 | 14 | wasn't some of the people that are there now.  He's no |
| 02:40:09 | 15 | longer on the bench, and it wasn't some of the ones |
| 02:40:14 | 16 | that historically we'd think of in terms of being |
| 02:40:18 | 17 | irascible.  Okay?  I can tell you who those people are. |
| 02:40:24 | 18 | I have one guy, for example, that the jury |
| 02:40:27 | 19 | found my client not guilty and then the judge found him |
| 02:40:33 | 20 | guilty of violating probation for the very act that he |
| 02:40:34 | 21 | had just been found not guilty on.  Okay?  Dear God. |
| 02:40:41 | 22 | So we've got some real losers. |
| 02:40:46 | 23 | Sorry.  If I think of it, I'll tell you, |
| 02:40:50 | 24 | Juan.  I'm not trying to withhold.  I just don't |
| 02:40:52 | 25 | remember who it was.  I think that's the only ones. |

**Coash & Coash, Inc., 602-258-1440**

| | | |
|---|---|---|
| 02:40:56 | 1 | The best thing that happens to you if |
| 02:40:59 | 2 | you're in private practice and you bounce a check, |
| 02:41:01 | 3 | though, is they really help you do it right.  Okay? |
| 02:41:06 | 4 | And I bought a system called QuickBooks in large part |
| 02:41:10 | 5 | because I had been using my own in-house accounting |
| 02:41:14 | 6 | system which was horrible, okay, and how I overdrafted |
| 02:41:20 | 7 | it is I overpaid a client when they asked for a |
| 02:41:23 | 8 | reimbursement.  I paid them too much but, anyway, |
| 02:41:26 | 9 | that's neither here nor there.  So that's the three |
| 02:41:28 | 10 | that I recall. |
| 02:41:29 | 11 | As far as O'Neil, I was disappointed to see |
| 02:41:33 | 12 | that they gave him the position that they have, but I |
| 02:41:37 | 13 | was ordered to pay $6,000 to John Jekubsik (phonetic) |
| 02:41:42 | 14 | by O'Neil.  Then O'Neil turns me into the bar and I go |
| 02:41:47 | 15 | through that process and spend about $20,000 on bar |
| 02:41:51 | 16 | counsel to defend myself, and we went before a |
| 02:41:56 | 17 | three-judge panel and found out I did not commit any |
| 02:41:58 | 18 | violation of ethics. |
| 02:42:07 | 19 | MS. GARD:  Okay.  I think -- I think that's |
| 02:42:08 | 20 | all I have. |
| 02:42:08 | 21 | Do you mind if we talk for a bit? |
| 02:42:13 | 22 | MR. ARNTSEN:  Yeah. |
| 02:42:14 | 23 | (Whereupon, a recess was taken in the |
| 02:42:14 | 24 | proceedings.) |
| 02:42:14 | 25 | /// |

**Coash & Coash, Inc.,  602-258-1440**

David DeLozier - November 25, 2013                     78

|         |    |                                                           |
|---------|----|-----------------------------------------------------------|
| 02:42:14 | 1  | EXAMINATION                                              |
| 02:42:14 | 2  | BY MR. MARTINEZ:                                         |
| 02:44:50 | 3  | Q.  Sir, you mentioned something about having items     |
| 02:44:53 | 4  | involving in this case on an email account or email     |
| 02:44:56 | 5  | file.                                                   |
| 02:44:57 | 6  | Do you remember telling us that earlier?                |
| 02:44:58 | 7  | A.  No.                                                  |
| 02:44:59 | 8  | Q.  You don't remember telling us that?                 |
| 02:45:00 | 9  | A.  No.  I don't know what you're talking about.        |
| 02:45:03 | 10 | Q.  So you have nothing on your computer about this     |
| 02:45:08 | 11 | case?                                                    |
| 02:45:09 | 12 | A.  Yeah, I've said computer.  I didn't say anything     |
| 02:45:11 | 13 | about emails.                                            |
| 02:45:11 | 14 | Q.  Okay.  How about the computer?                       |
| 02:45:12 | 15 | A.  What about it?                                       |
| 02:45:13 | 16 | Q.  You have a computer.                                 |
| 02:45:14 | 17 | Correct?                                                 |
| 02:45:15 | 18 | A.  Yeah.                                                |
| 02:45:15 | 19 | Q.  And in that computer you have items related to      |
| 02:45:18 | 20 | this case.                                               |
| 02:45:19 | 21 | Correct?                                                 |
| 02:45:19 | 22 | A.  I have items related to every case I've ever        |
| 02:45:24 | 23 | been in.                                                 |
| 02:45:24 | 24 | Q.  I don't care about any other case.  I care about    |
|          | 25 | this case.                                               |

**Coash & Coash, Inc., 602-258-1440**

David DeLozier - November 25, 2013                    79

1    A.   Well, you don't have to --

2    Q.   You're --

3    A.   -- raise your voice.

4    Q.   You're the one who raised your voice first.

5              (Whereupon, the reporter requests one

02:45:31  6  person speak at a time.)

02:45:31  7              MR. DeLOZIER:  I'm through.  Okay?  If

02:45:32  8  you're going to behave like this, Juan, I'm through.

02:45:32  9  BY MR. MARTINEZ:

02:45:32  10   Q.   No.

02:45:35  11   A.   You know I don't like you and you don't like me,

02:45:38  12  so just stop it.

02:45:38  13   Q.   No.  You don't know how I feel about you.  How

02:45:41  14  dare you presume to know how I think?  How dare you?

02:45:43  15  And sit down.

02:45:44  16   A.   You are not going to -- you are not going to

02:45:46  17  intimidate me.

02:45:47  18   Q.   I don't care --

02:45:47  19   A.   Stop.

02:45:48  20   Q.   -- about intimidating you or not intimidating

02:45:51  21  you.  Clearly you are upset about something and I don't

02:45:54  22  care but --

02:45:54  23   A.   You asked a bad question.

02:45:54  24              (Whereupon, the reporter requests one

02:45:54  25  person speak at a time.)

**Coash & Coash, Inc.,  602-258-1440**

| | | |
|---|---|---|
| 02:46:01 | 1 | MR. DeLOZIER:  You asked a bad question.  I |
| 02:46:01 | 2 | asked for clarification. |
| 02:46:02 | 3 | BY MR. MARTINEZ: |
| 02:46:02 | 4 | Q.  The record reflects -- |
| 02:46:03 | 5 | A.  I didn't say a thing about an email account. |
| 02:46:05 | 6 | Q.  The record reflects what the questions were. |
| 02:46:08 | 7 | Do you have a computer that has any documents, |
| 02:46:12 | 8 | including emails, about this case? |
| 02:46:14 | 9 | A.  Of course.  I said that earlier. |
| 02:46:16 | 10 | Q.  I would like a copy of that. |
| 02:46:18 | 11 | When can I get it? |
| 02:46:18 | 12 | A.  When you pay for it. |
| 02:46:20 | 13 | Q.  I will pay for it. |
| 02:46:20 | 14 | When can I get it?  It's not a question of me |
| 02:46:23 | 15 | not having nickels to rub together. |
| 02:46:24 | 16 | A.  Do you want to have someone come this afternoon |
| 02:46:27 | 17 | and copy it? |
| 02:46:28 | 18 | Q.  I will do it whenever -- |
| 02:46:30 | 19 | A.  You want to do it yourself. |
| 02:46:32 | 20 | Q.  Obviously, I'm going to have somebody else do |
| 02:46:32 | 21 | it. |
| 02:46:33 | 22 | When can you make it available so that someone |
| 02:46:35 | 23 | can come and get it?  Just tell me. |
| 02:46:38 | 24 | A.  I told you this afternoon. |
| 02:46:39 | 25 | Q.  I told you I can't do it this afternoon. |

**Coash & Coash, Inc.,  602-258-1440**

| | | |
|---|---|---|
| 02:46:41 | 1 | Obviously -- |
| 02:46:42 | 2 | A.  You didn't say that. |
| 02:46:43 | 3 | Q.  When can we do it, not this afternoon?  Give me |
| 02:46:47 | 4 | a time. |
| 02:46:47 | 5 | A.  Any other day.  Just let me know in advance. |
| 02:46:50 | 6 | Q.  I will pick a date and time. |
| 02:46:52 | 7 | Where can we do this? |
| 02:46:53 | 8 | A.  At my office. |
| 02:46:54 | 9 | Q.  Whe3re is your office located? |
| 02:46:55 | 10 | A.  3019 East Wagner Road, Phoenix, Arizona. |
| 02:47:02 | 11 | Q.  And the time?  Can it be between 8:00 and 5:00? |
| 02:47:07 | 12 | A.  It can't be any other time. |
| 02:47:09 | 13 | Q.  All right.  Do you remember anything |
| 02:47:12 | 14 | specifically -- |
| 02:47:13 | 15 | A.  No. |
| 02:47:14 | 16 | Q.  You don't even know what I was going to ask you. |
| 02:47:16 | 17 | A.  Yeah, you were going to ask me what's on the |
| 02:47:18 | 18 | computer.  I don't have any idea what's on the |
| 02:47:20 | 19 | computer.  Whatever is on the computer has already been |
| 02:47:22 | 20 | given to Dan. |
| 02:47:23 | 21 | Q.  Specifically, sir, do you remember -- this was |
| 02:47:27 | 22 | going to be my question -- whether or not you saw any |
| 02:47:32 | 23 | photographs of the defendant being in a bikini? |
| 02:47:36 | 24 | A.  I have no recollection of what's on that |
| 02:47:38 | 25 | computer. |

David DeLozier - November 25, 2013                82

02:47:38  1      Q.   I'm not asking you about the computer anymore.
02:47:41  2  I'm asking you now if you've ever seen any photographs
02:47:47  3  of the defendant in a bikini.   That's all I'm asking
02:47:49  4  you.
02:47:50  5      A.   I don't know.   I don't recall it.
02:47:52  6      Q.   You don't recall that.   I will take that as that
02:47:54  7  a no.
02:47:56  8           Do you remember any --
02:47:56  9               MR. ARNTSEN:   I object.
02:47:57 10               MR. DeLOZIER:   That's not what I said.   I
02:48:00 11  don't recall.   It's not a no.
02:48:01 12  BY MR. MARTINEZ:
02:48:01 13      Q.   All right.   Do you remember ever seeing her in
02:48:04 14  any scantily clad or -- her in a photograph being
02:48:11 15  scantily clad with Alejo being present?
02:48:13 16      A.   No.
02:48:13 17      Q.   Do you remember any photographs that you've seen
02:48:17 18  of the defendant being scantily clad taken by Alejo?
02:48:24 19      A.   I've already answered all these questions.
02:48:26 20      Q.   Answer my question, please.
02:48:27 21      A.   I've already answered it.
02:48:36 22      Q.   You haven't answered that one.
02:48:36 23      A.   I answered her earlier today.   She had the same
02:48:36 24  question.
02:48:36 25      Q.   No, she did not.

**Coash & Coash, Inc.,  602-258-1440**

David DeLozier - November 25, 2013                    83

| | | |
|---|---|---|
| 02:48:36 | 1 | Do you remember -- |
| 02:48:37 | 2 | A.  No. |
| 02:48:37 | 3 | Q.  -- any -- |
| 02:48:37 | 4 | A.  No. |
| 02:48:38 | 5 | Q.  So the answer is no.  Okay.  That's what I need |
| 02:48:40 | 6 | to know. |
| 02:48:43 | 7 | You claim that there was or appears to be a |
| 02:48:46 | 8 | sexual relationship or some sort of issue involving sex |
| 02:48:49 | 9 | between Alejo and the defendant, and you've talked |
| 02:48:53 | 10 | about how if you knew about it back then when they |
| 02:48:57 | 11 | asked you to represent them in terms of the child |
| 02:49:01 | 12 | custody agreement, that you would have sent them |
| 02:49:03 | 13 | packing and not taken their case. |
| 02:49:05 | 14 | What is it that you know now of that sexual |
| 02:49:07 | 15 | relationship? |
| 02:49:08 | 16 | A.  There was some kind of abuse of Wendi by Alejo. |
| 02:49:11 | 17 | That's all I know. |
| 02:49:13 | 18 | Q.  What kind of -- |
| 02:49:13 | 19 | A.  Sexual abuse. |
| 02:49:13 | 20 | Q.  What kind of sexual abuse? |
| 02:49:15 | 21 | A.  I don't know.  That's all I know. |
| 02:49:16 | 22 | Q.  Who did you hear it from? |
| 02:49:17 | 23 | A.  I did not get any details.  I haven't seen any |
| 02:49:20 | 24 | affidavits.  I don't know anything beyond that and I |
| 02:49:22 | 25 | got them from these people. |

**Coash & Coash, Inc.,  602-258-1440**

| | | |
|---|---|---|
| 02:49:23 | 1 | Q.  So the people that told you about this are the |
| 02:49:26 | 2 | people -- "these people" being who?  Who are "these |
| 02:49:28 | 3 | people"? |
| 02:49:29 | 4 | A.  The folks that are currently representing |
| 02:49:32 | 5 | Ms. Andriano. |
| 02:49:32 | 6 | Q.  Give me some names of the people that told you. |
| 02:49:34 | 7 | A.  I don't know anybody except Allen Arntsen, I |
| 02:49:37 | 8 | think his name is, and Matthew somebody.  I can't |
| 02:49:39 | 9 | remember his last name, and there was a lady that's |
| 02:49:41 | 10 | involved in it.  Okay?  I don't know her name.  I can't |
| 02:49:45 | 11 | remember her name. |
| 02:49:45 | 12 | Q.  And they're the ones that told you about this |
| 02:49:48 | 13 | sexual relationship? |
| 02:49:49 | 14 | A.  They have done research is what they've told me |
| 02:49:52 | 15 | that was not done by anybody during those years. |
| 02:49:54 | 16 | Q.  I'm and asking what was done or not done.  I'm |
| 02:49:56 | 17 | asking about people who may have told you about the |
| 02:49:58 | 18 | sexual relationship and you've named -- |
| 02:50:00 | 19 | A.  Her lawyers. |
| 02:50:01 | 20 | Q.  So those are the only people that have told you |
| 02:50:03 | 21 | about that. |
| 02:50:03 | 22 | Right? |
| 02:50:04 | 23 | A.  They're the only ones I've talked to, except you |
| 02:50:08 | 24 | and this lady here. |
| 02:50:09 | 25 | Q.  I'm asking whether or not those are the only |

David DeLozier - November 25, 2013                    85

| | | |
|---|---|---|
| 02:50:11 | 1 | three people that have told you about any sexual |
| 02:50:13 | 2 | relationship between Alejo and the defendant. |
| 02:50:15 | 3 |     A.  What problem do you have with yes?  That's the |
| 02:50:19 | 4 | only ones. |
| 02:50:19 | 5 |     Q.  Okay. |
| 02:50:20 | 6 |     A.  That's the third time I've answered that, Juan. |
| 02:50:23 | 7 |     Q.  So the answer is yes and, for example, Donna |
| 02:50:27 | 8 | never told you anything about that. |
| 02:50:29 | 9 |         Right?  No one -- |
| 02:50:30 | 10 |     A.  Wait a minute.  If that's the only ones, that's |
| 02:50:32 | 11 | the only ones, Juan. |
| 02:50:33 | 12 |     Q.  All right.  You really don't need to raise your |
| 02:50:35 | 13 | voice. |
| 02:50:35 | 14 |     A.  Well, you are causing it. |
| 02:50:37 | 15 |     Q.  You are raising -- are you fasting right now? |
| 02:50:39 | 16 |     A.  Mind your own business. |
| 02:50:42 | 17 |     Q.  Are you fasting right now? |
| 02:50:43 | 18 |     A.  Mind your own business. |
| 02:50:44 | 19 |     Q.  That is part of the case and it is my business |
| 02:50:47 | 20 | and I'm asking you to answer it. |
| 02:50:48 | 21 |     A.  No. |
| 02:50:49 | 22 |     Q.  When was the last time you fasted before today? |
| 02:50:52 | 23 |     A.  Yesterday morning I didn't eat breakfast.  Is |
| 02:50:55 | 24 | that a fast enough for you? |
| 02:50:55 | 25 |     Q.  I don't know.  You are the one that's defining |

**Coash & Coash, Inc.,  602-258-1440**

P-App. 005766

David DeLozier - November 25, 2013          86

| | | |
|---|---|---|
| 02:50:57 | 1 | the fasting. |
| 02:50:58 | 2 | Is that what you mean? |
| 02:50:59 | 3 | A.  There is a huge different definition of fasting. |
| 02:51:03 | 4 | Everybody has a different one.  Some people don't eat |
| 02:51:06 | 5 | breakfast and that's fasting. |
| 02:51:08 | 6 | Q.  I'm asking you what your definition of fasting |
| 02:51:10 | 7 | is. |
| 02:51:10 | 8 | A.  I have done them all. |
| 02:51:12 | 9 | Q.  Then tell me what your definition of fasting is |
| 02:51:15 | 10 | as it applies to this case and back then when this |
| 02:51:19 | 11 | trial was going on. |
| 02:51:19 | 12 | A.  I've already answered that question. |
| 02:51:21 | 13 | Q.  You said that missing breakfast could be |
| 02:51:23 | 14 | fasting. |
| 02:51:24 | 15 | A.  I answered her question.  I went through the |
| 02:51:26 | 16 | whole story.  I'm not going to repeat it for you. |
| 02:51:28 | 17 | Q.  No, you didn't go through the whole story. |
| 02:51:30 | 18 | You indicated that at some point you were taking |
| 02:51:35 | 19 | juices. |
| 02:51:35 | 20 | Do you want to take a look at your affidavit |
| 02:51:37 | 21 | that you were just taking juices?  Do you remember? |
| 02:51:40 | 22 | A.  I said that to her, also. |
| 02:51:41 | 23 | Q.  Explain to me when you began to take the |
| 02:51:45 | 24 | juices -- |
| 02:51:45 | 25 | A.  I don't know. |

**Coash & Coash, Inc.,  602-258-1440**

David DeLozier - November 25, 2013                    87

| | | |
|---|---|---|
| 02:51:46 | 1 | Q.  Could it be the first week? |
| 02:51:47 | 2 | A.  I don't know. |
| 02:51:48 | 3 | Q.  How about the last week? |
| 02:51:49 | 4 | A.  I don't know.  I'm not going to answer anything |
| 02:51:52 | 5 | besides I don't know. |
| 02:51:53 | 6 | Q.  And during that period of time, those 70 days, |
| 02:51:57 | 7 | you indicated that in terms of this fasting it was only |
| 02:52:02 | 8 | juices that you took. |
| 02:52:04 | 9 | Correct? |
| 02:52:04 | 10 | A.  No. |
| 02:52:05 | 11 | Q.  Water, also. |
| 02:52:06 | 12 | Correct? |
| 02:52:06 | 13 | A.  No. |
| 02:52:07 | 14 | Q.  Anything else?  Anything else other than -- |
| 02:52:09 | 15 | A.  Mixtures of water and juices. |
| 02:52:11 | 16 | Q.  All right.  Anything else besides water, juices |
| 02:52:15 | 17 | and/or mixtures of juices that you took that day? |
| 02:52:17 | 18 | A.  What day? |
| 02:52:18 | 19 | Q.  Or not that day.  During that period of time. |
| 02:52:20 | 20 | A.  I've already answered that question.  The answer |
| 02:52:22 | 21 | is no. |
| 02:52:23 | 22 | Q.  And why did you stop the fast? |
| 02:52:27 | 23 | A.  You stop them when you stop them. |
| 02:52:30 | 24 | Q.  I don't know when you stop them.  You're the |
| 02:52:32 | 25 | person that stops them. |

**Coash & Coash, Inc.,  602-258-1440**

David DeLozier - November 25, 2013          88

02:52:33  1        A.   I'm telling you that's the procedure.   You stop

02:52:35  2   them when you stop them.   It might be a breakfast.   It

02:52:38  3   might be all day.   It might be all week.   It might be

02:52:41  4   all month.   It might be 70 days.   At some point you say

02:52:44  5   it's over.

02:52:44  6        Q.   In this case why did you say it was over?

02:52:47  7        A.   I don't know.   I don't remember.   It was not

02:52:50  8   significant.   How many times did I go to the bathroom

02:52:53  9   that?   Day same kind of question.

02:52:54 10        Q.   I'm asking you about fasting.

02:52:56 11             With regard to this fasting and you said that

02:52:58 12   you decided to stop it, was it during the trial or

02:53:01 13   after the trial ended?

02:53:02 14        A.   I don't know.   I don't know.   It's like you go

02:53:07 15   to the bathroom.   You don't understand because you

02:53:09 16   don't do it.   I'm telling you, you stop when you stop.

02:53:14 17   There's no -- there's no marking on a calendar that

02:53:18 18   I've got to do it at the end of this week or at the end

02:53:21 19   of this month.   You don't have a celebration because

02:53:23 20   you stop.   You have something to eat.

02:53:26 21        Q.   With regard to this --

02:53:34 22        A.   This is so silly.

02:53:34 23        Q.   With regard to this -- and you indicated I don't

02:53:34 24   understand.   That's the reason why I'm asking the

02:53:35 25   question.   It's called discovery so that I can know

**Coash & Coash, Inc., 602-258-1440**

David DeLozier - November 25, 2013                    89

| | | |
|---|---|---|
| 02:53:37 | 1 | exactly for you when you stopped the fast. |
| 02:53:40 | 2 | And in this case, was it important?  In this |
| 02:53:43 | 3 | case, was it -- |
| 02:53:43 | 4 | A.  No. |
| 02:53:44 | 5 | Q.  -- during or after? |
| 02:53:44 | 6 | A.  No. |
| 02:53:45 | 7 | Q.  You don't know? |
| 02:53:45 | 8 | A.  No. |
| 02:53:46 | 9 | Q.  And was it -- the reason you don't know is |
| 02:53:49 | 10 | because it wasn't significant to your presentation of |
| 02:53:52 | 11 | the case? |
| 02:53:52 | 12 | A.  It never is significant to a stopping of the |
| 02:53:54 | 13 | fast.  You just decide to eat. |
| 02:53:57 | 14 | Q.  You didn't stop because you were feeling weak -- |
| 02:53:59 | 15 | the fast. |
| 02:54:00 | 16 | Right? |
| 02:54:01 | 17 | A.  I was feeling weak.  I don't know all the |
| 02:54:03 | 18 | reasons for it.  Okay?  I know one thing.  If you have |
| 02:54:07 | 19 | a lawyer in your office that gets a bullet through |
| 02:54:10 | 20 | their head through no fault of their own, you're weak. |
| 02:54:13 | 21 | Q.  You don't know that.  I'm just asking about the |
| 02:54:15 | 22 | fast right now. |
| 02:54:16 | 23 | A.  No. |
| 02:54:16 | 24 | Q.  I'm not asking about -- |
| 02:54:18 | 25 | A.  I don't know. |

02:54:18  1     Q.  Were you under any medical care?

02:54:21  2     A.  No.

02:54:21  3     Q.  Did you go to the doctor at any time during this

02:54:24  4  period of --

02:54:25  5     A.  I don't know that.  I have to go back and look

02:54:27  6  at my medical records.

02:54:28  7     Q.  Why don't you that and I'd like you to provide

02:54:29  8  those for me.

02:54:29  9     A.  I'm not going to provide you my medical records.

02:54:32 10     Q.  I'm asking you to provide them or make them

02:54:35 11  available so they can be examined and --

02:54:38 12     A.  And the answer is no.  You're not getting my

02:54:40 13  medical records.

02:54:41 14     Q.  I'm not asking you for them.  I'm asking that

02:54:43 15  you prepare them so that we can turn them to the judge

02:54:45 16  so he can examine to see whether or not you received

02:54:47 17  any medical care during this time that you were

02:54:50 18  supposedly fasting.

02:54:51 19     A.  I'm not going to look in 2004 for my medical

02:54:55 20  records, Juan.  I don't know who I was going to at the

02:54:57 21  time.  I wouldn't even know where to start on finding

02:55:00 22  them.  I've moved twice since then, okay, and I've

02:55:03 23  thrown stuff away.  I don't keep my medical records.

02:55:05 24     Q.  Do you have a regular physicians that you see?

02:55:07 25     A.  No.

02:55:08  1      Q.   Did you have a regular physician --

02:55:09  2      A.   No.

02:55:09  3      Q.   -- back then that you saw?

02:55:11  4      A.   No.

02:55:11  5      Q.   So if you were feeling weak with regard to this

02:55:14  6  fast, what would you have done in terms of medical

02:55:18  7  care?

02:55:18  8      A.   Nothing.

02:55:19  9      Q.   You would have just felt weak?

02:55:21 10      A.   I hate M.D.s.  Okay?  I don't go to them.

02:55:25 11      Q.   And even -- can you think of any time during the

02:55:29 12  trial that you felt so weak that you felt that you

02:55:31 13  needed to go see an M.D.?

02:55:32 14      A.   No.

02:55:33 15      Q.   Okay.

02:55:36 16      A.   I don't go see M.D.s.  What part of that didn't

02:55:38 17  you hear?  I don't go see M.D.'s, period.

02:55:42 18      Q.   My question was something else and you answered

02:55:42 19  it.

02:55:44 20           You said that --

02:55:44 21      A.   No, it wasn't something else.  It was -- that

02:55:46 22  wasn't part of it.  I don't go to M.D.s.  I don't care

02:55:51 23  what's wrong with me, period.

02:55:52 24      Q.   In this case, if you would have felt the need

02:55:57 25  for medical care back then in terms of the fasting,

**Coash & Coash, Inc.,  602-258-1440**

David DeLozier - November 25, 2013                92

| | | |
|---|---|---|
| 02:56:02 | 1 | would you have gone to a doctor? |
| 02:56:03 | 2 | A. I've already answered the question. |
| 02:56:04 | 3 | Q. Yes or no? |
| 02:56:05 | 4 | A. It isn't a yes or a no question. |
| 02:56:07 | 5 | Q. You would have or would not have gone? |
| 02:56:09 | 6 | A. It is not a yes-or-no question.  Okay? |
| 02:56:12 | 7 | Q. So if you were feeling badly, you don't know if |
| 02:56:15 | 8 | you would have gone to the doctor, to see a doctor? |
| 02:56:18 | 9 | A. One more time.  I don't go to doctors. |
| 02:56:22 | 10 | Q. Ever? |
| 02:56:22 | 11 | A. I don't go to doctors. |
| 02:56:24 | 12 | Q. When was the last time you went to a doctor? |
| 02:56:26 | 13 | A. I go to the chiropractor. |
| 02:56:29 | 14 | Q. I'm not interested in chiropractors. |
| 02:56:30 | 15 | When was the last time you went to see an M.D.? |
| 02:56:33 | 16 | A. I don't see relevance to this. |
| 02:56:56 | 17 | MR. ARNTSEN:  That's your call.  That's not |
| 02:56:58 | 18 | something I'm -- I'm not instructing you either way on |
| 02:57:08 | 19 | it. |
| 02:57:08 | 20 | MR. DeLOZIER:  It's irrelevant.  I'm not |
| 02:57:10 | 21 | answering it. |
| 02:57:10 | 22 | BY MR. MARTINEZ: |
| 02:57:10 | 23 | Q. So you are refusing to answer that? |
| 02:57:11 | 24 | A. Yes. |
| 02:57:12 | 25 | Q. You said a lawyer by the name of Justin Blair |

**Coash & Coash, Inc.,  602-258-1440**

David DeLozier - November 25, 2013          93

02:57:17  1    was shot and killed while this trial was going on.

02:57:21  2          Correct?

02:57:21  3    A.   Right.   October 17, 2004.

02:57:24  4    Q.   And during that time was when the Wendi Andriano

02:57:29  5    case was in the middle of trial.

02:57:31  6          Right?

02:57:32  7    A.   You were there.

02:57:34  8    Q.   I'm asking you whether or not, to your

02:57:38  9    recollection -- because you seem to have problems with

02:57:40 10    your recollection.   I don't -- whether or not you

02:57:43 11    remember whether or not --

02:57:43 12               MR. ARNTSEN:   Objection; argumentative.

02:57:44 13               MR. MARTINEZ:   I don't care if it's

02:57:44 14    argumentative.

02:57:44 15    BY MR. MARTINEZ:

02:57:46 16    Q.   Answer my question.

02:57:46 17               MR. ARNTSEN:   Counsel, Counsel, don't be

02:57:48 18    abusing the witness.

02:57:49 19               MR. MARTINEZ:   He's -- he's being --

02:57:50 20               MR. ARNTSEN:   No.   I will jump in on that.

02:57:51 21               MR. MARTINEZ:   Well, then jump in all you

02:57:53 22    want.   Act like a frog and jump in.   I don't care.

02:57:55 23               MR. ARNTSEN:   It's argumentative and --

02:57:55 24    BY MR. MARTINEZ:

02:57:58 25    Q.   With regard to this trial --

**Coash & Coash, Inc., 602-258-1440**

David DeLozier - November 25, 2013                    94

| | | |
|---|---|---|
| 02:57:58 | 1 | MR. ARNTSEN:  -- counsel should stop |
| 02:57:59 | 2 | abusing the witness. |
| 02:58:00 | 3 | BY MR. MARTINEZ: |
| 02:58:00 | 4 | Q.  With regard to the time that Justin Blair was |
| 02:58:05 | 5 | killed, was it during the Wendi Andriano prosecution, |
| 02:58:08 | 6 | the trial? |
| 02:58:08 | 7 | A.  The record speaks for itself, Juan.  I'm not |
| 02:58:11 | 8 | going to answer it.  That's a stupidest question you've |
| 02:58:14 | 9 | asked all day. |
| 02:58:14 | 10 | Q.  Okay.  So is that yes or no or are you just |
| 02:58:17 | 11 | refusing to answer that? |
| 02:58:18 | 12 | A.  The record speaks for itself.  Obviously. |
| 02:58:20 | 13 | Q.  How did you learn -- so you are refusing to |
| 02:58:20 | 14 | answer. |
| 02:58:23 | 15 | The answer is no? |
| 02:58:24 | 16 | A.  The record speaks for itself.  I don't have to |
| 02:58:26 | 17 | answer a stupid question. |
| 02:58:28 | 18 | Q.  All right.  So you don't have to answer |
| 02:58:29 | 19 | questions that you deem are stupid? |
| 02:58:31 | 20 | A.  No.  That's trial started here.  He was killed |
| 02:58:35 | 21 | here.  The trial was over there.  You know that.  Why |
| 02:58:37 | 22 | are you asking that question? |
| 02:58:38 | 23 | Q.  I'm not being deposed.  You are.  That's the |
| 02:58:41 | 24 | reason. |
| 02:58:41 | 25 | A.  I'm not being deposed.  This is an interview. |

**Coash & Coash, Inc.,  602-258-1440**

David DeLozier - November 25, 2013                    95

| | | |
|---|---|---|
| 02:58:43 | 1 | Q.  Okay.  You are being questioned.  I'm not.  You |
| 02:58:45 | 2 | understand that. |
| 02:58:47 | 3 | Right? |
| 02:58:48 | 4 | MR. ARNTSEN:  Counsel, Counsel, please |
| 02:58:50 | 5 | focus your questions to relevant matters.  It's like |
| 02:58:54 | 6 | the last series of questions is a function of the |
| 02:58:56 | 7 | calendar. |
| 02:58:56 | 8 | BY MR. MARTINEZ: |
| 02:58:58 | 9 | Q.  I'm asking you a question. |
| 02:59:07 | 10 | MR. ARNTSEN:  I believe it is abusive. |
| 02:59:07 | 11 | BY MR. MARTINEZ: |
| 02:59:07 | 12 | Q.  I'm asking -- |
| 02:59:07 | 13 | A.  I'm not going to answer it. |
| 02:59:07 | 14 | Q.  That's fine.  That's what I wanted to hear from |
| 02:59:07 | 15 | you. |
| 02:59:07 | 16 | And how did you find out that Mr. Blair had been |
| 02:59:07 | 17 | killed?  How did you find out?  Who told you? |
| 02:59:09 | 18 | A.  I don't remember. |
| 02:59:11 | 19 | Q.  Was it during the middle of the day?  Was it |
| 02:59:16 | 20 | night?  How did you find out? |
| 02:59:16 | 21 | A.  I don't remember. |
| 02:59:17 | 22 | Q.  You don't remember anything about how you were |
| 02:59:19 | 23 | told? |
| 02:59:19 | 24 | A.  No. |
| 02:59:20 | 25 | Q.  What's the first thing that you remember doing |

**Coash & Coash, Inc.,  602-258-1440**

David DeLozier - November 25, 2013                96

02:59:24   1   when you were notified that he was killed?
02:59:29   2       A.  I don't know.
02:59:42   3       Q.  And do you remember whether or not it was a
02:59:48   4   trial day when you were told?
02:59:50   5       A.  I don't know.  October 17 was the day he was
02:59:53   6   killed.  All we have to do is look at a calendar and
02:59:55   7   see what was happening that day.  I don't know.
02:59:56   8       Q.  I'm asking what you independently recall.
02:59:58   9           MR. ARNTSEN:  He just answered that
02:59:59  10   question.
03:00:00  11   BY MR. MARTINEZ:
03:00:00  12       Q.  And you are saying you don't know.
03:00:02  13           Right?
03:00:02  14       A.  You can put all the words in my mouth that you
03:00:05  15   want to, Juan.
03:00:06  16       Q.  I'm asking you the questions.
03:00:07  17       A.  I've already told you the answer, the only one I
03:00:10  18   know.
03:00:10  19       Q.  And during the time that this was going on, did
03:00:16  20   you go to -- do you need to take a break?
03:00:18  21       A.  No.  I'm getting a glass of water.
03:00:19  22       Q.  Okay.
03:00:28  23       A.  Go ahead.
03:00:28  24       Q.  Did you ever go to the Glendale Police
03:00:32  25   Department to discuss this case?

**Coash & Coash, Inc.,  602-258-1440**

David DeLozier - November 25, 2013                    97

03:00:34  1    A.   They came to us.

03:00:35  2    Q.   So is that yes or no?

03:00:37  3    A.   I don't know.  I'm telling you they came to us.

03:00:39  4  I don't remember if we went over there or not.

03:00:41  5    Q.   When you say they came to you, who came to you?

03:00:43  6    A.   Some cop, some cop.  I don't remember his name.

03:00:45  7    Q.   Was it a detective?  Was it a --

03:00:47  8    A.   I don't know.

03:00:49  9    Q.   And did he come --

03:00:50 10    A.   I don't know.

03:00:50 11    Q.   How many times?

03:00:51 12    A.   I don't know.

03:00:52 13    Q.   Who was present when he came?

03:00:54 14    A.   My wife, probably some other people from the

03:00:58 15  office.  Whether the TV people came with or without

03:01:02 16  him, I can't remember.  They photographed us in front

03:01:05 17  of the building.  They put us on TV trying to catch the

03:01:10 18  guy that did the murder.

03:01:11 19    Q.   You say --

03:01:12 20    A.   I think I've already answered those questions.

03:01:14 21    Q.   You say they came to see you and it appears from

03:01:16 22  your answer that they came to see you at your office.

03:01:20 23    A.   Yes.

03:01:20 24    Q.   Did they ever come to your home?

03:01:22 25    A.   That is my home.

**Coash & Coash, Inc.,  602-258-1440**

David DeLozier - November 25, 2013                    98

| | | |
|---|---|---|
| 03:01:24 | 1 | Q.  You live at your office? |
| 03:01:25 | 2 | A.  Yes. |
| 03:01:26 | 3 | Q.  When they came over, was it a trial day that |
| 03:01:33 | 4 | they came and -- |
| 03:01:33 | 5 | A.  I don't know. |
| 03:01:34 | 6 | Q.  Was it in the evening? |
| 03:01:36 | 7 | A.  I don't know. |
| 03:01:36 | 8 | Q.  Let me check my notes. |
| 03:01:53 | 9 | How many murder cases had you handled previous |
| 03:01:57 | 10 | to the Andriano case? |
| 03:01:58 | 11 | A.  I don't remember.  The declaration says second |
| 03:02:03 | 12 | degree. |
| 03:02:04 | 13 | Q.  Well, I'm saying any murder cases.  That |
| 03:02:07 | 14 | includes any where somebody died. |
| 03:02:09 | 15 | A.  I don't know. |
| 03:02:09 | 16 | Q.  You requested a Rule 11 examination. |
| 03:02:13 | 17 | Right? |
| 03:02:14 | 18 | A.  I've already answered that question. |
| 03:02:15 | 19 | Q.  I know.  I know.  You requested it, though. |
| 03:02:17 | 20 | Right? |
| 03:02:19 | 21 | A.  I've already answered that question. |
| 03:02:20 | 22 | Q.  It's a predicate question. |
| 03:02:21 | 23 | A.  I've already answered the question. |
| 03:02:23 | 24 | Q.  Okay. |
| 03:02:24 | 25 | A.  Read it back.  Read him the answer back from two |

**Coash & Coash, Inc.,  602-258-1440**

03:02:27   1    hours ago.

03:02:27   2        Q.   And what were the reasons that you requested

03:02:32   3    that Rule 11 --

03:02:33   4        A.   I have no recollection of why that was done.

03:02:35   5    You'd have to go through the files to see what I knew

03:02:38   6    at that time, and I don't have any independent

03:02:40   7    recollection of why.

03:02:41   8        Q.   Any independent recollection of any mental

03:02:46   9    health issues that you saw at any time from the time

03:02:49  10    you assumed the case until the time that Mr. Patterson

03:02:53  11    was brought on?

03:02:54  12        A.   Well, I don't remember those schedules, but

03:03:01  13    apparently December of 2000 and September of 2001.  I

03:03:07  14    think we've been over here this.

03:03:08  15        Q.   I'm and asking you for dates.  I'm asking you if

03:03:10  16    you --

03:03:10  17        A.   You are asking me for dates because you said

03:03:12  18    between this period and that period.

03:03:13  19        Q.   Right.  I'm not asking you to give me the dates.

03:03:15  20             I'm asking you between the time that you were

03:03:17  21    retained -- whatever date that was -- and the time that

03:03:19  22    Mr. Patterson came on board -- whatever date that

03:03:22  23    was -- do you have any independent recollection of any

03:03:27  24    mental health issues that you, yourself, saw involving

03:03:31  25    Ms. Andriano?

David DeLozier - November 25, 2013                    100

03:03:32  1      A.   Do you want read that question for the third

03:03:36  2  time?

03:03:36  3      Q.   No.  I want you to answer it for the first time.

03:03:39  4      A.   I was beginning to do that when you interrupted

03:03:41  5  me and repeated the same question.

03:03:44  6      Q.   Answer it.

03:03:45  7      A.   Okay?  December 2000-September 2001, that's the

03:03:51  8  time frame you are talking about.  Otherwise, I can't

03:03:53  9  answer your question.

03:03:55 10      Q.   I'm not asking you dates.  I'm asking you what

03:03:57 11  mental health issues --

03:03:58 12      A.   Why do you keep interrupting me?

03:04:00 13      Q.   Are you done now?

03:04:01 14      A.   No.

03:04:01 15      Q.   Go ahead then.

03:04:02 16      A.   I'm telling you that I can't answer your

03:04:04 17  question without having dates and you keep telling me

03:04:07 18  you don't need dates.  So will you shut up and let me

03:04:12 19  finish because I have to have dates to answer your

03:04:14 20  question.

03:04:15 21      Q.   You are now being rude, but I'm allowing -- you

03:04:19 22  are telling me to shut up and now you are laughing out

03:04:22 23  of control.

03:04:23 24           Let's just make sure that -- I now want to know

03:04:26 25  what mental health issues you saw while you were lead

**Coash & Coash, Inc.,  602-258-1440**

David DeLozier - November 25, 2013                    101

```
03:04:30  1    counsel.  That's all I'm asking you.
03:04:32  2        A.  They're in the exhibits.
03:04:35  3        Q.  I'm asking you what independent recollection you
03:04:38  4    have of it.
03:04:38  5        A.  They're in the exhibits.
03:04:39  6        Q.  So you have no independent recollection?
03:04:41  7        A.  They're in the exhibits.
03:04:42  8        Q.  That's not my question, sir.
03:04:44  9            My question is, what does your independent
03:04:45 10    recollection tell you?
03:04:48 11        A.  I wouldn't have asked for a Rule 11 unless I saw
03:04:53 12    something or knew something.  You asked me a minute ago
03:04:55 13    why did I ask for a Rule 11.  I told you I don't
03:04:58 14    remember.  I don't remember.
03:04:59 15        Q.  So you don't remember any -- when you were lead
03:05:03 16    counsel, you don't remember any specific mental health
03:05:05 17    issues?
03:05:06 18        A.  That is not what I said.  That is not what I
03:05:10 19    said and you're not going to put words in my mouth.
03:05:12 20        Q.  Then tell me what you remember about any mental
03:05:14 21    health issues that you, yourself, saw.
03:05:24 22        A.  This has been over 14 years ago, okay?
03:05:24 23        Q.  Still that's not my question.
03:05:24 24        A.  It's been over 14 years ago.
03:05:24 25        Q.  Okay.
```

**Coash & Coash, Inc.,  602-258-1440**

David DeLozier - November 25, 2013                    102

| | | |
|---|---|---|
| 03:05:25 | 1 | A.   I don't have any independent recollection of |
| 03:05:27 | 2 | anything except her name. |
| 03:05:29 | 3 | Q.   All right. |
| 03:05:29 | 4 | A.   And your behavior during the trial and today |
| 03:05:35 | 5 | which hasn't changed. |
| 03:05:37 | 6 | Q.   You spoke to Sharon Murphy. |
| 03:05:40 | 7 | Right? |
| 03:05:41 | 8 | A.   I thought you -- I thought you said that you |
| 03:05:44 | 9 | were through. |
| 03:05:45 | 10 | Q.   Did you or did you not speak -- |
| 03:05:46 | 11 | A.   Of course, I spoke to Sharon Murphy. |
| 03:05:48 | 12 | Q.   And you spoke to her prior to the Public |
| 03:05:52 | 13 | Defender's Office being appointed. |
| 03:05:53 | 14 | Correct? |
| 03:05:53 | 15 | A.   I think that's correct. |
| 03:05:54 | 16 | Q.   The reason that you spoke to Sharon Murphy is |
| 03:05:56 | 17 | what? |
| 03:05:57 | 18 | A.   Domestic violence.  That's what she's an expert |
| 03:05:59 | 19 | in. |
| 03:06:00 | 20 | Q.   All right.  And what aspects of domestic |
| 03:06:02 | 21 | violence that prompted you to contact Ms. Murphy? |
| 03:06:06 | 22 | A.   If I hold a gun to your head, do you consider |
| 03:06:09 | 23 | that domestic violence? |
| 03:06:10 | 24 | Q.   I'm not here to answer the questions about what |
| 03:06:12 | 25 | I consider to be domestic violence.  You are the person |

**Coash & Coash, Inc.,  602-258-1440**

David DeLozier - November 25, 2013          103

| 03:06:15 | 1 | that's here to answer these questions. |
|---|---|---|

03:06:15  1  that's here to answer these questions.

03:06:17  2      A.  Okay.  Well, I just told you.  One of the

03:06:19  3  episodes was Joe allegedly putting a gun to Wendi's

03:06:23  4  head.

03:06:23  5      Q.  All right.

03:06:25  6      A.  Another episode was when he would get angry at

03:06:27  7  her; another episode, that she always was the one that

03:06:29  8  cared for the children.  She had to work.  He wouldn't

03:06:31  9  work.  He had business failures, et cetera.  Okay?  You

03:06:35  10 can go down the list of domineering macho man.  Okay?

03:06:41  11 That's what he was, according to what I knew at the

03:06:41  12 time.

03:06:44  13      I talked to Sharon Murphy about what I had seen

03:06:47  14 about this man's behavior based on what I had been

03:06:50  15 told.  Now, all of that is being told.  Whether it's

03:06:54  16 true or not, I don't know.  We tried to gather as much

03:06:56  17 information from the collateral sources as possible so

03:06:59  18 that she would have access to the information she

03:07:01  19 needed to do whatever that person as an expert does.

03:07:05  20 So you hand them the stuff you have heard, hand them

03:07:08  21 the stuff that you've learned and they go do whatever

03:07:11  22 they do.

03:07:13  23      Q.  And this Sharon Murphy is the same Sharon Murphy

03:07:16  24 that ultimately testified --

03:07:17  25      A.  Yeah.

David DeLozier - November 25, 2013                104

03:07:18  1    Q.   -- in the mitigation phase?

03:07:19  2    A.   Yeah.

03:07:19  3    Q.   It's not anybody different?

03:07:21  4    A.   Yes, it's the same person.

03:07:22  5    Q.   At any point did you have -- during the time

03:07:25  6    that Mr. Patterson came on and the end of the trial,

03:07:30  7    did you have any conversations with Ms. Murphy?

03:07:33  8    A.   I don't recall whether I did or not.  I do not

03:07:35  9    know.

03:07:36 10    Q.   Did you have --

03:07:37 11    A.   Did I?  I don't know.  Did I not?  I don't know.

03:07:39 12    Q.   Did you write her or did you -- did you write

03:07:43 13    her anything during the time that --

03:07:46 14    A.   I don't have any recollection of ever having

03:07:48 15    written her.

03:07:49 16    Q.   Anything?

03:07:49 17    A.   Anything.  Now, did I write her something?  I

03:07:53 18    don't know.  It's possible.

03:07:54 19    Q.   With regard to Ms. Rohde, she was brought on, as

03:08:02 20    I understand, by the Ochoas.

03:08:04 21         Correct?

03:08:04 22    A.   I didn't pay her, so I assume that's the case.

03:08:07 23    Q.   Did you have any conversations with her?

03:08:09 24    A.   Oh, sure, lots of them.

03:08:11 25    Q.   And how many of those would you say you had?

**Coash & Coash, Inc.,  602-258-1440**

David DeLozier - November 25, 2013                    105

03:08:13  1        A.   I have no idea.

03:08:14  2        Q.   Was this during the time that Mr. Patterson was

03:08:16  3   on the case or not?

03:08:18  4        A.   I don't know.  Probably.

03:08:20  5        Q.   And during that time that you had all these

03:08:23  6   conversations with Ms. Rohde, did you and she discuss

03:08:29  7   the defendant's mental issues, if she had any?

03:08:34  8        A.   I'm sure we did.  As I said earlier, I gave --

03:08:39  9   everything she gave me I gave to Patterson.

03:08:41 10        Q.   And did you question -- do you remember whether

03:08:46 11   or not you were the person who actually conducted the

03:08:47 12   questioning of Ms. Murphy at the penalty phase?

03:08:50 13        A.   I do not remember who did it.

03:08:52 14             MR. MARTINEZ:  I don't have anything else.

03:08:55 15             MR. ARNTSEN:  Thank you.

         16             (Whereupon, the proceedings concluded at

         17   3:08 p.m.)

         18

         19

         20

         21

         22

         23

         24

         25

**Coash & Coash, Inc.,  602-258-1440**

David DeLozier - November 25, 2013                    106

```
 1 | STATE OF ARIZONA        )
 2 | COUNTY OF MARICOPA      )
 3 |          BE IT KNOWN the foregoing proceedings were
 4 | taken by me; that I was then and there a Certified
 5 | Reporter of the State of Arizona, and by virtue thereof
 6 | authorized to administer an oath; that the proceedings
 7 | were taken down by me in shorthand and thereafter
 8 | transcribed into typewriting under my direction; that
 9 | the foregoing pages are a full, true, and accurate
10 | transcript of all proceedings and testimony had and
11 | adduced upon the taking of said proceedings, all done to
12 | the best of my skill and ability.
13 |          I FURTHER CERTIFY that I am in no way
14 | related to nor employed by any of the parties thereto
15 | nor am I in any way interested in the outcome hereof.
16 |          DATED at Phoenix, Arizona, this _____ day of
17 | _____, 2013.
18 |                       _____
19 |                       LILIA MONARREZ, RPR, CR #50699
20 |
21 |
22 |
23 |
24 |
25 |
```

**Coash & Coash, Inc.,  602-258-1440**

State of Arizona vs.
Andriano

David DeLozier
November 25, 2013

**$**

**$20,000 (1)** 77:15
**$300 (2)** 75:14,25
**$6,000 (1)** 77:13

**/**

**/// (1)** 77:25

**A**

**ABA (1)** 12:14
**ability (1)** 50:6
**able (6)** 49:10;51:15;
  57:23,25;59:25;65:5
**Absolutely (2)** 43:23;
  74:7
**abuse (5)** 10:25;
  13:23;83:16,19,20
**abused (2)** 33:5;
  45:14
**abusing (2)** 93:18;
  94:2
**abusive (1)** 95:10
**access (3)** 5:21;6:13;
  103:18
**accidents (1)** 10:21
**according (2)** 72:10;
  103:11
**account (2)** 78:4;80:5
**accounting (1)** 77:5
**accurate (1)** 51:22
**accustomed (1)** 61:4
**act (2)** 76:20;93:22
**action (3)** 74:5,10,15
**active (1)** 52:14
**actual (1)** 4:20
**actually (1)** 105:11
**adding (1)** 60:15
**additional (1)** 47:3
**admitted (4)** 9:15,18,
  21,23
**Adopted (1)** 33:12
**adult (1)** 68:11
**advance (1)** 81:5
**advise (1)** 75:6
**affected (1)** 4:20
**affidavit (12)** 5:1,4,6;
  9:25;14:15;22:20;
  34:24;52:24,25;
  61:17;75:11;86:20
**affidavits (3)** 7:12,13;
  83:24
**affirmative (1)** 41:25
**afternoon (4)** 80:16,
  24,25;81:3
**again (6)** 4:21;26:5;
  34:1;38:22;73:23;
  75:24
**against (1)** 10:25;
  34:3;71:20;74:5,15

**aggravating (2)** 13:6,
  9
**aggressive (1)** 62:9
**ago (6)** 57:9;73:9;
  99:1;101:12,22,24
**agree (4)** 14:8;30:24;
  53:3,5
**agreed (1)** 57:15
**agreement (1)** 83:12
**ahead (4)** 4:25;23:6;
  96:23;100:15
**Alejo (18)** 31:5,22;
  32:4,19,19;33:4,11;
  34:3;42:12,16;43:8;
  50:19;69:20;82:15,
  18;83:9,16;85:2
**allegation (2)** 34:3;
  45:17
**allegations (1)** 71:20
**alleged (2)** 33:19;
  74:25
**allegedly (1)** 13:23
**Allen (5)** 7:24;9:10;
  54:9;73:17;84:7
**allow (1)** 42:19
**allowed (1)** 50:3
**allowing (1)** 100:21
**alluded (1)** 45:12
**almost (2)** 48:23;
  61:12
**alone (1)** 55:1
**along (3)** 22:8;33:13,
  20
**alternate (1)** 66:25
**although (1)** 51:12
**always (6)** 15:20;
  34:20,21;51:1,2;
  103:7
**amnesia (1)** 23:15
**analogy (1)** 46:21
**anatomy (1)** 75:23
**and/or (1)** 87:17
**Andrew (2)** 14:16;
  64:19
**Andriano (12)** 4:8,21;
  12:11;16:3;20:14;
  23:14;27:16;84:5;
  93:4;94:5;98:10;
  99:25
**Andrianos (1)** 67:1
**Andriano's (1)** 4:16
**Andrianos/Ochoas (1)**
  66:24
**angry (1)** 103:6
**answered (15)** 82:19,
  21,22,23;85:6;86:12,
  15;87:20;91:18;92:2;
  96:9;97:20;98:18,21,
  23
**anymore (6)** 6:3;37:2,
  3,23;67:2;82:1
**apparently (1)** 21:15;
  27:9;42:10;69:19;

**99:13**
**appeal (1)** 73:20
**appearing (1)** 66:9
**appears (2)** 83:7;
  97:21
**appellate (2)** 6:5;
  73:20
**applies (1)** 86:10
**appointed (4)** 18:13,
  15;56:4;102:13
**appropriate (1)** 22:16
**April (3)** 25:3;55:25;
  56:2
**area (2)** 4:19;34:23
**areas (2)** 10:16;25:5
**argue (1)** 57:13
**argumentative (3)**
  93:12,14,23
**Arizona (2)** 4:1;81:10
**arms (1)** 40:20
**ARNTSEN (28)** 4:5;
  9:12;10:19;19:20,24;
  38:21;39:5;50:16;
  54:20;72:18;73:18,
  21,23;74:3;75:6;
  77:22;82:9;84:7;
  92:17;93:12,17,20,
  23;94:1;95:4,10;
  96:9;105:15
**around (5)** 18:3;32:2;
  40:21;46:9;69:22
**arrangement (1)**
  67:11
**aside (1)** 71:13
**aspect (1)** 14:3
**aspects (1)** 102:20
**assessment (1)** 48:13
**assignment (1)** 22:23
**assignments (1)** 23:2
**assume (7)** 8:10;
  21:16;39:23;54:10;
  70:2;72:2;104:22
**assumed (1)** 99:10
**assuming (5)** 21:14;
  28:4;54:23;68:7;69:7
**ASU (1)** 28:10
**attempted (2)** 13:22;
  17:23
**Attorney (4)** 4:5;
  16:18,18;17:5
**audible (2)** 8:22;25:6
**authored (1)** 6:13
**available (2)** 80:22;
  90:11
**average (1)** 60:11
**aware (6)** 32:19,22;
  34:2;54:17,17;55:19
**away (3)** 36:16;
  37:18;90:23

**B**

**baby (1)** 48:4

**back (17)** 5:22;25:7;
  26:21,25;27:23;
  48:16;49:23;59:11;
  60:12;67:3;83:10;
  86:10;90:5;91:3,25;
  98:25,25
**background (1)** 31:14
**bad (4)** 37:9,20;
  79:23;80:1
**badly (1)** 92:7
**balanced (1)** 13:11
**bar (6)** 9:22;74:5,9,
  15;77:14,15
**Barrett (4)** 12:1,2;
  51:12;75:2
**based (9)** 17:11;45:1,
  6;53:2,4,8,25;70:5;
  103:14
**basically (4)** 48:15;
  58:2;64:12
**basis (1)** 21:5
**bathroom (2)** 88:8,15
**Bayless (5)** 20:7;
  48:21,22;49:25;50:2
**Bayless's (1)** 49:10
**bear (1)** 4:22
**beat (1)** 37:10
**became (3)** 15:8;
  16:23;63:7
**become (2)** 66:14,20
**began (1)** 86:23
**beginning (2)** 69:12;
  100:4
**behave (2)** 18:8;79:8
**behaved (1)** 45:11
**behavior (8)** 35:15;
  42:20,21;43:18;46:4;
  52:10;102:4;103:14
**behind (1)** 27:7
**bench (1)** 76:15
**benefit (1)** 46:24
**benefits (1)** 46:13
**besides (3)** 63:11;
  87:5,16
**best (3)** 13:23;66:22;
  77:1
**better (3)** 20:3;61:6;
  68:6
**beyond (6)** 10:17;
  38:20;45:23;49:8,9;
  83:24
**big (1)** 62:21
**bikini (2)** 81:23;82:3
**bill (1)** 58:3
**billing (1)** 16:11
**biological (3)** 33:23,
  24;45:14
**bit (4)** 18:24;30:24;
  45:15;77:21
**bitch (1)** 75:25
**black (1)** 48:4
**Blair (8)** 61:23;63:8;
  65:8,10,11;92:25;

**94:4;95:16**
**blame (1)** 41:2
**blind (1)** 42:18
**blinded (4)** 40:23;
  41:4;42:3,4;57:8,9,18
**blinders (2)** 20:9,16
**blindness (1)** 41:3
**board (4)** 34:14;
  38:14;52:11;99:22
**body (1)** 61:12
**books (1)** 59:21,23
**both (3)** 20:6;67:17;
  69:6
**bottom (1)** 8:18
**bought (2)** 51:18;77:4
**bounce (1)** 77:2
**bounced (1)** 74:17
**boy (1)** 76:11
**Bragg (2)** 59:16,18
**Bragg's (1)** 59:18
**brain (1)** 61:10
**brand (1)** 41:10
**brand-new (1)** 75:21
**Brandon (1)** 43:10
**break (1)** 96:20
**breakfast (6)** 46:15,
  16;85:23;86:5,13;
  88:2
**bring (1)** 67:3
**bringing (2)** 57:3;58:1
**brings (1)** 34:23
**broad (1)** 13:22
**broader (1)** 40:8
**brought (4)** 35:15;
  54:14;99:11;104:19
**Budge (1)** 72:8
**Budge's (1)** 72:19
**budget (1)** 27:20
**building (1)** 97:17
**bullet (1)** 89:19
**burdened (1)** 61:10
**bus (1)** 58:12
**business (6)** 11:10;
  31:24;85:16,18,19;
  103:9
**business-type (1)**
  32:11
**busy (1)** 52:14

**C**

**calendar (3)** 88:17;
  95:7;96:6
**call (4)** 22:6;24:20;
  54:13;92:17
**called (7)** 8:4;22:9;
  27:4;47:3;67:4;77:4;
  88:25
**calling (1)** 21:22
**calls (1)** 26:18
**came (22)** 16:19;
  25:2;26:21;27:13;
  28:14,22;38:13;

P-App. 005788

State of Arizona vs.
Andriano

David DeLozier
November 25, 2013

63:19;67:1;71:10;
97:1,3,5,5,13,15,21,
22;98:3,4;99:22;
104:6
Can (36) 4:25;13:22;
15:11;19:17;24:20;
28:4;30:21;35:5;
39:1;41:5,19;42:18,
19;48:17;51:10;
55:15;61:4;64:12;
66:7;73:24;76:12,17;
80:11,14,22,23;81:3,
7,11;88:25;90:11,15,
16;91:11;96:14;
103:10
capacity (2) 13:24;
19:12
capital (13) 11:19,22;
12:12,19;13:17;18:3;
32:8;47:25;48:5;
58:13,17;59:4,6
cared (1) 103:8
careful (1) 38:22
caring (1) 31:18
carrots (1) 60:25
case (72) 10:4;11:17,
19;13:2,22;14:10,16;
15:4;16:1,19,22;
19:14;24:1,3;26:22;
27:12;30:19;38:8;
40:18,22;42:6,25;
43:1;47:5,11,15,20,
22;48:2,12,15;51:12;
54:19;55:4;57:4;
58:3;62:24;63:1,3;
66:5,13,15,21;70:2;
71:14;72:4,25;74:21;
75:2,11,21;78:4,11,
20,22,24,25;80:8;
83:13;85:19;86:10;
88:6;89:2,3,11;
91:24;93:5;96:25;
98:10;99:10;104:22;
105:3
cases (10) 10:25;
11:23;12:18,25;
13:12,17;57:5;69:6;
98:9,13
cast (1) 41:5
catch (2) 63:6;97:17
Catholic (2) 11:1;52:2
caused (1) 36:4
causing (1) 85:14
celebration (1) 88:19
Certainly (5) 44:4,13,
18,25;71:3
cetera (8) 14:1,1;
18:4,4,4;26:19;
27:16;103:9
chair (4) 12:4,4,6;

48:3
chambers (1) 75:16
change (1) 37:25
changed (3) 8:25;
48:5;102:5
character (1) 14:4
charge (5) 24:13,18,
20,21;27:22
charged (2) 18:2;48:4
check (3) 74:17;77:2;
98:8
Child (3) 10:25;
68:10;83:11
childhood (1) 4:18
children (8) 18:4;
66:18,19,25;68:6,13;
70:16;103:8
chiropractor (1) 92:13
chiropractors (1)
92:14
chockfull (2) 53:11,18
chore (1) 41:18
church (5) 11:1;15:1;
63:11,19,23
Cindy (4) 63:22,23;
65:3;73:3
circumstance (1)
37:22
circumstances (4)
34:19;41:21,22;42:6
civil (2) 11:4;36:2
clad (4) 32:20;82:14,
15,18
claim (2) 33:4;83:7
clarification (1) 80:2
clarify (2) 5:9;68:9
classifications (1)
52:9
classify (1) 46:14
cleansing (1) 46:24
clear (1) 61:17
Clearly (1) 79:21
client (5) 11:10,10;
75:15;76:19;77:7
client's (1) 76:10
close (3) 33:16,18;
43:10
closed (1) 24:2
cluster (1) 23:15
collateral (1) 103:17
Collier (1) 61:17
colored (1) 69:13
coming (4) 35:23;
56:2,8;65:19
commencing (1) 4:8
Commenting (1)
75:13
comments (1) 59:11
commit (1) 77:17
common (1) 46:22
communication (1)
71:17
company (1) 59:20

complete (1) 69:17
completely (2) 52:6;
69:18
complex (2) 40:18;
42:7
computer (13) 6:15;
8:19;78:10,12,14,16,
19;80:7;81:18,19,19,
25;82:1
concerned (2) 18:11;
39:1
concerning (1) 38:23
concluded (1) 105:16
conclusions (2)
40:19;53:15
conducted (1) 105:11
confirmed (1) 45:18
conflict (4) 4:20;
67:15;70:12,13
confused (1) 53:17
conservative (1)
31:12
consider (4) 19:9;
48:1;102:22,25
considered (2) 28:4;
41:3
considering (1) 24:6
constant (1) 36:17
Constantly (1) 37:7
constructive (1) 68:8
consult (5) 22:13;
28:3;55:2,4,17
consulted (3) 54:18;
55:16,18
consuming (1) 60:21
contact (2) 14:21;
102:21
continue (1) 75:23
continuing (1) 65:22
continuous (1) 75:21
contract (2) 11:5;51:9
control (10) 24:9,12;
47:7;49:19;50:8,11,
11,12,13;100:23
conversation (1)
56:14
conversations (13)
8:9;9:1,7,11;26:8;
32:10,11;34:21;40:1,
4;104:7,23;105:6
conviction (1) 75:4
cop (2) 97:6,6
copies (1) 23:23
cops (1) 62:22
copy (2) 80:10,17
correctly (2) 37:1;
65:16
corroborate (2) 45:16,
17
counsel (12) 4:14;
6:5;8:10;52:1;77:16;
93:17,17;94:1;95:4,
4;101:1,16

counseled (1) 37:11
counter (3) 48:21;
49:25;50:2
county (4) 16:4,5;
73:13;76:8
course (4) 13:15;
48:9;80:9;102:11
Court (5) 18:12;
56:11,18;66:7;72:10
covered (1) 28:21
crime (1) 38:17
criminal (9) 10:1;
13:2;36:2;66:13,14;
68:23;70:2;71:14;
74:20
cross (1) 23:5
Cunningham (5)
14:16;64:19,20,25;
65:1
currently (2) 57:25;
84:4
custody (6) 66:5,21;
68:22;72:4,25;83:12

**D**

dah (3) 32:9,10,10
Dan (15) 21:21;
26:21;43:25;44:1;
48:20;49:17;52:15,
24;56:3;58:9,18;
65:20;73:4,10;81:20
Dan's (4) 45:25;
54:13;59:4
Daphne (4) 72:8,13,
19,19
dare (2) 79:14,14
date (3) 81:6;99:21,
22
dates (7) 99:15,17,
19;100:10,17,18,19
daughter (4) 31:9;
33:12,18;59:19
David (4) 27:22;
39:25,25;40:3
day (18) 23:6;32:2;
38:4;47:18;60:8,14;
81:5;87:17,18,19;
88:3,9;94:9;95:19;
96:4,5,7;98:3
daylight (1) 46:20
days (14) 27:5;46:17,
19;56:22;60:9,12,13,
13;61:22;62:19,21;
75:20;87:6;88:4
dead (2) 18:3;21:18
deal (2) 62:21;66:23
dealt (1) 41:21
Dear (1) 76:21
death (2) 14:6;38:1
deceased (2) 51:10;
59:19
December (3) 14:11;

99:13;100:7
decide (2) 15:21;
89:13
decided (4) 15:7;
22:6;27:10;88:12
deciding (1) 27:19
decision (2) 4:12;
73:20
decisions (1) 22:9
declaration (7) 5:7,8,
23,25;6:8;23:25;
98:11
decreased (1) 13:15
deem (1) 94:19
deeper (2) 36:10;
68:24
defend (1) 77:16
defendant (6) 21:10;
81:23;82:3,18;83:9;
85:2
defendant's (2) 14:4;
105:7
defender (3) 27:14;
56:4;58:1
Defender's (4) 27:2,9,
20;102:13
defense (6) 10:1;
12:12;13:10;19:10;
40:16;75:17
defining (1) 85:25
definitely (2) 28:10;
71:21
definition (3) 86:3,6,9
degree (4) 47:24,24;
48:5;98:12
delegated (2) 22:15;
27:24
DeLozier (25) 4:5,24;
5:3,6,9;10:17,20;
19:19,21;20:1;38:20,
25;44:20;50:15,18;
54:22;74:1;75:8;
76:6,9,11;79:7;80:1;
82:10;92:20
Department (3) 62:16,
23;96:25
depersonalization (1)
23:14
deposed (2) 94:23,25
deposition (1) 64:14
depressed (5) 18:5;
34:8;35:6,8,9
depression (2) 34:9,
15
describe (2) 34:7,9
desire (1) 31:9
destroying (1) 38:4
details (1) 83:23
detective (1) 97:7
detrimental (1) 36:15
develop (3) 61:15;
68:17;71:24
developed (9) 42:9;

State of Arizona vs.
Andriano

David DeLozier
November 25, 2013

45:3;52:22;53:21,22;
54:1;70:9;72:24;73:5
**developing (1)** 70:10
**diagnoses (1)** 21:12
**died (1)** 98:14
**difference (1)** 36:9
**different (8)** 45:10;
46:14,14;50:20;
65:25;86:3,4;104:3
**differently (7)** 43:17;
45:11;48:19;49:24;
70:1,2,3
**difficult (4)** 47:22;
48:11,12;50:8
**digestive (1)** 61:10
**digging (1)** 68:24
**direct (1)** 23:4
**direction (1)** 26:9
**directly (1)** 25:14
**disagree (1)** 53:3
**disappointed (1)**
77:11
**disclose (3)** 43:4,6,8
**disclosed (2)** 29:2;
72:17
**discovered (1)** 72:1
**discovery (1)** 88:25
**discuss (4)** 37:14;
67:14;96:25;105:6
**discussed (1)** 71:3
**discussion (5)** 22:4;
26:22;54:11;55:23;
66:2
**discussions (2)** 38:9;
49:21
**dishonesty (1)** 41:25
**disorder (1)** 23:14
**disorders (1)** 23:16
**disputes (1)** 11:5
**dissociative (1)** 23:15
**divide (1)** 26:23
**divorce (3)** 11:11;
14:25;35:21
**doctor (5)** 90:3;92:1,
8,8,12
**doctors (2)** 92:9,11
**document (1)** 41:22
**documents (2)** 6:21;
80:7
**domestic (10)** 13:24;
20:8,10;36:3;39:19;
65:23;102:18,20,23,
25
**domineering (1)**
103:10
**done (24)** 10:22;
12:18;20:7;41:12;
46:1,5;47:8,8;48:19;
49:23;50:7;58:16;
67:20;69:25;70:1;
72:2;84:14,15,16,16;
86:8;91:6;99:4;
100:13

**Donna (10)** 30:17;
42:16;43:6;63:21;
65:3;67:4;69:20;
71:15,17;85:7
**doubt (1)** 28:19
**down (7)** 32:4,8;
37:15;46:10;62:10;
79:15;103:10
**Dr (3)** 18:15,19,21
**draft (2)** 8:13,13
**drafted (1)** 73:3
**drafts (3)** 8:16,20,25
**drive (1)** 58:11
**driving (1)** 62:10
**DSM (3)** 23:19,23,24
**DUI (2)** 35:22;40:15
**dumped (2)** 57:6,11
**during (23)** 10:12;
23:3;31:16;46:19;
60:21;61:17;84:15;
87:6,19;88:12;89:5;
90:3,17;91:11;93:4;
94:5;95:19;96:19;
102:4;104:5,13;
105:2,5
**dynamic (3)** 31:10;
33:10;42:12
**dynamics (1)** 51:16

**E**

**earlier (4)** 78:6;80:9;
82:23;105:8
**early (2)** 17:21;63:14
**easily (1)** 60:12
**East (1)** 81:10
**eat (8)** 46:15,18,19,
20;85:23;86:4;88:20;
89:13
**eight (2)** 57:6,6
**either (6)** 21:5;31:6;
34:2;39:17;40:23;
92:18
**element (1)** 47:3
**else (21)** 7:11;9:19;
25:24;46:18;48:17;
49:23;50:7;54:17;
55:15,20;56:11;
62:17;69:21;72:1;
80:20;87:14,14,16;
91:18,21;105:14
**email (4)** 25:23;78:4,
4;80:5
**emails (5)** 26:18;
29:3;71:15;78:13;
80:8
**emotional (1)** 62:2,4
**end (3)** 88:18,18;
104:6
**ended (4)** 37:17;
71:14;72:11;88:13
**energy (1)** 61:11
**enough (2)** 59:24;

85:24
**entries (1)** 56:21
**episode (2)** 103:6,7
**episodes (1)** 103:3
**equally (1)** 13:11
**Especially (2)** 38:13;
69:22
**essentially (1)** 27:19
**et (8)** 14:1,1;18:4,4,4;
26:19;27:16;103:9
**ethics (1)** 77:18
**euphoria (1)** 61:12
**even (14)** 20:3;26:17;
33:21;53:9,9,11;54:8,
14;56:4,13;62:14;
81:16;90:21;91:11
**evening (1)** 98:6
**eventually (1)** 72:10
**everybody (8)** 15:15;
21:23;27:7;35:18;
51:23;55:20;70:3;
86:4
**evidence (4)** 4:18;
24:6;49:12,17
**evidentiary (3)** 4:10,
13;38:23
**Exactly (4)** 26:12,14;
44:7;89:1
**EXAMINATION (5)**
5:14;17:9;61:17;
78:1;98:16
**examine (1)** 90:16
**examined (1)** 90:11
**example (3)** 31:23;
32:6;38:18;76:18;
85:7
**except (4)** 10:12;
84:7,23;102:2
**excerpts (2)** 23:18,23
**exchange (1)** 71:15
**Exclusively (1)** 22:11
**Exhibit (2)** 5:11,25
**exhibits (4)** 73:22;
101:2,5,7
**Expand (1)** 67:18
**experience (1)** 9:14;
10:2,3;21:9,10;58:13,
17,20,21;59:4,7
**experiences (1)** 68:13
**expert (4)** 4:16;
19:12;26:7;27:4,6;
28:3,5;51:1;102:18;
103:19
**experts (3)** 21:4;
57:14,23
**explain (2)** 19:16;
86:23
**extremely (1)** 61:11

**F**

**face (2)** 25:20,20
**factors (4)** 13:3,7,10,

10
**failing (2)** 4:15,17
**failures (1)** 103:9
**fair (2)** 10:19;19:24
**fairly (1)** 32:12
**faith (1)** 34:25
**fall (1)** 28:16
**false (3)** 52:8;69:12,
14
**familiar (5)** 12:14,17;
41:8;59:16;61:21
**family (24)** 20:9,10,
12;27:10;30:19;
31:10;32:6,15,24;
39:14;42:11;43:18,
19,20,22;45:15;
51:16,19;59:18;
63:11,12;67:19;68:5;
69:23
**far (3)** 31:9;48:16;
77:11
**fast (16)** 47:3,4;
59:11,23,25;60:5,11;
61:5;65:8;85:24;
87:22;89:1,13,15,22;
91:6
**fasted (3)** 46:3;59:12;
85:22
**Fasting (19)** 46:9,14,
16,16,17;47:6;85:15,
17;86:1,3,5,6,9,14;
87:7;88:10,11;90:18;
91:25
**father (3)** 33:18,24;
45:20
**father's (1)** 17:24
**fault (1)** 89:20
**favor (1)** 14:5
**favoring (1)** 60:15
**fee (2)** 16:11;67:11
**feel (7)** 31:20;41:24;
59:22;61:18;68:25;
71:25;79:13
**feeling (4)** 89:14,17;
91:5;92:7
**felt (5)** 32:12;91:9,12,
12,24
**few (1)** 62:19
**file (16)** 5:21;6:3,8,9,
10;23:18,22;24:1,1,3;
29:2,2;66:8;72:11,
20;78:5
**files (1)** 99:5
**finally (1)** 75:20
**find (7)** 23:6;45:16;
51:13;57:4;95:16,17,
20
**finding (1)** 90:21
**fine (2)** 40:10;95:14
**fined (2)** 73:15;73:14
**finish (1)** 100:19
**finished (1)** 75:22
**First (30)** 9:21;11:16,

19;12:4,5,6;15:4,20;
16:18;26:21,21;
46:10;47:24;48:3,5;
52:19;56:1,4,5,14,17;
57:7;60:13;71:6,8,
10;79:4;87:1;95:25;
100:3
**first-degree (1)** 11:16
**fits (1)** 73:17
**five (2)** 57:5;71:18
**flat (1)** 11:11
**flavoring (1)** 60:17,18
**Florence (2)** 32:4,7
**flow (1)** 47:9
**flushing (1)** 69:18
**focus (2)** 40:3;95:5
**folks (3)** 18:2;42:24;
84:4
**follow (2)** 35:11;69:8
**forcefully (1)** 47:2
**foreign (2)** 11:8;67:25
**forget (1)** 52:6
**forgive (1)** 28:20
**forgot (4)** 48:2;70:23,
25;75:14
**form (1)** 18:8
**forth (5)** 44:5;52:7;
67:21,24;71:9
**found (12)** 36:16;
50:19,22,25,25;51:3,
13;74:20;76:19,19,
21;77:17
**four (5)** 7:7;21:5;
50:5;57:5;71:18
**frame (2)** 59:25;100:8
**frankly (1)** 68:5
**friendly (1)** 32:10
**friends (1)** 46:18
**frog (1)** 93:22
**front (3)** 35:19;41:15;
97:16
**fucking (1)** 76:1
**full (1)** 60:19
**function (3)** 61:5,6;
95:6
**fundamentalist (1)**
31:14
**fundamentalists (1)**
31:13
**further (1)** 26:25

**G**

**GARD (23)** 4:25;5:5,
8,10,15,24;9:10,13;
10:23;19:23;20:11;
39:2,6;44:21;50:23;
54:21,24;73:19,22;
74:4;75:7,9;77:19
**gather (2)** 30:17;
103:16
**gave (11)** 18:21;
24:14,16;25:12;

52:18;64:15;73:9;
77:12;105:8,9,9
**general (6)** 10:9;11:4,
6;15:11,24;40:1
**generally (4)** 13:12;
26:9;34:10;68:10
**generous (1)** 31:19
**gets (3)** 51:22;59:24;
89:19
**girl (2)** 48:4;69:23
**given (4)** 5:21;6:13;
58:14;81:20
**giving (1)** 31:19
**glad (1)** 34:20
**glass (2)** 60:19;96:21
**Glendale (3)** 62:15,
22;96:24
**God (2)** 76:13,21
**goes (2)** 13:20;67:23
**good (11)** 30:24;
31:19;34:21;43:20;
44:1,12;51:11;65:22;
67:19;68:1,2
**goods (1)** 58:3
**grandfather (3)** 33:22,
23;34:1
**grandparents (1)**
69:21
**grandparents' (2)**
67:20,22
**granted (1)** 75:22
**grave (1)** 36:9
**grew (1)** 31:13
**grind (1)** 60:25
**grotesque (2)** 48:23,
25
**guard (1)** 37:8
**guess (7)** 13:23;
24:20;31:12;41:23;
52:19;59:20;69:3
**guidelines (1)** 12:15
**guilt (6)** 20:6;38:22,
23;39:3;48:16;52:21
**guilty (3)** 76:19,20,21
**gun (3)** 62:13;
102:22;103:3
**guy (7)** 56:1,1,5;
59:16;63:6;76:18;
97:18
**guys (3)** 11:9;40:7;
49:11

### H

**Hammond's (1)** 75:10
**hand (2)** 103:20,20
**handed (1)** 26:20
**handle (6)** 27:12;
37:23;57:4;58:3;
65:7;72:2
**handled (6)** 11:22;
14:25;50:14;67:22;
70:3;98:9

**happen (1)** 59:3
**happened (3)** 59:2;
62:14;67:7
**happening (4)** 43:19;
71:1;75:3;96:7
**happens (4)** 17:25;
37:8;46:5;77:1
**harm (1)** 31:15
**harmful (1)** 30:23
**hate (1)** 91:10
**hated (1)** 75:17
**head (4)** 56:7;89:20;
102:22;103:4
**health (16)** 28:3,12;
36:15;39:12,15;
46:23;49:11,17;53:2;
54:23;99:9,24;
100:11,25;101:16,21
**healthy (1)** 68:10
**hear (3)** 83:22;91:17;
95:14
**heard (3)** 43:15;56:5;
103:20
**hearing (5)** 4:11,14;
27:6;38:23;41:14
**heck (1)** 48:5
**heightened (1)** 61:11
**held (1)** 74:12
**help (9)** 31:3,9;36:7;
62:23;67:5;70:15,21;
71:4;77:3
**helpful (1)** 30:22
**here's (2)** 52:22;62:8
**heroine (1)** 4:18
**high (3)** 61:15,15;
76:1
**hire (4)** 26:7;27:11;
51:1;52:15
**hired (1)** 51:6
**historically (3)** 26:16;
67:22;76:16
**history (3)** 39:15,17;
68:24
**hit (1)** 62:14
**hobby (1)** 31:22
**hold (1)** 102:22
**home (2)** 97:24,25
**horrible (1)** 77:6
**horse (3)** 31:24,24;
76:1
**hours (2)** 47:1;99:1
**house (1)** 63:4
**huge (2)** 46:24;86:3
**Huh-uh (7)** 32:25;
33:2;39:18;61:1,3;
66:4;74:24
**human (1)** 77:13
**hungry (2)** 60:2,3
**hurt (3)** 35:10,11;37:2
**husband (1)** 18:3

### I

**idea (6)** 19:5;24:3;
52:17;68:6;81:18;
105:1
**identification (1)** 5:12
**idiot (1)** 62:13
**ie (1)** 18:2
**ill (3)** 16:23;61:18;
63:7
**illness (2)** 4:17;17:22
**illnesses (2)** 23:19;
24:6
**immediate (1)** 63:11
**impact (1)** 68:22
**important (2)** 35:4;
89:2
**impression (1)** 36:13
**impropriety (1)** 33:19
**inability (1)** 37:18
**include (1)** 21:24
**included (1)** 20:5
**includes (1)** 98:14
**including (2)** 41:11;
80:8
**incorporated (1)** 47:2
**incorrectly (1)** 37:21
**increased (1)** 13:15
**independent (8)**
64:11;99:6,8,23;
101:3,6,9;102:1
**independently (2)**
16:2;96:8
**indicate (2)** 5:23;
59:12
**indicated (4)** 21:23;
86:18;87:7;88:23
**Indicating (1)** 5:18
**ineffective (3)** 4:14;
74:20,25
**information (11)**
30:18,25;67:17;
69:12,14,15;70:5;
72:23;73:4;103:17,
18
**in-house (1)** 77:5
**injury (1)** 10:20
**input (1)** 22:11
**insight (1)** 47:4
**instead (2)** 62:17;
65:25
**instruct (1)** 4:6
**instructed (1)** 8:5
**instructing (1)** 92:18
**intended (2)** 51:20;
53:24
**interacted (1)** 40:7
**interactions (2)** 17:17;
32:16
**interest (2)** 4:20;
67:15
**interested (1)** 92:14
**interesting (1)** 32:18
**interpersonal (1)**
37:15

**interrupted (1)** 100:4
**interrupting (1)**
100:12
**interview (4)** 5:2;
8:10;23:8;94:25
**interviewed (1)** 49:5
**interviewing (1)** 49:2,
3
**interviews (2)** 23:7,11
**intestinal (1)** 46:25
**intimidate (1)** 79:17
**intimidating (1)** 79:20,
20
**into (12)** 23:20;25:5;
35:14;36:13;39:11;
40:12;47:5;52:16;
65:23;68:24;74:9;
77:14
**investigate (3)** 4:15,
17;51:2
**investigating (3)**
12:17;22:21;24:17
**investigation (4)** 26:8,
13;39:11;68:22
**investigator (5)** 29:7,
20;30:4;38:17;39:3
**involved (17)** 19:14;
26:10;27:3;35:23;
40:18;42:8,24;45:4;
48:14;51:23;54:6,8;
56:23;63:23;66:14,
20;84:10
**involving (4)** 67:21;
78:4;83:8;99:24
**irascible (1)** 76:17
**irrelevant (1)** 92:20
**Ishikawa (4)** 4:11;
27:8,8;57:12
**issue (5)** 18:1;68:16,
17;73:15;83:8
**issues (8)** 4:10;99:9,
24;100:11,25;101:17,
21;105:7
**items (2)** 78:3,19,22

### J

**jail (7)** 15:18,19;16:4,
5;36:16,20,25
**January (1)** 72:11
**Jekubsik (1)** 77:13
**Jerry (3)** 64:20,25;
65:1
**Jersey (1)** 9:23
**job (2)** 36:7;72:13
**Joe (1)** 103:3
**John (1)** 77:13
**joined (1)** 14:10
**Joseph (1)** 20:14
**Juan (7)** 76:24;79:8;
85:6,11;90:20;94:7;
96:15
**Judge (7)** 4:11;41:15;

75:15,19;76:2,19;
90:15
**juice (2)** 60:16,20
**juicer (1)** 60:25
**juices (7)** 86:19,21,
24;87:8,15,16,17
**July (1)** 72:5
**jump (4)** 40:18;93:20,
21,22
**June (1)** 66:8
**jury (2)** 41:16;76:18
**Justin (3)** 61:23;
92:25;94:4

### K

**Kandy (5)** 17:11;
20:22;21:7;23:13;
25:10
**keep (5)** 37:14;57:12;
90:23;100:12,17
**Kelly (1)** 29:5
**kept (1)** 62:13
**kid (1)** 11:11
**kids (1)** 31:23
**killed (7)** 62:9;93:1;
94:5;20:95:17;96:1,6
**killing (1)** 48:4
**kind (24)** 13:2;30:1;
31:17;34:3;38:15;
39:14;40:4,18;41:12;
42:20;43:18;47:6;
51:2;52:10;54:6,20;
60:20;67:21,23;
70:13;83:16,18,20;
88:9
**kinds (2)** 35:24;69:5
**King (2)** 63:15,25
**kiss (1)** 75:24
**knew (13)** 20:2;
21:23;33:15;45:1;
47:5,10;53:8,9;70:5;
83:10;99:5;101:12;
103:11
**knowing (1)** 69:3
**knowledge (1)** 69:7
**known (3)** 52:12;
53:4;69:19

### L

**label (1)** 33:25
**labels (1)** 35:24
**labor (1)** 26:23
**lack (1)** 69:7
**lacked (2)** 69:18,18
**lady (4)** 30:3;51:10;
84:9,24
**Lamberts (2)** 66:24;
67:1
**large (2)** 58:10;77:4
**Larry (1)** 75:10
**last (7)** 30:7;84:9;

State of Arizona vs.
Andriano

David DeLozier
November 25, 2013

85:22;87:3;92:12,15;
95:6
**late (1)** 10:2
**later (3)** 8:25;51:14;
57:5
**laughing (1)** 100:22
**lawyer (9)** 27:5,11,13;
35:14,19;61:22;62:9;
89:19;92:25
**lawyers (3)** 11:9;
75:18;84:19
**lead (5)** 52:1;58:10,
14;100:25;101:15
**learn (3)** 11:12;
41:12;94:13
**learned (2)** 52:7;
103:21
**learning (1)** 11:15
**least (2)** 31:22;38:3
**leave (1)** 16:22
**leaving (1)** 56:1
**led (3)** 57:2;58:15;
59:3
**left (3)** 17:2,4;47:16
**length (1)** 60:11
**lengthy (3)** 59:23,25;
60:5
**Leod (7)** 24:13,17,23,
24;25:15;43:1;65:16
**Leod's (1)** 25:17
**Leon (1)** 16:19
**less (3)** 9:5,6;14:5
**lesser (1)** 14:5
**letter (1)** 18:21
**level (1)** 35:5
**levels (1)** 61:11
**life (4)** 37:7,8;38:1;
40:1
**lightheaded (1)** 61:18
**likely (1)** 63:8
**limit (1)** 49:10
**limited (3)** 4:7;8:3;
19:15
**Linderman (2)** 25:17,
18
**line (1)** 22:8
**lines (1)** 33:20
**list (3)** 6:24;52:19;
103:10
**litigation (1)** 11:4
**little (7)** 18:24;26:25;
36:10;45:15;48:3;
69:22;70:23
**live (5)** 36:17;37:7,
10;42:20;98:1
**living (2)** 36:14;42:16
**locally (1)** 51:8
**located (1)** 81:9
**long (2)** 37:21;73:9
**longer (4)** 18:3;
27:18;52:1;76:15
**longest (2)** 46:6;60:9
**look (13)** 18:12;

23:20;25:4;34:1;
39:8;9;52:16;53:10;
56:21;86:20;90:5,19;
96:6
**looked (6)** 6:18;7:4,5;
8:24;24:10;59:7
**looking (5)** 16:10;
24:5;25:8;66:7;73:16
**looks (4)** 8:17;28:16;
30:18;72:18
**loop (2)** 26:17;47:17
**lose (1)** 47:1
**losers (1)** 76:22
**lost (1)** 62:8
**lot (5)** 17:25;31:16;
32:3;46:23;52:7
**lots (1)** 104:24
**love (2)** 68:8,8
**loving (3)** 31:18;68:7,
18
**lunch (1)** 32:5
**lying (3)** 27:15,15,15
**Lynn (1)** 65:1

**M**

**Mac (8)** 24:12,17,23,
23;25:14,17;43:1;
65:16
**macho (1)** 103:10
**MADL (1)** 8:18
**making (2)** 37:6;
56:10
**malpractice (1)** 10:22
**man (4)** 36:15;37:5;
46:10;103:10
**man's (1)** 103:14
**many (10)** 8:16,20;
9:1;36:22;60:11;
68:12;88:8;97:11;
98:9;104:25
**Margaret (5)** 29:4,5;
30:3,9,11
**mark (1)** 4:25
**marked (1)** 5:11
**marking (1)** 88:17
**MARTINEZ (19)** 5:22;
76:4,8,10;78:2;79:9;
80:3;82:12;92:22;
93:13,15,19,21,24;
94:3;95:8,11;96:11;
105:14
**Mary (5)** 29:3,5;30:2,
9,10
**master's (1)** 21:16
**materials (1)** 72:17
**matrix (2)** 41:7;42:10
**matters (2)** 34:25;
95:5
**Matthew (1)** 84:8
**may (13)** 6:18;22:6;
25:3;32:19;45:14,25;
49:17,18;55:15,18;

69:14;73:15;84:17
**Maybe (3)** 30:8,8;
55:22
**McKenna (2)** 55:5,6
**MD (2)** 91:13;92:15
**MDs (3)** 91:10,16,22
**MD's (1)** 91:17
**mean (20)** 7:2,9;
20:12;23:25;33:13;
38:8;41:16;42:18;
47:10,14,20;48:25;
49:4;51:8;60:10;
66:24;68:23;73:19,
23;86:2
**meaning (1)** 11:4
**means (1)** 13:19
**meant (2)** 5:23;42:3
**meat (2)** 46:17,17
**medical (10)** 10:21;
90:1,6,9,13,17,19,23;
91:6,25
**medication (1)** 18:1
**meet (2)** 15:6;16:2
**meeting (2)** 15:17;
56:7
**meetings (2)** 54:6;
55:21
**member (1)** 19:9
**memories (1)** 52:8
**memory (6)** 7:9;
17:20;49:15;52:8,8;
71:10
**mental (18)** 4:16;
13:24;17:22;38:3,12;
39:12,15;49:11,17;
53:2;54:23;99:8,24;
100:11,25;101:16,20;
105:7
**mention (1)** 32:18
**mentioned (1)** 78:3
**met (8)** 15:4;21:2;
25:19,20;52:20;
56:14,15,17
**Michelle-something (1)**
30:6
**mid (1)** 10:1
**middle (2)** 93:5;95:19
**might (12)** 17:22;
30:10,13,22,23;
56:17;63:13;88:2,3,3,
3,4
**mind (6)** 4:23;59:25;
61:12;77:21;85:16,
18
**mind-boggling (1)**
57:7
**Mindi (1)** 55:9
**minute (4)** 48:6;57:9;
85:10;101:12
**minutes (1)** 75:17
**mislead (1)** 41:24
**misled (6)** 40:23;
41:4;42:3;57:1,2,2

**missing (1)** 86:13
**mission (1)** 35:13
**mitigating (3)** 13:3,7,
10
**mitigation (29)** 12:17,
18,19,24;13:4,18;
14:3;22:21;24:13,14,
18,24;26:7,10,11,20;
28:22;29:16;30:2;
41:14;50:17;51:1;
53:1,20;54:1;56:1;
65:23;73:1;104:1
**Mixtures (2)** 87:15,17
**models (1)** 44:3
**molested (3)** 33:4;
52:2,6
**mom (1)** 63:20
**Monday (1)** 4:2
**month (3)** 62:23;88:4,
19
**months (4)** 28:18;
41:13,14;43:1
**more (10)** 9:5,6;
10:12;26:17;31:12;
37:1;51:16;68:9,10;
92:9
**morning (1)** 85:23
**most (6)** 10:3;11:8;
12:1;40:11;60:1;61:6
**motion (1)** 75:22
**motivated (1)** 31:2
**mouth (3)** 34:18;
96:14;101:19
**move (1)** 37:19
**moved (2)** 9:24;90:22
**much (6)** 6:19;10:11;
19:3;20:3;30:1;
31:15;48:17;77:8;
103:16
**multiple (1)** 68:7
**murder (6)** 11:16;
18:3;47:22;97:18;
98:9,13
**murdered (1)** 61:22
**murders (2)** 10:2;13:1
**Murphy (14)** 20:21,
21;28:6;54:18;55:5;
102:6,11,16,21;
103:13,23,23;104:7;
105:12
**Muslim (1)** 46:19
**muster (1)** 21:17
**myself (4)** 37:19;
38:4;48:14;77:16

**N**

**name (24)** 20:20;
30:5,7;48:6,10;
51:11;53:12;54:14;
55:11,13,14;56:8;
63:21;64:12,22,24;
76:10;84:8,9,10,11;

92:25;97:6;102:2
**named (3)** 29:3;
59:16;84:18
**names (1)** 84:6
**necessarily (1)** 18:9
**need (11)** 7:3;40:3,
12;59:22,22;75:7;
83:5;85:12;91:24;
96:20;100:18
**needed (3)** 13:3;
91:13;103:19
**needs (1)** 11:11
**negative (4)** 35:9,10,
15;36:6
**negatively (2)** 36:5,6
**neither (1)** 51:14;
58:6;77:9
**New (3)** 9:23;41:10;
65:18
**news (1)** 63:5
**next (2)** 34:23;35:21
**nickels (1)** 80:15
**night (2)** 46:20;95:20
**nine (1)** 57:6
**nobody (1)** 56:11
**non-capital (1)** 13:12
**none (2)** 41:11;42:8
**nor (3)** 51:14;58:7;
77:9
**normal (3)** 21:3;
31:19;34:15
**note (1)** 61:16
**notes (2)** 19:8;98:8
**notified (1)** 96:1
**November (1)** 4:2
**Number (4)** 5:11;
47:15,16;63:22

**O**

**object (1)** 82:9
**objecting (1)** 39:4
**Objection (1)** 93:12
**observe (1)** 17:21
**obviously (9)** 11:19;
17:24;20:4;38:6;
40:21;54:10;80:20;
81:1;94:12
**occasions (1)** 60:8
**Ochoa (2)** 30:17;
43:10
**Ochoas (13)** 15:2,7;
16:2;18:25;20:13;
27:15;57:1,21;66:5;
68:21;71:14;72:11;
104:20
**October (4)** 61:20,21;
93:3;96:5
**off (3)** 58:2;68:6;76:1
**office (18)** 24:25;
27:3,9,20;28:2,11,21;
29:22;30:4;58:11;
72:14;81:8,9;89:19;

Coash & Coash, Inc., 602-258-1440

P-App. 005792

State of Arizona vs.
Andriano

David DeLozier
November 25, 2013

97:15,22;98:1;
102:13
often (3) 59:15;60:7,7
old (2) 11:9;62:9
once (1) 55:3
One (56) 4:14,18;
6:10;9:5,6;13:14;
22:21;23:15;25:19,
20;31:6,23;32:8,24;
36:10;38:19;41:6;
45:18;46:5;47:4;
48:9;51:9,10,14;
52:5;53:21;55:22,22;
56:10;59:23;60:3;
62:1;63:20;64:16;
65:25;67:1;68:1,2,
15;71:9;74:17;75:15,
16;76:18;79:4,5,24;
82:22;85:9,25;86:4;
89:18;92:9;96:17;
103:2,7
O'Neil (5) 73:13;74:9;
77:11,14,14
ones (9) 11:25;46:6;
76:15,25;84:12,23;
85:4,10,11
only (15) 16:25;17:4;
28:17;29:23;42:16;
74:3;76:25;84:20,23,
25;85:4,10,11;87:7;
96:17
OPDS (3) 27:4;51:9;
57:12
opening (1) 65:4
opinion (10) 18:6;
20:17,20;27:14;36:7;
40:20,22;44:16;
48:22;50:21
ordered (2) 4:11;
77:13
ordinary (1) 31:21
others (2) 12:7;48:7
otherwise (2) 33:5;
100:8
ought (3) 21:24;
22:18;47:9
out (27) 23:6;26:17;
27:11;31:20,24;35:6,
7;36:8;37:19;47:16;
50:19,22,25;25;51:3,
13,13;57:5;58:2;
63:4;66:23;69:18;
77:17;95:16,17,20;
100:22
outgoing (1) 34:10
outsider (1) 32:15
Outstanding (1) 43:22
outweighs (1) 13:14
over (24) 6:4,5,11;
8:8;24:9,12;27:5,14,
21;39:25;46:5;47:7;
49:19;57:14;66:17;
71:14;88:5,6;94:21;

97:4;98:3;99:14;
101:22,24
overdrafted (1) 77:6
overpaid (1) 77:7
own (5) 23:12;77:5;
85:16,18;89:20

P

packing (1) 83:13
paid (2) 16:7;77:8
pain (1) 27:7
painted (2) 51:17,22
panel (2) 74:11;77:17
paperwork (1) 23:17
paralegal (1) 30:4
paraphrasing (1) 4:12
Pardon (2) 42:18;
76:1
parents (4) 16:7;
70:16,19;71:6
part (20) 17:11;18:9;
27:2;35:13;36:7;
38:6,24;39:2,3;
40:21;43:24;44:14;
58:10;69:23;73:20;
75:23;77:4;85:19;
91:16,22
participated (1) 23:11
particular (2) 41:6,6
particularly (1) 48:12
pass (2) 21:17;49:1
passed (1) 9:23
Pastor (3) 14:16,16;
63:14
path (1) 37:15
Patrick (2) 12:1;25:18
pattern (3) 26:16;
35:15;46:4
Patterson (17) 21:21;
22:1,2,4;24:18;25:12,
13;41:11;56:5,9,15;
58:9;99:10,22;104:6;
105:2,9
pay (5) 67:9;77:13;
80:12,13;104:22
paying (1) 19:3
PCR (2) 7:14,16
PD (4) 28:9;38:13;
54:19;55:3
PD's (8) 24:24;28:2,
11,21;30:3;56:7;
58:11;72:14
pedophilic (1) 68:8
penalty (7) 4:15;20:6;
38:2;41:15;50:16;
52:20;105:12
Pennsylvania (1) 9:22
people (55) 15:18,21;
23:8;26:17;31:16,17,
18;35:4,6,10,11,14,
25;36:4,4,5,7,16;
40:11;42:8;45:4,13,

19,25;46:14,15,16,
23;50:19;51:5,9;
52:2,10,16;55:17;
60:1;63:18;68:7,9,
12;72:2;76:14,17;
83:25;84:1,2,2,3,6,
17,20;85:1;86:4;
97:14,15
per (1) 72:11
perceive (2) 67:14;
70:12
perceived (1) 68:1
percent (1) 10:13
perception (1) 49:4
performance (1)
75:13
perhaps (2) 20:3;43:1
period (12) 38:3;
54:25;55:24;60:4;
66:11;87:6,19;90:4;
91:17,23;99:18,18
periodically (1) 71:15
perpetuated (1) 37:21
person (20) 15:18,19;
26:7;28:12,12,22;
41:7;51:23;52:6;
54:23;56:7;57:25;
65:22;79:6,25;87:25;
102:25;103:19;
104:4;105:11
Personal (4) 10:20;
15:17;39:17;46:8
personality (2) 23:16;
40:6
personally (2) 18:25;
45:5
Peterson (2) 56:9,12
petition (1) 7:16
phase (9) 4:15;38:24;
39:3;41:15;50:17;
52:21,21;104:1;
105:12
phases (1) 20:6
Phoenix (2) 4:1;81:10
phone (4) 15:20;
25:23;26:18;71:8
phonetic (1) 77:13
photograph (2) 63:5;
82:14
photographed (1)
97:16
photographer (1)
31:22
photographs (5)
31:25;32:20;81:23;
82:2,17
photography (1)
32:18
phrase (1) 34:15
physician (1) 91:1
physicians (1) 90:24
pick (2) 43:3;81:6
picture (2) 40:21;

51:17
piece (1) 70:23
pig (1) 46:21
pigs (1) 46:20
Pinal (1) 73:12
places (1) 67:17
played (1) 65:17
playing (2) 52:13;
73:2
please (3) 34:18;
82:20;95:4
pm (4) 4:3;105:17
point (18) 6:10;7:12;
15:20;17:23;20:1;
37:22,23;38:3;48:16;
49:21;52:22;56:6;
60:16;61:18;63:20;
86:18;88:4;104:5
Police (3) 62:15,22;
96:24
position (2) 18:2;
77:12
positive (2) 44:3;
72:23
possible (3) 17:18;
103:17;104:18
post (1) 75:3
potential (1) 70:12
potentially (2) 23:15,
20
Potts (3) 18:15,19,21
PowerPoint (2) 65:18;
73:2
practice (11) 10:11,
14,15,16;15:11,24;
26:4;52:14;58:3;
59:2;77:2
practitioner (2) 10:9;
11:6
predecessor (1)
25:17
predicate (1) 98:22
preparation (1) 42:9
prepare (3) 5:16;
7:22;90:15
prepared (2) 8:11;
65:18
preparing (1) 48:15
present (10) 4:15,17;
23:7;24:6,16;54:10,
11;64:5;82:15;97:13
presentation (3) 13:3;
20:5;89:10
presented (15) 21:8,
12;24:14,16;36:14;
38:10,10,15;43:25;
44:1;47:7,17;49:17;
54:12;70:4
presenting (4) 23:20;
49:11;67:16;72:23
presume (1) 79:14
Presuming (1) 50:13
presumptive (1) 13:11

pretty (2) 32:2;63:19
prevent (1) 68:23
previous (1) 98:9
previously (1) 59:12
priests (1) 52:3
primarily (1) 34:25
primary (2) 10:14,15
prime (1) 62:8
prior (6) 8:9;9:18;
10:3;28:2,11;102:12
prison (6) 36:12;38:1;
45:19;68:12
private (5) 27:11,13;
29:20;58:2;77:2
privilege (7) 4:6,8,9,
19,22;8:3;74:3
pro (1) 72:11
Probably (10) 10:7,8;
11:8;14:7,9,25;20:6;
21:17;51:8,15;60:9;
69:22;70:25;97:14;
105:4
probation (1) 76:20
problem (5) 31:6;
40:22;67:25;74:1;
85:3
problems (5) 35:25;
36:4,4;39:15;93:9
procedure (1) 88:1
proceeding (1) 64:15
proceedings (3) 4:9;
77:24;105:16
process (2) 29:22;
77:15
products (1) 59:20
promises (1) 56:10
prompted (1) 102:21
propensities (1) 14:4
proportionally (1)
13:15
prosecution (2) 13:9;
94:5
prosecutor (1) 75:16
provide (3) 90:7,9,10
provided (1) 30:24
psyched (1) 60:5
psychologist (1)
54:23
psychologist-type (1)
28:12
psychology (1) 21:16
Public (8) 27:2,9,14,
20;56:3;58:1;73:24;
102:12
purpose (3) 5:1;46:7,
8
purposes (1) 29:16
pursue (1) 39:23
pursuing (1) 65:21
put (12) 22:19;34:17;
35:24;40:20;47:14;
60:19,20;63:5;69:1;
96:14;97:17;101:19

Coash & Coash, Inc., 602-258-1440

P-App. 005793

State of Arizona vs.
Andriano

David DeLozier
November 25, 2013

**puts (2)** 13:9,10
**putting (1)** 103:3

**Q**

**qualifications (1)**
21:15
**qualified (1)** 21:14
**QuickBooks (1)** 77:4
**quite (2)** 41:18;47:1

**R**

**raise (2)** 79:3;85:12
**raised (1)** 79:4
**raising (1)** 85:15
**range (1)** 13:16
**ranted (1)** 75:16
**raved (1)** 75:17
**read (4)** 65:13;98:25,
25;100:1
**reading (1)** 73:3
**real (2)** 67:25;76:22
**really (9)** 4:12;34:22;
36:14;56:11;61:7,14;
76:12;77:3;85:12
**reappointed (1)** 28:2
**reason (15)** 16:24,25;
17:16;27:2;35:2,3;
36:24;45:5;49:16;
65:9;72:15;88:24;
89:9;94:24;102:16
**reasonably (1)** 52:12
**reasons (3)** 46:24;
89:18;99:2
**recall (25)** 8:20,23;
9:1;23:10;24:4,5;
26:2;28:24;39:13,16,
18,24;49:14;65:20;
66:22;73:8;75:1;
76:12,13;77:10;82:5,
6,11;96:8;104:8
**receive (1)** 72:19
**received (1)** 90:16
**recent (2)** 10:3;12:1
**recently (2)** 32:21;
60:9
**recess (1)** 77:23
**recognize (2)** 18:10;
64:12
**recollection (17)** 8:24;
30:14;56:20;64:11;
67:6;81:24;93:9,10;
99:4,7,8,23;101:3,6,
10;102:1;104:14
**record (9)** 5:9;49:14;
58:5;73:24;80:4,6;
94:7,12,16
**recorded (1)** 9:7
**recordings (1)** 9:11
**records (7)** 16:11;
30:13;90:6,9,13,20,
23

**references (1)** 29:3
**referred (2)** 14:15,22
**referring (5)** 5:4;
12:25,25;42:12,13
**reflects (2)** 80:4,6
**refresh (1)** 30:13
**refusing (3)** 92:23;
94:11,13
**regard (7)** 88:11,21,
23;91:5;93:25;94:4;
104:19
**regarded (1)** 13:2
**regarding (3)** 4:16,18;
23:19
**regardless (1)** 35:4
**regular (9)** 90:24;
91:1
**regularly (1)** 25:7
**reimbursement (1)**
77:8
**related (3)** 64:20;
78:19,22
**relates (1)** 4:9
**relations (1)** 37:16
**relationship (6)**
33:11;83:8,15;84:13,
18;85:2
**relevance (2)** 73:18;
92:16
**relevant (1)** 58:13;
95:5
**relief (2)** 36:19;75:4
**relieved (4)** 27:18;
36:15,20,24
**religion (2)** 34:25;
37:14
**religious (1)** 46:8
**rely (1)** 26:11
**relying (1)** 42:1
**remember (83)** 7:10;
8:14,15,16;9:3,4;
10:5,6;12:8;14:13,19,
24;16:1;17:18,19,24;
18:23;22:1,3,3;
28:14;29:8,14,15;
30:5,6,10;32:23;
33:25;38:16;52:13;
55:11,12,13,14,23;
56:4,8,13,16;64:5,7,
24;67:10,11;72:6,7,9,
20;76:6,7,13,25;78:6,
8;81:13,21;82:8,13,
17;83:1;84:9,11;
86:21;88:7;93:11;
95:18,21,22,25;96:3;
97:4,6,16;98:11;
99:12;101:14,14,15,
16,20;105:10,13
**remote (1)** 52:5
**repeat (1)** 86:16
**repeated (1)** 100:5
**report (4)** 25:7;53:14,
18;54:4

**REPORTER (3)**
44:19;79:5,24
**represent (1)** 83:11
**representation (3)**
4:21;40:13;68:21
**represented (2)**
12:10;55:1
**representing (2)** 52:2;
84:4
**repressed (1)** 52:8
**request (1)** 17:8
**requested (3)** 98:16,
19;99:2
**requests (2)** 79:5,24
**research (2)** 46:9;
84:14
**researching (1)** 24:5
**resolution (2)** 73:12,
14
**response (2)** 8:22;
25:6
**responsibility (1)**
71:25
**responsible (3)**
70:10;74:12,13
**rest (2)** 38:1;60:20
**result (1)** 40:15
**retain (1)** 15:7
**retained (6)** 15:8;
18:25;38:19;66:21;
67:8;99:21
**retaining (1)** 39:2
**re-tool (1)** 41:19
**return (2)** 26:18,18
**revelation (1)** 43:14
**review (3)** 5:16;6:7;
7:11
**reviewed (3)** 7:13,16;
23:8
**reviewing (1)** 23:10
**Rich (2)** 29:10,12
**Right (97)** 5:10,25;
6:12;7:11,22;8:9;
9:16;14:13,14,17;
16:12,14,15,16;
17:12;18:16,22;19:1;
20:25;22:17,22;
23:18;24:19,25:1;
28:1,9,12,15;29:21;
30:17,18;33:23;36:9;
37:25;38:25;39:5,5;
41:8;44:6,10,11,15;
45:2,6,20;47:12;
48:10;49:13;52:19;
53:16;54:3,5;55:10,
25;57:16,24;58:19;
59:9,25;61:16,23;
62:20;63:10,16;64:1;
65:18;66:12,16,19;
69:24;70:17;73:7,11;
76:2;77:3;81:13;
82:13;84:22;85:9,12,
15,17;87:17;89:16,16,

22;93:3,6;94:18;
95:3;96:13;98:17,20;
99:19;102:3,7,20;
103:5
**rights (2)** 67:20,22
**Ring (1)** 41:8
**road (2)** 62:11;81:10
**Robertson (3)** 29:10,
12,17
**rock (1)** 41:5
**rocks (1)** 41:19
**Rohde (20)** 17:11,13,
14,14;18:11,24;21:7;
22:1,4,23:13;25:10;
28:4;34:2;50:1,3;
53:16,25;55:5;
104:19;105:6
**Rohde's (4)** 18:21;
22:2;33:21;53:10
**role (10)** 19:15;
26:24;27:18;29:18;
44:3;51:24;52:14;
65:17;70:25;73:1
**roles (1)** 52:4
**Rosengard (5)** 53:12,
13;54:3,16;55:5
**rosy (1)** 51:17
**routine (1)** 59:14
**rowing (1)** 56:23
**royal (1)** 27:7
**rub (1)** 80:15
**rude (1)** 100:21
**Rule (6)** 17:9;18:13;
98:16;99:3;101:11,
13
**running (1)** 59:19
**rut (3)** 36:8,9,11

**S**

**safe (2)** 37:1,2
**same (15)** 15:14;
22:8;34:14;35:14;
37:15;41:16,17,18;
55:25;67:16;82:23;
88:9;100:5;103:23;
104:4
**saw (8)** 17:17;81:22;
91:3;99:9,24;100:25;
101:11,21
**saying (8)** 37:24;
39:25;40:17;41:6;
53:19;69:13;96:12;
98:13
**scale (2)** 13:6,20
**scanned (1)** 6:16
**scantily (4)** 32:20;
82:14,15,18
**scary (1)** 47:19
**scenario (1)** 51:21
**scene (1)** 38:17
**schedules (1)** 99:12
**scope (7)** 4:6,22;8:7;

10:17;49:8,9,10
**Scott (2)** 24:12,17
**scream (1)** 37:9
**script (1)** 65:4
**second (6)** 12:4;
16:17,18;47:24;56:1;
98:11
**second-degree (2)**
10:2;13:1
**seeing (2)** 50:5;82:13
**seeking (1)** 47:4
**seem (2)** 31:2;93:9
**seemed (6)** 31:17;
33:15;59:11;63:13;
64:2,2
**seeming (1)** 34:8
**seems (3)** 17:11;
41:24;45:18
**self-perpetuating (1)**
35:8
**sense (5)** 31:11;
32:14;36:19;59:1;
69:9
**sent (2)** 27:5;83:12
**sentence (3)** 13:12;
14:5,5
**sentencing (10)**
13:16;21:7;39:7;
48:18,20;50:14,17;
65:21,23;72:23
**separately (1)** 67:9
**September (4)** 28:16,
17;56:17;99:13
**series (1)** 95:6
**serving (1)** 29:23
**set (1)** 41:20
**seven (3)** 28:18;60:9,
10
**several (1)** 51:5
**sex (2)** 10:25;83:8
**sexual (7)** 83:8,14,19,
20;84:13,18;85:1
**sexually (1)** 33:5
**Sharon (11)** 20:21,21,
23,23;28:6;102:6,11,
16;103:13,23,23
**Shawn (1)** 63:25
**ship (1)** 50:20
**shooting (2)** 62:13,14
**shot (1)** 93:1
**show (1)** 57:13
**shows (1)** 31:25
**shut (2)** 100:18,22
**significant (4)** 69:5;
88:8;89:10,12
**silly (3)** 7:2,3;88:22
**sit (2)** 27:22;79:15
**situation (4)** 37:18,20;
40:25;67:21
**situations (1)** 68:16
**six (2)** 28:18;41:13
**society (1)** 35:24
**sold (1)** 58:4

State of Arizona vs.
Andriano

David DeLozier
November 25, 2013

solve (2) 62:23;63:3
somebody (16) 15:1;
18:13;45:18;48:21;
52:3;53:11;57:3;
58:16;62:16,17;64:2;
66:23;73:2;80:20;
84:8;98:14
somebody's (2)
14:25;72:14
someone (6) 18:11;
29:3;49:25;72:1;
80:16,22
sometime (1) 25:3
somewhat (1) 31:14
somewhere (3) 9:19;
18:18;69:21
son (2) 62:6;75:25
soon (1) 43:2
Sorry (9) 28:25;
30:11;44:19,20;
46:20;53:23;68:9;
70:24;76:23
sort (8) 17:22;26:22;
31:13;32:15;34:23;
41:25;47:16;83:8
sound (1) 16:15
sounds (3) 14:13;
63:16;66:12
sources (1) 103:17
southeast (1) 56:8
Spanish (1) 30:5
speak (7) 7:23,25;
25:23;58:12;79:6,25;
102:10
speaks (3) 94:7,12,16
special (1) 58:2
specialist (3) 24:24;
26:11;57:4
specific (4) 25:4,5;
29:1;101:16
specifically (3) 16:1;
81:14,21
specifics (1) 15:9
speeding (1) 35:22
spend (1) 77:15
spent (1) 37:5
spiritual (2) 47:3,4
spoke (5) 64:23;
102:6,11,12,16
spoken (3) 7:22;
71:13,19
spousal (1) 13:23
stand (1) 48:23
start (5) 35:9;37:24;
60:2,14;90:21
started (10) 16:17;
19:6;42:25;43:2;
46:10;47:5;52:1;
66:8,9;94:20
starting (2) 10:1;
51:25
state (1) 32:9
statute (1) 67:23

stay (1) 35:8
step (1) 5:22
stick (2) 32:1;53:16
sticky (2) 73:15,16
still (14) 12:9;14:20;
19:14,19;41:23;
42:20;50:15;51:12;
53:14;59:6;62:4,22;
63:6;101:23
stop (16) 62:17;75:5;
79:12,19;87:22,23,
23,24;88:1,2,12,16,
16,20;89:14;94:1
stopped (2) 62:19;
89:1
stopping (1) 89:12
stops (1) 87:25
story (3) 15:8;86:16,
17
straighten (1) 35:6
strategic (2) 44:14,24
street (1) 58:2
strength (1) 37:19
Stress (1) 65:11
stress-related (2)
62:3;63:8
string (1) 67:6
stuff (11) 6:15,19;
22:2;33:21;51:2,13;
53:10;68:19;90:23;
103:20,21
stupid (2) 94:17,19
stupidest (1) 94:8
subject (1) 4:10
submitted (1) 7:14
substituted (1) 7:23
suffered (1) 23:14
suggest (2) 41:24;
52:15
suggestions (1) 52:18
suicide (1) 17:23
summer (1) 28:15
suppose (2) 20:1;
75:4
supposedly (1) 90:18
suppressed (1) 52:8
Sure (21) 21:14;
28:19;31:1;36:21;
37:6;38:11,11;39:21;
58:6;59:13;61:6,8;
63:19,24;65:10;67:4;
70:15,21;100:24;
104:24;105:8
suspected (1) 45:13
system (2) 77:4,6

T

tainted (1) 69:6
talk (19) 9:25;15:19;
17:8;18:24;21:21;
24:23;33:10;34:22,
22;35:20;37:13;38:8;

39:14,19;48:18;
63:10,13;77:1,25;
77:21
talked (14) 28:6,11;
34:8,24;38:6;45:15;
52:25;57:9;63:25;
64:3,19;83:9;84:23;
103:13
talking (6) 54:22,25;
59:4;71:8;78:9;100:8
task (1) 22:21
tasks (2) 22:15;25:4
team (4) 19:10;55:3,
18,21
teenager (1) 68:11
telling (11) 22:1;
38:17;68:2;78:6,8;
88:1,16;97:3;100:16,
17,22
ten (2) 57:6;60:13
tend (1) 15:14
term (1) 13:18
terms (20) 4:6;9:14;
33:13,14;34:10;39:7;
40:13,14;45:12;
50:16;58:9,9;60:1,3,
10;76:16;83:11;87:7;
91:6,25
terrible (1) 68:13
testified (1) 55:9;
103:24
testify (3) 20:4,20;
50:6
testimony (1) 4:16
Texas (1) 9:21
theme (5) 44:8;53:1,
20;54:1;65:23
theory (2) 65:21,24
Thikoll (3) 16:19,21,
22
thinking (3) 37:20;
60:2
third (2) 85:6;100:1
though (5) 49:11;
56:24;63:24;77:3;
98:19
thought (14) 21:15,
24;22:18;32:15;
43:17,20,24;47:9;
52:18;53:23;67:16,
19;102:8,8
three (7) 21:5;41:13;
42:25;61:22;62:21;
77:9;85:1
three-judge (2) 74:11;
77:17
throw (2) 41:19;48:24
thrown (1) 90:23
ticket (1) 35:22
times (4) 7:7;36:22;
88:8;97:11
tired (1) 27:8
title (1) 24:21

today (12) 5:17;7:12,
23;11:9;46:15;60:7;
69:15,20;75:24;
82:23;85:22;102:4
together (4) 15:21,22;
27:9;80:15
told (43) 18:11;22:12,
18,25;23:3,13;25:2,
10;27:10,10;32:5,6,
24,24;41:16;47:18;
54:9;57:22;58:5,24;
64:8,10;66:1;69:4,
20;80:24,25;84:1,6,
12,14,17,20;85:1,8;
95:17,23;96:4,17;
101:13;103:2,15,15
tolerable (1) 38:3
Tom (1) 63:15
took (5) 9:22;27:14;
72:13;87:8,17
topics (1) 4:13
torment (2) 36:18,18
tract (2) 46:25;47:1
traffic (1) 10:21
trainings (1) 12:11
traits (1) 31:20
transcript (1) 23:10
transcripts (1) 23:8
trial (30) 4:14;19:15;
23:3;24:22;31:16;
42:9,25;45:13;46:3;
51:25;52:11;56:23;
60:22;62:17,19;
63:19;86:11;88:12,
13;91:12;93:1,5,25;
94:6,20,21;96:4;
98:3;102:4;104:6
trials (1) 10:12
tried (2) 37:13;103:16
trouble (7) 35:4,5;
47:5,11,11,15,21
troubling (1) 12:9
true (3) 27:17;58:25;
103:16
trusting (1) 34:11
trusts (1) 11:3
truth (4) 68:3;69:4,7,8
truthful (1) 69:16
try (4) 40:20;45:16;
47:6;48:12
trying (7) 28:14;30:8;
32:14;63:6;74:6;
76:24;97:17
turn (1) 90:15
turned (5) 6:4,5,10;
32:8;74:9
turns (1) 77:14
TV (5) 62:15,23;63:5;
97:15,17
twice (1) 90:22
two (11) 4:13;12:8,9;
21:5;55:22;60:8;
62:21;66:17,17,19;

98:25
typically (5) 15:19;
29:22;41:13;59:22;
61:4

U

ultimately (1) 103:24
under (1) 90:1
unfolded (1) 71:11
unless (1) 101:11
unlikely (1) 28:18
unusual (3) 18:9;
32:2;36:17
unusual-type (1) 34:9
up (16) 26:25;31:13;
35:19;37:17;43:3;
48:24;52:22;54:15;
56:6;57:13;59:7;
60:5,25;72:11;
100:18,22
upbringing (3) 44:1,
12;72:24
upset (2) 37:6;79:21
use (7) 22:1;29:12;
42:2;46:21;56:6;
72:24;75:2
used (19) 19:16,18;
21:6;29:12,17;30:2;
34:14;38:18;49:19;
50:1;63:4;71:15;
73:19
using (3) 28:23;
72:22;77:5
usually (1) 23:5
utilized (1) 52:4

V

vague (1) 54:20
Valley (3) 29:7;32:7
variety (2) 46:13;
59:20
various (1) 32:1
viable (3) 53:1,6,19
violating (1) 76:20
violation (1) 77:18
violence (10) 13:24;
20:8,10;36:3;39:20;
65:23;102:18,21,23,
25
visiting (1) 71:9
voice (3) 79:3,4;
85:13

W

Wagner (1) 81:10
Wait (1) 85:10
waiting (1) 41:13
waiver (7) 4:7,7,9,19,
22;8:7;70:13
waste (1) 57:13

Coash & Coash, Inc.,  602-258-1440

**wasting (1)** 27:21
**water (6)** 60:14,15; 87:11,15,16;96:21
**way (15)** 14:2;21:18; 22:19;34:14;37:7,10; 40:7;47:9,14;52:20; 57:12,22;69:1;70:4; 92:18
**ways (2)** 32:3;46:14
**weak (6)** 89:14,17,20; 91:5,9,12
**week (6)** 57:13; 60:13;87:1,3;88:3,18
**weekly (1)** 21:5
**weigh (2)** 13:20;14:4
**Wendi (18)** 20:2,13, 14;31:3;32:20;33:1, 3,4;40:2;49:1;57:2, 15,15,21;70:15; 83:16;93:4;94:5
**Wendi's (2)** 63:20; 103:3
**weren't (5)** 32:22; 34:2;49:3;54:6,17
**Wess (1)** 56:12
**What's (15)** 8:1; 10:14;13:4;20:20; 24:3;27:24;30:21; 47:17;63:21;73:18; 81:17,18,24;91:23; 95:25
**Whe3re (1)** 81:9
**whenever (2)** 56:2; 80:18
**Whereupon (5)** 5:11; 77:23;79:5,24; 105:16
**wherever (2)** 35:15; 36:8
**whole (8)** 40:21,25; 41:7,20,20;50:20; 86:16,17
**whomever (1)** 70:9
**wife (4)** 62:6;64:21; 71:16;97:14
**willing (1)** 46:7
**Wills (1)** 11:3
**withdrew (1)** 72:4
**withhold (1)** 76:24
**within (2)** 13:16; 66:11
**without (2)** 97:15; 100:17
**witness (4)** 48:23; 54:12;93:18;94:2
**witnesses (2)** 7:13; 49:20
**wondering (1)** 74:2
**word (4)** 13:23;42:3; 52:19;69:17
**words (5)** 34:17; 35:20;37:2;96:14; 101:19

**work (4)** 15:21,22; 103:8,9
**worked (6)** 30:3;59:8, 10;62:22;65:14; 66:23
**working (2)** 62:25; 63:1
**world (1)** 40:12
**worried (1)** 37:8
**worth (1)** 75:25
**write (6)** 7:8,9;65:3; 104:12,12,17
**writing (1)** 46:10
**written (3)** 59:21; 70:13;104:15
**wrong (4)** 18:5;62:10; 74:14;91:23
**wrote (4)** 6:8;7:8,10; 65:13

## Y

**year (2)** 9:17;41:14
**years (9)** 14:21;21:5; 46:5;50:6;62:9; 71:18;84:15;101:22, 24
**yell (1)** 37:9
**yes-or-no (1)** 92:6
**Yesterday (1)** 85:23
**young (2)** 62:8;68:11
**younger (1)** 11:9

## 1

**1 (3)** 5:11,25;47:15
**1:28 (1)** 4:3
**11 (6)** 17:9;18:14; 98:16;99:3;101:11, 13
**13 (1)** 63:23
**14 (2)** 101:22,24
**15th (1)** 60:14
**17 (2)** 93:3;96:5
**18 (1)** 46:25
**1850s (1)** 32:7
**1978 (1)** 9:15

## 2

**2 (1)** 47:16
**20 (2)** 9:5,6
**2000 (2)** 14:11;99:13
**2000-September (1)** 100:7
**2001 (6)** 28:15,16,16; 66:8;99:13;100:7
**2002 (1)** 72:5
**2003 (1)** 51:25
**2004 (6)** 25:3;56:2; 61:20;72:12;90:19; 93:3
**2011 (1)** 66:8

**2013 (1)** 4:2
**20-some (1)** 11:3
**20th (3)** 61:20,21; 63:7
**24 (1)** 46:25
**25 (2)** 4:2;10:13
**29 (1)** 62:9

## 3

**3:08 (1)** 105:17
**30 (4)** 10:13;46:19; 75:17,20
**30,000 (1)** 16:13
**3019 (1)** 81:10

## 4

**40 (1)** 60:12

## 5

**5:00 (1)** 81:11

## 7

**70 (2)** 87:6;88:4
**74 (1)** 9:21
**75 (2)** 9:22,22
**76 (1)** 9:22

## 8

**8:00 (1)** 81:11

## 9

**90s (2)** 10:1,2

EXHIBIT K

000004365

Page 1 of 4

## MESA POLICE DEPARTMENT CONTINUATION REPORT   DR# 20011210670

On 050101 at 1719 hours I responded to 4450 E. Main reference a Fraud.  Upon arrival I spoke with Roxanne Altamirano, who advised the following:

Roxanne told me that a fraud had been committed at the Compass Bank.  She advised me that it occurred at approximately 1250 hours while she was at lunch.  She advised me that one of the bank tellers, Jennifer Muir, actually dealt with the incident.  I spoke with Jennifer and she advised me that a black female dressed in navy blue hospital scrubs came to her window and presented two checks from Arizona Retirement Center, both in the amount of four thousand five hundred dollars.  Jennifer said the female ( who identified herself to Jennifer as Cynthia Edwards) requested to purchase two cashiers checks made payable to the name Oloughlin.  Chad advised Jennifer that the cashier's checks could only be made out to the name purchasing them.  Jennifer returned to her window and explained this to Cynthia.  Cynthia told Jennifer she would go ahead and cash them.  Jennifer took the checks to Chad and he advised her to cash them.  He told Jennifer to set the checks aside so Roxanne could sign them when she returned.  Jennifer then went to the vault to get the money.  She returned to her window and counted out the money for Cynthia.  Cynthia took the money and left the building.

Roxanne advised me she was notified of the incident when she returned from lunch.  She said she looked at the checks and thought there was something wrong with them.  Roxanne called the Arizona Retirement Center and was advised that they knew nothing about the checks and had no one on their staff named Cynthia Edwards.  Roxanne then called her security department and reported the incident.

I was unable to speak with Chad because he was already gone when I arrived.

Roxanne turned over the security tape to me and I placed it into Mesa P.D. Property as evidence.  Roxanne also gave me copies of the two checks.

Cynthia is described as a black female, 5'6, 150-160 lbs, black hair and brown eyes.  Jennifer advised me that Cynthia wore large eyeglasses.

A Pims check was completed and I could not find a Cynthia Edwards matching the description.

No Further Information.  Request CID follow up

| OFFICER NAME & SERIAL # |
| --- |
| FRASIER #13845 |

MPD 004  Rev 3/91

000004366

K000000001

MESA POLICE DEPARTMENT CONTINUATION REPORT | DR# 20011240460

**NARRATIVE:**

On 050401 at 1330 hrs I went to Compass Bank located at 4450 E. Main St. in Mesa to investigate a suspect attempting to pass a forged check. I arrived and spoke with Officer G. Adams #7679 who had S/Cynthia Edwards in an office in the bank.

Officer Adams #7679 gave me Cynthia's Arizona driver's license and the check she was attempting to cash.

I asked Cynthia to explain to me what was going on and she told me she is a clergy for the prison system. She told me an inmate, I/ Beverly Audande, asked her if she would take checks from her daughter and cash them for her. Cynthia said Beverly told her that her daughter, P/Amber Troub who is 16 years old, did not have any form of identification and could not cash the checks. Cynthia said she agreed to help Beverly and Amber by cashing the checks and giving Amber the cash. Cynthia said she met with Amber on US-60 at Alma School and got two checks on 050101 at approximately 1230 hrs. Cynthia stated she got the checks from Amber and cashed them at the Compass Bank on 050201.

Cynthia told me she received the check she was attempting to cash today from Amber at the Boys and Girls Club loacated at Gilbert and Elliot. She told me Amber met her there on 050201 because the person that was driving Amber would not take Amber to Cynthia's house. Cynthia wrote a statment which is attached.

I spoke with W/Sahba Omair who is the bank teller Cynthia presented the check to and she told me, she ran the check through the bank's system and it indicated the account was "frozen". She said she told Cynthia about the freeze on the account and Cynthia acted surprised. Sahba said she asked her manager, Roxanne Altamirano to assist her in explaining the situation to Cynthia. Sahba wrote a written statement which is attached.

Roxanne told me she recognized Cynthia as the same person who was in the bank cashing high dollar checks on 050201. Roxanne told me both the checks cashed on 050201 by Cynthia are fraudulent. She told me they verified with the account holder, Arizona Retirement Centers, Inc., that the checks were not written by them and they did not know Cynthia Edwards. Roxanne told me the other teller working today, P/Jennifer Muir, is the teller who waited on Cynthia on 050201. A police report was made on 050201 regarding these two checks (DR# 20011210670).

OFFICER NAME & SERIAL #
G. Daniels #14130

MPD 004   Rev 3/91

K000000002

**MESA POLICE DEPARTMENT CONTINUATION REPORT** | DR# 20011240460

I spoke with Jennifer who told me she recognized Cynthia as the person who cashed the two checks on 050201. She told me the checks totaled $9000.00. Jennifer wrote a statement which is attached.

Detective K. Carroll #4692 responded to the Bank and took over the investigation. He interviewed Cynthia and during the interview he asked me to contact Amber with a phone number provided by Cynthia. I called the number and spoke with a female who identified herself as Amber Troub. Amber told me she knew Cynthia as someone who knows her mother, Beverly, who is in prison. Amber denied any knowledge of checks or any type of activity involving the checks. Amber told me her mother has not mentioned anything about passing checks to Cynthia to get them cashed. Amber told me she has a Arizona picture driver's license and would not need help cashing checks. Amber told me her mother was in Estrella Jail for forgery and fraud charges (her booking number is A650360).

I gave the information I received from Amber to Detective Carroll #4692 who was still interviewing Cynthia.

I was then asked to contact Northwest Bank and Trust and ask them about two checks Cynthia told Detective Carroll #4692 she cashed at that bank. I called the bank and spoke with P/Deborah Kaya who immediately recognized the name. She told me Cynthia was in the bank on 050101 and cashed a check for the amount of $4500.00 and was in the bank again on 050201 and cashed a check in the amount of $5000.00. Deborah told me the checks were created with a computer and were not printed on the same paper as the checks issued by the bank. She told me the police did respond and gave her a case number (DR# 20011220550).

Detective K. Carroll #4692 ended his interview with Cynthia and I placed Cynthia into custody charging her with three counts of presenting a forged instrument. I transported Cynthia to the Mesa holding facility where she was booked into jail.

Cynthia's husband, James Edwards, came to the central station and all Cynthia's personal items were released to him per Cynthia's request. Cynthia's car was left parked at the bank and keys were given to James Edwards per her request.

Detective K. Carroll #4692 seized all evidence in this case at the holding facility.

CLEARED ARREST.

| OFFICER NAME & SERIAL # |
| G. Daniels #14130 |

MPD 004   Rev 3/91

Page 1 of 7

## MESA POLICE DEPARTMENT SUPPLEMENTAL REPORT

**DR#** 20011240460

| TYPE OF ADDITIONAL INFORMATION: | CONTINUATION ☐ | INFORMATION ONLY ☐ | CLEARANCE ☒ |
| --- | --- | --- | --- |

| CRIME/INCIDENT CODE# 13-2002.A3 | A C | CONNECTING DR# 20011210670 |
| --- | --- | --- |

| CRIME/INCIDENT | DATE & TIME OF REPORT | GRID | BOOKING # | BOOKING POI # |
| --- | --- | --- | --- | --- |
| Forgery | 050401  1340 hrs. | AA22 | 265661 | |
| LOCATION 4450 E. Main, Mesa, Az | | | | |

**PERSON INVOLVED**

| TYPE S | P | NAME: LAST, FIRST, MIDDLE Edwards, Cynthia, La Vern | | | | CITES# | CODE# |
| --- | --- | --- | --- | --- | --- | --- | --- |
| SEX F | RACE B | ETHNIC N U | DOB | HT 502 | WT 135 | HAIR Blk | EYES Brn | SCARS/MARKS/TATTOOS |

| ADDRESS, CITY, STATE, ZIP CODE 323 E. Park Ave., Gilbert, Az 85234 | | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| PHONE/HOME 480-633-8313 | PHONE/WORK 480-396-9222 | SSN | | DRIVER'S LICENSE # | ST AZ | CL D |
| HAND USE — | MASK — | HAT — | BUILD 02 | GLASSES — | FACIAL HAIR — | HAIR STYLE/LENGTH — |
| PHYSICAL CONDITION — | CLOTHING 01 | TEETH 09 | COMPLEXION — | SPEECH 08 | TYPE OF INJURY 08 | PHOTO/POLAROID ☒ YES ☐ NO |

| CLOTHING DESCRIPTION OF SUSPECT/RUNAWAY/MISSING ADULT pink sweatpants and pink t-shirt |
| --- |

**NARRATIVE**

On 050401 I was assigned this case for follow-up investigation and possible submission to the Maricopa County Attorney's Office for review. On 050401 at approximately 1400 hrs. I received a call from Officer Clark #4373 advising that he and Officer Daniels #14130 were on a forgery call at the Compass Bank located at 4450 E. Main in Mesa. They had s/Cynthia La Vern Edwards detained for presenting counterfeit Compass Bank check #153646, written on the account of Arizona Retirement Centers, Inc. and made payable to Cynthia Edwards for the amount of $5000.00.

From a call I had received on 050101 from Compass Bank Fraud Investigator, Karen Garrison, I knew that two Compass Bank checks #153644 and #153645, written on the account of Arizona Retirement Centers, Inc. and made payable to Cynthia Edwards for the amount of $4500.00 each, were presented and cashed at the Compass Bank Branch located at 4450 E. Main in Mesa on 050101. The suspect had presented the checks along with Az picture driver's license OLN▓▓▓▓▓ which returned to a Cynthia La Vern Edwards. See DR# 20011210670 for further details on that incident.

I responded to the Compass Bank located at 4450 E. Main to assist with the investigation. Upon arrival, I located Officer Daniels and Officer Clark, sitting in a glass enclosed office with a black female I learned had been identified as s/Cynthia Edwards.

I spoke with bank teller, w/Jennifer Muir, who advised me she had been the teller who dealt with s/Edwards on 050101. According to w/Muir, she had been working as a teller on 050101 at approximately 1245 hrs. The bank wasn't busy at that time. A black female, who identified herself by Az picture driver's license as s/Cynthia Edwards OLN▓▓▓▓▓ came to w/Muir's window. S/Edwards presented two Compass Bank checks #153644 and #153645, written on the account of Arizona Retirement Centers, Inc. and made payable to Cynthia Edwards for the amount of $4500.00 each. S/Edwards requested using the checks to purchase two cashier's checks for $4500.00 each, made payable to Affordable Bail Bonds from the remitter of the name, Carolina. Because the cashier's checks were for an amount over w/Muir's signing limit, she

| UNFOUNDED REPORT | EXCEPTIONALLY CLEARED | INVEST. CONT. | CONN RPTS | PROPERTY | ARREST |
| --- | --- | --- | --- | --- | --- |
| JUVENILE CLEARED | CLEARED ARREST X | FIELD CLOSURE | | JUVENILE | OTHER |

| SUPERVISOR 7851 5/7/71 | OFFICER NAME & SERIAL # Detective K. Carroll 11692    KBC | JUL 1 0 2001 | CID FOLLOW-UP REQUESTED? ☐ YES  X NO |
| --- | --- | --- | --- |

MPD 005 Rev 3/91

000004369

K000000004

**MESA POLICE DEPARTMENT CONTINUATION REPORT**     DR # Z0011240400

presented them to the senior teller, Chad. Chad advised that the cashier's checks could not be made payable to a business, when the other checks are made payable to s/Edwards. S/Edwards chose to cash the presented checks instead. W/Muir counted out $9000.00 to s/Edwards. W/Muir later learned the presented checks were counterfeit and a report was filed with the Mesa Police Department (DR#20011210670).

This afternoon, w/Muir saw s/Edwards at w/Sahba's teller window. When s/Edwards said hi to w/Muir, she recognized s/Edwards as the same person who had presented the counterfeit checks on 050101. W/Muir found bank manager, w/Altamirano, and learned w/Altamirano was already aware of the situation with s/Edwards and that the police were being called.

I showed w/Muir copies of the two counterfeit checks #153644 and #153645, which she identified as copies of the checks she had been presented with on 050101 by S/Edwards. W/Muir told me she had copied s/Edwards OLN at the top of each check. W/Muir advised me that the female, sitting in the glass enclosed office with Mesa PD Officers, was the presenter of the two counterfeit checks. See w/Muir's written statement for further details.

I then spoke with bank teller, w/Sahba Omair, who advised me she had been presented with a Compass Bank check for $5000.00 at approximately 1315 hrs. by s/Edwards. According to w/Omair, a black female, who identified herself as s/Cynthia Edwards, came to her teller window and presented Compass Bank check #153646, written on the account of Arizona Retirement Centers, Inc. and made payable to Cynthia Edwards for the amount of $5000.00. S/Edwards asked w/Omair to verify that funds were available in the account to cash the check. When w/Omair looked up the account, the status was listed as "Frozen - No Activity". S/Edwards was surprised when w/Omair explained that she would be unable to cash the check, saying that it was not possible because they just asked her to do business for them. W/Omair asked s/Edwards if she was an employee of the company. S/Edwards said she was not, but that they'd recently hired her to do some work for them. W/Omair contacted the bank manager, w/Altamirano, and explained the situation. W/Altamirano looked at the screen and then asked s/Edwards for identification. S/Edwards provided an Az picture driver license. W/Altamirano asked s/Edwards if she has an account with Compass Bank. S/Edwards said she did not, but that she plans to open one in the future. In an attempt to stall, w/Altamirano advised s/Edwards that the account was frozen, but that the company has another account with Compass Bank and they could get the money from that account. W/Altamirano told s/Edwards that they would have to get the money from the vault. On the way to the vault, w/Altamirano advised w/Omair that they needed to call 911 and look normal. W/Altamirano also told w/Omair to count the money slowly, because they cannot give it to s/Edwards and she needed to be stalled until the police arrive. W/Omair and w/Altamirano were able to stall s/Edwards until a Mesa PD Officer approached them at the counter. S/Edwards was identified to the Officer as the presenter of the counterfeit check.

W/Omair told me that twice during the incident, s/Edwards asked if they still had her Identification. S/Edwards also asked w/Omair to be discreet about going to get the money from the vault. W/Omair advised me that the female, sitting with Mesa PD Officers in the glass enclosed office, was the person who presented the counterfeit check for $5000.00 and identified herself as s/Cynthia Edwards. See w/Omair's written statement for further details.

Next I spoke with bank manager, w/Roxanna Altamirano, who advised me she had been contacted by bank teller, w/Omair, reference a lady trying to cash a check on a frozen account. According to w/Altamirano,

| OFFICER NAME & SERIAL # | |
|---|---|
| Detective K. Carroll  11692 | MPD 604 Rev 3/91 |

K000000005

**MESA POLICE DEPARTMENT CONTINUATION REPORT**   | DR # 20011240460 |

when she went to the teller window and saw s/Edwards, she recognized her from a security tape of the incident on 050101. W/Altamirano also recognized the account holder and name, Cynthia Edwards, as being the same as on the two previous counterfeit checks from 050101. W/Altamirano asked s/Edwards for identification. S/Edwards presented an Az picture driver license and a Capital One Visa. W/Altamirano had s/Edwards place a thumbprint on the presented check. S/Edwards told w/Altamirano that she was starting a new business and she would like to speak to someone about business accounts. According to s/Edwards, she was waiting for her EIN to be mailed to her from back east. W/Altamirano asked s/Edwards if she has lived here long. S/Edwards said she had not. W/Altamirano observed that s/Edwards Az driver license looked worn. During this time, the police department was contacted. W/Altamirano stalled for time by slowly counting the money. W/Altamirano told s/Edwards that they had to go to the vault to get some money. During this She then had w/Omair count the money slowly. A Mesa Police Officer came in while w/Altamirano was talking with s/Edwards at the counter. W/Altamirano motioned the Officer over and explained the situation. When w/Altamirano told the Officer that s/Edwards had cashed two counterfeit checks on 050201 (I confirmed that the two counterfeit checks had actually been cashed on 050101), s/Edwards started talking really fast, denying to the Officer that she had been the one who cashed the fraudulent checks. When w/Altamirano told the Officer that the OLN's matched, s/Edwards admitted she had cashed the checks, but that she did not know they were bad checks. S/Edwards claimed someone from jail sent the checks to her to put money on their books. At this point, the Officer took s/Edwards to the office. See w/Altamirano's written statement for further details.

Officer Daniels provided me with s/Edwards' written statement prior to my interview with her. According to s/Edwards' statement, she received a call from Beverly Arundel, saying she has a business and asking if s/Edwards would cash checks for her 16 year old daughter, who has no ID. Arundel also asked that s/Edwards cash some checks and put money on the accounts of some prisoners. S/Edwards says she gave the rest of the money from the checks she cashed back to Amber, who provided the checks. S/Edwards says she did not ask questions originally because she believed Arundel must have a business, since the checks were so large. The first check she received in the mail was for $1000.00. S/Edwards deposited it into her own account and withdrew that amount. That check came back as no good. S/Edwards told Arundel and Arundel apologized, saying she would clear it. Arundel did clear it. On Monday s/Edwards received two checks from Amber. She came to Compass bank to cash them. S/Edwards told the teller, Jennifer, that she would open an account later. S/Edwards says she received another check on 050201 and was asked to cash it. She asked Amber when her mother would be finished taking care of her business. Amber told s/Edwards that she thought her mother was finished now with the business account. S/Edwards came to Compass Bank on 050401 to cash another check, thinking this was it. She was told the account was frozen. S/Edwards asked the teller for the date that it had been frozen. The teller got her manager, who stalled her until the police showed up. S/Edwards also states that she had been reported to Check Systems some years back and that she needed to wait for some information fraud forms from back east before she can open up an account here.

After speaking with the witnesses, I contacted s/Edwards. S/Edwards was sitting in the branch office with Officer Clark. I read s/Edwards her Miranda warnings from the Mesa PD Miranda card at 1512 hrs. S/Edwards said, "Yes I do," to understanding her rights and, "Yes I will," to voluntarily answering my questions. S/Edwards told me she belongs to New Life Ministries church, which has five members, including she and her husband. S/Edwards also goes into the prisons and meets with some of the inmates as clergy. One of the inmates, Beverly Arundel, learned of s/Edwards through inmate, Wendi Andriano. According to s/Edwards, Arundel called saying she has a business and since s/Edwards is clergy, Arundel

| OFFICER NAME & SERIAL # |
| Detective K. Carroll  11692 |

MPD 004 Rev 3/91

000004371

K000000006

## MESA POLICE DEPARTMENT CONTINUATION REPORT     DR #  20011240460

was hoping she could help her daughter, Amber (who is 16 years old and does not have ID), by cashing checks so bills could be paid. S/Edwards told me she got the first two checks for $4500.00 each, which she cashed at this branch of Compass Bank earlier this week, from Amber. She met Amber and another female, who was driving the car Amber was in, on the side of US60 near Alma School this past Monday. Amber was unable to explain why they met on the side of US60. S/Edwards said she was to cash the checks and, after depositing some of the money in several inmate's accounts, give the rest to Amber. S/Edwards claimed this is what she did. S/Edwards told me that she deposited $1200.00 of the money into Beverly's account at Estrella. I asked s/Edwards why she had first requested two cashiers checks for $4500.00 each, made out to Affordable Bails Bond for Carolina. S/Edwards told me she forgot that she had requested that first, but was unable to explain who Carolina was or why the request for cashiers checks made payable to affordable bails bond.

S/Edwards told me she got the third Compass Bank check, which she was attempting to cash today, from Amber on 050201 at the Boys and Girls Club located on the corner of Gilbert and Elliot in Gilbert. S/Edwards admitted to cashing all three checks, but denied knowing that they were counterfeit or part of fraudulent activity.

S/Edwards told me about additional checks she had cashed for Arundel:

The first two were for her church, New Life Ministries. One was for $4000.00 and the other for $4500.00. They were deposited into New Life Ministries account at Desert Schools Federal Credit Union. According to s/Edwards, these checks were a contribution to the church by Arundel and Amber. I asked if Arundel or Amber were members of her church or ever attended her church. S/Edwards claimed they were not and had not. I asked her why they would be willing to make such a large donation. S/Edwards claimed it was for tax purposes. S/Edwards was then to return the money to them, which s/Edwards says she did. This occurred last month.

The next two checks went into Cynthia Edwards' account at Desert Schools Federal Credit Union. This included a check for $1000.00 (which s/Edwards claims came back NSF) and another for $4000.00.

The fifth and sixth checks were made payable to Cynthia Edwards and cashed at a Northern Trust branch located at Greenfield and the freeway for $4000.00 and $4500.00, with the money going to Amber. Cynthia told me that Amber did give her $1000.00 from the two checks.

The seventh and eighth checks were made payable to Cynthia Edwards and cashed at a Bank One branch for the amounts of $6500.00 and $2000.00. One of them had been on a business account and the other on a personal account.

The last three checks, according to s/Edwards, were the two that were cashed at Compass Bank for $4500.00 each and the third check she had been trying to cash today for $5000.00.

When asked if she thought it was strange that Amber had access to so many large dollar amount checks over a short period of time, s/Edwards told me it did seem weird, but she wasn't keeping the money. S/Edwards claimed she only kept $1000.00 of the money, which she had been given by Amber. See s/Edwards' written statement for further details.

| OFFICER NAME & SERIAL # | |
|---|---|
| Detective K. Carroll  11692 | MPD 004 Rev 3/91 |

**MESA POLICE DEPARTMENT CONTINUATION REPORT**    | DR #  20011240460 |

S/Edwards denied telling the bank cashiers that she had done work for Arizona Retirement Centers, Inc.

From her bag, s/Edwards provided a telephone number for Amber. Officer Daniels contacted Amber Troub at that number. Amber told Officer Daniels that she does know s/Edwards. Amber said s/Edwards knows her mother, Beverly Arundel, who is in jail at Estrella on forgery and fraud charges. According to Amber, the last time she saw s/Edwards was a couple of weeks ago, when Amber and a friend had a blow-out on US60 near Alma School. S/Edwards had come by to help them. Amber denied knowing anything about or having any involvement with the counterfeit checks.

S/Edwards was arrested and transported to the Mesa PD Holding Facility, where she was booked on three counts of forgery. At the Holding Facility, Officer Clark provided me with evidence found in s/Edwards bags, incident to arrest. These items included:

1. Bank One check #7170, written on the account of Datacheck and made payable to Cynthia Edwards for the amount of $6500.00. S/Edwards' OLN_____ is written at the top of the check. The check appears to have been endorsed by s/Edwards as well. The stamp on the back of the check seems to indicate the check was presented on 042701 at 1517 hrs., but had not been cashed.

2. Community Bank of Arizona check #121273, written on the account of Freedom Plaza-Arizona and made payable to Cynthia Edwards for the amount of $4500.00.

3. A piece of paper with the name, DOB, and booking number of Terri Livingstone. The paper also contains an additional booking number without further information.

4. A Desert Schools Federal Credit Union printout for Cynthia Edwards dated 042401 at 0814 hrs. documenting the deposit of a $4500.00 and a $1000.00 check and advising of the release dates. The printout is signed by s/Edwards.

5. A note card with the name of Wendi Andriano and her cell block number. It has a date of 043001 and a time of 1630 hrs. The card is noted, "Last visit one month ago". There is also a note about (3,500 keep) and Balance on (2) books.

6. A piece of paper with the name, Carolina, and the phone number of 602-410-3781.

7. A carbon for a Desert Schools Federal Credit Union check #125, written on the account of New Life Ministries and dated 041001 for the amount of $3000.00. There is a note in the memo line saying, "Prison Fund".

8. An envelop with numerous figures listed and added. There is a circle around a thousand and the word, "mine" next to it. Amber's name and a phone number are written below the figures.

9. A piece of paper with Amber's name and phone number, Carolina's name in parenthesis, a figure scribbled out, a note saying, "4 or 5 more" followed by, "4500 each". Underneath that is a note saying, "money order for 10,000.00 Back". An arrow points from "10,000.00" to the note, "verify with Amber". There is another note saying, "(Afordable BailsBond) followed by "9 leave alone".

| OFFICER NAME & SERIAL # |
| Detective K. Carroll  11692 |

MPD 004 Rev 3/91

**MESA POLICE DEPARTMENT CONTINUATION REPORT**     | DR #  20011240460

10. An envelop from Andriano to s/Edwards stamped from Estrella Jail

11. A carbon for Desert Schools Federal Credit Union check #453, written on the account of Cynthia Edwards, dated 050201 and made payable to Caroline Pena for the amount of $155.00.

12. A carbon for Desert Schools Federal Credit Union check #451, written on the account of Cynthia Edwards, dated 050101 and made payable to Compass Bank for the amount of $5.00.  The memo line reads, "Cashiers Ck (Carolina)".

13. An envelop with the name of Trivia Thompson and the address of Perryvale Prison in Goodyear handwritten on it.  Below that information was a figure of 500.

14. A Maricopa County Sheriff's Office visitor form with inmate, Andriano's, name and info and the visitor name of Cynthia Edwards.

15. A Maricopa County Sheriff's Office visitor form with inmate, Andriano's, name and info and the visitor name of Cynthia Edwards.  Written in the amount line is 500.00.

16. A piece of paper, containing numerous figures and computations.  A note saying, "church name" is next to a 4000 and 5000.  A note saying, "Cynthia's name" is next to the figures 4500, 1000, 2000, 6500.  There is also a note to call Amber and Amber's phone number.  After some of the figures there are notes saying, "came back" "used it to clear the one for 4,000" "Good" "No good Bank" "good check NSF Funds".

17. A handwritten letter from Wendi to s/Edwards explaining how Wendi lied to her dad about why s/Edwards gave her $250.00.  Wendi also tells s/Edwards she hopes s/Edwards got her more money.  Wendi outlines $9000.00, which she says s/Edwards had, and lists the amounts out of that which s/Edwards has already given to Wendi, Paula, Bev, and Pat.  Wendi then says she wants s/Edwards to place additional amounts of money on Wendi, Bev, and Pat's accounts.  After completing this, Wendi advises s/Edwards that she should be left with $5600.00 out of the $9000.00.  Wendi then says, "That's only half of what I told you but the rest will be in to you by Sat. or so.  Thank you for doing all this for me.  I really appreciate it."

When I questioned s/Edwards concerning the letter in her property from Wendi, s/Edwards admitted that she had received $5600.00 and not $1000.00 as she had previously told me.  I asked s/Edwards about the different account holders on the checks she had in her purse.  S/Edwards told me she had not looked at the checks closely and was unaware of different account holders.

I seized this property, along with counterfeit Compass Bank check #153646, Az Driver license OLN████████nd Capital One Visa card belonging to s/Edwards.  The items were later placed into Mesa PD Property as evidence.

On 050901 I called the phone number listed on one of Cynthia's papers for Carolina.  A female answered the phone and identified herself as Carolina Pena.  Pena told me she knows s/Edwards through her friend Amber.  Pena told me that she had a blow-out while driving her car on US60 on 042401.  Amber was with her at the time.  They needed someone to assist them and Amber knew s/Edwards was clergy to her mother, Beverly, who is currently in jail.  Amber called s/Edwards, who came by their location.  S/Edwards talked

| OFFICER NAME & SERIAL # |
| Detective K. Carroll  11692 |

MPD 004 Rev 3/91

PAGE 7 OF 7

**MESA POLICE DEPARTMENT CONTINUATION REPORT**          | DR #   20011240460 |

with them a short time and left.  Pena did not see Amber give s/Edwards any checks.  Pena said she is unaware of s/Edwards cashing any checks for Amber or giving her any money.  I asked Pena if she had been incarcerated recently.  Pena said she had not.  In fact, Pena told me she went into the hospital to have her baby on 042601 and got out of the hospital on 050101.  Pena said she was not trying to bond anyone out of jail and did not know anyone who needed bonded out.

I received Mesa PD DR# 20011210670 after I conducted my interviews and investigations on 050401 reference this case.  Since my investigation covered the incident reported in DR# 20011210670 and all charges reference that case are included under this current report, DR# 20011210670 was cleared exceptional to DR#20011240460.  A copy of DR#20011210670 is attached to this report.

Based on the following information, I believe probable cause exists to charge suspect/Edwards with three counts of forgery 13-2002.A3:

> On 050401 at 1320 hrs.  Compass Bank check #153646, written on the account of Arizona Retirement Centers, Inc. and made payable to Cynthia Edwards for the amount of $5000.00, was presented to bank teller, w/Omair, at the Compass Bank branch located at 4450 E. Main in Mesa.  Along with the check, Az picture driver license and Capital One Visa card belonging to Cynthia Edwards were also presented.

> On 050101 at approximately 1245 hrs. two Compass Bank checks #153644 and #153645, written on the account of Arizona Retirement Centers, Inc. and made payable to Cynthia Edwards for the amount of $4500.00 each, were presented to bank teller, w/Muir, at the Compass Bank Branch located at 4450 E. Main in Mesa.  Along with the checks, an Az picture driver license belonging to Cynthia Edwards was also presented.

> The checks were confirmed with the account holder to be counterfeit/forged.

> Mesa PD Officers, who responded to 4450 E. Main on 050401 reference a forgery in progress, contacted s/Cynthia Edwards inside the bank.  S/Edwards was positively identified to the officers as the presenter of the counterfeit/forged check.

> Bank teller, w/Muir, positively identified s/Edwards as the presenter of the two counterfeit/forged checks on 050101.

> Under Miranda, s/Edwards admitted to presenting the two counterfeit/forged checks on 050101 and the counterfeit check on 050401.

> Although s/Edwards denied knowing the checks she presented were counterfeit, the inconsistencies in . her statements to the bank tellers, when compared to the statements she gave me, the number of checks and the amount of money involved, the number of different banks the checks were written on, and numerous other inconsistencies in her story clearly demonstrate s/Edwards' intent to defraud.

All witnesses and victims are willing to assist with prosecution.  I have included a completed complaint/warrant and release questionaire with this case for submission to the Maricopa County Attorney's Office for review and possible filing of the listed charges.

| OFFICER NAME & SERIAL # |
| Detective K. Carroll  11692 |

MPD 004 Rev 3/01

MESA POLICE DEPARTMENT CONTINUATION SHEET

SUPP [X]                                                          DR#:  20011240460
TYPE:  Continuation [ ]            Information Only [X]           Clearance [ ]

CRIME TYPE:  Forgery

VICTIM:  Compass Bank

SUSPECT:  Cynthia Edwards

On 05-01 I contacted investigative leads Amber Troub at her residence located at 8115 W. Canon in
Peoria.  Troub identified herself by Az picture driver license.  According to Troub, her friend, Carolina
Pena, needed $10,000.00 to save her mother, Yolanda Gomez', house.  The house had been been
put up as collateral for the bond of a guy named Roman Borquez.  Borquez failed to show for his
court appearance and Gomez was going to lose her house.

Troub told me that her mother, Beverly Arundel, who was currently being held in the Estrella Jail, had
a friend, Cynthia Edwards, who could loan the money to Gomez.  Gomez could then make payments
to Edwards to pay off the loan.  Troub believed Beverly knew Edwards through another friend,
Wendi, who was also in jail.  Troub said Beverly gave her a phone number for Edwards.

Troub said she and Pena called Edwards and set up a meeting with her in Scottsdale about one
month ago.  They got lost and did not end up meeting Edwards that day.  The two set up another
meeting with Edwards, off of Power Road in Mesa on Friday, April 27th.  She remembered the date
because Pena went to the hospital that night and had her baby.  On the way to meet Edwards, their
car had a flat tire at Alma School and US60.  They called Edwards, who came and helped them.

STATUS:                                                                    PAGE 1
CLEARED ARREST [X]    CLEARED EXCEPT. [ ]    INVES. CONT. [ ]   CLOSED INACTIVE [ ]
SUPERVISOR:              DATE:  031202          DETECTIVE:  K. Carroll 11692
   FADER 7840 (Act.)                                      KBC
   COPY TO CA 13-13-02 KH                                      MAR 1 3 2002

000004376

K000000011

P-App. 005808

MESA POLICE DEPARTMENT CONTINUATION SHEET

SUPP [X]                                                                    DR#:  20011240460
TYPE:  Continuation [ ]              Information Only [X]                    Clearance [ ]

Edwards asked how much money was needed.  They told her the exact amount was $10,454.00.

Troub told me that no money or checks exchanged hands at that time.


Troub told me that Edwards gave Pena the entire amount some time after she got out of the hospital.

She believes Pena met Edwards at her job (possibly a hospital).  Edwards gave her cashier's checks

totaling $10,000.00, $350.00 in cash, and a personal check for $150.00.  Troub said Pena told her

she cashed the personal check and then paid Affordable Bail Bonds with the cashier's checks and

$454.00 in cash.  Troub was not present at that time.  Troub went with Pena to Affordable Bail Bonds

on 050501 to pick up the deed.  Troub said Carolina signed some papers and they left.


When asked how Edwards came up with $10,500.00, Troub said Edwards explained that she would

get the money from her husband's church donations.


NFI

---

STATUS:                                                                       PAGE 2
CLEARED ARREST [X]      CLEARED EXCEPT. [ ]     INVES. CONT. [ ]   CLOSED INACTIVE [ ]
SUPERVISOR:             DATE:  031202           DETECTIVE:  K. Carroll 11692

---



K000000913



000004379   K000000014

11/23/2004    14:44    CLERK OF COURT → 67950                                    NO. 499    P10

JUN 0 4 2002

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
IN AND FOR THE COUNTY OF MARICOPA

THE STATE OF ARIZONA,                    )    NO. CR 2002-000712
                                         )
                Plaintiff,               )    PLEA AGREEMENT
                                         )
        vs.                              )
                                         )
CYNTHIA LA VERN EDWARDS (C),             )
                                         )
                Defendant.               )
                                         )

The State of Arizona and the Defendant hereby agree to the following disposition of this case:

Plea:    The Defendant agrees to plead GUILTY to:

    Count 11: FORGERY, A CLASS 4 FELONY in violation of A.R.S. §§ 13-2002, 13-2001, 13-701, 13-702, 13-702.01, and 13-801 committed on 5/1/01.
    Count 18: FORGERY, A CLASS 4 FELONY in violation of A.R.S. §§ 13-2002, 13-2001, 13-701, 13-702, 13-702.01, and 13-801 committed on 5/5/01.
    Count 41: FRAUDULENT SCHEMES AND ARTIFICES, A CLASS 2 FELONY in violation of A.R.S. §§ 13-2310, 13-701, 13-702, 13-702.01, and 13-801 committed between 4/30/01 – 11/9/01.

    These are non-dangerous, non-repetitive offenses under the criminal code.

THIS OFFER EXPIRES AND IS REVOKED IF NOT ENTERED IN COURT BY June 28, 2002.

Terms:   On the following understandings, terms and conditions:

    1.  The crimes carry presumptive sentences of 2.5/5 years; minimum sentences of 1.6/4 years (1/3 years if trial court makes exceptional circumstances finding); and maximum sentences of 3/10 years (3.75/12.5 years if trial court makes exceptional circumstances finding). Probation is available. Restitution of economic loss to the victim and waiver of extradition for probation revocation procedures are required. The maximum fine that can be imposed is $180,000.00 plus a 77% surcharge. If the Defendant is sentenced to prison, the Defendant shall also be sentenced to serve a term of community supervision equal to one-seventh of the prison term to be served consecutively to the actual period of imprisonment. If the Defendant fails to abide by the conditions of community supervision, the Defendant can be required to serve the remaining term of community supervision in prison. Special conditions regarding the sentence imposed by statute (if any) are None.

    2.  The parties stipulate to the following additional terms, subject to court approval at the time of sentencing as set forth in paragraph 7: Defendant shall be sentenced to the Department of Corrections, term to be determined by the Court. Defendant shall pay restitution to all victims, including dismissed counts, in an amount not to exceed $250,000. No Agreements.

    3.  The following charges are dismissed, or if not yet filed, shall not be brought against the Defendant: 2, 2A, 5-8, 10, & 11-14. The State agrees to dismiss the allegation of A.R.S. § 13-702.02.

    4.  This agreement serves to amend the complaint or information, to charge the offense to which the Defendant pleads, without the filing of any additional pleading. However, if the plea is rejected by the court or withdrawn by either party, or if the conviction is subsequently reversed, the original charges and any charges that are dismissed by reason of this plea agreement are automatically reinstated.

    5.  If the Defendant is charged with a felony, she hereby waives and gives up her rights to a preliminary hearing or other probable cause determination on the charge to which she pleads. The Defendant agrees that this agreement shall not be binding on the State should the Defendant be charged with or commit a crime between the time of this agreement and the time for sentencing in this cause; nor shall this agreement be binding on the State until the State confirms all representations made by the Defendant and her attorney, to-wit: Defendant avows no prior felony convictions. If the Defendant fails to appear for sentencing, the court may disregard the stipulated sentence and impose any lawful sentence which is the same as or exceeds the stipulated sentence in the plea agreement. In the event the court rejects the plea, or either the State or the Defendant withdraws the plea, the Defendant hereby waives and gives up her right to a preliminary hearing or other probable cause determination on the original charges.

000004380                                                        K000000015

P-App. 005812

11/23/2004   14:44   CLERK OF COURT → 67950                                NO.499   P11

THE STATE OF ARIZONA,                    )      NO. CR 2002-000712
                                         )
                    Plaintiff,           )      PLEA AGREEMENT
                                         )
        vs.                              )
                                         )
CYNTHIA LA VERN EDWARDS (C),             )
                                         )
                    Defendant.           )
                                         )

6. Unless this plea is rejected by the court or withdrawn by either party, the Defendant hereby waives and gives up any and all motions, defenses, objections, or requests which she has made or raised, or could assert hereafter, to the court's entry of judgment against her and imposition of a sentence upon her consistent with this agreement. By entering this agreement, the Defendant further waives and gives up the right to appeal.

7. The parties hereto fully and completely understand and agree that it is the court's duty to impose sentence upon the Defendant, and that any sentence either stipulated to or recommended herein in paragraph two is not binding on the court. If after accepting this plea the court concludes that any of the plea agreement's provisions regarding the sentence or the term and conditions of probation are inappropriate, it can reject the plea. If the court decides to reject the plea agreement provisions regarding sentencing, it must give both the state and the Defendant an opportunity to withdraw from the plea agreement. In case this plea agreement is withdrawn, all original charges will automatically be reinstated. The Defendant in such case waives and gives up her right to a probable cause determination on the original charges.

8. If the court decides to reject the plea agreement provisions regarding sentencing and neither the State nor the Defendant elects to withdraw the plea agreement, then any sentence either stipulated to or recommended herein in paragraph 2 is not binding upon the court, and the court is bound only by the sentencing limits set forth in paragraph 1 and the applicable statutes.

9. This plea agreement in no way affects any forfeiture proceedings pursuant to A.R.S. § 13-4301 et seq., § 13-2314, or § 32-1983, if applicable, nor does this plea agreement in any way compromise or abrogate any civil actions, including actions pursuant to A.R.S. § 13-2301 et seq. or § 13-4301 et seq., or the provisions of A.R.S. § 13-2314 or A.R.S. § 13-4310.

10. I have read and understand the provisions of pages one and two of this agreement. I have discussed the case and my constitutional rights with my lawyer. I understand that by pleading GUILTY I will be waiving and giving up my right to a determination of probable cause, to a trial by jury, to confront, cross-examine, compel the attendance of witnesses, to present evidence in my behalf, my right to remain silent, my privilege against self-incrimination, presumption of innocence and right to appeal. I agree to enter my plea as indicated above on the terms and conditions set forth herein. I fully understand that if, as part of this plea agreement, I am granted probation by the court, the terms and conditions thereof are subject to modification at any time during the period of probation. I understand that if I violate any of the written conditions of my probation, my probation may be terminated and I can be sentenced to any term or terms stated above in paragraph one, without limitation.

I have personally and voluntarily placed my initials in each of the above boxes and signed the signature line below to indicate I read and approved all of the previous paragraphs in this agreement, both individually and as a total binding agreement.

Date   5/31/02        Defendant   C. Edwards
                                  CYNTHIA LA VERN EDWARDS

I have discussed this case with my client in detail and advised her of her constitutional rights and all possible defenses. I believe that the plea and disposition set forth herein are appropriate under the facts of this case. I concur in the entry of the plea as indicated above and on the terms and conditions set forth herein.

Date   5/31/02        Defense Counsel   Maria L Schaffer

I have reviewed this matter and concur that the plea and disposition set forth herein are appropriate and are in the interests of justice.

Date   4/23/02        Prosecutor   Elizabeth A Gilbert
                                   Elizabeth A Gilbert

2

000004381

K000000016

June 20, 2002


Dear Judge Galati.

My name is Cynthia Edwards. My sentencing date is June 28, 2002 at 8:30am. I am praying that this letter gets to you prior to the sentencing date and that you will be able to read and maybe better understand what took place prior to my arrest, pre-trial conference, and plea-agreement hearing.

The only person I knew concerning this intire ordeal is a lady by the name of Wendi Andriano. Years ago as a high school student I knew Wendi. We are both from Casa Grande. We were both raised hard-core Christians. I also knew Wendi's' husband Joe. He and I went to school together. In the time that Wendi and I were apart, I had obtained my ministry license, and I had been in good standing with the church. Wendi had continued to provide for her family (her husband was diagnosed with cancer and found it hard to work). Wendi made over $60,000.00 a year and never had any financial problems.

One morning about 2 years later (since we had contact) Wendi's face came across the TV saying she had killed her husband. Being the friend as well as minister that I am, I went to see her. She explained to me that her husbands death was self-defense, which I know now was not true. I had no reason to doubt her because of the close relationship we had for so long, and the relationship I thought she had (I know she had at one time) with the Lord. While visiting her at estrella jail, we would have bible studies, I also conducted a bible study under the chaplain there at the jail during inmate chapel time. I also provided communion (the guards would allow other inmates to join in the communion), I never once met or knew the person by the name of Beverly Ardando.

One day after numerous and consistent visits to see Wendi, she asked me if I would do a favor for her. She said a lady in there with her has a business on the outside (sub-contracting). She wanted to know if I would cash a couple of checks for her and give the money to her daughter (the daughter had no ID) so that the business would not suffer. Wendi led me to believe that the lady would be getting out soon. Since the lady was a sub-contractor I told Wendi I would do it only if the company's she's contracted with would make the check payable to me (I worked in the bank for 8 years and I know that third party checks are hard to cash and I did not want to have to go through a lot of red tape). I agreed. The young lady I thought was Beverly's daughter Amber (whom I received the check from as well as gave the money to), I later found out she was no relation to Beverly. All charges were dropped against this female because she knew all the players (my co-defendants) and helped the prosecution indited all of them. So I became apart of something that I had no clue or idea I was apart of because of Wendi and some girl, that I don't know. Neither of them are in this picture or have been or will be charged. I have never met or talked to any of my co-defendants. Two of the tapes in evidence, that I have in my custody (from my attorney) have Beverly, her daughters and her sister

K000000017



talking about how they checked me out on the internet and how I was clean and that they could use me to cash the checks for them.

As I am typing this letter to you, my mere words sound foolish to me now because I can see red flags jumping all over the place. Please note, at the time this took place I did not. I've always known Wendi to have big money as well as associate herself with white collar people, so the large amount of the checks did not phase me at the time. You might even wonder why I didn't get the fact that these women, Wendi and Beverly were in jail and that should have been a red flag. Well I have never in my life seen the inside of a jail (other than on TV), not even to visit before I went on Wendi's behalf. I thought she was innocent (of her charges) and our visits were strictly clergical. Before now I would have almost sworn to you that Wendi would never betray the trust and friendship we had in each other.

Humbly yours,

C. Edwards

Cynthia L. Edwards

000004383

K000000018

11/23/2004   14:44   CLERK OF COURT → 67950                                    NO.499   P01



The Superior Court of Arizona in Maricopa County – Adult Probation Department
Chief Probation Officer Barbara A. Broderick

FILED
07-31-02   3:30 pm
MICHAEL K. JEANES, Clerk
By _____ Deputy

**PRESENTENCE INVESTIGATION**

State of Arizona v. Cynthia Lavern Edwards, CR2002-000712C

Superior Court Criminal Division SAJ 04

Sentencing Date: June 28, 2002

| Sentencing Judge: Frank T. Galati | Prosecutor: Elizabeth Gilbert, DCA |
| PSI Officer: Shani Martinez | Defense Counsel: Maria Schaffer, DPD |

## PRESENT OFFENSE:

The following information is summarized from Maricopa County Sheriff's Office Departmental Report #01-21628; Mesa Police Departmental Reports #2001-1240460 and 2001-1210670; Arizona Department of Public Safety Report #2001-078637:

On May 1, 2001, the defendant passed two counterfeit checks at Compass Bank, resulting in a loss to the bank of $9,000.00. On May 4, 2001, she attempted to pass another counterfeit check of $5,000.00 at the same branch. She was detained an arrested. She denied knowing the checks were bad, and she had been given them by codefendant A so she could put money on jail inmate accounts. She met codefendant A while working as volunteer ministry in the jail and was introduced by another inmate.

The defendant told police she received a telephone call from codefendant A, who told her she had a business. She asked the defendant to cash checks for her sixteen-year-old daughter who had no identification and put some of the money on accounts for other jail inmates. The defendant believed codefendant A had a business, so the size of the checks did not surprise her. The first check she cashed went through her own bank for $1,000.00. It was no good, she told codefendant A, and codefendant A cleared the check with other money. In April 2001 she cashed two checks at Desert Schools Federal Credit Union totaling $8,800.00. She cashed two more the same month, same bank totaling $5,000.00. She cashed two at Northern Trust Bank totaling $8,500.00. She cashed two at Bank One totaling $8,500.00.

Found in her bag incident to arrest were various other large dollar counterfeit checks and correspondence from various codefendants revealing her involvement was far more than she was reporting to police. She claimed she only received at total of $1,000.00. However, one of the documents in her possession showed she received $5,600.00, and when asked by police why she lied, she gave a contradicting answer. She denied being involved with multiple fraudulent check cashing. She told police inconsistent stories and told the tellers other stories.

Police determined the defendant was actually involved with at least eleven counterfeit checks totaling more than $40,000.00. The checks had been provided by codefendant D, codefendant A's older daughter. The checks were made by codefendant B, who is the sister to codefendant A and aunt to codefendants D and E.

PAGE 1

### The Superior Court of Arizona in Maricopa County – Adult Probation Department
#### Chief Probation Officer Barbara A. Broderick

### State of Arizona v. Cynthia Lavern Edwards, CR2002-000712C

Between April 30, 2001 and November 9, 2001, Beverly Jo Arundel (codefendant A) had her daughter, Amber Troub (codefendant D), Carolina Pena, and her other daughter, Ashley Troub (codefendant E), all three minors, engage in criminal activity involving check forgery, counterfeiting, sales and cashing, to benefit codefendant A who was in custody. Codefendant A was the person who instructed her daughters to deposit money into her jail account following their check cashing schemes. The defendant also deposited monies into codefendant A's account. Bobbie Valles (codefendant B), codefendant A's sister, made the counterfeit checks and delivered checks. She obtained the check information through her mother's business. Gabriel Garcia (codefendant F) accompanied Ashley Troub to deliver counterfeit checks to various persons. Some of the financial institutions and businesses victimized were: Northern Trust Bank, Sun Valley Group, Inc., Compass Bank, Arizona Retirement Centers, Norwest Bank, Century 21, Chase Manhattan Bank, United Healthcare, Bank of America, Salomon Smith Barney, Bank One, Pinnacle West, LaSalle National Bank, Lifecare Centers of America Inc., Nations Bank, Lou Grubb, Mellon Bank, Contact—a division of Banner Health Systems, Catholic Healthcare West, Wells Fargo Bank, and Freedom Plaza.

### DEFENDANT'S STATEMENT:

An old friend was in jail, and she went to see her, as the defendant is clergy. This friend asked her to cash a couple of checks. She trusted the friend, as she had known her for years. The defendant cashed the checks and gave them to the daughter of her friend's friend. As she was about to cash the second check, the bank noticed the first check was no good. The police were called and she was arrested. She had no idea the checks were not good.

She would like the Court to take no further action as restitution of approximately $2,000.00 should satisfy the situation. She signed the plea agreement and feels she should not be punished for this, as she did not know the checks were fake. She thought she was helping out a friend. She accepts her involvement in the offenses, but she reiterated she did not know they were fake and she was helping a friend.

The defendant does not know any of the other codefendants in this case, she told police everything she knew, even though the police officer called her a liar and arrested her. She knew nothing of the system and this world, now she knows. She did not receive any money for cashing the checks. She was helping her friend through her ministry.

The range of sanctions were discussed. The defendant stated she is a single parent with two children, and the police "have no proof." However, her hands are tied because the options she was given, she cannot afford, so she had to plead guilty. She "prays" the lord will speak. If she had money and no children, she would have taken this to trial as she stated, "I am innocent." She was used.

She provided a letter for the Court elaborating on her statement.

PAGE 2

K000000020

11/23/2004   14:44   CLERK OF COURT → 67950                              NO.499   D03

## The Superior Court of Arizona in Maricopa County – Adult Probation Department
### Chief Probation Officer Barbara A. Broderick

### State of Arizona v. Cynthia Lavern Edwards, CR2002-000712C

The defendant also stated she had already made arrangements on the date of sentencing to go to California and Disneyland.  Also, she was finalizing arrangements to go to Africa in August 2002.  She wanted to know if probation would interfere with her travel plans.  The range of sanctions were again discussed to include probation, prison, jail, and travel sanctions on probation.  She indicated she would put off her plans to go to Africa until the outcome of sentencing.

## CODEFENDANT ACTION:

Codefendant A, Beverly Jo Arundel, entered a plea agreement to count I, participation in a criminal syndicate, a class 2 felony with one prior felony conviction; count IV, money laundering, first degree, a class 2 felony, with one prior felony conviction; count VI, conspiracy to commit fraudulent schemes and artifices, a class 2 felony, with one prior felony conviction; and count XLI, fraudulent schemes and artifices, a class 2 felony, with one prior felony conviction.  She committed the present offenses while pending charges of fraudulent schemes and was sentenced to prison on the other case during which time she continued to conduct the scheme in the present offenses.  She was scheduled to be sentenced June 21, 2002.  No further information was found.

Codefendant B, Bobbie Valles, entered a plea agreement to count VII, conspiracy to commit assisting a criminal syndicate, a class 2 felony; count IX, computer tampering, a class 3 felony; and count XLI, fraudulent schemes and artifices, a class 2 felony.  She is scheduled to be sentenced July 25, 2002 before Judge Ballinger.

Codefendant D, Amber Troub, entered a plea agreement to count III, assisting a criminal syndicate, a class 4 felony; count V, money laundering, a class 3 felony, count XXII, forgery, a class 4 felony, and count XLI, fraudulent schemes and artifices, a class 2 felony.  She is scheduled to be sentenced July 1, 2002 before Judge Schwartz.

Codefendant E, Ashley Troub, has not entered into a plea agreement.  A status conference is scheduled July 26, 2002 before Judge Schwartz.  When her sister Amber was interviewed by this officer, she stated Ashley is still a juvenile and is pregnant.

Codefendant F, Gabriel Lopez Garcia, has not entered into a plea agreement.  A status conference is scheduled July 26, 2002 before Judge Schwartz.

Codefendant G, Mario Carbajal, entered a plea agreement to count XXXVIII, solicitation to sell dangerous drugs, a class 4 felony.  He was sentenced to three years probation, three months delayed jail, and a fine on May 16, 2002 before Judge Schwartz.

## STATEMENT OF VICTIMS:

Victim contact information was not provided by the County Attorneys Office, and this officer requested information from victims where information could be determined through the

PAGE 3

K000000021

000004386

11/23/2004   14:44   CLERK OF COURT → 67950                                    NO.499   P04

The Superior Court of Arizona in Maricopa County – Adult Probation Department
Chief Probation Officer Barbara A. Broderick

State of Arizona v. Cynthia Lavern Edwards, CR2002-000712C

police report while working on a codefendant report.   However, no information has been received. The loss to the victims is substantial monetarily.

Some of the losses directly attributed to the defendant were clear in the police report. However, due to the nature of this scheme, this officer is unsure if all losses are joint and severally for all of the defendants. Therefore, the ledger reflects only codefendant's A, B, and D as joint and severally liable with the defendant, as A, B, and D were the main participants of the scheme.

STATEMENT OF INTERESTED PARTIES:

The defendant was screened for Furlough Programs by Adult Probation screener Amona Roberts and found to be appropriate.

SOCIAL HISTORY CONSIDERATIONS:

Unless otherwise noted, the following information was provided by the defendant:

She reported no mental or physical health issues.  She has been divorced for six months and lives with her two children ages five and seven.  She does not receive child support at this time as her ex-husband recently lost his job.  When his employment resumes, so should child support.  She is close to her five siblings and her immediate family, and she stated thy are all well off.

She is a high school graduate (unverified) and completed an associates in science from Central Arizona College (unverified.)  She is a certified Phlebotomist and is going through the certification with her current employer as a dialysis technician.   She has to renew her Phlebotomist certification one a year.  A Word Recognition Aptitude Test administered to the defendant indicates a reading ability above the sixth grade level.

SUBSTANCE USE:

She initially denied any use of illegal substances.  Later, she admitted experimenting with marijuana several times as a high school senior.  She denies any other use or experimentation with illicit substances or the need for treatment.

She tried alcohol in the past, but did not provide the age at which she first tried alcohol. She does not like the taste and her religion asks for her to abstain.  She stated she would ask anyone who drinks to abstain.  She denied the need for treatment.

FINANCIAL STATUS AND EVALUATION:

She believes if her employer becomes aware of her offenses, she might be terminated. (Licensing board notification attached.)  She has been with her current employer, Renal Care

PAGE 4

K000000022

The Superior Court of Arizona in Maricopa County – Adult Probation Department
Chief Probation Officer Barbara A. Broderick

State of Arizona v. Cynthia Lavern Edwards, CR2002-000712C

Group since May 2002.  She was making a lot of money prior to her arrest as a Phlebotomist coordinator.

She cited assets $2,000.00 which includes her vehicle and bank account.  Later she reported she had bought a home and cited the asset as $78,000.00.  She has bad credit so the home is in her mother's name.  She is paying the owner for seven years, then she will finance the home in her own name when her credit is good.

She cited liabilities of $500.00 in credit card debt and $300.00 in medical debt.  She earns bi-weekly $740.00 per paycheck, and she receives $470.00 per month in child support.  She and her children are covered medically by the Arizona Health Care Cost Containment System (AHCCCS).  Her pay rate is $9.00 per hour, and she has over-time opportunities but they are discouraged.  She reported there were a number of documents she could not obtain to verify her expenses, as some are in her parents' name and mailed to their home, or her ex-husband has them and they are unavailable.  She reported monthly expenses as follows:  $478.00 mortgage, $200.00 utilities including cable television, telephone, and cellular telephone service, $110.00 insurance, $450.00 groceries, $50.00 for orthodontist, and $200.00 for gasoline.

Her adjusted gross income for 2001 according to an IRS statement was $25,438.00.  Her credit report reflects a number of accounts in collections, several recently past due, and several in good standing.

She believes she can afford to pay $50.00 per month toward Court fees and assessments.  She stated she only cashed two checks totaling $9,000.00 but in a form she completed she stated restitution should be about $2,000.00.

The defendant successfully cashed more than just two checks.  The police report showed she was responsible for the successful cashing of eleven checks and was arrested on a twelfth attempt.  She also had in her possession at the time of her arrest a number of large value checks.  The total value of the checks she cashed is $40,800.00.  The defendant should be held responsible for this amount in its entirety, and as previously stated, the ledger reflects her joint and severally liable with the family of defendants who were conducting the scheme.  The defendant noted she could only pay $50.00 per month toward assessments, and she did not disclose to this officer how she was financing her travel plans to Disneyland and Africa.

DISCUSSION AND EVALUATION:

The defendant is before the Court having used her volunteer clergy position to join a check-cashing scheme and make money for herself.  She claims all of her involvement was for the purpose of helping a friend, she denies knowing any of the codefendants, contrary to the police report, and she claims she never received any money for her involvement and she only cashed two checks.  However, she appears to have been more forthcoming with police.  She told this officer she is innocent of the charges.  She provided a lengthy statement with a number of contradictions, she minimizes her involvement, and she portrays herself as the victim.  She has

PAGE 5

K00000023

000004388

### The Superior Court of Arizona in Maricopa County – Adult Probation Department
#### Chief Probation Officer Barbara A. Broderick

State of Arizona v. Cynthia Lavern Edwards, CR2002-000712C

not voiced any concern for the damage caused by her large dollar successful check cashing, and she was concerned community supervision would interfere with her travel plans. She denies issues with alcohol or drugs, she is skilled vocationally, and she is currently employed.

Her known criminal history is comprised only of the present offenses.

The plea agreement and available sanctions were considered. Of great concern to this officer is the defendant's inability to give consistent information. She portrays herself as the victim although she exploited a volunteer clergy position to further her crimes, deflects blame, and on again and off again admits only a small portion of her criminal activity. Although incarceration is certainly necessary, this officer has had difficulty deciding whether it should be in prison or in jail. However, she has not previously been afforded community supervision, she is employable, and her activity had not yet reached the magnitude of her codefendants, although the potential certainly existed. Therefore, this officer believes a jail sentence and community supervision is appropriate. The White Collar terms of probation are necessary in order to facilitate supervision and payment of restitution.

These factors were considered in making a sentencing recommendation:

1. The nature of the present offenses, in that her actions resulted in losses to financial institutions exceeding $40,000.00.
2. The defendant denies her involvement, claims she is innocent, portrays herself as a victim, and changed her story multiple times as to her involvement.
3. The presence of accomplices.
4. The plea agreement and available sanctions.
5. The need to impress upon the defendant the seriousness of her actions and need to take responsibility.

### RECOMMENDATION:

#### Count XI AND XV:

It is respectfully recommended the defendant be granted four years standard probation and abide by the following terms and conditions:

Term #8      Do not drink alcoholic beverages.
Term #10     Submit to drug or alcohol testing as directed by probation officer.
Term #11     Successfully complete all programs of assistance, counseling, or therapy as directed by the Probation Department. In addition, the Court emphasizes the following services.
             Budgeting classes

PAGE 6

000004389

K000000024

**The Superior Court of Arizona in Maricopa County – Adult Probation Department**
*Chief Probation Officer Barbara A. Broderick*

State of Arizona v. Cynthia Lavern Edwards, CR2002-000712C

| | |
|---|---|
| Term #12 | Pay through the Clerk of the Maricopa County Superior Court: |
| | See count XLI |
| Term #16 | Have no contact with victim(s) unless approved by probation officer. |
| Term #17 | Abide by the following Addendum to Terms of Probation: |
| | White Collar |

### Count XLI:

It is respectfully recommended the defendant be granted seven years standard probation and abide by the following terms and conditions:

| | |
|---|---|
| Term #8 | Do not drink alcoholic beverages, |
| Term #10 | Submit to drug or alcohol testing as directed by probation officer. |
| Term #11 | Successfully complete all programs of assistance, counseling, or therapy as directed by the Probation Department. In addition, the Court emphasizes the following services, |
| | Budgeting classes |
| Term #12 | Pay through the Clerk of the Maricopa County Superior Court: |
| | Restitution per the attached ledger sheet. |
| | Probation fees at a monthly payment of $50.00 beginning on November 1, 2002. |
| | A $20.00 time payment fee. |
| Term #13 | Be incarcerated in the Maricopa County Jail, with furlough consideration, for four months beginning on June 28, 2002. |
| | Not to be released until October 27, 2002. |
| Term #16 | Have no contact with victim(s) unless approved by probation officer. |
| Term #17 | Abide by the following Addendum to Terms of Probation: |
| | White Collar |

The defendant has served three days of presentence incarceration.

Reviewed by: _____

Judge: _____

Date: _____

Respectfully submitted by: _____

Shani Martinez, Senior Adult Probation Officer
(602) 506-3829/June 23, 2002
mailto:smartine@apd.maricopa.gov

PAGE 7

000004390

K000000025

P-App. 005822

 **CASA GRANDE**
**REGIONAL MEDICAL CENTER**
1800 EAST FLORENCE BOULEVARD • CASA GRANDE, ARIZONA 85222
(520) 426-5300 FAX (520) 426-6435

June 25, 1996

CONFIDENTIAL



Mr. Robert Grennan
Hartford Fire Insurance Company
Bond Claim Department
Tower Building, 4th Floor Hartford Plaza
Hartford, CT 06115

Dear Mr. Grennam:

Per Mr. Jeff Hodges' request, I am forwarding the following information regarding Ms. Wendi Andriano to you, as I understand that Mr. Hodges has forwarded her file to you.

Attached please find a copy of Ms. Andriano's W-2 form. Ms Andriano's date of hire was 5/10/93 and date of termination was 03/06/96. The most current address we have on file is P.O. Box 12102, Casa Grande, AZ 85230.

The process of signatures on checks has been corrected and improvements have been made.

If I can be of any further assistance, please feel free to give me a call, if appropriate, at (520) 426-6581 or page me at (520) 426-5391.

Sincerely,

Jill A. Bates
Director of Human Resources

JAB/dt

c: Mr. John McEvoy, Agent

enclosure

000004221                                    I000000001

P-App. 005824

000004222

100000000002

| a Control number | | OMB No. 1545-0008 | 1 Wages, tips, other compensation | 2 Federal income tax withheld |
|---|---|---|---|---|
| | | | 24234.28 | 3221.45 |
| b Employer's identification number | | | 3 Social security wages | 4 Social security tax withheld |
| | | | 24234.28 | 1502.52 |
| c Employer's name, address, and ZIP code | | | 5 Medicare wages and tips | 6 Medicare tax withheld |
| REGIONAL HEALTHCARE SERV | | | 24234.28 | 351.38 |
| DBA/CGRMC | | | 7 Social security tips | 8 Allocated tips |
| 1800 E. FLORENCE BLVD | | | .00 | .00 |
| CASA GRANDE     AZ   85222 | | | | |
| d Employee's social security number | | | 9 Advance EIC payment | 10 Dependent care benefits |
| 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 | | | .00 | |
| e Employee's name, address, and ZIP code | | | 11 Nonqualified plans | 12 Benefits included in box 1 |
| WENDI E ANDRIANO | | | .00 | |
| P.O. BOX 12102 | | | 13 | 14 Other |
| | | | | DEN1     351.00 |
| CASA GRANDE          AZ | | | | MEDI     676.00 |
| 85222 | | | | VISI     65.00 |
| | | | 15 Statutory employee  Deceased  Pension plan  Legal rep.  Hshld. emp.  Subtotal  Deferred compensation | |

| 16 State | Employer's state I.D. No. | 17 State wages, tips, etc. | 18 State income tax | 19 Locality name | 20 Local wages, tips, etc. | 21 Local income tax |
|---|---|---|---|---|---|---|
| AZ | 11-2249680 | 24234.28 | 70.94 | | | |

Department of the Treasury—Internal Revenue Service

Form **W-2** Wage and Tax Statement   **1995**

Employer's State, City, Local or File Copy

# NOTICE OF CONCERN

Name Wendi Andriano  Job Title Staff Accountant  Facility Clobine

e of Notice 3-1-96  Date(s) of Occurance

---

**Action Taken:**

☐ Documented Verbal Notice  ☐ Performance Improvement  ☐ Written Notice  ☐ Termination

☑ Suspension for Pending Investigation days, to start on 3/1/96  and return on _____
w/o Pay                                    (date)                      (date)

---

**Nature of Concern:** Based on our conversation 3/1/96, (See attached statement), the hospital has identified some forms of misconduct as being so detrimental to the best interest of the hospital to warrant immediate discharge. (See Policy D-4-01)

At this time, my intent is to terminate Wendi's employment w/ Casa Grande Regional Medical Center based on her actions. However, at this time Wendi is suspended pending investigation. Wendi is to contact me Sue Patten, on Monday March 4, 1996 By pager (520) 426-6501 & Sue will notify Wendi of the status of the investigation. I will be Wendi's point of contact & this matter should not be disclosed w/ any employees of the organization. Wendi during the investigation. Wendi is encouraged to continue her contact w/the Employee Assistance Program ~ 1-800-634-6433.

Sue G. Patten
Director of Human Resources

**Employee Comments:** Joe and I would like to pay back the money to DVCC. At this time we are not able (to pay the full amount. We would be able to pay a monthly payment until the full amount is paid.

---

Action to be taken if same problem occurs:  ☐ Written Notice  ☐ Suspension  ☑ Termination
Important Note: If another type of problem occurs, the action may be different than shown above. All the
relevant facts would be taken into consideration, including this prior notice.

---

T  notice was given on 3-1-96          Wendi Andriano         3-1-96
                (date)                  Employee's Signature        Date
                                        ☐ Employee Refused to sign — requires witness signature

Supervisor's Signature              Date
Chris J. On                    3-1-96
Dept. Manager/Administrator         Date      Sue G. Patten          3/1/96
                                              Witness Signature          Date

White: Administrative/Personnel    Yellow: Dept. Mgr.    Pink: Employee

I 000000003

000004223

# NOTICE OF CONCERN

Name _Wendi Andriano_  Job Title _Staff Accountant_  Facility _CbRMC_

e of Notice _3-6-96_  Date(s) of Occurance _____

---

Action Taken:

☐ Documented Verbal Notice  ☐ Performance Improvement  ☐ Written Notice  ☒ Termination

☐ Suspension for _____ days, to start on _____ and return on _____
                                          (date)              (date)

---

Nature of Concern: Misconduct detrimental to the best interest of the organization to warrant immediate discharge. (See Policy D-4-01)
Investigation has been concluded & in conjunction w/ Wendi's statement on 3/1/96 we have concluded that termination is appropriate & in the best interest of the organization.
RHSC has decided not to press charges at this time, as long as Wendi makes restitution in an agreed & timely manner & as long as no further monies are noted missing.

---

Employee Comments: _____

---

Action to be taken if same problem occurs:  ☐ Written Notice  ☐ Suspension  ☐ Termination
  Important Note: If another type of problem occurs, the action may be different than shown above. All the
                  relevant facts would be taken into consideration, including this prior notice.

---

Th notice was given on _3-6-96_
                        (date)

_Wendi Andriano_                    _3-6-96_
Employee's Signature                  Date

Supervisor's Signature          Date      ☐ Employee Refused to sign — requires witness signature
                               _3-6-96_
Dept. Manager/Administrator     Date      Witness Signature              _3/6/96_
                                                                          Date

White: Administrative/Personnel    Yellow: Dept. Mgr.    Pink: Employee

75-3787-0                                                              I000000004



FEB-29-1996   14:24                                                    P.02

Desert Valley Care Center
General Account
950 N. Arizola Road
Casa Grande, Arizona 85222

14013

1-05-95                    $2237.07

Desert Valley Care Center

⑈014013⑈ ⑈122105292⑈ ⑈60 1050 1017⑈          ⑈0000223709⑈

FC MANAGEMENT INC.                THE BANK OF CASA GRANDE VALLEY          034996
dba CINDY'S WORK FORCE            Casa Grande, Arizona

Joe's Windsheild Repair Inc.
252 N Otter Rd.
1-5-95

02/29/96   14:18      TX/RX NO.4895      P.002
                                        I000000005
000004225

P-App. 005827

FEB-29-1996 14:24                                          P.03



TOTAL P.03

MAR-14-1996  15:34                                                    P.02



Angela

P-App. 005829

MAR-24-1996  15:35                                                    P.03





**CASA GRANDE**
**REGIONAL MEDICAL CENTER**
1800 EAST FLORENCE BOULEVARD
CASA GRANDE, ARIZONA 85222

Wendi Andrianis
1104 N. Park Ave
Casa Grande, AZ
85222

P-App. 005831

000004229

I000000009

MAR-14-1996  15:16                                                P.02



Angela

MAR-14-1996   15:16                                          P.03



TOTAL P.03

03/14/96  15:10    TX/RX NO.5168      P.003

I000000011

000004231



000004232

I000000012

P-App 005835

00004233

I0000000I3

MAR-19-1996  12:05                                                    P.02





03/19/96  11:59    TX/RX NO.5232    P.003

000004235

I000000015



000004236





000004237

1000000017

CENTRAL ARIZONA MEDICAL CENTER

16420

1-26-96

$2289.12

2289

PAY

Joe D. [illegible]
20052 N. Otter Rd
Casa Grande, AZ 85222

THE BANK OF CASA GRANDE VALLEY

CENTRAL ARIZONA MEDICAL CENTER

⑈016420⑈ ⑆122105252⑆ ⑈60138010 23⑈ ⑈0000228912⑈

1221-0001-1

43595878

000004238

I000000018

P-App 005841



| CASA GRANDE REGIONAL MEDICAL CENTER | | | | Policy and Procedure Manual | | |
|---|---|---|---|---|---|---|
| HUMAN RESOURCES | | | | | | |
| Chapter | Section | Subject | CONFIDENTIALITY OF INFORMATION | Date Issued | Date Revised | Page |
| D | 4 | 02 | | 11/20/87 | 1/94 | 1 of 2 |

I.  **OBJECTIVE:**
    To provide a right to privacy and confidential environment for patients, employees and physicians.

II.  **POLICY:**
    Casa Grande Regional Medical Center employees obtain and maintain confidential information regarding patients, employees and physicians in the normal course of their duties. Preserving this confidentiality is an integral part of the responsibilities of every employee.

III.  **DEFINITIONS:**
    Examples of confidential information include:

    Patient diagnosis/care
    Employee health information
    Employee pay and performance levels
    Insurance contract rates
    Strategic business information
    Patients' financial information, etc.
    Proprietary Business information

IV.  **PROCEDURES:**

1.  During new employee hospital orientation, a Human Resources representative will explain the importance of confidentiality to all new employees.  New employees will be given a copy of the "Confidentiality of Information" policy, and required to sign the attached Code of Ethics form.  The signed form will be placed in the employee's personnel file.

2.  Each department manager and/or supervisor is responsible for identifying to all current and future employees information which is sensitive and confidential to their respective area. They should also identify to whom and under what circumstances confidential information may be released appropriately.

    Under no circumstances should confidential information be disclosed inappropriately or to unauthorized individuals. A breech of confidentiality will result in a written warning or termination for the first offense (depending on the circumstances), and termination will result for the second offense.

| Signature | Title   ADMINISTRATOR/CEO |
|---|---|

000004240                                    I 000000020

| CASA GRANDE REGIONAL MEDICAL CENTER | | | | Policy and Procedure Manual | | |
|---|---|---|---|---|---|---|
| HUMAN RESOURCES | | | | | | |
| Chapter | Section | Subject | CONFIDENTIALITY OF INFORMATION | Date Issued | Date Revised | Page |
| D | 4 | 02 | | 11/20/87 | 1/94 | 2 of 2 |

The confidentiality of our patients and employees, and the trust they place in us to maintain that confidentiality requires our maximum respect.

V.   ATTACHMENTS:
        Code of Ethics Form

VI.   REFERENCES:  JM.2.1

000004241

I000000021

P-App. 005843

**CASA GRANDE REGIONAL MEDICAL CENTER**
Casa Grande, Arizona 85222

<u>**CODE OF ETHICS**</u>

I fully understand that the following is a provision of employment at Casa Grande Regional Medical Center.

I do solemnly pledge that I will hold in strictest confidence all personal matters committed to my keeping, or any information regarding any patient with whom I may have contact. I will not divulge to anyone within or without the Hospital any action of any patient, fellow employee or member of the medical staff unless I am instructed to do so by my superior or if giving such information falls within my normal scope of duties.

I am aware that if I violate any part of the above provision of employment, I may be dismissed from my position and lose all benefits from the Casa Grande Regional Medical Center.

_____
(Signed)

_____
(Witnessed)

_____
(Date)

000004242

I000000022

FIDELITY CLAIM DEPARTMENT

*Casa Grande Community Hospital, Inc.*
(Name of Principal)
*d.b.a. Casa Grande Regional Medical Center*
(Name of Insured)
*SPCBBBE817*
( Bond No.)

State of *Arizona*
County of *Pinal*

I _____
(If corporation, title of party making this affidavit must appear after name)
of _____ hereby certify that on or about ____ 1995
to *January 1996, Casa Grande Regional Medical Center* suffered loss through ____ ____ dishonesty of
*Wendi Andriano* employed as *Staff Accountant* and that the amount of money, s ____ ____ or other covered
property dishonestly misappropriated, or covered loss dishonestly caused by said *employee* amounts to
*eighteen thousand three hundred thirty six and 05/100 dollars ($18,336.05);* herein is a detailed statement
of said loss, and of all sums due or owing said employee, and all other credits, and the balance stated is the
true net loss from *March of 1995 to January of 1996.* I further certify that knowledge of this loss first came
to me on or about *February 29, 1996* as follows: *Routine bank reconciliation discovered missing check.*
*Employee subsequently contacted director of Human Resources for an appointment. See letter dated*
*March 01, 1996;* that the manner in which this loss occurred is as follow: *See attached;* And that nothing has
been suppressed, withheld or misrepresented by me material to a knowledge of the facts of said loss, and that
this statement is a complete and truthful recital of the facts.

There is no other suretyship, indemnity or insurance under which the above claim, or any portion thereof, is
claimable, except the following:

| Name of Insurer (Indemnitor) | Kind of Insurance (Indemnity) | Amount |
|---|---|---|
| *St. Paul Fire and Marine* | *Blanket Bond* | $250,000.00/100,00.00 |

_____
Jennifer Andrew, Controller

Sworn to and subscribed before me this _____ day of _____ 19___.

_____
Notary Public – My Commission Expires:

**INSTRUCTIONS FOR MAKING CLAIMS** (See Reverse Side)

(1)   In the loss portion of this form, the gross amounts of money or property stolen or embezzled should
be listed with their dates of loss, and these items should be described in the column marked
"Description of Item."

(2)   In the credit portion of this form should be listed in detail any salary, commission, cash, and other
credits, including securities, notes, offsets, etc., not paid the delinquent to which the delinquent is
entitled, the exact dates to be shown hereon.  Recoveries from third parties should be shown where
indicated.

(3)   Documentary or other evidence in support and in explanation of items claimed must be hereto
attached.

(4)   Where the loss covers collections made and not accounted for, if possible, use original receipts, or
verified copies thereof, given by delinquent for such payments, should accom ____ ____ his claim blank.
In the event such receipts or copies cannot be furnished, affidavits of the parti ____ ____ting to have
paid the delinquent must be obtained and furnished the Surety.

**ATTENTION**

(1)   Delivery of claim blanks, assistance rendered by representatives of this company c ____ ____ restigation
of loss is not a waiver of this company's rights or defenses, nor an admission of liabi ____ ____ ____ and is
entirely without prejudice.

(2)   Please be advised and take notice that a copy of this instrument and supporting documentation will
be presented to alleged principal and his/her attorney.

*Contact: Mr. John W. McEvoy
The Mahoney Group – Casa Grande
(520) 836-7483 for information

Form FC-34-2/Rev. 8/94

000004243

I000000023

## DOCUMENTATION OF MISSING CHECK SEARCH

- A search for missing checks was completed by matching cancelled checks returned by the bank to the corresponding bank statement for Central Arizona Medical Center (CAMC), Central Arizona Care Center (CACC), Desert Valley Care Center (DVCC) and Casa Grande Regional Medical Center (CGRMC).

- The time period of October 1994 through February 1996 was researched for CAMC. The search resulted in two (2) missing checks. Attached is a detail listing of these checks.

- The time periods of August 1994 and October 1994 through February 1996 were searched for DVCC. The search resulted in seven (7) missing checks. Of the checks missing one check was paid to a legitimate vendor. See attached listing for missing checks.

- For CACC the time period of July 1995 through February 1996 was searched. There was one check missing; but was subsequently found to be made payable to a legitimate vendor.

- For CGRMC the time periods of March 1995 through April 1995 and mid-May 1995 through February 1996 were searched. For the time period of May 1 - 15, 1995 cancelled checks were not found within the Accounting department or in storage. At this point, Caliber Bank was purchased by Norwest Bank and bank statements were cut mid-month. There is a question if cancelled checks were returned by Caliber Bank. There is also a question if Caliber Bank was returning cancelled checks to CGRMC for periods prior to March 1995. Norwest Bank has been unable to verify if checks were or were not returned.

- During the search of CGRMC three checks were determined to be missing; but did not appear suspicious. Check copies were returned by Norwest and were found to be paid to legitimate vendors.

Prepared by: Karen Edmunds

March 21, 1996

I 000000024

000004244

P-App. 005846

## DETAIL LISTING OF MISSING CHECKS

| BANK ACCT # | ENTITY | A/P SYSTEM PAYEE | DATE CLEARED | CHECK NUMBER | AMOUNT |
|---|---|---|---|---|---|
| 60138-0102-3 | CAMC | KRAFT | 12/18/95 | 18852 | 3,865.96 |
| 60138-0102-3 | CAMC | KRAFT | 1/30/96 | 16420 | 2,289.12 |
| | | | | | 6,155.08 |
| | | | | | |
| 60105-0101-7 | DVCC | KRAFT | 3/6/95 | 15052 | 2,185.95 |
| 60105-0101-7 | DVCC | KRAFT | 3/23/95 | 15105 | 2,314.56 |
| 60105-0101-7 | DVCC | KRAFT | 5/26/95 | 15472 | 1,672.13 |
| 60105-0101-7 | DVCC | KRAFT | 9/5/95 | 15774 | 1,519.95 |
| 60105-0101-7 | DVCC | KRAFT | 12/19/95 | 16340 | 2,251.29 |
| 60105-0101-7 | DVCC | KRAFT | 1/5/96 | 14013 | 2,237.09 |
| | | | | | 12,180.97 |
| | | | | GRAND TOTAL | 18,336.05 |

P-App. 005847

000004245

100000000025

```
ACCOUNTING              Casa Grande Regional Medical Ce...        3/15/9
ACCT6461                                                          7:58:2
JBRANES          * Use ATTN key to work with Printer and Job Ques *
===================================================================
    1. ******* MENUS *******      13. ******* MISC *******
     . General Ledger System      14. Set GL Library List
   ...ACCOUNTS Payable System     15. Set AP Library List - CGRMC
    4. View Roboted Reports       16. Set AP Library List - CAMC
    5. Fixed Assets System        17. Set FA Library List
    6. Payroll System             18. Set PR Library List
    7. EFI System                 19. Set EFI Library List
    8. MedSeries4 Report Writer Menu  20. Display Your Library List
    9. GL - Work with Object Locks 21. Query
   10. AP - Work with Object Locks 22. Start Print Writer - PA - ACCT
   11. FA - Work with Object Locks 23. Start Print Writer - PD - RAHP
   12. PP - Work with Object Locks 24. Sign Off
-----------------------------------------------------------------
                                       Invocation level 0:
Enter Menu Option

F3=Signoff.  F5=Reclaim Resources.F12=Previous menu. F15=Initial menu.

(c) Copyright GTE Health systems, Inc.  1982 - 1999.
```

1. 15 "Enter"

2. 3 "Enter"

000004246

I000000026

```
APMASTER                    Casa Grande Regional Medical Ctr        3/15/9
ACCT6461                    A C C O U N T S   P A Y A B L E          7:59:3
JBRANTS                            MASTER MENU
================================================================================

   AP Invoice Functions Menu        13. Reports Menu - Day End
                                     14. Reports Menu - On Demand
 3. Inquiry/Maintenance Menu         15.
 4.                                  16. Operations Menu
 5. Check Functions Menu             17.
 6.                                  18. Managers Menu
 7. Vendor Master Inquiry/Maint      19. Payables Report
 8. Vendor Delete/Combine            20. Purge Menu
 9.                                  21. Menu
10. 1099 Processing Menu             22.
11. AR Master                        23.
12.                                  24. Sign Off
                                     ----------------------------------------
------------------------------------------------------
                                         Invocation level 0:
Enter Menu Option

F3=Signoff.  F5=Reclaim Resources.F12=Previous menu. F15=Initial menu.
```

3. 1 "Enter"

000004247                                    I000000027

P-App. 005849

```
APMENU4                Casa Grande Regional Medical Ctr              3/15/9
ACCT6461              A C C O U N T S   P A Y A B L E                7:59:3
JBRANTS                     INVOICE FUNCTIONS
===========================================================================

   Invoice Entry/Update         13. Match Prepaids/Receipts
                                 14.
 3. Linematch Invoices          15. Hold/Release Invoices by Vendr
 4.                             16.
 5. Recurring Invoices           17. tst pt refunds--select
 6.                             18. approve pt rfnds
 7. Invoice Approval            19.
 8.                             20. INQUIRY/UPDATE MENU
 9. Invoice Maintenance Log      21. CHECK FUNCTIONS MENU
10.                             22. A/P MASTER MENU
11. Change Invoice User Name     23.
12. Create Unpaid Sales Tax Invoic   24. Sign Off

---------------------------------------------------------------------------
                                            Invocation level 03

Enter Menu Option

F3=Signoff.  F5=Reclaim Resources.F12=Previous menu. F15=Initial menu.
```

4. 1 "Enter"

```
                    A C C O U N T S   P A Y A B L E          3/15/96
APDI091C            H O S P I T A L   S E L E C T I O N   S C R E E N    8:02:25
==================================================================================
            Ln       User ID      Hospital ID   Hospital Name
----------------------------------------------------------------------------------
            01       JBRANTS         100          CGRMC
            02       JBRANTS         200          CAMC
            03       JBRANTS         250          CACC
            04       JBRANTS         300          DVCC
            05       JBRANTS         400          CGRRC
            06       JBRANTS         500          MAB
            07       JBRANTS         600          CFW
            08       JBRANTS         700          RAHP
            09       JBRANTS         710          REBA
            10       JBRANTS         720          VAN
----------------------------------------------------------------------------------

            Enter Line Number....... 1


F3=Exit
```

5. 1 "Enter"

000004249

I000000029

```
                    A/P INVOICE INPUT/UPDATE SCREEN (HEADER)          8:02:34
APDU100I
Hospital    100 CGRMC
Voucher.....                              Status....... NEW   Type...
Alternate Payable Master...              P.O.....
Vendor ID...
Invoice ....                               Expense
Total Inv $.                            Period Year
Dates: Invoice Discount  Pay    Check
(MMDDYY)

Enter Batch number:

Vendor  Name........
        Check Name..
        Addr1.......
        Addr2.......
        City/St/Zip.
        Fed ID/SSN..              Phone:



Inquiry : F19=Logs  F16=Vendor  F17=Invoice  F18=Checks
```

6o   F17 — Take you to invoice inquiry screen

000004250                                        I000000030

P-App. 005852

```
APDI010C              A C C O U N T S   P A Y A B L E        3/15/-6
Hosp  100 CGRMC       I N V O I C E   S E A R C H            8:29:10
===================================================================
Ln Inv Num        SN Chk Dt Vend ID Vend Name    PO Num Voucher Stat    Amour
-------------------------------------------------------------------
01 TRIAL          01 031496 20781   TEST OF A/          40052  PAID     10.0
02 REIMB FOR DINNE 01 031396 20782  APODACA, B          40054  PAID     38.8
03 KEFLEX PRESCIP. 01 010896 2079   WAL-MART P          34076  PAID     11.5
04 LUCAS NELSON-PR 01 090294 2079   WAL-MART P           3103  PAID     34.4
05 MEDICINE FOR 2  01 022396 2079   WAL-MART P          38427  PAID     30.8
06 MR 288500       01 082595 2079   WAL-MART P          25865  PAID     15.7
07 PT:KAISER,STEVE 01 020596 2079   WAL-MART P          36676  APRV     16.1
08 PT:RINDFLESCH,S 01 010896 2079   WAL-MART P          34196  PAID     18.7
09 RX JOYCE MONTIJ 01 102894 2079   WAL-MART P           6703  PAID     41.7
10 6702581         01 090894 2079   WAL-MART P           3933  PAID     48.2
-------------------------------------------------------------------
    Enter line No, or Voucher No......
    or Vendor ID and/or Invoice No....
           and      Status (O/C)..
    or PO Number...................
    Enter Vendor Name for Search....  TEST

F3=Exit    F12=Previous
    Line number and F8: Return to previous screen with selection
```

7. – Tab down to Vender Name Search

  – Type in Vendor/ or part of vendor name

  – In this case
     Type : Test "Enter"

I000000031

```
                    A C C O U T S   P A Y A B L E   S Y S T E M      3/15/96
APDI020C            V E N D O R   M A S T E R   F I L E   S E A R C H   8:29:25
================================================================================
                                                     Federal ID    Tmp  Ref
                                                                     Y
    Vendor Id      Vendor Name
--------------------------------------------------------------------------------
01  20781          TEST OF A/P CONTROLS #2
02  2012           THACKRAY RECONSTRUCTIVE SYSTEM                    Y
03  20615          THARRINGTON, ROY
04  4831           THE ARIZONA LABOR LETTER
05  4048           THE AZ PHARMACY ASSOC
06  4140           THE BUSINESS WORD INC.
07  4157           THE BUTTES
08  4550           THE CARING COMPANY                                Y
09  20164          THE EXECUTIVE GALLERY INC
10  4435           THE HEALTHCARE FORUM
--------------------------------------------------------------------------------
        Enter Line No, Vendor Name or *ADD.
               or Vendor ID....................


F3=Exit    F12=Previous
      Line Number and F8: Return to previous screen with selection
```

So Type : 1 "Enter"

000004252

I000000032

```
         A C C O U N T S   P A Y A B L E   S Y S T E M        3/15/9
APDU020A              VENDOR MASTER FILE MAINTENANCE           8:31:0
===================================================================
Category
Vendor ID 20781       Vendor Name                  Temp Vnd Flag
                      Check Name                   Refund Vendor
```



```
         ACCOUNTING ADDRESS              MATERIALS ADDRESS
         KDKDK                           KDKDK
Address 1
Address 2
City/State
Zipcode
Contact
Phone No.
Federal ID or SSNO          Service#
                            800 No.

Ship Term
Pay Term:  Payment  Day    Type         Creation Date     3/14/96
Disc Term: Discount Day    Type         Maintenance Date  3/15/96
           Discount %                   User ID           JBRANTS

Display Vendor Statistical detail N     Rec Sts.. A
```

This screen would show name of vendor
before check run which would be printed
on check ←
  ✱ "Enter" to get out of screen

000004253

I000000033

```
                A C C O U N T S   P A Y A B L E   S Y S T E M
APDU020A           VENDOR MASTER FILE MAINTENANCE              8:31:46
==============================================================================
Category                                                    Temp Vnd Flag
Vendor ID 20781        Vendor Name                           Refund Vendor
                       Check Name

             ACCOUNTING ADDRESS                MATERIALS ADDRESS
                    KDKDK                            KDKDK
Address 1
Address 2
City/State
Zipcode
Contact
Phone No.                        Service#
Federal ID or SSNO               800 No.

Ship Term
Pay Term:  Payment  Day      Type        Creation Date     3/14/96
Disc Term: Discount Day      Type        Maintenance Date  3/15/96
           Discount %                    User ID           JBRANTS

Display Vendor Statistical detail N    Rec Sts.. A
```

9. After check run you would return to this screen by repeating steps 7 & 8. Then would change name back to original vendor in which you wanted system to show

```
APDI010C                  A C C O U N T S   P A Y A B L E              3/--/--
Hosp   100 CGRMC.          I N V O I C E   S E A R C H                8:25:38
===========================================================================
                       SN Chk Dt Vend ID Vend Name   PO Num Voucher Stat   Amoun
Ln  Inv Num
---------------------------------------------------------------------------
                                                              40052 PAID       82.0
    REIMB FOR DINNE 01 031396 20782   APODACA, B       40054 PAID       38.8
03  KEFLEX PRESCIP. 01 010896 2079    WAL-MART P        34076 PAID       11.5
04  LUCAS NELSON-PR 01 090294 2079    WAL-MART P         3103 PAID       34.4
05  MEDICINE FOR 2  01 022396 2079    WAL-MART P        38427 PAID       30.8
06  MR 288500       01 082595 2079    WAL-MART P        25865 PAID       15.7
07  PT:KAISER,STEVE 01 020596 2079    WAL-MART P        36676 APRV       16.1
08  PT:RINDFLESCH,S 01 010896 2079    WAL-MART P        34196 PAID       18.7
09  RX JOYCE MONTIJ 01 102894 2079    WAL-MART P         6703 PAID       41.7
10  6702581         01 090894 2079    WAL-MART P         3933 PAID       48.2
---------------------------------------------------------------------------
    Enter line No, or Voucher No......
    or Vendor ID and/or Invoice No....
             and     Status (O/C)..
    or PO Number.....................
    Enter Vendor Name for Search......

F3=Exit   F12=Previous
    Line number and F8: Return to previous screen with selection
```

*+ Shows invoice again*

*Type L "F8"*

000004255

I000000035

```
                    A/P INVOICE INPUT/UPDATE SCREEN (DETAIL)        3/15/96
                                                                   8:26:25
APDU100C
Hospital    100 CGRMC              Status...... PAID   Type... NOPO
Voucher.    40052                  Packing List. TRIAL
Alternate Payable Master... OP     Vendor Information:
Vend ID. 20781      Warn: Duplicate Inv
Invoice. TRIAL                      1          KDKDK
P.O....
Dates: Invoice  Discount    Pay    Check
       3/14/96  3/14/96   3/14/96  3/14/96                            Net
Terms:Vend.                   /          Po.    /         Check     Date Prd T
  Ln Type Code  Amount   Tax  Account    %  Prd  Co   Check         31496    9
   1 DOLL         1000        834004200     9  100                  31496
   2                                        9  100                  31496
   3                                        9  100                  31496
   4                                        9  100                  31496
   5                                        9  100                  31496
   6                                        9  100                  31496
   7                                        9  100                  31496
   8
Invoice total:        10.00   Display 1099/Delete Screen.   N or F4
                              Display Distribution Process.  N or F11
Inquiry: F10=G/L Acct  F16=Vendor  F17=Invoice  F18=Check
```

\# Vendor before being change, but after
check was issued

000004256

I000000036

```
APDU010C      A / P   I N V O I C E   D E T A I L   S C R E E N      8:32:06
                                        01   Status....... PAID  Type... NOPO
Invoice... TRIAL                             Packing List. TRIAL
Voucher...   40052                      Vend ID 20781
P.O.......                              Vendor  [redacted]
1099...... N                            Check    KDKDK
Date     Invoice   Discount    Pay     Check
3/14/96  3/14/96   3/14/96   3/14/96  3/14/96
Comments.. TEST OF A/P INTERNAL CONTROLS
Terms...       /               Net
 Ln  Type      Amount     Tax  Account    Fund Sub  Co     Check     Type Prt Date A
  1 DOLL        10.00        834004200 OP   00  100 [redacted]  [redacted]0  N  3/14/96

                                                                  1 Lines
    Enter a Line Number for more Detail......
                                          Total Invoice Amount...          10.0
  F8: Return with selection       F10: Previous Inv  Enter: Next Invoice
```

* Shows vendor was changed after check was issued

I000000037

000004257

P-App. 005859

```
                 A C C O U T S   P A Y A B L E   S Y S T E M        3/15/96
                 V E N D O R   M A S T E R   F I L E   S E A R C H    8:31:50
 PDI020C
==================================================================================
                                              Federal ID     Tmp  Ref
 LP   Vendor Id      Vendor Name              -------------------------------
                                                               Y
                                   NUMBER
 02   2012           THACKRAY RECONSTRUCTIVE SYSTEM            Y
 03   20615          THARRINGTON, ROY
 04   4831           THE ARIZONA LABOR LETTER
 05   4048           THE AZ PHARMACY ASSOC
 06   4140           THE BUSINESS WORD INC.
 07   4157           THE BUTTES
 08   4550           THE CARING COMPANY                        Y
 09   20164          THE EXECUTIVE GALLERY INC
 10   4435           THE HEALTHCARE FORUM
--------------------------------------------------------------------------------
         Enter Line No, Vendor Name or *ADD....
              or Vendor ID...................


 F3=Exit   F12=Previous
      Line Number and F8: Return to previous screen with selection
```

*Shows Vendor name was change — done after check was cut to "Test OF A/P Control"*

000004258

I000000038

```
                 A C C O U T S   P A Y A B L E   S Y S T E M        3/15/96
PDI020C          V E N D O R   M A S T E R   F I L E   S E A R C H   8:29:25

=================================================================
                                              Federal ID   Tmp  Ref
Ln..  Vendor Id    Vendor Name          ----------------------------
01    20386        TEST ONE CORPORATION                      Y
02    2012         THACKRAY RECONSTRUCTIVE SYSTEM            Y
03    20615        THARRINGTON, ROY
04    4831         THE ARIZONA LABOR LETTER
05    4048         THE AZ PHARMACY ASSOC
06    4140         THE BUSINESS WORD INC.
07    4157         THE BUTTES
08    4550         THE CARING COMPANY                        Y
09    20164        THE EXECUTIVE GALLERY INC
10    4435         THE HEALTHCARE FORUM
-----------------------------------------------------------------
       Enter Line No, Vendor Name or *ADD....
            or Vendor ID...................


F3=Exit     F12=Previous
      Line Number and F8: Return to previous screen with selection
```

*Shows Vendor before check issued and.*
*Vendor changed*

000004259                                    I000000039

# NOTICE OF CONCERN

Name: Wendi Andriano   Job Title: Staff Accountant   Facility: Chelme

e of Notice: 3-1-96   Date(s) of Occurance

**Action Taken:**

☐ Documented Verbal Notice   ☐ Performance Improvement   ☐ Written Notice   ☐ Termination

☑ Suspension for Pending Investigation days, to start on 3/1/96 and return on _____
w/o Pay                                                    (date)                    (date)

Nature of Concern: Based on our conversation 3/1/96, (See Attached Statement), the hospital has identified some forms of misconduct as being so detrimental to the best interest of the hospital to warrant immediate discharge. (See Policy D-4-01)

At this time, my intent is to terminate Wendi's employment w/ Casa Grande Regional Medical Center based on her actions; however, at this time Wendi is suspended pending investigation. Wendi is to contact me, Sue Bates, on Monday March 4, 1996 by page (520) 420-6058 + She will notify Wendi of the status of the investigation. I will be Wendi's point of contact & this matter should not be discussed w/ any employees of the organization & Wendi during the investigation. Wendi is encouraged to continue her contact w/the Employee Assistance Program ~ 1-800-634-6433.
                                                                    Sue A Bates
                                                                    Director of Human Resources

**Employee Comments:** Joe and I would like to pay back the money to DVCC. At this time, we are not able to pay the full amount. We would be able to pay a monthly payment until the full amount is paid.

**Action to be taken if same problem occurs:**   ☐ Written Notice   ☐ Suspension   ☑ Termination

Important Note: If another type of problem occurs, the action may be different than shown above. All the relevant facts would be taken into consideration, including this prior notice.

Th_ notice was given on 3-1-96        Wendi Andriano        3-1-96
                        (date)         Employee's Signature            Date

                                        ☐ Employee Refused to sign — requires witness signature

Supervisor's Signature        Date
                    3-1-96
Dept. Manager/Administrator   Date     Sue A Bates        3/1/96
                                        Witness Signature              Date

White: Administrative/Personnel    Yellow: Dept. Mgr.    Pink: Employee

36-1747-9

I000000040

000004260

March 1, 1996

I Wendi Andriano have willfully and knowingly transferred funds from the Desert Valley Care Center account to my own personal account. I transferred these funds approximately one month a go.

I created a manual check and entered the check number into the system under the name of Kraft, deposited the money into my personal account, and destroyed the yellow duplicate copy of the check.

The check was for approximately $2200.00.

I requested this meeting on March 1, 1996 with Jennifer Andrew, Controller and Jill Bates, Director of Human Resources to explain what I had done.

_____          3-1-96
Wendi Andriano                           Date

Witnessed by:

_____          3-1-96
Jennifer Andrew, Controller              Date

_____          3-1-96
Jill A. Bates, Director of Human Resources   Date

I000000041

000004261

| CASA GRANDE REGIONAL MEDICAL CENTER | | | Policy and Procedure Manual | | |
|---|---|---|---|---|---|
| HUMAN RESOURCES | | | | | |
| Chapter | Section | Subject   EMPLOYER EXPECTATIONS | Date Issued | Date Revised | Page |
| D | 4 | 01 | 8/84 | 1/94 | 1 of 3 |

**I.     OBJECTIVE:**
To provide employees with examples of the types of misconduct which could result in corrective discipline.

**II.    POLICY:**
Employees engaging in the following acts of misconduct while on duty or while on CGRMC grounds, could be subjected to corrective discipline.

**III.   DEFINITIONS:**
<u>Misconduct:</u>     Any act intentional, or unintentional that results in the disruption of hospital operations, affects patient care, or is unsafe to the employee or others.

<u>Corrective discipline:</u>     As described in the Progressive Discipline Policy.

**IV.    PROCEDURES:**
Examples of minor offenses would include, but not be limited to, the following:

<u>Unexcused absences</u> (not notifying supervisor in an appropriate timely manner of an absence), repeated tardiness, excessive absenteeism (5 recorded absences within a sliding 12-month period), loafing, misuse of time, substandard work performance, excessive break time, or failure to follow safety rules.

More serious acts of misconduct even for the first offence, depending on the circumstances in each case, would call for more severe steps of corrective discipline. Examples of these more serious offenses would include but not be limited to the following:

1.     Inefficient or careless performance of duties.
2.     Deliberate waste of materials of supplies.
3.     Posting or removal of notices, signs or writing in any form on any bulletin board on hospital property without authorization.
4.     Violation of safety rules or hospital safety practices.
5.     Vulgar or abusive language or behavior.
6.     Failure to submit a physician's statement on request.
7.     Leaving one's own department during working hours for reasons not job-related without permission of one's department head.
8.     Excessive absenteeism (6 recorded absences within a sliding 12-month period).
9.     Allowing non-employees to enter hospital departments or work areas without

| Signature | Title   ADMINISTRATOR/CEO |
|---|---|

I 000000042

000004262

| CASA GRANDE REGIONAL MEDICAL CENTER | | | Policy and Procedure Manual | | | |
|---|---|---|---|---|---|---|
| HUMAN RESOURCES | | | | | | |
| Chapter | Section | Subject | EMPLOYER EXPECTATIONS | Date Issued | Date Revised | Page |
| D | 4 | 01 | | 8/84 | 1/94 | 2 of 3 |

authorization of department head.

10. Smoking in a "no smoking" area.
11. Discriminating against and patient, visitor, employee or doctor because of race, color, age, religion, handicap, sex or national origin.
12. Engaging in personal activities on hospital time without permission.
13. Reasonable suspicion of unauthorized personal use of hospital supplies and/or equipment.
14. Refusal to accept overtime assignments without justifiable reason when necessary and requested by department manager.
15. Reasonable suspicion of sexual harassment of any employee, patient, visitor or contract staff of C.G.R.M.C.

The hospital has identified some examples of misconduct as being so detrimental to the best interests of the hospital, it patients and employees, as to warrant possible **immediate discharge**. The following situations are examples of types of conduct for which the disciplinary procedure may be bypassed, but the list is not considered all inclusive:

1. Gross insubordination: outright refusal to follow directions or obey legitimate orders for supervision.
2. Willful negligence in performance on the job.
3. Willful or negligent misuse or abuse of hospital property, equipment or buildings.
4. Reasonable suspicion of releasing confidential employee and/or employer, and/or patient information to anyone without prior authority.
5. Altering time cards, willful falsification of time spent at work, and other records without supervisory approval.
6. Knowingly completing another employee's time card or allowing someone else to complete your time card.
7. Physical violence or threats toward any employee, patient or guest of the hospital.
8. Reasonable suspicion of stealing or conviction by a court of law for stealing from fellow employees, patients, the hospital or others on hospital premises.
9. Reasonable suspicion of taking hospital property, records, or hospital information without permission.
10. Conviction of a felony.
11. Sleeping, or giving the appearance of sleeping while on duty.
12. Gross negligence jeopardizing the welfare of a patient.
13. Falsification of application for employment, work reports, or other data required by the hospital.
14. Reasonable suspicion of bringing intoxicants, unauthorized drugs or narcotics onto hospital property, or consuming intoxicants, unauthorized drugs or narcotics on hospital property, or reporting for duty under the influence of intoxicants, drugs or narcotics.
15. Reasonable suspicion of buying and/or selling of any intoxicants, unauthorized drugs or narcotics or arranging to do same on hospital property.

000004263

I000000043

| CASA GRANDE REGIONAL MEDICAL CENTER | | | Policy and Procedure Manual | | |
|---|---|---|---|---|---|
| HUMAN RESOURCES | | | | | |
| Chapter | Section | Subject    EMPLOYER EXPECTATIONS | Date Issued | Date Revised | Page |
| D | 4 | 01 | 8/84 | 1/94 | 3 of 3 |

16.  Immoral conduct or indecency on hospital property.
17.  Reasonable suspicion of unauthorized possession of weapons on hospital property.

V.   ATTACHMENTS:  None

VI.  REFERENCES:  None

I000000044

000004264

| CASA GRANDE REGIONAL MEDICAL CENTER | | | | Policy and Procedure Manual | | | |
|---|---|---|---|---|---|---|---|
| HUMAN RESOURCES | | | | | | | |
| Chapter | Section | Subject | EMPLOYER EXPECTATIONS | Date Issued | Date Revised | | Page |
| D | 4 | 01 | | 8/84 | 1/94 | | 1 of 3 |

I.   **OBJECTIVE:**
To provide employees with examples of the types of misconduct which could result in corrective discipline.

II.   **POLICY:**
Employees engaging in the following acts of misconduct while on duty or while on CGRMC grounds, could be subjected to corrective discipline.

III.   **DEFINITIONS:**
   Misconduct:    Any act intentional, or unintentional that results in the disruption of hospital operations, affects patient care, or is unsafe to the employee or others.

   Corrective
   discipline:    As described in the Progressive Discipline Policy.

IV.   **PROCEDURES:**
Examples of minor offenses would include, but not be limited to, the following:

Unexcused absences (not notifying supervisor in an appropriate timely manner of an absence), repeated tardiness, excessive absenteeism (5 recorded absences within a sliding 12-month period), loafing, misuse of time, substandard work performance, excessive break time, or failure to follow safety rules.

More serious acts of misconduct even for the first offence, depending on the circumstances in each case, would call for more severe steps of corrective discipline. Examples of these more serious offenses would include but not be limited to the following:

1.   Inefficient or careless performance of duties.
2.   Deliberate waste of materials or supplies.
3.   Posting or removal of notices, signs or writing in any form on any bulletin board on hospital property without authorization.
4.   Violation of safety rules or hospital safety practices.
5.   Vulgar or abusive language or behavior.
6.   Failure to submit a physician's statement on request.
7.   Leaving one's own department during working hours for reasons not job-related without permission of one's department head.
8.   Excessive absenteeism (6 recorded absences within a sliding 12-month period).
9.   Allowing non-employees to enter hospital departments or work areas without

| Signature | _[signature]_ | Title | ADMINISTRATOR/CEO |
|---|---|---|---|

I000000045

000004265

| CASA GRANDE REGIONAL MEDICAL CENTER HUMAN RESOURCES | | | | | | Policy and Procedure Manual | |
|---|---|---|---|---|---|---|---|
| Chapter | Section | Subject | EMPLOYER EXPECTATIONS | | Date Issued | Date Revised | Page |
| D | 4 | 01 | | | 8/84 | 1/94 | 2 of 3 |

authorization of department head.

10. Smoking in a "no smoking" area.
11. Discriminating against and patient, visitor, employee or doctor because of race, color, age, religion, handicap, sex or national origin.
12. Engaging in personal activities on hospital time without permission.
13. Reasonable suspicion of unauthorized personal use of hospital supplies and/or equipment.
14. Refusal to accept overtime assignments without justifiable reason when necessary and requested by department manager.
15. Reasonable suspicion of sexual harassment of any employee, patient, visitor or contract staff of C.G.R.M.C.

The hospital has identified some examples of misconduct as being so detrimental to the best interests of the hospital, it patients and employees, as to warrant possible immediate discharge. The following situations are examples of types of conduct for which the disciplinary procedure may be bypassed, but the list is not considered all inclusive:

1. Gross insubordination: outright refusal to follow directions or obey legitimate orders for supervision.
2. Willful negligence in performance on the job.
3. Willful or negligent misuse or abuse of hospital property, equipment or buildings.
4. Reasonable suspicion of releasing confidential employee and/or employer, and/or patient information to anyone without prior authority.
5. Altering time cards, willful falsification of time spent at work, and other records without supervisory approval.
6. Knowingly completing another employee's time card or allowing someone else to complete your time card.
7. Physical violence or threats toward any employee, patient or guest of the hospital.
8. Reasonable suspicion of stealing or conviction by a court of law for stealing from fellow employees, patients, the hospital or others on hospital premises.
9. Reasonable suspicion of taking hospital property, records, or hospital information without permission.
10. Conviction of a felony.
11. Sleeping, or giving the appearance of sleeping while on duty.
12. Gross negligence jeopardizing the welfare of a patient.
13. Falsification of application for employment, work reports, or other data required by the hospital.
14. Reasonable suspicion of bringing intoxicants, unauthorized drugs or narcotics onto hospital property, or consuming intoxicants, unauthorized drugs or narcotics on hospital property, or reporting for duty under the influence of intoxicants, drugs or narcotics.
15. Reasonable suspicion of buying and/or selling of any intoxicants, unauthorized drugs or narcotics or arranging to do same on hospital property.

I000000046

| CASA GRANDE REGIONAL MEDICAL CENTER HUMAN RESOURCES | | | | Policy and Procedure Manual | | |
|---|---|---|---|---|---|---|
| Chapter | Section | Subject | EMPLOYER EXPECTATIONS | Date Issued | Date Revised | Page |
| D | 4 | 01 | | 8/84 | 1/94 | 3 of 3 |

16. Immoral conduct or indecency on hospital property.

17. Reasonable suspicion of unauthorized possession of weapons on hospital property.

V.   ATTACHMENTS:  None

VI.   REFERENCES:  None

000004267

I000000047

P-App. 005869

| | | | Policy and Procedure Manual | | | |
|---|---|---|---|---|---|---|
| CASA GRANDE REGIONAL MEDICAL CENTER | | | | | | |
| HUMAN RESOURCES | | | | | | |
| Chapter | Section | Subject | PROGRESSIVE DISCIPLINE PROCESS | Date Issued | Date Revised | Page |
| D | 4 | 21 | | 8/84 | 1/94 | 1 of 2 |

**I.     OBJECTIVE:**
To provide employees with a description of corrective disciplinary action to be used in a given case of misconduct. While each case of misconduct must be judged individually, first time, or lesser offenses would normally require beginning steps of corrective discipline. Repeated offenses, or failure to correct deficiencies, may require successive steps of corrective discipline or possible discharge.

**II.    POLICY:**
The hospital may use a four-step disciplinary procedure to resolve employee problems and/or deficiencies.

**III.   DEFINITIONS:** None

**IV.    PROCEDURES:**

Step One - Verbal: Discussion of the problem with the employee's supervisor in private, pointing out why correction of the problem is necessary and suggesting ways to improve. A brief write-up of what was discussed, with whom and when will serve as a reminder to your supervisor of the verbal warning. A Notice of Concern form should be used and a copy is to be placed in the employee's personnel file.

Step Two - Written: A Performance Improvement Recommendation will be written which will specify the problem and required improvement. The Notice of Concern form will be used and a copy will be placed in the employee's personnel file.

Step Three
Formal Reprimand: A statement of Formal Reprimand will be written on a Notice of concern form and a copy will be placed in the employee's personnel file. Once again the employee will be made aware of the problem and the relevant facts in a private conference. At this time the employee may be given a suspension without pay or be informed the continuation of the problem will lead to suspension or discharge.

Step Four
Written Notice
of Discharge: If the same problem continues, or serious misconduct for the first offense is taking place, an employee will be discharged by their supervisor.

Signature _____     Title   ADMINISTRATOR/CEO

I000000048

000004268

| CASA GRANDE REGIONAL MEDICAL CENTER | | | | | Policy and Procedure Manual | | |
|---|---|---|---|---|---|---|---|
| HUMAN RESOURCES | | | | | | | |
| Chapter | Section | Subject | PROGRESSIVE DISCIPLINE PROCESS | | Date Issued | Date Revised | Page |
| D | 4 | 21 | | | 8/84 | 1/94 | 2 of 2 |

The hospital reserves the right to apply progressive discipline steps, or immediate discharge as it determines appropriate on a case by case basis.

All steps will be documented on a "Notice of Concern" form and a copy will be placed in the employee's personnel file.

The Director of Human Resources will be present during any step at the request of either the department manager/supervisor or the employee.

If applicable, an employee may be suspended without pay under the Formal Reprimand step. Suspension may be used to permit time to conduct an investigation of alleged serious employee misconduct. Upon notification of a suspension, an employee will be required to leave the premises immediately. An employee may not be suspended for more than 5 working days as a result of disciplinary actions.

The corrective discipline and discharge policy may apply to employees during their 90-day orientation period.

V.    ATTACHMENTS:  Notice of Concern form

VI.   REFERENCES:  None

000004269                          I000000049

# FACSIMILE TRANSMISSION

NEAS

NATIONAL EMPLOYEE ASSISTANCE SERVICES, INC.

| | |
|---|---|
| Date: 3/1/96 | Time: 10:05 AM |
| To: Jill Bates | From: Linda R-G |
| Location: Casa Grande | Fax Number: (414) 798-3928 |
| Fax Number: 520-426-6615 | Phone Number: (414) 798-3900 |

The documents accompanying this telecopy transmission contain confidential information belonging to the sender which is legally privileged. The information is intended only for the use of the individual or entity named above. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or taking of any action in reliance on the contents of this telecopied information is strictly prohibited. If you have received this telecopy in error, please immediately notify us.

Message:

Total Number of Pages (including cover): 2

*Please call (414) 798-3900 if you do not receive all pages.*

NATIONAL EMPLOYEE ASSISTANCE SERVICES, INC.
20700 Swenson Drive Suite 200
Waukesha, WI 53186

1000000050

000004270

March 1, 1996

I Wendi Andriano have willfully and knowingly transferred funds from the Desert Valley Care Center account to my own personal account. I transferred these funds approximately one month a go.

I created a manual check and entered the check number into the system under the name of Kraft, deposited the money into my personal account, and destroyed the yellow duplicate copy of the check.

The check was for approximately $2200.00.

I requested this meeting on March 1, 1996 with Jennifer Andrew, Controller and Jill Bates, Director of Human Resources to explain what I had done.

_____          3-1-96
Wendi Andriano                            Date


Witnessed by:

_____          3-1-96
Jennifer Andrew, Controller               Date

_____          3-1-96
Jill A. Bates, Director of Human Resources   Date

000004271                              I 000000051

February 29, 1996
Karen Edmunds
Senior Accountant II

During the normal monthly bank reconciliation process for the January 1996 Desert Valley Care Center bank account an item appeared on the bank statement that was questionable. I was in the process of training Jerry Brantz, Senior Accountant for DVCC, on the reconciliation process. The item appeared on the January bank statement clearing the account as an 'INSF force check paid' item. This is not an unusual occurrence on a bank reconciliation. What causes this is that although the account is overdrawn, checks are forced to clear. The unusual part about this forced check item was that there was no check number associated with it; normally the bank will indicate what check number was forced paid. Since there was not a check number, Jerry and I searched the returned cancelled checks for any check that may have cleared for that amount; thus, giving us a check number to cancel on the AP system.

Once Jerry and I determined that the cancelled check had not been returned by the bank we completed the bank reconciliation and left the amount in question as a reconciling item. I then indicated to Jerry that I would contact the Bank of Casa Grande Valley and see if I could obtain a check copy. On the 22nd I called Laura at the Bank of Casa Grande Valley (836-4666) and informed her that I had an item on the bank statement that I could not identify. Within an hour she fax her a copy of the bank statement and indicate what item was in question. Within an hour she called me back and gave me a check number "14013". She thought that it was odd that I was missing that one cancelled check. In order to determine that I was missing the check Laura asked me to count the number of cancelled checks I received with the bank statement and to compare it to a number on the bank statement that indicates the number of enclosures. I counted the number of checks and was one item short of the number indicated. Laura said that it would be possible to get a copy of the missing document but it would take approximately one week to receive it.

Since Laura was able to provide me with a check number I looked the check number up on the A/P system. When I inquired by check number the system showed me that check number as being issued as payment for a Kraft invoice. I started questioning the check number at that point since the invoice to Kraft in the A/P system was for a different amount than the item that cleared the bank by approximately $30.00. My next step was to ask Marcie Mahon, A/P clerk, to see if she could find the invoice and the check copy that should be on file. On Friday the 23rd Marcie indicated that she could not find the check copy or the Kraft invoice. She asked me that since Wendi was on vacation, could I wait until Wendi returned to find the check since Wendi might have an idea where it might be. I told her I had no problem with that.

Then on the 29th during the early afternoon Jerry Brantz and Angela Gutzmer came to ask me if I had received the copy of the cancelled check yet. I said no, but that I would contact Laura at the Bank of Casa Grande Valley and find out the status getting the check copy. I contacted Laura and she orginally indicated that it could take another couple of days to receive the check copy. During the first part of our conversation Laura said that she had just spoke with Wendi that morning in regards to that check and that Wendi had indicated that when the copy was received to call her at 426-

I000000052

6582 (which is her work number). I told Laura, 'that's strange that you spoke with Wendi about that check, because Wendi is out of the office on personal leave.' I asked her if she was sure that she spoke with Wendi and she said yes. Laura said that it sounded as though Wendi was on a cell phone. I then told Laura that since Wendi was out of the office to please contact me instead when the check copy arrived. I indicated that we were anxious to get a copy of the check so that we could wrap up the bank reconciliation for the month. About a half hour after our initial conversation Laura called me back and said that she was able to get a faxed copy of the cancelled check.

I then asked Laura to verify the check number to be '14013' and she said yes. I then asked if the check was made out to Kraft since that is the payee per the A/P system. She said no— the check was made out to Joe's Windshield Repair and the check was dated 1/5/95. She then commented on the date but then said that could have been an easy mistake since the year had just changed and many people make that mistake of entering the wrong year. Laura said a copy would be available on Friday for the runner to pick up when they made their daily run to the bank.

At that point, knowing the connection between Wendi and Joe's Windshield Repair, I went to Angela Gutzmer and told her that I had received a call from Laura at the bank. I reiterated my call with Laura to Angela and said that Laura had a fax copy available. Angela called Jerry over to her desk and informed him of what I found out. At that point Angela said that we should get the fax copy from Laura as soon as possible. I picked up the copy from Laura and gave the copy to Angela Gutzmer when I returned.

CGRMCC                          ID:                          MAR 01'96   11:25

TRANSMIT CONFIRMATION REPORT

```
NO.          :  003
RECEIVER     :             4147962525
TRANSMITTER  :  CGRMCC
DATE         :         MAR 01'96   11:25
DURATION     :  01'34
MODE         :         STD
PAGES        :  02
 RESULT      :  OK
```

$$\left(\left(414\right)798-3928\right)$$
*WEAS*

000004274                          I000000054



## CASA GRANDE REGIONAL MEDICAL CENTER

## HUMAN RESOURCES DEPARTMENT

This fax is from:

[✓] Jill Bates
Director

[ ] Melinda Zambrano
Compensation/Information
Coordinator

[ ] Pam DeWitt
Employee Development
Coordinator

[ ] Tanya Haney
Assistant Director

[ ] Melissa Brewster
HR Coordinator

[ ] Debby Turner
HR Assistant

PLEASE DELIVER THIS FAX TO: _Linda Robinson-Coop_
_____NEAS_____

This fax is ___1___ pages long
(Not including cover sheet)

Please note the following: _(Seal Attached)_
_____
_____
_____

If any part of this fax is missing, please call the Human Resources
department at 502-426-6510.

Thanks!

tsh142

000004275                                    I000000055

03/01/1996  10:13   4147962525                NEAS                          PAGE  82

**National Employee Assistance Services, Inc.:**
**Consent for Release of Confidential Information**
MUST BE SIGNED BY EVERY CLIENT

CROSS OUT ALL SECTIONS WHICH DO NOT APPLY

| Section 1: Release by the EAP to providers/payors | Section 2: Release by providers to EAP | Section 3: Release to employer |

I, X Wendi Andriano _____ , voluntarily consent to and authorize the following releases of
(Name of Client)                                information:

**SECTION ONE:** I authorize National Employee Assistance Services, Inc. ("the EAP") to disclose and
release to the following individuals, agencies or organizations:

_____        (Name of affiliate, other providers,
_____        insurers, third party administra-
                                             tors, or others to whom informa-
                                             tion will need to be released)

All information needed to (a) have services authorized, (b) obtain benefit coverage or payment for services,
(c) help in planning, providing or monitoring services. Information released under this Section One may
include all information that the EAP has produced or obtained about services provided to me or on my
behalf, including the details of those services.
If I previously gave the EAP permission over the telephone to release information, my signature confirms
that this written consent also apply to any release of information which I authorized verbally and which has
already occurred.

**SECTION TWO:** I authorize any service provider to whom I am referred by the EAP or by any of its
affiliated providers, including, without limitation,

_____        (Name of Affiliate or other Provider)

to disclose and release to the EAP all information needed to help manage or coordinate my case.
Information released under this Section Two may include all information which any provider has produced
or obtained about services provided to me or on my behalf, including the details of those services.

**SECTION THREE:** (RELEASE TO EMPLOYER ONLY) I authorize the EAP to disclose and release to
representatives of my employer,  Gil Batle  Human Resources or desig___
                                 (Name of supervisor or other employer representative)

The following information (cross out any that do not apply):
(1) That I have accepted referral to and contacted the EAP.
(2) The EAP's assessment of my situation.
(3) The EAP's recommendations regarding services.
(4) My compliance with, progress toward fulfillment of, and/or completion of the EAP's recommendations,
    including test results and reports of other providers relating to my compliance or progress.
(5) Other: _____
                    (Other information authorized to be released)
The purpose of release under this Section Three is to assist in compliance with a company referral to the EAP.

**APPLICABLE TO ALL CONSENTS:** I understand that information to be released or disclosed under any
Section of this Consent may be confidential in nature, and may include written notes and records as well as
impressions and conclusions of providers.
•This Consent becomes effective on the date I sign it, and will continue in effect for twelve (12) months from
 that date unless I revoke it before that time.  I understand I can revoke this Consent at any time, but
 information released before revocation cannot be retrieved.
•I acknowledge that a copy of this Consent has been offered to me, and a copy will be kept in EAP records.
 I understand that I have a right, upon written request, to inspect and receive a copy of any written
 information disclosed under this Consent.
•I agree that a photocopy or facsimile copy of this Consent is as valid as the original.
•I release the EAP and other service providers referred to above from any liability for disclosure of
 confidential information while this Consent is effective.

Signed: X Wendi Andriano _____        Date: X 3-1-96
   OR
Signature of Legally
Authorized Person: Julie A Batle ___    Date: 3-1-96  ((520) 726-6581 - Work #4a )
                                                      ((520) 426-5551 - Pager )
Relationship to Client: _____

Witness: Julie A Batle _____           Date: 3-1-96

SEE INSTRUCTIONS ON REVERSE SIDE.                                      3

000004276                                                  I000000056

**NOTES**

- Typed CK — Made out to their
  - Deposited

Manual CK — Entered into Computer Until

Throw away Yellow CK Copy

About a month ago          (Approx — $2200)


Didn't


Spoke to Re Last Night —
— WK Card / Goes towards Business
— She buys Stuff
— Take Credit Card Statement — Maxed Out!
— Joe Went to Use & Couldn't
— Asked Why

   who knows
( Joe, Kellie & Us? )


//

★ Spoke w/ Linda Robinson ba :
(8/1/96 — 11:15 am )
RE: Already Knowing
   + VM message
   + has Employee


Reorder From Day-Timers, Inc., Allentown, PA • Style M337 • Prod #07204  ©1995, 1098 Blanchard Training & Development, Inc.

# interoffice
## MEMORANDUM

**to:**    Jill Bates, Director of Human Resources

**cc:**

**from:**    Angela Gutzmer

**re:**    Wendi Andriano

**date:**    March 1, 1996

<u>This letter will detail the events that occurred on Thursday, February 29, 1996:</u>

At approximately 1:30 p.m. Jerry Brantz and myself had a conversation regarding a very upsetting situation that had occurred between Marcy McMahon (Accounting Clerk) and Wendi Andriano (Staff Accountant) earlier this same day. Apparently, Wendi had made phone contact with Marcy during the morning hours asking her assistance in creating back-up for a manual check that had been entered into the computer system. This manual check had been cut in early January and cleared the bank on January 9, 1996. The check was actually tied to a Kraft Food Service invoice but was made out to Joe's Autoglass Shop. This is her husbands business. The check was for approximately $2,237.00.

from the desk of...

Angela Gutzmer
Financial Analyst
Central Arizona Medical Center
P.O. Box 2080
Florence, AZ

(520) 426-6572
Fax: (520) 426-6435

Jerry and myself began the process of searching for the actual cancelled check. We spoke with Karen Edmunds who had completed the January 1996 bank reconciliation for Desert Valley Care Center. This particular check was missing from the bank statement and it appeared as if someone had taken that check out of the cancelled checks. The bank statement showed their should have been 61 enclosures and their was only 60. At this point, Karen called The Bank of Casa Grande Valley to speak with Laurie, the women she had spoken with last week when

she ordered a copy of the check. Laurie made the comment that Wendi Andriano had called her that morning (2/29/96) and requested that they call her when that check copy was ready. Through the banks efforts, we were able to obtain a copy of the cancelled check which indicated that it was cashed to Joe's Autoglass Shop and was clearly not made to Kraft Food Service. We then confronted Jennifer Andrew and Jill Bates.

I also learned that Wendi stopped by Marci McMahon's apartment the morning of March 1, 1996 sometime before 8:00 a.m.

000004279                                    I000000059

March 1, 1996

Jill Bates
Human Resources Director
Casa Grande Regional Medical Center
1800 E. Florence Blvd.
Casa Grande, AZ  85222

Dear Jill:

This letter is documentation in reference to the call I received from Wendi Andriano Wednesday Feb 28, 1996.  She wanted Bessie Hamilton's telephone number for a member at her church.  Wendi did not sound well at all.  I told her to call me  if there was anything I can do for her or If she needed to talk someone.  Wendi mentioned that she was embarrassed.  I wasn't sure why she should be  embarrassed.  I told her some people go through emotional feelings and that was nothing to be embarrassed about.  The conversation ended at that point.  I have had no communication with Wendi since that evening.

Sincerely,

Delia Schroeder

Delia Schroeder

000004280                          I000000060

P-App. 005882

< Can We return Mig —>

• Consumer Credit Counseling .

• Call w/Kathy Opahl
  (↳ Setup Testing)

        Register
  ◦ 1/15
  ◦ 2 IDS
  ◦ 1½ Hours (Ap /Interview /Testing
  ◦ Resume

000004281                    I000000061

P-App. 005883

```
PPDU030B
                        F I L E   M A I N T E N A N C E          3/06/96 11:35:37
                        D E D U C T I O N   F I L E

                      100  ████████  ANDRIANO, WENDI E

Deduction Code ....... 0891  EMP SPECIAL PURCHASE
                          Employee        Employer      Processing Code..
Deduction Amount .....    216.50               .00      Rollup Type .......     0
Deduction Percent ....                                  Flex Ded?/Option   N
Computation Method ... A                     A          Transaction Type..
Billing/Option Code...
Deduction Limit ......  1,082.50             .00        Limit Use .........    2
One Time Amount ......       .00             .00        Frequency .........    E
Table Amounts ........   .0000           .0000
Bank Account Number...
Bank Routing Number...                                  EE/Spouse/Dep Sequence#..........
Deposit Type ......... N                                EE/Spouse/Dep Birth Date...  8/26/70
Chk/Sav Type .........                                    Employee        Employer
                                                 Current ..   216.50              .00
Take Deduction? ...... Y                          QTD ......   216.50              .00
                                                  YTD ......   216.50              .00
Effective Date .......  0/00/00                   Last Change: Yr 96   Pay Prd   5
Effective End Date ... 99/99/99
```

(+) Amount Taken — $

▸ Amount already Pd —
to be directed towards
monies owed if company
reimburses he for the
mtg.

I, Wendi Andriano, I will pay $100 as a downpayment on the debt I owe. On March 22, I will make arrangements to make regular payments.

Wendi Andriano 3-6-96

(Witness: Juli A. Bates (3/6/96))

• Wendi is to contact Juli A. Bates at (426-6581) or Page me (426-5391) on or before March 22, 1996. At this time, 3/22/96, Wendi will return the ring she purchased from the Jewelry sale to go against the monies owed.

(WITNESS: Jenji J. Ahn 3/6/96)

000004283                    I000000063

P-App. 005885

```
ACCOUNTING              Casa Grande Regional Medical Ctr           Friday
ACCT6461                                                          3/15/96
JBRANTS              * Use ATTN key to work with Printer and Job Ques *    7:58:24
============================================================================
```

```
    ******* MENUS *******              13. ******* MISC *******
 1. General Ledger System             14. Set GL Library List
 2. Accounts Payable System           15. Set AP Library List - CGRMC
 3.                                    16. Set AP Library List - CAMC
 4. View Roboted Reports               17. Set FA Library List
 5. Fixed Assets System                18. Set PR Library List
 6. Payroll System                     19. Set EFI Library List
 7. EFI System                         20. Display Your Library List
 8. MedSeries4 Report Writer Menu      21. Query
 9. GL - Work with Object Locks        22. Start Print Writer - PA - ACCT
10. AP - Work with Object Locks        23. Start Print Writer - PD - RAHP
11. FA - Work with Object Locks        24. Sign Off
12. PP - Work with Object Locks
```

```
--------------------------------------------------------------------------
                                                   Invocation level 01
Enter Menu Option

F3=Signoff.  F5=Reclaim Resources.F12=Previous menu. F15=Initial menu.

(c) Copyright GTE Health systems, Inc.  1982 - 1999.
```

1. 15 "Enter"

2. 3 "Enter"

Following pages are showing procedures
after check has be selected to pay

```
APMASTER          Casa Grande Regional Medical Ctr          Friday
ACCT6461          A C C O U N T S   P A Y A B L E          3/15/96
JBRANTS                   MASTER MENU                       7:59:30
================================================================================

 1. Invoice Functions Menu            13. Reports Menu - Day End
 2.                                    14. Reports Menu - On Demand
 3. Inquiry/Maintenance Menu           15.
 4.                                    16. Operations Menu
 5. Check Functions Menu               17.
 6.                                    18. Managers Menu
 7. Vendor Master Inquiry/Maint        19. Payables Report
 8. Vendor Delete/Combine              20. Purge Menu
 9.                                    21. Menu
10. 1099 Processing Menu               22.
11. AR Master                          23.
12.                                    24. Sign Off
------------------------------------------------------------------
--------------------------------------          Invocation level 02
Enter Menu Option

F3=Signoff.  F5=Reclaim Resources.F12=Previous menu. F15=Initial menu.
```

3. 1 "Enter"

P-App. 005887

```
APMENU4                  Casa Grande Regional Medical Ctr              Friday
ACCT6461                 A C C O U N T S   P A Y A B L E               3/15/96
JBRANTS                        INVOICE FUNCTIONS                       7:59:39
===============================================================================
```

```
    Invoice Entry/Update          13. Match Prepaids/Receipts
                                   14.
 3. Linematch Invoices            15. Hold/Release Invoices by Vendr
 4.                               16.
 5. Recurring Invoices            17. tst pt refunds--select
 6.                               18. approve pt rfnds
 7. Invoice Approval              19.
 8.                               20. INQUIRY/UPDATE MENU
 9. Invoice Maintenance Log       21. CHECK FUNCTIONS MENU
10.                               22. A/P MASTER MENU
11. Change Invoice User Name      23.
12. Create Unpaid Sales Tax Invoic 24. Sign Off
```

```
    ------------------------------------------------------------------
                                              Invocation level 03
    Enter Menu Option

    F3=Signoff.  F5=Reclaim Resources.F12=Previous menu. F15=Initial menu.
```

4o 1 "Enter"

P-App. 005888

```
                    A C C O U N T S   P A Y A B L E        3/15/96
                 H O S P I T A L   S E L E C T I O N   S C R E E N    8:02:25
APDI091C
================================================================================

          Ln      User ID     Hospital ID   Hospital Name
        ------------------------------------------------------------
          01      JBRANTS        100         CGRMC
          02      JBRANTS        200         CAMC
          03      JBRANTS        250         CACC
          04      JBRANTS        300         DVCC
          05      JBRANTS        400         CGRRC
          06      JBRANTS        500         MAB
          07      JBRANTS        600         CFW
          08      JBRANTS        700         RAHP
          09      JBRANTS        710         REBA
          10      JBRANTS        720         VAN

        ------------------------------------------------------------

                  Enter Line Number.......  1


F3=Exit
```

5. 1 "Enter"

```
                A/P INVOICE INPUT/UPDATE SCREEN (HEADER)        3/15/96
                                                                8:02:34
APDU100I
Hospital    100 CGRMC
Voucher.....
Alternate Payable Master...            Status....... NEW    Type...
                                       P.O.....
Vendor ID...
Invoice ....
Total Inv $.                           Expense
Dates: Invoice Discount   Pay   Check  Period Year
(MMDDYY)

Enter Batch number:

Vendor   Name........
         Check Name..
         Addr1.......
         Addr2.......
         City/St/Zip.
         Fed ID/SSN..          Phone:



Inquiry : F19=Logs  F16=Vendor  F17=Invoice  F18=Checks
```

6o   F17 — Take you to invoice inquiry screen

P-App. 005890

```
APDI010C              A C C O U N T S   P A Y A B L E        3/15/96
Hosp   100 CGRMC          I N V O I C E   S E A R C H         8:29:10
=====================================================================

Ln Inv Num        SN Chk Dt Vend ID Vend Name  PO Num Voucher Stat    Amount
---------------------------------------------------------------------
01 TRIAL          01 031496 20781   TEST OF A/        40052 PAID       10.00
02 REIMB FOR DINNE 01 031396 20782  APODACA, B        40054 PAID       38.82
03 KEFLEX PRESCIP. 01 010896 2079   WAL-MART P        34076 PAID       11.54
04 LUCAS NELSON-PR 01 090294 2079   WAL-MART P         3103 PAID       34.43
05 MEDICINE FOR 2 01 022396 2079    WAL-MART P        38427 PAID       30.86
06 MR 288500      01 082595 2079    WAL-MART P        25865 PAID       15.75
07 PT:KAISER,STEVE 01 020596 2079   WAL-MART P        36676 APRV       16.15
08 PT:RINDFLESCH,S 01 010896 2079   WAL-MART P        34196 PAID       18.74
09 RX JOYCE MONTIJ 01 102894 2079   WAL-MART P         6703 PAID       41.71
10 6702581        01 090894 2079    WAL-MART P         3933 PAID       48.23
---------------------------------------------------------------------
    Enter line No, or Voucher No......
    or Vendor ID and/or Invoice No....
         and    Status (O/C)..
    or PO Number.....................:
    Enter Vendor Name for Search....:   TEST

F3=Exit   F12=Previous
    Line number and F8: Return to previous screen with selection
```

7. — Tab down to Vender Name Search
   — Type in Vendor/ or part of vendor name
   — In this case
       Type : Test "Enter"

Page 6
000004289                                    I000000069

```
                  A C C O U T S   P A Y A B L E   S Y S T E M          3/15/96
                  V E N D O R   M A S T E R   F I L E   S E A R C H      8:29:25
APDI020C
==============================================================================
                                                  Federal ID    Tmp  Ref
     Vendor Id    Vendor Name
     -----------------------------------------------------------------    Y
01   20781        TEST OF A/P CONTROLS #2
02   2012         THACKRAY RECONSTRUCTIVE SYSTEM                           Y
03   20615        THARRINGTON, ROY
04   4831         THE ARIZONA LABOR LETTER
05   4048         THE AZ PHARMACY ASSOC
06   4140         THE BUSINESS WORD INC.
07   4157         THE BUTTES
08   4550         THE CARING COMPANY                                       Y
09   20164        THE EXECUTIVE GALLERY INC
10   4435         THE HEALTHCARE FORUM
------------------------------------------------------------------------------
     Enter Line No, Vendor Name or *ADD. 1
        or Vendor ID..................

F3=Exit   F12=Previous
   Line Number and F8: Return to previous screen with selection
```

So Type "1" Enter

```
            A C C O U N T S   P A Y A B L E   S Y S T E M         3/15/96
                     VENDOR MASTER FILE MAINTENANCE               8:31:07
==================================================================================
APDU020A
Category                                                    Temp Vnd Flag Y
Vendor ID 20781        Vendor Name TEST OF A/P CONTROLS #2   Refund Vendor
                       Check Name  TEST VENDOR #2

              ACCOUNTING ADDRESS              MATERIALS ADDRESS
              KDKDK                           KDKDK
Address 1     KDKDK
Address 2
City/State
Zipcode
Contact
Phone No.                          Service#
Federal ID or SSNO                 800 No.

Ship Term                                  Creation Date      3/14/96
Pay Term:  Payment  Day      Type          Maintenance Date   3/15/96
Disc Term: Discount Day      Type          User ID            JBRANTS
           Discount %

Display Vendor Statistical detail N      Rec Sts.. A
```

This screen would show name of vendor
before check run which would be printed
on check —
  ✱ "Enter" to get out of screen

Page 8
000004291                                    I000000071

```
                A C C O U N T S   P A Y A B L E   S Y S T E M        3/15/96
                        VENDOR MASTER FILE MAINTENANCE                8:31:46
==============================================================================
APDU020A
==============================================================================
Category
Vendor ID 20781          Vendor Name  TEST OF A/P CONTROLS NUMBER 2  Temp Vnd Flag Y
                         Check Name   TEST VENDOR NUMBER 2           Refund Vendor

               ACCOUNTING ADDRESS                 MATERIALS ADDRESS
               KDKDK                               KDKDK
Address 1  KDKDK
Address 2
City/State
Zipcode
Contact
Phone No.                               Service#
Federal ID or SSNO                      800 No.

Ship Term
Pay Term:  Payment  Day      Type       Creation Date      3/14/96
Disc Term: Discount Day      Type       Maintenance Date   3/15/96
           Discount %                   User ID            JBRANTS

Display Vendor Statistical detail N     Rec Sts.. A
```

9.  After check run you would return to this screen by repeating steps 7&8. Then would change name back to original vendor in which you wanted system to show

P-App. 005894

```
APDI010C                    A C C O U N T S   P A Y A B L E        3/15/96
Hosp   100 CGRMC            I N V O I C E   S E A R C H            8:25:38
==============================================================================
Ln  Inv Num          SN Chk Dt Vend ID Vend Name    PO Num Voucher Stat  Amount
------------------------------------------------------------------------------
    TRIAL            01 031496 20781   TEST OF A/     40052 PAID    10.00
    REIMB FOR DINNE  01 031396 20782   APODACA, B     40054 PAID    38.82
03  KEFLEX PRESCIP.  01 010896 2079    WAL-MART P     34076 PAID    11.54
04  LUCAS NELSON-PR  01 090294 2079    WAL-MART P      3103 PAID    34.43
05  MEDICINE FOR 2   01 022396 2079    WAL-MART P     38427 PAID    30.86
06  MR 288500        01 082595 2079    WAL-MART P     25865 PAID    15.75
07  PT:KAISER,STEVE  01 020596 2079    WAL-MART P     36676 APRV    16.15
08  PT:RINDFLESCH,S  01 010896 2079    WAL-MART P     34196 PAID    18.74
09  RX JOYCE MONTIJ  01 102894 2079    WAL-MART P      6703 PAID    41.71
10  6702581          01 090894 2079    WAL-MART P      3933 PAID    48.23
------------------------------------------------------------------------------
    Enter line No, or Voucher No......
    or Vendor ID and/or Invoice No....
              and        Status (O/C)..
    or PO Number...................
    Enter Vendor Name for Search...::.


F3=Exit    F12=Previous
    Line number and F8: Return to previous screen with selection
```

4 Shows invoice again

Pg. Type 1 "F8"

Page 10

000004293

I000000073

```
                    A/P INVOICE INPUT/UPDATE SCREEN (DETAIL)        3/15/96
                                                                   8:26:25
APDU100C
Hospital    100 CGRMC                    Status....... PAID   Type... NOPO
Voucher.  40052                          Packing List. TRIAL
Alternate Payable Master... OP           Vendor Information:
  nd ID. 20781     Warn: Duplicate Inv   TEST VENDOR #2
 .voice. TRIAL                       1   KDKDK
P.O....
Dates: Invoice  Discount    Pay    Check
       3/14/96  3/14/96   3/14/96  3/14/96                        Net
Terms:Vend.          /            Net       Po.   /          Check  Date Prd Typ
  Ln Type Code   Amount   Tax   Account  %  Prd  Co   Check    1  31496   9 10
   1 DOLL           1000         834004200   9  100  T           31496
   2                                         9  100             31496
   3                                         9  100             31496
   4                                         9  100             31496
   5                                         9  100             31496
   6                                         9  100             31496
   7                                         9  100             31496
   8

Invoice total:        10.00   Display 1099/Delete Screen.   N or F4
                              Display Distribution Process. N or F11

  Inquiry: F10=G/L Acct  F16=Vendor  F17=Invoice  F18=Check
```

✳ Vendor before being change, but after
check was issued

000004294                    I000000074

```
APDU010C      A / P   I N V O I C E   D E T A I L   S C R E E N        3/15/96
                                                                         8:32:06
Invoice... TRIAL                    01    Status...... PAID  Type... NOPO
Voucher...  40052                         Packing List. TRIAL
P.O.......                           Vend ID 20781
    99...... N                       Vendor  TEST OF A/P CONTROLS NUMBER 2
Create   Invoice  Discount   Pay    Check    KDKDK
3/14/96  3/14/96  3/14/96  3/14/96  3/14/96
Comments.. TEST OF A/P INTERNAL CONTROLS
Terms...     /              Net
  Ln  Type      Amount    Tax   Account   Fund  Sub  Co   Check    Type Prt Date App
   1 DOLL       10.00           834004200 OP    00   100  T        1 10 N  3/14/96 Y
```

                Enter a Line Number for more Detail......          1 Lines

                                       Total Invoice Amount...            10.00
          F8: Return with selection    F10: Previous Inv   Enter: Next Invoice

*Shows vendor was changed after check was issued*

```
                ACCOUTS  PAYABLE  SYSTEM              3/15/96
                VENDOR  MASTER  FILE  SEARCH          8:31:50
APDI020C
================================================================
      Vendor Id    Vendor Name                Federal ID  Tmp Ref
----------------------------------------------------------------
01   20781         TEST OF A/P CONTROLS NUMBER 2            Y
02   2012          THACKRAY RECONSTRUCTIVE SYSTEM
03   20615         THARRINGTON, ROY                         Y
04   4831          THE ARIZONA LABOR LETTER
05   4048          THE AZ PHARMACY ASSOC
06   4140          THE BUSINESS WORD INC.
07   4157          THE BUTTES
08   4550          THE CARING COMPANY
09   20164         THE EXECUTIVE GALLERY INC                Y
10   4435          THE HEALTHCARE FORUM
----------------------------------------------------------------
     Enter Line No, Vendor Name or *ADD....
        or Vendor ID...................


F3=Exit   F12=Previous
     Line Number and F8: Return to previous screen with selection
```

*Shows Vendor name was change — done after check was cut to "Test of A/P Control #2"*

Date: II (b)

000004296

I000000076

```
                A C C O U T S   P A Y A B L E   S Y S T E M          3/15/96
                V E N D O R   M A S T E R   F I L E   S E A R C H    8:29:25
APDI020C
=================================================================================
      Vendor Id     Vendor Name                    Federal ID   Tmp  Ref
--------------------------------------------------------------------------------
                                                                       Y
01   20781          TEST OF A/P CONTROLS #2
02   2012           THACKRAY RECONSTRUCTIVE SYSTEM              Y
03   20615          THARRINGTON, ROY
04   4831           THE ARIZONA LABOR LETTER
05   4048           THE AZ PHARMACY ASSOC
06   4140           THE BUSINESS WORD INC.
07   4157           THE BUTTES
08   4550           THE CARING COMPANY                          Y
09   20164          THE EXECUTIVE GALLERY INC
10   4435           THE HEALTHCARE FORUM
--------------------------------------------------------------------------------
        Enter Line No, Vendor Name or *ADD....
             or Vendor ID..................


F3=Exit   F12=Previous
    Line Number and F8: Return to previous screen with selection
```

Shows vendor befor check issued and
Vendor changed

Page 11 (c)
000004297                                              I000000077

Feb 29, 1996

The following statement is a summary of events which occured on Feb 29, 1996. About 1:00 pm Marcy asked if I had some time, she needed to talk to me. We went to a room outside of accounting since she wanted our conversation to be private. Marcy then informed me that Wendi had contacted her and asked for her assistance. Marcy was not really clear on what she was asking, but knew it involved a check from CSRMC which Wendi had wrote to Joes Auto Glass. The check was put in the system to Kraft and actually referenced an invoice for Kraft Foods. The check however was not wrote to Kraft. Upon receiving a copy of the check we found it was to Joes Auto Glass, Wendi's husband business. Marcy was very upset, and said she just didn't want to have any part of this and had to tell someone about. She was not really sure what needed to be done at this point. After our conversation I talked to Angelia and explained to her the events which had taken place. It was at this point we called the

000004298                          1000000078

bank to get a copy of the check and called ~~the~~ kraft foods to inquire about the invoice the check was to have paid. The check and invoice had different amounts and kraft explained they had faxed copies for this invoice a number of times and never received a check. Upon calling the bank they informed us that Wendi had also called them ~~and~~ asking about the check. She asked them to call her if ~~the~~ the copy came in. Upon collecting this information we ~~co~~ contacted Jill Bates & Jennifer Andrew about the issue.

The evening of February 29th I received a phone call from Wendi. She was very upset and told me she didn't know what to do. She said she had stolen some money from Dvc ~~and~~ I told her to call Jill or Jennifer immediately and set up a time for the morning to meet with them. I told her she needed to address the issue with them as soon as possible. I then called Jill and explained the conversation. I told her it would be good if she

000004299

1000000079

might even contact Wendi that evening.
I believe this was done.

000004300

I000000080

Incident Report : (RE: Wendi Andriano)          3/29/96

At approximately 4:00 p.m I was contacted by Angela Butzner & Terry Brantz that they would like to speak with me & Jennifer regarding a serious matter. They (Angela) said she'd locate Jennifer & we'd meet. I called Jennifer's office approximately 15 minutes later & Jennifer asked me to go up to the Accounting Dept. When I arrived in Accting, Jennifer was meeting w/ Angela Butzner & Terry Brantz in Jennifer Andrew's office. They explained that they had evidence that Wendi Andriano transfered money from the org. into her personal Acct.

After a lengthy discussion the following things happened:

1.) I paged Steve Weber & Bob Rude to have Payroll & Accting locks chg'd immediately. (Mark Severson Cplex) chg'd the locks)

2.) Angela called Bank One & notified them that Wendi was on Personal Leave & had no authorization.

3.) Met w/ entire Dept & notified of situation & asked them to document what they knew that had happened, any helpful hints & turn into me Fri 3/1 - Am.

000004301                    I000000081

P-App. 005903

⟨ Jennifer's Car - No Start ⟩

7.) Jennifer & I went to Mr. T's office around 5:30pm.
   + explain ~~discuss~~ Situation.

2/29/96

· I call ERP ~ Kellie) 8:00ish

Suzy called me ~

· I called Jennifer

· I call ERP

· I called Wendi ~ 9:00 ish

( to meet w/ Wendi ~ 8:01 Am - 3/, _my office )

000004302                    I000000082

P-App. 005904

Called Wendi Andriano at Home

000004303

I000000083

- Call Wendi ~ Get Supervisory Referal
- Call NEAS W/Team Plan  < Ask for Counselor.)

(Spoke w/ Kellie —)
2/29/96
8:27am

New Supervisor Record Ref 2/29/96

3/100 —
Pain & Disability
Attorney Fee O
Other

Declining
Conversation



NOTES

I000000085

P-App. 005907



000004306                    I000000086

P-App. 005908

## DETAIL LISTING OF MISSING CHECKS

| BANK ACCT # | ENTITY | A/P SYSTEM PAYEE | DATE CLEARED | CHECK NUMBER | AMOUNT |
|---|---|---|---|---|---|
| 60138-0102-3 | CAMC | KRAFT | 12/18/95 | 18852 | 3,865.96 |
| 60138-0102-3 | CAMC | KRAFT | 1/30/96 | 16420 | 2,289.12 |
| | | | | | 6,155.08 |
| | | | | | |
| 60105-0101-7 | DVCC | KRAFT | 3/6/95 | 15052 | 2,185.95 |
| 60105-0101-7 | DVCC | KRAFT | 3/23/95 | 15105 | 2,314.56 |
| 60105-0101-7 | DVCC | KRAFT | 5/26/95 | 15472 | 1,672.13 |
| 60105-0101-7 | DVCC | KRAFT | 9/5/95 | 15774 | 1,519.95 |
| 60105-0101-7 | DVCC | KRAFT | 12/19/95 | 16340 | 2,251.29 |
| 60105-0101-7 | DVCC | KRAFT | 1/5/96 | 14013 | 2,237.09 |
| | | | | | 12,180.97 |

GRAND TOTAL  18,336.05

CHECKS MISSING - FOUND PAYABLE TO LEGIMATE VENDORS:

| 61556-0101-9 | CACC | BANK OF CASA GRANDE VALLEY | 12/11/95 | 9123 | 7,781.07 |
|---|---|---|---|---|---|
| 60105-0101-7 | DVCC | CGRMC | 11/30/95 | 16274 | 2,339.64 |

CHECKS MISSING - UNDER RESEARCH BY NORWEST BANK:

| 3000174362 | CGRMC | MOORE BUSINESS PRODUCTS | 5/26/95 | 5881 | 140.61 |
|---|---|---|---|---|---|
| 3000174362 | CGRMC | SONORA LABS SCIENCES | 5/26/95 | 5910 | 16,329.63 |
| 3000174362 | CGRMC | AIR LIQUIDE AMERICA CORP | 5/26/95 | 5832 | 1,283.32 |

P-App. 005909

000004307

1000000087

AR27

ACCOUNT STATUS
THRU 03/14/96
CASA GRANDE REG MED CNTR

A/R ACCOUNT: 33334947
DISTRICT: 4146
ACCT BAL: 84,924.32    TERMS: NET 30 DAYS

03/14/96
16:34:34
PAGE: 1

| REF/CK# | TRN | CUSTOMER | DATE | AGE | AMOUNT | NET DUE | CUMUL AMT |
|---|---|---|---|---|---|---|---|
| 6365 | IAT | 33334947 | 07/21/95 | 237 | 291.44 | 291.44 | 291.44 |
| 5956845 | CRE | 33334947 | 09/21/95 | 203 | 14.92- | 14.92- | 276.52 |
| 59947770 | CRE | 33334947 | 09/24/95 | 175 | 24.31- | 24.31- | 252.21 |
| 59901590 | CRE | 33334947 | 09/26/95 | 170 | 5.98- | 5.98- | 246.23 |
| 59000668 | CRE | 33334947 | 09/27/95 | 169 | 15.27- | 15.27- | 230.96 |
| 59006984 | CRE | 33334947 | 09/29/95 | 167 | 4.26- | 4.26- | 226.70 |
| 5991560 | CRE- | 33334947 | 12/13/95 | 104 | 36.40- | 36.40- | 190.30 |
| 5908008 | CRE | 33334947 | 12/01/95 | 98 | 75.12- | 75.12- | 115.18 |
| 10203 | IWT | 33334947 | 01/25/96 | 92 | 101.60- | 101.60- | 115.18 |
| 5720143 | INV | 33334947 | 01/03/96 | 71 | 28.48 | 6,412.79 | 6,527.97 |
| 5976139 | CRE | 33334947 | 01/04/96 | 70 | 89.34- | 89.34- | 6,468.63 |
| 5752730 | INV | 33334947 | 01/09/96 | 65 | 97.18- | 97.18- | 6,565.81 |
| 5752730 | INV | 33334947 | 01/09/96 | 65 | 4,781.59 | 4,781.59 | 11,347.40 |
| 5943373 | CRE | 33334947 | 01/10/96 | 64 | 989.82- | 388.82- | 10,958.58 |
| 5943373 | INV | 33334947 | 01/10/96 | 64 | 4,461.56 | 4,461.56 | 15,322.59 |
| 3758636 | CRE | 33334947 | 01/11/96 | 63 | 97.54- | 97.54- | 15,609.19 |
| 5946568 | CRE | 33334947 | 01/11/96 | 63 | 281.60 | 281.60 | 15,609.19 |
| 5946732 | CRE | 33334947 | 01/12/96 | 62 | 20.03- | 20.03- | 15,592.42 |
| 3824500 | INV | 33334947 | 01/18/96 | 56 | 263.26 | 263.26 | 16,078.62 |
| 3803149 | INV | 33334947 | 01/23/96 | 51 | 226.20 | 226.20 | 20,040.93 |
| 3824700 | INV | 33334947 | 01/23/96 | 51 | 3,992.31 | 3,992.31 | 20,332.43 |
| 3830729 | INV | 33334947 | 01/24/96 | 50 | 291.50 | 291.50 | 20,623.68 |
| 5963000 | CRE | 33334947 | 01/25/96 | 49 | 7.48- | 7.48- | 28,561.33 |
| 5963470 | INV | 33334947 | 01/25/96 | 49 | 46.73 | 46.73 | 23,980.15 |
| 5963304 | INV | 33334947 | 01/30/96 | 44 | 304.02 | 304.02 | 28,708.81 |
| 5960941 | INV | 33334947 | 01/30/96 | 44 | 4,819.66 | 4,819.66 | 28,436.01 |
| 5800916 | INV | 33334947 | 01/30/96 | 44 | 69.80- | 69.80- | 28,483.87 |
| 5970595 | CRE | 33334947 | 01/31/96 | 43 | 177.14- | 177.14- | 28,442.22 |
| 5970596 | CRE | 33334947 | 01/31/96 | 43 | 16.65- | 16.65- | 32,720.42 |
| 5970587 | INV | 33334947 | 01/31/96 | 43 | 4,278.20 | 4,278.20 | 32,800.43 |
| 3867443 | CRE | 33334947 | 01/31/96 | 43 | 30.01- | 30.01- | 32,795.31 |
| 3867443 | INV | 33334947 | 01/31/96 | 43 | 42.12- | 42.12- | 35,850.47 |
| 5972071 | INV | 33334947 | 02/06/96 | 37 | 4,092.16 | 4,092.16 | 36,835.37 |
| 3886479 | INV | 33334947 | 02/07/96 | 36 | 14.50- | 14.50- | 37,027.79 |
| 5979083 | CRE | 33334947 | 02/07/96 | 36 | 191.82 | 81.67- | 37,027.79 |
| 3902028 | INV | 33334947 | 02/08/96 | 36 | 4,283.13 | 4,283.13 | 41,280.92 |
| 5981018 | INV | 33334947 | 02/08/96 | 35 | 4,134.93 | 4,134.93 | 41,209.25 |
| 3903737 | INV | 33334947 | 02/14/96 | 30 | 4,102.65 | 4,102.65 | 45,446.83 |
| 3993834 | INV | 33334947 | 02/15/96 | 29 | 81.67- | 81.67- | 49,428.83 |
| 5902241 | CRE | 33334947 | 02/15/96 | 28 | 17.00- | 42.97 | 49,428.83 |
| 3946811 | INV | 33334947 | 02/16/96 | 28 | 42.97 | 42.97 | 49,472.80 |

I000000088

~AR27

```
                              ACCOUNT STATUS                        03/14/96
                              THRU 03/14/96                         16:34:34

       A/R ACCOUNT: 33334947  CASA GRANDE REG MED CNTR      PAGE:     2
       DISTRICT: 4146
       ACCT BAL:       84,924.32  TERMS: NET 30 DAYS

   REF/CK#   TRN  CUSTOMER    DATE      AGE     AMOUNT      NET DUE      CUMUL AMT
   -------   ---  --------    ----      ---    --------    --------     ---------
   3972276   INV  33334947  02/20/96    23    3,843.68    3,843.68      53,316.48
   5997791   CRE  33334947  02/21/96    22       61.64-      61.64-     53,254.84
   3978201   INV  33334947  02/21/96    22    4,881.67    4,881.67      58,136.51
   5999577   CRE  33334947  02/22/96    21      114.24-     114.24-     58,022.27
   4010588   INV  33334947  02/27/96    16    4,335.81    4,335.81      62,358.08
   5907116   CRE  33334947  02/28/96    15       24.00-      24.00-     62,334.08
   4016787   INV  33334947  02/28/96    15    3,945.56    3,945.56      66,279.64
   4024815   INV  33334947  02/29/96    14      175.02      175.02      66,454.66
   5910449   CRE  33334947  03/01/96    13      148.72-     148.72-     66,305.94
   4048609   INV  33334947  03/05/96     9    5,074.06    5,074.06      71,380.00
   5916199   CRE  33334947  03/06/96     8       39.88-      39.88-     71,340.12
   4055197   INV  33334947  03/06/96     8    4,672.16    4,672.16      76,012.28
   5917925   CRE  33334947  03/07/96     7       45.37-      45.37-     75,966.91
   4063072   INV  33334947  03/07/96     7      172.72      172.72      76,139.63
   4066884   INV  33334947  03/12/96     2    4,093.17    4,093.17      80,232.80
   5925466   CRE  33334947  03/13/96     1       22.58-      22.58-     80,210.22
   4092366   INV  33334947  03/13/96     1    4,464.70    4,464.70      84,674.92
   4101256   INV  33334947  03/14/96     0      249.40      249.40      84,924.32
```

P-App. 005911

00004309

I000000089

AR27

```
                        ACCOUNT STATUS                      03/14/96
                        THRU 03/14/96                       16:35:22

     A/R ACCOUNT: 73346025  DESERT VALLEY CARE CENTER      PAGE:     1
        DISTRICT: 4146
        ACCT BAL:      18,536.99   TERMS: NET 90 DAYS

REF/CK#  TRN  CUSTOMER    DATE      AGE   AMOUNT      NET DUE    CUMUL AMT
-------  ---  --------    ----      ---   ------      -------    ---------
5903020  CRE  73346025  09/13/95   183      73.25-      73.25-       73.25-
3410122  INV  73346025  11/03/95   132   2,251.29    2,251.29     2,178.04
5988184  CRE  73346025  11/29/96   106      92.97-      92.97-     2,085.07
5904458  CRE  73346025  12/11/95    94      13.46-      13.46-     2,071.61
5908202  CRE  73346025  12/13/95    92      18.79-      18.79-     2,052.82
5914055  CRE  73346025  12/18/95    87      45.96-      45.96-     2,006.86
5923332  CRE  73346025  12/26/95    79      36.42-      36.42-     1,970.44
5931455  CRE  73346025  01/02/96    72      57.36-      57.36-     1,913.08
5939940  CRE  73346025  01/08/96    66      56.02-      56.02-     1,857.06
5939941  CRE  73346025  01/08/96    66      18.61-      18.61-     1,838.45
5943624  CRE  73346025  01/10/96    64       5.75-       5.75-     1,832.70
5952881  CRE  73346025  01/17/96    57      51.82-      51.82-     1,780.88
3795800  INV  73346025  01/17/96    57     357.09      357.09     2,137.97
3844926  INV  73346025  01/26/96    48      58.57       58.57     2,196.84
3875184  INV  73346025  02/01/96    42      81.00       81.00     2,277.84
3879771  INV  73346025  02/02/96    41      33.44       33.44     2,310.98
3879772  INV  73346025  02/02/96    41   1,705.86    1,705.86     4,016.84
3879773  INV  73346025  02/02/96    41      16.60       16.60     4,033.44
3896476  INV  73346025  02/06/96    37       4.10        4.10     4,037.54
3896478  INV  73346025  02/06/96    37   1,136.46    1,136.46     5,174.00
3917101  INV  73346025  02/08/96    34   1,329.79    1,329.79     6,503.79
3933738  INV  73346025  02/18/96    30   1,048.14    1,048.14     7,551.93
3956705  INV  73346025  02/16/96    27   1,059.39    1,059.39     8,611.32
3956706  INV  73346025  02/16/96    27      42.23       42.23     8,653.55
3972277  INV  73346025  02/20/96    23   1,552.98    1,552.98    10,206.53
3973795  INV  73346025  02/20/96    23     377.90      377.90    10,584.43
3993900  INV  73346025  02/23/96    20   1,272.68    1,272.68    11,857.11
3993901  INV  73346025  02/23/96    20      48.86       48.86    11,905.97
5903865  CRE  73346025  02/26/96    17      21.00-      21.00-   11,884.97
4010690  INV  73346025  02/27/96    16     771.15      771.15    12,656.12
5907354  CRE  73346025  02/28/96    15      12.23-      12.23-   12,643.89
4031828  INV  73346025  03/01/96    13   1,598.56    1,598.56    14,242.45
4031829  INV  73346025  03/01/96    13     237.22      237.22    14,479.67
4034611  INV  73346025  03/02/96    12      64.86       64.86    14,544.53
4046607  INV  73346025  03/05/96     9   1,215.41    1,215.41    15,759.94
4046608  INV  73346025  03/05/96     9     120.83      120.83    15,880.77
4065990  INV  73346025  03/08/96     6   1,365.30    1,365.30    17,246.07
4073003  INV  73346025  03/08/96     6     103.54      103.54    17,349.61
5822073  CRE  73346025  03/11/96     3       3.00-       3.00-   17,346.61
4086883  INV  73346025  03/12/96     2   1,190.38    1,190.38    18,536.99
         CUSTOMER 73346025 DESERT VALLEY CARE CENTER TOTAL:       18,536.99


         ACCOUNT  73346025 DESERT VALLEY CARE CENTER TOTAL:       18,536.99
```

P-App. 005912

000004310

1000000090

```
AR27                                    ACCOUNT STATUS                          03/14/96
                                        THRU 03/14/96                           16:35:10

           A/R ACCOUNT: 23462054  CENTRAL AZ MEDICAL CENTER              PAGE:     1
           DISTRICT: 4146
           ACCT BAL:     87,680.73  TERMS: ** Multiple **

    REF/CK#   TRN   CUSTOMER   DATE       AGE    AMOUNT      NET DUE      CUMUL AMT
    -------   ---   --------   ----       ---    ------      -------      ---------
    3244690   INV   3345931   10/04/95    162    3,865.98    3,865.98     3,865.98
    5926508   CRE   3345931   10/13/95    153      27.56-      27.56-     3,838.40
    6933799   CRE   3345931   10/19/95    147      44.06-      44.06-     3,794.34
    5942630   CRE   3345931   10/26/95    140       2.35-       2.35-     3,791.99
    5942831   CRE   3345931   10/26/95    140       7.64-       7.64-     3,784.48
    6973629   CRE   3345931   11/17/95    118     127.65-     127.65-     3,656.80
    5999761   CRE   3345931   12/07/95     98      73.69-      73.69-     3,583.11
    5919064   CRE   3345931   12/21/95     84      21.50-      21.50-     3,561.61
    5934628   CRE   3345931   01/04/96     70     474.06-     474.06-     3,087.55
    5944751   CRE   3345931   01/11/96     63       7.78-       7.78-     3,079.77
    5953997   CRE   3345931   01/18/96     56      26.10-      26.10-     3,053.67
    188       IAT   3345931   01/25/96     49     382.95-     382.95-     2,670.72
    5963198   CRE   3345931   01/25/96     49      10.90-      10.90-     2,659.82
    3901994   INV   3345931   02/07/96     36    4,034.02    4,034.02     6,693.84
    5982266   CRE   3345931   02/09/96     34       6.14-       6.14-     6,687.70
    5982269   CRE   3345931   02/09/96     34       4.44-       4.44-     6,683.26
    3939306   INV   3345931   02/14/96     29    3,297.58    3,297.58     9,980.84
    5997951   CRE   3345931   02/21/96     22       2.12-       2.12-     9,978.72
    3976873   INV   3345931   02/21/96     22      50.20       50.20     10,028.92
    3976874   INV   3345931   02/21/96     22     124.16      124.16     10,153.08
    3976076   INV   3345931   02/21/96     22   8,200.53    8,200.53     18,353.61
    5999474   CRE   3345931   02/22/96     21      73.19-      73.19-    18,280.42
    3986668   INV   3345931   02/22/96     21      75.24       75.24     18,355.66
    3996327   INV   3345931   02/23/96     20     164.12      164.12     13,519.78
    4004484   INV   3345931   02/26/96     17   1,159.03    1,159.03     14,678.81
    4016683   INV   3345931   02/28/96     15   3,395.05    3,395.05     18,073.86
    5913850   CRE   3345931   03/06/96      8      60.41-      60.41-    18,013.45
    4059992   INV   3345931   03/06/96      8   3,357.89    3,357.89     21,371.34
    4092353   INV   3345931   03/13/96      1   3,229.75    3,229.75     24,601.09
              CUSTOMER   3345931 CENTRAL AZ MEDICAL CENTER TOTAL:        24,601.09


    3666169   INV   3462041   01/31/96     43   3,859.42    3,859.42     3,859.42
    3901395   INV   3462041   02/07/96     36   1,807.06    1,807.06     5,666.48
    5982615   INV   3462041   02/09/96     34       4.92-       4.92-     5,661.56
    3939305   INV   3462041   02/14/96     29   1,693.41    1,693.41     7,354.97
    3976876   INV   3462041   02/21/96     22   1,660.91    1,660.91     9,015.88
    5999522   CRE   3462041   02/22/96     21      29.27-      29.27-     8,986.61
    3986669   INV   3462041   02/22/96     21      29.27       29.27      9,015.88
    4016631   INV   3462041   02/28/96     15   1,525.15    1,525.15     10,541.03
    5908731   CRE   3462041   02/28/96     14      18.46-      18.46-    10,522.57
    4059991   INV   3462041   03/06/96      8   1,144.42    1,144.42     11,666.99
    4092352   INV   3462041   03/13/96      1   1,412.65    1,412.65     13,079.64
              CUSTOMER   3462041 CENTRAL ARIZONA CARE CTN  TOTAL:        13,079.64


    ACCOUNT   23462054 CENTRAL AZ MEDICAL CENTER TOTAL:                 87,680.73
```

*[handwritten notes:]*
attn: Jerry Brantz
520-426-6435
4 pages

from: Becky
Alliant foodservice
602-352-3556

P-App. 005913

000004311

I00000091



## DETAIL LISTING OF MISSING CHECKS

| BANK ACCT # | ENTITY | A/P SYSTEM PAYEE | DATE CLEARED | CHECK NUMBER | AMOUNT |
|---|---|---|---|---|---|
| 60138-0102-3 | CAMC | KRAFT | 12/18/95 | 18852 | 3,865.96 |
| 60138-0102-3 | CAMC | KRAFT | 1/30/96 | 16420 | 2,289.12 |
| | | | | | 6,155.08 |
| | | | | | |
| 60105-0101-7 | DVCC | KRAFT | 3/6/95 | 15052 | 2,185.95 |
| 60105-0101-7 | DVCC | KRAFT | 3/23/95 | 15105 | 2,314.56 |
| 60105-0101-7 | DVCC | KRAFT | 5/26/95 | 15472 | 1,672.13 |
| 60105-0101-7 | DVCC | KRAFT | 9/5/96 | 15774 | 1,519.95 |
| 60105-0101-7 | DVCC | KRAFT | 12/19/95 | 16340 | 2,251.29 |
| 60105-0101-7 | DVCC | KRAFT | 1/5/96 | 14013 | 2,237.09 |
| | | | | | 12,180.97 |
| | | | | GRAND TOTAL | 18,336.05 |

### CHECKS MISSING - FOUND PAYABLE TO LEGIMATE VENDORS:

| 61556-0101-9 | CACC | BANK OF CASA GRANDE VALLEY | 12/11/95 | 9123 | 7,781.07 |
|---|---|---|---|---|---|
| 60105-0101-7 | DVCC | CGRMC | 11/30/95 | 16274 | 2,339.64 |

### CHECKS MISSING - UNDER RESEARCH BY NORWEST BANK:

| 3000174362 | CGRMC | MOORE BUSINESS PRODUCTS | 5/26/95 | 5881 | 140.61 |
|---|---|---|---|---|---|
| 3000174362 | CGRMC | SONORA LABS SCIENCES | 5/26/95 | 5910 | 16,329.53 |
| 3000174362 | CGRMC | AIR LIQUIDE AMERICA CORP | 5/25/95 | 5832 | 1,283.32 |

P-App. 005914

000004312

298

100000092'

```
                                                                    Friday
                        Casa Grande Regional Medical Ctr            3/15/96
ACCOUNTING                                                          7:58:24
ACCT6461               * Use ATTN key to work with Printer and Job Ques *
JBRANTS
==================================================================================
                                         13.  ******** MISC ********
     ******** MENUS ********          14.  Set GL Library List
   2.  General Ledger System          15.  Set AP Library List - CGRMC
   3.  ACCOUNTS Payable System         16.  Set AP Library List - CAMC
   4.  View Roboted Reports           17.  Set FA Library List
   5.  Fixed Assets System            18.  Set PR Library List
   6.  Payroll System                 19.  Set EFI Library List
   7.  EFI System                     20.  Display Your Library List
   8.  MedSeries4 Report Writer Menu  21.  Query
   9.  GL - Work with Object Locks    22.  Start Print Writer - PA - ACCT
  10.  AP - Work with Object Locks    23.  Start Print Writer - PD - RAHP
  11.  FA - Work with Object Locks    24.  Sign Off
  12.  PP - Work with Object Locks
                                      -----------------------------------------
                                                       Invocation level 01
     ----------------------------------------------------------------------------
Enter Menu Option

F3=Signoff.  F5=Reclaim Resources.F12=Previous menu. F15=Initial menu.

(c) Copyright GTE Health systems, Inc.  1982 - 1999.
```

1o 15 "Enter"

"n 3 "Enter"

000004313                                            I000000093

```
                                                                    Friday
APMASTER            Casa Grande Regional Medical Ctr             3/15/96
ACCT6461            A C C O U N T S   P A Y A B L E              7:59:30
JBRANTS                       MASTER MENU
================================================================
1. Invoice Functions Menu        13. Reports Menu - Day End
2.                               14. Reports Menu - On Demand
3. Inquiry/Maintenance Menu      15.
4.                               16. Operations Menu
5. Check Functions Menu          17.
6.                               18. Managers Menu
7. Vendor Master Inquiry/Maint   19. Payables Report
8. Vendor Delete/Combine         20. Purge Menu
9.                               21. Menu
10. 1099 Processing Menu         22.
11. AR Master                    23.
12.                              24. Sign Off
                                 -----------------------------------
----------------------------------          Invocation level 02
------------------------------------------------------------
Enter Menu Option

F3=Signoff.   F5=Reclaim Resources.F12=Previous menu. F15=Initial menu.
```

3.  1 "Enter"

000004314                                        I000000094

```
APMENU4              Casa Grande Regional Medical Ctr        Friday
ACCT6461             A C C O U N T S   P A Y A B L E        3/15/96
JBRANTS                      INVOICE FUNCTIONS              7:59:39
=================================================================
      Invoice Entry/Update         13. Match Prepaids/Receipts
 2.                                 14.
 3. Linematch Invoices              15. Hold/Release Invoices by Vendr
 4.                                 16.
 5. Recurring Invoices              17. tst pt refunds--select
 6.                                 18. approve pt rfnds
 7. Invoice Approval                19.
 8.                                 20. INQUIRY/UPDATE MENU
 9. Invoice Maintenance Log         21. CHECK FUNCTIONS MENU
10.                                 22. A/P MASTER MENU
11. Change Invoice User Name        23.
12. Create Unpaid Sales Tax Invoic  24. Sign Off
----------------------------------------------------------------
                                      Invocation level 03
----------------------------------------------------------------
Enter Menu Option

F3=Signoff.  F5=Reclaim Resources.F12=Previous menu. F15=Initial menu.
```

40  1 "Enter"

I000000095

P-App. 005917

```
                    A C C O U N T S   P A Y A B L E              3/15/96
                H O S P I T A L   S E L E C T I O N   S C R E E N   8:02:25
 APDI091C       ==============================================================

        Ln        User ID       Hospital ID   Hospital Name
  --------------------------------------------------------------------
        01        JBRANTS          200          CGRMC
        02        JBRANTS          200          CAMC
        03        JBRANTS          250          CACC
        04        JBRANTS          300          DVCC
        05        JBRANTS          400          CGRRC
        06        JBRANTS          500          MAB
        07        JBRANTS          600          CFW
        08        JBRANTS          700          RAHP
        09        JBRANTS          710          REBA
        10        JBRANTS          720          VAN
  --------------------------------------------------------------------

                Enter Line Number . . . . . . .   1


 F3=Exit
```

5. 1 "Enter".

000004316

I000000096

```
                 A/P INVOICE INPUT/UPDATE SCREEN (HEADER)        3/15/96
                                                                 8:02:34
APDU100I
Hospital    100 CGRMC
Voucher.....                          Status....... NEW   Type...
Alternate Payable Master...           P.O.....
  ndor ID...
Invoice ....                               Expense
Total Inv $.                               Period Year
Dates: Invoice Discount   Pay   Check
(MMDDYY)

Enter Batch number:

Vendor  Name........
        Check Name..
        Addr1.......
        Addr2.......
        City/St/Zip.
        Fed ID/SSN..              Phone:



Inquiry : F19=Logs  F16=Vendor              F18=Checks
```

6. F17 — Take you to invoice inquiry screen

000004317                              I000000097

```
APDI010C                    A C C O U N T S   P A Y A B L E          3/15/96
                            I N V O I C E . S E A R C H              8:29:10
Hosp   100 CGRMC
==================================================================================
Ln Inv Num              SN Chk Dt  Vend ID Vend Name    PO Num Voucher Stat   Amount
   TRIAL                01 031496  20781   TEST OF A/          40052 PAID     10.00
02 REIMB FOR DINNE      01 031396  20782   APODACA, B          40054 PAID     38.82
03 KEFLEX PRESCIP.      01 010896  2079    WAL-MART P          34076 PAID     11.54
04 LUCAS NELSON-PR      01 090294  2079    WAL-MART P           3103 PAID     34.43
05 MEDICINE FOR 2       01 022396  2079    WAL-MART P          38427 PAID     30.86
06 MR 288500            01 082595  2079    WAL-MART P          25865 PAID     15.75
07 PT:KAISER,STEVE      01 020596  2079    WAL-MART P          36676 APRV     16.15
08 PT:RINDFLESCH,S      01 010896  2079    WAL-MART P          34196 PAID     18.74
09 RX JOYCE MONTIJ      01 102894  2079    WAL-MART P           6703 PAID     41.71
10 6702581              01 090894  2079    WAL-MART P           3933 PAID     48.23
----------------------------------------------------------------------------------
      Enter line No, or Voucher No......
      or Vendor ID and/or Invoice No....
               and     Status (O/C)..

      or PO Number....................
      Enter Vendor Name for Search....    TEST

   F3=Exit   F12=Previous
      Line number and F8: Return to previous screen with selection
```

%. — Tab down to Vendor Name Search
   - Type in Vendor, or part of vendor name

   - In this case
        Type : Test "Enter"

I000000098

```
              A C C O U T S   P A Y A B L E   S Y S T E M      3/15/96
              V E N D O R   M A S T E R   F I L E   S E A R C H   8:29:25
APDI020C
============================================================================
                                          Federal ID     Tmp  Ref
----------------------------------------------------------------------------
      Vendor Id     Vendor Name                            Y
01    20781         TEST OF A/P CONTROLS #2
02    2012          THACKRAY RECONSTRUCTIVE SYSTEM         Y
03    20615         THARRINGTON, ROY
04    4831          THE ARIZONA LABOR LETTER
05    4048          THE AZ PHARMACY ASSOC
06    4140          THE BUSINESS WORD INC.
07    4157          THE BUTTES
08    4550          THE CARING COMPANY                     Y
09    20164         THE EXECUTIVE GALLERY INC
10    4435          THE HEALTHCARE FORUM
----------------------------------------------------------------------------
        Enter Line No, Vendor Name or *ADD.
           or Vendor ID...................


F3=Exit   F12=Previous
      Line Number and F8: Return to previous screen with selection
```

So Type °.1 " Enter"

000004319                              I000000099

```
              A C C O U N T S   P A Y A B L E   S Y S T E M        3/15/96
                    VENDOR MASTER FILE MAINTENANCE                 8:31:07
APDU020A
================================================================================
Category                                                   Temp Vnd Flag Y
Vendor ID 20781           Vendor Name ████████████          Refund Vendor
                          Check Name  ████████████

                ACCOUNTING ADDRESS                    MATERIALS ADDRESS
                KDKDK                                 KDKDK
Address 1       KDKDK
Address 2
City/State
Zipcode
Contact
Phone No.                             Service#
Federal ID or SSNO                    800 No.

Ship Term                             Creation Date       3/14/96
Pay Term: Payment  Day     Type       Maintenance Date    3/15/96
Disc Term: Discount Day    Type       User ID             JBRANTS
          Discount %

Display Vendor Statistical detail N        Rec Sts.. A
```

*This screen would show name of vendor before check run which would be printed on check*

*✱ "Enter" to get out of screen*

```
                A C C O U N T S   P A Y A B L E   S Y S T E M          3/15/96
                   VENDOR MASTER FILE MAINTENANCE                       8:31:46
 ================================================================================
 APDU020A
 Category                                                         Temp Vnd Flag
 Vendor ID 20781        Vendor Name
                        Check Name                                Refund Vendor

               ACCOUNTING ADDRESS                MATERIALS ADDRESS
                    KDKDK                              KDKDK
 Address 1    KDKDK
 Address 2
 City/State
 Zipcode
 Contact
 Phone No.
 Federal ID or SSNO                      Service#
                                         800 No.

 Ship Term
 Pay Term:  Payment  Day    Type         Creation Date     3/14/96
 Disc Term: Discount Day    Type         Maintenance Date  3/15/96
            Discount %                    User ID          JBRANTS

 Display Vendor Statistical detail N       Rec Sts.. A
```



9₀ After check run you would return to this screen by repeating steps 7&8. Then would change name back to original Vendor in which you wanted system to show

000004321                                    I000000101

```
APDI010C                    A C C O U N T S    P A Y A B L E        3/15/96
                            I N V O I C E    S E A R C H             8:25:38
Hosp   100 CGRMC
=============================================================================
                        SN Chk Dt Vend ID Vend Name    PO Num Voucher Stat   Amount
Ln Inv Num
-----------------------------------------------------------------------------
01 ▓▓▓▓▓▓▓ 01 ▓▓▓▓▓ 20782   ▓▓▓▓▓▓▓▓▓        40054 PAID    10.00
02 REIMB FOR DINNE 01 031396 20782   APODACA, B        40054 PAID    38.82
03 KEFLEX PRESCIP. 01 010896 2079    WAL-MART P        34076 PAID    11.54
04 LUCAS NELSON-PR 01 090294 2079    WAL-MART P         3103 PAID    34.43
05 MEDICINE FOR 2  01 022396 2079    WAL-MART P        38427 PAID    30.86
06 MR 288500       01 082595 2079    WAL-MART P        25865 PAID    15.75
07 PT:KAISER,STEVE 01 020596 2079    WAL-MART P        36676 APRV    16.15
08 PT:RINDFLESCH,S 01 010896 2079    WAL-MART P        34196 PAID    18.74
09 RX JOYCE MONTIJ 01 102894 2079    WAL-MART P         6703 PAID    41.71
10 6702581         01 090894 2079    WAL-MART P         3933 PAID    48.23
-----------------------------------------------------------------------------
     Enter line No, or Voucher No......
     or Vendor ID and/or Invoice No....
           and      Status (O/C)..

     or PO Number........................
     Enter Vendor Name for Search......


F3=Exit    F12=Previous
     Line number and F8: Return to previous screen with selection
```

4 Shows Invoice again

or Type 1 "F8"

```
                    A/P INVOICE INPUT/UPDATE SCREEN (DETAIL)        3/15/96
                                                                   8:26:25
APDU100C                             Status....... PAID  Type... NOPO
Hospital   100 CGRMC                 Packing List. TRIAL
Voucher.   40052                     Vendor Information:
Alternate Payable Master... OP
  ʌd ID. 20781     Warn: Duplicate Inv        KDKDK
Invoice. TRIAL                          1
P.O....
Dates: Invoice  Discount    Pay    Check
        3/14/96  3/14/96  3/14/96  3/14/96           Po.    /            Net
Terms:Vend.                       Net          Prd  Co   Check      Date Prd Typ
   Ln Type Code  /Amount   Tax  Account    %    9  100            31496    9 10
    1 DOLL             1000      834004200       9  100            31496
    2                                           9  100            31496
    3                                           9  100            31496
    4                                           9  100            31496
    5                                           9  100            31496
    6                                           9  100            31496
    7                                           9  100            31496
    8
Invoice total:         10.00    Display 1099/Delete Screen.  N or F4
                                Display Distribution Process. N or F11
Inquiry: F10=G/L Acct  F16=Vendor  F17=Invoice  F18=Check
```

✱ Vendor before being change, but after check was issued

000004323

I000000103

P-App. 005925

```
APDU010C    A / P   I N V O I C E   D E T A I L   S C R E E N        3/15/96
                                                                     8:32:06
Invoice... TRIAL              01    Status...... PAID  Type... NOPO
Voucher...  40052                   Packing List. TRIAL
P.O.......                     Vend ID 20781
  99...... N                   Vendor  TEST OF A/P CONTROLS NUMBER
Create  Invoice Discount  Pay   Check   KDKDK
3/14/96  3/14/96  3/14/96  3/14/96  3/14/96
Comments.. TEST OF A/P INTERNAL CONTROLS
Terms...      /              Net
Ln  Type   Amount   Tax  Account  Fund Sub  Co    Check    Type Prt Date App
 1 DOLL      10.00       834004200 OP  00  100               10 N  3/14/96
```

Enter a Line Number for more Detail......                    1 Lines

                          Total Invoice Amount...            10.00

   F8: Return with selection    F10: Previous Inv  Enter: Next Invoice

* Shows vendor was changed after check was
  issued

000004324                                    I000000104

```
                    A C C O U T S   P A Y A B L E   S Y S T E M        3/15/96
APDI020C            V E N D O R   M A S T E R   F I L E   S E A R C H   8:31:50
=========================================================================
                                                      Federal ID    Tmp  Ref
L-    Vendor Id      Vendor Name                                 --------------
01    ▨▨▨▨           ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨                       Y
02    2012           THACKRAY RECONSTRUCTIVE SYSTEM                 Y
03    20615          THARRINGTON, ROY
04    4831           THE ARIZONA LABOR LETTER
05    4048           THE AZ PHARMACY ASSOC
06    4140           THE BUSINESS WORD INC.
07    4157           THE BUTTES
08    4550           THE CARING COMPANY                             Y
09    20164          THE EXECUTIVE GALLERY INC
10    4435           THE HEALTHCARE FORUM
-------------------------------------------------------------------------
      Enter Line No, Vendor Name or *ADD....
           or Vendor ID.....................


F3=Exit    F12=Previous
   Line Number and F8: Return to previous screen with selection
```

*Shows vendor name was change — done after check was cut to "Test of A/P Control #;*

000004325                                          I000000105

```
                   A C C O U T S   P A Y A B L E   S Y S T E M        3/15/96
 APDI020C          V E N D O R   M A S T E R   F I L E   S E A R C H    8:29:25
================================================================================
 Ln   Vendor Id    Vendor Name                      Federal ID   Tmp  Ref
                                                    ----------------------------
 01                                      CONTROL                       Y
 02   2012         THACKRAY RECONSTRUCTIVE SYSTEM                      Y
 03   20615        THARRINGTON, ROY
 04   4831         THE ARIZONA LABOR LETTER
 05   4048         THE AZ PHARMACY ASSOC
 06   4140         THE BUSINESS WORD INC.
 07   4157         THE BUTTES
 08   4550         THE CARING COMPANY                                  Y
 09   20164        THE EXECUTIVE GALLERY INC
 10   4435         THE HEALTHCARE FORUM
--------------------------------------------------------------------------------
      Enter Line No, Vendor Name or *ADD....
         or Vendor ID.....................


 F3=Exit   F12=Previous
     Line Number and F8: Return to previous screen with selection
```

*Shows vendor befor check issued and Vendor changed*

000004326                                          I000000106

P.02

MAR-14-1996  15:34



DESERT VALLEY
CARE CENTER
850 N. Arizola Road
Casa Grande, Arizona 85222

No. 0016340

| DATE | CHECK NUMBER |
|------|--------------|
| 12/15/85 | 0016340 |

CHECK AMOUNT
******2,281.29

DOLLARS  AND  29 CENTS

DESERT VALLEY CARE CENTER

Angela

P-App. 005929



Desert Valley Care Center
General Account
950 N. Arizola Road
Casa Grande, Arizona 85222

14013

1-05-95

$2237.09

Desert Valley Care Center

BY

⑈0140143⑈ ⑆1221052521⑆ ⑈601050 1017⑈   ⑈0000223709⑈

KC MANAGEMENT INC.
dba CINDY'S WORK FORCE

THE BANK OF CASA GRANDE VALLEY
Casa Grande, Arizona

034996

000004328

I000000108

P.02

MAR-14-1996  15:16



Angela

P-App. 005931

Desert Valley Care Center

ID 14013 → Coded to Kraft
      → Check made to Joe Auto Glass
      → Amount  2237.09
      → Cleared Bank Acct 60105-0101-7  1/9/96

16340 → Coded to Kraft
      → Joes Auto Glass
      → $ 2261.29
      → Cleared Acct  60105-0101-7  12/9/96

* Both are same invoice

Central Arizona Care Center
      → Coded to Kraft
      → Joes Auto Glass
      → $ 3865.96
      → Cleared Acct  60138-0102-3  12/18/96

I000000110

I000000111

000004331



000004332

I000000112



000004333

I000000113

P-App. 005935



000004334

I000000114

DVCC, √Lawa√

#16430   $ 2,251.29   12/19/95
16340   2237
#403611600

Angela -

An copy request — ASAP

Thanx !

Ck # 18852   $ 3,865.96

Paid to: Kraft

Cleared   12/18/95

Acct # 60138-0102-3

Seq # 30140970

Need copy ASAP!

Thanx !

000004335

I000000115

AR27

ACCOUNT STATUS
THRU 03/14/96

03/14/96
16:34:34

PAGE:   1

A/R ACCOUNT: 33334947   CASA GRANDE REG MED CNTR
DISTRICT: 4146
ACCT BAL:   84,924.32   TERMS: NET 30 DAYS

| REF/CK# | TRN | CUSTOMER | DATE | AGE | AMOUNT | NET DUE | CUMUL AMT |
|---|---|---|---|---|---|---|---|
| 6965 | IAT | 33334947 | 07/21/95 | 227 | 291.44 | 291.44 | 291.44 |
| 6965 | IAT | 33334947 | 08/24/95 | 203 | 14.92- | 14.92- | 276.52 |
| B95E178 | CRE | 33334947 | 09/21/95 | 175 | 24.31- | 24.31- | 252.21 |
| B95577B | CRE | 33334947 | 09/26/95 | 170 | 5.98- | 5.98- | 246.23 |
| B90163B | CRE | 33334947 | 09/27/95 | 169 | 15.27- | 15.27- | 228.96 |
| B90006G | CRE | 33334947 | 09/29/95 | 167 | 4.26- | 4.26- | 228.70 |
| B90C394 | CRE | 33334947 | 12/01/95 | 104 | 36.40- | 36.40- | 190.30 |
| B90155B | CRE | 33334947 | 12/13/95 | 92 | 103.60- | 75.12- | 115.18 |
| B90156B | PMT | 33334947 | 01/25/96 | 71 | 78.49 | | 115.18 |
| 1C293 | PMT | 33334947 | 01/25/96 | 71 | 91.84 | 91.84 | 6,822.84 |
| G720643 | INV | 33334947 | 01/04/96 | 70 | 97.18 | 97.18 | 6,460.63 |
| 599B1B9 | CRE | 33334947 | 01/04/96 | 65 | 97.18- | 97.18- | 5,565.81 |
| 3752738 | CRE | 33334947 | 01/08/96 | 65 | 4,781.89 | 4,781.89 | 11,347.40 |
| 37B2579 | CRE | 33334947 | 01/10/96 | 64 | 389.82 | 389.82 | 10,958.58 |
| 37B3S73 | CRE | 33334947 | 01/10/96 | 64 | 1,461.85 | 1,461.85 | 15,822.58 |
| 97SBG3S | INV | 33334947 | 01/11/96 | 63 | 281.84 | 281.84 | 15,609.19 |
| B945DBB | CRE | 33334947 | 01/11/96 | 63 | 286.60 | 286.60 | 15,892.42 |
| 37G5BB0 | INV | 33334947 | 01/14/96 | 62 | 20.03- | 20.03- | 16,073.26 |
| B94G732 | CRE | 33334947 | 01/18/96 | 58 | 263.26 | 263.26 | 16,079.93 |
| 3B04149 | CRE | 33334947 | 01/23/96 | 51 | 226.30 | 226.30 | 30,040.93 |
| 3B2B399 | INV | 33334947 | 01/23/96 | 51 | 3,961.31 | 3,961.31 | 30,032.43 |
| 3B2470D | INV | 33334947 | 01/24/96 | 50 | 4,466.02 | 4,466.02 | 24,788.48 |
| 3B24701 | INV | 33334947 | 01/25/96 | 49 | 1,162.96 | 1,162.96 | 29,695.49 |
| 3B5O729 | CRE | 33334947 | 01/25/96 | 49 | 7.43- | 7.43- | 23,810.06 |
| 59650729 | CRE | 33334947 | 01/25/96 | 49 | 46.79- | 46.79- | 23,561.43 |
| 59G5B470 | ORE | 33334947 | 01/30/96 | 44 | 304.01 | 304.01 | 23,888.18 |
| 59G33G4 | INV | 33334947 | 01/30/96 | 44 | 4,819.66 | 4,819.66 | 28,705.81 |
| B9467H3 | INV | 33334947 | 01/31/96 | 43 | 69.80- | 69.80- | 28,636.01 |
| 3B609H | INV | 33334947 | 01/31/96 | 43 | 177.14- | 177.14- | 28,458.87 |
| 3B60916 | INV | 33334947 | 01/31/96 | 43 | 16.65- | 16.65- | 28,442.22 |
| B9705SG | CRE | 33334947 | 01/31/96 | 43 | 4,278.20 | 4,278.20 | 32,720.42 |
| B9705537 | CRE | 33334947 | 02/01/96 | 42 | 80.01 | 80.01 | 32,800.43 |
| 3B62264 | INV | 33334947 | 02/06/96 | 37 | 4,082.16 | 4,092.16 | 36,892.47 |
| 3B672G4 | INV | 33334947 | 02/07/96 | 36 | 42.12- | 42.12- | 32,758.31 |
| B9674H3 | CRE | 33334947 | 02/07/96 | 36 | 14.50- | 14.50- | 36,850.47 |
| B972G79 | INV | 33334947 | 02/08/96 | 35 | 191.82 | 191.82 | 35,037.79 |
| 3B56479 | CRE | 33334947 | 02/08/96 | 36 | 4,283.19 | 4,283.19 | 41,280.92 |
| B979GBB3 | INV | 33334947 | 02/14/96 | 30 | 81.67 | 81.67 | 45,344.18 |
| 3BC0027 | INV | 33334947 | 02/14/96 | 30 | 4,194.93 | 4,134.93 | 41,420.83 |
| 3S51O1B | INV | 33334947 | 02/15/96 | 28 | 4,102.65 | 4,102.65 | 49,446.83 |
| 59B0B11 | CRE | 33334947 | 02/15/96 | 28 | 17.00- | 17.00- | 49,429.83 |
| 394BB11 | INV | 33334947 | 02/16/96 | 28 | 42.87 | 42.87 | 49,472.80 |

I000000116

000004336

P-App. 005938

```
AR27                           ACCOUNT STATUS                    03/14/96
                               THRU 03/14/96                     16:34:34

        A/R ACCOUNT: 33334947  CASA GRANDE REG MED CNTR      PAGE:    2
        DISTRICT: 4146
        ACCT BAL:     84,924.32  TERMS: NET 30 DAYS

   REF/CK#  TRN  CUSTOMER    DATE     AGE   AMOUNT      NET DUE     CUMUL AMT
   -------  ---  --------   --------  ---   -------     -------     ---------
   3972276  INV  33334947   02/20/96   23   3,843.68    3,843.68    53,316.48
   5997791  CRE  33334947   02/21/96   22      61.64-      61.64-   53,254.84
   3978281  INV  33334947   02/21/96   22   4,881.67    4,881.67    58,136.51
   5999577  CRE  33334947   02/22/96   21     114.24-     114.24-   58,022.27
   4010689  INV  33334947   02/27/96   16   4,335.81    4,335.81    62,358.08
   6907116  CRE  33334947   02/28/96   15      24.00-      24.00-   62,334.08
   4016787  INV  33334947   02/28/96   15   3,945.56    3,945.56    66,279.64
   4024515  INV  33334947   02/29/96   14     175.02      175.02    66,454.66
   5910449  CRE  33334947   03/01/96   13     148.72-     148.72-   66,305.94
   4040600  INV  33334947   03/05/96    9   5,074.06    5,074.06    71,380.00
   5916199  CRE  33334947   03/06/96    8      99.88-      99.88-   71,340.12
   4055197  INV  33334947   03/06/96    8   4,672.16    4,672.16    76,012.28
   5917925  CRE  33334947   03/07/96    7      45.37-      45.37-   75,966.91
   4063072  INV  33334947   03/07/96    7     172.72      172.72    76,139.63
   4086884  INV  33334947   03/12/96    2   4,093.17    4,093.17    80,232.80
   5925466  CRE  33334947   03/13/96    1      22.58-      22.58-   80,210.22
   4092366  INV  33334947   03/13/96    1   4,464.70    4,464.70    84,674.92
   4101256  INV  33334947   03/14/96    0     249.40      249.40    84,924.32
```

1000000117

000004337

P-App. 005939

```
AR27                          ACCOUNT STATUS                    03/14/96
                              THRU 03/14/96                     16:38:22

        A/R ACCOUNT: 73346025  DESERT VALLEY CARE CENTER        PAGE:    1
        DISTRICT: 4146
        ACCT BAL:     18,536.99  TERMS: NET 90 DAYS

   REF/CK#   TRN   CUSTOMER    DATE     AGE    AMOUNT     NET DUE      CUMUL AMT
   -------   ---   --------    ----     ---    ------     -------      ---------
   5983020   CRE   73346025  09/13/95   183       79.25-      79.25-        79.25-
   3410122   INV   73346025  11/03/95   133    2,251.29    2,251.29,      2,178.04
   5988184   CRE   73346025  11/29/95   106       92.97-      92.97-      2,085.07
   5904458   CRE   73346025  12/11/95    94       13.46-      13.46-      2,071.61
   5908202   CRE   73346025  12/13/95    92       18.79-      18.79-      2,052.82
   5914055   CRE   73346025  12/18/95    87       45.96-      45.96-      2,006.86
   5923332   CRE   73346025  12/26/95    79       36.42-      36.42-      1,970.44
   5931455   CRE   73346025  01/02/96    72       57.36-      57.36-      1,913.08
   5939940   CRE   73346025  01/08/96    66       56.02-      56.02-      1,857.06
   5939941   CRE   73346025  01/08/96    66       18.61-      18.61-      1,838.45
   5943624   CRE   73346025  01/10/96    64        5.75-       5.75-      1,832.70
   5952681   CRE   73346025  01/17/96    57       51.82-      51.82-      1,780.88
   3795800   INV   73346025  01/17/96    57      357.09      357.09       2,137.97
   3844926   INV   73346025  01/26/96    48       58.57       58.57       2,196.54
   3875184   INV   73346025  02/01/96    42       81.00       81.00       2,277.54
   3879771   INV   73346025  02/02/96    41       33.44       33.44       2,310.98
   3879772   INV   73346025  02/02/96    41    1,705.86    1,705.86       4,016.84
   3879773   INV   73346025  02/02/96    41       16.60       16.60       4,033.44
   3896476   INV   73346025  02/06/96    37        4.10        4.10       4,037.54
   3896478   INV   73346025  02/06/96    37    1,136.46    1,136.46       5,174.00
   3917101   INV   73346025  02/09/96    34    1,329.79    1,329.79       6,503.79
   3933738   INV   73346025  02/13/96    30    1,048.14    1,048.14       7,551.93
   3956705   INV   73346025  02/16/96    27    1,059.39    1,059.39       8,611.32
   3956706   INV   73346025  02/16/96    27       42.23       42.23       8,653.55
   3972277   INV   73346025  02/20/96    23    1,552.98    1,552.98      10,206.53
   3973755   INV   73346025  02/20/96    23      377.90      377.90      10,584.43
   3993900   INV   73346025  02/23/96    20    1,272.68    1,272.68      11,857.11
   3993901   INV   73346025  02/23/96    20       48.86       48.86      11,905.97
   5903885   CRE   73346025  02/26/96    17       21.00-      21.00-     11,884.97
   4010690   INV   73346025  02/27/96    16      771.15      771.15      12,656.12
   5907364   CRE   73346025  02/28/96    15       12.23-      12.23-     12,643.89
   4031828   INV   73346025  03/01/96    13    1,598.56    1,598.56      14,242.45
   4031829   INV   73346025  03/01/96    13      237.22      237.22      14,479.67
   4034811   INV   73346025  03/02/96    12       64.86       64.86      14,544.53
   4048007   INV   73346025  03/05/96     9    1,215.41    1,215.41      15,759.94
   4048608   INV   73346025  03/05/96     9      120.83      120.83      15,880.77
   4068990   INV   73346025  03/08/96     6    1,365.30    1,365.30      17,246.07
   4073003   INV   73346025  03/09/96     5      103.54      103.54      17,349.61
   5922073   CRE   73346025  03/11/96     3        3.00-       3.00-     17,346.61
   4086883   INV   73346025  03/12/96     2    1,190.38    1,190.38      18,536.99
        CUSTOMER 73346025 DESERT VALLEY CARE CENTER TOTAL:    18,536.99

        ACCOUNT  73346025 DESERT VALLEY CARE CENTER TOTAL:    18,536.99
```

000004338

P-App. 005940

```
AR27                        ACCOUNT STATUS                    08/14/96
                            THRU 03/14/96                     16:36:10

       A/R ACCOUNT: 23462054  CENTRAL AZ MEDICAL CENTER          PAGE:    1
       DISTRICT: 4146
       ACCT BAL:   37,680.73  TERMS: ** Multiple **

   REF/CK#   TRN   CUSTOMER   DATE      AGE    AMOUNT      NET DUE    CUMUL AMT
   -------   ---   --------   ----      ---    ------      -------    ---------
   3244690   INV   3345931   10/04/95   162    3,865.96    3,865.96    3,865.96
   5926508   CRE   3345931   10/13/95   153       27.56-     27.56-    3,838.40
   5933799   CRE   3345931   10/19/95   147       44.06-     44.06-    3,794.34
   5942830   CRE   3345931   10/26/95   140        2.35-      2.35-    3,791.99
   5942931   CRE   3345931   10/26/95   140        7.54-      7.54-    3,784.45
   5973629   CRE   3345931   11/17/95   118      127.65-    127.65-    3,656.80
   5999781   CRE   3345931   12/07/95    98       73.69-     73.69-    3,583.11
   5919084   CRE   3345931   12/21/95    84       21.50-     21.50-    3,561.61
   5934628   CRE   3345931   01/04/96    70      474.06-    474.06-    3,087.55
   5944751   CRE   3345931   01/11/96    63        7.78-      7.78-    3,079.77
   5953997   CRE   3345931   01/18/96    56       26.10-     26.10-    3,053.67
   188       1AT   3345931   01/25/96    49      382.95-    382.95-    2,670.72
   5963199   CRE   3345931   01/25/96    49       10.80-     10.90-    2,659.92
   3901994   INV   3345931   02/07/96    36    4,034.02    4,034.02    6,693.84
   5982269   CRE   3345931   02/09/96    34        6.14-      6.14-    6,687.70
   5982269   CRE   3345931   02/09/96    34        4.44-      4.44-    6,683.26
   3939306   INV   3345931   02/14/96    29    3,297.58    3,297.58    9,980.84
   5997951   CRE   3345931   02/21/96    22        2.12-      2.12-    9,978.72
   3976873   INV   3345931   02/21/96    22       50.20      50.20   10,028.92
   3976874   INV   3345931   02/21/96    22      124.16     124.16   10,153.08
   3976876   INV   3345931   02/21/96    22    3,200.53    3,200.53   13,353.61
   5999474   CRE   3345931   02/22/96    21       73.19-     73.19-   13,280.42
   3986668   INV   3345931   02/22/96    21       75.24      75.24   13,355.66
   3906327   INV   3345931   02/23/96    20      164.12     164.12   13,519.78
   4004454   INV   3345931   02/26/96    17    1,159.03    1,159.03   14,678.81
   4016832   INV   3345931   02/28/96    15    3,395.05    3,395.05   18,073.86
   5913850   CRE   3345931   03/05/96     9       60.41-     60.41-   18,013.45
   4058992   INV   3345931   03/06/96     8    3,357.89    3,357.89   21,371.34
   4092353   INV   3345991   03/13/96     1    3,229.75    3,229.75   24,601.09
             CUSTOMER 3345931 CENTRAL AZ MEDICAL CENTER TOTAL:      24,601.09


   8866169   INV   3462041   01/31/96    43    3,869.42    3,869.42    3,859.42
   3901995   INV   3462041   02/07/96    36    1,807.06    1,807.06    5,666.48
   5982615   CRE   3462041   02/09/96    34        4.92-                5,661.56
   3939305   INV   3462041   02/14/96    29    1,693.41    1,693.41    7,354.97
   3976875   INV   3462041   02/21/96    22    1,660.91    1,660.91    9,015.88
   5999522   CRE   3462041   02/22/96    21       29.27-     29.27-    8,986.61
   3986669   INV   3462041   02/22/96    21       29.27      29.27     9,015.88
   4016831   INV   3462041   02/28/96    15    1,525.15    1,525.15   10,541.03
   5908791   CRE   3462041   02/29/96    14       18.46-     18.46-   10,522.57
   4053991   INV   3462041   03/06/96     8    1,144.42    1,144.42   11,666.99
   4092352   INV   3462041   03/13/96     1    1,412.65    1,412.65   13,079.64
             CUSTOMER 3462041 CENTRAL ARIZONA CARE CTN TOTAL:       13,079.64


       ACCOUNT  23462054 CENTRAL AZ MEDICAL CENTER TOTAL:          37,680.73
```

*attn: Jerry Brantz*
*520-426-6435*
*4 pages*

*from: Becky*
*Alliant Foodservice*
*602-352-3556*

I000000119

000004339

P-App. 005941

*8-20-98*

# FIRST WEST
## PROPERTIES CORPORATION

# APPLICATION FOR EMPLOYMENT
PRE-EMPLOYMENT QUESTIONNAIRE   AN EQUAL OPPORTUNITY EMPLOYER

## PERSONAL INFORMATION

DATE 5-21-98

NAME Andriano, Wendi E.
LAST    FIRST    MIDDLE

SOCIAL SECURITY NUMBER ▓▓▓▓▓▓▓

PRESENT ADDRESS 20052 W. Otter Rd. Casa Grande, AZ 85222
STREET    CITY    STATE    ZIP

PREVIOUS ADDRESS 1650 N. Kadota CG, AZ 85222
STREET    CITY    STATE    ZIP

PHONE NUMBER (520) 426-0403    ARE YOU 18 YEARS OR OLDER    YES ☑    NO ☐

### SPECIAL QUESTIONS
DO NOT ANSWER ANY OF THE QUESTIONS IN THIS FRAMED AREA UNLESS THE EMPLOYER HAS CHECKED A BOX PRECEDING A QUESTION.  THEREBY INDICATING THAT THE INFORMATION IS REQUIRED FOR A BONA FIDE OCCUPATIONAL QUALIFICATION., OR DICTATED BY NATIONAL SECURITY LAWS, OR IS NEEDED FOR OTHER LEGALLY PERMISSIBLE REASONS.

☐ Height ____ Feet ____ Inches    ☐ Are you prevented from lawful employment in the U.S.? ____ Yes ____ No

☐ Weight ____ lbs.    ☐ Date of Birth *____

☐ What foreign languages do you speak fluently? _____ Read ____ Write ____

☐ Have you ever been convicted of any crime other than a traffic violation? ** ____ Yes ____ No . Describe: ____

☐ Do you use or are you involved in the sale or distribution of illegal drugs or substances? ____ Yes ____ No

☐ Have you ever had a judgement filed against you? ____ Yes ____ No

☐ Have you ever been evicted? ____ Yes ____ No

## EMPLOYMENT DESIRED
POSITION Manager / Courtyard    DATE YOU CAN START 6-26-98    SALARY DESIRED ____

ARE YOU EMPLOYED NOW? no    IF SO MAY WE INQUIRE OF YOUR PRESENT EMPLOYER?

EVER APPLIED TO THIS COMPANY BEFORE? yes    WHERE? Quail    WHEN? '92

## EDUCATION

| SCHOOL | NAME AND LOCATION | *NO OF YEARS ATTENDED | *DID YOU GRADUATE | SUBJECTS STUDIED |
|---|---|---|---|---|
| HIGH SCHOOL | Harvest Christian Academy | | yes | |
| COLLEGE | Univ. of Phoenix | | yes | Acctg / Bs. Mgmt. |
| TRADE, BUSINESS OR CORRESPONDENCE SCHOOL | | | | |

* The Age Discrimination in Employment Act of 1967 prohibits discrimination on the basis of age with respect to individuals who are at least 40 but less than 70 years of age.
** You will not be denied employment solely because of a conviction record, unless the offense is related to the job for which you have applied.

000004401

## FORMER EMPLOYERS (LIST BELOW FOUR EMPLOYERS, STARTING WITH LAST ONE FIRST).

| DATE MONTH AND YEAR | NAME AND ADDRESS OF EMPLOYER | SALARY | POSITION | REASON FOR LEAVING |
|---|---|---|---|---|
| From _present_ | Joe's Windshield Repair | | owner | |
| To | | | | |
| From _8-93_ | CG Regional Medical Center | 32,000.- | Staff Accountant | Work w/ husband |
| From _5-96_ | | | | |
| From _90_ | Quail Gardens | 1200/mo w/Apt. | Asst. Mgr. | benefits + higher pay |
| From _8-93_ | | | | |
| From | | | | |
| To | | | | |

## REFERENCES: GIVE THE NAMES OF THREE PERSONS NOT RELATED TO YOU, WHOM YOU HAVE KNOWN AT LEAST ONE

| NAME | ADDRESS AND PHONE NUMBER | BUSINESS | YRS. ACQUAINTED |
|---|---|---|---|
| 1. Tom King | CC   836-0045 | Pastor | 17 |
| 2. Dr. Yang | CG   836-9785 | Dentist | 17 |
| 3. Nita Johnson | | Apt. Mgr. | 7 |

DESCRIBE SPECIALIZED TRAINING, APPRENTICESHIP, SKILLS, AND DESCRIPTION OF PAST WORK PERFORMED

Management experience with own business, computer experience with Win 95, Excel, Spreadsheets, etc. Can prepare financials, budgets, etc.

## PHYSICAL RECORD:
DO YOU HAVE ANY PHYSICAL LIMITATIONS THAT PRECLUDE YOU FROM PERFORMING ANY WORK FOR WHICH YOU ARE BEING CONSIDERED? __Yes _X_ No   IF YES, WHAT CAN BE DONE TO ACCOMODATE YOUR LIMITATION? _____

PLEASE DESCRIBE:

INCASE OF EMERGENCY NOTIFY   _Donna Ochoa_   _1104 N. Park   CG_   _836-6829_
NAME                          ADDRESS                  PHONE NO.

"I CERTIFY THAT THE FACTS CONTAINED IN THIS APPLICATION ARE TRUE AND COMPLETE TO THE BEST OF MY KNOWLEDGE AND UNDERSTAND THAT, IF EMPLOYED, FALSIFIED STATEMENTS ON THIS APPLICATION SHALL BE GROUNDS FOR DISMISSAL, I AUTHORIZE INVESTIGATION OF ALL STATEMENTS CONTAINED HEREIN INCLUDING OBTAINING A CREDIT REPORT. I AUTHORIZE THE REFERENCES LISTED ABOVE TO GIVE YOU ANY AND ALL INFORMATION CONCERNING MY PREVIOUS EMPLOYMENT AND ANY PERTINENT INFORMATION THEY MAY HAVE PERSONAL OR OTHERWISE, AND RELEASE ALL PARTIES FROM ALL LIABILITY FOR ANY DAMAGE THAT MAY RESULT FROM FURNISHING SAME TO YOU.

I UNDERSTAND AND AGREE THAT, IF HIRED, MY EMPLOYMENT IS FOR NO DEFINITE PERIOD AND MAY, REGARDLESS OF THE DATE OF PAYMENT OF MY WAGES AND SALARY, BE TERMINATED AT ANY TIME WITHOUT ANY PRIOR NOTICE."

DATE: _5-21-98_     SIGNATURE: _Wendi T. Andriano_

| INTERVIEWED BY: | | DATE: |
|---|---|---|
| | | |

| HIRED: | Yes   No | POSITION: | SALARY/WAGE: |
|---|---|---|---|

This form has been designed to strictly comply with State and federal fair employment practice laws prohibiting employment discrimination.

First West Properties Corporation · EMPLOYMENT APPLICATION · Form EMPLOYAP, p.2 FRM © 1991

000002402

OCT-17-00 10:31 AM                                    P-01

October 17, 2000

Mountain States Credit Corporation
Attn.: Donna
1307 N. Pinal Avenue
Casa Grande, AZ 85222

re:   **Theft by Conversion by Former Employee(s)**
      **Courtyard Apartments - Casa Grande, AZ**
      Wendi Andriano   SSN          DOB
                       SSN          DOB

Pursuant to our conversation in September, 2000 please find enclosed materials related to the above referenced matter. We have included copies of materials to establish our claims which were gathered during our internal audits.

Although we can attribute more than $30,000.00 in theft by conversion by Ms. Andriano, we are only able to support or track on paper $8,338.17 of the total misappropriated. Andriano refused certified mail service, and was recently booked into the Maricopa County Jail on suspicion of 2nd degree murder. We have provided information gathered from news sources of her last known address and employer as of 10/09/00. We wish to proceed with our claim against Ms. Andriano.

We have been more successful in our audit of ███████'s activities. With the cooperation of residents, we have established and included substantial back up for our claim of $15,185.58 against ███████. We have also included a record of her current employment and address as of 10/13/00. We wish to aggressively pursue our claim against █████.

Thank you for any assistance that you render in this matter. If you are in need of any additional information, please call. We look forward to hearing from you soon.

Very truly yours,

*Timothy Lee*

Timothy Lee
Agent/Owner
(602) 243-4250

SPM
SPM INC
Property Management

17 West Wetmore
Suite 201
Tucson, Arizona
85705-1643

Tel: 520-577-5700
Fax: 520-577-8824

A Subsidiary of
Schnase Group, Inc.

000004341                                    J000000001

OCT-17-00 10:31 AM                                                    P.02

**Theft by Conversion by Former Employee**
**Courtyard Apartments - Casa Grande, AZ**

Wendi Andriano  SSN   DOB

Last Known Address:

Murder 2, Maricopa County Jail
100 W. Washington, 19th Floor
Phoenix, AZ 85003
(602) 256-1032

San Riva at the Foothills Apartments
Manager
2155 E. Liberty Lane
Phoenix, AZ 85048
(480) 283-8488

Employer:
Fairfield Residential, Inc.
8260 E. Raintree Drive, Suite 204
Scottsdale, AZ 85260

000004342                                          J000000002

*Wendi Andriano*

# FAX TRANSMISSION

## SCHOMAC PROPERTY MANAGEMENT, INC.
### Timothy Lee, Regional Director – Phoenix
PHOENIX, AZ 85040
(602) 243-4250
Fax:(602) 266-5208

| | | | |
|---|---|---|---|
| **To:** | Ms. Christy Dotson | **Date:** | December 17, 1999 |
| **Fax #:** | (520) 888-8221 | **Pages:** | 1⅞ including this cover sheet |
| **Subject:** | Courtyard Apartments Supplemental Information Assessment of Property Audit Wendi Ochoa/Andriano | | |

**COMMENTS:**

Christy:

In <u>addition</u> to the materials sent by Sophia this week, the following is a recollection of activity uncovered during the Audit of the above referenced matter.

We have tracked a pattern of numerous Accounting and Data Entry irregularities which resulted in delinquencies being covered up and occupancies being elevated.

The methods used appear to have been accelerated in Spring, 1999. That was the time of year when most Home in Arizona Residents paid an entire year of rent in advance. The rents were taken in and redistributed through Rent Roll into other tenant delinquencies and vacant apartments. We are also aware that Wendi had knowledge of pass codes to the Rent Roll program which were only known to Kris Reed. She evidently watched over Kris Reed's shoulder and memorized the data entry necessary to bypass the Rent Roll audit systems we have in place for all of our Properties.

All Home in Arizona Residents purchased the existing furniture in their units at $1.00, upon signing a Lease Renewal in the Spring of 1999. The furniture was new. The actions were verbal. The results are of consequence. There is no additional future revenue gain against this action, therefore the result of this action is very costly.

000004343                              J000000003

The Home in Arizona Residents were also given free carport parking and free storage space, for paying in advance, during the Spring of 1999. We believe this action was taken to accelerate the funds coming into the office, to cover for the Accounting actions outlined in Sophia's Memo.

Wendi covered for Move-In mistakes for a new resident out of a Checking Account at Norwest Bank, Casa Grande Branch. Please note one example attached which we have audited. It denotes Check #1222 Norwest Bank and Account ▉▉▉▉▉▉ and Wendi Andriano and Joe D. Andriano as the Account holder. The check for $800.30 was made payable to Moving Services in Tucson, AZ. The resident stated that she was reimbursed "... by the Property..." for several mistakes made during her Move-In period at Courtyard, including an unfinished market ready apartment. The resident was told that "... there is no problem with the Property covering her additional hassles and moving expenses..." We obtained a copy of the check from the moving company. See attached.

Courtyard's Clubhouse Furniture was 'sold' and delivered to Wendi's Father - See attached Invoice of missing furniture.

The Accounting and judgement errors are calculated, deceitful, and numerous. However, there are still many unknowns from the results of the Accounting irregularities. The judgement errors are not simple oversights, but deliberate actions which can be very costly to future value with regard to income and related occupancies/delinquencies. Our total write-offs and liabilities, at this point, are still not fully known.

000004344

J000000004

DEC-17-99 04:51 PM   WWW.1AZPROPERTY.COM      602 242 1518          P-03

*Memo*

To: Christy Dotson-Human resource SPM, Inc.

From: Sophia Wieneke-Assistant Area Manager, Phx Casa Grande

Below is an assessment of audit findings for Courtyard Apartments, Casa Grande.

---

Apt # 408-Schlaphoff                              $  54.35
Tenant was over charged on monthly
auto bill for yearly prepay as Winter
Visitor.

Apt # 702-Scott                                  $  150.30
Tenant was given discount per CD due
to condition of apt at move in and tardiness
in having apt non market ready for day of move in.

Apt # 112                                        $  359.82
Tenant was not credited payment for the month of
August 99.  Payment was divided and credited to
other tenants apartments.

Apt # 201-Daquisto                               $  14.40
Tenant was overcharged in monthly auto bill due
to yearly prepay as winter visitor.

Apt # 1115-Johnson                               $  105.09
Tenant was overcharged in monthly auto bill
resulting in delinquent balance and additional
late fee.

Apt # 111-Burley                                 $  8.15
Tenant was overcharged in monthly auto bill
resulting in delinquent balance.

Apt # 320 -Schoenenberger, Paul                  $  336.90
Tenant was charged for 15 days of occupancy
which was false resulting in balance due and
late fee.

Apt# 1111-Schoenenberger, Richard                $  489.00

000004345                                    J000000005

P-App. 005948

Tenant was overcharged on application
fee and monthly auto bill, resulting in
balance due and late fees.                                    $   485.00

Apt# 208-Sward
Tenant was overcharged in monthly
auto bill for parking and discounted
yearly prepay for selling chair and
sleeper sofa to CD.

Apt# 708-Rowen                                               $ 3,485.11
Tenant was overcharged monthly auto bill
for Corp suite apartment, but apartment
was not a suite.

Apt#1108-Jessen                                             $ 1,800.05
Tenant prepaid $4,487.75or discount as Winter
visitor was only credited a partial payment of
$2,687.70.  Additional part of tenants payment
was distributed between 3 other apartments which
were delinquent at the time.

Reservations                                        $   900.00 (I dep)
Six tenants prepaid  $175.00 for security deposits        150.00 (app fee)
and application fees for priority hold list.  Tenants
did not rent requesting refunds.   Checks did clear
the bank, but we cannot find record of the deposits.

*Estimated Total                                          $8,338.17

*Please note that the above audit does not include the number of late fees written off due to
checks not being posted to correct accounts.  Nor does it reflect the estimated yearly loss of
revenue due to tenants who were given free covered parking and storage due to renewing for
a year and paying up front. That could estimate anywhere $750.00-$1500.00 depending on
apartment.

The above amounts have been written off toward vacancy loss as well as late fee charge backs
and application fee charge backs.  All information was verified by tenant as well as canceled
checks where necessary.

cc: Timothy Lee

000004346                                    J000000006

Suzie
The home of
the moving company
that Wendy paid
storage to in Tucson
is:

Moving Services
(520) 622-7676

ASK FOR CHERYL

I CALLED AND LET HER
KNOW YOU WOULD BE CALLING
SOMETIME IN THE FUTURE.
Veronica

WENDI ANDRIANO
JOE D. ANDRIANO
7060 N TREKELL RD, APT 808
CASA GRANDE, AZ 85222

91-527/1271
N4950483

1222

Date 8-16-99

Pay to the
Order of   Moving Services        $ 800.30

Eight  hundred  30/                   Dollars

NORWEST BANKS

Norwest Bank Arizona N.A.
Casa Grande Office 30844
1000 E. Florence Blvd.
Casa Grande, AZ 85222

Memo _____

⑆ 122105278⑆ 122 2⑈ 944950488 3⑈

Wendi Andriano

P-App. 005950

000004347

J000000007

DEC-17-99 04:53 PM  WWW.IAZPROPERTY.COM          602 242 1518          P.06

DEC-18-99 06:40 HM                                                    P.03/31

HEILIG-MEYERS FURNITURE
1146 E. FLORENCE BLVD.
CASA GRANDE, AZ 85222

COURTYARD APT. C. LAWSON
2860 N. TREKELL RD.
CASA GRANDE, AZ
520-426-9451 / 520-836-4012

EFFECTIVE DATE: 5/05/1998

| QTY | SKU # | MFGR | OPT | MFGR # | DESCRIPTION | SP | UNITPRICE | AMOUNT |
|-----|-------|------|-----|--------|-------------|-----|-----------|--------|
| 1 | 565828 | BENCHCR | 001 | 544-000 | UTICA SOFA | | 399.00 | 399.00 |
| 1 | 283416 | GUARDIA | 021 | | MIRACLE GUARD | | 64.99 | 64.99 |
| 1 | 283440 | GUARDIA | 023 | SOFA | MIRACLE GUARD | | 49.99 | 49.99 |
| 1 | 565937 | BENCHCR | 001 | 544-18-W | UTICA LOVESEAT | | 379.00 | 379.00 |

*Clubhouse Furniture*

The undersigned Buyer (whether one or more) purchases
the goods ("Goods") and services described above from
Seller, subject to the terms and conditions hereof. Buyer
agrees to pay Seller the Total of Payments by installments
in the number and amounts, and by the due dates,
described herein.

ITEMIZATION OF THE AMOUNT FINANCED
1. TOTAL AMOUNT FOR GOODS          892.98
2. SALES TAX        7.0000 %        62.65
3. CASH PRICE (1+2)                955.53
4. DOWN PAYMENT                       .00
5. CASH PRICE LESS DOWN PAY (3-4)  962.63
6. OLD BALANCE                        .00
7. REFUNDS    FINANCE CHARGE          .00
              LIFE INS                .00
              DISAB INS               .00
              PROP INS                .00
              UNEMP INS               .00

8. BALANCE BEFORE FINANCING (5+6-7) 962.63
9. INS: AMOUNT PAID TO LIFE INS CO    .00
        AMOUNT PAID TO DISAB INS CO   .00
        AMOUNT PAID TO PROP INS CO    .00
        AMOUNT PAID TO UNEMP INS CO   .00
10. NON-FILING CHARGES                .00
11. AMOUNT FINANCED (8+9+10)        962.63

A PORTION OF ANY AMOUNTS SHOWN ON
LINE 9 MAY BE RETAINED BY THE CREDITOR

FOR STORE USE ONLY               1004.40

IF THE AMOUNT FINANCED SHOWN BELOW IS
PAID WITHIN 90 DAYS OF THE DATE HEREOF,
NO FINANCE CHARGE WILL BE IMPOSED

PAGE  1 OF  1

| ANNUAL PERCENTAGE RATE | FINANCE CHARGE | Amount Financed | Total of Payments | Total Sale Price |
|---|---|---|---|---|
| The cost of your credit as a yearly rate | The dollar amount the credit will cost you. | The amount of credit provided to you or on your behalf. | The amount you will have paid after you have made all payments as scheduled. | The total cost of your purchase on credit including your downpayment of $ .00 |
| 24.00 % | $ 41.77 | $ 962.63 | 1004.40 | 1004.40 |

Your Payment Schedule will be:
1 PMTS OF  1004.40  DUE ON 10TH DAY OF THE MONTH STARTING   7/10/1998

SECURITY: Certain household items are the security for this transaction.

LATE CHARGE: If a payment is more than 10 days late you may be charged a late charge equal to $5.00.

PREPAYMENT: If you pay off early, you may be entitled to a refund of part of the finance charge.

See your contract for any additional information about nonpayment, default, any required repayment in full before the scheduled date, and prepayment refunds and penalties.

Important Warranty Information: SELLER MAKES NO EXPRESS WARRANTY, AND UNLESS BUYER PURCHASES A SERVICE CONTRACT FROM SELLER AT THE TIME OF THE SALE OF THE GOODS OR WITHIN 90 DAYS THEREAFTER, SELLER MAKES NO IMPLIED WARRANTY, INCLUDING ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE IN CONNECTION WITH THE SALE OF ANY GOODS.

Notice to the Buyer: (1) Do not sign this agreement before you read it or if it contains any blank spaces to be filled in. (2) You are entitled to a completely filled-in copy of this agreement. (3) You can repay the full amount due under this agreement at any time and obtain a partial refund of the finance charge. (4) If you desire to pay off in advance the full amount due, the amount of the refund you are entitled to, if any, will be furnished upon request.

TERMS AND CONDITIONS PRINTED ON REVERSE SIDE HEREOF ARE INCORPORATED IN AND CONSTITUTE A PART OF THIS AGREEMENT

000004348

J000000008

Timothy,
    This is a list of Winter Visitors that pd. in deposits. That we are refunding back to them. These monies were not posted in Computer that we can find.

Kline          175.00
Ashby          175.00
Barnaby        175.00
Rubenstien     175.00
Siddoway       175.00
Czepa          175.00

               1,050.00

: Susie
12-17-99

000004349

J000000009

P-App. 005952

DEC-17-99 04:54 PM   WWW.1AZPROPERTY.COM       602 242 1518       P.08
DEC-18-99 06:39 AM                                               P.02

1139

7-5- 19 99

Pay to the order of *Courtyard Apt. Homes*     $ 175.00

*One Hundred Seventy-Five 00/* ___ Dollars

U.S. BANK OF IDAHO
NATIONAL ASSOCIATION
( 800 US BANKS )

*Appl. Fee - 25*
*Sec. Dep. 150*

000004350                                        J000000010

DEC-17-99 04:54 PM   WWW.1AZPROPERTY.COM   602 242 1518   P.09





000004351   J000000011

DEC-17-99 04:55 PM   WWW.IAZPROPERTY.COM          602 242 1518              P.10

SCHOMAC PROPERTY MANAGEMENT                                         Page
Courtyard Apartments                                               1AM
Account Ledger

Unit #415

| Applied... : 30 Apr 1999 | Autobill Rent .: | 470.00 | Sched Rent .: | 470.00 |
| Moved In. ...: 16 May 1999 | Other Charges .: | 0.45 | Telephone #.: 303/733-2975 |
| Lease Start... 16 May 1999 | Other Credits .: | 0.00 | Alt Phone #.: |
| Lease End .. 30 Apr 2000 | Account Balance. | -13.32 | Alt Phone # : |
| Notice G.vm.: | | | Last NSF....: 17 Jul 1999 |
| Notice For... : | Deposit Required..: | 150.00 | Times NSF Checks. .: 2 |
| Moved Out  .. | Deposit Paid To. : | 150.00 | Times Late Charges : 2 |

| Date | Vlog Date | Description | User/Source/Jrnl | Document | Code | Period | Charge | Credit | Balance |
|---|---|---|---|---|---|---|---|---|---|
| 04/30/1999 | | TENANT Application Fee | JO | S RESI | CH APPF | 199905 | 25.00 | | 25.00 |
| 05/08/1999 | | SCHOMAC Payment, Payme | WA | N RESI 461 | PZ PMT | 19990507 | | 25.00 | 0.00 |
| 05/14/1999 | | 415 Rent | WA | P RESI | CA RENT | 199505 | 253.73 | | 253.73 |
| 05/14/1999 | | 415 Sales Tax | WA | P RESI | CF TAX | 199505 | 9.48 | | 263.21 |
| 05/28/1999 | | 415 Late Charge | WA | S RESI 8463 | CB LATE | 199905 | 50.00 | | 313.21 |
| 05/13/1999 | | 415 Payment, Payme | WA | M RESI 8460 | PZ PMT | 19990509 | | 436.50 | 131.15 |
| 05/23/1999 | | 415 Non Refundable Redec Fee | WA | M RESI | CH NRF | 199905 | 131.35 | | 0.00 |
| 06/01/1999 | | 415 Payment, Payme | WA | M RESI | PZ PMT | 19990602 | | 470.46 | -470.46 |
| 06/01/1999 | | 415 Rent | WA | A RESI | CA RENT | 199906 | 470.00 | | -8.46 |
| 06/01/1999 | | 415 Sales Tax | WA | A RESI | CF TAX | 199906 | 8.46 | | 0.00 |
| 06/24/1999 | | 415 Statistics | WA | N RESI | CR UTIL | 199906 | 35.98 | | 35.98 |
| 07/01/1999 | | 415 Rent | WA | A RESI | CA RENT | 199907 | 470.00 | | 505.98 |
| 07/01/1999 | | 415 Sales Tax | WA | A RESI | CF TAX | 199907 | 8.46 | | 514.44 |
| 07/01/1999 | | 415 Payment, Payme | WA | M RESI | PZ PMT | 19990705 | | 478.50 | 35.94 |
| 07/17/1999 | | 415 NSF FEE, UNIT 415, Payme | WA | M RESI 481 | CC NSFF | 199907 | 25.00 | | 60.94 |
| 07/17/1999 | | SCHOMAC NSF: Payment, Payme | WA | N RESI 481 | PZ PMT | 19990709 | 25.00 | | 85.94 |
| 07/24/1999 | | 415 L/C Waived: n/a | WA | S RESI 648643 | CB LATE | 199908 | | | -392.56 |
| 07/31/1999 | | 415 Payment, Payme | WA | M RESI 648643 | PZ PMT | 19990803 | | 478.50 | -392.56 |
| 08/01/1999 | | 415 Rent | WA | A RESI | CA RENT | 199908 | 470.00 | | 77.44 |
| 08/01/1999 | | 415 Sales Tax | WA | A RESI | CF TAX | 199908 | 8.46 | | 85.90 |
| 08/01/1999 | | 415 Rent | KAR | A RESI | CA RENT | 199909 | 470.00 | | 555.90 |
| 09/01/1999 | | 415 Sales Tax | KAR | A RESI | CF TAX | 199909 | 8.46 | | 564.36 |
| 09/01/1999 | | 415 L/C Waived: was not late | SPM | S RESI 63424 | CB LATE | 199909 | | | 85.46 |
| 09/01/1999 | | 415 Payment, Payme | SPM | M RESI 63424 | PZ PMT | 19990906 | | 478.50 | 85.46 |
| 09/28/1999 | | 415 Late Charge | KAR | M RESI | CB LATE | 199909 | 50.00 | | 35.98 |
| 09/28/1999 | | 415 Late Charge | KAR | M RESI | CB LATE | 199909 | 100.00 | | -64.14 |
| 09/28/1999 | | 415 for late fee | KAR | M RESI | CF TAX | 199909 | 0.90 | | 63.24 |
| 09/28/1999 | | 415 Oct 2 Net | KAR | M RESI | CF TAX | 199909 | 0.93 | | 62.31 |
| 09/28/1999 | | 415 Non Refundable Redec Fee | KAR | M RESI | CH NRF | 199909 | 48.70 | | -13.64 |
| 09/28/1999 | | 415 Non Refundable Redec Fee | KAR | M RESI | CH NRF | 199909 | 0.30 | | -13.34 |
| 10/01/1999 | | 415 Rent | MOR | A RESI | CA RENT | 199910 | 470.00 | | 456.66 |
| 10/01/1999 | | 415 Sales Tax | MOR | A RESI | CF TAX | 199910 | 8.46 | | 465.12 |
| 10/28/1999 | | 415 Late Charge | SG | S RESI 27364 | CB LATE | 199910 | 50.00 | | 515.12 |
| 10/28/1999 | | 415 Payment, Payme | SO | M RESI 27364 | PZ PMT | 19991010 | | 478.50 | 36.62 |
| 11/01/1999 | | 415 Rent | SG | A RESI | CA RENT | 199911 | 470.00 | | 506.62 |
| 11/01/1999 | | 415 Late Charge | SO | M RESI | CB LATE | 199911 | 50.00 | | 456.62 |
| 11/01/1999 | | 415 Sales Tax | SO | A RESI | CF TAX | 199911 | 8.46 | | 465.08 |
| 11/01/1999 | | 415 Payment, Payme | | SG | M RESI 142 | PZ PMT | 19991114 | | 478.46 | -13.38 |

** Designates Items Contributing To Delinquent Or Prepaid Balances.

DEC-17-99 04:55 PM   WWW.1AZPROPERTY.COM          602 242 1518          P-11

*Deposited*
*Aug 99*
*Batch 12*





21181-13DEC99/P-CL/GXL003/19-AUG-99/359.82/USD/6104622196//332/Q
14-DEC-99/ 000000005971004883/REFR: 199912130960/A6/

Enclosed is the photocopied item you requested. For further assistance,
please call 1-800-869-3557. (1-800-TO-WELLS) A separate fee for this
service, as described in your account disclosure agreement, has been
subtracted from your account.
Thank you for banking with Wells Fargo - your Anytime Anywhere Bank.

- - - - INTEROFFICE MAIL - - - -
MAC: S3914011
TO: MARGARET AVALOS   AU:

000004353                                      J000000013

DEC-17-99 04:56 PM   WWW.1AZPROPERTY.COM        602 242 1518        P.12

11/22/99 09:34:39        ->61663378152        9482768        Page 002



CUSTOMER:ORB-SOUTHWEST SOUTH HAVEN
ITEM NUMBER:V4AR 001-01-9722100160 $        1

DEC-17-99 04:56 PM   WWW.IAZPROPERTY.COM          602 242 1518          P.13

| | | SCHOMAC PROPERTY MANAGEMENT | | | Page 1 |
|---|---|---|---|---|---|
| | | Courtyard Apartments | | | 1.3.4 |
| | | Cash Basis Accounting For April '1999 | | | |
| | | Deposit Batch 06 | | | |

| Prin I.D | Name | Description | User/Source | Document | JNL | Period | Date | Code | Debit | Credit |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Payment | WA | M 740622F | RESI | 19990406 | 04/10/99 PZ PMT | | 405.75 | |
| | | Payment | WA | M 2441 | RESI | 19990406 | 04/10/99 PZ PMT | | 947.76 | |
| | | Payment | WA | M 11215 | RESI | 19990406 | 04/10/99 PZ PMT | | 457.48 | |
| | | Payment | WA | M 7406349 | RESI | 19990406 | 04/10/99 PZ PMT | | 175.30 | |
| | | Security Deposit Paid In | WA | M 544 | RESI | 19990406 | 04/10/99 I DEP | | 155.70 | |
| | | Payment | WA | M 844 | RESI | 19990406 | 04/10/99 PZ PMT | | 372.18 | |
| | | Payment | WA | M 739224 | RESI | 19990406 | 04/10/99 PZ PMT | | 291.49 | |
| | | Payment | WA | M 735219 | RESI | 19990406 | 04/10/99 PZ PMT | | 339.38 | |
| | | Payment | WA | M 5858 | RESI | 19990406 | 04/10/99 PZ PMT | | 4,832.41 | |
| | | Payment | WA | M 8545 | RESI | 19990406 | 04/10/99 PZ PMT | | 595.05 | |
| | | Payment | WA | M 7265 | RESI | 19990406 | 04/10/99 PZ PMT | | 363.89 | |
| | | Payment | WA | M 8367 | RESI | 19990406 | 04/10/99 PZ PMT | | 594.24 | |
| | | R Payment | WA | M | RESI | 19990406 | 04/10/99 PZ PMT | | 2,687.70 | |

Checking Account Number Main Checking Net For Deposit          11,984.96

| Code | Description | General Ledger Account Name | G/L Account # | Debit | Credit |
|---|---|---|---|---|---|
| PMT | Payment | Cash In Bank | 1120.0016 | 11,836.86 | |
| PMT | Payment | Accounts Receivable Rent | 1130.0000 | | 2,038.58 |
| RENT | Rent | Rental Revenue | 5200.0050 | | 8,764.31 |
| TAX | Sales Tax | City Sales Tax | 2250.0018 | | 188.05 |
| LATE | Late Charge | Late Charges | 5520.0010 | | 339.90 |
| CAB | Cable Television | Cable Tv | 6990.0010 | | 31.96 |
| DEP | Security Deposit Paid In | Cash In Bank | 1120.0010 | 150.00 | |
| DEP | Security Deposit Paid In | Deposit Security | 2030.0010 | | 150.00 |
| NRF | Non Redeemable Paden Fee | Non Redecorating Fee | 5920.0020 | | 254.00 |
| APPF | Application Fee | Application Fee | 5990.0026 | | 25.00 |
| PKG | Parking | Parking Revenue | 5170.0030 | | 105.00 |
| STOR | Storage Space | Storage Revenue | 5150.0010 | | 105.00 |
| | | | Totals: | 11,986.86 | 11,986.86 |

1800.05

DEC-17-99 04:57 PM  WWW.1AZPROPERTY.COM          602 242 1518          P.14

11/25/1999                    SCHOMAC PROPERTY MANAGEMENT                     Page   1
2:25 pm                         Courtyard Apartments                          TRAN
                                   Account Ledger
                               Utilities (RG02ocio1)
                                  Unit BCOM626

          Applied. ....: May 1998    Autobill Rent ...     0.00    Sched Rent ..:      0.00
          Moved In .....: May 1998   Other Charges...      0.00    Telephone #.:
          Lease Start .: May 1998    Other Credits.       0.00    Alt Phone #.:
          Lease End...: 31 Dec 2099  Account Balance .    0.00    Alt Phone #.:
          Notice Given.:                                           Last NSF  ..:
          Notice For...:             Deposit Required     0.00    Times NSF Checks...    0
          Moved Out ...:             Deposit Paid In..    0.00    Times Late Charges.    0

===================================================================================
Date   Bldg Unit  Description      User/Source/Jrnl  Document  Code  Period   Charge   Credit   Balance
===================================================================================



Rent Applied (deposited)

4/r 3850    4,487.75 Rent
3/18 3842  -335.94 guest
      4/r 3851    525.00 furn

000004356                                            J000000016

DEC-18-99 06:16 AM

P-07

DEC-17-99 04:57 PM   WWW.1AZPROPERTY.COM          602 242 1518          P.15

SCHCHAC PROPERTY MANAGEMENT
Courtyard Apartments
Account Ledger
Guest Suite (D23700SC07)
Unit 9C2000

Page 1
TRAN

| | | |
|---|---|---|
| Applied......: 1 May 1998 | Autobill Rent..: 0.00 | Sched Rent .: 0.00 |
| Moved In......: 1 May 1998 | Other Charges .: 0 00 | Telephone #.: |
| Lease Start..: 1 May 1998 | Other Credit..: 0 00 | Alt Phone #.: |
| Lease End....: 31 Dec 2099 | Account Balance..: -91.62 | Alt Phone #.: |
| | | Last NSF...: 24 Sep 1998 |
| Notice Given..: | | |
| Notice For...: | Deposit Required.: 0.00 | Times NSF Checks.: |
| Moved Out...: | Deposit Paid In.: 0.00 | Times Late Charges.: 0 |

| Date | Bldg Unit | Description | User/Source/Jrnl | Document | Code | Period | Charge | Credit | Balance |
|---|---|---|---|---|---|---|---|---|---|
| 04/15/1998 | | COMMON Guest Housing | WA M RESI | | CK BSI | 199806 | 30.54 | | 30.54 |
| 05/25/1998 | | COMMON Payment, Guest Suite | WA M RESI 0619 | | PZ PMT | 19980618 | | 30.54 | 0.00 |
| 06/26/1998 | | COMMON Brutinel Plumbing-2114 | CSE M RESI | | CK BSI | 199806 | 213.78 | | 213.78 |
| 08/24/1998 | | COMMON Brutinel Plumbing -1114 | CSP M RESI 13405 | | CK BSI | 19980623 | | 213.71 | 0.00 |
| 07/15/1998 | | COMMON Guest Housing | WA M RESI 3676 | | CK BSI | 199807 | 122.16 | | 122.16 |
| 07/15/1998 | | COMMON Payment, Guest Suite | WA M RESI 3676 | | PZ PMT | 19980713 | | 122 16 | 0.00 |
| 08/20/1998 | | COMMON Guest Housing | WA M RESI 267 | | CK BSI | 199808 | 30.05 | | 30.80 |
| 08/07/1998 | | COMMON Payment, Guest Suite | WA M RESI 267 | | PZ PMT | 19980806 | | 30 00 | 0 00 |
| 09/08/1998 | | COMMON Guest Housing - Laacker | WA M RESI 6128 | | CK BSI | 199809 | 850.12 | | 850.12 |
| 09/09/1998 | | COMMON Laacker | WA M RESI 6128 | | PZ PMT | 19980908 | | 850 12 | 0.00 |
| 09/28/1998 | | COMMON Payment, Guest Suite r. Ravi | WA M RESI 111 | | PZ PMT | 19980912 | | 175 00 | -175.00 |
| 09/24/1998 | | COMMON Guest Housing | WA M RESI 6128 | | CK BSI | 199809 | 105.00 | | -1,025.12 |
| 09/24/1998 | | COMMON Guest Housing | WA M RESI | | CK BSI | 199809 | | 1080.12 | -1,025.12 |
| 09/24/1998 | | COMMON Guest Housing | WA M RESI | | CK BSI | 199809 | 89.77 | | -935.35 |
| 09/24/1998 | | COMMON Payment, Guest Suite | WA M RESI 6128 | | PZ PMT | 19980913 | | 139.50 | -1,315.35 |
| 09/24/1998 | | COMMON NSF, Payment, Guest Suite | WA M RESI 6128 | | PZ PMT | 199809NS | 180.00 | | -935.35 |
| 09/24/1998 | | COMMON NSF, Laacker | WA M RESI 6128 | | PZ PMT | 19980998 | 850 12 | | -85.73 |
| 09/26/1998 | | COMMON Payment, Guest Suite | WA M RESI 2441 | | PZ PMT | 19980913 | | 89.77 | -175.00 |
| 09/29/1998 | | COMMON Payment, Guest Suite--Ravi | WA M RESI 1053 | | PZ PMT | 19981002 | | 1138.00 | -1,313.00 |
| 11/01/1998 | | COMMON Guest Housing | WA M RESI | | CK BSI | 199811 | 1113.00 | | 120.00 |
| 12/07/1998 | | COMMON Guest Housing | WA M RESI | | CK BSI | 199812 | 120 00 | | 120.90 |
| 12/07/1998 | | COMMON Payment, Guest Suite | WA M RESI 0617 | | PZ PMT | 19981207 | | 120.90 | 0.00 |
| 01/23/1999 | | COMMON Guest Housing | WA M RESI | | CK BSI | 199901 | 213.76 | | 213.78 |
| 01/23/1999 | | COMMON Payment, Guest Suite | WA M RESI 0508 | | PZ PMT | 19990112 | | 213.78 | 0.00 |
| 01/28/1999 | | COMMON Guest Housing | WA M RESI 1021 | | CK BSI | 199909 | 213.78 | | 213 78 |
| 02/05/1999 | | COMMON Payment, Guest Suite | WA M RESI 1021 | | PZ PMT | 19990201 | | 213.76 | 0.00 |
| 02/12/1999 | | COMMON Guest Housing | WA M RESI | | CK BSI | 199902 | 63.00 | | 61.00 |
| 02/12/1999 | | COMMON Payment, Guest Suite | WA M RESI 3482 | | PZ PMT | 19990210 | | 61.00 | 0.00 |
| 02/12/1999 | | COMMON Payment, Guest Suite | WA M RESI | | PZ PMT | 19990221 | | 50.00 | -50.00 |
| 02/16/1999 | | COMMON Payment, Guest Suite | WA M RESI 9902 | | PZ PMT | 19990221 | | 30.54 | -80.54 |
| 02/23/1999 | | COMMON Guest Housing | WA M RESI | | CK BSI | 199902 | 83 54 | | 3.00 |
| 02/23/1999 | | COMMON Sales Tax | WA M RESI | | CF TAX | 199903 | 8.29 | | 8.29 |
| 02/28/1999 | | COMMON Payment, Guest Suite | WA M RESI | | PZ PMT | 19990302 | | 8.29 | 0.00 |
| 03/05/1999 | | COMMON Guest Housing | WA M RESI | | CK BSI | 199903 | 397 02 | | 397.02 |
| 03/05/1999 | | COMMON Guest Housing | WA M RESI 0469 | | PZ PMT | 19990306 | | 30.54 | 366.48 |
| 03/06/1999 | | COMMON Payment, Guest Suite | WA M RESI 3146 | | PZ PMT | 19990306 | | 366.48 | 0.00 |
| 03/08/1999 | | COMMON Payment, Guest Suite | WA M RESI 479 | | PZ PMT | 19990300 | 235.00 | | -235.00 |
| 03/08/1999 | | COMMON Payment, Guest Suite | WA M RESI | | PZ PMT | 19990328 | | 7.33 | -242.33 |
| 03/05/1999 | | COMMON Sales Tax | WA M RESI | | CF TAX | 199903 | 9.67 | | -232.96 |
| 03/31/1999 | | COMMON Guest Housing | WA M RESI | | CK BSI | 199903 | 242.33 | | 9.67 |

WA 17:90 66-EI-DEC

000004357                                      J000000017

P-App. 005960

DEC-17-99 04:58 PM  WWW.1AZPROPERTY.COM       602 242 1518       P.16



000004358

J000000018

P-App. 005961

**SCHOMAC GROUP OF COMPANIES**

1-ENTERED/COMPUTER

<u>EMPLOYEE TERMINATION NOTICE</u>

Archiano                Wendi                            CYO         O1
Last Name               First            M.I.            Job Title/Location

5/27/98                 9/6/99                           T. LEE
Hire Date               Termination Date                 Supervisor

Resigned/ Discharged/ Laid Off  (Circle One)            Eligible for Rehire    Y____  N(X)

Reason for Separation (In Detail): Failure to follow company
Policy & Procedures in Personnel Time Management
And in Paperwork Management. Failure to
Employee Comments: _____ Appropriately direct Subordinate

                                                        520 426 0403
                                                        520 705 4219
Forwarding Address: _____
                    Street Address              City            State    Zip Code

SALES LICENSE    Y(X)    N____    N/A____

HOME OFFICE NOTIFIED TO SEVER LICENSE (Y X)    N____

<u>Items Turned In</u> (If Applicable):

1.  ✓ Keys                        8.  ○ Pager
2.  ✓✓ Price Club Card            9.  ○ Operations Manual
3.  ✓ Postage Paid              10.  NA Back Belt
4.  ○ Long Distance Paid         11.  NA Badge
5.  ○ Chips Turned In            12.  ○ Cobra Forms
6.  ○ Petty Cash (closed out)    13.  ○ Laundry Keys
7.  ○ Uniforms                   14.  ✓ Final Time Sheets
                                 15.  ✓ Employee Guide
                                 16.  ○  cell phone

_____          _____
Employee Signature                    Date

(Signature acknowledges employment termination under the above terms.)

_____          9/6/99
Supervisor Signature                  Date

Revised 8/95

                    000004359                          J000000019

file:///Untitled

Timothy:

I spoke with Wendi today regarding the status of vacating her apartment.  She stated that she has a U-haul coming on Friday night and will be packing up over the weekend.  She assured me that she would be completely out by the end of the weekend.

She further stated that she told both Sophia and Kris of her plans this morning.  I asked her if she had contacted you regarding her plans, and she said that she had not.  I suggested that she leave a message on your voice mail.

A copy of this E-mail will be placed in her personnel file.

000004360                          J000000020

SEP-03-99 08:32 AM   WWW.1AZPROPERTY.COM       602 242 1518       P.01

Wendy Andrian

# FAX TRANSMISSION

### SCHOMAC PROPERTY MANAGEMENT, INC.
#### Timothy Lee, Regional Director – Phoenix
PHOENIX, AZ 85040
(602) 243-4250
FAX:(602) 268-5208

| | | | |
|---|---|---|---|
| **To:** | Ms. Christy Dotson | **Date:** | September 3, 1999 |
| **Fax #:** | (520) 887-4594 | **Pages:** | -4-,  including this cover sheet |
| **Subject:** | Courtyard Apartments | | |

**COMMENTS:**

Christy:

Attached please find a Summary of the events that unfolded on Thursday, September 2, 1999 at Courtyard Apartments. The situation is almost unbelievable.

000004361

J000000021

SEP-03-99 08:32 AM   WWW.1AZPROPERTY.COM      602 242 1518        P.02
Courtyard Apartments

**Subject: Courtyard Apartments**
    **Date:** Fri, 03 Sep 1999 08:22:23 -0700
    **From:** traduce@excite.com
    **To:** Kimberly Fitch <kfitch@spminc.com>, kreed@spminc.com

Review of 9/2/99 - Courtyard Apartments

Termination of ▮▮▮▮▮▮▮

Property Review, Company Policies, with Staff
including Neal Breault, Wil Mariano, Ana Velazquez
with Jese Mora present as Interpreter for Ana.

The QC Staff has routinely been working 10-12 hour days,
Saturday, Sunday and Holidays with "Comp Time" being
doled out in the week after the actual time worked occurred.

If QC Staff works more than 40 hours in week one,
they routinely take the following Wednesday or
Friday off in week two and Wendi has been marking
the Time Sheet with 8 hours actually worked when
in reality, the QC person is not physically present
and working on the Property.

Wil told me that Wendi "caught him up" on his last
paycheck by putting in 25 hours of Overtime in
exchange for the "Comp Time" he has accumulated.
In addition, we still owe him 25 Hours of "Comp Time."

Neal told me that he has "been caught up" on his
"Comp Time" through the use of "PTO" coupled
with his recent vacation, and that the system outlined
above is standard at Courtyard.

I noticed that Neal was not at work on Wednesday
August 11 when I was there for the Mortgage Company
Review, and on Thursday, August 12, when we toured
the Property with Moise. His Time Sheet did not
indicate PTO and I telephoned Wendi about this.
She told me that she "turned it into Payroll, directly."
I noted that Neal did not have sufficient PTO time
accumulated and that he would need to sign a
PTO Pay back Agreement Form. Wendi told me that
this Form was also sent to Payroll.

I noted the discussion on Neal's Time Sheet, and recently
discussed the matter with Christy Dotson, who followed
up with Wendi in order to find the missing paperwork.

9/3/99 8:23 AM

000004362

J000000022

SEP-03-99 06:33 AM    WWW.1AZPROPERTY.COM        602 242 1518            P.03

Courtyard Apartments

Ana told me through the Interpreter that she cleans
Wendi's apartment during working hours and then
sometimes baby sits until 10:00 p.m. Her "Comp
Time" is also arranged by taking days off after
working the overtime and marked by Wendi on her
time sheet as 8 hours worked - when she is not
physically on the Property. We owe Ana approximately
20 Hours of "Comp Time." She is desperately afraid of
retribution regarding this issue, as she is the 'Personal
Assistant' of Wendi's family. She was very reluctant
to discuss much of the details involved in her
"Comp Time" duties. I informed Ana that she was
hired to clean the Property, only. Personal work for
the Manager was personal and not to be mixed with
the Time Sheet.

I think that Christy Dotson needs to get personally
involved in this matter, immediately.

Both Neal and Wil told me that the "Property is
out of control." This was verified by ▓▓▓▓ who told
me that "You are so stupid, you're firing the wrong
person." "This stuff has been going on from day one."
"I only do what I am directed to do by my Manager."
"If you don't fire her, too, I filing a law suit."

▓▓▓▓ proceeded to tell me how Wendi manipulates
the computer to make the paper work look like the
the Property is always 100% leased. Indeed, she
showed me one example - the one I have been chasing
for the past 60 days - that there are apartments involved in
the "transaction" with no Move-In or Move-Out paper work
completed - so that all three appear leased or pre-leased.

The scary part is that there really is physical occupancy
in all three apartments - without paperwork.

I sat with and spoke to the three Residents involved in this
"transaction" Apt #'s 1113, 526 and 703. It is a carnival
of transaction errors and 'switch-a-roo.' The Residents -
DPS Officers - are exasperated with the situation.

Apartment #904 was locked out of his apartment
without Due Process. Neal told me that this has
happened about six or seven times in the last year
at the direction of the Manager.

The Residents Ledger shows he owes $90.00. He was

2 of 3                                                                      9/3/99 8:23 AM

Courtyard Apartments

locked out for Non-Payment of over $900.00. ▓▓▓▓
told me that Wendi knows how to manipulate the computer
so that there are no delinquencies showing and uses
the lock out system to force the issue, if they don't pay.
There is no "Hot Rack" or "Legal Book" to verify who
is in Court or pending legal action.  The "Hot Rack"
that was there has been moved to a file drawer which
in no manner resembles a "Hot Rack."

There are checks everywhere.  There are files everywhere.
There is stacks of paper work everywhere.

We do not know at this point what the status of
vacancies is.  We do know that there are people
living in Guest Suites - for months - awaiting a
move into a market ready apartment.  The Guest Suites
are showing up a vacant on the computer.

Respectfully ...

3 of 3

9/3/99 8:23 AM

000004364

J000000024

# HEARING EXHIBIT 179

# PLACEHOLDER FOR VIDEO RECORDING

# DVDs OF WENDI ANDRIANO'S INTERVIEW WITH DETECTIVES DAVID LUCERO AND SANDY DILLIAN

State of Arizona v. Andriano, Wendi Elizabeth
Case #2000-096032-A

TRANSCRIPT

WENDI ELIZABETH ANDRIANO

POLICE INTERVIEW

LEGEND _____

WA    :    WENDI ANDRIANO

DB    :    DETECTIVE DAVE BELLISARO

SD    :    DETECTIVE SALLY DILLIAN

FO    :    FEMALE OFFICER (JOSIE)

MO    :    MALE OFFICER (PHIL)

HC    :    HOMER CHALIS

UI    :    UNINTELLIGIBLE

_____

DB:    HERE YOU GO MAAM.

WA:    OK THANKS.

DB:    WENDI I'M DAVE BELLASARO.

WA:    CAN YOU, CAN YOU OPEN THAT.

1

000011500

DB:   YEAH YOU BET.

WA:   I MEAN MY HANDS ARE ALL LIKE MESSED UP.

DB:   OK, MY NAMES DAVE.

WA:   OK.

DB:   OKAY.  I'M A DETECTIVE HERE WITH THE PHOENIX POLICE.

WA:   OK.

DB:   LET ME START WITH MAKING SURE I GOT ALL OF YOUR CORRECT INFORMATION.  IT'S WENDI, WITH AN "I"?  W-E-N-D-I?

WA:   YEAH.

DB:   ELIZABETH.

WA:   YEAH.

DB:   AND IT'S A-N-D-R-I-A-N-D-O?

WA:   NO JUST "O".

DB:   OK, LET'S SEE, A-N-D

WA:   D-R-I-A-N-O

DB:   UI, A-N-D-R-

WA:   I-A-N-O

DB:   N-O.  WENDI.  OKAY AND YOUR BIRTHDAY IS 8/26/70.

2

000011501

WA:     YUP.

DB:     SOCIAL, 5-2-7-6-5-9-7-0-3?

WA:     YEAH.

DB:     AND WE GOT YOU AT 5 FOOT 6, 120, BLUE AND BROWN.

WA:     NO.

DB:     NO?

WA:     HOW FUNNY, I'M 5'4".

DB:     OKAY.  5 FOOT 4

WA:     110 SOMETIMES.

DB:     110

WA:     BROWN AND BROWN, I GUESS EYES.

DB:     BROWN AND BROWN, OKAY.  THAT'S WHY I NEED TO CONFIRM ALL OF THIS STUFF.  YOU LIVE IN

APARTMENT 132?

WA:     UH HUH.

DB:     AND IT'S 4806592630?

WA:     YEAH.

DB:     AND YOU'RE THE MANAGER OF THE APARTMENTS?

WA:     YEAH.

3

000011502

DB:   AND UH PHONE NUMBER FOR THE MANAGEMENT I'VE GOT IS 480-283-8488?

WA:   YES.

DB:   AND IT'S SAND RIVA, R-I-V-A?

WA:   JUST S-A-N AND THEN R-I-V-A.

DB:   S-A-N

WA:   UH HUH.

DB:   R-I-V-A.  TWO WORDS OR ONE?

WA:   UH HUH, TWO WORDS.

DB:   APARTMENTS.  HOW LONG, HOW LONG YOU BEEN MANAGER THERE?

WA:   A YEAR.

DB:   OK.  WENDI UM UNTIL WE GET THINGS FIGURED OUT WHAT I'M GOING TO DO IS, I, I NEED TO TALK TO YOU ABOUT WHAT'S GOING ON OKAY?

WA:   YEAH.  I WOULD LOVE, I'M LIKE PLEASE.

DB:   OKAY.

WA:   MY HEAD IS JUST KILLING ME AND I'M NOT SURE WHAT'S GOING ON.  WHAT'D I DO?

DB:   OH WERE TRYING TO GET THAT FIGURED OUT.

WA:   OKAY.

DB:   UM LET ME JUST GET A....UM

4

000011503

WA:    AND I KNOW, I, I HAD TO ANSWER QUESTIONS BEFORE AND I WANT TO COOPERATE AS MUCH

AS POSSIBLE.  UM I'M JUST WONDERING, I'M SITTING HERE JUST THINKING AND THINKING AND MY

DAD ASKED ME IF I NEEDED AN ATTORNEY.  DO I NEED AN ATTORNEY OR IS THIS JUST NORMAL STUFF?

DB:    THAT'S STRICTLY UP TO YOU, MAAM.

WA:    WELL......

DB:    UM I CAN'T GIVE YOU LEGAL ADVICE.

WA:    OKAY.

DB:    UM I DO WANT TO QUESTION  YOU.

WA:    SURE.

DB:    TRY AND GET EVERYTHING....

WA:    ME TOO, YEAH....

DB:    BUT IT'S STRICTLY UP TO YOU, YOU DON'T, IF YOU WANT TO CALL AN ATTORNEY YOU HAVE

THAT RIGHT.

WA:    YEAH I KNOW.

DB:    WHAT I HAVE TO DO ...

WA:    I DON'T KNOW....

DB:    CAUSE WE DON'T KNOW WHAT HAPPENED OUT THERE YET.

WA:    SURE.  YOU'RE JUST TRYING TO FIGURE IT OUT NOW.

5

000011504

DB:     IS I NEED TO ADVISE YOU OF YOUR RIGHTS,

WA:     OKAY, THAT'S FINE.

DB:     OKAY.  FIND MY LITTLE CARD HERE....

WA:     WHERE EVER THEY ARE.

DB:     UM,

WA:     AM I UNDER ARREST THEN?

DB:     WELL,

WA:     WHAT'S GOING ON?

DB:     WERE TRYING TO FIGURE OUT WHAT'S GOING ON, OKAY.

WA:     OKAY.

DB:     BASICALLY YOU ARE NOT FREE TO LEAVE AT THIS POINT CAUSE WERE TRYING TO FIGURE

EVERYTHING OUT.

WA:     SURE.

DB:     OKAY.

WA:     OKAY.

DB:     OKAY, BECAUSE YOU'RE NOT FREE TO LEAVE I'M GONNA ADVISE YOU OF YOUR RIGHTS.

WA:     OKAY.

DB:     OKAY?

6

000011505

WA:     OKAY.

DB:     OKAY, UNTIL WE CAN GET EVERYTHING FIGURED OUT.

WA:     OKAY.

DB:     DECIDE WHAT WE'RE GOING TO DO.

WA:     OKAY.

DB:     OKAY, YOU HAVE THE RIGHT TO REMAIN SILENT, ANYTHING YOU SAY CAN BE USED AGAINST YOU IN A COURT OF LAW.  YOU HAVE THE RIGHT TO THE PRESENCE OF AN ATTORNEY TO ASSIST YOU PRIOR TO QUESTIONING AND BE WITH YOU DURING QUESTIONING, IF YOU SO DESIRE.  IF YOU CANNOT AFFORD AN ATTORNEY YOU HAVE THE RIGHT TO HAVE AN ATTORNEY APPOINTED FOR YOU PRIOR TO QUESTIONING.  DO YOU UNDERSTAND THESE RIGHTS?

WA:     UM HUH.

DB:     I NEED A YES OR NO?

WA:     YEAH.

DB:     YES?

WA:     YES.

DB:     OKAY.  OKAY. UM, I'M SORRY?

WA:     I'M, I'M TRYING TO THINK.  IT'S HARD FOR ME TO FOCUS RIGHT NOW.  I'M SORRY.

DB:     OKAY WELL, IF YOU NEED A BREAK OR SOMETHING ....

7

000011506

WA:   NO.

DB:   ...YOU LET ME KNOW, OKAY.

WA:   ALRIGHT.

DB:   OKAY, WENDI, WELL LET'S DO THIS, UM I WANT TO SEE IF YOU HAVE ANY, ANY INJURIES ON YOU...

WA:   OH SURE.

DB:   ...OKAY, SO WHAT I'M GONNA HAVE TO DO IS I'M GONNA HAVE TO KIND OF RECORD THEM HERE ON MY NOTES.

WA:   OH OKAY.

DB:   AND I'M ALSO GONNA HAVE THEM PHOTOGRAPHED, OKAY?

WA:   OH OKAY.

DB:   LET ME GO GRAB MY PHOTOGRAPHER AND WELL GO OVER THEM OKAY?

WA:   OKAY.

DB:   WHY DON'T YOU JUST SIT TIGHT FOR JUST A SECOND.

WA:   OKAY.

DB:   ALRIGHT.

DB:   WENDI

WA:   YEAH

8

000011507

DB:     WE'LL LOOK AND SEE WHAT KIND OF INJURIES YOU GOT HERE, OKAY? UI OKAY LET'S SEE

WA:     UI, IT'S HURTS, MY HAND HURTS, MY HANDS HURT.

DB:     ALRIGHT, UM LET'S SEE YOUR HANDS.  LET'S START WITH YOUR RIGHT HAND.  ALRIGHT JUST OKAY.  OKAY WHAT ELSE WE GOT ON THIS HAND, A SMALL CUT, INDEX FINGER.  OKAY AND THEN YOU GOT SOME BRUISING?  LET ME SEE YOUR HAND.

WA:     (UI) SHAKING.

DB:     OKAY.  MIDDLE FINGER YOU'VE GOT BROKEN NAIL.  OKAY AND TURN YOUR HAND BACK OVER FOR ME.  OKAY ONE MORE TIME TURN YOUR HAND.

WA:     THESE WERE HERE EARLIER TODAY.

DB:     THOSE WERE THERE EARLIER...

WA:     YEAH I DON'T KNOW WHAT IT IS FROM BUT...

DB:     OKAY, RIGHT HAND

WA:     TWO LITTLE KIDS YOU DON'T KNOW WHAT....

DB:     (LAUGHING) YEAH.  OAKY LET ME SEE YOUR, IS THERE ANY OTHER INJURIES ON THIS ARM AT ALL?

WA:     I, I DON'T KNOW.

DB:     NOT THAT YOU SEE?

WA:     I MEAN I CAN....

9

000011508

DB:    OKAY.

WA:    I DON'T KNOW.

DB:    LET ME SEE YOUR LEFT HAND.

WA:    I KNOW MY PINK...

DB:    PARDON ME?

WA:    ... JUST (UI) AROUND MY RIBS, MY NECK.

DB:    OKAY AND YOU GOT, IS THAT A CUT THERE?

WA:    (UI)

DB:    LOOK LIKE YOU CUT THIS?

WA:    (UI) YEAH.

DB:    OKAY.

WA:    IT'S ALL SWOLLEN.

DB:    OKAY, LET'S SEE, YOU HAVE BRUISING...

WA:    I CAN'T, YEAH I CAN'T OPEN THAT FINGER ALL OF THE WAY.

DB:    OKAY TURN IT OVER FOR ME, BRUISING TOO.

WA:    RIGHT THIS JUST ALL HURTS.  LIKE MY FINGERS BROKEN.

DB:    OKAY. OKAY ANY, ANY OTHER INJURIES ON THE ARM HERE?  OKAY.

10

000011509

WA:   NOT THAT I KNOW, YOU KNOW I MEAN...

DB:   OKAY HOW ABOUT YOUR LEGS?  WELL LETS SEE, LET ME SEE YOUR NECK.  OKAY.

WA:   I KNOW HE HAD ME AROUND MY NECK.

DB:   CAN YOU KIND OF PULL YOUR HAIR BACK FOR A MINUTE?

WA:   SORRY.

DB:   OKAY

WA:   I DON'T BRUISE VERY EASY. (LAUGHS)

DB:   OKAY, HOW ABOUT YOUR LEGS?  LET ME TAKE A LOOK AT YOUR LEGS THERE.

WA:   LOOKS LIKE SOMETHING, I HAVE NO IDEA.

DB:   OKAY. LET'S SEE..

WA:   LIKE I SCRAPED IT ON SOMETHING.

DB:   RIGHT SIDE.

WA:   MY LEGS DON'T HURT THOUGH.

DB:   YOUR LEGS AREN'T HURTING AT ALL?

WA:   JUST RIGHT HERE ON THIS SIDE.

DB:   OKAY, HOW ABOUT YOUR LEFT LEG?

WA:   YEAH I DON'T' SEE ANYTING ON THAT LEFT SIDE.

11

000011510

DB:     OKAY.  OKAY, UM YOU, YOU SAID YOUR RIBS HURT?

WA:     MY RIBS HURT REALLY BAD ACTUALLY.

DB:     WHEREABOUTS?

WA:     PROBABLY LIKE RIGHT WHERE HE, HE SQUEEZES ME TOGETHER.

DB:     OKAY.

WA:     AND THAT'S WHERE THEY HURT.

DB:     OKAY. WELL WHAT I CAN DO IS I CAN HAVE A FEMALE OFFICER ...

WA:     YEAH SHE CAN LOOK (UI)

DB:     I'LL HAVE ONE OF MY FEMALE DETECTIVES COME IN AND TAKE A LOOK AS WELL.

WA:     OKAY.

DB:     TAKE A LOOK AT YOUR, YOU CAN PULL UP YOUR SHIRT AND TAKE A LOOK AT YOUR RIBS.

WA:     OKAY.

DB:     OKAY?  LET'S UH, LET'S GO AHEAD (UI) START WITH OVERALLS.  GO AHEAD AND STAND RIGHT

HERE MAAM.

WA:     OH GREAT.

DB:     JUST, YEAH BEST YOU CAN JUST LAY RIGHT (UI) BEST YOU CAN.  IF YOU CAN'T YOU CAN'T.

WA:     OKAY.

FO:     TURN TO THE SIDE.

12

000011511

DB:   PARDON?

FO:   DID YOU WANT HER ON HER SIDE THERE?

DB:   YEAH.

FO:   GO AHEAD AND FACE THE WALL.   OKAY, TURN TO THE OTHER SIDE.  OKAY.

DB:   OKAY, UM LET'S GO AHEAD AND GET SOME OF HER HANDS.

FO:   OKAY, LAY STILL.

WA:   OKAY.

DB:   (UI)

FO:   (UI) FLIP THEM OVER AND THEN DO ONE AT A TIME (UI)

DB:   OKAY, OKAY, OKAY.

FO:   (UI)

DB:   WE'LL DO THEM WITH A COLOR CHART IN WITH YOUR SCALE.

FO:   OKAY, WHICH HAND DO YOU WANT TO DO FIRST?

DB:   DOESN'T MATTER.

FO:   OKAY, JUST UM

DB:   LET'S START WITH THIS (UI) KIND OF HAVE TO LEAVE IT UP, THE BEST YOU CAN.

FO:   CAN YOU HAVE HE SIT DOWN ?

13

000011512

DB:     OKAY, YOU BET.  YOU BET.  WHATEVER'S BEST FOR YOU.

FO:     OKAY (UI) OKAY THEN (UI)

WA:     WHERE AT THIS WAY?

DB:     THIS WAY.

FO:     UM HUH.

DB:     OKAY GIVE ME ONE WITH THE SCALE.

FO:     (UI)  OKAY (UI) WITH YOU.

WA:     (UI)

DB:     OKAY, UM

FO:     DO YOU WANT TO KIND OF DO THIS AREA (UI)

DB:     (UI) OKAY.

FO:     GO AHEAD YOU'RE OKAY.

DB:     OKAY TURN YOUR HAND OVER FOR ME.

WA:     MY HAND'S JUST KILLING ME.

DB:     I KNOW I'M SORRY.

FO:     (UI)

DB:     OKAY, I'LL COME MEET YOU DOWN THERE.  I'M TRYING TO ROTATE IT THE OTHER WAY.

14

000011513

FO:   THERE YOU GO.

DB:   NOW THE OTHER.

WA:   MY HANDS ARE SHAKING.

DB:   YEAH.  OKAY ON THAT HAND TOO, THERE'S A BROKEN NAIL.  OKAY TURN, TURN YOUR HAND,

OOPS.  LET ME SEE THESE.  I'M TRYING TO ROTATE YOUR HAND...

FO:   (UI)

DB:   YEAH.  JUST ABOUT RIGHT THERE.  THAT SHOULD SHOW BOTH OF THOSE RIGHT?

FO:   RIGHT.

DB:   MY HEAD IN YOUR WAY?

FO:   NO.

DB:   OKAY.

FO:   (UI)

WA:   OKAY.

FO:   (UI) LET ME GET THE (UI) CHART WITH YOU, RIGHT HERE.

DB:   OKAY, OKAY.

WA:   OKAY.

FO:   WELL GO AHEAD AND LEAVE YOUR HAND THERE.

WA:   OH, OKAY.

15

000011514

DB:     DO YOU WANT IT WITH THIS?

FO:     (UI)

DB:     WAS THIS UM NAIL BROKEN TONIGHT?

WA:     NO ALL OF MY NAILS WERE FINE..

DB:     OKAY, RIGHT THUMB NAIL BROKEN TOO.

FO:     OKAY WERE ALMOST DONE WITH YOUR HAND.

WA:     THAT'S FINE.

FO:     OKAY.

DB:     OKAY.

FO:     DO YOU WANT TO DO HER THUMB AGAIN?  TO SHOW THAT THERES NO NAIL?

DB:     OKAY, THUMB NAIL, OKAY YEAH. THAT'S FINE.  JUST TO SHOW THAT YOU….,.

WA:     WHY DO YOU DO ALL OF THIS STUFF?

DB:     WELL TWO THINGS, YOU KNOW YOU HAVE OBVIOUS  INJURIES FROM WHAT OCCURRED

TONIGHT.

WA:     UH HUH.

DB:     SO WE WANT TO SHOW ALL OF THAT, WE WANT TO PROPERLY DOCUMENT ALL OF THAT.

WA:     OKAY.

DB:     OKAY AND

16

000011515

FO:    (UI)

DB:    GET AROUND OKAY.  COLOR CHART HELPS US UH WERE JUST MAKING SURE WE GOT THE RIGHT

COLOR ON YOUR BRUISING. (UI)

FO:    (UI)

WA:    FOR WHAT?

DB:    WELL YOU HAVE ALL OF THESE INJURIES FROM WHAT OCCURRED TONIGHT AND MY

UNDERSTANDING IS, WHAT YOU AH WHAT YOU TOLD THE PATROLMAN ...

FO:    OKAY.

DB:    WAS THAT UH, THAT THIS WAS BASICALLY YOU THAT YOU WERE ATTACKED AND SO WE NEED

TO DOCUMENT THAT.  TO SHOW THAT, THAT YOU....

FO:    (UI) YOUR HAND LIKE THAT.

WA:    OH OKAY.

FO:    GO AHEAD AND DO THE BITE MARK OVER THERE.

DB:    OKAY.

FO:    THE WAY HER FINGER IS BENT....

WA:    I CAN'T.

FO:    YEAH I KNOW, THAT'S WHY WE'LL DO IT THIS WAY.

DB:    LIKE THIS?

17

000011516

FO:     THAT WAY. OKAY.

DB:     OKAY. YOU WANT TO TURN YOUR HAND THE OTHER WAY.

FO:     OKAY.

DB:     OKAY. (UI)

FO:     ON THE ONE WITHOUT THE COLOR CHART?

WA:     UM HUH.

DB:     YEAH.

FO:     I NEED TO DO IT WITH THAT. (UI)

DB:     PARDON ME?

FO:     (UI) AND PHOTOGRAPH?

DB:     YEAH.

FO:     OKAY. (UI)

DB:     ROTATE. YEAH ROTATE. DID YOU WANT THIS ONE?

FO:     YEAH.

DB:     OKAY.

FO:     WELL WILL DO THIS FIRST THOUGH.

DB:     OKAY. COLOR CHART.

18

000011517

P-App. 005986

FO:     OKAY.

DB:     OKAY.  ALRIGHT AND LET ME SEE, WE'VE GOT THE FRONT OF HER LEG.

FO:     OKAY.

DB:     DO YOU NEED THE ONE...

FO:     YEAH I JUST WANT TO DO THIS NEXT ONE.  GO AHEAD PUT YOUR HAND ON YOUR SIDE...

WA:     OH OKAY.

FO:     AND THEN I WANT TO DO THIS FINGER.  TRY AND STRAIGHTEN IT OUT AS MUCH AS YOU CAN, I KNOW IT HURTS.

WA:     OH PLEASE DON'T PUSH IT.

DB:     OKAY WE WON'T PUSH IT.

FO:     OKAY I'M SORRY I DIDN'T MEAN TO.

WA:     UM LIKE I THINK IT'S BROKEN.

FO:     OK, (UI)  TURN IT THIS WAY, THAT WAY, KIND OF LIKE THAT.

DB:     OKAY.

FO:     THERE YOU GO.

DB:     OKAY.

FO:     (UI) THE ARMS?

DB:     UH NO NOT YET.  HER RIB CAGE. (UI)

19

000011518

FO:     OKAY. I NEED THE COLOR CHART RIGHT HERE.

DB:     COLOR CHART RIGHT IN THE MIDDLE? WE'LL DO A COUPLE OF YOUR NECK AND THEN UM,
WHAT I'M GONNA DO IS HAVE MY PARTNER SALLY DELANE COME IN HERE.

WA:     OKAY.

DB:     THAT WAY YOU CAN LIFT YOUR SHIRT UP AND TAKE A LOOK AT YOUR RIBS.  HOW LONG HAVE
YOU BEEN THE APARTMENT MANAGER THERE?

WA:     SINCE LAST OCTOBER.

DB:     THIS LAST OCTOBER? (UI) NECK.  UM LET'S DO IT STRAIGHT ON AND THEN FROM EACH SIDE AS
WELL.

FO:     OKAY.

DB:     SO, OKAY (UI) THERE YOU GO.

FO:     I'M GONNA TAKE ANOTHER ONE.

WA:     (UI) ABOUT TO FALL OFF.

FO:     YEAH (UI).

DB:     OKAY, I DON'T WANT TO GET MY HAND IN THERE.  HOW'S THAT?

FO:     OKAY. (UI)

DB:     YEAH.

FO:     OKAY.

20

000011519

DB:     OKAY, MAAM IF YOU'LL TURN TOWARDS ME, JUST A LITTLE BIT.

WA:     RIGHT HERE?

DB:     AND KIND OF, YEAH KIND OF LIFT YOUR UP A LITTLE BIT.  THANK YOU.  HOW ABOUT IF WE GO

ABOVE HER, RIGHT THERE?

FO:     THAT'S NEXT.  PROBABLY BETTER IF WE DID IT ….

DB:     OKAY.

FO:     THE CENTER HAS TO BE LIKE RIGHT AGAINST THIS THING.

DB:     OKAY.

FO:     WE'LL TRY IT LIKE THIS.

DB:     OKAY.  LET ME KNOW IF THAT POKES YOU THERE OR NOT.

WA:     OKAY.

DB:     OKAY YOU CAN TURN.  (UI) CHAIR BACK THERE.  OKAY.OKAY LET ME GET ONE OF THE BACK OF

YOUR NECK TOO MAAM.   I'M JUST GONNA PULL DOWN YOUR SHIRT HERE FIRST, RIGHT THERE.

WA:     (UI)

DB:     OKAY.  OKAY MAAM GO AHEAD AND HAVE A SEAT, I'LL GET DETECTIVE DELANE AND SHE'LL BE

RIGHT IN.

WA:     OKAY.  I HAVE A BIG OL KNOT ON THE BACK OF MY HEAD.

DB:     YOU HAVE A KNOT ON THE BACK OF YOUR HEAD?  IS IT SWOLLEN?

21

000011520

WA:     WELL IT JUST HUR....IT, I DON'T KNOW.  IT JUST HURTS.

DB:     CAN YOU FEEL IT AND SEE IF YOU CAN FEEL ANY SWELL.

WA:     YEAH I CAN FEEL IT.

DB:     OKAY, WHAT I CAN DO IS I CAN PUT ON RUBBER GLOVES AND FEEL THE BACK AND SEE IF I FEEL

KNOTS.

WA:     THAT'S FINE.

DB:     OKAY.

WA:     MY DAD'S A PHOTOGRAPHER.

FO:     OH YEAH.

WA:     UM HUH.  AAH MAN.  THIS FINGER FEELS LIKE IT'S GOING TO EXPOLDE.

FO:     WHAT FINGER HURTS?

SD:     HEY WENDI?

WA:     YEAH.

SD:     HI I'M SALLY DELANE.

WA:     OKAY.

SD:     AND I WORK WITH DAVE.

WA:     ALRIGHT.

SD:     NOW HE SAYS YOU HAVE SOME INJURIES

22

000011521

WA:   WELL I DON'T KNOW IF THERE'S BRUISING, I JUST

SD:   OKAY WELL COME ON JUST STAND OVER HERE FOR ME AND JUST UM CAN YOU JUST LIFT UP YOUR BLOUSE FOR RIGHT NOW?

WA:   IT'S JUST ALL RIGHT HERE IT HURTS AND I JUST TAKE IT SO THEN I CAN....

SD:   ANY PLACE SPECIFIC THAT

WA:   YOU KNOW WHAT I JUST FEEL IT LIKE RIGHT HERE ONE THE SIDES.

SD:   OKAY LET ME JUST TURN YOU AROUND HERE.

WA:   OKAY.

SD:   OKAY, WHAT I WANT TO DO IS, I WANT, LET'S HAVE, HAVE YOU HOLD IT RIGHT THERE AND JOSIE IF YOU COULD JUST TAKE A COUPLE OF PICTURES OF THE, OF THE

WA:   LOOK I DON'T BRUISE.  I DON'T KNOW IF THEIR JUST SORE.

SD:   OKAY.

FO:   (UI)  IT'S FROM HER WAIST UP TO THE SHIRT LINE?

SD:   RIGHT.

FO:   LET ME GET A QUICKY WITH A COLOR CHART THERE.

SD:   (UI)  WHY DON'T YOU GO AHEAD AND THEN DO HERE TO HERE AND THEN DO THERE TO THERE.

FO:   OKAY.  YOU DON'T BRUISE EASILY?

WA:   NO.

23

000011522

FO:    OKAY.

SD:    OKAY AND NOW I JUST, JUST LET ME PULL THAT UP FOR JUST A SECOND CAUSE I DON'T SEE.

SD:    JOSIE CAN YOU JUST, ACTUALLY DO ME A FAVOR JUST TAKE THAT OFF.

WA:    I WOULD LOVE TO THROW IT IN THE TRASH.

SD:    ALRIGHT. OKAY.

WA:    MY NECK AND HEAD HURTS.

SD:    AND THEN UM JOSIE WHY DON'T WE JUST DO THIS AND JUST TAKE AN UPPER...

FO:    OKAY.

SD:    SHOT FOR US.

FO:    OKAY.

SD:    AND THEN WE JUST DO (UI). FROM HERE TO THERE

FO:    UH HUH.

SD:    AND THEN THE TOP HALF.

FO:    YEAH.

SD:    AND THEN WE'LL DO. WELL I WANT BOTH....

FO:    RIGHT

SD:    BUT JUST RIGHT NOW.

24

000011523

FO:     UM HUH.

SD:     THAT'S OKAY, GO AHEAD AND PUT YOUR BLOUSE BACK ON.

FO:     (UI)

SD:     YOU ONLY GOT ONE SIDE?

FO:     RIGHT, CAUSE I JUST DID (UI)

SD:     LOWER, WE JUST NEED TO DO LOWER?

FO:     NO I DID FROM HERE TO THERE

SD:     OKAY

FO:     AND THERE TO THERE, AND THEN

SD:     OH OKAY. OKAY.  YOU CAN KIND OF LIKE, I WISH I HAD ANOTHER BLOUSE FOR YOU OR

SOMETHING ELSE TO PUT ON UM UH YOU KNOW HANG ON JUST A SECOND LET ME SEE IF I CAN GET A

BUNNY SUIT.  I MIGHT HAVE A BUNNY SUIT OUT HERE.  THEIR JUST, THEIR LIKE LITTLE BROWN RABBIT

SUITS BUT AT LEAST IT WOULD MAKE YOU FEEL BETTER.  LET ME SEE WHAT I GOT.

WA:     OK, THANKS.

SD:     WENDI I CHECKED OUT TO GET A BUNNY SUIT, OKAY

WA:     THAT'S OKAY.

SD:     SO WE'LL AT LEAST GET YOU OUT OF THOSE CLOTHES ANYWAY.

25

000011524

FO:     I WAS WONDERING DID YOU WANT ANYMORE CLOSE UPS OF HER WITH THE SHIRT ON OR DO

YOU WANT....

SD:     HAVE YOU TAKEN ANY OFCLOSE....

FO:     I JUST TOOK OVERALL (UI) WITH THE SHIRT ON.

SD:     OKAY

FO:     (UI) YOU KNOW TO GET, YOU KNOW THE FRONT OF THE SHIRT BECAUSE....

SD:     YEAH WE'LL DO THAT FIRST SO.  OKAY LET'S DO YOUR (UI) WE SHOULD BE ABLE TO GET YA ....

FO:     WENDI GO AHEAD AND STEP TO YOUR LEFT PLEASE.  THAT WAY.

WA:     OKAY.

FO:     GO AHEAD.

SD:     OKAY WENDI WE NEED, I NEED YOU TO TAKE YOUR GLASSES OFF AND PUT YOUR SHIRT ON FOR

JUST A SECOND IF YOU WANT TO DO IT WITH YOUR GLASSES ON AND THEN WE'LL TAKE A COUPLE OF

PICTURES OF YOUR SHIRT AND THEN I'LL GET A BUNNY SUIT FOR YA.

WA:     OKAY.

FO:     THIS WAY.  JUST THE SHIRT RIGHT?

SD:     YEAH, JUST...

SD:     OKAY AND THEN TURN AND JUST LIFT UP YOUR AND THEN TURN THIS WAY.  THERE YOU GO.

SO THAT SHE CAN GET (UI) YOUR ARM IS WHAT I'M INTERESTED IN AND THEN PUT YOUR ARM DOWN

AND JUST TAKE AH.  OKAY NOW FLIP AROUND TOWARDS THE WALL.  (UI)  OKAY (UI)

26

000011525

FO:     AM I GETTING CLOSE UPS OF THE ONE SHOULDER?

SD:     YEAH (UI)  OKAY NOW IF YOU CAN FACE THIS WALL FOR ME AND (UI)

FO:     OKAY LIFT UP YOUR HAND SO THAT I GET UNDERNEATH HERE.

SD:     OKAY.

(KNOCK ON DOOR) (UI)

SD:     COOL.  THANK YOU.  OKAY YOUR NOT GOING TO LOOK GLAMOROUS OKAY BUT I'LL AT LEAST BE

ABLE TO GET YOU CLEAN.  UM I'M ALSO GONNA NEED YOU TO TAKE YOUR SHORTS, OKAY? OFF FOR

AND THEN THIS IS

WA:     YOU KNOW WHAT THOUGH I AM ON MY PERIOD AND I NEED TO KEEP MY SHORTS ON.

SD:     DO YOU, I MEAN DO YOU HAVE PANTIES OR?

WA:     NON VERBAL RESPONSE.

SD:     WELL WERE GONNA EVENTUALLY GONNA NEED TO TAKE YOUR SHORTS SO...

WA:     OH.

SD:     IF, IF YOU WANT RIGHT NOW AND YOU FEEL MORE COMFORTABLE DOING THAT YOU CAN BUT

WA:     AND THEN CAN I GIVE THEM TO YOU BEFORE I LEAVE?

SD:     AND THEN, YEAH THAT'S FINE.

WA:     I JUST DON'T (UI)

SD:     OKAY THAT'S FINE.  I UNDERSTAND WHAT YOU'RE SAYING.

27

000011526

WA:     I DON'T WANT TO MAKE A MESS.

SD:     DO YOU NEED A TAMPAX OR ANYTHING?

WA:     I DON'T KNOW.

SD:     OKAY CAUSE IF YOU NEED SOMETHING I PROBABLY COULD FIND IT AT MY DESK SO.

WA:     I JUST REALLY COULD USE AN ASPIRIN RIGHT NOW.

SD:     YOU KNOW I DON'T (UI)

WA:     NOBODY SEEMS TO HAVE ANY.

SD:     YOU KNOW

FO:     I THINK I HAVE SOME MOTRIN OR TYLENOL DOWN STAIRS.

SD:     MAYBE WHEN, WHEN WERE THROUGH HERE

FO:     OKAY

WA:     YEAH

SD:     (UI)

FO:     WHICH ONE YOU WANT TO PUT IN AN (UI)

SD:     NO I DON'T THINK SO.  UM DID YOU GUYS TAKE FEET PHOTOS?

FO:     NO FEET PHOTOS.  JUST ONE LEG WHERE SHE HAS

SD:     OKAY THAT'S FINE JUST DO A QUICKY ON THE FEET.

28

000011527

FO:     (UI) TOGETHER THEN.

SD:     AH THIS IS GONNA SOUND ODD BUT WHAT I NEED YOU TO DO IS JUST TURN YOUR HEAD AND

DO THAT FOR ME, SO THAT SHE CAN ...

WA:     (UI)

SD:     WELL THAT'S, THAT'S OKAY.

WA:     OKAY.

JO:     DO YOU WANT ME TO GET (UI)

SD:     YEAH AND WHEN DO YOU A FRONT SHOT THERE YOU GO.

WA:     (UI)

SD:     YEAH I'LL TRY AND HELP YOU,

WA:     OKAY.

SD:     OKAY AND THE SAME THING WITH THE OTHER FOOT FOR ME PLEASE.  OKAY AND LOOK TO

YOUR SIDE HERE, THERE YOU GO.

FO:     WHAT ABOUT HER HEEL?

SD:     FLASH DIDN'T GO ON THAT ONE.

FO:     YEAH I KNOW.  HANG ON.  OKAY.  DO YOU WANT HER HEEL TOO?

SD:     YEAH LET'S GO AHEAD AND DO THE HEEL.

FO:     WAIT A SECOND.

29

000011528

SD:     YOU KNOW WHAT YOU CAN PUT IT DOWN IF YOU'RE MORE COMFORTABLE, SURE.  SURE.

WA:     AH THAT'S MUCH BETTER.  I THINK EVERY MUSCLE IN MY BODY HURTS RIGHT NOW.

SD:     OKAY.  I THINK THAT'S GONNA DO IT FOR RIGHT NOW.  I'LL AH GO TELL DAVID BACK THERE.

YOU LOOK DASHING.

WA:     IT'S WARM.

SD:     YOU KNOW THAT'S RIGHT.

WA:     I WAS FREEZING COLD.

SD:     OKAY THERE YOU GO.

FO:     (UI)

SD:     SURE WHY DON'T WE GO AHEAD AND

WA:     OKAY

FO:     (UI)

WA:     IS MY NECK BRUISED?

FO:     IT HAS LIKE SCRATCH MARKS, RED MARKS. OKAY TURN (UI) CAN YOU TRY AND PUT YOUR HAIR

BEHIND YOUR EARS PLEASE.

WA:     OKAY.

FO:     OKAY, THANK YOU.

WA:     UH HUH

30

000011529

DB:   OKAY WENDI THEY ALL DONE WITH YOU?

WA:   YEAH.  SHE GOT ME THING TO WEAR.

DB:   SHE HAD TO CHANGE YOU HUH?

WA:   YEAH.

DB:   ALRIGHT IS THAT A LITTLE BETTER?

WA:   AT LEAST IT'S WARMER, YEAH.

DB:   OKAY.  ALRIGHT WENDI WHAT I WANT TO DO IS START GETTING SOME BACKGROUND ON YOU

OKAY?  NOW LET'S SEE, IS IT JOE OR JOSEPH?

WA:   JOE.

DB:   JOE?

WA:   YEAH.

DB:   UM HOW LONG HAVE YOU AND JOE BEEN MARRIED?

WA:   SINCE '94.

DB:   SINCE 1994?

WA:   YEAH.

DB:   SO IT'S BEEN SIX YEARS?

WA:   YEAH, THIS WOULD BE SEVEN IN JANUARY.

DB:   SEVEN IN JANUARY.  HOW, HOW LONG DID YOU DATE BEFORE YOU GOT MARRIED?

31

000011530

WA:   TWO YEARS.

DB:   TWO YEARS.

WA:   YEAH.

DB:   DID YOU LIVE TOGETHER OR..

WA:   UM MMMM WE DID BEFORE WE GOT MARRIED, YEAH.

DB:   YEAH, HOW LONG?

WA:   JUST FOR A LITTLE WHILE.  UM UM I MET HIM IN MARCH OF OF 92 WE GOT MARRIED IN JANUARY OF 94 AND HE MOVED IN WITH ME LIKE IN 93 SOMETIME.

DB:   OKAY.

WA:   I DON'T EVEN REMEMBER.

DB:   OKAY.

WA:   SO MAYBE NOT A FULL YEAR.

DB:   NOT A FULL YEAR?

WA:   YEAH.

DB:   OKAY, UM YOU HAVE TWO CHILDREN TOGETHER?

WA:   UM HUH.

DB:   AND I JUST WANT TO MAKE SURE I GOT THEIR CORRECT BIRTH DATES.

WA:   ONE BORN IN 97 AND ONE IN 98.

32

000011531