# TABLE OF CONTENTS (INTERACTIVE)

| LLLLLLLLLLL | |
|---|---|
| PART 16 | Petitioner's Appendix to Petition for Review |

# EXHIBIT LLLLLLLLLL
# PART 16

- Feminist models of scholarship
- Culturally relevant research methodologies, assessment & interventions
- Practitioner-researcher issues
- Domestic Violence program development, implementation, and evaluation
- Battered women and custody issues

## SOCIAL WORK PRACTICE EXPERIENCE

- **1999- 2003** Clinical Supervisor/Field Instructor for MSW student interns at Prehab of Arizona, a mental health placement
- **2000-2001** Clinical Supervisor for MSW clinician seeking licensure in Arizona
- **1994-1998** Private Practice, Tempe, AZ.
- **1994-present** Domestic Violence Consultant to Native American Connections, Inc. (formerly known as Indian Rehabilitation, Inc.), Phoenix, AZ. Designed a training manual for an eight week psycho-educational domestic violence survivor group. Facilitated a domestic violence survivor group, provided individual counseling, and staff training, and coordinated services with children's program regarding effects of domestic violence on children. Designed and co-facilitated a batterer intervention program for American Indian men.
- **Summer 1996** Native American Connections, Inc., Phoenix, AZ  Provided clinical supervision to MSW intern from Arizona State University
- **1987-1993** College of St. Joseph, Rutland, VT   Provided ten (10) hours per week of Brief Therapy for College Student Population - emphasis on issues relating to family violence and sexual abuse
- **1983-1986** Crisis Team Specialist, Rutland Mental Health Services, Inc., Rutland, VT

## DOMESTIC VIOLENCE COURT EXPERIENCE

- **1997 – present**  Conducted approximately twelve domestic violence assessments for attorneys representing battered women.  This experience includes all phases of court work from assisting in the development of a jury questionnaire, interviewing and assessing defendants for domestic violence, testifying at numerous hearings, trial or family court, testifying at sentencing, and at clemency hearings.  All cases involved  battered women  who were represented by the Maricopa County Public Defender, the Maricopa County Office of the Legal Defender, Graham County Attorney's Office or attorneys in private practice.

- **2003 (current) Permenter v Morrison**
  Father is suing mother for custody of their 3 year old daughter.  I was hired to conduct a domestic violence assessment of mother and to testify as a domestic violence expert.  Testimony will include results of domestic violence assessment as well as impact of domestic violence on children.  Trial is scheduled for October 2003 in Phoenix, AZ.

- **2003 (current- March 2003)  Fleitz vs. Handler**
  civil suit – case scheduled for trial September, 2003 in Phoenix, AZ

- **2003 (current)  State v. Andriano  CR2000-096032**
  Wendi Andriano is charged with the 1st degree murder of her husband.  I was hired by the Maricopa County Public Defender to conduct a domestic violence assessment of the defendant,

4

007184

P-App. 006498

prepare a report for court and testify as an expert on doemestic violence.  This case is scheduled for trial  November 2003 in Phoenix, AZ.

- **2003   City of Scottsdale, AZ v Delwyn Gibbons  CR2001-24004  Scottsdale, AZ City Prosecutor's Office**
  Mr Gibbons was charged with a misdemeanor domestic violence against his former partner.  I was hired by the prosecution  to present testimony on the phenomenon of recantation.  I did not conduct an assessment nor did I interview the victim.  I testified on the phenomenon of recantation.  The accused was acquitted of the charge.

- **2002   State v Michael Cruz  CR2002-185   Graham County Attorney's Office**
  Mr Cruz was accused of aggravated assault on his wife, Amanda Cruz.  I worked with the prosecutor in this case to help develop the case against the accused.  Additionally, I assisted the prosecutor in understanding the dynamics of domestic violence, in particular, why a victim would recant.  Mr Cruz pled guilty to a felony aggravated assault.  I do not know the outcome of sentencing.

- **State v Patricia Marie Rispoli and Richard H Lopez  CR2002-006820  Maricopa County Office of the Legal Defender**
  Ms Rispoli was accused of fraud, theft, and forgery.  She wrote checks to her partner (Richard Lopez) from her company's accounts totaling approximately $140,000.  A plea bargain resulted in a possible sentence of 2-8 years for her and probation for Mr Lopez.  Ms Rispoli was incarcerated while awaiting sentencing; Mr Lopez was never incarcerated.  I was asked to conduct a domestic violence assessment and issue a report to the Maricopa County Office of the Legal Defender (attorney Michelle Allen).  At the sentencing the judge requested that both attorneys review the  plea agreement in light of my report stating that it was clear that Ms Rispoli was a victim of Mr Lopez's violence.  Attorneys did not change the plea and Ms Rispoli was given the super-mitigated term of 2 years in prison and Mr Lopez was given 1 year in jail and 5 years supervised probation.

- **2002 Family Court Case No  FC-2002-092496  Southwest Superior Court, Mesa, AZ Petitioner: Laura Church, Respondent:  Reginald Stewart Sr**.  I was hired by Mr David DeLozier, Esq to conduct a domestic violence assessment, issue a report to the court, and testify on behalf of Laura Church at the hearing for the temporary custody of their 3 children.  Children were awarded to the parents of Mr Stewart pending a custody evaluation.

- **2001 State v Melanie Neal and Brad Rakestraw  CR 1999-10367  Maricopa County Office of the Legal Defender**
  Ms Neal and Mr Rakestraw were both indicted in the murder of Ms Neal's 3 year old son.  I was hired by the Maricopa Country Office of the Legal Defender, attorney John Camby to conduct a domestic violence assessment of Ms Neal and to submit a written report to the court.  Ms Neal was initially charged with 1st degree murder but a plea agreement resulted in a conviction of manslaughter.  My assessment revealed substantial domestic violence by Mr Rakestraw toward Ms Neal but no abuse of the child by Mr Rakestraw.  Ms Neal left Mr Rakestraw to babysit the child when she went to work.  While Ms Neal was at work, Mr Rakestraw killed the child.  The judge sentenced Ms Neal to 10 years in prison stating that she should have known that Mr Rakestraw would be abusive to the child since he had been abusive of her.  Mr Rakestraw was given a life sentence without parole.  I submitted a written report to the court to be used in mitigation but was not asked to testify at sentencing.

5

007185

- **2001 State v Myra L. Crum  CR  00-008514  Maricopa County Public Defender**
  Ms Crum pled guilty to sexual conduct with a minor, attempted sexual conduct with a minor (her children) and received a sentence of 15 years. Her partner, Wesley Yeo was also charged with similar crimes and was also found guilty. I do not know his sentence. I was hired by the Maricopa Country Public Defender's Office, the attorney was Marci Kratter. I conducted a domestic violence assessment of Ms Crum and issued a report to the court. I did not testify.  Ms Crum was a victim of Mr Yeo as were her children. I requested I.Q. testing be conducted of Ms Crum; testing was denied.

- **State v Kenton  CR 96-11216  Maricopa County Public Defender**
  Stella Kenton, an enrolled member of the San Carlos Indian Nation, was initially charged with 1st degree murder in the death of her partner, Richard Martinez in 1996. It was later changed to a charge of 2nd degree murder.  I was hired by the Maricopa County Public Defender's Office (Phoenix, AZ), attorney was Tennie Martin, because of my expertise on domestic violence, particularly as it relates to American Indian women. I conducted a domestic violence assessment, wrote the report, assisted in writing the jury questionnaire, testified at multiple hearings, trial, sentencing, and at 2 clemency hearings. Ms Kenton was convicted of negligent homicide, received the minimum sentence of 4 years, and also received an expedited review for clemency per judge's request. Ms Kenton's request for clemency was denied and she is currently serving her sentence at Perryville State Prison.

- In addition to the previous cases, I have assisted numerous attorneys and battered women in the greater Phoenix metropolitan area with case planning and defense. Those cases have been conducted on a pro bono basis. Most of those cases involve divorce and custody issues although some have been dependency hearings. All of my work involves domestic violence cases. I have assisted 4 battered women in securing divorce and custody of their children. Several other women that I am assisting are currently involved in the process.

## PUBLICATIONS

### Refereed Articles

Waller, M., Risley-Curtiss, C., Murphy, S., Medill, A. & Moore, G.  (1998).  Harnessing the Power of Language:  American Indian Women, A Case Example. Journal of Poverty, 2, (4), 63 – 81.

Murphy, S., Gerdes, K., Risley-Curtiss, C.  (June, 2003).   American Indian women and domestic violence:  The lived experience. Human Behavior in the Social Environment, 7, (3/4).

Murphy, S., & Risley-Curtiss, C.  (January, 2000).  American Indian women's lived experience of domestic violence:  Telling the stories of survival. E-Research Newsletter [On-line], Vol. 6, (1). Available: emailnewsletter@yahoo.com

### Book Chapters

Murphy, S. (2004).  An unexpected journey.  In  E. Segal, K. Gerdes & S. Steiner, Social Work An Introducton to the Profession (p. 320). Belmont, CA:  Brooks/Cole Publishing.

Waller, M., Risley-Curtiss, C., Murphy, S., Medill, A. & Moore, G.  (1998).  Harnessing the power of language:  American Indian women:  a case example. In Elizabeth A. Segal and Keith M. Kilty (Eds.) Pressing Issues of Inequality and American Indian Communities (pp 63-81). NY: Hayworth.  (Also published as a journal article)

6                                      007186

PCRDIS-P000653

**Conference Proceedings**

Alexander, G. and Murphy, S. (1992). A Mentoring Model for Women. Proceedings of the Fifth Annual Diversity in Mentoring Conference (pp. 1-11). Chicago: Western Michigan University Press.

**Manuscript in Progress**

Larson, N. & Murphy, S. (2000). Beyond Survival: Stories of Resilience Among First Nations Women. Manuscript in preparation.

Murphy, S. (in press). Domestic violence. In E.A. Segal, K. Gerdes & S. Steiner (Eds.), Social Work in the New Century: An Introduction to the Profession. F.E. Peacock Publishers.

Murphy S., Gillespie, A. (2002). Battered Mother's Testimony Project. Manuscript in preparation.

**Cited in**

Williams, L. (2002). Family Violence and American Indian/Alaskan Natives: A Report to the Indian Health Service Office of Women's Health. Washington, DC: Indian Health Service Report

**Unpublished Work**

Murphy, S. (1998). Surviving Domestic Violence: A Study of American Indian Women Claiming their Lives. Unpublished dissertation.

Murphy, S. (1999). Group Manual for Domestic Violence Survivors. Native American Connections, Inc. Funded by Arizona Community Foundation.

Murphy S. (1999). Group Manual for Child Witness to Domestic Violence. Native American Connections, Inc. Funded by Arizona Community Foundation.

## COMPETITIVE or INVITATIONAL PROFESSIONAL PAPER PRESENTATIONS and WORKSHOPS

**International:**

- "Domestic Violence: Responding to Children's Needs" June, 2002 presented to the London Borough of Croydon, England

**United States:**

- Keynote Address at 3rd Annual Governor's Rural Summit on Domestic Violence, April 15, 2003, Safford, AZ
- "Forging Partnerships Conference", April 1, 2003  Workshop Title: "Risk Assessment and Safety Plannng for Battered Women", Scottsdale, AZ

007187

PCRDIS-P000654

- "Sixth Annual Mental Health Providers Training " January 2003 to Family Court Department Mental Health Providers Training
- "Effective Assessment of Domestic Violence" September 2002 presented to Southwestern School for Behavioral Health Studies, Tucson, AZ (co-presented with D. Nicholas)
- "I Have One of Those DV Cases – Now What?" June 2001 presented to the State Bar of Arizona, Continuing Legal Education Department
- "Cultural Competency" May 2001 presented to the AZ Bar Foundation
- "The Co-Occurrence of Domestic Violence and Child Maltreatment" May, 2001 presented to members of the AZ Bar Association
- "The Correlation of Domestic Violence and Substance Abuse", October 2001 sponsored by Ft McDowell Apache Indian Community
- "Co-occurrence of Domestic Violence and Child Maltreatment", April, 2001 sponsored by Ft McDowell Apache Indian Community.
- "Ethical and Cultural Considerations for Domestic Violence Shelter Staff", March 21, 2001 sponsored by Chrysallis Domestic Violence Shelter, Scottsdale, AZ
- "Through Our Children's Eyes", Dec 1 – 3, 2000, co-facilitated a wellness conference retreat sponsored by the Yavapai-Prescott Indian Tribe for members of the Yavapai Nation.
- "The Co-Occurrence of Child Maltreatment and Domestic Violence" October 17, 2000, sponsored by the Family Advocacy Center, Phoenix, AZ (co-presented this full-day training to 55 practitioners/graduate school students).
- "Understanding the Effects of Domestic Volence on Women and Children" June 9, 2000. Presentation sponsored by Inter Tribal Council of Arizona.  Presented to tribal child welfare workers.
- "Evaluation of the Coordinated Community Response Teams to Domestic Violence" June 9, 2000.  Presentation to the Governor's Office for Domestic Violence Prevention, and county representatives.
- "Telling their stories:  American Indian Women Survivors of Domestic Violence" January 30, 2000.  In C. Risley-Curtiss (Chair),  Conducting culturally sensitive and respectful research with American Indians.  Symposium conducted at the meeting of the Society for Social Work and Research, Columbia, SC.
- "Domestic Violence and Substance Abuse" September 29, 1999, for conference entitled, "Solutions II, Advanced Advocacy Conference" coordinated by the Governor's Office for Domestic Violence Prevention, Mesa, AZ
- "The Effects of Domestic Violence on Children" October 28, 1998 for conference entitled, "Join our Journey Towards a Healthy Future" sponsored by the Navajo Nation in Albuquerque, NM.
- "Leaving as a Process: Healing is a Journey" October 29, 1998 for conference entitled, "Join our Journey Towards a Healthy Future" sponsored by the Navajo Nation in Albuquerque, NM.
- "Domestic Violence Treatment Strategies" August, 1998 for conference entitled, "Mending the Spirit" sponsored by Indian Health Service and Indian Rehabilitation, Inc. Mesa, AZ
- "Domestic Violence 101" December, 1997 for Indian Health Service, Nashville Area Office, Fourth Annual Winter School, Naples, FL
- "Domestic Violence - Past and Present" July, 1997 for Indian Health Service, Nashville Area Office Domestic Violence Workshop, Bangor, Maine
- "Domestic Violence - Assessment and Intervention" May, 1996 at Native American Nurses Association, Phoenix Indian Medical Center, Phoenix, Arizona
- "A Treatment Model for Native American Survivors of Domestic Violence" March, 1996, Presented to Social Services Department at Phoenix Indian Medical Center, Phoenix, Arizona

**PROFESSIONAL and COMMUNITY SERVICE**

8                                         007188

PCRDIS-P000655

- **2003 – Present**: Member of the NH Governor's Task Force Against Domestic & Sexual Violence Subcommittee on Mental Health and Substance Abuse
- **2002 - 2003:** Member of the Legal Committee of the Arizona Coalition Against Domestic Violence
- **2000–2003:** Member of AZ Attorney General's Domestic and Family Violence Task Force
- **2000 -2003:** Co-Chairperson to Women of Color Committee of the Arizona Coalition Against Domestic Violence
- **1999 - 2003:** Board of Directors, Arizona Coalition Against Domestic Violence, Secretary, 2002
- **1999 -2001:** Chairperson, Program Guidelines and Technical Assistance Committee of the Arizona Coalition Against Domestic Violence
- **1999 - Present:** Governor's Office of Domestic Violence Prevention, Steering Committee member for the County Coordinated Community Response Team
- **1998-Present**: Women of Color Committee member, Arizona Coalition Against Domestic Violence
- **1998-Present:** Legislative Committee member, Arizona Coalition Against Domestic Violence
- **1996-1997** Member of the Arizona State-wide Planning Committee - Batterer Intervention Program Guidelines, Arizona Coalition Against Domestic Violence
- **1994-1995** Conference planning committee member for "Curbing Violence," sponsored by the National Association of Social Workers - Arizona Chapter, Branch I
- **1991-1993** Ethics Consultant for the Vermont Chapter of National Association of Social Workers,
- **1985-1987** Member of the National Association of Social Workers, Rutland County Chapter, Rutland, VT, Chairperson, Fund Raising Committee
- **1985-1987** Member of the Board of Directors, National Association of Social Workers, Vermont Chapter

## CURRENT PROFESSIONAL MEMBERSHIPS and CERTIFICATIONS

- Governor's Commission on Child Protective Services; Advisory Commission – Health Subcommittee
- Domestic Violence Specialist Certification by Arizona Police Officers Standards and Training
- National Association of Social Workers – Arizona Chapter Branch 1
- American Professional Society on the Abuse of Children
- Certified Independent Social Worker (SW-3428I), Arizona State Board of Behavioral Health Examiners
- Arizona Coalition Against Domestic Violence
- Academy of Certified Social Workers (ACSW)
- Alpha Delta Omega (National Human Service Honor Society)

## REFERENCES

Furnished upon request

9

007189

ADMISSION/REGISTRATION RECORD
AND SUMMARY

| | | | |
|---|---|---|---|
| Med Rec: 0034010082 | Acct No: 03270-00278 | Hosp Serv: EME | ADM DATE/TIME: 09/27/03 2222 |
| Unit/Room/Bed:    - | Admit Type: EMERGENCY | | |

Patient: ANDRIANO,WENDY        SEX: F  Age: 33Y   DOB: 08/26/70 Race: 1   Ms: S    Religion: XXX
Ssn:                           Phone: (520)831-6829
Mailing Addr: 1104 N PARK AVE         City: PHOENIX       St: AZ   Zip: 85222-3320

Emergency Contact: OCHOA,ALEJO       Rel to Pat: FATHER        Phone: (520)831-6829
Contact Addr: 1104 N PARK AVE         City: PHOENIX       St: AZ   Zip: 85222-3320

Guarantor: ANDRIANO,WENDY        Rel to Pat: SELF     Phone: (520)831-6829   Ssn:
Guar Addr: 1104 N PARK AVE         City: PHOENIX       St: AZ   Zip: 85222-3320

Guar Employer:                   Emp Status:  *NOT EMPLOYED   Phone:
Empl Addr:                        City:              St:      Zip:

Pat Type: ED    Class:         FC: CH Correctional H      Publicity: @           FHC: N NONE
Previous Admit: 02/13/03     Admit By: TI              Adv Dir: UNK

Primary: CHS                                Secondary:
Phone:                Rel to Pat: *PATIENT IS INSURED    Phone:                Rel to Pat:
Insured Name: ANDRIANO,WENDI                Insured Name:
Ins Id No: A631830                          Ins Id No:
Auth No:                                    Auth No:

Tertiary:                                   Fourth:
Phone:                Rel to Pat:            Phone:                Rel to Pat:
Insured Name:                               Insured Name:
Ins Id No:                                  Ins Id No:
Auth No:                                    Auth No:

Adm Dx: LAC TO LEFT HAND                    Admitting Physician: HORWOOD,BRUCE
Prim Care Physician:                        Attending Physician: HORWOOD,BRUCE

PRINCIPLE DIAGNOSIS:                        Discharge Status (Circle)

                                               Approval         AMA

                                               Expired          Autopsy

                                               No Autopsy       Coroner's Care

OTHER DIAGNOSES:

                                            Discharge Destination (List)

                                               Home: _____

                                               Long Term Care: _____

                                               Penal Instit: _____

OPERATIVE PROCEDURES:                          Other Hospital: _____

                                               Other: _____

                                            Follow-up Care

                                               H.H.C.: _____

OTHER PROCEDURES:                              Clinic: _____

                                               Primary Care: _____
                                                              (Specify)

Discharge Date: _____
                Providers Signature - Sign Here or at bottom of Abstract Summary        Date

                    Date Printed: 09/28/03 0303

ANDRIANO, WENDY, MRN-34010082, ACCT #-0327000278, Chartmaxx Copy- lrivera
Face Sheet - Page 1/1                          Job 31875 (12/09/2004 11:38) - Page 1 Doc# 1

000009722

P-App. 006504

**MARICOPA EMERGENCY CENTER TRIAGE NOTES / NURSING DOCUMENTATION**

Date: 9/27/2003
Time: 10:24 PM
Pt #: 140

Triage Acuity:   Level3

DT0001

**PATIENT DATA**
Name: ANDRIANO, WENDY       DOB: 8/26/1970      Age: 33Y       Method of Arrival: Ambulance
Account #: 0327000278   Social Security #: ~~████~~   Patient Doctor:       Sex: F       Language: English
Medical Record #: M0034010082       Chief Complaint: SELF INFLICTED LAC

**TRIAGE VITALS**
VS Time: 09/27/2003 22:22   BP: 134 / 74   Pulse: 124   Temp: 37.5 Oral   Resp: 20
Allergies: unknown
Prior History: unknown
Current Medications: unknown
LMP: unk       Pregnant:       Childhood Immunizations UTD:   N/A

Height: (in)
O2 Sats: 97 %
Visual Acuity OS:       Weight: 0 (lb); 0 (Kg)
Visual Acuity OD:       Source of Hx: Paramedics
Tetanus <= 5 Years: Unknown
Domestic Violence:

**PRE-HOSPITAL TREATMENT**
pressure dressings to l hand and l ac

**NURSING ASSESSMENT - System**

**Ventilation**
Respiratory: Normal Effort,
Breath Sounds: L-Not Assessed, R-Not

**Behavior**
Mental Status: Conscious,
Speech:
Behavior: Withdrawn,

**Circulation**
Skin Temp: Normal / Warm       Skin Moisture: Normal,       Lesions: None
Capillary Refill: Normal <2 Sec   Skin Color: Pale,       Mucous Membranes/Tongue: Moist
Edema: Absent       Skin Turgor: Normal       O2: 97%
Extremity CSM: No Deficit

**Pain** (Scale: N = Numeric, WB = Wong-Baker)
What Provokes the Pain: unk       Radiation or Region of Pain: unk   Severity of Pain: 2 flaccN / WB
What is the Quality of the Pain: unk   Timing and Hx of Pain: unk   Pain Description:

Chest: N/A
Abdomen: N/A       Fontanelle:

**NURSING ASSESSMENT - Problem Based**

**TRIAGE NOTES and INTERVENTIONS**
Notes: Pt attempted suicide from the jail. Pt will not answer   Interventions: Triage doctor evaluated
questions

Assessment Nurse Signature _M.Williams Rn_   Time To Room _2225_   Room _OBS_

**DISCHARGE / ADMIT / TRANSFER ASSESSMENT**
VS: BP___P___R___T___ O2 Sat___ GCS: E___M___V___=Tot___
Respirations: Regular Shallow Labored Retractions RUL LUL N/A
Clear Coarse Wheezes Rales RLL LLL
Behavior: Cooperative Uncooperative Confused Unresponsive
Restless Combative Crying Other___
Skin: Warm Moist Normal
Dry Pale Other
Skin Integrity: Wounds _l Antecub OSD applied by MJ_
Pain Scale: 0-10 N / WB Location___ Quality___
Instructions Given _Via Interpreter _ Copy Given _ Verbalized Understanding
_l To _Oil_ _Via___ _With___
_ Report Called St___ Time___ RN _Irene, Nurse Durango_
X IV DC'd _ Cath Intact l _ Foley DC'd _ NG DC'd

RN Signature _S A Ronald_ Time _0440_   See Narrative

ANDRIANO, WENDY, MRN-34010082, ACCT #-0327000278, Chartmaxx Copy- irivera

MEDS / PROCEDURES       Name:  ANDRIANO, WENDY        Acct#: 0327000278      MR#: M0034010082      Pt#: 140

| Time | Initials | Medications | 0-10 Pain Scale | | | Dose | Route | Site | Time | Initials | Procedures |
|------|----------|-------------|---|---|---|------|-------|------|------|----------|------------|
| | | | a | Time | p | | | | | | |
| 0110 | RW | dt | LOT 4099870A EXP 5/2/05 | | | 5u | IM | (L) | 0120 | MR | X-Ray (L) Elbow |

| | INPUT | | | | | | OUTPUT | |
|------|-------|-----------|------|------|--------|------|--------------------|--------|
| Time | Initials | IV / NG / PO | | Size | Site | Amount | Time | Foley / NG / Urine | Amount |
| 0115 | CR | HL-NS 1L w/o | | | 20 | R Ank | 0440 | | HNV |
| 0150 | CR | NS 1L 120cc/hr | | | 20 | R Ank | | | |

Total  1/20

NOTES

| Time | Vital Signs | Pain 0-10 N/WB | Narrative |
|------|-------------|------------------|-----------|
| 2145 | | | Pt arrived to Area 3 SRT tearful, not talking. NCD Det. Officer in attendance. Lacy bleeding is controlled @ this time. Zanaflex. Note: Pt. now quiet. Na pupils. JR |
| 2350 | | | w. Kronenhoek @ BS talking c Pt and examining. L anterio R. — No other wounds. Da Kroman RN |
| 0110 | | | Pt awake, NAD pleasant cooperative. Feet cleansed. L UE cleansed lightly. Up |
| 0130 | | | To xray for (L) Elbow xray. DOC officer stays c Pt. R |
| 0300 | | | Dr Kronenhoek @ BS attending to L anter. walking R |
| 0410 | 92 82 16 37 | | Report called to Irene Durango Nurse. NO A W Pt NB c/o.0 R |
| 0420 | | | To jail. D |

Signature & Initials                                    MR. Michelle Raphael PCA

ANDRIANO, WENDY, MRN-34010082, ACCT #-0327000278, Chartmaxx Copy- irivera
Emergency Room Reports  -  Page 2/4                    Job 31875 (12/09/2004 11:38) - Page 3  Doc# 2

000009724

P-App. 006506

## EMERGENCY DEPARTMENT RECORD
MARICOPA INTEGRATED HEALTH SYSTEM
2601 East Roosevelt
Phoenix, AZ 85008

Acct#: 0327000278    MR#: M0034010082    Pt#: 140
Name: ANDRIANO, WENDY
DOB: 8/26/1970    Age: 33Y    Sex: F

DT10355

**TRIAGE**    Chief Complaint:    SELF INFLICTED LAC
Time: 9/27/2003 10:22:14 PM    Source Of Hx: Paramedics    Weight: 0 (lb) 0 (kg)
BP: 134 / 74    Pulse: 124    Resp: 20    Temp: 37.5 Oral    O2 Stats: 97

Allergies    unknown
History:    unknown
Current Meds:    unknown
LMP: unk    Pregnant: Unknown    Tetanus <=5 Yrs:  Unknown  Child Imm UTD: N/A
Pre-Hosp Tx: pressure dressings to l hand and l ac
Triage Notes:  Pt attempted suicide from the jail.  Pt will not answer questions
Interventions:    Triage doctor evaluated
Time Seen: 2350    Historical Sources: ✓Patient ___Family ___Paramedic ___Translator ___Old chart

**History**
Elements: location, quality, severity, time, course, modifiers, associated signs/symptoms, status of chronic illnesses.

1-3 elements: Lvl 1-3
4+ elements: Lvl 4-5
Level 5 caveat (Patient unable or too critical - document reason)

CC:    Laceration

HPI:  33 y/o ♀ inmate sustained self-inflicted lac to ⓁL antecubital ā pencil. Pt reports stabbing x 2, reports pencil inserted ~1". Per report bled ~200 cc. Pt reports ⊕ LOC, per report no LOC. No current SI.

Past Medical: ___ Reviewed
∅

Current Meds: ___ Reviewed
∅

**PFSH**
None: Lvl 1-3
1 of 3 areas: Lvl 4
2 of 3 areas: Lvl 5

Family:

Social:

Review of Systems    ___Unable to obtain    ___All systems reviewed and negative except as marked

| | | |
|---|---|---|
| Const. | ⊘fever ⊘chills | Muscskel |
| ENT | ___sore throat ___nasal drainage/congestion | Skin |
| Eyes | ⊘double vision ___visual changes | Neuro |
| Cardio | ⊘chest pain ___palpitations | Psych |
| Resp | ___cough ___short of breath | Endrocrine |
| GI | ⊘N ⊘vomiting ___diarrhea ___dark/bloody stools | Hem/Lymph |
| Gu | ⊘dysuria ___frequency ___urgency ___hematuria | Allergies |
|  | ___vag bleeding G___ P___ LMP_____ | Immunizations |

Muscskel: ⊘back pain
Skin: ___rash
Neuro: ___headache ___lost feeling or power R L lace arm leg
Allergies: NKDA

**ROS**
None: Lvl 1
1 system: Lvl 2-3
2-9 systems: Lvl 4
10+ systems: Lvl5

**Physical Exam**    BP_____/_____    P_____    R_____    T_____    Sats_____    Triage vitals reviewed: ✓

**Constitutional**
- VS (at least three) • General appearance  NAD, WDWN

**Eyes**
- Conj/lids • Pupils/irises  PERRL, EOMI
- Discs

**ENT**
- External Ears/nose• Otoscopic
- Hearing  • Nasal mucosa
- Lips, teeth, gums• Oropharynx

**Neck**
- Thyroid • Appearance/masses  supple

**Chest (breasts)**
- Inspection • Palpation of breast and axillae

**Respiratory**
- Resp effort • Percussion  CTA ⒷB, good effort
- Palpation • Auscultation

**Physical Exam**
1-5 bullets: Lvl 1
6+ bullets: Lvl 2-3
2+ bullets from each of 6 & OS/BA or 12+ bullets:Lvl 4
2+ bullets from each of 9 OS/BA: Lvl5

ANDRIANO, WENDY, MRN-34010082, ACCT #-0327000278, Chartmaxx Copy- lrivera
Job 31875 (12/09/2004 11:38) - Page 4 Doc# 2

000009725

Acct#: 0327000278 MR#: M0034010082 Pt#: 140

**Cardiovascular** nl S1 S2 no murmur.
- Palpation - Auscultation
- Carotids - Abdominal aorta
- Femoral arteries - Pedal pulses
- Extremities (edema, varicosities)

**Abdomen**
- Liver and spleen - Masses and tenderness
- Hernias - Anus, perineum, rectum

(L) arm: 2 cm lac to medial aspect distal antecubital space. hemostatic. sensation intact to light & 2 pt [illegible] motor 5/5.

**GU**
- Rectal - Stool for occult blood
- Ext. Gen. - Urethra - Bladder
- Cervix - Uterus - Adnexa
- Scrotal contents - Penis

**Skin**
- Inspection - Palpation warm & dry.

**Lymphatic**
- Neck - Axilla - Groin - Other

**Neurologic**
- Cranial Nerves - DTRs/Babinski - Sensation

**Psychiatric**
- Orientation - Judgement/Insight
- Mood or affect - Recent and remote memory A+O x4, appropriate, not suicidal.

**Clinical Course / Test Results / Critical Thinking**

Imp. lac to (L) antecubital space will irrigate & close

Procedure Note
Procedure: Lac repair
Indication: 3cm lac (L) arm
Physician: David Lott, M4
Description: Area cleaned c pressure wash. Local anesthetic administered c 4cc Lidocaine 1% c epi. Sewn c 4-0 Vicryl.
Disposition: Pt stable + resting
D. Lott, M4

~~0010 9/27/13~~
~~Att note 33 y/o RHD stabbed (L) antecubital often c [illegible]. Bled @ scene. No LOC. No injury. No [illegible] signs of [illegible]. HR 120. Will [illegible] for FB then suture [illegible] c [illegible] [illegible] no evidence of arterial injury. NV intact~~

KENNETH C. JACKIMCZYK MD
PAS #1774

**Medical Decision Making**
- Straight forward (Lvl 1)
- Low Complexity (Lvl 2)
- Mod complexity (Lvl 3-4)
- High Complexity (Lvl 5)

Code as 2nd best of the following 3 medical decision making categories:

**# Diagnoses/Mngmt Options**
- 1 = Straightforward
- 2 = Low
- 3 = Moderate
- 4+ = High

**Complexity of Data**
- None or 1 item = Straightforward
- 2 items = Low
- 3 items = Moderate
- 4+ items = High

**Risk**
- Minimal
- Low
- Moderate
- High

**Final Diagnoses:**
1. 2 cm left arm laceration
2.
3.
4.

**Procedures:** 3 cm laceration repair

**Examiner Signature & PAS** [signature] 9323
Staffed With: KENNETH C. JACKIMCZYK M.D. PAS #1774
**Attending Signature & PAS** [signature]
Condition on Discharge

Consultant
Time Called
Dictated By
Job Number
Dictated By
Job Number

```
                     MARICOPA INTEGRATED HEALTH SYSTEM
Maricopa Medical Center - Comprehensive Healthcare Center - Family Health Center
                     (602) 344-5311 Diagnostic Imaging


PATIENT: ANDRIANO,WENDY                      CI#: 649836
PCP:                                         MR#: 0034010082
ORDERING PHYSICIAN: KROMMENHOEK,ADAM         ACCT#: A0327000278
ORDERING LOCATION:                           DOB: 08/26/70
DATE OF STUDY: 09/28/03 0145                 SEX: F
STUDY PERFORMED: 72251 RAD ELBOW AP/LAT      Pat Type: ED
-----------------------------------------------------------------------

     REASON FOR EXAM      ;L ANTECUBITIS PAIN

     LEFT ELBOW, TWO VIEWS (09-28-03)
     Slight soft tissue swelling.  No visible radiopaque foreign
     bodies.  No bone or joint abnormalities.



                              Read By: RENATO M SANTOS
                              Released By: RENATO M SANTOS
DD:
DT:
DR:
```

```
     Page 1                              FINAL
```

ANDRIANO, WENDY, MRN-34010082, ACCT #-0327000278, Chartmaxx Copy- irivera

Diag Imaging Report - Page 1/1                    Job 31875 (12/09/2004 11:38) - Page 6  Doc# 3

000009727

CRS

1. Orders must:
   A. Be dated and timed.
   B. Have legible signature and PAS number.
2. Indicated patient weight and allergies on
   admission and transfer orders.

## Maricopa Integrated Health System
2601 E. ROOSEVELT • PHOENIX, ARIZONA 85008



DT10780

| DATE | TIME | AM PM | Pt. Weight: _____ Kg or _____ Lb. ALLERGIES: _____ |
|------|------|-------|----|
| 9/28/03 | 0015 | AM | |

Tet 0.5 cc Tel ☑

9/27.03# NS 1L W.O. , then at 120 cc/° AT

/ X-ray 2) antenubiter No foreign body

0115   O4P Mac/R Krummenhoel m
                                    9323

9/28/03  0400

D/c to jail  0410

Dx: laceration to ℞ forearm

Cond: stable

keep wound clean and dry,

remove sutures in 7-10 days

F/U in jail clinic

| DATE | TIME | AM PM | Pt. Weight: _____ Kg or _____ Lb. ALLERGIES: _____ |
|------|------|-------|----|
| / / | | AM PM | |

Krummenhoel m
                    9323

PHYSICIAN SIGNATURE/PAS                    ATTENDING ☐

PHYSICIAN'S ORDERS   MUST INDICATE ROOM & BED NO.

ANDRIANO,WENDY
DOS: 09/27/03   0327000278
PHOENIX,AZ 85000
Sec:
Att Phys:

DOE-00261970
CEO   0034010082

ANDRIANO, WENDY, MRN-34010082, ACCT #-0327000278, Chartmaxx Copy- irivera

Physicians Orders  -  Page 1/1          Job 31875 (12/09/2004 11:38) - Page 7  Doc# 4

000009728

**CONDITIONS OF ADMISSION/TREATMENT**
Maricopa Integrated Health System
Maricopa Medical Center
2601 E. Roosevelt
Phoenix, AZ 85008



DT2076

1.     **Medical Treatment:** The patient's attending physicians or specialists control his or her health care. The Provider is not liable for following the instructions of those physicians. The patient consents to customary X-ray examinations, nursing and technical services, and laboratory services. The undersigned further consents to the use of anesthesia, medical and surgical treatment, and Provider services rendered to the patient under the general and special instructions of the physician. The undersigned recognizes that all physicians furnishing services to the patient (including radiologists, pathologists, and anesthesiologists) may be independent contractors, not employees or agents, of the Provider. The Provider is not liable for the actions or omissions of independent contractors.

2.     **Release of Information:** The Provider may release all or any part of the patient's record pertaining to this or any other hospitalization or treatment (INCLUDING ALCOHOL- OR DRUG ABUSE, HIV-RELATED, OR COMMUNICABLE DISEASE INFORMATION) to persons or entities engaged in the activities stated below:

   A.     **Insurance and Quality Review:** persons or corporations (including insurance companies, workers' compensation payers, hospital or medical service corporations, welfare funds, governmental agencies, or the patient's employer), or their designees, which may be liable under contract to the Provider, any other party, the patient, a family member, or employer of the patient, for purposes of securing payment for all or part of a provider's charges, and quality assurance, utilization review, and peer review committees, accrediting agencies, and Provider and physician liability insurance carriers to enable them to carry out their functions.

   B.     **Billing and Collection:** agents or employees of the Provider that process or duplicate medical records for billing and reimbursement purposes.

   C.     **Medical Audit:** persons or entities authorized by the Provider for purposes of conducting medical audit activities.

   D.     **Medical Research:** authorized persons to advance medical studies or medical research.

   E.     **Other Providers:** physicians and personnel involved in the patient's care to provide and manage the patient's health care.

   F.     **Organ Donations:** health facilities, providers, or their designees for the purpose of procuring, processing, or distributing human body or body parts for use in medical education, research, therapy, or transplantation.

The undersigned further consents to the release of the patient's name and address to entities acting on behalf of the Provider, including, but not limited to, affiliated fundraising agencies. I understand that I may revoke this authorization at any time, except to the extent the Provider has acted in reliance upon it or the disclosure is authorized by law. This consent to the release of patient information remains valid until expressly revoked by the patient in writing.

3.     **Assignment:** If I am entitled to benefits arising out of any insurance policy insuring the patient or any other party liable to the patient, I assign such benefits to the Provider or any person or entity rendering services to the patient to pay the patient's bill. I understand that I am responsible for any charges not covered by this assignment. If I am eligible for Medicare benefits, I assign the benefits payable for physician services to the physician or organization furnishing the services and authorize those entities to bill and collect from Medicare directly.

4.     **Financial Agreement:** I agree that in return for Provider services furnished to the patient, I will pay the Provider's charge for such services prior to discharge or make other financial arrangements satisfactory to the provider and other providers to which payment is due. If the account is referred for collection, I agree to pay reasonable attorney's fees and collection expenses.

       I request payment of authorized benefits for all physician services furnished to me by Medical Professional Associates of Arizona (Med Pro) at Maricopa Integrated Health System. I authorize release of any or all medical and other information needed to determine these benefits. I understand that I may also receive a bill from Medical Professional Associates of Arizona (Med Pro).

5.     **Teaching Program:** Maricopa Integrated Health System participates in a medical residency program. This program includes Medical Residents and students who receive instruction and supervision from the hospital staff. During your admission, these health care professionals may participate in your care.

6.     **Miscellaneous:** I, the undersigned, hereby state that I have:

   ☐ executed a Health Care (advance) Directive      ☑ not executed a Health Care (advance) Directive      ☑ read and understand the Conditions
                                                                                                              of Admission/Treatment
   ☐ Living Will                                      ☐ Health Care Power of Attorney
   ☐ provided a copy of my directive                 ☐ copy of directive on record                          ☐ Mental Health Power of Attorney
   ☐ been requested to provide a copy                ☐ want more information on Advance Directives (referred to Social work)
   ☑ received a copy of Maricopa Health System's booklet on Health Care Decisions and Patients Rights
   ☐ been provided a copy of the notice entitled "An Important Message from Medicare"
   ☐ updated with the registration staff the information required upon the Medicare Secondary Payor form

7.     **General Duty Nursing:** The Provider furnishes only general duty nursing care. If the patient needs continuous or special duty care, the patient, his or her legally authorized representative, or physician(s) must arrange this care. The undersigned releases the Provider from any and all liability arising from the fact that the Provider does not provide additional nursing care.

8.     **Personal Valuables:** The Provider maintains a safe for the protection of money and valuables. The Provider is not liable for the loss or damage to any money, jewelry, glasses, dentures, documents, clothing, or other articles, unless placed therein, or otherwise expressly deposited with the Provider for safekeeping. The Provider's maximum liability in case of loss or damage for items deposited in the Provider's safe is $500.00 (five hundred dollars).

9.     **Unapproved Discharge:** The Provider, its agents or employees are not responsible for injury or any other untoward result whatsoever occurring to the patient or any one else should the patient leave the premises before the physician in charge of the case has discharged the patient or against medical advice or should the patient leave the premises because all or part of the charges will not be paid for, or on behalf of the patient.

I have read and understand this form, receiving a copy thereof, and I certify that I am the patient, or am a person authorized to act on the patient's behalf.

| | | | | |
|---|---|---|---|---|
| _Tracey Lucio_ | 9/27/03 | | | 9/27/03 |
| Witness: | Date | Patient's Signature: | | Date |

| | | | |
|---|---|---|---|
| Witness (optional): | Date | Signature of Legal Authorized Representative: | Date |

|  |  |
|---|---|
| Relationship to Patient: | Date |

2076 (9/99)

White-Medical Records   Yellow-Nursing Floor   Pink-Patient Copy   Gold-Department Copy

ANDRIANO, WENDY, MRN-34010082, ACCT #-0327000278, Chartmaxx Copy-- irivera

000009729

Form # 70844    PHOENIX FIRE DEPARTMENT  EMS INCIDENT REPORT    See Supplement ☐    Triage #

| YEAR | INCIDENT NUMBER | NUMBER | CITY | COMPANY REPORTING | SHIFT | ALARM DATE M M D D | UNITS PROVIDING CARE | UNITS PROVIDING CARE | TRANS UNIT |
|---|---|---|---|---|---|---|---|---|---|
| 0 3 | 2 1 7 2 1 0 | P | R 1 1 | C | 0 9 2 7 | R 2 1 | | |

ADDRESS: 7880 W Durango

| TIMES APPROXIMATE DISP | PT CONTACT | LV HOSP | AT HOSP | PT TRANSFER | EMT/CEP # A: | EMT/CEP # B: |
|---|---|---|---|---|---|---|
| | | 0457 | | | EMT/CEP # C: | EMT/CEP # D: |

SERVICE DELIVERED:  NE ☐  BLS ☒  ALS ☐    HOSPITAL ☐    REASON ☐    REFUSAL ☐    RELEASE ☐

NAME: Wendy Adriano    AGE ___  SEX F  W/B  DOB 8-26-70  SSN ____
ADDRESS: 2155 E. Liberty
CITY ____  STATE ____  ZIP ____

| APPX TIME: | 2146 | | | |
|---|---|---|---|---|
| BP | 110/70 | / | / | / |
| PULSE | 100 S/R | | | |
| RESP | 18 | | | |
| SKIN | W/D | | | |
| PUPILS | PERL | | | |
| GCS / ETCO2 | 15 / | / | / | / |
| CAP RFL | <2 | | | |
| PULSE OX | RA | | | |

PMH CARDIAC ☐  HBP ☐  CVA ☐  RESP ☐  SEIZ ☐  DIAB ☐
CA ☐  PREG G ___ P ___  DUE DATE / LMP: ____
DENIES ☐  UNK.
RX/S DENIES ☐  UNK.
ALLERGIES DENIES ☐  UNK.
DR/GROUP ____

C/C  Lac on (L) Hand    ONSET TIME ____    PAIN NONE ☐ MIN ☐ MOD ☐ SEVERE ☐  1:10 SCALE

HPI/MOI: S/A found pt sitting on floor after self inflict
wounds to left hand and arm. 2" in lac on hand
area. Pt loss apprx 200cc blood. MESa stop bleeding
no loss ____ no loc. MESa stated at color was
normal, transported to County hospital

CLINICAL FINDINGS ____    REPORTED HISTORY OF

LOC AWAKE ☑ ALERT ☑ ORIENTED PERSON ☑ PLACE ☑ TIME ☑ EVENTS ☑    UNCON YES ☐ NO ☑ UNK ☐    NEAR SYNCOPE YES ☐ NO ☑ UNK ☐

☐ NO CLINICAL FINDINGS    PT'S STATED NEEDS ____

HEAD/FACE

NECK

CHEST

ABD

PELVIS

EXT  Lac on back of L hand & arm

BACK

| UNIT/EMT/CEP # | APPX TIME | TREATMENT / PROCEDURE | RESPONSE TO TREATMENT | HOSPITAL COMMUNICATION @ |
|---|---|---|---|---|
| | | O2 @ ___ l/m  NASAL CANNULA ☐  OPA ☐  FACE MASK ☐  BVM ☐ | | CN ⇨ RF ☐   PATCH ⇨ AB ☐ |
| | | EKG: | | PATCH ⇨ RF ☐    CN ⇨ PATCH ☐ |
| | | IV: | | CONTACT PERSON ____   RN ☐ ADMIN  DR ☐ BASE |
| | | Vitals, stop bleeding | | HOSPITAL DIVERSION? YES ☐ NO ☐ |
| | | | | NFO ☐    PHYSICIAN'S ORDERS ☐ |

MISCELLANEOUS PROCEDURES
BLOOD GLUCOSE ____ mg/dl @ ____
BLOOD GLUCOSE ____ mg/dl @ ____

STATUS O/A HOSP: ☐ CHANGED ☐ UNCHANGED  EKG: ☐ CHANGED ☐ UNCHANGED  INTUBATION YES ☐ NO ☐ INTACT??  IV PATIENT YES ☐ O/A HOSP? NO ☐  TOTAL FLUIDS ____ CC☐

EMT / CEP ACCEPTING PATIENT ____    RN / DR ACCEPTING PATIENT  B. Johnson RN    RN / PHARM. EXCHANGING DRUGS ____

(PRINT) EMT ☐  CEP ☐  Ryan Ract
CITY OF PHOENIX, ARIZONA

92-45 Rev. 1/03    39628505800

TO PATIENT MEDICAL RECORDS
ANDRIANO, WENDY, MRN-34010082, ACCT #-0327000278, Chartmaxx Copy- irivera

EMS Incident Report - Page 1/1    Job 31875 (12/09/2004 11:38) - Page 9 Doc# 6

000009730

## Chart Release Cover Sheet

12/09/2004

TO:    MARICOPA COUNTY ATTORNEY
       222 E. JAVELINA DR. STE.2400

       MESA, AZ 85210

Attn:               Tel: 602-506-2600       Fax:

The following charts were sent on 12/09/2004.

Patient: WENDY ANDRIANO       MR#: 34010082
Reference#:

Electronic Records:
          0327000278     Visit    09/27/2003   Visit    EME-Emergenc   Pages:    Uncalc
Account                  Date:                  Type:    y                        ulated
#:
          Date:          Document:

               Face Sheet
               Emergency Room Reports
               09/28/2003  Diag Imaging Report
               Physicians Orders
               Conditions of Admission
               EMS Incident Report

Paper Records:
                         Visit                 Visit                   Pages:
Account                  Date:                 Type:
#:
          Document Type:


Notes:

If you have any questions regarding these charts, please contact the medical
records department.

000009731

**Wendi Andriano**

Booking Number:  A631830
PID Number:       000082785

CHS Special Needs Treatment Plan (SNTP) Form

I. Counselor's Assessment continued

| | | | |
|---|---|---|---|
| ☐ | Violent Behavior toward others | 0 | charge: remains unsubstantiated, no other incidents reported or observed |
| ☑ | Violent Behavior toward self | 2 | Serious SA led to D-2 admit |
| ☐ | Property Destruction | 0 | not observed/reported |
| ☐ | Eating Problems | 0 | not observed/reported |
| ☑ | Sleep Problems | 1 | difficulty maintaining sleep |
| ☐ | Inappropriate Behavior | 0 | not observed/reported |
| ☐ | Alcohol Abuse | 0 | denied |
| ☐ | Drug Abuse | 0 | denied |
| ☐ | Compulsive behaviors (not already specified) | 0 | not observed/reported |
| ☐ | Housing Problems | 0 | can return to family home if released |
| ☐ | Poor Personal Hygiene/Dress | 0 | good |
| ☐ | Social Support | 0 | good; family, legal team |
| ☑ | Other | 2 | Significant stress due to facing trial on capital case whose outcome could include death sentence |

*Current Summary of problem:*

Pt coping strategies overwhelmed by multiple circumstances including time in custody, sleep disturbance, severe legal status, and unexpected placement in isolation in GP. Pt frightened by her impulsive decision to suicide.

Counselor
Signature: _____

Date: _____

2

000009732

000009733

Wendi Andriano
Booking Number:  A631830
PID Number:        000082785

CHS Special Needs Treatment Plan (SNTP) Form

SNTP3

## II. Counselor's Assessment continued

### Clinical History

☐ Prior Psychiatric Hospitazations

Date of Most Recent:

Prior Hospitalizations

| | | |
|---|---|---|
| N/A | ROI sent on | |
| | ROI sent on | |
| | ROI sent on | |

☐ Prior Outpatient Mental Health

Date of most Recent OP.tx

Place of most recent OP  N/A

☐ Prior Residental Treatment Program   N/A
☐ Hx DeTox Service
☐ Prior OP drug/alcohol abuse service

Significant family mental health history:

N/A

Counselor Impressions:

Pt comes to D-2 following nearly 3 years in custody. Pt facing capital charge, recently placed in adseg. Pt made serious SA by cutting arm. Cannot say why. Unanticipated by all service providers, family and legal team. Increasing stress of incarceration, legal status, and toxic GP environment have combined to erode pt's ability to cope successfully.

3.

000009734

000009735

Date Initiated: _____

Special Needs Plan *Update* Goals, Objectives and Interventions

Patient's Name _ANDRIANO_____   BK # _____   Today's Date __/__/__

1.    Goal Area: Psychiatric Symptoms
      (Completed by Psychiatric Provider)

2.    Goal Area: Dangerous to Self/Others
      (Completed by Primary Counselor)

GOAL(s): (1) ↓ DEPRESSION
         (2) ↑ x/w/oth

GOAL(s): NO DTO/DTS

OBJECTIVES (in behavioral measurable terms):

A.  30 v/o ↑ 1x
    SENSE OF FUTURE

B.  30 v/o MESO-
    CD M D

C. _____

OBJECTIVES (in behavioral measurable terms):

A.  pt will make no plan
    to harm self/others

B.  pt will take no action
    to harm self/others

C.  pt will notify staff of
    thoughts/feelings/intentions
    to harm

INTERVENTIONS (Specify activity & frequency)

1.  MEDS

2.  1:1

3.  GROUPS

INTERVENTIONS (Specify activity & frequency)

1.  1:1

2.  Groups

3. _____

000009736

000009737

Wendi Andriano
Booking Number:   A631830
PID Number:       000082785

CHS Special Needs Treatment Plan (SNTP) Form

**V. Special needs Plan goals, Objectives and Interventions**
(to be completed by clinical team within 14 days of admission)

1.  **Goal Area: Psychiatric Symptoms**
    (Completed by Psychiatric Provider)

**GOAL (s)**

1.  **Goal Area: Dangerous to Self/Others**
    (Completed by Primary Counselor)

**GOAL (s)**

No DTS/DTO

**OBJECTIVES (in behavioral measurable terms):**

A

B

C

**OBJECTIVES (in behavioral measurable terms):**

A  pt will make no plan to harm self/others 100% x 30 days

B  Pt will take no action to harm self/others 100% x 30 days

C  Pt will notify staff of any thought, feeling, intention to harm self or others 100% x 30 days

**INTERVENTIONS (Specify activity  frequency)**

1

2

3

**INTERVENTIONS (Specify activity  frequency)**

1  1:1 weekly with counselor at least 30 min weekly

2  participation in all groups offered

3  Support/encouragement by staff

6

000009738

000009739

```
CCC082785
ANDRIANO,WENDI
OB-24-30   C/F
PID
```

Date Initiated: _____

Special Needs Plan *Update* Goals, Objectives and Interventions

Patient's Name _____    BK # _____    Today's Date __/__/__

| 1. | Goal Area: Psychiatric Symptoms | 2. | Goal Area: Dangerous to Self/Others |
| | (Completed by <u>Psychiatric Provider</u>) | | (Completed by <u>Primary Counselor</u>) |

GOAL(s): Control anxiety

GOAL(s): No DTS

OBJECTIVES (in behavioral measurable terms):

A. Pt will report ≥ 5 hrs conse. sleep/night x 5 nights

B. Pt will develop 2 new coping mech's within 30 days

C. _____

OBJECTIVES (in behavioral measurable terms):

A. Pt will have no action to harm self, no more any plan to harm self 10x x 30 days

B. Pt will report ↓ in SI 20% x 30 days.

C. _____

INTERVENTIONS (Specify activity & frequency)

1. meds

2. ind counseling

3. art/activities

INTERVENTIONS (Specify activity & frequency)

1. 1:1 w/ counselor

2. participate in all groups offered

3. _____

000009740

000009741

PLEASE DATE AND SIGN ALL ENTRIES.

ENCOUNTER DATE

12/29/03 0600 [Level II Nrg] Pt. S. "I'm OK, I just woke up and realized I need to go to the BR" O. I'm up & to gail steady; denies suicidal ideation for now. A. Level I SR P. continue level II SW — *[signature]* L Brown RN #204

---

9-29-03 SOCIAL WORK NOTE
1800 No VO re consumer access line. *[signature]*
L King CIII #427

---

**INITIAL Rx STAFFING**

9-29-03
1030  Met with tx team to review pt status and establish
discharge criteria. Pt referred from Estrella. Has
been in custody since 10/00, often on S/D status.
Appears to have taken suicidal action in response
to S/D by detention. Pt has court coming up
for sentencing change. Will keep on unit for
brief respit unless behavior changes and
she takes advantage of others. Discharge
criteria: (1) no DTO/DTS 100 3 x 14 days @ Trng
for current situation 258 x 14 days. Need for
stabilization justified 1-2 as LRE.
*[signature]*
L King CIII #427

---

9-29-03 COUNSELOR ADMIT NOTE
1800  "I guess I just panicked. That officer lied to me
and I felt trapped. I knew I would be
in lock down during my trial and I
just couldn't do it. I just freaked out." Pt is 33
y.o. White female approaching trial on sex-
ous charge. She came to D-2 after
panicked and impulsive suicidal gesture
which was too successful. Pt has no prior
SA in custody or prior. Pt has no
Hx prior to custody except for brief con-
tact through EAP at work. Pt was married
x 7 years, had two children - now S/6. They
live with husband's family who are trying
to terminate pt's parental rights. Pt denies
Hx of drugs, etoh, and smoking. Pt has
degree in accounting and real estate license.
She was working in apartment management

000009742

☐ PUBLIC HEALTH
☐ CORRECTIONAL HEALTH

Andriano, Wendy
A 631830

This form will be used by the medical staff for:
PATIENT'S - PERSONAL HISTORY, PHYSICAL EXAMINATIONS and PROGRESS NOTES and DISCHARGE SUMMARY. (In & Out Patients)

| ENCOUNTER DATE: | PLEASE DATE AND SIGN ALL ENTRIES. |
|---|---|
| 9/28/03 | Admitted To Durango Psych |
| 1115 | S: female inmate transported to D2 by W/C from Estrella. O: pt frail, pale white skin ē pale mucous membranes. oriented X3, alert c/o feeling dizzy under using BR prior to 4 pts. VS 111/64 P. 84 T. 97.7 Mood: dysphoric. affect congruent. Thoughts - irrational, minimizing suicide attempt last PM. (pt stabbed self on (L) brachial area ē pencil and was sent to MMC for suture. Bandage dry and intact. Good ROM. States just wants to sleep. Unable to complete nursing assessment. A: ↑ Risk DTO/DTS. P: Level I. 4 pt as ordered. |
| | D Anderson RNC #217 D Anderson RNC |
| 9/28/03 | Nursing note: Level I (4 pt). |
| 1900 | S: pt mute. Level I ✓. O: pt oriented X3, alert mood: smiling, thoughts logical currently. ∅ DTO/DTS. (L) arm dressing changed. Sutures in place, skin edges approximated over brachial area. Bandaid re-applied. Contracts to reduce to 2 pt. A: 2 pt. P: cont + x plan as ordered. |
| | Anderson RNC #217 D Anderson RNC |
| 9/28/03 | Nursing Note Level I 2 pt - 2 point restraint |
| 1926 | S: I know I have to be here until I see the Doctor. I was angry at being in jail. O: In 2 pt restraint. Cooperative. Pleasant. A: Remains at risk for DTS. P: Continue Level I 2 pt. restraint for safety. M Taitkov |

CHM - 1600 R 3-03

(OVER)

000009743

P-App. 006525

| ENCOUNTER DATE: | PLEASE DATE AND SIGN ALL ENTRIES. |
|---|---|

9/27/03 (cont'd) Skin is pale 1 day. Buccal membrane dry
and pale. Bleeding to ® hand controlled c̄ DO's
"pressure dsg." Puncture wound to ® AC area. 5
bleeding open area. Approx 1cm rounded.
911 called.   AR-134   R-16   100/68   97 1/2 °-54
Pt transported in timely manner to mmc ER
for eval of self inflicted wounds. ————
                    L. Sweeney RN #284.   [signature]  ————

® Pt has written a suicide note which is also
the book surrounded by various pictures of children
repeatedly. Ten children. ————   L. Sweeney RN #284 [signature]

9-28-03  S) Pt seen in intact 4pt restraint S/d to
09:30.   3 pt. Pt. states "remorse for stabbing her
arm."
         O) dressing DN ® FA CLI. Restraints checked
ok. HR 90, RR 20. tailstaal c̄ c/o of wrist
on ankle pressure.
         A) Pt not able to make solid contract
Danger to self.
         P) transfer to Da. order from Dr Wendy
obtained. Report given to Dr Mary
RN Donna ————   [signature] Ahuladphi

000009744

P-App. 006526

PROGRESS NOTES

☐ PUBLIC HEALTH
☐ CORRECTIONAL HEALTH

DT081-6035

Andriano, Wendy
8.26.70
A631830

This form will be used by the medical staff for:
PATIENT'S PERSONAL HISTORY, PHYSICAL EXAMINATIONS and
PROGRESS NOTES and DISCHARGE SUMMARY. (In & Out Patients)

| ENCOUNTER DATE: | PLEASE DATE AND SIGN ALL ENTRIES. Estes R301 NKDA |
| --- | --- |
| 1-15-02 | IM to clinic C/o Blood in stool |
| | IM Refused Medical |
| 3-14-03 | (O) Eyeglasses from ... have arrived. Cleared |
| 1305 | through Security. Given to IM. IM signed |
| | for eyeglasses |
| | (P) Give eyeglasses. ... |
| 5.13.03 | Psych Note: A. Hernandez MHP |
| 1400 | S- Per Detention Staff this Inmate was tearful. |
| | O - tearful, fragile mood, states saw an old |
| | friend and was not able to talk to her. |
| | Denies S.I./H.I. Denies AH/VH problems |
| | She wants to talk to Dr. Garcia. |
| | A - Fragile mood / emotional adjustment problems |
| | P - Staff to be supportive. C. Alster Counsel III |
| | C Alster CIII #410 |
| 8/25/03 | S: I'm anxious ... on trial for 1st murder - need |
| 1350 | to be able to relax to prepare for trial" |
| Psychiatry | O: Speech clear, spontaneous, logical. Mood is calm |
| | affect appropriate. Reports Above - wants to inc. |
| | Seroquel to achieve desired effect of "calming down." |
| | On Seroquel 200mg HS and Ativan 1mg BID. Not |
| | Psychotic - denies AV hallucinations. No SI. |
| | A: Anxiety - anticipating trial for 1st murder charge. |
| | P: Will ↑ Ativan to 2mg BID, follow-up PRN. |
| | Vincent ... Psych ... |
| 9/21/03 2210 | man down "seizure - poss" |
| | (O) IM found lying on floor - D.O. is holding pressure |
| | over a "Lac on (L) hand" 1" from 5th digit towards |
| | wrist. Approx 20ml EBL on bed and on floor. |
| | IM is awake - eyes closed. Stating "a help me" ... |

081-6035 (Rev. 9/97) (OVER)

000009745

**ARIZONA DEPARTMENT OF CORRECTIONS**

30-D

Date: 23 JUL '12   AM 2:10
Time:
Initials:

**Health Needs Request (HNR)**

23 JUL   7-20-12

| Inmate Name/Nombre *(Last, First M.I.) (Apellido, Nombre, Inicial)* | ADC Number/Número de ADC |
| Andriano, Wendi | 191593 |

| Cell/Bed Number/Celda/Número de Cama | Unit/Unidad | P.O. Box/Apartado Postal | Institution/Facility/Instalación: ASPC |
| 266 30 D | SMA/Lumley | 3300 | Perryville |

You are required to be truthful.  Failure to be cooperative and any abuse of the health care system or its staff could cause a delay in delivery of care to you and others, and may result in disciplinary action (Use this form to describe only one problem or issue at one time). [Se le exige dlga la verdad.  La falta de cooperación y cualquier abuso del sistema del cuidado de la salud o del personal podría retrasar la asistencia de este cuidado para usted y para otros y puede dar lugar a una acción disciplinaria (Use este formulario para describir un problema a la vez!]

AREA OF INTEREST *(Check only one block below)*/AREA DE INTERES *(MARQUE UN ESPACIO SOLAMENTE)* ☐ Medical/Médica ☐ Dental ☐ FHA ☐ Pharmacy/Farmacia ☑ Mental Health/Salud Mental ☐ Eyes/Ojos ☐ Other *(specify)*/Otros *(especifique)* _____
PLEASE PRINT! Describe your medical/dental treatment issue need in the space below.  Be clear and specific.  NO ADDED PAGES. [¡POR FAVOR, ESCRIBA EN IMPRENTA! Describa su tratamiento o necesidad médica/dental en el espacio de abajo.  Describa claramente y sea específico. ¡NO USE MAS HOJAS!]

Please   Discontinue  my  medication:

Carbamazepine.

Thank You.

I do not wish to take psych meds!

I understand that, per ARS 31-201.01, I will be charged a $4.00 Health Service fee *(excluding exemptions granted by statute)* for the visit that I am herein requesting.  I further understand that by paying this fee I do not have the right to dictate treatment or who provides treatment. [Entiendo que de acuerdo con ARS 31-201.01 se me cobrará una cuota por el servicio médico de $4.00 por la cita que aquí estoy pidiendo *(excluyendo las exenciones otorgadas por la ley)*.  Además entiendo que al pagar esta cuota no tengo el derecho a imponer el tratamiento o quien lo proporcione.]

Inmate's Signature/Firma del prisionero

**REMOVE THE GOLDENROD COPY AND PLACE THE REMAINDER IN THE HEALTH NEEDS REQUEST DROP BOX[SEPARE LA COPIA DE COLOR AMARILLO OBSCURO Y DEJE LAS DEMAS EN EL BUZON PETICION DE NECESIDADES MÉDICAS]**

REFERRAL BY MEDICAL STAFF/REFERENCIA MEDICA ☐ Medical/Médica ☐ Dental ☐ Pharmacy/Farmacia ☐ FHA
☑ Mental Health/Salud Mental ☐ Eyes/Ojos ☐ Other/Otros *(specify) (especifique)* _____
Comments/Comentarios

| Staff Signature Stamp/Firma del empleado | Date/Fecha 7/22/12 | Time/Hora 0830 |

**PLAN OF ACTION/PLAN DE ACCION**

We will schedule you to be seen to officially DC it. You can refuse

| Staff Signature Stamp/Firma del empleado | Date/Fecha 7-24-12 | Time/Hora 0730 |

Distribution: White/Blanca - Health Unit/Unidad de Salud, Canary, Pink & Goldenrod - Inmate/Amarillo Canario, Rosa y Amarillo Obscur - Prisonero
This document is a translation from original text written in English. This translation is unofficial and is not binding on this state or a political subdivision of this state. [Este documento es una traducción de texto original escrito en ingles. Esta traducción no es oficial y no compromete a este estado o una subdivisión política de este estado.]

000012152

1101-10ES

# HEARING EXHIBIT 186

# PLACEHOLDER FOR VIDEO RECORDING

# DVD OF FORENSIC INTERVIEW OF WENDY ANDRIANO BY DRS. STEVEN PITT AND KIRAN AMIN

MARICOPA COUNTY SHERIFF'S OFFICE — Joseph M. Arpaio, Sheriff

2 C41

Segregation Days:

## DISCIPLINARY ACTION REPORT

DAR #: 18 144

ANDRIANO, WENDY  A631830   DURA/D2/UNIT C-41   12-3-3/1330

| Inmate Name | Booking # | Facility | Cell/Room | Date/Time |

Specific Offense(s): 105 POSS. OF UNAUTH. ITEMS   121 VIOLATION OF ANY RULES

Formal Statement of Charge(s). (Include who, what, when, where, how, and witnesses): ON 12-23 at approx. 1330, while conducting a 'headcount' I briefly searched I/m Andriano's cell (C41) while she had a visit. I found under her mattress a compact & a glass mirror. This had to come into the jail from outside as glass cannot be purchased thru Comm02s. Andriano has made a serious attempt @ suicide by cutting. Today @ approx. 1030 Also while I was doing clothing exchange, CFA inmate blu & me in D-Pod while off. Lose A#1166 conducted cell search in CFA and found more contraband in Andriano's cell w/in her possession. The items include: 2 black pens, a new lipstick in a metal case, lip gloss & eyeliner. None of which can be obtained thru jail commissary. 

Officer's Action and Recommendation: These items can be very dangerous to her or any other person that could get ahold of them.

___ Written Warning   You are being issued a warning for the listed offense(s). An accumulation of minor offenses, for any infractions, can be used as documented evidence in future disciplinary action against you.

___ Days Disciplinary Segregation   Harris A2340                12-3-3/1330
                                      Officer's Signature & A#          Date/Time

30 Days Full Restriction

I have been informed of the offense(s) listed hereon. I acknowledge receipt of this report and plead:  guilty ___X___   not guilty ___

Wendy Andriano                12-303
Inmate's Signature              Date/Time

Supervisor Review/Comments: 15 Days FR
Sgt R Morton A418              12/8/13   0800
Supervisor's Signature & A#          Date/Time

### Bureau Hearing Officer Action or Sanctions:

Findings: 105 - Guilty                     121- REPETATIVE
THIRD OFFENSE

Ø Days Disciplinary Segregation            20 Days Full Restriction
To Commence 0001 _____ to End 2400 _____   To Commence 0001 12/6/03 to End 2400 12/25/03
                  Time/Date      Time/Date                        Time/Date              Time/Date

Hearing Officer: Cole A5500               Forward to Classification: _____
                              Reclassified: _____

I have been informed of the right to appeal this decision and know I must submit my appeal with my yellow copy attached within 24 hours of the below date/time.

## GUILTY PLEA MAY APPEAL
Inmate's Signature                         12/5/03   0645
                                            Date/Time

3) 105 X2

012557
PCRDRJP001722 93

MARICOPA COUNTY SHERIFF'S OFFICE -- Joseph M. Arpaio, Sheriff

Segregation Days: 353

### DISCIPLINARY ACTION REPORT

DAR #: 18803

Andriano, Wendi    A631830    DueA    D-2 D52    12/10/03 1150

| Inmate Name | Booking # | Facility | Cell/Room | Date/Time |

Specific Offense(s): 013A - Possessing, Hoarding or misuse of Prescribed Narcotics or other dangerous prescribed drugs

Formal Statement of Charge(s). (Include who, what, when, where, how, and witnesses): On 12/10/03 at approx 1130 Hrs while I was doing clothing and bedding exchange a white pill fell out of the blanket. The pill was stamped Seroquel. Inmate Andriano takes this medication and I gave the pill to R LPN Despain. I then did a complete search of her cell and I didn't find any other medication

Officer's Action and Recommendation:

Written Warning    You are being issued a warning for the listed offense(s). An accumulation of minor offenses, for any infractions, can be used as documented evidence in future disciplinary action against you.

15 Days Disciplinary Segregation

15 Days Full Restriction

Officer's Signature & A#: ____ A41166    Date/Time: 12/10/03 1215

I have been informed of the offense(s) listed hereon. I acknowledge receipt of this report and plead: guilty ____ not guilty X

Inmate's Signature: ____    Date/Time: 12-10-03

Supervisor Review Comments: Currently on Restriction till 12/25

Concur

Supervisor's Signature & A#: ____ A#85    Date/Time: 12-10-03 1300

Bureau Hearing Officer Action or Sanctions:

Findings: Guilty 013A

____ Days Disciplinary Segregation    30 Days Full Restriction

To Commence 0001 ____ to End 2400 ____    To Commence 0001 12-26-03 to End 2400 1-24-03

Hearing Officer: ____ A231    Forward to Classification: ____

Reclassified: ____

I have been informed of the right to appeal this decision and know I must submit my appeal with my yellow copy attached within 24 hours of the below date/time.

Inmate's Signature: Hearing Held Copy Given    Date/Time: 12-15-03 0915

5000-247  R 7/97    WHITE - Division File Copy    YELLOW - Inmate After Disposition    PINK - Inmate Copy

4) F/R 12/25

012558

PCRDS-001-17794

P-App 006532

012559
PCRDG000174795

CASE # 18883

MARICOPA COUNTY SHERIFF'S OFFICE
DETENTION BUREAU
INMATE INSTITUTIONAL DISCIPLINARY APPEAL

| | | | | |
|---|---|---|---|---|
| FROM: | INMATE NAME | BOOKING # | FACILITY | CELL/RM   DATE |
| | Wendi Anderson | A453830 | Tower 2 | C552   12-15-03 |

| | | |
|---|---|---|
| TO: | FACILITY COMMANDER | RECEIVED BY: _____ DATE 12-15-03 |

DISCIPLINARY APPEAL (TO BE COMPLETED BY INMATE):

I am appealing the decision of the Bureau Hearing Officer for the following reason(s):

I am not guilty of _____ offense stated on DAR #    dated 12-10-03. I
(Disciplinary Action Report attached)
never possesed or misused Percription drugs. I recently moved into room 052
which was greviously occupied by inmate Burns. She also takes Seroquel. The
pills I lived in this room. I also had visitors that would sit on that bed. Inmate
Burns was one of those visitors. After Seeing how upset I was about this situation
the nurse told me and said it was not life-threatning. Dr. Garcia and Dr. Perry
do not have a history of not recieving my medication. I also spoke with the nurses who take
medication and they would notice that I take my medication to. I believe who certifie who
unable be able to testify. This is also spoke with the nurses who certifie who
and interpreptor. Another fact to know is I began trial for 1st degree murder. I am under
[illegible] stress and need that medication. Please central that voluntary statements provided
It is obvious.

| | | |
|---|---|---|
| INMATE SIGNATURE | BOOKING # | DATE |
| Wendi Anderson | A453830 | 12-15-03 |

RESPONSE TO THE INMATE (TO BE COMPLETED BY THE FACILITY COMMANDER):

I HAVE REVIEWED YOUR DISCIPLINARY REPORT AND THE RESPONSE OF THE HEARING OFFICER, AND
ORDER THAT THE FOLLOWING ACTION BE TAKEN:

Sanctions Stand

The blanket was one of two (you are allowed one)
and it was in your room on your bunk. You are
not supposed to have other inmates in your room.

| | | |
|---|---|---|
| FACILITY COMMANDER'S SIGNATURE AND TITLE | | DATE RETURNED TO INMATE |
| R. Kim  Capt - Hdqtr Medical Svcs Commander | | 12-16-03 |

DISTRIBUTION:   WHITE – DIVISION FILE COPY
                YELLOW – INMATE UPON DISPOSITION
                PINK – INMATE BEFORE DISPOSITION

50-817 R9-96

(7)

ARIZONA DEPARTMENT OF CORRECTIONS

Print or Type – No Attachments

Inmate Letter

| Inmate Name *(Last, First M.I.)* | ADC Number |
|---|---|
| Andriano, Wendi E. | 191593 |

Institution / Unit

ASPC - Perryville - Lumley - 30 D 266   SMA

Subject

Religious Diet

| To Individual | Location |
|---|---|
| Chaplain Powers | Lumley |

Please Describe Your Problem or Question Completely:

According to my religious beliefs, my body is the temple of the Holy Spirit. I am required to keep it clean and pure. In doing so, I may not consume the flesh from an animal. Please remove all meat and/or meat products from my diet.

Thank You.

Diet has been sent to Food Service on 23 Aug 05.

Becky
Chaplain

| Inmate Signature | Date |
|---|---|
| Wendi Andriano | 8-10-05 |

Have You Discussed This With Institution Staff?  ☐ Yes  ☐ No

If yes, give the staff member's name:

Distribution:  White  -  Central Office Master File
Yellow  -  Inmate
Pink  -  Institutional File

916-1P
1/9/02

000011386

# ARIZONA DEPARTMENT OF CORRECTIONS
## Religious Preference and Privilege Request

☐ NEW    ☐ CHANGE REQUEST

| Inmate Name (Last, First M.I.) | ADC Number | Institution/Facility |
|---|---|---|
| Andriano, Wendi E. | 191593 | ASPC-Pr-Lumley |

**My Religious Preference is:** Messianic Jewish

**Check the areas in which you are interested** (If not interested leave blank)

☐ Bible Study          ☐ Religious Services          ☐ Appointment with Chaplain

☐ Growth Group         ☐ Personal Counseling         ☐ Other_____

☐ Family Counseling

Indicate any special privilege (s) you are requesting. Any requests granted are done so under the provision that they are a part of your religious faith. It is your responsibility to show a commitment toward that faith in order to retain the privileges granted. A lack of commitment can result in loss of those privileges.

☑ Diet    Kosher _____

☐ Other _____

**In Case of Emergency, who would you like notified?**

| Name (Last, First M.I.) | Relationship | Telephone Number (with area code) |
|---|---|---|
| Ochoa, Alejo and Donna | Parents | ▓▓▓▓▓▓▓▓▓ |

| Address (Street) | City | State | ZIP Code |
|---|---|---|---|
| ▓▓▓▓▓▓▓ | ▓▓▓▓ | ▓▓▓ | ▓▓▓▓ |

## CHANGE OF RELIGIOUS PREFERENCE

I am requesting a change to be made in my religious preference

| From | To |
|---|---|
| Christian | Messianic Jewish |

I understand this request must be accompanied by a written statement, from an accredited leader (who is not an inmate) of the religious group of which I am a member ( or wish to become a member). The attached statement will affirm my membership, loyalty and commitment.

| Inmate's Signature | Date |
|---|---|
| [signature] | 7-6-07 |

| ☑ Approved | Chaplain's Signature | Date |
|---|---|---|
| ☐ Disapproved | C. Lansford | 07/13/07 |

| | Receiving Staff Member's Signature | Date |
|---|---|---|
| | [signature] | 7-12-07 |

Distribution
White - Master Record
Canary - Chaplain

00001137

904-1P
4/13/98

P-App. 006534

**ARIZONA DEPARTMENT OF CORRECTIONS**

**Information Report**

| | |
|---|---|
| Report Number | 06 B02 0206 |
| Report Date | 01-70-06 |
| Page | 1 OF 3 |

| | | |
|---|---|---|
| To Manzur | Title S6t | Unit Blw |
| From STRATION | Title Co II | Unit Blw |

**Subject** Target Cell Search

**Staff Involved**

| Employee Name (Last, First M.I.) Allen | Title Co II | Badge Number |
|---|---|---|
| Employee Name (Last, First M.I.) Hill | Title Co II | Badge Number 10588 |

**Intel**

| Intelligence Category 1 | Intelligence Category 2 |
|---|---|
| | |

| Source Type | Source's Last Name | Source's ADC Number |
|---|---|---|
| | | |

**Inmates Involved**

| Inmate Name (Last, First M.I.) Andriano, W | ADC Number 191593 | Unit Blw | HU/BED 30 D 266 | Involved As: Subject |
|---|---|---|---|---|
| Inmate Name (Last, First M.I.) | ADC Number | Unit | HU/BED | Involved As: |

| Time 0855 | Date 01-70-06 | Location SMA 30 D 266 |
|---|---|---|

**Summary**

On 01-70-06 at 0855 a target cell search was conducted on cell 30 D 266 based on some information retrieved in written form from a search done on 30 209 on 01-18-06 by Co II Carpenter + Co II Bache. Contraband was sized from 30 D 266 by my self Co II Stration 9362, Co II Hill 10588, Sgt. Allen 0258 In the form of letters and cards

| Employee's Signature 9362 | Title Co II |
|---|---|

**Comments/Action Taken**

Cell search was approved by Sgt Manzur 100 due to prior searches and information leading to this cell. Letters were seized and seized property receipts were issued.

| Employee's Signature 1506 | Title Sgt |
|---|---|

**Distribution ( ✓ Check all that apply)**

☐ Master File
☐ Institutional File
☐ SSU

| Entered Into Data Base | |
|---|---|
| By | |
| Date | |

105-2PF
3/10/00
(40000029)

000011365

ARIZONA DEPARTMENT OF CORREC~

SMA
30/266

Inmate Disciplinary Report

Case Number 08 - B02 - 0#73

| Inmate Name *(Last, First, M.I.)* | ADC Number | Institution |
|---|---|---|
| ANDRIANO, WENDI E. | 191593 | ASPC-PV-BWL |

Charge: Group Number and Title

B24 INTRODUCTION OF CONTRABAND

**I. Statement of Violation**   *(State fully the facts and circumstances of the violation including the means by which the inmate was advised of the charge(s))*

I/M ANDRIANO #191593 WAS VERBALLY ADVISED BY COII SIMMONS #4803 REGARDING THE ISSUANCE OF THIS REPORT ON 3/4/08 AT 1015 HR'S. REPORT WRITTEN BY OFFICER GIETOW #4844 ON 3/4/08 AT 1106 HR'S. ON TUE. MARCH 4, 2008 I BECAME AWARE OF I/M ANDRIANO'S INVOLVEMENT REGARDING THE ABOVE STATED CHARGE, AT 0600 HRS. ANDRIANO HAD CONSPIRED TO INTRODUCE CONTRABAND INTO SMA THRU USE OF HER "KOSHER TRAY" (EVENING MEAL). HER WRAPPED FOOD TRAY CONTAINED TWO PLASTIC BAGS OF TOBACCO WRAPPED TOGETHER WITH TAPE, ALONG WITH A MESSAGE FOR HER SON TO PASS ON.

| Date of Violation | Time of Violation | Reporting Officer: *(print)* | Signature |
|---|---|---|---|
| 3-4-08 | 0600 | GIETOW #4844 | 4844 |

| Shift Supervisor Review *(print name)* | Date / Time | Disposition | Signature |
|---|---|---|---|
| T.A. Dembrone | 3-4-08 / 1900 | Refer | 4586 |

**II. Delivery of Charge/Hearing Date:** I hereby certify that on ___/___/___ at _____ hours, I have served notice on this inmate for a hearing on the charge before the Disciplinary Hearing Officer as a Major Violation. The inmate has received a copy of the disciplinary charge. The hearing is scheduled on ___/___/___ at _____ hours.

| Inmate was offered staff assistance and it was: ☐ accepted  ☐ declined | Inmate Signature | Delivering Officer Signature |
|---|---|---|

**III. Report of Investigation**   MAJOR VIOLATIONS ONLY - SEE ATTACHMENT - (use form # 105-5P)

| Date Investigation Completed | Investigating Officer | Signature |
|---|---|---|

**IV. Disposition**  This case was handled as:

☐ Informal Resolution   ☐ Major Violation: Refer to Disciplinary Hearing Officer   ☒ Minor Violation: Action taken:

Penalty Assessed For A Minor Violation

☐ _____ Hours Extra Duty   ☐ _____ Days Loss of Privilege*   ☐ Return/Forfeit Contraband Items*

☐ _____ Days Restriction   ☒ Reprimand   ☐ Other*

For Minor Violations Only: Inmate was given a copy of the results and advised that effective this date, he/she has five days to appeal

| Inmate Signature | Date / Time | Coordinator's Signature |
|---|---|---|
|  | 3-6-08  1930 | Sgt Spring 4800 |

*  *Document specific details on a continuation sheet - privileges lost; items to be returned or forfeited; documentation of postponements and continuances; reasons for witness denial.*

Distribution:  White - Master Record File
Yellow - Institutional File
Pink - Inmate

103-1P
5/09/01

00001136

ARIZONA DEPARTMENT OF CORRECTIONS

Continuous Progress Record - Mental Health

| DATE | TIME | S.O.A.P. | Note clinical course, complications, consultations, change in diagnosis, condition on discharge, instruction to patient. |
|------|------|----------|------|
| 11-23-11 | 1550 | | *People assessment* |
| | | S | Discussed D-pod situation, feeling "suffocated, isolated." Reported getting psychiatric reports back from her legal team. Discussed D-pod possibilities for a healthier environment. |
| | | O | anxious, teary, cooperative |
| | | A | deferred   DTO/DTS = Denied |
| | | P | cont. tha. schedule in 3 weeks |

M. Page, LAC
Psychology Associate II

| Inmate Name | ADC Number |
|-------------|------------|
| Andriano, Wendi | 191593 |
| DOB | Facility/Unit |
| 8-26-70 | PV-SMA |

000012221

2009

1103-40P
8/9/01

**CONTINUOUS PROGRESS RECORD - Mental Health**

P-App. 006537

ARIZONA DEPARTMENT OF CORRECTIONS

Continuous Progress Record - Mental Health

| DATE | TIME | S.O.A.P. | Note clinical course, complications, consultations, change in diagnosis, condition on discharge, instruction to patient. |
|------|------|----------|---------------------------------------------------------------------------------------------------------------------------|
| 12-12-11 | 14⁵⁵ | | psych assess'tt |
| | | S | Discussed psych evals that she got from her lawyer, reported "it's a lot to go through" and read'n JM reported some frustrations with D-pod, not feeling seen or heard. Discussed short-term goals around reading her psych eval reports. |
| | | O | depressed, distractable, logical |
| | | A | deferred - Denied DTO/DTS |
| | | P | set goal around reading and visits - schedule - consult w/ team for clinical direction |

M. Page, LAC
Psychology Associate II

| Inmate Name | ADC Number |
|-------------|------------|
| Andriano, Wendi | 191593 |
| DOB | Facility/Unit |
| | PU - Sawe 012219 |

CONTINUOUS PROGRESS RECORD - Mental Health

1103-40P

*Casa Grande Valley Counseling Service Inc.*
*Marriage, Family, Personal, Group*
835 E. Cottonwood Lane, Casa Grande, Arizona 85222, Ph: (520) 836-0440 Fax (520) 836 0924

FAX TRANSMISSION COVER SHEET          TIME: 6:15 p.m.

DATE: 3-6-96

TO: Ellen Pederson or any EAP counselor
@ NEAS

FAX#: (414) 798-3928

FROM: Beverly Nichols, M. Ed.
Casa Grande Counseling Svc.

FAX#: (520) 836-0924

NUMBER OF PAGES INCLUDING COVER SHEET: 1

The documents accompanying this telecopy transmission contain confidential information belonging to the sender which is legally privileged. The information is intended only for the use of the individual or entity named above. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or taking of any action in reliance on the contents of this telecopied information is strictly prohibited. If you have received this telecopy in error, please immediately notify us.

MESSAGE/INSTRUCTIONS: RE: client - Wendi Andriano
Wendi came in for her appt. today and has rescheduled for next Thurs @ 3 p.m. (March 14). She reports she signed a release form which was faxed to you, even though she was dismissed from her job on Monday, March 4th. She has started on some anti-depressants, but has had a bad reaction to them, so plans to re-contact her doctor. We worked a lot on improving her communication skills (esp. w/ her husband) at today's session.
Thanks -

BEVERLY A NICHOLS, M. Ed.
Certified Marriage & Family Therapist
Certified Professional Counselor

R. A. CORNELIUS, PH.D.
Certified Marriage & Family
Therapist

PHYLLIS E. WELLS, M.A.
Certified Marriage & Family

000004212

NOTIFICATION OF ASSESSMENT
## CASA GRANDE VALLEY COUNSELING SERVICE INC.
635 E. COTTONWOOD LANE   CASA GRANDE, ARIZONA 85222
PHONE (520) 836 0440   FAX (520) 836 0924

CONTACT PERSON: MARGE SUNDBLOM

RE: Wendi E. Adriano _____ S.S. ▓▓▓▓▓▓ DOB 8-26-'70
     (Client Name)

This individual is receiving behavioral health services. The client's authorized medications and laboratory services, if any, are identified on the attached Medication Plan. If additional information is required, please contact the aforementioned person.

DSM Provisional Diagnosis: Date 3/1/96

AXIS I   309.40   ; R/O Major depression     Psychiatric Evaluation: Y or (N)

AXIS II   N/A     Dr. _____

AXIS III   N/A     Outpatient Counseling: (Y) or N

AXIS IV   Occupational problems &     Therapist: Beverly A. Nichols, M.S.
Prblms w/ primary support group     Residential/Inpatient: Y or (N)

AXIS V   58          (Facility)

RECOMMENDATIONS: If Wendi continues to have crying spells and/or sleep difficulties, I would strongly recommend she be considered for anti-depressant medication to help stabilize her at school and work.

X   I CONSENT to the above named provider releasing this document on the date of consent to my Primary Care Physician

___   I DO NOT consent to the above named provider releasing this information to my Primary Care Physician.

Franklin Barné M.D. _____     426-1871
Primary Care Physician     (Telephone)

1820 E. Florence Blvd   CG   AZ 85222     426-9347
Physician's Location     (Fax)

_____Wendi Adriano_____     2-27-96
Client/Parent/Guardian Signature     Date

000004213

Sent 9/1/96
(p 230 p

*Casa Grande Valley Counseling Service Inc.*

*Marriage, Family, Personal, Group*

635 E. Cottonwood Lane, Casa Grande, Arizona 85222. Ph: (520) 836-0440 Fax (520) 836 0924

FAX TRANSMISSION COVER SHEET            TIME: 2:20 pm

DATE: 3/1/96

TO: Dr. Franklin Baroi

FAX#: (520) 426-9347

FROM: Beverly Nichols, M.Ed, CMFT, CPC

Casa Grande Counseling Service

FAX#: (520) 836-0924

NUMBER OF PAGES INCLUDING COVER SHEET: 2

The documents accompanying this telecopy transmission contain confidential information belonging to the sender which is legally privileged. The information is intended only for the use of the individual or entity named above. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or taking of any action in reliance on the contents of this telecopied information is strictly prohibited. If you have received this telecopy in error, please immediately notify us.

MESSAGE/INSTRUCTIONS: Dr. Baroi — I saw Wendi for the second time today and still feel she would be a good candidate for a mild anti-depressant to help her sleep better and cope with the stresses she is facing at work and at home. Please call me if I can provide you with any further information.

— Beverly Nichols, M.Ed

BEVERLY A. NICHOLS, M.Ed.
Certified Marriage & Family Therapist
Certified Professional Counselor

R. A. CORNELIUS, PH.D.
Certified Marriage & Family
Therapist

PHYLLIS E. WELLS, M.A.
Certified Marriage & Family
Therapist

000004214

8/29/04

Andrian's had 4 packages of candy in her legal papers and I removed it. She said it was court ordered and she doesn't understand why I pick on her. I told her that she's the only one who tries to sneak items out. (Last week it was a book) When she comes back, she'll have a court order from the judge allowing her (and not the other inmate) to bring food with her. Shannon #3768

000004216

H000000001

P-App. 006542

3- FF II 2-25-04

ised per
worker

Andriano's counsellor Kandy Rhode
not allowed in house. Can only
visit in Vis Room.

)(

ks. Couch

Shift I 2-26-04

0630  For the past 2 wks. we have tried to get Long Harris
to r/u to C-Pod. Today she told me that she
would rather give up patio + all the C-Pod perks
and put up with the bullying and dominance of
Mall and Jones/Debrah so as not to be housed
in the same pod as the "Control FREAK" Wendy.
Is Andriano really any good to this unit, and
are we doing the others a service by keeping
her here?

0800  ✱ I. S. Long has just agreed to try C-Pod but
has expressed that the move may be doomed
to failure.

000004217

H000000002

Shift II 2-25-04

Exhibit No.: 546

Case No.: CR2000-096032

For Identification: PLF

12/14/04

In Evidence:

Clerk of Superior Court

By: _____ M. LeSueur
                (Deputy Clerk)

Andriano's counsellor is
not allowed in house.
Visit in Vis Room...

)(

Shift I 2-26-04

0630 For the past 2 wks. we have tried to get Long Doris
to R/h. to C-Pod. Today she told me that she
would rather give up patio + all the C-Pod perks
and put up with the bullying and dominance of
Mall and Jones/Deborah so as not to be housed
in the same pod as the "Control Freak" Wendy.
Is Andriano really any good to this unit, and
are we doing the others a service by keeping
her here?

0800 ✱ P. S. Long has just agreed to try C-Pod but
has expressed that the move may be doomed
to failure.

000004218

H000000003

C/Do GONZALES & AORIANO NEED TO BE BUNKED
TOGETHER. — That was done @ 0630 this morn.

8/21

000004219

H000000004

Exhibit No.: 548

Case No.: CR2000-096032

For Identification: PLF

12/14/04

In Evidence: PLF

12/14/04

**Clerk of Superior Court**

CR-05-0005-AP

By: _____ M. LeSueur
(Deputy Clerk)

1000544275

000004392

MARICOPA COUNTY SHERIFF'S OFFICE — Joseph M. Arpaio, Sheriff

2 C41

Segregation Days:

**DISCIPLINARY ACTION REPORT**    DAR #: 18 146

ANDRIANO, WENDY A631830  AREA/D2/UNIT C41  12-3-3 / 1320

| Inmate Name | Booking # | Facility | Cell/Room | Date/Time |

Specific Offense(s): 105 POSS. OF UNAUTH. ITEMS   121 VIOLATION OF ANY RULES

Formal Statement of Charge(s). (Include who, what, when, where, how, and witnesses): ON 12-2-3 at approx. 1330, while conducting a "headcount" I briefly searched I/m Andriano's cell (C41) while she had a visit. I found under her mattress a compact & a glass mirror. This had to come into the jail from outside as glass cannot be purchased thru Commissary. Andriano has made a serious attempt @ suicide by cutting. Today @ approx. 1130 hrs while I was doing clothing exchange, C41 inmate was @ me in D-Pod while Off. Lose A1166 conducted cell search in C-Pod and found more contraband in Andriano's cell w/ her possession. The items include: 2 black pens, a new lipstick in a metal case, lip gloss, & eyeliner. None of which can be obtained thru jail commissary.

Officer's Action and Recommendation: These items can be very dangerous to her or any other psych inmate that could get ahold of them.

Written Warning    You are being issued a warning for the listed offense(s). An accumulation of minor offenses, for any infractions, can be used as documented evidence in future disciplinary action against you.

_____ Days Disciplinary Segregation    Harris A3245    12-3-3 / 1330

30 Days Full Restriction    Officer's Signature & A#    Date/Time

I have been informed of the offense(s) listed hereon. I acknowledge receipt of this report and plead:  guilty  X   not guilty

Inmate's Signature    12-3-03    Date/Time

Supervisor Review/Comments: 15 Days FR

Sgt R Martin A4118   12/8/03  0800
Supervisor's Signature & A#    Date/Time

Bureau Hearing Officer Action or Sanctions:

Findings: 105 - Guilty

THIRD OFFENSE    121 - REPETATIVE

0 Days Disciplinary Segregation    20 Days Full Restriction

To Commence 0001 _____ to End 2400 _____    To Commence 0001 12/6/03 to End 2400 12/25/03
         Time/Date          Time/Date         Time/Date         Time/Date

Hearing Officer: _____ A5500    Forward to Classification: _____

Reclassified: _____

I have been informed of the right to appeal this decision and know I must submit my appeal with my yellow copy attached within 24 hours of the below date/time.

GUILTY PLEA MAY APPEAL    12/5/03  0645
Inmate's Signature    Date/Time

5000-247  R 7/97    WHITE - Division File Copy    YELLOW - Inmate After Disposition    PINK - Inmate Copy

000004393

P-App. 006547

JUN-01-1999  10:48        DCS                           2098563939   P.02/05

# STATEMENT OF FINANCIAL STATUS

### [INFORMATION PROVIDED ON THIS FORM WILL BE HELD CONFIDENTIAL]

The information you provide in the following statement will be used to determine your ability to repay your defaulted loan. It is to your advantage to be as accurate and clear as possible, and explain any unusual expenses. You must enclose a copy of two recent pay stubs (leave and earnings statement) from you and your spouse, as well as, any other contributing member of your household.  You must provide documentation (copies of bills, receipts, etc.) of expenses you list.  You may attach additional pages if needed to document additional expenses or provide explanations.

Do not include monthly payments on credit cards.  If, for example, you are making payments on a department store card that you use to purchase clothing, list that payment under "clothing" expenses.  If you are paying some of your expenses quarterly or annually, such as automobile insurance or property taxes, calculate what the amount would be on a monthly basis and put that amount in the space provided.  Do not leave any item blank.  If the answer is zero, write zero.

Andriano, Wendi E.
**Your Name (Last, First, Middle, Previous)**        Date of Birth        Social Security Number

2060 N. Trekell        Casa Grande, AZ 85222   520 426-0403
**Current Residence Address**        City  State  Zip        Res. Telephone Number

Courtyard Apts.                                             6-98
**Your Present Employer(s)**                                Date Employed

2060 N. Trekell  CG AZ 85222   520 836-4012
**Employer(s)' Address(es)**        City  State  Zip        Employer(s)' Telephone Number

Community Director  Gross Income $ 2198.46 per mo.  Net Income $ 1921.30 per mo.
**Present Position**

Number of dependents including self (as defined by IRS) ___  (Married)  Single ___  Divorced ___  W 3 dependents

Andriano, Joe D.
**Spouse's Name (Last, First, Middle)**                     Social Security Number

Gross Income $ 0 per ___  Net Income $ 0 per ___

**Other Contributing Resident(s)**                          Social Security Number(s)

Gross Income $ 0 per ___  Net Income $ ___ per ___

**OTHER INCOME  (Child Support, Alimony, Interest, public assistance, etc.)  describe:**

0

_____

_____

### See Back Page For Privacy Act Notice

CREATED JUNE 98                    Page 1        G:\CORPADMIN\PRODUCTN\DEFAULT\4LWR\STMTFINSTAT.DOC & H1)-3

000004396

JUN-01-1999  10:49       DCS                        2096583939    P.03/05

## Monthly Expenses

**Please provide documentation for all bills pertaining to shelter, utilities, medical expenses, car payments, car insurance, child expenses and any other insurance you may have.**

**Shelter:** Rent/Mortgage (To Whom _Courtyard Apts_ ) $585.35
If Buying – Name & Address of Lender)

Second Home Mortgage (To Whom _N/A_ ) $ 0

Home Insurance $ 0

Property Taxes $ 0

Other ( Describe _____ ) $ 0

**Food:** $ 400.00

**Utilities:** Electric $ 80.—

Gas $ 0

Water Sewer $ 0

Garbage Pickup $ 0

Basic Telephone $ 30.—

Other (Describe _____ ) $

**Clothing:** $ 30.—

**Medical Expenses:** Medical Insurance Payments Not Deducted From Paycheck $

Medical Bill Payments Not Covered By Insurance _Mayo clinic_ $ See bill

Other (Describe _Therapy_ ) $ 240.00

**Transportation:** Car Payments (To Whom _____ ) $

Gas & Oil $ 100.00

Public Transportation $ 0

Car Insurance $ 0

Other (Describe _____ ) $

**Child Expenses** Child Care (Number of Children _2_ ) $ 700.00

Child Support (Number of Children _____ ) $ 0

Other (Describe_____ ) $ 0

Other Insurance (Describe_____ ) $ 0

CREATED JUNE 98                    Page 2          G:\CORPADMIN\PRODUGTN\DEFAULT\AWB\STMTFINSTAT.DOC & H13-3

000004397

P-App. 006549

JUN-01-1999  16:58        DCS                                    2098583939    P.04/05

## Assets

| | | |
|---|---|---|
| All Checking Account Balances | (Where Held  Norwest _____) | $ 200 +− |
| | (Where Held  N|A _____) | $ 0 |
| All Savings Account Balances | (Where Held  N|A _____) | $ 0 |
| | (Where Held  N|A _____) | $ 0 |

Home --Current Market Value:  $_____ , Balance of Note: $_____ , Equity:  $ 0

Other Property Owned:   Type _____   (If Real Estate, Location _____)   $ 0

    Current Market Value:  $_____ , Balance of Note $_____ , Equity:  $ 0

Auto #1--Current Market Value:  $_____ , Balance of Note $_____ , Equity:  $ 0
    Make _____   Year _____

Auto #1--Current Market Value:  $_____ , Balance of Note $_____ , Equity:  $ 0
    Make _____   Year _____

Stocks, Bonds and Certificates of Deposit—Current Value:   $ 0

Current Cash (Loan) Value of Life Insurance   $ 0

Other Accounts Receivable or Asset (Describe_____)   $ 0

**Please sign the declaration below:**

I cannot pay my debt in full at this time.   Please schedule monthly payments in the amount of $ 50⁰⁰ based on my financial statement above.

I declare under the penalties provided by Title 18, Sec. 1001 U.S. Code, that the answers and statements contained herein are the best of knowledge and belief true, correct and complete.

_Wendi Andriano_        6-11-99
Signature                     Date

_WARNING:_  Title 18, Sec. 1001 U.S. Code: "whoever . . .knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or devise a material fact, or makes any false, fictitious or fraudulent statements or representations., shall be fined not more that $10,000.00, or imprisoned not more than five years, or both".

CREATED JUNE 98           Page 3       G:\CORPADMIN\PRODUCTM\DEFAULT\AWG\STMTFINSTAT.DOC & H11-3

000004398



1        IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

2            IN AND FOR THE COUNTY OF MARICOPA

3

4    STATE OF ARIZONA,            )
                                  )
5            Plaintiff,           )
                                  )
6    .v.                          )      No. CR 05-0005 AP
                                  )      MARICOPA COUNTY
7    WENDI ELIZABETH ANDRIANO,    )      No. CR 2000-096032
                                  )
8            Defendant.           )
     _____)

9                                              PUBLIC DEFENDER

10                                             MAR 1 0 2005

11                                             APPEALS RECEIVED

12                         Mesa, Arizona
                           September 8, 2004
13

14

15

             BEFORE:  The Honorable BRIAN K. ISHIKAWA
16

17

18         REPORTER'S TRANSCRIPT OF PROCEEDINGS

19              TRIAL DAY 8 -- TESTIMONY

20

21

22

23

24    ORIGINAL Prepared for APPEAL by:
      TRACI L. WHEELER, CSR, RPR
25    Certified Court Reporter No. 50313
      Official Court Reporter


      TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

2

```
 1                  A P P E A R A N C E S

 2    FOR THE STATE:       JUAN M. MARTINEZ,
                           Deputy County Attorney
 3
      FOR THE DEFENDANT:   DANIEL B. PATTERSON,
 4                         Deputy Public Defender
                                   and
 5                         G. DAVID DELOZIER,
                           Attorney at Law
 6

 7         I N D E X   O F   E X A M I N A T I O N

 8    WITNESS                                        PAGE

 9    HASHISAKI, CHRIS, Called to testify by the State
              Direct Examination by Mr. Martinez
10            Voir Dire Examination by Mr. Patterson

11

12    E X H I B I T S   A D M I T T E D   I N   E V I D E N C E

13    NO.   DESCRIPTION                             PAGE

14    141   Photograph                              31
      142   Photograph                              31
15    143   Photograph                              31
      144   Photograph                              31
16    145   Photograph                              31
      146   Photograph                              31
17    147   Photograph                              31
      148   Photograph                              31
18    149   Photograph                              31
      150   Photograph                              31
19    151   Photograph                              31
      152   Photograph                              31
20    230   San Riva Documents                      73
      297   Large Diagram                           60
21    313   Photograph                              43

22

23

24

25
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

P-App. 006552

3

1           MESA, ARIZONA, WEDNESDAY, SEPTEMBER 8, 2004

2

3           THE COURT:  Please be seated.  This is cause number

4    CR 2000-096032, State of Arizona versus Wendi Elizabeth

5    Andriano.  The record will reflect the presence of the

6    defendant and counsel.  We're outside the presence of the

7    jury.

8                Yes?

9           MR. DELOZIER:  Yes, Your Honor.  I wanted to make a

10   motion for mistrial based on your making evidentiary rulings

11   during opening remarks.  We were attempting to make a good

12   faith attempt to what we believe would come in as evidence.

13   Of course, our position is later if it's determined not to be

14   admissible, all you would have to do is remind the jury that

15   the opening statements were not evidence and we believe the

16   rulings that were made during opening excluding things we

17   wanted to mention this morning would fit into that category.

18           THE COURT:  Mr. Martinez?

19           MR. MARTINEZ:  Every first year law student learns

20   you cannot unring a bell once it's been rung although we have

21   a lot of guarantees sometimes, trying to admonish the jury

22   they should not consider it is difficult to do.  Rather than

23   wade in troubled waters, the safer and more temperate course

24   was the one the Court took and specifically that is to make a

25   ruling not to allow that sort of evidence in.


         TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1               Additionally, it appears that the defendant is

2       asking for a mistrial based on the Court's conduct, however

3       he has not cited any legal basis other than that he doesn't

4       like the Court's ruling.

5               So for those reasons I don't think his request

6       is we will taken and his request should be denied.

7               MR. DELOZIER:  Well, Your Honor, we certainly could

8       brief it if you wish.

9          THE COURT:  Sorry?

10              MR. DELOZIER:  We could certainly brief it for you if

11      you wish, but making evidentiary rulings during opening

12      remarks we believe are improper.

13              THE COURT:  The Defendant's oral motion for mistrial

14      is denied.

15                  We ready for the jury?

16              MR. MARTINEZ:  Yes, sir.

17

18              (Whereupon, the jury enters the courtroom.)

19

20              MR. DELOZIER:  Your Honor, could we approach?

21

22              (The following proceedings were held at the

23      bench:)

24

25              MR. DELOZIER:  I don't want to be super sensitive,


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    but we've been criticized for Mr. Alejo Ochoa holding open

2    the door open for the jurors, and his staffing person sitting

3    with him is now sitting the door open for the jurors.  I

4    believe it could be appropriate for court staff to do that,

5    not one of the people from our staff and his staff.

6            THE COURT:  What are you saying?

7            MR. DELOZIER:  The gentleman sitting at his desk --

8            MR. PATTERSON:  Detective Olson.

9            MR. DELOZIER:  Detective Olson is opening the door

10    for the jurors.  He raised that as criticism at Alejo Ochoa

11    doing that very same thing earlier.

12            THE COURT:  When was he doing that?

13            MR. DELOZIER:  He's doing it right now.  He's done it

14    before.

15            THE COURT:  Oh, you mean the juror box?

16            MR. DELOZIER:  Yes.

17            THE COURT:  Instruct him to not do that.  That should

18    just be common sense.

19            MR. DELOZIER:  Thank you, Your Honor.

20

21            (The following proceedings were held in open

22    court:)

23

24            THE COURT:  Please be seated.  This is cause number

25    CR 2000-096032, State of Arizona versus Wendi Elizabeth


        TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1   Andriano.   The record will reflect the presence of the

2   Defendant, Counsel and the jury.   The State may call its

3   first witness.

4          MR. MARTINEZ:   State calls Chris Hashisaki.

5          THE COURT:   Please step forward right up here to be

6   sworn by the clerk.

7

8                     CHRIS HASHISAKI,

9          CALLED TO TESTIFY ON BEHALF OF THE STATE,

10      HAVING FIRST BEEN DULY SWORN, TESTIFIES AS FOLLOWS:

11

12         THE COURT:   Please have a seat on the witness stand.

13  Please make yourself comfortable there on the witness stand.

14  Please pull the microphone close to you.   Please remember to

15  speak loudly and clearly into the microphone so that everyone

16  can hear you.   Also please wait until the question is

17  completed before you answer the question, and please make

18  sure you give a verbal response.   A lot of times people shake

19  their head, say "uh-huh," "huh-uh."   You need to give a

20  verbal response.   Is that agreeable to you?

21         THE WITNESS:   Yes.

22         THE COURT:   Mr. Martinez, you may proceed.

23

24  DIRECT EXAMINATION BY MR. MARTINEZ:

25         Q.   May I have your name, please?


              TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1       A.      Chris Hashisaki.

2       Q.      And drawing your attention back to January of

3   the year 2000, where were you employed?

4       A.      San Riva Apartments.

5       Q.      And what were your duties with the San Riva

6   Apartments?

7       A.      I was the bookkeeper and activities director.

8       Q.      And as the bookkeeper, what is it that -- I

9   know what term "bookkeeper" means, but what were you required

10  to do there at San Riva?

11      A.      As a book keeper I was required to temporarily

12  lease apartments, show them to potential residents.  Also

13  bookkeeping functions were to enter data into the computer

14  system as far as new leases, move-outs, move-ins, move-outs.

15  I also completed reports that were transferred to the

16  corporate office on a weekly and monthly basis, and prepared

17  accounts payable for approval by the manager to send off to

18  the corporate office.

19      Q.      You also indicated that you were an activities

20  director?

21      A.      Correct.

22      Q.      What did that require you to do?

23      A.      We planned -- or I planned different functions

24  for the community, the apartment community, and residents.

25      Q.      And who was your boss?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1        A.    Wendi Andriano.

2        Q.    And is that individual in court today?

3        A.    Yes, she is.

4        Q.    Tell me where she is seated and what she's

5    wearing?

6        A.    The table over there, purple sweater.

7        MR. MARTINEZ:  Your Honor, may the record reflect the

8    identification of the defendant?

9        THE COURT:  The record may reflect the identification

10   of the defendant by the witness.

11   BY MR. MARTINEZ:

12       Q.    And did you interact with the defendant on a

13   day-to-day basis back then?

14       A.    Yes.

15       Q.    Would you say you were very good friends, just

16   friends?  Describe the relationship that you had, the two of

17   you had back then.

18       A.    We were friends.  We were all professional

19   working friends.

20       Q.    And as part of that relationship, did the group

21   of you also go out?

22       A.    Yes.

23       Q.    And how often, if you can remember?  Let's say

24   around August or July of 2000.  How often would you and she

25   go out?


                TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          A.     Over a period of time?

2          Q.     Or on a weekly basis.  Did you go out once a

3    week or twice a week?

4          A.     Once a week.

5          Q.     And when you and she went out, did the both of

6    you go alone or was it a situation where you went with others?

7          A.     We went with others.

8          Q.     And normally where was it that you would go?

9          A.     Tijuana Country Club or Rockin' Rodeo.

10         Q.     When you went to these places, were you able to

11   see the defendant's actions while she was out there that

12   June -- sorry, that July or August of the year 2000 when she

13   was out there interacting on that social basis?

14         A.     Yes.

15         Q.     And how was she with the other men that were

16   there?

17         A.     Flirtatious.

18         Q.     Would she ever have any physical contact with

19   them, for example kissing them?

20         A.     Yes, she would.

21         Q.     Would she have other physical contact, for

22   example touching them, that sort of thing?

23         A.     Yes.

24         Q.     Would they touch her back?

25         A.     Yes.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          Q.      And during this time that you were working with

2     her, you indicated that not only were you professionals but

3     you also socialized on an ongoing basis.   Did you have

4     occasion to talk to her about, you know, almost anything that

5     came up?

6          A.      Yes.

7          Q.      And during that time that you would talk to

8     her, did there ever come a time where she would complain

9     bitterly about her husband and/or may have made comments like

10    that and that you ever advised her that she should just go

11    ahead and leave him?

12         A.      She complained about it being too much, about

13    things getting to be too much.

14         Q.      But did she ever -- did you then say to her,

15    "Well, then leave him."  Did you ever counsel her that that

16    was the appropriate course?

17         A.      A few of us told her to move him out or get a

18    divorce.

19         Q.      Now, with regard to October 8th of the year

20    2000, in the morning, sometime around 2:30 in the morning,

21    did you receive a telephone call?

22         A.      Yes, I did.

23         Q.      And did you receive a telephone call from the

24    defendant?

25         A.      Yes, I did.


                TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1      Q.    And as a result of that telephone call, did you

2    then go over to the defendant's apartment?

3      A.    Yes.

4      Q.    And when you arrived there, what is it that you

5    saw?

6      A.    When I arrived, Wendi was outside of the

7    apartment building on the sidewalk.

8      Q.    And were you able to see what she was wearing?

9      A.    Yes.

10     Q.    And what was she wearing?

11     A.    White t-shirt and dark shorts.

12     Q.    And did -- did they have any stains, whether

13   it's red, brown any other color, did that shirt have any

14   stains on it?

15     A.    No.

16     Q.    It appeared -- did it appear to be clean?

17     A.    Yes.

18     Q.    When you walked up to her was she crying?

19     A.    No.

20     Q.    Was she despondent or hysterical in any way?

21     A.    Not hysterical, no.

22     Q.    How would you describe her demeanor?

23     A.    Confused.

24     Q.    And did she have a telephone in her hand?

25     A.    She did.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1      Q.    And did you and she have a conversation?

2      A.    Yes.

3      Q.    What was that conversation?

4      A.    I walked up to her and I said, "How are you

5   doing," and she said, "I have a problem.  Don't ask any

6   questions.  My husband's in on the floor dying and I haven't

7   called 911 yet."

8      Q.    And did she indicate whether or not he knew if

9   she had called 911?

10      A.    Yes.  As we walked inside, she indicated that.

11      Q.    That -- that he knew that she hadn't called 911

12   or that she hadn't told him that -- that she had told him

13   that she called 911 but hadn't done that?

14      A.    She told me Joe did not know she hadn't called.

15      Q.    Was it your indication she had already told him

16   she called 911 but she hadn't done it?

17      A.    She told me she had not called and she told me

18   that she thought she had but she had not.

19      Q.    In other words, she told you, "He thinks I've

20   called 911, but I haven't done it"?

21      A.    Correct.

22      Q.    And he's in there dying, correct?

23      A.    Correct.

24      Q.    Did she tell you why he was dying or anything?

25      A.    No.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1      Q.    Did she say, "It's the cancer" or anything like
2    that?
3      A.    No.
4      Q.    Did you then advise her, admonish her to do
5    anything with to the 911 call?
6      A.    I said she needed to call 911.
7      Q.    And did there come a point when the two of you
8    then began to walk towards her apartment?
9      A.    Yes.  She couldn't get reception outside. She
10   said she couldn't get reception outside, so we -- I told her,
11   "Let's go inside.  You need to call."
12     Q.    And then what happened?
13     A.    We walked in toward the apartment and she
14   attempted to dial and could not get reception there either,
15   so she --
16     Q.    When she attempted to dial, was that in the
17   breezeway leading up to the apartment or inside the
18   apartment?
19     A.    In the breezeway in the corridor at the first
20   apartment.
21     Q.    And when you and she were standing out there,
22   were you able to see whether or not her hair was wet?
23     A.    No, her hair was not wet.
24     Q.    In other words, did it look like she'd just
25   been in a tub or anything like that?  In other words, wet of

1    any -- any fashion to you?

2            A.    No.

3            Q.    So you're now walking down the breezeway and

4    towards her apartment.  What number is it, do you remember?

5            A.    132.

6            Q.    And as you get there, what happened?

7            A.    The doorway was open and she walked back to the

8    back bedroom to utilize the telephone and call.  And I walked

9    over to Joe on the floor.

10           Q.    Well, when you walked in, where was Joe?

11           A.    He was lying on the living room floor.

12           Q.    And describe his position for me.

13           A.    He was lying on his left side in a fetal

14   position by the couch.

15           Q.    Was he facing the front door or facing away

16   from the front door?

17           A.    Facing the front door.

18           Q.    When you saw him, what did you do?

19           A.    I walked over to him and knelt down beside him.

20           Q.    Did you say anything?

21           A.    I asked him if he recognized me and he said

22   "Yes."  And I said "Do you recognize me with my glasses on?"

23   And he said "Yes."

24           Q.    Did he appear to be angry in any way at that

25   point?


                TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

```
 1          A.    No.

 2          Q.    What was his demeanor like when he was down

 3    like that?

 4          A.    It was weak, worn out and he vomited on the

 5    floor.

 6          Q.    Then what happened?  Did you and he continue

 7    speaking?

 8          A.    Yes.  I asked him how he was doing and he said

 9    "I need help."  And I said "I know.  She's on the phone right

10    now. " And I said that "They're on their way."  And I said --

11    he said "I've needed help for a long time."

12          Q.    At any time while he was telling you he needs

13    help, did he indicate to you "Don't call the ambulance, don't

14    do anything, go away"?  Did he ever --

15          MR. PATTERSON:  Your Honor, form of the question

16    suggests the answer to the question.

17          THE COURT:  Sustained.  Restate the question.

18    BY MR. MARTINEZ:

19          Q.    At any time point did he indicate to you

20    whether or not he wanted people to leave him alone?

21          A.    No.  He wondered where they were at and why it

22    was taking 45 f-ing minutes.

23          Q.    45 what minutes?

24          A.    45 fucking minutes.

25          Q.    So he was upset and it appears -- and if I'm,
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    incorrect tell me -- it appears he was upset because it had

2    been a while?

3         MR. PATTERSON:   Objection.  Leading question

4    suggesting the question (sic).

5         THE COURT:   Sustained.   Restate the question.

6    BY MR. MARTINEZ:

7         Q.    He appeared to be upset is what you told us,

8    right?

9         A.    He was wondering, yes, and he stated why it was

10   taking them so long to get there.

11        Q.    And who is "them" we're talking about?

12        A.    The paramedics.

13        Q.    So the term about 45 minutes was suggested or

14   indicated, correct?

15        A.    Correct.

16        Q.    Where was the defendant while you're having

17   this conversation with Mr. Andriano?

18        A.    Back in the master bedroom on the phone.

19        Q.    While you're sitting there talking to him, was

20   he able to sit up?  Did he get up and sit up or did he do

21   anything like that?

22        A.    No.

23        Q.    Did he just remain laying there?

24        A.    He -- he remained on the floor.

25        Q.    Do you remember what he was wearing?


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          A.     Pair of dark shorts, no shirt.

2          Q.     And did you get a chance to take a look at, for

3     example, his face up close?

4          A.     Yes.

5          Q.     Did you see any bruising?  For example, like

6     right here in the mouth or the nose or the eye, anything?

7          A.     No.

8          Q.     How about any bruising in the back of the head?

9          A.     No.

10         Q.     Blood anywhere?

11         A.     No.

12         Q.     But I think you did tell us that you did see

13    vomit, correct?

14         A.     There was a cloth, like a dishcloth in the --

15    sort of where he was laying, and he had thrown up and it was

16    covering that, yes.

17         Q.     And how far away was his mouth from the vomit?

18    In other words, place the vomit in the location to his body.

19         A.     I would say chest and stomach area in front of

20    him, lying down.

21         Q.     And that would have been closer to the door

22    than he was, right?

23         A.     Correct.

24         Q.     And, again, you indicated he was in a fetal

25    position, but if you could describe it a little bit more,

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    what do you mean that he was in a fetal position?

2         A.    He was lying on his left side with his knees

3    bent.

4         Q.    Okay.  So now you've had this conversation.

5    And how long are you talking to him before anything else

6    happens?

7         A.    Maybe three minutes.

8         Q.    And then what happens?

9         A.    I told him I was going to go back and check on

10   Wendi and ask him if he would be okay.

11        Q.    What did he say?

12        A.    He said "Yeah."

13        Q.    And then?

14        A.    Went back to the back bedroom and found Wendi

15   on the phone.

16        Q.    And at any time after she was on the phone did

17   the two of you then walk back out?

18        A.    Yes.  She -- she was apparently asked what his

19   condition was and --

20        Q.    Well, don't tell us what she was asked.  What

21   did she tell you while you were back there?

22        A.    Nothing.  She was on the phone.

23        Q.    So she -- right.  And then you came out?

24        A.    Then we came out to the living room, she knelt

25   down beside him while she was still on the phone.


              TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

```
1          Q.    While she knelt down beside him, where did she
2    kneel?  Next to him?
3          A.    In front of him.
4          Q.    So in other words she would be closer to the
5    door then?
6          A.    Correct.
7          Q.    Where were you when she was kneeling close to
8    him?
9          A.    Right next to her.
10         Q.    And were you behind her or to her left or
11   right?
12         A.    I was to her left.
13         Q.    And at this point was the defendant crying at
14   all?
15         A.    No.
16         Q.    Was she hysterical, screaming, upset, that kind
17   of thing?
18         A.    No.
19         Q.    How would you describe her demeanor?
20         A.    Calm as she was talking to 911.
21         Q.    And what did you hear her say?
22         A.    She -- while we were in the back bedroom, she
23   was explaining his condition.
24         Q.    But --
25         A.    And that's --
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1       Q.      -- when --

2       A.      -- when we walked to the front.  She had asked

3    what his color was like and --

4       Q.      She asked you that?

5       A.      Yes.

6       Q.      And what did you say?

7       A.      I said "His color is fine.  He's having trouble

8    breathing.  They need to get here."

9       Q.      Then was there, at any point, any suggestion or

10   any talk about the color of his lips?

11      A.      Yes.

12      Q.      When was that?

13      A.      At the same time.

14      Q.      And --

15      A.      "What's his color like?  Are his lips blue?"

16      Q.      And when she asked you this, about the lips

17   being blue, what did you say?

18      A.      I said "No, his lips are not blue.  He's having

19   trouble breathing.  They need to get here."

20      Q.      When you say he had trouble breathing, how was

21   it you learned or found out that he had trouble breathing?

22      A.      It was visible to me he was having trouble

23   intaking air.

24      Q.      So was there sort of -- sort of a shortness of

25   breath, that kind of thing?


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1        A.      Heavy breathing, yes.

2        Q.      And -- but at this point you haven't seen him

3    vomit.  You had seen vomit in front, correct?

4        A.      That's correct.

5        Q.      Where we left off I think she was kneeling in

6    front of him and you were kneeling on her left.  Then what

7    happened?

8        A.      She hung up the phone and she went around

9    behind him and said she needed to get him in the car.

10       Q.      When you say she went behind him, would that be

11   towards his head or would that be toward the bedroom area

12   or --

13       A.      Towards his head, shoulders.

14       Q.      And when she said something about needing to

15   get him to the car, what was her demeanor like then?  Was it

16   still -- how was it?

17       A.      She was anxious.  She needed to get him to the

18   car.

19       Q.      Then what happened?

20       A.      She said she needed to get him to the car

21   because they were on another call and it would be faster to

22   get him to the hospital, and he said, "I can't get up.  I

23   can't make it to the car."  And she attempted to -- she said,

24   "I'm going to help you up," and attempted to help him up.

25       Q.      How did she attempt to help him up?


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          A.     She reached underneath his arms, was attempting

2     to help him up.

3          Q.     Was he able to get up with her help?

4          A.     No.   He said "I can't make it to the car. I

5     can't get up."

6          Q.     What was your impression about his strength at

7     that point?  Was it somebody really strong, was he faking,

8     was -- what was your impression about the strength?

9          A.     No.   He was weak.   He couldn't make it to the

10    car.

11         Q.     And could he even get up?

12         A.     No.

13         Q.     Could he even sit up?

14         A.     He was having a lot of trouble sitting up or

15    getting up, yes.

16         Q.     So then you indicated that she went behind him

17    and tried to lift him up or something.   Then what happened?

18         A.     Then she got irritated.   She said, "Get your

19    ass up," and he said, "I can't make it to the car."

20         Q.     When she said "Get your ass up," did she use

21    any expletive or is that the whole statement?

22         A.     After he said that she said, "Get your fucking

23    ass up."

24         Q.     At first she said "Get your ass up"?

25         A.     Uh-huh.


                TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          THE COURT:  Is that a "yes?" You need to give a
2     verbal response.
3          THE WITNESS:  Yes.
4     BY MR. MARTINEZ:
5          Q.    When she said "Get your ass up," was she trying
6     to lift him at that point?
7          A.    Yes, she was.
8          Q.    Was she able to lift him when she said "Get
9     your ass up"?
10         A.    No.
11         Q.    Was it -- he was still on the ground then?
12         A.    Correct.
13         Q.    And then she made another statement, correct,
14    that you just told us about?
15         A.    Right.
16         Q.    What was his position when she made that second
17    statement, which I believe was what?  What was that second
18    statement?
19         A.    "Get your fucking ass up."
20         Q.    Was she still with her hands behind him trying
21    to get him up?
22         A.    Trying to lift him, yes.
23         Q.    Was he able to get up?
24         A.    No.
25         Q.    Was it said -- when she made that statement,

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

```
 1    was it said in a caring sort of jovial sort of kidding sort
 2    of way?
 3              A.    No.
 4              Q.    Was it in anger?
 5              A.    Anxious anger, yes.  She was wanting him in the
 6    car.
 7              Q.    And what was his reaction to that?
 8              A.    He couldn't get up.  He said, "I can't make it
 9    to the car."
10              Q.    Then what happened?
11              A.    Then I told her to wait a minute.  I said, "Get
12    back on the phone and see where they're at."
13              Q.    Okay.
14              A.    So she came back around to the front of him and
15    called again.
16              Q.    And after she called, what did she tell you?
17              A.    She said they were about a mile away or so, and
18    I said, "That's three minutes.  We're waiting."
19              Q.    Then what happened?
20              A.    Then -- decided to wait and I heard the fire
21    truck or ambulance or whatnot outside, and I said "I'm going
22    to go flag down the fire department" because in an apartment
23    community they have trouble finding apartments, so I'm going
24    out to flag them down, "Would that be okay," and she said
25    "Yeah."
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1        Q.     Were you going out to just sit around and smoke
2    a cigarette out there?
3        A.     No.
4        Q.     But you are a smoker?
5        A.     I am a smoker and I did begin to leave the
6    apartment and turned around and I said, "I'm going to grab a
7    cigarette, go flag them down."
8        Q.     Was your main purpose for leaving to grab a
9    cigarette and smoke it or was it to go flag them down?
10       A.     It was to flag down the fire department.
11       Q.     So did you grab that cigarette?
12       A.     Yes, I did.
13       Q.     And then what happened?
14       A.     I walked out to the front of the building and
15   out onto the street and waited for the fire department.
16       Q.     Did you notice anything unusual about the door
17   after you walked out?  In other words, while you were -- let
18   me back you up.
19              As you begin to walk out, did you ever look
20   back to see whether or not Mr. Andriano had gotten up?
21       A.     As I was walking up the first time, I turned
22   around to get my cigarette and he had begun to vomit again.
23       Q.     And he was still in that same fetal position?
24       A.     Correct.  He had propped himself up on his
25   elbow somewhat and began to vomit.


                TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

```
 1          Q.    Where was she -- and by "she" I mean the
 2    defendant -- when he was vomiting?
 3          A.    Dining room area between the kitchen and the
 4    hallway.
 5          Q.    And at this point you're leaving.  Are there
 6    any bruises, is there -- are there any cuts, are there any
 7    bloods -- any blood on Mr. Andriano?
 8          A.    No.
 9          Q.    So you walk out, correct, with a cigarette?
10          A.    Correct.
11          Q.    And you're going to show these people --
12          A.    Uh-huh.
13          Q.    -- in?
14                Is that a "yes?"
15    THE COURT:  "Yes?"
16    THE WITNESS:  Yes.
17    THE COURT:  Make sure you give a verbal response.  A
18    lot of times people say "uh-huh," "huh-uh."  You need to make
19    sure you give a verbal response.
20          THE WITNESS:  Sorry.
21    BY MR. MARTINEZ:
22          Q.    As you were walking out, do you know whether
23    she left the door open behind you?
24          A.    The door was --
25          Q.    Initially.
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

```
1        A.    The door was propped open the entire time, yes.

2        Q.    Then you left, right?

3        A.    Then I left.

4        Q.    So where did you go?

5        A.    I walked up to the front of the building,

6   waited for the fire department to come, and as they came

7   around the corner, Wendi screamed from the hallway.

8        Q.    What did she say?

9        A.    She screamed, "Go away, go away.  Chris, tell

10  them to go away."

11       Q.    Did you hear whether or not Joseph Andriano

12  said anything or did you hear him scream or anything?

13       A.    No.

14       Q.    So the only person that you heard, so we're

15  clear, was the defendant?

16       A.    Correct.

17       Q.    Did the door stay open or anything or what?

18       A.    No.  At that time I said "Wendi, they're here.

19  They're coming in."  I said "My purse is inside.  We're

20  coming in."  And at that time my purse flew out the door and

21  the door slammed.

22       Q.    Do you know whether or not the door was locked?

23       A.    I do not know that.

24       Q.    But the door did slam?

25       A.    Correct.
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1      Q.   Were you already with the paramedics at that

2  time or were you on your way to speak with the paramedics?

3      A.   They had just parked and were getting out of

4  the vehicle.

5      Q.   So you were walking towards them?

6      A.   Correct.

7      Q.   You then took your purse with you, correct?

8      A.   No.  I hadn't gone back to get my purse yet.

9      Q.   Okay.  So she screamed after you and then the

10  purse came flying out?

11      A.   Correct.

12      Q.   Then what happened?

13      A.   The fire department got out of their vehicle

14  and started walking towards me, and I said, "I'm not too sure

15  what's going on here," I said, "But this is -- she called me

16  over to watch the kid, you know.  Her husband's got cancer.

17  He's in there dying on the floor, and she just slammed the

18  door and threw my purse outside, told us to go away, told me

19  to tell you to leave."

20      Q.   At any time while you're having this

21  conversation -- previously when you had a conversation with

22  her, did she ever tell you anything about any poison or

23  anything like that?

24      A.   No.

25      Q.   What happened after that?  You've now talked to

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    the paramedics, and what happened?

2         A.    They said, "We cannot administer treatment if

3    they're refusing it, but we will go knock on the door."

4         Q.    Okay.  And then what happened?

5         A.    We walked up to the apartment door and I

6    knocked and knocked and there was no answer.  And the fireman

7    knocked and knocked and there was no answer.  And one of the

8    firemen called back to dispatch to have someone call.

9         Q.    Let me ask you this.  This knocking and no

10   answer, how long were you and the fire department personnel

11   standing there, you know, knocking?

12        A.    5, 10 minutes.

13        Q.    And at any time did you hear any noises from

14   inside the apartment?

15        A.    No.

16        Q.    Did you ever hear Joseph Andriano's voice from

17   inside?

18        A.    No.

19        Q.    Did you ever hear Wendi Andriano's voice --

20        A.    No.

21        Q.    -- from -- from inside?

22        A.    No.

23        Q.    Any crying from the kids or anything like that?

24        A.    No.

25        Q.    So you guys are standing out there and

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    knocking, and finally about 5 or 10 minutes later, what

2    happens?

3           A.    He got a call back from dispatch and she said

4    that she was coming out.

5           Q.    Were you guys standing by the front door?

6           A.    Standing right by the front door.

7           Q.    That would be of apartment 132?

8           A.    That's correct.

9           Q.    Did the front door open?

10          A.    No, sir.  She came around through the corridor

11   of the front of the building.

12          Q.    Would that be the north or south side?

13          A.    That would be the north side.

14          Q.    I'm going to show you some photographs and I

15   want you to take a look at them.  I want you to see if this

16   is representative of the way the San Riva Apartment complex

17   was and Building Number 5 which houses Apartment 132 and how

18   it looked from the front and the back.  Go ahead and take a

19   look at it.  These are Exhibits 141 to 152.

20               (Pause in proceedings.)

21   BY MR. MARTINEZ:

22          Q.    Are those true and accurate depictions of

23   Building Number 5 as it existed back when you went there on

24   October 8, 2000?  Is that what it looked like?

25          A.    Yes.


                 TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

31

1          MR. MARTINEZ:  Move for the admission of Exhibits 141
2     to 151 -- sorry, 152.
3                    (Pause in proceedings.)
4          MR. PATTERSON:  No objection.
5          THE COURT:  Exhibit Numbers 141 through 152 for
6     identification are admitted into evidence.
7          MR. MARTINEZ:  Judge, while she's marking them, I
8     would make the request to be allowed to use the easel now to
9     publish them to the jury and also ask this witness questions.
10         MR. PATTERSON:  No objection.
11         THE COURT:  You may proceed.
12                   (Pause in proceedings.)
13    BY MR. MARTINEZ:
14         Q.    Let's take a look, first of all, at Exhibit
15    141.  Do you recognize what's depicted there?  Can you see it
16    from where you are?
17         A.    Yes.  That's going towards Building 5.
18         Q.    And if we take a look at it -- I'm going to
19    point something out here -- this is at the very corner here.
20    What number of building is that?  This one at the very back
21    here (indicating).
22         A.    I believe that's 5.
23         Q.    Right here?
24         A.    (No audible answer.)
25         Q.    And where did you live back then?  Did you live

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

```
 1    in this area here or did you live somewhere else?

 2         A.    I lived at the front of the community.

 3         Q.    How long would it take you to get to Building 5

 4    from your apartment?

 5         A.    3, 4 minutes.

 6         Q.    And would this be the back of the community

 7    (indicating)?

 8         A.    Yes.

 9         Q.    Exhibit 142, what does that show us?

10         A.    The front of Building 5.

11         Q.    Is this the breezeway we've been talking about

12    (indicating)?

13         A.    Yes.

14         Q.    Is this north or south?

15         A.    It's looking south.  It's the north entrance.

16         Q.    North entrance.  And this breezeway we're

17    talking about, is it a through and through kind of thing that

18    allows you to go from north to south?

19         A.    Correct.

20         Q.    If you wanted to come from the south for

21    whatever reason, there was a way to get in then?

22         A.    Yes.

23         Q.    What does 143 show?

24         A.    Corner view of the building.

25         Q.    And, again, you indicated previously that this
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    was the north entrance.  Are we now moving in a sort of

2    eastern way?

3         A.    Yes.

4         Q.    And if we take a look at 144, what does that

5    show?

6         A.    The back of the building.

7         Q.    And are we facing west now?

8         A.    Yes.

9         Q.    And the north entrance would be right about

10   here then (indicating), right?

11        A.    Correct.

12        Q.    145, what does that show?

13        A.    I can't see.

14   THE COURT:  You can step down.

15   MR. MARTINEZ:  Why don't you step down as it appears

16   to us and stand to the left of it.

17   THE COURT:  When you're away from the microphone,

18   just remember to speak up so everyone can hear you.

19             (Pause in proceedings.)

20   THE WITNESS:  Back of the building.

21   BY MR. MARTINEZ:

22        Q.    I think you indicated that's the back of the

23   building, correct?

24        A.    Yes.

25        Q.    And 146, what is that?


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1      A.     It's going around -- it's the side of the
2   building going around to the back.
3      Q.     This right here (indicating) would be the east
4   then?
5      A.     That's correct.
6      Q.     And down here would be to the south?
7      A.     Yes.
8      Q.     147, what does that show us?
9      A.     It's the back of the building patios.
10      Q.     This patio, do you know which apartment that
11   belongs to?
12      A.     That would be Wendi's apartment.
13      Q.     That would be Apartment 132?
14      A.     Yes.
15      Q.     So when you indicated to us previously that she
16   came in through the north side.  And you're familiar with
17   these apartments; is there any other way out of this
18   apartment other than through this back area here
19   (indicating)?  In other words, is there another door other
20   than the front and this one (indicating)?
21      A.     No.  There's a door off onto the patio, but
22   you'd have to climb over the patio.
23      Q.     So in other words there's only two doors, one
24   in the front and this one back here, correct?
25      A.     Correct.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1      Q.    And you indicated that she came from the north
2  side, correct?
3      A.    Yes.
4      Q.    So that would mean that she climbed over this
5  patio, walked all the way around, and then came down?
6          MR. PATTERSON:  Your Honor, objection.  Calls for
7  speculation unless she observed this.
8          THE COURT:  Sustained.
9              Rephrase the question.
10 BY MR. MARTINEZ:
11     Q.    Is there any other way she could have got to
12 that position on the north side other than going out that
13 back door?
14     A.    No, sir.
15     Q.    Okay.  Let's take a look now at Exhibit 148.
16 What is that?
17     A.    The back patio.
18     Q.    And this is the back patio to 132, right?
19     A.    Yes.
20     Q.    149, what does that show?
21     A.    That would be the south entrance to the
22 breezeway.
23     Q.    And what apartment would this be right here?
24     A.    132.
25     Q.    And this is the area that we've been talking

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    about, correct?

2            A.    Yes.

3            Q.    Patio?

4                  It appears that there are, like, rocks down

5    here.  Is that what that is down there?

6            A.    Yes, landscaping rocks.

7            Q.    So as we look at Exhibit 150, that also appears

8    to be rocks, right?

9            A.    Uh-huh.

10           MR. MARTINEZ:  Is that "yes?"

11           THE COURT:  "Yes?"

12           THE WITNESS:  Yes.

13   BY MR. MARTINEZ:

14           Q.    So that would tell us that we're looking in

15   what direction?

16           A.    You're looking north.

17           Q.    Is this the area that she came through where

18   there are rocks or was it the other direction?

19           A.    No.  It was the other direction.

20           Q.    And if we look at 152, that's a look at the

21   breezeway from the other direction down the other way,

22   correct?

23           A.    That's correct.

24           Q.    Why don't you go ahead and resume the stand.

25                 So she came through -- you saw her come in


              TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1   through the north down to where the group of you were

2   standing, correct?

3       A.    Yes.

4       Q.    When she came towards you, did you notice

5   whether or not she was wearing the same clothing as she had

6   been wearing previously when you were inside?

7       A.    She had changed clothing.

8       Q.    What was she wearing now?

9       A.    Dark shorts and a striped t-shirt.

10      Q.    And before she had been wearing what?

11      A.    Dark shorts and a white t-shirt.

12      Q.    And was there anything different about her hair

13  that you noticed?

14      A.    It was wet.

15      Q.    And then what happened?

16      A.    She walked past the fire department and myself

17  and stood by the front door and explained that she did not

18  want any service, that her husband was dying and this was not

19  the way that he wanted to go, and that she would like us to

20  leave.

21      Q.    And what did the fire department people do?

22      A.    The fire department said that if you're

23  refusing treatment that was something they understood.  They

24  asked her if he had a "DNR."  She asked them what a "DNR" was

25  and they said "DNR" was a "do not resuscitate."

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          Q.    And then?

2          A.    She said yes, she had one with Joe's doctor and

3    that she would let the doctor take care of that.  She had

4    called her father and he was on his way and she wanted us to

5    leave.

6          Q.    So she indicated that she already called her

7    father, right?

8          A.    Correct.

9          Q.    When you first went to speak with her and met

10   her out there and she had the telephone, did she tell you at

11   that point she had already called her father or is this the

12   first mention of her father?

13         A.    That's the first time she mentioned she had

14   done that.

15         Q.    Did she tell you or indicate where her father

16   was?

17         A.    No, she didn't tell me.  I knew where her

18   father was.

19         Q.    And --

20         A.    Her father lived in Casa Grande.

21         Q.    Okay.  And then what happened?

22         A.    At that particular point the firemen picked up

23   their things and began to walk away.

24         Q.    And what did the defendant do?

25         A.    I asked her what was going on, if she was going

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    to be okay.  She said, "Yeah, we'll be fine.  Just go home

2    I'll call you tomorrow."

3         Q.    What was her demeanor like when she was talking

4    to the fire department?  Was she crying?

5         A.    No.

6         Q.    So what was her demeanor?

7         A.    She was just calm and very certain that she

8    wanted -- didn't want any help, wanted them to go home.

9         Q.    Did the fire department at any time or did the

10   paramedics at any time speak with Joseph Andriano that you

11   saw?

12        A.    No.

13        Q.    Then what happened?  Did you leave or did you

14   stay?

15        A.    No.  We walked up to the front of the building

16   and the fire department loaded up and I asked her again if

17   she wanted me to sit with her and stay with her until her dad

18   got there, and she said, "No, just go home.  I'll call you

19   tomorrow."

20        Q.    And, again, was she crying when she said that?

21        A.    No.

22        Q.    Now, you knew that the defendant's birthday was

23   in August, did you not?

24        A.    Yes.

25        Q.    And that August of 2000, did a group of you go

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    out?

2         A.    Yes.

3         Q.    And describe a little bit for me what the group

4    you went out in?

5         A.    For Wendi's birthday, she had arranged a

6    limousine and also arranged with one of the apartment

7    locaters some champagne and whatnot for eight of us to go out

8    on her birthday.

9         Q.    Do you know whether or not her husband, Joseph,

10   even knew that's what was happening?

11        A.    He did not know.

12        MR. PATTERSON:   Objection.   Basis of knowledge?

13        THE COURT:   I'll sustain the objection.   That last

14   answer is stricken.

15   BY MR. MARTINEZ:

16        Q.    With regard to whether or not he knew, did you

17   and Wendi speak about whether or not her husband knew?

18        A.    He didn't know she got the limo.

19        Q.    And -- but what I'm asking is this.   Did you

20   and Wendi talk about it?   Is that how you gained your

21   knowledge?

22        A.    Yes.

23        Q.    When did you and Wendi talk about whether or

24   not Joe knew that or did not know that she was going to go

25   out for her birthday?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

P-App. 006590

1      A.    During the planning of her birthday.  It was

2    days before that.

3      Q.    And this conversation that you had with the

4    defendant, what did she say specifically about Joe's

5    knowledge about whether or not he knew?

6      A.    She said that he was unaware of her having the

7    limo and going out with the girls.

8      Q.    I'm going to show you Exhibit 313.  Please take

9    a look at it.  Do you recognize what's in that photograph?

10     A.    Yes.

11     Q.    What is it?

12     A.    All of the girls getting ready to go out in the

13   limo.

14     Q.    And this was in August of 2000?

15     A.    Yes.

16     Q.    At any time when you had the conversation and

17   the preparation with her about this going out thing, did she

18   ever indicate, well, you know, Joe doesn't take me out and

19   that's why I'm doing this, or was it just he doesn't even

20   know.

21          MR. PATTERSON:  Objection.  Leading.  Suggests the

22   answer in the form of the question.

23          THE COURT:  Overruled.  Go ahead and answer the

24   question if you can.

25          THE WITNESS:  I'm sorry.  Can you repeat it?


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

```
 1    BY MR. MARTINEZ:
 2         Q.    Sure.  With regard to when she was planning
 3    this, did she ever say to you, "Well, he won't take me out,
 4    that's why I'm doing this"?
 5         A.    No.
 6         Q.    But she did tell you -- I think that you told
 7    us previously that he did not know?
 8         A.    He didn't know.
 9         MR. MARTINEZ:  I move for the admission of Exhibit
10    313.
11              (Pause in proceedings.)
12         MR. PATTERSON:  Your Honor, is there another current
13    exhibit list than the one you --
14         THE COURT:  I'm sorry?
15         MR. PATTERSON:  May I --
16         THE COURT:  Step up.
17         MR. PATTERSON:  I have an exhibit list that doesn't
18    have 313 on it.
19         THE CLERK:  He just gave it to me.
20         MR. PATTERSON:  Just got it today?
21              Okay, Judge.  Thank you.
22              May I have a moment, Judge?
23         THE COURT:  Yes.
24              (Pause in proceedings.)
25         MR. PATTERSON:  No objection, Judge.
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          THE COURT:   Exhibit Number 313 for identification is

2     admitted into evidence.

3     BY MR. MARTINEZ:

4          Q.     Let's go ahead and take a look at Exhibit 313.

5     Who is this individual here, right here?

6          A.     That would be Wendi.

7          Q.     And who's this person in the black dress?

8          A.     That would be myself.

9          Q.     And these other people that are here, are they

10    also people that worked at the San Riva apartment complex or

11    other people too?

12         A.     Two of the other persons in the picture worked

13    with us.   The others are residents.

14         Q.     Who is this individual I'm pointing to second

15    from the left?

16         A.     Shannon Sweeney.

17         Q.     Did she work for the apartment complex?

18         A.     Yes, she did.

19         Q.     And this individual that's to the right of the

20    defendant?

21         A.     Stephanie.

22         Q.     What was her last name?

23         A.     Koeppen.

24         Q.     Did she also work for the San Riva apartment

25    complex?

1          A.    She did.

2          Q.    And what was Stephanie Koeppen's or Koeppen's

3    position?  What did she do?

4          A.    She was a leasing agent.

5          Q.    What did that require her to do?

6          A.    She basically showed prospective residents and

7    leased apartments.

8          Q.    And how about this individual, Shannon Sweeney?

9          A.    She was the assistant manager.

10          Q.    Where did you guys go that night?

11          A.    Downtown to a number of different places.

12          Q.    And when you went out, was there some dancing

13    that took place?

14          A.    Yes.

15          Q.    Did you see the defendant's demeanor?

16          A.    Yes.

17          Q.    And you indicated previously that when you'd

18    gone out with her she would kiss men and perhaps touch them.

19    Did that happen that night?

20          A.    Yes.

21          Q.    About what time did this party break up with

22    you guys coming home?

23          A.    It was after 12:00.  I don't know for certain.

24          Q.    And where did the car pull up?

25          A.    The car pulled up in front of San Riva.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          Q.    And when it pulled up in front of San Riva, was

2    there anybody there?

3          A.    Yes.

4          Q.    Who was there?

5          A.    Joe was out front.

6          Q.    But you just told us that he didn't even know

7    what she was doing and where she was going.  Do you know how

8    he acquired the knowledge, why he was waiting there?

9          A.    I did not know that.

10         Q.    But was he unhappy or upset or what was he --

11         A.    He was angry.

12         Q.    And what happened?

13         A.    He threw something.  I believe it was a

14   telephone.

15         Q.    And where did he throw it?

16         A.    Into the street.

17         Q.    And who was he angry at?

18         A.    He was angry with Wendi.

19         Q.    And did you hear what he said?

20         A.    No.

21         Q.    Did they then walk away together or anything or

22   what happened?

23         A.    She said, "Joseph, just a minute," and they

24   started walking back towards their apartment.

25         Q.    Did she begin crying or anything like that as

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    she said "Joseph, wait a minute"?

2         A.    No.

3         Q.    What was her demeanor when she said "Joseph,

4    wait a minute"?

5         A.    She was attempting to explain.

6         Q.    And what -- was she upset?

7         A.    No.

8         Q.    Was she calm?

9         A.    Yes.

10        Q.    Did she appear to you to be frightened?

11        A.    No.

12        Q.    And when they walked away, were they walking

13   together or was she walking in front, was she walking behind

14   him?  How were they walking away?

15        A.    He started walking in front of her as she was

16   following him.

17        Q.    She was actually following him rather than him

18   saying things to her?

19        A.    Yes.

20        Q.    And is that when she said, "Let me explain

21   things to you"?

22        A.    She didn't say that.  She said "Joseph" as

23   she -- like she wanted to.

24        Q.    Like she wanted to?

25              Okay.  And did you watch them as they walked


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    away?

2                A.     No.

3                Q.     Now, you indicated that you guys had gone out

4    to several bars.  Did there ever come a time in the early

5    morning hours that -- well, let me ask you, what apartment

6    number did you live in?

7                A.     385.

8                Q.     Did an individual by the name of Rick Freeland

9    live at the San Riva apartments?

10               A.     Yes.

11               Q.     And where did he live in relationship to your

12   apartment?

13               A.     Next door.

14               Q.     And what was his apartment number?  Do you

15   remember?

16               A.     384.

17               Q.     And did there ever come a time when there was a

18   situation where the defendant was knocking on Rick Freeland's

19   apartment?

20               A.     Yes.

21               Q.     Was this before or after the birthday bash that

22   you guys had?

23               A.     I can't answer that.

24               Q.     Was it in the summer?

25               A.     Yes, it was in the summer.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1     Q.    And during the summer, did this -- about what
2  time was it?
3     A.    That what?
4     Q.    That she was over at Rick Freeland's knocking
5  on the door?
6     A.    At what time during the day?
7     Q.    Yes.  Or night.
8     A.    Evening.
9     Q.    About what time was it?
10     A.    8:00?  I don't know.
11     Q.    And was she knocking lightly or loudly?
12     A.    No.  She was pounding on the door.
13     Q.    And what was she saying, if anything?
14     A.    She wanted in.  She wanted him to let her in.
15     Q.    How long did she pound on the door before
16  anything happened?
17     A.    Five minutes.
18     Q.    And then what happened?
19     A.    I came outside and she came inside and used my
20  telephone to call him.
21     Q.    Did you say anything to her while she was out
22  there pounding to let her come in or what happened?
23     A.    Asked "What are you doing?"
24     Q.    And what did she say?
25     A.    She was trying to get him to come to the door.

```
1              Q.    And then what did you say?  How was it --
2              A.    Told her to come on in.
3              Q.    And did she?
4              A.    Uh-huh.
5              THE COURT:  Is that a "yes"?
6              THE WITNESS:  Yes.
7    BY MR. MARTINEZ:
8              Q.    When she came in, you saw her use the phone I
9    take it?
10             A.    Correct.
11             Q.    You saw -- did you see her dial?
12             A.    Yes.
13             Q.    And did you then see her start talking on the
14   telephone?
15             A.    Yes.
16             Q.    What was she saying?
17             A.    I don't know.  I didn't stay for the
18   conversation.
19             Q.    What was her demeanor when she was pounding on
20   the door?
21             A.    She was anxious.
22             Q.    Was she angry?
23             A.    She was -- yes, pissed off that he wouldn't let
24   her in.
25             Q.    If you compare the demeanor at the door where
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    she's pounding "Let me in, let me in," to the demeanor that

2    she exhibited when she began to follow Joseph from the

3    limousine, I want you to make a comparison with the two of

4    them.  Was she angry at the time that she followed Mr.

5    Andriano like she was when she was pounding on the door?

6              MR. PATTERSON:  Objection.  Relevance.

7              THE COURT:  Overruled.  Go ahead and answer the

8    question if you can.

9              THE WITNESS:  No.

10   BY MR. MARTINEZ:

11             Q.   Was she angrier when she was pounding on the

12   door or when she was following Joseph?

13             A.   Yes.

14             Q.   Was she angry when she was following Joseph?

15             A.   No.

16             Q.   You indicated she was calm.  Was she calm when

17   she was pounding on the door?

18             A.   No.

19             Q.   How long did she stay on the telephone?

20             A.   Not very long.  Five minutes maybe.

21             Q.   Then what happened?

22             A.   Sat down and visited.

23             Q.   How long did she visit you with -- visit with

24   you?

25             A.   I don't recall.  20 minutes, 30 minutes.


          TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1              Q.     Do you know where her husband was while she was

2       out there pounding on that door?

3              A.     He was at home.

4              Q.     Where were the kids?  Were they with her when

5       she was pounding on that door?

6              A.     No.  They were with him.

7              MR. PATTERSON:  Objection.  Based on what knowledge?

8       How does she know?

9              THE COURT:  Sustained.  Those last two answers will

10      be stricken.

11      BY MR. MARTINEZ:

12             Q.     Did you see the kids with her?

13             A.     I did not see the children with her.

14             Q.     Did you see Joseph Andriano with her?

15             A.     No.

16             Q.     Did there come a time that you and she

17      discussed a relationship with this Rick Freeland individual?

18             A.     Yes.

19             Q.     And during the -- how many times would you say

20      you discussed it?

21             A.     I don't know to put a number on it.

22      Frequently.

23             Q.     And when you say "frequently," during those

24      frequent conversations, did she ever tell you whether or not

25      she had ever been intimate or had sexual intercourse with Mr.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    Freeland?

2              A.    Yes.

3              Q.    What did she say about that?

4              A.    She was sexually active with Rick Freeland.

5              Q.    Did she, during those conversations, ever

6    express any remorse and say "Well, you know, I'm sorry for

7    Joe," or anything like that while you guys were talking about

8    it?

9              A.    No.

10             Q.    Was she happy in her relationship with Mr.

11   Freeland?

12             A.    Yes.

13             Q.    Were there -- were you aware whether or not

14   that relationship continued or was it ever -- did it end?

15             A.    Mr. Freeland ended that relationship.

16             Q.    So it wasn't that she ended it?  You believe --

17   and let me ask you what -- the basis of your belief is that

18   he ended it?

19             A.    Yes.

20             Q.    And did you gain that -- where did you gain

21   that knowledge or how did you know that Mr. Freeland ended

22   the relationship?

23             A.    From Mr. Freeland.

24             Q.    Did you also talk to the defendant about who

25   ended the relationship?


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          A.     No.

2          Q.     Did she ever tell you "I ended the

3    relationship?"  In other words that she, the defendant, ended

4    the relationship?

5          MR. PATTERSON:  Objection.  Asked and answered. She

6    already said she never acquired any knowledge from my client.

7          THE COURT:  Sustained.  Ask your next question.

8    BY MR. MARTINEZ:

9          Q.     What was said about the time that the

10   relationship ended with Mr. Freeland?  What was the

11   defendant's demeanor after that happened, if you remember?

12         MR. PATTERSON:  Again, date, time, circumstance and

13   what proximity to --

14         THE COURT:  Sustained.  Rephrase the question.

15   BY MR. MARTINEZ:

16         Q.     When did you have this conversation, if you

17   could remember, with Mr. Freeland about him ending the

18   relationship?

19         A.     Maybe a week after the end of the relationship.

20         Q.     And would that have been in the summer?

21         A.     Would have been in the summer, yes.

22         Q.     Would that have been -- do you know what month

23   it would have been?

24         A.     Definitely?  No.  Maybe July.

25         Q.     Okay.  And after this July ending of the


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    relationship, did you see a change or did the defendant's

2    demeanor remain the same?

3          A.    She was upset that they weren't seeing one

4    another any longer.

5          Q.    How do you know that?

6          A.    Because of the persistency in coming over to

7    see him and pounding on his door and talking about it in the

8    office.

9          Q.    When you say she persisted in coming over to

10   see him, how many times would you say that she went over to

11   see him at his apartment after the breakup?

12         A.    I don't know.

13         Q.    Was it -- but she persisted in doing that?

14         MR. PATTERSON:  She just said she doesn't know, Judge.

15         THE COURT:  Sustained.  Ask your next question.

16   BY MR. MARTINEZ:

17         Q.    You indicated that she persisted in coming

18   over.  What did you mean when you said she persisted?

19         A.    She would drop by his apartment and drop by my

20   apartment.

21         Q.    Okay.  And you just don't know the number.  Is

22   that what you're saying?

23         A.    That's correct.

24         Q.    With regard to Joseph Andriano in the summer of

25   2000, would you see him often?


                TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1      A.     Yeah.

2      Q.     And how often would you see him?

3      A.     He would come by the office maybe a couple

4   times a week.

5      Q.     And when he would come by the office, was there

6   a normal time that he came by or was it just randomly?

7      A.     He would come by in the afternoon.

8      Q.     About --

9      A.     Before Wendi was to get off.

10     Q.     Would -- and would he come alone or come

11  accompanied?

12     A.     He would bring the children.

13     Q.     And what was his demeanor -- well, let me put

14  it this way. Was there ever a situation where you saw him

15  angry when he came to pick up Wendi in the afternoon, those

16  twice-a-week times that you saw him?

17     A.     No.

18     Q.     What was their demeanor when they would walk

19  away?

20     A.     Fine.

21     MR. PATTERSON:  Well, again, date, time,

22  circumstances when this happened.

23     THE COURT:  Sustained.  Ask your next question.

24  BY MR. MARTINEZ:

25     Q.     At any time during this whole time that you saw


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    Joseph with the kids walking away, did you ever see him angry
2    at the defendant?

3         A.    No.

4         Q.    Did San Riva have -- you indicated you were the
5    activities director.   Did San Riva have pool parties?

6         A.    Yes, we did.

7         Q.    Were you in charge of those or somebody else in
8    charge of those?

9         A.    I was in charge of those.

10        Q.    And what was the defendant's role or function
11   with regard to those parties?

12        A.    Well, naturally, as a manager she authorized
13   everything and assisted.

14        Q.    Would she attend those parties?

15        A.    Yes.

16        Q.    How often would you have those parties?

17        A.    That summer I believe we had three.

18        Q.    And at any of those parties did Joseph Andriano
19   attend?

20        A.    Yes.

21        Q.    And when he attended those parties, did he go
22   by himself?

23        A.    No.

24        Q.    Who did he go with?

25        A.    Wendi.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          Q.    And do you know whether or not he ever came
2    with the children to those parties?
3          A.    The children came to the party, yes.
4          Q.    Did they come to the three parties he came to
5    or just one, two, or --
6          A.    I believe they came to two.
7          Q.    At any of those parties that summer, did you
8    ever see Joseph Andriano drinking?
9                (Pause in proceedings.)
10         THE WITNESS:  One of the parties we had a keg at,
11   and I believe he had a beer.
12   BY MR. MARTINEZ:
13         Q.    So at one of the parties he had a beer?
14         A.    Yes.
15         Q.    Anything else to drink at all of those parties
16   that you saw?
17         MR. PATTERSON:  Judge, objection.  The opportunity to
18   observe.  Was she watching this guy?
19         THE COURT:  I'll sustain the objection.  Lay some
20   foundation.
21   BY MR. MARTINEZ:
22         Q.    Well, you noticed he was at each of those three
23   parties, right?
24         A.    Correct.
25         Q.    At each of those three parties, the first


                TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    party.  Let's just call it the first party.  You saw him

2    there, correct?

3         A.    Yes.

4         Q.    At this party you saw him at, was this the one

5    you saw him take a drink?

6         A.    I don't recall.

7         Q.    It was just one of them, right?

8         A.    Right.

9         Q.    But you did see him at a party and it was only

10   one of them you saw him with the drink?

11        A.    I saw him at the party, yeah, and I did see him

12   have a beer from the keg.

13        Q.    With regard to these parties, you indicated I

14   think that the children attended two of them I think you

15   said?

16        A.    Yes.

17        Q.    Who was taking care of the kids at those

18   parties?

19        A.    I don't know.

20        Q.    And did Mr. Andriano stay there the whole party

21   or was he there --

22        A.    I know there was one party that he had left

23   early and one party that Wendi had left early, but which one,

24   I don't recall.

25        Q.    Okay.  Did San Riva have a softball -- a

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    softball team?

2          A.    San Riva sponsored a softball team, yes.

3          Q.    Was -- you indicated you know Rick Freeland,

4    right?

5          A.    I do.

6          Q.    Was Rick Freeland on that softball team?

7          A.    Yes, he was.

8          Q.    Do you know what his function was?  In other

9    words, was he a captain or --

10         A.    He was the captain of the softball team, yes.

11         Q.    I want to talk to you a little bit about the

12   layout of the San Riva and where your offices may have been.

13   I'm going to show you what's been marked for identification

14   as Exhibit 297.  Why don't you go ahead and take a look at

15   it.  It's not to scale, but take a look at it.

16               (Pause in proceedings.)

17         THE WITNESS:  Okay.

18   BY MR. MARTINEZ:

19         Q.    Is that a true and accurate depiction of the

20   San Riva offices as they existed back when you were working

21   there in October -- or October 8 of 2000?

22         A.    Yes.

23         MR. MARTINEZ:  Move for admission of Exhibit 297.

24         MR. PATTERSON:  If I could have a moment, Judge?

25         THE COURT:  Yes.


            TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

```
 1                    (Pause in proceedings.)

 2          MR. PATTERSON:  No objection, Judge.

 3          THE COURT:  Exhibit 297 for identification is

 4    admitted into evidence.

 5    BY MR. MARTINEZ:

 6          Q.   Can you see it from there?

 7          A.   Yes.

 8          Q.   What area is this (indicating)?  What does that

 9    show?

10          A.   It's the front entry.

11          Q.   And is that where the people that have any

12    business or may want to go into the office walk in?

13          A.   Correct.

14          Q.   And to the lower right on this diagram

15    (indicating), what would that be?

16          A.   That -- I'm sorry.  The entry that you just

17    showed me --

18          Q.   I have this backwards?

19          A.   Yeah, it's backwards.

20          Q.   This one right here.  What is that?

21          A.   That's the front entry.

22          Q.   Okay.  And this entry we're talking about is --

23          A.   That's the back entry, by the office.

24          Q.   Is this the entry (indicating) that people who

25    do not work for San Riva use?  And I'm talking about the one
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    to the right of the diagram.

2            MR. PATTERSON:  Judge, may I ask you to direct the

3    county attorney to use a pointer or something?  Every time

4    he steps in front, I can't see what he's pointing at.

5            THE COURT:  That's fine.  Is there a pointer there?

6            MR. MARTINEZ:  Yeah.  Here's one.

7    BY MR. MARTINEZ:

8            Q.    And I'll describe it for you.  I'm talking

9    about the opening that is to the right of this diagram.  Do

10    you see what I'm talking about?

11           A.    Yes.

12           Q.    Is that an opening that is commonly used by the

13    public or is that for employees only?

14           A.    Staff members and existing residents. Sometimes

15    existing residents utilize that entry.

16           Q.    And is this also an entrance (indicating)? And

17    I'm over here to the extreme left of the diagram.

18           A.    That would be the main entrance to the office

19    or for prospective residents, vendors, the public.

20           Q.    And immediately to the right of that, what is

21    that?

22           A.    To the --

23           Q.    Right here (indicating).

24           A.    Lounge areas for prospective residents.

25           Q.    To the top of that, what would that be

         TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    (indicating)?

2           A.    Two leasing desks there.

3           Q.    On the -- as we look at it and we're traveling

4    along, we see what appears to be an office on the lower

5    right-hand side (indicating).  Do you see that?

6           A.    The first office in there is the assistant

7    manager's office.

8           Q.    And who would that be?

9           A.    Shannon Sweeney.

10          Q.    And we saw a photograph of her, correct?

11          A.    Yes.

12          Q.    And in terms of hierarchy, if the defendant is

13   the manager, what is Shannon Sweeney with regard to that

14   hierarchy?

15          A.    Second in line.

16          Q.    And what -- are you in any part of that line?

17          A.    No.

18          Q.    Okay.  And if we continue on back to the very

19   end of this diagram, to the very end near the entrance that

20   is reserved for employees and not the public, there seems to

21   be a room to the right (indicating).  Do you see that?

22          A.    Across from Shannon's office?

23          Q.    No, right over here in the back (indicating).

24          A.    That's a maintenance office.

25          Q.    When somebody -- did the San Riva apartment

1    complex, would they sign for packages and that sort of thing?

2         A.    Yes, we would.

3         Q.    And if you would sign for those packages, would

4    you take them up to the apartment that it was for or would

5    you hold them?

6         A.    They would be held in the maintenance office.

7         Q.    Is that what we just pointed to there?

8         A.    That's correct.

9         Q.    Right immediately above that is also an office.

10   Do you see that?

11        A.    Yes, I do.

12        Q.    Whose office is that?

13        A.    That was my office.

14        Q.    And did you have a computer in your office?

15        A.    I did.

16        Q.    And with regard to having the absolute

17   authority over that computer, was that you or did the

18   defendant have more authority?

19        A.    There were two computers in the office and we

20   had a security level clearance for the rent roll or

21   information on the computer.  The manager, Wendi, had

22   complete access to the computer system.

23        Q.    And that would be this one back here, right?

24        A.    To both of them.

25        Q.    Right.  The other computer, would that be in


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    this -- in Shannon's office that we're talking about?

2           A.    Correct.

3           Q.    Now, how is it that somebody would log on to

4    your computer?  Would they have to have a password or how did

5    it work?

6           A.    Yes.  Everyone who logged on had a password to

7    log on with.

8           Q.    Did the defendant have access to your computer

9    via the use of the pass -- use of her password?

10          A.    She has access to the computer and to all the

11   passwords.

12          Q.    That would mean she also had access to this one

13   right here (indicating)?

14          A.    Yes.  That would be Shannon's.

15          Q.    In the scheme of things, we've talked about the

16   bottom here.  What about the top?  The room -- this office

17   (indicating).  Whose office is this?

18          A.    That wasn't an office.  That was sitting room

19   for prospective rentals.

20          Q.    How about the office right there (indicating)?

21          A.    That was Wendi's office.

22          Q.    And what is that?

23          A.    That's a glass window?

24          Q.    Okay.  So she could --

25          A.    She could see out the front and into my office,


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1  and then the door, obviously, and down the hallway.

2      Q.   Did you ever open an account with USA.net

3  using the name Wendi -- not Wendi, but Anne Newton?

4      A.   No.

5      Q.   Did you ever open an account with USA.net under

6  the name of Aztec Creations?

7      A.   No.

8      Q.   Did you ever, using this computer here that's

9  to the back in your office, ever go online and hold yourself

10  out to be Anne Newton?

11      A.   No.

12      Q.   Did you ever, while you were employed with San

13  Riva, did you ever email a company by the name of Voigt

14  Global?

15      A.   No.

16      Q.   Did you ever request any poison over the

17  internet ever?

18      A.   No.

19      Q.   With regard to issue of -- that issue that

20  we're talking about, did there ever come a time when you saw

21  the defendant looking at some privileged license or business

22  license or doing something with them?

23      A.   She was creating a business license in my

24  office.

25      Q.   She actually did it in your office?


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          A.     Yes.

2          Q.     Are you familiar with Copperstate Glass and

3     Mirror?

4          A.     I am.   They're a vendor of San Riva's.

5          Q.     And when you saw the defendant doing something

6     with this business license, what is it you saw her doing?

7          A.     She was typing it up on the typewriter located

8     in that office and removing a seal or something from

9     Copperstate.

10         Q.     And what else did you see her do?

11         A.     Said she was putting it together.   I asked her

12    what she was doing.

13         Q.     And did she tell you why she was putting it

14    together?

15         A.     She said that she was starting another business

16    and to just nevermind.

17         Q.     And did you nevermind?

18         A.     Yes, I did.

19         Q.     Now, drawing your attention to maybe that

20    Friday before that Sunday when Joseph Andriano was on the

21    ground and you saw him in the fetal position -- it was a

22    Friday.   Did you work on Fridays?

23         MR. PATTERSON:   Judge, I think there's -- it was

24    past midnight when she may have seen him.

25         MR. MARTINEZ:   I'm talking about whether or not she

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    worked on Friday.

2           MR. PATTERSON:   Okay.   The preforatory question

3    seemed to suggest -- well, would you ask him to rephrase?  I'm

4    sorry.

5           THE COURT:   Why don't we rephrase the question so

6    there's no misunderstanding.

7    BY MR. MARTINEZ:

8           Q.    Did you work the Friday before Joseph Andriano

9    was killed?

10          A.    Yes, I did.

11          Q.    Did defendant work that Friday?

12          A.    No.

13          Q.    Did she come into the office?

14          A.    She was in the office, yes.

15          Q.    Do you remember what time?

16          A.    I believe it was late morning.

17          Q.    And when she came over, was she with somebody

18   or was she alone?

19          A.    She was by herself.

20          Q.    And did you see what she did?

21          A.    She had brought in a box.

22          Q.    And what was she doing with the box?  What did

23   you see her do?

24          A.    I was in Shannon's office and Shannon asked me

25   to ask her what was in the box.


             TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1        Q.    And did you?

2        A.    I asked her what was in the box and she was on

3    the telephone at that time.

4        Q.    Do you know who -- do you know what she was

5    saying when she was on the telephone?

6        A.    I do not know what she was saying.  She was on

7    the telephone with Travis.

8        Q.    How do you know she was on the telephone with

9    Travis?

10        A.    Shannon told me she was on the telephone with

11    Travis.

12        MR. PATTERSON:  Objection.  Move to strike.  Hearsay.

13        THE COURT:  Sustained.  That last answer is stricken.

14    BY MR. MARTINEZ:

15        Q.    She was on the telephone with somebody, right?

16        A.    Correct.

17        Q.    Then what happened?

18        A.    Shannon said to ask her what's in the box, so I

19    asked her, "What's in the box?"  And she said "It's a

20    present."  And I said, "Who's the present for?"  And she

21    said, "It's a present for a friend."

22        Q.    And did she seem upset when she said that or

23    what?

24        A.    No.

25        Q.    Now, you were familiar with Rick Freeland's

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    apartment, weren't you?

2         A.    Yeah.   I know where it's at, yes.

3         Q.    Were you familiar with how some of the

4    furnishings got into that apartment?

5         A.    Yes.

6         Q.    And first of all, how is it that you are

7    familiar with how the furnishings got into that apartment?

8         A.    Wendi purchased the furnishings for that

9    apartment and she told me that she did it.

10        Q.    And what furnishings did she tell you that she

11   purchased for Mr. Freeland?

12        A.    She purchased a couch, bed, dining room table,

13   coffee table, television.

14        Q.    To your knowledge did she purchase any of these

15   items for anybody else?

16        A.    No.

17        Q.    Do you know when she purchased them?  Did she

18   tell you when she purchased them?

19        A.    I do not recall the date that she purchased the

20   items.

21        Q.    Do you know when she told you?  Was it in the

22   summer, was it in the spring?

23        A.    It was during the purchase.  A previous

24   resident was moving out.  They were relocating and selling

25   all of their items, so she went and purchased them for him.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          Q.    And then did you -- okay.

2                Now, as your job as a bookkeeper there, was it

3    your job to send out late notices?

4          A.    Yes.

5          Q.    I'm going to show you what has been marked for

6    identification as 230.

7                (Pause in proceedings.)

8          MR. PATTERSON:   Judge, may I have permission to move

9    the easel?  We can't see the witness.

10         THE COURT:   Yes.

11               (Pause in proceedings.)

12   BY MR. MARTINEZ:

13         Q.    Take a look at these documents, and

14   particularly the first three pages from Exhibit Number 230 to

15   see if you recognize those along with everything else that's

16   there.

17               (Pause in proceedings.)

18         THE WITNESS:   Yes.  I recognize these.

19   BY MR. MARTINEZ:

20         Q.    What is that paperwork?

21         A.    These are 5-day notices that we deliver to

22   persons who could not pay their rent.

23         Q.    And what is the first document on top?  What is

24   it, first of all?

25         A.    It' a fax cover sheet that I --


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1        Q.    Who is it to?

2        A.    To Brita.

3        Q.    And who sent it?

4        A.    Initially I sent it, but there's additional

5    writing on here.

6        Q.    And whose name is on there?

7        A.    My name is on there, Wendi -- well, it's been

8    crossed out, signed "Wendi," and "Please cancel all five

9    days, do not deliver."

10       Q.    Okay.  With regard to the notice that's

11   immediately after that 5-day notice, who is that to?

12       A.    Erik Vaillant.

13       Q.    How about the notice after that?

14       A.    Rick Freeland.

15       Q.    And then there are other notices of other

16   tenants, correct?

17       A.    Yes.

18       Q.    If I may have that back.

19       MR. MARTINEZ:  I move for the admission of Exhibit

20   230.

21       THE COURT:  Any objection?

22            (Pause in proceedings.)

23       MR. PATTERSON:  Judge, can I voir dire the witness?

24       THE COURT:  Yes.

25       MR. PATTERSON:  Admissibility issue.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1

2      VOIR DIRE EXAMINATION BY MR. PATTERSON:

3           Q.    Sorry.  I may have been talking with my client

4      at the time, are you the person that prepares those notices?

5           A.    Correct.

6           Q.    Okay.  And after they're prepared, where do

7      they wind up before they're delivered to the tenant?

8           A.    Manager's desk.

9           Q.    Okay.  And -- all right.  So the last that you

10     would have seen of these notices is when they were in the --

11     or left on the desk of the manager, correct?

12          A.    Correct.

13          Q.    That's when your contact with these things

14     stops?

15          A.    They have to be approved by her.

16          Q.    Okay.

17          A.    At that particular point, then they are

18     delivered.

19          Q.    Okay.  But you don't deliver them?

20          A.    Yes.  We deliver 5-day notices.

21          Q.    I'm sorry, you personally?

22          A.    Yes.

23          Q.    You personally deliver them?

24          A.    Uh-huh.

25                THE COURT:  Is that a "yes"?


            TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          THE WITNESS:  Yes.

2          MR. PATTERSON:  Okay.

3               I have no objection, Judge.

4          THE COURT:  Exhibit 230 for identification is

5     admitted into evidence.

6               Is this a good time to take our evening break?

7          MR. MARTINEZ:  It is if you'd like.

8          MR. PATTERSON:  Yes, Judge.

9          THE COURT:  Why don't we go ahead and take our

10    evening recess at this point in time.  We'll always try to

11    finish the day about 4:50.

12              Now, during this evening recess remember the

13    entire admonition I gave you including the fact you're not to

14    discuss this case with anyone, do not let anyone discuss the

15    case with you, keep an open mind about the case, and avoid

16    any media coverage if there is any media coverage.

17              Have a nice evening.  We'll see you tomorrow.

18    Do not do any investigation or research on your own.

19    Remember the entire admonition.

20              Have a nice evening.  We'll see you tomorrow at

21    1:00 p.m.  We'll be in recess.

22

23              (Evening recess.)

24

25


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1

2

3                          CERTIFICATE OF REPORTER

4

5    STATE OF ARIZONA      )
                           )
6    COUNTY OF MARICOPA    )

7

8                 I, Traci L. Wheeler, CSR, RPR, an official

9    and certified reporter in the Superior Court of the State

10   of Arizona, in and for the County of Maricopa, hereby

11   certify that I made a shorthand record of the proceedings

12   had in the within case, and that the foregoing transcript

13   is a full, true, and correct transcription of the

14   proceedings in this case.

15                 Dated this 5th day of March, 2005.

16

17

18                          _____
                            Traci L. Wheeler, CSR, RPR
19                          Certified Court Reporter No. 50313
                            Official Court Reporter
20

21

22

23

24

25


          TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR



COPY

1           IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

2              IN AND FOR THE COUNTY OF MARICOPA

3

4    STATE OF ARIZONA,              )
                                    )
5            Plaintiff,             )
                                    )
6    v.                             )    No. CR 05-0005 AP
                                    )    MARICOPA COUNTY
7    WENDI ELIZABETH ANDRIANO,      )    No. CR 2000-096032
                                    )
8            Defendant.             )
     _____)

9

10                                            PUBLIC DEFENDER

11                                            MAR 1 0 2005

12                    Mesa, Arizona           APPEALS RECEIVED
                   September 9, 2004
13

14

15

16           BEFORE:  The Honorable BRIAN K. ISHIKAWA

17

18           REPORTER'S TRANSCRIPT OF PROCEEDINGS

19                      TRIAL DAY 9

20

21

22

23

24    ORIGINAL Prepared for APPEAL by:
      TRACI L. WHEELER, CSR, RPR
25    Certified Court Reporter No. 50313
      Official Court Reporter


          TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1                          A P P E A R A N C E S

2     FOR THE STATE:        JUAN M. MARTINEZ,
                            Deputy County Attorney
3
      FOR THE DEFENDANT:    DANIEL B. PATTERSON,
4                           Deputy Public Defender
                                 and
5                           G. DAVID DELOZIER,
                            Attorney at Law
6

7            I N D E X   O F   E X A M I N A T I O N

8     WITNESS                                              PAGE

9     HASHISAKI, CHRIS, Called to testify by the State
              Continued Direct Examination by Mr. Martinez    3
10            Cross-examination by Mr. Patterson              17
              Redirect Examination by Mr. Martinez            64
11            Follow-up Questions by Mr. Martinez            101
              Follow-up Questions by Mr. Patterson           103
12
      OLSON, DENNIS, Called to testify by the State
13            Direct Examination by Mr. Martinez            114

14    RICHARDS, BRYAN, Called to testify by the State
              Direct Examination by Mr. Martinez            106
15            Cross-examination by Mr. Patterson            109
              Redirect Examination by Mr. Martinez          113
16

17       E X H I B I T S   A D M I T T E D   I N   E V I D E N C E

18    NO.    DESCRIPTION                                   PAGE

19    153    Photograph                                       7
      154    Photograph                                       7
20    155    Photograph                                       7
      156    Photograph                                       7
21    157    Photograph                                       7
      158    Photograph                                       7
22    171    Photograph                                       7
      172    Photograph                                       7
23    173    Photograph                                       7
      174    Photograph                                       7
24    175    Photograph                                       7

25

            TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

```
 1          MESA, ARIZONA, THURSDAY, SEPTEMBER 9, 2004

 2

 3          THE COURT:  Please be seated.  Good afternoon.  This

 4   is trial in cause number CR 2000-096032, State of Arizona

 5   versus Wendi Elizabeth Andriano.  The record will reflect the

 6   presence of the Defendant, Counsel, and the jury.

 7                Yesterday when we took our recess, Chris

 8   Hashisaki was on the witness stand.  She has returned to the

 9   witness stand, and we'll continue with the direct examination

10   by Mr. Martinez.

11                Mr. Martinez?

12

13                CHRIS HASHISAKI,

14        CALLED TO TESTIFY ON BEHALF OF THE STATE,

15   HAVING PREVIOUSLY BEEN SWORN, FURTHER TESTIFIES AS FOLLOWS:

16

17   CONTINUED DIRECT EXAMINATION BY MR. MARTINEZ:

18        Q.    Ma'am, last time when we left off we were

19   talking about Exhibit 230, some notices that you sent out.

20   Do you remember what we were talking about?

21        A.    Yes.

22        Q.    Now, I'm going to show you the front page of

23   those notices.  If you can't see them, just go ahead and let

24   me know.  Basically, it includes an address, 2155 East

25   Liberty Lane, Phoenix, Arizona.  Is that where San Riva was
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    located?

2            A.    Yes.

3            Q.    Is that in Phoenix, Maricopa County, Arizona?

4            A.    Yes.

5            Q.    Now, right down here on the bottom it says from

6    "Chris" and then it says "Wendi."  Did you write the name

7    Chris there?

8            A.    Yes.

9            Q.    Did you write the name "Wendi" there?

10           A.    No.

11           Q.    Did you cross out the name Chris on there?

12           A.    No.

13           Q.    It also has some comments on there, and these

14    comments indicate "Please cancel all five days.  Do not

15    deliver."  What does that mean?

16           A.    5-day notices that were to be sent out for

17    nonpayment of rent, she cancelled them.

18           Q.    What does that mean for the tenant if you

19    cancel that notice?

20           A.    The only reason the 5-day notice would be

21    cancelled would be if we had received payment clearing up

22    that account for that month.

23           Q.    But in terms of the tenant, what I'm talking

24    about, if these 5-day notices are cancelled, that means they

25    don't have to worry about being kicked out of their


                TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    apartment, right?

2          A.    That's correct.

3          Q.    Because there's a procedure that needs to be

4    initiated before that can happen, right?

5          A.    Correct.

6          Q.    And have there been occasions when somebody at

7    the complex has had to go and evict somebody for nonpayment

8    of rent?

9          A.    Oh, yes.

10         Q.    And the first step is -- this is the first step

11   in getting somebody out for nonpayment of rent?

12         A.    Yes.

13         Q.    I'm going to show you one of the nonpayment of

14   rent notices that's here.  And can you see it from there?

15         A.    Yes.

16         Q.    And who is that to?

17         A.    Rick Freeland.

18         Q.    And his apartment number was?

19         A.    384.

20         Q.    And it also indicates how much he has to pay,

21   that sort of thing.  And at the bottom of it, it's got --

22   whose signature is there on the left-hand side?

23         A.    Mine.

24         Q.    And then it has a date, correct?

25         A.    Yes.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

```
 1        Q.    What's the date?

 2        A.    10/5 of 2000.

 3        Q.    Did you know Rick Freeland?

 4        A.    Yes.

 5        Q.    Is that the same individual we spoke of

 6   yesterday?

 7        A.    It is.

 8        Q.    I'm going to show you another one, and it's --

 9   who is this one too?

10        A.    Erik Vaillant.

11        Q.    Did you also know Erik Vaillant?

12        A.    Yes.

13        Q.    And the apartment number for him was?

14        A.    382.

15        Q.    And just like before, there was a signature

16   there and a date.  Did you put those on there?

17        A.    Yes, I did.

18        Q.    Did you actually deliver these or not?

19        A.    No.  They were not delivered.

20        Q.    It does say on the bottom, just so we could

21   clear it up, it does have a date and it says "hand delivered

22   this date," but it doesn't have a little "X" to the left of

23   it.  Does that mean it was not done?

24        A.    That's correct.

25        Q.    So when it was delivered, somebody or you would
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    put an "X" right there to signify the date?

2         A.    Yes.

3         Q.    Do you know why these were not delivered?

4         A.    I do not.

5         Q.    Part of what we talked about yesterday was

6    Exhibit 297, which is a schematic of the office, correct?

7         A.    Yes.

8         Q.    I'm going to show you some exhibits.  They are

9    Exhibits 153 through 158 and 171 through 175.  Please take a

10   look at these photographs.

11               (Pause in proceedings.)

12   BY MR. MARTINEZ:

13        Q.    Are these true and accurate depictions of the

14   San Riva leasing office from the inside and outside back as

15   it appeared in October of 2000?

16        A.    They are.

17        MR. MARTINEZ:  I move for the admission of 153

18   through 158 and 171 through 175.

19               (Pause in proceedings.)

20        MR. PATTERSON:  No objection, Judge.

21        THE COURT:  Exhibit Numbers 153 through 158 and 171

22   through 175 are admitted into evidence.

23               (Pause in proceedings.)

24   BY MR. MARTINEZ:

25        Q.    Go ahead and take a look at these.  First of

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    all, let's take a look at Exhibit 153.  What does that show

2    us?

3            A.    I can't see.

4            Q.    Can you see it from there?  Why don't you step

5    down if you need to.

6            THE COURT:  Just remember, when you're away from the

7    microphone, speak up as loudly as you can so everyone can

8    hear you.

9    BY MR. MARTINEZ:

10           Q.    What does that show us?

11           A.    The front of the leasing office.

12           Q.    And if we're taking a look at that photograph,

13   where would the front door be, the one where the people would

14   go in?

15           A.    Here (indicating).

16           Q.    That would be to the left of the photograph?

17           A.    Correct.

18           Q.    Before we also talked that there was another

19   door with regard to this particular building, and you just

20   motioned to the front door which was right here.  You also

21   previously indicated there was a back door.  Where would the

22   back door, what general area would it be?

23           A.    This direction (indicating), back of the

24   building.

25           Q.    Okay.  Let's take a look now at Exhibit 154.


                TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    What does that show?

2         A.    Front entrance to the leasing office.

3         Q.    And if we were to walk straight back to the

4    back, would there be another door in the back?

5         A.    You would have to go around -- out and around.

6    If you go through, yes, it would be straight back.

7         Q.    Okay.  But you could go straight back?

8         A.    Yes.

9         Q.    All right.  Exhibit 155, what is that?

10        A.    Sign on the front door.

11        Q.    Exhibit 156, what does that show us?

12        A.    It's the entry area to the leasing office.

13        Q.    And what is this over here (indicating) to the

14   right?  What is that right there, that one on the extreme

15   right?

16        A.    The office on the right is the assistant

17   manager's office.

18        Q.    What was her name?

19        A.    Shannon Sweeney.

20        Q.    And we already talked about, in terms of this

21   diagram that we have here, Exhibit 297, that it was this

22   office right here (indicating)?

23        A.    That's correct.

24        Q.    Okay.  Take a look at Exhibit 157.  What does

25   that show us?


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

10

1        A.    It's the hallway of the back offices.

2        Q.    I'm going to ask you a question about this area

3   right back -- what is -- what is that right here

4   (indicating), that white sort of area there that seems to

5   lead to the outside.   What is that?

6        A.    The back door.

7        Q.    That's the back door we've seen here on Exhibit

8   297 that's back here (indicating).

9        A.    That's correct.

10        Q.    What is this right here to the left

11   (indicating)?   What is that?

12        A.    That's the leasing office where you could take

13   potential residents.

14        Q.    That would be this right here (indicating),

15   correct?

16        A.    Correct.

17        Q.    And if we were to put it in perspective in

18   terms of the back door, whose office would that be right

19   there in the very back?

20        A.    That would have been mine.

21        Q.    And this door that we're showing here, whose

22   office would that be to?

23        A.    Wendi's office.

24        Q.    Okay.   Exhibit 158.   And what does this show us?

25        A.    The door to Wendi's office.


                TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1   Q. And in terms of Wendi's office, whose -- whose
2 office would that be way in the back here (indicating)?

3   A. Mine.

4   Q. Let's take a look at Exhibit 171.  What does
5 that show?

6   A. Entrance into my office.

7   Q. And Exhibit 172, what does that show?

8   A. My office and desk.

9   Q. And there's a computer there, right?

10   A. Correct.

11   Q. Did you ever use that computer and send out any
12 emails under the name of Anne Newton?

13   A. No, I did not.

14   Q. Did you ever contact Voigt Global from that
15 computer?

16   A. No, I did not.

17   Q. Take a look at Exhibit 173.  What is that?

18   A. That is a picture of the desk and computer.

19   Q. And finally 175.  What is that?

20   A. Computer screen.

21   Q. And that's your computer, correct?

22   A. That's correct.

23   Q. Go ahead and take a seat please.

24   Did San Riva have something like a petty cash
25 account from where the manager or people that worked there

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    were able to go out and buy items from a store, let's say for

2    the parties and that sort of thing?

3            A.    Yes, we did.

4            Q.    And who was in control of that account?  Was

5    that you as a bookkeeper or who?

6            A.    No.  Wendi was in control of that account.

7            Q.    Do you know how much was received into that

8    petty cash account on a monthly basis?

9            A.    No.

10            MR. PATTERSON:  Your Honor, foundation, if she knows.

11    She says it was at the charge of Ms. Andriano.

12            THE COURT:  Overruled.  Go ahead and ask your next

13    question.

14    BY MR. MARTINEZ:

15            Q.    And with regard to how it worked, do you know

16    how that account worked?  In other words, would you be

17    allowed or would Shannon be allowed or Stephanie be allowed

18    to go over to ABCO and buy something and sign for it or how

19    did it work?

20            A.    The ABCO account was basically on account.  So,

21    yes, we had authorized personnel able to go over to ABCO and

22    sign.  It's set up like an accounts payable account.

23            Q.    And did you ever go to that ABCO and buy items

24    from that ABCO for San Riva?

25            A.    Yes.


        TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

```
1          Q.    Do you know whether or not Shannon Sweeney ever
2     did something like that?
3          A.    Yes.
4          Q.    And that account allowed you, Shannon Sweeney,
5     and the defendant to go down to ABCO and buy items, correct?
6          A.    Correct.
7          Q.    Where was that ABCO located?
8          A.    Desert Foothills Parkway.
9          Q.    Now, yesterday when we were talking about the
10    defendant's birthday, we had a photograph and we talked
11    about -- and that's Exhibit Number 313.  You told us that you
12    guys went out and you ended up coming home.  Do you remember
13    that?
14         A.    Yes.
15         Q.    In this photograph, I count -- or I see all
16    females there.  When you left, there were all females, I
17    assume?
18         A.    When we were on our way home?
19         Q.    No, no.  When you left the San Riva apartment
20    complex?
21         A.    Yes.
22         Q.    When you came back, were there any males
23    accompanying the group?
24         A.    Yes.
25         Q.    And was one of those males with the defendant?
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

```
 1          A.    Yes.

 2          Q.    And do you know the name of this individual?

 3          A.    I do not.  It was Shannon's boyfriend's

 4     roommate.

 5          Q.    Did he also live at San Riva?  Do you know?

 6          A.    No.

 7          Q.    And when you were coming back that night, was

 8     the defendant and this individual doing anything?

 9          A.    Yes.  They were kissing in the limo.

10          Q.    And was this throughout the whole ride back or

11     just a couple pecks on the cheek, or was it the amorous kind

12     of kissing?

13          A.    She had requested we stop by Shannon's

14     boyfriend's apartment to pick them up.  When they got in the

15     car, they sat in the back seat.  Shannon, her boyfriend,

16     Wendi, and the roommate.

17          Q.    Who requested that they be picked up?

18          A.    Wendi did.

19          Q.    And so she then said "Let's go over to

20     Shannon's boyfriend's house or apartment to pick them up"?

21          A.    Correct.

22          Q.    And how far away were you from the San Riva

23     complex where they were picked up?

24          A.    20 minutes.

25          Q.    And during that 20 minutes, was there this
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1   kissing going on with the defendant?

2         A.   Correct.

3         Q.   Did she ever make any statements herself as to

4   what she thought about what she was doing?

5         A.   We asked her what she was doing.

6         Q.   What was her response?

7         A.   She said, "We're just kissing."

8         Q.   Pardon?

9         A.   She said "We're just kissing."

10        Q.   So you get to the San Riva apartments, and this

11   is the same night that Joseph threw the telephone -- that you

12   believe he might have thrown the telephone?

13        A.   Yes.

14        Q.   So what happens?  All of you are getting out of

15   the limousine and now you have these two individuals, one of

16   them is with the defendant -- males, one of them is with the

17   defendant, the other is with Shannon Sweeney.  What happens

18   then?

19        MR. PATTERSON:   Objection.  That's leading.  That's

20   not what she's described.

21        THE COURT:  Sustained.  Rephrase the question,

22   please.

23   BY MR. MARTINEZ:

24        Q.   Describe for me who gets out and how that

25   happened?


          TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          A.    We all get out of the limo.  Wendi took care of

2    the driver, and then Shannon, her boyfriend, Wendi, and this

3    other gentleman started walking towards Shannon's apartment.

4          Q.    So the four of them, Shannon, the defendant,

5    these two males, started walking over to whose apartment?

6          A.    To Shannon's apartment.

7          Q.    And by that time had Joseph shown up yet or no?

8          A.    Yes.

9          Q.    When he showed up, was the -- did the defendant

10   see him initially as she and the three others began that walk

11   to Shannon's apartment?

12         A.    I don't believe so.

13         Q.    And then what happened?

14         A.    He threw the telephone.

15         Q.    Did he call out to the defendant?  Or how is it

16   he got her attention?

17         A.    No, he didn't call out to her.

18         Q.    He just --

19         A.    She saw him.

20         Q.    She saw him?

21         A.    Uh-huh.

22         THE COURT:  Is that a "yes"?

23         THE WITNESS:  Yes.

24         THE COURT:  Make sure you give a verbal response.

25   / / / / /


                TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    BY MR. MARTINEZ:

2         Q.    That's when -- after she saw him, that's when

3    he threw the phone?

4         A.    Yes.

5         Q.    And then that's when he started to walk away, I

6    think you told us?

7         A.    Yes.

8         MR. MARTINEZ:  I don't have any other questions.

9         THE COURT:  Mr. Patterson, cross-examination?

10        MR. PATTERSON:  Thank you, Judge.

11

12    CROSS-EXAMINATION BY MR. PATTERSON:

13        Q.    Good afternoon, ma'am.

14        A.    Good afternoon.

15        Q.    We've spoken before, haven't we?

16        A.    We have.

17        Q.    It was on April 1, 2003?

18        A.    I believe so.

19        Q.    Was that at Mimi's Cafe, I believe?

20        A.    Yes.

21        Q.    And your son was there?

22        A.    Yes, he was.

23        Q.    My investigator was there?

24        A.    Yes.

25        Q.    And we tape recorded it, correct?


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          A.     You did.

2          Q.     Okay.  And then you also made a statement to a

3     Detective Ballentine of the Phoenix Police Department?

4          A.     I did.

5          Q.     And I assume Detective Ballentine was taking

6     notes when he was talking to you?

7          A.     I received a transcript of the taping --

8          Q.     Okay.

9          A.     -- from detective Ballentine.

10          Q.     And in addition to taking notes, he also tape

11     recorded it, correct?

12          A.     Yes, he did record it.

13          Q.     Okay.  Let's talk about your observations on

14     the night of October 8, 2000.  Wendi called you up around

15     2:00 and awoke you from sleep, correct?

16          A.     Correct.  It was about 2:15.

17          Q.     Thereabouts, and she told you that she had a

18     medical problem and she needed to take Joe to the hospital,

19     correct?

20          A.     She said, "I need you to watch the kids while I

21     take Joe to the doctor."

22          Q.     Exactly.  But she said she had a medical

23     problem involving Joe and needed you to watch the children

24     for her and she had a medical problem.

25          A.     She said she needed me to watch the kids so she

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    could take him to the doctor.

2        Q.    She said there was an illness or something of

3    that nature that required --

4        A.    She told me she needed me to come over to watch

5    the kids so she could take Joe to the doctor.  She didn't

6    say anything about a medical problem.

7        Q.    Okay.  But inferentially within that question

8    there's certainly a medical problem involving her husband

9    Joe, correct?

10       A.    Correct.

11       Q.    You didn't come over immediately, did you?

12       A.    I got dressed and left, yes.

13       Q.    But it took time for you to get dressed and

14   take care of your children, I assume, and put the glasses on

15   and take care of other problems you had there at that time,

16   correct?

17       A.    No.  I got dressed, put my glasses on, and

18   left.  My daughter was asleep.

19       Q.    Okay.  She called you a second time, didn't she?

20       A.    Yes.

21       Q.    Okay.  And there was an urgency in the tone of

22   that second call, correct?

23       A.    She said, "Where are you?  Are you coming?"

24       Q.    "Are you coming," exactly.

25       A.    Uh-huh.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1        Q.    So she had to call you two times that evening,

2    correct?

3        A.    She did call me again, yes.

4        Q.    Okay.  And there was a sense of urgency in that

5    second call, correct?

6        A.    Yeah.

7        Q.    And because of that, you ran over to her

8    apartment, correct?

9        A.    Yes.

10       Q.    Okay.  And that running over, that was based

11   upon the sense of urgency that was in Wendi's second phone

12   call, correct?

13       A.    Yes.

14       Q.    All right.  She invited you to her apartment,

15   correct?

16       A.    She asked me to come to her apartment, yes.

17       Q.    Right.  Okay.  And when you first arrived at

18   that location, she was outside the apartment, correct?

19       A.    She was.

20       Q.    She had a landline phone or a mobile phone in

21   her hand, correct?

22       A.    She had a cordless phone in her hand.

23       Q.    It wasn't a cell phone?

24       A.    No.

25       Q.    Okay.  And when you first met with her, one of

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1   the first things she said to you was that she needed a hug,

2   correct?

3          A.    No.  The first thing she said to me --

4          Q.    One of the -- I'm sorry.

5          MR. MARTINEZ:  Judge, he's not allowing the witness

6   to respond.

7          THE COURT:  Go ahead and answer the question if you

8   can.

9          THE WITNESS:  The first thing she said to me was "I

10  have a problem."

11  BY MR. PATTERSON:

12         Q.    Okay.  But one of the first things was you --

13  listen to my question, please.  One of the first things she

14  said to you was she needed a hug, correct?

15         A.    She did say she needed a hug, yes.

16         Q     And you gave her a hug, didn't you?

17         A.    I did.

18         Q.    Okay.  That landline phone, she had a difficult

19  time making a connection on that phone because there was a

20  bit of a distance away from the base phone inside the house,

21  correct?

22         MR. MARTINEZ:  Objection.  Lack of -- Rule 702.

23         THE COURT:  I'll sustain the objection.  Rephrase the

24  question.

25  / / / / /


                TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    BY MR. PATTERSON:

2         Q.    She had some difficulty making a connection

3    outside with that landline phone, didn't she?

4         A.    She told me she could not call from outside

5    because the reception was not good.

6         Q.    Okay.  But at that point or about that point

7    she welcomed you into the apartment?

8         A.    Yes, we walked into the apartment.

9         Q.    And Mr. Andriano was on the floor at that time?

10        A.    Yes.

11        Q.    She didn't restrict your access to Mr. Andriano

12   at that time, did she?

13        A.    No.  She walked to the back bedroom.

14        Q.    Okay.  She allowed you the opportunity to

15   observe Mr. Andriano, correct?

16        A.    Yes.

17        Q.    She allowed you the opportunity to speak with

18   Mr. Andriano, correct?

19        A.    Yes, I did speak with him.

20        Q.    And nothing that you observed about Mr.

21   Andriano's condition at that time led you to believe that

22   Wendi posed a threat to her husband, correct?

23        A.    No.

24        Q.    Okay.  And nothing he told you at that time led

25   you to believe that Wendi posed a threat to him at that time,

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    correct?

2              A.    Correct.

3              Q.    Okay.   Because had either of those two things

4    been true, you would have brought that suspicion to the

5    attention of the EMTs who arrived shortly thereafter,

6    correct?

7              A.    That's correct.

8              Q.    All right.   The plan at that point was to --

9    back that up.   The original plan was that Wendi would place

10   Mr. Andriano in her vehicle and drive him to a medical

11   facility, correct?   That was the original plan.

12             A.    She told me she wanted to take him to the

13   doctor.

14             Q.    Okay.   That was the original plan, correct?

15             A.    Okay.

16             Q.    All right.   When you arrived, you modified the

17   plan somewhat by suggesting that she call 911, correct?

18             A.    Correct, because she hadn't done it yet.

19             Q.    Right.   But that was your idea, correct?

20             A.    Absolutely.

21             Q.    Okay.   And in response to your suggestion, she

22   did in fact make a 911 phone call?

23             A.    Yes.

24             Q.    And the EMTs are on the way?

25             A.    Yes.


              TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1        Q.    Okay.  Your observation of the apartment

2  condition at that time, you saw no evidence of a previous

3  struggle having occurred within that apartment, correct?

4        A.    Correct.  She wasn't the best housekeeper, but

5  I never saw that.

6        Q.    In your words, yes, it was as clean an

7  apartment as you'd ever seen Wendi maintain?

8        A.    Correct.

9        Q.    She wasn't in your opinion the best

10  housekeeper, correct?

11        A.    Correct.

12        Q.    Okay so you've spoke with Mr. Andriano, you've

13  spoken with Wendi, you're aware the EMTs are on their way,

14  you go outside to flag them down?

15        A.    Yes.

16        Q.    Because it's an apartment complex.  There are

17  many apartments there, and the EMTs don't know exactly where

18  132 is?

19        A.    Correct.

20        Q.    In your experience you needed to direct them?

21        A.    Correct.

22        Q.    That was one of the reasons you went outside

23  there to wait for them?

24        A.    Correct.

25        Q.    Ms. Andriano didn't send you out there, right?


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1        A.    Correct.

2        Q.    Outside -- you grabbed a cigarette before you

3   left?

4        A.    Correct.

5        Q.    But you wouldn't smoke in the apartment.  You

6   would do it in the breezeway outside, correct?

7        A.    Correct.

8        Q.    And you went out there for the EMTs.  Actually,

9   after they arrived, you walked back towards apartment 132,

10  correct?

11       A.    No.

12       Q.    Okay.  You are -- you don't greet them out

13  there?

14       A.    After their arrival after they got out of the

15  vehicle?

16       Q.    Correct.

17       A.    Yes.  We then walked back towards the

18  apartment.

19       Q.    Okay.  That's what I thought.  You walked back

20  towards the apartment.

21             Prior to that time, the apartment door had

22  remained open, correct?

23       A.    Prior to their arrival, the apartment door was

24  open.

25       Q.    Okay.  And that would have allowed persons to


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    come into the apartment during that period of time because it

2    was open, correct?

3         A.    Yes.

4         Q.    Okay.

5         A.    It was open until she slammed the door.

6         Q.    The EMTs arrive, you start walking back, the

7    door closes, correct?

8         A.    No.  As they were getting out of their vehicle,

9    before they had unloaded their vehicle and got out, she came

10   out and screamed "Go away.  Tell them to go away."

11        Q.    Okay.  How much time elapsed from that point

12   where you left the apartment, the door remained open, and you

13   were out waiting for the EMTs?

14        A.    5, 10 minutes.

15        Q.    Okay.  Certainly, enough time elapsed for a

16   person to engage in a conversation with another individual,

17   correct?

18        A.    Yes.

19        Q.    Okay.  She then comes out, says we basically

20   don't need your services anymore, and closed the door,

21   correct?

22        A.    After they had arrived, yes.  She came around

23   and told us that she did not want us there.

24        Q.    Okay.  And I think she said "We don't want you

25   here," correct?  "We don't need you, we don't want you here."


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          A.     She did.

2          Q.     Okay.  Notwithstanding that, the EMTs and you

3    come back into the breezeway of the apartment unit, right?

4          A.     No.  We're standing in front of the door.

5          Q.     I understand, but at some point you come back

6    to get your purse?

7          A.     I walked up, my purse is on the ground when I

8    walked back there with the fire department.

9          Q.     Okay.  You then go to the front door and you

10   knock on the front door of the apartment, correct?

11         A.     Yes, I did.

12         Q.     And you stand knocking there for 5 to 10

13   minutes?

14         A.     Uh-huh.

15         THE COURT:  Is that a "yes"?

16         THE WITNESS:  Yes.

17         THE COURT:  Make sure you give a verbal response.

18   BY MR. PATTERSON:

19         Q.     Okay.  And you're just outside the door,

20   obviously, because you're knocking on it?

21         A.     Yes.

22         Q.     And it's an apartment complex with hollow

23   doors, apartment doors?

24         MR. MARTINEZ:  Objection.  Lack of foundation.

25         MR. PATTERSON:  If she knows.


             TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          THE COURT:  If you know, go ahead and answer the

2     question.

3          THE WITNESS:  No, they don't have apartment doors.

4     BY MR. PATTERSON:

5          Q.    Wait a minute.  It's an apartment complex,

6     correct?

7          A.    Right.  It is apartment construction.

8          Q.    Okay.  And there are shared walls between the

9     various units, correct?

10         A.    Yes.

11         Q.    And you're knocking there for 5 or 10 minutes,

12    correct?

13         A.    Uh-huh.

14         THE COURT:  Is that a "yes"?

15         THE WITNESS:  Yes.

16         THE COURT:  Make sure you give a verbal response.

17    BY MR. PATTERSON:

18         Q.    Wendi doesn't answer the door, does she?

19         A.    No, she did not.

20         Q.    Mr. Andriano doesn't answer the door either,

21    does he?

22         A.    No, he does not.

23         Q.    During the 5 or 10 minutes you're outside that

24    door, you don't hear anything consistent with any kind of

25    physical confrontation inside the apartment, do you?


          TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          A.     No.

2          Q.     You don't hear what appears to be somebody

3    being struck by any object?

4          A.     No.

5          Q.     Okay.  You don't hear any furniture being

6    broken?

7          A.     No.

8          Q.     Okay.  You don't hear anybody screaming or

9    crying or any words uttered in anger from the interior.  Is

10   that right?

11         A.     That's correct.

12         Q.     Okay.  The next significant thing I gather that

13   happens is that you see Wendi coming around the corner of the

14   unit?

15         A.     No.  We were by the front door.  She came

16   walking in through the breezeway.

17         Q.     She came walking in through the breezeway?

18   Okay.  So she didn't walk around the perimeter of the unit.

19   She came in through the south entrance of your breezeway?

20         A.     North entrance of the breezeway.  The front of

21   the building.

22         Q.     That's where you and the EMTs were standing?

23         A.     No, sir.  Wendi's apartment is on the backside

24   of the building.

25         Q.     Correct.  On the south side?


                 TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

```
1           A.    Correct.

2           Q.    Southeast side?

3           A.    Correct.

4           Q.    Okay.  And you are standing in a building on

5     the north side of the apartment -- of the unit?

6           A.    No, sir.  We're back by the door.

7           Q.    You're standing at the door of 132?

8           A.    Correct.

9           Q.    And she comes through the south entrance of the

10    breezeway or the north entrance of the breezeway?

11          A.    The north entrance.

12          Q.    Okay.  And at that time she has a discussion

13    with the EMTs?

14          A.    Yes.

15          Q.    And you're within earshot of that discussion?

16          A.    She was standing right next to me.

17          Q.    So you overheard essentially everything she was

18    telling the EMTs at that time?

19          A.    Yes.

20          Q.    Okay.  Nothing then, obviously, that she said

21    to the EMTs raised any suspicion in your mind that she

22    exposed a threat to Joe Andriano that evening, correct?

23          A.    That's correct.

24          Q.    Okay.  Because had that been the case, you

25    would have certainly encouraged or demanded the EMTs make
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    entry into that apartment?

2           A.    I would have, yes.

3           Q.    And the EMTs, certainly, were the ones engaged

4    in the conversation with Ms. Andriano that evening, correct?

5           A.    Yes.

6           Q.    So nothing that she told them raised any

7    suspicion in their minds because they didn't thereafter make

8    any effort to try and get into the apartment?

9           MR. MARTINEZ:  Objection.  Speculation as to --

10          THE COURT:  Sustained.

11   BY MR. PATTERSON:

12          Q.    Did the EMTs after their conversation with Ms.

13   Andriano make any effort to get into the apartment?

14          A.    No, they did not.

15          Q.    They picked up their bags and went home?

16          A.    They did.

17          Q.    As an office employee there, certainly had you

18   had suspicions that Wendi posed a threat to Mr. Andriano that

19   evening, you could have gone back to the office and accessed

20   a pass key, correct?

21          A.    I could have gotten a key, yeah.

22          Q.    And you could then come back and you yourself

23   made entry into that apartment had you been concerned about

24   the health or welfare of Mr. Andriano that evening based upon

25   what you observed.


                TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1      A.   I could have gotten a key, yes.

2      Q.   You didn't do that, did you?

3      A.   I did not.

4      Q.   Okay.  Let's talk a bit about the jobs of the

5   folks that basically were depicted in that photograph we saw.

6      A.   Uh-huh.

7      Q.   Wendi's the resident manager, right?

8      A.   She was, yes.

9      Q.   Her task is to basically run the place.  She's

10   the boss, right?

11      A.   Correct.

12      Q.   Okay.  And in that capacity, she has a great

13   deal of discretion, correct?

14      A.   Regarding the operation of the community?

15      Q.   Yes.

16      A.   Yes, she had that.

17      Q.   Okay.  And your discretion is somewhat more

18   limited I gather because you were not a manager, you were not

19   management, you were the bookkeeper?

20      A.   Correct.

21      Q.   Okay.  So she's the decision maker, correct?

22      A.   Yes.

23      Q.   And you were the person obliged to follow her

24   decisions, correct?

25      A.   Absolutely.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

```
1              Q.    Okay.  And then I expect that same kind of
2     relative relationship persists with Ms. Sweeney and Ms.
3     Koeppen; they were not management, they were under the
4     direction of Ms. Andriano?
5              A.    Correct.
6              Q.    Okay.  All right.  You described Wendi in
7     social settings as friendly.  Is that correct?
8              A.    Yes.
9              Q.    Flirtatious?
10             A.    Yes.
11             Q.    Outgoing?
12             A.    I describe her this way?
13             Q.    Uh-huh.  Would you agree?
14             A.    Oh, would I agree?
15             Q.    (No audible response.)
16             A.    Yes, she was.
17             Q.    Sweet?
18             A.    Yes.
19             Q.    Okay.  And that was in the social context with
20    you folks going out after work, correct?
21             A.    Uh-huh.
22             THE COURT:  Is that a "yes"?
23             THE WITNESS:  Yes.
24    BY MR. PATTERSON:
25             Q.    And in a social setting where Mr. Andriano was
```

1    not present, correct?

2         A.    When the girls went out, he was not present,

3    correct.

4         Q.    In that context she was friendly, flirtatious,

5    outgoing and sweet, correct?

6         A.    Correct.

7         Q.    In that context Mr. Andriano was not present,

8    correct?

9         A.    Correct.   When we went out, he was not present.

10         Q.    All right.   In those circumstances that you

11    observed Ms. Andriano with Mr. Andriano, would you agree with

12    me that her attitude was more appeasing, subservient and

13    non-confrontational?

14         A.    No.

15         Q.    Would you disagree with that?

16         A.    Yes, I disagree with that.

17         Q.    Okay.   The situation you described with coming

18    home from the birthday party, she was confronted by Joe in

19    the parking lot, correct?

20         A.    Yes.

21         Q.    Okay.   And you now told us it was because of

22    this collateral stuff.   Did you ever tell the -- those things

23    to either me or Detective Ballentine previously --

24         MR. MARTINEZ:   Objection.   Lack of foundation.

25         MR. PATTERSON:   -- that the reason for the --


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          THE COURT:  Hold on.  Finish the question.

2     BY MR. PATTERSON:

3          Q.     -- the reason for the confrontation was because

4     she was seen with another man that night?

5          MR. MARTINEZ:  Objection.  She never said why she

6     knew Joe was upset.

7          THE COURT:  Overruled.  Go ahead and answer the

8     question if you can.

9          MR. PATTERSON:  Sorry.  Would you repeat it for me?

10              (Whereupon, the record was read:

11                   Q.     Okay.  And now you told us it was

12          because of this collateral stuff.  Did you ever

13          tell the -- those thing to either me or Detective

14          Ballentine previously that the reason for the

15          confrontation was because she was seen with another

16          man that night?)

17     BY MR. PATTERSON:

18          Q.     Well, let's slow it down.  Did you ever tell me

19     in my interview that the reason perhaps Joe was angry that

20     evening with Wendi was he may have seen her with another man?

21          A.     We didn't talk about that evening at our

22     interview.

23          Q.     Did you volunteer that information for me?

24          A.     No, I did not.

25          Q.     Did I ask you questions about the relationship

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    between Ms. Andriano and Mr. Andriano in our meeting?

2         A.    Not that I can recall.  If you have a copy of

3    the transcript, I'll look at it.

4         MR. PATTERSON:  May I approach, Your Honor?

5         THE COURT:  Yes.

6              (Pause in proceedings.)

7         MR. MARTINEZ:  Judge, perhaps he could direct her to

8    the area, that way we don't --

9         THE WITNESS:  That would be helpful.

10        THE COURT:  Mr. Patterson, did you want to direct the

11   witness to a specific area?

12        MR. PATTERSON:  Let me look at my notes, Judge,

13   please.  Thank you.

14              (Pause in proceedings.)

15        MR. PATTERSON:  Starting on Page 6 -- actually, it's

16   page 5, "Was she complaining about Joe" --

17        MR. MARTINEZ:  I'm going to object.  She says she

18   didn't recall.  He has to refresh her recollection and then

19   he could ask her.

20        MR. PATTERSON:  Focus on --

21        THE COURT:  I'll sustain the objection.

22   BY MR. PATTERSON:

23        Q.    Okay.  Focus on Page 5, Page 6, Page 7.

24              (Pause in proceedings.)

25        MR. MARTINEZ:  Judge, may we have --


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

```
 1              MR. PATTERSON:  Could you read back my question,
 2      please?
 3                   (Whereupon, the record was read:
 4                   Q.    Did I ask you questions about the
 5              relationship between Ms. Andriano and Mr. Andriano in
 6              our meeting?)
 7              MR. PATTERSON:  Did I?
 8              THE WITNESS:  Yes.
 9      BY MR. PATTERSON:
10              Q.    And specifically on Page 7 --
11              MR. MARTINEZ:  Objection.  Improper impeachment.  She
12      said she did.
13              THE COURT:  Sustained.
14              MR. PATTERSON:  I'm focusing on --
15              THE COURT:  Let me hear the question.
16      BY MR. PATTERSON:
17              Q.    I asked you whether or not there was any kind
18      of physical confrontation.  Your answer --
19              MR. MARTINEZ:  Objection.  Hearsay.
20              THE COURT:  Overruled.  Go ahead and finish the
21      question.
22      BY MR. PATTERSON:
23              Q.    -- Um, not physical confrontation, other than
24      they had a fight, had a spat.  Question, Okay --
25              MR. MARTINEZ:  Objection.  Hearsay.  If he wants to
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

```
 1    just read the transcript, we can just submit it to the jury.
 2              THE COURT:  Let me hear the question.
 3    BY MR. PATTERSON:
 4         Q.    Okay.  Can you tell me a little bit about that?
 5    Your answer --
 6              MR. MARTINEZ:  Objection.  Hearsay.
 7              THE COURT:  Overruled.  Go ahead.
 8    BY MR. PATTERSON:
 9         Q.    I think one time she told me --
10              MR. MARTINEZ:  Objection.  Hearsay.
11              MR. PATTERSON:  Judge, you ruled --
12              THE COURT:  Go ahead and finish the question.
13    Overruled.
14    BY MR. PATTERSON:
15         Q.    Your answer, I think one time she told me --
16              MR. MARTINEZ:  Objection.  Hearsay, "she told me."
17              THE COURT:  Overruled.
18    BY MR. PATTERSON:
19         Q.    -- she had fought and they had broken a dresser
20    drawer or something.  He was angry with her.  I asked you --
21    well, was that your answer to my series of questions?
22         A.    Yes.
23         Q.    I asked you a generalized question about
24    physical confrontations, and all you could recollect in our
25    meeting was one episode involving a dresser.  Isn't that
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    accurate?

2            A.    Uh-huh.

3            THE COURT:  Is that a "yes"?

4            THE WITNESS:  Yes.

5            THE COURT:  Make sure you give a verbal response.

6    BY MR. PATTERSON:

7            Q.    You didn't bring up this other physical

8    confrontation in the parking lot with this boyfriend or boy

9    at the time, did you?

10           A.    I did not.

11                 (Check all that -- transcript.)

12           Q.    Okay.  Let's talk about you.  You began your

13   employment there in January of 2000, correct?

14           A.    Correct.

15           Q.    And through October of 2000 is about a 10-month

16   period, right?

17           A.    Correct.

18           Q.    And you had, obviously, Monday through Friday,

19   probably, had daily contact with Wendi Andriano, correct?

20           A.    Correct.

21           Q.    Okay.  And then on a weekly basis or bi-weekly

22   basis, you may have gone out socially with her, correct?

23           A.    Correct.

24           Q.    Okay.  And you would have conversations with

25   her at that time?


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          A.     Yes.

2          Q.     Okay.  And so you were aware that they were

3    having domestic problems, she and Mr. Andriano?

4          A.     Domestic problems such as --

5          Q.     The marriage had some problems?

6          A.     They were having trouble with his illness, yes.

7          Q.     Beyond the illness, they were having other

8    problems?

9          A.     Such as what?

10         Q.     Such as -- I don't know how else to describe

11   it.  Difficulty between man and wife in a husband and wife

12   kind of relationship?

13         A.     She expressed difficulty in the relationship,

14   yes.

15         Q.     And she attributed those problems to the

16   conduct of Mr. Andriano, correct?

17         A.     More so towards his illness.

18         Q.     Illness was one of the problems, but there were

19   other items that were causing marital discord between these

20   two individuals, correct?

21         A.     That I don't know of.

22         Q.     Are you telling me that she never suggested

23   that she was having problems with Mr. Andriano?

24         A.     No, I'm not suggesting that.  I'm suggesting

25   that it was more so due to the illness and how difficult it

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    was for her to deal with.

2         Q.    Okay.  And that the illness then created a -- a

3    response or attitude of Mr. Andriano's that made life with

4    him difficult?

5         A.    Yes, it made her life difficult.

6         Q.    Okay.  And you were aware that Mr. Andriano had

7    a temper?

8         A.    I did not see Joe's temper.

9         Q.    Well, you told it to Detective Ballentine

10   didn't you?

11        A.    That was a long time ago.  I would have to

12   look at that transcript as well.

13        Q.    All right.

14        A.    I heard more of Joe than from Joe.

15        Q.    Okay.  But you were aware that Mr. Andriano had

16   a temper and you told that to Detective Ballentine?

17        MR. MARTINEZ:  Objection.  Lack of foundation, how

18   it is she knows.

19        THE COURT:  Sustained.

20   BY MR. PATTERSON:

21        Q.    It was reported to you that Mr. Andriano had a

22   temper?

23        A.    Yes.

24        MR. MARTINEZ:  Objection.  The answer is hearsay,

25        THE COURT:  Sustained.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          MR. PATTERSON:  We need to talk, Judge.

2          THE COURT:  Ask your next question.  Rephrase the

3    question.  Let me hear the question.

4    BY MR. PATTERSON:

5          Q.     These conversations that you had, it was Ms.

6    Andriano's position that Mr. Andriano had a temper?

7          A.     Yes, she did tell me he had a temper.

8          Q.     Okay.  You saw Mr. Andriano manifest some of

9    that temper the evening when he came home from the birthday

10   party.  He threw a telephone, correct?

11         A.     Correct, he threw a telephone.

12         Q.     Okay.  And he was angry at Ms. Andriano,

13   correct?

14         A.     Correct.

15         Q.     You also saw manifestations of that temper when

16   you observed a dresser that had been broken in Wendi's

17   apartment?

18         A.     I did not observe the dresser.

19         Q.     Okay.  You were -- had been told that a dresser

20   had been broken?

21         A.     Correct.

22         Q.     Okay.  You in fact recommended to Wendi that

23   she either move him out or get a divorce?

24         A.     I did.

25         Q.     Okay.  And that was based upon information that

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    you had pertaining to their relationship, correct?

2           A.    That she told me, yes.

3           Q.    Okay.  But you also observed things too.  For

4    instance, on those occasions when you'd been out socially

5    with Ms. Andriano, she would receive constant telephone calls

6    from Mr. Andriano, wouldn't she?

7           MR. MARTINEZ:  Objection.  Lack of foundation.

8           THE COURT:  Sustained.  Lay some foundation.

9    BY MR. PATTERSON:

10          Q.    Were you present with Ms. Andriano socially at

11   places like Rockin Rodeo and Tijuana Country Club, those

12   kinds of places?

13          A.    Yes, I was.

14          Q.    And Ms. Andriano would receive phone calls

15   reportedly from Mr. Andriano?

16          MR. MARTINEZ:  Objection.  Lack of foundation.  She

17   said she went out bi-weekly sometimes.

18          THE COURT:  Overruled.  Go ahead and answer the

19   question if you can.

20          THE WITNESS:  We were at a sports bar after the ball

21   game and she did receive phone calls.  As far as Tijuana

22   Country Club and Rockin Rodeo, no, sir.

23   BY MR. PATTERSON:

24          Q.    I'm taking about her receiving an abundance

25   of --


        TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          MR. MARTINEZ:  Objection.  Lack of foundation.  Now

2     we're talking about sports bars.

3          THE COURT:  Go ahead and answer the question if you

4     can.

5          THE WITNESS:  One night.

6     BY MR. PATTERSON:

7          Q.     Okay.  And she received constant calling from

8     Mr. Andriano, correct?

9          A.     She received a number of calls that night, yes.

10         Q.     And it got so bad she had to turn her phone

11    off, didn't she?

12         A.     That I can't answer for you.

13         Q.     And the substance of those phone calls, at

14    least as advised to you by Ms. Andriano, was that she had to

15    get home, he wanted her home?

16         A.     She didn't advise me of those phone calls.

17         Q.     Okay.  She would receive phone calls from Mr.

18    Andriano at work, correct?

19         A.     Correct.

20         Q.     And he would insist that she come home and do

21    things for him like change the children's diapers?

22         MR. MARTINEZ:  Objection.  Hearsay.

23         THE COURT:  Sustained.

24    BY MR. PATTERSON:

25         Q.     You would -- Ms. Andriano had to leave as a


                TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1      result of these phone calls, correct?

2              MR. MARTINEZ:  Objection.  Hearsay.

3              THE COURT:  Overruled.

4              THE WITNESS:  She did go home.

5      BY MR. PATTERSON:

6          Q.     Okay.  And she advised you that she was on your

7      way home to change diapers, take care of things at home?

8              MR. MARTINEZ:  Objection.  Hearsay.

9              THE COURT:  Sustained.

10     BY MR. PATTERSON:

11         Q.     There were occasions when Mr. Andriano would

12     come to the office and lay on the horn in an effort to get

13     Wendi to come out and talk with him?

14         A.     I don't recall that.

15         Q.     You never complained of that to Ms. Andriano?

16         A.     That he came and laid on the horn?

17         Q.     Yes.  Beep, beep, beep, beep, beep, laying on

18     the horn, demanding that Ms. Andriano come out and speak with

19     him?

20         A.     No, I don't recall that.

21         Q.     Things were, in your opinion, so bad that you

22     made an effort to seek out Wendi's mother and inform her of

23     your concerns about their relationship, didn't you?

24         A.     I don't recall speaking to Wendi's mother.

25     Seeking her out?  I spoke to her when she would visit.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          Q.     Okay.  You made an effort to relate to Donna
2    Ochoa, Wendi's mother, your concerns about the relationship
3    between Wendi Andriano and Joe Andriano?
4          A.     Specifically, I can't remember what we talked
5    about, sir.
6          Q.     Are you denying that you ever had any
7    conversation with Donna Ochoa about your concerns about the
8    relationship between Wendi Andriano and Joe Andriano?
9          A.     I'm not denying I had a conversation with her.
10   I don't recall the conversation, what it all entailed.
11         Q.     Would one of those conversations have involved
12   your concern about the relationship between Wendi Andriano
13   and Joe Andriano?
14         A.     I don't recall what the conversation entailed.
15         Q.     You're aware, obviously, that Ms. Andriano had
16   a personal relationship with a Rick Freeland, correct?
17         A.     Yes.
18         Q.     Okay.  And that continued for about five weeks?
19         A.     I can't answer that for you.
20         Q.     Okay.  More than two weeks?
21         A.     Yes.
22         Q.     Okay.  And yet you made no effort whatsoever to
23   contact Mr. Andriano and advise him of what you observed, did
24   you?
25         A.     No.


             TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          Q.     You never brought the existence of this

2     personal relationship between Wendi Andriano and Rick

3     Freeland to the attention of Mr. Andriano, did you?

4          A.     That wasn't my place, no.

5          Q.     Did you?

6          A.     No, sir.  I did not.

7          Q.     Okay.  Let's talk about some of the things that

8     you observed in that 10-month period there in San Riva.  You

9     observed Wendi Andriano have a personal relationship with a

10    Rick Freeland, correct?

11         A.     Yes.

12         Q.     And she discussed that with you openly?

13         A.     Yes.

14         Q.     She made no effort to hide it from the persons

15    in the office?

16         A.     No, she did not.

17         Q.     Okay.  She went over in fact on certain

18    occasions, actually knocked on his door and requested he come

19    out, correct?

20         A.     Yes.

21         Q.     And that was in public, correct?

22         A.     Yes.

23         Q.     She also apparently confided in you about a

24    relationship with Mr. Travis Black?

25         A.     I was aware of that, yes.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1        Q.     Okay.  That, too, was open, at least with
2    regard to you?
3        A.     Yes.
4        Q.     Correct?  Okay.  She made no effort to hide
5    that relationship from you, did she?
6        A.     No.
7        Q.     In the office set up there, she openly was in
8    the process of creating a fictitious business license,
9    correct?
10       A.     Yes.
11       Q.     You observed that?
12       A.     Yes.
13       Q.     She made no effort to hide that fact from you
14   in doing it, correct?
15       A.     To a point.
16       Q.     Right.  And then when you inquired of it, she
17   basically said it's none of your business, leave me alone?
18       A.     Correct.
19       Q.     But she did it at a time during business hours,
20   correct?
21       A.     She did, yes.
22       Q.     When you were a witness to it?
23       A.     Yes.
24       Q.     There came a time when there was a cardboard
25   box package in the office, correct?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1        A.    Correct.

2        Q.    You saw that package?

3        A.    I saw the package, yes.

4        Q.    Okay.  It was in the -- in the office complex,
5   correct?

6        A.    No, it was in her arms.

7        Q.    Okay.  I'm sorry.  She's carrying it in the
8   office, correct?

9        A.    Correct.

10       Q.    She made no effort to hide it from you?

11       A.    No, correct.  Not that box.

12       Q.    When you inquired, she basically said it was a
13   package for a friend, right?

14       A.    Correct.

15       Q.    All right.  Again, did you have a conversation
16   with Detective Ballentine?

17       A.    Yes.

18       Q.    And it was tape recorded, correct?

19       A.    Yes.

20       Q.    Okay.  You claim now in court that Wendi used
21   the "F" word in the context with Joe Andriano, "Get up off
22   your fucking ass."  Is that what you're telling us?

23       A.    She said, "Get your fucking ass up."

24       Q.    Okay.  You never told that fact to Detective
25   Ballentine, did you?


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          A.     Yes, I did.

2          Q.     Okay.  Did you use the "F" word in your

3    discussions with Detective Ballentine?

4          A.     Yes.  I would have said "f-ing."

5          Q.     Okay.  And you certainly didn't tell me about

6    that situation, did you?

7          A.     I believe I did.

8          Q.     Well, we could go through the transcript.  I

9    don't see it in the transcript, so --

10         MR. MARTINEZ:  Objection.  Vouching, what he sees.

11         THE COURT:  Sustained.

12         MR. PATTERSON:  We could sit here and have her look

13    through it again.

14         THE WITNESS:  Using the "F" word?

15    BY MR. PATTERSON:

16         Q.     Yes.  Is that what you're saying?

17         A.     Yes.

18         Q.     Do you recall using the "F" word with me in my

19    interview?

20         A.     Yes.

21         Q.     Okay.

22         MR. PATTERSON:  May I approach the witness, Judge?

23         THE COURT:  Yes --

24         MR. PATTERSON:  Would you please try to locate it for

25    me?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

```
 1              THE WITNESS:  I have a --
 2              MR. MARTINEZ:  Judge --
 3              THE COURT:  You have a copy of the transcript there
 4    in front of you?
 5              THE WITNESS:  I do.
 6              THE COURT:  Why don't you review that.  Just wait
 7    until Mr. Patterson asks the next question.
 8              MR. PATTERSON:  Judge, I think I gave her two sets.
 9              THE COURT:  Right.
10              MR. PATTERSON:  I'll take one back.
11              THE COURT:  She has a set already.
12                   (Pause in proceedings.)
13              THE COURT:  While we're waiting, you could get up
14    and stretch if you'd like.
15                   (Pause in proceedings.)
16              THE WITNESS:  Okay.
17    BY MR. PATTERSON:
18         Q.    Did you find it for me?
19         A.    No.
20         Q.    Okay.  It's not in the transcript, is it?
21         A.    It's not in your transcript, no.
22         Q.    So you didn't, according to my transcript, you
23    never mentioned --
24         A.    Not that portion of it's in there, so --.
25         Q.    Let me ask the question.  Based upon your
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    perusal of the transcript, you never told me that Wendi used

2    the "F" word that night insisting that her husband get up?

3         A.   No.   None of that part is in there.

4         Q.   I gather that you were a bookkeeper slash

5    director of social activities, correct?

6         A.   Correct.

7         Q.   All right.  And one of the social activities

8    that you had at the complex was pool parties?

9         A.   Correct.

10        Q.   Okay.  And was that kind of a monthly thing in

11   the summer or --

12        A.   We tried to.

13        Q.   Okay.  And they were well attended, I gather,

14   at San Riva?

15        A.   Yes.

16        Q.   And on occasion -- well, maybe on more than one

17   occasion, at each pool party would you have a keg of beer?

18        A.   There was a couple, yes.

19        Q.   Couple of kegs or couple of times?

20        A.   Couple of times, yes.

21        Q.   Okay.  Would you allow the residents to bring

22   their own alcoholic beverages?

23        A.   Yes.

24        Q.   So there was certainly no prohibition on the

25   use of alcoholic beverages at those pool parties, correct?


        TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          A.     No.  It was allowed.

2          Q.     Okay.  And your job, I gather, was to kind of

3   make certain that people were having fun at this pool party

4   as the director of social activity?

5          A.     Yes.

6          Q.     Okay.  So you would -- you would mingle or

7   meander around the people at these parties?

8          A.     Yes.

9          Q.     Okay.  You wouldn't keep track of the number of

10  alcoholic beverages that the party goers were consuming at

11  these parties, would you?  That wasn't one of your jobs.

12         A.     No.

13         Q.     Certainly, with all the number of people at

14  these parties, there's no humanly way you could keep track of

15  alcohol consumption of these party goers, correct?

16         A.     No, sir.

17         Q.     What I suggest is that you would only have

18  noticed if there had been a problem, if somebody had too much

19  you would have remembered that, right?

20         A.     Yes, I would have remembered that.

21         Q.     Okay.  All right.  Let's talk about the

22  business of Fairfield Properties.  That was your employer

23  back in January of 2000?

24         A.     Yes.

25         Q.     Okay.  They owned the property, right?


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          A.     No.  They managed the property.

2          Q.     Okay.  My mistake.  You're right.  But they

3     were the developer of the project?

4          A.     Correct.

5          Q.     Okay.  And what their practice was, as

6     developers of apartment projects, that was their business,

7     right?

8          MR. MARTINEZ:  Objection.  Lack of foundation.

9          MR. PATTERSON:  If she knows, Judge.

10         THE COURT:  Overruled.  If you know.

11         THE WITNESS:  Repeat the question.

12    BY MR. PATTERSON:

13         Q.     Fairfield Properties developed apartments,

14    luxury apartment complexes.  That was their business,

15    principle business, right?

16         A.     Correct.

17         Q.     Right.  And then they hired folks like Wendi

18    and you to run them, right?

19         A.     Correct.

20         Q.     Okay.  And then they would ultimately sell them

21    to investors, correct?

22         A.     Yes, some of them, yes.

23         Q.     Okay.  And this particular property, San Riva,

24    was on the market to be sold, correct?

25         A.     Correct.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          Q.     All right.  And one of the things that
2    Fairfield Properties encouraged you folks to do is maximize
3    the occupancy rate, correct?

4          A.     Correct.

5          Q.     Because that makes the property more valuable
6    to be sold?

7          A.     Correct.

8          Q.     Okay.  So to that end you folks used tenant
9    locator services, correct?

10         A.     Correct.

11         Q.     You gave out special fliers advertising
12   specials, move-in specials, so much off if you'd sign such
13   and such a lease?

14         A.     Correct.

15         Q.     And that -- okay.  And that was an effort in
16   part of the management team on site at San Riva to maximize
17   occupancy, correct?

18         A.     Correct.

19         Q.     You would agree also it's easier to keep a
20   tenant than it is to go out and find a new one?

21         A.     Keep a good one.

22         Q.     You agree?

23         A.     Correct.

24         Q.     But it's easier to keep a good one than go out
25   and find another one?


          TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1        A.    Correct.

2        Q.    So efforts were made on the part of the

3   management team, specifically the resident manager, to keep

4   the tenants happy on site so they don't move out?

5        A.    Correct.

6        Q.    All right.  Let me show you -- as I get older I

7   have to do this more and more.  Exhibit 230, that's been

8   admitted into evidence.  It's a stack of 5-day notices, isn't

9   it?

10       A.    It is.

11       Q.    Did you count how many 5-day notices there are?

12       A.    Will I count them?

13       Q.    Have you counted them up to this point?

14       A.    No.

15       Q.    Okay.  Would you count them for us?

16             (Pause in proceedings.)

17       THE WITNESS:  There's 29 here.

18   BY MR. PATTERSON:

19       Q.    29 separate notices, correct?

20       A.    Correct.

21       Q.    Mr. Martinez brought to your attention two of

22   them, right?

23       A.    Correct.

24       Q.    One was Rick Freeland and one was Erik

25   Vaillant, correct?


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    A.    Correct.

2    Q.    But there were 27 other 5-day notices that were

3  cancelled, if you will, by virtue of this cover sheet that's

4  on them, correct?

5    A.    Correct.

6    Q.    All right.  And one of the ones that was

7  cancelled was your housekeeper, wasn't it?  Maybe I could

8  help you.  Here we go, right on top.  Do you recall who your

9  housekeeper was back in 2000?

10    A.    Debbie -- I don't remember her last name.

11    Q.    Who's that 5 day to?

12    A.    Hines.

13    Q.    Debbie Hines?

14    A.    Yes.  It says Debbie Hines.

15    Q.    So you were about to terminate or commence

16  legal proceedings on your very own housekeeper?

17    MR. MARTINEZ:  Objection.  Look of foundation.  She

18  says she doesn't know whose that is.

19    THE COURT:  Sustained.  Lay some foundation.

20    MR. PATTERSON:  Well, she recalls the housekeeper

21  being named Debbie.

22  BY MR. PATTERSON:

23    Q.    Do you recall anything else about her, what

24  room did -- what apartment did she live?

25    A.    I don't remember her apartment number.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          Q.     You had a housekeeper named Debbie terminated

2    for failure of rent payment?

3          MR. MARTINEZ:  Again, objection.

4          THE COURT:  Overruled.  If you know.

5          THE WITNESS:  I don't recall.  I don't recall the

6    housekeeper's name.  I believe it was Debbie.  I don't recall

7    if I was sending her a notice.

8    BY MR. PATTERSON:

9          Q.     Let's talk about essentially what we have

10   here.  These five day notices have to be delivered to the

11   tenant in order to initiate the legal process of eviction or

12   forcible detainer as we call it in Arizona, correct?

13         A.     Yes.

14         Q.     Cancelling these 5-day notices doesn't relieve

15   the tenant of his responsibility to pay rent, does it?

16         A.     No.  They're still required to pay rent.

17         Q.     Exactly.  So by not serving these things, you

18   didn't relieve Rick Freeland of his obligation to pay rent at

19   San Riva Apartments, did you?

20         A.     He still owed the rent, yes.

21         Q.     Still owed the money, right?

22         A.     Yes.

23         Q.     Okay.  And as of the date you put this

24   together, he owed, looks like 904 bucks and some change, and

25   then a late charge, $25 late fee, and $10 attorney fee,

1     right?

2              A.    If that's what it says, yes.

3              Q.    And these are figures based upon your books,

4     right?

5              A.    Correct.

6              Q.    That's why you create these because you have

7     the figures?

8              A.    Correct.

9              Q.    All right.  So, again, by cancelling this, you

10    don't relieve Rick Freeland of his obligation to pay the

11    money described herein?

12             A.    He still owed the money.

13             Q.    Same thing with Erik Vaillant?

14             A.    Correct.

15             Q.    Still owed the money?

16             A.    Correct.

17             Q.    Okay.  And as I understand this cover sheet,

18    what you were cancelling, at least it appears, is

19    instructions to Arizona Legal Services, right?

20             A.    Correct.

21             Q.    Okay.  That didn't preclude the possibility

22    that you personally could have taken each of those out and

23    dropped them off at each of the doors, right?

24             A.    We could have served them, yes.

25             Q.    Right.  All you're cancelling is the legal

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    services business that does that chore for you?

2              A.     Notification for further services, yes.

3              Q.     Right.  There's a business out there that will

4    take a stack of these and go door to door and deliver them,

5    right?

6              A.     Correct.

7              Q.     Okay.  This cover sheet appears to cancel that

8    service, correct?

9              A.     Cancels notices to Arizona Legal Services, yes.

10             Q.     Right.  But it doesn't preclude somebody from

11   San Riva from going door to door and handing these out,

12   correct?

13             A.     We could have done that, yes.

14             Q.     And in fact doesn't that happen in your

15   industry?  Because, you know, these people go to the door and

16   say Mrs. Jones, you're late.  Oh, I'm sorry, I didn't get the

17   check to you, here you go.  Doesn't that happen in your

18   industry?

19             A.     We could deliver the notices in our industry,

20   yes.

21             Q.     Right.  And they would pay you, right?

22             A.     Yes, some of them, they would.

23             Q.     And they wouldn't get evicted, right?

24             A.     Correct.

25             Q.     Okay.  I'm almost done, ma'am.  Let me just

1    bounce around a little bit here.

2           Okay.  You've, I gathered, been in the

3    apartment leasing industry most of your life, right?  Isn't

4    that your --

5       A.    No.

6       Q.    I mean -- well, bad question.  Let me start

7    over.

8           You transferred into San Riva from San Simeon,

9    which is another Fairfield property, right?

10      A.    Correct.

11      Q.    So you had how many years in the business as of

12   January 2000?

13      A.    Two.

14      Q.    Okay.  And then about 10 months through

15   October --

16      A.    Uh-huh.

17      Q.    -- of 2000, so almost three years experience?

18      A.    Correct.

19      Q.    Okay.  And in your experience, are there

20   tenants who leave the apartment prior to the expiration of

21   the lease?

22      A.    Yes.

23      Q.    And are there tenants who leave the apartment

24   prior to the expiration of the lease that leave behind

25   furniture?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1     A.     Yes.

2     Q.     Okay.  And other personal belongings?

3     A.     Yes.

4     Q.     Okay.  And as a practical matter, I guess

5  technically you guys are supposed to seize that stuff and

6  sell it and apply it to the account for non -- whatever rent

7  may be due you, right?

8     A.     If there are things that are left and they're

9  after a certain period of time.

10    Q.     30 days maybe?

11    A.     I believe that's what it was.

12    Q.     Okay.

13    A.     They become property of the community.

14    Q.     Exactly.  And there are times then perhaps you

15  sell that stuff and use it to defray any outstanding rent

16  balance that might be owed or you might just keep the stuff,

17  right?

18    A.     I don't believe that we ever sold anything to

19  put into an account, no.

20    Q.     All right.  But then you just kept the stuff,

21  right?

22    A.     It would be placed in storage.

23    Q.     Okay.  But you offered furnished apartments at

24  that location, correct?

25    A.     No.


        TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          Q.     No?  Okay.

2          A.     We had guest suites.

3          Q.     All right.  Would you use that abandoned

4    property in the guest suites?

5          A.     No.

6          Q.     Okay.  Do you know any employees who have taken

7    that stuff and used it for their own personal purposes?

8          A.     There was some employees.  I know we had

9    offered a bed to a needy person at one particular point in

10   time.

11         Q.     All right.  And these are decisions that would

12   be made by the resident manager, correct?

13         A.     Correct.

14         Q.     Did Wendi display photographs of her family in

15   her office?

16         A.     Yes.

17         Q.     Okay.  And did the residents of this complex go

18   into Wendi's office periodically?

19         A.     Yes.

20         Q.     Okay.  And this door that you describe, the

21   manager area, you had a front door for potential renters to

22   come in, right?

23         A.     Correct.

24         Q.     But that rear door was called the resident's

25   entrance, right?


         TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

64

1      A.    Correct.

2      Q.    And that was for use of the residents of the

3  San Riva complex to come and visit you folks in the

4  management office, right?

5      A.    Correct.  They could enter that way also.

6      MR. PATTERSON:  Judge, if I could just have a minute?

7      THE COURT:  Yes.

8      MR. PATTERSON:  I think I'm done.

9          (Pause in proceedings.)

10     MR. PATTERSON:  Thank you, Judge.  I have nothing

11  additional at this time.

12     THE COURT:  Mr. Martinez, redirect examination?

13

14  REDIRECT EXAMINATION BY MR. MARTINEZ:

15     Q.    Ma'am, are you the moral police for the San

16  Riva apartment complex?

17     MR. PATTERSON:  Objection, form of the question.

18     THE COURT:  Overruled.  Go ahead and answer the

19  question if you can.

20     THE WITNESS:  No.

21  BY MR. MARTINEZ:

22     Q.    Is it part of your job to go telling Joseph

23  Andriano that his wife is out having sexual intercourse with

24  other men?

25     A.    No.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          MR. PATTERSON:  Objection, Your Honor.  Leading.

2          THE COURT:  Let's move on, Mr. Martinez.

3    BY MR. MARTINEZ:

4          Q.    Well, you were asked about it that you didn't

5    tell him -- that you didn't tell Mr. Andriano that his wife

6    was having sex.  Do you remember that during

7    cross-examination?

8          A.    Yes.

9          Q.    Is that part of your job to go do that?

10         A.    No.

11         Q.    Is it -- do you have a moral obligation

12   somewhere that we don't know about that you need to go

13   tattle --

14         MR. PATTERSON:  Objection.  Leading.

15         THE COURT:  Overruled.  Go ahead and answer the

16   question if you can.

17         THE WITNESS:  No.

18   BY MR. MARTINEZ:

19         Q.    You were also asked about the transcript and

20   the -- about the interview that was given to you by you and

21   the defense attorney.  Do you remember that?

22         A.    Yes.

23         Q.    We were told there was a number of people

24   there, you had this back and forth conversation that you were

25   present, the investigator was present, I think your --


              TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1        A.      Yes.

2        Q.      -- son was present?

3        A.      Yes.

4        Q.      Was Mr. Martinez, the prosecutor, invited to

5   this little social soiree?

6        A.      No.

7        Q.      Was he there to perhaps ask any questions or

8   anything?

9        A.      No.

10       Q.      It was just you and the defense attorney,

11   right?

12       A.      That's correct.

13       Q.      Were you the one that was directing this

14   interview?  In other words, were you the one that said, well,

15   you missed this or missed that, or was he the one asking the

16   questions?

17       A.      He was asking the questions.

18       Q.      Who set up the interview?

19       A.      He did.

20       Q.      Did you show up at the time that he wanted you

21   to show up?

22       A.      Yes.

23       Q.      Did you tell him "No, I'm not going to

24   cooperate with you in any way, shape or form"?

25              MR. PATTERSON:  Judge, this is clearly leading.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          THE COURT:  Overruled.  Go ahead and answer the
2   question if you can.
3          THE WITNESS:  No.
4   BY MR. MARTINEZ:
5          Q.   Did you answer everything that he asked you
6   with regard to that interview?
7          A.   Yes.
8          Q.   Did you answer his questions?
9          A.   Every one.
10         Q.   At any time did you say to him I'm tired, you
11   know, my child is running around, or did you ever at any time
12   give him any excuse for you wanting to terminate the
13   interview?
14         MR. PATTERSON:  Leading.
15         THE COURT:  Overruled.
16         THE WITNESS:  No.
17   BY MR. MARTINEZ:
18         Q.   On the -- whose request or whose insistence, at
19   whose direction was the interview terminated?
20         A.   He was finished.  It was his.
21         Q.   You also told us, and you were given some time
22   today, to review a transcript of the interview.  Do you
23   remember that earlier?
24         A.   Yes.
25         Q.   Did he ever call you up again?  He obviously


          TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    has your number.  Did he ever call you up again and say,

2    "Hey, here's the interview we had.  Would you mind reviewing

3    this to see whether or not there's anything missing"?

4         A.    No.

5         Q.    Did he ever provide you the courtesy of that

6    tape that you indicated that he had running?

7         A.    No.

8         Q.    Now, you did tell us, and correct me if I'm

9    wrong, please, something about -- well, when you -- when you

10   were being asked about the word "fucking," I think that's

11   what we were talking about.  Was that your understanding?

12        A.    Yes.

13        Q.    Now, with regard to that particular word, you

14   said, well, none of these parts is in -- or none of that part

15   is in the transcript.  Do you remember making a statement to

16   that effect?

17        A.    Yes.

18        Q.    What did you mean by that?

19        A.    The whole incident of him laying on the floor

20   trying to pick him up is not in there.

21        Q.    So in this transcript that he gave you, it's

22   never even asked about then, right?

23        A.    No.

24        Q.    So it is true in a sense that that word isn't

25   in there though, right?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          MR. PATTERSON:  Judge, can we approach?

2          THE COURT:  Yes.

3                  (The following proceedings were held at the

4      bench:)

5          MR. PATTERSON:  This is leading.  He's suggesting

6      the answer in his question and she's giving yes or no

7      responses.  This is black letter leading.

8          THE COURT:  Listen to the last question.  He asked

9      whether the "F" word was in the transcript.  That's a yes or

10     no question, but that's not leading.  That's just a yes or no

11     question.

12         MR. PATTERSON:  He asks so many questions in context

13     and consequence that most of them are leading and

14     occasionally he gets one that's right.

15         THE COURT:  Okay.  The last question was I believe

16     whether the "F" word was in the transcript, and that's a yes

17     or no question.  It's not a leading question suggesting an

18     answer, okay?

19

20                  (The following proceedings were held in open

21     court:)

22

23         THE COURT:  Go ahead and answer the question if you

24     can.

25         THE WITNESS:  Could you repeat the question?


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1           (Whereupon, the record was read:

2                Q.   So it is true in a sense that that

3      word isn't in there though, right?)

4      THE WITNESS:  Correct.

5  BY MR. MARTINEZ:

6           Q.   With regard to this issue of the property and

7      items that may have been left over and the furniture, that

8      sort of thing, I think you said something to the effect that

9      one time that you can remember a needy person got a bed.  Do

10     you remember telling us that?

11          A.   Yes.

12          Q.   Was Rick Freeland in your opinion a needy

13     person?

14          A.   No.

15          Q.   Did you -- for example, did Erik Vaillant ever

16     get a big screen TV?

17          A.   No.

18          Q.   Did anybody else in that complex get a big

19     screen TV from the defendant?

20          A.   No.

21          Q.   Did Rick Freeland get a big screen television?

22          A.   He received a television.

23          Q.   From whom?

24          A.   From Wendi.

25          Q.   And where did that television come from?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1        A.      We had some residents that were moving out and
2    selling their furnishings.  She purchased it for him.
3        Q.      So it wasn't like it was left behind then?
4        A.      No.
5        Q.      What else did she purchase from these people
6    that were moving out?
7        A.      A bed.
8        Q.      Where did that bed go to?
9        A.      To Rick Freeland.
10       Q.      Anything else that she purchased from these
11   people?
12       A.      Couch, dining room table, coffee table.
13       Q.      How about the couch?  Where did that end up?
14       A.      With Rick Freeland.
15       Q.      How about the dining room table?
16       A.      With Rick.
17       Q.      And the end tables?
18       A.      With Rick.
19       Q.      You did indicate I think earlier that when
20   people were moving in, there were incentives given to them to
21   move in.  Do you remember telling us that?
22       A.      Yes.
23       Q.      What were some of the incentives that were
24   offered?
25       A.      There were a number of incentives offered.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    They got a portion off their rent, six weeks off, a free

2    month, gift certificates to the mall, a number of different

3    incentives.

4         Q.    Would these incentives -- for example, do you

5    know anything about computers that were being given out?

6         A.    We did have one special promotion that included

7    a computer, uh-huh.

8         Q.    How about a Palm Pilot?

9         A.    Correct, yes.

10        Q.    With regard to these items -- these computers

11   and palm pilots, specifically -- were they ever given to, for

12   example, somebody, a renter or tenant, in the middle of their

13   tenancy?

14        A.    I believe the -- I don't recall the exact

15   special promotion.  They were offered to new leases if they

16   leased for a certain period of time.  Say they signed a

17   13-month lease or whatnot, then they were offered at -- at

18   particular apartments for a particular lease.

19        Q.    But I guess my question is were they just given

20   without the tenant doing anything else in return, for

21   agreeing to do anything else in return?

22        A.    No.  It was for a particular promotion.

23        Q.    With regard to this conversation that you may

24   or may not have had with Donna Ochoa, do you remember how

25   many conversations you may have had with the defendant's


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    mother?

2            A.    Not specifically.  More than a couple.

3            Q.    And where did they take place?

4            A.    She attended one of the pool parties, she came

5    in the office, brought things in for the kids, shopped for

6    Wendi.

7            Q.    When you were at the pool parties, was it, I

8    guess, your function to sit down and talk to Donna Ochoa

9    about her daughter's problems there?  Is that something that

10   you would expect yourself to do?

11           A.    No.

12           Q.    And why is that?  Why would you not talk to her

13   about these things at this pool party?

14           A.    Well, it was in the middle of the community

15   function.

16           Q.    How about when she came in to bring something

17   for the kids?  I think you said something about shopping.

18   Would she come by and stay a long while to visit?

19           A.    She'd stop in to see Wendi's office, take

20   things out of bags, show what they got for the kids, say hi.

21           Q.    Do you remember having a long conversation

22   about any problems at that time that the defendant may have

23   had with her husband?

24           A.    No, I did not.

25           Q.    And I think you mentioned a third conversation,

1    something about just coming by or something like that, or

2    were there any other times you may have spoken to her?

3          A.    Just her coming by the office.

4          Q.    And those contacts where she came by her

5    office, were they something that lasted a long time, you sat

6    back in your office and sort of did a counseling bit or what?

7          A.    No.

8          Q.    Describe them for me, please.

9          A.    Just brief visits.  She would stop by, say hi,

10   how you doing, I went shopping, here's what I got the kids,

11   look what I got Wendi.

12         Q.    One of the things you were telling defense

13   counsel or he was asking about was the defendant's demeanor

14   when she was out with the girls.  Do you remember talking

15   about that?

16         A.    Yes.

17         Q.    What were the terms that were used?  I can't

18   even remember those --

19         A.    Sweet, outgoing, flirty.

20         Q.    Had she been drinking when she was quote,

21   unquote, sweet, outgoing and flirty?

22         A.    Yes.

23         Q.    I guess they indicated that her husband wasn't

24   present, right?

25         A.    Correct.


                 TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          Q.     Was her husband present when she was kissing on

2     this guy that was a friend of Shannon's boyfriend?

3          A.     No.

4          Q.     Was her husband present when she was flirty

5     with the men at this bar?

6          A.     No.

7          Q.     One of the things that you were asked about is

8     the anger that Mr. Andriano may have expressed one time when

9     he threw a telephone.  Do you remember being asked about

10    that?

11         A.     Yes.

12         Q.     And do you remember that you said you thought

13    he was angry at Wendi and --

14         A.     Yes.

15         Q.     -- do you remember you were asked about what he

16    was thinking?  Was it your impression that he was angry at

17    her because she was with another guy or what was -- why was

18    he angry?  Do you even know?

19         A.     Not for certain, no.

20         Q.     But based on the circumstances, what was he

21    angry about?

22              MR. PATTERSON:  Judge, I think she told us she's not

23    certain.

24              THE COURT:  Sustained.

25    / / / / /


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    BY MR. MARTINEZ:

2        Q.    But you did tell us before you were asked about

3    what he was thinking before, weren't you?  Remember during

4    the cross-examination?

5        A.    Yes.

6        Q.    You have no way of knowing what he could or

7    could not have been angry about, right?

8        A.    Correct.

9        Q.    Could even been he was angry about seeing her

10   with another guy?

11       A.    Correct.

12       Q.    You were asked over and over again about, you

13   know, whether or not there was any physical or any outburst

14   or anything about Mr. Andriano and his temper.  Do you

15   remember that?

16       A.    Yes.

17       Q.    In all the times that you ever saw him aside

18   from the one about the parking lot, did you ever see him lose

19   his temper?

20       A.    No.

21       Q.    At any time, again, other than that one time,

22   did you ever see him or hear him raise his voice to the

23   defendant?

24       A.    No, not while he was in the office or I was

25   present, no.

```
 1          Q.    And bottomline, the only time that you saw
 2    him -- and say if this is correct or not -- that you actually
 3    saw him show any emotion was when he threw that telephone,
 4    right?
 5          A.    That's the time I saw him angry, yes.
 6          Q.    Did he hit anybody with it?
 7          A.    No.
 8          Q.    Did he throw it at anybody?
 9          A.    No.  He threw it into the parking lot.
10          Q.    So it wasn't like he was throwing it at her,
11    was it?
12          A.    No.
13          Q.    You were asked about something about some
14    dresser being broken, something like that.  Did you ever see
15    a broken dresser in Wendi's apartment?
16          A.    No.
17          Q.    You had gone into Wendi's apartment, didn't
18    you?
19          A.    I had been in Wendi's apartment, yes.
20          Q.    Had you ever been in the bedroom?
21          A.    Yeah, I have been in her bedroom.
22          Q.    How many times have you been in her bedroom?
23          A.    Maybe twice.
24          Q.    During the two times you went in there, did you
25    ever see a broken dresser?
```

1       A.      No.

2       Q.      You were also asked about whether or not you

3  went to get a key or to see whether or not Mr. Andriano was

4  okay.  Do you remember that?

5       A.      Yes.

6       Q.      Are you somehow part of the security also with

7  San Riva, that's part of your job to do that?

8       A.      No.

9       Q.      Would you have had any sort of authority

10  whatsoever to take a key, go open another tenant's door under

11  those circumstances?

12      A.      No.  Under the -- the existing circumstances,

13  no.

14      Q.      Under those circumstances, just to change the

15  question a little bit, do you have any legal authority to go

16  into your boss's house in the middle of the night?

17      A.      No, not unless there's a fire or --

18      Q.      Was there a fire that night?

19      A.      No.

20      Q.      Was there any reason you could have gone in

21  there that you know of?

22      A.      No.

23      Q.      You indicate -- you were asked about this

24  constant calling that may or may not have happened.  Did it

25  ever happen when you were at Tijuana Tilly's or anything like

1    that?

2          A.    No.

3          Q.    The only time that it happened was one time

4    then.  Is what you told us, if I remember right?

5          A.    Correct.

6          Q.    And was -- what was the occasion that this

7    happened, this one time?

8          A.    We had gone to a softball game and stopped at a

9    sports club, sports club after that.

10         Q.    Was this a softball team that you talked about

11   at San Riva actually sponsored at the time?

12         A.    Correct.

13         Q.    Is this the team that had Rick Freeland on it?

14         A.    Yes.

15         Q.    And was the constant calling while the game was

16   going on or after the game was over?

17         A.    After the game.

18         Q.    So during the -- when the game was going on,

19   there were no calls to your knowledge?

20         MR. PATTERSON:  Objection.  Leading.

21         THE COURT:  Don't lead.

22   BY MR. MARTINEZ:

23         Q.    Were there any calls during that time?

24         A.    Not that I was aware of.

25         Q.    And -- well, I'm asking what you're aware of.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1   Were there any calls?

2          A.    No.

3          Q.    How about when did the calls begin to your

4   knowledge?

5          A.    When we were at the bar.

6          Q.    Do you know whether or not there were any male

7   patrons and saying -- say I'm taking care of your old lady in

8   response to any of that?

9          MR. PATTERSON:  Objection.  Leading and --

10         THE COURT:  I'll sustain the objection.

11         MR. PATTERSON:  -- 404 (B).

12         THE COURT:  I'll sustain the objection.  Ask your

13  next question.

14  BY MR. MARTINEZ:

15         Q.    Now, the other questions I have are with regard

16  to that night that this happened.  You were asked about the

17  second phone call.  Do you remember being asked about that?

18         A.    Yes.

19         Q.    And you were asked whether or not there was a

20  sense of urgency.  Do you remember that?

21         A.    Yes.

22         Q.    Would you have considered it a sense of urgency

23  or more of a sense of urgency if she told you I just gave him

24  poison or he's taken poison.  Would you consider that more of

25  an urgent situation?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          MR. PATTERSON:  Objection.  Leading.

2          THE COURT:  I'll sustain the objection.  Rephrase

3     the question.

4     BY MR. MARTINEZ:

5          Q.    Do you know whether or not he was poisoned?

6          MR. PATTERSON:  Objection.  No foundation.  Can we

7     approach the bench?

8          THE COURT:  I'm sustaining the objection.  Ask your

9     next question.

10    BY MR. MARTINEZ:

11         Q.    What did you know about at that time?

12         A.    That Joe had cancer, that he was being treated

13    and that he was dying and she needed help.

14         Q.    That's all you knew.  Nothing else, right?

15         A.    That's all I knew.

16         Q.    So you did go over there, right?

17         A.    I did.

18         Q.    And then that's when you had a conversation,

19    right?

20         A.    Yes.

21         Q.    And there's an issue about whether or not

22    something with a hug, something like that?

23         A.    Yes.

24         Q.    Why don't you relate the conversation that you

25    had for me starting with beginning to end so we know where

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    this issue about the hug fits in.

2              MR. PATTERSON:  Judge, use the question, answer

3    process, not open narrative.

4              THE COURT:  I'll sustain the objection.  Rephrase the

5    question.

6    BY MR. MARTINEZ:

7         Q.    What did she say first?

8         A.    When I walked up, she was outside and I said,

9    "How are you doing?"  She says, "I have a problem."

10        Q.    Okay.  Let me stop you there.  And then what

11   did she say, just so we could follow the mandate, what did

12   she say?

13             THE COURT:  Hold on a second.  Let me see Counsel at

14   the bench.

15

16             (The following proceedings were held at the

17   bench:)

18

19             THE COURT:  No editorial comments.  Let's move on.

20             MR. MARTINEZ:  Okay.

21

22             (The following proceedings were held in open

23   court:)

24

25             THE COURT:  Restate the question, Mr. Martinez.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    BY MR. MARTINEZ:

2              Q.     What did she say next?

3              A.     She said, "Don't ask any questions.  My

4    husband's in on the floor dying and I haven't called 911

5    yet."

6              Q.     Then what did she say?

7              A.     Then I said, "You need to call 911."  And she

8    said "I can't call from out here, I don't have any

9    reception."  And I said, "Let's go inside."  And she said, "I

10   need a hug," and I gave her a hug and we walked inside.

11             Q.     At any time during that conversation did she

12   ever say "He doesn't know I haven't called 911"?

13             A.     On the way in she told me.

14             Q.     So that was after.  That was after?

15             A.     Correct.

16             Q.     So you had that conversation and then you began

17   to walk in?

18             A.     Correct.

19             Q.     Then what is the conversation that takes place?

20             A.     We walked into the apartment and she attempted

21   to call.

22             Q.     No, no, no, no.  As you're walking down the

23   breezeway, what is it that is said?

24             A.     As we were walking inside, she attempted to

25   call again and she said that Joe didn't know she hadn't

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    called, and I said, "You need to call.  If you don't call,

2    you'll regret it the rest of your life."

3         Q.    Okay.  And the hug was immediately preceding

4    that?

5         A.    Correct.

6         Q.    You were asked about walking into the

7    apartment.  Do you remember that?

8         A.    Yes.

9         Q.    When you walked into the apartment you were

10   asked about whether or not you went and spoke to the victim.

11   Do you remember that?

12        A.    Yes.

13        Q.    And what is it that you told the victim?

14        A.    When I went over to Joe, I asked him how he was

15   doing and if he recognized me and he said, "Yes," and I said,

16   "With my glasses on?"  And he said "Yes," and --

17        Q.    And --

18        A.    -- he said, "I need help," and I said, "I know.

19   They're coming."  And he said "I've needed help for a long

20   time."

21        Q.    Did he ever mention a time?

22        A.    Not at that particular point, no.

23        Q.    Later on did he mention a time?

24        A.    He wondered later on why it was taking them 45

25   F-ing minutes.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          Q.    You were asked whether or not, when you walked

2    in, whether or not you thought the defendant posed a threat

3    to her husband.  Do you remember that question?

4          A.    Yes.

5          Q.    Did you know everything about what was going on

6    to make an adequate determination as to whether or not she in

7    fact posed a threat to her husband?

8          MR. PATTERSON:  Judge, that misstates my question,

9    okay?  I asked her from what she observed, did she perceive

10   any threat?

11         THE COURT:  I'll sustain the objection.  Rephrase the

12   question.

13         MR. MARTINEZ:  Okay.  I'll ask the same question.

14   BY MR. MARTINEZ:

15         Q.    From everything that you knew, not only

16   observation, you were asked about observation, but from

17   everything else that you had including observation, did you

18   know that she posed a threat?

19         A.    No.

20         Q.    Did you at that point ever go back to where she

21   was talking to?  I mean, initially when you came in or was

22   that later?

23         A.    After I had spoke with Joe I went back to the

24   back bedroom.

25         Q.    And did she then come back out?

```
 1        A.    Then we came back out to the living room, yes.

 2        Q.    You were asked about something about the

 3   condition of the apartment.  Can you tell me something about

 4   that condition of the apartment?

 5        A.    It was clean, cleaner, than I've seen it.

 6        Q.    And you had been in that apartment many

 7   times -- well, how many times had you been in that apartment?

 8        A.    Four or five.

 9        Q.    And is this when the next conversation happens

10   with the defendant, you and Mr. Andriano?

11        A.    Correct.

12        Q.    And with regard to that conversation, tell me

13   whether or not there was a threat.  What did you see and

14   hear?

15        A.    After she had talked to -- she had been on the

16   phone with 911.  She had asked what his color was --

17        Q.    Okay.

18        A.    -- and --

19        Q.    You don't know what they asked her.  She was

20   asking you questions?

21        A.    She was asking me.

22        Q.    Just give me --

23        A.    She said "How is his color?"

24        Q.    What did you say?

25        A.    I said, "His color is fine."  "Are his lips
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    blue?"  "No, his lips are not blue.  He's having trouble

2    breathing, they need to get here."

3           Q.    Then what was said?

4           A.    Gave that information, hung up the phone and

5    came up behind him.

6           Q.    Then?

7           A.    She said, "I need to get him in the car," and I

8    said "Why?"  She said They're out on other another call.  She

9    proceeded to try to lift him and he said, "Help me."  She

10   said, "Pick your ass up."  He said, "I can't get to the car,

11   I can't.  Why is it taking them 45 F-ing minutes?"  Then she

12   said, "Get your F-ing ass up."

13          Q.    As a result of that, did you let this go on or

14   try to provide any assistance as to what was supposed to --

15   happen?

16          A.    I said, "Wait a minute.  Call them back and

17   find out where they're at."

18          Q.    Was there another call that was made at that

19   point?

20          A.    Yes, she called back.

21          Q.    Did she make that call in front of you or did

22   she make it somewhere else?

23          A.    She made it in front of me.

24          Q.    And how long did that call take?

25          A.    She called them back, told them she had just

1    called in about their husband -- about her husband and wanted

2    to know how far away they were.

3             Q.    And then how far were they according to her?

4             A.    She told me they were a mile or two and I said,

5    "That's three minutes.  We're waiting here."

6             Q.    Then what happened?

7             A.    She put the phone down and I heard the sirens

8    and that's when I --

9             Q.    So you heard the sirens almost immediately upon

10   her putting the phone down?

11            A.    Correct.

12            Q.    Then what, if anything, did you decide to do?

13            A.    Then I told her I was going to go out and flag

14   down the fire department so they knew which apartment to come

15   to.

16            Q.    So was your intent in going out to smoke a

17   cigarette or was your intent to do something else?

18            A.    To flag down the fire department.

19            Q.    Okay.  Did you just happen to take a cigarette

20   with you?

21            A.    I turned around and grabbed a cigarette, yes.

22            Q.    Did you take your purse with you?

23            A.    No.  I left my purse in the chair.

24            Q.    Then what happened?

25            A.    I went out to the front of the building, to the

1    street and waited for the fire department to show up.

2          Q.    And then?

3          A.    They started coming into the back entrance.

4          MR. PATTERSON:  Judge, this is beyond the scope of

5    rebuttal.  She's just repeating direct.

6          THE COURT:  I'll sustain the objection.

7          MR. MARTINEZ:  Well, I want to find out at which

8    point she threw the purse out that you discussed with Mr.

9    Patterson.  If you could, after you go out, describe for us

10   in that sense.

11         THE COURT:  Rephrase the question.

12   BY MR. MARTINEZ:

13         Q.    You indicated that you left without your purse,

14   right?  Do you remember I asked you that, right?

15         A.    Correct.

16         Q.    When you went to meet the paramedics, did you

17   have your purse with you?

18         A.    No, I did not.

19         Q.    Had your purse already been thrown out?

20         A.    No, it hadn't.

21         Q.    So you're out there with the paramedics.  Then

22   what happens as it applies to your purse?

23         A.    As the paramedics were getting out of the fire

24   truck, she screamed from the apartment or hallway "Tell them

25   to go away, go away."  I said "We're coming in.  My purse is

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1   inside." She then threw my purse out the door and closed the

2   door.

3        Q.      Then you were asked which direction you walked,

4   and which direction did you walk and where did you end up?

5        A.      Then I greeted the fire department.  We walked

6   in through the north entrance back to the front of the door

7   of the apartment.

8        Q.      In that north entrance, is that like a parking

9   lot area?  Is that what you're talking about?

10       A.      The breezeway of the apartment building.

11       Q.      And what's on the south part?  Is there a place

12   to park cars on the south part?

13       A.      No.

14       Q.      So when you get to the door, one of the things

15   you were asked about was whether or not you checked the door

16   to see whether or not it was locked.  Do you remember that?

17       A.      Yes.  He asked me if the door was looked.

18       Q.      Do you remember whether or not --

19       MR. PATTERSON:  I didn't ask that question.

20   BY MR. MARTINEZ:

21       Q.      Do you remember whether or not Mr. Patterson

22   asked you if the door was open or locked or unlocked?  Do you

23   remember that question?  Do you remember that earlier today?

24       A.      He asked me if the door was locked?

25       Q.      So I'm going to ask you a little bit about

1    that.  With regard to whether the door was locked or

2    unlocked, did you try the knob?

3            A.    No, I did not.

4            Q.    What did you do?

5            A.    I knocked on the door.

6            Q.    And you were asked about how long you stood

7    there.  Do you remember that?

8            A.    Yes.

9            Q.    How long did you and the fire department stand

10   there?

11           A.    Probably 5 to 10 minutes.

12           Q.    And you were asked whether or not you heard

13   anything or any sounds consistent with a struggle.  Do you

14   remember that?

15           A.    Yes.

16           Q.    Did you hear anything consistent with a

17   struggle?

18           A.    No.

19           Q.    Did you hear any sounds that were consistent

20   with making love?

21           A.    No.

22           Q.    Did you hear any sounds consistent with the tub

23   running?

24           A.    No.

25           Q.    And then you were asked about what direction

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1     the defendant came from.  You were asked whether it was south

2     or north.  Do you remember that?

3          A.   Yes.

4          Q.   And you indicated which direction?

5          A.   She came in from the north entrance.

6          Q.   Would that be the area where the parking lot is

7     and the fire department was staging or would that be the area

8     to the south where there is no parking lot?

9          A.   The parking lot area.

10         Q.   If you are going to -- and where is the

11    apartment?  What part of the building?  Is it on the north or

12    south side?

13         A.   It's on the south side.

14         Q.   If an individual, any individual were walking

15    out through the back and jumping over the back, which is the

16    closest route to take to apartment 132?  If they were going

17    out the back patio door of 132, is it to go from the door

18    here or come in from the south side?

19         MR. PATTERSON:  Judge, this is new direct.

20         THE COURT:  Overruled.  Go ahead and answer the

21    question if you can.

22         THE WITNESS:  South entrance is the closest entrance

23    to her apartment.

24    BY MR. MARTINEZ:

25         Q.   And what direction did she come from?


                TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          A.    The north.

2          Q.    And there was a conversation then, right?

3          A.    Yes.

4          Q.    And you told us about that conversation before,

5    correct?

6          A.    Correct.

7          Q.    And in that conversation was it the fire

8    department's reluctance to do the call that caused them to go

9    away or was it something the defendant said that caused them

10   to go away?

11         MR. PATTERSON:  If she knows, Judge.

12         THE COURT:  If you know.  Only if you know.

13         THE WITNESS:  She asked them to go away.

14   BY MR. MARTINEZ:

15         Q.    What did she say?

16         A.    She said, "We don't want you here.  This is --

17   my husband's dying of cancer.  This isn't how he wanted to

18   go.  I would like you to leave.  We would like you to leave."

19         Q.    And at any time while you're standing there,

20   did you hear any sounds from inside perhaps from the husband?

21         A.    No.

22         Q.    Finally, you are were asked about whether or

23   not she had hidden her activities.  Do you remember that?

24   About, you know, whether or not she had hid them from you?

25         A.    Yes.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1      Q.    And especially or specifically about Rick
2  Freeland, you were asked about that, do you remember?
3      A.    Yes.
4      Q.    And you indicated what?
5      A.    No, she did not.
6      Q.    And was Mr. Andriano present when she was being
7  so open with you?
8      A.    No.
9      Q.    At any time she was being open about Mr.
10 Freeland was Mr. Andriano present?
11     A.    No.
12     Q.    In terms of this situation with Travis Black,
13 was her husband present when she provided you with that
14 knowledge?
15     A.    No.
16     Q.    How about this issue about the fictitious
17 business license?  Do you remember that?
18     A.    Yes.
19     Q.    You indicated that she was the one that was
20 doing it sort of out in the open, right?
21     A.    Correct.
22     Q.    And there was a bit of a conversation that went
23 on.  Can you describe that for me?
24     A.    She was typing up a business license and I
25 asked her what it was for and she said she was starting up

1    another business and I asked her a question about the seal

2    and she said just never mind.

3          Q.    And did you then press her on that?

4          A.    No.

5          Q.    So was she in control then?

6          A.    Yes.

7          Q.    And you obeyed what she told you?

8          A.    Yes.

9          MR. MARTINEZ:   I don't have anything else.

10         THE COURT:   Okay.   Ladies and gentlemen of the jury,

11   after counsel has finished asking their questions I turn to

12   you and ask whether there are any further questions of this

13   witness before the witness is excused.   If you do have a

14   question, raise your hand, write it down.   Don't confer about

15   what that question might be, and don't write your name or

16   juror number on the question.

17              So after each witness, before they're excused,

18   I'll turn to you and ask if there are any further questions

19   of this witness by the jury.   Go ahead and write it down and

20   the bailiff will get the questions from you.

21              Remember that I do apply the same legal

22   standards to your questions as I do to the questions asked by

23   Counsel.   If I don't ask your question, don't be offended.

24   I'm applying the same rules of evidence and the rules of law

25   to your question as I do to the attorneys.


            TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

```
 1                    (Pause in proceedings.)
 2            THE COURT:  May I see Counsel here at the bench?
 3
 4                    (The following proceedings were held at the
 5     bench:)
 6
 7            THE COURT:  First question, "Was cancelling the 5-day
 8     notices standard procedure?"  Any objection from the State?
 9            MR. MARTINEZ:  No.
10            THE COURT:  Any objection from defense?
11            MR. PATTERSON:  I don't understand what "standard
12     procedure" means.
13            MR. MARTINEZ:  She could explain it if --
14            THE COURT:  You could follow-up.  I'll allow you to
15     follow-up.
16            MR. PATTERSON:  I just think it's a poorly worded
17     question.  You need to ask her if she understands the
18     procedure.  I have no objection.  Go ahead.
19            THE COURT:  I'll let you follow up.
20            MR. PATTERSON:  Go ahead.
21            THE COURT:  Next question, "Was Wendi's demeanor
22     different when Joe was present, paren, other than during
23     girls' social nights, end of paren.
24                    Mr. Martinez, any objection?
25            MR. MARTINEZ:  I don't have an objection to the
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    question per se, but if I could just follow up when she is

2    talking about.  Like the previous question, but no objection.

3              MR. PATTERSON:  No objection.

4              THE WITNESS:  I'll allow you to follow-up on that.

5                   Stay here.  There will be more questions.

6              MR. PATTERSON:  Judge, would you also tell the jury

7    that they're not required to have questions?

8              THE COURT:  Right.

9              MR. PATTERSON:  Okay.

10             THE COURT:  Next question, "How long was she outside

11   of the apartment waiting for paramedics?"

12             MR. PATTERSON:  No objection.

13             THE COURT:  Any objection?

14             MR. MARTINEZ:  No.

15             THE COURT:  Next question, "Did Joe Andriano show --

16   show --

17             MR. MARTINEZ:  Anger.

18             THE COURT:  "Did Joe Andriano show anger towards the

19   man with his wife --

20             MR. MARTINEZ:  No objection. .

21             THE COURT:  -- the night of her birthday?"

22             MR. MARTINEZ:  No objection.

23             MR. PATTERSON:  No objection.

24             THE COURT:  Next question, "I assume that the

25   second --


         TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          MR. PATTERSON:  Eviction notice.

2          THE COURT:  I'm not sure what this is.  I assume that

3     the, looks like second, question mark, notices to Rick

4     Freeland was other than the 5-day notice.  If that is true,

5     is the testimony correct she also cancelled the second notice?

6          MR. MARTINEZ:  She didn't cancel the second day

7     notice.  We could ask her about it.  It's not clear what

8     she's asking, but if she could answer the question.

9          MR. PATTERSON:  There never was a second day

10    notice -- second notice generated, Judge.

11         MR. MARTINEZ:  What they're asking about is whether

12    or not she could go back because he asked it on cross if they

13    could go back.

14         THE COURT:  And whether there was a second notice.

15         MR. PATTERSON:  I just think we should reject it

16    because it's unclear.

17         THE COURT:  Right.

18         MR. MARTINEZ:  I just ask --

19         THE COURT:  Okay.

20         MR. MARTINEZ:  I'm sorry.  I would request we ask it.

21         MR. PATTERSON:  I would object.  It's just unclear

22    and uncertain.

23         MR. MARTINEZ:  If she could answer it, I mean.

24         THE COURT:  I'm not going to ask the question.  It's

25    too confusing.


          TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1              Hold on.  Stay here.

2         MR. PATTERSON:  I thought we were through.

3         THE COURT:  Next question, "I would like to get a

4    better look at apartment 132 to better understand what Chris

5    and paramedics entered the breezeway and when the defendant

6    came around the building."

7         MR. PATTERSON:  There's photos of the interior. That

8    question should be answered later.

9         MR. MARTINEZ:  It will be answered later.

10        THE COURT:  I'll tell them some of these questions

11   may be answered later.

12        MR. PATTERSON:  There you go.

13        THE COURT:  Next question --

14        MR. MARTINEZ:  Oh, my God.

15        THE COURT:  -- "After the 5-day notices were

16   cancelled, did Rick Freeland and Erik Vaillant pay their rent

17   or did someone else pay it for them that you know of?

18        MR. MARTINEZ:  No objection.

19        MR. PATTERSON:  Objection.  It's not relevant.

20        MR. MARTINEZ:  No objection.  It's whether or not

21   the defendant paid it for them, but wouldn't know.  Or if she

22   knows --

23        THE COURT:  I'll ask if you know.

24        MR. PATTERSON:  I'll still object.

25        THE COURT:  Okay.  I'll let you follow up, okay?


         TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1

2                    (The following proceedings were held in open

3        court:)

4

5              THE COURT:   Okay.  And not to influence you one way

6        or the other, don't feel obligated to write questions.  I'm

7        telling you you don't have to feel obligated either way, but

8        you do have an opportunity to ask questions.  And some of the

9        questions you may be asking will be something brought up

10       later on during this trial, so it may not be asked, okay?

11                    Ma'am, I have some additional questions here

12       for you.  If you know, was cancelling the 5-day notices

13       standard procedure?  If you know.

14             THE WITNESS:   No.

15             THE COURT:   Next question, was Wendi's demeanor

16       different when Joe was present other than during girls'

17       social nights?

18             THE WITNESS:   No.

19             THE COURT:   How long were you waiting outside of the

20       apartment for the paramedics?

21             THE WITNESS:   Three to five minutes.

22             THE COURT:   Did Joe Andriano show anger towards the

23       man and his wife the night of her birthday?

24             THE WITNESS:   No.

25             THE COURT:   If you know, only if you know, after the

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

```
1    5-day notices were cancelled, did Rick Freeland and Erik
2    Vaillant pay their rent or did someone else pay it for them
3    that you know of?  Only if you know.
4            THE WITNESS:  I don't know.
5            THE COURT:  Are there any follow-up questions to
6    these questions by Mr. Martinez?
7            MR. MARTINEZ:  I have a question about the time line.
8
9    FOLLOW-UP QUESTIONS BY MR. MARTINEZ:
10           Q.    Ma'am, I think you just told us that you waited
11    for the paramedics three to five minutes to arrive.  Did you
12    say that?
13           A.    After I got outside.
14           Q.    Had they -- was that during the time they were
15    also staging or is that for the truck or whatever they were
16    driving to actually pull in?
17           A.    To pull up.
18           Q.    And after they pulled up, you've got three to
19    five minutes you're waiting, right?
20           A.    Correct.
21           Q.    After they pulled up, did they immediately go
22    to the apartment or how long did it take them for the term
23    stage.  You know what I mean by "stage"?  Get their items --
24           A.    They sauntered.  It seemed they took their
25    time.  It took a while.
```

1        Q.    How much time would you say they sauntered?

2        A.    By the time they got out, unloaded their

3    equipment, visited with me for a few minutes, I told them

4    what was going on, probably at least a minimum of five

5    minutes.

6        Q.    So what is the maximum if that's the minimum?

7        A.    10 minutes.

8        Q.    So there were 5 to 10 minutes out there when

9    you were talking to the fire department, right?

10       A.    Yes.

11       Q.    When you were waiting for the paramedics for

12   the three to five minutes, were you right in front of the 132

13   or were you right in front of -- where were you?

14       A.    I was -- if you walk out of the apartment

15   community there's the sidewalk and then gravel and then

16   parking and then the street.  I was out on the street.

17       Q.    Oh, so you waited near the street, that was the

18   3 to 5 minutes?

19       A.    Yes.  And that's where they pulled their trucks

20   in.

21       Q.    You were there 5 to 10 minutes?

22       A.    Yes.

23       Q.    By my count, just from -- as I understand it,

24   from the time you walk out from the time you may return, you

25   have a maximum 15 minutes out of the apartment, right?  I'm

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    adding.

2         A.    Maximum, yeah.

3         Q.    3 to 5 and 5 to -- a minimum of 8 minutes,

4    right?

5         A.    Yes.

6         Q.    And during this 8 to 15 minute time period are

7    you far away or are you close enough to hear what may be

8    going on inside of that apartment?

9         A.    Could not have heard a thing.

10        Q.    Then in these 8 to 15 minutes you get to the

11   front door, how much time elapsed while you're at the front

12   door before the defendant appears on the north part of the

13   breezeway?

14        A.    Another 8 minutes, 10 minutes, at least.

15        Q.    So that -- okay.  So that would be a total of

16   25 minutes before she appears, at the maximum, in front of

17   the north breezeway, if my math is correct.

18        A.    Correct.

19        MR. MARTINEZ:  I don't have anything else.

20        THE COURT:  Mr. Patterson, any follow-up questions?

21        MR. PATTERSON:  Thank you, Judge.

22

23   FOLLOW-UP QUESTIONS BY MR. PATTERSON:

24        Q.    You were asked whether you perceived a

25   difference in Wendi's demeanor when she was present with Joe?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1      A.    Yes.

2      Q.    The fact of the matter is you never really saw

3  Joe and Wendi together often, correct?

4      A.    Not often, no.

5      Q.    You didn't go out with them socially, correct?

6      A.    No.

7      Q.    And the only times then that you would actually

8  see Joe and Wendi together were the times when he would come

9  pick her up and take her elsewhere or --

10      A.    When he would be in the office or at the

11  functions of the community, correct.

12      Q.    Okay.  But you didn't socialize with them

13  frequently?

14      A.    I did not.

15      Q.    All right.  And I think your position was that

16  you knew more of him than you knew him?

17      A.    That's correct.

18      Q.    Okay.  You could pick him out of a crowd, but

19  you never really knew him?

20      A.    Joe and I didn't have a lot of personal

21  conversation, correct.  It was more of what Wendi told me.

22      MR. PATTERSON:  Okay.  Thank you, Judge.

23      THE COURT:  Any further questions of this witness

24  before she's excused?

25          (No audible response.)


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

```
1              THE COURT:  No one has raised their hand.  May this
2    witness be excused?
3              MR. MARTINEZ:  Yes, sir.
4              MR. PATTERSON:  No objection.
5              THE COURT:  You are excused.
6                   We'll go ahead and take our afternoon break at
7    this time.  We'll take a 20 minute break.  During this break,
8    remember the entire admonition I gave you including the fact
9    you're not to discuss this case with anyone, do not let
10   anyone discuss the case with you, keep an open mind about the
11   case.
12                   Have a nice break.  We'll take about 20
13   minutes.
14
15                   (Recess.)
16
17             THE COURT:  Please be seated.  This is cause number
18   CR 2000-096032, State of Arizona versus Wendi Elizabeth
19   Andriano.  The record will reflect the presence of the
20   Defendant, Counsel, and the jury.
21                   Mr. Martinez, the State may call its next
22   witness.
23             MR. MARTINEZ:  State calls Bryan Richards.
24             THE COURT:  Sir, if you could please step forward
25   right up here.  Give your name to the clerk and she'll swear
```



1          IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

2              IN AND FOR THE COUNTY OF MARICOPA

3

4    STATE OF ARIZONA,            )
                                  )
5            Plaintiff,           )
                                  )
6    v.                           )      No. CR 05-0005 AP
                                  )      MARICOPA COUNTY
7    WENDI ELIZABETH ANDRIANO,    )      No. CR 2000-096032
                                  )
8            Defendant.           )
     _____ )
                                           PUBLIC DEFENDER
9

10                                         MAR 1 0 2005

11                                         APPEALS RECEIVED

12                         Mesa, Arizona
                         September 13, 2004
13

14

15

16            BEFORE:  The Honorable BRIAN K. ISHIKAWA

17

18          REPORTER'S TRANSCRIPT OF PROCEEDINGS

19                      TRIAL DAY 10

20

21

22

23

24    ORIGINAL Prepared for APPEAL by:
      TRACI L. WHEELER, CSR, RPR
25    Certified Court Reporter No. 50313
      Official Court Reporter


        TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

```
 1                       A P P E A R A N C E S

 2   FOR THE STATE:        JUAN M. MARTINEZ,
                           Deputy County Attorney
 3
     FOR THE DEFENDANT:    DANIEL B. PATTERSON,
 4                         Deputy Public Defender
                                    and
 5                         G. DAVID DELOZIER,
                           Attorney at Law
 6

 7              I N D E X   O F   E X A M I N A T I O N

 8   WITNESS                                              PAGE

 9   FREELAND, RICK, Called to testify by the State
                Direct Examination by Mr. Martinez         16
10              Cross-examination by Mr. Patterson          35
                Redirect Examination by Mr. Martinez        63
11              Follow-up Questions by Mr. Martinez         72
                Follow-up Questions by Mr. Patterson        72
12
     OLSON, DENNIS, Called to testify by the State
13              Continued Direct Examination by Mr. Martinez    74
                Continued Direct Examination by Mr. Martinez   105
14              Voir Dire Examination by Mr. Patterson          123
                Continued Direct Examination by Mr. Martinez   124
15

16

17      E X H I B I T S   A D M I T T E D   I N   E V I D E N C E

18   NO.      DESCRIPTION                                 PAGE

19   1        Photograph                                    76
     2        Photograph                                    76
20   3        Photograph                                    76
     5        Photograph                                    76
21   6        Photograph                                    79
     7        Photograph                                    79
22   8        Photograph                                    79
     9        Photograph                                    79
23   10       Photograph                                    79
     11       Photograph                                    82
24   12       Photograph                                    82
     13       Photograph                                    82
25   14       Photograph                                    82
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    E X H I B I T S   A D M I T T E D   C O N T I N U E D

| 2 | NO. | DESCRIPTION | PAGE |
|---|-----|-------------|------|
| 3 | 15 | Photograph | 82 |
|   | 16 | Photograph | 88 |
| 4 | 17 | Photograph | 88 |
|   | 18 | Photograph | 88 |
| 5 | 19 | Photograph | 88 |
|   | 20 | Photograph | 88 |
| 6 | 21 | Photograph | 88 |
|   | 22 | Photograph | 88 |
| 7 | 23 | Photograph | 88 |
|   | 24 | Photograph | 88 |
| 8 | 25 | Photograph | 88 |
|   | 26 | Photograph | 88 |
| 9 | 27 | Photograph | 88 |
|   | 28 | Photograph | 88 |
| 10 | 29 | Photograph | 93 |
|   | 30 | Photograph | 93 |
| 11 | 31 | Photograph | 93 |
|   | 32 | Photograph | 93 |
| 12 | 33 | Photograph | 93 |
|   | 34 | Photograph | 93 |
| 13 | 35 | Photograph | 93 |
|   | 36 | Photograph | 93 |
| 14 | 37 | Photograph | 93 |
|   | 38 | Photograph | 104 |
| 15 | 39 | Photograph | 104 |
|   | 40 | Photograph | 104 |
| 16 | 41 | Photograph | 104 |
|   | 42 | Photograph | 104 |
| 17 | 43 | Photograph | 113 |
|   | 44 | Photograph | 113 |
| 18 | 46 | Photograph | 113 |
|   | 47 | Photograph | 120 |
| 19 | 49 | Photograph | 120 |
|   | 50 | Photograph | 122 |
| 20 | 51 | Photograph | 122 |
|   | 52 | Photograph | 122 |
| 21 | 53 | Photograph | 122 |
|   | 54 | Photograph | 122 |
| 22 | 55 | Photograph | 122 |
|   | 56 | Photograph | 132 |
| 23 | 57 | Photograph | 132 |
|   | 58 | Photograph | 132 |
| 24 | 59 | Photograph | 132 |
|   | 60 | Photograph | 132 |
| 25 | 61 | Photograph | 136 |

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

```
 1        E X H I B I T S   A D M I T T E D   C O N T I N U E D

 2     NO.      DESCRIPTION                                    PAGE

 3     62       Photograph                                     136
       63       Photograph                                     136
 4     64       Photograph                                     136
       65       Photograph                                     136
 5     66       Photograph                                     136
       68       Photograph                                     141
 6     69       Photograph                                     141
       70       Photograph                                     141
 7     71       Photograph                                     141
       72       Photograph                                     141
 8     73       Photograph                                     141
       74       Photograph                                     141
 9     75       Photograph                                     145
       76       Photograph                                     145
10     77       Photograph                                     145
       78       Photograph                                     145
11     79       Photograph                                     145
       80       Photograph                                     145
12     81       Photograph                                     149
       82       Photograph                                     149
13     83       Photograph                                     149
       84       Photograph                                     149
14     85       Photograph                                     149
       86       Photograph                                     152
15     87       Photograph                                     152
       88       Photograph                                     152
16     89       Photograph                                     156
       90       Photograph                                     156
17     91       Photograph                                     156
       92       Photograph                                     156
18     93       Photograph                                     156
       94       Photograph                                     156
19     95       Photograph                                     156
       96       Photograph                                     156
20     97       Photograph                                     156
       98       Photograph                                     156
21     99       Photograph                                     156
       100      Photograph                                     156
22     228      Letters                                        26
       229      Several photographs and white envelope         30
23     229.001  Photograph taken from Exhibit 229              30
       229.002  Photograph taken from Exhibit 229              30
24     249      Bloodstained section of barstool seat          118
       257      Bloodstained section of barstool seat          115
25     258      Bloodstained pillowcase                        86
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

P-App. 006733

1        E X H I B I T S   A D M I T T E D   C O N T I N U E D

2    <u>NO.</u>      <u>DESCRIPTION</u>                                          <u>PAGE</u>

3    259      Bloodstained broken barstool                       155
     294      Large diagram                                      124
4    317      Photograph                                         106
     319      Photograph                                         113
5    320      Photograph                                         113
     324      Belt                                               109
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

              TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1     MESA, ARIZONA, MONDAY, SEPTEMBER 13, 2004

2

3    THE COURT:  Please be seated.  Good afternoon.  This

4 is cause number CR 2000-096032, State of Arizona versus Wendi

5 Elizabeth Andriano.  The record will reflect the presence of

6 the Defendant and Counsel.  We're outside the presence of the

7 jury.

8     Let me see Counsel here at the bench for just

9 a moment.

10

11     (The following proceedings were held at the

12 bench:)

13

14    THE COURT:  I was alerted by security this morning

15 when I was on the morning calendar, Mr. Martinez, apparently

16 you had some concerns about someone having recording

17 equipment in here?

18    MR. MARTINEZ:  Yeah.  What happened is that I had a

19 conversation with somebody from security, and I can't

20 remember his name, on Thursday and it happened when I did the

21 opening statement on September 7.  I noticed that there was a

22 tape recorder that was over there in the corner.  I know that

23 there was a lot of rustling going on at the time I was doing

24 my opening statement, but I heard what appeared to be like

25 clicking sounds on and off.  I can't say for a fact that the

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1   recorder was on so I didn't bring it to anybody's attention,

2   but what I did see was that a recorder was turned over to

3   Donna Ochoa on that Tuesday and then I saw it again on

4   Wednesday, which would be September 8, brought it back in,

5   and on that particular date I did not hear the clicking that

6   I associated or that I heard on that Tuesday.  But I do know

7   that a person that left with that recording device was Donna

8   Ochoa.

9           And what happened after that was that somebody

10  was contacted by security because they took a picture of

11  Donna Ochoa with the recorder and they didn't want pictures

12  taken, so then he came to me and said "Who is this woman," I

13  can't remember the name, and I said "I don't know who it is,"

14  and he pointed her out and I said "That's the sister of the

15  decedent."  "She's the one taking pictures of this woman.  Do

16  you know why she would be doing it?"  I said, "Well, the

17  reason is that this Tuesday," and then I related the story

18  that I told you.  So that's --

19          THE COURT:  Well, I guess a couple things, if there's

20  something like this, I should probably be made aware of it,

21  and two, just to inform your people, whoever, you know, is

22  here on behalf of whoever, that they're not to have any

23  recording devices here in the courtroom.

24          MR. PATTERSON:  First I've heard of this, Judge.

25          THE COURT:  Okay.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1        MR. DELOZIER: All right. Did you --

2        THE COURT: All right. Did you have anything you

3   wanted to say about the other person?

4        MR. PATTERSON: Oh, apparently the burgandy-haired

5   juror was just sitting out in the corridor just talking about

6   the testimony out loud and it was a curiosity according to

7   this woman. She didn't appear to be talking to anybody in

8   particular, but just talking out loud such that everybody on

9   the jury panel who's within earshot could have heard her.

10       THE COURT: You mean one of the jurors was doing

11  this --

12       MR. PATTERSON: Yes.

13       THE COURT: -- today?

14       MR. MARTINEZ: Yes, the diabetic.

15       MR. PATTERSON: Yes. She has very distinctive hair.

16  It's almost a red, purple hair.

17       THE COURT: She -- Juror Number 5?

18       MR. MARTINEZ: Right.

19       MR. PATTERSON: Yes, sir.

20       THE COURT: The one that had some -- was not feeling

21  too well?

22       MR. PATTERSON: Yes, sir.

23       THE COURT: And this occurred on Thursday?

24       MR. PATTERSON: I think it was Thursday. May I --

25       MR. DELOZIER: I'm not sure.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

```
 1                    (Pause in proceedings.)

 2              MR. PATTERSON:  I believe this was observed on

 3    Wednesday last week.

 4              MR. DELOZIER:  She just told us today.

 5              MR. PATTERSON:  It just came to my attention when I

 6    got here.

 7              THE COURT:  Did you have any information about this?

 8              MR. MARTINEZ:  I don't know anything about this.

 9    First I've heard of it.

10              THE COURT:  Either one of you want me to question the

11    juror?

12              MR. PATTERSON:  Not specifically, but in general, if

13    you advise them they're not to talk about the case, the

14    admonition clearly tells them not to.

15              THE COURT:  But someone told you she was sitting by

16    herself talking out loud?

17              MR. PATTERSON:  Exactly.  Within earshot talking

18    about trying to get an insurance policy, some insurance

19    policy, was the only thing this lady could tell me.

20              THE COURT:  What I'll say, when we recess for the

21    evening, Do not discuss the testimony with anyone or discuss

22    it even when you think no one's around, that type of thing.

23              MR. MARTINEZ:  For the record purposes, should this

24    result in a conviction, can we get the name of the person

25    that told him?
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1              THE COURT:  Yeah.

2              MR. PATTERSON:  Yeah, excuse me.

3                   (Pause in proceedings.)

4              MR. DELOZIER:  Is the person here what you thought

5     had the recording device?

6              MR. MARTINEZ:  No, Donna is not here.

7              MR. DELOZIER:  Did another person have a recording

8     device because she wasn't in when --

9              MR. MARTINEZ:  I wasn't paying attention how it got

10    to her.  All I know, I saw her walk out of the courtroom with

11    a recording device.

12             MR. DELOZIER:  You don't know who would have had it

13    in here?

14             MR. MARTINEZ:  No, I do not, but I could tell you

15    where it was.  It was right next to your desk on the right

16    hand side.

17             MR. DELOZIER:  By the water cooler?

18             THE COURT:  Right next to the water cooler?

19             MR. MARTINEZ:  Yes.

20             MR. PATTERSON:  I don't have a recording device.  I

21    don't know what he's talking about.

22             THE COURT:  Go ahead.

23             MR. PATTERSON:  The person who reported seeing the

24    juror make these declarations in the corridor, her name is

25    Alice, common spelling, Elzy, E-l-z-y.


          TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          THE COURT:  And she says that this occurred on

2    Wednesday?

3          MR. PATTERSON:  Wednesday.

4          THE COURT:  Okay.

5          MR. PATTERSON:  And with regard to the recording

6    device, I don't have a recording device.  I didn't see a

7    recording device.

8          MR. DELOZIER:  You mean it was around our desk?

9          MR. MARTINEZ:  Absolutely.  It was -- the desk is

10   there, the water fountain is there.  It was in between your

11   desk and the water fountain.  That I saw because I was

12   wandering around I saw it sitting there.

13         MR. DELOZIER:  Was Patty here that day?

14         THE COURT:  Patty is who?

15         MR. DELOZIER:  Rubio, the --

16         MR. PATTERSON:  Paralegal.

17         MR. DELOZIER:  -- paralegal.  She had various

18   equipment here to help me.  I think Donna helped her carry

19   some of it.  I don't have any idea -- I don't have a copy of

20   the photo.

21         THE COURT:  What photo?  You said somebody made a

22   photograph?

23         MR. MARTINEZ:  No, I don't have a copy of that

24   photograph.  They had the camera.  I didn't ask them to

25   develop it.


                TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          THE COURT:  Who had the camera?

2          MR. PATTERSON:  Decedent's sister.

3          MR. MARTINEZ:  Her first name is Jeanette, I don't

4    know her last name.  She took a photograph of it.  They

5    returned her camera to her.  If your -- if I could ask her to

6    go ahead get it developed?

7          THE COURT:  Wait, wait.  Let me back up a little bit.

8    Someone had a camera in the courtroom?

9          MR. MARTINEZ:  Right, but they didn't take pictures

10   in here.  What happened is they were in the hallway or out

11   front.  They took pictures of Donna Ochoa with the recording

12   device.

13         THE COURT:  Who's the one that took the picture?

14         MR. MARTINEZ:  Jeanette.  I don't remember her last

15   name.

16         MR. PATTERSON:  I didn't record anything.  Nobody on

17   my team, to my knowledge, has reported anything

18   inappropriately.

19         THE COURT:  Okay.  Well, you all can look into it. If

20   you think there's something further we need to discuss, we'll

21   discuss it.  But just make sure all of your folks understand

22   what the rules are here in court and especially be careful

23   about any jurors or witnesses, okay?

24         MR. MARTINEZ:  Okay.

25         MR. DELOZIER:  Thanks.


          TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          THE COURT:  Okay.

2          MR. PATTERSON:  Did you make a decision?

3          THE COURT:  Right.  I'm announcing it right now.

4

5          (The following proceedings were held in open

6     court:)

7

8          THE COURT:  Okay, Counsel.  With regard to the

9     defendant's oral motion in limine related to Exhibit Numbers

10    4, 5, 8, 9, 11, 12, 13, 38, 45, 48, 67, 109, 316 and 318

11    marked for identification, the Court finds that each of those

12    referenced exhibits marked for identification is relevant for

13    the purpose of, among other things, to corroborate the

14    State's theory of how and why the crime was committed, and/or

15    to show the nature and location of the physical evidence,

16    and/or to corroborate the State's witnesses, and/or to

17    explain or illustrate the testimony.  The Court finds that

18    the probative value of Exhibit numbers 4, 5, 8, 9, 11, 12,

19    13, 38, 67, 109, and 316 for identification outweighs any

20    prejudicial effect.

21          However, the Court further finds that Exhibit

22    Number 4 for identification would be cumulative to

23    uncontested Exhibit 39 for identification.

24          The Court further finds that the probative

25    value of Exhibit Numbers 45, 48, and 318 for identification

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1   is outweighed by unfair prejudice and each would be a

2   needless presentation of cumulative evidence.

3           Therefore, it is ordered granting the

4   Defendant's Oral Motion in Limine relating to Exhibit Numbers

5   4, 45, 48, and 318 for identification.  It is ordered denying

6   the Defendant's Oral Motion in Limine relating to Exhibit

7   Numbers 5, 8, 9, 11, 12, 13, 38, 67, 109, and 316 for

8   identification.

9           So, Counsel, basically the exhibits that were

10  marked for identification that I referenced, I have them

11  here, okay, and the ones that I ruled are such that the State

12  is not allowed to introduce, I have them separated, okay.

13          Any questions about the Court's ruling?

14          MR. MARTINEZ:  No, sir.

15          MR. PATTERSON:  No, Judge.  Thank you.

16          THE COURT:  Okay.  Are we going to take a witness out

17  of order at this time?

18          MR. MARTINEZ:  Yes, Your Honor.  We were going to

19  call Rick Freeland.

20          THE COURT:  Okay.  Are we ready for the jury then?

21          MR. MARTINEZ:  Yes.

22          THE COURT:  We'll go ahead and let them know that

23  Counsel, at times, are agreeable to taking witnesses out of

24  order and we're going to do such at this time.  Okay?

25  / / / / /

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          (Whereupon, the jury enters the courtroom.)

2

3          THE COURT:  Please be seated.  Good afternoon.  This

4    is trial in cause number CR 2000-096032, State of Arizona

5    versus Wendi Elizabeth Andriano.  The record will reflect the

6    presence of the Defendant, Counsel and the jury.

7               Ladies and gentlemen of the jury, at times the

8    parties are agreeable to taking a witness out of order and

9    they've agreed to do so at this time.

10              So, Mr. Martinez, you may call your next

11   witness.

12         MR. MARTINEZ:  State calls Rick Freeland.

13              (Pause in proceedings.)

14         THE COURT:  Sir, if you could please step forward

15   right up here.  Please give your name to the clerk and she'll

16   swear you in.

17

18              RICK FREELAND,

19         CALLED TO TESTIFY ON BEHALF OF THE STATE,

20    HAVING FIRST BEEN DULY SWORN, TESTIFIES AS FOLLOWS:

21

22         THE COURT:  Please have a seat on the witness stand.

23   Please make yourself comfortable there on the witness stand.

24   See the microphone there?  Why don't you go ahead and pull

25   that over.  Place it right in front of you.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          Please remember to speak loudly and clearly in

2     the microphone so everyone can hear you.  Also, please wait

3     until the question is completed before you answer the

4     question, and please make sure you give a verbal response.  A

5     lot of times people shake their head, say "uh-huh," "huh-uh."

6     Make sure you give a verbal response.  Is that agreeable to

7     you?

8          ,          THE WITNESS:  Yes.

9                     THE COURT:  Mr. Martinez, you may proceed.

10

11    DIRECT EXAMINATION BY MR. MARTINEZ:

12          Q.    Your name, sir?

13          A.    Rick Freeland.

14          Q.    And you're -- you are currently living in what

15    state?

16          A.    California.

17          Q.    What city?

18          A.    Bethal Island.

19          Q.    Drawing your attention back to the early part

20    of the year 2000, were you living in Arizona?

21          A.    Yes.

22          Q.    And specifically at some point early in 2000,

23    did you have occasion to visit the San Riva apartment complex

24    with the purpose of moving there?

25          A.    Yes.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1        Q.    And where were you living at the time that you
2    were thinking of moving to the San Riva complex?

3        A.    With my sister, in Glendale.

4        Q.    And how is it that you found the San Riva
5    apartment complex?  Is it -- did you just drive by, in the
6    paper, how is it that you found out about it?

7        A.    An apartment service.

8        Q.    And do you remember about what month it was
9    that you went over there?

10       A.    No, I don't remember which month.

11       Q.    But it was early in 2000.  Do you remember
12   that?

13       A.    Yes.

14       Q.    And who was it that you spoke with when you
15   went to this apartment complex to determine whether or not
16   you would move there?

17       A.    Wendi.

18       Q.    And what was Wendi's last name?

19       A.    Andriano?  Yeah.

20       Q.    Is that individual in court today?

21       A.    Yes.

22       Q.    Can you tell me where she is seated and what
23   she's wearing?

24       A.    Sitting right there, white shirt, pink.

25            MR. MARTINEZ:  Your Honor, may the record reflect the


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    identification of the defendant?

2           THE COURT:  The record may reflect identification of

3    the defendant by the witness.

4    BY MR. MARTINEZ:

5           Q.    Was she the person that signed you up to move

6    into the San Riva apartment complex?

7           A.    Yes.

8           Q.    And when you moved in the apartment that you

9    rented, was it a one or two bedroom?

10          A.    It was a one bedroom.

11          Q.    And how long did you actually stay in that

12   one-bedroom apartment?

13          A.    I don't remember exactly how long it was.  I

14   moved out into another two bedroom.

15          Q.    And why did you move from the one bedroom to

16   the two bedroom?

17          A.    Conflicts with the other people that lived

18   right next to me or under me.

19          Q.    In other words, they were too loud.  Is that

20   right?

21          A.    Yeah.

22          Q.    And who did you see about getting this transfer

23   from a one bedroom to a two bedroom?

24          A.    Wendi.

25          Q.    And at the time that you requested this


                TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    transfer, had you and she -- were you and she friends or had

2    you formed a relationship or what?

3         A.    Yeah.  At that point I guess it was a

4    friend-management relation.

5         Q.    So at that time you had nothing other than a

6    professional relationship with her?

7         A.    No.

8         Q.    Subsequent to your move to the two-bedroom

9    apartment, did you have occasion to become closer, if you

10   will, to the defendant?

11        A.    Nothing more than friends, I guess.

12        Q.    And at some point did you become closer than

13   friends?  Did you start dating?

14        A.    Yes.

15        Q.    How much time elapsed between the time that you

16   moved in, if you can tell us, and the time that you and she

17   started to actually have a dating relationship?

18        A.    I don't know the exact amount of time.

19        Q.    Was it a month, was it a couple months, or was

20   it --

21        A.    It was a couple months.

22        Q.    Okay.  Do you remember where your first date

23   was?

24        A.    No, I don't.

25        Q.    And after you started dating, how long was it,

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    was it shortly thereafter, that you became intimate or not?

2         A.    It was somewhat shortly thereafter, yeah.

3         Q.    And before you became intimate with her -- and

4    by "intimate," just so we're on the same page, are we talking

5    about sexual intercourse?

6         A.    Yes.

7         Q.    Did you and she ever discuss her marital

8    status?  In other words, prior to that did she ever tell you

9    whether or not she was married?

10        A.    No.

11        Q.    Did she ever tell you whether or not she had

12   any kids?

13        A.    No.

14        Q.    So you indicated that you started to have this

15   relationship with her.  Would you -- as part of that

16   relationship, did that include going out to dinner?

17        A.    I don't believe that we went to -- went out to

18   dinner.

19        Q.    Did that include going out to nightclubs?

20        A.    Yes.

21        Q.    And how many times would you say that you and

22   she went out to a nightclub?

23        A.    I don't remember.  She was there when we went

24   out with my friends also, so.

25        Q.    So it was on more than one occasion perhaps or

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1     less than that?

2            A.     Yes.

3            Q.     Okay.  And this -- these instances that you

4     were with her, can -- can you put a number on them, how many

5     times you were together?

6            A.     Around 5, 7.

7            Q.     And where did they take place?

8            A.     My apartment.

9            Q.     Did any of them take place outside?

10           A.     Yes.

11           Q.     Where?

12           A.     Right beside the complex.

13           Q.     Was that underneath a bridge?

14           A.     Yes.

15           Q.     And describe a little bit more what this bridge

16    has to do with the complex?

17           A.     I don't think it has anything to do with the

18    complex.

19           Q.     Is it associated with a golf course?

20           A.     It's just right next to the complex.

21           Q.     Now, when you were having these relations with

22    her at your apartment, did they take place during the day or

23    did they usually take place at night?

24           A.     Mainly at night, evening.

25           Q.     Did any of them take place during the day?

1       A.      I don't believe so.

2       Q.      And did any of them take place deep into the

3    night, somewhere around midnight or thereafter, or were they

4    all in the early evening?

5       A.      No.  It was evening up to midnight, I think,

6    1:00 a.m.

7       Q.      Was that a couple of times it took place that

8    late or was it earlier?

9       A.      I think probably a couple of times.

10      Q.      Okay.  And the others were in the earlier

11   evening then, correct?

12      A.      Yes.

13      Q.      Did you ever know her by the name of Anne

14   Newton?

15      A.      No.

16      Q.      You're having this relationship and you're

17   going along, did there ever come a time when the relationship

18   ended where this having of sexual intercourse ended?

19      A.      It ended when she told me she was married, had

20   kids, and lived in the complex.

21      Q.      Who broke up?  Who was the person that broke

22   up?  Was it she or was it you?

23      A.      I let her know that I didn't want anymore

24   sexual relations or anything like that as soon as I found out.

25      Q.      And do you have -- would that have been during

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    the summertime that this happened that you broke up with her?

2         A.    Yeah, it was in the summertime.

3         Q.    And what was her demeanor or how did she act

4    after you told her, "Look, I don't -- I don't want to be with

5    you anymore because you're married."  What -- what was her

6    demeanor?

7         A.    She was upset.

8         Q.    And how did she manifest this being upset?

9    What did she do?

10        A.    She'd come to my apartment, bang on the door,

11   want me to let her in.

12        Q.    And would you let her in?

13        A.    Eventually.

14        Q.    When you say "eventually," when she would come

15   over, did she also call you as she was coming over?

16        A.    Yes.  She'd call me outside the door.

17        Q.    Would you then -- what would you do?  She's

18   calling you from -- how do you know she was outside the door?

19        A.    I'd look through the eye hole.

20        Q.    And she'd be standing out there calling you?

21        A.    Yes.

22        Q.    And when she stood out there and she was

23   calling you, what did she want?

24        A.    She just wanted to come in.

25        Q.    And would you let her in?


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

```
1        A.    Eventually.

2        Q.    And when you would let her in, eventually did

3   you and she ever have any sexual intercourse after you broke

4   up with her?

5        A.    No.

6        Q.    You indicated that she would come over and she

7   would stand out there.  Give me a range of time of how long

8   she would stand out there waiting for you to let her in.

9        MR. PATTERSON:  Judge, could we also have the date

10  and time perhaps when this happened?

11       THE COURT:  I'll sustain the objection.  Lay some

12  foundation.

13  BY MR. MARTINEZ:

14       Q.    Sir, this happened, when she was coming over,

15  after you broke up with her, correct?

16       A.    Yes.

17       Q.    And was this within, let's say, a month of the

18  time when you broke up with her that summer?

19       A.    Yes.

20       Q.    And during the time that she would come over,

21  you indicated that on at least one occasion you looked

22  through the eye hole, correct?

23       A.    Yes.

24       Q.    And she was standing there with a telephone?

25       A.    Yes.
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

```
1         Q.    Did that happen on more than one occasion?

2         A.    Yes.

3         Q.    And with regard to these occasions that

4    occurred during the summer, what was the length of time, the

5    most, that she stayed out there waiting for you and the least

6    amount of time that she stayed?

7         A.    I can't give you an exact time.  Sometimes it

8    was half hour, an hour.

9         Q.    And then what would happen after that half hour

10   or hour would go by?

11        A.    Well, sometimes I wouldn't let her in.  She'd

12   go down and talk to my friends until I let her in.  When I

13   did let her in, we just talked and I told her she shouldn't

14   be over there.

15        Q.    And which friends would she go over to talk to?

16        A.    Erik Vaillant.

17        Q.    Okay.  Now, did she ever communicate with you

18   via written correspondence?  In other words, letters, that

19   sort of thing?

20        A.    Email.

21        Q.    I'm going to show you a document, Exhibit 228.

22        MR. MARTINEZ:  May I have some scissors, please?

23   BY MR. MARTINEZ:

24        Q.    Why don't you take a look at those four

25   documents in there and read them to yourself.
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1             (Pause in proceedings.)

2    BY MR. MARTINEZ:

3        Q.    Sir, you read what appears to be four sheets of

4    paper, correct?

5        A.    Yes.

6        Q.    Are those sheets of paper correspondence

7    between you and the defendant, Wendi Andriano?

8        A.    Yes.

9        Q.    And they have the respective dates on them,

10   correct, I think on the top?

11       A.    Yes.

12       Q.    If I may have those back.

13   MR. MARTINEZ:  Move for the admission of Exhibit

14   228.

15            (Pause in proceedings.)

16   MR. PATTERSON:  I have no objection, Judge.

17   THE COURT:  Exhibit 228 for identification is

18   admitted into evidence.

19            (Pause in proceedings.)

20   BY MR. MARTINEZ:

21       Q.    Sir, I'm going to show you one that's dated

22   July 23rd at 5:32 in the afternoon.  Can you go ahead and

23   read it beginning with the salutation?

24       A.    "Hey, Rick.  Here I go again with the letters.

25   But this time I just need to clear the air.  After you --

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    after your rejection and plain speaking Friday night, I
2    totally understand that you want nothing to do with me.  I am
3    so sorry that I had to keep pushing -- pushing everything.  I
4    hope you understand that I have the utmost respect for you.
5    I feel like such a jerk to think you were interested in me.
6    Regardless of the past, I do not want you to be uncomfortable
7    around me.  Your home is here at San Riva and as your friend
8    I want you to be happy.  You deserve the best life has to
9    offer you, so please don't feel like you can't do the normal
10   guy things just because I'm here.  I hope sometime later
11   in -- later in life we can be friends.  Sorry, Wendi."
12          THE COURT:  Mr. Freeland, sometimes you're a little
13   bit too close to the microphone.
14          THE WITNESS:  Okay.
15          THE COURT:  Just remember that.  Thank you.
16   BY MR. MARTINEZ:
17          Q.    I then want to you read the next email, which
18   is dated Sunday July 23rd at 8:27 p.m.  Go ahead.
19          A.    "Wendi, I think the best thing for me to do is
20   just say okay.  If you need to talk about any of your
21   problems with your life, I will try to help.  You know I will
22   always have words of wisdom.  I just hope they help.  San
23   Riva co-ed softball rules.  Talk to you soon, Me."
24          Q.    That indication there of "me," is that how you
25   used to refer to yourself when you spoke with her?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1        A.      Yeah, by email, yes.

2        Q.      How about what was her response to you when --

3    how did she refer to herself?

4        A.      I put "Me" and she would end it with "You."

5        Q.      Okay.  Let's take a look at another letter

6    dated Wednesday, September 20th of the year 2000, shortly

7    after midnight, which would be at 12:27 a.m.  Go ahead and

8    read that to us.

9        A.      Want me to read the whole thing?

10       Q.      Yes, sir.

11       A.      "Congratulations on the *** Go Rico, Go Rico.

12       Q.      Let me stop you there.  Who is Rico?

13       A.      That's me.

14       Q.      Okay.  Go ahead.

15       A.      "I think you did an excellent job with

16   coaching.  It was just too bad about some of the players.

17   I'm sure I don't have to name any names.  Hopefully we could

18   sponsor you again sometime.  How's the new job going for

19   you?  I know it's more difficult, but it's great to see

20   someone with some determination to better themselves, and I

21   am confident that you will be quite successful.  How about a

22   drink sometime?  Wendi."

23       Q.      So she's asking you for a drink in that letter,

24   correct?

25       A.      Yes.


                TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1      Q.    And what was your response?

2      A.    "Hey you, thank you for the sponsor.  It would

3  have been hard to get things going again without it.  There

4  are -- there are other places now that want to sponsor us now

5  that we have done so good.  I just would rather stay with San

6  Riva right now.  We are San Riva.  Teams worry when they see

7  San Riva walk in.  Ain't it cool?  My work is great.  I do

8  like the pressure but I don't like what comes with it.  A

9  drink would be good.  Talk to you soon, Me."

10     Q.    Did that drink ever take place?

11     A.    I don't remember.

12     Q.    Did you ever have -- after you broke up with

13 her, did you ever have intimate relations with her?

14     A.    No.

15     Q.    Now, with regard to the relationship that you

16 had with her, I'm going to show you some photographs.  This

17 is Exhibit 229, and specifically take a look at these two

18 photographs that I've taken out of there.

19           Who are the individuals in those two

20 photographs?

21     A.    That's myself and Wendi.

22     Q.    Both of them?

23     A.    Yes.

24     Q.    There's one that -- that has you there with a

25 cap.  Where was that taken?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1        A.    It was at the pool.

2        Q.    Would that have been during the summer of 2000?

3        A.    I believe so.

4        Q.    You were only there probably --

5        A.    I was --

6        Q.    -- a few --

7        A.    Yes.

8        Q.    Okay.  How about with regard to the other

9   photographs that is there with you without the cap?

10       A.    I think it's in the office at San Riva.

11       Q.    Would that have also been during the summer?

12       A.    Yes.

13       Q.    And what was the occasion of that photograph?

14       A.    I think it's the night when she had a wine get

15  together, wine tasting thing or something.

16       Q.    Okay.

17             (Pause in proceedings.)

18        MR. MARTINEZ:  Judge, I'm going to move for

19  admission of Exhibits 229.01 and 229.02 and separately 229.

20        MR. PATTERSON:  I have no objection, Judge.

21        THE COURT:  Okay.  Exhibit Numbers 229, 229.01 and

22  229.02 for identification are admitted into evidence.

23        MR. PATTERSON:  Judge, could we just approach

24  quickly --

25        THE COURT:  Yes.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          MR. PATTERSON:  -- so I could make a brief record?

2

3              (The following proceedings were held at the

4      bench:)

5

6          MR. PATTERSON:  Just so it's clear, I previously

7      moved in limine to preclude this entire discussion about this

8      affair that my client purportedly had.  I don't want there

9      to be any suggestion I'm waiving this by not specifically

10     objecting to the individualized exhibits that pertain to his

11     testimony.

12         THE COURT:  I understand.

13         MR. PATTERSON:  Okay.

14         THE COURT:  Thank you.

15

16             (The following proceedings were held in open

17     court:)

18

19     BY MR. MARTINEZ:

20         Q.   Let's go ahead and take a look at Exhibit

21     Number 229.01.  And if you need to step down --

22              And that is you, correct?

23         A.   Yes.

24         Q.   And that is the defendant, Wendi Andriano?

25         A.   Yes.


                TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1      Q.    Does she appear to have undergone a substantial

2  change from then to today?

3      A.    Yes.

4      Q.    And Exhibit Number 229.02, I think this is the

5  one that you referred was taking -- taken at the San Riva

6  office during the wine tasting?

7      A.    Yes.

8      Q.    Sir, when you were -- that apartment that you

9  moved to, what was the number of the apartment that you were

10 moved to after the one bedroom?

11     A.    384.

12     Q.    And at that -- while you were at that apartment

13 complex, did you and the defendant or did she ever bring over

14 any furniture for you while you were at that apartment?

15     A.    She gave me furniture to use, yes.

16     Q.    And what kind of furniture are we talking

17 about?

18     A.    Table -- a table, a couch, a TV.

19     Q.    Did she also bring over a bed?

20     A.    I don't think that was her bed, no.

21     Q.    How about some end tables?  Were those also

22 brought over?

23     A.    Yes.

24     Q.    Now, did you pay her for that or were they just

25 brought over?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    A.    I don't -- for one of the items I think I paid

2    for, and the others, no.

3    Q.    And what happened to those items when you moved

4    out of the San Riva complex?

5    A.    I took them to the other -- the other

6    apartment.

7    Q.    So you took them with you?

8    A.    Yes.

9    Q.    Okay.  I'm going to show you part of Exhibit

10   Number 230.  It's a 5-day notice to terminate rental

11   agreement.  Why don't you go ahead and take a look at it,

12   okay?

13            (Pause in proceedings.)

14   BY MR. MARTINEZ:

15   Q.    Okay.  And then also just to be complete with

16   you, if you take a look at Exhibit -- the first page of

17   Exhibit 229 and read the bottom for your own edification what

18   it says.

19   A.    You want me to read what it says?

20   Q.    No, just to yourself.

21   THE COURT:  I think you said Exhibit 229.  Are you

22   referencing Exhibit 230?

23   MR. MARTINEZ:  It is 230, correct.

24            (Pause in proceedings.)

25   / / / / /

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    BY MR. MARTINEZ:

2         Q.    Now, this notice that you've just been shown

3    indicates that you were late and currently there's a

4    5-day -- it's a 5-day notice.  Was that ever delivered to you

5    at all?

6         A.    I don't remember it being delivered, no.

7         Q.    When you left the San Riva apartment complex,

8    was it something that you voluntarily did after the lease had

9    run out or were you evicted from the San Riva complex?

10        A.    Can you ask me that again, please?

11        Q.    Were you evicted from the San Riva apartments

12   for nonpayment of rent or did you leave on your own accord or

13   voluntarily?

14        A.    I ended up leaving on my own.

15        Q.    Okay.  After her -- after you broke up with the

16   defendant, you indicated that she may have come over and that

17   you may have seen her through the eyehole and you had some

18   conversations.  With regard to that period after you broke up

19   with her, how would you characterize it?  Was she a shrinking

20   violet or somebody other than a shrinking violet during that

21   period?

22        A.    After we broke up?

23        Q.    Yeah, uh-huh.

24        A.    Shortly after, she was -- when she kept coming

25   over -- this is right after we broke up?

1      Q.      Right, uh-huh.

2      A.      She was just, I guess, aggressive towards

3   staying together or wanting to talk.

4      Q.      And then this phase of being aggressive, how

5   long did it last?

6      A.      I don't remember exactly how long.  Maybe two

7   weeks, three weeks.

8      MR. MARTINEZ:  I don't have anything else.

9      THE COURT:  Mr. Patterson?

10      MR. PATTERSON:  Thank you, Judge.

11

12   CROSS-EXAMINATION BY MR. PATTERSON:

13      Q.      How are you doing, Mr. Freeland?

14      A.      Good.

15      Q.      We've spoken before, haven't we?

16      A.      Yes.

17      Q.      And there was a tape recorder running when we

18   talked?

19      A.      I believe so, if you pushed record, yes.

20      Q.      If I pushed the right button?  Okay.

21              And this happened back in April of 2004?

22      A.      I believe that's the date, yeah.

23      Q.      Okay.  It's my understanding that you moved

24   into the San Riva apartment complex in the summer of '99.

25   Sound about right?


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1        A.    Yeah.

2        Q.    Okay.  And it's a nice complex, right?

3        A.    Yes.

4        Q.    You had a -- it had a number of group

5   activities for the residents at this particular complex,

6   didn't they?

7        A.    Yes.

8        Q.    That was almost a weekly -- a weekly event,

9   right, that something was going on?

10       A.    Something was going on, yes.

11       Q.    Pool parties?

12       A.    Yes.

13       Q.    That one photograph we saw of you with Wendi,

14   that was a wine and cheese party for one of the apartment

15   locator services, wasn't it?

16       A.    I guess.  I don't know what it was for.

17       Q.    But it was a sit-down wine and cheese tasting

18   party?

19       A.    Yes.

20       Q.    Those kinds of things happened with great

21   frequency at this complex, didn't they?

22       A.    Yes.

23       Q.    At these pool parties, there were a number of

24   folks there, right?

25       A.    Yes.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

```
1          Q.    Well attended by the residents at the complex?
2          A.    Yes.
3          Q.    Okay.  And there was a kind of a core group of
4    folks that you generally went out with, be it to the pool
5    parties or out to the local places of entertainment in the
6    Ahwatukee Foothills area, right?
7          A.    Yes.
8          Q.    Okay.  And that included the staff of the San
9    Riva apartments by and large, right?
10         A.    Yes.
11         Q.    Chris Hashisaki?  That name sound familiar?
12         A.    Yes.
13         Q.    Shannon Sweeney?
14         A.    Yes.
15         Q.    Stephanie Koeppen, I think her name is?
16         A.    Yes.
17         Q.    Okay.  And these are -- and Wendi, correct?
18         A.    Yes, uh-huh.
19         Q.    And there were a number of males who went with
20   this core group to either parties or local establishments.
21   Erik Vaillant I guess it's pronounced?
22         A.    Yes.
23         Q.    Yourself?
24         A.    Yes.
25         Q.    Were there other males in this core group that
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    used to go out?

2          A.    Some of my friends would meet us out, but as

3    far as the complex, mainly me and Erik.

4          Q.    Okay.  But then your buds from the real world,

5    so to speak, would meet you at these places the core group

6    would go to?

7          A.    Yes.

8          Q.    Okay.  And that describes all of the times you

9    ever went out with Wendi Andriano, right?  It was this --

10   with this core group, never one on one, correct?

11         A.    No.  We would do things separate, just

12   ourselves.  I don't remember, like I said, as far as dinner

13   by ourselves.

14         Q.    Well, you never went out to dinner by yourself,

15   right?

16         A.    I don't remember if we did, no.

17         Q.    Well, let's talk just a minute about that.  I

18   asked you a series of questions here on Page 8 of our

19   conversation, starting about Line 5.  "Okay.  And the same

20   from Rockin Rodeo from what I understand?"  Your answer,

21   "Yeah."  "Okay," my question, "Um, first social engagement,

22   dancing, cocktails, that kind of thing?"  Your answer "Yes."

23   And my specific question, "Okay, uh, and was it a one on one

24   or in the context of other folks from the --" Your answer,

25   "Yeah, it was never one on one.  It was pretty much always


                TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    this group."

2                  Okay.  Isn't that what you told me back in

3    April this year?

4          A.    I don't remember exactly what I said, no.

5          Q.    Okay.  Well, again, wasn't that pretty much the

6    way you and Wendi went out --

7          A.    Yes.

8          Q.    -- was with a group of folks, never a one on

9    one?

10         A.    Again, I can't say it was never one on one.  I

11   can't remember anything one on one, but mostly, yes, with a

12   group of people.

13         Q.    Okay.  And one of the social activities that

14   was sponsored, underwritten, if you will, by the San Riva

15   apartment was your softball team, right?

16         A.    Yes.

17         Q.    And that was a big part of your life, wasn't

18   it?

19         A.    Yes.

20         Q.    Okay.

21         A.    Softball?

22         Q.    Yes.

23         A.    Yeah.

24         Q.    Was it a co-ed or men's team?

25         A.    Co-ed.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1      Q.    Co-ed team?  Was Wendi on the team?

2      A.    No.

3      Q.    Okay.  Were other women from the San Riva

4   complex involved with that team?

5      A.    I don't remember if there was any girls on the

6   team, but Erik was.

7      Q.    Okay.  Erik Vaillant?

8      A.    Yes.

9      Q.    Okay.  And that was a Group A or Class A, B, C,

10   D -- the group?

11      A.    I think we were in C.

12      Q.    Okay.  So it was somewhat competitive, I guess?

13      A.    Yeah.  We had a pretty good team.

14      Q.    Okay.  Was this a Monday, Thursday weekly

15   thing?

16      A.    I don't remember which night it was.

17      Q.    Twice a week, once a week?

18      A.    Once a week, I believe.

19      Q.    All right.  And it was -- not only was it an

20   athletic competition, but a social event, right, as most of

21   these softball leagues are?

22      A.    Yeah.

23      Q.    Okay.  You might have a little training table

24   before the game starts or if it didn't happen before the

25   game, you essentially had training table after the game,

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    right?

2          A.    Yes.

3          Q.    You would go to some local place, and over

4    pitchers of beer, talk about the game and socialize, right?

5          A.    Yeah.

6          Q.    Okay.

7          A.    Mostly downtown.

8          Q.    Okay.  And it's not unusual for a sponsor to

9.   come to these social situations after the game, right?

10         A.    Some sponsors do.

11         MR. MARTINEZ:  Objection.  Lack of foundation as to

12   how he knows.

13         MR. PATTERSON:  He says sometimes they do.

14         THE COURT:  Overruled.  Your answer?

15         THE WITNESS:  Sometimes they do, sometimes they

16   don't.

17   BY MR. PATTERSON:

18         Q.    Okay.  Did Wendi ever come to one of those

19   after-softball social situation sessions?

20         A.    She came to one game, I believe, towards the

21   end of season.

22         Q.    Okay.  One game and one game only?

23         A.    I don't remember if she came to more than one

24   or not.

25         Q.    Okay.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          A.    I remember her coming to one.

2          Q.    After the game was over, you stopped for a beer

3    at a social establishment after the game?

4          A.    I don't remember if it was after that game that

5    she was at or not.

6          Q.    Okay.  Now, you tell us that you had an

7    intimate relationship with Wendi Andriano.  Can you tell me

8    what month of the year 2000 that was?

9          A.    No.

10         Q.    Okay.  Do you believe it may have been in April

11   of 2000?

12         A.    I don't remember.  I couldn't tell you which

13   month it was.

14         Q.    Okay.  It was of two to three weeks duration.

15   Is that a fair statement?

16         A.    Yes, I believe so.

17         Q.    So you lived at the complex in total, what,

18   almost a year?  How many months?

19         A.    I think it was around a year maybe.

20         Q.    Okay.  12 months?

21         A.    Yeah.

22         Q.    During the period of time that you actually

23   lived at the San Riva, your period of intimacy with Ms.

24   Andriano was all of two to three weeks?

25         A.    The whole entire relationship?  I guess.


                TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          Q.     No, just the intimacy part of it.

2          A.     I believe so.  Might have been a little longer,

3     yes.

4          Q.     Okay.  And in terms of frequency, five, six

5     times?

6          A.     Yes.

7          Q.     Okay.  But you had more than just an intimate

8     sexual relationship with Ms. Andriano, correct?

9          A.     Yes.

10         Q.     It was a -- it was a true friendship there,

11    wasn't there?

12         A.     Yes.

13         Q.     Okay.  You could talk with her, couldn't you?

14         A.     Yes.

15         Q.     And she could talk with you, couldn't she?

16         A.     Yes.

17         Q.     And that was the most significant part of your

18    relationship was your ability to be there for each other,

19    friendship, the conversation, the fact that you liked each

20    other, correct?

21         A.     I guess it was both, yes.

22         Q.     Okay.  But after the intimacy stopped, you

23    maintained a friendly relationship with Ms. Andriano, right?

24         A.     Yes.

25         Q.     You continued to talk with her in the complex?


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          A.    Yes.

2          Q.    Okay.  And in fact that was one of the reasons

3    she came back knocking on your door.  She had sensed that by

4    stopping the intimate portion, you were also withdrawing the

5    friendship?

6          MR. MARTINEZ:  Objection.  Lack of foundation.

7    Speculation as to what she sensed.

8          THE COURT:  Sustained.  Rephrase the question.

9    BY MR. PATTERSON:

10         Q.    Okay.  Was that one of the things she expressed

11   to you, she was concerned you were backing away from her in

12   terms of friendship?

13         MR. MARTINEZ:  Objection.  Hearsay.

14         THE COURT:  Overruled.  Go ahead and answer the

15   question, if you can.

16         THE WITNESS:  The question is whether she wanted to

17   continue a relationship other than just sexual?

18   BY MR. PATTERSON:

19         Q.    A friendly relationship, not a sexual

20   relationship.

21         A.    I don't know what her exact intentions were

22   when she came over.

23         Q.    Okay.  Did you continue to maintain a

24   friendship relationship afterwards?

25         A.    We did, yes.


              TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1        Q.    Okay.

2        A.    We were on a talking basis, yes.

3        Q.    All right.  And as I recall, you don't recall

4   how the intimate relationship got started, right?

5        A.    No.

6        Q.    Okay.  You don't recall whether it was your

7   idea, her idea, or it just happened?

8        A.    Yes.

9        Q.    And in fact your recollection is it just kind

10  of happened, right?

11       A.    Uh-huh.

12       THE COURT:  Is that a "yes"?

13       THE WITNESS:  Yes.

14  BY MR. PATTERSON:

15       Q.    Because you would go out with the group and

16  you'd sit down with this woman and you have -- you have --

17  you'd have some common -- some ability to talk with this

18  woman, right?

19       A.    Yes.

20       Q.    And she -- I assume you made a -- flattered her

21  on occasion in these conversations, early conversations?

22       A.    Before I found out that she was married and had

23  kids, yes.

24       Q.    Okay.

25       A.    After that --


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

```
 1         Q.    That's fine.  Let's talk about that point in
 2   time when you're first kind of getting to know one another,
 3   okay?  You don't know that she's married, so I assume you're
 4   doing the things that men do to get to know this woman in
 5   terms of conversation, right?
 6         A.    Yes.
 7         Q.    You're flattering her, correct?
 8         A.    Yes.
 9         Q.    You're listening to her when she's talking,
10   correct?
11         A.    Yes.
12         Q.    Okay.  You're paying attention to her?
13         A.    Yes.
14         Q.    Okay.  All right.  And, again, as she told me,
15   it was a close knit group there at the San Riva apartments,
16   correct?
17         A.    Yes.
18         Q.    Okay.  And I understand that Wendi's job as
19   resident manager was to organize these parties for the
20   residents, correct?
21         A.    I believe so.  I don't --
22         Q.    Okay.  She appeared to be in charge --
23         A.    Yes.
24         Q.    -- of the things that were being done --
25         A.    Yes.
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

```
1          Q.     -- in a social nature there?

2          A.     Yes.

3          Q.     Okay.  All right.  And one of the reasons you

4    were able to relate with her, to empathize with her

5    circumstance, is because you also lost a fiancee earlier,

6    correct?

7          A.     Yes.

8          Q.     Okay.  And it was about what, eight, nine years

9    prior to, say, the year 2000?

10         A.     Yes.

11         Q.     Okay.  And was it an auto accident?

12         A.     Yes.

13         Q.     And you also lost another significant person in

14   your life in that auto accident, right?

15         A.     Yes.

16         Q.     So you had some understanding of what a person

17   would be going through about to lose a loved one.  Is that

18   true?

19         A.     Yes.

20         Q.     Okay.  That was one of the things you and Wendi

21   talked about?

22         A.     One of the things, yes.

23         Q.     Okay.  She also talked about with you about the

24   fact that she was having difficulties with Joe Andriano,

25   correct?
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1      A.    Yes.

2      Q.    And obviously these conversations happened

3   after you were aware that she was married to him, correct?

4      A.    Yes.

5      Q.    Okay.  And one of the things that she wanted

6   Joe to do was to go to counseling because of the problem?

7         MR. MARTINEZ:  Objection.  Hearsay.

8         THE COURT:  Sustained.

9         MR. PATTERSON:  Judge, could we just approach?  I

10   want to make one record on this.

11         THE COURT:  Yes.

12

13         (The following proceedings were held at the

14   bench:)

15

16         MR. PATTERSON:  One of the things we need to be

17   mindful of is the government's claim that she never reported

18   the abuse, she never reported any problem, so this is not

19   hearsay in that it is a statement made earlier in time to

20   rebut allegations of recent fabrication, okay, which I'm

21   certain the government's going to make, either in summation

22   or with other witnesses, so I think it's important we be able

23   to establish she made a complaint prior to the October 2000

24   fracas.

25         THE COURT:  Mr. Martinez.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          MR. MARTINEZ:  This is anticipatory.  It's something

2     that may or may not happen.  How does he know what the State

3     is going to say?  I don't know what I'm going to say, so he

4     knows better than I do.

5                    I just think that they're trying to get in

6     their story.  I know they previously indicated that the

7     defendant would testify, I know on Thursday they told me she

8     might not testify, so it just looks like they're trying to

9     get it in through someone else.

10          THE COURT:  I've sustained the objection, but you've

11     made your record.

12

13                    (The following proceedings were held in open

14     court:)

15

16     BY MR. PATTERSON:

17          Q.    Was there ever any conversation concerning

18     medical malpractice claim?

19          A.    No.

20          Q.    Did she ever ask you to pose as her husband in

21     an effort to secure -- to secure a life insurance policy?

22          A.    No.

23          Q.    Did she ever ask for your assistance in using

24     the internet to access chemicals, anything of that nature?

25          A.    No.


                TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1       Q.      Okay.  Okay.  Now, you keep -- the government

2   kept using the term "broke up" with Wendi.  Isn't -- isn't it

3   better stated that you and she terminated any kind of

4   intimate or sexual relationship, right?

5       A.      Repeat the question, please.

6       Q.      Okay.  Government kept using the term "broke

7   up" with Wendi during its direct examination of you.  Isn't

8   it more accurate that you just terminated the physical end of

9   the relationship, you maintained the friendship and the

10  conversational aspect of the relationship?

11      A.      Yes.

12      Q.      Isn't that true?

13      A.      Yes.

14      Q.      Okay.  Let's talk about some exhibits here, Mr.

15  Freeland.  This is the balance of Exhibit 2 -- let me make

16  sure -- 229.  You spoke specifically about two of the

17  photographs.

18          MR. PATTERSON:  Judge, if I could show these --

19          THE COURT:  Yes.

20          MR. PATTERSON:  -- to Mr. Freeland?

21  BY MR. PATTERSON:

22      Q.      Why don't you go through those and get a feel

23  for what they kind of represent.

24              (Pause in proceedings.)

25  / / / / /


                TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    BY MR. PATTERSON:

2         Q.    You've had a chance to look through these?

3         A.    Yes.

4         Q.    Do they show the flavor of the pool parties at

5    the San Riva apartment complex?

6         A.    Yes.

7         Q.    People sitting around in their swim attire

8    drinking beverages, correct?

9         A.    Yes.

10        Q.    Seem to be having a great time?

11        A.    Yes.

12        Q.    There's one here of Wendi and you're kind of

13   goofing off in the background there.  Is that you in the

14   back?

15        A.    Yes.

16        Q.    Okay.  Here's another one, appears to be at a

17   pool party.  Do you know who that gentleman is?

18        A.    No, I don't.

19        Q.    But, again, is it kind of consistent with the

20   kind of times the folks had around the pool at the San Riva

21   apartments?

22        A.    Yes.

23        Q.    Here's another one with Wendi in a purple

24   outfit, blonde hair with two males.  Do you know who those

25   two guys are?


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          A.    One looks familiar, but I don't know him.

2          Q.    Again, those are just kind of common --

3          A.    Yes.

4          Q.    -- scenes at the pool party?

5          A.    Yes.

6          Q.    Here's one with two gentlemen.  Do you

7    recognize these two gentlemen?

8          A.    Yes.

9          Q.    Who are those two gentlemen?

10         A.    Scott and I think it's Joe.

11         Q.    Okay.  It appears Joe and Scott are having fun

12   at one of these pool parties, right?

13         A.    Yes.

14         Q.    And that's Joe Andriano?

15         A.    I believe so.

16         Q.    Mark sure I get them back in the right package

17   here.

18               Exhibit 230 had to do with some correspondence

19   between you and Wendi.  Do you recall Exhibit 230?

20         A.    No.

21         Q.    Okay.  Let's --

22         MR. PATTERSON:   Judge, I'm going to show this to him

23   again.

24         THE COURT:   Yes.

25   / / / / /

1   BY MR. PATTERSON:

2        Q.   Remember those?

3        A.   Yes.

4        Q.   Okay.  Let's talk first about the letter.  On

5   the upper left-hand corner of that letter, there are --

6   there's a date, 7/23/2000?

7        A.   Yes.

8        Q.   A time, 17:32 correct?

9        A.   Yes.

10       Q.   And a phone number, 283-5588?

11       A.   Yes.

12       Q.   Okay.  And then there's a space and then San

13   Riva?

14       A.   Yes.

15       Q.   And then it says page 01 slash 01, correct?

16       A.   Yes.

17       Q.   This was a faxed transmittal to you, wasn't it?

18       A.   Yes.

19       Q.   Okay.  You were in the business office when

20   this faxed transmittal came in?

21       A.   I'm -- I don't remember.  I don't remember

22   where I got it.

23       Q.   You don't remember pulling it off the fax

24   machine in the business office at the San Riva?

25       A.   No.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          Q.    Okay.  When you got this then did you go back

2     to your place and generate a response?

3          A.    I don't -- I never faxed anything to her, I

4     don't believe.  I don't remember.  I didn't have a fax

5     machine.

6          Q.    Okay.  I'm sorry.  That was not a great

7     question.  Did you generate a response by email?

8          A.    Yes.

9          Q.    Okay.  And that's the next entry in that packet

10    there, right?  Sunday, July 23 at 2 27 p.m.

11         A.    Yes.

12         Q.    So if this was received at 5:32 about --

13    20:27 -- about three hours later you cut an email to her,

14    right?

15         A.    Yes.

16         Q.    Okay.  It appears to me this email is written

17    from the heart, right?

18         A.    Yes.

19         Q.    You tell her "If you need to talk about any of

20    your problems with your life, I will try to help."  What did

21    you mean by that?

22         A.    Because her and Joe were having problems.

23         Q.    Okay.  And you were aware of those problems?

24         A.    Yes.

25         Q.    You were willing to help her through those

1   problems by talking with her as a friend?

2           A.    Yes, should she want advice or anything, yes.

3           Q.    She needed a shoulder to cry on, you were

4   there?

5           A.    No.  Words of advice.

6           Q.    You would have helped her through?

7           A.    Yes.

8           Q.    Okay.  You emphasized there, reiterated that.

9   "You know I will always have words of wisdom."  Is that a

10  comment on your history with her that you provided words of

11  wisdom for her throughout your relationship with her?

12          A.    No, just if she wanted some help with Joe and

13  the problems she was going through.

14          Q.    Words of wisdom, that suggests maybe you had

15  helped her previously?

16          A.    Yes.

17          Q.    Is that true?

18          A.    I don't remember if I did previous to that

19  statement or not, no.

20          Q.    Okay.  Then you make reference again to the San

21  Riva co-ed softball rules, right?

22          A.    Yes.

23          Q.    And that's a reference to the softball team

24  that was a significant part of your life, correct?

25          A.    Yes.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          Q.    Okay.  And --

2          A.    It was part of my life, yes.

3          Q.    Okay.  Well, you mentioned it, I mean, kind of

4     out of context in the email, right?

5          A.    Yes.

6          Q.    Okay.  And San Riva apartments had been helpful

7     in sponsoring your team previously, right?

8          A.    Yes.

9          Q.    Okay.  And then as I understand it, softball is

10    the reason for the email that was generated September 20th,

11    the next item in the packet.

12          MR. MARTINEZ:  Objection.  Speculation as to why she

13    wrote the email.

14          THE COURT:  Sustained.  Rephrase the question.

15    BY MR. PATTERSON:

16          Q.    There was a softball event that day that

17    accounts for the generation of this email, correct?

18          A.    Which one?

19          Q.    The last one in the packet dated Wednesday, 20

20    September, 2000 --

21          A.    Okay.

22          Q.    Right.  You got that one there?

23          A.    Yes.

24          Q.    Okay.  Again, that was softball related.  First

25    paragraph says "Congrats on the softball thing.  Go.  Rico,

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    Go Rico."  Is that the first paragraph?

2          A.    Yes.

3          Q.    Because your softball team had just won a

4    championship, right?

5          A.    Yes.

6          Q.    And Wendi had apparently become aware of that?

7          A.    I don't remember.  Obviously she did, yes.

8          Q.    Because that's what she leads the email with,

9    right?

10         A.    Uh-huh.

11         THE COURT:  Is that "yes"?

12         THE WITNESS:  Yes.

13   BY MR. PATTERSON:

14         Q.    The next paragraph has to do with softball,

15   right?

16         A.    Yes.

17         Q.    "I think you did an excellent job with

18   coaching."  That's certainly an acknowledgment of your

19   softball coaching ability, right?

20         A.    Yes.

21         Q.    There's no other coaching we're talking about

22   here, right?

23         A.    No.

24         Q.    Okay.  "It was just too bad some of the players

25   apparently had personal issues as most coaches and managers


         TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1      do," right?

2              A.      Yes.

3              Q.      Okay.  And then she allows she'd like to

4      sponsor your team again, "San Riva would like to sponsor the

5      team again," correct?

6              A.      Yes.

7              Q.      All right.  So the first two paragraphs are

8      softball related.  Is that a fair statement?

9              A.      Yes.

10             Q.      Okay.  Next paragraph, it's more personal but

11     it's job inquiry, "How's your new job going," right?

12             A.      Yes.

13             Q.      Apparently, you had gotten a new job and she

14     had a time or occasion or ability to sit down and talk with

15     you about it, correct?

16             A.      Yes.

17             Q.      Okay.  She apparently had a little knowledge

18     about it because it appeared to be a greater challenge for

19     you, right?

20             A.      Yes.

21             Q.      That's reflected through "It is more difficult

22     but great to see someone with some determination to better

23     themselves," right?

24             A.      Yes.

25             Q.      Okay.  And she closes, "I am confident that you

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

```
 1    will be quite successful," gives you kudos for apparently
 2    believing that you can do a good job in life, correct?
 3              A.    Yes.
 4              Q.    Okay.  And then she says the fourth sentence,
 5    "How about a drink sometime," question mark, question mark,
 6    right?
 7              A.    Yes.
 8              Q.    Okay.  And then your response, again, softball
 9    related, "Thank you for the sponsor," right?
10              A.    Yes.
11              Q.    Okay.  "It would have been hard to get things
12    going again without it."  In other words, but for the
13    sponsorship, you couldn't have had the team that just won the
14    championship, right?
15              A.    Yes.
16              Q.    In fact, you guys were so good now it appears
17    that there were sponsors chomping at the bit to try to
18    sponsor your team.  That's what that third sentence says?
19              A.    Yes.
20              Q.    "There are other teams that want to sponsor us
21    now that we've done so good."  That's what it says, right?
22              A.    Yes.
23              Q.    But you say nope, basically, going to stay with
24    San Riva, right?
25              A.    Yes.
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

```
 1          Q.    And that's a softball-related conversation?

 2          A.    Yes.

 3          Q.    Right?

 4          A.    Yes.

 5          Q.    Okay.  And then you say "We are San Riva."  I

 6    mean, that means San Riva's meant something for you, right?

 7          A.    Yeah.  It was something that was said in

 8    softball, yes.

 9          Q.    And you just don't walk away from an experience

10    that meant something to you or your softball team, correct?

11          A.    Yes.

12          Q.    All right.  And then you respond to her inquiry

13    concerning the job.  You say "My work is great.  I do like

14    the pressure, but I don't like what comes with it," right?

15          A.    Yes.

16          Q.    Okay.  And then your last comment, "A drink

17    would be good" in response essentially to her last comment,

18    "How about a drink sometime?"  Have I read this correctly?

19          A.    Yes.

20          Q.    Okay.  Okay.  At some point you went from a one

21    bedroom to a two bedroom, correct?

22          A.    Yes.

23          Q.    And that's more space, I assume?

24          A.    Yes.

25          Q.    Okay.  Did you have enough furniture when you
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    were living in the one-bedroom apartment to furnish a

2    two-bedroom apartment?

3         A.    No.

4         Q.    Okay.

5         A.    I don't think I did.  I don't remember.  I

6    usually don't.

7         Q.    Okay.  At some point in time Wendi offered you

8    some additional furniture, right?

9         A.    Yes.

10        Q.    And did she tell you how she acquired it?

11        A.    She did, but I don't remember.  Somebody left

12    it there or something.

13        Q.    Abandoned property?

14        A.    Yes.

15        Q.    Okay.  And you paid for some of the items that

16    she had brought over, correct?

17        A.    Yes.

18        Q.    Specifically the -- do you recall which item?

19        A.    No.  I don't remember which one.

20        Q.    Okay.  All right.  And these extra items helped

21    you fill out your two-bedroom apartment, correct?

22        A.    Yes.

23        Q.    Okay.  And because you believed it to be

24    abandoned property, when you moved from the complex, you took

25    the stuff with you, right?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          A.     Basically she gave me the stuff in the first

2     place.

3          Q.     Right.   Because it was an abandoned property

4     situation, right?

5               MR. MARTINEZ:  Objection.  Speculation.

6               THE COURT:  Overruled.  Go ahead and answer if you

7     can.

8               THE WITNESS:  Yes.

9     BY MR. PATTERSON:

10          Q.     Okay.  And as manager of the apartment complex,

11     did you assume she had the authority to give you abandoned

12     property?

13          A.     She offered it to me, so --

14          Q.     And you took it?

15          A.     Yes.

16          Q.     So when you left you took it with you because

17     you assumed it was yours?

18          A.     Yes.

19          Q.     Okay.  Were there any agreements with regard to

20     your receiving the property from her, any hidden

21     understandings here between you and she?

22          A.     No.

23          Q.     Okay.  Anything sinister about this in your

24     mind?

25          A.     No.


                TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          MR. PATTERSON:   Judge, if I could have a minute?

2          THE COURT:   Yes.

3               (Pause in proceedings.)

4    BY MR. PATTERSON:

5          Q.    Let me just ask you one final question.   Were

6    you ever in Wendi's office during your stay there at the San

7    Riva apartments prior to becoming aware that she was in fact

8    married?

9          A.    I was in her office.   I don't know if it was

10   prior to that, but I believe it was, yes.

11         MR. PATTERSON:   Okay.   Thank you, Judge.   That's all

12   I have.

13         THE COURT:   Redirect examination?

14         MR. MARTINEZ:   Can I have the exhibits, please?

15         MR. PATTERSON:   Yes.

16              (Pause in proceedings.)

17

18   REDIRECT EXAMINATION BY MR. MARTINEZ:

19         Q.    Sir, I want to talk to you about this breakup

20   and this implication you perhaps were still hooked up with

21   her after you spoke with her.   And I want to do it in the

22   context of Exhibit 229.   I'm sorry, it's Exhibit 228.   Let's

23   look at the fax dated July 23rd, 2000.   Can you see up there

24   or not?   Can you see the TV from there?

25         A.    I can -- I can't read the other side of it.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

```
 1              THE COURT:  If you need to step down, step down.
 2      But if you're answering a question, speak up as loudly as
 3      you can away from the microphone.
 4      BY MR. MARTINEZ:
 5              Q.    I read the top part.  There's a salutation and
 6      then what does it say?
 7              A.    You want me to read it out loud?
 8              Q.    Yes.
 9              A.    "Here I go again with the letters.  But this
10      time I just need to clear the air.  After -- after your
11      rejection and plain speaking Friday night, I totally
12      understand that you want nothing to do with me.  I am so
13      sorry that I had to keep pushing everything."
14              Q.    Go ahead and have a -- a seat.
15                    Any doubt in your mind that you were the person
16      that ended that relationship?
17              A.    No.
18              Q.    Any doubt that you told her you didn't ever
19      want to have sex with her again?
20              A.    No, there's no doubt.
21              Q.    So you may have agreed to speak with her, but
22      that doesn't mean that things were the same as they were
23      before or were they?
24              A.    No, they weren't the same.
25              Q.    And along the same vein, you indicated on
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    cross-examination you didn't know she was married.  Do you

2    remember telling us that?  Remember when he was asking you

3    the questions, you told us you didn't know she was married.

4    Do you remember that?

5            A.    Yes.

6            Q.    Well, how was it you didn't know?  Did she wear

7    a ring or not?

8            A.    No.

9            Q.    Did you ever see her with her kids?

10           A.    No.

11           Q.    Did you ever see her with Joseph Andriano, her

12   husband?

13           A.    No.

14           Q.    Did she ever tell you she was married?

15           A.    No.

16           Q.    Did she ever bring the kids around on one of

17   those nights she came over to your house?

18           A.    No.

19           Q.    Did she ever bring Joseph Andriano for you to

20   meet him?

21           A.    No.

22           Q.    You also indicated that you were asked about

23   how many times you went out and whether or not it was one on

24   one.  Do you remember that?

25           A.    Yes.

1      Q.    And you indicated I think -- and, you know,

2    clear this up for me -- that most of the time it was with a

3    group of people as I understand it, right?

4      A.    Yes.

5      Q.    Was there ever -- could there have been times

6    when you actually went out with her?

7           MR. PATTERSON:   Your Honor, could is speculative.

8           THE COURT:  Overruled.  Go ahead, answer the question

9    if you can.

10          THE WITNESS:   No.   I still don't remember.   I mean,

11   the -- if it was one on one, if we went on certain things one

12   on one, I don't remember.

13   BY MR. MARTINEZ:

14     Q.    Okay.  Now, with regard to this one on one

15   situation, when you and she were alone in your bedroom having

16   sex, was that one on one or not?

17     A.    Yes, one on one.

18     Q.    And in terms of this property that you were

19   asked about, were you there when she acquired the property?

20     A.    No.

21     Q.    So you don't know whether or not she paid for

22   it, do you?

23     A.    No.

24     Q.    You don't know if she got it free?

25     A.    No.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          Q.    You don't know if it was abandoned?

2          A.    No.

3          Q.    You had no reason to question it, but the

4    property showed up at your doorstep with her behind it?

5          MR. PATTERSON:   Judge, this is all leading.

6          THE COURT:   Don't lead.   Restate your question.

7    BY MR. MARTINEZ:

8          Q.    The property, who was it brought over by?

9          A.    We went -- me and I think it was Erik went over

10   and got it out of the office, I think it was.

11         Q.    And you and Erik went over there.   How did you

12   know that the property was there for you to pick up?

13         A.    Wendi told us that it was there.

14         Q.    And when she told you that it was there, did

15   you give her money there?

16         A.    I don't think the day we picked it up I did.

17         Q.    And you and Erik, did you and Erik carry that

18   property to your apartment?

19         A.    Yes.

20         Q.    And when it was in your apartment, did you have

21   a doubt as to whether or not you owned that property?

22         A.    Yes.

23         Q.    But with regard -- even though you had a doubt

24   as to whether you owned that property, you took it with you,

25   right?


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    A.    Yes.

2    Q.    Did she ever say you need to pay me for that

3  property?

4    MR. PATTERSON:  Judge, these are leading questions.

5  Objection.

6    THE COURT:  Overruled.  Go ahead, answer the question

7  if you can.

8    THE WITNESS:  No, she didn't.

9  BY MR. MARTINEZ:

10    Q.    How did it come about that you paid for some of

11  it?

12    A.    She asked me -- she asked me to pay her and

13  then after I did pay her some, she said she didn't want any

14  more.

15    Q.    So you paid for some and she didn't want money

16  for the other?

17    A.    Yes.

18    Q.    Okay.  And in terms of the time afterwards when

19  you were on speaking terms and you were asked about that on

20  cross-examination, the speaking terms we're talking about and

21  you being her friend, did that occur when she was coming over

22  and standing outside of your apartment for half an hour to an

23  hour wanting to talk to you?  Is that when you had these

24  conversations with her?

25    A.    We had conversations and I don't remember

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    exactly what was said except she wanted to come in and I just
2    told her I didn't think it was a good idea.
3            Q.    Why didn't you think it was a good idea?
4            A.    Because she told me she was married and had
5    kids.
6            MR. MARTINEZ:  I don't have anything else.
7            THE COURT:  Are there any further questions of this
8    witness by the jury?  If so, please raise your hand.
9                 Okay.   Write it out.
10                (Pause in proceedings.)
11           THE COURT:  Let me see Counsel here at the bench.
12
13                (The following proceedings were held at the
14   bench:)
15
16           THE COURT:  First question, "What month, slash, date
17   did Rick F. move in -- into and out of San Riva apartments?"
18   It's been asked a couple times but I'll go ahead and ask it
19   again.
20           MR. PATTERSON:  No objection.
21           MR. MARTINEZ:  No objection.
22           THE COURT:  Next question, "When in Wendi's office,
23   did you ever see pictures of husband" --
24           MR. PATTERSON:  And kids.
25           THE COURT:  -- "and kids?"


            TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          MR. PATTERSON:  No objection.

2          MR. MARTINEZ:  No objection.

3          THE COURT:  Okay.

4              (Pause in proceedings.)

5          THE COURT:  Question, "Will we be able to see the

6     pool party to get an idea what they look like?"  I assume

7     she's talking about the photographs for reference.

8          MR. PATTERSON:  Yeah.

9          THE COURT:  I'll tell them the exhibits admitted into

10    evidence will be given to the jury.

11         MR. PATTERSON:  That's fine.

12         THE COURT:  Second question, "Did you pay?  If not,

13    why move?"

14         MR. PATTERSON:  For rent I assume?  I'm assuming it's

15    for rent.  We can't read their mind, so we can't ask it.  I

16    assume it's for rent.

17         MR. MARTINEZ:  But she could also --

18         MR. DELOZIER:  It could be for the property.

19         MR. PATTERSON:  If it's uncertain, I don't think we

20    should ask it.

21         MR. MARTINEZ:  I don't think we should ask it.

22         THE COURT:  I'm not going to ask that question.

23             Next question, "Why did you keep a friendly

24    relationship with the defendant knowing how she would come

25    and hang on your door for long periods of time?"  Any


          TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    objection?

2         MR. PATTERSON:  None.

3         THE COURT:  Okay.

4              (The following proceedings were held in open

5    court:)

6

7         THE COURT:  One of the questions here, there's an

8    inquiry about whether you'll be able to see photographs.  If

9    a photograph had been admitted into evidence, you'll be able

10   to see it at a later date, at a later time.

11             Mr. Freeland, I have additional questions here

12   for you.  First question reads as follows:  What month,

13   slash, date did you move into and out of San Riva apartments?

14        THE WITNESS:  I don't know the exact dates.

15        THE COURT:  Next question, "When in Wendi's office,

16   did you ever see pictures of husband and kids?"

17        THE WITNESS:  No.

18        THE COURT:  Next question reads as follows: "Why did

19   you keep a friendly relationship with the defendant knowing

20   how she would come and hang on your door for long periods of

21   time?"

22        THE WITNESS:  I just would.  I don't know how else to

23   answer it.

24        THE COURT:  Any follow-up questions to those specific

25   questions of the jury by Mr. Martinez?


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    FOLLOW-UP QUESTIONS BY MR. MARTINEZ:

2         Q.     Did you know that was how she was going to

3    react, ie. hang by your door after you broke up with her or

4    terminated the sexual relationship?

5         A.     No.

6         MR. MARTINEZ:  I don't have anything else.

7         THE COURT:  Mr. Patterson?

8

9    FOLLOW-UP QUESTIONS BY MR. PATTERSON:

10        Q.     Certainly, Mr. Freeland, you maintained a

11   friendship with her after that episode of the knocking on the

12   door, right?

13        A.     Yes.

14        MR. PATTERSON:  Okay.

15        THE COURT:  Are there any further questions of

16   witness by the jury before he is excused?

17             (No response.)

18        THE COURT:  No one else has raised their hand.

19             May this witness be excused?

20        MR. MARTINEZ:  Yes, sir.

21             (Pause in proceedings.)

22        MR. PATTERSON:  Judge --

23

24             (The following proceedings were held at the

25   bench:)


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

```
 1           MR. PATTERSON:  Could we just see the questions
 2    again?
 3           THE COURT:  Yes.
 4           MR. PATTERSON:  Thank you, Judge.
 5           MR. DELOZIER:  Sorry.
 6
 7              (The following proceedings were held in open
 8    court:)
 9
10           THE COURT:  May this witness be excused?
11           MR. MARTINEZ:  Yes.
12           MR. PATTERSON:  Yes, Your Honor.
13           THE COURT:  Thank you very much.  You're excused.
14               Mr. Martinez?
15           MR. MARTINEZ:  State recalls Dennis Olson to the
16    stand.
17           THE COURT:  Okay.  Sir, you were previously sworn
18    last Thursday, September 9.  You're still under oath and
19    we'll continue the examination by Mr. Martinez.
20
21                     DENNIS OLSON,
22          CALLED TO TESTIFY ON BEHALF OF THE STATE:
23       HAVING PREVIOUSLY BEEN DULY SWORN, TESTIFIES FURTHER:
24    / / / / /
25    / / / / /
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

STATE OF ARIZONA,           )
                            )
            Plaintiff,      )
                            )
    vs.                     )      No. CR2000-096032
                            )          CR05 0005-AP
WENDI ELIZABETH ANDRIANO,   )
                            )
            Defendant.      )
_____)

PUBLIC DEFENDER   JUL 2 7 2005   EALS RECEIVED

BEFORE:   THE HONORABLE BRIAN K. ISHIKAWA

Mesa, Arizona
December 14, 2004

REPORTER'S TRANSCRIPT OF PROCEEDINGS
(Trial)

COPY

SHARON FLORES
CERTIFIED COURT REPORTER
50374

2

1

2

3                         A P P E A R A N C E S

4

5

6

7       For the State:

8                         Mr. Juan M. Martinez

9                         Deputy County Attorney

10

11

12

13

14      For the Defense:

15                        Mr. Daniel B. Patterson

16                        Mr. G. David Delozier, Jr.

17                        Office of the Public Defender

18

19

20

21

22

23

24

25

3

1

2                                 I N D E X

3    WITNESSES:                                                PAGE

4

5      JANA CLAYTON

6         Redirect Examination by Mr. Martinez             19

7         Examination by the Court                         22

8

9      TIMOTHY LEE

10        Direct Examination by Mr. Martinez               24

11        Cross-Examination by Mr. Patterson               27

12        Redirect Examination by Mr. Martinez             31

13

14     DAWNA HARRIS

15        Direct Examination by Mr. Martinez               48

16        Cross-Examination by Mr. Patterson               82

17        Redirect Examination by Mr. Martinez             96

18        Examination by The Court                        101

19        Further Redirect Examination by Mr. Martinez    102

20

21     BONNIE LOSE

22        Direct Examination by Mr. Martinez              104

23

24

25

4

1

2

3                         E X H I B I T S

4

5           (Exhibits were marked prior to trial unless

6    indicated.)

7

8    NUMBER:          DESCRIPTION          MARKED    ADMITTED

9     548             Disciplinary Report             65

10    549             Pencil                          77

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  the time you've given us.

2          Mr. Martinez.

3          MR. MARTINEZ:  State calls Dawna Harris.

4          THE COURT:  Please step forward right up here to

5  the clerk and she will swear you in.

6          (Witness sworn.)

7          THE COURT:  Please have a seat on the witness

8  stand.  Please pull the microphone close to you. Remember

9  to speak loudly and clearly so everyone can hear you.

10  Also, wait until the question is completed before you

11  answer the question.  And please make sure you give a

12  verbal response.

13          Is that all agreeable to you?

14          THE WITNESS:  Yes.

15          THE COURT:  Mr. Martinez, you may proceed.

16

17                  DAWNA HARRIS,

18  called as a witness herein, having been first duly sworn,

19  was examined and testified as follows:

20

21                  DIRECT EXAMINATION

22  BY MR. MARTINEZ:

23      Q.   State your name, please?

24      A.   Dawna Harris.

25      Q.   And who do you work for?

49

1      A.    Maricopa County Sheriff's Office.

2      Q.    How long have you been working for the Maricopa

3    County Sheriff's Office?

4      A.    Seventeen years, four months.

5      Q.    And when have you -- with regard -- where do you

6    work at?

7      A.    I'm now at Durango D2.

8      Q.    How long have you been at Durango D2?

9      A.    Four years.

10      Q.    Do you know an inmate by the name of Wendi

11    Elizabeth Andriano?

12      A.    Yes, I do.

13      Q.    Is she in court today?

14      A.    Yes, she is.

15      Q.    Tell me where she is seated and what she is

16    wearing?

17      A.    She's is seated between the two gentlemen at that

18    table, wearing a purple sweater.

19            MR. MARTINEZ:   May the record reflect the

20    identification of the defendant by the witness?

21            THE COURT:   The record will reflect the

22    identification of the defendant by the witness.

23      Q.    BY MR. MARTINEZ:   You indicated that you worked

24    at D2 Durango facility.   Can you tell me a little bit about

25    that facility?

1      A.    It's a psychiatric facility.  It's unique in that
2  it houses both males and females.

3      Q.    And do the males and females get to sleep on the
4  same side?  How does that work?

5      A.    No, it is separated.

6      Q.    And so one side is directed towards males and one
7  side to females?

8      A.    That's correct.

9      Q.    Do they associate or do they socialize during the
10 day hours or how does that work?

11     A.    No.  We try to keep them apart as much as
12 possible.

13     Q.    What are your duties with regard to that facility
14 at Durango?

15     A.    My duties are to keep everyone safe at all times,
16 the facility secure.

17     Q.    And you've been doing that I think you said four
18 years, correct?

19     A.    In that facility, yes.

20     Q.    And how is it -- Is there also a mental health
21 staff that forms a component of the unit there at Durango?

22     A.    Yes, there is.

23     Q.    Is one of the people there somebody by the name
24 of Joyce Van Every?

25     A.    Yes, she is.

1    Q.    How about Gerald Perry, does he also work there?

2    A.    Yes.

3    Q.    And somebody by the name of Laura King, does she

4    work there sometimes?

5    A.    She did but no longer does.

6    Q.    Do you know when she left?

7    A.    I believe it was about three months ago.

8    Q.    They also work for the sheriff's office but they

9    are different than you, correct?

10   A.    They are County Health Service, but yes.

11   Q.    And what is your job in comparison to what they

12   do.  What is it that you do in comparison to what they do?

13   A.    I just keep the place secure and they do

14   counseling therapy and medical services.

15   Q.    How it is that -- is there a specific way in

16   writing that you communicate with them on a day-to-day

17   basis?

18   A.    Yes.

19   Q.    What is that?

20   A.    We have a spiral notebook that we make notations

21   in if we see things are awry or need attention.  And that

22   gets passed along to the staff.

23   Q.    What is your shift?

24   A.    6:30 to two.

25   Q.    Let's say there is an issue that arises, do you

52

1   then go to the spiral notebook during your shift and write

2   whatever is of concern to you?

3        A.   Yes, I do.

4        Q.   How -- and where is this notebook?

5        A.   It's kept in our control booth.

6        Q.   And is it a requirement or policy or custom that

7   the health people then come over and take a look at it?

8   How is it they get the messages that are in that book?

9        A.   Every day they have a meeting at 10:30.  They

10  come into the control booth and get the spiral notebook and

11  take to their staff meeting.

12       Q.   I'm showing you Exhibit 546 and ask you if you

13  recognize what's here.

14       A.   Yes, I do.

15       Q.   And that's referring to an entry back on February

16  25th of 2004 and February 26, 2004, as it relates to Wendi

17  Elizabeth Andriano, correct?

18       A.   Correct.

19       Q.   Did you write those notes?

20       A.   I wrote the bottom one.

21       Q.   And the top one, do you know who wrote that one?

22       A.   That appears to be Officer Lose's handwriting.

23       Q.   But it's part of this same book or same page of

24  the book that we've been talking about, correct?

25       A.   Yes, it is.

1      Q.    And you were the one that actually made the copy,

2  right?

3      A.    Yes, I am.

4            MR. MARTINEZ:   I move for the admission of

5  Exhibit Number 546.

6            MR. PATTERSON:   Judge, we need to approach.

7            (Bench conference was held outside the hearing of

8  the jury.)

9            MR. PATTERSON:   This is one of the things I just

10  got today.  We made requests for all of the medical and

11  jail records from the county jail.  They never sent this to

12  us.  This apparently is something, a spiral notebook that

13  they keep personally and that had some entries in it that

14  are germane.  They should have disclosed this to us

15  pursuant to the order that you signed weeks ago.  It should

16  have been submitted to us.

17            Secondly, it pertains to an allegation of one

18  inmate having some problems with Wendi and not wishing to

19  be in the same pod.  And it's information that should be

20  more properly presented perhaps by that person rather than

21  through this lady because it injects collateral issues into

22  the case I can't adequately defend against just having been

23  notified this existed today.

24            THE COURT:   Mr. Martinez?

25            MR. MARTINEZ:   She indicated that that's not her

1    personal note because everybody writes in it, including the

2    other D.O.s that are there.  So it's not her own notebook.

3    But additionally with the complaint, we bring in the person

4    that made that comment.  You know, the rules don't require

5    us to do that at this point.

6              Additionally, she said she wrote it.  So she has

7    personal knowledge of it.  Why the jail doesn't give him

8    this information, I don't know.  But that's all I know.

9    After Joyce Van Every testified the next day I just can't

10   remember what the dates were but after she testified, I

11   asked the paralegal to contact Joyce Van Every for the name

12   of the officer that they indicated to us was unhappy or had

13   something to say.  And as a result of that, I just sent

14   them a subpoena and asked them to provide me with all

15   correspondence naming Wendi Andriano.  I received it this

16   morning when they came to court today at ten.

17             THE COURT:  I'm going to allow you to elicit

18   testimony about the information here.  But I'm not going to

19   allow it to be admitted to.  I'll allow you to elicit

20   testimony.

21             MR. MARTINEZ:  Can she read it?

22             THE COURT:  No.  But she can testify about the

23   events.

24             MR. MARTINEZ:  Judge, I think that Rule 703

25   allows me to do that.  I'm not arguing with you.

1          THE COURT:  I'm not allowing you to admit it

2          (Bench conference concluded.)

3     Q.   BY MR. MARTINEZ:  Ma'am, are you the one who made

4  the entries on February 26, 2004?

5     A.   Yes, I am.

6     Q.   Did you write that entry as a result of a

7  conversation that you may have had with someone?

8     A.   Yes.

9     Q.   You had a conversation with whom?

10    A.   Her name is Long Horse.

11    Q.   Is that who?  Is that an inmate?

12    A.   Yes, it is.

13    Q.   And where was this inmate?  Where was she housed?

14    A.   She was housed in D pod.

15    Q.   And you and she had a conversation and what did

16  she tell you?

17    A.   Well, the conversation was initiated because the

18  staff wanted her to move to C pod.

19    Q.   Who is a resident on C pod?  Who is a resident of

20  C pod back then?

21    A.   Andriano.

22    Q.   Go ahead.

23    A.   And when I tried to convince her to move to C

24  pod --

25    Q.   From where was she?

1      A.    D pod.

2      Q.    Go ahead.

3      A.    -- to C pod because that was the staff's wishes,

4  she informed me that she did not, in fact, want to go over

5  there as long as that quote control freak, was still living

6  in that pod.

7      Q.    Which control freak was she talking about?

8      A.    Andriano.

9      Q.    Did she specifically say Andriano or was that

10  something you came up with?

11     A.    She called her Wendi.  There was only one Wendi

12  there at the time.

13     Q.    And did he also indicate that she was willing to

14  put up with any bullying by other members as long as she

15  didn't have to be housed with the defendant?

16     A.    That's correct.

17     Q.    You indicated there is also some more writing at

18  the top.  You indicated that may have been written by

19  someone else.  It may have been Officer Lose, I think you

20  said?

21     A.    Yes.

22     Q.    But it does refer to somebody by the name of

23  Candy Rohde?

24     A.    Yes.

25     Q.    How is Candy Rohde related or associated with the

1    defendant?

2         A.   I'm not sure.   For some reason, the staff was

3    allowing this woman to come into the unit to have

4    counseling sessions of some sort with her that were contact

5    visits, which is unprecedented.

6         Q.   When you say "unprecedented" what do you mean?

7         A.   We have a visitation facility and those visits

8    were taking place up there.

9         Q.   Were you under the impression she was a lawyer?

10        A.   I was under the impression she had something to

11   do with legal staff.

12        Q.   And  as a result of one of those visitations did

13   something occur with regards to the defendant?

14        A.   Yes.

15        Q.   Tell me about that?

16        A.   Right after she had a visit with her --

17        Q.   Right after Andriano had a visit with Ms. Rohde?

18        A.   Correct.   We were doing cell searches.

19        Q.   You searched cells?

20        A.   We did at C cell, in C pod.

21        Q.   All right?

22        A.   And when I searched Andriano just lightly, I

23   discovered a compact case in there with a glass mirror.

24        Q.   And this --

25             MR. PATTERSON:   Judge, can we approach, please?

1          (Bench conference was held outside the hearing of

2  the jury.)

3          MR. PATTERSON:  I don't know where she came from

4  but this lady is not a member of my legal staff.  And for

5  her to suggest that she is now associated with my office,

6  and thereafter brought some contraband into our client is

7  just outrageous.

8          THE COURT:  Who is the lady?

9          MR. PATTERSON:  She is a counselor who was hired

10  by the mother to give counseling services to the client.

11  She is not a member of our staff.  There is nothing to do

12  with legal staff.

13          THE COURT:  Okay.

14          MR. PATTERSON:  So could you direct that that be

15  cleared it up so we don't have to -- I don't have to --

16          MR. MARTINEZ:  I stipulate that's not -- I don't

17  have a problem with that.

18          THE COURT:  You both will to stipulate that this

19  person is not associated with?

20          MR. PATTERSON:  Anything to clear this issue up

21  right now.

22          THE COURT:  And her name is Candy Rohde?

23          MR. MARTINEZ:  Candy is the first name.

24  R-o-h-d-e.

25          THE COURT:  And have you both stipulated?

59

1          MR. PATTERSON:  She is not a member of the public

2  defender's staff, a legal representative and not a lawyer.

3  She has nothing to do with the legal defense of this case

4  or even my staff.

5          MR. DELOZIER:  She's a professional counselor

6  provided by the mother and father.

7          MR. MARTINEZ:  Just not associated.  We don't

8  know who she was hired by.

9          MR. PATTERSON:  But she wasn't hired by my

10 office.  She wasn't hired by his office.

11         THE COURT:  This Candy Rohde is not associated

12 with the public defender's office or staff of either

13 Mr. Delozier or Mr. Patterson's office.

14         MR. PATTERSON:  That's fine.

15         MR. DELOZIER:  Okay.

16         (Bench conference concluded.)

17         THE COURT:  Ladies and gentlemen, the parties

18 stipulate to the following:  That this Candy Rohde that's

19 been mentioned is not associated in any way with the

20 Maricopa County Public Defender's Office or Mr. Patterson's

21 or Mr. Delozier's offices.

22         The parties stipulate that this person that was

23 mentioned, Candy Rohde, is not associated in any way with

24 the Maricopa County Public Defender or with Mr. Patterson's

25 or Mr. Delozier's office.

60

1          Mr. Martinez.

2          Q.   BY MR. MARTINEZ:  To get back to Ms. Rohde, one

3     of the things you told us was she was getting visitation

4     that was face-to-face, correct?

5          A.   Yes.

6          Q.   That implies that the visitation with everybody

7     else was different or otherwise?

8          A.   Yes.

9          Q.   How is that?  In other words, how does that take

10    place?  Was it through a glass?

11         A.   Well, no, it was in that conversation booth about

12    this size, maybe twice this size, with plexiglas walls and

13    with full vision from our office.

14         Q.   And could the two people touch each other?

15         A.   They could.

16         Q.   In other words, they could just extend and do

17    whatever?

18         A.   That's correct.

19         Q.   Prior to coming to court, did you have occasion

20    beginning in June of 2004 to present, to take a look at the

21    records to determine how many times someone by the name

22    Donna Ochoa had visited the defendant in the last six

23    months?

24         A.   There were four visits total.

25         Q.   And that's beginning in June of 2000?

1      A.    June 1 until December 3rd.

2      Q.    Do you remember what dates those visits were,

3  what month they were?

4      A.    There was one on June 1st, there was another

5  towards the end of October.  Another towards the end of

6  November and then December 3rd was the other one.

7      Q.    One of the things that's in Exhibit 546 that's

8  related to us about indicating something about a control

9  freak.  Did you have occasion to see the defendant, Wendi

10  Andriano, interact with the other inmates in her pod?

11      A.    Yes.

12      Q.    And in terms of the person who was in charge, if

13  you will, do you have an opinion as to who was in charge

14  involving the defendant and the other inmates?

15      A.    I didn't actually see her controlling them.  I

16  got many, many complaints from inmates saying that

17  different things were going on and all of these things seem

18  to come back to Wendi Andriano.

19      Q.    As a result of those complaints and the things

20  that were coming back, did you form an opinion as to who

21  was in charge?

22      A.    Yes.

23      Q.    Who was that?

24      A.    Wendi.

25      Q.    Now, was there also a situation where there was

1   movement in and out of this pod of the inmates that were

2   there?

3        A.   Yes.

4        Q.   Did you then have occasion over the last year

5   let's say, were there many movements in and out of that

6   facility?

7        A.   Several.

8        Q.   And with regard to those movements, did you then

9   question the staff involving Mr. Perry, Laura King,

10  perhaps, Ms. Van Every about what was going on?

11       A.   Yes, I did.

12       Q.   And what is it that they would tell you?

13       A.   They just said they had received information

14  about inmates that led them to believe that that inmate was

15  not conducive for that environment and needed to go back.

16       Q.   Then did you press them on what that information

17  was?

18       A.   I asked where they got the information.

19       Q.   And what did they tell you?

20       A.   They told me Andriano was telling them.

21       Q.   As a result of this information she was

22  providing, people were being moved?

23       A.   That's correct.

24       Q.   We had left off with Ms. Rodhe and we were

25  talking about the compact.  Do you remember that?

1     A.   Yes.

2     Q.   Is a compact something that's allowed in that
3  particular pod?

4     A.   No, it is not.

5     Q.   Is it allowed in the jail-wide facility?

6     A.   No.

7     Q.   Is it something that they can buy from the
8  commissary?

9     A.   No.

10    Q.   Does the compact that you're talking about, did
11  it have glass in it?

12    A.   Yes, it did.

13    Q.   Is that something that is a potential hazard
14  either to this inmate or perhaps to other inmates?

15    A.   Yes, it is.

16    Q.   Why is that?

17    A.   Because anyone could break it out.  It was a
18  psychiatric unit and a lot of people were very emotionally
19  fragile.

20    Q.   It could be used as a weapon, I think that's what
21  you're telling me, right?

22    A.   Yes.

23    Q.   Did you have occasion, at one point, take a
24  disciplinary action against the defendant, Wendi Andriano?

25    A.   Yes, I did.

1       Q.    And was that put in writing?

2       A.    Yes, it was.

3       Q.    Let me show you.   This is Exhibit Number 548.

4             Is this a report that you wrote?

5       A.    Yes, it is.

6       Q.    And what's the date on it?

7       A.    12/3 of '03.

8       Q.    And our understanding is that she arrived there

9  about July of '03, is that when she arrived?

10      A.    I don't recall, exactly.   I thought it was

11 September.

12      Q.    And with regard to this, what is it that she did

13 that caused you to write this report?

14      A.    She had tried to conceal various makeup items

15 that had been brought in from the outside.

16      Q.    Is this the same time that we are taking about

17 with the compact that is referenced here on Exhibit Number

18 546 that's dated 2/25/04?

19      A.    Yes.

20      Q.    What's the date of this again?

21      A.    12/3/03.

22      Q.    That appears to be happening -- I see what you're

23 saying.   Okay.

24            I move for the admission of Exhibit 548?

25            MR. PATTERSON:  No objection.

1            THE COURT:  Exhibit 548 for identification is

2  admitted into evidence.

3       Q.   BY MR. MARTINEZ:  Why don't you read for us the

4  items that were allegedly contraband, that you found to be

5  contraband?

6       A.   Just list the items?

7       Q.   Yes.  The items that you found.

8            MR. PATTERSON:  May I have the exhibit number?

9            THE COURT:  Exhibit 548.

10            MR. PATTERSON:  Thank you, sir.

11            THE WITNESS:  Besides the compact case with glass

12  mirror, were two black pens, new lipstick in a little case,

13  lib gloss and eye liner.  All of them still had the

14  store-brought wrapping on them so they were very new.

15       Q.   Was there an investigation as to how they got in?

16       A.   No.

17       Q.   Any idea how they got in?

18       A.   We believe that Candy Rohde was bringing them in.

19       Q.   That's why on February 25th, '04 was the notation

20  that she's not allowed?

21       A.   That's correct.

22       Q.   Drawing your attention back to mid July of 2004.

23  Did you have occasion to be working double shifts back

24  then, say, July 24th of 2004?

25       A.   I actually worked about two and a half hours

1  over.

2      Q.   And when you were working those two and a half

3  hours over, if you started at two that would have taken you

4  to 4:30?

5      A.   Approximately 4:30.

6      Q.   And did you have occasion, again on July 24th of

7  2004, to speak to somebody by the name of Joyce Van Every?

8      A.   Yes, I did.

9      Q.   Who is she?

10     A.   She's the R.N. for the unit.

11     Q.   When she came up to you, what is -- First of all,

12  tell us what her demeanor was like upon seeing you there.

13     A.   She was agitated.

14     Q.   And then, did she say anything to you?

15     A.   Yes, she did.

16     Q.   What did she say?

17     A.   She asked me when I was going to leave.

18     Q.   And what did you say?

19     A.   I said, "I don't know.  I'll be here for a

20  while.  I may work a double."

21     Q.   And then what happened?

22     A.   She said, "Well, I've got to go in and see Wendi

23  before I go home."

24     Q.   Did she have anything in her possession when she

25  was going to go see Wendi before she went home?

1    A.    Yes, she did.

2    Q.    What did she have?

3    A.    She had a white plastic shopping bag.

4    Q.    And is it the kind that you get like at Fry's or

5 something?

6    A.    Yes, it is.

7    Q.    And was there items in that shopping bag?

8    A.    The bag was probably three quarters full.

9    Q.    So, she takes this bag in and says she needs to

10 see Wendi.  Then what happens?

11    A.    I let her into C pod and she went out of sight of

12 the camera monitor at that point.

13    Q.    How long was she gone before you saw her again?

14    A.    Just minutes.

15    Q.    And then what happened?

16    A.    When she exited the C pod, that bag was better

17 than half empty.

18    Q.    And what conclusion did you draw from that?

19    A.    I decided that she had passed something to the

20 inmate.

21    Q.    Did you then go and check to see what that was?

22    A.    No.  Because by the time we discovered it, it was

23 too late for me to go in.  Plus, I was noncontact at the

24 time because of an accident that happened so I couldn't

25 personally do it.

68

1      Q.    What does "noncontact" mean?

2      A.    That means I had an injury that left me

3  vulnerable.  So I had no contact, physical contact.

4      Q.    When she came out, did she, I'm talking about

5  Joyce Van Every, did she say anything to you?

6      A.    No.  Just said she's going home and I let her

7  out.

8      Q.    One of the things when the defendant was there,

9  did Joyce Van Every and the defendant have contact on a

10  frequent basis?

11      A.    Daily.

12      Q.    And with regard to the other inmates that were

13  there, did Joyce Van Every have daily contact with them

14  like she did with the defendant?

15      A.    No.

16      Q.    When you say she had daily contact with the

17  defendant, explain that to me?

18      A.    She would go over to C pod and ask us to open the

19  door.  We would open the door and she would have Andriano

20  exit the pod.

21      Q.    And they would sit and talk?

22      A.    Yes.

23      Q.    Where would they talk?

24      A.    Most of the time at the round table just outside

25  of C pod.

1     Q.   Would it be unusual for her to talk to her every
2  day?

3     A.   That is an unusual practice.

4     Q.   Let's say she's talking to her and you perhaps
5  need her for something.  Was it something that she would
6  leave Ms. Andriano and go back to whatever you're talking
7  about or was it something that she would continue talking
8  to Ms. Andriano?

9     A.   She would refer me to someone else.

10     Q.   How about Dr. Perry, do you know whether or not
11  there were any notes kept of what appears to be daily
12  conversations?

13     A.   I don't know.  I wasn't privy to the nurse's
14  notes.

15     Q.   How about Dr. Perry, did he spend some time with
16  the defendant?

17     A.   When he was there and she was there, it was
18  daily.

19     Q.   And, again, is that something that he did with
20  the other inmates?

21     A.   No.

22     Q.   How about Laura King, did she spend some time
23  with her?

24     A.   Yes, she did.

25     Q.   And, again, was it as frequent as it was with

1   Ms. Van Every and Mr. Perry?

2       A.   Yes, it was.

3       Q.   And do you know whether or not they kept notes on

4   that?

5       A.   No, I don't.

6       Q.   What about this issue about -- are books allowed

7   to go into an inmate without you first inspecting them?

8       A.   No.

9       Q.   Why is that?

10      A.   Because in the past things have been hidden

11  within the leaves of the book.

12      Q.   And do you know whether or not the defendant ever

13  was in possession of items, such as books without first

14  having been inspected by you?

15      A.   Yes, I do.

16      Q.   And do you know who brought them in?

17      A.   Both Joyce Van Every and Roberto Escobar.

18      Q.   Who is Roberto Escobar?

19      A.   He's another R.N. on the unit.

20      Q.   Wasn't the defendant there because of a suicide

21  attempt?

22      A.   Yes, she was.

23      Q.   Wouldn't it be possible to hide some sort of a

24  weapon in these books?

25      A.   Yes, it would.

1      Q.   Speaking about books, was there ever a situation
2  or something that came to you about whether or not the
3  defendant was writing a book with Joyce Van Every?

4      A.   I was told that.

5      Q.   And who were you told that by?

6      A.   By Andriano's cell mate, at the time Anthony
7  Gonzales.

8      Q.   Was the defendant present when he told you that?

9      A.   No.

10      Q.   One of the things that we were told about, well,
11  let me ask you, is clothing distributed on a daily basis in
12  this pod?

13      A.   No, once a week.

14      Q.   And when we're talking about clothing, what are
15  we talking about.

16      A.   We're talking about the striped shirt on the top
17  and striped pants on the bottom and underwear, change of
18  socks.

19      Q.   With regard to the items in the uniform, would
20  you give these items to the defendant?

21      A.   I handed them to them, yes.

22      Q.   Was there ever any issues with the defendant
23  involving the garments that you were giving out on a weekly
24  basis?

25      A.   She was very fussy about the colors of the

1   stripes.

2       Q.   What do you mean she was fussy about the color of

3   the stripes?  They are black and white, right?

4       A.   Correct.

5       Q.   What was she fussy about?

6       A.   She was fussy if the top did not match the

7   bottom.  And color as far as density.

8       Q.   So what would happen if you would give her

9   something that doesn't match?

10      A.   She would get upset with me and beg me to give

11  her something that would match.

12      Q.   What did you do?

13      A.   I'd finally just say you show me what matches and

14  I would hand it to her because it would take too long.

15      Q.   Is this something that happens on a weekly basis

16  with her?

17      A.   Yes.

18      Q.   And it still continues?

19      A.   Yes.

20      Q.   We talked a little bit about Donna -- I'm sorry

21  about Laura King.  You know who she was, right?

22      A.   Yes.

23      Q.   Did she seemed to have a somewhat special

24  relationship with the defendant?

25      A.   Yes, she did.

1     Q.    How do you mean that she had a special

2   relationship with the defendant.  How did that manifest

3   itself?

4     A.    They would be seen a lot joking and kidding

5   around and spending a lot of time conversing.

6     Q.    And in anticipation of this trial, do you know

7   whether or not Ms. King would come in in her own time to

8   assist the defendant?

9     A.    Yes, she did.

10     Q.    Explain that to me?

11     A.    She came in in the evening to do her hair and

12   makeup the day before she had to come to trial.

13     Q.    How many times would she do that?

14     A.    I can't be certain of that.

15     Q.    Ma'am, these people that we're talking about,

16   Ms. King, Mr. Perry and Ms. Van Every, are they bound by

17   the same rules of the jail as you are?  In other words, not

18   to bring in items that you don't check, not to bring in

19   contraband, basically, worry about the safety of the

20   inmates as well as themselves?  Are they bound by the

21   policies of the jail?

22     A.    Yes, they are.

23     Q.    It's not like, or is it, that they have their own

24   rules that aren't applied to them?

25     A.    No.

1        Q.    Are you familiar with the policy of CP 2, the

2    code of conduct involving employees of the sheriff's

3    office?

4        A.    Yes, I am.

5        Q.    And, specifically, does that section CP 2, number

6    19, talk about association and fraternization with

7    prisoners?

8        A.    Yes, it does.

9        Q.    Does it talk about employees shall not indulge in

10    undue familiarity with inmates?

11        A.    Yes, it does.

12        Q.    It's forbidden?

13        A.    Yes, it is.

14        Q.    Why?  Do you know it's forbidden?  I know you've

15    been there about 17 years, can you tell us why, if you can,

16    and if you can't, that's okay?

17        A.    Because it puts you in a compromising position.

18        Q.    How does it put you in a compromising position?

19        A.    It puts you in a position where you can be

20    manipulated if you become too familiar.

21        Q.    How about, it also indicates that employees shall

22    not do favors for or accept favors from somebody who is an

23    inmate.  Is that something that you're familiar with?

24        A.    Yes.  This thing with Ms. King coming in and

25    providing this thing with the hair and talking to her and

1  engaging in this conduct with her, is that something that

2  you think is covered by this?

3          MR. PATTERSON:  Objection.  Her opinion.

4          THE COURT:  Sustained.

5      Q.  BY MR. MARTINEZ:  Ma'am, you are charged with

6  keeping order there, aren't you?

7      A.  Yes, I am.

8      Q.  You are charged with enforcing these, aren't you?

9      A.  Yes, I am.

10     Q.  Did you speak to them about this?

11     A.  Yes, I did.

12     Q.  And with regard to Ms. King, what did she say?

13     A.  That it was unimportant, not a problem.

14     Q.  Even though you talked to her about it?

15     A.  Yes.

16     Q.  Even though you perceived it to be a problem?

17         MR. PATTERSON:  Objection.  Leading.

18         THE COURT:  Don't lead.

19     Q.  BY MR. MARTINEZ:  Did you perceive it to be a

20  problem?

21     A.  Yes, I did.

22     Q.  How about with Ms. Van Every, did you perceive

23  the fact that she was bringing in books a problem?

24     A.  Yes, I did.

25     Q.  And did you ever discuss that with her?

1    A.   Yes, I did.

2    Q.   What was her response to that?

3    A.   She said I didn't know what I was talking about.

4    Q.   Is there a policy, for example, that says

5    employees shall not provide inmates with books from outside

6    the jail?

7    A.   Yes, there is.

8    Q.   What's the procedure for getting a book to an

9    inmate?

10   A.   In general population the books have to be

11   donated to the library.  There has been exceptions made in

12   D2 because the staff there has been very insistent on being

13   able to bring in magazines and books for the inmates.  So

14   in order to accommodate them, we have agreed to allow them

15   to bring in paperback books from home as long as they are

16   dropped off in our control booth to at least be sure we are

17   able to check them over for any kind of contraband that may

18   be coming in.

19   Q.   And did Ms. Van Every comply with that modified

20   rule of security?

21   A.   No, she did not.

22   Q.   One of the things that has been raised in this

23   case is that the defendant potentially, possibly, may have

24   attempted suicide sometime in, I guess it was September of

25   2003.  And one of the allegations is that perhaps that she

1    may have used a pencil for that.  Are you familiar with the

2    pencils that are given to inmates?

3        A.   Yes.

4        Q.   Were you asked to bring a sample pencil with you?

5        A.   Yes, I was.

6        Q.   Do you have it with you?

7        A.   Yes, I do.

8        Q.   May I take a look at it?

9        A.   (Witness complies.)

10       Q.   Showing you what's been marked for identification

11   as Exhibit Number 549.  Do you recognize it?

12       A.   Yes, I do.

13       Q.   And is that type of pencil -- or you tell me.  Is

14   that the type of pencil the jail used and provided to

15   inmates back in September of 2003?

16       A.   Yes, it is.

17            MR. MARTINEZ:  I move for the admission of

18   Exhibit 548.

19            MR. PATTERSON:  No objection.

20            THE COURT:  Exhibit Number 549 for identification

21   is admitted into evidence.

22       Q.   BY MR. MARTINEZ:  Did you ever have occasion to

23   work outside of what I guess is called the psych ward?

24       A.   Yes, I have.

25       Q.   And were you familiar with these pencils when you

1   were out in the psych ward?

2       A.   Yes.

3       Q.   Awe how is it that they were sharpened?  Was

4   there a special sharpener?  Who did the sharpening?  Do you

5   know?

6       A.   There was a pecil sharpener attached to the wall

7   that was provided.

8       Q.   Are you familiar with -- I think you mentioned an

9   R.N. by the name of Escobar.  Do you know who he is?

10      A.   Yes, I do.

11      Q.   What's his first name?

12      A.   Roberto.

13      Q.   Are you familiar with a situation involving him

14  and some shampoo and the defendant?

15      A.   Yes, I am.

16      Q.   Tell me about that?

17      A.   The following day of the incident, my partner

18  told me that --

19      Q.   Your partner is Bonnie?

20      A.   Lose.

21      Q.   Is she the person that's outside?

22      A.   Yes.

23      Q.   Go ahead.

24      A.   And she told me that Roberto was trying to bring

25  in some shampoo for Andriano, specifically for her.

1    Q.   And is that something that the rules allow?

2    A.   No.

3    Q.   What happened when he tried to bring it in?  Did

4  one of the other nurses get wind of it?

5    A.   Yes.  Donna Anderson came to the office and told

6  her what was happening and that she was uncomfortable with

7  it.

8    Q.   And then what happened after this conversation

9  between Donna Anderson and Bonnie Lose?

10    A.   Bonnie told her that she needed to go back to the

11 office and let them know how she felt about it.  And make

12 sure that it did not ever make it into the pod.

13    Q.   What was Escobar's response to that?

14    A.   His response was it's part of her treatment

15 plan.  It will just be our little secret.

16    Q.   Well, if that's their little secret, is that

17 something that, from a security standpoint, that's

18 something that should be countenanced?

19          MR. PATTERSON:  Wait, Judge.  Your Honor, he's

20 using --

21          THE COURT:  Sustained.

22    Q.   BY MR. MARTINEZ:  Is this something that's

23 allowed by the rules to, I guess, secretively give an

24 inmate anything, including hair products?

25    A.   No, these are provided in a generic form.

1    Q.   Why is that a security issue?

2    A.   Because if they're doing anything like that

3 secretively, without us knowing, there is no way for us to

4 be able to know what is coming in besides that.

5    Q.   Since the defendant has arrived there, do you

6 have an opinion, based on your observations of her -- how

7 many days a week do you work?

8    A.   Five.

9    Q.   Do you have any observations based on your five

10 days a week that you have there, whether or not the

11 defendant receives preferential treatment in that pod?

12    A.   Yes, she does.

13    Q.   Aid, specifically, who provides her preferential

14 treatment?

15    A.   Dr. Perry, Roberto Escobar and Van Every.

16    Q.   And when Ms. King was there, did she also provide

17 preferential treatment to her?

18    A.   Yes, she did.

19    Q.   Do you remember a situation when -- what was the

20 defendant's -- Anthony Gonzales was the defendant's cell

21 mate?

22    A.   Cell mate, yes.

23    Q.   Was there a situation when the defendant came to

24 you about 8:30 in the morning -- or at least he came to you

25 about using the telephone?

1       A.   Yes.

2       Q.   And what did you tell him as it applied?  What

3  did you tell him?

4       A.   He asked me if he could make a phone call but the

5  phone was not turned on yet.  I said no it was too early.

6       Q.   Then what happened?

7       A.   Then immediately after that --

8       Q.   By immediately, how much time passed?

9       A.   A matter of seconds.

10      Q.   Then what happened?

11      A.   Ms. Andriano came immediately to the window.  She

12  rang the buzzer and told me that she wanted the phone on

13  because she needed to make a legal phone call.

14      Q.   And did you continue to observe Ms. Andriano

15  immediately after her making that request?

16      A.   Yes.

17      Q.   And for how long did you observe her?

18      A.   As often as I could throughout the day.

19      Q.   And at any time throughout the day did you ever

20  see her using that phone?

21      A.   No, I did not.

22      Q.   How about Anthony Gonzales, did you see him using

23  the phone?

24      A.   Yes.  As soon as the power to the phone was on,

25  Anthony made a phone call.

1          MR. MARTINEZ:  I don't have any other questions.

2          THE COURT:  Mr. Patterson.

3          MR. PATTERSON:  Thank you, Judge.

4

5                        CROSS-EXAMINATION

6    BY MR. PATTERSON:

7          Q.   Are you a detention officer or a deputy sheriff?

8          A.   Detention.

9          Q.   And what is your rank at the facility?

10         A.   Detention officer.

11         Q.   Okay.  Do you have supervisors there at that

12   facility?

13         A.   Sometimes.  There are some scheduled there.

14         Q.   And would they be given rank, sergeant, that kind

15   of thing, lieutenant?

16         A.   Sergeant would be the only one that would be in

17   that facility.

18         Q.   And so who is your immediate supervisor, again?

19         A.   Right now?

20         Q.   Yes.  Well, back when -- yeah, currently and at

21   the time that you were in D2?

22         A.   We've had numerous.  But right now it's Sergeant

23   Frank Valenzuela.

24         Q.   The things that you observed that were done by

25   Dr. Perry and Joyce Van Every, Laura King, did you report

1   this conduct to your supervisor?

2       A.   Yes, I did.

3       Q.   Was there ever any disciplinary action commenced

4   against these people for the allegations you made?

5       A.   They're not directly over them and they informed

6   me they had gone to Ms. Van Every's supervisor, who is the

7   Laurie Saint Lewis.

8       Q.   Was she disciplined as a result of this?

9       A.   I don't know.

10      Q.   Was she removed from her position as head

11  psychiatric nurse there?

12      A.   No.

13      Q.   She stills remains today as the head psychiatric

14  nurse?

15      A.   Yes, she does.

16      Q.   Dr. Perry, the complaints that you made that he

17  was visiting with Ms. Andriano or fraternizing, I think you

18  were suggesting, did you make the complaint to the powers

19  that be about Dr. Perry?

20      A.   Yes.

21      Q.   Was he ever disciplined or removed from the

22  staff?

23      A.   No.

24      Q.   And this particular pod that you're in is a

25  medical pod, right?

1      A.    No, it's psychiatric.

2          Q.    But it has -- the people are there because they

3   have psychiatric issues, right?

4      A.    Yes.

5          Q.    And these issues the inmates have are dealt with

6   by professionals like Dr. Perry and Counselor Laura King

7   and Psychiatric Nurse Joyce Van Every, right?

8      A.    Yes.

9          Q.    And do you have any kind of medical background or

10  degree that we should be aware of?

11     A.    I've had a number of hours of training for the

12  psychiatric unit.

13         Q.    I know but do you have a doctorate?

14     A.    No.

15         Q.    Do you have a psychiatric degree?

16     A.    No.

17         Q.    Do you have a psychology degree?

18     A.    No.

19         Q.    Do you have a nursing degree?

20     A.    Nope.

21         Q.    So decisions are made by nursing staff and

22  doctors staff that affect these patients that are on that

23  particular unit, correct?

24     A.    That's correct.

25         Q.    There are also issues involving security that

```
 1  you're more involved with, correct?

 2       A.   Correct.

 3       Q.   And it seems to me that there's inherent tension

 4  between the security staff and the medical staff, is that a

 5  fair statement?

 6       A.   Yes.

 7       Q.   From what you could observe, Wendi apparently got

 8  along very well with the medical staff there in the pod,

 9  correct?

10       A.   Most of them.

11       Q.   Well.  Laura King, correct?

12       A.   Yes.

13       Q.   Dr. Perry?

14       A.   Yes.

15       Q.   Joyce Van Every?

16       A.   Yes.

17       Q.   Roberto Escobar?

18       A.   Yes.

19       Q.   Are there other medical staff that she didn't get

20  along with?

21       A.   There are many other people from that staff who

22  complained about what went on.

23       Q.   Okay.

24       A.   There was an R.N. there, Donna Anderson, who did

25  not believe that the activity is ethical.  She expressed
```

1   that many times.

2        Q.   Has she complained to the powers that be over

3   there?

4        A.   No, because she is an underling to Joyce.

5        Q.   Joyce Van Every is a supervisor there?

6        A.   Yes.

7        Q.   She makes decisions that relate to the patients

8   that are on the pod, correct?

9        A.   Yes.

10       Q.   You may not always agree with those decisions,

11  correct?

12       A.   That's correct.

13       Q.   I suspect she probably doesn't always agree with

14  everything you do in that pod, correct?

15       A.   That's correct.

16       Q.   Okay.  You did write up a report about the

17  incident of December 3, is that correct?

18       A.   Yes, that incident in December.

19       Q.   Exhibit 53 -- Exhibit 548.  Let's talk about some

20  of the things that are on this exhibit.

21            One of the reasons the compact was problematic in

22  this instance is because Wendi had previously made, in your

23  words, "a serious attempt at suicide by cutting?"

24       A.   Yes.

25       Q.   And that's your verbiage and right from the

1  exhibit, right?

2      A.   Yes.

3      Q.   And that's why the compact was problematic?

4      A.   Yes.

5      Q.   She apparently admitted responsibility, correct?

6      A.   I don't recall.

7      Q.   "I've been informed of the offenses listed here

8  on.  I acknowledge receipt of the report and plead," and

9  then there's two check marks available, guilt, not guilty?

10     A.   That would have been between her and the hearing

11  officer.

12     Q.   Let's talk about the exhibit.  You can read the

13  exhibit for us?  Isn't there a spot there it says she's

14  given an opportunity to plead, correct?

15     A.   Yes.

16     Q.   Looks like she admitted responsibility, pled

17  guilty, right?

18     A.   Yes, that's what it says.

19     Q.   And signed it, correct?

20     A.   Yes.

21     Q.   Let's look at it on the ELMO.  It says right

22  here, "I've been informed of the offense listed here on.  I

23  acknowledge receipt of the report and plead, guilty, not

24  guilty".  And looks like the x is on the guilty.

25     A.   Correct.

1      Q.   So she accepted responsibility.  You recommended

2   that she receive 30 days full restrictions, right?

3      A.   Yes.

4      Q.   But the hearing office or the person that

5   resolves these things gave her 20 days restriction, right?

6      A.   Yes.

7      Q.   Okay.  So, this person didn't abide by your

8   recommendation, correct?

9      A.   Correct.

10     Q.   You told us about an episode where Joyce Van

11  Every had a shopping bag.  At any point in time did you

12  look inside the shopping bag?

13     A.   No.  She's staff.

14     Q.   You don't know what the contents were in the

15  shopping bag?

16     A.   No.

17     Q.   Did you examine the shopping bag after she left?

18     A.   Only could see that it was much less.

19     Q.   Okay.  Do you know what contents were remaining

20  in the shopping bag?

21     A.   No.

22     Q.   Do you know what contents, if any, were removed

23  from the shopping bag?

24     A.   No.

25     Q.   Do you know where those contents wound up?

1     A.   I saw her walk directly to Andriano's room and

2  leave from Andriano's room.

3     Q.   Did anybody from your staff search that room

4  thereafter in an effort to find what contents may have been

5  left there?

6     A.   No.

7     Q.   So we don't know what, if anything, was left in

8  the room of Ms. Andriano, do we?

9     A.   No.

10    Q.   And were staff available -- I know I told us you

11  had medical issues that precluded you from doing it

12  yourself -- but was there other staff available, security

13  staff, available to go and check the contents that may have

14  been left behind?

15    A.   Not soon enough for it to be effective.

16    Q.   Meaning?

17    A.   Meaning my partner was busy in another pod doing

18  something else for several minutes before I could tell him

19  what happened.

20    Q.   Okay.  So time elapses?

21    A.   Correct.

22    Q.   But even with the elapse of time, there was no

23  effort made to go into the room and see if something was

24  there that shouldn't be there?

25    A.   I don't know.  I was only there a couple hours.

1   I don't know if anything occurred after that.

2        Q.   What I'm trying to understand, if you thought it

3   was of such consequences that something was in her room

4   that could constitute a safety hazard either to herself, to

5   other inmates or to your staff that no one in that building

6   made an effort to try and find out what may be inside that

7   room?

8        A.   I can't make anybody do something they don't want

9   to do.

10        Q.   Well, but, did you make any effort to contact

11   anybody to get someone to go in there and check it out?

12        A.   Yes, I did.

13        Q.   And, what, you asked your partner and she was

14   busy?

15        A.   That's correct.

16        Q.   Did you do anything beyond that?

17        A.   I reported it to my supervisor the next day.

18        Q.   Okay.  Did the supervisor follow up on that?

19        A.   She reported it to her supervisor, Joyce Van

20   Every.

21        Q.   Just kind of kept going on up the ladder?

22        A.   I'm afraid that's the way it happened.

23        Q.   And nobody went to check the room?

24        A.   Not that I'm aware of until the next cell

25   searching were done.

1      Q.   You talk about books being potential contraband

2  issue.

3           Did you ever find Wendi in possession of

4  contraband that had been spirited in, squirreled in, in the

5  books?

6      A.   I have no way of know how that got there.

7      Q.   Did you ever find her in possession of contraband

8  that had been brought by the book?

9      A.   No.

10      Q.   Are you telling us that she has an issue that her

11  top and bottom should match?

12      A.   Yes.

13      Q.   That suggests to me that she has pride in her

14  appearance.  That should not be rewarded in the jail

15  environment?

16      A.   No.

17      Q.   Why does it create a problem for you that she

18  wants her uniform to match?

19      A.   Because it takes too long to accomplish a change

20  out of 25 women when one is going to be very picky.

21      Q.   But you accommodate her, allow her to do it her

22  way, it seems to expedite the process, right?

23      A.   No.  I don't let any inmates handle the clothing

24  personally.  So since I have to do that for her, it does

25  not expedite things.

1    Q.  But if you said to her -- it seems to me if you

2  accommodated her need to have pride in her appearance by

3  saying why don't you pick out two that you want, how does

4  that create a problem for you?

5    A.  I don't like to treat somebody more special than

6  someone else.

7    Q.  Okay.  And when you see other persons in your

8  unit treating inmates specially, that creates a problem for

9  you?

10    A.  It creates a problem in the unit.

11    Q.  And it creates a problem for you personally, it

12  appears?

13    A.  Yes, because of the other problems it creates.

14    Q.  Now, you talked about Inmate Long-Horse.  Is that

15  like a Native American name, Long-Horse?

16    A.  It's a hyphenated name.

17    Q.  Is that Horse, is that last name?

18    A.  Yes.

19    Q.  Now, this person is in D2 because of mental

20  health issue?

21    A.  She is.

22    Q.  And does this inmate have issues with other

23  inmates or patients in the D2 pod?

24    A.  Not to that extent.

25    Q.  But she did have issues with other inmates?

1    A.    Yes.

2    Q.    And what she apparently didn't like is that Wendi
3    directed her to do certain things or controlled her
4    behaviors, correct?

5    A.    Yes.

6    Q.    There was no complaint made that she was violent
7    towards her, right?

8    A.    No.

9    Q.    Or that she jeopardized her safety or anything
10   like that, right.

11   A.    No.

12   Q.    Now, you talked about a special visitation
13   arrangements that was enforced as with regard to Ms. Rohde,
14   and Ms. Andriano?

15   A.    Yes.

16   Q.    I assume that special arrangement was approved by
17   the supervisor in your unit, correct?

18   A.    Yes it was.

19   Q.    And I assume it was also authorized or approved,
20   if you will, by the medical staff at the unit, correct?

21   A.    Yes.

22   Q.    You just disagreed with it?

23   A.    We were misinformed as to who she was.  It
24   appeared to be a cover up.

25   Q.    Well, I understand that.  But what you're saying

1   at this point, was the decision was made to allow that

2   arrangement to occur in the jail setting, correct?

3        A.   Correct.

4        Q.   And those decisions were made by supervisory

5   staff at the unit, correct?

6        A.   Based on misinformation.

7        Q.   Okay.   The conduct that you find problematic with

8   Laura King was that at some point during the course of this

9   trial, I guess, Ms. King assisted her with her hair and

10  makeup the night before?

11       A.   Yes.

12       Q.   And that happened on one occasion?

13       A.   I am not aware of how many occasions.   I'm only

14  aware of one.

15       Q.   I assume in the unit there are a host of things

16  that are classified as contraband, correct?

17       A.   Yes.

18       Q.   Weapons?

19       A.   Yes.

20       Q.   Drugs?

21       A.   Yes.

22       Q.   Can you give me other examples of what

23  constitutes contraband in the jail setting?

24       A.   Anything that cannot be purchased from the

25  commissary and anything that is brought in from the outside

1   without been authorized.

2        Q.   Okay.  Was Wendi ever found to be in possession

3   of street drugs, like marijuana?

4        A.   Not that I'm aware of.

5        Q.   Was she ever found to be in possession of any

6   weapons?

7        A.   No.

8        Q.   And you talked about Nurse Escobar attempting to

9   bring the shampoo for Ms. Andriano?

10       A.   Yes.

11       Q.   Was she ever written up for that?

12       A.   No.

13       Q.   Did you ever discuss it with her as to whether or

14   not she knew why Nurse Escobar was doing this kind of thing

15   or trying to do this kind of thing?

16       A.   No.

17       Q.   Didn't get her side of the story?

18       A.   No.

19       Q.   So you have no evidence or indication she was

20   even aware that Nurse Escobar was doing this?

21       A.   No.

22            MR. PATTERSON:  Judge, I have nothing further.

23   Thank you.

24            THE COURT:  Mr. Martinez.

25

1                    REDIRECT EXAMINATION

2  BY MR. MARTINEZ:

3       Q.   With regard to this Nurse Escobar, what is his

4  first name, again?

5       A.   Roberto.

6       Q.   With regard to Roberto Escobar, did you ever find

7  out that he ever brought in shampoo for any other inmates

8  that was in that pod?

9       A.   To my knowledge, he did not.

10      Q.   Did anybody talked about him ever doing that or

11  anything other than the defendant?

12      A.   No.

13      Q.   With regard to Laura King, was there ever another

14  occasion that you know of that she came in to fix another

15  inmate's hair?

16      A.   No.

17      Q.   This Long Harris inmate you talked about.  You

18  did indicate she did not want to be in the same pod as

19  Andriano?

20      A.   Yes.

21      Q.   And what was the term she is used?

22      A.   She called her a control freak.

23      Q.   In terms of your asking about whether or not

24  somebody was written up for the shampoo being brought in by

25  Escobar, you were asked if you wrote her up.  Do you write

1  up nurses for whatever they do or is that someone else's

2  job?

3       A.   All we can do is report it their superiors.

4       Q.   And did you do it that way?

5       A.   Yes.

6       Q.   You also were asked about the clothing and

7  everything and you were asked as long as you do it her way

8  wouldn't it just be more efficient?  Do you remember that

9  question?

10      A.   Yes.

11      Q.   Would it really be more efficient if the jail ran

12 that particular area the defendant's way?

13      A.   No.

14      Q.   Why not?

15      A.   It would be too time consuming if I had a problem

16 with every one of them.

17      Q.   How about if she wants to take a different meal

18 at a different time, would that?

19      A.   That would not be convenient.

20      Q.   Does it, at some point, effect the security of

21 the area?

22      A.   Yes, it does.

23      Q.   Does it make everybody happy if, you know, that

24 somebody is getting preferential treatment?

25      A.   No.

1    Q.    Does it make things more difficult to do your job

2  if somebody is getting preferential treatment?

3    A.    Yes, it does.

4    Q.    How come?

5    A.    Because, they ask for things they should not

6  receive; they know they should not receive.  And I have to

7  tell them no and the general response is why does Wendi get

8  it.

9    Q.    In terms of the bag that Ms. Van Every may have

10  had, you indicated that it appeared three quarters full

11  when she took it in, right?

12    A.    Yes.

13    Q.    Then it appeared to be emptier when she came out?

14    A.    Yes.

15    Q.    How full was it when she came out?

16    A.    I would say a quarter.

17    Q.    And did you report that?

18    A.    Yes, I did.

19    Q.    In terms of treatment, you say that perhaps there

20  may be some tension between treatment and security.  You

21  were asked about that.  Do you remember that?

22    A.    Yes.

23    Q.    And one of the things we know is that she, the

24  defendant, was moved there because of a suicide attempt.

25  Do you remember that?

1      A.    That's correct.

2      Q.    And there being this tension, do you know whether

3 or not the defendant ever was in possession of scissors?

4      A.    Yes, she was.

5      Q.    And were they the scissors that were provided by

6 these people that were providing treatment for attempted

7 suicide?

8      A.    I was told they were medical scissors.

9      Q.    Anyway that -- When people come into the jail, do

10 you know if they are screened?  How is it that it works?

11      A.    As far as?

12      Q.    For visitation.

13      A.    For visitation?

14      Q.    Uh-huh?

15      A.    They go through metal detectors.  They can't take

16 anything in in their hands.

17      Q.    Can't bring in scissors?

18      A.    No, they cannot.

19      Q.    In terms of Exhibit 548, which was the one

20 involving the compact that you wrote up and asked for 30

21 days.  Do you remember that?

22      A.    Yes.

23      Q.    One of the things you were asked about was she

24 only got 20 days instead of 30?

25      A.    Yes.

1      Q.    Does that mean that she wasn't guilty just

2  because she got less than you requested?

3      A.    No.

4      Q.    One of the other issues was that perhaps you were

5  being unduly harsh on the defendant.  In other words, that

6  you may have a problem with her.  If you do have a problem

7  with her, is it related to your job or is it a personal

8  thing?

9      A.    It's related to my job.

10           MR. MARTINEZ:  I don't have anything further.

11           THE COURT:  Does the jury have any questions of

12  the witness?

13           (Bench conference was held outside the hearing of

14  the jury.)

15           THE COURT:  Question:  Is Anthony Gonzales a male

16  or female.

17           If a male, please explain the term used "cell

18  mates."

19           MR. MARTINEZ:  No objection.

20           MR. PATTERSON:  I think he's a transitional

21  person, if you know what I mean.  Undergoing sex change

22  therapy.

23           THE COURT:  I guess we'll find out.

24           Next question:  Do males and females share rooms

25  or cells within the unit?

1          MR. MARTINEZ:  I have no objection.

2          MR. PATTERSON:  Same question.

3          THE COURT:  I'll go ahead and ask that.

4          MR. PATTERSON:  It's the same question.  This

5   goes to the same issue.

6          THE COURT:  Okay.  To what does the term "cell

7   mate"" refer?

8          MR. PATTERSON:  Same question.

9          MR. MARTINEZ:  No objection.

10          THE COURT:  Next question:  When Laura King is

11   not there to assist with Wendi's hair and makeup, does

12   Wendi have access to items herself to do her hair and

13   makeup?

14          MR. MARTINEZ:  No objection.

15          MR. PATTERSON:  That's fine.

16          (Bench conference concluded.)

17

18                          EXAMINATION

19   BY THE COURT:

20      Q.   I have some questions for you.  The first

21   question reads as follows:  Do males and female share rooms

22   or cells within the unit?

23      A.   No.

24      Q.   To what does the term "cell mate"" refer?

25      A.   The person that they share their cell with.

1    Q.   Is Anthony Gonzales a male or female?

2    A.   As this point, a female.

3    Q.   Next question:  When Laura King is not there to

4  assist with Wendi's hair and makeup, does Wendi have access

5  to items herself to do her hair and makeup?

6    A.   She can purchase hair rollers and those kinds of

7  items through the commissary.

8         THE COURT:  Are there any further questions of

9  this witness by the jury?  No one has raised a hand.

10        Any follow-up questions by Mr. Martinez to these

11  specification questions?

12

13              FURTHER REDIRECT EXAMINATION

14  BY MR. MARTINEZ:

15    Q.  The issue involving Anthony Gonzales, was there

16  ever an issue involving the beds of Anthony Gonzales and

17  Wendi Andriano?

18    A.   There were a few times when we had to say

19  something about the beds having been pushed together.  And

20  when Andriano would sit cross-legged with Anthony's head in

21  her lap while she was massaging her head.  That kind of

22  touching is prohibited.

23        MR. MARTINEZ:  I don't have any other questions.

24        THE COURT:  Mr. Patterson?

25        MR. PATTERSON:  No questions.



# Arizona Department of Corrections

1601 WEST JEFFERSON
PHOENIX, ARIZONA 85007
(602) 542-5497
www.azcorrections.gov



JANICE K. BREWER
GOVERNOR

CHARLES L. RYAN
DIRECTOR

April 03, 2013

Arizona Attorney General's Office
400 West Congress, Bldg. S-315
Tucson, Arizona 85701

Ref:       Andriano, Wendi E.
DOB:       08/06/1970
ADC#       191593

Attached are true, accurate and complete copies of the master record file maintained by the Department of Corrections in accordance with the provisions of Arizona Revised Statue 31-221.

Sincerely,

Alfreda Harris, Administrative Assistant III
Public Access (602) 364-0576

SUBSCRIBED and sworn to before me this __4__ day of _April_ , 2013.

Notary Public

My Commission Expires: _____

000011329

**NAME:**     **ANDRIANO, WENDI E.**

**ADC#:**     **191593**

**INMATE MASTER FILE:   SIDE ONE**

**AIMS REPORT**

000011330

```
04/03/13              ARIZONA DEPARTMENT OF CORRECTIONS          PAGE   1
IISO100 REQUESTOR:              INMATE RECORD                 TIME 11:51

ADC NO: 191593    NAME: ANDRIANO, WENDI E.   ("A")      STAT: A ACTIVE

BIRTH : 08/06/70
SEX: F  AGE: 42                    PED : NOT APPL.
RACE  : CAUC
NAMES : ANDRIANO, WENDI E.  (LEGAL)    CSBD:   DEATH   CSED:   DEATH
        OCHOA, WENDI E.  (MAID)        CUS :           CRD : 01/10/2014
                                                       ZIP : 85222

             01/03/2005  LOC: B50   PV-LUMLEY DEATH ROW

COM COUNTY     SENT BEGIN   COMM SUPER    SENT IMP  CC CS  REL DATE   STATUS
A  MARICOPA    12/22/2004   0Y 0M 0D      DEATH                DEATH  IMPOSED
CNT CO/CAUSE        OFFENSE DESC          FELONY     SENT IMP  CC CS  VERIFY
01R 07-2000-096032  MURDER 1ST DEGREE     CL1 D/NR   DEATH            ACTIVE Y
                    DANGER/REPETIT/ENH
                                              888Y88M88D  (FLAT)

MOVEMENT  DATE & TYPE      DESTINATION     REASON FOR   ORIGIN
12/23/04  NEW COMMITMENT   ASPC-PV RECPT&A              MARICOPA
12/23/04  TRANSFERRED TO   ASPC-PV SPEC. M              ASPC-PV RECPT&ASMN
12/23/04  RECEIVED AT      ASPC-PV SPEC. M              ASPC-PV RECPT&ASMN
02/02/05  OUT TO COURT     MARICOPA                     ASPC-PV SPEC. MANA
02/11/05  RET.FM.COURT     ASPC-PV SPEC. M              MARICOPA
12/17/10  TRANSFERRED TO   PV-LUMLEY DEATH              ASPC-PV SPEC. MANA
12/17/10  RECEIVED AT      PV-LUMLEY DEATH              ASPC-PV SPEC. MANA

ICSS      TY PUBLIC RISK SCORE        INSTITUTIONAL RISK SCORE    DATE    APVD
             1  2  3  4  5  6  7  8     1  2  3  4  5  6  7  8
          ----------------------     ----------------------
12/28/04 11 5  5  3  1  1  5  1       1  2  1  1  3  1  1  1   01/10/05 LCC1
          P:5 I:3 M:   MH:   E:2 V:2 W:2 A/D:1 S:   R:1 OVERRIDE:0

RCSS      TY P      I      M  MH    E      V     W    AD     S     R    ADMN  LOC  APVD
07/01/05  91 5      2             2      2     2    1           1           B28  PLD3
02/03/06  07                                                               NNM1
09/25/06  07 5      2             2      2     2    1           1     0     B28  NNM1
11/07/07  07 5      2             3      0     1    0                 0     B28  SMA6
11/20/08  07 5      2             3      0     1    0                 0     B28  SMA6
11/30/09  07 5      2             3      0     1    0                 0     B28  BR21
12/10/10  07 5      2             3      0     1    0                 0     B28  JRL9
12/16/11  07 5      2             3      0     1    0                 0     B50  JRL9
01/10/13  07 5      2             1      0     1    0                 0     B50  JRL9

CUSTODY CLASS DATE & TYPE     APPROVED   NEXT REV    PAROLE CLASS   LOCATION
12/22/04  ADMISSION    N                              2            ASPC-PV SPEC. M
12/22/04  PAR.CL.CHG.  *                              1      N/A   ASPC-PV SPEC. M
12/28/04  INITIAL CL.  5/3   01/10/05   02/26/05      6            ASPC-PV SPEC. M
02/26/05  60 DAYS - NO       02/26/05   06/26/05                   ASPC-PV SPEC. M
07/01/05  NO MOVEMENT  5/2   07/01/05   12/28/05                   ASPC-PV SPEC. M
02/03/06  RE-CLASS/ADM       10/05/06   10/05/06                   ASPC-PV SPEC. M
09/25/06  RE-CLASS/ADM 5/2   10/05/06   11/25/06
```

ARIZONA DEPARTMENT OF CORRECTIONS
[illegible stamp]
WE TIZ

000011331

```
 04/03/13            ARIZONA DEPARTMENT OF CORRECTIONS         PAGE   2
IISO100 REQUESTOR:              INMATE RECORD                TIME 11:51

ADC NO: 191593     NAME: ANDRIANO, WENDI E.  ("A")     STAT: A ACTIVE

COM COUNTY      SENT BEGIN              SENT IMP  CC CS  REL DATE   STATUS
CUSTODY CLASS DATE & TYPE    APPROVED  NEXT REV   PAROLE CLASS  LOCATION
11/07/07  RE-CLASS/ADM  5/2  11/21/07  11/06/08               ASPC-PV SPEC. M
11/20/08  RE-CLASS/ADM  5/2  12/02/08  11/20/09               ASPC-PV SPEC. M
11/30/09  RE-CLASS/ADM  5/2  12/08/09  11/30/10               ASPC-PV SPEC. M
12/10/10  RE-CLASS/ADM  5/2  12/13/10  12/10/11               ASPC-PV SPEC. M
12/16/11  RE-CLASS/ADM  5/2  12/16/11  12/15/12               PV-LUMLEY DEATH
01/10/13  RE-CLASS/ADM  5/2  01/10/13  01/10/14               PV-LUMLEY DEATH
          END PC TIME            12/22/04

WORK/PGM  EVAL DATE&ASSIGN  TYPE *RATING* HRS   RATE DI  SP      LOCATION
09/08/05  NON WORK          NONE   0 0 0   0.0   0.00  SUSPENSI ASPC-PV S

DISCIPLINE VIOLATION DATE CASE TYPE  VERDICT        DISPOSITION      STATUS
09/10/07 07-B02-1681 DISOBEYING ORDE INFRML RESO                     FINALIZED
03/06/08 08-B02-0473 SMUGGLING CNTRB GUILTY-MIN.    VERBAL REPRMND FINALIZED

HOUSING DATE  LOCATION    & TYPE       COUNSELOR       WK/PGM ASGN
12/23/04  B28-30-D268L  MAXIMUM CU    DRL5            LOCKDOWN          #
01/25/05  B28-30-D266L  MAXIMUM CU    CZE1            LOCKDOWN          #
01/27/05  B28-30-D266L  MAXIMUM CU    CZE1            LOCKDOWN          #
02/11/05  B28-30-D266L  MAXIMUM CU    CZE1            LOCKDOWN          #
04/11/05  B28-30-D266L  MAXIMUM CU    CZE1            LOCKDOWN          #
07/12/05  B28-30-D266L  MAXIMUM CU    CZE1            LOCKDOWN          #
07/25/05  B28-30-D266L  MAXIMUM CU    CZE1            PORTERS           #
08/10/05  B28-30-D266L  MAXIMUM CU    CZE1

08/25/05  B28-30-D266L  MAXIMUM CU    MMLA            PORTERS           #

09/08/05  B28-30-D266L  MAXIMUM CU    MMLA            PORTERS           #

11/08/05  B28-30-D266L  MAXIMUM CU    TPH1            NON WORK          #

08/02/06  B28-30-D266L  MAXIMUM CU    GLF2            NON WORK          #

08/23/06  B28-30-D266L  MAXIMUM CU    GLF2            NON WORK          #
                                                      LOCKDOWN          #
                                                      PORTERS           #
09/22/06  B28-30-D266L  MAXIMUM CU    GLF2            LOCKDOWN          #
03/07/07  B28-30-D266L  MAXIMUM CU    TLB1            LOCKDOWN          #
06/12/08  B28-30-D266L  MAXIMUM CU    TLB1            LOCKDOWN          #
11/14/08  B28-30-D266L  MAXIMUM CU    SPL0            LOCKDOWN          #
01/09/09  B28-30-D266L  MAXIMUM CU    SPL0            UNASSIGNED
01/15/09  B28-30-D266L  MAXIMUM CU    SPL0
08/10/09  B28-30-D266L  MAXIMUM CU    MDL0
12/15/10  B28-30-D266L  MAXIMUM CU    MJ29
12/17/10  B28-30-D266L  MAXIMUM CU    MJ29
12/17/10  B50-30-D266L  DEATH ROW     MJ29
09/21/11  B50-30-D266L  DEATH ROW     GXX2
```

000011332

```
 04/03/13              ARIZONA DEPARTMENT OF CORRECTIONS        PAGE    3
IISO100 REQUESTOR:              INMATE RECORD              TIME 11:51

ADC NO: 191593    NAME: ANDRIANO, WENDI E.  ("A")    STAT: A ACTIVE

HOUSING DATE  LOCATION  & TYPE        COUNSELOR      WK/PGM ASGN
12/09/11  B50-30-D266L  DEATH ROW     ORJ8
07/06/12  B50-30-D266L  DEATH ROW     MJ29
08/08/12  B50-30-D266L  DEATH ROW     MJ29


IISUI012 NO WARRANTS OR DETAINERS FOUND

IISUI005 NO OUT TIME FOUND

IISUI009 NO PAROLE BOARD INFO FOUND
1
```

000011333

**NAME:**   **ANDRIANO, WENDI E.**

**ADC#:**   **191593**

**INMATE MASTER FILE:   SIDE TWO**

**DISCIPLINARY & RECLASSIFICATIONS**

000011334

Maximum Custody Placement Recommendation/Approval Cont'd    Adriano # 191593

Evidence relied on to support the recommendation:  *(Evidence may include copies of the Disciplinary Reports)*,

Was the inmate provided a copy of the Hearing Findings?    ☐ Yes   ☒ No

Inmate notified of the appeal process?    ☒ Yes   ☐ No

Inmate   ☐ does   ☒ does not   waive their right to an appeal regarding placement in Maximum Custody?

Inmate given a copy of the Notice of Appeal for Maximum Custody Placement?    ☐ Yes   ☒ No

| Inmate Printed Name | Inmate Signature | Date |
|---|---|---|
| Wendi Andriano | | 1-3-13 |
| **Classification Officer** Printed Name | Classification Officer Signature | Date |
| Godinez-Galvan #5121 | | 1-3-13 |

☒ Recommended   ☐ Denied

| **Deputy Warden** Printed Name | Deputy Warden Signature | Date |
|---|---|---|
| Lacy Scott | | 1/4/13 |
| Comments | Max. Deathrow 2 | |

☒ Approved   ☐ Denied

| **Warden** Printed Name | Warden Signature | Date |
|---|---|---|
| James O'Neil | | 1/8/13 |
| Comments | Max Custody | |

☒ Approved   ☐ Denied

| **Classification Administrator** Printed Name | Classification Administrator Signature | Date |
|---|---|---|
| R Jackson | | 1/10/13 |
| Comments | | |

Distribution: White - Master Record File
           Canary - Inmate Copy
           Pink - Institutional File

801-7
2/25/10

000011335

P-App. 006868

**ARIZONA DEPARTMENT OF CORRECTIONS**

**Notice of Hearing and Inmate Rights**
**(Proposed Maximum Custody Placement)**

| Inmate Name *(Last, First M.I.) (Please print)*<br>ANDRIANO, WENDI E. | ADC Number<br>191593 | Unit<br>Aspc Perryville, Lumley Unit | Hearing Date<br>1-3-13 |
|---|---|---|---|

**Purpose of Hearing:**    You are being referred for a Classification Review and Hearing to determine whether you should be placed at a maximum custody institution. The issue being considered is whether your already proven conduct, in conjunction with an assessment of your overall record, constitutes a threat to the safety and security of the institution.

The COIII or CO-IV will determine whether that behavior, together with your overall record, constitutes a threat to the safety and security of the institution. In addressing this issue, the staff member will determine whether your proven behavior falls within any of the categories below.

**Behavior Categories:**    Indicate *(with a check)* which of the following behavioral categories apply to the inmate's proven behavior.

- [ ] 1.   The inmate has demonstrated physical or sexually assaultive behavior resulting in either serious physical injury or death to any person, or in an attempt to sexually assault any person, or to cause serious physical injury or death to any person, or if the inmate has conspired in the planning any of the mentioned. Such demonstrated assaultive behavior may or may not involve the use of a weapon.

- [ ] 2.   The nature of the criminal offense(s) committed prior to incarceration constitutes a current threat to the security and orderly operation of the institution and to the safety of others; for example, assaults against law enforcement, participation in gang activity or actions indicating an escape risk.

- [ ] 3.   The inmate was an active participant in, organized, or incited a disturbance or riot that resulted in the taking of a hostage, loss of life, property damage, or physical harm to others.

- [ ] 4.   The inmate has conspired or attempted to convey, introduce or poses contraband, which posses a threat or danger to the security of the institution. Such items of contraband may include, but are not limited to weapons, drugs, ammunition, communication devices, or escape material.

- [ ] 5.   The inmate functions as a leader, enforcer, recruiter, or member of a validated Security Threat Group.

- [ ] 6.   The inmate escaped, attempted escape or committed acts to facilitate an escape from custody.

- [ ] 7.   The inmate, through repetitive and/or seriously disruptive behavior, has demonstrated a chronic inability to adjust to a lower custody unit, as evidenced by repeated guilty findings by the Disciplinary Hearing Officer (DHO).

**Rationale for placement:**  *(Instructions:  provide a detailed factual account of the incident(s) that supports the proposed placement.  In addition, if the incident(s) that triggered the proposed placement is a rule violation found by the DHO, attach a copy of the DHO report(s).)*

Inmate is serving a Death Sentence and cannot go below Maximum Custody.

Distribution: White - Master Record File
Canary - Inmate Copy
Pink - Institutional File

801-6
2/25/10

000011336

Page 1

P-App. 006869

**Notice of Hearing and Inmate Rights Cont'd**

Adriano # 191593

**Inmate Rights:**     An inmate has a right to be present at the hearing and respond to evidence presented.  The staff member may waive, in writing, the inmate's appearance, if it is determined that a waiver is in the best interest of the secure and orderly operation of the institution.

The inmate shall be afforded an opportunity to provide an oral or a written statement during the hearing.  A summary of the inmate's oral statement or of the statement by a witness requested by the inmate shall be recorded.  A copy of the written statement(s) shall be attached to the Hearing Findings.  The staff member shall insure that such summary statements are based on the inmate's intended meaning.  The inmate shall be asked to read the statement and certify its accuracy when signing the form.

The staff member shall exercise authority over witnesses and the testimony of witnesses at all hearings.  Witnesses requested by inmates shall be authorized at the hearing based on the conclusion by the staff member prior to the hearing that the testimony to be provided will be relevant to material facts to be considered at the hearing.  If such relevancy cannot be clearly established, the witness shall not be authorized.  No witnesses shall be permitted at the hearing when the sole basis for the hearing is a finding of  "guilty" by the Disciplinary Hearing Officer (DHO).  The staff member shall evaluate the relevance of the information the witness expects to present and approve or deny the witness for the hearing.

If confidential information is to be used in the hearing, the inmate shall be advised of such and this fact shall be stated in a manner that avoids the compromise of the confidential source of that information.  If such information is to be used, a Confidential Informant Reliability Assessment Questionnaire (CIRAQ) shall be completed.

An inmate may waive appearance at the hearing, by signing the waiver provided on the referral notice, if the following circumstances exist:

☐ Both the staff member and the inmate agree to waive the inmate's appearance.

☐ The inmate must be served written notice of the scheduled hearing and the inmate shall sign the written waiver provided on this form.

_____ 1-3-13_____ waive the right to the 48 hour notice of hearing.
*(Inmate Initials)*   *(Date)*

| Inmate Signature | Staff Signature / Title | Date |
|---|---|---|
| | | 1-3-13 |

Distribution: White - Master Record File
Canary - Inmate Copy
Pink - Institutional File

801-6
2/25/10

000011337

**ARIZONA DEPARTMENT OF CORRECTIONS**

Maximum Custody Placement Recommendation/Approval

| Inmate Name (Last, First M.I.)<br>ANDRIANO, WENDI E. | ADC Number<br>191593 | Unit<br>Aspc Perryville, Lumley Unit | Hearing Date<br>1-3-13 |
|---|---|---|---|

The inmate ☑ was ☐ was **not** present for the hearing (if not provide reason): _____

The inmate ☐ did ☒ did **not** submit a written statement, if so, is the statement attached? ☐ Yes ☐ No

The inmate ☐ did ☒ did **not** request witnesses, if so, was the Witness Request form(s) completed? ☐ Yes ☐ No

Present at the hearing were: COIII Godinez-Galvan #5121 and inmate Adriano #191593 _____

_____

**Purpose of Hearing:**    To determine whether the inmate should be placed at a maximum custody institution based on already proven conduct, in conjunction with an assessment of the inmate's overall record, which constitutes a threat to the safety and security of the institution.  In addressing this issue, the Classification Officer will determine whether the behavior falls within any of the categories below.

**Behavior Categories:**    Indicate (with a check) which of the following behavioral categories apply.

☐ 1.  The inmate has demonstrated physical or sexually assaultive behavior resulting in either serious physical injury or death to any person, or in an attempt to sexually assault any person, or to cause serious physical injury or death to any person, or if the inmate has conspired in the planning any of the mentioned.  Such demonstrated assaultive behavior may or may not involve the use of a weapon.

☐ 2.  The nature of the criminal offense(s) committed prior to incarceration constitutes a current threat to the security and orderly operation of the institution and to the safety of others; for example, assaults against law enforcement, participation in gang activity or actions indicating an escape risk.

☐ 3.  The inmate was an active participant in, organized, or incited a disturbance or riot that resulted in the taking of a hostage, loss of life, property damage, or physical harm to others.

☐ 4.  The inmate has conspired or attempted to convey, introduce or possess contraband, which posses a threat or danger to the security of the institution.  Such items of contraband may include, but are not limited to weapons, drugs, ammunition, communication devices, or escape material.

☐ 5.  The inmate functions as a leader, enforcer, recruiter, or member of a validated Security Threat Group.

☐ 6.  The inmate escaped, attempted escape or committed acts to facilitate an escape from custody.

☐ 7.  The inmate, through repetitive and/or seriously disruptive behavior, has demonstrated a chronic inability to adjust to a lower custody unit, as evidenced by repeated guilty findings by the Disciplinary Hearing Officer (DHO).

Recommendation

Maximum Custody placement.

Rationale

Inmate is serving a Death Sentence and cannot go below Maximum Custody.

P-App. 006871

**Maximum Custody Placement Recommendation/Approval Cont'd**

Evidence relied on to support the recommendation: *(Evidence may include copies of the Disciplinary Reports)*

PN                    191593

RECEIVED DEC 2 0 2011
DEPARTMENT OF CORRECTIONS
CAPE. INST. SERVICES

Was the inmate provided a copy of the Hearing Findings?  ☐ Yes  ☑ No
Inmate notified of the appeal process?  ☑ Yes  ☐ No
Inmate  ☑ does  ☐ does not  waive their right to an appeal regarding placement in Maximum Custody?
Inmate given a copy of the Notice of Appeal for Maximum Custody Placement?  ☐ Yes  ☑ No

| Inmate Printed Name | Inmate Signature | Date |
|---|---|---|
| Wendi Andriano | | 12-13-11 |
| **Classification Officer** Printed Name | Classification Officer Signature | Date |
| Corp dMento | | 12-13-11 |

☑ Recommended   ☐ Denied

| **Deputy Warden** Printed Name | Deputy Warden Signature | Date |
|---|---|---|
| Lacy Scott | | 12/17/1 |
| Comments | MAX | |

☑ Approved   ☐ Denied

| **Warden** Printed Name | Warden Signature | Date |
|---|---|---|
| James O'Neil | | 12/16/11 |
| Comments | Max Custody | |

☑ Approved   ☐ Denied

| **Classification Administrator** Printed Name | Classification Administrator Signature | Date |
|---|---|---|
| Rack | | 1/1/14 |
| Comments | MTK | |

Distribution:  White - Master Record File
Canary - Inmate Copy
Pink - Institutional File

801-7
2/25/10

Page 2

000011339

P-App. 006872

ARIZONA DEPARTMENT OF CORRECTIONS

**Notice of Hearing and Inmate Rights**
**(Proposed Maximum Custody Placement)**

| Inmate Name *(Last, First M.I.) (Please print)*<br>Andriano, Wendi | ADC Number<br>191593 | Unit<br>ASPC-Perryville Lumley Unit | Hearing Date<br>12-13-11 |
| --- | --- | --- | --- |

**Purpose of Hearing:**   You are being referred for a Classification Review and Hearing to determine whether you should be placed at a maximum custody institution.  The issue being considered is whether your already proven conduct, in conjunction with an assessment of your overall record, constitutes a threat to the safety and security of the institution.

The COIII or CO-IV will determine whether that behavior, together with your overall record, constitutes a threat to the safety and security of the institution.  In addressing this issue, the staff member will determine whether your proven behavior falls within any of the categories below.

**Behavior Categories:**   Indicate *(with a check)* which of the following behavioral categories apply to the inmate's proven behavior.

- [ ] 1.   The inmate has demonstrated physical or sexually assaultive behavior resulting in either serious physical injury or death to any person, or in an attempt to sexually assault any person, or to cause serious physical injury or death to any person, or if the inmate has conspired in the planning any of the mentioned.  Such demonstrated assaultive behavior may or may not involve the use of a weapon.

- [x] 2.   The nature of the criminal offense(s) committed prior to incarceration constitutes a current threat to the security and orderly operation of the institution and to the safety of others; for example, assaults against law enforcement, participation in gang activity or actions indicating an escape risk.

- [ ] 3.   The inmate was an active participant in, organized, or incited a disturbance or riot that resulted in the taking of a hostage, loss of life, property damage, or physical harm to others.

- [ ] 4.   The inmate has conspired or attempted to convey, introduce or poses contraband, which posses a threat or danger to the security of the institution.  Such items of contraband may include, but are not limited to weapons, drugs, ammunition, communication devices, or escape material.

- [ ] 5.   The inmate functions as a leader, enforcer, recruiter, or member of a validated Security Threat Group.

- [ ] 6.   The inmate escaped, attempted escape or committed acts to facilitate an escape from custody.

- [ ] 7.   The inmate, through repetitive and/or seriously disruptive behavior, has demonstrated a chronic inability to adjust to a lower custody unit, as evidenced by repeated guilty findings by the Disciplinary Hearing Officer (DHO).

**Rationale for placement:** *(Instructions:  provide a detailed factual account of the incident(s) that supports the proposed placement.  In addition, if the incident(s) that triggered the proposed placement is a rule violation found by the DHO, attach a copy of the DHO report(s).)*

Inmate Andriano is currently on Death Row.

Distribution: White - Master Record File
Canary - Inmate Copy
Pink - Institutional File

801-6
2/25/10

Page 1

000011340

**Notice of Hearing and Inmate Rights Cont'd**

**Inmate Rights:**    An inmate has a right to be present at the hearing and respond to evidence presented.  The staff member may waive, in writing, the inmate's appearance, if it is determined that a waiver is in the best interest of the secure and orderly operation of the institution.

The inmate shall be afforded an opportunity to provide an oral or a written statement during the hearing.  A summary of the inmate's oral statement or of the statement by a witness requested by the inmate shall be recorded.  A copy of the written statement(s) shall be attached to the Hearing Findings.  The staff member shall insure that such summary statements are based on the inmate's intended meaning.  The inmate shall be asked to read the statement and certify its accuracy when signing the form.

The staff member shall exercise authority over witnesses and the testimony of witnesses at all hearings.  Witnesses requested by inmates shall be authorized at the hearing based on the conclusion by the staff member prior to the hearing that the testimony to be provided will be relevant to material facts to be considered at the hearing.  If such relevancy cannot be clearly established, the witness shall not be authorized.  No witnesses shall be permitted at the hearing when the sole basis for the hearing is a finding of "guilty" by the Disciplinary Hearing Officer (DHO).  The staff member shall evaluate the relevance of the information the witness expects to present and approve or deny the witness for the hearing.

If confidential information is to be used in the hearing, the inmate shall be advised of such and this fact shall be stated in a manner that avoids the compromise of the confidential source of that information.  If such information is to be used, a Confidential Informant Reliability Assessment Questionnaire (CIRAQ) shall be completed.

An inmate may waive appearance at the hearing, by signing the waiver provided on the referral notice, if the following circumstances exist:

☐   Both the staff member and the inmate agree to waive the inmate's appearance.

☐   The inmate must be served written notice of the scheduled hearing and the inmate shall sign the written waiver provided on this form.

_____  12-13-11  I waive the right to the 48 hour notice of hearing.
(Inmate initials)   (Date)

| Inmate Signature | Staff Signature / Title | Date |
|---|---|---|
| | COII O'Mara | 12-13-11 |

801-6
2/25/10

Distribution:  White - Master Record File
           Canary - Inmate Copy
           Pink - Institutional File

000011341

ARIZONA DEPARTMENT OF CORRECTIONS

**Maximum Custody Placement Recommendation/Approval**

| Inmate Name *(Last, First M.I.)* | ADC Number | Unit | Hearing Date |
|---|---|---|---|
| Andriano, Wendi | 191593 | ASPC-Perryville Lumley Unit | 12-13-11 |

The inmate ☑ was ☐ was **not** present for the hearing *(if not provide reason)*: _____

The inmate ☐ did ☑ did **not** submit a written statement, if so, is the statement attached?   ☐ Yes   ☐ No

The inmate ☐ did ☑ did **not** request witnesses, if so, was the Witness Request form(s) completed?   ☐ Yes   ☐ No

Present at the hearing were: COII O Meno, COII Matson  I/M Andriano _____

**Purpose of Hearing:**     To determine whether the inmate should be placed at a maximum custody institution based on already proven conduct, in conjunction with an assessment of the inmate's overall record, which constitutes a threat to the safety and security of the institution.  In addressing this issue, the Classification Officer will determine whether the behavior falls within any of the categories below.

**Behavior Categories:**    Indicate *(with a check)* which of the following behavioral categories apply.

☐ 1.   The inmate has demonstrated physical or sexually assaultive behavior resulting in either serious physical injury or death to any person, or in an attempt to sexually assault any person, or to cause serious physical injury or death to any person, or if the inmate has conspired in the planning any of the mentioned.  Such demonstrated assaultive behavior may or may not involve the use of a weapon.

☑ 2.   The nature of the criminal offense(s) committed prior to incarceration constitutes a current threat to the security and orderly operation of the institution and to the safety of others; for example, assaults against law enforcement, participation in gang activity or actions indicating an escape risk.

☐ 3.   The inmate was an active participant in, organized, or incited a disturbance or riot that resulted in the taking of a hostage, loss of life, property damage, or physical harm to others.

☐ 4.   The inmate has conspired or attempted to convey, introduce or possess contraband, which posses a threat or danger to the security of the institution.  Such items of contraband may include, but are not limited to weapons, drugs, ammunition, communication devices, or escape material.

☐ 5.   The inmate functions as a leader, enforcer, recruiter, or member of a validated Security Threat Group.

☐ 6.   The inmate escaped, attempted escape or committed acts to facilitate an escape from custody.

☐ 7.   The inmate, through repetitive and/or seriously disruptive behavior, has demonstrated a chronic inability to adjust to a lower custody unit, as evidenced by repeated guilty findings by the Disciplinary Hearing Officer (DHO).

**Recommendation**

Max Custody

**Rationale**

Inmate Andriano is currently on Death Row.

Distribution: White - Master Record File
Canary - Inmate Copy
Pink - Institutional File

801-7
2/25/10

Page 1

000011342

P-App. 006875

ARIZONA DEPARTMENT OF CORRECTIONS

**Notice of Hearing and Inmate Rights**
**(Proposed Maximum Custody Placement)**

| Inmate Name *(Last, First M.I.) (Please print)* | ADC Number | Unit | Hearing Date |
|---|---|---|---|
| ANDRIANO  WENDI | 191593 | ASPC PV BRENT W. LUMLEY | 12/1/10 |

**Purpose of Hearing:**    You are being referred for a Classification Review and Hearing to determine whether you should be placed at a maximum custody institution.  The issue being considered is whether your already proven conduct, in conjunction with an assessment of your overall record, constitutes a threat to the safety and security of the institution.

The COIII or CO-IV will determine whether that behavior, together with your overall record, constitutes a threat to the safety and security of the institution.  In addressing this issue, the staff member will determine whether your proven behavior falls within any of the categories below.

**Behavior Categories:**    Indicate *(with a check)* which of the following behavioral categories apply to the inmate's proven behavior.

- [ ]  1.  The inmate has demonstrated physical or sexually assaultive behavior resulting in either serious physical injury or death to any person, or in an attempt to sexually assault any person, or to cause serious physical injury or death to any person, or if the inmate has conspired in the planning any of the mentioned.  Such demonstrated assaultive behavior may or may not involve the use of a weapon.

- [ ]  2.  The nature of the criminal offense(s) committed prior to incarceration constitutes a current threat to the security and orderly operation of the institution and to the safety of others; for example, assaults against law enforcement, participation in gang activity or actions indicating an escape risk.

- [ ]  3.  The inmate was an active participant in, organized, or incited a disturbance or riot that resulted in the taking of a hostage, loss of life, property damage, or physical harm to others.

- [ ]  4.  The inmate has conspired or attempted to convey, introduce or poses contraband, which posses a threat or danger to the security of the institution.  Such items of contraband may include, but are not limited to weapons, drugs, ammunition, communication devices, or escape material.

- [ ]  5.  The inmate functions as a leader, enforcer, recruiter, or member of a validated Security Threat Group.

- [ ]  6.  The inmate escaped, attempted escape or committed acts to facilitate an escape from custody.

- [ ]  7.  The inmate, through repetitive and/or seriously disruptive behavior, has demonstrated a chronic inability to adjust to a lower custody unit, as evidenced by repeated guilty findings by the Disciplinary Hearing Officer (DHO).

**Rationale for placement:**  *(Instructions:  provide a detailed factual account of the incident(s) that supports the proposed placement.  In addition, if the incident(s) that triggered the proposed placement is a rule violation found by the DHO, attach a copy of the DHO report(s).)*

TRIGGER C15 - ANNUAL REVIEW.
INMATE REQUIRES MAXIMUM CUSTODY DUE TO SENTENCE , CONDEMNED ROW.
REQUIRES CONTINUED MAXIMUM CUSTODY.

Distribution: White - Master Record File
Canary - Inmate Copy
Pink - Institutional File

801-6
2/25/10

Page 1

000011343

P-App. 006876

Notice of Hearing and Inmate Rights Cont'd

**Inmate Rights:**     An inmate has a right to be present at the hearing and respond to evidence presented.  The staff member may waive, in writing, the inmate's appearance, if it is determined that a waiver is in the best interest of the secure and orderly operation of the institution.

The inmate shall be afforded an opportunity to provide an oral or a written statement during the hearing.  A summary of the inmate's oral statement or of the statement by a witness requested by the inmate shall be recorded.  A copy of the written statement(s) shall be attached to the Hearing Findings.  The staff member shall insure that such summary statements are based on the inmate's intended meaning.  The inmate shall be asked to read the statement and certify its accuracy when signing the form.

The staff member shall exercise authority over witnesses and the testimony of witnesses at all hearings.  Witnesses requested by inmates shall be authorized at the hearing based on the conclusion by the staff member prior to the hearing that the testimony to be provided will be relevant to material facts to be considered at the hearing.  If such relevancy cannot be clearly established, the witness shall not be authorized.  No witnesses shall be permitted at the hearing when the sole basis for the hearing is a finding of  "guilty" by the Disciplinary Hearing Officer (DHO).  The staff member shall evaluate the relevance of the information the witness expects to present and approve or deny the witness for the hearing.

If confidential information is to be used in the hearing, the inmate shall be advised of such and this fact shall be stated in a manner that avoids the compromise of the confidential source of that information.  If such information is to be used, a Confidential Informant Reliability Assessment Questionnaire (CIRAQ) shall be completed.

An inmate may waive appearance at the hearing, by signing the waiver provided on the referral notice, if the following circumstances exist:

☐ Both the staff member and the inmate agree to waive the inmate's appearance.

☑ The inmate must be served written notice of the scheduled hearing and the inmate shall sign the written waiver provided on this form.

_11-29-10_  I waive the right to the 48 hour notice of hearing.
(Inmate Initials)   (Date)

| Inmate Signature | Staff Signature / Title  # 5132 | Date 11/29/10 |
|---|---|---|

801-6
2/25/10

Distribution: White - Master Record File
Canary - Inmate Copy
Pink - Institutional File

000011344

P-App. 006877

ARIZONA DEPARTMENT OF COR   .CTIONS

**Maximum Custody Placement Recommendation/Approval**

| Inmate Name (Last, First M.I.) | ADC Number | Unit | Hearing Date |
|---|---|---|---|
| ANDRIANO, WENDI E. | 191593 | ASPC PV BRENT W. LUMLEY | 11/29/10 |

The inmate ☑ was  ☐ was **not** present for the hearing (if not provide reason): _____

The inmate ☐ did  ☑ did **not** submit a written statement, if so, is the statement attached? ☐ Yes  ☐ No

The inmate ☐ did  ☑ did **not** request witnesses, if so, was the Witness Request form(s) completed? ☐ Yes  ☐ No

Present at the hearing were: COIII MORRIS,  INMATE ANDRIANO COIII MOORE _____

_____

**Purpose of Hearing:**   To determine whether the inmate should be placed at a maximum custody institution based on already proven conduct, in conjunction with an assessment of the inmate's overall record, which constitutes a threat to the safety and security of the institution.  In addressing this issue, the Classification Officer will determine whether the behavior falls within any of the categories below.

**Behavior Categories:**   Indicate (with a check) which of the following behavioral categories apply.

☐ 1.  The inmate has demonstrated physical or sexually assaultive behavior resulting in either serious physical injury or death to any person, or in an attempt to sexually assault any person, or to cause serious physical injury or death to any person, or if the inmate has conspired in the planning any of the mentioned.  Such demonstrated assaultive behavior may or may not involve the use of a weapon.

☐ 2.  The nature of the criminal offense(s) committed prior to incarceration constitutes a current threat to the security and orderly operation of the institution and to the safety of others; for example, assaults against law enforcement, participation in gang activity or actions indicating an escape risk.

☐ 3.  The inmate was an active participant in, organized, or incited a disturbance or riot that resulted in the taking of a hostage, loss of life, property damage, or physical harm to others.

☐ 4.  The inmate has conspired or attempted to convey, introduce or possess contraband, which posses a threat or danger to the security of the institution.  Such items of contraband may include, but are not limited to weapons, drugs, ammunition, communication devices, or escape material.

☐ 5.  The inmate functions as a leader, enforcer, recruiter, or member of a validated Security Threat Group.

☐ 6.  The inmate escaped, attempted escape or committed acts to facilitate an escape from custody.

☐ 7.  The inmate, through repetitive and/or seriously disruptive behavior, has demonstrated a chronic inability to adjust to a lower custody unit, as evidenced by repeated guilty findings by the Disciplinary Hearing Officer (DHO).

**Recommendation**

TRIGGER C15 - ANNUAL REVIEW.
INMATE REQUIRES MAXIMUM CUSTODY

**Rationale**

INMATE REQUIRES MAXIMUM CUSTODY DUE TO SENTENCE , CONDEMNED ROW.
REQUIRES CONTINUED MAXIMUM CUSTODY.

Distribution:  White  -  Master Record File
Canary  -  Inmate Copy
Pink  -  Institutional File

801-7
2/25/10

Page 1

000011345

P-App. 006878

**Maximum Custody Placement Recommendation/Approval Cont'd**

Evidence relied on to support the recommendation: *(Evidence may include copies of the Disciplinary Reports)*

CONDEMNED ROW

Was the inmate provided a copy of the Hearing Findings?  ☐ Yes  ☑ No

Inmate notified of the appeal process?  ☑ Yes  ☐ No

Inmate ☐ does  ☑ does **not** waive their right to an appeal regarding placement in Maximum Custody?

Inmate given a copy of the Notice of Appeal for Maximum Custody Placement?  ☐ Yes  ☑ No

| Inmate Printed Name | Inmate Signature | Date |
|---|---|---|
| Wendi Andriano | | 11/29/10 |

| Classification Officer Printed Name | Classification Officer Signature | Date |
|---|---|---|
| D. MORRIS #5132 | | 11/29/10 |

☑ Recommended   ☐ Denied

| Deputy Warden Printed Name | Deputy Warden Signature | Date |
|---|---|---|
| Lacy Scott | | 12-1/10 |

Comments: Condemned Row

☑ Approved   ☐ Denied

| Warden Printed Name | Warden Signature | Date |
|---|---|---|
| James O'Neil | | 12-9-10 |

Comments: Max Custody - Condemned Row

☑ Approved   ☐ Denied

| Classification Administrator Printed Name | Classification Administrator Signature | Date |
|---|---|---|
| R Jackson | | 12/13/10 |

Comments: PER Policy

Distribution: White - Master Record File
Canary - Inmate Copy
Pink - Institutional File

801-7
2/25/10

Page 2

000011346

P-App. 006879

ARIZONA DEPARTMENT OF CORRECTIONS

Notice of Hearing and Inmate Rights
(Proposed Maximum Custody Placement)

| Inmate Name *(Last, First M.I.)* | ADC Number | Unit | Hearing Date |
|---|---|---|---|
| Andriano, Wendi E. | 191593 | ASPC - Perryville Brent W Lumley SMA | 11/23/09 |

**Purpose of Hearing:** You are being referred for a Classification Review and Hearing to determine whether you should be placed at a maximum custody institution. The issue being considered is whether you already proven conduct, in conjunction with an assessment of your overall record, constitutes a threat to the safety and security of the institution.

The COIII or CO-IV will determine whether that behavior, together with your overall record, constitutes a threat to the safety and security of the institution. In addressing this issue, the staff member will determine whether your proven behavior falls within any of the categories below.

**Behavior Categories:** Indicate *(with a check)* which of the following behavioral categories apply to the inmate's proven behavior.

☐ 1. The inmate has demonstrated physical or sexually assaultive and/or predatory behavior resulting in either serious physical injury or death to any person, or in an attempt to sexually assault any person, or to cause serious physical injury or death to any person, or if the inmate has conspired in the planning any of the mentioned. Such demonstrated assaultive behavior may or may not involve the use of a weapon.

☐ 2. The nature of the criminal offense(s) committed prior to incarceration constitutes a current threat to the security and orderly operation of the institution and to the safety of others; for example, assaults against law enforcement, participation in gang activity or actions indicating an escape risk.

☐ 3. The inmate was an active participant in, organized, or incited a disturbance or riot that resulted in the taking of a hostage, loss of life, property damage, or physical harm to others.

☐ 4. The inmate has conspired or attempted to convey, introduce or possess contraband, which posses a threat or danger to the security of the institution. Such items of contraband may include, but are not limited to weapons, drugs, ammunition, communication devices, or escape material.

☐ 5. The inmate functions as a leader, enforcer, recruiter, or member of a validated Security Threat Group.

☐ 6. The inmate escaped, attempted escape or committed acts to facilitate an escape from custody.

☐ 7. The inmate, through repetitive and/or seriously disruptive behavior, has demonstrated a chronic inability to adjust to a lower custody unit, as evidenced by repeated guilty findings by the Disciplinary Hearing Officer (DHO).

**Rationale for placement:** *(Instructions: provide a detailed factual account of the incident(s) that supports the proposed placement. In addition, if the incident(s) that triggered the proposed placement is a rule violation found by the DHO, attach a copy of the DHO report(s).)*

trigger 43- Yearly ReClass
Inmate Andriano # 191593 requires MAX Custody due to
sentence of Death.
Inmate has no disciplinary since 3/6/08 - minor.
Requires continued max custody.

801-6

000011347

Notice of Hearing and Inmate Rights Cont'd

**Inmate Rights:**   An inmate has a right to be present at the hearing and respond to evidence presented.  The staff member may waive, in writing, the inmate's appearance, if it is determined that a waiver is in the best interest of the secure and orderly operation of the institution.

The inmate shall be afforded an opportunity to provide an oral or a written statement during the hearing.  A summary of the inmate's oral statement or of the statement by a witness requested by the inmate shall be recorded.  A copy of the written statement(s) shall be attached to the Hearing Findings.  The staff member shall insure that such summary statements are based on the inmate's intended meaning.  The inmate shall be asked to read the statement and certify its accuracy when signing the form.

The staff member shall exercise authority over witnesses and the testimony of witnesses at all hearings.  Witnesses requested by inmates shall be authorized at the hearing based on the conclusion by the staff member prior to the hearing that the testimony to be provided will be relevant to material facts to be considered at the hearing.  If such relevancy cannot be clearly established, the witness shall not be authorized.  No witnesses shall be permitted at the hearing when the sole basis for the hearing is a finding of "guilty" by the Disciplinary Hearing Officer (DHO).  The chairperson shall evaluate the relevance of the information the witness expects to present and approve or deny the witness for the hearing.

If confidential information is to be used in the hearing, the inmate shall be advised of such and this fact shall be stated in a manner that avoids the compromise of the confidential source of that information.  If such information is to be used, a Confidential Informant Reliability Assessment Questionnaire (CIRAQ) shall be completed.

An inmate may waive appearance at the hearing, by signing the waiver provided on the referral notice, if the following circumstances exist:

☐   Both the staff member and the inmate agree to waive the inmate's appearance.

☐   The inmate must be served written notice of the scheduled hearing and the inmate shall sign the written waiver provided on this form.

_____ / ___11-20-09___ I waive the right to the 48 hour notice of hearing.
*(Inmate Initials)*      *(Date)*

| Inmate Signature | Staff Signature / Title | Date |
|---|---|---|
|  | DMorris /COII | 11-20-09 |

Distribution: White - Master Record File
          Canary - Inmate Copy
          Pink - Institutional File

801-6
10/25/05

000011348

P-App. 006881

ARIZONA DEPARTMENT OF CORRECTIONS

Maximum Custody Placement/Recommendation/Approval

| Inmate Name (Last, First M.I.) | ADC Number | Unit | Hearing Date |
|---|---|---|---|
| Andriano, Wendi E. | 191593 | ASPC - Perryville Brent W. Wenley SMA | 11/20/09 |

The inmate ☑ was ☐ was not present for the hearing (not present note:) _____

The inmate ☐ did ☑ did not submit a written statement. If so, is the statement attached? ☐ Yes ☐ No
The inmate ☐ did ☑ did not request witnesses. If so, was the Witness Request form(s) completed? ☐ Yes ☐ No
Present at the hearing were: COII Morris, Inmate Andriano, COII Santiago

Purpose of Hearing:   To determine whether the inmate should be placed at a maximum custody institution based on already proven conduct, in conjunction with an assessment of the inmate's overall record, which constitutes a threat to the safety and security of the institution. In addressing this issue, the Classification Officer will determine whether the behavior falls within any of the categories below.

Behavior Categories:   Indicate (with a check) which of the following behavioral categories apply.

- ☐ 1. The inmate has demonstrated physical or sexually assaultive and/or predatory behavior resulting in either serious physical injury or death to any person, or in an attempt to sexually assault any person, or to cause serious physical injury or death to any person, or if the inmate has conspired in the planning any of the mentioned.  Such demonstrated assaultive behavior may or may not involve the use of a weapon.

- ☐ 2. The nature of the criminal offense/s, committed prior to incarceration constitutes a current threat to the security and orderly operation of the institution and to the safety of others; for example, assaults against law enforcement, participation in gang activity or actions indicating an escape risk.

- ☐ 3. The inmate was an active participant in, organized, or incited a disturbance or riot that resulted in the taking of a hostage, loss of life, property damage, or physical harm to others.

- ☐ 4. The inmate has conspired or attempted to convey, introduce or possess contraband, which posses a threat or danger to the security of the institution.  Such items of contraband may include, but are not limited to weapons, drugs, ammunition, communication devices, or escape material.

- ☐ 5. The inmate functions as a leader, enforcer, recruiter, or member of a validated Security Threat Group.

- ☐ 6. The inmate escaped, attempted escape or committed acts to facilitate an escape from custody.

- ☐ 7. The inmate, through repetitive and/or seriously disruptive behavior has demonstrated a chronic inability to adjust to a lower custody unit, as evidenced by repeated guilty findings by the Disciplinary Hearing Officer (DHO).

Recommendation: Trigger C13 - Yearly declass.

Inmate Andriano # 191593 requires Max Custody

Rationale:
Due to Sentence of Death.
Inmate has no disciplinary since 8/6/08 - minor.
Requires continued Max custody.

Distribution: White - Master Record File
Canary - Inmate Copy
Pink - Institutional File

801-7
10/25/05

000011349

Maximum Custody Placement Recommendation/Approval Cont'd

Evidence relied on to support the recommendation: *(Evidence may include copies of the Disciplinary Reports)*

Was the inmate provided a copy of the Hearing Findings?   ☐ Yes   ☑ No

Inmate notified of the appeal process?   ☑ Yes   ☐ No

Inmate ☐ does ☑ does not waive their right to an appeal regarding placement in Maximum Custody?

Inmate given a copy of the Notice of Appeal for Maximum Custody Placement?   ☐ Yes   ☑ No

| Inmate Printed Name  191593<br>Wendi Andriano | Inmate Signature | Date<br>11-20-09 |
|---|---|---|
| Classification Officer Printed Name<br>D. Morris  # 5132 | Classification Officer Signature<br>COIII D Morris | Date<br>11-20-09 |

☑ Recommended   ☐ Denied

| Deputy Warden Printed Name<br>Lary Scott | Deputy Warden Signature | Date<br>11/27/09 |
|---|---|---|
| Comments<br>Rec Max | | |

☑ Approved   ☐ Denied

| Warden Printed Name<br>Diaz, Tara | Warden Signature | Date<br>11-30-09 |
|---|---|---|
| Comments<br>DEATH ROW - REQUIRES MAX CUSTODY | | |

☑ Approved   ☐ Denied

| Classification Administrator Printed Name<br>COII Bayles | Classification Administrator Signature<br>COII Bayles 8568 | Date<br>12/08/09 |
|---|---|---|
| Comments   61 / TYPE 07 COMPLETED / REVIEWED RPS<br>MAX CUSTODY @ B2B PENDING FINAL APPROVAL | | |

☑ Approved   ☐ Denied

| Offender Services Administrator Printed Name<br>STACEY CRABTREE | Offender Services Administrator Signature | Date<br>12/08/09 |
|---|---|---|
| Comments | | |

Distribution: White - Master Record File
Canary - Inmate Copy
Pink - Institutional File

501-7
10/25/05

000011350

ARIZONA DEPARTMENT OF CORRECTIONS

Notice of Hearing and Inmate Rights
(Proposed Maximum Custody Placement)

| Inmate Name (Last, First M.I.) | ADC Number | Unit | Hearing Date |
|---|---|---|---|
| Andriano Wendi | 191593 | Lumley | 11-14-08 |

**Purpose of Hearing:** You are being referred for a Classification Review and Hearing to determine whether you should be placed at a maximum custody institution. The issue being considered is whether you already proven conduct, in conjunction with an assessment of your overall record, constitutes a threat to the safety and security of the institution.

The COIII or CO-IV will determine whether that behavior, together with your overall record, constitutes a threat to the safety and security of the institution. In addressing this issue, the staff member will determine whether your proven behavior falls within any of the categories below.

**Behavior Categories:** Indicate *(with a check)* which of the following behavioral categories apply to the inmate's proven behavior.

- [ ] 1. The inmate has demonstrated physical or sexually assaultive and/or predatory behavior resulting in either serious physical injury or death to any person, or in an attempt to sexually assault any person, or to cause serious physical injury or death to any person, or if the inmate has conspired in the planning any of the mentioned. Such demonstrated assaultive behavior may or may not involve the use of a weapon.

- [ ] 2. The nature of the criminal offense(s) committed prior to incarceration constitutes a current threat to the security and orderly operation of the institution and to the safety of others; for example, assaults against law enforcement, participation in gang activity or actions indicating an escape risk.

- [ ] 3. The inmate was an active participant in, organized, or incited a disturbance or riot that resulted in the taking of a hostage, loss of life, property damage, or physical harm to others.

- [ ] 4. The inmate has conspired or attempted to convey, introduce or possess contraband, which posses a threat or danger to the security of the institution. Such items of contraband may include, but are not limited to weapons, drugs, ammunition, communication devices, or escape material.

- [ ] 5. The inmate functions as a leader, enforcer, recruiter, or member of a validated Security Threat Group.

- [ ] 6. The inmate escaped, attempted escape or committed acts to facilitate an escape from custody.

- [ ] 7. The inmate, through repetitive and/or seriously disruptive behavior, has demonstrated a chronic inability to adjust to a lower custody unit, as evidenced by repeated guilty findings by the Disciplinary Hearing Officer (DHO).

**Rationale for placement:** *(Instructions: provide a detailed factual account of the incident(s) that supports the proposed placement. In addition, if the incident(s) that triggered the proposed placement is a rule violation found by the DHO, attach a copy of the DHO report(s).)*

This is inmates annual review. Inmate is on Death Row. Maximum custody placement by policy.

Distribution: White - Master Record File
Canary - Inmate Copy
Pink - Institutional File

801-6
10/25/05

000011351

Notice of Hearing and Inmate Rights Cont'd

**Inmate Rights:**   An inmate has a right to be present at the hearing and respond to evidence presented.  The staff member may waive, in writing, the inmate's appearance, if it is determined that a waiver is in the best interest of the secure and orderly operation of the institution.

The inmate shall be afforded an opportunity to provide an oral or a written statement during the hearing.  A summary of the inmate's oral statement or of the statement by a witness requested by the inmate shall be recorded.  A copy of the written statement(s) shall be attached to the Hearing Findings.  The staff member shall insure that such summary statements are based on the inmate's intended meaning.  The inmate shall be asked to read the statement and certify its accuracy when signing the form.

The staff member shall exercise authority over witnesses and the testimony of witnesses at all hearings.  Witnesses requested by inmates shall be authorized at the hearing based on the conclusion by the staff member prior to the hearing that the testimony to be provided will be relevant to material facts to be considered at the hearing.  If such relevancy cannot be clearly established, the witness shall not be authorized.  No witnesses shall be permitted at the hearing when the sole basis for the hearing is a finding of "guilty" by the Disciplinary Hearing Officer (DHO).  The chairperson shall evaluate the relevance of the information the witness expects to present and approve or deny the witness for the hearing.

If confidential information is to be used in the hearing, the inmate shall be advised of such and this fact shall be stated in a manner that avoids the compromise of the confidential source of that information.  If such information is to be used, a Confidential Informant Reliability Assessment Questionnaire (CIRAQ) shall be completed.

An inmate may waive appearance at the hearing, by signing the waiver provided on the referral notice, if the following circumstances exist:

☑ Both the staff member and the inmate agree to waive the inmate's appearance.

☐ The inmate must be served written notice of the scheduled hearing and the inmate shall sign the written waiver provided on this form.

_____ / 11/12/08 I waive the right to the 48 hour notice of hearing.
(Inmate Initials)      (Date)

| Inmate Signature | Staff Signature / Title | Date |
|---|---|---|
|  |  | 11-12-08 |

Distribution: White - Master Record File
            Canary - Inmate Copy
            Pink - Institutional File

000011352
10/25/05

P-App. 006885

ARIZONA DEPARTMENT OF CORRECTIONS
Maximum Custody Placement Recommendation/Approval

| Inmate Name (Last, First M.I.) | ADC Number | Unit | Hearing Date |
|---|---|---|---|
| Andriano  Wendi | 191593 | Lumley | 11-14-08 |

The inmate ☑ was  ☐ was not present for the hearing (if not provide reason): _____

The inmate ☐ did  ☑ did not submit a written statement, if so, is the statement attached?  ☐ Yes  ☑ No
The inmate ☐ did  ☑ did not request witnesses, if so, was the Witness Request form(s) completed?  ☐ Yes  ☑ No
Present at the hearing were: Thomas + Andrian + Jynel.

**Purpose of Hearing:**    To determine whether the inmate should be placed at a maximum custody institution based on already proven conduct, in conjunction with an assessment of the inmate's overall record, which constitutes a threat to the safety and security of the institution.  In addressing this issue, the Classification Officer will determine whether the behavior falls within any of the categories below.

**Behavior Categories:**    Indicate (with a check) which of the following behavioral categories apply.

☐ 1.   The inmate has demonstrated physical or sexually assaultive and/or predatory behavior resulting in either serious physical injury or death to any person, or in an attempt to sexually assault any person, or to cause serious physical injury or death to any person, or if the inmate has conspired in the planning any of the mentioned.  Such demonstrated assaultive behavior may or may not involve the use of a weapon.

☐ 2.   The nature of the criminal offense(s) committed prior to incarceration constitutes a current threat to the security and orderly operation of the institution and to the safety of others; for example, assaults against law enforcement, participation in gang activity or actions indicating an escape risk.

☐ 3.   The inmate was an active participant in, organized, or incited a disturbance or riot that resulted in the taking of a hostage, loss of life, property damage, or physical harm to others.

☐ 4.   The inmate has conspired or attempted to convey, introduce or possess contraband, which posses a threat or danger to the security of the institution.  Such items of contraband may include, but are not limited to weapons, drugs, ammunition, communication devices, or escape material.

☐ 5.   The inmate functions as a leader, enforcer, recruiter, or member of a validated Security Threat Group.

☐ 6.   The inmate escaped, attempted escape or committed acts to facilitate an escape from custody.

☐ 7.   The inmate, through repetitive and/or seriously disruptive behavior, has demonstrated a chronic inability to adjust to a lower custody unit, as evidenced by repeated guilty findings by the Disciplinary Hearing Officer (DHO).

Recommendation

Maximum custody.

Rationale  this is inmates annual review. Inmate is in deathrow maximum custody placement by policy.

Distribution: White - Master Record File
Canary - Inmate Copy
Pink - Institutional File

801-7
10/25/05

000011353

Maximum Custody Placement Recommendation/Approval Cont'd

Evidence relied on to support the recommendation: *(Evidence may include copies of the Disciplinary Reports)*

*This is inmate*
Annual review. Inmate is on Death Row. Maximum cust(ody)
placement by policy.                              PV

Was the inmate provided a copy of the Hearing Findings?  ☐ Yes  ☒ No
Inmate notified of the appeal process?  ☒ Yes  ☐ No
Inmate ☐ does ☒ does not waive their right to an appeal regarding placement in Maximum Custody?
Inmate given a copy of the Notice of Appeal for Maximum Custody Placement?  ☐ Yes  ☒ No

| Inmate Printed Name | Inmate Signature | Date |
|---|---|---|
| Wendi E. Andriano | | 11-14-08 |

| Classification Officer Printed Name | Classification Officer Signature | Date |
|---|---|---|
| L. Thomas | | 11-14-08 |

☒ Recommended  ☐ Denied                   BOLD   MAX

| Deputy Warden Printed Name | Deputy Warden Signature | Date |
|---|---|---|
| Michele Bailey | | 11-17-08 |

Comments I/m on Death Row must remain in SMA

☒ Approved  ☐ Denied

| Warden Printed Name | Warden Signature | Date |
|---|---|---|
| White E.L | | 11-17-08 |

Comments        concur  w/ DW

☒ Approved  ☐ Denied

| Classification Administrator Printed Name | Classification Administrator Signature | Date |
|---|---|---|
| Cou Saintry | | 12/2/08 |

Comments        MAX Death Row

☒ Approved  ☐ Denied

| Offender Services Administrator Printed Name | Offender Services Administrator Signature | Date |
|---|---|---|
| ASU J. Morris | | 12/8/08 |

Comments Max custody

Distribution: White - Master Record File
Canary - Inmate Copy
Pink - Institutional File

501-7
10/25/05

000011354

P-App. 006887

**ARIZONA DEPARTMENT OF CORRECTIONS**

**Notice of Hearing and Inmate Rights**
**(Proposed Maximum Custody Placement)**

| Inmate Name *(Last, First M.I.)* | ADC Number | Unit | Hearing Date |
|---|---|---|---|
| Andrano, Wendi | 191593 | | 10-24-07 |

**Purpose of Hearing:**   You are being referred for a Classification Review and Hearing to determine whether you should be placed at a maximum custody institution. The issue being considered is whether you already proven conduct, in conjunction with an assessment of your overall record, constitutes a threat to the safety and security of the institution.

The COIII or CO-IV will determine whether that behavior, together with your overall record, constitutes a threat to the safety and security of the institution. In addressing this issue, the staff member will determine whether your proven behavior falls within any of the categories below.

**Behavior Categories:**   Indicate *(with a check)* which of the following behavioral categories apply to the inmate's proven behavior.

- [ ] 1. The inmate has demonstrated physical or sexually assaultive and/or predatory behavior resulting in either serious physical injury or death to any person, or in an attempt to sexually assault any person, or to cause serious physical injury or death to any person, or if the inmate has conspired in the planning any of the mentioned. Such demonstrated assaultive behavior may or may not involve the use of a weapon.

- [ ] 2. The nature of the criminal offense(s) committed prior to incarceration constitutes a current threat to the security and orderly operation of the institution and to the safety of others; for example, assaults against law enforcement, participation in gang activity or actions indicating an escape risk.

- [ ] 3. The inmate was an active participant in, organized, or incited a disturbance or riot that resulted in the taking of a hostage, loss of life, property damage, or physical harm to others.

- [ ] 4. The inmate has conspired or attempted to convey, introduce or possess contraband, which posses a threat or danger to the security of the institution. Such items of contraband may include, but are not limited to weapons, drugs, ammunition, communication devices, or escape material.

- [ ] 5. The inmate functions as a leader, enforcer, recruiter, or member of a validated Security Threat Group.

- [ ] 6. The inmate escaped, attempted escape or committed acts to facilitate an escape from custody.

- [ ] 7. The inmate, through repetitive and/or seriously disruptive behavior, has demonstrated a chronic inability to adjust to a lower custody unit, as evidenced by repeated guilty findings by the Disciplinary Hearing Officer (DHO).

**Rationale for placement:** *(Instructions: provide a detailed factual account of the incident(s) that supports the proposed placement. In addition, if the incident(s) that triggered the proposed placement is a rule violation found by the DHO, attach a copy of the DHO report(s).)*

inmate is on deathrow. Remains in max custody.

Annual Review.

801-6
10/25/05

000011355

Notice of Hearing and Inmate Rights Cont'd

**Inmate Rights:**     An inmate has a right to be present at the hearing and respond to evidence presented.  The staff member may waive, in writing, the inmate's appearance, if it is determined that a waiver is in the best interest of the secure and orderly operation of the institution.

The inmate shall be afforded an opportunity to provide an oral or a written statement during the hearing.  A summary of the inmate's oral statement or of the statement by a witness requested by the inmate shall be recorded.  A copy of the written statement(s) shall be attached to the Hearing Findings.  The staff member shall insure that such summary statements are based on the inmate's intended meaning.  The inmate shall be asked to read the statement and certify its accuracy when signing the form.

The staff member shall exercise authority over witnesses and the testimony of witnesses at all hearings.  Witnesses requested by inmates shall be authorized at the hearing based on the conclusion by the staff member prior to the hearing that the testimony to be provided will be relevant to material facts to be considered at the hearing.  If such relevancy cannot be clearly established, the witness shall not be authorized.  No witnesses shall be permitted at the hearing when the sole basis for the hearing is a finding of "guilty" by the Disciplinary Hearing Officer (DHO).  The chairperson shall evaluate the relevance of the information the witness expects to present and approve or deny the witness for the hearing.

If confidential information is to be used in the hearing, the inmate shall be advised of such and this fact shall be stated in a manner that avoids the compromise of the confidential source of that information.  If such information is to be used, a Confidential Informant Reliability Assessment Questionnaire (CIRAQ) shall be completed.

An inmate may waive appearance at the hearing, by signing the waiver provided on the referral notice, if the following circumstances exist:

[✓] Both the staff member and the inmate agree to waive the inmate's appearance.

[ ] The inmate must be served written notice of the scheduled hearing and the inmate shall sign the written waiver provided on this form.

_____ / 10-24-07  I waive the right to the 48 hour notice of hearing.
*(Inmate Initials)*      *(Date)*

| Inmate Signature | Staff Signature / Title | Date |
|---|---|---|
|  |  | 10-24-07 |

Distribution: White - Master Record File
Canary - Inmate Copy
Pink - Institutional File

801-6
10/25/05

000011356

**ARIZONA DEPARTMENT OF CORRECTIONS**

Maximum Custody Placement Recommendation/Approval

| Inmate Name (Last, First M.I.) | ADC Number | Unit | Hearing Date |
|---|---|---|---|
| Andrianm Wendi | 191593 | Smu | 10-24-07 |

The inmate ☒ was ☐ was not present for the hearing (if not provide reason):_____

_____

The inmate ☐ did ☒ did not submit a written statement, if so, is the statement attached? ☐ Yes ☒ No

The inmate ☐ did ☒ did not request witnesses, if so, was the Witness Request form(s) completed? ☐ Yes ☒ No

Present at the hearing were: _____Thom + Andrianm_____

_____

**Purpose of Hearing:**    To determine whether the inmate should be placed at a maximum custody institution based on already proven conduct, in conjunction with an assessment of the inmate's overall record, which constitutes a threat to the safety and security of the institution. In addressing this issue, the Classification Officer will determine whether the behavior falls within any of the categories below.

**Behavior Categories:**    Indicate (with a check) which of the following behavioral categories apply.

☐ 1.  The inmate has demonstrated physical or sexually assaultive and/or predatory behavior resulting in either serious physical injury or death to any person, or in an attempt to sexually assault any person, or to cause serious physical injury or death to any person, or if the inmate has conspired in the planning any of the mentioned. Such demonstrated assaultive behavior may or may not involve the use of a weapon.

☐ 2.  The nature of the criminal offense(s) committed prior to incarceration constitutes a current threat to the security and orderly operation of the institution and to the safety of others; for example, assaults against law enforcement, participation in gang activity or actions indicating an escape risk.

☐ 3.  The inmate was an active participant in, organized, or incited a disturbance or riot that resulted in the taking of a hostage, loss of life, property damage, or physical harm to others.

☐ 4.  The inmate has conspired or attempted to convey, introduce or possess contraband, which posses a threat or danger to the security of the institution. Such items of contraband may include, but are not limited to weapons, drugs, ammunition, communication devices, or escape material.

☐ 5.  The inmate functions as a leader, enforcer, recruiter, or member of a validated Security Threat Group.

☐ 6.  The inmate escaped, attempted escape or committed acts to facilitate an escape from custody.

☐ 7.  The inmate, through repetitive and/or seriously disruptive behavior, has demonstrated a chronic inability to adjust to a lower custody unit, as evidenced by repeated guilty findings by the Disciplinary Hearing Officer (DHO).

**Recommendation**

Max custody

**Rationale**

Inmate is on deathrow. remain in max. Annual review

Distribution: White - Master Record File
Canary - Inmate Copy
Pink - Institutional File

801-7
9/25/05

00001135

**Maximum Custody Placement Recommendation/Approval Cont'd**

Evidence relied on to support the recommendation: *(Evidence may include copies of the Disciplinary Reports)*

Death Row inmate
Annual report.

Was the inmate provided a copy of the Hearing Findings?  ☐ Yes  ☑ No
Inmate notified of the appeal process?  ☑ Yes  ☐ No
Inmate  ☐ does  ☑ does not  waive their right to an appeal regarding placement in Maximum Custody?
Inmate given a copy of the Notice of Appeal for Maximum Custody Placement?  ☐ Yes  ☑ No

| Inmate Printed Name | Inmate Signature | Date |
|---|---|---|
| Neal Andriano | | 10-24-07 |
| Classification Officer Printed Name | Classification Officer Signature | Date |
| L Thomas | | 10-24-07 |

☑ Recommended  ☐ Denied

| Deputy Warden Printed Name | Deputy Warden Signature | Date |
|---|---|---|
| Chris Lang | | 11-1-07 |
| Comments | | |
| Death row Inmate Annual report | | |

☑ Approved  ☐ Denied

| Warden Printed Name | Warden Signature | Date |
|---|---|---|
| | | |
| Comments | | |
| Max Custody | | |

☒ Approved  ☐ Denied

| Classification Administrator Printed Name | Classification Administrator Signature | Date |
|---|---|---|
| | | |
| Comments | | |
| Death Row | | |

☒ Approved  ☐ Denied

| Offender Services Administrator Printed Name | Offender Services Administrator Signature | Date |
|---|---|---|
| ADW S. Morris | ADW S. Morris | 12/4/07 |
| Comments | | |
| Max Custody | | |

Distribution: White - Master Record File
Canary - Inmate Copy
Pink - Institutional File

801-7
3/05

0000113958

**ARIZONA DEPARTMENT OF CORRECTIONS**

Notice of Appeal - Maximum Custody Placement

| Inmate Name *(Last, First M.I.)* | ADC Number | Unit | Hearing Date |
|---|---|---|---|
| | | | |

I am appealing:

☐ Placement at Maximum Custody Unit.  The Hearing was held on _____/_____/_____.

☐ Continued placement at Maximum Custody Unit.  The Hearing was held on _____/_____/_____.

I understand that I have five (5) working days from the date of placement notice from which to file my appeal.

**Basis for appeal:** *(Be specific with the facts and detail the rationale on why you feel the approved placement should be reversed.)*

| Inmate Signature | Receiving Officer Signature/Title/Badge Number | Date |
|---|---|---|
| | | |

Distribution: White - Master Record File
Canary - Inmate Copy
Pink - Institutional File

901-8
10/25/05

000011359

P-App. 006892

ARIZONA DEPARTMENT OF CORREC.                      SMA
                                                   30/266
Inmate Disciplinary Report                                    Case Number 08 - B02 - 0#73

| Inmate Name (Last, First, M.I.) | ADC Number | Institution |
|---|---|---|
| ANDRIANO, WENDI E. | 191593 | ASPC-PV-BWL |

Charge: Group Number and Title

B24 INTRODUCTION OF CONTRABAND

**I. Statement of Violation** *(State fully the facts and circumstances of the violation including the means by which the inmate was advised of the charge(s))* I/m ANDRIANO #191593 WAS VERBALLY ADVISED BY COII SIMMONS #4803 REGARDING THE ISSUANCE OF THIS REPORT ON 3/4/08 AT 1015 HR'S. REPORT WRITTEN BY OFFICER GIETOW #4844 ON 3/4/08 AT 1106 HR'S. ON TUE. MARCH 4, 2008 I BECAME AWARE OF I/m ANDRIANO'S INVOLVEMENT REGARDING THE ABOVE STATED CHARGE, AT 0600 HRS. ANDRIANO HAD CONSPIRED TO introduce CONTRABAND into SMA THRU USE OF HER "KOSHER TRAY" (EVENING MEAL). HER WRAPPED FOOD TRAY contained TWO PLASTIC BAGS OF TOBACCO WRAPPED TOGETHER with TAPE, along with A MESSAGE FOR HER done TO PASS ON.

| Date of Violation | Time of Violation | Reporting Officer: *(print)* | Signature |
|---|---|---|---|
| 3-4-08 | 0600 | GIETOW #4844 | (signature) 4844 |

| Shift Supervisor Review *(print name)* | Date / Time | Disposition | Signature |
|---|---|---|---|
| T.A. Dembrone | 3-4-08 / 1900 | Refer | (signature) 4576 |

**II. Delivery of Charge/Hearing Date:** I hereby certify that on ___/___/___ at _____ hours, I have served noticed on this inmate for a hearing on the charge before the Disciplinary Hearing Officer as a Major Violation. The inmate has received a copy of the disciplinary charge. The hearing is scheduled on ___/___/___ at _____ hours.

| Inmate was offered staff assistance and it was: ☐ accepted  ☐ declined | Inmate Signature | Delivering Officer Signature |
|---|---|---|

**III. Report of Investigation**
MAJOR VIOLATIONS ONLY - SEE ATTACHMENT - (use form # 105-5P)

| Date Investigation Completed | Investigating Officer | Signature |
|---|---|---|

**IV. Disposition** This case was handled as:
☐ Informal Resolution   ☐ Major Violation: Refer to Disciplinary Hearing Officer   ☒ Minor Violation: Action taken:

Penalty Assessed For A Minor Violation
☐ ____ Hours Extra Duty        ☐ ____ Days Loss of Privilege*        ☐ Return/Forfeit Contraband Items*
☐ ____ Days Restriction        ☒ Reprimand                          ☐ Other*

For Minor Violations Only: Inmate was given a copy of the results and advised that effective this date, he/she has five days to appeal

| Inmate Signature | Date / Time | Coordinator's Signature |
|---|---|---|
| (signature) | 3-6-08  1930 | Sgt Spence 4850 |

* Document specific details on a continuation sheet - privileges lost; items to be returned or forfeited; documentation of postponements and continuances; reasons for witness denial.

Distribution: White - Master Record File
Yellow - Institutional File
Pink - Inmate

00001136

ARIZONA DEPARTMENT OF CORRECTIONS                                    OCT - 5

Maximum Custody Placement Recommendation/Approval

DEPARTMENT OF CORRECTIONS
OFFENDER SERVICES

| Inmate Name (Last, First M.I.) | ADC Number | Unit | Hearing Date |
|---|---|---|---|
| ANDRIANO, WENDI | 191593 | ASPC - PV - LUMLEY | 9-26-06 |

The inmate [X] was [ ] was not present for the hearing (if not provide reason):_____

The inmate [ ] did [X] did not submit a written statement, if so, is the statement attached? [ ] Yes [ ] No
The inmate [ ] did [X] did not request witnesses, if so, was the Witness Request form(s) completed? [ ] Yes [ ] No
Present at the hearing were: _____

**Purpose of Hearing:** To determine whether the inmate should be placed at a maximum custody institution based on already proven conduct, in conjunction with an assessment of the inmate's overall record, which constitutes a threat to the safety and security of the institution. In addressing this issue, the Classification Officer will determine whether the behavior falls within any of the categories below.

**Behavior Categories:** Indicate (with a check) which of the following behavioral categories apply.

[ ] 1. The inmate has demonstrated physical or sexually assaultive and/or predatory behavior resulting in either serious physical injury or death to any person, or in an attempt to sexually assault any person, or to cause serious physical injury or death to any person, or if the inmate has conspired in the planning any of the mentioned. Such demonstrated assaultive behavior may or may not involve the use of a weapon.

[X] 2. The nature of the criminal offense(s) committed prior to incarceration constitutes a current threat to the security and orderly operation of the institution and to the safety of others; for example, assaults against law enforcement, participation in gang activity or actions indicating an escape risk.

[ ] 3. The inmate was an active participant in, organized, or incited a disturbance or riot that resulted in the taking of a hostage, loss of life, property damage, or physical harm to others.

[ ] 4. The inmate has conspired or attempted to convey, introduce or possess contraband, which posses a threat or danger to the security of the institution. Such items of contraband may include, but are not limited to weapons, drugs, ammunition, communication devices, or escape material.

[ ] 5. The inmate functions as a leader, enforcer, recruiter, or member of a validated Security Threat Group.

[ ] 6. The inmate escaped, attempted escape or committed acts to facilitate an escape from custody.

[ ] 7. The inmate, through repetitive and/or seriously disruptive behavior, has demonstrated a chronic inability to adjust to a lower custody unit, as evidenced by repeated guilty findings by the Disciplinary Hearing Officer (DHO).

**Recommendation** MAXIMUM CUSTODY PLACEMENT.

**Rationale** DEATH SENTENCE - MURDER 1ST DEGREE.

Distribution: White - Master Record File
Canary - Inmate Copy
Pink - Institutional File

801-7
10/25/05

000011361

P-App. 006894

Maximum Custody Placement Recommendation/Approval Cont'd

Evidence relied on to support the recommendation:  *(Evidence may include copies of the Disciplinary Reports)*

Was the inmate provided a copy of the Hearing Findings?   ☐ Yes   ☒ No

Inmate notified of the appeal process?   ☒ Yes   ☐ No

Inmate ☒ does ☐ does not waive their right to an appeal regarding placement in Maximum Custody?

Inmate given a copy of the Notice of Appeal for Maximum Custody Placement?   ☐ Yes   ☒ No

| Inmate Printed Name | Inmate Signature | Date |
|---|---|---|
| Wendi Andriano | | 9-26-06 |
| Classification Officer Printed Name | Classification Officer Signature | Date |
| GOMEZ, L. CO III | L. Dom #540 | 9-26-06 |

☒ Recommended   ☐ Denied

| Deputy Warden Printed Name | Deputy Warden Signature | Date |
|---|---|---|
| DISU, HAKEEM | | 09-27-06 |
| Comments | | |
| RECOMMENDED | | |

☒ Approved   ☐ Denied

| Warden Printed Name | Warden Signature | Date |
|---|---|---|
| D Harbin | D | |
| Comments | | |

☒ Approved   ☐ Denied

| Classification Administrator Printed Name | Classification Administrator Signature | Date |
|---|---|---|
| Stacey Crabtree | | |
| Comments | | |
| Sentence of Death - MAX CUSTODY APPROVED. | | |

☒ Approved   ☐ Denied

| Offender Services Administrator Printed Name | Offender Services Administrator Signature | Date |
|---|---|---|
| Stacey Crabtree | | 10/5/06 |
| Comments | | |

Distribution:  White - Master Record File
Canary - Inmate Copy
Pink - Institutional File

801-7
10/25/05

000011362

P-App. 006895

ARIZONA DEPARTMENT OF CORRECTIONS

RECEIVED

Notice of Hearing and Inmate Rights
(Proposed Maximum Custody Placement)

OCT - 1

DEPARTMENT OF CORRECTIONS
OFFENDER SERVICES

| Inmate Name (Last, First M.I.) | ADC Number | Unit | Hearing Date |
|---|---|---|---|
| ANDRIANO, WENDI | 191593 | ASPC-PV- LUMLEY | 9-26-06 |

**Purpose of Hearing:**    You are being referred for a Classification Review and Hearing to determine whether you should be placed at a maximum custody institution.  The issue being considered is whether you already proven conduct, in conjunction with an assessment of your overall record, constitutes a threat to the safety and security of the institution.

The CO-III or CO-IV will determine whether that behavior, together with your overall record, constitutes a threat to the safety and security of the institution.  In addressing this issue, the staff member will determine whether your proven behavior falls within any of the categories below.

**Behavior Categories:**    Indicate (with a check) which of the following behavioral categories apply to the inmate's proven behavior.

☐ 1.  The inmate has demonstrated physical or sexually assaultive and/or predatory behavior resulting in either serious physical injury or death to any person, or in an attempt to sexually assault any person, or to cause serious physical injury or death to any person, or if the inmate has conspired in the planning any of the mentioned.  Such demonstrated assaultive behavior may or may not involve the use of a weapon.

☒ 2.  The nature of the criminal offense(s) committed prior to incarceration constitutes a current threat to the security and orderly operation of the institution and to the safety of others; for example, assaults against law enforcement, participation in gang activity or actions indicating an escape risk.

☐ 3.  The inmate was an active participant in, organized, or incited a disturbance or riot that resulted in the taking of a hostage, loss of life, property damage, or physical harm to others.

☐ 4.  The inmate has conspired or attempted to convey, introduce or possess contraband, which posses a threat or danger to the security of the institution.  Such items of contraband may include, but are not limited to weapons, drugs, ammunition, communication devices, or escape material.

☐ 5.  The inmate functions as a leader, enforcer, recruiter, or member of a validated Security Threat Group.

☐ 6.  The inmate escaped, attempted escape or committed acts to facilitate an escape from custody.

☐ 7.  The inmate, through repetitive and/or seriously disruptive behavior, has demonstrated a chronic inability to adjust to a lower custody unit, as evidenced by repeated guilty findings by the Disciplinary Hearing Officer (DHO).

**Rationale for placement:** (Instructions:  provide a detailed factual account of the incident(s) that supports the proposed placement.  In addition, if the incident(s) that triggered the proposed placement is a rule violation found by the DHO, attach a copy of the DHO report(s).)

DEATH SENTENCE - MURDER 1ST DEGREE.

Distribution: White - Master Record File
Canary - Inmate Copy
Pink - Institutional File

801-6
10/25/05

000011363

P-App. 006896

**Notice of Hearing and Inmate Rights Cont'd**

**Inmate Rights:**    An inmate has a right to be present at the hearing and respond to evidence presented.  The staff member may waive, in writing, the inmate's appearance, if it is determined that a waiver is in the best interest of the secure and orderly operation of the institution.

The inmate shall be afforded an opportunity to provide an oral or a written statement during the hearing.  A summary of the inmate's oral statement or of the statement by a witness requested by the inmate shall be recorded.  A copy of the written statement(s) shall be attached to the Hearing Findings.  The staff member shall insure that such summary statements are based on the inmate's intended meaning.  The inmate shall be asked to read the statement and certify its accuracy when signing the form.

The staff member shall exercise authority over witnesses and the testimony of witnesses at all hearings.  Witnesses requested by inmates shall be authorized at the hearing based on the conclusion by the staff member prior to the hearing that the testimony to be provided will be relevant to material facts to be considered at the hearing.  If such relevancy cannot be clearly established, the witness shall not be authorized.  No witnesses shall be permitted at the hearing when the sole basis for the hearing is a finding of  "guilty" by the Disciplinary Hearing Officer (DHO).  The chairperson shall evaluate the relevance of the information the witness expects to present and approve or deny the witness for the hearing.

If confidential information is to be used in the hearing, the inmate shall be advised of such and this fact shall be stated in a manner that avoids the compromise of the confidential source of that information.  If such information is to be used, a Confidential Informant Reliability Assessment Questionnaire (CIRAQ) shall be completed.

An inmate may waive appearance at the hearing, by signing the waiver provided on the referral notice, if the following circumstances exist:

[ ]  Both the staff member and the inmate agree to waive the inmate's appearance.

[ ]  The inmate must be served written notice of the scheduled hearing and the inmate shall sign the written waiver provided on this form.

_____/ _09-26-04_ I waive the right to the 48 hour notice of hearing.
*(Inmate Initials)*    *(Date)*

| Inmate Signature | Staff Signature / Title  # 540   COIII | Date  9 26 06 |

Distribution: White - Master Record File
              Canary - Inmate Copy
              Pink - Institutional File

00001136
10/25/05

P-App. 006897

ARIZONA DEPARTMENT OF CORRECTIONS

**Information Report**

Report Number _06 1802 0206_
Report Date _01-20-06_
Page _1 OF 3_

| To | _Manzur_ | Title | _Sgt_ | Unit | _Blu_ |
| From | _Straiton_ | Title | _Co II_ | Unit | _Blu_ |

Subject _Target Cell Search_

**Staff Involved**

| Employee Name *(Last, First M.I.)* | _Allen_ | Title _Co II_ | Badge Number |
| Employee Name *(Last, First M.I.)* | _Hill_ | Title _Co II_ | Badge Number _10588_ |

**Intel**

| Intelligence Category 1 | Intelligence Category 2 |
| Source Type | Source's Last Name | Source's ADC Number |

**Inmates Involved**

| Inmate Name *(Last, First M.I.)* | _Andriano, W_ | ADC Number _191693_ | Unit _Blu_ | HU/BED _30 D 266_ | Involved As: _Subject_ |
| Inmate Name *(Last, First M.I.)* | | ADC Number | Unit | HU/BED | Involved As: |

**Summary**

Time _0855_   Date _01-20-06_   Location _SMA 30 D 266_

Summary _on 01-20-06 at 0855 a target cell search was conducted on cell 30 D 266 based on some information retrieved in written form from a search done on 30 D 209 on 01-8-06 by Co II Carpenter & Co II Buche. Contraband was seized from 30 D 266 by my self Co II Straiton 936C, Co II Hill 10588, & Co II Allen 1855 in the form of letters and cards_

Employee's Signature _J Straiton 936C_   Title _Co II_

Comments/Action Taken

**Action Taken**

_cell search was approved by Sgt Manzur 1966 due to prior searches and information leading to this cell. letters were seized and seized property receipts were issued._

Employee's Signature _1966_   Title _Sgt_

Distribution *( ✓ Check all that apply)*
☐ Master File
☐ Institutional File
☐ SSU

| Entered Into Data Base |
| By |
| Date |

105-2PF
3/10/00
(40000029)

000011365

P-App. 006898

**ARIZONA DEPARTMENT OF CORRECTIONS
CONTINUATION SHEET**

To be used as a continuation sheet for all reports
Indicate sections being continued.

Date: 01-20-06
Report #: 06 B02 0706
Page: 3 of 3

leading to information regarding other inmates. This
report written & completed by cof R.Stratta 9362
at 6950 on 01-20-06. End report ⇒

Form: 40000030

000011366

ARIZONA DEPARTMENT OF CORRECTIONS
RECLASSIFICATION SCORE SHEET

Inmate Name *(Last, First, MI)* ANDRIANO                              Number: 191593

Type of Hearing to be Conducted:  [X] 180 Day;   [ ] Admin;   [ ] New ICSS;   [ ] Disciplinary

Current Scores:  P 5 I 3  M ☒  MH ☐  E 2  V 2  W 2  A/D 1  S ☒ R 1      Detainer Score: 1

Subcodes: _____           Parole Class: 1

AIMS Next Review Due Date: 6/26/05    Violations: Number of Majors 0   Number of Minors 0

List Violation Case Numbers: _____ N/A _____

Education Class/Course Title: _____ N/A _____   Term/Semester Ends: __/__/__

Grant: [ ] Yes; [X] No.  If Yes, Name/Type of Grant: ACA    Grant Period Ends: __/__/__

Classification Officer/COIII: L. Bell   COIII              Date: 7/1/05

Date of ICC Hearing: 7/1/05.  If less than 5 working days from date of Referral Notice!  Explain:
WAIVED

Inmate present: [X] Yes; [ ] No.  If no, Explain: _____
Summary statement of Inmate and/or Witness: NO COMMENT

SUMMARY STATEMENT OF COMMITTEE: Based on review of the INSTITUTIONAL FILE and AIMS RECORD prior to the hearing, and
DISCUSSION with the inmate during the hearing, this ICC reports the following findings and recommendations:
180 DAY REVIEW   P5 I 2  B28

DEATH          NO DNHW          LeVeL A1

P 5 for 6 months.   Override Request: [ ] Yes; [X] No.   Recommended Detainer Score : 1

Recommended Institutional Assignment: B28    Recommended Parole Class: 1

Recommended Scores:   P 5 I 2  M ☒  MH ☐  E 2  V 2  W 2  A/D 1  S ☒ R 1

Subcodes: _____ Q Bell COIII _____                _____ COIII 222 _____
Committee Chairperson                              Committee Member

Date of Next Review:  MO 1  YR 06    Inmate Initials: ___   [X] Agree;  [ ] Disagree

ICC Recommendation: [X] Approve;   [ ] Deny.                    Detainer Score: 1

Recommended Scores: P 5 I 2   Recommended Institutional Assignment: B28   Parole Class: 1

Rationale/Comments: _____

Institutional Administrator: _____    Date: 07/05/05

Institutional Administrator's Recommendation:   [ ] Approve;  [ ] Deny    Detainer Score: ____

Final Scores: P____ I____   Institutional Assignment: _____   Parole Class: ____

Comment: _____

Central Classification: _____    Date: ___/___/___

RECLASSIFICATION SCORE SHEET (RCSS)

DISTRIBUTION:        (White) Master Record File        (Pink) Institutional File        (Yellow) Inmate Copy

000011367

607-4P
1/1/98

P-App. 006900

ARIZONA DEPARTMENT OF CORRECTIONS
INSTITUTION CLASSIFICATION REFERRAL NOTICE

*7/1/05*
DATE NOTICE WAS SERVED

TO: _ANDRIANO_
INMATE NAME (First, MI, Last Name)

ADC NUMBER _191593_

FROM: _L. BELL_
STAFF NAME (First, MI, Last Name)

TITLE _Co II_

LOCATION: _ASPC - PV_
NAME OF INSTITUTION

NAME OF UNIT/ _Lumley_

You will be brought before the Institutional Classification Committee (ICC) on or after _7/8/05_ (which is five workdays from this date) to be considered for transfer to a higher/lower degree of security/custody within the institution, transfer to another institution, changes in work, training or treatment programming assignments, change of your parole eligibility classification to a lower/higher class and/or review of your provisional release eligibility status.

This review is being conducted at the request of for the following reasons:

_M. MUSE D.W._
NAME/TITLE OF WARDEN/DEPUTY WARDEN/ADMINISTRATOR

_180 DAY REVIEW_

You will be permitted to:

 1. Appear at the hearing.
 2. Call witnesses if testimony is considered relevant by the chairperson.
 3. Remain silent.
 4. Have an willing employee of your choice assist you.
 5. Receive a copy of the ICC's written findings after finalized by Central Office.
 6. Appeal Classification errors and overrides to the Administrator, Offender Services Bureau.

 * Item 2 will not be afforded the inmate during hearings based solely on documented disciplinary committee reports.

This is to certify that I have received a copy of this notice at least five workdays prior to the hearing date and have had it explained to me. Listed below are the witness(es) I wish to have appear on my behalf at the hearing.

**Witness(es) Requested:**

_____

_____

_____
INMATE SIGNATURE

**Waiver of Five Day Waiting Period:**

I understand that I am permitted to use my five day waiting period to prepare for my hearing. I hereby waive my five day wait.

_____        _7/1/05_
INMATE SIGNATURE                    DATE

**Waiver of Appearance at ICC Hearing:**

I have been informed that the ICC will recommend that no changes be made in my classification scores, institutional placement, parole eligibility classification, or current participation in work, training, or treatment programming assignments. I therefore waive my appearance at the ICC hearing. I understand that if it is determined that changes must be made in my classification scores, institutional placement, parole eligibility class or work training or treatment programming, my case will be reheard and I will be given the opportunity to appear at a new hearing.

_____        __/__/__
INMATE SIGNATURE                    DATE

DISTRIBUTION:    (White) Master Record File    (Pink) Institutional File Copy    (Canary) Inmate Copy    801-2P
1/1/96

000011368

ARIZONA DEPARTMENT OF CORRECTIONS
INITIAL CLASSIFICATION SCORE SHEET

Commitment Name (Last, First, MI): _ANDRIANO WENDI E._    Number: _191593_

| Public Risk Score | | Institutional Risk Score | |
|---|---|---|---|
| 1. Severity of Present Offense | ★ _5_ (2) | 1. Prior Institutional Adjustment | _-1_ (1) |
| 2. Extent of Violence in Current Offense | _5_ (2) | 2. Community Stability | _-2_ (2) |
| 3. Use of Weapon in Current Offense | _-3_ (2) | 3. Adjustment During Initial Classification | _-1_ (1) |
| 4. Escape History | _-1_ (3) | 4. Probation/Parole Adjustment | _-1_ (3) |
| 5. Violence History | _-1_ (3) | 5. Mental Health Adjustment | |
| 6. Confinement History | _-1_ (3) | 6. Age | _-1_ (2) |
| 7. Estimated Length of Confinement | _-5_ (2) | 7. Security Threat Group Affiliation | |
| 8. Detainer Status | _-1_ (1) | 8. Substance Abuse | _-1_ (3) |
| SCORED PUBLIC RISK SCORE | _-5_ (1,2,3) | SCORED INSTITUTIONAL RISK SCORE | _3_ (1,2,3) |

Verification Codes: V-1 (DOC) V-2 (PSI/POR) V-3 (Inmate/Not Verified) V-4 (Agency) _____

C L A S S I F I C A T I O N

★ A.R.S. Title 13 § 13-604: _[4]_    Severity of Present Offense Score Reduction Applied: [ ]

Override Requests: [ ] Yes; [✓] No.    Eligibility Class _6_  Date: _12/28/04_

Recommended Scores: P _5_  I _3_  M ___  MH ___  E _2_  V _2_  W _2_  A/D _1_  S ___  R _1_

Screening Score A.R.S. Title 13 § 13-4602: ___    Institutional Assignment Recommendation: _B28_

Rationale/Comments: _F FIRST DEGREE MURDER_

Classification Officer: _____ 214    Date: _12-28-04_

Date of Next Review: MO _2_  YR _05_    Inmate Initials: ___ ✗ [ ] Agree; [ ] Disagree.

I A N D S M T I I N T .

Recommendation: [✓] Approved; [ ] Denied.    Override Requests: [ ] Yes; [✓] No.

Recommended Scores: P _5_  I _3_  M ___  MH ___  E _2_  V _2_  W _2_  A/D _1_  S ___  R _1_

Institutional Assignment: _B28_    Rationale/Comments: _____

Institutional Administrator: _____    Date: _12/28/04_

C E N T R A L   C L A S S .

Institutional Administrator's Recommendation: [ ] Approve; [ ] Deny.   Institutional Assignment: _B28_

Final Scores: P _5_  I _3_  M ___  MH ___  E _2_  V _2_  W _2_  A/D _1_  S ___  R _1_

Comments: _____

Central Classification: _C. LAMB, COIV_    Date: _01/10/05_

INITIAL CLASSIFICATION SCORE SHEET (ICSS)

ARIZONA DEPARTMENT OF CORRECTIONS

INSTITUTIONAL NEED CONSULTATION REFERRAL (INCR)

Inmate Name: _Andriano    Wendi_    ADC#: _191593_

Name of Institution: _ASPC    P.V._    Referral Date: _12 / 23 / 04_

TO:    [ ]    Medical Unit Administrator: the type of consultation required is marked below.

*[ ]    Medical: consultation for reclassification is required.

*[ ]    Psychiatric: consultation for reclassification is required.

[ ]    Psychologist/Psych Associate: the following is required for reclassification.

*[ ]    Sex offender treatment progress consultation (Psychologist only).

*[ ]    Substance abuse treatment consultation (Psych. Assoc. or Program Provider).

[ ]    Correctional Education Program Teacher: consultation for reclassification is required.

[ ]    Correctional Vocation Program Teacher: consultation for reclassification is required.

[ ]    Work Program Supervisor: department recognized OJT program only.

[ ]    Other Training/Treatment Program Coordinator: _____

FROM:    Classification Officer/Title: _____

Institutional Unit: _____

This referral must be completed and returned not later than this date: _____/____/_____

Reason for referral: _INTAKE_ _____

_____

_____

_____

* Mark only one. If both are required submit two referrals.

**INSTRUCTIONS:** Use the criteria contained within the ADC Classification Operating Manual to evaluate the inmate's Institutional Need Score(s) as marked below:

[ ]    M - Medical [Sections: D3c, E3c]          [ ]    W - Work Skills [Sections: D3g, E3g]

[ ]    MH - Mental Health [Sections: D3d, E3d]   [ ]    A/D - Alcohol/Drug Treatment [Sections: D3h, E3h]

[ ]    E - Education [Sections: D3e, E3e]         [ ]    S - Sex Offense Treatment [Sections: D3i, E3i]

[ ]    V - Vocational Training [Sections: D3f, E3f]  [ ]    P - Proximity to Residence [Sections: D3j, E3j]

Inmate's Current Score: ____ – ____    Current Subcodes: _____

**CONSULTATION RESULTS:** DR. CONNIE MULLEN    Date Referral Received: _12 / 23 / 04_

Name/Title of Preparer: _____ M.H. TEAM COORDINATOR _____

Inmate's New Score: _MH_ – _MH_    New Subcodes: _____

Explanation of new score: _____

_____

_____

Cannot be assigned to the following institutions: _____

Signature: _muller_    Date: _12 / 23 / 04_

DISTRIBUTION: (White) Master Record File Copy   (Pink) Institutional File Copy   (Canary) Consultant's File Copy

801-6P
1/1/98

000011370

**NAME:**     **ANDRIANO, WENDI E.**

**ADC#:**     **191593**

**INMATE MASTER FILE:   SIDE THREE**

**INMATE LETTERS & MAIL WAIVERS**

000011371

**ARIZONA DEPARTMENT OF CORRECTIONS**

For distribution: Copy of corresponding Inmate Letter must be attached to this response.

**Inmate Letter Response**

| Inmate Name (Last, First M.I.) ANDRIANO  WENDI E | ADC Number 191593 |
|---|---|

| Institution/Unit ASPC-Perryville-Lumley |
|---|

| From COIII Swearingin | Location ASPC-PV-Lumley |
|---|---|

In response to your inmate letter dated on 04/30/2009 you state that on 4/09/2009 you purchased at TV for $254.51 and the item was delivered on 4/14/2009.  The item had your info engraved onto it.  Sgt. Springer gave you the TV.  You plugged it in and programmed it and discovered the picture was distorted.  You called the officer back and gave them the TV.  On 4/23/2009 you ordered a replacement TV.  On 4/28/2009 you received that TV and it was in working order.  I contacted L. Barrett and she stated,"Inmate Andriano was told that because the TV was engraved that we could not issue a credit on it. The TV had to be sent out to be repaired. She knew this and she told our delivery agent ok. When the TV comes back repaired we will send it back to property. I believe she had told our agent that she was going to send it home."  Because the TV was engraved Keefe will not issue a credit on it.  I spoke to Officer Schlagenhaft and she states that in Mail and Property there is no way to fully check to see if the TV works due to there is no outlet to check the picture quality and when the TV was delivered to her to color was not working properly on the tv.  In the future she will engrave the TV's in SMA after they have been checked with an outlet.

| Staff Signature | Date 05/07/2009 |
|---|---|

Computer Electronic Version

Distribution:  Original - Central Office Master File
              Copy - Inmate
              Copy - Institutional File

916-2
4/15/04

000011372

ARIZONA DEPARTMENT OF CORRECTIONS

Inmate Letter

Requests are limited to one page and one issue, NO ATTACHMENTS PERMITTED. Please print all information.

| Inmate Name (Last, First M.I.) | ADC Number | Institution/Unit | Date |
|---|---|---|---|
| Andriano, Wendi | 191593 | ASPC-PV-Lumley 30 D 266 | 4-30-09 |

| To: COIII Swearingen | Location: Lumley Programs |
|---|---|

State briefly but completely the problem on which you desire assistance. Provide as many details as possible.

I am attempting to informally resolve the following issue : On 4-9-09, I purchased a TV for $254.51. The item was delivered to me on 4-14-09, already engraved with my info. The ADC I/M Property Received form indicated the TV was inspected by the Property CO and was in working condition. Sgt. Springer brought the TV into my cell. When he re-locked my door, I plugged it in then programmed it. When this finished, the picture was clearly distorted. According to the manual, it was a mechanical problem. I called the Property Officer back to my cell and showed her the problem. She said I would have to return it and order another one. I asked her why they didn't check it before bringing it to me. She said they do not have a cable outlet and cannot check the TV fully. The paperwork never indicated the TV had only been partially checked. I also complained about the delay in having to order another one. She said she would see if the warehouse had another one. I never received an answer. So on 4-23-09, I ordered a replacement TV as directed. It was delivered on 4-28-09 and in proper working condition. The balance on my store receipt still did not reflect the refund from the 1st TV. I asked how much longer this would take. She expressed surprise and concern that it hadn't happened and couldn't believe I didn't wait for it before ordering another one. She then said she would have to check her paperwork and get back to me. She never did. I then complained to the COIII and to Sgt. Trujillo. Someone relayed the message to Ms. _____ with Keefe. She talked to me on 4-30-09. She said the Property Officer had not said a word to her about my issue; that since my TV (the 1st one) had been engraved with my info before the problem was found, I would not be eligible for a refund. Instead, the store would send it for repair. I told her this scenario was not communicated to me at any time. In fact, I was specifically told a credit would be issued. She also said it is the responsibility of the Property Office to ensure any appliance is in proper working condition before engraving it. Since this wasn't done, Keefe won't refund my money. I should not be held responsible for this error and am seeking redress with Risk Management.

Thank You.

| Inmate Signature: Wendi C. Andriano | Date: 4-30-09 |
|---|---|

Have You Discussed This With Institution Staff?  [X] Yes   [ ] No

If yes, give the staff member's name:

Distribution: White - Master Record File      Canary - Inmate

000011373

916-1
4/15/04

ARIZONA DEPARTMENT OF CORRECTIONS

INMATE LETTER
RESPONSE

INMATE NAME Wendi E. Andriano                    ADC#    191593

INSTITUTION/UNIT    ASPC-PV-Lumley Unit

FROM  Special Investigator D. Trapp   LOCATION ASPC-PV-CIU DATE 11/19/2007

Inmate Andriano,

I am sorry for the delay in responding but this office is short-handed,
thus there are priorities.

Upon receipt of your letter dated 10/12/07 (copy attached) I did review the
data base for information of any investigation this office may be
conducting.  The review was negative.  To the best of my knowledge there is
no investigation being conducted which would involve any specific mail-
scans being conducted on your mail.  I am unable to review Administrative
Investigations.

I must remind you that all mail is scanned as per policy to determine if
the letter contains contraband, the exception being legal mail, that should
be opened in the presence of a Correctional Officer, and is not read.

I can appreciate you concern regarding your legal appeals and would caution
you to ensure information of that nature be provided to your legal
representative.

I hope this answers your questions, however, if there still appears to be
delays in the receipt of your mail, please document to your supervisor
(sergeant) and if that does not effect the delivery, I would suggest to
write your Deputy Warden or myself.

Sincerely,

D. Trapp #275
STAFF SIGNATURE

Distribution:  White  - Central Office Master File
               Yellow - Inmate                        FORM 70501168B
               Pink   - Institutional File                 Rev. 1/89

000011374

ARIZONA DEPARTMENT OF CORRECTIONS

Inmate Letter

Requests are limited to one page and one issue. NO ATTACHMENTS PERMITTED. Please print all information.

| Inmate Name *(Last, First M.I.)* | ADC Number | Institution/Unit | Date |
|---|---|---|---|
| Andriano, Wendi E. | 191593 | PV- Lumley- 30 D 246 | 10-12-07 |

| To: | Location |
|---|---|
| CIU | |

State briefly but completely the problem on which you desire assistance. Provide as many details as possible.

For the past 60 days + my outgoing mail has not been sent out according to policy. This leads me to believe I may be involved in an investigation. Some of my mail arrives 3-4 weeks late, re-sealed with tape. Some never arrives at all. This is causing additional stress to my family because they worry when they don't hear from me. I am also concerned because I am a death-row inmate and I would hate for anything to be used against me in my legal appeals. Could someone please research this and let me know why this is happening to me? I would really appreciate any help.

Thank you.

| Inmate Signature | Date |
|---|---|
| | 10-12-07 |

Have You Discussed This With Institution Staff?  ☒ Yes  ☐ No

If yes, give the staff member's name: COII Ruiz , COII Thomas

Distribution: White - Master Record File      Canary - Inmate

916-1
05/04

000011375

Wendi E. Adriano   #19153   266

ARIZONA DEPARTMENT OF CORRECTIONS

Notification In Case of Accident, Serious Illness or Death
And Disposition of Property

In case of serious illness, accident or death, I direct that my _____ parents
                                                                    (Relationship)

whose name is _____ Alejo or Donna Ochoa _____

and whose address is _____

_____                                          (State / Province)              (Zip Code)

_____ be notified.
       (Telephone Number)

In the event that ADC staff is unable to locate the above designated person, following a reasonable search, I authorize the substitution of the following person:

| Name Kelly Heins | | Relationship Sister |
|---|---|---|
| Address | City | State / Province | Zip Code |
| Telephone Number | | |

In the event of my death I authorize ADC to transmit my property and personal effects including money remaining in my account, or due me from ADC, to the above named persons in accordance with state law.

In the event that the above named persons cannot be located or refuse to accept my property, I agree that disposition may be made of my personal property located within the prison facility, including clothing, in accordance with rules and regulations of ADC.

| Inmate Signature | ADC Number 191593 | Date 4-26-07 |
|---|---|---|
| Witness Signature and Title COIII Lancaster #219 | Date | |

711-1
3/7/07

000011376

P-App. 006909

# ARIZONA DEPARTMENT OF CORRECTIONS

## Religious Preference and Privilege Request

☐ NEW    ☐ CHANGE REQUEST

| Inmate Name *(Last, First M.I.)* | ADC Number | Institution/Facility 30 D 26 |
|---|---|---|
| Adriano, Wendi E. | 191593 | ASPC - Pr-Lumley |

My Religious Preference is: **Messianic Jewish**

Check the areas in which you are interested *(If not interested leave blank)*

☐ Bible Study        ☐ Religious Services      ☐ Appointment with Chaplain
☐ Growth Group       ☐ Personal Counseling     ☐ Other_____
☐ Family Counseling

Indicate any special privilege (s) you are requesting. Any requests granted are done so under the provision that they are a part of your religious faith. It is your responsibility to show a commitment toward that faith in order to retain the privileges granted. A lack of commitment can result in loss of those privileges.

☑ Diet    **Kosher**

☐ Other

In Case of Emergency, who would you like notified?

| Name *(Last, First M.I.)* | Relationship | Telephone Number *(with area code)* |
|---|---|---|
| Ochoa, Alejo and Donna | Parents | ▓▓▓▓▓▓▓▓ |
| Address *(Street)* | City | State | ZIP Code |
| ▓▓▓▓▓▓▓ | ▓▓▓▓▓ | ▓▓▓ | ▓▓▓▓ |

## CHANGE OF RELIGIOUS PREFERENCE

I am requesting a change to be made in my religious preference

| From | To |
|---|---|
| Christian | Messianic Jewish |

I understand this request must be accompanied by a written statement, from an accredited leader (who is not an inmate) of the religious group of which I am a member ( or wish to become a member). The attached statement will affirm my membership, loyalty and commitment.

| Inmate's Signature | Date 7-6-07 |
|---|---|

| ☑ Approved ☐ Disapproved | Chaplain's Signature C. Lanford | Date 07/13/07 |
|---|---|---|

| | Receiving Staff Member's Signature | Date 7-12-07 |
|---|---|---|

Distribution
White - Master Record
Canary - Chaplain

00001137   904-1P
4/13/98

ARIZONA DEPARTMENT OF CORRECTIONS

Inmate Letter

Requests are limited to one page and one issue. NO ATTACHMENTS PERMITTED. Please print all information.

| Inmate Name (Last, First M.I.) | ADC Number | Institution/Unit SMA 3C D 266 | Date 4-11-07 |
|---|---|---|---|
| Andriano, Wendi | 191593 | PV- Lumley | |

To: Dean CCIII Thomas    Location Lumley - Programs

State briefly but completely the problem on which you desire assistance. Provide as many details as possible.

The multivitamins that are offered on store are not complete. They lack many vitamins and minerals which are necessary for good health. What must I do to have a better vitamin made available for purchase?

| Inmate Signature | Date 4-11-07 |
|---|---|

Have You Discussed This With Institution Staff?  ☐ Yes  ☐ No

If yes, give the staff member's name:

Distribution:  White - Master Record File    Canary - Inmate

916-1
15/04

000011378

**ARIZONA DEPARTMENT OF CORRECTIONS**

**Inmate Letter Response**

> For distribution:   Copy of corresponding
> Inmate Letter must be attached to this
> response.

| Inmate Name *(Last, First M.I.)* | ADC Number |
|---|---|
| . Andriano | 191593 |

| Institution/Unit |
|---|
| ASPC_PV_Lumley |

| From | Location |
|---|---|
| COIII Thomas | SMA . |

I have contacted inmate store in regards to your concern. 'I have been advised to inform you that an inmate letter must be submitted to the Keefe store liaison.  Your contact person is Rachel Garza.  She will address your concerns.

| Staff Signature *Thomas* #204 | Date 4/19/07 |
|---|---|

Computer Electronic Version

Distribution: Original - Central Office Master File
      Copy - Inmate
      Copy - Institutional File

916-2
4/15/04

000011379

# ARIZONA DEPARTMENT OF CORRECTIONS

| | For distribution: Copy of corresponding Inmate Letter must be attached to this response. |
|---|---|

## Inmate Letter Response

| Inmate Name *(Last, First M.I.)* | ADC Number |
|---|---|
| Andriano, W. | 191593 |

| Institution/Unit |
|---|
| ASPC-Perryville-Brent W. Lumley Unit: 30 D 266 |

| From | Location |
|---|---|
| D.C Harkins, Warden | Perryville |

I am in receipt of your letter dated June 2, 2006 in regards to your concerns of being denied taking the possession of a purchase of an electric fan, I have asked Deputy Warden Drake to look into this matter and she advises accordingly.

Current Department Order 909, attachment A does not authorize death row inmates to purchase and possess electric fans. The proposed revised DO 909, attachment A, does authorize death row inmates but the Department still awaits the approval.

Keefe has been advised and will refund you on the purchase.

In the future, please contact your unit CO III for assistance.

cc: PO# 06-057
    M. Drake, DW BWL



| Staff Signature | Date 6/23/06 |
|---|---|

Computer Electronic Version

Distribution: Original - Central Office Master File
            Copy - Inmate,
            Copy - Institutional File

916-2
4/15/04

000011380

ARIZONA DEPARTMENT OF CORR      ONS

Inmate Letter

| Request ... a limited to one page and one issue. NO ATTACHMENTS PERMITTED. Please print all information. |

| Inmate Name *(Last, First M.I.)* | ADC Number | Institution/Unit | Date |
|---|---|---|---|
| Andriano, Wendi E. | 191593 | ASPC-PV-Lumley   30 D 266 | 6-2-06 |

| To: | Location |
|---|---|
| Warden Dennis Harkins | Perryville |

State briefly but completely the problem on which you desire assistance. Provide as many details as possible.

In April 2006, a new store list was generated from the updated DO 909. A fan was added to the list of approved appliances. On 5-11-06, I purchased a fan but the property officer won't give it to me. She returned it to the store for a refund. Her reason is that the entire DO 909 has not received the final approving signatures. Mr. Sublett has only signed off on the store list portion. Therefore, I can purchase a fan but not have possession of it. It will be months before the entire DO 909 is finalized; meanwhile I continue to suffer from the heat. It is apparent that Central Office now allows Level 5 inmates to have a fan once again. Warden Harkins, I am asking that you step in and solve this illogical problem, please. Thank you for your assistance.

| Inmate Signature | Date |
|---|---|
| Wendi Andriano | 6-2-06 |

Have You Discussed This With Institution Staff?   ☒ Yes   ☐ No

If yes, give the staff member's name: COIII Tritilli, Captain Diaz, COIV Bivens, DW Drake ...

916-1
5/04

**ARIZONA DEPARTMENT OF CORRECTIONS**

For distribution: Copy of corresponding
Inmate Letter must be attached to this
response.

● **Inmate Letter Response**

| Inmate Name (Last, First M.I.)<br>ANDRIANO, WENDI | ADC Number<br>191593 |
|---|---|

| Institution/Unit<br>ASPC-PV BRENT W. LUMLEY UNIT SMA BLDG 30-D265L |
|---|

| From<br>CO III TIRITILLI | Location<br>PROGRAMS |
|---|---|

This is in response to your undated "inmate letter" concerning special diet requirements food served to you during SMA meals.

I addressed your concerns with Ms. Wolf, canteen and food services manager, immediately following our discussion regarding the same subject.

Ms. Wolf met with you personally to discuss these matters on March 27, 2006. I hope you found her answer satisfactory.

| Staff Signature | Date<br>04/19/2006 |
|---|---|

Computer Electronic Version

Distribution:  Original - Central Office Master File
        Copy - Inmate
        Copy - Institutional File

916-2
4/15/04

000011382

# ARIZONA DEPARTMENT OF CORRECTIONS

**Inmate Letter**

| | Print or Type — No Attachments |
|---|---|

| Inmate Name *(Last, First M.I.)* | ADC Number |
|---|---|
| Andriano, Wendi E. | 191593 |

| Institution / Unit |
|---|
| ASPC-PV-Lumley    30 yd  266 D |

| Subject |
|---|
| Property |

| To Individual | Location |
|---|---|
| Property Offices | Lumley |

**Please Describe Your Problem or Question Completely:**

On Oct 13, 2005 I purchased a Sweat Shirt Size(L). It has not been delivered yet. When can I get my Clothing?

Thank you.

| Inmate Signature | Date |
|---|---|
| | 11-30-05 |

**Have You Discussed This With Institution Staff?**  ☒ Yes  ☐ No

If yes, give the staff member's name: Property Offices

Distribution:  White  -  Central Office Master File
Yellow  -  Inmate
Pink  -  Institutional File

916-1P
1/9/02

000011383

ARIZONA DEPARTMENT OF CORRECTIONS

Inmate Letter Response

For distribution: Copy of corresponding Inmate Letter must be attached to this response.

| Inmate Name (Last, First M.I.) | ADC Number |
|---|---|
| ANDRIANO, W. | 191593 |

Institution/Unit
ASPC-PV-LUMLEY SMA BLDG 30-D266

| From CO II TIRITILLI | Location Programs |
|---|---|

RE: I/m LETTER 11-30-05
PROPERTY OFFICER SCHLAGENHAFT SAYS CLOTHING IS
SLOW COMING FROM WAREHOUSE, WILL TALK WITH
YOU ~~THE~~ TUESDAY 12-27-05.

| Staff Signature   S. Tiritilli | Date 12-21-05 |
|---|---|

Distribution: White - Central Office Master File
Yellow - Inmate
Pink - Institutional File

916-2
4/15/04

000011384

ARIZONA DEPARTMENT OF CORRECTIONS

Inmate Letter

Requests are limited to one page and one issue. NO ATTACHMENTS PERMITTED. Please print all information.

| Inmate Name (Last, First M.I.) | ADC Number | Institution/Unit | Date |
|---|---|---|---|
| Andriano, Wendi E. | 191593 | ASPC-PV-Lumley | 9-10-05 |

| To: CO II MACHEN | Location SMA-Lumley |
|---|---|

State briefly but completely the problem on which you desire assistance. Provide as many details as possible.

On September 10, I tried to place my second phone call for the week. The computer said I was over my call limit.

This is NOT true. I am allowed TWO calls per week but can't get through.

I have told everyone about this problem. What must I do to get this fixed??

My family sits by the phone waiting for my call and it hasn't happened. This is very unnecessary! This is been going on since the beginning of July. Please fix this!!

Per policy - Two 10min calls

Ms French to fix by this week. It should be fixed now! 9-11-05 CoII

| Inmate Signature | Date 9-11-05 |
|---|---|

Have You Discussed This With Institution Staff?  ☒ Yes   ☐ No

If yes, give the staff member's name: CoII Cartagena, CoIII Machen, CoIV Morris, Mrs. French, inmate Spardine, & aide

P-App. 006918

ARIZONA DEPARTMENT OF CORRECTIONS

Print or Type -- No Attachments

**Inmate Letter**

Inmate Name *(Last, First M.I.)*
Andriano, Wendi E.

ADC Number
191593

Institution / Unit
ASPC- Perryville - Lumley - 30 D 26 L    SMA

Subject
Religious Diet

To Individual
Chaplain Powers

Location
Lumley

Please Describe Your Problem or Question Completely:

According to my religious beliefs, my body is the temple of the Holy Spirit. I am required to keep it clean and pure. In doing so, I may not consume the flesh from an animal. Please remove all meat and/or meat products from my diet.

Thank You.

Diet has been sent to Food Service on 23 Aug 05.

Brody
Chaplain

Inmate Signature
Wendi Andriano

Date
8-10-05

Have You Discussed This With Institution Staff?    ☐ Yes    ☐ No

If yes, give the staff member's name:

Distribution: White - Central Office Master File
Yellow - Inmate
Pink - Institutional File

916-1P
1/9/02

000011386

ARIZONA DEPARTMENT OF CORRECTIONS

INMATE LETTER
RESPONSE

POD 266

INMATE NAME _Andriano_     ADC# _191593_

INSTITUTION/UNIT _P.V. - Lumley - SMA_

FROM _Cott Machen_    LOCATION _SMA_    DATE _9-14-05_

Re: Your 8-27-05 "# of Phone calls..." letter

I'am Responding for Cott Morris.

Per D.W. Muse you are to Receive the
same phone privileges as male D/R Im's
A Step II in Accordance with
D.O. 915, 1.5.1.3.

Two calls of ten minutes in duration
Per week.

I will inform Ms J. French to make the
necessary changes to accomplish this.

_Machen, Cott_
STAFF SIGNATURE

Distribution:   White - Central Office Master File
Yellow - Inmate
Pink - Institutional File

FORM 70501168B
Rev. 1/89
00001738

P-App. 006920

ARIZONA DEPARTMENT OF CORRECTIONS

Inmate Letter

| Print or Type — No Attachments |
|---|

**Inmate Name** (Last, First M.I.)
Andriano, Wendi

**ADC Number**
191593

**Institution / Unit**
ASPC-PV- Lumley  30 D 266

**Subject**
Number of Phone Calls per Week

**To Individual**
CO IV Morris

**Location**
Programs

**Please Describe Your Problem or Question Completely:**

I received your response regarding the purchase
of a new phone. Thank you.
I now have an entirely different problem.
The phone system is not allowing me to
make TWO calls per week. It won't
let me make more than one call. I
am allowed per policy 2 calls each week
Can you please fix this for me? I
have written Joelle french many times on
this but she isn't fixing it.

Thank you so much for all
you help!

**Inmate Signature**

**Date**
3-27-05

**Have You Discussed This With Institution Staff?**  ☒ Yes  ☐ No

**If yes, give the staff member's name:**

    Yellow  - Inmate
    Pink  - Institutional File

916-1P
1/9/02

000011388

P-App. 006921

ARIZONA DEPARTMENT OF CORRECTIONS

INMATE LETTER
RESPONSE

INMATE NAME _Andriano_                          ADC# _191593_

INSTITUTION/UNIT _DSP. PV  B2  80A_

FROM _Cartagena_          LOCATION _80A_     DATE _8-17-0_

In response to your letter dated 8-13-05 which
addresses issues pertaining to your phone privilege,
I send an e-mail to the Phone "CO3" operator.
I requested she looks into your issue and
to take any appropriate action as she deems
necessary. I am hoping your phone issue is
solved.

STAFF SIGNATURE

Distribution:  White  - Central Office Master File
Yellow - Inmate
Pink   - Institutional File

FORM 70501168B
Rev. 1/89
000011389

**ARIZONA DEPARTMENT OF CORRECTIONS**

Inmate Letter

| | Print or Type – No Attachments |

**Inmate Name** *(Last, First M.I.)*
Andriano, Wendi E.

**ADC Number**
191593

**Institution / Unit**
ASPC- PV- Lumley   30  D  266

**Subject**
Phone Calls — Troubleshooter Report

**To Individual**

**Location**

**Please Describe Your Problem or Question Completely:**

The system is not allowing me to have 2 10min calls per week. After 5min, I am disconnected. On 8-13-05 at 8:10 am, I called ~~———~~. I was only allowed to talk for 5 min.

Per policy, I am given 2 10min calls per week. Please correct this problem.

My score is P5, I2.

Thank you.   3rd request

**Inmate Signature** Wendi Andriano

**Date** 8-13-05

**Have You Discussed This With Institution Staff?**  ☐ Yes  ☐ No
If yes, give the staff member's name:

Distribution: White - Central Office Master File
Yellow - Inmate
Pink - Institutional File

916-1P
9/02
000011390

**ARIZONA DEPARTMENT OF CORRECTIONS**

For distribution: Copy of corresponding Inmate Letter must be attached to this response.

● Inmate Letter Response

| Inmate Name *(Last, First M.I.)*<br>Andriano, Wendi | ADC Number<br>191593 |
|---|---|

| Institution/Unit<br>ASPC-Perryville, Lumley unit |
|---|

| From<br>COIV Morris | Location<br>Programs |
|---|---|

In response to your inmate letter, dated 08/20/05, concerning the telephone problem in SMA:
This issue has been addressed in several administrative meetings. The administration has tried changing telephones without success. The current telephones are simply not adequate. New telephones are being purchased and will be installed as soon as possible. This action will correct the problem.

| Staff Signature | Date<br>08/25/2005 |
|---|---|

Computer Electronic Version

Distribution:  Original - Central Office Master File
                        Copy - Inmate
                        Copy - Institutional File

916-2
4/15/04

000011391

ARIZONA DEPARTMENT OF CORRECTIONS

**ADC**

Inmate Letter

| | Print or Type – No Attachments |

Inmate Name *(Last, First M.I.)*

Andriano, Wendi E.

ADC Number

191593

Institution / Unit

ASPC - PV - Lumley    3C D 266

Subject

Phone Calls

To Individual

Joelle French

Location

PV - Telephone System

Please Describe Your Problem or Question Completely:

On Saturday 8-6-05 I was finally able to place a phone call to ~~_____~~ The phone call was disconnected by the system after 5 min. When I tried to place my second call, the system said I was not authorized to make additional calls.

Per policy, as a PSI2, I am allowed to make 2 10min calls per week. Please rectify whatever is necessary to permit me to use my phone time. I also want my missing 15 min from this week replaced. I have already missed three weeks of calls due to technical difficulties. Thank you for your help.

Inmate Signature  W. Andriano

Date  8-6-05

Have You Discussed This With Institution Staff?  ☒ Yes  ☐ No

If yes, give the staff member's name:  Coiil Cartajeña

Distribution: White - Central Office Master File
Yellow - Inmate
Pink - Institutional File

918-17

00001139

P-App. 006925

ARIZONA DEPARTMENT OF CORRECTIONS

Inmate Letter

| | Print or Type — No Attachments |

| Inmate Name *(Last, First M.I.)* | ADC Number |
|---|---|
| Andriano, Wendi E. | 191593 |

Institution / Unit
ASPC- Perryville- Lumley     30 D 266

Subject
Phone Calls

| To Individual | Location |
|---|---|
| CO III Cartagena | Lumley- SMA |

Please Describe Your Problem or Question Completely:

On Sat morning 8-6-05, I was able to place a phone call. This was the first time in 4 weeks I have been able to call. However, my phone call was disconnected after 6 minutes and I was not allowed to place a second call. Per policy, I am allowed 2 10-min calls. Why is the system only letting me make 1 5-min call? I want my phone calls. Please add 15 min to my calls for next week.

Important

| Inmate Signature | Date |
|---|---|
| Wendi | 8-6-05 |

Have You Discussed This With Institution Staff?   ☐ Yes   ☐ No

If yes, give the staff member's name:

Distribution: White - Central Office Master File
Yellow - Inmate
Pink - Institutional File

916-1P
1/9/02

000011393

ARIZONA DEPARTMENT OF CORRECTIONS

Inmate Letter

Requests are limited to one page and one issue. NO ATTACHMENTS PERMITTED. Please print all information.

| Inmate Name (Last, First M.I.) | ADC Number | Institution/Unit | Date |
|---|---|---|---|
| Andriano, Wendi E. | 191593 | PV-Lumley-30D 26b | 8-20-05 |

| To: CCIV Norris | Location Lumley- Programs |
|---|---|

State briefly but completely the problem on which you desire assistance. Provide as many details as possible.

For the past Seven weeks, I have been denied my phone calls. The latest problem is the phone system will only allow me to make 1 call instead of 2. Per policy I am allowed two ten-minute calls. This morning I attempted to make my second call for the week of 8/16-8/21. I was denied access to the call. I have written numerous kites and trouble reports to the appropriate people but it still isn't fixed. I am asking you for help. I would like to utilize the phone according to policy. Please have someone fix the phone system to allow me 2 calls per week. Thank you.

| Inmate Signature  Wendi Andriano | Date 8-20-05 |
|---|---|

Have You Discussed This With Institution Staff?  ☒ Yes  ☐ No

If yes, give the staff member's name:  COIII Cartagena   Joelle French

Distribution:  White - Master Record File     Canary - Inmate

916-1
4/15/04

00001139A

P-App. 006927

**ARIZONA DEPARTMENT OF CORRECTIONS**

⬤ **Inmate Letter Response**

> For distribution: Copy of corresponding
> Inmate Letter must be attached to this
> response.

| Inmate Name *(Last, First M.I.)*<br>Andriano, W. | ADC Number<br>191593 |
|---|---|

| Institution/Unit<br>ASPC-Perryville, Lumley unit |
|---|

| From<br>COIV Morris | Location<br>Programs |
|---|---|

In response to your inmate letter concerning recreation time and athletic clothing:
Please understand that you are not a general population inmate. You are housed in and are considered a death row inmate. You are recognized as a level five inmate under D.O.909, therefor you are eligible to purchase and wear athletic clothing for the purpose of recreation.  D.O. 704 states:
704.05    INMATE DRESS AND CLOTHING REQUIREMENTS - Inmates shall present a neat well groomed appearance.

1.2 Inmates shall be dressed in gym shorts/pants/sweat pants and a shirt, or an appropriately fastened jumpsuit at all times when out of the cell or cubicle.

1.2.1 All shirts shall be neatly tucked in at all times when out of the housing unit with the exception of sweatshirts and pullover outerwear shirts.

⬤ 1.2.2 Sweat pants and gym shorts shall only be worn for recreational activities when worn outside of the housing area.

1.2.3 When in the run or cell, inmates shall not be in any state of undress unless preparing for bed or immediately upon return from the shower.
I hope that I have addressed your questions concerning recreational clothing. As we have discussed in the past, your recreation time is being provided in accordance with policy.

| Staff Signature | Date<br>6-23-05 |
|---|---|

Computer Electronic Version

⬤ Distribution:  Original - Central Office Master File
          Copy - Inmate
          Copy - Institutional File

916-2
4/15/04

000011395

**ARIZONA DEPARTMENT OF CORRECTIONS**

Work Assignment Screening/Exception

| Inmate Name (Last, First M.I.) ANDRIANO | ADC Number 191593 |
|---|---|
| Work Activity | Location ASPC-PV Lumley |

| | | |
|---|---|---|
| Conviction (must meet department order criteria) MURDER 1st | ☒ Yes | ☐ No |
| Interstate Compact Agreement (approval of sending agency) | ☐ Yes | ☒ No |
| Any convictions for escape/attempted escape within five years or multiple escape attempts within ten years? | ☐ Yes | ☒ No |
| Received a disciplinary conviction for escape/attempted escape within the last five years? | ☐ Yes | ☒ No |
| Any major discipline within previous six months? | ☐ Yes | ☒ No |
| Date of last major disciplinary _____ N/A | | |
| Pending Major Disciplinary Charges? | ☐ Yes | ☒ No |
| USINS Detainer? | ☐ Yes | ☒ No |
| A detainer score of 3 or Higher? | ☐ Yes | ☒ No |
| Meets time served requirement? | ☒ Yes | ☐ No |

P Score 5    I Score 2

Release Date DEATH        Parole Eligibility Date N/A

Check Potential Level of Supervision   ☒ A1   ☐ A2   ☐ A3   ☐ B1   ☐ B2   ☐ B3   ☐ C

| ☒ Recommended Supervision Level A1   ☐ Not Recommended | Reason(s) |
|---|---|
| Correctional Officer's III Signature L. BELL COIII | Date 7.1.05 |

| ☒ Recommended  ☐ Not Recommended | Date 7.1.05 | Level OA1 | Exception to Criteria? ☐ Yes ☒ No |
|---|---|---|---|

Reason for Exception

DEATH ROW

| ICC Chairperson's Signature L C Bell COIII | ICC Member's Signature | ICC Member's Signature |
|---|---|---|

| ☒ Approved | ☐ Denied | ☐ Request Exception to Criteria |
|---|---|---|

Reason for Exception

Deputy Director's Approval Required?   ☐ Yes   ☒ No

| Warden/Deputy Warden/Administrator's Signature | Date 07-05-05 |
|---|---|

For Exceptions Requiring the Deputy Director's Approval

| ☐ Approved  ☐ Denied | Deputy Director's Signature | Date |
|---|---|---|

Distribution:
White - Master Record File
Canary - Institution File
Pink - Warden/Deputy Warden/Administrator

713-2P
05/97

00001139

**ARIZONA DEPARTMENT OF CORRECTIONS**

For distribution: Copy of corresponding
Inmate Letter must be attached to this
response.

● **Inmate Letter Response**

| Inmate Name *(Last, First M.I.)*<br>Andriano, Wendi E. | ADC Number<br>191593 |
|---|---|

| Institution/Unit<br>ASPC - Perryville / Brent W. Lumley Unit    30 D 266 |
|---|

| From<br>Deputy Warden M. Muse | Location<br>PV/ Brent W. Lumley Administration |
|---|---|

In response to your Inmate Letter dated 07/06/05, received on 07/08/05, concerning "Photo,", I offer the following information:

After a review of DO #911, you (as a death row inmate) are not allowed to purchase picture tickets, nor have your picture taken.  Request denied.

cc:   CO IV Morris
      Assigned CO III
      AA III
      DW File

| Staff Signature   *M. Muse, Dw* | Date<br>07/12/2005 |
|---|---|

Computer Electronic Version

Distribution:  Original - Central Office Master File
               Copy - Inmate
               Copy - Institutional File

916-2
4/15/04

000011397

ARIZONA DEPARTMENT OF CORRECTIONS

**Inmate Letter**

Print or Type -- No Attachments

JUL 2005
DEPUTY WARDEN
BRENT W. LUMLEY
UNIT

Inmate Name (Last, First M.I.)
Andriano, Wendi E.

ADC Number
191593

Institution / Unit
Perryville - Lumley - 30 D 266

Subject
Photo

To Individual
Deputy Warden Muse

Location
Lumley

Please Describe Your Problem or Question Completely:

My grandfather has severe diabetes and had part of his leg amputated. He lives in Northern Arizona and due to his medical condition, he is unable to visit me. He is my only remaining grandparent and I am trying to make my incarceration easier on him. I would like to send him a photograph so he can rest easier. Will you please give me permission to purchase photo coupons so I can get my picture taken?

I was in County jail for 4 yrs before coming here in Dec '04. I will be in my current situation, death row, for a minimum of three years until my appeal goes to court. My grandfather is elderly and in poor health. I would greatly appreciate being allowed to send him a picture!

Inmate Signature: Wendi Andriano

Date
7-6-05

Have You Discussed This With Institution Staff?  [X] Yes  [ ] No

If yes, give the staff member's name: Lt. Bailey

Distribution: White - Central Office Master File
Yellow - Inmate
Pink - Institutional File

916-1P
1/9/02

000011398

P-App. 006931

## ARIZONA DEPARTMENT OF CORRECTIONS

For distribution: Copy of corresponding Inmate Letter must be attached to this response.

### Inmate Letter Response

| Inmate Name *(Last, First M.I.)* | ADC Number |
|---|---|
| ANDRIANO, W. | 191593 |

Institution/Unit
ASPC-PERRYVILLE-LUMLEY: 30 D 266

| From | Location |
|---|---|
| M. MUSE, DEPUTY WARDEN | ASPC-PV-LUMLEY: ADMIN |

This is in response to your Inmate Letter dated 06/27/05 and received on 06/29/05 concerning the authorization to maintain on site your personal prescription eyeglasses and/or have them sent in.

Director's Instruction 201, Changes to DO 909 permits inmates arriving on site for the initial intake process to have in their possession prescription eyeglasses. Once assigned to a unit the inmate is required to either mail out or donate the property.

Department Order 909, Inmate Mail/Property and Stores subsection Attachment A, Inmate Store/Property List only authorizes you to have in your possession an all plastic frame prescription eyeglasses.

Medical has provided you with the necessary means to see with by providing you with eyeglasses that are authorized by the Departments policies.

Your request to have personal prescription eyeglasses sent in by your family is denied. The Property Officer will be advised to contact you concerning having your metal framed eyeglasses sent out and/or donated.

Please refer future correspondence concerning these subject(s) to your assigned CO III.

cc: file
Property Officer
CO III

| Staff Signature *M. Muse, SW* | Date 7/6/05 |
|---|---|

Computer Electronic Version

Distribution: Original - Central Office Master File
Copy - Inmate
Copy - Institutional File

916-2
4/15/04

000011399

P-App. 006932

# ARIZONA DEPARTMENT OF CORRECTIONS

## DIRECTOR'S OFFICE

## MEMORANDUM

TO:        DISTRIBUTION: General Access "G"
FROM:     Terry L. Stewart, Director
DATE:     November 1, 2002
SUBJECT:  Director's Instruction <u>201</u>, Changes to #Department Order 909<u>: **Inmate
          Mail/Property and Stores**</u>

**<u>The following additions, deletions, changes and updates are to be applied to DO 909:</u>**

See revised "Attachment A", appended to this Director's Instruction. Modifications are contained
in the rows/cells with the thick black border.

**Add the <u>underlined</u> language to, the following section:**

909.10 PROPERTY CONTRABAND SEIZURE/DISPOSITION

1.6 Inmates are not permitted to bring in any property, other than legal papers, prescription
eyeglasses/contact lenses<u>, authorized photographs</u> and a wedding band during initial intake and are required
to either mail the property out at the inmate's expense or donate their property to a charity.

**<u>Guidance for the property transition process follows:</u>**

Battery powered reading lamps shall be confiscated and the inmate shall be reimbursed for the cost of the
lamp. Alternating Current (AC) powered lamps shall remain an authorized property item.

Although individual religious articles are no longer specifically described item by item, and current policy only
cites the total possession quantity allowed for these items, inmates shall be allowed to retain, in their
possession, any previously approved and authorized religious items. They shall not be confiscated.

**EFFECTIVE DATE:** <u>November 1, 2002</u>

#Property List

000011400

P-App. 006933

ATTACHMENT A - DEPARTMENT ORDER 909
INMATE STORE/PROPERTY LIST

**AUTHORIZED STORE LIST**

**ITEM**

(All items/products subject to availability. Product style, color, packaging, size, weight, characteristics, etc. may vary)

Inmates entering the ADOC from other jurisdictions with personal property shall be authorized to retain any property item which complies with the specifications and requirements of that property item as authorized in current policy. The property item shall be examined by qualified staff and approved by the Deputy Warden of the Unit.

Female inmates, in Intake/Reception status, are authorized store privileges for the purchase (or debit of their account, if they have had no money placed on deposit) of panties, over-the-counter medications, health and hygiene items only (this is not to include food, "make-up" and other items not qualifying under the categories listed).

**Inmate Populations**

Level 5 Unit is to include: SMU I (Double Bunk A30 and Sex Offenders),Central Unit and SMU II Death Row
No store privileges for Intake inmates at Reception Centers/Units

00001 401

| Item | | Level 2 Unit | Level 3 Unit | Level 4 Unit | Level 5 Unit | CDU/CB6 Detention Status | SMU I (including IU 67) SMU II SMAs Disciplinary Isolation |
|---|---|---|---|---|---|---|---|
| ...ting Pad - White (8½x11 in.)(No Metal) | 1 pad | 2 | 2 | 2 | 2 | 2 | 2 |
| **MISCELLANEOUS** | | | | | | | |
| Batteries · AAA, AA, C, D & 9 volt sizes (watch battery by special order, 1 for 1) (Pkg of up to 4) | 1 ea. | colspan: Quantity is as needed for appliances in inmate's possession. | | | | | |
| Lighter · Disposable (Clear Plastic ONLY) (No Tokai type) | 1 ea. | 1 | 1 | 1 | 0 | 0 | 0 |
| Bowl, plastic | | 1 | 1 | 1 | 1 | 0 | 0 |
| Plastic Spoon, Teaspoon size, max 6" length, white | 1 ea. | 1 | 1 | 1 | 1 | 0 | 0 |
| Adapter (mono/stereo) · for headphones/earbuds | | 1 | 1 | 1 | 1 | 1 | 1 |
| Headphones · Stereo, (Non-metal headband)(⅛" jack, maximum 8' cord) | 1 ea. | 1 | 1 | 1 | 1 | 1 | 1 |
| Mirror · 6" (Plastic) | 1 ea. | 1 | 1 | 1 | 1 | 0 | 0 |
| Shoelaces · (White ONLY) (Up to 54 in.)   *Central Unit Only | 1 pr. | 2 | 2 | 2 | 2* | 0 | 0 |
| ...wer Shoes (No Toe Separator) | 1 pr. | 1 | 1 | 1 | 1 | 1 | 1 |
| Sunglasses · Non-Reflective (Value Not to Exceed $10.00)(All plastic frame or clip-on type) | 1 ea. | 1 | 1 | 1 | 0 | 0 | 0 |
| Alarm Clock, (wind-up or battery operated, No AC powered) | 1 ea. | 1 | 1 | 1 | 1 | 0 | 0 |
| Desk Lamp Bulb (replacement, for AC powered lamps) | | 1 | 1 | 1 | 1 | 0 | 0 |
| REMOVE · Can Opener, no handle | 1 ea. | 0 | 0 | 0 | 0 | 0 | 0 |
| Eyeglasses · Prescription (All Plastic Frame)(Personal, upon initial intake/reception ONLY) | 1 ea. | 2 | 2 | 2 | 2 | 2 | 2 |
| Contact Lens · Prescription, non-tinted/colored (Personal, upon initial intake/reception ONLY) | 1 ea. | 1 | 1 | 1 | 1 | 1 | 1 |
| Ice Chest (Styrofoam)(No Handles) (Up to 12 qt.) | | 1 | 1 | 1 | 0 | 0 | 0 |
| Padlock (Master Key Override)(Statewide) | 1 ea. | 1 | 1 | 1 | 0 | 0 | 0 |

P-App. 006934

ARIZONA DEPARTMENT OF CORRECTIONS
Inmate Letter

| Print or Type — No Attachments |

Inmate Name (Last, First M.I.)

**Andriano, Wendi E.**

ADC Number

**191593**

Institution / Unit

**Aspc- Perryville - Lumley     SMAF   Death Row    30 D 26**

Subject

**Inability To Access The Courts**

To Individual

**Deputy Warden Muse**

Location

**Lumley**

Please Describe Your Problem or Question Completely:

Despite my efforts to follow DOC policy, I have an issue that I
cannot resolve. I must ask for your assistance. It is my understanding
that as the Deputy Warden you have the power to grant me the ability to see.
Upon my arrival, my eyeglasses were confiscated due to the metal frame. I
was told to get a pair of state-issue glasses. I did, however, the glasses
provided are extremely heavy causing indentations and slight bruising on my nose
and ears. I cannot wear them. I informed medical of the problem and was told they
could do nothing about it. I am unable to read or write without my glasses. I am
unable to participate in my appeal because I cannot read 4 mos. of trial
transcripts and write appropriate responses. It is imperative that I am
active in my legal defense. Will you please allow me to purchase glasses
that I can wear for extended periods of time? My family is willing to pay
for them and ship them from the manufacturer, just like books are. I also
will follow any guidelines you set forth to protect the security of this
facility. I only ask that you allow me to see again.
          Thank you for your help.

Inmate Signature

*Wendi Andriano*

Date

**6-27-05**

Have You Discussed This With Institution Staff?   ☒ Yes   ☐ No

If yes, give the staff member's name: Ruiz 2043   Dr. Rodriguez   Dr. Kirby
Com Cartagena   Dr. Rumsey   and many other CO's

Distribution: White - Central Office Master File
             Yellow - Inmate
             Pink - Institutional File

916-1P
9/02

000011402

ARIZONA DEPARTMENT OF CORRECTIONS

Inmate Letter

| Print or Type – No Attachments |

| Inmate Name *(Last, First M.I.)* | ADC Number |
|---|---|
| Andriano, Wendi E. | 191593 |

Institution / Unit

ASPC- PV- Lumley - 30 D 266

Subject

Recreation

| To Individual | Location |
|---|---|
| CO IV Morris | Programs |

Please Describe Your Problem or Question Completely:

Thank you for your timely response to my recreation question. I do agree the department has met the minimum requirements in the policy. At this time, I wish to discuss with you any options available that would increase my outdoor recreation time. As a general population inmate, I am hoping my good behavior might be considered when determining my request. I also have health concerns. I would prefer to discuss that topic in person.

One last question – policy DO 909 allows me to purchase athletic shorts. Level 5 general population inmates are allowed to wear them outside after 5:00 pm on weekdays and on weekends. May I do the same? The jumpsuit is unbearably hot in this weather and prohibits vigorous exercise.

I look forward to meeting with you. Thank you again for your help.

| Inmate Signature | Date |
|---|---|
| Wendi Andriano | 6-4-05 |

Have You Discussed This With Institution Staff?   ☒ Yes   ☐ No

If yes, give the staff member's name:   CO II Mircic

Distribution: White - Central Office Master File
Yellow - Inmate
Pink - Institutional File

916-1P

000011403

**ARIZONA DEPARTMENT OF CORRECTIONS**

● **Inmate Letter Response**

| For distribution:  Copy of corresponding Inmate Letter must be attached to this response. |

| Inmate Name *(Last, First M.I.)* | ADC Number |
|---|---|
| Andriano, W. | 191593 |

| Institution/Unit |
|---|
| ASPC-Perryville, Lumley unit |

| From | Location |
|---|---|
| COIV Morris | Programs |

In response to your inmate letter concerning recreation time and athletic clothing:
Please understand that you are not a general population inmate. You are housed in and are considered a death row inmate. You are recognized as a level five inmate under D.O.909, therefor you are eligible to purchase and wear athletic clothing for the purpose of recreation.  D.O. 704 states:
704.05    INMATE DRESS AND CLOTHING REQUIREMENTS - Inmates shall present a neat well groomed appearance.

1.2 Inmates shall be dressed in gym shorts/pants/sweat pants and a shirt, or an appropriately fastened jumpsuit at all times when out of the cell or cubicle.

1.2.1 All shirts shall be neatly tucked in at all times when out of the housing unit with the exception of sweatshirts and pullover outerwear shirts.

● 1.2.2 Sweat pants and gym shorts shall only be worn for recreational activities when worn outside of the housing area.

1.2.3 When in the run or cell, inmates shall not be in any state of undress unless preparing for bed or immediately upon return from the shower.
I hope that I have addressed your questions concerning recreational clothing. As we have discussed in the past, your recreation time is being provided in accordance with policy.

| Staff Signature  COIV S. M. | Date  6·2J·05 |

Computer Electronic Version

Distribution:  Original - Central Office Master File
                     Copy - Inmate
                     Copy - Institutional File

916-2
4/15/04

000011404

ARIZONA DEPARTMENT OR CORRECTIONS

Inmate Letter

| Print or Type — No Attachments |

| Inmate Name (Last, First M.I.) | ADC Number |
| Andriano, Wendi E | 191593 |

Institution / Unit

ASPC Perryville - Lumley - 30 D 266

Subject

| To Individual | Location |
| CO IV   Morris | Lumley |

Please Describe Your Problem or Question Completely:

I am a death row inmate who is housed in SMA. My score is 5.3. I am not in SMA due to disciplinary sanctions, rather because there isn't any where else to house me. This has created confusion and I'm hoping you can help clarify matters for me. When I arrived here 12-23-05, I was given 1½ hours 3 times/wk of outdoor exercise according to policy. On 4-21-05 this time was reduced to only 1 hour 3x/wk. I am now being punished like I-5 inmates under disciplinary sanctions (Dept Order 804.01 #1.2.6.1 and 1.2.6.6). I do not believe this applies to me. I live in SMA but I don't shop, make calls, etc like an I-5 inmate. I am having great difficulty explaining this to people. Can you assist me with this? I really need a copy of what an inmate under my classification is allowed to have. Thank you for your time and for your help.

| Inmate Signature | Date |
| Wendi Andriano | 5-19-05 |

Have You Discussed This With Institution Staff?  ☒ Yes  ☐ No

If yes, give the staff member's name:  CO III  Cartegena

Distribution:  White  -  Central Office Master File
Yellow  -  Inmate
Pink  -  Institutional File

916-1P
6/02

000011405