# TABLE OF CONTENTS (INTERACTIVE)

| | |
|---|---|
| LLLLLLLLLLL PART 17 | Petitioner's Appendix to Petition for Review |
| MMMMMMMMMMM | Response to Motion to File Overlength Brief |
| NNNNNNNNNNN | Unopposed Motion for 30 Day Extension of Time |
| OOOOOOOOOO | Order Extending Time |
| PPPPPPPPPPP | Reply in Support of Motion to File |
| QQQQQQQQQQQ | Order 5-5-15 RE:  Motion Overlength |
| RRRRRRRRRRR | Unopposed Motion for Extension |
| SSSSSSSSSSS | Order 5-27-15 RE:  Extending Time |
| TTTTTTTTTTT | Unopposed Motion for 7-Day Extension to File Response |
| UUUUUUUUUUU | Order 6-30-15 RE:  Granting Extension |

# EXHIBIT LLLLLLLLLL
# PART 17

# ARIZONA DEPARTMENT OF CORRECTIONS

| For distribution:  Copy of corresponding Inmate Letter must be attached to this response. |
| --- |

## Inmate Letter Response

| Inmate Name *(Last, First M.I.)*<br>Andriano, W. | ADC Number<br>191593 |
| --- | --- |

| Institution/Unit<br>ASPC-Perryville, Lumley unit |
| --- |

| From<br>COIV Morris | Location<br>Programs |
| --- | --- |

In response to your inmate letter concerning recreation:
906.01 RECREATIONAL PROGRAMS/ACTIVITIES - Wardens and Administrators shall ensure that a quality program of recreational activities exists and that all inmates receive recreational opportunities.

1.1 A Correctional Recreation Program Officer shall be assigned to each unit and shall be responsible for organizing and supervising the recreational program for the unit.

1.4 All inmates shall be afforded the opportunity to exercise activities that involve the use of large muscles. An exercise area for this purpose shall be designated.

1.4.1 The minimal exercise period shall not be less than one hour, three times a week

1.4.2 Large muscle exercise shall include, but is not limited to:

1.4.2.1 Walking.

1.4.2.2 Jogging in place.

1.4.2.3 Basketball.

1.4.2.4 Isometrics.

As you can see the policy requires that all inmates, regardless of custody level, be afforded three opportunities to have a  recreation period no less than one hour in length, each week. The department has met all requirements in this policy. I will come speak with you concerning the question of what you are allowed to have.

| Staff Signature<br>COIV S. M | Date<br>5 26 25 |
| --- | --- |

Computer Electronic Version

Distribution:  Original - Central Office Master File
 Copy - Inmate
 Copy - Institutional File

916-2
4/15/04

000011406

ARIZONA DEPARTMENT OF CORREC___ S

INMATE LETTER
RESPONSE

INMATE NAME Andriano                          ADC# 151553

INSTITUTION/UNIT  ASPC  PV  B2  SMA

FROM Hagone (SII)     LOCATION B2 SMA     DATE 5/19/05

This is in response to your request of a copy
of the policy regarding outdoors exercise. I can't
provide you with a copy. This post order, "SMA
Security," dated April 21, 2005, is restricted. The
number of the post order is PO-017-B02. In paragraph
1.15.11 "Outdoors Exercise and Showers," the order states
that one hour of exercise period is afforded each
three times per week, each on different days
of the week.

_____
STAFF SIGNATURE

Distribution:  White  – Central Office Master File
               Yellow – Inmate
               Pink   – Institutional File

FORM 705011688
000074407/89

ARIZONA DEPARTMENT OF CORRECTIONS

INMATE LETTER
RESPONSE

INMATE NAME_____Wendi Andriano_____ ADC#__191593____

INSTITUTION/UNIT_____ASPC-PV-Lumley_____(30-D-266)_____

FROM_Investigator Trapp_____ LOCATION___ASPC-PV-CIU___ DATE__05-06-2005___

In response to your letter of 03-15-2005, pertaining to your outgoing mail.
My understanding of you mail process is once the mail is obtained from you
for mailing it is then taken to the Mail and Property room where it is then
examined for correct return addresses (no abbreviations) then delivered to
the United States Postal Service, who in turn then process it as normal
mail.  The only exception is if the mail is inmate to inmate, then it is
examined for contraband.

I have made contact with the Security Supervisor at the Lumley Unit who is
assigned to building #30, and to the Security Supervisor at the Complex
Mail and Property.  Both of these supervisors have been advised of your
concerns.

I conducted a review of the case assignments here at ASPC-PV-CIU and you
are not part of any investigation.  I also reviewed all mail scan
assignments and again you are not shown.

I have done all that I am capable of and I hope that there was nothing more
than a "glitch" in the postal service, but I have been assured the problem
is not with the handling of your mail within Perryville.

If there are any further questions or concerns this office can assist with,
please feel free to correspond.


Sincerely,

_____
STAFF SIGNATURE



Distribution:  White  - Central Office Master File
               Yellow - Inmate
               Pink   - Institutional File                FORM 70501168B
                                                          Rev. 1/89


000011408

**ARIZONA DEPARTMENT OF CORRECTIONS**

Inmate Letter

| Print or Type — No Attachments |
| --- |

| Inmate Name (Last, First M.I.) | ADC Number |
| --- | --- |
| Andriano, Wendi E. | 191593 |

Institution / Unit

ASPC-Perryville-Lumley

Subject

US Postal Mail is being delayed.

| To Individual | Location |
| --- | --- |
| I + I | |

Please Describe Your Problem or Question Completely:

I am having issues with outgoing mail. Several letters have not reached their destination. It also takes 2-3 weeks for my mail to reach my parents' address. It is my understanding that by law, within 30 days mail must be posted. This is not happening. Every letter that I send out is being opened, pages are missing or out of sequence. I understand you have the right to search my mail for contraband but this is too much. Can you please inform me if I'm under investigation and why I'm having these issues with my mail? Due to the complexity of my case, I am highly uncomfortable with what is happening.

| Inmate Signature | Date |
| --- | --- |
| Wendi Andriano | 3-15-05 |

Have You Discussed This With Institution Staff?  ☒ Yes  ☐ No

If yes, give the staff member's name:  CoIII Cartagena

Distribution:  White  -  Central Office Master File
Yellow  -  Inmate
Pink  -  Institutional File

916-1P
1/9/02

000011409

ARIZONA DEPARTMENT OF CORRECTIONS

INMATE LETTER
RESPONSE

INMATE NAME Andriano, Wendi E.                    ADC# 191593

INSTITUTION/UNIT ASPC / PV / BL / SMA

FROM Cartagena CO II    LOCATION SMA    DATE 1/14/05

In response to your letter dated 1-05-05, I am enclosing your most recent banking statement. In addition, I contacted the mailroom and they reported not having received any money orders for you. Furthermore, you reported having been told by an officer that your money was here. It will be helpful if in the future you can identify your source by name. In my opinion, this process will help clarify any misunderstanding.

STAFF SIGNATURE

Distribution:   White  - Central Office Master File
                Yellow - Inmate
                Pink   - Institutional File

FORM 70501168B
0000141 Rev. 1/89

P-App. 006943

ARIZONA DEPARTMENT OF CORRECTIONS

INMATE LETTER
RESPONSE

INMATE NAME _Andriano_____ ADC# _191593_

INSTITUTION/UNIT _ASPC/PV/ BL - SMA_____

FROM _CO-II CoMagena_____ LOCATION _BL_ DATE _1/10/05_

Your banding account reflects a Ø dzc balance as
of today. Indigent applications are processed
every Thursday. I am enclosing an indigent
request in case you decide to apply for it. In
addition, I am enclosing an HNR so you're
should you decide to address your eye glasses
issue. As I stated to you, the eye-glasses you
came in with are not in compliance and
property won't release them.

_____ CO-II
STAFF SIGNATURE

Distribution:  White  - Central Office Master File
               Yellow - Inmate
               Pink   - Institutional File

FORM 70501168B
0000141189

ARIZONA DEPARTMENT OF CORRECTIONS

Mail Waiver

I, _Wendi Elizabeth Andriano_ , ADC Number _191593_ an inmate under jurisdiction of the Arizona Department of Corrections, do hereby authorize the Warden/Superintendent of the Institution of my confinement, by him or his authorized representatives, to receive, open and inspect all letters, packages and all other mail matters addressed to me and to endorse and deposit all checks and money orders on my behalf in accordance with rules, regulations and policies of the Department of Corrections and Federal Court Orders.

_____
Inmate Signature

I hereby attest that the above Mail Waiver was read and fully explained to the above named inmate before he signed and that he voluntarily signed in my presence on this _23_ day of _December_ , 20 _04_ .

_____
Witness Signature

**NOTICE IN CASE OF DEATH OR SERIOUS ILLNESS**

In case of serious illness, accident or death, I request the following person(s) by notified:

| Name Alejo Ochoa | Name Donna Ochoa |
|---|---|
| Relationship Father | Relationship Mother |
| Address | Address |
| City | State | City | State |
| Zip Code | Zip Code |
| Phone Number | Phone Number |

Inmate Signature _____

ADC Number _191593_

DISTRIBUTION: White - Master Record File
Yellow - Inmate
Pink - Institutional File

901-32
00001140323

P-App. 006945

ARIZONA DEPARTMENT OF ~RECTIONS

**Religious Preference and Privilege Request**

☑ NEW          ☐ CHANGE REQUEST

| Inmate Name *(Last, First M.I.)* | ADC Number | Institution/Facility |
|---|---|---|
| Adriano Wendi E. | 191593 | ASPC PV |

My Religious Preference is: Christian – non-denominational

Check the areas in which you are interested *(If not interested leave blank)*

☑ Bible Study          ☑ Religious Services          ☐ Appointment with Chaplain
☐ Growth Group        ☐ Personal Counseling        ☐ Other _____
☐ Family Counseling

Indicate any special privilege (s) you are requesting. Any requests granted are done so under the provision that they are a part of your religious faith. It is your responsibility to show a commitment toward that faith in order to retain the privileges granted. A lack of commitment can result in loss of those privileges.

☐ Diet _____

☐ Other _____

**In Case of Emergency, who would you like notified?**

| Name *(Last, First M.I.)* | Relationship | Telephone Number *(with area code)* |
|---|---|---|
| Ochoa, Donna E. | Mother | ~~~~~~~~ |

| Address *(Street)* | City | State | ZIP Code |
|---|---|---|---|
| ~~~~~~~~ | ~~~~~~~~ | ~~~~ | ~~~~ |

**CHANGE OF RELIGIOUS PREFERENCE**

I am requesting a change to be made in my religious preference

| From | To |
|---|---|
|  |  |

I understand this request must be accompanied by a written statement, from an accredited leader (who is not an inmate) of the religious group of which I am a member ( or wish to become a member). The attached statement will affirm my membership, loyalty and commitment.

| Inmate's Signature | Date |
|---|---|
| Wendi Adriano | DEC 2 3 2004 |

☐ Approved
☑ Disapproved

| Chaplain's Signature | Date |
|---|---|
|  |  |

| Receiving Staff Member's Signature | Date |
|---|---|
| [signature] | DEC 2 3 2004 |

Distribution
White - Master Record
Canary - Chaplain

00001141    2004-1P 4/13/98

# ARIZONA DEPARTMENT CORRECTIONS

Family Background Information

The information requested herein is for the confidential use of the administration and is not intended for the purpose of notifying these relatives and friends where you are. This is left up to you. Each inmate must complete this form fully, showing full name whenever possible, or first name, middle initial, address, and age, if known. If age is unknown, give approximate age. In case of any married couple, show full name of each. (Mr. & Mrs. John Doe, for example, is not acceptable). You must show both names as John & Nellie Doe. Remember that any future request for addition or change will be checked against this record and if the name does not appear thereon, request will be denied. Prompt and accurate completion of this form will facilitate completion of your visiting and mailing privileges.

| Inmate Name (Last, First M.I.) | | ADC Number | |
|---|---|---|---|
| Andriano, Wendi E. | | 191593 | |
| Age | Race | Date Received | |
| 34 | White | DEC 2 3 2004 | |

| | Name | Address | Age |
|---|---|---|---|
| Mother | Donna Ochoa | | 55 |
| Step Mother | N/A | | |
| Father | Alejo Ochoa | | 52 |
| Step Father | N/A | | |
| Wife | N/A | | |
| Husband | N/A | | |
| Fiance(e) | N/A | | |
| Mother-in-Law | | | |
| Father-in-Law | | | |
| Daughters (If Step-daughters, and married, show husband's full name) | Ashlee E. Andriano | | 6 |
| Sons (If married, show wife's full name) | Nicholas J. Andriano | | 7 |
| Sisters, Step-sisters and Half-sisters | | | |
| Brothers, Step-brothers and Half-brothers | | | |
| Grandmother (Maternal) | Anne Worsham | deceased | |
| Grandfather (Maternal) | Henry Worsham | deceased | |
| Grandmother (Paternal) | Natalie Ochoa | deceased | |
| Grandfather (Paternal) | Alejo Ochoa | | ? |

Persons with a disability may request a reasonable accommodation such as a sign language interpreter, by contacting the Department. Requests should be made as early as possible to allow time to arrange the accommodation.

This document available in alternate formats upon request.

000011414 901-1P 4/10/98

**Family Background Information** (cont'd)

| Inmate Name (Last, First M.I.) | ADC Number |
|---|---|
| Andriano, Wendi E. | 191593 |

| | Name | Address | Age |
|---|---|---|---|
| Uncles (Maternal) (List Wife, if any) | Steve Worsham | | |
| | Kathy Worsham | | |
| Uncles (Paternal) (List Wife, if any) | | | |
| Aunts (Maternal) (List Husband, if any) | Kathy Smith | | 40 |
| | Nadine Bednorz | | 60+ |
| Aunts (Paternal) (List Husband, if any) | Delia Alvarez | | 58 |
| Cousins (Female) (List Husband, if any) | Carmen Garcia | | 36 |
| | Barbara Mitchell | | 30 |
| Cousins (Male) (List Wife, if any) | AJ Gonzalez | | 35 |
| | Rudy Hernandez | | 33 |
| Minister | | | |
| Close Friends (Male & Female) | | | |

| Is any member of your immediate family or any relative an inmate here now? | ☒ Yes ☐ No |
|---|---|

| Inmate Name (Last, First M.I.) | ADC Number | Age |
|---|---|---|
| Gonzalez, Anthony J | ? | 35 |

| Has any member of your immediate family or any relative been an inmate here before? | ☒ Yes ☐ No |
|---|---|

| Inmate Name (Last, First M.I.) | ADC Number | Age |
|---|---|---|
| Garcia, Melissa | ? | 37 |

| Is any member of your immediate family or relative in prison elsewhere? | ☒ Yes ☐ No |
|---|---|

| Inmate Name (Last, First M.I.) | Place | Age |
|---|---|---|
| Robertson, Skip | CA | ? |

| Did any member of your immediate family or relative come to prison with you? | ☐ Yes ☒ No |
|---|---|

| Inmate Name (Last, First M.I.) | ADC Number | Age |
|---|---|---|
| | | |

00001145

4/10/98

P-App. 006948

**NAME:**      **ANDRIANO, WENDI E.**

**ADC#:**      **191593**

**INMATE MASTER FILE:   SIDE FOUR**

**SENTENCE OF IMPRISONMENT   PRESENTENCE INVESTIGATIONS.**

000011416

191593

PV

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032

12/22/2004

CLERK OF THE COURT
M. LeSueur
Deputy

HONORABLE BRIAN K. ISHIKAWA

FILED: 12/23/2004

STATE OF ARIZONA                    JUAN M MARTINEZ

v.

WENDI ELIZABETH ANDRIANO            DANIEL B PATTERSON
                                    G DAVID DELOZIER JR.
DOB: 8/26/1970
                                    APPEALS-SE
                                    AZ DOC
                                    CERTIFICATION DESK - SE
                                    DISPOSITION CLERK-SE
                                    EXHIBITS-SE
                                    FILE ROOM-SE
                                    MCSO-DIS
                                    REMAND DESK-SE
                                    VICTIM SERVICES DIV-CA-SE

TRIAL MINUTE ENTRY
DAY 58
SENTENCE OF DEATH

State's Attorney:          Juan Martinez
Defendant's Attorney:      Daniel Patterson and David Delozier
Defendant:                 Present
Court Reporter:            Dana Smith

1:00 p.m. LET THE RECORD REFLECT that the jury is all present in the jury room and resume their deliberations from December 21, 2004.

2:25 p.m. Court reconvenes. Court, Counsel, and Defendant are present.

Court Reporter, Dana Smith, is present.

Docket Code 012                    Form R571                    Page 1

000011417

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                              12/22/2004

The Jury is not present.

Counsel for Defendant presents oral Rule 20 Motion and Motion for Mistrial.

IT IS ORDERED denying Defendant's Rule 20 Motion and Motion for Mistrial.

The Jury is now present in the jury box and by their foreperson return into Court their verdict, which is read and recorded by the clerk, and is as follows:

"We, the Jury, duly empanelled and sworn in this matter, upon our oaths, do unanimously find that the Defendant, Wendi Elizabeth Andriano, shall be sentenced to DEATH."

Signed by the Foreperson.

The Jury replies that this is their true verdict.

At the request of Defense Counsel, the Jury is polled, and each juror replies that these are his or her true verdicts as to each count.

FILED:  Verdict

Sentencing proceeds at this time.

The Defendant was found guilty after a trial by jury.

IT IS THE JUDGMENT of the Court Defendant is guilty of the following:

OFFENSE:  FIRST DEGREE MURDER, A DANGEROUS OFFENSE
Class 1 FELONY
A.R.S. § 13-1101, 13-1105, 13-703, 13-801, and 13-604(P)
Date of Offense: October 8, 2000
Dangerous pursuant to A.R.S. § 13-604 - Non Repetitive

AS PUNISHMENT, IT IS ORDERED Defendant is sentenced to a term of imprisonment and is committed to the Arizona Department of Corrections as follows:

DEATH BY LETHAL INJECTION
Presentence Incarceration Credit: 0 days
See Special Verdict

IT IS ORDERED authorizing the Sheriff of Maricopa County to deliver the Defendant to the Arizona Department of Corrections to carry out the term of imprisonment set forth herein.

Docket Code 012                     Form R571                          Page 2

000011418

P-App. 006951

## SUPERIOR COURT OF ARIZONA
## MARICOPA COUNTY

CR 2000-096032                                    12/22/2004

IT IS ORDERED the Clerk of the Superior Court remit to the Arizona Department of Corrections a copy of this order together with all presentence reports, probation violation reports, and medical and psychological reports that are not sealed in this cause relating to the Defendant.

IT IS ORDERED directing the Clerk of the Court to file a Notice of Appeal on behalf of the Defendant.

cc:  DOC - Certified Copy via Certification Desk

cc:  MCSO-DIS - Certified Copy via Certification Desk

The Jury is excused from further consideration of this cause.

IT IS ORDERED that the Clerk release the exhibits not offered in evidence to counsel and counsel shall take possession of the exhibits.

FILED:  Exhibit Worksheet and Exhibit Release Form

2:35 p.m. Court stands at recess.

Docket Code 012                    Form R571                    Page 3

000011419

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                              12/22/2004


Defendant's thumbprint is permanently affixed to this sentencing order in open court.


/s/  HONORABLE BRIAN K. ISHIKAWA
JUDGE OF THE SUPERIOR COURT


(thumbprint)


Docket Code 012                     Form R571                      Page 4

000011420

91593

```
FILED
JUL - 9 2007
RACHELLE M. RESNICK
CLERK SUPREME COURT
BY
```

```
RECEIVED
JUL 17 2007
AZ DEPT OF CORRECTION
TIME COMPUTATION
```

SUPREME COURT OF ARIZONA
En Banc

| | | |
|---|---|---|
| STATE OF ARIZONA, | ) | Arizona Supreme Court |
| | ) | No.  CR-05-0005-AP |
| Appellee, | ) | |
| | ) | Maricopa County |
| v. | ) | Superior Court |
| | ) | No.  CR2000-096032 |
| WENDI ELIZABETH ANDRIANO, | ) | |
| | ) | |
| Appellant. | ) | **O P I N I O N** |
| | ) | |

Appeal from the Superior Court in Maricopa County
The Honorable Brian K. Ishikawa, Judge

**AFFIRMED**

TERRY GODDARD, ARIZONA ATTORNEY GENERAL                    Phoenix
     By   Kent E. Cattani, Chief Counsel,
          Capital Litigation Section
          Robert J. Gorman, Jr.,                           Tucson
          Assistant Attorney General
Attorneys for State of Arizona

JAMES J. HAAS, MARICOPA COUNTY PUBLIC DEFENDER             Phoenix
     By   Brent E. Graham, Deputy Public Defender
          Margaret M. Green, Deputy Public Defender
Attorneys for Wendi Elizabeth Andriano

B E R C H, Vice Chief Justice

¶1        In 2004, Wendi Andriano was found guilty of one count
of first degree murder and sentenced to death.   This automatic
appeal followed.   We have jurisdiction pursuant to Article 6,
Section 5(3), of the Arizona Constitution and Arizona Revised
Statutes ("A.R.S.") section 13-4031 (2001).

- 1 -

000011421

## I. FACTS[1] AND PROCEDURAL BACKGROUND

¶2     Wendi Andriano, her terminally ill husband, Joe, and their two small children attended a barbeque on October 7, 2000. They returned to their apartment around midnight and put the children to bed.

¶3     At about 2:15 a.m. on October 8, Andriano called Chris, a coworker who also lived at the apartment complex, and asked her to watch the children while Andriano took Joe to the doctor. When Chris arrived, Andriano met her outside the apartment. She told Chris, "I have a problem. Don't ask any questions. My husband's in on the floor dying and I haven't called 911 yet." When Andriano cautioned, "He doesn't know I haven't called 911," Chris urged her to make the call.

¶4     Upon entering the apartment, Chris found Joe lying on the living room floor in the fetal position. He had vomited, appeared weak, and was having difficulty breathing. While Andriano was in another room calling 911, Joe told Chris that he needed help and had "for a long time." He asked why it was taking forty-five minutes for the paramedics to arrive.

¶5     Andriano returned to the room and told Chris she needed to get Joe to the car so she could drive him to the

---

[1]     We view the facts in the light most favorable to sustaining the verdict. *State v. Tucker*, 205 Ariz. 157, 160 n.1, 68 P.3d 110, 113 n.1 (2003).

000011422

P-App. 006955

hospital because the paramedics were responding to another call. Joe said he could not get up, so Andriano tried to lift him. When she could not, she became irritated and yelled at Joe, using profanities. Hearing sirens approaching, Chris went out to direct the paramedics to the apartment as Joe began to vomit again.

¶6    As the paramedics were unloading their equipment, Andriano came out of the apartment screaming at them to go away. She then slammed the door. Chris and four paramedics knocked on the apartment door, but no one answered. After five to ten minutes of knocking, the Phoenix Fire Department alarm room called the Andrianos' home telephone in an attempt to get Andriano to open the door. The alarm room notified the paramedics that contact had been made with someone in the apartment who would come out to speak with them. Rather than coming through the front door, which opened to the living room, Andriano went out through her back door, climbed over the back patio wall, and walked around the apartment building to the front door, where Chris and the paramedics were standing. Andriano had changed her shirt and her hair was wet. She told the paramedics that Joe was dying of cancer and had a do-not-resuscitate order. She explained that "this was not the way that he wanted to go." The paramedics and Chris left without going into the apartment.

- 3 -

000011423

P-App. 006956

¶7      Andriano called 911 again at 3:39 a.m.   The same paramedics responded and saw Andriano, wearing a bloody shirt, standing outside the apartment talking to a police officer.

¶8      When the paramedics entered the apartment, they found Joe lying on the floor in a pool of blood.  He had a deep stab wound to the left side of his neck and lacerations on his head that exposed some brain matter.  A police detective observed at 3:52 a.m. that the blood surrounding Joe's head was already starting to dry.  A broken bar stool covered in blood was found near Joe's body, as were pieces of a lamp, a kitchen knife with blood on the sharp edge, a bloody pillow, and a belt.

¶9      A search of the Andrianos' storage unit revealed an open cardboard shipping box containing a 500-gram bottle of sodium azide, two Tupperware containers containing sodium azide, nine Q-tips, a plastic knife and fork, and two pairs of latex gloves.  Andriano's fingerprints were on the plastic knife and the vacuum-packed bag in which the cardboard box was shipped. During a search of the Andrianos' apartment, the police found gelatin capsules filled with sodium azide in a bottle labeled for an herbal supplement.  Trace amounts of sodium azide were also discovered in the contents of a pot and two soup bowls in the kitchen.  In all, 20.8 grams of sodium azide could not be accounted for.

¶10     The medical examiner determined that Joe sustained

- 4 -

000011424

brain hemorrhaging caused by no fewer than twenty-three blows to the back of his head, eight to ten of which independently could have rendered Joe unconscious. Defensive wounds on Joe's hands and wrists indicated, however, that he was conscious for at least part of the attack. Joe also sustained a 3 and 3/4-inch-long by 2-inch-wide stab wound to the left side of his neck that extended to his spine and severed his carotid artery. The medical examiner opined that the blows to the head were sustained before the stab wound to the neck and that Joe was still alive, although likely unconscious, when he was stabbed. Trace amounts of sodium azide were found in Joe's blood and gastric contents. The cause of death was attributed to blunt force trauma and the stab wound.

¶11     Based on the blood spatter and other evidence, a Phoenix police detective opined that Joe was lying down while he was being struck and did not get up during the attack. He further opined, based on the absence of arterial spurting on the belt and the knife, that both items were placed beside Joe's body after he died. Blood spatter on the bar stool, on the other hand, suggested that the stool was present when the arterial spurting began.

¶12     After being taken into custody, Andriano called one of her coworkers and asked her to hide certain items that were in Andriano's business office. Andriano's adoptive father told a

- 5 -

police detective on the day of the murder, "I remember [Andriano] telling me that she stabbed [Joe]."

¶13     Andriano was indicted on one count of first degree murder. The State filed a notice of intent to seek the death penalty and subsequently alleged two aggravating factors:  that Andriano committed the offense "in expectation of the receipt[] of anything of pecuniary value," in violation of A.R.S. § 13-703(F)(5) (Supp. 2000), and that she committed the murder "in an especially heinous, cruel or depraved manner," in violation of A.R.S. § 13-703(F)(6).  The State further alleged that the offense was a dangerous felony, see id. § 13-604(P), because it "involved the intentional or knowing infliction of serious physical injury upon Joseph Andriano."

¶14     At trial, Andriano testified that after a failed assisted suicide attempt by poison, she and Joe got into a fight, during which she hit Joe with a bar stool in self-defense.  She claimed that he ultimately slit his own throat. The jury found Andriano guilty of first degree murder and further found that the murder was a dangerous felony.

¶15     The same jury found the (F)(6) "especially cruel" aggravating factor, but did not find the (F)(5) "pecuniary gain" aggravator.  Finding that the mitigating circumstances were not sufficiently substantial to call for leniency, the jury returned a verdict calling for a sentence of death.

- 6 -

000011426

## II.   DISCUSSION

¶16     Andriano raises eleven issues on appeal and lists an additional thirteen claims to avoid preclusion.[2]

### A.   Guilt Phase Issues

#### 1.   Admission of other act evidence

¶17     Andriano claims that evidence of her extramarital affairs and her attempts to obtain insurance policies on Joe's life was unfairly prejudicial and was neither intrinsic to the charge against her nor admissible under Arizona Rule of Evidence 404(b).   We review evidentiary rulings for an abuse of discretion.   *State v. McGill*, 213 Ariz. 147, 156, ¶ 40, 140 P.3d 930, 939 (2006), *cert. denied*, 127 S. Ct. 1914 (2007).

¶18     The trial court found the insurance and affairs evidence "intrinsic" to the crime.   "'Other act' evidence is 'intrinsic' when [1] evidence of the other act and evidence of the crime charged are 'inextricably intertwined' or [2] both acts are part of a 'single criminal episode' or [3] the other acts were 'necessary preliminaries' to the crime charged."   *State v. Dickens*, 187 Ariz. 1, 18-19 n.7, 926 P.2d 468, 485-86 n.7 (1996) (quoting *United States v. Coleman*, 78 F.3d 154, 156 (5th Cir. 1996)).

---

[2]     The thirteen claims listed to avoid preclusion are appended to this opinion.

- 7 -

000011427

###### a.   *Life insurance policies*

¶19     After three surgeries to remove a recurring tumor in his salivary gland and as many misdiagnoses, Joe was diagnosed with metastatic adenoid cystic carcinoma in 1998. By that time, the cancer had spread to his lungs and his condition was deemed terminal.

¶20     Nevertheless, during August and September of 2000, Andriano made several attempts to obtain insurance on Joe's life through various companies. During the prescreening process, Andriano claimed that Joe did not have cancer. One agent contacted Joe on September 6 after receiving an electronic pre-application, at which time Joe indicated that he was not interested in applying. Andriano sent an email three days later from her personal email account asking that Joe's request be reinstated and directing that further contact be made with her. She also asked two men to pose as Joe for a life insurance physical exam, one of whom she offered to pay as much as $50,000. Both refused. No life insurance policy was ever obtained through these efforts.

¶21     Andriano's attempts to procure insurance on Joe's life do not fall into any of the three categories of intrinsic evidence. Because she never secured insurance, the attempts to procure it were not inextricably intertwined with Joe's murder, part of a single criminal episode, or a necessary preliminary to

- 8 -

000011428

Joe's murder.  *See id.*   The insurance procurement evidence clearly differs from, for example, evidence deemed intrinsic in *Dickens* that the defendant had stolen the gun used in the charged murders and robberies.  *See id.; see also State v. Nordstrom*, 200 Ariz. 229, 248, ¶ 56, 25 P.3d 717, 736 (2001) (commenting on the "necessary preliminary" prong of the intrinsic evidence inquiry).

¶22   Even though not intrinsic to the crime charged, "other act" evidence may nonetheless be admissible under Rule 404(b) to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident," as long as its probative value is not substantially outweighed by the danger of unfair prejudice.   Ariz. R. Evid. 403; *see also Dickens*, 187 Ariz. at 19, 926 P.2d at 486.

¶23   Evidence of Andriano's attempts to obtain insurance on Joe's life was admissible to show her plan, knowledge, and intent to kill Joe, and also to show that she premeditated Joe's murder.   Moreover, the significant probative value of such damaging evidence is not substantially outweighed by the danger of unfair prejudice to Andriano.   Because the evidence was admissible under Rule 404(b), the trial court did not abuse its discretion in admitting the evidence, even if it might have admitted the evidence for the wrong reason.  *See State v. Perez*, 141 Ariz. 459, 464, 687 P.2d 1214, 1219 (1984) (affirming trial

- 9 -

court's ruling even though trial judge reached the proper conclusion for the wrong reason).

b. *Extramarital affairs*

¶24    During the summer of 2000, Andriano had a brief extramarital affair with Rick, a resident of the apartment complex where she lived and worked as the property manager. That affair ended in July when Rick learned that Andriano was married and had children. Despite his rejection of her advances, Andriano aggressively pursued Rick. On one occasion, she stood outside his apartment late at night, banging on his door for five minutes, demanding to be let in, and threatening to get the master "pass key" if he did not let her in.

¶25    During that same summer, Andriano frequented bars on a weekly basis with coworkers and friends. There, she was seen dancing and flirting and even groping and kissing men. On September 27, the evening after Joe's fourth chemotherapy treatment, Andriano went to a dance club and began dancing provocatively with and kissing a man she met there. They ultimately returned to the Andrianos' apartment and had sex. During a phone conversation the following day, Andriano told the man her husband had died of cancer.

¶26    Like the insurance evidence, evidence of Andriano's extramarital affairs is not intrinsic to the first degree murder charge. The affairs were not inextricably intertwined with or

– 10 –

000011430

part of the same criminal episode as the murder, nor were they a necessary preliminary to the murder. *Dickens*, 187 Ariz. at 18-19 n.7, 926 P.2d at 485-86 n.7. The evidence was admissible under Rule 404(b), however, as evidence of Andriano's motive for killing her husband – to be free to pursue other relationships. Supporting this purpose was testimony from Andriano's hairdresser, who testified that Andriano told her in February of 2000 that she would have divorced Joe were he not ill. At a later visit, Andriano disclosed that Joe "wanted to keep the marriage together," but she was "emotionally out of it" and "wished he was dead so she could move on with her life." Around August of 2000, Andriano confided to the hairdresser that she was interested in another man who hesitated to get involved in a relationship because she was married.

¶27    The evidence was also admissible under Rule 404(b) to rebut the defense theory that Andriano was a domestic violence victim who lived in fear of her abusive husband, whom she bludgeoned to death in self-defense.

¶28    Andriano maintains, nonetheless, that the evidence was unfairly prejudicial because "[t]he prosecutor took every opportunity to infuse the trial with marginally relevant information about Andriano's partying and man-chasing."[3] Nearly

---

[3]    Andriano does not allege prosecutorial misconduct.

- 11 -

000011431

all the examples Andriano provides relate to the prosecutor's comments in the guilt phase closing arguments. Comments in closing arguments, however, are not evidence, as the jury was instructed, and thus the comments do not render unfairly prejudicial evidence that is otherwise properly admitted.

¶29    Another incident about which Andriano complains occurred during the cross-examination of defense expert Dr. Sharon Murphy. The prosecutor asked Dr. Murphy whether Andriano used a personal lubricant during sexual intercourse with Rick. The door to this line of questioning had been opened by defense counsel's questioning on direct examination, to which Dr. Murphy responded that Andriano and Joe "needed to use a lubricant" during intercourse. Considered in context, the questioning was designed to rebut Dr. Murphy's suggestion, elicited by defense counsel's question, that Andriano's need to use a lubricant when she had sex with Joe showed that Joe was an abusive spouse. The evidence elicited was not unfairly prejudicial.

¶30    The final incident relates to a comment the prosecutor made during aggravation phase closing arguments and therefore is not relevant to whether such evidence was admissible in the guilt phase. The probative value of evidence of Andriano's extramarital relationships is not substantially outweighed by the danger of unfair prejudice, and thus the trial court did not abuse its discretion in admitting the evidence.

- 12 -

000011432

¶31     In sum, although neither category of evidence is intrinsic to the crime charged, both categories are admissible under Rule 404(b): evidence of attempts to procure life insurance to prove plan, knowledge, intent, and premeditation; and evidence of extramarital affairs to prove motive and to rebut the defense theory that Andriano was a domestic violence victim. The trial court did not abuse its discretion in admitting the evidence.

### 2.   Lesser-included offense instructions

¶32     Andriano argues that the trial court was required sua sponte to instruct the jury on the lesser-included offenses of second degree murder and "sudden quarrel or heat of passion" manslaughter. Defense counsel did not request any lesser-included offense instructions. We review a trial court's failure to give lesser-included offense instructions for fundamental error when the instructions are not requested at trial. *Nordstrom*, 200 Ariz. at 253, ¶ 81, 25 P.3d at 741. In a capital case, it is fundamental error for the trial court to fail to give a lesser-included offense instruction if one is supported by the evidence, *id.*, *see also Beck v. Alabama*, 447 U.S. 625, 627, 638 (1980), and not waived by the defendant.

¶33     As to second degree murder, Andriano contends on appeal that because sodium azide poisoning did not cause Joe's death, a reasonable jury could have found that she abandoned her

- 13 -

000011433

P-App. 006966

plan to poison Joe. Abandonment is shown, she argues, by her summoning Chris to the apartment and her call to 911. She maintains that a new sequence of events began that led to an intentional or knowing - but not premeditated - death. As to manslaughter, Andriano contends that the evidence supports a conclusion that Joe provoked her when he reached for a knife, and she then killed him during a sudden quarrel or in the heat of passion.

¶34    Andriano did not argue either of these theories at trial, however, and the evidence presented does not support either theory. Andriano testified that she was attempting to assist Joe in committing suicide when they got scared and decided to call for help. She claimed that after 911 was called and Chris left the apartment to meet the paramedics, Joe decided that he wanted to follow through with the suicide. She testified that, after the paramedics left, she admitted to Joe that she had an affair. Joe then became violent and tried to choke her with a phone cord, but she was able to reach a knife, cut the cord, and free herself. When she put the knife down, Joe bent down to pick it up, so she hit him with the bar stool until he stopped moving. Ultimately, Joe picked up the knife and said he was going to kill himself. Andriano tried to stop him, but her hand slipped off the knife. Suddenly there was blood everywhere, but she had not stabbed Joe.

- 14 -

000011434

¶35     Despite Andriano's testimony that Joe had killed himself, in closing argument, defense counsel argued that Andriano was a domestic violence victim who acted in self-defense after an assisted suicide attempt. The jury was instructed on self-defense and told that if it found Andriano to be a domestic violence victim, "the state of mind of a reasonable person . . . shall be determined from the perspective of a reasonable person who has been a victim of those past acts of domestic violence."

¶36     We held in *State v. Celaya* that "where the sole defense is self-defense so that the evidence requires either conviction or acquittal, any instruction on any other grade would be impermissible." 135 Ariz. 248, 255, 660 P.2d 849, 856 (1983); *see also State v. Wall*, 212 Ariz. 1, 6, ¶ 29, 126 P.3d 148, 153 (2006) (noting that when defendant asserts an "all-or-nothing" defense, the record usually will not support the giving of a lesser-included offense instruction); *State v. Jones*, 109 Ariz. 80, 81-82, 505 P.2d 251, 252-53 (1973) (holding that lesser-included offense instructions were not required where evidence at trial and defendant's self-defense theory presented an "either-or" situation requiring either first degree murder conviction or acquittal). We conclude that the evidence in this case did not support either a second degree murder or manslaughter instruction and that the trial court therefore did

- 15 -

000011435

not commit fundamental error in failing to give either instruction.

**B.   Aggravation Phase Issues**

1.   Constitutionality of (F)(6) aggravating factor

¶37    Andriano argues that the A.R.S. § 13-703(F)(6) "especially heinous, cruel or depraved" aggravator is both facially vague and vague as applied by juries rather than trial judges. In *Walton v. Arizona*, the United States Supreme Court found Arizona's (F)(6) aggravator facially vague. 497 U.S. 639, 654 (1990), *overruled on other grounds by Ring v. Arizona (Ring II)*, 536 U.S. 584 (2002). The Supreme Court nonetheless upheld the factor against a constitutional challenge because this Court's narrowing construction of the (F)(6) aggravator "gives meaningful guidance to the sentencer." *Id.* at 653-55.

¶38    Because juries rather than trial judges now find the existence of aggravating factors, *see* A.R.S. § 13-703.01(C) (Supp. 2006), Andriano argues that the judge's knowledge of the narrowing construction cannot save the (F)(6) aggravator from unconstitutional vagueness. We rejected this argument in *State v. Cromwell*, 211 Ariz. 181, 188-89, ¶¶ 40-42, 119 P.3d 448, 455-56 (2005), *cert. denied*, 126 S. Ct. 2291 (2006), and *State v. Anderson (Anderson II)*, 210 Ariz. 327, 352-53, ¶¶ 109-14, 111 P.3d 369, 394-95 (2005). "Those cases hold that the (F)(6) aggravator may be constitutionally applied if given substance

- 16 -

000011436

and specificity by jury instructions that follow this Court's constructions." *State v. Hampton*, 213 Ariz. 167, 176, ¶ 36, 140 P.3d 950, 959 (2006), *cert. denied*, 127 S. Ct. 972 (2007).

¶39      Andriano also argues that the (F)(6) aggravating factor is unconstitutionally vague when applied by a jury because without proportionality review the jury has no way to determine whether the murder for which it has found the defendant guilty is "above the norm of other first degree murders." We rejected this argument in *State v. Johnson*, 212 Ariz. 425, 431-32, ¶¶ 19-20, 133 P.3d 735, 741-42, *cert. denied*, 127 S. Ct. 559 (2006). We similarly reject it here.

### 2.  (F)(6) "cruelty" instruction[4]

¶40      The trial court provided the following (F)(6) "cruelty" instruction to the jury:

> "Cruelty" involves the infliction of physical pain and/or mental anguish on a victim before death. A crime is committed in an especially cruel manner when a defendant either knew or should have known that the manner in which the crime is committed would cause the victim to experience physical pain and/or mental anguish before death. The victim must be conscious for at least some portion of the time when the pain and/or anguish was inflicted.

---

[4]      The jury found only the cruelty prong of the (F)(6) aggravating factor. It did not find the murder heinous or depraved. A finding of any of the three prongs is sufficient to support the (F)(6) aggravating circumstance. *Cromwell*, 211 Ariz. at 189, ¶ 43, 119 P.3d at 456.

000011437

Andriano asserts that this instruction was insufficient to guide the jury and channel its discretion in applying the aggravator.

¶41    The instruction given paraphrases this Court's statement in *State v. Trostle*, 191 Ariz. 4, 18, 951 P.2d 869, 883 (1997), that "[c]ruelty exists if the victim consciously experienced physical or mental pain prior to death, and the defendant knew or should have known that suffering would occur." (Internal citation omitted.)    We recently reaffirmed that the *Trostle* definition of "cruelty" sufficiently narrows and gives substance to the (F)(6) "especially cruel" aggravating factor to save it from constitutional infirmity.    *Anderson II*, 210 Ariz. at 352 & n.18, ¶ 109, 111 P.3d at 394 & n.18.    We similarly conclude here that the trial court's instruction gave sufficient substance and specificity to the term "cruelty" to channel the jury's discretion and correct any unconstitutional vagueness.[5]

---

[5]    Andriano's brief also seems to claim that the evidence was insufficient to support the jury's finding that the murder was "especially cruel."    Because we would review sufficiency of the evidence to "determine whether substantial evidence supports the jury's finding, viewing the facts in the light most favorable to sustaining the jury['s] verdict," *State v. Roque*, 213 Ariz. 193, 218, ¶ 93, 141 P.3d 368, 393 (2006), and affirm the jury's finding if the evidence is such that "reasonable persons could accept [it] as adequate and sufficient to support a conclusion of defendant's guilt beyond a reasonable doubt," *id.* (quoting *State v. Roseberry*, 210 Ariz. 360, 369, ¶ 45, 111 P.3d 402, 411 (2005)), the issue is subsumed in our independent review.    *See infra* ¶¶ 64-68.

- 18 -

3.  "Above the norm of other first degree murders" instruction

¶42     The trial court instructed the jury that the (F)(6) aggravating circumstance "cannot be found to exist unless the murder is especially heinous, cruel or depraved, that is, where the circumstances of the murder raise it above the norm of other first degree murders."   Andriano claims that this instruction required the jury to engage in proportionality review, which was improper in light of *State v. Salazar*, 173 Ariz. 399, 416, 844 P.2d 566, 583 (1992), and *State v. Greenway*, 170 Ariz. 155, 171, 823 P.2d 22, 38 (1991).   Because Andriano did not object on this ground at trial, we review only for fundamental error.   *See State v. Henderson*, 210 Ariz. 561, 567, ¶ 19, 115 P.3d 601, 607 (2005).

¶43     We have held that "the death penalty should not be imposed in every capital murder case but, rather, it should be reserved for cases in which either the manner of the commission of the offense or the background of the defendant places the crime 'above the norm of first-degree murders.'"   *State v. Carlson*, 202 Ariz. 570, 582, ¶ 45, 48 P.3d 1180, 1192 (2002) (quoting *State v. Hoskins*, 199 Ariz. 127, 163, ¶ 169, 14 P.3d 997, 1033 (2000)).   Such an instruction does not require the jury to engage in proportionality review.   Instead, the jurors must assess whether the murder was so cruel that it rose above

- 19 -

000011439

P-App. 006972

the norm of first degree murders. To assist them in this inquiry, the judge instructed the jurors on the definition of "cruelty," explaining how to determine whether "the circumstances of the murder raise it above the norm of other first degree murders." Considering the instructions as a whole, the jury was properly instructed to apply the definition of "cruelty," rather than to engage in proportionality review. The trial court did not err, fundamentally or otherwise, in giving the instruction.

**C.   Penalty Phase Issues**

    1.   <u>Residual doubt mitigation</u>

¶44    The trial court denied Andriano's request to present evidence of residual doubt as a mitigating circumstance in the penalty phase.  Andriano claims that the trial court was constitutionally required to allow her to present such mitigation evidence for the jury's consideration.  We review alleged constitutional violations de novo. *McGill*, 213 Ariz. at 159, ¶ 53, 140 P.3d at 942.

¶45    Both the United States Supreme Court and this Court have rejected the argument that a capital defendant must be allowed to present residual doubt evidence in mitigation.  In *Oregon v. Guzek*, the defendant argued that the Eighth and Fourteenth Amendments granted him a constitutional right to present new alibi evidence at his sentencing proceeding.  546

- 20 -

000011440

U.S. 517, ___, 126 S. Ct. 1226, 1230 (2006). The Supreme Court, although not deciding whether such a right exists, held that its previous cases do not grant capital defendants a constitutional right to present evidence of residual doubt at sentencing. *Id.* at ___, 126 S. Ct. at 1231-32. We thus noted in *State v. Ellison* that "there is no constitutional requirement that the sentencing proceeding jury revisit the prior guilty verdict by considering evidence of 'residual doubt.'" 213 Ariz. 116, 136, ¶ 82, 140 P.3d 899, 919 (citing *Guzek*, 546 U.S. at ___, 126 S. Ct. at 1230-32), *cert. denied*, 127 S. Ct. 506 (2006). The trial court did not err in denying Andriano's request to present residual doubt evidence in mitigation.

### 2. Mercy mitigation

¶46    The trial court also denied Andriano's request to include "mercy" among the enumerated mitigating circumstances for the jury's consideration. Andriano maintains that the trial court was constitutionally required to allow her to do so. We disagree.

¶47    Arizona Revised Statutes § 13-703(G) (Supp. 2004) provides that mitigating circumstances are "any factors proffered by the defendant or the state that are relevant in determining whether to impose a sentence less than death, including any aspect of the defendant's character, propensities or record and any of the circumstances of the offense." The

- 21 -

000011441

defendant bears the burden of proving mitigating circumstances by a preponderance of the evidence.   *Id.* § 13-703(C).   The defendant cannot, however, prove "mercy" by any standard, nor does it relate to the character or propensities of the defendant or the circumstances of the crime.   Therefore, mercy is not a mitigating circumstance.

¶48     Mercy is a concept jurors may apply in evaluating the existence of mitigating circumstances and in deciding whether the death penalty is appropriate in a particular case.   In this sense, "mercy" is simply another word for "compassion" or "leniency."   A capital defendant is free to argue to the jury, as the defense did here, that mercy or leniency is appropriate based on the mitigation evidence presented.

¶49     The instructions given in this case correctly conveyed the role of mercy in determining the appropriate sentence.   The trial court did not err in refusing Andriano's request to include mercy among the enumerated mitigating circumstances for the jury's consideration.

   3.   Jury unanimity in determining mitigating circumstances

¶50     The trial court instructed the jury in the penalty phase as follows:

> Any verdict of death or life imprisonment must be unanimous.   If you unanimously find that no mitigation exists, then you must return a verdict of death.   *If you unanimously find that mitigation exists*, each one of you must individually weigh that mitigation in

- 22 -

000011442

> light of the aggravating circumstance already found to
> exist, and if you unanimously find that the mitigation
> is not sufficiently substantial to call for leniency,
> you must return a verdict of death. *If you
> unanimously find that mitigation exists* and it is
> sufficiently substantial to call for leniency, you
> must return a verdict of life.

(Emphasis added.)   Andriano claims that this instruction
improperly required the jury to unanimously find particular
mitigating circumstances before each juror could individually
consider whether that mitigation was sufficiently substantial to
call for leniency.   We review the challenged instruction de novo
and consider the instructions as a whole "to ensure that the
jury receives the information it needs to arrive at a legally
correct decision."   *State ex rel. Thomas v. Granville (Baldwin)*,
211 Ariz. 468, 471, ¶ 8, 123 P.3d 662, 665 (2005).

¶51      Each juror in a death penalty case must individually
determine whether any mitigating circumstances exist.   A.R.S.
§ 13-703(C); *see Baldwin*, 211 Ariz. at 472, ¶ 13, 123 P.3d at
666; *see also Ellison*, 213 Ariz. at 139, ¶ 102, 140 P.3d at 922
(discussing Supreme Court cases holding that capital sentencing
statutes may not require unanimity as to mitigating
circumstances).   Then, in light of the aggravating circumstances
the jury has already found to exist, each juror must
individually determine whether the mitigation that juror has
found to exist is sufficiently substantial to call for leniency.
*See* A.R.S. § 13-703(C), (E); *Baldwin*, 211 Ariz. at 473, ¶ 18,

- 23 -

000011443

123 P.3d at 667.

¶52    Read as a whole, the instructions given here correctly advised the jurors that they did not have to agree upon the existence of any particular mitigating circumstance before each juror could individually assess whether the mitigation was sufficiently substantial to call for leniency.   The court repeatedly advised them during the penalty phase that each juror was required to "individually" determine the existence of mitigating circumstances.[6]  We therefore conclude that the trial

---

[6]    Before being given the instruction to which Andriano objects, the jurors had been instructed as follows:

> Although a final decision on a penalty of death or life imprisonment must be unanimous, the determination of what circumstances are mitigati[ng] is for *each one of you to resolve, individually*, based upon all the evidence that has been presented to you during this phase and at any of the prior phases of the trial.

(Emphasis added.)   The jurors were also given the following instruction:

> You must make your decision about whether mitigation is sufficiently substantial to call for leniency based solely upon your weighing of any mitigation proven to you and the aggravating factor you have already found during the Aggravation Phase. To do this, *you must individually determine the nature and extent of mitigating circumstances.*   Then, in light of the aggravating circumstance that has been proven to exist, you must individually determine if the totality of the mitigating circumstances is sufficiently substantial to call for leniency and a life sentence.

(Emphasis added.)

- 24 -

000011444

court's instruction, considered in light of the other instructions, adequately informed the jury and does not require reversal.

### 4.  Jury coercion

¶53     Andriano argues that the trial court coerced the jury's death verdict in two ways when it gave an impasse instruction:  (1) by giving the instruction before ascertaining whether the jury was truly deadlocked; and (2) by improperly instructing the jury about its duty to deliberate.   "In determining whether a trial court has coerced the jury's verdict, this court views the actions of the judge and the comments made to the jury based on the totality of the circumstances and attempts to determine if the independent judgment of the jury was displaced."   *State v. Huerstel*, 206

---

Moreover, at the outset of the penalty phase, the jury was preliminarily advised that "[t]he jurors do not have to agree unanimously that a mitigating circumstance has been proven to exist.   Each juror may consider any mitigating circumstance found by that juror in determining the appropriate penalty."   The jury was further instructed at that time to "individually decide whether there is mitigation and whether it is sufficiently substantial to call for the imposition of a life sentence rather than a sentence of death."

Defense counsel's closing argument in the penalty phase also correctly advised the jurors regarding their responsibilities.   Defense counsel told the jury, "[t]o clarify once again, individually determine the nature and extent of the mitigating circumstances.   Not as a group, individually.   What is it to me, as one juror.   What is my moral position on that circumstance."

- 25 -

000011445

Ariz. 93, 97, ¶ 5, 75 P.3d 698, 702 (2003).

¶54      Near the end of the second day of penalty phase deliberations, the jury submitted the following question to the trial court: "If we are unable to reach an unanimous verdict, what is the procedure that will be followed?"  The court instructed the jury as follows:

> It appears from your note that you are at a deadlock in your deliberations. I have some suggestions to help your deliberations, not to force you to reach a verdict. I am merely trying to be responsi[ve] to your apparent need for help. I do not wish or intend to force a verdict. Each juror has a duty to consult with one another, to deliberate with a view to reaching an agreement if it can be done without violence to individual judgment. No juror should surrender his or her honest conviction as to the weight or effect of the evidence solely because of the opinion of other jurors or for the purpose of reaching a verdict.
>
> However, you may want to identify areas of agreement and disagreement and discuss the law and the evidence as they relate to the areas of disagreement.
>
> If you still disagree, you may wish to tell the attorneys and me which issues, questions, law, or facts you would like us to assist you with. If you decide to follow this suggestion, please write down the issues, questions, law or facts on which we can possibly help. Please give your note to the bailiff. We will then discuss your note and try to help.[7]

The jury asked no further questions and returned a death verdict two days later.

_____

[7]    This instruction contains language very similar to that set forth in the comment to the 1995 amendment to Arizona Rule of Criminal Procedure 22.4.

- 26 -

000011446

### a.   *Prematurely given instruction*

¶55      Rule 22.4 of the Arizona Rules of Criminal Procedure permits the trial court, upon being advised by the jury that it has reached an impasse in its deliberations, to inquire how it can assist the jury in its deliberations.   "Although the rule gives a trial judge broad discretion in dealing with juries at an impasse, the rule requires an affirmative indication from the jury it is in need of help before assistance may be offered." *Huerstel*, 206 Ariz. at 99, ¶ 17, 75 P.3d at 704.   In *Huerstel*, the trial court sent an impasse instruction to the guilt phase jury after three days of deliberations although it had received no note or other indication that the jury had reached an impasse.   *Id.* at 97-98, ¶¶ 6-8, 75 P.3d at 702-03.   The only questions the court had received related to the credentials of an expert witness, evidentiary matters, and a jury instruction. *Id.*   We held that the impasse instruction was prematurely given because it was given "without any clear evidence the jury needed help."   *Id.* at 99, ¶ 17, 75 P.3d at 704.

¶56      In this case, unlike the situation in *Huerstel*, the jury's question inquiring what would happen if the jury could not reach a verdict affirmatively indicated that the jurors were at an impasse.   The *Huerstel* rule does not require that the jury unequivocally state that it cannot reach a verdict, only that it give an "affirmative indication" that it is deadlocked.   The

– 27 –

000011447

trial court did not err in giving the impasse instruction.

     *b.*  *Duty to deliberate instruction*

¶57    Andriano also argues that the impasse instruction given by the trial court inaccurately stated the law regarding a capital jury's duty in penalty phase deliberations. The crux of the argument is that, although the trial court's instruction would have been proper in the guilt phase or the aggravation phase of the proceedings, it was not appropriate in the penalty phase because jurors have no duty to "deliberate with a view to reaching an agreement" in the penalty phase.

¶58    In *Lowenfield v. Phelps*, the United States Supreme Court addressed whether an impasse instruction given to a capital sentencing jury coerced the death sentence in that case. 484 U.S. 231, 233 (1988).[8]  The Supreme Court held that the

---

[8]  In *Lowenfield*, the trial court gave an instruction that said in part:

    When you enter the jury room it is your duty to consult with one another to consider each other's views and to discuss the evidence with the objective of reaching a just verdict if you can do so without violence to that individual judgment.

    Each of you must decide the case for yourself but only after discussion and impartial consideration of the case with your fellow jurors. You are not advocates for one side or the other. Do not hesitate to reexamine your own views and to change your opinion if you are convinced you are wrong but do not surrender your honest belief as to the weight and effect of evidence solely because of the opinion of

- 28 -

000011448

instruction did not coerce the jury's death verdict.   *Id.* at
241.   The Court quoted with approval another capital case in
which it had opined that jurors must try to reach a verdict:

> The very object of the jury system is to secure
> unanimity by a comparison of views, and by arguments
> among the jurors themselves.   It certainly cannot be
> the law that each juror should not listen with
> deference to the arguments and with a distrust of his
> own judgment, if he finds a large majority of the jury
> taking a different view of the case from what he does
> himself.   It cannot be that each juror should go to
> the jury room with a blind determination that the
> verdict shall represent his opinion of the case at
> that moment; or, that he should close his ears to the
> arguments of men who are equally honest and
> intelligent as himself.

*Id.* at 237 (quoting *Allen v. United States*, 164 U.S. 492, 501-02
(1896)).   The Court emphasized that "[t]he continuing validity
of this Court's observations in *Allen* are beyond dispute."   *Id.*

¶59      *Lowenfield* thus makes clear that jurors in capital
cases have a duty to deliberate in sentencing proceedings.
Arizona's death penalty sentencing scheme does not alter this
duty.   While jurors individually determine whether a mitigating
circumstance exists, A.R.S. § 13-703(C), the jury must still be
unanimous in its decision to impose a death sentence or a life
sentence, *id.* § 13-703.01(H).   Therefore, the jurors may be
instructed that they have a duty to deliberate in the penalty

---

your fellow jurors or for the mere purpose of
returning a verdict.

484 U.S. at 235.

- 29 -

000011449

phase of a capital case.

¶60     In sum, because the impasse instruction correctly stated the law and was given after an affirmative indication from the jury that it was deadlocked, it cannot be said that the verdict was coerced.

**D.   Constitutionality of Lethal Injection Statute**

¶61     Arizona Revised Statutes § 13-704(A) (2001) provides that "[t]he penalty of death shall be inflicted by an intravenous injection of a substance or substances in a lethal quantity sufficient to cause death, under the supervision of the state department of corrections." Andriano contends that this statute is unconstitutionally vague because it does not prescribe the type or dosage of drugs that must be administered, the order in which they must be administered, or the qualifications of the personnel who administer them, thereby failing to ensure that death by lethal injection is not cruel and unusual. She argues that to comport with the Eighth Amendment, "[t]he statute must [also] address the inherent difficulties with individual issues . . . such as vein accessibility and chemical resistances."

¶62     Section 13-704(A) constitutionally prescribes that the method of death shall be lethal injection. *See State v. Hinchey*, 181 Ariz. 307, 315, 890 P.2d 602, 610 (1995) (considering and rejecting argument that death by lethal

- 30 -

000011450

injection constitutes cruel and unusual punishment). *Hinchey's* pronouncement that lethal injection as a method of execution comports with the Eighth Amendment was not conditioned upon the use of particular procedures in implementing lethal injection. Moreover, the United States Supreme Court has never held that death by lethal injection is cruel and unusual absent specific procedures for implementation, nor does Andriano cite any cases to that effect. Andriano has thus failed to establish an Eighth Amendment right to a particular protocol for lethal injection.[9]

## E.   Independent Review

¶63     Because Andriano's offense occurred before August 1, 2002, we independently review the aggravating and mitigating circumstances and the propriety of the death sentence. A.R.S. § 13-703.04(A) (Supp. 2006); *see* 2002 Ariz. Sess. Laws, 5th Spec. Sess., ch. 1, § 7. In conducting our independent review, we "consider the quality and the strength, not simply the number, of aggravating and mitigating factors." *State v. Roque*, 213 Ariz. 193, 230, ¶ 166, 141 P.3d 368, 405 (2006) (quoting *State v. Greene*, 192 Ariz. 431, 443, ¶ 60, 967 P.2d 106, 118 (1998)).

---

[9]     Andriano may raise in a petition filed pursuant to Arizona Rule of Criminal Procedure 32 any objections to the protocol to be used.

000011451

1.   Aggravation

¶64     The jury found one aggravating factor – that Andriano committed the murder in an especially cruel manner.   A.R.S. § 13-703(F)(6).   Andriano argues that we should find the evidence insufficient to support the "especially cruel" finding by the jury because (1) Joe experienced only "distress," but not "extreme" physical pain or mental anguish after ingesting the sodium azide; (2) the defensive wounds were "minor and . . . not indicative of a great or prolonged struggle," showing that Joe was rendered unconscious "very quickly" after the bar stool attack began; and (3) Joe's distress was not reasonably foreseeable.   We review the jury's finding de novo.   *Anderson II*, 210 Ariz. at 354, ¶ 119, 111 P.3d at 396 (citing A.R.S. § 13-703.04 (independent review)).

¶65     The cruelty prong of the (F)(6) aggravating circumstance may be proved by showing that the defendant knew or should have known that the manner in which the crime was committed would cause the victim to consciously experience either physical pain or mental anguish before death.   *Trostle*, 191 Ariz. at 18, 951 P.2d at 883.   The evidence showed that Andriano poisoned Joe with sodium azide and left him to suffer for what felt to Joe like a "long time."   During that period, Joe vomited at least twice, was too weak to sit or stand, and was having difficulty breathing.   After pretending to call 911,

- 32 -

Andriano stood by for approximately forty-five minutes as Joe suffered from the effects of sodium azide poisoning. Andriano's Internet research on sodium azide and the warnings accompanying the shipped chemical demonstrate that she knew or should have known that poisoning her husband with sodium azide would cause him physical pain and mental anguish. Joe, who was conscious during this time, as evidenced by his interaction with Chris, undoubtedly "experienced significant uncertainty as to [his] ultimate fate." *See Ellison*, 213 Ariz. at 142, ¶ 120, 140 P.3d at 925 (quoting *State v. Van Adams*, 194 Ariz. 408, 421, ¶ 44, 984 P.2d 16, 29 (1999)) (mental anguish, and hence cruelty, established upon this showing).

¶66    Moreover, Andriano struck her terminally ill husband at least twenty-three times in the back of the head with a bar stool. Defensive wounds on Joe's hands and wrists indicate that he was conscious for at least some of the attack and thus knew his wife was attacking him as he lay on the floor, unable to defend himself. Andriano also knew or should have known that beating her husband with a bar stool would cause him physical pain and mental anguish.[10]

¶67    Andriano asks us to require that the physical or

---

[10]   The evidence established that Joe was likely unconscious when his throat was slashed. We therefore do not consider whether the stabbing caused physical pain or mental anguish.

- 33 -

000011453

P-App. 006986

mental pain experienced by the victim be "extreme." There is no such requirement for a cruelty finding. *See Trostle*, 191 Ariz. at 18, 951 P.2d at 883. Nonetheless, the physical pain and mental anguish Joe experienced likely were "extreme" by any standards.

¶68    Although Andriano argued at trial that she was assisting Joe in a suicide by poisoning, she argues on appeal that because Joe did not know he was being poisoned, mental anguish cannot be proved. While a victim's knowledge of the source of physical pain may be relevant to whether the victim experienced mental anguish, it is not a requisite for a finding of mental anguish. And on the facts of this case, mental anguish is established even if Joe did not know he had been poisoned. Moreover, cruelty can be established upon a showing of either mental anguish or physical pain. *Id.* We thus conclude that cruelty was established based on either – or both – mental anguish or physical pain.

2. Mitigation[11]

¶69    Andriano presented several mitigating circumstances

---

[11]    Andriano did not argue why the Court should find in its independent review that the mitigating circumstances were "sufficiently substantial to call for leniency." A.R.S. § 13-703(E). Counsel in capital cases "should take advantage of all appropriate opportunities to argue why death is not suitable punishment for their particular client." *ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases* Guideline 10.11(L) (2003).

– 34 –

000011454

for the jury's consideration, including the stress of Joe's cancer, her good grades in school, missionary and community work, and strong religious convictions. In addition, she presented evidence that she was a sexual abuse and domestic violence victim, a good mother to two children, married for six years, and a good inmate.

¶70     Although Andriano presented some evidence that she was a domestic violence victim, we assign little weight to this mitigating circumstance, in part because it is not related to the murder. See Roque, 213 Ariz. at 231, ¶ 169, 141 P.3d at 406 ("[T]he relationship between mitigating evidence and the murder may affect the weight given to the mitigating evidence.") (citation omitted); State v. Newell, 212 Ariz. 389, 405, ¶ 82, 132 P.3d 833, 849, cert. denied, 127 S. Ct. 663 (2006). The evidence established that Andriano did not kill Joe while defending against a domestic violence attack. Instead, she poisoned her terminally ill husband, struck him in the back of the head twenty-three times, and slit his throat. Joe posed no threat to Andriano at the time of the attack because he was so weak from the poison and chemotherapy that he could not get up.

¶71     Andriano was under substantial stress from having to deal with Joe's terminal cancer. The record does not indicate, however, that at the time of the offense, the stress was any greater than it had been two years earlier when she and Joe

- 35 -

000011455

first learned he was terminally ill, and she was pregnant with their second child. Moreover, this is not a case in which Andriano suddenly "cracked" under extreme stress. Andriano methodically premeditated Joe's murder, showing that her stress bore little relation to Joe's death. This mitigating circumstance thus does not warrant substantial weight.

¶72     Andriano also offered evidence that she "may have been" sexually abused by her biological father when she was around the age of two, although she does not recall it, and that a member of the traveling ministry to which her family belonged exposed himself to Andriano when she was between six and eight years old. Andriano also showed that she maintained good grades in school and participated in missionary and community work. We do not weigh these mitigating circumstances heavily because the events are remote in time to the offense and thus their relevance is minimal. *Cf. Ellison*, 213 Ariz. at 144, ¶ 136, 140 P.3d at 927 (finding defendant's "childhood troubles deserve little value as a mitigator for the murders he committed at age thirty-three").

¶73     The record contains conflicting evidence on whether Andriano was a good mother. In any event, we afford this mitigating circumstance minimal value in light of the fact that Andriano murdered her children's father while the children were present in the apartment. Moreover, neither the fact of

- 36 -

Andriano's marriage nor its six-year duration is mitigating considering that she would have remained married and the marriage would have lasted longer had she not killed her husband.

¶74    Andriano was a good inmate in jail and helpful to staff and inmates from September 2003 until the penalty phase of her trial in December 2004.  Because inmates are expected to behave, however, we assign this mitigating circumstance little weight.  *State v. Harrod*, 200 Ariz. 309, 319, ¶ 53, 26 P.3d 492, 502 (2001), *vacated on other grounds*, 536 U.S. 953 (2002).

¶75    Although Andriano had what might be considered a strict religious upbringing, many of her actions, such as killing her husband and having extramarital affairs, appear inconsistent with holding strong religious convictions.  We thus assign this evidence minimal value.

¶76    Andriano also alleged as mitigating circumstances cooperation with law enforcement authorities, remorse, and age.  The evidence presented, however, contradicts Andriano's assertion that she cooperated in the investigation of Joe's murder.[12]    Moreover, because Andriano continues to deny

---

[12]    Andriano did not mention the sodium azide when she was questioned by police and later asked her coworker to hide evidence.  Evidence was also presented that Andriano staged the scene of the murder to make it appear as though she acted in self-defense.

- 37 -

000011457

responsibility for her conduct, we reject her contention that she is remorseful. *See State v. Gulbrandson*, 184 Ariz. 46, 70-71, 906 P.2d 579, 603-04 (1995) (noting that defendant continued to deny responsibility in finding that he had not proven remorse as a mitigating circumstance). We likewise do not find her age - thirty at the time of the offense - to be mitigating, particularly in light of her above-average I.Q.

¶77     We likewise give minimal weight to the remaining mitigating circumstances urged:  lack of prior convictions, good candidate for rehabilitation, no future threat to the community, and impact on family and friends.

3.   Propriety of the death sentence

¶78     The quality and strength of Andriano's mitigation evidence is not sufficiently substantial to call for leniency in light of the especially cruel manner in which Andriano murdered her husband. We therefore affirm Andriano's sentence of death.

### III.   CONCLUSION

¶79     For the foregoing reasons, we affirm Andriano's conviction and death sentence.

Rebecca White Berch, Vice Chief Justice

- 38 -

000011458

CONCURRING:

_____

Ruth V. McGregor, Chief Justice


_____

Michael D. Ryan, Justice


_____

Andrew D. Hurwitz, Justice


_____

W. Scott Bales, Justice

– 39 –

000011459

# APPENDIX

## Claims Raised to Avoid Preclusion

Andriano raises the following thirteen challenges to the constitutionality of Arizona's death penalty scheme to avoid preclusion:

1. The death penalty is cruel and unusual punishment under any circumstances. This argument was rejected by the United States Supreme Court in *Gregg v. Georgia*, 428 U.S. 153, 187 (1976), and by this Court in *Harrod*, 200 Ariz. at 320, ¶ 59, 26 P.3d at 503.

2. The death penalty is imposed arbitrarily and irrationally in Arizona. We rejected this argument in *State v. Beaty*, 158 Ariz. 232, 247, 762 P.2d 519, 534 (1988).

3. Application of the death penalty on the facts of this case would constitute cruel and unusual punishment. No argument or authority is presented to support this claim.

4. The prosecutor's discretion to seek the death penalty is not channeled by standards. We rejected this argument in *State v. Sansing*, 200 Ariz. 347, 361, ¶ 46, 26 P.3d 1118, 1132 (2001), *vacated on other grounds*, 536 U.S. 954 (2002).

5. The aggravating factors set forth in A.R.S. § 13-703(F) are elements of capital murder and must be alleged in an indictment and screened for probable cause. We rejected this argument in *McKaney v. Foreman ex rel. County of Maricopa*, 209 Ariz. 268, 270, ¶ 9, 100 P.3d 18, 20 (2004).

6. Application of the death penalty statutes promulgated after *Ring II*, 536 U.S. at 584, violates the prohibition against ex post facto laws. The changes altered the rules of evidence to permit different testimony than that permitted at the time of Andriano's offense. We rejected this argument in *State v. Ring (Ring III)*, 204 Ariz. 534, 547, ¶ 24, 65 P.3d 915, 928 (2003).

- 40 -

000011460

7.  The absence of proportionality review of death sentences by Arizona courts denies capital defendants due process of law and equal protection and amounts to cruel and unusual punishment. We rejected this argument in *Gulbrandson*, 184 Ariz. at 73, 906 P.2d at 606.

8.  Arizona's capital sentencing scheme is unconstitutional because it does not require that the State prove that the death penalty is appropriate. We rejected this argument in *Gulbrandson*, 184 Ariz. at 72, 906 P.2d at 605.

9.  Arizona Revised Statutes § 13-703 provides no objective standards to guide the sentencer in weighing the aggravating and mitigating circumstances. We rejected this argument in *State v. Pandeli*, 200 Ariz. 365, 382, ¶ 90, 26 P.3d 1136, 1153 (2001), *vacated on other grounds*, 536 U.S. 953 (2002).

10. Arizona's death penalty scheme is unconstitutional because it does not require the sentencer to find beyond a reasonable doubt that the aggravating circumstances outweigh the accumulated mitigating circumstances. We rejected this argument in *State v. Poyson*, 198 Ariz. 70, 83, ¶ 59, 7 P.3d 79, 92 (2000).

11. Arizona Revised Statutes § 13-703 does not sufficiently channel the sentencer's discretion. Aggravating circumstances should narrow the class of persons eligible for the death penalty and reasonably justify the imposition of a harsher penalty. The broad scope of Arizona's aggravating factors encompasses nearly anyone involved in a murder. We rejected this argument in *Pandeli*, 200 Ariz. at 382, ¶ 90, 26 P.3d at 1153.

12. Execution by lethal injection is cruel and unusual punishment. We rejected this argument in *Hinchey*, 181 Ariz. at 315, 890 P.2d at 610.

13. Arizona's death penalty scheme unconstitutionally requires imposition of the death penalty whenever at least one aggravating circumstance exists and there is no mitigation sufficiently substantial to call for leniency. We rejected this argument in *State v. Miles*, 186 Ariz. 10, 19, 918 P.2d 1028, 1037 (1996).

000011461

P-App. 006994

FROM :

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

**COPY**

CR 2000-096032

02/04/2005

CLERK OF THE COURT
M. LeSueur
Deputy

HONORABLE BRIAN K. ISHIKAWA

FILED:_____

JUAN M MARTINEZ

STATE OF ARIZONA

v.

WENDI ELIZABETH ANDRIANO

DANIEL B PATTERSON
G DAVID DELOZIER JR.

MCSO-DIS
VICTIM SERVICES DIV-CA-SE

HEARING ON ORAL ARGUMENT
RE: MOTION FOR NEW TRIAL

State's Attorney:            Juan Martinez
Defendant's Attorney:       Daniel Patterson and David Delozier
Defendant:                  Present
Court Reporter:             Traci Wheeler

This is the time set for Hearing on Oral Argument re: Defendant's Motion for New Trial. *Phase III.*

Counsel present oral arguments to the Court.

IT IS ORDERED taking the matter under advisement.

IT IS FURTHER ORDERED that the Maricopa County Sheriff's Office, shall immediately return the Defendant to the custody of the Arizona Department of Corrections.

Docket Code 020                    Form R000D                    Page 1

000011462

# Arizona Department of Corrections



1601 West Jefferson
Phoenix, Arizona 85007
(602) 542-5497



DORA B. SCHRIRO
DIRECTOR

JANET NAPOLITANO
GOVERNOR

## DETAINER

**INMATE NAME:**  **ANDRIANO, WENDI**

**INMATE NUMBER:**  **191593**

**ALL LAW ENFORCEMENT AGENCIES   MARICOPA COUNTY**

THE  above referenced inmate was TEMPORARILY TRANSFERRED to your jurisdiction on
<u>02/02//05</u> under *Your File* CR 2000 296032

Please **PLACE A DETAINER** on behalf of the Arizona Department of Corrections. **DO NOT RELEASE** the above referenced inmate prior to contacting the Central Office Time Computation Unit Manager at (602) 542-3277 for verification of release dates.

When ready to **return the inmate to ADC custody**, please contact the ASPC - Perryville Offender Information Unit at (623) 853-0304 Ext.# 6400 OR Ext 6406
Sincerely,

**CHARLOTTE COOPER CRCII**

*Charlotte Cooper*
**FOR JUDITH GUERRIN**
Correctional Records Supervisor II
ASPC- Perryville

Received by (Signature of Officer)    Title        Agency         Date

MCSO                   2-2-05

cc:    Master Records File
        Institutional File

Po 45/22

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                             01/14/2005

                                            CLERK OF THE COURT
HONORABLE BRIAN K. ISHIKAWA                       M. LeSueur
                                                   Deputy

                                            FILED: _____ JAN 2 4 2005 _____

STATE OF ARIZONA                            JUAN M MARTINEZ

v.

WENDI ELIZABETH ANDRIANO                     DANIEL B PATTERSON
                                            G DAVID DELOZIER JR.

                                            AZ DOC MAIL CODE 481


ORDER SECURING ATTENDANCE OF PRISONER


        IT IS ORDERED that the Arizona Department of Corrections, release to the custody of
the Maricopa County Sheriff's Office, or any county sheriff's office within the state of Arizona,
Wendi Elizabeth Andriano, A631830, date of birth: 8/26/1970, for purposes of transportation for
hearing on **February 4, 2005 at 11:00 a.m.** before Judge Brian K. Ishikawa.

        IT IS FURTHER ORDERED upon conclusion of said hearing the Maricopa County
Sheriff's Office, or any county sheriff's office within the state of Arizona, shall return the
prisoner to the custody of the Arizona Department of Corrections.

3 certified copies delivered to MCSO-DIS

        DATED this 14th day of January, 2005.


The foregoing instrument is a full, true and correct copy of
the original document.

Attest_ 1/24/05    4:40PM _____     HONORABLE BRIAN K. ISHIKAWA
                                           Judge of the Superior Court
MICHAEL K. JEANES, Clerk of the Superior Court of
the State of Arizona, in and for the County of Maricopa.

        By___ M. LeSueur _____Deputy

Docket Code 086                   Form R086A                        Page 1


                                                          000011464

P-App. 006997

*P. VILLE.*

*DEATH ROW*
*191593*

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                      01/14/2005

CLERK OF THE COURT
HONORABLE BRIAN K. ISHIKAWA                          M. LeSueur
                                                     Deputy

FILED: _____ JAN 2 4 2005 _____

STATE OF ARIZONA                          JUAN M MARTINEZ

v.

WENDI ELIZABETH ANDRIANO                   DANIEL B PATTERSON
                                           G DAVID DELOZIER JR.

                                           AZ DOC MAIL CODE 481


ORDER SECURING ATTENDANCE OF PRISONER


IT IS ORDERED that the Arizona Department of Corrections, release to the custody of
the Maricopa County Sheriff's Office, or any county sheriff's office within the state of Arizona,
Wendi Elizabeth Andriano, A631830, date of birth: 8/26/1970, for purposes of transportation for
hearing on **February 4, 2005 at 11:00 a.m.** before Judge Brian K. Ishikawa.

IT IS FURTHER ORDERED upon conclusion of said hearing the Maricopa County
Sheriff's Office, or any county sheriff's office within the state of Arizona, shall return the
prisoner to the custody of the Arizona Department of Corrections.

3 certified copies delivered to MCSO-DIS

DATED this 14th day of January, 2005.

The foregoing instrument is a full, true and correct copy of
the original document.

Attest_____ 1/21/05 4:40PM _____

MICHAEL K. JEANES, Clerk of the Superior Court of
the State of Arizona, in and for the County of Maricopa.

By_____ M. LESUER _____Deputy

HONORABLE BRIAN K. ISHIKAWA
Judge of the Superior Court

Docket Code 086                    Form R086A                         Page 1

000011465

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                          01/14/2005

CLERK OF THE COURT
HONORABLE BRIAN K. ISHIKAWA                    M. LeSueur
Deputy

FILED: 01/24/2005

STATE OF ARIZONA                          JUAN M MARTINEZ

v.

WENDI ELIZABETH ANDRIANO                  DANIEL B PATTERSON
                                          G DAVID DELOZIER JR.

                                          AZ DOC MAIL CODE 481


ORDER SECURING ATTENDANCE OF PRISONER


        IT IS ORDERED that the Arizona Department of Corrections, release to the custody of
the Maricopa County Sheriff's Office, or any county sheriff's office within the state of Arizona,
Wendi Elizabeth Andriano, A631830, date of birth: 8/26/1970, for purposes of transportation for
hearing on **February 4, 2005 at 11:00 a.m.** before Judge Brian K. Ishikawa.

        IT IS FURTHER ORDERED upon conclusion of said hearing the Maricopa County
Sheriff's Office, or any county sheriff's office within the state of Arizona, shall return the
prisoner to the custody of the Arizona Department of Corrections.

3 certified copies delivered to MCSO-DIS

        DATED this 14th day of January, 2005.



        / s /   HONORABLE BRIAN K. ISHIKAWA
_____
JUDICIAL OFFICER OF THE SUPERIOR COURT



Docket Code 086                    Form R086A                    Page 1


                                                        000011466

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                **CERTIFIED COPY**                12/22/2004

HONORABLE BRIAN K. ISHIKAWA

CLERK OF THE COURT
M. LeSueur
Deputy

FILED: _12/23/2004_

STATE OF ARIZONA

JUAN M MARTINEZ

v.

WENDI ELIZABETH ANDRIANO

DANIEL B PATTERSON
G DAVID DELOZIER JR.

DOB: 8/26/1970

APPEALS-SE
AZ DOC
CERTIFICATION DESK - SE
DISPOSITION CLERK-SE
EXHIBITS-SE
FILE ROOM-SE
MCSO-DIS
REMAND DESK-SE
VICTIM SERVICES DIV-CA-SE

TRIAL MINUTE ENTRY
DAY 58
SENTENCE OF DEATH

State's Attorney:          Juan Martinez
Defendant's Attorney:      Daniel Patterson and David Delozier
Defendant:                 Present
Court Reporter:            Dana Smith

1:00 p.m. LET THE RECORD REFLECT that the jury is all present in the jury room and resume their deliberations from December 21, 2004.

2:25 p.m. Court reconvenes.  Court, Counsel, and Defendant are present.

Court Reporter, Dana Smith, is present.

Docket Code 012                    Form R571                          Page 1

000011467

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                        12/22/2004

The Jury is not present.

Counsel for Defendant presents oral Rule 20 Motion and Motion for Mistrial.

IT IS ORDERED denying Defendant's Rule 20 Motion and Motion for Mistrial.

The Jury is now present in the jury box and by their foreperson return into Court their verdict, which is read and recorded by the clerk, and is as follows:

"We, the Jury, duly empanelled and sworn in this matter, upon our oaths, do unanimously find that the Defendant, Wendi Elizabeth Andriano, shall be sentenced to DEATH."

Signed by the Foreperson.

The Jury replies that this is their true verdict.

At the request of Defense Counsel, the Jury is polled, and each juror replies that these are his or her true verdicts as to each count.

FILED:  Verdict

Sentencing proceeds at this time.

The Defendant was found guilty after a trial by jury.

IT IS THE JUDGMENT of the Court Defendant is guilty of the following:

OFFENSE:  FIRST DEGREE MURDER, A DANGEROUS OFFENSE
Class 1 FELONY
A.R.S. § 13-1101, 13-1105, 13-703, 13-801, and 13-604(P)
Date of Offense: October 8, 2000
Dangerous pursuant to A.R.S. § 13-604 - Non Repetitive

AS PUNISHMENT, IT IS ORDERED Defendant is sentenced to a term of imprisonment and is committed to the Arizona Department of Corrections as follows:

DEATH BY LETHAL INJECTION
Presentence Incarceration Credit: 0 days
See Special Verdict

IT IS ORDERED authorizing the Sheriff of Maricopa County to deliver the Defendant to the Arizona Department of Corrections to carry out the term of imprisonment set forth herein.

Docket Code 012                    Form R571                    Page 2

000011468

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                      12/22/2004

IT IS ORDERED the Clerk of the Superior Court remit to the Arizona Department of Corrections a copy of this order together with all presentence reports, probation violation reports, and medical and psychological reports that are not sealed in this cause relating to the Defendant.

IT IS ORDERED directing the Clerk of the Court to file a Notice of Appeal on behalf of the Defendant.

cc: DOC - Certified Copy via Certification Desk

cc: MCSO-DIS - Certified Copy via Certification Desk

The Jury is excused from further consideration of this cause.

IT IS ORDERED that the Clerk release the exhibits not offered in evidence to counsel and counsel shall take possession of the exhibits.

FILED: Exhibit Worksheet and Exhibit Release Form

2:35 p.m. Court stands at recess.

Docket Code 012                    Form R571                    Page 3

000011469

SUPERIOR COURT OF ARIZON
MARICOPA COUNTY

CLERK OF THE COURT

Date: 12/22/04        HONORABLE BRIAN K. ISHIKAWA        M. LESUEUR
                                                        Deputy

No.  CR2000-096032

STATE v. ANDLIANO

 

 

       Let the record reflect that the Defendant's thumbprint is permanently affixed to this sentencing order in open court.



(thumbprint)

HONORABLE BRIAN K. ISHIKAWA
Judge of the Superior Court

the foregoing instrument is a full, true and correct copy
of the original on file in this office.

Attest_____ DEC 2 2 2004 _____ 20____
MICHAEL K. JEANES, Clerk of the Superior Court of the
State of Arizona, in and for the County of Maricopa.

By_____ Deputy

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032     **CERTIFIED COPY**     12/22/2004     191593
12234

CLERK OF THE COURT

HONORABLE BRIAN K. ISHIKAWA     M. LeSueur
Deputy

FILED: 12/23/2004

STATE OF ARIZONA     JUAN M MARTINEZ

v.

WENDI ELIZABETH ANDRIANO     DANIEL B PATTERSON
G DAVID DELOZIER JR.

DOB: 8/26/1970

APPEALS-SE
AZ DOC
CERTIFICATION DESK - SE
DISPOSITION CLERK-SE
EXHIBITS-SE
FILE ROOM-SE
MCSO-DIS
REMAND DESK-SE
VICTIM SERVICES DIV-CA-SE

TRIAL MINUTE ENTRY
DAY 58
SENTENCE OF DEATH

State's Attorney:     Juan Martinez
Defendant's Attorney:     Daniel Patterson and David Delozier
Defendant:     Present
Court Reporter:     Dana Smith

    1:00 p.m. LET THE RECORD REFLECT that the jury is all present in the jury room and resume their deliberations from December 21, 2004.

    2:25 p.m. Court reconvenes.  Court, Counsel, and Defendant are present.

    Court Reporter, Dana Smith, is present.

Docket Code 012        Form R571        Page 1

000011471

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                    12/22/2004

The Jury is not present.

Counsel for Defendant presents oral Rule 20 Motion and Motion for Mistrial.

IT IS ORDERED denying Defendant's Rule 20 Motion and Motion for Mistrial.

The Jury is now present in the jury box and by their foreperson return into Court their verdict, which is read and recorded by the clerk, and is as follows:

"We, the Jury, duly empanelled and sworn in this matter, upon our oaths, do unanimously find that the Defendant, Wendi Elizabeth Andriano, shall be sentenced to DEATH."

Signed by the Foreperson.

The Jury replies that this is their true verdict.

At the request of Defense Counsel, the Jury is polled, and each juror replies that these are his or her true verdicts as to each count.

FILED:  Verdict

Sentencing proceeds at this time.

The Defendant was found guilty after a trial by jury.

IT IS THE JUDGMENT of the Court Defendant is guilty of the following:

OFFENSE:  FIRST DEGREE MURDER, A DANGEROUS OFFENSE
Class 1 FELONY
A.R.S. § 13-1101, 13-1105, 13-703, 13-801, and 13-604(P)
Date of Offense: October 8, 2000
Dangerous pursuant to A.R.S. § 13-604 - Non Repetitive

AS PUNISHMENT, IT IS ORDERED Defendant is sentenced to a term of imprisonment and is committed to the Arizona Department of Corrections as follows:

DEATH BY LETHAL INJECTION
Presentence Incarceration Credit: 0 days
See Special Verdict

IT IS ORDERED authorizing the Sheriff of Maricopa County to deliver the Defendant to the Arizona Department of Corrections to carry out the term of imprisonment set forth herein.

Docket Code 012                    Form R571                    Page 2

000011472

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                    12/22/2004

IT IS ORDERED the Clerk of the Superior Court remit to the Arizona Department of Corrections a copy of this order together with all presentence reports, probation violation reports, and medical and psychological reports that are not sealed in this cause relating to the Defendant.

IT IS ORDERED directing the Clerk of the Court to file a Notice of Appeal on behalf of the Defendant.

cc:  DOC - Certified Copy via Certification Desk

cc:  MCSO-DIS - Certified Copy via Certification Desk

The Jury is excused from further consideration of this cause.

IT IS ORDERED that the Clerk release the exhibits not offered in evidence to counsel and counsel shall take possession of the exhibits.

FILED:  Exhibit Worksheet and Exhibit Release Form

2:35 p.m. Court stands at recess.

The foregoing instrument is a full, true and correct copy of the original on file in this office.

Attest_____ 20_____
MICHAEL K. JEANES, Clerk of the Superior Court of the State of Arizona, in and for the County of Maricopa.

By_____Deputy

Docket Code 012                  Form R571                          Page 3

000011473

SUPERIOR COURT OF ARIZON...
MARICOPA COUNTY

CLERK OF THE COURT

Date: 12/22/04          HONORABLE BRIAN K. ISHIKAWA          M. LESUEUR
                                                                                      Deputy

No. CR2000-096032

STATE v. ANOLIANO

        Let the record reflect that the Defendant's thumbprint is permanently affixed to this sentencing order in open court.



(thumbprint)

HONORABLE BRIAN K. ISHIKAWA
Judge of the Superior Court

the foregoing instrument is a full, true and correct copy
of the original on file in this office.
Attest _____ **DEC 2 2 2004** _____ 20 ____
MICHAEL K. JEANES, Clerk of the Superior Court of the
State of Arizona, in and for the County of Maricopa.

By _____ Deputy

Page _____
000011474

I57 0 191593
  IISB157                    RISK ASSESSMENT PROFILE
DC.NO.  191593  ANDRIANO, E              STATUS  ACTIVE
  CUR.LOC.   ASPC-PV SPEC. MANAGE

| ACTOR | COMMUNITY RISK | | INSTITUTIONAL |
|---|---|---|---|
| | GENERAL | VIOLENCE | VIOLENCE RISK |
| AGE AT MOST RECENT COMMITMENT | 6 | 6 | 9 |
| CURRENT AGE | 6 | 6 | 9 |
| ADULT CRIMINAL HISTORY | 2 | 2 | 1 |
| JUVENILE ADJUDICATIONS HISTORY | 1 | 1 | 1 |
| NARCOTICS USE HISTORY | N | N | N |
| GANG AFFILIATION STATUS | NO | NO | NO |
| MOST RECENT FACILITY ASSIGNMENT | B28 | B28 | B28 |
| CURRENT/PRIOR ADC OFFENSE CATEGORY | 14 | 14 | 14 |
| HISTORY OF INSTITUTIONAL VIOLENCE | | 2 | 2 |
| RISK SCORE | 5 | 3 | 5 |
| RISK LEVEL | 1 | 1 | 3 |

000011475

CERTIFIED COPY

FILED

12/22/04   2:20 PM

**MICHAEL K. JEANES, Clerk**

By _M. LESUEUR_

Deputy

# *IN THE SUPERIOR COURT OF THE STATE OF ARIZONA*

# *IN AND FOR THE COUNTY OF MARICOPA*

STATE OF ARIZONA

No.  CR2000-096032

v.

PENALTY VERDICT

WENDI ELIZABETH ANDRIANO

We, the Jury, duly empanelled and sworn in this matter, upon our oaths, do unanimously find that the Defendant, Wendi Elizabeth Andriano, shall be sentenced to:

_X_ DEATH

_____ LIFE

Foreperson:

_Barbara Bauer_
(Signature)

BARBARA BAUER
(Printed Name)

The foregoing instrument is a full, true and correct copy of the original on file in this office.

Attest_____ DEC 2 2 2004 _____20_____

MICHAEL K. JEANES, Clerk of the Superior Court of the State of Arizona, in and for the County of Maricopa.

By_____Deputy

000011476



CLERK OF THE SUPERIOR COURT
MARICOPA COUNTY, ARIZONA

[ ] Self Surrender

ORDER OF CONFINEMENT

DOB *8/26/1970*

Cause No. CR *2000-096032*        Defendant *WENDI ELIZABETH ANDRIANO*

To the Sheriff of Maricopa County, the above-named individual:

[ ] having been remanded to the custody of the Sheriff
    pending sentencing/disposition/further order the court
[ ] having been placed/reinstated on probation with a term of
    incarceration

[ ] having rejected probation
[X] having been sentenced by this court
[ ] having been found incompetent
[ ] having been found in violation of probation

[ ] OTHER: _____

on the charge(s) of ___ *COUNT 1: FIRST DEGREE MURDER,* _____

_____ *A CLASS 1 FELONY* _____

_____

_____

_____

[ ] IT IS HEREBY ORDERED that the Defendant be confined the MARICOPA COUNTY JAIL for a period of _____

_____ commencing _____

_____ not to be released until _____

[ ] Defendant may not be considered for placement in a furlough program _____

[ ] Defendant is immediately eligible for the Day Reporting Center pending acceptance _____

[ ] Defendant may be considered for screening and/or placement in a residential treatment program at the discretion of the
    probation department _____

[ ] For treatment at the Arizona State Hospital/Correctional Health Services. Status hearing: _____

_____

[ ] Other _____

_____

[X] IT IS HEREBY ORDERED that the Defendant be confined in the DEPARTMENT OF CORRECTIONS for a period of _____

_____ (years/months) commencing _____ credit: _____ days

_____ (years/months) commencing _____ credit: _____ days

_____ (years/months) commencing _____ credit: _____ days

_____ (years/months) commencing _____ credit: _____ days

_____ (years/months) commencing _____ credit: _____ days

[X] _____ *DEATH BY LETHAL INJECTION* _____

concurrent with _____

[ ] _____

consecutive to _____

[ ] IT IS FURTHER ORDERED dismissing _____

Today's date _____ *12/22/04* _____

Order of Confinement to begin _____ *12/22/04* _____

JUDGE OF THE SUPERIOR COURT 000011477

1600-118 R05-02

**NAME:**   **ANDRIANO, WENDI E.**

**ADC#:**   **191593**

**INMATE MASTER FILE:**

**VISITATIONS**

000011478

```
DV05 0 010188 191593                                04/03/13 10.40.36
   IVSB005                      VISIT SCREEN                  PAGE   1
INMATE: 191593  ANDRIANO, WENDI E.
         T                    VISITORS      T S  R                M
         Y                                  E T S A R             U
C        P     VISITOR NAME     V I S I T   R A E C E  BEGIN  END  L
T        E LAST,FIRST MIDDLE SUFFIX  DATE  LOC  M T X E L   T I M E    T
__       R OCHOA, ALEJO L.      05/16/05 B28  N A M M P  08:39 09:02
__       R OCHOA, DONNA E.      05/23/05 B28  N A F C P  08:16 10:10
__       R PERKINS, KELLY S.    05/23/05 B28  N A F C N  08:16 10:10
__       R OCHOA, ALEJO L.      06/06/05 B28  N A M M P  07:31 09:02
__       R OCHOA, DONNA E.      06/13/05 B28  N A F C P  07:00 09:34
__       R OCHOA, ALEJO L.      07/23/07 B28  N A M M P  06:54 16:16
__       R OCHOA, DONNA E.      07/23/07 B28  N A F C P  06:54 16:16
__       R OCHOA, ALEJO L.      06/02/08 B28  N A M M P  07:34 09:10
__       R OCHOA, ALEJO L.      07/07/08 B28  N A M M P  07:08 17:03
__       R OCHOA, ALEJO L.      08/04/08 B28  N A M M P  07:18 09:11
__       R OCHOA, DONNA E.      12/01/08 B28  N A F C P  07:00 12:07
__       R OCHOA, ALEJO L.      12/29/08 B28  N A M M P  08:05 09:27
ACTION CODE:  S = SELECT VISITOR RECORD


                                  PRESS ENTER FOR NEXT PAGE
```

ARIZONA DEPARTMENT OF CORRECTIONS
OFFENDER INFORMATION PUBLIC ACCESS
1601 WEST JEFFERSON   M/C 112
PHOENIX, ARIZONA  85007

000011479

```
DV05 O 010188 191593                              04/03/13 10.40.39
   IVSB005                     VISIT SCREEN                 PAGE  2
INMATE: 191593  ANDRIANO, WENDI E.
       T               VISITORS        T  S   R                    M
       Y                               E  T  S  A  R               U
C      P      VISITOR NAME      V I S I T   R  A  E  C  E  BEGIN  END  L
T      E LAST,FIRST MIDDLE SUFFIX  DATE  LOC  M  T  X  E  L   T I M E  T
    _  R OCHOA, DONNA E.        12/29/08 B28  N  A  F  C  P  08:05 09:27
    _  R VEMULAPALLI, MELISSA A. 01/05/09 B28 N  A  F  C  R  08:16 12:14
    _  R OCHOA, ALEJO L.        02/02/09 B28  N  A  M  M  P  07:49 09:57
    _  R OCHOA, DONNA E.        02/02/09 B28  N  A  F  C  P  07:49 09:57
    _  R VEMULAPALLI, MELISSA A. 03/30/09 B28 N  A  F  C  R  07:54 09:51
    _  R OCHOA, ALEJO L.        04/20/09 B28  N  A  M  M  P  08:11 07:13
    _  R OCHOA, ALEJO L.        05/18/09 B28  N  A  M  M  P  07:13 09:36
    _  R OCHOA, ALEJO L.        06/01/09 B28  N  A  M  M  P  08:05 14:24
    _  R OCHOA, DONNA E.        06/01/09 B28  N  A  F  C  P  08:05 14:24
    _  R OCHOA, ALEJO L.        07/06/09 B28  N  A  M  M  P  14:24 14:24
    _  R OCHOA, DONNA E.        07/06/09 B28  N  A  F  C  P  14:24 14:24
    _  R VEMULAPALLI, MELISSA A. 07/13/09 B28 N  A  F  C  R  07:09 09:09
ACTION CODE:  S = SELECT VISITOR RECORD
```

PRESS ENTER FOR NEXT PAGE

000011480

```
DV05 0 010188 191593                                    04/03/13 10.40.41
   IVSB005                    VISIT SCREEN                    PAGE   3
INMATE: 191593  ANDRIANO, WENDI E.
     T                    VISITORS        T S  R                    M
     Y                                    E T S A R                 U
C    P       VISITOR NAME        V I S I T   R A E C E  BEGIN  END   L
T    E  LAST,FIRST MIDDLE SUFFIX  DATE  LOC  M T X E L   T I M E     T
_    R  HEYNS, KELLY             07/20/09 B28  N A F C N  07:33 07:24
_    R  OCHOA, ALEJO L.          08/31/09 B28  N A M M P  07:30 07:24
_    R  OCHOA, DONNA E.          08/31/09 B28  N A F C P  07:30 07:24
_    R  OCHOA, ALEJO L.          09/20/10 B28  N A M M P  07:24 07:31
_    R  OCHOA, DONNA E.          09/20/10 B28  N A F C P  07:24 07:22
_    R  OCHOA, ALEJO L.          10/04/10 B28  N A M M P  08:20 07:22
_    R  OCHOA, ALEJO L.          10/18/10 B28  N A M M P  07:22 08:40
_    R  OCHOA, ALEJO L.          11/15/10 B28  N A M M P  08:40 10:31
_    R  OCHOA, DONNA E.          11/15/10 B28  N A F C P  08:40 10:31
_    R  WILLIAMSON, BILLY   J.   06/13/11 B50  N A M C N  09:45 12:02
_    R  WILLIAMSON, MAUREEN E.   06/13/11 B50  N A F C N  09:45 12:02
_    R  OCHOA, DONNA E.          09/19/11 B50  N A F C P  06:58 12:02
ACTION CODE:  S = SELECT VISITOR RECORD


                                       PRESS ENTER FOR NEXT PAGE
```

000011481

```
DV05 0 010188 191593                                    04/03/13 10.40.43
  IVSB005                      VISIT SCREEN                       PAGE   4
INMATE: 191593  ANDRIANO, WENDI E.
      T                  VISITORS        T S  R                      M
      Y                                  E T S A R                   U
C     P      VISITOR NAME       V I S I T  R A E C E  BEGIN  END     L
T     E LAST,FIRST MIDDLE SUFFIX  DATE  LOC M T X E L   T I M E      T
_     R OCHOA, DONNA E.         11/14/11 B50  N A F C P  06:57 10:26
_     R HEYNS, KELLY            12/19/11 B50  N A F C N  07:24 10:13
_     R OCHOA, ALEJO L.         12/26/11 B50  N A M M P  07:07 10:13
_     R OCHOA, DONNA E.         12/26/11 B50  N A F C P  07:07 10:13
_     R WILLIAMSON, BILLY  J.   01/02/12 B50  N A M C N  07:58 10:42
_     R WILLIAMSON, MAUREEN E.  01/02/12 B50  N A F C N  07:58 10:42
_     R OCHOA, ALEJO L.         01/09/12 B50  N A M M P  07:18 10:42
_     R VEMULAPALLI, MELISSA A. 01/16/12 B50  N A F C R  07:00 10:00
_     R OCHOA, DONNA E.         01/23/12 B50  N A F C P  07:00 10:00
_     R OCHOA, DONNA E.         04/16/12 B50  N A F C P  09:07 13:07
_     R OCHOA, ALEJO L.         04/30/12 B50  N A M M P  07:34 12:01
_     R OCHOA, DONNA E.         06/11/12 B50  N A F C P  07:10 10:00
ACTION CODE:  S = SELECT VISITOR RECORD


                                      PRESS ENTER FOR NEXT PAGE
```

000011482

```
DV05 0 010188 191593                                04/03/13 10.40.44
   IVSB005                    VISIT SCREEN                     PAGE   5
INMATE: 191593  ANDRIANO, WENDI E.
     T                     VISITORS        T S   R                  M
     Y                                     E T S A R                U
C    P       VISITOR NAME      V I S I T   R A E C E   BEGIN  END   L
T    E LAST,FIRST MIDDLE SUFFIX   DATE  LOC M T X E L    T I M E    T
_    R OCHOA, DONNA E.         07/16/12 B50 N A F C P  07:00 10:00
_    R HEYNS, KELLY            07/30/12 B50 N A F C N  07:20 10:00
_    R OCHOA, ALEJO L.         08/13/12 B50 N A M M P  07:19 11:00
_    R OCHOA, DONNA E.         09/17/12 B50 N A F C P  07:13 10:03
_    R OCHOA, DONNA E.         10/15/12 B50 N A F C P  07:22 10:04
_    R OCHOA, ALEJO L.         10/22/12 B50 N A M M P  07:34 10:27
_    R HEYNS, KELLY            10/29/12 B50 N A F C N  07:29 09:57
_    R OCHOA, ALEJO L.         11/19/12 B50 N A M M P  07:13 10:03
_    R OCHOA, DONNA E.         11/26/12 B50 N A F C P  07:22 15:55
_    R OCHOA, DONNA E.         12/24/12 B50 N A F C P  07:12 10:07
_    A ARNSTEN, ALLEN          01/25/13 B50 N A M C N  10:06 11:45
_    R OCHOA, DONNA E.         01/28/13 B50 N A F C P  07:30 10:20
ACTION CODE:  S = SELECT VISITOR RECORD
```

PRESS ENTER FOR NEXT PAGE

000011483

```
DV05 0 010188 191593                              04/03/13 10.40.45
   IVSB005                    VISIT SCREEN                    PAGE   6
INMATE: 191593  ANDRIANO, WENDI E.
      T                    VISITORS       T S   R                    M
A     Y                                   E T S A R                  U
C     P      VISITOR NAME     V I S I T   R A E C E   BEGIN   END    L
T     E LAST,FIRST MIDDLE SUFFIX DATE  LOC M T X E L   T I M E       T
      R OCHOA, ALEJO L.         02/04/13 B50  N A M M P  07:14 10:03
_     R OCHOA, DONNA E.         02/18/13 B50  N A F C P  07:11 10:18
_     R ROBERTSON, SHELBY W.    02/20/13 B50  N A M U P  12:26 12:38
_     _ _____  / /  ___  _ _ _ _ _  __:__ __:__  _
_     _ _____  / /  ___  _ _ _ _ _  __:__ __:__  _
_     _ _____  / /  ___  _ _ _ _ _  __:__ __:__  _
_     _ _____  / /  ___  _ _ _ _ _  __:__ __:__  _
_     _ _____  / /  ___  _ _ _ _ _  __:__ __:__  _
_     _ _____  / /  ___  _ _ _ _ _  __:__ __:__  _
_     _ _____  / /  ___  _ _ _ _ _  __:__ __:__  _
_     _ _____  / /  ___  _ _ _ _ _  __:__ __:__  _
_     _ _____  / /  ___  _ _ _ _ _  __:__ __:__  _

ACTION CODE:  S = SELECT VISITOR RECORD
```

000011484

# HEARING EXHIBIT 203

# PLACEHOLDER FOR AUDIO RECORDING

# CALL BETWEEN W. ANDRIANO AND D. OCHOA, DATED 11/3/2013

 **Public Interest Investigations, Inc.®**

## REPORT OF KEITH ROHMAN

TO:        Foley & Lardner LLP

FROM:    Keith Rohman

DATE:     January 23, 2014

RE:        Wendi Andriano
            PII case no. 11-2809

SUBJECT:  **Review of Mitigation Investigation**

You asked that I review the mitigation investigation and presentation conducted by trial counsel and their investigators.  You requested that I provide you with my impressions and analysis of their work, based upon my experience and the relevant ABA Guidelines

I.     **Analytical Approach**

       A.     Materials reviewed

To prepare this memorandum, I reviewed the following items:

       1.     Guilt/innocence phase opening and closing arguments
       2.     Penalty phase transcript
       3.     Emails from Patrick Linderman
       4.     Emails from Scott MacLeod
       5.     Declaration of David DeLozier
       6.     Declaration of Scott MacLeod
       7.     Declaration of Daniel Patterson
       8.     Dr. Bayliss report and relevant notes

The Bradbury Building
304 S. Broadway, Suite 596
Los Angeles, CA 90013

Phone (213) 482-1780
License #PI19508
www.piila.com

Andriano Mitigation Review
Public Interest Investigations, Inc.
Page 2

      9.     Correspondence from H. Kandy Rohde
    10.   Notes of H. Kandy Rohde
    11.   Dr. Potts report
    12.   Dr. Rosengard report
    13.   Dr. Murphy report
    14.   Wendi Andriano visitor logs

I also met with Wendi Andriano, Donna Ochoa and Alejo Ochoa. My interviews with them were limited to the mitigation investigation process, rather than any information about their own life histories or backgrounds.

I have been informed that PCR counsel has undertaken a post-conviction mitigation investigation. I have not reviewed any of these materials. My review has been limited to what was available to counsel at the time of trial.

### A.    Structure of memorandum

This memorandum is divided in two sections. The first is a listing of flaws I found in the mitigation investigation and presentation. I based this analysis on the factors outlined in *ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, Revised Edition, February 2003* (*2003 Guidelines*), the *Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases, June 2008* (*2008 Supplementary Guidelines*), and my own experience as a mitigation specialist. A copy of my CV is attached. Exhibit A.

My listing of these flaws is not exhaustive, but is representative of the types of mistakes or shortcomings I observed. For each item in this section, I describe the mistake I noted, the relevant section of the ABA Guidelines and Commentary, and some of the evidence of that shortcoming I found in the records.

## II.    Mitigation Investigation and Presentation Flaws

### A.    Failure to utilize a qualified mitigation specialist

Scott MacLeod was the person assigned to the Andriano case by the Maricopa County Office of Public Defender (OPD). While his job title was "mitigation specialist," he did not have the requisite training and experience, and was not qualified for this position.

#### 1.    ABA Guidelines

Guideline 4.1.A.1 of the *2003 Guidelines* states that the defense team should include a

Andriano Mitigation Review
Public Interest Investigations, Inc.
Page 3

mitigation specialist.  The mitigation specialist is described as an "indispensable member of the defense team . . . [who] possess[es] clinical and information-gathering skills and training that most lawyers simply do not have." (*2003 Commentary*, p. 959.)

Guideline 5.1.B of the *2008 Supplementary Guidelines* states that "capital defense team members should demonstrate a commitment to providing high quality services in the defense of capital cases; should satisfy the training requirements set forth in these Supplementary Guidelines; and should be skilled in the investigation, preparation and presentation of evidence within their areas of expertise."

The training is described at Guideline 8.1 of *2008 Supplementary Guidelines* as "a specialized training program that focuses on the defense of death penalty cases offered by an organization with substantial experience and expertise in the defense of persons facing execution and committed to the national standard of practice embodied in these supplemental Guidelines and the ABA Guidelines as a whole."  The trainings should be attended at least annually.

> 2.    Examples of MacLeod's lack of qualifications
>
> > a.    MacLeod's declaration of March 1, 2011
> >
> > > (1)    No training in handling capital cases

MacLeod was hired by the OPD in August 2001 as a non-capital mitigation specialist. His prior relevant work experience was a two and one-half year position as a Maricopa County Probation Officer.  His educational background was in political science and criminal justice.  He had no education in "social work, sociology, psychology, or other behavioral sciences."

When he was hired as a non-capital mitigation specialist, he received no training specific to that position.  All of his training was on-the-job.  He was assigned to the Andriano case in April 2004, while he was still designated by OPD as a non-capital mitigation specialist.

In June 2004, two months after starting work on the Andriano case, he applied for and was designated as a capital case mitigation specialist.  However, he received no training on handling capital cases.  He stated, "I did not view my role as a mitigation specialist any differently; there is nothing that I would not have done in standard felony cases that I would otherwise do in capital cases."

Following the *Ring* decision, MacLeod made no changes in how he handled the

Andriano Mitigation Review
Public Interest Investigations, Inc.
Page 4

mitigation investigations, and received no special training regarding this.  MacLeod had
no experience or training in working in a jury-sentencing context prior to the Andriano
case.

> b.     MacLeod's statement to client

MacLeod told Wendi Andriano that he had not done a capital case before and did not
believe he was qualified to work on one.  She stated that most of their time together was
spent with MacLeod discussing office gossip.

> c.     MacLeod's capital case training

MacLeod appears to have, belatedly, attended a capital case training.  In an email to
Dan Patterson entitled "Some ideas from Thurs and Friday's seminar," he outlined a
number of potential mitigation themes and approaches which the defense could take.
The email is dated December 6, 2004, about one week after the penalty phase
presentation began.  Exhibit B.

> B.    **Mitigation specialist did not recommend experts**

>> 1.     ABA Guidelines

The *2003 Guidelines* state that the mitigation specialist will have the skills to "identify
the most appropriate experts to examine the defendant and testify on his behalf." (*2003
Commentary*, p. 959)

>> 2.     MacLeod's declaration of March 1, 2011

MacLeod did not recall "the retention of any experts in the case, or assisting in
identifying appropriate experts."

>> 3.     Patterson's declaration of June 14, 2011

Dan Patterson stated that MacLeod did not recommend or assist in the retaining of any
experts.

Andriano Mitigation Review
Public Interest Investigations, Inc.
Page 5

> C. **No one on defense team qualified to identify, document and interpret mental health symptoms**
>
> > 1. ABA Guidelines

Guideline 4.1.A.2 of the *2003 Guidelines* states, "The defense team should contain at least one member qualified by training and experience to screen individuals for the presence of mental or psychological disorders or impairments." In my experience on capital cases, this person is generally the mitigation specialist.

> > 2. Mitigation specialist was not qualified
> >
> > > a. MacLeod's declaration of March 1, 2011

MacLeod stated, "As a mitigation specialist you always screen for mental health issues, but I do not recall identifying or investigating any potential issues relating to Ms. Andriano's mental health." As will be noted below in the section on failure to recognize potential mental illness, there were numerous detailed and specific indications that Wendi Andriano suffered from some form of mental illness. These included letters from her therapist to the defense team, her suicide attempt, and her being housed in the psych unit at the jail. MacLeod's failure to recognize these, and the numerous other factors cited below, reveal how thoroughly unqualified he was for the role of identifying mental health symptoms called for in the Guidelines.

> > > b. MacLeod's statement to Donna Ochoa

Wendi's mother, Donna Ochoa, told MacLeod that Wendi's cousin was bi-polar and had tried to burn down his own mother's house. MacLeod responded that he had forgotten to ask about the family's mental health history. This conversation occurred while they were awaiting the jury verdict in the penalty phase.

> > 3. Defense lawyers were not qualified for this function

The declarations of both Dan Patterson and David DeLozier recount their familiarity with the evidence indicating that Wendi Andriano suffered from mental illness. Both state in their respective declarations that they took few, if any, steps to investigate these issues.

Andriano Mitigation Review
Public Interest Investigations, Inc.
Page 6

### D. **Mitigation investigation started much too late**

An understanding of the key dates in the Andriano case is helpful in this section:

| | |
|---|---|
| October 8, 2000 | Murder and Andriano's arrest |
| December 2, 2000 | David DeLozier is retained as counsel |
| July 23, 2001 | Daniel Patterson becomes lead counsel through the Maricopa Office of Public Defender |
| September 7, 2004 | Guilt/innocence phase opening statements |
| November 14, 2004 | Guilt/innocence phase closing statements |
| November 30, 2004 | Penalty phase begins |
| December 16, 2004 | Penalty phase goes to jury |

Guidelines 10.7 and 10.11.A of the *2003 Guidelines* state that defense counsel has an obligation "at every stage of the case" to conduct a thorough investigation of penalty phase issues. The *2003 Commentary* states, "The mitigation investigation should begin as quickly as possible because it may affect the investigation of first phase defenses. . . Accordingly, immediately upon counsel's entry into the case appropriate member(s) of the defense team should meet with the client" to discuss matters including "the client's mental state" and "any mitigating factors." (p. 1023.)

The *2008 Supplementary Guidelines* state, "The responsibility for the development and presentation of mitigation evidence must be incorporated into the defense case at all stages of the proceedings from the moment the client is taken into custody, and extending to all stages of every case." [Underline added] (p. 678.) Guideline 1.1.B of the *2008 Supplementary Guidelines* state, "These Guidelines apply from the moment that counsel is appointed and extend to all stages of every case in which the jurisdiction may be entitled to seek the death penalty."

### 1. MacLeod's declaration of March 1, 2011

MacLeod stated that he did not begin work on the mitigation investigation until April 2004, three and one-half years after Andriano's arrest, and only five months before opening statements. While there had been another mitigation specialist, Patrick Linderman, assigned to the case prior to MacLeod, there is no indication that Linderman performed significant work on the case prior to his departure from the Public Defender's Office in April 2004.

### 2. Patterson's declaration of June 14, 2011

Because of his representation of other clients, Patterson stated, "My personal

Andriano Mitigation Review
Public Interest Investigations, Inc.
Page 7

involvement in Wendi's representation was limited until early 2003." This is
approximately two and one-half years since the client's arrest.

      3.    DeLozier's declaration of June 7, 2011

DeLozier stated, "I understand that my role was to be passive-providing assistance on
discrete tasks when requested by Attorney Patterson-rather than taking the lead on any
aspects of the pre-trial preparation or investigation. From that time forward, I did not
assume responsibility for any tasks related to Wendi's case unless Attorney Patterson
asked for my assistance." He stated that Patterson did not ask that he assist with the
penalty phase, and he took no action on his own, until the Spring of 2004.

      4.    MacLeod's emails to counsel

Given his late start with the mitigation investigation, it is not surprising that MacLeod
had not completed his work by the time of trial.

On November 29, 2004, the day before the penalty phase began, MacLeod emailed a
potential witness list to Patterson. Exhibit C. In the email, MacLeod stated he had
interviewed "almost every person on list" and had some follow up interviews scheduled.
He stated, "This is not a complete, nor exhaustive list, it is simply my list of witnesses."
In fact, this list includes all the penalty phase witnesses who were called except Gia
Palicki. Three people on MacLeod's list were not called, Cindy Fike, Martha England
and Frances Archuleta, who was in Alabama.

      5.    Jail records

Another example of the extraordinarily late start for the mitigation investigation is found
in the obtaining of the jail records on the client. These records included jail disciplinary
reports and housing records of Andriano. The defense team did not seek those
records until filing a "Motion for Court Order to Assist Mitigation Investigation" on
November 19, 2004, after the jury verdict on guilt and just before the penalty phase
began in early December.

      6.    Trial transcript

In the transcript of December 8, 2004, Dan Patterson stated that he had to transition
from one mitigation specialist to Scott MacLeod and "he [MacLeod] has been
scrambling to get up to speed." (p. 15-16.) This occurred during the middle of the
penalty phase.

Andriano Mitigation Review
Public Interest Investigations, Inc.
Page 8

   E.      **Defense lawyers were uninvolved in mitigation investigation**

      1.    ABA Guidelines

Guideline 10.4.B of the *2003 Guidelines* states, "Lead counsel bears overall responsibility for the performance of the defense team, and should allocate, direct, and supervise its work in accordance with these Guidelines and professional standards."

This guideline is underscored in the *2008 Supplementary Guidelines* at Guideline 10.4 A & B which specifically defines the "role of counsel with respect to mitigation specialist." It states,

> "It is the duty of counsel to lead the team in conducting an exhaustive investigation into the life history of the client. . . . Counsel guides the defense team and, based on consultation with team members and experts, conducts ongoing reviews of the evidence, assessments of potential witnesses, and analyses of the most effective manner in which to convey the mitigating information. Counsel decides how mitigation evidence will be presented."

      2.    Patterson's declaration of June 14, 2011

Dan Patterson did not take this role in the Andriano case. He stated, "I gave limited direction to Mr. Linderman and Mr. MacLeod as to developing themes and theories of mitigation. <u>I do not recall giving Mr. MacLeod any specific direction and largely left the development of the mitigation case to the discretion of Mr. MacLeod and Attorney DeLozier</u>, who had the primary relationship with Wendi and her family." [Underline added.]

He also stated, "Prior to trial, I did not personally investigate or conduct interviews of mitigation related fact witnesses, except for Wendi and her immediate family. I relied on others-including the mitigation specialist assigned to the case, Scott MacLeod-to locate and interview potential witnesses not identified by the State who could be relevant to Wendi's defense."

      a.    Roles of DeLozier and MacLeod

Patterson's reliance upon DeLozier and MacLeod was problematic for a number of reasons. The first problem was that neither DeLozier nor MacLeod had any capital case experience. The larger problem, however, was that while Patterson was relying on DeLozier and MacLeod to prepare the mitigation case, DeLozier and MacLeod were awaiting Patterson's direction on how to handle the mitigation case.

Andriano Mitigation Review
Public Interest Investigations, Inc.
Page 9

In DeLozier's declaration of June 7, 2011, he stated that he viewed his "primary goal [in meeting with Andriano] was to provide psychological and spiritual support." He stated that once Patterson came on to the case,

> "I understand that my role was to be passive-providing assistance on discrete tasks when requested by Attorney Patterson-rather than taking the lead on any aspects of the pre-trial preparation or investigation. From that time forward, I did not assume responsibility for any tasks related to Wendi's case unless Attorney Patterson asked for my assistance. Because I viewed my role in the case as limited to tasks that Attorney Patterson assigned me, I did not continue to pursue my own investigation of the case after Attorney Patterson's appointment."

MacLeod, in turn, was looking to DeLozier and Patterson for direction. In MacLeod's declaration of March 1, 2011, he stated, "I took my direction from the lawyers on a particular case. In my view, they were the ones holding the law license, and I deferred to their judgment in all matters relating to mitigation. Generally speaking, the lawyers told me what they wanted in terms of mitigation evidence, and I would investigate accordingly. . . . The themes for mitigation were provided to me by Dan Patterson; mitigation strategy was always his call, as far as I was concerned."

        3.    Penalty phase closing argument presentation

The core of the defense closing argument during the penalty phase was a Powerpoint presentation which DeLozier presented. Unfortunately, this critical presentation of the defense mitigation case was not written by either lawyer, or even by the mitigation specialist. DeLozier stated in his declaration, "I met with some of Wendi's friends and family to research the mitigation case and then narrated a Power Point prepared by Scott MacLeod with photographs of Wendi during the mitigation case. I initially requested that Donna Ochoa, Wendi's mother, write the script for the Power Point. Donna recommended that a family friend, Cindy Schaider, write the script, which I later read during the Power Point."

Patterson also played no role in the preparation of the Powerpoint, and did not even review it before its presentation. We know this because while arguing to reopen the defense case for the admission of some photographs that were part of the Powerpoint timeline, Patterson stated, "There's no intent to deceive Mr. Martinez. I just didn't supervise or oversee the production of the time line by my mitigation specialist McCloud [sic]. It just came to my attention ten minutes ago that there was potential issue here." (12/15/04, p. 69)

Andriano Mitigation Review
Public Interest Investigations, Inc.
Page 10

### F. No team approach to defense case, including mitigation

#### 1. ABA Guidelines

The Commentary to the *2003 Guidelines* has a subsection entitled, "The Team Approach to Capital Defense," which outlines the need for different professionals working in concert under the direction of defense counsel. (p. 955-960.) This is underscored in the *2008 Supplementary Guidelines,* which state at Guideline 10.4.B that, "Counsel guides the defense team and, based on consultation with team members and experts, conducts ongoing reviews of the evidence, assessments of potential witnesses, and analyses of the most effective manner in which to convey the mitigating information."

#### 2. DeLozier's declaration of June 7, 2011

The two co-counsel were not in regular contact during the preparation of the case. DeLozier stated in his declaration, "Attorney Patterson rarely requested my assistance in Wendi's case. He only met with me a few times total between our first meeting in 2001 until Wendi's trial in August 2004, and he rarely communicated with me by phone."

As noted above, Patterson was not in contact with the mitigation specialist during the period leading up to the trial. DeLozier was also not in contact with the mitigation specialist. He stated, "I only met with Scott MacLeod, the mitigation specialist from the Public Defender's Office, a few times before Wendi's trial and had minimal contact by phone. . . . Other than Scott's preparing the slides for the Power Point presentation I narrated, we did not coordinate on the mitigation portion of the case."

### G. Failure to conduct family history mitigation investigation

#### 1. ABA Guidelines

The Commentary to the *2003 Guidelines* clearly calls for a "multi-generational investigation extending as far as possible vertically and horizontally." (p. 1023.) Counsel is directed to investigate "at least three generations." (footnote 216.) "Penalty phase preparation requires extensive and generally unparalleled investigation into personal and family history." (p. 1022.) Records are to be collected about every aspect of the client's life and also "his parents, grandparents, siblings, cousins and children. (p. 1024-1025.)

The *2008 Supplementary Guidelines* at 10.4 call for "an exhaustive investigation into the life history of the client," and at 10.11.B for "an ongoing, exhaustive and independent

Andriano Mitigation Review
Public Interest Investigations, Inc.
Page 11

investigation of every aspect of the client's character, history, record and any circumstances of the offense, or other factors, which may provide a basis for a sentence less than death."

As noted above, the mitigation investigation did not really begin until April 2004, only five months before Opening Statements.  Neither of the defense counsel conducted any independent investigation.

A review of trial counsel's files showed no indication that releases for records were obtained from the client's family, nor that any life history records were collected on the family members.  Only a few limited life history records were obtained regarding the client.

Extensive interviews with the client are the first step in the family history mitigation investigations.  However, as noted above, no one on the defense team spent any significant time with the client, other than attorney DeLozier who was mostly acting as a "spiritual counselor."  Disregarding the time DeLozier spent with the client, members of the defense team spent approximately 29 hours with the client in the four-year period from her arrest through the trial.  It is safe to assume that some significant portion of this time was spent on issues relating to the guilt/innocence phase of the trial, leaving even less time available for discussing the mitigation phase with Ms. Andriano.

Neither Donna nor Alejo Ochoa were interviewed at any depth about their life history, nor were they asked to sign releases for their life history records.

Based solely upon my review of the file materials available to trial counsel, I identified over fifty possible entities from which life history records could be collected.  I have been informed by PCR Counsel that they have located only a handful of life history documents in trial counsel's file, and sent all they could find to me.  None of these records related to Andriano's family history in any depth.

I also identified a list of over 100 witnesses from the client's family, employment, church and education experiences who could have been interviewed.  In MacLeod's November 29, 2004 email to Dan Patterson on the eve of trial, MacLeod identified a list of 15 witnesses, only some of which he had interviewed.  There is little indication in the defense file of any additional mitigation witnesses who were interviewed.

Andriano Mitigation Review
Public Interest Investigations, Inc.
Page 12

      H.     **Failure to investigate mental health issues relating to both guilt and penalty phases**

          1.     ABA Guidelines

The Commentary to the *2003 Guidelines* state,

> "In particular, mental health experts are essential to defending capital cases. Neurological and psychiatric impairment, combined with a history of physical and sexual abuse, are common among persons convicted of violent offenses on death row. Evidence concerning the defendant's mental status is relevant to numerous issues that arise at various junctures during the proceedings. . . . Further, the defendant's psychological and social history and his emotional and mental health are often of vital importance to the jury's decision at the punishment phase."

          2.     Indications that client suffered from mental illness

From the very beginning of their representation of Ms. Andriano, defense counsel received numerous reports that their client might suffer from serious mental illness. Some, though not all, of those indications are summarized below.

            a.     H. Kandy Rohde

On February 19, 2001, Rohde, a Certified Professional Counselor, wrote to DeLozier that she believed Andriano suffered from a personality disorder, and stating, "The intense sense of peace she describes since her arrest is sufficiently inappropriate to cause me to ask for collaboration from another professional. It would assist me greatly in diagnosis and treatment if she could be evaluated by a psychiatrist." On March 21, 2001, she wrote to DeLozier again to state that Andriano "seems to have begun dissociating as a defense beginning as a very young child and continuing until today. . . . I think Wendi suffers from serious psychological disorders and am anxious to have examined by another professional for a second opinion."

            b.     Dr. Jack Potts

Dr. Potts was appointed by the court to conduct a Rule 11 Evaluation. His report of March 28, 2001 stated, ""Certainly there is something quite bizarre about what allegedly occurred. If Ms. Rhode [sic] is accurate . . . then the criminal culpability of the defendant and her state of mind at the time . . . should be evaluated independently, outside the scope of a Rule 11 evaluation."

Andriano Mitigation Review
Public Interest Investigations, Inc.
Page 13

        c.     Rohde communication

Michaelle Arvanitas, who appears to have been a paralegal on the case, emailed Dan Patterson on February 13, 2002 regarding a conversation she had with Rohde. Rohde suggested possible diagnoses of "1) Depersonalization Disorder (300.6) is persistent or recurrent episodes of depersonalization characterized by a feeling of detachment or estrangement from one's self. She does not let the "bad stuff in". She ignores any bad feeling.; 2) Disassociative Amnesia. (300.12) Is an inability to recall important personal information, usually of a traumatic or stressful nature, that is too extensive to be explained by normal forgetfulness.; 3) Physical, Sexual or Neglect of a child. [sic] V61.21"

        d.     Dr. Rosengard

In his report on August 27, 2002, Rosengard states that the client has been suffering panic attacks ("like having a heart attack") since she was a child.

        e.     Rohde communication

In her file notes, Kandy Rohde noted that on January 2, 2003 she had called Patterson. "I asked [Patterson] about pursuing a psychological defense. He said that he had sent a doctor to interview her and the doctor said that she had PTSD. I asked him if he had noticed how she remembers and forgets and [he] said that she did and in an odd way. I said that it is necessary to be with her over time to see her go in and out. He asked me to look for an expert."

        f.     Suicide attempt/ Psych ward

Wendi Andriano attempted suicide on September 27, 2003, and was then placed in the jail psych ward until trial.

        3.     Defense team's actions relating to mental health issues

In spite of these numerous, specific and detailed indications that the client suffered from significant mental illness, the defense effort to evaluate the client's mental health was perfunctory, disorganized, and never included a thorough mental health examination informed by a social history investigation.

H. Kandy Rohde was a Certified Professional Counselor. Her exact role was not spelled out in the file materials, however it appears her primary responsibility was to provide therapy for the client. She was never called to testify. She did provide the defense team with information regarding the client's mental status, and with

Andriano Mitigation Review
Public Interest Investigations, Inc.
Page 14

recommendations regarding other mental health professionals they should consult.

Dr. Mindy Mechanic was consulted to rebut the defense expert, Dr. Bayliss, and did not do a full evaluation of the client. Dr. Sharon Murphy is an expert in the area of battered woman's syndrome, and she evaluated the client for that. She testified at both phases of the trial.

The only overall mental health evaluation of the client appears to have been conducted by Dr. Richard Rosengard. However, Rosengard conducted his evaluation of the client in August 2002, prior to any mitigation investigation having been conducted. He was only provided with police reports and jail records. He was not provided even the most basic life history or family history on the client. For instance, he was not informed that the client's father was in prison for sexually abusing children, nor was he provided with Ms. Rohde's counseling session notes or even her tentative diagnoses. Rosengard was not called to testify.

III.    **Conclusion**

The overall picture here is of a mitigation investigation and presentation that was conducted by unqualified professionals, was started far too late to be effective and was significantly deficient in almost every manner.

Andriano Mitigation Review

# **Exhibit A**

Public Interest Investigations, Inc.

CURRICULUM VITAE

**KEITH ROHMAN**

PUBLIC INTEREST INVESTIGATIONS, INC.

Work Address:

The Bradbury Building
304 S. Broadway, #596
Los Angeles, CA 90013
(213) 482-1780
rohman@piila.com
www.piila.com

Work Experience

**Mitigation Specialist:** Assisted attorneys preparing social histories and mitigation presentations for capital defendants at the trial and post-conviction levels in state and federal courts, including over 40 capital murder cases at the trial and appellate levels, in both state and federal courts in California, Arizona, Alaska, Washington, Utah, New Mexico, Indiana, Ohio, Tennessee, and New York. Worked closely with mental health professionals to prepare mitigating evidence presentations. (1987 to present)

**President: Public Interest Investigations** (PII) an investigations and consulting firm assisting attorneys, non-profits, corporations and governmental entities in all aspects of legal investigations. (1984 to present)

PII's other case work has included:

- Criminal defense investigations on major felony cases.
- Principal investigator for plaintiff's attorneys in *Saleh v. CACI, et al.*, litigation filed on behalf of Iraqis tortured at the Abu Ghraib prison against two American defense contractors, and in *Albazzaz et al. v. Blackwater et al*, litigation filed against Blackwater for killings in Nisoor Square, Baghdad, in September 2007.

**Adjunct Professor:** Loyola School of Law-Los Angeles; Fact Investigation class in techniques of investigations, including mitigation and guilt investigations in capital cases. (January 2004 to present)

**Monitor:** Appointed on June 28, 2011 by U.S. District Court Judge Audrey B. Collins as the Court's monitor in *Fred Pierce, et al v. County of Orange, et al.*, a class-action suit alleging that Orange County jail facilities did not comply with the Americans with Disabilities Act (ADA) and that disabled inmates were denied access to some of the jail's programs and services. (June 2011 to present)

1

**International Monitor:** Observed the hearings and surveyed the investigative staff of the South Africa Truth and Reconciliation Commission as a member of the International Monitoring Project of the National Lawyers Guild Southern Africa Section.  Participated in the drafting of the Monitoring Project Report.  (May to July 1998)

**Staff and Research Director: Local #862.** United Labor Unions (now affiliated with Service Employees International Union), Philadelphia, PA.  Coordinated organizing efforts, investigated unfair labor practice charges, and conducted background and asset checks of employees. (1979 - 1982)

## Presentations/Publications

Co-author, with Elizabeth Rita-  "Capturing the Witness Statement," AWI Journal, Association of Workplace Investigators, July 2013.

Author- "Diagnosing and Analyzing Flawed Investigations: Abu Ghraib as a Case Study," Cardozo Law Review de novo, July 2009, Cardozo School of Law, also Penn State International Law Review, August 2009, Penn State School of Law.

Author- "Lost in Translation: Lawyers and Interpreters," presented at the Mexican Capital Legal Assistance Program seminar, Phoenix, AZ., February 29, 2008. Also in Los Angeles Daily Journal, May 5, 2008.

Author- "Do Not Punish the Entire Investigation Trade for HP's Deviant Probe," Los Angeles Daily Journal, November 24, 2006.

Author- "Investigating the Past: An Examination of the Investigative Unit at the South Africa Truth and Reconciliation Commission," Truth and Reconciliation: Exposing Offenses of the South African Apartheid Past, National Lawyers Guild, New York, 2004.

Addressed (By Invitation)- "Conducting Community Based Investigations into Police Misconduct," Rampart Independent Review Panel, Los Angeles Board of Police Commissioners, May 2000.

Author- "Out of the Box- Investigating Juror Misconduct," Los Angeles Daily Journal, February 11, 2000.

Author- "Schools Must Share Environmental Investigations With Public," Los Angeles Daily News, November 18, 1999.

Interviewed on Jury Misconduct Investigations - CBS Evening News, ABC's Good Morning America and Primetime Live, the Oprah Winfrey Show, the Los Angeles Times, and Los Angeles Daily Journal, October 1995 - March 1996.

Author - "The Hardest Cold Call: Interviewing the Victim," California Death Penalty

2

Defense Manual Mitigation Workbook, 1993 Edition, Published by California Attorneys for Criminal Justice and California Public Defenders Association; CALI Newsletter, California Association of Licensed Investigators, April/May, 1992.

Author - "Reciprocal Discovery in a Post-115 World," The Legal Investigator, Official Journal of National Association of Legal Investigators, May, 1991; CACJ Forum, California Attorneys for Criminal Justice, September, 1990.

Addressed (By Invitation) - California State Assembly Transportation Committee Interim Hearing on DMV Privacy Legislation, October 4, 1989.

Lecture and Training Experience

| | |
|---|---|
| October 2013 | **Presenter**, with Elizabeth Rita- "Capturing the Witness Statement," Fourth Annual Conference, Association of Workplace Investigators, October 2013, Glendale, California. |
| October 2013 | **Presenter**, "Ground Zero: An Expert Approach to Interview Techniques," Association of Human Resources Officers/Equal Employment Officers (ACHRO/EEO) 2013 Fall Training Institute, Newport Beach, California. |
| September 2013 | **Presenter**, "The Truth Matters®: Seven Steps to An Effective Investigation," Western Independent Bankers Association, 2013 Education Summit and Expo, Anaheim, California |
| June 2013 | **Lecturer,** "Understanding and Addressing the Role of Bias in Investigation," AWI Local Circle- Attorneys and Investigators, Toronto, Ontario, Canada |
| April 2013 | **Lecturer**, day-long seminar, "Workplace Investigations Basics," Association of Workplace Investigators, Inc., Los Angeles, California |
| Spring 2013 | **Ongoing Case Consultant**, Juvenile Innocence and Fair Sentencing Clinic, Loyola Law School, Los Angeles, California |
| March 2013 | **Faculty,** National Training Institute for Workplace Investigators, Association of Workplace Investigators, Santa Barbara, California. |
| January 2013 | **Presenter,** "Eliminating The Impact of Cognitive Biases on Our Work and Our Profession" Webinar, MCLE Bias Training, Association of Workplace Investigators. |
| November 2012 | **Presenter**, "Beyond the Courthouse Walls: Combining Law, Science, History & Engineering to Build a Better Investigation," Association of |

3

Workplace Investigators Third Annual Conference, Oakland, California.

| August 2012 | **Guest Lecturer**, "The Role of Life Histories in Sentencing," Sentencing and Punishment Class, Loyola Law School, Los Angeles. |
| --- | --- |
| Fall 2012 | **Guest Lecturer and Case Consultant**, Juvenile Innocence and Fair Sentencing Clinic, Loyola Law School, Los Angeles. |
| July 2012 | **Moderator**, Webinar, "The Interplay Between Workplace Investigation and Criminal Investigation," presented by Association of Workplace Investigators. |
| November 2011 | **Lecturer**, "Ground Zero: An Expert Approach to Interview Techniques," General Plenary Session, California Association of Workplace Investigators 2011 Annual Conference, Glendale, CA. |
| May 2011 | **Lecturer**, "Advanced Interview Techniques," Los Angeles County Advocates Council, Los Angeles, CA. |
| April 2011 | **Lecturer**, "Investigations Strategies and Techniques," Fidler Institute on Criminal Justice, Loyola Law School, Los Angeles, CA. |
| December 2010 | **Lecturer**, "Investigation Bias and Interview Techniques," Internal Affairs Bureau (IAB), Los Angeles Sheriff's Department, Commerce, CA. |
| May 2008 | **Lecturer**, "Interview Techniques," Training Seminar for the staff of Los Angeles Daily Journal, Los Angeles, CA. |
| February 2008 | **Lecturer**, "Role of the Mitigation Specialist and Collecting Evidence in Mexico" and "Addressing Language and Cultural Barriers," Mexican Capital Legal Assistance Program: Representing Mexican Nationals in Capital Cases, Phoenix, AZ. |
| August 2005 | **Lecturer**, "Thinking Like an Investigator," Loyola Law School Center for Juvenile Law and Policy, Los Angeles, CA. |
| January 2005 | **Lecturer**, "Criminal Defense Investigation," Loyola Law School Center for Juvenile Law and Policy, Los Angeles, CA. |
| April 2004 | **Program Developer and Lecturer**, "Who's Telling the Truth: Credibility Assessment in Investigation," College of the Canyons, Santa Clarita, CA. |
| February 2003 | **Lecturer**, "Tips from the Professionals on How to Attack or Defend Jury Outcomes," Labor and Employment Law Symposium, Los Angeles County |

4

Bar Association, Los Angeles, CA.

November 2002    **Program Developer and Lecturer**, "Investigative Techniques on Slumlord Cases," Training for staff of non-profit Strategic Alliance for Rational Economy, Los Angeles, CA.

June 2002    **Lecturer**, "Locating Assets and Witnesses for Low Income Clients," CLE training for Bet Tzedek Legal Services, Los Angeles, CA.

May 2002    **Lecturer**, "Best Practices in EEO Investigations," Annual Conference; California Association of Equal Rights Professionals, San Diego, CA.

November 2001    **Program Developer and Lecturer**, "Investigative Techniques for Legal Aid Staff," Legal Aid Foundation of Los Angeles, Los Angeles, CA.

October 2001    **Lecturer**, "Investigative Techniques on Slumlord Cases," CLE Training Seminar, Legal Aid Foundation of Los Angeles, Los Angeles, CA.

March 2001    **Program Developer and Lecturer**, Employment Discrimination Investigator Training.  Developed and presented a training curriculum to the staff of the City of Los Angeles, Office of Discrimination Complaint Resolution, Los Angeles, CA.

May 2000    **Lecturer**, "Investigation Techniques," International Research Staff, Hotel and Restaurant Employees Union (HRE), Los Angeles, CA.

October 1999/ March 1999/    **Lecturer**, "Misconduct of Death Penalty Juries," Capital Litigation Class, Loyola University School of Law, Los Angeles, CA.

July 1998    **Lecturer**, "The Role of Investigators in the South African Truth Commission," Sociology 101 Class, West Los Angeles College; also at the Office of Civil Rights Monitor, Los Angeles, CA.

July 1997    **Program Developer and Lecturer**, "The Truth Matters™, A Guide to Conducting Internal Investigations." Developed a training curriculum for human resource professionals at the Denny's restaurant chain.

November 1996    **Lecturer**, "Privacy, Community, and Information Work," The Southern California Conference on Technology, Employment & Community, California State University at Los Angeles, CA.

October 1996    **Lecturer**, "Legal Investigation," Capital Litigation Class, Loyola University School of Law, Los Angeles, CA.

5

| June 1995 | **Lecturer**, "Jury Misconduct and New Trial Motions," Civil Liability Training Class, Office of the City Attorney of Los Angeles. |
|---|---|
| March 1995 | **Lecturer**, "What Are Juries Thinking?," Litigators Luncheon, Law Offices of Mitchell, Silberberg & Knupp. |
| January 1994 | **Lecturer**, "Housing Discrimination Investigations," University of California at Los Angeles (UCLA) School of Law. |
| January 1994 | **Lecturer**, "Investigating Habeas Cases," Central District [of California] Capital Counsel Seminar. |
| February 1993 | **Lecturer**, "Police Reports: Truth and Fiction," Alternative Media Class, California State University at Long Beach. |
| March 1989 | **Lecturer**, "Criminal Defense Investigation," Criminal Procedure Class, Whittier College of Law, Los Angeles, CA. |
| February 1986 | **Lecturer**, "Crime on their Minds," UCLA Extension, Department of Humanities and Social Services. |

## Education

Mt. St. Mary's College, Bachelor of Arts, Los Angeles, CA, May 2001

## Professional Education

Tenth National Seminar on the Development and Integration of Mitigation Evidence: *Ten Years After Wiggins*, Habeas Assistance & Training Counsel Project, April 2013, Baltimore, Maryland.

National Training Institute for Workplace Investigators (certification received), March 2013, Association of Workplace Investigators, Santa Barbara, California.

Capital Case Defense Seminar, February 2013; California Attorneys for Criminal Justice, California Public Defenders Association, Monterey, CA.

Association of Workplace Investigators Third Annual Conference, November 2012, Oakland, California.

Capital Case Defense Seminar, February 2012; California Attorneys for Criminal Justice, California Public Defenders Association, Monterey, CA.

2011 Annual Conference, November 2011, California Association of Workplace

6

Investigators, Glendale, CA.

Seventh National Seminar on the Development and Integration of Mitigation Evidence, April 2010, Habeas Assistance & Training Counsel Project, Seattle, WA

Authorized Capital Case Training & Consultation Conference, July 2009, Federal Death Penalty Resource Counsel, Indiana University School of Law, Indianapolis, Indiana.

Fifth National Seminar on the Development and Integration of Mitigation Evidence, April 2009, Habeas Assistance & Training Counsel Project, Philadelphia, PA.

Legal Frameworks for Prosecution and Defense of Terrorism Suspects during the Obama Administration, April 2009, One World Research, New York, NY.

Representing Mexican Nationals in Capital Cases Seminar, February, 2008; Mexican Capital Legal Assistance Program, Phoenix, AZ.

International Justice 60 Years After Nuremberg, Amnesty International Lawyer's Conference, February 2006; Seattle, Washington

Death Penalty Defense Seminar, February, 2005; California Attorneys for Criminal Justice, California Public Defenders Association, Monterey, CA.

Death Penalty Defense Seminar, February, 2004; California Attorneys for Criminal Justice, California Public Defenders Association, Monterey, CA.

Effective Litigation: Investigations & Mitigation, November 2003; International Justice Project and Office of the Federal Public Defender for the District of Arizona, Phoenix, AZ.

Law, Lawsuits and Reasonable Accommodation, March 2003; California Association of Equal Rights Professionals (CAERP), Alhambra, California.

Death Penalty Defense Seminar, February, 2003; California Attorneys for Criminal Justice, California Public Defenders Association, Monterey, CA.

Death Penalty Defense Seminar, February, 2002; California Attorneys for Criminal Justice, California Public Defenders Association, Monterey, CA.

Managing Diversity in Times of Crisis Seminar, January, 2002; California Association of Equal Rights Professionals (CAERP), Diamond Bar, CA.

Investing in Investigations: How to Conduct Defend and Critique Workplace Investigations, October 2001; Labor & Employment Law Section of Los Angeles County Bar Association.

7

Abnormal Psychology, Spring 2001, Mt. St. Mary's College, Los Angeles, CA.

Death Penalty Defense Seminar, February, 2001; California Attorneys for Criminal Justice, California Public Defenders Association.

Death Penalty Defense Seminar, February, 2000; California Attorneys for Criminal Justice, California Public Defenders Association.

Mid-Winter Education and Training Conference, February 2000; California Association of Licensed Investigators.

Death Penalty Defense Seminar, February, 1999; California Attorneys for Criminal Justice, California Public Defenders Association.

Death Penalty Defense Seminar, February, 1998; California Attorneys for Criminal Justice, California Public Defenders Association.

Employment Law Seminar, CALI Mid Winter Education and Training Conference, January, 1994.

Criminal Law, Winter 1993; Mt. St. Mary's College, Los Angeles, CA.

Death Penalty Defense Seminar, February, 1993; California Attorneys for Criminal Justice, California Public Defenders Association.

Environmental Compliance Auditing, May, 1992, Chicago, IL; Executive Enterprises, Inc.

Death Penalty Defense Seminar, February, 1992; California Attorneys for Criminal Justice, California Public Defenders Association.

Mid-Winter Education and Training Conference, January 1992; California Association of Licensed Investigators.

The Science of Environmental Law, September 1991, Washington, D.C.; Executive Enterprises, Inc.

Proposition 115 Criminal Law Seminar, June 1990; California Attorneys for Criminal Justice.

Death Penalty Defense Seminar, February, 1989; California Attorneys for Criminal Justice.

Mid-Winter Education and Training Conference, January, 1989; California Association of Licensed Investigators.

8

Medicolegal Investigation of Death Seminar, May 1998; Wayne State University School of Medicine.

Death Penalty Defense Seminar, February, 1998; California Attorneys for Criminal Justice.

## State License

Licensed Private Investigator, PI#10349, State of California, January, 1984.

## Other Affiliations

Juvenile Innocence and Fair Sentencing Program, Loyola Law School (Board member)

Los Angeles City Human Relations Commission (Commissioner, Past-President)

California Association of Licensed Investigators

California Attorneys for Criminal Justice (Associate)

9

P-App. 007042

Andriano Mitigation Review

# Exhibit B

Public Interest Investigations, Inc.

**Daniel Patterson - PDX**

| | |
|---|---|
| **From:** | Scott MacLeod - PDX |
| **Sent:** | Monday, December 06, 2004 7:45 AM |
| **To:** | Daniel Patterson - PDX |
| **Cc:** | Patty Lopez - PDX |
| **Subject:** | Some ideas from Thurs and Friday's seminar |

- Why shouldn't the jury be afraid of Wendi any more?

- Execution Impact: How would the LOSS (and use the word loss, and phrase such as loss of life, or the tragedy of Wendi's possible execution) of life impact Wendi's family? Wendi's friends? If you want, I can provide statistics on how clients on death row have family members who suffer from newly formed mental health conditions, physiological conditions (high blood pressure and heart disease) and emotional estrangement.

- Why punish the family too?

- Noted repeatedly throughout the seminar: Experts, doctors, etc do not have the impact that us professionals may often believe they do.  Try to illicit emotional, or common sense testimony from experts at this stage.

- Clergy members.  Do we have any clergy who could appear for Wendi?  I will check around.  Was she seeing any clergy in the jail?  Short deadline here, but I will give it my best.

- Wendi MUST show some sort of remorse.  I know we have discussed this lately, but its crucial.  At both the seminar, and the research I have reviewed for years suggest that the #1 mitigating factor (short of she didn't do it) is some form of allocution.

- Explain Wendi's unique situation to the jury.  We put on a viable defense for Wendi, so now do not expect Wendi to stand up here and confess to the crime.  In addition, explain that what she does allocate to is consistent with our defense.  Wendi is NOT damned if she does, damned if she doesn't.  Her allocution makes sense.

- Finally, one very compelling idea:

  - Make a list of aggravators on some sort of visual media (a poster board, etc) and to the left of that, a list of mitigating factors.  We can always make up many more mitigating factors than aggravating factors.  The visual cue here for the jury is clear – which ever side has more mitigating factors must be the side who "wins".

It might look something like this:

| **Mitigating Factors** | **Aggravation Factors** |
|---|---|
| Wendi's lack of prior history | blah, blah, blah |

Thanks,

Scott

1

011931

Andriano Mitigation Review

# Exhibit C

Public Interest Investigations, Inc.

**From:** Daniel Patterson - PDX
**Sent:** Monday, November 29, 2004 9:39 AM
**To:** Scott MacLeod - PDX
**Subject:** RE: updated list 11/30 of mitigation witnesses

Thanks-Dan P.

**From:** Scott MacLeod - PDX
**Sent:** Monday, November 29, 2004 9:33 AM
**To:** Daniel Patterson - PDX
**Cc:** Carole Besore - PDX
**Subject:** updated list 11/30 of mitigation witnesses

Hi Dan.

Here is an updated list of mitigation witnesses. I will also provide Carole with a hardcopy. Almost every person on this list I have interviewed, and have scheduled follow up interviews sometime this week.

I will submit summaries of their interviews sometime on Wed or Thurs.

This is not a complete, nor exhaustive list, it is simply my list of witnesses.

> Donna Ochoa - 520-836-6829
> Alejo Ochoa
> Barbara Mitchell - 520-560-0623
> Martha England - 520 - 466 - 7527
> Sharon Murphy 602 - 369 - 0192
> Brandon Ochoa (your call) 520 - 836 – 6829
> Laura King (602) 876-1959
> Joyce Van Every – nurse at the Durango Jail
> Dr. Gerald Perry – psych at the Durango Jail
> Linda Galleon (520) 298-4188
> Jimmy Galleon (520) 298-4188
> Cindy Fike (520) 426-6323 *work*
> Chris Vasquez (520) 866-5145 *work* (asst chief of police in Pinal cnty)
> Frances Archuleta (she is in school in Alabama) Email: farchuleta@hotmail.com
> Lonnie Inskeep 520 - 568 - 2893

I am currently inclined to NOT ask the correctional expert to help out. With Laura King's testimony, Dr. Perry's and the nurse, I believe we can construct a strong argument supporting Wendi's ability to succeed while incarcerated. Let me know what you think?

If you want to be present during interviews with any of the above, let me know? Many I will be meeting with in the Mesa Court house.

Thanks,

Scott

**From:** Daniel Patterson - PDX

011784



# SUPPLEMENTARY GUIDELINES FOR THE MITIGATION FUNCTION OF DEFENSE TEAMS IN DEATH PENALTY CASES

## INTRODUCTION

The ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (2003 revision) assign to lead counsel (at Guideline 10.4(B)) the responsibility for conducting a thorough investigation relating to both guilt and penalty, regardless of any statement by the client opposing such investigation. (Guideline 10.7) To meet this responsibility, lead counsel must assemble a capital defense team consisting of no fewer than two qualified attorneys, an investigator, and a mitigation specialist – with at least one member of that team qualified by training and experience to screen for the presence of mental or psychological disorders or impairments. (Guidelines 4.1 and 10.4 C).

Inherent in the approach to competent capital defense dictated by the Guidelines is the recognition that the mitigation function is multi-faceted and multi-disciplinary, even though ultimate responsibility for the investigation of such issues rests irrevocably with counsel. Because the mitigation function is of utmost importance in the defense of capital cases, and because counsel must rely on the assistance of experts, investigators and mitigation specialists in developing mitigating evidence, these supplementary interdisciplinary performance standards are necessary to ensure that all members of the defense team perform in accordance with prevailing national norms when representing a client who may be facing execution.

These Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases were developed in cooperation with the ABA Death Penalty Representation Project to assist its work and to reflect prevailing professional norms. They are the result of a two-year drafting and review process by experts in the field of death penalty litigation. These Supplementary Guidelines provide comprehensive, up-to-date guidance for all members of the defense

677

STETLER.PSP                                                   6/20/2008 12:57:26 PM

team, and will provide useful guidance to judges and defense counsel on selecting, funding and working with mitigation specialists. Following the Guidelines will help ensure effective assistance of counsel for all persons charged with or convicted of capital crimes. These Supplementary Guidelines explain in greater detail the elements of the mitigation function of capital defense teams. Because they are consistent with, elucidate and incorporate by reference the ABA Guidelines, these Supplementary Guidelines follow the same general organizational structure as the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases.

The skills, abilities, and functions outlined in these Supplementary Guidelines must be present throughout the defense team, and the responsibility for the development and presentation of mitigation evidence must be incorporated into the defense case at all stages of the proceedings from the moment the client is taken into custody, and extending to all stages of every case in which the jurisdiction may be entitled to seek the death penalty, including initial and ongoing investigation, pretrial proceedings, trial, appeal, post-conviction review, clemency proceedings and any connected litigation. The duty to investigate, develop and pursue avenues relevant to mitigation of the offense or penalty, and to effectively communicate the fruits of those efforts to the decision-makers, rests upon defense counsel.

## GUIDELINE 1.1—OBJECTIVE AND SCOPE OF GUIDELINES

A.    The objective of these Guidelines is to summarize prevailing professional norms for mitigation investigation, development and presentation by capital defense teams, in order to ensure high quality representation for all persons facing the possible imposition or execution of a death sentence in any jurisdiction. All capital defense teams must be comprised of individuals who, through their experience, training and function, strive to fulfill the constitutional mandate that the sentencer consider all evidence in support of a sentence other than death. Mitigation evidence includes, but is not limited to, compassionate factors stemming from the diverse frailties of humankind, the ability to make a positive adjustment to incarceration, the realities of incarceration and the actual meaning of a life sentence, capacity for redemption, remorse, execution impact, vulnerabilities related to mental health, explanations of patterns of behavior, negation of aggravating evidence regardless of its designation as an aggravating factor, positive acts or qualities, responsible conduct in other areas of life (e.g. employment, education, military service, as a family member), any evidence bearing on the degree of moral culpability, and any other reason for a sentence less than death.

B.    These Guidelines apply from the moment that counsel is appointed and extend to all stages of every case in which the jurisdiction may be entitled to seek the death penalty, including initial and ongoing investigation, pretrial proceedings, trial, appeal, post-conviction review, competency-to-be-executed proceedings, clemency proceedings and any connected litigation.

*Cross-References:*

ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases 1.1—Objective and Scope of Guidelines; 4.10—The Defense Team and Supporting Services.

STETLER.PSP                                            6/20/2008 12:57:26 PM

## GUIDELINE 4.1—THE CAPITAL DEFENSE TEAM: THE ROLE OF MITIGATION SPECIALISTS

A.  In performing the mitigation investigation, counsel has the duty to obtain services of persons independent of the government and the right to select one or more such persons whose qualifications fit the individual needs of the client and the case. Applications to the court for the funding of mitigation services should be conducted ex parte, in camera, and under seal.

B.  Counsel has a duty to hire, assign or have appointed competent team members; to investigate the background, training and skills of team members to determine that they are competent; and to supervise and direct the work of all team members. Counsel must conduct such investigation of the background, training and skills of the team members as will determine that they are competent and must ensure on an ongoing basis that their work is of high professional quality.

C.  All members of the defense team are agents of defense counsel. They are bound by rules of professional responsibility that govern the conduct of counsel respecting privilege, diligence, and loyalty to the client. The privileges and protections applicable to the work of all defense team members derive from their role as agents of defense counsel. The confidentiality of communication with persons providing services pursuant to court appointment should be protected to the same extent as if such persons were privately retained. Like counsel, non-attorney members of the defense team have a duty to maintain complete and accurate files, including records that may assist successor counsel in documenting attempts to comply with these Guidelines.

D.  It is counsel's duty to provide each member of the defense team with the necessary legal knowledge for each individual case, including features unique to the jurisdiction or procedural posture. Counsel must provide mitigation specialists with knowledge of the law affecting their work, including an understanding of the capital charges and

STETLER.PSP                                                          6/20/2008 12:57:26 PM

2008]                    *SUPPLEMENTARY GUIDELINES*                         681

available defenses; applicable capital statutes and major
state and federal constitutional principles; applicable
discovery rules at the various stages of capital litigation;
applicable evidentiary rules, procedural bars and "door-
opening" doctrines; and rules affecting confidentiality,
disclosure, privileges and protections.

*Cross- References:*

ABA Guidelines for the Appointment and Performance of Defense
Counsel in Death Penalty Cases 4.1—The Defense Team and Supporting
Services.
ABA Model Rules of Professional Conduct 1.3—Diligence; 1.6—
Confidentiality of Information; 1.7—Conflict of Interest: Current
Clients; 1.8—Conflict of Interest: Current Clients: Specific Rules; 1.9—
Duties to Former Clients; 1.10—Imputation of Conflicts of Interest:
General Rule; 1.11—Special Conflicts of Interest for Former and
Current Government Officers and Employees; 1.14—Client with
Diminished Capacity; 2.3—Evaluations for Use by Third Person.

STETLER.PSP                                                      6/20/2008 12:57:26 PM

## GUIDELINE 5.1—QUALIFICATIONS OF THE DEFENSE TEAM

A.  Capital defense team members should demonstrate a commitment to providing high quality services in the defense of capital cases; should satisfy the training requirements set forth in these Supplementary Guidelines; and should be skilled in the investigation, preparation and presentation of evidence within their areas of expertise.

B.  The defense team must include individuals possessing the training and ability to obtain, understand and analyze all documentary and anecdotal information relevant to the client's life history. Life history includes, but is not limited to: medical history; complete prenatal, pediatric and adult health information; exposure to harmful substances in utero and in the environment; substance abuse history; mental health history; history of maltreatment and neglect; trauma history; educational history; employment and training history; military experience; multi-generational family history, genetic disorders and vulnerabilities, as well as multi-generational patterns of behavior; prior adult and juvenile correctional experience; religious, gender, sexual orientation, ethnic, racial, cultural and community influences; socio-economic, historical, and political factors.

C.  Mitigation specialists must be able to identify, locate and interview relevant persons in a culturally competent manner that produces confidential, relevant and reliable information. They must be skilled interviewers who can recognize and elicit information about mental health signs and symptoms, both prodromal and acute, that may manifest over the client's lifetime. They must be able to establish rapport with witnesses, the client, the client's family and significant others that will be sufficient to overcome barriers those individuals may have against the disclosure of sensitive information and to assist the client with the emotional impact of such disclosures. They must have the ability to advise counsel on appropriate mental health and other expert assistance.

D.  Team members must have the training and ability to use the information obtained in the mitigation investigation to

STETLER.PSP                                                6/20/2008 12:57:26 PM

illustrate and illuminate the factors that shaped and influenced the client's behavior and functioning. The mitigation specialist must be able to furnish information in a form useful to counsel and any experts through methods including, but not limited to: genealogies, chronologies, social histories, and studies of the cultural, socioeconomic, environmental, political, historical, racial and religious influences on the client in order to aid counsel in developing an affirmative case for sparing the defendant's life.

E.    At least one member of the team must have specialized training in identifying, documenting and interpreting symptoms of mental and behavioral impairment, including cognitive deficits, mental illness, developmental disability, neurological deficits; long-term consequences of deprivation, neglect and maltreatment during developmental years; social, cultural, historical, political, religious, racial, environmental and ethnic influences on behavior; effects of substance abuse and the presence, severity and consequences of exposure to trauma. Team members acquire knowledge, experience, and skills in these areas through education, professional training and properly supervised experience.

F.    Mitigation specialists must possess the knowledge and skills to obtain all relevant records pertaining to the client and others. They must understand the various methods and mechanisms for requesting records and obtaining the necessary waivers and releases, and the commitment to pursue all means of obtaining records.

*Cross- References:*

ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases 10.7—Investigation; 4.1—The Defense Team and Supporting Services; 5.1—Qualifications of Defense Counsel.

STETLER.PSP                                                    6/20/2008 12:57:26 PM

## GUIDELINE 6.1—WORKLOAD

**Counsel should ensure that the workload of defense team members in death penalty cases is maintained at a level that enables counsel to provide each client with high quality legal representation in accordance with these supplementary Guidelines and the ABA Guidelines as a whole. In the case of mitigation specialists on the staff of an institutional defender office, the office should implement mechanisms to ensure that their workload is maintained at a level that enables them to provide each client with high quality services and assistance in accordance with these Guidelines.**

*Cross- Reference:*

ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases 6.1—Workload.

## GUIDELINE 8.1—TRAINING

A. All capital defense team members should attend and successfully complete, at least once every year, a specialized training program that focuses on the defense of death penalty cases offered by an organization with substantial experience and expertise in the defense of persons facing execution and committed to the national standard of practice embodied in these supplemental Guidelines and the ABA Guidelines as a whole.

B. Funding should be provided for team members to receive effective training and continuing professional education in their respective fields of expertise.

*Cross- Reference:*

ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases 8.1—Training.

P-App. 007056

686                          *HOFSTRA LAW REVIEW*                        [Vol. 36:677

## GUIDELINE 9.1—FUNDING AND COMPENSATION

**Non-attorney members of the defense team should be fully compensated at a rate that is commensurate with the provision of high quality legal representation and reflects the specialized skills needed to assist counsel with the litigation of death penalty cases. Flat fees, caps on compensation, and lump-sum contracts are improper in death penalty cases.**

*Cross- Reference:*

ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases 9.1—Funding and Compensation.

## GUIDELINE 10.3—OBLIGATIONS OF TEAM MEMBERS RESPECTING WORKLOAD

**All members of the defense team in death penalty cases should limit their caseloads to the level needed to provide each client with high quality legal representation in accordance with these supplementary Guidelines and the ABA Guidelines as a whole.**

*Cross Reference:*

ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases 10.3—Obligations of Counsel Respecting Workload.

688                          *HOFSTRA LAW REVIEW*                      [Vol. 36:677

## GUIDELINE 10.4—THE DEFENSE TEAM: THE ROLE OF COUNSEL WITH RESPECT TO MITIGATION SPECIALISTS

A.     Counsel bears ultimate responsibility for the performance of the defense team and for decisions affecting the client and the case. It is the duty of counsel to lead the team in conducting an exhaustive investigation into the life history of the client. It is therefore incumbent upon the defense to interview all relevant persons and obtain all relevant records and documents that enable the defense to develop and implement an effective defense strategy.

B.     Counsel guides the defense team and, based on consultation with team members and experts, conducts ongoing reviews of the evidence, assessments of potential witnesses, and analyses of the most effective manner in which to convey the mitigating information. Counsel decides how mitigation evidence will be presented.

*Cross- References:*

ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases 10.4—The Defense Team. ABA Model Rules of Professional Conduct 5.3—Responsibilities Regarding Nonlawyer Assistant.

## GUIDELINE 10.11—THE DEFENSE CASE: REQUISITE MITIGATION FUNCTIONS OF THE DEFENSE TEAM

A.    **It is the duty of the defense team to aid counsel in coordinating and integrating the case for life with the guilt or innocence phase strategy.**

B.    **The defense team must conduct an ongoing, exhaustive and independent investigation of every aspect of the client's character, history, record and any circumstances of the offense, or other factors, which may provide a basis for a sentence less than death. The investigation into a client's life history must survey a broad set of sources and includes, but is not limited to: medical history; complete prenatal, pediatric and adult health information; exposure to harmful substances in utero and in the environment; substance abuse history; mental health history; history of maltreatment and neglect; trauma history; educational history; employment and training history; military experience; multi-generational family history, genetic disorders and vulnerabilities, as well as multi-generational patterns of behavior; prior adult and juvenile correctional experience; religious, gender, sexual orientation, ethnic, racial, cultural and community influences; socio-economic, historical, and political factors.**

C.    **Team members must conduct in-person, face-to-face, one-on-one interviews with the client, the client's family, and other witnesses who are familiar with the client's life, history, or family history or who would support a sentence less than death. Multiple interviews will be necessary to establish trust, elicit sensitive information and conduct a thorough and reliable life-history investigation. Team members must endeavor to establish the rapport with the client and witnesses that will be necessary to provide the client with a defense in accordance with constitutional guarantees relevant to a capital sentencing proceeding.**

D.    **Team members must provide counsel with documentary evidence of the investigation through the use of such methods as genealogies, social history reports, chronologies and reports on relevant subjects including, but not limited to, cultural, socioeconomic, environmental, racial, and**

religious issues in the client's life. The manner in which information is provided to counsel is determined on a case by case basis, in consultation with counsel, considering jurisdictional practices, discovery rules and policies.

E.  It is the duty of the defense team members to aid counsel in the selection and preparation of witnesses who will testify, including but not limited to:

    1.  Expert witnesses, or witnesses with specialized training or experience in a particular subject matter. Such experts include, but are not limited to:

        a.  Medical doctors, psychologists, toxicologists, pharmacologists, social workers and persons with specialized knowledge of medical conditions, mental illnesses and impairments; substance abuse, physical, emotional and sexual maltreatment, trauma and the effects of such factors on the client's development and functioning.

        b.  Anthropologists, sociologists and persons with expertise in a particular race, culture, ethnicity, religion.

        c.  Persons with specialized knowledge of specific communities or expertise in the effect of environments and neighborhoods upon their inhabitants.

        d.  Persons with specialized knowledge of institutional life, either generally or within a specific institution.

    2.  Lay witnesses, or witnesses who are familiar with the defendant or his family, including but not limited to:

a. The client's family, extending at least three generations back, and those familiar with the client;

b. The client's friends, teachers, classmates, co-workers, employers, and those who served in the military with the client, as well as others who are familiar with the client's early and current development and functioning, medical history, environmental history, mental health history, educational history, employment and training history, military experience and religious, racial, and cultural experiences and influences upon the client or the client's family;

c. Social service and treatment providers to the client and the client's family members, including doctors, nurses, other medical staff, social workers, and housing or welfare officials;

d. Witnesses familiar with the client's prior juvenile and criminal justice and correctional experiences;

e. Former and current neighbors of the client and the client's family, community members, and others familiar with the neighborhoods in which the client lived, including the type of housing, the economic status of the community, the availability of employment and the prevalence of violence;

f. Witnesses who can testify about the applicable alternative to a death sentence and/or the conditions under which the alternative sentence would be served;

       **g.** Witnesses who can testify about the adverse impact of the client's execution on the client's family and loved ones.

**F.**   It is the duty of team members to gather documentation to support the testimony of expert and lay witnesses, including, but not limited to, school, medical, employment, military, and social service records, in order to provide medical, psychological, sociological, cultural or other insights into the client's mental and/or emotional state, intellectual capacity, and life history that may explain or diminish the client's culpability for his conduct, demonstrate the absence of aggressive patterns in the client's behavior, show the client's capacity for empathy, depict the client's remorse, illustrate the client's desire to function in the world, give a favorable opinion as to the client's capacity for rehabilitation or adaptation to prison, explain possible treatment programs, rebut or explain evidence presented by the prosecutor, or otherwise support a sentence less than death.

**G.**   It is the duty of the team members to aid counsel in preparing and gathering demonstrative evidence, such as photographs, videotapes and physical objects (e.g., trophies, artwork, military medals), and documents that humanize the client or portray him positively, such as certificates of earned awards, favorable press accounts and letters of praise or reference.

*Cross References:*

ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases 4.1—The Defense Team and Supporting Services; 10.7—Investigation; 10.10.1—Trial Preparation Overall; 10.11—The Defense Case Concerning Penalty.

Investigations Division Supplemental Report                                      Page 1 of 2





## MARICOPA COUNTY ATTORNEY'S OFFICE
## INVESTIGATIONS DIVISION
## SUPPLEMENTAL REPORT

| | | | | |
|---|---|---|---|---|
| **Report / Case #:** | CA2000033668 | | **Tracking #:** | 288536 |
| **Victim:** | | | **Defendant:** | ANDRIANO, WENDI ELIZABETH |
| **Charge/s:** | MURDER 1ST DEG-PREMEDITATED; A Class 1 Felony | | **Date:** | |
| **Detective:** | OLSON, DENNIS | | **Attorney:** | Martinez, Juan |
| **Approved By:** | | | | |

| Subject Name | DOB | SSN | SID | FBI |
|---|---|---|---|---|
| OCHOA, ALEJO LORENZANA | 8/1/52 | | | |

Interview Alejo Ochoa
1104 N. Park, Case Grande, Arizona
520 431 2929

Donna Ochoa
602 826 1150

On 2/3/2014 at 1430 hours, I contacted Alejo Ochoa at 1104 N. Park Avenue in Casa Grande, Arizona at the request of DCA Juan Martinez. I digitally recorded our conversation without his knowledge.

I knocked on his door and he answered the door. He identified himself as Alejo Ochoa and I identified myself, asking if I could speak to him for a few minutes. We had our conversation on the front porch of his residence.

He advised that he had a subpoena for tomorrow to show up in court. I told him that I wanted to talk to him about Wendi's case and told him that there have been some allegations of inappropriate touching of Wendi. He agreed with me and I asked if he was aware of the allegations. He said he was and that her attorneys told him about the allegations. I told him that I knew that he gave a Declaration a while back and I told him that I did not remember reading anything about where that was addressed about the touching. He agreed with me that that it was not addressed.

I asked him if Wendi was making these allegations and he said they did not tell him who made them. I asked if there was any truth to that or if anything happen in the past between him and Wendi that he can remember. He said no. I told him that I was not there to arrest him and that he was not a suspect but I needed to get to the bottom of this. He said in his declaration that they used to wrestle around and if he touched her anywhere, it was by accident. I asked if Wendi and he were pretty close when she was growing up and he said that they were. I told him I meant as a father and daughter. He said that was correct.

I asked if he ever touched her inappropriately on purpose and he said no. I asked if any of her friends were touched by him and he said no. I asked if he knew Kyre and he said yes. I asked if they hung out together when they were younger and he said yes. I asked if they spent a lot of time at his house and he said yes. I asked him to explain if he touched her by accident while playing with her or that it never happened period. He said he doesn't ever remember touching her and I asked him if he did not remember or he didn't. He said he didn't and knows he didn't touch her inappropriately.

I told him that there was a time that she would ask him about sex terms and he asked if I was talking about Kyre. I said no, Wendi. He said that Wendi would ask about dating and wanted to know what I meant by sex terms. I asked him if Wendi asked him about a hand job and he said she never asked him about that. He said he knew a girl at church had sex and there was a big blow up at the church. He continued by saying that he asked Wendi not to have

P-App. 007064

sex until she was eighteen years old.

I said that he never showed her anything, how to have sex or anything like that and he said no. I asked if Wendi ever ask him to show her anything about sex and he said no. I said like how to have intercourse or give hand jobs or anything and he said no. I asked if there any other girls in the school that made any allegations about him that he was aware of and he said he did not know, not that he knew of. He said he did even know who made the allegation about Wendi.

He said that his Donna did not want to talk to Wendi about sex and she told her to talk to her dad about it but nothing ever came up about him touching her. I asked if he was still pretty close with Wendi and he said not actually now since all this came up and he have not talk to her since all this came out. I asked how long that was and he said it been months. He said his biggest obstacle was his back, sitting there a long time. He said he saw her almost every week for a while, and then it was every couple of weeks, then once a month. He said when he drives to Phoenix; it takes him a while to get out of the car because of his back.

He said since the allegation, he thought it would be better if he did not talk to her on the phone or see her.

I asked him if he knew Barry and he asked Lorts? I said yes and he said that he did know him. I asked if he got along with him and he said that he did. He said he has not seen him for years and I asked if they were just friends and or related. He said there were just friends. I asked if they hung out together in high school and he said yes. I asked if they were good friends and he said they smoked some dope together. I asked if they took ACID and he said he did, he smoke marijuana and took LSD. I asked if he got into a drug program later and he said that was not entirely correct. He quit taking drugs and drinking on his own and they started a drug program to help people to get off drugs. He said he did not go through a program to get off drugs.

I asked if Barry and him leave on good terms or did you guys separated because you grew older. He said Barry's brother started a church here and started another church in Tempe. Barry moved to Tempe to go to church and something happen and he left the church. They just lost track of each other over the years. He said that Donna saw him at some grocery store a few years ago and Barry said to tell him hi.

I asked if he was still married to Donna and he said yes. He asked if he had an allegation also and I said I could not really tell him anything.

I told him that since it was not addressed in his previous statement, we just want to clarify the allegation. I asked him if he ever gave her a shower or bath and he said no. He said that all three of them would do this-he would be in the shower and Wendi would not open the curtain or door but would dump cold water over the top on him. He said Wendi and him would never shower together. He said that his wife and he did but not Wendi.

I obtained his and Donna cell phone number before I left. I asked if he knew who made the allegation and he said he didn't. He said it could have come from Wendi, he does not know for sure. He agreed at first to be interviewed but now they are trying to make him and Donna look so bad and that's why Wendi is in jail.

I left his residence and parked on the street to look at my file. He approached me again while I was in my vehicle and said that he is going to talk to the attorneys tomorrow. He said that he is going to plead the fifth and not testify. I turned on the digital recorder again and recorded our conversation. I asked when he is scheduled to go to court and he walked back to his truck to get his subpoena.

He said again that he was going to plead the Fifth Amendment. He said he wanted to give both of them notice that he was planning on not testifying. I told him that I would relay his information to Mr. Martinez.

I then drove to 1730 E. Shari Street in San Tan, Arizona to contact Kyre Lorts. She answered the door but refused to speak to me. She said she would talk to the attorneys tomorrow.

CAIS closed

P-App. 007065

# HEARING EXHIBIT 228

# PLACEHOLDER FOR AUDIO RECORDING

# INTERVIEW BY DETECTIVE DENNIS OLSON OF MR. OCHOA, DATED 2/3/2014

1 | **G. DAVID DELOZIER. P.C.**
4016 East Forest Pleasant Place
2 | Cave Creek, AZ 85331
3 | Phone: (480) 575-6660
Fax: (480) 575-6661
4 | E-Mail: gddelozier@aol.com
5 |
G. David DeLozier
6 | State Bar of Arizona I.D: 005237
Attorney for Defendant
7 |



**COPY**

**FEB 2 2 2001**

MICHAEL K. JEANES, CLERK
J. BERRY
DEPUTY CLERK

8 | **IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**
9 | **IN AND FOR THE COUNTY OF MARICOPA**

10 | **STATE OF ARIZONA,**                    Case No. 2000-096032
11 |          Plaintiff,
                                   **MOTION FOR DETERMINATION**
12 |                                **OF COMPETENCY PURSUANT TO**
                                   **RULE 11, ARIZONA RULES OF**
13 | vs.                          **CRIMINAL PROCEDURE**
14 |
15 |
16 | **WENDI ELIZABETH ANDRIANO,**
17 |          **Defendant.**
18 |                                (Assigned to the Honorable
                                   Daniel A. Barker, Judge)
19 |

20 |        COMES NOW G. David DeLozier, as private counsel for Defendant Wendi Elizabeth

21 | Andriano, pursuant to **Rule 11.2, Arizona Rules of Criminal Procedure**, requests that this Court

22 | have the Defendant examined to determine whether she is competent to stand trial. competent to

23 | assist defense counsel in her defense, and to investigate the defendant's mental condition at the

24 |

25 | time of the offense.

26 |        Further, pursuant to **Rule 11.3 §§ (a) and (b)(1)**, Defendant requests the exclusive

27 | appointment of physician psychiatric mental health experts. This request is predicated upon the

28 |

-1-

069181

evaluation of H. Kande Rohde, C.P.C., a true and correct copy of which is included herein as Exhibit "1".

This motion is based on the following Memorandum of Points and Authorities.

**RESPECTFULLY SUBMITTED** this _22_ day of February, 2001.

G. DAVID DELOZIER, P.C.

G. David DeLozier
Attorney for Defendant

## MEMORANDUM OF POINTS AND AUTHORITIES

**Rule 11.2** provides that any party may move for an examination to determine whether the defendant is competent to stand trial, assist counsel in preparation of the defense of the case, and to investigate the defendant's mental condition at the time of the offense. Defendant's counsel believes that there is sufficient evidence to warrant a determination of whether the Defendant (1) is competent to stand trial, (2) is able to assist him in the preparation of the defense of the case, and (3) the mental condition at the time of the offense.

Defendant's counsel's belief is based, in part, upon the report of H. Kande Rohde, Certified Professional Counselor, which indicates that in the course and scope of Ms. Rohde's attempts to diagnose and treat the Defendant, she has determined that the Defendant may suffer from a mental disorder, disease or defect, which is sufficient to call into question her sanity, not only at the time in which the alleged offense was committed, but also subsequent to the event which gives rise to this prosecution. Specifically, Ms. Rohde notes, "I would recommend that a psychiatrist be called in to examine her (Defendant). . . It would assist me greatly if she could be evaluated by a psychiatrist."

-2-

009182

1    A true and correct copy of the evaluation of Ms. Rohde, as well as her resume, are attached and

2    incorporated herein as **Exhibits "1" and "2",** respectively.

3          Defense counsel therefore requests that this Court have the Defendant examined by

4    physician psychiatrists to determine whether the Defendant is not only competent to stand trial, is

5    equally competent to assist counsel in her defense, and her mental condition at the time of the

6

7    offense.

8          **RESPECTFULLY SUBMITTED** this 20 day of February, 2001.

9                                    G. DAVID DELOZIER, P.C.

10

11

12                                   G. David DeLozier
                                     Attorney for Defendant
13

14   Original of the foregoing filed this
15   22 day of February, 2001, with:

16   Clerk of the Superior Court
     201 West Jefferson
17   Phoenix, AZ 85003

18   Copies of the foregoing delivered*/mailed** this
19   22 day of February, 2001, to:

20   The Honorable Daniel A. Barker*
     Judge, Maricopa County Superior Court
21   222 E. Javelina
22   Mesa, Arizona 85210-6201

23   Juan Martinez, Esquire**
24   Deputy County Attorney
     301 West Jefferson
25   Phoenix, AZ 85003
     Attorney for the Plaintiff
26

27

28
     By Kathy O'Quinn

                                     -3-

                                                                    009183

# EXHIBIT "1"

009184

H. Kandy Rohde, CPC
5507 East Shea Blvd.
Scottsdale AZ 85254
(480) 443-9313

Law Offices of G.David DeLozier
4016 East Forest Pleasant Place
Cave Creek, AZ 85331

February 19, 2001

Dear Mr. DeLozier,

I have been meeting with Wendi Andriano, and I recommend that a psychiatrist be called in to examine her. I believe that her willingness to give up her will to others is a symptom of some kind of personality disorder. I also suspect that her defense system includes dissociation. Her mother's reference to possible abuse by Wendi's paternal grandfather could be the origin of that dissociation. The intense sense of peace she describes since her arrest is sufficiently inappropriate to cause me to ask for collaboration from another professional.

It would assist me greatly in diagnosis and treatment if she could be evaluated by a psychiatrist. Ideally I would like to have him or her administer personality tests and perhaps interview Wendi under hypnosis. I would also hope she could be evaluated for medication.

Please let me know if this is possible and if I can confer with the professional she chooses. Thank you.

Sincerely,

H.Kandy Rohde, CPC

009185

# EXHIBIT "2"

009186

**Harriet Kandy Rohde**
*Certified Professional Counselor #CC2418*
5507 East Shea Boulevard
Scottsdale AZ 85254
(602) 443-9313
FAX (602) 368-0704

| | |
|---|---|
| **EDUCATION** | M.A. Counseling Psychology, May, 1997<br>Loyola Marymount University, Los Angeles CA<br><br>M.S. 1967, B.S. 1966<br>Northwestern University, Medill School of Journalism,<br>Evanston IL |
| **EXPERIENCE** | *Jewish Family & Children's Service*<br>*6376 W. Bell Road*<br>*Glendale, AZ 85308*<br>*March 1999   Present*<br><br>Therapist specializing in individual, couples, and family therapy as well as case management, home-based therapy, assessment and discharge evaluation at a managed care facility.<br><br>*Private Practice*<br>*Scottsdale, AZ 85254*<br>*March 2000   Present*<br><br>Therapist specializing in individual, couples, family therapy.  Treatment areas include parenting, conflict resolution, stress management, depression, anxiety, and grief work.<br><br>*Southern California Counseling Center*<br>*Los Angeles, California*<br>*January, 1996-August, 1998*<br><br>Counselor at privately funded clinic with diverse client population.  Worked with individuals, couples, families and groups.  Experience doing assessments and intakes. |

009187

*McManual Health Center*
*Manual Arts High School*
*Los Angeles, California*
*September, 1997- August, 1998*

Counselor for high risk students and students on probation in Los Angeles County Vision 2000 program. Worked in individual sessions and groups.

*Department of Social Services*
*Bronx, New York*
*December, 1967-October, 1969*

Caseworker. Conducted intake interviews, determined client needs, issued payments, made home visits, made referrals to other agencies

**MEMBERSHIPS**        California Association of Marriage and Family Therapists
                       Los Angeles Chapter CAMFT

009188

# *Law Offices of G. David DeLozier, P.C.*

*4016 East Forest Pleasant Place, Cave Creek, Arizona 85331*

*E-Mail: gddelozier@aol.com*

*Phone (480) 575-6660   Facsimile (480) 575-6661*

G. David DeLozier SBAZ #05237
  *(Admitted in AZ, PA, TX & Federal Courts)*
Kathy M. O'Quinn SBLA #14195
  *(Admitted in LA & Federal Courts)*

Legal Assistants:

General:
  Ronald Ramirez
  Kimberly Birdsong

Planning & Zoning:
  Marlene J. Bates
Domestic Relations
  Tamera Martin

December 14, 2000

Mr. Alejo Ochoa
Mrs. Donna Ochoa
1104 North Park
Casa Grande, AZ 85222

Re: State v. Wendi E. Andriano

Dear Mr. and Mrs. Ochoa:

It was a pleasure to meet with you today, Mr. Ochoa. Thank you for driving that long distance to meet with me and provide the initial funds, $5,400.00, of the retainer.

As you know, your daughter's request came to me through mutual friends and we are willing to assist her for several reasons, including those friends. We have, however, significantly reduced our normal fees for this representation. However, that does not mean that your daughter will not receive all of the best efforts we are able to make on her behalf.

However, the one aspect that I believe that may be significantly beyond our abilities is that of forensic experts in various areas, most notably psychologists. Thus, I am very hopeful that Mr. Thikoll will advise me expeditiously of his intent in assisting with the case and what his plans are in especially this area of expert witnesses. It is my opinion, that without the use of experts, your daughter's defense is going to be extremely difficult. Thus, while attorney's fees are critical, and I am thankful for all you are doing to raise the funds for these fees, I want to be certain you are aware of these critical areas, as well. Of course, if Mr. Thikoll or you know of persons in these fields of expertise that will work with us on a reduced basis, that would also be helpful to know. But, the defense of the case needs immediate attention.

With that in mind, I have revised the representation agreement and have included two copies of it. I have executed both; please have your wife and you sign one of them and return to me. Please feel free to call with your questions and comments at any time. Again, thank you for driving up to meet with me today.

PCRDIS-D002787

Mr. Alejo Ochoa
Mrs. Donna Ochoa
Re: State v. Wendi E. Andriano
December 14, 2000
Page 2.

Also, I look forward to those chips and tamales.  Best regards.

Very truly yours,

LAW OFFICES OF G. DAVID DELOZIER, P.C.

G. David DeLozier

enclosures

cc: Wendi E. Andriano

PCRDIS-D002788

## Law Offices of G. David DeLozier, P.C.

*4016 East Forest Pleasant Place, Cave Creek, Arizona 85331*
*E-Mail: gddelozier@aol.com*
*Phone (480) 575-6660   Facsimile (480) 575-6661*

G. David DeLozier SBAZ #005237
*(Admitted in AZ, PA, TX & Federal Courts)*
Kathy M. O'Quinn SBLA #14195
*(Admitted in LA & Federal Courts)*

Legal Assistants:
General:
Ronald Ramirez
Kimberly Birdsong

Planning & Zoning:
Marlene J. Baker
Domestic Relations
Tamera Martin

### REPRESENTATION AGREEMENT

This Agreement was made on <u>December 14</u>, 2000, by and between <u>Wendi Elizabeth Andriano</u>, herein referred to as "client", and G. David DeLozier of the law firm of G. David DeLozier, P.C., herein referred to as "attorney".

**WITNESSETH:**

1. Client employs attorney to represent client as her attorney at law in a criminal matter, presently pending in the Maricopa County Superior Court bearing case number CR2000-09032. The pending charges are for murder in the first degree. Client empowers attorney to take such action as may be advisable in the judgment of attorney, including the taking of judicial review and filing notice of appeal.

2. In consideration of the services to be performed by the attorney and it being the desire of the client to compensate attorney, attorney shall be paid a non-refundable retainer of $30,000.00. Initially, Client is herewith providing the sum of $5,400.00, and attorney is willing to undertake representation of Client upon the promise of her Father, Alejo Ochoa, to be fully responsible for the balance of the fee, $24,600.00. The full fee is earned upon execution of this Agreement and is non-refundable. Attorney will not be providing monthly billing statements of time spent on the various matters required to

PCRDIS-D002779

REPRESENTATION AGREEMENT

Wendi E. Andriano, Client
G. David DeLozier, Attorney
December 14, 2000
Page 2.

represent Client; but, will provide status statements of the remaining balance due, from time to time. However, in the event Client, or Client's family, fails to make a payment hereunder, attorney is authorized to request that the Court permit him to withdraw from the case. If the Court grants attorney's motion to withdraw, this Agreement shall be considered a Note, and shall draw interest at the annual rate of 12% on the unpaid balance on the date of default.

3.   All costs, including, but not limited to, costs for filing fees, service of process fees, consultations and examinations by experts, and private investigatory services deemed necessary by client and attorney in connection with the cause of action shall be paid by client. However, it is anticipated that the above referenced fees, along with fees previously paid to another attorney in Tucson, Leon Thikoll, who has agreed to assist with the case, will be adequate to cover costs. But, there can be guarantee by attorney that such will occur. This is especially important in the area of fees to retain the services of psychologists and other technical personnel who may be required to assert various potentially appropriate defenses. In any event, attorney will keep Client and her parents advised of the necessity of such professionals and will attempt to cover their costs from either his retainer or from fees that may be available through Leon Thikoll, Esquire.

PCRDIS-D002780

REPRESENTATION AGREEMENT

Wendi E. Andriano, Client
G. David DeLozier, Attorney
December 14, 2000
Page 3.

4.  Attorney may in his discretion employ any other member of a law firm, private investigators, and/paralegals of to assist him in the client's claim. However, in the event any such person who intends to separate submit a billing for services to client, attorney shall advise client and obtain client's acceptance.

5.  Attorney shall be entitled to his full fee, not withstanding the client may discharge or obtain the substitution of attorneys before attorney has completed the services for which he is hereby employed.

6.  Attorney has made no warranties as to the successful termination of the cause of action, and all expressions made by attorney relative thereto are matters of attorney's opinion only.

7.  This Agreement comprises the entire contract between attorney and client.

8.  The laws of the State of Arizona shall govern the construction and interpretation of the Agreement.

9.  Attorney agrees to perform all the services herein mentioned for the compensation provided above, which includes the above recited retainer and the receipt $5,400.00 as an initial deposit from client, which is hereby acknowledged by attorney.

IN WITNESS WHEREOF, attorney and client have executed this Agreement on the day and year stated above.

REPRESENTATION AGREEMENT

Wendi E. Andriano, Client
G. David DeLozier, Attorney
December 14, 2000
Page 4.

_____          _____
Wendi E. Andriano, Client                G. David DeLozier, Attorney

PERSONAL GUARANTEES:

_____
Alejo Ochoa

_____
Mrs. Donna Ochoa
1104 North Park
Casa Grande, AZ 85222
520-709-1200
520-836-6829 — home
520-836-5493

**REPRESENTATION AGREEMENT**

Wendi E. Andriano, Client
G. David DeLozier, Attorney
December 14, 2000
Page 4.


_____            _____
Wendi E. Andriano, Client                           G. David/DeLozier, Attorney



PERSONAL GUARANTEES:


_____
Alejo Ochoa


_____
Mrs. Donna Ochoa
1104 North Park
Casa Grande, AZ 85222
520-709-1200
520-836-6829
520-836-5493


PCRDIS-D002778



SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

RECEIVED
SEP 14 '93        SEP 15 '93

CLERK OF THE COURT



September 9, 1993        HON. MAURICE PORTLEY        M. Garcia
Deputy

Nº CR 92-93356

STATE OF ARIZONA        County Attorney
                        By: Scott Evans
v.

SHELBY WAYNE ROBERTSON (B)        Michael Bresnehan
DOB: 3/11/48

                        Victim Witness Division

                        M.C.S.O.
                        Attn: Records Manager



## SENTENCE OF IMPRISONMENT

12:45 p.m.   State is represented by above-named counsel.  Defendant is present with above-named counsel.

Court Reporter, Yvonne M. Hurley, is present.

The Defendant is advised of the charge, the determination of guilt and is given the opportunity to speak.

THE COURT FINDS that reasonable efforts have been made to give the victim notice of this proceeding and an opportunity to be heard.

Pursuant to A.R.S. § 13-607,

THE COURT FINDS AS FOLLOWS:

WAIVER OF TRIAL  The Defendant knowingly, intelligently and voluntarily waived his right to a trial with or without a jury, his right to confront and cross examine witnesses, his right to testify or remain silent and his right to present evidence and call his own witnesses after having been advised of these rights.  The determination of guilt was

P-App. 007082

Office Distribution
General Acctg - SE .... X
APO ............. X
MCSO/AIS ......... X
AZ DOC ........... X
Dispo. Clerk - SE .... X
Appeals - SE ...... X
Cert Desk/Waiver - SE

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

RECEIVED
SEP 14 '93      SEP 15 '93

CLERK OF THE COURT

September 9, 1993

HON. MAURICE PORTLEY

M. Garcia
Deputy

Nº CR 92-93356

State v. Robertson (B)

Continued

based upon a plea of **guilty**.

Having found no legal cause to delay rendition of judgment and pronouncement of sentence, the Court enters the following judgment and sentence:

IT IS THE JUDGMENT of the Court that the Defendant is guilty of the following crime(s) as set forth on the following page(s), that upon due consideration of all the facts, law and circumstances relevant herein, the Court finds that suspension of sentence and a term of probation are not appropriate and that a sentence of imprisonment with the Department of Corrections is appropriate.

THE COURT FURTHER FINDS that there are circumstances sufficiently substantial to call for the term as indicated. These circumstances are stated by the Court on the record.

AS PUNISHMENT, IT IS ORDERED that the Defendant is sentenced to a term of imprisonment and is committed to the Arizona Department of Corrections as follows:

OFFENSE: (Amended) Count V: Molestation Of A Child, a Dangerous Crime Against Children in the First Degree

FELONY CLASS: 2

IN VIOLATION OF A.R.S. § 13-1410, 3821, 31-281, 13-604.01, 702, 801 and 812

DATE OF OFFENSE: between November 1, 1992 to November 30, 1992

SENTENCE: 17 years

PRESUMPTIVE

Docket Number 181

Continued

Page 62

Office Distribution
General Acctg - SE . . . X
APO . . . . . . . . . . . . . X
MCSO/AIS . . . . . . . . X
AZ DOC . . . . . . . . . . X
Dispo. Clerk - SE . . . X
Appeals - SE . . . . . . X
Cert Desk/Waiver - SE

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

RECEIVED

SEP 14 '93      SEP 1 5 '93

CLERK OF THE COURT

September 9, 1993          HON. MAURICE PORTLEY          M. Garcia
                                                          Deputy

№ CR 92-93356

State v. Robertson (B)                                    Continued


NONDANGEROUS

NONREPETITIVE

          This sentence is to date from September 9, 1993.

          The Defendant is to be given credit for 57 days served prior to sentencing.

          Sentence is to run concurrent with sentence imposed in Count IV - lifetime probation.

          IT IS ORDERED that the Defendant pay an assessment in the amount of $112.00 to the Clerk of the Superior Court of Maricopa County:

          Pursuant to A.R.S. § 13-812, Defendant shall pay a $100 ($100.00 for each count) felony assessment.

          Pursuant to A.R.S. §12-116, Defendant shall pay a fee of $12.00 to the Clerk of the Superior Court of Maricopa County. Should Defendant pay all penalties, fines and/or sanctions in full this date, said fee is not applicable.

          Payment shall commence on the first day of the fourth month upon release from custody of the Department of Corrections. Said payment shall not be less than $5.00 per month.

          Any order entered by the Board of Pardons and Paroles Pursuant to A.R.S. § 31-412 shall be transmitted to the Clerk of the Superior Court of Maricopa County.

          The Defendant is advised concerning rights of review after conviction and written notice of those rights is provided.

          IT IS ORDERED granting the Motion to Dismiss Count VI, M.C.S.O.

P-App. 007084

Office Distribution
General Acctg - SE . . X
APO . . . . . . . . . . . . . X
MCSO/AIS . . . . . . . . X
AZ DOC . . . . . . . . . . X
Dispo. Clerk - SE . . . X
Appeals - SE . . . . . . X
Cert Desk/Waiver - SE

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

RECEIVED

SEP 14 '93           SEP 15 '93

CLERK OF THE COURT

September 9, 1993        HON. MAURICE PORTLEY        M. Garcia
                                                      Deputy

№ CR 92-93356

State v. Robertson (B)                                Continued

Departmental Report DR 92-23089, DR 92-00990 and DR 92-22750.

       IT IS ORDERED authorizing the Sheriff of Maricopa County to deliver the Defendant to the custody of the Arizona Department of Corrections and authorizing the Department of Corrections to carry out the term of imprisonment set forth herein. Issued: Order of Confinement.

       IT IS FURTHER ORDERED that the Clerk of the Court shall remit to the Department of Corrections a copy of this order together with all presentence reports, probation violation reports, medical and psychological reports relating to the Defendant and involving this cause.

       FILED:  Notice of Rights of Review After Conviction.

       Pursuant to A.R.S. § 13-3821(C), notification is hereby made to the Sheriff of Maricopa County, Arizona.

P-App. 007085

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

RECEIVED        SEP 15 '93
SEP 14 '93

CLERK OF THE COURT

9-9-93        Hon. Maurice Portley        M Garcia
NO. CR 92-93356        Judge/Commissioner/Pro Tem        Deputy

STATE VS. Robertson (B)        (Continued)

Let the record reflect that the Defendant's thumbprint is permanently affixed to this sentencing order in open court.

1:36 p.m. Hearing concludes.

(thumbprint)

JUDGE OF THE SUPERIOR COURT

The foregoing instrument is a full, true and correct copy of the original on file in this office.

Attest ___2-7___ 20 14
MICHAEL K. JEANES, Clerk of the Superior Court of the State of Arizona, in and for the County of Maricopa.

By _____ Deputy

Sentence - Last Page
1601-026 Rev. 1/90

Page 65



Office Distribution
General Acctg - SE ... X
APO ............ X
MCSO/AIS ........ X
AZ DOC .......... X
Dispo. Clerk - SE ... X
Appeals - SE ...... X
Cert Desk/Waiver - SE

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

RECEIVED            PROCESSED

AUG 1 8 '93        AUG 1 5 '93

/ 0

CLERK OF THE COURT

August 13, 1993                HON. MAURICE PORTLEY            M. Garcia
Deputy

№ CR 92-93356

STATE OF ARIZONA                         County Attorney
                                         By: Scott Evans
v.

TOMMY LEE ROBERTSON (A)                  Michael Bresnehan
DOB: 11/02/43
                                         Victim Witness Division

                                         M.C.S.O.
                                         Atten: Records Manager


## SENTENCE OF IMPRISONMENT/LIFETIME PROBATION


        10:25 a.m.   State is represented by above-named counsel.   Defendant is
present with above-named counsel.

        Court Reporter, Yvonne M. Hurley, is present.

        Defendant's exhibits #1 and #2 are marked for identification and received in
evidence.

        The Defendant is advised of the charge, the determination of guilt and is given
the opportunity to speak.

        THE COURT FINDS that reasonable efforts have been made to give the
victim notice of this proceeding and an opportunity to be heard.

        Pursuant to A.R.S. § 13-607,

THE COURT FINDS AS FOLLOWS:

Docket Number 181                    Continued                         Page  9

Office Distribution
General Acctg - SE ... X
APO ............... X
MCSO/AIS ......... X
AZ DOC ........... X
Dispo. Clerk - SE ... X
Appeals - SE ...... X
Cert Desk/Waiver - SE

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

RECEIVED              PROCESSED

AUG 1 3 '93          AUG 1 3 '93

CLERK OF THE COURT

August 13, 1993          HON. MAURICE PORTLEY          M. Garcia
                                                        Deputy

№ CR 92-93356

State v. Robertson (A)                                  Continued


__WAIVER OF TRIAL__  The Defendant knowingly, intelligently and voluntarily waived his right to a trial with or without a jury, his right to confront and cross examine witnesses, his right to testify or remain silent and his right to present evidence and call his own witnesses after having been advised of these rights.  The determination of guilt was based upon a plea of **Guilty**.

Having found no legal cause to delay rendition of judgment and pronouncement of sentence, the Court enters the following judgment and sentence:

IT IS THE JUDGMENT of the Court that the Defendant is guilty of the following crime(s) as set forth on the following page(s), that upon due consideration of all the facts, law and circumstances relevant herein, the Court finds that suspension of sentence and a term of probation are not appropriate and that a sentence of imprisonment with the Department of Corrections is appropriate.

THE COURT FURTHER FINDS that there are circumstances sufficiently substantial to call for the term as indicated.  These circumstances are stated by the Court on the record.

AS PUNISHMENT, IT IS ORDERED that the Defendant is sentenced to a term of imprisonment and is committed to the Arizona Department of Corrections as follows:

OFFENSE:  (Amended) Count I:  Attempted Sexual Exploitation of A Minor

FELONY CLASS:  3 and Dangerous Crime Against Children in the Second Degree

IN VIOLATION OF A.R.S.  § 13-1001, 3553, 3551, 3821, 604.01, 702, 801 and 812

DATE OF OFFENSE:  10/19/92

SENTENCE:  five years

Docket Number 181                    Continued                    Page  10

P-App. 007088



Office Distribution
General Acctg - SE . . . X
APO . . . . . . . . . . . . X
MCSO/AIS . . . . . . . X
AZ DOC . . . . . . . . . X
Dispo. Clerk - SE . . . X
Appeals - SE . . . . . . X
Cert Desk/Waiver - SE

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

RECEIVED          PROCESSED

AUG 1 8 '93      AUG 1 8 '93

CLERK OF THE COURT

August 13, 1993          HON. MAURICE PORTLEY          M. Garcia
                                                                              Deputy

Nº CR 92-93356

State v. Robertson (A)          Continued


MITIGATED

NONDANGEROUS

NONREPETITIVE

This sentence is to date from 8/13/93.

The Defendant is to be given credit for 248 days served prior to sentencing.

IT IS ORDERED that the Defendant pay an assessment in the amount of $100.00 to the Clerk of the Superior Court of Maricopa County:

Pursuant to A.R.S. § 13-812, Defendant shall pay a $100 ($100.00 for each count) felony assessment without a penalty assessment fee.

Payment shall commence on the first day of the fourth month upon release from custody of the Department of Corrections.  Said payment shall not be less than $25.00 per month.

As to Count II,


IT IS THE JUDGMENT OF THE COURT that the Defendant is guilty of the crime of:

OFFENSE:  (Amended) Count II:  Attempted Sexual Exploitation Of A Minor, a class 3 felony and Dangerous Crime Against Children in the Second Degree, nondangerous and nonrepetitive offense in violation of A.R.S. § 13-1001, 3553, 3551, 3821, 604.01, 702, 801 and 812 committed on 10/19/92.

Upon consideration of the offense, the facts, law and circumstances involved

Docket Number 181                    Continued                    Page   11



Office Distribution
APO . . . . . . . . . . . . .   X
Appeals - SE . . . . . .   X
General Acctg. - SE . .   X
Dispo. Clerk - SE . . .   X
MCSO/AIS  · · · · · ·   X
OCI - SE
ADOC   · · · · · ·   X
Cert Desk/Waiver - SE

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

RECEIVED          PROCESSED

AUG 1 5 '93       AUG 1 5 '93

CLERK OF THE COURT

August 16, 1993                    HON. MAURICE PORTLEY                    M. Garcia
                                                                          Deputy

Nº CR 92-93356

State v. Robertson (A)                                                    Continued

in this case, the Court finds that the Defendant is eligible for probation. The specific reasons for the granting of probation are stated by the Court on the record.

As punishment for this crime(s),

**IT IS ORDERED** suspending imposition of sentence and placing the Defendant on probation for a period of lifetime commencing August 13, 1993 under the supervision of the Adult Probation Department of this Court, in accordance with the formal Judgment and Order suspending sentence and Order imposing terms of probation signed by the Court.

As a condition of probation,

IT IS ORDERED that the Defendant pay a monthly probation service fee to the Clerk of the Superior Court of Maricopa County at a rate of $40.00 commencing on the first day of the fourth month after release from custody and due on the first day of each month thereafter during the term of probation.

IT IS ORDERED that the Defendant pay an assessment in the amount of $100.00 to the Clerk of the Superior Court of Maricopa County:

Pursuant to A.R.S. § 13-812, Defendant shall pay a $100 ($100.00 for each count) felony assessment.

Payment shall commence on the first day of the fourth month upon release from custody of the Department of Corrections. Said payment shall not be less than $5.00 per month.

Special Terms: Defendant is to have no contact with Julie Jacobson.

Docket Number 181                    Continued                    Page   12



Office Distribution
APO . . . . . . . . . . . . X
Appeals - SE . . . . . . X
General Acctg. - SE . . . X
Dispo. Clerk - SE . . . . X
MCSO/AIS - . . . . . X
OCI - SE
ADOC - . . . . . X
Cert Desk/Waiver - SE

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

RECEIVED

AUG 1 6 '93

PROCESS

AUG 1 6 '93

CLERK OF THE COURT

August 16, 1993                    HON. MAURICE PORTLEY              M. Garcia
                                                                      Deputy

№ CR 42-93356

State v. Robertson (A)                                            Continued


   The written terms and conditions of probation are handed to the Defendant for explanation, acceptance and signature.  The Defendant agrees to the stated waiver of extradition.  The Defendant is advised concerning the consequences of failure to abide the conditions of probation.

   Any order entered by the Board of Pardons and Paroles Pursuant to A.R.S. § 31-412 shall be transmitted to the Clerk of the Superior Court of Maricopa County.

   The Defendant is advised concerning rights of review after conviction and written notice of those rights is provided.

   IT IS ORDERED granting the Motion to Dismiss Count III and no further charges will filed out of M.C.S.O. Departmental Report 92-923089.

   IT IS ORDERED authorizing the Sheriff of Maricopa County to deliver the Defendant to the custody of the Arizona Department of Corrections and authorizing the Department of Corrections to carry out the term of imprisonment set forth herein. Issued: Order of Confinement.

   IT IS FURTHER ORDERED that the Clerk of the Court shall remit to the Department of Corrections a copy of this order together with all presentence reports, probation violation reports, medical and psychological reports relating to the Defendant and involving this cause.

   FILED:  Notice of Rights of Review After Conviction and Order Suspending Sentence and Imposing Terms Of Probation.

   Pursuant to A.R.S. § 13-3821(C), notification is hereby made to the Sheriff of Maricopa County, Arizona.

   Let the record show that restitution is to be determined in this matter and that that matter will be set for a hearing unless counsel can stipulate to a certain amount of

Docket Number 181                    Continued                    Page __13__

Office Distribution
APO . . . . . . . . . . .  X
Appeals - SE . . . . . .  X
General Acctg. - SE .   X
Dispo. Clerk - SE . . .  X
MCSO/AIS  . .  < > X
OCI - SE
ADOC  . . . . . . . . X
Cert Desk/Waiver - SE

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

RECEIVED

AUG 1 8 '93

PRODUCED

AUG 1 8 '93

CLERK OF THE COURT

August 16, 1993       HON. MAURICE PORTLEY         M. Garcia
                                                     Deputy

Nº CR  92-93356

State v. Robertson (A)                                Continued

restitution.

P-App. 007092

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

RECEIVED                 PROBATE

AUG 1 8 '93          AUG 1 3 '93

CLERK OF THE COURT

8-13-93          Hon, Maurice Portly     M Garcia

NO. CR92-93356          Judge/Commissioner/Pro Tem          Deputy

STATE VS. Robertson (A)          (Continued)

Let the record reflect that the Defendant's thumbprint is permanently affixed to this sentencing order in open court.

11:17 a.m. Hearing concludes.

(thumbprint)

JUDGE OF THE SUPERIOR COURT

The foregoing instrument is a full, true and correct copy of the original on file in this office.

Attest ___2-7___ 20 14
MICHAEL K. JEANES, Clerk of the Superior Court of the
State of Arizona, In and for the County of Maricopa.

By_____ Deputy

Sentence - Last Page
1601-026 Rev. 1/90

Page 15

P-App. 007093

# Representation Timeline

# Wendi's Representation

## The Ochoas' Representation

| October 2000 | November 2000 | December 2000 |

**October 8, 2000**
Wendi arrested.

**November 24, 2000**
DeLozier speaks with the Cunninghams about representing Wendi. (Exh. 82)

**November 15, 2000**
The Maricopa County Superior Court appoints the Lambeths as the guardians of Nicholas and Ashlee Andriano. (Exh. 81)

**December 2, 2000**
DeLozier visits Wendi in jail. (Exh. 82)

**December 14, 2000**
The Ochoas sign a fee agreement with DeLozier for Wendi's representation. (Exh. 83)

**December 22, 2000**
The State files notice of intent to seek the death penalty.

1

# Wendi's Representation

| February 2001 | March 2001 | April 2001 | June 2001 |
| --- | --- | --- | --- |

**February 14, 2001**
Rohde notes that Wendi showed signs of memory problems. (Exh. 45)

**March 12, 2001**
Rohde letter to DeLozier, noting Wendi's memory problems which may have been caused by childhood sexual abuse. (Exh. 7B)

**April 13, 2001**
With Ochoas' consent, DeLozier agrees to Public Defender as lead counsel.

# The Ochoas' Representation

**March 2001**
Thikoll files to terminate the Lamberths' guardianship. (Exh. 84)

**April 2001**
Thikoll becomes ill and Donna increasingly relies upon DeLozier for guidance on the guardianship case.

**April 5, 2001**
Dr. Yee appointed to determine whether the Ochoas should be allowed overnight visits with the children.

**June 12, 2001**
DeLozier files a notice of substitution of counsel for the Ochoas in the guardianship case. (Exh. 84)

2

**Wendi's Representation**

| July 2001 | August 2001 | December 2001 |
|-----------|-------------|---------------|

**July 23, 2001**
Patterson assigned to Wendi's case. (Exh. 6)

**The Ochoas' Representation**

**July and August, 2001**
At DeLozier's request, the Ochoas collect letters attesting to their character and parenting abilities. (Exhs. 85 and 86)

**August 31, 2001**
DeLozier files adoption petition in Pinal County Superior Court.

**December 18, 2001**
DeLozier ordered to serve the Lambeths with the adoption petition and include them in the home study. (Exh. 87)

3



# Wendi's Representation

**January 2002**

**February 2002**

**March 2002**

**July 2002**

**February 6, 2002**
Rohde notes that Wendi showed signs of childhood sexual abuse. (Exh. 45)

# The Ochoas' Representation

**January 2, 2002**
DeLozier files a notice of change of judge in the adoption case. (Exh. 88)

**March 15, 2002**
The Lambeths accuse Alejo of abusing Ashlee and Donna of telling Ashlee to keep the abuse secret. (Exh. 95)

**July 31, 2002**
Budge substitutes for DeLozier as counsel in the guardianship case. (Exh. 102)

**July 15, 2002**
The Lambeths move for sanctions in the adoption case. (Exh. 100)

4

# Wendi's Representation

| August 2002 | September 2002 | October 2002 | December 2002 |

# The Ochoas' Representation

**August 1, 2002**
The Maricopa County Superior Court suspends all visitation until the Ochoas undergo "therapeutic counseling." (Exh. 99)

**September 27, 2002**
DeLozier and Budge both argue at the hearing on the Lambeths' motion for sanctions that the Ochoas should not be sanctioned.

**October 18, 2002**
The Pinal County Superior Court sanctions DeLozier and dismisses the Ochoas' adoption petition with prejudice. (Exh. 104)

**December 10, 2002**
The Maricopa County Superior Court denies the Ochoas' petition to terminate the Lambeths' guardianship. (Exh. 105)

5



## Wendi's Representation

**March 2003**

**March 30, 2003**
Murphy emails DeLozier that Wendi dissociated as a result of events in her childhood. (Exh. 52)

## The Ochoas' Representation

**March 2003**

**March 3, 2003**
DeLozier and Donna email regarding the upcoming hearing on the Lambeths' petition to sever Wendi's parental rights. (Exh. 107)

**April 2003**

**April 14, 2003**
DeLozier and Donna email regarding the ruling on the Lambeths' petition to sever Wendi's parental rights. (Exh. 108)

**May 2003**

**May 16, 2003**
Donna blind-copies DeLozier on email correspondence with Budge regarding upcoming visitations and a mediation session with the Lambeths. (Exh. 109)

**May 27, 2003**
DeLozier files a brief in the Arizona Court of Appeals, seeking to overturn the sanctions imposed on him and the Ochoas. (Exh. 111)

**June 2003**

**June 9, 2003**
DeLozier pays private investigator Robertson, who DeLozier retained to work on the guardianship case. (Exh. 110)

6

P-App. 007100

# Wendi's Representation

## The Ochoas' Representation

**October 2003 | November 2003 | December 2003 | February 2004 | April 2004 | August 2004**

**October 22, 2003**
DeLozier and Patterson meet with Linderman. (Exh. 117)

**October 31, 2003**
DeLozier and Patterson meet with Linderman. (Exh. 117)

**December 2, 2003**
DeLozier emails Linderman about preparing for penalty phase. (Exh. 122)

**November 24, 2003**
DeLozier pays private investigator Robertson, who DeLozier retained to work on the guardianship case. (Exh. 110)

**February 27, 2004**
DeLozier meets with the Ochoas, two days after Budge notified the court that she no longer represented the Ochoas in the guardianship case. (Exh. 124)

**April 17, 2004**
The Ochoas exchange emails with DeLozier, the same day that Lamberts fail to bring the children to a Saturday visit. (Exh. 126)

**April 21, 2004**
DeLozier files lawsuit seeking damages for client's injuries suffered as a result of sexual abuse by clergy or others associated with the Catholic church. (Exhs. 133 and 134)

**April 26, 2004**
Rohde notes that Wendi "learned about sex from Alejo" and that Alejo encouraged her to write and send him erotic stories "for the internet." (Exh. 45)

**August 19, 2004**
The Arizona Court of Appeals dismisses DeLozier's appeal of the sanctions awarded by the Pinal County Superior Court. (Exh. 77)

7

# Wendi's Representation

| November 2004 | December 2004 | | March 2005 |

**December 8, 2004**
DeLozier presents the opening statement in the penalty phase.

**December 8, 2004**
DeLozier presents the opening statement in the penalty phase.

**December 9 and 13, 2004**
DeLozier calls Chris Vargas, Jimmy Gaylon, Linda Gaylon, and Lonnie Inskeep, soliciting glowing testimony about the Ochoas.

**December 15 and 16, 2004**
Closing arguments in penalty phase. Prosecutor Martinez contrasts the Ochoas' religious, wholesome parenting with Wendi's behavior before, during, and after Joe's death.

**December 22, 2004**
The jury imposes a death sentence.

# The Ochoas' Representation

**November 15, 2004**
The Ochoas file a notice of pro se representation drafted by DeLozier. (Exh. 114)

**December 8, 2004**
DeLozier meets with Alejo to review the guardianship and adoption files. (Exh. 130)

**December 7, 2004**
DeLozier reviews medical records and photographs of the children's red bottoms. (Exh. 130)

**March 21, 2005**
Donna sends the court a letter, drafted with DeLozier's assistance, documenting the Ochoas' efforts to maintain a relationship with the children. (Exh. 113)

**March 7, 2005**
Donna sends DeLozier a letter urging him to prevent termination of Wendi's parental rights. (Exh. 115)

8



# Larry A. Hammond

Phone: (602) 640-9361 | Email: lhammond@omlaw.com

Larry has spent over 30 years practicing in the private sector, but regards his two tours with the Department of Justice as among his most satisfying professional experiences. He served as an Assistant Watergate Special Prosecutor in 1973-1974 and then returned to Justice during the Carter Administration where he worked in the Office of Legal Counsel as the First Deputy Assistant Attorney General under both Attorneys General Griffin Bell and Ben Civiletti.



2929 North Central Avenue
Twenty-First Floor
Phoenix, AZ 85012-2793

## Education

- J.D., University of Texas, 1970; *Texas Law Review*, Editor-in-Chief, 1969-1970; Order of the Coif
- B.A., University of Texas, 1967

## Bar Admissions

- Arizona, 1975
- California, 1971

## Court Admissions

- U.S. Court of Appeals, Tenth Circuit, 2004
- U.S. Court of Appeals, Ninth Circuit, 1984
- U.S. Court of Appeals, Sixth Circuit, 1984
- U.S. Supreme Court, 1977
- Arizona Supreme Court, 1975
- California Supreme Court, 1971

## Clerkships

- U.S. Supreme Court, Justice Lewis F. Powell, Jr., 1971 - 1973
- U.S. Supreme Court, Justice Hugo L. Black, 1971
- U.S. Court of Appeals, District of Columbia Circuit, Judge Carl McGowan, 1970 - 1971

## Practice Areas

- Commercial Litigation
- Criminal Defense
- Internal and Governmental Investigations

## Representative Matters

- *State ex rel. Napolitano v. Gravano*, 204 Ariz. 106, 60 P.3d 246 (App. 2002)

## Awards & Recognition

- 23 Osborn Maledon, P.A. Lawyers Named 'Best' in National Publication
  Twenty-three of the 51 attorneys in the Phoenix law firm of Osborn Maledon, P.A. have been singled out for national recognition in the new 2012 edition of Best Lawyers®, the oldest peer-review publication in the legal profession.
- Osborn Maledon, P.A. Attorneys Named to *Super Lawyers* List
  Fourteen of the 49 attorneys at Osborn Maledon, P.A., a Phoenix law firm, have been named to the *Southwest Super Lawyers 2011* list.
- Osborn Maledon, P.A. Practice Groups and Attorneys Ranked as Tops in Chambers Guide
  Three practice areas in the Phoenix law firm of Osborn Maledon, P.A. received the highest possible ranking among Arizona law firms for the seventh year in a row in the 2011 ranking by the prestigious legal resource guide, Chambers USA.

© Copyright Osborn Maledon, P.A. All Rights Reserved



*Order of the Samaritan for Public Service and Criminal Justice*, University of Alabama School of Law, March 2011

*The International Who's Who of Business Crime Defense Lawyers*, 2011

Morris Dees Justice Award, 2010

Larry Hammond Endowed Criminal Law Scholarship at the James R. Rogers College of Law at the University of Arizona, established in 2008

Justice Award, The American Judicature Society, 2008

John Flynn Award, Arizona Attorneys for Criminal Justice, 2008

Maricopa County Hall of Fame, 2008

Distinguished Honorary Alumnus Award, University of Arizona Law School, May, 2004

Judge Learned Hand Award for Community Service, Arizona Chapter of American Jewish Committee, March, 2003

Arizona State Bar Foundation Walter E. Craig Award for Career Service, 2001

President's Commendation, Arizona Attorneys for Criminal Justice, January, 1997 and 1999

Civil Libertarian of the Year, Arizona Civil Liberties Union, 1993, 2000

Pro Bono Service Award, State Bar of Arizona, 1991

Exceptional Service Award, U.S. Justice Department, 1980

Federal Younger Lawyer of the Year, 1980

Chambers USA, *America's Leading Lawyers for Business*, Litigation: White-Collar Crime & Government Investigations, 2004-2011

*The Best Lawyers in America®*, Appellate Law, Bet-the-Company Litigation, Commercial Litigation, White-Collar Criminal Defense, editions 1995-2012

Best of the Bar, *Business Journal*, Pro Bono, 2005

*Southwest Super Lawyers*, Top 50 Arizona Attorneys, 2007-2010

*Southwest Super Lawyers*, Criminal Defense: White Collar, 2007-2011

*Arizona's Finest Lawyers*

## Professional Activities

American Judicature Society, President and member of Executive Committee, 2003-2005, Board of Directors, 1995-2007, Criminal Justice Reform Committee, Chair 1992-present

Arizona Attorneys for Criminal Justice, Justice Project Chair, 1998-present

American Bar Association, Biological Evidence Task Force, 2003-2005

American Bar Association, Task Force on War Crimes in the Former Yugoslavia, 1993-1995

Arizona Capital Representation Project, of Directors, 1988-present, Vice President, 1988-present

© Copyright Osborn Maledon, P.A. All Rights Reserved



Arizona State Bar Association, Indigent Defense Task Force, 1995-present

Human Rights First, Lawyer Steering Committee (formerly known as the Lawyers' Committee for Human Rights)

Elon University College of Law (Visiting Professor; Advanced Criminal Procedure) 2008

Sandra Day O'Connor College of Law at Arizona State University (Adjunct Professor of Law:   Advanced Criminal Procedure, Death Penalty, Presidential Powers,  Advanced Civil Discovery, and Ethics)

University of Arizona College of Law (Adjunct Professor of Law:  Presidential Powers), 1995

Arizona State University Undergraduate School (Guest Faculty Member:  Death Penalty, Practicum re: The Justice Project)

Birmingham City University, School of Law, United Kingdom, (Visiting Professor; Center for American Legal Studies)

St. John's College, Santa Fe, New Mexico (Tutor:  Seventeenth Century Literature - 1983)

University of New Mexico School of Law (Trial Practice - 1983)

### Publications

- Innocent Until Interrogated
  Law Journal for Social Justice, May 2, 2011
- John Sears, John J. Flynn Lifetime Achievement Award 2011
  The Defender, April 21, 2011
- Why Should You Oppose the Death Penalty?
  The Arizona Republic, April 15, 2011
- Opinion: What Did Jeffrey Landrigan's Execution Teach Us About Respect?
  Maricopa Lawyer, November 6, 2010
- Protecting Moscow from the Soviets – Book Review
  Experience, 2009
- Napolitano will Defend State Death Penalty Law before Supreme Court
  The Arizona Republic, April 21, 2002

Opinion, *Ariz. case to test rights of convicted in Supreme Court*, The Arizona Republic, October 4, 2011

Viewpoint, *The failure of forensic science reform in Arizona*, Judicature, May-June 2010

*Sotomayor is Newest Face in a Long Line of Heroes*, The Arizona Republic, August 10, 2009 (author)

Editorial for Judicature, *Setting Forensic Science on a New Path*, March-April 2009 (unsigned editorial co-authored with Dr. Barry Fisher of the Los Angeles County Crime Laboratory)

*Counsel for The Indigent Accused in Death Penalty Cases*, The Defender (Winter 2006), co-author

Presentation:  Speech to the Harris County Bar *The Landscape of Criminal Justice:  Texas and Beyond*, May 21, 2004

Justice Project Editorial, *Why Gideon Mattered to Hugo Black*, The Champion, January/February 2003 (reprinted in The Defender, April 2003)

Editorial, *Justice Project:  5 Year Report*, The Defender, January 2003

Editorial, *Restoring Confidence in the Criminal Justice System*, Judicature, 2002 (unsigned)

*Justice Project:  Status Report and Update*, The Defender, July 2002

© Copyright Osborn Maledon, P.A.  All Rights Reserved.



*Scrutiny a Must in Criminal Cases*, The Arizona Republic, January 2002 (Co-author)

*Capital Punishment in Arizona and The "New" Death Penalty Debate*, The Defender, June 2001 (Co-author)

*Popular Culture and The Death Penalty*, The Defender, July 2000 (Co-author)

*Aiding the Incarcerated*, Litigation Magazine, Winter 2000 (Co-author)

*Aryan Brother's legacy is safer prison system*, The Arizona Republic, February 6, 2000 (Co-author)

*The Justice Project: Y2 OK!*, The Defender, January 2000 (Co-author)

*Worldwide Concern: We Should Offer Global Support to Those Fighting for Human Rights Anywhere*, Arizona Journal, August 9, 1999 (Co-author)

Editorial on Felony Murder: *Bad Law Needs Reining in for Sake of Fairness*, Arizona Republic, May 14, 1999

*May God Have Mercy: A True Story of Crime and punishment*, Judicature, November-December 1998

*U.S. Has Everything to Gain From an International Criminal Court*, Nov. 9, 1998 Arizona Journal (reprinted in the Colorado Journal, Nevada Journal, and Washington Journal)

*Prisons Lack Commitment to Safety*, Arizona Republic, April 12, 1998 (Co-author)

*Arizona's Crisis in Indigent Capital Representation*, Arizona Attorney, March 1998 (Co-author)

*Observations on the Mock Impeachment Trial of Abraham Lincoln*, 40 Ariz.L.Rev. 351 (1998)

Editorial on Capital Execution: *Jose Ceja Didn't Deserve to Die*, Arizona Republic, January 25, 1998

*New Rules, on Indigent Representations*, Arizona Attorney, February, 1997 (Co-author)

© Copyright Osborn Maledon, P.A. All Rights Reserved.

# TRANSCRIPT OF FORENSIC PSYCHIATRIC EVALUATION

# WENDI ELIZABETH ANDRIANO

# (NOVEMBER 26, 2013)

**WENDI ELIZABETH ANDRIANO
FORENSIC PSYCHIATRIC EVALUATION
TABLE OF CONTENTS**

## SUBJECT HEADINGS

## PAGE NO.

**INTRODUCTORY REMARKS/ISSUE OF NON-CONFIDENTIAL
  ASPECT OF INSTANT EVALUATION** . . . . . . . . . . . . . . . . . **1**

**PRESENT DAY LIVING SITUATION** . . . . . . . . . . . . . . . . . . . **7**

**ADULT INTERESTS** . . . . . . . . . . . . . . . . . . . . . . . . . . **9**

**DEFENDANT'S VERSION OF THE INSTANT OFFENSE -
  PART I** . . . . . . . . . . . . . . . . . . . . . . . . . . . . **11**

**DEFENDANT'S VERSION OF THE INSTANT OFFENSE -
  PART II** . . . . . . . . . . . . . . . . . . . . . . . . . . **25**

**DEFENDANT'S VERSION OF THE INSTANT OFFENSE -
  PART III** . . . . . . . . . . . . . . . . . . . . . . . . . . **26**

**DEFENDANT'S VERSION OF THE INSTANT OFFENSE -
  PART IV** . . . . . . . . . . . . . . . . . . . . . . . . . . **41**

**DEFENDANT'S VERSION OF THE INSTANT OFFENSE -
  PART V** . . . . . . . . . . . . . . . . . . . . . . . . . . . **82**

**DEFENDANT'S VERSION OF THE INSTANT OFFENSE -
  PART VI** . . . . . . . . . . . . . . . . . . . . . . . . . . **212**

**DEFENDANT'S UNDERSTANDING ABOUT THE REASON FOR
  THE INSTANT EVALUATION** . . . . . . . . . . . . . . . . . . **23**

**ISSUE RE: DEFENDANT'S APPRECIATION OF
  WRONGFULNESS - PART I** . . . . . . . . . . . . . . . . . . **25**

i

# WENDI ELIZABETH ANDRIANO
## FORENSIC PSYCHIATRIC EVALUATION
### TABLE OF CONTENTS

**SUBJECT HEADINGS**                                                **PAGE NO.**

ISSUE RE: DEFENDANT'S APPRECIATION OF
    WRONGFULNESS - PART II . . . . . . . . . . . . . . . . . . . . . 32

ISSUE RE: DEFENDANT'S APPRECIATION OF
    WRONGFULNESS - PART III . . . . . . . . . . . . . . . . . . 122

ISSUE RE: DEFENDANT'S APPRECIATION OF
    WRONGFULNESS - PART IV . . . . . . . . . . . . . . . . . . . . 231

DEFENDANT'S RECALL RE: TRIAL AND TRIAL TESTIMONY . . 35

ISSUE RE: ALLEGED PROBLEMS WITH MEMORY . . . . . . . . . . 37

LEGAL HISTORY . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

CIVIL LITIGATION HISTORY . . . . . . . . . . . . . . . . . . . . 54

DEFENDANT'S DESCRIPTION OF HER CONDUCT WHILE
    INCARCERATED . . . . . . . . . . . . . . . . . . . . . . . . . 55

MEDICATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

ALLERGIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

DEFENDANT'S CONTACT WITH MENTAL HEALTH TREATMENT
    PROVIDERS WHILE INCARCERATED . . . . . . . . . . . . . . . 60

PSYCHIATRIC HISTORY PRIOR TO OCTOBER 8, 2000 -
    PART I . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

PSYCHIATRIC HISTORY PRIOR TO OCTOBER 8, 2000 -
    PART II . . . . . . . . . . . . . . . . . . . . . . . . . . . . 226

ii

**WENDI ELIZABETH ANDRIANO**
**FORENSIC PSYCHIATRIC EVALUATION**
**TABLE OF CONTENTS**

**SUBJECT HEADINGS**                                    **PAGE NO.**

**PSYCHIATRIC HISTORY SUBSEQUENT TO OCTOBER 8, 2000 -**
  **PART I** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **72**

**PSYCHIATRIC HISTORY SUBSEQUENT TO OCTOBER 8, 2000 -**
  **PART II** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **139**

**MS. ANDRIANO'S OBSERVATIONS RE: TRIAL** . . . . . . . . . . . . **78**

**MS. ANDRIANO'S OPINION RE: TRIAL COUNSEL** . . . . . . . . . **83**

**ISSUE RE: SUICIDAL IDEATION** . . . . . . . . . . . . . . . . . . . . . **83**

**RELIGIOUS UPBRINGING AND PRESENT DAY RELIGIOUS**
  **AFFILIATION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **84**

**PERSONAL HISTORY - PART I** . . . . . . . . . . . . . . . . . . . . . . . . **88**
  **Date of Birth** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **88**
  **Place of Birth** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **88**
  **Birth and Developmental History** . . . . . . . . . . . . . . . . . . **88**
  **Raised By** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **90**
  **Childhood Discipline** . . . . . . . . . . . . . . . . . . . . . . . . . . **90**
  **Childhood Interests** . . . . . . . . . . . . . . . . . . . . . . . . . . **94**
  **Traumatic Childhood Experiences** . . . . . . . . . . . . . . . . **94**
  **Issue Re: Childhood Physical Abuse or Childhood**
    **Emotional Abuse** . . . . . . . . . . . . . . . . . . . . . . . . . . **95**

**PERSONAL HISTORY - PART II** . . . . . . . . . . . . . . . . . . . . . . **126**
  **Juvenile Behavioral History** . . . . . . . . . . . . . . . . . . . . **126**
  **Childhood Interests** . . . . . . . . . . . . . . . . . . . . . . . . . **126**
  **Socioeconomic Upbringing** . . . . . . . . . . . . . . . . . . . . **127**
  **Geographical History** . . . . . . . . . . . . . . . . . . . . . . . . **127**

iii

**WENDI ELIZABETH ANDRIANO**
**FORENSIC PSYCHIATRIC EVALUATION**
**TABLE OF CONTENTS**

<u>**SUBJECT HEADINGS**</u>                                      <u>**PAGE NO.**</u>

**FAMILY HISTORY - PART I** . . . . . . . . . . . . . . . . . . . . . . . . . . . **98**
    **Father** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **98**
    **Mother** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **101**
    **Adoptive Father** . . . . . . . . . . . . . . . . . . . . . . . . . . . . **105**
    **Relationship Growing Up With Adoptive Father** . . . . . . **109**
    **Mother and Adoptive Father's Relationship** . . . . . . . . **112**

**FAMILY HISTORY - PART II** . . . . . . . . . . . . . . . . . . . . . . . . **161**
    **Siblings** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **161**

**ISSUE RE: CULPABILITY - PART I** . . . . . . . . . . . . . . . . . . . **117**

**ISSUE RE: CULPABILITY - PART II** . . . . . . . . . . . . . . . . . . . **124**

**DEFENDANT'S DESCRIPTION OF HER CHILDHOOD** . . . . . . . **118**

**EDUCATIONAL HISTORY** . . . . . . . . . . . . . . . . . . . . . . . . . . **129**

**MEDICAL HISTORY PRIOR TO OCTOBER 8, 2000** . . . . . . . . **134**

**MEDICAL HISTORY SUBSEQUENT TO OCTOBER 8, 2000** . . . **136**

**SUBSTANCE USE HISTORY** . . . . . . . . . . . . . . . . . . . . . . . **136**

**TYPICAL DAY** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **143**

**ISSUE RE: NIGHTMARES AND SLEEP DISTURBANCE PRIOR**
    **AND SUBSEQUENT TO OCTOBER 8, 2000** . . . . . . . . . . **144**

**MILITARY HISTORY** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **147**

**SOURCE OF INCOME** . . . . . . . . . . . . . . . . . . . . . . . . . . . . **148**

P-App. 007111

**WENDI ELIZABETH ANDRIANO
FORENSIC PSYCHIATRIC EVALUATION
TABLE OF CONTENTS**

**SUBJECT HEADINGS**                                    **PAGE NO.**

HABITS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 149

MEDICATIONS TAKEN PRIOR TO THE INSTANT
    EVALUATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 149

ISSUE RE: WHAT MS. ANDRIANO HOPES TO GAIN FROM
    HER APPEAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 151

ISSUE RE: STRESS ASSOCIATED WITH APPEAL . . . . . . . . . 152

EMPLOYMENT HISTORY . . . . . . . . . . . . . . . . . . . . . . . . . 152

MS. ANDRIANO'S DESCRIPTION OF HERSELF IN THE 30
    DAYS PRIOR TO THE INSTANT OFFENSE . . . . . . . . . . 156

MS. ANDRIANO'S PRESENT DAY DESCRIPTION OF
    HERSELF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 157

ISSUE RE: WHAT MS. ANDRIANO HAS LEARNED ABOUT
    HERSELF AS IT RELATES TO HER ROLE IN THE
        INSTANT OFFENSE . . . . . . . . . . . . . . . . . . . . . 158

FAMILY PSYCHIATRIC HISTORY . . . . . . . . . . . . . . . . . . . 164

FAMILY MEDICAL HISTORY . . . . . . . . . . . . . . . . . . . . . . 167

v

**WENDI ELIZABETH ANDRIANO**
**FORENSIC PSYCHIATRIC EVALUATION**
**TABLE OF CONTENTS**

<u>**SUBJECT HEADINGS**</u>                                                    <u>**PAGE NO.**</u>

**RELATIONSHIP HISTORY** . . . . . . . . . . . . . . . . . . . . . . . . . **169**
  **Menarche** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **169**
  **Sexual Orientation** . . . . . . . . . . . . . . . . . . . . . . . . . **170**
  **Issue Re: Whether or Not Ms. Andriano Believes That**
      **She Was the Victim of Childhood Emotional Abuse,**
          **Sexual Abuse or Physical Abuse** . . . . . . . . . . **172**
  **Issue Re: Whether or Not Ms. Andriano Believes She**
      **Was the Victim of a Sexual Assault** . . . . . . . . . . . **175**
  **Age of Interest in Sex** . . . . . . . . . . . . . . . . . . . . . . . . **175**
  **First Serious Heterosexual Relationship** . . . . . . . . . . . **175**
  **Issue Re: Number of Lifetime Serious Heterosexual**
      **Relationships** . . . . . . . . . . . . . . . . . . . . . . . . . . **178**
  **Issue Re: Number of Lifetime Heterosexual Partners** . **178**
  **Second Serious Relationship - Joe Andriano** . . . . . . . . **180**
      **Issue Re: Alleged Domestic Violence - Part I** . . . . **187**
      **Issue Re: Alleged Domestic Violence - Part II** . . . **198**
      **Children** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **192**
          *Nicholas Andriano* . . . . . . . . . . . . . . . . . . . . . **192**
          *Ashlee Andriano* . . . . . . . . . . . . . . . . . . . . . . **194**
      **Issue Re: Joe Andriano's Cancer - Part I** . . . . . . . **194**
      **Issue Re: Joe Andriano's Cancer - Part II** . . . . . . **207**
      **Source of Income While Married** . . . . . . . . . . . . . **196**
      **Issue Re: Extramarital Relationships** . . . . . . . . . . **202**
      **Issue Re: Disclosure of Extramarital Affairs to**
          **Spouse** . . . . . . . . . . . . . . . . . . . . . . . . . . . . **205**
      **Issue Re: Medical Malpractice Litigation** . . . . . . . **206**
  **Defendant's Description of Her Relationship With**
      **Her Spouse During the Week Leading Up to**
          **the Instant Offense** . . . . . . . . . . . . . . . . . **207**

vi

**WENDI ELIZABETH ANDRIANO**
**FORENSIC PSYCHIATRIC EVALUATION**
**TABLE OF CONTENTS**

<u>**SUBJECT HEADINGS**</u>                                     <u>**PAGE NO.**</u>

**ISSUE RE: SODIUM AZIDE - PART I** . . . . . . . . . . . . . . . . . . 208

**ISSUE RE: SODIUM AZIDE - PART II** . . . . . . . . . . . . . . . . 210

**ISSUE RE: DEFENDANT'S EFFORT TO SECURE LIFE**
    **INSURANCE POLICY FOR JOE ANDRIANO** . . . . . . . . . 209

**ISSUE RE: DEFENDANT'S ASSESSMENT OF THE STATE'S**
    **VERSION OF THE INSTANT OFFENSE** . . . . . . . . . . . . . 211

**INTERVIEW CONDUCTED BY KIRAN AMIN, PH.D.** . . . . . . . . 217

**FOLLOW-UP INTERVIEW CONDUCTED BY**
    **STEVEN E. PITT, D.O.** . . . . . . . . . . . . . . . . . . . . . . . 225

**CONCLUDING REMARKS** . . . . . . . . . . . . . . . . . . . . . . . 232

P-App. 007114

SP = Steven E. Pitt, D.O.
KA = Karin Amin, Ph.D.
AA = Alan Arntsen, Esq.
WA = Wendi Andriano

## INTRODUCTORY REMARKS/ISSUE OF NON-CONFIDENTIAL ASPECT OF INSTANT EVALUATION:

1   SP:  Okay.  The date is Tuesday, November 26th.  It's approximately
2        8:40 AM.  I am at Perryville Prison Complex.  And I'm going to
3        shortly meet - with me is Dr. Kiran, K-I-R-A-N, Amin, A-M-I-N.
4        We're going to shortly be introduced to Wendi Andriano and her
5        lawyer, Alan Arntsen, A-R-N-S - I'm sorry, A-R-N-T-S-E-N, is going
6        to be the one making the introduction.  So the key at the top of the
7        transcript will be A-A for Alan Arntsen, S-P for Steven Pitt, K-A for
8        Karin Amin, and W-A for Wendi Andriano.  We're all set.  Machines
9        are on.
10
11  AA:  You want Wendi right here?
12
13  SP:  That would be terrific if your client sat right there.
14
15  AA:  Yeah.  Yeah.  And again, I'll just - I'll be leaving momentarily then.
16        I'm just here initially.  Here's your seat, Wendi.
17
18  WA:  Okay.
19
20  AA:  Would then just you just give her just a quick overview of what this
21        is going to involve and then I'll just kind of -
22
23  SP:  Well, I was going to do that after you introduced us.
24
25  AA:  Okay.  Yeah, that's fine.
26
27  SP:  I thought -
28
29  AA:  Yeah.  Tell me when you're ready.
30
31  /////////////////////////////////////////////////////////////////////
32  /////////////////////////////////////////////////////////////////////

Transcript of Forensic Psychiatric Evaluation
Re: Wendi Elizabeth Andriano
November 26, 2013
Page 2

1   SP:   I believe we are ready.   It is 8:40 - by the way I may have
2         misspoke on the time earlier, I think it was 9 - when I said 9:40.
3         It's actually 8 - now it's 8:42 or 8:43.
4
5   AA:   Wendi, this is Dr. Steven Pitt and doctor - is it Kamir [sic] Amin?
6
7   KA:   Kiran Amin.
8
9   AA:   Kiran Amin.   Dr. Pitt is a forensic psychiatrist and Dr. Amin is a
10        neuropsychologist that the state is going to be evaluation on behalf
11        of the state.   That's - that - that'll happen over the course of today.
12        Your - your evaluation will be videotaped and audio taped.   Do you
13        have any questions about it?
14
15  WA:   No.
16
17  AA:   Anything else in terms of intro - introductory stuff?
18
19  SP:   I mean are you happy with your introduction?
20
21  AA:   I am.
22
23  SP:   Okay, good.   So then are we done or no?
24
25  AA:   Yeah.   Anything else?   Any questions?
26
27  WA:   No.
28
29  AA:   Okay.
30
31  SP:   Okay.
32
33  AA:   There we go.
34
35  SP:   All right.   Thank - thank you very much.

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 3

1    AA:  All right.  Thank you.
2
3    WA:  Okay.
4
5    AA:  Yeah.
6
7    WA:  Thank you.
8
9    SP:  Ms. Andriano, let me introduce myself again, or let me introduce
10        myself.  Your - your lawyer just did an introduction, but my name
11        is Steven Pitt, Dr. Pitt.  I am a forensic psychiatrist.  To my right
12        and  -  is  Dr.  Kiran  Amin,  and  that's  -  Dr.  Amin  is  a
13        neuropsychologist.  As your lawyer indicated, we are both retained
14        by the state as it relates to a proceeding you have going on in the -
15        in the court system.  Okay?
16
17   WA:  Uh-huh.
18
19   SP:  All right.  The evaluation is being audio and video recorded.  It will
20        be transcribed and your lawyer will get a copy of the video record
21        as well as a copy of the transcript.  However, the transcriptionist,
22        she doesn't have the benefit or get the benefit of seeing the
23        evaluation.  She only hears is.  So that requires two things.  One,
24        you're going to have to speak up.  And two, ways of communicating
25        that we're all used to such as head-nods and "uh-huhs" and "uh-
26        uhs," those don't translate very well at all on a transcript.  So
27        periodically I will ask you, "Is that a yes?" or, "Is that a no?"  I will
28        ask you to clarify information.  But I really need you to cooperate
29        insofar as to avoid the head-nods as a way of - of communicating.
30        We're all guilty of it, we all do it.  But I'm pretty sure after a couple
31        times when I - if I catch you doing it, you'll - you'll catch on pretty
32        quickly.
33
34   WA:  Okay.
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 4

1    SP:  Is that - all right?
2
3    WA:  Okay.
4
5    SP:  Another thing you need to know is both Dr. Amin and I have been
6         provided, oh, somewhere between 7,000 and 8,000 pages of
7         material, including trial transcripts, offense reports, supplemental
8         offense reports, autopsy reports, various expert reports.  But you -
9         and we are meeting with you for - for the first time, and so there's -
10        we want to hear your story.  And so there's going to be I'm sure
11        some repetition of information that is already included in some of
12        the records that we already have.  But again, that's for the purpose
13        of - of hearing your story from you.  Okay?
14
15   WA:  Okay.
16
17   SP:  Periodically you'll see me looking at this device to my right, the
18        video camera, as well as the device in front of me.  I'm not doing
19        that to be rude or discourteous or impolite.  I'm simply doing it
20        because I want to make sure that we're getting sound.  One of the
21        nice things about video and audio recording an examination is that
22        it leaves no doubt as to who said what during the course of an
23        evaluation and I don't need to really - neither one of us really need
24        to take very many notes if we so choose.   But we're wholly
25        dependent on the equipment, so that's why we make extra good
26        effort to make sure that the equipment is working.  Okay?
27
28   WA:  Okay.
29
30   SP:  Now, another thing that you need to understand is that we are both
31        doctors.  But - and normally when you visit with a doctor what you
32        talk about with that doctor remains confidential.  A couple things -
33        one, we're not your doctors.  We're not here to treat you.  And
34        we're seeing you in the context of a legal proceeding.  So you need

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 5

1        to understand that anything we talk about here today is not
2        confidential.
3
4    WA: I understand.
5
6    SP: Okay. So if there's something that you don't wish to talk to us
7        about, if there's something that you think is none of our business,
8        if there's something that you think you want to check with your
9        lawyer first, just let - let me know that. Okay?
10
11   WA: Okay.
12
13   SP: I'm going to ask you why, but I'm not going to force you or try to
14       make you answer questions that you don't want to talk about -
15
16   WA: Okay.
17
18   SP: The answers to. Okay?
19
20   WA: Okay.
21
22   SP: All right. After I'm done talking with you today, Dr. Amin, I think -
23       well he'll explain to you what he's going to do, whether he's going
24       to do some testing or not today, whether he's going to do some
25       today and come back another day, I'm not quite sure. But he will
26       explain all of that to you.
27
28   WA: Okay.
29
30   SP: All right. You - you with us so far?
31
32   WA: I'm with you.
33
34   SP: Okay. Are you comfortable where you're sitting?
35

Transcript of Forensic Psychiatric Evaluation
Re: Wendi Elizabeth Andriano
November 26, 2013
Page 6

1    WA: Uh-huh.
2
3    SP:  Okay.  Is that a "yes"?
4
5    WA: Yes.
6
7    SP:  Okay.  Can you repeat back to me what I said about the non-
8         confidential aspect of the interview?
9
10   WA: Yes.  You are doctors, but you're here in a legal aspect.  Therefore,
11        anything you have - and you're not here to treat me, you're not my
12        doctor.  Anything that we discuss is not confidential.
13
14   SP:  Okay.
15
16   WA: And if I don't want to answer something then I don't have to.
17
18   SP:  Okay.  Did you - did you eat today?
19
20   WA: Yes.
21
22   SP:  Okay.  What time did you eat at?
23
24   WA: About 5:30 this morning.
25
26   SP:  All right.  And what is usually lunch?
27
28   WA: I don't know.  I don't know.  10:30-11:00.
29
30   SP:  Okay.
31
32   WA: 11:30-12:00.  I don't - I'm not sure up here.
33
34   ////////////////////////////////////////////////////////////////////////
35   ////////////////////////////////////////////////////////////////////////

Transcript of Forensic Psychiatric Evaluation
Re: Wendi Elizabeth Andriano
November 26, 2013
Page 7

1    SP:   Okay.   And that actually brings me to a - another - another
2          question, which is where are we right now?  What's the name of this
3          place?
4
5    WA:   Lumley.
6
7    SP:   Say it again?
8
9    WA:   Lumley.  L-U-M-L-E-Y.
10
11   SP:   Okay.  And what's the complex that we're - that you're -
12
13   **PRESENT DAY LIVING SITUATION:**
14
15   WA:   We're at Perryville.
16
17   SP:   Okay.  And where - where are you - is this the unit you're on?
18
19   WA:   Yes.
20
21   SP:   Is this the complex you're in?
22
23   WA:   Yes.
24
25   SP:   And what pod are you in?  Or how do they -
26
27   WA:   I live on a yard and it's called SMA-30 Yard.
28
29   SP:   Okay.  SMA-30 Yard.  And how many -
30
31   WA:   And it's for maximum custody people.  We're locked down 24/7.
32
33   SP:   Okay.  And - and of the people on that yard - how many people are
34         on that yard?
35

Transcript of Forensic Psychiatric Evaluation
Re: Wendi Elizabeth Andriano
November 26, 2013
Page 8

1    WA: Oh, I don't have a clue.
2
3    SP:  And are you single bunked?
4
5    WA: Yes.
6
7    SP:  Okay.  And you say you get out - how - how much time do you get
8         out during the day?
9
10   WA: Per policy I'm allowed out one hour per day.
11
12   SP:  Okay.  And when you say "per policy," does that - do the folks
13        adhere to the policy?
14
15   WA: Oh, yes.
16
17   SP:  And do you get out?
18
19   WA: I don't.
20
21   SP:  You choose not to?
22
23   WA: Right.
24
25   SP:  And how come you choose not to?
26
27   WA: I just don't like to.  I like to stay in my room.
28
29   SP:  Okay.  And what does your room have?
30
31   WA: I have a bed and a sink and a toilet, shelves, a desk and a chair, a
32        TV.
33
34   SP:  Okay.  And the TV, what channels do you get?
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 9

1   WA:  They provide some basic cable channels.
2
3   SP:  And do you -
4
5   WA:  Like local stations.
6
7   SP:  And do you watch TV or?
8
9   WA:  Occasionally.
10
11  **ADULT INTERESTS:**
12
13  SP:  And what do you usually watch?
14
15  WA:  PBS, channel 8, National Geographic, CNN.
16
17  SP:  Okay.  And do - do you read?
18
19  WA:  I read a lot.
20
21  SP:  All right.  You read a lot.  What do you read?
22
23  WA:  Whatever's available.
24
25  SP:  Okay.
26
27  WA:  They have a cart of books and just whatever is there, I read it.
28
29  SP:  Okay.  So what's the last five books you've read, if you know?
30
31  WA:  Well, right now I'm reading The Power of Now by Eckhart Tolle.  I
32       read Beautiful Creatures, which is like a fiction series.  I read Dr.
33       Dyers books, they're just lots of spiritual self-help books.
34
35  SP:  Okay.

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 10

1   WA: I like those.
2
3   SP: All right. Something that I didn't say earlier that I wanted to let
4       you know, which is I suspect we'll be chatting here around four
5       hours, maybe five hours. It could be a little more, it could be a
6       little less. I'll - I'll know in a couple hours about how much longer
7       we're going to need. But this is not an endurance contest. So if
8       you need to use the restroom, just - just let us know and we'll get
9       one of the correctional officers to - to take care of that. And if you
10      want some food, just let us know and we'll ask the correctional
11      officer to do that as well.
12
13  WA: Okay. I know that their schedule is whenever lunch is served she
14      said already that they would bring me a tray.
15
16  SP: Okay.
17
18  WA: And I can take a break to eat. So I don't know what time, but
19      maybe between 11:00 and 12:00.
20
21  SP: Works perfectly fine for us. Okay?
22
23  WA: Okay.
24
25  SP: So explain to me - first of all, do you know what today - what the
26      date is today?
27
28  WA: It's like the 26th, I think.
29
30  SP: Of - of what month?
31
32  WA: November.
33
34  SP: And what year?
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 11

1    WA:  2013.

2

3    SP:  And - and what holiday is just around the corner?

4

5    WA:  Thanksgiving.

6

7    **DEFENDANT'S VERSION OF THE INSTANT OFFENSE - PART I:**

8

9    SP:  Okay.  And - and so how is it that you - you ended up here?  What
10        happened?

11

12   WA:  I was sentenced to death by the court system and so that's - I'm
13        here.

14

15   SP:  Okay.  And you say you were sentenced to death by the court
16        system and you're here.  What - what is it that the court system -
17        what were you found guilty of?

18

19   WA:  First degree murder.

20

21   SP:  Of who?

22

23   WA:  My husband.

24

25   SP:  And what - what - what is his name?

26

27   WA:  Joe.

28

29   SP:  And when - first of all, do you admit that you - you - that you
30        committed that offense?

31

32   WA:  I admit that I killed my husband.  I don't admit that it's first degree
33        murder.

34

35   SP:  Okay.

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 12

1   WA:  That's my disagreement with the - with what happened.

2

3   SP:  Okay.  Well, what did happen?

4

5   WA:  Well, my husband was dying from cancer.  And we had had many
6         discussions about him not wanting to suffocate to death and I made
7         the choice to help him take his life.  And that's what the entire
8         situation was based on.  And that night - I've since learned that -
9         I don't even know how to describe it, but - I'm sorry, I don't know
10        how I'm going to put it into words or even talk about it.  That's why
11        I'm like oh.

12

13  SP:  I'm sorry, I didn't hear what you said?

14

15  WA:  Well, I don't know.  I don't know how to describe what happened
16        that night.  I don't know.  I don't - but I killed my husband that
17        night and I don't know - I don't - there was a lot of things going on
18        that I don't know how to describe.

19

20  SP:  Okay.  And - and why is it that you don't know how to describe
21        them?

22

23  WA:  Because it's hard for me to understand -

24

25  SP:  Okay.

26

27  WA:  Everything that happened.

28

29  SP:  Okay.  Well what - well what did happen?

30

31  WA:  I killed my husband.

32

33  SP:  Okay.  How?

34

35  /////////////////////////////////////////////////////////////////////

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 13

1   WA: Are you just asking me to describe that night to you?  I don't
2        understand what you're asking me to - to -
3
4   SP:  That would - that would be a terrific place.
5
6   WA: You want me to just sit here and - and verbatim tell you the events
7        of that night?  Is that what you're asking me?
8
9   SP:  If - if you would be so kind as to explain to me what happened that
10       evening that would be terrific.
11
12  WA: I don't have a clear memory of what happened that evening.  So
13       when - if you would like to ask me specific questions, I would be -
14       I would try to answer them.  But I can't give you a verbatim recall
15       of the events of that night.
16
17  SP:  Okay.  Can - can you give me any recall of the events of that night?
18
19  WA: I - I'm like - I'm just stuck.  I guess I just would rather if you would
20       ask me questions if you want to know something.  I don't - I can't -
21       I don't even know.  It's all just - it's -
22
23  SP:  Well, how about we do this.
24
25  WA: Yeah.  That doesn't - I can't.
26
27  SP:  What - what - what - what is the date that we're talking about?
28
29  WA: It happened in 2000, in October of 2000.
30
31  SP:  What date?
32
33  WA: I can't tell you the exact date.  I don't know.
34
35  SP:  Okay.

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 14

1　　WA:　I don't - just - I haven't been talking about that or been asked that
2　　　　　question.
3
4　　SP:　Okay.  Well let - let's break the - the month up into thirds.  Do -
5　　　　　first of all, do you know how many days are in October?
6
7　　WA:　Well, yes.
8
9　　SP:　How many?
10
11　　WA:　31.
12
13　　SP:　Okay.  So did it happen in the first third, the middle third or the last
14　　　　　third?
15
16　　WA:　I - I don't know.  I could - I can't even -
17
18　　SP:　Okay.  How about we break it up into halves?  Did it happen before
19　　　　　or after October 15th?
20
21　　WA:　It was the beginning of the month.
22
23　　SP:　Okay.  What - what - what - what do you remember - just - just -
24　　　　　do you remember - well, let's start this way.  Do you remember
25　　　　　anything about the offense?
26
27　　WA:　Yeah.
28
29　　SP:　Tell me what you remember.
30
31　　WA:　Yeah, I remember lots of blood and I remember - I remember that
32　　　　　Joe took some pills that were supposed to stop his heart and it was
33　　　　　supposed to just be peaceful.  And then things just didn't go that
34　　　　　way.
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 15

1  SP:  What - what kind of pills?
2
3  WA:  And I know that we were - I know we ended up arguing over a
4       bunch of stuff.  It was just - I don't know.
5
6  SP:  What kind of pills?
7
8  WA:  We had put some - I'm trying to remember what it was called.  We
9       put something in these capsules and he had taken like a handful of
10      them.
11
12 SP:  So you had - what were the capsules originally?
13
14 WA:  Some health - healthy stuff.  I don't remember.  They were just
15      clear capsules that we took out the herb or the - the - I don't
16      remember what it exactly - what it was in it, but -
17
18 SP:  And -
19
20 WA:  Like - like a vitamin type of thing.
21
22 SP:  I see.  And what did you replace that with?
23
24 WA:  We - we had bought some powder that was supposed to - I can't
25      remember what it was called.  I don't know, it was white powder
26      that was supposed to stop your heart.
27
28 SP:  And so where did you get the white powder from?
29
30 WA:  From an online store.
31
32 SP:  What's the white powder used for?
33
34 WA:  I don't remember, but I think it had some sort of commercial use.
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 16

1  SP:  And whose idea was it to get the white powder?
2
3  WA:  Well, Joe had wanted me to find cyanide and I couldn't.  And that
4       was - seemed to be the alter - the only alternative.
5
6  SP:  I see.
7
8  WA:  This stuff.  I can't remember what it was called.  I don't know.
9
10  SP:  So you ordered - you ordered this?
11
12  WA:  Uh-huh.
13
14  SP:  Online?
15
16  WA:  Yes.
17
18  SP:  From - from where?
19
20  WA:  I don't remember the name of the place.
21
22  SP:  No, no.  Maybe my question wasn't very good.  You ordered it from
23       a computer?
24
25  WA:  From an on - with a computer?
26
27  SP:  With a computer.
28
29  WA:  Yeah.
30
31  SP:  Whose computer?
32
33  WA:  I think the one at work.
34
35  SP:  Uh-huh.  How come you didn't use your computer at home?

Transcript of Forensic Psychiatric Evaluation
Re: Wendi Elizabeth Andriano
November 26, 2013
Page 17

1    WA: I didn't have a working - like I didn't have - I think computers were
2         kind of new to me back then and so I had only used them for work
3         and that was the one I used was at work.
4
5    SP: I - I see.  And so - so did you research this powder online?
6
7    WA: I don't know that I researched that specific powder, just the general
8         topic maybe.
9
10   SP: And - and -
11
12   WA: I don't know.
13
14   SP: How much did the powder cost?
15
16   WA: I don't remember that.
17
18   SP: Who was the powder delivered to?
19
20   WA: I don't remember that stuff either.
21
22   SP: Did -
23
24   WA: I haven't discussed that with anybody.
25
26   SP: Did - did you have it sent to yourself?
27
28   WA: I don't think I did.  I think it had to be a company that bought -
29        bought it, because it was a commercial whatever.
30
31   SP: So what company did you have - have it sent to?
32
33   WA: I don't know.  I don't know.  I can't tell you that either, but I think
34        it was a company name.
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 18

1   SP:   Uh-huh.  Did the - did - what - independent of it being a company,
2         there probably had to be like a person's name attached to it, right?
3
4   WA:   I don't remember that.
5
6   SP:   So where does the powder end up arriving?
7
8   WA:   I don't know.
9
10  SP:   Okay.  How - how soon after you ordered the powder did it arrive?
11
12  WA:   Oh, and I wouldn't - I don't know that either.
13
14  SP:   Okay.  Did you pay for the powder with a credit card?
15
16  WA:   I don't - I - I don't know.  I haven't thought about all that stuff.  I
17        don't even - I have no idea.
18
19  SP:   Okay.  So anyhow, at some point though you said "we," you - "we"
20        was the word you used.  It sounds like you - you took the powder
21        and you put it in capsules?
22
23  WA:   Yes.
24
25  SP:   Okay.  And walk me through that process.  Do - because it sounds
26        like you remember some of that.
27
28  WA:   Yeah.  I remember doing that.
29
30  SP:   And where was your husband during that time?
31
32  WA:   We were at my house.
33
34  SP:   Okay.  And where did you physically do that?
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 19

1   WA: Outside because there was some concern about the fumes or the
2        smell of it or something.
3
4   SP:  I see.
5
6   WA: And with my babies, I didn't want, you know, them to -
7
8   SP:  And you say your "babies," that would be Nicholas and Ashlee,
9        correct?
10
11  WA: Yes.
12
13  SP:  Okay.  And how old were Nicholas and Ashlee around this time?
14
15  WA: Like two and three.
16
17  SP:  Okay.  And with Nicholas being the older one?
18
19  WA: Yes.
20
21  SP:  Okay.  So - so I've looked at some - some crime scene photos and
22        if my memory is right, you lived in an apartment?
23
24  WA: Yes.
25
26  SP:  Okay.  So where did you - where did you do this with the - with the
27        powder?  Where - where did you - when you -
28
29  WA: Out - outside on our little patio.
30
31  SP:  Out on your patio?
32
33  WA: Uh-huh.
34
35  /////////////////////////////////////////////////////////////////

Transcript of Forensic Psychiatric Evaluation
Re: Wendi Elizabeth Andriano
November 26, 2013
Page 20

1    SP:  Got it.  Okay.  And where was your husband while this was going
2          on?
3
4    WA: He was doing it with me.
5
6    SP:  Okay.  And what physically were you doing?  Like how - walk me
7          through how you mechanically did that.
8
9    WA: Well, we just emptied out the capsules and put the powder in them.
10
11   SP:  What did you use?
12
13   WA: What do you mean?  I don't -
14
15   SP:  Well, what did you use?
16
17   WA: My hands.  I don't understand what you're asking me.
18
19   SP:  Well yeah, I mean did you use a tool, an instrument?
20
21   WA: No.
22
23   SP:  Okay.  So the capsules that you were taking apart, these were like
24         gel capsules?
25
26   WA: Yeah, they were just clear plastic.
27
28   SP:  And help me understand, what's the logic of - of putting the - the
29         powder inside the capsules?
30
31   WA: To be able to swallow it.
32
33   SP:  Okay.  So you remember doing that though?
34
35   WA: Uh-huh.

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 21

1    SP:  Yes?
2
3    WA:  Yes.
4
5    SP:  With your husband?
6
7    WA:  Yes.
8
9    SP:  Do you know about how long before the offense that that
10        happened?
11
12   WA:  Not exactly.  It wasn't a great amount of time.  I don't -
13
14   SP:  Okay.
15
16   WA:  Really remember.
17
18   SP:  Whose - whose Ann Newton?
19
20   WA:  Oh.  Thank you.  See, if you would ask me questions, that is the
21        name that I used.
22
23   SP:  Okay.
24
25   WA:  Uh-huh.
26
27   SP:  You used for - for what?
28
29   WA:  Yeah.  With that whole situation involving the - I can't remember
30        what the stuff is called, whatever the powder was.
31
32   SP:  Okay.  And so I don't - so that's a name that you used to - to
33        purchase -
34
35   WA:  Yes.

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 22

1    SP:  The powder, correct?
2
3    WA:  Yes.  Yes.
4
5    SP:  Okay.  How did you come up with that name?
6
7    WA:  I don't remember.
8
9    SP:  Okay.
10
11   WA:  It was pretty random.
12
13   SP:  Okay.  So - so your - your - do you have any memories of what
14        happened on October 8th?  By the way, that is the date, October 8th.
15
16   WA:  Okay.
17
18   SP:  2000.
19
20   WA:  Okay.  I do have memories, it's just - I - it's not something that -
21        it's like when you ask me the question about it my mind doesn't
22        even want to go there.
23
24   SP:  Uh-huh.
25
26   WA:  So I - I'm not sitting here thinking, "Oh this is what happened that
27        night."
28
29   SP:  Okay.
30
31   WA:  I don't - that's why I don't - I'm not trying to not cooperate with
32        you, it's just that's how - I'm sitting here not think - I see lots of
33        blood and it's - but it doesn't run like a movie in my head.
34
35   SP:  Okay.  So how does it run?

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 23

1   WA: Actually I just feel like lots of resistance.
2
3   SP:  Okay.
4
5   WA: And I don't want to think about it.
6
7   SP:  Okay.  Does - how - how did - how did your - your husband die?
8        What was the cause of death?
9
10  WA: I don't know what the official thing was.
11
12  SP:  Okay.  Do you - ma'am, do - do you - are you going to be okay
13       there?  Is that "yes"?
14
15  WA: Okay.
16
17  SP:  Do you - first of all, it's not my intent to upset you.  But - but I -
18
19  WA: Well this is not something that is comfortable to talk about.  This
20       was terrible.
21
22  SP:  Well I - I understand that.
23
24  WA: And you guys have all the papers.  You've read everything.  And
25       then you're sitting here ask me just to relive and talk about all that
26       over again and I don't understand the point.
27
28  **DEFENDANT'S UNDERSTANDING ABOUT THE REASON FOR THE**
29  **INSTANT EVALUATION:**
30
31  SP:  Okay.  Well, that actually gets me to my next question.  Which is,
32       do you understand what the purpose of this evaluation is?
33
34  WA: I don't know why - why you - I don't know.
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 24

1   SP:  You don't know why we're here?
2
3   WA:  Well I guess because I'm - I'm try - going back to court and so I
4        don't know.
5
6   SP:  What are you going back to court for?
7
8   WA:  To present evidence that wasn't in my trial.
9
10  SP:  Okay. And what kind of evidence are they looking to present?
11
12  WA:  And you're not asking me anything that was not in trial so I don't
13       understand.
14
15  SP:  Okay. Well what - what -
16
17  WA:  I feel like I'm in trial again.
18
19  SP:  Yeah. What - what - what evidence wasn't presented at trial?
20
21  WA:  I guess some childhood stuff and my mental stuff and I don't know.
22
23  SP:  Okay. Well, you have my word that I'm going to ask you about
24       those issues.
25
26  WA:  Well I don't care if you do, I'm just saying.
27
28  SP:  Okay. See - see ma'am, one of the issues is - is that - that your -
29       your lawyers, if I understand it correctly, they're - they're saying
30       that these issues - one of the allegations is - is that these issues,
31       your - your childhood and some other things in your life somehow
32       affected your ability to conform your conduct to the requirements
33       of the law or appreciate the wrongfulness of your conduct. So it -
34       I'm just doing my job by asking you questions about the offense to
35       try to see what you understood. Which actually, that gets me to

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 25

1    another question.  When - you don't - you said you don't recall what
2    your husband - what the cause of death was?
3
4    **DEFENDANT'S VERSION OF THE INSTANT OFFENSE - PART II:**
5
6    WA:  I don't know what the official cause of death was.
7
8    SP:  What do you think it was?
9
10   WA:  Well, I think from - from when I hit him on the back of the head and
11        then I think from - I - I - from the knife, from the cut on his throat.
12
13   SP:  How did that happen?
14
15   WA:  I can't remember that specific instance so I'm not sure.
16
17   **ISSUE RE: DEFENDANT'S APPRECIATION OF WRONGFULNESS -**
18        **PART I:**
19
20   SP:  Is - is it wrong to kill someone?
21
22   WA:  Of course it is.
23
24   SP:  Did you know - did you know back at -
25
26   WA:  No, I know it's wrong.
27
28   SP:  Wait, wait.  Let me finish my question because we're talking over
29        each other.  So you - you know it's wrong to kill someone, correct?
30
31   WA:  Yes.
32
33   SP:  Did you know back on October 8, 2000, it was wrong to kill
34        someone?
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 26

1   WA: I do know that it's wrong to kill someone.  That situation I really
2        thought I was doing the best thing possible by agreeing with my
3        husband in helping him.
4
5   SP:  Okay.  But independent of what you thought you were doing was
6        the best thing possible, you were aware back on October 8, 2000,
7        that it's wrong to kill your husband?
8
9   WA: Yes.
10
11  SP:  Okay. So similarly, it would be wrong to poison somebody, correct?
12
13  WA: Of course.
14
15  SP:  Similarly, it would be wrong to steal, correct?
16
17  WA: Of course.
18
19  SP:  Similarly, it would be wrong to use an alias to try to secure powder
20        to kill someone, correct?
21
22  WA: Of course.
23
24  SP:  Okay.  So those are things that you - you knew back on October 8th,
25        correct?
26
27  WA: Yes.
28
29  **DEFENDANT'S VERSION OF THE INSTANT OFFENSE - PART III:**
30
31  SP:  Okay.  So what - what time of day did this all - did everything start
32        happening?  Do you recall that?
33
34  ////////////////////////////////////////////////////////////////////////
35  ////////////////////////////////////////////////////////////////////////

Transcript of Forensic Psychiatric Evaluation
Re: Wendi Elizabeth Andriano
November 26, 2013
Page 27

1   WA: Well, that evening I know that we had gone to his parents' house
2        for a family like dinner barbeque thing.  And then it would've been
3        after we got home from that.
4
5   SP:  Okay.  And what happened -
6
7   WA: So late evening.
8
9   SP:  So - and - and what happened - well first of all, the barbeque thing,
10       did you drink any alcohol?
11
12  WA: No.
13
14  SP:  Did you use any drugs?
15
16  WA: No, I -
17
18  SP:  Did you use any alcohol or drugs that day?
19
20  WA: No.
21
22  SP:  Okay.  Do you feel that alcohol or drugs in any way affected your
23       behavior on October 8, 2000?
24
25  WA: No.
26
27  SP:  Okay.  What about on October 7, 2000, did you drink alcohol?
28
29  WA: I don't know.  I don't remember what I did on -
30
31  SP:  You don't remember?  Okay.  What about did you use any drugs on
32       October 7, 2000?
33
34  WA: No.  I've never used illegal drugs.
35

Transcript of Forensic Psychiatric Evaluation
Re: Wendi Elizabeth Andriano
November 26, 2013
Page 28

1    SP:   You've never used any illegal drugs?
2
3    WA:  No.
4
5    SP:   Okay.  I'm just repeating some things because there's people there
6          in the yard and we're picking up a lot of the ambient noise.  So - so
7          anyhow, you don't recall exactly what time you got home on - when
8          - on October 8th, correct?
9
10   WA:  No, sir.
11
12   SP:   And do you - do you remember what happened when you got
13         home?
14
15   WA:  No.  I - I - that's - it's been - that's a long time ago.
16
17   SP:   Okay.  What's your next memory after you got home?
18
19   WA:  Oh my God.
20
21   SP:   Why don't you just hold on.  And just for the transcriptionist, the
22         reason why I told Ms. Andriano to hang on for a second is that a
23         correction officer was passing through the in - the area we're doing
24         the interview.  Do you remember the question?
25
26   WA:  I do.  I remember putting the babies to bed.  I remember - I think
27         what I remember most is - is after we had everything settled and -
28         and everything was, you know, I don't know - oh, that's a lot
29         quieter.
30
31   SP:   Yeah, it makes it better.  The correction officer just closed the door.
32         Go - go ahead.  You said every -
33
34   WA:  Okay.
35

Transcript of Forensic Psychiatric Evaluation
Re: Wendi Elizabeth Andriano
November 26, 2013
Page 29

1   SP:   Oh, hang on a second now.   Let me just say for the record,
2         apparently the room that we're in is a - I guess -
3
4   WA:   General purpose room.
5
6   SP:   General purpose room and - and it cuts out into the yard which is
7         why some correctional officers apparently are using it to cut across.
8         But go ahead, I'm sorry.
9
10  WA:   I remember - I remember Joe and I being on the bed and I
11        remember - I think just because of what was about ready to happen
12        we didn't have - there wasn't like crying and lots of emotion going
13        on.   It was just pretty - I don't - it was almost surreal.   And I
14        remember Joe had something to drink and he had the bottle of pills
15        on his night stand and we were sitting there and he was leaning up
16        against pillows and so he took a handful of pills and it was - it was
17        just - he had said goodbye to everybody earlier in the evening and
18        it was just time.   That's what he was ready to do.   And so I
19        remember he put a bunch of pills in his hand and he swallowed
20        them with whatever and then we kind of just lay there and waited
21        to see what would happen.
22
23  SP:   How long did you wait?
24
25  WA:   I don't know.   I can't - I don't have a concept of time.
26
27  SP:   Okay.   So then what happened?
28
29  WA:   I think our expectations were that it would be just something
30        peaceful and like a peaceful passing and then that's not what
31        happened.   He started feeling sick.   He started to feel - I remember
32        him feeling really just sick.   It was like - I can't remember if it was
33        his stomach.   I can't remember what it was but I remember him
34        feeling really, really sick and then getting panicky and starting to be
35        upset and how ill he was feeling.

Transcript of Forensic Psychiatric Evaluation
Re: Wendi Elizabeth Andriano
November 26, 2013
Page 30

1   SP:  Okay.  And then what happened?

3   WA:  And - I don't remember what our decision was or what exactly -
4        what - because it was kind of panicky at that point not knowing
5        what was happening, what next.  And I think that it just became so
6        - where he was feeling so ill that we had gone out to the living room
7        and I don't know - I - see, I don't want to say something that's not
8        true because I don't remember if that point - if he wanted to go to
9        the hospital.  I don't - I don't re - I just can't - I can't - I have little
10       bits and pieces and knowledge of knowing things, but I don't know
11       if it's from hearing it because I've discussed it so many times.
12       Because I don't exactly recall the -

14  SP:  Okay.

16  WA:  And I don't want to say something that's not true.

18  SP:  And you know what, I appreciate - I appreciate that explanation.
19       So just tell me what it is you believe that you recall, and if you think
20       it's something that you're not sure, that it's something you read,
21       then just say, "You know what" -

23  WA:  That's why at this - from - from this point forward I don't have a
24       clear running memory, like a movie, I can't tell you details that I
25       myself recall what happened.

27  SP:  Okay.

29  WA:  Because I went through the trial.  I've went through so many
30       questions that I don't know what -

32  SP:  Okay.  And - and I - I appreciate that answer and I appreciate
33       where -

35  WA:  I don't know what I know to be true.

Transcript of Forensic Psychiatric Evaluation
Re: Wendi Elizabeth Andriano
November 26, 2013
Page 31

1   SP:  Okay.  That's - that's fair enough.  So - so let me then ask you - let
2        me ask you a couple questions about that then so I - so maybe I
3        can better understand and you - you help me understand.  You, if
4        my memory is correct, you were arrested the same day as the
5        offense, correct?
6
7   WA:  Yes, that night.
8
9   SP:  That - that evening, correct?
10
11  WA:  I believe so, yes.
12
13  SP:  Okay.  And I also believe that you gave a statement to the police?
14
15  WA:  I did.
16
17  SP:  Okay.  Was your memory working fine then?
18
19  WA:  Well, it is my nature to want to answer your questions and I know
20       that.  I had never seen the police as against me or bad people.  It
21       was - I was raised to - that they're your friends and they're, you
22       know, like the pastor of your church.  And so when I was asked
23       questions, I provided answers just trying to show that I was
24       cooperating, even though I wasn't sure what had happened.  And
25       I - I don't like to say, "I don't know," because then you don't
26       approve of me, you don't like me, and I just want to answer what
27       you want.   So I know that whenever people would ask me
28       questions, I would just fill in whatever.
29
30  SP:  I see.  So - so are you telling me that you weren't -
31
32  WA:  And that's why I'm not going to do that with you today.
33
34  SP:  Well, and you know what, I - I don't want you to do that.  I just
35       want you to be as truthful with me as you possibly can.

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 32

1   WA: And that's what I'm trying to do.
2
3   SP: Okay. But let's get back to the interview you gave the police. Are
4        you telling me -
5
6   WA: I don't even remember what exactly I told them. I don't know, I
7        just -
8
9   SP: Okay.
10
11  WA: I know that I wanted to cooperate and I wanted them to -
12
13  **ISSUE RE: DEFENDANT'S APPRECIATION OF WRONGFULNESS -**
14        **PART II:**
15
16  SP: Were you truthful with the police?
17
18  WA: I doubt it.
19
20  SP: Is it wrong to lie to the police?
21
22  WA: Yes, it is.
23
24  SP: I'm sorry, you were covering your nose at that time so I'm going to
25        repeat the question. Is it wrong to lie to the police?
26
27  WA: It's wrong to lie to anybody.
28
29  SP: Okay. So - so are you telling me that you - I -
30
31  WA: I'm telling you that since I've gone through this process of learning
32        how I am, I know that I fill in the blanks and I answer questions
33        even if I didn't -
34
35  /////////////////////////////////////////////////////////////////////////////

Transcript of Forensic Psychiatric Evaluation
Re: Wendi Elizabeth Andriano
November 26, 2013
Page 33

1   SP:   Excuse me one second.  Is there - excuse me?  Is there a possibility
2         that this door stays closed?
3
4   CO:   They want the door closed.  Close it?
5
6   SP:   Thank you so much.
7
8   CO:   Sure.
9
10  WA:   I don't - when I tell you - when you ask me a question and I tell
11        you, "I don't know," there's a sense of frustration and then I feel
12        like you get upset.  Not you personally, but people in general.  And
13        at that time that was just my nature.  I would just fill in whatever
14        because I don't want - I don't want somebody upset at me and I
15        don't want them to be frustrated and think I'm not cooperating.
16
17  SP:   Okay.
18
19  WA:   So did I just sit there and want to lie?  No.
20
21  SP:   Yeah.
22
23  WA:   It wasn't that.
24
25  SP:   Okay.  So -
26
27  WA:   Even though it is a lie.
28
29  SP:   Yeah.  So -
30
31  WA:   In my mind, it wasn't.
32
33  SP:   Okay.  So let - let's - let's - let's - let's - let's set some - some
34        things up here.  One, I - I just want you to be truthful with me here
35        today.

Transcript of Forensic Psychiatric Evaluation
Re: Wendi Elizabeth Andriano
November 26, 2013
Page 34

1    WA:  I am.
2
3    SP:  And - and give it your best shot, okay?  Are you with me?
4
5    WA:  Yes, sir.
6
7    SP:  Okay.  And I also want you to understand that, "I don't know," is a
8         perfectly fine answer from - from my perspective.  If you don't
9         know -
10
11   WA:  And I appreciate that.
12
13   SP:  If you don't know, you don't know.  Okay?  Is that a "yes"?
14
15   WA:  Yes.
16
17   SP:  All right.  So - but let's - let's go back though because I'm still a
18        little - I'm still trying to connect the dots on this.  So you - you do
19        this interview with the police, correct?
20
21   WA:  Yes.
22
23   SP:  And - and you believe - and by the way, if I summarize something
24        and I get it wrong, you say, "No Dr. Pitt, that's not what I said."  If
25        I have it right - if you don't say anything to me I'm going to assume
26        I have it correct.  Okay?
27
28   WA:  Yes.
29
30   SP:  All right.  So did you lie to the police?
31
32   WA:  That's such a black and white question.  I know that "yes", I did tell
33        them things that probably I didn't even know what I was - that
34        were not - I don't know.
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 35

1   SP:  Why did you do that?

2

3   WA:  I explained to you why I do that already.

4

5   SP:  Oh, that's because you have a need to please people?

6

7   WA:  Well, I - I fill in - I just fill it in and try to give you an answer that
8        makes sense to me.

9

10  **DEFENDANT'S RECALL RE: TRIAL AND TRIAL TESTIMONY:**

11

12  SP:  Okay.  Now, if my memory is right, do you remember when your
13       trial was?

14

5   WA:  It - that was in 2004.

16

17  SP:  Okay.  Do you remember about how long it lasted?

18

19  WA:  It was like the last half of the year.  It just was the last months of
20      the years.

21

22  SP:  About how long did it go through?

23

24  WA:  Almost four months I think.

25

26  SP:  Four months continuously?

27

28  WA:  I feel - it felt - I think so.  I don't remember.

29

30  SP:  Well unless I'm wrong, it may have felt like four months but - but
31      I - how about from September 1, 2004, to November 17, 2004?

32

33  WA:  Well, I didn't get to prison until after Christmas and so - and I know
34      it was - I was in court the day before I got here.

35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 36

1  SP:  Well, there was a - there was a verdict and then there - I think -
2       believe it was a little bit of a - a delay, and then they had the
3       penalty phase.
4
5  WA:  I don't know.
6
7  SP:  If I'm not mistaken.
8
9  WA:  I don't recall.
10
11 SP:  Okay.  And it's possible that I'm -
12
13 WA:  It just seemed like it was the whole -
14
15 SP:  And it's -
16
17 WA:  And I just know I got here right after Christmas and so I know it
18      went to the end of the year.
19
20 SP:  Okay.  And it's - and it's possible that - that I could have my dates
21      wrong.  But my - my bigger question is that if my memory is right,
22      didn't you take the witness stand at your trial?
23
24 WA:  I did, yeah.
25
26 SP:  Okay.  And you - you - you gave direct exam testimony, correct?
27
28 WA:  Yes.
29
30 SP:  And you gave cross-examination testimony, correct?
31
32 WA:  Yes.
33
34 SP:  I mean you were cross-examined, right?
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 37

1    WA: Right.
2
3    SP:  Okay.  Did - was everything that you told at the trial truthful?
4
5    WA: I don't know.  I haven't read the stuff and I don't even - at that
6         point I don't - I don't - I don't know.
7
8    **ISSUE RE: ALLEGED PROBLEMS WITH MEMORY:**
9
10   SP:  Okay.  Now, it's also my - my recollection that over time both in
11        preparation for the matter that we're meeting about as well as
12        issues related to - during your trial, I believe that you've met with
13        several different types of folks; psychiatrists, psychologists, a
14        counselor, when you met with those people were you - were you
15        truthful with them?
16
17   WA: Yes.
18
19   SP:  Did you have memory problems with them?
20
21   WA: Yes.
22
23   SP:  Okay.  Well, let's talk about the memory for a second.  Had you
24        ever had memory problems before?  And when I say "before," I'm
25        talking about before October 8, 2000.
26
27   WA: Yes.
28
29   SP:  You did have memory problems?
30
31   WA: Yes.
32
33   SP:  When - when - when was the first time you had a memory problem?
34
35   WA: I wouldn't be able to tell you that.

Transcript of Forensic Psychiatric Evaluation
Re: Wendi Elizabeth Andriano
November 26, 2013
Page 38

1   SP:  Why is that?
2
3   WA:  That - it was just a frequent happening of my entire existence.
4
5   SP:  Really?
6
7   WA:  Yes.
8
9   SP:  Did you ever tell anyone about it?
10
11  WA:  Yes.  My mom and dad know about it because they're the ones that
12       brought it to my attention.  I did not know I had memory problems.
13
14  SP:  Okay.
15
16  WA:  Per se.
17
18  SP:  Give - give me a -
19
20  WA:  But they would recount things and I would have no inclination of
21       what they were talking about, could not remember it.
22
23  SP:  Did - did you ever - did you ever - have you had any mental health
24       treatment for these memory problems?
25
26  WA:  No, that was against my religion.
27
28  SP:  Okay.  And when was the last time before October 8, 2000, you had
29       a memory problem?
30
31  WA:  I wouldn't be able to answer that question.
32
33  SP:  Because you don't remember?
34
35  WA:  Right.  I -

Transcript of Forensic Psychiatric Evaluation
Re: Wendi Elizabeth Andriano
November 26, 2013
Page 39

1   SP:   Okay. But you're saying that you had memory problems beginning
2         at what age at least when your parents started telling you?
3
4   WA:   I don't even - I couldn't tell you that either. I just know that that
5         was a - a normal theme in my life that, you know, somebody would
6         remind me of something that had happened and I would think they
7         were making it up because I had no - no recognition even of what
8         they were talking about.
9
10  SP:   Okay. So what about have you ever been bumped - bumped on the
11        head?
12
13  WA:   Not that I'm aware of.
14
15  SP:   You ever had any head injuries?
16
17  WA:   Not that I'm aware of.
18
19  SP:   Okay. You ever been knocked unconscious?
20
21  WA:   Not that I know of.
22
23  SP:   Okay. The reason I'm asking is I - I - I seem to remember that
24        somewhere in the records there was an automobile accident that
25        you were involved in. I want to say you were - it was while you
26        were a teenager but I could be mistaken on my time frame.
27
28  WA:   I was in a car wreck with my mom. I don't remember how old I
29        was though.
30
31  SP:   What happened in that car wreck?
32
33  WA:   I just remember a car t-boned us on the side where I was sitting.
34
35  SP:   Okay. And were you injured?

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 40

1    WA: I don't know.
2
3    SP:  Okay.  Were you hospitalized?
4
5    WA: We didn't really believe in going to the doctor.
6
7    SP:  So my question was were you hospitalized?
8
9    WA: No, sir.
10
11   SP:  Okay.  Had anyone ever treated you or examined you for memory
12        problems?
13
14   WA: No, sir.
15
16   SP:  Prior to Oct - prior to October 8?
17
18   WA: No.
19
20   SP:  I'm going to just ask the question completely so there's no
21        confusion.  Prior to October 8, 2000, had anyone ever examined
22        you for memory problems?
23
24   WA: No, sir.
25
26   SP:  Okay.  Since October 8, 2000, has anyone examined you for
27        memory problems?
28
29   WA: Yes, sir.
30
31   SP:  Who has examined you for that?
32
33   WA: I believe Dr. Woods and maybe Dr. Young.
34
35   SP:  Okay.  And what did they say?

Transcript of Forensic Psychiatric Evaluation
Re: Wendi Elizabeth Andriano
November 26, 2013
Page 41

1   WA: Well they were just asking me lots of questions and they did some
2       tests on me and -
3
4   SP: Did they ever tell you the results?
5
6   WA: I know some, yes.
7
8   SP: What do you know?
9
10  WA: They diagnosed me with some mental health issues and
11     acknowledged my memory problems.
12
13  SP: Okay. What - what types of mental health issues did they diagnose
14     you with?
15
16  WA: The biggest one I just remember right now is the bipolar. I know
17     there was a list of them.
18
19  SP: I see. Okay. Well we'll come back to that in a little - little bit.
20
21  WA: Okay.
22
23  **DEFENDANT'S VERSION OF THE INSTANT OFFENSE - PART IV:**
24
25  SP: So - so let's go back to October 8, 2000. What I recall you telling
26     me is that your husband wasn't feeling very well and this wasn't
27     going as smoothly or as peacefully as you both had planned, or
28     thought it would.
29
30  WA: Right. Right.
31
32  SP: Am I correct?
33
34  WA: You're correct.
35

Transcript of Forensic Psychiatric Evaluation
Re: Wendi Elizabeth Andriano
November 26, 2013
Page 42

1   SP:   Okay.  So then what happens next?
2
3   WA:   I'm not comfortable with the chronological order of events because
4         I can't tell you chronologically what happened that night.
5
6   SP:   Okay.  Well what do you remember though?  Even if it's out of
7         chronological order.
8
9   WA:   I don't know what is going on.  I feel very agitated right now and I
10        can't even like make myself think about what's going on that night.
11
12  SP:   Okay.  Would you like to take -
13
14  WA:   I'm so sorry.  I - I'm not -
15
16  SP:   Would you like to take a break?  You're shaking your head "no."
17
18  WA:   As we're sitting here right now and you keep asking me about what
19        happened that night, what do I remember, I can't even - I'm not
20        pulling up what's happened that night.  I told you I remember lots
21        of blood.  I know I killed my husband.  I can't sit here and tell you
22        events of that night.
23
24  SP:   Okay.  Do you - but - but you've told other people about those
25        events of that night.
26
27  WA:   It took a long time.
28
29  SP:   Okay.  Do - do - how - well how did you kill your husband?
30
31  WA:   Can - can - in order for me to answer that question I could just tell
32        you things that I know but not from my memory but just because
33        it's been discussed.
34
35  SP:   Okay.  So you don't have an independent recollection?

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 43

1   WA: So I don't - that's why I told you I don't want to sit here and say
2        something that I'm not remembering for myself right now.
3
4   SP:  Okay.  So let me - let me make sure I understand what you're
5        saying.  As you sit here today on Tuesday, November 26th at about
6        9:37-ish in the morning, you have - have you told me everything
7        that you personally remember about that night?
8
9   WA: No, I haven't.
10
11  SP:  Okay.  Is there anything else you want to tell me, recognizing -
12
13  WA: I just - look, this is what I'm afraid of.  I feel like if I answer your
14       questions right now and I'm not telling you in chronological order,
15       that I'm a liar again and I'm this and I'm that and so I feel very
16       defensive with you.
17
18  SP:  Right.  And you didn't let me finish my question.  My - my - my
19       question is as we sit here today on Tuesday, November 26th, have
20       we exhausted your memory about what happened on October 8,
21       2000, putting aside chronology?
22
23  WA: Okay.
24
25  SP:  Have we exhausted your memory?
26
27  WA: No.
28
29  SP:  In other words, I'm giving you -
30
31  WA: Right.
32
33  SP:  A pass on chronology.
34
35  WA: Right.

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 44

1   SP:  Okay.  I just want to know what you remember about that evening.
2

3   WA:  No, there are more things that I remember.
4

5   SP:  Okay.  Tell me what you remember.  This is what you remember,
6       not what you've read but what you remember.
7

8   WA:  It's so hard.  I remember - I remember Joseph not feeling good.  I
9       remember - I remember one time him - him throwing up.  I
10      remember him getting really upset.  I remember us arguing.  I
11      remember wanting to take him to the hospital, him wanting to go
12      to the hospital, him not able to go to the hospital.  I remember
13      calling 9-1-1.  I remember trying to get a coworker to come over to
14      stay with my babies while we went to the hospital.  It's like right
15      now all I see is just lots of blood everywhere.
16

17  SP:  Is there anything else you remember?
18

19  WA:  I can see him laying there.
20

21  SP:  Do you remember what your argument was about?
22

23  WA:  Yeah, me cheating on him.
24

25  SP:  Okay.  What - what was going on there?
26

27  WA:  I don't know.  I just - we were just spending more and more time
28      apart and he was going to the lake and doing his thing and I was
29      going out.  And it's like we were just trying to run away from each
30      other.
31

32  SP:  And so did - did you tell him about your - the cheating?  Or how did
33      he find out?
34

35  WA:  I did finally.

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 45

1   SP:  That night?  What did you tell him?  What do you re -
2
3   WA:  I don't remember the exact words or what.
4
5   SP:  Okay.
6
7   WA:  But I finally admitted to it.
8
9   SP:  I see.  How did he respond to that?
10
11  WA:  He was really angry.
12
13  SP:  Okay.  And what did he do?
14
15  WA:  I just remember him being really angry and yelling at me.
16
17  SP:  Did - did you - did the paramedics ultimately show up at your
18       house?
19
20  WA:  Yeah.
21
22  SP:  And again -
23
24  WA:  They were there.
25
26  SP:  And this is - I'm asking you what you remember.
27
28  WA:  No, I remember sitting by Joe and I remember lots of people
29       around.  And I don't know if they were policemen or paramedics,
30       but I remember lots and lots of people around.
31
32  SP:  Was there a time that the paramedics showed up and that you told
33       them that they weren't necessary?
34
35  WA:  I do know that.

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 46

1    SP:  But do you remember that?
2
3    WA:  No, I don't know.  I don't know.  But I do know that.
4
5    SP:  So you know -
6
7    WA:  It's - I know it and it's really hard to define whether or not I
8         remember it or if it's just because I have been told it so many
9         times.
10
11   SP:  Okay.
12
13   WA:  I have a hard time - listen, this has been talked about so much that
14        it gets really hard to distinguish between what I know and what I
15        know - what I know to be true.
16
17   SP:  Okay.  Well, all - all I want to know is what you know to be true.
18
19   WA:  I know.  I know.  And I'm trying to separate it for you but it's
20        difficult.
21
22   SP:  Okay.  Well, do you know it to be true that you asked the
23        paramedics to leave?
24
25   WA:  Right now I don't know.  I can't tell you for certain that I know that
26        to be true.
27
28   SP:  Let's assume that that is true.
29
30   WA:  Okay.
31
32   SP:  Let's just assume that -
33
34   WA:  I know it is true.
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 47

1    SP:  Okay.

2

3    WA:  I know it's true because I've been - I've seen it and read it and
4          been told it.  I know it, but I'm just telling you because I'm trying
5          to be very honest with you that I personally cannot tell you "yes" or
6          "no" that I know I did that.

7

8    SP:  Let - let me see if I have this - this correct.  And you tell me if I'm -
9          I have this right.  You know about -

10

11   WA:  I -

12

13   SP:  That - let me finish.  You know about this issue because you've
14         been told it and/or read about it but you don't independently recall,
15         is that correct?

16

17   WA:  And that's not correct either.

18

19   SP:  Okay.  Well what - tell me what's right.

20

21   WA:  I'm trying to explain it.  When you have known something for so
22         many years, it's really hard to distinguish between like I know this
23         myself or I have come to know this because it's been told to me so
24         many times that I don't know any longer what I know and what's
25         been told to me.

26

27   SP:  Okay.

28

29   WA:  And I know that sounds crazy but it's the - that's really what goes
30         on in my mind.

31

32   SP:  Well let - let's assume that that happened.

33

34   WA:  Yeah.
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 48

1    SP:  Let's just assume it happened.  Are you with me?
2
3    WA:  Yes.
4
5    SP:  Why would you have done that?  Let's assume they showed up and
6          you asked them to - that - and told them that their services were
7          not necessary.  Or words to that affect.  Let's assume you did that.
8
9    WA:  Right.
10
11   SP:  Why would you have done that?
12
13   WA:  I think it was so in my head that Joseph just wanted to die.
14
15   SP:  Okay.  Did you -
16
17   WA:  I - I really feel like that was the whole - and so you know, I just -
18         I think it was just to see it through to the end and just do it.
19
20   SP:  Do you have an independent recollection of doing any - engaging in
21         any behaviors to conceal your actions as it relates to the crime - as
22         it relates to the murder?
23
24   WA:  To conceal that?
25
26   SP:  No.  Is it -
27
28   WA:  No.
29
30   SP:  Let me try asking that question again.  As it relates to the murder
31         of your husband, do you have an independent recollection of doing
32         things that covered your tracks?  In other words, did things that -
33         that - to kind of lead people astray?
34
35   WA:  No.

Transcript of Forensic Psychiatric Evaluation
Re: Wendi Elizabeth Andriano
November 26, 2013
Page 49

1   SP:  So you think it was pretty straightforward crime scene?
2
3   WA: I think so.
4
5   SP:  Okay.  Did you change your clothes after your husband was
6        murdered?
7
8   WA: After he - no, I don't think so.
9
10  SP:  Did you take a shower after he died?
11
12  WA: I don't remember doing that, no.
13
14  SP:  Did you clean yourself up after you told the paramedics to leave but
15       before the police came?
16
17  WA: No, I don't think so.
18
19  SP:  Okay.
20
21  WA: I don't know.  I mean I saw my - my - that my clothes were bloody,
22       the ones the police had.  So that's why I'm saying no, I don't think
23       I cleaned up anything.
24
25  SP:  Okay.  So we haven't gotten to this part about how - we talked
26       about the capsules that he took, the name of the substance you
27       don't remember, right?
28
29  WA: Right.
30
31  SP:  So - but how does he - like how does - and it sounds like there's an
32       argument, correct?
33
34  WA: Right.
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 50

1    SP:  So where's all this blood coming from?  How does that enter into
2         the picture?
3
4    WA:  Okay, so I know - I know that there was a stool involved.  I told
5         you I had hit him on the head.  And I know that there was a knife
6         involved.  I know these things.  But as far as telling you I recall and
7         can see myself doing everything that happened, I can't tell you
8         that.
9
10   SP:  Okay.  So you don't recall having a knife in your hand?
11
12   WA:  I don't.
13
14   SP:  Do you recall stabbing him?
15
16   WA:  I don't.
17
18   SP:  Do you recall where he was stabbed?
19
20   WA:  Yes.
21
22   SP:  This is something that you recall?
23
24   WA:  No.  I do recall it because when he was dead laying beside me I
25         mean I have a very vivid picture of that in my head.
26
27   SP:  And that's it - that's an independent memory that you have?
28
29   WA:  I see it right -
30
31   SP:  I'm sorry?
32
33   WA:  I can see it right now.
34
35   SP:  So where was he stabbed?

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 51

1   WA:  In his neck.
2
3   **LEGAL HISTORY:**
4
5   SP:  Okay.  Had you - had you ever been arrested for anything in the
6        past?
7
8   WA:  No.
9
10  SP:  Are you sure?
11
12  WA:  Am I sure?  I think so.  I've - I know I've had tickets.
13
14  SP:  What kind of tickets?
15
16  WA:  Like speeding tickets.
17
18  SP:  Okay.
19
20  WA:  I don't know.
21
22  SP:  Were you ever - were you ever investigated for any criminal
23       behavior?
24
25  WA:  Yes.
26
27  SP:  What were you investi -
28
29  WA:  Well no, I don't know.  I don't know.  I don't think - how do I say
30       this?  I don't know that I've ever had any interaction with law
31       enforcement besides my tickets.
32
33  SP:  Okay.  And have you - prior to October 8, 2000, have you ever
34       spent any time overnight in jail?
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 52

1    WA: No.
2
3    SP:  Had you ever been in prison?
4
5    WA: No.
6
7    SP:  You ever been charged with any criminal offenses?
8
9    WA: No.
10
11   SP:  Had you ever been investigated for any criminal behavior?
12
13   WA: Not by the police I don't think.
14
15   SP:  Who were you investigated by?
16
17   WA: Well, one of my - the - my employment.
18
19   SP:  What - what happened there?
20
21   WA: Well, I just took some money from my employment and my bosses
22        found out so I know my boss has investigated me and then I ended
23        up losing my job.
24
25   SP:  What job was that?
26
27   WA: At the hospital.
28
29   SP:  What hospital?
30
31   WA: Casa Grande Regional.
32
33   SP:  And why did you steal the money?
34

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 53

1    WA:  I was just trying to pay for all this stuff when me and Joe were
2          going through all his surgeries.
3
4    SP:  Okay.  How much did you -
5
6    WA:  And just to live on.
7
8    SP:  How much did you steal?
9
10   WA:  I don't re - I don't - I don't remember.
11
12   SP:  How did you steal it?
13
14   WA:  I just wrote company checks to myself and cashed them.
15
16   SP:  Okay.  How much - how much money was it about?
17
18   WA:  I don't know.
19
20   SP:  Okay.  Did you know that was wrong to do?
21
22   WA:  Yes.
23
24   SP:  I'm sorry?
25
26   WA:  Yes, I did.
27
28   SP:  Okay.  But you went ahead and did it anyhow?
29
30   WA:  At the time, yes.  I -
31
32   SP:  How many -
33
34   WA:  I felt like it was more important for us to survive than -
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 54

1    SP:  How many checks do you think you wrote?
2
3    WA:  I don't know.
4
5    SP:  Okay.  More than a dozen?
6
7    WA:  I - I honest - I don't even remember.
8
9    SP:  More than three dozen?
10
11   WA:  I don't know.
12
13   SP:  And you don't recall the amount?
14
15   WA:  I don't.
16
17   **<u>CIVIL LITIGATION HISTORY:</u>**
18
19   SP:  Okay.  Had you ever been involved in any civil litigation before?
20        Like have you ever been involved in a lawsuit?
21
22   WA:  I don't think so.
23
24   SP:  Have you ever brought a lawsuit against someone?
25
26   WA:  No, I haven't.
27
28   SP:  Had you ever had someone bring a lawsuit against you?
29
30   WA:  Not that I know of.
31
32   //////////////////////////////////////////////////////////////////
33   //////////////////////////////////////////////////////////////////
34   //////////////////////////////////////////////////////////////////
35   //////////////////////////////////////////////////////////////////

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 55

1   **DEFENDANT'S DESCRIPTION OF HER CONDUCT WHILE**
2   **INCARCERATED:**
3
4   SP:   Okay.  While you've been in the Department of Corrections, have
5         you gotten any tickets?
6
7   WA:  Yeah.
8
9   SP:   For what?
10
11  WA:  The last - well I just got two recently, and one was for
12        communicating with somebody who's still on paper and the other
13        one is because I had prison contraband.
14
15  SP:   What was the contraband?
16
17  WA:  They sell disposable razors here and I had one to be able to cut my
18        hair because they don't allow anybody to come near me to cut hair.
19        So I had to cut my own hair with something, so I had a razorblade
20        in my room and I gave it to them and told them I had it to cut my
21        hair.  So then I got a ticket for it.
22
23  SP:   And communicating with someone that's "still on paper," so you
24        were communicating with someone outside, is that it?
25
26  WA:  Yeah, it was a neighbor of mine that had lived by me for a few
27        years.  And when she went home, she still had to do some time on
28        paper or -
29
30  SP:   Right.
31
32  WA:  Parole, whatever you call it.  And so I guess while they're on the
33        paper you're not allowed to communicate with them until after
34        they're off the paper.
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 56

1   SP:  Right.  What other tickets have you gotten?

3   WA:  I feel like I've had two other ones but they've been a long time ago.

5   SP:  How - how do you describe yourself as an inmate?

7   WA:  A good inmate.

9   SP:  If you were to give yourself a letter grade, what would you give?

11  WA:  A "B."

13  SP:  How come not an "A"?

15  WA:  Well because I've had some tickets.

17  SP:  Because of the tickets?

19  WA:  Yeah.

21  SP:  Okay.

23  WA:  But I'm not - you can - even all the staff here, I don't cause
24      problems and I really try to help people and -

26  SP:  How - who puts money on your books?

28  WA:  Some church people.

30  SP:  Okay.  Anyone else?

32  WA:  No, just friends and church people.

34  SP:  Okay.  Who are the friends?
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 57

1   WA:  What - just people that I've met and have become friends with.
2
3   SP:  Friends prior to your - prior to your arrest?
4
5   WA:  I'm trying to think.  Well my cousin Alissa, she - I didn't meet her
6        until after I was incarcerated.  So she's a family member friend who
7        helps me out.  Another lady, I've known her like prior to my arrest.
8        And then the other one, Pat, he's - I met him here.  No, so some
9        are from before and some are from in here that I've met.
10
11  SP:  Okay.
12
13  WA:  I just want to be accurate.  I'm trying to -
14
15  SP:  That's okay.
16
17  WA:  Sorry.
18
19  SP:  How did you do - how did you do in - while you were in jail?
20
21  WA:  What do you mean?
22
23  SP:  While you were pre-trial down at the Maricopa County Jail.
24
25  WA:  What are you asking me?
26
27  SP:  What kind of inmate were you there?
28
29  WA:  Oh.  I was fine.
30
31  SP:  Okay.
32
33  WA:  Yeah.
34
35  /////////////////////////////////////////////////////////////////

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 58

## **MEDICATIONS:**

1
2
3    SP:  Are you on any medication currently?
4
5    WA:  Yes.
6
7    SP:  What medication are you on?
8
9    WA:  BuSpar®.
10
11   SP:  BuSpar®, okay.  And that's - I'm just going to spell it, it's B-U-S -
12
13   WA:  Yeah.
14
15   SP:  P-A-R.  Do you know how much you're taking?
16
17   WA:  I don't remember what the dosage is, no.
18
19   SP:  Okay.  Do you know what you're taking that for?
20
21   WA:  For - well when I went and talked to psych, I just told them that I
22        was having a lot of anxiety and emotional swings and so that's what
23        they put me on.
24
25   SP:  Okay.  And then what - what other medication are you on?
26
27   WA:  That's it.
28
## **ALLERGIES:**
30
31   SP:  Okay.  Are you allergic to any medication?
32
33   WA:  Not that I know of.
34
35   SP:  Okay.  Have you been on other psychiatric med -

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 59

1   WA:  Well, okay, when you say "allergic," I - there is something that I
2        cannot take.
3
4   SP:  What's that?
5
6   WA:  Because they've put me on a couple of things and it really like
7        exacerbated my situation.
8
9   SP:  What was that?
10
11  WA:  I don't remember what they were, but I know they had to do some
12       experiments with me to find something that worked.
13
14  SP:  These were psychiatric medicines?
15
16  WA:  Uh-huh.
17
18  SP:  Was one of them - yeah, that's a "yes"?
19
20  WA:  Yes.
21
22  SP:  Was one of them Seroquel®?
23
24  WA:  No, that was fine.  I could take that.
25
26  SP:  Okay.
27
28  WA:  No, it was here in prison that - I was on medication in county that
29       they don't provide here in prison, so we had to go through some -
30
31  SP:  Some changes.
32
33  WA:  Uh-huh.
34
35  /////////////////////////////////////////////////////////////////////

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 60

| | |
|---|---|
| 1 | **DEFENDANT'S CONTACT WITH MENTAL HEALTH TREATMENT** |
| 2 | **PROVIDERS WHILE INCARCERATED:** |
| 3 | |
| 4 | SP:  Okay.  So how often do you see psych while you're here? |
| 5 | |
| 6 | WA:  Well her office is a few doors down from me so whenever I need to |
| 7 |       see her she's there. |
| 8 | |
| 9 | SP:  What - |
| 10 | |
| 11 | WA:  Oh, like a weekly basis. |
| 12 | |
| 13 | SP:  Okay.  And do - is that - what's the nature of the - the visits?  Is it - |
| 14 | |
| 15 | WA:  Just a wellness check and if I'm having - I think because I live alone |
| 16 |       and I don't talk to people, I - I - I - I talk with her more just to help |
| 17 |       relieve the anxiety and - and I build up things in my mind and it |
| 18 |       helps me just - |
| 19 | |
| 20 | SP:  So how long do you talk to her for? |
| 21 | |
| 22 | WA:  Just - |
| 23 | |
| 24 | SP:  On - on average. |
| 25 | |
| 26 | WA:  Oh, just probably 30 minutes at a time. |
| 27 | |
| 28 | SP:  And you say that's weekly? |
| 29 | |
| 30 | WA:  Yeah. |
| 31 | |
| 32 | SP:  What's her name? |
| 33 | |
| 34 | WA:  Well she's - there's a new lady here now, Dr. Kyle.  They change |
| 35 |       personnel all the time so it just depends on whoever is - |

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 61

| | | |
|---|---|---|
| 1 | SP: | Do you know how Dr. Kyle spells her name? |
| 2 | | |
| 3 | WA: | No. |
| 4 | | |
| 5 | SP: | Okay.  Who was before Dr. Kyle? |
| 6 | | |
| 7 | WA: | Oh gosh.  Oh my goodness.  There was a lady named Paige, Dr. |
| 8 | | Paige.  There was - there was a gentleman and then another lady, |
| 9 | | and I can't recall their names right now. |
| 10 | | |
| 11 | SP: | Do you - do you feel that they did right by you? |
| 12 | | |
| 13 | WA: | Yes. |
| 14 | | |

**PSYCHIATRIC HISTORY PRIOR TO OCTOBER 8, 2000 - PART I:**

| | | |
|---|---|---|
| 16 | | |
| 17 | SP: | Okay.  Prior to October 8, 2000, had you ever been under the care |
| 18 | | of a psychiatrist? |
| 19 | | |
| 20 | WA: | No.  Well, I think one time I tried to talk to somebody after I lost |
| 21 | | my job, or got fired from my job, and it didn't sit well with me.  I |
| 22 | | was really raised where you - where doctors and psychiatrists and |
| 23 | | psychologists were not Godly and so it wasn't really - you should |
| 24 | | really go talk to your pastor rather than them.  And so it just really |
| 25 | | was uncomfortable for me and I stopped going. |
| 26 | | |
| 27 | SP: | How many times did you see this person? |
| 28 | | |
| 29 | WA: | I think just a couple of times. |
| 30 | | |
| 31 | SP: | What was the reason why you saw them? |
| 32 | | |
| 33 | WA: | The stress from everything that was going on with my job and my |
| 34 | | husband and - |
| 35 | | |

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 62

1   SP:  That's right, you said the job.
2
3   WA:  Yeah.
4
5   SP:  That's right.  And then what - was it a male or a female?
6
7   WA:  Gosh, I think it was a lady.
8
9   SP:  And do you remember where - where her office was?
10
11  WA:  Well, it was in Casa Grande and I think it was like the Casa Grande
12       Counseling Service or something.
13
14  SP:  I see.
15
16  WA:  I've really tried to remember.
17
18  SP:  I see.  And had - had you ever try to kill yourself before October 8,
19       2000?
20
21  WA:  No.
22
23  SP:  Did you ever used to cut on yourself before October 8, 2000?
24
25  WA:  No.
26
27  SP:  Did you ever used to use laxatives or other kinds of like diet pills to
28       keep your weight down?
29
30  WA:  No.
31
32  SP:  Before October 8, 2000?
33
34  WA:  No.
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 63

| | | |
|---|---|---|
| 1 | SP: | Before October 8, 2000, did you ever - you ever used to binge on |
| 2 | | food? |
| 3 | | |
| 4 | WA: | No. |
| 5 | | |
| 6 | SP: | Purge food? |
| 7 | | |
| 8 | WA: | No. |
| 9 | | |
| 10 | SP: | To keep your weight down? |
| 11 | | |
| 12 | WA: | No. |
| 13 | | |
| 14 | SP: | Okay.  Did you ever used to break things to relieve tension? |
| 15 | | |
| 16 | WA: | No. |
| 17 | | |
| 18 | SP: | Before October 8, 2000, did you ever - did you ever have a period |
| 19 | | of time for say like a run of two weeks or more where your mood |
| 20 | | was so down and low and - that you didn't feel like get - going out |
| 21 | | and - and doing things? |
| 22 | | |
| 23 | WA: | Yes. |
| 24 | | |
| 25 | SP: | How - how often would that happen? |
| 26 | | |
| 27 | WA: | It's hard to put a time on it.  Just had lots of anxiety and depression |
| 28 | | going - you know, just lots of times that I just wanted - I just |
| 29 | | couldn't - I didn't even want to interact. |
| 30 | | |
| 31 | SP: | And how long would that go - for how long a period would that last? |
| 32 | | |
| 33 | WA: | Well, I could - because - okay, this is - I had to get up and function |
| 34 | | and I had people who relied on me and depended on me and so |
| 35 | | there was this - because I - how do I explain this?  I know now that |

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 64

1    I don't have - I'm in a secluded environment.  I'm not getting up
2    and going to work and having to do something.  I probably have
3    them like every couple of weeks or I'm - lots of ups and downs, but
4    before, I had to get up.  I had to go to work and I had to go take
5    care of people and so I couldn't give in to I'm depressed and I don't
6    want to but it was just like a constant battle in my mind.
7
8    SP:  Well, what - what - what were -
9
10   WA:  Does that make sense?
11
12   SP:  Sure.   What were - what were the symptoms you were
13        experiencing?
14
15   WA:  Just lots of nervousness, anxiety, I didn't - just not wanting to have
16        to participate in what -
17
18   SP:  Okay.
19
20   WA:  Life was bringing every day.
21
22   SP:  All right, let's - let - let's - let's break this up.
23
24   WA:  Okay.
25
26   SP:  Let's say zero to age 18, did you have periods of - the kinds of
27        things that you're talking about - the depression, the anxiety, did
28        you have - did you experience that between - bef - between the
29        ages of zero and 18 that you remember?
30
31   WA:  I don't really know.
32
33   SP:  Okay.  What about from 18 to 30?
34
35   WA:  Then I can say definitely I did.

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 65

1   SP:  Okay. So - and those symptoms that you experienced consisted of,
2          again, tell me what?  You said anxiety.
3
4   WA:  Yeah, lots of anxiety.  I was - I worry about everything.
5
6   SP:  Okay.  So you're a worrier.
7
8   WA:  Yeah.
9
10  SP:  Right.
11
12  WA:  And just always - just stressed wondering how - how I could take
13        care of everything.
14
15  SP:  Okay.
16
17  WA:  And -
18
19  SP:  You're how old now?
20
21  WA:  43.
22
23  SP:  Okay.  And what's your - what's your birth date?
24
25  WA:  8/26/70.
26
27  SP:  Okay.  And how old were you when you were arrested?
28
29  WA:  I was 30.
30
31  SP:  Okay.  So - so let's talk about this time period - let's kind of really
32        understand this time period between 18 and 30.  Are you with me?
33
34  WA:  Okay.
35

Transcript of Forensic Psychiatric Evaluation
Re: Wendi Elizabeth Andriano
November 26, 2013
Page 66

1  SP: All right.  So anxiety is one of the issues.  What about - sometimes
2      people sit and they tell me that they can be just minding their own
3      business watching television, watching something enjoyable, and
4      then all of a sudden they just get super anxious.  Their heart starts
5      racing and they get sweaty and clammy and they feel pressure on
6      their chest.  Did you ever experience anything like that?
7
8  WA: So between the ages of 18 and 30 I don't recall that happened.
9
10 SP: Okay.
11
12 WA: Yeah, I can't remember just having it for no reason.
13
14 SP: Okay.  So when you were anxious it was usually tied to something?
15
16 WA: Yes.
17
18 SP: That you were worried about?
19
20 WA: Yes.
21
22 SP: Okay.  What about - sometimes I talk to people and they tell me
23     that one of the ways that they deal with their anxiety is they - they
24     have like - they have some rituals or things in their head that they
25     have to do "X," "Y," and "Z," they have to like follow some steps,
26     and if they do those things then it relieves their anxiety.
27
28 WA: No, I wish.
29
30 SP: You didn't have that?
31
32 WA: No.
33
34 SP: What about someone that kind of checks doorknobs and locks
35     repeatedly?

Transcript of Forensic Psychiatric Evaluation
Re: Wendi Elizabeth Andriano
November 26, 2013
Page 67

1    WA:  I've never done that.
2
3    SP:  Okay.  What about repeated hand washing?  You're - you're going
4         "no" like this.
5
6    WA:  I don't think so.
7
8    SP:  Okay.  And again, we're talking about 18 to 30.
9
10   WA:  Yeah, I don't -
11
12   SP:  Okay.  What about - now let's - let's kind of - what about hearing
13        voices or hearing people talk to you who weren't in the room?
14
15   WA:  That's a funny question.  No.
16
17   SP:  What's so funny about that question?
18
19   WA:  Well, because I want to explain something but I don't want you to
20        think I'm weird.  I believe that God talks to me.  So it's not like
21        some strange voice, like I'm not having a psycho - psychotic
22        moment, but I do believe that God is inside of everybody and he -
23        if you listen, he - there is communication going on.
24
25   SP:  Okay.  So you used a word that I'm familiar with, but I want to
26        make sure you understand it.  You used the word "psychotic."  What
27        is psych -
28
29   WA:  They ask you that here all the time, that's why I know this.
30
31   SP:  Okay.  Let - let me finish my question.  What - what is "psychotic"?
32
33   WA:  Well, when you - I mean they have girls here who actually hear
34        people tell them, "I'm okay."  Tell them to kill themselves and to do
35        crazy things and whatever.  That's what I mean by -

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 68

1   SP:  So that's like hear - like having hallucinations?
2
3   WA:  Right.
4
5   SP:  And you - have you ev -
6
7   WA:  I don't believe I do that.
8
9   SP:  You don't have that?
10
11  WA:  No.
12
13  SP:  Okay.
14
15  WA:  I don't think so.
16
17  SP:  What about - what about visually seeing things other people aren't
18       seeing?
19
20  WA:  No.
21
22  SP:  Okay.  What about - so with - with this depressive stuff that you've
23       experienced, what - when you have it, what's the - what's a typical
24       run, how long will it last?  Again, we're talking between 18 and 30.
25
26  WA:  So like in particular I remember like, you know, you have to work
27       Monday through Friday and then I would ask my mom, "Could you
28       please come get Nicholas and Ashlee," and I would - I would sleep
29       all day.
30
31  SP:  Okay.
32
33  WA:  Just -
34
35  SP:  And how -

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 69

```
1   WA: You know, just to try to get away from my thoughts.
2
3   SP:  And then how long - how long was that - how - how long would
4        something like that last?
5
6   WA: It would just - it would - it would be like until I was forced, I have
7        to get up and engage in life again.
8
9   SP:  Okay.  So what would your energy level be like during that time?
10
11  WA: Well, I was sleeping so I would sleep - I'd try to sleep it off and just
12       sleep it away and so I would have no energy.
13
14  SP:  Okay.  What about your concentration?
15
16  WA: Not good.  It would be very - just my mind all over the place.
17
18  SP:  What about your appetite?
19
20  WA: Not good.
21
22  SP:  What about your sex drive?
23
24  WA: Not good.
25
26  SP:  What about your weight?
27
28  WA: It would fluctuate.
29
30  SP:  Okay.
31
32  WA: I don't know.
33
34  SP:  What about your interest in doing pleasurable things?
35
```

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 70

1  WA: I know if - I know when - when I would get to where I couldn't even
2      just deal with it anymore, I would want to just drink some alcohol
3      and that would help me stop thinking about whatever.
4
5  SP: Okay. What about - what about just the opposite of - of your mood
6      being down?  What about your mood being elevated?
7
8  WA: Yeah.
9
10 SP: Do you ever experience anything like that?
11
12 WA: I have.
13
14 SP: Okay.  Tell me what kind of symptoms you experience there.
15
16 WA: Where - I don't know, it's almost this feeling of being really full of
17     energy for no reason and just wanting to do all kinds of things.
18
19 SP: Okay.  And how long would that type of situation last?
20
21 WA: Not as long as my anxiety.  I feel like I have way more anxiety and
22     depression than I do the other.
23
24 SP: Okay.  Were you able to sleep when you were having these periods
25     where your - felt like your mood was - I'm going to use the word
26     "elevated"?
27
28 WA: Yeah.  Not very well.
29
30 SP: What about your sex drive?
31
32 WA: I can't say that I ever considered that as a pleasurable activity, so
33     that wouldn't have been included in my -
34
35 ////////////////////////////////////////////////////////////////////////

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 71

1  SP:  Okay.  What about spending - what about your spending habits
2        during these periods?
3
4  WA:  I liked that.
5
6  SP:  So you would spend money?
7
8  WA:  Yeah.
9
10 SP:  Spend money you didn't have?
11
12 WA:  Yeah.
13
14 SP:  Buy things you didn't need?
15
16 WA:  Yes.
17
18 SP:  Okay.
19
20 WA:  And it was usually for other people.  If I could make somebody else
21        happy and I usually thought I could do that by buying them things,
22        that made me feel better.
23
24 SP:  Was there a seasonal pattern to this?
25
26 WA:  I don't know.
27
28 SP:  You don't know?
29
30 WA:  I don't know.  I think I was - I felt like I was always in debt and
31        spending money I didn't have.
32
33 SP:  Did you - did you ever contemplate taking your life before your
34        arrest?
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 72

1    WA:  I think at that point I had never thought about taking my own life.
2            I sure had thought about running away though, trying to just get
3            away from it.
4

5    **PSYCHIATRIC HISTORY SUBSEQUENT TO OCTOBER 8, 2000 -**
6    **PART I:**
7

8    SP:  Okay.  Since - since your arrest, have you tried to kill yourself?
9          How many times?
10

11    WA:  Once.
12

13    SP:  And when was that?
14

15    WA:  When I was in county jail.
16

17    SP:  Okay.  What did you do there?
18

19    WA:  I had cut my arm.
20

21    SP:  What did you cut it with?
22

23    WA:  A mirror.
24

25    SP:  Okay.  And what happened?
26

27    WA:  Well, I didn't die.  I - I remember coming to and I was in the
28          hospital.  And - and they sent me back to jail.
29

30    SP:  How long were you at the hospital for?
31

32    WA:  I don't know.
33

34    SP:  Did you leave a note?
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 73

1    WA:  I'm not sure.  I know I had thought about it.  But I don't know if I
2           ever did it or not.
3
4    SP:   Have - have you had - have you tried to kill yourself since you've
5           been in the Department of Corrections?
6
7    WA:  I don't want to answer that question.
8
9    SP:   I'm going to take that as a "yes."  So when was the last time you -
10         you tried to kill yourself?
11
12   WA:  I have become aware that when I get in a really depressed state
13        that's something that floats around in my thinking.  But because I
14        know that that's what's going on, I - I can talk myself out of it.
15
16   SP:   So - so when was the last time you tried to take your life?
17
18   WA:  That I - back in county.
19
20   SP:   Okay.  But you've had thoughts of doing - taking your life while
21        you've been here?
22
23   WA:  Numerous times.
24
25   SP:   When was the last time?
26
27   WA:  Gosh, like maybe a month ago.
28
29   SP:   Okay.  What - what was going on a month ago for you that - that
30        caused you to have thoughts of taking your life?
31
32   WA:  Just some things with my living environment that really distressed
33        me and I felt like it was just the end of the world and then I started
34        having to deal with the depression and the thoughts of - of not
35        wanting to be here.

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 74

1   SP:   Okay.  What was going on with your living environment?
2
3   WA:   Somebody that I had lived by my entire time here had left and then
4         somebody that I really don't get along with moved next door to me.
5         And it was - I - it was very hard for me.
6
7   SP:   Is that person still next door to you?
8
9   WA:   Yeah.  And I've adjusted now, but in the moment it was - it's hard
10        to adjust to things.
11
12  SP:   The person who left, they were released?
13
14  WA:   Uh-huh.
15
16  SP:   And were they on - they have a death -
17
18  WA:   They did.
19
20  SP:   So that would be, what, Debra -
21
22  WA:   But not any - yeah.
23
24  SP:   That would be Debra Milke?  Correct?
25
26  WA:   Yes.
27
28  SP:   So she was next door to you?
29
30  WA:   Yes, my entire time I've been in prison.
31
32  SP:   Okay.
33
34  WA:   So that was for nine years and she went home.
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 75

1   SP:  Okay.
2
3   WA:  And I think I was okay with that, but then the other person who
4         moved next to me was - creates a lot of stress for me.
5
6   SP:  And how does that person create the stress?
7
8   WA:  Just the things she does.
9
10  SP:  Like what?
11
12  WA:  I don't want to discuss her business.
13
14  SP:  How come?
15
16  WA:  Because she's in court also and anything that I say can hurt her and
17         I'm not trying to hurt her.  That's why.
18
19  SP:  Okay.  So this is a -
20
21  WA:  She is who she is and - and it's distressful for me to be around and
22         -
23
24  SP:  So this is someone who is currently having legal proceedings going
25         on right now?
26
27  WA:  Yes.  Yes.
28
29  SP:  Okay.  Does this person do things intentionally to agitate you?
30
31  WA:  Yes.
32
33  SP:  For - to - to - why?  Why?
34
35  WA:  Because we don't get along.

Transcript of Forensic Psychiatric Evaluation
Re: Wendi Elizabeth Andriano
November 26, 2013
Page 76

1   SP:  Why?
2
3   WA:  I don't know.  I don't know.  I don't talk to her.  I don't - I don't
4        know.  I just - there's - prison is full of strange people, some you
5        get along with, some you don't, and that's just how it is.
6
7   SP:  Have you asked - is there any way there can be a move?
8
9   WA:  No, because I've - I'm adjusting and I know how to mind my own
10       business and not interact and so I just shut it all out and -
11
12  SP:  Okay.
13
14  WA:  But it took me a little while to get to that point.
15
16  SP:  Help me understand this because I - I really want to - I want to kind
17       of wrap my brain around this.  Is - is the person - what - how does
18       the - how does the - the things that bother you, what form does it
19       take?  Without getting - if you don't want to get into specific -
20
21  WA:  No, I don't.
22
23  SP:  I don't -
24
25  WA:  I don't.
26
27  SP:  Okay.  We're talking over each other.  You don't want to get into
28       specifics, and I'm okay with that, but - but how does the - how does
29       the harassment manifest itself?  Or how does whatever it is bother
30       you manifest itself?  Without - you don't have to be specific.
31
32  WA:  With noise and conversations and gossip and just lots of -
33
34  SP:  Okay.
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 77

1   WA: Words that are meant to hurt.
2
3   SP:  Okay, got it.  All right.
4
5   WA: Like people like to talk about my case.
6
7   SP:  Right.
8
9   WA: And then I have you sitting here asking about my case.  And that
10      was a hurtful time.  I mean I took my husband's life and it's just
11      awful what happened.  But now people want to gossip about it
12      because the prosecutor wants to make TV shows about it.  So then
13      the inmates get to watch it.
14
15  SP:  Well, if I remember reading it right, there were a couple - there
16      were a couple TV shows, correct?
17
18  WA: I don't even know.
19
20  SP:  That I think have been made.  But how would they get - how would
21      the inmates get to watch it on the - based on the channels that -
22      that are coming through?  Because I don't think those channels are
23      -
24
25  WA: We have Investigational Discovery Channel coming through and so
26      lots of people got to see him on TV talking about me.
27
28  SP:  But they didn't bring their cameras in here, did they?
29
30  WA: No.  I wasn't part of it.  I don't participate in those.  But he did.
31
32  SP:  Who is "he"?
33
34  WA: Mr. Juan Martinez.
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 78

1    SP:   Oh, I see. You're saying the prosecutor -
2
3    WA:   Yes.
4
5    **MS. ANDRIANO'S OBSERVATIONS RE: TRIAL:**
6
7    SP:   Talked? Got it. Got it. So let - let's kind of - since - since you
8         brought that up, let's - let's - let's talk about that for a second. You
9         - you had a trial.
10
11   WA:   Yes.
12
13   SP:   And early on what - what - you told me - we talked a little bit about
14        guilt, but what - what was your - what was your opinion of the trial?
15        What did - what did you - what was your take away?
16
17   WA:   I don't - I don't really want to say my opinion about the trial.
18
19   SP:   How come?
20
21   WA:   I was on a lot of medications so I didn't have a whole lot of - and I -
22        I was just after the fact when I have been told about a lot of things
23        that happened and then I have - I'm not - I don't have a good
24        opinion about the trial.
25
26   SP:   What - what did - well first of all, what medications were you on
27        during the trial?
28
29   WA:   I was on an antidepressant, I don't remember which one. I know
30        I had Seroquel® and Ativan® and I don't know, three or four
31        different meds.
32
33   SP:   Are - are you saying that these medications affected the way you -
34        your ability to think?
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 79

1   WA:  They helped me get through it, yes.

2

3   SP:   Wait, let me ask my question. Okay? Are you saying that these
4        medications affected your ability to pay attention during the trial?

5

6   WA:  Yes, sir.

7

8   SP:   Are you saying that the medications somehow caused you to not be
9        aware of what was taking place?

10

11  WA:  They did not cause me to be aware, I willingly took the medication
12       and it repressed my ability to comprehend what was going on and
13       to interact and to even be aware of a lot that was happening.

14

15  SP:   So - so do you think that the medications, being on the medications
16       somehow hurt your ability to participate in your trial?

17

18  WA:  I know it did. Yes, sir.

19

20  SP:   How do you know that?

21

22  WA:  After I started the appeals process later on and people were
23       bringing trial transcripts and telling me this certain person had
24       taken the stand and testified and I did not even have any memory
25       of them even being up on the stand. So that's how I know, because
26       there was a lot of things that were brought to my attention that I
27       did not even remember.

28

29  SP:   Well, I - I thought we already established that you have memory
30       problems from way back when. Remember you telling me that?

31

32  WA:  Right.

33

34  SP:   That was before you were on medications, right?

35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 80

1  WA: Right.
2
3  SP: Because your mom and dad used to tell you about things that you
4      didn't remember.
5
6  WA: Yes, sir.
7
8  SP: Remember that?
9
10 WA: Yes.
11
12 SP: And you said you don't remember a lot about the offense.
13
14 WA: Right.
15
16 SP: And you weren't on medication then.
17
18 WA: Right.
19
20 SP: So how do you know that it was the medications that were causing
21     you to not have a memory during the trial?
22
23 WA: Well, I don't know that.  But I do know that the reason why I took
24     the medications was so I could have control of my anxiety, control
25     of my emotions going on, all this sort of stuff, so I just made the
26     assumption that because I was on all these meds I was - I have no
27     - I can't tell you a whole lot of what happened in my trial.
28
29 SP: Do you remember taking the witness stand?
30
31 WA: I do.  I do.
32
33 SP: What was your opinion about the outcome?
34
35 ////////////////////////////////////////////////////////////////////

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 81

1   WA: Well, I feel that - I mean I'm in a legal system and if that's what the
2         decision was, then that's what it is.
3
4   SP:  So then why appeal?
5
6   WA: I - I feel like - I feel like that the reason - well, the reason why I
7         would like to appeal is just if the jury could've heard everything and
8         had a full - and then they still decide that, then that's okay.  But I
9         don't feel like they were presented with everything.
10
11  SP:  Okay.  What - what was - I think earlier you said you - you - you
12        agreed with the finding of - and I'm going to paraphrase this and I -
13        I will readily admit at the outset I may get this one wrong, you
14        readily admit that you were guilty but I think you said but not of
15        first degree murder?
16
17  WA: I don't - that's how I feel, yes.
18
19  SP:  Okay.  If not first degree murder, what do you think you were guilty
20        of?
21
22  WA: Well I don't know.  I don't - that's hard to distinguish.  Like I don't
23        know all the things that go into - and I guess because - how do I
24        explain this?  I just feel like the jury - if the jury could've heard
25        everything and - and - and had a better understanding, then I
26        wouldn't have been found guilty of first degree murder.  I don't
27        know why I think that.  I just do.
28
29  SP:  You know first - first degree murder, the type of murder you were
30        convicted, is premeditated?
31
32  WA: Right.
33
34  SP:  That means you planned it out.
35

Transcript of Forensic Psychiatric Evaluation
Re: Wendi Elizabeth Andriano
November 26, 2013
Page 82

1    WA: I know, but that makes it seem as if I just wanted to - I took it
2          upon myself to kill somebody who didn't want to die, and that's not
3          what the situation was.  Why are you looking at me like that?
4
5    SP: I'm not looking at you in any way.
6
7    WA: Oh.  I'm like what -
8
9    SP: I'm just - I'm - I'm just - I'm just pausing to hear - that - to kind of
10        process your answer.  So it's - it's your position that - it's your
11        position that -
12
13   WA: I don't know.  Look, I don't know what's fair.  I don't know.  I don't
14        have anything against the death penalty or what the conviction is,
15        it's just I didn't know all these things that have been - have been
16        brought up since we've gone through the appeal process.  I didn't
17        have all this information.  I didn't understand why that night went
18        the way it went.  And now that I know a whole lot more, I would
19        like the jury to hear the whole story and then make a decision.
20        That's all.  And then if they still decide that I need to die, then
21        that's what their decision is.
22
23   **DEFENDANT'S VERSION OF THE INSTANT OFFENSE - PART V:**
24
25   SP: So - but - but as you sit here today, it's your position that your -
26        your husband wanted to die?
27
28   WA: Yes, sir.
29
30   SP: Correct?
31
32   WA: Not that he wanted, he had no choice.  He had cancer.
33
34   SP: Yeah, well -
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 83

1   WA: It was just on how he died.
2
3   **MS. ANDRIANO'S OPINION RE: TRIAL COUNSEL:**
4
5   SP:  Okay.  What was your opinion of your trial counsel, your lawyer?
6
7   WA: Well I saw Mr. David DeLozier just as my - I felt very comfortable
8        with him.  He had the same religious beliefs that I had so I felt
9        comfortable with that as if that was the thing that God wanted to
10       happen.  So I was okay with that.  I never questioned his legal
11       abilities to represent me.  It never occurred to me to even -
12
13   SP:  So - so while the process was going on did you think he was doing
14        right by you?
15
16   WA: I - I - I didn't stop to evaluate that because that wasn't my concern.
17
18   SP:  Okay.  Are -
19
20   WA: I felt like God was in control of that and that God had sent him to
21        me to represent me and so -
22
23   SP:  Okay.
24
25   WA: It wasn't my place to question that.
26
27   **ISSUE RE: SUICIDAL IDEATION:**
28
29   SP:  Earlier we were talking about suicidal thoughts.  Remember?
30
31   WA: Yes.
32
33   SP:  Okay.  Are you currently having thoughts of suicide?
34
35   WA: No.

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 84

1   SP:   Is there a mechanism in place that if you do have those kind of
2         thoughts, that you - to - what - what - what happens, what are you
3         supposed to do?
4
5   WA:   If I feel that way and it's something that I feel like I can't control -
6         see, I - I have a lot of meditation things that I go through now.
7
8   SP:   Right.
9
10  WA:   I have a lot of tools that I now know to use to help me deal with
11        that.
12
13  SP:   Such as?
14
15  WA:   With the meditation and using positive affirmations and I have the
16        psych person that I can talk to.  Because as long as I can, you
17        know, actively use some of my tools, then I - I won't fall into that.
18
19  SP:   Okay.  All right.
20
21  WA:   But see now that I'm aware that this is what's going on with me and
22        I know, then I know I'm starting to feel really depressed, I know
23        that I need to start listening to my meditation.  I need to practice,
24        you know, mindfulness and there's just a lot of things that I use
25        now.
26
27  **RELIGIOUS   UPBRINGING   AND   PRESENT   DAY   RELIGIOUS**
28  **AFFILIATION:**
29
30  SP:   Got it.  Do you - you've talked about religion a few times.  What -
31        what's your current religious affiliation?
32
33  WA:   Well, how do I say?  I - I don't know.  I don't really have a label.
34        I just - I believe that - I believe that everything is connected, that
35        we're all - we all are made of spirit and - and that the purpose of us

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 85

|    |     |                                                                             |
|----|-----|-----------------------------------------------------------------------------|
| 1  |     | being here is to learn how to love and to take care and be respectful        |
| 2  |     | and become more spiritually aware so that way we make this place            |
| 3  |     | that we're in a better place and that everything we go through is a          |
| 4  |     | lesson and a learning -                                                      |
| 5  |     |                                                                             |
| 6  | SP: | Do - do you - do you have a particular religious affiliation though?         |
| 7  |     |                                                                             |
| 8  | WA: | I would say Christian more than anything.                                    |
| 9  |     |                                                                             |
| 10 | SP: | Okay.  And do you - how do you practice your faith here?                     |
| 11 |     |                                                                             |
| 12 | WA: | I spend a lot of time praying and meditating and studying, you              |
| 13 |     | know, with my different books and the <u>Bible</u> and listening to church  |
| 14 |     | services and -                                                               |
| 15 |     |                                                                             |
| 16 | SP: | So - so you're reading scripture and what have -                            |
| 17 |     |                                                                             |
| 18 | WA: | I do.  I do.                                                                 |
| 19 |     |                                                                             |
| 20 | SP: | Okay.  Are there particular psalms, prayers, scripture that - that          |
| 21 |     | you derive a certain amount of strength from?  Are there certain -          |
| 22 |     | I guess what I'm asking if there's certain ones that you look to that       |
| 23 |     | are like your go-to?                                                         |
| 24 |     |                                                                             |
| 25 | WA: | Oh.  Not so much because I was raised in a really strict one and I          |
| 26 |     | feel like - I feel like the rigidity of the beliefs I was raised in helped  |
| 27 |     | me end up where I'm at.  So I've really tried to separate what was          |
| 28 |     | programmed into my mind than what is really true.                            |
| 29 |     |                                                                             |
| 30 | SP: | Okay.                                                                        |
| 31 |     |                                                                             |
| 32 | WA: | What is spiritually true.  So I've had to go on this separating of -        |
| 33 |     |                                                                             |
| 34 |     | ///////////////////////////////////////////////////////////////////////////|
| 35 |     | ///////////////////////////////////////////////////////////////////////////|

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 86

1    SP: Well that actually gets me to my next question, which was about
2         your religious upbringing.  I want to say it was like fundamentalist
3         Christian, I'm - I'm blocking on -
4
5    WA: Well, I don't know what they called it, but I know that whenever our
6         pastor would say he's - he would say, "We are non-denominational
7         Bible-believing church."
8
9    SP: Right.
10
11   WA: So I don't know what the outside world would label that as.
12
13   SP: But as - if I read this correctly, it sounded like a fairly religious
14        household, correct?
15
16   WA: Yes, sir.
17
18   SP: And how often - like was there prayer in the morning?
19
20   WA: There we had devotions and - on a daily basis, and prayer and
21        going to church three, four times a week.
22
23   SP: And it -
24
25   WA: And then my school was also a church school.
26
27   SP: Right.
28
29   WA: So I was in it every day.
30
31   SP: Okay.  And how is it that you believe that the belief system that you
32        were raised in got you to the situation you're in now?
33
34   WA: There's so many ways.
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 87

1   SP:   Well, how about you give me your top three?
2
3   WA:   Okay.  Well number one would be instead of finding out things for
4         myself and actually having knowledge and understanding how the
5         world works, you're just taught just give it to God and let go and
6         he'll - God will work it out.  So you - just like you're putting it off on
7         somebody else and not taking responsibility for yourself.
8
9   SP:   Okay.
10
11  WA:   And I think that - that's not a good - good, healthy thing to do.
12
13  SP:   Okay.  Give me another example.
14
15  WA:   The other one is really this position of authority that men had over
16        women and listening to them and just thinking that God spoke to
17        them and they're God speaking to you now and so you need to
18        follow everything that they say and do.
19
20  SP:   Okay.  And another way?
21
22  WA:   I think the hypocrisy.  The - even though I - I lived under these
23        rigid religious beliefs, I really can't tell you one person who really
24        followed them both in public and private.
25
26  SP:   Okay.
27
28  WA:   There was lots of preaching about something and then when they're
29        out of the public and then in the private home and all of that, that
30        it was completely different.
31
32  SP:   Okay.
33
34  ////////////////////////////////////////////////////////////////////////
35  ////////////////////////////////////////////////////////////////////////

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 88

1   WA: So it was almost that it was okay to not follow the rules, even
2        though it's follow the rules.  It's - it's just - I don't know.  It's hard
3        to describe.
4
5   **PERSONAL HISTORY - PART I:**
6
7   **Date of Birth:**
8
9   SP:  You were born August 26, 1970, correct?
10
11  WA: Yes.
12
13  **Place of Birth:**
14
15  SP:  Where were you born?
16
17  WA: In Texas.
18
19  SP:  Where in Texas?
20
21  WA: Groom, Texas.
22
23  SP:  G-R-O-O-M?
24
25  WA: G-R-O-O-M.
26
27  **Birth and Developmental History:**
28
29  SP:  Okay.  And as it was told - as it was told to you, did your mom have
30       any problems with birth or her pregnan - your birth or her
31       pregnancy?
32
33  WA: I don't know.
34
35  ////////////////////////////////////////////////////////////////////

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 89

1   SP:   Okay.  As it was told to you, were there any difficulties or problems
2         with your reach - with you reaching your developmental milestones?
3
4   WA:  I don't remember.
5
6   SP:   Okay.
7
8   WA:  I don't know.  I haven't -
9
10  SP:   You wouldn't -
11
12  WA:  I don't even know.
13
14  SP:   It would be stunning if you remembered.
15
16  WA:  Yeah, I'm like -
17
18  SP:   What I'm - what I'm - what I'm wonder -
19
20  WA:  I don't even know if any of that's ever been discussed.
21
22  SP:   Okay.
23
24  WA:  I've never asked.  I don't know.
25
26  SP:   But you don't have - it has been discussed because I've seen it in
27        some of the other documents.  But -
28
29  WA:  Oh, sorry.
30
31  SP:   But my question to you is was any of that -
32
33  WA:  I'm not aware of it.
34
35  ///////////////////////////////////////////////////////////////

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 90

1   **Raised By:**
2
3   SP:   Okay.  Who were you raised by?
4
5   WA:   I remember my grandma a lot.
6
7   SP:   On which side?
8
9   WA:   My mom's mother.
10
11  SP:   Okay.  And who else raised you?
12
13  WA:   And then I remember my mom and then Alejo, who is my stepdad.
14        But he adopted me so I guess he's my - I don't know what the
15        proper label is.
16
17  SP:   And - and tell me if I have this correct, Alejo is spelled A-L -
18
19  WA:   A-L-E-J-O.
20
21  SP:   Right.  Okay.  And who else had a hand in raising you?
22
23  WA:   Then I know we traveled around with a bunch of other ministers and
24        so they all kind of I guess had a hand in raising me.
25
26  SP:   But who were the - the top - the - the ones that you were most
27        closest to?  Is it your mom's mom, your mom and Alejo?
28
29  WA:   Yeah.
30
31  **Childhood Discipline:**
32
33  SP:   Okay.  How were you disciplined as a - as a child?
34
35  WA:   I was spanked.

Transcript of Forensic Psychiatric Evaluation
Re: Wendi Elizabeth Andriano
November 26, 2013
Page 91

1    SP:  Did the pun - any other ways?
2
3    WA:  I know I was spanked.  I know that I got grounded.  I think part of
4           - well - I don't - I don't know.  Yeah, I had to - sometimes I'd - we'd
5           have to go do work and things as part of punishment.
6
7    SP:  Okay.  Did - did the punishment usually fit the - I'm going to use
8           the word "crime," but the transgression, did it fit what it is you did
9           wrong?
10
11   WA:  I guess they thought so.  I don't know.  I mean -
12
13   SP:  Well, I'm asking you.  Do you -
14
15   WA:  Oh.  Well, I mean it seemed - I - that's how I was raised, so that
16         was normal to me.  So I - I would -
17
18   SP:  Okay.  So - and were - were you ever hit with like a pan or a pot?
19
20   WA:  No.
21
22   SP:  A spatula?
23
24   WA:  No, I think they always used a paddle and a belt and -
25
26   SP:  A switch?
27
28   WA:  Oh my gosh, I think I have been a couple of times.
29
30   SP:  Okay.  What were you hit with a switch for?
31
32   WA:  Wipe your eye.  Sorry.  Can you wipe your eye?  You have - there
33         you go.  Thank you.  Well, I don't know.  I - just - for just - well if
34         you don't listen and you don't do everything they tell you to do or
35         whatever.

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 92

1    SP:  Did - did you - did you think that the punishment though or the way
2         you were punished - different people have different ideas about
3         punishment.  Some people believe just in time outs, some people
4         believe in kind of a corporal punishment model.
5
6    WA:  Right.
7
8    SP:  Did you think - it sounds like you were raised in an environment
9         that was more a corporal punishment type of environment.
10
11   WA:  Uh-huh, right.
12
13   SP:  Okay.  Which frankly at your age probably isn't that uncommon.
14        But the - the question is, did you think that the punishment that
15        you received was appropriate?
16
17   WA:  Are you asking me my opinion today or back then?  I mean that's -
18
19   SP:  Today.  You have - you're an adult.
20
21   WA:  Oh.  Well no, as an adult I wouldn't - I don't agree with it at all.
22
23   SP:  Okay.  So did - you thought the punishment then was in excess of
24        what you deserved?
25
26   WA:  Yes.
27
28   SP:  Okay.  How?
29
30   WA:  Well, I guess because now as an adult I believe that the time out
31        and the talking and - and, you know, actually helping people figure
32        out how to think would be a lot more effective than just spanking
33        their bottom.
34
35   ////////////////////////////////////////////////////////////////////////

Transcript of Forensic Psychiatric Evaluation
Re: Wendi Elizabeth Andriano
November 26, 2013
Page 93

1   SP:   Okay.  Did you ever end up with any bruises or welts as a result of
2         the punishments you received?
3
4   WA:  I don't know.
5
6   SP:   You don't recall?
7
8   WA:  I don't recall.
9
10  SP:   Did - that noise is some type of fan blower.  I'm just going to move
11        this microphone a little closer.  You're fine where you are.
12
13  WA:  Okay.
14
15  SP:   Okay.  Did you ever end up in the hospital as a result of any
16        punishments you received?
17
18  WA:  No.
19
20  SP:   Because you were hurt in a certain way?
21
22  WA:  No.
23
24  SP:   Okay.  Were you ever pun - putting aside - putting aside your
25        beliefs about corporal punishment and how you believe it should've
26        been done, what were the - what were the kinds of things that you
27        got punished for?
28
29  WA:  I'm trying to think of a specific incident.  My goodness.  Oh, this is
30        terrible.  I can't - I don't - I don't remember like specifically what
31        I would do or not do.  I'm not - I'm not - I'm - I just remember that
32        any - anything that they considered disobedience.
33
34  SP:   Okay.
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 94

1    WA: I don't -
2
3    SP:  Did - did you ever just get randomly hit or punished for - like let's
4         say you're just watching TV and minding your own business or
5         reading a book, did anyone ever just come over to you and just hit
6         you for no reason?
7
8    WA: No.
9
10   SP:  Or bring a belt or switch out?
11
12   WA: I don't think so, no.
13
14   **Childhood Interests:**
15
16   SP:  Okay.  What - what kinds of things did you - what kinds of things
17        did you enjoy doing as a child?
18
19   WA: Reading, I love to read.
20
21   SP:  Okay.  What kinds of things were you reading as a kid?
22
23   WA: Like The Chronicles of Narnia and Little Women and I think Nancy
24       Drew.  I don't know.  My mom would take me to the library and we
25       would pick out books.
26
27   **Traumatic Childhood Experiences:**
28
29   SP:  Okay.  Are there any traumatic childhood experiences that stand out
30        from your upbringing?
31
32   WA: Well - well, I remember that when - like always remember being -
33       there was always this fear of not having somewhere to live.  There
34       was always this worry about housing.  There was always a worry

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 95

1       about how to pay for anything.  I remember going hungry a lot.  I
2       don't know.  I mean -
3
4  SP:  Was the family on food stamps or government assistance?
5
6  WA:  I don't know.
7
8  **Issue Re: Childhood Physical Abuse or Childhood Emotional**
9       **Abuse:**
10
11 SP:  Were you ever the victim of - do you think of any childhood physical
12      abuse or emotional abuse?
13
14 WA:  As a grown up looking at the way I was raised I would say that that
15      wasn't healthy.  Gosh, that's such a general question.  What - what
16      - do you want - I don't know what you want me to speak about
17      specifically.  Like - I don't know.
18
19 SP:  I just want to know if you think you were as a child ever emo - do
20      you believe you were emotionally or physically abused?
21
22 WA:  I do.
23
24 SP:  Okay.
25
26 WA:  As an adult now looking at it, I do.
27
28 SP:  How - how were you emotionally and physically abused?
29
30 WA:  I say that because as a child having to worry about how you're
31      going to eat next and wondering if I was taught that God was the
32      one that if you were being a good person, that God would provide
33      all your needs and he would feed you and put a roof over your
34      head.  And so if that wasn't happening, it's because you're doing
35      something bad.  And I lived with - with parents who chose to kind

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 96

1        of wander around.  And even though like my mom was there
2        physically, I don't feel like she was ever really a mom to me.
3        Because I remember after leaving and not having my grandma
4        around I really felt like my grandma had - had been my mother.
5        And I really felt like the expectations of being the mom or being a
6        grown-up or being kind of like a grown-up were put on me by my
7        dad. And I just remember lots and lots of pressure on me to please
8        him.  And lots of times I would feel uncomfortable but I think as a
9        child you just - I just wanted to please my dad.  And I was aware
10       of - of like - of my mom not being there for my dad and so I always
11       felt like I needed to make it up for her, on her behalf.
12
13  SP:  Okay.
14
15  WA:  To keep the peace.  I don't know.  I mean I don't know where I got
16       those ex - expectations, but I remember thinking and feeling that
17       way.
18
19  SP:  Okay.  Let me just say something for the record here.  It's - it's
20       10:46.  And what I'm going to do right this second is I'm going to
21       stop both of these devices and then turn them right back on.  And
22       the reason for this is that when we make a disc, we can put it on a
23       two hour - a disc that can hold two hours of content. So just - what
24       I ask is you don't talk while I do this and I'm going to power it right
25       back.
26
27  WA:  Okay.  Let me get some more tissue.
28
29  SP:  Wait a minute.  Wait, wait.  Just - the whole point - I understand
30       that she wants to come but I want to do that while the equipment
31       is -
32
33  WA:  Oh, okay.
34
35  SP:  Re-powered back up.

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 97

1   [Break]
2
3   SP:  Okay.  And you would agree it's - that took all of ten seconds.  You
4          would agree we didn't have any conversation while I was doing that,
5          correct?
6
7   WA: Yes.
8
9   SP:  Do you want to - me to get you some tissue here?
10
11  WA: Yes.
12
13  SP:  Do you have some tissue?
14
15  WA: Thank you.  I'll trade you.
16
17  SP:  So - I'm just going to repeat what you said to the correction officer.
18       You - so you said, "Thank you.  I'll trade you."
19
20  WA: Yes.
21
22  SP:  So what kind of things did you do to please your father?
23
24  WA: Well, he - I would cook for him and - and clean the house certain
25       ways for him and when he'd get home from work he'd like for me
26       to scratch his head and play with his hair and rub his legs, rub his
27       back, that kind of thing.
28
29  SP:  Okay.  What other kinds of things did you do to please him?
30
31  WA: He always had a temper and so you just learned, I don't know, you
32       learn how to just pacify him and get - I don't know.  I would laugh
33       at his, you know, I don't know, he would - it's hard to describe
34       because it's not as if you make decisions to do certain things, but

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 98

1       just whenever you - you just learn how to live your life in a way
2       that you know makes them happy.
3
4    **FAMILY HISTORY - PART I:**
5
6    **Father:**
7
8    SP:  Okay.  But let - let's talk about him a little bit.  First of all, let's talk
9        about your - your - your biological father.  His name is what?
10
11   WA:  Skip Robertson.
12
13   SP:  Skip - Skip what?
14
15   WA:  Robertson.
16
17   SP:  Skip Robertson.  And did Skip Robertson have any role -
18
19   WA:  Oh, he used to put some money on my books too.  You were asking
20      about that and I forgot about him.
21
22   SP:  Okay.  So Skip - Skip Robertson puts money on your book?
23
24   WA:  No, he did.  He passed away.
25
26   SP:  Okay.  So he was - he's your biological father, correct?
27
28   WA:  Yes, yes.
29
30   SP:  And what role did he have in your upbringing?
31
32   WA:  I don't remember him in my upbringing.
33
34   SP:  Okay.  When do you remember him?
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 99

1    WA: I remember one time I was little, I don't recall what age, and I
2          remember one time for me it felt like meeting him for the first time.
3          And I spent the weekend with him and his wife and his children.
4          And then I didn't have anything - any interaction with him until here
5          in prison.
6
7    SP:  Okay.  Did he come and visit you?
8
9    WA: One time.
10
11   SP:  Okay.  And are you allowed a contact visit?  No?
12
13   WA: No.
14
5    SP:  Okay.  It was through -
16
17   WA: Glass.
18
19   SP:  Glass.  What was that like for you?
20
21   WA: It was hard because he was dying from cancer and he was in a
22          wheelchair and -
23
24   SP:  How - how long ago was that?
25
26   WA: This year.
27
28   SP:  Okay.  How - how - how old was he when he passed away?
29
30   WA: I don't know his age.
31
32   SP:  What - what - do you know what kind of cancer?
33
34   WA: Oh my goodness.  I believe he had lung cancer.
5

Transcript of Forensic Psychiatric Evaluation
Re: Wendi Elizabeth Andriano
November 26, 2013
Page 100

1   SP:  And do you know what he did for a living?
2
3   WA:  I don't.
4
5   SP:  And what about -
6
7   WA:  Well I know - well yes, I think he was a truck driver.
8
9   SP:  And do you know how far in school he went?
10
11  WA:  No.
12
13  SP:  Now, did he have any psychiatric or emotional problems that you
14       know of?
15
16  WA:  Well, the thing off the top of my head that I know was he used to
17       suffer with depression and suicidal thoughts too.
18
19  SP:  Okay.
20
21  WA:  So that helped me not feel so -
22
23  SP:  Okay.  Did he ever get any treatment for that?
24
25  WA:  I don't know.  He spent I think 17 years in prison.
26
27  SP:  Okay.  For what?
28
29  WA:  And - I don't know what the official charge was.  But it had to do
30       with his stepdaughter and maybe - I don't know, some sexual stuff.
31       I don't know.
32
33  SP:  Okay.  So you didn't really have a relationship with him growing up?
34
35  WA:  No.

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 101

1    SP:  And nor did you have a relationship with him as an adult?
2
3    WA:  Not until prison.
4
5    SP:  How long was that visit?
6
7    WA:  That visit was just a couple hours, or maybe like an hour and a half
8         actually.  That's all he could - his body could handle sitting here.
9         But we used to write back and forth and so that's - is how I had
10        gotten to know him.
11
12   **Mother:**
13
14   SP:  Okay.  And your mother, is she still alive?
15
16   WA:  Yes.
17
18   SP:  And what is her name?
19
20   WA:  Donna.
21
22   SP:  And what's Donna's last name?
23
24   WA:  Ochoa, O-C-H-O-A.
25
26   SP:  And Donna is how old now?
27
28   WA:  64.
29
30   SP:  And how far in school did your mom go?
31
32   WA:  I feel like maybe she's had some college.
33
34   SP:  Okay.  And what kind of - what kind of work does she do or did she
35        do?

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 102

| | | |
|---|---|---|
| 1 | WA: | She works as a human resource - I don't know what her official title |
| 2 | | is, but she's in human resources at a hospital. |
| 3 | | |
| 4 | SP: | And what - does she have any medical problems? |
| 5 | | |
| 6 | WA: | I know she takes medication.  I don't know exactly for what. |
| 7 | | |
| 8 | SP: | Okay.  What about psychiatric or emotional problems? |
| 9 | | |
| 10 | WA: | I don't know the details of what she has. |
| 11 | | |
| 12 | SP: | Does she have any emotional - do you know if she - |
| 13 | | |
| 14 | WA: | Well I know she - I know she takes something and I don't - and I |
| 15 | | know it was for anxiety and depression, but I don't recall - I don't |
| 16 | | know - |
| 17 | | |
| 18 | SP: | Do you - do you know if she's ever been psychiatrically |
| 19 | | hospitalized? |
| 20 | | |
| 21 | WA: | I don't think so. |
| 22 | | |
| 23 | SP: | Okay. |
| 24 | | |
| 25 | WA: | I think my aunt, her sister has been. |
| 26 | | |
| 27 | SP: | Your - |
| 28 | | |
| 29 | WA: | My aunt. |
| 30 | | |
| 31 | SP: | Your maternal aunt? |
| 32 | | |
| 33 | WA: | Right. |
| 34 | | |
| 35 | SP: | Okay.  Does your mom have a drug or alcohol history? |

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 103

1   WA:  Well, I have learned that she did.
2
3   SP:  Okay.  What about - what about trouble with the law?
4
5   WA:  No.
6
7   SP:  And what was your relationship like growing up with your mom?
8        You already kind of dis -
9
10  WA:  Yeah, my mom was there.  I mean she was there.  I -
11
12  SP:  But it sounds like it was distant?
13
14  WA:  Very distant.
15
16  SP:  I think I read -
17
18  WA:  I - I try to describe it as, okay so I love to read, my mother loved
19        to read.  So we could sit in the same room and so it seems like
20        you're together, she's reading her book and I'm reading my book.
21        So we would do things and be around each other, but no, we were
22        not connected and did not have conversations about things.
23
24  SP:  Do you think she neglected you?
25
26  WA:  Well, I don't like to say that word.  I think she was as much there
27        as she could be.
28
29  SP:  Do you think you were though?
30
31  WA:  But did I get what I needed from her?  No.
32
33  SP:  Okay.  Do you - what's your present day relationship like with her?
34
35  WA:  It's better.

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 104

1  SP:  How often does she come visit?
2
3  WA:  Once a month.
4
5  SP:  And how often does - how else do you communicate with her?
6
7  WA:  Well, we write - she'll send me cards and, you know.  But most of
8       our communication is done when she comes to visit me and she
9       spends four hours with me.
10
11  SP:  How many - how much visitation time are you allowed to get in a
12       month, or in a week?
13
14  WA:  In a week is four hours per week.
15
16  SP:  And you can't - you can't - it's got to be used that week and that's
17       it?
18
19  WA:  Right.
20
21  SP:  Okay.  What about phone?
22
23  WA:  15 minutes.
24
25  SP:  How - how -
26
27  WA:  Per week.
28
29  SP:  Per week?
30
31  WA:  Yes.
32
33  SP:  Okay.
34
35  ////////////////////////////////////////////////////////

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 105

1   WA: So that - and that really isn't enough to even get into a
2        conversation, so that's why I say most of our conversation is when
3        she comes to see me.
4

5   SP: Okay. What about before - before your arrest, what was - what was
6        your relationship like with her?
7

8   WA: The same as my whole time growing up. My mom has always been
9        present in my life and she's always been around. She did lots of
10       things with Joe and I, would go on trips with us, so she was always
11       around but very not - how do I explain it? But not emotionally
12       there and not - I don't know how to explain, it's -
13

14  SP: Okay.
15

16  WA: Like I couldn't sit down and talk to her if I had a problem. I
17       couldn't - we didn't ever have - we had social conversation, we
18       didn't have life conversation.
19

20  SP: All right. Do you recall anything about your - what - well first of all,
21       was Skip married to your mom?
22

23  WA: Yes.
24

25  SP: Okay. Do you recall anything about their - their relationship?
26

27  WA: I don't.
28

29  SP: Okay. And then mom eventually meets -
30

31  **<u>Adoptive Father:</u>**
32

33  WA: Alejo.
34

35  SP: Alejo, okay. And you're how old when mom meets Alejo?

Transcript of Forensic Psychiatric Evaluation
Re: Wendi Elizabeth Andriano
November 26, 2013
Page 106

1   WA:  Young.  I don't know the age, but young.
2
3   SP:  And then they ultim -
4
5   WA:  Because my actual - probably - like right after my grandma I feel
6        like he was there.
7
8   SP:  Okay.  So - so Alejo is the father figure for you, correct?
9
10  WA:  Yes.  Yes.
11
12  SP:  And - and - and Alejo is still alive?
13
14  WA:  Yes.
15
16  SP:  And Alejo's last name again is?
17
18  WA:  Ochoa.
19
20  SP:  Och - Ochoa.  And that's the name you end up taking?
21
22  WA:  Yes.  I do believe that like they did some adoption process.
23
24  SP:  Right.
25
26  WA:  And I got his last name legally.
27
28  SP:  Okay.  So he's how old now?
29
30  WA:  Well, he's a couple years younger than my mom.
31
32  SP:  And mom and him are still together?
33
34  WA:  Yes.
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 107

1    SP:   Okay.  And how far in school did Alejo go?
2
3    WA:   Well, I know he graduated high school and I know he's taken come
4            college, but I don't know.
5
6    SP:   Okay.
7
8    WA:   How much.  I think he has and actually I don't know for a fact.
9
10    SP:   What kind of work does he do?
11
12    WA:   He's disabled.
13
14    SP:   From?
15
16    WA:   An injury to his back.
17
18    SP:   Okay.  What kind of work did he do?
19
20    WA:   Well, he was in the church as a church leader for most of my
21            growing up and then later on - well, I think he did landscaping and
22            I think he did house construction also.
23
24    SP:   What - what's his - what's his cultural background?
25
26    WA:   Latino.
27
28    SP:   Okay.  What - does he have - how is his health?
29
30    WA:   He's not well.
31
32    SP:   What - what - what - she's signaling that there's lunch there?
33
34    WA:   Yeah.
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 108

1   SP:  Okay.  Let me just finish up this -
2
3   WA:  Yes.
4
5   SP:  Section, if you don't mind.
6
7   WA:  That's fine.
8
9   SP:  He - what - what - what - what's medically wrong with him?
10
11  WA:  Well, I don't know the exact details but I just know he's not doing
12       well.
13
14  SP:  Okay.  Does he have any psychiatric or emotional problems?
15
16  WA:  Not that's been officially diagnosed.
17
18  SP:  Drug or alcohol problems?
19
20  WA:  No, but I know he's on a lot of pain pills so -
21
22  SP:  And he's how old again about?
23
24  WA:  Well, I feel like he's two years younger than my mom or something
25       like that.
26
27  SP:  And she's how old you said?  60 -
28
29  WA:  64.
30
31  SP:  64.  And has he been in trouble with the law?
32
33  WA:  Not that I'm aware of.
34
35  ///////////////////////////////////////////////////////////////////

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 109

1    **Relationship Growing Up With Adoptive Father:**
2
3    SP:   And this is what started this whole thing is we were talking about
4          your relationship growing up.
5
6    WA:   Oh, okay.
7
8    SP:   With him.
9
10   WA:   Oh.
11
12   SP:   And - and so -
13
14   WA:   He was my best friend growing up.
15
16   SP:   Okay.  Were you and him sexually involved?
17
18   WA:   Well, I - what I - what I remem - I don't believe so.  I don't know.
19         Okay.  He's a very sexual person, like everything has something to
20         do with something sexual.
21
22   SP:   Okay.
23
24   WA:   Every joke he tells, all the conversations, I don't know.   And
25         growing up, that seemed normal to me.
26
27   SP:   What?
28
29   WA:   Just the - his like overly sexualized behavior just seemed normal to
30         me so I could -
31
32   SP:   But -
33
34   WA:   I didn't - I don't know.
35

Transcript of Forensic Psychiatric Evaluation
Re: *Wendi Elizabeth Andriano*
November 26, 2013
Page 110

1   SP:  But did you have a sexual relationship with Alejo?
2
3   WA:  No.
4
5   SP:  Did sex - did Alejo ever fondle you or touch you in a sexual way?
6
7   WA:  Not that I remember.
8
9   SP:  Did you ever perform fellatio on Alejo?
10
11  WA:  Not that I remember.
12
13  SP:  Did you ever - were you ever in any type of sexually intimate
14       relationship with Alejo?
15
16  WA:  Not that I remember.  I - I would say emotionally, yes.   But
17       physically, I don't know.  I don't remember that.
18
19  SP:  Okay.  Did - I read something, and I think it's about him, and you -
20       you correct me if I'm - if this sounds right.  I think I read something
21       where you visited with him or he took you along to - to different
22       kinds of stores that had intimate apparel and sex toys?  Is that - am
23       I right about that?
24
25  WA:  Right.
26
27  SP:  Do you remember that?
28
29  WA:  I - I don't specifically remember that.
30
31  SP:  Okay.  Well, let's stop there.  Let's stop for a second there.
32       Because early on when we were talking about the offense we went
33       through what you know, what you know you know -
34
35  WA:  I know.

Transcript of Forensic Psychiatric Evaluation
Re: Wendi Elizabeth Andriano
November 26, 2013
Page 111

1    SP:  And what you remember.  So my ques -
2
3    WA:  I don't - I do not remember physically going inside a store.  That -
4         an adult themed store with him.
5
6    SP:  What about going inside an intimate -
7
8    WA:  Oh, and that's - you know what, I do remember going into some
9         like - I don't know what you want to call it, I think it was like a
10        Frederick's of Hollywood or something.
11
12   SP:  Right.  And -
13
14   WA:  I do remember that.
15
16   SP:  And for what purpose?
17
18   WA:  I don't remember what the purpose was.
19
20   SP:  Did you ever sleep naked in the bed with him?
21
22   WA:  No, not that I know of.
23
24   SP:  Did you ever sleep naked in the bed with him and your mom?
25
26   WA:  Not that I know of.
27
28   SP:  Did you ever sleep naked in the bed with him and someone else?
29
30   WA:  Not that I know of.
31
32   SP:  And "him" I mean Alejo.
33
34   WA:  Right.  Not that I am aware of.
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 112

1    SP:  So you have no -
2
3    WA:  I don't remember.
4
5    SP:  You don't remember?
6
7    WA:  I don't.
8
9    SP:  So was Alejo - and I'm almost done with this thread.
10
11   WA:  That's okay.
12
13   SP:  I don't want to - I don't want to keep you from lunch.
14
15   WA:  No, it's okay.
16
17   **Mother and Adoptive Father's Relationship:**
18
19   SP:  Did - what was your - what was Alejo's relationship like with your
20        mom?
21
22   WA:  Well, I don't think it was good.  They used to - lots of fighting and
23        arguing and me being put in the middle of it.
24
25   SP:  Police ever come out?
26
27   WA:  No.
28
29   SP:  Was Alejo running around on your mom?  By that I mean was he
30        cheating on her?
31
32   WA:  Oh, I don't know.
33
34   SP:  Was your mom cheating on him?
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 113

1    WA: No, not that I know of.
2
3    SP:  Did - did Alejo beat your mom?
4
5    WA: No.
6
7    SP:  Hit your mom?
8
9    WA: No.
10
11   SP:  Throw things at your mom?
12
13   WA: Yes.
14
15   SP:  Break things?
16
17   WA: Yes.
18
19   SP:  Did he ever get physical with her?
20
21   WA: Not that I saw.
22
23   SP:  And they're still together, correct?
24
25   WA: Yes.
26
27   SP:  When was the last time you saw him?
28
29   WA: It's been a while, like maybe a year or so.
30
31   SP:  When was the last time you talked to him?
32
33   WA: It's been a while.  I don't know.
34
35   SP:  Well, when was the last time you communicated by writing?

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 114

1    WA:  Well, I did send him a Father's Day card because -
2
3    SP:  Why is that upsetting you?
4
5    WA:  It just does.
6
7    SP:  I think you said this, and - and correct me if I'm - I'm wrong.  I
8         asked you if he had any psychiatric or emotional history and you
9         said words to the effect of - these are my words, nothing official.
10        You didn't use that word.  But do you think he has psychiatric or
11        emotional problems?
12
13   WA:  I do now.
14
15   SP:  What do you think his problems are?
16
17   WA:  I don't - I'm not qualified to say, but there's something going on.
18
19   SP:  Like what?
20
21   WA:  I don't know.  I'm not - I - I don't know.
22
23   SP:  Well just - just - I'm not asking you to be a psychiatrist or a
24        psychologist, I'm just asking just as a lay person, what do you see?
25        What do you - what makes you think there's a problem?
26
27   WA:  I guess I would say because of how he handles situations and his -
28        either how he - just how he handles problems.
29
30   SP:  Like give me an example.
31
32   WA:  I don't - I can't think of - okay, so earlier I talked about religion and
33        how if you don't have food to feed your family, I know now that you
34        don't just sit there and pray and expect God to bring it to you.  And

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 115

1  yet, that's the belief.  So somebody who has chosen to live a life
2  that way and have children and live that way, something's wrong.
3
4  SP:  Okay.  What would you - how would -
5
6  WA:  I can see - like I was raised in it so I get it, but he wasn't raised in
7  it.  He chose to adopt that belief as an adult.
8
9  SP:  How - how would - how would you - you were - were you like the
10  peace keeper?
11
12  WA:  Yes.
13
14  SP:  The - in the family between Alejo and your mom?
15
16  WA:  Yes.
17
18  SP:  And how would you - how would you -
19
20  WA:  Even - even as an adult they would bring their issues to me and
21  instead of talking to each other about it, it was brought to me and
22  so I would - and not even for advice but just to share in their - their
23  - take their side.
24
25  SP:  I see.
26
27  WA:  Yeah, it was -
28
29  SP:  Okay.  I tell you what, it's - it's 11:10, and there's lunch waiting out
30  there for you.  So what I'm going to do is this, is I'm going to stop
31  this equipment.  When you're - I'm assuming they want you to eat
32  out there, is that it?  When you're ready to come back in, let me
33  know, knock on the door, take your time, and I'll start the
34  equipment back up.
35

Transcript of Forensic Psychiatric Evaluation
Re: Wendi Elizabeth Andriano
November 26, 2013
Page 116

1    WA:  Okay.
2
3    SP:  Does that sound okay?
4
5    WA:  Okay.
6
7    SP:  So it's - I'm just going to mark the time.  It's 11:10.  And once you
8         walk out of here I'm going to shut this off.
9
10   WA:  Okay.
11
12   SP:  All right?
13
14   WA:  Okay.
15
16   SP:  And then like I said just knock on the - knock on the door when
17        you're ready to come back in.
18
19   WA:  Okay.
20
21   [Break]
22
23   SP:  Okay, the time - okay, the time is 11:32, and Ms. Andriano is back
24        from lunch.  Ms. Andriano, you would agree that - that during the
25        break other than me asking you if you were ready to come back in
26        and you telling me that you were waiting for some water, that we
27        didn't have any conversation, correct?
28
29   WA:  Correct.
30
31   SP:  Okay.  All right.  So you were talking about - and you have - you
32        have a cup of water, right?
33
34   WA:  Yes.
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 117

1   SP:   Okay.  We were talking about the relationship with your stepdad, do
2         you remember?
3
4   WA:   Yes.
5
6   **ISSUE RE: CULPABILITY - PART I:**
7
8   SP:   Okay.  Do you in any way hold your stepdad accountable for your
9         current predicament?
10
11  WA:   No.
12
13  SP:   Do you in any way hold your stepdad's actions no matter how
14        potentially inappropriate they may have been, or allegedly how
15        inappropriate they may have been, for the actions that resulted in
16        your arrest?
17
18  WA:   No.  It's not for me to hold anybody accountable but myself.  I
19        really believe that every person, everybody is who they are.  They
20        make the decisions that they make because they feel that that's the
21        right decision.
22
23  SP:   Okay.
24
25  WA:   However bad it may be or - or not healthy or not good for
26        somebody else, they - you know, you can't - I can't - I can't hold
27        anybody accountable for anything that's happened to me because
28        it's my life and I still am the one ultimately who chooses.
29
30  SP:   Okay.  So with - with - with that - having - having now said that,
31        earlier when we were - we were talking, you were saying there's a -
32        again I'm paraphrasing here a little bit, but you essentially said
33        there was a whole bunch of things that came out afterward,
34        meaning after your conviction, that you just wanted a jury to hear.
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 118

1   WA:  Explanations.
2
3   SP:  Ex - explanations.  And if -
4
5   WA:  But not trying to put -
6
7   SP:  Wait, wait, wait, let me finish.  And - and explanations that you
8        wanted the jury to hear and if the jury hears them and they come
9        back the same way then so be it, correct?
10
11  WA:  Well of course.
12
13  SP:  All right.
14
15  WA:  That's the system, yeah.
16
17  SP:  Okay.  So what are the things - what are the things that came out
18       that you think are - are important by way of explanation that help
19       us better understand your actions that occurred on or around
20       October 8 of 2000?
21
22  WA:  Well, I know that during my trial, or it was presented to the jury
23       that I had this happy great childhood, which is not true.  That - I
24       don't know, it's so hard for me - I don't -
25
26  SP:  Well I tell you what -
27
28  WA:  Like I don't have any list of things, I don't know, I just -
29
30  **DEFENDANT'S DESCRIPTION OF HER CHILDHOOD:**
31
32  SP:  Well - well I - I would like a list, but if you can't come up with a list,
33       let - let me - let's talk about the childhood piece and maybe others
34       will come back to you or maybe some of my questions will - will jog
35       your memory.  Okay?

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 119

1    WA: Okay.
2
3    SP:  What - what - so how would you describe your childhood then?
4
5    WA: Not appropriate, pretty stressful.  I think it was abusive.  I think
6         that I was not prepared to - or I was not raised in a way that would
7         really prepare me to go be a healthy adult, to make good decisions
8         on my own.  That - just - I don't - it - I think the job of parents is
9         to help a child become a responsible, wise, healthy adult and that
10        did not happen.
11
12   SP:  Okay.  So let's kind of break these down.  You said your childhood
13        was not appropriate.
14
15   WA: Right.
16
17   SP:  What was not appropriate about your childhood?
18
19   WA: Oh my goodness.  Well, I think the overriding the whole religious
20        aspect of it, which was a part of everyday decision making and life.
21        It was I think extreme.  It was not - it doesn't teach somebody how
22        to be a - a responsible adult.  You put everything off on God and
23        you don't make good decisions.  And my parents, like, they're
24        fighting all the time and - and this - all this sexual stuff with Alejo
25        and then my mom not being there emotionally and worrying about
26        adult things as a child.  I - it's - having to always be in the middle
27        of everything and -
28
29   SP:  Any other ways?
30
31   WA: That's all I can think of off the top of my head.
32
33   SP:  So how was it pretty stressful?
34
35   WA: I just said how.  I don't - I really -

Transcript of Forensic Psychiatric Evaluation
Re: Wendi Elizabeth Andriano
November 26, 2013
Page 120

1    SP:   Well, you told me how it was pretty - you told me how it was not
2          appropriate.
3
4    WA:   Yeah, but stressful too.  I said about having to be a child and worry
5          about adult things, being put in the middle of my parents' fighting,
6          the sexualized nature, I mean that - that's very stressful.
7
8    SP:   Give me an example of the sexualized nature.
9
10   WA:   The - okay, so in everyday life it seems to me that I remember
11         everything - not everything, but a lot of just normal everyday
12         occurrences being made out to be something sexual.  And then - I
13         don't know how to explain it.
14
15   SP:   Can you give me an example?
16
17   WA:   I'm trying to.  So as an adult I could be talking to somebody and
18         maybe you'll say something that could refer to - I don't know, I
19         can't think of a specific example right now.  I'm sorry, I can't think
20         of details.  I don't know, just in - just in conversation, just every -
21         just there was always - if somebody was eating a lollipop or a
22         popsicle or something and - and how that would be funny and - and
23         now in - in a sexual way.  And I don't know how to tell you the
24         exact conversation because I can't repeat it, I don't recall, you
25         know.
26
27   SP:   Okay.
28
29   WA:   But I mean just - just everyday occurrences; playing basketball and
30         something about the ball referring to male parts.  I mean just - just
31         things -
32
33   SP:   Okay.  How was it abusive?
34

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 121

1  WA: Are you asking me that when an adult talks about sexual things
2  with a child how is that abusive?
3

4  SP: No.  What I'm saying to you is you said your childhood was "not
5  appropriate," it was "pretty stressful," it was "abusive," and you
6  were - it was such that you were not ready to be a "healthy adult,"
7  "to make good decisions" on your own.  Those were essentially what
8  you told me.
9

10  WA: Okay.
11

12  SP: Okay.  So I'm asking you, I've moved on now, how was your - how
13  was your childhood abusive?
14

15  WA: Okay.  Some of - when - when you're hungry, I think that's abusive
16  if you're not feeding your child.  If you are spanking them, I feel like
17  that's abusive.  If you're not there for them emotionally, I think that
18  that's emotionally abusive.  If you're not - I think if you're raising
19  them in a sexually whatever environment, that's abusive.   You
20  know.
21

22  SP: Okay.  What - what about the child - hang on.  What - that was just
23  an overhead mic.  What about - what about the - what - as you look
24  back, and maybe you've already said this, what about your
25  childhood made you not ready to be a healthy adult, to make good
26  decisions on your own?
27

28  WA: Well gosh, that's - I think a lot of the things that I've said before
29  would answer that question.  I mean it - it's - when - I don't know
30  how to give you more details.
31

32  SP: Let - let's - let's -
33

34  WA: What are you wanting from me?
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 122

1    SP:  Well -
2
3    WA:  I'm feeling like -
4
5    SP:  Well I just want the truth.  And -
6
7    WA:  Well, and I'm -
8
9    SP:  And - and if you can't answer the question then - then so be it.  But
10        let me - let me try - try asking this a little bit differently.  Let's
11        assume that everything you're telling me is - is correct, that your
12        childhood wasn't appropriate, that it was pretty stressful, that it was
13        abusive.   How does - how does that, all those things together
14        collectively explain the choices that you made on October 8, 2000,
15        as it relates to killing your husband?
16
17   WA:  Well, I don't know that that's for me to decide because I'm not
18        qualified to do - I don't - haven't had the schooling to do all that.
19        I can just answer questions and then somebody else makes that
20        decision.  Because I can just tell you how my childhood was, and I
21        know now as an adult I've had to really re-learn a lot of things.  I've
22        had to - I don't know, I feel like I've almost had to start from
23        scratch.
24
25   **ISSUE RE: DEFENDANT'S APPRECIATION OF WRONGFULNESS -**
26   **PART III:**
27
28   SP:  Well, do you think the abusive childhood is - is - using your words
29        as you describe it, do you think that didn't allow you to appreciate
30        the wrongfulness of your actions?
31
32   WA:  No.  No, I almost feel like there's this environment that it's okay to
33        do wrong things for right reasons.
34
35   SP:  Okay.

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 123

1    WA:  And -
2
3    SP:  Do - do you think that you're not - the childhood you said that was
4         not appropriate somehow kept you from appreciating the
5         wrongfulness of your actions on October 8, 2000?
6
7    WA:  I don't know. I just - I don't know. I - I - I understand what you're
8         asking. I - I guess I understand what you're asking me, but I don't
9         - it - that - I don't know. It is what it is. My childhood is what it is.
10        And if - I mean all the events that you go through, every day that
11        you've lived lead up to a point where you make decisions that you
12        make. And apparently I was not making very good decisions at all.
13        I mean so you're sitting here asking me, "Well, did your childhood
14        affect that?" Of course it did. That's how I was raised.
15
16   SP:  Okay, well -
17
18   WA:  I don't understand.
19
20   SP:  Well, it's not - I'm not - I'm not quibbling with you about the effect.
21        What I'm - what I'm to understand is do you think it inhibited your
22        ability to appreciate wrongfulness?
23
24   WA:  Well, I think everybody's perspective of life it affects. How you're
25        raised affects how you make decisions and how you respond to
26        thinks. Of course. I mean I don't - I don't know. I don't know
27        what you're - I - I know it was wrong what I did. I'm sitting here
28        today, and I've said it to you probably 50 times. I don't understand
29        what more you're asking me.
30
31   SP:  Okay. Well, here's -
32
33   WA:  I'm feeling really defensive right now because I feel like you're
34        pushing me for something that I don't understand what you want
35        from me.

Transcript of Forensic Psychiatric Evaluation
Re: Wendi Elizabeth Andriano
November 26, 2013
Page 124

1    SP:  Well, I don't think I'm - I'm pushing you at all.
2
3    WA:  Okay.
4
5    SP:  I think I'm - I'm just trying to understand -
6
7    WA:  Well you keep asking about this wrongfulness.  I know what - it was
8         wrong.  Why did I make the decisions I made?  I don't know.  I
9         don't know why.  All I can do is look at the life and this is how
10        circumstances were and that's why I made the decision I made, so -
11
12   **ISSUE RE: CULPABILITY - PART II:**
13
14   SP:  So do you - do you - this is what I'm trying to understand.  Do you
15        blame -
16
17   WA:  I don't blame anybody.
18
19   SP:  Well let me finish my question.  Do you blame the circumstances of
20        your childhood, of Alejo being this sexualized person, of the abuse
21        that you talked about, of the stressfulness, do you blame those -
22        those things that you're claiming took place in your childhood as -
23        as what drove you to kill your husband on October 8, 2000?
24
25   WA:  I've never said that and I don't blame any - anybody, anything.
26
27   SP:  So you accept responsibility?
28
29   WA:  But I think - I think that if you're going to sentence somebody to
30        die, I feel like everything should be explained, reality should be
31        presented as it is and as it was and then make a decision.
32
33   SP:  Okay.
34
35   ////////////////////////////////////////////////////////////////

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 125

1   WA: And that did not happen in my trial and so I just would like for
2        everything to be explained first and then -
3
4   SP: I - I understand.  I totally -
5
6   WA: I mean -
7
8   SP: No, no.  No, wait a minute.
9
10  WA: I don't blame.  I know that it was wrong.  I accept responsibility.
11
12  SP: Okay.  Well, do you understand why I'm asking that question?
13
14  WA: I don't.  I don't.  I guess maybe that's why I'm like why - and you
15       keep asking it and so I'm not - I don't know what you want from
16       me.
17
18  SP: Well, I - well I'm asking it because I've read reports from - from
19       other experts who have evaluated you who are - who are essentially
20       blaming a number of - of these things that happened in your
21       childhood on - on the actions that took place on October 8, 2000.
22       That's why I'm asking.  I'm just trying to understand it.  Have you
23       read those reports?
24
25  WA: No, I have not.
26
27  SP: Okay.
28
29  WA: That's their job.  That's - they're a professional just like you are and
30       you evaluate somebody's childhood, somebody's whatever, how
31       they're raised, what their thinking is.  I don't know.  And then you
32       guys make that decision, I don't.  So you're asking me if I do.  I
33       don't.  That's not my place to.  I'm not a - I'm not a psychiatrist.
34       I'm not a psychologist.
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 126

1   SP:  I'm -
2
3   WA: I don't know.
4
5   SP:  I'm not - I'm not asking you as a psychiatrist or as a psychologist.
6
7   WA: I just would like to be judged on the facts, that's all.
8
9   SP:  Well, what are the facts?
10
11  WA: The facts are that the way - the way things were presented in trial
12      were not accurate.  And so let's try again.
13
14  SP:  Okay.  And the parts that weren't presented as accurate were your
15      childhood?  What else?
16
17  WA: I don't - I don't have a list of them right now.  I - I know my
18      lawyers filed that with the court.  I don't - I can't think of what they
19      are right now.
20
21  **PERSONAL HISTORY - PART II:**
22
23  **Juvenile Behavioral History:**
24
25  SP:  Okay.  Speaking of childhood, were you - did you ever have any
26      trouble with the law as a juvenile?
27
28  WA: No.
29
30  **Childhood Interests:**
31
32  SP:  Okay.  And - and what were your interests as a kid?
33
34  WA: Probably music and swimming and I liked school, I liked to read.
35      That's about it.

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 127

1   **Socioeconomic Upbringing:**
2
3   SP:   Okay.  And then it sounds like - you've mentioned this a few times,
4         I want to make sure I have it right.  It sounds like the - how would
5         you - it sounds like the socioeconomic upbringing you were raised
6         in was - what would you call, lower class?
7
8   WA:  Yes.
9
10  SP:   And - because at times it sounds like you were worried about when
11        you were going to get a meal?
12
13  WA:  Uh-huh.
14
15  SP:   True?
16
17  WA:  Yes.
18
19  SP:   What about shelter?
20
21  WA:  Yes.
22
23  SP:   Okay.
24
25  WA:  Up to a point.
26
27  **Geographical History:**
28
29  SP:   You were born in Groom, Texas?
30
31  WA:  Right.
32
33  SP:   And then how do you end up in Arizona?  How does -
34
35  ////////////////////////////////////////////////////////////////////

Transcript of Forensic Psychiatric Evaluation
Re: Wendi Elizabeth Andriano
November 26, 2013
Page 128

1    WA:  I don't know.  I don't - I - I guess my mom, that was her decision.
2         I don't know why.
3
4    SP:  Okay.  How old were you when you moved here?
5
6    WA:  Well, I don't remember moving here so it had to be before - I don't
7         know.
8
9    SP:  Okay.  And then have you lived here your whole life?
10
11   WA:  No.
12
13   SP:  Okay.  Where - where else have you lived?
14
15   WA:  In California.
16
17   SP:  Okay.  And where did you -
18
19   WA:  Well, we lived in vehicles in California -
20
21   SP:  Right.
22
23   WA:  And drove around all over the place.  So -
24
25   SP:  Okay, did -
26
27   WA:  I don't really know where.
28
29   SP:  Did you ever have a permanent - set up a permanent residence
30        anywhere in California?
31
32   WA:  No, we lived in vehicles.
33
34   SP:  Okay.  And this is while you were doing the church work?
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 129

1    WA:  My parents were, yeah.
2
3    **EDUCATIONAL HISTORY:**
4
5    SP:  Your parents were.  So - okay.  So that actually gets me to the next
6         question that - and I think I know a portion of the answer to this,
7         but I - I didn't fully appreciate it.  Talk to me about your schooling.
8         You end up graduating high school, correct?
9
10   WA:  Yes.
11
12   SP:  From where?
13
14   WA:  Harvest Christian Academy.  It was the church school.
15
16   SP:  And where was that?
17
18   WA:  In Casa Grande.
19
20   SP:  Okay.  And I read though - I thought I read that you were home
21        schooled?
22
23   WA:  I was.
24
25   SP:  For what - from when to when?
26
27   WA:  Maybe like what would've been normally first grade up until I was -
28        gosh, I don't know if I was 10 or 11 or so.
29
30   SP:  Okay.  And then who did the home schooling?
31
32   WA:  My mom did.
33
34   SP:  Okay.
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 130

1   WA: I think.
2
3   SP: Did - did - but -
4
5   WA: So let me say - let me finish answering this.  My mom I know has
6        told me that she did the home schooling while we were living in
7        these vehicles.  I don't really remember any structured learning or
8        anything.  So I don't - I can't say to you that I know my mother
9        schooled me.
10
11  SP: Okay.  But - but at some point the home schooling stops and -
12
13  WA: Uh-huh.
14
15  SP: You end up in like -
16
17  WA: In the church school.
18
19  SP: At the - it's church academy - I'm - I'm missing a word.
20
21  WA: Right.  Harvest Christian Academy.
22
23  SP: Bright - Bright Harvest?
24
25  WA: Huh?
26
27  SP: What's it called?
28
29  WA: Just Harvest Christian Academy.
30
31  SP: Oh.  Harvest Christian Academy.  And how many kids were in your
32        graduating class?
33
34  WA: I was the only one.

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 131

1    SP:  Okay.
2
3    WA:  Yeah.
4
5    SP:  How many kids went to the school?
6
7    WA:  I think the numbers fluctuated according to church attendance.  And
8         so sometimes there were between kindergarten and high school
9         there might - I think the highest number I ever remember was
10        about 60 children.  But then sometimes it would drop to 20.
11
12   SP:  And how many were like in your grade?
13
14   WA:  Well, I was the only one in my grade because I -
15
16   SP:  Well - right.  You said you were the only one that graduated, but
17        how - were there - was it - it wasn't a good question.  How many -
18        were there different times when there was more than just you in
19        your grade?
20
21   WA:  No.  There were a couple who were ahead of me so the entire high
22        school would've been in one room.  And in - within the room was
23        about anywhere from 8 to 12 people.
24
25   SP:  Got it.
26
27   WA:  And then we each - like the year after me where two people
28        graduated.
29
30   SP:  Was there like sports or extracurricular activities?
31
32   WA:  I was - they did have a track team and a swim team and I was part
33        of the swim team.
34
     SP:  And what did you swim?

Transcript of Forensic Psychiatric Evaluation
Re: Wendi Elizabeth Andriano
November 26, 2013
Page 132

1   WA: Freestyle, long distance.
2
3   SP:  Okay.  Did you have any schooling after high school?
4
5   WA: Yes.  I went to the community college there a little bit.
6
7   SP:  What's that?
8
9   WA: Well actually - actually during high school I went.
10
11  SP:  Is that Central Arizona Community College?
12
13  WA: Yes.
14
15  SP:  Okay.  And what did -
16
17  WA: And then - I don't even remember what classes I took there, but I
18      took some classes there and then - then I ended up going to Mexico
19      on a - like a missionary trip.  So I did that.  And then it wasn't until
20      I came back and had a full time job that I started taking some
21      University of Phoenix classes at night.
22
23  SP:  So do you - do you have a college degree?
24
25  WA: I do not.
26
27  SP:  How much col - how many college credits do you think you have?
28
29  WA: Well, I remember - it's hard to say because the University of
30      Phoenix works a little bit differently, but I was signed up for one of
31      their programs and I know that I had like a year left of - with them
32      and I could've had my Bachelor in something, and I can't remember
33      what it was, but -
34

///////////////////////////////////////////////////////////////////////

Transcript of Forensic Psychiatric Evaluation
Re: Wendi Elizabeth Andriano
November 26, 2013
Page 133

1    SP:  Do you remember what you were taking up, what you were
2         studying?
3
4    WA:  It was some business classes, and I don't remember the official title
5         of the degree.
6
7    SP:  Okay.  Do you have any vocational educational training?
8
9    WA:  No.
10
11   SP:  Okay.
12
13   WA:  Well, I took real estate classes.  I don't know if that counts.
14
15   SP:  Did - did you get a real estate license?
16
17   WA:  No.  I took all the classes and then I did not go take the test.
18
19   SP:  How come you didn't do - how come that happened?
20
21   WA:  Life interfered.
22
23   SP:  How?
24
25   WA:  It was right around the time that Ashlee was being born and we had
26        found out that my husband had cancer and not just benign tumors.
27
28   SP:  I see.  So did you grow up in Casa Grande?
29
30   WA:  I would say yes, from the time of like 10-11.
31
32   SP:  To - to when?
33
34   WA:  Until - until after my marriage.

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 134

1
2
3

SP: Okay.  And - and help me - I - I've heard people say Casa Grande and Casa Grande.  What - what's the correct -

4
5
6

WA: I don't know what the correct - I mean - oh, I guess the correct is Casa Grande, but everybody just says Casa Grande.

7
8
9

SP: Okay.  All right.  Do you - did you prior to your arrest own any weapons?

10
11

WA: No.

12
13

SP: Were there guns in the house?

14
15

WA: Yes.

16

SP: What - what kind of - what kind of firearms were in the house?

17
18
19

WA: I don't know, but Joe had a gun collections.

20
21

SP: Did you ever - did you ever fire any of them?

22
23
24

WA: I don't think - I think I would go with him, but I - no, I wasn't interested in firing them.

25
26

SP: Did you ever discharge a firearm?

27
28
29

WA: Gosh.  I can't say for certain that I've never done it once or twice, but I don't really remember.

30

**MEDICAL HISTORY PRIOR TO OCTOBER 8, 2000:**

31
32
33
34

SP: Okay.  Before - before October 8, 2000, what types of medical problems, if any, did you have?

WA: None that I know of.

Transcript of Forensic Psychiatric Evaluation
Re: Wendi Elizabeth Andriano
November 26, 2013
Page 135

1    SP:  Were you ever in the hospital overnight for anything?
2
3    WA:  Just to have my babies.
4
5    SP:  Were you ever - were they c-section or?
6
7    WA:  No.
8
9    SP:  Vaginal delivery?
10
11   WA:  Uh-huh.
12
13   SP:  Yes?
14
15   WA:  Yes.
16
17   SP:  Did you ever have any broken bones?
18
19   WA:  No.
20
21   SP:  Any stitches?
22
23   WA:  I don't think so, no.
24
25   SP:  Did you ever contract a sexually transmitted disease?
26
27   WA:  No.
28
29   SP:  Okay. And you said you don't - you were never hospitalized for any
30         head injury or any head trauma?
31
32   WA:  No.
33
34   SP:  And you don't recall ever being - losing consciousness I believe,
            correct?

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 136

1   WA: Not that I know of.

2

3   **MEDICAL HISTORY SUBSEQUENT TO OCTOBER 8, 2000:**

4

5   SP: What about since your arrest, since October 8, 2000, have you
6       encountered any medical problems?

7

8   WA: I don't think so.

9

10  SP: Okay. Have you been diagnosed with any medical conditions?

11

12  WA: Does that include the psychia -

13

14  SP: No.

15

16  WA: Or the whatever?

17

18  SP: But I'm - I'm glad you asked. I'm glad you asked me. No, other
19      than psychiatric.

20

21  WA: No.

22

23  **SUBSTANCE USE HISTORY:**

24

25  SP: Okay. You mentioned that sometimes - first of all you mentioned
26      two things earlier. I think one was that you didn't do illegal or illicit
27      drugs, correct?

28

29  WA: Correct.

30

31  SP: Did you ever smoke marijuana?

32

33  WA: No.

34

35  SP: Used LSD?

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 137

1   WA:  No.
2
3   SP:  PCP?
4
5   WA:  No.
6
7   SP:  Crystal meth?
8
9   WA:  No.
10
11  SP:  What about since you've been here, have you used -
12
13  WA:  No.
14
15  SP:  Well let me finish -
16
17  WA:  I don't - absolutely not.
18
19  SP:  Okay.  So let me just finish the question so that it's clear.  You're
20       saying that since you've been incarcerated you have not used any
21       illicit drugs?
22
23  WA:  Never.
24
25  SP:  Correct?
26
27  WA:  Correct.
28
29  SP:  Okay.  And then what about - now alcohol it sounds like you've
30       drank in the past?
31
32  WA:  Yes.
33
34  SP:  Okay.  What's your drink of choice?

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 138

1   WA: I would just - wine and wine coolers, that - anything fruity.
2
3   SP:  Did you used to drink to intoxication?
4
5   WA: Yes, I would.
6
7   SP:  Did anyone ever ask you to cut down on your drinking?
8
9   WA: No.
10
11  SP:  Did any - you ever wake up somewhere and not know how you got
12       there as a result of your drinking?
13
14  WA: No.  Thankfully I always had somebody around me who looked out
15       for me.

17  SP:  Did anyone ever ask you to cut down on your drinking?
18
19  WA: No, sir.
20
21  SP:  Did you ever drink in the morning -
22
23  WA: No.
24
25  SP:  To take the edge off from the night before?
26
27  WA: No.
28
29  SP:  Did you used to drink alone?
30
31  WA: I have, yes.
32
33  ////////////////////////////////////////////////////////////////
34  ////////////////////////////////////////////////////////////////
5   ////////////////////////////////////////////////////////////////

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 139

1   **PSYCHIATRIC HISTORY SUBSEQUENT TO OCTOBER 8, 2000 -**
2         **PART II:**
3
4   SP:   Okay.  We talked about your psychiatric history before October 8,
5         2000.  Since you've been - since your arrest, since October 8, 2000,
6         I asked you this earlier but I - I want to kind of come back to it.
7         What is it that - but - what is it that you understand your
8         psychiatric condition or conditions to be?  One thing you said earlier
9         was bipolar.
10
11  WA:   Right.
12
13  SP:   Do you believe you have any other psychiatric conditions?
14
15  WA:   Do I believe I do?
16
17  SP:   Yes.
18
19  WA:   Well, I can't diagnose myself.  So I'm not sure what you - I mean
20        I've been told that I do.
21
22  SP:   Fair enough.  I thank you for the clarification.
23
24  WA:   Yeah, I - I -
25
26  SP:   What - what have - what have you been told?
27
28  WA:   And I don't remember what they were, I just remember there was
29        a list of some things.
30
31  SP:   But as you sit here today you don't know what your other conditions
32        are?
33
34  WA:   No, I've never tried to memorize what they are.

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 140

1   SP:   Okay.
2
3   WA:   I don't know.
4
5   SP:   I think something I've seen is that some people say you have
6         Posttraumatic Stress Disorder?
7
8   WA:   Oh, I have heard that, yes.
9
10  SP:   What is - what is that?  What do you know that condition to be?
11
12  WA:   Well, I only - I know from - from hearing about it with the military
13        people, that they go through something traumatic and then they
14        have trauma from it.
15
16  SP:   And do you believe you have that condition?
17
18  WA:   I don't - I would - I don't know.
19
20  SP:   But you've been told you do?
21
22  WA:   Yes, I have been told that.
23
24  SP:   What - what do you believe the trauma was that you went through?
25
26  WA:   I don't know that either.
27
28  SP:   What do you believe the diagnosis is based on?
29
30  WA:   I don't - I've never asked, so I don't know.
31
32  SP:   Okay.  Now, earlier you talked about how before October 8, 2000,
33        there were times when you felt like you just needed to sleep and
34        I'm going to use this word, kind of almost to recharge yourself. You
35        didn't say that word, but I - I - I'm using it.

Transcript of Forensic Psychiatric Evaluation
Re: Wendi Elizabeth Andriano
November 26, 2013
Page 141

1   WA: Uh-huh.
2
3   SP:  Okay?  Remember?
4
5   WA: Right.
6
7   SP:  And you would have someone else take the kids to school or -
8
9   WA: No, they -
10
11  SP:  Or not to school.  You would have someone else watch the kids.
12
13  WA: My mother, yes.
14
15  SP:  Your - yeah, right.  So - so - and since you've been here, and when
16       I say "here" in prison, I think what I heard you tell me is that you
17       now notice that if you find yourself - if your mood kind of cycling
18       down, that you do some self-help types of things whether it's
19       meditation or self-healing books or what have you.  Do I have that
20       correct?
21
22  WA: That's correct.
23
24  SP:  Okay.   What about just - just the opposite since you've been
25       incarcerated where your mood is elevated, where you feel like you
26       can go a couple days without sleep and your mind is just kind of
27       working over time and your speech might be kind of rapid or fast?
28
29  WA: I haven't had too many of those I don't think.
30
31  SP:  Have you had any of those?
32
33  WA: I always have - okay, so this is - when I'm having periods of - of
34       like anxiety that doesn't have a basis in reality, it's not attached to
35       something, like I hardly ever go a whole night - sleeping the whole

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 142

1       night.  I wake up with panic attacks and don't even know why, like
2       what - why am I feeling this way with my heart racing and - and
3       then I can't go back to sleep and then I'm agitated and I'm pacing
4       the floor and all that.  So -
5
6   SP:   So you have that now?
7
8   WA:  I do.
9
10  SP:   So you have panic attacks?
11
12  WA:  I do.
13
14  SP:   But you didn't have them before?
15
16  WA:  I did have them before and I remember Joe's doctor had given me
17       something to help me with that, but I don't remember what it was.
18       So I was taking some little medication that would help me with that.
19
20  SP:   Okay.  So I want to make sure I'm hearing you right.  Because
21       earlier I could've sworn I asked you about panic attacks and you're
22       saying that prior to October 8, 2000, you did have episodes of
23       panic?
24
25  WA:  Uh-huh.
26
27  SP:   Correct?
28
29  WA:  Yes, sir.
30
31  SP:   Okay.  And what were the symptoms that you experienced?
32
33  WA:  Just that - where my mind's racing and my heart's racing and I
34       can't sleep and I pace the floor and -
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 143

1    SP:  So you had that before?
2
3    WA:  Yes, I have.
4
5    SP:  And you've had it since?
6
7    WA:  Yes.
8
9    SP:  While you've been incarcerated?
10
11   WA:  Yes.
12
13   SP:  Okay.  When was the last time you had that?
14
15   WA:  Just this weekend.  I have it frequently.
16
17   SP:  When was the last time before that?
18
19   WA:  Well I don't keep a - a thing, but I would say every week I have
20          this.
21
22   SP:  Okay.
23
24   WA:  It's really hard when you're incarcerated, the concept of time, it all
25          meshes together.
26
27   SP:  Right.
28
29   WA:  So when you're asking me for time, I have a hard time telling you.
30
31   **TYPICAL DAY:**
32
33   SP:  Okay.  What is a typical day like for you right now?
34
35   *//////////////////////////////////////////////////////////////*

Transcript of Forensic Psychiatric Evaluation
Re: Wendi Elizabeth Andriano
November 26, 2013
Page 144

1   WA:  Well, I'm in my room.  It's a little room.  And I - I live around very
2        loud people and so I try to sleep when I can sleep and I read as
3        much as I can.  I eat whenever I get hungry.  I clean my - I like to
4        clean my room because that gives me something to do, so I
5        frequently scrub down the walls and the floor and hand wash
6        laundry and -
7
8   SP:  What - what time do you typically get up?
9
10  WA:  Probably - well we have to be out of our beds by 7:30 with our bed
11       made, so by 7:30 I'm -
12
13  SP:  And what time do you get to bed?
14
15  WA:  I don't have a regular schedule so it's just - I know that I sleep a
16       little bit in the early evening and then I tend to wake up for a while
17       and then it - I usually have to keep my TV on all night long so I
18       don't - it's almost as if the noise of the TV distracts me so then I
19       can try to fall back asleep.  But I - it's very erratic.
20
21  **ISSUE RE: NIGHTMARES AND SLEEP DISTURBANCE PRIOR AND**
22       **SUBSEQUENT TO OCTOBER 8, 2000:**
23
24  SP:  Do you have nightmares?
25
26  WA:  I did, and that's when I learned to just keep the TV on and that
27       would help it.
28
29  SP:  Well, what kind of nightmares?  What were you having nightmares
30       of?
31
32  WA:  Like I remember just - probably the biggest theme is like I always
33       feel like somebody was trying to attack me and sometimes I would
34       have one where I'd feel like somebody was trying to rape me.  Just
35       weird -

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 145

1    SP:  Are those -
2
3    WA:  Waking up just afraid.
4
5    SP:  And those are nightmares since you've been incarcerated?
6
7    WA:  I feel like I've had them always, but I try to - when I was out there
8         I had the option of working and keeping myself busy.  And so when
9         I would finally go to bed I would be exhausted and I would have -
10        then I could sleep.  But in here I don't have anything to exhaust
11        me.
12
13   SP:  So are the nightmares the same then that you had -
14
15   WA:  Yeah, I've always had pretty much the same theme.  I wouldn't tell
16        you - I can't really remember that, you know, the specifics of the
17        nightmare or dreams but I just know waking up feeling really afraid
18        like - of whatever was -
19
20   SP:  Okay.  So - so the nightmares that you're having since you've been
21        arrested are the same as the nightmare - since you've been
22        incarcerated are the same as the nightmares you've had before you
23        were incarcerated?
24
25   WA:  I - yes, I would say so.
26
27   SP:  Thematically.
28
29   WA:  Thematic - yes.
30
31   SP:  And the themes are again what?
32
33   WA:  I've had like two - two that I can really latch onto that happen more
34        regularly is I - this one where I always feel - and I don't know who
35        it is or what it is but I wake up afraid as if somebody was just

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 146

1        getting ready to attack me.  And this other one I've had is more of
2        a - in a sexual nature where I feel like somebody's trying to grope
3        me and touch me or rape me or something like that.
4
5    SP:  I see.
6
7    WA:  And then I wake up out of it.
8
9    SP:  So now it sounds like you have a problem falling asleep, correct?
10
11    WA:  Sometimes.  And unless I'm - unless I'm in this really depressed
12        mood and then it seems like I can just go to sleep and then sleep
13        for a really long time.
14
15    SP:  What a "really long time"?
16
17    WA:  Without even getting up and having to get water or anything for
18        almost - well a little bit less than 24 hours, but still probably a full
19        cycle, unless officers wake me up.
20
21    SP:  Well how - how can you sleep a full cycle if your bed has to be
22        made at 7:30?
23
24    WA:  The officers will wake me up and then I tell them I'm not feeling
25        well and since they know this is how I am they'll leave me alone
26        and let me -
27
28    SP:  Okay.  And then - but for those times when you kind of catch up on
29        the sleep, so to speak, it sounds like there's a problem then falling
30        asleep -
31
32    WA:  Yeah.
33
34    SP:  Staying asleep, and then do you wake up earlier than you wish if
35        you're able to fall asleep?

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 147

1  WA: Yes.
2
3  SP: And then what about before -
4
5  WA: My mind is busy and so then my - it seems like my busy mind
6      wakes me up.
7
8  SP: What about before your - before your arrest?  What was your sleep
9      - and it sounds like you had the nightmares?
10
11 WA: Yeah, I had - and - and like I - well, out - I remember just being out
12     there, being - by the time it was night time to go to sleep, being so
13     exhausted that I could lay down and go to sleep.
14
15 SP: And would you wake up feeling rested?
16
17 WA: No.
18
19 SP: Would you wake up in the middle of the night?
20
21 WA: I don't remember really waking up in the middle of the night, but I
22     always felt tired as if I did not sleep well.
23
24 SP: Did you wake up earlier in the morning than you wished?
25
26 WA: I don't remember.
27
28 **MILITARY HISTORY:**
29
30 SP: Okay.  You - you have not been in the military, correct?
31
32 WA: No.
33
34
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 148

**SOURCE OF INCOME:**

1

2

3  SP:  What was your source of income before October 8, 2000?

4

5  WA:  I was working.

6

7  SP:  Doing what?

8

9  WA:  I was a property manager at an apartment complex.

10

11  SP:  And what was the name of that complex?

12

13  WA:  San Re - Rivas - Rivas.

14

15  SP:  San Rivas?

16

17  WA:  I think so, yeah.

18

19  SP:  And how long had you been working there?

20

21  WA:  Okay, so I don't know - it was under two years.  I'll just say that.

22

23  SP:  How much money were you making?

24

25  WA:  I don't remember.

26

27  SP:  Were you getting paid hourly or was it like a salary?

28

29  WA:  No, that - I think that was a salaried position.

30

31  SP:  And you don't remember how much?

32

33  WA:  I don't.

34

35  /////////////////////////////////////////////////////////////

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 149

1    **HABITS:**
2
3    SP:  Are you allowed to get caffeinated beverages here?  Like coffee?
4
5    WA:  Yes.
6
7    SP:  Coca-Cola?
8
9    WA:  No, they don't sell that.  They -
10
11   SP:  Pepsi?
12
13   WA:  They don't sell that.
14
15   SP:  Do you - do you -
16
17   WA:  I don't know.  I don't buy soda, so I don't know.
18
19   SP:  Do you drink coffee?
20
21   WA:  One cup a day, yes.
22
23   SP:  Okay.  Do you smoke?
24
25   WA:  No.
26
27   SP:  I mean did you used to smoke?
28
29   WA:  No.
30
31   **MEDICATIONS TAKEN PRIOR TO THE INSTANT EVALUATION:**
32
33   SP:  Did you take your medicine today before visiting with me, the
34        BuSpar®?
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 150

1   WA: No. I get it - they give me my meds once a day and it's in the early
2       evening every day.
3
4   SP: Okay. And then - and then I think earlier I was asking you about
5       allergies. I'm losing the thread. Maybe I didn't ask. Are you
6       allergic to any medication?
7
8   WA: Oh, you did ask me that.
9
10  SP: Yeah, that's what I thought. You were allergic - it came back to
11      me.
12
13  WA: I don't - right.
14
15  SP: You were aller -
16
17  WA: I -
18
19  SP: There was something they gave you that you were allergic to.
20
21  WA: I know that there are some psych meds that they tried to give me
22      that really had the opposite affect on me than what it was supposed
23      to do.
24
25  SP: Got it. It just came - just came back to me.
26
27  WA: But I don't know if it's allergic or what you want to call it.
28
29  SP: Got it. But you're not - to your knowledge you're not - no one's told
30      you you're allergic to a medication?
31
32  WA: No.
33
34  ////////////////////////////////////////////////////////////////
35  ////////////////////////////////////////////////////////////////

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 151

1   **ISSUE RE: WHAT MS. ANDRIANO HOPES TO GAIN FROM HER**
2            **APPEAL:**
3
4   SP:  Okay.  What - what - you have this - this appeal going on.  What -
5        what do you hope to gain from it?  What's the end game for you?
6
7   WA:  I actually don't - I haven't put an expectation on it so I don't have
8        a hope of an end game.  So I -
9
10  SP:  If you were a king, what would you -
11
12  WA:  If what?
13
14  SP:  Or queen.  If you were a queen and you could wave -
15
16  WA:  But I actually - I don't - my mind doesn't - I don't actually think
17       about that.  I just am trying to - I think more than anything I would
18       just like the whole story to be out there and even if the end results
19       don't change, that's not what's in my mind.  It's more for Nicholas
20       and Ashlee to know everything.
21
22  SP:  I see.
23
24  WA:  So that way when they grow up they can just see or read the whole
25       story and have all the facts.
26
27  SP:  Now, you - while we were talking earlier about the offense and -
28       and that was upsetting, that seemed stressful for you to kind of be
29       going back over some of that information.
30
31  WA:  Yes.  I don't like - it - yeah.
32
33  SP:  True?
34
35  WA:  Very true.

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 152

1   **ISSUE RE: STRESS ASSOCIATED WITH APPEAL:**
2
3   SP:   How stressful has this process been itself, the actual appeal
4         process?
5
6   WA:   It's very - I don't even like to participate in it.
7
8   SP:   Okay.  And - and why is that?
9
10  WA:   Because all the things that I have to talk about are painful and I -
11        it's - I don't enjoy doing this.
12
13  **EMPLOYMENT HISTORY:**
14
15  SP:   Okay.  And again, it's not my intent to upset you here but there's
16        certain questions that I just have to ask you.  So you talked about
17        that prior to the offense you were working at a - as a property
18        manager at an apartment complex, correct?
19
20  WA:   Uh-huh, yes sir.
21
22  SP:   Is that the same complex you were living at?
23
24  WA:   Yes.
25
26  SP:   Okay.  And then let - let's work backwards.  Let's start - what's the
27        first job you ever had going back to when you were a kid?
28
29  WA:   Oh, I grew up working.  I didn't have like an official job, but we -
30        families in the church would always hire me to come do odd and
31        end jobs for them and babysitting and that sort of thing.  And my
32        first real job was - I think I worked for a man that was in our church
33        and he had a business and I worked there for a little while.
34
35  SP:   What - what kind of work was it that you did?

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 153

1  WA:  Secretarial.

2
3  SP:  Okay.  And then what was the next job you had?

4
5  WA:  As a leasing agent at an apartment.

6
7  SP:  And how old were you when you did that job?

8
9  WA:  21.

10
11  SP:  Okay.  And what was the name of that complex?

12
13  WA:  That one was Quail Gardens.

14
15  SP:  Okay.  And how long did you work there?

16
17  WA:  I don't remember the length of time.

18
19  SP:  Okay.  And then what was the next job you had?

20
21  WA:  The hospital.

22
23  SP:  And that's where you did - you worked where in the hospital?

24
25  WA:  In the accounting department.

26
27  SP:  And that's where you - the issue came up with the money being
28        taken?

29
30  WA:  Yes, sir.

31
32  SP:  And what was the name of that hospital again?

33
34  WA:  The Casa Grande Hospital.

35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 154

1    SP:  Okay.  And how - and then so you were let go?

2

3    WA: Yes, sir.

4

5    SP:  How long did you work there again?  I'm sorry.

6

7    WA: I don't remember.

8

9    SP:  Okay.  And then what was the next job you had?

10

11   WA: For another apartment place at Courtyard Apartments.

12

13   SP:  Courtyard Apartments.  And how long did you work there?

14

15   WA: I don't remember that either.  I -

16

17   SP:  Okay.  And then what was the next job you had?

18

19   WA: Then to San Rivas.

20

21   SP:  Okay.  So there's - there's San Rivas, there's the hospital, and it
         sounds like there's two other apartment complex jobs.  Am I right?

22

23

24   WA: I think so.

25

26   SP:  And - so San Rivas, the hospital, so there's four - do I have it right
         that there's four jobs?

27

28

29   WA: Oh, I don't know.  I'm -

30

31   SP:  Four jobs of - of any length as well?

32

33   WA: Sure.

34

35   SP:  You would agree?

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 155

1  WA: Yes.  I agree.

3  SP:  And am I right in that two out of the four while you were working
4       there, there were problems with money being taken or issues
5       regarding your management of the money?

7  WA: Yes, sir.

9  SP:  Was - was San Rivas one of them?  No?

11 WA: No.  It was Courtyard and then the hospital.

13 SP:  Okay.  What kind of employee do you think you were?

15 WA: Oh gosh.  I don't know.  That's hard to label.

17 SP:  Okay.  Well, if you were to like give a letter grade?  "A," "B," "C,"
18       "D" or "F"?

20 WA: Well, as I am today I would look at it and give myself an "F"
21       because I, you know, I didn't - was not - I didn't keep my
22       employment and I actually hurt my employers.

24 SP:  So letter grade for San Rivas would be?

26 WA: I would just say for all of it because it just - I don't know.

28 SP:  What did you do at San Rivas?

30 WA: What do you mean?

32 SP:  Well, why would you flunk yourself at San Rivas?

34 WA: Oh gosh, I couldn't get the place filled up with people the way they
35       wanted.

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 156

1    SP:   Were you giving people free rooms as well?
2
3    WA:   Well, I did give some concessions that I was not allowed to give,
4          yes.
5
6    SP:   Why did you do that?
7
8    WA:   I was trying to help them.
9
10   SP:   Why?
11
12   WA:   Because they were in really bad situations and I felt bad for them.
13         But it wasn't my place and I did it anyway.
14
15   **MS. ANDRIANO'S DESCRIPTION OF HERSELF IN THE 30 DAYS**
16   **PRIOR TO THE INSTANT OFFENSE:**
17
18   SP:   How do you - how do you - how would you describe yourself in the -
19         in the month prior to the offense?  In other words, how would you
20         describe yourself between September 8, 2000, and October 8,
21         2000?
22
23   WA:   Very, very, very stressed out.  Just - I - I don't - just - I - I couldn't
24         get a grip on anything.  It was very stressful.  Everything was very
25         stressful.
26
27   SP:   What about your - your constitutional makeup, the person - your
28         being, who you are, would you consider yourself at that time an
29         honest person?
30
31   WA:   Oh I don't know.  I - I - so sitting here today and reviewing my
32         behavior from back then would I call myself honest?  No.
33
34   SP:   Trustworthy?
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 157

1   WA:  No.

2

3   SP:  Reliable?

4

5   WA:  No.

6

7   SP:  How would your friends describe you during that time period?

8

9   WA:  I don't know.  You would have to ask them.

10

11   SP:  How do you think they would describe you?

12

13   WA:  I don't know because you have different opinions.  You know, some
14          people understood what was going on, some people didn't, and I
15          don't know what - you'd have to ask them.

16

17   **MS. ANDRIANO'S PRESENT DAY DESCRIPTION OF HERSELF:**

18

19   SP:  How do you describe yourself now?

20

21   WA:  I feel like I have a much better understanding and I've learned a lot
22          of things that help me make better decisions, so -

23

24   SP:  How have you learned these things?

25

26   WA:  I've really done a lot of reading and studying and really trying to be
27          honest with myself.  Excuse me.  And try to figure out who I am as
28          a person and why I do what I do and why I made decisions that I
29          make.  And that's helped me just get better knowledge and - and
30          understanding about how to not make a wreck of my life the way I
31          did before.

32

33   SP:  So what have you learned about yourself that helps you understand
34          the financial issues that arose when you were working at the
35          hospital?

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 158

1
2
3
4
5
6
WA: That it's really not okay - even if you have good intentions and you're trying to help somebody else, it is not okay to do bad things for right reasons.  That's been a really big - and that I am - I am not responsible for everybody that I'm around.  It - it's - I take on more than what I think that was healthy and so sometimes I - it's not up to me to fix everything.

7
8
9
SP: What have you learned about yourself that helps you understand the money situation that went down at - was it Courtyard?

10
11
WA: Right.

12
13
SP: What - how do you understand that?

14
15
16
WA: Just like what I said.  It's not okay to do wrong things for the right reasons.

17
18
19
## ISSUE RE: WHAT MS. ANDRIANO HAS LEARNED ABOUT HERSELF AS IT RELATES TO HER ROLE IN THE INSTANT OFFENSE:

20
21
22
SP: Okay.   And then same question, what have you learned about yourself as it relates to your behavior on October 8, 2000?

23
24
25
26
27
28
29
30
WA: That at that - in October of 2000, is - how do I explain this?  I think today that I know how to say "no."  I know to have boundaries. Back then I didn't.  I was - I - I didn't want to reach out for help. I didn't want to talk about problems.  I didn't know how to.  I couldn't communicate.  I didn't even really understand everything that was going on.  It was - it was - I don't know.  There was a very big lack of awareness of how to handle situations and - yeah.

31
32
33
SP: You almost make it sound like as an adult you were like emotionally immature.

34
35
WA: Very much so.

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 159

1    SP:  There was a - the door is -

2

3    WA:  Very much so.

4

5    SP:  You're saying "very much so."

6

7    WA:  Yes.  I can say that today just because of experiences that I've had

8         in the 13 years it's been.

9

10   SP:  Right.

11

12   WA:  I can look back then and say today I wouldn't make that decision

13        because now I know better.  I know how I work and how my mind

14        was and how I was trained to be and I wouldn't be - I just am - I

5         just am way different.

16

17   SP:  Do - do you - do you think being emotionally immature is a -

18        another explanation for what happened on October 8, 2000?

19

20   WA:  I think it could be a piece of it, sure.  Well, I don't know if

21        emotionally immature would be something I would call it.  I don't

22        know.  It's - I don't know, I don't feel comfortable with that label.

23

24   SP:  Okay.  Well, let me - let me ask you this question and see if - see

25        how this plays out in terms of if I can conceptualize this the way I

26        want.  If you were a model builder and you could reconstruct you,

27        what would you have changed about yourself prior to October 8,

28        2000?  If you could put different pieces in, what - what - what do

29        you think the big - the big changes would be?

30

31   WA:  That it's okay to be upset.  It's okay to have a backbone and it's

32        okay to ask people for help.  That it's okay to say "no."  And it's

33        okay that even if you love somebody, that you can't fix everything

34        for them.  That it's not okay to be dishonest or to take from

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 160

1
2        somebody else just to help somebody that you love.  There's just -
        that - well that's a start.
3
4  SP:  Do - do - do - do you think that you were unaware of - of what
5        represented legal and illegal behavior?
6
7  WA:  I don't think I ever stopped to - to actually analyze it and think
8        about it.  Like I was just really reacting to everything.
9
10  SP:  Okay.
11
12  WA:  See, I've had 13 years alone in a room and it really - you have to
13        make friends with yourself and figure out who you are, otherwise
14        you lose your mind.  And so I've really had to get to know myself
5        whereas before I don't think I ever even thought about doing that
16        or had time.  I know my parents didn't raise me that way.  It was
17        always - and if something was wrong, I - it just - it was a complete
18        - I don't - I don't know.  I don't even think there was a lot of
19        thinking going on.
20
21  SP:  Okay.
22
23  WA:  Because compared to who I know I am today, I've really had to go
24        through a lot of analysis and just understand how - how - who -
25        why do I do what I do?  Why did I make the decisions I made?  You
26        know?  Those are tough questions to answer.
27
28  SP:  You were 30 at the time of the offense, correct?
29
30  WA:  Right.
31
32  ////////////////////////////////////////////////////////////////////
33  ////////////////////////////////////////////////////////////////////
34  ////////////////////////////////////////////////////////////////////
35  ////////////////////////////////////////////////////////////////////

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 161

1   **<u>FAMILY HISTORY - PART II</u>:**
2
3   **<u>Siblings</u>:**
4
5   SP:  You - do you have any biological siblings?
6
7   WA:  I think that I have half, but not full.
8
9   SP:  From who?
10
11  WA:  My father.
12
13  SP:  From Skip?
14
15  WA:  Yeah.
16
17  SP:  So do you - do you know them?
18
19  WA:  No.  She died in a car wreck.
20
21  SP:  Okay.
22
23  WA:  So I know that I had a sister.
24
25  SP:  But do you have any memory of her?
26
27  WA:  No.
28
29  SP:  No.  Do you have mem - do you have any other siblings, step-
30       siblings, half siblings?
31
32  WA:  I had a - well I think there's some half, but I don't know.  I don't
33       know them.
34
35  SP:  But they - you don't know them?

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 162

1    WA:  No.
2
3    SP:  Is the bottom line.
4
5    WA:  Right.  And then I know that my cousin was adopted by my parents
6         and was raised in my house.
7
8    SP:  Right.  I remember this.  Hang on a sec.  It's your cousin - tell me
9         who that was?
10
11   WA:  My mom's sister's child.
12
13   SP:  Your mom's sister's child.  Right.
14
15   WA:  And we adopted him.
16
17   SP:  And he was how old?
18
19   WA:  "We," my parents adopted him.
20
21   SP:  He was - he was how old?  What's his name?
22
23   WA:  Brandon.
24
25   SP:  What's his last name?
26
27   WA:  Ochoa.
28
29   SP:  And how old is Brandon now?
30
31   WA:  He's - let me think.  He's 14 years younger than I am.  Or no, 15
32        years younger than I am.  So he's 27.
33
34   SP:  And do you - do you remember being raised with him or not?
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 163

1    WA: Yes. I -
2
3    SP: Yeah?
4
5    WA: I do.
6
7    SP: And -
8
9    WA: Because I was already like 16 or something when we got him.
10
11   SP: And why did they take him in?
12
13   WA: Because he was in the custody of CPS.
14
15   SP: Because?
16
17   WA: He and his two other brothers were abandoned by his mother and
18        left in a home alone and CPS took them.
19
20   SP: And what is he doing now?
21
22   WA: I don't know.
23
24   SP: When was the last time you had any communication with him?
25
26   WA: It's - gosh, like it's been a while.   I haven't had regular
27        communication with him.
28
29   SP: Has it been - have you had any communication since you've been
30        incarcerated?
31
32   WA: I have.
33
34   SP: Okay.
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 164

1   WA: Brief.

2

3   SP: So you don't know what he's doing with his life?

4

5   WA: I don't.  I know where - I know he's in Tucson and I know that he's
6        not having a very good life right now.

7

8   SP: Why?

9

10  WA: I don't - well, he just - well, I don't know why but I just know that
11       he's - he's 27 and I know that he's unable to keep a job and he just
12       has a lot of issues going on.

13

14  SP: What kind of issues?

15

16  WA: Just with trying to be an adult.

17

18  SP: So does he have a drug problem?

19

20  WA: I don't know.

21

22  SP: Psychiatric problem?

23

24  WA: Yeah, I don't - I don't know because I'm not around him.

25

26  SP: Okay.

27

28  WA: I just know that he has - he's not -

29

30  **FAMILY PSYCHIATRIC HISTORY:**

31

32  SP: Okay.  The - on your - your mom's side of the family, I think you
33       said your maternal aunt has some depression?

34

35  /////////////////////////////////////////////////////////////////////

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 165

1   WA:  So I don't know what her clinical diagnosis was but I know that she
2        had a lot of problems.
3
4   SP:  Emotional problems?
5
6   WA:  Yeah.
7
8   SP:  What about on the -
9
10  WA:  I feel like she was hospitalized.  I know that she took a lot of psych
11       meds.  I don't really know what the details are though.
12
13  SP:  What about any other psychiatric issues in the immediate or
14       extended family, other than what we've already talked about?  Did
15       anyone like aunts, uncles, cousins, grandparents, did anyone else
16       have a history of first of all substance use that you know of?
17
18  WA:  I don't know.  I don't know.  You know, I don't really know.
19
20  SP:  Okay.  That's okay.
21
22  WA:  Yeah.
23
24  SP:  What about - what about psychiatric or emotional problems?
25
26  WA:  I know my cousin, which would be my aunt's daughter has problems
27       but I can't tell you specifics because I - I don't really know.
28
29  SP:  The - the same aunt that we already talked about?
30
31  WA:  Uh-huh.
32
33  SP:  Your mom's sister?
34
35  WA:  Uh-huh.

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 166

1   SP:  That's a "yes," right?
2
3   WA:  Yes.  Her daughter I know has a bunch of psychiatric issues and her
4        son, but I can't tell you what they are.
5
6   SP:  You don't know what they are.  And then mom had some - some
7        issue too, am I right or no?
8
9   WA:  Well, I don't know - oh gosh, see, I don't know.  I just know that
10       she's taking something.
11
12  SP:  She's taking something.  Biological dad, Skip -
13
14  WA:  Right.
15
16  SP:  Had some emotional issues, correct?
17
18  WA:  Yeah, he did.
19
20  SP:  And then you have on your maternal aunt, and then your maternal
21       aunt's -
22
23  WA:  Children.
24
25  SP:  Children, a boy and a girl.
26
27  WA:  Yes.
28
29  SP:  Which is - okay.  Anyone else in the family have any emotional or
30       psychiatric -
31
32  WA:  So I don't know my father's family very well.
33
34  SP:  Right.
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 167

1   WA: But I've heard -

2

3   SP:  Right.

4

5   WA: That a lot of them had a lot of psychiatric - or psychological issues
6        or whatever.

7

8   SP:  And I - and I think - I think what you're telling me resonates with
9        some - some stuff that I read.

10

11  WA: I just don't remember the details.

12

13  SP:  Okay.  So did you - do you know if anyone has suicided?   Or
14       successfully complete - successfully took their life?

15

16  WA: I don't know.

17

18  **FAMILY MEDICAL HISTORY:**

19

20  SP:  Okay.  What about med - medical history in the family?

21

22  WA: Oh gosh.  I don't - gosh.

23

24  SP:  Well here - let me - let me try and - and I'm not looking to
25       overwhelm you so let me just try and break it down for you.  Do
26       you know anything about your biological father's parents?

27

28  WA: I don't.

29

30  SP:  Okay.  What about your mom - are your mom's parents still alive?

31

32  WA: No.  My grandma -

33

34  SP:  Yeah.

5

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 168

1  WA: That I remember as my mom, she died of emphysema, I believe.
2
3  SP:  Okay.
4
5  WA: And -
6
7  SP:  So she must - was she a smoker?
8
9  WA: Yes.
10
11  SP:  Okay.
12
13  WA: And my grandfather I think died of a heart attack.
14
15  SP:  Okay.  Do you know about how old both of them were?
16
17  WA: Well -
18
19  SP:  When they passed?
20
21  WA: I don't.  I know I was around 18 when my grandma passed away,
22       but I don't know how old she was.
23
24  SP:  Okay.  What about in the extended family; cousins, other family
25       members, biological family members, is there - like some families
26       have a history for example of high blood pressure.
27
28  WA: Right.
29
30  SP:  Some families have a history of cancer, diabetes, things of that
31       sort.
32
33  WA: And I probably should know this, but I actually don't.
34
35  SP:  That's okay.

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 169

1   WA:  I've - I -

2

3   SP:   That's all right.

4

5   WA:  I feel like I know maybe something about heart disease, but I - I

6          don't really know.

7

8   **RELATIONSHIP HISTORY:**

9

10  **Menarche:**

11

12  SP:   Okay.  Let's talk about your - your relationship history.  First of all,

13         how old were you when you started having your periods?

14

15  WA:  I don't know.

16

17  SP:   Okay.  Who educated you about that?

18

19  WA:  Well, probably more my dad.  I don't really remember talking about

20         it with my mom.

21

22  SP:   What did your dad tell you?

23

24  WA:  And I don't remember that either.

25

26  SP:   How old - how old were you when you started?

27

28  WA:  I don't know.

29

30  SP:   You don't know?  Okay.

31

32  WA:  Yeah, I just don't even know.

33

34  SP:   Are you still having your menstrual cycle?

35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 170

1    WA: Yes.
2
3    **Sexual Orientation:**
4
5    SP:   Okay.  What do you consider your sexual orientation?
6
7    WA: What does that mean?
8
9    SP:   Well, do you - are you exclusively with - your relationships been
10        exclusively with men, have you had sexual relations with women?
11
12   WA: Oh.
13
14   SP:   Do you consider yourself to like both men and women?
15
16   WA: Well, I don't know.  I think - well, I guess - I don't know, I've never
17        stopped to think about it.  Yeah, I don't know.
18
19   SP:   Have you had sexual relations with women?
20
21   WA: Yes.
22
23   SP:   And has that been while you've been - was that before October 8,
24        2000?
25
26   WA: No.  That was in jail.
27
28   SP:   In jail.
29
30   WA: Yes.
31
32   SP:   Okay.  How many -
33
34   WA: But I live by myself, so I'm not -
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 171

1   SP:  How - what types of relations did you have at the jail?
2
3   WA:  I had a relationship with a - a girl in the jail.
4
5   SP:  Okay.
6
7   WA:  Yeah.
8
9   SP:  More than one or just one?
10
11  WA:  Just one.
12
13  SP:  Okay.
14
15  WA:  And it's weird because I - I don't - I wouldn't say like I look at a
16       female and am attracted to them.  It was like a companionship type
17       of thing.
18
19  SP:  Okay.
20
21  WA:  And more of a - the person.
22
23  SP:  Okay.  Was it sexually gratifying?
24
25  WA:  I think for me it was way more of an emotional thing.
26
27  SP:  Okay.  And you haven't had any other relations since you've been -
28
29  WA:  No, I - I live alone.  I'm secluded, isolated from everybody.
30
31  ////////////////////////////////////////////////////////////////////////
32  ////////////////////////////////////////////////////////////////////////
33  ////////////////////////////////////////////////////////////////////////
34  ////////////////////////////////////////////////////////////////////////
35  ////////////////////////////////////////////////////////////////////////

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 172

1   **Issue Re: Whether or Not Ms. Andriano Believes That She Was the**
2   **Victim of Childhood Emotional Abuse, Sexual Abuse or**
3   **Physical Abuse:**
4
5   SP:   Okay.  We - we - we touched on this before but I'm going to - I'm
6         going to circle back now.  Do you believe that as a - as a child you
7         were physically abused?
8
9   WA:  Yes, I do.
10
11  SP:   Do you believe as a child you were emotionally abused?
12
13  WA:  Yes.
14
15  SP:   And do you believe as a child you were sexually abused?
16
17  WA:  I think so, yeah.
18
19  SP:   Who - who perpetrated the sexual abuse?
20
21  WA:  I think there was several different men growing up that I feel
22        treated me in a sexually inappropriate way.
23
24  SP:   And who would those be?
25
26  WA:  One would be Alejo and one would be - I can't remember, but his
27        name was Rick and he was one of the ministers that we traveled
28        with.  And another one was - would've been a principal that was at
29        the Christian school that I went to.
30
31  SP:   What did - what did Rick the traveling minister do?
32
33  WA:  Well, I feel like it was just more of inappropriate touching and I
34        remember him showing me his private parts one time.  And I don't
35        know that I even understood what was - I don't know.

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 173

1   SP:   How - how -
2
3   WA:   But I just - it's so - it's really not a - just - because I remember him
4         playing the guitar all the time and then he would want to try to
5         teach me play the guitar but it made me very uncomfortable, like
6         there was something not good about it.  So that's what I can -
7
8   SP:   How old were you when you think he showed you his genitals or
9         penis?
10
11  WA:   I don't know.   That was when we were traveling around in the
12        vehicles.
13
14  SP:   Okay.
15
16  WA:   So I don't know.
17
18  SP:   So there's Rick the - the - the traveling minister, there's Alejo.
19
20  WA:   Uh-huh.
21
22  SP:   Did - have we covered everything with Alejo already or were there
23        some specific sexual acts?
24
25  WA:   I can't really think of specifics.  I - I - I just know that -
26
27  SP:   He was just a sexualized - very sex - everything was sexual.
28
29  WA:   Yeah.  And - and I know that, you know, I can't - see, it's hard for
30        me because I don't know if it was on purpose or if it's not.   It's
31        really - I don't like to make accusations.
32
33  SP:   Okay.
34
35  WA:   But - yeah.

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 174

1   SP:  And then there was a third -
2
3   WA:  Yeah.  There was a principal at the school that was - was kind of
4        inappropriate with me too.
5
6   SP:  How?
7
8   WA:  Just in hugging and the touching and the talking and all that sort of
9        stuff.
10
11  SP:  Did - did - do you have any independent recollection of being
12       sexually violated in any way as a - as a child?
13
14  WA:  I don't.
15
16  SP:  Okay.  Do you have any independent recollection as a child of being
17       asked to perform certain sexual acts on a male or female?
18
19  WA:  I don't.
20
21  SP:  That was an adult.
22
23  WA:  I don't remember.
24
25  SP:  Okay.  What was the - I think you may have discussed this already
26       but I just want to make sure.  What was the nature of the
27       emotional abuse?
28
29  WA:  I would - I would say the expectation of me to behave as an adult
30       and to fulfill adult needs would - and not - like always having to
31       play the peacemaker and the caretaker and the - it's like I had to
32       be the adult and my parents were more the children.
33
34  SP:  Okay.  And the physical abuse thing again, we've covered that?
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 175

1    WA: Uh-huh.

2

3    SP:  Yes?

4

5    WA: Yes.

6

7    **Issue Re: Whether or Not Ms. Andriano Believes She Was the**
8    **Victim of a Sexual Assault:**

9

10   SP:  Okay.  Have you ever been sexually assaulted?  Child or adult.

11

12   WA: Not that I physically remember.  It just come - but I have that -
13       those nightmares, that - of - of it, and so I don't know.

14

15   SP:  Who - who - who -

16

17   WA: And I don't know who.

18

19   **Age of Interest in Sex:**

20

21   SP:  Okay.  How many - when did you start getting interested in sex?

22

23   WA: I don't - I can't even - I - I couldn't even tell you.  I don't know.
24       It's always just been in part of the awareness for as long as I can
25       ever remember.

26

27   **First Serious Heterosexual Relationship:**

28

29   SP:  Who was your first relationship, serious relationship with?

30

31   WA: The pastor's son.  But we never had physic - or had actual sex.  So
32       I don't know.

33

34   SP:  You were how old when that happened?

35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 176

1   WA: 21.
2
3   SP:  And he was how old?
4
5   WA: No, I didn't have sex with him.  I was - I had a - we had - we were
6         boyfriend/girlfriend when I was like a teenager.
7
8   SP:  Right.  So you were a teenager and he was how old?
9
10  WA: Same - same age as I am.
11
12  SP:  Which was what?
13
14  WA: A - as a teenager.  I can't tell you exact date.
5
16  SP:  Okay.  Was there no - just so we're clear about terms here, was
17        there any - you didn't have intercourse is what you're saying?
18
19  WA: No, sir.
20
21  SP:  Correct?
22
23  WA: Correct.
24
25  SP:  Was there any - was there any foreplay or sexual relations of any
26        kind?
27
28  WA: We did later when we were probably like 19 or 20.
29
30  SP:  And what was - what happened there?
31
32  WA: I don't really remember details, but I know we - I don't know.
33
34  SP:  Well you - was - were you a consensual participant?
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 177

1   WA: Yes.
2
3   SP:  Okay.  So he was your first serious relationship?
4
5   WA: Yes.
6
7   SP:  How long did that last for?
8
9   WA: Maybe four years.
10
11  SP:  Did you live together?
12
13  WA: No.
14
15  SP:  And was there oral sex in this relationship?
16
17  WA: Maybe when I was around 20.
18
19  SP:  Okay.  Is - did he want to have intercourse?
20
21  WA: Okay, so yes but no.  And I say that because he did but our
22      religious beliefs said that that was a sin and so we never did.
23
24  SP:  Okay.  So you didn't have any vaginal intercourse?
25
26  WA: No.
27
28  SP:  Was - did it allow for anal intercourse?
29
30  WA: No.
31
32  SP:  Okay.  But it allowed for you two to - to be involved - to - to have
33      other types of sexual relations?
34
35  /////////////////////////////////////////////////////////////

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 178

1   WA: Well no, it didn't allow, but there's always these grey areas and so
2       then you think technically if you don't have sex then it's okay.
3
4   SP: And by "sex" you mean intercourse?
5
6   WA: Yes.
7
8   SP: Okay.  What was the next serious relationship you had?
9
10  WA: Serious?  Well, the person that I did have sex with I did not have a
11      relationship with.  I just chose to do that.  And then - I don't even
12      know.  There was - there was some - like a six month to a year
13      time there that I was out partying and I know I slept with a couple
14      of people and it wasn't a relationship and then so my next
15      relationship would've been with Joe.
16
17  **Issue Re: Number of Lifetime Serious Heterosexual Relationships:**
18
19  SP: Okay.  So let's - so let's break this down.  So there were - it sounds
20      like - how many serious relationships have you had in your life?
21
22  WA: Two.
23
24  **Issue Re: Number of Lifetime Heterosexual Partners:**
25
26  SP: Okay.  And how many sexual partners would you say you've had in
27      your life?
28
29  WA: Let me think.
30
31  SP: And when I'm talking about sex, I'm talking about how many people
32      you've had intercourse with.
33
34  WA: Right.  Maybe like five or six.
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 179

1   SP:  Okay.  So there was a - when was this time period before Joe when
2        you were with other men?  How old were you when that was?
3
4   WA:  21.
5
6   SP:  And where were you meeting these men?
7
8   WA:  At the bar.
9
10  SP:  And what was going on in your life at that time that you just
11       decided here I am?
12
13  WA:  Yeah.  I'm not really sure.  I - I don't know if it was - I had lived
14       under - with my parents and in that religious very secluded - and I
15       think that when I got my first apartment job they gave me an
16       apartment and my cousin who is several years younger than I kind
17       of moved in with me and she went to public school and knew
18       everybody.  And that was very fun to me and so I started going out
19       with her.  And I - I like just - I - I don't know.  I'm going out and
20       I'm drinking and I'm meeting people and then I had sex and it was
21       just a craziness.  And then I met Joe and -
22
23  SP:  So how - for what period of time did this go on?  This -
24
25  WA:  Just -
26
27  SP:  You were 21, from 21 to?
28
29  WA:  Like only for six, eight months.
30
31  SP:  And how many partners would you say you had?
32
33  WA:  I will just say three.  I don't really recall.
34
35  ///////////////////////////////////////////////////////////////////

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 180

1   SP:  Did you - so what - how - so where did you lose your - not "where,"
2        but how old were you when you lost your virginity?
3
4   WA:  21.
5
6   SP:  It was with one of these -
7
8   WA:  Yeah.  I - I - I didn't - I know it sounds weird, but I didn't want to
9        be a virgin and I wasn't in a relationship with somebody and I went
10       out with this person like twice and then slept with him and then
11       didn't - he called me back and I never would return his calls
12       because I felt really bad.
13
14  SP:  Okay.  And so - so there's these at least three relationships that you
15       had that were pretty short lived, correct?
16
17  WA:  Well, I guess if you want to call it a relationship.   It was just
18       probably just having sex and it was - that was it.
19
20  **Second Serious Relationship - Joe Andriano:**
21
22  SP:  Okay.  And then you meet Joe?
23
24  WA:  Uh-huh.
25
26  SP:  And how old are you when you meet him?
27
28  WA:  I'm still 21.
29
30  SP:  And how long do you guys date?
31
32  WA:  Like a year and a half, maybe.
33
34  SP:  He was how old?
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 181

1   WA: Three years older than I, so -
2
3   SP: He was 24?
4
5   WA: Right.
6
7   SP: Where did you meet?
8
9   WA: At a bar.
10
11  SP: Okay. And how soon after you met did - did you start having sexual
12       relations with him?
13
14  WA: Now we didn't have - well, gosh let me think. I don't know, five or
15       six months.
16
17  SP: And what - why did you wait - or maybe I have that - maybe I
18       made a wrong assumption there. Did - did you want to have sexual
19       relations and he wanted to wait or was - what was going on?
20
21  WA: So because I cared about him, it was different. I don't know how
22       to explain it. It just was different. I - it was just a different thing
23       than just going to the bar and partying. It was a relationship and
24       so I was trying to reconcile my not sinning and not having sex with
25       - it was - yeah, I - so that's why we waited.
26
27  SP: Okay. So you date - so - so you date about five or - five months or
28       so or six months or so and then you have -
29
30  WA: Excuse me.
31
32  SP: You have sexual relations?
33
34  WA: Yes.
35

Transcript of Forensic Psychiatric Evaluation
Re: Wendi Elizabeth Andriano
November 26, 2013
Page 182

1    SP:  And how was that for you?

2

3    WA:  It was - I think in my mind it's more - it was more I participate in
4          it but it's not because I enjoy it, it was more because I want to
5          make him happy. That was pretty much my mentality about having
6          sex. And that's just the way it was even through my marriage.

7

8    SP:  You get married in what year?

9

10   WA:  January of '94.

11

12   SP:  And what kind of - what kind of wedding was it?

13

14   WA:  At a church.

15

16   SP:  And how many - how many folks were there?

17

18   WA:  I don't remember.

19

20   SP:  Was there a honeymoon or a -

21

22   WA:  Well, I was working and couldn't get away from work but we did go
23         to Vegas. His sister sent us to Vegas for the weekend.

24

25   SP:  How did he propose?

26

27   WA:  He didn't really - he didn't really ever have like an official "marry
28         me" type of thing or an engagement ring or any of that kind of
29         stuff. It was just - he ended up moving into my apartment and I
30         don't know, it just happened. It just -

31

32   SP:  How soon after you started dating did he move in?

33

34   WA:  Well, he moved in just as - as needing somewhere to live and so it
35         wasn't because we wanted to have a relationship. It was a matter

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 183

1   of necessity.  He needed somewhere to live.  So he slept on my
2   couch for a while.  And -
3
4   SP:  How soon after you met did that start happening?
5
6   WA:  Like within a month.
7
8   SP:  Okay.
9
10  WA:  Yeah.  So he slept on my couch for a while and then later when we
11        started - I don't know, it just developed into a relationship, a sexual
12        relationship.  So then he moved from the couch to my bedroom.
13        And then my dad wouldn't speak to me for a long time because I
14        was living in sin.  So that was not - and I think that's more of - of
15        why we both felt we needed to make our families happy and so to
16        do the marriage.  Even though we loved each other, but I mean as
17        far as - yeah.
18
19  SP:  Talk - talk to me about Joe.  How far in school did he go?
20
21  WA:  I know he graduated and I know that he took some classes at the
22        community college.
23
24  SP:  And what - what kind of work did he do?
25
26  WA:  He was a welder and a farmer.
27
28  SP:  And did he have any drug or alcohol problems?
29
30  WA:  He liked to drink.
31
32  SP:  Was drinking an issue though for him?  Or a problem, I should say?
33
34  WA:  I think so.
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 184

1   SP:   What would he get like when he had been drinking?
2
3   WA:   Well, as long as he was drinking beer he was lots and lots and lots
4         of fun.  And - but he can't drink - he couldn't drink hard alcohol
5         because then he would get very mean.
6
7   SP:   Okay.  What would he do?
8
9   WA:   Break everything and throw things and want to argue.
10
11  SP:   Okay.  Was he in trouble with the - had he ever been in trouble with
12        the law?
13
14  WA:   I don't know.
15
16  SP:   What - what was your early relationship like with him, in the first
17        couple years?
18
19  WA:   We actually got along really good.
20
21  SP:   So - so you're - you're how old when you get married?
22
23  WA:   I'm 23.
24
25  SP:   You're 23 at the time you get married?
26
27  WA:   Yes.
28
29  SP:   And the - what - what's that make him, like 20 -
30
31  WA:   26.
32
33  SP:   26.  Okay.  And so the - the first part of the marriage, how's that
34        going?
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 185

1  WA: I liked it because we got along great.  I mean - and - and he liked
2      it because I was different than the girls he had grown up around
3      and that made me feel good.  And I - you know, I could provide for
4      him.
5
6  SP: So where were you living at the time?
7
8  WA: In my apartment that came along with my job.
9
10 SP: The - which one?
11
12 WA: The Quail Gardens.
13
14 SP: Quail Gardens.
15
16 WA: Uh-huh.
17
18 SP: So Quail Gardens is - that's the one before the hospital job, correct?
19
20 WA: Right.
21
22 SP: So it goes Quail Gardens, hospital job, then the Courtyard?
23
24 WA: Right.
25
26 SP: And then San Rivas?
27
28 WA: Right.
29
30 SP: And so he ends up living with you at all three, correct?
31
32 WA: Yes.
33
34 SP: Okay.
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 186

1   WA: Uh-huh.
2
3   SP:  So - so everything is going along well?
4
5   WA: Yes.
6
7   SP:  Were you -
8
9   WA: We got along really good.  More - more like friends than romantic
10       oh I'm in love type of thing, but we really got along very well.
11
12  SP:  So was there a change at some point do you think in the
13       relationship?
14
15  WA: No.  No, just - he was already - it's interesting now because the
16       same sort of environment that I had grown up with my parents was
17       the same thing with Joe.
18
19  SP:  How so?
20
21  WA: He loved for me to take care of him and be responsible and be the
22       one that always had work and that could pay the bills and if he got
23       upset about something then I could calm him down and fix it.  And
24       I could nurture him and take care of him, and he liked that.  And
25       that felt very comfortable to me.
26
27  SP:  So when did things change?
28
29  WA: They never did change.
30
31  SP:  So that was the relationship?
32
33  WA: Yeah, absolutely.
34
35  /////////////////////////////////////////////////////////////////

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 187

1  SP:  So how would - overall, how would you describe like - how would
2       you describe, like, if you were talking about your relationship to -
3       to someone you were just meeting in a social kind of context and
4       they were asking you about your - your husband and the
5       relationship, what would you say?
6
7  WA:  We were great friends.  We loved to do things together.  We're - did
8       we have romantic love?  No, but we - we really - we bonded and we
9       really got along well.  We liked to do the same things and he made
10      me feel very good about myself.
11
12 SP:  Did he?
13
14 WA:  As far as I could take care of him, any problem he had I could fix it,
15      and if he was upset, you know, I knew how to calm him down and
16      make it better.
17
18 SP:  So he made you feel good about yourself?
19
20 WA:  Well, every problem I could - every problem I could solve, that
21      made me feel like I had some worth and that I was contributing.
22
23 **Issue Re: Alleged Domestic Violence - Part I:**
24
25 SP:  Was he ever demeaning to you?
26
27 WA:  Yeah, if I couldn't - if I wasn't quick enough or fast enough or if I
28      didn't - if there was some lack in our household then it was my
29      fault.
30
31 SP:  And how would he let you know that?
32
33 WA:  Because he would yell and throw things and break things and - just
34      like my dad would.
35

Transcript of Forensic Psychiatric Evaluation
Re: Wendi Elizabeth Andriano
November 26, 2013
Page 188

1    SP:  But -
2
3    WA:  And then instead of me getting upset, it - all it does is pressure me
4         to try to figure out a way to fix it.
5
6    SP:  But you still say the relationship was terrific?
7
8    WA:  Well, I - that's - in my sickness and in his sickness it worked for us.
9
10   SP:  So basically what you're saying is -
11
12   WA:  Do you understand today I wouldn't be in that?  Back then, that's
13        what suited my behavior.
14
15   SP:  So you're saying that if that relationship was abnormal, that
16        abnormalness was what you knew?
17
18   WA:  It was very normal to me.
19
20   SP:  Got it.  Okay.  So -
21
22   WA:  That's what I was familiar with and what I knew.
23
24   SP:  Did he ever force you to have sex?
25
26   WA:  Yes.
27
28   SP:  How often?
29
30   WA:  Well, most of the time I would just concede because I also feel like
31        that was just part of making him happy.  So would I really make
32        him force me?  A few times there were.  Like after I had Nicholas I
33        remember him wanting really to have sex right away and I
34        physically could not and that turned into a not comfortable

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 189

1    situation.  But there are many, many, many times that I had to
2    have sex and I did not feel like I had the option to say "no."
3
4    SP:  Did the police ever come out to the house?
5
6    WA:  No, I would never tell anybody.
7
8    SP:  Did he ever tie you down?
9
10   WA:  No.
11
12   SP:  He ever -
13
14   WA:  No, I wouldn't fight him and I wouldn't even argue back with him
15        because I didn't feel like that was my place to do that.
16
17   SP:  Did he ever hold a gun to your head to have sex?
18
19   WA:  I remember we had an altercation that had a gun but I don't
20        remember if sex was involved in it or not.
21
22   SP:  Did he ever videotape your sexual relations?
23
24   WA:  I don't think so.  I hope not.
25
26   SP:  Did he ever say, "Hey, we need to have a third person in this sexual
27        relations"?
28
29   WA:  I don't think so.
30
31   SP:  Did you ever have a third person?
32
33   WA:  No.
34
35   SP:  Did - did he threaten you?

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 190

1    WA: Yeah, I was threatened by him.
2
3    SP:  How often?
4
5    WA: Not very often because most of the time I could keep the peace.
6
7    SP:  So give me an example of how he would threaten you.
8
9    WA: Well, I remember one night he had been out drinking tequila and I
10       remember I was with him and he started getting really mean and
11       I called my dad to take me home from the bar.  And he didn't want
12       me to go home and I left anyway and went home and went to -
13       tried to go to sleep.  Oh no, I didn't even go to sleep because I was
14       - I didn't - anyway, he came home drunk and I remember him
15       breaking through the door, breaking the coffee table, throwing me
16       up against the wall, punching a hole through the wall and all kinds
17       of things.  So yeah, there - we had - we had a few little -but they
18       weren't consistent.   Not enough for me to like - to me that was
19       okay.  It's like -
20
21   SP:  Were you hit by him?
22
23   WA: He never took his fist and punched me, no.  But did he try to choke
24       me or push me up against walls or hold me down?  Yes.
25
26   SP:  Slap you?
27
28   WA: No.
29
30   SP:  How did he try to choke you?
31
32   WA: With his hands.
33
34   SP:  Okay.
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 191

1   WA: But it wasn't - I think what I was telling myself is that it wasn't
2       anything different than what I had grown up with and it wasn't
3       severe that I thought.  Today I would think so.  Back then it wasn't
4       - I don't know, it was okay.
5
6   SP:  Was he - was he running around on you?
7
8   WA: I don't think so.  I don't think so.  But there got to be a point where
9       he - see this was after - I felt like we were always in it together
10      because he got that tumor like six months into our marriage.
11
12  SP:  Right.
13
14  WA: So that was something that we just lived with.  But it was us
15      together trying to get him better, get him healthy, and we were
16      always doing it together.  Always trying to find him employment
17      together, find him a job that he would like.  It just - so I was always
18      part of the process.  And it wasn't until like after he learned about
19      the cancer being everywhere that he just started pulling away from
20      me and Nicholas and Ashlee.  And so he started leaving us and try -
21      just going to do his own thing.  And that's when we really just
22      started having - where we weren't connected anymore.
23
24  SP:  So how long do you think it went that you guys weren't connected
25      before October 8th of 2000?
26
27  WA: It's really hard to say time, but I mean it was a chunk of time.  I
28      don't know.
29
30  SP:  Three years?  Four years?
31
32  WA: Oh no, less than a year probably.
33
34  SP:  Okay.  So - so -
35

Transcript of Forensic Psychiatric Evaluation
Re: Wendi Elizabeth Andriano
November 26, 2013
Page 192

1   WA: I can't remember - I mean I could tell you if I knew the time when
2        he - when we went to Mayo Clinic and - and then after - found out
3        about - he had a MRI done or a CAT scan done and saw the - the
4        cancer all over. And that really freaked him out. It freaked me out.
5
6   SP:  You - you've been pregnant how many times?
7
8   WA: Twice.
9
10  **Children:**
11
12  SP:  And you have two children?
13
14  WA: Uh-huh.
15
16  SP:  Correct?
17
18  WA: Yes.
19
20  ***Nicholas Andriano:***
21
22  SP:  And the - we talked about this earlier, but the oldest one is
23        Nicholas?
24
25  WA: Yes.
26
27  SP:  And Nicholas is now, what, 16?
28
29  WA: Oh my goodness, yes.
30
31  SP:  And have you had any contact with Nicholas?
32
33  WA: No.
34
35  SP:  Who - who - was he adopted?

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 193

1    WA: I don't even know.
2
3    SP:  You don't - you don't know where he is?  Put in foster care?  You
4         don't know?
5
6    WA: No.  I know that my husband's sister has my children.
7
8    SP:  Okay.  So your sister-in-law, correct?
9
10   WA: Yes.
11
12   SP:  And was Nicholas - was he a healthy child?
13
14   WA: Yes.
15
16   SP:  He was a term baby?
17
18   WA: Yes.
19
20   SP:  Any problems or complications with the delivery?
21
22   WA: No.
23
24   SP:  Did you - did you experience -
25
26   WA: He was just late.  He didn't want to be delivered and so we had to
27         make him come out.
28
29   SP:  Did - were - did you have any depression following his birth?
30
31   WA: I did not.
32
33   SP:  Okay.  Did he reach his developmental milestones appropriately?
34
35   WA: Yes.

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 194

1    SP:   And then was he a planned pregnancy?
2
3    WA:  Yes.
4
5    **_Ashlee Andriano_:**
6
7    SP:   And then what about Ashlee?
8
9    WA:  Yes.
10
11   SP:   She was planned pregnancy?
12
13   WA:  More or less, yes.
14
15   SP:   And was she - any problems with her birth or delivery?
16
17   WA:  No.
18
19   SP:   Any problems with her reaching her developmental milestones?
20
21   WA:  No.
22
23   **Issue Re: Joe Andriano's Cancer - Part I:**
24
25   SP:   So - so talk to me about Joe's - about Joe's - Joe's cancer.  What
26         type of cancer was it?
27
28   WA:  It was salivary gland cancer.
29
30   SP:   Okay.
31
32   WA:  And that's where it started.  And the first few surgeries that he had
33         had, we didn't even know it was cancer.  We were always told that
34         it was a benign tumor.  So - yeah.
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 195

1  SP:  And then when do you find out that it's a malignant tumor?
2
3  WA:  The last surgery that he had - oh no, what had happened?  I'm - I
4        just haven't thought about this stuff in a long time.  He was getting
5        ready to have a surgery for the benign tumor.  And as part of the
6        process of getting ready for surgery you have to have a chest X-ray.
7        They did a chest X-ray and that's when all these nodules showed up
8        on his lungs.  And that was our first clue that something more was
9        going on and so then he ended up having a needle biopsy done in
10       his lungs and they sent it to the lab and it still came back that
11       benign stuff and you're like this is impossible.  So then we ended up
12       having his uncle, who was part of the - I don't know if he's the Air
13       Force or the Army or something, and he made arrangements for us
14       to send the - the pathology stuff to Walter Reed Hospital and that's
15       who finally gave him a diagnosis.
16
17 SP:  And what was the diagnosis?
18
19 WA:  Of the salivary gland cancer.  I can't remember the exact words, but
20       that's what it was.
21
22 SP:  When - when was he given that diagnosis, what year, do you
23       remember?
24
25 WA:  I was at Courtyard Apartments and pregnant with Ashlee.  I had her
26       in September of '98, so in '98 some time.
27
28 SP:  And what was the response to him finding out that he had this
29       malignancy, what did he do next?
30
31 WA:  It was a kind of shock because like you can't even - it doesn't seem
32       real.  Yeah, it - we - like you just can't even wrap your brain around
33       it.  It just didn't seem real.
34
35 SP:  Did he go for treatment?

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 196

1  WA: Well, that's when we tried to find somewhere better for him to go,
2       since the first doctors had missed it so much. And so that's how we
3       ended up at the Mayo Clinic. And he did agree to have surgery and
4       they wanted him to have radiation and chemotherapy and he said
5       "No" to those.
6
7  SP: Right.   He - he said - he said that he wasn't going to take
8       conventional treatments, correct?
9
10 WA: That's correct.
11
12 SP: But at some point then he changes his mind? Do I have that right?
13
14 WA: Right. Later on in the thing. We tried lots of like holistic therapies
15      first.
16
17 SP: Right. So is he working during this time?
18
19 WA: No.
20
21 **Source of Income While Married:**
22
23 SP: What's the - what's the longest job he ever had while you two were
24      together?
25
26 WA: Well, I think his longest one would've been working for a place
27      called Accuglass, and he worked for them as a subcontractor. And
28      he learned how to replace windshields and repair little cracks in
29      windshields.
30
31 SP: So how long did he work for them?
32
33 WA: I don't think it was very long because I had been fired from
34      Courtyard - no. That's not right. I had been fired from the hospital

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 197

```
 1        and that's when he got the job with Accuglass.  And I don't even -
 2        I don't know, maybe six months at the most.
 3
 4   SP:  Who was the - who was the person that during the course of your
 5        relationship brought in the lion's share of the money?
 6
 7   WA:  I did.
 8
 9   SP:  What do you think the most amount of money he made in a year
10        was?
11
12   WA:  I don't know because I don't even think he ever filed taxes.
13
14   SP:  Okay.
15
16   WA:  So I never - I - I don't know.
17
18   SP:  Did you guys have a lot of debt?
19
20   WA:  Lots and lots of debt.
21
22   SP:  How much?
23
24   WA:  I don't know, but a lot.
25
26   SP:  Tell me a number that you recall, ballpark.
27
28   WA:  I never added it up because we just maxed out credit card after
29        credit card.
30
31   SP:  Did you have debt collectors calling you?
32
33   WA:  No.
34
35   SP:  Did you file for bankruptcy at any point?
```

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 198

1  WA:  No.
2
3  SP:  Did you think about doing that?
4
5  WA:  No.
6
7  SP:  So it was - you were having a tough -
8
9  WA:  We always - we really - okay, so he had grown up within a family
10      of farmers.  Excuse me.  Excuse me.
11
12 SP:  Go ahead.
13
14 WA:  And in a environment with friends who were self employed.  And he
15      had always told me he liked to be self employed.  So when I met
16      him he had a - welding equipment.
17
18 SP:  Right.
19
20 WA:  And he used to do odd and end jobs for people doing welding.
21
22 SP:  Right.
23
24 WA:  And so that's how he had income coming in and part of the reason
25      why he moved in with me is because he did not have the money to
26      pay rent to somebody and his parents wanted him to pay rent at
27      home and he couldn't do that and so I told him he could move into
28      my house.
29
30 **Issue Re: Alleged Domestic Violence - Part II:**
31
32 SP:  Did you tell people that he was physically rough with you?
33
34 WA:  I don't think so.  I don't know.
35

P-App. 007312

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 199

1   SP: I - I asked you this before and I'm going to ask you - I think I
2       [inaudible], did - did he ever force you to have sex with him?
3
4   WA: You - yeah, you did ask me that.
5
6   SP: Right.  And I'm asking again, did - did - did he ever force you to
7       have sex with him?
8
9   WA: There were a few times that yes he employed force.
10
11  SP: And did any of those times occur in the year 2000?
12
13  WA: I don't remember.
14
15  SP: Did - when you had sexual relations, would he have an orgasm?
16
17  WA: Yes.
18
19  SP: Would you?
20
21  WA: No.
22
23  SP: Did you ever have orgasm with him?
24
25  WA: No.
26
27  SP: Did you ever have an orgasm with any other man - wait, let me
28      finish the question, before him?
29
30  WA: No.
31
32  SP: Okay.  Did he ever try to anally rape you?
33
34  WA: No.
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 200

1   SP:  And you're saying he never tied you down or -
2
3   WA: No.
4
5   SP:  Did he introduce sex toys into the relationship?
6
7   WA: He - yes.
8
9   SP:  What - what kinds of things did he introduce?
10
11  WA: Oh goodness.  I don't even remember what, but I remember him
12       coming home with some things and - I don't know.
13
14  SP:  What kinds of things?
15
16  WA: Do we have to talk about that?
17
18  SP:  Well, I -
19
20  WA: I don't -
21
22  SP:  I wouldn't be asking if -
23
24  WA: I mean gosh, I don't know.  I don't - I don't really remember.  It
25       was some - some thing in a styrofoam kit and it had all sorts of
26       different things in it.  I don't know.  I don't even -
27
28  SP:  Okay.
29
30  WA: I don't know.
31
32  SP:  How often did he introduce sexual toys or -
33
34  WA: He just did that a couple of times and that was when we were at
35       San Rivas.

Transcript of Forensic Psychiatric Evaluation
Re: Wendi Elizabeth Andriano
November 26, 2013
Page 201

1   SP:  Okay.  This was - was this -
2
3   WA: And I don't know where that came - like I don't know where that
4       came from.  I - I feel like - I feel like - I don't know, I - I don't
5       know.
6
7   SP:  Did he ever threaten to kill you?
8
9   WA: Yes.
10
11  SP:  How many times?
12
13  WA: Just a couple.
14
15  SP:  When was the last time before October 8, 2000?
16
17  WA: Gosh, I don't remember the time but it was like within the year and
18      - because he had broken - well he put his fist through the dresser
19      in my room and had broken our bed too.  Yeah.  That was the last
20      time.
21
22  SP:  So what do you - he threatened you?
23
24  WA: Yes.
25
26  SP:  Why?  What was going on?
27
28  WA: I don't remember what the cause of that one was.
29
30  SP:  What - typically what would your fights be about?
31
32  WA: Money.
33
34  SP:  Anything else?
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 202

1 WA: No, mostly money.

2

3 SP: Did he ever used to follow you?

4

5 WA: Oh, I don't know.

6

7 SP: Did he ever stalk you?

8

9 WA: I don't know.

10

11 **Issue Re: Extramarital Relationships:**

12

13 SP: Okay.  Were you completely faithful to him in the relationship?

14

15 WA: Up until the last year I was.

16

17 SP: Okay.  And what happened in the last year?

18

19 WA: Then I had two affairs.

20

21 SP: With - with who and who?

22

23 WA: Gosh, oh I don't even remember.  Rick and then somebody else.

24   No.

25

26 SP: Who was the first one?

27

28 WA: Rick.

29

30 SP: What was Rick's last name, do you remember?

31

32 WA: I can't remember right now.

33

34 SP: And how did you two meet?

35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 203

1    WA: At the apartments.

2

3    SP:  And was he living there?

4

5    WA: He had come to rent an apartment there and then he rented an
6         apartment there.

7

8    SP:  And how soon after you met did you and him start up having an
9         affair?

10

11   WA: A couple months.  I don't know.

12

13   SP:  And that affair became sexual?

14

15   WA: Yes.

16

17   SP:  And you had intercourse?

18

19   WA: Yes.

20

21   SP:  How - how often would you -

22

23   WA: It didn't last very long.  It wasn't - it was - I would - I can't put a
24        time on it, but maybe like a six month time or under.  I don't know.

25

26   SP:  And - and - and who ended it?

27

28   WA: He did.

29

30   SP:  Why?

31

32   WA: Because he felt bad that - he just felt bad that he was interfering in
33        a marriage.

34

35   SP:  Did he know you were married?

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 204

1   WA: Yes, he did.
2
3   SP: From the outset?
4
5   WA: Yes.
6
7   SP: Okay.
8
9   WA: I know he says he didn't, but that's not true.
10
11  SP: Oh, so you're aware of that?
12
13  WA: I'm aware of that because that really just surprised me.
14
15  SP: How did you know that, that he says that?
16
17  WA: Because I remembered him saying that. That just shocked me.
18
19  SP: Where do you remember him saying that?
20
21  WA: At court.
22
23  SP: And then who was the other affair with?
24
25  WA: I can't remember his name.
26
27  SP: How long did that last?
28
29  WA: That was just like a week or two thing. It wasn't -
30
31  SP: I want to say his first name was Eric, does that sound right?
32
33  WA: No. Eric was Rick's friend. I did not have an affair with him.
34
35  SP: Oh, okay.

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 205

1   WA: I don't - I can't remember.
2
3   SP:  Did you - did you - were these relationships sexually satisfying?
4
5   WA: No.
6
7   SP:  You didn't have orgasms with these relationships either?
8
9   WA: Nope.
10
11  SP:  What about with this relationship you had at the jail?
12
13  WA: I did there and that's how come I know that I didn't before, because
14       that was my first time and I didn't even - I was - it was a shock to
15       me.
16
17  SP:  Okay.
18
19  WA: So that's how I learned what the difference was.
20
21  SP:  Got it.
22
23  WA: Sorry for the - how embarrassing.
24
25  **Issue Re: Disclosure of Extramarital Affairs to Spouse:**
26
27  SP:  So - so who - so do you tell - ultimately tell your - your husband
28       about these relationships?
29
30  WA: I did.
31
32  SP:  One or both?
33
34  WA: I don't know.  I think just one.  I don't think I put a name to it and
35       said, but I just admitted that "yes", I had cheated on him.

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 206

1    SP:  When did you do that?
2
3    WA:  That night.
4
5    SP:  October 8th?
6
7    WA:  Yes.
8
9    SP:  But you don't remember which one you told him about?
10
11   WA:  I don't.
12
13   SP:  Why did you tell him?
14
15   WA:  Out of guilt and just need to confess.  I don't know, I just - I just
16        felt like I just had to tell.  I still do that.  I always feel like I have to
17        tell.  I don't know.  That's what got me one of my tickets.  I
18        wouldn't have had a ticket but I went and told on myself.  I don't
19        know why I do that.
20
21   **Issue Re: Medical Malpractice Litigation:**
22
23   SP:  You and your - your husband had a - a malpractice litigation going,
24        right?
25
26   WA:  Well, I don't know if it really officially started but I know they were
27        investigating it, yeah.  Because I don't know - I know there was
28        some sort of time limit before you have to file and all sorts of stuff
29        so I don't even know if we reached that point or not.
30
31   SP:  Did you meet with lawyers?
32
33   WA:  Yes.  Yeah.
34
35   SP:  But you don't know if the suit had been filed?

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 207

1  WA: Well, right.  And the reason I say that, technically I know that they
2       were - there's a lot of investigation stuff that has to happen and
3       then there's a time limit on it before it officially gets file and I don't
4       know if it ever officially got filed.

5
6  **Defendant's Description of Her Relationship With Her Spouse**
7  **During the Week Leading Up to the Instant Offense:**

8
9  SP: So what was your relationship like with your husband in the week
10      leading up to October 8th?

11
12 WA: Well, we weren't really having one too much.   I don't really
13      remember.

14
15 SP: What I'm going to do is I'm just going to stop this recording for a
16      second and I'm going to restart it.  So just hold your thoughts
17      there.

18
19 [Break]

20
21 SP: It's back recording.  Do you - you would agree we didn't have any
22      conversation, correct?

23
24 WA: I agree.

25
26 **Issue Re: Joe Andriano's Cancer - Part II:**

27
28 SP: So - so walk me through this part.  I'm - I'm - I'm just confused on
29      this.  Okay.  And I - and I - I want to understand this.  So - so help
30      me understand this, if you can.  Your husband - first of all, was his
31      cancer terminal?

32
33 WA: Yes.

34
35 SP: Who told you that?

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 208

1  WA:  Dr. Green at the Mayo Clinic.
2
3  SP:  That he said it was terminal?
4
5  WA:  Yes.
6
7  SP:  And you're sure about that?
8
9  WA:  Well yes.
10
11  **ISSUE RE: SODIUM AZIDE - PART I:**
12
13  SP:  Okay.  And so whose idea is it to get this - this chemical?
14
15  WA:  Well that specific one is - it wasn't like we knew.  The idea was to
16       find something that he could take that would just stop his heart.
17       And the first thing that is so well known was cyanide and I know
18       that that's what we had discussed, so that's what the beginning of
19       the conversation was.
20
21  SP:  When did you have that conversation?
22
23  WA:  He had had a couple of incidents where it was kind of scary where
24       he couldn't breathe and he felt like his body was seizing up.  And he
25       had been told that pretty much the tumors would take over his
26       lungs and he would suffocate to death, is how - what happens when
27       you have lung cancer.  And so when he had those episodes and he
28       couldn't catch his breath and like my mom was a respiratory
29       therapist and she would come - because he didn't want to call the
30       doctor and do all that, so my mom would come up and check and
31       try to listen for his breathing and help calm him down.  And so
32       that's - that's what prompted the discussions to start happening,
33       because he really didn't want to go to the hospital and get hooked
34       up to machines.
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 209

1   SP:  How long before October 8th did these conversations start?
2
3   WA:  I don't know.  It's hard for me to say.
4
5   SP:  Were - were you seeing the second person you were having the
6        relationship with right up to October 8th?
7
8   WA:  No, I think it might've been like a month before or something.  I
9        don't really remember.
10
11  SP:  Were you seeing anyone at that time?
12
13  WA:  No.  And I wasn't really seeing the other one.  It just was a - I don't
14       know what it was.  I can't explain it.  I don't even know.  I don't
15       know why I was doing that.  I don't know.
16
17  **ISSUE RE: DEFENDANT'S EFFORT TO SECURE LIFE INSURANCE**
18       **POLICY FOR JOE ANDRIANO:**
19
20  SP:  There was something I recall about life insurance.
21
22  WA:  Uh-huh.
23
24  SP:  Correct?
25
26  WA:  Yes.
27
28  SP:  And do - am I correct that you tried to talk to a friend about being
29       your husband and applying - and showing up for the exam for life
30       insurance?
31
32  WA:  Well, what I remember is that Joe wanted life insurance because of
33       him getting ready to die.  And I tried every which way to get life
34       insurance and it just didn't work.  And so then we dropped it.  So I
35       guess I don't - I don't know.  And I know when we went to trial like

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 210

1  they tried to make that some big deal with - that it had something
2  to do with this, but it - I don't know.
3
4  SP:  Well, did it?
5
6  WA:  No, not in my mind.  So I don't understand why, what that has to
7  do with it but - I tried to fix it, it didn't work and so it was a non-
8  issue.
9
10  SP:  So if your husband wants to die, why doesn't he just take a gun and
11  just kill himself?
12
13  WA:  I don't know that.
14
15  **ISSUE RE: SODIUM AZIDE - PART II:**
16
17  SP:  And - and why - why this whole elaborate thing of having to put -
18  by the way it's - I believe it's sodium azide.   Does that sound
19  familiar?
20
21  WA:  That - that's right, yes.
22
23  SP:  Why - why - why go through this whole exercise of putting these
24  things in a capsule?
25
26  WA:  Well, that you can't - you had to put it in something for him to
27  swallow it.  He - you can't just put the powder in your mouth and
28  try to swallow it, that was the point.
29
30  SP:  Okay.  And you're saying he - he knowingly - you're - you're saying
31  that he knowingly took these capsules -
32
33  WA:  Yeah.
34
35  SP:  Completely aware that sodium azide was in them?

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 211

1   WA:  Yes.
2
3   **ISSUE RE: DEFENDANT'S ASSESSMENT OF THE STATE'S VERSION**
4        **OF THE INSTANT OFFENSE:**
5
6   SP:  So - so what - so how do you reconcile this - this - the state's
7        version of this - of this case that you - you actively set out to poison
8        him?
9
10  WA:  Well, I don't - I don't know.  I don't know why.  I don't know.
11       Because I thought I had told my lawyers about what had happened
12       and then when we went to trial it just seemed to be all different and
13       so I don't really know.  And I think it was here that I actually
14       started becoming more aware of everything that the state had
15       really said against me because I - I don't know.  Like my mom
16       would tell me things or I would read an article in the - in a
17       magazine and I guess it was maybe for - I don't know how many
18       months it took me to get off all my psych pills and then I started
19       reading this stuff and I'm like well why are they saying this and why
20       are they saying that?  And that's when I became more aware of the
21       details of what the state was saying against me.
22
23  SP:  What - so what is it that you think as you sit here today, what is it
24       that you think the state has - what was - what was wrong about
25       their version?
26
27  WA:  I don't know because I don't have it memorized about everything.
28       But I know -
29
30  SP:  But -
31
32  WA:  I heard - I heard that they said I killed him because I wanted to be
33       with somebody.  Well, that's not true.  And somebody said, "Oh,
34       you wanted to kill him for life insurance." Well, that's not true.  And
35       so I don't know.  I don't - I don't know.  I get - I don't know.  I

Transcript of Forensic Psychiatric Evaluation
Re: Wendi Elizabeth Andriano
November 26, 2013
Page 212

1   don't have an answer for that.  I just know what I know.  But I
2   don't even think that that's what we're having an appeal about so
3   I don't know why I'm even discussing this.  Because I don't think
4   any of that's - the judge didn't allow any of that stuff in to be
5   renegotiated.
6
7   SP:   Well, that may be but I - that doesn't mean I can't ask you about -
8
9   WA:   Oh no, you can.  I'm just saying I didn't know -
10
11  **DEFENDANT'S VERSION OF THE INSTANT OFFENSE - PART VI:**
12
13  SP:   Okay.  So - so - so I want to make sure I heard your version right
14        earlier.  Okay.  Tell me if I - I have this correct.  And this is going
15        to be in a summary kind of fashion.  But the gist is that you and
16        your husband get the idea that it's time for him to - to die.
17
18  WA:   Right.
19
20  SP:   He want - he wants to die.
21
22  WA:   Well, he wants to die how he wants to die and not how it's going to
23        happen.
24
25  SP:   And he - what you're claiming is he enlists your services to secure
26        some type of poison for him to take?
27
28  WA:   Yes.
29
30  SP:   Do I have that part right?
31
32  WA:   Yes.
33
34  SP:   And then you find the - the appropriate poison and you order it,
35        correct?

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 213

1   WA: Right.
2
3   SP:  And you order it using a - you set up a fake business name as well
4        as a fake person that's going to receive it, correct?
5
6   WA: Right.
7
8   SP:  Okay.  Then the - the poison comes and you and he, together,
9        empty out some capsules of whatever and - to go and put the
10       sodium azide in, correct?
11
12  WA: Yes.
13
14  SP:  And then - then on this one particular night, October 8, 2000, he
15       proceeds to take the sodium azide.
16
17  WA: Yes.
18
19  SP:  Knowing full well what he's doing?
20
21  WA: Yes.
22
23  SP:  Okay.  But then somehow it doesn't work as well as you all had
24       allegedly planned and he ends up getting sick.
25
26  WA: Right.
27
28  SP:  And it - it's not going well.
29
30  WA: No.
31
32  SP:  And then at some point after it's not going well, that's when you
33       share with him that you've been seeing someone else?
34
35  /////////////////////////////////////////////////////////////////////

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 214

1  WA: No.   He was - we - there - because of - I don't know what
2       happened, but he just was starting to get really agitated and mad
3       and then he - of course he starts yelling at me because that's what
4       he does.
5
6  SP: Okay.  So what was he doing?
7
8  WA: So - always accusing me of having an affair.
9
10 SP: So -
11
12 WA: Which was true, but I had up to that point always told him "no,"
13      and I was lying to him.
14
15 SP: So - so why on -
16
17 WA: And -
18
19 SP: So - so what - what get - so here you are -
20
21 WA: I know.
22
23 SP: You're this pretty sophisticated person when it comes to calming
24      him down and the one thing that's going to set him off beyond, is
25      you admitting this.  That doesn't make sense to me.  Here - you're
26      this polished problem solver.
27
28 WA: Yeah.
29
30 SP: How does that go?  Here you are, you've got your life's work with -
31      between your - your dad and your mom and others as being the
32      problem solver, the peacemaker.
33
34 WA: Yeah.
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 215

1   SP:  Bringing people together.  So why on that night do you go ahead
2        and - and spill the beans?
3
4   WA:  I don't know.  I just did.
5
6   SP:  Explain that one.
7
8   WA:  I can't give you a rational explanation.
9
10  SP:  Give me any explanation.
11
12  WA:  Oh, I mean - I - no, see it's not funny.  It really is not funny.
13
14  SP:  I - I know it's not, but I'm - I'm looking for - for - for any
15       explanation.  I guess what I'm really getting at is why - why then?
16
17  WA:  I don't know.  I just felt really, really bad and I just did it.  I don't
18       know.
19
20  SP:  Well, what - what - what - surely you knew that he was going to get
21       upset, right?
22
23  WA:  Well, yes I think that if I had been sitting there thinking rationally
24       and considering everything, then I would've made a better decision.
25       But I didn't.  So I don't have a rational explanation for it.
26
27  SP:  Okay.  So - so now you tell him this, right?
28
29  WA:  That what?
30
31  SP:  You tell him?
32
33  WA:  Yeah.
34
35  SP:  That you've been having this affair.  And then what does he do?

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 216

1    WA: It just - like everything just went to a whole other level of - of rage
2         and being very, very pissed off.
3
4    SP:  And what is he doing?  Is there -
5
6    WA: And I don't - I - that part of it, it's -
7
8    SP:  That's the part that doesn't run like a film for you.
9
10   WA: No.  I'm like - I just remember this explosive thinking oh my God
11        what did I just do type of thing and freaking out because it was just
12        -
13
14   SP:  So is he - so - so why don't you leave the - the apartment?
15
16   WA: I never left.  I would never leave him.
17
18   SP:  But you somehow get a hold of a knife?
19
20   WA: I don't know.
21
22   SP:  Well, he ends up getting stabbed, right?
23
24   WA: He does.
25
26   SP:  He didn't stab himself, did he?
27
28   WA: I don't know.
29
30   SP:  You think he may have?
31
32   WA: No, I don't know.  That's why - I - I don't know.  I don't - I can't
33        answer that question.
34
35   ////////////////////////////////////////////////////////////////

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 217

1 SP: Okay. So you - you don't have a memory of what happened right
2 then?
3
4 WA: No, I don't.
5
6 SP: Well, what if there's information in some other statements that you
7 made where it shows your memory was actually pretty good around
8 that time?
9
10 WA: Well, I - and I would sit here today knowing how I am and tell you
11 I don't know if I was telling the truth or not, if I really remembered
12 at that time and I'm not remembering now. That's what I would tell
13 you.
14
15 SP: I think I got it.
16
17 WA: Do you?
18
19 SP: I do.
20
21 WA: Okay.
22
23 **INTERVIEW CONDUCTED BY KIRAN AMIN, PH.D.:**
24
25 SP: It's 1:37. Dr. Amin, do you have any questions?
26
27 KA: Yeah, I just have some straightforward questions.
28
29 SP: What I'm going to do is I'm going to switch seats with Dr. Amin.
30
31 WA: Okay.
32
33 SP: To make sure that the sound is picked up.
34
35 WA: Okay.

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 218

1   SP:  Okay.
2
3   KA:  Some of these -
4
5   SP:  Excuse me.  I'm sorry.
6
7   KA:  Sure.  Some of these questions have already been over but the
8        ques - first question, have you ever been hospitalized?  And if I
9        understand correctly you said to your knowledge you have only
10       been hospitalized twice when you had your children?
11
12  WA:  Yes.
13
14  KA:  Right?
15
16  WA:  Yes.
17
18  KA:  Have you ever had to go to emergency department for, you know,
19       medical attention or anything like that?  Either for yourself or your
20       children or anybody else?
21
22  WA:  Yeah.  Yes, yes.  I remember one time, I don't recall my age, but I
23       was younger and I - I remember my parents had been praying for
24       me because I had something wrong in my ear, over here,
25       something going on.  And they had been praying for God to heal
26       me.  And it finally got to a point where they were scared I was
27       going to die, I guess, and they took me to the emergency room.
28       But I don't remember what happened or whatever.
29
30  KA:  Rough - roughly how old were you then, can you remember?
31
32  WA:  I don't know.
33
34  KA:  Were you still in school or?
35

Transcript of Forensic Psychiatric Evaluation
Re: Wendi Elizabeth Andriano
November 26, 2013
Page 219

1       WA:  Yeah.  I was not a teenager.
2
3       KA:  You were?
4
5       WA:  I was not.
6
7       KA:  Oh.
8
9       WA:  I was under my teens.
10
11      KA:  Okay.
12
13      WA:  I know that -
14
15      KA:  And what you can remember was they took you there and then that
16           was it?  You came back home, they gave you some medicine or
17           something?  What happened?
18
19      WA:  I - I don't know.
20
21      KA:  You can't remember?
22
23      WA:  I think so.  Yeah, because I don't -
24
25      KA:  Okay.
26
27      WA:  I don't know.
28
29      KA:  All right.  Any other times that you've been in an ER for whatever
30           reason?
31
32      WA:  I know once as an adult I had to go to the ER for myself and then
33           I've been to the ER twice with Nicholas.  I think that was it.
34
35      KA:  And what was the reason you had to go as an adult?

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 220

1  WA:  Oh gosh.  I was having stomach pains really bad.  I don't remember
2       what it was.  And I know they sent me home with medication and
3       I took it and it was better.
4
5  KA:  And does - as an adult, meaning?
6
7  WA:  I was working at the hospital, in fact.
8
9  KA:  Okay.
10
11 WA:  And I just went - I had them come get me from the emergency
12      room.
13
14 KA:  Okay.  Okay, thank you.  Now, we asked you this question again,
15      have you ever passed out or lost consciousness or blacked out to
16      your knowledge of any time - at any time?
17
18 WA:  I don't know.  Not that I'm aware of.
19
20 KA:  Okay.  So no loss of consciousness, blackouts that you can
21      remember?
22
23 WA:  Not that I remember.
24
25 KA:  Okay.  All right.  Now, what about accidents like falling down stairs
26      or falling off a swing or falling off a tree or anything like that, have
27      you had accidents of that kind at all when you were growing up or
28      later as an adult?
29
30 WA:  Not that I remember.
31
32 KA:  What about - you said you had been given some speeding tickets?
33
34 WA:  Uh-huh.
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 221

1   KA:  So how many speeding tickets are we talking?
2
3   WA:  I don't know.  I don't know if I had two or three, but something like
4        that.
5
6   KA:  What age did you learn to drive?
7
8   WA:  Well, my dad used to take me and my friends out driving in the
9        desert when we were young, so pretty young.
10
11  KA:  So by 16 or 17 you had your license?
12
13  WA:  Yes.
14
15  KA:  So what about motor vehicle accidents?
16
17  WA:  Well, the one with my mom.  I think that's it.
18
19  KA:  And what I remember you saying is that you were in the car with
20       her and you got T-boned by another vehicle on your side?
21
22  WA:  Yes.
23
24  KA:  You were the passenger?
25
26  WA:  Yes.
27
28  KA:  Were both of you wearing seatbelts?  Can you remember or was
29       that long before seatbelts -
30
31  WA:  Oh.  Yeah, I don't remember.
32
33  KA:  Were mandatory?
34
35  WA:  I just don't remember.

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 222

1   KA:  So this would've been when you were what, a teenager?
2
3   WA:  I don't - I don't know, maybe 11-12.
4
5   KA:  Oh, okay.
6
7   WA:  13.  I don't know.
8
9   KA:  You mentioned that when you did have alcohol, like wine coolers
10        and stuff -
11
12  WA:  Yes.
13
14  KA:  That you would get to the point where you would get intoxicated?
15
16  WA:  Yes.
17
18  KA:  So at that time can you recall any instance where you fell down on
19        your face or anything like that?
20
21  WA:  I don't know.  I don't know.
22
23  KA:  And along the same lines, what would happen after you got
24        intoxicated?  Did you drive home or walk home?  What was -
25
26  WA:  No, I was always with somebody.
27
28  KA:  So -
29
30  WA:  I guess, who - yeah, because I didn't drive home.
31
32  KA:  Okay.
33
34  /////////////////////////////////////////////////////////////////
35  /////////////////////////////////////////////////////////////////
    ///////////////////////////

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 223

1  WA: Joe would always laugh and make fun of me because I would always
2     pass out or throw up or something.  They would get me home.  I
3     don't know.
4
5  KA: Growing up no hits to the head, falling back on the back of your
6     head or anything like that on steps, stuff like that?  Hitting the
7     concrete with your head?
8
9  WA: Not that I know of.
10
11 KA: Okay.  And currently today you are on BuSpar®, right?
12
13 WA: Yes, sir.
14
15 KA: That's the only medication you are on?
16
17 WA: Yes.
18
19 KA: Okay.  Do you take any other medications as needed like aspirin or
20     Tylenol or whatever?
21
22 WA: Yes.
23
24 KA: And what do you take those for?
25
26 WA: For headaches.
27
28 KA: So what kind of headaches do you get?
29
30 WA: I just get really bad headaches up the back of my head and then
31     sometimes like even right now it's the whole front of my head hurts.
32     So I take them quite a bit.
33
34 KA: So how frequently do you get these headaches?
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 224

1   WA: I don't know.  Not - I don't -
2
3   KA:  Once a week?  Once ever two weeks?
4
5   WA: Maybe ever two weeks, say.
6
7   KA:  Yeah.
8
9   WA: It's - I don't know, it's really hard to keep track of time here.  I
10       don't know.
11
12  KA:  I understand.  And how bad are they, are they pretty bad?
13
14  WA: Yeah.
.5
16  KA:  So on a zero to ten scale, "zero" means no pain -
17
18  WA: Probably like an "eight."
19
20  KA:  An "eight."  And how long do they last?
21
22  WA: For several hours.
23
24  KA:  Okay.  Have you been to the medical people here for these
25       headaches?
26
27  WA: No.  I just - because medical here always just tells you drink water
28       and take IBU's.  Unless you're bleeding, they don't really want to
29       deal with it.
30
31  KA:  Now, have you always had these kinds of headaches or this is
32       something new?
33
34  WA: No, I've always had headaches.
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 225

1    KA:  Of this type?
2
3    WA:  Yeah.
4
5    KA:  Back of the head kind of idea?
6
7    WA:  Yeah.
8
9    KA:  Okay.  Where else did you say?  Back of the head and?
10
11   WA:  Sometimes it's right here.  Like right now, I - it's -
12
13   KA:  On the front?
14
15   WA:  Yeah.  It hurts on the front of my head.
16
17   KA:  You used to have these headaches when you were a kid?  Or it's
18        more when you were a little older?
19
20   WA:  Maybe when I was older.  I don't really - yeah.  I've never stopped
21        to think about when.  They - I've just lived with it.
22
23   KA:  So the only motor vehicle accidents you can - accident you can
24        remember is the one with your mother?
25
26   WA:  Yes.
27
28   KA:  All right.  I think I'm done.
29
30   **FOLLOW-UP INTERVIEW CONDUCTED BY STEVEN E. PITT, D.O.:**
31
32   SP:  Okay.  I just have a couple more questions.  The time is 1:46.
33
34   KA:  Do you want me to move?
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 226

1    **PSYCHIATRIC HISTORY PRIOR TO OCTOBER 8, 2000 - PART II:**
2
3    SP:  No, I'm okay right here.   Did - did - have you ever had an
4         experience whereby like you felt like you were almost out of your
5         body?  You're shaking your head "yes."
6
7    WA:  Yes.
8
9    SP:  Explain that to me.
10
11   WA:  Okay.  So I think I'm more aware of it because I'm by myself, but
12        I've had times where I feel like I'm watching myself.  Yes.  It's hard
13        to describe it.
14
15   SP:  And what are you doing when you're watching yourself?
16
17   WA:  Well it could just be random.  I could be - it makes me sound crazy.
18        Like I could be watching TV and just feel like I'm out of my body
19        seeing myself watch TV.
20
21   SP:  Okay.  Is that -
22
23   WA:  Which is - now, I want to say that sometimes when I'm meditating,
24        I can have that feeling too.
25
26   SP:  Okay.  Have you had - did you ever have that feeling though before
27        October 8, 2000?
28
29   WA:  Yes.
30
31   SP:  Okay.  How often?
32
33   WA:  There was one time when I'd first gone to Mexico to do the
34        missionary trip and it was right - I was placed in a home with
35        somebody I didn't know and I remember feeling outside of myself

P-App. 007340

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 227

1        for the first few days that I was there.  It was - I couldn't - and it
2        was very weird.
3
4  SP:  What about in the year leading up to the offense?  How often did it
5        happen, if at all?
6
7  WA:  I don't know that I ever felt outside of my body because at that
8        time I was feeling like I couldn't grab a hold of my thoughts.
9
10  SP:  Okay.
11
12  WA:  I felt like it was all racing everywhere crazy, like, I don't know.
13
14  SP:  Sometimes I talk to people and they - they believe that in addition
15        to being out of their body but that they take on different
16        personalities.
17
18  WA:  I can't say that.  It's more - no, because I still feel like I'm me, but
19        I just don't feel attached.
20
21  SP:  So prior to October 8, 2000, when do you think the last time you
22        had one of these out-of-body-like experiences?
23
24  WA:  I don't know.
25
26  SP:  A year?
27
28  WA:  I don't think they were frequently.  Like just - just every once in a
29        while.  Just -
30
31  SP:  Okay.  So -
32
33  WA:  I don't know.
34
35  */////////////////////////////////////////////////////////////*

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 228

1   SP:  Do you think in the year before, can you give me a - a sense?  Are
2        we talking one, ten, 100?
3
4   WA:  Oh, no.  I would say in my lifetime I think probably under 12 to 15.
5
6   SP:  Okay.  And of the 12 to 15, in the year - can you give me a sense
7        in that year, or even two years before October 8?
8
9   WA:  I know, it's so hard.  I really can't.
10
11  SP:  Do you think it was more than one?
12
13  WA:  I don't - okay, so I'm going to say this is a deductive reasoning type
14       of thing.  When I'm under - I don't know.  I don't know.  I don't
15       even want to answer it because I just don't know.
16
17  SP:  Well, what were you going to say though?  You were going to say
18       when you're under -
19
20  WA:  I notice myself from my experience here that under moments of
21       extreme stress or like if -
22
23  SP:  Right.
24
25  WA:  I feel like everything is just craziness, and I sit down trying to pull
26       myself back together is probably when I am more likely to have that
27       feeling.
28
29  SP:  Got it.  But as you sit here today you don't know when that last -
30
31  WA:  I can't - yeah, I can't -
32
33  SP:  Episode was before October 8?
34
35  WA:  I really can't say.

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 229

1    SP:  Do you think it happened on October 8?
2
3    WA:  I don't know.
4
5    SP:  Okay.
6
7    WA:  I wish I could say.
8
9    SP:  Okay.  We - we've asked you a bunch of questions.  Is there
10        anything else that you think we need to know that we haven't
11        talked about here?
12
13   WA:  I don't - I don't know because I don't know what information you
14        need to know.  I don't know.  I don't know.  Because even like you
15        asked me about all this - these people I've talked to getting ready
16        for the appeal.  They just had endless amounts of questions for me.
17        So you know, then I'm - I don't know what it is you need to know
18        from me.
19
20   SP:  I see.  Well, surely you - you knew that we were coming today,
21        correct?
22
23   WA:  I did.
24
25   SP:  Okay.  So were there certain things in ad -
26
27   WA:  And I had this - I didn't even want to come because I knew what we
28        were going to have to talk about and I really thought over the
29        weekend to try to refresh and I couldn't even make myself think
30        about what I know you were going to ask me.  Because I wanted to
31        be more prepared.
32
33   SP:  Okay.  Were there any things though that you thought about in
34        advance of this meeting where you're like "wow," I really want the

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 230

1         doctors to know this or I hope that I make this point.  Anything like
2         that?
3
4   WA:  Well, I know for me just I know that when I was finally told the
5         things about my mood swings and the - and the getting the
6         depression and the - not being able to gather my thoughts and just
7         this - this stuff that I was going through helped explain my behavior
8         to me.  I know that's brought me peace because at least I have a
9         reason for why I am the way I am.  And I don't know - to you that
10        probably means nothing, but for me that's helped me be more
11        accepting of myself.
12
13   SP:   So - so let me see if I get this right.  What you're saying is you now
14        better understand your actions?
15
16   WA:  I do, and why - why - why in that moment couldn't I do something
17        different or whatever.
18
19   SP:   Yeah, so why couldn't you?
20
21   WA:  I was not able.  My -
22
23   SP:   Why?
24
25   WA:  My brain wouldn't even process it.  I can't even - I don't know.
26
27   SP:   So your brain can't - let's just assume that the - that the pathology
28        reports says that there is a - a knife wound.
29
30   WA:  Sure.
31
32   SP:   Your - your - your - you can't process why it is you - you -
33
34   WA:  Yes.  So I - look - look, the same -
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 231

1   SP:  Wait, I didn't finish.
2
3   WA:  Oh, I'm so sorry.
4
5   SP:  You - you - you can't process why you - why - what - why you
6        couldn't do that?
7
8   WA:  No.  I - I sit in my room reading this stuff, the same things that
9        you've looked at and have to have all this knowledge that look you
10       did this, this and this and I'm sitting here - I know who I am, how
11       did that happen?  How did I arrive at that point?
12
13  SP:  So how did you arrive at that point?
14
15  WA:  I don't know.  That's what I'm saying.  It's - it had - it had to be
16       this - this - not being able to - to process things when I'm under
17       extreme stress or not being able to make good decisions, that sort
18       of thing.
19
20  **ISSUE RE: DEFENDANT'S APPRECIATION OF WRONGFULNESS -**
21  **PART IV:**
22
23  SP:  Even when you're under extreme stress and not make good
24       decisions, do you acknowledge that you could appreciate that
25       decisions are still wrong?
26
27  WA:  In that moment I don't know.
28
29  SP:  Okay.
30
31  WA:  Sitting here today, absolutely.
32
33  SP:  So you don't know if in that moment you -
34
35  WA:  I don't.

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 232

1  SP:  You can't tell me if in that moment what you were doing you knew
2       was wrong?
3
4  WA:  Yeah, I can't tell you that.  Sitting here today, yes I can tell you
5       that because I'm looking at it and I know - I - I know.
6
7  SP:  I - I could be wrong about this, but I think there's some things that
8       you did after the offense that would actually speak to your - the fact
9       that you appreciated that some of the things you were doing were
10      wrong.
11
12 WA:  Yeah, I don't know.
13
14 SP:  You wouldn't quibble with that if it's in the records?
15
16 WA:  No, I can't - I'm not trying to - yeah.
17
18 **CONCLUDING REMARKS:**
19
20 SP:  Okay.  All right.  Well, I appreciate you answering all of our
21      questions and I wish you the best of luck.
22
23 WA:  Thank you.
24
25 SP:  Thank you.  I think - let me go - I'm going to keep the equipment
26      on and then -
27
28 WA:  That's fine.
29
30 SP:  Do you want to - what's the protocol?  Do you want us to get her?
31      I don't -
32
33 WA:  Oh.
34
35 SP:  I don't know if she's -

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 233

1    WA: Yeah, I should -
2
3    SP:  Why don't you have a seat there, I'll just look for her.
4
5    WA: Okay.
6
7    SP:  If she's -
8
9    WA: She should be in that office.
10
11   SP:  Okay.
12
13   WA: Oh, I am so sorry.  I just saw her right there.
14
5    SP:  Okay.  I'm just going to go ahead and - it's 1:56.  I'm going to shut
16        this equipment off because the -
17
18   WA: Yeah.
19
20   SP:  Correctional officer appears that she is coming in.

# EXHIBIT
# MMMMMMMMMMM

**ARIZONA SUPREME COURT**

| | |
|---|---|
| STATE OF ARIZONA, | CR–15–0115–PC |
| Respondent, | MARICOPA County Superior Court No. CR2004–005523–001 |
| v. | |
| WENDI ELIZABETH ANDRIANO, | RESPONSE TO MOTION TO FILE OVERLENGTH BRIEF |
| Petitioner. | |

Petitioner Wendi Andriano has petitioned this Court to review the trial court's dismissal of her post-conviction relief (PCR) petition. (Dkt. # 1.) Andriano seeks permission to exceed this Court's 20-page limit on her petition by 37 pages, for a total of 57 pages of text. *See* Ariz. R. Crim. P. 32.9(c)(1). The State acknowledges that additional pages may be necessary in this case given the lengthy PCR hearing and does not object to a 10-page extension of the page limit. However, the State objects to Andriano's request for a 37-page extension—which would permit her to file a petition nearly *three times* as long as normally allowed—for the reasons set forth below.

"Excessively long briefs confer no benefit on defendants, unless bulk and congestion for delay's sake is considered a benefit. The most effective briefs this court receives, including those in death penalty cases, *all* comply with the liberal page limitations of the rules." *State v. West*, 176 Ariz. 432, 439, 862 P.2d 192, 199 (1993) (emphasis in original). Andriano's proposed petition is unnecessarily lengthy, verbose, and detailed, and can be shortened without affecting the

substance of her arguments or her ability to present them in a manner sufficient to exhaust them for federal review.  *See id.* ("If preservation is sought to avoid issue preclusion, brevity should be employed.").   For example, the proposed petition contains approximately 3 pages of single-spaced quotations from the trial transcripts.   (Dkt. # 1, at 5–8.)   Andriano also uses space-consuming block quotations at other locations in the petition, and has pasted photographs into the document.  (Dkt. # 1, at 16–17, 28, 33, 35, 38, 39–40, 53.)  Instead of directly quoting transcripts and including photographs in the text of the petition, Andriano should concisely describe the testimony or exhibit at issue and direct this Court to the pertinent portions of the transcripts or the relevant exhibit.  Further, throughout the proposed petition, Andriano incorporates numerous minor, insignificant details that can easily be omitted without compromising her arguments.

Although the State does not oppose a 10-page extension of the page limit, there is no justification for the voluminous, 57-page document Andriano has presented to this Court.  The State therefore respectfully requests that this Court deny Andriano's motion to exceed the page limit and direct her to instead file a 30-page petition.

Finally, the State does not oppose Andriano's request that this Court retain a copy of the proposed 57-page petition as part of the record as an offer of proof supporting the motion to exceed or her request for additional time to file a revised, shortened petition.  (Motion to File Overlength Brief, at 3.)  Finally, if this Court permits Andriano to file an oversized petition, the State respectfully requests

permission to exceed the page limit for its response by an equivalent number of pages.

      DATED April 20, 2015.

                                MARK BRNOVICH
                                Attorney General
                                (Firm State Bar No. 14000)

                                /s/ LACEY STOVER GARD
                                Chief Counsel
                                Capital Litigation Section
                                400 West Congress, Bldg. S–315
                                Tucson, Arizona  85701–1367
                                Lacey.Gard@azag.gov
                                Telephone: (520) 628–6520
                                (State Bar Number 22714)
                                Attorneys for RESPONDENT

4420407

# EXHIBIT NNNNNNNNNNN

**ARIZONA SUPREME COURT**

| | |
|---|---|
| STATE OF ARIZONA, | CR–15–0115–PC |
| Respondent, | MARICOPA County |
| | Superior Court |
| v. | No. CR2000–096032 |
| WENDI ELIZABETH ANDRIANO, | UNOPPOSED MOTION FOR |
| | 30-DAY EXTENSION OF |
| Petitioner. | TIME TO FILE RESPONSE |
| | TO PETITION FOR REVIEW. |

Petitioner Wendi Andriano has petitioned this Court to review the trial court's dismissal of her post-conviction relief petition.  (Dkt. # 1.)  The State's response is presently due on May 4, 2015.  The State respectfully requests a 30-day extension of this deadline, until June 3, 2015.[1]  An extension is necessary because of undersigned counsel's involvement in appeals and legal matters before the federal courts, including 1) oral argument in *Apelt v. Ryan*, No. 98–0882–PHX–ROS (United States District Court for the District of Arizona), on April 23, 2015, and 2) a response to a *Martinez v. Ryan*, 132 S. Ct. 1309 (2012), motion in *Walden v. Ryan*, No. CV–99–559–TUC–RCC (United States District Court for the District of Arizona), which is presently due on May 5, 2015, but, if the State's requested extension is granted, will be due on May 15, 2015.

---

[1] The present motion will become moot if this Court denies Andriano's pending motion to exceed the page limit and allows her additional time to shorten and refile her petition for review.  Because this Court has yet to rule on Andriano's motion, the State files the present extension request in an abundance of caution.

1

Opposing counsel, Allen Arntsen, does not oppose this motion.  The State therefore respectfully requests that this Court grant its motion for a 30-day extension of time and extend its response deadline to and including June 3, 2015.

DATED April 29, 2015.

MARK BRNOVICH
Attorney General
(Firm State Bar No. 14000)

/s/ LACEY STOVER GARD
Chief Counsel
Capital Litigation Section
400 West Congress, Bldg. S–315
Tucson, Arizona  85701–1367
Lacey.Gard@azag.gov
Telephone: (520) 628–6520
(State Bar Number 22714)
Attorneys for RESPONDENT

4436225

# EXHIBIT OOOOOOOOOOO

SUPREME COURT OF ARIZONA

| | |
|---|---|
| STATE OF ARIZONA,                  ) | Arizona Supreme Court |
|                          ) | No. CR-15-0115-PC |
|            Plaintiff, ) | |
|                          ) | Maricopa County |
|          v.              ) | Superior Court |
|                          ) | No. CR2000-096032 |
| WENDI ELIZABETH ANDRIANO,     ) | |
|                          ) | |
|          Defendant. ) | |
|                          ) | **FILED 4/29/2015** |
| _____ ) | |

**O R D E R**

An "Unopposed Motion for 30-Day Extension of Time to File Response to Petition for Review" (Plaintiff State) having been filed on April 29, 2015,

**IT IS ORDERED** granting a first extension of time to file the Response to Petition for Review on or before June 3, 2015.

DATED this 29th day of April, 2015.

                                _____
                                Janet Johnson
                                Clerk of the Court

TO:
Lacey Stover Gard
Gregory Michael Hazard
Scott M Bennett
Allen A Arnsten
Matthew R Lynch
Wendi Elizabeth Andriano, ADOC #191593, Arizona State Prison,
     Perryville - Lumley/San Juan Unit
Dale A Baich
Diane Alessi
Amy Armstrong
bp

# EXHIBIT PPPPPPPPPP

# IN THE ARIZONA SUPREME COURT

STATE OF ARIZONA

RESPONDENT,

v.

WENDI ELIZABETH ANDRIANO

PETITIONER.

)
)
)
)
)
)
)
)
)
)
)

ARIZONA SUPREME COURT
CR-15-0115-PC

Maricopa County Superior Court
No. CR2000-096032-A

## REPLY IN SUPPORT OF MOTION TO FILE OVERLENGTH BRIEF

In its opposition, the State agrees that an extension to exceed the page limit of Ariz. R. Crim. P. 32.9(c)(1) is appropriate in light of the complexity of this case; it simply urges this Court to grant a shorter extension than that sought by Andriano.  The State's proposal would not promote the efficient adjudication of her claims by this Court, for two primary reasons.

*First*, as Andriano, the State, and the trial court recognized below, this is a uniquely complex capital case with a voluminous record, which has consistently required both Andriano and the State to exceed statutory briefing limits. Andriano's 57-page brief to this Court is shorter than *every* principal brief filed by either party below, including her 70-page brief in support of post-conviction relief (filed *before* the testimony introduced at the evidentiary hearing), the State's 65-page response, Andriano's 115-page post-hearing brief, and the State's 74-page

response.  Thus, the State itself has acknowledged that the unique issues in this case are sufficiently complex to warrant more discussion than the 30-page limit suggested by the State (State's Response at 1-2) would allow.

*Second*, cutting Andriano's brief shorter would not make those issues any less significant or challenging; it would merely make this Court's task in addressing them more burdensome.  The record in this proceeding is voluminous, both for Andriano's original trial (which lasted more than three months) and her post-conviction relief proceeding (which consisted of eight days of testimony and more than 200 exhibits, some of which are very lengthy).  Andriano's opening brief summarizes, cites, and explains the significance of the pertinent evidence, endeavoring to provide this Court with a concise reference for understanding the basis of Andriano's arguments for post-conviction relief.

The State does not appear to disagree.  Its only suggestions for trimming the brief—cutting a photograph and "space-consuming" quotations and simply referring this Court to the record instead (*id.* at 2)—only make this Court's job harder, by having to repeatedly refer back to the record while reviewing Andriano's brief.  Moreover, the State's suggestions would save at most five pages; the State identifies no other purported "fat" in the brief that could be trimmed without making this Court's task substantially more difficult and/or prejudicing Andriano's right to make her legal challenges.

Accordingly, Andriano respectfully requests that the Court grant her Motion to File Overlength Brief of 57 pages.

Respectfully submitted this 4th day of May, 2015.

COPPERSMITH BROCKELMAN PLC


By: _ /s/ Scott M. Bennett_____
Scott M. Bennett (Bar No. 022350)
COPPERSMITH BROCKELMAN PLC
2800 North Central Avenue
Phoenix, Arizona  85004
(602) 224-0999 (office)
(602) 224-6020 (fax)
sbennett@csblaw.com

Allen A. Arntsen, admitted pro hac vice
Matthew R. Lynch, admitted pro hac vice
FOLEY & LARDNER LLP
150 E. Gilman Street
Madison, Wisconsin 53703
(608) 257-5035 (office)
(608) 258-4258 (fax)
aarntsen@foley.com
mlynch@foley.com

Attorneys for Petitioner Wendi Andriano

# EXHIBIT QQQQQQQQQQ

SUPREME COURT OF ARIZONA

| | |
|---|---|
| STATE OF ARIZONA, | ) Arizona Supreme Court |
| | ) No. CR-15-0115-PC |
| Respondent/Plaintiff, | ) |
| | ) Maricopa County Superior Court |
| v. | ) No. CR2000-096032 |
| | ) |
| WENDI ELIZABETH ANDRIANO, | ) |
| | ) |
| Petitioner/Defendant. | ) **FILED 5/5/2015** |
| | ) |
| _____ | ) **O R D E R** |

After considering Petitioner Andriano's "Motion to File Overlength Brief," the State's Response, and Petitioner's Reply,

IT IS ORDERED granting the motion to file the "Petition for Review of Denial of Post-Conviction Relief (Capital Case)" containing 57 pages.  The State may file a response of equal length.

DATED this 5th day of May, 2015.

_____
Rebecca White Berch
Duty Justice

TO:
Lacey Stover Gard
Gregory Michael Hazard
Scott M Bennett, Coppersmith Brockelman PLC
Allen A Arnsten, Foley & Lardner LLP
Matthew R Lynch, Foley & Lardner LLP
Wendi Elizabeth Andriano, ADOC 191593, Arizona State Prison,
 Perryville - Lumley/San Juan Unit
Diane Alessi
Dale A Baich
Amy Armstrong

# EXHIBIT RRRRRRRRRR

**ARIZONA SUPREME COURT**

| | |
|---|---|
| STATE OF ARIZONA, | CR–15–0115–PC |
| Respondent, | MARICOPA County<br>Superior Court<br>No. CR2000–096032 |
| v. | |
| WENDI ELIZABETH ANDRIANO, | UNOPPOSED MOTION FOR<br>30-DAY EXTENSION OF<br>TIME TO FILE RESPONSE |
| Petitioner. | TO PETITION FOR REVIEW. |

Petitioner Wendi Andriano has petitioned this Court to review the trial court's dismissal of her post-conviction relief petition. (Dkt. # 1.) The State's response is presently due on June 3, 2015. The State respectfully requests a second, 30-day extension of this deadline, until July 6, 2015. Undersigned counsel is currently preparing for oral argument before this Court in *State v. Lynch*, No. CR–12–0359–AP, which is scheduled for June 2, 2015. In addition, Andriano's petition for review is nearly three times the normal page limit, further complicating the State's ability to meet the current deadline. *See* Ariz. R. Crim. P. 32.9(c)(1).

Opposing counsel, Allen Arntsen, does not oppose this motion. The State therefore respectfully requests that this Court grant its motion for a 30-day extension of time and extend its response deadline to and including July 6, 2015.

….

….

….

….

1

DATED May 26, 2015.

MARK BRNOVICH
Attorney General
(Firm State Bar No. 14000)

/s/ LACEY STOVER GARD
Chief Counsel
Capital Litigation Section
400 West Congress, Bldg. S–315
Tucson, Arizona  85701–1367
Lacey.Gard@azag.gov
Telephone: (520) 628–6520
(State Bar Number 22714)
Attorneys for RESPONDENT

4480338

2

# EXHIBIT SSSSSSSSSS

SUPREME COURT OF ARIZONA

| | |
|---|---|
| STATE OF ARIZONA, | )  Arizona Supreme Court |
| | )  No. CR-15-0115-PC |
| Plaintiff, | ) |
| | )  Maricopa County |
| v. | )  Superior Court |
| | )  No. CR2000-096032 |
| WENDI ELIZABETH ANDRIANO, | ) |
| | ) |
| Defendant. | )  **FILED 5/27/2015** |
| | ) |
| _____ | )  **O R D E R** |

Upon considering the State's Unopposed Motion for 30-Day Extension of Time to File Response to Petition for Review,

IT IS ORDERED that the motion is granted. The Response to the Petition for Review shall be filed no later than July 6, 2015.

DATED this 27th day of May, 2015.

 

_____
Rebecca White Berch
Duty Justice

 

TO:
Lacey Stover Gard
Gregory Michael Hazard
Scott M Bennett
Allen A Arnsten
Matthew R Lynch
Wendi Elizabeth Andriano, ADOC 191593, Arizona State Prison,
 Perryville - Lumley/San Juan Unit
Dale A Baich
Diane Alessi
Amy Armstrong

# EXHIBIT TTTTTTTTTTTT

**ARIZONA SUPREME COURT**

| | |
|---|---|
| STATE OF ARIZONA, | CR–15–0115–PC |
| Respondent, | MARICOPA County Superior Court No. CR2000–096032 |
| v. | |
| WENDI ELIZABETH ANDRIANO, | UNOPPOSED MOTION FOR 7-DAY EXTENSION OF TIME TO FILE RESPONSE TO PETITION FOR REVIEW. |
| Petitioner. | |

     Petitioner Wendi Andriano has petitioned this Court to review the trial court's dismissal of her post-conviction relief petition.  (Dkt. # 1.)  The State's response is presently due on July 6, 2015.  The State respectfully requests a third, 7-day extension of this deadline, until July 13, 2015.  Andriano's petition for review is nearly three times the normal page limit, *see* Ariz. R. Crim. P. 32.9(c)(1), and this Court has permitted the State to exceed the page limit by an equivalent amount.  (Dkt. # 13.)  Although the State's response is nearly complete, it is fact-intensive and lengthy and involves two claims that were the subject of an 8-day evidentiary hearing.  Undersigned counsel projects that an additional 7 days will be necessary to edit the response, check all citations, and prepare any appendix that may be necessary.

     Opposing counsel, Allen Arntsen, does not oppose this motion.  The State therefore respectfully requests that this Court grant its motion for a 7-day extension of time and extend its response deadline to and including July 13, 2015.

DATED June 29, 2015.

MARK BRNOVICH
Attorney General
(Firm State Bar No. 14000)

/s/ LACEY STOVER GARD
Chief Counsel
Capital Litigation Section
400 West Congress, Bldg. S–315
Tucson, Arizona  85701–1367
Lacey.Gard@azag.gov
Telephone: (520) 628–6520
(State Bar Number 22714)
Attorneys for RESPONDENT

4529682

# EXHIBIT UUUUUUUUUU

SUPREME COURT OF ARIZONA

| | | |
|---|---|---|
| STATE OF ARIZONA, | ) | Arizona Supreme Court |
| | ) | No. CR-15-0115-PC |
| Plaintiff, | ) | |
| | ) | Maricopa County |
| v. | ) | Superior Court |
| | ) | No. CR2000-096032 |
| WENDI ELIZABETH ANDRIANO, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | **FILED 6/30/2015** |
| _____ | ) | |

**O R D E R**

An "Unopposed Motion for 7-Day Extension of Time to File Response to Petition for Review" (Planitiff State) having been filed on June 29, 2015,

**IT IS ORDERED** granting a second extension of time to file the Response to Petition for Review on or before July 13, 2015.

DATED this 30th day of June, 2015.

_____
ROBERT M. BRUTINEL
Duty Justice

TO:

Lacey Stover Gard
Gregory Michael Hazard
Scott M Bennett
Allen A Arnsten
Matthew R Lynch
Wendi Elizabeth Andriano, ADOC #191593, Arizona State Prison,
    Perryville - Lumley/San Juan Unit
Dale A Baich
Diane Alessi
Amy Armstrong
bp