# TABLE OF CONTENTS (INTERACTIVE)

| VVVVVVVVVVV PART 1 | State's Response to Petition for Review and Appendices |
|---|---|
| | Appendix A-B |
| | Appendix C |
| | Appendix D |
| | Appendix E |
| | Appendix F |
| | Appendix G PART 1 |
| | Appendix G PART 2 |
| | Appendix G PART 3 |
| | Appendix H PART 1 |
| | Appendix H PART 2 |
| | Appendix H PART 3 |
| | Appendix H PART 4 |
| | Appendix I PART 1 |
| | Appendix I PART 2 |
| | Appendix I PART 3 |

# EXHIBIT VVVVVVVVVV PART 1

# ARIZONA SUPREME COURT

| | |
|---|---|
| STATE OF ARIZONA, | No. CR–15–0115–PC |
| Respondent, | |
| v. | Maricopa COUNTY<br>Superior Court<br>NO. CR–2000-096032-A |
| WENDI ELIZABETH ANDRIANO, | |
| Petitioner. | |

## THE STATE OF ARIZONA'S RESPONSE TO PETITION FOR REVIEW

Mark Brnovich
Attorney General
(Firm State Bar No. 14000)

John R. Lopez, IV
Solicitor General

/s/Lacey Stover Gard
Chief Counsel
Capital Litigation Section
400 West Congress, Bldg. S–315
Tucson, Arizona 85701–1367
Telephone: (520) 628–6520
Lacey.Gard@azag.Gov
(State Bar Number 22714)

Gregory Hazard
Assistant Attorney General
1275 West Washington
Phoenix, Arizona 85001
Telephone: (602) 542-4686
Gregory.Hazard@azag.gov
(State Bar Number 23258)
Attorneys for Respondent

## I.     ISSUES PRESENTED FOR REVIEW.

1. Did the post-conviction relief (PCR) court abuse its discretion by rejecting, after an 8-day evidentiary hearing, Petitioner Wendi Andriano's claim that second-chair counsel labored under a conflict of interest when he represented Andriano in her criminal case and her parents in a guardianship case involving her children, where Andriano's interests aligned with her parents' and no actual conflict existed?

2. Did the PCR court abuse its discretion by rejecting, after an 8-day evidentiary hearing, Andriano's claim that counsel was ineffective in investigating and presenting mitigating evidence, where counsel presented all available mitigation and the majority of Andriano's post-conviction evidence was cumulative to that presented at trial and the remainder was speculative and not credible?

3. Did the PCR court abuse its discretion by summarily dismissing, as precluded under Arizona Rule of Criminal Procedure 32.2(a)(3), Andriano's claims that both the prosecutor and the jurors engaged in misconduct, where Andriano waived those claims by not raising them on direct appeal?

4. Did the PCR court abuse its discretion by summarily dismissing on the merits Andriano's claims that counsel was ineffective for various reasons during the guilt and aggravation phases?

5. Did the PCR court abuse its discretion by summarily dismissing on the merits Andriano's claim that appellate counsel was ineffective for failing to raise several meritless claims on direct appeal?

## II.     FACTUAL AND PROCEDURAL BACKGROUND.

In 2004, a jury found Andriano guilty of first-degree murder and sentenced her to death for killing her terminally-ill husband, Joe Andriano. *State v. Andriano*, 215 Ariz. 497, 500, 502, ¶¶ 1, 15, 161 P.3d 540, 543, 545 (2007).  This Court affirmed Andriano's conviction and sentence on direct appeal, *id.* at 513, ¶ 79, 161

P.3d at 556.   The facts underlying Andriano's conviction and sentence, and her case's procedural history, are as follows.

### A. *Joe's murder.*

In 1998, doctors diagnosed Joe with terminal cancer.   *Andriano*, 215 Ariz. at 502, ¶ 19, 161 P.3d at 545.   By the summer of 2000, Andriano was working as a property manager and living, along with Joe and their two young children, in an apartment in the complex she managed.   *Id.* at 503, ¶ 24, 161 P.3d at 546.   Despite Joe's illness, Andriano and her friends visited bars on a weekly basis.   *Id.* at 503, ¶ 25, 161 P.3d at 546.   On these outings, Andriano routinely danced with and kissed various men.   Andriano also engaged in an extramarital affair with a man who lived in her apartment complex.   *Id.* at 503, ¶ 24, 161 P.3d at 546.   The affair ended in July 2000, after the man discovered that Andriano was married and had children. *Id.*   Despite the man's lack of interest, Andriano pursued him relentlessly.   *Id.*   Late one night, she stood outside of his apartment, banged on the door for 5 minutes, demanded that he let her in, and threatened to retrieve the apartment complex's master key if he did not open the door.   *Id.*

In August and September 2000, Andriano made several attempts to obtain a life-insurance policy covering Joe, without his knowledge or consent.   *Id.* at 502, ¶ 20, 161 P.3d at 545.   She falsely represented to one insurance company that Joe did not have cancer.   *Id.*   When an insurance agent contacted him in response to

Andriano's pre-application, Joe declined to complete the application.  *Id.*  Three days later, Andriano emailed the company, asked it to reinstate Joe's application, and directed that it communicate only with her in the future.  *Id.*  She also approached two male acquaintances and asked them to impersonate Joe for a physical examination in support of a life-insurance application, offering to pay one of the men $50,000.  *Id.*  The acquaintances refused.  *Id.*

On September 27—the day Joe completed his fourth chemotherapy treatment—Andriano again danced with and kissed a man at a nightclub.  *Id.* at 503, ¶ 25, 161 P.3d at 546.  Andriano and the man returned to the apartment she shared with Joe and had a sexual encounter.  *Id.*  The following day, Andriano spoke to the man by telephone and claimed that her husband had died of cancer. *Id.*  Around the same time, Andriano purchased sodium azide, a poison commonly used for pest control, over the internet from a chemical distributer, using a fictitious name and shipping address and a falsified business license.  (Appx. B, at 64–68; C, at 29–115; D, at 22–146; E, at 3–49.)

On the evening of October 7, 2000, Andriano and Joe attended a barbeque. *Id.* at 500, ¶ 2, 161 P.3d at 543.  They returned to their apartment around midnight and put their children to bed.  *Id.* Around 2:15 a.m. on October 8, Andriano called a coworker, Chris, and asked her to watch Andriano's children while Andriano took Joe to the doctor.  *Id.* at 500, ¶ 3, 161 P.3d at 543.  Andriano met Chris outside of

the apartment and said, "'I have a problem. Don't ask any questions. My husband's in on the floor dying and I haven't called 911 yet.'"  *Id.*  Andriano admitted, "'He doesn't know I haven't called 911.'"  *Id.* Chris encouraged Andriano to do so.  *Id.*

Chris entered the apartment and encountered Joe, lying on the living room floor, curled in the fetal position.  *Id.* at 500, ¶ 4, 161 P.3d at 543.  Joe looked weak, had vomited, and was having difficulty breathing.  *Id.*  Andriano went into another room to call 911.  *Id.*  While she was gone, Joe told Chris that he had needed help "'for a long time,'" and questioned why he had been waiting 45 minutes for the paramedics to arrive.  *Id.*  Andriano returned to the living room, explained that the paramedics had been delayed by another emergency, and announced her intention to drive Joe to the hospital herself.  *Id.* at 500, ¶ 5, 161 P.3d at 543.  Joe was too weak to stand and Andriano tried to lift him but failed. *Id.*  She became angry and shouted profanities at Joe.  *Id.*  As Joe vomited again, Chris heard sirens approaching and left the apartment to meet the paramedics.  *Id.*

Subsequently, Andriano came out of her apartment, screamed at the paramedics to leave, and slammed the apartment door.  *Id.* at 500, ¶ 6, 161 P.3d at 543.  The paramedics and Chris knocked on the door for 5 to 10 minutes, but Andriano did not respond.  *Id.*  Eventually, the Phoenix Fire Department's alarm room called Andriano's residence, spoke to someone inside, and informed the paramedics that Andriano would come outside to meet them.  *Id.* at 501, ¶ 6, 161

P.3d at 544.  Andriano left her apartment shortly thereafter.  *Id.*  However, she did not exit through the front door, which opened to the living room.  *Id.*  Instead, she left through the back door, scaled the patio wall, and walked around the building to the apartment's front door, where the paramedics and Chris were waiting.  *Id.*  Andriano's hair was wet and she had changed her shirt.  *Id.*  She informed the paramedics that Joe was dying, that he had signed a do-not-resuscitate order, and that "'this was not the way that he wanted to go.'"  *Id.*  The paramedics and Chris left without entering the apartment.  *Id.*

At 3:39 a.m., Andriano called 911 a second time.  *Id.* at 501, ¶ 7, 161 P.3d at 544.  The same paramedics who had been to the apartment earlier and had spoken to a freshly-showered Andriano responded.  *Id.*  This time, Andriano was wearing a bloody shirt.  *Id.*  When the paramedics entered the apartment, they saw Joe lying on the floor in a pool of blood.  *Id.* at 501, ¶ 8, 161 P.3d at 544.  He had suffered a deep stab wound to the left side of his neck, and on his head were lacerations that exposed brain matter.  *Id.*  A bloody and broken bar stool was near his body, along with broken pieces of a lamp,[1] a kitchen knife with blood on the sharp edge, a

---

[1] The remainder of this lamp was never found, although its shade remained in the apartment.  (Appx. F, at 16–17, 28–32.)  Presumably, Andriano (or someone assisting her, suggested at trial to be her stepfather Alejo Ochoa) removed it from the apartment after she murdered Joe but before she reported the crime.  As this Court found, the evidence suggested that "Andriano staged the scene of the murder

(continued ...)

bloody pillow,[2] and a belt.  *Id.*  By 3:52 a.m., the blood surrounding Joe's head was already starting to dry.  *Id.*

Police arrested Andriano.  *Id.* at 501, ¶ 12, 161 P.3d at 544.  During a break in her police interview, Andriano called a coworker and asked her to remove certain documents from her business office and conceal them.  *Id.*  Police later seized these documents, which pertained to Andriano's efforts to procure sodium azide from various internet sources.  (Appx. F, at 65–68; C, at 29–115; D, at 22–146; E, at 3–49.)  Further, Andriano's stepfather, Alejo Ochoa, told police that Andriano had admitted to stabbing Joe.  *Id.*

Joe died from blunt-force trauma and the stab wound to his neck.  *Id.* at 501, ¶ 10, 161 P.3d at 545.  He had sustained at least 23 blows to the back of his head, which caused his brain to hemorrhage.  *Id.*  Defensive wounds on his hands and wrists showed that he was conscious for at least a portion of the attack, *id.*, and blood spatter patterns and other physical evidence suggests that he was lying down while being struck and did not get up during the beating.  *Id.* at 501, ¶ 11, 161 P.3d at 545.  The gaping stab wound to his neck measured 3.75 inches long and 2 inches

---

( ... continued)

to make it appear as though she acted in self-defense."  *Andriano*, 215 Ariz. at 512, ¶ 76 n.12, 161 P.3d at 555.

[2] This pattern of blood on the pillow was consistent with Joe exhaling blood onto it as Andriano held it over his face.  (Appx. F, at 21–24.)

wide.  *Id.* at 501, ¶ 10, 161 P.3d at 545.  Joe was likely stabbed after he was

bludgeoned and he was probably still alive, but likely unconscious, at that point.

*Id.*  His blood and gastric contents contained trace amounts of sodium azide.  *Id.*

Blood spatter patterns also suggest that the belt and knife were placed next to Joe's

body after he died, but that the bar stool was present when his carotid artery was

severed.  *Id.* at 501, ¶ 11, 161 P.3d at 545.

In Andriano's storage unit, police found an open cardboard shipping box

containing a 500-gram bottle of sodium azide, two Tupperware containers

containing sodium azide, nine Q-tips, a plastic knife and fork, and two pairs of

latex gloves.  *Id.* at 501, ¶ 9, 161 P.3d at 544.  Police found Andriano's fingerprints

on the plastic knife and the vacuum-packed bag in which the cardboard box was

shipped.  *Id.*  Inside Andriano's apartment, they found capsules filled with sodium

azide in a bottle labeled for an herbal supplement.  *Id.*  And they found trace

amounts of sodium azide inside a pot of food on the stove and in two soup bowls in

the kitchen.  *Id.*  In total, 20.8 grams of sodium azide was missing from the amount

Andriano ordered.  *Id.*  Based on the foregoing, the Maricopa County Grand Jurors

indicted Andriano for first-degree murder.  *Andriano*, 215 Ariz. 501, ¶ 13, 161 P.3d

at 544.

….

….

## B. *Guilt-phase defense.*

At trial, Andriano alleged that she was a domestic-violence victim and had killed Joe in self-defense. She claimed the following version of events:

> Andriano testified that she was attempting to assist Joe in committing suicide when they got scared and decided to call for help. She claimed that after 911 was called and Chris left the apartment to meet the paramedics, Joe decided that he wanted to follow through with the suicide. She testified that, after the paramedics left, she admitted to Joe that she had an affair. Joe then became violent and tried to choke her with a phone cord, but she was able to reach a knife, cut the cord, and free herself. When she put the knife down, Joe bent down to pick it up, so she hit him with the bar stool until he stopped moving. Ultimately, Joe picked up the knife and said he was going to kill himself. Andriano tried to stop him, but her hand slipped off the knife. Suddenly there was blood everywhere, but she had not stabbed Joe.

*Andriano*, 215 Ariz. at 504, ¶ 34, 161 P.3d at 547.

To establish Andriano's status as a domestic-violence victim, counsel presented evidence that her childhood experiences had predisposed her to entering a domestic-violence relationship. Andriano's mother, Donna Ochoa, recounted the "strict" discipline (including spanking) that Andriano received at the hands of her biological father during her first 3 years of life. (Appx. H, at 113–17.) After Donna married Alejo Ochoa, the family joined a traveling ministry, slept in a fifth wheel, and had insufficient money even to purchase shoes. (Appx. G, at 15–17.)

Donna also described the isolationist atmosphere of 91st Psalm/Harvest Family Church in Casa Grande, where the family attended church and where

Andriano attended school as an older child and young adult.  (*Id.* at 15–21, 32–36.)
She also described Andriano's stepfather, Alejo as a "[v]ery nice man" who was
"[g]ood with children" and generally had a positive relationship with Andriano.
(Appx. G at 8, 11.)  She recalled "a good home environment." (Appx. H, at 115–
18.)  However, Alejo also had a volatile temper and arguably abused Donna and
Andriano verbally (although not physically).  (Appx. G, at 36–38; H, at 66–73.)
On several occasions, the women hid to escape Alejo's anger.  (Appx. G, at 38–39;
H, at 66–73.)  Donna also claimed to have witnessed Joe commit several acts of
domestic violence against Andriano.  (Appx. G, H.)

During her nine days of testimony, Andriano also described her time living
in the traveling ministry, her experience with Harvest's strict rules, and Alejo's
volatility.  (Appx. I, at 9–42.)  After Alejo's outbursts, Andriano and Donna
routinely placated him by stroking his hair.  (*Id.* at 38.)  When asked if Alejo had
ever struck her or otherwise touched her inappropriately, aside from one occasion
where he grabbed her arms and shook her, Andriano replied, "No."  (*Id.* at 42.)
Andriano's adopted brother, Brandon, and her cousin, Barbara Mitchell, likewise
testified about the restrictive environment at Harvest, describing how its leaders
corporally punished schoolchildren and isolated the church's congregants from
outside influences.  (Appx. J, at 55–58, 149–53.)

Dr. Sharon Murphy testified as an expert on domestically-violent relationships. To form her opinions, she relied on Andriano's membership in a traveling ministry, her potential status as a molestation and indecent-exposure victim, her strict religious upbringing, and Alejo's violent verbal outbursts. (Appx. K, at 39–47; *see also* Appx. W, X.) Dr. Murphy opined that Andriano's childhood experiences shaped her into a timid and submissive woman, who was vulnerable to domestic violence. (Appx. W, X.) The jurors rejected Andriano's defense and found her guilty of first-degree murder. *Andriano*, 215 Ariz. 500, ¶ 1, 161 P.3d at 543.

## C. *Aggravation and mitigation phases.*

The jurors found that the State had proved the A.R.S. § 13–751(F)(6) especially cruel aggravating factor, *Andriano*, 215 Ariz. at 510, ¶ 64, 161 P.3d at 553, and Andriano continued her domestic-violence theme into the penalty phase. Although Andriano's counsel relied on much of the guilt-phase evidence, they nonetheless called several of Andriano's friends, and recalled Donna and Alejo Ochoa, to offer additional information about Andriano's character and upbringing and to describe how her execution would affect them. (Appx. L, M.) These witnesses overwhelmingly characterized Andriano as an excellent mother, who was devoted to her children. (Appx. L, M.) They also described Andriano's intelligence and her academic, athletic, and musical accomplishments as an

adolescent.  And they characterized her as passive, meek, friendly, and nonviolent. (Appx. L, M.)  Counsel also recalled Dr. Murphy, who offered additional testimony on domestic violence, reminded jurors that Andriano may have been sexually abused as a child and that a man had exposed himself to her as a youngster, and opined that she may have been in a dissociative state during her police interview. (Appx. L, at 47–83.)

Counsel did not present testimony from a mental-health expert.  However, they offered lay witness testimony from three employees of the Maricopa County Jail's psychiatric unit:  a mental health counselor, Laura King; a psychologist, Dr. Gerald Perry; and a psychiatric nurse, Joyce Van Every, each of whom treated Andriano after she was admitted to the unit following a suicide attempt in September 2003.  (Appx. N, at 68.)  The witnesses characterized Andriano as desperate to help others and to have others like her.  (*Id.* at 73–74; 85–85.)  They described her as trusting and easily deceived and claimed she was valuable to the unit because she helped troubled inmates and brought problems to the attention of the psychiatric staff.  (*Id.* at 81–83, 142–43.)  Both Dr. Perry and King conceded that Andriano was not diagnosed with a serious mental illness in jail, and was treated only for depression and anxiety.  (*Id.* at 71–72, 92, 111, 121–22, 134.) These conditions, King and Van Every opined, stemmed from the trauma of killing

Joe.  (*Id.* at 111, 146.)  Dr. Perry opined that they resulted from the stress inherent in the jail environment.  (*Id*. at 122.)

In rebuttal, the State presented testimony from Joe's sister, Jana Clayton, who recounted several instances on which Andriano had placed the burden of caring for her children on others; described Andriano's use of a paddle to discipline her son; and recalled that Andriano was sad when she became pregnant with her daughter because she did not want to gain weight.  (Appx. P, at 119–32.)  Likewise, Timothy Lee testified about Andriano's refusal to leave work to attend to her seriously-injured son, which directly contradicted her trial testimony that she had immediately rushed to the hospital to see him.  (*Id.* at 24–33.)

The State also called Dr. Michael Brad Bayless (who had testified in the guilt phase for the limited purpose of expressing his opinion that Andriano was not a domestic-violence victim), who opined that Andriano was a manipulative individual and that her suicide attempt, helpful behavior in prison, frequent tearfulness, and general portrayal of herself as a victim were all goal-directed actions. (Appx. O, at 10–16.)  And two detention officers testified about Andriano's reputation as a "control freak" in prison who upset other inmates; their belief that Andriano was in command of the other inmates; Andriano's discipline for possessing contraband; occasions on which Van Every, King, and Dr. Perry were caught giving Andriano preferential treatment or violating policy to accommodate

her; and inappropriate contact between Andriano and her transsexual cellmate. (Appx. P, at 48–111.)   The jurors found Andriano's mitigation insufficiently substantial to warrant leniency and sentenced her to death.

### D. *Post-conviction proceeding.*

After this Court affirmed her conviction and death sentence, *Andriano*, 215 Ariz. at 511–13, ¶ 79, 63–78, 161 P.3d at 556, Andriano sought post-conviction relief.  (P-App. 41–125.)  The PCR court summarily dismissed the majority of her claims, but ordered an evidentiary hearing on her allegations that 1) second-chair counsel labored under a conflict of interest that adversely affected his performance when he represented Andriano in her criminal case and her parents in guardianship and adoption proceedings involving her children, and 2) both counsel were ineffective for failing to investigate and present evidence of Andriano's "harrowing" childhood, sexual abuse, and mental illness.  (P-App. 1–7.)

At the 8-day PCR hearing, Andriano "all but abandoned" her domestic-violence theory of mitigation (P-App. 22) and her theory that she was a good person raised by an upstanding family.[3]   Instead, she attempted to show her purportedly "harrowing" childhood, sexual abuse, and mental illness.  However,

_____

[3] Andriano includes in her appendix all exhibits from the evidentiary hearing, without designating which were admitted and which were not.  The State has therefore attached the clerk's exhibit worksheet as Appendix A.  This Court should only consider the admitted evidence in reviewing the PCR court's ruling.

aside from allegations that her stepfather Alejo Ochoa molested her, the post-conviction evidence of her upbringing did not differ in substance from that presented at trial.[4]  Donna Ochoa—who has been chastised by the Pinal County Superior Court for engaging in conduct intended to "thwart" a court order (P-App. 1006, 1371)—testified about Andriano's infancy and very early childhood, during which Donna bonded poorly with her daughter and, while she worked, left Andriano in the care of her mother, her then-husband, or other babysitters, one of whom had a history of child molestation.  (P-App. 880–920, 1001–02.)  Donna also described, as she did at trial, her belief that Andriano's biological father, or his family members, may have molested her.  (P-App. 900–06.)  She discussed, as she did at trial, the family's transient and impoverished lifestyle in the traveling ministry.  (P-App. 929–40.)  Donna also revealed her suspicion (undisclosed before this proceeding) that Alejo sexually abused Andriano when she was an adolescent.  However, Donna never witnessed any such activity.  (P-App. 995–99.)

---

[4] The PCR court recognized that Andriano had presented some of the trial evidence at the PCR hearing but had interpreted it differently.  In particular, the court identified a photograph offered at the PCR hearing to "illustrate [Andriano's] time with a 'religious cult,'" which had been shown at trial to illustrate her time with a more benign-sounding "'travelling ministry.'"  (P-App. 17.)  The court also noted that Donna and Andriano's description of rubbing Alejo's hair to placate him after his angry outbursts "took on sexualized overtones at the PCR hearing."  (P-App. 18.)

Other fact witnesses included Andriano's childhood friends and fellow church members Jasper Neace (a four-time convicted felon who, at the time of the PCR hearing, was serving a prison sentence for a felony conviction) (P-App 1054–81), Kyre Lorts (P-App. 839–72), Jeri Lynn Cunningham (P-App. 1012–43), and Cindy Schaeder (P-App. 1618–49), all of whom described (as did numerous witnesses at trial) the closed religious community in which Andriano was raised and its use of corporal punishment. No witness, however, saw Andriano receive corporal punishment. The witnesses also described Alejo's suspicious behavior, but only Lorts—whom the PCR court considered "a somewhat fragile witness" (P-App. 19)—claimed to have witnessed sexual impropriety between Alejo and Andriano. (P-App. 852–63.) But as the PCR court observed, Lorts' account directly contradicted other evidence, "calling into question [her] credibility."[5] (P-App. 19.)

—————————

[5] Further diminishing Lorts' credibility is the fact that she refused to be interviewed by the State's investigator before she testified. (P-App. 805–09.) After the investigator contacted her, Andriano's defense team collected her from her home and took her to the hotel at which the team was staying, "where she just felt more safe and comfortable." (*Id.*) Additionally, Lorts conceded that, for a long time, she believed that she had "made … up" or "dreamt" the memories. (P-App. 868.) And even more critically, Andriano's expert, Dr. James Hopper, did not interview Lorts before writing his report because she was "mentally unstable." (P-App. 594, 789.)

First-chair counsel, Dan Patterson (P-App. 1288–1461), second-chair counsel David DeLozier (P-App. 1519–52), and former mitigation specialist Scott MacLeod (P-App. 1198–1227) described their trial strategy and mitigation investigation.[6]  Patterson, a Deputy Maricopa County Public Defender, was appointed to represent Andriano, while her parents retained DeLozier as second-chair pursuant to *Knapp v. Hardy*, 111 Ariz. 107, 523 P.2d 1308 (1974).  (P-App. 1290–21, 1303–06, 1529.)  Because DeLozier had a particularly close relationship with the family, Patterson assigned him to compile mitigation evidence and prepare for the penalty phase, while Patterson focused on the guilt-phase defense.  (P-App. 1307–17, 1345.)

Counsel retained Dr. Richard Rosengard, a psychiatrist, to evaluate Andriano and complete a report.  (P-App. 2439–43, 1311, 1335.)  Dr. Rosengard did not diagnose Andriano with a major mental illness (identifying only depression,

---

[6] Andriano also presented testimony from several legal "experts":  Larry Hammond (an expert on the prevailing professional norms for defense counsel) (P-App. 1657–1763), Gary Lowenthal (an expert on conflicts of interest) (P-App. 1763–1844), and Keith Rohman (an expert on mitigation investigation) (P-App. 7223–26).  This Court should disregard these witnesses' testimony as irrelevant.  *See Earp v. Cullen*, 623 F.3d 1065, 1075 (9th Cir. 2010) ("Expert testimony is not necessary to determine claims of ineffective assistance of counsel."); *Hovey v. Ayers*, 458 F.3d 892, 910–11 (9th Cir. 2006) (affirming exclusion of *Strickland* expert testimony, in part because the court "was qualified to assess the factual and legal issues involved in [the petitioner's] *Strickland* claim.); *see generally* Ariz. R. Evid. 702.

probable post-traumatic stress disorder (PTSD), and panic disorder).  (P-App. 2439–43.)  Given that the defense he selected was not consistent with mental illness, his observations of Andriano and knowledge of her history did not suggest a serious mental illness, and no defense team member recommended further mental-health investigation, Patterson did not see a need to further investigate mental-health issues.  (P-App. 1357.)

Neither counsel was aware that Alejo may have molested Andriano.  (P-App. 1342, 1348, 1350–52, 1406, 1409, 1442–44, 1613–14.)  Andriano never made that allegation and eventually denied it under oath.[7]  (P-App. 1406–09, 1415–16, 1613–14; Appx. I, at 39–42.)  She also does not appear to have disclosed that information to her personal counselor, the late H. Kandy Rohde, or to Dr. Murphy, despite disclosing other sensitive information such as her potential early childhood molestation, the details of her sexual relationship with Joe, and Alejo's verbal outbursts.  (*See* Appx. K, at 41.)  Likewise, neither Alejo nor Brandon Ochoa reported any sexual impropriety involving Alejo and Andriano.  (P-App. 1406–08, 1445–46, 1614.)  Neither did Donna, despite providing voluminous information

_____

[7] To this day, Andriano has not confirmed that Alejo molested her.  In fact, she told the State's PCR expert that she did not think Alejo did.  (P-App. 7223–26.)  Alejo invoked the Fifth Amendment and declined to testify at the PCR hearing, but his declarations (in which he did not address the allegations) and a statement he made to the State's investigator (in which he denied them) were admitted into evidence.  (P-App. 1258–60, 1194–96, 2653–2712, 7064–66.)

before trial, including alleged sexual abuse by Andriano's biological father's family and Alejo's propensity to engage in verbal tirades. (P-App. 1003, 1408–09, 1614, 3347–52.)

From July 12, 2001, to July 31, 2002, while he was representing Andriano, DeLozier also represented Alejo and Donna Ochoa in guardianship and adoption proceedings involving Andriano's children. (P-App. 1536–50, 3710, 3718.) Although Andriano initially consented to Joe's sister and brother-in-law, the Lambeths, serving as guardians for her children, the arrangement soon disintegrated and the parties found themselves in contentious litigation. (P-App 3638–41.) DeLozier did not perceive a conflict of interest in representing Andriano and the Ochoas because he argued in both proceedings that Andriano "had a good upbringing" and believed that he was presenting truthful information. (P-App. 1610–13.) Although Andriano does not appear to have consented in writing to the joint representation, she told DeLozier that Andriano wanted him to represent her parents. (*Id.*)

DeLozier was aware that, during his representation of the Ochoas, the Lambeths had accused them of mistreating Andriano's children, and the Ochoas had accused the Lambeths of similar misbehavior. DeLozier, who had handled other domestic cases, considered the allegations "not … unusual" and opined that there are "always allegations in these kinds of cases." (P-App. 1538.) DeLozier

"expect[s] [parties] to be exaggerating on both sides" of a domestic dispute.  (P-App. 1602.)

Andriano also presented testimony from three mental-health experts.  Dr. James Hopper described the childhood "trauma" to which Andriano was exposed, and opined that it affected her decision-making ability and executive functioning and led to memory problems and periods of dissociation.  (P-App. 643–44, 648–49, 821–33.)   Dr. George Woods diagnosed Andriano with bipolar disorder, complex PTSD, dependent personality disorder, and cognitive deficits.  (P-App. 1088.)  He opined that, in the months before Joe's murder, Andriano's disorders had worsened and amplified each other, causing impaired judgment, impulsivity, memory impairment, executive functioning defects, and an inability to function under stress.  (P-App. 1109–34, 1148–49, 1155–57.)   These factors, in turn, resulted in her atypical behavior, such as engaging in insurance fraud, obtaining sodium azide, and murdering her husband.  (*Id.*)   And Dr. Joette James, a neuropsychologist who has never met, let alone evaluated, Andriano opined that she suffers from cognitive disorder not otherwise specified and resultantly has difficulty adjusting her behavior to respond to changing demands, is easily overwhelmed when faced with a large quantity of information, and behaves impulsively.  (P-App. 1488, 1495, 1501–02, 1510–12.)

Drs. Steven Pitt (a psychiatrist) and Kirin Amin (a neuropsychologist) testified for the State in rebuttal.  Dr. Amin tested Andriano for cognitive deficits and reviewed prior testing, and concluded that she did not suffer from a cognitive disorder.  (P-App. 1856–64, 1872–73.)  Dr. Pitt opined that Andriano does not suffer from a serious mental disorder and instead diagnosed her with 1) personality disorder not otherwise specified with antisocial, borderline, and dependent features, and 2) adjustment disorder with mixed anxiety and depressed mood.  (P-App. 1924–25.)  He also opined that Andriano understood her conduct's wrongfulness and could conform it to the law.  (*Id.* at 25–26.)

The PCR court denied relief, recognizing that its resolution of both claims depended on the threshold "factual issue of whether trial counsel failed to discover and present mitigating evidence that was readily available."  (P-App. 10.)  The court found that much of the evidence presented at the PCR hearing was cumulative to that presented at trial and that the allegations involving Alejo either are not true or were deliberately concealed and thus were not available to counsel.  (P-App. 15, 19, 20, 22, 24, 26, 27, 30.)  The court additionally found no reasonable probability that Andriano would have received a life sentence had she proved all of her mitigation given the aggravating factor's substantial weight and Andriano's undisputed knowledge of right from wrong.  (P-App. 19–20, 30–36.)

### III.   REASONS THIS COURT SHOULD DENY REVIEW.

The PCR court did not abuse its discretion by denying relief.  *See State v. Mata*, 185 Ariz. 319, 331, 916 P.2d 1035, 1047 (1996) (PCR court's order denying relief reviewed for abuse of discretion).  In arguing otherwise, Andriano asks this Court to second-guess the PCR court's factual and credibility findings on her conflict-of-interest and ineffective-assistance-at-sentencing claims, which it made after personally observing testimony and evidence at the 8-day PCR hearing *and* at Andriano's trial.[8]   But the record supports the court's findings and this Court should defer to them.  *State v. Swoopes*, 216 Ariz. 390, 393, ¶ 4, 166 P.3d 945, 948 (App. 2007) (court reviews PCR court's factual findings for clear error).  Andriano also asks this Court to review the PCR court's summary dismissal of five additional claims.  However, these claims, like the ineffective-assistance claims developed at the PCR hearing, present only case-specific issues.  Because the

_____

[8] Judge Brian Ishikawa presided over both Andriano's PCR proceeding and her trial.  In resolving Andriano's claims after the PCR hearing, Judge Ishikawa considered both the hearing evidence and his "own notes and recollection of the [trial] proceedings."  (P-App. 9.)  That the same Judge presided over Andriano's trial and PCR action entitles his findings to an even higher measure of deference than this Court ordinarily applies.  *See State v. Gerlaugh*, 144 Ariz. 449, 458, 698 P.2d 694, 703 (1985) (rejecting, where same judge presided over PCR and trial, defendant's argument that the PCR court's factual findings were not entitled to deference and observing, "The trial judge is present at the trial and can better evaluate the cogency of evidence.  The trial judge can also better assess the relationship between counsel's defective performance and the verdict.").

record supports the PCR court's factual findings, and Andriano presents no dispositive legal question with statewide importance for this Court to resolve, this Court should deny review.

### A. *The PCR court did not abuse its discretion by dismissing Andriano's claim that* **Knapp** *counsel had an actual conflict of interest that adversely affected Andriano's representation.*

Andriano contends that DeLozier labored under a conflict of interest because he also represented Donna and Alejo Ochoa in guardianship and adoption proceedings involving Andriano's children. (Petition, at 17–37.)  She suggests that his duty of loyalty to the Ochoas prevented him from investigating "red flags" emerging in the guardianship proceeding suggesting that Andriano was sexually abused. (*Id.*)  The State disagrees.

As a preliminary matter, the PCR court acknowledged that this claim "may" be precluded, but did not resolve this issue and instead rejected the claim on the merits.[9] (P-App. 25.)  Conflict-of-interest claims are cognizable on direct appeal. *See State v. Moore*, 222 Ariz. 1, 16, ¶ 82, 213 P.3d 150, 165 (2009); *State v. Martinez-Serna*, 166 Ariz. 423, 424–26, 803 P.2d 416, 418–19 (1990); *State v. Jenkins*, 148 Ariz. 463, 464–68, 715 P.2d 716, 717–21 (1986).  *But see State v.*

---

[9] The PCR court erroneously cited Arizona Rule of Criminal Procedure 32.2(a)(1), under which a claim is precluded if still "raisable on direct appeal or on post-trial motion" as the basis for the potential preclusion. (P-App. 25.)  In fact, the claim is precluded under Rule 32.2(a)(3), which specifies that a claim is precluded when it is waived at trial or on direct appeal.

*Tucker*, 205 Ariz. 157, 161–64, ¶¶ 19–33, 68 P.3d 110, 114–17 (2003) (conflict-of-interest claim based on omission of third-party defense required expanded record and thus had to be raised in PCR proceeding).  Here, Andriano knew that DeLozier represented her parents in the guardianship proceeding—in fact, that information was brought to the trial court's attention on the record.  (Appx. Q, at 15–26; N, at 6–7.)  Based on this information, Andriano should have raised her conflict-of-interest claim at trial or on direct appeal.  Because she failed to do so, it is precluded under Rule 32.2(a)(3).

Preclusion notwithstanding, Andriano's claim fails on the merits.  To prove that a conflict of interest rendered counsel ineffective under *Cuyler v. Sullivan*, 446 U.S. 335 (1980), a defendant must show that an actual conflict existed and adversely affected her representation.  *State v. Jenkins*, 148 Ariz. 463, 466, 715 P.2d 716, 720 (1986); *see Mickens v. Taylor*, 535 U.S. 162, 172 n.5 (2002) (clarifying that actual conflict and adverse effect are not separate inquiries but part of a single question).  An actual conflict of interest that adversely affects a defendant's representation is presumed prejudicial.  *Sullivan*, 446 U.S. at 349–50.  The Court intended *Sullivan* "to apply needed prophylaxis in situations where *Strickland* [*v. Washington*, 466 U.S. 668 (1984)] itself is evidently inadequate to

assure vindication of the defendant's Sixth Amendment right to counsel." *Mickens*, 535 U.S. at 176.[10]

A *potential* conflict of interest is insufficient to warrant relief under *Sullivan*. *See Sullivan*, 446 U.S. at 450 ("We hold that the possibility of conflict is insufficient to impugn a criminal conviction."); *Beets v. Scott*, 65 F.3d 1258, 1268 (5th Cir. 1995) ("[N]ot every potential conflict … is an 'actual' one for Sixth Amendment purposes."). Rather, until "'a defendant shows that his counsel *actively represented* conflicting interests, [s]he has not established the

---

[10] Although not dispositive of the issue because Andriano's claim fails under either test, *Strickland*, not *Sullivan*, should govern Andriano's claim. *Sullivan* concerned the joint representation of criminal defendants, 446 U.S. at 337–38, and the Court recently declined the opportunity to expressly extend it to conflicts stemming from successive representation. *Mickens*, 535 U.S. at 174–76 (resolving *Sullivan* issue in successive representation case but declining to rule on the need for *Sullivan*'s protection in such cases). In fact, in *Mickens*, the Court cautioned lower courts not to apply *Sullivan* "unblinkingly to all kinds of alleged attorney ethical conflicts," and noted that not all types of conflicts present the same likelihood of prejudice as multiple concurrent representation of criminal defendants. *Id.* (quotations omitted); *see id.* ("[T]he language of *Sullivan* does not clearly establish, or indeed even support, such expansive application."). Here, DeLozier withdrew from representing the Ochoas in July 2002, long before Andriano's trial, and any hypothetical conflict at her trial or immediately beforehand arose from his earlier representation of the Ochoas. (P-App. 1536–50, 3710, 3718.) This is not the type of "situation[] where *Strickland* … is evidently inadequate to assure vindication of the defendant's Sixth Amendment right to counsel." *Id.* And under *Strickland*, Andriano's claim fails for lack of prejudice, as discussed in Argument III(B), below.

constitutional predicate for [her] claim of ineffective assistance.'" *Mickens*, 535 U.S. at 175 (quoting *Sullivan*, 446 U.S. at 350) (emphasis added).

"In order to establish an actual conflict of interest, a defendant must demonstrate that some plausible alternative defense strategy might have been pursued." *Martinez-Serna*, 166 Ariz. at 425, 803 P.2d at 418 (quotations and alterations omitted). The defendant need not show that the strategy would have been successful, but merely that it was a viable alternative. *Id.* The defendant must also establish that "the alternative defense was inherently in conflict with the attorney's other loyalties or interests." *Id.*; *see also Jenkins*, 148 Ariz. at 467, 715 P.2d at 720 (defendant must prove that conflict of interest reduced attorney's effectiveness and that the negative effect was "substantial although it need not have caused defendant's conviction"). The presence of a conflict under the ethical rules does not, standing alone, establish an actual conflict for Sixth Amendment purposes. *Martinez-Serna*, 166 Ariz. at 425, 803 P.2d at 418.

In this case, Andriano failed to "'establish[] the constitutional predicate for [her] claim of ineffective assistance'": the existence of an actual conflict. *Mickens*, 535 U.S. at 175 (quoting *Sullivan*, 446 U.S. at 350). The PCR court

correctly found[11] that although a *potential* conflict of interest existed, Andriano's interests aligned with her parents' and no conflict materialized.[12]  (*See* P-App. 26 ("The defendant wanted the children to be with her parents.  It was in her interest [at trial] to portray her growing-up years as positive, in a favorable light to support such a placement.").)  The record supports the PCR court's finding.  Andriano initially consented to the Lambeths' appointment as guardians.  (P-App. 3638–41.)  Later, though, she sought to rescind this order and asked the court to appoint her parents as guardians.  (Appx. R.)  She wanted DeLozier to represent her parents in the ensuing litigation.  (P-App. 1610–13.)  And, of course, the Ochoas pursued that litigation with the goal of obtaining custody of Andriano's children.  Likewise, the Ochoas' assistance with Andriano's defense shows that they did not want her to receive the death penalty.  Andriano's interests aligned with the Ochoas'.

_____

[11]  This Court should reject Andriano's efforts to characterize this factual finding as a legal ruling.  (Petition, at 3–4, 32.)  To the contrary, "the determination of actual conflict and adverse effect is tightly bound to the particular facts of the case at hand."  *Perillo v. Johnson*, 205 F.3d 775, 782 (5th Cir. 2000); *see also United States v. Infante*, 404 F.3d 376, 392 (5th Cir. 2005) (whether conflict exists is "highly fact-sensitive"); *Maiden v. Bunnell*, 35 F.3d 477, 480–81 (9th Cir. 1994) ("Determining whether an attorney has an actual conflict involves a closer examination of the facts of each particular case …").

[12]  Commenting on Donna Ochoa's credibility, the court also remarked, "Now, ten years [after trial], the defendant's parents have been deprived of having a relationship with [Andriano's] children and the defendant is facing a death sentence.  Their interests have again aligned, this time in favor of portraying negative aspects of her growing-up years."  (P-App. 26.)

As the PCR court correctly found, had DeLozier failed to investigate Andriano's background "*because* of the impact on the parents['] case, there may have been an actual conflict."  (P-App. 26 (emphasis added).)  *See Perillo*, 205 F.3d at 806 (requiring defendant to show that counsel's compromised performance was "generated by the actual conflict between [his clients'] interests").  But DeLozier reasonably did not perceive any "red flags" warranting investigation into whether Alejo abused Andriano.  He considered the Lambeths' allegations that the Ochoas mistreated Andriano's children to be the type of "normal aspersions cast in domestic situations."[13]   (P-App. 26.)   Given his experience with and direct observation of the parties involved, DeLozier was in the best position to assess the credibility of the allegations and the PCR court appropriately deferred to his evaluation.  *Cf. State v. Glassel*, 211 Ariz. 33, 48, ¶ 50, 116 P.3d 1193, 1208 (2005) (credibility "cannot be easily discerned from an appellate record") (quotations omitted).

Further, DeLozier's assessment is consistent with other evidence in the record, including a report documenting that the animosity between the families had

_____

[13] Andriano attacks this finding and others on the ground that the PCR court ignored contrary evidence.  (Petition, at 33, 35–37.)  But the mere presence of conflicting evidence does not render a court's findings clearly erroneous.  *See In re U.S. Currency in Amount of $26,980.00*, 199 Ariz. 291, 295, ¶ 9, 18 P.3d 85, 89 (App. 2000) ("Factual findings are not clearly erroneous if substantial evidence supports them, even if there is substantial conflicting evidence.").

"at times reached hysterical proportions," and the fact that the *Ochoas* had also accused the *Lambeths* of harming the children and had reported the Lambeths to Child Protective Services.  (P-App. 1005–06, 1835, 3704–07.)  And in any event, it is unclear how allegations that Alejo mistreated Andriano's *children* would have put reasonable, non-conflicted counsel on notice that he needed to investigate whether Alejo had sexually abused *Andriano* decades earlier.

Moreover, the PCR court determined that Andriano had failed to prove that the allegations involving Alejo were available to counsel, specifically finding that the accusations "may not be true," "may be merely speculative," or may have been concealed by Andriano and her family.  (P-App. 27; *see* Argument III(B), *infra* (discussing lack of credibility of allegations against Alejo).)   That first-chair counsel Patterson and the mitigation specialist—who did not possess conflicts of interest—also did not discover the information confirms that it was not reasonably available for discovery, regardless of the existence of any conflict.   Because the information was not available to counsel and likely would not have been found even with a more thorough investigation, Andriano failed to show an actual conflict of interest that adversely affected her representation.

Andriano challenges the PCR court's ruling on several unpersuasive grounds.  First, she asserts that the court "incorrectly framed the conflict issue." (Petition, at 32–33.)  Rather than consider the parties' shared desire that the Ochoas

raise her children, Andriano argues that the court should have recognized her interest in presenting all available mitigation and posits that "*any* non-conflicted trial counsel would have investigated" the possibility that Alejo abused her in light of the purported "red flags."  (Petition, at 32–33.)  As previously stated, though, Patterson had no conflict and did not perceive the need to investigate whether Alejo abused Andriano.   And Andriano's argument incorrectly assumes that Andriano had no right to limit her mitigation presentation.  *See State v. Hausner*, 230 Ariz. 60, 85, ¶ 119, 280 P.3d 604, 629 (2012) (Sixth Amendment does not require presentation of mitigation against defendant's wishes).   It also presupposes—despite the PCR court's contrary finding—that evidence of Alejo's alleged misdeeds against Andriano would have been available to DeLozier had he specifically looked for it.  (P-App. 27.)

Second, Andriano chastises the PCR court for relying on her under-oath admission that Alejo did not abuse her, claiming that childhood sexual-abuse victims often "repress those traumatic memories."  (Petition, at 34; P-App. 27.) She contends that the court ignored Dr. Hopper's testimony that she has severe memory deficits.  (*Id.*)  But the PCR court did not *ignore* this evidence—it simply did not *believe* it.   The Court found that Andriano's post-conviction claims of memory problems were inconsistent with the court's observations of her memory at trial:

The Court observes that the defendant's ability to remember, recall and describe at trial contrasts sharply with her current memory, especially when interviewed by the State's expert, Dr. Pitt.  At trial, the defendant seldom (if at all) claimed an inability to remember, provided narrative responses and detailed answers in response to trial counsel Patterson's questioning.   In addition, she responded appropriately, and sometimes aggressively, to the State's trial cross-examination.  In contrast, certain PCR interview questions asked of the defendant and memorialized in video clips[14] led to long silences, extended pauses, and an absence of recall or an inability to access memories.

….

The defendant herself denied experiencing anything other than a strict, religiously-directed childhood.  She testified that she was neither physically nor sexually abused.  Although post-conviction experts provide the Court with inferences from testing,  describe behaviors that are "consistent with" sexual or physical abuse or mental health issues; and attribute her denials to an inability to access memories, the Court finds the defendant's and her witnesses' words, shared before a death sentence was imposed, to be more credible.

(P-App. 22; *see also* P-App 11 ("The Court recalls that the defendant [at trial] …

remembered and described childhood events and the evening of the murder …").)

These findings deserve the utmost deference, *see Gerlaugh*, 144 Ariz. at 458, 698

P.2d at 703, and Andriano's disagreement with them does not make them clearly

erroneous.

---

[14] These clips are from Dr. Pitt's videotaped interview with Andriano, which was admitted into evidence at the PCR hearing.  (P-App. 6529.)

Andriano's third argument, that the PCR court erred both factually and legally by finding that the evidence of Alejo's abuse "may not be true … or may be merely speculative," also fails.  (Petition, at 35; P-App. 27.)  Andriano asserts that, under *Sullivan*, she need show only a plausible defense strategy that was not pursued because of DeLozier's purported conflict and need not prove that it would have succeeded.  (*Id.*)  *See Martinez-Serna*, 166 Ariz. at 425, 803 P.2d at 418.  Andriano misses the point:  the court found that she *did not show* a plausible alternative defense strategy because she failed to prove that evidence of Alejo's purported abuse was available to counsel.   The court therefore applied the appropriate standard—Andriano simply disagrees with its findings.

Finally, Andriano suggests that DeLozier had a conflict of interest because the Ochoas paid his fees in the criminal case.  (Petition, at 26–28.)  But to the extent this constitutes a conflict, *Sullivan* does not apply.  *See Mickens*, 536 U.S. at 175–75 (noting that courts have applied *Sullivan* to cases where "representation of the defendant somehow implicates counsel's personal or financial interests" and suggesting that *Sullivan* should not be read so expansively); *Beets*, 65 F.3d at 1260, 1272 (declining to apply *Sullivan* where attorney obtained contract for media rights to defendant's story).  Moreover, nothing in DeLozier's testimony indicates that he declined for pecuniary reasons to investigate or present evidence that Alejo abused

Andriano.  For the reasons stated above—and primarily because this claim turns on factual findings that are not clearly erroneous—this Court should deny review.

> **B. *The PCR court did not abuse its discretion by rejecting—based on extensive factual findings and credibility determinations-- Andriano's claim that counsel was ineffective for failing to investigate and present mitigation.***

Andriano argues that counsel was ineffective for failing to present mitigating evidence regarding her 1) "harrowing" childhood, 2) sexual abuse, and 3) mental-health difficulties.  (Petition, at 37–48.)  To show ineffective assistance, Andriano must prove that counsel's performance was deficient under prevailing professional standards and that she suffered prejudice as a result.  *Strickland*, 466 U.S. at 687–88.  To establish deficient performance, she must overcome this Court's strong presumption of effectiveness, and prove that counsel's performance was *objectively* unreasonable.  *Id.* at 687–96.  To show prejudice, she must establish a reasonable probability that any errors affected the case's outcome.  *Id.*  Andriano has failed to carry her burden on either prong of *Strickland*.

### 1. Deficient performance.

The PCR court found that "there was a lack of communication and coordination between members of the defense team" but that counsel nonetheless "secured and presented that evidence that was readily available at the time of trial." (P-App. 23–24.)  The court found that counsel had front-loaded the mitigation

presentation by presenting substantial mitigating evidence in the guilt phase.[15]  (P-App. 11, 24.)  And the court emphasized, in response to Andriano's claim that counsel failed to unearth certain mitigation, that it was "not persuaded, first as to the credibility of the proposed evidence and, second, as to its availability at trial." (P-App. 24.)

**Childhood/sexual abuse evidence:**  Counsel also investigated Andriano's upbringing, as evidenced by their mitigation theme—supported by the testimony of numerous witnesses—that she had an impoverished early childhood, was thereafter raised in a controlling religious environment, and fell victim as an adult to a domestic-violence relationship.  The PCR evidence overlapped to a substantial degree with this evidence.  Counsel was not ineffective for failing to present evidence that was cumulative to that offered at trial.  *See Bobby v. Van Hook*, 558 U.S. 4, 11 (2009)  ("[T]here comes a point at which evidence from more distant

---

[15] Andriano challenges this finding as erroneous, citing a motion counsel filed after the guilt-phase verdict seeking records relating to Andriano and her family, and an email the mitigation specialist sent 2 days before the penalty phase brainstorming mitigation themes. (Petition, at 47 (citing P-App. 3339, 3866–67).) But these documents do not negate the fact that, in the guilt phase, counsel presented abundant evidence of Andriano's background and status as a domestic-violence victim, which they later incorporated in their penalty-phase presentation. In fact, Patterson testified that (consistent with his training) he strategically chose to use the domestic-violence evidence both as a defense to the murder charge and, when that was unsuccessful, as mitigation. (P-App. 1388–90.)

relatives can reasonably be expected to be only cumulative, and the search for it distractive from more important duties.").

Nor did the PCR court err by finding that the accusations against Alejo were not available to counsel. Despite a thorough investigation of Andriano's background, counsel uncovered no reason to believe that Alejo Ochoa had abused her. Andriano never claimed to have been abused as a child or adult by anyone other than Joe, and counsel developed that information and presented it in detail at trial. (P-App. 1406–09, 1415–16, 1613–14.) Likewise, Andriano's family members did not report that she had been abused as a child by anyone other than her biological father and his family members—information which, again, counsel presented at trial. (P-App. 1406–08, 1445–46, 1614.) Donna Ochoa, in particular, gave counsel abundant background information, and reported no suspicions about Alejo. (P-App. 1003, 1408–09, 1614, 3347–52.)

Andriano cannot show deficient performance from counsel's failure to discover evidence that neither she nor her family members disclosed. "An attorney does not render ineffective assistance by failing to discover and develop childhood abuse that his client does not mention to him." *Puiatti v. Sec'y, Fla. Dep't of Corr.*, 732 F.3d 1255, 1281 (11th Cir. 2013) (quotations omitted). A "lawyer also is not ineffective when the family members [his client] directs [him] to talk to … do not

mention a history of physical abuse." *Id.* (quotations omitted).  The PCR court appropriately found no deficient performance.

**Mental-health evidence:**  Counsel retained Dr. Rosengard to evaluate Andriano.  (P-App. 1311, 1335, 2439–43.)  His opinions were not helpful.  (P-App. 2439–44.)  Dr. Rosengard did not recommend additional testing (*see id.*) and Patterson's own observations of Andriano led him to believe that additional investigation was unnecessary.  (P-App. 1357.)  Faced with these results, counsel pursued another mitigation theory:  that Andriano was a domestic-violence victim. Counsel supported this theory with expert testimony from Dr. Murphy.  *See, e.g., Turner v. Calderon*, 281 F.3d 851, 875–76 (9th Cir. 2002) ("The choice of what type of expert to use is one of trial strategy and deserves a heavy measure of deference.").  And although they testified as fact, rather than expert, witnesses, counsel used Dr. Perry and nurses King and Van Every, from the Maricopa County Jail's psychiatric unit, to place before the jurors general information about Andriano's mental-health difficulties without opening the door to rebuttal mental-health evidence.

Counsel's decisions were reasonable, especially given that Dr. Rosengard did not recommend consulting with another expert (*see* P-App. 2439–44) or otherwise place counsel on notice that further evaluation was necessary.  *See Earp*, 623 F.3d at 1077 ("An expert's failure to diagnose a mental condition does not

constitute ineffective assistance of *counsel*, and [a defendant] has no constitutional guarantee of ineffective assistance of experts.").  The PCR court did not abuse its discretion by finding no deficient performance.

### 2. Prejudice.

The PCR court compared the trial evidence—"which provided a singular, linear view of mitigation"—with the post-conviction evidence—"which provided a global, cumulative overview of [Andriano's] development over time" to determine whether she had shown prejudice.  (P-App. 28.)  The court noted that, at trial, Andriano had claimed to be a "good person raised with a good background who made a bad decision—attributable to her being a victim of domestic violence" but, at the PCR hearing, claimed to be "a person shaped by her horrendous childhood." (P-App. 29.)  The court found that Andriano's childhood "was somewhere between 'good' and 'impoverished,' but was neither 'horrific' nor 'harrowing.'"  (*Id.*)  The court also viewed much of the omitted mitigation as cumulative, and specifically found that the allegations against Alejo Ochoa lacked credibility because they were undocumented, did not emerge until after Andriano's death sentence, and came from "interested third parties" like Donna Ochoa.  (P-App. 19, 22, 27, 30.)

With respect to Andriano's mental health, the court accepted as true that Andriano suffers from depression, PTSD, impulsivity and impairment of executive functioning, as her experts opined.  (P-App. 20.)  However, it found that Andriano

36

understood her conduct's wrongfulness and observed that she had conceded in her allocution that she had made a "'horrible choice'" to kill Joe.  (*Id.*)  The court concluded that Andriano's stress and impulsivity would have carried little weight in mitigation, particularly where killing Joe "brought on the stress."  (*Id.*)  And the court found Andriano's mental-health mitigation unpersuasive because her experts relied on the less-than-credible information regarding Alejo.  (P-App 20–22.) Balancing the newly-presented mitigation against 1) the aggravating factor, 2) the fact that Andriano was a high-functioning, successful person before killing Joe, and 3) the fact that Andriano's own actions led to the stress with which she had to contend, the court found no reasonable probability that the omitted mitigation would have resulted in a life sentence.  (P-App. 30.)

**"Harrowing" childhood evidence:**  For the reasons discussed above, the PCR court appropriately found that much of this evidence was cumulative, and that it did not prove Andriano experienced a "harrowing" childhood.  The jurors were aware of her early childhood poverty, potential molestation, and strict religious upbringing and this information did not persuade them to impose a life sentence. There is no reasonable probability that additional, cumulative details would have changed this result.  *See Wong v. Belmontes*, 558 U.S. 15, 23 (2009) (additional humanizing evidence "would have offered an insignificant benefit, if at all"); *Van Hook*, 558 U.S at 12 (where counsel presented significant background information,

defendant failed to show that "minor additional details" would have changed the result).

**Sexual abuse:**  The allegation that Alejo molested Andriano did not emerge until *after* Andriano was convicted and sentenced to death.  The timing of the allegation, standing alone, calls into question its veracity.  Even more significant, Andriano testified under oath—unequivocally—that Alejo had *never touched her improperly*, save one occasion when he grabbed her shoulders and shook her. (Appx. I, at 39–42.)  These in-court statements are entitled to a strong presumption of verity.  *Cf. Blackledge v. Allison*, 431 U.S. 63, 74 (1977).  And if the allegations are true, Andriano and her family actively concealed them from discovery. Andriano cannot carry her burden under *Strickland* by speculating that someone would have disclosed the information had counsel asked different questions.  *See generally Grisby v. Blodgett*, 130 F.3d 365, 373 (9th Cir. 1997) (speculation is insufficient to establish *Strickland* prejudice); *Lackey v. Johnson*, 116 F.3d 149, 152 (5th Cir. 1997) ("In general, counsel is not ineffective for failing to discover evidence about which the defendant knows but withholds from counsel.").

Further, even if Alejo sexually abused Andriano, that fact would be cumulative to evidence presented at trial that Andriano may have been molested as a child.  Changing the number of times Andriano was abused, and the identity of the perpetrator, would not have made Andriano's status as a molestation victim any

more compelling.  This is particularly true where over a decade passed between the time Andriano reached adulthood and the night she murdered Joe, dramatically reducing the weight to which the evidence is entitled.  *See, e.g., State v. Pandeli*, 215 Ariz. 514, 532, ¶ 72, 161 P.3d 557, 575 (2007).  Andriano has not shown prejudice from counsel's failure to present evidence that Alejo sexually abused her.

**Mental health:**  Despite having been evaluated by multiple professionals both before and after Joe's murder, Andriano has *never been diagnosed with a serious mental illness* until the present proceeding, in which she seeks to evade her lawfully-imposed death sentence.  (*See* P-App. 3158–64 (pre-offense counseling records); 2435–37 (Dr. Jack Potts' competency report); 2485–89 (Dr. Rosengard's report); 2446–73 (Dr. Bayless' report); 2485–89 (Kandy Rohde's notes); 1916–21 (testimony regarding post-offense medical records).)  There is no reasonable probability that the outlying opinions offered by Andriano's current mental-health experts would have convinced the jurors that she is mentally ill or persuaded them to impose a life sentence.

The expert opinions are also inconsistent with the facts of Joe's murder and with Andriano's prior behavior.  Andriano carefully planned and executed Joe's murder.  *Andriano*, 215 Ariz. at 500–01, ¶¶ 2–12, 161 P.3d at 543–44.  And contrary to her experts' opinions, Andriano has engaged in calculating, devious behavior throughout her life—it did not suddenly arise in the fall of 2000 and

unexpectedly result in her killing Joe.  (*See* P-App. 2554–78 (deposition of former boyfriend recalling Andriano's deviousness, infidelity, and manipulation); 1165–67, 1916–19, 3158–64 (all describing Andriano's multiple complicated schemes to embezzle from employers); P. App. 1167, 1923 (describing Andriano's involvement in a fraudulent scheme at the Maricopa County Jail); 6548–50 (reflecting Andriano misrepresenting information on loan application)).   Had counsel presented mental-health testimony, they would have opened the door to this damaging evidence.[16]   *See, e.g., Belmontes*, 558 U.S. at 26 (had counsel presented additional mitigation, "the worst kind of bad evidence would have come in with the good").

Andriano contends that the PCR court erred by considering whether she could appreciate her conduct's wrongfulness, because she believes the analysis should focus only on whether counsel found all available mitigation.  (Petition, at 44–45.)   However, Andriano argued in her petition that counsel should have presented expert testimony to establish the A.R.S. § 13–751(G)(1) factor, which

---

[16] Further, by limiting his mitigation presentation, Patterson convinced the trial court to limit the scope of Dr. Bayless' testimony and thus prevented the State from introducing damaging rebuttal evidence, such as Andriano's conduct in stealing from an employer.  (Appx. U.)  And Dr. Bayless' full report, which would have been admitted had Patterson presented mental-health evidence, recognizes Andriano's antisocial traits, discusses at length her various maladaptive behaviors, and communicates Dr. Bayless' belief that she is an untruthful, manipulative person.  (P-App. 2446–2473.)

*requires* proof that the defendant's ability to appreciate her conduct's wrongfulness was impaired.   (P-App. 102.)   Andriano cannot reasonably fault the court for resolving a claim she raised expressly.

Andriano's argument also fails because the sentencing process does not focus merely on the *quantity* of mitigating factors but on their *quality*, and whether a defendant knows right from wrong is relevant to the mitigation's quality.   The absence of an explanatory relationship between a defendant's mental disorder and her offense severely reduces the disorder's mitigating weight.   *See, e.g., State v. Styers*, 227 Ariz. 186, 189, ¶ 12, 254 P.3d 1132, 1135 (2011).   A defendant's knowledge that his conduct is wrong diminishes the disorder's weight even further. *See Pandeli*, 215 Ariz. at 533, ¶ 81, 161 P.3d at 576 (court considers claim of mental impairment offered as non-statutory mitigation "in proportion to a defendant's ability to conform or appreciate the wrongfulness of his conduct") (quotations omitted).   The PCR court appropriately found that, because Andriano's proffered mental-health mitigation did not explain the crime and would have carried slight weight, counsel's failure to present it did not prejudice Andriano.

Finally, Andriano neglects to address a substantial portion of the PCR court's ruling:   that even if the jury had heard the mitigation Andriano proffered at the PCR hearing, it would have sentenced her to death in light of the (F)(6) aggravating factor.   *See Cullen v. Pinholster*, __ U.S. __, 131 S. Ct. 1388, 1408

(2011) (court must reweigh "'the evidence in aggravation against the totality of available mitigating evidence'") (quoting *Wiggins v. Smith*, 539 U.S. 510, 534 (2003)).    This Court has already determined that Andriano's childhood circumstances carry little mitigating weight because "the events are remote in time to the offense and thus their relevance is minimal." *Andriano*, 215 Ariz. at 512, ¶ 72, 161 P.3d at 555.  The new details Andriano has submitted do not remedy this deficiency.    And as argued above, Andriano's mental-health evidence carries equally little weight given its lack of a connection to Joe's murder.  *See Styers*, 227 Ariz. at 189, ¶ 12, 254 P.3d at 1135; *Pandeli*, 215 Ariz. at 533, ¶ 81, 161 P.3d at 576.    Andriano has not shown a reasonable probability of a different result had counsel presented the omitted mitigation.

### C. *The PCR court did not abuse its discretion by declining to admit hearsay evidence at the PCR hearing*

Andriano contends that the PCR court erred by denying her motion to admit numerous declarations into evidence at the PCR hearing in lieu of testimony because A.R.S. § 13–751(C) makes the rules of evidence inapplicable at the penalty phase.  (Pet. 55–58; *see* P-App. 288–94, 804.)  However, the PCR hearing was not a penalty-phase proceeding governed by § 751(C).  Instead, it was a post-conviction hearing governed by Rule 32 of the Arizona Rules of Criminal Procedure.  And Rule 32.8(b) expressly provides that the rules of evidence apply at PCR hearings.  No error occurred.

**D.** ***The PCR court did not abuse its discretion by summarily dismissing Andriano's prosecutorial and juror-misconduct claims as precluded, and her guilt-phase, aggravation-phase, and appellate ineffective-assistance claims as not colorable.***

Before granting an evidentiary hearing, a PCR court must first identify and dispose of all precluded claims. Ariz. R. Crim. P. 32.6(c). One reason a claim is precluded is if it "has been waived at trial, on appeal, or in any previous collateral proceeding." Ariz. R. Crim. P. 32.2(a)(3). After identifying and excluding all precluded claims, a court must dismiss any portion of the petition that does not present a colorable claim for relief. Ariz. R. Crim. P. 32.6. A colorable claim is one that, if true, might have changed the outcome of the trial or sentencing. *State v. Schrock*, 149 Ariz. 433, 441, 719 P.2d 1049, 1057 (1986).

> 1. The PCR court did not abuse its discretion by dismissing Andriano's prosecutorial-misconduct claims as precluded.

Andriano alleges that the prosecutor engaged in misconduct by 1) gratuitously highlighting her sexual history and acts of adultery, 2) engaging in vouching, and 3) impugning a defense expert's ethics. (Petition, at 52–54.) The PCR court appropriately found that Andriano should have raised these claims on direct appeal and, because she did not, they are waived and precluded. (P-App. 3 (citing Ariz. R. Crim. P. 32.2(a)(3).). Alternatively, the court rejected on the merits Andriano's claim that the prosecutor improperly highlighted her extramarital affairs, noting that this Court had affirmed that evidence's admission to show

Andriano's motive, *see* Ariz. R. Evid. 404(b), and, as a result, the prosecutor could

comment on it.  *See Andriano*, 215 Ariz. at 503–04, ¶¶ 24–31, 161 P.3d at 546–47.

The court also cited this Court's finding that the majority of the prosecutor's

disputed comments occurred during the guilt-phase closing argument, and that the

trial court dispelled any prejudice by instructing the jurors that the attorneys'

comments were not evidence.  (*Id.*)  *Id.*

Andriano does not explain how the PCR court erred by finding that she

should have raised her misconduct claims on direct appeal, and this Court should

deny review for that reason alone.  (Petition, at 52–54.)  Instead, she attacks the

court's alternative merits resolution,[17] asserting that it did not address her argument

that the prosecutor "went well beyond the … stated purpose" for the evidence and

that he argued Andriano had killed Joe for money, not to live a single lifestyle.

(*Id.*)  But nothing presents the State from suggesting more than one motive for an

offense.  *See State v. Hargrave*, 225 Ariz. 1, 8–9, ¶ 14, 234 P.3d 569, 576–77

(2004)  (affirming admission of evidence that defendant belonged to white-

supremacist organization as evidence of motive even though the State also

presented evidence of less prejudicial motives).  And the prosecutor's proposal that

Andriano killed Joe out of greed does not negate the fact that the evidence of her

_____

[17] Andriano cites the prosecutor's purported vouching and improper attack on a defense expert, but provides no argument on the merits of these claims.

extramarital affairs was properly admitted and available for commentary.  Finally, contrary to Andriano's position (Petition, at 53–54), whether the references occurred during argument or questioning is irrelevant where the contested evidence was properly admitted.  *See Andriano*, 215 Ariz. at 503–04, ¶¶ 24–31, 161 P.3d at 546–47.  The PCR court did not abuse its discretion by denying this claim.

2.  The PCR court did not abuse its discretion by dismissing Andriano's juror-misconduct claim as precluded.

Andriano argues that the PCR court erred by dismissing her claim that the jurors engaged in misconduct when they purportedly considered, in evaluating the A.R.S. § 13–751(F)(6) aggravating factor, the likelihood Andriano would be released from prison.  (Petition, at 54–55.)  The PCR court found this claim precluded under A.R.S. § 13–753(F)(6) because Andriano should have raised it in a motion for a new trial, *see* Ariz. R. Crim. P. 24.1(c), a motion to vacate judgment, *see* Ariz. R. Crim. P. 24.2(a), or on direct appeal.  (P-App. 3.)  The court specifically found that Andriano had notice of the facts underlying this claim through a newspaper article containing juror statements, which she attached to a post-trial motion concerning a different juror issue.  (*Id.*; *see* Appx. T.)  Andriano asserts that the newspaper article established only that the jurors considered her parole eligibility during the penalty phase.  (Petition, at 54.)  But her identification of a perceived juror-misconduct issue should have placed her on notice to

investigate and raise other similar issues.  Andriano failed to do so, resulting in her claim's preclusion.

A juror-misconduct claim does not, as Andriano intends, require a knowing, intelligent, and voluntary waiver.  *See* Ariz. R. Crim. P. 32.2 (2002 cmt.) (although most claims are waived by the failure to raise them, those of "sufficient constitutional magnitude" require knowing, intelligent and voluntary waivers).  Andriano has the burden to show her claim is of a sufficient constitutional magnitude to require a personal waiver, *see Swoopes*, 216 Ariz. at 399, ¶ 28, 166 P.3d at 954, and she has not carried her burden here.  Andriano cites no authority holding that a juror-misconduct claim requires a personal waiver, and Arizona courts have long found such claims waived by a defendant's failure to raise them.  *See State v Prince*, 226 Ariz. 516, 533, ¶ 56, 250 P.3d 1145, 1162 (2011); *State v. Adams*, 27 Ariz. App. 389, 390–91, 555 P.2d 358, 359–60 (App. 1976).[18]  This Court should deny review.

---

[18]   Andriano's juror-misconduct claim also rests on inadmissible juror declarations offered to impeach the death verdict.  *See, e.g., State v, Cruz*, 218 Ariz. 149, 159, ¶ 33, 181 P.3d 196, 206 (2008).  And even if the declarations are admissible, the claim fails on the merits.  No juror states that the jury found the aggravating factor proven solely to qualify Andriano for a death sentence, or that they did not find the elements of cruelty proven beyond a reasonable doubt.  (P-App. 3037–42.)

3. The PCR court did not abuse its discretion by finding
that Andriano's claims of ineffective assistance in the
aggravation phase were not colorable.

**Mental-health evidence:**   The PCR court rejected Andriano's claim that counsel was ineffective for failing to present mental-health evidence in the aggravation phase to show that she did not know her actions would cause Joe to suffer.  (Petition, at 48–49.)  *See* A.R.S. § 13–751(F)(6); *see also, e.g., State v. Chappell*, 225 Ariz. 229, 234–35, ¶ 11, 236 P.3d 1176, 1181–82 (2010) (cruelty exists when victim consciously experiences physical or mental pain and defendant knew or should have known suffering would occur).   Because cruelty is "determined by reference to an objective standard," the court reasoned, mental-health evidence would have been irrelevant and inadmissible and counsel was not ineffective for failing to offer it. (P-App. 4.)

The PCR court did not abuse its discretion by denying this claim.  This Court has consistently analyzed cruelty under an *objective* standard that considers whether the defendant was aware *or should have been aware* of the victim's suffering.  *See State v. Bocharski*, 218 Ariz. 476, 494, ¶ 85 n.15, 189 P.3d 403, 421 (2008) (recognizing the "knew or should have known" standard as cruelty's "intent requirement") (quotations omitted); *see generally State v. Lefevre*, 193 Ariz. 385, 390, ¶ 21, 972 P.2d 1021, 1026 (App. 1998) (the phrase "having reason to know"

"establishes an objective standard of guilt and Defendant is guilty if a reasonable person would have known the relevant fact").

Notwithstanding the clarity of the law on this issue, Andriano asserts that cruelty is a subjective standard to which mental-health evidence is relevant.  She relies on *Bocharski* for this proposition, but the very language she quotes recites an *objective standard*.  (Petition, at 49 (quoting *Bocharski*, 218 Ariz. at 494, ¶ 85 n.15, 189 P.3d at 421).)  She also cites *State v. Moody*, 208 Ariz. 424, 472, ¶ 226, 94 P.3d 1119, 1167 (2004), in which this Court did not find the *Ring v. Arizona*, 536 U.S. 584 (2002), error in a judge's finding of cruelty harmless because the defendant presented evidence that he was in a dissociative state at the time of the murders. But this Court did not construe the (F)(6) factor in *Moody* or find that mental-health evidence is admissible to rebut cruelty.  In fact, that question did not appear to be before this Court.  Rather, this Court simply conducted a *Ring* harmless-error review, noted that the defendant presented mental-health evidence at sentencing, and found that such evidence could have made a difference to the cruelty finding. *Moody* is therefore unavailing.  Because mental-health evidence was inadmissible at the aggravation phase, counsel was not ineffective for failing to present it.  *See, e.g., Sones v. Hargett*, 61 F.3d 410, 414–15 n.5 (5th Cir. 1995) ("Counsel cannot be deficient for failing to press a frivolous point.").

**Failure to object to sodium azide:**  The PCR court rejected Andriano's argument that counsel was ineffective for failing to request an order precluding the jury from considering Joe's ingestion of sodium azide in assessing cruelty. (Petition, at 49–50.)  The court found that Andriano did not contest the sodium azide evidence's admission in the guilt phase "because it played a key role in her self-defense theory."  (P-App. 5.)  Because all guilt-phase evidence is deemed admitted in the aggravation phase, the court continued, counsel could not have sought the sodium azide's preclusion in the aggravation phase.  *See* A.R.S. § 13–752(I) ("If the trier of fact at any prior phase of the trial is the same trier of fact at the subsequent phase, any evidence that was presented at any prior phase of the trial shall be deemed admitted as evidence at any subsequent phase of the trial.").

Andriano contends that the PCR court erroneously construed her claim to argue that the evidence of sodium azide poisoning was "inadmissible for any purpose."  (Petition, at 49.)  She explains that she instead argued that counsel should have objected to the State's argument that she poisoned Joe because, given the amount of sodium azide found in the food Andriano prepared, he would have had to consume unrealistic quantities of the food to achieve a fatal dose.  (*Id.*)  But even if the court misconstrued Andriano's argument, the statutory basis for its ruling remains sound:  all evidence admitted at the guilt phase is deemed admitted for sentencing.  A.R.S. § 13–751(I).  Counsel could not reasonably have sought an

instruction directing jurors *only* to consider the sodium azide to the extent they believed Andriano's assisted-suicide theory.

In addition, Andriano cannot show prejudice because the poison's effects were not the only evidence supporting cruelty—or even the strongest evidence. *See Andriano*, 215 Ariz. at 511, ¶¶ 65–66, 161 P.3d at 554 (noting Joe's defensive wounds, which revealed his consciousness and knowledge that he was being beaten by his wife while incapacitated and defenseless). Accordingly, even if the jurors had found that Joe voluntarily consumed the sodium azide, they would still have found cruelty proven based on the mental and physical suffering he experienced from the bludgeoning. Thus, there is no reasonable probability the jurors would not have found cruelty had they not considered the sodium azide and this Court should deny review.

4. The PCR court did not abuse its discretion by finding that Andriano's claims of ineffective assistance at the guilt phase were not colorable.

Andriano argues that counsel was ineffective for failing to 1) present evidence of her purported mental illness to negate the *mens rea* for first-degree murder, 2) present testimony from Gia Palicki to establish that Joe was aware of Andriano's efforts to obtain life insurance, 3) present testimony from Jeffrey Miller to establish that Joe was depressed, and 4) seek a jury instruction on lesser-

included offenses. (Petition, at 59–61.) These are not colorable claims for relief and the PCR court did not err by dismissing them.

**Mental-health evidence:** Andriano claims that counsel was ineffective for failing to introduce evidence of her purported mental health difficulties in the guilt phase. (Petition, at 50.) The PCR court correctly rejected this claim because Andriano did not raise an insanity defense and evidence of her mental illness was not admissible to negate the *mens rea* for first-degree murder. (P-App. 5.) *See State v. Mott*, 187 Ariz. 536, 541, 931 P.2d 1046, 1051 (1997) ("Arizona does not allow evidence of a defendant's metal disorder short of insanity either as an affirmative defense or to negate the *mens rea* element of a crime."); *see also Clark v. Arizona*, 548 U.S. 735, 756 (2006).

Andriano contends that the mental-health evidence would have been relevant to a defense under *State v. Christensen*, 129 Ariz. 32, 34–36, 628 P.2d 580, 582–84 (1981), which permits "limited" expert testimony regarding "a character trait of acting reflexively in response to stress" to rebut the element of premeditation. *Mott*, 187 Ariz. at 544, 931 P.2d at 1054. (Petition, at 50.) But the evidence belies any claim that Andriano acted reflexively in killing Joe: she obtained sodium azide under false pretenses long before the event, attempted to obtain life insurance to profit from the murder, and secretly administered the poison to Joe. These facts

establish that her actions were calculated and premeditated, not reflexive.  No error occurred.

**Joe's awareness of Andriano's efforts to obtain life insurance:**  Andriano faults counsel for failing to present testimony from Gia Palicki in the guilt phase regarding a conversation she had with Joe and Andriano in the summer or fall of 1999 about obtaining a life insurance policy.  (Petition, at 50–51; P-App. 2944–51.)  The PCR court concluded that the conversation "was remote in time to the murder and would not have rebutted [Andriano's] later attempts to obtain life insurance for Joe without his knowledge."  (P-App. 5.)

The PCR court did not err by so ruling.  First, Palicki's proposed testimony is hearsay and thus inadmissible.  Second, Palicki's conversation with Joe occurred in mid-1999, over 1 year before his death.[19]   Andriano, however, made her clandestine attempts to obtain life insurance much later, in August and September of 2000.  *Andriano*, 215 Ariz. at 502, ¶ 20, 161 P.3d at 545.  The evidence established that Joe was not aware of those efforts, and that he declined the opportunity to complete the application process when contacted by one company.  *Id.* at 502, ¶ 20, 161 P.3d at 546.  In light of the foregoing, and the timing of the

---

[19]  Andriano quarrels with the trial court's finding that the conversation occurred in the summer or fall of 1999.  (Petition, at 51.)  But Palicki's declaration states that she met Joe and Andriano in the summer or fall of 1999 and had the conversation at issue "really soon after [they] met."  (P-App. 2944–51, ¶ 8.)

conversation between Joe and Palicki, there is no reasonable probability that her testimony would have changed the verdict.  Nor did counsel perform deficiently by declining to present this unpersuasive evidence.  Andriano has failed to carry her burden under *Strickland*.

**Evidence of Joe's depression:**  Andriano contends that counsel should have presented testimony from Jeffrey Miller (an attorney who represented the Andrianos in a medical malpractice lawsuit related to Joe's cancer) to corroborate her claim that Joe was depressed and suicidal.[20]  (Petition, at 51–52.)  Miller would purportedly have testified that Andriano told him on several occasions that Joe was suicidal, that Miller confronted Joe with these concerns, and that Joe did not deny being suicidal but told Miller "not to worry" because he knew that his death from any means other than cancer would compromise the wrongful-death lawsuit.[21]  (P-App. 2600–03.)  The PCR court found no deficient performance or prejudice, observing that Miller's testimony would have been inadmissible hearsay and that

---

[20]  In her PCR petition, Andriano also argued that counsel should have presented testimony from another witness, Chris Weaver, also to show Joe's depression.  Andriano does not raise this claim in her petition for review.  (Petition, at 51–52.)

[21]  In these conversations, Andriano revealed her true motive in reporting these concerns.  Miller recalls that she "asked [him] to remind Joe that, from a legal perspective, he would be hurting his family by committing suicide because the malpractice claim would be dismissed."  (Petition, at Tab 19, ¶ 4.)

counsel's decision which witnesses to call is subject to deference.   (P-App. 5 (citing *State v Lee*, 142 Ariz. 210, 689 P.2d 153 (1984)).

Andriano has failed to carry her burden under *Strickland*.   Most notably, counsel did not *fail* to introduce this evidence.   Rather, he *attempted* to elicit it when Miller testified on other matters in the guilt phase, but this Court properly sustained the State's hearsay objection.   (Appx. E, at 89–91.)   Andriano contends that counsel should have argued that Miller's testimony fell within the hearsay exception for "[t]hen existing mental, emotional, or physical condition."  Ariz. R. Evid. 803(3).   Even if counsel had successfully invoked this exception and the evidence had been admitted, it would not have changed the outcome.   Joe's purported statements to Miller establish that, while he may have been depressed and contemplating suicide because of his illness, he had no intention of killing himself and compromising his family's lawsuit.  There is no reasonable probability the statements would have affected the outcome if admitted and the PCR court did not abuse its discretion by denying this claim.

**Lesser-included offense instructions:**  Andriano contends that counsel was ineffective for failing to ask the trial court to instruct the jurors on lesser-included offenses to first-degree murder.  (Petition, at 52.)  In rejecting this claim, the PCR court correctly relied on this Court's conclusion that Andriano advanced an "all-or-nothing" defense and that the evidence did not support a lesser-included-offense

instruction.  (P-App. 5.)  *Andriano*, 215 Ariz. at 504–05, ¶¶ 32–36, 161 P.3d at 547–58.  To challenge this conclusion, Andriano simply states, "[I]f trial counsel had done a proper investigation of guilt phase issues … they would have requested a jury instruction as to lesser included offenses."  (Petition, at 52.)  This conclusory statement, particularly where it includes no explanation of the "guilt phase issues" in question, how their investigation would have supported a lesser-included instruction, or what specific instructions counsel should have requested, does not show that the PCR court abused its discretion by dismissing this claim.  This Court should deny review.

     5.  <u>The PCR court did not abuse its discretion by denying Andriano's claim of ineffective assistance on direct appeal.</u>

Andriano contends that appellate counsel was ineffective for failing to raise on appeal any claims found precluded, and specifically for failing to challenge 1) DeLozier's alleged conflict of interest, 2) prosecutorial misconduct, and 3) this Court's order sustaining the State's hearsay objection to Miller's testimony.  (Petition, at 55.)  These claims fail on their merits for the reasons stated above, and appellate counsel is not ineffective for failing to raise meritless claims.  *See Pope v. Wood*, 93 F.3d 1434, 1445 (9th Cir. 1996)).  The PCR court appropriately rejected this claim.

## IV. CONCLUSION.

For all of the foregoing reasons, this Court should deny review.

RESPECTFULLY SUBMITTED this 13th day of July, 2015.

<div style="margin-left:40%">

Mark Brnovich
Attorney General

John R. Lopez, IV
Solicitor General

/s/Lacey Stover Gard
Chief Counsel
Capital Litigation Section

Gregory Hazard
Assistant Attorney General

Attorneys for Appellee

</div>

4404387

## List of Appendices

A) PCR hearing exhibit list.

B) Excerpt of R.T. 9/8/04.

C) R.T. 9/21/04.

D) Excerpt of R.T. 9/22/04.

E) R.T. 9/92/04.

F) Excerpt of R.T. 9/14/04.

G) Excerpt of R.T. 10/4/04.

H) R.T. 10/5/04.

I) R.T. 10/25/04.

J) Excerpt of R.T. 10/21/04.

K) R.T. 10/12/04.

L) R.T. 12/9/04.

M) R.T. 12/13/04.

N) R.T. 12/8/04.

O) Excerpt of R.T. 12/15/04.

P) R.T. 12/14/04.

Q) R.T. 12/7/04.

R) Andriano's withdrawal of consent to guardianship.

S) Minute entry from 11/10/04.

T) Factual statement supporting motion for new trial.

U) R.T. 10/13/04.

W) R.T. 10/14/04

# APPENDIX A

# SUPERIOR COURT OF
# MARICOPA COUNTY

## *EXHIBIT WORKSHEET*

FILED

12/11/2014-2:00pm

Michael K. Jeanes, Clerk

By: _____
Deputy Clerk

Hearing Officer: **Hon. Brian K. Ishikawa**

Case Number: **CR2000-096032**

Co-Defendant: **No**

Hearing Type: **EVIDENTIARY HEARING**

Hearing Date: **02/03/2014**

STATE OF ARIZONA

Counsel:   GREGORY MICHAEL HAZARD

vs

WENDI ELIZABETH ANDRIANO

Counsel:   SCOTT BENNETT

| Ex # | ID | Off'd | In Evidence | Exhibit Description | Released |
|------|-----|-------|-------------|---------------------|----------|
| 1 | DEF | DEF | | DECLARATION OF LARRY A. HAMMOND | |
| 2 | DEF | STIP | 2/3/2014 | REPORT FROM GEORGE W. WOODS, JR., M.D. DATED FEBRUARY 14, 2012 | |
| 2.001 | DEF | STIP | 2/3/2014 | APPENDIX A TO THE EXPERT REPORT FROM GEORGE W. WOODS, JR., M.D. | |
| 2.002 | DEF | STIP | 2/3/2014 | APPENDIX B - OVERVIEW OF THE BIOPSYCHOSOCIAL AND PSYCHIATRIC HISTORY OF WENDI ELIZABETH ANDRIANO AND HER FAMILY | |
| 2.003 | DEF | STIP | 2/3/2014 | CURRICULUM VITAE OF GEORGE W. WOODS, JR., M.D. | |
| 2.004 | DEF | STIP | 2/3/2014 | APPENDIX D - QUALIFICATIONS, EXPERT WITNESS EXPERIENCE AND COMPENSATION RATE IN THIS CASE | |
| 3 | DEF | STIP | 2/3/2014 | EXPERT REPORT OF JAMES HOPPER, PH.D. | |
| 4 | DEF | STIP | 2/3/2014 | APPENDIX TO THE EXPERT REPORT OF JAMES W. HOPPER, PH.D. | |
| 4.001 | DEF | STIP | 2/3/2014 | CURRICULUM VITAE OF JAMES W. HOPPER, PH.D. | |
| 4.002 | DEF | STIP | 2/3/2014 | EXHIBIT B TO THE EXPERT REPORT OF JAMES W. HOPPER, PH.D. | |
| 5 | DEF | STIP | 2/3/2014 | CONFIDENTIAL NEUROPSYCHOLOGICAL TESTING OF WENDI ELIZABETH ANDRIANO FROM MYLA H. YOUNG, PH.D.. ABN DATED JULY 11, 2011 | |
| 5.001 | DEF | STIP | 2/3/2014 | CONFIDENTIAL NEUROPSYCHOLOGICAL EVALUATION TEST SCORES FROM MYLA H. YOUNG, PH.D.. ABN DATED JULY 11, 2011 | |
| 6 | DEF | | | AFFIDAVIT OF DANIEL PATTERSON | Y |

Hearing Officer: **Hon. Brian K. Ishikawa**          Case Number: **CR2000-096032**

Co-Defendant: **No**

Hearing Type: **EVIDENTIARY HEARING**          Hearing Date: **02/03/2014**

STATE OF ARIZONA                              Counsel:   GREGORY MICHAEL HAZARD

vs

WENDI ELIZABETH ANDRIANO                       Counsel:   SCOTT BENNETT

| Ex # | ID | Off'd | In Evidence | Exhibit Description | Released |
|------|-----|-------|-------------|---------------------|----------|
| 6.001 | DEF | STIP | 2/3/2014 | LETTER DATED MARCH 28, 2001 FROM THE FORENSIC SERVICES UNIT RE: COMPETENCY SCREENING EVALUATION OF WENDI ELIZABETH ANDRIANO | |
| 6.002 | DEF | DEF | 2/7/2014 | EMAIL FROM DAN PATTERSON TO PATRICK LINDERMAN DATED DECEMBER 20, 2001 | |
| 6.003 | DEF | STIP | 2/3/2014 | EVAULATION REPORT ON WENDI ELIZABETH ANDRIANO DATED AUGUST 27, 2002 FROM RICHARD J. ROSENGARD, D.O. | |
| 6.004 | DEF | DEF | 2/7/2014 | EMAIL FROM DANIEL PATTERSON TO MICHELLE ARVANITAS DATED FEBURARY 14, 2002 | |
| 6.005 | DEF | STIP | 2/3/2014 | PSYCHOLOGICAL REPORT RE: WENDI ANDRIANO DATED AUGUST 4, 2004 FROM MICHAEL B. BAYLESS, PH.D. | |
| 7 | DEF | | | DECLARATION OF G. DAVID DELOZIER | Y |
| 7.001 | DEF | | | LETTER FROM H. KANDY ROHDE, CPC TO G. DAVID DELOZIER DATED FEBRUARY 19, 2001 | Y |
| 7.002 | DEF | DEF | 2/10/2014 | LETTER FROM H. KANDY ROHDE TO G. DAVID DELOZIER DATED MARCH 12, 2001 | |
| 7.003 | DEF | | | LETTER FROM H. KANDY ROHDE TO G. DAVID DELOZIER FAXED DATE SEPTEMBER 30, 2003 | Y |
| 7.004 | DEF | | | ANDRIANO TRIAL SCHEDULE | Y |
| 7.005 | DEF | | | LETTER TO G. DAVID DELOZIER FROM GERALD M. PERRY DATED SEPTEMBER 1, 2004 | Y |
| 8 | DEF | | | AFFIDAVIT OF SCOTT A. MACLEOD | Y |
| 9 | DEF | | | DECLARATION OF WENDI ANDRIANO | Y |
| 10 | DEF | | | DECLARATION OF CONSTANCE BOYS | Y |
| 11 | DEF | | | DECLARATION OF GEORGE CARLIN | Y |
| 12 | DEF | | | DECLARATION OF JERI LYNN CUNNINGHAM | Y |
| 13 | DEF | | | DECLARATION OF MARK KEATING | Y |
| 14 | DEF | | | DECLARATION OF NANCY KEATING | Y |
| 15 | DEF | STIP | 2/3/2014 | DEPOSITION OF SHAWN KING DATED JULY 11, 2011 | |
| 16 | DEF | | | DECLARATION OF BARRY LORTS | Y |
| 17 | DEF | | | DECLARATION OF KELSEY LEON MCGUFFEE, JR. | Y |

Hearing Officer: **Hon. Brian K. Ishikawa**          Case Number: **CR2000-096032**

Co-Defendant: **No**

Hearing Type: **EVIDENTIARY HEARING**          Hearing Date: **02/03/2014**

STATE OF ARIZONA                    Counsel:   GREGORY MICHAEL HAZARD

vs

WENDI ELIZABETH ANDRIANO                    Counsel:   SCOTT BENNETT

| Ex # | ID | Off'd | In Evidence | Exhibit Description | Released |
|------|-----|-------|-------------|---------------------|----------|
| 18 | DEF | | | DECLARATION OF MARJORIE MICEK | Y |
| 19 | DEF | | | DECLARATION OF JEFFREY B. MILLER | Y |
| 19.001 | DEF | | | LETTER FROM JEFFREY B. MILLER DATED OCTOBER 10, 2000 RE: ANDRIANO MEDICAL MALPRACTICE CLAIM | Y |
| 20 | DEF | | | DECLARATION OF SHARON MURPHY | Y |
| 21 | DEF | | | DECLARATION OF BRENDA NAGORE | Y |
| 22 | DEF | | | DECLARATION OF FRANK NAGORE | Y |
| 23 | DEF | | | DECLARATION OF JASPER NEACE | Y |
| 24 | DEF | STIP | 2/6/2014 | DECLARATION OF ALEJO LORENZANA OCHOA | |
| 25 | DEF | STIP | 2/6/2014 | DECLARATION OF ALEJO OCHOA | |
| 26 | DEF | | | DECLARATION OF BRANDON OCHOA | Y |
| 27 | DEF | DEF | | DECLARATION OF DONNA OCHOA | |
| 28 | DEF | DEF | | SUPPLEMENTAL DECLARATION OF DONNA OCHOA | |
| 29 | DEF | DEF | | SECOND SUPPLEMENTAL DECLARATION OF DONNA ELIZABETH OCHOA | |
| 30 | DEF | | | DRAFT DECLARATION OF DEBLEN OKE | Y |
| 31 | DEF | | | DECLARATION OF GIA PALICKI | Y |
| 32 | DEF | | | DECLARATION OF SHELBY WAYNE "SKIP" ROBERTSON | Y |
| 33 | DEF | | | DECLARATION OF STUART WADE ROBERTSON | Y |
| 34 | DEF | | | DECLARATION OF CYNTHIA DENISE SCHAIDER | Y |
| 35 | DEF | | | DECLARATION OF STEPHEN SCHAIDER | Y |
| 36 | DEF | | | DECLARATION OF JOHN SHADDLE | Y |
| 37 | DEF | | | DECLARATION OF CHRISTOPHER SHANE WEAVER | Y |
| 38 | DEF | | | DECLARATION OF KIMBERLY WILSON | Y |
| 39 | DEF | | | DECLARATION OF BARBARA BAUER | Y |
| 40 | DEF | | | DECLARATION OF MARTHA COLVIN | Y |
| 41 | DEF | | | DECLARATION OF LINDA PERCY | Y |
| 42 | DEF | | | DECLARATION OF JACQUELINE SACAMANO | Y |
| 43 | DEF | | | DECLARATION OF MATTHEW R. LYNCH | Y |

Hearing Officer: **Hon. Brian K. Ishikawa**    Case Number: **CR2000-096032**

Co-Defendant: **No**

Hearing Type: **EVIDENTIARY HEARING**    Hearing Date: **02/03/2014**

STATE OF ARIZONA    Counsel:  GREGORY MICHAEL HAZARD

vs

WENDI ELIZABETH ANDRIANO    Counsel:  SCOTT BENNETT

| Ex # | ID | Off'd | In Evidence | Exhibit Description | Released |
|------|-----|-------|-------------|---------------------|----------|
| 44 | DEF | STIP | 2/3/2014 | NOTICE OF DEFENSES AND DISCLOSURE BY DEFENDANT AND REQUEST FOR DISCLOSURE OF REBUTTAL WITNESSES DATED JANUARY 16, 2001 | |
| 45 | DEF | STIP | 2/3/2014 | MEETING NOTES WITH WENDI ANDRIANO | |
| 46 | DEF | STIP | 2/3/2014 | INTAKE INFORMATION ON WENDI E. ANDRIANO DATED FEBRUARY 28, 1996 | |
| 47 | DEF | STIP | 2/3/2014 | EXCERPTED MEDICAL NOTES FROM WENDI ANDRIANO'S INCARCERATION (TYPEWRITTEN) | |
| 48 | DEF | STIP | 2/3/2014 | CHS SPECIAL NEEDS TREATMENT PLAN (SNTP) FORM DATED SEPTEMBER 28, 2003 | |
| 49 | DEF | STIP | 2/3/2014 | MARICOPA COUNTY CORRECTIONAL HEALTH SERVICES DOCUMENTS | |
| 50 | DEF | DEF | 2/7/2014 | EMAIL FROM DONNA OCHOA TO PATTERSOND@MAIL.MARICOPA.GOV DATED DECEMBER 4, 2001 | |
| 51 | DEF | DEF | 2/4/2014 | EMAIL FROM DONNA OCHOA TO PATTERSOND@MAIL.MARICOPA.GOV; GDDELOZIER@AOL.COM; ARVANITAS@MAIL.MARICOPA.GOV DATED SEPTEMEBER 30, 2002 | |
| 52 | DEF | DEF | 2/7/2014 | EMAILS FROM SBMURPHYAZ@YAHOO.COM TO GDDELOZIER@AOL.COM; PATTERSOND@MAIL.MARICOPA.GOV DATED MARCH 30, 2003 | |
| 53 | DEF | | | OFFICE OF THE PUBLIC DEFENDER INTEROFFICE MEMORANDUM WITH ATTACHMENTS DATED JANUARY 14, 2002 | Y |
| 54 | DEF | STIP | 2/3/2014 | MOTION FOR COURT ORDER TO ASSIST MITIGATION INVESTIGATION AND PROPOSED ORDER DATED NOVEMBER 19, 2004 | |
| 55 | DEF | | | SEXUAL ABUSE AS MITIGATION DATED JANUARY 17, 2003 | Y |
| 56 | DEF | DEF | 2/4/2014 | EMAIL FROM DONNA OCHOA TO GDDELOZIER@AOL.COM DATD FEBRUARY 12, 2001 | |
| 57 | DEF | DEF | 2/4/2014 | EMAIL FROM DONNA OCHOA TO ARVANITAS@MAIL.MARICOPA.GOV DATED FEBRUARY 26, 2003 | |

Hearing Officer: **Hon. Brian K. Ishikawa**          Case Number: **CR2000-096032**

Co-Defendant: **No**

Hearing Type: **EVIDENTIARY HEARING**          Hearing Date: **02/03/2014**

STATE OF ARIZONA                    Counsel:   GREGORY MICHAEL HAZARD

vs

WENDI ELIZABETH ANDRIANO          Counsel:   SCOTT BENNETT

| Ex # | ID | Off'd | In Evidence | Exhibit Description | Released |
|------|-----|-------|-------------|---------------------|----------|
| 58 | DEF | | | INTERVIEW OF CHRIS WEAVER | Y |
| 59 | DEF | | | EMAIL FROM DANIEL PATTERSON TO MICHELLE ARVANITAS DATED FEBRUARY 2, 2004 | Y |
| 60 | DEF | | | ESTATE PLANNING STATEMENT DATED OCTOBER 3, 2000 | Y |
| 61 | DEF | DEF | 2/4/2014 | LETTER FROM G. DAVID DELOZIER TO ALEJO OCHOA AND DONNA OCHOA DATED DECEMBER 14, 2000 | |
| 62 | DEF | | | LETTER FROM LEON THIKOLL TO BETHANNE KLOPP-BRYANT DATED NOVEMBER 29, 2000 | Y |
| 63 | DEF | DEF | 2/10/2014 | EMAIL FROM MICHELLE ARVANITAS TO GDDELOZIER@AOL.COM DATED AUGUST 5, 2002 | |
| 64 | DEF | DEF | 2/11/2014 | EMAIL FROM PATRICIA RUBIO TO DANIEL PATTERSON DATED OCTOBER 23, 2003 | |
| 65 | DEF | STIP | 2/3/2014 | REPORT OF AUTOPSY OF JOSEPH D. ANDRIANO DATED OCTOBER 11, 2000 | |
| 65.001 | DEF | STIP | 2/3/2014 | PHOENIX FIRE DEPARTMENT INCIDENT HISTORY REPORT DATED OCTOBER 16, 2000 | |
| 66 | DEF | | | PHOTOS | Y |
| 67 | DEF | | | DECLARATION OF KRISTEN POWERS | Y |
| 68 | DEF | DEF | 2/4/2014 | ANDRIANO-POVERTY/INCOME CHART WITH WENDI'S AGE | |
| 68.001 | DEF | DEF | 2/4/2014 | ITEMIZED STATEMENT OF EARNINGS | |
| 68.002 | DEF | DEF | 2/4/2014 | ITEMIZED STATEMENT OF EARNINGS | |
| 69 | DEF | | | ANDRIANO WENDI AND JOE INCOME COMPARISON CHART | Y |
| 69.001 | DEF | | | ITEMIZED STATEMENT OF EARNINGS | Y |
| 69.002 | DEF | | | ITEMIZED STATEMENT OF EARNINGS | Y |
| 70 | DEF | | | INFORMATION FOR INMATE #100374 - SHELBY ROBERTSON | Y |
| 71 | DEF | | | INFORMATION FOR INMATE #0099844 - TOMMY ROBERTSON | Y |
| 72 | DEF | | | PHOTO | Y |
| 73 | DEF | DEF | 2/4/2014 | PHOTOGRAPHS | |

Hearing Officer: **Hon. Brian K. Ishikawa**     Case Number: **CR2000-096032**

Co-Defendant: **No**

Hearing Type: **EVIDENTIARY HEARING**     Hearing Date: **02/03/2014**

STATE OF ARIZONA     Counsel: GREGORY MICHAEL HAZARD

vs

WENDI ELIZABETH ANDRIANO     Counsel: SCOTT BENNETT

| Ex # | ID | Off'd | In Evidence | Exhibit Description | Released |
|------|-----|-------|-------------|---------------------|----------|
| 74 | DEF | DEF | 2/4/2014 | PHOTOGRAPHS | |
| 75 | DEF | | | COPY OF GREETING CARD | Y |
| 76 | DEF | DEF | 2/6/2014 | AMERICAN BAR ASSOCIATION GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF DEFENSE COUNSEL IN DEATH PENALY CASES REVISED EDITION FEBRUARY 2003 | |
| 77 | DEF | | | COURT OF APPEALS MANDATE RE: IN RE THE ADOPTION OF NICHOLAS A. AND ASHLEE A. FILE STAMPED AUGUST 19, 2004 | Y |
| 78 | DEF | DEF | | EXPERT REPORT OF GARY L. LOWENTHAL, J.D. | |
| 79 | DEF | DEF | 2/11/2014 | APPENDIX 1 - GARY LOWENTHAL RESUME | |
| 80 | DEF | DEF | 2/4/2014 | APPENDIX 2 - AGREEMENT REGARDING THE GUARDIANSHIP OF NICHOLAS ANDRIANO AND ASHLEE ANDRIANO | |
| 81 | DEF | DEF | 2/4/2014 | APPENDIX 3 - ORDER APPOINTING GUARDIAN OF MINOR CHILDREN | |
| 82 | DEF | STIP | 2/10/2014 | APPENDIX 4 - INVOICE FROM LAW OFFICES OF G. DAVID DELOZIER, P.C. DATED FEBRUARY 7, 2001 | |
| 83 | DEF | | | APPENDIX 5 - DECLARATION OF JERI LYNN CUNNINGHAM | Y |
| 84 | DEF | DEF | 2/4/2014 | APPENDIX 7 - PROBATE COURT CASE INFORMATION - CASE HISTORY | |
| 85 | DEF | DEF | 2/4/2014 | APPENDIX 8 - LETTERS | |
| 86 | DEF | DEF | 2/4/2014 | APPENDIX 9 - EMAIL FROM DONNA OCHOA TO GDDELOZIER@AOL.COM DATED JULY 15, 2001 | |
| 87 | DEF | DEF | 2/4/2014 | APPENDIX 10 - RULING ON NOTICE OF COMPLIANCE WITH A.R.S. 8-106 AND REQUEST FOR HEARING FILE DATED DECEMBER 27, 2001 | |
| 88 | DEF | DEF | 2/10/2014 | APPENDIX 11 - NOTICE OF CHANCE OF JUDGE DATED JANUARY 2, 2002 | |
| 89 | DEF | DEF | 2/10/2014 | APPENDIX 12 - LETTERS FROM LAW OFFICERS OF G. DAVID DELOZIER, P.C. | |
| 90 | DEF | | | APPENDIX 13 - LETTER FROM JOHN J. JAKUBCZYK TO G. DAVID DELOZIER DATED APRIL 1, 2002 | Y |

Hearing Officer: **Hon. Brian K. Ishikawa**          Case Number: **CR2000-096032**

Co-Defendant: **No**

Hearing Type: **EVIDENTIARY HEARING**          Hearing Date: **02/03/2014**

STATE OF ARIZONA          Counsel:  GREGORY MICHAEL HAZARD

vs

WENDI ELIZABETH ANDRIANO          Counsel:  SCOTT BENNETT

| Ex # | ID | Off'd | In Evidence | Exhibit Description | Released |
|------|-----|-------|-------------|---------------------|----------|
| 91 | DEF | | | APPENDIX 14 - LETTER FROM G. DAVID DELOZIER, P.C. TO JOHN J. JAKUBCYZYK, ESQ. DATED MARCH 20, 2002 | Y |
| 92 | DEF | | | APPENDIX 15 - MOTION TO COMPEL PRODUCTION OF MEDICAL RECORDS FILE DATED MARCH 12, 2002 | Y |
| 93 | DEF | | | APPENDIX 16 - SUBPOENA IN PB 2000-004531 | Y |
| 94 | DEF | | | APPENDIX 17 - LETTER FROM MIKE BARTLEY, LPI TO G. DAVID DELOZIER, P.C. DATED MAY 8, 2002 WITH ATTACHMENTS | Y |
| 95 | DEF | DEF | 2/4/2014 | APPENDIX 18 - LETTER FROM BRAD AND JEANEA LAMBETH TO JOHN JAKUBCZYK DATED MARCH 15, 2002 | |
| 96 | DEF | DEF | 2/4/2014 | APPENDIX 19 - LETTER FROM ALEJO AND DONNA OCHOA TO DR. BRIAN YEE DATED MARCH 28, 2002 | |
| 97 | DEF | PLF | 2/11/2014 | APPENDIX 20 - LETTER FROM BRIAN W. YEE, PH.D TO HONORABLE JANE BAYHAM-LESSELYONG DATED MARCH 13, 2002 | |
| 98 | DEF | | | APPENDIX 21 - LETTER FROM THE CHILDREN'S ADVOCACY CENTER TO THE HONORABLE JANE BAYHAM-LESSELYONG | Y |
| 99 | DEF | DEF | 2/10/2014 | APPENDIX 22 - MINUTE ENTRY DATED AUGUST 1, 2002 | |
| 100 | DEF | DEF | 2/10/2014 | APPENDIX 23 - MOTION TO DISMISS PETITION TO ADOPT / MOTION FOR SANCTIONS FOR FAILURE TO COMPLY WITH COURT ORDER | |
| 101 | DEF | DEF | 2/10/2014 | APPENDIX 24 - MINUTE ENTRY ACTION:  RULING ON MOTION(S) / ISSUE(S) DATED JULY 23, 2002 | |
| 102 | DEF | DEF | 2/4/2014 | APPENDIX 25 - ORDER DATED JULY 31, 2002 | |
| 103 | DEF | | | APPENDIX 26 - G. DAVID DELOZIER (BAR NO. 005237) FILE NO: 01-2071 | Y |
| 104 | DEF | DEF | 2/4/2014 | APPENDIX 27 - MINUTE ENTRY ACTION:  RULING ON MOTION(S) / ISSUE(S) | |
| 105 | DEF | DEF | 2/11/2014 | APPENDIX 28 - MINUTE ENTRY DATED 12/10/2002 | |
| 106 | DEF | | | APPENDIX 29 - MINUTE ENTRY DATED SEPTEMBER 8, 2003 | Y |

Hearing Officer: **Hon. Brian K. Ishikawa**          Case Number: **CR2000-096032**

Co-Defendant: **No**

Hearing Type: **EVIDENTIARY HEARING**          Hearing Date: **02/03/2014**

STATE OF ARIZONA          Counsel:   GREGORY MICHAEL HAZARD

vs

WENDI ELIZABETH ANDRIANO          Counsel:   SCOTT BENNETT

| Ex # | ID | Off'd | In Evidence | Exhibit Description | Released |
|------|-----|-------|-------------|---------------------|----------|
| 107 | DEF | DEF | 2/4/2014 | APPENDIX 30 - EMAIL FROM DONNAEOCHOA@HOTMAIL.COM TO GDDELOZIER@AOL.COM DATED MARCH 3, 2003 | |
| 108 | DEF | DEF | 2/4/2014 | APPENDIX 31 - EMAIL FROM INHISPRESENCE@AOL.COM TO GDDELOZIER@AOL.COM DATED APRIL 14, 2003 | |
| 109 | DEF | DEF | 2/4/2014 | APPENDIX 32 - EMAIL FROM GRANDMAOCHOA@HOTMAIL.COM TO DAPHNEBUDGE@GWEST.NET DATED MAY 16, 2003 | |
| 110 | DEF | DEF | 2/10/2014 | APPENDIX 33 - INVOICES FROM RICH ROBERTSON CONSULTING & INVESTIGATIONS | |
| 111 | DEF | | | APPENDIX 34 - COURT OF APPEALS APPELLANT'S OPENING BRIEF FILE DATED MAY 27, 2003 | Y |
| 112 | DEF | | | APPENDIX 36 - MOTION TO REINSTATE APPEAL FILE DATED FEBRURARY 25, 2004 | Y |
| 113 | DEF | DEF | 2/4/2014 | APPENDIX 38 - LETTER FROM ALEJO AND DONNA OCHOA TO THE HONORABLE JUDGE PRO TEM KAIPIO DATED MARCH 21, 2005 | |
| 114 | DEF | DEF | 2/4/2014 | APPENDIX 40 - NOTICE RE:  REPRESENTATION FILE DATED NOVEMBER 15, 2004 | |
| 115 | DEF | DEF | 2/4/2014 | APPENDIX 42 - LETTER FROM DONNA OCHOA FAX DATED MARCH 7, 2005 | |
| 116 | DEF | STIP | 2/10/2014 | APPENDIX 46 - SUMMARY OF STATEMENT DATED JULY 5, 2002 | |
| 117 | DEF | STIP | 2/10/2014 | APPENDIX 44 - INVOICE FROM G. DAVID DELOZIER DATED OCTOBER 1, 2003 | |
| 118 | DEF | STIP | 2/10/2014 | INVOICE FROM G. DAVID DELOZIER, P.C. DATED NOVEMBER 3, 2003 | |
| 119 | DEF | STIP | 2/10/2014 | INVOICE FROM G. DAVID DELOZIER, P.C. DATED DECEMBER 1, 2003 | |
| 120 | DEF | STIP | 2/10/2014 | INVOICE FROM G. DAVID DELOZIER, P.C. DATED DECEMBER 1, 2003 | |
| 121 | DEF | STIP | 2/10/2014 | INVOICE FROM G. DAVID DELOZIER, P.C. DATED DECEMBER 31, 2003 | |
| 122 | DEF | STIP | 2/10/2014 | APPENDIX 45 - INVOICE FROM G. DAVID DELOZIER, P.C. DATED DECEMBER 31, 2003 | |

Hearing Officer: **Hon. Brian K. Ishikawa**          Case Number: **CR2000-096032**

Co-Defendant: **No**

Hearing Type: **EVIDENTIARY HEARING**          Hearing Date: **02/03/2014**

STATE OF ARIZONA          Counsel:   GREGORY MICHAEL HAZARD

vs

WENDI ELIZABETH ANDRIANO          Counsel:   SCOTT BENNETT

| Ex # | ID | Off'd | In Evidence | Exhibit Description | Released |
|------|-----|-------|-------------|---------------------|----------|
| 123 | DEF | STIP | 2/10/2014 | INVOICE FROM G. DAVID DELOZIER, P.C. DATED JANUARY 31, 2004 | |
| 124 | DEF | STIP | 2/10/2014 | APPENDIX 37 - INVOICE FROM G. DAVID DELOZIER, P.C. DATED FEBRUARY 29, 2004 | |
| 125 | DEF | STIP | 2/10/2014 | INVOICE FROM G. DAVID DELOZIER, P.C. DATED MARCH 31, 2004 | |
| 126 | DEF | STIP | 2/10/2014 | APPENDIX 39 - INVOICE FROM G. DAVID DELOZIER, P.C. DATED APRIL 30, 2004 | |
| 127 | DEF | STIP | 2/10/2014 | INVOICE FROM G. DAVID DELOZIER, P.C. DATED MAY 31, 2004 | |
| 128 | DEF | STIP | 2/10/2014 | INVOICE FROM G. DAVID DELOZIER, P.C. DATED JUNE 30, 2004 | |
| 129 | DEF | STIP | 2/10/2014 | INVOICE FROM G. DAVID DELOZIER, P.C. DATED SEPTEMBER 30, 2004 | |
| 130 | DEF | STIP | 2/10/2014 | APPENDIX 41 - INVOICE FROM G. DAVID DELOZIER, P.C. DATED DECEMBER 31, 2004 | |
| 131 | DEF | STIP | 2/3/2014 | COURT OF APPEALS APPELLANT'S OPENING BRIEF FILE DATED MAY 27, 2003 | |
| 132 | DEF | DEF | 2/4/2014 | LETTER FROM ALEJO AND DONNA OCHOA TO JILL ZUBERS DATED MARCH 18, 2003 | |
| 133 | DEF | | | UNITED STATES BANKRUPTCY COURT DOCUMENT IN PROCEEDINGS UNDER CHAPTER 11 | Y |
| 134 | DEF | DEF | | UNITED STATES BANKRUPTCY COURT DOCUMENT IN PROCEEDINGS UNDER CHAPTER 11 FILED ON NOVEMBER 28, 2006 | |
| 135 | DEF | DEF | 2/6/2014 | CURRICULUM VITALE KEITH ROHMAN | |
| 136 | DEF | DEF | 2/6/2014 | EMAIL FROM DANIEL PATTERSON TO SCOTT MACLEOD DATED NOVEMBER 29, 2004 | |
| 137 | DEF | DEF | 2/6/2014 | EMAIL FROM MACLEODS@MAIL.MARICOPA.GOV TO GDDELOZIER@AOL.COM DATED DECEMBER 6, 2004 | |
| 138 | DEF | DEF | 2/7/2014 | WENDI ANDRIANO WHEN VALUE AND WORTH ARE IMPORTANT: THE LIFE WE MUST SAVE WITH ATTACHMENTS | |
| 139 | DEF | | | NEWS ARTICLE TITLED JUSTICE SYSTEM CAN'T COPE WITH BACKLOG OF DEATH PENALTY CASES DATED MARCH 4, 2003 | Y |

Hearing Officer: **Hon. Brian K. Ishikawa**   Case Number: **CR2000-096032**

Co-Defendant: **No**

Hearing Type: **EVIDENTIARY HEARING**   Hearing Date: **02/03/2014**

STATE OF ARIZONA   Counsel:   GREGORY MICHAEL HAZARD

vs

WENDI ELIZABETH ANDRIANO   Counsel:   SCOTT BENNETT

| Ex # | ID | Off'd | In Evidence | Exhibit Description | Released |
|------|-----|-------|-------------|---------------------|----------|
| 140 | DEF | DEF | 2/4/2014 | PHOTO | |
| 141 | DEF | DEF | 2/4/2014 | PHOTO | |
| 142 | DEF | DEF | 2/4/2014 | PHOTO | |
| 143 | DEF | DEF | 2/4/2014 | PHOTO | |
| 144 | DEF | | | PHOTO | Y |
| 145 | DEF | | | PHOTO | Y |
| 146 | DEF | | | PHOTO | Y |
| 147 | DEF | DEF | 2/4/2014 | PHOTO | |
| 148 | DEF | DEF | 2/4/2014 | PHOTO | |
| 149 | DEF | DEF | 2/4/2014 | PHOTO | |
| 150 | DEF | | | PHOTO | Y |
| 151 | DEF | | | PHOTO | Y |
| 152 | DEF | DEF | | ARIZONA DEPARTMENT OF PUBLIC SAFETY DISPOSITION REPORT | |
| 153 | DEF | | | PHOTO | Y |
| 154 | DEF | DEF | 2/4/2014 | PHOTO | |
| 155 | DEF | | | PHOTO | Y |
| 156 | DEF | | | PHOTO | Y |
| 157 | DEF | | | PHOTO | Y |
| 158 | DEF | DEF | 2/4/2014 | PHOTO | |
| 159 | DEF | DEF | 2/4/2014 | PHOTO | |
| 160 | DEF | DEF | 2/4/2014 | PHOTO | |
| 161 | DEF | DEF | 2/4/2014 | PHOTO | |
| 162 | DEF | | | PHOTO | Y |
| 163 | DEF | | | PHOTO | Y |
| 164 | DEF | | | PHOTOS | Y |
| 165 | DEF | DEF | | CD | |
| 166 | DEF | STIP | 2/3/2014 | RESUME FOR JOETTE DEANNA JAMES, PH.D., ABPP-CN | |

Hearing Officer: **Hon. Brian K. Ishikawa**          Case Number: **CR2000-096032**

Co-Defendant: **No**

Hearing Type: **EVIDENTIARY HEARING**          Hearing Date: **02/03/2014**

STATE OF ARIZONA                    Counsel:   GREGORY MICHAEL HAZARD

vs

WENDI ELIZABETH ANDRIANO                Counsel:   SCOTT BENNETT

| Ex # | ID | Off'd | In Evidence | Exhibit Description | Released |
|------|-----|-------|-------------|---------------------|----------|
| 167 | DEF | STIP | 2/3/2014 | REVIEW OF NEUROPSYCHOLOGICAL EVALUATION FROM ALINA ASSESSMENT SERVICES, PLLC | |
| 168 | PLF | PLF | | (2) BINDERS - REPORT OF FORENSIC PSYCHIATRIC EVALUATION OF WENDI ELIZABETH ANDRIANO FROM STEVEN E. PITT, D.O. | |
| 169 | PLF | PLF | 2/14/2014 | LETTER FROM KIRAN AMIN, PH.D. TO STEVEN PITT, D.O. DATED DECEMBER 26, 2013 | |
| 170 | PLF | | | ANDRIANO PHOENIX POLICE DEPARTMENTAL REPORT | Y |
| 171 | PLF | STIP | 2/3/2014 | MEETING SUMMARIES WITH WENDI ANDRIANO | |
| 172 | PLF | | | EMAIL FROM MLYNCH@FOLEY.COM TO LACEY GARD, AARNTSEN@FOLY.COM, SCOTT BENNETT DATED MAY 6, 2013 WITH ATTACHMENTS | Y |
| 173 | PLF | | | INTERVIEW OF DANIEL PATTERSON, ESQ. DATED NOVEMBER 26, 2013 | Y |
| 174 | PLF | PLF | 2/11/2014 | INTERVIEW OF DAVID DELOZIER, ESQ. DATED NOVEMBER 25, 2013 | |
| 175 | PLF | | | MESA POLICE DEPARTMENT CONTINUATION REPORT DR#20011210670 | Y |
| 176 | PLF | | | CASA GRANDE REGIONAL MEDICAL CENTER EMPLOYMENT RECORDS OF WENDI ANDRIANO DATED JUNE 25, 1996 | Y |
| 177 | PLF | | | APPLICATION FOR EMPLOYMENT DATED MAY 21, 1998 | Y |
| 178 | PLF | | | MOUNTAIN STATES CREDIT CORPORATION LETTER DATED OCTOBER 17, 2000 WITH ATTACHMENTS | Y |
| 179 | PLF | STIP | 2/3/2014 | (5) CD'S | |
| 180 | PLF | STIP | 2/3/2014 | TRANSCRIPT WENDI ELIZABETH ANDRIANO POLICE INTERVIEW | |
| 181 | PLF | | | ARIZONA DEPARTMENT OF CORRECTIONS MEDICAL RECORDS | Y |
| 182 | PLF | | | CASSETTE TAPE | Y |
| 183 | PLF | STIP | 2/3/2014 | SHARON B. MURPHY, PH.D., CISW DOMESTIC VIOLENCE ASSESSMENT DATED SEPTEMBER 22, 2003 | |

Hearing Officer: **Hon. Brian K. Ishikawa**          Case Number: **CR2000-096032**

Co-Defendant: **No**

Hearing Type: **EVIDENTIARY HEARING**          Hearing Date: **02/03/2014**

STATE OF ARIZONA                              Counsel:   GREGORY MICHAEL HAZARD

vs

WENDI ELIZABETH ANDRIANO                 Counsel:   SCOTT BENNETT

| Ex # | ID | Off'd | In Evidence | Exhibit Description | Released |
|------|-----|-------|-------------|---------------------|----------|
| 184 | PLF | STIP | 2/3/2014 | ADMISSION / REGISTRATION RECORD AND SUMMARY DATED SEPTEMEBR 27, 2003 | |
| 185 | PLF | | | ARIZONA DEPARTMENT OF CORRECTIONS HEALTH NEEDS REQUEST (HNR) DATED JULY 20, 2012 | Y |
| 186 | PLF | PLF | 2/14/2014 | (4) CD'S | |
| 187 | PLF | | | MARICOPA COUNTY SHERIFF'S OFFICE DISCIPLINARY REPORT DATED DECEMBER 3, 2003 | Y |
| 188 | PLF | | | MARICOPA COUNTY SHERIFF'S OFFICE DISCIPLINARY ACTION REPORT DATE DECEMBER 10, 2003 | Y |
| 189 | PLF | | | ARIZONA DEPARTMENT OF CORRECTIONS DATED AUGUST 10, 2005 | Y |
| 190 | PLF | | | ARIZONA DEPARTMENT OF CORRECTIONS RELIGIOUS PREFERENCE AND PRIVILEGE REQUEST DATED JULY 6, 2007 | Y |
| 191 | PLF | | | ARIZONA DEPARTMENT OF CORRECTIONS INFORMATION REPORT DATED JANUARY 20, 2006 | Y |
| 192 | PLF | | | ARIZONA DEPARTMENT OF CORRECTIONS INMATE DISCIPLINARY REPORT DATED MARCH 6, 2008 | Y |
| 193 | PLF | | | ARIZONA DEPARTMENT OF CORRECTIONS CONTINUOUS PROGRESS RECORD - MENTAL HEALTH DATED NOVEMBER 23, 2011 | Y |
| 194 | PLF | | | ARIZONA DEPARTMENT OF CORRECTIONS CONTINUOUS PROGRESS REOCRD - MENTAL HEALTH DATED DECEMBER 12, 2011 | Y |
| 195 | PLF | STIP | 2/3/2014 | CASA GRANDE VALLEY COUNSELING SERVICE, INC. NOTICE OF ASSESSMENT DATED FEBRUARY 27, 1996 | |
| 196 | PLF | | | HANDWRITTEN NOTES | Y |
| 197 | PLF | | | COPY OF EXHIBIT # 548 - MARICOPA COUNTY SHERIFF'S OFFICE DISCIPLINARY ACTION REPORT DATED DECEMBER 5, 2003 | Y |
| 198 | PLF | | | STATEMENT OF FINANCIAL STATUS | Y |
| 199 | PLF | STIP | 2/3/2014 | TRIAL DAY 8 TESTIMONY AND TRIAL DAY 9 - COURT REPORT TRANSCRIPT OF PROCEEDINGS DATED SEPTEMBER 8, 2004 AND SEPTEMBER 9, 2004 | |

Hearing Officer: **Hon. Brian K. Ishikawa**          Case Number: **CR2000-096032**

Co-Defendant: **No**

Hearing Type: **EVIDENTIARY HEARING**          Hearing Date: **02/03/2014**

STATE OF ARIZONA          Counsel:   GREGORY MICHAEL HAZARD

vs

WENDI ELIZABETH ANDRIANO          Counsel:   SCOTT BENNETT

| Ex # | ID | Off'd | In Evidence | Exhibit Description | Released |
|------|-----|-------|-------------|---------------------|----------|
| 200 | PLF | STIP | 2/3/2014 | TRIAL DAY 10 - COURT REPORTER'S TRANSCRIPT OF PROCEEDINGS DATED SEPTEMBER 13, 2004 | |
| 201 | PLF | STIP | 2/3/2014 | COURT REPORTER'S TRANSCRIPT OF PROCEEDINGS (TRIAL) DATED DECEMBER 14, 2004 | |
| 202 | PLF | | | ARIZONA DEPARTMENT OF CORRECTIONS INMATE MASTER FILE OF WENDI E. ANDRIANO, #191593 | Y |
| 203 | PLF | PLF | 2/14/2014 | CD | |
| 204 | DEF | DEF | 2/6/2014 | REPORT OF KEITH ROHMAN DATED JANUARY 23, 2014 | |
| 205 | DEF | DEF | 2/4/2014 | PHOTO | |
| 206 | DEF | DEF | 2/6/2014 | SUPPLEMENTARY GUIDELINES FOR THE MITIGATION FUNCTION OF DEFENSE TEAMS IN DEATH PENALTY CASES | |
| 207 | PLF | | | TRANSCRIPT TRIAL PROCEEDINGS DATED DECEMBER 13, 2004 | Y |
| 208 | PLF | | | TRANSCRIPT TRIAL PROCEEDINGS DATED OCTOBER 4, 2004 | Y |
| 209 | PLF | | | TRANSCRIPT TRIAL PROCEEDINGS DATED OCTOBER 6, 2004 | Y |
| 210 | PLF | | | TRANSCRIPT TRIAL PROCEEDINGS DATED DECEMBER 9, 2004 | Y |
| 211 | PLF | | | INTERVIEW OF DONNA OCHOA / ALEJO OCHOA DATED MAY 17, 2004 | Y |
| 212 | PLF | | | TRANSCRIPT TRIAL PROCEEDINGS DATED DECEMBER 13, 2004 | Y |
| 213 | DEF | STIP | 2/3/2014 | APPENDIX TO THE EXPERT REPORT OF JAMES W. HOPPER, PH.D. | |
| 214 | PLF | | | INTERVIEW WITH WENDI ANDRIANO DATED JUNE 8, 2010 | Y |
| 215 | PLF | | | INTERVIEW WITH WENDI ANDRIANO DATED JUNE 9, 2010 | Y |
| 216 | PLF | | | INTERVIEW WITH WENDI ANDRIANO DATE JULY 6, 2010 | Y |
| 217 | PLF | | | INTERVIEW WITH WENDI ANDRIANO DATED AUGUST 31, 2010 | Y |

Hearing Officer: **Hon. Brian K. Ishikawa**          Case Number: **CR2000-096032**

Co-Defendant: **No**

Hearing Type: **EVIDENTIARY HEARING**          Hearing Date: **02/03/2014**

STATE OF ARIZONA                    Counsel:   GREGORY MICHAEL HAZARD

vs

WENDI ELIZABETH ANDRIANO                    Counsel:   SCOTT BENNETT

| Ex # | ID | Off'd | In Evidence | Exhibit Description | Released |
|------|-----|-------|-------------|---------------------|----------|
| 218 | PLF | | | INTERVIEW WITH WENDI ANDRIANO DATED SEPTEMBER 1, 2010 | Y |
| 219 | PLF | | | INTERVIEW WITH WENDI ANDRIANO DATED NOVEMBER 2, 2010 | Y |
| 220 | PLF | | | INTERVIEW WITH WENDI ANDRIANO DATED JANUARY 4, 2011 | Y |
| 221 | PLF | | | INTERVIEW WITH WENDI ANDRIANO DATED JANUARY 5, 2011 | Y |
| 222 | PLF | | | INTERVIEW WITH WENDI ANDRIANO DATED APRIL 11, 2011 | Y |
| 223 | PLF | | | INTERVIEW WITH WENDI ANDRIANO DATED APRIL 12, 2011 | Y |
| 224 | PLF | | | INTERVIEW WITH WENDI ANDRIANO DATED APRIL 13, 2011 | Y |
| 225 | PLF | | | INTERVIEW WITH WENDI ANDRIANO DATED AUGUST 16, 2011 | Y |
| 226 | PLF | | | DECLARATION OF KYRE LORTS | Y |
| 227 | DEF | STIP | 2/6/2014 | MARICOPA COUNTY ATTORNEY'S OFFICE INVESTIGATIONS DIVISION SUPPLEMENTAL REPORT | |
| 228 | DEF | STIP | 2/6/2014 | CD | |
| 229 | DEF | | | TRANSCRIPT TRIAL PROCEEDINGS DATED NOVEMBER 15, 2004 | Y |
| 230 | DEF | DEF | 2/7/2014 | COPY OF MOTION FOR DETERMINATION OF COMPETENCY PURSUANT TO RULE 11, ARIZONA RULES OF CRIMINAL PROCEDURE | |
| 231 | DEF | DEF | 2/10/2014 | COVER LETTER AND REPRESENTATION AGREEMENT DATED DECEMBER 14, 2000 | |
| 232 | DEF | DEF | 2/11/2014 | SENTENCE OF IMPRISONMENT MINUTE ENTRY DATED SEPTEMBER 9, 1993 | |
| 233 | DEF | DEF | 2/11/2014 | SENTENCE OF IMPRISONMENT / LIFETIME PROBATION MINUTE ENTRY DATED AUGUST 13, 1993 | |
| 234 | DEF | DEF | | REPRESENTATION TIMELINE | |
| 235 | DEF | | | STRUCTURED INVENTORY OF MALINGERED SYMPTOMATOLOGY - SIMS INTERPRETIVE REPORT | Y |
| 236 | DEF | STIP | 2/14/2014 | LARRY A. HAMMOND RESUME | |

Hearing Officer: **Hon. Brian K. Ishikawa**          Case Number: **CR2000-096032**

Co-Defendant: **No**

Hearing Type: **EVIDENTIARY HEARING**          Hearing Date: **02/03/2014**

STATE OF ARIZONA                    Counsel:   GREGORY MICHAEL HAZARD

vs

WENDI ELIZABETH ANDRIANO                    Counsel:   SCOTT BENNETT

| Ex # | ID | Off'd | In Evidence | Exhibit Description | Released |
|------|-----|-------|-------------|---------------------|----------|
| 237 | PLF | PLF | 2/14/2014 | TRANSCRIPT OF FORENSIC PSYCHIATRIC EVALUATION OF WENDI ELIZABETH ANDRIANO DATED NOVEMBER 26, 2013 | |

Received By: _____  _____ Date: 12/30/14

Processed By: _____  _____ Date: 12/30/14

*IN THE SUPERIOR COURT OF THE STATE OF ARIZONA*
*IN AND FOR THE COUNTY OF MARICOPA*

**EXHIBIT/RECORD RELEASE FORM**

FILED
2/25/14 ~ 11:00 AM
MICHAEL K. JEANES, Clerk
By _____
Deputy

STATE OF ARIZONA _____     Case No. CR 2000-096032 A

v

WENDI ELIZABETH ANDRIANO _____

Items released: (State) 170, 172, 173, 175, 176, 177, 178, 181, 182, 185, 187, 188, 189, 190, 191, 192, 193, 194, 196, 197, 198, 202, 207, 208, 209, 210, 211, 212, 214, 215, 216, 217, 218, 219, 220, 221, 222, 223, 224, 225, 226

☒   Permanent Release

_____   Temporary Release, to be returned on: _____

Released to (please print): *Kim Carter*          Date: *2/25/2014*

Returned by (please print): _____   Date: _____

_____
Signature of Recipient

*Kim Carter*
_____
Printed Name/Title
   On behalf of   *STATE*

_____
Signature of Deputy Clerk (upon release)

_____
Signature of Deputy Clerk (upon return)

FORM: EXH                                                         LRD: 02/02/2006

*IN THE SUPERIOR COURT OF THE STATE OF ARIZONA*
*IN AND FOR THE COUNTY OF MARICOPA*

**EXHIBIT/RECORD RELEASE FORM**

FILED
2/28/14 1000AM
MICHAEL K. JEANES, Clerk
By _____
Deputy

STATE OF ARIZONA _____     Case No.  CR 2000-096032 A _____

v

WENDI ELIZABETH ANDRIANO _____

Items released: (Defendant) 6, 7, 7.001, 7.003, 7.004, 7.005, 8, 9, 10, 11, 12, 13, 14, 16, 17, 18, 19, 19.001, 20, 21, 22, 23, 26, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 41, 42, 43, 53, 55, 58, 59, 60, 62, 66, 67, 69, 69.001, 69.002, 70, 71, 72, 75, 77, 83, 90, 91, 92, 93, 94, 98, 103, 106, 111, 112, 133, 139, 144, 145, 146, 150, 151, 153, 155, 156, 157, 162, 163, 164, 229, 235

___X___ Permanent Release

_____ Temporary Release, to be returned on: _____

Released to (please print): Cory Shields          Date: 2/28/14

Returned by (please print): _____     Date: _____

X _____
Signature of Recipient

X Cory Shields
Printed Name/Title
On behalf of  Coppersmith Brockleman

_____
Signature of Deputy Clerk (upon release)

_____
Signature of Deputy Clerk (upon return)

FORM: EXH                                                                              LRD: 02/02/2006

# APPENDIX B

COPY

1        IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

2            IN AND FOR THE COUNTY OF MARICOPA

3

4   STATE OF ARIZONA,            )
                                 )
5            Plaintiff,          )
                                 )
6   v.                           )    No. CR 05-0005 AP
                                 )    MARICOPA COUNTY
7   WENDI ELIZABETH ANDRIANO,    )    No. CR 2000-096032
                                 )
8            Defendant.          )
    _____)

9

10

11

12                      Mesa, Arizona
                      September 8, 2004

13

14

15        BEFORE:  The Honorable BRIAN K. ISHIKAWA

16

17

18        REPORTER'S TRANSCRIPT OF PROCEEDINGS

19            TRIAL DAY 8 -- TESTIMONY

20

21

22

23

24   ORIGINAL Prepared for APPEAL by:
     TRACI L. WHEELER, CSR, RPR
25   Certified Court Reporter No. 50313
     Official Court Reporter


        TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

```
 1                        A P P E A R A N C E S

 2    FOR THE STATE:          JUAN M. MARTINEZ,
                              Deputy County Attorney
 3
      FOR THE DEFENDANT:      DANIEL B. PATTERSON,
                              Deputy Public Defender
 4                                      and
                              G. DAVID DELOZIER,
 5                            Attorney at Law

 6
              I N D E X   O F   E X A M I N A T I O N
 7                                                            PAGE

 8    WITNESS

 9    HASHISAKI, CHRIS, Called to testify by the State
            Direct Examination by Mr. Martinez
10          Voir Dire Examination by Mr. Patterson

11

12     E X H I B I T S   A D M I T T E D   I N   E V I D E N C E

                                                             PAGE
13     NO.    DESCRIPTION
                                                              31
14     141    Photograph                                      31
       142    Photograph                                      31
15     143    Photograph                                      31
       144    Photograph                                      31
16     145    Photograph                                      31
       146    Photograph                                      31
17     147    Photograph                                      31
       148    Photograph                                      31
18     149    Photograph                                      31
       150    Photograph                                      31
19     151    Photograph                                      31
       152    Photograph                                      73
20     230    San Riva Documents                              60
       297    Large Diagram                                   43
21     313    Photograph

22

23

24

25
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    this -- in Shannon's office that we're talking about?

2          A.    Correct.

3          Q.    Now, how is it that somebody would log on to

4    your computer?  Would they have to have a password or how did

5    it work?

6          A.    Yes.  Everyone who logged on had a password to

7    log on with.

8          Q.    Did the defendant have access to your computer

9    via the use of the pass -- use of her password?

10         A.    She has access to the computer and to all the

11    passwords.

12         Q.    That would mean she also had access to this one

13    right here (indicating)?

14         A.    Yes.  That would be Shannon's.

15         Q.    In the scheme of things, we've talked about the

16    bottom here.  What about the top?  The room -- this office

17    (indicating).  Whose office is this?

18         A.    That wasn't an office.  That was sitting room

19    for prospective rentals.

20         Q.    How about the office right there (indicating)?

21         A.    That was Wendi's office.

22         Q.    And what is that?

23         A.    That's a glass window?

24         Q.    Okay.  So she could

25         A.    She could see out the front and into my office,

1      and then the door, obviously, and down the hallway.

2              Q.    Did you ever open an account with USA.net

3      using the name Wendi -- not Wendi, but Anne Newton?

4              A.    No.

5              Q.    Did you ever open an account with USA.net under

6      the name of Aztec Creations?

7              A.    No.

8              Q.    Did you ever, using this computer here that's

9      to the back in your office, ever go online and hold yourself

10     out to be Anne Newton?

11             A.    No.

12             Q.    Did you ever, while you were employed with San

13     Riva, did you ever email a company by the name of Voigt

14     Global?

15             A.    No.

16             Q.    Did you ever request any poison over the

17     internet ever?

18             A.    No.

19             Q.    With regard to issue of -- that issue that

20     we're talking about, did there ever come a time when you saw

21     the defendant looking at some privileged license or business

22     license or doing something with them?

23             A.    She was creating a business license in my

24     office.

25             Q.    She actually did it in your office?

1    A.    Yes.

2    Q.    Are you familiar with Copperstate Glass and

3    Mirror?

4    A.    I am.  They're a vendor of San Riva's.

5    Q.    And when you saw the defendant doing something

6    with this business license, what is it you saw her doing?

7    A.    She was typing it up on the typewriter located

8    in that office and removing a seal or something from

9    Copperstate.

10    Q.    And what else did you see her do?

11    A.    Said she was putting it together.  I asked her

12    what she was doing.

13    Q.    And did she tell you why she was putting it

14    together?

15    A.    She said that she was starting another business

16    and to just nevermind.

17    Q.    And did you nevermind?

18    A.    Yes, I did.

19    Q.    Now, drawing your attention to maybe that

20    Friday before that Sunday when Joseph Andriano was on the

21    ground and you saw him in the fetal position -- it was a

22    Friday.  Did you work on Fridays?

23    MR. PATTERSON:  Judge, I think there's -- it was

24    past midnight when she may have seen him.

25    MR. MARTINEZ:  I'm talking about whether or not she

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    worked on Friday.

2           MR. PATTERSON:  Okay.  The preforatory question

3    seemed to suggest -- well, would you ask him to rephrase? I'm

4    sorry.

5           THE COURT:  Why don't we rephrase the question so

6    there's no misunderstanding.

7    BY MR. MARTINEZ:

8           Q.    Did you work the Friday before Joseph Andriano

9    was killed?

10          A.    Yes, I did.

11          Q.    Did defendant work that Friday?

12          A.    No.

13          Q.    Did she come into the office?

14          A.    She was in the office, yes.

15          Q.    Do you remember what time?

16          A.    I believe it was late morning.

17          Q.    And when she came over, was she with somebody

18   or was she alone?

19          A.    She was by herself.

20          Q.    And did you see what she did?

21          A.    She had brought in a box.

22          Q.    And what was she doing with the box?  What did

23   you see her do?

24          A.    I was in Shannon's office and Shannon asked me

25   to ask her what was in the box.

68

1        Q.    And did you?

2        A.    I asked her what was in the box and she was on

3 the telephone at that time.

4        Q.    Do you know who -- do you know what she was

5 saying when she was on the telephone?

6        A.    I do not know what she was saying.  She was on

7 the telephone with Travis.

8        Q.    How do you know she was on the telephone with

9 Travis?

10       A.    Shannon told me she was on the telephone with

11 Travis.

12       MR. PATTERSON:  Objection.  Move to strike.  Hearsay.

13       THE COURT:  Sustained.  That last answer is stricken.

14 BY MR. MARTINEZ:

15        Q.    She was on the telephone with somebody, right?

16        A.    Correct.

17        Q.    Then what happened?

18        A.    Shannon said to ask her what's in the box, so I

19 asked her, "What's in the box?"  And she said "It's a

20 present."  And I said, "Who's the present for?"  And she

21 said, "It's a present for a friend."

22        Q.    And did she seem upset when she said that or

23 what?

24        A.    No.

25        Q.    Now, you were familiar with Rick Freeland's

# APPENDIX C

05-0002  1

COPY

DP

1            IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

2                 IN AND FOR THE COUNTY OF MARICOPA

3

4    STATE OF ARIZONA,              )
                                    )
5              Plaintiff,           )
                                    )
6    v.                             )      No. CR 05-0005 AP
                                    )      MARICOPA COUNTY
7    WENDI ELIZABETH ANDRIANO,      )      No. CR 2000-096032
                                    )
8              Defendant.           )
     _____)
9

10

11

12                           Mesa, Arizona
                          September 21, 2004
13

14

15

                 BEFORE:  The Honorable BRIAN K. ISHIKAWA
16

17

18            REPORTER'S TRANSCRIPT OF PROCEEDINGS

19                       TRIAL DAY 15

20

21

22

23

24   ORIGINAL Prepared for APPEAL by:
     TRACI L. WHEELER, CSR, RPR
25   Certified Court Reporter No. 50313
     Official Court Reporter


          TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

2

1                          A P P E A R A N C E S

2    FOR THE STATE:        JUAN M. MARTINEZ,
                           Deputy County Attorney
3
     FOR THE DEFENDANT:    DANIEL B. PATTERSON,
4                          Deputy Public Defender
                                  and
5                          G. DAVID DELOZIER,
                           Attorney at Law
6

7               I N D E X   O F   E X A M I N A T I O N

8    WITNESS                                              PAGE

9    DEYOUNG, JOHN, Called on behalf of the State
              Direct Examination by Mr. Martinez          74
10
     FLANNES, KATHY, Called on behalf of the State
11            Direct Examination by Mr. Martinez          56
              Cross-examination by Mr. Patterson          64
12
     GALBARI, KATHY, Called on behalf of the State
13            Direct Examination by Mr. Martinez          102
              Voir Dire Examination by Mr. Patterson      104
14            Continued Direct Examination by Mr. Martinez 109
              Voir Dire Examination by Mr. Patterson      122
15            Continued Direct Examination by Mr. Martinez 122
              Voir Dire Examination by Mr. Patterson      125
16            Continued Direct Examination by Mr. Martinez 125
              Follow-up Questions by Mr. Martinez         131
17            Voir Dire Examination by Mr. Patterson      133

18   HODGE, PETE, Called on behalf of the State
              Direct Examination by Mr. Martinez          66
19            Cross-examination by Mr. Patterson          72

20   MENCHACA, DEANNA, Called on behalf of the State
              Direct Examination by Mr. Martinez          78
21
     ORTEGA, RAYMOND, Called on behalf of the State
22            Direct Examination by Mr. Martinez          86

23   SINGELAIS, BARRY, Called on behalf of the State
              Direct Examination by Mr. Martinez          6
24            Voir Dire Examination by Mr. Patterson      15
              Contined Direct Examination by Mr. Martinez 16
25            Follow-up Examination by Mr. Martinez       23

          TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    I N D E X  O F  E X A M I N A T I O N  C O N T I N U E D

2    WITNESS                                              PAGE

3    VOIGT, WADE ALLEN, Called on behalf of the State
            Direct Examination by Mr. Martinez             25

4

5    E X H I B I T S  A D M I T T E D  I N  E V I D E N C E

6    NO.     DESCRIPTION                                  PAGE

7    159     Photograph                                   91
     160     Photograph                                   91
8    219     Envelope containing photographs             128
     219.001 Photograph taken from Exhibit 219            128
9    223     Handwritten note on back of business card    122
     231     Handwritten note                             123
10   233.001 Document dated 02-23-01, Subscriber records   62
     266     Large white envelope with poisonous material 113
11   266.001 Manila envelope                              113
     266.002 San Riva history document                    113
12   266.003 Shipping document                            113
     266.004 Packaging label                               12
13   266.005 Alfa Aesar safety data sheet document         16
     266.006 Alfa Aesar documents                          20
14   266.007 Document dated 03-31-02                      113
     266.008 Laboratory reference manuals                 113
15   266.009 Email dated 09-25-00                         113
     266.010 Email documents and post-its                 113
16   266.011 Voigt Global document                        113
     266.012 City of Phoenix Lic. No. 9002400 document    113
17   266.013 City of Phoenix Lic. No. 9002501 document    113
     266.014 Copy of Exhibit 266.013                      113
18   266.015 Copy of City of Phoenix document             113
     266.016 Arizona Department of Revenue document       113
19   266.017 Almond Extract document                      113
     266.018 Email document dated 03-21-00                113
20   266.019 Cyanide and Almonds document                 113
     266.020 Document dated 07-31-00                       136
21   266.021 Remit to document                            136
     266.022 Document with partial signature              136
22   267     Fax cover sheet and letter from Voigt Global  32
     281.001 Azcreat@usa.net subscriber records            58
23   286.001 Photocopy of check and money order            50
     287     ABCO Foods money order                        69
24   296     Large Diagram                                 96
     314     Delivery manifest from Airborne Express       80
25   366     Diagram                                       29

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

4

1          - I N D E X   O F   E X H I B I T S   C O N T I N U E D

2     NO.      DESCRIPTION                                    PAGE

3     367      Latex glove                                    125
      368.001  Note                                           126
4     369      Verizon bill                                   127
      370      Manila envelope                                134

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

5

```
1          MESA, ARIZONA, TUESDAY, SEPTEMBER 21, 2004

2

3          THE COURT:  Good afternoon.  This is trial in cause

4   number CR 2002-096032, state of Arizona versus Wendi

5   Elizabeth Andriano.  The record will reflect the presence of

6   Defendant, Counsel and the jury.

7              Mr. Martinez, the State may call its next

8   witness.

9          MR. MARTINEZ:  State calls Barry Singelais.

10

11              BARRY SINGELAIS,

12      CALLED TO TESTIFY ON BEHALF OF THE STATE,

13   HAVING FIRST BEEN DULY SWORN, TESTIFIES AS FOLLOWS:

14

15          THE COURT:  Please have a seat on the witness stand

16   there.  Please make yourself comfortable there on the witness

17   stand.  Please pull the microphone close to you.  Please

18   remember to speak loudly and clearly into the microphone so

19   everyone can hear you.  Please wait until the question is

20   completed before you answer the question, and please make

21   sure you give a verbal response.  Is that agreeable?

22          THE WITNESS:  Yes, sir.

23          THE COURT:  Mr. Martinez, you may proceed.

24   / / / / /

25   / / / / /
```

6

1    DIRECT EXAMINATION BY MR. MARTINEZ:

2        Q.    May I have your name, sir?

3        A.    Barry Singelais.

4        Q.    What do you do for a living?

5        A.    I work for Alpha Aesar.

6        Q.    What do you do for them?

7        A.    I'm director of research of chemicals.

8        Q.    How long have you been in that position with

9    Alpha Aesar?

10       A.    Four, five years.

11       Q.    What are your duties in general?

12       A.    I'm the manager of several facilities globally,

13   mostly U.S., France, and Germany.

14       Q.    Tell me a little bit about Alpha Aesar.  First

15   of all, what kind of products does it put out?

16       A.    Yeah.  We sell research chemicals to

17   universities, academic institutions and industrial

18   corporations.  Probably anybody you can name.  We sell a

19   variety of different chemicals, 20,000 perhaps, to use for

20   manufacturing and research.

21       Q.    How is it normal orders are placed with Alpha

22   Aesar?  People call, come in, email thing?  How is it orders

23   are placed?

24       A.    Orders are placed via email via the internet,

25   electronically through distributors, phone calls by

7

1    distributors, and also direct calls from the outside.

2         Q.    You indicated something about electrically

3    through distributors.  If you could talk about that and

4    explain to us how that would go through the process at Alpha

5    Aesar resulting in an order being shipped?

6         A.    Okay.  We have distributors who represent us in

7    different regions of the world including the United States.

8    Distributors go out and use our catalogue to sell products.

9    If they get an order from the university or a lab, they'll

10   then place the order through us either by calling us on the

11   telephone or we'll get an order electronically.  They'll

12   simply place the order in their system and the order comes

13   through to our system.

14        Q.    Are you familiar with VQR?

15        A.    Yes.

16        Q.    Do you know what those initials stand for?

17        A.    It was Van Waters and Rogers at one time.

18        Q.    What is it now?

19        A.    I'm not sure what it is now, to be honest.

20        Q.    Were they one of the distributors that would

21   place electronic orders with you on occasion?

22        A.    Electronic and via phone calls.

23        Q.    Once the order comes in, let's say that it's

24   placed at your facility.  How is it that it gets to somebody,

25   or if you could walk me through the procedure how it would

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000006055

1    get to somebody who then in turn fills it?

2        A.    The order is taken at our facility

3    electronically or via phone call.  The order pick tickets are

4    out in our warehouse.  It is repackaged for shipment or

5    already on the shelf in the size the person ordered.  It's

6    picked -- the material safety data sheet is included with the

7    product that prints at the same time as the pick ticket.

8            Someone takes that product and the material

9    safety data sheet to our shipping department.  They then take

10   the product, determine how it's to be ship, package it up

11   properly according to whatever regulations.  They go over

12   that product to make sure it's ready, and the product is

13   given a parcel carrier and airborne UPS or federal fees and

14   sent via whatever method the buyer determined to be used.

15       Q.    Where is the warehouse?  Are they throughout

16   the United States or --

17       A.    Our warehouse is in Ward Hill, Massachusettes.

18       Q.    Is that where you are?

19       A.    One mile away at the office.

20       Q.    I'm going to show you some documents to see if

21   they're familiar to you.

22            (Pause in proceedings.)

23   BY MR. MARTINEZ:

24       Q.    We're having them marked right now.  As soon as

25   we get them, we'll show them to you.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

```
 1                    I'm going to show you Exhibit Number 266.002.
 2      I want you to take a look at it.  And specifically I will
 3      direct your attention to the lower right hand corner of that
 4      document.  First of all, have you ever seen that document
 5      before?
 6              A.    No.
 7              Q.    What's the heading of the document, just so we
 8      know?
 9              A.    San Riva History.
10              Q.    And -- but there is some writing on the lower
11      right hand corner, correct?
12              A.    Right.
13              Q.    There's a name there by the name of Barry, and
14      then there's a telephone number there.  Can you give us the
15      telephone number?
16              A.    It's 978-521-6415.
17              Q.    And your name again is Barry Singelais?
18              A.    Yes.
19              Q.    And that number that's there, do you know whose
20      number that is?
21              A.    That's my direct line.
22              Q.    Did you ever have an indication to have any
23      direct contact with anybody that identified themselves as
24      Wendi Elizabeth Andriano or Wendi Andriano?
25              A.    Not that I recall.
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000006057

1        Q.    Did you ever have occasion to have contact with
2    anybody by the name of Anne Newton?
3        A.    Not that I recall.
4        Q.    Is that your direct line there?
5        A.    Yes.
6        Q.    I want you to take a look at the woman sitting
7    here with the glasses in the light blue sweater.  Have you
8    ever had any contact with her before?
9        A.    No.
10        Q.    Do you know how your name and number got on the
11    lower righthand corner of that?
12        A.    I have no idea.
13        Q.    Sir, I'm now going to show you Exhibit
14    266.003.  Please take a look at it.  What is it?
15        A.    It's an Airborne Airway bill.
16        Q.    Is it something that was generated by Alpha
17    Aesar?
18        A.    Yes, it is.
19        Q.    And does it have to do with a certain
20    transaction?
21        A.    Yes.
22        Q.    Why don't you go ahead and open it so that you
23    could -- have you seen both sides of it?
24        A.    I think I can see both sides.
25        Q.    Okay.  If I may have it back then.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1              Please take a look at Exhibit 266.04.

2         MR. PATTERSON:  Did you say 266?  Sorry, Judge.

3         THE COURT:  Did you -- I think you said 266.04.  Are

4    you referring to 266.004?

5         MR. MARTINEZ:  Correct.

6         MR. PATTERSON:  So the sequence is the 266 sequence?

7         MR. MARTINEZ:  Right.

8    BY MR. MARTINEZ:

9         Q.    Do you recognize what's there?

10        A.    It's a tracking label that would go on a

11   package.

12        Q.    It's a tracking label from whom to whom?

13        A.    It's from Alpha Aesar, 30 Bond Street?

14   Ward Hill, Massachusettes, to Aztec Creations, Anne Newton,

15   in Phoenix, Arizona.

16        Q.    With regard to the particular address there in

17   Massachusettes, is that an address you're familiar with?

18        A.    That's our warehouse address.

19        Q.    And is this the company that you normally use

20   sometimes or customarily?

21        A.    I don't understand the question.

22        Q.    On occasion, do you use that company to ship

23   items out?

24        A.    Oh, yes.

25        Q.    And on that -- and the person that is sent to

1   is whom again?

2          A.    Aztec Creations, Anne Newton.

3          Q.    Is that what is normally placed on the outside

4   of the packages when they're being sent out.

5          A.    Yes.

6          Q.    But that's not the whole package, is it?

7          A.    No.

8          MR. MARTINEZ:  I move for admission of Exhibit

9   266.004.

10                 (Pause in proceedings.)

11          MR. PATTERSON:  No objection, Judge.

12          THE COURT:  Exhibit 266.004 is admitted into

13   evidence.

14   BY MR. MARTINEZ:

15          Q.    Sir, let's just -- if you could see the

16   television from where you are, go ahead and take a look at it

17   so you can see what we're talking about.  And that's where

18   you told us is the person that it was going to right up here,

19   correct, Aztec Creations?

20          A.    Correct.

21          Q.    Then it's got the name and then it says Phoenix

22   Arizona 85034.  Are you able to read the street address for

23   me?

24          A.    2442 South 24th Street.

25          Q.    And then the remitter or person sending it is

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1      somebody in Ward Hill, Massachusetts, correct?

2              A.      Right.

3              Q.      There is a shipping number on there, right?

4              A.      Correct.

5              Q.      What number is that?

6              A.      That's a number where you can track the package

7      by.

8              Q.      Okay.  And then that's -- that stays with the

9      package and Airborne Express, correct?

10             A.      Correct.

11             Q.      It does have someone who it's mailed through,

12     right?

13             A.      Yes.

14             Q.      What is that?

15             A.      Airborne Express.

16             Q.      And then it also indicates a shipping date,

17     doesn't it?

18             A.      It does.

19             Q.      If we move this out of the way a little bit,

20     that would be what -- what's the date?

21             A.      It's 9/28.

22             Q.      I want you to go ahead and take a look at

23     Exhibit 266.005.  Open it and take a look at the documents

24     that are in there.

25                     (Pause in proceedings.)

1    BY MR. MARTINEZ:

2         Q.    What are they?

3         A.    This is a material's safety data sheet and a

4    cover sheet.

5         Q.    And the cover sheet, what is that?

6         A.    A sheet that indicates what product is being

7    shipped and whether or not a materials safety data sheet was

8    shipped along with the product.

9         Q.    And the material data sheet, can you hold that

10   up for us so we could see what that looks like.

11        A.    (Indicating.)

12        Q.    It's got a lot of writing on it.   And the other

13   sheet, the cover sheet, can you hold that up so we could know

14   what you're talking about?

15        A.    (Indicating).

16        Q.    Does that have like any routing number or

17   anything on the cover sheet?

18        A.    It indicates the order number.

19        Q.    And what is the order number that is indicated

20   on that?

21        A.    5252176.

22        Q.    I want you to take a look at Exhibit 266.004,

23   and there on the lower left-hand corner, it's -- is that the

24   same order number, sir?

25        A.    It is.

15

1          Q.     So these documents that you have there
2     correspond to the order where this label came from.  Is that
3     what you're telling me?
4          A.     Yes.
5          Q.     Go ahead and put those back inside the
6     container with the data sheet on top for now.
7          A.     Data sheet on top?
8          Q.     There appeared to have been some yellow
9     post-its on these.  Do you know how those got there?
10          A.     No.
11          Q.     Aside from that though, these are the type of
12     documents or these are the documents that went out with this
13     order as set forth on 266.04?
14          A.     That would be the type of document, yes.
15          MR. MARTINEZ:  I move for admission of Exhibit
16     266.005.
17          MR. PATTERSON:  Voir dire, Judge?
18          THE COURT:  Yes.
19
20     VOIR DIRE EXAMINATION BY MR. PATTERSON:
21          Q.     This material safety data sheet, this
22     particular sheet you did not examine or see before the order
23     went out, correct?
24          A.     Correct.
25          Q.     This is the kind of data sheet that is

1 generally placed in those kinds of deliveries?

2   A. It's the type of document, yes.

3   Q. Okay.  And there's a different MSDS or material

4 safety data for each different product that comes out of your

5 warehouse, I assume?

6   A. Correct.

7   Q. Okay.  But you didn't actually see this

8 particular document as we speak today?

9   A. No.

10   MR. PATTERSON:  Okay.  With that understanding,

11 Judge, I have no objection.

12   THE COURT:  Exhibit 266.005 for identification is

13 admitted into evidence.

14

15 CONTINUED DIRECT EXAMINATION BY MR. MARTINEZ:

16   Q. Sir, I want to talk to you about some of the

17 information that may be contained in this material data --

18 material safety data sheet.

19   Q. It does indicate under hazard description and

20 hazard identification, it has a T plus and then it has --

21 what does that say?

22   A. Very toxic.

23   Q. What does T plus mean?

24   A. It's just a code that's used to determine

25 whether or not a product's toxic, flammable, whatever.

17

1          Q.      Okay.

2          A.      In this case it's very toxic.

3          Q.      It also indicates what you are supposed to do

4   in case something happens, first aid measures, that sort of

5   thing, correct?

6          A.      Correct.

7          Q.      On page 4 of 5, it does have something called

8   toxicological information, doesn't it?

9          A.      Correct.

10          Q.      It say Oral LD50:27 MG/KG, correct?

11          A.      Correct.

12          Q.      LD stands for Lethal Dose, doesn't it?

13          A.      Yes.

14          Q.      And MD?

15          A.      Although I'm not a chemist, I believe that's

16   the point it becomes a lethal dose.

17          Q.      It also has 27 milligrams, kilograms, something

18   like that?

19          A.      Milligrams per kilo.

20          Q.      And so with regard to this number right here,

21   this tells you that as I understand -- well, maybe you could

22   tell me.  Does that mean that 50 percent of the people die at

23   that dose?  Is that what that's telling you?

24          A.      I believe so, but I'm not positive.

25          Q.      Okay.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000006065

1           MR. PATTERSON:  Judge, could we strike that

2      testimony?  He doesn't have the requisite expertise.

3           THE COURT:  I'll sustain that objection.  That last

4      answer will be stricken.

5      BY MR. MARTINEZ:

6           Q.    It does -- under that same toxicological

7      information, it does have some writing about subacute chronic

8      toxicity.  Do you see that?

9           A.    Yes.

10          Q.    Why don't you go ahead, I'll hand it to you and

11     read that to us, please.

12          A.    If sodium azide is swallowed, symptoms similar

13     to strychnine poisoning will develop.  Effects include

14     violent heart stimulations within minutes, throbbing at the

15     base of the brain, loss of consciousness, and vomiting. If

16     hydrozoic acid is released, death may result due to

17     respiratory arrest.

18          Q.    Thank you.  One of the things the cover sheet

19     indicates is this is sodium azide 99 percent MINS assay.

20     What does 99 percent assay mean?  What does that mean?

21          A.    It means it was analyzed to 99 percent purity.

22          Q.    Let's take a look at Exhibit 266.006.  It

23     contains two articles of paper.  Go ahead and open it and

24     take a look at both of them.  What do they show?

25          A.    They're packing lists indicating what was

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

```
 1    shipped or to be shipped.

 2           Q.    You indicated to be shipped or shipped.  Is one

 3    of them to be shipped and the other one is actually what was

 4    shipped?

 5           A.    No.  It's actually a document that tells you

 6    what you are to ship.

 7           Q.    Okay.  What is it that was going to be shipped

 8    as part of this order?

 9           A.    1500 milligram unit of sodium azide.

10           Q.    Does it indicate the date it was shipped or not?

11           A.    I -- it's difficult to see on this.  It

12    indicates the date that it was printed.

13           Q.    What's the date that it printed?

14           A.    Appears to be 9/28/2000.

15           Q.    And what is the order or tracking number you

16    may have on that if you can read it?

17           A.    I can read the last five digits which appear to

18    be 52176.

19           Q.    If we take a look at Exhibit 266.005, which is

20    the one we just talked about, what are the numbers there?

21           A.    5252176.

22           Q.    Is that something that accompanies the product

23    or something that stays behind in your office?

24           A.    Both.

25           Q.    But -- okay.
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          A.      That fit?

2          MR. MARTINEZ:  I move for admission of Exhibit

3     266.006.

4                  (Pause in proceedings.)

5          MR. PATTERSON:  I have no objection, Judge.

6          THE COURT:  Exhibit 266.006 for identification is

7     admitted into evidence.

8     BY MR. MARTINEZ:

9          Q.      I'm going so show you 266.007.  What is it?

10         A.      This is paperwork that's required when you ship

11    a poison and the poison pack.

12         Q.      And what is that paperwork?  What does it

13    indicate or who requires it?

14         A.      The federal government requires a DOT and --

15         Q.      So that's something that goes with something

16    that's poison, right?

17         A.      If there's a poison pack used to ship a

18    product, not all requires a poison pack, but if it's

19    required, yes, it would.

20         Q.      Does that have an order number or routing

21    number on it?

22         A.      No.

23         Q.      Okay.  Based on all the documentation that you

24    seen, sir, and the date that you indicated to us I think was

25    September 28, what was shipped out from Alpha Aesar on

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

```
 1    September 28, year 2000?

 2              A.    500 grams of sodium azide.

 3              Q.    And who was it shipped to?

 4              A.    Aztec Creations.

 5              Q.    And somebody by the name of Anne Newton also?

 6              A.    Correct.

 7         MR. MARTINEZ:  I don't have anything else.

 8         THE COURT:  Mr. Patterson?

 9         MR. PATTERSON:  Thank you, Judge.  I have no

10    questions for this gentleman.

11         THE COURT:  Are there any questions of this witness

12    by the jury?  If so, please raise your hand.

13              (Pause in proceedings.)

14         THE COURT:  Let me see Counsel here at the bench.

15

16              (The following proceedings were held at the

17    bench:)

18

19         THE COURT:  Question, "Before shipping, don't you do

20    a background check of the company and/or person requesting

21    the product?"

22              Mr. Martinez?

23         MR. MARTINEZ:  I don't have any objection to that.

24         MR. PATTERSON:  No objection.

25         THE COURT:  Okay.
```

1    MR. PATTERSON:  Judge -- you might want to tell him

2  what you just told me so he could tell the jury.

3    MR. MARTINEZ:  The reason we're wearing gloves is

4  this was treated with chemicals.  These documents were

5  treated by our latent fingerprint examiner.  If you touch

6  them with your fingers, they're toxic and they could cause --

7  they didn't tell me exactly what, but they said don't touch

8  them without gloves.

9    THE COURT:  Okay.

10    MR. PATTERSON:  You might want to tell the jury that.

11    THE COURT:  They may not be allowed to open that

12  document?

13    MR. PATTERSON:  Well --

14    THE COURT:  We'll do that later, okay?

15

16    (The following proceedings were held in open

17  court:)

18

19    THE COURT:  Sir, I have a question here for you.

20  Question reads as follows: Before shipping, don't you do a

21  background check of the company and/or person requesting the

22  product?

23    THE WITNESS:  Certain -- certain chemicals require a

24  background check.  They're on certain federal lists.  This

25  isn't one of those chemicals.  In some cases chemicals that

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000006070

1    might have certain properties we would do a check anyway, but

2    not for this particular product.   There are no regulations

3    requiring it.

4             THE COURT:   Any further questions of this witness by

5    the jury?

6                       (No response.)

7             THE COURT:   No one has raised their hand.

8                  Any follow-up questions to this specific

9    question by the jury, Mr. Martinez?

10

11   FOLLOW-UP EXAMINATION BY MR. MARTINEZ:

12        Q.     You indicated this order was place bid VWR, I

13   think.   Is that correct?

14        A.     Correct.

15        Q.     Would you normally do a background check on VWR

16   when they place an order?

17        A.     VWR is one of the market leaders as far as

18   distributors of chemicals.   We know who they are.

19             MR. MARTINEZ:   I don't have anything else.   Thank

20   you.

21             THE COURT:   Mr. Patterson?

22             MR. PATTERSON:   No follow up, Judge.   Thank you.

23             THE COURT:   May this witness be excused?

24             MR. MARTINEZ:   Yes, sir.

25             MR. PATTERSON:   No objection.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          THE COURT:  Thank you very much.  You're excused.

2                Mr. Martinez, the State may call its next

3     witness.

4          MR. MARTINEZ:  State calls Wade Allen Voigt.

5                (Pause in proceedings.)

6          THE COURT:  Sir, if you could please step forward

7     right up here.  Give the clerk your name and she'll swear you

8     in.

9

10                    WADE ALLEN VOIGT,

11          CALLED TO TESTIFY ON BEHALF OF THE STATE,

12     HAVING FIRST BEEN DULY SWORN, TESTIFIES AS FOLLOWS:

13

14          THE COURT:  Sir, please have a seat on the witness

15     stand.  Please make yourself comfortable there on the witness

16     stand.  Please pull the microphone close to you.  Please

17     remember to speak loudly and clearly in the microphone so

18     everyone can hear you.  Please wait until the question is

19     completed before you answer the question, and please make

20     sure you give a verbal response.  Is that all agreeable to

21     you, sir?

22          THE WITNESS:  Yes.

23          THE COURT:  Mr. Martinez, you may proceed.

24     / / / / /

25     / / / / /

1    DIRECT EXAMINATION BY MR. MARTINEZ:

2        Q.    Your name, sir?

3        A.    Wade Allen Voigt.

4        Q.    And who do you work for or are you

5    self-employed?

6        A.    I am self-employed.  My company is

7    incorporated.

8        Q.    And what's the name of your company?

9        A.    Voigt Global Distribution, LLC.

10       Q.    What is Voigt Global Distribution?

11       A.    Work with chemicals, biologicals scientific

12    instrument.

13       Q.    When did you start your company?

14       A.    January 12th, 1998.

15       Q.    Do you have any education -- why don't you give

16    us a little bit of your educational background?

17       A.    BS Biology, BS in Chemistry, minor in Physics.

18       Q.    How is it that your business is run?  In other

19    words, do you advertise or is it word of mouth?  Exactly how

20    is it people order things from you?

21       A.    Currently I have three domains on the

22    internet.  That's the only actual form of advertising that is

23    done for my company.  I do not use printed catalogues.

24       Q.    Drawing your attention back to the summer of

25    the year 2000, how was it that people would get in touch with

1    you to place orders?

2         A.    Both use of the internet, my company's

3    websites, and government orders could be placed through the

4    central contractor's registration database.

5         Q.    Okay.  You indicated that you had degrees in --

6    what again what were your degrees in?

7         A.    BS in Biology, BS in Chemistry, and a minor in

8    Physics.

9         Q.    Are you familiar with a form known as a

10   material safety data sheet?

11        A.    Yes.

12        Q.    What is a material safety data sheet?

13        A.    That document is required by law any time a

14   chemical is sold.  The end user for the company where the end

15   user works has a right by law to have access to all specific

16   information associated with that chemical.

17        Q.    I'm going so show you a page in the material

18   safety data sheet of -- involving some sodium azide.  It's

19   page 4 of 5.  It talks about Oral LD 50, 27 MG, and then

20   hyphen KG.  What is that?

21        A.    That stands for lethal dose, 50 percent of test

22   subjects, first line refers to orals.  Test subjects are

23   usually rats, mice, so forth.  The lethal dose to kill 50

24   percent of those test subjects was 27 milligrams per

25   kilogram.

1          Q.     Can we -- if we use a little bit of math, can

2     we work it out if we know the weight of an individual to see

3     how it fits into that formula?

4          A.     Yes.

5          Q.     Can you see Exhibit 366 from where you're

6     seated?  If you want me to move it closer --

7          A.     Now I can.

8          Q.     I want to talk to you about the oral lethal

9     dose 50 27 milligrams, slash, kilograms.  That is on that

10    sheet, right?

11         A.     Yes.

12         Q.     If an individual weighs 170 pounds, how is it

13    that you go about converting that into kilograms?

14         A.     You would divide 170 pounds by 2.2.  There are

15    approximately 2.2 pounds in one kilogram.

16         Q.     If a person weighs 170 pounds, how many

17    kilograms would they weigh?

18         A.     Roughly 77 kilograms roughly.

19         Q.     It says up there 27 kilograms.  What does that

20    mean?

21         A.     27 milligrams of the substance that's being

22    reported on the material safety data sheet that would be

23    required per kilogram to kill 50 percent of the test

24    subjects.

25         Q.     So it would, as I understand it, then it would

1    take 27 milligrams per kilogram to kill 50 percent of the

2    test subjects?

3         A.    Correct.

4         Q.    In this case we know it's sodium azide.  We've

5    already had testimony that's what this refers to.  If you

6    want to find out how much it would take to kill somebody of

7    170 pounds who we now know weighs 77.27 kilograms, how is it

8    you go about ascertaining that?

9         A.    You simply compute the 77.27 kilograms by 27

10   milligrams to get a theoretical lethal dose to kill 50

11   percent of test subjects who weigh 77.27 kilograms.

12        Q.    So in order to kill 50 percent of the subjects

13   who weigh 77.27 kilograms, you would need 2286 milligrams,

14   right?  Sorry 2086 milligrams, correct?

15        A.    Correct.

16        Q.    In terms of grams, what is that?

17        A.    Roughly 2.09 grams.

18        Q.    It was actually rounded up here, right?

19        A.    Correct.

20        Q.    So if a person weighed theoretically 170

21   pounds, it would take approximately 2 grams to kill 50

22   percent of them?

23        A.    Correct.

24              MR. MARTINEZ:  Move for admission of Exhibit 366.

25              MR. PATTERSON:  No objection.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          THE COURT:  Exhibit 366 for identification is

2     admitted into evidence.

3     BY MR. MARTINEZ:

4          Q.   Sir, we were talking about your business, Voigt

5     Global, and you indicated that most of the time people send

6     emails to you, I think, and that's how you get your business,

7     right?

8          A.   Correct.

9          Q.   Did there come a time when somebody by the name

10    or with an email name of Anne Newton contacted you?

11         A.   Yes.

12         Q.   Did you know this Anne Newton prior to this

13    contact in their attempt to buy whatever it is they wanted to

14    buy?

15         A.   No.

16         Q.   Do you remember the first time you had contact

17    with this person?  Do you know about when it was?

18         A.   Roughly August of 2000.

19         Q.   Going to show you Exhibit 267.  I want you to

20    take a look at it to see if you recognize what's in this

21    packet.

22              (Pause in proceedings.)

23         THE WITNESS:  Yes.  I recognize all the documents.

24    BY MR. MARTINEZ:

25         Q.   What is in that packet?

1          A.    A letter that I wrote -- correction, a fax that

2    I had sent to Dave Lucero, some email communications from an

3    individual named Anne Newton.

4          Q.    What is the email they used, the email address

5    or moniker?

6          A.    Anne Newton, email address A-Z-C-R-E-S --

7    correction, A-Z-C-R-E-A-T at U-S-A dot net.

8          Q.    Okay.   Approximately how many messages are

9    there?

10         A.    Three.

11         Q.    And what else is there?

12         A.    A Contract Disclaimer and Indemnity Agreement

13    that my company requires from any entity other than federal,

14    state or educational institutions.

15         Q.    Who is that signed by?

16         A.    Anne Newton.

17         Q.    And what is the address that is given there for

18    Anne Newton?

19         A.    6962 East 1st Avenue, Number 102, Scottsdale

20    Arizona 85251.

21         Q.    And this is something that you had in your

22    records you made a copy and faxed --

23         A.    Correct.

24         Q.    -- over to the Phoenix Police Department?

25         A.    Correct.

1  Q. What else is there?

2  A. A business license issued by the city of

3 Phoenix.

4  Q. And does it have any writing on it on the side?

5  A. To Allen.

6  Q. Let me ask you, what is your full name again?

7  A. Wade Allen Voigt.

8  Q. Do you sometimes go by the name of Allen?

9  A. Frequently.

10  Q. All right.  And what else?

11  A. An invoice from my company for 500 grams sodium

12 azide.

13  Q. Okay.  And this involved this person that you

14 knew as Anne Newton?

15  A. Correct.

16  Q. With regard to this particular order, this

17 person sent a request to you.  They wanted something, right?

18 And as a result of that, ultimately there was an order for

19 what?  What was placed?  What kind of order was placed?

20  A. 500 grams sodium azide.

21  Q. Were you able to provide the sodium azide or

22 were you not able to provide this sodium azide?

23  A. I was able to facilitate a drop shipment

24 directly from the manufacturer to Aztec Creations.

25  Q. Who is the manufacturer that made the drop

1    shipment?

2              A.    Alpha Aesar.

3              Q.    Was there a middleman that was involved?

4              A.    VWR International.

5              Q.    And so explain to me how it was that this

6    worked.  You get this request, then what happens?

7              A.    At the time my company was too small to place

8    orders directly with the manufacturer.  I used a larger

9    distributor, VWR International, to place the order with Alpha

10   Aesar.  Aesar then drop shipped the sodium azide directly to

11   Aztec Creations.

12             Q.    When you say "drop shipped," why don't you

13   explain to me what that means?

14             A.    My company never came in possession of the

15   chemical, VWR never came in possession of the chemical.  It

16   went directly from Alpha Aesar to Aztec Creations.

17             Q.    And then you presumably paid VWR or Alpha

18   Aesar?

19             A.    Correct.

20             Q.    If I may have those back.

21             MR. MARTINEZ:   I move for admission of Exhibit 267.

22             MR. PATTERSON:   No objection, Judge.

23             THE COURT:   Exhibit 267 for identification is

24   admitted into evidence.

25   / / / / /

1      BY MR. MARTINEZ:

2              Q.    Let's go ahead and take a look at some of the

3      documents we have here.   First of all, with what we call

4      page -- what is indicated as page 1 of 5, at the margin it

5      has a fax number.   Whose fax number is that?

6              A.    That was my company's fax number at the time.

7              Q.    And right here on the right?

8              A.    The date that fax was sent.

9              Q.    That you sent, right?

10             A.    Correct.

11             Q.    So did you fax these to somebody?   Who did you

12     fax these to?

13             A.    Those documents I originally faxed to Mr.

14     Lucero.

15             Q.    At the Phoenix Police Department?

16             A.    Correct.

17             Q.    Okay.   This does indicate a date, doesn't it?

18             A.    Yes.

19             Q.    What is it?

20             A.    Friday, September 22nd of 2000.

21             Q.    And it gives a time, doesn't it?

22             A.    11:19 a.m.

23             Q.    Does it tell you what standard time it is?

24             A.    I believe that stands for Mountain Time.

25             Q.    It's MDT in other words, right?

1        A.      Correct.

2        Q.      And it's from sales -- if you -- why don't you

3   go ahead and step down.

4        THE COURT:  You could step down just as long as you

5   remember to speak up as loud as you can when you're away from

6   the microphone.

7        THE WITNESS:  This is one of my company's email

8   addresses, Sales at Voigt Global dot com.

9   BY MR. MARTINEZ:

10       Q.      Who's it to?

11       A.      Anne Newton.

12       Q.      And there's the email address, right?

13       A.      Correct.

14       Q.      It's regarding what?

15       A.      Sodium azide.

16       Q.      Now, there is a text to this message, isn't

17  there?

18       A.      Correct.

19       Q.      Over on the righthand side it says something.

20  What does it say?

21       A.      Please send via overnight.  Thanks.

22       Q.      Did you put that on there?

23       A.      No.

24       Q.      How is it that you came into possession of a

25  copy -- of this document that had please send by overnight?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          A.    This was sent along with a money order my

2    company received for the purchase of sodium azide.

3          Q.    So this particular page with the -- with the

4    email messages on it was sent to you with that writing on it,

5    right?

6          A.    Correct.

7          Q.    Was it faxed to you or sent to you?

8          A.    By the mail.

9          Q.    By the mail?  Okay.  So its -- let's look at

10   the message that's on top.  And is that a response by you

11   there on top?

12         A.    Correct.

13         Q.    What are you telling the person?

14         A.    "Again, there is no technical grade available.

15   The difference is in level of impurities, not necessarily the

16   potencies."

17         Q.    Okay.  And are you responding to the message

18   that's directly underneath?

19         A.    Correct.

20         Q.    And who is -- that message that's directly

21   underneath, who is that from?

22         A.    Anne Newton.

23         Q.    And when was it sent?

24         A.    Friday, September 22nd of 2000 at 11:25 a.m.

25         Q.    It doesn't indicate if it's, Central, Mountain

1   time, Standard Time, or Eastern Mountain Time.  It doesn't

2   indicate anything like that?

3          A.    No, it does not.

4          Q.    So -- and on it is a message to you, right?

5          A.    Correct.

6          Q.    And what does it say?

7          A.    "Allen, I realize it may not seem like a great

8   bang for the buck, but an acquaintance swears they have used

9   sodium azide or potassium cyanide mixed with specially

10  prepared greens for the rodents placed near the concentrated

11  area of plant life they tend to muck up and it apparently did

12  the job.  Other alternatives have been nearly as costly and

13  as always we understand there are no guarantees, so we're

14  happy to give this route a shot.  What is the pricing for a

15  technical grade strong enough to kill rodents?  Anne."

16         Q.    And then do you respond to that?

17         A.    Yes, I did.

18         Q.    What did you tell her?  You give her the

19  prices, that sort of thing?

20         A.    Correct.

21         Q.    But as I understand it, this sheet of paper

22  that we are working with, that was actually sent over to you

23  with the money requesting the sodium azide?

24         A.    Correct.

25         Q.    So that the writing that we have here is not --

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000006084

37

1    is that something you added or is that something that --

2            A.    I did not write that.

3            Q.    Was there an indemnity agreement or an

4    agreement that was sent over to you?

5            A.    Yes.

6            Q.    I'm now showing you what is -- this -- I don't

7    want you to read it, but what about the portion on top?  What

8    is that basically indicating?

9            A.    That the customer takes full responsibility or

10   adequate knowledge of handling, storage, of anything ordered

11   from Voigt Global, that it shall not be used for any illegal

12   purpose if that individual that places the purchase --

13           Q.    Okay.

14           A.    -- leaves ownership to someone else that may be

15   employed by that person, that these -- the signature will

16   take responsibility.

17           Q.    All right.  And who is it signed by?

18           A.    Anne Newton.

19           Q.    And it is printed there, right?

20           A.    Correct.

21           Q.    What's the date?

22           A.    August 21st, 2000.

23           Q.    And then it has the listed address that you've

24   already told us about?

25           A.    Correct.

38

1      Q.     How was it that this document came into your
2   possession?
3      A.     My company requires that for any purchase of
4   chemical unless the individuals placing the order is a
5   federal, state or educational entity.
6      Q.     Okay.  And that would have been faxed in
7   advance or sent by the mail prior to the order of sodium
8   azide?  I mean, either way you would have had to have this
9   before you would have considered even sending anything?
10     A.     Correct.
11     Q.     And at the very bottom it does have a -- it
12  says HTP something something Voigt Global dot com?
13     A.     Correct.
14     Q.     So is this something that was already in the
15  computer pre-printed for people to use?
16     A.     Correct.  They could simply perform a screen
17  print from my company's website.
18     Q.     What are the other documents that you indicated
19  that you had?  Was this -- what's that called?  What's that
20  name?
21     A.     A license from the city of Phoenix, finance
22  department.
23     Q.     And on the side of it, it says?
24     A.     To Allen.
25     Q.     Okay.  Is this the license that was sent to you

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

39

1    as part of this order?

2              A.    Correct.

3              Q.    Did it come at the same time as the indemnity

4    agreement or at another time?

5              A.    Within a close time frame of one another.

6              Q.    Okay.  And let's see.  Who is this from?

7              A.    Aztec Creations Winstar Enterprises.

8              Q.    What's the address?  Can you read it?

9              A.    2442 South 24th Street, Phoenix, Arizona,

10   85034-6802.

11             Q.    Does it have an expiration date?

12             A.    December 21st, 2000.

13             Q.    There is a number listed there on the bottom

14   there.  Whose number is that?

15             A.    That is Anne Newton's telephone number.

16             Q.    And you were the one that actually placed that

17   on there, right?

18             A.    Yes.  I wrote that telephone number.

19             Q.    Was it based on information that you received

20   from Anne Newton?

21             A.    Correct.

22             Q.    Going to show you now another part of what you

23   brought with you.  It says Voigt LLC.  What is that?

24             A.    Voigt Global Distribution LLC.  LLC stands for

25   Limited Liability Company.  That's the correct legal name of

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    my business.

2         Q.    Now, if we go over here to the left-hand side

3    what is that telling us?

4         A.    The salesperson, invoice number, invoice date,

5    the terms of sale, the date shipped, shipping method, tax

6    exemption, the OB price, prepaid or collect.

7         Q.    It says prepaid or collect then?

8         A.    Correct.

9         Q.    Has something next to it.  What does that say?

10        A.    Money order.

11        Q.    What does that indicate?

12        A.    Anne Newton, Aztec Creations placed this order

13   by paying in advance with a money order.

14        Q.    And then it also says something about out of

15   state.  What is that?

16        A.    My company does not charge sales tax out of the

17   state that my business is operating in at the time, which was

18   Kansas.

19        Q.    Okay.  And then we go down to the bottom. It

20   says something like sold to?

21        A.    Correct.

22        Q.    Go ahead tell us what the name was of the

23   person you sold it to?

24        A.    Anne Newton, 6962 East First Avenue, Number

25   102, Scottsdale, Arizona, 85251, USA, telephone number


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    602-826-1150.

2         Q.    Would that be the same number that appears on

3    the business license that you put on there?

4         A.    Correct.

5         Q.    And it also does have a company name and the

6    email address, right?

7         A.    Correct.

8         Q.    Now, on the right it tells you the -- it gives

9    you a total at the top, doesn't it?

10        A.    Correct.

11        Q.    And then we go down, you take that same total

12   and then it's exempt from sales tax I think it tells you,

13   right?

14        A.    Correct.

15        Q.    Shipping, handling, insurance -- how much was

16   that?

17        A.    65.25.

18        Q.    Then it talks about payments.  How much was

19   paid?

20        A.    180.

21        Q.    In what form?  Cash?  Check?  Money order?

22        A.    Money order.

23        Q.    What is this credit balance thing?

24        A.    Anne Newton paid an additional 9 dollars over

25   what was quoted to her.

1          Q.    Has anybody ever requested that 9 dollars be

2    given back to them?

3          A.    No.

4          Q.    Going to show you another one -- another email

5    that you provided, the lower portion of the first page that

6    says "Please send via overnight, thanks" -- it's something

7    about Sales and Voigt Global.  Are you familiar with that?

8          A.    Yes.

9          Q.    First of all, what does it say?  Who is it

10   to -- or it says sales on there.  Then what does it indicate?

11         A.    This chemical will explode when heated.  I then

12   give the chemical name, the CAS Registry Industry Number, and

13   price for a 500 gram unit.

14         Q.    And how much is the price for that?

15         A.    105.75.

16         Q.    Is that the same price that you listed here?

17         A.    Correct.

18         Q.    And then you also have a Hazmat surcharge.

19   What is that?

20         A.    Hazardous materials surcharges are imposed by

21   carriers any time they transport a chemical identified by the

22   United Nations Department of Transportation, FAA, as being

23   hazardous to transport.

24         Q.    Okay.  And then what appears to be the

25   continuation of it is -- what is that?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1        A.     I itemize the total charges.  Poison packaging

2    required by the Department of Transportation is an additional

3    13 dollars.  I had originally requested that the product be

4    shipped by ground, which was 8 dollars, for a total price of

5    141.75.

6        Q.     That price that you quote there, is that

7    different from the price that eventually ended up being paid?

8        A.     Correct.

9        Q.     And why is that?

10        A.     I don't recollect why other than the fact that

11    she wanted it faster --

12        Q.     Okay.

13        A.     -- then ground shipping.

14        Q.     And then it says here something.  What does it

15    say?

16        A.     "I really don't think that you're getting your

17    best return on the money invested with this product.  This

18    purity of sodium azide is used in research laboratories, ie.

19    highly pure analytical reagent.  It not a technical grade for

20    killing rodents."

21        Q.     What are you telling her with regard to this

22    research laboratory thing?  What are you saying there?

23        A.     Industrial applications such as what could be

24    used for as a pesticide.  For example, the acceptable levels

25    of impurities are higher than if someone was to order a

44

```
 1    chemical in a laboratory and they wish to use it as a

 2    reference standard.

 3           Q.    Okay.  And as part of this message, is there a

 4    message from Anne Newton to you?

 5           A.    Yes.

 6           Q.    And the date of that?

 7           A.    September 19th, 2000.

 8           Q.    What does it say?

 9           A.    "Allen, sorry for the delay.  We just got back

10    from Ireland for vacation.  It is a beautiful country.  I

11    sent over a fax yesterday.  Let me know if you need anything

12    else."

13           Q.    That fax that is spoken of, do you know what

14    that is?  Do you remember now or not?

15           A.    It would have been the contract disclaimer and

16    or the city of Phoenix license.

17           Q.    Okay.  Also -- you left off there.

18           A.    "Also, let me know the total price so I could

19    send you a check.  Thanks, Anne."

20           Q.    And then there's some other writing on the

21    bottom of this, right?

22           A.    Correct.

23           Q.    These were the some of the emails that you

24    actually had in your possession, right?

25           A.    Correct.
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          Q.    But are those all of the emails or could there

2     also be more?

3          A.    There could also be more.

4          Q.    Why don't you go ahead and take a seat.

5                Do you know somebody by the name of Wendi

6     Andriano?

7          A.    I do now.

8          Q.    Back then did you know anybody by the name of

9     Wendi Andriano?

10         A.    No.

11         Q.    Do you know somebody by the name of Anne Newton

12    other than by these documents that we're talking about here?

13         A.    No.

14         Q.    Right now I'm going to show you Exhibit Number

15    266.08 (sic).  Go ahead and take a look at it and -- know

16    what?  Because of the chemicals on it, let me give you some

17    gloves.

18                MR. PATTERSON:  Judge, can we approach?

19                THE COURT:  Yes.

20

21                (The following proceedings were held at the

22    bench:)

23

24                MR. PATTERSON:  I'd like you to explain to the jury

25    what chemical we're worried about touching.  I'm afraid there

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1     may be an inference drawn there's azide on it.

2            THE COURT:  I'll allow you to do that during your

3     questioning.

4            MR. MARTINEZ:  I'll do it in the form of a leading

5     question and he'll just answer yes.

6            MR. PATTERSON:  Right.  And if you could follow

7     there's no sodium azide on it.

8            MR. MARTINEZ:  Yes.

9            MR. PATTERSON:  Okay.

10           THE COURT:  Okay.

11           MR. PATTERSON:  Thanks, Judge.

12

13           (The following proceedings were held in open

14    court:)

15

16    BY MR. MARTINEZ:

17           Q.    Sir, before you open it with regard to the

18    chemicals on that particular exhibit, you know that those

19    chemicals are actually put on there by the Phoenix Police

20    Department to try to develop what are called latent

21    fingerprints, correct?

22           A.    Right.

23           Q.    And the sodium azide is not associated with

24    these -- not -- sorry.  There's no sodium azide on these

25    documents.  It's actually something that was put there by the

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000006094

1    Phoenix Police Department.  You know that, right?

2           A.    Correct.

3           Q.    Why don't you go ahead and open that.

4                 (Pause in proceedings.)

5    BY MR. MARTINEZ:

6           Q.    Let's take a look at the large sheets.

7           A.    What is that?

8           A.    The first page is a page from my company's

9    website advertising laboratory reference manuals.

10          Q.    Okay.  What else?

11          A.    An additional page of the same subject matter,

12   an additional page of the same subject matter, an additional

13   page of the same subject matter, partially completed copies

14   of my company's contract disclaimer and indemnity agreement

15   that's available for printing from my company's website.

16          Q.    When you say that they were partially

17   completed, specifically what are you talking about?

18          A.    Someone has partially completed a signature and

19   nothing else.

20          Q.    What is that signature on there?

21          A.    The letters "A" "N."

22          Q.    Okay.

23          A.    The second one has no writing other than my

24   company's business telephone number at the time.

25          Q.    Okay.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000006095

1          A.      The third one has a signature, a name, a date,

2    city, state, and country.

3          Q.      Okay.  And is that -- all the documents there

4    may be a random piece of paper there, but what is that to?

5          A.      It looks to be perhaps a portion of business

6    letterhead from Copperstate Glass and Mirror.

7          Q.      Have you ever had any business deals with

8    Copperstate Glass and Mirror?

9          A.      No.

10         Q.      I don't -- don't you -- go ahead and put

11   everything back.

12                 Is there -- from the back of one of those

13   sheets that is completed that you indicated was your

14   indemnity agreement.  First of all, on the front of it, what

15   does it have?

16         A.      Signature Anne Newton, name Anne Newton, date

17   July 31st of 2000, City of Phoenix, State, Arizona, Country,

18   USA.

19         Q.      But there is some writing on the back also,

20   correct?

21         A.      Correct.

22         Q.      Is there Voigt Global written on the back?

23         A.      Correct.

24         Q.      Any other indications of any contact with your

25   company on the back of that document?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

49

1    A.    My company's email at the time.

2    Q.    Anything else other than those two things?

3    A.    Not as it pertains directly to my company.

4    Q.    Okay.  Sir, as a result of any contact you may

5    have had from the Phoenix Police Department, did you then

6    obtain a copy of the money order that was used by Anne Newton

7    of Aztec Creations, also doing business as Winstar

8    Enterprises to purchase the sodium azide?  Did you cause --

9    did you go and get a copy of that money order?

10    A.    Correct.

11    Q.    I'm going to show you what has been marked for

12    identification as Exhibit 286.  Go ahead and take a look at

13    it.

14          (Pause in proceedings.)

15    THE WITNESS:  I recognize it.

16    BY MR. MARTINEZ:

17    Q.    And what is it?

18    A.    It is a copy of a money order used to purchase

19    the sodium azide, as well as another check from the

20    University of California that was deposited into my company's

21    checking account on the same day.

22    Q.    And this money order, who is it signed by?

23    A.    Anne Newton.

24    Q.    And that was the one that -- what is the amount?

25    A.    $180.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          Q.     If I may have that back.

2          MR. MARTINEZ:  Move for admission of Exhibit 286.

3               (Pause in proceedings.)

4          MR. PATTERSON:  Judge, there's a letter from this

5     gentleman clearly not part of the exhibit.  I would ask that

6     be taken out and -- I'm sorry.  Voir dire, Judge?

7          THE COURT:  Yes.

8          MR. PATTERSON:  Is this -- this is the envelope you

9     sent to the sheriff, so if we could just delete these two

10    items.  This is the actual exhibit that I think is germane.

11         THE COURT:  Is that agreeable, Mr. Martinez?

12         MR. MARTINEZ:  Yes, Your Honor.  If we could have it

13    marked as 286.001.

14         THE COURT:  You're moving to have 286 --

15         MR. PATTERSON:  Modified.

16         THE COURT:  -- modified?

17         MR. MARTINEZ:  I'm withdrawing the request to move in

18    286 and instead asking 286.001 be admitted.

19         THE COURT:  Exhibit Number 286.001 for identification

20    is admitted into evidence.

21    BY MR. MARTINEZ:

22         Q.     Let's go ahead and take a look at Exhibit 286.

23         THE COURT:  It's 286.001, correct?

24         MR. MARTINEZ:  That's correct.  I'm sorry.

25    / / / / /

```
 1    BY MR. MARTINEZ:

 2            Q.    What's the amount of that money order?

 3            A.    $180.

 4            Q.    And there's a signature on there?

 5            A.    Anne Newton.

 6            Q.    And who is it made out to?

 7            A.    Voigt.

 8            Q.    And you really can't tell any of the dates or

 9    anything on there, can you?  Or can you?

10            A.    September 25th, 2000.

11            Q.    Okay.  Sir, as a result of all of this

12    information you've seen and all of the documents we've

13    received, did you cause or set in motion the wheels to have

14    500 milligrams of sodium azide shipped to somebody?

15            A.    500 grams?

16            Q.    Sorry, 500 grams.

17            A.    Correct.

18            Q.    Okay.  And the person you ostensibly shipped it

19    to, what was his or her name?

20            A.    Anne Newton.

21            Q.    And were they part of a company who represented

22    themselves out as part of a company?

23            A.    Correct.

24            Q.    How much did you charge them?

25            A.    $180 --
```

52

1          Q.     And --

2          A.     -- was how much was remitted, but that wasn't

3    the original charge.

4          Q.     And as I understand it, you asked the middle

5    man to get involved who then had somebody by the name of

6    Alpha Aesar --

7          A.     Correct.

8          Q.     -- become involved.  As part of this, did you

9    ever receive any telephone calls from somebody named Anne

10   Newton?

11         A.     Correct.

12         Q.     Was this before or after the shipment had taken

13   place?

14         A.     After.

15         Q.     And what did Anne Newton want from you?

16         A.     The courier company and tracking number of the

17   shipment.

18         Q.     Did you give those to her?

19         A.     Yes.

20         Q.     Do you have a copy of it or is it just

21   something you gave to her back then?

22         A.     That is something I verbally gave her over the

23   phone.

24                MR. MARTINEZ:  I don't have any other questions.

25                THE COURT:  Mr. Patterson?


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

53

1          MR. PATTERSON:  I have no questions for this

2     gentleman.  Thank you.

3          THE COURT:  Any questions from the jury for this

4     witness?

5                    (Pause in proceedings.)

6                    (The following proceedings were held at the

7     bench:)

8

9          THE COURT:  Question, "When the rush was put on the

10    product, didn't that send up a red flag in your mind?  If so,

11    did you do anymore investigating sending the product to this

12    address, paren, given to you, end of paren."

13         MR. MARTINEZ:  I think that's irrelevant, but if

14    they want to ask it, that's fine.

15         THE COURT:  Mr. Patterson?

16         MR. PATTERSON:  I don't think it's relevant, Judge.

17         THE COURT:  I'm not going to ask it.

18              Next question, "Does your company check to see

19    what the product is being used for?"

20              Mr. Martinez?

21         MR. MARTINEZ:  He can -- I mean, he could answer

22    that.  It's not relevant.

23         MR. PATTERSON:  It's -- in the email, they're talking

24    about rodent control.  I think that's cumulative.  It's

25    already been discussed with this gentleman through the course

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000006101

```
 1   of the emails, so I don't think we need --
 2              MR. MARTINEZ:  But does he check?  I mean, I would
 3   think --
 4              MR. PATTERSON:  Did he verify elements in the email?
 5   That's fine.
 6              THE COURT:  So how do you want it asked?
 7              MR. PATTERSON:  Well, if the question is did he
 8   verify the elements claimed in the email correspondence it
 9   was going to be used as rodent control, that's fine.  You
10   could ask him that.  But I just don't know why it's relevant.
11              THE COURT:  I'm not going to ask it.  I don't think
12   it's relevant.
13                   Next question, "How is it that you, a small
14   company, be able to come in contact with toxic materials?"
15              MR. MARTINEZ:  I don't see how that's relevant.
16              MR. PATTERSON:  I don't see where she's going with
17   these things.
18              THE COURT:  Okay.  I'm not going to ask any questions.
19
20                   (The following proceedings were held in open
21   court:)
22
23              THE COURT:  Any further question?  Remember, I apply
24   the same legal standards to your questions as I do to the
25   attorneys questions, so if your question is not asked, don't
```

```
 1    be offended.

 2                    Any other questions of this witness by the

 3    jury?

 4                  (No response.)

 5            THE COURT:  No one has raised their hand.

 6                  May the witness be excused?

 7            MR. MARTINEZ:  Yes, sir.

 8            MR. PATTERSON:  No objection, Judge.

 9            THE COURT:  Thank you very much.  You're excused.

10                  Mr. Martinez, the State may call its next

11    witness.

12            MR. MARTINEZ:  State calls Kathy Flannes.

13                  (Pause in proceedings.)

14            THE COURT:  Please step forward right up here.  Give

15    the clerk your name.

16            THE WITNESS:  Sorry.

17            THE COURT:  Right over here.

18            THE WITNESS:  Sorry.

19

20                    KATHY FLANNES,

21          CALLED TO TESTIFY ON BEHALF OF THE STATE,

22        HAVING FIRST BEEN DULY SWORN, TESTIFIES AS FOLLOWS:

23

24            THE COURT:  Please have a seat on the witness stand

25    there.  Please make yourself comfortable there on the witness
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

```
 1    stand.  Please pull the microphone close to you.  Please
 2    remember to speak loudly and clearly into the microphone so
 3    everyone can hear you.  Also please wait until the question
 4    is completed before you answer the question, and please make
 5    sure that you give a verbal response.  Is that agreeable to
 6    you?
 7              THE WITNESS:  Yes.
 8              THE COURT:  Mr. Martinez, you may proceed.
 9
10    DIRECT EXAMINATION BY MR. MARTINEZ:
11         Q.   May I have your name?
12         A.   Kathy Flannes.
13         Q.   Who do you work for?
14         A.   USA dot net incorporated.
15         Q.   Where -- what down do you work in?
16         A.   Colorado Springs.
17         Q.   And what do you do for USA dot net?
18         A.   I'm custodian of records.
19         Q.   As custodian of records, are these records kept
20    of people who open accounts with you?
21         A.   Yes.
22         Q.   And the information on the opening of the
23    accounts, is that created at the time the person is providing
24    the information?
25         A.   Yes.
```

1          Q..    How is that done in this case if a person

2     wants -- back in, let's say, July of year 2000, how was that

3     done?

4          A.  .  In July of 2000 the service was a free service.

5     Persons would come to out website, create an email address.

6     If that address was available, they could then proceed with a

7     subscription process.

8          Q.    And as the person is creating that email

9     address, is another portion of your company or another

10    computer keeping track or keeping a record of what is going

11    on by the person who is seeking to create a new email address?

12         A.    Yes.

13         Q.    You're the person in charge of that, correct?

14         A.    Correct.

15         Q.    I'm going to show you what has been marked for

16    identification as Exhibit 281.  Take a look at it, please.

17                   (Pause in proceedings.)

18    BY MR. MARTINEZ:

19         Q.    What is it?

20         A.    This is subscriber information for the email

21    address created "azcreat@usa.net."

22         Q.    Who is the person that actually was requesting

23    to do that?

24         A.    It was listed as Anne Newton.

25         Q.    And the date that letter address was sought to

58

```
 1    be created?

 2              A.    July 26th, 2000.

 3              Q.    If I may have that back, please.

 4                    There is also another document in there, right?

 5                    (Pause in proceedings.)

 6          THE WITNESS:  Yes.

 7    BY MR. MARTINEZ:

 8              Q.    Is there -- this a letter?

 9              A.    Yes.

10              Q.    Did you author the letter or did someone else?

11              A.    Someone else.

12              Q.    Okay.  If I may have that back.

13          MR. MARTINEZ:  Judge, I'm going to cause one of the

14    documents to be marked 281.001, and I'm showing that document

15    to Mr. Patterson.  I'm going to move that into evidence.

16                    (Pause in proceedings.)

17          MR. PATTERSON:  Your Honor, I have no objection to

18    281.001 being admitted into evidence.

19          THE COURT:  Exhibit 281.001 for identification is

20    admitted into evidence.

21    BY MR. MARTINEZ:

22              Q.    Let's go ahead and just take a look at it

23    briefly.  Okay.  Can you see the TV from there?

24              A.    Yes.

25              Q.    Okay.  What is that at the top?
```

59

1    A.    "azcreat@usa.net."

2    Q.    Okay.  And then --

3    A.    That is the email address created.

4    Q.    There is an account number there, right?

5    A.    Yes.  That's assigned by "usa.net".

6    Q.    Then it says "Status Okay."  What does that

7  mean?

8    A.    That's means it's an active account.  It hasn't

9  been cancelled.

10    Q.    And that was as of what date?

11    A.    February 14th, 2001.

12    Q.    And number of filters, what is that?

13    A.    Filters would be forwarding filters to send

14  mail on or junk mail filters.

15    Q.    Destination says Inbox.  What does that mean?

16    A.    That means mail received automatically is

17  delivered to the Inbox instead of a different folder.

18    Q.    Time zone, it says MM.  What is MM?

19    A.    That's just the time zone.  MM is a designation

20  for a table in our data base.

21    Q.    Then it says America Denver?

22    A.    That would be the time zone collected by the

23  subscriber.

24    Q.    So in other words, if I live in California,

25  could I request to have a New York time zone?

60

1         A.    Yes, you could.

2         Q.    And in this particular case Ms. Newton

3    requested a Denver time zone?

4         A.    Correct.

5         Q.    Do you know what the time zone -- what it's

6    called here in -- if she had requested one for Arizona, would

7    it say Arizona on there or would it say something else?

8         A.    It would typically be a city.   Probably

9    Phoenix.

10        Q.    Okay.   Then it does have another account number

11   up there, correct?

12        A.    Correct.

13        Q.    And that's the same one as --

14        A.    It's the same.

15        Q.    And it talks about the email address, correct?

16        A.    Yes.

17        Q.    Gives you the name of the person?

18        A.    That was the name provided by that subscriber.

19        Q.    And what name is that?

20        A.    Anne Newton.

21        Q.    The address?

22        A.    1722 east 16th.

23        Q.    Phoenix?

24        A.    Phoenix, Arizona, United States, 85044.

25        Q.    And just so that we're clear, that does say

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1      "E."  That is a small "E," right?

2              A.      That is an "E," yes.

3              Q.      At the bottom of this sheet it says "subscriber

4      information was not verified."  What does that mean?

5              A.      It was a free email service.  You can say any

6      name you wish.  We did not verify that information and there

7      were no billing orders associated with the name.

8              Q.      That's what it says.  There are no billing

9      records associated with that account?

10             A.      Correct.

11             Q.      Why is that?

12             A.      Because it was free.

13             Q.      Okay.  Let's take -- go ahead and take a look

14     at Exhibit Number 233.  Do you recognize what's there?

15             A.      Yes.

16             Q.      What is it?

17             A.      This is a subscriber record with a different

18     email address, "wendi.bbw@usa.net."

19             Q.      And when was that opened?

20             A.      June 27, 2000.

21             Q.      Okay.  If I may have that.  And, again, all the

22     prerequisite questions that I asked you with regard to the

23     other thing, do they apply to this?

24             A.      Yes, they do.

25             Q.      Go ahead and take a look at it.  It does appear

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1      to be two documents in there, correct?

2            A.     Correct.

3            Q.     And is one of them a letter?

4            A.     One is.

5            Q.     Did you write that letter or not?

6            A.     I did not.

7            MR. MARTINEZ:  Judge, I'm going to move for admission

8      of Exhibit Number 233.001.

9                  (Pause in proceedings.)

10           MR. PATTERSON:  No objection, Judge.

11           THE COURT:  Exhibit Number 233.001 is admitted into

12     evidence.

13     BY MR. MARTINEZ:

14           Q.     Let's go ahead and take a look at this.  It

15     gives us the email address at the top, right?

16           A.     Yes.

17           Q.     What is that?

18           A.     "wendi.bbw@usa.net."

19           Q.     Was that an active account as of February 23rd,

20     2001?

21           A.     Yes, it was.

22           Q.     If we go to the same thing, again, it does talk

23     about the number of filters.  How many are there?

24           A.     Zero.

25           Q.     And the destination, what does it refer to?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          A.     Inbox.

2          Q.     And the time zone that is signed up, what time

3    zone is that?

4          A.     That would be America, Denver.

5          Q.     Is that the same as the previous exhibit we

6    discussed which is 281.001?

7          A.     Yes.

8          Q.     And the signup date is what?

9          A.     June 27th, 2000.

10         Q.     Would that be -- well, let's just look at it.

11   And the other one was what date again?

12         A.     July 26, 2000.

13         Q.     And let's go down to the address.  And what's

14   the address there?

15         A.     2155 E. Liberty Lane, Phoenix, Arizona.

16         Q.     And, again, is there -- I think you previously

17   indicated you took it to be an "east," correct?

18         A.     I assumed "east," yes.

19         Q.     You look at the other one, that's the same

20   thing, little "E" there?

21         A.     Correct.

22         Q.     Were there billing records for this account?

23         A.     No.  It was also a free account.

24         Q.     And was the identity of the person or the

25   subscriber verified as to this account?


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000006111

1       A.    No.

2       MR. MARTINEZ:  I don't have any other questions.

3       THE COURT:  Mr. Patterson?

4       MR. PATTERSON:  I just have a few questions, Judge.

5

6    CROSS-EXAMINATION BY MR. PATTERSON:

7       Q.    These accounts are created, there's a field on

8    an internet kind of web page, right?

9       A.    Correct.

10      Q.    Okay.  And there's an opportunity to plug in

11   certain information within the fields, right?

12      A.    Yes, sir.

13      Q.    Okay.  This America, Denver thing, are you

14   certain that doesn't have something to do with the fact

15   Arizona may not go on daylight savings time and has something

16   to do with that timing thing?

17      A.    No, sir.  Every time zone in the world is

18   available.

19      Q.    Okay.

20      A.    It's a drop down menu.  You select which one

21   you want and it plugs it in.

22      Q.    Is there a default drop down or default entry

23   if you don't select something on a drop down?

24      A.    I don't know.

25      Q.    So there may be an internal mechanism within

1    your system.  If a subscriber doesn't fill-in a particular

2    blank, you fill it in for them?

3              A.    I don't know.

4              Q.    Okay.  That exists as a possibility though?

5              A.    Could be.

6         MR. PATTERSON:  Judge, that's all I have.  Thank you.

7         THE COURT:  Any further -- sorry.  Redirect?

8         MR. MARTINEZ:  No.  None.  Thank you.

9         THE COURT:  Are there any further questions of this

10   witness by the jury?  If so, please raise your hand.

11              (No response.)

12        THE COURT:  No one has raised their hand.

13              May this witness be excused?

14        MR. MARTINEZ:  Yes, sir.

15        MR. PATTERSON:  No objection.

16        THE COURT:  Thank you very much.  You're excused.

17              Mr. Martinez, the State may call its next

18   witness.

19        MR. MARTINEZ:  State calls John DeYoung.

20              (Pause in proceedings.)

21        MR. MARTINEZ:  Judge, the State would call Pete Hodge

22   first.

23              (Pause in proceedings.)

24        THE COURT:  Sir, please step up here give the clerk

25   your name and she'll swear you in.


              TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

66

1    / / / / /

2    / / / / /

3                              PETE HODGE,

4              CALLED TO TESTIFY ON BEHALF OF THE STATE,

5         HAVING FIRST BEEN DULY SWORN, TESTIFIES AS FOLLOWS:

6

7              THE COURT:  Please have a seat on the witness stand

8    here.

9              THE WITNESS:  Uh-huh.

10             THE COURT:  Please make yourself comfortable there.

11   Please pull the microphone close to you.  Please remember to

12   speak loudly and clearly into the microphone so everyone can

13   hear you.  Also please wait until the question is completed

14   before you answer the question, and please make sure you give

15   a verbal response.  Is that all agreeable to you, sir?

16             THE WITNESS:  That's fine.

17             THE COURT:  Mr. Martinez, you may proceed.

18

19   DIRECT EXAMINATION BY MR. MARTINEZ:

20        Q.     Your name please?

21        A.     Pete Hodge.

22        Q.     Who do you work for?

23        A.     Currently I work for Safeway Company.

24        Q.     Drawing your attention back to the summer of

25   the year 2000, who did you work for then?


               TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

                             000006114

1 A. ABCO Desert Market.

2 Q. There -- are they still in business, sir?

3 A. No, they're not.

4 Q. What were your duties with regard to ABCO back

5 then?

6 A. Sorry?

7 Q. Go ahead.

8 A. I was manager of operational accounting.

9 Q. What does that mean, you were manager of

10 operational accounting?

11 A. I handled most of the accounting that went

12 through anything to do with our retail facilities as well as

13 payroll.

14 Q. Did you have occasion or did that include

15 handling items such as money orders and reconciling the

16 ledgers?

17 A. Yes, it did.

18 Q. I'm going to show you what has been marked for

19 identification as Exhibit Number 287 to see if you recognize

20 it.

21 A. Yes, I do.

22 Q. What is it?

23 A. It is a money order.

24 Q. And is that a money order that you occasion to

25 come in contact with or cause anything to be done with?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

68

| | | |
|---|---|---|
| 1 | A. | Yes, it is. |
| 2 | Q. | What is that -- when did you come in contact |

3 with it?

| | | |
|---|---|---|
| 4 | A. | I was requested to obtain a copy of it. |
| 5 | Q. | And was that toward the fall of the year 2000? |
| 6 | A. | Yes, it was. |
| 7 | Q. | And how it that you went about obtaining this |

8 money order?

| | | |
|---|---|---|
| 9 | A. | I contacted the vendor who we go through. |
| 10 | Q. | Who is the vendor? |
| 11 | A. | At that time it was Western Union. |
| 12 | Q. | So you went through Western Union?   Okay. |
| 13 | A. | And requested a copy of the money order that |

14 was asked of me.

| | | |
|---|---|---|
| 15 | Q. | Did you get a copy of the money order and |

16 return -- in response to the request or did you actually get

17 the original?

| | | |
|---|---|---|
| 18 | A. | I got the original. |
| 19 | Q. | And that's the money order that you obtained? |
| 20 | A. | Yes, it is. |
| 21 | Q. | And who is it signed by, if you could tell, if |

22 you could read it?

| | | |
|---|---|---|
| 23 | A. | Well, there's three signatures on it. |
| 24 | Q. | The one that's in ink. |
| 25 | A. | I am having a difficult time reading it.   It |

1    looks something like Nestore or --

2         Q.    Okay.

3         A.    I can't read it.

4         Q.    How about who is it made out to?

5         A.    Looks like V-o-i-g-t.

6         Q.    Okay.  If I may have that back.

7               Through this paper that it has on there, are

8    you able to make out a date?

9         A.    Well, I know what the date is if I could see it

10   again.

11        Q.    Okay.

12              (Pause in proceedings.)

13   BY MR. MARTINEZ:

14        Q.    Do you want me to --

15        A.    No.  It says 9/25/00.

16        Q.    So that's September 25, 2000?

17        A.    Correct.

18        MR. MARTINEZ:  Move for admission of Exhibit Number

19   287.

20        MR. PATTERSON:  No objection, Judge.

21        THE COURT:  Exhibit Number 287 for identification is

22   admitted into evidence.

23   BY MR. MARTINEZ:

24        Q.    Let's go ahead and take a look at it.

25              Over here to the left, and that's -- the one


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

```
 1    that you indicated perhaps went to Voigt, correct or

 2    V-o-i-g-t.

 3             THE WITNESS:   I --

 4             THE COURT:   You could step down if you'd like.

 5             THE WITNESS:   Yes.   That's what I saw.

 6    BY MR. MARTINEZ:

 7        Q.    Now, if you go to the middle of it, why don't

 8    you just step down and -- go ahead.   I'm going to zoom in a

 9    little bit more.

10        A.    Okay.

11        Q.    And what is -- what is this say right here?

12    Can you read it?

13        A.    Yes.   That's the agent number, which would have

14    been like the account number for that retail location that

15    was assigned to issuing this money order.

16        Q.    Do you know which retail location that came

17    from?

18        A.    In this case it would have been our store,

19    number 435.

20        Q.    That was an ABCO store?

21        A.    Yes, it was.

22        Q.    Where is that or where was that store located?

23        A.    I -- I don't know the address, I believe it was

24    around Chandler Boulevard and 12th Street, somewhere in that

25    neighborhood.
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          Q.     All right.  And then it has here, time.  What

2     is that?

3          A.     I -- I can't really read it real clearly, but

4     it would have been the time it would have been purchased.

5          Q.     Okay.  There's like an "02" there and a "54"

6     there.  Can you see that?

7          A.     It's very -- I mean, if what I see -- looks

8     like 145402.  Might have been probably 254 if the -- yeah.

9          Q.     Okay.  And then there's a date up here?

10         A.     Uh-huh.

11         Q.     Is that "yes"?

12         A.     Yes.

13         Q.     And what's the date that you see?

14         A.     September 25th, 2000.

15         Q.     And the amount?

16         A.     180.

17         Q.     Okay.  What does it say there?

18         A.     For the deposit part?

19         Q.     Yeah.  Just read that.

20         A.     For deposit only, Voigt Global Distribution

21     Account 995883-09.

22         Q.     And then it gives -- do you know what this

23     credit union thing would be down there?

24         A.     That, I don't know.  I would guess that would

25     probably be the place where whoever accepted the gift

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    certificate deposited it in their account.

2              Q.    What was the date listed there?

3              A.    September 28, 2000.

4         MR. MARTINEZ:   I don't have any other questions.

5         MR. PATTERSON:   May I have a moment, Judge?

6         THE COURT:   Yes.

7              (Pause in proceedings.)

8         MR. PATTERSON:   Just a few questions Mr. Hodge.

9

10   CROSS-EXAMINATION BY MR. PATTERSON:

11             Q.    You didn't deal with the -- the selling end of

12   this product, right?

13             A.    That's correct.

14             Q.    Okay.  Do you have a knowledge of in general

15   how these products are created and sold in the ABCO stores?

16             A.    Yes, I do.

17             Q.    Okay.  Could you tell me if I wanted to buy a

18   money order at an ABCO market that you used to work at, how

19   would I go about doing that?

20             A.    You would basically go up to the customer

21   service desk and request to buy a money order.

22             Q.    Okay.

23             A.    And you would give the person the amount that

24   you wanted.  They would also include a service fee, whatever

25   that would happen to be.


                TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

                          000006120

1        Q.     Okay.

2        A.     And they actually did it, they were on line

3    when the money was supplied by the money order manufacturer

4    and they would put in the amount that the money order was for

5    and basically run it through and the machine would print it

6    out.

7        Q.     Okay.  Do you have to give your ID to purchase

8    a money order?

9        A.     I don't believe you'd have to, no.

10       Q.     Okay.  There isn't any record made of who

11   actually purchased the money order, right?

12       A.     Not to my knowledge.

13       Q.     Okay.

14   MR. PATTERSON:  Thank you, Judge.  That's all I have.

15   THE COURT:  Redirect?

16   MR. MARTINEZ:  I don't have any other questions.

17   THE COURT:  Are there any further questions of this

18   witness by the jury?  If so, please raise your hand.

19           (No response.)

20   THE COURT:  No one has raised their hand.

21           May this witness be excused?

22   MR. MARTINEZ:  Yes, sir.

23   MR. PATTERSON:  No objection.

24   THE COURT:  Thank you very much.  You're excused.

25           State may call its next witness.

1          MR. MARTINEZ:  State calls John DeYoung.

2                    (Pause in proceedings.)

3          THE COURT:  Sir, if you could please step forward

4     right up here.  Right up here.  Please give the clerk your

5     name and she'll swear you in.

6

7                         JOHN DEYOUNG,

8          CALLED TO TESTIFY ON BEHALF OF THE STATE,

9     HAVING FIRST BEEN DULY SWORN, TESTIFIES AS FOLLOWS:

10

11         THE COURT:  Please have a seat on the witness stand.

12    Please make yourself comfortable there on the witness stand.

13    Please pull the microphone close to you.  Please remember to

14    speak loudly and clearly into the microphone so everyone can

15    hear you.  Also please wait until the question is completed

16    before you answer the question, and please make sure you give

17    a verbal response.  Is that all agreeable to you?

18         THE WITNESS:  Yes, sir.

19         THE COURT:  Mr. Martinez, you may proceed.

20

21    DIRECT EXAMINATION BY MR. MARTINEZ:

22         Q.    May I have your name, sir?

23         A.    John DeYoung.

24         Q.    Who do you work for?

25         A.    City of Phoenix Police Department.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1       Q.      What do you do for them?

2       A.      I'm a patrol officer.

3       Q.      Drawing your attention back to October 10th of

4   the year 2000, did you have -- sometime around 3:30 in the

5   afternoon, did you have occasion to be on duty?

6       A.      Yes, I did.

7       Q.      And where were you on duty?

8       A.      In the area of Ahwatukee, which on that

9   particular time, 2155 East Liberty Lane.

10      Q.      What's the name -- does that location have a

11  name?

12      A.      It's an apartment complex.  I don't remember

13  the name.

14      Q.      Would it be the San Riva apartment complex?

15      A.      That's correct.

16      Q.      Okay.  And while you were there did you have

17  occasion to speak to an individual from the San Riva

18  apartment complex?

19      A.      Yes, I did.

20      Q.      Do you remember his name?

21      A.      Ortega.

22      Q.      And as a result of that conversation or that

23  contact with Mr. Ortega, did you receive something?

24      A.      Yes.  He gave me a packet.

25      Q.      What was that packet in?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1        A.     A manila folder.

2        Q.     I'm going to show you what is marked for

3   Exhibit Identification as 266.001.  Does that look like it?

4        A.     That is it.

5        Q.     About what time did this happen?

6        A.     Sometime in the afternoon.

7        Q.     Would it be around 4-ish?

8        A.     That sounds right.

9        Q.     And what did you do once you received it from

10  Mr. Ortega?  What did you do with the envelope?

11       A.     I placed the envelope into my patrol car and

12  then we drove to Apartment 132 where I was advised to stand

13  by for detectives to arrive.

14       Q.     When the detectives arrived, were they male or

15  female?

16       A.     Female.

17       Q.     Do you remember their names?

18       A.     Not their last name, sir, no.

19       Q.     What are their first names?

20       A.     Well, I spoke with Kathy.

21       Q.     Okay.  And did you tell Kathy anything and did

22  you give Kathy anything.

23       A.     Yes.  I just explained to Kathy what was given

24  to me.  I gave her the manilla packet and stood by while they

25  processed the area.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000006124

1          MR. MARTINEZ:  I don't have any other questions.

2          MR. PATTERSON:  No questions, Judge.  Thank you.

3          THE COURT:  Any further question of was witness by

4     the jury?

5               (No response.)

6          THE COURT:  No one has raised their hand.

7               May the witness be excused?

8          MR. MARTINEZ:  Yes, sir.

9          MR. PATTERSON:  No objection.

10         THE COURT:  Thank you very much.  You're excused.

11              State may call its next witness.

12         MR. MARTINEZ:  State calls Deanna Menchaca.

13              (Pause in proceedings.)

14         THE COURT:  Please step forward right up here.  Right

15    up here.  Please give the clerk your name.  She'll swear you

16    in.

17

18                    DEANNA MENCHACA,

19          CALLED TO TESTIFY ON BEHALF OF THE STATE,

20     HAVING FIRST BEEN DULY SWORN, TESTIFIES AS FOLLOWS:

21

22         THE COURT:  Please have a seat on the witness stand.

23    Please make yourself comfortable there on the witness stand.

24    Please pull the microphone close to you.  Please remember to

25    speak loudly and clearly into the microphone so everyone can

1    hear you.  Also please wait until the question is completed

2    before you answer the question.   Please make sure you give a

3    verbal response.   Is that agreeable to you?

4            THE WITNESS:  Yes.

5            THE COURT:  Mr. Martinez, you may proceed.

6

7    DIRECT EXAMINATION BY MR. MARTINEZ:

8            Q.    Your name, please?

9            A.    Deanna Kay Menchaca.

10           Q.    Who do you work for?

11           A.    Airborne express DHO.

12           Q.    How long have you worked there?

13           A.    14 and a half years.

14           Q.    Drawing your attention back to October 5 of

15   year 2000, were you employed by that same outfit?

16           A.    Yes.

17           Q.    And what were your duties back then?

18           A.    I -- the same as now.   I'm field service

19   operations agent.

20           Q.    Do you -- are you also sort of the custodian of

21   records for Airborne Express?

22           A.    Yes.

23           Q.    And as a custodian of records what do you do?

24           A.    As far as the records go, we have to keep them

25   on file three years.


                TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          Q.     And are -- the records we're talking about, are

2     they made with information from the customer as they go

3     through the will call, sort of, if you will, line there?

4          A.     Yes, correct.

5          Q.     Okay.  And the customer provides information,

6     the item is filled out, then you guys keep the records?

7          A.     Correct.

8          Q.     And you're the person that's in charge of that?

9          A.     Yes.

10          Q.     I'm going to show you Exhibit 314.  Please take

11     a look at it.

12                (Pause in proceedings.)

13     BY MR. MARTINEZ:

14          Q.     Do you recognize it?

15          A.     Yes.

16          Q.     Is this something or a document that you

17     provided or caused to be generated so that you could provide

18     it to the police.

19          A.     Yes.

20          Q.     And what is it?

21          A.     It's just -- it's called a manifest.  Any time

22     a driver makes a delivery or somebody comes in the office to

23     sign for a package, there's a signature on file.

24          Q.     And this one, is it somebody came to the office

25     or is it somebody --

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000006127

1          A.     This is one coming to the office.

2          Q.     And somebody picked it up?

3          A.     Correct.

4          Q.     What is the address where your business used to

5     be where people used to pick it up?

6          A.     1450 East Buckeye in Phoenix.

7          Q.     And the date on this is October 5th, right?

8          A.     Correct.

9          MR. MARTINEZ:  Move for the admission of Exhibit

10    314.

11               (Pause in proceedings.)

12          MR. PATTERSON:  I have no objection, Judge.

13          THE COURT:  Exhibit Number 314 for identification is

14    admitted into evidence.

15    BY MR. MARTINEZ:

16          Q.     Let's go ahead and take a look at it.

17                 The city, what is that?

18          A.     PHX.  That's a station code.

19          Q.     And it says route something?

20          A.     That's "hold it airborne."

21          Q.     What does that mean?

22          A.     It's packages that we hold at the station that

23    either a customer requires to pick up or it's ready to be

24    picked up.

25          Q.     What if you go to deliver to an address that's

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000006128

1    not there?

2              A.    If a driver goes to a delivery that's not

3    there, it's vacant, then it automatically comes back to the

4    office and we try to call the receiver or call the shipper to

5    get a better address.

6              Q.    What if you get a number for the person that

7    it's addressed to and you contact them, would that -- say

8    they'll come pick it up.  Does that fall under this category?

9              A.    Right.  The package would stay at the station

10   and they would pick it up.

11             Q.    It asks for driver's name?

12             A.    Well, that's Airborne because it's our station.

13             Q.    And the date?

14             A.    Uh-huh.

15             Q.    What's the date?

16             A.    10/5/2000.

17             Q.    And what's this manifest number?

18             A.    Every we have a scanner and every time we scan

19   shipments it creates a manifest for those shipments.

20             Q.    Okay.  I want to go down to this one right

21   here.  First of all, can you see the time on there?

22             A.    Yeah.  It's 14:34.

23             Q.    What time is that?

24             A.    2:34.

25             Q.    And that would be on October 5th?


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          A.    Correct.

2          Q.    And there's a person who signed for it.  Can

3     you see who it was?

4          A.    Anne Newton.

5          Q.    Underneath the printed area it does say "UNK."

6     Can you -- first of all, explain to me how the information on

7     the right in the sequencing of things when that comes into

8     play?

9          A.    Yeah.  When we get packages in every morning,

10    there'll be held airborne packages, get out the manifest and

11    we notify the customers to tell them their shipment is

12    available for pick up.

13         A.    And if it has the UNK, that means that there

14    was no phone number on the package and there was no way for

15    us to contact that person.

16         Q.    You indicated previously that in some

17    situations you then called the shipper.  Is that what you

18    said?

19         A.    Correct.  If we couldn't get an address.

20         Q.    So in this case does -- there is no telephone

21    number that you had, but would you have then normally called

22    the shipper to try obtain a number, telephone number?

23         A.    Yeah.  The next procedure would be to call the

24    shipper, try to get more information.  If they don't have it,

25    they would tell us to return it and we would return it.  In

1    this case --

2         Q.    Since it wasn't returned, were you provided

3    information then?

4         A.    Yeah.  Obviously, they called possibly and said

5    we want to pick it up.  That's normally what happens.

6         Q.    What is the procedure when somebody wants to

7    pick it up?  Back then did they have to show a driver's

8    license?

9         A.    Yeah.  We ask for an ID and we didn't make

10   copies of a license or anything, we just had to see the ID,

11   proper identification, and they would sign for it.

12        Q.    What if they didn't have a driver's license?

13   Would there be any circumstances where the package would just

14   be turned over to somebody if they could provide some other

15   identifying information?

16        A.    Yeah.  Back then, if it was -- if they didn't

17   have ID, a lot of times what we'll do is bring in the air

18   bill under an attempted notice tag that our driver would

19   normally leave.  Or if the customer already had an air bill

20   number, more than likely they knew the shipment number, so it

21   was obviously their package.

22        Q.    So in other words, if a person came in

23   with 6802739090, would Airborne Express then turn the

24   package over even though they didn't provide other

25   identification?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000006131

1          A.      Back then, yes.

2          Q.      And, again, that's all we're talking about.

3          A.      Right.

4          Q.      So if a person came in and said my package

5    number, you called me, is 6802739090, they walked in, I don't

6    have a driver's license, would the package be turned over?

7          A.      Yes.

8          MR. MARTINEZ:  I don't have any other questions.

9          THE COURT:  Mr. Patterson?

10         MR. PATTERSON:  I have none, Judge.  Thank you.

11         THE COURT:  Any further questions of this witness by

12   the jury?  If so, please raise your hand.

13              (Pause in proceedings.)

14         THE COURT:  May I see Counsel here at the bench?

15

16              (The following proceedings were held at the

17   bench:)

18

19         THE COURT:  Question, "Do you know if this package

20   was a Hazmat shipment?  And, if so, would Hazmat require

21   proving person, ID?"

22         MR. PATTERSON:  Fair question.

23         MR. MARTINEZ:  No objection.

24         THE COURT:     Okay.

25

1              (The following proceedings were held in open

2       court:)

3

4              THE COURT:  I have a question here for you.  That

5       question reads as follows:  Do you know if this package was a

6       Hazmat shipment?  If so, would Hazmat require proving person,

7       ID?"

8              THE WITNESS:  Back then, no, and it wasn't noted on

9       the manifest that it was and -- so no.

10              THE COURT:  Any further questions of this witness by

11       the jury?

12              (Pause in proceedings.)

13              THE COURT:  No one has raised their hand.

14              Any follow-up questions to that specific

15       question by Mr. Martinez on behalf of the State?

16              MR. MARTINEZ:  No.  Thank you.

17              MR. PATTERSON:  No, Your Honor.  Thank you.

18              THE COURT:  May the witness be excused?

19              MR. MARTINEZ:  Yes, sir.

20              MR. PATTERSON:  No objection.

21              THE COURT:  Thank you very much.  You're excused.

22              Mr. Martinez, the State may call its next

23       witness.

24              MR. MARTINEZ:  Judge, let me see if the one that is

25       next is out there.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

```
 1                    (Pause in proceedings.)

 2          MR. MARTINEZ:  State calls Raymond Ortega.

 3          THE COURT:  Sir, please come up here to the clerk.

 4    Give her your name and she'll swear you in.

 5

 6                       RAYMOND ORTEGA,

 7           CALLED TO TESTIFY ON BEHALF OF THE STATE,

 8       HAVING FIRST BEEN DULY SWORN, TESTIFIES AS FOLLOWS:

 9

10          THE COURT:  Sir, if you could please have a seat on

11    the witness stand there.  Please make yourself comfortable

12    there. Please pull the microphone close to you.  Please

13    remember to speak loudly and clearly in the microphone so

14    everyone can hear you.  Also please wait until the question

15    is completed before you answer the question, and please make

16    sure that you give a verbal response.  Is that all agreeable

17    to you, sir?

18          THE WITNESS:  Yes.

19          THE COURT:  And, Mr. Martinez, you may proceed.

20

21    DIRECT EXAMINATION BY MR. MARTINEZ:

22          Q.    Your name, sir?

23          A.    Raymond Ortega.

24          Q.    Where are you currently employed?

25          A.    I am self-employed right now.
```

1       Q.      What do you do for a living?

2       A.      I have a small air-conditioning, plumbing and

3  electrical business.

4       Q.      Drawing your attention back to summer of 2000,

5  where were you employed?

6       A.      I was employed for Fairfield Properties.

7       Q.      What did you do for them back then?

8       A.      I was regional maintenance director and

9  trainer.

10      Q.      Did you have somebody by the name of Jerry

11  Sentelle that worked for you?

12      A.      Yes.

13      Q.      When you indicated you worked for Fairfield and

14  that you were a regional trainer, did one of your areas or

15  did one of the properties include the San Riva apartment

16  complex?

17      A.      Yes.

18      Q.      How long did you work for Fairfield?

19      A.      Eight years.

20      Q.      From -- when did you start?

21      A.      I want to say it was '93.

22      Q.      You remember that there was a killing that

23  occurred in October of 2000 out at Fairfield, correct?

24      A.      Yes.

25      Q.      And -- and it occurred on a Sunday.  Do you

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000006135

1    remember?

2             A.     Yes.

3             Q.     The following Monday, did you have occasion to

4    be in Wendi Andriano's office along with other people?

5             A.     Yes.

6             Q.     Who were you in that office with?

7             A.     Janice Linn and some of the other employees

8    that were regular employees that were there.

9             Q.     Did you have occasion to -- prior to that day

10   did you have occasion to know somebody by the name of Wendi

11   Andriano?

12            A.     Yes.

13            Q.     Is she in court today?

14            A.     Yeah.   That looks like her over there.

15            Q.     What is she wearing?

16            A.     A turquoise sweater, glasses.

17            MR. MARTINEZ:   Your Honor, may the record reflect the

18   identification of the defendant?

19            THE COURT:   The record may reflect identification of

20   the defendant by the witness.

21   BY MR. MARTINEZ:

22            Q.     So you indicated you were sitting in the

23   defendant's office.   Again, what was her function with regard

24   to the San Riva apartments?   What was her position?

25            A.     She was one of our managers at San Riva.   She

1    was the manager at San Riva.

2          Q.    And on this particular Monday, you indicated

3    that you're sitting there with a couple other people.  About

4    what time of the day is it?

5          A.    That was probably -- it was in the morning

6    probably like around 10:00 by the time we got into the office

7    and got situated.

8          Q.    And while you're sitting there, who is sitting

9    behind the desk?

10         A.    Janice Lind.

11         Q.    And where are you seated?

12         A.    Across on the other side of the desk.

13         Q.    And as you're sitting there, what happens?

14    Anything unusual happen?

15         A.    We were just, you know, talking about what

16    happened.

17         Q.    All right.

18         A.    We were in shock, and then Janice hit something

19    under the desk with her foot.

20         Q.    So she was actually sitting behind the desk?

21         A.    Right.

22         Q.    And were you able to see what it was that she

23    hit?

24         A.    She pulled it out from the desk and gave it to

25    me.

```
 1           Q.     What was it?

 2           A.     It was a manilla envelope.

 3           Q.     And that manilla envelope, did it look like

 4    this?

 5           A.     Uh-huh.

 6           THE COURT:  Is that a "yes"?

 7           THE WITNESS:  Yes.

 8           THE COURT:  Make sure you give a verbal response.

 9           THE WITNESS:  Sorry.

10    BY MR. MARTINEZ:

11           Q.     Did you then have occasion to look inside of

12    that manilla envelope?

13           A.     Yes, I did.

14           Q.     Was Janice Lind present when you looked inside

15    that manilla envelope?

16           A.     Yes, she was.

17           Q.     I'm going to show you a couple photographs.

18    They're Exhibits 159 and 160.  Please take a look at them and

19    see if you recognize what's in those pictures.

20           A.     That looks like the office at San Riva.

21           Q.     Is this the office that you and the other

22    individuals were sitting in?

23           A.     Yes.

24           Q.     And is this where this envelope was found?

25           A.     Yes.
```

1          Q.    And if -- and that's the way the office looked

2     back on that Monday when you found -- or when you guys came

3     across this envelope?

4          A.    Yeah, yes.

5          MR. MARTINEZ:  Move for admission of Exhibits 159 and

6     160.

7                (Pause in proceedings.)

8          MR. PATTERSON:  I have no objection, Judge.

9          THE COURT:  Sorry?

10         MR. PATTERSON:  I have no objection.

11         THE COURT:  Exhibit Number 159 for identification and

12    Exhibit Number 160 for identification are admitted into

13    evidence.

14    BY MR. MARTINEZ:

15         Q.    Let's go ahead and take a look at them.  You

16    indicated that Janice Lind was sitting behind the desk.  Is

17    that correct?

18         A.    Correct, yes.

19         Q.    And this chair here, is that behind the desk,

20    in front of the desk?  Why don't you go ahead and step down.

21         THE COURT:  You can step down.  Just remember when

22    you're away from the microphone to speak up as loudly as you

23    can.

24         THE WITNESS:  Okay.

25                (Pause in proceedings.)

1        THE WITNESS:  This -- yeah.  This is where she was

2   sitting and I was sitting here.

3   BY MR. MARTINEZ:

4        Q.    Okay.  If we take a look at Exhibit 160 -- all

5   right.  Why don't you show us where she was seated and where

6   you were seated?

7        A.    She was sitting here and I was sitting here.

8        Q.    And who was -- was anybody else seated over

9   here?

10       A.    Yeah.  Chris was there, sitting there.

11       Q.    So the three of you were talking and you

12   indicated that I think she hit or she found the envelope?

13       A.    She tapped it with her foot.

14       Q.    And did you actually see the envelope come

15   through the bottom -- or how is it that you guys got it?

16       A.    Yeah, she reached under and grabbed it.

17       Q.    Okay.  Go ahead and take a seat.

18            Why don't you go ahead and take a look at the

19   contents of this envelope, see if it looks familiar to you.

20            (Pause in proceedings.)

21       THE WITNESS:  This -- this looks familiar.  This, I

22   know I saw, the UPS package, and then this right here.  This

23   right here too.  And this -- I'm just putting over here what

24   I remember.

25   / / / / /

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

```
 1    BY MR. MARTINEZ:

 2         Q.    Right.

 3         A.    What looks familiar to me.

 4         Q.    If I may have that?

 5         A.    This right here is what I remember seeing.

 6    These I -- these I don't remember.

 7         Q.    Okay.  Let's take -- go ahead and talk about --

 8    the ones that you think were familiar that you remember are

 9    266.09, something about cyanide?

10         A.    Yes.

11         Q.    Oh, you remembered that?

12         A.    Yeah.

13         Q.    Let's just name them off.  Some email from an

14    individual named Shawn King.  Do you remember that one?

15         A.    Yeah, yes.

16         Q.    Something about ammonia extract for BFGs,

17    something like that cyanide page?

18         A.    Yes.

19         Q.    There's a bond exemption certificate?

20         A.    Yes.

21         Q.    And there's a couple -- one, two, three, four,

22    business licenses?

23         A.    Yes.

24         Q.    Also something signed by Anne Newton.  Do you

25    remember that?
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1      A.      Yes.

2      Q.      And something involving Voigt Global and some

3   emails?

4      A.      Yes.

5      Q.      And then finally something about laboratory

6   reference manuals, and then a shipping manifest.   You

7   remember those?

8      A.      Yes.

9      Q.      The others may have been in there.   You just

10   don't remember them right now, right?

11      A.      Yeah.   They -- they don't stand out in my mind.

12      Q.      Okay.

13      A.      These ones don't.

14      Q.      Did you or Janice Lind or the other individual

15   that was there, did they take anything out of the envelope

16   that you guys came across?

17      A.      No.

18      Q.      Did everything stay inside of that envelope?

19      A.      Yes.

20      Q.      Did you hold it in your possession and then

21   turn it over to somebody?

22      A.      Yes.

23      Q.      And did you turn it over to -- who did you turn

24   it over to?

25      A.      To a Phoenix police officer.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          Q.     You indicated that you were aware of the

2     defendant and that her position was that of manager at the

3     San Riva apartment complex?

4          A.     Yes.

5          Q.     Were you familiar with the San Riva apartment

6     complex?

7          A.     Yes.

8          Q.     Did she have one or two or any storage sheds?

9          A.     She had two.

10          Q.     And do you remember their numbers?

11          A.     One was 315, I believe.

12          Q.     And do you remember the other one?

13          A.     329, I think.  I believe the other one was 329.

14          Q.     I'm going to show you -- but for sure you

15     remember one was 315?

16          A.     Yes.

17          Q.     I'm going to show you what has been marked for

18     identification as Exhibit Number 296.  Do you recognize it?

19          A.     Yes.

20          Q.     Is it a partial diagram of the San Riva

21     apartment complex as it existed back in October of the year

22     2000?

23          A.     Yeah.  Yes.

24          Q.     Does it show Apartment 132 as well as storage

25     shed number 315?

1          A.     Yes, it does.  I see where they're at, yes.

2          MR. MARTINEZ:  Move for admission of Exhibit 296.

3          MR. PATTERSON:  No objection.

4          THE COURT:  Exhibit 296 for identification is

5     admitted into evidence.

6     BY MR. MARTINEZ:

7          Q.     Let's go ahead and take a quick look at it.

8                 This is -- over here it's got 132.  Would that

9     be apartment 132?

10         A.     Yes.

11         Q.     How is it that somebody could get to Apartment

12    132?  Is there more than one way to get there, is there two,

13    is there three?

14         A.     Yes.

15         Q.     How does one get there?

16         A.     There was a back entrance.

17         Q.     Where's that?

18         A.     Right -- it's right there.

19         Q.     Is that right here, the back road here?

20         A.     Uh-huh.

21         THE COURT:  Is that a yes?

22         THE WITNESS:  Yes.

23         THE COURT:  Yes.

24         THE COURT:  Okay.

25         THE WITNESS:  Yes.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    BY MR. MARTINEZ:

2         Q.    Somebody coming in from that location could

3    come over this way and park right in front?

4         A.    Yes.

5         Q.    These little areas with the crosses on them and

6    the little lines, what are those?

7         A.    Those are covered parking spaces.

8         Q.    And what does this "5" mean here?

9         A.    That's the building number.

10        Q.    How many -- if you remember, how many buildings

11   are there?  I know we have five at least.  We see nine here.

12   Do you remember how many there were?

13        A.    That was a smaller property.  There probably

14   wasn't much more than nine or probably twelve, maybe.  I

15   don't remember exactly how many there were there.

16        Q.    And right here we have a "T" and then the

17   legend says that's trash.  Were these the smaller or bigger

18   kinds of dumpsters?

19        A.    They were big.

20        Q.    And then finally we have over here to our left

21   315.  Do you see that?

22        A.    Yes.

23        Q.    Is that the defendant's storage shed?

24        A.    Yes.

25        Q.    How far in your estimation is 132 from number

```
 1    315?
 2           A.    Probably about 300 feet, probably between --
 3    between there, somewhere around there.  350 maybe.
 4           Q.    Okay.  After you found this documentation, did
 5    you have occasion to go over to number 315?
 6           A.    Yes.
 7           Q.    Did you open it and go on in there?
 8           A.    Yes.
 9           Q.    And was that the same day that you found these
10    items?
11           A.    Yes.
12           Q.    Did you have a key to go on in there?
13           A.    Yes.
14           Q.    Going to show you some photographs and see if
15    anything looks familiar.  First of all, let's take a look at
16    Exhibit 178.
17                 (Pause in proceedings.)
18    BY MR. MARTINEZ:
19           Q.    Which storage shed does that show us?
20           A.    315.
21           Q.    There appears to be something in front of it,
22    like a crib or something.  When you first opened it, was the
23    crib outside or is this something that happened afterwards?
24           MR. PATTERSON:  Sorry, Mr. Martinez.  What word are
25    you using?  "Crib"?
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1           MR. MARTINEZ:  Crib.

2           MR. PATTERSON:  Thank you, Judge.

3           THE WITNESS:  Afterwards.  There was nothing outside

4    when I opened it.

5    BY MR. MARTINEZ:

6           Q.    I am now showing you Exhibits 179, 180, and

7    181.  Go ahead and take a look at them.

8                (Pause in proceedings.)

9    BY MR. MARTINEZ:

10          Q.    What do they represent?

11          A.    This box right here is where I saw two rubber

12   gloves sitting on top and a plastic jug inside.

13          Q.    And aside from the rubber gloves, is it in

14   substantially the same condition today -- does it appear to

15   be how it looked back on October 10th of 2000 when you went

16   in there?

17          A.    Yes.

18          Q.    What did the box look like?  Did it have any

19   distinctive markings on it?

20          A.    It had a -- a delivery that stood out to me.

21   It had a delivery UPS shipping label on top.

22          Q.    Okay.  Do you know somebody by the name of -- I

23   guess I may have asked you this -- but did Jerry Sentelle

24   work for you?

25          A.    Yes.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          Q.     What was his position with regard to you? In

2     other words, was he beneath you, above you, or I mean --

3          A.     He was beneath.

4          Q      But did he work -- what -- what complex did he

5     work at?

6          A.     He worked at San Riva.

7          Q.     Did there ever come a time when you and Mr.

8     Sentelle ever discussed a desk?

9          A.     No.

10          MR. MARTINEZ:  I don't have anything else.

11          THE COURT:  Let's see, Mr. Patterson?

12          MR. PATTERSON:  No questions.

13          THE COURT:  Are there any further questions of this

14     witness by the jury?

15               (No response.)

16          THE COURT:  No one has raised their hand.

17               May this witness be excused?

18          MR. MARTINEZ:  Yes, sir.

19          THE COURT:  Thank you very much.  You're excused.

20          MR. PATTERSON:  Yes.  No objection, Judge.

21          THE COURT:  We'll go ahead and take our afternoon

22     break at this time.

23               Ladies and gentlemen, during this break

24     remember the entire admonition I gave you including the fact

25     you're not to discuss this case with anyone, do not let

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

```
 1    anyone discuss the case with you, keep an open mind.  We'll
 2    take a 20 minute break.  Have a nice break.
 3    / / / / /
 4              (Recess.)
 5
 6         THE COURT:  This is CR 2000-090032, State of Arizona
 7    versus Wendi Elizabeth Andriano.  The record will reflect the
 8    presence of Defendant, Counsel and the jury.
 9              State may call its next witness.
10         MR. MARTINEZ:  State calls Kathy Galbari.
11              (Pause in proceedings.)
12         THE COURT:  Please step forward right up here.
13    Please give your name to the clerk and she'll swear you in.
14
15                   KATHY GALBARI,
16         CALLED TO TESTIFY ON BEHALF OF THE STATE,
17    HAVING FIRST BEEN DULY SWORN, TESTIFIES AS FOLLOWS:
18
19         THE COURT:  Please have a seat on the witness
20    stand.  Please make yourself comfortable there on the witness
21    stand.  Please pull the microphone close to you.  Please
22    remember to speak loudly and clearly into the microphone do
23    everyone can hear you.  Please wait until the question is
24    complete before you answer the question, and please make sure
25    you give a verbal response.  Is that agreeable to you?
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000006149

1           THE WITNESS:  Yes, sir.

2           THE COURT:  Mr. Martinez, you may proceed.

3

4    DIRECT EXAMINATION BY MR. MARTINEZ:

5           Q.    May I have your name, please?

6           A.    Yes, Kathy Galbari.

7           Q.    And drawing your attention back to October of

8    2000, who were you employed by?

9           A.    The city of Phoenix Police Department.

10          Q.    What unit were you assigned to?

11          A.    Homicide.

12          Q.    Are you still currently with the Phoenix Police

13   Department?

14          A.    No, sir.

15          Q.    And what are you doing these days?  Are you

16   retired?

17          A.    I am retired and I'm unemployed.

18          Q.    When did you become retired?

19          A.    Approximately 2 and a half years ago.

20          Q.    Now, going back to October 10th of the year

21   2000, did you have occasion to go over to the San Riva

22   apartment complex sometime around 3:30 or 4:00 in the

23   afternoon?

24          A.    Yes, sir.

25          Q.    Who did you go with?

1          A.      Detective Dillian.

2          Q.      And what was the purpose of both of you going

3    down there?

4          A.      We were called to the location to execute a

5    search warrant at an apartment at that complex.

6          Q.      Was that Apartment 132?

7          A.      Yes, sir.

8          Q.      And as you got to that location, Apartment 132,

9    did you come across anybody?

10         A.      Yes.

11         Q.      Who did you guys come across?

12         A.      Patrol -- two patrol officers in a marked

13   Phoenix Police Department patrol car.

14         Q.      Was one of them Officer DeYoung that has been

15   out in the hallway that -- that you've seen today?

16         A.      Yes, sir.

17         Q.      Did he have occasion to go -- did you have

18   occasion to have any -- a transaction with him, if you will,

19   a transfer?

20         A.      Yes.

21         Q.      What is it that happened?

22         A.      He provided me with two envelopes containing

23   some documents that apparently had come from Airborne

24   Express.

25         Q.      He provided you with two envelopes, right?

1          A.     Yes.

2          Q.     Okay.  I'm going to show you what has been

3    marked for identification as Exhibit 266.  And the contents

4    of it we've already taken -- these two came in there.

5                 Are these -- take a look at them and --

6                 (Pause in proceedings.)

7    BY MR. MARTINEZ:

8          Q.     Are those the envelopes that came -- that were

9    given to you by Officer DeYoung and that you subsequently

10   placed in Exhibit 266?

11         A.     Yes.

12         Q.     And the large envelope, is that labeled

13   266.001?

14         A.     Yes.

15         MR. MARTINEZ:  I move for admission of Exhibit

16   266.001.

17         MR. PATTERSON:  Judge, can I voir dire?

18         THE COURT:  Yes.

19

20   VOIR DIRE EXAMINATION BY MR. PATTERSON:

21         Q.     Did you have a chance to go through the

22   contents of this envelope at some point.

23         A.     Say again?

24         Q.     Did you have occasion to go through the

25   contents of the envelope after you received it from Officer

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    DeYoung?

2         A.    I don't think I went through it at that point,

3    but during the impounding process -- I believe I looked at

4    the contents during the impound process, which would have

5    been like the next day.

6         Q.    Okay.  Have you had a chance subsequent to that

7    time to look through these contents a second time to

8    determine whether all the contents that were originally in

9    the envelope are still in that envelope?

10        A.    Yes.

11        Q.    Okay.  And are these all the contents that were

12   in the envelope on the date Officer DeYoung gave it to you?

13        A.    I don't know.  I didn't specifically count each

14   document in the envelope, so I don't -- I never remembered

15   like the number of papers that were actually inside.

16        Q.    Okay.  How are we to know then these are the

17   same papers that were in that envelope?  Is there some

18   tracking mechanism?

19        A.    The case agent would have copies of the

20   documents in his case file, which is customary to do when

21   there's documents seized at any location.

22        MR. PATTERSON:  Judge, I have reservations about

23   whether this is the same amount of contents that was handed

24   to her on the date on October 10, 2000.

25        THE COURT:  Let me see Counsel here at the bench with

1     the exhibit.

2

3                    (The following proceedings were held at the

4     bench:)

5

6           THE COURT:  Did you have the clerk mark the larger

7     envelope as --

8           MR. MARTINEZ:  Yeah.

9           THE COURT:  -- 266, and then you had items inside

10    marked individually by 00 --

11          MR. MARTINEZ:  I had them -- I caused them to be

12    marked today and I also had the envelope marked 266.01, and

13    then the items in there marked as 02, 03, 04.

14          THE COURT:  Right.  And you're just moving right now

15    for the envelope?

16          MR. MARTINEZ:  And the contents of the envelope.

17          THE COURT:  What -- so you're moving to have all of

18    these exhibits --

19          MR. MARTINEZ:  Right, everything in there, right.

20    Uh-huh.

21          THE COURT:  Do you know what numbers are marked that

22    are in the envelope?

23          MR. MARTINEZ:  No, I don't.  I mean, we marked them,

24    but --

25          THE COURT:  Okay.  I think you need to move to have

1    each individually --

2         MR. MARTINEZ:  What I'm going to do, actually, for

3    me to lay foundation, Judge, I just have to say, "Is this the

4    envelope?"  "Yes."  "Did you take an envelope?"  "Yes."

5    "Does this appear -- or is this the envelope?"  "Yes."  "Did

6    you put anything in that envelope?"  "No."  "Did you remove

7    anything from that envelope?"  "No."

8         THE COURT:  I know that, but because you had specific

9    items marked for identification under specific numbers,

10   that's fine, you can move to have it all moved into

11   evidence --

12        MR. MARTINEZ:  Right.

13        THE COURT:  -- but you should probably make reference

14   to the specific numbers so on record we know to what you're

15   moving to have admitted.

16        MR. MARTINEZ: I want the whole -- she doesn't

17   remember the specific numbers.  She just remembers this bunch

18   of documents.  I'm going to ask you these are all the

19   exhibits in there.  I'm saying the foundation is laid if I

20   ask her, "Did you have an envelope?"  "Yes."  "Are all of the

21   items in the envelope?"  "Did your remove anything?"  "No."

22   "Did that envelope go into that big envelope?"  "Yeah."  "Did

23   you remove anything?"  "No."

24        THE COURT:  I know.  What I'm saying is this.  You

25   have the envelope right now --


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000006155

1       MR. MARTINEZ:  right.

2       THE COURT:  -- and you had --

3       MR. MARTINEZ:  266.

4       THE COURT:  -- you had it marked as 266.001.

5       MR. MARTINEZ:  Right, uh-huh.

6       THE COURT:  You have the contents of the envelope.

7       MR. MARTINEZ:  Right.

8       THE COURT:  I don't disagree with what you're saying.

9       MR. MARTINEZ:  Right.

10      THE COURT:  However, each item in the envelope is

11  marked specifically 266 point whatever number.

12      MR. MARTINEZ:  Right.

13      THE COURT:  You're asking basically for the envelope

14  to be moved into evidence even though I know you're asking

15  for the contents of the envelope also, you should be making

16  specific --

17      MR. MARTINEZ:  I see what --

18      THE COURT:  -- just so we have a clear record.

19      MR. MARTINEZ:  I see what you're saying.

20      THE COURT:  In that case I think there's foundation

21  nothing was removed.

22      MR. MARTINEZ:  Right.

23      THE COURT:  That's what I'm trying to say.

24      MR. MARTINEZ:  Okay.

25      MR. PATTERSON:  I would disagree.  There has been

1    sufficient foundation to establish nothing's been removed.

2    She doesn't have specific recollection of that, that's why I

3    asked her those questions on voir dire.  If you can further

4    elucidate that issue, I will be satisfied with the

5    foundation, but I want to make sure all the items in this

6    envelope were all the items seized and handed to Mr. DeYoung

7    and to Ms. Galbari who did the impound and there were no

8    items taken out in the process.

9         THE COURT:  Let me just double check something here.

10             (Pause in proceedings.)

11        THE COURT:  Okay.  Yeah.  I -- lay some more

12   foundation.  I'm looking at my notes here.

13        MR. MARTINEZ:  Okay.

14        THE COURT:  Lay some more foundation to get those

15   specific items done.

16

17             (The following proceedings were held in open

18   court:)

19

20   CONTINUED DIRECT EXAMINATION BY MR. MARTINEZ:

21        Q.   Ma'am, with regard to Item 266 prepared -- you

22   prepared all those items on there?

23        A.   Yes.

24        Q.   Did you put something in Exhibit 266?

25        A.   Yes, I did.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000006157

110

1        Q.      Did you put it in a manilla envelope?

2        A.      In the impound bag, yes.

3        Q.      That's what I'm talking about, the impound bag.

4    Did you put in there a manilla envelope?

5        A.      Yes.

6        Q.      This was taken out during court from that 266

7    and we labeled it 266.01.  Do you see that?

8        A.      Correct.

9        Q.      Is there any reason for you to believe that

10   266.01, the manilla envelope -- take a look at it -- if there

11   is anything other than the items that you put in there.

12       A.      No.  I have no reason to believe it is

13   something else.

14       Q.      All right.  With regard to 266 that you have

15   there in front of you, after Officer DeYoung gave it to you,

16   you may have looked into -- inside, right?

17       A.      Yes.

18       Q.      And you may -- you may have cataloged or not

19   cataloged what was inside, right?

20       A.      Yes.

21       Q.      Did you remove anything from 266.01?

22       A.      I did not remove anything from 266.01.

23       Q.      Did you take 266.01 without removing anything

24   and place it in 266?

25       A.      Yes.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000006158

1      Q.   In other words, did you take that manilla
2   envelope without taking anything out and place it inside the
3   big white envelope?

4      A.   Yes, I did.

5      Q.   It was sealed with my initials.  .

6      Q.   Then what did you do with 266, which is the big
7   white envelope?

8      A.   I impounded that as instructed for evidence at
9   the police department.

10     Q.   The point is, you took it into custody, right?

11     A.   Yes.

12     Q.   And then you sent it to the property room or
13   wherever it is they keep them, right?

14     A.   Yes.

15     Q.   Any reason that you have to believe that
16   somebody has tampered with that, other than we know we opened
17   it here in court, other than that.  Do you have any reason to
18   think it's been tampered with?

19     A.   No.

20     Q.   Now, with regard to these items here, when we
21   were in court, the court staff placed numbers on them.  They
22   go from 266.02 to 266.19.  That would be this whole packet
23   here.

24         With regard to 266.02 to 266.19, what you have
25   in your possession, any indication to you that those are not

1    the items that were inside of that Exhibit 266.01?

2         A.    None.

3         Q.    Any indication that those have been tampered

4    with in any way?

5         A.    No.

6         Q.    I'm sorry.  I keep saying 266.01.

7         THE COURT:  You keep saying 01 or 02.

8         MR. MARTINEZ:  Sorry.

9         THE COURT:  It should be a 002 or 001.

10   BY MR. MARTINEZ:

11        Q.    Okay.  Any indication of anybody -- of those

12   have been tampered with or anybody taken anything based on

13   looking at that documentation you have in front of you?

14        A.    No.

15        MR. MARTINEZ:  I move for admission of Exhibits

16   266.001 through 266.019 along with Exhibit 266.

17        MR. PATTERSON:  No objection.

18        THE COURT:  Okay.  266.004,, 266.005, 266.006 have

19   already been moved into evidence.

20             Basically what you're asking is 266 and then

21   266.001, 002, 003, then 007 through 019, correct?

22        MR. MARTINEZ:  Yes, sir.

23        THE COURT:  Any objection?

24        MR. PATTERSON:  None.

25        THE COURT:  Exhibit 266 for identification and

1    266.001 through 266.003 and 266.007 through 266.019 are

2    admitted into evidence.

3                    (Pause in proceedings.)

4    BY MR. MARTINEZ:

5            Q.    Ma'am, I'm going to ask you to take a look at

6    the television monitor, and our experience has indicated that

7    you would probably have to step down to get a good look at

8    these documents.

9            THE COURT:  You could step down.  If you step down,

10   just remember to speak up as loud as you can so everyone can

11   hear you.

12   BY MR. MARTINEZ:

13           Q.    Take a look at Exhibit 02.  And at the top what

14   does it say?

15           A.    San Riva and history.

16           Q.    If we go down to the lower left-hand corner, it

17   does have -- what is this letter here?

18           A.    An "S" like in "Sam."

19           Q.    Then what's underneath it?

20           A.    16th Street.

21           Q.    Go ahead, keep reading?

22           A.    Right on 263580 1450 East Buckeye.

23           Q.    Would it be right on 1450 East Buckeye 16th

24   Street?

25           A.    Yes, sir.

1          Q.     And then if we look over here to the right, do

2     you see a name?

3          A.     Barry.

4          Q.     And then do you see a number?

5          A.     Yes, 9785216415.

6          Q.     All right.  Let's take a look at Exhibit

7     266.010, and there appears to be a Post-it, green in color,

8     correct?

9          A.     Yes.

10         THE COURT:  Why don't you go ahead state which

11    Exhibit number that is again, please?

12         THE WITNESS:  266.010.

13         THE COURT:  Thank you.

14    BY MR. MARTINEZ:

15         Q.     What does it say?

16         A.     Sales@VoigtGlobal.com Reagent ACS grade

17    chemicals inquiry.

18         Q.     Then to the right of it we have -- can you read

19    it?

20         A.     Yes, Voigt Global Distribution LLC, Post Office

21    Box 4455, Topeka, Kansas, 66604-0455.

22         MR. PATTERSON:  Judge, can we approach?

23         THE COURT:  Yes.

24

25                (The following proceedings were held at the

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000006162

1      bench:)

2

3           MR. PATTERSON:  I don't know whether this witness

4      knows the answer to these various questions.  The documents

5      speak for themselves.  She has no specialized expertise, she

6      has no independent recollection of the exhibit.

7           THE COURT:  You're making an objection, right?

8           MR. PATTERSON:  Yes.

9           THE COURT:  I sustain the --

10          MR. MARTINEZ:  She could read the documents, the

11     salient features.  I'm not going through each and every

12     document with her, but the jury is entitled to know what it

13     says.

14          THE COURT:  That's correct, but the documents speak

15     for themselves.  She doesn't know anything about the

16     specifics of those except that she took them --

17          MR. MARTINEZ:  Okay.  Then I'll just show them to

18     her, okay?

19          THE COURT:  Thank you.

20

21          (The following proceedings were held in open

22     court:)

23

24     BY MR. MARTINEZ:

25          Q.   We're still looking at 266.010.  Can you see

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000006163

1    that clearly there or --

2         A.    Yes.

3         Q.    And if we just go -- are you able to see

4    that portion of it clearly?

5         A.    Yes.

6         MR. PATTERSON:  Judge, I have the same objection.

7         THE COURT:  I'll sustain the objection.  Let's move

8    on, Mr. Martinez.

9         MR. MARTINEZ:  Judge, I would like to have these

10   published to the jury.  And if I may, then I would like to

11   give all of these to the jury for them beginning at the end

12   so that they could take a look at them starting with

13   Exhibit .010.

14        THE COURT:  Let me see Counsel here at the bench.

15

16             (The following proceedings were held at the

17   bench:)

18

19        THE COURT:  You want to publish them -- all these

20   documents right here?

21        MR. MARTINEZ:  I do, because as you can see, some of

22   them have to do with the emails and these are emails that

23   were important to our case.  Additionally, when the computer

24   guys come up for them to know or compare these items that

25   were found in the defendant's desk, it's important to show

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000006164

1   that the defendant is Anne Newton.

2          THE COURT:  When the computer people come up you

3   could refer to these specific documents.  I think right now

4   if we show them 19 exhibits right now, this's going to kind

5   of disrupt the testimony of these witnesses, so let's move

6   on.  If you need to refer to a specific exhibit when

7   examining your witnesses, that's fine, but really this

8   witness, except for the fact she took possession of the

9   documents, she doesn't know anything about these documents.

10         MR. MARTINEZ:  Would you have any objection to me

11   mentioning 002 is this or 003 is this or whatever?

12         THE COURT:  In your examination of witnesses that's

13   fine, but other than that you would be testifying.  Let's

14   move on.

15         MR. MARTINEZ:  No, but what I'm saying, I want to go

16   over each one and say what is this document, what does it say?

17         THE COURT:  I know, but this witness isn't in a

18   position to answer that.  And you may be able to do it

19   through -- I don't know who else you have as a witness, but

20   you may be able to do that through other witnesses in your

21   examination.  But really, the documents speak for

22   themselves.  If you don't have any witnesses that you may be

23   asking questions about specific portions of the contents of

24   these documents, you could argue in your closing argument

25   this is what this is, this is what that is --

1        MR. MARTINEZ:  Okay.

2        THE COURT:  -- because they've already been admitted.

3        MR. MARTINEZ:  I can go through the documents, count

4    the pages, that sort of thing?

5        THE COURT:  That's fine because they've been admitted

6    into evidence.

7        MR. MARTINEZ:  Right.

8        THE COURT:  You could do that in your closing.

9        MR. MARTINEZ:  I can't do that right now?

10       THE COURT:  No, not right now.  Otherwise you will be

11   testifying.  You have witnesses you may be asking specific

12   questions about the contents because of -- I don't know,

13   whatever reason.

14       MR. MARTINEZ:  Right.

15       THE COURT:  And you mentioned some computer people,

16   that's fine, but legally, the documents speak for themselves.

17       MR. MARTINEZ:  Let me get the documents to show you

18   what I want to do.  I understand your ruling, but --

19      THE COURT:  Okay.

20       MR. MARTINEZ:  -- I don't know if you understand my

21   question.

22       THE COURT:  Okay.

23              (Pause in proceedings.)

24              (The following proceedings were held in open

25   court:)


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1
2          THE COURT:  Go ahead and have a seat.  You could have

3     a seat.

4                    (The following proceedings were held at the

5     bench:)

6

7          MR. MARTINEZ:  For example, 266.005 if -- if you

8     won't let me number, what I'm going to do is I'm going to

9     just have them marked as 00 whatever.  That's not the --

10    that's -- it's actually this one, 008266.  These are what I'm

11    calling basically her practice indemnity agreements that were

12    found there.  They just have to be put in this position, so

13    I'm going to ask they be marked as 20, 21 and 22.

14         THE COURT:  Wait.  What is that?  That's already been

15    admitted into evidence, right?

16         MR. PATTERSON:  Uh-huh.

17         MR. MARTINEZ:  Right, but when we have documents

18    that are -- things that are admitted into evidence, we could

19    then breakdown what's in there to highlight it.  There's no

20    prohibition against that, just like we did with the big

21    envelope 266 we took something out.  These I would want

22    marked individually.

23         THE COURT:  That packet, what is it?  It's been

24    admitted into evidence as --

25         MR. MARTINEZ:  266.008.


                TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

120

1          THE COURT:  Okay.  So you're asking those be marked

2     separately, the contents?

3          MR. MARTINEZ:  And then be admitted into evidence,

4     right.

5          THE COURT:  Well --

6          MR. PATTERSON:  I don't have any problem with that.

7     He doesn't need to discuss it with this witness because this

8     witness just took possession of the whole packet.

9          THE COURT:  That's fine if there's no objection.

10    Let's do it at some other time.

11         MR. MARTINEZ:  Okay.

12         THE COURT:  Because really there's nothing to be

13    asked of this witness further about the contents of these

14    exhibits, right?

15         MR. MARTINEZ:  Okay.  All right.

16         THE COURT:  Right.

17

18              (The following proceedings were held in open

19    court:)

20

21         THE COURT:  Counsel --

22

23              (The following proceedings were held at the

24    bench:)

25

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000006168

121

1          THE COURT:  Are you going to be referring to these

2   with the next witness?

3          MR. MARTINEZ:  No.

4          THE COURT:  Don't worry about it right now then.

5          MR. MARTINEZ:  Okay.  I just --

6          THE COURT:  Okay.

7

8          (The following proceedings were held in open

9   court:)

10

11  BY MR. MARTINEZ:

12        Q.    Did you also assist Detective Sallie Dillian

13  when you went inside Apartment 132?

14        A.    Yes.

15        Q.    What was your function with regard to number

16  132?

17        A.    I was designated as a scribe.

18        Q.    And -- but does -- as a scribe, were you also

19  inside of the apartment?

20        A.    Yes.

21        Q.    And were you watching as Ms. Dillian found

22  something and then gave it to you?

23        A.    Absolutely.

24        Q.    I'm going to show you what has been marked for

25  identification as Exhibit 223.  Please take a look at it.

122

1                    What is it?

2          A.    This is my evidence envelope containing a

3    business card with dates and times on it.

4          Q.    Where did you find it?

5          A.    This was found on the kitchen counter.

6          Q.    Okay.   In Apartment 132?

7          A.    Yes, sir.

8          MR. MARTINEZ:  Move for admission of Exhibit 223.

9          MR. PATTERSON:   Judge, if I could just voir dire?

10

11    VOIR DIRE EXAMINATION BY MR. PATTERSON:

12         Q.    Does it bear an inventory number that you used

13    to track these things that we're discussing?

14         A.    Yes.

15         Q.    What inventory number is it?

16         A.    That is my number 9.

17         MR. PATTERSON:  Thank you.  No -- well, I want to

18    look at it.

19               (Pause in proceedings.)

20         MR. PATTERSON:  I have no objection, Judge.

21         THE COURT:  Exhibit Number 223 for identification is

22    admitted into evidence.

23

24    CONTINUED DIRECT EXAMINATION BY MR. MARTINEZ:

25         Q.    Let's go ahead and take a look at it.  This is

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

123

1     the front of the card, right?

2              A.    Yes.

3              Q.    And it has some names on it.  Specifically on

4     the right it has the name Christopher M. Kellogg, MD,

5     correct?

6              A.    Yes.

7              Q.    And then is there writing on the back?

8              A.    Yes.

9              Q.    I want you to take a look at Exhibit Number --

10    let me have this marked as an exhibit.

11              Take a look at Exhibit 231.  What is it?

12              A.    This would be my item Number 132, and it's a --

13    it's a piece of paper with some names on it and other words

14    that are next to the names.

15              Q.    Where was it seized from?

16              A.    This is from the master bedroom of the

17    Apartment 132.

18              MR. MARTINEZ:  Move for admission of Exhibit 231.

19                   (Pause in proceedings.)

20              MR. PATTERSON:  May I have a moment, Your Honor?

21              THE COURT:  Yes.

22                   (Pause in proceedings.)

23              MR. PATTERSON:  I have no objection, Judge.

24              THE COURT:  Exhibit Number 231 for identification is

25    admitted into evidence.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

124

1                    (Pause in proceedings.)

2     BY MR. MARTINEZ:

3          Q.    Go ahead and take a look at it.

4                You indicated it had some numbers and -- right?

5          A.    Yes.

6          Q.    There is a 3 there, right?

7          A.    Yes.

8          Q.    And what does it say after the 3?

9          A.    Rick.

10         Q.    Is that all it says?

11         A.    Dash love.

12         Q.    Where was this found?  I don't remember.

13         A.    In the master bedroom under their -- under a

14    bed.

15         Q.    Under the bed in the master bedroom?

16         A.    Yes, sir.

17         Q.    Show you Exhibit 367.  What is it?

18         A.    This is a latex -- one latex glove.

19         Q.    Where was it found?

20         A.    This was also found on the floor under the foot

21    of the bed in the master bedroom.

22         Q.    Do you have any idea how far away it was found

23    from the previous exhibit, which is Exhibit 231, the one with

24    numbers and phrases after it?

25         A.    I do not.

1            MR. MARTINEZ:  Move for admission of Exhibit 367.

2            MR. PATTERSON:  Again, voir dire, Judge?

3            THE COURT:  Yes.

4

5     VOIR DIRE EXAMINATION BY MR. PATTERSON:

6            Q.    What is your inventory number for this one?

7            A.    This is Number 116.

8            MR. PATTERSON:  No objection, Judge.

9            THE COURT:  Exhibit Number 367 for identification is

10    admitted into evidence.

11

12    CONTINUED DIRECT EXAMINATION BY MR. MARTINEZ:

13           Q.    Take a look at Exhibit Number 368.  What is it?

14           A.    This is my item Number 6.

15           Q.    What is it?

16           A.    It's notes with names and addresses and phone

17    numbers on them.

18           Q.    Where did you find it?

19           A.    This was -- this was found on the kitchen

20    counter.

21           MR. MARTINEZ:  Okay.  I'll move for admission of

22    Exhibit 368.

23                 (Pause in proceedings.)

24                 (Attorney-attorney discussion.)

25           MR. PATTERSON:  Judge, I believe we're going to


                TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    modify Exhibit 368 to delete two items, number them

2    separately, and then Admit 368.  However you want to do it.

3              MR. MARTINEZ:  Actually, if we could just make what I

4    want 368.01 (sic) and I'll move that in and I'll withdraw

5    368.

6              MR. PATTERSON:  No objection to that procedure, Judge.

7              THE COURT:  Okay.  Exhibit Number 368.001 for

8    identification is admitted into evidence.

9    BY MR. MARTINEZ:

10             Q.   Let's take a look at 368.001.  Where was this

11   found again?

12             A.   On the kitchen counter of the apartment.

13             Q.   Okay.  Let's take a look at Exhibit 369.  What

14   is it?

15             A.   This is a Verizon telephone bill with the

16   account number to the Andrianos.

17             Q.   Which Andriano are we taking about, do you

18   know?  Here.  Let me open it for you.

19             A.   It is open.  I just didn't see it.

20             Q.   Okay.

21             A.   Account name is Jeanette Andriano.

22             Q.   All right.  If I may have that back.  Where did

23   you find it?

24             MR. PATTERSON:  May I have the number?

25             THE WITNESS:  Yes, sir.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1      MR. PATTERSON:  Your Number 121?

2      THE WITNESS:  Yes, sir.  This was found on the second

3  shelf on the desk in the child's room of the apartment.

4      MR. MARTINEZ:  Judge, I move for admission of Exhibit

5  369.

6      MR. PATTERSON:  May I have a moment, Your Honor?

7      THE COURT:  Yes.

8          (Pause in proceedings.)

9      MR. PATTERSON:  I have no objection, Judge.

10      THE COURT:  Exhibit Number 369 for identification is

11  admitted into evidence.

12  BY MR. MARTINEZ:

13      Q.    Take a quick look at it.  My finger's right

14  underneath the number.  Can you read that number for me,

15  please?

16      A.    Yes.  602-826-1150.

17      Q.    Please take a look at Exhibit 219, also has

18  another photograph marked as 219.001.  See if you recognize

19  it.

20          (Pause in proceedings.)

21      THE WITNESS:  Yes, I recognize it.

22  BY MR. MARTINEZ:

23      Q.    And what is it?

24      A.    This is my item Number 3, and it's developed

25  colored photographs.

128

1        Q.    And where did you get these from?

2        A.    These were also from the kitchen counter in the

3    apartment.

4        Q.    Was 2 -- what's the first three numbers of that

5    exhibit?  219, I think?  It would be on the green tag at the

6    top.

7        A.    219.

8        Q.    219.001, that was part of the packet, correct?

9    I just took it out is what I'm --

10       A.    Yes.  Yes.

11       MR. MARTINEZ:  Move for admission of 219 and

12   219.001.

13               (Pause in proceedings.)

14       MR. PATTERSON:  I have no objection, Judge.

15       THE COURT:  Exhibit Numbers 219 and 219.001 for

16   identification are admitted into evidence.

17               (Pause in proceedings.)

18   BY MR. MARTINEZ:

19       Q.    Let's take a look at Exhibit 219.001.  And this

20   is one of the pictures that you seized from this packet 219?

21       A.    Yes, sir.

22       MR. MARTINEZ:  I don't have any other questions.

23       THE COURT:  Mr. Patterson?

24       MR. PATTERSON:  I don't know that I have any

25   questions.  Let me talk to my colleague, Judge.

1          (Pause in proceedings.)

2          MR. PATTERSON:  Judge, I have no questions for this

3     witness.

4          THE COURT:  Are there any further questions of this

5     witness by the jury?  If so, please raise your hand.

6          (Pause in proceedings.)

7

8          (The following proceedings were held at the

9     bench:)

10

11         THE COURT:  Question, "What, paren, if you know, end

12    of paren, is the process of impounding items from a scene and

13    are records kept at the impound department?"

14         MR. MARTINEZ:  I don't -- I mean, I don't know how

15    relevant that is, but okay.

16         MR. PATTERSON:  That's fine, Judge.

17         THE COURT:  Okay.  Next question, "Was 266.001 sealed

18    when you put it into 266?"

19         MR. MARTINEZ:  No objection.

20         MR. PATTERSON:  No objection.

21         THE COURT:  Next question, "Was there two envelopes

22    that went into 266, paren, confused as to how many envelopes

23    there are, end of paren."

24         MR. MARTINEZ:  No objection.

25         MR. PATTERSON:  She could explain.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1        MR. MARTINEZ:  Yeah.

2        THE COURT:  Next question, "What is a script?"

3        MR. MARTINEZ:  I think she means "scribe."

4        THE COURT:  Okay.

5        MR. PATTERSON:  Okay.

6        THE COURT:  I'll ask as "scribe."

7        MR. MARTINEZ:  Judge, this is the last witness I had

8    for today.  I had eight lined up.

9        THE COURT:  That's fine.  We'll discuss marking of

10   the exhibits you were discussing earlier.

11       MR. PATTERSON:  Okay.

12       MR. MARTINEZ:  Yes.

13

14            (The following proceedings were held in open

15   court:)

16

17       THE COURT:  I have some additional questions here

18   you.  The first one reads as follows.  What, if you know, is

19   the process of impounding evidence items from a scene and are

20   records kept at the impound department?

21       THE WITNESS:  The process of collecting any evidence

22   at the scene is that it's collected in a sanitary manner no

23   matter what the evidence is.  It's logged in on a

24   supplemental police department report by a scribe or a

25   finder, which was my duty at that location on that date.

1    It's secured and marked in an envelope with report number,

2    the date, the time, and my name and serial number.  It is

3    sealed, and then each particular item of evidence is taken to

4    an impound room where it is then logged in there.

5         THE COURT:  Next questions reads as follows:  Was

6    Exhibit 266.001 sealed when you put it into Exhibit Number

7    266?

8         THE WITNESS:  I believe it was, yes.

9         THE COURT:  Next question, was there -- were there

10   two envelopes that went into Exhibit Number 266?

11        THE WITNESS:  Yes.

12        THE COURT:  And you answered this part earlier just a

13   few moments ago, What is a scribe?

14        THE WITNESS:  A scribe is the detective that actually

15   writes down the police supplemental report, each item and

16   description as it's being collected at a scene or crime scene.

17        THE COURT:  Are there any further questions of this

18   witness by the jury?  If so, please raise your hand.

19             (No response.)

20        THE COURT:  No one has raised their hand.

21             Mr. Martinez, any follow-up questions to those

22   specific questions?

23

24   FOLLOW-UP QUESTIONS BY MR. MARTINEZ:

25        Q.    I'm going to show you a document that has been

1    marked as exhibit number --

2                    (Pause in proceedings.)

3    BY MR. MARTINEZ:

4            Q.    -- 370.  Take a look at it.

5                    (Pause in proceedings.)

6            THE WITNESS:  Yes.

7    BY MR. MARTINEZ:

8            Q.    Do you remember being in court yesterday and

9    looking at this big white envelope that we've come to call

10   266?

11           A.    Yes.

12           Q.    Did it contain one or two manilla envelopes in

13   the brown envelopes?

14           A.    It contained one envelope.

15           Q.    Do you remember whether or not we, prior to

16   court starting, we took out 266 while we stood over there.

17   Do you remember that?

18           A.    Oh, yes.  Yes I do, I'm sorry.

19           Q.    Is that the envelope that we took out of

20   Exhibit 266?

21           A.    Yes, it is.

22           Q.    Is it in the -- it is -- is it in the same

23   condition today as when you seized it or it was given to you?

24           A.    Yes, sir.

25           MR. MARTINEZ:  Move for admission of Exhibit 370.

133

```
1                    (Pause in proceedings.)
2          MR. PATTERSON:  Judge, I have some questions on voir
3     dire with regard to the exhibit.  May I proceed, Judge?
4          THE COURT:  Yes.
5
6     VOIR DIRE EXAMINATION BY MR. PATTERSON:
7          Q.    Just so my mind is clear on this, Officer
8     DeYoung gave you one or two envelopes?
9          A.    I remember him giving me two envelopes.
10         Q.    Okay.  One of the envelopes contained those
11    things that we discussed earlier, correct?  Sorry, that's a
12    bad question.  It was -- it was kind of a thicker one with
13    things in it, and then this one has these things in it.  I
14    mean, is that --
15         THE COURT:  When you say "this one," are you --
16         MR. PATTERSON:  Yeah, it's --
17         THE COURT:  You're referring to Exhibit 370 for
18    Identification?
19         MR. PATTERSON:  Absolutely, Judge.  My mistake.
20    BY MR. PATTERSON:
21         Q.    Exhibit 370 contains a number of things.  Did
22    you have occasion to look into Exhibit 370 when you received
23    it from Officer DeYoung?
24         A.    Yes.
25         Q.    Okay.  Do you recall making a kind of mental
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1   inventory of what was in that envelope?

2          A.   You know, it's been a long time ago.

3          Q.   I understand.

4          A.   I don't know.

5          Q.   Okay.  Do you remember if you took anything out

6   of Exhibit 370?

7          A.   I did not take anything out.

8          Q.   Okay.  You took that Exhibit 370 along with the

9   other, I believe it's 266, and put both of those envelopes

10  into the larger white bag?

11         A.   Yes, sir.

12         Q.   Okay.  And then you impounded those two

13  envelopes in one bag at the Phoenix Police Department?

14         A.   Yes, sir.

15         Q.   Okay.

16              (Pause in proceedings.)

17         MR. PATTERSON:  I have no objection, Judge.

18         THE COURT:  Exhibit Number 370 for identification is

19  admitted into evidence.

20              Did you have any --

21         MR. MARTINEZ:  I don't, no.  I don't have any further

22  questions.

23         THE COURT:  Mr. Patterson, did you have any follow-up

24  questions to the questions asked by the jury?

25         MR. PATTERSON:  No, Your Honor.

1        THE COURT:  May this witness be excused?

2        MR. MARTINEZ:  Yes, sir.

3        MR. PATTERSON:  Yes.

4        THE COURT:  Thank you very much.  You're excused.

5        THE WITNESS:  Thank you.

6        THE COURT:  Ladies and gentlemen, we'll go ahead and

7    take our evening recess at this point in time.

8                During this recess remember the entire

9    admonition I gave you including the fact you're not to

10   discuss this case with anyone, do not let anyone discuss the

11   case with you, do not do any research or investigation on

12   your own.  Avoid any media coverage of this case, keep an

13   open mind.  I want you to have a nice evening.  We'll see you

14   tomorrow at 1:00.

15               Have a nice evening.  I'll stay here with

16   Counsel.

17

18               (Whereupon, the jury exits the courtroom.)

19

20        THE COURT:  Please be seated.   This is cause number

21   CR 2000-096032, State of Arizona versus Wendi Elizabeth

22   Andriano.  The record will reflect the presence of the

23   Defendant and Counsel.  We're outside the presence of the

24   jury.

25               Mr. Martinez, I believe you wanted to have some

1   items that were already admitted into evidence marked as a

2   subject group of that exhibits.  Is that correct?

3          MR. MARTINEZ:  That's correct.  And the number that

4   we're dealing with is 266, and I believe the next one in

5   sequence would be 020, 021, and 022.

6          THE COURT:  Any objection from Mr. Patterson?

7          MR. PATTERSON:  None.

8          THE COURT:  Okay.  So just so we're clear, there's

9   three items that Counsel has separated from Exhibit 266, some

10  additional three items, and 266 has already been admitted

11  into evidence.  And the parties -- well, the State moved and

12  there's no objection that those three items can be remarked

13  and stay admitted as 266.020, 266.021 and 266.022.  Is that

14  correct, Counsel?

15         MR. MARTINEZ:  Yes, sir.

16         THE COURT:  Okay.  Then it's so ordered.

17              Anything further, Counsel?

18         MR. MARTINEZ:  No.  I have nothing.

19         MR. PATTERSON:  No, Judge.  Thank you.

20         THE COURT:  Okay.  We'll see everyone at 1:00

21  tomorrow.  We'll be in recess.  Thank you.

22

23              (Evening recess.)

24

25

1

2

3                           CERTIFICATE OF REPORTER

4

5    STATE OF ARIZONA      )
                           )
6    COUNTY OF MARICOPA    )

7

8                I, Traci L. Wheeler, CSR, RPR, an official

9    and certified reporter in the Superior Court of the State

10   of Arizona, in and for the County of Maricopa, hereby

11   certify that I made a shorthand record of the proceedings

12   had in the within case, and that the foregoing transcript

13   is a full, true, and correct transcription of the

14   proceedings in this case.

15                Dated this 5th day of March, 2005.

16

17

18   _____
     Traci L. Wheeler, CSR, RPR
19   Certified Court Reporter No. 50313
     Official Court Reporter
20

21

22

23

24

25

         TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

# APPENDIX D





05-0002   1

Braccio

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

STATE OF ARIZONA,                    )
                                     )
          Plaintiff,                 )
                                     )
     v.                              )        No. CR 05-0005 AP
                                     )        MARICOPA COUNTY
WENDI ELIZABETH ANDRIANO,            )        No. CR 2000-096032
                                     )
          Defendant.                 )
_____      )


Mesa, Arizona
September 22, 2004


BEFORE:  The Honorable BRIAN K. ISHIKAWA


REPORTER'S TRANSCRIPT OF PROCEEDINGS

TRIAL DAY 16


ORIGINAL Prepared for APPEAL by:
TRACI L. WHEELER, CSR, RPR
Certified Court Reporter No. 50313


TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

2

1                    A P P E A R A N C E S

2    FOR THE STATE:          JUAN M. MARTINEZ,
                             Deputy County Attorney
3
     FOR THE DEFENDANT:      DANIEL B. PATTERSON,
4                            Deputy Public Defender
                                   and
5                            G. DAVID DELOZIER,
                             Attorney at Law
6

7            I N D E X   O F   E X A M I N A T I O N

8    WITNESS                                            PAGE

9    ALLINICH, GREG, Called on behalf of the State
          Direct Examination by Mr. Martinez            23
10        Voir Dire Examination by Mr. Patterson        28
          Continued Direct Examination by Mr. Martinez  29
11        Cross-examination by Mr. Patterson            41
          Redirect Examination by Mr. Martinez          46
12        Follow-up Questions by Mr. Martinez           52
          Follow-up Questions by Mr. Patterson          52
13
     BARANOWSKI, EDWARD, Called on behalf of the State
14        Direct Examination by Mr. Martinez            68
          Voir Dire Examination by Mr. Patterson        72
15        Continued Direct Examination by Mr. Martinez  73
          Continued Direct Examination by Mr. Martinez  84
16        Voir Dire Examination by Mr. Patterson        85
          Continued Direct Examination by Mr. Martinez  86
17        Voir Dire Examination by Mr. Patterson        92
          Continued Direct Examination by Mr. Martinez  92
18        Cross-examination by Mr. Patterson            96
          Redirect Examination by Mr. Martinez         106
19        Follow-up Questions by Mr. Martinez          110

20   GUZMAN, JOHN, Called on behalf of the State
          Direct Examination by Mr. Martinez            54
21
     JEWEL, CLIFTON, Called on behalf of the State
22        Direct Examination by Mr. Martinez           111
          Cross-examination by Mr. Patterson           118
23        Redirect Examination by Mr. Martinez         120

24   KNELL, JOHN, Called on behalf of the State
          Direct Examination by Mr. Martinez           124
25        Cross-examination by Mr. Patterson           142

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

000006188

3

1        I N D E X   O F   E X A M I N A T I O N   C O N T I N U E D

2    WITNESS                                                      PAGE

3    SENTELLE, JERRY, Called on behalf of the State
              Direct Examination by Mr. Martinez              6
4             Cross-examination by Mr. Patterson              12
              Redirect Examination by Mr. Martinez            17

5

6

7        E X H I B I T S   A D M I T T E D   I N   E V I D E N C E

8    NO.      DESCRIPTION                                        PAGE

9    161      Photograph                                        25
     162      Photograph                                        25
10   163      Photograph                                        25
     164      Photograph                                        25
11   165      Photograph                                        25
     166      Photograph                                        25
12   167      Photograph                                        25
     169      Photograph                                        25
13   178      Photograph                                        113
     179      Photograph                                        113
14   180      Photograph                                        113
     181      Photograph                                        113
15   182      Photograph                                        113
     183      Photograph                                        113
16   184      Photograph                                        128
     185      Photograph                                        128
17   186      Photograph                                        128
     187      Photograph                                        128
18   188      Photograph                                        128
     189      Photograph                                        128
19   190      Photograph                                        128
     191      Photograph                                        128
20   192      Photograph                                        128
     193      Photograph                                        128
21   194      Photograph                                        128
     195      Photograph                                        128
22   264      Poison packing materials                          130
     265      Poison silver packing materials                   129
23   269      Plastic fork and baggie containing sodium azide   136
     270      Plastic knife containing sodium azide residue     137
24   271      Tupperware containing sodium azide residue        135
     272      Tupperware containing sodium azide residue        134
25   273      White paper towel and sodium azide residue        134

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

4

1              E X H I B I T S   A D M I T T E D   C O N T I N U E D

2      NO.      DESCRIPTION                                          PAGE

3      274      One pair of latex gloves (in plastic)               138
       275      Latex gloves (in plastic)                           138
4      276      Two pieces of aluminum packing foil                 132
       277      Bubble wrap (in plastic)                            133
5      278      Clear plastic bag with black residue                138
       282      Handwritten note in sealed plastic                   29
6      372      Document from Anne Newton (dated 08-21-00)           73
       373      Correspondence sales document                       75
7      374      Document from Anne Newton (dated 08-23-00)          76
       375      Correspondence document - FID # request             77
8      376      Correspondence document - FID # provided            78
       377      Correspondence requesting proof of business         78
9      378      Document from Anne Newton (dated 09-19-00)          78
       379      Correspondence document warning                     78
10     380      Correspondence document (dated 09-22-00)            78
       381      Document "Chemical Description Clarification"        78
11     382      Address "Aztec Creations" document                  78
       383      Voigt agreement document unsigned                   78
12     384      "Sodium Azide" documents from internet              86
       385      Email documents "Lewis dot of Sodium Azide"         90

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MR. MARTINEZ:  Yes, sir.

2          MR. PATTERSON:  No objection.

3          THE COURT:  You're excused.

4               State may call its next witness.

5          MR. MARTINEZ:  State calls Greg Allinich.

6               (Pause in proceedings.)

7          THE COURT:  Sir, if you could please step forward

8     right up here.  Give the clerk your name and she'll swear you

9     in.

10

11               GREG ALLINICH,

12          CALLED TO TESTIFY ON BEHALF OF THE STATE,

13     HAVING FIRST BEEN DULY SWORN, TESTIFIES AS FOLLOWS:

14

15          THE COURT:  Please have a seat on the witness stand.

16     Please make yourself comfortable there on the witness stand.

17     Please pull the microphone close to you.  Please remember to

18     speak loudly and clearly into the microphone so everyone can

19     hear you.  Also please wait until the question is completed

20     before you answer the question, and please make sure you give

21     a verbal response.  Is that all agreeable to you?

22          THE WITNESS:  Yes.

23          THE COURT:  Mr. Martinez, you may proceed.

24     / / / / /

25     / / / / /

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

000006208

1    DIRECT EXAMINATION BY MR. MARTINEZ:

2         Q.    Your name?

3         A.    Greg Allinich.

4         Q.    Who do you work for?

5         A.    City of Phoenix Police Department.

6         Q.    What do you do for the city of Phoenix Police

7    Department?

8         A.    I examine computer systems for information and

9    evidence.

10        Q.    How long have you been doing that sort of work?

11        A.    Four years.

12        Q.    Total?  How long have you been with the Phoenix

13   Police Department?

14        A.    15 years.

15        Q.    Drawing your attention back to October 10 of

16   the year 2000, did you have occasion to be on duty or

17   participate in the homicide that occurred at the San Riva

18   apartments?

19        A.    Yes.

20        Q.    Specifically with regard to that investigation,

21   did you have occasion to go over to the San Riva office where

22   the leasing is done?

23        A.    Yes, I did.

24        Q.    And specifically did you have occasion to go

25   over to the manager's office?

24

1          A.     Yes.

2          Q.     I'm going to show you some photographs, it's

3     159, 160, 161, 162, 163, 164, 166, 167 and 169.  Go ahead and

4     take a look at those.

5               (Pause in proceedings.)

6          THE WITNESS:  Okay.

7     BY MR. MARTINEZ:

8          Q.     Sir, are those true and accurate depictions of

9     that office as it existed back on October 10 of the year 2000

10    along with some of the items found in that office?

11         A.     Yes.

12         Q.     And I want you to take a look at Exhibit 294, I

13    think.  Actually, 297.  We've already been told that the

14    office of the manager was this one.  Is that what the

15    photographs -- is that the office that the photographs

16    depict?

17         A.     The front door would be where your left hand

18    is.

19         Q.     Yes, uh-huh.

20         A.     And the manager's office is --

21         Q.     We've also already been told it's this one

22    with -- this is going to be the bookkeeper's office.  Would

23    you have occasion to disagree?

24         A.     No, that's correct.

25         Q.     May I have that back?

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

000006210

1          A.     Sure.

2          MR. MARTINEZ:  I move for admission of Exhibits 161

3     through 169.

4          THE COURT:  Was 168 -- I didn't hear you mention 168

5     when you handed it to me.

6          MR. MARTINEZ:  It is not in there, sorry.  It's with

7     the exception of 168.

8                    (Pause in proceedings.)

9          MR. PATTERSON:  No objection, Judge.

10         THE COURT:  Exhibit numbers 161, 162, 163, 164, 165,

11    166, 167 and 169 for identification are admitted into

12    evidence.

13                   (Pause in proceedings.)

14    BY MR. MARTINEZ:

15         Q.     Sir, let's start out by taking a look at

16    Exhibit 159.  What does that show us, sir?  If you need to

17    step down, let me know.

18         THE COURT:  You could step down.  Just remember when

19    you're away from the microphone to speak up as loud as you

20    can so everyone can hear you.

21    BY MR. MARTINEZ:

22         Q.     What does that show us?

23         A.     This picture shows basically a desk, a

24    credenza, trash can, box, a stereo and out basket.

25         Q.     And would the door be right here where my pen

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1    is pointing to?

2         A.    Yes, right back here.

3         Q.    And if we take a look at 160, what does that

4    show us?

5         A.    Same trash can.  Basically, the same office,

6    just the opposite side of the wall with a glass window that

7    looks into the bookkeeper's office.

8         Q.    161, I think you said this was the bookkeeper's

9    office previously.  What does this show us?

10        A.    Basically the same thing, just as -- if you

11   were to enter the door over to the left of this photo, to the

12   right would be the easel and the other portion of the office.

13        Q.    Would the hallway and the door be on this side

14   to the right of the photo?

15        A.    Yes.

16        Q.    162?

17        A.    Same office.

18        Q.    And is the door to the outside right here?

19        A.    Yes.

20        Q.    I want to you take a look at 163.  Do you --

21   and do you see this box that's here?

22        A.    Yes.

23        Q.    And 164.  Is that just a close-up of that box?

24        A.    Yes, it is.

25        Q.    Did you have occasion to look inside that box?

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

000006212

1       A.      Yes.

2       Q.      And I'm showing you Exhibit 165.   Whose hand is

3    that?

4       A.      Mine.

5       Q.      And holding a white sheet of paper, is 166 the

6    white sheet of paper that you were holding?

7       A.      Yes, it is.

8       Q.      So we could complete this, 167, what does that

9    show?

10       A.      A brochure that was in the box.

11       Q.      And whose hand is that?

12       A.      Mine.

13       Q.      Why don't you go ahead and take the stand

14    again.

15               Please take a look at Exhibit 282.

16               (Pause in proceedings.)

17    BY MR. MARTINEZ:

18       Q.      Do you recognize it?

19       A.      Yes.

20       Q.      What is it?

21       A.      It's the piece of paper that I was holding in

22    the photograph that you were displaying.

23       Q.      Okay.  If I may have it back.

24       MR. MARTINEZ:  I move for admission of Exhibit 282.

25               (Pause in proceedings.)

1          MR. PATTERSON:  Voir dire, Judge?

2          THE COURT:  Yes.

3

4   VOIR DIRE EXAMINATION BY MR. PATTERSON:

5          Q.    Were you holding it over the box to suggest

6   that you found this in the box?

7          A.    Yes.

8          Q.    Okay.  This wasn't given to you by a person

9   employed by the Fairfield Management?

10         A.    It was -- sorry.  It was given to me, yes, by

11  the manager.

12         Q.    By the name of Cheryl Green?

13         A.    Green, yes.

14         Q.    Okay.

15         A.    And the box was next to the desk of the

16  manager's office, and I was just simply holding it up there

17  because she informed me she cleaned out the desk and put all

18  of the personal belongings -- belongings to Wendi Andriano.

19         Q.    Okay.  So just so I understand it, you didn't

20  discover this in the desk?

21         A.    No.  The -- no, I did not.

22         Q.    Okay.  Somebody apparently did?

23         A.    Green, yes.

24         Q.    Okay.  And she placed all of the contents of

25  the desk drawer into that box that was just displayed in the

1    photograph?

2         A.    Yes, except she did leave that there just to

3    show me where she found that in the top center drawer in the

4    desk in that office.

5         Q.    Okay.  So you actually received this from a

6    lady?

7         A.    Yes.

8         Q.    You didn't take it from the box?

9         A.    No, I didn't take it out of the box, I'm sorry.

10        Q.    All right.

11        A.    Okay.

12        Q.    I'm trying to figure out why did you hold it

13   over the box?

14        A.    Oh.  I have no idea other than maybe the

15   position of where the photographer was standing at the time.

16        Q.    Okay.  So it has no relationship whatsoever to

17   the box.  I mean, is that a fair statement?

18        A.    No, just that it's the same owner.

19        Q.    Okay.  All right.

20        MR. PATTERSON:  With that understanding, Judge, I

21   have no objection.

22        THE COURT:  Exhibit 282 for identification is

23   admitted into evidence.

24   CONTINUED DIRECT EXAMINATION BY MR. MARTINEZ:

25        Q.    Let's take a look at it to see what we've been


TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

000006215

1    talking about.  Can you see it from there?  What is deleting

2    cookies?  What does that mean in computer vernacular?

3         MR. PATTERSON:  Judge, could we just establish some

4    foundation for this opinion.

5         THE COURT:  Yes.  Lay some more foundation.

6    BY MR. MARTINEZ:

7         Q.    Sir, you've indicated you're in what unit of

8    the Phoenix Police Department?  What unit are you in?

9         A.    In the -- in the forensic unit.

10        Q.    And what do you do or what do you deal with on

11   a day-to-day basis?

12        A.    Computer evidence.

13        Q.    And specifically what is it that you do with

14   this computer evidence?  I mean, what is it that you do?

15        A.    Recover information, recover deleted files,

16   lost or hidden files, that type of information.

17        Q.    And is that what you do everyday -- not

18   everyday, but every week, 40 hours a week?

19        A.    Yes.

20        Q.    Now, did you have any special training that

21   allowed you to go into this field with computers?

22        A.    Yes.

23        Q.    And what -- give me a little bit of your

24   background, a little bit of the training you've had?

25        A.    Well, I'm certified by IACIS, International

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1    Association of Computer Investigative Specialists as a

2    forensic examiner.  I've attended about 150 hours of

3    training -- excuse me, about 250 hours of training through

4    them.  I've also attended training through the National White

5    Collar Crime Center, and I've had about three to 400 hours of

6    training through them, plus numerous other classes such as

7    International Association Chiefs of Police, the County

8    Attorney's Office, Attorney General's Office, the Search

9    Group, which is federally funded by the United States

10   Department of Justice in search and seizure and examination

11   of computer evidence.

12              Q.    During the time that you've had this education

13   and during the time you've been examining computers, have you

14   ever had occasion to be trained or come across the term

15   "deleting cookies"?

16              A.    Yes.

17              Q.    And, roughly, how many times would you say

18   you've been either educated or seen this term?

19              A.    Numerous.

20              Q.    And what does it mean, "deleting cookies"?

21              A.    To delete cookies is basically saying to delete

22   a file, and that is a cookie file.  That's what that's making

23   reference to.

24              Q.    So let me see if I understand it.  How is it,

25   first of all, that one creates a file?  I mean, what are we


         TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1      talking about when you say creating a file?

2              A.    Can I explain --

3              Q.    Sure.

4              A.    -- cookie file?

5              Q.    Sure.

6              A.    Okay.  A cookie file is basically a file that

7      is placed on your hard drive by remote website, and the

8      purpose is so that when you return to that website, it will

9      recognize you, identify you, and in some way store some of

10     your preferences.

11             Q.    So in other words, let's see if I understand

12     it, and if I don't please correct me, the user of a computer

13     can go to a site.  Let's assume they do that.  The site they

14     go to, let's say it's a commercial site will then have a

15     record as I understand it of you going to their site.  Is

16     that true so far?

17             A.    Correct.

18             Q.    And then that's the file that's created on your

19     preferences based on your earlier contact with them.  Is

20     that correct?

21             A.    Correct.

22             Q.    And they -- these people that you may have

23     contacted, this business then has a file out there, correct?

24             A.    Yes, on your hard drive.

25             Q.    On your hard drive.  And what this refers to is

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1    deleting their file from your hard drive?

2            A.    That's correct.

3            Q.    So just so that we could use a concrete

4    example, for example if I went onto a site called Voigt

5    Global, and then Voigt Global knew my preferences, that would

6    be one of the files that would be on my hard drive, right?

7            A.    That's correct.

8            Q.    If I were to go in and delete the cookies

9    associated with Voigt Global, would I then be, and correct me

10   if I'm wrong, would I then be deleting the file that they put

11   on my hard drive based on my preferences?

12           A.    Yes.

13           Q.    Thank you.  When you were out there, sir, did

14   you also have occasion to go to the bookkeeper's office in an

15   effort to get that computer?

16           A.    Yes.

17           Q.    Who did you go with?

18           A.    Detective Guzman.

19           Q.    And who was doing the yeoman's work and who was

20   doing the supervising?

21           A.    Neither.

22           Q.    Okay.

23           A.    He was -- Detective Guzman was doing the

24   seizure.

25           Q.    And what's his first name?


TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1    A.    John.

2    Q.    When you say he was doing the seizure, was he

3  the person actually taking the computer down?

4    A.    Yes, that's correct.

5    Q.    And you were the one assisting that?

6    A.    Yes.

7    Q.    Was that computer taken that day?

8    A.    Yes.

9    Q.    From the -- from the bookkeeper's office?

10    A.    Correct.

11    Q.    How is it that -- have you done that before in

12  your career with the Phoenix Police Department?

13    A.    Yes.

14    Q.    And in your training have you been taught how

15  to do that?

16    A.    Yes.

17    Q.    How is it that one goes about tearing down or

18  taking a computer so that you could access whatever

19  information may be in there?  How do you do that?

20    A.    Well, in this case I would say you should

21  probably ask Detective Guzman since he seized it and I did

22  not since I was speaking with Ms. Green.

23    Q.    But you were there when he was doing it though,

24  right?

25    A.    I was in another room.

1          Q.     Okay.  He did that and you were doing other

2     things?

3          A.     Yes.

4          Q.     Did you and he then go somewhere else?

5          A.     Yes.

6          Q.     Where did you guys go?

7          A.     We went to Apartment 132 of the San Riva

8     apartment.

9          Q.     And you and Detective Guzman went there,

10    correct?

11         A.     Yes.

12         Q.     When you went there, what did you and he do?

13         A.     He seized a laptop computer from that apartment

14    complex or office.

15         Q.     Do you remember what -- do you remember what

16    room he took it from or would that be better directed to him?

17         A.     Better directed to him.

18         Q.     After -- so now so far you have, as I

19    understand it, you have a computer from the bookkeeper's

20    office, you have a laptop.  Are you done at the San Riva

21    apartment complex?

22         A.     No.

23         Q.     Where do you go from there?

24         A.     We went to Apartment 382.

25         Q.     And when you went to Apartment 382, what did

1    the two of you do?

2         A.    Seized a computer over there.

3         Q.    And just so that I could get my terms straight,

4    is there a difference between a computer and a laptop?  See

5    what I'm saying?

6         A.    In the way we make reference to them, yes, but

7    are -- they're both still computers and capable of

8    functioning the same way and usually performing the same

9    tasks.

10        Q.    Okay.  What we associate with computers -- I

11   guess I'll ask you to take a look at Exhibit 174.  Do you see

12   what's there?

13        A.    Yes.

14        Q.    What does that show us?

15        A.    This is the actual computer or what we might

16   call a computer midtower.

17        Q.    So it's --

18        A.    It's just the tower.

19        Q.    It's not the monitor, it's the tower, right?

20        A.    Correct.

21        Q.    And with regard to a laptop, does a laptop also

22   have a tower or not?

23        A.    No.

24        Q.    So when you seize a computer, do you take the

25   monitor and the -- and the tower or do you just take the

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1    tower?

2           A.    It depends on the situation.  Each situation,

3    each case is different.  In this particular case we did not

4    seize the computer monitor and the keyboard and the mouse and

5    the other peripheral devices.  We just simply took the

6    computer tower.

7           Q.    You indicated that in 132 you took a laptop

8    computer.

9           A.    That's correct.

10          Q.    Does the laptop have one of those towers

11   associated with it?

12          A.    No.  The laptop is self-contained.  The

13   computer and the monitor and keyboard are all built into one

14   unit and it's self-contained, much, much smaller.

15          Q.    So when you seize the laptop, you just take the

16   laptop.  You don't take towers or anything like that?

17          A.    Correct.

18          Q.    So get back to Apartment 382.  I think you

19   indicated you seized what from in there?

20          A.    The computer.

21          Q.    Subsequent to that, did you receive information

22   there may have been a laptop in Apartment 382?

23          A.    Yes.

24          Q.    Did you do anything with regard to the seizure

25   of the laptop in Apartment 382?

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

000006223

1          A.     It was later seized.

2          Q.     Did you have anything to do with taking it into

3    custody and that sort of thing?

4          A.     Yes.

5          Q.     Explain to me what it was that you did with

6    regard to the laptop that came from Apartment 382?

7          A.     Okay.  On October 12th, Detective Lucero called

8    me and informed me that he was --

9          MR. PATTERSON:  Well, Judge, if we could just get to

10   what he did in response to the phone call.

11         THE COURT:  Just say what you did.

12   BY MR. MARTINEZ:

13         Q.     In other words, Officer, you had a conversation

14   with Detective Lucero, correct?

15         A.     Yes.

16         Q.     In response to that conversation, something

17   happened, right?

18         A.     Yes.

19         Q.     Tell me what happened.

20         A.     He gave me a laptop computer.

21         Q.     Okay.  And it was your understanding which

22   lap -- who did this laptop computer belong to?

23         A.     Erik Vaillant.

24         Q.     Okay.  What did you do with the laptop

25   computer?

1          A.    I took it -- took it back to the computer

2    forensic lab and gave it to Detective Baranowski.

3          Q.    Are you familiar with the term "imaging"?

4          A.    Yes.

5          Q.    What does that mean?

6          A.    "Imaging" simply means you're making an exact

7    duplicate.  In terms that we use it, it means we're making an

8    exact duplicate of a hard drive or some type of magnetic

9    media which could be a floppy disk, CD rom, or computer hard

10   drive.

11         Q.    So when you image a computer or a hard drive,

12   does that mean that everything that's in that hard drive is

13   then on the image that you've created?

14         A.    That is correct.

15         Q.    So the image that you've created can then be

16   put into the computer and it will run as before even though

17   it's just the image?

18         A.    That's correct.

19         Q.    Does it lose anything going from the original

20   hard drive during the imaging process to the imaged copy?

21         A.    No.

22         Q.    Back on October 10, 2000, did you have occasion

23   to speak to somebody by the name of Janice Lind?

24         A.    Yes, I did.

25         Q.    And what was the substance of the conversation

1    that you had with her?  What was the subject?

2         MR. PATTERSON:  Objection.  Calls for hearsay.

3         THE COURT:  Sustained.

4    BY MR. MARTINEZ:

5         Q.    Did you tell her -- what did you tell her?

6         A.    What did I tell her?

7         Q.    Yeah, yes, sir, without telling us what she

8    said.

9              (Pause in proceedings.)

10   BY MR. MARTINEZ:

11        Q.    Let me put it to you this way.  Did you ever

12   utter the words "floppy disk" or "disk" or anything like that

13   in your conversation with Janice Lind?

14        A.    Yes.  That was the primary topic.

15        Q.    I'm going to show you what has been marked for

16   identification as Exhibit 371.  Do you recognize it?

17        A.    Yes, I do.

18        Q.    What is it?

19        A.    It's a 3.5 inch diskette.

20        Q.    Were you the person who actually put it in that

21   envelope?

22        A.    Yes.

23        Q.    How is it that it came to you?  Who did you

24   receive it from or how did you get it?

25        A.    I received it from Detective Guzman.


TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

000006226

1          Q.     And was it at the Phoenix Police Department

2     that he gave it to you?

3          A.     Yes, it was.

4          Q.     And then you put that diskette in that

5     envelope, right?

6          A.     That's correct.

7          Q.     Did you have anything to do with imaging any

8     computers involved in this investigation or making an image

9     of a floppy disk or anything like that, imaging anything?

10          A.     No, sir.  I did not.

11     MR. MARTINEZ:  I don't have any other questions.

12     THE COURT:  Mr. Patterson?

13     MR. PATTERSON:  Thank you, Judge.

14

15     CROSS-EXAMINATION BY MR. PATTERSON:

16          Q.     How you doing, Detective?

17          A.     Okay.  Thank you.

18          Q.     We've spoken before, haven't we?

19          A.     I don't remember.

20          Q.     Yeah.  Let me see what day it was.  May have

21     been several years ago.  Yeah, May 16, 2002?

22          A.     Okay.  Sorry.

23          Q.     It's hard to remember what we had for lunch

24     last week much less recall an interview that happened over

25     two years ago.

1              Let's talk about this deleting cookies

2    proposition.  By going through that process to delete the

3    cookies, you don't disable the computer's ability to receive

4    cookies, do you?

5           A.    Well, no.  No.

6           Q.    Okay.  It will continue to accept cookies the

7    next time you access an internet website, correct?

8           A.    Correct.

9           Q.    Assuming that website generates cookies in the

10   first place, right?

11          A.    That's true.

12          Q.    Not all websites generate cookies?

13          A.    That's very true.

14          Q.    Okay.  And there's a process within the windows

15   operating system that you can disable the cookie receiving

16   function, correct?

17          A.    That's correct.

18          Q.    All right.  By essentially going through the

19   process -- you probably know how to do it probably better

20   than I do -- but hitting a series of functions, you can

21   render your computer or the computer accessing the internet,

22   render it incapable of accepting cookies, correct?

23          A.    Yes, that's correct.

24          Q.    They use the term disable or enable?

25          A.    Yes.

1        Q.   Okay.  When your computer is disabled, it will

2  not accept cookies from any website, correct?

3        A.   Correct.

4        Q.   All right.  And you're making an effort to

5  avoid cookies.  Disabling the computer is better than just

6  deleting the cookies, correct?

7        MR. MARTINEZ:  Objection.  Speculation.

8        THE COURT:  Overruled.  Go ahead and answer the

9  question if you can.

10       THE WITNESS:  Say it one more time.

11  BY MR. PATTERSON:

12       Q.   In terms of eliminating the possibility of

13  having cookies on your computers, the disabling process is

14  far better than just the deleting process, right?

15       A.   Absolutely.

16       Q.   Okay.

17       A.   Absolutely.

18       Q.   Okay.  And there are security systems like

19  McAfee or Norton that can also be used to eliminate cookies

20  from your system, right?

21       A.   That's true.

22       Q.   Do you know whether the computer you seized

23  from the bookkeeper's office had a McAfee or Norton system in

24  the software component?

25       A.   I'm sorry, I don't, because I didn't examine

1    it.

2              Q.    Okay.

3              A.    I have no idea.

4              Q.    All right.  Same question with regard to the

5    computer seized from the manager's office, you didn't examine

6    it?

7              A.    That's correct.

8              Q.    Okay.  So you don't know whether it has a

9    security system like McAfee or Norton?

10             A.    I do not, no.

11             Q.    And I assume the same thing applies for the

12   other laptops you seized, right?

13             A.    Yes.

14             Q.    Okay.  All right.  Do you know whether these --

15   let's take it incrementally.  Do you know whether the

16   computer -- the tower I guess they call it or the PCU or P --

17   CPU, that's what you seized, right?

18             A.    Yes.

19             Q.    Central processing unit, right?

20             A.    Yes.

21             Q.    Okay.

22             A.    That's what a lot of people refer to it as,

23   yes.

24             Q.    Okay.  The tower, the CPU, everything but the

25   TV screen and the keyboard and the mouse, right?

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1          A.     Yes.

2          Q.     Okay.

3          A.     Sorry.

4          Q.     Do you know whether the computer you ceased

5    from the bookkeeper's office was password protected?

6          A.     I don't, no.

7          Q.     Because you didn't examine the -- the Windows

8    operating system, right?

9          A.     Right.

10         Q.     That's where you find that, right?

11         A.     Uh-huh, yes.

12         Q.     Okay.  And you didn't examine the manager's

13   computer to determine whether it, too, was password

14   protected, correct?

15         A.     Correct.

16         Q.     Did you have occasion to examine the laptops to

17   determine whether or not they were password protected?

18         A.     No.

19         Q.     Okay.  Can you tell me what the intent of

20   password protection is?

21         A.     Password protection is just simply a method to

22   keep the unintended viewer from viewing the contents of your

23   drive or the computer itself.

24         MR. PATTERSON:  Okay.  I believe that's all I have,

25   Judge.  Thank you, Detective.


TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

000006231

1          THE COURT:  Mr. Martinez?

2

3    REDIRECT EXAMINATION BY MR. MARTINEZ:

4          Q.    With regard to this issue of password

5    protection, what if you give somebody your password? Would

6    they then be able to access the computer?

7          A.    Sure, yes.

8          Q.    And what if you gave it to ten people. Would

9    they also be able to access your computer?

10         A.    Yes.

11         Q.    This deleting cookies that you were talking

12   about, when people go on the computer and there are these pop

13   up sort of messages that come up, is that the cookies you're

14   talking about or is it something different?

15         A.    Actually, it's -- it's using two different

16   terms.  Cookies are totally different from what we refer to

17   as popups.  I can give you another example if you'd --

18         Q.    Sure.  Go ahead.

19         A.    An example I'd like to use is like, let's say

20   you order a book through Amazon.com, you order it online

21   using your computer, and let's just say as an example you

22   want to order a computer book.  And let's say that that

23   particular computer book you want to order is a book that has

24   something to do with the internet.  When you go to Amazon.com

25   they will put their cookie on your hard drive, on the user's

1    hard drive.  And as an example, just easier to use myself,

2    the cookie goes on there so the next time I -- I would access

3    Amazon.com with that same computer, with my computer, it will

4    say oh, this is Greg.  The last time he accessed our website

5    was such and such a date.  His preferences are computer books

6    or computer manuals, and the subject topic to that could be

7    the internet.

8        Q.    So what would they do as a result of that?

9    Would they do anything or just keep --

10        A.    Well, that's a good question because when

11    cookies first came out everybody was really scared about, you

12    know, cookies, cookies are a bad thing.  In reality, cookies

13    are a good thing.  And as usual, anything that can be good

14    can also be bad, but basically the natural intention of a

15    cookie is a good thing so that when you go back and access

16    that website again, you do not have to scour any or click on

17    umpteen pages to try and find out where did I find that book

18    the last time.  The website will automatically remember it

19    for me and take me directly there and then give me the choice

20    of browsing around other areas of their website or their

21    business.

22        MR. MARTINEZ:  I don't have any other questions.

23        THE COURT:  Are there any further questions of this

24    witness by the jury?  If so, please raise your hand.

25        (Pause in proceedings.)

```
 1              THE COURT:  Let me see Counsel here at the bench.

 2

 3              (The following proceedings were held at the

 4    bench:)

 5

 6              THE COURT:  Question, "Please define hearsay and

 7    effect on testimony and when it occurs.  Thank you."

 8              MR. MARTINEZ:  I don't think she's entitled to that.

 9              MR. PATTERSON:  No.  It's not going to happen, Judge.

10              THE COURT:  Sorry?

11              MR. PATTERSON:  I don't think you should instruct

12    them on matters of the law.

13              THE COURT:  Okay.  Next question, "What office is

14    shown in photos 159 through 163?  Wendi's office or

15    bookkeeper's office?"

16              THE COURT:  Mr. Martinez?

17              MR. MARTINEZ:  No objection.

18              MR. PATTERSON:  No objection.

19              THE COURT:  Next question, "How many computers were

20    seized?  From where?"

21              MR. MARTINEZ:  No.  No objection.

22              MR. PATTERSON:  It's cumulative.  I wish she'd keep

23    track of the testimony, but you could go over it again.

24              Okay.  Next question, "Would a user know his

25    address is now saved by the site he contacted?"
```

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

000006234

49

1        MR. MARTINEZ:  That's kind of speculative as to "he."

2   Depends on the knowledge of the user.

3        MR. PATTERSON:  Not all websites generate cookies.

4   Cookies are not readily apparent to the user.

5        THE COURT:  I'm not going to ask that.

6             Next question, "When you do deleting

7   cookies" -- sorry.  "When you do delete cookies, does it also

8   delete the information you send to the company or just the

9   information from the company?"

10        MR. MARTINEZ:  No objection.

11        MR. PATTERSON:  No, that's fine.  That's clarifying.

12        THE COURT:  Next question, "Cookies is a website like

13   ie.  shockwave.com, slash, soapnet.com, or is it some other

14   types of websites?"

15        MR. PATTERSON:  Well --

16        MR. MARTINEZ:  That shows, I think, a lack of

17   understanding in his previous explanation on what that was.

18   It has been explained when we allowed him to go into that

19   narrative, there wouldn't be this kind of question, so I'll

20   leave it to defense counsel if he wants to have it asked.

21        MR. PATTERSON:  I -- it's not -- yeah, shows a

22   complete misunderstanding of the cookies concept.  It's not a

23   website.

24        THE COURT:  Right.

25        MR. PATTERSON:  It is something generated about a

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

50

1    website, some websites.  So we'll explain that to them in our

2    closing argument.  I would object to this.

3              THE COURT:  You'll object?

4              MR. PATTERSON:  Yes.

5              THE COURT:  Okay.  I won't ask it.

6                   Next question, "How are you able to find out

7    who belongs to the computer, paren, If you know, end of

8    paren, and using other passwords?  Does that affect it in any

9    way?"

10             MR. MARTINEZ:  I don't think he has the knowledge to

11   answer that.  I mean, how does it affect other passwords?  I

12   just -- I'm not quite sure.  I don't know what she's asking.

13             MR. PATTERSON:  I don't understand the question.

14             THE COURT:  I'm not going to ask that.  I don't think

15   it would be something he would be able to answer.

16

17                   (The following proceedings were held in open

18   court:)

19

20             THE COURT:  Do you have the Exhibits 159 through 163

21   there?

22             MR. MARTINEZ:  I do.

23             THE COURT:  Sir, I have a question here for you.  And

24   that question read as follows.  "What office is shown in

25   photos 159 through 163?  Wendi's office or bookkeeper's?

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1          THE WITNESS:  159 through 163?

2          THE COURT:  Yes.

3          THE WITNESS:  The main focus of the photograph is the

4     manager's office, Wendi Andriano.  But I think I did make

5     reference that in a couple of the pictures there is a window

6     with clear glass that you can -- it's not a solid wall.  You

7     can look from one office to the next.  But the main focus of

8     the photographs would be the manager's office, yes.

9          THE COURT:  Next question read as follows:  "How many

10    computers were seized and from where?"

11         THE WITNESS:  One -- one computer was seized from the

12    bookkeeper's office, which is right next to the manager's.

13    And the next second one that was seized was Apartment 132,

14    and then apartment 382.  So that's three.

15         THE COURT:  Next question reads as follows:  "When

16    you delete cookies, does it also delete the information you

17    send to the company or just the information from the

18    company?"

19         THE WITNESS:  When you delete a cookie, you are

20    deleting it only off of your hard drive so you cannot delete

21    anything from the remote site or the website that put it on

22    there.  So it would only be deleting that information.

23         THE COURT:  Are there any further questions of this

24    witness by the jury?  If so, please raise your hand.

25              (No response.)


TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

000006237

52

1          THE COURT:  No one has raised their hand.

2              Mr. Martinez, do you have any questions to

3     those specific questions asked by the jury?

4

5     FOLLOW-UP QUESTIONS BY MR. MARTINEZ:

6          Q.    You indicated, sir, there were three computers

7     seized on October 10, 2000, right?

8          A.    Yes.

9          Q.    You also previously in your testimony mentioned

10    Erik Vaillant's computer.  Do you remember that?

11         A.    Yes.

12         Q.    That was also in Phoenix Police Department

13    possession, right?

14         A.    Correct.

15         Q.    What date did you come into possession of that?

16         A.    On the 12th.

17         Q.    Of October?

18         A.    October 12, 2000.

19         Q.    And was that a tower or was that a laptop?

20         A.    That was a laptop.

21    MR. MARTINEZ:  I don't have anything else.

22    THE COURT:  Mr. Patterson?

23

24    FOLLOW-UP QUESTIONS BY MR. PATTERSON:

25         Q.    On the issue of deleting cookies, when you do

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

000006238

1    delete cookies you free up additional space on your hard

2    drive, right?

3         A.    Yes, absolutely.

4         Q.    It's one of the reasons to delete cookies in

5    the first place, to clean up your computer, correct?

6         A.    Yes, that's correct.

7         MR. PATTERSON:  Thank you, Judge.

8         THE COURT:  May this witness be excused?

9         MR. MARTINEZ:  Yes, sir.

10        MR. PATTERSON:  Yes, thank you.

11        THE COURT:  Thank you very much.  You're excused.

12        THE WITNESS:  Thank you.

13        THE COURT:  State may call its next witness.

14        MR. MARTINEZ:  State calls John Guzman.

15            (Pause in proceedings.)

16        THE COURT:  Sir, if you could, please step forward

17   right up here.  Give the clerk your name and she'll swear you

18   in.

19

20              JOHN GUZMAN,

21        CALLED TO TESTIFY ON BEHALF OF THE STATE,

22   HAVING FIRST BEEN DULY SWORN, TESTIFIES AS FOLLOWS:

23

24        THE COURT:  Sir, if you could also please have a seat

25   on the witness stand here.  Please make yourself comfortable

1    there on the witness stand.  Please pull the microphone close

2    to you.  Please remember to speak loudly and clearly into the

3    microphone so everyone can hear you.  Also please wait until

4    the question is completed before you answer the question, and

5    please make sure you give a verbal response.  Is that

6    agreeable with you, sir?

7             THE WITNESS:  Yes, sir.

8             THE COURT:  Mr. Martinez, you may proceed.

9

10   DIRECT EXAMINATION BY MR. MARTINEZ:

11            Q.    Your name, sir?

12            A.    John Guzman.

13            Q.    Who are you employed by?

14            A.    Detective with Phoenix Police Department.

15            Q.    In what unit are you serving now?

16            A.    I'm assigned to the computer forensics unit.

17            Q.    How long have you been in that unit?

18            A.    Approximately four and a half years.

19            Q.    Did you receive any special training that

20   allows you to work in that unit?

21            A.    Yes.

22            Q.    Tell me about it.

23            A.    I've had quite a bit of extensive training

24   since the spring of 2000 on several different agencies or

25   institutions including the National White Collar Crime

1    Center, ASSIS, Encase, and a few others primarily on basic

2    and advanced types of computer forensic examination.

3         Q.    And prior to you receiving this training, did

4    you already know something about computers or is it something

5    that you were assigned to do?

6         A.    I had some familiarity with computers several

7    years prior to that.

8         Q.    What kind of familiarity did you have?

9         A.    Actually started with an investigation I was

10   doing that forced me into learning about computers, and for

11   several years in the Organized Crime Bureau, I became the so

12   called resident expert --

13        Q.    When did that investigation start, just so we

14   could have a point of reference the one involving the

15   organized crime?

16        A.    January of '94.

17        Q.    Go ahead.

18        A.    Anyway, I became the resident expert in my

19   unit, so that allowed me to work on computers, take classes,

20   build databases, do some programming, that sort of thing.

21        Q.    And post 1994 when you began working on it,

22   let's say for the next year -- couple of years or so, did

23   your job mainly consist of work with computers or was it

24   computers and something else?

25        A.    I carried the responsibility of troubleshooting

1     and assisting the other detectives while I was doing my own

2     investigations.  That included building databases for them

3     and troubleshooting their computers.

4          Q.    And since I think early 2000, have you been

5     solely devoted to dealing with computers and computer crime?

6          A.    Yes, with the exception of one short period of

7     time where I was assigned to another investigation.

8          Q.    When were you assigned to that investigation,

9     the date?

10         A.    October 24, 2000.

11         Q.    As a result of that assignment on October 24th,

12    2000, were you taken off the investigation of the killing of

13    Joseph Andriano?

14         A.    Yes.

15         Q.    But to take you back to October 10 of the year

16    2000, did you have occasion to be in the company of Detective

17    Greg Allinich and go over to the San Riva apartment complex?

18         A.    Yes, I did.

19         Q.    When you went over to the San Riva apartment

20    complex, did you have occasion to go and seize a computer

21    from the manager's -- from the office, the main office, if

22    you will, that's on site?

23         A.    Yes.

24         Q.    And whose or what individual's computer did you

25    seize?

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1          A.    It was the -- as I understood it, it was the

2     office computer in the back office of the San Riva's

3     apartment office.

4          Q.    Let me show you what has been marked for

5     identification as Exhibit Number 297.   If this is the front

6     door, where did you seize the computer from, what office?

7          A.    Would be to the far right on the top corner

8     office.

9          Q.    That would be, if we're looking at this

10    diagram, it would be to the right and then to the upper

11    portion of the diagram?

12         A.    That's correct.

13         Q.    This office here?

14         A.    Yes, sir.

15         Q.    I'm going to show you photographs.   They're

16    Exhibits 172, 173, 174, and 175.

17         A.    Yes.

18         Q.    Do you recognize what's shown in those

19    photographs?

20         A.    Yes, sir.

21         Q.    Are those true and accurate depictions of what

22    may have existed in the subject matter back on October 10th

23    of the year 2000?

24         A.    Yes.

25              MR. MARTINEZ:  Move for admission of Exhibits 172,

1    173, 174 and 175.

2              MR. PATTERSON:  No objection, Judge.

3              THE COURT:  Counsel, I believe they have all been

4    admitted already.  Check the green tag.

5              MR. MARTINEZ:  Okay.

6              THE COURT:  172, 173, 174 and 175 have previously

7    been admitted.

8              MR. MARTINEZ:  Let's take a look at them.

9              THE WITNESS:  Can I step down?

10             MR. MARTINEZ:  Yes.

11             THE COURT:  You could step down.  Just remember to

12   speak up as loud as you can when you're away from the

13   microphone.  Thank you.

14   BY MR. MARTINEZ:

15        Q.    What does that show us, 172?

16        A.    This shows -- can I use this?

17        Q.    Yes.

18        A.    That picture shows this area, this desk area

19   with this back wall where the window is along this back wall

20   here.  The computer in question is on the floor behind that

21   chair, which would be in this approximate area here.

22        Q.    And if you take a look at Exhibit 173, is that

23   a closer view of that area?

24        A.    Yes.

25        Q.    What is this item called down here?

1      A.    It's the computer tower.

2      Q.    And this up here?

3      A.    That's the monitor.

4      Q.    And this right here?

5      A.    Keyboard.

6      Q.    And this little white thing to the right?

7      A.    It may be the mouse.  I can't tell from --

8      Q.    Okay.  Exhibit 174?

9      A.    That's the depiction of the backside of the

10  computer tower where all the cables are connected.

11     Q.    And Exhibit 175?

12     A.    That's a close-up of the monitor and the

13  speaker.

14     Q.    What's this little white thing to the right

15  here?

16     A.    That's the mouse.

17     Q.    Go ahead and take a seat please.

18          Sir, in looking at those photographs I notice

19  that at least in Exhibit 172 -- or, actually, Exhibit 174,

20  we're looking at what you called the tower, right?

21     A.    Yes.

22     Q.    We've all seen many towers.  They all seem to

23  look alike.  When you take a tower, do you assign it a

24  certain number or how is it you keep them straight?

25     A.    Any time you seize a computer, we do an

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

000006245

60

1    examination report.  Any serial numbers, if there are any, we

2    label all the connections, we look inside the tower, we open

3    the box up, we look at all the hardware that's installed, and

4    we make notes and reports based on that.

5           Q.    Did this have an "S" number or any sort of

6    number attached to it?

7           A.    Yes.  I believe that was S16, Item 1, D1.

8           Q.    Okay what was that number again?

9           A.    S16, I1, D1.

10          Q.    This -- looking inside, labeling -- does that

11   happen at the scene or some happen at the scene and rest back

12   at the office?

13          A.    The examination of the exterior of the computer

14   and the photographing takes place at the scene.  We transport

15   the computer to our lab and we do the rest of the examination

16   in the lab.

17          Q.    And in this case were you the person who

18   actually took the tower out of that office there in the back

19   that we've been talking about?

20          A.    Yes.

21          Q.    Did Officer Allinich assist you in taking it or

22   was it all your doing?

23          A.    He was present.  He may have opened the door to

24   the car when I put it in, I don't know.

25          Q.    Then where did you go besides that office?  Did

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

000006246

1    you go anywhere else or --

2            A.    Yes.  After that, we went to an apartment.  I

3    believe it was Apartment 132.

4            Q.    And what did you do there with regard to the

5    computers?

6            A.    I was directed to a computer laptop --

7            Q.    Okay.

8            A.    -- that was in the bedroom of that apartment on

9    top of a dresser.

10           Q.    All right.

11           A.    And the only cable that was connected to that

12   computer was the power cable into the outlet.

13           Q.    When you say that -- so was it connected to the

14   internet or to the outside world or did it just have power to

15   it?

16           A.    I don't recall.

17           Q.    Okay.  And did you say that was the laptop or a

18   tower?

19           A.    That was a laptop.

20           Q.    And did you give that a number?

21           A.    Yes, we did.  I believe that was -- let me

22   refer to my notes.  I don't want to give you the wrong one.

23                 (Pause in proceedings.)

24                 THE WITNESS:  That would have been S16, I2, D1.

25    / / / / /


           TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1    BY MR. MARTINEZ:

2         Q.    Where did you go after you left Apartment 132?

3    Did you remain there at the complex continuing your work or

4    did you go back to the office?

5         A.    After removing the laptop from that apartment,

6    we went to a second apartment.  I believe it was 382.

7         Q.    And what did you take there?

8         A.    I was directed to another computer tower that

9    was in the front living room area or kitchen area, I'm not

10   sure.  And I -- I did this, basically, the same thing.  I

11   removed the cables and secured that computer tower from that

12   apartment.

13        Q.    And did you give that a number?

14        A.    Yes.  That was S16 I3 D1 and 2.

15        Q.    Why do you say D1 and 2?

16        A.    It had two hard drives in it.  The other two

17   computers had one hard drive.  That's why the designation of

18   D1.

19        Q.    When you say they have two hard drives, this is

20   for my own edification, does that mean it has two brains or

21   how do two hard drives differ from the computers that have

22   one?

23        A.    Hard drives contain all the data that you save

24   on the monitor when you turn the computer on.  It stores all

25   the data.  It's where data is written to, and it's a small --

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

000006248

1    some hardware drives are installed by cables and others power

2    inside the interior part of the computer.  In the first two

3    computers, there was one only installed.  In this computer in

4    Apartment 382, there were two hard drives installed.

5         Q.    And then you took these items back to the

6    office, correct?

7         A.    Correct.

8         Q.    And you finished your work out at the San Riva

9    complex that day?

10        A.    That's correct.

11        Q.    Did you have occasion on October 11, year 2000,

12   to speak to an individual or come into contact with an

13   individual by the name of Ray Ortega?

14        A.    On the 11th?

15        Q.    Yes, sir.

16        A.    Yes.

17        Q.    Where did you come in contact with him?

18        A.    At my office, 620 West Washington.

19        Q.    When you came in contact with him, did he gave

20   you anything?

21        A.    Yes.  He gave me a floppy diskette.

22        Q.    I'm going to show you what's marked for

23   identification as 371.  I want you to take a look at it.

24        A.    Yes.

25        Q.    Is that the diskette that he gave you?

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

000006249

1          A.      Appears to be.

2          Q.      Once he turned it over to you.  Who did he --

3   what did you do with the diskette?

4          A.      I kept it in the office with me until Detective

5   Allinich, when he showed up in the office, I turned it over

6   to him.

7          Q.      Was that that same day?

8          A.      Yes.

9          Q.      How long did you speak with Mr. -- or how long

10  did this investigation take with Mr. Ortega (sic)?  Was it a

11  quick sort of thing or something that you sat and talked to

12  him?

13         A.      I met him up at the front desk.  He gave me the

14  floppy.  Apparently, that was an arrangement that had been

15  made prior to my seeing him.  But the other thing -- the

16  other reason he was there to see me, he brought me another

17  blank hard drive.

18         Q.      And when you say he brought you another blank

19  hard drive, what is it he wanted to you do for him?

20         A.      The first computer that was taken from the

21  office, that was the office computer.  Apparently contained

22  information and programs that assisted them in running their

23  business, so they requested that we restore or somehow return

24  that back to them so they could continue with their business.

25  So what we did, I instructed him to bring a blank hard drive

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1    so I could make a copy of the first and put it on his, and

2    then I was able to return that to him.

3              Q.    Is that -- does that process have a name?

4              A.    Yes.

5              Q.    What's that?

6              A.    I made an exact duplicate image of the original

7    hard drive.

8              Q.    Does everything on the original hard drive,

9    when you make an image of it, go on to the duplicate?

10             A.    Yes.

11             Q.    Does the duplicate allow the computer then to

12   then work who ever -- work the same way as it did before?

13             A.    Yes.  We tested it when we installed the second

14   hard drive, and it contained all the information that the

15   first hard drive had.

16             Q.    So as I understand it, and I'm going to call it

17   for lack of better term the bookkeeper's computer, the one

18   you referred to as S16, I think, I1 -- I think something like

19   that?

20             A.    Yes.

21             Q.    You actually did the imaging on that one,

22   right?

23             A.    Yes.

24             Q.    Did you do the imaging on any other computer?

25             A.    The only other computer I imaged was the other

1    tower computer that came out of Apartment 382 with the two

2    drives.

3          Q.    So as I understand it, you did the bookkeeper

4    one?

5          A.    Yes.

6          Q.    And then you also did the one, that 382, that

7    had the two hard drives?

8          A.    Yes.

9          Q.    We've also heard about a computer laptop from

10   Erik Vaillant.  Did you do the imaging on that one?

11         A.    No.

12         Q.    What was the number that was assigned to the

13   Erik Vaillant computer?

14         A.    I believe that was S47, I1, D1.

15         Q.    We just had a document, I guess it was

16   yesterday, where the time was indicated as being Denver

17   time.  Are you familiar with the time that's involved, let's

18   say, in Denver and Arizona in terms of whether or not they're

19   same time?

20         A.    Yes.

21         Q.    Are they the same time?

22         A.    Denver and Arizona are, I believe, both on

23   Rocky Mountain time.  However, Arizona has daylight savings

24   time, so for -- so during a certain part of the year there

25   would be a one hour difference.


TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

```
 1          Q.    In other words, at one point Denver is one hour
 2    ahead of Arizona at some point?
 3          A.    Correct.
 4          MR. MARTINEZ:  I don't have any other questions.
 5          THE COURT:  Mr. Patterson?
 6          MR. PATTERSON:  I have no questions of this
 7    gentleman.  Thank you, Judge.
 8          THE COURT:  Any further questions of this witness by
 9    the jury?  If so, please raise your hand.
10                (No response.)
11          THE COURT:  No one has raised their hand.
12                May this witness excused?
13          MR. MARTINEZ:  Yes, Your Honor.
14          MR. PATTERSON:  Yes.
15          THE COURT:  Thank you very much.  You're excused.
16          THE WITNESS:  Thank you.
17          THE COURT:  State may call its next witness.
18          MR. MARTINEZ:  State calls Edward Baranowski.
19                (Pause in proceedings.)
20          THE COURT:  Sir, if you could please step forward
21    right up here.  Right over here.  Right over here.  Please
22    give the clerk your name and she'll swear you in.
23    / / / / /
24    / / / / /
25    / / / / /
```

1                              EDWARD BARANOWSKI,

2                 CALLED TO TESTIFY ON BEHALF OF THE STATE,

3            HAVING FIRST BEEN DULY SWORN, TESTIFIES AS FOLLOWS:

4

5               THE COURT:  Please have a seat on the witness stand

6      there.  Please make yourself comfortable there on the witness

7      stand.  Please pull the microphone close to you.  Go ahead

8      pull that over.  Pull that over.  Remember to speak loudly

9      and clearly into the microphone so everyone can hear you.

10     Also, please wait until the question is completed before you

11     answer the question, and please make sure you give a verbal

12     response.  Is that agreeable to you?

13               THE WITNESS:  Yes, sir.

14               THE COURT:  Mr. Martinez, you may proceed.

15

16     DIRECT EXAMINATION BY MR. MARTINEZ:

17               Q.     Your name, sir?

18               A.     Edward Baranowski.

19               Q.     Who do you work for?

20               A.     City of Phoenix Police Department.

21               Q.     And how long have you been employed by the city

22     of Phoenix Police Department?

23               A.     20 years.

24               Q.     Are you a detective with them?

25               A.     Yes.


                TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1         Q.    Drawing your attention back to October of 2000,

2    maybe the early part of 2001, what area were you

3    investigating -- what areas did you participate in?

4         A.    I was a computer forensic detective.

5         Q.    And did you have any special training such as

6    schooling that allowed you and gave you the -- the requisite

7    knowledge to be in that -- in that field?

8         A.    Yes.

9         Q.    Tell me a little bit about that.

10        A.    In 1998, I went to a two week class in

11   Florida.  It was a class, IACIS, which is International

12   Association of Computer Investigative Specialists.

13        Q.    What else did you do in terms of training, that

14   sort of thing?

15        A.    I went to class in -- a class called Encase and

16   that's the software I use to look at computers.

17        Q.    Total how much training in terms of hours would

18   you estimate that you've had?

19        A.    Probably 200.

20        Q.    And back in 2000, how long had you been in the

21   computer area just working solely with computers?

22        A.    About 2 and a half years.

23        Q.    And for those 2 and a half years, was your

24   40-hour week solely devoted to working with computers?

25        A.    Yes.


TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1          Q.    I want to talk to you about a computer that you

2     may have worked on, and I'm going to refer to it as the

3     bookkeeper computer.  I think the number they gave to it was

4     S16 1L or something -- I1, D1 are you familiar with that?

5          A.    Yes.

6          Q.    Did you have occasion to work with that

7     computer?

8          A.    Yes.

9          Q.    What is that?  What kind of work did you do

10    with that computer?

11         A.    I looked for evidence -- evidence inside the

12    computer, that computer.

13         Q.    And had you done that on other occasions?  In

14    other words, with regard to other cases, had you gone into

15    computers and attempted to retrieve what may or may not have

16    been on them?

17         A.    Yes.

18         Q.    Are you familiar with the term "unallocated

19    space"?

20         A.    Yes.

21         Q.    What is unallocated space?

22         A.    Unallocated space is the space or area

23    designated by the computer to where new data can be placed.

24         Q.    Well, let's see if I can sort of flesh this out

25    a little bit.  Let's say that somebody goes on a computer and

1    has some correspondence, hits a delete button.  It goes into

2    the trash and then they delete that.  That information that's

3    been deleted twice, where does it go?

4          A.    Well, the indicators have just been deleted.

5    The actual body of whatever you're talking about, the data,

6    is still on the computer somewhere.

7          Q.    And what is that somewhere that this

8    information may be?  What is that called?

9          A.    Unallocated space.

10         Q.    With regard to this bookkeeper's computer, did

11   you go into this unallocated space and retrieve data?

12         A.    Yes.

13         Q.    Did you retrieve raw data?

14         A.    Yes.

15         Q.    And also from that raw data, did you then also

16   retrieve items that were of interest to you?

17         A.    Yes.

18         Q.    I'm going to show you what has been marked for

19   identification as Exhibit 372.  I want you to take a look at

20   it and see if you recognize what's here.

21               (Pause in proceedings.)

22         THE WITNESS:  Yes.

23   BY MR. MARTINEZ:

24         Q.    Is that something that you retrieved from the

25   unallocated space after viewing the raw data from the

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1    bookkeeper's computer?

2           A.    Yes, it is.

3           Q.    If I may have it back.

4           MR. MARTINEZ:  I move for admission of Exhibit 372.

5                 (Pause in proceedings.)

6           MR. PATTERSON:  May I voir dire, Judge?

7           THE COURT:  Yes.

8

9    VOIR DIRE EXAMINATION BY MR. PATTERSON:

10          Q.    Did you generate this particular document in

11   some fashion?

12          A.    I typed it out from raw data that I got from

13   the computer.

14          Q.    Okay.  Is that -- the raw data, is that in a

15   form or using characters that are not generally understood by

16   the general populace?

17          A.    Some of it is and some of it is text.

18          Q.    Okay.  And so you took that text and converted

19   it into this written word?

20          A.    I didn't convert it.  It was plain text.  I

21   just copied it out.

22          Q.    Okay.  All right.  And is there any indication

23   as to when this may have been placed on the unallocated

24   portion of that particular computer?

25          A.    Unless the text has some kind of date or time

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

73

1      in it, it has no time that we can --

2            Q.    Okay.  If it says sent Monday, August 21, 2000,

3      sent, does that give you an indicator of as to when it may

4      have been placed there?

5            A.    Yes.

6            MR. PATTERSON:  No objection, Judge.

7            THE COURT:  Exhibit 372 is admitted into evidence.

8

9      CONTINUED DIRECT EXAMINATION BY MR. MARTINEZ:

10           Q.    Sir, I want you to take a look at 372.  And

11     tell us what it was that you were able to retrieve from that

12     computer, the bookkeeper's computer?

13           A.    Do you want me to read it?

14           Q.    Yes, sir.

15           A.    Okay.  "Original message, From: Anne Newton,

16     azcreat@usa.net, To: sales@voigtglobal.com.  Sent: Monday,

17     August 21, 2000, 10:36 a.m.  Subject:  Reagent ACS Grade

18     Chemicals Inquiry.  Please forward pricing and availability

19     for Sodium Cyanide, about 10 grams, at your earliest

20     convenience.  Thank you.  The required contract has been

21     signed and faxed.  Anne Newton Aztec Creations.  Get free

22     email and permanent address at http://www.netaddress.com."

23           Q.    Did you then continue with your search and come

24     up with other items that you deemed of interest?

25           A.    Yes.


           TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1          Q.     Going to show you Exhibit 373, and take a look

2     at it and see whether or not this is something that you were

3     able to retrieve from the unallocated space of the

4     bookkeeper's computer.

5          A.     Yes, it is.

6          Q.     And in terms of whether -- when something was

7     placed or deleted or put into or defaulted into unallocated

8     space, can you tell us when it was put there or not?

9          A.     No.  Like I said before, unless it's in the

10    text itself.

11         Q.     But even if it's in the text, you really don't

12    know when it went into uncalculated space, when it was

13    deleted, do you?

14         A.     True, yes.

15         Q.     But the date may give you an indication of when

16    it was written, not when it was put in unallocated space,

17    right?

18         A.     Yes.

19         Q.     Again, with regard to what you have in front of

20    you, 373, is that something you generated with regard to that

21    bookkeeper's computer?

22         A.     It is.

23         Q.     Is it from unallocated space?

24         A.     Yes.

25         Q.     If I may have it back.


TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1          MR. MARTINEZ:  I move for admission of -- admission

2     of Exhibit 373.

3          MR. PATTERSON:  No objection, Judge.

4          THE COURT:  Exhibit 373 for identification is

5     admitted into evidence.

6                    (Pause in proceedings.)

7     BY MR. MARTINEZ:

8          Q.    Sir, I want you to take a look at it first.

9     Does that have a date on it?

10         A.    No.

11         Q.    And what is it that it says?  What is it that

12    you retrieved?

13         A.    It says, "Sales, sales@voigtglobal.com, wrote:

14    What will this chemical be used for?  This is not a routine

15    chemical and is drop shipped directly from the

16    manufacturer -- we do not keep it in our regular supply

17    inventory.  We need: Business name, given in parentheses,

18    State of Incorporation, State Sales Tax ID or Business ID,

19    Business Telephone Number, Allen.  Ordering instructions:

20    Http://www.VGDLLC.com order underscore page at htm Voigt

21    Global Distribution LLC, http://www.VGDLLC.com.  Your

22    international retailer of scientific instruments, chemicals,

23    biologicals and nutraceuticals.  VOICE 01-785-554-0757, FAX

24    01-785-232-5573."

25         Q.    Did you then continue your search and come up

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1    with another item?

2          A.    Yes.

3          Q.    Going to show you now Exhibit 374.  Did you

4    undertake the same procedure or process and were you then

5    able to obtain this -- this information from the unallocated

6    space of the bookkeeper's computer?

7          A.    Yes.

8          Q.    If I may have it back.

9          MR. MARTINEZ:  I move for admission of Exhibit 374.

10         MR. PATTERSON:  No objection.

11         THE COURT:  Exhibit 374 for identification is

12   admitted into evidence.

13   BY MR. MARTINEZ:

14         Q.    I want to take a look at it, please.  Does that

15   have a date on it?

16         A.    Yes.

17         Q.    What's the date on that one?

18         A.    Wednesday, August 23rd, 2000, 10:46 a.m.

19         Q.    Read to us what you were able to retrieve from

20   the computer?

21         A.    "Original message From: Anne Newton

22   azcreat@usa.net.  To: Sales, sales@voigtglobal.com.  Sent:

23   Wednesday, August 23rd, 2000, 10:46 a.m.  Subject: RE: RE:

24   Reagent ACS Chemical Grade Chemicals Inquiry.  Use: disposal

25   of rodents.  Business: Wyndstar Enterprises dba Aztec

1    Creations.  This is a partnership.  We are not incorporated.

2    State of Arizona.  I'm not sure what the Fed ID # is but here

3    is my SS # 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.  Business phone is 602-826-1150.  We

4    farm several acres in Arizona and Oklahoma.  We are having

5    severe problems with rodents.  An acquaintance suggested

6    sodium cyanide.  We are hoping this will work.  Do you have

7    any suggestions?  Anne."

8         Q.    What is the phone number again?  Can you read

9    it just a bit slower?

10        A.    602-826-1150.

11        Q.    I'm now going to show you Exhibit 375.  Did you

12   obtain this also from the bookkeeper's computer from the

13   unallocated space?

14        A.    Yes.

15        Q.    And did you undergo the same process as you did

16   with regard to the others?

17        A.    Yes.

18        MR. MARTINEZ:  I move for admission of Exhibit 375.

19             (Pause in proceedings.)

20        MR. PATTERSON:  No objection, Judge.

21        THE COURT:  Exhibit Number 375 for identification is

22   admitted into evidence.

23   BY MR. MARTINEZ:

24        Q.    Go ahead and take a look at that.  With regard

25   to the salutation that's on top of it, is it Sales at

1       Sales@voigtglobal that you've read before?

2               A.      Yes.

3               Q.      Omitting that formal caption, what is the

4       substance of the message?

5               A.      Wrote: FID # equals Federal Identification

6       Number, aka: EIN - Employer Identification Number.  Please

7       fax a copy of your proof of business that you received when

8       registering with the State of Arizona to the fax number

9       below.  Sincerely, Allen.  Ordering instructions" --

10              Q.      Let me stop you there.  Is the text involving

11      ordering -- ordering instructions, the same as in Exhibit

12      373, which is this one that we see throughout these messages?

13              A.      Yes, it is.

14              Q.      If I may have it back.  Let's take a look at

15      Exhibit 376 through 383.  I want you to take a look at these

16      and see whether or not these are items that you generated

17      from the bookkeeper's computer from the unallocated space.

18                      (Pause in proceedings.)

19              THE WITNESS:  Yes, they are.

20              MR. MARTINEZ:  Move for admission of Exhibits 376

21      through 383.

22                      (Pause in proceedings.)

23              MR. PATTERSON:  No objection, Judge.

24              THE COURT:  Exhibit Numbers 376 through 383 for

25      identification are admitted into evidence.


        TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

```
 1                      (Pause in proceedings.)
 2     BY MR. MARTINEZ:
 3             Q.    I want to you take a look at starting with
 4     Exhibit 376.  I want you to take a look at that.  Tell us
 5     what you retrieved in that portion?
 6             A.    "Original message From: Anne Newton
 7     azcreat@usa.net.  To: Sales, sales@voigtglobal.com.  Sent:
 8     Tuesday, August 29, 2000, 5:43 p.m.  Subject: RE: RE: RE:
 9     Reagent AZ -- sorry, ACS Grade Chemicals Inquiry.  Here is my
10     FID #, 86-0834681."
11             Q.    Is that the end of the message?
12             A.    Yes.
13             Q.    Now, what exhibit number is that?
14             A.    376.
15             Q.    Take a look at Exhibit 377.  Tell us what
16     that -- what you were able to retrieve?
17             A.    Sales, sales --
18             Q.    Is that the same as in Exhibit 3 -- the formal
19     caption, Sales at sales@voigtglobal.com?
20             A.    Yes. "Wrote: Again: please fax a copy of your
21     proof of -- proof of business that you received when
22     registering with the State of Arizona to the fax number
23     below.  Simply typing numbers on the screen does not provide
24     proof of business.  Sincerely, Allen.  Ordering
25     instructions" --
```

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1          Q.    And are those the same that have been repeated

2    before?

3          A.    Yes.

4          Q.    What is the next Exhibit Number?

5          A.    378.

6          Q.    What does that tell you?

7          A.    "Original message From: Anne Newton

8    azcreat@usa.net To: Sales at sales@voigtglobal.com.   Sent:

9    Tuesday, September 19th, 2000, 11:19 a.m.   Subject: RE: RE:

10   RE: Reagent ACS Grade Chemicals Inquiry.   Allen, Sorry for

11   the delay.   We just got back from Ireland for vacation.   It

12   is a beautiful country.   I sent over a fax yesterday.   Let me

13   know if you need anything else.   Also let me know the total

14   price so I can send check.   Thanks, Anne."

15         Q.    In reading that I notice that there was how

16   many RE RE's there?

17         A.    Three.

18         Q.    Going to Exhibit 379.   Go ahead.

19         A.    Okay.   "Sales, sales@voigtglobal.com wrote:

20   THIS CHEMICAL WILL EXPLODE WHEN HEATED.   Sodium Azide,

21   Granular, Reagent Grade (No inexpensive technical grades are

22   available)   CAS 26628-22-8 500 -- 500 grams $105.75.   HAZMAT

23   surcharge (UN Hazard Class 6.1) $15.00.   Poison packaging

24   (DOT requirement) $13.00, Regular Ground Shipping Charges

25   $8.00.   Total: 141.75.   THIS CHEMICAL WILL EXPLODE WHEN


TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

```
 1    HEATED.  I really don't think that you are getting your best

 2    return on the money invested with this product.  This purity

 3    of Sodium Azide is used in research laboratories (ie: highly

 4    pure analytical reagent).  It is not a technical grade for

 5    killing rodents.  Sincerely, Allen.  Ordering

 6    instructions" --

 7            Q.    And does it then repeat the same --

 8            A.    Yes.

 9            Q.    -- thing we've seen, for example, on 373?

10            A.    Yes.

11            Q.    Go on to the next Exhibit 380.

12            A.    "Original message From: Anne Newton,

13    azcreat@usa.net To: Sales, sales@voigtglobal.com Sent:

14    Friday, September 22nd, 2000, 11:25 a.m.  Subject: RE Sodium

15    Azide.  Allen, I realize it may not seem like a great bang

16    for buck, but an acquaintance swears they have used sodium

17    cyanide or potassium cyanide mixed with specially prepared

18    greens for the rodent's placed near the contaminated" -- I

19    mean, excuse me -- "concentrated area of plant life they tend

20    to muck up, and it apparently did the job.  Other

21    alternatives have seemed nearly as costly, and as always, we

22    understand that -- we understand there are no guarantees.  So

23    we're happy to give this route a shot.  What is the pricing

24    for a technical grade strong enough to kill rodents?  Anne."

25            Q.    What's the number of the next exhibit?
```

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1          A.    381.

2          Q.    Please read that to us.

3          A.    Friday -- excuse me -- "Friday, 22 September,

4    2000.  11:19 a.m., MDT.  From: Sales, sales@voigtglobal.com.

5    Add to Address Book.  To: Anne Newton, azcreate@usa.net.

6    Subject: RE Sodium Azide.  More Details Again – there is no

7    technical grade available.  The difference is in level of

8    impurities – not necessarily the potencies.  Voigt Global

9    Distribution LLC."

10         Q.    Is that the same thing that repeats itself at

11   the end of the messages?

12         A.    Yes.

13         Q.    Now, what's the number of the next exhibit?

14         A.    382.

15         Q.    And 382 is that sort of an email type of

16   message or something else?

17         A.    It's something else.

18         Q.    First of all, describe what it was that you

19   were able to obtain and then read it for us?

20         A.    It's basically text and numbers.  What it says

21   is AZ Creations Wyndstar Enterprises 2442 S 24th Street,

22   Phoenix, AZ, 85034-6802.  Expirations date 12/31/00.  2442 S.

23   24th Street 220290002501.

24         Q.    Next Exhibit 383, I don't want you to read it

25   to us, but does it have a large amount of text at the top?

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1       A.      Yes, it does.

2       Q.      Then does it have lines at the bottom?

3       A.      Yes.

4       Q.      And starting with the first line, what does

5  that ask for?

6       A.      Signature.

7       Q.      Go on.  What's the second line?

8       A.      Name in parenthesis, legible print only.  Next

9  one is date, and then address, then city, then state or

10  province, and then zip or postal code, and then country.

11       Q.      All right.  If I may have that back.

12                Did you also continue beyond this?  Did you

13  also search the computer for other items?

14       A.      Yes.

15       Q.      We could go ahead and show you some of these

16  items.

17                (Attorney-attorney discussion.)

18           THE COURT:  Would this be a good time to take our

19  afternoon break?

20           MR. MARTINEZ:  Yes, sir.  I'm just going to staple

21  them.

22           THE COURT:  Why don't we take our afternoon break at

23  this time, ladies and gentlemen.

24                During this break, remember the entire

25  admonition I gave you including do not discuss this case with

84

1    anyone, do not let anyone discuss the case with you, keep an

2    open mind.  We'll take a 20 minute break.  See you in 20

3    minutes.

4

5                    (Recess.)

6

7         THE COURT:  This is cause number CR 2000-096032,

8    State of Arizona versus Wendi Elizabeth Andriano.  Let the

9    record reflect the presence of the Defendant, Counsel and

10   the jury.  Edward Baranowski is on the witness stand, and

11   we'll continue with direct examination by Mr. Martinez.

12             Mr. Martinez?

13

14   CONTINUED DIRECT EXAMINATION BY MR. MARTINEZ:

15        Q.    Sir, in front of you, you have Exhibit 384.  Do

16   you recognize the contents of that exhibit?

17        A.    Yes.

18        Q.    Are these items that you were able to obtain

19   from the so-called unallocated space from the computer that

20   we've designated as belonging to the bookkeeper?

21        A.    Yes, they are.

22        Q.    How many articles or items are in that packet?

23   If you could count them, please.

24                    (Pause in proceedings.)

25             THE WITNESS:  19.


         TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

85

```
 1              MR. MARTINEZ:  Could you just put the clip back on
 2     please?
 3                        Move for admission of Exhibit 384.
 4              MR. PATTERSON:  Just a couple of voir dire questions,
 5     Judge?
 6              THE COURT:  Yes.
 7
 8     VOIR DIRE EXAMINATION BY MR. PATTERSON:
 9              Q.    Is there any way we could ascertain when these
10     particular sites were accessed by that computer?
11              A.    No.
12              Q.    Okay.  And you printed out all this stuff.  Do
13     we know about -- is there something in the computer that can
14     tell us whether or not those websites were sent to a printer
15     for printout?
16              A.    No.
17              Q.    Okay.  And lastly as you're generating this
18     data such that it resides in the unallocated space, does it
19     also appear on the monitor?  Is that what's at work here?  Or
20     do we know that?
21              A.    I'm not sure I understand the question.
22              Q.    Well, as I understand what you're telling us
23     here, at some point in time this computer accessed this
24     information, correct?
25              A.    Yes.
```

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

000006271

1          Q.    All right.  But is there anything about the

2     data that could tell us whether or not it was at one time

3     viewed on a monitor or printed out by a printer or anything

4     of that nature?

5          A.    No.

6          Q.    Okay.  And we, again, don't know when or at

7     what point in time this stuff was accessed?

8          A.    Correct.

9          MR. PATTERSON:  No objection to 384, Your Honor.

10         THE COURT:  Exhibit 384 for identification is

11    admitted into evidence.

12                    (Pause in proceedings.)

13

14    CONTINUED DIRECT EXAMINATION BY MR. MARTINEZ:

15         Q.    Sir, let's just go through this in a brief

16    fashion.  If you could give me the titles of some of these

17    documents that we have here in 384, starting with the first

18    one on top?

19         A.    Found Sodium Azide.

20         Q.    Number two?

21         A.    Found Sodium Azide.

22         Q.    Number three?

23         A.    Found Sodium Azide.

24         Q.    Number four?

25         A.    RE: Sodium Azide, Worth the trouble.


TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1      Q.      Number five?

2      A.      Toxicology and Carcinogenesis, Studies of

3    Sodium Azide.

4      Q.      Number six?

5      A.      Published: Journal of Analytical Toxicology.

6    Analytical Findings in a Suicide Involving Sodium Azide.

7      Q.      On the first sentence of that article, is there

8    an amount of Sodium Azide referenced?

9      A.      Yes.

10     Q.      How much?

11     A.      9 grams.

12     Q.      Next?

13     A.      This is a list of links in reference to a

14    conversion table.

15     Q.      Is there a conversion from metric to the

16    English system there?

17     A.      Yes, down at the bottom.

18     Q.      Next?

19     A.      This says Selected EPS pages for Sodium Azide.

20     Q.      The next one?

21     A.      This is a reference, laboratory reference of

22    numerous manuals, chemical manuals.

23     Q.      Next?

24     A.      This states, "How can I purchase Cyanide."

25     Q.      Next?

1       A.      How can I purchase Cyanide.

2       Q.      Next?

3       A.      This says Cyanide at the top and information

4   about it.

5       Q.      Next?

6       A.      Cyanide, information about Cyanide.

7       Q.      Next?

8       A.      This is raw data that has VoigtGlobal.com in

9   it.

10      Q.      Next?

11      A.      This is information that says 300 K State AL

12  and it says select.

13      Q.      So it has State AL next to it, and then it has

14  an amount.  How much are we talking about?

15      A.      300 K.

16      Q.      Okay.  Next?

17      A.      This is information about Adriamycin.  I can

18  spell it for you, I'm not sure --

19      Q.      Go ahead and spell it.

20      A.      A-d-r-i-a-m-i -- m-y-c-i-n.

21      Q.      Okay.  Next, what is that document?  What does

22  it just say on the upper left-hand corner?

23      A.      EPS selected pages search result.

24      Q.      All right.  Next?

25      A.      EPS selected pages for Sodium Azide.

1          Q.      Next?

2          A.      It's a table with chemical information

3   reference Sodium Azide.

4          Q.      I believe that's the last one, correct?

5          A.      Yes.

6          Q.      We've been talking about items that may have

7   been found in unallocated space, correct?

8          A.      Yes.

9          Q.      Did you bring us everything you found in

10  unallocated space or is this just a sampling?

11         A.      Sampling.

12         Q.      Now, were there any active files in the

13  computer that were not in unallocated space?

14         A.      Yes.

15         Q.      And with -- were you able to access those?

16         A.      Yes.

17         Q.      What is the difference between the files that

18  are active and the files that are in unallocated space?

19         A.      Well, when you say "active," those are valid

20  files the computer can see.

21         Q.      When you say those are valid files the computer

22  can see, what does that mean?  How are they different from

23  unallocated space?

24         A.      Well, the computer regular user couldn't see

25  any kind of information in unallocated space.


TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1          Q.     In other words, you're saying that with

2    unallocated space you have to have a special program to go in

3    and get it?

4          A.     Yes.

5          Q.     How about with these valid files that you're --

6          A.     No, you would not.

7          Q.     I'm going to show you what's been marked for

8    identification as Exhibit 385.  Do you recognize what these

9    are?

10                (Pause in proceedings.)

11         THE WITNESS:  Yes.

12   BY MR. MARTINEZ:

13         Q.     What are they?

14         A.     They're files I found in the temporary internet

15   file on the computer.

16         Q.     Are we talking about the bookkeeper's computer?

17         A.     Yes.

18         MR. MARTINEZ:  I move for admission of Exhibit 385.

19                (Pause in proceedings.)

20         MR. PATTERSON:  No objection, Judge.

21         THE COURT:  Exhibit 385 for identification is

22   admitted into evidence.

23                (Pause in proceedings.)

24   BY MR. MARTINEZ:

25         Q.     I'm going to show it to you again, if you'd


TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

000006276

1   just read us the captions of these items.

2          A.     First one is Lewis dot of Sodium Azide.

3          Q.     Next?

4          A.     Lewis dot structure of H2CO.

5          Q.     Next?

6          A.     RE: Sodium Azide, worth the trouble.

7          Q.     Next?

8          A.     Sodium Azide worth the trouble.

9          Q.     The next one?

10         A.     RE: Sodium Azide worth the trouble.

11         Q.     Okay.  Sir, just so that we could get a summary

12  of what you did with regard to the bookkeeper's computer, how

13  many references or how many times was the name "Anne Newton"

14  mentioned?

15         A.     I have to look at my notes.

16         Q.     Go ahead and take a look.

17                (Pause in proceedings.)

18         THE WITNESS:  11 times.

19  BY MR. MARTINEZ:

20         Q.     How about "Sodium Azide."  How much was that

21  mentioned?

22         MR. PATTERSON:  Judge, so I can follow along with the

23  case report --

24         THE COURT:  Yes.

25         MR. PATTERSON:  -- what are you referring to?


TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1           THE WITNESS:  That's where I got the information.  I

2    wrote a summary of those notes.

3           MR. PATTERSON:  May I inquire, Judge?

4           THE COURT:  Yes?

5

6    VOIR DIRE EXAMINATION BY MR. PATTERSON:

7           Q.    Is it the Encase report we're talking about?

8           A.    Yes?

9           Q.    And what page --

10          A.    I'd have to check the Encase report.  The

11   Encase report, can I add, it gives a total summary of all the

12   hits on all the devices that were in the case.  The

13   information I was just providing Mr. Martinez is just the

14   hits on this one computer.

15          MR. PATTERSON:  Thank you, Judge.

16               (Pause in proceedings.)

17          MR. PATTERSON:  Again, Judge, if -- is there a number

18   you're reading from?  I'm just trying to follow along with

19   you here.

20          THE WITNESS:  It's the information that was provided

21   back when we had our meeting.

22          MR. PATTERSON:  Okay.  All right.  I got you.  I'll

23   just look over Mr. Martinez's shoulder.

24   CONTINUED DIRECT EXAMINATION BY MR. MARTINEZ:

25          Q.    Cyanide -- how many hits were there for


TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

000006278

1    cyanide?

2              A.    365.

3              Q.    And sodium?   How many hits were there for that?

4              A.    351.

5              Q.    Voigt Global, how many for that?

6              A.    44.

7              Q.    Sodium Cyanide?

8              A.    27.

9              Q.    And Sodium Azide?

10             A.    186.

11             Q.    Did you also have occasion to work with a

12   computer by the number that they have given the number S47,

13   I1, D1?

14             A.    Yes.   That's the one we called the Vaillant

15   computer.

16             Q.    What did you do with regard to the Vaillant

17   computer?

18             A.    I did the same examination by date.

19             Q.    Did you do the Encase examination?

20             A.    Yes.

21             Q.    Did you also look for files?

22             A.    Valid files, yes.

23             Q.    With regard to that computer, how many hits

24   were there for Voigt Global?

25             A.    11.

1        Q.    With regard to a computer that was designated

2   as S16, I2, D1 that we're designating as the computer from

3   Apartment 132, did you also conduct an examination of that?

4        A.    Yes.

5        Q.    And with regard to that, did you get any hits

6   for Sodium Azide, Voigt global, for anything of this interest

7   in this case?

8        A.    I did, but they were from a different source.

9        Q.    In other words, from an encyclopedic source,

10  correct?

11       A.    Yes.

12       Q.    That could not be attributed to the user,

13  correct?

14       A.    Yes.

15       Q.    Now, with regard to the computer number S16 I3

16  D1 and 2, did you also have occasion to work with that?

17       A.    Yes.

18       Q.    And we're going to call those they were from

19  Apartment 382.  And were you able to find any hits to Sodium

20  Azide, cyanide, anything on that computer?

21       A.    Yes, but they were in the same realm of the

22  encyclopedia.

23       Q.    In other words, they were not items that were

24  used for sites that were accessed by the user of that

25  particular computer?

1       A.      Correct.

2       Q.      Is there a way for you to tell when the user is

3   actually accessing these items and when it's maybe an

4   encyclopedia already put on the computer?

5       A.      Just by the path of where I got the hits on the

6   words.

7       Q.      So the answer is yes, there is a way, right?

8       A.      Yes.

9       Q.      And based on your experience, you know that it

10  is you follow the path and it tells you where it comes from,

11  the encyclopedia or the user is the one that's actually

12  accessing those sites, right?

13      A.      Yes.

14      Q.      I'm going to show you what has been marked for

15  identification as Exhibit Number 371.  Did you have occasion

16  to work with that too?

17      A.      Yes.

18      Q.      And do you follow the same procedure?  Do you

19  do the encase and do you then check the files or how does

20  that work or is that the same?

21      A.      It's the same.

22      Q.      And on that particular floppy, were you able to

23  find any references to cyanide?

24      A.      Yes.

25      Q.      How many hits did you get on that?

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

000006281

1          A.    111.

2          Q.    Just so that I'm clear about what we've just

3    done, with regard to the bookkeeper's computer, there were

4    all these things that we've just gone over, right?

5          A.    Yes.

6          Q.    With regard to the Vaillant computer, there was

7    a hit on Voigt Global, correct?

8          A.    Yes.

9          Q.    11 of them, I think you said.

10               And with regard to the floppy, there was 111

11   hits to cyanide, right?

12         A.    Yes.

13         Q.    The computer from 132, although it had hits, it

14   could not be attributed to the user, right?

15         A.    Correct.

16         Q.    And the computer from Apartment 382, although

17   that had hits, it could not be attributed to the user either,

18   correct?

19         A.    Correct.

20         MR. MARTINEZ:   I don't have any other questions.

21         THE COURT:   Mr. Patterson?

22         MR. PATTERSON:   Thank you, Judge.

23

24   CROSS-EXAMINATION BY MR. PATTERSON:

25         Q.    How you doing, Detective?  We've spoken before,

1    haven't we?

2              A.     Yes.

3              Q.     Let me understand your terms.   This gentleman

4    kept talking about hits.   Are you talking about the number of

5    times that word appeared in that computer?

6              A.     Yes.

7              Q.     Okay.   So if -- if a paragraph talking about

8    cyanide used the word cyanide 47 times, it would be 47 hits,

9    right?

10             A.     Correct.

11             Q.     So it's not 47 separate websites you're talking

12   about when you say "hit," right?

13             A.     Correct.

14             Q.     It's just the time that word is discovered

15   inside that computer, correct?

16             A.     Yes.

17             Q.     All right.   So theoretically, all these hits

18   that you've aggregated for us could have been found in one

19   website assuming that website used that word that many times,

20   correct?

21             A.     Correct.

22             Q.     Okay.   Okay.   You have 385?

23             MR. MARTINEZ:   Right here.

24             MR. PATTERSON:   May I approach the witness, Judge?

25             THE COURT:   Yes.


TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

000006283

1    BY MR. PATTERSON:

2         Q.    385 is entitled, and you read us the title, if

3    you will, of the various documents that are in that group

4    exhibit, right?  Could you also go over some of the substance

5    of that so we get a feeling for what these documents are

6    about?  Maybe flip to --

7         A.    Want me to just read it?

8         Q.    -- the third one.  I don't want to go through

9    all of them, but let's go to the third one there.  It's

10   entitled at top Sodium azide worth the trouble, question

11   mark.  And then it appears that it's some scientific

12   discussion.  Is that my accurate reading of that particular

13   paragraph?  Why don't you read that aloud for us, Detective.

14        A.    Okay.  The Sodium Azide route in my opinion, is

15   a good alternative when other simpler pathways are blocked.

16   Sodium azide is a pretty expensive safrole basis, that is you

17   have to buy an expensive azide precursor to create an ameno

18   after reduction.  However, if you insist on using this

19   method, I think the best way to go is to substitute the

20   bromide for an azide in bromosafrole by a solid PTC

21   reaction.  Bromosafrole is in benzene or toluene and powder

22   Sodium Azide Na PTC with heating to react.  After isolating

23   the safrole azide, this will be hell, safrole bromide and

24   azide should have pretty much the same boiling point,

25   solubility characteristics PTC.  The azide can be converted

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1   to amino by action of Ca or Mg.  It's cheaper in cold

2   methynol.

3          Q.   Sounds like a bunch of scientific mumbo jumbo,

4   doesn't it?

5          A.   Yes.

6          Q.   Doesn't sound like a recipe for poison, does

7   it, or anything of that nature?

8          MR. MARTINEZ:  Objection.  Lack of foundation as to

9   what a recipe is.

10          THE COURT:  I'll sustain the objection.

11   BY MR. PATTERSON:

12          Q.   Let's read page 1 of that group of exhibits.

13   Starting where it says posted by Spiceboy.

14          A.   Posted by Spiceboy on March 26 1998 at

15   10:39:43.  In reply to RE Sodium Azide worth the trouble?

16   Posted by Muki on March 26, 1998, at 7:22:31.  Well, the

17   thought was to get bromosafrole by dehydrating 48 percent HBr

18   with dry HCl gas and then swapping the halogen out for the

19   azide.  Are the mixtures going to be that difficult to

20   separate?

21          Q.   Okay.  And lastly it appears there may be

22   another posting by this Spiceboy?

23          A.   Posted by Spiceboy on March 23rd, 1998, at

24   9:24:51.  Would the bromosafrole yields improve if instead of

25   trying to direct pressure RXW slash NH3 you went through the

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

000006285

1    additional steps of substituting in azide.  Is the CR

2    reduction scheme feasible?

3           Q.     And then lastly this was posted by Kathy on

4    December 8, 1998.  What does she have to say?

5           A.     Posted by Kathy on December 8, 1998, at

6    16:24:07.  Where would I find a picture of a loose electron

7    dot structure of formaldehyde H2CO.

8           Q.     Okay.  This appears to be a kind of a chat room

9    discussion about Sodium Azide from a scientific perspective,

10   doesn't it?

11          A.     Yes.

12          Q.     Now, these were discovered in the temporary

13   internet files --

14          A.     Yes.

15          Q.     -- of this computer?

16                 Okay.  If you delete cookies, do you remove

17   temporary internet files?

18          A.     No.

19          Q.     Okay.  How do you get rid of temporary internet

20   files?

21          A.     Well, there's several ways.  You could manually

22   do it or you could set your browser to eliminate them at

23   certain -- at the end of a certain period of time.

24          Q.     Okay.  When I hit the temporary internet file

25   little logo on my computer, it pops up and says, Do you want

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1      to delete these cookies, right?  Is there a connection, a

2      correlation between these two things?

3              A.    I'm not familiar with that.

4              Q.    One of the things in the packet of group

5      Exhibit 384 is a reference to Adriamycin, correct?

6              A.    Yes.

7              Q.    All right.  Did you retrieve from -- what I

8      understand your focus was, you were given a list of things by

9      Detective Lucero that might be of some interest in this

10     computer, correct?

11             A.    Yes.

12             Q.    Okay.  And with that kind of focus, you

13     retrieved selected items from this computer, correct?

14             A.    Yes.

15             Q.    Okay.  You didn't retrieve all of the things

16     that were retrievable from this particular computer, correct?

17             A.    Yes.

18             Q.    All right.  One of the things you did retrieve

19     was this reference to Adriamycin RDF or Adriamycin PFS,

20     correct?

21             A.    Yes.

22             Q.    All right.  Did you endeavor to retrieve from

23     this computer cancer control drugs or --

24             A.    No.

25             Q.    -- chemotherapy drugs?

1          A.    No.

2          Q.    Okay.  That wasn't one of the focal points that

3    Detective Lucero gave you in terms of items to retrieve from

4    this machine?

5          A.    No, it wasn't.

6          Q.    It was not?

7          A.    No, correct.

8          Q.    All right.  In this group Exhibit 372 -- sorry,

9    it's not a group exhibit.  It's a sequential exhibit 372,

10   373 -- okay, specifically Exhibit 379, one of the things you

11   retrieved from this particular computer was what appears to

12   me to be an email transmission.  Is that fair to categorize

13   that in the nature of an email transmission?

14         A.    It's data.  You could interpret it that way I

15   suppose, but --

16         Q.    That would not be inconsistent with an email

17   transmission type of data?

18         A.    Yes.

19         Q.    Okay.  That email transmission says something

20   about something will explode if heated.  What does it say?

21         A.    This chemical will explode when heated, Sodium

22   Azide.

23         Q.    And is it referenced to two occasions in that

24   particular data?

25         A.    "Chemical will explode when heated" is said


TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

```
 1   twice.

 2          Q.   It is said twice?

 3          A.   Yes.

 4          Q.   It's in bold?

 5          A.   Capital letters.

 6          Q.   Capital letters, okay.  Based on your

 7   experience, if this were an email transmission, would the

 8   data that you show on this document be transmitted in the

 9   same information to the email recipient?  Meaning, if it's in

10   bold in the thing you want printed out, would it appear in

11   bold on the email transmission?

12          A.   Yes.

13          Q.   Okay.  You had occasion to look at the computer

14   that was seized from Apartment 132, correct?

15          A.   Yes.

16          Q.   All right.  And there apparently was some

17   software on that computer of an encyclopedic nature, correct?

18          A.   Yes.

19          Q.   Like an Encarta, something along those lines?

20          A.   Yes.

21          Q.   As a resource that may have had some

22   information pertaining to Sodium Azide, sodium cyanide, that

23   kind of thing as most general resource documents do, right?

24          A.   Yes.

25          Q.   Okay.  We don't know who accessed the
```

1    information reference Sodium Azide, sodium cyanide by the

2    user of that particular computer, do we?

3         A.    No.

4         Q.    Okay.  Nor do we know when it was accessed?

5         A.    No, I don't.

6         Q.    Okay.  But that computer -- is there something

7    that would tell you whether or not a computer at some point

8    in time was connected to the internet?

9         A.    Yes.

10        Q.    Okay.  Did you find any information with regard

11   to the computer seized from Apartment 132 that led you to

12   believe or would indicate to you that at any time that

13   computer was connected to an internet source?

14        A.    I didn't look for that, so I don't -- the

15   answer would be no.

16        Q.    Okay.  So you can't tell us.  There's a way you

17   could have figured that out, but you just didn't do it?

18        A.    Right.

19        Q.    Okay.  And is there kind of a supplement that's

20   generated at the time the computer is seized which indicates

21   whether or not there are coaxial cables connected to the

22   computer and also connected to a source in the wall?

23        A.    That kind of information should be noted --

24        Q.    Okay.

25        A.    -- during any seizure.

1          Q.     Okay.  Do you have any supplement, any

2     knowledge that can tell us whether or not that was noted by

3     law enforcement at some point in time either way?

4          A.     Well, I wasn't at the scene so I -- I don't

5     know anything about that.

6          Q.     Okay.  But in the information that was

7     transmitted to you along with this computer, was there any

8     indication that cables were disconnected from it which would

9     lead to the inference that it was connected to an internet

10    source?

11         A.     I -- I don't know.  I don't have the

12    information for that.

13         Q.     Okay.

14         A.     You'd have to ask the person who ceased it.

15         Q.     Okay.  My question to you though is you

16    received no notification from the persons that seized it that

17    seemed to indicate it was connected to an internet source?

18         A.     No, I didn't.  That's not the information I'm

19    looking for.  I'm looking for information strictly inside the

20    computer.

21         Q.     Okay.  That's fair.

22              The same series of questions with regard to the

23    computer that was evaluated coming out of 382, do you have

24    any information whether or not that was at any time connected

25    to an internet source?

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

000006291

1        A.      No.

2        Q.      Okay.  Okay.  Just so we're certain and clear

3   here, in terms of the concept of hits, the same answer would

4   apply to your evaluation of the floppy diskette as well,

5   correct, when you make reference to hits found on that

6   diskette?

7        A.      Correct.

8        Q.      That means just the number of times that

9   particular word was found within that diskette, correct?

10       A.      Yes.

11       MR. PATTERSON:  Okay.  Judge, I believe that's all I

12  have.  Thank you, Detective.

13       THE COURT:  Redirect?

14

15  REDIRECT EXAMINATION BY MR. MARTINEZ:

16       Q.      Sir, with regard to the hard drives and the

17  mirror -- or the imaging that we have, they're still

18  available aren't they?

19       A.      Yes.

20       Q.      So if somebody wanted to access them and see

21  whether or not something like cancer-curing drugs were asked

22  about, they could -- they could still be looked at, right?

23       A.      Yes.

24       Q.      You were asked about Exhibit 385, which is the

25  one from the valid files of the bookkeeper's computer.  Do

1    you remember being asked about that?

2         A.    Yes.

3         Q.    Do we have any way of knowing or do we have any

4    idea what the user was looking for when these things popped

5    up?

6         A.    Just by the content of what's in them.

7         Q.    Right.   But -- but you can't tell what they

8    were looking for, can you?

9         A.    No.

10        Q.    These are search documents, aren't they?

11        A.    Yes.

12        Q.    And in terms of the theory of how many hits you

13   could get in a certain paragraph or a certain term, do you

14   remember being asked about that?

15        A.    Yes.

16        Q.    And you remember being asked theoretically

17   whether or not one computer could contain 111 hits.  Do you

18   remember being asked about that?

19        A.    Yes.

20        Q.    That's in theory, but if we go to the computer

21   involving the bookkeeper, is that the practicality of it?

22        A.    No.

23        Q.    And just to be fair with regard to computer

24   132, which is the computer that was from Apartment 132, I

25   think you indicated that all of those hits had to do with

1    something called Encarta.  Didn't you tell us that?

2         A.    Yes.

3         Q.    It did not have to do with the user of that

4    computer that was found in 132, right?

5         A.    Yes.

6         Q.    In your experience, you were able to see that,

7    just so that we're clear, that that is something that came

8    with the computer, if you will, not accessed by the user,

9    correct?

10        A.    Yes.

11        MR. MARTINEZ:  I don't have any other questions.

12        THE COURT:  Are there any further questions of this

13   witness by the jury?  If so, please raise your hand.

14             (Pause in proceedings.)

15        THE COURT:  Let me see Counsel here at the bench.

16

17             (The following proceedings were held at the

18   bench:)

19

20        THE COURT:  Question, "How can you tell it isn't the

21   user who was get the information and not the dictionary?"

22   This is misspelled, but I'm reading it the way it appears.

23        MR. MARTINEZ:  That's the Encarta we just covered.

24   If he can answer, I think it should be answered.  I don't

25   think he provided a reason as to why.  He mentioned something

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1    about pathways.  I don't know if he was clear.

2         MR. PATTERSON:  No objection.

3         THE COURT:  Next question, paren, "If you know, end

4    of paren, how long is the information on the computer after

5    cookies have been used?"

6         MR. MARTINEZ:  I think she's mixing her things, but

7    we could ask that question.

8         MR. PATTERSON:  It's not a coherent question.

9         THE COURT:  I'm not -- I'm not going to ask that.

10            Next question, "Is it possible for items in

11   unallocated space to be written over like a VHS tape or if

12   once used it always stays there?"

13        MR. MARTINEZ:  No objection.

14        MR. PATTERSON:  That's a fair question.

15

16            (The following proceedings were held in open

17   court:)

18

19        THE COURT:  Sir, I have some additional questions

20   here for you.  First question reads as follows:  How can you

21   tell it isn't the user who was getting the information and

22   not the dictionary?

23        THE WITNESS:  The information that points back to the

24   dictionary, like Encarta, points right to the program files

25   of that program, and the other ones come back as web pages.

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

110

1          THE COURT:   Next question reads as follows:   Is it
2   possible for items in unallocated space to be written over
3   like a VHS tape, or if once used, it always stays there?
4          THE WITNESS:   That's exactly right.   Information in
5   unallocated space does get written over and can get written
6   over.
7          THE COURT:   Are there any further questions of this
8   witness by the jury?
9              (No response.)
10          THE COURT:   No one has raised their hand.
11              Are there any follow-up questions to those
12   specific questions by the jury from Mr. Martinez?
13
14   FOLLOW-UP QUESTIONS BY MR. MARTINEZ:
15          Q.    The information in unallocated space, although
16   it can be written over, can you still access it like you did
17   in this case, or in you accessing it, it was not written
18   over?
19          A.    Correct.   If I found something in unallocated
20   space, it hasn't yet been written over.
21          Q.    That's what you printed out?
22          A.    Yes.
23          MR. MARTINEZ:   Okay.   No other questions.
24          THE COURT:   Mr. Patterson?
25          MR. PATTERSON:   None.   Thank you, Judge.


        TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1          THE COURT:  May this witness be excused?

2          MR. MARTINEZ:  Yes, sir.

3          MR. PATTERSON:  Yes, Your Honor.

4          THE COURT:  Thank you very much.  You're excused.

5               Mr. Martinez, the State may call its next

6      witness.

7          MR. MARTINEZ:  State calls Clinton Jewel.

8               (Pause in proceedings.)

9

10                    CLIFTON JEWEL,

11          CALLED TO TESTIFY ON BEHALF OF THE STATE,

12      HAVING FIRST BEEN DULY SWORN, TESTIFIES AS FOLLOWS:

13

14          THE COURT:  Please have a seat on the witness stand.

15      Please make yourself comfortable there on the witness stand.

16      Please pull the microphone close to you.  Please remember to

17      speak loudly and clearly into the microphone so everyone can

18      hear you.  Also please wait until the question is completed

19      before you answer the question, and please make sure that you

20      give a verbal response.  Is that all agreeable to you, sir?

21          THE WITNESS:  Yes, sir.

22          THE COURT:  Mr. Martinez, you may proceed.

23

24      DIRECT EXAMINATION BY MR. MARTINEZ:

25          Q.    Your name, sir?


                TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1          A.      I'm Detective Clifton Jewel.

2          Q.      Who do you work for?

3          A.      The Phoenix Police Department.

4          Q.      What unit are you in?

5          A.      I'm assigned to the homicide unit.

6          Q.      How long have you been in that unit?

7          A.      Five years.

8          Q.      Drawing your attention back to October 10th of

9    the year 2000, did you have occasion to assist in the

10   investigation of a murder that occurred at the San Riva

11   apartment complex?

12          MR. PATTERSON:  Object to the terminology.

13          THE COURT:  Sustained.  Rephrase the question.

14   BY MR. MARTINEZ:

15          Q.      Did you have occasion to assist in the killing

16   that happened at the San Riva apartment on October 10, year

17   2000?

18          A.      Yes.

19          Q.      And specifically with regard to the

20   investigation into that killing, what did you do?

21          A.      On the 10th of October, I was contacted at home

22   by my supervisor and requested to respond to the office in

23   preparation for serving two search warrants at two storage

24   lockers located at that location.

25          Q.      And what storage lockers did you serve the

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1    warrants on?

2            A.    There were two.  One was -- the number was 323

3    and the other was 315.

4            Q.    With regard to the service of the warrant on

5    315, I'm now going to show you Exhibits 178, 179, 180, 181,

6    182, and 183.  Take a look at them.

7                 (Pause in proceedings.)

8    BY MR. MARTINEZ:

9            Q.    Are those photographs true and accurate

10   depictions of Number 315 as it existed back on October 10 of

11   2000?

12           A.    Yes.

13           Q.    If I may have them back.

14           MR. MARTINEZ:  Judge, I move for admission of

15   Exhibits 178, 179, 180, 181, 182, and 183.

16                 (Pause in proceedings.)

17           MR. PATTERSON:  No objection, Judge.

18           THE COURT:  Exhibit Numbers 178, 179, 180, 181, 182,

19   and 183 for identification are admitted into evidence.

20   BY MR. MARTINEZ:

21           Q.    Sir, I'm going to show you some photographs via

22   the use of this ELMO, and I would prefer it if you step down

23   so we could have you describe what we're looking at.

24           THE COURT:  Just remember to speak up when you're

25   away from the microphone.


TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

114

1              THE WITNESS:  Yes, sir.

2     BY MR. MARTINEZ:

3          Q.    178, what does that show us?

4          A.    That's a photograph that I directed the

5     evidence technician to take of the -- of the storage locker

6     Number 315, showing the raised door and the interior.

7          Q.    And what is that in the front there?

8          A.    It's a baby crib.

9          Q.    Was the crib found inside or was it outside of

10    the door when the door was open?

11         A.    I believe it was inside and kind of in the way.

12         Q.    Exhibit 179?

13         A.    That's the same storage locker.  It's a

14    photograph moving in a few feet into the storage locker.

15         Q.    And these are -- what color are they, sir?

16         A.    They're kind of a turquoise.

17         Q.    And 180, first of all are these those turquoise

18    items that we were looking at?

19         A.    Yes.  Those were plastic storage bins.

20         Q.    What does that show of interest to us?

21         A.    In this particular photograph it shows a number

22    of boxes that are stacked along the -- if you're standing

23    looking into the storage locker, would be on the left side of

24    the storage locker.  And specifically this box located here

25    that's open.


TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1        Q.      Exhibit 181, what is that?

2        A.      That is a cardboard -- double cardboard

3   shipping container that was found on the left side of the

4   storage locker about the mid -- midway point.

5        Q.      What's this on top of it right there?

6        A.      That's, I believe, a portion of a latex glove

7   that's visible.

8        Q.      If we go back to 180 -- I want to make sure we

9   don't miss anything -- what is this item that's up here?

10       A.      That was a foil -- it's actually a vacuum

11  packed bag that that box was shipped in.

12       Q.      Was this the top or was this how it was found,

13  I guess I'm asking, Item 180?

14       A.      Yes.  That was as it was found.

15       Q.      And look to the top of 181.  Just want to make

16  sure, is that the same plastic bag there at the top?

17       A.      Yes, it is.

18       Q.      182 is what?

19       A.      182 is just a close-up view looking down into

20  that particular box.

21       Q.      And if we get closer, maybe you can't see it

22  here, can you read the number if it does come into focus or

23  not?

24       A.      The number --

25       Q.      The lot number on that?


TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

000006301

1        A.      The lot number is E --

2        Q.      Oops, sorry.

3        A.      "E" as in "Edward," 19 "K" as in "kick," and

4   either a "Q" or "O" 1.

5        Q.      Okay.  Let's take a look at Exhibit 183?

6   Does that allow you to see the lot number a little bit

7   clearer?

8        A.      Yes.  "E" as in "Edward," 19 "K" as in "king,"

9   01.

10       Q.      Can you read the writing on the top of this

11  right here?

12       A.      Yes.

13       A.      It says Sodium Azide 99 percent MIN assay in

14  parenthesis 500 grams.

15       Q.      Then it also has numbers here down to the left,

16  doesn't it?

17       A.      Yes.

18       Q.      Once you found this box, what did you do with

19  it?  Go ahead and have a seat.

20       A.      Not knowing the hazard that exists with that

21  particular chemical, I placed it in a red biohazard bag.

22       Q.      And then what did you do with it?

23       A.      I sealed the top of the bag as best I could and

24  I seatbelted it to the front seat of my detective car.

25       Q.      What did you do with it after that?


TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

000006302

1          A.      It was transported down to the property room

2    and placed in a temporary evidence locker.

3          Q.      Did you do that or somebody else did that?

4          A.      I placed it in the locker.

5          Q.      I'm going to show you what has been marked for

6    identification as Exhibit Number 265.  Please take a look at

7    it.  First of all, what is that red bag?

8          A.      It's a biohazard bag.

9          Q.      Is this the bag you used to pack the items that

10   you found in storage locker 315?

11         A.      It appears to be.

12         Q.      Did you open it or did you put any marks on it

13   to indicate whether or not it was the same bag?

14         A.      No, I did not.

15         Q.      How about the item on the backside?  It appears

16   to be of a shiny consistency or veneer.  Does that look

17   familiar to you?

18         A.      Yes.  It's the outer aluminum packaging that

19   was depicted in the photograph.

20         Q.      And the photograph that we're talking about,

21   180, does that appear to be this packaging material that's

22   right here?

23         A.      Yes, it does.

24         Q.      Did you put the packaging material inside the

25   box, inside of the box of the red bag?


TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

118

1          A.     They were all -- the box and the aluminum foil

2     was placed inside the evidence -- or the biohazard bag.

3          MR. MARTINEZ:  I don't have any other questions.

4          THE COURT:  Mr. Patterson?

5          MR. PATTERSON:  Thank you, Judge.

6               May I use your ELMO?

7          MR. MARTINEZ:  Yes.

8

9     CROSS-EXAMINATION BY MR. PATTERSON:

10         Q.     This crib that's out in front, where was it

11    previously if you recall?

12         A.     I don't recall.  I believe it was in that space

13    between the overstuffed chair.

14         Q.     Okay.  So we just slide this into this area,

15    that's where it was?

16         A.     I believe so.

17         Q.     Okay.  And it was blocking your ingress, I

18    guess is the term of arte, into this storage unit.  That's

19    why you slid it out and walked in?

20         A.     Yes.

21         Q.     Okay.  And were you looking for anything in

22    particular in these storage units?

23         A.     Yes, I was.

24         Q.     Was one of the things you were looking for

25    Sodium Azide?

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1       A.    Yes, it was.

2       Q.    Okay.  And so you walked into this area -- this

3  is open space here, right? -- and it connects with that open

4  space where the crib was up front here, right?

5       A.    No.  Actually, that's a second open space.

6  It's actually more of a "U."  There were lots of books on the

7  sides, back, and the other side, some stuff in the center, so

8  where the crib was at was actually on the right side.   The

9  box containing the Sodium Azide was on the left.

10      Q.    I understand that.  But is this open space here

11  open space that continues to the front of the unit?

12      A.    Yes, it does.

13      Q.    Okay.  And at some point within the open space

14  near the door of the unit was the crib, right?

15      A.    Yes.

16      Q.    Okay.  Move the crib out of the way, right?

17      A.    Yes.

18      Q.    Now, you're walking into the unit directly down

19  this open space, correct?

20      A.    That's not how it -- I searched that unit.

21      Q.    Okay.  Maybe you didn't do it that way, but is

22  that possible?

23      A.    Yes, that's possible.

24      Q.    Okay.  You going into the unit right down the

25  open space and you look to your left, right next to a little

120

1      dinette set, what do you see?

2              A.     The open box.

3              Q.     Okay.  And that open box was not covered with

4      anything when you first observed it, correct?

5              A.     No, it was not.

6              Q.     Okay.  It was in this condition when you first

7      laid eyes on it, right?

8              A.     Yes.

9              Q.     It wasn't sealed up?

10             A.     No.

11             Q.     Nor was it covered by anything?

12             A.     No.

13             Q.     And the packing stuff, this stuff that you

14     talked about earlier, Number 265, was laying to the north of

15     it and in no way obscuring it, correct?

16             A.     Correct.

17             Q.     Okay.  So the chemical itself is easily visible

18     through the top opening in the box, correct?

19             A.     Yes.

20             MR. PATTERSON:  Thank you, Judge.  That's all I have.

21             THE COURT:  Mr. Martinez?

22

23     REDIRECT EXAMINATION BY MR. MARTINEZ:

24             Q.     You were asked whether or not the box was

25     covered or uncovered.  Do you remember that question?


       TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

```
1          A.    Yes.
2          Q.    And you were asked whether or not it was easily
3    visible.  Do you remember that?
4          A.    Yes.
5          Q.    Was -- that storage shed, was the door open or
6    closed when you got there?
7          A.    It was closed.
8          Q.    Was that door locked or unlocked when you got
9    there?
10         A.    It was locked.
11         Q.    So in the condition that you found that storage
12   locker, with the door closed and locked, was this box easily
13   visible to the outside?
14         A.    No.
15         Q.    How about the chemical you were asked, well,
16   about it being on the top.  Do you remember being asked that?
17         A.    Yes.
18         Q.    Again, in the condition that you found the
19   storage shed, in a closed and locked position, was that
20   visible from the outside?
21         A.    No, it was not.
22         MR. MARTINEZ:  I don't have any other questions.
23         THE COURT:  Are there any further questions of this
24   witness by the jury?
25              (Pause in proceedings.)
```

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

```
 1              THE COURT:  Let me see Counsel here at the bench?

 2

 3              (The following proceedings were held at the

 4   bench:)

 5

 6              THE COURT:  Question, "Had someone told you that box,

 7   paren, shipping box, end of paren, for Sodium Azide was there

 8   before going to storage 315?"

 9              Mr. Martinez?

10         MR. MARTINEZ:  The answer is yes, but I don't know

11   if --

12         MR. PATTERSON:  Calls for hearsay.

13         MR. MARTINEZ:  Calls for hearsay.

14         THE COURT:  Okay.  I won't ask it.

15

16              (The following proceedings were held in open

17   court:)

18

19         THE COURT:  Any further questions of this witness by

20   the jury?

21              (No response.)

22         THE COURT:  No one has raised their hand.

23              May this witness be excused?

24         MR. MARTINEZ:  Yes, sir.

25         MR. PATTERSON:  Yes, Your Honor.
```

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

```
 1          THE COURT:  Thank you very much.  You're excused.

 2          THE WITNESS:  Thank you.

 3          THE COURT:  Mr. Martinez?

 4          MR. MARTINEZ:  State calls John Knell.

 5               (Pause in proceedings.)

 6          THE COURT:  Sir, if you could please step forward

 7   right up here.  Give the clerk your name and she'll swear you

 8   in.

 9

10                    JOHN KNELL,

11          CALLED TO TESTIFY ON BEHALF OF THE STATE,

12      HAVING FIRST BEEN DULY SWORN, TESTIFIES AS FOLLOWS:

13

14          THE COURT:  Please have a seat on the witness

15   stand.  Please make yourself comfortable there on the witness

16   stand.  Please pull the microphone close to you.  Please

17   remember to speak loudly and clearly into the microphone so

18   everyone can hear you.  Also, please wait until the question

19   is completed before you answer the question, and please make

20   sure you give a verbal response.  Is that all agreeable to

21   you?

22          THE WITNESS:  Yes, Your Honor.

23          THE COURT:  Mr. Martinez, you may proceed.

24   / / / / /

25   / / / / /
```

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

```
 1     DIRECT EXAMINATION BY MR. MARTINEZ:

 2              Q.     May I have your name?

 3              A.     I'm John Knell.

 4              Q.     Who do you work for?

 5              A.     Criminalist with the Phoenix Police Department

 6     in the crime lab.

 7              Q.     What do you do for them there?

 8              A.     Assigned to trace evidence section.

 9              Q.     And in that section, what is it that you look

10     for or do?

11              A.     The laboratory is broken down into various

12     sections and one is trace.  In that section, I analyze

13     microscopic items of evidence, things you can't see with your

14     naked eye.  You need special instrumentation.  We call that

15     trace evidence as a general term for that type of material.

16              Q.     And do you have any schooling?  In other words,

17     do you have a college degree?

18              A.     I have a bachelor of science degree in

19     chemistry.  I have a Masters degree in chemistry as well.

20     That was 1999 from Arizona State University.

21              Q.     How long have you been working for the city of

22     Phoenix?

23              A.     About 19 and a half years.

24              Q.     Drawing your attention to a substance that

25     later -- or had the indications of Sodium Azide, did you have
```

125

1    occasion to work with the packaging and the substance itself?

2         A.    Yes, I did.

3         Q.    What date?

4         A.    That was done on November 8 and November 7 of

5    the year 2000.

6         Q.    Where did you receive these items so that you

7    could work on them?  Where were they before you retrieved

8    them?

9         A.    The items were recovered from a property

10   management custodian.  Her actual name was Sandy Emery, so

11   they were in police property impound and I received them from

12   the property custodian.

13        Q.    When they're in police property impound, is

14   that a secure facility not accessible to anyone other than

15   authorized police personnel?

16        A.    Yes, it is.

17        Q.    Going to show you Exhibits 184 through 195.

18   Please take a look at this and see if you recognize these

19   things.

20             (Pause in proceedings.)

21        THE WITNESS:  Yes, I do.

22   BY MR. MARTINEZ:

23        Q.    Do these photographs depict the items that --

24   that involved this Sodium Azide?

25        A.    Yes, they do.


TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

000006311

1          Q.    And specifically with regard to that Sodium

2    Azide, what is it that you were asked or what was your

3    assignment?

4          A.    The Sodium Azide, there was a white powder --

5    I didn't know it was Sodium Azide at the time -- but the

6    white powder came in and some packaging and some Tupperware

7    containers inside a bag.  I was asked to separate the powder

8    from the other items, repackage it and weigh it, and that's

9    what I did.

10         Q.    And once you repackaged it, what did you do

11   with it?

12         A.    Once it was repackaged and separated, a new

13   invoice was created and then some items were released back to

14   property, property custody, I don't know, for storage.  Other

15   items were retained in the laboratory for further analysis.

16         Q.    And were any items sent out anywhere?

17         A.    One particular item was released to an outside

18   analytical laboratory, and that was sent out a week or so

19   later.

20         Q.    This item that you say that was packaged up and

21   sent out later, was it just one item or was it one package

22   that included multiple items?

23         A.    That was just one item.  It was Item 7.1 is the

24   item number we have in the laboratory.

25         Q.    What was Item Number 7.1?

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1    A.    Item 7.1 was -- actually, I'll give you the

2  entire invoice.  It's a unique number.  Item is invoice

3  2787725, and it's Item 7.1 from that invoice.  No other item

4  or invoice has that number.  And that was a sample of

5  material from a Tupperware container that I found inside of a

6  cardboard box.

7    Q.    And was this -- where was this sent to, do you

8  know?

9    A.    It was sent to a laboratory called West Coast

10 Analytical.

11   Q.    Is that in California?

12   A.    Yes, it is.

13   Q.    Who was it sent by?

14   A.    Another criminalist in the laboratory.  His

15 name was Mahesh Patel actually, arranged for the transfer

16 sent by Fed-ex to West Coast Analytical.

17   Q.    He arranged for transfer, but he didn't package

18 it or do anything like that.  He just arranged --

19   A.    No, I did the separation and packaging.  Once

20 it was packaged in a manner that could be sent, he did the

21 arrangements to have it sent out.

22   MR. MARTINEZ:  I move for admission of Exhibits 184,

23 185, 186, 187, 188, 189, 190, 191, 192, 193, 194 and 195.

24                       (Pause in proceedings.)

25   MR. PATTERSON:  No objection, Judge.


TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1              THE COURT:  Exhibit Numbers 184 through 195 for

2     identification are admitted into evidence.

3                    (Pause in proceedings.)

4     BY MR. MARTINEZ:

5         Q.    Sir, let's go ahead and take a look at these

6     photographs.  Starting with Exhibit 184, what does that show

7     us?

8         A.    That's a heavy duty red bag.  It's a biohazard

9     bag.  It wasn't used to contain any biohazard other than

10    Sodium Azide or potential Sodium Azide.  That was tagged in a

11    red bag that I received and containing the other items that I

12    looked at.

13        Q.    I'm going to show you Exhibit Number 265.

14    Please take a look at it.

15        A.    I have some notes I'm looking at to refresh my

16    memory that I had of this particular item number.

17        MR. PATTERSON:  Judge, can we just ascertain whose

18    notes he's looking at so I could follow along?

19        THE COURT:  Yes.  What are you referring to?

20        THE WITNESS:  I have some case notes and these are

21    case notes that I originated during my analysis.

22        MR. PATTERSON:  Your Honor, may I show him --

23        THE COURT:  Yes.

24        MR. PATTERSON:  Is that these you're talking about?

25        THE WITNESS:  Yes, they are.


TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

000006314

1          MR. PATTERSON:  What page are you referring to?

2          THE WITNESS:  I was looking through and it's on

3    page -- my hand numbered page 5.

4          MR. PATTERSON:  Thank you.

5          THE WITNESS:  Top line says I have a tape sealed

6    marked red biohazard bag.  This particular bag has my

7    initials.  Yes, I've seen the item before.

8    BY MR. MARTINEZ:

9          Q.    How about the item in the back?  Have you also

10   seen that?

11         A.    Yeah.  The silver material is Item Number 14

12   and it's on Page 8 of -- my handwritten page 8 of my notes.

13   I didn't do the particular analysis of this, but I did

14   receive it and then I transferred it to inside the lab for

15   further analysis.

16         MR. MARTINEZ:  Move for admission of Exhibit Number

17   265.

18         MR. PATTERSON:  No objection.

19         THE COURT:  Exhibit 265 for identification is

20   admitted into evidence.

21   BY MR. MARTINEZ:

22         Q.    Let's take a look at the photograph and see

23   what we have here.  We have the red bag that we've talked

24   about, and then what is this right here?

25         A.    That's a cardboard box contained inside of the

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1    red bag.

2            Q.    And was it just one box or two boxes that came

3    in there?

4            A.    I have it described as a double-lined box.   It

5    was a single box with a double liner is the way I described

6    it.

7            Q.    Does it have the puffy stuff we normally

8    associate with these kinds of things or not?

9            A.    It had some foam peanuts that came with the

10   box.

11           Q.    I'm going to show you Exhibit 264.   Please take

12   a look at it.   It's been repackaged, but take a look at it to

13   see if that is the box that is depicted there.

14           A.    Again, on page 5, handwritten notes, item

15   number invoice matches what I analyzed in my notes.

16           Q.    Okay.   Was this box sent over to the California

17   laboratory or was it kept at the Phoenix Police Department?

18           A.    That particular box was kept inside the

19   laboratory.

20           MR. MARTINEZ:   Move for admission of Exhibit 264.

21           MR. PATTERSON:   No objection.

22           THE COURT:   Exhibit 264 is admitted into evidence.

23   BY MR. MARTINEZ:

24           Q.    What is this right here in the front?

25           A.    Those are Q-tips.   I believe there were nine of

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1    those.

2         Q.    Did you --

3         A.    Let me double check.

4         Q.    Go ahead.

5         A.    I have nine cotton swabs.

6         Q.    Did you put those there or did that come from

7    somewhere?

8         A.    They were included inside the box.

9         Q.    And I'm showing you Exhibit 186.  What is that?

10        A.    That's a large blowup of those particular

11   items.

12        Q.    If we take a look again at 184, what is this to

13   the left of it?

14        A.    That's an additional silver mylar-type film or

15   packaging.

16        Q.    And if we look at 185, what does that show us?

17        A.    I believe that's the enlarged version of that

18   same item.

19        Q.    I'm going to show you Exhibit Number 276.

20   Please take a look at it.

21        A.    Page 8 of my notes, I had this item in my

22   possession.  I didn't do any analysis other than package it

23   or transfer it to another person in the laboratory for

24   further analysis, but I do recognize that.

25        Q.    And that's the item we have pictured there,

1    right?

2            A.    Yes.

3            MR. MARTINEZ:  Move for admission of Exhibit 276.

4            MR. PATTERSON:  No objection.

5            THE COURT:  Exhibit 276 for identification is

6    admitted into evidence.

7    BY MR. MARTINEZ:

8            Q.    Let's take a look, again, at 184.  What is this

9    substance that's right here in front?

10           A.    I believe that is some -- can I get off my

11   chair to look a little closer?

12           Q.    Sure.

13           THE COURT:  Just remember to speak up when you're

14   away from the microphone.

15           THE WITNESS:  Okay.

16                 (Pause in proceedings.)

17   BY MR. MARTINEZ:

18           Q.    Maybe I could give you a close-up of it?

19           A.    Yeah, would you please?

20           Q.    187.

21           A.    I have as item number two of invoice 2787725

22   some bubble wrap that was included.  Is that it?

23           Q.    Let me show you Exhibit Number 277, see if

24   that's what that is?

25           A.    This item number 2, it's bubble wrap that was


            TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1    included in the box.  Again, I didn't analyze it other than

2    preserve it and keep it for further analysis in the

3    laboratory.

4          MR. MARTINEZ:  Move for admission of Exhibit 277.

5          MR. PATTERSON:  No objection, Judge.

6          THE COURT:  Exhibit 277 for identification is

7    admitted into evidence.

8    BY MR. MARTINEZ:

9          Q.    Take a look over here to the right.  What is

10    that right there?  And if I show you a close-up of 188, does

11    that tell you what it is?

12          A.    One of the items that I analyzed is a white

13    paper towel.  That appears to be the white paper towel.

14          Q.    Let me show you Exhibit Number 273.  Please

15    take a look at it and see if that's what that is.

16          A.    This is Item Number 4, which I have in my

17    notes as having in my possession.  I did not analyze it, but

18    it was in my possession.  I retained it for further analysis

19    in the laboratory.

20          MR. MARTINEZ:  Move for admission of Exhibit 273.

21          (Pause in proceedings.)

22          MR. PATTERSON:  I'm sorry, Judge.  I was in

23    conference.

24          THE COURT:  Yes.  Mr. Martinez has moved into -- has

25    asked that Exhibit 273 for identification be admitted into

1    evidence.

2           MR. PATTERSON:  I apologize, Judge.  I have no

3    objection.

4           THE COURT:  Exhibit 273 for identification is

5    admitted into evidence.

6    BY MR. MARTINEZ:

7           Q.    Take a look at the -- take a look at this

8    bottle that says Sodium Azide on it.  Is it laying on

9    something?  Does it appear to be on something?

10          A.    The particular -- it's a reagent bottle, is the

11   proper term for it, and it was found inside of the cardboard

12   box in a round Tupperware container.

13          Q.    And Exhibit 189?

14          A.    Also loose white powder in the Tupperware

15   container which is visible in the photograph.

16          Q.    I'm going to show you Exhibit Number 272.

17          A.    Again, the item numbers correspond to items I

18   looked at in my report.

19          MR. MARTINEZ:  Move for admission of Exhibit -- is it

20   272?

21          THE WITNESS:  Yes, sir.

22          MR. PATTERSON:  No objection.

23          THE COURT:  Exhibit 272 for identification is

24   admitted into evidence.

25   / / / / /

1    BY MR. MARTINEZ:

2          Q.    Let's take a look at some of the other items

3    that you may have found there, starting with 194.  Do you

4    recognize what that is?

5          A.    I believe so.  Let me look at my -- I analyzed

6    a square Tupperware container without a lid.  It was Item 13

7    off invoice 2780436.  That appears to be that item.

8          Q.    And if I show you Exhibit Number 271, is that

9    that Tupperware container?

10         A.    Yes, it is.

11         MR. MARTINEZ:  Move for admission of Exhibit 271.

12         MR. PATTERSON:  No objection, Judge.

13         THE COURT:  Exhibit 271 for identification is

14   admitted into evidence.

15   BY MR. MARTINEZ:

16         Q.    Did you also find some -- a fork, for example,

17   in that?

18         A.    There was.

19         Q.    And I'm showing you Exhibit 190?

20         A.    Yes, I did.

21         Q.    Did you find a spoon in there?

22               (Pause in proceedings.)

23   BY MR. MARTINEZ:

24         Q.    You may not have.  I'm just asking.

25         A.    I'm double checking to make sure.

1                    (Pause in proceedings.)

2          THE WITNESS:  I don't have a record of seeing a

3    fork -- I mean, a spoon.

4    BY MR. MARTINEZ:

5          Q.    And you actually cataloged everything that you

6    found there?  You didn't leave anything out, did you?

7          A.    No, I did not.

8          Q.    And I'm showing you Exhibit Number 269.   Take a

9    look at that?

10         A.    I recognize it, yes.

11         Q.    And this is the fork that you dealt with on

12   that day?

13         A.    Yes.

14         MR. MARTINEZ:  Move for admission of Exhibit 269.

15         MR. PATTERSON:  No objection.

16         THE COURT:  Exhibit 269 for identification is

17   admitted into evidence.

18   BY MR. MARTINEZ:

19         Q.    Did you also find a knife there?

20         A.    Yes, I did.

21         Q.    Showing you Exhibit 191, is that a picture of

22   that knife?

23         A.    That's a picture of a knife that appears to be

24   the knife that I examined.

25         Q.    And take a look at Exhibit 270.  Is that the


          TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1    knife that you found that day?

2              A.    Yes, it is.

3              MR. MARTINEZ:  Okay.  I move for admission of Exhibit

4    270.

5              MR. PATTERSON:  No objection.

6              THE COURT:  Exhibit 270 for identification is

7    admitted into evidence.

8    BY MR. MARTINEZ:

9              Q.    Did you also find some latex gloves?

10             (Pause in proceedings.)

11             THE WITNESS:  Yes, I did.  Sorry.  Took me a while to

12   find my information.

13   BY MR. MARTINEZ:

14             Q.    Would that be items 9 and 10?

15             A.    Yes.

16             Q.    Going to show you Exhibit 192, a pair of latex

17   gloves, right?

18             A.    Appears to be, right.

19             Q.    And 193?

20             A.    Also appears to be a pair.

21             Q.    Take a look at Exhibit 275 and 274.  Take a

22   look at these.

23             A.    Item invoice numbers match my report.

24             MR. MARTINEZ:  Move for admission of Exhibits numbers

25   274 and 275.

138

1           MR. PATTERSON:  No objection.

2           THE COURT:  Exhibit Number 274 and Exhibit Number 275

3     for identification are admitted into evidence.

4     BY MR. MARTINEZ:

5           Q.    Going to show you another exhibit, it's Exhibit

6     Number 278.  Please take a look at it.  First, do you

7     recognize what that is?

8           A.    Yes.  This is Phoenix Police Inventory

9     2787725-3.  It's a clear plastic bag that I had in my

10    possession.  I remember it.

11          Q.    Did it come from that cardboard box we've been

12    talking about?

13          A.    Yes.

14          MR. MARTINEZ:  I move for admission of Exhibit 278.

15          MR. PATTERSON:  No objection, Judge.

16          THE COURT:  Exhibit 278 for identification is

17    admitted into evidence.

18    BY MR. MARTINEZ:

19          Q.    I now want to show you a picture to see if you

20    recognize what's there, Exhibit 195.  If you need to step

21    down, tell us.

22          A.    I can recognize it.  JEK are my initials.  When

23    I -- I indicated there was powder that was either on the

24    Tupperware or loose in the box.  These are the containers I

25    repackaged the powder in and I marked it with a date,


                TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1    November 7, and my initials JEK, and a short description.

2         Q.    What's the item here on the top?  Where did

3    that come from?

4         A.    There's a portion of these samples that a

5    smaller portion was removed for further analysis, sent to

6    West Coast Analytical.  The small vial on top would have been

7    a sample sent to West Coast Analytical.

8         Q.    What was it removed from --

9         A.    It's smaller portion of that powder in the

10   container.  This was found around the reagent and the round

11   Tupperware container it was sitting in.

12        Q.    Here on the top, what is this?

13        A.    That's also a -- that's another small vial

14   containing a portion of the powder that was in the container

15   below it.  That particular item was not sent out for further

16   analysis.

17        Q.    How about the one here on the right?

18        A.    Sorry.

19        Q.    If you want, I could show you the photograph

20   because it actually shows what -- it's a little bit better.

21        A.    Okay.  There was some bubble wrap packaging

22   inside the box that had white powder on it.  That's the

23   powder I scraped and removed from the bubble wrap and

24   repackaged it into a plastic vial.

25        Q.    This right here, where did you remove that

1    from?

2              A.    That -- okay.  That -- let me take a look at it

3    a little closer to make sure.

4              Q.    If you need the photograph, let me know.

5              A.    I can read Item Number 8 on the vial on top of

6    it.  That corresponds to my notes.  Item Number 8 was a

7    powder that was found in the plastic Tupperware container

8    underneath the reagent bottle.  Item 7, the larger container

9    to the left of it, was powder that was inside the reagent

10   bottle.

11             Q.    And the one on top I think is the one that you

12   told us was sent over to West Coast Analytical?

13             A.    Yeah.  That would have been 7.1, and that was

14   sent out for further analysis.

15             Q.    Where is the amber-colored jar?  What did you

16   do with that?

17             A.    Once that was emptied of its contents, the jar

18   itself -- sorry, it was Item Number 10 at that point in time

19   and that was retained in the laboratory for further analysis.

20             Q.    What is the invoice number or the --

21             A.    The brown glass bottle in the description is --

22   that's Invoice 2787725 Item Number 10.

23             Q.    I want you to take a look at Exhibit Number

24   268.  Go ahead.  What is that?

25             A.    It's a metal can we have in the laboratory for

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1    sealing up particular items.  The invoice and item number --

2    I don't believe I've ever looked at this particular item.  So

3    this is something that could have come from somebody else

4    like West Coast Analytical when they returned it or

5    something.

6                        The portion of the invoice description at the

7    bottom, it says Removed from Invoice 2787725 item and I can't

8    tell -- it doesn't continue.  This may have been removed from

9    the item I examined after I looked at it, but I do not know

10   that.

11           Q.    But the invoice number that we're talking about

12   is 2787725, correct?

13           A.    Yes.  And the description for that particular

14   item, bottom of the barcode, says this was removed from that

15   invoice, but I don't have knowledge of that happening.

16           Q.    Okay.

17                 (Attorney-attorney discussion.)

18   BY MR. MARTINEZ:

19           Q.    You took a look at the amber container, didn't

20   you?

21           A.    Yes, I did.

22           Q.    And on the outside, it's -- how much was its

23   weight?

24           A.    The packaging of the amber reagent bottle said

25   that it contained 500 grams.


                TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1        Q.     Did you weigh all of the amount of white

2 substance you see in 195 to determine how much was left over?

3        A.     Yes, I did.

4        Q.     How much was left over?

5        A.     The total weight of all the white powder I

6 could recover was 479.2, grams.

7        Q.     Which means there was some not there?

8        A.     Correct.

9        Q.     And how much was not there?

10       A.     20.8 grams.

11       Q.     So could you give us a feel of how much is not

12 there?  Could you give us, let's say, the equivalent of that

13 amount, let's say, in Sweet and Low packets?  How many Sweet

14 and Low packets would it take to make 20.8 grams?

15       A.     Individual Sweet and Low packet contains 1

16 gram, so there would be 20.8, almost 21 packets of Sweet and

17 Low.

18       MR. MARTINEZ:  I don't have any other questions.

19       THE COURT:  Mr. Patterson?

20       MR. PATTERSON:  Thank you, Judge.  May I have a

21 moment, Judge?

22       THE COURT:  Yes.

23

24 CROSS-EXAMINATION BY MR. PATTERSON:

25       Q.     We've spoken before, Mr. Knell, haven't we?

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1          A.     Yes, sir.

2          Q.     Just so I understand all the things we went

3     through here, you found two pairs of latex rubber gloves in

4     this box, right?

5          A.     Correct.

6          Q.     Okay.  You found two Tupperware bowls, one

7     square and one round?

8          A.     Yes.

9          Q.     Okay.  The round one serves as kind of the

10    repository, if you will, of the amber reagent bottle that

11    contained most of the Sodium Azide, correct?

12         A.     Yes.

13         Q.     There was no round top found in the box,

14    cardboard box that would have -- could have been affixed on

15    top of that round Tupperware container, was there?

16         A.     No.

17         Q.     Okay.  The Tupperware container, it had a top

18    to it, didn't it?

19         A.     I removed the lid on the square Tupperware

20    container.

21         Q.     Okay.  That's my mistake.  There was no lid for

22    the square one either?

23         A.     That's correct.

24         Q.     Okay.  There were 9 Q-tips discovered, correct?

25         A.     Correct.

1        Q.     Did you send those Q-tips to West Coast

2   Analytical for evaluation?

3        A.     I do not believe those were sent.

4        Q.     Do you know whether or not those have been

5   evaluated?

6        A.     I don't have that information.

7        Q.     Okay.  So the two things that you did send to

8   West Coast Analytical for evaluation were samples from the

9   Tupperware container and samples from the amber reagent

10  bottle, correct?

11       A.     That's more knowledge than I have, but that's

12  knowledge I'm privy too.  I was involved with just the

13  separation of the material.

14       Q.     All right.  That's my -- my fault then.  I

15  jumped the gun here.  You segregated a portion of the unknown

16  white substance from the amber reagent bottle?

17       A.     Correct.

18       Q.     Okay.  And that was put in a smaller container?

19       A.     Yes.

20       Q.     You don't know where that went, but it would

21  have been something segregated for testing at some lab.

22  That's consistent with your experience, right?

23       A.     That particular item I'm aware was sent to West

24  Coast Analytical, but I wasn't involved in the actual

25  arrangement of that.


TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1      Q.    Okay.  As was the sample from the open

2   Tupperware container, correct?

3      A.    That sample was collected.  I don't believe it

4   was sent.

5      Q.    Okay.  So the only sample that was sent, to

6   your knowledge, to West Coast Analytical was that which was

7   taken from the amber reagent bottle itself?

8      A.    Only samples of white powder I'm aware of that

9   were sent, correct.

10     Q.    All right.  And doing the math, if there were

11   500 grams of substance in the amber reagent bottle initially,

12   you were able to keep track of in this box 479.2 grams,

13   right?

14     A.    Correct.

15     Q.    So there's 20.8 grams unaccounted for?

16     A.    Correct.

17     MR. PATTERSON:  Okay.  Thank you, Judge.  That's all

18   I have.

19     THE COURT:  Mr. Martinez?

20

21   REDIRECT EXAMINATION BY MR. MARTINEZ:

22     Q.    Sir, with regard to the 20.8 grams that you

23   were asked about, earlier in court somebody testified as to

24   an amount of -- somebody testified to an amount of 2.09

25   grams.  Just so that we don't get caught up in the math and

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

000006331

1    lose sight of it, would it be say fair to say 2.01 -- that

2    20.8 grams is about 10 times 2.09 grams?

3         A.    Correct.

4         MR. MARTINEZ:  I don't have any other questions.

5         THE COURT:  Are there any further questions of this

6    witness by the jury?  If so, please raise your hand.

7

8              (The following proceedings were held at the

9    bench:)

10

11        THE COURT:  Question, Did you find any caplets in --

12   or let me start over.  "Did you find any caplets in and/or

13   around the box?  If so, were any of them tested?"

14        MR. MARTINEZ:  That's jumping the gun.  He would not

15   have found them.

16        MR. PATTERSON:  That's a fair question.

17        THE COURT:  "Did you find any vitamin" -- I think

18   it's misspelled, but I think they mean vitamin -- "bottle

19   around or in the box?"

20        MR. MARTINEZ:  No objection.

21        MR. PATTERSON:  No objection.

22        THE COURT:  "One, when you use the term, quote,

23   invoice, end of quote, what do you mean?"

24        MR. MARTINEZ:  No objection.

25        MR. PATTERSON:  No objection.


         TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1          THE COURT:  Next question, "Two, is Sodium Azide

2    hazardous extremely to the skin or to breathe in?"

3          MR. PATTERSON:  It's beyond the scope.

4          MR. MARTINEZ:  Yeah.

5          MR. PATTERSON:  There are going to be other people

6    coming in.

7          THE COURT:  Okay.  I won't ask that.

8          MR. MARTINEZ:  Judge, with regard to this witness, I

9    know you usually ask if we're going to excuse them.  I don't

10   know where the amber bottle is.  I it thought was in that

11   can.  It still may be, but I'm not sure, so I'm going to

12   check that out.  If need be, I'll bring him back.

13         THE COURT:  Okay.

14         MR. PATTERSON:  That's fine.

15

16              (The following proceedings were held in open

17   court:)

18

19         THE COURT:  Sir, I have some additional questions

20   here for you.  The first question reads as follows:  "Did you

21   find any caplets in and or around the box?  And if so were

22   any of them tested?"

23         THE WITNESS:  I'm reviewing my notes.  I do not

24   recollect seeing any caplets, but I want to make sure before

25   I say so.


TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1                    (Pause in proceedings.)

2              THE WITNESS:  I have no record of describing such an

3       item.

4              THE COURT:  Next question read as follows:  "Did you

5       find any vitamin bottles around or in the box?"

6              THE WITNESS:  No, I did not.

7              THE COURT:  Next question reads as follows:  "When

8       you use the term, quote, invoice, end of quote, who do you

9       mean?"

10             THE WITNESS:  The Phoenix Police Department receives

11      a lot of property.  In order to track one item, not getting

12      it mixed up with the next, we've developed an invoice item

13      number system.  An invoice is generated, I think it's six or

14      eight digits long, and there's only one of those invoices

15      generated.  On that invoice a number of items can be attached

16      to that, and so an invoice can be generated and this water

17      pot could be given an item number.  There will never be an

18      item number or another invoice that duplicates that.  It's

19      unique to this particular item.  That's how we keep track of

20      items so we know which one we're talking about.

21             THE COURT:  Any further questions of this witness by

22      the jury?

23                    (No response.)

24             THE COURT:  No one has raised their hand.

25             Mr. Martinez, any questions to -- follow-up


TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1   questions to the specific requests asked by the jury?

2        MR. MARTINEZ:  No, sir.

3        THE COURT:  Mr. Patterson?

4        MR. PATTERSON:  No, Your Honor.  Thank you.

5        THE COURT:  Okay.  You may step down.  Thank you.

6        THE WITNESS:  Thank you, Your Honor.

7             Ladies and gentlemen, we'll go ahead and take

8   our evening recess at this point in time.  During this

9   recess, remember the entire admonition I have given you,

10  including the fact you're not to discuss this case with

11  anyone, do not let anyone discuss the case with you.  Also,

12  do not do any research, experimentation, investigation or

13  tests on your own, okay?  Avoid any media coverage of the

14  case or the trial.  Keep an open mind.  I want you to have a

15  nice evening.  We'll see you tomorrow at 1:00 p.m.  Have a

16  nice evening.

17

18             (Evening recess.)

19

20

21

22

23

24

25


TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

000006335

```
 1

 2

 3                    CERTIFICATE OF REPORTER

 4

 5   STATE OF ARIZONA      )
                           )
 6   COUNTY OF MARICOPA    )

 7

 8             I, Traci L. Wheeler, CSR, RPR, an official

 9   and certified reporter in the Superior Court of the State

10   of Arizona, in and for the County of Maricopa, hereby

11   certify that I made a shorthand record of the proceedings

12   had in the within case, and that the foregoing transcript

13   is a full, true, and correct transcription of the

14   proceedings in this case.

15             Dated this 28th day of March, 2005.

16

17

18             _____
                 Traci L. Wheeler, CSR, RPR
19               Certified Court Reporter No. 50313
                 Official Court Reporter
20

21

22

23

24

25
```

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

000006336

# APPENDIX E

DP

D5-0062   1
Braccio

COPY

1            IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

2                IN AND FOR THE COUNTY OF MARICOPA

3

4    STATE OF ARIZONA,              )
                                    )
5            Plaintiff,             )
                                    )
6    v.                            )    No. CR 05-0005 AP
                                    )    MARICOPA COUNTY
7    WENDI ELIZABETH ANDRIANO,      )    No. CR 2000-096032
                                    )
8            Defendant.            )
     _____)
9

10

11

12                        Mesa, Arizona 4
                      September 29, 2008
13

14

15

16            BEFORE:  The Honorable BRIAN K. ISHIKAWA

17

18            REPORTER'S TRANSCRIPT OF PROCEEDINGS

19                      TRIAL DAY 20

20

21

22

23

24   ORIGINAL Prepared for APPEAL by:
     TRACI L. WHEELER, CSR, RPR
25   Certified Court Reporter No. 50313

        TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

2

1                    A P P E A R A N C E S

2   FOR THE STATE:        JUAN M. MARTINEZ,
                          Deputy County Attorney
3
    FOR THE DEFENDANT:    DANIEL B. PATTERSON,
4                         Deputy Public Defender
                          and
5                         G. DAVID DELOZIER,
                          Attorney at Law
6

7          I N D E X   O F   E X A M I N A T I O N

8   WITNESS                                        PAGE

9   HSEUH, JOHN, Called on behalf of the State
              Direct Examination by Mr. Martinez      4
10
    MILLER, JEFFREY, Called on behalf of the State
11            Direct Examination by Mr. Martinez     53
              Cross-examination by Mr. Patterson     70
12            Redirect Examination by Mr. Martinez   95

13

14     E X H I B I T S   A D M I T T E D   I N   E V I D E N C E

15   NO.    DESCRIPTION                            PAGE

16   280    Handwriting exemplar (dated 06-12-02)   46
     280.001 Handwriting exemplar (dated 02-06-01)  22
17

18

19

20

21

22

23

24

25


        TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

                        000004405

```
 1              MESA, ARIZONA, WEDNESDAY, SEPTEMBER 29, 2004
 2
 3          THE COURT:  Good afternoon.  This is trial in CR
 4     2000-096032, State of Arizona versus Wendi Elizabeth
 5     Andriano.  The record will reflect the presence of Defendant,
 6     Counsel and the Jury.
 7              Mr. Martinez, the State may call its next
 8     witness.
 9          MR. MARTINEZ:  State calls John Hseuh.
10          THE COURT:  Sir, if you could step forward right up
11     here.  Give your name to the clerk and she'll swear you in.
12
13                      JOHN HSEUH,
14          CALLED TO TESTIFY ON BEHALF OF THE STATE,
15        HAVING FIRST BEEN DULY SWORN, TESTIFIES AS FOLLOWS:
16
17          THE COURT:  Sir, please have a seat on the witness
18     stand.  Please make yourself comfortable there.  Please pull
19     the microphone close to you.  Please remember to speak loudly
20     and clearly in the microphone so everybody can hear you.
21     Also please wait until the question is completed before you
22     answer the question, and please make sure you give a verbal
23     response.  Is that agreeable, sir?
24          THE WITNESS:  Yes, Your Honor.
25          THE COURT:  Mr. Martinez, you may proceed.
```

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

```
1      DIRECT EXAMINATION BY MR. MARTINEZ:

2              Q.      Your name, sir?

3              A.      My name is John Hseuh.

4              Q.      Who are you employed by?

5              A.      I'm employed by the City of Phoenix Police

6      Department in the crime lab.

7              Q.      What do you do there in the crime lab?

8              A.      I'm a forensic document examiner with the City

9      of Phoenix Police Department.

10             Q.      And specifically what are your day-to-day

11     duties?

12             A.      My day-to-day duties as a document examiner are

13     able to determine authenticity, is this a genuine driver's

14     license, cashier's check, passport, or I'm asked to determine

15     authorship, who wrote it or did this copier or typewriter or

16     printer produce this document.

17             Q.      What is your educational background?

18             A.      My educational background consists of attending

19     the University of Missouri, St. Louis, and St. Louis

20     University.  I received two bachelor degrees; one in Biology,

21     one in Chemistry, both from St. Louis University.

22             Q.      Sir, what is the process of photocopying?  I

23     know you mentioned you work with that, but what is the

24     process of photocopying and where did you obtain your

25     experience and experience with regard to that area?
```

1          A.     Okay.   There's several different questions.

2          Q.     Right.

3          A.     Let me just -- if I could just explain the

4     process of photocopy first.

5          Q.     Sure.

6          A.     In the process of photocopy, the document is

7     placed on the glass, which is also called the platen.   A

8     source of light scans the document and gives that information

9     to a corona wire and a drum.   The corona wire is -- excuse

10    me, the drum is moving and the corona wire is charging the

11    document, making an image of the document.   The drum is now

12    charged and then continues to rotate.   As it rotates, it's

13    also spraying on toner.   That toner is attributed to the

14    charged area of the drum.   The drum continues to rotate and

15    then the paper feed comes in on the bottom side and now in

16    contact with the drum.   The drum becomes deactivated or

17    decharged and the paper is now charged, and the toner will

18    now attract to the paper.   The paper continues beyond the

19    drum, and through a process of fusion, either hot or cold,

20    the toner, that is now from the drum onto the paper, is fused

21    to the paper.   Once that fusion is completed, that paper will

22    be ejected from the machine into the tray.

23         Q.     Where did you get your experience in this field?

24         A.     I -- my background in question documents

25    consists of being trained as senior document examiner for

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

000004408

```
 1     four years.  I've also been trained by the FBI, Secret
 2     Service, Rochester institute of technology.  It's just a
 3     matter of all the other tests and all the other experience.
 4          Q.    Going to show you what I've marked for
 5     examination -- identification as Exhibit 395.  Do you
 6     recognize it?
 7          A.    Yes, I do.
 8          Q.    If I may have it back.  Is this CD a copy of
 9     what you are about to present to us today?
10          A.    This CD is a copy of a Power Point
11     presentation.
12          Q.    And the Power Point presentation is what you
13     are going to present to us today, correct?
14          A.    That's correct.
15          Q.    Now, before you begin your Power Point
16     presentation, did you have occasion to be presented with
17     documents that are marked as Exhibits number 266.04 -- sorry,
18     .014, 266.016, 266.012, 266.013, and 266.015.
19                (Pause in proceedings.)
20                THE WITNESS:  266.015, I have seen.
21     BY MR. MARTINEZ:
22          Q.    Okay.
23          A.    Exhibit 266.013, I have seen.  Exhibit 266.012,
24     I have seen.  Exhibit 266.016, I have seen.  And Exhibit
25     266.014, I have seen.
```

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1          Q.      And are these items that are used as part of

2    the -- your Power Point presentation today?

3          A.      Yes.

4          Q.      Why don't you go ahead and show us the first

5    slide that you want to discuss as it relates to these

6    documents that we just discussed.

7          A.      May I step down, please?

8          Q.      Sure.

9          MR. PATTERSON:   Judge, could we just approach for a

10   minute?

11         THE COURT:   Yes.

12

13                      (The following proceedings were held at the

14   bench:)

15

16         MR. PATTERSON:   I've been trying cases for 25 years,

17   Judge.   I got to admit I've never seen a witness give a Power

18   Point presentation, so I really don't know what the rules

19   are.   My sense is he should not be allowed to give a

20   narrative testimony, but I don't know what Mr. Martinez's

21   intent is in that regard, if he's going to ask questions

22   or --

23         MR. MARTINEZ:   What's going to happen is he's going

24   to show an image and I'm going to show him -- I'll ask him

25   about this exhibit,   And now, with regard, just as an

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

```
 1    example, 266.015, what is it that you did with it, and then
 2    he'll show on the screen what he did with it.
 3              THE COURT:  Make sure you use question and answer
 4              MR. MARTINEZ:  And we're going one at a time also.
 5              MR. PATTERSON:  Okay.  Thanks, Judge.
 6
 7              (The following proceedings were held in open
 8    court:)
 9
10              THE COURT:  Sir, you could step down.  Please
11    remember when you're away from the microphone speak up as
12    loudly as you can so everyone can hear you.
13              THE WITNESS:  Yes, Your Honor.
14    BY MR. MARTINEZ:
15         Q.    Up there you have something that looked to be
16    like a privilege license.  I want you to take a look at
17    Exhibit 266.015.  Is that what you have up there?
18         A.    Yes, it is.
19         Q.    Okay.  With regard to this particular document,
20    what is it that you can tell us about it?
21         A.    I marked this as Q6 when I first received it
22    and it's part of my analysis of this set.
23         Q.    And is this the one that has the "To Allen" on
24    the margin?
25         A.    Yes.  It was handprinted.
```

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

```
 1              Q.      All right.  What is the next item that you
 2     dealt with?
 3              A.      This is marked as Q7.
 4              Q.      Is your Q7 actually Exhibit 266.013?
 5              A.      Yes, it is.
 6              Q.      Okay.  And do you want to tell us what this
 7     shows or are you going to wait until we --
 8              A.      The format of this presentation was simply to
 9     place all of the cues in context first and then to present
10     what was requested and what the analysis was.
11              Q.      Okay.  Let's go --
12              A.      If you want, I could --
13              Q.      No.  Let's go ahead with the next slide.  And
14     is this Exhibit 266.012?
15              A.      Yes, it is.
16              Q.      Go ahead to the next slide.  Is this 266.016?
17              A.      Yes, it is.
18              Q.      And the next slide.  Is that 266.014?
19              A.      Yes, it is.
20              Q.      Okay.  Let's go on to the next slide.  What
21     were you asked to do with regard to these documents?
22              A.      I was asked to examine the city of Phoenix
23     business license to see and look for alterations.
24              Q.      And what is the first thing that you did?
25              A.      I looked at these exhibits and worked with them
```

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1    and came up with the following.  This is the initial --

2         Q.    With regard to the one that you have there as

3    Q9, I know we've looked at it before.  Just for the sake of

4    the record, it's 266.016, right?

5         A.    Yes, it is.  This is the initial document. What

6    I wanted to show essentially was -- if I could use a pointer,

7    please -- this is a faxed information.  This is page number

8    2.  This document is the Arizona State Department of Revenue

9    document for a bond exemption in the name of Cardinal

10   Industry, also known as Copperstate Glass and Mirror.  This

11   document is smaller than the full scan of the photocopier.

12        Q.    How did you know that?

13        A.    Because there are other indicia of information

14   on there.

15        Q.    Go ahead and tell me what that is?

16        A.    As I mentioned the process of a photocopy, in

17   this case, as I said, this document is smaller than the full

18   scan so other information was included.  Essentially this is

19   the belt mark.  This would be the cover of your photocopier.

20   What it says if there's a belt mark and there was an autofeed

21   involved where you could put a set of documents and it will

22   mechanically feed the documents into the printer -- or,

23   excuse me, into the copier.  Because this one was smaller,

24   the belt or the cover was reflected into the scan.

25              In addition to that, we also have trash marks.


TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1      Q.     Can you explain the difference between a trash

2  mark and a belt mark?

3      A.     Yes.  The belt mark, again, is from the cover.

4  This is the roller that's on there and shows some of the

5  features.  The trash mark would be trash marks or blemishes

6  on your glass, or what's called a platen, whether somebody,

7  let's say, used some white out and it didn't dry right away

8  and they put it on the photocopier face down and some of the

9  copier -- excuse me, some of the white out got onto the

10 glass, or some other blemishes had occurred on the glass, and

11 they will come up and show up as trash marks.

12     Q.     You also have something there and you mentioned

13 the corona wire?

14     A.     Yes.  The corona wire, as I mentioned before,

15 is giving a charge to the drum.  As the drum rotates, the

16 corona wire will charge and discharge certain areas in order

17 to reflect the document that's being copied.

18            In this case, as the drum is rotating, the

19 corona wire is not correctly working, and so we have a

20 scanned line where it just literally activated the entire

21 strip for that run of that drum.  That's reflected and the

22 toner gets on there, then gets on the paper so that you have

23 a corona wire defect.

24     Q.     When you say you have a corona wire defect, is

25 there two places there can be a defect or just -- or it could

1    be both, either one.  How does that work?  I'm not sure I

2    understood what you said about that.

3              A.    The corona wire is a full wire going across.

4    Parts of it are not acting properly, and so parts of it, as

5    in this case, two sections of it, are activated and does not

6    turn itself off, and therefore the toner is attracted and the

7    toner reflects that onto the paper.

8              Q.    Let's go on to the next slide, please?

9              A.    This is the --

10             Q.    Before we get started, this document as you

11   indicated is Q8, correct?

12             A.    May I see --

13             Q.    Q8?

14             A.    Yes, it is.

15             Q.    And that would be our Exhibit Number 266.012,

16   right?

17             A.    Yes.

18             Q.    And on this one it appears that's the same or

19   it appears there's also belt marks.  Are those significant to

20   you?

21             A.    Yes.

22             Q.    Why is that?

23             A.    They are the same belt marks, the same corona

24   wire, and same trash marks that were on the previous

25             Q.    Exhibit?

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1          A.      -- exhibit.

2          Q.      So what does that tell you?

3          A.      Well, in addition to the past exhibit being

4    page 2, this is now page 3 according to the faxed

5    information, and my conclusion here -- if I may go to the

6    next --

7          Q.      Sure.

8          A.      My conclusion here is that Q9 and Q8 were

9    produced by the same copy machine.

10         Q.      When you're saying they were produced by the

11   same copy machine, just so I'm clear, does that mean they're

12   run in the same copier?

13         A.      That is correct.

14         Q.      Let's go on to the next line.  This is your Q7,

15   which I believe is Exhibit Number 266.013?

16         A.      Yes, it is.

17         Q.      Okay.  What does this show us?

18         A.      This shows us that there are paper strips that

19   have directional text that have been inserted or taped onto

20   the document.  In addition, this document is a copy of the

21   previous document, Q8.

22         Q.      How do you know it's a previous copy of Q8?

23         A.      Essentially because it still has the faxed

24   information on there, page 3.

25         Q.      Okay.

```
 1          A.      -- in addition -- well, let me --

 2          Q.      You can go back for a minute.

 3          A.      All right.  In addition, I will show that there

 4    is the same information as far as the same defects from the

 5    first photocopier there.

 6          Q.      Let me ask you -- I was going to ask you about

 7    that.  The line we have at the bottom, is that the defect

 8    we're talking about?

 9          A.      These are the corona wire defects from the

10    first copier.

11          Q.      How many paste ons do we have up there?

12          A.      One, two, three, four -- it appears five.

13          Q.      Okay.  Let's go on to the next one?

14          A.      What I did next is I lifted the paste off in

15    order to show that it was Copper State, which, again, is a

16    copy of the original Q8.

17          Q.      Okay.

18          A.      Which was, again, page 3.

19          Q.      Now, you have another slide up there, and you

20    marked that as Q7?

21          A.      That's the same one we're still on.

22          Q.      Okay.

23          A.      As I mentioned, this is a copy of Q8, so these

24    are the defects from the first copier.  In addition, to that

25    we now have a second copier with more trash marks.
```

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1          Q.      Before you go any further, we've been talking

2    about the first one having -- the first couple being copied

3    and the first one copied.  Are you now telling us that with

4    regard to your Q7 that was run through another copier

5    different from the first two.

6          A.      That is correct?

7          Q.      How could you tell that?

8          A.      Because we now have trash marks that were on

9    this copy that weren't on the original.

10         Q.      Okay.  Go ahead.

11         A.      We still have the faxed information on the

12   side.  The next item is Q10?

13         Q.      I'm going to show you Exhibit 266.014.  Is that

14   your Q10?

15         A.      Yes, it is.

16         Q.      And you have some arrows there to the left of

17   this document.  Why is that significant?

18         A.      In addition to now being a copy of the previous

19   document, which now the original had the Copperstate Glass,

20   and then the -- the paper that was on top of it said Aztec

21   Creation, this photocopy shows the Aztec Creation, however,

22   it still has some of the faxed information.

23         Q.      But before we go any further, just so I'm

24   clear, one of the previous exhibits, and that would be

25   Exhibit 266.03 (sic), had some paste ons -- pasted on items.


TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

```
 1    Is this a copy of that exhibit that previously had the paste
 2    ons?
 3            A.    Yes.  May I show --
 4            Q.    No, that's okay.
 5            A.    Okay.  So this is a copy of the previous
 6    information or the previous document, and, as I said, there
 7    is the correction tape that you have for your typewriters.
 8    They are inserted over here.  What I did was I put it onto a
 9    light box.  A light box is a sort of light, put the document
10    on top of it so instead of peeling off the white correction
11    tape I could read through it.  Unfortunately, we can't read
12    it.
13            Q.    Well, with this lighting --
14            A.    Let me show you this date.  This is time 437
15    that reflects this 437 on a previous document.
16            Q.    And so after putting it under a light, were you
17    able to determine that this white out that was on -- on your
18    Q10 was actually the same as the one that we've been
19    previously talking about?  For example, with regard to
20    266.012 that's on the margin there and 266.013, that's also
21    on the side?
22            A.    Yes.
23            Q.    Okay.  So in your opinion did somebody put that
24    on there to obstruct that number?
25            A.    Yes.
```

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

000004419

1          Q.      Okay.  Go ahead.

2          A.      In addition as I mentioned before, this is now

3    a second copy.  And so we still have the trash marks from the

4    first generation copy on the second copy, but this copy is a

5    copy -- this is a copy of the original -- of the previous

6    document, Q7.

7          Q.      But was it made on a second copier?

8          A.      Yes, it was.

9          Q.      Okay.

10         A.      In addition to that we now have a second

11   generation on this second copy.  And, again, there are trash

12   marks, the same trash marks as was on the first -- on the

13   previous document, however, the orientation is different.  If

14   I could --

15         Q.      What does that mean when you tell us that the

16   orientation is different?

17         A.      It means that the defect was on the glass.

18   Let's say if the glass was -- the defect was on the north --

19   on the north-south on the glass, the first copy was placed

20   with the header, let's say, on the north side.  The second

21   copy was rotated and placed there so the defect is still on

22   the north side but the heading and everything, the

23   orientation, is completely 180 degrees changed.

24         Q.      Let me ask you, at this point the very top now,

25   the orientation is changed.  The marked two lines across it

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

000004420

```
 1    are now not part of the business license, correct?
 2            A.    Yes.  Do you see what I'm saying?  The business
 3    license no longer has those marks going through it, right?
 4    You see what I'm saying?  They're not going through the
 5    heading or any part like it did here on Exhibit 266.016
 6            Q.    These lines are not touching the actual
 7    document that's being copied, correct?
 8            A.    That's correct.
 9            Q.    Go ahead.
10            A.    This is a close up of that with the trash marks
11    on the -- from the second copy of that second copier.
12            Q.    And that tells us what?
13            A.    That tells us that a second copy was used with
14    a second generation document.
15            Q.    Okay.  Next?
16            A.    From this point on, I came to the conclusion.
17            Q.    And what is that?
18            A.    The conclusion is that the final copy of the
19    citizens -- the City of Phoenix privileged license for Aztec
20    Creation, referred to as Q6, which is this document, which
21    has no faxed information anymore, which has the Aztec
22    Creation and has trash marks from the first, the second, and
23    the third generation of that copy are present.
24            Q.    So -- okay.  What does that tell you?
25            A.    That tells me it was altered from the faxed
```

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1    Phoenix license of Copperstate Glass Mirror, referred to as

2    Q8.

3          Q.    In other words, just so that -- see if I

4    understand it, there was a fax from Copperstate Glass and

5    Mirror that eventually turned into, if you could go back to

6    the previous slide, turned into what we have here as Aztec

7    Creations, Wyndstar Enterprises.

8          A.    Yes.

9          Q.    If you take a look at this, which is our

10   Exhibit 266.015, and you look to the right margin, what does

11   it say there?

12         A.    This is a handwriting or handprinting document

13   that says "To Allen."

14         Q.    That -- that is handwritten, correct?

15         A.    That is handwritten.

16         Q.    Now, do you have any experience in attempting

17   to match up or identify handprinting to unknown handprinting

18   to that of a known individual?

19         A.    Yes.

20         Q.    And can -- does it have to be cursive writing

21   or can you also make the comparison involving, like I said,

22   handprinting or printing like we have here.

23         A.    Comparison can be apples to apples, so if the

24   questioned document is printed, then the knowns have to be

25   printed.  If the questioned document is cursive writing then

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1      the knowns have to be cursive writing too in order to compare

2      one to the other.

3            Q.     Were you asked to attempt to ascertain who in

4      fact had printed that on the one that says "To Allen"?

5            A.     Among other documents, yes.

6            Q.     And in an attempt to do that, did you attempt

7      or did you obtain some writing samples back on February 6 of

8      the year 2001?

9            A.     Yes.

10           Q.     And are these the writing samples that you

11     obtained back on that date, they're marked as 280.001?

12           A.     May I check my --

13           Q.     Sure.

14                  (Pause in proceedings.)

15           THE WITNESS:  Can you repeat the question for me,

16     please?

17     BY MR. MARTINEZ:

18           Q.     Did you obtain those writing samples?

19           A.     They appear to be the same in my opinion.

20           Q.     When you say they appear to be the same, do you

21     have any doubt about it?

22           A.     Yes, I do.

23           Q.     How so?

24           A.     I cut -- when I received it, it was marked and

25     sealed.

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1    Q.    Okay.

2    A.    I did my incision.  I pulled the documents

3    out.  I identified them, then I placed it back into the bag.

4    Q.    Okay.

5    A.    There is a second incision here that I have no

6    knowledge of.

7    Q.    But aside from that, I want to you take a look

8    at the documents themselves.  Let me open -- perhaps Mr.

9    Martinez may have opened them before.  Just take a look at

10   them and see if these are the ones you actually seized.

11   (Pause in proceedings.)

12   THE WITNESS:  Yes.

13   BY MR. MARTINEZ:

14   Q.    These are the documents you seized back on

15   February 6, 2001?

16   A.    I did not seize them.

17   Q.    In other words, you had someone provide them to

18   you?

19   A.    Yes.

20   Q.    And the individual that provided them to you,

21   is that individual in court today?

22   A.    Yes.

23   Q.    Can you tell me where they are seated and what

24   they are wearing?

25   A.    Wendi Andriano is seated over to my right.


TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

000004424

1    She's wearing a pink sweater with a black -- excuse me, a

2    pink blouse with a black sweater.

3         MR. MARTINEZ:  Your Honor, may the record reflect the

4    identification of the defendant?

5         THE COURT:  The record may reflect identification of

6    the defendant by the witness.

7         MR. MARTINEZ:  I move for admission of Exhibit

8    280.001.

9         MR. PATTERSON:  No objection, Judge.

10        THE COURT:  Exhibit 280.00 -- sorry for that.

11   Exhibit 280.001 for identification is admitted into

12   evidence.

13   BY MR. MARTINEZ:

14        Q.    What did you do next with regard to this

15   investigation?

16        A.    I was asked to do a handwriting comparison.

17        Q.    Of what?

18        A.    Of the known samples to the questioned

19   documents.

20        Q.    And what questioned documents are we talking

21   about that you were asked to compare?  Do you have those up

22   there?

23        A.    Yes, I do.

24        Q.    Okay.  Let's go to the first document that you

25   were asked to take a look at.  And that's your Q1, right?


TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1          A.     Yes, it is.

2          Q.     Is that our Exhibit 266.011?

3          A.     This is 266.011, yes.

4          Q.     And what other document were you asked to take

5     a look at?  You have a Q2 and Q2A.  Can you explain to me

6     what you're referring to when you put Q2 and Q2-A?

7          A.     Apparently this document also had a pay stub or

8     a post it with it, and so one document was Q2 and then the

9     second document, the post it, that was also attached to this

10    document was -- was classified as 2-A.

11         Q.     And if I show you Exhibit 266.010, is that the

12    document that you have displayed?

13         A.     Yes, it is.

14         Q.     Let's go on to the next document.  You have Q3

15    and Q3-A.  Specifically what is that?

16         A.     If I can -- Q3 was a whole set of notes or,

17    excuse me, whole set of items and the first item was marked

18    as A, item A, 3-A.  Let me show you what has been marked for

19    identification as Exhibit Number 266.020.  Take a look at it

20    and then I'll ask you some questions about it.

21                (Pause in proceedings.)

22    BY MR. MARTINEZ:

23         Q.     What you have displayed up there, take a look

24    at the back.  Is that this right here?  It says 10 grams

25    sodium cyanide, Voigt Global sales.  Is that what you have up


TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1     there?

2          A.     Yes, it is.

3          Q.     Okay.  Let's go onto the next slide.  Q3-A R,

4     I'm now going to show you that same exhibit, but it's the

5     front of it.  Is that the front of it?

6          A.     It's the reverse, that's why it's initialed

7     "R."  This is, again, 3-A, but this is my reverse side.  This

8     was the original side.

9          Q.     So you were looking at the backside as your

10    original side?

11         A.     Well, I --

12         Q.     Or the front side.  I understand.

13         A.     Okay.

14         Q.     There's a line on the middle of this exhibit

15    here that we have up there.  Can you explain how that

16    happened?  See what I'm talking about?

17         A.     No, I do not.

18         Q.     Let me have your pointer, please.  See that

19    right there?

20         A.     Okay.

21         Q.     Do you know how that happened?

22         A.     It -- it appears to be either from the copy

23    machine or from a laser printer.

24         Q.     Okay.  What do you have next?

25         A.     This is C3-B as the reverse side of Q3-B.


TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1          Q.     I'm showing you Exhibit 266.021.  Is that it?

2          A.     Yes.

3          Q.     Does that seem to have the same line as the

4     previous exhibit that we discussed right down the middle?

5          A.     Yes, it does.

6          Q.     Next?

7          A.     This is from the Q3 -- this is the third

8     document referred to as C, and it's the reverse side.  That's

9     why it's "R."

10         Q.     And is that Exhibit 266.022?

11         A.     Yes, it is.

12         Q.     Next, what is this, first of all?  What was the

13    area of interest that caught your eye?

14         A.     The area of interest has always been the

15    handprinting or the handwriting.  That's what I was asked to

16    do a comparison on.  This appears to be a San Riva history

17    printout.

18         Q.     And was your area of interest what's toward the

19    bottom, written out?

20         A.     Yes.  The area I wanted was the writing.

21         Q.     What did you number that as?

22         A.     I numbered that as Q4.

23         Q.     Showing you Exhibit 266.002, that one?

24         A.     Yes, it is.

25         Q.     Next, what did you work with?

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1          A.    Q --

2          Q.    What are those, first of all.  What is it?

3          A.    Q5 is two post its that were attached to a

4     piece of paper.

5          Q.    And I show you Exhibit 266.019.  Are these the

6     two post its and the piece of paper?

7          A.    Yes, they are.  They are the post its.

8          Q.    So now you have the known samples, you have the

9     unknowns, and go to work.  And first of all, just generally

10    speaking, how is it that you go about effecting or attempting

11    to effect a match and/or a comparison?

12         A.    Well, first of all, on handwriting, I did a

13    side by side comparison between the question and the known in

14    order to determine -- with measurement, magnification and

15    lighting in order to determine there are more consistencies

16    and inconsistencies between the questioned and known.

17         Q.    Okay.  Go ahead.

18         A.    There are additional documents --

19         Q.    Why don't you go ahead and put them up?

20         A.    This was from the previous set.  This was Q6.

21    Again, there was the original handprinting on this document.

22         Q.    And that is our Exhibit 266.015?

23         A.    Yes, it is.

24         Q.    Okay.  Go ahead.

25         A.    The next document that had handprinting on it

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1  was Q11.  This was a money order, a Western Union money order

2  with some handprinting and some handwriting.

3        Q.    And what number did you give it again?

4        A.    I identified it as Question Document Number 11.

5        Q.    Show you Exhibit 287.  Is that what you have up

6  there?

7        A.    Yes, it is.

8        Q.    Okay.  Next?

9        A.    This is an Airborne manifest, and this was

10 listed as Questioned Document Number 12.

11       Q.    And what were you most interested in on this

12 one?

13       A.    I was interested in the signature line and the

14 printed line here.

15       Q.    Would that be our Exhibit 315?

16       A.    Yes.

17       Q.    What did you do next?

18       A.    I now looked at the known samples.

19       Q.    Okay.  And then did you make your comparison?

20       A.    Yes, I did.

21       Q.    And what conclusion did you draw?

22       A.    The handprinting on the documents listed as

23 Q1 --

24       Q.    Why don't you show us what Q1 is as you go

25 along.

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

```
 1         A.      Okay.

 2         Q.      Hand printing on Q1, which handprinting are you

 3    talking about?

 4         A.      I'm referring to all the handprinting.

 5         Q.      Okay?

 6         A.      This is handwriting.  All the handprinting is

 7    over here.

 8         Q.      Okay.  You were saying all the handprinting on

 9    Q1 -- we've seen Q1.  Go ahead?

10         A.      All the handprinting on Q 2 --

11         Q.      All right.

12         A.      Q3-A.

13         Q.      All the handprinting there, okay.  Go back a

14    step.  How about -- okay.  How about there, Q3, Q3-A?

15         A.      Yes.  The reverse side of Q3-A all the

16    handprinting.

17         Q.      All right.  Go ahead.  How about the numbers?

18    Are you able to -- that's Q3-B R.  Are you able to effect a

19    comparison to numbers?

20         A.      Yes, I did.

21         Q.      So you looked at those?

22         A.      Yes.

23         Q.      Okay.  What else?

24         A.      Let's skip this one.

25         Q.      You're looking at Q3-R.  That doesn't have any
```

1    printing on it, correct?

2            A.    That's correct.  It had handwriting, hand

3    cursive.  Q3, 4, all the handprinting on there.

4            Q.    All right.

5            A.    Q5, all the handprinting, Q6 all the

6    handprinting.

7            Q.    Which is the "To Allen" on that one?

8            A.    Yes.  Q11, the handprinting.

9            Q.    That appears to be "Voigt" on it, right?

10           A.    Yes.

11           Q.    Go ahead.

12           A.    Those are all written by one writer.  All of

13   these documents were written by one writer.

14           Q.    Did you have occasion to compare these to the

15   known exemplars provided by the defendant --

16           A.    Yes.

17           Q.    -- to see whether or not there was the one

18   writer?

19           A.    Yes.

20           Q.    And what were your findings?

21           A.    That the writer of the known examplars wrote

22   the handprinting.

23           Q.    All of these documents we talked about?

24           A.    Yes.

25           Q.    Okay.  Go ahead.  You have up there something

1   about known exemplars.  Do you want to tell me a little bit

2   about that?

3          A.    Basically in this section here, if I could just

4   show the knowns that were given?

5          Q.    Sure.

6          A.    These were the knowns that were received that

7   were written by the -- by this writing.

8          Q.    And what you're showing us up there actually is

9   exhibit -- what's in Exhibit 280.001, correct?

10         A.    Yes.

11         Q.    Okay.  Go ahead.  And just --

12         A.    There were 13 of these exhibits, or, excuse me,

13   13 of these, I apologize.  There are 12 of these documents.

14         Q.    Okay.  Before we get to that, while you were

15   taking down these samples from the defendant back on what

16   appears to be February 9 of the year 2001, did she ever voice

17   any complaints or ever indicate that she didn't want to

18   continue with the examination?

19         A.    Towards the end she complained of fatigue,

20   hand -- her hand hurt.

21         Q.    That her hand hurt?

22         A.    Yes.

23         Q.    Would that affect the samples that are provided

24   to you?

25         A.    They might, yes.

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1          Q.     How long total time were you with her on
2     February 9 of the year 2001 -- February 6, 2001, sorry?
3          A.     Approximately an hour.
4          Q.     And during that hour that you were there, were
5     you asking her to write different things throughout that
6     whole hour?
7          A.     As you saw from the forms, some of them I asked
8     her just to answer the questions.  Others were dictated words
9     that I asked her to either print or write.
10         Q.     And as I understood it there was a total of 12
11    documents generated during that hour visit with her, correct?
12         A.     Yes.
13         Q.     Okay.  And you have up there there's a request
14    to compare the known exemplars to the questioned documents.
15    Can you explain to me what that is?
16         A.     As I mentioned before, we do a side by side
17    comparison to the questions and knowns.  We look for the same
18    words or the same group of words or the same letter grouping
19    between the question and the known.  If I can --
20         Q.     Sure.  Go ahead.
21         A.     In this case what I've done is --
22         Q.     With regard to this one, before we go any
23    further, just give us the number to the left, and then you
24    could tell us whatever you want to tell us.
25         A.     The number to the left is -- this is Q3,


TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

```
 1      Q3-A.  What I've highlighted is the "Anne Newton" in the
 2      questioned document.
 3              Q.    Okay.
 4              A.    I've placed that "Anne Newton" now in what we
 5      call a pay stub, which is literally a cut and paste.   I
 6      photocopied the documents, then cut out the handprinting and
 7      placed it on a -- on another piece of paper and compared
 8      "Anne Newton" to other forms of either "Anne" or "Newton."
 9              Q.    This is the one you previously indicated to us
10      was written by the defendant?
11              A.    The Q1, Q4, Q3-A, and Q3-A R were all written
12      by the writer of the known.
13              Q.    Okay.  In addition this is a document -- the
14      known document number 9.  The word "Anne" has been isolated.
15      And this is something that you received from her back on
16      February 6, 2001?
17              A.    This is from the exemplars that were given, the
18      handwriting.
19              Q.    Right.
20              A.    That was photocopied and then I cut out --
21              Q.    Okay.
22              A.    -- and pasted, and then the designation at the
23      bottom, Q9.
24              Q.    All right?
25              A.    Again, another known sample Q12.  The word
```

1    "new" has been isolated and has been placed in this pay stub

2    to compare the handprinting of "Anne Newton" to the "Anne" or

3    "Newton" parts of it in the knowns.  All of these are known

4    writings from Wendi, all of these are from the question that

5    has the designation of where it is by the "Q."

6            Q.    Okay.  All right.  Go ahead.

7            A.    The "Anne Newton" on the questioned document,

8    only isolated.  This one here is from the Q12.  This is from

9    the Airborne manifest.  What I've done is I go through a

10   series of steps, series of tests.  I look for the size, the

11   proportion, the slant.  In this case is an example of the

12   slant both in the question to see if they were first written

13   by one writer and then to see if it compares to the known.

14           Q.    Okay.

15           A.    My conclusion --

16           Q.    Go ahead.

17           A.    The handprinted "Anne Newton" in the documents

18   referred to as Q1, Q3, Q4 were authored by the writer of the

19   knowns K1 through K12.

20           Q.    And the writer of the knowns was the defendant?

21           A.    Yes.

22           Q.    Go ahead.

23           A.    I isolated this one here, Q12, this is the

24   Airborne manifest.  This is the handprinting, the

25   handprinting of "Anne Newton" on Q12 was probably authored

1   by the knowns K1 through K12.

2          Q.    Do you see -- probably on with this one and on

3   the previous three items, you indicated they were written by

4   the defendant?

5          A.    In this case here the handprinting runs on

6   beyond the line that was allotted for "of the."  Also, it's

7   very mechanical and not naturally written.

8          Q.    Go ahead.

9          A.    In addition, as I said before, I also compared

10   the rest of the handprinting.  Again, the designations are

11   the Qs with the questioned documents and the Ks for the

12   knowns.

13          Q.    The one on the right looks like it's just a cut

14   out piece of something.  What is that?

15          A.    This one here on the right is Q11.  This is in

16   the money order.  This is the Abco Western Union money order.

17          Q.    Okay.

18          A.    And just very briefly, some of the

19   characteristics, you've got a "V" with the terminal stroke

20   going higher than the initial stroke, the "G" is very good.

21   It comes down and goes up.  We'll see a lot of "G"s coming

22   down and going up having, exaggerated terminal strokes.  The

23   "I" dot is very good, the "I"s.  Above the stem and to the

24   left of the stem.  Again, this is another one from the

25   questioned document.  Here we're showing the "PH" combination

1   that were touching each other.  Here we're showing the "OE"

2   combination that's touching each other.  "PH" combination

3   that's touching each other.  Here the "X" is very good.  This

4   stroke is taller than this other one.

5           QRA questioned document R 3A on the other

6   side.  The "S" is very good.  The A combination is also

7   taller in the question and also in the known.  The "Arizona"

8   again in the question Q3A reverse side to the knowns.  I

9   noticed that all the lower case is very, very even, both in

10  the question and the known.  Again, on the questioned

11  document "East First Avenue."

12          Q.    This address came from -- the exhibit number

13  that you're looking at right there, came in Exhibit 266.011?

14          A.    Yes.

15          Q.    Okay.  Go ahead.

16          A.    This is the questioned document.  These are the

17  knowns.  Again, what I'm trying to do is get the same word,

18  same combination of words in order to do a comparison.  The

19  "E" is very good.  The "ST" combination is very good.  The

20  "V" has a curvature on the terminal stroke.  The "V" has a

21  very good curvature on the terminal stroke.

22          This is the Scottsdale --

23          Q.    That's the same exhibit we were previously

24  referring to?

25          A.    Yes.  That is still Q1.  The initial stroke

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1    "S," a flat "S" going down both in the question and known.

2    The "O" -- the "CO" where the terminal stroke of the "C" goes

3    into the "O" is very good, both in the question and known.

4    The "T"s have a crossing, what we call a T-bar crossing which

5    is the individual typically will do one cross through both

6    "T"s.  They are separate for both the question and known.

7    The "D" initial stroke is round and then coming down both in

8    the question and the known.  Two part "D," sorry.  "Aztec

9    Creation," the "AZ" we've already seen the "AZ" in the Aztec

10   Creation.

11          Q.     You have up there Q3-A, right?

12          A.     Q3-A, Q3-A -- yes.  All from Q3-A.

13          Q.     All right.

14          A.     Again, getting some of the combination with

15   "AZ" in the "Arizona," we also have the "Creation."  The

16   "C" -- terminal stroke of the "C" going into the "R".  The

17   "TI" combination, which is very good.  The T bar crossing

18   goes into the next letter, both in the question and known.

19   The "AE" combination in "create," both in the question and

20   known.

21          Q.     All right.

22          A.     Next, the react "ACT" included is in Q3, 2-W.

23   The "chem" or "chemical inquiry" in Q2-A 5 compared to the

24   known samples.  The "R" is very good initial stroke, comes

25   down, goes back up on the retrace, comes down and over both

1    in the question and known.  In "chemical," the "AL"

2    combination both in the question and known.  The question is

3    very good with the terminal stroke of the "Q" exaggerated

4    both in the question and known.  The "G," again, as we've

5    seen before, long extension then terminal stroke upward both

6    in the question and known.  The "Y," we'll be able to see in

7    a future slide also, a long loop and large oval.

8              Q.    Okay.

9              A.    Global.com, QA -- Q2-A, K5.  The "AL"

10   combination both in the question and known.  The ".com,"

11   notice that the initial hump is smaller than the second hump,

12   again, both in the question and known.

13             Q.    All right.

14             A.    This is the upper case "Global."

15             Q.    Q2, right?

16             A.    This is Q2, and these are the known standards,

17   the "G" is very good.  The terminal stroke on the "G" that

18   we've seen in the past on some of the questions is here now

19   in the known.  The "AL" combination, again, both in the

20   question and in the known.  In "distribution," the "T" with

21   the T-bar crossing goes into the "R" both in the question and

22   known.

23             Q.    Okay.

24             A.    Again, the word "right."

25             Q.    Is that in Q4?


                TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1          A.    QU.

2          Q.    Is that QU?

3          A.    Yes.

4          Q.    Okay.

5          A.    The initial stroke "7" downward stroke and

6    coming back up both in the question known.  The "I" over --

7    again, over here to "the."  This is above the stem, this is

8    above the stem, this is slash, this is also a slash.  The "G"

9    comes out and extends to the right both in the question and

10   known.  "Buckeye" initial stroke --

11         Q.    Is that from Q4 also?

12         A.    Sorry, yes.  It is from Q4.

13         Q.    All right.

14         A.    The "Buckeye" initial stroke is downward.  The

15   stroke on the "B" comes back up and around both in the

16   question and in the known.  The "Y" as we've seen previous,

17   in the question is a long loop, both also in the question and

18   the known.

19         Q.    All right.

20         A.    Also here the "BU" the combination which

21   connects and touches each other.  This is very good.  This is

22   from --

23         Q.    Again, this is from Q2?

24         A.    This is Q2.  Initial stroke on "P" is down

25   toward initial stroke is down and over in the known.  The "O"

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

000004441

1    initially starts at the top, comes down, and the terminal

2    stroke over here on the right.  Same with over here on the

3    known.  The box -- again the box, in the box there's a stroke

4    down, comes down around over both in the question and the

5    known.

6            Q.    Next.

7            A.    The "Topeka" the T bar crossing --

8            Q.    Is that Q2?

9            A.    That is from Q2.  The "Topeka" the T-bar

10   crossing over off-centered to the right, both in the question

11   and the known.  The "KS" combination, the "S" that's flat

12   both in the question and known.

13           Q.    Next.

14           A.    This is some of the numbers that were generated

15   on question 2.  The "4," the downward stroke on that stem is

16   taller both in the question and known.  The "5" has a wave on

17   the top, again, both in the question and known.  The "6" has

18   a long elliptical both, again, in the question and in the

19   known.

20           Q.    All right.  Next.

21           A.    This, again, is a phone number from Q3-B on the

22   reverse side.  Initial stroke on the "7," there is downward,

23   goes up both in the question and known.  The "8" is very

24   good.  It has a flattop initial stroke, comes from right to

25   left, comes down makes an oval and back up, terminal stroke

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

000004442

1    on the right.  Again, both in the question and in the known.

2        Q.    And this is from Q3-A?

3        A.    This is Q3-A.  Initial stroke is down to the

4    "10" and the "0."  The stroke is from the left side, goes

5    around, and then terminal stroke is here.  Again, the same

6    thing, initial stroke is from the left side and goes around

7    and terminal stroke is down.  The "G" is, again, exaggerated

8    and hooked both in the question and known.

9        Q.    All right.

10       A.    Sales.

11       Q.    And that's Q2-A, right?

12       A.    That is Q2-A.  "Sales" you could see also the

13    combinations touching each other both in the question and

14    known.

15       Q.    Go ahead.

16       A.    This is Q3-A.  The "Zebra," "Z" is very good.

17    The "E" from the left to right then comes around.  The "B"

18    initial stroke is down and comes back up, down, comes back up

19    and then goes around.  Down, comes back up and goes around

20    both in the question and known.

21       Q.    And from Q4, you have something there?

22       A.    Q4 is "Wyndstar."  Again, we've seen that the

23    elliptical curve is on the "Y." The "D" is a two stroke.  "Y"

24    initial stroke is left to right counter clockwise, and then

25    downward stroke, again, both the question and known.  The "S"

1    is -- got a flat "S" both in the question and known.  This

2    is "LLC" --

3              Q.    Is that Q2?

4              A.    That is Q2.  This is from the known K10.

5              Q.    All right?

6              A.    These are some of the dates.  This is one is

7    8/21.

8              Q.    That's from Q1, right?

9              A.    That is from Q1.  And, again, the same

10   formatting both in the question and known.  The "8," that's

11   flat.  The "2," very good.

12             We get into the next one -- this is from Q3-A

13   R.  This is the 731.  And, again, this "3" is very good.

14   Initial 3 goes down, around, terminal stroke is up both in

15   the question and known.

16             Q.    Next.

17             A.    "16th," either "16th" or "16th Street" --

18             Q.    That's the "Q4," correct?

19             A.    Q3, Q4 and K4.

20             Q.    Okay.

21             A.    Again, that compares with the question -- or

22   with the known documents.  These are samples from Q3 and Q4.

23   This is the zip code "85004."  Again, the flat "8."  The

24   curvature on the top of the "5" both in the question and the

25   known.  The downward stroke of the "4" again in both the

1    question and known being the tallest, the initial stroke on

2    the "7" being upward, both, again, in the question and known.

3         Q.    All right.

4         A.    This is the from Q3-A and Q5, "sodium," that's

5    very good with the "S" and "O" connected, the upper case "S"

6    flat top, the "D," the "U" -- "IUM," the "cyanide." It's a

7    two part "Y" on the "cyanide," again, both in the question

8    and knowns.  We've seen the "G" before with the long stroke

9    hidden from the question to the known.

10        Q.    This one is from the license.  This is Q6,

11   correct?

12        A.    That is correct.  This is from Q6, this is "To

13   Allen," and in comparison I took the first part Topeka, "TO"

14   combination, you can see the downstroke of the stem, there's

15   a space between that and the -- the T-bar crossing on the

16   top, off centered to the right both in the question and

17   known.  Initial stroke of the "A" is downward stroke, comes

18   back up, has a tent at the top and comes back down, both on

19   the question and known.

20        Q.    On the K9, did -- you got "Allen."  Did you ask

21   her to just printout "Allen"?  Is that how that worked?

22        A.    I believe so.

23        Q.    Go ahead.

24        A.    We're also showing the stroke across on the "A"

25   that goes beyond the downward stroke, both on the question

1    and known.  Also the headline, the "A" is tallest, two "L"s

2    and then the "EN," both in the question and known.

3            Q.     Okay.

4            A.     This is from Q4.  This is the "Johnson."

5    Again, the T-bar crossing on the top overhangs, several of

6    the letters to the right of it both in the question and

7    known.

8            Q.     All right.  Next?

9            A.     Some more of the index.

10           Q.     That's Q5, right?

11           A.     Q5, Q5.  Again, same printing style both

12   question and known.  This is the --

13           Q.     Q3-A?

14           A.     Q3-A and Q5, I believe, with a "www," "W"s and

15   the curvature to the left on the terminal stroke both in the

16   question and the known.

17           Q.     Next.  We have a conclusion there, right?

18           A.     Yes, sir.  I do.

19           Q.     What are they?  What is that?

20           A.     The conclusion is that the handprinting you've

21   just seen was all authored by the writer of the known --

22   writer of the known being the writer of the known numbers K1

23   through K12.

24           Q.     Let me see if I could repeat that.  The writer

25   of the documents is the writer we've referred to today, is

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

000004446

1   that the defendant?

2          A.    Yes, it is.

3          Q.    Next were you asked to do something else?

4          A.    Yes.

5          Q.    Go ahead.  And did that refer to the signature

6   portion or the cursive writing of the name "Anne Newton"?

7          A.    Yes.

8          Q.    You went earlier and you received some

9   documents from the defendant and some writing samples.  Why

10  is it that you weren't -- you didn't do it the first time?

11  In other words, what necessitated you to visit with her a

12  second time?

13         A.    I'm still on the first.

14         Q.    Okay.  Go ahead.

15         A.    In this case what I'm doing is comparing the

16  "Anne Newton" signature to what I received the first time for

17  the "Anne Newton."  I was not able to get an upper case "A"

18  in cursive, but I was able to get a lower case "A" in

19  cursive.  If I could go to the next slide --

20         Q.    Sure.

21         A.    The next slide showing the known exemplars,

22  again, with the lower case "A" but in cursive, the rest of

23  the handprinting or handwriting that was in comparison,

24  again, with the known samples versus the questioned

25  document.  There wasn't enough there for a full comparison of

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

000004447

1    the question to the known.

2            Q.    Okay.  So then did that require that you go

3    back and get a second set of exemplars?

4            A.    Later on, yes.

5            Q.    Okay.  I'm going to show you what has been

6    marked for identification as Exhibit 280.  Do you recognize

7    what's in this exhibit?

8            A.    Yes.

9            Q.    And what was the date you obtained these?

10           A.    These were obtained on June 12, 2002.

11           Q.    Who were they obtained from?

12           A.    These were obtained, again, from Wendi

13   Andriano.

14           Q.    Is that the same person that you previously

15   identified in court?

16           A.    Yes.

17           MR. MARTINEZ:  Your Honor, I ask for the

18   identification -- that the record reflect the identification

19   of the defendant.

20           THE COURT:  The record will reflect identification

21   of the defendant by the witness.

22           MR. MARTINEZ:  And I move for admission of

23   Exhibits -- Exhibit Number 280.

24           MR. PATTERSON:  No objection, Judge.

25           THE COURT:  Exhibit 280 for identification is


TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1    admitted into evidence.

2    BY MR. MARTINEZ:

3           Q.    Go ahead.  You were telling us about the

4    signature?

5           A.    In my first handwriting comparison there was

6    not enough to do a full comparison of the questions and the

7    known, so what I did was I compared all the questioned

8    documents to see if they were all written by the same

9    writer.  Again, doing the slants as well as the rest of the

10   initials -- initial strokes, terminal strokes, I was able

11   come to a conclusion.

12          Q.    And what was that conclusion?

13          A.    The signatures, "Anne Newton" on Q1, Q3-A R,

14   Q3-C R, and Q11 and Q12 were all written by one writer.

15          Q.    So all of the signatures which you have up

16   there were authored by the same writer?

17          A.    Yes.

18          Q.    Okay.  Go ahead.

19          A.    As I said, I tried to compare it to what I had

20   as far as knowns but I was limited because I didn't have the

21   upper case "A," I didn't have a full "A-N-N-E," and so the

22   best I could do was make a determination that it was probably

23   written by the writer, but there was not enough consistency

24   to go any further than that.

25          Q.    So what you're telling us right now, the


TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1   signatures "Anne Newton" you told us about before were

2   written by the same person and they're probably written by

3   the defendant?

4          A.     That is correct.

5          Q.     Okay.  Go ahead.  And we've already talked

6   about you having to go out and speak with the defendant to

7   get some other samples, correct?

8          A.     Yes.

9          Q.     Go -- and when you went this second time, how

10  long did your visit -- yeah.  How long did your visit last?

11         A.     Approximately an hour.

12         Q.     And during that time did you go through the

13  same process that we just discussed before where you asked

14  her to write certain things?

15         A.     Yes, I did.

16         Q.     And how many pages were generated that day?

17         A.     There were only seven pages generated that

18  time.

19         Q.     Was she able to -- did she complain at any

20  time?

21         A.     Again, she complained about fatigue of her

22  hand.

23         Q.     And was she able to provide you with an upper

24  case "A" or were there some samples that you were unable to

25  obtain?


TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

```
 1           A.    I was still unable to get a cursive upper case

 2    "A."

 3           Q.    In other words, the large "A" you weren't able

 4    to get?

 5           A.    That is correct.

 6           Q.    Go ahead.  And the first thing you have up

 7    there is Q11, correct?

 8           A.    Yes.  This is the money order.

 9           Q.    All right.  And the "Anne Newton" we're looking

10    at is the one on the right, right?

11           A.    Yes.

12           Q.    Okay.  Go ahead.

13           A.    In this case, additional exemplars were

14    obtained.  These are in order K13, 14, 15 all the way through

15    19.

16           Q.    Okay.  And then you were asked to make a

17    comparison to the money order.  And what did you do?

18           A.    I was asked to make a more definitive if

19    possible opinion of this, so what I did was I took, again,

20    the "Anne Newton."  I cropped it out, cut and paste.  I

21    received more "Anne Newtons" and did a comparison.  Again,

22    the "Newton" from the K9 was there.

23           Q.    And what was your conclusion?

24           A.    Conclusion was that the "Anne Newton" on the

25    money order referred to as Q11 was, again, probably written
```

1    by the writer of the exemplars.  Q11, the signature "Anne

2    Newton" was unnaturally written.  No other opinion could be

3    rendered.

4        Q.    When you say that the Q11 money order, the

5    signature was unnaturally written, what are you saying by

6    that?

7        A.    Okay.  What I'm saying is in this case, the

8    "Anne Newton," each letter was created.  There was a pen lift

9    and then the next letter was put in, so it was not naturally

10   written.  No one would write the first letter and lift the

11   pen, put their pen down, up, down, up, down; simply, if it

12   was a signature, it would be a complete cursive continuance

13   signature.  In this case there were a lot of pen lifts, first

14   in the "Anne" and parts of the "Newton."

15       Q.    Go ahead.  I think that's all the slides we

16   have, correct?

17       A.    Yes, it is.

18       Q.    Go ahead and take a seat and I have some

19   questions for you.

20             I want you to take a look at Exhibit 266.011,

21   266.021, and 266.022.  Are they same document?

22       A.    As --

23       Q.    As each other.  In other words, do they have

24   the same words on there except for maybe the line going down

25   the middle?

```
 1          A.    Yes.

 2          MR. MARTINEZ:  I don't have any other questions.

 3          THE COURT:  Mr. Patterson?

 4          MR. PATTERSON:  I have no questions for this

 5   gentleman.  Thank you, Judge.

 6          THE COURT:  Any further questions of this witness by

 7   the jury?  If so, please raise your hand.

 8

 9              (The following proceedings were held at the

10   bench:)

11

12          THE COURT:  Question, "Would you be able to make a

13   comparison today by viewing a document?  If so, could you

14   compare Exhibit Number 368.001 to known writer Wendi

15   Andriano?"

16              Exhibit 368.001 is -- it's listed on the

17   exhibit list as some kind of note.

18          MR. PATTERSON:  Well, there's a Rule 15 issue,

19   Judge.  This opinion he would be asked to render was never

20   disclosed, so it's -- they can't do what the county attorney

21   can't do.

22          MR. MARTINEZ:  Is that the deleting cookies note?  Is

23   that what --

24          THE COURT:  I don't know which.

25          MR. MARTINEZ:  Okay.
```

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1          THE COURT:  I'm not going to ask that.  Did either

2     one of you want to put anything on the record on that last

3     question?

4          MR. MARTINEZ:  No.

5          THE COURT:  Okay.  Next question, "Did Wendi appear

6     to try to change her handwriting or printing for your known

7     exemplars?"

8          MR. MARTINEZ:  No objection to that.

9          MR. PATTERSON:  Well, again, I don't know how he can

10    do that.  I think it's -- he had never seen other printing

11    from this defendant.  He wouldn't know what she was doing was

12    different in any fashion.  I think it's beyond the scope of

13    this gentleman's opinion.

14         MR. MARTINEZ:  The thing is that his expertise is

15    also in watching people write, the way their hand goes up and

16    down, whether or not they slant it to the right or left.  I

17    know he has an opinion about that.

18         THE COURT:  I'm not going to ask that because there

19    hasn't been foundation laid to answer the question.

20

21              (The following proceedings were held in open

22    court:)

23

24         THE COURT:  Are there any further questions of this

25    witness by the jury?  If so, please raise your hand.


TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

```
 1                    (No response.)
 2            THE COURT:  No one has raised their hand.
 3                    May the witness be excused?
 4            MR. MARTINEZ:  Yes, sir.
 5            MR. PATTERSON:  Yes, Your Honor.
 6            THE COURT:  Thank you very much.  You're excused.
 7            THE WITNESS:  Thank you, Your Honor.
 8            THE COURT:  Thank you.
 9                    Mr. Martinez, the State may call its next
10    witness.
11            MR. MARTINEZ:  State calls Jeffrey Miller.
12                    (Pause in proceedings.)
13            THE COURT:  Sir, if you could please step forward
14    right up here.  If you could give your name to the clerk and
15    she'll swear you in.
16
17                    JEFFREY MILLER,
18            CALLED TO TESTIFY ON BEHALF OF THE STATE,
19        HAVING FIRST BEEN DULY SWORN, TESTIFIES AS FOLLOWS:
20
21            THE COURT:  Please have a seat on the witness
22    stand.  Please make yourself comfortable there on the witness
23    stand.  Please pull the microphone close to you.  Please
24    remember to speak loudly and clearly into the microphone so
25    everybody can hear you.  Also please wait until the question
```

1    is completed before you answer the question, and please make

2    sure you give a verbal response.  Is that agreeable to you,

3    sir?

4            THE WITNESS:  Yes, sir.

5            THE COURT:  Mr. Martinez, you may proceed.

6

7    DIRECT EXAMINATION BY MR. MARTINEZ:

8         Q.    Your name, sir?

9         A.    Jeff B. Miller.

10        Q.    What do you do for a living, sir?

11        A.    I'm an attorney.

12        Q.    Who do you work for?

13        A.    My law firm is Rousch, McKracken, Guerrero,

14   Miller and Ortega.

15        Q.    What is your primary area or what are your

16   primary areas of practice?

17        A.    Professional negligence, medical malpractice,

18   legal malpractice, and catastrophic personal injury cases.

19        Q.    Generally speaking with regard to that -- those

20   areas that you've talked about, how is it that you attain

21   your fee?  In other words, how is it that there's any

22   recovery?  If you could just explain to us generally how that

23   system works.

24        A.    Typically as opposed to a contract attorney who

25   might charge on an hourly basis, most attorneys charge on

1    contingency fee basis which means there is no payment made

2    for the work that was done unless the case is successful.

3         Q.    And what is it that you are seeking to get in

4    these type of cases for the client?  What is it that you were

5    attempting to get?  In other words, are you attempting to get

6    money or how does that work?

7         A.    About the only thing that a personal injury

8    attorney can do for a client is to obtain some type of

9    financial compensation either through a settlement or through

10   a judgment after a trial.

11        Q.    And you mentioned something about a

12   settlement.  Again, generally speaking, how does the general

13   practice of personal injury work?  Do you go through the

14   settlement phase first or -- and then go to the filing or

15   does it vary, but just generally speaking?

16        A.    It varies and it varies particularly depending

17   on the type of case that's involved.  Just to give an

18   example, the typical auto accident case might sit there with

19   no litigation involved especially if the injuries are

20   relatively minor.  We don't typically do those kind of cases

21   in my office.  Most of the cases that we handle, because of

22   the nature of the injuries and the complexity of the type of

23   claim require filing litigation, the case might settle during

24   the course of that litigation either through discussion by

25   the attorneys or through mediation.  The case could settle

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1   while the jury is out considering the case after a trial has

2   already taken place.  So there are no rules, but it tends to

3   happen in my type of cases later rather than sooner.

4        Q.    And, again, just generally speaking about this

5   area, we've heard terms and one of them that was used by

6   medical malpractice cases and then we've also perhaps heard

7   terms like "wrongful death."  Are they the same thing?  If

8   so, let me know that.  If not, how are they different?

9        A.    They're not exactly the same thing.  A medical

10  malpractice claim is a type of personal injury claim where

11  the plaintiff is claiming that some act of negligence was

12  done by a doctor or healthcare professional that then led to

13  some type of damages.

14              A wrongful death claim only arises when a

15  person passes away, and that claim is the claim of the -- of

16  a certain specific survivor of the person who is deceased,

17  and in this state it's statutorily a surviving parent,

18  surviving spouse and surviving children of the deceased if

19  any of these persons exist.

20              A wrongful death claim could arise out of

21  medical malpractice.  In other words, you could allege the

22  death of the result of malpractice, but there is -- there's

23  at least a conceptual difference between the two types of

24  claims and a definite difference in the two and how they can

25  resolve, hypothetically speaking, when we have a medical

1    malpractice claim where the patient has died.

2         Q.    There was an allegation there was some

3    negligence out there by some healthcare provider.  And let's

4    assume this individual is married for the purposes of this

5    question that I'm going to ask.  This recovery that this

6    person is going to get for the damages done to him as a

7    result of the negligence, do they go to him or do they go to

8    him and the wife, if he's married?

9         A.    The proceeds of any settlement?

10        Q.    Right.  Uh-huh.

11        A.    It depends on how the claim was -- is pled.

12   The personal injury claim, the malpractice claim of the

13   person who has sustained the damages is his claim.  There may

14   also be a claim for the spouse in such a situation for what's

15   called loss of consortium, which is loss of spousal services,

16   the things a spouse might do for another spouse.

17        Q.    But this claim that we have for this

18   individual, the one that's been injured, generally speaking,

19   and it's hypothetical, is that usually larger than the loss

20   of consortium we're talking about or is it the same or is it

21   less?

22        A.    I can't conceive of a circumstance where it

23   would be -- where the spouse's claim would be greater than.

24   The spouse's claim can be significant, for example, where one

25   spouse becomes a quadriplegic and the other spouse then has a

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1    whole lot of caring obligations in addition to the loss of

2    services.  So the spousal claim can be significant, but

3    typically the -- the injured party, the person who sustained

4    the actual physical injuries claim is going to be larger.

5         Q.    Let's assume for purposes of our hypothetical

6    That the parties are living together for a certain period of

7    time during which -- and they're married during which the

8    punitive or the alleged negligence by the doctor arises.

9    They live together, let's say, maybe four, five, six, seven

10   years.  And before the case is settled and before it goes to

11   trial, before anything is done or any money is offered, the

12   couple gets divorced.  In that case, let's say that there's

13   an award and it's an award for the damages done to the

14   patient.  Who gets to keep that money?

15        A.    I'm not a divorce attorney and I stay as far

16   away from that area of the law as possible.  As far as trying

17   to decide whether that's joint property or sole and separate

18   property, my information on that would be somewhat

19   secondhand.  Typically, because we have had to deal with the

20   issue on some occasions, a personal injury settlement is sole

21   and separate property, which would make the injury property

22   sole and separate.  And the loss of consortium also to the

23   extent was awarded is sole and separate property.

24        Q.    In other words you're saying the spouse who has

25   the loss of consortium, so to speak, is the other party that

1    would get what was due to them for whatever damages had been

2    caused?

3          A.    I'm only hesitant because it's a little murkier

4    than that.  For example, one of the claims of the injured

5    person might be a lost wage claim and those last wages were

6    lost to the client.

7          Q.    Right.

8          A.    So that claim might be split right down the

9    middle.

10         Q.    Right.

11         A.    I'm giving you a generality.

12         Q.    Right.

13         A.    But there are exceptions to all those things.

14         Q.    How about for pain and suffering, the injury

15   itself?  Let's say that they're living together as husband

16   and wife, they get a divorce and there is an award for the

17   suffering -- the pain and suffering, disfigurement, whatever

18   it may have been, awarded to one of the spouses.  Does the

19   other spouse get any of that?

20         A.    Again, without putting it into the divorce

21   context and how things might be divided up for divorce

22   purposes, that is typically the claim of the injured party.

23         Q.    In this case did you have occasion to come in

24   contact by the -- with somebody by the name of Wendi

25   Elizabeth Andriano?


TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

000004461

```
1          A.    Yes.

2          Q.    Is she in court today?

3          A.    I -- I only know that because I know why I'm

4    here and I know she's sitting at the defense table.  It's

5    been a long time since I've seen her.

6          Q.    When was the last time you saw her?

7          A.    It's been at least four years, and it may be

8    closer to four and a half years ago.

9          Q.    And --

10         A.    We've both aged since then.

11         Q.    And the Wendi Elizabeth Andriano that you dealt

12   with, was she married?

13         A.    Yes.

14         Q.    Did she have a husband?

15         A.    Yes.

16         Q.    What was his name?

17         A.    Joe.

18         Q.    Could it have been Joseph Dwayne Andriano?

19         A.    It was, but he was "Joe" in our office.

20         Q.    And were they married, the two of them?

21         A.    As far as I knew.

22         Q.    I mean, that's how they presented themselves to

23   you?

24         A.    Absolutely.

25         Q.    And when was it that you first had contact with
```

1    either them, whether they called you, mailed you something,

2    or you spoke with them?

3            A.    When was the first time they contacted the

4    office?

5            q.    Yeah, uh-huh.

6            A.    Late summer of 1998.  It was either the last

7    week of August, first week of September 1998.

8            Q.    And who was it that initiated that contact?

9    Was -- was it him or was it her?

10           A.    There had been a call to our office and I can't

11   tell you by which one it was.  It was actually for my partner

12   Chuck Rousch and Mr. Rousch was out of the country at the

13   time.  I responded to that call and on that occasion I

14   reached Wendi Andriano.

15           Q.    And what date was that?  Is that the date that

16   you just gave us where --

17           A.    It would have been -- the conversation would

18   have been a week or two prior to that.  I remember I went to

19   their apartment or their apartment complex last week of

20   August, first couple days of September.  I know that because

21   I sent them a letter that was dated September 3, 1998, and it

22   references "It was nice to see you all on Saturday."

23           Q.    Right.

24           A.    So whenever the Tuesday was is when I saw them.

25           Q.    You mentioned letters.  Do you have as part of

1    your file a correspondence backer?

2         A.    I do.

3         Q.    If there had been a letter written by either of

4    them, would it be, in the general course of business, usually

5    included in that correspondence backer?

6         A.    Yes.

7         Q.    Would you mind taking a look to see what the

8    first correspondence from them is to you there?

9         A.    I looked through this before I came in, Mr.

10   Martinez, and the truth is I don't have a recollection of

11   anything substantive from them by way of correspondence.

12   They returned things to me that I sent to them.  There may

13   have been some correspondence at some time, but I don't

14   remember it being of any substance.

15        Q.    But in any event, the first contact with either

16   of them was a telephone call in which you spoke to Wendi

17   Andriano, the wife?

18        A.    That's true.

19        Q.    What was the substance of that conversation if

20   you can remember?

21        A.    What I recall was that there was a failure to

22   diagnose cancer.  There was not a lot of specific

23   information.  They were interested in whether or not that

24   failure was medical malpractice and were in the process of

25   talking to lawyers and were interested in whether or not we

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1    were interested in representing them.  My partner had been in

2    I think it was Phoenix Magazine's best lawyers in the state

3    or something and that was how they found our particular name.

4           Q.    Again, just so I'm clear, you said "they were

5    interested."  You only spoke with her at that time, though,

6    right?  He wasn't on the extension or anything?

7           A.    I don't believe so.

8           Q.    Okay.  In response to that, what happened?

9           A.    I drove to Casa Grande within a couple days of

10   the conversation and -- and met with them.

11          Q.    Okay.  Do you remember the time of day it might

12   have been that you met with them?

13          A.    It was daytime.  My recollection was it was

14   early afternoon, early to this time of the day, afternoon,

15   but I'm not absolutely certain.

16          Q.    And who did you speak with first or did you

17   speak with both of them at the same time?

18          A.    At that first meeting there were several people

19   present.  Wendi was there.  My recollection is that there

20   were a member or two of his family, and my recollection is

21   that Joe came in at some point during the course of the

22   conversation.

23          Q.    But just so that I understand it, my perception

24   of it may be wrong, but my perception of it is that you came

25   over, the defendant -- Mrs. Andriano was there, members of

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

000004465

1    his family were there, but he wasn't present initially when

2    you came over?

3         A.    That's my recollection is that he came in at

4    some point.

5         Q.    And how much time elapsed before he came in?

6         A.    Couldn't tell you.

7         Q.    Had you already began to speak with the family

8    about the representation or was it just sort of a salutation

9    kind of thing?

10        A.    There was a lot of general discussion.  Some of

11   it was questions of me regarding our firm, regarding me in

12   particular, what we did, how much of this we did, how it

13   worked, what we would do.  As I recall the meeting lasted for

14   some time, an hour, an hour and a half, something like that.

15        Q.    And he came in at some point?

16        A.    Yes.

17        Q.    And what was his demeanor if you could

18   remember?

19        A.    He was attentive and polite.

20        Q.    And did he stay for the whole meeting?

21        A.    My recollection is from the time he came in, he

22   stayed.

23        Q.    And after that was there an agreement, a

24   meeting of the minds, or did anything come of that meeting?

25        A.    I left there with no particular commitment,

 1    only that they would get back to me, and at some point within

 2    a week or two of that meeting they did indeed get back to us.

 3              Q.    When you say they got back to you, do you know

 4    who actually called you?  Was it just a message or --

 5              A.    I believe it was Wendi.

 6              Q.    And what -- what was the context or what was it

 7    that she indicated?

 8              A.    Only that they had decided to go with our law

 9    firm and to -- I mentioned that we would need medical

10    releases and I would provide them a copy of our fee agreement

11    if they agreed to retain us, and I did those things.

12              Q.    You sent those out to her?

13              A.    Yes.

14              Q.    And were they returned?

15              A.    They were returned in two phases.  I think I

16    got the medical releases back first.  There was a correction

17    they wanted to make because I didn't have Joseph's full name,

18    and there was a request that I correct that and I did so, and

19    then ultimately that came back.

20              Q.    All right.

21              A.    More like October, somewhere in there.

22              Q.    Did you -- when was the next time you spoke to

23    either Mr. Andriano or Mrs. Andriano?

24              A.    I wouldn't be able to give you specific days

25    and times.  There were several conversations and I spoke to

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1    both Joe and Wendi during the first month or two while we

2    were doing our investigation.  Primarily calls from us to

3    them seeking information, names of doctors, how he was doing,

4    what treatment he was undergoing, and my recollection was

5    that they were expecting a baby and also just to check on how

6    they were doing.

7         Q.    At that point it appears that you then engaged

8    in some sort of discovery or checking the claim out, right?

9         A.    The process of -- of investigating a medical

10   malpractice claim takes a while.  We explained that to them

11   and went about the process of doing our investigation.

12        Q.    During the time that you were investigating

13   this claim, did you ever receive any call from the defendant

14   or Wendi Andriano?

15        A.    Periodically.

16        Q.    Do you remember whether or not you received any

17   calls from Joseph Andriano?

18        A.    There were a call or two from Joseph over the

19   course of the first six or eight months.

20        Q.    And thereafter did you decide this is a case

21   that had some merit and you would go forward with it?

22        A.    We ultimately made that decision, yes.

23        Q.    When was that made?

24        A.    With earnesty, it was made in the early part of

25   2000, but because we were able to retain a good pathology

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1    review by a fairly prominent pathologist over at Scripps in

2    California, I was able to go visit him, he have gave us the

3    analysis that we needed, and at that time I communicated to

4    them we were in a position to go forward.  We were still

5    looking for an expert to talk about the issue of staging,

6    where Joe would have been in the progress of his cancer had

7    it been detected with the first pathologist who missed the

8    diagnosis versus the second pathologist versus the third.

9    That was one of the trickiest issues of the case.

10        Q.    And was the kind of case -- I know  that you

11   handle -- had handled complex cases, but did this case

12   ultimately result in a filing?

13        A.    It did.

14        Q.    And where did you file that?

15        A.    We filed that in Superior Court, Maricopa

16   County.

17        Q.    And what date?

18        A.    Actually, I may have just misstated that.

19        Q.    May have been Pinal -- or Pima?

20        A.    Yeah, it was Pima County, I'm sorry.  Because

21   most -- the misdiagnosis had taken place at medical

22   facilities in Pima County.

23        Q.    And what was the date that you filed?

24        A.    I'm -- looks like it was filed middle of July.

25        Q.    Do you have the date that the document -- I

```
 1    know they have dates on them.
 2            A.    I have a summons date July 2000.  Usually
 3    that's same day date --
 4            Q.    Okay.
 5            A.    -- as the complaint.  Let me find the
 6    complaint, if you'd like.
 7                  (Pause in proceedings.)
 8            THE WITNESS:  Maybe I can't.  July 12.
 9    BY MR. MARTINEZ:
10            Q.    Okay.  Was it actually Pima or Pinal County
11    where you filed it?
12            A.    Pima County.
13            Q.    Okay.  And once you filed it, did you let the
14    Andrianos know that's what had happened?
15            A.    Yes.
16            Q.    And did you continue to have conversations both
17    with Wendi Andriano and Joseph Andriano?
18            A.    The -- the complaint was not served immediately
19    but served over the course of the next couple of months.
20    They were advised as we accomplished service and as lawyers
21    began filing answers to the complaint on behalf of the
22    defendants, so there was some communication there, and there
23    were a couple phone calls around that time period, but not
24    much after the answers came in.
25            Q.    Did you ever have a conversation with Wendi
```

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1    Andriano about this lawsuit and indicating any value to it?

2         A.    I never put a specific value on any case

3    until -- until I have to officially either through the

4    settlement process or in asking a jury to award damages.

5         Q.    Did you ever indicate that this could be

6    something that's worth millions of dollars or words to that

7    effect?

8         A.    I suppose it's all in how you hear it.  I would

9    use words like "significant," "substantial," that it's

10   certainly a case that has a significant value.  In my

11   business you try not to put specific numbers on things

12   because clients look to specific numbers and things happen in

13   cases that change their value for the better or worse during

14   the course of litigation and you want to maintain

15   flexibility.

16        Q.    As you sit here today, what is your --

17   obviously, you're not representing her anymore.  What is your

18   view of what significant may have been as it applied to that

19   particular case?

20        A.    It was -- it was a case where if it had -- if

21   nothing had changed, and just to be specific this is not in

22   any fashion in a way I would have communicated it to the

23   clients.

24        Q.    Right.

25        A.    But in terms of internal evaluation of the

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

000004471

 1    case, we saw it as a case that was a seven figure case.  But

 2    what that meant specifically, even internally we don't lock

 3    ourselves into thinking it is a 1.2 million dollar versus 2.6

 4    million dollar versus 3 million dollar case until we're much

 5    further along in the process.

 6         Q.    In this particular case if the matter had

 7    proceeded to trial, assuming it had and prior to it actually

 8    being presented to a jury or to a judge, depending, and Mr.

 9    Andriano had died, what -- would that have changed the value,

10    either make it lower or more in the case or not at all?

11         A.    It would have depended on a couple of things,

12    would have depended on what he died from.

13         Q.    Let's assume he had a horrible, painful

14    asphyxiation, and prior to this we have been told he would

15    die from that, and dying from the cancer.

16         A.    From the dancer.  It would have to go through

17    changes in the pleadings to make a wrongful death, there

18    would be additional parties added, such as his parents,

19    assuming they were still alive and --  well, any additional

20    children that had come along in the process, so the parties

21    would change, the character of the claim would change, and

22    you'd have to evaluate it at that time through addition of

23    additional parties, and the fact that you can say then with

24    certainty what was going to happen to him whereas in a

25    failure to diagnose cancer case, there's always at least

EXHIBIT O

000004473

1    potentially a good possibility somebody doesn't die from the

2    the cancer.

3         Q.    Right.

4         A.    And the jury may find that, you have to go

5    through and evaluate where you are at that time.  But the

6    potential is there for the case to be more valuable only

7    because the damages are going to be more certain, there may

8    be additional parties who would have claims, the results will

9    certainly be permanent and --

10        Q.    Is --

11        A.    -- there is significant sympathy that's

12   involved.

13             MR. MARTINEZ:  Thank you very much.  I have nothing

14   else.

15             THE COURT:  Mr. Patterson.

16             MR. PATTERSON:  Thank you, Judge.

17

18   CROSS-EXAMINATION BY MR. PATTERSON:

19        Q.    How you doing, Mr. Miller?

20        A.    Fine, thank you.

21        Q.    We've spoken on several occasions about this

22   case, haven't we?

23        A.    Yes, sir.

24        Q.    You are a civil lawyer?

25        A.    Yes, sir.


TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

000004474

```
 1          Q.    Okay.  And what you do is governed by the Rules
 2    of Civil Procedure, right?
 3          A.    Yes.
 4          Q.    Okay.  There are certain statute of limitations
 5    with regard to causes of action, right?
 6          A.    Yes.
 7          Q.    And you need to file pleadings in a -- a court
 8    in order to avoid the impact of a statute of limitations
 9    violation, which would be a dismissal of the case or
10    inability to proceed with the cause of action, right?
11          A.    Yes.
12          Q.    Okay.  So there's deadlines by which you need
13    to file things, right?
14          A.    Yes.
15          Q.    Okay.  In this case what was the deadline by
16    which you needed to file some civil pleading to get the ball
17    rolling?
18          A.    It wasn't far after the time period when we
19    filed it.  And I don't have the specific date in front of me,
20    but it was based on when the Andrianos learned that Joe had
21    had cancer and had had cancer from the time of the first
22    pathology report that was erroneous.
23          Q.    All right.  So that deadline's out there kind
24    of in the -- in the nether region, if you will, and mindful
25    of that, you're trying to evaluate, investigate, and look
```

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

 1      into this case, right?

 2              A.    Yes.

 3              Q.    Okay.  So what kind of time frame did you have

 4      in order to give an initial assessment to the cause of action

 5      to the Andrianos?

 6              A.    This was one of the few cases where we had

 7      quite a bit of time to do that.  Often that's not true, but

 8      they had only recently before talking to me learned what I

 9      just told you, so I had almost two years to do an

10      investigation.

11              Q.    All right.  And at the two year period then did

12      you contact experts of your own in an effort to try to

13      determine whether there was medical malpractice here?

14              A.    Yes.

15              Q.    What was that gentleman's name

16              A.    The gentleman that ended up providing us with

17      the opinions was Dr. Bernard Chang (phonetic).

18              Q.    Okay.  And in that period of time when were you

19      working up your initial evaluation of the case, did you

20      mention any figures in terms of settlement amount to either

21      Joe Andriano or Wendi Andriano?

22              A.    No.

23              Q.    Okay.  Did you actually have a feel for what

24      this case was worth until after you had done the workup?

25              A.    Only in the broadest sense, only in the sense

```
 1    of is this a significant case, is this a case that is worth

 2    doing and doing all of the work and spending all of the money

 3    that would be required to investigate it?  And if the facts

 4    turn out to be as the clients related to us, which doesn't

 5    always turn out to be true, if all of that worked out, is

 6    this a significant enough case to be involved in, and we did

 7    believe that to be true.

 8          Q.    Okay.  Did you ever mention the figure of 20

 9    million dollars to Wendi Andriano, that's what you thought

10    this case was worth?

11          A.    No.

12          Q.    Did you ever mention that figure to Joseph

13    Andriano?

14          A.    No.

15          Q.    Okay.  As you told us, that's not the custom of

16    your industry to make that kind of statement to your clients

17    because it could be construed as a guarantee?

18          A.    That would be one of ways to look at it.

19          Q.    Okay.  You just don't do that?

20          A.    You don't do that.

21          Q.    Okay.  At some point in time then having spoken

22    with an expert you believed you had a viable cause of action

23    and you filed the lawsuit, right?

24          A.    Yes.

25          Q.    That was in advance of the statute of
```

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1    limitations?

2          A.    Yes.

3          Q.    Okay.   In that pleading did you ask for a

4    specific amount of money?

5          A.    No.

6          Q.    Okay.   Prior to filing the pleading did you

7    make any overtures to the potential defendants in this case

8    in an effort to settle it?

9          A.    No.

10         Q.    Okay.   So you certainly didn't throw out any

11   figures to the other side prior to filing the pleading in an

12   effort to settle the case, right?

13         A.    There were no discussions of that at all.

14         Q.    Okay.   Were they aware, if you know, of the

15   potential for the filing of the lawsuit in this case?   I

16   guess did you get a call from any lawyers purporting to

17   represent these doctors saying, you know, You're nosing

18   around here, you want to settle this thing?

19         A.    I don't remember getting any phone calls.   It's

20   typical for doctors to have some concern if they get a

21   request from a lawyer for medical records information.

22         Q.    Okay.   That would, I would understand,

23   noticeably frighten them a little bit.   Did you get any

24   overtures from persons representing the doctors saying, What

25   are you nosing around for?


TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

000004478

```
 1            A.    No.

 2            Q.    So you didn't get any settlement proposal from

 3    the other side?

 4            A.    No.

 5            Q.    Okay.  So no figures offered by you nor figures

 6    offered by them?

 7            A.    True.

 8            Q.    Okay.  Having not offered anything, you

 9    certainly didn't communicate that information to Wendi or Joe

10    Andriano, right?

11            A.    That's right.

12            Q.    Okay.  All right.  You file a complaint and

13    that kind of starts the case rolling, right?

14            A.    Yes.

15            Q.    And in that complaint you make certain

16    allegations of medical malpractice, right?

17            A.    Yes.

18            Q.    Okay.  Who were the clients that you were

19    representing at that time?

20            A.    Joseph and Wendi Andriano.

21            Q.    Okay.  So you -- you advanced a claim for both

22    of those individuals seeking money or monetary damages on

23    their behalf for the misconduct or malpractice of the doctors

24    involved in the cancer?

25            A.    Yes.
```

1          Q.    Okay.  You filed that in July of 2000, July 12?

2          A.    Yes.

3          Q.    Okay.  What's the first thing you have to do

4     after you file a civil lawsuit?

5          A.    Wait.  You wait until the answers come in from

6     the defendants, you find out who all of the attorneys are,

7     you have some informal conversations, just exchanging

8     information.

9          Q.    Let me back you up just a little bit.  After

10    you file it, you have to give them a copy of it, right?

11         A.    True.  You have to serve the doctor.

12         Q.    Okay.  That sometimes takes time, right?

13         A.    Yes.

14         Q.    Okay.  So there's a delay or lag time between

15    the filing of the lawsuit and service of process upon the

16    defendants, correct?

17         A.    Yes.

18         Q.    Okay.  How many potential defendants were there

19    in this case?

20         A.    Well, there were three major doctors and then

21    the facilities at which they practiced when they performed

22    the malpractice.

23         Q.    All right.  And in general, what was the theory

24    of your claim?

25         A.    Was that each of the doctors had failed to

 1    pursue -- perceive that the pathology sample that they

 2    examined was adenoid cystic carcinoma as opposed to some type

 3    of benign tumor.

 4            Q.    Because that's what those potential defendants

 5    had done.  They'd excised a portion of Joe Andriano's tumor,

 6    they looked at it, said in their professional opinion this

 7    was a benign noncancerous tumor, and he needn't to worry

 8    about it in so many words?

 9            A.    Essentially, that's so.

10            Q.    This diagnosis was made not once, not twice,

11    but by three separate pathologists, right?

12            A.    Yes.

13            Q.    So you essentially sued all three of these

14    doctors for failing to recognize the jeopardy Mr. Andriano

15    was in as a result of the cancer in his neck?

16            A.    Yes.

17            Q.    Okay.  Now, once these folks are served they

18    have a period of time within which to get back to you, right?

19            A.    Filing the answer, yes.

20            Q.    They could do one of two things.  They could

21    roll over and say "We did it," right?  Or they could file a

22    response and say "Huh-uh, you're off base, your claim's not

23    meritorious, we're fighting this," right?

24            A.    Yes.

25            Q.    Okay.  In this case what happened in terms of

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

000004481

```
 1    responses that you received from the defense?
 2         A.    You know, my recollection is that they -- they
 3    answered.   There may have been a motion to dismiss filed.
 4    There were a couple motions that were filed very early on
 5    instead of answers, but in flipping through I'm seeing
 6    answers rather than initial motions to dismiss.
 7         Q.    Okay.   So they expressed to you by virtue of
 8    their pleadings they were actively fighting you on those
 9    issues, right?
10         A.    No one rolled over.
11         Q.    All right.  And some of them took the added step
12    of saying throw this out of court at this point because it's
13    not a colorable claim for -- for whatever reason.   They said
14    let's dismiss this thing, not only fighting it but we're
15    asking the court to dismiss it, right?
16         A.    That was the position that was taken, yes.
17         Q.    All right.  And none of these doctors made a
18    settlement proposal accompanying their pleadings.   They were
19    fighting the issues that you had raised in your complaint,
20    correct?
21         A.    True.
22         Q.    All right.  And when did you receive these
23    answers in general?
24         A.    They came in over the course of September -- I
25    see some dated, for example, 12th of September, and that was
```

1      the general -- general time period, 12th of September, 7th of

2      September.  They would have all been due on approximately the

3      same date.  Sometimes you get a request for a couple days

4      extension which is typically granted --

5              Q.    Okay.

6              A.    -- just as a courtesy.

7              Q.    So fair to say it's very early on in the fight

8      here, right?

9              A.    Yes.

10             Q.    Okay.

11             A.    The earliest answer was September 1.

12             Q.    All right.  They're not rolling over, they're

13     contesting the allegation that you make?

14             A.    Yes.

15             Q.    All right.  There's no settlement proposal on

16     the table at this point?

17             A.    True.

18             Q.    All right.  Not being able to predict the

19     future, you could lose your lawsuit, correct, ultimately?

20             A.    Always a possibility.

21             Q.    All right.  No guarantees in your business?

22             A.    Not at all.

23             Q.    Okay.  And I believe you told me one of the

24     curiosities of the case was that they could use the fact that

25     three doctors failed to diagnose the problem as kind of an

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1  affirmative defense, right?

2       A.     I perceived that to be the defense as a

3  practical matter for the defendants in this case.

4       Q.     In so many words, you anticipated their defense

5  would be, look, three guys in this industry all certified to

6  diagnose this kind of thing didn't catch it?

7       A.     Right.

8       Q.     And if that was somehow evidence, it was

9  reasonable for each of them not to have caught it.

10      A.     Exactly.

11      Q.     Because that's the standard you're dealing

12 with.  Physicians are allowed to make mistakes, right?

13      A.     Right.

14      Q.     But the mistakes have to be reasonable mistakes

15 in those circumstances.

16      A.     That's a fair general statement.

17      Q.     Okay.  So we don't hold physicians to a strict

18 standard of care, they've got to cure all cancer, they have

19 to diagnose all cancer, they could never make a mistake,

20 right?

21      A.     That's true.

22      Q.     Okay.  You had one physician or pathologist in

23 San Diego willing to say it was unreasonable as to their

24 failure to diagnose this problem?

25      A.     As to each one of them.


TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1        Q.    Okay.  All right.  When you're getting the

2  answers in at this point in time, you're able to come to some

3  kind of settlement value?

4        A.    We were a long way from that in my mind at that

5  point, and that's typical.  There's nothing usual about that.

6        Q.    So certainly you didn't communicate to Wendi

7  Andriano at this stage of the process this is a 50 million

8  dollar lawsuit, let's try and settle it?

9        A.    No.  I never communicated that.

10        Q.    Nor did you communicate that fact to Joe

11  Andriano?

12        A.    That's true.

13        Q.    Okay.  All right.  Now there are two kinds of

14  lawsuits potentially at issue here.  You started this out

15  with a -- a medical malpractice lawsuit?

16        A.    Yes.

17        Q.    All right.  And in that context Wendi has --

18  has a claim?

19        A.    Yes.

20        Q.    As does Joe Andriano?

21        A.    Yes.

22        Q.    And what are the elements, if you will, of that

23  claim?  How do we figure out monetarily how much a person

24  should be awarded for a medical malpractice claim?

25        A.    It's not scientific.  Ultimately, it's either a

1    process of negotiation between the parties where the parties

2    simply agree upon a value, or it's subject to a jury

3    determination; the jury hears all the evidence and comes to a

4    decision as to what the value of the case is.

5        Q.    Okay.  In that settlement process, suppose the

6    defendants said we'll give you a million bucks and you had

7    accepted that settlement.  Would it necessarily be broken

8    down into what amount of money constituted what award for

9    what particular kind of damage?

10       A.    No.

11       Q.    Okay.  It would just be 1 million bucks?

12       A.    In your scenario, yes.

13       Q.    He'd cut a check to you initially, I assume?

14       A.    If there isn't -- is nothing to cause the check

15   to be broken up, the check would come to Joseph and Wendi

16   Andriano, husband and wife, and Jeff Miller, their attorney.

17       Q.    Okay?

18       A.    All on one check.

19       Q.    You would then take the check, deposit in your

20   account, take your fee out of it --

21       A.    Yes.

22       Q.    -- because you've earned it, then you'd remit

23   the proceeds, the balance of the proceeds to Joseph and Wendi

24   Andriano?

25       A.    As however they direct them to.


TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

```
 1          Q.    Okay.  They would have some input in that
 2     process?
 3          A.    Sure.
 4          Q.    They could put it in a joint checking account?
 5          A.    They could.
 6          Q.    Okay.  But the money that comes in to you from
 7     the defendants doesn't say this is so much for Joe, this is
 8     so much for Wendi, this is so much for Jeffrey Miller,
 9     typically?
10          A.    Typically only if it was directed to be that
11     way by the clients for some reason.
12          Q.    All right.  Now, at this point in time in your
13     discussions with Joe and Wendi Andriano had you gotten any
14     input from them compelling you or directing you to segregate
15     it or break it down into Joe's money or Wendi's money?
16          A.    No.
17          Q.    Okay.  Had you ever heard any discussion up to
18     this time about the prospect of divorce?
19          A.    No.
20          Q.    These persons appeared to be happily married?
21          A.    As far as I knew.
22          Q.    From what you observed?
23          A.    Absolutely.
24          Q.    Okay.  And had there been the prospect or hint
25     of divorce, would you have considered bringing another lawyer
```

```
 1    into the process?

 2            A.      Potentially.

 3            Q.      Because of ethical problems for you?

 4            A.      There's potentially a conflict of interest

 5    between the position of husband and position of wife with

 6    respect to some fund of monies.

 7            Q.      Okay.  You didn't do that?

 8            A.      No.

 9            Q.      So you didn't perceive that there was

10    antagonism or opposite interest between Wendi and Joe

11    Andriano?

12            A.      That's true.

13            Q.      Okay.  All right.  At some point the

14    possibility exists for converting this med mal case, medical

15    malpractice case, into a wrongful death case because of the

16    severity of the disease that's involved here, right?

17            A.      It was recognized that Joe's condition, and I

18    don't mean to be informal by saying "Joe," that's just how I

19    always thought of him -- but Mr. Andriano's condition was

20    known to be terminal and we recognized that as a possibility.

21            Q.      Okay.  If you had a broken leg, you wouldn't

22    have been unduly concerned about the possibility of a

23    wrongful death action?

24            A.      True.

25            Q.      But you knew this was terminal cancer so you
```

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1     were mindful of that eventuality right?

2          A.     Yes.

3          Q.     And to that end did you explain the difference

4     between a medical malpractice lawsuit and wrongful death

5     lawsuit to Joseph Andriano?

6          A.     Yes.

7          Q.     Did you explain it to Wendi Andriano?

8          A.     Yes.

9          Q.     Okay.  And was this done jointly or separately?

10         A.     It was done at the initial meeting.

11         Q.     Okay.  Did you explain to both parties, Joseph

12    and Wendi, that in order to preserve the -- the viability of

13    the wrongful death claim that the death ultimately -- that

14    transpired, that he expired from, had to bear some reasonable

15    relationship to the original misdiagnosis of the doctors?

16         A.     It came up in the context of the initial

17    discussion about whether or not this was a case where the

18    family wanted me to expedite the case.

19         Q.     Okay.  Talk to us about that.

20         A.     Sometimes, and this was one of those

21    circumstances, there may be reasons that the family has for

22    wanting a case to move faster than most situations.  What

23    you're trying to do is maximize the value of the case.  And

24    those circumstances often exist in, for example, a case like

25    this where the only therapies that might be available to the

1    person with the disease are experimental and might not be

2    covered by insurance and they have a need of funds.

3            Q.    Okay.

4            A.    So the discussions is that under what

5    circumstance do you need me to fire sale this case.

6            Q.    Discount?

7            A.    Discount it, settle it for below what it might

8    actually be worth because you need the money right now.  And

9    we had that discussion early because it was a concern of mine

10   based on where Joseph was in his treatment, and as part of

11   that discussion it also came up how it works and I -- my

12   recollection is being asked this specific question, what if

13   Joe were to pass away during the course of a medical

14   malpractice case?  And I explained what a wrongful death case

15   was and explained drawing the distinction that his passing

16   away has to be from the medical malpractice.  And I typically

17   use a car accident as my example, by delaying, one of the

18   risks is that you have a car accident and if Mr. Andriano

19   passes away from the car accident, the medical malpractice

20   case goes away and there is not a wrongful death case at

21   least from the cancer.  There might be one from the car

22   accident but not from the cancer.

23           Q.    And both parties, Wendi and Joe, appeared to

24   appreciate the substance of what you explained to them?

25           A.    I believe so.


TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1          Q.     Okay.  What did Mr. Andriano say about

2    discounting or fire sale-ing the case, settling it at the

3    earliest possible --

4          MR. MARTINEZ:  Objection.  Hearsay as to his --

5          MR. PATTERSON:  Judge, I need to complete -- can we

6    approach?

7

8               (The following proceedings were held at the

9    bench:)

10

11         MR. PATTERSON:  We are limiting our inquiry to

12   conversations that this gentleman had with this gentleman.

13   He inquired in that regard.  I'm allowed to bring in other

14   facts and other statements that this person made to this

15   gentleman within that same context.

16         THE COURT:  Mr. Martinez?

17         MR. MARTINEZ:  I never asked him to tell me anything

18   Joseph said.

19         THE COURT:  I sustained the objection.

20         MR. PATTERSON:  Okay.

21

22              (The following proceedings were held in open

23   court:)

24

25         THE COURT:  Mr. Patterson.


TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

```
 1    BY MR. PATTERSON:

 2         Q.   After your discussion with Mr. Andriano, did

 3    you make any effort to discount or fire sale or settle the

 4    case on an expeditious basis?

 5         A.   No there's correspondence from me regarding

 6    having spoken with him and --

 7         MR. MARTINEZ:  Objection.  Hearsay if he's going to

 8    go into what he wrote or said.

 9         THE COURT:  Just answer the question "yes" or "no."

10    BY MR. PATTERSON:

11         Q.   You didn't make any --

12         A.   I did not.

13         Q.   Did Wendi encourage you to fire sale the case?

14         A.   No.

15         Q.   Okay.  Now, just so -- conceptually you used

16    the auto accident case.  If you cross against the red light

17    and get hit by a bus, that kind of thing would eliminate the

18    med mal case, right?

19         A.   Yes.

20         Q.   Any way or manner of dying that's not basically

21    cancer related would be problematic to the lawsuit that you

22    were pursuing on behalf of these people?

23         A.   Yes.

24         Q.   Okay.  Now, if a person would -- were to have a

25    heart attack which were -- which you could arguably attribute
```

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

000004492

1    the cancer which was misdiagnosed, would the lawsuit

2    theoretically be in a posture to avoid dismissal?

3              A.    If you could relate those items, as long as

4    they were in a causal chain going back to the malpractice.

5              Q.    Okay.  At some point in time did you make a

6    phone call to Joe and express some concern about some

7    suicidal ideations he might be having?

8              MR. MARTINEZ:  Objection.  Hearsay.

9              THE COURT:  Sustained.

10             MR. PATTERSON:  I'm going --

11             THE COURT:  Just ask -- did you make a phone call?

12             THE WITNESS:  Yes.

13             THE COURT:  Ask your next question.

14   BY MR. PATTERSON:

15             Q.    Did you discuss with Joe any suicide --

16             MR. MARTINEZ:  Objection.  Hearsay.

17             THE COURT:  Overruled.  Go ahead and answer the

18   question "yes" or "no."

19                   Let me see Counsel here at the bench.

20

21                   (The following proceedings were held at the

22   bench:)

23

24             THE COURT:  Tell me where you're going on this and

25   whatever was said.


TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

000004493

1    MR. PATTERSON:  I'm sorry?

2    THE COURT:  Tell me where you're going with this.

3    MR. PATTERSON:  He called having -- Wendi expressed a

4    concern to him that Joe was expressing suicidal ideations.

5    He called him, he talked to him about suicide and offered him

6    a counselor if he needed one to combat or fight any

7    depression he may be having.

8    THE COURT:  Mr. Martinez?

9    MR. MARTINEZ:  What we have is the defendant making a

10   call, which I believe was the kind of situation where --

11   where it's something that she may want or believe in, and as

12   a response to that, he made a call.  But it's in response to

13   hearsay that he did this.  He has absolutely no knowledge

14   that the victim was suicidal.

15   MR. PATTERSON:  He could cross-examine on that.

16   THE COURT:  Hold on a second.

17        What did she tell Mr. Miller?

18   MR. PATTERSON:  She told Mr. Miller that Joe

19   expressed to her the thoughts of suicide, that he wanted to

20   commit suicide, okay?  And in that regard she said "Joe,

21   we're going to lose the lawsuit if you do that.  Talk to the

22   lawyer."

23        She called the lawyer, the lawyer called Joe.

24   They talked about suicide and he offered him a counselor.

25   THE COURT:  Okay.  I'm going to sustain the objection.


TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1

2             (The following proceedings were held in open

3      court:)

4

5             THE COURT:  The objection is sustained.  Ask your

6      next question.

7      BY MR. PATTERSON:

8             Q.    All right.  You had discussions during the

9      course of this lawsuit, the pendency of this lawsuit with

10     both Joseph and Wendi, correct?

11            A.    True.

12            Q.    All right.  And would you call them typically

13     or would they call you or how would the conversations or

14     dialogues be initiated?

15            A.    They occurred both ways.  More frequently we

16     called them than they called us.

17            Q.    Okay.  Were there --

18            A.    And there were personal visits as well.

19            Q.    Were there occasions when you called and Wendi

20     would speak with you and then hand the phone to Joe and then

21     he would finish the conversation with you?

22            A.    My recollection is it was usually the other way

23     around.

24            Q.    That you would call, speak with Joe, and he

25     would hand the phone to Wendi?

1  A. Yes.

2  Q. Okay.  When you got into the specifics of the

3 lawsuit, Joe would hand the phone to Wendi and let her deal

4 with it?

5  A. No.  It was more the sense of I was calling for

6 a specific piece of information, I'd talk to Joe, ask

7 questions about how he was doing and tell him why I was

8 calling, and he'd say -- he'd hand the phone to Wendi.

9  Q. All right.

10  A. It was not a frequent thing.

11  Q. Okay.  The contract that you had with the

12 parties, was that endorsed by Joseph Andriano?

13  A. Yes.

14  Q. Okay.  The medical releases which allowed you

15 to access information about his medical treatment and

16 condition, were those releases endorsed by Joseph Andriano?

17  A. Yes.

18  Q. Okay.  In response to Mr. Martinez's

19 questioning, this first meeting you met initially with Wendi

20 and Joseph's parents?

21  A. And Joseph during the course of the meeting.

22  Q. Okay.  Did you go over anything kind of

23 clandestinely with Wendi and Joseph's parents before Joe

24 Junior's arrival?

25  A. No.

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1      Q.     Okay.   There's nothing secretive going on here?

2      A.     No.

3      Q.     Okay.   He just arrived late to the meeting?

4      A.     I have some recollection being told he might do

5   that.

6      Q.     Okay.   When he did finally arrive, you had a

7   full and fair and open discussion with him as well as with

8   the other members of the family?

9      A.     I believe I regurgitated in a more brief form

10   what we already covered just so he heard it.

11      Q.     There was no effort on your part to leave him

12   out of the loop at that point?

13      A.     Not at all.

14      Q.     Okay.   And as a general proposition you can't

15   say whether one kind of lawsuit is more valuable than

16   another, right?

17      A.     That is -- that's a fair statement.   They all

18   depend on where they are at any particular point of time,

19   what the politics in the world are at that particular time

20   and what's happening.

21      Q.     And factored specifics with regard to each

22   case?

23      A.     As a general matter, that's true.

24      Q.     As a general rule, you can't tell us a med mal

25   case is less valuable than a wrongful death case?

1           A.     Not without a lot more information.

2           MR. PATTERSON:  Thank you, Judge.  That's all I have.

3           THE COURT:  Redirect?

4           MR. PATTERSON:  Sorry, Judge, may I have one moment?

5    BY MR. PATTERSON:

6           Q.     I think out of an abundance of clarification,

7    we need to know what happened to that lawsuit?

8           A.     The lawsuit was ultimately dismissed, trading

9    the cost incurred by the defense for the dismissal of the

10   lawsuit.  I can explain that if you'd like.

11          Q.     Please.  It was dismissed after the death of

12   Joe?

13          A.     After the death of Mr. Andriano and simply

14   based on the description of what had transpired, the

15   communication was do we dismiss this, do we let them file

16   motions and force it to be dismissed, or do we attempt to

17   make the best of the situation and trade any claim for costs

18   that the doctors would have by virtue having had to file

19   answers and being served in a lawsuit for an agreement to

20   dismiss the case with prejudice, which means it can't be

21   refiled.  That was authorized and that was done.

22          Q.     Okay.  And I assume the logic from your

23   perspective was that the cause of death for Mr. Andriano was

24   not caused by the cancer, right?

25          A.     That was the -- the only thing we knew, yes.


TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1          Q.     Okay.  So that brings me to my last question.

2     Would death by being struck by a stool vanquish or eliminate

3     an ability to recover for the wrongful death of Joe Andriano?

4          A.     Unless one could find some causal connection

5     between the cancer and that incident, you know, yes, it would

6     vanquish the case.

7          Q.     Okay.  Similarly, a cut throat which caused the

8     death of Joe Andriano, that too would eliminate any recovery

9     for the original medical malpractice failing to diagnose the

10    cancer?

11         A.     Yes.

12         MR. PATTERSON:  Okay.  That's all I have, Judge.

13    Thank you.

14         THE COURT:  Mr. Martinez?

15

16    REDIRECT EXAMINATION BY MR. MARTINEZ:

17         Q.     Along that same vein, how about if somebody

18    poisoned him?  Would that also do away the lawsuit?

19         A.     Yes.  Knowing no more than that, yes.

20         Q.     Well, you knew no more than that when Mr.

21    Patterson was asking you, right?

22         A.     And the same answer.

23         Q.     How about if he was suffocated with a pillow?

24    Would that be the same answer?

25         A.     Yes.

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

```
 1              Q.      Now, one of the things that you indicated to us
 2      was that you never discussed with the -- your clients the
 3      amount.  You don't give them a figure, right?
 4              A.      That's true.
 5              Q.      And -- but would you agree or disagree that
 6      good communication is something that is key to a practice
 7      such as a law practice?
 8              A.      True.
 9              Q.      So are you saying that you never communicated
10      to them that it was a good case?
11              A.      No.  In fact as I told you before, I would have
12      used words like "significant" or "substantial" and did use
13      words like that.
14              Q.      So just so that we're clear, you didn't
15      leave -- did you leave them with an impression that it was a
16      "dog case," that you were just doing charity work?
17              A.      Absolutely not.
18              Q.      You indicated that it was a substantial case,
19      right?
20              A.      True.
21              Q.      And you may have also discussed with them at
22      the first meeting something about what would happen if he
23      died during the pendency of the lawsuit.
24                      MR. PATTERSON:  Judge, he's leading on redirect.
25                      THE COURT:  Sustained.
```

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1         Q.    Now, one of the things that you indicated to us

2    was that you never discussed with the -- your clients the

3    amount.  You don't give them a figure, right?

4         A.    That's true.

5         Q.    And -- but would you agree or disagree that

6    good communication is something that is key to a practice

7    such as a law practice?

8         A.    True.

9         Q.    So are you saying that you never communicated

10   to them that it was a good case?

11        A.    No.  In fact as I told you before, I would have

12   used words like "significant" or "substantial" and did use

13   words like that.

14        Q.    So just so that we're clear, you didn't

15   leave -- did you leave them with an impression that it was a

16   "dog case," that you were just doing charity work?

17        A.    Absolutely not.

18        Q.    You indicated that it was a substantial case,

19   right?

20        A.    True.

21        Q.    And you may have also discussed with them at

22   the first meeting something about what would happen if he

23   died during the pendency of the lawsuit.

24               MR. PATTERSON:  Judge, he's leading on redirect.

25               THE COURT:  Sustained.


TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

 1    BY MR. MARTINEZ:

 2         Q.    Did you discuss with them at the first meeting

 3    what would happen if he died during the pendency of the

 4    claim?

 5         A.    Yes.

 6         Q.    And did you give them the same explanation that

 7    you gave us as to the value?

 8         A.    With respect to "significant" or "substantial,"

 9    words such as that?

10         Q.    Yes, uh-huh.

11         A.    I don't recall having that discussion at that

12    time.  It's possible that I did.  I don't have a recollection

13    of it.

14         Q.    Now, you also talked about the claims and you

15    talked about the amount that may be offered during the

16    settlement.  Do you remember that colloquy between you and

17    defense counsel?

18         A.    Yes.

19         Q.    And you indicated, well, the check just comes

20    in and then I just give it over to the clients minus the fee?

21         A.    Very, very general terms.

22         Q.    But if you are settling something -- let's just

23    talk about settling first.  Generally speaking, if you have a

24    loss of consortium claim and you have a medical malpractice

25    case such as this, are the people going to settle with you?

1    Say they'll give you $500,000 for the loss of consortium in

2    this case and $500 for the medical malpractice.  Is that what

3    you would expect in this case?

4         A.    Most often it's settled for a number.

5         Q.    And you never discussed the amount of pain and

6    suffering one suffered versus the other?

7         A.    Not never, but in most circumstances, it's

8    settled for a number.

9         Q.    And in your experience as a lawyer then, what

10   you're telling us, I think, is that the amount that the

11   person that is aggrieved receives the same or even less than

12   the person who loses the consortium.

13              MR. PATTERSON:  Judge, he's leading.

14              THE COURT:  Sustained.  Rephrase the question.

15   BY MR. MARTINEZ:

16        Q.    Well, in your experience is the loss that is

17   suffered by a person who in this case has been misdiagnosed

18   with cancer more or less substantial than the loss of

19   consortium that was pleaded in this case?

20        A.    In doing an internal evaluation, you would

21   evaluate the personal injury side of it as being more

22   substantial.  If -- your question related to settlement as I

23   understood it.

24        Q.    Well, the value of -- let me put it this way.

25   Was the value of the case being significant, was that related

1    to the loss of consortium or was that related to the medical

2    malpractice that Mr. Andriano suffered?

3          A.    The significance was in the injury that Mr.

4    Andriano suffered as a primary matter.

5          Q.    With regard to the pleadings that were filed in

6    this case, you did indicate that some filed answers.   You

7    also indicated perhaps there were motions there to dismiss.

8    Were there any motions to dismiss?

9                (Pause in proceedings.)

10          THE WITNESS:   My recollection is that there was at

11   least one motion to dismiss filed.   I'm not seeing it on the

12   pleading backer.   I don't have my entire file any longer, so

13   I can't tell you with certainty.

14   BY MR. MARTINEZ:

15          Q.    Okay.   As you sit here today, if you're

16   pleading backer -- does it have a motion to dismiss in it?

17          A.    It does not, at least not that I'm seeing, and

18   I'm flipping through quickly.

19          Q.    So that leads you to my next point.   You -- you

20   were asked, Well, Did these answers actively indicate that

21   they were going to fight lawsuit?   Do you remember that line

22   of questioning?

23          A.    Yes.

24          Q.    Now, with regard to that line of questioning,

25   does that mean that you thought that it was a bad lawsuit

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1    just because they were actively or aggressively fighting it?

2            A.    No.    That's typicals.

3            MR. MARTINEZ:  I don't have any other questions.

4            THE COURT:  Are there any further questions of this

5    witness by the jury?  If so, please raise your hand.

6                (No response.)

7            THE COURT:  No one has raised their hand.  May the

8    witness be excused?

9            MR. MARTINEZ:  Yes, sir.

10           MR. PATTERSON:  Yes, Your Honor.

11           THE WITNESS:  No objection.

12           THE COURT:  Thank you very much.  You're excused.

13           Okay.  We'll go ahead and take our afternoon

14   break at this point in time.

15               Ladies and gentlemen, during this break

16   remember the entire admonition I gave you including the fact

17   you're not to discuss this case with anyone, do not let

18   anyone discuss the case with you, keep an open mind about the

19   case.  Have a nice break.  We'll see you in 20 minutes.  And

20   I'll stay here with Counsel.

21               (Whereupon, the jury exits the courtroom.)

22

23           THE COURT:  Please be seated.  This is cause number

24   CR-2000-096032, State of Arizona versus Wendi Elizabeth

25   Andriano.  The record will reflect the presence of the


TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

 1    Defendant and Counsel.

 2              Where are we at in terms of scheduling?

 3         MR. MARTINEZ:  As I previously indicated to the

 4    Court, I will rest at this point.

 5         THE COURT:  Okay.  What I'll do is go ahead and allow

 6    you to formally rest in front of the jury, but we could argue

 7    the motion that Mr. Patterson would like to make at this

 8    point in time.

 9         MR. PATTERSON:  Yes, Judge.  Pursuant to Rule 20, I

10    would ask that this cause be dismissed, the State's having

11    failed to produce any substantial evidence establishing the

12    defendant as having caused the death of Mr. Joseph Andriano.

13    There's no substantial evidence establishing any connection

14    between the object that may have caused the death of Mr.

15    Andriano with my client in terms of fingerprints or blood

16    analysis, anything of that nature.  There's no substantial

17    evidence adduced of any premeditation with regard to that

18    case, so my request is it be dismissed outright or at a bare

19    minimum be reduced to second degree murder.

20         THE COURT:  Mr. Martinez?

21         MR. MARTINEZ:  With regard to his last point last --

22    first, there is ample evidence of premeditation.  We have the

23    indications that she was attempting or thinking about killing

24    him early on in July when she opened the account in the name

25    of Anne Newton, an account that she opened for the sole

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1    purpose of obtaining poison which she gave to him and which

2    was found in his system.

3             Additionally, we have had other testimony from

4    others who indicated that she was sick of him and that she

5    was sick of the cancer and she hoped he would just die so

6    that she could move on.

7             On that particular night, I don't need to

8    regale the Court with all the details, you were here, but her

9    conduct that night during the death is suspect to say the

10   least, so I do believe that we have demonstrated that there

11   is substantial evidence that she is the person that caused

12   the death.  There was nobody else there.  This theory that

13   they perhaps espoused during their opening statement that

14   he -- he took this knife and stuck it in the side of his neck

15   and twirled the knife around there just does not stand up to

16   the light of day, if you will, when the witnesses testified,

17   so it's my view there is premeditation.  There is one that

18   did it.  There's no requirement there be fingerprints on

19   anything for there to be a conviction for this sort of thing,

20   so I think this issue is best left -- better left for the

21   jury.

22            THE COURT:  Anything further from Mr. Patterson?

23            MR. PATTERSON:  No, Judge.  That's all I have.

24            THE COURT:  The Court -- having considered the

25   Defendant's Rule 20 motion, the Court does find there is

1    substantial evidence to warrant a conviction as charged and

2    it is ordered denying the Defendant's Rule 20 motion.

3             We'll go ahead and take a break.  When we

4    return with the jury, I'll allow Mr. Martinez to rest

5    formally before the jury, and then we'll begin with you, Mr.

6    Patterson.

7             MR. PATTERSON:  Well, we had an understanding,

8    Judge --

9             THE COURT:  What is that?

10            MR. PATTERSON:  I told you yesterday at side bar our

11   first witness is scheduled for tomorrow.

12            THE COURT:  Okay.  I forgot about that.  We won't

13   have additional witnesses until tomorrow?

14            MR. PATTERSON:  No, sir.

15            THE COURT:  Okay.  Let's do this.  In 20 minutes when

16   we reconvene with the jury, we'll have Mr. Martinez go ahead

17   and rest formally before the jury and we'll recess.  I forgot

18   about that.

19            MR. PATTERSON:  Thank you, Judge.

20            THE COURT:  We'll be in recess.

21            (Recess.)

22

23            THE COURT:  This is cause CR 2000-096032, State of

24   Arizona versus Wendi Elizabeth Andriano.  The record will

25   reflect the presence of the Defendant, Counsel and the jury.


TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

```
 1              Mr. Martinez?
 2         MR. MARTINEZ:  The State rests, Your Honor.
 3         THE COURT:  Ladies and gentlemen, we're going to go
 4    ahead and take our evening recess.  I'll have everyone return
 5    tomorrow at 1:00 p.m.
 6              During this evening recess remember the entire
 7    admonition I have given you, including the fact you're not to
 8    discuss this case with anyone.  Do not let anyone discuss the
 9    case with you.  Do not do any research, investigation,
10    experimentation or investigation on your own.  Avoid any
11    media coverage in the case.  Keep an open mind.
12              We'll see you tomorrow at 1:00 p.m.  Have a
13    nice evening.  I'll stay here with Counsel.
14
15              (Whereupon, the jury exits the courtroom.)
16
17         THE COURT:  Please be seated.  The record will
18    reflect the presence of Defendant and Counsel.  We're outside
19    the presence of the jury.
20              Anything further we can discuss at this point?
21         MR. MARTINEZ:  No, sir.
22         MR. PATTERSON:  No, Your Honor.
23         THE COURT:  We'll see everyone tomorrow at 1:00.
24    Have a nice evening.  We'll be in recess.
25
```

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1                    (Evening recess.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

```
 1

 2

 3                    CERTIFICATE OF REPORTER

 4

 5   STATE OF ARIZONA    )
                         )
 6   COUNTY OF MARICOPA  )

 7

 8              I, Traci L. Wheeler, CSR, RPR, an official

 9   and certified reporter in the Superior Court of the State

10   of Arizona, in and for the County of Maricopa, hereby

11   certify that I made a shorthand record of the proceedings

12   had in the within case, and that the foregoing transcript

13   is a full, true, and correct transcription of the

14   proceedings in this case.

15              Dated this 28th day of March, 2005.

16

17

18              _____
                Traci L. Wheeler, CSR, RPR
19              Certified Court Reporter No. 50313
                Official Court Reporter
20

21

22

23

24

25
```

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

# APPENDIX F

05-0002   1

COPY

DP

1          IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

2              IN AND FOR THE COUNTY OF MARICOPA

3

4    STATE OF ARIZONA,            )
                                  )
5            Plaintiff,           )
                                  )
6    v.                           )      No. CR 05-0005 AP
                                  )      MARICOPA COUNTY
7    WENDI ELIZABETH ANDRIANO,    )      No. CR 2000-096032
                                  )
8            Defendant.           )
     _____)

9

10

11

12                        Mesa, Arizona
                       September 14, 2004
13

14

15          BEFORE:  The Honorable BRIAN K. ISHIKAWA

16

17

18          REPORTER'S TRANSCRIPT OF PROCEEDINGS

19                     TRIAL DAY 11

20

21

22

23

24   ORIGINAL Prepared for APPEAL by:
     TRACI L. WHEELER, CSR, RPR
25   Certified Court Reporter No. 50313
     Official Court Reporter


          TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

2

<div align="center">

A P P E A R A N C E S

</div>

FOR THE STATE:    JUAN M. MARTINEZ,
                  Deputy County Attorney

FOR THE DEFENDANT:  DANIEL B. PATTERSON,
                    Deputy Public Defender
                            and
                    G. DAVID DELOZIER,
                    Attorney at Law


<div align="center">

I N D E X   O F   E X A M I N A T I O N

</div>

WITNESS                                                    PAGE

MCKINNON, BENJAMIN, Called on behalf of the State
        Direct Examination by Mr. Martinez            154
        Cross-examination by Mr. Patterson            171
        Redirect Examination by Mr. Martinez          178
        Follow-up Questions by Mr. Martinez           184

OLSON, DENNIS, Called on behalf of the State
        Continued Direct Examination by Mr. Martinez    4
        Cross-examination by Mr. Patterson             50
        Redirect Examination by Mr. Martinez          104

<div align="center">

E X H I B I T S   A D M I T T E D   I N   E V I D E N C E

</div>

NO.    DESCRIPTION                                      PAGE

101    Photograph                                       10
102    Photograph                                       10
103    Photograph                                       10
104    Photograph                                       10
105    Photograph                                       10
106    Photograph                                       10
107    Photograph                                       10
108    Photograph                                       10
110    Photograph                                       15
111    Photograph                                       15
112    Photograph                                       15
113    Photograph                                       15
114    Photograph                                       15
115    Photograph                                       18
116    Photograph                                       18
117    Photograph                                       18
118    Photograph                                       18

<div align="center">

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005862

</div>

3

1     E X H I B I T S   A D M I T T E D   C O N T I N U E D

| 2. | NO. | DESCRIPTION | PAGE |
|----|-----|-------------|------|
| 3 | 119 | Photograph | 18 |
|   | 120 | Photograph | 18 |
| 4 | 121 | Photograph | 18 |
|   | 122 | Photograph | 18 |
| 5 | 123 | Photograph | 18 |
|   | 124 | Photograph | 18 |
| 6 | 125 | Photograph | 25 |
|   | 126 | Photograph | 25 |
| 7 | 127 | Photograph | 25 |
|   | 128 | Photograph | 25 |
| 8 | 129 | Photograph | 25 |
|   | 130 | Photograph | 25 |
| 9 | 131 | Photograph | 25 |
|   | 132 | Photograph | 25 |
| 10 | 133 | Photograph | 25 |
|   | 134 | Photograph | 25 |
| 11 | 135 | Photograph | 25 |
|   | 237 | Bloodstained Knife | 43 |
| 12 | 238 | Small envelope containing hair | 42 |
|   | 239 | Small envelope containing hair | 41 |
| 13 | 240 | Broken piece of lamp | 24 |
|   | 241 | Bloodstained broken piece of lamp | 19 |
| 14 | 242 | Bloodstained broken piece of lamp | 21 |
|   | 243 | Bloodstained broken piece of lamp | 23 |
| 15 | 245 | Bloodstained napkin | 35 |
|   | 246 | Bloodstained paper | 36 |
| 16 | 248 | Cut cell phone cord | 37 |
|   | 251 | Bloodstained hair barrette and plastic baggie | 42 |
| 17 | 252 | Victim's shorts at the time of death | 32 |
|   | 256 | Bloodstained blanket | 35 |
| 18 | 260 | Barstool in red plastic | 33 |
|   | 263 | Lamp in box | 28 |
| 19 | 321 | Map with measurements | 38 |
|   | 322 | Map of apartment complex | 38 |
| 20 | 323 | Bloodstained silverware tray | 34 |

21

22

23

24

25

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

4

```
 1              MESA, ARIZONA, TUESDAY, SEPTEMBER 14, 2004

 2

 3              THE COURT:  Good afternoon.  This is cause number

 4   CR 2000-096032, State of Arizona versus Wendi Elizabeth

 5   Andriano.  The record will reflect the presence of the

 6   Defendant, Counsel and the jury.  Dennis Olson is on the

 7   witness stand and when we recessed yesterday evening, and

 8   he's on the witness stand at this time.  We'll continue with

 9   the direct examination by Mr. Martinez.

10              Mr. Martinez?

11

12                   DENNIS OLSON,

13              CALLED TO TESTIFY BY THE STATE,

14   HAVING FIRST BEEN DULY SWORN, FURTHER TESTIFIES AS FOLLOWS:

15

16   CONTINUED DIRECT EXAMINATION BY MR. MARTINEZ:

17        Q.    Good afternoon.  Your name, please?

18        A.    Dennis Olson.

19        Q.    And are you the same individual that was

20   testifying yesterday?

21        A.    Yes, sir.

22        Q.    And we were about to go over some photographs,

23   and we'll start with Exhibit Number 89 and I'll ask you to

24   step down.  And we also have 294 up, which is a diagram.

25              What does that show us?
```

1       A.      This is the hallway that leads east from the

2   dining room and the living room area back to the back bedroom

3   and master bathroom.

4       Q.      If you could come down to Exhibit 294 and sort

5   of stand there and show us where that is leading to?

6       A.      Photograph leads down the hallway to the

7   northeast bedroom and to the master bedroom and bathroom.

8       Q.      Previously, again, and if you don't mind

9   referring to Exhibit 294, we talked about a door leading up

10  to -- out from the master bedroom that leads out to the patio

11  and then outside.  Could you show us where that is?

12      A.      Yes.  This is a door that leads from the master

13  bedroom to the rear porch.

14      Q.      We talked about a door from the living room led

15  to this -- to the same patio.  On Exhibit 294, if you could

16  show me where that door is?

17      A.      The west side of the patio leads from the

18  living room to the patio.

19      Q.      Let's take a look now at Exhibit Number 90.

20  And what does that show us?

21      A.      That's a photograph of the dining room table

22  and the dining room which is located in the north section of

23  the apartment just east of the kitchen.

24      Q.      And this item right here (indicating), what is

25  that?

1      A.      That's a bar stool.

2      Q.      And is that the bar stool we have here today?

3      A.      Yes, same one as this Exhibit, 259.

4      Q.      And on the table there appears or there is some

5  paper.  You see where I'm pointing to?

6      A.      Yes.

7      Q.      On that paper, were you able to determine

8  whether or not there were any drops of blood?

9      A.      Yes.

10      Q.      And in terms of, again, of that paper, were you

11  able to make a determination as to -- and we have three terms

12  that you were using yesterday -- as to what type that was?

13      A.      Yes.  That would be cast-off blood spatter.

14      Q.      Exhibit 91 is a photograph of what?

15      A.      This is the north wall of the dining room which

16  is this area at the top of the diagram.

17      Q.      And what is this right here?

18      A.      That's a large mirror that's on the north wall.

19      Q.      If we go back to Exhibit 90, where would the

20  mirror be on this photograph?

21      A.      It's at the top portion of the photograph, just

22  above the chair.

23      Q.      Exhibit 92, what is that?

24      A.      That's a photograph of a mirror on the north

25  wall of the dining room and I have on the mirror marked

1    bloodstains.

2          Q.    And that would be right here?

3          A.    Yes.

4          Q.    This photograph that's right here in the

5    mirror, is that just a reflection or is that -- do you see

6    this right here (indicating)?

7          A.    Yes.

8          Q.    This picture right here?

9          A.    That's a reflection of the photograph that's on

10   the -- the east wall of the dining room.

11         Q.    And 93?

12         A.    Just a close up of one of the bloodstains

13   that's on the mirror --

14         Q.    And --

15         A.    -- with the scale in it.

16         Q.    -- when you said you were scaling it, what does

17   that mean?

18         A.    We have little one inch strips that measures in

19   millimeters the measurement and we put it next to the

20   bloodstain to show how big it is in the photograph.

21         Q.    94?

22         A.    This is a picture of another bloodstain on the

23   mirror with the scale.

24         Q.    And, again, was this -- what kind of blood was

25   this in terms of the three types we talked about?

1       A.      Cast off.

2       Q.      And cast-off is where somebody is swinging an

3  object that may have blood on it?

4       A.      Yes.

5       Q.      How far away was this mirror from the body?

6       A.      Say approximately 12, 15 feet.

7       Q.      Exhibit Number 95, what does that show us?

8       A.      These are bloodstains that's located on the

9  wall above the mirror on the north wall of the dining room.

10      Q.      And this brown item that starts here and goes

11  up right here and then -- what is that right there

12  (indicating)?

13      A.      That's the west side of the dining room chair.

14      Q.      And the mirror that we were just looking at,

15  where would it be in relationship to this particular

16  photograph?

17      A.      It would be above it.

18      Q.      And there seems to be three spots that are

19  marked there.  Is that correct?

20      A.      Yes.

21      Q.      Is that the only drops that you found there or

22  were there more?

23      A.      I think there's more on the other side.

24      Q.      And 96?

25      A.      That's just a close up of one of the

1    bloodstains that is on the north wall.

2.        Q.      97?

3         A.   Another close up of a bloodstain on a north

4    wall.

5         Q.      And, again, those are cast-off?

6         A.      Cast off, yes.

7         Q.      And Number 98, what is that?

8         A.      A Cast-off bloodstain on the north wall.

9         Q.      Exhibit 99, first of all, what is that?

10        A.      That is a children's plastic chair.

11        Q.      And where is it located on 294?

12        A.      I believe it's located right here (indicating).

13   It's just west of the table and against the north wall.

14        Q.      And of interest to us, is there any blood on

15   this one?

16        A.      Yes.

17        Q.      Show me where?

18        A.      There's bloodstain at the bottom of the chair,

19   and I believe this is a bloodstain also.

20        Q.      In relationship to the bloodstains on the wall,

21   where would the wall be, the one that had the bloodstains,

22   the ones we just talked about, Exhibit 97, 98, and 96 and 95?

23        A.      It would be the wall in this area right here

24   just above it.

25        Q.      And the mirror that also had the bloodstains,

1    where would it be if we use this photograph as a reference?

2              A.    It would be above this chair on the wall.

3              Q.    And finally, if we look at Exhibit 100, what is

4    that?

5              A.    That's a close up of the bloodstain that's on

6    the bottom of the chair.

7              Q.    I'm going to show you some more photographs,

8    Exhibits 101 through 108.  Go ahead and take a look at them.

9                    (Pause in proceedings.)

10   BY MR. MARTINEZ:

11             Q.    Do you recognize what's in those photographs?

12             A.    Yes, I do.

13             Q.    What's in them?

14             A.    They're pictures of bloodstains that's located

15   in the kitchen area on the refrigerator, countertop.

16             Q.    And, again, are these photographs accurate

17   representations of the kitchen area and the cabinets as it

18   existed back on October 8 of year 2000?

19             A.    Yes.

20             MR. MARTINEZ:  Move for admission of exhibits 101

21   through 108.

22                   (Pause in proceedings.)

23             MR. PATTERSON:  I have the same position, Judge.

24             THE COURT:  Exhibit Numbers 101, 102, 103, 104, 105,

25   106, 107, and 108 for identification are admitted into

1    evidence.

2                      (Pause in proceedings.)

3    BY MR. MARTINEZ:

4         Q.    Let's talk about Exhibit 101.   What does that

5    show us?

6         A.    This is a photograph of the refrigerator and

7    the kitchen area and showing the bloodstains on the east

8    corner of the refrigerator.

9         Q.    And Exhibit 102?

10        A.    Is a close up of the bloodstain that's on the

11   corner of the refrigerator.

12        Q.    And how would you characterize it?   What term

13   would you use to describe that?

14        A.    Transfer, smear.

15        Q.    And specifically what does that mean, a

16   transfer or smear?

17        A.    Object that's bloody is touching another object

18   that's not bloody and transferring the blood to that

19   non-bloody surface.

20        Q.    Okay.   103, what does that show us?

21        A.    This is the north end of the countertop that

22   leads into the kitchen that shows the bloodstains on the

23   countertop.

24        Q.    In relationship to Exhibit 102, next to the

25   stove here that we talked about, where would this bloodstain

1    be?

2            A.    The -- the refrigerator is located on the right

3    side of the photograph here and the bloodstain is up here in

4    the corner.

5            Q.    And, again, what type of bloodstain is that?

6            A.    That appears to be finger swipes, transfer.

7            Q.    Same as the one in Exhibit 102?

8            A.    Yes.

9            Q.    So it's a transfer or smear as you call it?

10           A.    Yes.

11           Q.    Exhibit 104?

12           A.    This is a photograph of the bloodstain that's

13   on the kitchen floor and also the cellular cord which goes to

14   a cell phone.

15           Q.    And this blood that's down here, we've talked

16   about a number of them -- transfers, cast-offs, smears --

17   what is this right here on the floor?

18           A.    Looks like there's blood drops and also there's

19   a smear in the blood on the floor.

20           Q.    With regard to the drops as you call them, how

21   would they -- how could that have been placed there?   In

22   other words, we've talked about other drops that are cast-off

23   and we've talked about other drops that are spattered on

24   there.  How -- are these the same or are these blood drops

25   the same or different from those?

1      A.     These would be different.  This is more like a
2  passive blood drop where blood is on an object or hand where
3  it's dropping off the hand or object onto the floor.
4      Q.     You used another term, passive blood drop.  If
5  you could just describe that?
6      A.     Passive is just the normal flow of blood. If
7  you have a bloody object or hand or whatever, when there's so
8  much blood on it that blood is dropping off that object and
9  onto the floor, that's what we call a passive blood drop.
10     Q.     Okay.  105, what does that show?
11     A.     This is the left side of the refrigerator and
12  it shows the finger smears on the freezer part and also on
13  the refrigerator part of the door.
14     Q.     We previously talked about what may have been
15  other smears on the right hand side of the photograph,
16  correct, on the refrigerator?
17     A.     That's correct.
18     Q.     And 106, what does that show us?
19     A.     This is a close up photograph of the finger
20  smears.  You can see four different marks of the blood
21  smears.
22     Q.     Exhibit 107, first of all, tell us where it is
23  in relationship to the refrigerator and counter and tell us
24  what it is?
25     A.     This is the, I guess what you call, the

1    silverware drawer.  This is the refrigerator, this is

2    directly west.  This is the top of the countertop, and this

3    would be the top drawer of that countertop, and this is a

4    silverware drawer that had some bloodstains on it.

5         Q.    And is this the position that this silverware

6    drawer was found in?

7         A.    When we arrived, yes.

8         Q.    And 108?

9         A.    Just a close up of the blood smears on the

10   drawer and also on the measuring spoon.

11        Q.    And just so I understand, you indicated these

12   were smears all around this particular drawer?

13        A.    That's what I would call them, yes.

14        Q.    Are any of these the passive blood drops that

15   you described previously?

16        A.    No.  They're blood smears.

17        Q.    Let's continue looking at some photographs.

18   Let's go to Exhibit 110 through 114.  Please take a look at

19   those.

20             (Pause in proceedings.)

21   BY MR. MARTINEZ:

22        Q.    Do you recognize what's in those photographs?

23        A.    Yes, I do.

24        Q.    What is it?

25        A.    They're photographs of the green chair that

1    contains the bloodstained pillow in the living room.

2         Q.    Are these true and accurate depictions of the

3    pillow and chair as it existed back on October 8, 2000?

4         A.    Yes, sir.

5         MR. MARTINEZ:  I move for admission of Exhibits 110

6    through 114.

7              (Pause in proceedings.)

8         MR. PATTERSON:  I have the same position, Judge.

9    Thank you.

10             THE COURT:  Exhibit Numbers 110, 111, 112, 113 and

11   114 are admitted into evidence.

12             (Pause in proceedings.)

13   BY MR. MARTINEZ:

14        Q.    Let's take a look at Exhibit 110.  What does

15   that show us?

16        A.    This is the green chair that's against the east

17   wall of the living room, the bloodstained pillow.  This is a

18   hallway that leads to the east portion of the apartment.

19        Q.    And these things that are sticking up here,

20   what are those?

21        A.    That's the broken bar stool that's laying on

22   the floor.

23        Q.    And Exhibit 111?

24        A.    This is when we picked up the pillow to

25   photograph both sides.  I believe this is the bottom side of

1    the pillow laying on the seat of the chair.

2         Q.    And these -- we've talked about smears, passive

3    blood drops, cast-off and spatter.  These particular blood

4    patterns, what are they called?

5         A.    They would be called transfer smear patterns.

6         Q.    And are these -- is there anything unusual or

7    different about these particular transfers?

8         A.    Not on this side of the pillow, no.

9         Q.    Okay.  How about on Exhibit 112?  What does

10   that show us?

11        A.    This is the other side of the pillow, this is

12   the transfer that you see on the other photograph on this

13   side of the pillow.  And this has what we call expired

14   blood pattern on top of the pillow.

15        Q.    What -- if you could explain, what does

16   expired blood pattern mean or what is that?

17        A.    Expired blood is blood in your nose or your

18   mouth and you expirate it.  As you're trying to breathe,

19   you're blowing out blood out of your mouth and nose.

20        Q.    And Exhibit 113?

21        A.    Just a close up of the expired blood pattern

22   on the pillow.

23        Q.    114, what does that show us?

24        A.    Item Number 18 is a broken piece of metal lamp

25   that we found on the seat of the couch.  This is the

1   bloodstained pillow that was next on it -- sorry, this was on

2   the green chair, not on the couch.

3          Q.    With regard to this particular pillow, was it

4   on top of the piece of lamp or is this how you found the lamp

5   and the -- what we believe to be a piece -- and the pillow?

6          A.    No.  This is how we found it.

7          Q.    And if you take a look at Exhibit 110 from a

8   different perspective, the number 18 that you guys numbered

9   would have been where?

10          A.    It would have been in this corner of the chair

11   below the pillow.

12          Q.    And was the pillow covering that or to the side

13   of that particular item?

14          A.    I believe it was just like we found it.  It was

15   just in that little open area of the seat and the pillow was

16   laying like crossways.

17          Q.    Let me show you some photographs and let's

18   continue talking about these items that were found, and I

19   want you to -- to that end, I want you to take a look at

20   Exhibits 115 through 124.

21                (Pause in proceedings.)

22   BY MR. MARTINEZ:

23          Q.    What do they show?

24          A.    They're specific photographs of the broken lamp

25   pieces, some of the bloodstains that we have in the living

1    room.

2              Q.    And is this a true and accurate depiction of

3    these pieces as they were when you found them back on October

4    8 of the year 2000?

5              A.    Yes, sir.

6              MR. MARTINEZ:   Move for admission of Exhibits 115

7    through 124.

8                    (Pause in proceedings.)

9              MR. PATTERSON:   Same position, Judge.   Thank you.

10             THE COURT:   Exhibit Numbers 115, 116, 117, 118, 119,

11   120, 121, 122, 123, and 124 for identification are admitted

12   into evidence.

13                   (Pause in proceedings.)

14   BY MR. MARTINEZ:

15             Q.    Let's start by taking a close up look at

16   exhibit -- of where your Number 18 is, which is Exhibit 115.

17   What does that show us?

18             A.    This is a piece of broken lamp found on the

19   corner of that green chair.

20             Q.    And is that the bottom or the top -- the design

21   side or outer part of the piece?

22             A.    It -- it's the inner part.

23             Q.    And if you take a look at 116, that shows us

24   what?

25             A.    It's the same piece of lamp that's placed on a

1    blue piece of paper and this shows the outer part of the

2    lamp.

3         Q.    Did this appear to be what you believe to be

4    blood on that particular item?

5         A.    Yes.

6         Q.    Now, I'm going to show you what has been marked

7    for identification as Exhibit 241 and, it's actually opened a

8    little bit, but take a look at it.  Do you recognize that?

9         A.    Yes.

10        Q.    What is it?

11        A.    It's Item Number 18, that broken piece of lamp.

12        MR. MARTINEZ:  I move for admission of Exhibit 241.

13        MR. PATTERSON:  No objection.

14        THE COURT:  Exhibit 241 for identification is

15   admitted into evidence.

16             (Pause in proceedings.)

17   BY MR. MARTINEZ:

18        Q.    Let's take a look at it on the ELMO and see

19   what it actually looks like.  What is this right here

20   (indicating)?  What is that?

21        A.    Some kind of design that's on the piece of

22   lamp.

23        Q.    Does it also appear to be a design right here

24   (indicating) going up and down?

25        A.    Yes.

1    Q.    Let's take a look at Exhibit 117.  First of

2    all, let's start with what is this item right here on the

3    left.

4         A.    That is the I would call the left side of that

5    green chair that's against the east wall of the living room,

6    and then this is the north portion of the couch that's

7    against the east wall.  There's a small table in between

8    them.

9         Q.    What about the -- is this the table where your

10   Number 18 was found, which is our Exhibit Number 241?  Is

11   that where it was found?

12        A.    It was found on top of this green chair.

13        Q.    All right.  And what is this right down here at

14   the bottom?

15        A.    This is the broken piece of stool.

16        Q.    And there seems to be something yellow right

17   there.  Do you know what that is?

18        A.    Yes.  These are number placards we use to

19   identify evidence so we could photograph it and collect it.

20        Q.    Take a look at Number 118.  What is it we're

21   looking at there?

22        A.    Item Number 16 is another piece of broken lamp

23   that was found on the floor, and 15 is the paper napkin that

24   we found that has bloodstains on it.

25        Q.    That would be this right here, the paper

1    napkin, right?

2           A.    Yes, sir.

3           Q.    And Exhibit Number 119, what does that show?

4           A.    That is a piece of broken lamp.  The shadow is

5    covering up the majority of it.

6           Q.    But if we take a look at Exhibit 120, what does

7    that show us?

8           A.    This is the same piece of broken lamp on the

9    floor.

10           Q.    I want you to take a look at Exhibit Number

11    242.  Do you recognize that?

12           A.    Yes.

13           Q.    What is it?

14           A.    It's Item Number 16, the broken piece of lamp.

15           Q.    And that's the one we're taking a look at

16    that's pictured in Exhibit 120?

17           A.    Yes.

18           Q.    Does that also have what you believe to be the

19    presence of blood on it?

20           A.    Yes, sir.

21           MR. MARTINEZ:  Move for admission of Exhibit 242.

22           MR. PATTERSON:  No objection, Judge.

23           THE COURT:  Exhibit 242 for identification is

24    admitted into evidence.

25                    (Pause in proceedings.)

1    BY MR. MARTINEZ:

2         Q.    And with regard to this one, if you could just

3    sort of --

4         MR. MARTINEZ:  If the Court will permit, may he walk

5    this in front of the jury, Your Honor?

6         THE COURT:  Yes.

7         MR. MARTINEZ:  Sort of walk it starting at that end.

8              (Pause in proceedings.)

9    BY MR. MARTINEZ:

10        Q.    Sir, if we take a look at Exhibit 241, when we

11   take a look at Exhibit 242 side by side, they appear to have

12   the same sort of -- or do they appear to have the same sort

13   of design to them?

14        A.    Yes, they do.

15        Q.    Let's take a look at Exhibit 121.  Do you

16   recognize what's there?

17        A.    Yes.  Item Number 20 is another piece of broken

18   lamp found on the floor in front of the green chair.  This is

19   the bloodstained pillow that was on top of the green chair

20   that we've already talked about.

21        Q.    In fact, if we take a look at 112, that's the

22   one we're talking about?

23        A.    Yes, sir.

24        Q.    And 122?

25        A.    That's the close up photograph of Item Number

1   20, which is another piece of broken lamp.

2        Q.   Going to show you Exhibit Number 243.  Please

3   take a look at it.  Do you recognize it?

4        A.   Yes.

5        Q.   What is it?

6        A.   Item Number 20, broken piece of lamp.

7        Q.   Did it appear to you to have a substance on it

8   that you believed to be blood?

9        A.   Yes.

10       MR. MARTINEZ:  Move for admission of Exhibit 243.

11       MR. PATTERSON:  No objection.

12       THE COURT:  Exhibit Number 243 for identification is

13   admitted into evidence.

14        (Pause in proceedings.)

15   BY MR. MARTINEZ:

16        Q.   And if we could just take a look at it, does it

17   appear to have the same designs as the other parts of the

18   what you've described as lamps, maybe, for example, Number

19   242 -- 241?

20        A.   Yes.

21        Q.   Let's now look at Exhibit 123.  And if you

22   could orient us first where that is and tell us what we're

23   looking at?

24        A.   This is the entryway in the front door into the

25   living room.  This is the closet.  This is the carpet to the

1  living room, and this is the west wall where the trash can

2  was located.

3       Q.    And what is this item that's right here near

4  the entryway?

5       A.    That's a broken piece of lamp.

6       Q.    I'm now going to show you Exhibit Number 124.

7  What is that?

8       A.    This is a broken piece of lamp.

9       Q.    That's a close up of it, correct?

10      A.    Yes.

11      Q.    I'm now going to show you Exhibit 240.   Please

12  take a look at it.

13      A.    Okay.

14      Q.    What is it?

15      A.    It's this piece of broken lamp found at the

16  entryway to the living room.

17           MR. MARTINEZ:  I move for admission of Exhibit 240.

18           MR. PATTERSON:  No objection, Judge.

19           THE COURT:  Exhibit Number 240 for identification is

20  admitted into evidence.

21  BY MR. MARTINEZ:

22      Q.    And, again, did this also appear to have the

23  presence of blood on it?

24      A.    Yes.

25      Q.    Let me show you some other photographs,

1    Exhibits 125 through 135.

2                    (Pause in proceedings.)

3    BY MR. MARTINEZ:

4           Q.    Do you recognize what's there?

5           A.    Yes.

6           Q.    What is it?

7           A.    These are photographs of the master bedroom.

8           Q.    Are these true and accurate photographs of the

9    master bedroom as it existed back on October 8th, 2000?

10          A.    Yes.

11          MR. MARTINEZ:  Move for admission of exhibits 125

12   through 135.

13                   (Pause in proceedings.)

14          MR. PATTERSON:  May I have a moment with the county

15   attorney, Your Honor?

16          THE COURT:  Yes.

17                   (Attorney-attorney discussion.)

18          MR. PATTERSON:  I have the same position with regard

19   to the photographs, Judge.

20          THE COURT:  Exhibit Numbers 125 through 135 for

21   identification are admitted into evidence.

22                   (Pause in proceedings.)

23   BY MR. MARTINEZ:

24          Q.    Let's take a look at Exhibit 125.  What does

25   that show us?

1          A.    This is a photograph of the master bedroom, the
2    east wall along the north wall of the bedroom.
3          Q.    And if you could come down to the diagram,
4    which is 294, and show us where that --
5          A.    It would be standing on the west side shooting
6    a photograph in this direction (indicating) showing the lamp
7    and the north side of the bed.
8          Q.    Now, what is this object that's right here?
9          A.    It's a lamp.
10          Q.    Take a look at Exhibit 126.  What does that
11    show us?
12          A.    That's a close up of the lamp on the nightstand
13    next to the bed.
14          Q.    And Exhibit 127?
15          A.    It's a close up of the design of the lamp.
16          Q.    128?
17          A.    It's a close up of the design of the lamp.
18          Q.    129, what does that show us?
19          A.    We're standing in the -- it would be the
20    northeast corner of the bedroom looking southwest.  It's a
21    photograph of the foot of the bed and the west wall showing a
22    dresser and then the door that leads out onto the patio.
23          Q.    This is the door that would go to the patio.
24    Is that correct?
25          A.    Yes, sir.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005886

1          Q.    What is this right here in the middle?

2          A.    That's an open box that used to contain one of

3     these lamps.

4          Q.    If you could show us on 294 where the box would

5     be?

6          A.    The box would be on -- I don't know what you

7     call it -- the little table at the foot of the bed.

8          Q.    Exhibit 130, what does that show us?

9          A.    We're now standing in the southwest corner

10    looking northeast.  It shows the open box for the lamp and

11    the dresser against the north wall and the lamp in the

12    northeast corner.

13         Q.    The lamp -- this is a box?

14         A.    Yes.

15         Q.    Exhibit 131?

16         A.    We're standing at the northwest corner of the

17    bedroom looking south and it shows the box at the foot of the

18    bed and the table that it's on.  And also, at the top

19    left-hand corner, there's the glass lamp shade that goes on

20    top of the lamp.

21         Q.    If we go back to Exhibit 126, does this have a

22    glass lamp shade already on it?

23         A.    Yes, it does.

24         Q.    Exhibit 132?

25         A.    It's a photograph of a box that contains one of

1    those lamps.

2         Q.    And up here, what is that (indicating)?

3         A.    That's a lamp in the northeast corner of the

4    bedroom that appear to be the same design that's on the box.

5         Q.    Exhibit 133?

6         A.    It's a close up of the box.

7         Q.    Exhibit 134?

8         A.    We're standing on the north side of the bed,

9    looking south, and it shows the glass lamp shade on top of

10   the bed, and that's the window that oversees the south side

11   of the property.

12        Q.    And Exhibit 135?

13        A.    That's a picture of the lamp shade that's on

14   the bed with the light bulb, and also the washer that helps

15   tighten down the light shade on top of the lamp.

16        Q.    Why don't you go ahead and take a seat.

17             Go ahead and take a look at exhibit 263.   What

18   is it?

19        A.    It's the lamp that's located in the northeast

20   corner of the bedroom.

21        Q.    And if we take a look at Exhibit 126, is that

22   the lamp you're talking about?

23        A.    Yes.

24        Q.    If I may have it back.

25             MR. MARTINEZ:  Move for the admission of Exhibit

1   263.

2                    (Pause in proceedings.)

3          MR. PATTERSON:  I have no objection, Judge, although

4   can I just inquire of the witness?  There's a broken light

5   bulb in here.  Was it broken at the time you put it in the

6   box?

7          THE WITNESS:  I don't think so no.

8          MR. PATTERSON:  It may have been broken being

9   transported either from this apartment to your police station

10  or from the police station to the courtroom?

11         THE WITNESS:  That's correct.

12         MR. PATTERSON:  No objection, Judge.

13         THE COURT:  Exhibit 263 for identification is

14  admitted into evidence.

15  BY MR. MARTINEZ:

16         Q.   Why don't you go ahead and hold it up so people

17  can see it.  And the designs on that match the designs, for

18  example, on Exhibit Number 241?

19         A.   Yes, it does.

20         Q.   And how about the design of that?  Does it

21  match the design on Exhibit Number 242?

22         A.   Yes.

23         Q.   And does it match the design on Exhibit Number

24  243?

25         A.   Yes it does.

1          Q.    And does it match the exhibit on -- the design

2    on Exhibit Number 240?

3          A.    Yes, it does.

4          Q.    If you could take a look at Exhibit 294 from up

5    there and if you could step down and show us where these

6    pieces were found of the lamp?

7          A.    I don't know which exhibit numbers, but there's

8    one found at the entry way from front door to the living

9    room, one on top of this green couch, one on the south side

10   of the couch, and one on the west side --   I'm sorry, the

11   green chair, and one in front of the green chair.

12         Q.    And the lamp itself, the one that we have right

13   behind you, where was that found?

14         A.    It's located in the northeast corner of the

15   master bedroom.

16         Q.    And was the box that was found for this lamp or

17   another lamp the same as this one?  Where was this found?

18         A.    Found on the little table at the foot of the

19   bed.

20         Q.    All right.  What is this?

21         A.    This is the glass lamp shade.  That's what I

22   call it.

23         Q.    Okay.  And there was two of those, correct,

24   back at the apartment?

25         A.    Yes, one laying on the bed and one actually on

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005890

```
 1    the lamp.

 2            Q.      Go ahead and have a seat.

 3                    Were you -- did you or any other members of the

 4    Phoenix Police Department, were they ever able to find the

 5    other lamp?

 6            A.      No.

 7            Q.      Did the Phoenix Police Department look

 8    throughout the living room where the body was found?

 9            A.      Yes.

10            Q.      Did they look through the kitchen?

11            A.      Yes, sir.

12            Q.      How about the living room area?  Not the living

13    room, but the dining room area.  Did they look there?

14            A.      Yes.

15            Q.      How about the children's bedrooms?  Did you

16    look there?

17            A.      Yes.

18            Q.      How about the master bedroom?

19            A.      Yes.

20            Q.      Did they look through every part of that

21    apartment?

22            A.      Yes.

23            Q.      Were they successful in finding the base, if

24    you will, with these designs on it anywhere in that

25    apartment?
```

1      A.    No.

2      Q.    Let me talk to you a little bit more about some

3  of the items that have been found there.  Take a look at

4  Exhibit 252.  What is that?

5      A.    This is a pair of green shorts that the victim

6  was wearing.

7      Q.    And these were the ones that the police seized?

8      A.    Yes.

9      Q.    If I may have them back.

10     MR. MARTINEZ:  Move for the admission of Exhibit 252.

11     MR. PATTERSON:  I have no objection, Judge.  Thank

12  you.

13     THE COURT:  Exhibit 252 for identification is

14  admitted into evidence.

15          (Pause in proceedings.)

16  BY MR. MARTINEZ:

17     Q.    Officer, if you could just take Exhibit 252

18  out.  You may not need the scissors, but hold it up so we

19  could see it.

20          (Pause in proceedings.)

21  BY MR. MARTINEZ:

22     Q.    And that -- that would be the front that you're

23  showing us?

24     A.    Yes.

25     Q.    And if you could show us the back.  With regard

1      to the belt, is it the kind that stays on there all the time

2      or is it the kind that you actually have to get an

3      independent belt that goes around?

4              A.    No, it's an independent belt.

5              Q.    If you could put that away, please.

6                    Let's take a look at Exhibit Number 260, can

7      you tell me what that is?

8              A.    This is the bloodstained pillowcase.

9              Q.    And where was it found?

10             A.    It was found on the pillow on the green chair

11     in the living room.

12             Q.    If I may have it back.

13             MR. MARTINEZ:  Move for the admission of Exhibit 260.

14             MR. PATTERSON:  I have no objection, Judge.

15             THE COURT:  Exhibit 260 for identification is

16     admitted into evidence.

17     BY MR. MARTINEZ:

18             Q.    Why don't you go ahead and open it for us and

19     hold it up so we could take a look at it.

20                    (Pause in proceedings.)

21             THE WITNESS:  You want me to take it out of the bag

22     or just --

23             MR. MARTINEZ:  Yes, please.  And if you could just

24     hold it up so we could look at it.

25                    (Pause in proceedings.)


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

# APPENDIX G - Part 1

05-0005 1
Braccio

DP



1    IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

2    IN AND FOR THE COUNTY OF MARICOPA

3

4    STATE OF ARIZONA,            )
                                  )
5         Plaintiff,              )
                                  )
6    v.                           )    No. 1 CR 05-0005 AP
                                  )    MARICOPA COUNTY
7    WENDI ELIZABETH ANDRIANO,    )    No. CR 2000-096032
                                  )
8         Defendant.              )
     _____)

9

10

11

12              Mesa, Arizona
                October 4, 2004

13

14

15

16    BEFORE:  The Honorable BRIAN K. ISHIKAWA

17

18    REPORTER'S TRANSCRIPT OF PROCEEDINGS

19              TRIAL DAY 22

20

21

22

23

24    ORIGINAL Prepared for APPEAL by:
      TRACI L. WHEELER, CSR, RPR
25    Certified Court Reporter No. 50313


      TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

2

```
 1                     A P P E A R A N C E S

 2    FOR THE STATE:        JUAN M. MARTINEZ,
                            Deputy County Attorney
 3
      FOR THE DEFENDANT:    DANIEL B. PATTERSON,
 4                          Deputy Public Defender
                                    and
 5                          G. DAVID DELOZIER,
                            Attorney at Law
 6

 7           I N D E X   O F   E X A M I N A T I O N

 8    WITNESS                                           PAGE
```

```
 9    OCHOA, DONNA, Called on behalf of the Defendant
              Direct Examination by Mr. DeLozier           5
10        Voir Dire Examination by Mr. Martinez           28
          Continued Direct Examination by Mr. DeLozier    29
11        Voir Dire Examination by Mr. Martinez           30
          Continued Direct Examination by Mr. DeLozier    31
12        Continued Direct Examination by Mr. DeLozier    90
```

```
13

14        E X H I B I T S   A D M I T T E D   I N   E V I D E N C E

15    NO.      DESCRIPTION                               PAGE
```

```
16    406      Photograph                                 30
      407      Photograph                                 27
17    408      Photograph                                 29
      420      Photograph                                 63
18    421      Photograph                                 63
      422      Photograph                                135
19    423      Photograph                                135
      430      Photograph                                114
20    431      Photograph                                110
```

```
21

22

23

24

25
```

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

```
 1              MESA, ARIZONA, MONDAY, OCTOBER 4, 2004

 2

 3         THE COURT:  Good afternoon.  This is trial in cause

 4    number CR 2000-096032, State of Arizona versus Wendi

 5    Elizabeth Andriano.  The record will reflect the presence of

 6    the Defendant, Counsel, and the jury.

 7                   Mr. DeLozier?

 8         MR. DELOZIER:  Thank you, Your Honor.  First off,

 9    I'd like to withdraw some of the exhibits that we had marked

10    we don't plan to use.

11         MR. MARTINEZ:  Judge, if we could approach if he'll

12    be making this kind of record?

13         THE COURT:  Let me see Counsel at the bench.

14

15              (The following proceedings were held at the

16    bench:)

17

18         THE COURT:  You don't have to withdraw.  Just move

19    not to have them admitted into evidence.

20         MR. MARTINEZ:  That's right.  They stay there.  If I

21    need to use them, they're there.

22         THE COURT:  Right.

23         MR. DELOZIER:  We were going to withdraw them just

24    to get them out of the clerk's office and I wanted to give

25    them back to the family.
```

1        MR. MARTINEZ:  They've been marked for identification

2   and should stay as part of the record even though they are or

3   aren't going to be admitted into evidence.

4        MR. DELOZIER:  Okay.

5        THE COURT:  Right.

6

7        (The following proceedings were held in open

8   court:)

9

10       THE COURT:  Mr. DeLozier?

11       MR. DELOZIER:  Call Donna Ochoa, please.

12

13                  DONNA OCHOA,

14       CALLED TO TESTIFY ON BEHALF OF THE DEFENDANT,

15    HAVING FIRST BEEN DULY SWORN, TESTIFIES AS FOLLOWS:

16

17       THE COURT:  Please have a seat on the witness stand.

18   Please make yourself comfortable there on the witness stand.

19   Please pull the microphone close to you.  Please remember to

20   speak loudly and clearly into the microphone so everyone can

21   hear you.  Please wait until the question is completed before

22   you answer the question, and please make sure you give a

23   verbal response.  Is that agreeable to you?

24       THE WITNESS:  Yes, it is.

25       THE COURT:  Mr. DeLozier, you may proceed.

1          MR. DELOZIER:  Thank you, Your Honor.

2

3     DIRECT EXAMINATION BY MR. DELOZIER:

4          Q.    Would you please state your full name?

5          A.    My name is Donna Elizabeth Ochoa.

6          Q.    And who's your husband?

7          A.    My husband is Alejo Ochoa.

8          Q.    And do you have any children?

9          A.    Yes, I do.  I have two children, Wendi -- Wendi

10    Elizabeth Andriano and Brandon Henry Ochoa.

11         Q.    Okay.  How long have you lived in Casa Grande?

12         A.    I've lived in Casa Grande probably about total

13    around 31 years minus a couple years.

14         Q.    Can you give us a little bit of your

15    educational background?

16         A.    I graduated from high school in Tucson,

17    Arizona.  I have attended Eastern Arizona College.  Also

18    University of Phoenix, Phoenix College.  I have an Associates

19    degree.

20         Q.    In what?

21         A.    Actually, it's in respiratory therapy.

22         Q.    Okay.  What is your career?

23         A.    Right now I work in human resources as a senior

24    human resource analyst.

25         Q.    Where is that?

1          A.     Casa Grande Medical Center, Casa Grande,

2     Arizona.

3          Q.     Had you been previously married?

4          A.     Yes, I was.

5          Q.     And when was that marriage?

6          A.     I was married from 1968 to I believe 1974 to

7     Shelby Wayne Robertson.

8          Q.     Okay.  What happened to that marriage?

9          A.     We were divorced.

10         Q.     Okay.  And did you two have any children?

11         A.     Shelby and I had one child.  That is Wendi

12    Elizabeth who is sitting at the table.

13         Q.     Very good.  Can you tell me a little bit how

14    Mr. Shelby --

15         MR. MARTINEZ:  Objection.  Relevance.

16         THE COURT:  I didn't hear the question.  Did you

17    complete the question?

18         MR. DELOZIER:  Yes.

19         THE COURT:  What was the question again?

20         MR. DELOZIER:  Tell me about Shelby.  What kind of

21    man was he?

22         THE COURT:  Overruled.

23         THE WITNESS:  Shelby was -- well, let's put it this

24    way.  We got divorced because of two reasons.

25         MR. MARTINEZ:  Objection.  Relevance.

1          THE WITNESS:  Okay.

2          THE COURT:  I'll sustain the objection.  Why don't

3   you be a little more specific in your question.  Go ahead.

4   I'll have you restate the question.

5   BY MR. DELOZIER:

6          Q.    All right.  Can you tell me any character

7   traits that Shelby had?

8          MR. MARTINEZ:  Objection.  Relevance.

9          THE COURT:  I'll sustain the objection.

10          THE COURT:  Hold on a second.  Ask your next

11   question.

12   BY MR. DELOZIER:

13          Q.    How did he treat you?

14          MR. MARTINEZ:  Objection.  Relevance.

15          THE WITNESS:  He did not --

16          THE COURT:  I'll sustain the objection.

17   BY MR. DELOZIER:

18          Q.    Did he know Wendi?

19          A.    Yes, he did.

20          Q.    And how?

21          A.    Shelby -- Shelby knew Wendi.  She was

22   approximately, I believe, 3 years old one of the last times

23   she saw him.  I think she saw him another time after that

24   when she was young, 7 or 8.

25          Q.    When you saw them together, how did he treat

1    her?

2                MR. MARTINEZ:  Objection.  Relevance.

3                THE COURT:  Overruled.  Go ahead and answer the

4    question if you can.

5                THE WITNESS:  He treated her strictly.  I didn't like

6    how he treated her.  I felt it wasn't like a father-daughter

7    relationship.

8                MR. MARTINEZ:  Objection.  Beyond the scope.

9                THE COURT:  Ask your next question.

10   BY MR. DELOZIER:

11               Q.    What do you mean you didn't like how he treated

12   her?

13               MR. MARTINEZ:  Same objection, Your Honor.

14               THE COURT:  I'll sustain the objection.

15   BY MR. DELOZIER:

16               Q.    When did you meet Alejo?

17               A.    I met Alejo in, I believe, December of '74.

18               Q.    Where were you at the time you met him?

19               A.    I was in Casa Grande.  I was working for a drug

20   abuse center.

21               Q.    Where was he working?

22               A.    He was on the board of directors for the drug

23   abuse center in Casa Grande.

24               Q.    What was Alejo like when you met him?

25               A.    Very nice man.  Stable.  Good with children,

```
 1   friendly.  He was quiet, but very -- I liked him.
 2        Q.    Did he have any children?
 3        A.    No, he did not.
 4        Q.    How did your romance begin?
 5        A.    We started going -- actually, we started going
 6   to some church meetings together and progressed from there.
 7        Q.    Okay.  And when were you married?
 8        A.    We were married 6/6 of 1975.
 9        Q.    Were you working at that time?
10        A.    Yes, I was.
11        Q.    Where were you working?
12        A.    I was working for Pinal Alcohol and Drug Abuse
13   Center, it was called PADAC, as a counselor and grant writer.
14        Q.    Okay.  How did you and Alejo make decisions?
15        A.    After --
16   MR. MARTINEZ:  Objection.  Relevance as to how.
17   THE COURT:  I'll sustain the objection.
18   BY MR. DELOZIER:
19        Q.    Was there either -- were either of you
20   domineering over the other?
21        MR. MARTINEZ:  Objection.  Relevance.
22        THE COURT:  Let me see Counsel here at the bench.
23
24             (The following proceedings were held at the
25   bench:)
```

1

2          THE COURT:  Mr. DeLozier, I think it might be

3  relevant if you're able to tie it in to what maybe your

4  client observed, but just saying, you know -- you know,

5  basically these types of general questions, I don't find it

6  relevant.  Do you understand what I'm saying?

7          MR. DELOZIER:  Yeah, role models.

8          THE COURT:  Lay some foundation and relate it to

9  something that's relevant to the case, okay?

10         MR. DELOZIER:  Role model is what I'm doing.

11         THE COURT:  Well, but lay some foundation to show

12  that maybe when your client lived with them or what she

13  observed --

14         MR. DELOZIER:  Okay.

15         THE COURT:  -- as far as when she lived with him.

16  Lay some foundation.

17         MR. DELOZIER:  Okay.

18

19              (The following proceedings were held in open

20  court:)

21

22         THE COURT:  Mr. DeLozier?

23  BY MR. DELOZIER:

24         Q.    Thank you, Your Honor.  When did Wendi meet

25  Alejo?

1        A.    Wendi would have met Alejo in 1975.

2        Q.    Okay.  How did he treat her?

3        A.    He treated her very well.

4        Q.    Okay.

5        A.    They used to go to the store together.

6        MR. MARTINEZ:  Objection.  Narrative.

7        THE COURT:  Sustained.  Just answer the question

8   that's asked.

9   BY MR. DELOZIER:

10        Q.    Can you give some illustrations of the kinds of

11   things they did together?

12        MR. MARTINEZ:  Objection.  Lack of foundation, date

13   and time they're talking about.

14        THE COURT:  Overruled.  Answer the question if you

15   can.

16        THE WITNESS:  They would go to -- walk to the store

17   together with the dogs.  He had two really pretty dogs.  They

18   would -- sometimes Alejo babysat her and the other child that

19   was living at my apartment while I worked and while the other

20   mother went to school.  We --

21   BY MR. DELOZIER:

22        Q.    Excuse me.  This is the time period you're

23   talking about when you first met each other.  And how old was

24   she?

25        A.    She would have been 4 years old and this would

1    have been in the spring of 1975.

2         Q.   Okay.  Did -- you're referring to things that

3    took place up until the time she went to school?

4         A.   Yes.

5         Q.   Okay.  Anything else you wanted to add to your

6    illustrations?

7         A.   Yes.  He used to play tea party with the

8    girls.  Actually dug them out a little fort, and we were

9    building a house at the time and he would be out there,

10   playing tea party in the middle of the desert while the

11   construction people were watching them, kind of giggling with

12   them.

13        Q.   Uh-huh.  And when did you get married again?

14   I'm sorry.

15        A.   We got married June 6, 1975 in Florence,

16   Arizona.

17        Q.   And did the relationship between Alejo and

18   Wendi change at some point?

19        A.   Wendi and Alejo just got closer and closer.  As

20   far as Wendi was concerned, that was her dad.

21        Q.   Did he adopt her?

22        A.   Yes, he did.

23        Q.   When was that?

24        A.   He adopted her -- it would have been 2 years

25   because we had to wait.  The rule is that you have to be

1    married two years before you could adopt, and so as soon as

2    we were able we were down -- down there into the judge's

3    office adopting her.

4         Q.    Okay.  During this period of time, did Wendi go

5    to church?

6         A.    Church as in that we had church meetings at the

7    local Christian bookstore and in home.

8         Q.    Okay.  This is still prior to age 6?

9         A.    Yes, it is.

10        Q.    Okay.  Did she go to school?

11        A.    Yes, she did.  She went to kindergarten and

12   first grade at Evergreen Public Schools in Casa Grande,

13   Arizona.

14        Q.    All right.  What was -- what was she like at

15   that time?

16             MR. MARTINEZ:  Objection.  Relevance.

17             THE COURT:  Sustained.

18   BY MR. DELOZIER:

19        Q.    Did Wendi get the opportunity to see you and

20   Alejo interact?

21        A.    Yes, she did.

22        Q.    Okay.  During that -- I'm talking about the

23   period of time when she first met Alejo until she finished

24   her first year of -- of elementary school.

25        A.    How did that -- how did that interaction

1    between you and Alejo appear to Wendi?

2            A.    On occasion there would be an argument and

3    Wendi would see that and Alejo would -- would be upset and

4    Wendi and I would usually run -- not run, but go into the

5    bedroom or the bathroom and get away from any harsh words.

6            Q.    Tell me what -- what happened after first

7    grade?  What did Wendi do next?

8            A.    After first grade, we made the -- after first

9    grade, the decision was made to join up with a ministry

10   called Fishers of Men, and we went with them to travel to

11   different churches to preach in different churches, and Wendi

12   was with us.

13           Q.    How long did that last?

14           A.    It lasted approximately three years.

15           Q.    What did you do about her education at that

16   time?

17           A.    We taught her, we homeschooled her through a

18   program in Las -- I believe it was Las Cruces New Mexico.  It

19   was New Mexico.

20           Q.    How many people are you talking about going on

21   this traveling missionary group?

22           A.    There was -- let's see.  At minimum there were

23   nine of us, and the number increased, I think, one time up to

24   12.

25           Q.    How many children?

1    A.    One.

2    Q.    And that's Wendi?

3    A.    That was Wendi.  Wendi was the only child.

4    Q.    After you left -- well, let's talk a little bit

5  more about that.  Who was in charge of that group?

6    A.    Rick.

7    Q.    And when I say "in charge," he made all the

8  decisions?

9    A.    Pretty much.  It was a partnership with Rick

10  and with Alejo and -- but basically, yes, Rick made the

11  decisions.

12    Q.    Okay.  And what living conditions did you have

13  for Wendi while she was traveling?

14    A.    We had a bus and a fifth wheel.

15    Q.    Where did she sleep?

16    A.    Wendi actually slept in the fifth wheel with

17  two of the -- the young women, Rosalie and Rebecca.

18    Q.    And where did she take her home study classes?

19    A.    In the fifth wheel.  We had it set up.  There

20  was a little drop down desk where we took turns instructing

21  her using materials that were provided by Tucson Public

22  School District.

23    Q.    Do you -- do you consider that three year

24  period, four-year period a wholesome experience for Wendi?

25    MR. MARTINEZ:  Objection.  Relevance as to what she

1    considers.

2           THE COURT:  Sustained

3    BY MR. DELOZIER:

4           Q.    Did you know of any negative things that

5    occurred during that three, four-year period?

6           A.    Well, I remember one time that we couldn't -- I

7    couldn't buy Wendi shoes.  She outgrew her shoes and --

8           MR. MARTINEZ:  Objection.  Relevance.

9           THE COURT:  Overruled.  Go ahead and complete your

10   answer.

11   BY MR. DELOZIER:

12          Q.    Do you need me to repeat it?

13                (Pause in proceedings.)

14          MR. DELOZIER:  You need to take a minute?

15          THE WITNESS:   (No audible reponse.)

16          MR. DELOZIER:  Just a moment, Your Honor.

17                (Pause in proceedings.)

18          THE WITNESS:  There was one time that we couldn't buy

19   shoes because we weren't allowed to have money to buy her

20   shoes.  She didn't get to play with other children, of

21   course.  And, I mean, we couldn't even go to the -- like to

22   little laundromat or anything without Rick or Alejo and going

23   with us.  It wasn't the most normal situation.

24   BY MR. DELOZIER:

25          Q.    How did you decide to leave him?

1       A.      After -- after a period of time, Alejo said

2   that we needed to leave, and so we took our -- our van and we

3   left.

4       Q.      What -- what happened to Wendi after the

5   Fishers of Men?

6       A.      We -- we came back to Arizona and were stopping

7   in Casa Grande first and then went down to Tucson.  And were

8   there for about a month or so with her father, and then we

9   came back to Casa Grande.  But Alejo went off on some

10  training and I still homeschooled Wendi until January.  After

11  we got back in, like, September and I still homeschooled her

12  until January, and then we put her into a Christian school in

13  Casa Grande, 91st Palm Ministries.

14      Q.      Who was involved in 91st Psalm school?

15      A.      Cal Lords (phonetic) and Cal Lords was a friend

16  of mine and my husband.  Cal Lords and my husband were the

17  ones that began the drug program in Casa Grande.

18      Q.      Was he affiliated with any church group?

19      A.      No.  It's -- it's a nondenominational.

20      Q.      Was the school affiliated with a church?

21      A.      Yes.  The school was an ACE school, Accelerated

22  Christian Education school, which is affiliated with the

23  Baptist convention out of Texas.

24      Q.      Did you folks attend a church at this time?

25      A.      Yes, we did.  We attended 91st Psalm Ministries

1    and Wendi went to school there and I did volunteer work

2    there.

3         Q.    How many students was there -- were there in

4    the school at the time?

5         A.    When Wendi started school there were 24.  The

6    school was kindergarten through 12th grade.

7         Q.    Okay.  What kind of activities besides

8    education did they have at the school?

9         A.    None really.  It was more academic.  She didn't

10   have sports or extracurricular activities anything like that.

11        Q.    So no band?

12        A.    No band, no -- no other activities.

13        Q.    When you enrolled her at the school, did --

14   what was her academic rankings like?

15        A.    I'm not sure if this is what you mean, but the

16   children --

17        Q.    Based on her education at this time?

18        A.    (No audible response.)

19        Q    She went to public school two years, I think,

20   kindergarten, first grade.  Then homeschooling three or four

21   years.  Now she's moving into another school.  So was there

22   any kind of a --

23        A.    Okay.  What happens when you start the ACE

24   program is the child is tested to see what grade level that

25   they would be in or what -- actually, it's not so much grade

1    level as where they are like in math, social studies,

2    science.  So if they have missed any areas, then they kind of

3    do gaps, is what they're called, and Wendi was two to three

4    years above grade level when they tested her.

5         Q.    All right.  Thank you.  Where did you folks

6    live in relationship to the school?  It's you, Alejo and

7    Wendi at this time, right?

8         A.    Yes.  We lived probably a couple of miles away

9    from the school in a little house with a little tin roof.

10        Q.    All right.  Was the -- was Alejo -- what was

11   Alejo doing during this period of time?

12        A.    At that time Alejo went to -- he was going to

13   school for the labor union at first.

14        Q.    And were you working?

15        A.    No.

16        Q.    Okay.  How would you describe Wendi's

17   personality at this time?

18        A.    Wendi was very quiet.  She didn't interact with

19   the other children very much because she hadn't been around

20   children.  She knew how to visit with adults, but children

21   she didn't, so that was a whole new experience so she was

22   quiet.  She tried to make friends by doing -- you know, doing

23   stuff -- she's the kind of kid that was generous, I guess you

24   would say, to a fault.  If she had something somebody else

25   needed, she gave it to them.  She was just a very quiet,

1   compliant-type child.

2        Q.    Okay.

3        A.    She wanted to -- she wanted to get approval

4   from other people.  If I expected her to get As in school,

5   she got As in school.

6        Q.    A few moments ago, you talked about things that

7   might go on in your home between you, Alejo and Wendi.  Up

8   until now, she's what -- what grade are we now?  If you can

9   convert it to grade.  I know --

10       A.    Yeah.

11       Q.    -- it's difficult.

12       A.    Yeah, it's difficult, but it -- it wasn't

13  really graded.  She probably would have been, in the normal

14  system, around fourth grade, fourth, 5th grade.

15       Q.    All right.  Did she continue to stay in that

16  school --

17       A.    Yes, she did.

18       Q.    -- through what we would consider 8th grade?

19       A.    The system's different there because they work

20  at their own speed.  It's like having a one-room school house

21  and they -- they work towards goals and things like that.

22  She went all the way through and she graduated from -- from

23  there.

24       Q.    Okay.  Did -- how many friends did she have

25  during those years, friends her own age?

1      A.    Friends her own age?

2      Q.    Yeah.

3      A.    Probably three at the most, four.

4      Q.    Okay.  How about -- we're now talking about

5 teen years and we're all the way up to almost graduation.

6      A.    Uh-huh, right.  Right

7      Q.    She stayed in that school all the way through?

8      A.    Yes, she did.

9      Q.    How many people in her graduating class?

10      A.    There was one.

11      Q.    Okay.  During that period of time up until age

12 18, what contacts did she have?  What --

13      MR. MARTINEZ:  Objection.  Lack of foundation how she

14 knows the contacts

15      THE COURT:  Sustained.  Lay some foundation.

16 BY MR. DELOZIER:

17      Q.    Let me ask it this way.  Did you permit her to

18 see people outside the school and church?

19      A.    Outside of the church realm?

20      Q.    Yes.

21      A.    Our -- no.  No, we did not.  She had two

22 friends, Laura and Jerry Lynn, that she was very close with

23 her, like, say, 13 to 14, but one of them moved away, her

24 parents moved away, and the other one was basically forced

25 out of school.  So Wendi didn't have anyone else after that.

1    I think she had maybe one or two friends after that left at

2    school --

3            Q.    And who --

4            A.    -- that were her age.

5            Q.    And who was that?

6            A.    That would have been, I believe, Kim and Shawn.

7            Q.    Who is Shawn?

8            A.    Shawn King, our pastor's son.

9            Q.    Okay.  What was their relationship like?

10           A.    At -- they were both in the same grade.  They

11   played together from the times that they were little --

12   little children because when we would work at the -- Alejo

13   and I were working or volunteering at the church, and, of

14   course, you know, we didn't send them to daycare or anything,

15   so the pastor's kids and Wendi, being the youth pastor's

16   child, played together, so basically she played with their

17   children.

18           Q.    Did you allow her to date?

19           A.    No, we did not.  We did not allow her to date.

20   We were going to let her date at 16, and because her and --

21   we just -- we just decided to wait until she graduated from

22   high school.  Actually, Alejo decided.

23           Q.    I'm sorry?

24           A.    Alejo decided.

25           Q.    Okay.  Did you ever see Wendi get angry?

1      A.      There's only one time that I could say I saw

2   Wendi upset, and that was at school when Brandon was little.

3   I think he was in -- in kindergarten in the reading program.

4   And one of the monitors -- those are what we called the

5   teachers or the helpers -- started to --

6          MR. MARTINEZ:  Objection.  Lack of foundation how she

7   knows that.

8          THE COURT:  Sustained.  Lay some foundation.  Ask

9   your question again, lay some foundation.

10  BY MR. DELOZIER:

11     Q.      Were you there?

12     A.      No.  I was told about it afterwards.

13     Q.      By?

14     A.      By Wendi and by several other people in the

15  school that saw it.

16     Q.      Okay.  And what were you told by Wendi?

17         MR. MARTINEZ:  Objection.  Hearsay.

18         THE COURT:  I'll sustain the objection.

19  BY MR. DELOZIER:

20     Q.      So you didn't have any instances where you

21  actually saw her angry yourself?

22     A.      No, I did not.

23     Q.      Okay.  What happened to Jerry Lynn?  You said

24  she left?

25     A.      Yes.  Jerry Lynn's father went to work in

1    the -- the church basically split off and her father went to

2    work in the -- the church that they -- that we started up in

3    Phoenix, in Ahwatukee, 91st Psalm, and we stayed in Casa

4    Grande and eventually changed the name from 91st Psalm to

5    Harvest Family Church.

6          Q.    All right.  During her high school years, did

7    she do anything other than go to school?

8          A.    She went to school at Harvest and she also went

9    to school at Central Arizona College at the same time in high

10    school.  Other things that she would have done would have

11    been in -- in group activities.  We would have, because my

12    husband was the youth minister, we would have the youth come

13    to our house and, you know, we'd play games or watch a movie

14    or something like that.  Or if they went to the movies in

15    town, an adult always supervised.

16          Q.    She had a number of awards from school, didn't

17    she?

18          A.    Yes, she did.  Yes.

19          Q.    Can you tell us about some of those?

20          A.    In ACE we have state conventions and

21    national -- actually, international conventions where they

22    compete in academics, arts, platform arts, things like --

23    things like that.  Wendi competed in singing, solos, duets,

24    she competed in sewing, and one sport.  I think she competed

25    one year in table tennis.  She also did writing.  She wrote

1    poetry she wrote short stories.

2        Q.    Did she win any awards for these kinds of

3    activities?

4        A.    Yes, she did.  She won awards.  I believe she

5    went five years to States and she won awards in States every

6    time that she went, especially with singing and piano.

7    Essays, she won national awards in inter -- in the

8    international convention.  One of the biggest ones that she

9    worked for was the Golden Apple Award and that's where the

10   student recites the entire book of Proverbs.  They do it a

11   chapter at a time within a certain time limit, and that was

12   an award she won at States and also International because it

13   wasn't something that very many people did.

14       Q.    What specifically -- what kind of award did she

15   win in the piano area?

16       A.    For playing the piano.  She -- actually, she

17   was self taught and --

18       MR. MARTINEZ:  Objection.  Nonresponsive.

19       THE COURT:  Sustained.  Repeat the question.  Listen

20   to the question.

21   BY MR. DELOZIER:

22       Q.    Yeah.  What was the award she won?

23       A.    She won awards for her piano playing, playing

24   the piano.

25       Q.    Did she come in first or last --

1          A.     Actually, I think she came in sixth in

2   Internationals, which is quite an honor because there's

3   several thousands of people -- of children that attend from

4   all over the world.

5          Q.     Okay.

6          MR. DELOZIER:  If I could approach, Your Honor?

7          THE COURT:  Yes.

8   BY MR. DELOZIER:

9          Q.     Showing you what's been marked for

10  identification as 407.  Do you recognize that?

11         A.     Yes, I do.

12         A.     That's one of the pictures that I took at one

13  of the competitions when Wendi was playing the piano.

14         Q.     Okay.  And you took that?

15         A.     Yes, I did.

16         Q.     Could you tell me about when?

17         A.     This probably would have been probably 1987, I

18  think, right around there.

19         Q.     When did she graduate high school?

20         A.     She graduated high school in 1989.

21                (Pause in proceedings.)

22         MR. MARTINEZ:  You need to turn the television on.

23                (Pause in proceedings.)

24         MR. DELOZIER:  Your Honor, move for admission of

25      407.

```
 1            MR. MARTINEZ:  Object on the grounds of relevance and
 2    Rule 403.
 3            MR. DELOZIER:  May I approach?
 4            THE COURT:  Yes.
 5                  (Pause in proceedings.)
 6            THE COURT:  Exhibit 407 is admitted into evidence.
 7    BY MR. DELOZIER:
 8            Q.    Let's take a look.  Is that the photograph we
 9    were discussing?
10            A.    Yes, it is.
11            Q.    Is this the time she won the award or are you
12    sure --
13            A.    Yes, she -- she was actually playing and they
14    allowed us to take pictures while they were performing.
15            Q.    Very good.
16            A.    Thank you.  What about her -- did you say
17    something about her sewing being a seamstress?
18            A.    Yes, I did.  One year she designed a dress and
19    she had to make a pattern and put the dress together and had
20    to sit -- fit into certain categories that were set up by the
21    school, the Accelerated Christian Education schools, and she
22    actually had one of the physician's wives in Casa Grande --
23            MR. MARTINEZ:  Objection.  Nonresponsive.  Narrative.
24            THE COURT:  Sustained.  Just answer the question
25    that's asked.
```

1   BY MR. DELOZIER:

2           Q.    Did she win an award for any of her seamstress

3   work?

4           A.    Yes, she did.  She won first in states and she

5   won in the top 12.  I don't recall which one.  It was in the

6   international convention for that dress.

7           Q.    I'm going to show you what's been marked for

8   identification as Exhibit 408.  Do you recognize that photo?

9           A.    Yes, I do.

10          Q.    Did you take it?

11          A.    Yes, I did.

12          Q.    Is that the dress you're referring to?

13          A.    Yes, it is.

14          MR. DELOZIER:  Move Exhibit 408 into evidence, Your

15   Honor?

16          MR. MARTINEZ:  Judge, may I voir dire the witness on

17   that?

18          THE COURT:  Yes.

19

20   VOIR DIRE EXAMINATION BY MR. MARTINEZ:

21          Q.    Ma'am, how old was she when this photograph was

22   taken?

23          A.    15 or 16 -- 16, I think.

24          Q.    That was when she was still in high school,

25   correct?

1          A.    Yes.

2          Q.    And her hair in this photograph is definitely

3    blond, isn't it?

4          A.    Yes.

5          MR. MARTINEZ:  I don't have anything else.  No

6    objection.

7          THE COURT:  Exhibit 408 for identification is

8    admitted into evidence.

9

10   CONTINUED DIRECT EXAMINATION BY MR. DELOZIER:

11         Q.    Is that the dress you're referring to?

12         A.    Yes, it is.

13         Q.    And she made that herself?

14         A.    Yes, she did.

15         MR. DELOZIER:  Excuse me a second, Your Honor.

16              (Pause in proceedings.)

17   BY MR. DELOZIER:

18         Q.    I'm going to show you what's been marked as

19   Exhibit 406 and see if you can identify it for us.

20         A.    Yes.  That's a picture of Wendi and her best

21   friend Laura Bell.

22         Q.    What --

23         A.    That was at state convention in Flagstaff.

24         Q.    Had they won something?

25         A.    Yes, she did.  They won -- they won first or

1    second in the State for a duet that they sang together.

2          Q.    And did you take that photograph?

3          A.    Yes, I did.

4          Q.    And approximately when?

5          A.    I believe it was 1987.

6          Q.    Thank you.

7          MR. MARTINEZ:  If I may voir dire her on this, Your

8    Honor?

9          THE COURT:  Yes.

10

11   VOIR DIRE EXAMINATION BY MR. MARTINEZ:

12          Q.    If this was taken in 1987, that would make her

13   17 years old, correct?

14          A.    No.  She would have just been 16 at the time.

15          Q.    Her date of birth is August 26 1970, isn't it?

16          A.    Yes, it is.

17          Q.    And this picture here, number 406, you

18   indicated was taken in '87?

19          A.    Yes.

20          Q.    And, again, her hair is blond in this

21   photograph, isn't it?

22          A.    Yes.

23          MR. MARTINEZ:  I don't have any objection to 406.

24          THE COURT:  Exhibit 406 for identification is

25    admitted into evidence.

1    CONTINUED DIRECT EXAMINATION BY MR. DELOZIER:

2         Q.    Is this the photo you're referring to?

3         A.    Yes, it is.

4         Q.    Who are the two people?

5         A.    Wendi would be -- on the screen, would be to

6    the -- to the left, and Laura, her friend, is to the right in

7    Flagstaff.

8         Q.    Thank you.  Do you know what year Laura left

9    school?

10        A.    Well, it would have been after '87 or at least

11   it might have been around -- it was after that convention.  I

12   don't recall the exact date.

13        Q.    Well, I'm trying to be more specific about when

14   you might have -- when you took the picture on -- how old was

15   Wendi when she graduated high school?

16        A.    Wendi was 18, just shy of being 19.

17        Q.    All right.  Does that help you?

18        A.    I believe that Laura left sometime when Wendi

19   was in the year that she was 16.

20        Q.    So it would have been equivalent of the

21   sophomore year?

22            MR. MARTINEZ:  Objection.  Leading.

23            MR. DELOZIER:  Is that right?

24            THE COURT:  Sustained.  Don't lead.  Restate your

25   question.

```
 1    BY MR. DELOZIER:
 2           Q.    Can you tell me, based on that, what -- what
 3    year you would normally call if there were kids not in this
 4    kind of a school, what grade level that would have been?
 5           A.    Okay.  Again, that's hard.  I'd have to relate
 6    it, but probably around sophomore, maybe going into junior.
 7           Q.    Okay.  You talked about some of the things
 8    that -- that Wendi grew up with as rules to her conduct,
 9    right, a few moments ago?
10           A.    Yes.
11           Q.    Remember those?  How about going to dances?
12           A.    No.  We didn't allow Wendi to go to dances.
13           Q.    We're still talking about prior to age 18?
14           A.    That's correct.
15           Q.    Okay.  How about did school have a program?
16           A.    No, we didn't have -- we didn't do dances,
17    didn't do programs, didn't have anything like that.
18           Q.    How about wearing makeup?
19           A.    Not to school.  They weren't allowed to wear
20    makeup to school.
21           Q.    How about going hanging out at the mall?
22           A.    Only if there were adults.
23           Q.    So did she ever go to a movie?
24           A.    If they went to movies, they went with a group
25    of kids and usually there was adult supervision.
```

1        Q.    How about cheerleading and volleyball,
2   basketball, baseball?
3        A.    No cheerleading.  And if they played
4   volleyball, it would be a girl's team and she had to wear
5   shorts -- shorts past -- actually, they weren't shorts, they
6   were culottes past their knees.
7        Q.    Sorry, past their what?
8        A.    Knees.
9        Q.    Okay.  She's now graduated, okay?  What does
10  she do next?
11       A.    She -- actually, she helped in the school for a
12  while.  Then she -- in Harvest Family, Harvest Christian
13  Academy School, and then she went -- the church paid for her
14  to go to a Berlitz Spanish class because she wanted to go on
15  a mission to Mexico.
16       Q.    And did she?
17       A.    Yes, she did.
18       Q.    Where did she go?
19       A.    They had -- she was going to go to Guadalejara,
20  but there was civil unrest, so the decision was made for her
21  to go to Mexicali because it was closer.
22       Q.    So was that sponsored by your church?
23       A.    It was encouraged by our church.
24       Q.    Okay.  Well, did she get paid for going?
25       A.    No, she did not.

1      Q.      How long did she stay?

2      A.      She stayed six months.

3      Q.      Okay.  And besides her time, what else did

4  she --

5      A.      When she -- prior to going down to Mexicali to

6  work in the church down there, she purchased on her own,

7  materials to take with her to work with children.

8      Q.      So at this point in time she's graduated and

9  she's 19 and she takes this Berlitz school, right?

10     A.      Correct.

11     Q.      And sometime after she's 19, she spends six

12  months in Mexico.  How old is she when she comes back to

13  Mexico?

14     A.      She's just right around 20.

15     Q.      Okay.  And what did she do next?

16     A.      I believe that she -- I know she took -- I

17  think she worked for a little while.  I believe she started

18  class at CAC.  She'd already taken classes at CAC prior to

19  that time, like I mentioned before, in high school.  Because

20  we didn't have like Biology and things like that in the high

21  school, so she was -- she took, I think, Chemistry at CAC and

22  other classes.  So she sort of had a head start, so she was

23  continuing on with classes at CAC.

24     Q.      How long did she keep doing that?

25     A.      I'm not sure.  Several semesters because she's

1   in the honor curriculum at CAC.  I do recall that because

2   that was pretty special.

3        Q.    Was she employed during this time?

4        A.    She -- I think, I believe right around that

5   time she took a position at an apartment complex.

6        Q.    Okay.  So she had stopped living with you and

7   Alejo?

8        A.    Yes.  Probably in her 20s, sometime in the year

9   that she was 20, almost 21.

10       Q.    Okay.  So except for the six months in Mexico

11  until she got her first apartment, she continued to live with

12  you and Alejo?

13       A.    That's correct.

14       Q.    Okay.  Was there somebody else that came to

15  live with you and Alejo?

16       A.    Brandon came to live with Alejo and I and

17  Wendi.

18       Q.    And how did that happen?

19       MR. MARTINEZ:  Objection.  Relevance.

20       THE COURT:  Sustained.

21  BY MR. DELOZIER:

22       Q.    Did you and Alejo adopt Brandon?

23       MR. MARTINEZ:  Objection.  Relevance.

24       THE COURT:  Overruled.  Go ahead and answer the

25  question "yes" or "no."

1          THE WITNESS:  Yes.

2    BY MR. DELOZIER:

3          Q.    Thank you.  What age did Brandon come to live

4    with you and Alejo and Wendi?

5          A.    Two and a half.

6          Q.    Okay.  So he had 15 and a half or so years with

7    Wendi.  He continued to live with her until she finished high

8    school and went to Mexico?

9          A.    Yes, he did.

10         Q.    Okay.  You mentioned a moment ago during that

11   period of time, early -- early period of time, that Alejo

12   would often lose his temper.  Did that continue on until she

13   moved out into her own apartment?

14         A.    Yes, it did.

15         Q.    Did she continue to witness it?

16         A.    Yes, she did.

17         Q.    What was your -- what was Wendi's reaction?

18         MR. MARTINEZ:  Objection.  Lack of foundation.

19         THE COURT:  Sustained.  Lay some foundation.

20   BY MR. DELOZIER:

21         Q.    Did she see him when he lost his temper?

22         A.    Yes, she did.  She would be in the house.

23         MR. MARTINEZ:  Objection.  Nonresponsive and lack of

24   foundation, date and time.

25         THE COURT:  Lay some foundation.

```
 1    BY MR. DELOZIER:
 2         Q.    Prior to the time she left and got her own
 3    apartment and after the time we've already talked about,
 4    which was when I think she was 9, okay, so we got years 9 to
 5    18, did there -- were there episodes where Alejo would lose
 6    his temper?
 7         A.    Yes, there were numerous episodes of Alejo
 8    losing his temper throughout those years.
 9         Q.    Did Wendi see them?
10         A.    Yes, she did.  She was witness to them.
11         Q.    What was her response?
12         MR. MARTINEZ:  Objection.  Lack of foundation, how
13    old was she?
14         THE COURT:  Sustained.
15         MR. DELOZIER:  We've already discussed the ages from
16    9 to 18.
17         THE COURT:  I sustained the objection.  Restate your
18    question.
19    BY MR. DELOZIER:
20         Q.    How old was she at each episode?
21         A.    9, 10, 11, 12, then, 15 through 20
22         Q.    Okay?
23         A.    And we haven't gone past that yet, so --.
24         Q.    Very well.  Did she witness these episodes?
25         A.    Yes, she did.
```

1          Q.     What was her response?

2          A.     Wendi's response would be to to go into either

3     her room or my room or the bathroom along with me.

4          Q.     And do what?

5          A.     We would just sit and wait until Alejo either

6     left or he calmed down and then we'd go out and see if he was

7     still there.  We'd just sort of make nice, I guess, is the

8     right word, would be passive, you know, and sort of ignore

9     everything that happened and try to make sure that dad was

10    happy.

11         Q.     So she's now attending college whenever she

12    could work it into her schedule and living in her own

13    apartment, did you say?

14         A.     Yes.

15         Q.     Okay.  And has a job working for that apartment

16    complex?

17         A.     That's correct.

18         Q.     She's about 20, 21?

19         A.     Yes.

20         Q.     Okay.  Did you notice any changes in her

21    behavior patterns when she started living and working in that

22    manner at that age?

23         A.     Well, obviously, you know, she wasn't at the

24    house as much.  She was still going to church, still doing,

25    you know -- we'd do short missionary trips, like a weekend

1    trip or toys for kids, you know, with the church, and she

2    would still be involved in that.  Our Harvest Track Classic,

3    which is something we've done since, I believe, 1980.  She

4    was still always involved in those, but I do know that she

5    was spending more time with her cousin, Barbara, and some of

6    her friends, and they were -- they were a little bit younger

7    than she was.

8              Q.    Notice any change in her dress?

9              A.    Yes.

10             Q.    What did you notice?

11             A.    I -- well, I noticed that she, you know, that

12   she was dressing a little -- little bit not quite as

13   conservative as what we always made her dress.

14             Q.    Okay.

15             A.    In other words, instead of having something

16   long and frilly and wearing a dress, she might be wearing

17   pants, something like that, shorts or something.

18             Q.    During this period of time were you giving her

19   any advice on how to conduct herself?

20             A.    Basically, the advice that we were giving her

21   then was the same advice we gave to her when she was younger,

22   that you don't date people that don't go to church, you

23   know, don't be, you know, out running around or doing things

24   that you know we don't approve of.

25             Q.    Did she ever express resentment for the way you

1    had raised her?  I'm talking about 20, 21.  Now it's 1990.

2           A.    No, she never expressed resentment.  In fact

3    when she -- well --.

4           Q.    Okay.  Did you feel like you had -- you were

5    getting closer together as a family or was there more

6    distance?

7           A.    Well, I know that she still, you know, came and

8    would talk to us.  But no, of course, there was, you know,

9    more distance.

10          Q.    You mentioned Shawn.  Was Shawn a part of her

11   life at this time?

12          A.    Yes, he was.  They were going out together.  By

13   then both of them had graduated and that was okay that they

14   could, you know, date.

15          Q.    And did -- how did that relationship go?

16          A.    They were seeing each other.  He was -- for a

17   long time he was up in Prescott and she was in Mexico and

18   then in Casa Grande.  They would see each other and then they

19   -- I was told they had a fight.

20          MR. MARTINEZ:  Objection.  Hearsay.

21          THE COURT:  Sustained.  Don't say what someone else

22   said.

23          THE WITNESS:  Okay.

24          THE COURT:  Restate your question.

25   / / / / /

1    BY MR. DELOZIER:

2         Q.    Did the relationship end?

3         A.    Yes, it did.

4         Q.    Did it end smoothly?

5         MR. MARTINEZ:  Objection.  Hearsay.

6         THE COURT:  Sustained.

7    BY MR. DELOZIER:

8         Q.    If you know.  Did you witness anything about

9    their breakup?

10        A.    They weren't going out with each other anymore

11   and her car had two broken windows.

12        Q.    Do you know what age Wendi was when she first

13   met Joe?

14        A.    She would have been 21.

15        Q.    Okay.  And would that have been just after

16   reaching 21 or just before becoming 22?

17        A.    It would have been before -- it would have been

18   21 and a half because she -- she met him on St. Patrick's

19   Day.

20        Q.    Okay.  And was she employed at that time?

21        A.    Yes, she was.  She was working at the apartment

22   complex.

23        Q.    And is that the same apartment complex that you

24   just discussed a moment ago?

25        A.    Yes, it is.

1          Q.     And she had her own -- she had her own

2     apartment?

3          A     Yes.

4          Q.     Did she have her own car?

5          A.     Yes, she did.

6          Q.     What was the state of her finances at that

7     time?

8          A.     She was doing fine.  She had her own place.

9     She had her own Lumina.  She was doing pretty well for, you

10    know, a young kid.

11         Q.     Okay.  Do you recall the first time you met

12    Joe?

13         A.     I recall it was in I believe the summer of

14    1992.  I don't recall the exact incident or circumstance.

15         Q.     Summer of '92?  So it would have been four,

16    five, six months after Wendi met him?

17         A.     Yes.

18         Q.     Okay.  And do you remember the occasion that

19    you met him on?

20         A.     I believe that they had come back from a lake

21    trip and she introduced me to him because I think I was over

22    at the apartment.

23         Q.     Okay.  You didn't go to the lake though?

24         A.     No, not at that time.

25         Q.     They had come back from a lake trip?

1      A.    They came back from a lake trip.

2      Q.    They were attired in the normal attire you go

3    to the lake in when you met him?

4      A.    He had like shorts or swimsuits on.

5      Q.    Okay.  Uh-huh, okay.  Now, at that point in

6    time had you -- had you and Wendi had any discussions about

7    Joe prior to your first meeting him?

8      A.    Wendi had told me that she --

9      MR. MARTINEZ:  Objection.  Hearsay and nonresponsive.

10     THE COURT:  Sustained.  Just answer the question

11   "yes" or "no."

12   BY MR. DELOZIER:

13     Q.    Had you and Wendi had discussions?

14     A.    Yes.

15     Q.    Okay.  Now, had you learned or did you know

16   what Joe's reputation in the community was for violence and

17   anger?

18     MR. MARTINEZ:  Objection.  Lack of foundation, when

19   she learned this, when did she aquire this knowledge?

20     THE COURT:  Sustained.  Lay the foundation.

21   BY MR. DELOZIER:

22     Q.    We're talking about the times you first learned

23   she was seeing him and right after St. Patrick's Day.  You

24   said it was 1992?

25     A.    Yes.

1          Q.     First time you met him was sometime in the

2     summer of 1992, so prior to that time you had learned?

3          A.     I had learned that he was --

4          MR. MARTINEZ:  I'm going to object.

5          THE COURT:  The question was a "yes" or "no"

6     question, I believe.  Why don't you restate the question.

7     Answer the question "yes" or "no." I believe it was a "yes"

8     or "no" question, then Mr. DeLozier can follow-up.

9     BY MR. DELOZIER:

10         Q.     Prior to that time period, February, whatever

11    St. Patrick's Day is, and sometime in July or August of

12    2000 -- I mean 1992, had you learned what Joe's reputation

13    was in the community?

14         A.     Yes.

15         Q.     Okay.  What was his reputation that you learned

16    for violence and anger, things of that nature?

17         A.     That he drank a lot and that he had a temper on

18    him.

19         Q.     Did you and Wendi discuss that prior to your

20    meeting him?

21         A.     Yes.

22         Q.     When you met him, what was your impression?

23         A.     When I met him, like I said, she just came back

24    from somewhere, I believe it was the lake, and he had -- he

25    had a twinkle in his eye, which I later discovered was --

1          MR. MARTINEZ:  Objection.  Hearsay as to the --

2          THE COURT:  Sustained.  Go ahead, Mr. DeLozier.

3   BY MR. DELOZIER:

4          Q.    What was your impression as far as --

5          A.    I thought he was a cute young -- a cute young

6   kid.

7          Q.    Okay.  Did you have an occasion to see them as

8   a couple prior to their marriage?

9          A.    Yes, I did.

10          Q.    What occasions were those and when?

11          A.    Actually, I saw them lots of times before.

12   When they would come to the house or --

13          Q.    We're talking about your house with Alejo and

14   Brandon?

15          A.    Yes.

16          Q.    Okay.

17          A.    Also, you know, I had seen him over at the

18   apartments, Wendi's apartment.  And out to dinner, things

19   like that.

20          Q.    Did you actually go out to dinner with them?

21          A.    Yes.

22          Q.    Did you -- did they come to your house for

23   dinner?

24          A.    Before they were married?

25          Q.    Yes, before they were married.

1      A.    Yes, they would come to our house for dinner.
2   In fact one of the things we always did was, and we followed
3   through in the years, was that they would come to our house
4   on Christmas Eve and they were there on Christmas Eve in
5   1992.
6          MR. MARTINEZ:  Objection.  Nonresponsive.
7          THE COURT:  Overruled.  Go ahead and ask your next
8   question.
9   BY MR. DELOZIER:
10         Q.    Did you have dinner in their home or Wendi's
11  apartment, I should say?
12         A.    I don't recall having dinner at the apartment.
13         Q.    You went out socially though to have --
14         A.    Yes.
15         Q.    Okay.  And they would come over to your house
16  you say on special occasions too?
17         A.    That's correct.
18         Q.    Okay.  Now, this is from the time you first met
19  him and before they got married?
20         A.    Correct.
21         Q.    Did you witness any physical abuse of Wendi by
22  Joe?
23         A.    On Christmas Eve in 1993 --
24         MR. MARTINEZ:  Objection.  It's a yes or no.
25         THE WITNESS:  Yes.

1          THE COURT:  Just answer the question that's asked and

2     Mr. DeLozier can ask you additional questions.

3     BY MR. DELOZIER:

4          Q.    You did?

5          A.    Yes, I did.

6          Q.    All right.  Give us -- tell us the date and

7     time and place of that and what happened.

8          A.    Okay.  It was Christmas Eve of 1993 and they

9     were in the living room, Wendi and Joe were in the living

10    room as well as Alejo and I believe Brandon.  And Joe was

11    roughhousing around with Wendi and pinned her down.  And

12    first he let the dog lick all over her and she was trying to

13    get away because it's a huge dog, a big Rottweiler.  I'm

14    sorry -- it's a German Shepherd, but -- and then the next

15    thing, he had her down there and he grabbed her like this

16    (indicating) around the neck and Alejo came in and said, "I

17    think you're getting a little rough," or something to that

18    effect, and he just sort of laughed it off and let her up.

19         Q.    Is that the only time prior to marriage?

20         A.    No.  I saw bruises on her knee and she just

21    tried to laugh it off and said that she fell.

22         MR. MARTINEZ:  Objection.  Lack of foundation.

23         THE COURT:  Sustained.  That last sentence will be

24    stricken.  Ask your next question.

25     / / / / /

1    BY MR. DELOZIER:

2         Q.    Prior to the time they were married and after

3    the first time that you met him, did you see any other

4    episodes of violence?

5         A.    You know, depends on what your definition of

6    violence is.  I did see her grab her arm or something like

7    that, you know.

8         Q.    I'm talking about slapping, hitting, bruising?

9         A.    No.

10        Q.    Hurting?

11        A.    Not --

12        Q.    Kicking?

13        A.    No.

14        Q.    Okay.  Where did -- was she still living in the

15   apartment at the time they were married?

16        A.    No.

17        Q.    Okay.  At what point after you met Joe until

18   they were married did they move or did she move?

19        A.    After she met Joe she was living in an upstairs

20   apartment at the -- where she was working.  And then when Joe

21   moved in with her, she moved to a downstairs apartment.  Then

22   they moved to, like, a town house on Pepper prior to their

23   marriage, and they moved from Pepper into a house on -- I'm

24   not sure, but I believe it was Park.  It was a cul-de-sac

25   down the street from the Jiffy Lube, and that's where they

49

1      were living when they were married.

2              Q.    Now, why did she move out of the apartment, do

3      you know?

4              A.    When I -- I had --

5              MR. MARTINEZ:  Objection.  Nonresponsive.  It's "does

6      she know."

7              THE WITNESS:  I know, yes.

8              THE COURT:  Just answer the question that's asked.

9      BY MR. DELOZIER:

10             Q.    Why did she move?

11             MR. MARTINEZ:  Objection.  Hearsay.

12             THE COURT:  Sustained.

13     BY MR. DELOZIER:

14             Q.    Do you know why she moved?

15             MR. MARTINEZ:  Objection.  Asked and answered.

16             THE COURT:  It's a "yes" or "no" question.  Go ahead

17     and answer the question.

18     BY MR. DELOZIER:

19             Q.    Did -- did she move?

20             MR. MARTINEZ:  Objection.  Hearsay.

21             THE COURT:  Sustained.

22     BY MR. DELOZIR:

23             Q.    Was she still employed by the apartment complex

24     when she moved from the apartment complex?

25             A.    No.

1  Q. Do you know what job she took next?

2  A. She took a position at Casa Grande Regional

3 Medical Center in the accounting department.

4  Q. Okay.  Do you know the date that the -- of the

5 marriage?

6  A. January 21st, 1994.

7  Q. Okay.  January 20 --

8  A. 21st.

9  Q. -- 21st, 1994.  So we've gone up to her being

10 what age at this point?

11  A. In '94 in January she would have been 23.

12  Q. Okay.  Did you say that Joe moved in with her?

13  A. Yes, I did.

14  Q. Okay.  And what was your reaction to that?

15  A. I was not happy.

16  Q. Did you have a discussion with Wendi about your

17 not being happy?

18  A. Yes, I did.

19  Q. What did you tell her?

20  MR. MARTINEZ:  Objection.  Hearsay.

21  THE COURT:  Sustained.

22  MR. DELOZIER:  Your Honor, I'm asking what she told

23 her.

24  THE COURT:  Sustained.  Ask your next question.

25  MR. DELOZIER:  Could we approach?

# APPENDIX G - Part 2

```
 1            THE COURT:  Continue on.  Continue on.

 2    / / / / /

 3                   (The following proceedings were held at the

 4    bench:)

 5

 6            THE COURT:  Go ahead.

 7            MR. DELOZIER:  I'm not asking what Wendi told her

 8    mother.  I'm asking when her mother told her.

 9            THE COURT:  I understand.

10            MR. MARTINEZ:  And the way to phrase it is "why were

11    you unhappy?"  Just ask her that.

12            THE COURT:  It's -- if you termed your question in

13    the manner that Mr. Martinez --

14            MR. DELOZIER:  Okay.

15            THE COURT:  -- is stating, I'll allow the question.

16            MR. DELOZIER:  Okay.

17

18                   (The following proceedings were held in open

19    court:)

20

21            THE COURT:  Mr. DeLozier?

22    BY MR. DELOZIER:

23            Q.   Why were you unhappy?

24            A.    I was unhappy because that's totally against

25    how we raised her was that have -- to have somebody -- you
```

1    don't move -- you don't live together unless you're married,

2    so that was totally against what we taught.

3         Q.   Do you know if Joe was employed during the time

4    that they -- before they got married?  Just "yes" or "no."

5         A.   Do I know?  Yes.

6         Q.   Yes.  What was he employed at?

7         A.   He was employed at doing welding for different

8    farmers.

9         Q.   During the time prior to their marriage, did

10   you see Wendi and Joe as a couple?

11        A.   Yes, I did.

12        Q.   And what did you see?

13        MR. MARTINEZ:  Objection.  Lack of foundation.  Later

14   on in the marriage, early on?

15        THE COURT:  I'll sustain the objection.  Lay some

16   foundation.

17        MR. DELOZIER:  Prior to the marriage, after you met

18   him.  I thought I said it.  I apologize if I didn't.

19        THE COURT:  Okay.  Go ahead.

20        THE WITNESS:  Yes, I did.

21   BY MR. DELOZIER:

22        Q.   Prior to the marriage after you met, did you

23   see them together as a couple?

24        A.   Yes, I did.

25        Q.   And what did you see?

1        A.    A young -- nice looking young couple that

2    actually looked like brother and sister.

3        Q.    How did they behave?

4        A.    A lot like brother and sister.

5        Q.    Well, let me ask you more specifically, did you

6    see them hugging and kissing?

7        A.    No.  I never saw them romantically as far as

8    kissing or hugging or holding hands.

9        Q.    How about moving -- did you know if -- well,

10   let me rephrase that.  Let's just move on to the marriage.

11            Was it a big wedding?

12       A.    It was a nice wedding.

13       Q.    Okay.  Was -- everything go okay?

14       A.    Some of the flowers didn't get -- no.

15       Q.    What happened?

16       A.    Some of the flowers didn't get there, and I

17   know that there was an issue about following through with the

18   wedding.

19       Q.    I'm sorry?

20       A.    There was an issue about following through with

21   the wedding.

22       Q.    I don't know what you mean by "following

23   through"?

24       A.    There was one point where I didn't know if

25   Wendi was going to follow through.

1          Q.     Okay.  But there weren't any episodes at the

2     wedding?

3          A.     No.

4          Q.     Nobody got angry, nobody got mad?

5          A.     No.  Lost a little bridesmaid to getting sick,

6     I believe, but that was --

7          Q.     Did they have any type of party after the

8     wedding?

9          A.     Yes.

10         Q.     Okay.  Did Joe and Wendi get to dance?

11         A.     I believe they danced the first dance.  I don't

12     recall any other dance.

13         Q.     Okay.  Now, you said they were living in a

14     small house by this time.  She was working in Casa Grande?

15         A.     Yes.

16         Q.     The hospital?

17         A.     Yes.

18         Q.     Okay.  And was he still doing the welding

19     trade?

20         A.     No.

21         Q.     What was he doing now?

22         A.     I -- he was trying to start a glass repair

23     business.

24         Q.     What was the name of it?

25         A.     I believe it was Joe's Windshield Repair.

1        Q.     I'm sorry?

2        A.     Joe's Windshield Repair.

3        Q.     Okay.  And what was it supposed to do?

4        A.     Make money.

5        Q.     No, I mean, what actually did you do in that

6    business?

7        A.     He would replace windshields or repair stars,

8    little cracks in the windshields.

9        Q.     We're now into what year?

10       A.     It would be '94.

11       Q.     '94?  Did you have discussions with Wendi

12   about the state of their financial afairs at this time?

13       A.     No, I did not.

14       Q.     Okay.  Were you having to give them any

15   assistance financially at this time?

16       A.     No, we were not, other than paying for a

17   wedding.

18       Q.     How about did you supply them any modes of

19   transportation?

20       A.     Yes, we did.

21       Q.     What was that?

22       A.     It was a an old Dodge that belonged to my

23   mother.  We let Wendi use it because she didn't have a

24   vehicle.

25       Q.     Did you and Alejo loan any money to them for

1    Joe's windshield business?

2         A.    Not for Joe's windshield business.

3         Q.    Okay.  Do you know whether the windshield

4    business survived, or what happened?

5         A.    No.  No, it didn't.  More competition came into

6    town and Joe wasn't -- he didn't go out and --

7         MR. MARTINEZ:  Objection.  Speculation, lack of

8    foundation.  How she knows?

9         THE COURT:  Overruled.

10        MR. DELOZIER:  If you're familiar with that, go

11   ahead.

12        THE WITNESS:  I'm sorry?

13   BY MR. DELOZIER:

14        Q.    Go ahead.

15        A.    Okay.  No, because Joe didn't really go out and

16   work at business.  In fact, sometimes we'd -- Alejo and I, we

17   would tell him people who needed windshields and say hey, you

18   know, if you call so and so, she said she'd let you replace a

19   windshield, but he wouldn't follow-up on it.

20        Q.    So Wendi is still at the hospital --

21        A.    Wendi is still at the hospital.

22        Q.    -- in 1994?

23        A.    Yes.

24        Q.    Okay.  And the windshield, Joe's windshield

25   business is going down?

1          A.     Well, it -- it wasn't really going up and

2    Alejo -- like I said, Alejo and I at that time, she's

3    married, we're trying to help, you know, help him, but --

4          Q.     What did he do next as far as business

5    ventures?

6          A.     After Joe's windshield business, he worked

7    for -- and he still kind of had his business on the side, you

8    know, do one or two windshields a month, something like

9    that.  He went to work in, I guess it's Chandler, for Accu

10   Glass.  He went to work as a repair person there.

11         Q.     Did he continue working for them for some

12   period of time or did that relationship change?

13         A.     He worked for that and whenever he wanted --

14   basically, he worked for them whenever he felt like working,

15   and then --

16         MR. MARTINEZ:  Objection.  Speculation.

17         THE COURT:  Sustained.

18         THE WITNESS:  Okay.  He worked for them whenever he

19   didn't want to go to the lake.

20         MR. MARTINEZ:  Objection.  Speculation.

21         THE COURT:  Sustained.

22   BY MR. DELOZIER:

23         Q.     Did he eventually try to buy the business?

24         A.     Yes, he did.

25         Q.     Okay.  And was he successful in purchasing the

```
 1    business?
 2              A.     With a partner, yes.
 3              Q.     Okay.  And how did that business work out?
 4              A.     That business did not work out.
 5              Q.     He have a problem with his partner?
 6              MR. MARTINEZ:  Objection.  Hearsay.
 7              THE COURT:  Sustained.
 8    BY MR. DELOZIER:
 9              Q.     During that period of time when the business
10    didn't work out, was there some dispute with the partner that
11    you're aware of?
12              A.     Yes.
13              Q.     And do you know what that was?
14              MR. MARTINEZ:  Objection.  Hearsay.
15              THE COURT:  Sustained.
16    BY MR. DELOZIER:
17              Q.     Can you -- were you party to any discussions
18    with Joe and Wendi and his partner about that, about the
19    business?
20              A.     Not that included the partner.
21              Q.     Okay.  Did you help him, try to help him, start
22    any other businesses?
23              A.     Yes, we did, besides putting money and time
24    into helping him get Accu Glass started, after he had his
25    third surgery, he wanted some help with starting some other
```

```
 1   businesses.  What we did, what Alejo and I did, we purchased

 2   a hot dog cart and purchased the licenses and everything for

 3   Wendi and Joe because Joe wanted to do that.

 4           Q.   Did that -- was that successful?

 5           A.   No, it was not.  They were told about one --

 6           MR. MARTINEZ:  Objection.  Hearsay.

 7           THE COURT:  Sustained.

 8           THE WITNESS:  They --

 9   BY MR. DELOZIER:

10           Q.   Did Joe have any income after the hot dog cart

11   that you're aware of?

12           A.   No.

13           Q.   Okay.  At what point was there a surgery?  You

14   mentioned a surgery a minute ago.  Do you know approximately

15   what date that was?

16           A.   Joe had four surgeries.  Which one?

17           Q.   Can you tell me when the first one was?

18           A.   The first one was in 1994.

19           Q.   Was that spring, fall, or --

20           A.   August or September.

21           Q.   So Wendi is, what, 24?

22           A.   She would have been 24.

23           Q.   Okay.  How did that go?

24           A.   Apparently, it seemed to go well.

25           Q.   Do you know -- do you know why he needed the
```

1      surgery?

2            A.    Because he had a lump down here by his salivary

3      glands.

4            Q.    Did you get to see him after he had the

5      surgery?

6            A.    Yes, I did.

7            Q.    What was his physical appearance like?

8            A.    He just had a small scar which he, you know, he

9      showed to me, and other than that he was fine.  It was an

10     outpatient surgery, I believe.

11           Q.    What was the diagnosis?

12           A.    That it was a benign tumor.

13           Q.    Did you notice any changes in Joe after this

14     surgery?

15           A.    Not really after the first surgery, no.

16           Q.    Okay.  Did you notice him treating Wendi any

17     differently?

18           A.    No.

19           Q.    We're in August or so of '94, right?

20           A.    Correct.

21           Q.    Okay.  And we've covered the business

22     activities during that period, in fact, all the way up to the

23     hot dog cart, right?  When was that?  Do you remember the

24     approximate date you got the golf -- hot dog cart?

25           A.    The hot dog cart I believe would have been in

1    '97.

2           Q.    Okay.  From the time that you had Christmas Eve

3    '93, the physical abuse, until the first surgery, did you

4    witness any episodes of physical violence?

5           A.    No.

6           Q.    Okay.  During that period of time, Wendi was

7    working at the hospital and he was still in the welding

8    business?  Or had he started the windshield business?

9           A.    I believe when she was working at the hospital

10   that he was in the Joe's windshield business.

11          Q.    Okay.  How was the cost of the first surgery

12   paid for?

13          A.    That was paid through insurance through Wendi's

14   work.

15          Q.    Okay.  Now, how long between that surgery and

16   the next one?

17          A.    I believe it was 11 months.  I don't even think

18   it was a year, that second surgery.

19          Q.    So we're looking at July or so of '95?

20          A.    I belive that one was in August of '95.

21          Q.    Okay.  So the other one might have been

22   September, right?

23          A.    Correct.

24          Q.    So this is August of '95 and Wendi is now 25?

25          A.    She would have been 25.

1      Q.      And Joe's 28?

2      A.      Three years older.

3      Q.      Okay.  How did that surgery go?

4      A.      That surgery apparently went fine.  He was

5  supposed to have outpatient and go home, and he -- the doctor

6  asked him to stay in town -- it was in Tucson at the

7  University Medical Center, and the physician asked him to

8  stay in town that night because they had to do a little bit

9  more surgery than he expected.  The next morning, Wendi and

10  Joe and I went to the physician's office, the physician

11  showed me how to change his dressing, and he okayed him to go

12  ahead and come back to Casa Grande.

13      Q.      Why did he show you how the change the

14  dressing?

15      A.      Because I worked in the hospital and I

16  volunteered and I could do it.

17      Q.      Did he show Wendi how to do it?

18      A.      No.  Wendi couldn't stand blood.

19      MR. DELOZIER:  If I could approach again, Your Honor?

20      THE COURT:  Yes.

21  BY MR. DELOZIER:

22      Q.      Showing you what's been marked as Exhibits 420

23  and 421, do you recognize those?

24      A.      Yes.  Those are pictures that I took after the

25  second surgery.

1          Q.    So those are photographs that you took?

2          A.    Yes, I did.

3          Q.    And they're photographs of whom?

4          A.    They're photographs of my son-in-law, Joe.

5          Q.    And that's his -- a point in time after the

6    second surgery?

7          A.    Yes.

8          Q.    Can you tell me how many weeks, days after?

9          A.    From the looks of the scar, I'd probably say a

10   week or two because the stitches are still in.

11         Q.    Okay.  Thank you.

12         MR. DELOZIER:  Move for admission of 420 and 421,

13   Your Honor?

14         MR. MARTINEZ:  No objection.

15         THE COURT:  Exhibits 420 and 421 are admitted into

16   evidence.

17   BY MR. DELOZIER:

18         Q.    Okay.  Take a look at the TV screen.  If you

19   need to move down, you can so you can see them.

20               Oops.  I mess that up every time.

21               Is that a photograph you took?

22         A.    Yes, it is.

23         Q.    It's 420, and that's of Joe and that's the scar

24   from the second surgery, did you say?

25         A.    Yes.

```
 1          Q.    Okay.  And this same picture, just a little
 2     different.  What --
 3               MR. MARTINEZ:  What exhibit?
 4     BY MR. DELOZIER:
 5          Q.    This is 421, correct?
 6          A.    Yes.
 7          Q.    And that one you took as well?
 8          A.    Yes.
 9          Q.    Took them both on the same day?
10          A.    Yes.
11          Q.    Okay.  So we're August of 1995.  Joe's been
12     trying to do the windshield business, and has that stopped
13     yet or has he gone to work at Accu Glass yet?
14          A.    I don't believe he's gone to work at Accu Glass
15     yet.
16          Q.    Okay.
17          A.    So he's still working on Joe's Windshield
18     Repair?
19          A.    Yes.
20          Q.    And what's Wendi doing?  Still at the hospital?
21          A.    Yes.
22          Q.    Okay.  You had a grandson born sometime along
23     here.  Am I ahead of him yet or is --
24          A.    Yes.
25          Q.    We getting close?
```

1          A.     He was born in 1997.

2          Q.     Okay.  So we're a couple years away from --

3     from that young man, right?

4          A.     Yes.

5          Q.     Okay.  During this period of time, I'm talking

6     about after the second surgery, was there a long

7     recuperation?

8          A.     Not so much -- no.  It took him a little bit

9     longer than -- than the first one.

10         Q.     Do you know what the diagnosis was?

11         A.     Benign tumors.

12         Q.     Did she have to treat -- did Joe have to be

13    treated differently after this one than the first one by --

14    you said you had to learn how to do something.  What did you

15    have to learn how to do, put it that way?

16         A.     To clean the incision and, you know, put

17    medicine on it.  He had a larger dressing, of course, because

18    it was a larger incision on the second one.

19         Q.     How often did somebody have to attend to that?

20         A.     Usually twice a day, change it -- change it,

21    clean it, clean it and change it in the morning, in the

22    evening.

23         Q.     Okay.  Were you living fairly close to each

24    other at that time?

25         A.     Yes, I think we were only -- we were only maybe

1     a mile and a half away.

2          Q.     Okay.  And they'd been married now, what, year

3     and a half?

4          A.     Year and a half, yeah.

5          Q.     Okay.  The first one was only six months or so

6     after the marriage, wasn't it?

7          A.     Yes, about eight, nine months after they were

8     married.

9          Q.     Okay.  So now we're eighteen months later --

10         A.     Yes.

11         Q.     -- and we've had two.  Did you notice any

12    change in the way Joe behaved?

13         A.     After -- I know after the second surgery he was

14    -- he was moodier.

15         Q.     Did you -- were there any episodes where he

16    treated Wendi differently?

17         A.     Not that I know of.

18         Q.     Okay.  Just for the sake of trying to

19    understand the time flow, okay, at what point was the Accu

20    Glass business acquired?  Do you have a recollection?

21         A.     1996, August or September.

22         Q.     Okay.  Well, when was the third surgery then?

23         A.     The third surgery, I believe, was in February

24    of '97.

25         Q.     Okay.  So he tried the Accu Glass business for

1    about a year?

2            A.    No.   They were only in the Accu Glass -- as far

3    as owning the Accu Glass business, being in partnership with

4    the Accu Glass business --

5            Q.    Uh-huh.

6            A.    -- that was four or five months.

7            Q.    So sometime in early '96 to maybe early summer,

8    '96.  Is that what you're saying?

9            A.    It was August or September '96 until December

10   of '96.

11           Q.    I see.

12           A.    January of 97.

13           Q.    Okay.  So we're in the Fall after the second

14   surgery.  Is that what you're saying?

15           A.    Yes.

16           Q.    Okay.  While they were married, are you

17   familiar with nicknames that Joe had for Wendi?

18           A.    Yes.

19           Q.    And what were they?

20           MR. MARTINEZ:  Objection.  Relevance.

21           THE COURT:  Sustained.

22           MR. DELOZIER:  Can we approach?

23

24           (The following proceedings were held at the

25   bench:)

1

2          THE COURT:   This -- does this go to the domestic

3   violence?

4          MR. DELOZIER:   Uh-huh.

5          THE COURT:   What -- in what way?

6          MR. DELOZIER:   Well, he had negative nicknames for

7   her.

8          THE COURT:   What were they?

9          MR. DELOZIER:   Shit eyes, called her fat.

10          THE COURT:   Mr. Martinez?

11          MR. MARTINEZ:   Well, I'd like some foundation laid,

12   if she ever heard him call her that.

13          THE COURT:   Yeah, if you lay some foundation I'll let

14   that in --

15          MR. DELOZIER:   Okay.

16          THE COURT:   -- based upon what you just told me.

17          MR. DELOZIER:   Yes.

18          THE COURT:   Okay.

19

20          (The following proceedings were held in open

21   court:)

22

23          THE COURT:   Mr. DeLozier?

24          MR. DELOZIER:   Thank you.

25   / / / / /

```
1    BY MR. DELOZIER:

2         Q.    Did you ever hear Joe use any nicknames or

3    refer to her other than "Wendi"?

4         A.    Yes.

5         Q.    And what were some of those names?

6         A.    The one most common was "shit brown eyes".  He

7    also would, especially when he was upset and sometimes when

8    he wasn't, he -- he would say -- you said I didn't have to

9    say this word -- but he'd call her --

10        MR. MARTINEZ:  Objection.  Beyond the scope of the

11   question.  Those are not nicknames.

12        THE COURT:  Overruled.  Go ahead and answer the

13   question if you can.

14        THE WITNESS:  He would call her an F-ing bitch or GD

15   stupid blonde, and this wasn't necessarily in the context of

16   being angry.

17        MR. MARTINEZ:  Objection.  Narrative.

18        THE WITNESS:  He would do it any time.

19        THE COURT:  Sustained.  Ask your next question.

20   BY MR. DELOZIER:

21        Q.    Were there other names he used?

22        A.    Yes.

23        Q.    What were they?

24        A.    F-ing whore.  Stupid.  He would tell her

25   that --
```

1          MR. MARTINEZ:  Objection.  Lack of foundation.

2          THE COURT:  Sustained.  Ask your next question.

3   BY MR. DELOZIER:

4          Q.    Any additional names?

5          A.    Yes.

6          Q.    What were they?

7          MR. MARTINEZ:  Objection.  Hearsay, lack of

8   foundation.

9          THE COURT:  Overruled.  Go ahead and answer the

10  question if you can.

11         THE WITNESS:  Fat F-ing bitch.  He --

12  BY MR. DELOZIER:

13         Q.    Okay.  Now, did they move from this little

14  house at some point during -- in between these surgeries,

15  second and third, that they had while she was working at the

16  hospital?

17         A.    Yes.

18         Q.    When did they move?

19         A.    They were only in that -- that home for maybe

20  six months and then they moved out to some -- a property that

21  Joe's parents owned.  It was like a -- it had been a shop on

22  a back end of a -- a shop office on the back end of a house

23  that had been converted.

24         Q.    Sorry.

25         A.    A home office on the back end, a shop that had

1    been converted.

2          Q.    Did you tell us when that was?

3          A.    That would have been in 9 -- I believe that was

4    in '94.

5          Q.    Did you think they moved to the little

6    farmhouse in '94?

7          A.    I believe so.  I know they didn't live in the

8    nice house very long.  They only lived there six, seven

9    months at the most.

10          Q.    All right.  So when they moved there, where was

11    Wendi working?

12          A.    At the hospital.

13          Q.    Okay.  They moved to the farmhouse while she

14    was there at the hospital?

15          A.    Yes.

16          Q.    When did she stop working at at the hospital?

17          A.    I believe in 1996.

18          Q.    All right.  So '96 is when they bought Accu

19    Glass business with the partner, right?

20          A.    Correct.

21          Q.    So did she work in that business?

22          A.    Yes, she did.

23          Q.    Okay.  So he was working in it, Wendi was

24    working in it.  Was the partner working in it too?

25          A.    No, he was more of a silent partner.

```
 1              Q.    Okay.  Do you know how long they lived at that
 2    little -- little farmhouse, I guess I'll call it?
 3              A.    I believe sometime in '94 until May of 1998.
 4              Q.    May of '98?  Okay.  So that's fairly, what,
 5    three, four years?
 6              A.    Yes.
 7              Q.    Okay.  Did you ever go to that apartment --
 8    that little farmhouse?
 9              A.    Yes.
10              Q.    Did you have meals with them at that farmhouse?
11              A.    Yes.
12              Q.    Did you see any episodes of physical violence
13    while you were with them at that house?
14              A.    Just pushing around and things like that.
15              Q.    And name calling?
16              A.    Name calling, definitely.
17              Q.    Did you see any evidence of any violence that
18    might have taken place when you weren't there?
19              MR. MARTINEZ:  Objection.  Lack of foundation, how
20    she --
21              THE COURT:  Sustained.
22    BY MR. DELOZIER:
23              Q.    Did you see any holes in the walls?
24              A.    I saw a hole in the door.
25              Q.    Okay.
```

```
 1              MR. DELOZIER:  Excuse me, Your Honor.
 2     BY MR. DELOZIER:
 3              Q.    Can you please describe the damage you saw to
 4     the door?
 5              A.    It was an indention in the door about the size
 6     of a fist or a -- about the size of a fist.
 7              Q.    Wendi still driving the old Dodge by this time?
 8              A.    She was still -- yes.
 9              Q.    Okay.  And at what point did she stop using --
10     driving the Dodge?
11              A.    At some point they bought a new car.  Joe was
12     driving a truck that they had, I believe, had traded Wendi's
13     car in, the Lumina that I mentioned earlier and --
14              MR. MARTINEZ:  Objection.  Narrative.
15              THE COURT:  Sustained.  Go ahead.  Ask your next
16     question.
17     BY MR. DELOZIER:
18              Q.    You mentioned that she had a Lumina?
19              A.    Yes.
20              Q.    What happened to it?
21              A.    It was traded in for a full size pickup.
22              Q.    Okay.  And what was Wendi driving after she
23     traded in the Lumina?
24              A.    Joe would take her to work until we gave them
25     the Dodge to use.
```

```
 1              MR. MARTINEZ:  Objection.  Nonresponsive.

 2              THE COURT:  Sustained.  Restate the question

 3      BY MR. DELOZIER:

 4              Q.     Do you know how he got from place to place

 5      after she traded in the Lumina?

 6              A.     Yes.

 7              Q.     What was that?

 8              A.     Joe would take her back and forth to work.

 9              Q.     Okay.  At what point in time did she get

10      another vehicle or go back to using the old Dodge?

11              A.     They bought a new car.  Wendi and Joe bought a

12      new car.

13              Q.     This is what year?

14              A.     I'm not sure.

15              Q.     How long had they been married?

16              A.     They'd been married a couple years.

17              Q.     He's doing the windshield business and she's

18      working at the hospital?

19              A.     Yes.

20              Q.     Am -- are my facts right?

21              A.     Yes.

22              Q.     All right.  So they now have two new cars?

23              A.     Yes.

24              Q.     Okay.  What happened -- do you know if they

25      kept both of them?
```

```
 1              A.    No.
 2              Q.    What -- when did one of them leave or what did
 3   they do with it?
 4              A.    One of them --
 5              MR. MARTINEZ:  Objection.  Narrative, hearsay.
 6              THE COURT:  Sustained.  Rephrase the question.
 7   BY MR. DELOZIER:
 8              Q.    Do you know if they traded either one of them
 9   in for another vehicle?
10              A.    Yes.
11              Q.    What happened to it then?
12              MR. MARTINEZ:  Objection.  Hearsay.
13              THE COURT:  Overruled.  Go ahead and answer the
14   question if you can.
15              THE WITNESS:  It was stolen.
16              MR. MARTINEZ:  Objection.  Hearsay.  She wasn't
17   there, Your Honor.  She doesn't know.
18              THE COURT:  Overruled.  Go ahead.  Ask your next
19   question.
20   BY MR. DELOZIER:
21              Q.    Now, we're up to '96, I think.  The third
22   surgery is when?
23              A.    The third surgery was in February of '97.
24              Q.    February of '97?  Okay.  What did they do in
25   '96?  What was Wendi's life like in '96?  Where was she
```

1    working?

2         A.    In '96 she was trying to help Joe with his

3    business, the windshield business, and then she was helping

4    him in the Accu Glass business.

5         Q.    Okay.  So most 'of 96 they were both in that

6    business?

7         A.    Yes.

8         Q.    Okay.  All right.  And they were living at the

9    farmhouse?

10        A.    Yes.

11        Q.    Okay.  Why don't we -- since you mentioned

12   Christmas a little bit ago, why don't we discuss if you know

13   up to this point in '96, what Christmas was like, holidays

14   were like at Joe and Wendi's home?

15        A.    They -- they would spend Christmas Eve with us

16   and usually would go, except one year when they were in

17   Florida, but they would normally go with Alejo, Brandon and I

18   to Christmas service at the church early in the morning and

19   come back and spend some time with us and then go over to his

20   parents.  They -- Wendi would -- you asked me what it was

21   like or --

22        Q.    Uh-huh.

23        A.    Wendi would put up Christmas things.  She loved

24   Christmas because we didn't have Christmas for a lot of

25   times, but they never put up a tree, a Christmas tree.  Alejo

```
 1    and I would volunteer to by them a tree, but --
 2               MR. MARTINEZ:  Objection.  Narrative, relevance.
 3               THE COURT:  Sustained.
 4    BY MR. DELOZIER:
 5          Q.    Are there things that one normally associates
 6    with Christmas that were not present?
 7          A.    Yes.
 8          Q.    And what were they?
 9          A.    Christmas tree.
10          Q.    Okay.  Do you know why they didn't have one?
11               MR. MARTINEZ:  Objection.
12               THE WITNESS:  No.
13    BY MR. DELOZIER:
14          Q.    Up to this point in time did -- had Joe ever
15    done anything in your presence that threatened you, talking
16    up to '96?
17          A.    I -- yes.
18          Q.    What was it?
19          A.    I went to the lake a number of times with Joe
20    and Wendi and some of their friends, and one of the things
21    that would frighten me would be like on the way up there and
22    how he drove because it was scary driving up to Apache lake
23    and -- and we'd have these great big barrels of fuel and
24    stuff on the back and cans of nitrous oxide, and it was just
25    kind of scary all that stuff flying around.  And normally he
```

1    was drinking.  Joe was actually a lot of fun when he was

2    drinking, but he was scary.

3         MR. MARTINEZ:  Judge, I'm going to ask the previous

4    comment be stricken based on what she said earlier about him

5    being fun, drinking, that sort of stuff.

6         THE COURT:  I'll sustain the objection.  That last

7    portion will be stricken.

8    BY MR. DELOZIER:

9         Q.    Okay.  So up to 1996, right, those are the

10   that's only thing you recall that he did was driving fast?

11        A.    Driving fast and -- yeah.

12        Q.    Okay.  Were you able to observe Joe around

13   animals?

14        A.    Yes.

15        Q.    What did you observe?

16        A.    I saw him --

17        MR. MARTINEZ:  Objection.  Lack of foundation, date

18   and time.

19        THE COURT:  Sustained.  Lay some foundation.

20   BY MR. DELOZIER:

21        Q.    Okay.  When did you -- when did you observe

22   what you were -- an episode regarding an animal that you were

23   going to relate?

24        A.    Okay.  Sometime in 1996 I observed Joe shoot

25   Max, Wendi's dog, with a BB gun.

```
1              Q.     Anything else?  Any other episode?

2              A.     I've also seen him kick dogs.

3              MR. MARTINEZ:  Objection.  Lack of foundation as to

4     time.

5              THE COURT:  Lay some foundation.

6     BY MR. DELOZIER:

7              Q.     When was that?

8              A.     In 1996 I observed him kick Max, and later on

9     in '98, I believe it was, I observed him kicking Chewy, his

10    dog.

11             Q.     Up to 1996, right, and is it in early part of

12    '96 that was the third surgery.  Do I have my years right?

13             A.     '94, '95, then February of '97.

14             Q.     February '97?  Okay.

15             A.     Yes.

16             Q.     So we finished '96, trying to run the Accu

17    Glass business, Joe's windshield business, working together,

18    and living in the farmhouse, correct.

19             A.     Yes.

20             Q.     Okay.  So by February 1997 -- yeah 1997, where

21    are they living?

22             A.     The house attached to the shop.

23             Q.     Farmhouse?

24             A.     Farmhouse.

25             Q.     Okay.  So did I ask you who paid for the second
```

1    surgery?

2              MR. MARTINEZ:  Objection.  Relevance.

3              THE WITNESS:  No.

4              THE COURT:  The question was whether he asked you

5    that question.  It was a "yes" or "no" question.  Can you

6    answer that question?

7              THE WITNESS:  No.

8    BY MR. DELOZIER:

9         Q.    Do you know how it was paid for?

10             MR. MARTINEZ:  Objection.  Relevance.

11             THE COURT:  Overruled.  You can answer the question

12   if you know.

13             THE WITNESS:  Again, that was paid through Wendi's

14   insurance through her work.

15   BY MR. DELOZIER:

16        Q.    Okay.  We're up to February of 1997 and Nicolas

17   is still on the way?

18        A.    Yes.

19        Q.    Okay.  Just so we don't get confused, where did

20   this surgery take place?

21        A.    The third surgery took place at Tucson General.

22        Q.    Tucson General, same people involved in the

23   operations, same doctors?

24        A.    I believe that -- I'm not sure, but I believe

25   the same doctor from the second surgery was involved.

```
 1              Q.    Okay.  And how did that one go?

 2              A.    That one was more intensive.

 3              Q.    What does that mean?

 4              A.    He was under the knife longer.  He was in

 5     surgery longer.

 6              Q.    Uh-huh.

 7              A.    He had a longer recovery.

 8              Q.    Did he require more extensive treatment after?

 9              A.    Not so much on -- no.  Pretty much the same,

10     you know, cleaning the -- cleaning the site and changing the

11     dressings.

12              Q.    Okay.  And what was the diagnosis after the

13     third, if you know?

14              A.    They kept saying it was benign.

15              Q.    Okay.  You saw the photographs a moment ago

16     that we showed, Exhibit 420 and 421.

17              A.    Yes.

18              Q.    I don't have any exhibits of the third -- after

19     the third surgery, but can you give us a description of what

20     he looked like after the third?

21              A.    The doctor tried to follow along the same scar

22     as the second surgery so that it -- it wouldn't be so bad,

23     but you could definitely see more of an indentation, you

24     know, in his -- in his chin or in this area right here.

25              Q.    Uh-huh.  Now, so you come away from the third
```

1   surgery and the doctor is still saying benign?

2        A.    Yes.

3        Q.    So any changes in Joe or Wendi's behavior?

4        A.    Joe was in a lot of pain and his language was a

5   lot more abusive towards anybody.  He was angry.

6        Q.    So did he treat you differently?

7        A.    He -- he would be a little bit more short, but

8   I -- I'd say no, not really, because we were -- we were

9   close.  I had a lot of good times with him.

10       Q.    You guys took vacations together?

11       A.    Yes.

12       Q.    What were some of the places you went, would

13  go?

14       A.    We went to Sedona and we also went to Lake

15  Tahoe for a vacation.  I had been to New Mexico with him.  It

16  was a racing trip and we would do weekends, you know, go to

17  boat races or go to Apache Lake.  And also fourth of July to

18  Laughlin for the fireworks and to take the boats.

19       Q.    You say boats.  Was there more than one?

20       A.    Well, Joe had two boats and some of his friends

21  had boats.

22       Q.    Okay.  So it's sort of a group outing?

23       A.    Yes.

24       Q.    And of your family who would go?

25       A.    It would depend.

1          A.     Sometimes it would be Brandon and I, sometimes

2     it would be Alejo and Brandon, sometimes it would be all

3     three of us, depending you know, what was going on and what

4     time of year it was, you know, for work.

5          Q.     Up to this point, Wendi and Joe didn't have any

6     children, so it's just the two of them?

7          A.     Correct.  Well, when we went to Sedona they had

8     Nicolas and that's where Ashley was started.  Then when we

9     went to Lake Tahoe we had -- they had Nicolas and Ashley.

10         Q.     Okay.  So about how often would you folks make

11    these trips?

12         A.     Well, as far as like going to the lake or that,

13    maybe a couple times of year we would go up to the lake with

14    them.

15         Q.     Okay. How about the extended trips to Sedona

16    and so forth?

17         A.     Those weren't -- let's see.  The one to Sedona

18    was in '97 and one to Tahoe was '99.

19         Q.     And Laughlin?

20         A.     Laughlin, to be honest, I can't remember which

21    years, but it was several years that we went on the fourth of

22    July.

23         Q.     More than one?

24         A.     More than one.

25         Q.     Okay.  Now we're in '97, this is early '97,

1    though, right?  And Joe had a lot of pain and took a longer

2    time to recover --

3           A.    Yes.

4           Q.    -- I think you said.  By this time Accu Glass

5    is history?

6           A.    That's correct.

7           Q.    Okay.  And they're living in the farmhouse?

8           A.    Yes.

9           Q.    How are they supporting themselves?

10          A.    Alejo and I were paying a number of Wendi and

11   Joe's bills.  They'd bring me the utility bills, things like

12   that, different things, and I would pay for them.  I also put

13   money until they were -- I put down like 2500 for Nicolas for

14   the doctor because the doctor wouldn't --

15          MR. MARTINEZ:  Objection.  Narrative.

16          THE COURT:  Sustained.

17   BY MR. DELOZIER:

18          Q.    We're talking about the expenses and I'm asking

19   you specific examples of the kinds of things that you

20   assisted with?

21          A.    Okay.

22          Q.    Okay.  And, for example, how was the third

23   surgery paid for?  And they were out of the Accu Glass

24   business, and how did that get paid for?

25          A.    That was paid for through AHCCCS and I believe

1    that we -- my husband and I gave them money for the hospital

2    so they could get in because they wouldn't take just AHCCCS.

3    They needed cash, too.

4         Q.    Okay.  So after the surgery then we have a

5    period of convalescence where Joe's unable to work?

6         A.    Correct.

7         Q.    Wendi is not working because she's been working

8    in the glass business?

9         A.    And she was very pregnant.

10        Q.    Okay.  Thank you.  When -- when was Nicolas

11   born?

12        A.    Nicolas was born on June 20th, 1997.

13        Q.    Okay.  Were you able to observe the

14   relationship between Nicolas and Joe?

15        A.    Yes.

16        Q.    And how was it -- let's talk about birth the

17   first year, age 1?

18        A.    Okay.  Joe was -- well, he didn't like to

19   change -- he wouldn't change diapers in that first year

20   because it was messy.  If you would ask Joe to hold the baby,

21   you know, he would hold the baby, but he didn't want to take

22   him anywhere by himself.  He was proud of him, he had a

23   little boy.

24        Q.    So did he play with him?  Read books to him,

25   play toys with him, any of those kinds of activities --

1          A.     Not in the first --

2          Q.     -- that you saw?

3          A.     Not in the first year.

4          Q.     Okay.  So the change you saw, after the third

5     surgery was it, that he was more angry?

6          A.     He was more angry.

7          Q.     Did you see any acts of physical violence

8     toward Wendi during that period of time after the third

9     surgery?

10          A.     Just verbal abuse was more so -- he would be

11     yelling at her to do things for him and -- and, you know, she

12     already was doing lots of things for him, but he was a lot

13     more demanding --

14          Q.     Okay.

15          A.     -- of everyone.

16          Q.     At some point in time Wendi took a job?

17          A.     Wendi -- are you talking outside?

18          Q.     From the time Accu Glass was over and Joe had

19     his third surgery, at some point in time she was employed

20     again, wasn't she?

21          A.     Yes.  Well, she tried to do some at home-type

22     businesses to bring money in, sales, you know, type things.

23          Q.     What was her next job outside the home then?

24          A.     She took a job in May of 1998 at Courtyard

25     Apartments.

```
 1            Q.     That's approximately a year after Nicolas is
 2     born?
 3            A.     That was a year after Nicolas was born and she
 4     was pregnant with Ashley.  And the -- she needed a job
 5     because they needed insurance to cover the birth.
 6            Q.     And you said a moment ago you had to assist
 7     with the cost of Nicolas's birth?
 8            A.     Yes.
 9            Q.     Did you have an agreement with Wendi after
10     Nicolas was born?
11            A.     From the -- yes.
12            Q.     What was it?
13            A.     It was that we told them that, you know, Wendi
14     would stay home whenever they had their first child, if she
15     could stay home for a year we would help them, you know, with
16     bills.
17            Q.     Okay.  And did you?
18            A.     Yes.
19            Q.     What were they driving at this point in time?
20            A.     When Nicolas was born, it was a -- a blue or
21     green pickup truck, fairly new, Chevy.
22            Q.     That same one they bought in '94?
23            A.     I believe so.
24            Q.     Okay.  So they had one pickup truck?
25            A.     Yes.
```

1          Q.     Okay.  Was there a point in time after this
2     third surgery that Joe became employed again?
3          A.     I think he might have been like -- not really.
4     He might have been doing like windshields on the side or I
5     think he would go to -- I don't remember, but I think he
6     would go to Tucson and work for a friend of his that was
7     painting on the side.
8          Q.     Okay.  Now, how old was Nicolas when Ashley was
9     born?
10          A.     They're 15 months apart.  He's 15 months.
11          Q.     So that would put us into '98?
12          A.     Yes.
13          Q.     In what, September?
14          A.     September 16th of 1998 is when Ashley was born.
15          Q.     Okay.  Nicolas birth again was?
16          A.     June 20th, 1997.
17          Q.     Okay.  So between age 1 and 2 for Nicolas, did
18     you have -- were you able to visit with Joe and Wendi when
19     Nicolas was present?
20          A.     Yes.
21          Q.     And did you -- were you able to notice the
22     relationship between Joe and Nicolas during that period of
23     time?
24          A.     Yes.
25          Q.     And what did you notice?

1          MR. MARTINEZ:  Objection.  Asked and answered.

2          THE COURT:  Overruled.

3  BY MR. DELOZIER:

4          Q.    This is between age 1 and 2.

5          A.    Right.

6          Q.    Between age 1 and 2.

7          A.    Okay.  Between age 1 and 2 as -- as Nicolas got

8  older and was walking, he would follow his dad around and

9  he -- he would go out into the shop by the area where Joe

10  would be working on boats or whatever like that.

11          One of the things that I observed was that Joe

12  thought it was real funny when Nicolas would slap his mom,

13  and I didn't think that was appropriate and mentioned that.

14  But he still wasn't really taking him too many places yet

15  because of the diaper situation, you know.  As long as he was

16  in diapers, he didn't really want to have to do that.

17          Q.    He was really proud of him though, wasn't he?

18          A.    Oh, he was so proud of him.  And --

19          (Pause in proceedings.)

20  BY MR. DELOZIER:

21          Q.    Take your time.

22          A.    And Nicolas looks like him, like his dad.

23          THE COURT:  This will be a good time to take our

24  afternoon break.  We'll take our break at this time.

25          During this break remember the entire

1    admonition I gave you including the fact you're not to

2    discuss this case with anyone, do not let anyone discuss the

3    case with you, keep an open mind during the break.  We'll see

4    you in 20 minutes.

5

6                    (Recess.)

7

8                THE COURT:  This is CR 2000-096032, State of Arizona

9    versus Wendi Elizabeth Andriano.  The record will reflect the

10   presence of the Defendant, Counsel and the jury.  Donna Ochoa

11   is on the witness stand.  And we'll continue with the

12   redirect -- sorry, direct examination by Mr. DeLozier.

13               MR. DELOZIER:  Thank you, Your Honor.

14

15   CONTINUED DIRECT EXAMINATION BY MR. DELOZIER:

16               Q.    Now, Donna, you've known Joe now for, what, was

17   it early '92?

18               A.    Middle of '92.

19               Q.    Okay.  Middle of '92, so we're in the middle of

20   '97, so it's five years or so.

21               A.    Yes.

22               Q.    Right?

23               A.    Yes.

24               Q.    You had an opinion when you first met him about

25   what his reputation was in the community.  Has that changed?

```
 1    It's a yes or no.

 2              A.    Yes.

 3              Q.    Okay.  On what basis?

 4              A.    On the basis of our conversation that I had

 5    with my son-in-law.  We were going up to Phoenix.  This would

 6    have been after his --

 7              MR. MARTINEZ:  I'm going to object on the grounds of

 8    hearsay.

 9              THE COURT:  Let me see Counsel here at the bench.

10

11              (The following proceedings were held at the

12    bench:)

13

14              THE COURT:  Where she's going isn't proper.

15    Reputation --

16              MR. DELOZIER:  Yes, it is.  Is that your --

17              THE COURT:  -- isn't proper.

18              MR. DELOZIER:  It's proper, yes.  Oh, sorry.  I

19    thought you were asking.

20              THE COURT:  It's not proper.

21              MR. DELOZIER:  Something she witnessed.

22              THE COURT:  Are you going into specific --

23              MR. DELOZIER:  Yes.

24              THE COURT:  -- conduct?  Okay.  Because sounds like

25    you asked her about reputation and now she was going to go
```

```
 1    into something he said --
 2              MR. DELOZIER:  Okay.
 3              THE COURT:  -- which I don't think is appropriate.
 4              MR. DELOZIER:  Okay
 5              THE COURT:  Are you going into some specific conduct
 6    as far as showing --
 7                   (Attorney-attorney discussion.)
 8              MR. DELOZIER:  Yes.  Yes, it's -- it's conduct.
 9    That's what I was -- what I was going to say and the offer
10    that I'll make is she's going to say he threatened to kill
11    somebody.
12              MR. MARTINEZ:  But that's not a reputation.  That's
13    an instance.  I mean, he's asking her about the reputation.
14    That's something that you hear about in the community.  If he
15    wants to ask her about a time when he may or may not have
16    threatened to kill somebody and she communicated that to the
17    defendant, then it comes in, but other than that, it does
18    not.
19              THE COURT:  Because the way you asked it.  You
20    asked --  you said something to the effect did you have --
21    did your opinion of his reputation in the community change.
22              MR. DELOZIER:  Right.
23              THE COURT:  Okay.  Then she said yes, then you said,
24    well, how did it change?  Now she's going into that specific
25    instant, okay?  That has nothing to do with reputation.
```

```
 1            MR. DELOZIER:  I understand.

 2            THE COURT:  Sounds like you're going into a specific

 3     instance where he made a threat and this -- I guess you're

 4     going to tie it up to some other time that your client was

 5     aware of this threat.

 6            MR. DELOZIER:  Uh-huh.

 7            THE COURT:  Okay, then.  That's fine.

 8            MR. DELOZIER:  Okay.

 9            THE COURT:  Make it clear it's not --

10            MR. MARTINEZ:  Judge, just so we're clear, and he

11     doesn't have to do it this way, but I would ask whatever the

12     predicate question is, do you remember an instance of conduct

13     and then did you relay that to the defendant, rather than

14     having her go right into it and have her say no, I didn't.

15            MR. DELOZIER:  Okay.  No problem.

16            THE COURT:  Yeah.  If you're going, like we discussed

17     previously, if you go into the reputation, it should be

18     something to the effect of have you heard the reputation --

19            MR. DELOZIER: Um-hmm.

20            THE COURT:  -- and then what the opinion, do you have

21     an opinion concerning whether Mr. Andriano or whatever.

22            MR. DELOZIER:  Okay.

23            THE COURT:  Ask it in that fashion --

24            MR. DELIZIER:  okay.

25            THE COURT:  -- so it's clear.
```

```
 1              MR. DELOZIER:  Very good.  Thank you.

 2

 3              (The following proceedings were held in open

 4    court:)

 5

 6              THE COURT:  Mr. DeLozier?

 7    BY MR. DELOZIER:

 8         Q.    Was there a specific instance that you were

 9    with Mr. Andriano and that you -- and you relayed that

10    instance to his wife, Wendi, that bothered you?

11         A.    Yes.

12         Q.    And about when was that?

13         A.    That would have been in the Spring of 1997.

14         Q.    And what was that instance?

15         A.    It was -- I relayed the fact that I'd had a

16    conversation where --

17         Q.    What was the instance?  What did he --

18         A.    Joe was very angry, upset.  He appeared to be

19    highly agitated and said that he was going to kill someone.

20         Q.    And you related that to Wendi?

21         A.    Yes, I did.

22         Q.    And who was he threatening to kill?

23         A.    His ex-partner, Jerry.

24         Q.    That's Jerry from the Accu Glass business?

25         A.    That was Jerry from the Accu Glass.
```

1          Q.   Now, you've watched this family, if you will,

2    Wendi and Joe now, for 5 years, as a mother and a

3    mother-in-law, right?

4          A.   Yes.

5          Q.   And then you knew them before they were

6    married, or knew Joe before he was married?

7          A.   Yes.

8          Q.   Do you have an opinion about who was in control

9    in that family?

10         A.   Joe was in control of the family.  There's no

11   doubt about that.  He's the one that made the decisions.  He

12   even made the decision about where to have their reception

13   and things like that.  He made the decisions what cars to buy

14   and --

15         Q.   How about people that could be in the wedding?

16         MR. MARTINEZ:  Objection.  Hearsay.

17         THE COURT:  Sustained.

18   BY MR. DELOZIER:

19         Q.   Do you know if he made a decision or choice or

20   about who could actually participate in the wedding?

21         A.   Yes, he did.

22         Q.   And -- okay.  The -- in '97 Nicolas was born.

23   Am I right again?

24         A.   That's correct.

25         Q.   Okay.  And that was in which month?

1        A.      That was in June.

2        Q.      Okay.  And we talked about that was after the

3    third surgery, right?

4        A.      Correct.

5        Q.      Okay.  And we -- we had seen -- let me rephrase

6    that.  Did you see changes in Joe after the third surgery?

7            MR. MARTINEZ:  Objection.  Asked and answered.

8            THE COURT:  Sustained.

9    BY MR. DELOZIER:

10       Q.      You answered that one.  I apologize.  Did he

11   treat Wendi any differently after the third surgery?

12           MR. MARTINEZ:  Objection.  Asked and answered.

13           THE COURT:  Sustained.

14   BY MR. DELOZIER:

15       Q.      At some point in time there was a fourth

16   surgery?

17       A.      Yes, there was.

18       Q.      Okay.  When was that?

19       A.      That was in 1998.

20       Q.      Do you remember what month?

21       A.      August.

22       Q.      What led Joe to believe that he needed another

23   surgery in -- in August of 1998, if you know?

24       A.      Yes, I do.

25       Q.      What is it?

1         A.      Well, he was told that he needed to have

2    surgery.

3         Q.      Are these the same people that had done the

4    first three?

5         A.      No.

6         Q.      So he went to someone different?

7         A.      Yes, he did.  He went to a physician to have it

8    checked out because he was in pain again and he could -- he

9    could feel the bumps, lumps, whatever you want to -- however

10   it was described, but he could feel the growth coming back

11   and he was in a lot of pain.  So he went to a physician in

12   Tucson and he was -- the doctor, you know, took x-rays of him

13   and discovered that he had spots on his lungs as well as the

14   growth again.

15        Q.      Okay.  And that -- that led to the surgery in

16   August of '98?

17        A.      Yes.

18        Q.      Now, Wendi's working now?

19        A.      Yes.

20        Q.      Have they moved out of, and I probably misnamed

21   it when I said "farmhouse."  Tell me a little bit more about

22   what that place looked like?

23        A.      It was -- well, if you went down a dirt road,

24   got out on the field and when you first saw it, you'd see

25   this great big huge like tall shed with the metal, you know,

1    that equipment like columbines or something could fit under.

2    And then along the, I believe it's the west length which

3    would be like the long side of the rectangle was what had

4    been a building -- it was a building I guess, -- that had

5    been part of the shop, like an office and stuff, and I

6    believe part of it had been converted for Joe's younger

7    brother.  So it had a kitchen and a bathroom and a living

8    room, and there was another room that at the time had been

9    filled with stuff and -- and my husband actually helped them

10   move things and he laid carpet down and there was a bed

11   room.  So it was like -- almost like a trailer where it was

12   one long length --

13          Q.    Okay.

14          A.    -- attached to the shop.

15          Q.    Okay.  Now, from the third surgery to the

16   fourth surgery was anybody working in the family?

17          A.    After this third surgery, Joe pretty much

18   stayed home with Wendi while, you know, she was pregnant then

19   had the baby and that's when we were helping them out

20   financially.  Like I said, I believe he may have gone and

21   done some work for a couple of his friends in Tucson, but

22   that was usually under the table where he was paid.  He

23   wasn't drawing a paycheck or anything.  And then --

24          MR. MARTINEZ:  Objection.  Hearsay.  Lack of

25   foundation how she knows.

```
1              THE COURT:  Ask your next question.

2   BY MR. DELOZIER:

3         Q.    So was Wendi working?

4         A.    Wendi began working in May, the end of May of

5   1998.

6         Q.    May 1998.  Is that before Ashley's born?

7         A.    That was before Ashley was born.

8         Q.    And Nicolas is now, what, 8, 9 months?

9         A.    He's about 11 months old.

10        Q.    11 months old?  And where did she go to work?

11        A.    She went to work as a manager at Courtyard

12  Apartments in Casa Grande.

13        Q.    And did they provide an apartment for them to

14  live in?

15        A.    Yes, they did.  They provided them with a

16  two-bedroom apartment.

17        Q.    So they were able to move out of the --

18        A.    Yes.

19        Q.    -- okay, the farm property?

20              Do you know about when they moved into that

21  facility?

22        A.    Probably right after Memorial day, right around

23  the first of June.

24        Q.    '98?

25        A.    '98.
```

1        Q.    Okay.  During this five, six-year period, are

2    there still lake activities going on?

3        A.    Oh, yes.

4        Q.    Did you --

5        A.    Joe loved the lake.  He loved boats.  He wanted

6    to be a professional boat race driver, so second best -- he

7    had his boats.  At the time, I think, Nicolas was born, there

8    were two boats and -- beautiful race boats.  They both ran on

9    nitrous, which makes them go really, really fast.

10       Q.    Well --

11       A.    Also fuel, but he would add a nitrous oxide

12   bottle to it and --

13       Q.    So when you say really, really fast, I'm not a

14   boater so I don't know.  What do you mean?

15            MR. MARTINEZ:  Objection.  Relevance.

16            THE COURT:  Sustained.

17   BY MR. DELOZIER:

18       Q.    Well, it took -- when he's driving the boat,

19   okay, it's not like you're cruising around in a little

20   fishing boat, right?

21            MR. MARTINEZ:  Objection.  Relevance.

22            THE COURT:  Sustained.

23            MR. DELOZIER:  Can we approach?

24

25            (The following proceedings were held at the

# APPENDIX G - Part 3

1   bench:)

2

3          MR. DELOZIER:  They've raised the issue that he was

4   very weak at the end.  What I'm trying to demonstrate is he

5   was not.  These boats went over 100 miles an hour and it took

6   a great deal of strength to control them.  He was up there

7   quite often.

8          THE COURT:  Mr. Martinez?

9          MR. MARTINEZ:  He was weak at the time.  Before that

10  he could be boating around, wherever.

11         MR. DELOZIER:  What we're doing is the same

12  foundational stuff.

13         THE COURT:  I don't think it's relevant.  You were

14  talking about the time frame of --

15         MR. DELOZIER:  Before the fourth surgery.

16         THE COURT:  I don't think it's relevant, okay?  I

17  wasn't sure where you were going.  I don't think it's

18  relevant.  Let's move on.

19

20              (The following proceedings were held in open

21  court:)

22

23         THE COURT:  Ask your next question.

24  BY MR. DELOZIER:

25         Q.    After the third surgery, did you notice any

1    decrease in Joe's physical abilities?

2         A.    No.

3         Q.    And so he was still going to the boat -- I

4    mean, to the lake frequently?

5         A.    He was -- oh, yes.  He was still going to the

6    lake frequently.  And one of the things he had to do was take

7    a --

8         MR. MARTINEZ:  Objection.  Nonresponsive.

9         THE COURT:  Just answer the question that's asked.

10   Ask your next question.

11   BY MR. DELOZIER:

12        Q.    How many times a month would he be going to the

13   lake, if you know?

14        A.    In the summertime, three or four times a month.

15        Q.    Okay.  Now, this is '97 after the third surgery

16   or '98?

17        A.    Yes.

18        Q.    Okay.  Did Wendi go with him?

19        A.    On occasion.

20        Q.    How about Nicolas?  He was a little baby at

21   this point.  Did he get to go?

22        A.    Yes.

23        Q.    So when she went, he went.  Is that what you

24   mean?

25        A.    Yes.

     1          Q.    Okay.  And you went how many times a year?

     2          A.    Depending on how many times I could get off

     3   because Joe would leave on a Friday and not come back until

     4   Sunday and I would have to work.  Quite a bit at the time.  I

     5   went quite a few times.

     6          Q.    Uh-huh.  Can you tell us a little about how the

     7   weekend would go.  Where did you sleep?  What did you do?

     8          MR. MARTINEZ:  Objection.  Relevance.

     9          THE COURT:  Sustained.

    10   BY MR. DELOZIER:

    11          Q.    Did you stay out all weekend?

    12          A.    Yes.

    13          Q.    Okay.  Was there any alcohol consumed?

    14          MR. MARTINEZ:  Objection.  Relevance.

    15          THE COURT:  Sustained.

    16   BY MR. DELOZIER:

    17          Q.    During these outings, did you have an occasion

    18   to see Joe drunk?

    19          A.    Yes, I did.

    20          MR. MARTINEZ:  Objection.  Relevance.

    21          THE COURT:  I'll sustain the objection.

    22   BY MR. DELOZIER:

    23          Q.    Did you have any occasion to see any violence

    24   on any of these occasions?

    25          A.    Yes.

1        Q.    What did you see?

2        A.    One time --

3        MR. MARTINEZ:  Objection.  Lack of foundation, days

4    and time.

5        THE COURT:  I'll sustain the time.  Lay some

6    foundation.

7    BY MR. DELOZIER:

8        Q.    We're talking about the year 1997, the fourth

9    surgery, so it's -- the period we're referring to is from

10   third surgery to when?  Before the fourth surgery?

11       MR. MARTINEZ:  Objection.  Leading.

12       THE COURT:  Overruled.

13       MR. DELOZIER:  Trying --

14       THE COURT:  Go ahead and answer the question.

15       THE WITNESS:  Okay.  During the summer.

16   BY MR. DELOZIER:

17       Q.    So during that period of time prior to the

18   fourth surgery, after the third surgery, did you see any acts

19   of violence during these trips to the boat -- the boating --?

20       A.    Yes, I did.

21       Q.    What did you see?

22       A.    New Mexico, in the summer, I believe it was

23   August 1997, we were at a boat race.  I went, Wendi went, the

24   baby was there.  The baby was only a couple months old.  We

25   were going to sleep outside and I said I just did not think

1    that was appropriate for the baby, so I rented a room and was

2    yelled at about renting the room to get the baby inside.

3                    And then later that night, at boat races people

4    drink and Joe had been drinking, and someone made a comment

5    to him and he started to go after him and Frank had to hold

6    him back.

7        Q.    Was that the only time that you saw anything

8    during that one year period of time?

9        A.    I --

10       Q.    I'm talking about specifically boating

11   activities?

12       A.    Specifically boating activities?

13       Q.    That's it.

14       A.    I would see him get angry at other people if

15   they got into his way when he was, like, pulling the boat out

16   or anything.  He yelled a lot.  Yelled a lot at people.

17       Q.    Now, they're back living at the Courtyard,

18   right?

19       A.    Yes.

20       Q.    Okay.  And Nicolas is approaching one year?

21       A.    Correct.

22       Q.    Wendi's working at that location --

23       A.    Correct.

24       Q.    -- in the apartment there, right?

25       A.    Yes.

```
 1        Q.    And what's Joe doing?
 2        A.    Again, when he was working, he was doing side
 3   jobs, odd jobs.
 4        Q.    Okay.  So coming to the fourth surgery, and
 5   this is August of 1998, I think you testified, correct?
 6        A.    Yes.
 7        Q.    And he had gone to some different doctors.  Do
 8   you know who they were?
 9        A.    I don't recall the doctor's name, but I believe
10   he was on Ironwood or Orange Grove in Tucson --
11        Q.    Okay.
12        A.    -- because I went there.
13        Q.    All right.  Do you know how this surgery was
14   paid for?
15        MR. MARTINEZ:  Objection.  Relevance.
16        THE COURT:  Overruled.  Go ahead and answer the
17   question if you can.
18        THE WITNESS:  This surgery was paid for several
19   different ways.  I need to explain that a little bit better
20   in that I -- I fought for Joe to go to the Mayo Clinic and
21   had to -- because his insurance company, which was Pacificare
22   at the time, did not want to pay for Mayo Clinic the first
23   time he went to the Mayo clinic.  They were told they had to
24   put $500 up front before the doctors would even see him.
25   Wendi and Joe looked over, and it was myself and Alejo, Joe
```

```
 1    and Joe's parents, Mr. And Mrs. Andriano, and Joe said --
 2              MR. MARTINEZ:  Objection.  Relevance.
 3              THE COURT:  Let me see Counsel here at the bench.
 4
 5              (The following proceedings were held at the
 6    bench:)
 7
 8              THE COURT:  Let me ask you something.  I don't have
 9    any problem with her telling us that, hey, this surgery was
10    paid by X persons or whoever insurance company, whatever,
11    because it -- it sounds like you're getting to there was some
12    financial considerations that were brought up as far as their
13    financial situation that might be, I guess, remotely related
14    to what the State's alleging, okay?  But does it matter as
15    far as getting into specifics of all this that she's getting
16    into?
17              MR. DELOZIER:  Well, when --
18              THE COURT:  Do you understand what I'm saying?
19              MR. DELOZIER:  When I ask the question, she's trying
20    to answer it.  I'm not trying to make her draw it out.
21              THE COURT:  I know, but is it something -- what she's
22    going to say, is it something relevant?
23              MR. DELOZIER:  These people had significant financial
24    problems that enhanced their hopelessness.  That's what I'm
25    trying to do.
```

```
 1              THE COURT:  I understand.  That's why I'm allowing
 2    you to go into that, but don't get into every minute detail.
 3              MR. DELOZIER:  Maybe I could say who paid for the --
 4              THE COURT:  Right.  Just ask her.
 5              MR. DELOZIER:  Rather than open ended.
 6              THE COURT:  I'll --
 7              MR. MARTINEZ:  Judge, he's just intending to smear
 8    the mother and father because the whole story they tell to
 9    me, according to them, of course, they were asked or told you
10    have to put up this money -- I think I heard 800 last time
11    during the interview, and they said the Andrianos did
12    nothing.
13              MR. DELOZIER:  I'm not asking that.
14              MR. MARTINEZ:  I'm just telling the Judge,
15              MR. DELOZIER:  That's not what I'm asking.
16              MR. MARTINEZ:  He doesn't know how she's going to
17    answer that and I don't see how that's relevant.
18              MR. DELOZIER:  I agree.  I'm not asking that.
19              THE COURT:  You can get into the amount and where it
20    came from, but leave it at that.  Don't get into the minute
21    details.
22              MR. DELOZIER:  I understand.  Thank you.
23
24              (The following proceedings were held in open
25    court:)
```

1

2          THE COURT:  Mr. DeLozier.

3          MR. DELOZIER: Thank you, Your Honor.

4    BY MR. DELOZIER:

5          Q.    Donna, so and you Alejo put up the money?

6          A.    Yes, we did.

7          Q.    Did Pacificare put -- pay for some of it?

8          A.    Yes, they did.

9          Q.    There was additional funds from Pacificare and

10   there was what you made?

11         A.    Yes, there was.

12         Q.    Did you try to raise the money through benefits

13   or what did you do?

14         A.    There was --

15         MR. MARTINEZ:  Objection.  Nonresponsive, what did

16   she do?

17         THE COURT:  Go ahead and answer the question that he

18   asked you, the specific question he asked you.

19         THE WITNESS:  I was party to some friends that had

20   asked to do a benefit for Joe to raise money.

21   BY MR. DELOZIER:

22         Q.    Showing you what's been marked for

23   identification as Exhibit 431, did you take that photo?

24         A.    Yes, I did.

25         Q.    What is it?

1        A.      It's a sign outside of the lodge that said "Joe

2    Andriano Benefit Dinner and Dance, October 30th," and it was

3    in 1998.

4        Q.      Okay.

5        A.      In fact, that was the place they had their

6    reception.

7        Q.      Thank you.

8        MR. MARTINEZ:  I think he's offering that exhibit,

9    Your Honor.  He hasn't said it.

10       MR. DELOZIER:  I was showing it to you.

11       THE COURT:  Are you offering the exhibit?

12       MR. DELOZIER:  Offer 431 into evidence.

13       THE COURT:  Any objection?

14       MR. MARTINEZ:  Yes, sir.  Relevance.

15       THE COURT:  Exhibit 431 for identification is

16   admitted into evidence.

17   BY MR. DELOZIER:

18       Q.      That's the photograph of Exhibit 431, correct?

19       A.      Correct.

20       Q.      Okay.  That's the photograph that you took?

21       A.      Yes, it is.

22       Q.      That's the benefit that you're referring to?

23       A.      Yes, it is.

24       Q.      Thank you.  Okay.  So now we've financed the

25   surgery, he's had it.  Is that correct?

1         A.     Yes.

2         Q.     Okay.  And how did it go?

3         A.     Sadly, it went -- it went sadly.   The

4    physicians did the best that they could, but the cancer had

5    already metastisized at Stage IV, which means as -- which

6    means it had already spread into other organs in his body.

7         Q.     Okay.  Now, was there any kind of special

8    things that had to be done for him after this surgery?

9         A.     Yes.  Very much so.

10        Q.     What were they?

11        A.     During this surgery, they did what's called a

12   radical where they actually take out muscle and -- and tissue

13   and everything all through here, so basically it was just

14   like, just bones.  They went up, took part of his tongue out,

15   up into the roof of his mouth, and the scar went like -- like

16   this way down this far and then far down into the shoulder a

17   little bit.  It had to be dressed -- started out four times a

18   day because you had, to explain it, there was a little bottle

19   that had gauze in it that was like a long string, and it had

20   to be shoved up into his -- the area, now, through an open

21   hole.  They couldn't close it because they needed it to heal

22   from the inside out.  Also, he had to have a trach, which

23   means they had to, you know, put him on the ventilator, they

24   had to put the hole right here so he could breathe.  He went

25   home with -- after they took him off, they took him off

1    before they let him go home, and that area had to be taken

2    care of as well.  Joe went home with a feeding tube that

3    entered through his nose and down into his stomach, so he

4    also had to be fed.

5              I didn't have any problem at all taking care of

6    the trach site because that's part of what I do as a

7    respiratory therapist.  The -- I also would feed Joe through

8    the feeding tube three times a day, and my sister, who is an

9    RN, had volunteered to come out, you know, after the surgery

10   and stuff, but she wasn't able to get there for a couple

11   weeks.  I tried to do the -- where you put the gauze in

12   and -- and I couldn't do it, so my husband Alejo did.  And

13   he -- Joe asked him to go -- my husband was taught by the

14   physicians how to do that.  They even gave us equipment from

15   the hospital from the Mayo Clinic to do that because

16   insurance companies unfortunately let people out of the

17   hospital too soon.  I would go over at the beginning four

18   times a day to take care of the trach site and feed Joe

19   through the tube, and my husband was going four times a day

20   to repack the site, and packing the site probably went on for

21   a good six weeks, maybe longer.

22             Q.    Where -- I'm sorry.

23             A.    That's okay.

24             Q.    You finished?

25             A.    Just to say that, you know, my husband and I

1    would both have to leave work, you know, to be able to do

2    those things, but that's something that we wanted to do.

3         Q.    Where did you live in relation to the

4    Courtyard?

5         A.    Maybe two miles.  I worked maybe three miles,

6    four miles from the apartment.

7         Q.    So this Courtyard's in Casa Grande?

8         A.    The Courtyard's in Casa Grande.

9         Q.    Okay.  Because you worked there, and what was

10   Alejo doing as work in those days?

11        A.    Alejo was running the -- the family tortilla

12   shop.  He's the manager at Ochoa's tortillas.

13        Q.    Okay.  Wasn't he also a pastor or something?

14        A.    Yes.  He was also at the same time involved

15   in -- still involved in a church as a youth pastor and

16   performing functions on Wednesdays and Sundays, and then any

17   other times that they would do things with the youth.

18        Q.    Let me show you what's been marked for

19   identification as Exhibit 430 and see if you could tell me

20   what this is.  Did you take that photograph?

21        A.    Yes, I did.  It's a photograph of Joe and

22   Nicolas' godfather, some of the other children.  It was at

23   Nicolas's birthday party at Peter Piper's Pizza and it shows

24   in the picture where you could see the scar on Joe's neck

25   from the fourth surgery.

114

1           MR. DELOZIER:  Thank you.  Move for admission of

2     Exhibit 430.

3           THE COURT:  Any objection?

4           MR. MARTINEZ:  No, sir.

5           THE COURT:  Exhibit 430 is admitted into evidence.

6           MR. DELOZIER:  Thank you.

7     BY MR. DELOZIER:

8           Q.    Is that the photograph you just identified?

9           A.    Yes, it is.

10          Q.    Okay.  Is that Joe?

11          A.    Yes, it is.  And you can see from the picture

12    how the scar is.

13          Q.    It's hard to tell what angle is the best.  So

14    you're looking at the left shoulder?

15          A.    Looking at the left shoulder --

16          Q.    Left neck?

17          A.    -- and left side of his neck.  You could see

18    there's no longer muscle or -- or fatty tissue there.  And

19    that was approximately -- his surgery was in August of 1998.

20    That would have been June of 1999.

21          Q.    This would have been June 1999?

22          A.    Yes.

23          Q.    Okay.  So we're looking at eight, what, ten

24    months later?

25          A.    Correct.

1        Q.     Okay.  Now, you mentioned that this went --

2   this was -- this one went bad.  Obviously, it was much more

3   radical, but, I mean, what else did you mean when you said it

4   went bad?

5        A.     Because there was no way of knowing if all of

6   the cancer was gotten.  They just -- what they just tried to

7   do was get as much as they could at that time.  They were

8   still concerned that it had traveled up his head because that

9   type of cancer doesn't just always -- it goes from place to

10  place.  In fact, Dr. Green was practically crying when he

11  came out and talked to him.

12       MR. MARTINEZ:  Objection.  Relevance.

13       THE COURT:  Sustained.  Let's move on.

14  BY MR. DELOZIER:

15       Q.     Up to this point in time I thought you told us

16  everyone told you it was benign.  Are you telling me now

17  you're being told something different?

18       A.     Yes.

19       Q.     What were you being told?

20       A.     That it was, again, it was adenoid cystic

21  carcinoma, that it was Stage IV.  After the doctor in Tucson

22  has taken pictures and x-rays and found out there were spots,

23  they did biopsies of the spots.  They were asked to provide

24  slides of the tissue from each of the prior three surgerys,

25  and they were sent to -- Joe's uncle knew somebody who worked

```
 1    for the government, I believe, and they was sent to I believe

 2    Bethesda, Maryland, and the experts there looked at the three

 3    slides and determined that it had been malignant from the

 4    very beginning.

 5         Q.    Okay.  How long after the surgery did you --

 6    did you learn that?

 7         A.    We learned that before the final surgery.

 8         Q.    Oh, you knew it before?

 9         A.    Yes.

10         Q.    Okay.  Did you notice any changes in Joe after

11    this surgery?

12         MR. MARTINEZ:  Objection.  Lack of foundation.  We

13    now have him at the pizza parlor immediately after or two

14    years after.

15         THE COURT:  Why don't you provide more foundation?

16    BY MR. DELOZIER:

17         Q.    Within -- did you say Wendi was pregnant with

18    Ashley --

19         A.    Wendi was pregnant with Ashley, yes.

20         Q.    -- at the time of the fourth surgery?

21         A.    At the time of the fourth surgery, she was

22    pregnant with Ashley, yes.

23         Q.    That was in August, and Ashley was born --

24         A.    September 16.

25         Q.    -- just a month or so later?
```

1          A.     Yes, less than a month.

2          Q.     Right.

3          A.     Yes.

4          Q.     So now we have two babies?

5          A.     Now, we have two babies 15 months apart, a

6     husband who just had major surgery.

7               MR. MARTINEZ:  Objection.  Nonresponsive.

8               THE COURT:  Overruled.  Go ahead and ask the next

9     question.

10    BY MR. DELOZIER:

11         Q.     So we have two babies?

12         A.     Two babies.

13         Q.     Okay.  They're still living at the apartment at

14    the Courtyard?

15         A.     Yes, they are.

16         Q.     Okay.  And you and Alejo are going over several

17    times a day to take care of it, right?

18         A.     Correct.

19         Q.     So let's -- take us up from that period of time

20    until Christmas of 1998.  Did you notice any changes in Joe's

21    behavior during that period of time?

22         A.     Of course he was very depressed because he felt

23    like he was never going to be able to see his children grow

24    up, which basically was a fact, a true fact.  He wanted to,

25    you know, spend time with them.  He took money from the

```
 1    benefit and went to an alternative treatment --
 2              MR. MARTINEZ:  Objection.  Nonresponsive.
 3              THE COURT:  Sustained.
 4    BY MR. DELOZIER:
 5         Q.    What we're talking about now was the things he
 6    did differently.
 7         A.    Okay.
 8         Q.    We'll get into alternative -- what you're
 9    alluding to, what you're addressing a little later.
10         A.    Okay.
11         Q.    We're still in Fall and early winter, if you
12    will, of 1998, and we're asking specifically for changes in
13    his behavior patterns that you had seen over the last five,
14    six years that you're now seeing after the fourth surgery.
15         A.    Okay.  He was very -- he was depressed.  He was
16    upset.  Everything -- you know, in his life, of course,
17    everything, you know, focused on him because that was the big
18    thing going on, so much so that even when Wendi went into
19    labor, Joe insisted that we -- that we redo his bandages and
20    everything and -- and take a shower and everything before we
21    drove Wendi to the hospital.  And because of that, Ashley was
22    almost born in the car.
23              MR. MARTINEZ:  Objection.  Relevance.
24              THE COURT:  Sustained.  Let's move on.
25              THE WITNESS:  Okay.
```

1    BY MR. DELOZIER:

2         Q.    Was that a behavior change that you saw?

3    That's what my question was.

4         A.    Yes, it was.  Yes, it was because in the past,

5    like with Nicolas, you know, we were going to go, you know,

6    the baby's coming, you know, or it's, you know, time for

7    the -- for the baby to be induced as it was with Nicolas,

8    but, you know, he would have been more, you know, let's hurry

9    and go and he wasn't.

10        Q.    Very good.  Did you notice any difference in

11   the way he treated Wendi?

12        A.    He -- he was treating Wendi more like she was

13   there to do everything for him even more so than she had in

14   the past.  She not only -- she went back to work about a week

15   and a half after Ashley was born, but yet he was still

16   consistently saying "I want this, I want that," you -- you

17   know, "You're not doing things right, You can't ever do

18   anything right."

19        MR. MARTINEZ:  Objection.  Lack of foundation.

20        THE COURT:  Sustained.  Ask your next question.

21   BY MR. DELOZIER:

22        Q.    My question for you is did he treat you any

23   differently?  Did he treat your daughter, Wendi, any

24   differently?

25        A.    Yes.  He was a lot harder to please.

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1          Q.     And he was more demanding?

2                 MR. MARTINEZ:  Objection.  Leading, lack of

3     foundation.

4                 THE COURT:  Sustained.  Don't lead

5     BY MR. DELOZIER:

6          Q.     Can you give me characteristics that you saw

7     that were changes?  Now are you clear?

8          A.     Okay.  Changes.

9          Q.     It could be changes that became more pronounced

10    that were already there.

11         A.     Correct.  There was an incident in the Fall of

12    1998 where Nicolas pulled down a crockpot and landed on his

13    head.  And instead of, you know, trying to take care of

14    Nicolas, all of a sudden Joe just blew up and started

15    screaming at Wendi, you know, like Wendi had done it, yet

16    both of them were, you know, in the room.  He was just a lot

17    shorter.  I -- I was seeing a different Joe and -- because,

18    I'm sure, because of everything that he was going through.

19    And he -- his -- he changed.  He changed.

20    BY MR. DELOZIER:

21         Q.     Okay.

22         A.     He was under a lot of stress.

23         Q.     Was he nicer to Wendi?

24         A.     No, he wasn't.

25         Q.     How about to you?

1        A.     No.  He -- he wasn't even -- he was different.

2    He was a lot different just how he behaved towards anyone.

3    He -- he didn't want to talk to anybody about his cancer.

4    Things were brought up, he would just brush people off.

5        Q.     Any additional -- how about -- how did he treat

6    Nicolas?  Now, Nicolas is two years old, right?

7        A.     Nicolas is two years old.  And, like I said,

8    you know, Joe was real proud of that little boy.  He would

9    have Nicolas with him, you know, on occasion.  Actually, the

10   children were at a babysitter that lived upstairs.

11       MR. MARTINEZ:  Objection.  Lack of foundation how she

12   knows this.

13       THE COURT:  Sustained.

14   BY MR. DELOZIER:

15       Q.     We're talking about how he treated the children.

16   Do you have specific illustrations?  And we're talking about

17   when Nicolas was two years old.

18       A.     When Nicolas was two years old, there was an

19   occasion where Nicolas cut his -- his --

20       MR. MARTINEZ:  Objection.  Lack of foundation how she

21   knows.

22       THE COURT:  Sustained.

23   BY MR. DELOZIER:

24       Q.     Was there a time when Nicolas cut his -- cut

25   himself on something?

1            MR. MARTINEZ:  Objection.  Same -- same reason.

2            THE COURT:  Sustained.

3    BY MR. DELOZIER:

4            Q.    Were you present when Nicolas cut himself?

5            A.    No, I wasn't.

6            Q.    Okay.  So you don't have any -- any comments on

7    how he -- how he treated the children at the time Nicolas was

8    2?

9            A.    Yes, I do.

10           Q.    Well, tell me.  That's what I've asked.

11           MR. MARTINEZ:  Objection.  Relevance, hearsay.

12           THE COURT:  Sustained.

13    BY MR. DELOZIER:

14           Q.    How did you know?  Did you see how they were

15    treated?

16           A.    Yes.

17           Q.    You were present?

18           A.    I was present at their apartment several times

19    a week.

20           Q.    This is when Nicolas is 2, so we're still in

21    '98, '99?

22           A.    Yes.

23           Q.    All right.  What did you see?

24           A.    I saw that, whereas before the surgery, Joe, he

25    was yelling at Nicolas a whole lot more.  He was where he

1    didn't want to hear the kids, you know, crying or anything,

2    and he would demand that Wendi make them be quiet.  He would

3    still take Nicolas on occasion, you know, to different

4    places.

5            Q.    Okay.  Now, you've talked about the -- Wendi

6    and Joe's relationship for the last six years, now, right?

7            A.    Yes.

8            Q.    Did you have her suggest that they go to

9    counseling?

10           A.    Yes, I did.

11           Q.    When did you do that?

12           A.    Right after the surgery.

13           Q.    Which surgery?

14           A.    The fourth surgery in August of 1998 I

15    suggested that.  I picked up brochures at the clinic in the

16    hospital that talk about for people for -- that have terminal

17    cancer, support groups, suggested them, you know, speaking

18    with, you know, a pastor or counselor.

19           Q.    If you know, did they go?

20           A.    As far as I know, no.

21           Q.    Okay.  How about you? Did you provide any

22    counseling to them yourself to them as a mother,

23    mother-in-law?

24           A.    Yes, I did.  As far as you know, like, spending

25    time together and the children and doing the best, you know,

1     that they could with what they had left.

2           Q.    Okay.  So you mentioned that after the fourth

3     surgery that the verbal abuse got worse?

4           A.    Yes, it did.

5           MR. MARTINEZ:  I'm going to object to the

6     mischaracterization.  She said he yelled a lot more.  Maybe

7     it was because he was in pain.

8           THE COURT:  Sustained.

9     BY MR. DELOZIER:

10          Q.    Tell us the kinds of things you classified as

11    verbal abuse that occurred after the fourth surgery that you

12    mentioned?

13          A.    What I witnessed was the demeanor of Joe being

14    angry, that he would belittle Wendi a lot more and in front

15    of people.  It -- it was a lot different.  People would be at

16    the house and he would go --

17          MR. MARTINEZ:  Objection.  Lack of foundation.

18          THE COURT:  I'll sustain the objection.

19    BY MR. DELOZIER:

20          Q.    So you were at the house and somebody else was

21    there.  Is that what you're saying?  Is this happening after

22    the fourth --

23          A.    Yes.

24          Q.    Okay.  After the fourth surgery you saw things?

25          A.    After the fourth surgery, yes, I did see things

```
 1    where --

 2              Q.    What you considered to be mistreatment of one

 3    of the guests in the house.  Is that correct?

 4              A.    Correct, yes.

 5              Q.    Okay.  Do you have any other illustrations?

 6    We're talking about what's being classified as verbal abuse

 7    or --

 8              A.    Uh-huh.

 9              Q.    -- that you say got worse?

10              A.    It got worsse, yes.

11              Q.    Well, these --

12              A.    The language got worse.

13              Q.    And you're talking about the words you don't

14    want to say?

15              A.    The words I don't want to say, yes, thank you.

16    The profanity.

17              Q.    Okay.  In fact, didn't you encourage Wendi to

18    leave him?

19              A.    Yes, I did.

20              Q.    Okay.  When was that?

21              A.    That was in May of 2000.

22              Q.    Okay.

23              A.    I asked -- I asked her because -- because of

24    the verbal abuse, I asked her, "Why don't you leave," and she

25    told me --
```

```
 1              MR. MARTINEZ:  Objection.  Hearsay.

 2              THE COURT:  Sustained.  Ask your next question.

 3    BY MR. DELOZIER:

 4         Q.    Did you -- you said earlier that he was in

 5    control.  Did that escalate?

 6         A.    Yes.

 7         Q.    In what way?

 8         A.    He would ask me, you know, where was she,

 9    what's she doing,

10              MR. MARTINEZ:  Objection.  Lack of foundation.  Are

11    we talking May 2000 or August of '98?

12              THE COURT:  Sustained.

13              MR. DELOZIER:  That's a good question.  I apologize,

14    Your Honor.

15    BY MR. DELOZIER:

16         Q.    What we're talking about again is after the

17    fourth surgery when we're going from August of 1998 and we're

18    going to, say, August of 1999.  Talking about that period of

19    time where you're saying that things escalated after the

20    surgery.  Obviously, it took him, what, three, four months to

21    get over this and stop having to have treatments?

22         A.    Yes.  It took a couple of months.

23         Q.    Okay.  So then after that period of time, and

24    we're moving into, you know, early summer of -- midsummer of

25    '99 --
```

1          A.      Okay, mid --

2          Q.      -- illustrations of control?

3          A.      Midsummer of '99 would -- examples would be

4   Wendi was working at the apartment and we would -- Joe would

5   want to go to the lake and she would --

6          MR. MARTINEZ:  Objection

7          THE WITNESS:  And I was there.

8          MR. MARTINEZ:  Objection.  Lack of foundation.  Did

9   she see this or was she --

10         THE COURT:  Is this from your personal observation?

11         THE WITNESS:  Yes.

12         THE COURT:  You saw it?

13         THE WITNESS:  Yes.

14         THE COURT:  You may continue.

15         THE WITNESS:  He wanted to go to the -- it was on a

16  Thursday evening.  He wanted to go to -- leave for the lake

17  on Friday and he was demanding that she not go to work and

18  that we leave, all of us, on Friday.  Because she was the

19  only breadwinner at the time, Wendi said no, and I offered to

20  drive Wendi and I and the children on Friday evening as soon

21  as she got off work, but he was upset because he wanted her

22  to leave then.

23  BY MR. DELOZIER:

24         Q.      Okay.  At some point in time after the fourth

25  surgery, there were various kinds of alternative treatments

1      that Joe attempted.  Was that correct?

2              A.      That's correct.

3              Q.      And can you tell me what -- if you know, what

4      the first one after the surgery -- he's now two or three

5      months past it and we're looking at what came next basically?

6              A.      Right.  In the Fall of --

7              MR. MARTINEZ:  Objection.  Hearsay, lack of

8      foundation.

9      BY MR. DELOZIER:

10             Q.      If you know.

11             THE COURT:  Sustained.  Just from your personal --

12             MR. DELOZIER:  Personal experience.

13             THE COURT:  -- observation.

14             THE WITNESS:  Joe went to an alternative week-long

15     place in Colorado and to learn --

16             MR. MARTINEZ:  Again, objection.  Lack of foundation.

17             THE COURT:  Sustained.

18     BY MR. DELOZIER:

19             Q.      Were you aware that he went there by your

20     personal experience of seeing that he was gone?

21             A.      Yes.

22             Q.      Okay.  And what kind of program was it?

23             MR. MARTINEZ:  Objection.  Hearsay.

24             THE COURT:  Sustained.

25     / / / / /

1    BY MR. DELOZIER:

2          Q.    Do you know what kind of program it was?

3          A.    Yes.

4          Q.    And what kind of program was it?

5          MR. MARTINEZ:  Objection.  Hearsay.

6          THE COURT:  Sustained.

7    BY MR. DELOZIER:

8          Q.    Would we refer to that program they offered as

9    alternative?

10         MR. MARTINEZ:  Observation.  Hearsay.

11         THE COURT:  Sustained.

12   BY MR. DELOZIER:

13         Q.    Do you know if that one -- what he did when he

14   was taking whatever he took?  Did it help?

15         MR. MARTINEZ:  Objection.  Lack of foundation,

16   hearsay.

17         THE COURT:  Sustained.

18   BY MR. DELOZIER:

19         Q.    Do you know if it helped?

20         A.    Yes.

21         Q.    And did it help?

22         A.    No.

23         Q.    What was attempted next, if you know.  Let me

24   rephrase it.  Was he offered chemo right after the surgery?

25         A.    Yes, he was.

```
1              Q.   Did he take it?

2              A.   No, he did not.

3              Q.   Okay.  After he tried alternative, did he go to

4    the dentist?  Do you know anything about him going to a

5    dentist?

6              A.   I know that --

7              MR. MARTINEZ:  Objection.  Hearsay.

8              THE COURT:  Sustained.

9    BY MR. DELOZIER:

10             Q.   Did you go with him to the dentist?

11             A.   No.

12             Q.   Okay.  Did you -- what about any other kinds of

13   treatments that Joe tried after the fourth surgery in August

14   of 98?

15             A.   I know that --

16             MR. MARTINEZ:  Objection.  Hearsay.

17             THE WITNESS:  Yes.

18             THE COURT:  Sustained.

19             MR. DELOZIER:  I guess we ought to approach.  I don't

20   understand, Your Honor.

21

22                  (The following proceedings were held at the

23   bench:)

24

25             THE COURT:  Go ahead, Mr. DeLozier.
```

1          MR. DELOZIER:  Just trying to find out what she knows

2     about what kind of treatments he took.  Seemed like a

3     pretty --

4          MR. MARTINEZ:  All based on what the defendant told

5     her the victim did.

6          MR. DELOZIER:  I said if you know.  Do you know?

7          THE COURT:  Right, but that's the reason I kept

8     sustaining the objection is she was going to go beyond that

9     at this point.  I know you asked a yes or no question, but

10    she started answering it with more than yes or no, and that's

11    why I sustained the objection at that point.

12              But if you have a situation where she had -- in

13    her personal observation she went with him to those places,

14    she was able to see certain things, I don't have any problem

15    with you asking that.  But the way you're asking it, I'm

16    sustaining the objection.

17         MR. DELOZIER:  Okay.

18

19              (The following proceedings were held in open

20    court:)

21

22         THE COURT:  Mr. DeLozier?

23         MR. DELOZIER:  Thank you, Your Honor.

24    BY MR. DELOZIER:

25         Q.    Did you go with Mr. Andriano -- Joe, I'm

```
 1     talking about, of course -- any time after August of 1998 to

 2     seek any kinds of treatment?

 3              A.    Yes, I did.

 4              Q.    And what did you --

 5              A.    I went --

 6              Q.    Name one.

 7              A.    Okay.  I went with him to the Mayo Clinic to

 8     discuss chemotherapy and radiation.

 9              Q.    Okay.  You mentioned that earlier.  Did you go

10     with him on another -- any other kind of --

11              A.    I went with him to the stores and bought him a

12     book on herbal remedies and herbs.

13              Q.    And he was with you?

14              A.    Yes.

15              Q.    Okay.  Did you do anything else?

16              A.    I had purchased some stuff for them.

17              Q.    How about going to church?

18              A.    Oh, yes.  I went to church with them and Joe

19     asked for prayer for healing.

20              Q.    At some point in time did he change his mind

21     about the chemo?

22              A.    Yes, he did.

23              Q.    Do you know when?

24              MR. MARTINEZ:  Objection.  Hearsay.

25              THE COURT:  Sustained.
```

```
1     BY MR. DELOZIER:

2          Q.    Did you go with Joe to get any chemo

3     treatments?

4          A.    No, I did not.

5          Q.    You were aware that he took some?

6          A.    Yes, I was.

7          Q.    Okay.  Do you know how many?

8          A.    I believe he took four.

9          Q.    Okay.  Were you around him after he took the

10    first one?

11         A.    Yes.  After the first?

12         Q.    Yes.

13         A.    Yes.

14         Q.    Okay.  Now, I'm going to ask the same

15    questions.  Did you notice any demeanor change, behavior

16    changes after the first chemo?  And the answer is "yes" or

17    "no" again.

18         A.    Yes.

19         Q.    And what were they?

20         A.    Extremely moody, extremely anxious.  Again, the

21    anger was just escalating.  Then despair hit and a drawing

22    into himself.  He wasn't as outgoing as he had been before.

23    He was drawing into himself.

24         Q.    How did he treat Wendi based on what you saw?

25         A.    Based on what I saw?  Based on what I saw, I
```

1    saw him increasingly, again, with the profanity, with telling

2    her she was fat, she was stupid -- and this is a 100-pound

3    woman -- and you're dumb, you're stupid, and with all the

4    profanty in there also.

5            Q.    Are we still at the Courtyard or when did that

6    change?

7            A.    No.  She took a position up in Ahwatukee, I

8    believe, in November of '99 working as the manager at San

9    Riva.

10           Q.    Now, the chemo's after --

11           A.    Chemo's after.

12           Q.    -- the move to Ahwatukee, right?

13           A.    Yes, it is.

14           Q.    Okay.  And how old is Nicolas at this point?

15           A.    Nicolas is just --

16           Q.    Talking about November of '99, sorry?

17           A.    November of '99, Nicolas was 2 and a half.

18           Q.    How old is Ashley?

19           A.    Ashly would have just been a little over a

20   year.

21           Q.    Okay.

22           A.    14, 15 months.

23           Q.    Okay.  Let me show you what's been marked as

24   Exhibits 422 and 423.  See if you could give us time frames

25   on those, if you know.  Did you take those photographs?

1          A.     Yes, I did.

2          Q.     And when did you do that?

3          A.     On the one that's labeled 422, would have been

4     in September of 1998 which shows Wendi and Ashley and Joe and

5     that was Wendi leaving the hospital after having Nicolas.

6          Q.     After having whom?

7          A.     Nicolas -- no, I'm sorry.  After having Ashley,

8     I'm sorry.

9          Q.     It's all right.

10         A.     And the second picture, 423, is in the foyer of

11    Harvest Family Church with Joe and Wendi.  Wendi's holding

12    Ashley, Pastor Tom King is holding Nicolas.

13         Q.     This is approximately when?

14         A.     That would have been just -- probably just a

15    couple months -- no, maybe three months or so after Joe's

16    surgery because the bandage is off.

17         Q.     And you took both of those?

18         A.     Yes, I did.

19         MR. DELOZIER:  Okay.  Move for admission of Exhibits

20    422 and 423, Your Honor.

21         MR. MARTINEZ:  I would object on grounds of relevancy

22    and Rule 403.

23         THE COURT:  Exhibit 422 and 423 for identification

24    are admitted into evidence.

25    / / / / /

```
1    BY MR. DELOZIER:

2         Q.    This is Exhibit 422.  And can you tell us what

3    we have here?

4         A.    That's at the Chandler Regional Medical Center

5    with Wendi in the back of the Yukon and that's baby Ashley

6    after she was born.  And there's Joe, and you could see the

7    bandages that he still had.  That would have been around

8    September 17 of 1998.

9         Q.    So he had surgery only maybe a month earlier?

10        A.    Yes.

11        Q.    And he's still got those bandages and this is

12   from the fourth surgery, correct?

13        A.    That's correct.  That's from the fourth

14   surgery.

15        Q.    All right.  That's 422.

16              Then I have 423.  Tell me what we have here?

17        A.    Okay.  Again, that's in the foyer of Harvest

18   Family Church in Casa Grande .  Nicolas is being held by

19   Pastor Tom King, Wendi is holding --

20        Q.    He's on the left?

21        A.    Yes, with the white hair.

22        Q.    Okay.

23        A.    Wendi is holding baby Ashley, and Joe is

24   standing next to Wendi and I'm taking the picture.

25        Q.    Okay.  And --
```

1            A.    So the baby would have been a couple months.

2            Q.    Over here on the right -- now, how many months

3     is this after surgery?

4            A.    It would have to be three or four months after

5     surgery, I believe.

6            Q.    So the bandages are off by now?

7            A.    Yes, they are.

8            Q.    Okay.  So is Joe able to work now?

9            THE COURT:  What period of time are you asking about?

10           MR. DELOZIER:  Ones related to the picture.  This is

11    fall of '99, sorry.

12                 Thank you, Your Honor.

13           THE WITNESS:  In the fall of '99, Joe probably would

14    have been doing windshields, you know, here and there still.

15    BY MR. DELOZIER:

16           Q.    Okay.  And Wendi's working where?

17           A.    Wendi's working at -- she would have been at

18    Courtyard in '98.

19           Q.    Okay.  What time did --

20           MR. MARTINEZ:  Judge, I thought we were talking '99?

21           THE COURT:  I think Mr. DeLozier asked about Fall of

22    '99.

23           THE WITNESS:  Fall of '99, Wendi was working at San

24    Riva apartment.

25    BY MR. DELOZIER:

1          Q.    When did she start there?

2          A.    I believe in November of '99.

3          Q.    And, sorry, did she leave Courtyard to go

4    there?

5          A.    Actually, she left Courtyard and she went to

6    another property off of Camelback, but she stopped working

7    there because Joe didn't want her to --

8          MR. MARTINEZ:  Objection.  Hearsay, relevance.

9          THE COURT:  Sustained.  That last portion will be

10   stricken.

11   BY MR. DELOZIER:

12         Q.    So she was at a place on Camelback down in

13   central Phoenix --

14         A.    Yes.

15         Q.    -- for a while?  How long did that --

16         A.    That was like a month or so.  That was it.

17         Q.    Okay.  And then she was unemployed for a little

18   while, or went straight from that place to San Riva?

19         A.    She pretty much went straight from there to San

20   Riva.

21         Q.    Okay.  That was in December of '99 you're

22   saying?

23         A.    November.

24         Q.    November, December?  Okay.

25               Now, did they provide a place for them to live

1    at San Riva?

2        A.    Yes, they did.   A nice two-bedroom --

3    three-bedroom, excuse me, apartment.

4        Q.    Okay.  So each of the children had their own

5    room?

6        A.    Yes.  Each child had their own room.  Ashley

7    had one, Nicolas had one, and Joe and Wendi had one.

8        Q.    Okay.  Were you able to visit them at that

9    location?

10       A.    Yes, I was.

11       Q.    Talk about the subject of insurance for a

12    minute.  Were you aware of the coverage that Joe and Wendi

13    had at any time during their marriage?  Life insurance.

14       A.    Life insurance?  I do know that.

15       MR. MARTINEZ:  Objection.  Nonresponsive, hearsay.

16       THE COURT:  Just answer the question that's asked.

17       THE WITNESS:  Yes.

18    BY MR. DELOZIER:

19       Q.    How did you come into that knowledge?

20       A.    Because they had told me.  In fact, they tried

21    to get me to get some insurance from the first --

22       MR. MARTINEZ:  Objection.  Hearsay.

23       THE COURT:  Sustained.

24    BY MR. DELOZIER:

25       Q.    Did you make any payments on any life insurance

1    for them?

2           A.    No, I did not.

3           Q.    Okay.  Did you have any discussions -- do you

4    know if they were covered by life insurance during '98, '99

5    either one of them?

6           A.    I believe she would have been with wherever she

7    worked.

8           Q.    You don't know though?

9           A.    I don't know for sure.

10          Q.    Okay.  Do you know if they had insurance at one

11   time and they lost it?

12          A.    I do know they had insurance at one time.

13          Q.    Okay.  So do you know approximately when the

14   chemo treatments began?

15          A.    July of 2000.

16          Q.    Okay.  And that was -- how did -- do you know

17   how he came to start it, the chemo?

18          MR. MARTINEZ:  Objection.  Hearsay.

19          THE COURT:  It's a "yes" or "no" question.  Just

20   answer the question "yes" or "no."

21          THE WITNESS:  Yes.

22   BY MR. DELOZIER:

23          Q.    How did you come to that knowledge?

24          A.    Because I was told that --

25          MR. MARTINEZ:  Objection.  Hearsay.

```
 1              THE COURT:  Hold on.  Ask your next question.
 2    BY MR. DELOZIER:
 3         Q.    The second one was when, if you know?
 4         A.    I believe on August 1st, 2000.
 5         Q.    Okay.  Each time what I'm asking -- what I want
 6    you to tell me is did you notice any changes in, let's say,
 7    strength?
 8         A.    Yes.
 9         Q.    And what changes did you notice?
10         A.    I noticed on the --
11              MR. MARTINEZ:  Objection.  Lack of foundation as to
12    days.
13              THE COURT:  Sustained.  Lay some foundation about the
14    time period after the treatment you're talking about.
15    BY MR. DELOZIER:
16         Q.    Talking about after the second chemo.
17         A.    Okay.
18         Q.    Did you notice any strength-related issues that
19    changed just a moment ago?  You said he was strong?
20         A.    Yes.
21         Q.    I'm trying to ask if you -- did you notice a
22    change in that?
23         A.    I just noticed like on the day that he would
24    have surgery -- that he would have chemo because I would be
25    at the house after he had chemo, at their house, that he
```

1   wasn't feeling well, and I would, you know, hold his hand

2   and, you know, wipe his face --

3           MR. MARTINEZ:  Objection.  Nonresponsive.

4           THE WITNESS:  -- that type of stuff.

5           THE COURT:  Overruled.  Ask your next question.

6   BY MR. DELOZIER:

7           Q.   Was he more verbally abusive?

8           A.   Yes.

9           MR. MARTINEZ:  Objection.  Lack of foundation.  Which

10  day and time?

11          THE COURT:  Lay some foundation.

12          MR. DELOZIER:  Same foundation, Your Honor.  I'm

13  talking about between the -- after the second chemo, she said

14  was August is her observation of 2000.

15          THE COURT:  You're saying before the second chemo or

16  the third chemo?

17        · THE WITNESS:  Third one.

18          THE COURT:  Go ahead and answer the question.

19          MR. MARTINEZ:  Judge, I'm objecting on the -- based

20  on what Dr. Kellogg told is the progression.  Is it the

21  beginning?  I mean --

22          THE COURT:  You know what?  I'll have you lay some

23  more foundation, Mr. DeLozier, as far as what specific time

24  during that period of time.

25          MR. DELOZIER:  Okay.  Thank you, Your Honor.

1    BY MR. DELOZIER:

2         Q.    On the day that he took the second chemo, were

3    you at his home?

4         A.    Yes.

5         Q.    Okay.  Did you notice any difference in his

6    strength that day?

7         A.    I just noticed that he was, you know, feeling

8    nauseous.  As far as strength, you know, he was, you know,

9    rested in bed on those days.

10        Q.    He didn't go boating on that day, did he?

11        A.    No.

12        Q.    Did he go boating the second day?

13        A.    No.

14        Q.    How about the third day after the second

15   surgery or chemo?

16        A.    It's possible.  I don't know that.

17        Q.    All right.

18        A.    As far as --

19        Q.    After the second chemo, did he go boating at

20   all before the third?

21        A.    Yes.

22        Q.    Okay.  Do you know about when?

23        A.    On the weekend, but I don't know if it was like

24   a week or so after, or if it was two weeks.

25        Q.    All right.  Between the second and third chemo,

144

 1    did he go boating more than once to your knowledge?

 2            A.    To my knowledge, yes.

 3            Q.    Yes?

 4            A.    Yes.

 5            MR. MARTINEZ:  Objection.  Hearsay, how they came to

 6    that knowledge.

 7            THE COURT:  Do you have personal -- were you there?

 8            THE WITNESS:  No.

 9            THE COURT:  I'll sustain the objection.

10    BY MR. DELOZIER:

11            Q.    Did you notice any changes in -- in what we

12    have referred to as verbal abuse on the day of the second

13    chemo?

14            A.    He was -- yes.

15            Q.    What did you -- what -- you were there, right?

16            A.    Yes.

17            Q.    And what did you witness?

18            A.    I witnessed Nicolas climbing up on the bed with

19    Joe, with his daddy, and Joe getting upset and telling him to

20    get the hell out of there.

21            Q.    Okay.

22            A.    Anything else that day?

23            A.    Wendi had come in and asked if he wanted --

24            MR. MARTINEZ:  Objection.  Hearsay.

25            THE COURT:  Sustained.

1    BY MR. DELOZIER:

2         Q.    I'm asking what you saw.

3         Q.    What I saw?  I saw him yell at his wife when

4    she came in to offer him something to drink.

5         Q.    Anything else that you saw that first day when

6    he gets home after the second chemo?

7         A.    As far as behavior, those were the two big

8    things.

9         Q.    I'm just asking if there was anything else?

10        A.    Not to my recollection.

11        Q.    Was there any physical violence --

12        A.    No.

13        Q.    -- on the first day?

14        A.    No.

15        Q.    Were you there the second day after the second

16   chemo?

17        A.    No, I was not.

18        Q.    How about the third day?

19        A.    No, I was not.

20        Q.    How about the fourth day after?

21        A.    I don't know how many days after it was, but

22   whatever date he had the chemo, I was there that weekend.

23        Q.    You were there the following weekend?

24        A.    Yes.

25        Q.    And who all was in the home?

1       A.    Myself, Wendi, Joe, and the children.

2       Q.    When did you arrive?

3       A.    Saturday morning.

4       Q.    What time?

5       A.    Approximately 8:00, 9:00.

6       Q.    How long did you stay?

7       A.    I stayed long enough to pick up the children,

8  take them back to Casa Grande with me?

9       Q.    Well, is this 5 minutes or an hour?

10      A.    Probably anywhere from 45 minutes to an hour.

11      Q.    Okay.  What did you observe while you were

12  there?  What did you see?

13      A.    What did I see?  I saw Joe being irritable and

14  irritated and wanted me to hurry up and get the kids.

15      Q.    Anything else that you saw?

16      A.    I just saw him or heard him, again, extremely

17  derrogatory to Wendi.

18      Q.    Okay.  Now, you were there that weekend, you

19  can't tell us for sure how many days it was from the second

20  chemo, but now we move into the time after that weekend.  So

21  you had the kids how long that weekend?

22      A.    I normally kept them Saturday morning till

23  Sunday evening.

24      Q.    All right.  So you brought them back sometime

25  Sunday evening approximately?

```
 1              A.    I -- usually around 4:00 or 5:00 after they

 2    woke up from naps.

 3              Q.    4:00 or 5:00?

 4              A.    Yes.

 5              Q.    Do you know of your own knowledge what Wendi

 6    and Joe did that weekend?  I just want to know if you know.

 7              A.    No.

 8              Q.    They weren't with you?

 9              A.    Not with me.

10              Q.    Okay.  When you brought them back on Sunday

11    night, 4 or 5:00, how long did you stay?

12              A.    5 or 10 minutes.  I did not stay long.

13              Q.    Anything happen during that 5 or 10 minutes?

14              A.    Not that I recall.

15              Q.    Were you there on Monday after that?

16              A.    No.

17              Q.    How about Tuesday?

18              A.    No.

19              Q.    How about Wednesday?

20              A.    No.

21              Q.    When was the next time you were back at the

22    apartment after this second chemo after that weekend,

23    whenever that weekend was?

24              A.    To be honest, I'm not sure if -- if I was back

25    the next weekend or the weekend after, but I know that during
```

1    July and August I would take the children down to the house

2    in Casa Grande quite a bit on the weekend.

3         Q.    I'm sorry.  We're not in July and August.

4         A.    Okay.

5         Q.    We're in November, December, January of '99 and

6    the early part of 2000.  I apologize.  You're right.  We're

7    in 2000, August, right?  I'm sorry.

8         A.    I got lost.

9         Q.    So you're in August of 2000.  So at that time

10   you had at a pattern of doing some things with the children,

11   right?

12        A.    Correct.

13        Q.    Okay.  And that was typically every other

14   weekend or so?

15        A.    Yeah, yes.  We would bring them down to the

16   house.

17        Q.    Do you --

18        A.    That gave Wendi and Joe time to be by

19   theirselves and spend some time together.

20        Q.    All right.  During that period of time, summer

21   of 2000, did you ever see Wendi injured, any bruises?

22        A.    I saw bruises on her in the summer of 2000.

23        Q.    Okay.  Do you know when the third chemo was?

24        A.    Before I came up on the stand I knew when all

25   of them were.  I can't remember right now, I'm sorry.

1          Q.     All right.  It was sometime after the second

2     one, probably.  How long?  Can you --

3          A.     Probably around three weeks.

4          Q.     About three weeks?

5          A.     Uh-huh.

6          THE COURT:  Is that a "yes"?

7          THE WITNESS:  Yes, sorry.

8          MR. DELOZIER:  Thank you, Your Honor.

9     BY MR. DELOZIER:

10          Q.     So this was probably, your best guess, is

11     somewhere near the end of August?

12          A.     I believe so.

13          Q.     Okay.  During August were there any trips that

14     were made by Joe or Wendi outside of the Phoenix area that

15     you know of?

16          A.     That I actually saw?

17          Q.     Yeah, you know of?

18          A.     Oh, I know that he was going to the lake.

19          Q.     Okay.  Do you have a period of time where you

20     were watching the children during -- during August or did --

21     or were they -- were they not in town during August or do you

22     remember?

23          A.     I don't remember August.

24          Q.     Okay.  So, anyway, he had a third chemo

25     treatment sometime during, you think, the latter part of

```
 1      August?

 2            A.    Yes.

 3            Q.    Were you at their apartment when he came home

 4      from the third chemo?

 5            A.    I went to the apartment after he got home.

 6            Q.    After when?

 7            A.    After he got home from the chemo.

 8            Q.    Same day?

 9            A.    Yes.

10            Q.    Okay.  How were things that night?

11            A.    Again, the same.  He'd be feeling nauseous and

12      I'd give him support, mental support, hold his hand, wipe his

13      face type of things while Wendi fixed dinner.

14            Q.    Were there any episodes of verbal abuse while

15      you were there?

16            A.    That one, I don't recollect.

17            Q.    How about physical violence?

18            A.    No.

19            Q.    Were the children there?

20            A.    Yes.

21            Q.    So we didn't have any issues about the children

22      that night?

23            A.    No.

24            Q.    Or that day?

25            A.    I don't believe so.
```

1      Q.    Were you back the next day after?

2      A.    No, I was not.

3      Q.    How long -- when was your next visit back to

4   Joe and Wendi's apartment after the third chemo?

5      A.    I believe it was right around Labor Day.  I

6   went up to pick up Nicolas, I believe, and bring him back

7   down to the house.

8      Q.    Anything happen that day?

9      A.    No.  I -- I don't -- I don't even recall seeing

10  Joe there because Wendi was going to come and stay at our

11  house over the weekend because Joe was going to be at the

12  lake.

13     Q.    Okay.  Now, from the time chemo started until

14  he finished the fourth chemo, did you go to the lake?

15     A.    No, I did not.

16     Q.    Okay.  Let's back up just a little bit.  We've

17  talked a lot about Joe and so forth and his changes, but

18  starting around the time that Ashley was born, did you start

19  noticing any changes in Wendi?  And what were they if you

20  did?

21     A.    Yes, I did notice changes in Wendi.  She was

22  obviously more stressed and overworked because she was -- she

23  was working full time right there on the site at the

24  apartments and she also had two children.

25           MR. MARTINEZ:  Objection.  Hearsay if she's going to

```
 1    tell us --

 2              MR. DELOZIER:  This is what you observed from the

 3    time --

 4              THE COURT:  Overruled.

 5              MR. DELOZIER:  -- Ashly was born.

 6              THE WITNESS:  Yes.

 7    BY MR. DELOZIER:

 8         Q.    You could go ahead.

 9         A.    Okay.

10         Q.    Until third or fourth chemo, so we're talking

11    about almost a two year period of time.

12         A.    Okay.  I saw Wendi losing weight, definitely

13    losing weight.  Overworked.  She -- she wasn't sleeping

14    well.  She --

15              MR. MARTINEZ:  Objection.  Lack of foundation.

16              THE COURT:  Sustained.

17    BY MR. DELOZIER:

18         Q.    You saw her go back to work how long after

19    Ashley's birth?

20         A.    Went about a week and a half, two weeks after

21    Ashley was born.

22         Q.    At that time where was she working?

23         A.    She was working at the Courtyard Apartments?

24         Q.    Okay.  And what other changes did you notice?

25    I'm talking about what you saw --
```

1          A.     I saw --

2          Q.     -- in her behavior?

3          A.     She was a lot more withdrawn also.  She -- she

4    was -- it was obvious she was tired.  She had black circles

5    under her eyes and stuff sometimes, and just looked like --

6    just haggard.

7          Q.     Mm-hmm.  Let's move on to 2000.  Any further

8    changes or that about cover it?

9          A.     That about covers it.  She was -- it was a

10   rough time for all of them.

11         Q.     Okay.  Now, we've had -- we had the fourth one

12   sometime in when?  Fourth chemo, I'm talking about.

13         A.     I believe that was in September sometime.

14         Q.     Okay.  Not sure when?

15         A.     I'm not sure of the exact date, but it was in

16   September.

17         Q.     Were you there the day that he came home from

18   the fourth chemo?

19         A.     No, I wasn't.

20         Q.     Okay.  Do you recall when you were present in

21   their home after the fourth chemo?

22         A.     No, I -- I was present in their home around

23   the -- sometime in the week of the 20th, I believe, but Joe

24   wasn't there.  Just Ashley and Wendi were there.

25         Q.     Let's do it this way.  After October -- after

```
 1    the fourth chemo and up until October 7, did you -- were you
 2    present when he and Wendi were both together?
 3              A.    On October 7, I was.
 4              Q.    I'm talking about between those dates.  We'll
 5    get to the 7th in a minute.  I should have said the 6th, I
 6    guess.
 7              A.    I would imagine I was because I used to go up
 8    there.  I would try to go up, you know, once a week, every
 9    two weeks.  I just don't recall.
10              Q.    Any specific --
11              A.    No.
12              Q.    Okay.
13              THE COURT;  Would this be a good time to break for
14    the day?
15              MR. DELOZIER:  Sure.
16              THE COURT:  Okay.  We'll go ahead and take our
17    evening recess at this point in time, ladies and gentlemen.
18              During this evening recess, remember the entire
19    admonition I gave you including the fact you're not to
20    discuss this case with anyone.  Do not let anyone discuss the
21    case with you.  Do not do any research, investigations,
22    experimentation or testing on your own.  Avoid any media
23    coverage of the case.  Keep an open mind.
24              I want you to have a nice evening.  We'll see
25    you tomorrow at 1:00 p.m.  Have a nice evening.  We'll be in
```

1      recess.

2

3                        (Evening recess.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

156

```
 1

 2

 3                      CERTIFICATE OF REPORTER

 4

 5     STATE OF ARIZONA      )
                             )
 6     COUNTY OF MARICOPA    )

 7

 8              I, Traci L. Wheeler, CSR, RPR, an official

 9     and certified reporter in the Superior Court of the State

10     of Arizona, in and for the County of Maricopa, hereby

11     certify that I made a shorthand record of the proceedings

12     had in the within case, and that the foregoing transcript

13     is a full, true, and correct transcription of the

14     proceedings in this case.

15              Dated this 28th day of March, 2005.

16

17

18                             _____
                               Traci L. Wheeler, CSR, RPR
19                             Certified Court Reporter No. 50313
                               Official Court Reporter
20

21

22

23

24

25
```

# APPENDIX H - Part 1



05-0002 1
Braccio



1      IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

2           IN AND FOR THE COUNTY OF MARICOPA

3

4    STATE OF ARIZONA,            )
                                  )
5             Plaintiff,          )
                                  )
6    v.                           )     No. CR 05-0005 AP
                                  )     MARICOPA COUNTY
7    WENDI ELIZABETH ANDRIANO,    )     No. CR 2000-096032
                                  )
8             Defendant.          )
     _____ )

9

10

11

12                      Mesa, Arizona
                      October 5, 2004
13

14

15

16         BEFORE:   The Honorable BRIAN K. ISHIKAWA

17

18         REPORTER'S TRANSCRIPT OF PROCEEDINGS

19                     TRIAL DAY 23

20

21

22

23

24   ORIGINAL Prepared for APPEAL by:
     TRACI L. WHEELER, CSR, RPR
25   Certified Court Reporter No. 50313


     TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

2

1                    A P P E A R A N C E S

2    FOR THE STATE:        JUAN M. MARTINEZ,
                           Deputy County Attorney
3
     FOR THE DEFENDANT:    DANIEL B. PATTERSON,
4                          Deputy Public Defender
                                    and
5                          G. DAVID DELOZIER,
                           Attorney at Law
6

7            I N D E X   O F   E X A M I N A T I O N

8    WITNESS                                          PAGE

9    OCHOA, DONNA, Called on behalf of the Defendant
               Continued Direct Examination by Mr. DeLozier      3
10             Voir Dire Examination by Mr. Martinez            10
               Continued Direct Examination by Mr. DeLozier     10
11             Cross-examination by Mr. Martinez                30
               Continued Cross-examination by Mr. Martinez     120
12             Redirect Examination by Mr. DeLozier            156
               Follow-up Questions by Mr. Martinez             189
13             Follow-up Questions by Mr. DeLozier             190

14

15       E X H I B I T S   A D M I T T E D   I N   E V I D E N C E

16   NO.      DESCRIPTION                             PAGE

17   410      Photograph                               47
     412      Photograph in brown paper frame          45
18   433      Photograph                               10
     445      Photocopy of photograph                  48
19

20

21

22

23

24

25

```
 1                MESA, ARIZONA, TUESDAY, OCTOBER 5, 2004

 2

 3          THE COURT:  Good afternoon.  This is trial in cause

 4     number CR 2000-096032, State of Arizona versus Wendi

 5     Elizabeth Andriano.  The record will reflect the presence of

 6     Defendant, Counsel and the jury.  The record will also

 7     reflect that Donna Ochoa is on the witness stand, and we'll

 8     continue with the direct examination by Mr. DeLozier.

 9                Mr. DeLozier?

10          MR. DELOZIER:  Good afternoon, Your Honor.  Thank you.

11

12                     DONNA OCHOA,

13          CALLED TO TESTIFY ON BEHALF OF THE DEFENDANT,

14     HAVING PREVIOUSLY BEEN SWORN, FURTHER TESTIFIES AS FOLLOWS:

15

16     CONTINUED DIRECT EXAMINATION BY MR. DELOZIER:

17          Q.    You talked about -- is this on?  Can you hear

18     me?

19          THE COURT:  Why don't you pull it up?

20          MR. DELOZIER:  That's great.  Thank you.

21     BY MR. DELOZIER:

22          Q.    You talked yesterday about changes that you saw

23     in Wendi --

24          A.    Yes.

25          Q.    -- during the last year or so.
```

```
 1            A.    Yes.
 2            Q.    I think that's how we sort of ended up with
 3   yesterday's discussions, just kind of bringing you back to
 4   where we were.  You described her physical appearance and so
 5   forth.  Do you remember that?
 6            A.    Yes, I do.
 7            Q.    All right.  During that year 2000, did you see
 8   a change in how she confided in you?
 9            A.    Yes.
10            Q.    And what change did you see?
11            A.    Throughout -- she -- she changed by not -- she
12   wasn't sharing as much.  She -- we didn't visit a whole lot
13   or she didn't tell me, just share things.
14            Q.    Uh-huh.
15            A.    She had closed up.
16            Q.    I'm sorry?
17            A.    She closed up.  She just wasn't talking.
18            Q.    Well, did she ever tell you about how Joe was
19   treating her?
20            A.    The --
21            THE COURT:  That's a "yes" or "no" question.
22            THE WITNESS:  Yes.
23   BY MR. DELOZIER:
24            Q.    Okay.  Did you understand --
25            THE COURT:  Hold on.  What was the answer?  Did you
```

1    answer the question?

2              THE WITNESS:  Not yet, sorry.

3              THE COURT:  She hasn't answered the question.  I

4    thought she had.  She wasn't responding to you.  Go ahead.

5              THE WITNESS:  Okay.  Yes, she --

6         MR. MARTINEZ:  Objection.  Narrative.

7              THE COURT:  Ask your next question.

8    BY MR. DELOZIER:

9         Q.    Did that change?

10        A.    Yes.

11        Q.    And how did that change?

12        A.    She finally just closed up and wasn't talking.

13        Q.    You had a mistake yesterday in one part of your

14   testimony.  Is that correct?

15        A.    Yes.

16        MR. MARTINEZ:  Objection.  Leading.

17             THE COURT:  Overruled.  Go ahead ask your next

18   question

19   BY MR. DELOZIER:

20        Q.    What did you want to correct?

21        A.    I just wanted to correct Wendi and Joe's -- the

22   date they got married was January 22nd of 1994, and that was

23   a continual mistake of mine.  I would always call them on the

24   21st and go "Happy Anniversary" and she'd go, "No, it's

25   tomorrow," so I just wanted to clear that up.

```
 1          Q.     You mentioned yesterday that Joe was in control
 2   in your opinion?
 3          A.     Yes.
 4          Q.     Did that change during the year 2000?
 5          A.     No.
 6          Q.     Did it change at all?
 7          A.     No.
 8          Q.     Okay.  He was still in control?
 9          A.     Yes, he was.
10          Q.     We talked a lot about Nicolas yesterday and I
11   think I forgot to ask you about Ashley, so let's talk a
12   little bit about Ashley.  From -- she was born shortly after
13   the fourth surgery.  Is that correct?
14          A.     Yes, she was born --
15          Q.     That was -- I'm sorry.
16          A.     Yes.
17          Q.     When was she born?
18          A.     September 16 of 1998.
19          Q.     And that fourth surgery was in August of 1998?
20          A.     Yes.
21          Q.     Okay.  So from her birth through maybe her
22   first year, can you tell us what you saw as Joe's treatment
23   of her?
24          A.     Joe and Ashley, it -- it appeared they never
25   really bonded because he didn't spend much time with her at
```

1    all.  He was -- he was focused, you know, on his condition

2    with the cancer and -- and that's where he -- that's where he

3    was focused, not on Ashley.  Ashley was kind of the little

4    one that sort of didn't get any attention from dad.  Nicolas

5    did because, again, like I said, you know, Joe was pretty

6    proud of Nicolas and Nicolas looked like his daddy.

7             Q.    Well, what was Ashley's physical appearance.

8    What color hair, what color eyes?

9             A.    Ashley had brown -- brown hair and brown eyes.

10   And in fact, I even made the comment --

11            MR. MARTINEZ:  Objection.  Narrative.

12            THE COURT:  Sustained.

13   BY MR. DELOZIER:

14            Q.    She had brown hair and brown eyes?

15            A.    Yes.

16            Q.    Okay.  Was there any disparaging remarks made

17   about her eyes or hair?

18            A.    Yes.

19            Q.    What were they?

20            A.    "Oh, no, I have another kid with shit brown

21   eyes."

22            Q.    Okay.  How about age 1 to 2?  She would have

23   been just over 2 at the date of her dad's death.  Is that

24   correct?

25            A.    That's correct.

```
 1          Q.    Any particular changes in the way Joe treated
 2     her during that second year of her life?
 3          A.    Yes.
 4          Q.    What were they?  I'm talking about things you
 5     saw now.
 6          A.    Correct.  On one occasion in July of 2000 I was
 7     at the apartment, Joe and Wendi's apartment, and Wendi was
 8     cooking and Joe was sitting in his chair I was sitting on the
 9     floor playing with Nicolas, and Ashley crawled up onto Joe's
10     lap and proceeded to vomit all over him and he -- he picked
11     her up and threw her on the floor.  I mean, he didn't just
12     set her on the floor; he literally pushed her down hard on
13     the floor.  And she started wailing and I picked her up and
14     he was cursing, and then he started cursing at Wendi for
15     letting Ashley throw up on him.
16          Q.    Did you see any other episodes?
17          A.    There was an episode when I was watching the
18     children during one of the -- the pool parties that San Riva
19     had.  I had come up there again to watch the children.  And I
20     was --
21          Q.    When was that?
22          A.    It was around the first of June, end of May,
23     first of June of 2000.  And I had -- I had told them that I
24     needed to leave by 8:00, I could only watch the children
25     until 8:00.  And I was told that --
```

```
 1            MR. MARTINEZ:  Objection.  Hearsay.
 2            THE COURT:  Sustained.
 3            THE WITNESS:  So at 8:00 no one showed up and 9:00,
 4    10:00, and I was pretty upset.  And --
 5    BY MR. DELOZIER:
 6       Q.    Did Joe do anything?
 7       A.    Pardon?
 8       Q.    Did Joe do anything that night?
 9       A.    Yes, he did.
10       Q.    What did he do?
11       A.    Well, he didn't return to watch the children
12    and he told me to just leave them there.
13            MR. MARTINEZ:  Objection.  Hearsay.
14            THE COURT:  Sustained.
15    BY MR. DELOZIER:
16       Q.    Okay.  While we're on pool parties, let me show
17    you what's been marked for identification as Exhibit 433.
18    Did you take that picture?
19       A.    Yes, I did.
20       Q.    And what does it show?
21       A.    It's a picture.
22       Q.    Pardon me.  About when did you do that?
23       A.    This was in 2000, June, July, around there.
24       Q.    Okay.  What does it show?
25       A.    It shows -- it's a picture of San Riva at the
```

```
 1    pool -- during one of the pool parties that the San Riva had

 2    for them.  Wendi was hosting it.  There's a --

 3             Q.    Okay.  Thank you.

 4             MR. MARTINEZ:  Judge, may I voir dire?

 5             THE COURT:  Yes.

 6

 7    VOIR DIRE EXAMINATION BY MR. MARTINEZ:

 8             Q.    You did say you took this picture, right?

 9             A.    Yes, I did.

10             MR. MARTINEZ:  No other questions.  No objection.

11             MR. DELOZIER:  Move for Exhibit 433 into evidence,

12    Your Honor.

13             THE COURT:  Exhibit 433 for identification is

14    admitted into evidence.

15                  (Pause in proceedings.)

16             MR. DELOZIER:  Can you help us?

17

18    CONTINUED DIRECT EXAMINATION BY MR. DELOZIER:

19             Q.    There we go.  Can you identify the person on

20    the left, looks like he's holding a phone?

21             A.    Yes.  That's -- that's my son-in-law, Joseph.

22             Q.    Did -- can you identify the person in the

23    foreground on the right?

24             A.    Yes.  That's one of the tenants, Erik Vaillant.

25             Q.    And how about in the background?
```

```
 1          A.    Okay.  I don't know who that -- the name of the
 2   gentleman that's back there.  I believe that was a tenant
 3   also, and then my daughter, Wendi.
 4          Q.    Very good.  You were at several parties?
 5          A.    Yes, I was.
 6          Q.    Okay.  Who was in charge at those parties?
 7          A.    Wendi and her co-workers, the people that
 8   worked under her.
 9          Q.    Did you ever see Joe try to take over?
10          A.    Yes.
11          Q.    You said yesterday you had counseled Joe and
12   Wendi at various times, correct?
13          A.    That's correct.
14          Q.    Did you counsel them regarding children?
15          A.    Yes, I did.
16          Q.    And what did you counsel them about children?
17          MR. MARTINEZ:  Objection.  Relevance.
18          THE COURT:  Sustained.
19          MR. DELOZIER:  Can we approach, Your Honor?
20
21               (The following proceedings were held at the
22   bench:)
23
24          MR. DELOZIER:  There's a large segment of our -- our
25   country that believes abortion is a form of abuse, and
```

1    when -- what I'm -- what she was going to respond was she had

2    counseled them against abortion.  Obviously, being strict

3    fundamentalist, she's certainly greatly opposed to that.

4         THE COURT:  I don't think it's relevant.  I sustained

5    the objection.  Let's move on.

6

7              (The following proceedings were held in open

8    court:)

9

10        THE COURT:  Objection sustained.  Let's move on.

11        MR. DELOZIER:  Yes, sir.  Thank you.

12   BY MR. DELOZIER:

13        Q.    We talked about his -- Joe's reputation for

14   anger.

15        A.    Yes.

16        Q.    Did you actually see him get angry with people?

17        A.    Yes.

18        Q.    Okay.  How did he treat those people from what

19   you saw after when he would get mad at them?

20        MR. MARTINEZ:  Objection.  Lack of foundation.  When

21   are we talking about?

22        THE COURT:  Sustained lay some foundation

23   BY MR. DELOZIER:

24        Q.    All right.  You -- can you relate anything you

25   saw during '94 in how he treated people once he got angry

```
 1    with them?
 2              A.    In an incident where -- not '94.
 3              Q.    '95?
 4              A.    '95.
 5              Q.    The summer, how he treated those people?
 6              A.    There would be an incident where he got mad at
 7    a certain gentleman involved with boat racing and after that
 8    he would just totally avoid them.  He -- he didn't mumble and
 9    complain and, you know, fuss and cuss and stuff to everyone
10    else, but he would avoid that person and not confront the
11    issue.
12              Q.    How about '96?
13              A.    Yes.
14              Q.    What would Joe do in '96?
15              A.    If he got mad at somebody, he would just avoid
16    them after that.
17              Q.    '97?
18              A.    Same.
19              Q.    '98?
20              A.    Same.
21              Q.    '99?
22              A.    Same.
23              Q.    2000?
24              A.    Same.
25              Q.    Did you confront him when he was angry?
```

```
 1          A.    No.

 2          Q.    Why not?

 3          A.    Because I was afraid to because I didn't want

 4    to be cutoff from my daughter and my children -- my

 5    grandchildren.

 6          Q.    Well, he was your grandson.  You liked him,

 7    didn't you?

 8          A.    My son-in-law?

 9          Q.    Sorry.

10          A.    Yes, I did.

11          Q.    Son-in-law, sorry.

12          A.    Yes, I did like him, but I also know that if he

13    was angry, he would avoid them from then on.  Sometimes it

14    would take a couple years because he'd eventually get things

15    back to where they were close friends again.

16          Q.    In fact is it fair to say you were actually

17    fond of him?

18          A.    Yes, I was.  I loved him like a son, otherwise

19    we wouldn't have done all those things we did for him.

20          Q.    During the -- during the year 2000, did you and

21    just the girls go somewhere?

22          A.    Yes, we did.

23          Q.    Where was that?

24          A.    We went to a -- to the -- to a time share in

25    Las Vegas.
```

1        Q.    What time frame are we talking about in 2000?

2        A.    May of 2000.

3        Q.    Who went with you?

4        A.    I went and Wendi went, and Barbara Mitchell,

5    Wendi's -- went and she came a day later.

6        Q.    What about the kids?

7        A.    No.  The children stayed home with their

8    fathers and babysitters.

9        Q.    Okay.  Anything unusual about that trip?

10       A.    Yes.

11       Q.    What was that?

12       A.    When we were there, we were getting phone calls

13   on my cell phone and also on Wendi's, you know, continually

14   from Joe saying, "When are you coming home, when are you

15   coming home?"

16            MR. MARTINEZ:  Objection.  Hearsay.

17            THE COURT:  Sustained.

18   BY MR. DELOZIER:

19       Q.    Okay.  Go ahead, but just what happened?

20       A.    Okay.  And so on Sunday our flight was delayed

21   because of weather and so we called and let the families know

22   that we were going to be late.  Joe was to pick up -- was to

23   pick us up at the airport.  When we boarded -- as we boarded

24   the plane, we called to let him know because there -- it's

25   just, you know, a so-many minute trip from Las Vegas, and

 1    when we got there, we already had messages on our phones, you

 2    know, saying where were we.

 3                MR. MARTINEZ:  Objection.  Hearsay.  She's also

 4    talking about numerous phones.

 5                THE COURT:  Sustained.  Ask your next question.

 6    BY MR. DELOZIER:

 7        Q.    Once you got to the airport in Phoenix -- are

 8    you referring to Phoenix?

 9        A.    Yes, I am.

10        Q.    Okay.  What happened then?

11        A.    Okay.  Wendi and Barbara and I gathered our

12    luggage and we called and let our ride know that we were

13    walking outside.  And we got outside and at the time, you

14    know, at Phoenix airport, there is always construction.  And

15    the lane closest where normally you would park was closed

16    off, and then the second lane over was one where you were

17    supposed to pull in to pick up people, and the third one was

18    a continue-through lane.

19                And as we walked out the door and we were

20    waiting, you could hear this loud noise coming from a

21    vehicle, and up drives Joe and slams on the brakes in that

22    third lane where you're supposed to continue.  And either

23    airport security guard or police, I don't recall which, Joe

24    jumped out of the Yukon and the security -- the officers

25    started yelling at him, you know, "You have to continue

```
 1    going, you can't just stop there, sir," and Joe said, "Fuck
 2    off," and he started yelling.  He grabbed our bags, just
 3    threw them into the Yukon.  Barbara and I were -- just kind
 4    of looked at each other.  We didn't say anything, and we got
 5    into the Yukon.  Wendi got into the front seat, and all this
 6    time Joe's mouth was just running again with the curse -- he
 7    was very angry.  His face was very red.  We got into the car,
 8    into the Yukon, and he -- he screeched off, squealed the
 9    tires and -- and squealed off.  I -- I don't recall what
10    number that freeway is, but we left the airport and went on
11    that -- the little one that hooks up to Interstate 10 going
12    east.  And he had -- it was, again, a Sunday night and he had
13    the Yukon cranked up.  And from where I was sitting behind
14    Wendi in the second seat, I looked over, I could tell that we
15    were going over 100 miles an hour and I was scared to death.
16    Didn't dare say anything to him because he was -- he was
17    raging and, you know, why hadn't we gotten there sooner, et
18    cetera, et cetera, which was not anything that we had control
19    over.  And he didn't -- when we got off onto Chandler, and
20    then the way that you had to go to catch Pecos and over to
21    San Rivas.  He was just hauling -- I mean, I expected to be
22    stopped or run into somebody or -- it was just very, very
23    frightening.  I had never -- that was horrible.  It was
24    horrible.
25                    And we pulled up to the apartment and didn't --
```

1    again, you know, Barbara and I had never said a word during

2    the trip, and got out and told -- got our stuff out of the

3    van, and Barbara and I headed home to Casa Grande and never

4    said a word.

5              Q.    Did you and Joe talk on the phone quite a bit?

6              A.    Yes, we did.

7              Q.    During the time then that they were married?

8              A.    Yes.

9              Q.    Did any of those conversations change as we got

10   into -- in the year 2000?

11             A.    Yes, they did.

12             Q.    How did they change?

13             A.    They changed from, you know, being more, you

14   know, fun and casual -- how are you, the kids are this, that

15   and the other -- into being yelled at, being told to run

16   errands and pay for things, and -- and running to "Go find

17   Wendi, I need her right now."  Things like that.

18             Q.    During any of your counseling sessions with

19   Joe, did you ever discuss suicide?

20             MR. MARTINEZ:  Objection.  Relevance, hearsay.

21             THE COURT:  Sustained.

22             MR. DELOZIER:  Could we approach, Your Honor?

23

24             (The following proceedings were held at the

25   bench:)

1

2      MR. DELOZIER:  We've established that she had

3   counseling sessions with them.  I'm now going to ask her what

4   she discussed.  I'm not asking anything about what he said,

5   but I think it's a relevant part of the case and it calls for

6   a "yes" or "no."

7      THE COURT:  Okay.  But the way you said it, did you

8   have counseling sessions with Joe about suicide, so basically

9   you're telling us what they were talking about and what Joe

10  probably said.  If you ask the question, "Did you have

11  counseling sessions with Joe?" period, then I'll allow the

12  question.

13     MR. DELOZIER:  Okay.

14     MR. MARTINEZ:  And I would note this issue of suicide

15  is irrelevant in this case.  As the Court is aware, even if

16  it's assisted suicide, that is not a lesser included offense

17  of first degree murder.  So even if she was assisting him

18  with suicide -- excuse me -- that was and that would be

19  irrelevant to this inquiry, and so any talk about suicide is

20  irrelevant.

21     THE COURT:  Right, but I sustained the objection.

22  You can restate the question.

23     MR. PATTERSON:  Judge, we need to clarify this.

24

25              (Attorney-attorney discussion.)

1      / / / / /

2              THE COURT:  Mr. DeLozier?

3              MR. DELOZIER:  I believe I'm allowed to elicit from

4      her from what she said to him.

5              MR. MARTINEZ:  First of all, it's hearsay.  Second

6      of all, it's irrelevant, as I said to him, because assisted

7      suicide is not a lesser included offense of first degree

8      murder, so why not begin talking about theft or why not begin

9      talking about fraudulent schemes?  None of those are relevant

10     here.  The only reason I mention those is because we wouldn't

11     talk about those, and so I would ask her to not go into that

12     area.

13             MR. DELOZIER:  Her whole defense is he told her about

14     this stuff so he could kill himself.

15             THE COURT:  I sustained the objection.  Let's move on.

16             MR. DELOZIER:  Reword the way you said?

17             THE COURT:  I indicated to you basically you asked a

18     yes or no question, and I said I will allow the question if

19     the question was "Did you counsel Joe" and she would answer

20     "yes" or "no."

21             MR. DELOZIER:  Okay.

22             THE COURT:  Okay.

23

24             (The following proceedings were held in open

25     court:)

1

2    BY MR. DELOZIER:

3         Q.    Talked about your counseling Joe about

4    children, right?

5         A.    Yes.

6         Q.    And did you have other subjects that you

7    counseled Joe on?

8         A.    Yes.

9         Q.    And what were they?

10         MR. MARTINEZ:  Objection.  Hearsay.

11         THE COURT:  I'll sustain the objection.  Ask your

12    next question.

13              (Attorney-attorney discussion.)

14         MR. DELOZIER:  Approach again, Your Honor?

15

16              (The following proceedings were held at the

17    bench:)

18

19         MR. DELOZIER:  I think we need to have a private

20    session with you off -- outside of the jury on this subject.

21         THE COURT:  We could talk about it here, go ahead.

22         MR. DELOZIER:  Well, I just don't think we could do

23    it adequately, so I --

24         THE COURT:  Why is that?

25         MR. DELOZIER:  Well, you're cutting me off from

 1     asking her about counseling in general.  I don't know what

 2     she's going to say.  I worded it Do you believe, that was

 3     appropriate a moment ago, and obviously that's on everybody's

 4     mind in the jury box here, but a substantial piece of her

 5     defense is he told her to order this stuff and he went

 6     through the whole process of trying to kill himself that

 7     night.

 8            THE COURT:  Mr. Martinez.

 9            MR. MARTINEZ:  Basically, what he wants to do is put

10     a defense that's not amenable to him before the jury and look

11     into the areas and perhaps seek to get jury nullification in

12     this case.  As I already said before, this assisted suicide

13     is not a lesser included offense.  Even if it were all true,

14     we're not going to instruct them on that, we're not going to

15     talk about it.  It's irrelevant and anything that he said

16     about it has nothing to do with domestic violence, it doesn't

17     have anything to do with whether he was angry or not, so I

18     just don't see --

19            MR. PATTERSON:  The whole subject was brought up by

20     the prosecution.  The whole subject -- we had pretrial

21     motions on that, okay?  And we -- we didn't want to include

22     it.  It got included at their request.  They have done that

23     to trash her.

24            THE COURT:  Okay.  Both sides have made their record.

25     I made my ruling.  Let's move on.

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1

2              (The following proceedings were held in open

3       court:)

4

5              THE COURT:  Mr. DeLozier?

6              MR. DELOZIER:  Thank you, Your Honor.  Just one

7       second, Your Honor.

8       BY MR. DELOZIER:

9              Q.    At some point in time, and you'll have to help

10      me with this because I'm not sure exactly the date, did

11      you -- you adopted Brandon.  Talk about him for a second.

12             A.    Yes.

13             Q.    All right. And when was that?

14             A.    Brandon came to live with us in 1988 and we

15      adopted him in '89.

16             Q.    '89?  So Wendi is 19, 18?

17             A.    When the official adoption went through she

18      would be 18.

19             Q.    And he came to live with you when?

20             A.    He came to live with us in '88, 1988.

21             Q.    So about 16, 17 --

22             A.    Yes, that's correct.

23             Q.    -- Wendi's age?  Did he live with you and Alejo

24      continuously?

25             A.    No.

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

```
 1          Q.    At some point in time, did he -- what did he
 2    do?
 3          A.    Actually, one summer he lived with Wendi and
 4    Joe at the shop.  It was the summer that Nicolas was born,
 5    that would be 1997.  During the entire summer when school was
 6    out, he stayed with them and lived with them.
 7          Q.    Okay.  He was very fond of both of them?
 8          A.    He loved them both dearly.
 9          Q.    October 7.  Where were you October 7, 2000?
10          A.    October 7 of 2000, in the morning I was in Los
11    Angeles, Los Angeles, California.  We flew in -- my husband
12    and I had been on vacation and we flew in to Phoenix.
13          Q.    I'm sorry flew in where?
14          A.    We flew in to Phoenix.
15          Q.    About what time?
16          A.    We landed, I think, around noon, sometime
17    around there, and got our car.
18          Q.    How long had you been out of down?
19          A.    We'd been out of town nine or ten days.
20          Q.    Okay.  Did you see Wendi and Joe that day?
21          A.    Yes, we did -- I did.
22          Q.    Where was that?
23          A.    I saw them at their apartment at San Rivas.
24          Q.    Approximately what time was that?
25          A.    Between 1:00 and 2:00, somewhere around there.
```

1          Q.     Did you stay very long?

2          A.     No.   Actually, we arrived there before they

3      did.   I had phoned them and said we were at the airport, and

4      I was told to wait and they would be there shortly.

5          Q.     Okay.   Did she arrive -- who was with Joe and

6      Wendi when she got there?

7          A.     Joe and Wendi and Nicolas and Ashley and Joe's

8      mom, Jeanette Andriano.

9          Q.     Did you stay at the apartment any length of

10     time or how long did you stay?

11         A.     Alejo and I stayed maybe 10, 15 minutes.   That

12     was about all.

13         Q.     Anything special happen that day?

14         A.     No.   I just -- they showed me some things they

15     had gotten from the swap meet.

16         A.     Joe took out of the trunk of the Buick a

17     bicycle for the kids.   It was kind of -- both of them can sit

18     on it and ride together.   Nicolas could ride, Ashley could

19     sit.   And then groceries and things like that that he took

20     out of the car.   I had gone into the house before they got

21     there to write a note, then we didn't go back into the

22     apartment.   We just kind of just stood out.

23         Q.     And what did you do next?

24         A.     And then Alejo and I, you know, told them all

25     goodbye.   We were on our way home because we had a bunch of

1    film in the car that we needed to get refrigerated, some

2    photography my husband had done.   It was real sensitive film.

3            Q.    Okay.  And what happened next with Joe and

4    Wendi as far as you know?

5            A.    As far as I know, they -- they had said they

6    were going take a nap and go to Casa Grande for dinner at the

7    Andrianos.

8            Q.    Let me rephrase that.  At some point during the

9    night of October 7 or morning of October 8, were you awake?

10           A.    Yes, I was.

11           Q.    Do you know approximately what time that was?

12           A.    No, I don't because I didn't go to bed until

13   almost midnight.  And all I know is there was -- that Alejo's

14   cousin came and knocked at our door and then at our window to

15   wake us up.

16           Q.    And what did you do?

17           A.    I got up and -- pretty disoriented, you know,

18   because, again, I spent the night at the LAX airport the

19   night before and went to bed late.  So the next thing that I

20   would have done was get dressed and talk to -- I did talk

21   with my daughter on the phone and I headed up to the

22   apartments.

23           Q.    Okay.  When you got there, what -- well, let me

24   ask it this way.  What did you drive, what vehicle did you

25   drive to get there?

```
 1              A.     I drove my 19 -- my Mazda to get there.

 2              Q.     Okay.  And who was at the apartment when you

 3      arrived?

 4              A.     When I arrived, I parked over to the side

 5      because there was an ambulance or EMS vehicle in front of the

 6      apartment.  Police were all around the apartment.  There were

 7      neighbors and stuff around the apartment, so I pulled up kind

 8      of around the corner where I could see the apartment, but it

 9      was -- it was quite a distance.

10              Q.     So who was there?

11              A.     The EMS people, police were there, and just all

12      kinds of people.

13              Q.     What did you do after you parked?

14              A.     I started to get out of my vehicle and then

15      Alejo approached me with the children, with Nicolas and

16      Ashley, and so what I did was he handed me the children and I

17      sat in the back seat of my Mazda with the children.

18              Q.     What was the children's condition?

19              A.     They had -- they appeared to have just woken up

20      and/or, you know, been sleeping.  They had their pajamas on.

21      Nicolas had a wet diaper on and I asked if I could -- you

22      know, if Alejo could find a diaper for me.

23              Q.     Did you change him?

24              A.     Yes, I did.  A policemen brought over a bag of

25      clothes that he said they had taken out of the house, of the
```

1    apartment, and I guess he had just kind of grabbed

2    everything -- you know, just things, and there were diapers

3    in there so I changed his -- his diaper and his clothes and

4    changed Ashley's diaper also.

5            Q.   Now, did you ever go into the apartment itself?

6            A.   No, I did not.

7            Q.   Did you speak to Wendi there?

8            A.   No, I did not.

9            Q.   About how long did you stay?

10           A.   I think I was there about an hour, an hour and

11   a half, somewhere like that.  I know that by the time that

12   the police gave me permission to leave, it was just you know,

13   dawn breaking, the sky was turning pink.

14           Q.   All right.  What did you drive from the

15   apartment back to  your home?

16           A.   I drove the Yukon home.

17           Q.   That's the one you leased to the kids?

18           A.   That's the one I leased that was in our name.

19           Q.   Okay.

20           A.   I made the payment.

21           Q.   Why did you drive it home?

22           A.   Pardon?

23           Q.   Why did you drive that one home?

24           A.   I drove that one home because when we had

25   returned from vacation on Saturday, I had not yet put our car

1    seats, baby seats back into the Mazda and there were car

2    seats in the Yukon.

3            Q.    When you left in the Yukon, what did you take

4    with you?

5            A.    My grandchildren and the bag of clothes the

6    policeman gave to me.

7            Q.    Nothing else?

8            A.    No, just -- nothing else.  I didn't take

9    anything.

10           Q.    All right.  Sometime after October the 8th, did

11   you take things from the apartment?

12           A.    Only after the police had been through the

13   apartment.

14           Q.    What did you take and when?

15           A.    I'm -- I'm not sure of the dates and stuff.

16           Q.    Well, approximately, week, two weeks?

17           A.    Seemed like it was a couple weeks before they

18   let us back in.  I'm not really sure.  I'm not sure.

19           Q.    Do you recall what you took?

20           A.    We -- we took some of -- we had to clean out

21   the apartment.

22           Q.    Okay.

23           A.    And we took some things -- the Andrianos took

24   some things, and basically we cleaned out the apartment and

25   cleaned out the stuff like that.

1          Q.     Uh-huh.  Any furniture?

2          A.     Yes.  I took the bedroom furniture from Wendi

3     and Joe's bedroom and my jewelry case that I had let Wendi

4     use.  I had the children's bedroom furniture.

5          Q.     Okay.  What was the condition of the master

6     bedroom furniture?

7          A.     The master bedroom furniture was -- it wasn't

8     in real good shape.  My reason for taking it was to return it

9     to the -- to the store because it wasn't paid for yet.  And

10    I -- I had taken, like, the frame and that.  The Andrianos

11    asked for the mattress.  We let them have the mattress.  But,

12    like, the footboard was basically destroyed.  It had -- it

13    needed to be fixed.  There were great big -- I don't know --

14    it's not really dents, it's gashes out of the -- the tall

15    dresser.

16          MR. DELOZIER:  Nothing further at this time, Your

17    Honor.

18          THE COURT:  Mr. Martinez?

19

20    CROSS-EXAMINATION BY MR. MARTINEZ:

21          Q.     Ma'am, this trial started back on October --

22    on August 23rd of the year 2000 -- 2004, and you were here,

23    weren't you, during jury selection?

24          A.     During jury selection, yes.

25          Q.     Yeah.  And you were here every day, weren't

```
 1      you?
 2              A.      Almost.  Not every day.
 3              Q.      And you came in and the jury was selected, and
 4      for those two weeks you were sort of in and out all the time,
 5      weren't you?
 6              A.      Yes.
 7              Q.      However, when the actual proceedings started,
 8      you were not allowed to stay in court, right?
 9              A.      That's correct.
10              Q.      Like all the other witnesses, the Court didn't
11      want you to be able to compare what was going on with your
12      story.  In other words, you were not allowed to hear what
13      other people were saying, right?
14              A.      That's correct.
15              Q.      Just like the other witnesses you saw them
16      standing out there, right?
17              A.      That's correct.
18              Q.      But you were able to get around not being able
19      to find out what other witnesses were saying, weren't you?
20              A.      I don't understand what were you're saying.
21              MR. DELOZIER:  Your Honor, object.  Relevance.
22              THE COURT:  Overruled.
23      BY MR. MARTINEZ:
24              Q.      You know somebody by the name of Alice Elsey,
25      don't you?
```

```
 1          A.      Yes, I do.

 2          Q.      In fact, she's the woman right back there with

 3     the blond hair, second from the end, isn't she?

 4          A.      Yes, she is.

 5          Q.      In fact, on September 13 of the year 2000

 6     (sic), you were talking to her about what was going on, "yes"

 7     or "no."  Do you remember that?

 8          A.      I don't remember the actual day.

 9          Q.      Do you remember talking to her when Shannon

10     Sweeney was testifying?

11          A.      I remember that Alice -- if the -- this is the

12     incident that you're talking about.

13          Q.      Ma'am, let me put it, "yes" or "no," did you

14     and she talk about any things that were going on in the

15     courtroom?

16          A.      Did her and I --

17          Q.      Yes

18          A.      -- talk?

19          Q.      Yes, uh-huh?

20          A.      As a straight answer, I -- yes.

21          Q.      Okay.  And it happened downstairs when?  During

22     the break, didn't it?

23          A.      Yes.

24          Q.      Now, the other thing, you were here during the

25     days that there were opening statements, which was September
```

1     2nd -- sorry, September 7 of 2004.  You were here that day

2     also, correct?

3          A.    Yes.

4          Q.    During that day you actually had to sit

5     outside, didn't you?

6          A.    Yes.

7          Q.    And during that day Alice Elsey was also here,

8     wasn't she?

9          A.    I believe so.

10         Q.    And you and she had a tape recorder that day.

11    Do you remember that?

12         A.    No, I did not have a tape recorder that day,

13    excuse me.

14         Q.    How about the next day after that?  You and she

15    had a tape recorder, didn't you?

16         A.    I did not have a tape recorder.

17         Q.    You were not walking out of this courtroom or

18    walking out of this courthouse with a tape recorder after the

19    proceedings on either September 7 of the year 2004 or

20    September 8, 2004?

21         A.    I carried the paralegal's tape recorder.

22         Q.    So you did carry a tape recorder, correct?

23         A.    Yes.  We were all helping her carry her stuff

24    out.

25         Q.    You don't know whether or not that tape

34

1    recorder was ever used by the defense in this case, do you?

2             A.    No, I did not.

3             Q.    But it is a fact that you --

4        MR. DELOZIER:  Your Honor, could we approach?

5

6             (The following proceedings were held at the

7    bench:)

8

9        MR. DELOZIER:  Move for mistrial.

10            (Attorney-attorney discussion.)

11       THE COURT:  Mr. Patterson, since Mr. DeLozier is the

12   one that's handling the examination of this witness, you're

13   whispering, but I think the court reporter can hear what

14   you're saying.  She's not taking down what you're saying.

15       MR. PATTERSON:  My understanding is I have to

16   communicate my position through Mr. DeLozier because he is

17   the lead counsel at this moment.

18       THE COURT:  Go ahead, Mr. DeLozier.

19       MR. DELOZIER:  We have already gone over this.

20   You -- we talked to that witness back there, okay?  And this

21   was cleared.  He's obviously using this as a -- as a tactic

22   to undermine her testimony and there's no good faith basis

23   for it.

24       THE COURT:  Mr. Martinez.

25       MR. MARTINEZ:  I think he's having selective memory.

1    If memory serves me right, and the record will prove me out,

2    Joseph Andriano indicated that he heard the conversation go

3    as follows, And then what did she say, And then what did she

4    say, so they're forgeting that portion of it, so I do have a

5    good faith basis for asking it.

6                    Additionally, I do believe that I saw her

7    walking out with a tape recorder, and she admitted she was

8    walking out with a tape recorder.  Throughout this whole

9    proceeding, the defense has never used a tape recorder. In

10   fact, if we all remember, on the record they indicated We

11   don't know anything about a tape recorder, so I do have a

12   good faith basis.

13          MR. DELOZIER:  Your Honor, the paralegal is here.

14   She could tell you it was her tape recorder, we were all

15   helping her carry stuff out that day.  This needs to stop.

16          THE COURT:  Mr. DeLozier, you can follow-up on

17   redirect, okay, to clarify anything.

18          MR. DELOZIER:  To have -- so I need to call my

19   paralegal to tell her -- tell what happened that day?

20          THE COURT:  No.

21          MR. DELOZIER:  That's what this is doing.

22          THE COURT:  No.  You can ask her whether that was the

23   paralegal's tape recorder that she was carrying.  You could

24   do that on redirect.

25                    (Attorney-attorney conversation.)

1          MR. DELOZIER:  The issue we've got is he knows

2     that's not true that -- we've never tape recorded anything.

3     He's making the inference that we are, okay, and I should be

4     able to call the paralegal to say it was hers.

5          THE COURT:  I may allow you to do that, but let's

6     move on right now, okay?

7

8               (The following proceedings were held in open

9     court:)

10

11          THE COURT:  Mr. Martinez.

12     BY MR. MARTINEZ:

13          Q.    And, ma'am, this issue with Shannon Sweeney,

14     and you just told us yes, there was some discussion, that's

15     not the first time that you've actually tried to go behind a

16     court's order, is it?  It's the second time that we know

17     about, isn't it?

18          A.    I don't know what -- you're going to have to

19     give me more information.

20          Q.    You're familiar with a civil lawsuit involving

21     Ashley and Nicolas, aren't you?

22          MR. DELOZIER:  Objection.  Relevance, Your Honor.

23          THE COURT:  Sustained.

24          MR. MARTINEZ:  Judge, may 1 make a record on it?

25

1          (The following proceedings were held at the

2     bench:)

3

4          MR. MARTINEZ:   Judge, under Rule 608 I'm entitled to

5     ask about instances of dishonesty.   In this particular case,

6     what they did is there was a lawsuit involving Ashley and

7     Nicolas in Maricopa County Superior Court.   What happened is

8     that they received a ruling that they did not like, and so

9     what they did is they surreptitiously, because they did not

10    like the result, went over to Pinal County.   And in Pinal

11    County what they did is, even though they knew the order was

12    set, even though they knew the order said they couldn't do

13    certain things, they, without giving notice to Maricopa

14    County Superior Court, without giving notice to the parties

15    that were interested, sought to adopt the kids underneath the

16    Maricopa County -- away from the Maricopa County Superior

17    Court order.   I have the minute entries from that.   They

18    indicate that the court found specifically that they

19    surreptitiously, in violation of a court order, in a

20    dishonest fashion, filed that lawsuit and as a sanction

21    sanctioned them $9000 and sanctioned Mr. DeLozier $6000 for

22    surreptitiously doing it.

23          MR. DELOZIER:   That's --

24          MR. MARTINEZ: I'm not asking about Mr. DeLozier, but

25    acts of dishonesty I can ask about.

1          MR. DELOZIER:  That's absolutely not true.  That case

2     was filed long before there was any ruling, okay?  That case

3     down there, we were told -- well, the statute says you do --

4     there are certain people that are entitled to notice.  We

5     gave notice to everybody that was supposed to receive

6     notice.  Pinal County judge said they believed the guardians

7     should ahave notice as well.  He allowed the case to be

8     dismissed down in Pinal County.

9          THE COURT:  Anything further, Mr. Martinez?

10          MR. MARTINEZ:  I have the minute entrys indicating

11     otherwise.

12          THE COURT:  Let's move on.  I'll sustain the

13     objection.  Let's move on.

14

15          (The following proceedigns were held in open

16     court:)

17

18          THE COURT:  Mr. Martinez?

19     BY MR. MARTINEZ:

20          Q.    I want to talk with you about your daughter and

21     growing up.  One of the things that you told us was she had

22     this sort of idyllic life growing up.  You were talking us

23     about that, right, very religious?

24          A.    Religious.  I didn't say idyllic.

25          Q.    One of the things you told us, and you started

39

1    to cry when you told us about the shoes issue.  Do you

2    remember that?

3          A.    Yes.

4          Q.    There wasn't anything that forced you to stay

5    in this -- in this band of travelling like gypsies from place

6    to place, was there?

7          A.    As -- no, because we thought we were doing the

8    right thing.

9          Q.    Right.  You could have left at any time, right?

10         A.    No.  We didn't have money to leave at any time.

11         Q.    You mean you were servants?  Is that what

12   you're telling me?

13         A.    Servants to whom?

14         Q.    To the person that you said was in charge?

15         A.    We worked under him.

16         Q.    Did that mean that you were slaves and couldn't

17   go out and find your own job at any time that you wanted?

18         A.    No.

19         Q.    You could have, couldn't you?

20         A.    Yes.

21         Q.    And in fact subsequent to that you did, right?

22         A.    Yes.

23         Q.    So the point about her not having shoes, that

24   was a choice you made, not anything else.  You chose not to

25   go out and get a job to buy her shoes, right?

```
 1          A.     My husband and the other men would work on

 2   occasion, and all the money went to Rick and he -- he made

 3   the decision on what to do.

 4          Q.     Right.  But you didn't have to stay there is

 5   the point, right?

 6          A.     I guess you could say no.

 7          Q.     No.  I don't want what I can say.  What would

 8   you say?  Was there was some sort of way that he kept you

 9   locked up at night so you couldn't go out and work?

10          A.     No.

11          Q.     Was there anything during those circumstances

12   that forced your husband to stay locked up so he couldn't go

13   out and buy something?

14          A.     No.  Like I said, they did have jobs and all

15   the money went into a pot.

16          Q.     That's what you told us before, but you're not

17   answering my question.  My question is your husband could

18   have left at any time, right?

19          A.     He -- he could have.

20          Q.     And he could have gotten a job, right?

21          A.     I already explained that.  You know, they do do

22   other jobs and work.

23          Q.     I'm not saying within the confines of this

24   troop.  I'm saying he could have left the troop at any time

25   he wanted to, right?
```

```
 1          A.    Yes, but we believe we were where we were
 2    supposed to to be.
 3          Q.    So it was both of your choice not to buy her
 4    the shoes then, right?
 5          A.    No.  I wanted to buy her shoes.
 6          Q.    But you didn't go out and do the work to get
 7    the money to buy the shoes though, right?
 8          A.    No because I wouldn't have ever been allowed to
 9    go out and work.
10          Q.    You keep saying you wouldn't be allowed.
11          A.    Right.
12          Q.    My question to you is this.  Was -- did they
13    have you in a jail of some sort so that you couldn't walk
14    away?
15          A.    No.
16          Q.    They didn't have you chained down to anything,
17    did they?
18          A.    No.
19          Q.    This was America, wasn't it?
20          A.    Yes.
21          Q.    So you could have, if you wanted to, walked
22    away at any time?
23          A.    Yes.
24          Q.    Now, the other thing that I wanted to talk to
25    you about, you indicated that she had a very good, not
```

1    childhood, but she had a good childhood growing up in the

2    school, right?  You told us about that, right?  No problems?

3         A.    No, I didn't say there was no problems.

4         Q.    Well, there were problems with her growing up,

5    wasn't there?

6         A.    Everybody has problems.

7         Q.    Is that "yes" or "no"?

8         A.    Yes, everyday problems.

9         Q.    But you didn't tell us about when she ran away,

10   did you?

11        A.    No.

12        Q.    And she did run away when she was 16 years old,

13   didn't she?

14        A.    I don't remember how -- no, she was probably

15   around 12, and her and the pastor's daughter ran off and they

16   were -- probably got about a mile away.

17        Q.    Ma'am, the question is did you tell us -- first

18   of all, how old was she in your memory of when she ran away?

19        A.    They were probably, like, 11 or 12.

20        Q.    So you don't remember the time she was 15 or 16

21   when she ran away?

22        A.    No.

23        Q.    You don't remember that she ran away four times?

24        A.    I -- I know she ran away two or three times.

25        Q.    Is that "yes" or "no"?

1          A.     No.

2          Q.     And you do know who Sharon Murphy is, right?

3          A.     Yes.

4          Q.     And you do know that the defendant has spoken

5     to Sharon Murphy, right?

6          A.     I've been told.

7          Q.     Have you read the report --

8          A.     On Sharon --

9          Q.     -- prepared by Sharon Murphy?

10         A.     You have to tell me what it looks like if --

11         Q.     Well, no, ma'am. I'm asking you whether or not

12    you read the report prepared by Sharon Murphy.  That's pretty

13    straight forward.

14         A.     No.

15         Q.     Okay.  Haven't even seen it at all?

16         A.     I may have seen it with the attorney.  I don't

17    recall.

18         Q.     Okay.  So you don't know whether or not you

19    read it.  Is that what you're telling me?

20         A.     Right.

21         Q.     How is it that something that is prepared by an

22    expert that you don't remember whether or not you read it --

23    and my question is this.  Have you read everything that's

24    involved in the case and it's just you don't remember what

25    else you've read?

1        A.    No, I've not read everything involved in the

2   case.

3        Q.    But you've read parts involved with the case,

4   haven't you?

5        A.    As far as like I -- I've seen -- I have a list

6   they gave me from the car.  I've seen newspapers.  I've seen

7   some items from the original police report, yes.

8        Q.    In other words, what you're telling me is you

9   read part of the police report, right?

10       A.    Right.

11       Q.    You've seen some of the items that were seized?

12       A.    Right, yes.

13       Q.    And as part of this, you may or may not have

14   read Sharon Murphy's report, right?

15       A.    Correct.

16       Q.    And now, when you're talking about your

17   daughter and when she was going through high school -- there

18   was a picture that was taken at graduation, wasn't there?

19       A.    A number of pictures, yes.

20       Q.    Well, there's one specifically, and I'll show

21   it to you and see if this is one of the pictures that was

22   taken for her graduation or in anticipation or about the time

23   that she graduated.  This is -- this is Exhibit 412.  Let's

24   take a look at it.

25       A.    Okay.

```
 1          Q.    Is that a picture that was taken on the
 2   occasion of her graduation?
 3          A.    No.  That was her senior picture.
 4          Q.    Okay.  She was going to graduate in 1989,
 5   right?
 6          A.    Correct.
 7          Q.    And she graduated May 18th, 1989, right?
 8          A.    I don't recall the exact date.
 9          Q.    Well, she -- she graduated in '89 according to
10   you?
11          A.    Yes, she did.
12          Q.    And if the record's indicate May 18th, 1989,
13   you have no reason to doubt that?
14          A.    Correct.
15          Q.    This, according to you, is her senior picture,
16   right?
17          A.    That's correct.
18          Q.    That would make her 18 years of age, right?
19          A.    She would have -- yes, 18.
20          Q.    All right.  If I may have it back please.
21          MR. MARTINEZ:  Move for admission of Exhibit Number
22   412.
23          MR. DELOZIER:  No objection, Your Honor.
24          THE COURT:  Exhibit 412 for identification is
25   admitted into evidence.
```

1   BY MR. MARTINEZ:

2         Q.    Let's take a look at it.  When we look at this,

3   her -- the color of her hair is blond, isn't it?

4         A.    It's blond with dark -- dark at the root.

5         Q.    Is it blond, "yes" or "no," ma'am?

6         A.    It's partly blond, yes.

7         MR. MARTINEZ:  Your Honor, may I just sort of walk

8   this in front of the jury so they may take a look at it --

9         THE COURT:  Yes.

10        MR. MARTINEZ:  -- so there's no dispute?

11             (Pause in proceedings.)

12  BY MR. MARTINEZ:

13        Q.    And, ma'am, that was before she met Joe

14  Andriano, wasn't it?

15        A.    Yes, it is.

16        Q.    Now, there are other pictures that were taken

17  of her when she was about 19 or 20, isn't there -- aren't

18  there, ma'am?

19        A.    If you have them.

20        Q.    Well, let me show you a couple other pictures

21  then, okay?  Let's take a look at Exhibit 410.

22        A.    Okay.

23        Q.    Do you recognize your daughter in those

24  pictures?

25        A.    Yes.  That's my daughter and her friend Laura.

1        Q.      How old was she in that picture?

2        A.      This one, probably 17 -- 16 or 17.

3        MR. MARTINEZ:  Okay.  I move for admission of Exhibit

4   410.

5        MR. DELOZIER:  No objection, Your Honor.

6        THE COURT:  Exhibit 410 for identification is

7   admitted into evidence.

8   BY MR. MARTINEZ:

9        Q.      Let's go ahead and take a look at that.

10               Her hair color there is, what, blond?

11       A.      Yes, it is.

12       Q.      Are you also going to tell me this one has the

13   dark roots?

14       A.      It probably does.  If you notice, she was --

15   that's from the summer and her hair lightens up in the

16   summer.  She was a towhead when she was born.

17       Q.      The point is she didn't lighten it up or

18   anything.  This was her natural color?

19       A.      That was in the sun.  In the winter, it wasn't

20   like that.

21       Q.      Ma'am, is that the natural color?

22       A.      No, it's sun.

23       Q.      The point is, did she put any additive on it to

24   make it turn blond?

25       A.      At that point, I don't think so.  I don't

48

1    recall.

2            Q.    Well, she was living with you, right?

3            A.    Right.

4            Q.    Did she ever bleach her hair blonde when she

5    was living with you?

6            A.    No.

7            Q.    Exhibit Number 445.  First of all, who is that?

8            A.    That's Wendi.

9            Q.    And where was it taken?

10           A.    That was taken in Sedona.

11           Q.    And how old was she?

12           A.    I believe that she was -- I'm not sure.   In

13   that picture, she was already married.

14           Q.    Okay.  If I may have that back.

15           MR. MARTINEZ:  I move for admission of Exhibit 445.

16           MR. DELOZIER:  No objection, Your Honor.

17           THE COURT:  Exhibit 445 for identification is

18   admitted into evidence.

19   BY MR. MARTINEZ:

20           Q.    Take a look at that one.

21           A.    Yes.

22           Q.    Also has blonde hair there, correct?

23           A.    Yes.

24           Q.    Now, ma'am, you know your daughter, her voice,

25   pretty well.  Do you know her voice pretty well?

49

```
 1              A.    Yes.

 2              Q.    I'm going to play a tape for you, okay?  I want

 3      you to listen to it.

 4              THE COURT:  Let me see Counsel --

 5              MR. DELOZIER:  Approach, Your Honor?

 6              THE COURT:  -- at the bench.

 7

 8              (The following proceedings were held at the

 9      bench:)

10

11              THE COURT:  Is this something that's already been

12      admitted?

13              MR. MARTINEZ:  Yeah, Exhibit 210.

14              THE COURT:  Okay.  I just wanted to make sure it was

15      something that's been admitted into evidence.

16              MR. DELOZIER:  What is it?

17              THE COURT:  You wanted to approach?

18              MR. DELOZIER:  Yes.  I just wanted to know what it

19      was.

20              MR. MARTINEZ:  Exhibit 210.

21              MR. DELOZIER:  What is it?

22              MR. MARTINEZ:  It's a tape that you heard in court.

23      I mean --

24              THE COURT:  Is this the one that we've already played

25      in court?
```

```
 1            MR. MARTINEZ:  Uh-huh.

 2            THE COURT:  Okay.

 3            MR. DELOZIER:  Cumulative, redundant, no reason to

 4    play it.

 5            THE COURT:  You're not going to play the whole tape?

 6            MR. MARTINEZ:  No, just a part of it to see if she

 7    recognizes the voice on it.

 8            THE COURT:  Okay.  I'll allow you to do it in that

 9    sense.

10            Counsel, just one more thing.  The court

11    reporter is not going to take down this portion.

12            MR. MARTINEZ:  Right.

13            THE COURT:  Okay.

14

15            (The following proceedings were held in open

16    court:)

17

18            THE COURT:  Mr. Martinez?

19    BY MR. MARTINEZ:

20       Q.    This is Exhibit Number 210.  I want you to

21    listen to it, okay?

22

23            (Whereupon, the tape was played.)

24

25            THE WITNESS:  I can't hear -- I can't hear it.
```

# APPENDIX H - Part 2

```
 1              MR. MARTINEZ:  Okay.  Let's back it up and I'll play
 2    it up here close to you.
 3
 4                   (Whereupon, the tape was played.)
 5
 6              THE WITNESS:  I think that's her.
 7    BY MR. MARTINEZ:
 8         Q.    Now, ma'am, you heard that, right?  You heard
 9    that tape, part of 210, right?
10         A.    (No audible answer.)
11         Q.    Is that "yes"?
12         A.    Yes.
13         Q.    And that's your daughter on there, right?
14         A.    I believe so.
15         Q.    And it was talking about tickets and talking
16    about moving traffic violations.  Did you hear that part?
17         A.    I was listening.  To say if it was her voice, I
18    can't tell you that.
19         Q.    We've played it and in it she says she has
20    moving violations -- traffic violations.
21              MR. DELOZIER:  Your Honor, beyond the scope of what
22    you have allowed him to get into.
23              THE COURT:  Sustained.  Let's move on.
24    / / / /
25    BY MR. MARTINEZ:
```

```
 1          Q.      Ma'am, one of the things we've heard in this
 2     court is your daughter had moving traffic violation.  It's
 3     actually more than that.  Isn't it true she had her license
 4     suspended back on December 28 of 1999?
 5          A.      That I do not know.
 6          Q.      Well, I thought you were -- I thought you were
 7     pretty close to her in 1998 and 1999.  Didn't you tell us
 8     that on direct examination?
 9          A.      Yes, but I don't know about that.
10          Q.      So she just -- you don't if that's true.  They
11     didn't tell you about it, right?
12          A.      Not that I recall.
13          Q.      They did have a couple cars.  They had a Yukon,
14     right?
15          A.      They had the Yukon I leased for them, yes.
16          Q.      The answer is yes, right?  They had a Yukon,
17     right?
18          A.      Yes, they had a Yukon.
19          Q.      And you wanted to tell me you were the person
20     that actually paid for that, right?
21          A.      Yes.
22          Q.      They also had another car, right?
23          A.      They were using his parent's car.
24          Q.      So the answer is "yes," right?
25          A.      Yes.
```

1          Q.    And your daughter, in the year 2000, was
2     driving around, wasn't she?
3          A.    Yes.
4          Q.    And you'd see her drive both cars, the Yukon
5     and the other car, right?
6          A.    Yes.
7          Q.    And she would drive with the kids in it, right?
8          A.    Yes.
9          Q.    Now, one of the other things that we were
10    talking about yesterday, you told us about the Courtyard
11    Apartments and that she worked there.
12         A.    Do you remember that?
13         A.    Yes.
14         Q.    And she left there about, I don't know, you
15    said November of 1999 I believe, right?
16         A.    No.   I said that she started a new job in
17    November of 1999.
18         Q.    And that would have been the San Riva
19    apartments, right?
20         A.    That's correct.
21         Q.    But before that she worked at the Courtyard,
22    right?
23         A.    She worked one other place in between, yes.
24         Q.    But before that she worked at the Courtyard,
25    right?

```
 1              A.     That's correct.

 2              Q.     She worked at the Courtyard somewhere around, I

 3    don't know.  When was it that she worked there?

 4              A.     She worked at the Courtyard from May, June of

 5    '98 to September, October of '99.  September, I think.

 6              Q.     And one of the kids was born while she was

 7    under their employ.  Ashley, right?

 8              A.     That's correct.

 9              Q.     One of the things you told us during that time

10    was she worked really, really hard, right?

11              A.     Yes, she did.

12              Q.     You told us that she took care of the kids,

13    right?

14              A.     That's correct.

15              Q.     You also told us that she took care of Mr.

16    Andriano, right?

17              A.     That's correct.

18              Q.     Because by that time he'd already had his

19    fourth surgery, right?

20              A.     Correct.

21              Q.     And she was doing everything, right?

22              A.     Yes.

23              Q.     And she was looking tired, right?

24              A.     Yes.

25              Q.     But you didn't tell us about the times that she
```

1   would go to the tanning booth.  Did you tell us about that?

2          A.   I don't know about that.

3          Q.   Well, let me show you a document from there and

4   see if that -- remember, you were the one that -- she told

5   you everything prior to the year 2000?

6          A.   I said we talked and we had a good

7   relationship.  I didn't say she told me everything.  She

8   didn't tell me everything.

9          Q.   She didn't tell you about going tanning when

10  she was working there at the Courtyard?

11         A.   No.

12         Q.   She didn't tell you she was held accountable

13  for that by the management and wrote up for going tanning

14  during work hours?

15         A.   I don't have any knowledge of that.

16         Q.   The other thing you told us was she worked

17  really hard around the house, right?

18         A.   I said she worked really hard taking care of

19  the children, taking care of Joe, working.

20         Q.   Which means she was also taking care of the

21  house back in 1998?

22         A.   I did not say that specifically.

23         Q.   She didn't clean up around the house in 1998?

24  She left it all for Joe to do?

25         A.   No, not all.  Joe wouldn't have done it.

1         Q.    Right.  That's the point you were trying to

2    make, right?

3         A.    Uh-huh.

4         THE COURT:  Is that "yes"?

5         THE WITNESS:  He's getting me confused.

6         THE COURT:  Hold on.  Don't say "uh-huh," "huh-uh."

7    Make sure you give a verbal response.  Ask your question.

8    BY MR. MARTINEZ:

9         Q.    Okay.  Back -- is there anything confusing

10   about 1998 that you don't understand?

11        A.    No.

12        Q.    That's the year we're talking about?

13        A.    Okay, 1998.

14        Q.    Is there anything confusing about when she

15   worked at the Courtyard Apartments?  You understand that's

16   the date, right?

17        A.    Correct.

18        Q.    And we're talking about -- you spent hours

19   going over it with Mr. DeLozier.  I just want to flesh it out

20   a little bit more.  You said yesterday that she worked very

21   hard when she was at the Courtyard Apartments, right?

22        A.    Yes, she did.

23        Q.    That she took care of the kids, right?

24        A.    That's correct.

25        Q.    Joseph Andriano did not lift a hand to help

```
 1    her, right?
 2          A.    I did not say that.
 3          Q.    He didn't help her, right?  Wouldn't change
 4    diapers?
 5          A.    He didn't want to change --
 6          Q.    You said he didn't?
 7          A.    -- diapers.
 8          Q.    That's what you said.  The other thing we
 9    need --
10          A.    In my sight.  Does that help?
11          Q.    No, ma'am, it doesn't.  And you also told us,
12    ma'am, that she was responsible for the household in the
13    sense that he was sick and he couldn't do any of the
14    household chores, right?
15          A.    I did not say he was sick and couldn't do the
16    household chores.
17          Q.    But he didn't do the household chores.  Is that
18    what you told us?
19          A.    That's correct.
20          Q.    You didn't do the household chores, right?
21          A.    No.
22          Q.    Your husband, Alejo, didn't do the household
23    chores, did he?
24          A.    Not at that house.
25          Q.    Actually, somebody by the name of "Anna" who
```

```
 1      was working at the Courtyard Apartments did their cleaning,
 2      didn't she?
 3           A.    I don't know that.
 4           Q.    They had a personal -- a person who worked for
 5      the apartments who she actually had come and do her cleaning,
 6      didn't she?
 7           A.    I don't know.
 8           Q.    She worked -- well, I thought you were there?
 9           MR. DELOZIER:  Your Honor, could we apreach?
10
11           (The following proceedings were held at the
12      bench:)
13
14           THE COURT:  She said she didn't know about Anna.
15      Let's move on.
16           MR. DELOZIER:  My objection is he's testifying though.
17           THE COURT:  Okay.  Let's move on.
18           MR. MARTINEZ:  I'll move on, but I could ask the
19      question if she knows because she was there every day.
20           THE COURT:  Go ahead and ask the --
21           MR. DELOZIER:  He needs to back off though, Your
22      Honor.  He's badgering.  He's close to badgering her.
23           THE COURT:  Just one at a time.  Ask the question.
24           MR. MARTINEZ:  Okay.
25           THE COURT:  Let her answer, and let's move on.
```

1

2                    (The following proceedings were held in open

3       court:)

4

5       BY MR. MARTINEZ:

6              Q.    Now, with regard to this Anna, she was the one

7       who did the babysitting, didn't she?

8              A.    No, she -- I don't know who Anna is, but that

9       wasn't the babysitter.

10             Q.    Now, ma'am, one of the other things that you

11      told us yesterday was that -- that they were having family

12      difficulties back then, right?

13             A.    Correct.

14             Q.    How is it that the defendant was then able to

15      buy you a whole set of chairs and stuff that were delivered

16      to Alejo when she was working at the Courtyard Apartments if

17      they didn't have any money?

18             A.    What chairs?  I --

19             Q.    Do you remember ever a gift of furniture from

20      the defendant to you while she worked at the Courtyard

21      Apartments?

22             A.    We received a couch and a chair that had

23      been -- that weren't being used at the apartments anymore,

24      yes.

25             Q.    You did receive some furniture from that

 1    apartment then, didn't you?

 2              A.    Yes.

 3              Q.    Now, the other thing that you were telling us

 4    was that she did everything for him.  Do you remember telling

 5    us that she did everything for him, that if he wanted to, she

 6    would, I guess, clip his toenails?  I think you had mentioned

 7    that.  Do you remember saying that?

 8              A.    Yes.  Yes, she used to clip his toenails,

 9    fingernails.

10              Q.    She did everything for him like that, right?

11              A.    Yes.

12              Q.    One of the other things that you told us was

13    that during -- after the second operation, the incision

14    required some management after he went home, right?

15              A.    Yes.

16              Q.    And in fact the way you described it is the

17    doctor kept him over one day to take a look, for whatever

18    reason he stayed over one day after the second surgery,

19    right?

20              A.    Yes.

21              Q.    And for that second surgery, after they let him

22    go home, the person who actually ended up taking care of him

23    was you, right?

24              A.    Uh --

25              Q.    "Yes" or "no"?  Was it you?  Did you tell us

1    that yesterday?

2            A.    Yes.

3            Q.    It wasn't the defendant, the person who you

4    said cut his toenails and did all of that, right?

5            A.    She -- she did also.   She --

6            Q.    Well, wait a minnute.   Didn't you tell us

7    yesterday that it grossed her out because there was blood

8    associated with it and she wouldn't do it?   That's what you

9    told us yesterday, right?

10           A.    No, I did not.   I did not say it grossed her

11   out.   I said she was never able to handle blood.

12           Q.    You left us then with the impression, ma'am,

13   that the person who actually took care of him was you, right?

14           A.    Yes.

15           Q.    With regard to his third surgery -- or the

16   fourth, the one done at the Mayo Clinic, the one that took

17   all his muscles and took a lot of the left side.   Do you

18   remember that?

19           A.    The fourth surgery?

20           Q.    Right.   That was in 1998, remember that?

21           A.    That's correct.

22           Q.    And you told us that after that Mr. Andriano

23   was able to work.   You told us that, right?

24           A.    I did, yes.

25           Q.    You told us he was able to work, right?

1           A.      Yes.

2           Q.      And one of the things that you didn't tell us

3      was that all of his muscles of his shoulder were actually

4      taken out as part of that operation, wasn't it?

5           A.      I believe I said that they took out all of

6      this.

7           Q.      Right.  What that means is he didn't have the

8      strength to be able to left those windshields anymore.  Isn't

9      that true, ma'am?

10          A.      No, that's not true.

11          Q.      He was -- you were able to test him out to see

12     the strength in his arm?

13          A.      I saw him pick up 50 gallon drums of fuel.  I

14     saw him change windshields, yeah.

15          Q.      So the answer is yeah, you think he still could

16     work then, right?

17          A.      Oh, yes.

18          Q.      He could also work while he was having

19     chemotherapy too, right?

20          A.      I don't know about that.

21          Q.      You don't know what?

22          A.      If he could work while he had chemotherapy.

23          Q.      Well, according to you, the only job he had

24     after that was the one where -- the one after the 1998

25     surgery.  Isn't that true?

1        A.    No.  I said he also did work on the side with

2    his windshield business, replacing windshields whenever, you

3    know, he did, you know.  And no one ever asked me, but he

4    also worked for an air-conditioning place in Spring of 2000.

5        Q.    So after the fourth surgery, the thing that you

6    told us though was that he came home after a stay in the

7    hospital, right?

8        A.    Correct.

9        Q.    And that the care for him was a little bit more

10   than it was after the third surgery?

11       A.    Definitely, yes.

12       Q.    And the other thing you told us was that you

13   came home four times a day to take care of him, right?

14       A.    That's correct.

15       Q.    Not the defendant.  You took care of him,

16   right?

17       A.    Correct.  I --

18       Q.    And -- sorry.

19       A.    As far as the feeding tube and the trach.

20       Q.    Right.  And the other -- the other person who

21   took care of him, that you told us, was your husband, Alejo

22   Ochoa?

23       A.    As far as repacking, yes, he did that.

24       Q.    You -- even though at that time the defendant

25   was working at the Courtyard Apartments, right?

1        A.    Yes.

2        Q.    And she was within walking distance of him,

3    right?

4        A.    Yes.

5        Q.    One of the things that you also told us was

6    that, well, you know, he would force her to drive home, to

7    come home and change the diapers.  Do you remember telling us

8    about that incident?

9        A.    Yes.  He -- he'd even bring the children to me

10   at work for me to change them.

11       Q.    I understand that.  But the point I'm trying to

12   make, he wouldn't walk down there.  He'd drive down there

13   according to you, right, even though they lived in the same

14   complex?

15       A.    I -- I -- say it again, please?

16       MR. MARTINEZ:  Could you read that back?

17

18            (Whereupon, the question was read:

19            Q.    I understand that.  But the point I'm

20            trying to make, he wouldn't walk down there.  He'd

21            drive down there according to you, right, even though

22            they lived in the same complex?)

23

24            THE WITNESS:  He would take them to her if I wasn't

25   there.  I don't know on occasion if he walked or drove.

1      BY MR. MARTINEZ:

2           Q.    Well, you told us he would drive down there.

3      That's what your words were yesterday.  Do you remember that?

4           A.    Okay.

5           Q.    So you're -- now you're telling us perhaps you

6      misspoke yesterday?

7           A.    I'm human.

8           Q.    Ma'am, is that the question before you?  No

9      one's accusing you of not being human, but is that the

10     question before you?  The question before you is you made a

11     mistake yesterday, right?

12          A.    I may not have said it the exact way that I

13     should have.

14          Q.    The bottomline is you didn't see it is the

15     point I'm trying to get at.  Somebody told you?

16          A.    Oh, no.  I saw him bring the kids over to the

17     office before when I was in the office for her and he'd bring

18     them to her to change them.

19          Q.    And he would walk over.  He wouldn't drive

20     over, would he?

21          A.    Actually, I think he drove over.

22          Q.    Now, you indicated that you and she were pretty

23     close.  She's your only child.

24          A.    She's my only child --

25          Q.    Right.

1          A.      -- except for Brandon.  She's not my only

2     child.  She was the only child for a long time.

3          Q.      She's your only biological child, right?

4          A.      Yes.

5          Q.      You indicated you were pretty close with her,

6     weren't you?

7          A.      Pretty close.  She was closer with her father,

8     actually.

9          Q.      Okay.  She was closer to her father, even

10    though her father was the same guy that, according to you,

11    would scream at you, right?

12         A.      Yes.

13         Q.      And he's the guy that would scream at you so

14    much it would force you to run into the bathroom, right?

15         A.      I would go into the bathroom or to the bedroom,

16    correct.

17         Q.      And you would lock the door, right?

18         A.      Yes.

19         Q.      And then as part of going into there, you would

20    take your child with you, right?

21         A.      Yes.

22         Q.      That's the man that she loves more than -- or

23    has a better affinity with than you, right?

24         A.      Yes.

25         Q.      And then the other thing that strikes me about

1    that is that he was being violent to you then, right, because

2    he was screaming at you, right?

3         A.    He was screaming.  There was never any cursing

4    or physical.

5         Q.    He was screaming to the point where he made you

6    afraid, right?

7         A.    He was screaming to the point where I just

8    didn't want to hear it.

9         Q.    So you weren't afraid when you would go into

10    the bedroom or the bathroom and lock the door?

11         A.    Not afraid.  Just wanted to get away from it.

12         Q.    So if you -- why are you locking the door if

13    you're not afraid?

14         A.    So that I -- that he wouldn't follow in and

15    keep yelling.

16         Q.    Well, and he would never come to the door then.

17    He would never check the lock?

18         A.    I don't recall.

19         Q.    So then you locking it had nothing to do with

20    it because he would never come check the door then?

21         A.    I don't recall.

22         Q.    You don't recall him checking the door.  That's

23    what you're saying?

24         A.    That's true.

25         Q.    So he could not -- in other words, it could be

1   he never checked the door, right?

2        A.    It could be.

3        Q.    You said this happened every year when she was

4   growing up, right?

5        A.    Yes.

6        Q.    You gave us a litany of all of the years.

7   This would include when she was growing up and also when she

8   was in high school, right?

9        A.    Correct.

10       Q.    You never called the police on him, right?

11       A.    No.

12       Q.    It was just a fight between you and him, right?

13       A.    Not necessarily a fight.  It could be where he

14   was just yelling about something.  It could have been he was

15   yelling about something that happened to him somewhere, so

16   you can't say a fight every time no.

17       Q.    Well, he was yelling?

18       A.    Yes.

19       Q.    And you were the object of his yelling, right?

20       A.    I may not have been what he was yelling about,

21   but if he was yelling, I -- and I was there, he would be

22   yelling and then I would leave.  I would take Wendi and go

23   into the bedroom.

24       Q.    Just so I understand, he'd start yelling the

25   way you pictured it to me?

1        A.      Uh-huh.

2        Q.      On occasion he'd be yelling like a crazy man.

3    Like Don Quixote screaming at the the windmills?

4        A.      No.

5        Q.      Well, you --

6        A.      No, I didn't say --

7        Q.      Ma'am, the point I'm trying to make, when the

8    yelling was going on, the voice was directed towards you,

9    wasn't it?

10       A.      He was yelling -- it could have been towards --

11   towards a book.  I don't know.  Directed towards me or in my

12   presence, yes, in my presence.

13       Q.      So what you're saying is he yelled in your

14   presence -- it could be he would just start yelling for no

15   reason, not to you but in your presence, and then that would

16   cause you, when he started letting loose like the crazy man,

17   to go into the bedroom or bathroom?

18       A.      He didn't yell like a crazy man.

19       Q.      Well, he yelled at nothing according to you?

20       A.      He would be yelling about a situation.

21       Q.      So he -- just so I'm clear, he wouldn't yell at

22   you.  On occasion he'd just start yelling?

23       A.      He would yell at me on occasion or Wendi on

24   occasion or a situation on occasion, yes.

25       Q.      And when those situations arose, you would then

```
1    take off and go into either the bedroom or the bathroom?

2            A.    Yes.

3            Q.    And according to you, that's no reason to leave

4    him, right?  That's -- you weren't an abused woman, were you?

5    You didn't feel abused, did you?

6            A.    On occasion I did because of verbal abuse, but,

7    no, I was not going to leave him because that's --

8            Q.    The question is --

9            A.    -- against --

10           Q.    The question is did you feel abused?

11           A.    On occasions, yes.

12           Q.    Did you feel abused when he started to scream

13   at a book?

14           A.    No.

15           Q.    Did you feel abused when he started to scream

16   at Wendi, according to you?  Wasn't screaming at you, but

17   screaming at her.  Did you feel abused?

18           A.    I would feel upset, not abused.

19           Q.    so the answer is no, you would not feel abused,

20   right?

21           A.    Okay.

22           Q.    The only time you would feel abuse was when he

23   screamed at you?

24           A.    I'm going to retract that and say yeah,

25   probably so when he would scream at Wendi or Brandon, yes.
```

```
 1          Q.    Well, I'm asking -- now that you've retracted
 2    that, you would feel abused when he would scream at Wendi?
 3          A.    I would feel we were being abused.
 4          Q.    No, no.  I'm asking you -- he's screaming at
 5    Wendi. Did you feel abused when he screamed at Wendi?
 6          A.    Not every time.
 7          Q.    Just sometimes, right?
 8          A.    Yes.
 9          Q.    And sometimes when you felt abused that was
10    because he was screaming probably louder and harsher, right?
11          A.    Possibly.
12          Q.    Well, I wasn't there.  You're going to have to
13    help me out.  Is that when you felt abused?
14          A.    On occasion.
15          Q.    And on this occasion when you felt you were
16    being abused, that would also mean that you felt that he was
17    abusing Wendi, right?
18          A.    That he was being loud and abusive as far as
19    being loud.
20          Q.    But my point is you felt abused on certain
21    situations when he screamed at Wendi, right?
22          A.    Uh-huh.
23          Q.    Is that "yes"?
24          A.    Yes.
25          Q.    And so what I'm saying is then if that's the
```

```
1    case and if you felt, abused then you also felt he was

2    abusing Wendi then, right?

3            A.    I never -- abusing us.

4            Q.    Okay.  So if he was abusing the "us," which

5    would include Wendi, you never called Child Protective

6    Service when he was to take care of this child that he was

7    abusing, right?

8            A.    No.

9            Q.    Okay.  Because it wasn't that serious, was it?

10           A.    No, because I would just forget about it.

11           Q.    Right.  Because it didn't even -- you didn't

12   need to call the police?

13           A.    No.  I never would have called the police.

14           Q.    It wasn't that serious, right?  He never laid a

15   hand on you, did he?

16           A.    No, he did not.

17           Q.    He never laid hand on her?

18           A.    No, he did not.

19           Q.    All he did was scream, right?

20           A.    Scream.

21           Q.    And frighten you?

22           A.    Yes.

23           Q.    But you never, throughout all of those years

24   that he was doing this screaming, felt like he would ever hit

25   you, right?
```

1      A.    I never felt like he would hit me.  Plus, I
2    would never divorce him.
3      Q.    I'm asking you --
4      A.    I would have never left him, which would have
5    proceeded to a divorce.
6      Q.    I'm not asking about divorce.  I'm asking about
7    him hitting you, if you ever felt like he was going to hit
8    you?
9      A.    No.
10     Q.    Did you ever feel like he was going to hit her?
11     A.    No.
12     Q.    All it was was just talk?
13     A.    Yelling.
14     Q.    Yelling.  I want to talk to you a little bit
15    about October 8, 2000.  Do you know what day that is?
16     A.    That was a Sunday.
17     Q.    And that was the date that --
18     A.    My son-in-law died.
19     Q.    That your daughter killed him?
20     A.    No.  I did not say that, you did.
21     Q.    I know.  I want to talk to you about it.
22           My understanding is that you had just arrived
23    back from California then the previous day, the Saturday,
24    right?
25     A.    Yes.

```
 1              Q.      And what car did you drive back from the
 2    airport to your home in Casa Grande when you drove back?
 3              A.      The Mazda.
 4              Q.      The Mazda?
 5              A.      Yes.
 6              Q.      Okay.  But you didn't drive the Mazda all the
 7    way to California, did you?
 8              A.      No.
 9              Q.      You just left it at the airport, right?
10              A.      Correct.
11              Q.      So it wasn't a situation where you had to pack
12    everything in there and drive all the way to California.  It
13    was a situation where it was parked there and then you drove
14    on home, right?
15              A.      At the airport, yes.
16              Q.      And there was a concern about some -- some
17    rolls of film, right?
18              A.      Correct.
19              Q.      So that's when you stopped over at the
20    Andrianos.  You were only there about 10 or 15 minutes, and
21    then you went home, right?
22              A.      Correct.
23              Q.      And then what happened was that you went to
24    sleep, but albeit until about midnight, which would now make
25    it October 8 of the year 2000, right?
```

1          A.     Okay.

2          Q.     Well, no, I was --

3          A.     Correct.

4          Q.     One of the things that happened is later on

5     after you went to sleep, you couldn't tell us the time, you

6     guys were woken up, right?

7          A.     Yes.

8          Q.     You were woken up by somebody who came over and

9     woke you up, right?

10         A.     Yes, Alejo's cousin.

11         Q.     Right.  And you did see your husband get on the

12    telephone, right?

13         A.     I saw my husband on the telephone, yes.

14         Q.     And you heard him -- I'm not asking you what he

15    said, but you heard him talking, didn't you?

16         A.     No, I did not.  He went into the bathroom.

17         Q.     So there's -- you get a call very late at

18    night, right?  And that -- didn't that cause a little bit of

19    concern that you're getting this call really late at night?

20         A.     Yes.

21         Q.     And yet you didn't ask him what it was about,

22    did you?

23         A.     I said --

24         Q.     No, ma'am, "yes" or "no," you didn't ask him,

25    right?

1          A.    Yes.

2          Q.    Well, ma'am, do you remember that you and I had

3     a conversation back on May 7 of the year 2004?

4          A.    Yes.

5          Q.    And do you remember that I asked you

6     specifically about whether or not you asked him about this

7     and whether or not he told you.  Do you remember that?

8          A.    I know we had a conversation.  I don't remember

9     everything that we talked about.

10         Q.    Well, and do you remember telling me that he

11    left town without telling you why he was leaving?  Do you

12    remember telling me that?

13         A.    Yes.

14         Q.    So as I understand it today then, he's on the

15    telephone, right?

16         A.    Yes.

17         Q.    You're in bed still, right?

18         A.    No.

19         Q.    You got up?

20         A.    I got up.

21         Q.    He goes into the bathroom to -- for the call,

22    right?

23         A.    Yes.  Well, he was on --

24         Q.    You said he went to the bathroom, right?

25         A.    Yes, he went to the bathroom.  I know he went

1    to the bathroom because by then I was up.

2         Q.    Right, the point being he went to another room,

3    right?

4         A.    Yes.

5         Q.    And in a -- it's a room where you didn't hear

6    the conversation.  Is what you're telling us, right?

7         A.    That's correct.

8         Q.    And as a result -- well, you didn't follow him

9    into the bathroom, right?

10        A.    No.

11        Q.    Okay.  And the point is he wanted some privacy,

12   or for whatever reason, he wanted to be away from you, right?

13        A.    You'd to have ask him that.

14        MR. MARTINEZ:  That's right.

15        MR. DELOZIER:  Objection, Your Honor.  Speculation.

16        THE COURT:  Sustained.

17   BY MR. MARTINEZ:

18        Q.    I'm not asking you to tell me why he went over

19   there.  I'm just asking you it was spatially apart.  You and

20   he were spatially apart, right --

21        A.    Yes.

22        Q.    -- when he was over there.  He cames out of

23   that bathroom, right?

24        A.    Correct.

25        Q.    He starts getting dressed, right?

1          A.    I think he already started getting dressed in
2    the bathroom.
3          Q.    Okay.  But you weren't in the bathroom?
4          A.    No.
5          Q.    Well, you weren't in the bathroom with him,
6    right?
7          A.    No, I was not.
8          Q.    So you don't know if he was getting dressed in
9    the bathroom or not?
10         A.    No.
11         Q.    So he comes out and starting to get dressed,
12   right?
13         A.    Yes.
14         Q.    And without telling you anything, he up and
15   leaves, right?
16         A.    Basically, I said what's going on, and he said,
17   I'll tell you later, or something to that effect.  But, no,
18   he did not tell me what was going on.
19         Q.    Right.  And you just let him go, right?
20         A.    I'm going to Wendi's.
21         Q.    You let him go, right?
22         A.    Yeah.
23         Q.    Okay.  And you just added something about him
24   saying he was going over to Wendi's, something like that?
25         A.    I think, yeah, he said something about he was

```
 1    going to Wendi's or something.
 2         Q.    And so --
 3         A.    God, that whole night was --
 4         Q.    I understand all that.  I'm not asking you
 5    about the whole night.  I'm just trying to talk about the
 6    first part.  He has a Chevy truck, right?
 7         A.    Yes, he does.
 8         Q.    He takes off in this Chevrolet truck, doesn't
 9    he?
10         A.    That's correct.
11         Q.    It takes about 30 minutes on a normal Sunday to
12    drive from where you live to the San Riva apartments, right?
13         A.    I don't -- I've never -- I don't know.  Depends
14    on who's driving, I guess.
15         Q.    Ma'am, let me put it this way.
16         A.    It takes me about --
17         Q.    Let's do it this way, okay?
18         A.    Okay.
19         Q.    You indicated to us previously that they moved
20    into that apartment complex in November of 1999, right?
21         A.    Yes, that's correct.
22         Q.    And you told us that from November of 1999 all
23    the way up to the year -- to October 6 of the year 2000, that
24    you visit them -- visited them --
25         A.    Yes.
```

```
 1          Q.    -- many times, right?

 2          A.    That's correct.

 3          Q.    You didn't fly over there, right?  You didn't

 4    fly over to their house, right?

 5          A.    I didn't fly.

 6          Q.    You didn't take a bus as well, right?

 7          A.    No.

 8          Q.    You drove from your house each and every time,

 9    right?

10          A.    No.

11          Q.    You would walk?

12          A.    No.  Sometimes I would in be in Phoenix and

13    drive from Phoenix.

14          Q.    I'm talking about from the trip from your house

15    to their apartment, whenever you made it.  You indicated you

16    made that many times, right?

17          A.    That's correct.

18          Q.    Sometimes you would drive it yourself right?

19          A.    That's correct.

20          Q.    And sometimes your husband would drive it with

21    you, right?

22          A.    That's correct.

23          Q.    And in all of those times, how many would you

24    estimate that from November of 1999 to October of year 2000,

25    which is approximately 11 months, how many times would you
```

1    estimate that you drove over there --

2            A.     I can't --

3            Q.     -- from your house?

4            A.     Give me a calculator.  I mean -- I don't know.

5    I mean, sometimes it might be several times a week, sometimes

6    once a week, sometimes maybe not for a couple weeks.  I don't

7    know how to answer that.

8            Q.     Would it be fair to say it was a lot of times?

9            A.     It was a lot of times.

10           Q.     And in those lots of times, you never formed an

11   impression of how long it takes to drive from your house all

12   the way over to the San Riva apartments?

13           A.     It could take anywhere from 40 minutes to an

14   hour and a half depending on traffic.

15           Q.     And you -- it never has taken you 30 to 35

16   minutes?

17           A.     It may have.  It's possible.

18           Q.     In any of the times that you have driven when

19   there was no traffic and it was light, it -- it takes 30 to

20   35 minutes, doesn't it?

21           A.     It's possible.

22           Q.     Isn't that the norm?

23           A.     It usually takes me 45 minutes.

24           Q.     Okay.  Now, you're saying that when you'd

25   drive, it would take you 45 minutes?

1        A.    Yes, sir.

2        Q.    And when somebody else drove, it would be

3    quicker for them?

4        A.    It's possible.

5        Q.    Now, he leaves in the truck, right?

6        A.    Yes.

7        Q.    You can't tell us the time that he leaves,

8    right?

9        A.    No.   I don't -- I don't know.

10        Q.    You're sitting back there and you begin to get

11    dressed, right?

12        A.    Sometime in that -- in that time.

13        Q.    Sure. He's already gone, isn't he?

14        A.    Yes.

15        Q.    And you're still back at the house, right?

16        A.    Yes.

17        Q.    You don't talk to Ms. Andriano, do you?

18        A.    Yes.

19        Q.    You do make a call then, right?

20        A.    Yes.

21        Q.    And you speak briefly with her, right?

22        A.    Briefly.

23        Q.    And after speaking briefly with her, you decide

24    to do something, don't you?

25        A.    Yes.

```
 1          Q.    You decide to leave, right?

 2          A.    I got dressed and left.

 3          Q.    But you were going to leave anyway, weren't

 4    you?

 5          A.    Maybe.

 6          Q.    Well, ma'am, your daughter calls in the dead of

 7    night?

 8          A.    Yes.

 9          Q.    Obviously, there's a problem?

10          A.    Obviously.

11          Q.    Husband takes off.

12          A.    Yes.

13          Q.    Right?

14          A.    Yes.

15          Q.    You're getting dressed, right? That's what you

16    told me?

17          A.    I told you that I got dressed around that time,

18    yes.

19          Q.    When he was in the bathroom getting dressed,

20    coming out and getting dressed, you're getting dressed.

21    That's what you --

22          A.    Not yet.  Sometime in that time I got dressed.

23    I did get dressed.

24          Q.    If you're getting dressed, if you -- if you're

25    not going to go, why are you getting dressed as soon as Alejo
```

1        leaves?  Why are you getting dressed?

2                A.      Because he would -- that's what you do.

3                Q.      So you were --

4                A.      Get dressed.

5                Q.      You were going to stay up?

6                A.      I was getting -- I was going to stay up until I

7        knew what was going on.

8                Q.      But you didn't think it was important enough to

9        immediately go with him, did you?

10               A.      He was out the door before I was dressed.

11               Q.      I understand that.  But you didn't think it

12       important enough to hurry up and put whatever you had on to

13       get into that truck with him, did you?

14               A.      I'm not -- I can't answer that as far as I

15       didn't think it was important enough.  There was no time for

16       me to get in to leave with him.

17               Q.      And he left -- so he leaves way before you then

18       because now you've got to take time to get dressed?

19               A.      It only took about five minutes.  I didn't put

20       make up or anything else on.

21               Q.      He couldn't wait five minutes for you.  Is that

22       what you're --

23               A.      You'd have to ask him that.

24               Q.      Well --

25               A.      He didn't wait five minutes.

```
 1          Q.    Did you ask him to wait for you?

 2          A.    No.  He was gone.

 3          Q.    The point is you didn't ask him to wait for

 4     you?

 5          A.    No, I don't believe I did.

 6          Q.    So you then get ready to go and you get in your

 7     car to leave then, right?

 8          A.    That's correct.

 9          Q.    But before that, you spoke to your daughter,

10     right?

11          A.    I'm trying to find out what's going on.

12          Q.    Yes, you have a conversation, very short

13     conversation with her?

14          A.    I don't know if I'd call it a conversation, but

15     I spoke with her, yes.

16          Q.    Let me back you up a little bit.  When your

17     husband says, "I'm leaving, I've got to go see Wendi,"

18     whatever words were said, you were still in your house when

19     he uttered those words, weren't you?

20          A.    Yes.

21          Q.    You never thought to call the police at that

22     point, did you?

23          A.    No, because I didn't know what was --

24          Q.    Ma'am, the answer is "yes" or "no"?

25          A.    No.
```

```
 1          Q.    And the reason you didn't think to call the
 2    police at that time was because you knew that Joseph Andriano
 3    had never laid a hand on Wendi Andriano.  Isn't that true?
 4          A.    No.
 5          Q.    Well, you just stated yesterday when you were
 6    testifying that you never ever saw him touch her, right?
 7          A.    No, that's not --
 8          MR. DELOZIER:  Your Honor, that's mistating.
 9          THE COURT:  Overruled.
10    BY MR. MARTINEZ:
11          Q.    Okay.  Let's talk about the Christmas of 1993.
12    Joseph was laughing when he was holding her down, wasn't he?
13          A.    Yes.
14          Q.    It wasn't like he was mad, was he?
15          A.    No.
16          Q.    And in fact what was happening was he just
17    wanted the dog to lick her face, right?
18          A.    Then he --
19          Q.    The answer --
20          A.    He held her down so the dog could lick her
21    face.
22          Q.    Right.
23          A.    And then he had his hands around her throat.
24          Q.    But he was laughing throughout the whole thing,
25    right?
```

1        A.    Yes.

2        Q.    It wasn't like he was screaming, cursing at

3    her, right?

4        A.    No.   She was crying and he was laughing.

5        Q.    And then when your husband came into the room,

6    remember, he made some sort of comment, right?

7        A.    Yes.

8        Q.    And that was the end of the roughhousing,

9    wasn't it?

10        A.    Yes

11        Q.    It wasn't like he said, No, I'm going to

12    continue with it.   He stopped immediately, right?

13        A.    Yes.

14        Q.    And you didn't think about calling the police

15    on that incident, did you?

16        A.    No.

17        Q.    It wasn't that big of a deal, was it?

18        A.    I thought it was a big deal, but you don't call

19    the police for something like that.

20        Q.    Okay.   You thought it was a big deal, yet you

21    didn't --

22        A.    No, I did not call the police.

23        Q.    Okay.   So the point now takes us back to what

24    we're talking about.   When your husband left, you didn't call

25    the police, right?

```
 1              A.    No, I did not call the police.

 2              Q.    You didn't think she was being harmed at that

 3   point, did you?

 4              A.    I did not know what was going on.

 5              Q.    But the point is that if you would have thought

 6   that she was being harmed, don't you think that the police

 7   would get there quicker than your 45 minutes?

 8              A.    I did not know what was going on until I --.

 9              Q.    Ma'am --

10              A.    I didn't know what was going on.

11              Q.    -- are you familiar with the 911 system?

12              A.    Yes.

13              Q.    Do you know they respond in -- well, we don't

14   know how many minutes, but very quickly?

15              A.    Yes.

16              Q.    Would you agree they would have arrived there

17   quicker than you driving all the way from Casa Grande?

18              A.    Yes.

19              Q.    Would you agree that they would arrive there

20   quicker than, as far as your husband was driving, they would

21   have beaten him there, too?

22              A.    Yes.

23              Q.    You never called 911 right?

24              A.    No.

25              Q.    But you did get into your car, Mazda, and then
```

1    you began to drive over, right?

2            A.    After I talked to Wendi.

3            Q.    Right.  And so you take off, right?

4            A.    Yes.

5            Q.    What year is your Mazda?

6            A.    It's 1995.

7            Q.    Has a clock in it, doesn't it?

8            A.    Yes, I believe so

9            Q.    What time was it when you got into that car,

10   ma'am?

11           A.    Didn't look.

12           Q.    You didn't put your watch on?

13           A.    I don't wear a watch.

14           Q.    But it was at night?

15           A.    Yes, it was dark.

16           Q.    It was a Sunday morning, wasn't it?

17           A.    Yes.

18           Q.    There were not many cars on the freeway, right?

19           A.    I don't recall.

20           Q.    In your experience, have you ever driven the

21   freeways of Maricopa County very early on a Sunday morning?

22           A.    No.

23           Q.    You've never driven them?

24           A.    No.

25           Q.    Is that -- that's an absolute "no," just like

```
 1    it was absolute in your mind that you've never seen the
 2    defendant angry?
 3              A.    I don't recall if --
 4         MR. DELOZIER:  Argumentative.  I object.
 5         THE COURT:  What's the objection?
 6         MR. DELOZIER:  Argumentative.  I object.
 7         THE COURT:  I'll sustain the objection.  Move on.
 8    BY MR. MARTINEZ:
 9              Q.    You indicated on your direct examination you
10    never said you've seen the defendant angry?
11              A.    The defendant -- okay.  I'm --
12              Q.    Ms. Andriano.  You told us that you never --
13              A.    I -- I heard about her being angry.
14              Q.    I'm not asking you about what you heard.  I'm
15    asking about what you saw with your two eyes.  I was clear
16    about that, right?
17              A.    Yes.
18              Q.    It's true that you testified yesterday that
19    you'd never ever seen her angry, right?
20              A.    Yes.  I don't recall ever seeing her angry.
21              Q.    All right.  Now go back to the freeway.  You
22    never ever recall driving those freeways in the early morning
23    hours on a Sunday?
24              A.    No, I'm sorry.  No.
25              Q.    And the trip -- you don't know how long it took
```

1      that day, right?

2              A.     I would say around 45 minutes, 40, 45 minutes.

3              Q.     Just like it does during the day?

4              A.     No.   Actually I was probably speeding.  I don't

5      know.

6              Q.     That was my next point.  You thought -- wern't

7      you worried?

8              A.     Yeah, I was worried, yes.

9              Q.     Are you saying you did or did not maintain the

10     35 miles an hour that it is around your house or 65 miles an

11     hour speed limit on the freeway?  Did you maintain --

12             A.     I'm sure I was going 75 because that's the

13     speed limit on the freeway, but I was probably going faster.

14             Q.     And --

15             A.     And then I told you that everything -- every

16     just -- just -- it was a blur.

17             Q.     Well, you do remember arriving at the San Riva

18     apartments, right?

19             A.     Yes, I do.

20             Q.     And when you arrived at the San Riva apartment

21     complex, the -- the emergency personnel were already there,

22     right?

23             A.     Yes.   There was a big, red truck in front of

24     the apartment, which is why I couldn't pull up and park in

25     front of the apartment.

```
 1          Q.    So as I understand it --

 2          A.    And police.

 3          Q.    -- it takes you about 45 minutes generally

 4   speaking.  That's what you've been telling us, right?

 5          A.    Uh-huh.

 6          Q.    Yes?

 7          A.    Yes.

 8          Q.    And he left about 5 minutes before you.  "Him"

 9   being your husband, right?

10          A.    Yes.

11          Q.    And could it have been 10 minutes since you

12   don't have a watch?

13          A.    It's possible.

14          Q.    All right.  Let's go with the outside safe

15   figure of 10 minutes.  That would mean you arrived at San

16   Riva 55 minutes after you got the call that night, right?

17          A.    That's possible.

18          Q.    And when you arrived there, there were already

19   the emergency personnel there, right?

20          A.    That's correct.

21          Q.    You never saw Wendi Andriano there, right?

22          A.    I could see her at the -- in front of the

23   apartment.

24          Q.    All right.  But you didn't go up to talk to

25   her, right?
```

```
 1            A.     No, I did not.

 2            Q.     And so that means that your husband was already

 3    there by the time that you arrived, right?

 4            A.     Correct.

 5            Q.     And if he says it took him 15 minutes to get

 6    there, and let's just assume that for the sake of

 7    hypothetical it takes you 45 minutes to leave plus the 10

 8    extra, that would mean that he got there about 30 minutes

 9    before you then, right?

10            A.     That's possible.

11            Q.     Because you don't know the time frame, so --

12            A.     Right.

13            Q.     And as I understand it then the kids were

14    brought over to you, not by the police but by your --

15            A.     Husband.

16            Q.     -- husband, right?

17            A.     Yes.

18            Q.     And just so I'm clear about the car

19    situation --

20            A.     Uh-huh.

21            Q.     -- you were inside the Mazda, right?

22            A.     Correct.

23            Q.     According to you, you had already taken the

24    child seats out of there?

25            A.     We took them out before the vacation.
```

```
 1          Q.    And you did that because, according to you, you
 2    were going to leave it at the apartment, right?
 3          A.    We left it at the airport because we needed
 4    room to put our stuff in --
 5          Q.    Well --
 6          A.    -- to take to the airport.
 7          Q.    You have a trunk, right?
 8          A.    My trunk doesn't work.
 9          Q.    What does that mean?  You can't open it?
10          A.    You can open it.  Can't close it.
11          Q.    So you can open it.  Is that true?
12          A.    You can open it.  Can't close it.
13          Q.    So does that mean that as you drive down the
14    freeway it's unopened then, right?
15          A.    Once you close it, you leave it closed because
16    it takes a long time to ever get it to shut again.
17          Q.    So you don't want to use that to put items in
18    there, right?  Is that what you're telling me?
19          A.    That's correct.
20          Q.    So -- but in this particular case, you then
21    decide to take the Yukon, right?
22          A.    I drove my car from --
23          Q.    Ma'am --
24          A.    Ask me again.
25          Q.    You were there, you have two kids in the back,
```

```
 1      and you decide to take the Yukon, right?

 2              A.      Yes.

 3              Q.      But before you do that, you change the diapers

 4      in the back seat of the Yukon, right?

 5              A.      No, in the back seat of my Mazda.  That's where

 6      I was sitting with the children.

 7              Q.      Okay.  My mistake.  You were in the back of the

 8      Mazda and you change the diapers in the back of the Mazda,

 9      right?

10              A.      That's correct.

11              Q.      You get out, you go over to the Yukon?

12              A.      No.  I didn't go over there until they told me

13      I could, the police.

14              Q.      After some point after changing the diapers,

15      you go over to the Yukon, right?

16              A.      Yes, about an hour later.

17              Q.      Okay.

18              A.      I'm not leaving.

19              Q.      And you told me that -- that what happened is

20      that you were not able to speak to the defendant?

21              A.      That's correct.

22              Q.      You weren't able to speak with her?

23              A.      No, I did not speak with her.

24              Q.      She didn't give you anything, right?

25              A.      No, she did not.
```

1          Q.    One of the things -- well, all they gave you

2    were the two --

3          A.    Alejo gave me the two babies and the police

4    gave me a bag with the diapers and clothes.

5          Q.    Right.  And then you got into -- after an hour

6    and permission, you got into the Yukon and you left, right?

7          A.    After I had to sign for the children and the

8    Yukon.

9          Q.    Right.  And the, bottomline, police didn't give

10   you any keys either, did they?

11         A.    I -- I believe I had my own set of keys.   I

12   don't --

13         Q.    Ma'am --

14         A.    You know, I don't recall.  I don't know what to

15   tell you on that.

16         Q.    Ma'am, how is it that you're so prepared when

17   you're worried about your daughter and driving down the

18   freeway and you have this terrible phone call and driving by

19   yourself that you could be so prepared to take the extra set

20   of keys to the Yukon?

21         A.    Because I would carry them.

22         MR. DELOZIER:  Your Honor, objection.  Argument.

23         THE COURT:  Overruled.  Go ahead and --

24         THE WITNESS:  Because I carry all the keys in my

25   purse.

```
 1   BY MR. MARTINEZ:
 2         Q.    Including the Yukon, right?
 3         A.    I would, yes.  I carry all of them, my office
 4   keys, everything.
 5         Q.    So the answer is yes, you had the keys to the
 6   Yukon then
 7         MR. DELOZIER:  Asked and answered.
 8         THE COURT:  Overruled.  Go ahead and answer the
 9   question if you can.
10         THE WITNESS:  I believe that I had them.  I -- to be
11   honest, I can't -- I don't remember if they gave them to me
12   or if I had a set.
13   BY MR. MARTINEZ:
14         Q.    We were talking earlier about the incident at
15   Christmas.  Remember when you indicated that you felt that
16   was inappropriate touching?  Do you remember what I'm talking
17   about?
18         A.    No.
19         Q.    The dog, the licking of the face?
20         A.    1993?  Yes.
21         Q.    Yes.  And it's fair to say that in -- when did
22   they first meet?
23         A.    I was --
24         Q.    No.
25         A.    Well, That's hearsay.
```

|    |    |                                                          |
|----|----|----------------------------------------------------------|
| 1  | Q. | Well, you --                                             |
| 2  | A. | I was told in --                                         |
| 3  | Q. | You testified, okay?                                     |
| 4  | A. | I was told St. Patrick's Day in 1992.                    |
| 5  | Q. | When did you first meet him?                             |
| 6  | A. | Sometime in that summer, and I just found --             |
| 7  | Q. | 1992?                                                     |
| 8  | A. | Yes.                                                     |

9        Q.    And from 1992 until year 2000, you described

10   for us one -- wasn't it Christmas or Christmas Eve where

11   there was what you believed to be inappropriate touching,

12   right?

13       A.    Yes.

14       Q.    Then we did have an interview, and in fairness

15   to you and we did have another incident that you described of

16   inappropriate touching or something like that.  What was

17   that?  You want to tell me what that was?

18       A.    Can you give me a little --

19       Q.    No.  No, ma'am.  It's your memory.  If you

20   can't remember, just say --

21       A.    You'd have to --

22       Q.    You can't remember it, can you?

23       A.    I remember I told about -- about the bruises I

24   saw --

25       Q.    No --

1          A.      -- in 2000.

2          Q.      But you don't know he did that. For all you

3    know, somebody named Rick Freeland did that while they were

4    making love.  You don't know it wasn't him, do you?

5          MR. DELOZIER:  Objection.  Argumentative, Your Honor.

6          THE COURT:  Sustained.

7    BY MR. MARTINEZ:

8          Q.      Do you know who made those bruises?

9          A.      No, sir.

10         Q.      Okay.  Then -- all right.  You can't even think

11   of any other times of inappropriate touching, can you?

12         A.      I can think of times like if he was dragging

13   her somewhere, you know, would grab her arm, drag her, say

14   come on, let's go, especially at the lake.

15         Q.      So you're taking about two incidents, or one at

16   Christmas Eve, and you're talking about another situation

17   where he led her away from the -- with the arm, right?

18         A.      I've seen him grab her arm and lead her away.

19         Q.      You're saying he's grabbing and saying "Come

20   on," words to that effect?

21         A.      Right.

22         Q.      You're calling that inappropriate touching,

23   right?

24         A.      Correct.

25         Q.      And in all of the time from, I guess it was

1    1992 or whatever they met until the year 2000, those are the

2    only two instances that you witnessed of inappropriate

3    touching, right?

4    A.    That I witnessed the inappropriate touching?

5    Q.    Right?

6    A.    That I could think of right now.

7    Q.    Right.  You indicated that he had a reputation

8    for being aggressive, right?

9    A.    Yes.

10    Q.    And who is it that you spoke to to get this

11    idea that he was aggressive?  Who did you speak to?

12    A.    His friends had told me that.

13    Q.    Ma'am, give me a name of somebody that you

14    spoke to that you base that reputation on?

15    A.    Okay.  Do I need to have last names too?

16    Q.    Ma'am, I would like any information that you

17    could provide for me, please.

18    A.    There were several people at work that had told

19    me.

20    Q.    Ma'am --

21    A.    One of them would be -- I'm getting there.

22    Q.    -- I just want a name, okay?

23    A.    That's -- okay.

24    Q.    That's what I'm looking for here.

25    A.    Okay.  Okay.  Actually, some of the people that

# APPENDIX H - Part 3

```
 1    told me that he --
 2            Q.    Ma'am --
 3            A.    -- was aggressive were --
 4            Q.    Ma'am --
 5            A.    -- some of his friends.
 6            Q.    Ma'am -- please.  There's no question before
 7    you.  I just want you to give me a name, please, of somebody
 8    that -- upon which you relied to render the opinion that
 9    you've given us in court yesterday and today.  Just a name.
10    One name.
11            A.    Jerry.
12            Q.    And where does Jerry work?
13            A.    Jerry was Joe's partner.
14            Q.    Okay.  You're talking about the Accu Glass
15    business, right?
16            A.    Yes.
17            Q.    And what you're talking about is a situation
18    much later than when you met him though?
19            A.    Okay.
20            Q.    No, no, no.  Let me go over the question.  That
21    is much later than when you met him, right?
22            A.    Yes.
23            Q.    Yet you opined in court that you had met him --
24    you knew that he had a reputation for being aggressive and
25    violent when you met him.  Who told you that?
```

1        MR. DELOZIER:  Your Honor, could we approach?

2

3            (The following proceedings were held at the

4    bench:)

5

6        MR. DELOZIER:  Our problem isn't that she doesn't

7    know.  Our problem is that it's part of his own family that

8    told him and she doesn't want to say anything negative.  She

9    has this religious problem of saying negative things about

10   people, and it's also people she works with.  She doesn't

11   want to expose them to possible issues, so he's asking her to

12   name -- I would at least ask you to -- to --

13       THE COURT:  Well --

14       MR. DELOZIER:  -- be cognizant of that issue.

15       THE COURT:  He has the right to ask the questions.

16   If you want to follow up on redirect --

17       MR. DELOZIER:  I understand that, but that's what I

18   wanted to explain.

19       THE COURT:  Okay.

20

21           (The following proceedings were held in open

22   court:)

23

24       THE COURT:  Mr. Martinez.

25   BY MR. MARTINEZ:

```
 1          Q.     Okay.  Ma'am, give me a name, please.

 2          A.     Okay.  As as far as with the reputation and

 3    stuff, a lot of that was based on his -- his friends.  I

 4    don't remember the first friend that I met.  He worked for

 5    their -- back for them in Oklahoma and they were based on

 6    stories that his friends like Brandon, Dale, and some of

 7    those fellows told me.

 8          Q.     So as soon as you met him, you sat around and

 9    you started to, if you will, exchange stories with -- with

10    these young men?

11          A.     No, not with those young men until I had met

12    them.  It was just, you know, like if you just talked to

13    somebody in the community -- it's a small community.  Say,

14    you know, my daughter's going out with so and so, and they'd

15    say Oh, yeah, I know about them.

16          Q.     Let me ask you about this Brandon?

17          A.     Yes.

18          Q.     You have a son by the name of Brandon.  Is that

19    who we're talking about?

20          A.     No.

21          Q.     It's somebody else named Brandon, right?

22          A.     Correct.

23          Q.     And what is Brandon's relationship or what was

24    his relationship to the victim?

25          A.     Brandon is a -- was a friend of Joe.
```

104

```
 1          Q.    Okay.

 2          A.    And did they go to high school together?  Who

 3   is -- what is his last name?

 4          A.    I know this.  This is -- his wife does the HR

 5   stuff with me.  I'm sorry.  I'm just -- I can give you Dale's

 6   name.  It's Dale Hartman.

 7          Q.    Sorry, I didn't understand what you said.   I

 8   didn't hear you.

 9          A.    I said I can't -- I'm sorry, I can't think of

10   Brandon's.  I know --

11          Q.    All right.  We'll move on.  Later on as you

12   began to know him more --

13          A.    Uh-huh.

14          Q.    -- you indicated that he still had this

15   reputation.  Are you still talking to these same friends as

16   before or are you getting --

17          A.    Friends that we would go to the lake with Joe

18   with.

19          Q.    Okay.  And you indicated that he would drive

20   very fast around the lake, right?

21          A.    Up to the lake, yes.

22          Q.    He was never cited for that, was he?

23          A.    Not -- not to my knowledge.

24          Q.    Ma'am --

25          A.    I do not know.
```

```
 1          Q.     Ma'am, if you don't know he was driving fast --
 2    you're telling us if you don't know he was driver cited, you
 3    don't know if he was driving fast then, right?
 4          A.     On the speedometer he was driving fast.
 5          Q.     Okay.  All right.  So you were in the car and
 6    he was driving fast, right?
 7          A.     That's correct.
 8          Q.     And while you were in that car and he was
 9    driving fast, he was never stopped for speeding, was he?
10          A.     Not when I was in the car, no.
11          Q.     That's all I'm asking --
12          A.     Okay.
13          Q.     -- about, what you know, not what you think.
14    You may know based on what somebody else tells you.  I think
15    you told us you were going twice a month with him, right?
16          A.     No.  I said he -- no, that was the question
17    when he said how many times he was going.  I would go several
18    times during the summer with them.  You know, if I could ever
19    get off work, depending on when they went.
20          Q.     None of those times when you -- while you were
21    driving with him in the summer was he ever stopped, right?
22          A.     No, not while I was there, no.
23          Q.     That's all I'm asking, right?
24          A.     Uh-huh.
25          THE COURT:  Is that "yes"?
```

```
 1                THE WITNESS:  Yes.
 2      BY MR. MARTINEZ:
 3           Q.    Yes?
 4           A.    Yes, that's what you're asking me.
 5           Q.    Now, you also told us there were circumstances
 6      that happened at the airport.  Do you remember telling us
 7      about that?
 8           A.    Yes, I do.
 9           Q.    That also involved driving, didn't it?
10           A.    That did.
11           Q.    When you got to the airport you indicated he
12      pulled up and screeched his tires, right?
13           A.    Yes.
14           Q.    Was that pre or post 911, before the attack on
15      the towers?
16           A.    That was pre because that was in 2000.
17           Q.    And one of the things that happened, according
18      to you, was that he pulled in really quick and there was a
19      security guard there, right?
20           A.    Yes.
21           Q.    And he and the security guard may have
22      exchanged words, right?
23           A.    Correct.
24           Q.    Was he ticketed at that time, ma'am?
25           A.    No.
```

1          Q.     Was the police called that time?

2          A.     I -- I don't know because I don't remember if

3     that was a policeman or a security officer.

4          Q.     Well, the point is as you're driving through

5     out of Sky Harbor Airport --

6          A.     Uh-huh.

7          Q.     -- there's nobody behind you, is there, with a

8     police car with lights going on?

9          A.     Not a police car with lights, no.

10          Q.     You flew what airline again?

11          A.     I don't recall.

12          Q.     Well --

13          A.     Um, I don't recall.  I don't recall.

14          Q.     Was it Terminal 3 that you flew into, was it

15     Terminal 2?

16          A.     It's the big one.

17          Q.     What number is it?  Do you know?

18          A.     No.

19          Q.     And so you flew into this terminal, which

20     number you don't know, and he pulls up, has these words, and

21     then the luggage is put in the Yukon, right?

22          A.     He threw the luggage in the Yukon, yes.

23          Q.     He's how far away when he threw it?  That's

24     your characterization, but how far did he throw it?  Two

25     feet, four feet, five feet?

1        A.      Several feet.

2        Q.      So he was several feet away.  And which door

3   did he throw it in, ma'am?

4        A.      The back door.

5        Q.      So he opened it up and he threw it -- threw the

6   stuff in, right?

7        A.      Yes.

8        Q.      Your luggage too?

9        A.      Yes.

10       Q.      Everybody's luggage?

11       A.      Everybody's.

12       Q.      He was throwing it in there, so did any of it

13   make it into the back seat?

14       A.      Just what I carried into the back seat.

15       Q.      What year was that again, ma'am?

16       A.      It was -- the Yukon or when he --

17       Q.      When he's in there throwing stuff into the

18   back.

19       A.      May of 2000.

20       Q.      Okay.  And that was after his fourth surgery,

21   wasn't it?

22       A.      That's correct.

23       Q.      And this was after he had not had any

24   treatment, right?  Having treatment for his illness at that

25   time?

```
 1          A.    Just alternative --

 2          Q.    Right.

 3          A.    -- methods.

 4          Q.    He'd had no traditional what we call

 5    traditional from a medical doctor or anything, right?

 6          A.    Correct.  He had not had chemo yet.

 7          Q.    This was when his disease as you said was

 8    continuing to grow?

 9          A.    Correct.

10          Q.    This is when he was out of control and throwing

11    all of this in there, right?

12          A.    Correct.

13          Q.    This is the same person who has this problem

14    with the shoulder muscles all gone and there's a problem with

15    the salivary glands, all of that, right?

16          A.    Yes.

17          Q.    Okay.  That's him, right?

18          A.    Yes.

19          Q.    And so then he gets behind the wheel, right?

20          A.    Correct.

21          Q.    The defendant gets in the passenger right side?

22          A.    Yes.

23          Q.    And then --

24                THE COURT:  Hold on.  You said "defendant."

25                MR. MARTINEZ:  I mean -- yeah, I mean Wendi.
```

```
1    BY MR. MARTINEZ:

2         Q.   She gets in on the passenger side, right?

3         A.   Yes.

4         Q.   And you and -- this Barbara Whitehead I think

5    is her name?

6         A.   No, Mitchell.

7         Q.   -- Barbara Mitchell get in the back, right?

8         A.   Correct.

9         Q.   And he takes off, right?

10        A.   Yes.

11        Q.   Takes off this small freeway as you call it?

12        A.   Yeah, took off from the airport onto that.  I

13   don't know what number it is.  I just know how to get there.

14        Q.   And as he's driving down that freeway and

15   nobody stops him, right?

16        A.   No.

17        Q.   There isn't a policeman in sight to give him a

18   ticket, right?

19        A.   Right.

20        Q.   Then he gets to the I-10?

21        A.   Yes, right.

22        Q.   He's also speeding according to you?

23        A.   Yes.

24        Q.   Nobody stops him, right --

25        A.   No.
```

```
1          Q.    -- to your knowledge?  And this is -- to your
2    knowledge, in all the time that you saw him, did he ever get
3    a speeding ticket?
4          A.    I -- I believe he did on the river.
5          Q.    Other than that, did he ever get another
6    speeding ticket?  You're not even sure, right?  You're not --
7          A.    I don't know if it was a speeding ticket.  I
8    know -- no, it wasn't.
9          Q.    It wasn't that at all, was it?
10         A.    I wasn't with him.
11         Q.    Okay.  Bottomline is you drove with him other
12   times too, didn't you?
13         A.    Yes.
14         Q.    In any of those times did you ever get stopped
15   by police?
16         A.    Not when I was with him, no.
17         Q.    That's what I'm asking.
18         A.    Right.
19         Q.    Whenever you were with him?
20         A.    Right.
21         Q.    The other thing I want to talk to you about is
22   we had an interview and we talked about whether or not you
23   had ever seen any instance of hitting between the two of
24   them.  Do you remember we talked about that?
25         A.    Yes.
```

```
 1            Q.    And you never ever saw him hitting her, did
 2     you?
 3            A.    No.
 4            Q.    You never ever saw him bruise her?
 5            A.    I did not see him bruise her.
 6            Q.    All right.  You talked about this farmhouse
 7     that may have been out there in Casa Grande.  Remember you
 8     told us about that?
 9            A.    Uh-huh
10            Q.    Is that "yes"?
11            A.    Yes.
12            Q.    This farmhouse back in Casa Grande, it did have
13     running water, right?
14            A.    Yes.
15            Q.    It had a toilet, right?
16            A.    Yes.
17            Q.    It had all the amenities one associates with a
18     home, didn't it?
19            A.    Yes.
20            Q.    In fact, you indicated one of the rooms had
21     carpet in it?
22            A.    Yes.  My husband helped put it in.
23            Q.    Right.  So it even had carpet, right, in one of
24     the rooms?
25            A.    Correct.
```

1          Q.     And you did indicate that one of the items on

2     one of the doors or something like that may have had a knock

3     in it or a -- or something?

4          A.     A hole.

5          Q.     Hole in it, right?

6          A.     Yes.

7          Q.     You have no idea how that got there because you

8     weren't there?

9          A.     I did not see when the hole was put there, no.

10         Q.     So you don't know, right?

11         A.     No.

12         Q.     Any other damage around the house that, aside

13    from that hole, but that's the only thing you mentioned.  You

14    don't know how that got there, right?

15         A.     No.

16         Q.     You indicated that one of the things that

17    happened was that you had this husband -- I forget his

18    name -- Shelly, I think.  What was your husband's -- first

19    husband's name?

20         A.     Shelby.

21         Q.     Shelly or Shelby?

22         A.     Shelby.

23         Q.     Shelby?

24         A.     Yes.

25         Q.     One of the things you told us about, you were a

```
 1    bit critical of him because he was too -- too strict with the
 2    defendant, right?
 3              A.    Correct.
 4              Q.    And he left when she was, what, two years old?
 5              A.    No, I think she was 3.
 6              Q.    Okay.  She was very young when he left, right?
 7              A.    Yes.
 8              Q.    But you indicated that he was a bit too strict
 9    with her, right?
10              A.    Yes.
11              Q.    And according to you, after that he only may
12    have seen her two times, right?
13              A.    After -- after two or three -- two or three
14    times, yeah, from the time when -- maybe even a couple more
15    times.  I'm -- I'm -- from the time what -- tell me from what
16    time.  You're saying from the time that we divorced or from
17    the time that he left?
18              Q.    How about from the time that you divorced?
19              A.    From the time we divorced, he probably saw her
20    two or three times.
21              Q.    How about from the time that he left?
22              A.    More than that because we were separated for a
23    while before.
24              Q.    And you indicated that he did treat her
25    strictly, right?
```

1           A.      Yes.

2           Q.      And she was at a point where she didn't --

3      doesn't remember him very well, right?

4           A.      I -- you'd have to ask her.

5           Q.      Okay. The point I'm trying to make, ma'am, is

6      even if he did treat her strictly, it's not like he scarred

7      her for life, is it?

8           A.      They say the first five years make all the

9      difference in a child's life, so, you know, I'm not -- I'm

10     not qualified to answer that question.

11          Q.      You're not qualified to answer that, but you're

12     qualified to opine about the previous testimony you just gave

13     us?

14          A.      I don't --

15          Q.      Let's do it this way.  He was there about three

16     years, right?

17          A.      Yes.

18          Q.      Those three years, he never hit her, right?

19          A.      He spanked her.

20          Q.      He spanked her.  Other than that, he didn't hit

21     her so hard that it was inappropriate, was it?

22          A.      I don't -- well, he spanked her hard.

23          Q.      Did you think it was inappropriate hitting?

24          A.      Yes.

25          Q.      You never called CPS on him, did you?

1          A.    No.

2          Q.    Never called the police even though you thought

3     it was inappropriate, did you?

4          A.    No.

5          Q.    Okay. So then he leaves and what ends up

6     happening next is that you indicated that you met Mr. Ochoa

7     in about 1975, right?

8          A.    Yes.

9          Q.    And then you gave us all these wonderful

10    qualities about him, right?

11         A.    Yes.

12         Q.    You told us that he was stable, right?

13         A.    Yes.

14         Q.    He was funny.  What else did you tell us about

15    him?

16         A.    That he was real nice.  He was compassionate.

17    He was pretty quiet.

18         Q.    So basically what you're telling us is he was a

19    good man, right?

20         A.    Yes.  Still is.

21         Q.    Wouldn't you agree that's conducive to bringing

22    up a child that's being nurtured so that -- in other words,

23    that -- that child is being provided just about anything that

24    you guys could provide?

25         A.    Yes.

```
 1          Q.    It was a good home environment, wasn't it?
 2          A.    Yes.
 3          Q.    It wasn't like it was a bad home environment,
 4    right?
 5          A.    You -- you're talking aobut after we were
 6    married?
 7          Q.    Yes, ma'am.
 8          A.    Yes.
 9          Q.    You didn't teach her to lie, did you?
10          A.    No.
11          Q.    You didn't teach her to cheat or anything like
12    that?
13          A.    No.
14          Q.    Just the opposite, right?
15          A.    Yes.
16          Q.    That's when you guys went with this group of
17    other people and you started roaming around. You were -- you
18    were people of religion, weren't you?
19          A.    Roaming around, that's not -- that's not what
20    we did.  We were invited to churches to minister in church.
21          Q.    You went from place to place?
22          A.    Yes.
23          Q.    Are you comfortable with that?
24          A.    Yes.
25          Q.    And so the point being that she was brought up
```

1   in a religious sort of way, right?

2          A.     Right.

3          Q.     That's a good thing?

4          A.     Correct.  I believe that's correct.

5          Q.     And you still do as you sit here today, right?

6          A.     Yes.

7          Q.     And even though she may not have had shoes, she

8   had the spiritual and internal kind of thing that she would

9   need for later on in life?

10         A.     That's what I believe, yes.

11         Q.     Do you believe that now?

12         A.     I probably things -- I probably wouldn't have

13  done them the same.

14         Q.     Do you believe those were wrong or bad?

15         A.     The things I taught her as far as the word of

16  God, I believe that was correct.

17         Q.     In fact you guys talked about the Bible and

18  whatever is associated with it, right?

19         A.     Correct.

20         Q.     And you also indicated that Mr. Ochoa, in

21  response to one of the questions, was a pastor.  You told us

22  that, right?

23         A.     Correct.

24         Q.     Well, wasn't he just sort of appointed to that

25  post by Mr. King who was the head of that church you guys

1    attended?

2           A.    No.   He got his license through the internet.

3    Shoot, I can't remember.

4           Q.    Did you say the internet?

5           A.    No, no, no.   International -- no, not the

6    internet.   I don't think the internet was around then.   But

7    it wasn't with Tom King.   It was Calvin Lords.

8           Q.    There's --

9           MR. DELOZIER:   Your Honor, it's 3:00.   Appropriate to

10   take a break now?

11          THE COURT:   We'll go ahead and take our afternoon

12   break at this point in time.   During this break remember the

13   entire admonition I gave you including the fact you're not to

14   discuss the case with anyone, do not let anyone discuss the

15   case with you, keep an open mind.   Have a nice break.   We'll

16   see you in 20 minutes.

17

18                  (Recess.)

19

20          THE COURT:   This is CR 2000-096032, State of Arizona

21   versus Wendi Elizabeth Andriano.   The record will reflect the

22   presence of Defendant, Counsel and the jury.   Brandon Ochoa

23   is on the witness stand.   We'll continue with the

24   cross-examination by Mr. Martinez.

25   CONTINUED CROSS-EXAMINATION BY MR. MARTINEZ:

```
 1          Q.    Ma'am, when we left off last time we were
 2    talking about Alejo Ochoa, your husband, do you remember
 3    that?
 4          A.    No.  Please refresh my --
 5          Q.    We were talking about him whether or not he was
 6    a pastor.  Do you remember that line of questioning?
 7          A.    Yes.
 8          Q.    And one of the things that you were telling me
 9    is that somebody actually allowed him to be a pastor.  I
10    think you gave me a name.  What was the name of that person?
11          A.    Well, it was through an organization that Alejo
12    worked under Calvin Lords.
13          Q.    Is Calvin Lords the person that you traveled
14    around with?
15          A.    No.
16          Q.    It's somebody else, right?
17          A.    Yes.
18          Q.    Now, with regard to Mr. Ochoa and him being a
19    pastor, he didn't attend seminary school that you know?
20          A.    No, not that I know.
21          Q.    He didn't attend college, did he?
22          A.    Yes, he did.
23          Q.    And did he go and get a degree in theology?
24          A.    No.
25          Q.    In other words, his degree, if he has it, is --
```

1    does he have a degree?

2          A.    I -- I do not believe so.

3          Q.    But his emphasis wasn't theology or religion or

4    anything like that, right?

5          A.    No, it was -- no.

6          Q.    And so this being a pastor happened much later

7    in life, didn't it?

8          A.    It --

9          Q.    Other than when he was going to college?

10         A.    Yes.

11         Q.    It happened how much after -- long after going

12   to college?

13         A.    I believe in 1980.

14         Q.    And this was basically the type of situation

15   where somebody recommends you and you become a pastor, wasn't

16   it?

17         A.    To be honest, I don't know the procedure.

18         Q.    And he didn't -- there were, I guess, services

19   every Sunday at the Desert Harvest Church or -- right?

20         A.    It's 91st Psalm then Harvest Family Church.

21         Q.    He didn't officiate there at the 91st Psalm,

22   did he?

23         A.    He was in charge of children's church, so he

24   had church on Sunday morning with children and he had church

25   on Wednesday evening.

1          Q.    And as I understand it, it's a small

2    congregation, approximately, today, about 150 members, right?

3          A.    I don't -- I wouldn't know how many members

4    there are.

5          Q.    Do you still attend that church or not?

6          A.    Yes.

7          Q.    But just so I'm clear about it, you never saw

8    him actually leave Arizona to attend a school to get --

9          A.    No.

10         Q.    -- a degree that would allow him to be a

11   pastor, right?

12         A.    No.

13         Q.    One of the other things you told me or that you

14   told me that you talked to defense attorney about was back in

15   February of '97, Mr. Andriano had another surgery, a third

16   surgery?

17         A.    Yes.

18         Q.    And during that -- and at that third surgery

19   you indicated that -- that your daughter was not working,

20   right?

21         A.    No.   They had lost the business.

22         Q.    And what -- didn't you also indicate that she

23   was working at the Casa Grande Medical Center or whatever

24   it's called out there?

25         A.    Not '97.

1          Q.    When was she working there?

2          A.    I -- I believe -- I know she was working

3     there when they got married, so that would be '94.  I don't

4     know.  I think she started in '93.  I don't know the exact

5     dates.

6          Q.    And, again, in '97, that was one of the

7     procedures that began to be little bit more dicey for Mr.

8     Andriano in the sense that this time the incision was even

9     bigger and recovery was even longer, right?

10          A.    Yeah.  It was a tiny bit bigger.

11          Q.    She wasn't working at the time, right?

12          A.    No.  She was at home.

13          Q.    But yet you would take care of the wound for

14     him, right?

15          A.    Just for a couple days.  It wasn't lengthy.

16          Q.    But it needed to be taken care of.  My point is

17     you took care of it, not her?

18          A.    I did it or Joe changed his own.

19          Q.    Right.  It wasn't her that did it to your

20     knowledge, right?

21          A.    To my knowledge.

22          Q.    I want to talk to you a little bit about all

23     the surgeries that he had.  You talked about it in length.

24     I think the first one was in '95, right?

25          A.    No.  I believe it was '94.

```
 1          Q.    September of '94?
 2          A.    I believe so.
 3          Q.    After that surgery the incision wasn't very
 4    long and didn't require too long of a recuperation period,
 5    right?
 6          A.    I don't believe it did.
 7          Q.    It wasn't the occasions where you needed to go
 8    over there and help them, right?
 9          A.    No.
10          Q.    He didn't experience a lot of pain
11    associated -- there wasn't a lot of pain that you saw
12    associated with that, right?
13          A.    Well, I wouldn't have seen him on a daily
14    basis, so --.
15          Q.    So back then you didn't see them on a daily
16    basis, right?
17          A.    Right.
18          Q.    But you did tell us in the time that you did
19    see him, about that time, he was still a pretty good guy.  He
20    wasn't this violent person that subsequent to that you began
21    to know who was abusive to your daughter, right?
22          A.    He had -- he -- anger, now.  He, Joe, had
23    tendancies for anger the whole time.
24          Q.    In your mind he was somebody who was angry all
25    the time --
```

125

```
 1        A.    No.

 2        Q.    -- that you knew him?

 3        A.    No, he was not angry all the time.

 4        Q.    In other words, he had those tendancies toward

 5   anger since you first met him?

 6        A.    Yes.

 7        Q.    Okay.  And those tendencies didn't increase or

 8   decrease after the first surgery is what you told us, right?

 9        A.    I didn't see a significant increase.

10        Q.    There was no change in the way that he treated

11   you, right?

12        A.    No.

13        Q.    There was no way no change in the way he

14   treated your husband?

15        A.    Not that I know of.

16        Q.    Well, you saw them interact, didn't you?

17        A.    Yes, but there would be times my husband would

18   be with Joe and I wasn't there.

19        Q.    I'm asking you what you know, not what anybody

20   else knows.  What you know is there wasn't a significant

21   change in the way he treated your husband, right?

22        A.    From what I know --

23        Q.    Everything is from what you know.  If I asked

24   you your name, you could answer from what you know.  Your

25   name is Donna, couldn't you?
```

1      A.    Yes.

2      Q.    Now, with regard to his dealing with the

3   defendant, that didn't change either after the first surgery,

4   right?

5      A.    I don't believe so.

6      Q.    According to you, he still continued to call

7   her these names, right?

8      A.    Yes.

9      Q.    Wasn't in anger sometimes?

10      A.    Sometimes, yes, it was.

11      Q.    Sometimes not though, right?

12      A.    Right.

13      Q.    Sometimes it could be somewhat of a pet name?

14      A.    Oh, no.

15      Q.    No?

16      A.    Not -- no.

17      Q.    Not to you it wasn't?

18      A.    No.

19      Q.    But sometimes it wasn't in anger?

20      A.    Not that I was aware of.

21      Q.    Subsequent to that, there was a second surgery,

22   right?

23      A.    Yes.

24      Q.    One that's become a little bit more --

25      A.    Yes.

1          Q.     -- difficult --

2          A.     Thank you.

3          Q.     -- right?

4          A.     Uh-huh.

5          THE COURT:  Is that "yes"?

6          MR. MARTINEZ:  Yes.

7          THE WITNESS:  Yes.

8          THE COURT:  Make sure you give a verbal response.

9    BY MR. MARTINEZ:

10         Q.     That one actually required some after care,

11   right?

12         A.     For a few days, yes.

13         Q.     Right.  And during that you also indicated to

14   us there was really no change in his demeanor after that,

15   right?  You told us that, right?

16         A.     That's correct.

17         Q.     So everything remained the same.  He sort of

18   treated you the same way that he treated you before, right?

19         A.     Correct.

20         Q.     He never touched you, right?

21         A.     Just -- only when he was drunk -- drinking and

22   he would hug me.

23         Q.     Right.  But he never reached out to strike you

24   in anger ever, did he?

25         A.     No.

1          Q.    He never reached out to strike Alejo in anger

2    either, did he?

3          A.    I don't know.

4          Q.    In the times you saw him together, he never --

5          A.    In the times I saw them together, he did not.

6          Q.    You did mention something about a trip to New

7    Mexico.  Do you remember telling -- not New Mexico, but the

8    lake.  Do you remember that?

9          A.    I know that we discussed several trips to the

10   lake, yes.

11         Q.    One of them was where Mr. Andriano apparently

12   got involved in some sort of discussion with somebody at a

13   bar.  Do you remember telling us about that?

14         A.    Yes.

15         Q.    And when was that in terms of the surgeries?

16         A.    It could have been around the second or third

17   surgery.

18         Q.    The second or third surgery?  If it was after

19   the third surgery -- when was that?

20         A.    The third surgery was in '97.

21         Q.    Had they already had one child?

22         A.    Not yet.

23         Q.    Not yet.  So you were there, right?

24         A.    Yes.

25         Q.    And you saw what went on, right?

```
 1          A.     Yes.

 2          Q.     There was a confrontation between Joe and

 3    another man, right?

 4          A.     Correct.

 5          Q.     It didn't take much to hold him back, did it.

 6    In other words, it didn't proceed to fisticuffs, did it?

 7          A.     No, it did not.

 8          Q.     Somebody pulled them apart and they went their

 9    own separate ways, right?

10          A.     I believe so.

11          Q.     Let's get back now to the third surgery, the

12    one you indicated he's now becoming a little more

13    problematic, right?

14          A.     Correct.

15          Q.     The first -- the second surgery required a

16    couple of days taking care of the wound.  The third surgery

17    is now requiring a little bit more, isn't it?

18          A.     Yes, because they went along the same line they

19    went before.

20          Q.     But they took more out, right?

21          A.     Correct.

22          Q.     This is the one that you indicated that

23    required you to start doing some of the care, right?

24          A.     Correct.  The doctors showed me how to change

25    his dressing and --
```

130

```
 1          Q.    And the other thing that acompanied this, you
 2    told us, he was in substantial -- in a lot more pain.  Do you
 3    remember telling us that?
 4          A.    He was in more pain.
 5          Q.    And he was less friendly at that point, right?
 6    Started to --
 7          A.    You mean when he was in pain right after --
 8          Q.    Right.
 9          A.    -- after his surgery?
10          Q.    Right.
11          A.    He -- I don't know how to explain it.
12          Q.    He started to change.  Is what you told us
13    before?
14          A.    He started to change a little bit then and
15    greatly so after the '98 surgery.
16          Q.    Right.  But he started to change after that,
17    right?
18          A.    Yes.
19          Q.    The point I'm trying to make with you, ma'am,
20    is he started to change because he was in a lot more pain,
21    not that he was angry with you, right?
22          A.    I don't know that.
23          Q.    Well, did he ever demonstrate any anger at you
24    afterwards and say you did this or did that to me?
25          A.    That wasn't how he did it.  He would tell
```

131

1    Wendi, not me.

2         Q.    All right. Well, the point is if he told your

3    daughter, you weren't there, right?

4         A.    Correct.

5         Q.    So you don't know how they interacted when they

6    were alone, do you?

7         A.    No.

8         Q.    In other words, you told us, well, you know, he

9    was the boss.  Do you remember telling us that?

10        A.    Yes.

11        Q.    You don't know what would happen when those

12   doors would close between you, do you?

13        A.    No one does.

14        Q.    Did -- that's true.  And you don't know whether

15   or not she was the boss when they were alone, right?

16        A.    No.

17        Q.    And you don't know if she was the one that told

18   him, you know, you need to do this or you need to do that, or

19   I'm going to get a job or whatever.  The bottomline is no one

20   knows what was inside of their marriage, the intimacy of

21   their marriage, right?

22        A.    Correct.

23        Q.    But after that he did have a fourth surgery,

24   right?

25        A.    Correct.

1     Q.     This is the one that actually was a very

2     radical one, the one at the Mayo Clinic, right?

3     A.     Through the doctors at the Mayo Clinic.   It was

4     at Scottsdale Memorial.

5     Q.     And after that, this is when he was in even

6     more pain, right?

7     A.     Correct.

8     Q.     He was in pain because of what they had done to

9     him physically, right?

10     A.     Correct.

11     Q.     And because of the news emotionally, he was not

12     in the best way he could be, right?

13     A.     Correct.

14     Q.     And do you think it's unreasonable for him to

15     be a little cranky if he's just received news that he's going

16     to die?

17     A.     No.   Actually, I mentioned that.

18     Q.     So the answer is "no"?

19     A.     No.

20     Q.     And so do you think it's unreasonable for a

21     person to be cranky or maybe request a little bit more if

22     they're in a lot of pain?   Do you think that's unreasonable?

23     A.     No.

24     Q.     And that's exactly what was happening in this

25     case and in their marriage, right?

133

```
 1          A.    He was in a lot of pain.

 2          Q.    And just found out that, you know, he was going

 3    to die, right?

 4          A.    Correct.

 5          Q.    But there was a silver lining in all of this,

 6    wasn't there, and you knew about that, didn't you?

 7          A.    I don't know what you're talking about.

 8          Q.    Well, you were present when Jeffrey Miller made

 9    a trip out to their house and talked about the personal

10    injury lawsuit, weren't you?

11          A.    I don't see that as a silver lining.

12          Q.    The point is you were there, weren't you?

13          A.    Joe asked me to be there.

14          Q.    Ma'am, you were there, right?

15          A.    Yes.

16          Q.    What time of the day did this conversation take

17    case place?

18          A.    I don't recall.

19          Q.    Where did this conversation take place?

20          A.    I believe it was in the courthouse in -- not

21    courthouse, Courtyard Apartments in the club room.

22          Q.    So it was at their home?

23          A.    Not -- no.

24          Q.    The Courtyard --

25          A.    It wasn't at their home.  It was in the
```

134

```
 1    clubhouse.

 2            Q.    Of the Courtyard?

 3            A.    Yes.

 4            Q.    She was the manager of the Courtyard?

 5            A.    Yes.

 6            Q.    And it -- what time of the day was it?

 7            A.    I don't recall.

 8            Q.    Was it in the morning?

 9            A.    I don't recall.

10            Q.    Was it at night?

11            A.    I don't recall.

12            Q.    But you were there?

13            A.    Yes.

14            Q.    Who else was there besides you?

15            A.    I was there and Joe and Wendi were there and

16    Mr. Miller.

17            Q.    Was Mr. Ochoa there?

18            A.    No.

19            Q.    So it was just you, the defendant and Jeffrey

20    Miller to begin with, right?  Three people?

21            A.    I remember four.

22            Q.    Who else do you remember being there?

23            A.    Joe.

24            Q.    Are you sure Joe was there when the meeting

25    started?
```

1          A.    I don't recall.  I don't recall.  That's a long

2     time ago.

3          Q.    You recall things that were way before that

4     back in 1994.  This happened in 1998.

5          A.    That wasn't important to me.

6          Q.    I know it wasn't important to you, but you were

7     there?

8          A.    Yes.

9          Q.    And you remember -- to the best of your

10    recollection, you remember whether or not Mr. Andriano was

11    present at that first meeting when the meeting first started?

12         A.    To the best of my recollection, I don't

13    remember.

14         Q.    You did see him there though?

15         A.    Yes.

16         Q.    He could have arrived later?

17         A.    He could have.

18         Q.    And the conversation actually could have been

19    between -- initially between the lawyer and your daughter?

20         A.    I don't recall that.

21         Q.    So if you don't recall that the conversation

22    was between Mr. Miller and your daughter, then Mr. Andriano

23    must have been there when this whole thing started, right?

24         A.    I don't remember.

25         Q.    The bottomline, from what you saw, isn't it

1      true, that the only person that was really interested in that

2      lawsuit was your daughter?

3             A.    No.

4             Q.    Well, she was there that day, right?

5             A.    So was Joe.

6             Q.    So now you're sure that Joe was there at the

7      beginning?

8             A.    I didn't say that.  I said Joe was there.

9             Q.    Okay.  And after this conversation, when this

10     conversation started, isn't it true that as the parties are

11     sitting there talking and as the lawyer is talking, Mr.

12     Andriano actually got up and left, didn't he?

13            A.    I don't recall that.

14            Q.    He didn't even stay through the whole meeting,

15     did he?

16            A.    I do not recall that.

17            Q.    He wasn't feeling very well back then, was he?

18            A.    I don't recall how he was feeling that day.

19            Q.    Well, the point is --

20            A.    I can't answer that, I'm sorry.

21            Q.    Is -- the point is, he just got his surgery in

22     1998, August of 1998?

23            A.    Yes, he did.

24            Q.    That was real difficult for him, right?

25            A.    That's correct.

```
1            Q.    That's the one that was sort of the end of it
2    all, if you will, for the surgeries, right?
3            A.    That was the last.
4            Q.    Right.  And it was shortly thereafter that this
5    meeting took place, right?
6            A.    I know it was after.  I don't remember when.
7            Q.    Was it a long time after or shortly after?
8            A.    I don't remember.
9            Q.    Could it have a year after that?
10           A.    I don't believe it was that long.
11           Q.    Okay.  Anyway, the point is he wasn't very
12   comfortable during that meeting, right?
13           A.    I don't recall that.
14           Q.    After the 19 -- after that meeting that you
15   guys had, you indicated that's when his demeanor really
16   did start to change, right?
17           A.    From 1998, yes.
18           Q.    And from then on you indicated that he became
19   more demanding?
20           A.    Yes.
21           Q.    That's not being abusive, is it, to be
22   demanding?
23           A.    I didn't say that.
24           Q.    No, I'm asking you.  I'm asking you, being --
25           A.    It depends on the circumstance, I would
```

1    believe.

2          Q.    Well, if you ask somebody to bring you a cheese

3    crisp from a restaurant while you're out at a ball game, do

4    you think that's demanding?

5          A.    It would depend on what time it was.  I don't

6    know.

7          Q.    Well, then I'll give you the circumstances.

8    Let's assume it's about 9:00 or 10:00.  You've been at a

9    ballgame, your husband calls you up and says "Honey, on the

10   way home can you get a cheese crisp?"  Do you think that --

11         MR. DELOZIER:  Mistates the evidence.  Objection.

12         THE COURT:  Overruled.  Go ahead and answer the

13   question if you can.

14         THE WITNESS:  Yes.

15   BY MR. MARTINEZ:

16         Q.    You think your husband would be demanding then

17   if he asks you to stop by and get a cheese crisp?

18         A.    Yes.

19         Q.    That's kind of inconsiderate?

20         A.    Yes.

21         Q.    Is that abuse?

22         A.    I don't know if that would be labeled abuse.

23         Q.    I'm asking what you think right now because you

24   have been sort of the victim of it.  Is that abuse to call

25   and ask somebody to do something for you?

1          A.     Inconsiderate maybe, not abusive.

2          Q.     Okay.  How about --

3          A.     -- if that happened to me.

4          Q.     And I'm asking if it happened to you?

5          A.     Correct.

6          Q.     And what about the situation where you asked

7     somebody to do the laundry for you?  And, again, this is

8     after you've just been told you have cancer, you're in pain,

9     you're there and you ask somebody to do the laundry for you.

10    Do you think that's being abusive?

11         A.     I don't necessarily think that's being abusive,

12    but I need a little bit more information.

13         Q.     Just --

14         A.     I don't know, if that somebody was in pain --

15         Q.     I just told you that he was.

16         A.     -- from your example.

17         Q.     I just told you he was.  He was in pain, it was

18    after he just learned he was -- had cancer, wants somebody to

19    do his laundry for him?

20         A.     Okay.  So this is just an example?

21         Q.     Yes, just an example, right.

22         A.     Again, it would depend on the circumstances.

23    You know, are you asking me to -- you're in pain and ask --

24    you're asking me to do the laundry, I mean, is it 3:00 at

25    night or -- you --

1        Q.    I'm not -- I'm asking you to do the laundry.

2    You could put whatever limitations on it and tell me if

3    you think it's abusive or not?

4        A.    It -- in a general situation, no, that is not

5    abusive to ask for some laundry.

6        Q.    You also told us sometime after that Mr.

7    Andriano started receiving chemotherapy treatments, right?

8        A.    I assume he did.  I was not there.

9        Q.    Right.  You wanted to tell us about it earlier

10   and I'm asking you about it now.  Did you know he was having

11   chemotherapy treatments, "yes" or "no"?

12       A.    Yes.

13       Q.    The first chemotherapy treatment -- you talked

14   to us about it, didn't you?

15       A.    I talked to you about after the chemo.

16       Q.    Right.  You told us about the day after.

17       A.    Correct, the evening of -- right.

18       Q.    Right.  How long did those chemotherapy

19   treatments last?

20       A.    I don't know.

21       Q.    Okay.  You don't know if he was there all day

22   or anything like that, right?

23       A.    No, I couldn't tell you because I don't know

24   how long he went in, what time they left, how long the chemo

25   lasted.

```
 1            Q.    And you never went with him?

 2            A.    Right.

 3            Q.    And neither did your husband.  He never went to

 4     the treatments, right?

 5            A.    I don't know that.

 6            Q.    Okay.  But you did go over to the house, right?

 7            A.    Yes.

 8            Q.    What time did you get over there?

 9            A.    It would depend.

10            Q.    First time?

11            A.    One time -- the first time -- I believe the

12     first time I had been at a seminar in Phoenix and I was on my

13     way home and Joe called and asked if I would stop by, and I

14     turned around and went back.

15            Q.    So what time --

16            A.    Probably about 6:30.

17            Q.    And when you were -- why did he want you to

18     stop by?

19            A.    He wanted me to listen to his heartbeat.

20            Q.    In other words, when he was turning for help,

21     he was turning to you, not somebody else, right?

22            A.    Because I had --

23            Q.    No --

24            A.    -- the medical --

25            Q.    No, ma'am.  The question is --
```

```
 1          A.    Did he turn to me?

 2          Q.    Yes.

 3          A.    Yes, he did.

 4          Q.    Okay.  You went over there and saw him, right?

 5          A.    Yes, I did.

 6          Q.    He was tired?

 7          A.    Yes, he was in bed.

 8          Q.    He was laying down, right?

 9          A.    He was laying down.

10          Q.    He didn't look all that spry or anything like

11     that, right?

12          A.    He didn't look as bad as I thought he was going

13     to look, to be honest.

14          Q.    You thought he was looking pretty good?

15          A.    I'm not saying pretty good.  He didn't look as

16     rough as I expected him to.

17          Q.    With regard to him there, do you think he

18     looked well enough to, I don't know, do any sort of physical

19     exertion --

20          A.    Not that evening, no.

21          Q.    -- like making love?  Do you think he was up to

22     that?

23          A.    That's -- I'm not -- I'm -- I don't know that.

24          Q.    Okay.  So you think he's up to doing some

25     physical exertion then?
```

1        A.    I don't know that.  I know he was in bed and

2   he'd had the treatment, I was told.

3        Q.    Okay.  Did you ever go over there when he was

4   vomiting?

5        A.    He did not vomit when I was there, no.

6        Q.    Not the first night, but at any time during

7   this chemotherapy treatment, did you ever go over there when

8   he was vomiting?

9        A.    I believe the second time he -- second and --

10   second time, he did one time.

11        Q.    Bottomline, after each --

12        A.    It was more like spit.

13        Q.    So it wasn't too bad at all then, right,

14   because it was just like spit?

15        A.    I'm an RT.  Suctioning somebody's lungs doesn't

16   look too bad to me, but I am the -- sorry.

17        Q.    The point is to you it wasn't that bad,

18   whatever he was throwing up wasn't too bad?

19        A.    No.

20        Q.    Okay.  After each one of those times, he looked

21   sort of the same.  He was sort of just laying around, didn't

22   look too strong, but it wasn't as bad as you thought it was

23   going to be?

24        A.    The first time wasn't.

25        Q.    How about the second time?  Was the second time

1    bad?

2         A.    The second time was a little bit rougher.

3         Q.    Why do you say the second time was rougher than

4    the first time?

5         A.    Because the second time he was in -- in

6    laymen's terms,  he was sweating profusely which he had not

7    been the first time and --

8         Q.    How about the third time?

9         A.    The third time actually seemed similar to the

10   second time, and I said one of those two times, you know, he

11   had thrown up.

12        Q.    Okay.  How about the fourth time?  Did you see

13   him afterwards?

14        A.    No, I did not.

15        Q.    Would you agree or disagree given your limited

16   medical knowledge as a respiratory therapist, a person

17   undergoing this sort of thing is going to need a little more

18   care than if they're not undergoing this sort of?

19        A.    It depends on the person.

20        Q.    So people who are terminally ill who have had

21   all of these operations and undergoing chemotherapy

22   treatment, some of them don't require anybody to drive them

23   home.  Is what you're saying?

24        A.    I didn't say that.

25        Q.    You said some people don't receive any care?

1          A.     I said some people don't require as much care.

2     Some people don't -- maybe to take them them or something

3     like that, but depending on how -- different people react to

4     the drugs differently.

5          Q.     But he did require some care, didn't he?

6          A.     Yes.   I held his hand and wiped his face.

7          Q.     Was he being abusive to you when you were

8     holding his hand?

9          A.     No.

10          Q.     One of the other things that you were telling

11     us was that this started to take its toll on the defendant.

12     Do you remember telling us that that she became really

13     haggard, she was tired, that sort of thing?  Do you remember

14     telling us that?

15          A.     Beginning around '98, 1998, yeah.

16          Q.     So that would mean beginning of '98 it started

17     taking a toll all the way through '98?

18          A.     No, no.   Like starting when they found out.

19     She was six months pregnant when she found out about Joe and

20     that it was cancer.   In fact, she delivered a little early.

21          Q.     Right.

22          A.     And her OB was concerned about her and the

23     baby.

24          Q.     I understand all that.   But what I'm talking

25     about is whether or not she looked haggard and tired and this

1    was taking a toll according to you, right?

2              A.    Yes, physically, and --

3              Q.    And it was --

4              A.    -- emotionally.

5              Q.    It's taking a toll on her the next year because

6    nothing had changed, right?

7              A.    On both of them.

8              Q.    I'm not asking about him, ma'am.  I'm asking

9    about her.

10             A.    Yes.

11             Q.    Was it taking a toll on her?

12             A.    Yes.

13             Q.    And one of the ways it manifested itself, she

14   looked haggard and tired, right?

15             A.    Yes.

16             Q.    It continued into the year 2000, right?

17             A.    Yes.

18             Q.    I mean, it was taking a toll on her.  She was

19   working, right?

20             A.    Yes.

21             Q.    She had to take care of him, right?

22             A.    On -- yeah, you know, laundry, take care of --

23   yeah.

24             Q.    She had two kids to deal with?

25             A.    She had two children in '98, yes.

147

1          Q.    She had employment?

2          A.    Yes.

3          Q.    She had these parties that she had to give?

4          A.    Those were only a couple.

5          Q.    But she still had to go according to you,

6     right?

7          A.    Yes.

8          Q.    She was doing all these things that left her

9     really pretty tired and haggard?

10         A.    Yes, on occasion.  I'm not going to say

11    everyday, but yes, she was.

12         Q.    No, no --

13         A.    She was having a hard time.

14         Q.    Let me see if I got it.  I thought you

15    described it sort of a process, that, according to you he got

16    to be more abusive, and this began to take more and more of a

17    toll on her.  Isn't that what you're telling us?

18         A.    Yes.

19         Q.    Okay.  So if it's taking a toll on her

20    physically, it's also manifesting itself, right?

21         A.    Yes, because she was losing weight --

22         Q.    She --

23         A.    -- and appearing more tired.

24         Q.    More tired and you would see her on an ongoing

25    basis, right?

1          A.     Correct.

2          Q.     Could her looking more tired be because she was

3     going out two nights a week and staying out until maybe 1:00

4     or 2:00 in the morning?

5          A.     I have no idea.

6          Q.     Could it --

7          A.     I don't know about that.

8          Q.     If a person stays out until 1:00 or 2:00 in the

9     morning, do you think that's going to affect how they look?

10         A.     Not necessarily.  I know people at work that do

11    that and they look fine.

12         Q.     Okay.  But in this case it's a possibility for

13    you then that they can look tired?

14         A.     It's possible, a possibility.

15         Q.     Let me show you Exhibit 313.  I want you to

16    take a look at it, all right?  It's a photograph, they've

17    already had the foundation laid for this one, that it was

18    during the defendant's birthday in the year 2000.  I want you

19    to take a look at it.  And you may need to step down, okay?

20         A.     Okay.

21         Q.     See it?

22         A.     Yes.

23         Q.     And then I'm going to show it to you.  Take a

24    good look at it.

25         A.     Okay.

1   Q.   All right.  Have you looked at it?

2   A.   Yes.

3   Q.   Okay.  May I have it back?

4   A.   Yes.

5   Q.   She's smiling in that picture, isn't she?

6   A.   Yes.

7   Q.   Doesn't look too tired there?

8   A.   Her eyes are kind of sunken a little bit and

9   she's definitely lost weight.

10   Q.   So she looks like it's an unpleasant place for

11   her to be there?

12   A   No.

13   Q.   Looks like she's smiling?

14   A.   She is smiling.

15   Q.   Now, the other thing that you told us was that

16   she is your only daughter, right?

17   A.   Yes.

18   Q.   And I'm curious about how close your

19   relationship was in the year 2000.  And specifically you

20   indicated that you would go there two, three times a week,

21   sometimes, over to her apartment at the San Riva complex,

22   right?

23   A.   Yes, like if I was picking up the children.

24   Q.   For whatever reason, you would go over

25   sometimes as much as two or three times a week, right?  Back

1    in the year 2000?

2           A.     Right.

3           Q.     Part of it was because you felt sorry that Mr.

4    Andriano had this thing going on, right?

5           A.     Of course I did.

6           Q.     And part of it was to help your daughter

7    because she looked too tired and haggard given her schedule,

8    right?

9           A.     To help with the children.

10          Q.     Sure.  That was part of what you were doing,

11   right?  And in fact you helped them out financially, right?

12          A.     Correct.

13          Q.     Did you help her to go out to bars and pay for

14   the drinks there too?

15          A.     No, sir.

16          Q.     Now, you helped her pay for the car though,

17   right?

18          A.     Yes.

19          Q.     You sometimes helped her pay some of the other

20   bills, right?

21          A.     Correct.

22          Q.     You helped her pay utilities, right?

23          A.     On occasion, yes.

24          Q.     Ma'am, would it surprise you when Wendi lived

25   at San Riva, the utilities were covered and they didn't have

# APPENDIX H - Part 4

1    to pay them?

2            A.    No.   When I told you about utilities, that was

3    back in 1997 when Nicolas was born.

4            Q.    But, anyway, you -- you maintain, what appears

5    from outwardly, it was somewhat of a closer relationship

6    because you were seeing her so often, two or three days a

7    week sometimes, right?

8            A.    I was picking up the children and you already

9    asked me about -- somebody asked me about how long.

10           Q.    Additionally, you would also call her?

11           A.    On occasion.

12           Q.    Right.  How many times a week would you call

13   her?

14           A.    The -- I would call, she would call sometimes,

15   maybe once a week, maybe twice a week.   Sometimes maybe not

16   at all that week.

17           Q.    And that would be in addition to the visits

18   that you would have, right?

19           A.    The visits that were close, like we're talking

20   two times a week, was after the chemo started.

21           Q.    Okay.  And, ma'am, did she ever confide in you

22   and ever say to you, you know, "I'm having this religious

23   epiphany, I'm being unfaithful."  Did she ever come to you

24   with that?

25           A.    No.

 1          Q.     Did she ever come to you and say, you know,

 2     "I'm just going out all the time every -- you know, twice a

 3     week."  Did she ever come and tell you about that?

 4          A.     No.

 5          Q.     Did she ever come to you and say, "You know

 6     what?  In addition to staying out late at night, I go and

 7     stand outside my boyfriend's door for up to an hour until I

 8     get him to answer the door.  Can you help me?"  Did she ever

 9     ask you for any help like that?

10          A.     No.

11          Q.     So the bottom line is you didn't --

12          A.     I didn't know.

13          Q.     The bottom --

14          A.     I don't have any knowledge about that.

15          Q.     You didn't know your daughter in the year 2000,

16     did you?

17          A.     I believe I did.

18          Q.     Well, you told us before that she stopped

19     talking to you?

20          A.     She stopped talking as much to me, yes.

21          Q.     Right.  And she didn't tell you all these other

22     things that you, as a religious person, consider very

23     significant, right?

24          A.     Talking about what you just mentioned?

25          Q.     Yes.

```
 1          A.    No.

 2          Q.    You don't consider those significant?

 3          A.    No, no.  She -- I -- no, she did not talk to me

 4   about that.

 5          Q.    And, I mean, you indicated that she was raised

 6   in the religious background and stuff, right?

 7          A.    Correct.

 8          Q.    Never discussed those with you, right?  Never

 9   discussed these problems with you, right?

10          A.    No.

11          Q.    Never asked for help?

12          A.    Not in that area.

13          Q.    Well, I'm asking about that area, so did she

14   ask you for help?

15          A.    Like about money to buy drinks or something?

16          Q.    Yes, ma'am.

17          A.    No.

18          Q.    I'm asking about, you know, "I'm having issues

19   with other men, I want to leave him, I think that Joseph is

20   icky and gross and I don't want to be with him."  Did she

21   ever tell you that?

22          A.    No.  She told me --

23          Q.    The answer is "yes" or "no," ma'am.

24          A.    No, she --

25          Q.    The -- "yes" or "no"?
```

```
 1              A.    No.

 2              Q.    Did she ever tell you "I'm done with this

 3    cancer, I'm done with it, I wish he would just die"?

 4              A.    No.

 5              Q.    So you really, really didn't know her very

 6    well?

 7              A.    Yes, I -- I did know her --

 8              Q.    But she didn't --

 9              A.    -- but I didn't --

10              Q.    She didn't confide in you, did she?

11              A.    Obviously not everything, no.  No daughter

12    would.

13              Q.    And she didn't confide in you things that were

14    negative, did she?

15              A.    One time.

16              Q.    Well --

17              A.    I could tell you she said --

18              Q.    What I'm asking is did she tell you about the

19    affairs?

20              A.    No.

21              Q.    Ma'am, while we're still talking about it, you

22    indicated that she broke up with Shawn King.  Do you know why

23    she broke up with Shawn King?

24              A.    I -- only what she told me.

25              Q.    So you didn't see anything with your eyes,
```

1    right?

2            A.      I saw the windshields and the window.

3            Q.      But you didn't see what led up to it, did you?

4            A.      No.

5            Q.      You didn't see perhaps she was caught in a

6    compromising activity in skimpy clothing on with a Hispanic

7    male by Mr. King.  You didn't see that, did you?

8            A.      I don't know that happened.

9            Q.      You didn't see it though is the point, right?

10           A.      Of course not.

11           Q.      And so my last question to you is in this area.

12   It's really pretty much -- it's pretty clear that she wasn't

13   telling you everything that was going on in her life in the

14   year 2000 as October approached, right?

15           A.      I'm sure she was not telling me everything that

16   happened in her life every day.

17           Q.      So she wasn't -- you just indicated previously

18   on direct examination that she was clamming up.  Are you

19   backing away from that now?

20           A.      No, but I just said --

21           Q.      She was clamming up then, right?

22           A.      -- she was shutting down.

23           Q.      Shutting down.  And she told you less and less,

24   right?

25           A.      So did Joe, yes.

156

1           Q.    I'm not interested in Joe right now.   We're

2    talking about your daughter.

3           A.    Okay.

4           Q.    All right.   And she shut down, right, and told

5    you less and less, right?

6           A.    Yes.

7           Q.    Which means that you knew less and less of what

8    was going on with her, right?

9           A.    Correct.

10           Q.    Do you know Anne Newton?

11           A.    No.

12           MR. MARTINEZ:   I don't have anything else for you.

13           THE COURT:  Mr. DeLozier, redirect?

14           MR. DELOZIER:  Thank you, Your Honor.

15

16    REDIRECT EXAMINATION BY MR. DELOZIER:

17           Q.    The Fishers of Men group, what were they all

18    about?

19           A.    We were about --

20           Q.    Was it a Christian organization?

21           A.    Yes.

22           Q.    Were you missionaries?

23           A.    Yes.

24           Q.    And you stayed in it because --

25           A.    Because in our heart that's what we felt was

```
 1     the right thing to do.

 2              Q.    And your group had rules?

 3              MR. MARTINEZ:  Objection.  Leading.

 4              THE WITNESS:  Yes.

 5              THE COURT:  Don't lead.

 6     BY MR. DELOZIER:

 7              Q.    Did you follow the rules?

 8              A.    Yes, yes.

 9              Q.    What were some of the rules they had?

10              A.    Some of the rules would be we got up early in

11     the morning, got into the Word, we -- if any of the men there

12     worked, the money all went into the pot that Rick took care

13     of.  We had -- we -- we would go -- like we would go to the

14     different churches and minister.  The men would minister, the

15     women didn't.  You know, we kind of had our own roles.  The

16     woman were -- you know, we'd keep the house, things like

17     that.

18              Q.    Would you define that as a patriarchal group?

19              A.    Yes.

20              Q.    What were the women's roles in that group?

21              A.    Subservient.

22              Q.    Okay.  There came a time though when you

23     decided -- I think you told us Alejo decided, right?

24              A.    Correct.

25              Q.    That's correct?
```

1       A.      That we were going to leave?

2       Q.      That you were going to leave.

3       A.      Correct.

4       Q.      Did there -- was there any single event that

5    brought about Alejo's decision?

6       A.      Not that I know of.  It was just a culmination

7    of what was happening.

8       Q.      Okay.  So it's fair to say it didn't turn out

9    the way you thought it would?

10      A.      Exactly, yes.

11      Q.      Okay.  Another thing you were asked about was

12   something about Wendi running away from home.  What -- what

13   happened?

14      A.      Her and --

15      MR. MARTINEZ:  Objection.  Lack of foundation.

16   There's approximately four times.

17      THE COURT:  Sustained.  Lay some foundation.

18      MR. DELOZIER:  Well, I don't think she testified to

19   four times, Your Honor.

20   BY MR. DELOZIER:

21      Q.      So let's -- do you have a first time that you

22   can tell us about?

23      A.      A first time, yes.  First time would be that

24   Wendi and Carly Lords, who was a daughter of Calvin, the head

25   pastor at the time at 91st Psalm, decided that they were

1    going to run away.  And after school, they took off.  And

2    they got down, I don't know, probably three quarters of a

3    mile, maybe a mile to Foxworth, and stopped there to get some

4    water because it was hot.  And then they -- I don't remember

5    if they called us to come get them or if -- if Alejo and

6    Calvin went looking for them.

7            Q.    And -- so that was the first time.  What did

8    they take with them on this jaunt?

9            A.    Absolutely nothing.  You know children.

10           Q.    How old?

11           A.    Around 10 or 11. Carly was probably 9.

12           Q.    Okay.  Was there another time?

13           A.    I think they did it a couple more times that

14   year, and I think the next time they actually took water with

15   them.

16           Q.    How far did she get that time?

17           A.    Not much farther. The second and third times I

18   know they turned around and came back.

19           Q.    So there wasn't a fourth time?

20           A.    Not that I recall.

21           Q.    There were issues about hair color.  You were

22   talking about that.  Was Wendi on a swim team?

23           A.    Yes, she was.

24           Q.    And how about lifeguarding?

25           A.    Yes she did do lifeguarding.

```
 1        Q.    Did that have an effect on the hair?

 2        A.    Definitely.  Like I tried to say, she was a

 3   towhead when she was born, and as she got older her hair

 4   darkened just like her biological father's hair.  And when

 5   Wendi goes in the sun, and mine does the same thing, it

 6   lightens up from the sun and chlorine in the pools.

 7   That's -- I could see that it's a little bit darker in some

 8   of the pictures -- that one picture that Mr. Martinez showed

 9   me with Wendi and Laurabell.  You could see how dark Wendi

10   was because she had been swimming out in the swimming pool

11   and stuff that summer and she -- she tans very easily from

12   hereditary on her biological father's side.

13        Q.    Did I understand you to say on one of the

14   photos you could see the dark rooting?  What do you mean?

15        A.    In her graduation picture you could see -- it's

16   a little darker down here and lighter at the top.  It's

17   sun-bleached.

18        Q.    Okay.  There was some mention of cleaning the

19   house.  Did you ever see Joe clean the house?

20        A.    No, I did not.

21        Q.    So in the 10 years or 9 years or so you knew

22   him, you never saw him do any housework?

23        A.    Oh, no.  No.

24        Q.    Talk a little bit about Alejo for a minute.  If

25   I understood your testimony, he might be mad at something
```

1    that he read?

2            A.    That he -- I --

3            Q.    Like a newspaper you mean?

4            A.    I think I just used an illustration meaning an

5    inanimate object, you know, like maybe if he read something

6    and if didn't agree with it, maybe a newspaper article,

7    something like that.  What I was trying to relate that

8    wasn't -- it wasn't -- he wasn't always yelling at myself or

9    our children.

10           Q.    All right.  How about throwing things?

11           A.    No, he did not throw things.

12           Q.    Okay.  You had several questions about why you

13    didn't call 911.  Can you tell us why?

14           MR. MARTINEZ:  Objection.  Lack of foundation, which

15    time?

16           THE COURT:  Sustained.

17    BY MR. DELOZIER:

18           Q.    We're talking about Alejo right now.  That's

19    when we're talking before.  I'm continuing to ask you about

20    Alejo during these times.  He would yell and so forth?

21           A.    No, I wouldn't call 911 because that's a family

22    issue and that's something that we would have dealt with at

23    home.  I would not have called 911, that wasn't an option in

24    my mind to ever call 911.

25           Q.    Well, it wasn't --

```
1          A.    It's a -- you know, it's a family thing.  It's

2    a family afair.  It's not --

3          Q.    There's no violence though?

4          A.    No.

5          Q.    Just a -- just noise?

6          A.    Just noise, just yelling, just like -- just

7    like when Mr. Martinez got louder.  You know, it's louder to

8    me.  It's yelling.

9          Q.    So when this happened, you get a little

10   confused?

11             MR. MARTINEZ:  Objection.  Leading.

12             THE COURT:  Sustained.  Don't lead.

13   BY MR. DELOZIER:

14         Q.    What happens to you when people yell at you?

15         A.    This or I -- I run away from it.

16         Q.    Pardon me?

17         A.    I'll start crying or I want to get away.  I

18   don't want to be around the yelling.

19         Q.    So did it ever get so bad that you thought

20   about leaving Alejo?

21         A.    No.

22         Q.    Why wouldn't you?

23         A.    He's my husband.  I love him.  I had one

24   divorce which was a -- a whole different situation.  And I

25   just -- I wouldn't leave my husband.  It's against what I
```

```
1    believe in.

2            Q.    It's a religious decision, you mean?

3            A.    Yes.

4            Q.    You were asked about your -- what you did the

5    morning of October 8.  Do you remember that?

6            A.    Yes.

7            Q.    And you did not leave with your husband?

8            A.    No, I did not.

9            Q.    Is there any -- was there any sinister reason

10   in that?

11           A.    No.  No, there wasn't.

12           Q.    Is that a personality trait of Alejo's?

13           MR. MARTINEZ:  Objection.  Speculation, leading.

14           THE COURT:  Sustained.

15   BY MR. DELOZIER:

16           Q.    Have you seen him leave you before?

17           A.    Oh, yes.

18           Q.    Yes?

19           A.    Before in the past, if Wendi, you know -- there

20   was times that Wendi or somebody else --

21           MR. MARTINEZ:  Objection.  Nonrepetitive.

22           THE COURT:  Hold on a second.  It was a "yes" or "no"

23   question.  What was your answer?

24           THE WITNESS:  Yes.

25   BY MR. DELOZIER:
```

```
 1          Q.    When have you seen that?

 2          A.    There would be times like maybe if there was a

 3    ministry issue, somebody called they needed help, or it could

 4    be Wendi calling it, could be somebody in the church family,

 5    it could be another family member.  Alejo was always very

 6    quick to go and help.

 7          Q.    And you may not --

 8          A.    That's his nature?

 9          Q.    You may not know why he left?

10          A.    No, no.  I -- no.

11          Q.    But that night you, on the telephone, called

12    Wendi, right?

13          A.    I'm sorry;

14          Q.    That -- that morning you got to the phone and

15    talked to Wendi?

16          A.    Yes.

17          Q.    And what did you two talk about?

18          MR. MARTINEZ:  Objection.  Hearsay.

19          THE COURT:  Sustained.

20          MR. DELOZIER:  Approach, Your Honor?

21

22               (The following proceedings were held at the

23    bench:)

24

25          MR. DELOZIER:  He opened this wide open, Your Honor,
```

1    with his questioning with her and insinuating there was

2    something sinister about this whole -- about why they left 15

3    minutes later and why she didn't get there until 30 minutes

4    after he did and so forth.  It's got to be explained.

5          MR. MARTINEZ:  I never asked her the content of the

6    conversation.  That's the essence of hearsay.  I didn't open

7    any door whatsoever.

8          THE COURT:  I'm going to sustain the objection.

9    Let's move on.

10

11          (The following proceedings were held in open

12    court:)

13

14    BY MR. DELOZIER:

15          Q.    You were asked about how you formed your

16    opinion about the reputation that Joe had.  Do you remember

17    that?

18          A.    Yes.

19          Q.    And you had some difficulty giving Mr. Martinez

20    any names.  Is that correct?

21          A.    Yes, yes.

22          Q.    Can you explain why you had difficulty giving

23    names?

24          A.    The reason I have difficulty giving names is

25    because I don't want to bring in a bunch of negative stuff

```
 1    and tell negative stuff on other people because of any

 2    beliefs or -- I don't want any retribution against anyone.

 3         Q.    In other words, you --

 4         A.    I don't want somebody else mad at me.

 5         Q.    You do have some specifics that you've been

 6    reluctant to provide?

 7         A.    Yes.

 8         MR. MARTINEZ:  Objection.  Leading.

 9         THE COURT:  Don't lead.

10    BY MR. DELOZIER:

11         Q.    I'm sorry.  What was the answer?

12         A.    Yes.

13         Q.    You asked about your first husband.  Do you

14    remember that?

15         A.    Yes.

16         Q.    And specifically you were asked how many times

17    he saw Wendi after --

18         A.    That's correct.

19         Q.    Okay.  Was there a reason why they didn't see

20    each other?

21         A.    The reason that Wendi didn't see him any longer

22    is --

23         MR. MARTINEZ:  Objection.

24         THE WITNESS:  -- because he was in prison for

25    child --
```

```
1              THE COURT:  Hold a second.  What is the objection?

2              MR. MARTINEZ:  Relevance as to why.

3              THE COURT:  Overruled.

4              THE WITNESS:  Wendi could no longer see him because

5    he's in prison for child --

6              MR. MARTINEZ:  I'm going to object as to the reason

7    he's in prison.

8              THE COURT:  Let me see Counsel here.

9

10             (The following proceeding were held at the

11   bench:)

12

13             THE COURT:  Hold on a second.  I allowed the question

14   because Mr. Martinez asked about the times he had seen her,

15   but she's already said that the guy's in prison.  Let's move

16   on.

17             (Attorney-attorney discussion.)

18             THE COURT:  I'll allow you to restate the question,

19   but just -- I'll let you lead at this point.  It's because

20   he's in prison, correct, period, and let's move on.

21

22             (The following proceedings were held in open

23   court:)

24

25             THE COURT:  Mr. DeLozier?
```

1          MR. DELOZIER:  Thank you, Your Honor.

2     BY MR. DELOZIER:

3          Q.    She didn't have an opportunity to see him any

4     more because he was in prison.  Is that correct?

5          A.    That's correct.

6          Q.    Okay.  I'm -- sorry, but I've got to get into

7     this tape recorder business.  Would you explain to me what

8     you did and why you did it, who you did it for on this tape

9     recorder?

10         A.    Yes.  I seem to be getting in trouble whenever

11    I try to --

12         MR. MARTINEZ:  I'm going to object as nonrepetitive.

13         THE COURT:  Answer the question that's asked.

14         THE WITNESS:  Okay.

15         THE COURT:  Repeat the question.

16    BY MR. DELOZIER:

17         Q.    Tell me who asked you to handle a tape recorder?

18         A.    The paralegal asked some of us if we would help

19    her take her stuff back down to the car.

20         Q.    Okay.

21         A.    It just -- and that's when I was just given the

22    tape recorder.  Other people were given other items to carry

23    down.

24         Q.    And that's the paralegal sitting behind the

25    counsel desk?

```
 1          A.      That's correct, Patty.

 2          Q.      Okay.  Do you know how it got here?

 3          A.      No, I do not.  Well, I -- I assume Patty

 4    brought it in.

 5          Q.      You're assuming?

 6          A.      I'm pretty sure I saw her carry all that stuff

 7    in because she --

 8          Q.      You never touched it until she give it to you?

 9          A.      No, I did not.

10          Q.      She gave it to you where?

11          A.      Behind the gate.

12          Q.      Okay.  And you carried it from the gate to

13    where?

14          A.      Down to her car, to the elevator, to the lobby,

15    down to her car and --

16          Q.      Okay.

17          A.      -- gave it to her.

18          Q.      Let's talk about Alice next.

19          A.      Okay.

20          Q.      You guys had a conversation, didn't you?

21          A.      Yes.

22          Q.      Okay.  Well, tell me what the conversation was?

23          A.      Okay.  We were out in the smoking area.  Alice

24    was having a cigarette and I asked her if she wanted any food

25    or anything.  She said "No, thank you," and we started
```

1    talking and she made the comment that Shannon had been on the

2    stand and that she could see the difference in her attitude

3    when she responded to Dan or when she responded to Juan.   And

4    then we proceeded to talk about painting my bathroom the next

5    week when Alice came back, and we just discussed the

6    different colors of painting the bathroom.

7         Q.    That's it?

8         A.    That's it.

9         Q.    Okay.  You talked about seeing physical

10   violence by Joe with Wendi.  What you were not asked, I don't

11   think, to the point where I understood your responses anyway,

12   is how many times you saw him angry?

13        A.    I saw Joe angry a lot of times.

14        Q.    How many times a month?

15        A.    I'd say several times a month.

16        Q.    So several times during the eight, nine years

17   they were together?

18        A.    Yes.

19        Q.    Hundreds?

20        A.    Yes.

21        Q.    And this would be the words that you described?

22        A.    Yeah, the swearing and -- and yelling and --

23   and throwing things.

24        Q.    You were asked about the number of times Wendi

25   called you and talked to you about various things.  Did --

1    how many times would Joe call you on a given evening?

2         A.    Sometimes I'd have two or three calls from Joe,

3    if he was upset, if he was looking for something, if he

4    wanted me to do something the next day, if he wanted me to do

5    something then.

6         Q.    Two or three?

7         A.    Two or three, yes.

8         Q.    How about --

9         A.    Sometimes it would be one, you know, and not

10   every evening.  You're just talking especially towards the

11   end.

12        Q.    When you're talking about the calls, I think

13   one of the calls you talked about was coming from when he was

14   on the road with Nicolas?

15        A.    Correct.

16        MR. MARTINEZ:  Objection.  Beyond the scope.

17        THE COURT:  Overruled.  Go ahead.  Answer the

18   question if you can.

19        THE WITNESS:  That was in May of 2000.  He was on the

20   road.  He was on his way back from Oklahoma.

21        MR. MARTINEZ:  Objection.  Beyond the scope.

22        THE COURT:  Overruled.

23        MR. MARTINEZ:  I didn't ask her about that.

24        THE WITNESS:  He called and --

25   BY MR. DELOZIER:

```
1         Q.     How many times?

2         A.     Once or twice that night.  He called and --

3         MR. MARTINEZ:  Objection.  Hearsay if she's going to

4    say what he said.

5         THE COURT:  Sustained.  Ask your next question.

6    BY MR. DELOZIER:

7         Q.     So you -- your recollection is two or three

8    times.  So how many days a week would you get two, three,

9    four call at night from Joe?

10        A.     I could go two or three weeks without, you

11   know, that many calls a night.  I got called -- I didn't just

12   get calls at night.  I got calls at the office --

13        Q.     Well, okay.

14        A.     -- from Joe.

15        Q.     During the day, a 24-hour period?

16        A.     Maybe once or twice a week that he would call.

17   And sometimes, like I said, it would be several alls.

18        Q.     Okay.  You were asked that -- my recollection

19   is correct that Wendi didn't confide in you.  Is that what

20   you're saying?  She did not --

21        A.     She did not confide in me as much as her

22   father.  She confided in me less as the time went on.

23        Q.     And you covered specific areas that you did

24   not -- she did not confide in you assuming those were

25   accurate depictions of things, right?
```

```
1          A.     Correct.

2          Q.     You don't have any idea whether those things

3   happened or not?

4          A.     No.

5          Q.     Okay. What did she confide in you about?

6          MR. MARTINEZ:  Objection.  Hearsay.

7          THE COURT:  Sustained.

8          MR. DELOZIER:  We need to approach, Your Honor.

9

10              (The following proceedings were held at the

11   bench:)

12

13          MR. DELOZIER:  We got the same problem.  He keeps

14   opening the door and doesn't want me to walk in it.  And this

15   is the third or fourth area we've tried to cover.  I really

16   think this is closing us out of being able to rebut the stuff

17   that he brings up during his cross-examination.

18          THE COURT:  Mr. Martinez?

19          MR. MARTINEZ:  I don't know what door he's talking

20   about.  He's not being specific enough.

21              (Private discussion between Mr. Patterson and

22   Mr. DeLozier.)

23          MR. DELOZIER:  All I'm trying to do is complete the

24   story.  There were some areas that he brought out that she

25   did not confide in her, so obviously there are certain areas
```

1     that I need to complete the story.

2              THE COURT:  Mr. Martinez?

3          MR. MARTINEZ:  If you do allow --

4          THE REPORTER:  I can't hear you.

5          THE COURT:  Speak into the --

6          MR. MARTINEZ:  Sorry. If you do allow it, it has to

7     do with the year 2000.  I didn't ask about anything --

8          MR. DELOZIER:  I --

9          MR. MARTINEZ:  Let me finish.  I asked about certain

10    areas.  He can only rebut those areas.  He can't start asking

11    about everything under the sun.

12             THE COURT:  The questions dealt with certain things

13    as far as the affairs, alleged affairs, whatnot, and so I'm

14    going to allow you to go into that because he asked about

15    that.  She basically said she didn't know about those, okay?

16    I'll allow you to ask, "Well, did she confide about other

17    things," okay, but I'm not going to let you get into those,

18    okay?

19             MR. DELOZIER:  Okay.

20

21              (The following proceedings were held in open

22    court:)

23

24             THE COURT:  Mr. DeLozier?

25          MR. DELOZIER:  Thank you, Your Honor.

1    BY MR. DELOZIER:

2           Q.   You had said you didn't know about some of the

3    questions, most of the things, that Mr. Martinez asked you

4    about, correct?

5           A.   That's correct.

6           Q.   And obviously you had no knowledge of them so

7    there was nothing she discussed with you about those?

8           A.   That's correct.

9           Q.   Okay.  But there were other areas that you did

10   discuss with her?

11          A.   Correct.

12          Q.   Okay.  And you felt then that you were still

13   having a good relationship with your daughter, right?

14          A.   Yes.

15          Q.   Okay.  We talked a lot, and it's been

16   cross-examined, about religion and so forth.  You chose to

17   raise Wendi and -- you and Alejo chose to raise Wendi the way

18   you did.  Is that correct?

19          A.   That's correct.

20          Q.   Okay.  And if you were doing it over, would you

21   do the same thing?

22          A.   I believe I -- no, I would not do the same

23   thing.

24          Q.   What would you do different today?

25          A.   I would --

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

```
1              MR. MARTINEZ:  Objection.  Relevance.

2              THE COURT:  Sustained.

3    BY MR. DELOZIER:

4         Q.    You don't have any children her age -- under

5    teenagers today, do you?

6         A.    I have Brandon.

7         Q.    How old is he?

8         A.    Brandon is -- will be 19 in a few days.

9         Q.    Okay.  Have you raised Brandon the same way you

10   did Wendi?

11        A.    We started to and then we changed our -- our

12   way of childrearing so that Brandon would not be so

13   sheltered.

14        Q.    Objection.  Nonresponsive.

15             THE COURT:  Sustained.

16   BY MR. DELOZIER:

17        Q.    You said not being sheltered?

18             MR. MARTINEZ:  Objection.  Relevance.

19             THE COURT:  Sustained.

20   BY MR. DELOZIER:

21        Q.    What did you do different with Brandon?

22             MR. MARTINEZ:  Objection.  Relevance.

23             THE COURT:  Sustained.

24             MR. DELOZIER:  Need to approach, Your Honor.

25
```

```
 1                    (The following proceedings were held at the
 2      bench:)
 3
 4            MR. DELOZIER:  This same problem.  He trashed their
 5      religion during his cross-examination and all I'm trying to
 6      do is show who she was and what she would do differently.
 7            THE COURT:  He asked questions about some of the
 8      things you asked her on direct examination, okay, on his
 9      cross.
10            MR. DELOZIER:  Uh-huh.
11            THE COURT:  Brandon doesn't matter in this trial.
12      It's not relevant.
13            MR. DELOZIER:  He's a family member.  He's going to
14      testify.
15            THE COURT:  But how he was raised is not relevant,
16      okay?  I think that's where you're going.  Let's move on,
17      okay?
18
19                    (The following proceedings were held in open
20      court:)
21
22            THE COURT:  Mr. DeLozier?
23            MR. DELOZIER:  Just one moment, please.
24                    (Pause in proceedings.)
25            MR. DELOZIER:  All right.  Nothing further, Your
```

1    Honor.

2            THE COURT:   Any further questions of this witness by

3    the jury?  If so, please raise your hand.

4                    (Pause in proceedings.)

5            THE COURT:   Let me see Counsel here at the bench.

6

7                    (The following proceedings were held at the

8    bench:)

9

10           THE COURT:   Question, "Where are Nicolas and Ashley

11   today?"

12           MR. DELOZIER:   Not relevant.

13           THE COURT:   "Have they had contact with their

14   mother?"

15           MR. MARTINEZ:   Irrelevant.

16           THE COURT:   Mr. DeLozier?

17           MR. DELOZIER:   Not relevant.

18           THE COURT:   Next question, "Was Joe left or right

19   handed, paren, if you know, end of paren.

20                    Mr. Martinez?

21           MR. MARTINEZ:   That's fine.

22           MR. DELOZIER:   Fine.

23           THE COURT:   Next question, "2, where were the bruises

24   you saw on Wendi during 2000?"

25                    Mr. Martinez?

1          MR. MARTINEZ:  Irrelevant because we haven't hooked

2     them up to -- to Joe or anybody.  It could be Rick Freeland.

3          THE COURT:  Well, we don't know whether Mr.

4     DeLozier --

5          MR. MARTINEZ:  Right.

6          THE COURT:  -- is going to or not but --

7          MR. MARTINEZ:  Okay.

8          THE COURT:  -- any objection?

9          MR. MARTINEZ:  No.

10         THE COURT:  Mr. DeLozier?

11         MR. DELOZIER:  Fine.

12         THE COURT:  Okay.  Next question, "3, Did you

13    consider calling 911 after speaking with Wendi on 10/8/2000?

14    Why not?"

15         MR. MARTINEZ:  No objection.

16         MR. DELOZIER:  That's fine.

17         THE COURT:  What did you say?

18         MR. MARTINEZ:  I said no objection.

19         THE COURT:  Any objection?

20         MR. DELOZIER:  No.

21         THE COURT:  Okay.  Next question, "4, During 2000,

22    did Wendi ask for help or assistance?  If so, when did --

23    what did she ask assistance for?"

24                        Mr. Martinez?

25         MR. MARTINEZ:  First part is okay.  The second part

```
 1    is hearsay.

 2                    (Attorney-attorney discussion.)

 3            MR. DELOZIER:  Not hearsay, party -- admission by

 4    party opponent.

 5            MR. MARTINEZ:  They're going to have --

 6            MR. DELOZIER:  She's saying what she asked for.

 7            MR. MARTINEZ:  They're going to have go back and read

 8    the rule.  The only person that can present a party opponent

 9    statement is the State, not the jury -- not the defense.

10            THE COURT:  What is the -- what are you saying is the

11    admission?

12            MR. DELOZIER:  Pardon me?

13            THE COURT:  What are you saying is the admission?

14            MR. DELOZIER:  Well, until she answers the question,

15    I don't know.

16            MR. MARTINEZ:  And, Judge, just for the record, there

17    is case law.  If you want I could give you a case on this.

18    It doesn't have to be an admission at all.  It can just be a

19    statement even if it isn't an admission for it to qualify as

20    quote, unquote, party opponent, and I will avow to the facts

21    of law as to that.  In other words, even if she says she

22    asked me to help with the laundry, it doesn't matter.  It's a

23    statment by a party opponent.  It doesn't come in even if

24    it's a quote, unquote admission.

25            THE COURT:  Anything else you want to put on the
```

1    record?

2              MR. DELOZIER:  (No audible response.)

3              THE COURT:  I'm not asking that question.

4              MR. DELOZIER:  The first half is okay.

5              MR. MARTINEZ:  Yeah, that one is okay.  Did she ask

6    for assistance, yes or no.

7              THE COURT:  Okay.  Neither one has an objection to

8    that first part?

9              MR. DELOZIER:  Right.

10             THE COURT:  Next question, "In the Fall of 2000, did

11   Joe call you in the evenings looking for Wendi?  If so, how

12   often?"

13             MR. MARTINEZ:  No objection.

14             MR. DELOZIER:  Fine.

15             MR. PATTERSON:  It calls for --

16             THE COURT:  Talk to him if you want to say something.

17                  (Private discussion between Mr. Patterson and

18   Mr. DeLozier.)

19             THE COURT:  You have any objection?

20             MR. DELOZIER:  It looks like hearsay to us.

21             THE COURT:  Okay.  So you object?

22             MR. DELOZIER:  Yes.

23             THE COURT:  I won't ask it.

24                  Next question, "Did you think your life was in

25   danger when you rode in the car with Joe and he was

1    speeding?"

2                    Mr. Martinez?

3            MR. MARTINEZ:  No objection.  Well, relevance.  How

4    relevant is that?  I would object on the grounds of

5    relevance.

6            MR. DELOZIER:  I don't have any problem with that.

7    Looks perfectly appropriate.  She's danced all around it.

8            THE COURT:  I'm going to go ahead and ask it.

9                    "If so, why did you continue to ride with him

10   after each time instead of taking your own car or aranging

11   other transportation?"

12           MR. MARTINEZ:  No objection.  It's follow-up.

13           THE COURT:  Mr. DeLozier, any objection?

14           MR. DELOZIER:  Fine.

15           THE COURT:  Next question, "Did you receive a call --

16   wait.  Sorry.

17                    "Did you receive a phone call from Joe on

18   October 7 or October 8?  If so, did he express concern or

19   fear?"

20           MR. MARTINEZ:  No objection to first part, and then

21   second part calls for hearsay.

22           THE COURT:  Mr. DeLozier?

23                    (Attorney-attorney discussion.)

24           MR. DELOZIER:  That's fine, both of them.

25           THE COURT:  Okay.  I'll ask the first one.  I'm not

1    asking the second one.

2              Next question, "Were you aware before Joe's

3    death of any plan between Wendi and Joe to end Joe's life

4    prematurely?"

5         MR. MARTINEZ:  That would be based on hearsay, so I

6    would object to that.

7         THE COURT:  Mr. DeLozier?

8         MR. DELOZIER:  That's exactly what she says they did

9    and that's what she's going to testify to, so whether she

10   knew about it -- it's fair game looks to me in this

11   circumstance.

12        THE COURT:  Okay.  I'm not going ask it.

13             Next question, "Through your conversation with

14   Wendi on the night of October 7, slash, October 8, were you

15   aware that Joe was dead?"

16        MR. MARTINEZ:  That calls for hearsay because of what

17   she told her.

18        THE COURT:  Mr. DeLozier?

19        MR. DELOZIER:  Well, I think he opened the door for

20   that to be brought in, but you've already ruled against it so

21   I guess that has to be included in that same ruling.

22        THE COURT:  I won't ask that question.

23             Next question, "If you know, was Joe

24   right-handed or left-handed?"

25        MR. MARTINEZ:  That's already been asked and

1    answered.

2            MR. DELOZIER:  Yeah, one of those earlier ones, I

3    think.

4            THE COURT:  Okay.  Thank you.

5            MR. DELOZIER:  Thank you.

6

7            (The following proceedings were held in open

8    court:)

9

10           THE COURT:  Ma'am, I have some additional questions

11   here for you.

12           First question reads as follows.  "If you know,

13   was Joe right-handed or left-handed?"  If you know?

14           THE WITNESS:  He was right-handed.

15           THE COURT:  Next question reads as follows.  "Where

16   were the bruises you said -- sorry.  "Where were the bruises

17   you saw on Wendi during 2000?"

18           THE WITNESS:  During 2000 I saw bruises on her arm,

19   on the upper portion of her arm, and I also saw bruises after

20   she was in jail on her neck.

21           THE COURT:  Hold on a second.  Where -- the question

22   is just where were the bruises.

23           THE WITNESS:  Arm.

24           MR. MARTINEZ:  Judge, may we approach on that issue?

25           THE COURT:  Yes.

1

2                     (The following proceedings were held at the

3     bench:)

4

5          MR. MARTINEZ:  It's irrelevant the bruising in the

6     jail, and I ask that it be striken.  Additionally, under 403,

7     it's just too much.

8          MR. DELOZIER:  What's the question?

9          THE COURT:  Well, the question was where were the

10    bruises you saw on Wendi during the 2000.

11         MR. DELOZIER:  She answered it correctly.

12         THE COURT:  I know, but she went on about the --

13         MR. DELOZIER:  That's also --

14         MR. PATTERSON:  That's also 2000.

15         THE COURT:  But the question was not where your

16    client was when she saw the bruises.  The question was where

17    were the bruises on your client during 2000?

18                     (Private discussion between Mr. Patterson and

19    Mr. DeLozier.)

20         MR. DELOZIER:  Fine.

21         THE COURT:  Okay.

22         MR. MARTINEZ:  I ask it be re-asked and during the

23    time of up to October 7.

24         THE COURT:  You're asking what?

25         MR. MARTINEZ:  The question be asked where were the

1    bruises that you saw between January 1 of 2000 to October 7

2    of 2000.

3            MR. DELOZIER:  That's not the juror's question.

4            THE COURT:  I'm leaving it as written.  I think it's

5    best.

6            Hold a second.  Now, this question that we've

7    referred to, I wasn't sure -- were the two of you -- I forgot

8    whether the two of you agreed to this one.  She has a

9    tendency of saying things beyond what the question is, and

10   I'm wondering if we're going into areas, "Did you consider

11   calling 911 after speaking with Wendi on 10/8/2000."

12           MR. MARTINEZ:  It should be said "yes" or "no."

13           THE COURT:  Right.  I'm not going to ask why not.

14           MR. DELOZIER:  She's already covered that.

15           (Private discussion between Mr. Patterson and

16   Mr. DeLozier.)

17           MR. DELOZIER:  I agree.  Don't ask it at all.

18           THE COURT:  Don't ask --

19           MR. DELOZIER:  The whole thing.

20           THE COURT:  Do you have any objection?

21           MR. MARTINEZ:  I would ask it to be asked, but I

22   don't know what the question is.

23           THE COURT:  I won't ask it at all.

24           MR. DELOZIER:  Okay.

25           THE COURT:  Hold on a second.  Okay.  That's fine.

```
 1    / / / / /
 2                    (The following proceedings were held in open
 3    court:)
 4
 5            THE COURT:  Okay.  My next question reads as
 6    follows.  Did you feel your life was in danger when you rode
 7    in the car with Joe when he was speeding?
 8            THE WITNESS:  Yes.
 9            THE COURT:  If so, why did you continue to ride with
10    him after each time instead of taking your own car and
11    arranging other transportation?
12            THE WITNESS:  Did I?
13            THE COURT:  Yes.
14            THE WITNESS:  Okay.  The time that I was in fear of
15    my life was that -- was in May of 2000 the times I know that
16    he was driving exceptionally fast.  But I didn't -- you know,
17    I continued to ride with him.
18            THE COURT:  This is a "yes" or "no" question.  Just
19    answer the question "yes" or "no."  Did you receive a call --
20    sorry.  "Did you receive a phone call from Joe on October 7
21    or October 8?"  "Yes" or "no."
22            THE WITNESS:  Yes.
23            THE COURT:  Are there any further questions of this
24    witness by the jury?  If so, please raise your hand.
25                    Let me see Counsel here at the bench.
```

1

2          (The following proceedings were held at the

3    bench:)

4

5          THE COURT:  Question, "Would you have continued to

6    give Wendi money if you would have known she spent money at

7    bars with friends, boyfriends, twice a week?  Is it okay to

8    have affairs in your religion?  Was Wendi brought up as

9    such?"

10         MR. MARTINEZ:  I -- I just.  Sure, I have no

11   objection.

12              (Private discussion between Mr. Patterson and

13   Mr. Delozier.)

14         MR. DELOZIER:  Too far afield.  It's speculation.

15         THE COURT:  I'm not going to ask either question.

16

17              (The following proceedings were held in open

18   court:)

19

20         THE COURT:  Okay.  Any further questions of this

21   witness by the jury?

22              (No response.)

23         THE COURT:  No one has raised their hand.

24              Mr. Martinez, did you have any questions --

25   follow-up questions to those specific questions by the jury?

1           MR. MARTINEZ:  Yes.  Thank you.

2

3      FOLLOW-UP QUESTIONS BY MR. MARTINEZ:

4           Q.    After May 2000 when you indicated that you were

5      in fear for your life, you did continue to ride with Joe in

6      the car after that?

7           A.    I believe so.

8           Q.    How many times would you say that you did?

9           A.    If I did, it was once or twice.

10          Q.    Well, I thought you told us that --

11          A.    I believe once or twice.

12          Q.    Ma'am, I told -- you told us that it was at

13     least once or twice that you went to the lake with them.

14          A.    I did not go to the lake in the summer of 2000.

15          Q.    So it would be just around town or what?

16          A.    You --

17          Q.    Where did you ride around?  Where did you go

18     with him subsequent to May of 2000?

19          A.    After May 2000?

20          Q.    Yes.  That was the question.

21          A.    I can't recall a specific time when I was

22     actually riding with him.  I -- I'm just assuming I would

23     have ridden with him.

24          Q.    And that experience didn't leave you such that

25     you thought he was out to kill you by the way he drove or

1    anything like that.  In other words, you felt comfortable

2    enough to ride with him afterwards?

3              A.    Again, I'm trying to recall a specific instance

4    that I did ride with him after May of 2000.

5              MR. MARTINEZ:  Okay.  I don't have anything else.

6              THE COURT:  Mr. DeLozier, did you have any follow-up

7    questions to the specific questions by the jury?

8              MR. DELOZIER:  Yes.  Thank you, Your Honor.

9

10   FOLLOW-UP QUESTIONS BY MR. DELOZIER:

11             Q.    There were two elements on that night if I'm

12   following your testimony correctly.  One was speed and the

13   other one was anger?

14             A.    Correct.

15             Q.    Okay.  So the times you're speeding to the --

16   that you refered to earlier, was he angry then?

17             A.    No.  This was the night in May of 2000.  It was

18   a night that he was extremely angry, to me would have been

19   like raging, and driving in excess speeds of at least 100

20   from what I saw.  I have never ridden in a vehicle with Joe

21   when he had gone that fast.

22             Q.    And that angry?

23             A.    And was that angry.

24             Q.    Did you ever confront him about this situation?

25             A.    No.

1          Q.     Do you remember -- did I hear you say that --

2     did you get a call from either Joe or Wendi on October 7 or

3     8?

4          A.     Yes.

5          Q.     And do you remember when it was?

6          A.     It -- it was in the afternoon.  We came home

7     from the airport.

8          MR. MARTINEZ:  Objection.  Beyond the scope.

9          THE COURT:  Ask your next question.

10    BY MR. DELOZIER:

11         Q.     When was it and where were you at the time?

12         A.     I was -- Alejo and I were in my Mazda.  We had

13    left the airport.  We had left a couple -- I had left a

14    couple messages on the cell phone, and Joe called me back.

15         Q.     Now, you're saying that was in the afternoon --

16         A.     That was in the afternoon.

17         Q.     -- of October 7?

18         A.     Yes.

19         MR. DELOZIER:  Thank you, Your Honor.

20         THE COURT:  May this witness be excused?

21         MR. MARTINEZ:  No, sir.  I'd like to have her remain

22    under subpoena until later.

23         THE COURT: You're not excused at this point in time.

24    You may step down from the witness stand.

25              Okay.  We'll go ahead and take our evening

```
 1    recess at this point in time, ladies and gentlemen.  During

 2    the recess, remember the entire admonition I have given you

 3    including the fact you're not to discuss this case with

 4    anyone, do not let anyone discuss the case with you, do not

 5    do any research experimentation testing on your own.  Avoid

 6    any media coverage of this case.  Keep an open mind.  We'll

 7    see you tomorrow at 1:00.  Have a nice evening.  We'll be in

 8    recess until 1:00 p.m. tomorrow.

 9

10              (Evening recess.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1

2

3                          CERTIFICATE OF REPORTER

4

5      STATE OF ARIZONA      )
                             )
6      COUNTY OF MARICOPA    )

7

8                  I, Traci L. Wheeler, CSR, RPR, an official

9      and certified reporter in the Superior Court of the State

10     of Arizona, in and for the County of Maricopa, hereby

11     certify that I made a shorthand record of the proceedings

12     had in the within case, and that the foregoing transcript

13     is a full, true, and correct transcription of the

14     proceedings in this case.

15                  Dated this 28th day of March, 2005.

16

17

18                          _____
                            Traci L. Wheeler, CSR, RPR
19                          Certified Court Reporter No. 50313
                            Official Court Reporter
20

21

22

23

24

25

# APPENDIX I - Part 1

05-0002
Braccio
1

DP



1        IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

2          IN AND FOR THE COUNTY OF MARICOPA

3

4    STATE OF ARIZONA,              )
                                    )
5             Plaintiff,            )
                                    )
6    v.                            )        No. 1 CA-CR 04-0731
                                    )        MARICOPA COUNTY
7    WENDI ELIZABETH ANDRIANO,      )        No. CR 2000-096032
                                    )
8             Defendant.            )
     _____)

9

10

11

12                     Mesa, Arizona
                     October 25, 2004
13

14

15

                BEFORE:  The Honorable BRIAN K. ISHIKAWA
16

17

18          REPORTER'S TRANSCRIPT OF PROCEEDINGS

19                     TRIAL DAY 31

20

21

22

23

24    ORIGINAL Prepared for APPEAL by:
      TRACI L. WHEELER, CSR, RPR
25    Certified Court Reporter No. 50313

        TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1                    A P P E A R A N C E S

2    FOR THE STATE:        JUAN M. MARTINEZ,
                           Deputy County Attorney
3
     FOR THE DEFENDANT:    DANIEL B. PATTERSON,
4                          Deputy Public Defender
                                   and
5                          G. DAVID DELOZIER,
                           Attorney at Law
6

7         I N D E X   O F   E X A M I N A T I O N

8    WITNESS                                         PAGE

9    ANDRIANO, WENDI ELIZABETH, Called on her own behalf
              Direct Examination by Mr. Patterson      4
10            Continued Direct Examination by Mr. Patterson   86

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000004674

1       MESA, ARIZONA, MONDAY, OCTOBER 25, 2004

2

3       THE COURT:  Good afternoon.  This is trial in cause

4    number CR 2000-096032, State of Arizona versus Wendi

5    Elizabeth Andriano.  The record will reflect the presence of

6    the Defendant, Counsel and the jury.

7                Mr. Patterson?

8       MR. PATTERSON:  Thank you, Judge Ishikawa.  At this

9    time, with the Court's permission, Wendi Andriano would like

10   to testify.

11      THE COURT:  Please step forward to the clerk.  Please

12   give your name to the clerk and she'll swear you in.

13

14            WENDI ELIZABETH ANDRIANO,

15        CALLED TO TESTIFY ON HER OWN BEHALF,

16    HAVING FIRST BEEN DULY SWORN, TESTIFIES AS FOLLOWS:

17

18      THE COURT:  Please have a seat on the witness stand.

19   Please make yourself comfortable there on the witness stand.

20   Please pull the microphone close to you.  Please remember to

21   speak loudly and clearly into the microphone so everyone can

22   hear you.  Also please wait until the question is completed

23   before you answer the question, and please make sure you give

24   a verbal response.  Is that all agreeable to you?

25      THE WITNESS:  Yes, sir.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          THE COURT:  Mr. Patterson, you may proceed.

2          MR. PATTERSON:  Thank you, Judge.

3

4   DIRECT EXAMINATION BY MR. PATTERSON:

5          Q.   Would you give us your name, please?

6          A.   Wendi Elizabeth Andriano.

7          Q.   Let's start out, Wendi, with some dates and

8   establish kind of a time frame in which we're going to be

9   discussing things.  What is your date of birth?

10         A.   8/26/70.

11         Q.   So do the math for me.  Currently you are what

12  age?

13         A.   34.

14         Q.   And how old were you then in October of 2000?

15         A.   30 years old.

16         Q.   On what day did you and Joe Andriano marry?

17         A.   January 22nd, 1994.

18         Q.   Okay.  And how old were you on the date of the

19  marriage?

20         A.   23.

21         Q.   And how old was Joe at that time?

22         A.   26.

23         Q.   And you are the mother of two small -- well,

24  they're older children now, but two children.  Nicolas is the

25  first child?

1       A.   Yes, sir.

2       Q.   What is his date of birth?

3       A.   6/20/1997.

4       Q.   And that was followed with the daughter by the

5   name of Ashley.

6       A.   Uh-huh.

7       Q.   What is Ashley's birthday?

8       A.   Ashley is September 16th, '98.

9       Q.   Okay.  So currently how old is Nicolas?

10      A.   He's 7.

11      Q.   Okay.  And Ashley is?

12      A.   6.

13      Q.   Okay.  And what day did you graduate from high

14   school?  What year?

15      A.   May of '89.

16      Q.   All right.  And lastly in terms of dates and

17   other items, how tall are you?

18      A.   5'4".

19      Q.   Okay.  Has that changed in the last four years?

20   Have you gotten shorter or taller?

21      A.   No, sir.

22      Q.   Okay.  So you were 5 foot 4 inches tall back in

23   October of 2000?

24      A.   Yes, sir.

25      Q.   What is your current weight?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1       A.    Around 120.

2       Q.    Okay.  And in October of 2000 how much did you

3  weigh?

4       A.    103.

5       Q.    So the Wendi that presents herself today is

6  about 17 pounds heavier?

7       A.    Yes, sir.

8       Q.    Okay.  All right.  Let's go back in time,

9  Wendi, to that period of time, the growing up period of

10  time.  Were you born here in Arizona?

11       A.    No, sir.

12       Q.    Okay.  Where were you born?

13       A.    I was born in Texas.

14       Q.    Okay.  Near  a big city in Texas?

15       A.    That's -- it's 40 miles outside of Amarillo.

16       Q.    Okay.  So in the panhandle area of Texas?

17       A.    Yes.

18       Q.    Okay.  And what is your mother's name?

19       A.    Donna Ochoa.

20       Q.    Was that the woman that spoke earlier in these

21  proceedings?

22       A.    Yes.

23       Q.    Okay.  And your biological father, what was his

24  name?

25       A.    Skip Robertson.

1          Q.     Okay.  Did you have much contact with your

2    biological father growing up?

3          A.     Not that I recall, no.

4          Q.     Okay.  When did he leave Donna or when did that

5    unit kind of break up?

6          A.     My understanding is when I was small --

7          MR. MARTINEZ:  Objection.  Hearsay.

8          THE COURT:  Overruled.  Go ahead, answer the

9    question.

10          THE WITNESS:  When I was 3-ish, 3 or so.

11    BY MR. PATTERSON:

12          Q.     All right.  At some point in time did Donna

13    marry another gentleman?

14          A.     Yes.

15          Q.     Okay.  What was that gentleman's name?

16          A.     Alejo.

17          Q.     He too was the gentleman that came in here and

18    testified a week or so ago?

19          A.     Yes.

20          Q.     Okay.  Now, even though you weren't the

21    biological offspring of Alejo, did he commence legal

22    proceedings to become at some point your adoptive father?

23          A.     Yes.

24          Q.     Okay.  When did that happen?

25          A.     When I was around 5 or 6, I believe.  I'm not

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1      sure of the date.

2              Q.      Okay.  So if you were born in August of 1970,

3      '75, '76, thereabouts?

4              A.      Yes.

5              Q.      Okay.  Did you have any blood or siblings that

6      were both offspring of Alejo and Donna?

7              A.      No.

8              Q.      Okay.  Did you at some point acquire an

9      adoptive brother?

10             A.      Yes.  My cousin Brandon when he was around two

11     years old, my parents adopted him.

12             Q.      Okay.  And, again, was he the gentleman that

13     testified last week in this case?

14             A.      Yes, sir.

15             Q.      Okay.  So as I understand, he is the son of

16     your mom's sister?

17             A.      Yes.

18             Q.      Okay.  And did Brandon live with you and the

19     family for a period of time?

20             A.      Yes.

21             Q.      Okay.  Do you have any other siblings?

22             A.      From my biological father.

23             Q.      Okay.

24             A.      There's siblings there, but I don't know them

25     at all.

1         Q.    You didn't grow up with them, haven't maintain

2    contact with them?

3         A.    No.

4         Q.    Okay.   In the early years, where did you live?

5    3, 4, 5, in that area?

6         A.    In Phoenix, Arizona with my grandmother and my

7    mom.

8         Q.    Okay.   In Phoenix proper or do you recall

9    exactly where?

10        A.    No, I don't recall.

11        Q.    Okay.   At some point in time did the family go

12   out of state?

13        A.    After my mother married Alejo Ochoa, yes, we

14   did.  We went to California.

15        Q.    Okay.   And do you have memories of that

16   experience?

17        A.    Yes, I do.

18        Q.    Okay.   What was the purpose of the travel

19   adventure out to California with Alejo and Donna?

20        A.    My father was a street minister and they would

21   go around to different churches and do ministry work and

22   that's what they did.  I don't --

23        Q.    Okay.   Do you have memories of that period of

24   time?

25        A.    I do, actually.  I do.


                TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          Q.    Do you recall living arrangements, the

2    environment that you grew up in?

3          A.    I recall a fifth wheel trailer.  I recall a

4    small blue Volkswagen van that was also blue and had a white

5    top with flower curtains in it, and a bus that had been --

6    the inside had been redone into living arrangements.  There

7    was a bedroom, bathroom and small kitchen area type thing.

8          Q.    Okay.  So a bus converted into --

9          A.    Living quarters.

10         Q.    -- a mobile home?

11         A.    Yeah.

12         Q.    Living quarters?

13               Okay.  Do you recall at all was there a pastor

14   or a director of this troupe so to speak?

15         A.    Yes.  His name was Rick.

16         Q.    Okay.  And do you remember Rick?

17         A.    Yes, I do.

18         Q.    His influence on the group?

19         A.    The whole time that we were traveling around,

20   it always seemed to me that like he was one who was in charge

21   who told us what to do, how to do it and everything.  Even

22   more so than my father.  I actually probably took more orders

23   from Rick than I did my dad.

24         Q.    What age are we talking about here?

25         A.    Probably 6 to 9.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    Q.   Okay.  At some point in time was the decision

2    made to come back to Arizona?

3    A.   Yes, sir.

4    Q.   Okay.  Do you recall the basis for that

5    determination?  Were you involved in that procession?

6    A.   I wasn't involved in that process.  But the

7    only thing I remembered about it is that it was a secret and

8    I remember coming back to Arizona under -- like, it was a

9    secret type thing.  Being that small I didn't understand what

10   was happening, but --

11   Q.   Okay.  All right.  Where did the family unit --

12   I assume we're talking about Alejo, Donna and yourself at

13   this point.  Where did you guys wind up here in Arizona?

14   A.   At my dad's mom's house --

15   Q.   Okay.

16   A.   -- in Casa Grande.

17   Q.   All right.  So was Alejo originally, his

18   family, from the Casa Grande area?

19   A.   Yes.

20   Q.   Okay.  Did Donna have any connection with Casa

21   Grande?

22   A.   I believe so.  Before we traveled, my mom

23   worked down here, down in Casa Grande.

24   Q.   All right.  So this was a logical place to

25   return there, he had roots there, kinships in Casa Grande?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          A.     Yes.

2          Q.     Okay.  Where did you move into?  I mean, what

3    was the setup when you got back to Casa Grande?

4          A.     Well, it was my -- my nana's house.  She had --

5    1, 2 -- 3 bedrooms, and one bathroom.  And my nana, my

6    cousin, my aunt lived there, and then I remember my mom, dad

7    and I moved in too.

8          Q.     Okay.

9          A.     I don't know the length of time we lived there,

10   but it was for a little while so we could get our own house.

11         Q.     All right.  At some point in time did Alejo,

12   Donna and you find a place of your own?

13         A.     I remember moving to a little house.  It was on

14   12th Street and it was a little bitty tiny house, and I

15   remember it having a tin roof because every time it rained

16   you could -- it was very loud.

17         Q.     Okay.

18         A.     But, yeah.

19         Q.     All right.  What business or -- or things did

20   Alejo do at that point in order to provide for the family?

21         A.     I remember my dad being in construction with

22   Gallo Construction.  I also remember him working at Foxworth,

23   which is a very small version of like a Home Depot or

24   something.  It's carpentry-type stuff.  I remember him doing

25   things like that, and also working still with a church that

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    was in town called 91st Psalm.

2              Q.     Okay.  So was that the church that he was

3    affiliated with before you folks went over to California, is

4    that something he found on his return?

5              A.     I believe that before we went to California we

6    actually went to church at like in people's homes or at -- in

7    a business that had been closed for the day.  I don't think

8    there was an actual church building we went to.  I don't

9    recall that.

10             Q.     Okay.  Would your father, under those

11   circumstances would he be the pastor or the preacher or the

12   person leading the services?

13             A.     One of them.  They would take turns.

14             Q.     All right.  Come back to Casa Grande.  He now

15   allies himself with the 91st Psalm Church.  Is your mother

16   a -- a congregant, I guess the word is, at 91st Psalm as

17   well?

18             A.     Yes.  And she actually participated in the

19   church in several different ways.

20             Q.     In what capacity?

21             A.     I believe she did some secretarial work.  At

22   first that's mainly what she did.  Later on I know she helped

23   with the school we have there too.

24             Q.     All right.  How old are you now at this point?

25             A.     Around 9.

1     Q.     Okay.  Are there traditional Sunday services at

2     this church?

3     A.     Yes.  We had service every Sunday morning.

4     Well, we had Sunday School first and then Sunday service, and

5     then we had Sunday night service, and we also had a Wednesday

6     night service.

7     Q.     All right. And your father Alejo, is he a -- a

8     lay minister or participant in the preaching --

9     A.     Yes.

10    Q.     -- of this church?

11    A.     He wasn't the main pastor.  He was -- I don't

12    know if his official title was youth pastor, but I believe

13    that's what it was and he would fill in if the main pastor

14    wasn't available to run the service.  But my father's main

15    job there was actually doing children's church, and on

16    Wednesday night he would also do teen group.

17    Q.     Okay.  And those concepts, they're pretty much

18    self explanatory services for that age group?

19    A.     Yeah.  Children's church -- I remember he

20    actually drove around the neighborhoods in a bus and picked

21    up children whose parents didn't come to church, but they

22    wanted their kids to go, and so he had quite the, you know,

23    puppet shows and, you know, quite the thing going on to

24    entertain the children in a way they would also be educated

25    about the Bible.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1      Q.    Okay.  Is there a certain sect or denomination

2  we're dealing with here in terms of this particular church?

3      A.    My understanding of it is that it is

4  nondenominational, just a faith-filled Bible-believing

5  church.

6      Q.    Okay.  I guess we could differentiate -- let me

7  go back -- tell me what it isn't.  Is it Catholic?

8      A.    It is not.

9      Q.    Is it Muslim?

10     A.    No.

11     Q.    Is it Buddhist?

12     A.    No.

13     Q.    Okay.  What's the main thrust of the teachings

14  of this particular --

15     A.    We believe in the Holy Bible and we believe in

16  the Trinity -- God, the Father, and Jesus, his Son, and the

17  Holy Spirit.  They're three in one.  And that Jesus came

18  and --

19     MR. MARTINEZ:  Objection.  Relevance.

20     THE COURT:  Overruled.  Go ahead, finish the

21  question.

22     THE WITNESS:  Around, oh, 2000 years ago, he died on

23  the cross for our sin, rose from the dead, and as long as you

24  accept him as your Savior in your heart, then you'll go to be

25  with the son.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000004687

```
 1     BY MR. PATTERSON:

 2          Q.    Okay.

 3          A.    That's --

 4          Q.    More or less traditional Christian fundamental

 5     belief --

 6          A.    Yes.

 7          Q.    -- system?

 8          A.    Yes.

 9          Q.    Okay.  And in terms of, if you can understand

10     conceptually that continuum, where would the teachings of

11     that church lie on the kind of continuum of Christianity?

12          A.    I'm not -- I can't answer that.

13          Q.    Okay.  That's a lawyer question.  I apologize.

14     I'm trying to just find out how fundamental is this

15     fundamental church?

16          A.    The church was very -- very strict.  We --

17          Q.    Okay.

18          A.    Whatever the Bible says, that's what you

19     follow.  You obey your parents, you don't sin.  If you do

20     sin, I mean, it's a pretty major thing to the point where if

21     somebody's doing something wrong in the church, the -- the

22     pastor, whoever, will confront you and, you know, hope that

23     you straighten out.  And if you don't, you are asked the

24     leave the church.

25          Q.    Okay.  How big was this congregation when you
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000004688

1    folks first arrived?

2           A.    I don't recall when I first arrived.

3           Q.    Okay.

4           A.    Maybe like 100, 150 people.

5           Q.    All right.  Who was the pastor initially?

6           A.    Calvin Lords was the pastor.

7           Q.    Okay.  Was he the founder of the church too?

8           A.    I believe so, yes.

9           Q.    Okay.  At some point did the mantle of lineup

10    transfer to some other pastor?

11          A.    It did.  It went to Pastor Tom King.

12          Q.    All right.  And how old were you when he

13    assumed the lineup role there at 91st Psalm?

14          A.    I'm not real sure.  11, 12, maybe.

15          Q.    All right.  Was there a school associated or

16    affiliated with that particular church?

17          A.    Yes, there was.

18          Q.    Okay.  And what was the grade level?  And we'll

19    get into grades or -- not in a public school sense, but what

20    was the range of -- of student ages, if you will, in that

21    particular school?

22          A.    The school went from prekindergarten all the

23    way through high school.  You could graduate from there and

24    it was called Accelerated Christian Education.  That was

25    based out of Texas and it's a Southern Baptist curriculum.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000004689

1    Q.    Okay.  And tell me how particularly it worked.

2   Did you have kind of conventional teachers and student grade

3   groupings and promoted, you know, one year to the next, that

4   kind of thing?

5    A.    No.  It's more old-fashioned.  At -- what we

6   did was say all of the children from what you would consider

7   first grade through junior high would sit in one large

8   learning center.  It's just one large room and we had desks

9   that faced the wall and dividers between each of us, and we

10  would sit there and do our school work.  And if we needed

11  help, we would raise a flag and a supervisor or a monitor

12  would come over and assist you with your learning.

13   Q.    Okay.  And was the learning skills, were they

14  broken up into certain little increments so to speak?

15   A.    Yes.

16   Q.    What were they called?

17   A.    Basically one traditional grade was made out of

18  twelve paces, which are little booklets.  So take math for

19  instance.  If you were doing your second grade math, you

20  would have twelve math books and each one of those were

21  called "paces."  And whenever you finished those twelve, you

22  have basically finished second grade and you could move on to

23  the next grade.

24   Q.    Okay.  So it wasn't contingent upon a calendar

25  year?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000004690

1       A.    No.

2       Q.    As soon as you were at that point where you

3   could be promoted, you were promoted to the next level?

4       A.    Right.  We didn't even call it a promotion

5   because you just worked at your own pace and children who

6   wouldn't complete their work as quickly were not compared

7   with ones who went quicker, so there was no embarrassment if

8   you couldn't work as fast.  Or if you could work quickly,

9   there wasn't really a reward for that either.

10       Q.    Okay.  Were religious themes kind of involved

11   in this educational process at all stages and all levels?

12       A.    Most definitely.  The paces, as I said, for the

13   curriculum was Southern Baptist, which is very traditional,

14   very strict, very -- like girls wear dresses below their

15   knees and no more than two fingers blow your collar bone, no

16   make up, buns in the hair, that type of thing, and so those

17   were the people who actually put together this curriculum.

18   Well, in the curriculum they used a boy and a girl to talk to

19   each other at -- in order to relay instructions to you.

20       Q.    Okay?

21       A.    And those were always biblical based.

22       Q.    Give me a for instance.

23       A.    Just off the top of my head, I could think of

24   most popular, everybody knows Noah's Ark, how the animals

25   came in two-by-two.  That would be something used to help

1    with your multiplication tables or teach the concept of

2    adding two plus two.

3              Q.    And those themes are woven into all of the

4    subject matters?

5              A.    Yes, they are.

6              Q.    Okay.  And how did you begin your day?

7              A.    We began our day saying actually a prayer.  We

8    did the Pledge of Allegiance, and just had a basic -- we

9    read -- oh, we also read a chapter out of the Bible that

10   was -- we had a certain one assigned each month that we had

11   to memorize, so we had to read that over in the morning if

12   somebody was ready to recite it from memory at that time.

13   Everybody would listen to them stand up and say their

14   scripture.

15             Q.    Okay.  And each day was there a one subject or

16   one period set aside for the study of scripture and study of

17   the Bible?

18             A.    Yes.  On Tuesdays and Thursdays we had a class

19   called Devotions where we could leave the ordinary learning

20   center and go to another room, and my father taught that and

21   what that is is Bible study.  You take certain parts of the

22   Bible and he explains it to you in a way you could understand

23   and learn how to apply it to our own lives.  On Wednesday

24   morning we went to an actual church service where there was

25   music first, preaching afterwards, and then we'd return to

1    school.

2        Q.    Okay.  And what kind of ideals did they

3    instruct you about?

4        A.    Basically everything that is in the Bible is

5    how we're supposed to live our life.  We're supposed to

6    follow in Jesus' footsteps and so that's the main thrust of

7    everything.  It's -- it's basically love your neighbor as

8    yourself, love the Lord your God with all your heart, honor

9    your mom and dad, you know, the 10 Commandments, don't lie,

10   all that sort of stuff.

11       Q.    Particular ideals or scriptures given

12   concerning the role between husband and wife?

13       A.    Most definitely.

14       Q.    What were those?

15       A.    I grew up where my father was the head of the

16   household, decisions were made by him, and the mom is there

17   to support him in what he does and to help him assist him do

18   his job and his duties.  And you always -- you always obey

19   your father.  You -- so in -- I learned as being raised, in

20   addition in a husband and wife situation, the wife submits to

21   her husband and you do what he says.

22       Q.    Okay.  Were there certain subjects that were

23   not taught in your school?  For instance, Darwin's Theory of

24   Evolution?

25       A.    Right.  We were actually introduced to the

1    concept of evolution, but in such a manner it was false

2    because we believe in Creation and so we were -- you know, it

3    was like it was presented to you so you were aware of it, but

4    we were taught not to believe it.

5            Q.    Okay.  It was discredited as a theory?

6            A.    Yes.

7            Q.    Okay.  And you said it was explained or

8    contrasted with creationism.  What was that?

9            A.    Uh-huh, creation.

10           Q.    What was that?

11           A.    Creation as it is taught in the Bible in

12   Genesis Chapter 1, how God created the Earth in six days and

13   rested on the seventh.

14           Q.    Okay.  Were there home services during your

15   period of upbringing?

16           A.    Yes, there were.

17           Q.    Okay.  What were those all about?

18           A.    We would have Bible study groups at home or

19   like my father would do devotions with his family a lot.

20   Sometimes -- I remember sometimes going over to, when Calvin

21   was the pastor, going over to his house and having home

22   meetings also.  And if somebody was wanting to teach like a

23   certain subject or whatever, you would go to their house and

24   there might be a book or something that people were going

25   through and everybody would get together in these little like

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000004694

1    cell groups and do more in-depth Bible study.

2         Q.    Okay.  But the topic of discussion always was

3    the scriptural teachings of the Bible?

4         A.    Yes.

5         Q.    Okay.  Did your family socialize back at that

6    time frame?

7         A.    With other church members, yes.

8         Q.    Okay.  And the subject matter of your

9    socialization was what?

10        A.    Occasionally I recall us playing some board

11   games.  I recall one time they were showing movies on a

12   Friday night and we got to watch Sound of Music or Old

13   Yeller, and in particular I remember the Rocky movies.  And

14   the reason why we got to watch the Rocky movies is because we

15   never gave up.  He had a goal and did everything he had to do

16   to reach that goal.  And our school is very goal-oriented.

17   We state our own goals so it's drilled in us that you --

18   you -- you set goals and you work until you meet them.

19        Q.    Okay.

20        A.    So not meeting your goals, that's not accepted.

21        Q.    All right.  In the social context were there

22   certain activities not allowed or prohibited?

23        A.    Yes.  We were not allowed to dance or drink or

24   smoke or listen to secular music.  Pretty restricted on

25   wearing makeup and the types of clothes that you wore.  They

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    had to get approval by your parents.  You couldn't go

2    cruising around, hang out in the parking lots, couldn't go to

3    R-rated movies.  Even some of them that were PG-13 I wasn't

4    allowed to watch.  No dating.  No prom, no -- just --

5         Q.    Okay.  The activities that you were allowed to

6    participate in, were your folks always around, were there?

7         A.    Yes.  Because my father was the youth pastor,

8    my home was the one where we would invite a lot of teenagers

9    or younger kids over and we'd have like a fun night at my

10   house and that would be like playing games and doing

11   scavenger hunts, things like that.

12        Q.    But it was group activity --

13        A.    Uh-huh, group activities.

14        Q.    -- under the watchful eye of your father, the

15   associate --

16        A.    And my mom, yeah.

17        Q.    -- pastor?

18        A.    Yes.  He also took us camping, which was fun.

19   He would -- him and other couples would take all the kids

20   camping and a couple of summers I did -- was able to go to

21   camping, but it was -- it was the Assembly of God camps, so

22   it's another kind of Christian --.

23        Q.    Okay.  And was the focus of that camp the

24   teaching

25        A.    Uh-huh.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1     Q.     -- of scripture and --

2     A.     Yeah.

3     Q.     -- analysis, if you will, of the Bible?

4     A.     Yes.

5     Q.     Okay.  At some point in time did you change

6  headmasters or directors, if you will, to the high school

7  there at 91st Psalm?

8     A.     Yes.  At one point the principal and his wife's

9  name was Mr. And Mrs. Keeting (phonetic), Mark and Nancy, and

10  I know when they came in, they brought in some programs to

11  the school such as sports that we had not had before.  They

12  started a track team and --

13     Q.     All right.  Was there a reason for kind of

14  opening up the curriculum somewhat in terms of was there a

15  decline in the enrollment?

16     A.     Yes, there was.

17     Q.     Okay.  Tell me about that.

18     A.     Well, the school really -- the school was kind

19  of a reflection of the church and so the church membership

20  declined you wouldn't see as many kids in school, and so I

21  believe that they were brought in to try to make the school

22  more well rounded.

23     Q.     Okay.  A little more mainstream, if you will?

24     A.     I believe so.

25     Q.     Okay.  To that end what did they do?  Did they

1    implement some new programs?

2          A.    Mm-hmm.

3          Q.    Loosen it up a little bit?

4          A.    Well, they brought in sports is what they did.

5          Q.    Okay.  Tell me about that?

6          A.    Mr. Keeting started a swim -- swim team, swim

7    club, and his wife started a track team.  And that was pretty

8    fun.  Most everybody participated in that.

9          Q.    All right.  Were you a member of one or the

10   other team?

11         A.    Just the swim team, I was.

12         Q.    All right.  Tell me about your participation in

13   that program.  Was it a daily event?

14         A.    Yeah.  It was pretty grueling.  Mark had been a

15   swim coach before and had competed in swimming back east

16   wherever he was from, and we would -- at times we would have

17   swim practice in the morning before school, then go to

18   school, and then after school we'd have swim practice again,

19   then three times a week we also lifted weights.

20         Q.    Okay.  And I assume the 91st Psalm or Harvest

21   Christian Academy didn't have a swimming pool?

22         A.    No.

23         Q.    Where did you --

24         A.    We actually used the pool out at Central

25   Arizona College, which was about a 20-minute drive from us.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1         Q.    And did the fact that you had to go to a

2  different site for swim team have an influence on your

3  development?

4         A.    Well, at one point Mark Keeting started helping

5  coach the Casa Grande Union High School swim team and that

6  brought -- that was my first introduction to kids outside of

7  my church realm.

8         Q.    Okay.

9         A.    So that -- that was interesting.  It was

10  really -- we were very shy, didn't know how to talk to them

11  or how to socialize with them or anything.  It was -- we kind

12  of kept to ourselves, but we'd watch them, my friends and I

13  on the swim team, watched their behavior to see how they were

14  because we just weren't sure.

15         Q.    Okay.  And how old were you at this point in

16  your life?

17         A.    14, 15.

18         Q.    All right.  So just to kind of understand

19  what's going on here, up to age 14 or 15, you had associated

20  with -- with who primarily?

21         A.    Well, my friends were usually when Calvin was 3

22  he had three daughters and I hung around -- they were --

23  that's who my friends were.  And then when Pastor Tom was

24  there, he had Shawn and Brad and Amy, and I hung around them

25  all the time too.  They were my best friends.

1        Q.    And as a result of this swim team opportunity

2    where you went to different locations, this was the first

3    time you met people that didn't share your same scriptural

4.   beliefs?

5              A.    Yes.

6        Q.    Is that a fair statement?

7        A.    That's correct.

8        Q.    Okay.   To that end, what did began to develop

9    here in terms of your perceptions and attitudes?

10             A.    Well, it was always communicated to us that

11   those people who went to the high school -- to the, you know,

12   public high school were rowdy and always sinning and were

13   just -- not bad people, but just people that would be a bad

14   influence on us, that you're not supposed to hang around them

15   because you're only supposed to hang around Christian people,

16   and that was my first time that I saw that I didn't think

17   that they were bad.  I didn't think that they were -- in fact

18   they seemed very fun.  And, you know, they would talk about

19   different things they would do and even some of those kids

20   went to different churches in town and were still allowed to

21   do all those things like go to the movies, something just as

22   simple as after swim practice, they would go to McDonalds and

23   I would want to go but I couldn't go.  I wasn't allowed to.

24             Q.    Okay.  What was your hair color back then at 14

25   or 15?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1       A.    Well, I was born blonde and it stayed blonde,

2  and while I was swimming it definitely stayed that way

3  because of the chlorine and the sun.

4       Q.    Okay.  Chlorine accentuated the --

5       A.    Most definitely.

6       Q.    All right.  Were there times back when you were

7  attending the school that you ran away from home?

8       A.    Yes, I did.

9       Q.    Okay.  In terms of numbers?

10      A.    When Calvin was the pastor of the church, and

11  as I said before, Kyrie (phonetic), his daughter, was my best

12  friend, and we had corporal punishment in school.

13      Q.    What do you mean by that?

14      A.    We would get spanked with what they called the

15  rod, and it was a wooden paddle.  And you could get spanked

16  for a variety of reasons, and some of them in our little

17  minds, we didn't feel it was exactly fair.  We didn't want a

18  spanking.  So one day right after school, we decided to

19  just -- we were going -- we were going to go -- this is

20  embarrassing, sorry.  We were going to go live in one of

21  those KOA campgrounds, and I don't know what we were going to

22  do, but we were just -- it was to escape some type of, you

23  know, punishment that we knew was coming.  And so as soon as

24  school was over, we started walking through the desert and

25  down some dirt roads.  Then we got hot and tired and just sat

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    there on the side of the road until somebody drove by and

2    picked us up.

3              Q.    Okay.  What age were you at that first --

4              A.    Had to be like 9.

5              Q.    Okay.  Were there other times?

6              A.    Well, Kyrie and I did that a couple more times,

7    just --

8              Q.    Kyrie is the daughter of the original pastor?

9              A.    Uh-huh.

10             THE COURT:  Is that a "yes"?

11             THE WITNESS:  Yes.

12             THE COURT:  Make sure you give a verbal response.

13   Thank you.

14             THE WITNESS:  Yes, sir.

15   BY MR. PATTERSON:

16             Q.    All right.  So that happened a couple of

17   occasions, two or three occasions?

18             A.    Two or three times.

19             Q.    There was another time --

20             A.    Yes.

21             Q.    -- where you had enough and you tried to --

22             A.    Well --

23             Q.    -- make a change in your lifestyle?

24             A.    When I was 15 years old, my mom worked out at a

25   place called Ak-Chin Farms, and her boss was Mr. Don England.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1      Q.    Is that a tribe out in the Casa Grande area,

2  Maricopa County area?

3      A.    Uh-huh, Maricopa County area.

4      Q.    Okay.

5      A.    And his two children went to our school.  The

6  son was about my age and the daughter was a couple years

7  older.  And she used to drive to school everyday and she had

8  quite a lot of freedom.  They weren't raised the same way we

9  were raised.  They attended church, but they weren't really

10 involved with church, if that -- if you could understand the

11 difference.

12     Q.    Uh-huh, sure.

13     A.    They were Sunday-goers instead of actually

14 living that as your lifestyle.  Well, Susie would come to

15 school sometimes with pink hair, or, you know, she was just

16 kind of a little bit more outgoing than what we had ever

17 seen, and I felt that some of the things that I wanted to do,

18 like if I wanted to go to the State fair or if I wanted to go

19 to the movies or something like that, I didn't feel like it

20 was unreasonable and I didn't understand why my mom and dad

21 wouldn't let me.  So one day after school I told Susie, I

22 said, you know, can I go home with you because, you know, I

23 wanted to talk to her mom.  I really liked her mom, Martha.

24 And so Susie said, well, do your mom and dad know?  And,

25 well, no, they don't, but I said that they would let me go.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

```
 1    Anyways, I got in the truck and went home with her.  And I
 2    remember crying on Martha because I thought it was so unfair.
 3    I'm growing up around these kids from the swim team, around
 4    even your own mom's bosses kids who could watch things --
 5    like I wanted to watch the movie "Grease" and I wasn't
 6    allowed to, so I kind of cried on Martha's shoulder.  I
 7    wasn't running away, but I needed somebody to speak to my
 8    parents for me because they weren't listening.
 9         Q.    Okay.  How long did this venture last?
10         A.    I only stayed there overnight.  The next day I
11    went back to school and went home, and actually it was a good
12    thing because my parents sat down with me, talked with me and
13    really listened to me.
14         Q.    Okay.  Does that cover your --
15         A.    Yeah, that's it.
16         Q.    -- rebellious youth?
17         A.    That's all I did.
18         Q.    All right.  Tell me a little bit about the
19    relationship, the family relationship, between your father
20    Alejo, your mother, Donna, and yourself, the family dynamics.
21    Who was in charge of the home, so to speak?
22         A.    My father.
23         Q.    Okay.
24         A.    My father was definitely in charge.
25         Q.    All right.  Was it in the nature, I guess,
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000004704

1   where he would share decision-making responsibilities with

2   mom or did he make the decisions?

3          A.    No.   In fact because my father was part of the

4   church, there was a lot of things that went on in the church

5   that he was not able to share with my mother, and so I really

6   feel like a lot of things were just done by my dad and we

7   didn't even know what was going on, you know, if there was

8   problems going on in the church or whatever, and that just

9   carried over into our family life.   My dad would decide

10  everything.

11         Q.    For instance, give me an example of his -- his

12  decision making.

13         A.    Well, at the -- okay.   The only thing I recall

14  my mom making decisions would be sometimes if she would go

15  out to eat, she would decide because my dad didn't want to

16  decide.

17         Q.    She picked the restaurant?

18         A.    Picked the restaurant.

19         Q.    With that exception, all other major decisions

20  were made by your father?

21         A.    Oh, yes.

22         Q.    Okay.

23         A.    And the reason why is because he's the one

24  that, you know, he prays and asks God what God wants him to

25  do, so my mom trusts in that and trusts that my father's

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000004705

1    hearing from God and then follows those decisions.

2              Q.    Okay.  And did you share in that belief that

3    your father had kind of a right to make the decisions in the

4    family?

5              A.    Sure.

6              Q.    Okay.

7              A.    Yes.

8              Q.    Did your father also have a temper?

9              A.    Yeah.

10             Q.    Okay.  Describe it for me.  How extreme was his

11   temper?

12             A.    (No response.)

13             Q.    Take your time.  Have a sip of water.

14             A.    There was a lot of yelling between my --

15   actually more my father yelling at my mother or my father

16   yelling at me because there was a lot of frustration with

17   being a minister in a church and so we would get the brunt

18   end of it.

19             Q.    Okay.

20             A.    One of the things -- it's just hard because I

21   love my dad, you know.

22             Q.    I understand.

23             A.    He would yell about all kinds of stuff.

24             Q.    For instance?  Give me an example.

25             A.    After school --

1          MR. MARTINEZ:  Judge, could we have some foundation

2   of when he did this yelling?

3          THE COURT:  I'll sustain the objection.

4   BY MR. PATTERSON:

5          Q.    Okay.  Growing up you were in Casa Grande,

6   right?

7          A.    Yeah.

8          Q.    Okay.  How old are you when you first begin to

9   perceive your father has this significant temper?

10          A.    I had seen it when we were traveling in

11   California.

12          Q.    Okay.

13          A.    I had not seen it before then.  When we moved

14   back to Casa Grande is when it actually got a little worse.

15   When we lived at my nana's house, my mom and dad would go

16   outside and have their arguments, but of course you could

17   still hear them.  And it probably happened I wouldn't say on

18   a daily basis, but, I don't know, three, four times a week or

19   so that there would be an eruption.

20          Q.    Is this continuing throughout your --

21          A.    Yeah.  This is just --

22          Q.    -- teenage years while you were living at home?

23          A.    Yes.

24          Q.    All right.

25          A.    Until the day I moved out, that was my life.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    That was part of my life at home.

2        Q.    All right.  What kind of things would upset

3    your father?

4        A.    Well, some things I wasn't aware of.  I don't

5    know what was going on in the church, the people or whatever.

6        Q.    Okay.

7        A.    He would be upset about that.

8        Q.    What would the manifestations of that upset be?

9    When he would come home, what would you observe he and

10    mother do?

11        A.    Well, my mom and I seemed to get yelled at for

12    any little thing that wasn't done right, if the house wasn't

13    clean or if my mom would come home from work and hadn't made

14    dinner yet, so I had learned at an early age to make dinner

15    and make sure that was ready so my dad wouldn't be upset.

16        Q.    Okay.  And in terms of yelling --

17        A.    Yeah.

18        Q.    -- what kind of yelling are you talking about?

19        A.    He didn't curse at us.  It was just yelling.

20    He was -- he has one of those really bad tempers where, you

21    know, you start to break out in a sweat and yelling to where

22    you're halfway down the street you could hear it.  It was

23    embarrassing.

24        Q.    Would he throw things periodically?

25        A.    Yes, he would.

1        Q.      Okay.  What would he throw?

2        A.      Well, I remember specifically one day he --

3        MR. MARTINEZ:  Foundation for this day?

4        THE COURT:  Lay some foundation.

5  BY MR. PATTERSON:

6        Q.      How old are you when this happened?

7        A.      I'm about 14 years old.

8        Q.      Okay.  At the home there in Casa Grande?

9        A.      Uh-huh.  We're at the house and he was in the

10  living room, and I don't recall what he was mad about because

11  it was between my mom and him and I was standing in the

12  hallway just kind of waiting to see what was going to happen.

13  And it was silly, but he took his -- all the change that he

14  had in his pocket and threw it up against the wall.  And

15  later on he looked, and we actually laughed about it later,

16  but, I mean, there were imprints of the coins on the wall.

17  He didn't throw things a whole lot, I mean, but just

18  occasionally.

19        Q.      How would you react to your father's outbursts?

20        A.      It would scare me.  He's scary when he's mad.

21        Q.      Okay.  What would you do?

22        A.      If it was at me and my mother, then we would

23  either usually go to the bathroom or to her bedroom and shut

24  the door and hope he wouldn't come back there and keep on,

25  because usually if it's out of sight he would calm down or he

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000004709

1    would leave and drive away.  He'd come home a couple hours

2    later whenever he was cooled down.

3         Q.    Okay.  Did you witness your mother making any

4    efforts to try and placate him or calm him down?

5         A.    My mom and I both did that.

6         Q.    What would you do?

7         A.    When he'd leave, you know, we -- when -- we

8    knew that he'd come back in an hour, maybe an hour and a half

9    or two, and when he got back we'd want to have dinner ready

10   for him.  Or, you know, his favorite thing was he liked to

11   lay on the couch and I'd always play with his hair and that

12   would calm him down.  And just things like that.  Just --

13   just talking softly to him and, you know, just trying to

14   please him.

15        Q.    Did you ever encourage your mother to leave

16   him?

17        A.    When I was older I had a conversation with her

18   about that.  But my mother had been divorced once and she

19   said when you do something twice you make it a habit.

20        MR. MARTINEZ:  Objection.  Hearsay.  And if we could

21   have the foundation.

22        THE COURT:  I'll sustain the objection.  Ask your

23   next question.

24   BY MR. PATTERSON:

25        Q.    When did you have this conversation with your

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    mom?

2         A.    When I was about 17 years old.  Can I tell you

3    the whole incident or the --

4         Q.    Yeah what lead to this particular conversation

5    with your mother?

6         A.    I had asked to go to a family reunion with

7    somebody.  It wasn't a date.  It was a family thing.  It was

8    a group thing, but, yes, it was with a guy I had met through

9    Christian school.  And my dad didn't want me to go because he

10    thought it was a date.  My mom said, no it's not a date and

11    yes, you can go, so I went ahead and went.  And when I got

12    back, my dad was outside in the backyard watering the trees.

13    And I went out there because I knew that he'd been upset and

14    I just would rather face it and get it over with.  And as

15    soon as he saw me, he started yelling at me and couldn't

16    believe that I disobeyed him and just was yelling and

17    yelling, just -- I can't tell you all the words, but just he

18    ended up backing me up against the wall in the back of the

19    house and he -- he put his hands on me, put his hands on my

20    shoulders, and he was starting to shake me.  And then

21    something inside of him, it was like -- like somebody snapped

22    in front of his face or I don't know what it was, but he

23    said, You know what --

24         MR. MARTINEZ:  Objection.  Hearsay.

25         THE WITNESS:  -- get out of my sight.

1          THE COURT:  Sustained.

2          MR. PATTERSON:  Well, no, impact --

3

4              (The following proceedings were held at the

5      bench:)

6

7          MR. PATTERSON:  Judge, our entire defense is based

8      upon this woman's -- how she was molded during the course of

9      her life from the male patriarchal figures in the family.

10     We're not offering what this gentleman said to her on that

11     date for the truth of matter asserted, but how she reacted

12     and how it formed -- formed her personality.  So it's not

13     offered as a hearsay truth.

14         THE COURT:  Mr. Martinez?

15         MR. MARTINEZ:  What's -- I understand what he's

16     trying to do, and I can understand --

17         MR. DELOZIER:  Excuse me.

18         MR. MARTINEZ:  -- why he wants to elicit that from

19     her, but I'm not telling him how to do it, how to do this,

20     but the better course would be did he raise his voice, what

21     was his demeanor, all of that.  The fact is, if it isn't

22     important, we can't hear it.

23         THE COURT:  What's she going to say he said?

24         MR. PATTERSON:  That she basically -- I don't know

25     exactly what she's going to say but, what he said to her is

1    basically, you know, we're in charge here and learn to live

2    with it.

3          THE COURT:  Okay.  I'll allow the question about her

4    state of mind going towards 13-414, so go ahead and repeat

5    the question.

6

7               (The following proceedings were held in open

8    court:)

9

10         THE COURT:  Mr. Patterson, restate the question,

11   please.

12         MR. PATTERSON:  Yes, Your Honor.

13   BY MR. PATTERSON:

14         Q.    You had a confrontation with your father at

15   this time and you're about, what, 17?

16         A.    Yes.

17         Q.    Okay.

18         A.    And the background was I disobeyed basically a

19   direct order.

20         Q.    Okay.  Did you father say something to you at

21   that point in your life that affected you?

22         A.    He directed me to get out of his face before he

23   hurt me.

24         Q.    Okay.

25         A.    And I took off running to my bedroom and shut

1   the door.

2           Q.     Okay.  So his anger had gotten to such a point

3   where he was capable, you believe, of him hurting you?

4           A.     That's what I thought, yes.

5           MR. MARTINEZ:  I'm going to object.  She's being

6   nonresponsive.

7           THE COURT:  Sustained.  That last portion will be

8   stricken.

9   BY MR. PATTERSON:

10          Q.     Why was that?

11          A.     That was because he had his hands on me and he

12  never put his hands on me before.

13          Q.     Okay.

14          A.     Besides spanking me.

15          Q.     Did that affect you in some fashion?

16          A.     That scared me.

17          Q.     Okay.  Were there any other incidents where

18  your father touched you improperly or harmed you physically?

19          A.     No.

20          Q.     How about your mom?  Mom do anything that

21  harmed you physically during the course of your growing up

22  there in Casa Grande?

23          A.     Because of the way we say the father is the

24  head of the household, there's not quite the level of awe and

25  respect with your mother as there is with your father, at

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    least in my family.  And so sometimes when I was smaller, I

2    would reveal -- you know, when you say something smart to

3    your parents or smart off, or you're not listening or

4    whatever the deal is, I would do that with my mom more than I

5    would my dad, and she would always grab my hair and pull me

6    by my hair.

7         Q.    Okay.  Anything else that --

8         A.    No.  She just -- that was her thing.

9         Q.    All right.  Let's talk about your dating

10   history back there in Casa Grande.  Who was your first

11   boyfriend?

12        A.    Shawn King.

13        Q.    Okay.  Who was Shawn?

14        A.    Shawn was Pastor Tom's son.

15        Q.    Okay.  And how old were you when you first

16   started going with Shawn King?

17        A.    Well --

18        Q.    And probably the term "going with" is a little

19   extreme.

20        A.    Yeah, that's not --

21        Q.    Okay.  Let me --

22        A.    That's not --

23        Q.    -- back off on that.

24        A.    Wesley, Shawn and I were very good friends from

25   the time we were 11 years old, 12 years old.  It was never a

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000004715

1   boyfriend, girlfriend type of thing, although as children,

2   you know, you pull each other's hair and chase each other

3   around the playground, things like that.  But when we got

4   older is when it became more of a --, boyfriend girlfriend

5   relationship as far as just like holding hands, but we -- our

6   first date was after I was 18 and that was chaperoned by my

7   mom and dad.

8         Q.   Okay.  Were there certain pressures on you

9   because of who he was and who you were in the school there?

10        A.   Once this began, it was pretty much expected in

11   the church that we would get married.

12        Q.   Did you do any socializing with him alone with

13   him at any time up to age 18?

14        A.   Alone?

15        Q.   Yeah.  Did you go out to the movie --

16        A.   Oh, no.

17        Q.   -- together, anything of that nature?

18        A.   No.

19        Q.   Okay.  Again, does that go back to what you

20   told me those kinds of activities were not preferred?

21        A.   Right.  We -- right.  We did group things, but

22   nothing by ourselves.

23        Q.   Okay.  At some point in time, age 18, you did

24   have the opportunity to go out with him?

25        A.   Uh-huh.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    Q.    And it was chaperoned by your father?

2    A.    Right.  Our first date was chaperoned and we

3 actually went to -- I don't recall the restaurant, but it was

4 a nicer restaurant and Shawn and I sat at our own table and

5 my mom and dad sat at their table nearby, and that was our

6 first date.

7    Q.    Okay.  Did you ever have any intimate relations

8 with Shawn King?

9    A.    We -- to a degree, yes.

10    Q.    Okay.  To what extent?  How far?

11    A.    We --

12    Q.    I know it's somewhat private, but --

13    A.    We never had sexual intercourse.

14    Q.    Okay.

15    A.    But we did experiment a little bit, you know.

16    Q.    Okay.  At what age did this begin?

17    A.    Well, around that time I had gone to Mexico so

18 it would have been, I don't know, 19?  I guess 19 years old.

19    Q.    All right.  Did you have some experiences with

20 some other boys there in Casa Grande?  And if so, tell me

21 about them?

22    A.    Yes, I did.  After I was 21, I wasn't dating

23 Shawn any longer and Barbara, my cousin, actually introduced

24 me to Casa Grande society and we started going out to

25 different places, and that was the first time I had ever

# APPENDIX I - Part 2

1    taken a sip of alcohol, it was the first time I'd ever been

2    to a dance, and yes, I did have -- I dated a few guys.

3              Q.    Okay.  And did you have a sexual relationship

4    with either of those two gentleman or both?

5              A.    I did with two people.

6              Q.    Okay.  And what were their names?

7              A.    One was Didos Gamez and the other was Vernon

8    Barnes.

9              Q.    Okay.  Let's talk about the Didos Gamez

10   circumstance.  How did that come about?

11             A.    I had seen him around, you know, at different

12   bars or whatever, and I actually think that we met at a

13   desert party in Casa Grande.  Lots of the kids go out in the

14   desert and light a big bonfire and everybody kind of hangs

15   around out there.  And my friends that I hung around, like

16   Barbara and Margaret, continually were teasing me that I

17   hadn't slept with somebody.

18             Q.    Okay.  That you were still a virgin?

19             A.    Yeah.

20             Q.    Okay.

21             A.    And so I -- I guess one night I decided that I

22   wanted to see what this was all about, and that's the person

23   that -- oh, my God.

24             Q.    I understand it's difficult.  How old were you

25   at this time?

1     A.    I was 21.

2     Q.    All right.  And frequency?  Did it happen once,

3  twice, was that it?

4     A.    Yeah, it was not what I expected and so it

5  didn't -- no, that was --

6     Q.    Okay.  So it was an effort on your part to lose

7  your virginity --

8     A.    Uh-huh.

9     Q.    -- basically?

10    THE COURT:  You need to say "yes" or "no."

11    THE WITNESS:  Yes, sir.

12     Q.    Okay.  There was another Casa Grande boy that

13  you had a brief relationship with?

14     A.    Yes, there was.

15     Q.    What was his name?

16     A.    His name was Vernon Barnes and he was always

17  out at the bars and stuff and he was a lot of fun to be

18  around and he -- they're a farming family and so he had a

19  brother named Chris and I'd go out to the -- out there to the

20  farm fielding with them and out to Gila Bend and different

21  places and stuff.  And then what happened was I found out

22  that he had a girlfriend and I didn't know about that, and it

23  was -- that was my first introduction to drama in a small

24  town city that -- it was -- I had no idea.

25     Q.    Okay.  Did you sleep with Mr. Barnes?

1       A.    Yes, I did.

2       Q.    And how many times did that occur?

3       A.    Not a lot.  It was only over a period of maybe

4   two months that -- that we -- oh, gosh, I don't know, seven

5   or eight times.

6       Q.    Okay.  Was that -- were there any other males

7   in your life prior to your meeting Joe Andriano?

8       A.    I had gone out with a couple of others but I

9   hadn't slept with them.

10       Q.    Okay.  In terms of your sexual experiences, it

11   was with Didos --

12       A.    Uh-huh.

13       Q.    -- and Mr. Barnes?

14       A.    Yes, sir.

15       Q.    Okay.  All right.  Let's -- would you tell me,

16   before we leave your growing up period, about the different

17   kinds of groups of kids that were in the Casa Grande area?

18       A.    Well, my cousin is Mexican as is my father.

19   Her crowd of people were more middle class, didn't always

20   have a car to drive.  You know, sometimes you have to file

21   in -- in with a friend that does have a car.  And then there

22   was another group that -- of kids that seemed to always have

23   brand new vehicles.  They hung around in a couple of

24   different -- Cotton Hill or like Dell's Pizza, and they all

25   stuck together pretty much.

1          Q.     Okay.  And what group did you run with

2     primarily?

3          A.     Well, see, what happened was, I -- I was with

4     Barbara and all her friends, but when we'd be in the bar, the

5     guys from this other group were the ones who always wanted to

6     know who I was and were trying to buy me drinks, things like

7     that.

8          Q.     Okay.  Could you categorize the other group

9     from what kinds of families did they come from?

10         A.     They're -- well, I -- we just called them the

11    "farm kids" because --

12         Q.     Okay.

13         A.     most of their familiar -- most of their

14    parents, their families, were into farming or into the

15    chemical sales or into something that had to do with farming

16    cotton or things like that.

17         Q.     Okay.  And was it your perception that group

18    was more affluent than the group you were running?

19         A.     Uh-huh.

20         THE COURT:  Is that --

21         THE WITNESS:  Yes.

22         THE COURT:  -- a "yes"?

23         THE WITNESS:  Yes.

24    BY MR. PATTERSON:

25         Q.     All right.  Each group kind of hung to

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000004721

1    themselves or stuck with themselves?

2         A.    Yes, they did.  Joe was part of that group, and

3    when I met Joe, he kept me very much away from that group of

4    people until he had -- we had solidified a relationship

5    between us.

6         Q.    All right.  We'll come back to that.

7         A.    Okay.

8         Q.    Let's go now to your job history.  At what age

9    did you first go out and become gainfully employed?

10        A.    It was the summer of -- I was 15, and the

11   summer that I was 16 my mom worked, as I said before, at

12   Ak-Chin Farms.  She was a bookkeeper and Don England let me

13   come out there and he put me on the payroll to help do, you

14   know, little office things.

15        Q.    All right.  And was the opportunity that was

16   presented to you for jobs kind of coordinated through your

17   church?

18        A.    Yes.  My first few jobs were for people in the

19   church.

20        Q.    Okay.

21        A.    Unofficial jobs I'd like to talk about.

22        Q.    Sure, Uh-huh.

23        A.    One of the things with our school is that the

24   end of the year we always had a competition that we wanted to

25   go to.  It was a state competition, and then it went to a

1    national level or international, actually.  And one of the

2    things is that we had to pay for our trips.  And so several

3    families from the church were really -- they're wonderful to

4    work for.  They would hire you for the day and you would

5    clean windows, get weeds out of the yard, you would babysit,

6    I mean, anything that needed to be done, and they're very

7    good about helping us do that so we could earn the money to

8    go on our trip.

9         Q.    Okay.

10        A.    So I've always done that.

11        Q.    Okay.  There was some kind of expectation that

12   you should work at an early age --

13        A.    Yes.

14        Q.    -- in terms of the teachings of your --

15        A.    Well, even during school from 3:00 to 3:30 we

16   had chores we all had to do.  That was just part of -- and

17   then I know we'd have workdays on Saturdays or we'd come and

18   clean up the church grounds.

19        Q.    Okay.

20        A.    So working was -- and I always helped my dad

21   clean the church too.

22        Q.    All right.  While we're on the school topic,

23   did you ultimately graduate from this Harvest Christian

24   Academy?

25        A.    Yes, I did.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1      Q.    How old were you?

2      A.    Was in '89, so I was 18.

3      Q.    Okay.  Did you achieve or acquire any honors or

4  awards during the course of your high school experience?

5      A.    Yes, I did.

6      Q.    Can you go over them in general for me?

7      A.    I don't know all the terminology.  I just know

8  that I completed more than what was required, and so it was

9  something that you graduated with honors was always my

10  understanding --

11      Q.    Okay.

12      A.    -- of it.

13      Q.    How about in music?  Any awards in the --

14      A.    Yeah.  Every year I went to these competitions

15  now, so that was in between several ACE schools, I would win

16  awards a lot in music, piano, poetry recitation, short story

17  writing, sewing, things like that.

18      Q.    Okay.  Was there an award for memorizing

19  scripture?

20      A.    Oh, that's right.  My -- the one that -- it was

21  a new one that had come out and several of us in school did

22  it, but it was to memorize the Book of Proverbs within a

23  certain amount of time.  And -- and I did that and received

24  a, I think it was, like a bronze apple that sat on --

25      Q.    Okay.

1    A.    -- a plaque.  It was really nice.

2    Q.    Okay.  Let's go back to your jobs here.  First

3    true job, if you will, with working at Ak-Chin, kind of your

4    mom's gopher?

5    A.    Right.

6    Q.    Okay.  What was your next position --

7    A.    My next --

8    Q.    -- of employment?

9    A.    Given to me by "John Casey," we called him.

10   That was Pat King's father.  Pat King is Pastor Tom's wife.

11   Q.    Again, was this acquired through the good

12   graces of your church membership?

13   A.    Yes.

14   Q.    Okay.

15   A.    Yes.  And he was the manager of a place called

16   the Federal Compass, and that was in Picacho and that was in

17   a place where cotton was like ginned or whatever and then it

18   was put into bales and then we'd weigh the bales with cotton

19   and they would sit there until it was sold.  It was kind of a

20   big warehouse type of thing.

21   Q.    Okay.  And what was your task or assignment at

22   that particular location?

23   A.    I rode on top of what looks like a fork-lift,

24   but actually it has pinchers on the front of it and it would

25   pickup a bale of cotton.  And each bale is tagged and then

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000004725

1     this machine would weigh it and I would have to write down

2     the weight next to the tag.

3          Q.     All right.

4          A.     And the two guys that drove the machine were

5     members of our church also.

6          Q.     Okay.  All right.  Who was the owner again of

7     this particular enterprise?

8          A.     Not the owner, he was the manager, but we

9     called him John Casey.

10         Q.     Okay.  What was your next job?  Did you work

11    for a man named Charlie Peterson?

12         A.     Oh, I did, yeah.

13         Q.     What did he do?  What was the name of his

14         A.     The Peterson's also went to our church and the

15    pastor's sister was his secretary and I believe that she was

16    going to be leaving, and so somehow or the other I was hired

17    for the job and so I was -- it was Peterson Machinery and

18    what they had was big like drills and lathes and just all

19    this big machinery.  I don't know really know what it was.

20         Q.     A machine shop?

21         A.     A machine shop, yeah.  And Charlie Peterson was

22    the owner.  And my first week working there, this man -- the

23    man would always be upset about something.  I could hear him

24    on the phone yelling.  It was a pretty high stress business.

25    So -- I'm used to the yelling, you know, so that was okay.

1    But one day he brought it up -- he brought it out of his

2    office and came by me and -- and the little thermostat that

3    you have on the wall --

4        Q.    To adjust the temperature?

5        A.    Right, to adjust the temperature, as he's

6    yelling he strikes it with his fist and it just comes off --

7    flying off the wall.  And then he went storming out in the

8    machine shop, and that was the first time I had seen him do

9    something physically and I didn't know what to do.  I didn't

10   want to be around that, so I called my dad because I just

11   bought a car and I didn't know what to do.

12       Q.    Okay.  And --

13       A.    And my dad said that I could go ahead and just

14   leave and come home.

15       Q.    And did you resign your position there?

16       A.    I just walked out, yes.

17       Q.    Okay.  Were there efforts made to try to bring

18   you back?

19       A.    Yes.  He had a partner in Florida, his name was

20   Dan, and Dan called me at home and tried to smooth things

21   over and apologize and say this wouldn't happen again and --

22   and it was really hard for me to say no.  I wanted to go

23   ahead and go back to work for him, but I talked about it with

24   my dad and he said, you know, it will happen again.  So he

25   went ahead and got on the phone with Dan and told him I

1    wouldn't be coming back to work.

2         Q.    Again, what was the reason for your decision to

3    leave that particular position of employment?

4         A.    Him striking out in anger at an object on the

5    wall that was so close to me, it -- I already lived in a home

6    where my parents yelled.  I didn't want to be in a work place

7    where I had to hear yelling too because I just --

8         Q.    Okay.  So your decision at that point was to

9    remove yourself from that environment?

10        A.    Yes, sir.

11        Q.    Okay.  All right.  After the Peterson machine

12   shop, what did you do or what job did you have?

13        A.    Well, now I had a car payment that I'm

14   responsible for and so my aunt had suggested I go down to

15   DES.

16        Q.    Okay.

17        A.    So --

18        Q.    Before we get there, let's back up a little

19   bit?

20        A.    Okay.

21        Q.    There was a period of time when you weren't

22   paid for a job but you were a missionary in Mexico?

23        A.    Yes.  I -- I went to Mexico and I was -- it was

24   there was a church in Yuma who is considered --

25        Q.    Let's set the time frame?


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1       A.      Okay.

2       Q.      When did this missionary trip occur in your

3   life?

4       A.      When I was 18.

5       Q.      Okay.  And it was after your graduation?

6       A.      After I graduated.

7       Q.      But before what job?

8       A.      But before Peterson Machinery.

9       Q.      Okay.  And what did that entail?  What was that

10  all about?

11      A.      Well, first of all, the church that I went

12  to -- actually, Pastor Tom may have paid for it out of his

13  pocket, but they sent me to the Berlitz School of Language.

14      Q.      Okay.  For what purpose?

15      A.      To -- I knew Spanish from my dad's family, but

16  I was not fluent in it at all and so it was to become more

17  fluent in Spanish.

18      Q.      Okay.  And --

19      A.      So I went to that and I completed it, and then

20  I went to Mexico with a sister church of ours.  The church is

21  located in Yuma and --

22      Q.      What's the name of that church?

23      A.      I don't know the name of it.

24      Q.      Okay.  Who was the pastor?

25      A.      Ray.  Pastor Ray.

1      Q.    Okay.  And was that church affiliated in some

2  fashion with the Harvest Christian --

3      A.    It was.  Pastor Tom always referred to Pastor

4  Ray as his pastor because he always said there was somebody

5  you needed to check and balance with.  So Pastor Ray did a

6  lot of missionary work down in Mexico, so he would be the

7  natural person to go to if you wanted to go to Mexico.

8      Q.    Okay.

9      A.    So he placed me with a church down there.

10     Q.    What city?

11     A.    In Mexicali.

12     Q.    All right.  And what part of Mexico is Mexicali

13  in?

14     A.    It's -- well, Calexico is on the other side, so

15  it's -- it's right south of the California border.

16     Q.    Okay.  Just across --

17     A.    Uh-huh, because --

18     Q.    -- the border between the two countries?

19     A.    -- the city I'm told had about a million people

20  in it, but I could take the bus and go ahead and walk across

21  the border into the United States.

22     Q.    Okay.  So it was along the border there between

23  the United States and Mexico?

24     A.    Yes.

25     Q.    Okay.  And was there a church in that city that

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1   you were assigned?

2          A.    Yes.   There was a little church there, and

3   they -- one of the things I did was help with their music

4   because they had a keyboard, so I helped somebody learn how

5   to play that and so they could have music in their church.

6                 And my main focus though was the kids.   I liked

7   to take the children and I would do Sunday school with them

8   while their parents were in the regular service so they

9   wouldn't be disturbed.   And we'd also go around to different

10   places and drop off clothes and toys to children and things

11   like that.

12          Q.    How long was your service as a missionary?

13          A.    It was 6 months to a year and I don't recall

14   exactly how long I stayed.

15          Q.    Okay.   How did you get down there in the first

16   place?  Did you drive a car, was there a car waiting for you?

17          A.    No.   I believe -- I believe my dad drove me

18   down there because I had a car during high school, but I

19   went -- I gave it away to the -- to the church in Mexico.

20          Q.    You donated the car --

21          A.    I donated it to --

22          Q.    -- the church?

23          A.    Yeah, I donated it, yes.

24          Q.    Okay.   There was an orphanage associated with

25   the church?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000004731

1          A.     It wasn't associated with, but there were

2     several orphanages around that our church and their church

3     collected pounds and pounds of toys and clothes for.   And

4     even the -- we'd take -- I don't know if we took food or not,

5     but and we would -- it's just so adorable because like a doll

6     that an American child wouldn't want to play with anymore --

7          MR. MARTINEZ:   Objection.   Relevance.

8          THE COURT:   Sustained.   Let's move on.

9          MR. PATTERSON:   This -- well --

10    BY MR. PATTERSON:

11         Q.     Did you do any charitable work with the

12    children?

13         A.     Uh-huh.   We would give the little kids toys and

14    they would be so happy.

15         Q.     Did this period of time away from your family

16    in Mexico influence you to a certain degree?

17         A.     Sure.   I had -- I had a taste of independence.

18    I could make my own decisions kind of.   Living out from

19    underneath your father is a whole new experience.

20         Q.     Okay.   To that end when you came back to the

21    states, did you make any changes in relationships that you

22    had previously?

23         A.     I did.   What happened is when I came back I had

24    the job at Peterson Machinery, and then after that I got a

25    job at Quail Garden Apartments, and with that job was an

61

1    apartment of my own.  So I -- 20 years old, I just moved out

2    into my own place, and it was really exciting.  And all

3    these, you know, during high school, all the kids that I had

4    seen that didn't necessarily follow the way -- the way our

5    church did, they didn't seem bad to me.  It didn't seem that,

6    you know, they were going to go to hell because they're

7    watching a movie or because they're eating at Burger King or,

8    you know, doing all those sorts of stuff.  But we know to the

9    degree of going out and having a drink of alcohol wasn't -- I

10   just wasn't seeing anything wrong with it.

11            So I think being on my own in Mexico, it was

12   the first step of me being able to make some decisions and

13   say I want to experience a little bit more of what is out

14   there before I decide where I want to live and how -- what my

15   relationship with God is going to be.

16        Q.    Okay.  In that regard did you have a discussion

17   with Shawn King about any possible relationship that you and

18   he might have?

19        A.    I did.  In fact we had several discussions

20   about it because at this time I'm wanting to go out with

21   Barbara and with the girls and I wanted to go dancing and

22   I -- I had been in a dance class in -- in Central Arizona

23   College and I loved it.  It was just -- it was fun for me.

24   And so going to a dance place where you could dance was fun

25   for me.  And Shawn at that time was still living at home I

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    believe and wasn't inclined to do those sorts of things, and

2    so I told him that I -- I needed to do this for myself.    I

3    needed to go out and experience life and see how I wanted to

4    be.

5            Q.    Okay.

6            A.    And so that meant that him and I -- I still

7    wanted to be friends, you know, like we had been friends

8    before, but I didn't want -- I didn't want to date anymore.

9            Q.    Okay.

10           A.    We had several conversations about that.

11           Q.    All right.

12           A.    But it was really -- that was very difficult.

13           Q.    Did it come to a head at some point?

14           A.    It did.  In my mind I thought it was clear that

15   we weren't dating anymore, that this was over, and one day he

16   came over to my apartment and was very furious because he had

17   found out that I had slept with somebody.  And I guess he

18   felt that I betrayed him.  And I --

19           Q.    Did you feel that you betrayed him?

20           A.    I didn't because I made it clear so many times

21   it's just that -- it just wasn't -- we just couldn't resolve

22   it, you know?  It just -- it's really hard when you grow up

23   with somebody like that and try to go -- let go of all that

24   kind of stuff.

25           Q.    All right.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          A.     So he had given me an emerald ring.  It wasn't

2    an engagement ring, but it was, you know --

3          Q.     Friendship?

4          A.     A friendship, more than -- you know, special

5    friendship ring.  And I remember him, he had grabbed my hand

6    and bit it.

7          Q.     Bit your hand or the ring?

8          A.     No, he bit the ring while it was on my hand and

9    jerked it off my hand.  And I believe he took the band with

10   him, but even this day I still have the emerald that came out

11   of it.

12         Q.     Okay.  Did he do anything else --

13         A.     Well

14         Q.     -- at that time?

15         A.     It was brought to my attention by the security

16   guard at the apartments that I lived at that he had gone and

17   broken some windows on the car.

18         Q.     All right.  Let's back up.  You didn't see him

19   do that?

20         A.     No.

21         Q.     Okay.  Did you make a police report as a result

22   of his conduct in terms of biting the ring?  Did you call the

23   police?

24         A.     No, I did not.

25         Q.     Okay.  At some point in time did the police

1    arrive?

2           A.    Yes, they did.

3           Q.    Okay.  But you hadn't called them?

4           A.    No.

5           Q.    Okay.  Because you hadn't seen --

6           A.    I didn't see that, no.

7           Q.    Okay.  At some point in time did they take you

8    to your vehicle?

9           A.    The apartments had an off-duty police officer

10   who also went to our church and received a discount off his

11   apartment in order to patrol or keep an eye on the grounds.

12   And he was the one who had seen that happen.  So I got a

13   knock on my door and said that he had called it in because

14   he's required --

15          MR. MARTINEZ:  Objection.  Hearsay.

16          THE COURT:  Sustained.

17          THE WITNESS:  Oh.

18          THE COURT:  Let's move on.

19          THE WITNESS:  I didn't --

20   BY MR. PATTERSON:

21          Q.    You didn't report it.  It was reported in some

22   fashion?

23          A.    Uh-huh.

24          THE COURT:  Is that a yes?

25          THE WITNESS:  Yes.


             TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          THE COURT:  Make sure you give a verbal response.

2     BY MR. PATTERSON:

3          Q.    At some point did the police arrive at your

4     door step?

5          A.    Arrived at my doorstep and I was --

6          Q.    Were you escorted to where your car was parked?

7          A.    That's where I first saw it.

8          Q.    Where?

9          A.    I saw some windows broken and I don't remember

10    her name, she's on the police report, but she's the one who

11    had actually saw -- another tenant resident of the place had

12    seen what had happened.

13         Q.    How did that impact you, the first time you

14    kind of break up with a male, this kind of thing happened?

15         A.    I hurt for Shawn.  I felt bad for him because I

16    didn't mean -- you know, I didn't want him driven to that.

17         Q.    Did you make an effort to maintain a friendship

18    with him thereafter?

19         A.    We talked on the phone a few more times.

20         Q.    Okay.  Did you maintain a talking

21    conversational relationship with him thereafter?

22         A.    No.  There was a period of time that we didn't

23    talk.

24         Q.    Okay.  At some point in time was that

25    relationship, the friendship, rekindled?

1       A.    Yes.

2       Q.    Okay.  And was that after you had married Joe

3   Andriano?

4       A.    After I had married Joe and then he was dating

5   a girl named Nicky, we all became friends at church.

6       Q.    Okay.  Quail Garden Apartments, that was in

7   Casa Grande?

8       A.    Yes.

9       Q.    Okay.  And did you have a job with Quail

10  Garden?

11      A.    Yes, I did.  I was originally hired as a

12  leasing agent and my job was to show prospective residents a

13  tour of the property and of the apartments and basically

14  persuade them to rent at our place instead of somewhere else.

15      Q.    Okay.  And how -- how was it that you got into

16  the rental apartment business?

17      A.    When I had left Peterson Machinery, I had to

18  have a job right away, so I went down to DES and they had a

19  listing of jobs on the board, and this lady interviewed me

20  and she said she thought this job would be good for me, so

21  she sent me over to Quail Gardens, I had an interview that

22  day, and she hired me that day.

23      Q.    Okay.  So this was your first venture into the

24  rental apartment business, right?

25      A.    Yes, it was.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1   Q. Would that be the principle area of employment

2 that you would keep thereafter?

3   A. Yes.

4   Q. Okay.  What were the benefits that you received

5 at Quail Garden?  Salary?

6   A. I received a salary and a place to stay,

7 free apartment and free utilities.

8   Q. Okay.  And describe the first unit that you

9 received at Quail Garden?

10   A. It was a one-bedroom upstairs and had vaulted

11 sealings, had a patio.  It was, you know, maybe 6-, 700

12 square feet.

13   Q. Okay.  Leasing agent, essentially is that kind

14 of the low person on the --

15   A. That is.

16   Q. -- corporate ladder?

17   A. As far as office personnel, that is the lowest

18 you could go.

19   Q. Okay.  Did you receive any promotions while at

20 Quail Garden?

21   A. Yes, I did.

22   Q. What was that?

23   A. They promoted me to assistant manager.

24   Q. Contrast for me the difference between job

25 requirements with the leasing assistant versus the assistant

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    manager?

2         A.    Assistant manager just has a little bit more

3    responsibility as far as reporting to the main office.

4         Q.    Okay.  And what would an assistant manager do

5    on site?

6         A.    Well, our manager -- my manager didn't live on

7    site.  I did.  And so it would be up to me to be -- if there

8    were any resident problems, I would have to address them.

9    And we had procedures that we followed and so I would -- like

10   if somebody had slipped and fallen on the property, I'd have

11   to take pictures and report it for insurance reasons, things

12   like that.  So a leasing agent wouldn't do that, but an

13   assistant manager would.

14        Q.    Okay.

15        A.    I also planned activities.  We had a lot of

16   winter visitors that actually resided there, so I did a

17   lot -- we planned a lot for Thanksgiving and Christmas, New

18   Years, coffee and doughnuts in the morning for them and

19   things like that.

20        Q.    Okay.  Up to this point in time had you met Joe

21   Andriano?

22        A.    No.

23        Q.    Okay.  Is it your first home away from mom and

24   dad, correct?

25        A.    Yes, it was.

1       Q.      Okay.  And how is that influencing your

2   development?

3       A.      Well, obviously, I could go wherever I wanted

4   to go and I didn't have to report to anybody, and that was

5   kind of interesting.  It was -- I liked it but my mom was

6   over all the time anyway.  And she was so cute, my dad would

7   come over, and so it wasn't like I totally separated myself

8   from my parents.

9       Q.      Okay.

10      A.      They -- they thought my apartment was cute too

11   and she would come over and have dinner and watch television

12   and stuff, so -- but besides that, actually Barbara's the

13   one -- she kind of moved in with me.

14      Q.      Okay?

15      A.      It wasn't official.

16      Q.      Was this Barbara Mitchell that testified

17   earlier?

18      A.      Yes, my cousin.

19      Q.      Okay.

20      A.      So her and I used to go out and do everything

21   together.

22      Q.      All right.  Let's go over that for a moment

23   here.  Talk to me about your relationship with Barbara

24   Mitchell?

25      A.      Well, she became my best friend instead of just

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

```
 1     my cousin.
 2             Q.    Okay.
 3             A.    She -- because she had gone to Casa Grande High
 4     School, she knew everybody.  I didn't.  I didn't really even
 5     know my dad's family because he has quite an extended family
 6     in Casa Grande.  And so through Barbara is how I met all
 7     my -- my whole family.
 8             Q.    Was she at Harvest Christian Academy for a
 9     period of time?
10             A.    She went there a while, yes, but then her mom
11     allowed her to go to public school.
12             Q.    Okay.  Did you maintain a relationship with
13     Barbara Mitchell?
14             A.    I would see her at church, yes, and things like
15     that, but it wasn't -- it didn't become like a best friend
16     type of thing until she -- until I moved out into my own
17     apartment.  Then it -- that's when we did lunch together
18     everyday and dinner, and we were just always together.
19             Q.    Okay.  Inseparable?
20             A.    Yes.  Very much so.
21             Q.    Okay.  Have we exhausted your job history, if
22     you will, at Quail Garden?  Anything else of note?
23             Okay.  Where did you move from there?
24             MR. MARTINEZ:  Objection.  Lack of foundation.
25             THE COURT:  Overruled.  Go ahead, answer the question
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    if you can.

2         THE WITNESS:  After Quail Gardens I took a job at

3    Casa Grande Regional.

4    BY MR. PATTERSON:

5         Q.    Okay.  For what?

6         A.    And --

7         Q.    Why did you get out of the rental business and

8    into Casa Grande Regional Hospital?

9         A.    The whole reason I did that was because there

10   was no a way I could ever be promoted to a manager until I

11   had more financial experience.

12        Q.    Okay.

13        A.    And so I hired on as a clerk in the accounting

14   department at the hospital.  And that's when -- and they have

15   a program there where they'll pay your schooling, so I

16   started attending University of Phoenix at night with that

17   goal in mind to learn more about financial so I could go back

18   and be a manager.

19        Q.    Okay.  So you still kept the prospect of

20   working in the rental --

21        A.    Yeah.

22        Q.    -- apartment business?

23        A.    I loved it.

24        Q.    But you needed to fill out your resume?

25        A.    I did.  My education.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          Q.     Okay.  You went to University of Phoenix, what

2    kind of courses did you take there?

3          A.     They were in Business.

4          Q.     Okay.

5          A.     I never completed those, so I -- I got a lot of

6    them in accounting, finance, that type of stuff.

7          Q.     Okay.  And kind of got in practical experience

8    at Casa Grande Regional Hospital?

9          A.     I did.  I got a lot of experience there.

10         Q.     What things did you do for Casa Grande?

11         A.     I learned how to do accounts payable.  I

12    learned how to do the accounts receivable.  I learned how to

13    work the general ledger, how to prepare a set of financials,

14    how to audit books.  Just everything about accounting.

15         Q.     Okay.  And how long were you at Casa Grande

16    Regional Hospital?

17         A.     Maybe three years.

18         Q.     Okay.  Was Barbara also employed there during

19    that period of time?

20         A.     No.

21         Q.     Okay.  How about your mom?

22         A.     No.

23         Q.     Those folks got jobs there afterwards?

24         A.     Yes, sir.

25         Q.     Okay.  All right.  After you left Casa Grande

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    Regional Hospital, what was your next job?

2          A.    Was at AccuGlass.

3          Q.    Okay.  By this time you had met Joe Andriano?

4          A.    Yes, sir.

5          Q.    Okay.  And tell me a little bit about

6    AccuGlass.  What was it?

7          A.    It was a windshield replacement and repair

8    business that was located in Mesa.  And it had been in

9    existence for a while and Joe and I purchased it with a

10   partner.

11         Q.    Okay.  How is it that he became interested or

12   you became interested in AccuGlass, that particular --

13         A.    Through Joe.

14         Q.    -- firm?  Okay.

15         A.    Oh, through Joe.  My husband used to purchase

16   glass from them while he was doing his own business.

17         Q.    All right.  Let's backup a little bit then.  He

18   had his own venture.  What was the name of that?

19         A.    Joe's Windshield Repair.

20         Q.    Okay.  What would he do in that context in that

21   business?

22         A.    He was mobile.  He didn't have an office.  He

23   kept everything on his truck and he would go on site and

24   replace somebody's windshield or he could also repair cracks

25   in the window.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          Q.     Okay.  Did that business survive or --

2          A.     No.  It was based solely in Casa Grande, and

3    another glass business came to town that was backed by Empire

4    Glass, which was huge, and Joe didn't feel like he could

5    compete with them.

6          Q.     All right.  So that one went by the by, and in

7    its place you folks got involved with a place called

8    AccuGlass?

9          A.     Right, because it was already established.  And

10   so the idea was, well, if we could get into an established

11   one, then we could keep it going and make it better.

12         Q.     Okay.  And did you work side by side with Joe

13   at this enterprise?

14         A.     Yes.

15         Q.     What did you do?

16         A.     I stayed in the office and like would take

17   calls for jobs, call in to insurance companies to get

18   approval for jobs, things like that.

19         Q.     Okay.

20         A.     Printout work orders, which would tell the

21   installers where to go to replace the glass.

22         Q.     This business was located in Mesa, Arizona?

23         A.     Uh -- yes.

24         Q.     Did -- okay.  Did you actually work on site

25   or --

1        A.    Yes.

2        Q.    Was Joe there working on site as well?

3        A.    Some of his stuff was on site, but a lot of it

4  was out.  A lot of it was mobile.  He would have to go to

5  someone's place of business or like to Earnhardts, wherever

6  it was, that the jobs needed to be done.

7        Q.    Okay.  What years are we talking about that you

8  and Joe ran this enterprise known as AccuGlass?

9        A.    It would have been, I believe, around July or

10  August of '96, but by February of 9 -- February of '97, he

11  had surgery and, yeah, by then it was the partner had taken

12  it over.

13        Q.    Okay.  So we're talking five, six months?

14        A.    Right.

15        Q.    Okay.  What was the next job that you had after

16  AccuGlass?  Did we forgot Courtyard?  How's Courtyard --

17        A.    No, that's -- that's my next job.

18        Q.    Okay.  Talk to me then about Courtyard

19  Apartments?

20        A.    Courtyard Apartments, I began in '90 --

21  oh, '98, Spring of '98.

22        Q.    Where was Courtyard Apartments located?

23        A.    2060 North Trekell Road in Casa Grande.

24        Q.    How did you become involved there?

25        A.    From my job at Quail Gardens.  My manager there

1    got me the job as the manager there.

2         Q.   Is this the first time you were the manager of

3    an apartment complex?

4         A.   Yes.

5         Q.   Are you an on-site manager there?

6         A.   Yes.

7         Q.   What does that mean?

8         A.   I'm required to live on site and they, along

9    with my salary, provided me a 2-bedroom, 2-bath apartment

10   with utilities included.

11        Q.   Okay.  This is in '98, so obviously you were

12   married in '94, right?

13        A.   Yes.

14        Q.   So you're about four years along in your

15   marriage with Joe?

16        A.   Yes.

17        Q.   Okay.  And when -- what were your requirements

18   or tasks with Courtyard?  What do you do for them?

19        A.   As a manager you are responsible for the

20   maintenance, the housekeeping, the leasing, and resident

21   retention -- those are the four main areas.  You're also

22   responsible for month end closings.  You have to do the

23   financials and submit them to the corporate office.  I was

24   also responsible for all the social activities.

25             What happens is when somebody moves out of an

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    apartment, they usually leave it a mess and so we have to

2    schedule maintenance to go in and repaint and shampoo the

3    carpet, do all that sort of stuff, so everyday we'd have a

4    staff meeting and schedule out the apartments that needed to

5    be done and what needed to be done.  Excuse me.  I did have a

6    maintenance supervisor who reported to me and then also a

7    housekeeper because she would go in after maintenance was

8    done and at the same time that this is happening, the leasing

9    people would be renting these apartments.  So it's a circular

10   effect, you know, somebody moves out, you rent a new one, you

11   got to clean it up, get it ready, and I had to make sure that

12   wheel turned.

13        Q.    Okay.  Did you enjoy your stay at Courtyard?

14        A.    Yes, I did.

15        Q.    Okay.  Who was your supervisor?

16        A.    Timothy Lee.

17        Q.    Okay.  And was he a regional supervisor?

18        A.    Yes, he was.

19        Q.    Okay.  So he covered what?

20        A.    He covered a couple properties in Phoenix and

21   the three that we had in Casa Grande.

22        Q.    Is Joe working at this time when you were --

23   you're at Courtyard?

24        A.    No, he's not.

25        Q.    And do we have any children at this point?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1      A.    Two.

2      Q.    Okay.  So who's providing day care at this

3  particular set up for you?

4      A.    Jessie and Nina were a couple that lived right

5  above us, and during the day she would watch Nicolas and

6  Ashley for me.  And then when Brandon would get home from

7  school, he would get them and take them down to my apartment

8  until I could get home from work.

9      Q.    Okay.  He would watch them until what time

10  would you generally --

11      A.    Around 6:00.

12      Q.    Okay.  So he would have primary care of your

13  children from what time period?

14      A.    Maybe about two hours.  However, when Ashley

15  was just newborn, Nina would go ahead and keep Ashley because

16  Brandon couldn't.

17      Q.    Okay.

18      A.    So Brandon would basically take Nicolas and

19  play with him and entertain him.

20      Q.    All right.  Was there a time before when he

21  would come over and pick up your children that he actually

22  lived with you guys?

23      A.    When he lived with us it was right after I had

24  Nicolas in '97.

25      Q.    Okay.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000004750

1      A.    I wasn't working.  We were living out at the

2  shop on the farm.

3      Q.    Okay.

4      A.    And that's when he lived with us.

5      Q.    Okay?

6      A.    And he helped me a lot with Nicolas when he was

7  a newborn.

8      Q.    All right.  I think it's a good point to go

9  over to the shop there.  You mentioned the shop?

10     A.    Uh-huh.

11     Q.    What was the shop?

12     A.    Joe's father had a 10 acre parcel of land, and

13  in '94 when Joe wanted to start Joe's Windshield Repair, I'm

14  working at the hospital, and we had just leased, or rented I

15  should say, a condo and it was a 6-month lease.  When the six

16  months were over, Joe asked me if I would mind moving out to

17  where his brother had lived in this place they called the

18  shop -- excuse me -- in order to save on expenses so we could

19  get Joe's Windshield Repair off the ground.  That was not a

20  problem, so in July of '94, we moved to this attachment.

21           I'm trying to figure out how to explain it, but

22  there was a huge concrete pad like you could pull a tractor

23  up into, okay, and attached to that was a low-slung building

24  that had three rooms that ran in a row.  You'd walk in one

25  door and it was a kitchen, dining room type of thing, and it

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    had some really old tile with paint all over the floor and

2    whatever, and there was a little bathroom in there.

3           And then when you walked through the next

4    entryway or whatever you want to call it, it was more like a

5    living room and that became our living room and our bedroom

6    and there was carpet laid in there.  As I said, Joe's brother

7    lived in it before us so, he kind of made it like a little

8    bachelor pad.  They'd done some upgrades, put in kitchen

9    cabinets in there, a refrigerator later that I believe was

10   his mom and dad's old one or something, and so it was, you

11   know, you could live there.

12           Q.    Okay.  And for what period of time did you

13   reside at this small house?

14           A.    From July of '94 until we moved into Courtyard,

15   which would have been the Spring of '98.

16           Q.    Okay.  And it was an effort to save money so

17   you could actually buy something?

18           A.    Well, yes.  The deal was that we would live

19   there and we thought it would only be about a year and then

20   Joe wanted to buy a house.

21           Q.    Okay.

22           A.    And so did I.  We wanted to live in a house, so

23   that was the goal, but it never --

24           Q.    Okay.  We'll get to that later.

25           All right.  So you're that -- at that

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1   particular unit for a period of time.  You thereafter move to

2   the Courtyard?

3          A.    Yes.

4          Q.    You're now manager at that complex?

5          A.    Yes.

6          Q.    Okay.  At some point in time did you change

7   jobs from the Courtyard to another location?

8          A.    Yes.  Then I went to the Meridian at the

9   Biltmore and I was manager there but I was not resident

10   manager.

11          Q.    Okay.  Let's talk about that.  Meridian?  You

12   said the Biltmore.  That's in the city of Phoenix?

13          A.    Yes, on 32nd Street and Camelback.

14          Q.    What kind of benefits were afforded to you in

15   terms of conditions for employment for the Meridian?

16          A.    The Meridian is a very luxurious apartment

17   complex.  They don't let their staff live on site, but they

18   compensate you very well with salary, so my salary was a lot

19   higher and at the time we were living at Joe's parent's

20   house.

21          Q.    Okay.  So you moved out of the --

22          A.    Courtyard into the --

23          Q.    Courtyard?  Okay.

24          A.    His mom and dad's.  His mom and dad let us

25   stay with them and we were probably there two and a half

1    months or so, and I was driving back and forth from Casa

2    Grande to Phoenix so I wasn't getting home until probably

3    8:00 at night, 7:00, 8:00.

4         Q.    All right.  Did that commute and the fact you

5    didn't have an on site apartment create some -- some problems

6    with the relationship?

7         A.    Yes.  It caused a lot of friction because Joe

8    wanted me around more and I was gone all day.  So in the

9    beginning he looked around for rental places and we talked

10   about renting a house, but everything was too expensive, I

11   believe.

12        Q.    Okay.  Did you actually enjoy your employment

13   with Meridian?

14        A.    Yes.  That was -- that is if you're going to be

15   a manager of anything, that's one of the ones you would want

16   to be a manager of, because it's -- it's top of the line.

17        Q.    All right.  How long did you work at Meridian?

18        A.    Just for a few months.

19        Q.    Okay.  And why ultimately did you decide to

20   leave Meridian?

21        A.    Because they did not provide housing and the

22   friction it was causing in my relationship with Joe, I needed

23   to find a place that had housing.

24        Q.    Okay.  To that end did you find another

25   position of employment?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    A.    Yes, I did.

2    Q.    Where did you wind up?

3    A.    I wound up at San Riva Apartments.

4    Q.    Okay.   When did -- how did you acquire the

5    position at San Riva?

6    A.    Actually, it was in construction and Joe's

7    cousin would drive by it all the time and she knew I was --

8    you know, this was an issue that we were looking for

9    somewhere that we could live on site, and she's the one that

10   actually provided us with the phone number.   And Joe drove me

11   by quite often.   We kept an eye it and I called the number

12   and set up an interview with Janice Lind.

13   Q.    Okay.   Janice Lind, the lady --

14   A.    Yes.

15   Q.    -- that testified earlier in the trial?

16   A.    Yes.

17   Q.    What part of town was the San Riva apartment

18   complex?

19   A.    Ahwatukee.

20   Q.    All right.   And was it on the far south end of

21   the Ahwatukee?

22   A.    Oh, yeah.   It backed right up to Pecos Road,

23   which is the -- on the other side is the Indian reservation.

24   Q.    Okay.   Was that a good thing because of its

25   close proximity to Casa Grande?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          A.     It was very good for Joe, yes.

2          Q.     Okay.  And why was that?

3          A.     That's where he was comfortable at and we

4     wanted to stay close to that -- that area.

5          Q.     Okay.  Can you describe for me the San Riva

6     complex?

7          A.     It was a 280 unit luxury apartment complex.  We

8     had one bedrooms that started at 700 a month up to 3 bedrooms

9     which could go up to 17-, 1800 a month.

10         Q.     Okay.  And what were the benefits that you

11     acquired in addition to your salary?

12         A.     I received a three-bedroom apartment this time

13     and it's brand new.  It was a very nice apartment.

14         Q.     Okay.  So this was a good thing?

15         A.     Wonderful, yes.

16         Q.     Okay.  And you obviously had two children at

17     this point?

18         A.     Yes.

19         Q.     Okay.  And what are your tasks as resident

20     manager there at the San Riva?

21         A.     A little bit different than Courtyard because

22     this is a lease-up property.

23         Q.     Okay.  Explain that to me?

24         A.     What it is, it's brand new, nobody lives there.

25     So my job as a manager is to get it occupied as quickly as

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    possible so we could sell the asset and build more and do the

2    same thing.

3         Q.    Okay.  Who was the owner of the property?

4         A.    The owner was Sumatoma Corporation.

5         Q.    And was there a property management group?

6         A.    Property management was Fairfield Properties.

7         Q.    Okay.  What, again, was their general course of

8    business in terms of developing these kinds of complexes?

9         A.    They had two -- two corporations.  One was

10   Fairfield Development, which was basically a construction

11   company.  They went out and they built these apartments, and

12   then Fairfield management would come in and lease them up.

13   We'd fill up all these occupancies that we have, and when we

14   got the a certain occupancy, it would go on the market and

15   then I would have the job of escorting investors through the

16   property so they could see it.  So we had to keep it in tip

17   top shape all the time.

18        MR. PATTERSON:  Judge, might be a good time to break

19   for the afternoon.

20        THE COURT:  Okay.  We'll go ahead and take our

21   afternoon break at this point in time.  During this break

22   remember the entire admonition I have given you including the

23   fact you're not to discuss this case with anyone, do not let

24   anyone discuss the case with you, keep an open mind.

25             Have a nice break.  We'll see you in 20

1      minutes.

2

3                    (Recess.)

4

5            THE COURT:  This is cause number CR 2000-096032,

6      State of Arizona versus Wendi Elizabeth Andriano.  The record

7      will reflect the presence of the Defendant is on the witness

8      stand, the Counsel and the jury.  We'll continue with the

9      direct examination by Mr. Patterson.

10                   Mr. Patterson?

11           MR. PATTERSON:  Thank you, Judge Ishikawa.

12

13     CONTINUED DIRECT EXAMINATION BY MR. PATTERSON:

14           Q.    You are Wendi Andriano?

15           A.    Yes, I am.

16           Q.    You are the same Wendi Andriano that was

17     testifying before the break?

18           A.    Yes, sir.

19           Q.    And you realize you're still under oath?

20           A.    Yes, sir.

21           Q.    Okay.  We left off you just acquired the job as

22     resident manager at the San Riva apartment complex.  You were

23     describing for me in general what that complex, the physical

24     layout is.  Again, could we start there?

25           A.    Like I said before, it was 280 units.  There

                TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    were, I believe, nine separate buildings.  It was a

2    three-story building.  Each, you know, each building had

3    three floors on it.

4         Q.    Were the layouts of each of the nine

5    residential buildings essentially the same?

6         A.    No.  One building, like the building I lived

7    in --

8         Q.    Okay.  Let's start there.  Which unit did you

9    receive initially?

10        A.    A three-bedroom, two bath.

11        Q.    Okay.

12        A.    So it had the only three bedroom and then on

13   the inside were two bedroom two baths.

14        Q.    Okay.  What was the unit number of the

15   apartment that you received?

16        A.    132.

17        Q.    Okay.  And did you remain at 132 throughout

18   your residency there at San Riva?

19        A.    Yes, I did.

20        Q.    Okay.  Of the eight other buildings, they're

21   all three stories, were they four apartments per floor,

22   generally speaking, as yours was?

23        A.    Eight.

24        Q.    Okay.  Eight units per floor?

25        A.    I'm thinking -- eight, yes.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1       Q.    Okay.  And that's eight in the entire building

2    or --

3       A.    Eight on the floor.

4       Q.    Okay.  So each building had approximately 24

5    units?

6       A.    Right.

7       Q.    Okay.  So there was an on-site office, correct?

8       A.    Yes, there was.

9       Q.    Okay.  How far distant was that to from your

10   place of resident 132?

11      A.    I was in the very back of the property.  That's

12   what we called the back of the property.

13      Q.    Okay.  Was it -- geographically it was the far

14   south what -- what southern corner of the property, south?

15      A.    I'm not very good with directions.

16      Q.    Okay.  What was the street --

17      A.    Um --

18      Q.    -- immediately to the --

19      A.    Pecos was what we backed up to.

20      Q.    Okay.

21      A.    And then it was 24th Street, I believe.

22      Q.    Was the north-south street?

23      A.    Uh-huh.

24      Q.    Okay.  What was the street on the north end of

25   the complex?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000004760

1       A.      Liberty Lane.

2       Q.      Okay.  So the complex was officially within

3   Pecos, Liberty, 24th Street -- what was the far west

4   boundary, 32nd Street?

5       A.      There wasn't a street there, so it just ran

6   into desert.

7       Q.      Okay.  The office -- where was the office

8   situated in relationship to where your apartment was?

9       A.      You would have to turn down Liberty Lane to get

10   into the front entrance of San Riva.

11       Q.      Okay.  And that's --

12       A.      That's right where the front office was.

13       Q.      What effectively was the layout at the front

14   office?

15       A.      You would walk into somewhat of a courtyard.

16   It was a cement pad that had a couple of trees that had

17   little benches around them, and then to your right is the

18   front doors into the main leasing office.  But also there was

19   a gate into the pool area and the door into the fitness

20   room.  And behind the fitness room -- I mean, attached in

21   this one building was a business office for the residents to

22   use.  It had a computer fax machine, that type of thing.  But

23   as you walk into the leasing office, you walk into a

24   main -- a big room that had one, two -- two desks in it, a

25   sitting area, which were some upholstered chairs with a round

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    table with books on it.  Then also like a buffet-type thing

2    that we kept refreshments there for people who would come in,

3    such as we had our own bottled water so we would keep it on

4    ice and set out cookies and things like that.  And then

5    directly behind that would have been the assistant manager's

6    office.

7         Q.    Okay.

8         A.    And where the two leasing desks were behind

9    that, there was also an overflow office for more leasing.  If

10   there happened to be more than two sets of prospective

11   residents in there, we could use that room also.

12        Q.    Was there another entrance way into the office

13   proper?

14        A.    When you walked into the front door, it -- the

15   hallway went all the way back to another door, which is

16   called the resident's door, and that's where once you became

17   a resident of San Riva you would enter through that back door

18   to pay your rent, place work orders, pick up packages,

19   whatever reason.

20        Q.    Okay.  If a resident were to come in that

21   entrance way, what office would they discover on their

22   immediate left as they walked in?

23        A.    The resident's entrance, when you walked into

24   your left is -- was the maintenance kind of like a storage

25   office area and then to your right was the bookkeeper's

# APPENDIX I – Part 3

1 office, and she had a desk or a -- like a counter there that

2 you could walk up to and collect rent or talk to people or

3 would do whatever.

4   Q. Okay.

5   A. There was no window there.  It was just open.

6   Q. All right.  The next office, if you will, as a

7 residence is walking through the entry way --

8   A. Uh-huh.

9   Q. -- the second one on the left, what would that

10 be?

11   A. The left would be the kitchen.

12   Q. Okay.

13   A. And we would have residents that also came into

14 the kitchen to get cold water.  They liked our bottled water.

15 They'd come in there and help themselves to the fridge. We

16 also had soda pop in there, things like that.

17   Q. Okay.  Was there a key system or passcard

18 system back then?

19   A. The maintenance room there was a locked box

20 that actually contained a set of keys for every apartment.

21 They were not -- the old system was you would have a pass key

22 that could go into everything.  We didn't have that.  We had

23 individualized keys for each residence.

24   Q. Okay.  And they were kept in a central

25 receptacle?

1        A.      Yes, they were.

2        Q.      Who had access to that central receptacle?

3        A.      Every office person and everybody -- everybody

4    had the key to that box.

5        Q.      Okay.  Again, how would the resident then gain

6    access into this office complex coming in through the

7    residence entry way?  Was the door always open or do you use

8    your pass?

9        A.      Oh, it was open.  They could only come in

10   during business hours.

11       Q.      All right.  But any resident would have free

12   access into that door through the business area?

13       A.      Sure.

14       Q.      Okay.  As a resident is walking down this

15   corridor, what would be the second office on the right?

16       A.      My office.

17       Q.      Okay.  And describe what was on site there in

18   your office?

19       A.      In my office when you -- when you walked up to

20   it, I had a glass door and I had a window that went -- that

21   went directly -- it was a window instead of a wall that

22   separated my office from the bookkeeper's office.  And you

23   could walk into my office and I had a desk with two chairs

24   and behind me a built-in type of file drawers.  There was

25   it was -- it was built with the office, so it wasn't a


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000004764

1   separate piece of furniture, and there were file folder

2   drawers type of things behind me.

3          Q.    Okay.  And the walls to your office, you said

4   there were windows?

5          A.    Uh-huh?

6          THE COURT:  Is that a "yes"?

7          THE WITNESS:  Yes.

8   BY MR. PATTERSON:

9          Q.    Persons could see in as well as see out?

10         A.    Yes.

11         Q.    You could also see into the bookkeeper's office

12   as could the bookkeeper's office see inside to your office?

13         A.    Most definitely.

14         Q.    Okay.  How many computers were on site in the

15   business office?

16         A.    We had a computer in the bookkeeper's office,

17   which was that first office in the back.  That was probably

18   the most used.  And there was also a computer in the

19   assistant manager's office.

20         Q.    Did you have a computer in your office?

21         A.    No, I did not.

22         Q.    Okay.  Was one of the two computers that were

23   in the office connected to the internet system?

24         A.    The bookkeeper's office.

25         Q.    Okay.  And accessibility with regard to these

1    computers, how would an employee of Fairfield access the

2    computer?

3         A.    When you first would -- you know, you're first

4    screen would ask for some kind of password, and it was a

5    general password.  It was "San Riva" and then it was by

6    user.  We each had our own password, and instructions per

7    policy was to keep that to yourself --

8         Q.    Okay.  So --

9         A.    -- because each password had different levels

10   of -- like I could enter different areas than say the

11   maintenance person could, you know, so we can -- we each had

12   our password allowed different access to the program.

13        Q.    Okay.  Even though policy was such, did you

14   become aware of other employee's passwords and they become

15   aware of yours, or was that policy?

16        A.    Not frequently.  I mean, that could happen but

17   then you could just change your password.

18        Q.    Okay.  All right.  Did you have a computer in

19   your unit 132, the residence?

20        A.    I had a laptop.

21        Q.    Okay.  Was that connected to the internet

22   system?

23        A.    No.  I never used it.

24        Q.    Okay.  So you didn't have internet access on

25   your home computer?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1      A.    No, sir.

2      Q.    Okay.  All right.  When you first came on as

3  resident manager, who was working -- I assume you were the

4  top dog that --

5      A.    Uh-huh, yes.

6      Q.    Okay.  Who were your subordinates or who was

7  working under your supervision?

8      A.    I had a different assistant manager.  I cannot

9  recall her name.  I had to terminate her.

10      Q.    Okay.

11      A.    And I just -- I don't recall her name right

12  now.

13      Q.    All right.

14      A.    Stephanie Koeppen was there.  Jimmy Yost, I

15  believe, was there.  The housekeeper was there.

16      Q.    What was her name?

17      A.    Debbie Hines I believe was her last name.  And

18  I believe I ended up with different maintenance people later

19  on.

20      Q.    Okay.  During the period of time that you did

21  work there then, talk to me about all of the persons that

22  worked with you or whom you supervised?

23      A.    Okay.

24      Q.    You mentioned Stephanie?

25      A.    And, you know, I may be -- I may be wrong.  The

1      lady that I terminated was the bookkeeper, not the assistant

2      manager.

3              Q.    Okay.

4              A.    I believe that Jimmy Yost was the assistant

5      manager from the time I started.

6              Q.    Okay.

7              A.    I could be mistaken, but from what I recall.

8      So it would have been myself and Jimmy, as the assistant

9      manager, and then later on Chris Hashisaki -- Hashisaki

10     became the bookkeeper.  She had worked at a different

11     Fairfield property in Ahwatukee and I was asked by my manager

12     to bring her over to San Riva.  And then Stephanie was also a

13     leasing person, and we had different ones come through there.

14             Q.    Okay.

15             A.    I had --

16             Q.    So personal leasing agents-wise turned over?

17             A.    Yes.  And I just --

18             Q.    Okay.

19             A.    -- could not tell you all their names.

20             Q.    Okay.

21             A.    I don't recall.

22             Q.    How about --

23             A.    And then Jerry Sentelle was the maintenance

24     manager and Tim Mosna was his assistant.  And we also had a

25     porter and his name escapes me right now.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1      Q.      What did the porter do?

2      A.      The porter -- we had ashtrays out on the

3   property.  His main job was to make sure there was not trash

4   on the grounds, that the ashtrays were kept clean, windows,

5   that type -- things were just presentable because we didn't

6   ever know when an investigator was going to drive through to

7   look at our property.

8      Q.      Okay.  What were your job descriptions?  What

9   did you do as a resident manager at San Riva?

10      A.      I oversaw the people that worked there.  We

11   would have meetings, and we had actually a board that we

12   called.  It was like a make ready status and that kept track

13   of all the apartments, because even though they were brand

14   new, there's still minor maintenance things that need to be

15   done on them.  There was housekeeping that needed to be done

16   before a resident could move into it, so we had to oversee

17   that.

18              I also was in charge of bringing traffic -- we

19   called it traffic -- to our property.  Because of where we're

20   located, we don't have people that just drive by, see this

21   new place and want to, you know, check it out.  We're set

22   back out of the way and so we had to come up with creative

23   ideas as far as bringing traffic to us.

24      Q.      Okay.  What kind of programs did you --

25      A.      Lots of --

1          Q.     -- initiate?

2          A.     A lot of different advertising.  We did a thing

3     of -- we allowed large pets into our community so we did some

4     stuff with the humane society.  We did wine and cheese

5     parties for apartment locators.  A Locator is somebody who

6     advertises a lot and says they could help find you an

7     apartment, so we tried to develop a good relationship with

8     those people.  They would bring their traffic to us instead

9     of to our competition.

10          Q.     Okay.  What else?

11          A.     We also had activities for residents that Chris

12     actually, the bookkeeper, would put them together, but I

13     would have to oversee them and, you know, I approve all the

14     different things going on plus participate in them, make sure

15     everybody was, you know, happy, whatever.

16          Q.     What kinds of activities would you organize for

17     the residents there at San Riva?

18          A.     We had -- what all did we have?  We had --

19     well, a lot -- well, three or four pool parties because it

20     was summertime and we had a younger crowd of people that

21     lived there.

22          Q.     What was the typical pool party?

23          A.     Typical pool party started about 5:00 or so,

24     and we would barbecue.  We had barbecues around the pool.  We

25     would have hamburgers, hot dogs, things like that, or

1    actually buy those six-foot long sandwiches.  You know,

2    things like that.  I mean, it was just typical summer food

3    and people would come bring their kids and play in the pool.

4    And one time we had like hula dancers and a fireeater type of

5    entertainment, you know.  Just things like that at a couple

6    of the parties.  We also allowed drinking.  You could bring

7    your own, but because we were had such a younger crowd at San

8    Riva, we were trying to keep them there, I went ahead and

9    purchased a keg, so we had that there available also.

10         Q.   Okay.  How long would these pool parties last?

11   Start at 5:00, when would they typically end?

12         A.   Until people wanted to leave.  There was no --

13   when we sent the fliers out, we wouldn't put an ending date

14   or ending time, so just until everybody had their fill.

15         Q.   Okay.  Did San Riva sponsor any athletic teams?

16         A.   Yes, we did.

17         Q.   Okay.

18         A.   We sponsored a men's softball team and I was

19   asked by one -- couple of the residents actually who

20   participated on that team, we would sponsor them because they

21   didn't have a sponsor.

22         Q.   Okay.  And what did sponsorship entail?

23         A.   We had to give them a check so they could buy

24   their shirts, put San Riva on it, and we gave them support as

25   far as going to the ball game, things like that.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          Q.    Okay.  How many of those ball games do you

2     recall that you may have attended?

3          A.    In the beginning I didn't attend a lot of them.

4     I attended them more towards the end, whenever they were

5     winning, so they were in -- I don't know the terminology, but

6     where they would --

7          Q.    Play offs, that kind of thing?

8          A.    Yes, I guess so.  I'm not too much of a sport

9     person.  And that's -- our team was doing really well.   In

10    fact, they won the whole part of their division type of

11    thing.

12         Q.    Okay.  I know we talked about the folks working

13    with you at San Riva.  Who were your supervisors in the

14    Fairfield system?

15         A.    I had -- with brand new managers they had a

16    buddy system and, oh, my buddy was the manager of Red Rock

17    and -- Gail.  Her name was Gail.  And my direct supervisor

18    was Janice Lind.

19         Q.    Okay.  All right.  Let's talk about unit 132.

20    You said it was a three-bedroom --

21         A.    Two-bath.

22         Q.    -- two-bath layout and it was on the far corner

23    of that building?

24         A.    Of building 5.

25         Q.    Okay.

1          A.    Yes.

2          Q.    You told us there were two accesses into the

3    complex, one off of Liberty.  Was there also one off of 24th

4    Street?

5          A.    Yes.

6          Q.    Okay.  Which of the two did you generally use?

7          A.    One off 24th Street because it drove right to

8    my building.

9          Q.    Okay.  And typically where would you park when

10   you were living there?

11         A.    Well, the entry way or off of 24th Street drove

12   right to building 5 and so my bedroom window, the master

13   bedroom where Joe and I were when we drove in our headlights

14   would hit that window and we would park right there.

15         Q.    Okay.  So if you're going grocery shopping.

16   Would you park at that location?

17         A.    Uh-huh, yes.

18         Q.    And how would you get your groceries or

19   parcels, if you will, into your apartment?

20         A.    Well, because we were so close to our patio, I

21   mean our car was just, you know, a little bit away, we would

22   just take all our bags and put them right over the patio, put

23   Nicolas and Ashley over there, and I would go over and start

24   putting the groceries inside.

25         Q.    Okay.  Would you use that patio entrance as one

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    of the principle entrances to your apartment?

2           A.     Yes, we did.

3           Q.     Okay.  All right.  Talk to me about your tasks

4    on a daily basis at San Riva as a resident manager.  Were you

5    involved in the collection of rent?

6           A.     Not hands-on, really.  I -- what would happen

7    is people would basically give their rent to the bookkeeper,

8    and because we were trying to keep this -- we, you know, I

9    had a lot of pressure on me to fill this place up.  We needed

10   to reach a certain occupancy, and a lot of times when people

11   are renting apartments, they have -- they receive their

12   paychecks on a certain Friday and then come pay their rent.

13   Well, the first of the month may fall at a different time

14   than their paycheck, so a lot of the times we would have

15   residents who would call in and say, you know, we're going to

16   be a little bit late.

17          Q.     Okay.

18          A.     Now, that was my decision to make.  That was

19   not the bookkeeper's, so her -- she, you know, went by the

20   book.  You have to collect rent on the 1st and charge them a

21   $50 late fee.  If that was to be waived or any other -- any

22   other things were to be -- any other arrangements were to be

23   made, then it would have to be approved by me.

24          Q.     Okay.  Was there a formal legal process that

25   was initiated against tenants who were behind in their rent?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1      A.    Yes.

2      Q.    How did that work?

3      A.    There's a landlord tenant law out there and

4  what it allows us to do is it -- they have signed a lease at

5  the time that they receive keys to their residence, and they

6  agree to pay their rent on the 1st, and if not then they

7  assess a $50 late fee.  And on the 2nd of the month, we could

8  print out something out of the computer that showed us

9  everybody who had not paid rent.  And at that point we could

10  fill out what we called a 5-day notice.

11          What that does that's the first step in

12  evicting a resident, so you filled out a 5-day notice and we

13  had a company who would serve them for us for a fee or we

14  could serve them ourselves.  As long as they were served and

15  signed, you know, whatever, then it was considered legal.

16  Certain months we used that company because I didn't have

17  time to serve the 5 days or I didn't have, you know, or the

18  assistant manager didn't have time.  Other months I would

19  take Nicolas and Ashley and I would go around and serve five

20  days, but a lot of the times I would take that list and we'd

21  call people and remind them --   Because a call is much more

22  likely to get rent out of somebody than a legal action,

23  saying we're going to evict you out of your apartment.

24          So in San Riva's circumstances, we wanted

25  residents to stay, not leave, and so we were -- I was much

1    more inclined to call somebody and ask them, and then they'd

2    tell me, you know, I get paid in four days, I'll bring the

3    rent in and that was fine.  I would waive the rent fee.

4         Q.    Okay.  And you had the discretion to make that

5    waiver of penalty and fee?

6         A.    Yes, I did.

7         Q.    Okay.  All right.  Were there times when

8    tenants would leave and they would leave personal property

9    behind?

10        A.    Yes.

11        Q.    Okay.  In those circumstances did you have some

12   discretion as a residential manager to do with the personal

13   property that was left behind?

14        A.    Yes.  We actually had garages at San Riva that

15   had remotes to them and we had several, I should say, garages

16   full of items that residents had left.  And I never know why

17   people leave whatever they leave, but we would collect it and

18   we would hold it for 30 days.  After 30 days, it becomes our

19   property.  And so if somebody needed a bed, we felt like

20   giving them a bed, we could do so.  If you wanted to hold a

21   big garage sale and try a yard sale of all this stuff, you

22   could do that also.  It just, you know, it just depended

23   on -- I could do whatever I wanted with it.

24        Q.    Okay.  So you had some latitude in that regard?

25        A.    Yes, I did.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1      Q.    Okay.  Also with your residential unit at 132

2  did you also receive some garage space, storage space?

3      A.    Yes.  I had two garages.

4      Q.    Okay.

5      A.    I started out with one and ended up with two.

6      Q.    Okay.  And where were they located relative to

7  your apartment?

8      A.    Well, because I was not paying for mine, I

9  actually had to switch garages a couple of times because if a

10 resident was going to rent an apartment and we wanted to

11 throw in a free garage, which normally cost $95 a month, and

12 say it happened to be the one I was occupying but the closest

13 one to their apartment, I would give it up and move all the

14 stuff out and move to a different location so they could have

15 that one.

16          So in October of 2000 I had one that was --

17 Building 5 sat here and there was some parking, and then in

18 garages right here, and there was one right there, and then

19 building 5 also had another building in front of it with some

20 garages there, and I had one there also.

21     Q.    Okay.

22     A.    So they were the two closest ones to me.

23     Q.    During the period of time that you and Joe were

24 living at the San Riva, did it develop that one garage was

25 used for one thing and the other garage was used for

1    something else?

2            A.    The garage that was over here was really hard

3    to pull a boat up to because it deadended, whereas the garage

4    over here was right next to the that back entry way we used

5    all the time, and you could pull in and the boat would be

6    right there by the garage.  And that's where he could -- he

7    changed the oil, worked on the, engine and did whatever it is

8    that, you know.

9            Q.    Okay.

10           A.    So that one had a big red toolbox and I don't

11   know whatever.  And the other one held more of our overflow

12   stuff.

13           Q.    Okay.  Is the other one for storage, the one

14   closer to the boat was used as --

15           A.    Yeah.  If like Joe was working on his boat,

16   Nicolas and Ashley and I would be out there with him in the

17   garage.  I would be with him and Nicolas would be in the boat

18   Ashley would be in the stroller, and, you know, we'd all be

19   out there.

20           Q.    Persons that worked with you back in October of

21   2000, Ms. Hashisaki, did she live on site too?

22           A.    Yes, she did.

23           Q.    Okay.  Where was her apartment relative to your

24   apartment?

25           A.    It was just -- I wish I had a map.

1      Q.    We have the layout.  I guess my point is --

2      A.    If --

3      Q.    -- could you see your apartment from?

4      A.    If I was on Chris' balcony, I could see the

5  front entrance of my apartment --

6      Q.    Okay.

7      A.    -- of the entry way into my apartment, not my

8  front door.

9      Q.    Okay.  Because the interior door or front door

10  of your apartment opened --

11      A.    Into, yeah --

12      Q.    -- to the breezeway?

13      A.    -- the hallway, right.  Right.

14      Q.    Okay.  All right.  But Ms. Hashisaki's

15  balcony --

16      A.    Uh-huh, yes.

17      Q.    -- was it first story, second story?

18      A.    It was the third story.

19      Q.    From her balcony you could see the north or

20  southern breezeway entrance?

21      A.    The north.

22      Q.    The one closest to Liberty away from Pecos?

23      A.    Yes.

24      Q.    Did Ms. Sweeney also live on site?

25      A.    Yes, she did.

1        Q.      Where did she lived?

2        A.      She lived in the same building as Chris.  She

3    was on the third floor, but she actually faced north instead

4    of south.

5        Q.      Okay.  So from her balcony you could not see

6    the north entrance way or the north exit from the breezeway

7    to building 5?

8        A.      No.

9        Q.      Okay.  All right.  Let's change categories

10   now.  Let's talk about your life with Joe.  When did you

11   first meet Joe Andriano?

12       A.      On March 17th of '92.

13       Q.      St. Patrick's Day?

14       A.      St. Patrick's Day.

15       Q.      What were the circumstances?  Where did you

16   meet?

17       A.      We met at Dell's Pizza.  And Dell's Pizza is

18   somewhat of a sports bar pizza place, and I was out with a

19   lady named Maureen Murphy and she was Irish and wanted to go

20   out for St. Patrick's Day.  And I'm -- she was probably in

21   her 40s or so.  So we went around to a couple places and

22   ended up at Dell's Pizza and everybody was, you know,

23   drinking green beer, all that sort of stuff, so --

24       Q.      This is in Casa Grande?

25       A.      Yes.

1    Q.    All right.  What was your initial reaction to

2    this gentleman?

3    A.    I thought he was so cute.  He had -- when we

4    walked into Dell's Pizza, it only took a few minutes to see

5    him and the crowd of people around him because he was very

6    animated and very much the life of the party and very cute

7    about it.  Just had a boyish quality about him.

8    Q.    Okay.  Do you remember that day to this day?

9    A.    Uh-huh, yes, I do.

10   Q.    Okay.  Was he with any group -- certain kind of

11   group of people at Dell's Pizza?

12   A.    Yes, he was.

13   Q.    Which group was he with?

14   A.    He was with what I called the farm kids, and he

15   was actually sitting, or standing I should say, at a table

16   with a bunch of girls, and those were some of the same girls

17   who had given me grief about the guy Vernon Barnes.

18   Q.    Okay.  Was Vernon Barnes from that group of

19   kids that you called the farmer's kids?

20   A.    Yes.

21   Q.    Okay.  Was he there with any of his other

22   friends there at Dell's Pizza?

23   A.    The place was packed.

24   Q.    Okay.

25   A.    It was full of everybody.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1      Q.     All right.  Was everybody drinking basically?

2   Drinking beer, having a --

3      A.     By the time we had gotten to Dell's Pizza, it

4   was later in the evening so everybody was pretty happy.

5      Q.     All right.  Do you recall meeting with him,

6   talking with him?

7      A.     I do.  I was kind of shy and I didn't, you

8   know -- I didn't know -- I had never seen him in Casa Grande

9   before.  I didn't know who he was.  But I said to Maureen

10  that I thought he was cute.  And Maureen is funny because

11  she's very loud and boisterous so she is the one who actually

12  initiated the meeting between Joe and I.

13     Q.     Okay.

14     A.     And Joe came over and offered to buy me a drink

15  and stood at the bar with me for a long time, and we just

16  chit-chatted and just -- I don't know.  It was kind of like

17  an instant connection there.

18     Q.     Okay.  How long do you think you stood there at

19  Dell's Pizza with Joe Andriano chit-chatting?

20     A.     Until it closed.

21     Q.     How many hours is that?

22     A.     Probably about an hour or so.

23     Q.     Okay.  It was a pleasant experience?

24     A.     Yes, it was.

25     Q.     Did it affect you from the beginning?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1      A.    Yeah, I really liked him.  I thought he was a

2  lot of fun and he was easy to talk to and he wasn't stuck up

3  and snobbish, and I just -- I liked him.

4      Q.    Okay.  I assume you went your separate ways

5  that night.  Was there a plan to meet later to continue the

6  relationship?

7      A.    Yes.  I actually gave him one of my business

8  cards from Quail Garden's because that's where I was employed

9  because he said he wanted to call me and maybe we could hang

10  out.  And what -- we had discussed that there was no

11  boyfriend-girlfriend thing here, we just wanted to be

12  friends, and -- but he wanted to call me.  And we went our

13  separate ways and I didn't hear from him for, I don't know, a

14  couple weeks, and then he had given me his number also and he

15  told me to call him.

16      Q.    Okay.  And did you do you that?

17      A.    And I did that and they had an answering

18  service that answered the phone, so I left my name and number

19  a couple of times.  And one day I did get -- no, actually, I

20  was at work and Joe came into work.

21      Q.    At Quail Gardens?

22      A.    At Quail Gardens and surprised me.  I was like

23  oh, hi, stranger.  He had been in Oklahoma, that's why he

24  hadn't returned my of my calls or anything.

25      Q.    Barbara described your recollection to him as

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    being smitten.  Is that an apt description?

2          A.    Yeah.  I think she would use that word because

3    I -- yeah, everything was about Joe.  I just -- the

4    conversations that we had were -- were -- I had this

5    compassion for him and I -- I don't know.  He was just a

6    really neat guy.  He had some issues on things that I felt

7    sorry for him and I just wanted -- I wanted to help make his

8    life better.

9          Q.    That was from the inception from the first time

10   you met him?

11         A.    Probably those feelings started happening third

12   or fourth time that we --

13         Q.    Okay.  All right.  What would you do typically?

14   After the first meeting, where did you guys go?

15         A.    The second time we went out we actually went to

16   Tucson and ate at an Italian restaurant down there, and then

17   went to Dillards and he had me buy him some clothes because

18   he said that he wasn't very -- he was color blind or whatever

19   and couldn't pick out clothes very much, so we went shopping.

20         Q.    Okay.  So you picked out his wardrobe on the

21   second date?

22         A.    Second date, yes.

23         Q.    Yes?

24         A.    Yeah.

25         Q.    Okay.  What did you guys do after the second,

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    third, fourth?

2         A.    Like third and fourth, those started becoming

3    lake trips.  We -- we had some really good friends, Raul and

4    Tonya, and we would be at their house barbecuing or something

5    and the next thing I knew, we'd be packing up going to the

6    lake.

7         Q.    Okay.

8         A.    So it would be Friday night at, I don't know,

9    midnight, and everybody would decide they wanted to go to the

10   lake, so we'd take off to the lake.

11        Q.    All right.  Is that the principle recreation

12   for that group of folks that Joe was --

13        A.    Besides hanging out in the bar, yes, it was.

14        Q.    Okay.  So hanging out at the bar and going to

15   the lake?

16        A.    Uh-huh, yes.

17        Q.    Okay.  Did Joe have a boat at that time?

18        A.    Yes, he did.

19        Q.    Okay.  And what kind of boat was it?

20        A.    It was a Kachina jet boat.

21        Q.    Okay.  And that was one of the boats he had

22   throughout the period of your relationship?

23        A.    Yes.

24        Q.    Okay.

25        A.    It's like about eighteen feet long and had a,

1   you know, some kind of engine on the back of it with these

2   big pipes that come out and it went pretty fast.

3          Q.    Okay.  And did other folks in his group also

4   have boats?

5          A.    Yes, they did.

6          Q.    Okay.  Were they similar kinds of boats?

7          A.    Yes.

8          Q.    Okay.  Was boat racing some of the things --

9   one of the things that was done when you folks would go up to

10  the lake?

11         A.    Most definitely.

12         Q.    Okay.

13         A.    Yeah.  They're very competitive about whose

14  boat has what on it, what could go how fast, things like

15  that.

16         Q.    These are quite loud, noisy boats?

17         A.    Very loud.

18         Q.    Okay.  Would Joe spend time when he wasn't with

19  you working on --

20               (Cell phone rings in the courtroom.)

21      THE COURT:  Hold on a second.

22   BY MR. PATTERSON:

23         Q.    -- his boat --

24      THE COURT:  Hold on a second.

25               Ma'am.  Ma'am.  Ma'am, please leave the


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    courtroom with that cell phone.

2           WOMAN IN COURTROOM:  I'm turning it off, sir.

3           THE COURT:  Please leave the courtroom with that cell

4    phone.

5                If anyone has a cell phone in here, I want it

6    turned off.

7                Mr. Patterson, you may continue.

8           MR. PATTERSON:  Thank you, Judge.

9           THE WITNESS:  I don't know what you were saying.

10   BY MR. PATTERSON:

11          Q.   Yeah.  Let me repeat the question.  You folks

12   would go up to the lake.  I guess we could talk about what

13   lake you guys would go to.

14          A.   Most frequently we would go to Apache Lake and

15   spend the weekend.  If it was going to be a day trip, we

16   might go to Saguaro or Canyon.

17          Q.   Okay.  The times he wasn't actually going to

18   the lake with the boat, was he spending time fixing the boat

19   or souping up the boat or working on the boat?

20          A.   Yes.

21          Q.   Okay.  Did you do any other kind of

22   recreational things with Joe in the early phase of your

23   relationship?

24          A.   We went snow skiing a couple times.  We did

25   we liked to go to the movies, and we liked to go out and eat.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000004787

1       Q.    Okay.  Weren't forced to watch Rocky movies

2    with Joe, were you?

3       A.    No.  No.  We went and saw whatever was playing

4    at Casa Grande, you know, the little theater there.

5       Q.    Okay.  This relationship, is it -- do you still

6    categorize it as a couple of friends or is it developing into

7    something more serious?

8       A.    Yeah.  In the beginning Joe had a welding

9    business, so what would happen is he liked to do a lot of his

10   building towards the late evening because it's cooler, and so

11   he'd be finished sometime in the middle of the night and he'd

12   knock on the door at my apartment.  So I would get up and

13   we'd visit and he'd be hungry or something and I'd give him

14   something to eat and we'd watch TV for a little bit and he'd

15   fall asleep on my couch.

16            That went on for a while and then a few items

17   of clothing would get left at my house, and he told me that

18   he was having to pay rent at his parents and I didn't -- I

19   didn't like that, and so I eventually just said why don't you

20   move in here, you know, because it just would be a lot

21   easier.  We'd see each other more often and you live over

22   here all the time anyway.

23            And when he'd want to hide from people it would

24   be in my apartment, and he'd shut off his cell phone and

25   nobody knew me or my telephone number so he could get away

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000004788

1       from everybody and just hang out for the day.

2               Q.      All right.  So if you met on March 17 of '92,

3       what time are we talking about now when there's some

4       discussion about him actually moving into your apartment at

5       Quail Garden?

6               A.      Around August.

7               Q.      Okay.  So that's about five months?

8               A.      I believe so.

9               Q.      Okay.  Up to this point in time, is it a

10      friendship relationship or is there an intimate component to

11      it?

12              A.      The first couple of months it was just a

13      friendship thing, and later on, yeah, it became more -- more

14      of a sexual thing.  And I'm not going to say an intimate

15      thing, but it became -- it became sexual.

16              Q.      Okay.  But in a sexual intercourse sense or

17      like second or third base we used to call it?

18              A.      Yes -- lord, I don't know.

19              Q.      I don't know how else to describe it.

20              A.      I'm sorry.

21              Q.      That's okay.

22              A.      Yes.  It -- sexual intercourse and -- and Joe

23      and I always had an issue of being emotionally intimate.

24              Q.      Okay.  And

25              A.      And for me that means the hugging, kissing and

1    things like that.

2            Q.    Was that present in the relationship?

3            A.    We had fun together in the relationship.

4            Q.    Okay.  So just so I understand, the time he

5    moved in, it had developed into a sexual intercourse

6    relationship?

7            A.    Right about that time, yes.

8            Q.    Okay.  All right.  And was there a frequency of

9    that particular act in terms of number of times per week?

10           A.    It was everyday.

11           Q.    Okay.  And how was that for you at least

12   initially?

13           A.    Well, the first time it happened, I cried and I

14   don't know why.  And I -- it really freaked him out.  He

15   didn't know what to do.  He didn't know to hold me, walk

16   away, or what to do, you know.  It was just a really awkward

17   moment.  But after that, the friends he was hanging around

18   with then were like Justin and a couple others, and they

19   would really compare about sex and things like that.  And so

20   it was really important that for their egos or whatever you

21   want to call it to have sex every day, so I -- I realized

22   that through conversations and behaviors at the bars, things

23   like that and that Joe -- that was part of his -- what he

24   expected, and so -- so that's what we did.  We engaged in

25   sexual intercourse every day.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1      Q.   Prior to his moving in with you, had you heard

2  from his friends that he may have some anger control issues?

3      MR. MARTINEZ:  Objection.  Leading.

4      THE COURT:  Overruled.  Go ahead, answer the question

5  if you can.

6      THE WITNESS:  Yes, I had. I heard several --

7      MR. MARTINEZ:  Objection.  Lack of foundation as to

8  who she heard it from, dates, times.

9      THE COURT:  Ask your next question.

10     MR. PATTERSON:  Thank you, Judge.

11 BY MR. PATTERSON:

12     Q.   What point -- assuming you met him 3/17/92 --

13 obviously that's the first time you saw him, so then did you

14 start to hear reports from associates or friends of Joe there

15 may in fact be some anger control issues?

16     A.   The first people I heard it from was Raul and

17 Tonya, and that would have been the first year that we dated.

18 And --

19     Q.   Raul and Tonya were the two you went up to the

20 lake with?

21     A.   Right.

22     Q.   Okay.

23     A.   And they had their own place and it wasn't an

24 apartment so you didn't have to worry about being noisy to

25 the neighbor, things like that.  So we would always be over

1    at their place and a lot of it was made in a joking manner.

2    Oh, yeah, Joe blew up over this or Joe did that, Joe did

3    that, and you know, so you kind of laughed about it and

4    didn't -- I didn't take it too seriously.

5         Q.   Okay.  Did it continue and did you at some

6    point early on take it seriously?

7         A.   Well, after -- Joe seemed to switch groups of

8    friends, so we stopped hanging around Raul and Tonya and hung

9    around a different group of people.  And one night -- this

10   was -- had to be the summer of '93 -- we were at one of the

11   little bars in Casa Grande and I was sitting with Dale

12   Hartman, actually, because the girls there, I just wasn't

13   comfortable sitting with because they just hadn't accepted me

14   as part of their little group or whatever.  So I was sitting

15   there and Dale was a good friend of Joe's, very good friend.

16   They grew up together.  And Justin was there too.  And when

17   we were at a bar together, Joe didn't really hang around me

18   or pay attention to me.  He -- he did his thing with his

19   friends and I tried to make friends and, you know, whatever.

20   It was kind of awkward, but -- I just have to tell you this

21   story because Joe and --

22        MR. MARTINEZ:  I'm going to object if it's going to

23   be a narrative.

24        THE COURT:  Just answer the question.  Go ahead.

25        THE WITNESS:  Well, that's --

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

```
 1              MR. PATTERSON:  Is this --

 2              THE COURT:  Hold on a second.  Ask your next

 3    question.

 4    BY MR. PATTERSON:

 5         Q.    The report and topics, reports you got from

 6    associates of Joe pertaining to anger control issues?

 7         A.    While I was sitting there with Dale Hartman,

 8    Joe and Justin were up at the bar and they were starting to

 9    have a confrontation with -- we were in a bar that actually

10    Indians from the reservation would hang out in it.  It wasn't

11    one of your typical hang outs and they didn't appreciate us

12    being there, so they started to get into a confrontation and

13    I was kind of getting nervous and didn't know how to handle

14    it.  And Dale told me, he said that this -- they have guns

15    out in their trucks and this is -- if they want to be in the

16    bar, they'll be in the bar, Joe will handle it, don't worry

17    about it.

18                   And then as the evening progressed, he had also

19    said to me that --

20              MR. MARTINEZ:  I'm going to object.  Who is it, Joe

21    or --

22              THE WITNESS:  Dale Hartman had said to me --

23              THE COURT:  Go ahead.

24              THE WITNESS:  He started relating to me some of Joe's

25    earlier violent experiences that Dale had been witness to.
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    And I listened to Dale, but I had never seen evidence really

2    of that in Joe, so I didn't really know what to think.

3              The yelling and stuff like that was okay with

4    me because that's how I grew up, but physical violence I

5    didn't really approve of, but I hadn't seen any of that.

6    BY MR. PATTERSON:

7         Q.    Okay.   So you had heard --

8         A.    So I had heard stories, but --

9         Q.    All right.   Is there also something at work

10   here, were you happy that Joe had shown you some attention?

11        A.    Oh, yes, I was.

12        Q.    Talk to me about that.   Coming from one group

13   and he was in the other group, how did that impact you?

14        A.    Well, yeah.   It's very flattering.   Here you

15   have this -- he was very popular with the girls and a very

16   handsome man and lots of fun and all this sort of stuff, and

17   here he's interested in me.   And I come from, you know, a

18   very nonsocial group and I'm not used to all that sort of

19   stuff, so it was very flattering that he even wanted to spend

20   time with me.

21        Q.    Okay.   All right.   Now you mentioned that there

22   was some yelling.   Even early on in the relationship, he

23   began to yell?

24        A.    Yeah.   I would hear him yell.   It wasn't

25   necessarily directed at me so I didn't even -- that didn't

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000004794

1    bother me.

2          Q.   All right.  Directed at other instances,

3    incidents, or persons?

4          A.   Yes, other people or even just while doing

5    something out of frustration.

6          Q.   All right.  So you moved in together at Quail

7    Gardens?

8          A.   Yes.

9          Q.   You were the resident manager?

10         A.   Assistant manager.

11         Q.   Assistant manager, sorry.

12         A.   It was a one-bedroom apartment when we first

13    moved in.

14         Q.   Okay.  And did that change?

15         A.   Yes, it did.

16         Q.   How did that change?

17         A.   We were living in the one bedroom and it was

18    too small.  And Joe asked if we could have a two bedroom

19    since I worked there.  Well, normally an assistant manager

20    would not be given a two bedroom, only the manager would.

21    But we had that discussion several times and it seemed very

22    important in the relationship to keep things happy and keep

23    everybody, you know, whatever.  So I did go to my boss and I

24    told her and at first she said no.  I mean, she couldn't even

25    believe I had asked, but, you know, I -- I was persistent in

1    asking her.  And a month or so later she went ahead and

2    okayed it with our district manager and let me have a two

3    bedroom.

4             Q.    Okay.  Is Joe employed at this time?

5             A.    He has his welding business.

6             Q.    Okay.  Whatever happened to the welding

7    business?

8             A.    He told me he didn't want to do it anymore

9    because of the danger to his eyesight.

10            Q.    Okay.

11            A.    He said at one time he gotten a piece of metal

12   in his eye and he didn't want to lose his eyesight.

13            Q.    Okay.  After the welding business, were you

14   guys still at Quail Garden?

15            A.    No.

16            Q.    Okay.  Where did you?

17            A.    No.  We actually rented a townhouse on Pepper,

18   and the reason why we rented the townhouse on Pepper was

19   because I went to go work at the hospital, and so obviously a

20   free apartment was no longer part of my salary, so we moved

21   to Pepper and Joe still had his welding business then and

22   that's when I was working at the hospital.

23            Q.    Okay.  And what year are we talking about?

24            A.    This is Fall of '93.

25            Q.    Okay.  Is the fact that Joe and you are sharing

1   an apartment or townhouse creating difficulties for your mom

2   and dad?

3           A.    For my dad more than my mom.

4           Q.    Okay.  And --

5           A.    Um --

6           Q.    What was the impact upon you in that regard?

7           A.    When Joe moved in, when I was still in the one

8   bedroom, he moved in -- I think it was about August or so of

9   '92 -- and my dad did not talk to me until '93.

10          Q.    And that was the result of that living with Mr.

11  Andriano?

12          A.    He didn't approve of it.

13          Q.    Okay.  You're at the townhouse on Pepper you

14  said?

15          A.    Uh-huh.

16          Q.    This is in Casa Grande.  You're now working at

17  Casa Grande Regional Hospital?

18          A.    That's correct.

19          Q.    All right.  And how is the relationship with

20  Joe in terms of -- well, let's start is there verbal

21  altercations at this time?

22          A.    Yes, there is.  I had used my car to trade

23  in --

24          MR. MARTINEZ:  I'm going to object.  There's no

25  question before her.  She was asked if there were

1    altercations.

2            THE COURT:  I'll sustain the question.  Go ahead and

3    ask your next question.

4    BY MR. PATTERSON:

5            Q.    Is there an instance of verbal disagreements or

6    what you mentioned?

7            A.    Yes.  This is what happened.

8            MR. MARTINEZ:  If we could have more foundation

9    when.

10   BY MR. PATTERSON:

11           Q.    Where are you living at the time?

12           A.    In the townhouse at Pepper.

13           Q.    Okay.

14           A.    This is the Fall of '93.

15           Q.    Okay.  And you're at Casa Grande Regional --

16           A.    Casa Grade Regional Hospital.

17           Q.    And Joe's not employed?

18           A.    He has his welding business.

19           Q.    Welding business?  Okay.  Tell me about an

20   incident that --

21           A.    I traded in my car so he could have a full-size

22   truck.  We only had one vehicle between the two of us and

23   living at the townhouse, and he is taking me to work and I'm

24   finding rides home from work because usually by that time

25   he's outside doing welding stuff or at the bar with his

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000004798

1    friends.  And I would be home by myself and I'd want him to

2    come get me so I could, you know, be with him or do whatever,

3    not just sit at home.  And I would call on the cell phone and

4    that's what started all of the arguments is because he didn't

5    want to have to leave the bar come get me, things like that.

6    So when he would get home, I would get yelled at for

7    bothering him.

8        Q.    Okay.  And the inception of this verbal

9    altercation is while you're at the townhome?  Or had it

10   started before when you were at the Quail Garden Apartments?

11       A.    No.  I will -- would say it wasn't until I

12   really had -- probably the first time he ever yelled at me

13   was over me asking him to come pick me up.

14       Q.    Okay.  Were there times at the townhome --

15   we're talking Fall of '93 now, right?

16       A.    Yes.

17       Q.    -- where the verbal argument would escalate in

18   a touching episode?

19       A.    There's only one time that I recall.  I had

20   made dinner and I had, I believe, I made pot roast and made

21   corn to go with it.  And I don't mean to laugh, but when Joe

22   went to take a bite of the corn, something was wrong with it.

23   And he was like, What's in this corn?  And, you know, so I'm

24   tasting it and we're trying to figure out what in the world?

25   And we're kind of laughing about it or trying to figure out

1    what's going on.

2           And what had happened was earlier that day I

3    was washing dishes, and one of the plastic containers I had

4    stored red like tomato sauce or spaghetti sauce in and it

5    stained the thing, so I used bleach to clean it out.  And I

6    did not know you can't put bleach in Tupperware products.  I

7    was just trying to get it clean.  That same bowl is what I

8    cooked the corn in and the bleach obviously went into the

9    Tupperware and the heat from the microwave made --

10          Q.    So it had a foul taste?

11          A.    Yeah, it had a foul taste.  It was funny.  We

12   joked around about it at first and I -- you know, I -- I

13   didn't know -- I didn't know what was -- so, anyways, we

14   ended up throwing it away.

15          Later on in the evening I'm cleaning off the

16   table for, you know, after eating our dinner, whatever, and

17   he comes into the kitchen and he starts opening up all the

18   cupboards and just starts throwing away all the Tupperware.

19   And I'm like, "What are you doing?"  He just keeping throwing

20   this stuff away and starts cussing at me, saying I'm not --

21   won't have the chance to do that to him again, all this sort

22   of stuff.  And he starts getting mad about it and I didn't

23   know why he was mad, but he wanted to fill up the garbage can

24   with all this stuff.  And I didn't know what was going on and

25   I said something to him that I guess he might have been

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1   considered smart or whatever, and I got backhanded across the

2   side of my face.

3          Q.   Okay.  Was your adopted -- Brandon there that

4   day?

5          A.   Yes, he was.

6          Q.   How'd you deal with that issue that evening?

7          A.   I didn't know what to do.  I -- after he hit

8   me, I stood there stunned.  I just started crying.  I didn't

9   know.  I couldn't understand why he hit me.  He was still

10  upset and he ended up going outside.  I took Brandon and went

11  up to the bedroom and stayed up there.  And later on in the

12  evening Brandon went to bed in the guest bedroom and Joe came

13  in and went to bed and we never said anything about it.

14         Q.   Okay.  So you didn't deal with it directly at

15  all?

16         A.   No.  I didn't know what to say.

17         Q.   Okay.  Did he mention it?

18         A.   No.

19         Q.   Was it mentioned the following day or the day

20  thereafter?

21         A.   No.  We never talked about it.

22         Q.   After the townhouse, where did you folks move?

23         A.   For a brief amount of time I moved back in with

24  my parents and I think Joe moved in either with his sister or

25  with his mom and dad, and that was just right before our

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    wedding.

2          Q.     Okay.   There was a reason for the --

3          A.     The townhouse that we were renting, the people

4    were selling it, and so we had to move out of it and we

5    hadn't had time to find another place to live, and I also was

6    trying to make amends with my father, so I moved home a

7    little bit before I got married and moved into a house

8    together after we were married type thing.   I was just trying

9    to keep the peace.

10          Q.     Okay.   Had there been discussions between you

11   and Joe concerning marriage?

12          A.     Yes, there had been discussion.

13          Q.     Okay.   I mean --

14          A.     Um --

15          Q.     -- how did it happen?

16          A.     -- well --

17          Q.     How was the decision made that you folks

18   decided to become man and wife?

19          A.     Most of our time was spent when there was

20   drinking involved, and when Joe would drink that's when he

21   would talk to me more.   And so when we were in the

22   two-bedroom apartment at Quail Gardens was the first time it

23   came up because I asked him -- he told me he loved me and I

24   asked him why he loved me because I didn't really believe he

25   loved me.   And he told me that because I wasn't like all the

1    other girls that he had dated and that he -- that I really --

2    that he felt that I really cared about him and he liked the

3    way I took care of him and the way I offered to pay for

4    lunch, dinner, going to the movies, things like that.  And I

5    was just a different kind of person than he had ever gone out

6    with, so -- and I remember both of us crying that night.  It

7    was just -- and then just a little bit after that he started

8    talking about wanting to marry me.  So it was just kind of

9    decided we would get married.

10        Q.    Okay.  Was -- were there plans made for a

11    formal wedding ceremony, honeymoon, those kinds of things?

12        A.    There were.  I don't know how to even explain

13    all this, but I was working at the hospital and at that time

14    we decided -- his sister had gotten married the year before.

15        Q.    Which sister?

16        A.    Jan.

17        Q.    Jan?

18        A.    Either the year before or two years before.

19    I'm not real clear on that.  And so his parents didn't have a

20    whole lot of money to be putting into a wedding, my parents

21    aren't rich, they didn't have that either, so between the

22    three of us we were going to finance this wedding, you know,

23    Joe and I, his mom and dad, and my mom and dad.  And so we

24    picked January of '94 because of the cotton season, that

25    would be a good time.  And I believe there was some

1    discussion that there would be more funds available for us to

2    have a wedding at that time.

3            My mom actually ended up doing a lot of the

4    planning for me, and I know that just because I was so busy

5    at work and I also -- I don't know, it just -- I just

6    couldn't seem to take a huge interest in planning this

7    wedding.  And I don't know why, so my mom stepped in and

8    she -- she did that for me.

9            Q.    Did you have some reservations in your heart,

10   in your mind?

11           A.    I'm sorry.  My big reservation was that I had

12   been raised that you only marry a Christian man and I wasn't

13   doing that.  And I couldn't even go to my own pastor of my

14   church to ask him to marry us.

15           Q.    Did you have any reservations about his conduct

16   up to this point?

17           A.    No.  It hadn't seemed any different from my

18   father what I had been raised with, so no, I wasn't -- I

19   wasn't really concerned about it.

20           Q.    All right.  So the plans were made.  Which

21   facility did you folks use to --

22           A.    Well --

23           Q.    -- establish the marriage?

24           A.    There was some discrepancy because he had been

25   raised catholic and so we picked a neutral church and I

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000004804

1    couldn't even tell you the name of the church right now --

2         Q.    Okay.

3         A.    -- but some -- some other church.  And where we

4    got married, I know it's across the street from the Catholic

5    church.  I just don't remember the name of it.

6         Q.    In Casa Grande?

7         A.    Casa Grande.

8         Q.    Tell me about your relationship prior to the

9    wedding with your best friend Barbara Mitchell?

10        A.    Well, it went from her and I doing everything

11   together to it just being Joe and I, and he didn't like her.

12   He thought she was too wild or too this or too that or

13   whatever the reasons were.  I don't even -- can't even

14   recall, but there was always something.  And she did come to

15   the lake with us once and he never even acknowledged that she

16   was there.  And it just made her feel very uncomfortable, so

17   she just, you know, it just kind of dissipated our whole

18   friendship.

19        Q.    Okay.  Did you maintain any friendship

20   relationships with other girlfriends or other male friends

21   after you and Joe moved into together?

22        A.    Not with any of mine that had been my friends,

23   no.

24        Q.    Okay.  The friends that you were now

25   associating with were whom?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1      A.    They were Joe's friends.

2      Q.    Okay.

3      A.    Yeah.

4      Q.    Okay.  There was a decision made with regard to

5  who should be the maid or matron of honor in your wedding?

6      A.    Yes.  I had -- I knew if I asked Barbara it

7  just wouldn't, because of the previous history, go over well,

8  and so there was a person, Nola Barnes, that was also kind of

9  like me that came into this group through her boyfriend and

10  her and I got along pretty well, and she was somebody I felt

11  comfortable around, I could be myself around, she could be

12  herself, and, you know, if we were at the bars together it

13  was her and I sitting there at the table and kept -- kept

14  each other company.  And so I had asked her to be my maid of

15  honor.

16           And shortly before the wedding, Joe had a

17  falling out with her boyfriend, who was Steve Barnes, and

18  wouldn't -- they were no longer speaking to each other, and

19  so Joe instructed me to call Nola and tell her she was no

20  longer welcome to the wedding.  And I didn't want to do that

21  just, you know, because she's my friend.

22      Q.    Did you do that?

23      A.    I couldn't call.

24      Q.    Okay.

25      A.    So I ended up writing her a letter.  And the

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    next time that we saw her, she was -- it was horrible.

2        Q.    Okay.  Who served as your maid or matron of

3    honor in your wedding?

4        A.    I have to say that Joe's sister Janay was my

5    maid of honor, and her and her husband were so helpful to us

6    during the wedding.

7        MR. MARTINEZ:  Objection.  Beyond the scope.

8        THE COURT:  Sustained.  Go ahead, ask your next

9    question.

10   BY MR. PATTERSON:

11       Q.    Who served as maid of honor?

12       A.    Janay.

13       MR. MARTINEZ:  Objection.  Asked and answered.

14       THE COURT:  Ask your next question.

15       THE WITNESS:  Janay served as my maid of honor.

16   And --

17   BY MR. PATTERSON:

18       Q.    And who made that decision?

19       A.    Who made that decision?

20       MR. MARTINEZ:  Objection.

21       THE COURT:  Sustained.  Ask your next question.

22       MR. PATTERSON:  Wait, Judge.

23       THE COURT:  Re-ask the question.

24   BY MR. PATTERSON:

25       Q.    Who made the decision -- was it Janay?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1       A.      Janay.

2       Q.      -- of asking her?

3       A.      Janay asked me that, and I didn't have a

4   problem with that because I really liked Janay.

5       Q.      Okay.  But who brought her up as a potential

6   maid of honor?

7       A.      Joe did.  He asked me.

8       Q.      Okay.  Okay.  Got married in January of '94?

9   Okay.  Were you able to have a honeymoon?

10      A.      In January at the hospital in the accounting

11  department --

12          MR. MARTINEZ:  I'm going to object as being

13  nonresponsive.  Calls for a "yes" or "no."

14          THE COURT:  Sustained.  Just answer the question

15  that's asked.

16          THE WITNESS:  Okay.

17  BY MR. PATTERSON:

18      Q.      Did you take a honeymoon after --

19      A.      A brief one.

20      Q.      Okay.  How were you able to pay for that?

21      A.      Joe's sister Janay and Brad gave that to us as

22  our wedding present.

23      Q.      Okay.  Where did you guys go?

24      A.      We spent three days in Las Vegas.

25      Q.      All right.  Do you recall which particular

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    hotel?

2         A.    We stayed at the Flamingo Hotel and --

3         MR. MARTINEZ:  Objection.  She's now going to

4    narrate.

5         THE COURT:  Ask your next question.

6    BY MR. PATTERSON:

7         Q.    Okay.  Why was it a three-day duration?

8         MR. MARTINEZ:  Objection.  Relevance.

9         THE COURT:  Overruled.  Go ahead and answer the

10   question.

11        THE WITNESS:  That's all the time I could get off of

12   my job.

13   BY MR. PATTERSON:

14        Q.    Okay.  You returned back to Phoenix.  Did you

15   then go back -- you're at Casa Grande Regional?

16        A.    Still, yes.

17        Q.    Okay.  Is Joe still involved with his welding

18   practice?

19        A.    No.

20        Q.    Has he moved on to some other enterprise? What

21   is he doing now?

22        A.    At the time of our wedding and all this, he

23   decided that he wanted to do a windshield repair and

24   replacement business?

25        Q.    Okay.  And that's when he started Joe's --

1      A.    That's when he started Joe's Windshield Repair.

2      Q.    Okay.  And that was in Casa Grande?

3      A.    Yes.

4      Q.    Okay.  And how long did that last?

5      A.    Well, he kept it when we had AccuGlass.   He

6  always had Joe's Windshield Repair, but as far as being an

7  active, viable business, I don't -- we never -- he never

8  really even got it off the ground.

9      Q.    Okay.  Did you folks make any money at that

10  enterprise?

11      A.    We made money, but did not make profit.

12      Q.    Okay.

13           MR. PATTERSON:  Judge, it might be a good time stop.

14           THE COURT:  Okay.  We'll go ahead take our evening

15  recess at this point in time.

16           Ladies and gentlemen, during this recess

17  remember the entire admonition I've given you including the

18  fact you're not to discuss this case with anyone, do not let

19  anyone discuss the case with you, keep an open mind about the

20  case, do not do any research, investigation, experimentation

21  or testing on your own, avoid any media coverage of the case.

22           Again, keep an open mind.  I want you to have a

23  nice evening.  We'll see you tomorrow at 1:00 p.m.  Have a

24  nice evening.  We'll see you tomorrow.  Have a nice recess.

25           (Evening recess.)

1

2

3                          CERTIFICATE OF REPORTER

4

5    STATE OF ARIZONA      )
                           )
6    COUNTY OF MARICOPA    )

7

8                I, Traci L. Wheeler, CSR, RPR, an official

9    and certified reporter in the Superior Court of the State

10   of Arizona, in and for the County of Maricopa, hereby

11   certify that I made a shorthand record of the proceedings

12   had in the within case, and that the foregoing transcript

13   is a full, true, and correct transcription of the

14   proceedings in this case.

15                Dated this 5th day of June, 2005.

16

17

18   _____
     Traci L. Wheeler, CSR, RPR
19   Certified Court Reporter No. 50313
     Official Court Reporter
20

21

22

23

24

25

              TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR