# TABLE OF CONTENTS (INTERACTIVE)

| VVVVVVVVVVV PART 2 | State's Response to Petition for Review and Appendices |
|---|---|
| | Appendix J PART 1 |
| | Appendix J PART 2 |
| | Appendix J PART 3 |
| | Appendix K PART 1 |
| | Appendix K PART 2 |
| | Appendix K PART 3 |
| | Appendix L |
| | Appendix M PART 1 |
| | Appendix M PART 2 |
| | Appendix M PART 3 |
| | Appendix N PART 1 |
| | Appendix N PART 2 |
| | Appendix N PART 3 |
| | Appendix O |
| | Appendix P |
| | Appendix Q-S |

# EXHIBIT VVVVVVVVVV PART 2

# APPENDIX J - Part 1

05-0002
Braocio
1

COPY

DP

1          IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

2               IN AND FOR THE COUNTY OF MARICOPA

3

4    STATE OF ARIZONA,            )
                                  )
5            Plaintiff,           )
                                  )
6    v.                           )     No. 1 CA-CR 04-0731
                                  )     MARICOPA COUNTY
7    WENDI ELIZABETH ANDRIANO,    )     No. CR 2000-096032
                                  )
8            Defendant.           )
     ─────────────────────────────)

9

10

11

12                      Mesa, Arizona
                      October 21, 2004

13

14

15

16        BEFORE:  The Honorable BRIAN K. ISHIKAWA

17

18          REPORTER'S TRANSCRIPT OF PROCEEDINGS

19                     TRIAL DAY 30

20

21

22

23

24    ORIGINAL Prepared for APPEAL by:
      TRACI L. WHEELER, CSR, RPR
25    Certified Court Reporter No. 50313


        TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

2

1                    A P P E A R A N C E S

2    FOR THE STATE:        JUAN M. MARTINEZ,
                           Deputy County Attorney
3
     FOR THE DEFENDANT:    DANIEL B. PATTERSON,
4                          Deputy Public Defender
                                    and
5                          G. DAVID DELOZIER,
                           Attorney at Law
6

7           I N D E X   O F   E X A M I N A T I O N

8    WITNESS                                        PAGE

9    COLLIER, WILLIAM JOE, Called on Defendant's behalf
              Continued Cross-examination by Mr. Martinez      3
10            Redirect Examination by Mr. DeLozier            23
              Follow-up Questions by Mr. Martinez             49
11
     MITCHELL, BARBARA, Called on Defendant's behalf
12            Direct Examination by Mr. Patterson            147
              Cross-examination by Mr. Martinez              174
13            Redirect Examination by Mr. Patterson          184

14   OCHOA, BRANDON, Called on Defendant's behalf
              Direct Examination by Mr. Patterson             51
15            Cross-examination by Mr. Martinez               89
              Redirect Examination by Mr. Patterson          141

16

17

18

19

20

21

22

23

24

25


          TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1              (Pause in proceedings.)

2         MR. PATTERSON:  Judge, could we break for five

3    minutes?  I've lost my witness.

4         THE COURT:  We'll take a five minute break at this

5    time.  Remember the admonition I gave you.  Do not discuss

6    this case with anyone, do not let anyone discuss the case

7    with you, keep an open mind.  This should only take five

8    minutes.

9

10             (Recess.)

11

12        THE COURT:  This is CR 2000-096032, State of Arizona

13    versus Wendi Elizabeth Andriano.  The record will reflect

14    presence of the Defendant, Counsel and the jury.

15             Mr. Patterson?

16        MR. PATTERSON:  Thank you, Your Honor.  We would ask

17    Brandon Ochoa to testify.

18        THE COURT:  Please step forward right up here.  Give

19    the clerk your name and she'll swear you in.

20

21             BRANDON OCHOA,

22    CALLED TO TESTIFY ON BEHALF OF THE DEFENDANT,

23    HAVING FIRST BEEN DULY SWORN, TESTIFIES AS FOLLOWS:

24

25        THE COURT:  Please have a seat on the witness

```
 1    stand.  Please make yourself comfortable there on the witness
 2    stand.  Please pull the microphone close to you.  Please
 3    remember to speak loudly and clearly in the microphone so
 4    everyone can hear you.  Also please wait until question is
 5    completed before you answer the question, and give -- please
 6    make sure you give a verbal response.  Is that agreeable?
 7              THE WITNESS:  Yes.
 8              THE COURT:  Mr. Patterson?
 9              MR. PATTERSON:  Thank you, Judge.
10
11    DIRECT EXAMINATION BY MR. PATTERSON:
12         Q.   Please give us your name, sir?
13         A.   Brandon Ochoa.
14         Q.   Okay.  And are you related in some manner to
15    Wendi Andriano?
16         A.   Yes, I am.
17         Q.   Okay.  And what is that relationship?
18         A.   Biologically, I believe she's my cousin.
19         Q.   Okay.  What is your mother's name?
20         A.   Kathy Worship (phonetic).
21         Q.   Okay.  And what is her relationship to Donna
22    Ochoa, Wendi's biological mother?
23         A.   Sister.
24         Q.   Sister, okay.  How are -- how old are you, sir?
25         A.   I'm 19.
```

1   Q. Are you currently employed?

2   A. Yes, I am.

3   Q. What are you?

4   A. I'm a car lot sales attendant.

5   Q. Okay.  In what city?

6   A. Tucson, Arizona.

7   Q. All right.  At some point in time did you live

8 with Joe Andriano and Wendi Andriano?

9   A. Yes, I did.

10   Q. Okay.  And what year did you first move in with

11 them?

12   A. '97.

13   Q. Okay.  Do you recall a particular month?

14   A. No, sir.

15   Q. Okay.  And for what period of time did you live

16 with Joe and Wendi Andriano?

17   A. Ninety days.

18   Q. Okay.  Approximately three months?

19   A. Yes, sir.

20   Q. Okay.  And this being 2004, you were

21 approximately how old when you moved in with Joe and

22 Wendi Andriano?

23   A. I believe 10, 11.

24   Q. Okay.  Seven years earlier -- 12 maybe?

25   A. Yeah.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1      Q.    Okay.  Doing the math here.

2      A.    Yeah.

3      Q.    Okay.  All right.  And at some point in time

4 after that 90-day period expired, did you move out to

5 another residence?

6      A.    I moved back in with Donna and Alejo.

7      Q.    Okay.  And how far distant were you when you

8 moved out to your new location from the home of Joe and

9 Wendi Andriano?

10      A.    No more than three miles.

11      Q.    Okay.  After the 90-day period expired, did you

12 return to their house on a regular basis?

13      A.    Yes, sir.

14      Q.    And how regular was that?

15      A.    Every day.

16      Q.    Okay.  And was there a purpose why you returned

17 on a daily basis?

18      A.    My nephew.

19      Q.    Okay.  And the nephew's name is?

20      A.    Nicolas Andriano.

21      Q.    And what did you do for Joe and Wendi Andriano

22 with regard to Nicolas?

23      A.    Babysitter.

24      Q.    Okay.  So -- and how long then did you continue

25 this daily visit to the home of Joe and Wendi Andriano

```
 1     back at this time?
 2              A.      Constantly.
 3              Q.      Okay.  And from -- for what duration, what
 4     length?
 5              A.      Say about 2000, 2001.
 6              Q.      Okay.  So year and a half, thereafter?
 7              A.      Longer than that.
 8              Q.      Okay.  All right.  Let's take you back further
 9     than that point in time.  What elementary school did you
10     attend and in what city?
11              A.      Harvest Christian Academy in Casa Grande,
12     Arizona.
13              Q.      What grades did you attend at that particular
14     educational facility?
15              A.      From 1st till, I want to say, 7, 8.
16              Q.      Okay.  Can you describe the school for me?
17     Let's start with student class size.  How big were your
18     classes each year?
19              A.      Anywhere from 15 to 20 students.
20              Q.      50 to --
21              A.      15.
22              Q.      Oh, 15, sorry.
23              A.      To 20 students.
24              Q.      Did that perpetuate each year, the same number
25     of students per --
```

1    A.    It changed, varied.

2    Q.    Okay.  Smallest class you attended?  Give me

3  that range.

4    A.    7 students to 35.

5    Q.    Okay.  And is this the same educational

6  facility that Wendi Andriano attended?

7    A.    Yes, sir.

8    Q.    Okay.  And there's been another witness out

9  here, lady by the name of Barbara Mitchell.  She too attended

10  that school.

11    A.    Okay.

12    Q.    Can you tell me a bit about the educational --

13  the curriculum I think they call it at that particular

14  school?

15    A.    It was work at your own pace.

16    Q.    Okay.  And what kind of topics did you cover?

17    A.    English, basic mathematics, word building,

18  vocabulary skills -- basic school.

19    Q.    Okay.  Was there a religious component to the

20  education that you received there?

21    A.    Yes, there was.

22    Q.    How significant was that component?

23    A.    Very.

24    Q.    Okay.  Who was the school run by?

25    A.    Pastor Tom King.

1          Q.     Okay.  And was he what we call the principal in

2     a public school setting?

3          A.     Yes and no.

4          Q.     Okay.  Tell me how did he differ from a

5     conventional kind of principal at a public school.

6          A.     He wasn't really directly involved with the

7     school.  He ran the church more than anything else, but his

8     wife ran the school and he still monitored most of the

9     disciplinary activity.

10         Q.     Okay.  And was corporal punishment used as a

11    discipline at that school?

12                MR. MARTINEZ:  Objection.  Relevance.

13                MR. PATTERSON:  It's absolutely relevant, Judge.

14                THE COURT:  Overruled.

15    BY MR. PATTERSON:

16         Q.     Was that used?

17         A.     Yes, sir.

18         Q.     Okay.  We're talking about corporal punishment,

19    we're talking about?

20         A.     Yes.

21         Q.     Was this a daily occurrence amongst the

22    students or those who misbehaved at that school?

23         A.     I wouldn't say daily because most learned, but

24    it could be.

25         Q.     Okay.  Did you graduate from that school?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

```
 1        A.    No, I did not.

 2        Q.    Okay.  What grade did you leave?

 3        A.    8.

 4        Q.    And did you complete your schooling at some

 5   other location?

 6        A.    No, I did not.

 7        Q.    Okay.  Looking back kind of hindsight, was it a

 8   good educational experience for you?

 9        A.    Yes, it was.

10        Q.    Okay.  At the time what was your feeling about

11   the nature of the educational experience?

12        A.    I hated it.

13        Q.    Okay.  And why did you hate it?

14        A.    I thought they were holding me down.

15        Q.    And what exactly was holding you down?

16        A.    Being involved in the school pretty much meant

17   that your life was with the church and school.

18        Q.    Okay.  And as a result of that did it fail to

19   teach you how to deal with the society at large?

20        A.    Yes.

21        Q.    Okay.  And can you explain that conceptually

22   for me, how difficult has it been for you to kind of

23   assimilate into greater society?

24        A.    Difficult.

25        Q.    Okay.
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

```
 1          A.    It's -- they did do a really good job teaching
 2     academics and religion, but they didn't cover any social
 3     basis at all, I guess you could say.
 4          Q.    All right.  Let's jump forward to the 90-day
 5     period you actually lived with Joe and Wendi Andriano.  What
 6     residence are we talking about here?
 7          A.    I'm not sure of the address, but it was the one
 8     with the machine shop.
 9          Q.    The machine shop?  Was it on --
10          A.    Yes.
11          Q.    -- a particular greater parcel of property?
12          A.    Yes.
13          Q.    Okay.  What was the greater parcel?
14          A.    Farm land.
15          Q.    Okay.  And do you know who owned the farm, if
16     you will?
17          A.    The Andrianos, I believe.
18          Q.    Joe's parents?
19          A.    Yes, sir.
20          Q.    Okay.  And on this farm land there was, what
21     you described, was a machine shop?
22          A.    Yes, sir.
23          Q.    Okay.  Describe it for me with more
24     particularity.  How many rooms was -- was involved here?
25          A.    One large almost square house-sized building,
```

1      just no walls.

2              Q.      Okay.  Was it divided up into the rooms within

3      the interior?

4              A.      No, sir.

5              Q.      Okay.  What rooms then were inside that

6      particular machine shop?

7              A.      It was a single room with lots of tools and

8      equipment.

9              Q.      Okay.  Was there a bathroom?

10             A.      No, sir.  That was in the house.

11             Q.      Okay.  Well, I'm a little confused here.  I'm

12     talking about specifically where you resided with Joe and

13     Wendi Andriano?

14             A.      The house directly beside it.

15             Q.      Okay.  All right.  I apologize.  The machine

16     shop is one big building with tools in it?

17             A.      Yes.

18             Q.      Okay.  Next door to that machine shop was a --

19     a building that had been converted into a residence.  Is

20     that correct?

21             A.      Yes, sir.

22             Q.      Okay.  That building -- that's what I'm

23     interested in.  That building was converted into said

24     residence.  Describe that interior for me of that building?

25             A.      You walk in the front door, you're in the

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    kitchen and dining room.  Pretty much the bathroom is

2    directly in front of you.  Walk into the hallway, five steps

3    the hallway, then you're in the living room.

4            Q.    Was --

5            A.    Twenty steps across the living room, you're in

6    the bedroom.  That's it.

7            Q.    Is it as big as this courtroom?

8            A.    Maybe if you cut it in half and extended it --

9            Q.    Okay.

10           A.    -- long way.

11           Q.    Okay.  So after the -- half down the middle and

12   add a little bit on the back end?

13           A.    Yes, sir.

14           Q.    All right.  And did you have your own room or

15   did you sleep in a kind of common area?

16           A.    I resided in the living room.

17           Q.    Sleep on the couch basically?

18           A.    Yes.

19           Q.    Okay.  And where was Joe and Wendi's room,

20   sleeping room within this arrangement?

21           A.    In the master bedroom beyond the living room.

22           Q.    Okay.  And was this -- could you get some

23   privacy by closing off a door when you were back in that

24   room?

25           A.    Yeah.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

```
 1          Q.     Okay.  So it was a -- an actual room with a
 2    door and --
 3          A.     There was a pair of doors because there was a
 4    walk-in closet right before the master bedroom.
 5          Q.     All right.  Now, during the period of time that
 6    you were actually there, did you ever witness verbal
 7    altercations between Joe and Wendi Andriano?
 8          A.     Yes, sir.
 9          Q.     How frequently did the verbal altercations
10    happen, occur?
11          A.     Every other day maybe.
12          Q.     Okay.  So three to four times a week?
13          A.     Two to three.
14          Q.     Okay.  And are we talking about just kind of
15    minor disagreements or are those significant verbal
16    altercations?
17          A.     I'd say both.
18          Q.     Okay.  So little of each?
19          A.     Yes.
20          Q.     Okay.  Do you recall what topics these verbal
21    altercations would arise out of?
22          A.     There were many.
23          Q.     Okay.  Give me some examples.
24          A.     Anything between fighting over the businesses
25    to worrying about financing, things like that.
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000007879

1      Q.    Okay.  Any other topics?  Was Nicolas around at

2   this time?

3      A.    Yes, sir.

4      Q.    Okay.  Was there childcare issues?

5      A.    Not at that stage.

6      Q.    Okay.

7      A.    Not really.

8      Q.    All right.  Any other topics that you recall

9   that would precipitate verbal arguments between Joe and

10  Wendi Andriano?

11     A.    Sometimes drinking, but hardly ever.

12     Q.    His drinking or her drinking?

13     A.    His.

14     Q.    Okay.  Do you have a -- a recollection as to

15  who initiated these verbal altercations primarily?

16     A.    On average it was Joseph.

17     Q.    Okay.  And typically how would they -- they

18  transpire?  I mean topic would come up, verbal altercation

19  would begin, tell me about the typical verbal altercation

20  that you witnessed in that environment.

21     A.    Had argument, period of time to just kind of

22  cool down, and then they would be fine.

23     Q.    Okay.  Did you ever see Wendi strike Joe as a

24  result of those verbal altercations?

25     A.    No, sir.

1          Q.    Okay.  Did you ever observe in Joe any

2    demonstration of rage or extreme anger during the course

3    of these verbal altercations?

4          A.    Yes, sir.

5          Q.    How frequently or typically would that occur?

6          A.    Once a week --

7          Q.    Okay.

8          A.    -- maybe.

9          Q.    All right.  Did he have certain pet areas or

10   pet peeve areas that would set him off more so than others?

11         A.    Yes, sir.

12         Q.    Give me examples of that.

13         A.    Wendi's whereabouts, being unaware of what's

14   going on, sometimes he was jealous.

15         Q.    Okay.  And in circumstances wherein he

16   manifested this jealous aspect of his personality, would

17   that tend to make him more angry or more rageful if you

18   will?

19         A.    When he was unaware of her presence, that's

20   when he'd get worst.

21         Q.    Okay.  Were there occasions when these verbal

22   altercations escalated into physical fights between Wendi and

23   Joe Andriano?

24         A.    Yes, sir.

25         Q.    Okay.  And in that 90-day period that you were

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000007881

1    there in that residence, how many times did you see Joe

2    strike Wendi?

3            A.    Once.

4            Q.    Okay.  And describe it for me.

5            A.    Open hand strike to the face, the cheek.

6            Q.    Okay.  And he used -- which hand?

7            A.    Right.

8            Q.    Okay.  It impacted what part of Wendi's body?

9            A.    Jaw line.

10           Q.    Okay.  Of the left or right side?

11           A.    Left, I believe.  I'm not sure.

12           Q.    Okay.  All right.  And how significant was the

13    slap?  Was it significant?

14           A.    Hand print.

15           Q.    Hand print?

16           A.    Slight bruise the next day.

17           Q.    Okay.  This was done in your presence?

18           A.    Yes.

19           Q.    Okay.  Was there another occasion where you saw

20    what appeared to be physical striking of Wendi by Joe

21    Andriano?

22           A.    Yes, sir.

23           Q.    Okay.  What was the circumstance of that

24    incident?

25           A.    I believe an altercation had happened where it

1    started off like a joke.  Wendi had washed one of the dishes

2    and then she made dinner, and the corn she put the dish in

3    still tasted like bleach.  And it started off more like just

4    a joke and Joe was playing around, "Oh, yeah, she's trying to

5    poison us."  It was a laughing matter.  And a little bit

6    later that evening, they started arguing and I was still in

7    the living room.  From his backside, I just saw a motion of a

8    swing.

9         Q.    Okay.  What motion did you observe from the

10   rear?

11        A.    Closed fist and looked like he punched.

12        Q.    Okay.  Was Wendi in close proximity to him at

13   the time?

14        A.    As far as I'm aware, yes.

15        Q.    Okay.  And where was your vantage point when

16   you observed this conduct?

17        A.    From Joe's backside.

18        Q.    How far distant were you?

19        A.    15 yards, maybe.

20        Q.    Forty-five feet?

21        A.    About.

22        Q.    Okay.  Were there occasions where you saw Joe

23   Andriano break or destroy things within that residence

24   during the period of time that you were there?

25        A.    Yes, sir, a couple times.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1        Q.      Couple times?  Okay.  Describe for me the first

2   time that you recall seeing this?

3        A.      The first time was they were arguing, I was

4   doing the dishes Wendi went into the bathroom, I believe she

5   was crying and Joe was screaming at the door, ended up losing

6   his temper, striking the wall and the door.

7        Q.      Okay.  And you observed this?

8        A.      Yeah.

9        Q.      What was your vantage point?

10       A.      Five feet away from the sink.

11       Q.      Okay.  Did you see him strike the door?

12       A.      Yes.

13       Q.      What did he use to strike door?

14       A.      Open fist or closed fist.

15       Q.      Was there damage on the door as a result of his

16   contact with it?

17       A.      Large hole.

18       Q.      Did it have surrounding damage in addition to

19   the hole?

20       A.      You could see where the fist impacted as well

21   as like it kind of collapsed.

22       Q.      Okay.  And where was Wendi in relationship to

23   the point where the door was where the damage was occasioned

24   when it was occasioned?

25           MR. MARTINEZ:  Objection.  Speculation.  He indicated


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000007884

1       she was inside.

2                THE COURT:   Sustained.

3       BY MR. PATTERSON:

4                Q.      Okay.   Then I just need to clarify that.   Where

5       was Wendi when this happened?

6                A.      Inside the bathroom.

7                Q.      Okay.   And that was the door to that bathroom?

8                A.      Behind the locked door, yeah.

9                Q.      Okay.   Was there any other damage occasioned to

10      the building on that day by Mr. Andriano?

11               A.      Aside from the hole in the wall, no.

12               Q.      Okay.   Was there another incident where you

13      observed him damage the interior of this particular

14      residence?

15               A.      One other time he threw a remote against the

16      wall and left a little hole.

17               Q.      Remote to the television?

18               A.      Yes.

19               Q.      He tossed it?

20               A.      Tossed would be the -- not be the word I used.

21               Q.      Okay.   What would be the word you used?

22               A.      Flung.

23               Q.      Flung?   Okay.   Was it the result of being upset

24      at something?

25               A.      Yes.

1.      Q.    What was he upset at?

2       A.    If I remember correctly, I think Wendi was

3   going out.

4       Q.    Wendi was going out with friends?

5       A.    With Barbara.

6       Q.    Okay.  Last name is Mitchell?

7       A.    Mitchell, yes.

8       Q.    All right.  During the period of time that you

9   were on site there so to speak did Wendi have girlfriends

10   that came over to visit?

11       A.    They weren't allowed.

12       Q.    Okay.  And who made that decision?

13       A.    Joseph.

14       Q.    What kinds of recreational things did you do if

15   any with Joe and Wendi Andriano during the period of time

16   that you were living with them?

17       A.    Boat racing, window tinting, and repair, some

18   other things.

19       Q.    Okay.  Did Joe teach you a number of positive

20   things?

21       A.    Yes, sir.

22       Q.    As you speak today, did you like Joe?

23       A.    I loved him.

24       Q.    Okay.  Tell us about going up to the lake.

25   What would you do at the lake with him?

```
 1          A.    Play grease boy.

 2          Q.    Okay.  What's a grease boy?

 3          A.    It's -- sorry.  It's pretty much run around.  I

 4    would grab parts, tools, oil.

 5          Q.    Gopher?

 6          A.    They needed a hand, yeah.

 7          Q.    And you said Joe would race boats up there.

 8    Were these kind of organized regatta kinds of races he

 9    was involved in?

10          A.    Organized and unorganized.  He was really into

11    his boats.

12          Q.    Okay.  And was that his primary passion, if you

13    will?

14          A.    That and guns.

15          Q.    Okay.  All right.  Let's talk about the guns

16    then.  How did he -- how did he like his guns?

17          MR. MARTINEZ:  Objection.  Relevance.

18          THE COURT:  Sustained.

19    BY MR. PATTERSON:

20          Q.    Well, did he have guns?

21          A.    Yes, sir.

22          Q.    Okay.  How often while you were there did you

23    observe those?

24          MR. MARTINEZ:  Objection.  Relevance.

25          THE COURT:  Sustained.
```

1          MR. PATTERSON:  Judge, we need to talk.

2

3               (The following proceedings were held at the

4     bench:)

5

6          MR. PATTERSON:  Dr. Murphy testified the presence of

7     guns in the home is one of the criteria that she considers in

8     determining the existence of domestic violence and I'm just

9     establishing the presence of the guns in the home.

10         THE COURT:  Mr. Martinez?

11         MR. MARTINEZ:  The guns that I remember that Dr.

12    Murphy testified about was that repossession where the

13    individual was driving away and he ran out and got the gun

14    from inside the car.  There was never any indication that the

15    defendant ever was shot at or anything about the guns.  I do

16    remember that there was an incident that somebody mentioned

17    about shooting a dog with a BB gun, but that's not what we're

18    talking about.

19         THE COURT:  I'll overrule the objection in light of

20    Ms. Murphy or Dr. Murphy's testimony.

21         MR. PATTERSON:  Thank you.

22

23               (The following proceedings were held in open

24    court:)

25

```
 1              THE COURT:  The objection is overruled.

 2                   Mr. Patterson, repeat the question.

 3              MR. PATTERSON:  Yes, sir.

 4    BY MR. PATTERSON:

 5         Q.   Were there guns in the residence during the

 6    period of time you stayed with Joe and Wendi Andriano?

 7         A.   Yes, sir.

 8         Q.   How many guns?

 9         A.   About 20.

10         Q.   More than --

11         A.   More than 20?  I'm not aware.

12         Q.   Okay.  What kind of jobs did you observe Joe

13    doing during the period of time that you knew him?

14         A.   Freelance boat work like I said before.  Window

15    tinting, window repair.  Those were the two main things

16    involved there.

17         Q.   Okay.  Can we categorize these kind of jobs as

18    blue collar or physical labor kinds of jobs?

19         A.   Physical labor.

20         Q.   Okay.  Do you recall his physical strength back

21    when you were living with him?

22         A.   Yes, sir.

23         Q.   How strong of a or robust a man was he?

24         A.   I wouldn't want to meet him in a dark alley.

25         Q.   Okay.
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          A.     He was --

2          MR. MARTINEZ:  Objection.  Relevance.

3          THE COURT:  Sustained.  That last portion will be

4    stricken.  Rephrase the question.

5    BY MR. PATTERSON:

6          Q.     Okay.  Just tell me about his physical

7    capabilities, his strengths.  For instance, lifting things,

8    carrying things?

9          A.     He wasn't well defined, but he was strong.  He

10   was capable of moving large engine blocks, big chunks of the

11   boat.  He was a strong man.

12         Q.     All right.  Did he have a pain tolerance?

13         A.     Yes, sir.

14         Q.     Okay.  Tell me how you know that to be true?

15         A.     I witnessed him drill himself in the hand and

16   he started laughing.

17         Q.     Okay.  Describe with a little more

18   particularity, Brandon.

19         A.     Power drill with a 16-bit drill head about four

20   inches long.  He put two inches of that drill into his hand,

21   thought it was kind of funny.

22         Q.     What was his response?

23         A.     He laughed.

24         Q.     Okay.  Did you ever see him move the

25   50-pound -- well, is there a certain kind of fuel that was

1    used in these jet boats?

2         A.    Aside from like nitrous oxide, yeah, I believe

3    the primary fuel was, I believe, a diesel fuel.

4         Q.    Okay.  And what canisters, if you will, or

5    drums did this fuel come in?

6         A.    Originally they came in 250-pound blue

7    canisters.  From there we'd syphon them into about 50 to

8    55-pound gas tanks.

9         Q.    Okay.  Did you see him move these drums?

10        A.    Yes, sir.

11        Q.    How would he move them?

12        A.    Bear hug, lift up, set them in.

13        Q.    Okay.  And then after a portion of it was

14   syphoned off, into what kind of containers would it be

15   syphoned off into?

16        A.    Same kind of gas can you'd use on your car.

17        Q.    Okay.  How would --

18        A.    Around two, three in a hand.

19        Q.    Okay.  Are the cement blocks often involved in

20   the boating?  Do you recall those?

21        A.    We usually used lifts, but, yes, we did use

22   them occasionally.

23        Q.    Okay.  Did you see him tote these cement blocks

24   away?

25             MR. MARTINEZ:  Objection.  Lack of foundation.  When?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1      Late in life?

2             MR. PATTERSON:  Talking about --

3             THE COURT:  Sustained.  Lay some foundation.

4      BY MR. PATTERSON:

5             Q.    -- the period of time you lived with them or

6      period of time when you were with them on a daily basis.  Did

7      you observe him lifting these cement blocks?

8             A.    Yes, sir.

9             Q.    Okay.  Did he have any difficulty with them?

10            A.    No, sir.

11            Q.    Okay.  Did you observe Joe Andriano in the

12     period of time you were living with him or the year and a

13     half thereafter or two years that you told us that you went

14     over there on a daily basis, did you observe Joe making

15     decisions for Wendi?

16            A.    Yes, sir.

17            Q.    Okay.  In what categories would he make

18     decisions for her?

19            A.    She would have to lay her clothes out for his

20     approval.

21            Q.    What kinds of clothes?

22            A.    Anything from kick-back clothes to actual dress

23     clothes for whatever work.

24            Q.    Okay.  So the whole range of her wardrobe?

25            A.    Yes, sir.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          Q.     Okay.  And he would make decisions in what

2     regard?  What would he do?

3          A.     She wasn't allowed to wear block.  Certain

4     things were considered too attractive.

5          MR. MARTINEZ:  Objection.  Lack of foundation.

6     Hearsay.  How does he know?

7          THE COURT:  Sustained.

8     BY MR. PATTERSON:

9          Q.     During the period of time that you observed him

10     doing these things, did he make decisions for Wendi with

11     regard on her wardrobe?

12          A.     Yes, sir.

13          Q.     What did he do in that regard?

14          MR. MARTINEZ:  Objection.  Hearsay.  Lack of

15     foundation.

16          MR. PATTERSON:  It's not hearsay.  It's conduct,

17     Judge.

18          THE COURT:  Sustained.  Ask your next question.

19     BY MR. PATTERSON:

20          Q.     Was he making the decisions with regard to what

21     Wendi could or could not wear to work?

22          A.     Yes, sir.

23          MR. MARTINEZ:  Objection.  Lack of foundation how he

24     knows.

25     / / / / /

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000007893

```
1     BY MR. PATTERSON:

2            Q.    Were you present --

3            THE COURT:  Hold on.  Sustained.  Ask your next

4     question.

5     BY MR. PATTERSON:

6            Q.    Were you present when he was making decisions

7     with regard to her wardrobe?

8            A.    Constantly.

9            Q.    Would he make some decisions in that regard?

10           MR. MARTINEZ:  Again, lack of foundation, hearsay.

11           THE COURT:  Sustained.

12           MR. PATTERSON:  Judge --

13           THE COURT:  Ask your next question.

14           MR. PATTERSON:  I need to make a record on this.

15

16                 (The following proceedings were held at the

17     bench:)

18

19           MR. PATTERSON:  It is not hearsay.  I'm not -- it's

20     not offered for the truth of the matter asserted, one, and

21     second, it's conduct.  He's making decisions here.  Just

22     because it's verbal doesn't render it excludable hearsay.  He

23     was present when these edicts were made, and it's admissible

24     because it's conduct and --

25           THE COURT:  Okay.  What are you --
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          MR. PATTERSON:  -- what she does in response to that.

2          THE COURT:  I know.  What are you bringing it up for?

3    What is the purpose for bringing it out?

4          MR. PATTERSON:  Referring back to Dr. Murphy,

5    domestic violence is not only about violence and about

6    hurting your spouse.  It's about controlling your spouse.

7    And making decisions for your spouse with regard to her

8    apparel, both from what she wears informally and formally, is

9    a significant controlling conduct on the part of this

10   gentleman and it corroborates and supports Dr. Murphy's

11   position.

12         THE COURT:  Mr. Martinez?

13         MR. MARTINEZ:  It's offered for the truth of the

14   matter asserted and the only way that he knows is by what was

15   said.  How does he know that Mr. Andriano did not want Mrs.

16   Andriano to wear black other than by her telling him or Mr.

17   Andriano saying it?

18         THE COURT:  I'll sustain the objection.

19

20              (The following proceedings were held in open

21   court:)

22

23         THE COURT:  Mr. Patterson?

24         MR. PATTERSON:  Thank you, Judge.

25   / / / / /


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    BY MR. PATTERSON:

2         Q.    Were there other circumstances where you

3    observed Joe Andriano demonstrating control over Wendi's

4    conduct?

5         A.    Yes, sir.

6         Q.    What other circumstances?

7         A.    She was required to check in.

8         MR. MARTINEZ:  Objection.  Hearsay.

9         THE COURT:  Overruled.  Go ahead, answer the

10   question.  Answer the question.

11        THE WITNESS:  Via phone call or come by the house.

12   As I said before, he was very protective.  He didn't like the

13   thought of her being around and him not knowing about it.

14   BY MR. PATTERSON:

15        Q.    Were there control issues with regard to her

16   hairstyle that you observed?

17        A.    Yes, sir.

18        Q.    What happened there?

19        MR. MARTINEZ:  Objection.  Hearsay.  Lack of

20   foundation how he knows.

21        THE COURT:  Let me see Counsel here at the bench.

22

23             (The following proceedings were held at the

24   bench:)

25

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          THE COURT:  Is he going to say he saw her with a

2     specific hairstyle or is he going to say Joe told her how to

3     wear her hair?

4          MR. PATTERSON:  That he made the decision with regard

5     to what hairstyle she was allowed to wear.

6          THE COURT:  Okay.  Mr. Martinez?

7          MR. MARTINEZ:  The only way that he knows that's what

8     Joe allowed is by hearing Joe tell him or by having the

9     defendant tell him.  There's not a way for him to know.

10         THE COURT:  Right.  I'll sustain the objection.

11

12              (The following proceedings were held in open

13     court:)

14

15         THE COURT:  The objection is sustained.  Ask your

16     next question.

17     BY MR. PATTERSON:

18         Q.    Other areas where Joe manifested control with

19     regard to Wendi's daily life?

20         A.    As with the hair styling?

21         MR. MARTINEZ:  Objection.  That's already been

22     sustained.

23         MR. PATTERSON:  Move away from the hairstyle.

24         THE COURT:  Move on.

25         THE WITNESS:  Okay.  Actions.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1      BY MR. PATTERSON:

2            Q.    For instance?

3            A.    If it so happened Wendi wanted to go to lunch

4      with me and someone, it had to be approved.

5            MR. MARTINEZ:  Objection.  Hearsay.  Lack of

6      foundation how he knows.

7            THE COURT:  Overruled.  Go ahead, ask your next

8      question.

9            THE WITNESS:  I really don't know how to describe it

10     except for lock down.  Everything she did had to be

11     approved by him or else he questioned it.

12     BY MR. PATTERSON:

13           Q.    Okay.  Were there instances of behavior conduct

14     that you observed involving animal cruelty?

15           A.    Yes, sir.

16           Q.    Okay.  Tell me about those?

17           A.    Shot the dog with a BB gun.

18           Q.    Okay.  What were the specifics of that conduct?

19           A.    We were in the machine shop working.  I guess

20     he had a couple beers under his belt and thought it would be

21     entertainment.

22           Q.    Okay.  What did he do?

23           A.    Shot the dog.

24           Q.    Whose dog was it?

25           A.    It was Wendi and Joe's.

1      Q.    What was the dog's name?

2      A.    I'm unaware.

3      Q.    Okay.  Any other instances that you can recall

4  involving animal cruelty?

5      A.    I know he was fond of hunting and whatever

6  birds would come around, he would shoot them out of the

7  sky, things like that.

8      Q.    Okay.  Using the shotgun?

9      A.    Yes, sir.

10      Q.    Okay.  During these verbal altercations that

11  you observed, did you observe Joe demonstrate any kind of

12  physical presence in the context of his verbal altercations?

13      A.    If Joe wanted to get a point across, he would,

14  I guess you would say, shoulder check --

15      Q.    Okay.

16      A.    -- Wendi or himself.

17      Q.    Can you describe that?  What he would do?

18      A.    Wasn't really necessarily physical attack, but

19  if he was upset and we were talking to him, he'd walk past

20  you and just kind of bump you.

21      Q.    Okay.

22      A.    Things like that.  Just body language to

23  express that he was upset.

24      Q.    Okay.  Would he get close to Wendi?

25      A.    Very.

1          Q.     Okay.  How close would he get to her during the

2     course of these verbal altercations?

3          A.     Inches from, face-to-face.

4          Q.     Okay.  And during the course of these verbal

5     altercations what kind of language would he use directed

6     towards Wendi?

7          A.     Vulgar, unnecessary.

8          Q.     Okay.  Do you recall specific terms that he may

9     have used?

10         A.     Yes.

11         MR. MARTINEZ:  Objection.  Foundation.  Which time?

12         MR. PATTERSON:  Well, again, during this --

13         THE COURT:  Overruled.  Go ahead, answer the

14     question.

15         THE WITNESS:  I'm not sure if I could say it in

16     court.

17     BY MR. PATTERSON:

18         Q.     Well, yeah.  Everybody else has, Brandon, so

19     why don't you tell us?

20         A.     "Fuck you" was a big one.  "You're a whore,"

21     "why do you do this to me."  Just nasty things, things

22     to throw in someone's face to feel pretty much like shit

23     about themselves.

24         Q.     Okay.  All right.  And this general kind of

25     conduct that you've reported to us, would it change if he had

1    been doing certain things?

2           A.    I'm unaware.

3           Q.    Okay.  How about would it be affected by his

4    use of intoxicants?

5           A.    I don't believe beer had anything to do with

6    it.  He could be sober, he could be intoxicated and it didn't

7    change his temperament.  If anything, the beer made it worse.

8           Q.    Okay.  All right.  At some point in time it was

9    reported to the family, to you folks, Joe actually had

10   cancer.  Do you recall that particular circumstance?

11          A.    Yes, sir.

12          Q.    Okay.  How did it come to your attention that

13   Joe was suffering from cancer?

14          A.    We got a phone call at Friday night prayer

15   service and they told us that he had found cancer growing in

16   his neck.

17          Q.    Okay.  Did the cancer affect his conduct over

18   the passage of time?

19          A.    Yes, sir.

20          Q.    Okay.  How did that change in his health affect

21   his conduct?

22          A.    He became a little bit more agitated just in

23   general.  In the beginning he actually got a lot better.  He

24   started going to church and he just was trying really hard I

25   guess to be a really good father and nice person, but seemed

1      as it got worse and they found more things wrong --

2              Q.    Okay.

3              A.    -- it -- it ate his personality up.  He just

4      slowly kind of crept into a dark hole and never came back

5      out.

6              Q.    All right.  Did he have the -- he have personal

7      possessions during the period of time that you lived with

8      him?

9              A.    Yes, sir.

10             Q.    Give me examples of his personal possessions?

11             A.    Clothing, firearms, jewelry.

12             Q.    Boats?

13             A.    Boats, yes.  Two.

14             Q.    Okay.  How was he about his conduct with regard

15     to those personal possessions?

16             A.    They were his pride and joy.

17             Q.    Okay.  Was he possessive of his possessions?

18             A.    Very.

19             Q.    Okay.  All right.  Do you recall specific

20     instances where -- well, Nicolas had been born by this time.

21     How old was Nicolas during the period of time that you lived

22     with the them or in the two-year period thereafter when you

23     babysat Nicolas?

24             A.    Two months up until two and a half years ago.

25             Q.    Okay.  So at some point he began walking?

```
 1              A.    Yes, sir.

 2              Q.    Okay.  Were there specific incidents involving

 3    Nicolas that as a result of Nicolas' conduct you observed

 4    conduct in Joe?

 5              A.    Yes, sir.

 6              Q.    Okay.  Was there one incident involving one

 7    time that Nicolas got his leg cut?

 8              A.    Yes, sir.

 9              Q.    Tell us about that.

10              A.    I wasn't directly at the scene when it

11    happened, but as I was told --

12              Q.    Okay.  Well --

13              MR. MARTINEZ:  Objection.  Hearsay.

14              MR. PATTERSON:  -- forget what you were told.

15              THE COURT:  Sustained.

16    BY MR. PATTERSON:

17              Q.    When you got there, what did you see?

18              A.    I saw a large cut on the lower right-hand calf

19    of Nicolas.  He was bleeding somewhat profusely.

20              Q.    Okay.  We're talking about this area back here?

21              A.    Yes, sir.

22              Q.    Okay.  And how big a gash was it?

23              A.    Four inches by about half an inch wide.

24              Q.    Okay.  And he was bleeding significantly?

25              A.    They had wrapped it up, but you could see
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1   blood --

2        Q.    Okay.

3        A.    -- slowly seeping through.

4        Q.    Okay.  Did Joe Andriano become angry as a

5   result of this?

6        A.    Yes and no.

7        Q.    Okay.  Explain -- explain to me what you saw,

8   what you observed.

9        A.    At first he was scared when he had brought her

10  in or brought him in, but when Wendi started to show concern,

11  he became very self-defensive and I guess he couldn't really

12  take responsibility for it.  He became aggressive when she

13  started questioning him as to how it happened.

14       Q.    Okay.  Was Wendi -- well, I guess you weren't

15  there when it happened so you don't know who was present,

16  right?

17       A.    Yes, sir.

18       Q.    Okay.  What conduct did you observe as

19  apparently Joe became more agitated?

20       A.    He became really unconcerned and kind of just

21  stormed off.

22       Q.    Okay.  Was there any physical contact between

23  Joe and Wendi?

24       A.    If my memory serves me correctly, he grabbed

25  her by the arm and pulled her into the back room and had

1        a brief argument.

2                Q.      Okay.   Could you hear elevated voices from

3        inside?

4                A.      Yes, sir.

5                Q.      Okay.   Let me just take you back.   During the

6        period of time you were there, were there occasions where

7        arguments transpired in the master bedroom behind closed

8        doors?

9                A.      Often.

10               Q.      Okay.   And you could hear the -- the argument,

11       if you will, outside?

12               A.      Yeah.

13               Q.      Okay.   Was there another incident involving

14       Nicolas and a crock pot?

15               A.      Yes, sir.

16               Q.      Okay.   Tell me about that.

17               A.      Nicolas grabbed the crock pot by its cord as it

18       was on the counter, and I guess he was playing with it and I

19       guess he tugged a little too hard and the crock pot fell on

20       his head.

21               Q.      Okay.   What conduct did you observe in Joe

22       Andriano and when did you observe that?

23               A.      He lashed out at Wendi because I guess she was

24       in the kitchen at the time and questions such as, "Why aren't

25       you paying the fuck attention," stuff like that.


                    TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

88

```
 1          Q.     What was Wendi doing at the time Nicolas pulled
 2   the crock pot on his head?
 3          A.     Preparing dinner for Joe.
 4          MR. PATTERSON:  Okay.  Judge, if I could have a
 5   minute to check my notes.
 6          THE COURT:  Yes.
 7              (Pause in proceedings.)
 8          MR. PATTERSON:  Judge, that's all I have at this
 9   time.  Thank you.
10          THE COURT:  We'll take our afternoon break at this
11   time.  During this break remember the entire admonition I've
12   given you, including the fact you're not to discuss this case
13   with anyone, do not let anyone discuss the case with you,
14   keep an open mind.
15              Have a nice break.  We'll see you in 20
16   minutes.
17
18              (Recess.)
19
20          THE COURT:  Please be seated.  This is cause number
21   CR 2000-096032, State of Arizona versus Wendi Elizabeth
22   Andriano.  The record will reflect the presence of the
23   Defendant, Counsel and the jury.  Brandon Ochoa is on the
24   witness stand, and we'll begin the cross-examination by Mr.
25   Martinez.
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1            Mr. Martinez?

2

3    CROSS-EXAMINATION BY MR. MARTINEZ:

4            Q.    Sir, you indicated that you were the

5    defendant's cousin, correct?

6            A.    Yes, sir.

7            Q.    You're a little bit more than that, aren't you?

8    Aren't you her brother also?

9            A.    As far as our relationship goes, yes.

10           Q.    My understanding is that you were adopted by

11   Donna and Alejo Ochoa.  Isn't that true?

12           A.    Yes, sir.

13           Q.    And that at some point, even though you were

14   living with them and they were your adoptive parents, you

15   decided to go ahead and leave, right?

16           A.    Yes, sir.

17           Q.    And in fact you went to live with your mother

18   in Tucson, correct?

19           A.    Yes, sir.

20           Q.    That occurred when you were 14 years of age,

21   correct?

22           A.    Yes, sir.

23           Q.    And that was at the same time, about the same

24   time that you stopped going to the Desert Harvest or

25   Desert -- sorry, whatever it's called, the church, correct?

EXHIBIT SS

000007908

1          A.     Yes.

2          Q.     And that's when you stopped going to school,

3     right?

4          A.     No, sir.

5          Q.     When did you -- when did you go -- when did you

6     stop going to school?

7          A.     During 10th grade in Tucson.

8          Q.     So you actually went -- what was the last year

9     that you completed down here in Casa Grande?

10         A.     7th grade.

11         Q.     And then you went to Tucson and then completed

12     school there?

13         A.     I didn't complete it, but I continued.

14         Q.     All right.  So in 7th grade how old were you?

15         A.     12, I believe.

16         Q.     Okay.  So from the time that you were 12 years

17     old until the time you were 14 years old, you were still

18     living with Donna and Alejo Ochoa, correct?

19         A.     Yes, sir.

20         Q.     And during that time you didn't attend school,

21     right?

22         A.     No, sir.

23         Q.     And what were you doing during that time?

24         A.     Physical labor.

25         Q.     So basically what they were doing is they

1    were -- you were doing -- you were just working

2    basically and not going to school, correct?

3            A.    Yes, sir.

4            Q.    And this was with the knowledge, if you will,

5    of your parents, Donna and Alejo Ochoa, correct?

6            A.    Yes, sir.

7            Q.    When in relationship to this time that you're

8    doing this physical labor and not attending school did you go

9    live out in Casa Grande with the defendant and Joseph

10   Andriano?

11           A.    I never lived with them during that point in

12   time.

13           Q.    So that would -- how old were you again when

14   you stopped school?  When you quit school?

15           A.    12 going on 13.

16           Q.    And so when you were 14 you left to go to

17   Tucson, right?

18           A.    Yes, sir.

19           Q.    When before that did you begin living with the

20   Andrianos?

21           A.    I believe 10.

22           Q.    Excuse me?

23           A.    10 years old.

24           Q.    When you were -- when you were 10 years old?

25           A.    Yeah.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1       Q.      What year would that have been when you were 10
2   years old?
3       A.      '95.
4       Q.      In 1995?
5       A.      I believe so.
6       Q.      So when you went to live with them in 19 -- you
7   stayed with them in 1995, right?
8       A.      Yes, sir.
9       Q.      And you stayed with them for 90 days, right?
10      A.      Yes, sir.
11      Q.      And then you were there for, what, another half
12  year or another year?
13      A.      Past that?   I -- I was babysitting for Wendi up
14  until the point when I left.
15      Q.      But I'm trying to get the chronology straight
16  here.  If you -- the last grade that you actually attended
17  was -- what grade was it?
18      A.      9th grade in Tucson.
19      Q.      No, no, no.
20      A.      Down here?
21      Q.      Yeah.  Previously you told me 10th grade.
22  Which is it, 9th or 10th?
23      A.      I know I finished my 10th grade year.
24      Q.      When you were at 91st Psalm School what was
25  the last grade that you completed?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

 1          A.    That's hard to say because they didn't go by

 2     grades.  You worked at your own pace.

 3          Q.    Okay.  So how old were you when you last

 4     attended?

 5          A.    10 going on 11 -- no, 12 going on 13, my

 6     apologies.

 7          Q.    So you were 12 going on 13?

 8          A.    Yes, sir.

 9          Q.    And what year was that again?

10          A.    '97 to '98.

11          Q.    '97?  Okay.  I thought you told me something

12     different before.  I think you did, didn't you?

13          A.    I believe I told you '97.

14          Q.    Okay.  So in 1997 -- in 1997 is when you

15     stopped going to school, right?

16          A.    Yes.

17          Q.    Then for two years you didn't do anything,

18     right?

19          A.    No, not true.

20          Q.    Well, I didn't -- you didn't go to school,

21     right?

22          A.    During the point in time between 13 and 14,

23     right, when I left they re-enrolled me and I was continuing

24     school.

25          Q.    And, again, you can't tell me what grade you

```
 1    were re-enrolled because you go at your own pace, right?

 2            A.    Yes, sir.

 3            Q.    I really -- you know what?  I really still

 4    don't have it.  It's probably my problem, not yours.  You

 5    indicated that you stopped attending school.  Was it the

 6    summer?

 7            A.    No, sir.  It was during the school year.

 8            Q.    Okay.  And what month was it?

 9            A.    I'm unaware.

10            Q.    Could it have been around Christmas time,

11    anything like that, or --

12            A.    It was earlier than that.  It was still warm

13    outside.  That's what I remember.

14            Q.    Okay.  So it could have been like during the

15    Summer?

16            A.    I'd say Spring.

17            Q.    Of what year?

18            A.    Of '97.

19            Q.    So it was Spring of '97 you stopped going,

20    right?

21            A.    Yes, sir.

22            Q.    And then for two years after that until 1999

23    you did not attend school, right?

24            A.    Yes, sir.

25            Q.    And then in 1999 you went to Tucson, right?
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          A.     I believe so, yes.  Yes, sir.

2          Q.     And then you enrolled in school there, right?

3          A.     Yes, sir.

4          Q.     And when you enrolled in school in -- how old

5    were you in 1999?

6          A.     I was 14 years old.

7          Q.     When you enrolled in school in '99 in Tucson,

8    you enrolled as a 9th grader or 10th grader?

9          A.     I enrolled in school as a 8th grader because

10   they were unaware of my standings just as you are.

11         Q.     So in 1999 you were enrolled in Tucson as an

12   8th grader, right?

13         A.     Yes, sir.

14         Q.     Okay.  When you were in Tucson did you have

15   occasion to come back and do some of the things we talked

16   about or was that sort of removed from what was going on with

17   the Andrianos?

18         A.     I did not return.

19         Q.     So you stayed down there, right?

20         A.     Yes, sir.

21         Q.     And you had -- the decision to quit school was

22   yours, right?

23         A.     Yes, sir.

24         Q.     It wasn't anybody else's but yours, right?

25         A.     Circumstance had a lot to do with it, but it

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000007914

# APPENDIX J - Part 2

 1      was my decision.

 2              Q.     Right.  And it was with the -- with I guess

 3      it's with the permission of your parents, Donna and Alejo

 4      Ochoa, correct?

 5              A.     During that point in time, they were the ones

 6      that withdrew me from school.

 7              Q.     They're the ones that withdrew you from

 8      school.  You didn't make the decision to withdraw yourself

 9      from school then?

10              A.     Not during that point in time.

11              Q.     So for two years it was their decision to keep

12      you out of school for whatever reason?

13              A.     As I told you before, it wasn't a full two

14      years.  I re-enrolled.

15              Q.     All right.  How about a year and a half?  Would

16      that be fair?

17              A.     I'd say 13 months.  That's about it.

18              Q.     So 13 months you're not in school because Donna

19      and Alejo Ochoa did not allow you to attend school, right?

20              A.     Pretty much, yes, sir.

21              Q.     Okay.  Now, one of the things that happened

22      that you told us about earlier was this incident involving

23      Nicolas, right?

24              A.     Yes, sir.

25              Q.     Do you remember telling us that some of -- was

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

```
 1    that during the time you were enrolled in school, not
 2    enrolled in school?  When was that?
 3          A.    That was during the period of time I was not
 4    enrolled in school.
 5          Q.    So that would have been what year, '97
 6    through --
 7          A.    It was during '98.
 8          Q.    It was 1998?
 9          A.    Yes, sir.
10          Q.    Okay.  And so you're -- and what time of the
11    year was it?
12          A.    I'd like to say Fall.  Yes, Fall.
13          Q.    So it was Fall.  By Fall here in Arizona that
14    would be October, November, something like that, right?
15          A.    Previous to that.
16          Q.    September?  You think it was September?
17          A.    Yes, about.
18          Q.    So let's say this was September of 1998, right?
19          A.    Sure, yes.
20          Q.    Okay.  And this happened, according to you, at
21    about maybe 5:00 or 6:00 in the afternoon, right?
22          A.    Not that late.
23          Q.    Well, do you remember that we had a
24    conversation yesterday and that's what you told me?
25          A.    Yes, sir.
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          Q.     So is it between 5:00 and 6:00 or did you tell

2    me something different yesterday?

3          A.     I believe I overshot the time.  It was a little

4    bit earlier than that.

5          Q.     So now you've had time think about it

6    overnight.  You've -- your mind has become clearer?

7          A.     You could say that, yeah.

8          Q.     And so how much did you overshoot it by?

9          A.     Maybe an hour.

10         Q.     So now we're talking about 4:00 or 5:00?

11         A.     About that.

12         Q.     And you also told me that was when you came

13   home from school.  Do you remember telling me that?

14         A.     Yes, sir.

15         Q.     But -- but based on what you're telling me, you

16   weren't in school, right?

17         A.     I still worked on the grounds of the school.

18         Q.     That's true that you worked on the grounds of

19   the school, but that's not the same as telling me that you

20   were enrolled in school, right?

21         MR. PATTERSON:  Wait, wait, wait, wait, wait.

22   Misstates his testimony.

23         THE COURT:  Sustained.  Rephrase the question.

24   BY MR. MARTINEZ:

25         Q.     Sir, isn't it true that yesterday you told me

```
 1    that you were enrolled or coming home from school --
 2              A.    Come --
 3              Q.    -- when this incident happened?
 4         MR. PATTERSON:  Compound question.
 5         THE COURT:  Sustained.  Rephrase the question.
 6    BY MR. MARTINEZ:
 7              Q.    Did you speak to me yesterday about this issue?
 8              A.    Yes, sir.
 9              Q.    Did we talk about the time frame then?
10              A.    Yes, sir.
11              Q.    You told me between 5:00 and 6:00, right?
12              A.    Yes, sir.
13              Q.    We also mentioned school during that
14    conversation, didn't we?
15              A.    Yes, but you never directly asked me if I was
16    enrolled.
17              Q.    Sir, let me ask the questions, okay?
18              A.    Sorry.
19              Q.    Isn't it true that's what you told me?  You
20    arrived home from school, right?
21              A.    Yes, sir.
22              Q.    The bottom line here is that you didn't leave
23    school at the same time as the other students.  You left at a
24    different time because you were working there, not being
25    taught, right?
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

```
1          A.    No, sir.  I left at the exact same time.

2          Q.    And what time was that?

3          A.    3:30.

4          Q.    So you left at 3:30, then you walked home,

5     right?

6          A.    I did not walk home.  I walked towards --

7          Q.    You walked to their home, right?

8          A.    Yes, sir.

9          Q.    You told me you walked over to their home which

10    was the Quail Apartment, right?

11         A.    Yes, sir.

12         Q.    Sir, the problem that I have with you telling

13    me that you went to the Quail Apartments is that the

14    defendant lived at the Quail Apartments in 1991.  Did you

15    know that?

16         A.    I was unaware of that.

17         Q.    Well, let me show you an exhibit that we

18    previously discussed.  It's a police report regarding some

19    broken windows that was filed back on the date we probably

20    been -- the date has previously been indicated as November

21    18th of '91.  Take a look at that, sir.  First and second

22    page.

23              THE COURT:  What exhibit number again is this?

24              MR. MARTINEZ:  Sorry, Your Honor.

25                   Can I take a look at the green tag?
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000007919

```
 1                452.
 2          THE WITNESS:  This was not during the time when she
 3    was with Joe.
 4          MR. MARTINEZ:  I'm not asking you that.
 5                Go ahead and take a look at it at the first
 6    page and second page because then I'll ask you some
 7    questions.
 8                (Pause in proceedings.)
 9          THE WITNESS:  Okay.
10    BY MR. MARTINEZ:
11          Q.    All right.  May I have it back, please?  In
12    fact when she lived at the Quail Apartments, she didn't
13    even -- Nicolas wasn't even born, right?
14          A.    That's true.
15          Q.    So when you told me that yesterday, you were in
16    error, weren't you?
17          A.    Not that I would say, sir.  I believe she was
18    still living there when Nicolas was born.
19          Q.    So in other words you believe back in 1998 she
20    was living in the Quail Apartments, right?
21          A.    If I remember the apartment complex correctly,
22    yes, sir.
23          Q.    Okay.  Are you aware that they actually lived
24    at the Courtyard Apartments?  Did you know that?
25          A.    As I said, I was thinking different title to an
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    apartment complex.

2         Q.    But you did -- do admit you did tell me it was

3    the --

4         A.    Yes, sir.

5         Q.    Okay.  Now, the other thing that you told me,

6    if we could just focus in a little bit on the time, you did

7    say that you overshot it a little bit but after school got to

8    their apartment at about 4:00, right?

9         A.    Anywhere between 4:00, 4:30.  It was a good

10   walk.

11        Q.    Okay.  How far was it for you to walk?

12        A.    Maybe a mile to mile and a half.

13        Q.    And it was according to you in the Fall, which

14   is September, right?

15        A.    I believe so.

16        Q.    And you get home and one of the things that

17   happen -- has just happened is that Nicolas is hurt, right?

18        A.    Yes, sir.

19        Q.    Just happened, right?

20        A.    Yes, sir.

21        Q.    And they're arguing about it rather than taking

22   him to the hospital, right?

23        A.    For a brief moment.

24        Q.    Isn't it true that this incident did happen,

25   but it actually happened between noon and 1:00 in the

1     afternoon?  Isn't that true?

2          A.    As I said, I didn't witness the event.

3          Q.    But you told us it just happened now, didn't

4     you?

5          A.    That's what I understood when I walked in.

6          Q.    No, sir.  You -- that's -- you indicated that

7     you saw the wound, that you saw it was still bleeding and

8     they were still arguing, right?

9          A.    I was under the impression we were talking

10    about the crockpot incident.

11         Q.    No, no, no, sir.  The crockpot didn't result in

12    a wound, did it?

13         A.    No.

14         Q.    The crockpot didn't result in any blood, did

15    it?

16         A.    No, sir.

17         Q.    And the crockpot did not result in a gash to

18    the calf, did it?

19         A.    No, sir.

20         Q.    We're talking about the gash to the calf.

21         A.    I apologize.

22         Q.    And you indicated that you got home at about

23    4:30 and the wound was still fresh, right?

24         A.    To my knowledge, yes, sir.

25         Q.    And in fact you, if we could get back to the

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    crockpot for a minute, you saw that one so you know when that

2    one happened, right?

3              A.    Yes, sir.

4              Q.    What time did that one happen?

5              A.    In the afternoon.

6              Q.    What time?

7              A.    I just told you 4:30 to 5:00 because I was

8    standing there waiting for dinner.

9              Q.    That also happened at the same time as this

10   previous incident?

11             A.    No, sir.  As I said before, I was

12   misunderstanding you.  I believe we were talking about a

13   different incident.

14             Q.    Okay.  So now, if you don't understand

15   something, please -- please -- so now when do you think --

16   okay.  When did you arrive home and there was a gash to

17   Nicolas' leg?

18             A.    During that point in time I was not in school

19   and Wendi would come and pick me up.

20             Q.    So she came and picked you up that day?

21             A.    Yes, sir.

22             Q.    You didn't tell me that yesterday or --

23             A.    You didn't ask.

24             Q.    Pardon?

25             A.    You did not ask.

1      Q.     Okay.  So I didn't ask and you didn't feel like
2  telling me how, but I did ask how you got there, didn't I?
3      A.     I told you --
4      Q.     You didn't tell me she gave you a ride?
5      A.     Actually, yes, sir, I did not tell you.
6      Q.     And so if she's working, how is it that she's
7  able to give you a ride?
8      A.     During that point in time when I was working at
9  Harvest, she would come and pick me up.
10     Q.     Sir --
11     A.     I can't answer that.  I don't know.
12     Q.     Now I'm confused.  You're telling me you're
13  working, where right -- a couple minutes ago, you told me you
14  were enrolled in school.  Which one is it?
15     A.     As I said before --
16     Q.     Hold on.  Which one is it?  Are you enrolled in
17  school or working at school on the day of this injury to
18  Nicolas' calf?
19     A.     To my memory I believe I was working.
20     Q.     So that would mean that you would get home,
21  according to you, about 4:30 in the afternoon, right?
22     A.     If I left the school and was not picked up.
23     Q.     If you were picked up, then you got home at
24  4:15, right?
25     A.     Yes, sir.  There's points in time when she'd

1    come anywhere between 12:00 to 3:00.

2         Q.   So now in your mind you're telling us you would

3    have gotten there at 12:00, right?

4         A.   I didn't say that directly.

5         Q.   I know you didn't say it directly, but I want

6    to flesh it out a little bit more.  Are you telling me now

7    that you don't remember and on that date you actually got a

8    ride and got there about noon?

9         A.   I believe so, yes, sir.

10        Q.   So now you got there at noon and the thing had

11   just happened and they were arguing about it, right?

12        A.   I didn't show up at noon.  I believe it was

13   after the incident.

14        Q.   Right.  After the incident that just happened,

15   right?

16        A.   Yes, sir.

17        Q.   And so in fact what happens is her child,

18   Nicolas, is bleeding there, so she decides to go pick you up

19   rather than tend to him.  Is that what you're telling us?

20        A.   If I remember correctly, on that date I didn't

21   get a ride from her that day.

22        Q.   So now you didn't get a day -- didn't get a

23   ride from her on that day, right?

24        A.   No, sir.

25        Q.   That would mean that you walked home, right?

1         A.   No, sir.

2         Q.   Somebody else give you a ride?

3         A.   Yes, sir.

4         Q.   Now you remember that somebody else gave you a

5    right, right?

6         A.   Yes, sir.

7         Q.   So whereas yesterday you told me that she gave

8    you a ride, now you're telling us somebody else gave you a

9    ride.  Who gave you --

10        MR. PATTERSON:  Wait, wait, wait.  That misstates

11   what I believe is the testimony.  In this case, he didn't

12   recall.

13        THE COURT:  Hold on a second.  I'll sustain the

14   objection.  Restate the question.

15   BY MR. MARTINEZ:

16        Q.   Who else gave you a ride?

17        A.   Alejo Ochoa.

18        Q.   So Alejo gave you a ride and he was present

19   when all of this happened then, right?

20        A.   I don't believe so.  I -- if my memory serves

21   me correctly, he dropped me off.

22        Q.   Well, he wasn't working that day?

23        A.   Yes, sir, but --

24        Q.   So he took time at 12:30, 1:00, 2:00, whatever

25   time it was, to go pick you up, even though you'd been

1    walking, and dropped you off at the Andrianos?

2        A.    During that point in time he was working at the

3    church.  He didn't have to pick me up.

4        Q.    He wasn't working at the tortilla factory then?

5        A.    As I said, if my memory serves me correctly.

6        Q.    Are you sure he wasn't working at the tortilla

7    factory?

8        A.    I can't say I'm sure.

9        Q.    Now, I'm still with this incident here.  You

10   indicated that she was the one, "she" being the defendant,

11   was the one that was concerned for Nicolas' welfare, about

12   that injury, right?  That's what you said?

13       A.    If that's how you take it.  I did not mean it

14   that way.  They both were very concerned.

15       Q.    And then at some point it escalated to the

16   point where all Joe cared about was himself.  That's the way

17   you put it?

18       A.    When she began to ask him a little bit more

19   aggressively as to what happened, he -- yes.

20       Q.    So she became aggressive then?  She started

21   being aggressive with him then, right?

22       A.    I believe a mother's concern would do that to

23   you, yes, sir.

24       Q.    Would that be "yes"?

25       A.    Yes, sir.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1        Q.      When she became aggressive that's -- when she
2    became aggressive, that's when he became defensive?
3        A.      Defensive isn't the proper word for it.
4        Q.      That's when he became angry?
5        A.      Yes, sir.
6        Q.      When she became aggressive with him?
7        A.      Yes, sir.
8        Q.      And then it escalated into an argument, right?
9        A.      Yes, sir.
10       Q.      And this is the one that you characterized when
11   he was being self-centered, right?
12       A.      I did not mean to characterize it that way.
13       Q.      That's what you said.  He became self-centered
14   and involved, only worried about himself.
15       A.      When your son is sitting there bleeding and you
16   take your spouse to the other room, I consider that
17   self-centered, yes, sir.
18       Q.      Okay.  And you were there to see it, right?
19       A.      The fight, not the actual cut.
20       Q.      Right.  We know you weren't there.
21       A.      Yes, sir.
22       Q.      So now you get there -- what time do you think
23   you were there?  Was it late in the afternoon or around noon,
24   which one was it?
25       A.      Midday to early afternoon.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000007928

1    Q.    So would that be as late as 3:00?

2    A.    2:00, 2:30, not 3:00.

3    Q.    Do you know who Timothy Lee is, sir?

4    A.    Timothy?

5    Q.    Yes, sir.

6    A.    No, sir.

7    Q.    Do you understand he was the defendant's boss

8    at the Courtyard Apartments where this happened back in,

9    according to you, September of 19 -- when did you -- what

10   year did you think it happened?

11   A.    '97 or '98, I believe.

12   Q.    Well, she was -- she wasn't working there in

13   1997, so it wouldn't be that, could it?

14   A.    Obviously not.

15   Q.    And so did you know that Timothy Lee was her

16   boss?

17   A.    No, sir.

18   Q.    Did you know that he was actually there when

19   this happened?  Did you know that?

20   A.    No, sir.

21   Q.    Did you know that actually the way it

22   happened, Mr. Andriano actually called the defendant and

23   said, you know, "Nicolas hurt his leg."  Did you know that?

24   A.    Yes, sir.

25   Q.    And did you know at that point Mr. Lee urged

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    her to go home.  Did you know that?

2         A.    No, sir.

3         MR. PATTERSON:  Judge, this is all predicated on

4    hearsay declaration.

5         THE COURT:  Sustained.  Let's move on.

6    BY MR. MARTINEZ:

7         Q.    Sir, isn't it true that she's the one that

8    refused to leave the office and would not go take care of her

9    child?  Did you know that?

10        MR. PATTERSON:  Objection.  Foundation, basis of

11   knowledge, hearsay.

12        THE COURT:  Sustained.

13   BY MR. MARTINEZ:

14        Q.    You don't know anything about what Mr. Lee has

15   to say, do you?

16        A.    No, sir.

17        Q.    And if I tell you that he was there, you

18   wouldn't have any reason to dispute that, right?

19        A.    No, sir.

20        Q.    And since he was there, his rendition would be

21   more accurate than yours because -- well, by virtue of the

22   fact he was there?

23        MR. PATTERSON:  Objection.  Argumentative.

24        THE COURT:  Sustained.

25   / / / / /


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    BY MR. MARTINEZ:

2         Q.    You wouldn't have any reason as you sit there

3    to, for whatever reason, say to me later, well, no, Mr. Lee

4    was there later on when we talked about this.  Do you have

5    any way you'll be able to tell me that later?

6         A.    No, sir.

7         MR. PATTERSON:  Objection.  Asked and answered.

8         THE COURT:  Overruled.

9    BY MR. MARTINEZ:

10        Q.    What was your answer?

11        A.    No, sir.

12        Q.    Now, with regard to this other issue that we're

13   talking about, about the crockpot, are you as sure about the

14   incident involving the crockpot as you are about the other

15   incident involving the cut?

16        MR. PATTERSON:  Objection.  Argumentative, calls for

17   comparing answers.

18        THE COURT:  Overruled.  Go ahead, answer the question

19   if you can.

20        THE WITNESS:  I had witnessed the event with the

21   crockpot, so I would say my recollection of that account

22   would be a lot more accurate.

23   BY MR. MARTINEZ:

24        Q.    Didn't you also tell me that you witnessed the

25   cut on Nicolas' leg?

1      A.    No, sir.

2      Q.    You didn't tell me that you saw the cut and you

3  saw --

4      A.    I saw the cut.  I did not witness it happen.

5      Q.    I didn't ask you if you saw it happening.  I

6  asked you whether or not you saw the cut.

7      A.    Yes, sir.

8      Q.    Okay.  That's the same thing, viewing, as

9  watching the incident with the crockpot, right?

10         MR. PATTERSON:  Wait, wait, wait, wait, wait.

11  Judge, that's not a fair --

12         THE COURT:  Sustained.

13         MR. PATTERSON:  -- question.

14         THE COURT:  Sustained.  Rephrase that question.

15  BY MR. MARTINEZ:

16      Q.    You viewed both incidents?

17      A.    Not the cut, just the crockpot incident.

18      Q.    You viewed the cut on the leg, didn't you?

19      A.    Yes, sir.

20      Q.    It was really pretty traumatic, wasn't it?

21      A.    That's one way of putting it.

22      Q.    He was bleeding, wasn't he?

23      A.    Yes.

24      Q.    He wasn't bleeding or anything when the

25  crockpot hit him, was he?

1        A.   No, sir.

2        Q.   Was -- it was a situation when he didn't

3  require any medical care with the crockpot, right?

4        A.   No, sir.

5        Q.   So in terms of severity of injury, wouldn't you

6  agree the injury to the leg was more severe than the injury

7  with the crockpot?

8        A.   Yes, sir.

9        Q.   And it would sort of tend to lend credence to

10  the fact that perhaps you might remember that a little bit

11  more?

12        A.   No, sir, because it was the blood that got me

13  really worried.

14        Q.   It was because you were worried that you didn't

15  know --

16        A.   No, I was referring to the crockpot incident.

17  That's why I remember it clearly because it was a very trying

18  time, if you will.

19        Q.   But I think you said you were worried at the

20  time of the crockpot.  Didn't you say --

21        A.   Yes, sir.

22        Q.   Weren't you more worried with the cut on the

23  leg?

24        A.   Yes, but as I said before I was not fully aware

25  of the entire incident, so I was kind of more of an observer.

1      Q.    I understand that.  But we've just talked about

2  this wouldn't, if we're going to use the term "worried,"

3  weren't you more worried, if you will, over the leg, be much

4  more pronounced than the worry over the crockpot?

5      A.    Of course.

6      Q.    The crockpot incident, was it also at the Quail

7  Tree Apartments?

8      A.    No.  It was at Courtyard.

9      Q.    And this knowledge of the Courtyard Apartments,

10 the name of it, you acquired it today, didn't you?

11     A.    As you said it, sir.

12     Q.    So it could have been a different apartment.

13 You're just saying it because I said it, right?

14     A.    No, sir.  I remember exactly the exact same

15 apartment.

16     Q.    So now you remember whereas you didn't before

17 that it was the Courtyard Apartments.

18         MR. PATTERSON:  Judge, is he arguing with this

19 witness?

20         THE COURT:  Overruled.  Go ahead, answer the question

21 if you can.

22         THE WITNESS:  Can you restate the question?

23         MR. MARTINEZ:  Could you --

24

25         (Whereupon, the record was read:


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000007934

116

1          Q.     So now you remember whereas you

2          didn't before that it was the Courtyard

3          Apartments.)

4

5          THE WITNESS:  Due to the knowledge you've given me,

6   yes, sir.

7   BY MR. MARTINEZ:

8          Q.     With regard to the crockpot incident, were you

9   only working or were you enrolled in school?

10         A.     I believe I was enrolled in school, sir.

11         Q.     So when if I remember correctly, you indicated

12  that you were enrolled in school until 1997, right?

13         A.     Yes, sir.

14         Q.     And then after that in 1999 you may have been

15  reenrolled, but subsequent to that you moved to Tucson?

16         A.     No, sir.  In -- no, I apologize, you're

17  correct.  I believe so.

18         Q.     So now the crockpot incident in '97, did that

19  occur before or after the thing to the leg?

20         A.     My memory serves me correctly, it was after.

21         Q.     So that would have been -- well, what month?

22  We now have Fall for the incident involving the leg.  What --

23  what month would you give for the crockpot?

24         A.     I can't give anything more than an educated

25  guess.  I don't know.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

```
 1          Q.    What season?
 2          A..   Late summer, early spring -- no, late summer,
 3    early Fall.
 4          Q.    Sir, when you talked with Mr. Patterson you
 5    really had no difficulty remembering about the fights they
 6    had.  Do you remember talking about those?
 7          MR. PATTERSON:  Judge, that is argumentative.
 8          THE COURT:  Sustained.  Repeat the question.
 9          THE WITNESS:  Yes, I do.
10    BY MR. MARTINEZ:
11          Q.    Do you remember talking to Mr. Patterson about
12    the incidents involving the wall and that sort of thing?
13          A.    Yes, sir.
14          Q.    And you remember telling him in full detail how
15    it was -- how Mr. Andriano acted.  Do you remember telling
16    him that?
17          A.    Yes, sir.
18          Q.    And specifically the one involving the
19    bathroom, you -- you went ahead and you told him about the
20    hitting of the wall and that sort of thing, right?
21          A.    What I witnessed, yes, sir.
22          Q.    Yeah.  What date was that?
23          A.    I'm unaware.
24          Q.    Would it have been --
25          A.    '96?  I'm not sure of the month.  I believe it
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    was in that area, '96.

2         Q.    Could have been '95 since you don't really

3    remember, right?

4         A.    Yes, sir.

5         Q.    Could have been even later after that?

6         A.    It's a possibility.

7         Q.    And then you indicated that what you do

8    remember thinking was that the -- was the incident itself,

9    right?

10        A.    Yes, sir.

11        Q.    What time of day was it?

12        A.    Evening.

13        Q.    What time?

14        A.    5:30, 6:00.

15        Q.    Were they going to bed?

16        A.    For the day?

17        Q.    Yes.

18        A.    Not that I'm aware of.

19        Q.    On -- if it was around 5:30 or 6:00, what were

20   they arguing about?

21        A.    I'm unaware, sir.

22        Q.    You were there though, right?

23        A.    Yes, sir.

24        Q.    You were privy to see him hitting the wall or

25   the door, I think you said, with his fist, right?

1          A.    Yes, sir.

2          Q.    You also said he hit the wall, right?

3          A.    Yes, sir.

4          Q.    Did he also hit that with his fist?

5          A.    Yes, sir.

6          Q.    And you indicated that with regard to the door,

7    I think you said there was a hole that he created?

8          A.    Not all the way through the door, just in the

9    first layer.

10         Q.    Okay.  And then also with the wall there was

11   also a hole he created, right?

12         A.    Yes, sir.

13         Q.    You never told us he didn't suffer any injury

14   though, did you?

15         A.    No, sir.

16         Q.    It just -- the door was kind of flimsy and it

17   allowed him to punch it, but he suffered no injury to his

18   hand?

19         A.    I'm sure there was some form of pain, but

20   physical cut or bruising?

21         Q.    There was no physical cuts or bruising, right?

22         A.    Not that I'm aware of.

23         Q.    Now, there was another incident that you talked

24   to us about and this was the one I think you said from about

25   15 yards away you saw Mr. Andriano and Mrs. Andriano in the


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

```
1    bedroom if I remember correctly, right?

2            A.    Yes, sir.

3            Q.    And in this particular one you told us that you

4    really didn't know what Mr. Andriano did, right?

5            A.    Yes, sir.

6            Q.    In other words, you don't know when -- whatever

7    he was doing with his hands, you don't know what he was doing

8    with that, do you?

9            A.    No, sir.

10           Q.    You don't know if it was opened up, right?

11           A.    No idea, sir.

12           Q.    Well, didn't --

13           A.    Actually --

14           Q.    -- you tell us before he had a closed fist?

15           A.    That's what I was about to say.  When he raised

16    his hand, it was closed.  That's the only justification I

17    have for that.

18           Q.    He had a closed first here but when he went

19    this way, you don't know if it was open or anything, right?

20           A.    No, sir.

21           Q.    And you don't know if he struck anything,

22    right?

23           A.    No, sir.

24           Q.    And in fact the defendant's about 5 foot 4,

25    right?
```

1          A.     I believe so, yes, sir.

2          Q.     And he was about 5 foot 10, wasn't he?

3          A.     Yeah.  He seemed bigger.

4          Q.     Was he 6 foot?

5          A.     Yeah, he -- he was tall, about 6 feet, I'd say.

6          Q.     Okay.

7          A.     5'10".

8          Q.     Okay.  He in fact towered over her, right?

9          A.     That's a form of expression you could use, yes,

10    sir.

11         Q.     He was a bigger guy I think you said, right?

12         A.     Not in the gesture you just made.  He wasn't

13    fat or anything like that.  He was just well built.

14         Q.     And she wasn't fat either, was she?

15         A.     No, sir.

16         Q.     She was about 110, 120 pounds, right?

17         A.     If that.

18         Q.     He weighed much more than that?

19         A.     Yes, sir.

20         Q.     180 maybe?

21         A.     Anywhere from 180 to about 200, I would say.

22         Q.     Right.  So if he weighs that much and that tall

23    and she's the size and proportion I described and he's

24    standing in front of her, how do you know she's standing

25    there?

1      A.    Because I could see her legs between his feet.

2      Q.    So you were looking down there and you were

3   able to see her legs, right?

4      A.    Right.

5      Q.    But you weren't able to see her upper torso,

6   right?

7      A.    No, sir.

8      Q.    Do you remember we had a conversation yesterday?

9      A.    Yes, sir.

10      Q.    Do you remember we had a discussion about this

11   incident?

12      A.    Yes, sir.

13      Q.    Do you remember that yesterday you told me that

14   he punched her in the stomach?

15      A.    I believe the words I used was in my

16   observation that would have been the area, if he had swung

17   and actually connected and hit her, that would have been --

18   it was a downward motion.

19      Q.    No, sir.  You were much more positive than

20   that.  Don't you remember --

21      A.    No, sir.

22      Q.    Just so I'm clear, you're now -- you're not

23   contending at all then today that he even touched her that

24   day, right?

25      A.    If you're asking me if I saw him directly touch

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

```
 1    her, no, sir, I did not.

 2              Q.    And you didn't hear any scream at all, did you?

 3              A.    No, sir.

 4              Q.    In other words, if somebody gets hit, you

 5    didn't see any yelling or however it is people react when

 6    people get hit did you?

 7              A.    May I point something out?

 8              Q.    No, sir.  Did you hear anything like that?

 9              A.    Not that I'm aware of.

10              Q.    Well, you were there.  You keep telling me

11    you're not aware of things.  You were there within hearing

12    distance, weren't you?

13              A.    I turned around and walked out of the room.

14              Q.    If you turned around and walked out of the

15    room, does that mean your ears don't hear anymore?

16              A.    Not really, no, sir.

17              Q.    Well, the ears still function, don't they?

18              A.    Yes, sir.

19              Q.    That's what you're trying to tell me, you

20    couldn't see, right?  That's what you're telling me because

21    you turned around, right?

22              A.    Yes, sir.

23              Q.    But you didn't tell me that yesterday either

24    though?

25              A.    No, sir.
```

```
 1          Q.    When exactly was it in the course of these
 2    events that you turned around?
 3          A.    After the swing.
 4          Q.    After the swing?
 5          A.    Yes.
 6          Q.    But the swing was pretty quick, right?
 7          A.    Yes.
 8          Q.    And it's the kind of thing that draws a
 9    person's attention, isn't it?
10          A.    Not mine.
11          Q.    So whatever they want to do, if he's going to
12    hit her, that's all right, you're going to turn your back,
13    right?
14          A.    Yes, sir.
15          Q.    And that is your sister?
16          A.    Yes, sir.
17          Q.    You also talked a little bit about this dog
18    that supposed -- that was involved in some sort of
19    altercation with Mr. Andriano.  Do you remember telling us
20    that?
21          A.    Yes, sir.
22          Q.    How old were you when this happened?
23          A.    9 to 10.
24          Q.    So what year would that have been?
25          A.    '95, '96.
```

1      Q.   And where did it happen?

2      A.   In the backyard of the house out on the farm

3  there.

4      Q.   And apparently you guys were in the machine

5  shop someplace?

6      A.   Yes, sir.

7      Q.   And that dog had been around there for quite

8  sometime, right?

9      A.   As far as I remember, yes, sir.

10     Q.   What color was the dog?

11     A.   Tannish brown.

12     Q.   How big was the dog?

13     A.   Average.

14     Q.   How big is an average-sized dog to you, sir?

15     A.   I'd say 2 and a half to 3 feet tall, maybe 3 to

16  3 and a half feet long.

17     Q.   And how much did it weigh?

18     A.   I have no way of possibly telling you that.

19     Q.   And this particular dog, you'd seen it around

20  there all the time, right?

21     A.   Yes, sir.

22     Q.   Had they had it as a puppy or just acquired it

23  sometime after it was full grown?

24     A.   My memory serves me correct, it was a puppy

25  when they acquired it.

1      Q.    Okay.  And you'd seen the puppy, right?

2      A.    Yes, sir.

3      Q.    And you'd been over when the puppy was there,

4  right?

5      A.    Yes, sir.

6      Q.    And you would go over there -- in fact, you

7  spent 90 days with them living there, right?

8      A.    Yes, sir.

9      Q.    And it was during these 90 days that the dog

10  was there too, right?

11      A.    Yes, sir.

12      Q.    And so you had occasion to see them play with

13  the dog or do whatever it is that people do with dogs, right?

14      A.    Yes, sir.

15      Q.    You don't remember his name though, do you?

16      A.    No, sir.

17      Q.    No idea what the dog's name is, right?

18      A.    No, sir.

19      Q.    You indicated that this was the same apartment

20  where Nicolas got his leg cut that the crockpot happened,

21  right?

22      A.    No, sir.

23      Q.    It was a different apartment?

24      A.    No.  It was the house not the apartment.  Oh,

25  the crockpot happened, yes, sir, I'm sorry.

1      Q.    So the crockpot happened at the --

2      A.    Courtyard Apartments.

3      Q.    Right.

4      A.    If I remember correctly.

5      Q.    And this is where you did babysitting, right?

6      A.    When it was necessary, yes, sir.  They had a

7 professional babysitter.

8      Q.    Right.  Her name was Anna, wasn't it?

9      A.    Yes, sir.

10      Q.    And Anna would stay until about 10:00 at night

11 sometimes, wouldn't she?

12      A.    I'm unaware of that.  I'm not sure.

13      Q.    Why is it that you were required to babysit if

14 Anna was the professional babysitter?

15      A.    No one ever gave me that information.  I would

16 go upstairs, get the kids, take them downstairs and unlock

17 the apartment.

18      Q.    And Anna would just sort of sit around?

19      A.    She was in the apartment above us.  She had her

20 own home.

21      Q.    But she would babysit for them, wouldn't she?

22      A.    Yes, sir.

23      Q.    She would clean her house, right?

24      A.    Yes, sir.

25      Q.    And do you know who she worked for other than

```
 1     the Andrianos?

 2            A.    No, sir.

 3            Q.    Did you know she worked for the Courtyard

 4     Apartments?

 5            A.    No, sir.

 6            Q.    She was a woman that didn't speak English,

 7     right?

 8            A.    Yes, sir.

 9            Q.    How old was she?

10            A.    Mid to late '30s.

11            Q.    Sir, in -- you indicated that you left and went

12     to Tucson in 1999, right?

13            A.    Yes, sir.

14            Q.    And you didn't come back, right?

15            A.    No, sir.

16            Q.    You don't have any opinion whatsoever then as

17     to how Mr. Andriano's demeanor was in the year late 1999, do

18     you?

19            MR. PATTERSON:  Judge, he's rendered no opinion in

20     this case.  He's made objections of conduct.

21            THE COURT:  I'll sustain the objection.  Ask your

22     next question.

23     BY MR. MARTINEZ:

24            Q.    You didn't see Joe Andriano fighting with Wendi

25     Andriano in 1999 after you left, right?
```

1          A.     No, sir.

2          Q.     And you didn't see him shooting any dogs,

3     anything like that, in 1999, right, after you left?

4          A.     Not that I'm aware of, sir.

5          Q.     And you didn't see how he acted towards Mrs.

6     Andriano because you weren't there in 1999, right?

7          A.     Yes, sir.

8          Q.     This time, the slapping, according to you the

9     slapping of the defendant, you saw that, right?

10         A.     Yes, sir.

11         Q.     And of all the time that you spent with them,

12    that was the only incident that you could tell us where he

13    actually struck her, right?

14         A.     Yes, sir.

15         Q.     And according to you there was no -- there was

16    no bruising that was left?

17         A.     As I said there was slight bruising.

18         Q.     So she had it the next day, right?

19         A.     My memory serves me correct, yes, sir.

20         Q.     How old were you?

21         A.     8, 9.

22         Q.     And so what year would that make that?

23         A.     '94.  I believe '93.  Maybe it was in a

24    townhouse.

25         Q.     So they were living in the townhouse when this

1     happened?

2         A.    Yes, sir.

3         Q.    They weren't living out next to the machine

4     shop?

5         A.    No, sir.

6         Q.    Where was this townhouse, sir?

7         A.    I'm unaware of the apartment complex.

8         Q.    Was it in Casa Grande?

9         A.    Yes, sir.

10        A.    Was it near Courtyard Apartments?

11        A.    I don't believe so, no.

12        Q.    And did they live by themselves in this

13    townhouse?

14        A.    Aside from my occasional visit, yes, sir.

15        Q.    And did they have Nicolas in this townhouse?

16        A.    No, sir.

17        Q.    So it happened in a townhouse -- any idea what

18    road this is on?

19        A.    I'm unaware of the roads in Casa Grande.  It's

20    been a while.

21        Q.    What is it near where this townhouse is?

22        A.    It's -- I don't know the name of the buildings

23    around it, sir.

24        Q.    And what year do you think this was?

25        A.    If I remember correctly, '94, '95.

1          Q.    You may --

2          A.    Yeah, right, '94.

3          Q.    '94?

4          A.    Yes, sir.

5          Q.    Do you know if Nicolas had been born yet or no?

6          A.    I don't believe so.

7          Q.    And what -- what when in '94?  Was it early

8    '94, late '94?  When was it?

9          A.    If my memory serves me correct, early '94.

10         Q.    How early in '94 would it be?

11         A.    I can't give a specific answer.  I'm unaware.

12         Q.    Would it be January?  I mean, that's really

13   early in '94.

14         A.    It's a possibility.

15         Q.    So it's in January of --

16         MR. PATTERSON:  Judge, that's not what he's saying.

17         THE COURT:  Sustained.

18         MR. PATTERSON:  He's saying --

19         THE COURT:  Sustained.

20         MR. PATTERSON:  -- he doesn't recall.

21         THE COURT:  Ask your next question.  Sustained.

22   BY MR. MARTINEZ:

23         Q.    Could be means it might be, right?

24         A.    Yes, sir.

25         Q.    In January of '94, right?

1     A.    Yes, sir.

2     Q.    And where did this happen?  What -- what part

3  of the townhouse?

4     A.    Upstairs bedroom, I believe.

5     Q.    And is that where all the bedrooms were?

6     A.    Excuse me?

7     Q.    Is that where all of the bedrooms were?

8     A.    I'm unaware if there was more than one bedroom.

9     Q.    So he was up there, right?

10    A.    Yes, sir.

11    Q.    And you weren't staying with them back then,

12  were you?

13    A.    Not actually living with them, but I spent the

14  night there frequently.

15    Q.    Didn't you just tell us on direct examination

16  that during the 90-day period that you stayed with them when

17  they were living out next to the machine shop?  Didn't you

18  tell us that earlier?

19    A.    If that's the impression I gave you, I did not

20  mean to.

21    Q.    So you didn't tell us that it was during this

22  90-day period that you stayed with them, right?

23    A.    I don't believe so, no, sir.

24    Q.    So the only thing that you saw then during the

25  90-day period that you stayed with them was him having his

1    back to you, right?

2         A.    Yes, sir.

3         Q.    So you never saw any time during that 90-day

4    period when Mr. Andriano ever touched Mrs. Andriano?

5         A.    Touched?  That's completely different from

6    strikes.

7         Q.    Okay.  Strike?

8         A.    I've seen him touch her many times.  Striking

9    no, sir.

10        Q.    Okay.  I want to talk to you about throwing the

11   remote thing.  That also happened while they were at the --

12        A.    Yes, sir.

13        Q.    -- out at the house that's next to the machine

14   shop, right?

15        A.    Yes, sir.

16        Q.    And the defendant was upset according to you,

17   right?

18        A.    Yes, sir.

19        Q.    What time of the day was it?

20        A.    I'm unaware.  I was inside watching television.

21        Q.    Are you saying that just because you were

22   inside you didn't know what time it was?

23        A.    When you're a child, you really don't pay

24   attention.

25        Q.    Was it daytime or night time?

1      A.    Daytime, evening time.

2      Q.    Were you getting ready for dinner or had you

3   eaten lunch?

4      A.    I had eaten lunch.  I believe it was before

5   dinner.

6      Q.    Were you in school?

7      A.    Yes, sir.

8      Q.    Was this after school?

9      A.    This was during summer vacation.

10      Q.    So it was during the summer then, right?

11      A.    Yes, sir.

12      Q.    And according to you there was this argument.

13   What was the argument about?

14      A.    I believe Wendi had wanted to go out with her

15   cousin and a couple friends.

16      Q.    So it wasn't just Barbara Mitchell she was

17   wanting to go out with.  Now it's Barbara Mitchell and other

18   people, right?

19      A.    Yes.

20      Q.    But you can't give names?

21      A.    I don't know them.

22      Q.    And what kind of car did Mrs. Andriano drive

23   back then?

24      A.    I'm unaware.

25      THE COURT:  Mr. Ochoa, why don't you go ahead pull

1   that microphone a little bit closer.  Speak right into that

2   microphone.

3            THE WITNESS:  Yes, sir.

4            THE COURT:  Thank you.

5   BY MR. MARTINEZ:

6       Q.    A little bit about the employment thing, you

7   indicated that Mr. Andriano was employed doing a variety of

8   things, right?

9       A.    Yes, sir.

10      Q.    And that he was a pretty strong guy, right?

11      A.    Yes, sir.

12      Q.    You also indicated that he could pick up some

13  drums and hold them bear-hug style, right?

14      A.    Yes, sir.

15      Q.    Are those the 50-gallon drums?

16      A.    They were heavier than that.  I believe they

17  were 250 gallons or --

18      Q.    250 gallons?

19      A.    Large, blue gallons -- large blue drums.  I'm

20  not sure of their exact weight.

21      Q.    But you think they were 250?

22      A.    If I remember correctly I believe that's the

23  weight.

24      Q.    Okay.  You indicated that Mr. Andriano also

25  asked or required that Mrs. Andriano lay out his clothes

1    right?

2          A.    Yes, sir.

3          Q.    Was this at the townhouse?

4          A.    No, sir.

5          Q.    Was this at the Courtyard Apartments?

6          A.    No, sir.

7          Q.    So it wouldn't have been when they were out --

8          A.    It was also during that point of time.

9          THE COURT:  Speak right in that microphone.  Go

10   ahead, pull it closer to you.

11   BY MR. MARTINEZ:

12         Q.    So if he was going to work out in welding, that

13   sort of thing, he would require her to put out his overalls?

14         A.    No, sir.  I believe you misunderstood me. She

15   had to it with her clothing, not his.

16         Q.    No, sir.  You indicated that she laid out his

17   clothing for him to wear.

18         MR. PATTERSON:  Misstates prior testimony, Judge.

19         THE COURT:  Sustained.

20         MR. PATTERSON:  Not what he said.

21         THE COURT:  Sustained.

22   BY MR. MARTINEZ:

23         Q.    Didn't you say she would -- quote, she would

24   have to lay out his clothing?  Didn't you say that?

25         A.    Her clothing.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

```
 1          Q.    She didn't have to lay out his clothing?

 2          A.    He was quite capable of dressing himself.

 3          Q.    Okay.  So -- okay, then I misunderstood.  It

 4     wasn't she had to lay out his clothes, but it was her?

 5          A.    She had to show him what she was wearing.

 6          Q.    Okay.  I understand that now.  When did this

 7     happen?

 8          A.    The times I witnessed these kinds of events was

 9     all the way from the house at the farm up to --

10          Q.    You know, you're -- because you are a bit too

11     close to the microphone, can you restate --

12          A.    I said the times this was happening was from

13     the house out at the farmlands up until the point I left I

14     would see these events.

15          Q.    Okay.  And these cement blocks you talked about

16     that he would lift, how much would you estimate that they

17     weighed?

18          A.    I believe they're anywhere from 30 to 50 pounds

19     a piece.

20          Q.    How old was Nicolas when he got his leg cut?

21          A.    If my memory serves me correctly, two.

22          Q.    And you indicated, sir, that you were with the

23     Andrianos or visiting with them on a regular basis from the

24     time he was two months until he was 2 and a half years old,

25     right?
```

1          A.    Past 2 and a half.

2          Q.    So --

3          A.    But, yes, that's what I said.

4          Q.    Right.  So just so I could get a time period,

5     it's approximately 2 and a half years?

6          A.    No, not probably 2 and a half.  I don't believe

7     so.

8          Q.    It was more than that?

9          A.    I did say up until about 4, I believe.  I

10    misstated that last time.

11         Q.    Well, okay.  Go ahead and then tell me, from

12    when to when did you have contact with the Andrianos?  And if

13    you could give it to me in terms of Nicolas' age?

14          .   A.    From newborn to, as I said, anywhere from 3 and

15    a half and 4 years.

16         Q.    When was he born?

17         A.    July of I'd really like to say '96.  I'm

18    unaware though.  I can't give you an answer, sorry.

19         Q.    Okay.  From July of '96?

20         A.    Till --

21         Q.    And you said you stayed with them for three

22    years or four years, something like that.  That was the

23    figure that you gave us?

24         A.    I didn't stay with them.  I did visit and

25    babysit frequently.  The only point in time I was living with

1      them was the 90-day period.

2           Q.    So if you said before that it was from 2 months

3      to 2 and a half years old, that would have been incorrect?

4           MR. PATTERSON:  Judge, this ground has been plowed

5      many, many times.

6           THE COURT:  Overruled.  Go ahead, answer that last

7      question.

8           THE WITNESS:  Yes, sir.  I was incorrect in that

9      statement.

10     BY MR. MARTINEZ:

11          Q.    Were you also present here in the Casa Grande

12     area when Ashley was born?

13          A.    Yes, sir.

14          Q.    And did you also have occasion to babysit for

15     her?

16          A.    Not often, but there was a few times.

17          Q.    Sir, I just want to make sure that I understand

18     what you're telling us.  In terms of the times, you're not

19     sure, right --

20          A.    Yes, sir.

21          Q.    -- of when these things happened?

22          A.    Yes.

23          Q.    And in terms of the farms where it might have

24     happened, you're not sure of the times, right?

25          MR. PATTERSON:  Judge, he's regurgitating prior

1    testimony.

2         THE COURT:  Sustained.

3    BY MR. MARTINEZ:

4         Q.    With regard to the crockpot, when was that --

5         MR. PATTERSON:  Objection.  Asked and answered

6    numerous times.

7         THE COURT:  Let's move on.

8    BY MR. MARTINEZ:

9         Q.    Well, you indicated to defense counsel the

10   defendant was making dinner when this thing happened with the

11   crockpot.

12        MR. PATTERSON:  Judge, this whole episode has been

13   gone over meticulously.

14        THE COURT:  Sustained.  Move on, Mr. Martinez.

15   BY MR. MARTINEZ:

16        Q.    The bottomline is you've changed your mind or

17   your story a number of ways from what you told me yesterday,

18   correct?

19        MR. PATTERSON:  Objection.  That's argumentative.

20        THE COURT:  Sustained.  Let's move on.

21        MR. MARTINEZ:  I don't have anything else.

22        THE COURT:  Redirect?

23        MR. PATTERSON:  Thank you, Judge.

24   / / / / /

25   / / / / /

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

# APPENDIX J - Part 3

1    REDIRECT EXAMINATION BY MR. PATTERSON:

2         Q.    All right.  You spent -- did you spend a period

3    of time with Joe and Wendi Andriano where you actually lived

4    with them?

5         A.    Yes, sir.

6         Q.    Okay.  And was that at a time before or after

7    Nicolas was born?

8         A.    After.

9         Q.    Okay.  And in point of time, how old was

10   Nicolas at the time you moved in with them?

11        A.    I'd like to say three weeks to a month old.

12        Q.    Okay.  You moved out as you tell us 90 days

13   after living with them.  For what period of time did you

14   continue to come back and visit with the family on a daily

15   basis?

16        A.    Any chance I could up until the point I left.

17        Q.    Okay.  When did you finally leave for Tucson?

18        A.    October 18th of 1999.

19        Q.    Okay.  The things you've testified to today,

20   did you observe them with your own eyes?

21        A.    Yes, sir.

22        Q.    Okay.  Have you made some mistakes with regards

23   to the names of the apartments?

24        A.    Yes, sir.

25        Q.    All right.  You mentioned these oil drums or

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    fuel drums.  Can you show us in terms of with your hands

2    height and width?

3          A.    The drum --

4          Q.    You could stand up if you want.

5          A.    Ground level, it would have been about that

6    tall and about that wide in a circle.

7          Q.    All right.  And for the record you showed about

8    this high?

9          A.    Yes, sir.

10         Q.    Which is about 5 feet -- 4 feet off the ground?

11         A.    I'd say about four feet and about 2 and a half

12    feet wide in diameter.

13         Q.    Width, 2 and a half feet?  Okay.  These are the

14    drums that he was capable of hoisting around, moving them,

15    that type of thing, during the period of his good health?

16         A.    Yes, sir.

17         Q.    Okay.  All right.  Was there a -- a person who

18    served as a sitter periodically when they lived in the

19    Courtyard Apartments?

20         A.    Yes, sir.

21         Q.    Where did this person reside?

22         A.    Directly above them.

23         Q.    Okay.  And what was her job from your

24    observation?  What did she do in terms of taking care of the

25    children?

1          A.     My personal observation, I was never there

2     unless I was picking them up.  But as far as I'm aware,

3     babysit --

4          MR. MARTINEZ:  Objection.  Hearsay.  If he wasn't --

5          THE COURT:  Sustained.  You didn't see what she did?

6          THE WITNESS:  Yes, sir.

7     BY MR. PATTERSON:

8          Q.     What was your task when you were over there?

9     What did you do with the children?

10         A.     When I showed up at the apartment complex, I'd

11    usually hang out with Wendi a little while in the main

12    office, and after a while she'd give the keys to the

13    apartment.  I would pick Ashley and Nicolas up, take them

14    down to the lower apartment, turn some cartoons or Teletubby

15    on.

16         Q.     Okay.

17         A.     Entertainment.

18         Q.     So in terms of the time the care provider

19    was the lady upstairs was during the day, and when you got

20    off school you would pick them up and take them down to

21    Wendi's apartment?

22         A.     Yes, sir.

23         Q.     Okay.  Now, you told us that you only observed

24    one incident of slapping?

25         A.     Yes, sir.

1          Q.    Okay.  Again, where did that occur?  The best

2    of your recollection.

3          A.    The townhouse.  I don't have the name for it.

4          Q.    Okay.  That was Casa Grande?

5          A.    Yes, sir.

6          Q.    And did you ever see Joe touch Wendi roughly

7    during the period of time that you observed them together?

8          A.    Yes, sir.

9          Q.    Okay.  When and -- let's talk about the

10   townhouse.  Did you see Joe touch Wendi roughly?

11         MR. MARTINEZ:  Objection.  Beyond the scope.  I never

12   asked that.

13         THE COURT:  Overruled.  Go ahead, answer the

14   question.

15         THE WITNESS:  Restate that one more time, please.

16   BY MR. PATTERSON:

17         Q.    You said you saw some rough touching.  Did you

18   see it at the townhouse?

19         A.    Occasionally.  Not often.

20         Q.    Okay.  Describe for me what you describe as

21   rough touching?

22         A.    Shoving.  As I --

23         MR. MARTINEZ:  Objection.  Beyond the scope, Your

24   Honor.  No one asked him about that.

25         THE COURT:  Overruled.  Go ahead.


                 TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          THE WITNESS:  Shoving, shoulder checking, grabbing by

2    the arm, pulling into the other room.

3    BY MR. PATTERSON:

4          Q.    Okay.  Did you see that behavior when you

5    resided with them at the building next to the machine shop?

6          A.    Yes, sir.  It seemed to have escalated.

7          Q.    Okay.  Tell me about the nature of the rough

8    touching that you observed there?

9          A.    Same kind of nature, just more correct.

10         Q.    Okay.  Did you see it thereafter at the

11   Courtyard Apartments?

12         A.    A few opportunities, I did.  I could say I saw

13   it occasionally.

14         MR. PATTERSON:  Okay.  Thank you, Judge.  Nothing

15   additional.

16         THE COURT:  Any further questions of this witness by

17   the jury?  If so, please raise your hand.

18              (No response.)

19         THE COURT:  No one has raised their hand.

20              May this witness be excused?

21         MR. PATTERSON:  No objection.

22         MR. MARTINEZ:  Yes, sir.

23         THE COURT:  Thank you very much.  You're excused.

24              Mr. Patterson?

25         MR. PATTERSON:  Yes, Your Honor.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1      MR. MARTINEZ:  Actually, Judge, he may not depending

2  on what may happen later.

3      THE COURT:  Okay.  You're not excused, but you may

4  leave.

5      THE WITNESS:  Okay.

6      MR. PATTERSON:  Judge, we would ask Barbara Mitchell

7  to testify.

8            (Pause in proceedings.)

9      THE COURT:  Please step forward.  Please step

10  forward right up here.  Give your name to the clerk.  Go

11  ahead, step right up here.  Right up here.  Give your name to

12  the clerk and she'll swear you in.

13

14                    BARBARA MITCHELL,

15        CALLED TO TESTIFY ON BEHALF OF THE DEFENDANT,

16     HAVING FIRST BEEN DULY SWORN, TESTIFIES AS FOLLOWS:

17

18      THE COURT:  Please have a seat on the witness

19  stand.  Please make yourself comfortable there on the witness

20  stand.  Please pull the microphone close to you.  Please

21  remember to speak loudly and clearly into the microphone so

22  everyone can hear you.  Also, please wait until the question

23  is completed before you answer the question.  And please make

24  sure that you give a verbal response.  Is that all agreeable

25  to you?

1          THE WITNESS:  Yes.

2          THE COURT:  Mr. Patterson, you may proceed.

3          MR. PATTERSON:  Thank you, Judge.

4

5    DIRECT EXAMINATION BY MR. PATTERSON:

6          Q.   Would you give us your name please, ma'am?

7          A.   Barbara Mitchell.

8          Q.   Are you employed?

9          A.   Yes, I am.

10         Q.   What do you do?

11         A.   I'm a human resource analyst.

12         Q.   For which employer?

13         A.   Casa Grande Regional Medical Center.

14         Q.   Okay.  That's a hospital down in Casa Grande?

15         A.   Yes.

16         Q.   You are related in some fashion to Wendi Ochoa,

17    correct?

18         A.   Yes, I am.

19         Q.   Describe for me that relationship?

20         A.   She is my cousin.

21         Q.   Okay.

22         A.   Which is my uncle's -- my mother's brother.

23         Q.   All right.

24         A.   Alejo.

25         Q.   Your mom's name?

1  A. Delia Alvarez.

2  Q. Okay.  Who is her brother?

3  A. Alejo Ochoa.

4  Q. Okay.  So the adoptive father of Wendi Andriano

5 is your mom's brother?

6  A. That's correct.

7  Q. Okay.  So no biological connection with Wendi?

8  A. No.

9  Q. It's -- it's by marriage, I guess?

10  A. Yes.

11  Q. Okay.  And adoption?

12  A. Yes.

13  Q. Okay.  Where did you grow up?

14  A. In Casa Grande.

15  Q. Okay.  And were you friends with Wendi growing

16 up?

17  A. Yes, I was.

18  Q. Okay.  When did you first meet her?

19  A. Probably when I was about 5 years old.

20  Q. Okay.  So life-long acquaintance and friends?

21  A. Yes.

22  Q. Okay.  Did you go to the same school that Wendi

23 went to?

24  A. Yes, I did.

25  Q. What school was that?

1          A.    It was 91st Psalms.

2          Q.    All right.  Has it changed its name at some

3    point?

4          A.    Yes, it has, to Harvest Family Church.

5          Q.    Okay.  Tell me a little bit about that school?

6          A.    It was a private school, a Christian academy.

7    It's very small, not a big school at all.

8          Q.    All right.

9          A.    Few children.

10          Q.    Were you in the same level or grade with Wendi?

11          A.    No.  She's about two years ahead of me.

12          Q.    Okay.  Did they use conventional grading kind

13    of structure as public schools use or is there different

14    grouping used, if you will?

15          A.    Actually, it was very long time ago.  I don't

16    remember how it was.

17          Q.    All right.  Did you progress at your own pace?

18          A.    Yes.

19          Q.    Okay.

20          A.    Yes.

21          Q.    And can you tell me about the class sizes?

22    Each kind of calendar year, they ranged from what to what?

23          A.    Class sizes normally were, depending on --

24    could be 1 to 5 children, just depending on how many kids

25    were in the actual school.

1          Q.   Okay.  Who was the -- was there a principal?

2          A.   I guess you could call him a principal.

3          Q.   What was his name?

4          A.   Pastor King.

5          Q.   Okay.  Was he also the pastor of the church

6     that was affiliated with this particular school?

7          A.   Yes.

8          Q.   Okay.  What kind of subjects were you taught in

9     that environment?

10         A.   All of the subjects normally in a public

11    school.

12         Q.   Okay.  And were there -- was there an

13    additional emphasis upon religious teaching?

14         A.   Yes.

15         Q.   Okay.  Was that a significant part of the

16    curriculum?

17         A.   Yes, it was.

18         Q.   Okay.  How much religious instruction would you

19    get on an average day as opposed to the other academic

20    practice?

21         A.   Academic subjects I'd have to say about an

22    hour.

23         Q.   Okay.  Was there a corporal punishment imposed?

24         A.   Yes.

25         Q.   Spanking --

1    A.    Swats.

2    Q.    -- for misbehavior?

3    A.    Yes.

4    Q.    Swats?

5    A.    Uh-huh.

6    Q.    Okay.  As you speak with me today, what was

7    your perception -- what is your perception or feeling about

8    that educational experience?

9         MR. MARTINEZ:  Objection.  Relevance.

10        THE COURT:  Sustained.

11   BY MR. PATTERSON:

12   Q.    Back then what was your feeling about that

13   particular educational experience?

14        MR. MARTINEZ:  Objection.  Relevance.

15        THE COURT:  I'll sustain the objection.  Let's move

16   on.

17   BY MR. PATTERSON:

18   Q.    All right.  Let me ask you then, did it -- did

19   it enable you to deal with the outside world?  Was it kind of

20   an insular -- an isolated experience cut off from the rest of

21   the world?

22   A.    It was very isolated.

23   Q.    Okay.  Tell me about that.  How were you ill

24   prepared, if you will, to deal with the real world as a

25   result of these experiences?

1          MR. MARTINEZ:  Objection.  Leading.  Ill prepared?

2     She never said that.

3          THE COURT:  Overruled.  Go ahead, answer the

4     question.

5          THE WITNESS:  Because going to school there, seeing

6     the same children, going to church there you hung out with

7     those same children day in day out.  You didn't get to do

8     outside activities as far as, you know, sports, that kind of

9     thing.

10    BY MR. PATTERSON:

11         Q.    Okay.  And were you dealing with people who

12    shared the same kind of fundamental moral and religious

13    values?

14         A.    Yes.

15         Q.    Okay.  Were you instructed with regard to the

16    role of a woman and family?

17         A.    Yes.

18         Q.    What was that instruction?

19         A.    To take care of the family.

20         Q.    Okay.  And the role of the woman with regard to

21    her husband, was there specific teachings in that regard?

22         A.    Take care of your spouse, your husband.

23         Q.    Okay.  And were there specific teachings with

24    regard to who was in charge, who made the decisions, those

25    kinds of things?


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000007971

1       A.    Yes, the father.

2       Q.    Okay.  All right.  And did you graduate from

3  that school?

4       A.    No, I did not.

5       Q.    Okay.  Did you there after go to a public

6  school?

7       A.    Yes, I did.

8       Q.    Which public school did you go to?

9       A.    I enrolled at Stanfield Public School.

10      Q.    Okay.  And graduated what year?

11      A.    '92.

12      Q.    Okay.  Did you maintain a relationship with

13  Wendi even though you had left the 91st Psalm or Harvest

14  Christian School?

15      A.    Yes, I did.

16      Q.    Okay.  And how did you maintain that

17  relationship with her?  What would you guys do?

18      A.    Saw her on a daily basis at times, sometimes on

19  holidays, weekends, church, that type of thing.

20      Q.    Okay.  So even though you quit going to the

21  school, you maintained your relationship with the church?

22      A.    Yes.

23      Q.    Okay.  And would you categorize the quality of

24  your friendship with Wendi at that time?

25      A.    It was awesome.

1      Q.    Okay.

2      A.    I looked up to her.

3      Q.    All right.  Did you have a best friend back
4  then at that time?

5      A.    That was Wendi.

6      Q.    Okay.  And, again, I may have missed this, how
7  frequently during the week would you two get together?

8      A.    At least three times a week.

9      Q.    Okay.  All right.  At some point in time did --
10  was Wendi introduced to a person by the name of Joe Andriano?

11     A.    Yes.

12     Q.    Were you present or familiar with the
13  circumstances of that meeting?

14     A.    Yes, I was.

15     Q.    Okay.  How did that happen?

16         MR. MARTINEZ:  I'm going to object.  I don't know if
17  she was present or familiar.

18         THE WITNESS:  I'm sorry.

19         THE COURT:  Sustained.  Rephrase the question.

20  BY MR. PATTERSON:

21     Q.    Were you present during the initial meeting?

22     A.    No.

23     Q.    Okay.  Had she met him previous to that time
24  and you at some point then saw them together?

25         MR. MARTINEZ:  Objection.  Hearsay.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1       THE COURT:  Overruled.  Go ahead, answer the question

2   if you can.

3       THE WITNESS:  Could you repeat it?

4   BY MR. PATTERSON:

5       Q.   Sorry.  It's a bad question.  At some point in

6   time did you become aware that Joe and Wendi were dating?

7       A.   Yes.

8       Q.   Okay.  What point in time did you become aware

9   of that?

10      A.    It was right around the same week or week after

11  she had mentioned that she met Joe.

12      MR. MARTINEZ:  Objection.  Hearsay.

13      MR. PATTERSON:  Not offered for the truth.

14      THE COURT:  Okay.  Overruled.  Complete your answer.

15      THE WITNESS:  It was a week after that she happened

16  to meet this gentlemen.

17  BY MR. PATTERSON:

18      Q.   Okay.  Where were you when you saw them

19  together for the first time?

20      A.   Probably at the apartment.

21      Q.   Okay.  Did she appear to like this gentleman?

22      A.   Absolutely.

23      Q.   Okay.  In terms of her experiences that you

24  were aware of, had she dated other people prior to that time?

25      A.   Yes.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    Q.    Who had she dated?

2    A.    Shawn King.

3    Q.    Okay.  And who, again, is Shawn King?

4    A.    Her high school sweetheart.

5    Q.    Okay.  Was he the son of any particular person

6    in town there?

7    A.    Pastor Tom King.

8    Q.    That's the pastor running the school and the

9    church?

10    A.    Yes.

11    Q.    Can you describe her demeanor when she was

12    around Joe for the first time that you saw them together?

13    A.    Smitten, very smitten.

14    Q.    She was taken by him?

15    A.    Very taken by him.  She was in awe of him.

16    Q.    Okay.  And did you go out with them at least at

17    the beginning on a kind of a regular basis?

18    A.    Yes.

19    Q.    Where would you guys go?

20    A.    We went to a bar in town.  It was a small bar.

21    One time we went to -- I hung out with them at the lake.  One

22    time at their apartment.  Those kinds of things.

23    Q.    All right.  And how old were you at this time?

24    A.    19.

25    Q.    All right.  Hanging out at bars, was there a

1   little problem with hanging out at bars at age 19?

2           A.    It was in town, it was at lunch time.  It was a

3   small bar in Casa Grande.

4           Q.    Okay.  Were you guys drinking at lunch time?

5           A.    I wasn't.  They were playing pool.

6           Q.    Okay.  What year are we talking about to the

7   best of your recollection?

8           A.    1992 or '93.

9           Q.    Okay.  Do you recall when Wendi and Joe got

10  married?

11          A.    Yes.

12          Q.    What year was that?

13          A.    1994.

14          Q.    Okay.  Were you able to associate with Wendi

15  and Joe from the period of time that they first met up to

16  their marriage?

17          A.    Yes, that's correct.

18          Q.    Okay.  And how frequently were you allowed to

19  go out -- did you go out with Joe and Wendi?

20          A.    Not very much.

21          Q.    Okay.  Once a --

22          A.    Once every six months.

23          Q.    Okay.  And was that less frequent or more

24  frequent than the time you spent with Wendi before she met

25  Joe?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1       A.    Less frequent.

2       Q.    Okay.  Was there a change in that circumstance?

3       A.    Yes.

4       Q.    Tell me about that?

5       A.    She basically just withdrew from -- from

6   hanging out with me, just totally stopped.  You know, we'd go

7   to lunch.  She wouldn't -- either wouldn't go with me or --

8   well, she just pulled away.

9       Q.    Okay.  She began spending more time with whom,

10  if you know?

11      A.    With Joe.

12      Q.    Okay.  It came to your attention in what, early

13  '94, they were about to be married.  When did you become

14  aware of that?

15      A.    Probably end of '93.

16      Q.    Okay.  Did you indicate to Wendi a willingness

17  to participate in the wedding?

18      A.    Yes.

19      Q.    What did you tell her?

20      A.    She asked if I wanted to be a bridesmaid and I

21  said yes.

22      Q.    Okay.  Had you made plans to buy a dress or

23  whatever bridesmaids need --

24      A.    Yes.

25      Q.    -- for the ceremony?

1      A.    Yes.

2      Q.    Had you actually secured the dress?

3      A.    Yes.

4      Q.    Okay.  Where did you buy the dress?

5      A.    It was actually made in Oklahoma.

6      Q.    Did you make it or a seamstress involved with

7  the wedding?

8      A.    Donna made the dress.

9      Q.    Wendi's mom?

10     A.    Yes.

11     Q.    Okay.  Did it come to your attention at some

12 point that you were no longer going to be a bridesmaid in the

13 wedding?

14     A.    It was actually --

15     MR. MARTINEZ:  Objection.  Calls for yes or no answer.

16     THE COURT:  Just answer the question.

17     THE WITNESS:  Could you repeat the question?

18 BY MR. PATTERSON:

19     Q.    Did you at some point become aware that you

20 were no longer going to be a bridesmaid in the wedding?

21     A.    No.

22     Q.    Well, if -- nobody made you aware of that?

23     A.    No.

24     Q.    Okay.  Was there a time then when a change was

25 made and somebody else was a bridesmaid rather than you?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          A.    No.

2          Q.    Okay.  Did you actually involve yourself in the

3     wedding?

4          A.    Yes.

5          Q.    And were you a bridesmaid?

6          A.    Yes.

7          Q.    Okay.  And tell me about that experience.  What

8     did do you?

9          A.    I just participated in the wedding as a

10    bridesmaid, not a matron.

11         Q.    Okay.  Talking about wedding terminology, now.

12         A.    I'm sorry.

13         Q.    Let's go back.  At some point in time had you

14    intended or expected to be the maid of honor or matron of

15    honor?

16         A.    In my heart I thought I would be the matron of

17    honor.

18         Q.    Okay.  Was that decision ever communicated to

19    you that you would in fact be that person?

20         A.    No.

21         Q.    Okay.  The wedding happened, were you the maid

22    of honor or matron of honor?

23         A.    No.

24         Q.    Who was?

25         A.    Joe's sister Janay.

1      Q.    Okay.  You also participated in the wedding but

2   as a bridesmaid?

3      A.    That's correct.

4      Q.    Okay.  That's my mistake.

5            After the wedding did you have occasion to

6   socialize with Joe and Wendi?

7      A.    Yes.

8      Q.    Okay.  How frequently did that occur?

9      A.    Once.  I think it was once or twice during that

10  night.

11     Q.    Okay.  That was actually at the wedding?

12     A.    At the wedding, correct.

13     Q.    Talking about after the wedding, when they

14  moved into their home or townhome or apartment, did you

15  continue to socialize of a fashion with Joe and Wendi in

16  public?

17     A.    No.

18     Q.    Okay.  Were you eliminated or cutoff

19  completely?

20     A.    Yes.

21     Q.    Okay.  And why did you no longer socialize with

22  them?

23          MR. MARTINEZ:  Objection.  Speculation.

24          MR. PATTERSON:  I'm asking what her reasoning is.

25          THE COURT:  Overruled.  Go ahead, answer the

1    question.

2         THE WITNESS:  I had -- I felt that she was, again,

3    withdrawn, did not want me to be you know part of that family

4    portion.

5    BY MR. PATTERSON:

6         Q.    Okay.  You didn't feel welcome in that

7    environment?

8         MR. MARTINEZ:  Objection.  Leading.

9         THE COURT:  Sustained.  Don't lead.

10   BY MR. PATTERSON:

11        Q.    Did you feel welcomed in that environment?

12        A.    No.

13        Q.    Okay.  And that -- was that from Joe and Wendi

14   or just one or the other?

15        A.    Just Joe.

16        Q.    Okay.  Would Joe talk with you at times?  Did

17   you have occasion to be with both of them?

18        A.    No.

19        Q.    Okay.  Would he avoid you or socialize with you

20   in any fashion?

21        A.    It was as if I was not there.

22        Q.    Okay.  Did you nevertheless try to maintain

23   some kind of relationship with Wendi?

24        A.    Yes.

25        Q.    When would you go over to see Wendi?

1        A.    During my lunch hour.  Mostly that would be the

2   time.

3        Q.    Okay.

4        A.    My lunch hour.

5        Q.    Did you try to choose a time when Wendi would

6   be alone?

7        A.    Yes.

8        Q.    Okay.  And why did you do that?

9        A.    To avoid Joe.  I felt like he didn't want me

10  there.

11       Q.    Okay.  Did in fact the one time that you were

12  there, did Joe come home unexpectedly?

13       A.    Yes.

14       Q.    Okay.  And when did -- we did signify early

15  '94.  The relationship up to that point in time, when did

16  this -- this happen?

17       A.    This happened at the shop.

18       Q.    Okay.  So when they were living in the -- in

19  the resident next to the machine shop?

20       A.    That's correct.

21       Q.    Okay.  Do you recall the year of that

22  occurrence?

23       A.    It was probably '96.

24       Q.    Okay.  Had Nicolas been born at this point?

25       A.    Yes, he had.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1      Q.    Do you know Nicolas' birthday?

2      A.    6/20.

3      Q.    Of?

4      A.    It's either '96 or '97.

5      Q.    Okay.  So it's subsequent to Nicolas' birth.

6  You could use his birthdate as the point in time when you

7  were witnessing this?

8      A.    Yes.

9      Q.    Okay.  What did you see Joe do?

10      A.    Storm in the room and basically say "Where the

11  fuck is my -- "

12           MR. MARTINEZ:  Objection.  Hearsay.

13           MR. PATTERSON:  Judge --

14           THE COURT:  Overruled.  Go ahead.

15           THE WITNESS:  "Where the fuck is my blue shirt? Why

16  don't you iron my fucking blue shirt?"

17  BY MR. PATTERSON:

18      Q.    Was Wendi present when he made those

19  statements?

20      A.    Yes.

21      Q.    Okay.  What did she do?

22      A.    She spun off out of the chair and followed him.

23      Q.    Okay.  Did the discussion or -- yeah,

24  discussion, dialogue between the two parties continue in the

25  back room there?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1        A.    Yes.

2        Q.    Okay.  And you could hear that continuing from

3  your vantage point?

4        A.    Yes.

5        Q.    Okay.  At some point in time did Joe come out

6  wearing any particular item of apparel?

7        A.    Yes.

8        Q.    What was he wearing?

9        A.    A blue shirt.

10       Q.    Okay.  And did he remain there at that point in

11  time or did he leave?

12       A.    He left.

13       Q.    Okay.  Did Wendi come back out?

14       A.    She did.

15       Q.    What was her demeanor when she came back out?

16       A.    She was -- she had been crying.

17       Q.    Okay.  Was there another time when you went to

18  Las Vegas with Donna and Wendi?

19       A.    Yes.

20       Q.    Okay.  And what point in time was this?

21       A.    It was May of 2000.

22       Q.    Okay.  So it's about three years thereafter?

23       A.    Yes.

24       Q.    Okay.  In the intervening three years did you

25  have any significant contact on a social basis with Joe and

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    Wendi Andriano?

2           A.    No.   The only thing we had was my grandfather

3    was ill and in passing at the hospital.   That was it.

4           Q.    Okay.   Would you see Wendi periodically in that

5    intervening three-year period?

6           A.    No.

7           Q.    Okay.   So you'd been kind of -- you were no

8    longer associating with Joe and Wendi Andriano?

9           A.    Correct.

10          Q.    Okay.   At some point in time though you do go

11   to Las Vegas.   How did that happen that you were involved in

12   that?

13          A.    I was invited.   It was a girl's weekend out.

14          Q.    Who invited you?

15          A.    Donna and Wendi.

16          Q.    Okay.   Did you go over -- how did you get to

17   Las Vegas?

18          A.    They were already there and I flew in on Friday

19   night.

20          Q.    Okay.   So you met them after they'd already

21   arrived?

22          A.    Correct.

23          Q.    Okay.   And vacationed in Las Vegas?

24          A.    Yes.

25          Q.    Okay.   How long -- what duration was your stay


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    in Las Vegas?

2         A.    Two nights.

3         Q.    Okay.  During that period of time that you were

4    there, did you observe Wendi answering the phone

5    periodically?

6         A.    Yes.

7         Q.    How frequently would she be called to answer

8    the phone?

9         MR. MARTINEZ:  Objection.  Lack of foundation.  Which

10   day are we talking about?

11        THE COURT:  Overruled.  Answer the question.

12   BY MR. PATTERSON:

13        Q.    During the period of time you were in Las

14   Vegas?

15        A.    Mostly on Saturday and it was during the day

16   and it was the telephone in the hotel.

17        Q.    Okay.  How many calls did she receive that day?

18        A.    At least three.

19        Q.    Okay.  And the substance of the call, what did

20   Wendi do in response to those calls?

21        A.    She was angry after hanging up with him and

22   saying --

23        MR. MARTINEZ:  Objection.  Hearsay.

24        THE COURT:  Sustained.

25   / / / / /

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1   BY MR. PATTERSON:

2          Q.   Well, what did she do in response to those

3   calls?

4          A.   She was angry that he was calling --

5          MR. MARTINEZ:  Objection.  Hearsay.

6          THE COURT:  Sustained.  Just answer question that's

7   asked for.

8   BY MR. PATTERSON:

9          Q.   She was upset by the --

10         MR. MARTINEZ:  Objection.  Leading.

11         THE COURT:  Sustained.

12         MR. MARTINEZ:  She said she was angry.

13         THE COURT:  Sustained.  Rephrase the question.

14  BY MR. PATTERSON:

15         Q.   Was she upset by the call?

16         A.   Yes.

17         Q.   Did she throw anything as a result of those

18  calls?

19         MR. MARTINEZ:  Objection.  Leading.

20         THE COURT:  Overruled.

21         THE WITNESS:  No.

22  BY MR. PATTERSON:

23         Q.   Okay.  Did you cut short your trip in Las

24  Vegas?

25         A.   No.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1     Q.    Okay.  Did you change your travel plans in any

2  fashion?

3     A.    No.

4     Q.    Did you return to Phoenix, Arizona, consistent

5  with the plans that had been made prior to your departure?

6     A.    Yes.

7     Q.    And who came back with you to Phoenix?

8     A.    Both Donna and Wendi.

9     Q.    All right.  Was there a problem with the return

10  flight in some fashion?

11     A.    Yes.  We were 30 minutes late.

12     Q.    30 minutes late?

13     A.    Arriving 30 minutes late.

14     Q.    Did Wendi receive any telephone calls during

15  the period of time that you were driving back from Las Vegas?

16     A.    Not that I recall.

17     Q.    Okay.  When -- you got to Phoenix Sky Harbor by

18  airplane, right?

19     A.    Yes.

20     Q.    Okay.  What did you do when you first landed?

21     A.    She was on the phone.  Sorry, what did I do?

22     Q.    What did you do, yeah?

23     A.    We grabbed our luggage --

24     Q.    Okay.

25     A.    -- and went out to look for Joe.  He was

1    picking us up.

2          Q.    Okay.  Did Wendi use the phone to try to

3    contact anybody?

4          A.    Yes.

5          Q.    Okay.  Who was she intending to contact?

6          A.    She was trying to call Joe.

7          Q.    Okay.  Was she successful in getting hold of

8    Joe?  Did you see her involved in a conversation with

9    somebody?

10         A.    No.

11         Q.    Okay.  Got your bags, what did you do at that

12   point?

13         A.    Went to the curb and -- and was waiting for Joe

14   to pick us up.

15         Q.    Okay.  At some point did Joe arrive?

16         A.    Yes.

17         Q.    What was he driving?

18         A.    Tahoe.

19         Q.    Okay.  Tell me how he drove that vehicle in

20   your vicinity where you were standing with package -- with

21   your luggage?

22         A.    All I heard was wheels screeching, and when I

23   looked up it was Joe.

24         Q.    Okay.  And where had he -- had the vehicle come

25   to a stop?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1      A.    Yes.

2      Q.    In what lane?

3      A.    It was the middle lane.

4      Q.    The lane used for passing through travel?

5      A.    Through travel.

6      Q.    Okay.  What did he do at that point?

7      A.    He got out of the truck.

8      Q.    Okay.  And what did he do?

9      A.    He approached us and said "Where the fuck have

10   you guys been?"

11     Q.    Okay.  Was Wendi present when he was saying

12   these things?

13     A.    Yes.

14     Q.    Okay.  What was his demeanor?  What was his

15   tone?

16     A.    He was pissed.

17     Q.    Okay.

18     A.    He was very angry, just wouldn't hear it.

19     Q.    Okay.  What did he do at that point?

20     A.    Grabbed something out of her hand, the luggage

21   and then proceeded to grab our stuff and pitch it into the

22   Tahoe.

23     Q.    All right.  Were you frightened by his conduct

24   at that point?

25     A.    Yes.

1        Q.    Okay.  Was all the luggage at some point put

2  into the Tahoe?

3        A.    Yes.

4        Q.    Okay.  And did you get into the vehicle?

5        A.    Yes, I did.

6        Q.    Where did you sit relative to the other people?

7        A.    Joe was driving, I sat behind him.

8        Q.    Okay.  And who was in the front seat?

9        A.    Wendi.

10       Q.    And who was in the back seat --

11       A.    Donna.

12       Q.    -- passenger side?

13            Okay.  Where did you go?

14       A.    To the apartment, Wendi's apartment, Wendi and

15  Joe's apartment.

16       Q.    Describe the trip up to that point where you

17  put the -- or he's put the luggage -- well, how did he put

18  the luggage in the vehicle?

19       A.    He threw them.

20       Q.    Okay.  Describe for me the trip from that point

21  in time, where you all ended up in the vehicle until you get

22  to the apartment.  Is it the San Riva apartments?

23       A.    Yes.

24       Q.    Okay.  Describe that trip for me?

25       A.    Dead silence in the truck and he was speeding

1    and cutting -- you know, weaving in and out of lanes.

2         Q.    Okay.  Were you frightened by his conduct?

3         A.    Yeah.

4         Q.    Okay.  Did he appear to be emotionally upset,

5    disturbed in any fashion?

6         A.    He was angry.

7         Q.    Okay.  What did you see that led you to that

8    conclusion?

9         A.    He wouldn't make any kind of conversation with

10   Wendi at all or us.

11        Q.    Okay.

12        A.    Just kept driving, looking straight ahead.

13        Q.    Okay.  Did you get a chance to examine the

14   speedometer at some point?

15        A.    Yeah.  I looked around the corner and he was

16   going about 110.

17        Q.    Okay.  Was there traffic on -- what route are

18   you taking, do you remember?

19        A.    I don't recall.

20        Q.    Was it freeway, travel surface --

21        A.    Interstate.

22        Q.    Okay.  Did he drop you off at some location?

23        A.    No.  We went to the apartment in the parking

24   lot.

25        Q.    Okay.  Did anything happen in the parking lot

1    that indicated he was still upset, still angry?

2            A.    Nothing.  He didn't say a word to us.

3            Q.    Okay.  Did somebody come and take you home at

4    some point?

5            A.    He and Donna loaded our stuff into the car.

6            Q.    And then you guys drove to Casa Grande?

7            A.    Yes.

8            Q.    Okay.  Okay.  Did you --

9            MR. PATTERSON:  Judge, that's all I have.  Thank you.

10           THE COURT:  Mr. Martinez?

11

12    CROSS-EXAMINATION BY MR. MARTINEZ:

13           Q.    You indicated that after you were dropped off

14    that you and the defendant's mother got into a car and left

15    to go to Casa Grande, right?

16           A.    Yes.

17           Q.    Got into the mother's Mazda, didn't you?

18           A.    Yes.

19           Q.    And you put your luggage in the trunk, right?

20           A.    Yes.

21           Q.    There was no problem opening that trunk, was

22    there?

23           A.    Not that I'm aware.

24           Q.    You were there, weren't you?

25           A.    Yes.

1      Q.   So you saw her put the key in the trunk, right?

2      A.   Yes.

3      Q.   You saw her open the trunk, right?

4      A.   Yes.

5      Q.   And you put your luggage in it, right?

6      A.   Yes.

7      Q.   And she put her luggage in it, right?

8      A.   Yes.

9      Q.   There were no baby seats in there, were there,

10   in the car?

11     A.   There may have been babyseats in the car.

12     Q.   So even though you were -- you're not sure

13   whether there was or wasn't?

14     A.   No, I'm not sure.

15     Q.   Okay.  And then the two of you got into that

16   car and went to Casa Grande, right?

17     A.   Yes.

18     Q.   Did she drop you off at your house or did she

19   go to her house first?

20     A.   Dropped me off at my -- at her house.  My car

21   was there.

22     Q.   In other words, you drove from your house over

23   to Donna Ochoa's house, right?

24     A.   That's correct.

25     Q.   That's on Park, right?

```
1          A.    Correct.

2          Q.    The whole trip took you no more than about 35

3   or 40 minutes?

4          A.    From Casa -- from Phoenix to Casa Grande?

5          Q.    From the San Riva apartment complex, right.

6          A.    Yes.

7          Q.    So it took 35 to 40 minutes, right?

8          A.    Yes.

9          Q.    And she was driving the speed limit, wasn't

10  she?

11         A.    Yes.

12         Q.    It wasn't like she was speeding or anything

13  like that?

14         A.    No.

15         Q.    With regard to the Las Vegas excursion, you

16  indicated that while you guys were in Las Vegas, the

17  defendant received a total of three calls, right?

18         A.    Yes.

19         Q.    And it was a total of three calls including

20  calls to the hotel room and to her cell phone, right?

21         A.    Yes.

22         Q.    And that was for the full Friday through

23  Sunday, right?

24         MR. PATTERSON:  That misstates her testimony, Judge.

25  What she observed.
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1           THE COURT:  Right.  Just what you observed.

2           THE WITNESS:  That's what I observed.

3           MR. MARTINEZ:  Right.  That's all I'm asking about.

4      BY MR. MARTINEZ:

5           Q.   From Friday to Sunday when you got back, there

6      were only a total of three calls, right?

7           MR. PATTERSON:  That she observed, Your Honor.

8           THE COURT:  That you observed.  Is that correct?

9           THE WITNESS:  That I observed.

10     BY MR. MARTINEZ:

11          Q.   Everything I'm asking you is what you observed,

12     okay?  If I ask your name or ask you what courtroom this is,

13     it's what you observed.  Do you understand?

14          A.   Yes.

15          MR. PATTERSON:  Objection.  Argumentative.

16          THE COURT:  Let's move on.

17     BY MR. MARTINEZ:

18          Q.   So there were only three calls, right?

19          MR. PATTERSON:  Asked and answered.

20          THE COURT:  Sustained.

21          MR. PATTERSON:  As she observed.

22          THE COURT:  Move on.

23     BY MR. MARTINEZ:

24          Q.   With regard to those three calls, were they

25     bunched together or were they spread out?  When were they?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000007996

1   A.   They were sporadic.

2   Q.   Okay.  When was the first one?

3   A.   Saturday morning.

4   Q.   Okay.  When was the next one?

5   A.   It would have to be late afternoon.

6   Q.   Saturday?

7   A.   Saturday.

8   Q.   And then the third one?

9   A.   Evening.

10   Q.   Saturday evening?

11   A.   Saturday evening.

12   Q.   And there were no calls on Sunday, right?

13   A.   Not that I recall.

14   Q.   I'm only asking what you recall.  And there

15   were no calls on Friday, right?

16   A.   No.

17   Q.   And after the first call on Saturday morning,

18   you indicated that after getting off the phone the defendant

19   was angry, right?

20   A.   Yes.

21   Q.   And how long was she speaking on the phone?

22   A.   No more than 10 minutes.

23   Q.   Okay.  And after that, was that when she was in

24   the hotel room or walking around?  Or where were you guys?

25   A.   Hotel.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000007997

```
1          Q.     Okay.  And after that you did notice that she
2     was angry, right?
3          A.     Yes.
4          Q.     And after the one in the afternoon, how long
5     did that last?
6          A.     Like two, three minutes.
7          Q.     Very quick?
8          A.     Yes.
9          Q.     And she was angry after that one, too?
10         A.     Yes.
11         Q.     And finally there's the one at night, right?
12         A.     Yes.
13         Q.     And the one at night, how long did that last?
14         A.     That was very quick.  It was like two, three
15    minutes.
16         Q.     Just like the previous one?
17         A.     Yes.
18         Q.     And she was also angry after that one, right?
19         A.     Yes.
20         Q.     You indicated that you and she used to hang out
21    in a small bar that's out in Casa Grande, right?
22         A.     Yes.
23         Q.     And is that Spirits?
24         A.     No.
25         Q.     Which bar is it?
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          A.      The one in Casa Grande?

2          Q.      The one that you and she used to hang out when

3     you were 19 years old.

4          A.      Spirit.

5          Q.      So that was Spirits?

6          A.      Yes, I'm sorry.

7          Q.      Right.

8          A.      Sorry.

9          Q.      And although -- was it a bar or was it like a

10    pizza place?

11         A.      It was both.  It has a restaurant in the front.

12         Q.      And you guys would go there for lunch during --

13    this was before she was married, right?

14         A.      That's correct.

15         Q.      You guys would go there for lunch, right?

16         A.      No.  The first -- when I talked about the lunch

17    was a different bar in Casa Grande.

18         Q.      Okay.  What bar was that?

19         A.      I don't remember the name.

20         Q.      Okay.  But then you and she would go to Spirits

21    then, right?

22         A.      Yes.

23         Q.      When you guys went to Spirits, would that be at

24    night?

25         A.      Yes.

1    Q.    And there was alcohol that was being --

2    A.    Yes.

3    Q.    And you partook of that, right?

4    A.    Yes.

5    Q.    Were you driving also?

6    A.    Not always.

7    Q.    But sometimes you were, right?

8    A.    Yes.

9    Q.    And was the defendant drinking?

10   A.    Yes.

11   Q.    And how many times would you say that you and

12   she went to Spirits bar?

13   A.    In a nine-month period, every other weekend.

14   Q.    You indicated that when she was dating you were

15   familiar with her dating somebody by the name of Shawn King,

16   right?

17   A.    Yes.

18   Q.    And you indicated that you guys were pretty

19   close, right?

20   A.    Yes.

21   Q.    And did you know her to ever go out with

22   somebody by the name of Didos Gamez?

23   A.    Yes.

24   Q.    How about Pete Munoz.  She also went out with

25   him too, didn't she?

```
 1        A.    No.  I don't recall him.

 2        Q.    How about Vernon Barnes.  She also went out

 3   with him?

 4        A.    No.

 5        Q.    Not that you know?

 6        A.    Not that I know.

 7        Q.    The only one you know of was Didos Gamez,

 8   right?

 9        A.    Yes.

10        Q.    Okay.  Have you ever sped on the freeway

11   before?

12        A.    Yes.

13        Q.    And how fast have you driven?

14        A.    About 85.

15        Q.    Okay.  And the defendant is your best friend,

16   right?

17        A.    Yes.

18        Q.    And at least she was back then, right?

19        A.    Yes.

20        Q.    And in terms of this being the maid of honor,

21   all that stuff, that was never actually -- that honor was

22   never actually requested of you, was it?

23        A.    No.

24        Q.    It was something you felt probably would be a

25   good thing, right?
```

1      A.    Yeah.

2      Q.    And you also told us a little bit about the

3  trip home from Las Vegas.  He didn't -- Mr. Andriano didn't

4  say a word, right?

5      A.    No.

6      Q.    Except for the comment that he made when you

7  guys got there, he didn't continuously curse on the way home,

8  did he?

9      A.    No, not that I recall.

10     Q.    He didn't -- according to you previously, he

11  didn't say a thing, right?

12     A.    No.

13     Q.    When he got to the apartments, he didn't say a

14  thing to her either, right?

15     A.    To --

16     Q.    Mrs. Andriano.

17     A.    No.

18     Q.    In fact he just got the luggage and went on

19  inside, right?

20     A.    Yes.

21     Q.    They weren't fighting as they walked in, right?

22     A.    Not that I saw.

23     Q.    He wasn't saying anything, right?

24     A.    Right.

25     Q.    You did indicate to us that he -- one of the

1    things that you learned when you were at the 91st Psalm or

2    Harvest Family Church was that the woman's role was to take

3    care of the spouse, right?

4           A.    Yes.

5           Q.    That would not include having affairs, right?

6           A.    No.

7    MR. MARTINEZ:  Thank you.  Nothing further.

8    THE COURT:  Mr. Patterson?

9    MR. PATTERSON:  Thank you, Judge.

10

11   REDIRECT EXAMINATION BY MR. PATTERSON:

12          Q.    Did you indicate to us that you've actually

13   sped or speeded on the highway before?

14          A.    Yes.

15          Q.    Have you ever gone 110 miles per hour and

16   jeopardizing the welfare of passengers with you?

17   MR. MARTINEZ:  Objection.  That's assuming he was

18   jeopardizing the welfare.

19   THE COURT:  Sustained.  Rephrase the question.

20   BY MR. PATTERSON:

21          Q.    Did you ever go 110 miles an hour?

22          A.    No.

23          Q.    Did you ever go 110 with three other people in

24   your vehicle?

25          A.    No.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1       Q.    Okay.  Did you ever drive or speed in your car

2  because you were angry?

3       A.    Yes.

4       Q.    Okay.  And is this what you observed apparently

5  on that night when you came back from Las Vegas?

6       A.    Yes.

7      MR. PATTERSON:  Thank you, Judge.  That's all I have.

8      THE COURT:  Any further questions of this witness by

9  the jury?  If so, please raise your hand.

10       (No response.)

11      THE COURT:  No one has raised their hand.

12       May this witness be excused?

13      MR. MARTINEZ:  Yes, sir.

14      MR. PATTERSON:  No objection.

15      THE COURT:  You're excused.  Thank you very much.

16       Okay.  We'll go ahead and take our evening and

17  weekend recess at this point in time, ladies and gentlemen.

18  During the weekend recess remember the entire admonition I've

19  given you including the fact you're not to discuss this case

20  with anyone, do not let anyone discuss the case with you.  Do

21  not do any research, experimentation or testing on your own.

22  Avoid any media coverage on this case.  Keep an open mind.

23       I want to you have a nice weekend.  We'll see

24  everyone on Monday at 1:00.  Have a nice weekend.  We'll be

25  in recess.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

186

1

2               (Evening recess.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                        CERTIFICATE OF REPORTER

4

5    STATE OF ARIZONA      )
                           )
6    COUNTY OF MARICOPA    )

7

8                    I, Traci L. Wheeler, CSR, RPR, an official

9    and certified reporter in the Superior Court of the State

10   of Arizona, in and for the County of Maricopa, hereby

11   certify that I made a shorthand record of the proceedings

12   had in the within case, and that the foregoing transcript

13   is a full, true, and correct transcription of the

14   proceedings in this case.

15                    Dated this 5th day of June, 2005.

16

17

18                    _____
                      Traci L. Wheeler, CSR, RPR
19                    Certified Court Reporter No. 50313
                      Official Court Reporter
20

21

22

23

24

25


            TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

                              000008006

# APPENDIX K - Part 1

DP

05-0007
Braccio



COPY

1          IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

2              IN AND FOR THE COUNTY OF MARICOPA

3

4   STATE OF ARIZONA,              )
                                   )
5            Plaintiff,            )
                                   )
6   v.                            )      No. 1 CA-CR 04-0731
                                   )      MARICOPA COUNTY
7   WENDI ELIZABETH ANDRIANO,     )      No. CR 2000-096032
                                   )
8            Defendant.            )
    _____)

9

10

11

12                          Mesa, Arizona
                          October 12, 2004
13

14

15

                 BEFORE:   The Honorable BRIAN K. ISHIKAWA
16

17

18          REPORTER'S TRANSCRIPT OF PROCEEDINGS

19                     TRIAL DAY 26

20

21

22

23

24   ORIGINAL Prepared for APPEAL by:
     TRACI L. WHEELER, CSR, RPR
25   Certified Court Reporter No. 50313


        TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

2

1                    A P P E A R A N C E S

2    FOR THE STATE:        JUAN M. MARTINEZ,
                           Deputy County Attorney

3
     FOR THE DEFENDANT:    DANIEL B. PATTERSON,
4                          Deputy Public Defender
                                  and
5                          G. DAVID DELOZIER,
                           Attorney at Law

6

7         I N D E X   O F   E X A M I N A T I O N

8    WITNESS                                         PAGE

9    MURPHY, SHARON, Called to testify by the Defense
             Continued Direct Examination by Mr. Patterson     3
10           Continued Direct Examination by Mr. Patterson    31
             Continued Direct Examination by Mr. Patterson    81

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1               MESA, ARIZONA, TUESDAY, OCTOBER 12, 2004

2

3          THE COURT:  Good afternoon.  This is trial in cause

4     number CR 2000-096032, State of Arizona versus Wendi

5     Elizabeth Andriano.  The record will reflect the presence of

6     the Defendant, Counsel and the jury.  Sharon Murphy is on the

7     witness stand, and we'll continue with the direct examination

8     by Mr. Patterson.

9                    Mr. Patterson?

10

11                    SHARON MURPHY,

12          CALLED TO TESTIFY ON BEHALF OF THE DEFENDANT,

13       HAVING PREVIOUSLY BEEN DULY SWORN, TESTIFIES FURTHER:

14

15     CONTINUED DIRECT EXAMINATION BY MR. PATTERSON:

16          Q.    You are Dr. Sharon Murphy?

17          A.    Yes.

18          Q.    You are the same witness who was testifying

19     last time before our break?

20          A.    Yes.

21          Q.    You realize you're still under oath?

22          A.    Yes.

23          Q.    Would you please come down to the podium and

24     we'll wrap up the slide presentation.  I think we have two

25     more slides?

4

1           A.      Yes.

2           Q.      If you could stand on this side.

3                   Okay.  We were talking about common

4   characteristics seen in abusive spouses, and we've gotten

5   midway through it.  This next common characteristic is the

6   abuser is generally from a dysfunctional family and may have

7   witnessed abuse between parents.  Would you explain that in

8   greater detail?

9           A.      Yes.  I said also on Thursday, when we were

10  talking about characteristics in general, that these are a

11  list and they are the common ones, but you don't find them

12  necessarily in all cases.  This particular bullet implies

13  that there are some abusers who come from families in which

14  they may have witnessed domestic violence or have been,

15  perhaps, victims of child abuse in their own family.

16          Q.      Does this seem to suggest this is learned

17  behavior rather than genetic imprinted behavior?

18          A.      Right.  That's one of the theories that's most

19  commonly accepted.

20          Q.      Okay.  Next bullet reads, avoids responsibility

21  by rationalizing and blaming others.  Again, could you give

22  us more detail?

23          A.      Typically found in most individuals who abuse

24  their partners, you see minimalization, denial and blaming,

25  in effect not accepting responsibility for any abusive

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    behavior.

2          Q.    Could you give us an example?

3          A.    A common example might be after an abusive

4    incident, he may say to her, "Look what you made me do, if

5    you hadn't done such and such, I wouldn't have had to do this

6    to you."

7          Q.    Third bullet reads Avoids facts, quote, I think

8    it is this way so it is, closed quote.  Again, what do you

9    mean by this?

10         A.    Not accepting her opinion on anything.

11   Whatever he says goes.

12         Q.    Okay.  Does that relate then to the male

13   privilege doctrine that you talked about earlier?

14         A.    Exactly.

15         Q.    Okay.  And let's see, fourth one is believes

16   they are better and different than others.  Again, could you

17   explain that for us?

18         A.    Often times people who batter feel entitled,

19   feel like they have a right to do something because of who

20   they are, however they came about that understanding, and so

21   they stand out, they have a right, they're entitled, they're

22   privileged.

23         Q.    And the last bullet on this slide reads uses

24   anger to intimidate and control others.  What do you mean by

25   that?  Self explanatory?

1          A.     It is with one caveat.  I had said on Thursday

2     that domestic violence was not based in anger.  I said that

3     it was based on control, so I just want to add to this bullet

4     that what you see is anger, thinking, because you see the

5     violence or the abusive acts or abusive language, so anger is

6     used to intimidate and control others.  It's just not --

7     that's not the whole story.

8          Q.     Okay.  And can you differentiate for us kind of

9     for a better term anger that non abusers manifest, okay,

10    being angry over things which is kind of a common human

11    experience as compared to the anger that you see manifested

12    by an abuser.  What's the difference there?

13         A.     Well, typical anger is what we're all very used

14    to.  That's just maybe blowing up, being a little loud at

15    times and expressing an opinion that something terrible has

16    happened or whatever.  This kind of anger is very different.

17    There's a purpose to this anger and the purpose is to either

18    control the actions or the thoughts of another person or to

19    intimidate in such a way so that the other person is afraid

20    to do anything different than what the batterer has asked or

21    demanded.

22         Q.     All right.  So there's a significant difference

23    then between the anger of an abuser and the anger that we

24    experience in our normal lives?

25         A.     Correct.

1      Q.    I think we're onto the next slide here.  First

2  one, holds traditional views on women and family.  What do

3  you mean by that?

4      A.    On Thursday we spent a lot of time going over

5  the history.  One of the things we've learned about the

6  history is that there is sort of a sense societally that

7  there are gender roles that are very well defined, and often

8  you see in people who abuse their intimate partner that they

9  hold those kinds of traditional views on women and family,

10  meaning that women and children are typically seen as their

11  property so they could do what they want to do or do with

12  whatever they choose.

13      Q.    Next bullet, can't express or acknowledge

14  feelings?

15      A.    Typically those who abuse their intimate

16  partners are not very much in touch with their feelings.

17  They're not a touchy-feely kind of person, they may be under

18  the influence of alcohol or drugs, but not so much when the

19  alcohol or drugs are not present.

20      Q.    Okay.  So they are isolating kinds of

21  personalities who tend to remain isolated as well?

22      A.    Yes.  And that's not to be confused, however,

23  with not appearing to be happy.  They can still appear happy

24  but not really in touch with what's going on inside them in

25  terms of their rage.

1          Q.    And the last bullet on this slide is views

2    family in terms of ownership.  Is that basically an extension

3    of the first bullet?

4          A.    Yes, it is.

5          Q.    All right.  Does that conclude your

6    presentation on kind of an overview on domestic violence?

7          A.    Yes, it does.

8          Q.    Okay.  Why then -- let's see.  Why don't you

9    take a seat for a minute and let's ask some questions in some

10   other areas.

11              Okay.  Doctor, you kind of broke it down into

12   the common characteristics of abused, common characteristics

13   of abuser.  Is there, in a sense, common characteristics of

14   the relationship between an abuser and an abused person?

15         A.    Well, most commonly the abusive person is the

16   one who has the power and control we talked about and usually

17   is the one who uses violence.

18         Q.    The abuser?

19         A.    The abuser.

20         Q.    Okay.

21         A.    The abused may act in a defensive manner to try

22   to stop whatever the blows are, or sometimes victims don't

23   fight back in any way, just kind of curl up into a ball and

24   sort of, what we say is, take it, not try to fight back in

25   any way.  That's probably the most common thing you'd hear.

1    Q.    Okay.  In the research in your clinical

2    practice, is it your experience that it's common for the

3    abused person to -- to strike back in a violent fashion in

4    terms of dealing with abuse that's existed in a relationship?

5         A.    For the abused person to strike back?

6    Q.    Right.

7         A.    No.

8    Q.    Okay.  What is common in terms of the research

9    in your clinical practice response of the abused person in

10   trying to get out of or avoid that abusive relationship?

11        A.    There's a lot of different things that an

12   abused person might do.  The typical ones that we think about

13   that aren't necessarily demeanor, but the ones that we think

14   as a society we believe in, we think that a victim of

15   domestic violence is going to call the police.  In reality,

16   that's a very small percentage of women that do that.  We

17   think that they're going to pack their bag and pack the kids

18   up and haul off in the middle of the night.  That's also not

19   so often done.  We think that they're going to call their

20   mother or best friend and tell this large tale and have

21   people come and rescue them.  That's not so often done.  We

22   think they're going to call a shelter and seek refuge.  Some

23   people do, of course, but commonly, at least in the -- with

24   the women that I have worked with, what I see is women who

25   try to negotiate.  They want to talk it through.  They want

1    to talk it out.  They don't want this relationship to end.

2    They still love the person.  I know I said that on Thursday

3    also.  They're trying to maintain what they thought they had

4    in the beginning.

5              Q.    I contacted you in an effort to allow you to

6    assist us in this particular case?

7              A.    Correct.

8              Q.    How do you start participating in a domestic

9    violence assessment?

10             A.    It actually begins in the initial meeting with

11    the attorney --

12             Q.    Okay.

13             A.    -- because I'm listening to what the attorney

14    is telling me --

15             Q.    Okay.

16             A.    -- making some decisions up front about whether

17    or not this is even going to be a case that is appropriate.

18             Q.    Okay.  So did you receive an overview of the

19    circumstances --

20             A.    Yes.

21             Q.    -- in Wendi -- Wendi Andriano's circumstance

22    and the nature of this particular proceeding?

23             A.    Yes, I did.

24             Q.    Okay.  What exactly is a domestic violence

25    assessment?  I think you may have to step down, Doctor.

1          A.     Okay.

2          Q.     And the prospective is not conducive to

3    reading.  Why don't you take the podium?

4          A.     Okay.

5          Q.     Okay?

6          A.     Okay.

7          Q.     How do you start -- well, what is a domestic

8    violence assessment?  Let's start there.

9          A.     Well, an assessment in any way, shape or form,

10   whether it's a clinical assessment or assessment for court,

11   always starts with trying to gather the information to the

12   best of your ability.  So in court cases, you know, it's

13   going to start with -- sometimes it starts with reviewing of

14   the records.  That depends on the attorney and how fast the

15   material comes.

16          But in addition to the reviewing of the

17   records, there's two other main components to an assessment.

18   And they are both the unstructured interview and then the

19   structured interview.

20          Q.     Okay.  And what are you -- are you -- with this

21   domestic violence assessment, striving to answer any kind of

22   questions or -- what is the purpose of this domestic violence

23   assessment?

24          A.     Well, the purpose for court reasons is to

25   determine, first of all, whether or not the person that I'm

1     assessing is in fact a victim of domestic violence.  That's

2     number 1.  And then secondly, what's the level of severity,

3     both physical and nonphysical.  And then number 3, making  a

4     determination based on the -- the assessment tools and the

5     clinical interview and their records all together, whether --

6     you know, whether or not she's met that threshold and making

7     the determination as to the level of abuse.

8           Q.    Okay.  So one of the things that's part and

9     parcel of a domestic violence assessment is review of the

10    records.  What records are relevant to you in this assessment

11    process?

12           A.    In general?

13           Q.    In general.

14           A.    Okay.  Well, any police records.  I would look

15    for any medical records, meaning did the victim, you know,

16    have to go to the emergency room or see the medical room for

17    any injury.  Dental records, because sometimes there's blows

18    to the mouth and she might have needed to seek dental

19    treatment.  Any kind of police records on either side, his or

20    hers.  If there's mental health records, I might ask to see

21    those.  Basically -- well, in some cases, I need to see a

22    medical examiner's report.  If there's a psychiatric or

23    psychological report, I'd ask to see those.  Things that

24    would help me get as much information as I could.

25           Q.    Next entry, unstructured interview.  What

1    exactly Qs thaOkay.   Second entry is education?

2          A.     Basically, want toadnewwhether, othatwhed be

3    passed compyehedoeiaheataeysmantsecondaiy hogkisghbolgather

4    whemheh ofnomathereaboahythelladevexdpaieace, chow shaytdmd.

5    Vothreasbiesbfchooliingdt andeeobonthejgbppaprtoatheepsesgnst

6    bmmehandatheofeasontobha thenasmaismahntelligence?  This is not

7    an intelQigencekayst, Abuttheremake feaumphiones thefreomeAme

8    gheyuakedusism highusthlylvayhey wxamplathenefmal

9    intelligAnce. I could have added employment, but I think I

10   might haQe incDadedngthattunger WdycasibhabegaumaneMployment

11   is includAed inWehe, report donestthatiobehdehawaebeehat becomes

12   sepyrampobhhetbecause often times there's predecessors to

13   the violQnce iAltheightiatiBnadiphbhateybmies furrastand add

14   iookhem by.way of explanation.

15          Q.     Okay.  So ahpafiesh saekingchhdehokdnhssbory,

16   andabaonsihpy? what I said or what I would ask is what's your

17   earliestAmemoryhecanoybented1 mQhebeudoyenitfbaxeytofberihah,

18   whtea dimeyothgvetosssbmeihihgwthad poadebesnthchool, what

19   kamdsiofishhpigandidhbuppadaicmgamayibe whb theewgyuback to

20   famehds, what did you do for social activities, that kind of

21   thing.  Q.     Okay.  Fourth entry is history of relationship

22   with Joseph Andkagno.And why is that relevant?

23          A.     So, ginegerallothaf wnfidmbeignsabbubkihg at

24   famihystabyubfhbwethelamohyhopewatadthabputsbhesherwaa most

25   recenhythkethamily, how they saw family, how they saw life.

1        Q.    Okay.  So in general we would delete Joseph
2   Andriano's name and add the spouse?
3        A.    Right.
4        Q.    Okay.
5        A.    Correct.
6        Q.    All right.  Next entry is what's called the
7   structured interview.  Now, why do you categorize one as an
8   unstructured interview and contrast that with what you call
9   a structured interview?
10        A.    The unstructured interview is what a lot of
11   people would call the clinical interview.  That's the time
12   where you gather really the most information.  So the most
13   hours on my part are spent doing that.  I want to give the
14   person to be assessed the opportunity to tell me whatever she
15   thinks is important about her life, open-ended, so that I'm
16   not feeding questions and leading or, you know, anything like
17   that.  I basically say, "Tell me your life story and I want
18   you to begin at the beginning and what you're earliest memory
19   is," and I may have to ask clarifying questions or prod a
20   little bit in certain areas, but it's pretty open.  That's
21   why it's called unstructured.
22        Q.    In that context you do mostly listening --
23        A.    Right.
24        Q.    -- and note taking?
25        A.    Exactly.

1          Q.    All right.  Now contrast that with the

2     structured interview.  What's that about?

3          A.    Okay.  The structured interview follows the

4     completion of the clinical interview, so that can be days

5     later depending upon how long all of this is taking.  But

6     these are the tools that I typically would use in a

7     structured interview.  There's a number of tools that are

8     available on the market.  These are the ones that I chose.

9          Q.    Okay.  These are instruments that are generally

10     accepted in your discipline?

11          A.    Yes.

12          Q.    Okay.  Tell us then about each one of those

13     instruments.  What's number 1?  Is that the thing we saw

14     earlier on the slide?

15          A.    Yes.  We saw it on Thursday.  It wasn't very

16     good, we couldn't see the whole wheel, we had to go through

17     parts of it, but that's the power and control wheel that we

18     saw on Thursday.

19          Q.    All right.  How do you use that mechanically?

20          A.    Okay.  By the time in which you're doing the

21     structured part of the interview, you know, whether or not

22     the woman that you're assessing has used any social service

23     kinds of things, because that's one of the things you're

24     asking for.

25          Q.    The record review?

1        A.    The record review and in the clinical interview.

2        Q.    Okay.

3        A.    So I know if she's used a shelter or whether or

4    not she's sought counseling services for the domestic

5    violence.  Once I know that, then I can make a pretty good

6    judgment as to whether or not she's ever seen this before

7    because people who go to shelters, probably 99.9 percent of

8    them, have been shown the power and control wheel.

9        Q.    Okay.

10       A.    If she's never been shown it, then it's a good

11   tool for me to use.  If she has some information about it, I

12   may not use it.  So it's just a piece of paper with that

13   power and control wheel just like we saw on Thursday.  And I

14   simply put it down in front of her and say have you ever seen

15   this before?  Most of the cases I have have not seen it

16   before, so then I just say I'd like you to read the eight

17   little pieces of the pie, and if those represent something

18   that has happened to you in this relationship, could you

19   please write an example in the margin.  And I sit there while

20   she does it.

21       Q.    Okay.  Do you tell the person that you're

22   examining what answers are expected?

23       A.    No.

24       Q.    Or correct answers?

25       A.    No.

18

1        Q.    Incorrect answers?

2        A.    No.

3        Q.    Anything along that line?

4        A.    No.

5        Q.    The next entry is partner abuse scale

6    nonphysical, and then there's a publisher of the instrument

7    in parenthesis?

8        A.    She's the author, mm-hmm.

9        Q.    Okay.  All right.  Let's go back then in the

10   previous entry, Duluth Domestic Abuse Intervention Project.

11   Were they inventor of the power and control wheel?

12       A.    Yes.

13       Q.    Okay.

14       A.    Yes.

15       Q.    And what -- who are they?

16       A.    On Thursday when we were talking about the

17   history, and there was a bullet that said 1980s police

18   response, I think was how I think it was worded, and I told

19   the story about a woman in Torington Connecticut, who then

20   sued the police, okay?  Sorry to have to repeat that, but it

21   makes sense when you hear the whole piece.

22              There was a lot happening during the 1980s in

23   terms of domestic violence, a lot of information was being

24   generated, and the particular group of social service

25   providers in the city of Duluth, Minnesota, in conjunction

1    with law enforcement, kept finding that it was the same

2    people who were coming back over and over and over again with

3    repeat domestic violence.  It was the same men coming back

4    through they system over and over again, so they said what

5    the heck are we going to do with this situation?  We have to

6    come up with something.

7              So the people who were working in this project

8    decided that one good way to maybe once and for all get a

9    better handle on the problem was to go to the people with

10   whom it affected so they went to a shelter and they

11   interviewed, I don't know how many, but many, many, many,

12   many women over time.  And from the experiences that they

13   drew from those women victims living in shelter and from

14   other women who were the partners of those going through the

15   criminal justice system not in shelter, they designed this

16   wheel.

17        Q.    All right.  Is it in the same form today as

18   back in the 80s or has it evolved?

19        A.    Well, there's a number of new wheels, but the

20   wheel that I use is the original wheel.  I think it was

21   developed in '86, somewhere around that period of time.

22        Q.    All right.  The partner abuse scale, you were

23   about to explain that to us.

24        A.    Yes.  You can see that there's two up there by

25   Hudson, the non physical and the physical.  I choose to use

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000007315

1    the nonphysical first.

2          Q.    Why is that?

3          A.    Because these are difficult questions to

4    answer, difficult in terms of emotional response to the

5    questions, because this is about sexual abuse and all kinds

6    of different kinds of violence that nobody really wants to

7    talk about.  So I think it's easier to start with the

8    nonphysical.  It appears less threatening to have to answer.

9                So I, again, give her this piece of paper.

10   It's one page and I think it's 26 items, and I just ask her

11   to read the directions.  They're very self explanatory.

12   There's a scale from 1 to 7 that you're asking the person to

13   respond to the question with the 1 to 7 answer.  It's brief.

14   It's -- was written to be used by anyone with at least a

15   sixth grade education, and it takes very little time, maybe

16   15 or 20 minutes.  It's just 26 items so it's quick.  It's

17   not too threatening at this point and she's able usually to

18   answer those questions fairly rapidly.

19         Q.    All right.  And in the parenthesis a person

20   named Hudson is reflected?

21         A.    Right.

22         Q.    Who is this person?

23         A.    The author of this is Walter Hudson.  He was a

24   professor, a full professor at Arizona State University, the

25   social work program.  I studied under him.  He was a mentor

1    to many PhD students.  He has since passed away, but he is to

2    social work what someone else may might be to psychology in

3    terms of the generation of assessment tools.  He's very well

4    known in the social work community for that.

5              Q.     So how does the nonphysical abuse scale differ

6    from the physical abuse scale?

7              A.     Well, simply in the questions, of course, that

8    it's asking because the physical one is really focusing just

9    on physical, although it does contain some items about sexual

10   abuse, because most people believe that sexual abuse,

11   although a category is really a subject category of the

12   physical abuse.

13             Q.     Fourth entry is abusive observation checklist.

14   Let's start with the creator of that instrument, a person by

15   the name of Dutton?

16             A.     A woman by the name of Marian Dutton designed

17   this.  She has numerous articles and books.  She is a

18   forensic psychologist.  I believe she's still is an adjunct

19   faculty member at Georgetown Law University or Georgetown Law

20   School at the university.  She has private practice and has

21   done multiple forensic assessments.

22             Q.     And what exactly is in that abusive observation

23   checklist?

24             A.     This is quite lengthy.  It asks the person

25   assessed to read long lists of abusive acts of all different

1    kinds.  It basically makes use of the power and control wheel

2    and goes through each component and asks them did this ever

3    happen with this partner and how many times.  And there's

4    numbers at the top of each column, so the person being

5    assessed gets to choose 0 to 3 or 3 to 10, 10 to 49 or

6    greater than 50.  I believe those are the headings.  And

7    they're making checkmarks in the appropriate column, whether

8    it did happen and if so how many times.  And that's -- it's

9    about five or six pages.

10        Q.     Okay.  Fifth entry is response to violence

11   inventory, again the name "Dutton" is reflected

12   parenthetically.  That same person created this instrument as

13   well?

14        A.     Yes.  Actually, both the abusive objection

15   checklist and response to violence inventory appear as

16   appendices in one of Marian Dutton's books, and she has the

17   norm data in the back of the book also, if anybody wants to

18   know that.  But the response to violence inventory came about

19   because of a need to know what -- in what ways does the

20   victim actually respond.  So it asks questions like did you

21   ever call the police?  If you did, how many times?  And then

22   was it helpful or not helpful?  And it gives you a little

23   scale to rate helpfulness or not helpful by.  So it's how did

24   you escape, survive, and respond.  Those are the three things

25   we're looking for in that just because it helps to round out

1    what we really want to know, which is what happened, what was

2    the experience of the victim.

3          Q.    Last entry is the lethality check, Arizona

4    Coalition Against Domestic Violence.  Let's start with the

5    parenthetical first.  What is that?

6          A.    The Arizona Coalition Against Domestic Violence

7    is the Arizona State Coalition.  They have some oversight

8    around the whole issue of domestic violence in the state.

9    They collect data, they do many many trainings a year on

10   domestic violence.  They've put together packets of

11   information that they give out.  They do presentations to

12   every conceivable group that you could think of from clergy

13   to law enforcement and everybody in between.

14         Q.    Okay.  They created an instrument in some

15   fashion at some time?

16         A.    Yes.

17         Q.    What is that and when was it created?

18         A.    I don't have the date of when this particular

19   one was created.  There are many different lethality

20   checklists.  None of them give you a score or rating.  They

21   all ask anywhere from maybe 10 to 20 questions and you're

22   supposed to make a checkmark.  Typically, a lethality

23   checklist, if you're looking at a person who's still in the

24   relationship and you want to be able to show them how serious

25   or how lethal this relationship has become, that's when you

1      would use it.

2           Q.    Okay.  Is that it for this slide?

3           A.    Yes.

4           Q.    Okay.  Why don't you retake your seat then.

5                 All right.  Let's talk specifics.  Did you

6      agree to serve as an expert in this particular case?

7           A.    Yes, I did.

8           Q.    Okay.  And was there a fee involved for your

9      services?

10          A.    Yes.

11          Q.    Okay.  And what exactly was that fee?

12          A.    The hourly fee is $125 an hour.

13          Q.    Okay.  And do you have records that indicate

14     how many hours you've invested in this assessment not

15     including this point forward in terms of your testimony?

16          A.    If we could divide it.

17          Q.    Okay.  Tell me --

18          A.    I have the total dollar amount.

19          Q.    Let's start there and work backwards how much

20     are you going to bill us?

21               MR. MARTINEZ:  I'm going to object on the grounds of

22     relevance.  Additionally, I've not received that

23     documentation.

24               THE COURT:  Let me see Counsel here at the bench.

25     / / / / /

1                    (The following proceedings were held at the

2        bench:)

3

4              THE COURT:  What's the general range?  Have you

5        talked about --

6              MR. PATTERSON:  General range or amount?

7              THE COURT:  Yeah.

8              MR. PATTERSON:  I asked her to do the computation to

9        make it current up to today, so I don't know exactly what

10       number she's going to give.

11                    You've had an opportunity --

12             MR. MARTINEZ:  I did and she couldn't tell me because

13       it was in her notes, so she couldn't tell me.  I didn't get

14       those notes.

15             THE COURT:  You know, you talked to the interviewer.

16       You probably should have asked Mr. Patterson before today,

17       "Hey, did she come up with a figure," and you didn't, so I'm

18       going to overrule the objection.

19

20                    (The following proceedings were held in open

21       court:)

22

23             THE COURT:  The objection is overruled.

24       BY MR. PATTERSON:

25             Q.    Okay.  Start with how much you're going to bill

26

1    us.

2           A.    Okay.  This includes everything, including the

3    air fare, all of that.

4           Q.    Okay.

5           A.    The total as of through Thursday was $8133.54.

6           Q.    Okay.  And let's break that down.  How many

7    hours did you invest in the unstructured interview?  Did you

8    have it broken down in that fashion?

9           A.    I know how many hours I spent on the

10   assessment.

11          Q.    Okay.  Tell me how many hours you spent on the

12   assessment?

13          A.    That was 20.

14          Q.    That's the use of the instruments you just

15   talked about?

16          A.    And the unstructured interview, right.

17          Q.    Okay.  What other hours did you invest in this

18   particular case?

19          A.    I did collateral interviews, so there was an

20   additional five hours of collateral, and since I finished the

21   assessment, I have come back to Phoenix several other times

22   just to do other clients or whatever, and so on some of those

23   occasions I interviewed Wendi again to answer whatever

24   questions were still in my mind that I hadn't come up with

25   earlier.

27

1          Q.     Let's talk about the specifics in this case.

2    What did you first do in trying to come to some conclusions

3    in this case?

4          A.     What did I do?

5          Q.     First let's take it chronologically in terms of

6    how you've come to certain opinions in this case.

7          A.     I don't remember if I had received from your

8    office all of the records at the time that I started the

9    interview.  I just -- I can't remember that so I may have

10   received records before and then during, which is usually how

11   it happens.  But in any case, I would have reviewed all of

12   the records and then sat down with Wendi in Estrella and

13   started the actual assessment process, which began on March

14   25 of 2003.

15         Q.     Okay.  So your first meeting with Wendi was

16   3/25/03?

17         A.     Right.

18         Q.     And do you recall how much time you spent with

19   her initially?

20         A.     Well, actually, I might have that.

21         MR. MARTINEZ:  Judge, I'm going to object.  She's

22   referring to her notes.

23         THE COURT:  Do you need refer to your notes to

24   refresh your recollection?

25         THE WITNESS:  Yes, I do.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    THE COURT:  Let us know that and Mr. Patterson can

2  ask the questions appropriately at that time.

3  BY MR. PATTERSON:

4    Q.    Do you need to look at your notes to determine

5  how many hours you've spent with Ms. Andriano initially?

6    A.    Yes, I do.

7    Q.    Okay, please.

8    MR. MARTINEZ:  Judge, may we approach?

9

10    (The following proceedings were held at the

11  bench:)

12

13    MR. MARTINEZ:  These are the items that I requested

14  be disclosed pursuant to Rule 15.  Defense counsel indicated

15  that he would not disclose them and that everything that was

16  in those notes is already in the report.  As I indicated

17  previously, I foresaw this was going to happen.  She's going

18  to keep going through those notes and I've not had a chance

19  to review them.  I know we had an avowal from Counsel

20  indicating she wasn't going to use those notes, but it's

21  clear she's already started and will continue.  So I enter an

22  objection to these questions.

23    MR. PATTERSON:  Judge, these are administerial notes.

24  They talk in terms of time invested in certain things.  It's

25  not work product notes.  Those are the ones we indicated were

1    incorporated in the report that was disclosed to this

2    gentleman fully and fairly.  These are just referring to

3    session times that she met with certain people.  It's dates,

4    it's hours.  It's not work product.  It's not the same, it's

5    apples and oranges.

6         MR. MARTINEZ:  If it isn't, why didn't he give them

7    to me?

8         THE COURT:  Okay.  The objection is noted.  I'll

9    allow Mr. Patterson to continue.  Hey, but has she been

10   instructed not to say she was in jail?

11        MR. PATTERSON:  Well, no, not specifically, but I

12   won't -- I'll take great effort to make certain that doesn't

13   happen.

14        THE COURT:  Is it a situation whether we need to

15   take a break and remind her of that fact?

16        MR. PATTERSON:  Okay.  Let's do that.

17        THE COURT:  Okay.

18

19             (The following proceedings were held in open

20   court:)

21

22        THE COURT:  Okay.  I need to speak with Counsel

23   outside the presence of the jury.  This should only take a

24   few minutes, five minutes at the most.  I'll have the jury

25   step into the jury room.

1        Remember the admonition I gave you, do not

2    discuss the case, do not let anyone discuss the case with

3    you, keep an open mind about the case.  This should only take

4    a few minutes here.

5

6            (Whereupon, the jury exits the courtroom.)

7

8        THE COURT:  Please be seated.  The record will

9    reflect the presence of Defendant and Counsel.  We're outside

10   the presence of the jury.

11       While we're waiting here, I've noticed a

12   couple things.  There's a gentleman in the back there reading

13   a book, okay?  If you're going to be reading a book -- this

14   is not a library.  If you're going to be reading a book, step

15   outside and read your book.

16       Other thing is a gentleman drinking a soda pop

17   in here.  Food and soda pop is not allowed in the courtroom.

18   While you're in the courtroom, maintain the dignity of the

19   courtroom.

20       MR. PATTERSON:  Judge, at this time I'll make a copy

21   of the actual bill.

22       MR. MARTINEZ:  Judge, I don't want disclosure on the

23   day of trial.  It does me no good.  He might as well keep it.

24       MR. PATTERSON:  Very well.  I made an effort, Judge.

25            (Pause in proceedings.)

31

1           MR. PATTERSON:  Witness has been instructed pursuant

2      to the Court's directive.

3           THE COURT:  Okay.  We ready for the jury?

4           MR. PATTERSON:  Yes, Your Honor.

5           MR. MARTINEZ:  Yes.

6

7                (Whereupon, the jury enters the courtroom.)

8

9           THE COURT:  Please be seated.  This is cause number

10     CR 2000-096032, State of Arizona versus Wendi Elizabeth

11     Andriano.  The record will reflect the presence of Defendant,

12     Counsel and the jury.  Sharon Murphy is on the witness stand.

13          And we'll continue with the examination by Mr.

14     Patterson.

15          MR. PATTERSON:  Thank you, Judge.

16

17     CONTINUED DIRECT EXAMINATION BY MR. PATTERSON:

18          Q.   You are Dr. Murphy?

19          A.   Yes.

20          Q.   You're the same Dr. Murphy that was testifying

21     earlier?

22          A.   Yes.

23          Q.   You realize you're still under oath?

24          A.   Yes.

25          Q.   You met with Ms. Andriano on March 25 of '03.

1    How many hours did you spend with her the first meeting?

2        A.    Two.

3        Q.    Okay.  You then met with her the following date?

4        A.    Yes.

5        Q.    Was that 3/26/03?

6        A.    Yes.

7        Q.    How much time did you spend with her on that

8    occasion?

9        A.    Two.

10        Q.    Two hours?

11        A.    Yes.

12        Q.    Okay.  When was your next meeting with her?

13        A.    March 29, 2003.

14        Q.    Okay.  And, again, how many hours did you spend

15    with her on that occasion?

16        A.    Three.

17        Q.    Okay.  Did you meet with her again?

18        A.    March 30th, 2003.

19        Q.    Okay.  And these meetings are within the

20    context of the original assessment, correct?

21        A.    Correct.

22        Q.    Okay.  On March 30th, 2003, how many hours did

23    you spend with her?

24        A.    Three.

25        Q.    Okay.  When was your next meeting with her?

1            A.    April 8, 2003.

2            Q.    And --

3            MR. MARTINEZ:   Judge, she seems to be reading

4    something.  Are we still just -- is she just reading from

5    that document that we discussed previously?

6            THE COURT:   If you need to refresh your recollection

7    on something, just notify us if you need do that and Mr.

8    Patterson will ask you.

9    BY MR. PATTERSON:

10           Q.    Are you reviewing the bill --

11           A.    Yes.

12           Q.    -- that you submitted at some point?

13                 Again, was this the day of April 8, 2003?

14           A.    Yes.

15           Q.    And how many hours did you spend with Ms.

16   Andriano on that occasion?

17           A.    Four.

18           Q.    Okay.  When was your next meeting?

19           A.    April 11, 2003.

20           Q.    And, again, is that from your billing

21   statement?

22           A.    Yes, it is.

23           Q.    Okay.  And how many hours did you spend with

24   the client on that occasion?

25           A.    Two.

```
 1              Q.    Was there another meeting with the client in

 2      the context of doing the initial assessment?

 3              A.    Yes.

 4              Q.    Okay.  What date was that?

 5              A.    April 22nd, 2003.

 6              Q.    Again, are you reviewing the bill in this case?

 7              A.    Yes, I am.

 8              Q.    Okay.  How many hours did you spend with Ms.

 9      Andriano on that day?

10              A.    Two.

11              Q.    Okay.  Was there a -- an additional meeting

12      with the client?

13              A.    Yes.

14              Q.    Okay. And what date was that?

15              A.    June 4, 2003.

16              Q.    Again, are you reviewing something to assist

17      you there?

18              A.    I am.

19              Q.    What is that?

20              A.    It is a bill I sent your office.

21              Q.    Okay.  And how many hours or minutes did you

22      spend with Ms. Andriano on that occasion?

23              A.    Two hours.

24              Q.    So the total time with regard to the initial

25      assessment was how many hours?
```

```
 1           A.    20 hours.

 2           Q.    Do you feel you had sufficient time with the

 3    client in order to come to a valid opinion in this case in

 4    terms of the hours spent in the interview process?

 5           A.    Yes, I do.

 6           Q.    Okay.  All right.  So you reviewed records.

 7    When did you do the collateral interviews?

 8           A.    I need to review my notes.  Is that all right?

 9           Q.    Is that, again, from the bill?

10           A.    Same bill.

11           Q.    Okay.  Please.

12           A.    5/20/03 -- do you want to know who they were

13    with.

14           Q.    Yeah.  Who did you meet with?

15           MR. MARTINEZ:  I'm going to object.  That was not

16    included in the original report and now she's going beyond

17    that.

18           THE COURT:  Overruled.

19           THE WITNESS:  Barbara Mitchell.

20    BY MR. PATTERSON:

21           Q.    Okay.  Do you have an amount of time that you

22    spent talking with Ms. Mitchell?

23           A.    Yes, I do.

24           Q.    How many hours?

25           A.    One half hour.
```

36

```
 1          Q.   30 minutes?

 2          A.   Yes.

 3          Q.   Okay.  Who else did you speak with?

 4          A.   Donna Ochoa.

 5          Q.   Okay.  And how much time did you spend?

 6          A.   3 quarters of an hour.

 7          Q.   Okay.  On what date?

 8          A.   5/20/03.

 9          Q.   Again, is this information reflected in your

10     billing statement?

11          A.   Yes.

12          Q.   Okay.  Who else did you speak with?

13          A.   I met again with Donna Ochoa --

14          Q.   Okay.

15          A.   -- on 5/21/03 for one hour.

16          Q.   Anybody else?

17          A.   I met with Alejo Ochoa on 5/21/03 for 1.75

18     hours.

19          Q.   Okay.  And with whom else did you speak?

20          A.   Francis Arculetta?

21          Q.   On what date?

22          A.   That was on 5/20/03 also.

23          Q.   How many hours?

24          A.   That was one hour.

25          Q.   Okay.  So you've begun meeting with the
```

1       client, talked to collateral -- what else did you do --

2           A.      Reviewed the records.

3           Q.      -- in this case?

4           A.      Wrote the report.

5           Q.      Okay.  Let's talk about the particulars then of

6       the unstructured interview.  Do you have a copy of your

7       report?

8           A.      I do.

9           Q.      Okay.  Would that assist you in some fashion

10      your recollection of the specifics of things that may have

11      occurred in your interview with Ms. Andriano?

12          A.      Yes, it would.

13          Q.      Okay.  And did you breakdown your report in

14      terms of categories?

15          A.      Yes, I did.

16          Q.      Okay.  Let's talk then about category two and

17      that report.  What is the date of your report?

18          A.      9/22/03.

19          Q.      On page 2, is that where the unstructured

20      interview with Wendi Andriano commences?

21          A.      Yes.

22          Q.      Okay.  Tell me a bit about what Ms. Andriano

23      related to you with regard to childhood history?

24          A.      Well, I asked her, as I typically do, what's

25      her earliest memory and she talked about remembers a life

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1   with mom and grandmother, and actually most of her memories

2   are about grandmother because mother was working and a single

3   parent.  Talked a lot about -- or talked I should say very

4   little about the biological father and then a lot about her

5   adopted father.  Apparently, according to Wendi, she has very

6   little recollection of being around biological dad.

7          Q.    Okay.  Let's get the names down here.  Who is

8   the adoptive father?

9          A.    Adoptive father is Alejo Ochoa.

10         Q.    Okay.  And who was the biological father?

11         A.    I only have a first name, and that was Skip.

12         Q.    Okay.  Did she relate to you circumstances of

13  her relationship with her adoptive father?

14         A.    Yes.  She talked at great length about the

15  relationship between she and her adoptive father.

16         Q.    And what did she relate to you in that regard?

17         A.    Well, do you want me to specify just her

18  relationship with him or as part of the family?

19         Q.    Well, again, whatever you think is germane to

20  your conclusions in this case, so if they're both germane,

21  talk about them separately.

22         A.    Okay.  Because really Donna and Alejo are

23  related together because they were a family of three.  So

24  their stories are usually about the three of them together.

25  Talked a lot about her spiritual and religious background.

1          Q.     Okay.  And how is that germane or relative --

2    relevant to the domestic violence issue?

3          A.     Well, it helps me to understand the situation

4    and the life experience that this particular woman came from.

5          Q.     Okay.

6          A.     It's important to know whether or not a person

7    has a religious belief and what that belief is particularly

8    as it ties into perhaps gender roles and beliefs about them

9    through religion.

10         Q.     Okay.  And what did she tell you specifically

11   about her religious upbringing?

12         A.     Well, the earliest memories, I think, are about

13   the ministry that her parents belonged to and how they

14   traveled.  I believe it was in California for the particular

15   church group, and I think there were one or two other men

16   that did this traveling with them.  One of those early

17   memories was of one of those two men, not Alejo, but one of

18   these two men, who exposed himself --

19         MR. MARTINEZ:  Objection.  Relevance.

20         THE COURT:  Overruled.

21         THE WITNESS:  -- exposed himself to her.

22   BY MR. PATTERSON:

23         Q.     Okay.  How is that relevant to the formation of

24   attitudes and development later on in life?

25         A.     Well, for anybody, I believe that that would be

1   traumatic and so that's a traumatic experience from one of

2   her very early years.

3          Q.    Okay.  And she related that to you?

4          A.    Yes.

5          Q.    Okay.

6          A.    Yes.  She also told me that her mother had told

7   her that there was a question as to whether or not her

8   biological father may have sexually molested her.

9          MR. MARTINEZ:  Objection.  Hearsay, lack of

10  foundation.  She doesn't know if it happened.

11         THE COURT:  Overruled.

12         THE WITNESS:  Whether or not that may have happened.

13  So we don't know.  There's just some conjecture.  We do know

14  that he is currently serving a prison sentence for sexual

15  molestation of a -- a mentally retarded young woman, I

16  believe.

17  BY MR. PATTERSON:

18         Q.    This would be Wendi's biological father?

19         A.    Biological father, that's correct.

20         Q.    Did she tell you about growing up with Alejo

21  and Donna and whether or not her adoptive father had a

22  temper?

23         A.    Yes.

24         Q.    Okay.  What did she relate to you in that

25  regard?

1    A.    The temper seems to be around yelling and

2    screaming.  She did not at any time indicate that he had

3    acted out physically or sexually.  It was about yelling and

4    screaming.

5    Q.    Okay.  And did she relate to you her response

6    to this yelling and screaming?

7    A.    Yes, she did.

8    Q.    What did she tell you?

9    A.    She reported that she would run into the

10   bedroom and close the door as did mother.

11   Q.    All right.  And then was there a time

12   thereafter when the yelling would abate or subside and they

13   would do something jointly?

14   A.    Yes.

15   Q.    What would they do?

16   A.    According to Wendi's report, mother would try

17   to placate her husband and kind of soothe him.  What she

18   relayed was an action by which mother would stroke father's

19   head sort of in a soothing way and that Wendi often

20   participated in that to try to calm dad down.

21   Q.    Is that relevant in your estimation with regard

22   to future behaviors?

23   A.    It certainly could be, yes.

24   Q.    And how would it be relevant?

25   A.    Looked -- I'd look for similar behaviors in

1    adulthood.

2         Q.    Okay.   Are you stating that children model

3    themselves after their parents or is there that in the

4    literature?

5         A.    There is that in the literature.   This does not

6    mean that it, you know, happens 100 percent of the time.

7    Just like we talked about common or same characteristics,

8    it's the same thing here.   There certainly is theory grounded

9    in the belief of learned behavior.   That's very well

10   documented.

11        Q.    And did Wendi explain to you why mother and

12   child engaged in the nurturing or soothing behavior with the

13   the angry father, Alejo?

14        A.    What I recall from Wendi's report was that it

15   was done to calm him down and keep the peace.

16        Q.    All right.   And your report said "so the

17   screaming would not begin again"?

18        A.    Yes, correct.

19        Q.    Okay.   Did Wendi relate to you the specifics of

20   her education?

21        A.    Yes, she did.

22        Q.    Okay.   And, again, is that relevant to the

23   formulation of your opinion with regard to whether or not

24   she's a domestic violence victim?

25        A.    It's relevant to understanding how that could

1    have happened.

2         Q.    Okay.  What did she relate to you then with

3    regard to her educational background?

4         A.    She was homeschooled for a while by her mom,

5    and then I believe after the church ministry ended and they

6    settled back in Casa Grande, I believe that she went to a --

7    a school that was owned and operated by the church that they

8    belonged to.

9         Q.    Okay.  Did she give you a name in your report?

10   Page 3.

11        A.    Yes, the Evergreen School.

12        Q.    Okay.  That's the public school.

13        A.    That's the public school?  Sorry.

14        Q.    Right.

15        A.    Let me just read through this to find it.  The

16   church was 91st Psalms, now known as Harvest Family.

17        Q.    Kind of midway down in section B?

18        A.    I'm glad you could find it.  Yes.  She was

19   enrolled in a church affiliated school called 91st Psalm.

20        Q.    Okay.  Did she describe the structure of that

21   particular church-based school?

22        A.    What she described was that the school was very

23   strict and had some extreme kinds of foundations to it.

24        Q.    Okay.  Did she indicate to you a -- a

25   rebellious kind of response to some of the restrictions

1    there?

2         A.    At times.

3         Q.    Okay.  What did she say in that regard?

4         A.    She said she actually ran away on four

5    different occasions.

6         Q.    Okay.  And did she connect the strictness, if

7    you will, of the school with her running away?

8         A.    I -- as I recall her report, the running away

9    it seemed to me she was saying had more to do with the

10   strictness at home and the home as affiliated with the

11   church, and that's what she was running away from.

12        Q.    All right.  So as I understand, she had a very

13   strict school experience and then that was reinforced when

14   she got home?

15        A.    Yes.

16        Q.    Okay.  Did she indicate with whom she ran away

17   with on several occasions?

18        A.    Well, on one occasion at least it was with the

19   pastor's daughter.

20        Q.    Okay.  Did she explain her reasoning why?

21        A.    What she said was she just wanted to be allowed

22   to play in the park.

23        Q.    Like other kids do?

24        A.    Like other kids.

25        Q.    Okay.  Did she report to you how well she did

1    in school?

2         A.    Yes.  She apparently did well in school,

3    received a number of honors, graduated with honors.

4         Q.    Okay.  Is that based upon her self report or

5    were you able to look at other records?

6         A.    That is based upon self report.

7         Q.    Okay.  Did she take her educational experience

8    beyond high school?

9         A.    Yes.  She completed all but five or six courses

10   leading up to what would have been a bachelor's in business.

11        Q.    Okay.  In general, based on what she told you

12   about her educational background, how does that impact her

13   later life in your estimation?

14        A.    Well, she had success in school and she was

15   able to get jobs that helped then to support the family.  I'm

16   not sure if I'm answering your question.

17        Q.    No.  No, that's one aspect.  How about the

18   rigidity of the school experience?  Do you think that has any

19   impact in her later life choices, later life conduct?

20        A.    Rigidity in the elementary and high school

21   years, yes.

22        Q.    Okay.  How does that affect her later life

23   choices, that kind of thing?

24        A.    The way Wendi reported to me about her life

25   experience within the family and within the church, it

# APPENDIX K - Part 2

1    clearly defines a very rigid strict family rules and roles.

2    And given later life circumstances by report from Wendi, it

3    appears that those rigid expectations seemed to follow her.

4         Q.    Okay.  And in the -- the common characteristics

5    -- common characteristics of abused persons is one of them a

6    sense of traditional family values, those kinds of things?

7         A.    Yes.

8         Q.    Could you explain that as it relates to Wendi's

9    religious school upbringing?

10        A.    It appears based on Wendi's telling of her life

11   story that she followed very strict guidelines or edicts

12   about woman's role in the family.  That was one of nurturing

13   compassion, loving, caring for.  That kind of defined what a

14   woman was and it appears that she took that knowledge with

15   her then into adulthood.

16        Q.    Okay.  The next category in your report is

17   described as dating history.  What did Wendi relate to you in

18   that regard?

19        A.    Wendi did not date up through high school.  A

20   lot of the activities were group activities and they often

21   took place at her parent's home.  Her father was a youth

22   minister and so kids would come over to the house and they

23   would do, you know, games or go bowling or go to Metro Center

24   to skate, whatever was typical of the high school years not

25   dating a single person.

47

1        Q.      Okay.  Again, does that impact, in your

2   opinion, future conduct?

3        A.      Well, there wasn't a lot of dating history or

4   knowledge about dating by which she entered a future

5   relationship.

6        Q.      Okay.  And did she relate to you who her first

7   boyfriend was and only boyfriend prior to Mr. Andriano?

8        A.      Yes.  He was the pastor's son.

9        Q.      Again, is that significant in your opinion?

10       A.      Well, it -- what it says to me is that the

11  whole world was around church and family.

12       Q.      Did she relate to you some volunteer work that

13  she performed after her completion of high school?

14       A.      She did some missionary work in a period of

15  time for her church.

16       Q.      Why again is that noteworthy in the context of

17  why we're here?

18       A.      Certainly her life experiences are very clearly

19  religiously oriented.

20       Q.      Okay.  Did she report whether or not her

21  relationship with the pastor's son ended at some point?

22       A.      Yes, she did report that.

23       Q.      Okay.  And what were the circumstances of that

24  breakup?

25       A.      When she returned from her missionary work in

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

48

1    Mexico she decided she wanted to live a little bit and see

2    the world and she felt that in order to do that she needed to

3    break off a serious commitment made with the pastor's son.

4         Q.    And that commitment was represented by some

5    jewelry?

6         A.    He had given her a ring.  I don't know what

7    type.  I don't think it was a diamond.  She didn't say that,

8    but he gave her some type of ring.

9         Q.    Okay.  Did the circumstances of the breakup

10   become violent?

11        A.    Yes.

12        Q.    Tell me about that?

13        A.    When she told him that she wanted to break it

14   off, he did two things:  He smashed the windows of her car

15   with rocks, river rocks I think is the word that she used to

16   describe them.  And he also bit the stone out of the ring and

17   twisted her finger in the process.

18        Q.    Okay.  Did she relate to you whether or not she

19   reported that incident to law enforcement?

20        A.    She did not report it.

21        Q.    Okay.  Again, the same question, that

22   experience breaking up with her first boyfriend in that

23   fashion, does that play a part in your assessment in this

24   case?

25        A.    It seems to me that all of these life

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000007344

1    experiences become cumulative, so yes, it does.

2          Q.    Okay.  All right.  Did she relate to you how

3    she become involved with Joe Andriano?

4          A.    Yes, she did.

5          Q.    Okay.  What did she tell you in that regard?

6          A.    She went to a pizza place in Casa Grande on St.

7    Patrick's Day 1992.  That's where she met him.  She relayed

8    that he was a member of what she referred to as the "in

9    crowd" and she was not a member of that group.  She described

10   the "in crowd" as being members of farm families, and she

11   was -- her dad was not a farmer.

12         Q.    Okay.  So just so I understand it, there seemed

13   to be a -- some kind of clannishness or cliqueishness with

14   the families in Casa Grande with the ins and not ins, in that

15   sort of terminology?

16         A.    That's her interpretation, yes.

17         Q.    So how did that relate then to her feelings

18   when Mr. Andriano began to pay attention to her?

19         A.    Well, I believe she was flattered because she

20   was not a part of that group.  She found him attractive.  And

21   he appeared to her to be sort of the life of the party kind

22   of guy, you know, jovial, fun to be around, and he paid

23   attention to her.

24         Q.    All right.  Do you have a date for when this

25   relationship began?

1          A.     I have written down St. Patrick's Day, 1992,

2     which I think is March 17.

3          Q.     Okay.  So we're talking March of '92 is the

4     point in time when Wendi and Joe first met?

5          A.     Correct.

6          Q.     Okay.  Did she relate to you certain

7     inadequacies about her feelings or being at that time?

8          A.     She certainly felt inadequate as compared to

9     Joe's group.  She saw them as having more on a social ladder

10    than what she had and felt like she would have a hard time

11    competing.

12         Q.     Okay.  Did she describe and categorize the

13    beginning part of her relationship with Joe?

14         A.     She describes it as a friendship, that they

15    liked hanging out together.

16         Q.     Okay.  Did Wendi relate to you Joe's attitudes

17    towards her initially, his perception of their relationship

18    initially?

19         A.     One of the things that Wendi reported was that

20    Joe had said to her that she was the only one who really

21    understood him.

22         Q.     Did Joe relate to her any dysfunction in his

23    own home life --

24         A.     Yes, he did.

25         Q.     -- with his family?

1          A.     Yes.

2          Q.     What did he say?

3          A.     He talked about his dad having alcohol problems

4     during his -- during Joe's youth and that it was hard

5     sometimes to be around family.

6          Q.     Okay.  Did Joe relate to Wendi feelings that

7     his family was not supportive of things that he wanted to do,

8     that kind of thing?

9          A.     Yes, he did report that.

10         Q.     Okay.  And can you elaborate in that regard?

11         A.     What I recall from Wendi's report really

12    focussed more on Joe's relationship with his dad and not so

13    much on the relationship with mother when he talked about

14    things not being good.

15         Q.     Okay.  And are we seeing a moment at the

16    beginning that this was a problematic relationship?

17    Obviously,  it's too soon to tell, but are there symptoms

18    you're seeing?

19         A.     There are red flags at this point.

20         Q.     Okay.  Elaborate on that for me.

21         A.     It's so much easier to look back --

22         Q.     Sure.

23         A.     -- and see things, but it looks like there's

24    almost a set up here for things going bad.  And by that I

25    mean we have on one hand a person who has very strict almost

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    severe sounding rigid guidelines to live by.  Sometimes those

2    guidelines can be impossible to live up to.

3            Q.    You're talking about Wendi?

4            A.    Wendi now, yes.

5            Q.    Okay.

6            A.    And we have a young man who appears to be

7    dissatisfied part of the time with his own family life and

8    appears to be sad because she talked to me about when she

9    would say that Joe had a hard time expressing emotion except

10   when he drank too much.  And when he drank too much, which he

11   seemed to have done quite often early on in the relationship,

12   then he would get very sad.  He sometimes would cry, he would

13   talk about the sadness about his relationship with his dad,

14   and also about his grandfather's death by suicide.

15           Q.    Okay.  Let me just back you up a little bit.

16   In terms of threshold questions that you advanced to Ms.

17   Andriano when you first met her, did you tell her why you

18   were there?

19           A.    Actually, she already knew.

20           Q.    Okay.  And what did you explain to her about

21   your function in this particular case?

22           A.    I told her that you and your office had hired

23   me to conduct a domestic violence assessment, that I would

24   need to ask her questions, that I'd give her a number of

25   assessment tools to complete in her own writing, that I'd be

1    present while she was doing those, that I'd be asking

2    questions that would be emotionally difficult perhaps to

3    answer, and that I could not then offer her anything.

4         Q.    Okay.  Did she express to you initially whether

5    or not she believed she was a victim of domestic violence?

6         A.    She clearly did not believe she was a victim of

7    domestic violence.

8         Q.    All right.  Let's get back then to the

9    beginning of the relationship between Joe and Wendi.

10        A.    Okay.

11        Q.    Midway down in paragraph D you begin to tell us

12   about Wendi reporting that she felt that she was needed by

13   Joe?

14        A.    Yes.

15        Q.    Okay.  How is that concept integral to this

16   domestic violence issue?

17        A.    According to Wendi's report, she was struck by

18   the need and her ability to care for another person.  And

19   here was someone that she enjoyed spending time with, who

20   evidently enjoyed spending time with her, who professed that

21   need and who professed things saying things like you're the

22   only one who really understands me and I'm having a really

23   tough time at home and she's listening and she's nurturing to

24   him.

25        Q.    Okay.  And that could be a good thing, right?

54

1          A.     Yes, sure.

2          Q.     But in the domestic violence context, can it

3     also be a problematic thing?

4          A.     Well, it could be a setup.  You don't know

5     early on usually, but it certainly can be a set up for that

6     caretaking role and doing whatever it takes to care for.

7          Q.     Initially, apparently Wendi had financial

8     issues Joe assisted her with.  What was that about?

9          A.     Wendi was, I believe, negligent in making two

10    car payments and Joe was very helpful and I believe made

11    those payments for her.

12         Q.     Okay.  Again, does that potentially have

13    ramifications in the future in terms of economic relationship

14    between the parties?

15         A.     Well, one of the things that it does is it

16    cements in her mind he's a good guy, you know, he's helping

17    me, he's -- he's sad, he's lonely, he's had a tough time.  He

18    likes being with me, I can take care of him, I can help him

19    and look what he's just done for me.

20         Q.     At some point in time does the friendship

21    relationship become a sexual relationship?

22         A.     Several months after they first met I believe

23    from Wendi's report that Joe suggested that he move in with

24    her.

25         Q.     Okay.

1         A.     When they first started living together, there

2    was not a sexual relationship.  I believe according to Wendi

3    that that developed one to two months after Joe moved in.

4         Q.     Okay.  So in your report you state the fourth

5    or fifth month of dating, that squares with your

6    recollection?

7         A.     Yes.

8         Q.     Okay.  Were there problems in the initial part

9    of the relationship with excessive drinking on the part of

10   Mr. Andriano?

11        A.     Early on, yes.

12        Q.     Okay.

13        A.     She reported 10 to 12 beers when they would be

14   out at the bar.

15        Q.     Okay.  In terms of frequency was this a daily

16   thing, a weekly thing?

17        A.     I -- I don't remember how often it was.  I

18   mean, part of -- the bar scene was certainly part of their

19   early months together.

20        Q.     Okay.  And I think you told us that Joe

21   Andriano became more emotional and more emotionally

22   acceptable after drinking?

23        A.     Yes.

24        Q.     Okay.  And can you describe in terms of Wendi's

25   report the range, if you will, of range here?  I mean,

1    contrast it to the point when he wasn't drinking.

2         A.    According to her report, when he wasn't

3    drinking he was not emotionally available in any way.  But

4    when he drank too much, he would get tearful and cry, and it

5    would -- the tears according to her report always seemed to

6    focus around two key areas that was what he described as a

7    failed relationship with his father and then the death by

8    suicide of grandfather.

9         Q.    Okay.  In contrast to other issues with regard

10   to economics, did Joe have certain expectations in terms

11   of -- of toys or property that he would have and possess?

12        A.    Well, if I look at the report in it's entirety.

13        Q.    Okay.  Let's talk about an entirety then and go

14   back to specifics.

15        A.    Yeah.  I remember three things in particular.

16   One was the need for a new truck every year.  The second was

17   the racing boats.  He, I believe, owned two of those, didn't

18   want dad to know about the second one because he owed money

19   to dad.  Put a lot of money into them, into their engines.  I

20   think he was into the rebuilding and the racing scene.  And

21   just needing to have nice things, nice clothing, those kinds

22   of things.

23        Q.    All right  What did Wendi do in response?

24   Let's take it chronologically.  I think the first vehicle

25   that he really had to have was a full size pickup truck?

57

1     A.     Right.  He did not have one of those but his

2   buddies did and she wanted to help and she didn't have the

3   money to do that for him.  So instead she gave him her

4   vehicle to use as a trade in which left her then with no

5   vehicle.

6     Q.     Okay.  And, again, does this kind of portend

7   for future difficulties in terms of ties between the parties?

8     A.     It certainly appears that we have the woman of

9   the couple giving, giving, giving, giving, giving.

10     Q.     Okay.  And seems like a subset of that

11   particular issue, a result of her not having her vehicle to

12   whom she then becomes reliant upon to get to and from places?

13     A.     She had to call Joe to get to and from work or

14   join him after work at the bars, wherever they were.

15     Q.     Does that integrate with the control issues

16   we're beginning to see here in this relationship?

17     A.     Yes, it does.

18     Q.     Is it about this time in the relationship, four

19   or five months in, that she begins to perceive temper issues

20   with Joe?

21     A.     Yes.  This would have been perhaps the Fall now

22   of '93.  She reported a lot of screaming on his part, anger,

23   but at this point in time it was not against her.  It was

24   against other people raging about business gone bad or things

25   of that nature.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000007353

1        Q.    All right.  And did she express to you how it
2   impacted her?
3        A.    Well, this was also about the same time that he
4   said "Let's get married."
5        Q.    Okay.
6        A.    So she saw the screaming and the yelling but
7   made the decision to go ahead and get married, so there was
8   some vision, I would think, about what he might be like
9   although it's pretty foggy.
10       Q.    Okay.  Up to this point she had reports from
11  Joe's friends or other persons who gave her kind of an
12  assessment of Joe's potential for temper and anger?
13       A.    There were reports by his friends about some of
14  the things that he had done.
15       Q.    Okay.
16       A.    Like for example she said that he had a
17  reputation in town or something about spinning out his truck
18  tires in the gravel in a parking lot in front of a Circle K
19  and so the windows were broken.  And evidently this was done
20  on more than one occasion because he had a sort of a credit
21  line with the local windshield replacement people to replace
22  the glass at the Circle K.
23       Q.    Okay.  And it was her understanding that
24  conduct was in response to something that had angered him or
25  upset him?

1    A.    Yeah.

2    Q.    Okay.  All right.  In October of '93, again,

3  there were some economic issues.  And what did Wendi report

4  to you in that regard about failed businesses, new ventures,

5  that kind of thing?

6    A.    Well, I think it was at that point in time he

7  wanted to start his own business.  He had been in a glass

8  business I think before that, had gotten hurt somehow, so now

9  wanted to start his own business.  That's also the same time

10  they talked about getting married.  And, again, the marriage

11  plans seemed to take hold at that point in time.

12    Q.    Okay.  Were there important things related to

13  you by Wendi that, pertaining to the wedding, she had some

14  reservations, some hesitation?

15    A.    The way I recall the -- her telling that part

16  of the story, was that mom did make all the plans, that Wendi

17  was really not very much involved in the wedding plans as you

18  might expect a bride to be.  She explained that however in

19  terms of she's working full time, going to school nights to

20  finish up that business degree and just didn't have time to

21  do it.

22    Q.    Okay.  Did she also express that her parents

23  were desirous of seeing them married to perfect that living

24  in sin relationship they currently had together?

25    A.    I don't remember her saying that Donna said

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000007355

1   that.  I do remember her saying that Alejo somehow let her

2   know, and I don't know if it was in words or actions or just

3   that Wendi would have known based on his strict religious

4   beliefs, that living in sin, so-called, was not okay.

5          Q.    Again, did she have any reservations in going

6   forward with the plans to marry Joe?

7          A.    She did have some reservations, but I think

8   according to the report it was like a done deal, you know.

9   She had already, you know, gotten into a relationship with

10  him and mom seemed to really like him.  Dad is the one who

11  had the reservations and right down to the time that the

12  wedding was supposed to take place.  Dad was saying you don't

13  need to do this.  You can back out of this now.  That's as

14  he's walking her down the aisle.

15         Q.    Did you sense from Wendi whether or not she

16  felt she had any free will in this whole process?

17         A.    Yeah, I -- I didn't sense any free will.  It

18  was like she, you know, she had to.

19         Q.    Okay.  Things were being done for her and her

20  opinion or desires really were of no consequence?

21         A.    Yes, but this is -- it's complicated I think

22  because this does not mean -- I never got the sense from

23  Wendi that she wasn't attracted to him, that she didn't care

24  a great deal about him.  That was never there.  I think the

25  question of getting married, this clearly was what was in her

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    mind, not I never want to marry this man, no.

2         Q.    Okay.

3         A.    That was not the picture.

4         Q.    All right.  Were there economic difficulties at

5    this time as well in terms -- with the parties in terms of

6    ability to buy engagement rings, that kind of thing?

7         A.    Yes.  Joe was unable to buy the typical

8    diamond --  diamond engagement ring, so he put on a gold band

9    and had a fake stone set inside and said, you know, when

10   we're better off, you know, we'll replace this.

11        Q.    And apparently their honeymoon was funded by

12   some other matter?

13        A.    One of Joe's sisters paid for them to have a

14   three day honeymoon to Vegas.

15        Q.    Okay.  Did she relate to you the beginnings of

16   a sexual relationship with Mr. Andriano?

17        A.    Yes.

18        Q.    Okay.  What did she describe in that regard?

19        A.    Well, from the earliest time in the sexual

20   relationship, she told me that at least the first time that

21   she recalled having sex with him that she cried.

22        Q.    Okay.

23        A.    And that she didn't know why.

24        Q.    Did that occur at a time prior to the wedding?

25        A.    Yes.

1    Q.  Okay. She was crying in a -- in what sense?

2 Did you gather --

3    A.  Sadness.

4    Q.  Okay.

5    A.  There was something wrong but she didn't know

6 what it was. All she knew was, first of all, that it was

7 painful, but secondly, this wasn't what she thought it was

8 supposed to be.

9    Q.  Okay. And did she relate to you that was the

10 first sexual experience she had with any male?

11    A.  I believe that it was the first time. I

12 know -- I recall nothing about having sex with the pastor's

13 son. If she did, I don't know that.

14    Q.  Okay. Anything else that she related to you

15 about that first sexual experience with Joe Andriano that was

16 noteworthy?

17    A.  Well, that her belief from the beginning was

18 that this was sort of women's place in life, that part of

19 being a woman was succumbing to what your husband wanted, and

20 if he wanted sex, you needed to do that.

21    Q.  Okay. And did she describe to you what she

22 wanted out of the intimacy with Joe Andriano at that time?

23    A.  She was consistent about what she wanted and

24 that was love, affection, hugs, those forms of intimacy as

25 opposed to sex.

1        Q.    Okay.   And did she indicate whether or not Joe

2    Andriano was capable of performing in that regard in terms of

3    affection, hugging, emotional commitment, that kind of thing?

4        A.    According to Wendi's report, he was not able to

5    do it during the sexual encounter, that that emotional

6    spending was related to other -- you know, related to alcohol

7    or later on as when he was very ill.

8        Q.    Okay.   In terms of the actual physical act of

9    intercourse, did she describe what it was like, not in terms

10    of pain and that kind of thing, but in terms of the

11    mechanics, if you will, duration, that kind of thing?

12        A.    Yes.

13        Q.    What did she tell you?

14        A.    Very quick because of her -- I don't know if

15    it's -- if there's a medical reason or just displeasure or

16    what the meaning of this is, but that because of whatever

17    that is, they needed to use a lubricant.

18        Q.    Okay.   And the duration of the experience?

19        A.    Very short.

20        Q.    Okay.  And did this description of the sexual

21    relationship that she had with Mr. Andriano, is that

22    consistent throughout the period of their marriage?

23        A.    Yes.

24        Q.    Early on in the relationship did the topic of

25    infidelity become a topic of discussion between Joe Andriano

1    and Wendi Andriano?

2            A.      Yes, it did.

3            Q.      That was reported by Wendi Andriano to you?

4            A.      Yes, it was.

5            Q.      Okay.  Give me the facts and circumstances of

6    that issue.

7            A.      Evidently, Joe had been engaged prior to Wendi

8    to another woman and discovered at some point that that other

9    woman had been unfaithful to him, and so the relationship

10   ended abruptly upon his discovery.  According to her report

11   he became so enraged that his parents became concerned about

12   what he might do with that rage and so sent him to California

13   as a cooling off period.

14           Q.      Okay.  And those facts were known to Wendi?

15           A.      Yes.

16           Q.      Okay.  And she reported them to you?

17           A.      Yes, she did.

18           Q.      Again, does that circumstance portend, if you

19   will, towards future response, if you will, on the part of

20   Wendi Andriano towards Mr. Andriano?

21           A.      It does in a very important way.  On Thursday I

22   talked about the -- about the importance of understanding the

23   context in which domestic violence takes place, so this would

24   be an example.  When a woman gets this kind of information,

25   initially she may just file it away and say --

1          MR. MARTINEZ:  I'm going to object as beyond the

2    scope of the original question and what women think.

3          THE COURT:  Overruled.

4          THE WITNESS:  They may say he didn't really do that,

5    he's just trying to scare me, and just sort of, you know,

6    shelve it.  Then later on in the relationship if the violence

7    does in fact begin or begins in a myriad of ways, that

8    information comes back.  It comes back in a lot of different

9    forms to the woman.  And one thing that happens is he may not

10   have to do a great deal to her for her to be afraid because

11   she's already got the history that maybe she pushed aside

12   when it was being told to her.

13          Another thing that happens is he's -- she's

14   gotten some information from his friends who tried to warn

15   her about him, that she thought was about "I'm not part of

16   their crowd, they're just trying to keep me away from him."

17   And she's got this information about family, the hemisphere

18   of his rage, so later on down the road it doesn't take a

19   whole lot for her to become overwhelmed with fear.

20          Q.    Is there a kind of a conditioning at work here,

21   a --

22          A.    That's actually a really good word to use to

23   describe it.

24          Q.    Okay.  And, again, in your experience in the

25   clinical research, at these beginning times with the

1    relationship, is it the abused person's objective in terms of

2    the evaluation that he or she is making on the conduct of the

3    abuser or is it the honeymoon period, if you will, when you

4    tend to disregard objective facts?

5         A.    I've never known a woman to be objective during

6    that period in time because she's not really been so much the

7    target yet.  She says she may see developing rages but so

8    far, you know, she's not the target.  And if you couple that

9    with a person who believes that her job is to solve all

10   problems for her partner, she's just going to work harder at

11   fixing whatever's wrong.

12        Q.    All right.  And did Wendi relate to you at that

13   time that Joe issued to her a specific warning with regard to

14   infidelity?

15        A.    What Wendi told me in terms of this report at

16   this time during the assessment was that he warned her not to

17   cheat on him.  "Don't do to me what Shelly did."

18        Q.    All right.  In your report did Wendi reflect or

19   relate to you other violent episodes that she was aware of

20   that Joe's friends had informed her of?

21        A.    Joe's friends warned Wendi about a time when a

22   man kicked Joe's truck tire and Joe ran him over.  According

23   to his friends, the man was taken to the hospital following

24   that incident.

25              His friends also told her about a party that

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    had taken place at Joe's family's home when Joe became

2    enraged at his father over something, I don't know what that

3    was, and that it took two men to pull Joe off his father.

4                His friends also told Wendi that he chased his

5    sisters' boyfriends with a baseball bat, that he had broken

6    windows when he was mad, and then about the -- the earlier

7    incident that I reported about the charge account with the

8    local glass store that he would replace the windows that he

9    would spin out.

10          Q.    Were -- okay.  Were you also advised his anger

11   would manifest against his parent as well?

12          A.    Well, against his father.  I don't remember

13   anger against his mother.

14          Q.    Okay.  What specifically with regard to his

15   father did Wendi relate to you that she was aware of in terms

16   of manifestation of Joe's anger?

17          A.    Actually becoming involved in a family

18   altercation.

19          Q.    Okay.  And that he -- okay, about his parents?

20          A.    Right, right, right.

21          Q.    Okay.  Did Wendi relate to you whether or not

22   she felt she could deal and assist Joe in dealing with this

23   particular anger?

24          A.    Wendi reported repeatedly about her belief that

25   all Joe needed was her love and caretaking and nurturing and

1    that that would help Joe to overcome all of this anger and

2    rage that he seemed to have and express periodically.

3           Q.    Okay.  In your experience and does the research

4    support that is kind of a common characteristic of abused

5    spouses?

6           A.    The belief that we could make them change

7    and --

8           Q.    Okay.

9           A.    -- be okay, the partner.

10          Q.    Okay.  All right.  Did at some point in time

11   Joe develop a disease in the jaw area, in the throat area?

12          A.    Yes.

13          Q.    And did Wendi relate to you how that impacted

14   their relationship?

15          A.    Yes.  And it -- it happened at an early point

16   in their relationship and also at the same time they had a

17   financially difficult portion in their relationship.  It

18   seemed that the disease came at the early onset of marriage

19   and tough economic times all went together.

20          Q.    And, again, are these common characteristics

21   that you see in terms of these kind of relationships,

22   domestic violence relationships, the economic component,

23   perhaps a medical component?

24          A.    The economic, yes.  I don't recall anything

25   like this type of medical problem --

1          Q.    Okay.

2          A.    -- in my background.

3          Q.    All right.  Well, let me ask you, does the

4     research support a conclusion that a disease process turning

5     an otherwise normal person into an abuser?

6          A.    No.

7          Q.    Okay.  Is there some relationship perhaps that

8     the disease may -- may make the person more irritable or more

9     likely to be more explosive perhaps but not change his

10    fundamental personality?

11         MR. MARTINEZ:  Objection.  Calls for speculation.

12         THE COURT:  Sustained.  Rephrase the question.

13    BY MR. PATTERSON:

14         Q.    Is there research in what causes a person to

15    become an abuser?

16         A.    Most of the research literature rests on the

17    theory called the Social Learning Theory by Bantorra from

18    about 30 to 40 years ago.

19         Q.    Okay.  And in a nut shell, as I understand it,

20    that behavior is learned behavior through time?

21         A.    Right.

22         Q.    Okay.  So there's nothing in the research

23    literature that would tend to support the position that

24    disease and disease alone creates an abusive personality?

25         A.    I've never read anything that said that.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          Q.    All right.  One of the concepts that you

2    discuss in kind of general was the characteristic that an

3    abuser tends to try to isolate the victim.  And did that

4    happen to you as -- or did that happen to Wendi as related by

5    her to you?

6          A.    Yes.

7          Q.    What were some of the incidents that she

8    described for you?

9          A.    From the early days of their relationship, he

10   began to isolate Wendi in a variety of ways.  You know,

11   she -- she worked and went to school and cared for him in

12   extraordinary ways. That in and of itself doesn't allow much

13   time for social relationships.  But she learned as long as

14   she did that, things would go along a lot more smoothly.

15   Whenever friends would try to come over, he would have

16   something to say about that, so the beginnings of isolation

17   sort of took a good hold early on.

18         Q.    Okay.  Give me some for instances.  What kind

19   of behaviors would he engage in that tended to isolate Wendi

20   from her circle of friends?

21         A.    Well, one of the earliest ones that I recall

22   was actually around the wedding, and that was when Wendi had

23   already asked a young woman, I don't know who she was, to be

24   her maid of honor.  I believe and that was already sort of

25   set.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    Q.    This was a close childhood, personal friend?

2    A.    Close female friend of Wendi's.

3    Q.    Okay.

4    A.    And Joe wouldn't allow that to happen and made

5    Wendi call her and say I'm sorry, but I can't use you as my

6    maid of honor.  And instead had one of his sisters, I

7    believe, become the maid of honor.

8    Q.    Okay.  Other instances of -- of behaviors on

9    the part of Mr. Andriano that were designed, if you will, to

10   isolate Wendi Andriano from her circle of friends?

11   A.    One of the other things that stands out for me

12   this is not early on, but what comes to my mind when one of

13   the babies was born and -- it must have been the first baby.

14   Q.    Nicolas?

15   A.    Nicolas.

16   Q.    Uh-huh.

17   A.    People would come to the house and want to see

18   the baby and talk to the mother about the baby and all of

19   that, and when one particular old school chum came to do

20   that, he just, I think she said, pitched a fit and swore at

21   her about "what the fuck are you doing here, where's my blue

22   shirt, it's not even ironed yet."  So the effect of that on

23   the friend who was visiting would be "this is uncomfortable,

24   this is shaming, I don't want to be in this.  I don't want to

25   see it."  So then what happens, of course, is people start to

1    drop away.

2          Q.    All right.  Let me give you examples that have

3    come up during the course of the trial here.  It appears she

4    went out, if at all, with her circle of business associates.

5          A.    Right.

6          Q.    Again, how is that isolating in your

7    estimation?

8          A.    Well, that he narrowly has defined who she can

9    be with.

10         Q.    Okay.  And then it appears even when she was

11   allowed to do those things, there were phone calls.  How does

12   that relate to the concept of isolating?

13         A.    Well, the phone calls are about intimidation,

14   of course.  If I call your cell phone five or six times in

15   the course of an evening telling you to come home, whether

16   it's about changing a diaper or just, you know, you shouldn't

17   be out this late or whatever -- you know, whatever the

18   reasons are, that certainly tends to create a world in which

19   you have to live in, I'm not -- if I'm going to not have to

20   hear this anymore, I need to do exactly what he says, so, of

21   course, that's isolating and it's controlling.

22         Q.    Okay.  All right.  It appears during the course

23   of the trial testimony one of the few times that they would

24   go out jointly was in the context of going to the lake and

25   doing his boating hobby.  Again, how is that isolating in

1    your opinion?

2         A.    Well, he's choosing the entertainment and

3    doesn't give you -- doesn't give her the choice about what

4    she wants to do, where they're going, or how long they're

5    doing it for or who they'll do it with.

6         Q.    Okay.  Again, did she relate to you in this

7    context that in general things were okay?  I mean, this is

8    early in -- what time frame are we talking about here?  Early

9    days of marriage, so --

10        A.    They were married in '94.

11        Q.    Yeah.  January of '94, so we're talking about

12   year of '94.  In general did she describe her perception of

13   the relationship?

14        A.    Yes, she did.  Wendi reported that things were

15   okay.  You know, he'd have these temper tantrums almost and

16   she saw him as a spoiled child in many ways because she was

17   being required to care for him in certain ways such as

18   besides the cooking and the cleaning.  It was more than

19   that.  It was clipping his toe nails.  It was trimming his

20   hair.  It was laying out his clothing everyday.  That's more

21   than --

22        Q.    Okay, but yeah.  And -- those activities

23   though in a loving relationship can be innocuous, right?  I

24   mean --

25        A.    Sure.

1      Q.      -- how can they be problematic in a

2   relationship that's not well grounded or solid relationship?

3      A.      Depends on what's behind it.  What's behind

4   that behavior?  Do I feel like I have to do this?  If I don't

5   do it, what happens?  Do I have to contend with the rage if

6   I'm not constantly doing all the things that he thinks I'm

7   supposed to be doing?  What's the trade off for me?  And for

8   Wendi, the trade off was keeping the peace because that's

9   what she wanted to do, keep peace to keep his anger and rage

10  at bay.  When she did that, when she was successful at doing

11  it, and that doesn't mean she was a successful battered

12  woman.  I don't mean that.  What I mean is when she did what

13  he wanted and then he would be okay, then there was peace.

14  And when there was peace, times were fine.

15     Q.      I think you mentioned in your overview that

16  there are perceptible differences between the abuser in

17  public and the abuser in private, okay?  Did Wendi relate

18  that concept to you?  And if so, what did she tell you?

19     A.      One way to describe that would be public versus

20  private life.

21     Q.      Yes.  Joe's perception -- the perception of

22  others about Joe in public?

23     A.      Right.  What -- what Wendi relayed to me was

24  that she really saw him as the fun guy to have at a party.

25  He was just a lot of fun and a pleasure to be around.  That's

1    a different person than the one behind closed doors.

2         Q.   Okay.  And, again, your literature in you

3    clinical experience, is that something that is seen in these

4    relationships?

5         A.    It's quite typical.  There are cases -- let me

6    step back a minute from that statement.  Maybe four or five

7    years ago there was some initial research conducted on what

8    was called or is called Typologies of Battering.  And the

9    researchers, I think they were out of Seattle, were looking

10   to see if there were differences among men who batter.  And

11   this made the news, the media grabbed ahold of it, and what

12   they were looking at was, were some men violent in many of

13   their relationships or were they violent just within this

14   particular intimate relationship?  That research still is not

15   well defined.  There's a lot of different people that are

16   looking at it right now so they don't know a whole lot about

17   personalities of people who are only abusive within intimate

18   relationships.  But what we do know for sure is that there

19   are people who are only abusive within the context of that

20   one intimate relationship or in the context of many intimate

21   relationships and not, say, within friendship, friendships or

22   as batterer or whatever.

23        Q.    Okay.  And when you use that, when you say that

24   conceptually, you mean those persons don't endeavor to

25   control the conduct of other people.  They're -- the

1    controlling person's conduct is restricted or reserved for

2    the intimate partner?

3              A.    Correct.

4              Q.    Okay.  All right.  Up to this time there's been

5    no information relayed to you by Wendi concerning any

6    physical misconduct?

7              A.    Correct.

8              Q.    Okay.  And in your opinion up to this point in

9    time what are the potential abusive behaviors she related to

10   you that she attributes to Mr. Andriano?

11             A.    Well, what she's experienced up to date would

12   be the -- the name calling, the types of names that a lot of

13   women would find very hurtful like bitch, whore, those kinds

14   of names.  In the context of screaming or yelling, in the

15   context of being told that, you know, her job is to do this,

16   this, and this, whatever those things are.  She's been told

17   about acts of violence that had been done to other people,

18   not to her.  He told her himself according to Wendi about

19   what happened when his ex-fiance cheated on him, so she's got

20   that.  So what we're seeing is sort of a peeking of the

21   beginnings of violence, other forms of violence.

22             Q.    Does she relate to you what she believes to be

23   the first incidents of physical violence that Mr. Andriano

24   visited upon her?

25             A.    Yes.

1        Q.      When did this occur?

2        A.      May I look at this again?

3        Q.      Page 7 of your report, a category described as

4    First Physical Assault.

5        A.      It was in 1994 and it was about 8 to 9 months

6    after the marriage.

7        Q.      Okay.

8        A.      He was angry and yelling, so she went and hid

9    in the bedroom, I believe.

10       Q.      Okay.  Do you have a sense of where this may

11   have occurred, what living area?

12       A.      I know early on they didn't have enough money

13   to continue to live in their first apartment, which I believe

14   she called a townhouse.  When they could no longer afford

15   that, I think they moved to Joe's family's farm, and there

16   was a -- some sort of structure on that farm.  She described

17   it as small.  I think it had just a couple of rooms, and one

18   of them may have had farm machinery or something of that

19   nature in it.  I think that's where this particular scene

20   came from.

21       Q.      Okay.  Describe to me what she related to you

22   concerning the facts and circumstances of that assault?

23       A.      Okay.  I don't know what it was that he was

24   yelling and screaming about.  I just know that he was.  And

25   when he did that, she ran for cover, which was her common way

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    of taking care of herself, in the bedroom and closed the

2    door.  And so he tried to gain entrance into the bedroom

3    by -- in order to do that, he somehow threw his body up

4    against the door, and so -- I think it was a wooden door.  So

5    he had scratches on his arm from the wood and on his

6    shoulders.  I believe that he also destroyed the door or

7    shattered it in some way by putting -- throwing his weight

8    against it.  He -- that enabled him to get inside the bedroom

9    and to Wendi.  He grabbed her by the neck, pinned her up

10   against the wall, and grabbed a -- some kind of pot.  And

11   rather than hit her with the pot, he smashed the pot into the

12   wall, thereby creating a hole in the wall.  He then went out

13   and smashed an additional piece of furniture.  I think it was

14   a coffee table.  At some point he was -- became, I assume,

15   physically drained from that activity and laid down and went

16   to sleep.

17         Q.    Okay.  Aside from the obvious differences of

18   the physical assault, breaking bones and bruises that kind of

19   thing, is there a significant impact in these kinds of

20   silence on the attitudes and behaviors in the abused person?

21         MR. MARTINEZ:  Objection.  Improper foundation.  He

22   indicated breaking bones.

23         MR. PATTERSON:  No.

24         THE COURT:  Sustained.  Rephrase the question.

25         MR. PATTERSON:  No.

1    BY MR. PATTERSON:

2         Q.    Obviously, this is not a circumstance where

3    bones were broken or bruises inflicted, right?

4         A.    Correct.

5         Q.    But it is clearly an act of violence visited

6    upon Ms. Andriano?

7         A.    Yes.

8         Q.    Okay.  Are these acts of violence that don't

9    result in broken bones and bruising as significant in your

10   estimation in assessing whether or not a person is a victim

11   of domestic violence?

12        A.    Yes.

13        Q.    Okay.  And how is that?

14        A.    Well, clearly the intimidation of that act,

15   smashing something next to a person's head, that's clearly

16   fear provoking, but there was physical violence because he

17   did grab her by the neck and pin her up against the wall.

18   There is an act of physical violence and also all of the

19   intimidating behaviors and smashing furniture.  That's

20   clearly intimidation instilling fear in the eyes of the

21   victim.

22        Q.    Okay.  And do we go back to a term we used

23   earlier, conditioning the victim for future behaviors?

24        A.    Yes.

25        Q.    How is that?

1        A.     These are cumulative.  Every time something

2   happens, whether it's a story told, whether it's screaming

3   and yelling and name calling, or whether it's an act of

4   physical violence against the person or violence within the

5   home, breaking and smashing things, those are cumulative.

6   You don't forget those.

7        Q.     And -- okay.  And how about just the randomness

8   and utter unpredictability of the abuser's behavior?  How

9   does that impact the abused person?

10       A.     The literature talks about women, victims of

11  domestic violence, believing for at least some period of time

12  that they can control their partner's violence.  That if I

13  just do this, then he won't do that.  If I'm a better wife, a

14  better lover, a better cook, whatever, then I can in some way

15  stop this.  And this is -- all battered women want is for

16  this to stop.  So when you get random acts that she can't fix

17  or can't change or doesn't know when they're going to happen,

18  that little piece of comfort in the belief system that I can

19  change this by just being better begins to disappear.

20       MR. PATTERSON:  Judge, this might be a good moment to

21  take a break.

22       THE COURT:  We'll go ahead take our afternoon break

23  at this point in time, ladies and gentlemen.  During this

24  break, remember the entire admonition I've given you,

25  including the fact you're not to discuss this case with

1    anyone, do not let anyone discuss with the case with you,

2    keep an open mind.  Have a nice break.  We'll see you in 20

3    minutes.

4

5                    (Recess.)

6

7         THE COURT:  This is CR 2000-096032, State of Arizona

8    versus Wendi Elizabeth Andriano.  The record will reflect the

9    presence of the Defendant, Counsel and the jury.  Sharon

10   Murphy is on the witness stand, and we'll continue with the

11   direct examination by Mr. Patterson.

12        MR. PATTERSON:  Thank you, Judge.

13

14   CONTINUED DIRECT EXAMINATION BY MR. PATTERSON:

15        Q.    You are Dr. Sharon Murphy?

16        A.    Yes.

17        Q.    The same witness who was testifying before the

18   break?

19        A.    Yes.

20        Q.    Do you realize you're still under oath?

21        A.    Yes.

22        Q.    We were talking about the first assault and it

23   apparently occurred eight to nine months into the marriage

24   and about, what, year and three or four months from the

25   inception of the relationship?

1        A.      Relationship, correct.

2        Q.      Okay.  In your clinical experience and in the

3    literature, is this seen in these relationships, a honeymoon

4    period passes and then the behaviors become escalated?

5        A.      That's the phenomenon that I talked about on

6    Thursday that I actually didn't have a slide for because of

7    my own reticence to use it.  Excuse me.  It's called the

8    Cycle Theory of Violence.  My reticence is about -- it's

9    really a conceptual framework.  It's never been empirically

10   researched, so therefore it doesn't have the status of

11   theory, although people have come to know it as a theory, but

12   yes, that's what that talks about.  That would be a period of

13   sort of verbal assault sort of stuff leading to the physical

14   violence and leading to the honeymoon.

15       Q.      Okay.  Did Wendi relate to you whether or not

16   she reported this assault to law enforcement?

17       A.      She related that she did not.

18       Q.      Okay.  And, again, is that typical with

19   behaviors that you observed either in your clinical practice

20   or in the research?

21       A.      It's very typical.

22       Q.      Okay.  How did the couple deal with that

23   particular incident thereafter?

24       A.      There was never any conversation or

25   discussion.  Joe fixed the things that he had broken and she

1   never talked to him about it.  She said to me that she didn't

2   bring it up because she was afraid of what would happen if

3   she did, so therefore there was no conversation.

4          Q.    Okay.  And that's important for a number of

5   things.  Did Joe sustain any consequences as a result of his

6   behavior?

7          A.    None.

8          Q.    Okay.  And, secondly, this pattern of dealing

9   with violence by avoiding it, is this one of the common

10  characteristics that you described in general that abused

11  persons engage in?

12         A.    Yes.  They're part of the -- what the partner

13  uses in terms of minimizing blame, sort of what the victim

14  does in shutting out the bad acts.

15         Q.    Okay.  At this time did Wendi relate to you

16  rationalizing behaviors that Joe would engage in in terms of

17  whose fault the problem was?

18         A.    The way I recall what she reported was that he

19  blamed her for lots of things that were going wrong in their

20  lives, whether it was money, jobs, things of that nature,

21  that she was -- she needed to be the one to fix things.

22         Q.    Okay.  And did Wendi relate to you that he used

23  the "F" word in describing fault in this particular

24  relationship?

25         A.    Yes.

1        Q.    What did she say he accused her of?

2        A.    He would scream at her that things were her, in

3   quotes, fucking fault.

4        Q.    Okay.  And, again, is the use of swear words,

5   cuss words, one of the tools that an abuser uses?

6        A.    Yes, particularly words that an individual

7   victim might find particularly offensive.

8        Q.    Okay.  And did you find this to be the case in

9   their relationship?

10       A.    Yes, I did.

11       Q.    All right.  Moving again through your report,

12   you have an entry on page 7 called Joe's health in general,

13   how does Joe's health impact your opinion in this particular

14   case?

15       A.    Well, it impacts Wendi's thinking and decisions

16   about what to do.

17       Q.    Okay.  Enlarge upon that for me?

18       A.    Well, her husband's been at this point

19   diagnosed with some sort of tumor, although I believe early

20   on, those early diagnoses were they were benign.  However,

21   even a benign tumor must cause distress.  And so according to

22   Wendi's telling of the story, that leads just to more and

23   more time that needs to be invested in caring for him because

24   that's what she needs to do.

25       Q.    Okay.  And she was inclined to do it any way,

1   but now she's dealing with a potentially sickly person. Does

2   that kind of just -- what's the word I want -- make her feel

3   in her own mind more needed than otherwise?

4        A.    Correct.

5        Q.    All right.  Explain that to me.

6        A.    Well, from her perception of a woman's role,

7   this certainly fits into the caretaking and the nurturing

8   role that she's already had since they first became involved

9   with one another, firmly cements her in that relationship,

10  not that she ever reported at this point in time a desire to

11  leave.  However, this would impact any decision making.

12       Q.    Okay.  And does she relate at any time period

13  in the relationship an inability to leave him?

14       A.    Much later, yes.

15       Q.    What did she say in that regard?

16       A.    That there was no way she could leave him at

17  this point in time when he was terribly ill and really

18  dependent in some cases.

19       Q.    Okay.  What I'm trying to determine here, from

20  what you told me, I sense there's a great deal of reluctance

21  to leave anyway in -- in relationships that don't involve a

22  disease component.

23       A.    Exactly.

24       Q.    In the cases that disease component does exist,

25  it makes that process --

1          A.      It's compounded, yes.

2          Q.      Okay.  All right.  And I also understand that

3     the disease creates additional financial hardships for the

4     couple?

5          A.      There were times they didn't have health

6     insurance.  And I believe it was her parents, although I need

7     to go back and read that specifically as to who it was, but

8     some sort of parents were providing financial support.  One

9     of the doctors needed money up front, I recall, and so they

10    needed money right away.  Of course, it was lost time from

11    work, but there were a lot of medical costs involved.

12         Q.      All right.  It was the need to spend money on

13    the health care.  Did Wendi report to you as a result of that

14    Joe cut back in his spending habits in other areas to

15    accommodate that problem?

16         A.      No.

17         Q.      Okay.  What did she tell you in that regard?

18         A.      That even when he wasn't working, he was

19    spending a great deal of money on his boat, which she

20    referred to as a very expensive toy.  Whenever she would try

21    to offer any kind of what she would call constructive

22    criticism about those expenses and look at where we're at

23    financially, he would get very, very angry.  Wendi reports

24    that she learned early on in life that you just weren't

25    ·supposed to engage in arguing or fighting or yelling or

1    screaming, and so she would back off whenever that happened.

2    It seemed that Joe just expected that she would have the

3    money to pay for whatever expenses they had.

4         Q.    Okay.  At about this time, were counseling

5    services offered to Joe and Wendi?

6         A.    They were offered to Wendi.  I don't recall

7    that they were offered to Joe and --

8         Q.    Okay.

9         A.    -- that was through her work.

10        Q.    All right.  Did Wendi avail herself of those

11   counseling opportunities?

12        A.    She did, but very briefly.  She went -- you

13   know, I can't recall if she went several times or just a few,

14   but I know it wasn't for very long.

15        Q.    Okay.  Are you certain it wasn't -- well, Joe

16   may not have been present, but did Wendi indicate a reason

17   why she ceased going to these counseling sessions?

18        A.    Yes.

19        Q.    What did she say?

20        A.    She stopped going because the counselor was

21   blaming Joe for the problems and she did not want to hear

22   anybody blaming her husband for anything.

23        Q.    Okay.  Again, is that behavior that you observe

24   in an abused person the result of her relationship with an

25   abuser?

1        A.    Yes.

2        Q.    Okay.  And which of the criteria are we talking

3    about in terms of that kind of conduct, not wanting to hear

4    about things said about the person she loves?

5        A.    She was very protective of him.  She did not

6    so-call badmouth him to her parents, who would have been the

7    likely people because she had access to them.  They were not

8    people that he had, as far as I can recall, that he had ever

9    tried to isolate her from, so they would have been the

10   logical people for her to do that with and she chose not to

11   do that.

12       Q.    Okay.  And, again, is that typical behavior

13   that you see --

14       A.    Yes.

15       Q.    -- in abused persons?

16       A.    Yes.

17       Q.    A refusal to think badly or speak badly about

18   the person they love?

19       A.    Yes.

20       Q.    Okay.  So do you find it unusual there is no

21   badmouthing of Joe to either Alejo Ochoa or Donna Ochoa?

22       A.    Unusual?  No.

23       Q.    All right.  Let's talk about a particular

24   occurrence in the life of Wendi and Joe that related to an

25   inability to get this glass business either going or

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    sustaining the glass business.  At some point in time, the

2    glass business had need for an infusion of cash, correct?

3         A.    Yes.

4         Q.    Okay.  Did Wendi relate the facts and

5    circumstances of that infusion of cash into the business?

6         A.    Yes.

7         Q.    Okay.  What did she tell you in that regard?

8         A.    I assume that you are referring to the

9    borrowing -- I don't know if borrowing is the right word.

10   There was a business partner that came into the picture that

11   infused quite a lot of money into the business to keep it

12   going, and it worked for a while and then it stopped working

13   so well.

14        Q.    All right.  This infusion of cash in your

15   report was in the neighborhood of $75,000?

16        A.    Yes.

17        Q.    Okay.  And as a result of that, Joe acquired a

18   silent partner, if you will?

19        A.    Right.

20        Q.    Okay.  The business -- did it succeed at that

21   point with the infusion of cash or did it continue to spiral

22   downward?

23        A.    I think for a while it was doing okay and then

24   it began to spiral downward.

25        Q.    Okay.  Did Joe do some things in relationship

1    to that business failure that Wendi observed and related to

2    you that are relevant to this domestic violence issue?

3              A.    Yes.

4              Q.    What did she tell you?

5              A.    Well, the way I recall her report is that the

6    silent partner, when the business started to go bad, the

7    silent partner wanted to have much more of a say in the

8    operation to fix it.   Joe did not want any part of that and

9    became intensely angry about it and threatened to have the

10   silent partner killed.  He told that to Wendi.  Wendi became

11   frightened, tried to talk him out of it, told her father.

12   Her father tried to talk to Joe or just warn him not to do

13   that.

14             Joe was a gun owner.  He had numerous guns.   I

15   think Wendi said 20.  She had enough reason to think that he

16   could possibly attempt to kill this man.  He -- she, I think,

17   told him that she was going to let the man know and he warned

18   her not to do that by holding a handgun in his hand pointing

19   it at her -- I believe he was across the room at the time --

20   and basically warned her to never do that with the gun

21   pointed at her.

22             Q.    Okay.   And did you attribute a quote to Ms.

23   Andriano in your report?

24             A.    Yes.

25             Q.    Okay.   And what was that quote that Wendi

# APPENDIX K - Part 3

1    related to you that Joe said to her?

2           A.    He, according to Wendi, said, if you even think

3    about doing that, I'll use this on you instead of him.

4           Q.    Despite the threat, what did -- what did Wendi

5    do in response to the threat?

6           A.    She told the man anyway.

7           Q.    Okay.

8           A.    And he then hid or disappeared somehow.

9           Q.    All right.  In your assessment of that factor

10   in coming to conclusions in this case, the fact that she went

11   and did it anyway, how does that integrate into your

12   assessment?

13          A.    The ante's now been upped.  There's now a gun

14   that's been pointed at her with a threat that she believed

15   was viable.  Add that to her knowledge that there were

16   approximately 20 guns in the house, in the closet, one of

17   them was kept either in the nightstand or under the mattress,

18   so she lived with a gun next to her partner.  All of those

19   things added together are cumulative.  I think the fear

20   continues to rise, but even at this point her decision to

21   tell the intended victim says one of two things to me in

22   understanding her behavior.  Either she doesn't believe he's

23   going to use it, or things are so bad that she's willing to

24   take the risk.  I don't know which it is.

25          Q.    This does appear to be the first time, at least

1    as related to you by Wendi, that she contradicted an

2    expressed dictate of Mr. Andriano?

3         A.    Yes, I think so.

4         Q.    How is that significant?  I mean, I guess in

5    general, do abused people follow the dictates of the abuser

6    100 percent of the time?

7         A.    I wouldn't say 100 percent of the time, no.

8    That probably would be impossible.

9         Q.    All right.  So there are times the abused

10   person shows a little resistance to the order, the control,

11   and acts independently?

12        A.    Yes.

13        Q.    Okay.  But how frequently in the scheme of

14   things does that phenomenon occur?

15        A.    I think that's dependent upon the cumula --

16   accumulation of experiences with the violent person and

17   accumulation of experiences with life and her own personal,

18   the only phrase that comes to mind, cognitive scheme.  Where

19   do her thoughts, beliefs, and ethics come from, all combined.

20        Q.    All right.  That's what I'm driving at.

21   Abused people still have a moral or ethical limitation to

22   their conduct, right?

23        A.    Yes.

24        Q.    Okay.  And in this sense then could that be one

25   of the factors that caused her to warn the guy that she

1    believed was in jeopardy of dying because it -- her morals

2    compelled her to warn this person?

3            A.    I believe so.

4            Q.    Okay.  All right.  Wendi described to you in

5    this context kind of accelerating debt and increasing

6    economic problems in the family?

7            A.    Uh-huh.

8            Q.    Did she express to you how that impacted Joe?

9            A.    Well, in a variety of ways.  Joe watched the

10    business go down the tubes.  He watched their personal

11    finances floundering, and watched on a very concrete level

12    his vehicle becoming repossessed because of failure to pay,

13    the inability to pay the car payment.

14            Q.    Okay.  Did she explain or relate to you that it

15    was emotionally depressing for him?

16            A.    Depressing and increased his rage.

17            Q.    Okay.  And did she give you concrete examples

18    of those manifestations of the rage at this time --

19            A.    Yes.

20            Q.    -- period?

21                  What did she tell you?

22            A.    In her relating the story about the man who

23    came to repossess the van, she said that Joe always kept a

24    gun in the van, and when the man came and hooked up the van

25    to tow it, Joe ran after the vehicle, grabbed the gun out of

1    the van, and held it up to the driver's head.  And so the

2    driver stopped and Joe got the van back.

3         Q.    Moving on through the report here, did Wendi

4    relate to you any difficulties that Joe may have had at this

5    time in not being able to work as a result of his medical

6    condition?

7         A.    There were times that it seems to me that there

8    were periods of time in which he did work and he didn't

9    work.  Related to the illness but also sometimes not related

10   to the illness, like times when he really seemed to be

11   healthier but still choosing to not work.

12        Q.    Okay.  Is this consistent with what she related

13   to you in the early moments of their relationship that his

14   work history before the disease was discovered was kind of --

15   kind of inconsistent?

16        A.    Seemed to be very sporadic.

17        Q.    Okay.  Did she relate to you that they were

18   compelled to borrow money from relatives?

19        A.    Yes.

20        Q.    Okay.  At some point Wendi became pregnant with

21   their first child and delivered, obviously, at some point.

22   Did she relate to you how the birth of the first child

23   affected Joe?

24        A.    I remember that Joe's mother gave her a baby

25   shower and everybody was excited about the birth, and I think

1      it was either right around that time or shortly after that

2      that he went to work in Tucson at a boat business for friends

3      of his.  But because of his interest in boats, I guess, he

4      started buying more things for the boats that he already

5      owned.

6            Q.    Okay.

7            A.    I don't know at that point if he owned one or

8      two.  And so in order to get payment, the boat owners

9      deducted the amount that he was, you know, buying from his

10     salary, and so the salary was inadequate at that point

11     because of his purchases.

12           Q.    Okay.  After the birth of the first child, did

13     Wendi relate to you whether or not it was Joe's idea that she

14     go back to work or remain at home and take care of the child?

15           A.    At that time I think they were borrowing or

16     being given, I'm not sure which, money to help offset their

17     expenses by I think it was her parents at that point.  And

18     so, yes, he was very anxious for her to be able to get back

19     to work and help support the family.

20           Q.    Okay.  Was Joe resistant to Wendi's friends

21     coming over and admiring or playing with the child?

22           A.    Yes.  And that was the incident that I relayed

23     earlier today about screaming at her, about his fucking blue

24     shirt wasn't ironed or something.  That was in front of a

25     friend that had come to visit the baby.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          Q.    Okay.  Were there other incidents that Wendi

2     related to you where Joe exhibited behavior that led Wendi to

3     believe that her friends were not welcome to come see the

4     child?

5          A.    Yes.  I mean, he would yell things at her about

6     her needing to do other things at that time, letting the

7     visitor know they were not welcome.  He at one point even

8     yelled "What are you doing?"  At that point he needed her to

9     do whatever it was that he needed her to do.  So certainly

10    not making anyone feel welcome in the home.

11         Q.    How about with regard to their sexual

12    relationship after the birth of the child, Nicolas?  Was that

13    problematic as related to you by Wendi?

14         A.    Yes.

15         Q.    In what regard?

16         A.    It's a particular incident that stands out in

17    my mind.  Wendi was just a couple of weeks post partum.

18         Q.    You mean after birth?

19         A.    After birth, so before that six-week period

20    that the doctor says that you can engage in sex.  And Joe let

21    her know that he wanted to have sex and she said no, not

22    yet.  And he started to pull her arm.  She was sitting, I

23    think, on the couch and he was pulling her arm and they had a

24    dog, and the dog obviously witnessed Joe doing this to Wendi

25    and so the dog began to growl at Joe.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1      Q.    Okay.  This dog have a name?

2      A.    Max.

3      Q.    Okay.

4      A.    Joe became enraged at the fact that the dog was

5  now growling at him and his wife is saying no, and so he

6  grabbed the dog and pinned him to the floor with one hand and

7  with the other hand held his mouth shut so that he couldn't

8  bark or growl.  And there's a quotation --

9      Q.    Okay.  What did Wendi relate to you that he

10  said at the time that he had the dog pinned to the floor at a

11  time when he was demanding that Wendi perform sex for him?

12      A.    Well, what Wendi said was, "If you don't start

13  doing what I'm telling you to do, I'm going to kill this

14  fucking dog."

15      Q.    Did Wendi relate to you she had an emotional

16  response to this situation?

17      A.    That she was crying.  At the same time the baby

18  started to cry.  She nursed the baby -- she stopped, nursed

19  the baby to soothe him, put him back down, and then went with

20  Joe into the bedroom and engaged in sex.

21      Q.    Okay.  And, again, did they relate to you what

22  she said or did you quote it in your report?

23      A.    She said "Please stop, I'll do whatever you

24  want, please stop."

25      Q.    And did she relate to you the sum and substance

1    of the sex act that was done at that time?

2          A.    She did.

3          Q.    What did she say?

4          A.    She reported crying because of the discomfort.

5    Reports that it was very quick, no affection, no foreplay,

6    just quick.

7          Q.    All right.  At or near this time, did Wendi --

8    did Wendi relate to you facts at or near this time that

9    evidenced her desire to maybe leave Joe at this time?

10         A.    Yes.

11         Q.    What did she say?

12         A.    She made a call to the man who had been Joe's

13    silent partner in the glass business because she knew that he

14    had money and because he was, I believe, a friend of her

15    father's.  So there was a relationship.  So she called and

16    told him about her plan to leave and he gave her a small sum

17    of money to enable her to do that.

18         Q.    Okay.

19         A.    So she -- so she planned to do it, and in the

20    planning, Joe, I think, was away for a couple of days and was

21    going to leave -- she was going to leave the next morning,

22    Joe was still away.  She wrote a note to him, left it out,

23    was going to leave in the morning, but he came home

24    unexpectedly, read the note, woke her up and --

25         Q.    What did she say was his response to

1    discovering that she was about to leave him?

2         A.    He was shaking her and screaming at her, "Why

3    are you doing this to me?"  But he was also crying and she

4    felt badly for him and his upsettedness and believed that she

5    should not leave.

6         Q.    Okay.  And, again, in research, in your

7    clinical experience, is this typical behavior for abuse

8    victims?

9         A.    It's very typical.  The numbers change with the

10   research that comes out so I've read different things, but

11   the research says somewhere between five to eight times it

12   takes for a woman to actually leave for good.  So there are

13   many attempts generally before she really leaves.

14        Q.    Okay.  Did Wendi relate to you exactly where

15   she had expected to go?  Let's talk about the particulars.

16   Your report indicates she told you how much money she

17   received from this gentleman?

18        A.    I think it was $1000.

19        Q.    And this gentleman's name was Jerry Robles?

20        A.    Yes.

21        Q.    Did she tell you where she intended to go with

22   this thousand dollar opportunity, where she would go?

23        A.    There was a friend she was going to visit.  I

24   don't remember where it was, but I know it was in another

25   state.

1          Q.    After that did Wendi report to you -- strike

2    that.

3                Did Wendi report to you there was a change in

4    perceived behavior and perceived relationship after that

5    particular episode?

6          A.    Yes.  It would be like that honeymoon phase we

7    talked about a little bit earlier.  I think it was nice, he

8    did more things for her for a short period of time.

9          Q.    Okay.  And how does that in the research, in

10   your clinical experience, impact the abused person, all of a

11   sudden this abuser is now doing nice things?

12         A.    Uh-huh, yes.  The research calls that

13   intermittent episodes of violence, meaning that the violence

14   in many cases is not constant.  There's often periods of good

15   times, which has a couple of effects.  One is okay, things

16   are going to get better now.  I just have to work harder at

17   it.  He's come around, things are going to be okay.  That's

18   one way the person could look at it.

19         Q.    Which is kind of a self-fulfilling prophecy on

20   the part of the abused, right?

21         A.    Right.  But the other way is "Oh, my God, I'm

22   losing my mind.  I don't know what's happening here.  One

23   minute he's like this, other minute he's like that, and this

24   control that I think I have over him, I can't -- I can't wrap

25   my head around it anymore.  I don't know which way any

1    particular moment he's going to go."

2         Q.    All right.  I understand at about this time

3    Wendi relates that she and Joe moved into a different

4    apartment?

5         A.    Yes.

6         Q.    Okay.  And in general their economic

7    circumstance, did it stabilize briefly?

8         A.    Things got better.

9         Q.    Okay.  But, again, is there something that

10   causes problems for this relationship as related to you by

11   Wendi?

12        A.    Well, they were able -- they were able to leave

13   the little building on the farm and move into the apartment

14   that went with her new job.  But Joe was concerned about dad,

15   not knowing that things were getting better, that the -- he

16   just didn't want him to know a lot at this point.  So they

17   actually left in the middle of the night instead of packing

18   up in the daytime and moving out because of that.  And then

19   Joe started really experiencing neck pain again after a short

20   period of time.

21        Q.    All right.  And was it about this time that

22   they had sent the slides, if you will, of the biopsies to an

23   independent source to determine whether or not the original

24   problem had been misdiagnosed by other physicians?

25        A.    I know he got the diagnosis of cancer at this

1      time.

2              Q.      Okay.

3              A.      And I know that she was pregnant with the

4      second child at this time.

5              Q.      All right.  So just when things are starting to

6      get normal, so to speak, he has the setback because it's

7      actually now that he knows it's cancer?

8              A.      Correct.

9              Q.      Okay.

10             A.      Correct.

11             Q.      There's apparently another child on the way?

12             A.      Yes.

13             Q.      Okay.  Did Wendi relate to you that at about

14     this time they began searching for other treatments of

15     whatever type and kind in order to deal with his cancer?

16             A.      I believe that is this period of time -- I know

17     that when the cancer was diagnosed, Joe was given a very

18     dismal prognosis by the doctor.  And I believe that's what

19     led to looking for alternative treatment.

20             Q.      Okay.  And what did Wendi relate to you that

21     they explored in terms of alternative treatments?

22             A.      I think it may have been called, like, a

23     holistic treatment.  They -- I don't know who found it, but

24     somebody found it and it was located in Colorado and his

25     sister helped to raise money to help pay for those expenses

1    by holding a dinner dance, and that helped pay those expenses

2    so that he could avail himself of that particular treatment.

3         Q.    Okay.  Did they also resort to faith healing?

4         A.    They did.

5         Q.    Tell me about that.

6         A.    Wendi's church in faith healing and laying of

7    hands, and one of the things they tried was to have this done

8    for him.  And actually what happened was he was having pain

9    and they went to church and someone did this and the pain

10   stopped, so it helped Joe to believe that this could be a

11   viable option.

12        Q.    Okay.  It reinforced his belief that maybe this

13   was a way to go?

14        A.    Right.

15        Q.    Okay.  Did Wendi relate to you though at some

16   point Joe came to the conclusion that the faith healing was

17   not working and he blamed that, too, on Wendi?

18        A.    Yes.  That's right.

19        Q.    What did she tell you about that?

20        A.    Well, that when it stopped that it was her

21   fault that it was -- that she was the one who had introduced

22   him to God or her God, I'm not sure exactly how he said that,

23   and that this was all her fault.  So now she was being blamed

24   for the cancer.

25        Q.    All right.  Did Wendi relate to you that Joe

1    was offered the opportunity in order to deal with the cancer

2    either by radiation or radiation and chemotherapy as a

3    treatment mode?

4          A.    Yes.

5          Q.    And what did Wendi relate to you that Joe

6    decided in that regard?

7          A.    He chose not to use radiation, but I believe he

8    chose to use chemotherapy.

9          Q.    Okay.  And initially was there an initial

10   reluctance on Joe's part as reported by Wendi to not do

11   either radiation or chemotherapy?

12         A.    Initially, yes.

13         Q.    Okay.  Was that because of the chances of

14   success?

15         A.    Yes.  He still believed that he was going to

16   have a 30 percent chance of living regardless and there were

17   terrible side effects, of course, associated with either

18   treatment.

19         Q.    Okay.  Had there been during this time a

20   cessation, if you will, of the -- the sexual frequency

21   between the two parties?

22         A.    There was a period in time I -- I remember that

23   she said that he -- when they returned from Colorado that the

24   daily sex resumed.  So I'm assuming that it had stopped for a

25   period of time, but I don't know how long it stopped for.

1          Q.     Okay.  In any event, after the cessation did it

2     pick up and resume?

3          A.     Correct.

4          Q.     Is it a more normal sense of frequency, is

5     it -- what was that frequency?

6          A.     Daily.

7          Q.     Is daily sexual intercourse in and of itself

8     evidence of abusive behavior?

9          A.     No.

10         Q.     Okay.  In what context would that be abusive?

11         A.     It's abusive if one person is choosing to not

12    participate but is either being forced or feels like they're

13    being forced.  You know, like there's a ramification for not

14    participating.

15         Q.     Okay.  And in the marital relationship that

16    becomes very problematic because you can't really say no,

17    those kinds of things.  You were telling me something about

18    how in the context of marriage it's a little more difficult

19    to determine true consent.  It's -- it's not like a dating

20    relationship where there's questions, answers, those kinds

21    of --

22         MR. MARTINEZ:  Objection.  Leading.

23         THE COURT:  Sustained.

24         MR. PATTERSON:  Sorry.  I need to get at that issue

25     / / / / /

1    BY MR. PATTERSON:

2         Q.    Can you tell me about that issue?

3         A.    I'm not sure what you're asking me.

4         Q.    Okay.  All right.  Let me go back then to what

5    you told me, that it is problematic if it is daily and

6    unwanted by one of the parties?

7         A.    Right.

8         Q.    Okay.  In the marital context is there often

9    times difficulty in establishing whether or not one of the

10   participants wants it or doesn't want to engage in that

11   behavior?

12        A.    Well, you're referring to a wife's decision to

13   not specifically say no because of ramifications?  Sure.

14        Q.    Okay.  That's what I'm driving at.

15        A.    Okay.

16        Q.    In that context, is there a different dynamic

17   at work here?

18        A.    Yeah, fear.

19        Q.    Okay.  Did Wendi relate to you an incident in

20   the hospital where Joe manifested some rage and some temper,

21   dissatisfaction with the nursing staff there at the hospital?

22        A.    It was after one of the surgeries when he had a

23   tracheotomy.

24             MR. MARTINEZ:  I'm going to object.  Lack of

25   foundation.  Which one?

1          THE COURT:  Sustained.

2     BY MR. PATTERSON:

3          Q.    Page 11 of your report, next to last paragraph,

4     does that help you recall specifics?

5          A.    Yes.

6          Q.    Okay.  What surgery was it?

7          A.    This was surgery number 4.

8          Q.    Okay.  And on what date was that performed.

9          A.    August of 1998.

10         Q.    Which coincidentally was?

11         A.    She was -- oh, her birthday.

12         Q.    Wendi's birthday?

13         A.    Right.

14         Q.    Okay.  Tell me about that incident?

15         A.    Well, she was eight months pregnant and they

16    had done the surgery, and part of the surgical procedure was

17    to do a tracheotomy.  He was angry, angry about what had --

18    what was happening to his body, became enraged at the nurse

19    and threw a clipboard at her.

20         Q.    Okay.  This was observed by Wendi?

21         A.    Yes.

22         Q.    Okay.  And she related that to you?

23         A.    Yes.

24         Q.    Did Wendi relate to you Joe's reticence or

25    reluctance to engage in the radiation and chemotherapy

1    treatment for his cancer?

2         A.    Yes.

3         Q.    What did she tell you in that regard what the

4    side effects would be?

5         A.    Oh, his salivary glands would become burned,

6    his teeth would become badly decayed and most likely be

7    extracted.  He would lose a lot of weight and most likely

8    become very nauseous.

9         Q.    After the fourth surgery did Wendi relate to

10   you that she acquired a new job?

11        A.    Yes.  And in my report I did not put where that

12   job was located.

13        Q.    Okay.

14        A.    But I recall that it was on Camelback Road

15   or -- it was quite far from where they had been.  I remember

16   that.

17        Q.    Okay.  Do you recall the facts and

18   circumstances related to you by Wendi as to why that job was

19   a brief duration and they moved on to another job?

20        A.    Yes, because that job, for whatever reason, did

21   not include an apartment for them to live.

22        Q.    It was a resident manager job at an apartment

23   complex?

24        A.    Yes.

25        Q.    But it did not include as one of the

1   benefits --

2            A.    An apartment for the family to live in.

3            Q.    Okay.  So that particular job was --

4            A.    Shortlived.

5            Q.    -- shortlived?

6                  Okay.  What was the next position that she took

7    in terms of employment as related to you by Wendi Andriano?

8            A.    I believe it was San Riva.

9            Q.    Okay.

10           A.    Yes, San Riva.

11           Q.    At or about this time, did Wendi indicate that

12   she and Joe talked to a lawyer about possible malpractice

13   lawsuits?

14           A.    Yes, because of the misdiagnosis.

15           Q.    Okay.  Did she relate to you that was a joint

16   effort on the part of both she and Mr. Andriano?

17           A.    Yes.

18           Q.    Okay.  All right.  At or about what time did

19   Wendi and Joe move into the San Riva apartment complex?

20           A.    September or October of '99.

21           Q.    Okay.  Was there, as related by Wendi, a change

22   in Joe's conduct in general after they moved into that

23   apartment complex?

24           A.    Yes.

25           Q.    What did she relate to you in that regard?

1      A.     He -- prior to that time he was taking pretty

2  good care of himself, following the Colorado sort of

3  homeopathic regimen.  He was eating healthy, doing those

4  sorts of things, and at this point in time he stopped that

5  and sort of resumed old ways and the partying and the

6  drinking stuff again.

7      Q.     Okay.  So once again we see a period of time

8  where there's kind of a cessation of the battering behavior

9  kind of a honeymoon between two parties?

10     A.     Yes.

11     Q.     Okay.  But that ended apparently with Joe

12  changing in that regard to his eating habits?

13     A.     And becoming demanding again --

14     Q.     Okay.

15     A.     -- about picking out his clothes.  She had two

16  little ones, very little ones, and working full time.  If she

17  didn't have time in the morning to lay out his clothes for

18  him, that was enough reason for him to become really angry

19  again.

20     Q.     Okay.  Did Wendi relate to you on top of the

21  clothing that Joe had a preference as to what she would wear?

22     A.     I don't remember if there was a preference for

23  something, but I know what he didn't want.

24     Q.     Okay.  A prohibition?

25     A.     Prohibition was against wearing black.

1    Q.   Okay.  And, again, did she give you his

2    sentiments in that regard and cause you to quote them in your

3    report?

4    A.   Well, she was required, I guess to wear black

5    suits for business reasons, whatever, and she told me that he

6    said Those fucking bastards making you wear that shit, so

7    expressing anger at the establishment for making her wear

8    something that he otherwise would not have allowed her to

9    wear.

10   Q.   And, again, going back to the research and

11   clinical experience here, is that a manifestation of

12   controlling behavior?

13   A.   Yes, it is.

14   Q.   Okay.  At or near this time, and, again, the

15   precise chronology is not -- I don't know exactly at this

16   point, but during the course of trial we heard about an

17   incident involving a return from a Las Vegas trip that Wendi

18   had participated in with her mom and her friend.  Did Wendi

19   relate the sum and substance of that incident to you?

20   A.   Yes.

21   Q.   Okay.  Tell me about that incident?

22   A.   I believe it was she was with her mother and

23   her cousin, Barbara.  She had gone to Vegas.  I don't

24   remember what the reason was.  I think it was to relax and

25   have a good time.  I don't remember anything else about

1    that.  They were going to be gone a couple days.  They had a

2    return flight and the day before they were scheduled to fly

3    home, so.I think this would have been a Saturday, he started

4    calling and called numerous times telling her she really

5    needed to come home that day and she refused.  So they flew

6    home on Sunday.

7              The flight was delayed.  I don't remember by

8    how long, but when Joe arrived to pick the three women up, he

9    parked in the lane in which you don't normally park in, so

10   there was still moving traffic.  He was very angry, got out

11   of the truck, took their bags, threw them -- I don't know if

12   it was a truck -- took their bags, threw them inside the

13   vehicle and sped off.

14             On their way home, both the mom and the cousin,

15   as reported to me through the interview, collateral

16   interviews, said that he drove about 100 to 110 miles per

17   hour.  They had they could see the speedometer from where

18   they were sitting inside the truck.

19        Q.   Okay.  How is that incident relevant to your

20   determination and assessment in this particular case?

21        A.   Well, it certainly is another way to instill

22   tremendous fear.  Both the mother and the cousin relayed

23   their fear.  They were only going to be passengers for the

24   period of time it took to get there.  Wendi was a passenger

25   frequently.  Driving out of control or at -- I don't know if

1    it's out of control, but driving at an excessive speed can

2    certainly be frightening and intimidating.  So that's just

3    one more piece of information.

4         Q.    Is it also an example of random and erratic

5    behaviors that are controlling to the person that's

6    observing?

7         A.    Right.

8         Q.    Okay.  During the period of time that they're

9    at San Riva in the early months there, did Wendi relate to

10   you that Joe became more critical of her performance in terms

11   of keeping the house, taking care of the kids, cooking

12   dinner, that kind of thing?

13        A.    Are you referring -- tell me exactly what time

14   you're talking about.  This would be fall of '99?

15        Q.    I'm sorry, Spring of 2000.

16        A.    Okay.

17        Q.    Let me walk you back a little bit.

18        A.    Okay.

19        Q.    Did Wendi relate to you that Joe received a

20   report concerning the condition of his cancer that caused Joe

21   to react in a certain fashion?

22        A.    Yes.

23        Q.    Okay.  What was that about?

24        A.    As I recall her story, he was experiencing

25   mouth pain, went to the dentist, dentist did an x-ray, so it

1    was actually the dentist that discovered there was another

2    tumor.  So this then prompted another round of medical

3    intervention leading up to him being more tense and angry and

4    rageful and choosing whatever she was doing, it was the wrong

5    thing, and a lot of yelling and things like that.

6          Q.   Okay.  Did Wendi describe to you what would

7    happen when she would come home, make dinner for him and he

8    didn't care much for what she created for him?

9          A.   He'd throw it out, complain about it, whatever.

10   It was at this point that she was becoming extremely

11   careful -- some people call this hypervigilance.  Your

12   victim's -- the victim gets very good at scanning their

13   environment.  So she never knew which Joe was going to be

14   inside when she opened the door.  So she took great pains to

15   try to figure out what it was that he would want to give them

16   happy time or make him happy.  So she'd ask him repeatedly

17   what do you want for whatever, thinking if she asked him

18   enough, he would finally tell her what he really wants and

19   then she could help with that.

20         Q.   Did she relate to you he was critical of her

21   mothering skills with the children and overall perception of

22   his change in personality?

23         A.   If she had been a better mother she would have

24   been able to keep the kids quiet.  Any kind of noise was

25   disruptive and disturbing to him so that she ended up running

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    the washing machine in the middle of the night after he'd go

2    to bed so that it didn't give him another reason to become

3    rageful.

4         Q.    Did she relate to you her perception of Joe

5    because of his condition?

6         A.    He had officially given up, given up on her as

7    well, so the rages became more frequent.

8         Q.    What was Wendi's response to this behavior on

9    or about that time at least as related to you by Wendi?

10        A.    That in order to be a good Christian wife, she

11   needed to make things better.  In order to make things better

12   for Joe, she needed to do whatever he would need or want to

13   be that good Christian woman.

14        Q.    So she related to you a willingness to do

15   whatever he thought was appropriate at that time?

16        A.    Uh-huh.

17        Q.    Okay.  On or about this time -- let me back

18   up.  Did Wendi relate to you that on or about this time she

19   developed a relationship with a tenant at the San Riva

20   apartments?

21        A.    Yes, she did.

22        Q.    Okay.  Did she name that man for you?

23        A.    Yes, she did.

24        Q.    What was his name?

25        A.    It was Rick Freeland.

1        Q.      Okay.  Did she explain to you at what point in

2    her life she was when she met this gentleman?

3        A.      Well, chronologically, this is now Spring of

4    2000, things are pretty bad.  Joe's ill.  His rages are more

5    and more frequent.  She's lived through the gun incident,

6    gun being held out against her from across the room, the

7    threat of his killing the man that was his silent partner.

8    She's had quite a long history now with Joe.

9        Q.      Okay.  Was it as it related to her as related

10   by her to you, was that moment in her life a low point?

11       A.      Very low.

12       Q.      Okay.  Did she relate to you that her

13   colleagues at work were encouraging her to do any particular

14   thing with regard to Joe?

15       A.      One in particular was really encouraging her to

16   give Joe an ultimatum in order to get through this difficult

17   time.  Her last name is rather -- it was a long name and it

18   began with an "H"?

19       Q.      Hashisaki?

20       A.      Yes.

21       Q.      Okay.  So they met the gentleman, Rick

22   Freeland.  He was a tenant apparently at San Riva?

23       A.      I believe so.

24       Q.      Did Wendi relate to you how that relationship

25   started?

1        A.     Started as sort of a friendship.  He was a nice

2    guy.  She told him what was happening in her own life.  I

3    believe he told her that he had recently lost his fiancee to

4    death, and so they shared, sort of, an emotional attachment.

5        Q.     Did she relate to you what she was seeking in

6    terms of a relationship with this gentleman?

7        A.     Companionship, support, somebody to just talk

8    to.

9        Q.     Okay.  Did she have desires or need with regard

10   to sex with this particular gentleman?

11       A.     I don't believe she had any desire to have sex

12   with him.

13       Q.     Okay.  Did she indicate at some point she did

14   engage in sexual activity with him?

15       A.     She did.

16       Q.     Did she give you an explanation or reason for

17   that?

18       A.     Well, yes.  The explanation was that's what's

19   expected and that's what you do.

20       Q.     Okay.  And what did she expect in return?

21       A.     Hugging, affection, somebody who would listen,

22   somebody who would express care and support for what she was

23   living with.  Somebody she could have sort of an escape to

24   from what was going on at home.

25       Q.     Did she describe any particular activity she

1    attributed to doing with Rick that Joe wouldn't do with her?

2         A.    Dancing.

3         Q.    Did she describe for her feelings about this

4    gentleman in terms of his emotional components, what kind of

5    characteristics did she describe of this Mr. Freeland?

6         A.    Warm, caring, sharing.  He shared his own

7    personal story with her.

8         Q.    Okay.  And compassionate?

9         A.    Compassion, mm-hmm.

10        Q.    And did she counterpose his characteristics

11   with what she was experiencing from Joe at home?

12        A.    Yes, correct.

13        Q.    Okay.  Did you go over this quickly?

14        A.    Well, this is at time in which I said a few

15   minutes ago when she -- when she opened up the apartment door

16   to go home, she wouldn't know which Joe was going to greet

17   her.  This was very different from what she was getting with

18   Rick.

19        Q.    And describing the fact she did have sex with

20   this gentleman, did you attribute to her a statement in

21   quotes in the report?

22        A.    Yes.

23        Q.    What did Wendi relate to you and cause you to

24   quote?

25        A.    "Knowing men, you know, that's what they want.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    If he hadn't wanted to have intercourse, I would have been

2    okay with that.  For me it was an exchange for what I really

3    wanted, someone who really listened and cared about me and

4    showed me affection."

5         Q.    Okay.  Did she indicate to you that Rick

6    Freeland helped her deal with her own problems in some

7    fashion?

8         A.    I think by supporting her, yes.

9         Q.    He helped her in two capacities, mentally and

10   emotionally?

11        MR. MARTINEZ:  Objection.  Leading.

12        MR. PATTERSON:  I'm sorry.

13        THE COURT:  Sustained.

14   BY MR. PATTERSON:

15        Q.    In what fashion did she relate to you that this

16   gentleman helped her out?

17        A.    The way in which she described their

18   relationship was that he was warm and compassionate and

19   supportive, so in terms of being mentally and emotionally

20   helped by this gentleman, it was an important relationship

21   for her for the duration of that relationship.  I believe it

22   was six months.

23        Q.    Did she relate to you what she felt after that

24   relationship was over?

25        A.    Intense sadness.

120

1        Q.      In your report you describe it in a certain

2    fashion.

3        A.      She reported feeling like she'd lost her best

4    friend.

5        Q.      Okay.  Okay.  On or about this time did Wendi

6    relate to you that Joe began another course of treatment --

7        A.      Yes.

8        Q.      -- for his cancer?  What was that?

9        A.      Chemotherapy.

10       Q.      Okay.  And did she describe for you how the

11   chemotherapy seemed to affect Joe?

12       A.      When he would blowup and have a rage, it was

13   followed at least -- at least on one occasion it was followed

14   up by remorse, gift giving.  I think he brought home

15   balloons, and I don't remember if there was a stuffed animal

16   or something like that.  That would be reminiscent of that

17   honeymoon phase that we talked about earlier.

18       Q.      Okay.  Did the chemotherapy -- did Wendi

19   relate to you the chemotherapy made Joe nauseous?

20       A.      What I -- I don't remember about the nausea.

21       Q.      Okay.  Illness of any sort?

22       A.      I remember the crying over what was happening

23   to both of them over this.

24       Q.      Tell me about that.

25       A.      Well, according to Wendi it would appear that

1    Joe was aware of the eruptions and then his attempt at

2    reconciling.  And it was like what is happening here and so,

3    they would just together be just incredibly sad about what is

4    happening here.

5            Q.    Okay.  So there's a little change, adjustment

6    if you will, in Joe's behavior in the -- in the latter months

7    here.  Is that --

8            A.    At least at this particular point in time.  I

9    don't remember Wendi going on into the final months of the

10   relationship talking about him being kind in this way that

11   she did at this point.

12           Q.    Okay.  All right.

13           A.    I'm not sure it was long lasting.

14           Q.    All right.  Did Wendi relate to you about this

15   time that it was a stressful period in both of their lives?

16           A.    Certainly.

17           Q.    Okay.  Did the subject come up in your

18   discussions with Wendi about whether other people had advised

19   her to leave the relationship?

20           A.    Yes.

21           Q.    What did she tell you in that regard?

22           A.    I believe the persons that were sort of

23   encouraging her to leave were women that she worked with.  I

24   imagine they must have been people that she supervised, but

25   they were encouraging her to get on with life.

1      Q.      Did Wendi relate to you whether or not she ever

2  inquired of her mother why she didn't leave?

3      A.      Yes, she did.

4      Q.      What did she tell you in that regard?

5      A.      Her mom said something about not wanting to

6  make -- to fail another marriage because the first one had

7  ended in disaster, that she had been divorced and didn't want

8  to make it a habit of failing marriages.

9      Q.      Okay.  Did she also articulate any religious

10  reasons for not leaving Joe?

11      A.      You're talking about Wendi now?

12      Q.      Wendi, yes.

13      A.      That based on what it means to be a good

14  Christian wife that her job would certainly not to have been

15  to leave.  It would have been to stay and do what she could

16  to be helpful.

17      Q.      We talked about this hypervigilance where she

18  doesn't know what she's going to experience when she comes

19  home.  Did Wendi relate to you that the chemotherapy had an

20  adverse effect on Joe's hair and thus an emotional -- a

21  vanity complex?

22      A.      Yes.

23      Q.      What did she say about that?

24      A.      With that second round of chemotherapy he began

25  to lose his hair and so he asked her to, I guess, shave his

1  head so it would all be the same.  And I guess Nicolas came

2  in and said something like, "Daddy, what happened to your

3  hair?"  And he said, "This is what your mommy did to me."

4       Q.    Okay.  Did Wendi relate that to you in kind of

5  a jesting sense or was it --

6       A.    No.  She was very tearful.

7       Q.    Okay.  And what did you take this to mean?

8       A.    That Joe made an angry statement to the child,

9  gave the child reason to think that his mommy had done

10  something bad to his daddy.

11      Q.    Okay.  All right.  Was there a time at or near

12  this time that Wendi perceived Joe in the midst of a serious

13  physical problem and was inclined to call 911 or some medical

14  problem at that point?

15      A.    Joe evidently had some kind of a -- a feeling

16  like he might have been having like a heart attack --

17           MR. MARTINEZ:  Objection.  Lack of foundation.

18           THE COURT:  Sustained.  Lay some foundation.

19  BY MR. PATTERSON:

20      Q.    Well, did Wendi relate this incident to you?

21      A.    Yes.

22      Q.    It was related to you in the course of the

23  preparation of your assessment?

24      A.    Yes.

25      Q.    Did she tell you what time or date or month it

124

1    was?

2          A.    It was at some point in time in close proximity

3    to the hair issue.

4          MR. MARTINEZ:  Objection.  Leading.

5          MR. PATTERSON:  I'm trying to lay some foundation.

6          THE COURT:  Go ahead restate your question.

7    BY MR. PATTERSON:

8          Q.    In your report do you peg it to a certain point

9    in time either with regard to the chemotherapy treatment, the

10   loss of hair, that kind of thing?

11         A.    Yes.

12         Q.    Okay.

13         A.    What she said was that it must have been around

14   the summer of 2000.

15         Q.    Okay.

16         A.    Because all those incidents seem to go together

17   quite -- quite well.

18         Q.    Okay.

19         A.    The chemotherapy leads to hair loss, leads to

20   the comment, leads to then at some point in time this feeling

21   of I don't know if it was palpitations or something that he

22   was experiencing that frightened him and frightened her.

23         Q.    Okay.  And what did she do in response to that?

24         A.    She told him she was going to call 911 and he

25   wouldn't let her.

125

1      Q.     Okay.

2      A.     So she called her parents.

3      Q.     All right.  What did she do in the manner of

4  assisting Joe at that time?

5      A.     Well, her parents came and I think it was her

6  dad that kind of did some sort of massaging and he -- I think

7  Joe was lying down and over the course of time, I don't know

8  how long, that pain subsided.

9      Q.     Okay.  And how did this impact at least as

10  reported by Wendi, Wendi's emotional condition?

11      A.     Well, I think for Wendi it was the very first

12  time that she came face-to-face with Joe's mortality.  She

13  knew it, of course, because all that information from the

14  doctors was given to the two of them, but now it's right

15  there, it's visible.

16      Q.     Okay.  Coming to grips with his mortality, did

17  she relate to you she now might become a single mother of two

18  people?

19      A.     Single --

20      Q.     Was it in context related to you?

21      A.     Single mom of two very young children.

22      Q.     Did Wendi relate to you that at or near this

23  time Joe became more agitated about his suspicions that she

24  was being unfaithful to him?

25      A.     Yes.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000007421

1        Q.      What did she relate to you in that regard?

2        A.      That on a regular or daily basis he was asking

3    her who she was sleeping with.

4        Q.      Okay.  And was this after she had had this

5    relationship with Rick Freeland?

6        A.      Yes, it was.

7        Q.      Okay.  Did Wendi relate to you whether or not

8    up to this time she had relationships with any other

9    individuals?

10       A.      I do not believe at this point in time that she

11   had had relationships with anybody other than Rick Freeland.

12       Q.      Okay.  And does Wendi relate to you that Joe --

13   at this time his behaviors became even more gross, more

14   Exaggerated?

15       A.      Yes.

16       Q.      Okay.  What did she say to you in that regard?

17       A.      Well, she gave an example of what happened on

18   her birthday.

19       Q.      Okay.  What did she tell you in that regard?

20       A.      Well, typically, they would do something.

21       Q.      Let's back up a little bit.  Did Wendi relate

22   to you that she welcomed the opportunity to go out and get a

23   break from her home life?

24       A.      Going out with her female friends, yes.

25       Q.      Okay.  And did she tell you whether or not the

1    frequency of that increased or decreased?

2         A.    I believe that it increased.

3         Q.    Okay.  All right.  Specifically then on her

4    birthday, how did it come about that she wound up going with

5    her friends rather than with Joe?

6         A.    Joe refused to go.

7         Q.    Okay.  Refused to take her out on her birthday?

8         A.    Correct.

9         Q.    All right.  So in response to that, what

10   happened?  What did she do?

11        A.    Okay.

12        Q.    And what did she relate to you in that regard?

13        A.    She went out with her friends, was according to

14   Wendi, about 10 minutes late coming home and he was waiting

15   for her.  He had left the kids alone and asleep in the

16   apartment so he could wait for her in her office.  She had in

17   her hands a cell phone and a wine cooler.  He grabbed the

18   wine cooler and smashed it while screaming in her face and

19   then smashed her phone on the ground with his foot, and

20   basically had her by the arm and was pulling her home.  This

21   was done in front of her friends, who were not just friends

22   but they, I believe, were also the people who worked for her.

23        Q.    Well, and were you aware that there was a

24   superior-subordinate relationship between Wendi and the

25   colleagues there?

1      A.     Yes.

2      Q.     Okay.  So it was done in front of persons that

3  she supervised?

4      A.     Supervised, correct.

5      Q.     Okay.  Did that cause her any additional --

6      A.     Shame and embarrassment.

7      Q.     Okay.

8      A.     Sure.

9      Q.     All right.  And was this according as to Wendi

10  kind of the first public display that she could recall?

11      A.     Public in that manner.  There had been a time,

12  would have been quite a few years before this, that her

13  father had seen a little bit.  So public in front of him on

14  one occasion.

15      Q.     Okay.  But is there a distinction to be drawn

16  from acts of the batterer that are done truly in public as

17  opposed to done in the context of family --

18      A.     Sure.

19      Q.     -- or friends?

20      A.     Sure, sure.

21      Q.     Okay.  Tell me about that.

22      A.     Well, in front of public and in front of your

23  subordinates, that's -- you derive a sense of shame that's

24  quite different from just having your dad maybe know a little

25  bit.

1        Q.      Okay?

2        A.      But this was quite clear because of his actions

3   with the bottle and the phone and the stomping and the

4   yelling.  That's very visible.

5        Q.      All right.  Now, did Wendi relate to you on

6   that occasion did Joe physically harm her?

7        A.      He grabbed her I think by the arm and pulled

8   her home.  I don't -- I don't think he did anything else.

9        Q.      Okay.  How then is that behavior relevant to

10  your assessment diagnosis and opinion in this case?

11       A.      The controlling, the intimidation, just another

12  example.  It's ongoing.  The ante has been upped because it's

13  now in a public display.

14       Q.      Okay.  Did Wendi relate to you in terms of this

15  escalating public behavior that Joe now would do things

16  outside of her office he may not have done previously?

17       A.      There were a couple things.  One actually is

18  inside the office, I guess, because it was constantly calling

19  her on the phone, making sure she was there, making sure he

20  knew where she was.  The certain thing would be laying on the

21  horn, getting in the car, driving it around to the office and

22  just honking the horn until she'd come out.

23       Q.      Okay.  Did Wendi describe to you a change in

24  the tension in the family environment at or near this time?

25       A.      There were a couple of things I think that were

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1  going on at the same time.  I think that the way she reported

2  it to me it sounded like he was aware, you know, she -- he

3  was at her but she was somehow able to hold on enough to work

4  full time and manage to take care of kids, take care of the

5  house, and do whatever he needed, so she had not shriveled

6  up.

7       Q.    Okay.

8       A.    At the same time she reports seeing or thinking

9  that he was pulling away from her and the children, spending

10  less time there, going without her to the lake which

11  previously he would not have done.  He always wanted her with

12  him, so she sensed that he was starting to pull away from

13  them, from her and the kids.

14       Q.    Okay.  Did she relate to you whether or not Joe

15  took trips to the other states to visit relatives?

16       A.    He may have gone to Oklahoma.  I know that he

17  had gone there in the past and I don't know if that was at

18  this point in time that he did that.

19       Q.    Okay.  During the summer of 2000 did they still

20  have economic issues as a couple?

21       A.    Yes.  He -- he was continuing to buy things for

22  the boats, I believe, and had incurred additional debt that

23  she did not have the wherewithal to pay for.

24       Q.    Okay.  Did Wendi relate to you that at that

25  time Joe directed her to borrow additional funds and the

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1   response at this time was a little different?

2           A.    I know at one time he wanted her to borrow

3   money -- to get money, I should say, but this time she

4   refused.

5           Q.    Okay.  And how did that differ from the

6   previous circumstances here?

7           A.    I think it was the first time that she refused.

8           Q.    Okay.  And how did that impact Joe?

9           A.    Well, I -- I cannot recall what she said

10  specifically about his reaction to that.  I can respond to it

11  as another common reaction because this would be an example

12  of fighting the control --

13          Q.    Okay.

14          A.    -- which generally incenses and rages the

15  person who now sees they're losing control.

16          Q.    Okay.

17          A.    But that was, again, only an isolated incident.

18          Q.    Were there other manifestations of Wendi's

19  resisting a control issue related to you?

20          A.    Well, she was going out more.

21          Q.    Okay.

22          A.    So that's an indication of maybe developing a

23  sense of self.  I don't recall more than that.

24          Q.    All right.  Let me take your attention to about

25  September or so of 2000.  Did Wendi relate to you an episode

1    where she was out with her colleagues and she got a call from

2    Joe?

3        A.    I think this is the softball game?

4        Q.    Uh-huh.

5        A.    Okay.  She had gone to a softball game with her

6    friend, Chris, and he called her on her cell phone.  And I

7    think she was en route to the game at the time that he called

8    her and asked her to go to the store.  Maybe she was already

9    there, I don't remember.  He wanted her to stop --

10       Q.    Page 16 --

11       A.    -- what she was doing.

12       Q.    -- you reflect on that incident.  Would that

13   assist you in getting the details?

14       A.    Yeah.  I'm still not sure the way I wrote this

15   whether or not she was there or en route, but in any event

16   what he was asking her to do was stop what she was doing and

17   go to the store and buy a cheese crisp and bring it home to

18   him and she said no.

19       Q.    In and of itself is that problematic, absent

20   some kind of long term relationship where there are problems?

21       A.    No.

22       Q.    Okay.  But how is it problematic in the context

23   of Joe and Wendi?

24       A.    Well, if he feels like she's pulling away and

25   she's exerting independence, although minisculely, that's

1  just one more sign to him that she's becoming her own person,

2  independent, able to assert herself to some small degree.

3       Q.    Okay.  And what did she relate to transpire

4  that further?

5       A.    Because she refused.  He kept calling her cell

6  phone repeatedly and screaming at her to come home.

7  Eventually she did and he started screaming at her about why

8  did it take you so long and accused her of having slept with

9  someone.

10      Q.    Okay.  Again, that infidelity issue?

11      A.    Infidelity, right.

12      Q.    Okay.  Was there a confrontation when she got

13  home?

14      A.    Yes.

15      Q.    What happened?

16      A.    She, as I've stated repeatedly, she went into

17  the bedroom to get away and he followed her, screaming at her

18  the accusations about her having slept with somebody and her

19  way of pacifying him in the long term had always been tell me

20  what you need, tell me what you want, I'll give you what you

21  need, I'll give you what you want, and while she's doing this

22  she's also climbing into bed.  And he went out into the

23  kitchen, got a pitcher of Kool Aid, poured it on her and

24  started smashing things and broke, I believe, a couple

25  dresser drawers, broke, I think it was, the foot board of the

1    bed, and somehow -- whatever he had done to the bed, the bed

2    crashed to the floor with her still in it.

3          Q.    What did Wendi relate to you was her response?

4          A.    She was terrified.  She picked up the phone to

5    call Joe's sister, I don't know which sister, and he grabbed

6    the phone away from her and said to the sister in a very calm

7    voice "She's tripping, she's just tripping."

8          Q.    Did he hang up the phone?

9          A.    I -- let's -- he was calm and I don't remember

10   if he hung it up, but I know that as soon as he was finished

11   he began screaming at her again.

12         Q.    Okay.  So Wendi related to you that he

13   terminated the phone call between --

14         A.    I believe --

15         Q.    -- he and the sister?

16         A.    -- that is the case, yes.

17         Q.    Okay.  Did he then -- after the phone call was

18   terminated, did Wendi relate to you what he did?

19         A.    Just that he started screaming at her all over

20   again.

21         Q.    Does this constitute, in terms of what Wendi

22   related to you, the one time and only time that she ever

23   reported to some other person in Joe's presence the fact that

24   there was a violent act occurring?

25         A.    In Joe's presence?

1        Q.      Uh-huh.   Well, in general did she report any of

2    this conduct that you described for us to law enforcement?

3        A.      No, not to law enforcement, no.

4        Q.      Okay.   Did she ever report this conduct to

5    friends and family, at least as related to you by Wendi?

6        A.      Well, that's what I'm thinking about right now,

7    because her girlfriends at work, the people who were her

8    subordinates, obviously knew something because they were

9    encouraging her to, you know, be able to live.

10       Q.      Okay.   But Wendi didn't report to you the

11   detail of those discussions?

12       A.      No.

13       Q.      Okay.

14       A.      No.

15       Q.      Okay.   So in terms of actual knowledge of

16   reporting something to a third party while it was ongoing,

17   this appears to be the first time?

18       A.      While it was ongoing?   I'm struggling with this

19   because I remember that there was a time I think it was in

20   her parent's driveway that -- I think it was her father who

21   saw Joe push her.   I think he tried to intercede.   He talked

22   to her the next day, tried to talk her into leaving him.   At

23   some point he saw some bruising.   I don't think it was a lot.

24   I think he saw --

25              MR. MARTINEZ:   I'm going to object.   None of this has

136

1    been disclosed to the State.

2            THE COURT:  Sustained.  Let's move on.

3    BY MR. PATTERSON:

4        Q.    My question just relates to one issue, that she

5    actually reported the problem to some other person in some

6    fashion?

7        A.    Yes.

8        Q.    Okay.

9            MR. PATTERSON:  Judge, would this be a good time to

10   quit?

11           THE COURT:  Okay.  We'll go ahead and take our

12   evening recess at this point in time.  During this recess

13   remember the entire admonition I've given you, including the

14   fact you're not to discuss this case with anyone, do not let

15   anyone discuss the case with you.  Do not do any research,

16   investigation experimentation or testing on your own, avoid

17   any media coverage of the case, Keep an open mind.  And have

18   a nice evening.  We'll see you tomorrow at 1 p.m.  Have a

19   nice evening.  We'll be in recess.

20

21           (Evening recess.)

22

23

24

25

137

```
1

2

3                    CERTIFICATE OF REPORTER

4

5   STATE OF ARIZONA     )
                         )
6   COUNTY OF MARICOPA   )

7

8              I, Traci L. Wheeler, CSR, RPR, an official

9   and certified reporter in the Superior Court of the State

10  of Arizona, in and for the County of Maricopa, hereby

11  certify that I made a shorthand record of the proceedings

12  had in the within case, and that the foregoing transcript

13  is a full, true, and correct transcription of the

14  proceedings in this case.

15              Dated this 5th day of May, 2005.

16

17

18              _____
                Traci L. Wheeler, CSR, RPR
19              Certified Court Reporter No. 50313
                Official Court Reporter
20

21

22

23

24

25
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000007433

# APPENDIX L



05-0002
Braccio

DP

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

STATE OF ARIZONA,                )
                                 )
                Plaintiff,       )
                                 )
        vs.                      )        No. CR2000-096032
                                 )           CR05 0005-AP
WENDI ELIZABETH ANDRIANO,        )
                                 )
                Defendant.       )
_____)


BEFORE:   THE HONORABLE BRIAN K. ISHIKAWA


Mesa, Arizona
December 9, 2004


REPORTER'S TRANSCRIPT OF PROCEEDINGS
(Trial)


COPY

SHARON FLORES
CERTIFIED COURT REPORTER
50374

2

1

2

3                    A P P E A R A N C E S

4

5

6

7        For the State:

8                           Mr. Juan M. Martinez

9                           Deputy County Attorney

10

11

12

13

14        For the Defense:

15                           Mr. Daniel B. Patterson

16                           Mr. G. David Delozier, Jr.

17                           Office of the Public Defender

18

19

20

21

22

23

24

25

3

1

2

3                         I N D E X

4    WITNESSES:                                    PAGE

5

6       CHRIS VARGAS

7          Direct Examination by Mr. Martinez        6

8          Cross-Examination by Mr. Martinez        13

9

10      JIMMY GALYON

11         Direct Examination by Mr. Delozier       24

12         Cross-Examination by Mr. Martinez        29

13         Redirect Examination by Mr. Delozier     34

14

15      LINDA GALYON

16         Direct Examination by Mr. Delozier       36

17         Cross-Examination by Mr. Martinez        43

18         Redirect Examination By Mr. Delozier     45

19

20      SHARON MURPHY

21         Direct Examination by Mr. Patterson      47

22         Cross-Examination by Mr. Martinez        67

23         Redirect Examination by Mr. Patterson    82

24

25

4

1

2

3                                I N D E X (Continued)

4    WITNESSES:

                                                           PAGE
5

6       DONNA OCHOA

7          Direct Examination by Mr. Delozier
                                                            85
8          Cross-Examination by Mr. Martinez
                                                            116
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

5

1

2

3                           E X H I B I T S

4

5           (Exhibits were marked prior to trial unless

6    indicated.)

7

8    NUMBER:              DESCRIPTION          MARKED      ADMITTED

9     543                 Record                            116

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

6

PROCEEDINGS

THE COURT:  This is Cause Number CR2000-096032, State of Arizona versus Wendi Elizabeth Andriano.

The record will reflect the presence of the defendant, counsel and the jury.

Mr. Delozier.

MR. DELOZIER:  Thank you, Your Honor.

THE COURT:  Please step forward up here.  Please give the clerk your name and she will swear you in.

(Witness sworn.)

THE COURT:  Please have a seat on the witness stand.  Please make yourself comfortable.  Pull the microphone close to you.  Please speak loudly and clearly. Also, please wait until the question is complete before you answer the question.  And please make sure that you give a verbal answer.

Is that agreeable, sir?

Mr. Delozier, you may proceed.

MR. DELOZIER:  Thank you, Your Honor.

1                         CHRIS VARGAS,

2    called as a witness herein, having been first duly sworn,

3    was examined and testified as follows:

4

5                      DIRECT EXAMINATION

6    BY MR. DELOZIER:

7         Q.   Please state your name?

8         A.   Chris Vargas.

9         Q.   What do you do, Mr. Vargas?

10        A.   Chief deputy with Penal County Sheriff's Office.

11        Q.   How long have you had that position?

12        A.   Four years.

13        Q.   What did you do before you became chief deputy of

14   the sheriff's office?

15        A.   Spent about two years working in a justice court

16   of Pinal County and prior to that I was a police officer,

17   police lieutenant for Casa Grande police for 20 years.

18        Q.   Police lieutenant for the Casa Grande police?

19        A.   Yes.

20        Q.   That's the city?

21        A.   Yes, sir.

22        Q.   Are you familiar with the Achoa family, Donna,

23   Alejo and Wendi?

24        A.   Yes, I am.

25        Q.   When did you meet them?

1      A.    About 1978.

2      Q.    And what kind of relationship did you have from

3 '78 forward?

4      A.    I met them when I first started going to 91st

5 Psalm Church in Casa Grande.  They were one of the few

6 people I met and became good friends with.

7      Q.    How would you describe your relationship with

8 them?

9      A.    With Donna and Alejo.

10     Q.    Yes?

11     A.    Very close relationship.  I was a new Christian

12 at the time and they played a large role in my, I guess, my

13 Christian upbringing or my Christian walk as far as

14 applying the Bible to my life.

15     Q.    And how about Wendi, when did you first meet her?

16     A.    Same time, about.  She was about eight years old.

17     Q.    And did you have a relationship with Wendi?

18     A.    Just with minor interaction with her parents.

19 There were different church activities I would have contact

20 with her like in children's church.  I played a part

21 there.  She'd be in children's church and I would see her

22 there during activities at the church.

23     Q.    Was there a point in time that you stopped having

24 a day-to-day relationship with them, or a week-to-week

25 relationship with the family?

1       A.    Yes.   Probably around, I want to say
2   approximately '86 and '87 and I stopped going to, well,
3   then it changed names, change to a different pastor,
4   Harvest Family Church.   I stopped attending and attended
5   another church.

6       Q.    So you didn't see them as often after that?

7       A.    Not nearly as often, no.

8       Q.    Were you able to have any chance to observe Wendi
9   during these school -- this school was associated with the
10  church, right?

11      A.    Yes.

12      Q.    And did you have any contact with Wendi through
13  the school activities?

14      A.    Every now and then I'd come in the role as a
15  police officer.   The school principal would ask me to bring
16  my police car and give a talk to the children.   And my
17  children attended the same school.   And I would come and I
18  would see Wendi, how she interacts with the kids and
19  teacher.

20      Q.    What did you see?

21      A.    Very sweet, pleasant young lady, young child.
22  She was very, you know, very happy.   Kind of, I perceived
23  her as kind of laid back or kind of passive, I guess, not
24  really an aggressive-type of a person.

25      Q.    Now, you said '86 so she would be about 16 by

1   that time?

2       A.   I assume so, yes.

3       Q.   And did you see her during these teen years, any

4   impression change from this young person at eight years

5   old?

6       A.   No.  The only time I knew her was from the time I

7   started with the church and I left the church.  And a few

8   years after that I would have contact with her, she seemed

9   the same person to me.

10      Q.   So would you just describe her as meek?

11      A.   Yeah, kind of meek.

12      Q.   Passive?

13      A.   Passive, yes.

14      Q.   Introverted?

15      A.   Not bad but yeah.

16      Q.   Violent?

17      A.   No, never.

18      Q.   You're aware of the proceedings in the court,

19   aren't you?

20      A.   Yes, sir.

21      Q.   Did you find anything unusual about the charge

22   and conviction?

23           MR. MARTINEZ:  Objection.  Lack of foundation.

24   That's the province of the jurors.

25           THE COURT:  Sustained.

1          Rephrase the question.

2      Q.   BY MR. DELOZIER:  Would you consider the kind of

3   thing Wendi's been convicted of out of character for her?

4          MR. MARTINEZ:  Objection.  Lack of foundation.

5   He doesn't know her after he left in 1986.  So how does he

6   know.

7          THE COURT:  Lay some foundation.

8      Q.   BY MR. DELOZIER:  Based on the knowledge you had

9   up until the time you stopped seeing her, approximately

10  when was the last time you saw her?

11     A.   The last time I saw her, I've seen her probably

12  early '90s.  I've had contact with her on and off probably,

13  well, up to around, oh, the more I think about it, the

14  early '90s.

15     Q.   Early '90s?

16     A.   Yes.

17     Q.   Based on the knowledge you had of her during the

18  time you did know her up in the early '90s, do you find

19  this conviction uncharacteristic of the Wendi you knew?

20     A.   Yes, I do.

21     Q.   Did you consider Wendi a friend?

22     A.   Yes, I did.

23     Q.   Okay.  And if you were given the opportunity,

24  would you like to renew that friendship?

25     A.   Oh, yeah.  And when circumstances present itself

1    that you come -- you leave friendships or fall away from

2    friendships, it's always nice to reacquaint yourself with

3    old fiends that you know.

4         Q.    You know the Ochoa family, as you said.  What

5    kind of impact do you think this circumstance is going to

6    have on the Ochoa family?

7              MR. MARTINEZ:  Objection.  Lack of foundation.

8    He hasn't had any contact.

9              THE COURT:  Lay some more foundation.

10        Q.    BY MR. DELOZIER:  Based on your knowledge and

11   experience of the family from 1978 through the early part

12   of 1991, do you have an opinion about what kind of impact

13   that might have on the family?

14        A.    When it comes to my contact with

15   Mr. and Mrs. Ochoa, I probably have contact with them ail

16   the way up to now, on and off.  Maybe once a month I run

17   into them at the stores, stop and talk to them and interact

18   with them.  So based on that, I think they would be

19   devastated by the loss of a daughter by however which

20   means.

21        Q.    Do you have any reason to believe, based on your

22   background and knowledge of Wendi, that she'd be a threat

23   to the community?

24             MR. MARTINEZ:  Objection.  Lack of foundation.

25   He doesn't know.

1          THE COURT:  Overruled.

2          Answer the question if you can.

3          THE WITNESS:  I don't think she's a threat to the

4   community, no.

5      Q.   BY MR. DELOZIER:  If she were an inmate, would

6   you have any concern about there being a threat to the

7   inmate population based on your experience?

8      A.   None, whatsoever.

9      Q.   Do you have an opinion about that fellow inmates

10   may be benefited by her being there?

11          MR. MARTINEZ:  Objection.  Lack of foundation.

12          THE COURT:  I'll sustain the objection.

13          MR. DELOZIER:  That's all for now, Your Honor.

14   Thank you.

15          THE COURT:  Mr. Martinez.

16

17                    CROSS-EXAMINATION

18   BY MR. MARTINEZ:

19      Q.   You indicated that in your view what happened

20   here was uncharacteristic.  Remember telling us that?

21      A.   Yes, sir.

22      Q.   How about having affairs?  Was that

23   uncharacteristic of her?  Do you know that she did that?

24      A.   I have no knowledge of that.

25      Q.   Would that also be uncharacteristic of her?

1    A.    I believe so.

2    Q.    How about lying?  Would that be uncharacteristic

3  of her?

4    A.    Yes.

5    Q.    And this opinion that you've given us, actually,

6  is based on your knowing her from 1978 to about 1986,

7  correct?

8    A.    I'm sorry?

9    Q.    The opinions that you rendered here will largely

10  be based on your having contact with her between 1978 and

11  1986, correct?

12    A.    Not totally.  I've had contact with her after

13  1986.  I just didn't remember contact with her after 1986.

14    Q.    Okay.  The contact that you had after 1986 was

15  sporadic, wasn't it?

16    A.    Yes.

17    Q.    Do you know where she was working in 19 -- let's

18  say '95?

19    A.    I know one time in early 90s.

20    Q.    No, 1995?

21    A.    No, I don't.

22    Q.    Do you know where she was working in 1998?

23    A.    No.

24    Q.    Do you know when the children were born?

25    A.    No.

1    Q.    Did you attend her wedding?

2    A.    No.

3    Q.    Did you ever come over to her house for dinner

4  when she and Joe were married -- when she and Joe were

5  still together?

6    A.    No, sir.

7    Q.    Is it fair to say you had the bulk of the contact

8  with her from 1978 to 1986, correct?

9    A.    That would be correct.

10    Q.    And one of the things I think that you indicated

11  to us was that she was part of the church you attended, you

12  were a member of, correct?

13    A.    Correct.

14    Q.    And did you leave the church in 1987?

15    A.    '86, '87.

16    Q.    That's when you sort of didn't see her on that

17  frequent of a basis, then?

18    A.    Yes.

19    Q.    And you also indicated that you had contact with

20  her in the children's church, you saw her during the

21  activities that they had, right?

22    A.    Yes.

23    Q.    Was it in a school setting that you saw her

24  during that period of time between '78 and '96?

25    A.    School setting, church activities setting.  I saw

1    her in her own home.  I would frequently be invited over to

2    her home for dinner and I would see her interact in the

3    home setting.

4         Q.    Now, with regard to the church setting, did they

5    teach her there to lie?

6         A.    No, sir.

7         Q.    Did they teach her there to cheat on her husband?

8         A.    Absolutely not.

9         Q.    In fact, it's just the opposite, didn't they?

10        A.    Yes.

11        Q.    And did they teach her to kill?

12        A.    No, sir.

13        Q.    In fact, they teach just the opposite, right?

14        A.    Yes, sir.

15        Q.    And, in fact, if there's a problem, they teach

16   her that there is a place to go to or at least talk to

17   somebody before you take matters into your own hands,

18   right?

19        A.    I would believe so, yes.

20        Q.    And you indicated that with regards to her, that

21   she's not a violent individual.  Do you remember telling us

22   that?

23        A.    I never seen acts of violence out of her, no.

24        Q.    Let me ask you about what you would consider

25   violent or not.  How about an individual who poisons her

1  husband and after about an hour and a half of suffering she

2  takes a stool and hits him 23 times over the head while

3  he's helpless.

4          Do you consider that to be violent?

5     A.   Yes, sir, I do.

6     Q.   How about while he's down there in that same

7  position and unable to defend himself, she's hitting him so

8  that his head rubs up against the carpet, creating carpet

9  burns on his face.

10         Do you consider that violent?

11    A.   Yes, I do.

12    Q.   How about, then, while he's again in the same

13 position, hitting him over the head with a lamp and

14 breaking the lamp.

15         Do you consider that violent?

16    A.   Yes, sir.

17    Q.   How about when he's incapacitated, taking a

18 knife, sticking it in his neck and then wrenching it so the

19 hole is about the size of my hand.

20         Do you consider that violent?

21    A.   Yes, sir.

22    Q.   You indicated that you don't believe that she's a

23 threat to the community, correct?

24    A.   That's correct.

25    Q.   But, would it be fair to say that you don't

1   really know everything about her, starting, let's say about

2   1987, 1988 because you only had sporadic contact with her,

3   right?

4        A.   I wouldn't base it on 1986.  I think my contact

5   with her in the '90s, I think if she had any character

6   changes in her life, I think that I would pick up on that.

7        Q.   But you only saw her, for example, I think you

8   said at the store, places like that, right?

9        A.   Yes, sir.

10       Q.   You would only run into her here and there,

11  right?

12       A.   Yes.

13       Q.   You never had dinner with her, right?

14       A.   No.

15       Q.   You never talked to her about her relationships,

16  right?

17       A.   I talked to her about her relationships.

18       Q.   In 1990?

19       A.   Earlier '90s.  I asked her how she was doing,

20  what her life was about.

21       Q.   Who was she dating in 1991?

22       A.   I don't recall.  That was a long time ago.

23       Q.   Who was she dating in 1998?

24       A.   I don't recall.

25       Q.   Do you know the names of her kids?

1    A.    No, sir.

2    Q.    Do you know how many kids she had?

3    A.    No, sir.

4    Q.    One of the things that your name was brought up
5    in connection with this case, you never served as a
6    security guard for Quail Garden Apartments, did you?

7    A.    Yes.

8    Q.    You did?

9    A.    I worked there while I was with the Casa Grande
10   Police Department.  I worked -- they gave me an apartment
11   in exchange for doing extra security for them.

12   Q.    And when you were at the Quail Garden Apartments
13   you never remember being called over to Wendi Ochoa's
14   apartment, do you?

15   A.    I don't recall that.

16   Q.    You never remember -- When you say you don't
17   recall, you're sort of leaving it open.

18         As you sit here today, you don't recall ever
19   being called over to her apartment, do you?

20   A.    I don't recall that, no.

21   Q.    You did work for the Casa Grande Police
22   Department back then, did you?

23   A.    Yes, sir.

24   Q.    You're familiar with the report writing abilities
25   or requirements, right?

1    A.   Yes, sir.

2    Q.   If there was a call, for example, and somebody

3  makes a call and the person is there, you write that --

4  it's required that they write the name of the person who

5  actually made the call and is there, right?

6    A.   They should, yes.

7    Q.   That's procedure, right?

8    A.   Yes.

9    Q.   They wouldn't leave out the name of the person

10  who actually made the call and saw the crime happen, would

11  they?

12    A.   Can you repeat that?

13    Q.   If the police officer responded and somebody says

14  I saw x do whatever it was they saw, that would be

15  important to put in the report, right?

16    A.   Yes.

17    Q.   And that would be something that would be

18  included, right?

19    A.   Yes.

20    Q.   And it's something that is taught to the police

21  officers that they put important things in the report,

22  right?

23    A.   That's correct.

24    Q.   We read a report from 1991, November of 1991 in

25  which the defendant was involved in an incident.  Do you

1    know anything about that?

2         A.   No.

3         Q.   Your name's not mentioned anywhere in there.

4    Would that be an indication to you that you didn't have

5    anything to do with that report?

6         A.   Not necessarily.

7         Q.   So I just thought you told me that if a person is

8    a reporting person that the officers that are trained with

9    the Casa Grande Police Department, usually write a name

10   down?

11        A.   Usually.  That doesn't mean it always happens.

12        Q.   You're saying if a police officer left that out,

13   that he was, at that point, incompetent?

14        A.   No, sir, I'm not saying that.

15        Q.   You did say that you were a lieutenant with them,

16   right?

17        A.   Yes, sir.

18        Q.   There are classes that they take, right?

19        A.   Yes, sir.

20        Q.   And one of the things they're told in these

21   classes is that if there's a report and somebody saw

22   something, you get the name, right?

23        A.   Yes, sir.

24        Q.   Their social security number?

25        A.   Yes, sir.

1    Q.   And their date of birth, right?

2    A.   That's correct.

3    Q.   Because if charges are going to be filed later

4  those are the people that come in as eyewitnesses, right?

5    A.   That's correct.

6    Q.   And people's memory have a tendency to fade,

7  right?

8    A.   Yes.

9    Q.   Just like your's faded when I asked you about

10  something in the past, right?

11    A.   Absolutely.

12    Q.   And the reports are used to refresh recollection,

13  correct?

14    A.   That's correct.

15    Q.   And if the report doesn't include their name, and

16  knowing the background and experience that you have, it

17  would be a better chance that you weren't there than that

18  the officer committed negligence, right?

19          MR. DELOZIER:  Your Honor, this is largely

20  irrelevant.  Where is he going with it?

21          THE COURT:  Sustained.

22          Move on.

23    Q.   BY MR. MARTINEZ:  Do you ever remember meeting

24  Shawn King at the Gail Garden Apartments?

25    A.   No.

1        MR. MARTINEZ:  I don't have anything else.

2        THE COURT:  Redirect.

3        MR. DELOZIER:  I don't have any questions, Your

4  Honor.

5        THE COURT:  Thank you.  Are there any further

6  questions by the jury?  If so, please raise your hand.  No

7  one raised their hand.

8        May this witness be excused?

9        MR. MARTINEZ:  Yes, sir.

10       MR. DELOZIER:  Yes, sir.

11       THE COURT:  Thank you, sir.  You're excused.

12       THE COURT:  Mr. Delozier, you may call your next

13  witness.

14       MR. DELOZIER:  Thank you, Your Honor.

15       THE COURT:  Please step forward.  Please give the

16  clerk your name and she will swear you in.

17       (Witness sworn.)

18       THE COURT:  Please have a seat on the witness

19  stand.  Please make yourself comfortable there.  Remember

20  to speak loudly and clearly into the microphone so that

21  everyone can hear you.  Also, please wait until the

22  question is complete before you answer the question.  And

23  please make sure you give a verbal response.

24       Is that agreeable to you, sir?

25       THE WITNESS:  Yes, sir.

1          THE COURT:  Mr. Delozier, you may proceed.

2          MR. DELOZIER:  You may proceed.

3

4                    JIMMY GALYON,

5  called as a witness herein, having been first duly sworn,

6  was examined and testified as follows:

7

8                  DIRECT EXAMINATION

9  BY MR. DELOZIER:

10       Q.   Please state your name?

11       A.   Jimmy Galyon.

12       Q.   Would you spell your last name?

13       A.   G-a-l-y-o-n.

14       Q.   And where do you live, sir?

15       A.   Tucson, Arizona.

16       Q.   And do you know the Ochoa family?

17       A.   Yes, I do.

18       Q.   And when did you meet them?

19       A.   About 1985.

20       Q.   Again, by what circumstances?

21       A.   We used to go to the same church.  We started

22  going to the same church.

23       Q.   And how did you -- which members of the family,

24  did you meet?

25       A.   I met Wendi and Alejo and also Donna.  All three

1  of them.

2       Q.    Were you involved in activities in the church

3  with them?

4       A.    Yes, we were.

5       Q.    Would you describe those activities?

6       A.    We both went to church there and they had Harvest

7  Track Classic every year.  We were involved in that.

8       Q.    What is a Harvest Track Classic?

9       A.    Harvest Track Classic is a track meet they have

10  every year for kids up to 18 years of age.  And we were

11  involved in that.  So was the Ochoa family.

12            And then, our main interaction with them was the

13  church.  But also Wendi did a lot of baby-sitting for us.

14  We had three small children at the time.

15       Q.    Okay.  And how did she -- how often did she

16  baby-sit for you?  I think you said you live in Tucson

17  now.  Did you live in Casa Grande at the time?

18       A.    Yes, we did.  We lived in Casa Grande at the

19  time.  We moved to Tucson in 1990.  She probably baby-sat

20  for us maybe once a week or maybe once every two weeks

21  while we were in Casa Grande.

22       Q.    Did that continue after you move to Tucson?

23       A.    Yes.  She came down summers and baby-sat for us

24  and watched our boys, maybe two, three days at a time.

25       Q.    Can you ask describe the kinds of things she did

1  for your children?

2      A.   Well, having three small boys --

3      Q.   Tell us what ages they were at that time?

4      A.   They were three and four, I believe.  We had

5  because one was born in '88 and the boys were born in '87.

6  She would stay at night.  And she baby-sat for the three of

7  them.

8      Q.   What kinds of things did she do when she

9  baby-sat?

10      A.   She just had complete care of the boys.  We would

11  leave her with them all day.  When I was conducting

12  business with my wife, we were gone all day.  She fed them,

13  clothed them, bathed them.  Just basically took good care

14  of them.

15      Q.   Did you have any problems?

16      A.   No, not at all.

17      Q.   What kind of discipline was she?

18      A.   Well, that's the only problem that my wife had is

19  Wendi would not discipline them.  Wendi was very humble and

20  very kind and she was just wonderful.  She took care of our

21  boys.

22      Q.   Did you see violent behavior of her?

23      A.   Absolutely not.

24      Q.   Did your children ever report any violent

25  behavior of her?

1    A.    No.

2    Q.    How about anger?

3    A.    No, sir.

4    Q.    Did you use the word "humble?"

5    A.    Yes, sir.

6    Q.    Are there any other words that come to mind how

7  you would describe her?

8    A.    She was very calm and very timid and very quiet.

9    Q.    When was the last time she helped take care of

10  the children?

11    A.    That's -- I couldn't tell you a date.  I know

12  when Wendi got married she no longer was able to come down

13  and baby-sit for us.  I really don't know.

14    Q.    Okay.  Somewhere prior to her marriage?

15    A.    Yes, sir.

16    Q.    Were you at the wedding?

17    A.    Yes, sir.

18    Q.    And do you remember when that was?

19    A.    No, sir, I don't remember the date.

20    Q.    Okay.  Did you see her as being helpful to

21  people?

22    A.    Yes, in the church.

23    Q.    In what ways was she helpful to people?

24    A.    The church we went to and school, they all have

25  jobs.  In the evening, after school is let out, she was

1    very helpful with the other children.  Of course, she was

2    older so she helped some of the smaller children with their

3    jobs and in the church.

4        Q.    So you're aware of this case, obviously?

5        A.    I'm aware of it, yes.

6        Q.    Did this -- based on your experience and

7    knowledge of who Wendi was and how she took care of your

8    children, seem out of sorts for her?

9        A.    I was shocked.  We just couldn't believe it.

10        Q.    Based on your knowledge and experience of Wendi

11    during the time you've known her, does it seem

12    uncharacteristic?

13        A.    Yes.

14        Q.    Do you believe the community would be worse off

15    without her?

16        A.    I do.

17        Q.    You know the Ochoa family.  Can you describe what

18    impact you think it might have on the family?

19        A.    I think it would be a tragedy.

20        Q.    Do you have any reason to believe that Wendi

21    would be a threat to the community?

22        A.    No, I don't.  Not from my experience with her at

23    all.

24        Q.    If she were incarcerated would you believe she

25    would be a threat to the inmate population?

1          MR. MARTINEZ:  Objection.  Lack of foundation.

2          THE COURT:  Overruled.

3          Answer the question if you can.

4          THE WITNESS:  No, I don't think she would at all.

5      Q.   BY MR. DELOZIER:  Think she might even be a

6  benefit to them?

7      A.   Yes, sir.

8          MR. DELOZIER:  I have nothing further, Your

9  Honor.

10          THE COURT:  Mr. Martinez.

11

12                    CROSS-EXAMINATION

13  BY MR. MARTINEZ:

14      Q.   Sir, would it be fair to say you don't know what

15  she does, vis-a-vis or with other inmates, when she's

16  dealing with other inmates, right?

17      A.   No.

18      Q.   In fact, in the four years since this happened,

19  you don't know what she's been doing or anything, do you?

20      A.   No, sir.

21      Q.   You indicated that it would -- and let me do it

22  this way.

23          You indicated that you knew her from 1985 to, I

24  believe, 1990, correct?

25      A.   Somewhere in the early '90s.

1      Q.   And that would be the bulk of the experience that

2  you have with her, correct?

3      A.   Yes, sir.

4      Q.   The opinions -- most of the opinions that you

5  shared today with us are probably formed, in large part, to

6  what you saw back in 1985 through 1991, right?

7      A.   Yes.

8      Q.   Because your contact that you had with her after

9  that was somewhat limited, right?

10     A.   Yes, sir.

11     Q.   And you did see her as part of the church that

12  you attended, correct?

13     A.   Yes.

14     Q.   And the pastor -- who was the pastor when you

15  were there?

16     A.   Tom King.

17     Q.   Did that pastor have the ability to marry people?

18     A.   Yes, sir.

19     Q.   And did that pastor have the ability the bury

20  people?

21     A.   I do not know.

22     Q.   Did he have the two airplanes back then or not?

23          MR. DELOZIER:  Your Honor, I don't know where

24  we're going with that.

25          THE COURT:  Sustained.

1      Q.   MR. MARTINEZ:  Sir, again, the information that

2  you have for us is based from some time ago?

3      A.   Yes.

4      Q.   You don't know what she's been up to since,

5  really, 1991, 1992?

6      A.   No.

7      Q.   You don't know who her friends are, right after

8  1991, 1992?

9      A.   No.

10     Q.   You don't know who she dated?

11     A.   No.

12     Q.   But you do know about the church back then,

13  right?

14     A.   Yes.

15     Q.   They didn't teach people to lie, did they?

16     A.   No.

17     Q.   In fact, that's something that was frowned upon,

18  they were taught not to, right?

19     A.   They were taught basic Bible principles yes.

20     Q.   And that's one of the basic Bible principles,

21  right?

22     A.   Yes.

23     Q.   How about cheating.  Did they teach them to

24  cheat?

25     A.   No.

1    Q.   That's one of the other basic Bible principles,

2  correct?

3    A.   Yes.

4    Q.   How about being unfaithful to one husband?

5  That's not something that was taught by them, was it?

6    A.   No.

7    Q.   So if she did those things, she learned those

8  things, it wasn't as part of the church upbringing, was it?

9    A.   I don't know.

10   Q.   Or maybe she just didn't assimilate the church

11  upbringing?

12   A.   I don't know.

13   Q.   And when you say you don't know, that can also

14  apply to whether or not she's a threat to the inmate

15  population, right?

16   A.   I gave that based on how I knew her.

17   Q.   Back then.

18   A.   Yes, sir.

19   Q.   But you don't know how she is now, do you?

20   A.   No, sir.

21   Q.   So when you gave us that opinion, you really

22  don't know whether or not she would or would not be a

23  threat, right?  Your opinion is incomplete, isn't it?

24   A.   I don't know.

25   Q.   Well, it's based on incomplete information.

1    Wouldn't that be fair?

2         A.   Yes, sir.

3         Q.   And whether or not she would be a threat to the

4    community, again, the same answer, you really don't know,

5    do you?

6         A.   I don't believe she would be.

7         Q.   But you based that on what you knew back in 1985

8    to 1991, right?

9         A.   Yes, sir.

10         Q.   And you indicated that she baby-sat for you in

11    the summers.  Would that be in '88 and '87 and '89 or in

12    '90?

13         A.   My children were born in '87 and '88.  So it had

14    to be after that.

15         Q.   And that's when she would spend the three days

16    out there with you, right?

17         A.   I'm sorry?

18         Q.   That's when she would spend the three days out

19    there with you, baby-sitting?

20         A.   Yes, sir.

21         Q.   Because you guys had to be out.

22              And with regard to how she treated her children,

23    you never saw how she treated her kids, did you?

24         A.   No, sir.

25         Q.   You never even saw her interacting with them, did

1   you?

2        A.   No, sir.

3        Q.   You don't know anything about a paddle that she

4   used to hit Nicholas with, so you?

5        A.   No, sir.

6             MR. MARTINEZ:   I don't have anything else.

7             THE COURT:   Redirect.

8

9                    REDIRECT EXAMINATION

10   BY MR. DELOZIER:

11       Q.   Just to clarify some of the time sequences.

12            Do you know when -- you say you went to the

13   wedding, right?

14       A.   Yes, sir.

15       Q.   Do you know when Wendi met Joe?

16       A.   I met him before the wedding, I'm sure, at

17   church.

18       Q.   You met him at the church, also?

19       A.   Yes, sir.

20       Q.   Do you know when she met him?

21       A.   No, sir, I don't.

22       Q.   When you met him at church, can you give an

23   approximate time when that was?

24       A.   It was before they got married.

25       Q.   Right.

1    A.   I can't give you a date.  I don't know.

2    Q.   All right.  One last question.

3         Did -- you were asked a question about did the
4    church teach this, teach that, a few moments ago.  Do you
5    remember that?

6    A.   Uh-huh.

7    Q.   Is that yes?

8    A.   Yes, sir.

9    Q.   Did the church teach the women to obey their
10   husbands?

11   A.   Yes, sir.

12        MR. DELOZIER:  Thank you.  Nothing further, Your
13   Honor.

14        THE COURT:  Are there any further questions of
15   the jury?  If so, please raise your hand.  No one raised a
16   hand.

17        May this witness be excused?

18        MR. MARTINEZ:  Yes, sir.

19        MR. DELOZIER:  Yes, sir.

20        THE COURT:  Thank you.  You're excused.

21        Mr. Delozier, you may call your next witness.

22        THE COURT:  Step forward to the clerk.  Give her
23   your name and she will swear you in.

24        (Witness sworn.)

25        THE COURT:  Please have a seat on the witness

1   stand.  Please make yourself comfortable.  Please remember
2   to speak loudly and clearly so everyone can hear.  Also
3   please wait until the question is complete before you
4   answer the question.  And please make sure you give a
5   verbal response.
6          Is that all agreeable to you?
7          THE WITNESS:  Yes.
8          THE COURT:  Mr. Delozier, you may proceed.
9          MR. DELOZIER:  Thank you, Your Honor.
10
11                    LINDA GALYON,
12  called as a witness herein, having been first duly sworn,
13  was examined and testified as follows:
14
15                  DIRECT EXAMINATION
16  BY MR. DELOZIER:
17     Q.   Please state your name for the record?
18     A.   Linda Galyon.
19     Q.   Would you spell your last name?
20     A.   G-a-l-y-o-n.
21     Q.   Are you married?
22     A.   Yes.
23     Q.   To whom?
24     A.   Jimmy Galyon.
25     Q.   And when did you first -- Strike that.

1          Do you know the Ochoa family?

2     A.   Yes, I do.

3     Q.   And what members of the family do you know?

4     A.   Wendi, Alejo and Donna and Brandon.

5     Q.   When did you meet the Ochoa family?

6     A.   Probably in '86.

7     Q.   Okay.  And what circumstances?

8     A.   We went to church together.

9     Q.   Did you live in Casa Grande at the time?

10    A.   Yes.

11    Q.   Where do you live today?

12    A.   Tucson.

13    Q.   Do you have any children?

14    A.   Yes, I do.

15    Q.   How many children?

16    A.   Three.

17    Q.   And what are the birthday years?

18    A.   I have one born in '87 and twins that were born

19  in '88.

20    Q.   All right.  Did you -- was your contacted with

21  the Ochoa family limited to church activities?

22    A.   Wendi also baby-sat for me.

23    Q.   Any other activities besides church and

24  baby-sitting by Wendi?

25    A.   Just church activities.

1    Q.   Such as?

2    A.   We used to have track meets where we would go and
3  work at the track meets together.  School functions.
4  Different things that the kids would do at school.  We
5  would go and participate and watch.  I have a stepson that
6  also went to school with Wendi.

7    Q.   All right.  You say she baby-sat for your four
8  children then?

9    A.   Three.

10    Q.   Then she didn't baby-sit for the stepchild?

11    A.   No.

12    Q.   Just the three younger ones?

13    A.   Yes, sir.

14    Q.   When did that start?

15    A.   Probably in '88.

16    Q.   All right.  Right before or after the twins were
17  born?

18    A.   Yes.

19    Q.   So she assisted you when they were first born?

20    A.   Yes.

21    Q.   Do I have it right, you had one child in '87 and
22  the two in '88?

23    A.   Yes.

24    Q.   Did you have any problems with her baby-sitting?

25    A.   No.

1      Q.    What was she allowed to do or what was she

2  required to do as she baby-sat your children?

3      A.    She completely took care of them all day.  She

4  came to my home.  She would be there at eight o'clock in

5  the morning.  She would stay until five o'clock in the

6  afternoon a lot of days.  She would feed them breakfast.

7  She would dress them.  She would bathe them.  She would

8  feed them supper.

9           When we moved to Tucson, she would stay two or

10  three days at a time in our home and take care of them.

11     Q.    All right.  How about discipline?

12     A.    Wendi didn't like to discipline.  She would leave

13  that to me to do when I got home.  She would always just

14  say, "No, I can't do that."

15     Q.    How would you describe Wendi during the time that

16  you knew her?

17     A.    Very pleasant.  Very -- she was just a really

18  good girl.  If I'd seen anything in her that I didn't like,

19  I would never have had her in my home taking care of my

20  children because they're the most precious things to me.

21     Q.    Sure.  When was the last time you saw her?

22     A.    You know, I really don't know the last time I saw

23  her.

24     Q.    Did you go to the wedding?

25     A.    Yes, we went to her wedding and I'd seen her

1   after that at church functions.

2       Q.   All right.  So even though you moved to

3   Tucson -- when did you move to Tucson?

4       A.   1990.

5       Q.   Okay.  So even after you moved to Tucson, you

6   continued to go to the church?

7       A.   They had a track meet every year for the

8   children.  We took our kids down there for the track meet.

9       Q.   How many years after you moved to Tucson did you

10  continue doing that?

11      A.   Maybe up until the last two years.

12      Q.   You mean up until the year 2002?

13      A.   Yeah.

14      Q.   So, did you see Wendi when you went to the track

15  meets?

16      A.   Yes.

17      Q.   Even during the '90s?

18      A.   Yes.

19      Q.   Did you have contact with her at those track

20  meets?

21      A.   Yes.

22      Q.   What kind of contact did you have at those track

23  meets?

24      A.   Her and her mother worked at the station where

25  they handed out the medals to the children.  And my boys

1    would go over and help her and we talked and just be there

2    and just visit.

3         Q.   Do you know if Wendi has any children?

4         A.   Yes.

5         Q.   And do you know how many she has?

6         A.   Two.

7         Q.   Do you know their names?

8         A.   No.

9         Q.   Do you know approximately when they were born?

10        A.   No, I can't answer that.

11        Q.   Did you ever see Wendi with the children?

12        A.   Yes.

13        Q.   What circumstances?

14        A.   Just church functions, track meets.

15        Q.   Did you notice anything that was inappropriate in

16   her care of the children?

17        A.   No.

18        Q.   Did you notice any care at all?

19        A.   She took very good care of her children.

20        Q.   In the time that you saw her?

21        A.   In the time I saw her.

22        Q.   Okay.  You're aware of why you're here today?

23        A.   Yes.

24        Q.   Does the violence that you understand took place

25   seem out of sorts for Wendi?

1      A.   Yes, it does.

2      Q.   Do you think that the community would be worse

3  off without her?

4           Maybe you didn't understand my question.

5      A.   Yeah.

6      Q.   If she is not a member of the community, Casa

7  Grande, Tucson, whatever, do you think that the community

8  would be worse off without her?

9      A.   Yes.

10     Q.   You know the Ochoa family, Donna, Alejo and

11  Brandon?

12     A.   Yes.

13     Q.   Do you know what kind of impact that might have

14  on them?

15     A.   It has to be a terrible impact.  I can't even

16  imagine.

17     Q.   Do you have any reason to believe that Wendi

18  would be a threat to the community?

19     A.   No.

20     Q.   Do you have any reason to believe Wendi has any

21   -- well, let me rephrase that.

22          Do you believe Wendi to be a violent person?

23     A.   No.

24     Q.   Have you ever seen her express any anger?

25     A.   No.

1          MR. DELOZIER:  Nothing further, Your Honor.

2          THE COURT:  Mr. Martinez.

3

4                     CROSS-EXAMINATION

5    BY MR. MARTINEZ:

6          Q.   You attended the Harvest Family Church; is that

7    right?

8          A.   Yes, sir.

9          Q.   One of the things we heard about was their belief

10   that women are subservient to man.  Do you subscribe to the

11   motion?

12         A.   No.

13         Q.   So, you didn't learn at the Harvest Family Church

14   you were supposed be subservient to Jimmy?

15         A.   I learned that, yes.

16         Q.   And you don't agree with that?

17         A.   Not totally.

18         Q.   But do you do that?

19         A.   At times.

20         Q.   That notion that you are to be subservient to the

21   man, does that allow the woman to go out and have affairs?

22         A.   No.

23         Q.   Is that something that you learned in church,

24   part of being a subservient woman is to go out and kiss

25   guys?

1      A.   No.

2      Q.   That's contrary to everything that the church
3  teaches, isn't it?

4      A.   Yes.

5      Q.   You indicated that the defendant is not a violent
6  person, correct?

7      A.   Yes.

8      Q.   That is based on your knowledge of when you knew
9  her back when she was younger, right?

10     A.   Yes.

11     Q.   You really don't know what has happened since you
12  basically loss touch about '90, '91, do you?

13     A.   No.

14     Q.   And you did indicate that you saw her with her
15  kids a couple of occasions, right?

16     A.   Yes.

17     Q.   And you don't know that it was her husband that
18  actually bathed the kids before they went to church.  You
19  don't know if that's what happened, do you?

20     A.   No.

21     Q.   You never actually went over to their house, did
22  you?

23     A.   No.

24     Q.   You never saw who bathed the kids, right?

25     A.   No.

1    Q.   You never saw who fed the kids, right?

2    A.   No.

3    Q.   And it's fair to say you don't know who took the

4    kids to the doctor, do you?

5    A.   No.

6    Q.   Your impression, if you will, of the defendant is

7    based on knowing her back around 1990 and years before

8    that, right?

9    A.   Yes.

10   Q.   And when you say that she is good with kids that

11   is based on what you saw her do with your kids back then,

12   right?

13   A.   Yes.

14   Q.   You don't know whether or not she was a good

15   caretaker for her own kids, do you?

16   A.   No.

17        MR. MARTINEZ:   I don't have anything else.

18        THE COURT:   Mr. Delozier.

19        MR. DELOZIER:   Thank you, Your Honor.

20

21                    REDIRECT EXAMINATION

22   BY MR. DELOZIER:

23   Q.   To clarify, you say you saw her taking care of

24   the children at these track meets and other circumstances?

25   A.   Yes.

1      Q.   All the way, all through the '90s?

2      A.   Yes.

3      Q.   And you didn't see any problems with that, did

4  you?

5      A.   No.

6      Q.   You thought she was being a good mother at that

7  time?

8      A.   Yes.

9           MR. DELOZIER:  Nothing further, Your Honor.

10  Thank you.

11           THE COURT:  Are there any further questions of

12  this witness by the jury?  If so, please raise your hand.

13  No one has raised their hand.

14           May this witness be excused?

15           MR. DELOZIER:  Yes.

16           MR. MARTINEZ:  Yes.

17           THE COURT:  Thank you very much.  You are

18  excused.

19           Mr. Patterson, call your next witness

20           THE COURT:  Please step forward.  Please state

21  your name to the clerk and she will swear in.

22           (Witness sworn.)

23           THE COURT:  Please have a seat on the witness

24  stand.  Please make yourself comfortable on the witness

25  stand.  Remember to speak loudly and clearly into the

1  microphone so everyone can hear you.  Please wait until the

2  question is completed before you answer the question.  And

3  make sure that you answer verbally.

4          Is that agreeable to you?

5          THE WITNESS:  Yes.

6          THE COURT:  You may proceed, Mr. Patterson.

7          MR. PATTERSON:  Thank you, Judge

8

9                    SHARON MURPHY,

10  called as a witness herein, having been first duly sworn,

11  was examined and testified as follows:

12

13                    DIRECT EXAMINATION

14  BY MR. PATTERSON:

15      Q.   Give us your name, please?

16      A.   Sharon Murphy.

17      Q.   Are you the same Sharon Murphy that has testified

18  earlier in this trial?

19      A.   Yes.

20      Q.   It's not my intent, Dr. Murphy, to redo or repeat

21  everything you talked about previously.  The Judge will

22  instruct the jury to consider what you already testified to

23  in this proceeding, as well.  I just want to go over some

24  fundamental opinions and then we'll move on to another

25  area.

1          Do you still have an opinion whether or not Wendi

2    was the victim of domestic violence?

3          A.    Yes, I do have an opinion.

4          Q.    What is that opinion?

5          A.    That she is, in fact, a victim of domestic

6    violence at the hands of Joseph.

7          Q.    Do you believe that there were components of

8    emotional abuse in that domestic violence?

9          A.    Yes, I do.

10         Q.    Do you believe there were components of sexual

11   abuse in that relationship?

12         A.    Yes, I do.

13         Q.    And do you believe there were elements of

14   physical abuse in that relationship?

15         A.    Yes, I do.

16         Q.    Okay.  Now, the opinions that you testified to in

17   the first part of this trial were based upon circumstances

18   up to about October 7th, 2000, correct?

19         A.    Correct.

20         Q.    We didn't really talk about the events of October

21   8, 2000?

22         A.    Correct.

23         Q.    Have you been able to examine the literature and

24   determine whether there is any opinion or theory as to why

25   domestic violence victims sometimes wind up killing the

1   person that's abusing them?

2       A.   Yes.

3       Q.   Okay.  Tell me a bit about the literature that's
4   out there in that regard?

5       A.   MR. MARTINEZ:  Objection.  Relevance to this
6   case.

7            THE COURT:  Overruled.

8            Go ahead and answer the question if you can.

9            THE WITNESS:  There is not a huge literature
10  about this.  But, there are a number of pieces that
11  actually now are quite old in terms of research
12  literature.  Because if you recall from my earlier
13  testimony, the information that we have today about
14  domestic violence really only dates back to '74, '75, '76.
15  So the literature that we have today that talks
16  specifically about why battered women kill really comes
17  from about 1987.

18           There are two pieces that I would call "seminal",
19  meaning the most important pieces.  Cynthia Gilespie's,
20  Justifiable Homicide and Angela Brown's book, When battered
21  Women Kill or Why Battered Women Kill, excuse me.

22           MR. MARTINEZ:  Objection, State versus
23  Christianson.

24           THE COURT:  Let me have you approach.

25           (Bench conference was held outside the hearing of

1  the jury.)

2          THE COURT:  Where are you going with this?

3          MR. PATTERSON:  She was not allowed to testify

4  about the event of October 8, 2000 but Christianson rules

5  no long applies.  This is the penalty phase.  There are no

6  rules.  And she's allowed to opine her opinion, why she may

7  have overreacted, why she may have hit him 23 times, she

8  may have done things on this date that are totally out of

9  character based upon all the evidence you heard from other

10  people in this case.

11          THE COURT:  Mr. Martinez.

12          MR. MARTINEZ:  State versus Christianson still is

13  the law.  It doesn't mean that it goes away just because

14  the rules of evidence are no longer in effect.  That is

15  substantive rule.  There is no case law that allows her to

16  come in and basically vouch for the defendant.  Even though

17  she wasn't there, she is now going to tell us what the

18  defendant was thinking.  And I understand that under 703,

19  the rules of evidence are suspended.  But not the

20  substantive rule.  She can't now opine something that State

21  versus Christianson says she can't.

22          MR. PATTERSON:  That is simply not true.  She's

23  allowed to render her opinion about things that are

24  relevant to life or death decision.  She's allowed to opine

25  in this regard.  She's not going to get inside her mind but

1  she's going to explain why battered women have developed

2  some tolerance of abuse and given provocation on certain

3  days that it's focused, that it's upon the abuser and not

4  likely to be visited upon other members of the community.

5  That she's rehabilitable.  She's mindful what happened

6  caused her to do this.  I think that she's rehabilitative.

7      MR. MARTINEZ:  I think State versus Christianson

8  is controlling.

9      THE COURT:  I'm going to overrule the objection.

10     MR. PATTERSON:  Thank you, Judge.

11     (Bench conference concluded.)

12  Q.   BY MR. PATTERSON:  As we were saying before the

13  objection, you were telling us a bit about the literature

14  that was involved here.  You also have some personal

15  experience with persons on a case load who have committed

16  homicide?

17  A.   In the counseling case load that I used to have,

18  there weren't any homicides.  I had the one case for

19  criminal court.  That was in '97.

20  Q.   What do we see in the literature, start with the

21  Gilespie treatise, what is that all about?  What does that

22  tell us?

23  A.   There is an effort on the part of some

24  researchers, Cynthia Gilespie being one of the first, to

25  try to understand what happens inside that violent

1    relationship because the overwhelming majority of women who

2    have killed their abusive partners had no prior criminal or

3    violent history.

4           So there is something that just didn't make sense

5    here.  So that was the impetus to try to understand what

6    could possibly be happening that would make that the

7    response.

8           In trying to get that kind of information, lots

9    of interviews, obviously, are done with the women serving

10   prison sentences.  And one of the factors that seems to be

11   quite remarkable in both the Gilespie work or the Brown

12   work and after that Lenore Walker, is that in a majority of

13   the cases where women have killed their abusive partners,

14   there seems to have been an increase in frequency and

15   severity over time of the abuse.  But also, and may be even

16   more importantly, in the majority of those cases there was

17   a significant amount, meaning number -- and what's the word

18   I want -- duress around sexual abuse.  Seems to stand out.

19        Q.   So significant factor in those cases?

20        A.   Correct.  So what we know today, to try to sum up

21   the literature that is available, is that typically you

22   find that the violence has escalated over time but that it

23   is accompanied by terror.

24           Some researchers are now saying, okay, we have

25   25, 30 years of literature on domestic violence, it's time

1    now to summarize the different types of violence.  Let's
2    look at this a little bit differently.   Instead of calling
3    everything domestic violence, maybe there are shades inside
4    that.   So one of the phrases that came out in about, I
5    think it was 2000, one of the research pieces is the phrase
6    "intimate terrorism."

7        Q.   Can you describe that for me?

8        A.   When my testimony matter ended in October and the
9    jury had a chance to ask me questions, I remember that one
10   of the questions was about did I believe there was such a
11   thing as mutual combat.

12            The researcher who tried to break down this big
13   term "domestic violence" came up with a title of a type
14   that meant mutual violence.   Just go back to that piece.
15   But this new term "intimate terrorism" is the term that
16   seems to be the one used now that speaks the most clearly
17   about the power and control being at the center and about
18   that phenomenon of the increase in frequency and severity
19   leading to a terror that maybe you and I can't even begin
20   to feel if we haven't experienced it.

21       Q.   It's unique to a domestic violence relationship?

22       A.   It's unique to domestic violence.  It's unique to
23   experiences that we might call traumatic.  So. . .

24       Q.   Regardless of the sort of trauma?

25       A.   Right.  So other people are also trauma victims,

1   not just victims of domestic violence, like soldiers in

2   combat, for example.  But this phrase "intimate terrorism"

3   really speaks to an overriding, over arching fear that

4   envelops the battered woman's life.

5            It's a fear that goes so deep as for her to never

6   know when that next thing is going to happen.  And all of

7   the battered women I've met, many of them seem to need to

8   be able to predict when the next thing is going to happen.

9   Because if you remember from my testimony earlier, I talked

10  a lot about power and control and about how the batterer

11  controls every aspect of the woman's life or many aspects

12  of the woman's life.  This was an area that she

13  feels -- and when I say "she" I mean the proverbial

14  battered woman, not necessarily just Wendi -- that she

15  might have some control.  So she would try to predict when

16  the next thing was going to happen.  The way she could do

17  that was by trying to figure out what would set him off and

18  I'll do the opposite.  We actually have or I actually have

19  in my report Wendi's statements about asking him

20  repeatedly, "What do you want for dinner tonight," so she

21  wouldn't make a mistake.  So that was her effort at trying

22  to control some part of her life by doing things right.

23       Q.   Let's maintain a general approach at this point

24  then we'll tie it in with the particulars of Wendi's

25  circumstance here.

1          Is there a concept of a kind of tolerance level

2    of the abuse that develops?

3          A.    In most cases, the relationship does not start

4    off with some overwhelming form of violence.  It usually

5    starts off rather gradually and usually it starts off more

6    with the power and control issues as opposed to heavy-duty

7    physical or sexual violence.  It usually starts with

8    control and emotional and verbal abuse and then increases.

9          Now, is every single case like that?  No.  That's

10   just the majority and certainly isn't my experience the

11   majority of the time.  What happens is, and we all know

12   this from our own relationships, you get adjusted, you get

13   used to what's happening.  Early on, you don't even believe

14   what's happening.  You know there is -- we have a great

15   system called denial that we work from and we just don't

16   believe what's really happening is happening.  We make all

17   kinds of excuses for it.  Gradually, over time there is

18   some little realization.

19         In many cases, the realization, though, never has

20   a name.  You know, the term "domestic violence" that we

21   throw around so regularly as professionals is not the

22   word.  Those are not words that women use to describe those

23   experiences.  Perhaps if they could, it would be clearer to

24   them what exactly was happening.  So they adjust.  And the

25   emotional and verbal abuse today maybe, maybe six months

1   from now becomes something much more significant and maybe

2   a year from now it's even more significant.  I'm making up

3   those time frames, they absolutely are.  It could be two

4   weeks, you know.  But, yeah, the battered woman adjusts to

5   whatever is happening.

6        Q.   Is there a cumulative effect over time?

7        A.   There's absolutely a cumulative effect.

8        Q.   Tell me about that?

9        A.   I remember in my earlier testimony, talking a lot

10  about the importance of context, needing to understand the

11  acts and the situation in the context in which it

12  occurred.  Every time there is an act, whether it's

13  emotional abuse or verbal abuse or sexual abuse or physical

14  assault, that incident doesn't ever go away.  You don't

15  forget when things like that happen to you.  You might push

16  them back and not allow it to come to consciousness to

17  really think about what this is that just happened.  But it

18  doesn't go away.  So what we have over time is this

19  accumulation of many things that have happened over, in

20  some couples, over a very long period of time.  And so

21  that's the cumulative effect.

22       Q.   Okay.  The accumulation of these incidents, is it

23  important, then, how the abused victim deals with this

24  accumulation of things that impact he or she?  A kind of

25  sub-question:  How they have been taught to cope with

1  stresses or problems in their lives, is that a factor?

2       A.   If I'm not answering the question, tell me.  I'm

3  not exactly sure.

4       Q.   Okay.  Let me rephrase it.

5       A.   Okay.

6       Q.   Do you also need to factor in the coping

7  mechanisms of the way the abused victim deals with the

8  accumulation series of events that are evident in this

9  relationship with the abuser?

10      A.   Yes.

11      Q.   Tell me about that.

12      A.   There are some particular ways, I think, that the

13  majority of battered women go about dealing with their

14  life, the life that they are now leading.  Almost all in my

15  experience begin with that whole process of denial that I

16  mentioned a few minutes ago.  But denial doesn't last

17  forever.  For some people, it can last a very long time.

18  But for others a short time.  That's just very

19  idiosyncratic to the individual person that we're talking

20  about.  But over time, then, that denial will break down.

21  Either because she'll start to recognize it or someone

22  outside of her will recognized it, like a parent or a

23  coworker.  So somebody's going to start mentioning things

24  to her.  So the denial breaks down.  And but you can't

25  remove all of the ways in which she learned to cope.  So,

1    the next thing that might happen is she starts to blame

2    herself.  So she blames herself for what he's doing.  I

3    need to do this better.  If I do this better then he'll

4    stop.  So there's a whole series of things that takes

5    place.  And the point of understanding about the series is

6    that all of that's leading up and has this cumulative

7    traumatic affect on the individual battered woman.

8        Q.   Again, talking about the typical battering

9    scenario, suppose there are no outlets or opportunities to

10   deal with the accumulation of stress that have developed

11   between the two parties.  What can happen?

12       A.   Now by "outlets," do you mean people she can talk

13   to?

14       Q.   Friends, counselors, safe houses, you know.

15   Something to deal with the accumulated stressors you're

16   talking about?

17       A.   Right.  Well, if there is no where for it to go,

18   then it stays inside.  And that accumulation then leads to

19   just greater and greater and greater levels of trauma that

20   she is stuck, now, dealing with.

21       Q.   Let's talk about Wendi, specifically.  Based upon

22   the kind of model or scenario that you described for us,

23   what did you see in Wendi's relationship?  Well, not just

24   with Joe but starting with her early childhood experiences

25   and going up to the point in time when she did develop a

1   relationship with Joe.  What do you see that may be

2   significant to account for the behavior on October 8, 2000?

3       A.   Well, according to Wendi's story -- and I know we

4   don't have proof of this first factor that I'm going to

5   say -- there was information Mother told Wendi that she has

6   reason to doubt or believe or think, that Wendi may have

7   been sexually abused at a very young age.  I think she said

8   very young, meaning like a toddler to age of two.

9       Q.   By whom?

10      A.   I don't remember if it was Father or grandfather

11  but it was a member of the family; a male member of the

12  family.

13      Q.   How is that potentially significant?

14      A.   Well, any form of child sexual abuse is

15  significant in that person's life.  And that's just a setup

16  for difficulties down the road if something doesn't

17  intervene to help change it.  The next thing that I

18  remember was about, she must have been like six, seven,

19  eight, when the family was deeply involved in their

20  church.  There was a male member of the church that exposed

21  himself to her.  I don't know if there was any more than

22  that.  I remember Wendi saying he exposed himself to her.

23      Q.   How is that potentially significant?

24      A.   Well, that's another form of sexual abuse.  So we

25  now have some building blocks here to trauma that goes back

1   to perhaps to age two.  If not two, then this incident at

2   sixish.  All this time, we have the role of the church.

3   That's very important in Wendi' life and in Wendi's

4   family's life.  From her account of the church, it sounds

5   like there might have been some isolating that went on

6   within the church construct.  So that all of the functions

7   that a family or individuals might participating in, just

8   in normal social life, were really confined inside the

9   church.  So that doesn't give you an opportunity to see

10  what's going on outside the world of the church.  So that's

11  from the beginning and ongoing.

12          The next incident that I recall was the incident

13  with the pastor's son that had been her boyfriend.  And

14  when she tried to tell him that she wanted to start seeing

15  the world and dating other people, that's when he took the

16  rock and broke the window in her vehicle, tore the ring off

17  her finger.  So we have an incident that involved a peer.

18  This is the first time that I know of there is a peer

19  involved in some abusive activity.  And then the next thing

20  that I know about would be the beginning of the

21  relationship with Joseph Andriano.

22      Q.   And how, then, is this later developing

23  relationship with Joe Andriano significant in terms of the

24  conduct she might have engaged in on October 8, 2000?

25      A.   How is it significant?

1       Q.   How does it tie in with all the other building

2   blocks you're talking about that may have accounted for

3   some analogous, unusual behaviors that weren't

4   characteristic on October 8, 2000.

5           MR. MARTINEZ:  Objection.

6           THE COURT:  Overruled.

7           Answer the question.

8           THE WITNESS:  Well, what we have now is

9   information about accumulation of things that have happened

10  in her life that I would call "traumatic."  I think

11  everybody in the field would call "traumatic," episodes

12  that are outside of the norm of healthy human experiences.

13  And it may have been a setup.  I don't know, but it may

14  have been a setup for developing relationships with someone

15  who ended up being abusive.

16      Q.   BY MR. PATTERSON:  And then, adding that into the

17  mix, again, what are we seeing here, potentially, that's

18  consistent with the literature you just described?

19      A.   What we know from Wendi about the nature of that

20  relationship -- which, I think was about eight years in

21  length -- is that there was an ongoing pattern of abuse,

22  all the different forms that we talked about earlier from

23  Joe to Wendi.

24           And as far as I know, I don't recall ever hearing

25  that Wendi ever fought back.  She also didn't fight back

1    with the pastor's son.  And at two and six, I don't think

2    she could have fought back.

3              So we have a setup here leading up to the

4    increasingly severe levels of violence and abuse leading up

5    to that night in October.

6        Q.    What do we know about Wendi's responses to the

7    provocation in her life.  What was her general course of

8    conduct?

9        A.    Well, she didn't tell.  She didn't strike back.

10   She didn't do anything really that would be considered

11   fighting back in any way.  We know that.

12       Q.    Do you know of any episode of violent behavior

13   prior to October 8, 2000?

14       A.    On Wendi's part?

15       Q.    Yes?

16       A.    I do not know of any.

17       Q.    Is this -- what we're seeing in

18   Wendi -- consistent with the person you described in this

19   treatise?

20       A.    Yes.

21       Q.    In what regard?

22       A.    In all of these cases, women, either -- they do

23   one of two things -- they either try to fight back and find

24   out that's not such a good idea because all it does is

25   aggravate him further and the violence becomes worse.  Or

1   they don't fight back at all.  That seems to be what

2   happened with Wendi.

3        Q.   Okay.  But I think you told us that women who

4   kill their abusive spouses demonstrate a consistency, they

5   don't have a history of violent behavior up to the point in

6   time when they do the ultimate act?

7        A.   That's correct.

8        Q.   Do you see that here with Wendi's case?

9        A.   That's correct.

10       Q.   How is it then on October 8, 2000 she would have

11  engaged, in your opinion, in conduct that wasn't

12  demonstrated in her history prior to October 8, 2000?

13       A.   At first glance, it's looks like such an anomaly

14  that could this have happened.  The only way that you can

15  understand this is to truly -- to truly understand what

16  domestic violence is all about.

17            You have to remember, that's what we're talking

18  about here.  And it doesn't happen out in front of the

19  family.  For the most part, it's when the doors are

20  closed.  And in particular, sexual violence.  She chooses

21  not to tell people.  That's her choice.  She's made a

22  choice to not tell.  It's shameful.  It's shameful to tell

23  anybody that the person you love and live with and have

24  children with is doing to this to you.  So she chose not to

25  tell.  So what we have now, we have that early accumulation

1    from possibly age two up through this night in October.

2            However, it isn't just an accumulation.  There is

3    more to it than that.  We're talking about terror.  We're

4    talking about a fear that is so intense that the only thing

5    she knows how to do is to stop what's happening.  So, on

6    the face of it, it looks horrible.  The number of times

7    that she hit him with the bar stool looks horrible.  It is

8    horrible.

9            Why would she have done that, a person who never

10   acted violently before?

11      Q.   That's the question.

12      A.   That's the question.  And my response to that is

13   that she felt --

14           MR. MARTINEZ:  Objection.  Vouching as to what

15   the defendant felt.

16           THE COURT:  Sustained.

17      Q.   BY MR. PATTERSON:  Can you account for the

18   conduct at this point?

19      A.   Her life was in danger.

20      Q.   Okay.  And how does that precipitate this

21   particular response in your opinion?

22      A.   She was protecting herself by making sure that he

23   couldn't do any more.

24      Q.   Okay.  But, it appeared she may have misperceived

25   the degree of the threat?

1    A.   Correct.

2    Q.   How is that accounted for in your scenario?

3    A.   I think that we have to understand domestic

4    violence in order the really understand why that would

5    happen.  We keep using the words accumulative,

6    accumulation.  They are just really nice big words that

7    don't have a lot of meaning unless you feel it.  You have

8    to try very hard to put yourself in the shoes of the woman

9    who has lived with this for so long to understand the

10   degree of threat to her life that she felt at that moment.

11   And so whether it was five times or twenty times, what she

12   was doing was acting out the trauma, that terror that was

13   in her heart and had probably been in her heart for a

14   really long time, just never talked about.

15   Q.   All right.  In the literature, and your

16   experience, is this outburst, if you will, focused on one

17   particular individual, generally speaking or does she

18   constitute a threat to the community at large having

19   accumulated this series of stressors?

20   A.   I don't know of any case in which a battered

21   woman ever meted out violence towards anyone other than the

22   perpetrator.

23   Q.   So in that sense, she doesn't constitute a danger

24   to fellow community members?

25   A.   Correct.

1       Q.   From the contact you had with Wendi, is she a

2  viable candidate for the rehabilitative process to teach

3  her to cope with these issues in a better or different

4  fashion?

5       A.   I would say yes.

6       Q.   For what reasons?

7       A.   Wendi had no idea --

8            MR. MARTINEZ:  Objection.  Assumes what the

9  defendant is thinking again.

10           THE COURT:  Overruled.

11           Go ahead and answer the question.

12           THE WITNESS:  Wendi had no idea that what her

13  life had been with Joe was called domestic violence.  When

14  I went in and sat down with her, she wasn't using that

15  phrase.  In fact, when she saw one of the tests that I was

16  giving her, it had that language somewhere in it, she

17  wasn't grabbing on to that and using it and running with

18  it.  In fact, she was extremely upset by it.  Didn't want

19  me to use it.  Didn't want those words used.  Would hold

20  her abdomen and say, "this is making me sick.  I'm getting

21  nauseous."  I would think that's what was going to happen

22  from the change in her face.

23           So that was a very gradual progression for Wendi

24  over the course of a long time.

25       Q.   You're not suggesting you talked her into being a

1  domestic violence victim?

2      A.   No, no.

3      Q.   But, after you discussed things with her, things

4  that she thought were innocuous or were not consistent with

5  domestic violence, just normal in her married relationship,

6  in your experience, were, in fact, abusive behaviors?

7      A.   Right.  Over this period of time, now, she sees

8  what life was like in a different way because she now has

9  some language, vocabulary, to put with the acts that

10 happened.  And most recently, has said that some day --

11          MR. MARTINEZ:  Lack of foundation.

12          THE COURT:  Lay some foundation.

13     Q.   BY MR. PATTERSON:  When did you recently?

14     A.   When I testified in October.

15     Q.   Okay.

16     A.   -- said that she hoped that some day, you know,

17 she would be able to work with other victims of domestic

18 violence.

19          MR. PATTERSON:  That's all I have at this point

20 in time.

21          THE COURT:  Mr. Martinez.

22

23                    CROSS-EXAMINATION

24 BY MR. MARTINEZ:

25     Q.   One of the things you talked about was what

1   happened inside Apartment 132 on October 8 of the year

2   2000.  You talked to us about that, didn't you?

3       A.   The apartment, is that what you're saying?

4       Q.   You talked to us about the things that happened

5   in Apartment 132 on October 8, 2000, didn't you?

6       A.   In part, yes.

7       Q.   But you weren't there, were you?

8       A.   No, I was not.

9       Q.   You didn't see what happened, right?

10      A.   Correct.

11      Q.   You don't know what the defendant was thinking,

12  right?

13      A.   Correct.

14      Q.   Well, you said that with some hesitation.  Are

15  you trying to tell us that you knew what the defendant was

16  thinking?

17      A.   I know what she said to me.

18      Q.   Right.  But saying and knowing are two different

19  things, wouldn't you agree?

20      A.   Yes.

21      Q.   You're basing your testimony here on what the

22  defendant told you, right?

23      A.   Correct.

24      Q.   And even if she lied to you, you would still keep

25  the same opinion that she was a victim of domestic

1   violence, wouldn't you?

2         A.   Not if I saw a discrepancy.

3         Q.   Well, we talked about some of those.  Do you

4   remember that we talked about those during your testimony?

5         A.   I'm not sure what in particular you're referring

6   to.

7         Q.   Everything that we talked about.  Do you remember

8   that we talked about things in your report where she had

9   been untruthful?  Do you remember that?

10        A.   I don't remember specific things.

11        Q.   Well, let's start with the -- and I'm just

12  picking out some highlights -- with what happened on the

13  birthday limo issue.  Do you remember that?

14        A.   I remember talking about the birthday.

15        Q.   And do you remember that she told you that her

16  husband had left the kids asleep.  Do you remember that?

17        A.   Yes.

18        Q.   Well, one of the things we know and that she

19  admitted that she was lying about was that's not true.

20  That her husband had not left the kids asleep.  They were,

21  in fact, somewhere else.  That's a lie she said.

22             One of the other things that we know from the

23  people that were there was that on the ride home that night

24  she was kissing another man.  She didn't tell you that.

25  That's a lie by omission.

1      A.   She did not tell me that.

2      Q.   Right.  One of the other things that she didn't

3  tell you, per the witnesses, was that she was the one that

4  night that sort of precipitated the incident by walking

5  after the person, the man that she was with.  She didn't

6  tell you that, did she?

7      A.   No.

8      Q.   And the witnesses said that Mr. Andriano never

9  even grabbed her.  She didn't tell you that, did she?

10      A.   I remember the cell phone and the wine cooler.  I

11  don't remember if it was grabbing her or the objects.

12      Q.   Ma'am, to refresh your recollection, then, you

13  wrote down in your report that he screamed at her and

14  dragged her home.  Does that ring a bell with you?

15      A.   Okay.  Yes.

16      Q.   Per your report, he did drag her, right?

17      A.   Yes.

18      Q.   The people that were there said that that didn't

19  happen.  Did you know that?

20      A.   No.

21      Q.   That actually what happened, according to the

22  people that were there, Mr. Andriano threw the phone down

23  and said, "Wendi, what are you doing," and walked away.

24  Did you know that?

25      A.   No.

1     Q.   And that when he walked away, she was the one

2  that went after him and started saying things like, "Joe,

3  let me explain to you what's going on."  And that she was

4  the one that was trying to talk to him and that he was calm

5  and just walked away.  Did you know that?

6     A.   No.

7     Q.   The other thing that she told us after that was

8  that according to her, he then put her inside of the

9  Tahoe.  She never told you about that, right?

10    A.   I don't believe I know that.

11    Q.   And this was something that she did remember,

12 right?  I mean, she's the one that came forth with the

13 incident to you, right, she related?

14    A.   Yes.

15    Q.   And you give her enough time to relate that

16 incident to you, right?

17    A.   Yes.

18    Q.   She never told you about being in the Tahoe with

19 him that night, did she?

20    A.   No, she did not.

21    Q.   She never told you that after being in the Tahoe

22 that she somehow went into her apartment, jumping over a

23 wall.  She never told you that, did she?

24    A.   No.

25    Q.   Did you know that she actually came into the

1  apartment giggling that night per his sister, Jana Clayton?

2      A.   No.

3      Q.   That's what I'm -- that goes to the point that

4  I'm talking about.  You -- that's not true, per her

5  statement she told you a lie.  That doesn't change your

6  opinion?

7      A.   I'd need an awful lot more than that to change my

8  opinion.

9      Q.   How about the fact that she told you that there

10  was a hitting of some drawers on the night that she went to

11  the softball game.  Do you remember that from your report?

12      A.   If that's the same night where the bed, bottom of

13  the bed was broken, yes, I remember that.

14      Q.   And that happened in connection with the softball

15  game, right?

16      A.   Correct.

17      Q.   Well, she took the stand and said that was a

18  lie.  Did you know that?

19      A.   No, I didn't know that.

20      Q.   She actually told the detectives back on October

21  8th of 2000, that that occurred on the night of the limo.

22  Did you know that?

23      A.   No.

24      Q.   That was something important to you that he used

25  some violence, wasn't it?

1    A.    Yes.

2    Q.    Did you know that we also have -- let's do it

3  this way:

4          You indicated that there was no violent behavior

5  on Wendi's part.  You told us that, ever, in the

6  relationship, right?

7    A.    That is the knowledge I have, yes.

8    Q.    Do you remember that you related in your report a

9  conversation that you had with the defendant about an

10  incident that happened in the farm house where Mr. Anderson

11  became physically violent with items?

12    A.    Yes.

13    Q.    Do you remember that there was a situation, the

14  way you described it, where he grabbed a pot and went to

15  hit her and it hit the wall.  Do you remember that?

16    A.    Well, it wasn't exactly like that.

17    Q.    But it was something like that, right?

18    A.    Something like that, yes.

19    Q.    Tell me what you remember so we'll be on the same

20  field?

21    A.    What I recall is that he held her against the

22  wall and acted as though he were going to hit her with it

23  but instead hit the wall near her head.

24    Q.    But, did you know that what actually happened

25  that night is they had been at a function.  Did you know

1   that?  Do you remember that incident?

2         A.   I don't recall that.

3         Q.   She didn't tell you that, did she?

4         A.   I don't think so.

5         Q.   And she became upset with Mr. Andriano that night

6   because she thought he was looking at another woman.  Did

7   she tell you that?

8         A.   No.

9         Q.   And because of her jealousy, she called her

10  father to come pick her up from the function.  Did she tell

11  you that?

12        A.   No.

13        Q.   And her father picked her up and she went home

14  and she waited approximately two hours.  Did she tell you

15  that?

16        A.   No.

17        Q.   That when Mr. Andriano arrived home, she wanted

18  to go to sleep.  Did she tell you that?

19        A.   No.

20        Q.   And, in fact, he did go to sleep.  Did you know

21  that?

22        A.   No.

23        Q.   He was intoxicated, she indicated.  Did she tell

24  you that?

25        A.   I don't think so.

1    Q.   No, she didn't tell you that.   Your report

2  doesn't reflect that.

3         And then what happened is that she said she was

4  mad at him and started to pick a fight.   Did you know that?

5    A.   No.

6    Q.   And that during this process as this happened

7  that she hit him.   Did she tell you that?

8    A.   No.

9    Q.   Just given those three examples that we've talked

10 about, that didn't give you pause to reevaluate your

11 opinion that she's a victim of domestic violence?

12   A.   My report, I believe, spans eight years.

13   Q.   Ma'am, I understand that.   I'm not asking you

14 about your report.   I'm asking you whether or not just

15 those three main events that we're talking about, that fact

16 that she lied to you about those, whether or not that gives

17 you pause to reevaluate your opinion, yes or no?

18   A.   I am not changing my opinion based on those items

19 that you just brought forth.

20   Q.   Well, would you even consider reevaluating your

21 opinion just on those three items?

22   A.   I know you're going to cut me off, so I'm trying

23 to think of how to answer you.

24         I will not take acts out of context when I make a

25 decision.

1    Q.    So what does that mean?

2    A.    I have to look at the whole picture.

3    Q.    The fact that she lied to you about when the

4    dresser may have been hit, that didn't give you pause, did

5    it?

6          MR. PATTERSON:  Objection.

7          THE COURT:  Sustained.

8    Q.    BY MR. MARTINEZ:  The fact that there's an

9    inconsistency as to when the dresser was damaged doesn't

10   give you pause?

11   A.    The date of something happening is not

12   phenomenonally significant.

13   Q.    It wasn't a date that you gave us.  Do you

14   remember in your report you didn't give us a date?

15   A.    No, I don't remember.

16   Q.    Remember you gave us an event and that's how you

17   identified it, remember?

18   A.    Okay.

19   Q.    She changed events on you, didn't she?

20   A.    You're saying that those things never happened?

21   Q.    What I'm saying is she indicated to

22   Detective Lucero that they happened at a different event --

23   different from what she told you.

24   A.    Are you saying that the bed post, the bed thing

25   never got broken, he never dumped the Kool-Aid, that he

1  never punched the wall, that he never busted the dresser

2  drawers.  I'm not sure what it is you're saying.

3       Q.   I'm saying that she changed her story as to when

4  those events happened.  And she included things and then

5  lied about other things as part of her narration of those

6  events.

7       A.   I think that it is possible for any human to not

8  get dates totally accurate when you're looking back over

9  time as to whether or not it was '94,'95 or '96.

10      Q.   I just told you it wasn't about dates.  In fact,

11 I told you it was about events.  Do you remember we just

12 had that conversation?

13            MR. PATTERSON:  He's arguing with the witness.

14            THE COURT:  Let's move on.

15      Q.   BY MR. MARTINEZ:  We're talking about events,

16 ma'am.  You keep wanting to say dates.  She never gave you

17 dates, did she, about those events, did she?

18      A.   I don't believe she did.

19      Q.   And she never gave a date to the officer, from

20 what we've been told, but she did switch when things

21 happened.  You don't find that significant?

22      A.   I'm totally confused by what you're saying.  You

23 started by talking about the picture in the farm house and

24 whether or not she provoked that.  I'm not even sure where

25 you were going with that.

1      Q.   Well, some of evidence that we received is, that

2  according to her, she -- let me just set the scenario for

3  you.  She was the one that provoked the fight because she

4  was upset he may have been looking at another woman at a

5  function.  As a result of that, she called her father.  He

6  picked her up.  She came home and she waited for him.

7           During that time she waited for him, he came

8  home.  He was intoxicated.  He fell asleep.  She began to,

9  then, talk to him, try to wake him up.  He didn't want to

10 wake up.  And then during that, she hit him.  And then

11 other things may have happened.  The fact that she didn't

12 tell you all of that, that doesn't give you pause to at

13 least to think that perhaps she may have been untruthful

14 with you?

15      A.   It's sounds like she left out a part of the

16 story.  Now, what you just didn't say to me, you said, "and

17 other things may have happened," did he put a hole in the

18 wall?

19      Q.   Doesn't that give you pause that she left

20 something out as significant as her hitting him?

21      A.   Would I have wanted to know about that, yes.

22      Q.   So that is significant for you to know, right?

23      A.   It's significant enough that I would want to know

24 it.

25      Q.   The sense that I'm getting from you, ma'am, is

1   that nothing that happens in this courtroom or nothing or

2   any questions that anybody asks you is going to change your

3   opinion about whether or not she was a domestic violence

4   victim, right?

5        A.   I spent a lot of time with her, Mr. Martinez.

6        Q.   Is that yes or no, ma'am?

7        A.   Are you saying to me if Wendi were to tell me now

8   she had fabricated the whole story, would I change my

9   mind?  If she were to tell me that now, I would have to

10  change my mind.

11       Q.   That's not what I'm asking you.  Listen to my

12  question:  Are there any questions or any scenarios, as

13  I've just described, that would change your mind as to your

14  ultimate opinion that she was the victim of domestic

15  violence?  That's all I'm asking?

16       A.   There are scenarios, yes.

17       Q.   But the scenarios that I described are not

18  sufficient for you?

19       A.   Correct.

20       Q.   So with those scenarios, you believe she's the

21  victim of domestic violence, right?

22       A.   With the whole context.

23       Q.   And with regard to that, you then say that -- and

24  then you tell us what you think may have happened in that

25  apartment on October 8, 2000, right?

1      A.   Yes.

2      Q.   By the way you prefaced it, didn't you say, "I

3   don't know, it may have been a setup." Do you remember

4   saying that?

5      A.   What's the whole sentence?

6      Q.   That's the whole sentence.  We were talking about

7   what happened in the apartment.  You said, "I don't know.

8   It may have been setup."  That's what you said.

9      A.   Can you tell what I said before that?  I don't

10   have a context for that statement.

11      Q.   The context is you were talking about what

12   happened inside the apartment and why she may have struck

13   the victim and you said "I don't know.  It may have been a

14   setup."  That's what you said.

15      A.   Okay.  If you say that's what I said, I will

16   agree.

17      Q.   The bottom line is, you don't know what happened

18   in that apartment, right?

19      A.   I only know based on what I was told, correct.

20      Q.   So you don't know what she was thinking, right?

21           MR. PATTERSON:  Judge, we've gone through this

22   before.

23           THE COURT:  Sustained.

24      Q.   BY MR. MARTINEZ:  Did you know about the poison

25   and that she sat there and watched him for about an hour

1    and a half while he was dying?  Did you know about that?

2              MR. PATTERSON:  Judge, there's no evidence of

3    that.  That's conjecture.

4              THE COURT:  Sustained.

5              Move on.

6        Q.  BY MR. MARTINEZ:  Did you know that she poisoned

7    him?

8              MR. PATTERSON:  We don't -- Judge, that's his

9    theory of the case.  That's not the evidence.

10             THE COURT:  Sustained.

11             Let's move on.

12       Q.  BY MR. MARTINEZ:  You don't know anything about

13   any poison in this case?

14       A.  Well, I know that there was poison.

15       Q.  So you do know about the poison.  Did you take

16   that into account when you told us why she hit him?

17       A.  Did I take the poison into account?

18       Q.  When you said that she hit him?

19       A.  The hitting was in response to what he had done

20   to her.  It wasn't about poison.

21       Q.  But you weren't there.  You don't know if he did

22   hit her, do you?

23       A.  I only know what was reported to me.

24       Q.  The bottom line what you're telling us, here, is

25   that everything that you come forth, tell us about your

1    opinion, is based on what the defendant told you, right?

2         A.    Because she's the victim of domestic violence and

3    nobody knows except her.

4         Q.    But what you're saying is you're basing your

5    opinion on what she told you, right?

6         A.    Yes.

7               MR. MARTINEZ:  I don't have anything else.

8               THE COURT:  Redirect.

9

10                     REDIRECT EXAMINATION

11   BY MR. PATTERSON:

12        Q.    One of the scenarios that Mr. Martinez was

13   discussing was a statement that Wendi gave to law

14   enforcement about, by my math, must be four or five hours

15   after the incident at a time when, obviously, she

16   experienced significant, some significant trauma.  In your

17   experience, dealing with these domestic violence victims,

18   recency of trauma, does that have an effect on the recall,

19   protection, perhaps, of the abuse victim, protect, perhaps,

20   of the abuser, those kinds of things?

21        A.    Of course.

22        Q.    Tell me in general?

23        A.    Regardless of the manner in which Joe died, there

24   was a traumatic event that took place.  Trauma of that form

25   has an impact.  It would have an impact on any one of us.

1   Given the history of domestic violence that had occurred

2   over approximately eight years, the form that that

3   traumatic affect takes is even greater.  What she

4   remembered an hour, two hours, four hours, two years, can

5   change.  And that is common.  It is phenomenally well

6   researched.  This isn't a made-up scenario for the benefit

7   of this defendant.  The literature is replete with it.  I

8   can give you the psychological term.  It's called a

9   dissociative state.  We've not really talked much about its

10  psychology here.  It's very well known and very well

11  documented.  What she remembers the first day I saw her and

12  what she remembers today is probably quite different, also.

13          Q.    Okay.

14          MR. PATTERSON:  Thank you, Judge.  That's all I

15  have.

16          THE COURT:  Are there any further questions of

17  this witness by the jury?  If so, please raise your hand.

18  No one has raised their hand.

19          May this witness be excused?

20          MR. PATTERSON: Yes.

21          MR. MARTINEZ:  Yes.

22          THE COURT:  Thank you very much.  You're excused.

23          We'll go ahead and take our afternoon break.

24  Please remember the admonition.  Don't discuss this case

25  with anyone.  Don't let anyone discuss this case with you

1  Keep an open mind about the case.  Have a nice break. Let's

2  take 15 minutes.

3          (Recess taken.)

4          THE COURT:  This is Cause Number CR2000-096032,

5  State of Arizona versus Wendi Elizabeth Andriano.

6          The record will reflect the presence of the

7  defendant, counsel and the jury.

8          Mr. Delozier.

9          MR. DELOZIER:  Thank you, Your Honor.

10          (Witness sworn.)

11          THE COURT:  Please have a seat on the witness

12  stand.  Please make yourself comfortable on the witness

13  stand.  Remember to speak loudly and clearly into the

14  microphone so everyone can hear you.  Please wait until the

15  question is completed before you answer the question.

16  Also, please make sure you give a verbal response.

17          Is that agreeable to you?

18          THE WITNESS:  Yes.

19          THE COURT:  Mr. Delozier.

20          MR. DELOZIER:  Thank you, Your Honor.

21

22

23

24

25

1                             DONNA OCHOA,

2    called as a witness herein, having been first duly sworn,

3    was examined and testified as follows:

4

5                          DIRECT EXAMINATION

6    BY MR. DELOZIER:

7         Q.    State your name, please, for the record?

8         A.    My name is Donna Ochoa.

9         Q.    Who is your husband?

10        A.    My husband is Alejo Ochoa.

11        Q.    Do you have any children?

12        A.    Yes, I do.

13        Q.    Who are your children?

14        A.    I have two children.  I have Wendi Andriano and

15   Brandon Ochoa.

16        Q.    Okay.  We are here today about Wendi?

17        A.    Yes.

18        Q.    Right?

19        A.    Yes.

20        Q.    And she's your daughter?

21        A.    Yes, she is.  Wendi is my only natural born

22   child.

23        Q.    Okay.  Tell us what you think about her?

24        A.    I love my daughter very much.  She's been the joy

25   of my life.  I feel like she was a gift from God.  She was

1   the only child that I was able to have.  We wanted more

2   children.

3        Q.   If you have to stop and if you want to stop and

4   get some water, go ahead.

5        A.   Please.  Thank you.

6        Q.   Let's back up make sure we got what you said

7   earlier before getting water?

8        A.   All right.  Yes.  Again, Wendi is my only natural

9   born child.  We weren't able to have any more children.  We

10  would have loved to.  So she's always been especially

11  precious to me.

12       Q.   Okay.  Why don't you talk to us about her days as

13  a little one.  I don't want to go back into a history but

14  she learned to play the guitar at five and was musically

15  inclined, apparently.  So tell us a little bit about that

16  period of Wendi's life?

17       A.   Okay.  As a child she was a very good child, very

18  good child, real sweet.  Used to go around the neighborhood

19  and preach to everybody because that was the sort of --

20  because that's what we did.  And she did it, too.  I

21  remember a little neighborhood kid said one time, "Don't

22  mess with her because she has a God."

23            Wendi was musically inclined.  When we were in a

24  ministry traveling, she was, I think she was about five or

25  six and she started to teach herself how to play the

1    guitar.  She played.  And then some of older ones taught

2    her how to do cords and then actually sing in front of

3    churches and sit on the little steps and sing.  Later on

4    taught herself to play the piano.

5            We settled down in Casa Grande.  One of the

6    friends mentioned that she still, you know, thinks of her

7    as being a little girl in the school, in her uniform,

8    sitting and playing piano trying to learn how to play.  And

9    shortly after that he started instructing her.  And she

10   went on, you know, into high school and everything and

11   competed state wide and nationally with her piano, with

12   writing songs and singing.  Sometimes she'd take a whole

13   day and ask for the keys to go to church and just sit there

14   and play and sing.  That was one of things she just loved

15   to do.  She has a beautiful singing voice.

16        Q.   You stated competitions.  Was that expensive?

17        A.   Yes.  The competitions were expensive.  At that

18   time both myself and Alejo was working at the church and so

19   we didn't have the extra kind of money to do so.  So Wendi

20   would go out and she'd earned her own money.  She'd do

21   anything from pulling weeds to washing windows to

22   baby-sitting.  She didn't, you know, she never did have

23   like a job or anything like that.  We didn't want anything

24   like this to interfere with her studies.  So she would earn

25   money, like a hundred dollars for state.  And at least a

1 thousand to go to nationals and she always earned all the

2 money.  She was always a hard worker.  She's always been a

3 hard worker.

4      Q.   These are high school years you're talking about

5 now?

6      A.   These are from junior high on up.

7      Q.   So from age of what, 12 or 10?

8      A.   Eleven, twelve.

9      Q.   Up to 18?

10      A.   Uh-huh.

11      Q.   Is that yes?

12      A.   Yes, I'm sorry.

13      Q.   So in that context like '80, '81?

14      A.   On past, right.

15      Q.   '88, '89?

16      A.   Yeah about '89 or so.

17      Q.   So you say it costs two or three hundred dollars

18 for the state and a thousand dollars for nationals.  How

19 many years did she do that?

20      A.   She did that five years.

21      Q.   Five years?

22      A.   Yes.

23      Q.   And she raised up the money each time, you said?

24      A.   Yes, she did.

25      Q.   Did she write, also?

1      A.   Yes, she did.  She's writes.  She wrote.  She

2  wrote songs.  She also wrote poetry.  She did a lot of

3  things she competed in.  She still writes.  I've had her

4  write poetry for me and send me poems and things and she's

5  written me stories, kind of like, you know, wow, mom if you

6  and I can go and do something and she even writes we're

7  here and we're doing this and we're doing that.  And she's

8  very good at it.

9      Q.   After she went to jail do you have an

10  illustration of one of those writings?

11      A.   I have one of the shorter poems.  I didn't bring

12  anything about the stories that she's, you know, written

13  for us.

14      Q.   Did you want to read the poem?

15      A.   Is that okay?

16          THE COURT:  That's fine.

17          THE WITNESS:  "I could never ask for a more

18  wonderful Mom than you.  Without a doubt my love for you

19  will remain true.  I remember all you have done far more

20  than words can express.  You have given me your

21  unconditional love and care, not just second best.  You

22  taught me to laugh, love and remain strong.  In my eyes you

23  will always be my mom who can do no wrong.  God has given

24  us to each other.  When one falls weak, the other stays

25  strong.  I only pray that I can be the mother to my

1   children as perfectly as you have been mine."

2          That's a short one.  There are some that are real

3   tearjerkers.  And yet these stories that she's written for

4   us are beautiful.  She wrote my sister -- my sister lost

5   her husband last year -- and Wendi, you know, was in jail

6   and everything and she writes a letter to my sister

7   consoling her.  And it was just amazing because she's, you

8   know, sitting where she's been sitting.  And yet she has

9   the compassion to care to write this beautiful letter, you

10  know, for my sister, you know, to help to try to strengthen

11  her.  And that's the kind of girl she was.  That's the kind

12  of woman she's always been.

13          She's always been there for people that need

14  her.  She's always been there for like underdogs, the

15  person that needs help.

16     Q.   Is that the trait that you've seen when she was

17  even in elementary school?

18     A.   Yes.  Yes.  She's been like that.  I can remember

19  a time when we gave her something brand new or she'd have

20  earned some money and someone else needed something and

21  she'd give it.  We always taught her that it's better to

22  give than to receive.  But I can remember sometimes in her

23  growing up, giving away her things.  We told her you can

24  hang on to some of these things, you don't have to give

25  everything away.

1    Q.   She helped younger kids at school?

2    A.   Yes.  Yeah, she did.  The kids especially.  They

3 all loved her.  She's like a mom.  The little kids trailed

4 after her.  She did a lot of tutoring with the children

5 anywhere from kindergarten up to high school.  But the

6 little kids would follow her and they asked her to play

7 with them and she would.  And baby-sitting was something

8 that she loved to do.  I said, you know, when she works she

9 even cleaned windows and didn't even mind that.  But she

10 loved baby-sitting.  We have had kids from the

11 neighborhood, a little kid, when she was in high school,

12 and this little kid would come knack at the door asking can

13 Wendi play and Wendi's a teenager.  They wanted to know if

14 she can come play.

15    Q.   Okay.  We've heard about the missionary journey

16 for six months to Mexico.  Tell me about that.  I think

17 there was more to this kind of activity than just that six

18 months, wasn't there?

19    A.   Yes.

20    Q.   You can tell us tell about the six months, if you

21 wish?

22    A.   Before she went to the mission down in Mexico,

23 she went to Berlits learning class up in Phoenix and again

24 that was something that she provided just like the trip.

25 The time that she spent in Mexico, that wasn't sponsored or

1  paid for by the church.  She had to raise the money before

2  she went there.  Her dad and a couple of pastors flew her

3  down to another city, further down in Mexico, I'm sorry

4  it's slipped my mind, and they were going to do this

5  mission work down there.  But they were having a lot of

6  upheaval.  That's why she ended up closer to the border

7  because we were concerned.  We just didn't want to put her

8  in jeopardy.

9          During the years in her high school time, then

10  after high school, we've always supported churches in

11  Mexico and an organization down there that builds churches,

12  starts a church and trains the local people to run their

13  own churches.  Wendi used to go with her father and the

14  head pastor and some of the other men and some of the women

15  and they would go down and build churches, physically build

16  churches.  They also build homes for people down there,

17  too.  Especially on one place it was called, well, it is a

18  dump that had gotten filled up and we helped them build

19  this little house that their people were just so happy to

20  be in.  Like I said, she's always going to out of her way

21  to help other people.  That's just how she's always been.

22      Q.   Some of these trips that you're referring to, was

23  that a July thing or were you down on a regular basis or

24  just whenever you felt like going?

25      A.   There's also an annual outing that the children

1    would probably be involved in since 1987, annual Christmas

2    trip where throughout the year we collected toys and food

3    and take them down to Mexico.  We take them across the

4    border and share that.  In the beginning, we used to give

5    the presents and clothes and everything directly to the

6    people.  And then, you know, learned through time that it

7    was a better thing to give it to the pastors of the

8    churches and let them give it to the people.  The people

9    didn't accept it from the rich Americans.  That it was

10   coming from the church.  Wendi would -- she would go every

11   year when she was in school and high school.  When she was

12   younger, of course, my dad or her father or I would always

13   be there.  And then, later in high school, you know,

14   sometimes Alejo or I may not be able to make it due to work

15   but she always went.  And what you did, you actually had to

16   pay your own way because we went down there and stayed a

17   couple days delivering presents and clothes and food to a

18   number of places in Mexico.

19       Q.   When did Wendi make her last trip to Mexico?

20       A.   I think the last trip to Mexico was Christmas of

21   '91.  But, even though she wasn't -- even though she

22   didn't go any more, she still sent -- she would still buy

23   toys and stuff throughout the year and give the church

24   money at Christmastime.  And she did that all the way up

25   through 1999.

1    Q.   While she was in the school and church with you
2  folks, did she do any teaching or leading classes or those
3  kinds of things?
4    A.   Yes.  Wendi, through her time of growing up and
5  also being an adult, taught Sunday school.  She also helped
6  as an aide in the school.  She did tutoring.  Again, with
7  ages anywhere from kindergarten, all the way up, I believe,
8  at one time she came in and was working on the reading
9  program.  She did a lot of things for the school.  She
10  loved kids.
11    Q.   Was there a point in time when that stopped?
12    A.   After her and Joe, you know, became involved and
13  then married she didn't do a whole lot of that.  Most of
14  the time they -- Joe liked to spend the weekend at the
15  lake.  So that's where they went instead of being at
16  church.  He also didn't want her to go to Mexico, so she
17  didn't go.  But she always provided toys or money for the
18  kids.
19    Q.   Was one another practice Clean and Beautiful?
20    A.   Yes, Clean and Beautiful.  Actually, we started
21  doing this program before it officially became Clean and
22  Beautiful in Casa Grande.  What it is, is the children, we
23  wanted the children to be doing things in the community as
24  far as helping the community, so one of the things we would
25  have them do twice a year would be to clean up a couple

1   stretches of the road, the main road by the church and main

2   road coming into Casa Grande.  Like I said, twice a year we

3   spent the morning picking up the liter and things like

4   that.  But we did that a long time ago.  We had to start

5   wearing the orange vests so you didn't get run over or

6   anything.

7        Q.   What about Thanksgiving?

8        A.   Thanksgiving.  We love Thanksgiving, not because

9   it was something that we did large at our house, because it

10  wasn't.  I think Thanksgiving, even when we were in

11  California what we would do is work with the groups that

12  would make Thanksgiving dinners for people that are less

13  fortunate.

14       Q.   And as far as Wendi?

15       A.   Wendi and I and Alejo would serve Thanksgiving

16  dinner because we had more time.  We usually didn't, you

17  know, make a fancy dinner until later.  We would deliver

18  some of the food because what would happen is there are

19  shut-ins that, you know, they can't get down to get to

20  eat.  And it was always hard to get volunteers that would,

21  you know, actually take food out to people.  And that's

22  what we did and that was something that we enjoyed very

23  much.

24       Q.   You say you would include Wendi in those

25  activities?

1      A.    Yes.

2      Q.    When did she stop doing that?

3      A.    She did that for a couple of years probably, she

4   probably stopped doing that after they got married.

5      Q.    All right.   It's my understanding that she would

6   often even bring people home to your house to feed them.

7   Is that accurate?   Tell me about it if it is?

8      A.    Yes, it is.

9      Q.    What's that about?

10     A.    If she found somebody that she thought needed

11  something or they needed to, whether it was somebody that

12  she met in one of the college classes or one of the kids

13  from school she thought that they really needed to come

14  eat.   "I don't have food, Mom, but you make really good

15  Mexican food."   She brings these people home.   She then

16  even tried to convince us to let a young girl come and stay

17  with us.   I had to convince her, I think she has a family

18  sweetheart.   She has to go there.

19          If it wasn't people, it was animals.   When we

20  lived outside of town, I don't know how many puppies she

21  would bring home.   No cats, sorry.   But, puppies.   And then

22  we moved into town and I had to tell her that four is all

23  the city would allow us.   The last dog she brought home was

24  a stray.   One of the people at work, when she was working,

25  I don't recall if they had found the dog in Phoenix and

1   this dog needed a home.  And no one else would volunteer to

2   take the dog.  So the next thing Wendi did was bring the

3   dog home.  Ugly dog, too.  And she wasn't allowed to keep

4   the dog.  And so, you know, pleaded, "Mom, can you please

5   take the dog."

6          And so that was I think in '97.  And so I did

7   take the dog.  And it turned out to be a nice dog.

8          Q.   What about when one of the members of the family

9   or somebody has surgery or something, how would she respond

10  to that? .  Grandfather had leg surgery or something?

11         A.   Yeah.  It was her grandfather, in the spring of

12  2000, was flown down from Springerville on the helicopter

13  and he was brought to the hospital that he ended up having

14  an amputation, he was diabetic.  And they brought him and

15  he didn't have any clothes or anything to make him more

16  comfortable.  We all just sort of well, you wear your

17  hospital gown, not even thinking.  But she is always, she

18  always went the extra step.

19         Q.   So this is '95?

20         A.   That was in 2000.

21         Q.   Spring of 2000?

22         A.   Right.

23         Q.   You had surgery also, didn't you?

24         A.   Yes, I did.

25         Q.   Was that surgery several years ago?

1      A.   Yes.   That was in the early '80s.   She was about

2   12, 11 or 12.   I had two major surgeries within a year.

3   And she just sort of took up the whole slack.   She acted

4   like she was the keeper of the house and ended up, you

5   know, doing everything, laundry and cooking and

6   everything.   That was a big responsibility for a 11-,

7   12-year-old to do that.   But, as I said, she always put

8   other people first.

9      Q.   Was there some time she spent time visiting

10   people in nursing homes, too?

11      A.   Yes.

12      Q.   Tell me about that?

13      A.   Of course.   That was something we always had

14   church kids do.   But my mother was ill in South Dakota when

15   Wendi was in high school.   I think it was about '88.   And

16   she flew out to South Dakota and stayed with my mom for,

17   like, several weeks at a time.   She would, at first Mom was

18   living in an assisted living place so she could stay

19   there.   And when Mother was put into the hospital, then

20   Wendi would stay with an aunt back there.   And she loves,

21   she loves older people.   Even at the apartments, people

22   would keep coming back every year because Wendi listened to

23   them.   You know, she liked listening to their stories.   She

24   liked paying attention to them.   Very respectful and then

25   when grandma went into the nursing home, stays there where

1   sometimes you tend to sort of forget about family that are

2   in nursing homes.  She would go in to visit grandma.  Made

3   sure grandma has candy from Halloween to give to other kids

4   that would come into the nursing home.  She thought about

5   things like that.  She's was, like, getting grandma a

6   bedspread instead of the nursing bedspread to decorate.

7   And there was other little old ladies that didn't have

8   family or anything, she'd go get decorations and put them

9   up for them, too.

10      Q.   Okay.  There was some special circumstances of her

11  involvement with Brandon, as well, wasn't there?  Tell me

12  what you mean by that?  Brandon is your adopted son?

13      A.   Brandon is my adopted son.  Brandon is also my

14  nephew.

15      Q.   I'd like to know about Wendi's role?

16      A.   Wendi was the one that begged and pleaded and

17  pushed for Alejo and I to take Brandon out of the situation

18  that he was in.  DPS wanted a home for him and here Wendi,

19  is 15, 16, almost time to not have any little kids around

20  or any kids around any more.  You know.  I didn't really

21  know if we wanted to do that.  And she did.  She pleaded

22  and she goes, "When I grow up, after I get out of college,

23  I'll take him.  He can live with me.  You just keep him for

24  now.  And I go, "No, if we keep him, we keep him for

25  always."  And because of Wendi, she was the motivator for

1    that, you know.  Helped us open our hearts to give Brandon

2    a home.

3            A lot of reasons Alejo and I didn't want to take

4    in the child, we didn't want to have him just a year or two

5    and then have him go back.  We didn't want to have to deal

6    with the heart ache and having young ones and having to

7    lose them.  But, because of that, because of Wendi, that's

8    why we were able to love Brandon.

9        Q.    Very good.  I think you mentioned one of the

10    things she did to earn money for the trips to Mexico, also

11    the state and national competitions, was to baby-sit?

12        A.    Yes.

13        Q.    When did she start doing baby-sitting chores?

14        A.    I believe Wendi started baby-sitting around nine

15    or ten.  And that, to me, that was kind of young except we

16    had a couple in the church that really, really liked Wendi

17    and felt that she could watch the children at that time.  I

18    think her kids were like three and four.  And so. . .

19        Q.    Who's children were three or four?

20        A.    Yes, the Browns.

21        Q.    Okay.

22        A.    And we went ahead and let her baby-sit with the

23    side bar, I guess you'd say, that Alejo and I would go over

24    and check and make sure, you know, Wendi and the kids were

25    all right.  But, as I said, she was just always, she was

1   always more mature because of the time we did spent on the

2   road.  So, you know, that's another contributing factor.

3        Q.   When did she stop baby-sitting for others?

4        A.   Probably when she went to jail.  I mean, she's

5   always watched over people's kids for them.

6        Q.   Okay.  Are there several families during those

7   years that she assisted with or just one or two?

8        A.   No, there was actually a couple.  There were the

9   Browns until they left, the Banes, the Galyons.  I don't

10  know.  I think she baby-sat for Chris and Dora and for the

11  Monahans, the children.  And then when we had visiting

12  pastors and they'd come in with their families, she,

13  because she was, you know, the daughter, you know, of youth

14  pastor, then she usually watched those children, also.

15       Q.   So there is a lot of kids that she watched.

16            Did anyone ever complain to you about her care of

17  the children?

18       A.   Oh, no, not at all.  In fact, I had several

19  families, go, I wish she just lived with us and take care

20  of my kids.  She's just good with them.

21       Q.   Did any of them ever discuss discipline issues

22  with you or how she was supposed to discipline when she was

23  with them, as far as like discipline with baby-sitting?

24       A.   If you're talking about spanking, Wendi would not

25  spank children.  Even if a parent would ask her to, she

1   would not do that.

2       Q.   Okay.

3       A.   She may, you know, use things like sitting them

4   down, take the toy away or anything like.  But, no.

5       Q.   Let's talk about your daughter Wendi with her own

6   children.  Did you have an opportunity to -- you know their

7   names, correct?

8       A.   Nicholas and Ashley.

9       Q.   And did you have an opportunity to be present at

10  their births?

11      A.   Yes, I was.  I was there when Nicholas was born.

12  I was there when Ashley was born.  And, of course, I was

13  there through the whole time Wendi was pregnant.

14      Q.   Now, was she living with you?

15      A.   When she is pregnant?

16      Q.   Yeah.

17      A.   No.

18      Q.   What do you mean you were there throughout the

19  whole time?

20      A.   Because they lived not that far, you know, from

21  us when she was pregnant.  And Wendi would come over to the

22  house.  I'd go over and see Wendi.  I mean, especially, you

23  know, when your grand kids come, it's like it's so

24  exciting.

25           And, you know, I remember with Nicholas, I told

1  her, well, you know you have to talk to the baby and sing

2  to the baby.  She'd look at me, roll her eyes and go, yeah,

3  right, Mom.  Finally, she got to where I'd see her patting

4  her tummy and she would be talking to him.  She never would

5  sing to them, though.  She left that one to me.  But,

6  before they were born, I'm talking about.

7       Q.   I understand.  Go ahead.  Thank you for

8  clarifying.

9            Were you in the delivery room?

10      A.   Yes, I was.  Joe and Wendi asked me to be with

11 the delivery when Nicholas was born.

12      Q.   Was this the first day?

13      A.   June 20, 1997.

14      Q.   They lived in Casa Grande at the time?

15      A.   Yep.

16      Q.   Nicholas was born in the Casa Grande hospital?

17      A.   No, Nicholas was born in Chandler.

18      Q.   Okay.  Came up to Chandler with them?

19      A.   Yes, I did.

20      Q.   And stayed?

21      A.   Wendi was induced, so I went in that morning, the

22 three of us, Wendi, Joe and I.  And I spent the day there

23 until Nicholas was born.   And got to, when he was born, to

24 put him over and put him on the scale and stuff because I

25 was scrubbed out.

1       Q.    Okay.

2       A.    Cutie.

3       Q.    Did Wendi work the first year of Nicholas' life?

4       A.    No, she did not work.  She stayed home with the

5   baby.

6       Q.    Did you have contact with them after they left

7   the hospital?

8       A.    After they left the hospital?

9       Q.    When they went home?

10      A.    Oh, I probably was there every day for the first

11  couple weeks because that's a brand new grandbaby.  I never

12  had a grandbaby before.  And then I would go over there,

13  pop in several times a week, three, four.

14      Q.    I'm sorry?

15      A.    Three or four or, you know, just because it was

16  exciting.

17      Q.    Did you stay five minutes or stay five hours?

18      A.    Oh, no.  Sometimes I'd pop in and say hi.

19  Sometimes I'd stay for a while and get to help feed the

20  baby or give Nicholas a bath or help her pick up.  I mean,

21  even just things like that.  Help, you know, give her some

22  help.

23      Q.    Did you get to watch Nicholas, how Nicholas grew

24  during that year?

25      A.    Yes.  He grew like a great big ball.  He was a

1  chuncky little boy.  Wendi nursed him.  She nursed both
2  children.
3       Q.   How long did she nurse Nicholas?
4       A.   I don't remember if it was six months or more.  I
5  just don't recall.  I know it was a whole lot longer than
6  she was able to nurse Ashley.
7       Q.   Besides nursing, was there any anything else that
8  she fed him?
9       A.   As he got older, you know, and the doctor said,
10  you know, that she could start giving him cereal and things
11  like that.
12       Q.   Did he need to go to the doctor frequently?
13       A.   No, just for his vaccinations and things.  And
14  Ashley, I would meet her -- actually, I met her at the
15  doctor because her, Nicholas's doctor was actually in Casa
16  Grand when she was on AHCCCS.  She took him to Casa Grande
17  to the pediatrician.  I would just, you know, go over from
18  the hospital meet them there and stay.  And then when it
19  was time for Nicholas to get a shot, then Wendi would step
20  out of the room.  Because she --  she started crying.  Give
21  Nicholas or Ashley a shot or anything like that and she'd
22  start crying.  It was, you know, just easier to put her out
23  so she didn't have to, you know, she hated to hear them
24  cry.  She just didn't like to hear them cry.
25       Q.   You said that you were over there frequently and

1   may be even a pest the first three weeks and month.  How

2   about from that point forward until, say, for the next

3   year.  How many times did you spend with her and Nicholas?

4        A.   I did spend a lot of time with then.  Like I

5   said, I probably was that annoying mother that hung out.

6   But, you know, I'd stop by and see Nicholas.  And Brandon

7   spent that summer with Wendi and Nicholas and Joe, so I

8   would go over there and sometimes just pick Brandon up and

9   bring him back home for a little bit, for the night or

10  whatever and wash his clothes and let him go back because

11  he adored Nicholas.  I just didn't want to leave Nicholas.

12       Q.   Let's talk about time.  This was sometime in the

13  summer of '98?

14       A.   '97.  Nicholas was born June of '97 and Brandon

15  spent the summer there.

16       Q.   How often after that were you in their home or

17  the baby was with you, during the first year of the child's

18  life?  Okay.  Again, several times a week for the first

19  month or so?

20       A.   Right.  And then after that it would still be

21  two, three times a week I'd be over there.  Let's face it,

22  to go see Nicholas.  That's who I wanted to go see.

23  Actually, Wendi went on a boat trip, and I went with them,

24  when Nicholas was only, that first of August he was seven

25  or eight weeks old.  And I went with them for four days to

1  help her take care of him because he was so tiny and they

2  needed a place to stay and I rented a motel so that Wendi

3  would have a place for the baby.

4       Q.   In your opinion, was he properly fed?

5       A.   Yes.

6       Q.   In your opinion, did you ever -- was he properly

7  clothed?

8       A.   Oh, yes.  He was always clean.  Wendi used to rub

9  him down with baby lotion all the time.  Did the same thing

10  with Ashley.  Some babies that aren't taken real good care,

11  sometimes get cradle cap on them, you know.  Once they have

12  it, you just have to take care of it.  But they didn't have

13  that.  They didn't have rashes on their bottoms.  They were

14  just beautiful children.  And very well taken cared of.

15  Loved those children.  I have pictures of them in my office

16  and the people just go they're so beautiful.

17       Q.   So what you're saying that her care for both of

18  them was always good?

19       A.   Yes.

20       Q.   You never saw them with chapped bottoms, you

21  said?

22       A.   No, nothing like that.  They didn't, you know,

23  see, sometimes you see kids have snotty noses and things

24  like that or people let them take off bare foot and

25  stuff.  No, she always had real good -- I remember the

1    first time, I had a picture of it, I hope, but, the first

2    time that Nicholas played in the mud was over at my house

3    and Wendi was, like, going no, no, and I'd taken his socks

4    off because in the back of the house there was mud.  And I

5    thought, you know, this kid has to learn how to play in the

6    mud.  You can't leave shoes on him all his life.  And so, I

7    let him play around in the mud.  He was probably about ten

8    months old or something like that.  I know it was when she

9    was really pregnant with Ashley and it probably might even

10   be 11 months old.  And I have a picture of him playing in

11   the mud.  And mom goes not mud, not my child.

12        Q.    You were the one that let him?

13        A.    Yes.

14        Q.    Wendi bathed him?

15        A.    Wendi went and bathed him.

16        Q.    How about reading books?

17        A.    Wendi was very much into reading to the children,

18   both Ashley and Nicholas.  And she, because she's always

19   been a reader, I've always been a reader.  She had known

20   people close to her that didn't read well so she wanted to

21   make sure that Nicholas and Ashley liked books.  Wendi was

22   not a TV watcher.  And she didn't want the kids to be

23   that.  She'd rather they were involved in books.  In fact

24   sometimes -- I'd gone to the store and I bought this

25   ...ffed animal and she goes, "No, no, Mom.  Nicholas can't

1  have it.  It has little button eyes that come off."

2  Because it wasn't -- he's under the age of what the little

3  sticker says.

4          No, she's a real good mom.  She was a really good

5  mom.

6      Q.   How about things like clipping nails and so

7  forth.

8      A.   Oh, yes, she always clipped their nails.  I said

9  when you were little I used to just sort of just bite them

10  off.  She looked at me like what?  A so she always had the

11  baby clippers.  She always had the cotton swabs, always

12  kept their ears clean.

13     Q.   Did she nurse Ashley as long?

14     A.   No, because Wendi went back to work at two weeks

15  after Ashley was born because Joe had had his surgery in

16  August when Wendi had the baby earlier than planned.  She

17  had her in September.  And she was the only source of

18  income.  And because she was with the apartments, she was

19  able to take Ashley with her to the office.  And, you know,

20  that way she'd have her there.  So that, you know, if she

21  needed to nurse her, she could until Ashley was little bit

22  older.  And then she went to the baby-sitter, who lived

23  upstairs.

24     Q.   How did she handle discipline with her children.

25  We talked about discipline with people she was

1   baby-sitting.  Let's talk about discipline with her own

2   children.

3        A.   Well, Wendi always said she would never spank her

4   children.  A lot of that had to do with the upbringing in

5   the church.  And she said that she was not going to do

6   that.  She did not spank her children.

7        Q.   Why was that paddle in the house.  That came from

8   the church?

9        A.   There was a paddle.  Actually, yes the paddle had

10  come from the church.  That used to hang up in -- somebody

11  had brought it.  It said, "Spare the rod," or something

12  like that.  And it had flowers and decorations.  And one

13  day Joe had seen it and he said that's kind of funny.  Let

14  me have that.  And so, later on I gave it to him.  And

15  Wendi was upset.

16       Q.   I'm a little confused.  You say this was the

17  house and not the church?

18       A.   No.  It was in the church.  I think we had it

19  from the church.  Joe had seen it.

20       Q.   At the church?

21       A.   At the church.

22       Q.   Okay.

23       A.   And said he wanted one like that.  He thought it

24  was funny.

25       Q.   Okay.

1        A.    Alejo and I actually went a couple places to see

2    if we could find one and we never could so we let him have

3    the one from the church because he just thought it was

4    funny.   No one used it to spank children.

5        Q.    Okay.

6        A.    The only thing that Joe ever used to spank his

7    children was a wooden spoon or his hand.   That is all.

8        Q.    It's your testimony today he didn't do that?

9        A.    No.   But there was a time, a couple times that

10   she called over to our house, she was standing in the

11   hallway I think, one time Nicholas had ripped up some

12   wallpaper off his room and Joe spanked him and Wendi was

13   outside crying, telling us that Joe was spanking him and

14   she was upset.   Again, like I said, because of the things

15   from the church, she was just not going to spank her

16   children.   I think we talked about this kind of thing

17   before.

18       Q.    Let's talk about some other things you're not

19   able to do today with Wendi because of the circumstances.

20   I think you used to do some things on Saturday mornings?

21       A.    A couple of things.   First, when Nicholas was

22   small and Joe would go to the lake on the weekends and

23   Wendi, you know, Nicholas didn't need to be there.   She

24   stayed home.   And she'd come over on Saturday mornings and

25   Alejo would cook for us breakfast.   When Ashley was born,

1   we decided that we were going to have girls' Saturday

2   morning.  And so, Wendi would come over.  And I always got

3   up early.  Ashley always work up early and Wendi would get

4   her and come over.  The three of us, when they lived in

5   Casa Grande, a couple times when they moved up to Phoenix,

6   the three of us would go out and have breakfast.  We

7   usually had breakfast at the Casa Grande Cafe, they opened

8   early and they had good food.  And it was -- it was

9   something we thought we'd be doing for always.

10       Q.   Okay.  When they needed to go to the doctor, you

11  went with your daughter?

12       A.   Yes.  While we lived in Casa Grande, yes.

13       Q.   What about after they moved to Ahwatukee?

14       A.   No, I didn't.  I think I went with -- I think I

15  went with Joe one time because Wendi had to work.  I think

16  Joe took -- I don't remember if we took Nicholas or Ashley,

17  one of them to the doctor.  It was the doctor in Chandler.

18  I went with Joe once.

19       Q.   And the other times?

20       A.   The other times it was Wendi and I or Wendi and

21  Joe and I.

22       Q.   Okay.  So sometimes it was all three of you?

23       A.   Yes.

24       Q.   So Joe participated in those?

25       A.   Yes.

1      Q.   Did Joe read to the kids?  Did you ever see him

2  read to the kids?

3      A.   No, I never saw Joe read to the kids.

4      Q.   We're talking about things that you used to do.

5  What else has changed?

6      A.   Well, Wendi and I used to take the kids swimming

7  at the apartment and things like that.  I think that's when

8  they were bigger.  Then that changed.  I can't touch my

9  daughter.  I can't hug her.

10     Q.   It's been over four years since you were with her

11 and able to give her a hug, is that what you're saying?

12     A.   Yes.

13     Q.   Okay.  If she is executed, what impact is that

14 going to have on you?

15     A.   I already feel like my heart's been ripped out.

16 And if that were to happen, it's going to be real hard to

17 even want to go on.  Because I miss her.  I miss my grand

18 babies.  I miss talking to her.  I would, you know, I would

19 miss her.  And I don't want to lose her.

20     Q.   The poem you read a moment ago is one she sent

21 you in these last four years, right?

22     A.   Yes.

23     Q.   Okay.  And that one way that you have to

24 communicate now, right?

25     A.   Yes.

1    Q.   When you go to visit, is that an easy situation?

2    A.   No, it's not.  Sometimes we have to wait up to

3  six hours in line to visit her.  And then sometimes, you

4  know, finally get to just have my number called and they

5  say visitation is over.  I have to visit her with a glass

6  in front of us so there is no contact.  I have to be real,

7  real careful of anything I say only because things get

8  turned around.  I don't want anything, you know, to ever,

9  you know, how do I say this, I mean, sometimes, you know,

10  people will say I love you, someone would turn it around to

11  be something else.  It's hard.  It's hard.  And it's hard

12  hearing her voice when I tried to be strong for her.  And,

13  in turn, she ends up being the one to try to make me feel

14  better.  And it's hard.  I'm just so sorry that I didn't

15  pay more attention and that I didn't ever stand up for

16  her.  And I was -- I have a son that is devastated.

17    Q.   Talking about Brandon now?

18    A.   I'm talking about Brandon.  That he feels so

19  guilty that he feels like he should have been there to

20  protect her.  And it's been hard on everybody.  I mean,

21  it's been a tragedy:

22    Q.   Do you think the community would be better off if

23  she was executed?

24    A.   No.  No, I don't.

25    Q.   Do you feel that Wendi still has a lot to

1  contribute?

2      A.   Even if, you know, she is behind bars, she's

3  helped a lot of people inside.  I've gotten cards and

4  letters that have thanked me for having such a wonderful

5  daughter, saying how much she's helped them survive

6  inside.  I don't personally understand how anyone could be

7  strong in something like that.  I've never been to jail

8  before.  So seeing anybody, especially not my

9  daughter. . .  I'm sorry.

10      Q.   Let me ask:  Do you have any reason to believe

11  Wendi would be a threat to the community?

12      A.   No.  No, she would never be a threat to the

13  community.  That's not how -- she's always been -- she's

14  always been quiet yet always the kind to just, you know,

15  try and make everybody happy.  You know.  She wasn't

16  aggressive or ever tried to hurt anybody.  I mean, she is

17  the one out there trying to save people.

18          MR. DELOZIER:  Thank you, Your Honor.  Nothing

19  further.

20          THE COURT:  Mr. Martinez.

21

22                    CROSS-EXAMINATION

23  BY MR. MARTINEZ:

24      Q.   Ma'am, I think one of the things that you told us

25  was that she really cares for her kids, right?

1      A.    Yes.

2      Q.    And you also told us that before this happened

3  she cared for both Nicholas and Ashley, right?

4      A.    Yes.

5      Q.    One of the ways she manifested how much she cared

6  for them was, for example, she would take Ashley to get her

7  vaccinations, right?

8      A.    Yes.

9      Q.    Ma'am, you would do just about anything to your

10  daughter, right?

11      A.    I wouldn't lie.

12      Q.    You just told us that she would take Ashley to

13  get the vaccinations, didn't you?

14      A.    Yes.

15      Q.    Why don't we take a look at the records I have

16  marked into evidence to see who actually took Ashley.

17  Okay?

18           MR. MARTINEZ:   Judge, I move the admission

19  Exhibit 543.

20           MR. DELOZIER:   I have no objection.

21           THE COURT:   Exhibit 543 marked for identification

22  is admitted into evidence.

23      Q.    BY MR. MARTINEZ:   Why don't we go ahead and take

24  a look at the television set.   If you can't see it from

25  where you are, let me know.   We'll have you step down.

1          This is Exhibit Number 543.  This is Ashley's and

2   her date of birth is actually September 16 of '98, right?

3       A.   Yes.

4       Q.   And that's how you spell?

5       A.   Yes.

6       Q.   It does talk about child immunizations.  It says

7   DTP, one date given, 1/25/98.  And something, signature of

8   the person giving vaccination and then a signature of

9   parent or guardian.  Doesn't it say that?

10      A.   Yes.

11      Q.   It did say Joseph Andriano on there, didn't it?

12      A.   Yes.

13      Q.   And we have the next one, fair to say there is

14  one there that appears to be Wendi Andriano but of the

15  four, three of them are from Mr. Andriano, right?

16      A.   Yes.

17      Q.   And if we go down some more, the next three and

18  dates of those are 1999 appears those three are

19  Mr. Andriano, correct?

20      A.   Yes.

21      Q.   If we keep going down, the next set, we see again

22  that there are four signature lines and three of the four

23  are Mr. Andriano, correct?

24      A.   Correct.  It looks like it.

25      Q.   One of them appears, but couldn't tell, appears

1   to be something else.  So it may have been your daughter or

2   you?

3        A.   That looks like Wendi's writing.

4        Q.   Thank you.  The next one down the line there's

5   three and the last one appears to be your daughter but

6   those two of the three are Mr. Andriano, right?

7        A.   Yes.

8        Q.   It's fair to say that your daughter had a loving

9   home, right?  Fair to say she had a loving home when she

10  was growing up?

11       A.   Yes.

12       Q.   Loved her very much then, right?

13       A.   Yes.  And I still do.

14       Q.   Alejo, even though he wasn't her biological

15  father, loved her, right?

16       A.   Yes.

17       Q.   And even though you may have gone and done the

18  religious thing, that still means that you loved her,

19  didn't you?  You gave her the best that you had, right?

20       A.   Gave her the best that we had.

21       Q.   You instilled values in her, didn't you?  Tried

22  to teach values, didn't you?

23       A.   Of course.

24       Q.   And when you returned back from this religious

25  episode or period, you then enrolled her in the religious

1   school?

2       A.   In the Christian school called 1st Psalm.

3       Q.   What year did you enroll her in there?

4       A.   What year did she go there?  I believe in '79 and

5   I'd have to really look but right around there.

6       Q.   And if it was in '79, that would have made her

7   nine, right?

8       A.   Yes, she was born -- she could have been eight or

9   nine.

10      Q.   She was born August 26, 1970?

11      A.   That's correct.

12      Q.   And one of the reasons I suspect that you

13  enrolled her there was because that would teach her values,

14  right?

15      A.   Correct.

16      Q.   Some of them being don't lie, right?

17      A.   Correct.

18      Q.   Don't cheat?

19      A.   Correct.

20      Q.   Don't cheat on your husband?

21      A.   I don't think you necessarily say that.  That's

22  something they weren't teaching them at nine years old.

23      Q.   But she was there until she was 18?

24      A.   Correct.

25      Q.   And are you familiar with Exodus?

1       A.    I couldn't quote it to you.

2       Q.    You're familiar with the Ten Commandments, right?

3       A.    Yes.

4       Q.    One of them is not to cheat, don't commit

5  adultery, right?

6       A.    Uh-huh.

7       Q.    Is that yes?

8       A.    Yes.

9       Q.    And the Bible was taught there, right?

10      A.    Correct.

11      Q.    And from the very beginning from when she was

12  eight or nine, these are the kinds of things she was

13  taught, right?

14      A.    Yes.

15      Q.    She was a very intelligent girl, wasn't she?

16      A.    Yes.

17      Q.    She picked up things, it appeared, easily as she

18  was growing up?

19      A.    Well, she had to work at it just like most

20  people.

21      Q.    And studying?

22      A.    Right.

23      Q.    So in addition to that, she's got a loving home

24  and it wasn't a situation where you guys were on the

25  street, kind of poor.  I mean, it may have been modest, the

1  way you described it before but you had a home, didn't you,

2  a house?

3        A.   Not when we were traveling, no.

4        Q.   But after you were done traveling, you had a

5  home, correct?

6        A.   We had a home.

7        Q.   And it was a home that she felt comfortable

8  bringing friends over, right?

9        A.   I assume so.

10        Q.   Well, she brought them over I think is what you

11  just told us, right?

12        A.   Yes.

13        Q.   It was a home that animals were there.  I think

14  you said dogs but no cats?

15        A.   Yes.

16        Q.   So it seems like it's the idyllic, if you will,

17  sort of upbringing, wasn't it?

18        A.   That would always be somebody's own perception of

19  idyllic.

20        Q.   She didn't want for anything, did she?

21        A.   Yes, she did, at times.  Yes, she did.

22        Q.   Well, she had a roof over her head, right?

23        A.   Uh-huh.

24        Q.   Is that yes?

25        A.   Yes.

1            THE COURT:  Make sure the jury hears your

2    responses.

3         Q.   BY MR. MARTINEZ:  She had food to eat, correct?

4         A.   Yes.

5         Q.   She was nurtured by you and Mr. Ochoa, correct?

6         A.   Yes.

7         Q.   She's going to school where her mind was being

8    stimulated, correct?

9         A.   Yes.

10        Q.   And values were being taught, right?

11        A.   Yes.

12        Q.   And it appears from what you're telling us, it is

13   something she enjoyed, right?  Going to school, right?

14        A.   Going to school, like a child most times.

15   Sometimes not.

16        Q.   She had friends when she was in school, didn't

17   she?

18        A.   A few.  It was a small school.

19        Q.   But even though it was a small school, there were

20   still other peers that she would interact with, correct?

21        A.   Not the last couple years.  I mean, there were

22   children she took care of, the younger children but she

23   didn't have anyone like graduating in her class and anyone

24   of her age for the last couple years.

25        Q.   One of the things that you indicated to us was

1   that she was very musically inclined, I think, in the

2   beginning, right?

3       A.   Yes.

4       Q.   And that's something that you encouraged, right?

5       A.   Correct.

6       Q.   So, if she showed aptitude like she had in this

7   certain direction, you and Mr. Ochoa tried to do everything

8   you could for her to make a good sort of, you know, growing

9   up experience, for lack of a better term, didn't you?

10      A.   Yes.  Financially we weren't able to always do

11  much as far as that.

12      Q.   Well, you did talk about the contests that she

13  would go to.  I think yearly, basically?

14      A.   Correct.

15      Q.   She was able to go to those, right?

16      A.   Yes, because she earned the money.

17      Q.   Sure.  Absolutely.  In other words, it wasn't

18  like she missed out on that, did she, or anything, even

19  though she had to earn her own money?

20      A.   No, she was able to go.

21      Q.   Right.  It sounds like you taught her values,

22  too.  The value of hard work, right?

23      A.   Correct.

24      Q.   It didn't sound like you had to discipline her

25  very often, right?

1    A.    As far as like?

2    Q.    Well, I mean it didn't sound like the way you

3    described her, it didn't sound like she gave you too much

4    trouble, right?

5    A.    No.  She had her moments when, you know, she

6    didn't want to do the homework or things like that.  You

7    know, so you ground them.

8    Q.    Right.  You didn't beat her or anything like

9    that, did you?

10    A.    No.

11    Q.    And if she didn't do her homework, Mr. Ochoa

12    wouldn't beat her, right?

13    A.    No.

14    Q.    And, again, while she was growing up she never

15    came home and said to you, well, you know, some people at

16    the church touched me inappropriately or anything like

17    that, did she?  That never happened, right?

18    A.    No.

19    Q.    You also indicated to us that one of the things

20    that was remarkable or different about her was that she was

21    mature at an early age.  Do you remember telling us that?

22    A.    Yes.

23    Q.    And she matured, in fact, that's part of the

24    reason why other parents liked her to baby-sit so much,

25    right?

1       A.   Correct.

2       Q.   That was in part credit to you and your husband

3   because others wanted to help her and teach her, right?

4       A.   A lot of people helped her and taught her in

5   school, other adults.

6       Q.   But you and he probably had the major influence,

7   wouldn't you agree?

8       A.   I would like to think so.  But, you know, when

9   your child spends all these hours in school, you know,

10  there's a lot of outside influence.

11      Q.   And she did acquire her skill to be a good mother

12  from baby-sitting duties, right?

13      A.   Yes.

14      Q.   One of the things you told us was that you were

15  very happy when Nicholas was born, being it was the first

16  grandchild, right?

17      A.   Yes.

18      Q.   And then you also talked a little bit about the

19  second child being born, Ashley?

20      A.   I was really excited about Ashley because she got

21  to carry on our family name which is Ashley Elizabeth.

22  That goes back a couple of several generations.  She was

23  just precious.  She's just the sweetest little thing.  I

24  was excited to finally be able to buy little girl clothes.

25      Q.   Could it also be that perhaps when she was --

1  born -- again, it would have been October or September of

2  what year?

3      A.   '98.

4      Q.   So would it also be that perhaps when you learned

5  that your daughter was pregnant a second time that you

6  indicated that that's pretty horrible?  Did you ever

7  improvidently make that remark?

8      A.   No, I never did because Alejo and I always told

9  Wendi from the time she was young when you get married,

10  have two because we'll help out with the second one.  You

11  don't want to have just one because Wendi was raised as

12  just one and I always wanted more kids.

13      Q.   And could it perhaps be that your daughter was

14  unhappy about being pregnant a second time, perhaps did you

15  ever hear her say anything like that?

16      A.   No.  Wendi was looking forward to having a little

17  girl.

18      Q.   Did she ever complain that being pregnant was

19  going to make her fat and ugly and unattractive?  Did she

20  ever complain to you about that?

21      A.   No.

22      Q.   Did she ever tell you that it was Joe's fault

23  that she was pregnant the second time?  She really didn't

24  want the baby?

25      A.   No.

1    Q.   You indicated that she bathed and fed the kids.

2 Do you remember telling us that?

3    A.   Yes.

4    Q.   I assume like most kids they get fed throughout

5 the day, right?

6    A.   Yes.

7    Q.   My understanding was that she went to work or

8 returned to work or started working for Courtyard a week or

9 so after Ashley was born.  Wouldn't that be your

10 understanding of it?

11    A.   About two weeks after.

12    Q.   And that Mr. Andriano was home all day, right?

13    A.   Yes.  He was home from surgery because we were

14 still, my husband and I, were still helping take care of

15 him.

16    Q.   And he had surgery in August of 1998, right?

17    A.   Correct.

18    Q.   And when was she born, again, September 16th of

19 '98?

20    A.   She was born early.

21    Q.   And Ms. Andriano indicated to us previously that

22 after about a month he was back to normal, is that -- in

23 other words, from the surgery, is that your understanding

24 of it or not?

25    A.   A month after Ashley was born, I'm understanding.

1    Q.   The surgery was August of 1998, the major one?

2    A.   Yes.

3    Q.   Do you remember that?

4    A.   Yes.

5    Q.   And Ms. Andriano testified that it only took him

6    about a month for him to be having his strength back.  Is

7    that how you recall it or perhaps do you recall it a little

8    bit differently as far as like getting up and around or

9    doing things or having some strength?

10   A.   Yeah.  Oh, yeah.  He was doing real well.  He

11   actually was.  He was taking his drink.  The stuff that he

12   said was like chalk, nasty stuff.  But then after a bit he

13   started with therapy and with massage therapy and

14   everything that he came back like.  And the doctors were

15   just amazed.

16   Q.   Could it be perhaps that because his recovery was

17   so quick that he began to become the primary caretaker of

18   the kids after he regained his strength and after he

19   learned that he had this terminal illness?

20   A.   No, they had a baby-sitter at the Courtyard.  She

21   lived right upstairs.

22   Q.   Would that be Anna?

23   A.   No, Mena.

24   Q.   One of the things that you indicated to us was

25   that you miss your grand babies.  And it made you somewhat

1   emotional talking about it.  Do you remember, that?

2        A.   Uh-huh.

3        Q.   Is that yes?

4        A.   Yes.

5        Q.   And with regard to those grand babies, they're

6   still alive, correct?

7        A.   Oh, yes.

8        Q.   So, it's not if like anything happens in the

9   proceeding, whatever happens, that they're going to die or

10  anything like that, right?  They're still alive, correct?

11       A.   Yes, they are.

12       Q.   And finally, the issue -- not finally -- the

13  issue you were talking about the punishment.  There's a

14  paddle in Wendi Andriano's house.  There's a paddle that

15  they have had in this house, correct?

16       A.   Yes, there was a paddle.  Like I said, it's more

17  of a decoration than a paddle.

18       Q.   Describe the paddle for me.

19       A.   It was probably about this long (demonstrating).

20  And it was varnished and painted.  Has a, like I said,

21  scripture on it that said -- I don't remember what it

22  said.  Then it had a little hole and hanger at the top so

23  she could hang it on the wall.

24       Q.   And during the time through her pregnancy and

25  during the time that the defendant was married to Joseph,

1  you continued to try to help her, didn't you?

2        A.   Of course.

3        Q.   And Alejo Ochoa also continued to help her and

4  Mr. Andriano, right?

5        A.   Yes.

6        Q.   One of the things you told us was that the two of

7  you even went to the store and either paid for or financed

8  a Yukon, right, that they were driving?

9        A.   I leased the Yukon.

10        Q.   I mean, so if they ever had any -- if they had

11  any problems, it appears, financially, they felt

12  comfortable coming to you, correct?

13        A.   No.  She wasn't comfortable coming to me to ask

14  for money.

15        Q.   But --

16        A.   If that's what you're asking me.

17        Q.   But, in fact, what ended up happening is that you

18  and Mr. Ochoa often appeared to have been very benevolent

19  and helped them out a lot?

20        A.   Like I said, she's our child.

21        Q.   Sure, and you're going to help your children?

22        A.   Absolutely.

23        Q.   And so it appears that at least during the time

24  that Mr. Andriano is going to die, it appears that you and

25  Mr. Ochoa stepped forward to make the situation easier for

1   them, for the two of them, right?

2        A.   In any way we could.

3        Q.   And it appears you gave Joe money to go on boat

4   trips and things like that.  It seems that you and

5   Mr. Ochoa have always provided in whatever way is possible

6   for you for the defendant, correct?

7        A.   In any way that we could financially.  We weren't

8   able to do as much as, you know, we would have loved to

9   have been able to have done.

10       Q.   But no one is saying she was a deprived child or

11  anything like that, right?

12       A.   She had some periods that were real rough.  We

13  had some periods that were real, real hard that we only had

14  beans at the house.  So, yes, she did have some rough

15  times.

16       Q.   But, all in all, there was still love in the

17  house, correct?

18       A.   There was love in the house.

19       Q.   Encouragement, correct?

20       A.   Yes.

21       Q.   And took care of all her things when she was

22  younger, correct?

23       A.   To the best that we could do at the time.

24       Q.   Sure.  And appears to have continued up to the

25  point to today that you still are, you know, to the best of

1  your ability helping her out, right?

2      A.   To the best that we can.

3      Q.   Sure.  And that would include when Mr. Andriano

4  was living, you provided what financial help you could,

5  right?

6      A.   Correct.

7      Q.   Also provided emotional support, correct?

8      A.   As much as we could.

9      Q.   You also provided baby-sitting support, correct?

10     A.   Yes.

11     Q.   And during this same time, to your knowledge, it

12  appeared that his side of the family also may have provided

13  some support for the family, right?

14     A.   Of course.

15     Q.   They provided a car, right?  The Andrianos

16  provide a car for them to drive, right?

17     A.   I know they had Jeanette's car.

18     Q.   And were there -- you must have seen them around,

19  they provided emotional support to the family, didn't they?

20     A.   You'd have to ask them.  You know, you're asking

21  it seems to me something that I can't possibly say for

22  sure, you know.

23     Q.   If you know and if you don't, that's fine, too,

24  do you know whether the Andrianos ever provided money to

25  the Andriano household?

1      A.    I never saw them hand money.  Again, you're

2   asking something that I don't --

3      Q.    No.  I'm asking if you ever heard about it.  Did

4   you ever hear about the Andrianos giving them money?  Did

5   anybody say that?

6      A.    Actually, giving money, no.  I know that the

7   family had lent Joe money before.  I believe it was before

8   Wendi was married to help start his business.  But that's

9   not something, you know, you don't go around talking about

10   what other people are doing.

11      Q.    I understand.  But all in all, it appears that

12   there was all this support for the defendant.  There was

13   you and your husband were there.  And it appears that she

14   had, if not financially speaking, as a child it appears she

15   did have a loving upbringing?

16      A.    We loved her.  We talked about the hard times

17   with, you know, there was a lot of things that I wish she

18   hadn't done in her childhood, emotionally.  There was a lot

19   of stuff that we didn't do.  Especially, you know, as

20   things, you know, progressed on in their marriage, there

21   was a lot of things that when she asked me for help to

22   leave one time and I just sort of blew it off.  There are a

23   lot failures, too.

24      Q.    Sure.  But, you didn't do that intentionally,

25   right?  Whatever you did -- in other words, if anything

1   hurt her, you didn't do it intentionally?

2         A.   I would hope not.

3         Q.   You just told us that you love her very much.

4   That's understandable?

5         A.   I love her very much.

6         Q.   So you've been there for her as much as you can,

7   right?

8         A.   As much as can be expected.   I don't think I was

9   there enough.

10        Q.   Mr. Ochoa has been there as much as he can,

11  right?

12        A.   Again, you'd have to ask him but I would say yes.

13             MR. MARTINEZ:   Thank you.   I don't have anything

14  else.

15             THE COURT:   Ladies and gentlemen, we're going to

16  take our evening break at this point in time.   Remember

17  during the break to follow the entire admonition I have

18  given you including the fact you're not to discuss the case

19  with anyone.   Do not let anyone discuss the case with

20  you.   Don't do any research, investigation,

21  experimentation or testing about the case.   Keep an open

22  mind.   And have a nice evening.

23             We'll see you here at 1 p.m. tomorrow.

24             We'll be in recess.

25             (Proceedings adjourned.)

# APPENDIX M – Part 1

05-0002
Braccio

DP

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

| | | |
|---|---|---|
| STATE OF ARIZONA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. CR2000-096032 |
| | ) | CR05 0005-AP |
| WENDI ELIZABETH ANDRIANO, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

BEFORE:  THE HONORABLE BRIAN K. ISHIKAWA

Mesa, Arizona
December 13, 2004

REPORTER'S TRANSCRIPT OF PROCEEDINGS
(Trial)

COPY

SHARON FLORES
CERTIFIED COURT REPORTER
50374

2

1

2

3                          A P P E A R A N C E S

4

5

6

7      For the State:

8                      Mr. Juan M. Martinez

9                      Deputy County Attorney

10

11

12

13

14     For the Defense:

15                     Mr. Daniel B. Patterson

16                     Mr. G. David Delozier, Jr.

17                     Office of the Public Defender

18

19

20

21

22

23

24

25

3

1
2
3                          I N D E X
4    WITNESSES:                                        PAGE
5
6       DONNA OCHOA

7          Redirect Examination by Mr. Delozier            6
8          Examination by the Court                       31
9          Recross-Examination by Mr. Martinez            32

10
11
12      LONNIE INSKEEP

13         Direct Examination by Mr. Delozier             37
14         Cross-Examination by Mr. Martinez              43
15         Redirect Examination by Mr. Delozier           46

16
17      GIA PALICKI

18         Direct Examination by Mr. Patterson            48
19         Cross-Examination by Mr. Martinez              59
20         Redirect Examination by Mr. Patterson          68

21
22
23
24
25

4

1

2

3                           I N D E X (Continued)

4    WITNESSES:                                              PAGE

5

6    BARBARA MITCHELL

7       Direct Examination by Mr. Delozier              70

8       Cross-Examination by Mr. Martinez               74

9       Redirect Examination by Mr. Delozier            78

10      Examination by the Court                        80

11

12   ALEJO OCHOA

13      Direct Examination by Mr. Delozier              81

14      Cross-Examination by Mr. Martinez               89

15

16   JANA ANDRIANO CLAYTON

17      Direct Examination by Mr. Delozier              97

18      Cross-Examination by Mr. Patterson             132

19

20

21

22

23

24

25

5

1

2                        E X H I B I T S

3

4              (Exhibits were marked prior to trial unless

5      indicated.)

6

7      NUMBER:          DESCRIPTION        MARKED    ADMITTED

8       544             Counseling Documents            95

9       545             College Documents               95

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

6

```
 1                    P R O C E E D I N G S

 2

 3          THE COURT:  This is Cause Number CR2000-096032,

 4  State of Arizona versus Wendi Elizabeth Andriano.

 5          The record will reflect the presence of the

 6  defendant and counsel and the jury.

 7          Donna Ochoa is on the witness stand and we'll

 8  begin the redirect examination by Mr. Delozier.

 9          Mr. Delozier.

10          MR. DELOZIER:  Thank you, Your Honor.

11

12                    DONNA OCHOA,

13  called as a witness herein, having been previously duly

14  sworn, was examined and testified as follows:

15

16                 REDIRECT EXAMINATION

17  BY MR. DELOZIER:

18      Q.   Please state your name for the record?

19      A.   My name is Donna Ochoa.

20      Q.   You're the same person who was here on Thursday,

21  last week, testifying?

22      A.   That's correct.

23      Q.   And you're still under oath.

24      A.   Yes, I am.

25      Q.   Okay.  Okay.  There was some discussion during
```

1   your cross-examination by Mr. Martinez of immunization

2   records.   Remember that?

3        A.   Yes.

4        Q.   The testimony on direct was largely about

5   Nicholas; is that right?

6        A.   Yes.

7        Q.   And you really didn't talk about Ashley.   So why

8   don't you tell me a little bit about what happened at

9   Ashley's birth, how things went from that day and we'll get

10  into the immunization records in a bit?

11       A.   Okay.   Ashley is my granddaughter and Ashley was

12  born on September 16th of 1998.   She was a few weeks

13  early.   She was born about three weeks after Joe had his

14  last surgery.   And Wendi had tried to call her dad and I to

15  come over.   And it was like in the middle of the night when

16  she started having labor pains.   We didn't hear the phone

17  because the phone was in the front of the house.

18            MR. MARTINEZ:   Objection.   Relevance.

19            THE COURT:   Overruled.   Go ahead.

20            THE WITNESS:   Okay.   And so, anyway, she got

21  ahold of her cousin who came and knocked on our window and

22  told us Wendi was having the baby, you better get over

23  there.   So we went to the apartment and Wendi was having

24  contractions really close.   This one was going a whole lot

25  quicker than Nicholas.   Nicholas, she had to be induced.

8

1    So we were getting the stuff from Wendi's bag and taking it

2    to the car.  Joe said he wanted to take a shower and have

3    Alejo clean his incision first.

4              So we waited while that happened.  And then, Joe

5    and Wendi and I left and she was supposed to deliver at

6    Desert Sam.  And there was no way she was going to make

7    it.  In the meantime, when we were at Wendi's house I also

8    picked up scissors and floss and gauze and blankets and

9    pillows too and towels.  Because it was getting hard to

10   tell just how long they were, you know, the contractions

11   were apart.  So I just didn't want to take a chance and I

12   have delivered a baby before.

13             And so, we get close to Phoenix and there is no

14   way she's going to make it because, "Mom, I can feel the

15   baby's head." And I'm going, "Please, you know, just keep

16   your legs together.  We'll make this."

17             So, we pulled -- I told Joe to pull into Chandler

18   and we went to Chandler.  And they came out with a chair

19   and the nurse checked her and then they got a stretcher and

20   wheeled her into the labor and delivery room that they have

21   there.  And hit the walls and everything else.  It was like

22   exciting.  I thought, okay, the first one was nice and

23   calm.  We knew when she was going to have it.  And here

24   comes the baby girl, she's in a hurry to get here.

25             So, Ashley was born.  The nurse saw her and she

9

1    looked at her and said, "Have you ever helped?"  And I

2    said, "Yeah, I have a clinical background."  She goes gets

3    the gloves, because the doctor wasn't in there yet.  So

4    someone was going to have to help her.  The doctor made

5    it.  And then put little Ashley -- she was so cute -- put

6    her on the scale and she kind of didn't want to lay on her

7    back.  So they had to put her on her knees.  And she had

8    her little bottom had up.  She was just a beautiful little

9    baby girl.  Being a grandma, I'm a little bit prejudice.

10   But she was a beautiful baby.  And I did get to be involved

11   so much in the birth with both of my grandchildren.

12          And Ashley, again, is one that I told you we used

13   to go on a girls' breakfast.

14          We took Wendi and Joe and Nicholas and Ashley to

15   Lake Tahoe for vacation in '99.

16          MR. MARTINEZ:  Objection.  I don't know the

17   scope.

18          THE COURT:  Sustained.  Ask your next question.

19   Q.    BY MR. DELOZIER:  Give us some idea what happened

20   within the first couple months of Ashley's birth.  This is

21   September of 1998, you said?

22   A.    This is September of 1998.  Ashley was born about

23   six weeks after this surgery, or four weeks.  And Wendi had

24   to go back to work because she had only been working at

25   that position for a few months.  And she went back when

1   Ashley was two months old, or two weeks old.  She took her

2   to the office with her.  She had, you know, a carry thing.

3        Q.   Where was she working at that time?

4        A.   She was working at Courtyard Apartments.  And the

5   office was separate.  It wasn't out where the general

6   public was.  They had a separate office so she was able to

7   nurse Ashley in the office and care for her there.

8             My sister and her husband were also at the

9   apartments.  They helped with Nicholas.  My sister came out

10  from Texas who is an R.N. and helped.

11       Q.   At Ashley's birth, how old was Nicholas?

12       A.   They are 15 months apart.

13       Q.   Okay.

14       A.   So Nicholas wasn't, you know, he wasn't very big

15  either.  There was two babies with diapers and bottles.

16  And Ashley, she's a little fighter.  She would fight for

17  her share of the attention.  She kind of got shoved into

18  the back because of everything going on with Joe and the

19  surgery and all the stuff we had to do.  Little Ashley kind

20  of just got pushed aside a little bit.  And so it is a good

21  thing she got to go the first few weeks with her mom until

22  they found the baby-sitter who was upstairs from their

23  apartment.  And they took care of Ashley.

24       Q.   So the first few weeks when Wendi went back to

25  work, Ashley went with her.  Was that every day?

1    A.    Every day that Wendi worked, yes.

2    Q.    And was it a normal five-day week?

3    A.    Yes.  I believe -- I'm not sure.  She may have

4    worked -- I know she worked one of the days on the weekend

5    and then four days during the week.

6    Q.    All right.  And how long did that continue, for

7    several weeks?  Can you be more specific?

8    A.    Several weeks until she found the baby-sitter.

9    And then after she still would take Ashley with her for a

10   few hours a day because she was, like I said, she was

11   nursing her.  And then it got to where the baby-sitter

12   would bring the baby over to her.

13   Q.    Now, during that several weeks, Nicholas was with

14   your sister?

15   A.    Nicholas was at the apartment.  My sister and

16   brother-in-law were staying there.  And I'm not -- I don't

17   remember if Nicholas -- I know he stayed there while my

18   sister was there.  But then, after a week or two he went

19   over to another baby-sitter that used to be his

20   baby-sitter, if I remember correctly.  But that baby-sitter

21   didn't take babies.  So they were looking for somebody that

22   would take Nicholas and Ashley.

23   Q.    And they found that after several weeks, you say?

24   A.    After a few weeks.

25   Q.    Can you give us an approximate number?

12

1    A.   Probably three or four.

2    Q.   Do you remember that baby-sitter's name?

3    A.   The baby-sitter that ended up -- yes, her name

4  was Mina Mora.

5    Q.   What was Mina's schedule to care for the

6  children?

7    A.   She was supposed to watch them from the time, I

8  think it was eight to five.

9    Q.   Was that Wendi's work day?

10   A.   That was Wendi's work day.  Her husband would be

11 home around five and she hadn't wanted to baby-sit after

12 that.

13   Q.   Who's husband?

14   A.   Mina's husband.

15   Q.   So eight to five on the days that Wendi worked?

16 She kept them from eight to five on the days Wendi worked?

17   A.   Correct.

18   Q.   Was Joe working during that period?

19   A.   No.

20   Q.   How long did Mina help care for the children?

21   A.   Mina baby-sat the children a little over a year.

22 I believe it was a little over a year.

23   Q.   So we're into fall of 1999?

24   A.   Yes.

25   Q.   October, November, December?

1       A.   I think it began in September of '99.

2       Q.   Okay.  And the testimony you gave regarding

3   immunizations, that was largely Nicholas; is that correct?

4       A.   That's correct.  Because with Nicholas, that

5   first year of his birth, Wendi was at home with Nicholas

6   and so, you know, Wendi would be the one that obviously

7   took Nicholas to the doctors.  And I was in Casa Grande.

8   They were on AHCCCS.  And even though he was born in

9   Chandler, AHCCCS wouldn't pay for a pediatrician in

10   Chandler, she had to stay in Casa Grande.

11       Q.   So that was Nicholas they were on AHCCCS at that

12   time.  Were they on AHCCCS with Ashley's birth?

13       A.   No, they were not.

14       Q.   How was that paid for?

15       A.   That was paid for by insurance.

16       Q.   Through the Courtyard?

17       A.   Yes.

18       Q.   Okay.  At the time that Ashley was getting her

19   immunizations that you were asked questions about earlier,

20   where were they living then?

21       A.   I believe the first of her immunizations would

22   have been in Casa Grande.  She would have been living in

23   Casa Grande.  But I believe her doctor and pediatrician

24   were in Chandler.

25       Q.   All right.  So, during the time that Ashley was

1   getting her immunizations, Wendi was working?

2        A.   Yes.   Wendi would have been working in Casa

3   Grande.

4        Q.   Did you have a chance to look at the chart that

5   was shown you the other day?

6        A.   No.

7             MR. DELOZIER:   If I could approach.

8             THE COURT:   Yes.

9        Q.   BY MR. DELOZIER:   Exhibit 543, that we're

10   showing.   Take a few moments to look at it.

11        A.   Okay.

12        Q.   I'm going to put it up on the ELMO for you to

13   take a look at it.

14             What I want to direct your attention specifically

15   to are the dates -- I don't know if you can make those out

16   or not -- but the sort of third column.   Do you see the

17   third column?

18        A.   Yes.

19        Q.   It's one that has handwritten items?

20        A.   Yes.

21        Q.   The first column on the left-hand side, what is

22   that?

23        A.   The type of vaccination or immunization.

24        Q.   The first entry on the first handwritten portion,

25   is what?

15

1    A.   The first entry, the handwritten potion, would be

2  the date that it was administered.

3    Q.   What is the date?

4    A.   Looks like 11/25/98.

5    Q.   Let's go down to the seventh entry on the

6  left-hand side.  Likes look HIV?

7    A.   Uh-huh.

8         THE COURT:  Is that a yes?

9         THE WITNESS:  Yes.

10   Q.   BY MR. DELOZIER:  What's the date of this shot?

11   A.   Looks like 11/20 something.  Looks like pretty

12  much the same date as the one above, 11/25/98.

13   Q.   Let's go down to, skip that group that's vacant

14  there.  See what looks like OPC?  Do you see that one?

15   A.   Yes.

16   Q.   What's the date for that shot?

17   A.   11/25/98.

18   Q.   And moving on down to HVB, Number 1, towards the

19  bottom?

20   A.   Yes.  11/25/98.

21   Q.   Is that actually  HVB, Number 2, isn't it?

22   A.   Yes.

23   Q.   HVB Number 1 was done at that hospital, right?

24   A.   Yes.

25   Q.   If we -- let's go back to the top, then.  We've

16

1    got DPT, Number 2.  See that one?

2         A.   Yes.

3         Q.   What date is that?

4         A.   Looks like 2/3/99.

5         Q.   Okay.  Then come back to HIV Number 2, what date

6    is that?

7         A.   2/3/99.

8         Q.   Come down to OPV, Number 2?

9         A.   2/3/99.

10        Q.   Come down to HVB Number 3 what date is that?

11        A.   That's 3/19/99.

12        Q.   And we'll go back up to the top again.  We've got

13   DPT, Number 3.  What date is that?

14        A.   3/9/99.

15        Q.   Is that 3/9 or 3/29.  You can get up if you need

16   to?

17             THE COURT:  You can get up and move away from the

18   witness stand.  Just remember to speak up when you're away

19   from the witness stand.

20             THE WITNESS:  Okay.

21        Q.   BY MR. DELOZIER:  DPT, Number 3?

22        A.   It could be a 19.

23        Q.   Let me zoom in a little.  Does that help?

24        A.   Yeah, it looks like 29 there.

25        Q.   Okay.  Let's go down to HIV Number 3.  What date

1    is that?

2         A.   3/29/99.

3         Q.   Let's go down to HVB, 3 at the bottom?

4         A.   3/29/99.

5         Q.   So, looks like what happened is they give them

6    three or four shots on the same date, correct?

7         A.   Correct.

8         Q.   Thank you.  You were asked questions about the

9    Ten Commandments and the religious instruction.  Do you

10   remember those?

11        A.   Yes.

12        Q.   What would you do differently?

13             MR. MARTINEZ:  Objection.  Relevance.

14             THE COURT:  Sustained.

15             MR. DELOZIER:  May I approach?  May I have a

16   moment, Judge?

17             I'll come back to that in a minute.

18        Q.   BY MR. DELOZIER:  I want to go back to Exhibit

19   543.  The last column on the right is informed consent.  Do

20   you see that?

21        A.   Yes.

22        Q.   An entry there above the signatures, can you see

23   that?

24        A.   Signature of parent or guardian.  Signature of

25   parent or guardian in response to informed consent

18

1    statement.

2         Q.   You never signed any of those entries, did you?

3         A.   No.

4         Q.   In fact, they wouldn't have permitted that, would

5    they?

6         A.   No.

7         Q.   If both parents are present, they only require

8    one signature of the parent?

9              MR. MARTINEZ:  Objection.  Lack of foundation as

10   to that date and time.

11             THE COURT:  Sustained.

12        Q.   BY MR. DELOZIER:  Do you know if when the

13   children go for the immunization, if both parents are

14   present are both parents required to sign?

15        A.   No, they're not.

16        Q.   Also, let's go to the signature there, first line

17   on the DPT, Number 1 line, first one all the way across.

18   Are you able to tell whose that signature is?

19        A.   That appears to be Joe.

20        Q.   And the second?

21        A.   Second one appears to be Joe.

22        Q.   And the third one?

23        A.   Wendi.

24        Q.   Okay.  Fourth one?

25        A.   Joe.

1    Q.    On the next set?

2    A.    Appears to be Joe on all of those.

3    Q.    How about the next grouping.  Under OPV 1, jump

4    the blank spaces.  What do you see there?

5    A.    It looks like Joe, Joe, Wendi, Joe.

6    Q.    How about the last grouping?

7    A.    Joe, Joe, Wendi.

8    Q.    Let's look at the dates.  On March 9, go to DPT

9    one that's put in on March 9, correct?

10   A.    Looks like a stamp.

11   Q.    If you go across on the column, whose signature

12   is on that one?

13   A.    Joe.

14   Q.    Let's move down to OPV 3, whose signature is on

15   that one there?

16   A.    No.  There is a signature underneath.

17   Q.    Okay.  You think they might have signed the wrong

18   spot?

19        MR. MARTINEZ:  Objection.  Lack of foundation.

20        THE COURT:  Sustained.

21   Q.    BY MR. DELOZIER:  Okay.  So on the same date

22   March 9, we have two different signatures, by two different

23   parents.  Correct?

24        MR. MARTINEZ:  Objection.  That's not what the

25   document says.

20

1          THE COURT:  Sustained.

2     Q.   BY MR. DELOZIER:  Well, I think the document

3  shows March 9, right, for that test?

4     A.   Yes.

5     Q.   For the shots, right?

6     A.   Yes.

7     Q.   And the column for informed consent for the shot

8  is what you say is Joe's signature, correct?

9     A.   Yes.

10    Q.   Then on March 9 we have OPV 3, right?

11    A.   Yes.

12    Q.   And there is no signature on that line, but one

13  right below it, correct?

14    A.   Correct.

15    Q.   And if we go on down to the last entry, March 9,

16  right?

17    A.   Correct.

18    Q.   You go across to the right, there's a signature.

19  Who is that?

20    A.   Wendi.

21    Q.   Thank you.  I started to ask you a question

22  regarding the religious training and background that you

23  were asked about, that you testified a little bit about.

24  And you had experiences with the street ministry, if you

25  call it that, or traveling missionary group, right?

1      A.    Yes.

2      Q.    You had then enrolled her in the 91st Psalm later

3    Harvest Christian Academy School where she stayed until she

4    was 18; is that correct?

5      A.    That is correct.

6      Q.    If you had it to do over, what would you change

7    about the kind of religious experiences that you gave her?

8            MR. MARTINEZ:  Objection.  Relevance.

9            THE COURT:  Sustained.

10           MR. DELOZIER:  Can we approach, Your Honor?

11           (Bench conference was held outside the hearing of

12   the jury.)

13           MR. DELOZIER:  There has been continued issues

14   raised about violating the Ten Commandments by

15   Mr. Martinez.  Okay.  And wasn't this part of your church

16   instruction, doesn't she violate that church instructions.

17   And basically criticizing the experiences.  I think this

18   lady needs to have the opportunity to explain the nature of

19   those experiences and what she would change if she did them

20   today.

21           THE COURT:  Mr. Martinez.

22           MR. MARTINEZ:  I think that what we tried to show

23   on Thursday was that her up bringing was exemplar, just the

24   converse of what she's postulating for the Court saying

25   that she'd changed this or that.

22

1         THE COURT:  I'm going to sustain the objection

2   but you made your record.

3         (Bench conference concluded.)

4      Q.   BY MR. DELOZIER:  Mr. Martinez asked you if

5   thought she had an idyllic or perfect childhood or

6   upbringing.  Do you remember that line of questioning?

7      A.   Yes, I do.

8      Q.   Would you wish to clarify your answer on that

9   subject?

10      A.   Yes, I would.  I do not believe that Wendi had an

11   idyllic or perfect childhood.  Yes, we loved her, you know,

12   and I agreed with that.  But as far as a perfect childhood

13   or other, no.

14         I was married to Wendi's biological father and

15   abuse ran rampant in that family.  Her biological father is

16   in prison for child molestation of a retarded

17   stepdaughter.  His father had abused the other

18   granddaughters in the family.  His brother also went to

19   jail for that.

20         I know of a number of people -- I was really

21   young and really naive and when they said, well, you know,

22   your husband has been abusing your nieces, I thought there

23   is no way.  Finally, after Wendi was about three years old

24   I tried to get away from him because he not only abused

25   children, he abused adults.  I was verbally and physically

1   abused.

2            Those are things that I don't like to talk

3   about.  And a lot of other things I didn't admit for a lot

4   of years.  Actually, not until about three years ago.

5            To make things worse, when I left my husband and

6   I was living with my mom, I put Wendi into a nursery school

7   in Phoenix, downtown Phoenix.  And the next thing I knew,

8   they were sending all the kids home because the State was

9   doing abuse charges on them.

10           It was like -- it was just kind of crazy.  And I

11  moved to Casa Grande to get away from, you know, the people

12  that I knew and thought may be it could get better for

13  Wendi.  And I lived with a roommate.  I used to work -- I

14  worked for Pinal Alcohol and Drug Abuse because I'd gone

15  into counseling after I had left.  I had left and got

16  involved in programs.  I had -- I knew how to write grants

17  so we went to work for them writing grants.  And also I

18  worked shifts from Friday nights until Monday morning

19  because if the police brought in drunks off the street then

20  we had, there is a transport that would take them over to

21  the program.  All I had to do was kind of baby-sit the

22  person until transport checked them over.

23           At that time, Wendi was watched by my roommate.

24  Then Alejo and I were married.  And we got hooked up with

25  Rick and Al that were traveling missionaries that had come

24

1   out of an organization.  And for two years we lived in Casa

2   Grande and we had church meetings at the house.

3          There were probably, I think there was one other

4   child that was, you know, at the church, you know, we would

5   call it.

6          And then, one day, you know -- we were tithing

7   really good.  I grew up in the church, you know, it was

8   like hell, fire and brimstone if you didn't do what God

9   told you.  So you were going to go to hell and we got away

10  from all that.  And Rick and Al said you know God wants you

11  guys to go into the ministry and you're supposed to do this

12  and whatever.  We ended up in Wilcox, Arizona.  And for

13  about three months we lived like in a commune with, there

14  was a married couple and single women and single men.

15  There were three children, Wendi and two others.

16         All of a sudden, one day they said we needed to

17  leave.  We were to go to Tucson because Sister So And So

18  has a house in Tucson.  So we did.  We picked up and left.

19  Later on after Alejo and I left the traveling people, this

20  was several years later, I found out why we left Wilcox in

21  such a hurry.  And it was because Al had been or Rick had

22  been charged with child abuse.  And then later in my life I

23  find out about the situation with Rick and what he did to

24  my daughter.

25         We were on the road for all that time, for

1  several years.  We woke up at four o'clock in the morning

2  with Rick and Al, rise and shine.  Then we spent the next

3  about five hours reading in the Bible and doing Bible

4  studies and stuff.  And then as I shared with you guys

5  before and we did classes for Wendi.

6          That's not a normal childhood.  Then we bring her

7  back to Casa Grande and put her in a church school.  And

8  there, again, there was very few kids.  We isolated her.

9  We didn't want her to be sucked into worldly things.

10          You have to remember, it was a mess, those years,

11  living on the road.  The only friends that she had were two

12  single ladies and two married couples.  That's not a normal

13  childhood.  She was taught that you obey them, that they

14  had the rule over you.  You obey those in authority over

15  you.  She wasn't taught that there was a choice.  She

16  didn't have choice.

17          Wives are supposed to be submissive to their

18  husbands.  We taught her a lot of scripture but we didn't

19  ever teach her a balance.  You try so hard do the things

20  that are right.  But you forget that there is a balance.

21  It's like, Alejo and I went from one extreme to another

22  extreme and Wendi was caught in the middle of it.  There

23  were times that we didn't have food.  I mentioned to the

24  prosecutor the other day sometimes the only beans we had

25  were the ones she counted for school.

26

1        These are things I don't tell people.  Because

2   another thing that I was taught from growing up is that you

3   don't say bad things about people.  And you don't let

4   people know what's going on behind the doors.  I grew up in

5   a family with alcohol problems.  So I'd already learned how

6   to hide secrets.  You just don't talk about those things.

7   You just act like everything is fine.  It will be okay.

8        And I also expected Wendi to do everything that

9   she was told.  Because I had high expectations for myself

10  that I get everything right.  Because if you do everything

11  right, then everything is supposed to work out the way it's

12  supposed to.

13        Basically, I taught her how to, you know, follow

14  my example.  Yes, she learned the Ten Commandments and she

15  could quote scripture, sure.  But just because you know

16  those things, if you don't have them in your heart and know

17  to balance stuff, it's not going to do any good.  You can

18  memorize multiplication tables and it's got to be in your

19  heart.

20        And the times that she did rebel in school when

21  she tried so hard to get kicked out of school because she

22  wanted to go to public school and we wouldn't let her.

23  Like I shared earlier, we made her go out in front of her

24  peers in school and pull weeds for three months, in front

25  of all those people.  And yet we expected her to accept it

000008733

1   and just think it was okay.

2          With that kind of expectation from your parents,

3   how in the world would you tell your parents something else

4   is wrong.  She didn't have a chance.  She couldn't have

5   told us if anything was wrong.  She was taught you just

6   love people and things would change.

7          When Alejo would yell and scream at her, we would

8   tell her, dad gets down we'll go on out there and

9   everything will be fine and nice and it will just all go

10  away.  She had no clue how to survive.  No clue at all.

11          THE COURT:  Mr. Delozier, ask your next question.

12          MR. DELOZIER:  Thank you, Your Honor.

13     Q.   BY MR. DELOZIER:  You had some happy times in the

14  last couple of years before October with you and the grand

15  kids and with Wendi and Joe?

16     A.   Yes.  Yes.  We used to -- they used to come over

17  like on Christmas Eve and we'd -- sometimes we'd go ride

18  around and look at the lights and stuff.  And we'd decorate

19  and when the little ones were big enough I'd let them

20  decorate the bottom of the tree and they'd hang little

21  wooden men because they can't break those.

22          And then they'd spend the night and Joe and Wendi

23  and the kids and we'd make cookies and we'd bake.

24          In fact, one of my memories, my husband asked me

25  if I wanted to refinish our kitchen, dining room table,

1   Wendi and I -- and I won't do it, now.

2          Wendi and I had decided to make presents for

3   everyone that year.  And we had all the different flavors

4   out and I think it was the almond that spilled and so that

5   I have, like, it takes the finish off in one section of the

6   table and I won't ever refinish it.

7          We used to make ornaments and put the names on

8   them for everybody for each year.  And just had a good

9   time.  And it was especially a good time because when she

10  was young we wouldn't celebrate Christmas.

11         And so when we finally, you know, got our heads

12  together to do that, we really enjoyed it.  But I don't

13  have Christmas any more.  It's too hard.

14         For Easter we used to go, we'd go to church and

15  we and our two families, Alejo and I and Wendi and Joe,

16  first Nicholas and then Ashley, go to church for Easter and

17  then we'd go over to the Francisco Grande and they always

18  had a person dressed up as they were the Easter Bunny and

19  Nicholas hated it.  Nicholas was scared of him.  And he

20  never did like things that dressed up big, old things.  If

21  you're a little one, it would be pretty scary.  The first

22  time that Ashley went, she was only about six, seven months

23  old.  She really liked it.  She wasn't scared of the Easter

24  Bunny.  She wasn't scared of Santa Clause or anything like

25  that.  She's a little fighter.

29

1    She's the one I said, you know, would fight for

2  attention.  When all the bad things that happen and Joe had

3  his surgeries.  She had to fight for their attention.  And

4  now she's one that likes to go on roller coasters and

5  Ferris Wheels and things like that.  She's a little girl.

6  She reminds me of my daughter.

7    MR. DELOZIER:  I have nothing further.

8    THE COURT:  Are there any questions for this

9  witness by the jury.  If so, please raise your hand.

10    (Bench conference was held outside the hearing of

11  the jury.).

12    THE COURT:  Question:  Do you know if Wendi has

13  seen her children since she was arrested?

14    Mr. Delozier.

15    MR. DELOZIER:  I assume she means her

16  grandchildren.  Obviously, she's seen Wendi, she only has

17  one child.

18    THE COURT:  She's talking about Wendi.

19    MR. DELOZIER:  I'm sorry.

20    THE COURT:  Let me read it again.  Do you know if

21  Wendi has seen her children since she was arrested?

22    Mr. Delozier.

23    MR. DELOZIER:  We'll be getting close to being in

24  trouble if we ask that question because of the ruling you

25  made.

30

1          THE COURT:  Mr. Martinez.

2          MR. MARTINEZ:  I agree.  We shouldn't ask that.

3          THE COURT:  Will Wendi have access to her

4   children for visits while in prison?

5          Mr. Delozier.

6          MR. DELOZIER:  I think that's an illegal issue.

7   I don't know that she'd be capable of answering that.

8          MR. MARTINEZ:  I agree.  We shouldn't ask that.

9          THE COURT:  Question: How often do you currently

10  visit Wendi?

11         MR. DELOZIER:  I have no problem with that.

12         MR. MARTINEZ:  I don't see how it is relevant at

13  this stage.

14         THE COURT:  I'll ask that question.

15         THE COURT:  What types of changes have you seen

16  in Wendi since her arrest, if any?

17         Mr. Delozier.

18         MR. DELOZIER:  Yes.

19         MR. MARTINEZ:  I object.  It's beyond the scope.

20         THE COURT:  I'll allow you follow up and allow

21  you to follow up.

22         MR. MARTINEZ:  Okay.

23         (Bench conference concluded.)

24

25

31

EXAMINATION

1

2   BY THE COURT:

3       Q.   I have some additional questions here from the

4   jury.

5           First question reads as follows: How often do you

6   currently visit Wendi?

7       A.   Currently, I try to -- either Alejo goes or I go

8   down every Friday.  It's been difficult because of work.

9       Q.   Either you or Mr. Alejo go down on Friday.

10          Next question reads as follows:  What types of

11  changes have you seen in Wendi since her arrest, if any?

12      A.   I've seen lots of changes.  She was always taking

13  care of people.  And, you know, and I've seen her continue

14  to do that.  Because, like I said, I've gotten letters from

15  people.  I've talked to people and they say I want to tell

16  you what your daughter's done for me.

17          When she very first went in there, she said that

18  was the first time she felt safe in eight years.  I've seen

19  her strengthen.  I've seen her -- She's probably a whole

20  lot more able to handle things than I am.

21          She's gotten strong.  She's survived living with

22  people that might have, you know, like a fourth-grade

23  education and try to help them.

24          One day Wendi called and said she just got

25  finished giving this little lady a bath.  I said, "Are you

32

1    supposed to be doing that?" She goes, "Well, she is like

2    sixty-some years old.  She can't give herself a bath."

3    And, personally, I grossed out and said, "No, you don't do

4    that."

5         I've had lots of good comments just from when I

6    go to sign up to see her of the guards and staff.  They

7    say, "Hey, you really look like your daughter.  Oh, you

8    have to be Wendi's mom.  You guys look just alike."  Things

9    like that.

10        Stronger, a lot stronger.  A lot stronger.

11        THE COURT:  Are there any further questions of

12   the jury of this witness?  No one has raised their hand.

13   Mr. Delozier, do you have any follow-up questions

14   to the questions asked by the jury?

15        MR. DELOZIER:  No, Your Honor.  Thank you.

16        THE COURT:  Mr. Martinez.

17

18                  RECROSS-EXAMINATION

19   BY MR. MARTINEZ:

20        Q.   You indicated that you and your husband visit her

21   every Friday, correct?

22        A.   We try and visit every Friday.  One or the other

23   of us.  We try to go on the weekends because it's like a

24   six-hour wait before we can see her.

25        Q.   So you and your husband go about every Friday,

1  right?

2       A.   Yes.  We try and go every Friday.

3       Q.   That doesn't mean you go every Friday.  In other

4  words, you could alternate between him and you, correct?

5       A.   Oh, that's correct.

6       Q.   So, is it fair to say that you really don't know

7  how often you visited her in the last six months, do you?

8       A.   No, I have probably visited her -- I know it's

9  been less than my husband has but I do talk with her on the

10  phone.

11       Q.   I'm not talking about the phone.  How often do

12  you visit her?

13       A.   I've probably, in the last six months -- I can't

14  give you a count because we've been doing this for four

15  years.

16       Q.   One or two times?

17       A.   Definitely, more than one or two times because I

18  was just down there the other day.

19       Q.   And your assessment of what her changes are, are

20  based on that one-hour conversation that you have with her,

21  correct?

22       A.   No.  Like I said, I talk to her.

23       Q.   In addition to some other things, but it's mainly

24  based on the face-to-face conference, right?

25       A.   Partly.  Not mainly at all.

34

1      Q.   But that's a small part, right?

2      A.   Correct.

3      Q.   And the others are based on, I think you said, in

4   talking to, I guess, guards who make comments, "You look

5   like her?"

6      A.   Oh, they say that, you know, that, "You really

7   look like your daughter.  She's really nice."

8      Q.   But, let me stop you there.  They say that they

9   really like your daughter.  But that doesn't say anything

10  about her changes because she was liked before.  When she

11  was at San Riva, people liked her, didn't they?

12     A.   I wasn't at San Riva.  And, yes, I thought they

13  did.

14     Q.   But you did think they did.  I didn't ask you if

15  you were there.  I asked you whether or not they liked

16  her.  It appeared to you from when you went there they

17  liked her?

18     A.   Yes, it appeared to me.

19     Q.   She's a sociable woman.  She was a sociable woman

20  back then, right?

21     A.   I don't understand where you're coming from.

22     Q.   I'm asking whether or not she was a sociable

23  woman when she was at San Riva?

24     A.   I did not see her very often at San Riva in

25  content with other people.  At several of the parties that

1    they have to give, that she had to be the hostess of, yes,

2    then I saw her sociable there.

3        Q.   And just like you didn't see her being sociable

4    at San Riva, you don't see whether or not she's sociable in

5    the jail, do you?

6        A.   Just from what I overhear or hear from people.

7        Q.   When I asked you about San Riva, you fought me

8    and said, no, I don't know because I didn't see her.  Do

9    you remember telling me that?

10       A.   Yes.

11       Q.   And then I applied it to the jail, you didn't see

12   what's going on behind the bars, do you?

13       A.   No, just from what I hear.

14       Q.   You don't know whether or not she actually gets

15   along with the other inmates, do you?

16       A.   Well, the other inmates are talking to me on the

17   phone and saying that Wendi is friendly.  I would assume

18   she's getting along with them.

19       Q.   Right.  You haven't talked to all of the people

20   that she   --

21       A.   Of course, not.

22       Q.   You don't know whether or not she takes advantage

23   of them, do you, right?

24       A.   I do not know if she does or she doesn't.

25       Q.   You don't know if they have special names that

1  are derogatory for her, do you, the other inmates?

2      A.   No.

3      Q.   So, in terms of the changes, the ones that you

4  want us to consider, those are changes based on your

5  face-to-face conversation which may or may not be minimal,

6  your conversations with her on the telephone, right?

7      A.   Yes.

8      Q.   And what guards may say to you or what someone on

9  the phone may say to you, correct?  Is that what it's based

10  on?

11      A.   Yes.

12          MR. MARTINEZ:  I don't have anything else.   Thank

13  you.

14          THE COURT:  May this witness be excused?

15          MR. MARTINEZ:  Yes, sir.

16          MR. DELOZIER:  Yes, sir.

17          THE COURT:  Thank you.  You're excused.

18          (Witness sworn.)

19          THE COURT:  Please have a seat on the witness

20  stand.  Pull microphone close to you.  Remember to speak

21  loudly and clearly so everyone can hear.  Wait until the

22  question is complete before answer the question.  Please

23  make a verbal response.

24          Is that agreeable to you, sir.

25          THE WITNESS:  Yes, sir.

37

1       THE COURT:  Mr. Delozier, you may proceed.

2       MR. DELOZIER:  Thank you, Your Honor.

3

4                    LONNIE INSKEEP,

5   called as a witness herein, having been first duly sworn,

6   was examined and testified as follows:

7

8                 DIRECT EXAMINATION

9   BY MR. DELOZIER:

10      Q.   Please state your name for the record?

11      A.   Lonnie Inskeep.

12      Q.   Would you spell it?

13      A.   Lonnie, l-o-n-n-i-e.  Inskeep, I-n-s-k-e-e-p.

14      Q.   Thank you, sir.  And do you know the Ochoa

15  family?

16      A.   Yes, I do.

17      Q.   How long have you known the Ochoa family?

18      A.   I knew the Ochoa family from 1984 to 1990.

19      Q.   Okay.  Are you currently employed?

20      A.   Yes, I am.

21      Q.   Where do you work?

22      A.   I'm a firefighter for Ak Chin fire department.

23  I've been employed with them two and half years.

24      Q.   And what did you do prior to that?

25      A.   I retired from Sea Ray boats after 25 years.

38

1       Q.   How did you come to know the Ochoas?

2       A.   I met the Ochoa family at church.  We went to the

3   same church which was Harvest Church.  And that was the

4   period of time that I knew them.

5       Q.   Okay.  So you began -- you went to the church and

6   met them there, is that what you mean?

7       A.   Yes, I did.

8       Q.   And so you attended the church through to 1990?

9       A.   Yes, through 1990.

10      Q.   Have you had any contact with them since then?

11      A.   Really not.  We met the family one time, maybe at

12  a wedding.  After we saw on the news that --

13          THE COURT:   Hold on a second.

14          After what period of time?  You said the period

15  of time.

16          THE WITNESS:  The period of time?

17      Q.   BY MR. DELOZIER:  The wedding?

18      A.   At the wedding, like 1992.

19      Q.   Would that have been Joe and Wendi's wedding?

20      A.   I don't think we went to that wedding.  I'm not

21  sure.

22      Q.   So it was somebody else's wedding?

23      A.   Yeah, another person at our church's wedding.

24      Q.   You started to say something about a later time?

25      A.   Yes.

1    Q.   When was that?

2    A.   After Wendi was on the news, I wrote her some

3  letters in jail.

4    Q.   And did you have any contact with her mother and

5  father during that period of time?

6    A.   Yes, I did.  We went to another wedding, which

7  was an individual, common friends of ours, and we met at

8  that wedding.  That was about, I'm going to say 2001.

9    Q.   Okay.  Was that just hello?

10   A.   Basically, just stuff based on how is everyone

11  doing in their lives.

12   Q.   Okay.  All right.  What was the occasion for not

13  seeing them from 1990 forward?

14   A.   The occasion for not seeing them, the church we

15  were going to, I disagreed with some of the things that was

16  happening at the church.  Me and my wife and our two kids,

17  we decided that we were going to go to a different church.

18  That was pretty much the reason why I had no real contact

19  with them.

20   Q.   All right.  Do you have any recollection of the

21  roles that Alejo or Donna and Wendi played in the church,

22  if any?

23   A.   Yes, I do.

24   Q.   What were they?

25   A.   Wendi was, at the time she was real young, she

40

1  was a youth, I think from age 14 to like 18, somewhere in

2  that area.  She was a very active teenager at church.  She

3  was involved in the music program.  And while she was

4  involved in the music program, sometimes I was also

5  involved with music at church.  So she would play the

6  piano.  I would play keyboard.  She was active in the youth

7  group and their particular music involvement.  I really

8  wasn't active in that part of it.

9       Q.  Did Alejo have a role in the church?

10      A.  Yes.

11      Q.  What was that?

12      A.  He was a youth pastor for the younger kids.  And

13  I did go camping with the youth group a couple times and

14  Alejo was the leader at that time.

15      Q.  Did you have children that were there?

16      A.  Yes, I did.

17      Q.  What ages were your children during the time you

18  went to this church?

19      A.  I'm guessing they were about eight, nine.  My

20  daughter is eight years younger than Wendi.  Don't ask me

21  all the dates.

22      Q.  Did they attend the school?

23      A.  Yes, they did.

24      Q.  What role did Donna have in the church, the

25  school, if any?

1    A.    Donna was involved, I believe in the school.  And

2  she taught some classes.  And then sometime during that

3  period she took a job and she was not active in the school,

4  what I remember.

5    Q.    How would you describe Wendi during that period

6  of time?  You talked about the piano playing.  How would

7  you generally describe her personality?

8    A.    Wendi, I thought was an unique teenager.  She was

9  very kind and considerate when you talked to her.  She

10  would listen to you.  I never saw her get mad.  She was one

11  of the active teenagers involved.  She was a leader in the

12  group.  And she was just a neat person.  And that's the way

13  I've always remembered her as.

14    Q.    Active in -- do you know if she was active in any

15  of the school's activities?

16    A.    Yes.  The school usually had two or three main

17  activities a year.  And they would go to conventions and be

18  involved in the conventions.  They had different things

19  they participated in.  It was almost like a contest where

20  they would excel in maybe some of the subjects they

21  learned, scripture and memorization, things like that.

22    Q.    Okay.  You say you wrote to Wendi over the last

23  four years?

24    A.    Yes, I have.

25    Q.    About how many times do you think?

42

1    A.    Three times.

2    Q.    Did she respond?

3    A.    Yes, she did.

4    Q.    Did she ever say anything negative about Joe?

5    A.    No.

6    Q.    If Wendi were to be executed, would that have any

7    impact in your life?

8    A.    Yes, it would.

9    Q.    What impact would that be?

10    A.    For me, I remember her as a young lady that had a

11    lot of potential.  And out of the teenagers that I saw in

12    that church, I thought she would excel the most.  And I

13    just was impressed by the way she handled herself at that

14    time.

15         And the other thing is I think you know all of us

16    need to know Jesus Christ as our Lord and Savior.  I think

17    that's important.

18         MR. MARTINEZ:  Objection.  Non-responsive and

19    also lecturing.

20         THE COURT:  Sustained.

21         MR. DELOZIER:  I think he was just trying to

22    explain how it would have an affect on your life.

23         THE WITNESS:  How it impacts me is, you know,

24    none of us like death and I don't like death.  So, it's

25    going to impact me.  And, you know, I'm going through the

43

1    feelings of why did this person die.  Why did this person

2    do this to where she deserves this death.  That's hard to

3    deal with.

4              MR. DELOZIER:  Thank you.  No further questions.

5              THE COURT:  Mr. Martinez.

6

7                        CROSS-EXAMINATION

8    BY MR. MARTINEZ:

9         Q.   You indicated that death upsets you, I think is

10   the way you put it, right?

11        A.   Yes, sir.

12        Q.   Do you know that she poisoned her husband?

13        A.   I've read that in the paper.

14        Q.   Do you know after she poisoned him, she watched

15   him die for about an hour and a half?

16        A.   No, I did not.

17        Q.   Did you know that she then took a stool and hit

18   him over the head 23 times?

19        A.   No, I did not.

20        Q.   And then took a lamp and hit him over the head,

21   did you know that?

22        A.   No.

23        Q.   And she took a knife and stuck it in his throat

24   and wrenched the knife so that the wound was about this

25   wide.  Did you know that?

44

1       A.   No, I did not.

2       Q.   You haven't said anything about Mr. Andriano

3   dying that upset you?

4       A.   I'm sorry?  What did you say?

5       Q.   You never said anything about Mr. Andriano dying

6   that upset you?

7       A.   I did not know Mr. Andriano.

8       Q.   So it doesn't upset you if you don't know him?

9       A.   Yes, it would.

10      Q.   One of the things you told us was that you knew

11  her from 1984 to 1990, correct?

12      A.   Yes.

13      Q.   And so whatever opinions you have of her are

14  based on what you knew about her back then, correct?

15      A.   Exactly.

16      Q.   You don't know anything that she was doing when

17  she was married to her husband, do you?

18      A.   No.

19      Q.   You don't know that she was cheating on him with

20  men, did you?

21      A.   No.

22      Q.   Do you know he was having chemotherapy and the

23  day after chemotherapy she was out with other men.  Did you

24  know that?

25      A.   No, I did not.

1    Q.   So that's different than the normal person that

2  you described to us, isn't it?

3    A.  Yes, it is.

4    Q.  It's different from the one that had a lot of

5  potential, isn't it?

6    A.  Yes, it is.

7    Q.  It's different than the one you were impressed

8  with, correct?

9    A.  Yes, it is.

10    Q.  It is fair to say that when she was growing up

11  she was quite a normal teenager, correct?

12    A.  Yes.

13    Q.  And there wasn't anything that you saw that

14  indicated that there was anything wrong with her home life

15  back there, was there?

16    A.  No.

17    Q.  There wasn't anything that was wrong with the

18  parenting skills of Donna and Alejo, was there?

19    A.  No.

20    Q.  Alejo Ochoa, you indicated was a youth pastor, I

21  think?

22    A.  Yes.

23    Q.  He didn't have the ability to marry people, did

24  he?

25    A.  I don't know.

1      Q.   You did write her a couple of -- I think you said

2   three letters while she was in custody, correct?

3      A.   Yes.

4      Q.   And the reason that you're reaching out to her

5   was based on what you knew about her back then, right?

6      A.   That's part of it.

7      Q.   And when you did write those letters, you didn't

8   know any of the things that I just mentioned to you?

9      A.   No, I did not.

10         MR. MARTINEZ:   I don't have anything else.

11         THE COURT:   Redirect.

12

13                   REDIRECT EXAMINATION

14   BY MR. DELOZIER:

15      Q.   You don't know if what Mr. Martinez asked you

16   were true, do you?

17      A.   No, I don't.

18      Q.   Okay.  So you're entire understanding is based on

19   1984 through 1990 and what you've talk to the

20   parents -- did you talk to the parents?

21      A.   I never talked to them, no.

22      Q.   How did you get the address?

23      A.   I called the church, Harvest Church.

24      Q.   Okay.  So your information about Wendi was

25   obtained from what source?

# APPENDIX M - Part 2

1      A.    The only thing I've had is maybe there is a few

2   friends and through what the limited stuff is that came out

3   in the paper.

4      Q.    And approximately when did these letters get

5   written?

6      A.    Can I ask when she went into prison or jail?

7      Q.    We're talking about from October 8, forward.

8      A.    Of 2000?

9      Q.    Of 2000.

10     A.    I would say it was within six months of that.

11     Q.    That's when you began writing?

12     A.    Yes.

13     Q.    When did you stop?

14     A.    A year from that time, or a year and a half from

15   that time when I started.

16           MR. DELOZIER:  I have nothing further, Your

17   Honor.

18           THE COURT:  Are there any questions of the

19   witness by the jury?  If so, please raise your hand.   No

20   one has raised a hand.

21           May this witness be excused?

22           MR. MARTINEZ:  Yes, sir.

23           MR. DELOZIER:  Yes, Your Honor.

24           THE COURT:  Thank you very much.  You're

25   excused.

48

1          (Witness sworn.)

2          THE COURT:  Please have a seat on the witness

3   stand.  Please pull the microphone close to you.  Please

4   remember to speak loudly and clearly so everyone can hear

5   you.  Please wait until the question is completed before

6   you answer the question.  And answer in a verbal response.

7          Is that agreeable to you?

8          THE WITNESS:  Yes.

9          THE COURT:  Mr. Patterson, you may proceed

10         MR. PATTERSON:  Thank you, Judge.

11

12                    GIA PALICKI,

13   called as a witness herein, having been first duly sworn,

14   was examined and testified as follows:

15

16                 DIRECT EXAMINATION

17   BY MR. PATTERSON:

18     Q.    Give us your name, ma'am?

19     A.    Gia Palicki.

20     Q.    Have you ever testified in a courtroom before?

21     A.    No.

22     Q.    A little nervous?

23     A.    Yes.

24     Q.    It's pretty simple.  I ask the questions, this

25   gentleman will also ask questions and I will ask some more

1   questions.  Just give us your answer, okay?

2       A.   Okay.

3       Q.   Are you in the business of day care?

4       A.   Yes.

5       Q.   And how long you been a day care provider?

6       A.   Probably ten years.

7       Q.   Is it done at your home?

8       A.   Yes.

9       Q.   And is your home in the Mountain Park Ranch

10  Ahwatukee area of Phoenix?

11      A.   Yes.

12      Q.   And are you currently in that business with a

13  friend or associate?

14      A.   I'm in it with a friend.

15      Q.   What is his or her name?

16      A.   Stefanie.

17      Q.   And were you in business -- you say the last ten

18  years -- that would encompass back in 1990, correct?

19      A.   Yes.

20      Q.   And who were you in business with back at that

21  time?

22      A.   I started with a friend, Kim Payne, and then I

23  was on my own.

24      Q.   How many children would you average on a daily

25  basis, in your home providing care services for?

1    A.   Six.

2    Q.   And is there a rule, six or less or six or more

3  require certain licensing?

4    A.   Six per adult.

5    Q.   So six or less children that you monitor on a

6  daily business, you're not required to have a license, kind

7  of thing?

8    A.   No.

9    Q.   Back in 1990, did you begin to provide day care

10  services for Wendi Andriano and her children?

11    A.   Yes.

12    Q.   Do you recall the month that you started?

13    A.   I believe Nicholas started around the end of

14  October, beginning of November.  And then Ashley started

15  maybe a month or so later.

16    Q.   That would be 1999?

17    A.   Yes.

18    Q.   And services were provided in your home?

19    A.   We would started at Kim's house.  She taught

20  preschool and Nicholas came there for preschool.  And I had

21  Ashley in my care and when preschool was over Nicholas and

22  would go to my house.

23    Q.   And what duration in the morning was that

24  preschool component of the day care?

25    A.   I believe preschool started probably at nine

1  until one with lunch.

2      Q.   And so then you would go from your home over to

3  your partner's home and pick Nicholas up and bring him

4  back?

5      A.   I would stay at Kim's house and help her.  When I

6  left, Nicholas and Ashley would come with me.  They would

7  nap at my house and they would get picked up from my house.

8      Q.   Okay.  Did Wendi bring the children over at Kim's

9  house?  Is that how the day would start?

10     A.   Either Joe or Wendi would drop them off.

11     Q.   Both Joe and Wendi were active in taking care of

12  their children in your observation?

13     A.   Yes.

14     Q.   And would they split the chore of bringing the

15  children over for day care on a daily basis?

16     A.   Sometimes.

17     Q.   Okay.  The same with picking them up, in the

18  beginning at least?  Who would generally pick up the

19  children at the end of the day care?

20     A.   In the beginning, I would say Joe would dropped

21  them off and Wendi would come pick them up.

22     Q.   Did that change over the course of time that you

23  provided day care services for them?

24     A.   After a few months, Kim was moving and getting

25  married and everything was strictly at my house and Wendi

1   would usually drop them off and pick them up.

2       Q.   Okay.  How was Wendi as a mother, at least, from

3   your observations during the time she was with her children

4   in your company?

5           MR. MARTINEZ:  Objection.  Lack of foundation.

6   How does she know.

7           THE COURT:  Go ahead and answer the question.

8           THE WITNESS:  I think Wendi was a great mom.

9       Q.   BY MR. PATTERSON:  What things did you observe

10  that led you to this conclusion?

11      A.   Well, I would be there when she dropped them off

12  and picked them up.  And she would always stay and have

13  patience and wait until they were ready for her to go to

14  work.  Or she would come and finish playing or if anybody

15  was sleeping, she would wait for Nicholas to wake up.  She

16  was great to my kids.

17      Q.   Okay.  Let's about how many children did you have

18  also present at the day care at your home?

19      A.   Two.  I have two girls that are there that live

20  with me.

21      Q.   And what are their ages as related to Nicholas'

22  and Ashley's ages?

23      A.   They're school-age, Abby is 11 and Ashley is 15.

24      Q.   So, they were older than Nicholas and Ashley?

25      A.   Yes, like big sisters.

1    Q.   Would the children always well clothed when they

2  were brought to day care?

3    A.   Always.

4    Q.   Were they well nourished?  Food provided for

5  them?

6    A.   Always.

7    Q.   Were they clean when they were brought over?

8    A.   Always.

9    Q.   Did she caress them, hug them, touch them

10  appropriately?

11    A.   I believe so.  In fact, my girlfriend and I used

12  the laugh that she never would raise her voice.  She was

13  better than I was.

14    Q.   All right.  That kind of segue into the issue of

15  discipline.  Did you ever see her raise a hand to her

16  children when she was in your presence?

17    A.   No.

18    Q.   How was she, in terms of or what technique did

19  she employ in terms of discipline or correcting her

20  children in your presence?

21    A.   Well, Ashley was so little.  But, my example was

22  when Nicholas did not want to leave or he wanted to tie his

23  shoes -- he was three -- and she'd just talk him out of it,

24  saying, "Come on.  It's okay, Nicholas.  You can stop."

25  "Okay, come on.  Put your shoe on now.  It's okay.  Let's

1    go.  Put your shoe on."  Even if it took twenty minutes.

2         Q.    What length was the time that you served as kind

3    of primary day care provider for Nicholas and Ashley?

4         A.    About a year.

5         Q.    From November until October 8th of 2000?

6         A.    Yes.

7         Q.    During that time frame did you ever see Wendi do

8    anything that would cause you to believe she was a

9    neglectful mother?

10        A.    No.

11        Q.    Were there times when you would go to her

12   apartment at the San Riva complex?

13        A.    Yes.

14        Q.    How frequent did that occur about your one-year

15   time frame you were the principal day care provider?

16        A.    We went over there to swim with the kids a couple

17   times.  I would pick them up sometimes if I was running

18   late or whatever because my daughter was having doctor

19   appointments.  Or she would pick them up, drop them off or

20   just go hang out there for a day.

21        Q.    Okay.  In that one-year period, we're talking

22   once a month, twice a month.  How frequently?

23        A.    Maybe a few times a month.

24        Q.    Okay.  In that environment, that apartment there

25   at San Riva, how was she as a mother dealing with her

1  children from what you observed?

2      A.  Same as everyone.  Same or normal.

3      Q.  And that observation is -- What did you see in

4  terms of her interactions with her children?

5      A.  Well, what I would consider normal, you know.

6  Same thing, if they need something you help them.  They

7  were toddlers, you know.

8      Q.  Did there appear to be toys in the

9  environment --

10      A.  Yeah.

11      Q.  -- for the kids to play with?

12      A.  Yes.

13      Q.  Were there a bunch of toys?

14      A.  A lot of toys.

15      Q.  How about nourishment?  Did there appear to be

16  nourishment in that home environment?

17      A.  Yes.  They were picky eaters but they were good.

18      Q.  And did Wendi minister to the children's

19  nutritional needs from what you could observe the times you

20  were over there?

21      A.  Yes.

22      Q.  Was there a time when you had a change in

23  financial circumstances with the landlord that owned the

24  house where you were providing the day care?

25      A.  In the very beginning, Kim would ask if a couple

1   of her primary care could come to my house, also.  And I

2   was leasing my home and my landlord didn't want me to do

3   that.  There were too many kids.  So she said to me that if

4   I was going to do that, I was only allowed two children.

5   And she was going to raise my rent a hundred dollars a

6   month for insurance or something.  And I told everybody and

7   Wendi said right away that she wanted it to be Nicholas and

8   Ashley.  So she did.

9        Q.   So she agreed to increase her contribution to

10  your household by a hundred bucks a month?

11       A.   She payed an extra hundred.

12       Q.   So how long did she help you in that regard?

13       A.   Probably seven months until October.

14       Q.   Okay.  Wendi, was she a patient mom with her

15  children?

16       A.   Yeah.

17       Q.   Was she affectionate with the children?

18       A.   I think so.

19       Q.   How about diaper changes, those types of things.

20  Would she assist in the process?

21       A.   Well, when she was there when they needed it,

22  then she did it.  When they were in my care, I did it.

23       Q.   But there was never any issue that she refused to

24  do it or anything like that?

25       A.   No.

1      Q.   Was there a time when one of the children was

2  very ill?

3      A.   I have a little girl that's got a chronic

4  illness.

5      Q.   Were there times when she was hospitalized?

6      A.   Yes.

7      Q.   Did Wendi bring her children to come see your

8  sick child in the hospital?

9      A.   Yes or I would take Nicholas and Ashley with me

10  sometimes if I asked and she said yes.

11      Q.   So she encouraged that?

12      A.   Yeah.  They're part of our family.

13      Q.   During the period of time that Wendi was there

14  with her children, would you and she talk about her

15  relationship with Joe?

16      A.   Yes.

17      Q.   Okay.  Did she ever bad mouth or speak anything

18  negatively about Joe during the time you would talk with

19  her?

20      A.   No.

21      Q.   Did she use a term to categorize or characterize

22  what Joe meant to her in their relationship?

23      A.   She would tell us, she would tell me and my

24  girlfriend, Stephanie, that you know it was her best

25  friend.  That's all she knew.

58

1      Q.   Did she express to you that there was some

2  difficulty with regard to her sexual relationship with Joe?

3      A.   She would tell us about their sex life, yeah.

4      Q.   And without going into it in great degree, she

5  says that there was an issue there?

6      A.   She would just talk about the passion part of it

7  or you know, she just mentioned she likes to be kissed and

8  Joe didn't feel comfortable kissing any more.

9      Q.   Okay.  Did she speak to the issue of whether or

10  not there was lack of affection in the relationship?

11      A.   I don't know what you mean.

12      Q.   Hugging, kissing, touching.  That kind of thing?

13      A.   I don't -- I don't think Wendi -- I don't really

14  know how to answer that, actually.

15      Q.   Okay.  I understand.  But you did have

16  discussions with her about that topic in general?

17      A.   Uh-huh.

18      Q.   Is that yes?

19      A.   Yes.

20      Q.   And you came away from those discussions sensing

21  there was some issue there?

22      A.   Yes.

23      Q.   When was the last time that you recall providing

24  dare care services for Joe and Wendi, for their children.

25  Use October 8, 2000, perhaps, as a kind of base line, two

1  weeks before that, a week before that?

2      A.  Well, the last work day, would be Friday.

3      Q.  Okay.  Was Joe still going up to the lake in the

4  later part of the time that you were still serving as the

5  day-care provider?

6      A.  Yes.

7      Q.  When was the last weekend that you recall, using

8  October 8, 2000 as kind of a base line, when did you recall

9  Joe going to the lake?

10     A.  Far all I knew, he always went to the lake every

11 weekend, as far as I know.

12         MR. PATTERSON:  Thank you, Judge, I have nothing

13 further at this time.

14         THE COURT:  Mr. Martinez.

15

16                    CROSS-EXAMINATION

17 BY MR. MARTINEZ:

18     Q.  One thing that you told us about was that she

19 confided you a little bit about the relationship with

20 Mr. Andriano, right?

21     A.  Yes.

22     Q.  You indicated that she told you Joe didn't feel

23 comfortable kissing any more, right?

24     A.  Yes.

25     Q.  Did she tell you it was because of the

1   chemotherapy?

2       A.   No.

3       Q.   Did you know he had a tumor in his mouth from the

4   cancer?

5       A.   Yes.

6       Q.   Additionally, you indicated, I guess, the passion

7   was gone, that she may have at least led you to believe

8   that that was the case, right?

9       A.   No, I don't think she said that the passion was

10  gone.  I don't think she -- in my eyes, the passion was

11  gone.  But I don't think Wendi thought it was.  She would

12  come to us confused asking for advise and asking what we

13  thought.

14      Q.   And she would describe certain things, right?

15      A.   Yes.

16      Q.   Now, and these were problems that she had in her

17  life with Joseph, sexually speaking, correct?

18      A.   There would be more confusion on, right, should

19  it be this way.

20      Q.   Confusion, problems, right?  She was seeking your

21  counsel, right?

22      A.   I don't think Wendi thought of it as a problem.

23  I think Wendi --

24      Q.   She talked to you about --

25           MR. PATTERSON:  Can the witness be allowed to the

1  question?

2          THE COURT:  Mr. Martinez, ask the question and

3  let her answer.

4      Q.   BY MR. MARTINEZ:  Did she also talk to you about

5  the sex life and problems, yes or no?

6      A.   Yes.

7      Q.   Did she also tell you that she was also going out

8  and having affairs with other men?

9      A.   She told me about going out, yes.

10     Q.   No.  No.  No.  Having affairs, sexual intercourse

11 with other men.  Did she tell you about that?

12     A.   I'm confused.  I don't -- she didn't tell me the

13 physical details.  But I know she went out and saw other

14 men.

15     Q.   I'm asking you whether or not she ever told you

16 she had sexual intercourse with other men while she was

17 still married to Joe?

18     A.   No.

19     Q.   So she didn't go that far?

20     A.   No.

21     Q.   Did she tell you that she would, at least on one

22 occasion that we know, she brought them home to Apartment

23 132 and had sex with another man?  Did she tell you about

24 that?

25     A.   No.

1    Q.   But that she met him at the Rockin' Rodeo and

2   brought him home that night?

3    A.   No.

4    Q.   Did she tell you that when she would go out, at

5   those time, did she tell you she would kiss other men?

6    A.   Yes.

7    Q.   And this was when she would actually go out to

8   bars, right?

9    A.   Yes.

10    Q.   You and she used to also go out socially, didn't

11   you, with her?

12    A.   I didn't hear you.

13    Q.   You and she also used to go out to bars together,

14   socially, didn't you?

15    A.   No.  She went out once with me for my birthday.

16    Q.   Where did you guys go?

17    A.   We went to a restaurant bar that a friend of mine

18   owned one time for my birthday.

19    Q.   What's it called?

20    A.   It's closed now but it was called the End Zone.

21    Q.   And where was that located?

22    A.   On Alma School and Warner.

23    Q.   And Joseph didn't go with you, it was you and

24   her, right?  She didn't bring Joseph along?

25    A.   No, he didn't go.  It was me and Wendi and

63

1    Stephanie and another friend I worked with, about six of

2    us.

3        Q.    And what was Stephanie's last name?

4        A.    Casper.

5        Q.    With a K or with a C?

6        A.    C.

7        Q.    One of the other things that you told us was that

8    there was this issue where your landlord wanted to charge

9    you extra money.  That's what you told us?

10       A.    Yes.

11       Q.    And when you told the defendant about it, she

12   decided to pay the money right away, correct?

13       A.    Yes.

14       Q.    She never complained of their having any finance

15   problems, did she?

16       A.    No.

17       Q.    The only thing she talked to you about was their

18   sex life, right?

19             MR. PATTERSON:  Objection.  Asked and answered.

20             THE COURT:  Overruled.

21             Go ahead and answer if you can.

22             THE WITNESS:  Is that the only thing we talked

23   about?

24       Q.    BY MR. MARTINEZ:  Well, by contrast, she did talk

25   to you about their sex life but never spoke to you about

1  financial problems, right?

2      A.   Right.

3      Q.   She never indicated to you that she and Joseph

4  may have been having problems meeting their own

5  obligations, right?

6      A.   No.

7      Q.   Ever in their life, correct?  She never indicated

8  that to you?

9      A.   No.

10     Q.   That was for a whole year that you were

11  baby-sitting the kids, right?

12     A.   Yes.  Right.

13     Q.   One of the things that you told us was that you

14  think that she's a good mother, right?

15     A.   Yes.

16     Q.   And you based that on the fact that she would

17  drop her kids off and pick them up at your house, correct?

18     A.   I base that on that and I spent time with her on

19  weekends with the kids.  And I went out to dinner with her

20  and her family once.  And also, speaking with Joe.  I think

21  he was a great dad.  I saw them every day for, almost every

22  day for a year.

23     Q.   You indicated that you thought Joe was a great

24  dad?

25     A.   Yes.

1    Q.   Why did you say he is a great dad?

2    A.   Because I think for the same reasons, I would see

3  them interact.  He would -- sometimes they would both come

4  pick them up and they would just lay in the bed and wait

5  until Nicholas and Ashley were awake and ready.  And I just

6  believe they were committed to their children.

7    Q.   With regard to when you weren't there in the

8  privacy of their own home, do you know who changed the

9  diapers?

10    A.   When I wasn't there?

11    Q.   Right.

12    A.   No.

13    Q.   So it could have been Joseph that did all the

14  caretaking when you weren't there, right?

15    A.   I don't know.

16    MR. PATTERSON:  Same objection.  Asked and

17  answered.

18    THE COURT:  Sustained.

19    Q.   BY MR. MARTINEZ:  You don't know who gave them

20  baths, do you?

21    A.   I don't know.

22    Q.   One of the things that we talked about, or you

23  talked about with Counsel, was they didn't discipline the

24  kids.  Do you remember that?

25    A.   Yes.

1       Q.    Defendant's mother told us about a paddle that
2   may or may not have been used to discipline the kids.   Do
3   you know anything about that paddle?
4              MR. PATTERSON:   Object to the form of the
5   question.
6              THE COURT:   Sustained.
7              MR. PATTERSON:   May or may not been used.
8              THE COURT:   Sustained.
9       Q.    BY MR. MARTINEZ:   Do you know anything about
10   that?
11      A.    No.
12      Q.    You went over to her house, you said, right?
13      A.    Yes.
14      Q.    Did you see a paddle there?
15      A.    No.
16      Q.    Isn't it also true that you also took care of the
17   kids when the defendant wasn't working on her days off.
18   Sometimes you also took care of the kids, right?
19      A.    No.   I took care of the kids when Wendi was
20   working.
21      Q.    That's the only time you ever took care of the
22   kids?
23      A.    Yes.   Or -- on Friday of the last month or so,
24   Wendi would take the day off and her and Joe would go to
25   the movies and the kids would still come over.   So that

1    would be the only time I know she wasn't working.

2        Q.    And she worked how many days a week, according to

3    your records?

4        A.    Monday through Friday and Saturday, sometimes.

5        Q.    Okay.  So it wasn't Sunday that she worked?  It

6    was actually Monday through Friday and Saturdays?

7        A.    I don't remember exactly if she ever, how many

8    Sundays she worked but --

9        Q.    I'm asking about Saturday?

10       A.    She worked on Saturdays, is that what you're

11   asking me?

12       Q.    Yes.

13       A.    Yes.

14       Q.    And one of the things you told us, even though

15   you take care of kids -- I think you told us that you're

16   not required to be certified, right?

17            MR. PATTERSON:  Certified is a term of art,

18   Judge.

19            THE COURT:  Sustained.  Rephrase the question.

20       Q.    BY MR. MARTINEZ:  Licensed?

21       A.    The State of Arizona doesn't require a license.

22   I am certified, though.

23       Q.    And are you licensed, though, to take care of

24   kids?

25       A.    I don't know if there's a difference between

1   licensing and certified.  I am certified through the

2   State.  So I don't know if that's the same thing or not.

3        Q.   Your certification, does that allow you to take

4   care of more than six kids?

5        A.   The State of Arizona doesn't allow you to take

6   care of more than six kids.

7        Q.   The max you can take care of is six kids?

8        A.   Yes.

9             MR. MARTINEZ:  I don't have anything else.

10            THE COURT:  Redirect.

11

12                    REDIRECT EXAMINATION

13   BY MR. PATTERSON:

14        Q.   Clarification.  There are times when Wendi would

15   work on Saturdays or Sundays.  Do you recall specific days

16   or weekends that she may have worked?

17        A.   Do I recall specific weekends?

18        Q.   Yeah.  Specifically Saturday or specifically a

19   Sunday.  Do you recall what weekend day?

20        A.   It would be more Saturdays than Sundays.  But it

21   wasn't every weekend.

22        Q.   You're talking where both she and Joe would do

23   things together on those occasions you would take care of

24   the children?

25        A.   Yes.

1    Q.   Okay.  Going to the movies you mentioned.

2    A.   They told me that they were going to make a

3  Friday date day and Joe wanted to go to the movies and the

4  kids would come over.

5    Q.   Okay.  And was this in the months right before

6  October of 2000 or earlier, if you remember?

7    A.   This was when Joe started chemotherapy.

8    Q.   So it would be in the months approaching October

9  2000?

10    A.   Yes.

11        MR. PATTERSON:  Thank you, Judge.  I have no

12  further questions of the witness.

13        THE COURT:  Are there any questions by the jury?

14  If so, please raise your hand.  No one has raised their

15  hand.

16        May this the witness be excused?

17        MR. MARTINEZ:  Yes.

18        MR. PATTERSON:  No objection.

19        THE COURT:  Thank you very much.  You're

20  excused.

21        MR. DELOZIER:  Barbara Mitchell.

22        (Witness sworn.)

23        THE COURT:  Please make yourself comfortable on

24  the witness stand.  Speak loudly and clearly into the

25  microphone so that everybody can hear you.  Please wait

1 until the question is completed before you answer the

2 question.  And please make sure you give a verbal

3 response.

4          Is that agreeable to you?

5          THE WITNESS:  Yes.

6          THE COURT:  Mr. Delozier, you may proceed.

7          MR. DELOZIER:  Thank you, Your Honor.

8

9                    BARBARA MITCHELL,

10 called as a witness herein, having been first duly sworn,

11 was examined and testified as follows:

12

13                    DIRECT EXAMINATION

14 BY MR. DELOZIER:

15     Q.   State your name for the record?

16     A.   Barbara Mitchell.

17     Q.   And you testified earlier?

18     A.   Yes, I did.

19     Q.   During the period of time that Wendi was married,

20 so that was 1994, approximately, right?

21     A.   Yes.

22     Q.   Through October of 2000, did you have a chance to

23 witness her with the children?

24     A.   Yes.

25     Q.   Tell us what you observed?

1    A.    Couple times I went to the shop, the home that

2  was her parents -- I'm sorry, his parents.  And Nicholas

3  was a couple months old, maybe four or five months old.

4  And I witnessed Wendi around Nicholas.  Also --

5    Q.    What kind of things did you see?

6    A.    She was doing things around the house.  She was

7  carrying him on her side of her hip.  She was always with

8  him, always with her.  I remember her saying that Nicholas

9  was very curious so he to be facing outward with him;

10  feeding him, cuddling him, holding him, walking, making him

11  giggle.

12    Q.    Bathing?

13    A.    Bathing.  I remember he was a little bit older,

14  eight or nine months old, I remember he was able to hold

15  his head up and just making him laugh, giggle, talking to

16  him and just making him smile.

17    Q.    So how about the earlier years with Nicholas?

18    A.    Didn't see much of that.

19    Q.    How did she handle any problems that came up that

20  might require some corrections?

21    A.    Calmly.  I didn't see too much as far as other

22  than, no, don't do that.  That kind of thing.

23    Q.    Okay.  And this was at the farm house you say?

24    A.    Yes, it was.

25    Q.    At some point they moved from there?

1      A.   Yes.

2      Q.   And what was the next opportunity you had to

3  witness -- before we do that, where with Joe during this?

4      A.   I didn't see Joe around.

5      Q.   So he wasn't there when you were there?

6      A.   No, one particular time I was there he was just

7  in and out.

8      Q.   All right.  Let's go to the next location where

9  they lived that you visited.

10     A.   That would have been the apartment complex in

11 Ahwatukee.

12     Q.   San Riva?

13     A.   Yes.

14     Q.   That was in the fall of '99?

15     A.   Yes.

16     Q.   All right.  And what did you see there?

17     A.   I didn't have too much interaction with them as

18 far as the children and her.  So I didn't witness too much

19 there.

20     Q.   Okay.  Did you have occasions where you were out

21 socially with Joe and Wendi and the children?

22     A.   No.

23     Q.   So there wasn't a whole lot of contact during

24 that last year?

25     A.   No.

1    Q.   Did you have any contact with Ashley?

2    A.   No.

3    Q.   Okay.

4    A.   Didn't meet her very much.

5    Q.   I'm sorry?

6    A.   I didn't get a chance to meet her.  I met her

7  baby, that was it.

8    Q.   All right.  The background you have with Wendi is

9  you're related to her in some fashion, right?

10   A.   She's my cousin.

11   Q.   She's your cousin?

12   A.   Yes.

13   Q.   What impact would it have on your life if she was

14  executed?

15   A.   It's hard to describe.

16   Q.   Can you?

17   A.   It's like someone ripping your heart out.  She's

18  been part of my life since I was one.  It's difficult to

19  even think about it.

20   Q.   Would you consider her a good candidate for

21  rehabilitation?

22   A.   Yes.

23        MR. MARTINEZ:  Objection.  Lack of foundation.

24        THE COURT:  Overruled.

25        Go ahead and answer the question.

1          THE WITNESS:  Yes.

2     Q.   BY MR. DELOZIER:  And what do you base that on?

3     A.   She's a caring person.  She cares about people

4     around her.  She's always been giving.  If you needed

5     something she always was willing to help you, whether it

6     be, I mean, it could be anything from comforting you to

7     making you laugh, making you smile, giving you something

8     that was hers.

9     Q.   I understand.  Anything else like that?

10    A.   I have an incident, my grandmother was put in a

11    nursing home about six, seven, eight years ago.  And to

12    help her adjust, Wendi went to the nursing home and made

13    her semiprivate room as if it were her home.  Pictures of

14    the family.  Bedspread.  TV.  Just like it was at home.

15    She helped her adjust.

16         MR. DELOZIER:  I have nothing further Judge.

17         THE COURT:  Mr. Martinez.

18

19              CROSS-EXAMINATION

20    BY MR. MARTINEZ:

21    Q.   One of things you told us was that should the

22    death penalty be imposed you indicated that would have an

23    impact on you.  Do you remember telling us that?

24    A.   Yes.

25    Q.   What impact did Joe Andriano, his death have on

1  you?

2      A.   A lot.

3      Q.   Have you gone to even see the grave?

4      A.   No.

5      Q.   You don't even know where he's buried, do you?

6      A.   Out of state.

7      Q.   But you don't even know where he's buried, right?

8      A.   Oklahoma.

9      Q.   In other words, you don't know specifically where

10  he's buried.  You've never been there, right?

11      A.   No.

12      Q.   You don't call his family, do you?

13      A.   No.

14      Q.   You don't send them cards or anything like that,

15  do you?

16      A.   No.

17      Q.   Do you ever stay up, think about how much Joe

18  suffered before he died?

19      A.   Yes.

20      Q.   Do you think about the one and a half hours that

21  he laid on the carpet after she poisoned him, do you think

22  about that?

23      A.   No.

24      Q.   Do you think about after laying there for an hour

25  and a half, the 23 hits to his head that he took from her.

76

1   Do you think about that?

2        A.   No.

3        Q.   How she took the knife and stuck it in his

4   throat.  Do you think about that?

5        A.   No.

6        Q.   You grew up with her, correct?

7        A.   Yes, I did.

8        Q.   I think you were pretty close growing up, right?

9        A.   Yes.

10       Q.   But, after she got married, you weren't that

11  close, right?

12       A.   No.

13       Q.   She didn't tell you of the affairs she was

14  having, did she?

15       A.   Yes, she did.

16       Q.   What did she tell you about?

17       A.   His name was Ricky or Rick.

18       Q.   When did she tell you about him?

19       A.   During the Vegas trip, which would have been

20  2000.

21       Q.   In May of 2000?

22       A.   Yes.

23       Q.   Was she happy about the affair she was having?

24       A.   No.

25       Q.   She was just being forced to have an affair, is

1   that what's going on?

2       A.   No.

3       Q.   Subsequent to that, did she ever tell you about

4   any other affair she was having?

5       A.   No.

6       Q.   Did she tell you about Travis Black?

7       A.   No.

8       Q.   Did she tell you about going out and kissing

9   other men while she was out at bars?  Did she tell you

10  about that?

11      A.   No.

12      Q.   You indicated that you and she grew up together.

13  Did you and she ever discuss your virginity?

14      A.   No.

15      Q.   Did you and she ever discuss her virginity?

16      A.   No.

17      Q.   So it's not true that you forced her to lose her

18  virginity, did you?

19      A.   No, I didn't.

20      Q.   When you came to what we're calling the farm

21  house to see, I guess it was Nicholas, you indicated that

22  Joe wasn't there, right?

23      A.   He was in and out.

24      Q.   One time he was in and out, right?

25      A.   Yes.

78

1        Q.    You don't know if he was working or what he was

2   doing, do you?

3        A.    No.

4              MR. MARTINEZ:  I don't have anything else.  Thank

5   you.

6              THE COURT:  Redirect.

7

8                    REDIRECT EXAMINATION

9   BY MR. DELOZIER:

10       Q.    You were asked if you were close after the

11   marriage, right?

12       A.    Yes.

13       Q.    Why not?

14       A.    We lived in separate towns and we didn't hang out

15   with the same people.

16       Q.    Any other reason?

17       A.    No.

18       Q.    I thought your previous testimony was you were

19   not uncomfortable being around there?

20       A.    Didn't feel like I fit in as far as I wasn't

21   welcome.

22       Q.    Why didn't you feel welcomed?

23       A.    It was like I got the cold shoulder from Joe.

24       Q.    You also said regarding the affair, it was Rick

25   or Ricky?

1    A.   Yes.

2    Q.   You said she was not happy, right?

3    A.   She wasn't happy, no.

4    Q.   What do you mean by that?

5    A.   In her marriage.

6    Q.   Not with the affair, what I understand you to say
7  she wasn't happy with the affair with Rick?

8    A.   She seemed confused.  That's the only way I can
9  describe it as confused.

10    Q.   Confused over what?

11    A.   What she should be doing at this time.

12    Q.   About Ricky or about Joe or about what?

13    A.   About Ricky and Joseph.

14    Q.   So what you're saying is she wasn't happy and she
15  was confused?

16    A.   Yes.

17        MR. DELOZIER:  Thank you, Your Honor.

18        THE COURT:  Are there any further questions of
19  the witness by the jury?

20        THE COURT:  Let me see counsel here at the bench.

21        (Bench conference was held outside the hearing of
22  the jury.)

23        THE COURT:  The question is:  How many times have
24  you visited Wendi in jail?

25        MR. DELOZIER:  No problem.

1    MR. MARTINEZ:  No objection.

2    (Bench conference concluded.)

3

4                    EXAMINATION

5  BY THE COURT:

6    Q.   Ma'am, I have a question here by the jury.  The

7  question reads as follows:   How many times have you

8  visited Wendi in jail?

9    A.   Once.

10    THE COURT:  Are there any further questions of

11  this witness by the jury?  No one has raised a hand.

12    Any follow-up questions to that specific question

13  by Mr. Delozier?

14    MR. DELOZIER:  No, Your Honor.

15    THE COURT:  And Mr. Martinez?

16    MR. MARTINEZ:  No, sir.

17    THE COURT:  May the witness be excused?

18    MR. DELOZIER:  Yes.

19    THE COURT:  Thank you very much.  You're

20  excused.

21    MR. DELOZIER:  Can we approach, Your Honor?

22    THE COURT:  Yes.

23    (Bench conference was held outside the hearing of

24  the jury.)

25    MR. DELOZIER:  It's our last witness.  The last

1   witness is Mr. Ochoa and I wondered if you wanted to take a

2   break now rather than stop at three?

3              THE COURT:  We'll go ahead and continue.

4              (Bench conference concluded.)

5              THE COURT:  Okay.  Sir, please step up to the

6   clerk and she will swear you in.

7              (Witness sworn.)

8              THE COURT:  Sir, please have a seat on the

9   witness stand.  Make yourself comfortable.  Please pull the

10   microphone closer to you.  Please remember to speak loudly

11   and clearly so everybody can hear.  Also please wait until

12   the answer is complete before you answer the question.

13              Is that agreeable to you?

14              THE WITNESS:  Yes.

15              THE COURT:  Mr. Delozier, you may proceed.

16

17                      ALEJO OCHOA,

18   called as a witness herein, having been first duly sworn,

19   was examined and testified as follows:

20

21                    DIRECT EXAMINATION

22   BY MR. DELOZIER:

23      Q.   State your name, please?

24      A.   Alejo Ochoa.

25      Q.   And you're the father of?

1      A.   Wendi.

2      Q.   Okay.  You realize -- we understand you testified

3  previously, correct?

4      A.   Yes.

5      Q.   And we don't want you to necessarily repeat what

6  you've already said.  The jury has heard that.  Okay.  And

7  we're now in a different phase.  You understand that?

8      A.   Yes.

9      Q.   All right.  What impact would it have on you if

10  Wendi was executed?

11          Take your time.

12      A.   It would be devastating.  I tried my best over

13  the years to raise her the way I thought.  And I just know

14  it would be devastating.

15      Q.   Did you have anything else you wanted to add to

16  that?

17      A.   Can we just come back to that in a little bit?

18      Q.   I'd be glad to.

19          Tell me about your observations of Wendi as a

20  mother to Nicholas and Ashley?

21      A.   Very protective.  I thought she was a real good

22  mom.

23      Q.   What kind of things did you see her do with them?

24      A.   Well, I've been married almost 30 years and in a

25  marriage that long, sometimes you have little arguments

1   with your spouse.  One of the main things Wendi would

2   always say is don't argue in front of the children.  Don't

3   raise your voices.  Smart thing.

4           One of the things she was very very adamant about

5   she'd take them to the park, have birthday parties for

6   them.  Take them out to breakfast.  She'd bring them to the

7   house.  We had a Saturday morning ritual where I'd make

8   breakfast for the family.

9       Q.   Was Joe with you during these times with them

10  there?

11      A.   At times, sometimes he would be.  Sometimes he

12  wouldn't be.  Nicholas was hurt when he slipped on a

13  propeller on the back of the Yukon.  And Joe called me to

14  tell me to get to the hospital.  After that couple minutes

15  later Wendi called me, told me to get to the hospital.  So

16  when I got there, Nicholas wanted to come with me and both

17  Joe and Wendi were crying because they couldn't do much

18  anything to help.  And then Donna got there.  But, she

19  didn't like to see them hurt.  She didn't like pain.  She

20  didn't like shots.  She didn't like any of that.

21          When it was time to take them to the dentist, I

22  would go with Wendi and Joe just so Nicholas could sit on

23  my lap so I could hold Nicholas while they did work on

24  them.  I never took them -- went with them to the doctor.

25  My main thing was the dentist.

84

1   Q.   Did the children get bathed in your presence?

2   A.   Oh, yeah.  They were bathed daily, all the time.

3   Q.   Who did the baths when you saw them?

4   A.   Wendi did them.  Whenever I'd go to the house,

5   she was the one that bathed them.  If they spent the night

6   at our house, then, Donna was the one that bathed them.

7   Q.   How about changing diapers?

8   A.   Changing diapers, Donna or Wendi or Brandon.

9   They're the ones that changed the diapers.

10   Q.   When you were there?

11   A.   In my presence, yes.

12   Q.   How about preparing meals?

13   A.   Wendi was always preparing meals.  If she wasn't

14   preparing them she sent out for them bringing something in

15   for the children.

16   Q.   How about preparing clothing?  Washing the

17   clothes and drying them and so forth, getting the kids.

18   A.   Wendi always dressed them.  I don't know who --

19   as far as laundry, I don't know.  I know Donna and Wendi

20   did some.  But I don't know if they send any of the stuff

21   out.  They just did it at home.

22   Q.   Ever see Wendi or Joe mistreat either children?

23        That's two questions, I guess.

24        Did you ever see Wendi mistreat the children?

25   A.   No.

1      Q.    Did you ever have any knowledge of this paddle,

2   some sort of paddle they got from the church.  Do you know

3   anything about that?

4      A.    A paddle.  We had a decorative paddle.  I forget

5   the name of the game.  It's kind of some kind of game.

6      Q.    The paddle or the game?

7      A.    The paddle.

8      Q.    Okay.

9      A.    One of the kids at the school lost one of them.

10  That was just a decorative paddle that they just had

11  hanging up on the wall.

12     Q.    At the church?

13     A.    Yeah, at the church.  And Joe used to spank the

14  children with a spoon.  And he asked somebody -- any way he

15  got the paddle from the church.  I don't know who he asked

16  but I know that's where he got it from.

17     Q.    Did you ever see Wendi use the paddle on the

18  children?

19     A.    Wendi?

20     Q.    Yeah.

21     A.    No.  Wendi never spanked the children.  Joe

22  spanked the children.

23     Q.    Did you ever see Joe use the paddle?

24     A.    I never saw him use the paddle.  He used the

25  spoon.

1    Q.    Any negative parenting that you saw besides the

2  paddling with the spoon from Joe?

3    A.    Can you rephrase that?

4    Q.    Did you see anything that -- you said a moment

5  ago you didn't see anything negative with Wendi's character

6  with the children.  I'm asking the second part of the

7  question then?

8    A.    Oh, Joe, okay.

9    Q.    Yeah.

10    A.    Fine.  I seen him push Nicholas off the bed

11  once.  And he seemed to push, not physically but not have

12  much to do with Ashley.  Nicholas, I felt, was his

13  favorite.  Not that he mistreated her but he just

14    Q.    Right.

15    A.    -- favored Nicholas a lot more.

16    Q.    I think you testified when you were here before

17  that you loved Joe?

18    A.    Yes, I do.

19    Q.    What impact does his death have on you?

20    A.    It was just devastating on me.  I'm dealing with

21  it.  I poured a lot of my life into him.  I think I

22  mentioned once before that I saw a lot of him, a lot of him

23  in me when I was younger.  And I tried to help him through

24  a lot of situations in his life that he was dealing with.

25  It was very devastating to me, very devastating and it

1  still hurts.

2       Q.   How often do you get a chance to visit Wendi

3  while she's been incarcerated since October 8th?

4       A.   I try to see her at least once a week.  Sometimes

5  I can't.  They've had lock-down, something happens.  Like

6  when 9/11 happened they shut down the whole system.

7  Something happens with one of the other inmates, it could

8  be anywhere in the complex, they shut the thing down, do

9  security override.  So I may not be able to see her.  Or

10  she's meeting with one of the attorneys or counselors or

11  she's in medical, you know.  There are times when I can't

12  see her.  But I try to see her at least once a week.

13       Q.   What other forms of communication do you have

14  with her?

15       A.   She calls the house phone.  She calls collect.  I

16  told her to call us as much as she wants.  Sometimes she

17  calls once every two or three days.  Sometimes every day.

18  Sometimes two or three times in a day.  Usually in the

19  evening times.

20       Q.   Come back to the first question, how would her

21  execution affect you?

22            MR. MARTINEZ:  Objection.  Asked and answered.

23            THE COURT:  Overruled.

24            Go ahead and answer the question.

25            THE WITNESS:  I still haven't gotten over the

88

1  death of Joe and still dealing with that.  If I would lose

2  Wendi, too, it would just be very devastating to me.

3  Situations like this, it can either bring a marriage

4  together, stronger or tear it apart.  I feel that it's

5  brought our marriage closer.

6      Q.   You mean your's and Donna's?

7      A.   Mine and Donna's.  I don't know if it could

8  handle any more.  I don't know how much more it could

9  handle.

10      Q.   Do you think Wendi is a good candidate for

11  rehabilitation?

12      A.   Yes, definitely.

13      Q.   What makes you think that?

14      A.   She loves people.  She always loves doing things

15  for people.  Growing up, if we buy her something and she

16  saw another little kid that didn't have a toy, she would

17  give him her toy.  It didn't matter who bought it for her.

18  If she saw a need, she would try to fill it.  She

19  definitely loves to help people.  It's been an ongoing

20  thing since she was a little child.  She never changed.  I

21  know definitely she could be an asset to the community.

22          MR. DELOZIER:  Nothing further, Your Honor.

23  Thank you.

24          THE COURT:  Mr. Martinez.

25

89

CROSS-EXAMINATION

1

2  BY MR. MARTINEZ:

3      Q.   Sir, you indicated that -- it appeared to me that

4  you did the best to you could to raise her, right?

5      A.   At the time, I felt I did.

6      Q.   Sure.  I mean you were always there for her,

7  weren't you?

8      A.   I tried to be.

9      Q.   If, for example, she was married to Joe, she was

10  at a party and he was looking at another woman and she'd

11  call you, you would go pick her up, wouldn't you, if she

12  called you?

13      A.   Yes.

14      Q.   And growing up, if she needed something, you

15  would give it to her, you did, right?

16      A.   If it was within my -- if it was within my

17  ability.  There was certain limitations.

18      Q.   Sure, of course.

19      A.   Just like any parent would.

20      Q.   Okay.  You tried to send her to the school that

21  you knew about, right?

22      A.   Yes.

23      Q.   And if she ever had any problems, you would try

24  to talk to her about it, right?

25      A.   Yeah, I would talk about it.

90

1    Q.   And, in fact, it appears that she was closer to

2    you than she was to Donna, correct?

3    A.   At times, yes.

4    Q.   You did indicate that the only person that ever

5    mistreated the kids was Joseph, correct?

6    A.   I didn't hear you.

7    Q.   You indicated that the only person that

8    mistreated the kids was Joseph, right?

9    A.   I believe he asked me if Wendi or Joseph

10   mistreated the children.

11   Q.   No.  No.

12   A.   Joe was the only I saw mistreat the children.

13   Q.   He's the one that hit them with a spoon, right?

14   A.   I saw him spank the children with the spoon.

15   Q.   Push them off the bed, right?

16   A.   I saw him push Nicholas off the bed once.

17   Q.   Sir, you still maintain that those photographs of

18   the dresser were taken in late August or early September of

19   2000?

20   A.   I thought it was sometime in September.  When you

21   asked me that outside, I was trying to remember.  And

22   that's -- I don't remember.  I thought that was when I took

23   the photographs.

24   Q.   It was definitely before Joseph's death, wasn't

25   it.

1    A.   I believe so.

2    Q.   Well, Joseph's death was a very important factor

3 in your family, wasn't it?

4    A.   Definitely.

5    Q.   So, you did testify on the stand telling us that

6 you took those photographs before his death, didn't you?

7    A.   Yes, I said that, yes.

8    Q.   Could have been late August, could have been

9 early September of 2000?

10   A.   It would have been in August.

11   Q.   You'd do anything for your daughter, wouldn't

12 you, sir?

13   A.   Within my ability.

14   Q.   And that would include coming in and telling us

15 that those photographs were taken early September of 2000

16 late August of 2000, right?

17   A.   I'm sorry?

18   Q.   You would do just about anything for your

19 daughter, right?

20   A.   Yes.

21   Q.   That would include coming in to court and telling

22 us that the photographs of the dresser that had damage on

23 it were taken in early September or late August of 2000,

24 right?

25      A.   If that's when I thought they were taken, yes.

92

1          MR. MARTINEZ:  I don't have anything else.

2          THE COURT:  Mr. Delozier.

3          MR. DELOZIER:  I have nothing further.  Thank

4   you, Your Honor.

5          THE COURT:  Are any further questions of this

6   witness by the jury?  If so, please raise your hand.  No

7   one has raised their hand.

8          Could this witness be excused?

9          MR. DELOZIER:  Yes, you're excused.

10         THE COURT:  We'll take our afternoon break at

11  this time.  Remember the entire admonition I have given

12  you.  Don't discuss the case with each other.  Don't let

13  anyone talk about the case with you.  Keep an open mind.

14         Have a nice break.

15         (Recess taken.)

16         THE COURT:  This is Cause Number CR2000-096032,

17  State of Arizona versus Wendi Elizabeth Andriano.

18         The record will reflect the presence of the

19  defendant and counsel.  We're outside the presence the

20  jury.

21         Mr. Patterson.

22         MR. PATTERSON:  Judge, before I arrest, I've had

23  marked two exhibits, Exhibit 544 and Exhibit 545.  I don't

24  think there is a problem with 545.

25         MR. MARTINEZ:  No objection.

1       There's no objection to 545.

2       MR. PATTERSON:  There is a objection in that

3   sense.  My request to the Court is you made some previous

4   rulings about the admission of certain things on rebuttal.

5   With regard to Exhibit 544, there is a reference to my

6   client's being dismissed from her job in March of 1996.  As

7   a result, that's one of the reasons she went to Casa Grande

8   Valley Counseling Services.  She made reference also to

9   problems she had in her relationship, her marriage.  And

10  there are some Axis I and Axis 4 diagnoses.

11      I intend to move this evidence.  If, by so doing,

12  that opens a door for rebuttal, then I would not move it

13  into evidence.

14      THE COURT:  Mr. Martinez?

15      MR. MARTINEZ:  I believe it does open the door to

16  rebuttal.  Specifically, it did say in one of the

17  statements that she was dismissed from her job on Monday,

18  March 4th.  This is dated March 6, 1996.  What they are

19  referring to is the defendant working for Casa Grande

20  Medical Center and the reason she was fired was because she

21  stole approximately $18,000 worth of money.  And what these

22  records indicate is that as a condition to that matter not

23  been referred to authorities, that they wanted her to

24  attend counseling.

25      One of the things that we talked to the jury

94

1   about was that she has no prior felony convictions.  Well,

2   part of the reason she didn't have a prior felony

3   conviction is because she entered into agreements like

4   this.

5        Additionally, the fact that she was depressed

6   which is what this indicates, this Axis 4, occupational

7   problems.  The reason that she has the occupational

8   problems is because, as I said before, she stole money from

9   them.

10       So, the reason she was depressed or the reason

11   she has the problem is directly related to her being a

12   thief, not because she can't cope.  Not because as a

13   general rule she's depressed, not because she's, as a

14   general rule, subject to anxiety attacks.  The reason for

15   it is rooted somewhere else.  So I ask that I be allowed to

16   bring in why she was dismissed on March 4th of 1996 from

17   the Casa Grande Regional Medical Center.

18       THE COURT:  Anything further, Mr. Patterson?

19       MR. PATTERSON:  Yeah, Judge, I just want it

20   abundantly clear, if he's allowed to argue anything about

21   the business dismissal or bring in any kind of rebuttal

22   evidence, I will not offer it.  I don't want to open that

23   door at all.

24       THE COURT:  Okay.  With regard to Exhibit Number

25   545, I'm going to order that it be admitted into evidence.

95

1          With regard to Exhibit 544, I'm going to allow

2    that admitted to evidence; however, I'm going to preclude

3    the State from bringing in any evidence as to why the

4    defendant was dismissed.

5          (Jurors entered.)

6          THE COURT:  Please be seated.  This is Cause

7    Number CR2000-096032, State of Arizona versus Wendi

8    Elizabeth Andriano.

9          The record will reflect the presence of the

10   defendant, counsel and the jury.

11         Mr. Patterson.

12         MR. PATTERSON:  Yes, Your Honor.  At this time, I

13   would move admission of, formally before the jury, Exhibits

14   544 and 545.

15         THE COURT:  Mr. Martinez?

16         MR. MARTINEZ:  We've already discussed the

17   State's objection.

18         THE COURT:  Okay.  Exhibit Number 544 and Exhibit

19   Number 545 marked for identification are admitted as

20   evidence.

21         MR. PATTERSON:  If I could publish or explain

22   what they are?

23         THE COURT:  You may publish it.

24         MR. PATTERSON:  Okay.

25         THE COURT:  Mr. Patterson.

# APPENDIX M - Part 3

96

1          MR. PATTERSON:  Your Honor, upon the conclusion

2  of this aspect of the case, we would rest our mitigating

3  evidence.

4          Mr. Martinez.

5          MR. MARTINEZ:  Once they completed, the State

6  will call Jana Clayton.

7          THE COURT:  We can proceed at this time.

8          MR. PATTERSON:  Unless divided attention.

9          THE COURT:  You can pass it around.  Just wait

10  until that's completed.

11          Mr. Martinez.

12          MR. MARTINEZ:  State calls Jana Clayton.

13          THE COURT:  Please step over here and give the

14  clerk your name and she will swear you.

15          (Witness sworn.)

16          THE COURT:  Please have a seat on the witness

17  stand.  Please remember to make yourself comfortable and to

18  pull the microphone close to you.  Please remember to speak

19  loudly and clearly so everyone can hear you.  Also, please

20  wait until the question is completed before you answer the

21  question.  And please make sure you give a verbal response.

22          Is that agreeable to you?

23          THE WITNESS:  Yes.

24          THE COURT:  Mr. Martinez, you may proceed.

25

97

JANA CLAYTON,

1

2  called as a witness herein, having been first duly sworn,

3  was examined and testified as follows:

4

5                     DIRECT EXAMINATION

6  BY MR. MARTINEZ:

7       Q.   State your name, please?

8       A.   Jana Andriano Clayton.

9       Q.   Did you know somebody by the name of Joe or

10  Joseph Andriano?

11      A.   Yes.

12      Q.   Who was he?

13      A.   My brother.

14      Q.   And besides him, do you have any other brothers

15  and sisters?

16      A.   Yes.

17      Q.   Tell me about that?

18      A.   I've an older sister Jeanea.

19      Q.   Her name is what?

20      A.   Jeanea Lambeth.

21      Q.   And?

22      A.   Then also me and Joe was younger than me and then

23  James Andriano.

24      Q.   Were did James Andriano fall, older or younger?

25      A.   He's the youngest.

98

1    Q.   Back in the year 2000, where were you living?

2    A.   In Germantown, Tennessee.

3    Q.   How long have you lived there?

4    A.   About nine months.

5    Q.   Prior to that, where did you live?

6    A.   Bowling Green, Kentucky.

7    Q.   How long had it been since you actually lived in

8    this area?

9    A.   Which area?

10   Q.   I mean Arizona.

11   A.   Prior to living in Bowling Green?

12   Q.   How long -- when did you move from this area

13   here?

14   A.   I moved in 1989 after I graduated from college.

15   Q.   When you moved away, did you have occasion to

16   come in contact with Joseph Andriano?

17   A.   Yes, we talked regularly.

18   Q.   And he was married, correct?

19   A.   Yes.

20   Q.   And he was married to Wendi Andriano, correct?

21   A.   Yes.

22   Q.   Did you attend that wedding?

23   A.   Yes, I did.

24   Q.   After that did you have occasion again to keep in

25   contact with your brother, Joseph Andriano?

99

1      A.   Yes, I did.

2      Q.   And did you learn of his problems with cancer

3  subsequent to that?

4      A.   Yes, I did.

5      Q.   And did you try to help?

6      A.   Of course.

7      Q.   What did you do?

8      A.   Well, I was working in pharmaceutical sales at

9  the time.  So, I asked any doctor and every doctor that

10  would talk to me about it.  And I also researched on the

11  Internet for his specific cancer, adenoid cystic

12  carcinoma.  It's a very rare cancer.  They don't do

13  research.  There's no research studies that the different

14  pharmaceutical companies do.  So I was helping in trying to

15  find any type of treatment that might be available for him.

16      Q.   And during the course of your research did you

17  come across some that were so-called experimental

18  treatments?

19      A.   Yes.

20      Q.   Did you convey those or communicate that to

21  Joseph Andriano?

22      A.   Yes, I did.  We discussed them.

23      Q.   And were those also discussed with Wendi

24  Andriano?

25      A.   Yes.

1    Q.   And one of things that we heard from the

2  defendant was that there was one that was approximately

3  $25,000.  Do you remember something like that about one of

4  the treatments?

5    A.   Yes.

6    Q.   And you were the one that actually conveyed it to

7  them, right?

8    A.   Yes.  When Joe was visiting me we were doing

9  further research.  And that's in September of 2000.

10   Q.   Did you expect that you would help with the

11 treatment or were you just telling him about this

12 treatment.  This is what you need to do and leave it at

13 that.  That didn't you also indicate you would help?

14   A.   I always was willing to help and never would have

15 hung a carrot out there for him to dream about.  I would

16 have always offered help and assistance.  And I talked to

17 both of them about that.

18   Q.   Did you ever send them money from your home?

19   A.   Very frequently.

20   Q.   And when I say very frequently, in the year 2000

21 how often would you say you would send them money?

22   A.   Several times.  I mean, I gave them over the

23 course of his illness several thousand dollars.

24   Q.   With regard to the year 2000, did there come a

25 time when they came to visit you out in Memphis?

101

1    A.   Yes.

2    Q.   When was that?

3    A.   September, 2000.

4    Q.   Whose idea was it to have this visit, yours or

5    someone else's?

6    A.   It is my idea.  I've lived away from Arizona for

7    so long, I always tried to get any and every family member

8    to come and visit.  And so, when we lived in Bowling Green,

9    I tried to get Joe and his family to come.  They weren't

10   able to.  And so when I seen him in -- I saw Joe in August

11   of 2000, I talked about how it would be great if he and his

12   family could come to Memphis.

13   Q.   Was it a situation where you had a conversation

14   or was it conveyed to you by anybody whether it was Joseph

15   or anybody that the reason he wanted to come -- that he

16   actually wanted to come out, as opposed to you being the

17   person who made the arrangements for him to come out?  In

18   other words, who came up with the idea?

19   A.   I did.

20   Q.   So it wasn't Joseph who said, "I want to come and

21   see you," was it?

22   A.   No.

23   Q.   You indicated that prior to that September 2000,

24   that you also saw him in August of 2000, right?

25   A.   Yes, I did.

1    Q.   And tell me how that came about that you saw him

2    in 2000?  How did that come about?

3    A.   Well, Joe, when he started chemotherapy in July,

4    he had lost like 15 pounds the first week of chemotherapy

5    and all the doctors were surprised he lost so much weight

6    that first week.  And so I was quite concerned about his

7    well-being.  And I had several conversations with Wendi

8    over the phone and mentioned her at the beginning of August

9    that if Joe ever got to a point where he was really bad,

10   and that I -- because I wanted to see him before he might

11   die -- that I wanted her to let me know.  And she told me

12   without hesitation, well, if you want to see Joe you need

13   to come now.  And so I came to visit.  It was August 25th,

14   24th or 25th.  And the following weekend was Labor Day.  I

15   didn't even wait until Labor Day weekend.  I made

16   arrangements for my children and I came as soon as I could

17   to Phoenix so I could see my brother and help him.

18   Q.   What day of the week did you arrive?

19   A.   I came in on a Thursday.

20   Q.   And did you stay that Friday?

21   A.   Yes, I did.

22   Q.   Did you stay that Saturday night?

23   A.   I stayed Saturday night.

24   Q.   How about Sunday?  Did you stay Sunday or did you

25   leave Sunday?

103

1      A.    I left Sunday.

2      Q.    You indicated that when your brother started

3    chemotherapy that he lost a lot of weigh?

4      A.    Yes.

5      Q.    Were there discussions involving the defendant as

6    to who it was that wanted him, him being Mr. Andriano, to

7    start chemotherapy?

8      A.    Yes, there were.

9      Q.    And what was that?

10          MR. PATTERSON:  Judge, date, time, circumstances.

11          THE COURT:  Can you lay more foundation.

12     Q.    BY MR. MARTINEZ:  Was it shortly before the

13    chemotherapy started there were conversations involving the

14    defendant?

15     A.    It was in March of 2000 that there was another

16    trip that my family and I were visiting Arizona.  And Wendi

17    had talked about -- we talked about the lawsuit that they

18    had.  And she wanted Joe to try chemotherapy so that the

19    jury would see that he tried everything that was available.

20     Q.    To increase the value?

21     A.    So they could get more money.

22     Q.    With regard to the treatment for chemotherapy,

23    was there also a treatment where he went to Colorado that

24    you're aware of?

25     A.    Yes.

104

1      Q.   And again, was there a reason that was given per

2   the defendant why that was a good thing to try that

3   treatment?

4           MR. PATTERSON:  Judge, could we have a time

5   frame?

6           THE COURT:  Sustained.  Lay some more foundation.

7      Q.   BY MR. MARTINEZ:  This conversation, who did you

8   speak to about this conversation?

9      A.   About the conversation?

10     Q.   Involving the issue of the homeopathic approach.

11     A.   I spoke with my sister.

12     Q.   What is her name?

13     A.   Jeanea.

14     Q.   Jeanea what?

15     A.   Lambeth.

16     Q.   About when did you talk to her?

17     A.   Several years ago.

18     Q.   Was it right about the time that this was going

19   to happen?

20     A.   Yes.

21     Q.   So what was the discussion about?

22          MR. PATTERSON:  Judge, objection.  A discussion

23   that doesn't involve my client is not relevant.

24          THE COURT:  Overruled

25          Go ahead and answer if you can.

1      THE WITNESS:  About Joe doing the homeopathic

2  treatment and going to Colorado.  He wanted to.  Again,

3  because of the lack of medical information and knowledge of

4  him doing the traditional treatment for cancer the

5  homeopathic treatment was one that would be good for him to

6  try.

7      Q.   BY MR. MARTINEZ:  Do you know whether or not they

8  had to have money out of pocket or do you know how that was

9  paid for?

10     A.   Once Joe was diagnosed with cancer, there were

11 some people involved in the community, some friends of

12 ours, Tom Stevens, a family friend from childhood and Alma

13 Farrell that organized a fund raiding event and I helped

14 them from a distance.  But they organized a fund raising

15 event to assist Joe and his family in any way they might

16 need.  And they arranged this event to be held at the Elk's

17 Club.  About $15,000 was raised for Joe.

18     Q.   So it wasn't like the family had to pay out of

19 pocket for the cost of the homeopathic treatment?

20     A.   That's right.  That treatment wsa paid for from

21 this fund raising event.

22     Q.   You indicated that you flew out here on Thursday,

23 Friday and Saturday -- or Thursday in August and you

24 thought it was either August 24th or August 25th of 2000.

25 Do you remember telling us that?

1    A.   Yes.

2    Q.   When you came out here, where did you stay?

3    A.   I stayed in Wendi and Joe's apartment.

4    Q.   So the Thursday that you stayed, you did stay at

5  their apartment?

6    A.   Yes, I did.

7    Q.   And all the time you were there on the, 24th, 25t

8  and 26th, did you ever see anybody come in, go in and out

9  of the side door that has the wall there?

10   A.   No.

11   Q.   Which was the normal way of coming -- which was

12  the way that people came in and out of that apartment?

13   A.   The front door.

14   Q.   That first Thursday, about what time did you

15  arrive?

16   A.   It was during the work day.  Wendi picked me up

17  from the airport.

18   Q.   And so about what time was it?

19   A.   It was after lunch time, so probably between two

20  and three.

21   Q.   Where did you go?

22   A.   Straight to the apartment, 132.

23   Q.   When you went to the apartment, who was there?

24   A.   Joe.

25   Q.   And was Joe by himself or was anybody else with

1  him?

2       A.   Joe was by himself.

3       Q.   Where were the kids?

4       A.   They were at Gia's house.

5       Q.   Did there come a time when the kids come over to

6  the apartment?

7       A.   Yes.

8       Q.   About what time?

9       A.   After five.

10       Q.   Who brought them?

11       A.   Wendi picked them up.

12       Q.   And did Wendi remain at the apartment after she

13  picked them up and brought them down?

14       A.   No.

15       Q.   Did she leave?

16       A.   Yes.

17       Q.   Do you know where she went?

18       A.   I don't know.

19       Q.   Do you know what time she returned?

20       A.   It was about two o'clock in the morning.

21       Q.   And that night, when the kids came over, and the

22  kid were there, who fed them that night?

23       A.   I did.

24       Q.   And who bathed them that night?

25       A.   I did.  Joe wasn't feeling very good.

1    Q.  The next morning would have been a Friday,

2  correct?

3    A.  Yes.

4    Q.  And about what time did you get up?

5    A.  Early, between six and seven.

6    Q.  And were the kids up when you got up or not?

7    A.  I believe that they were.

8    Q.  And had they already received breakfast?

9    A.  No.  I slept on the couch in the leaving room so

10  I was right there next to the kitchen.

11    Q.  So, did you see the defendant that morning?

12    A.  I did.

13    Q.  And did she stay there that morning or did she go

14  somewhere?

15    A.  She went somewhere.

16    Q.  And so who fed the kids?  Did you feed the kids

17  or did Joe feed the kids?

18    A.  I did.

19    Q.  And when was the next time you saw the defendant

20  that day?

21    A.  It was later in the afternoon, probably about

22  between three and four.

23    Q.  Were the kids taken to the baby-sitter that day,

24  that Friday?

25    A.  I believe that they were.

109

1    Q.   And so what time did the kids get back?

2    A.   They were at the baby-sitter because Wendi had

3   gone into work that day.  They got home -- I didn't see

4   them that evening.  They were taken to Casa Grande.

5    Q.   That was the Friday?

6    A.   Yes.

7    Q.   Do you know who took them to Casa Grande?

8    A.   Wendi did.

9    Q.   Did you see Wendi that evening?

10    A.   Just briefly when she had come home between three

11   and four, she got ready to go out.

12    Q.   When you say "got ready to go out" what are you

13   talking about?  Get ready to go back to work or get ready

14   to go out for something else?

15    A.   She was going out for her birthday.  She had

16   called me to tell me that the girls in the office had

17   gotten a limo to go out for her birthday.  And I thought

18   Joe and I were invited to go.  And so I said, "Well, who's

19   going to take care of the kids."  She said, "Oh, my mom

20   will."  And so she took the kids to Casa Grande.

21    Q.   And that was about three o'clock in the afternoon

22   that you saw her?

23    A.   Yes.

24    Q.   What did you do after that time and who did you

25   do it with, if you did anything?

1    A.   Well, I was told that the limo ride was just for

2    the girls.  And that really Joe and I weren't going to be

3    included in that.  And so, we called my mom, Joe and I

4    called my mother and we went out to dinner, the three of us

5    did.

6    Q.   Where did you guys go?

7    A.   We went to Mimi's Cafe.

8    Q.   Where is that located?

9    A.   Chandler Boulevard in Ahwatukee.

10   Q.   And about what time did you get there?

11   A.   Probably about seven.

12   Q.   How long were you there having a meal?

13   A.   About an hour and a half.  It took a little bit

14   of time to get seated.

15   Q.   And then who was there, you, Joseph and who else?

16   A.   My mother, Jeanette Andriano.

17   Q.   And was that it?

18   A.   That was it.

19   Q.   Where did the three of you go after that?

20   A.   We went to -- we tried to see a movie but the

21   movie was sold out.  And so Joe knew how much Wendi liked

22   to read.  He wanted to get her some books for her

23   birthday.  So we went to the Barnes and Noble bookstore.

24   Q.   And was he successful or did he end up buying her

25   some books?

111

1      A.   He did and my mother is also a very avid reader

2  and she has some suggestions for Joe.  She knew the kind of

3  books that Wendi liked to read.

4      Q.   Where did the three of you go after the Barnes

5  and Noble trip or stop?

6      A.   Joe and I went back to the apartment.  And my mom

7  went to the grocery store and then home.

8      Q.   At any time was Joseph expressing any anxiety

9  over the defendant not being there with him or that she

10 might be out?

11     A.   No.

12     Q.   And that evening did you and he do anything other

13 than just sit in the apartment and hang around?

14     A.   We visited.  We talked about just things we used

15 to do when we were growing up.

16     Q.   What was his physical aspect like?

17     A.   He lost his hair and he was very thin.  His skin

18 had started to turn kind of yellow.

19     Q.   Could you tell anything about -- Could you tell

20 anything about his endurance or strength?  Were you able to

21 tell anything?

22     A.   He was weak and he was tired.  He slept a lot.

23 He took a couple naps a day.

24     Q.   So, what happened later on that evening:

25     A.   Joe and I just -- we visited.  We watched TV.  We

112

1  basically were waiting for Wendi to come home.

2      Q.   And prior to her coming home, did he leave the

3  apartment?

4      A.   He did.

5      Q.   And did he tell you why he left the apartment?

6      A.   He told me he was going to meet Wendi and see if

7  the limousine was back.

8      Q.   About what time was that?

9      A.   I think it was about one clock.

10     Q.   And how long was he gone?

11     A.   About ten minutes.

12     Q.   Was he agitated when he left?  Was he upset?

13     A.   No.

14     Q.   Had he been upset all throughout the night that

15  Wendi had been out?

16     A.   No.  He -- he thought Wendi was out sowing her

17  oats.

18     Q.   When you say that "he thought Wendi was out

19  sowing her oats" what does that mean?

20     A.   He just thought that -- Wendi had told him that

21  she wasn't able to go out and that she didn't get to go out

22  and experience things, like after she got out of high

23  school.  And so she -- so the fact that she wanted to go

24  out was okay with him.  I mean, he wasn't angry with her

25  about it.

113

1      Q.   What time did she come home the night before,

2  which was Thursday?

3      A.   About two o'clock.

4      Q.   So it's about one o'clock he goes outside.  You

5  indicated, I think, that he was gone about ten minutes or

6  how long?

7      A.   Yes, about ten minutes.

8      Q.   And then did he return?

9      A.   Yes.

10     Q.   And which door did he come in through?

11     A.   The front door.

12     Q.   What was his demeanor when he walked in?

13     A.   He just seemed normal.  I mean, he said they were

14  back.

15     Q.   And then, did Wendi come in shortly after that?

16     A.   Yes.

17     Q.   So, it wasn't like they came in together, was it?

18     A.   No.

19     Q.   And when she came in, what was her demeanor?

20     A.   She was just real happy and giggling and

21  laughing.  She said she had a really good time.

22     Q.   And when she came in, where did she go inside the

23  apartment?

24     A.   She sat in the chair in the living room.

25     Q.   And did you and she talk?

114

1    A.   We did.  We talked a little bit.

2    Q.   And what did she tell you?

3    A.   She said she just had to go out.  She just had to

4  do it.

5    Q.   And what did you say to that?

6    A.   I didn't know what to say.  I was overwhelmed

7  with the fact that she was going out without my brother and

8  staying out late.  I didn't respond.

9    Q.   How long did she stay out there in the chair with

10  you, talking then?

11    A.   Ten minutes, 15.

12    Q.   Where was your brother when she was talking to

13  you?

14    A.   He had gone back in the bedroom.

15    Q.   When he was back in the bedroom, did you hear any

16  slamming of drawers or anything that would categorize a

17  loud sort of striking noise?

18    A.   No.

19    Q.   Did you hear any cursing or anything while he was

20  back there in the bedroom?

21    A.   No.

22    Q.   So she decides, she leaves you after about ten to

23  15 minutes.  Where did she go?

24    A.   She went to the bedroom.

25    Q.   Did her demeanor at all change at all during

115

1  doing the ten, 15 minutes from being giggling and happy?

2      A.   No.

3      Q.   Was she intoxicated?

4      A.   Yes.

5      Q.   Then what happened?

6      A.   Then Joe ended up coming back out.

7      Q.   How long was he back there when she was back

8  before he came out?

9      A.   Not very long.  Probably 15 minutes.

10     Q.   While he was back there for 15 minutes, did you

11 hear any loud voices from the back?

12     A.   No.

13     Q.   Did you hear anything striking anything while he

14 was back there?

15     A.   No.

16     Q.   Did you hear anything that -- are you familiar

17 with the sounds that a drawer makes when it's being

18 slammed?

19     A.   Yes.

20     Q.   Did you hear anything like that?

21     A.   No.

22     Q.   When he came out, what was his demeanor?  What

23 was he acting like?

24     A.   He was tired but he couldn't go to sleep.

25     Q.   So?

116

1      A.   He wanted to spend time visiting with me.

2      Q.   What happened?

3      A.   So he sat on the rocking chair, on his chair and

4  we just we talked about his cancer.

5      Q.   Did he ever indicate to you a desire to die or

6  anything like that?

7      A.   No.  He was so optimistic and positive.  At

8  times, it would rub off on me.  I would think, I would be

9  as optimistic as he was.  I really wanted to believe that

10  he -- he believed he was going to live ten more years.

11  That's what he would tell us.  He was going to beat it.  He

12  felt so strong that he was going to beat it.  He wanted to

13  see his kids grow up.

14      Q.   And about what time did you and he finally end up

15  going to bed?

16      A.   It was late, between three and four.

17      Q.   And so that takes us, I guess, to Saturday

18  morning?

19      A.   Uh-huh.

20      Q.   Is that yes?

21      A.   Yes.

22      Q.   That Saturday morning, what time did you get up?

23      A.   Not quite as early because I stayed up so late

24  and the children weren't there.  So, we slept in, maybe ten

25  o'clock.

117

1      Q.    And do you remember the breakfast plans or

2   anything like that?   What happened?

3      A.    There wasn't any meal that was prepared while I

4   stayed there that weekend by Wendi.   I'm not a big

5   breakfast eater so I waited for lunch.

6      Q.    And what time did the children return that

7   Saturday?

8      A.    Yes.

9      Q.    What time did they return?

10     A.    Sometime in the afternoon.   I don't know the

11   exact time.

12     Q.    Do you know if Wendi went to pick them up or if

13   they were brought by somebody?

14     A.    I think Wendi went to pick them up.

15     Q.    What happened that evening?

16     A.    We just hung out at the apartment and watched a

17   movie.   I bathed the children.

18     Q.    Was the defendant there that night?

19     A.    I believe she was.

20     Q.    Even though she was there, you ended up bathing

21   the children?

22     A.    Yes.

23     Q.    How about dinner?   What was done about dinner

24   that night?

25     A.    We must have ordered something out, take out.

118

1      Q.   And then you left the next day, correct?

2      A.   I did.  I wanted -- one of the things I did

3   before leaving, I went to the grocery store and stocked the

4   refrigerator.  I made some casseroles for Joe.  I had a

5   chicken pot pie that he liked that I made.  And I made some

6   things that were in the freezer that would be easy for him

7   to prepare.

8      Q.   Then if we move ahead to September, about when in

9   September did he come out to visit you?

10     A.   September, he came out -- they came out for a

11  week and that was the 15th or 16th.

12     Q.   That would be in 2000?

13     A.   In 2000, it was a Friday.

14     Q.   During that time between September and

15  August -- you obviously were out in the August -- in

16  September that he went out there, did you continue to have

17  contact with Mr. Andriano?

18     A.   Daily.

19     Q.   And ever any indication that he was, you know,

20  not looking forward to the next day, anything like that?

21     A.   No, we were supposed to go to the lake.  He was

22  going to take my kids to the lake.  They'd never been in a

23  boat.  They, I mean, we were, my family was going to be in

24  Arizona for Thanksgiving.  We talked -- his best friend

25  from childhood who he went to kindergarten and graduated

119

1   from high school with him was getting married in November.

2   He was looking forward to Brandon's wedding.

3        Q.   How long were they supposed to stay?

4        A.   A week.

5        Q.   And who came out?

6        A.   Joe, Wendi, Nicholas and Ashley.

7        Q.   Who paid for that trip?

8        A.   I did.

9             MR. PATTERSON:  Judge, approach.

10            (Bench conference was held outside the hearing of

11   the jury.)

12            MR. PATTERSON:  Judge, I object to this line of

13   questions.  It's far afield in terms of rebutting

14   mitigation hearing.  Rebutting allegations that may have

15   been made during the course of the guilt, innocence phase.

16   But he's not restricting her testimony to the issues raised

17   in the mitigation.  So I ask that you cut this off and not

18   allow this.

19            THE COURT:  Mr. Martinez.

20            MR. MARTINEZ:  One of the things she is going to

21   talk about is whether or not she was a good mother.  And

22   that's where I'm headed with this.

23            THE COURT:  If you're headed for it, get to it.

24   I mean, I agree with Mr. Patterson, you're off on other

25   things.  Get to the point of this what Mr. Patterson

120

1    presented in way of mitigation.

2                (Bench conference concluded.)

3                THE COURT:  Mr. Martinez.

4        Q.   BY MR. MARTINEZ:  When they were out there in

5    September, 2000, was there ever -- did you see her interact

6    with her kids?

7        A.   Yes.

8        Q.   And how was she around them?

9        A.   She was always ready to hand them off to somebody

10   else.  Like, Joe, it's your turn, or I can't take this

11   crying any more.

12       Q.   With regard to the birthday, did Ashley have a

13   birthday when they were over at your place?

14       A.   Yes.

15       Q.   And did she want to do a birthday for her or not?

16       A.   Well, it was Ashley's second birthday.  And I

17   said, "Well, let's go get a cake so we can celebrate."  And

18   Wendi told me, "No, we don't need to do that.  She's not

19   going to even know.  She's two."

20       Q.   But, did the birthday go ahead anyway?

21       A.   The birthday went ahead anyway.  My husband

22   Lawrence took her to the store and purchased birthday hats

23   and plates and everything so we could celebrate Ashley's

24   birthday.

25       Q.   This birthday, how was she during this, again,

121

1    during the birthday towards the kids?  Was she primarily

2    taking care and looking over them?

3        A.   She seemed to have her mind on other things and

4    not really -- it seemed like she was trying to figure out a

5    way she could get home.  She was not really interested in

6    being there.

7        Q.   Not being there with the kids?

8        A.   Right.

9        Q.   Did there come a time when she actually did

10   leave?

11       A.   Yes.

12       Q.   Did she leave early?

13       A.   She left early.  I talked to her several times to

14   make sure she was able to get off work for the entire week

15   and she told me that she was.  And she was going to stay

16   the whole week.  And but while we were there, on Sunday she

17   said she was going to have to go back.  They were doing an

18   audit at work and she had to go back for it.

19       Q.   How about the kids.  Did she take them back with

20   her or leave them in Mr. Andriano's care?

21       A.   She took Ashley with.  Joe's energy level was

22   low.  I mean, he had taken a break, he'd taken a week off

23   his chemo treatments.  But, Ashley went with Wendi so Joe

24   had responsibility for Nicholas.

25       Q.   Are you familiar with this paddle that we've been

1   talking about?

2        A.   Yes.

3        Q.   And do you know whether or not that paddle had

4   anything inscribed on it?

5        A.   I remember it had a Bible versus or something to

6   that effect.

7        Q.   And where was the paddle when you saw it?

8        A.   I saw it in their apartment.

9        Q.   With regard to this paddle and whether or not it

10  was used as corporal punishment, did you have occasion

11  to -- do you have occasion to know whether or not it was

12  used by the defendant for corporal punishment?

13       A.   Yes, it was.

14       Q.   And describe the situation or circumstance for

15  me?

16            MR. PATTERSON:  Objection, Judge, the basis of

17  the knowledge.

18            THE COURT:  Lay some foundation.

19       Q.   BY MR. MARTINEZ:  Did you speak to your sister,

20  Jeanea Lambeth, about this?

21       A.   Yes, I did.

22       Q.   And did she relate to you about more or less when

23  this occurred?

24       A.   Yes.  She told me Nicholas was --

25            MR. PATTERSON:  Judge, foundational.

123

1      THE COURT:  Okay.  Sustained.  Lay some

2  foundation.

3      Q.  BY MR. MARTINEZ:  When did you have this

4  conversation with her?

5      A.  Oh.  A couple of years ago.

6      Q.  And how old would Nicholas be a couple of years

7  ago?

8      A.  Nicholas?

9      Q.  In other words, this didn't happened when

10  Nicholas -- he's about seven now?

11      A.  Yes.

12      Q.  It wouldn't have happened when he was five,

13  right?

14      A.  No.

15      Q.  This conversation was a couple years ago relating

16  to something that happened when?

17      A.  When Nicholas was three.

18      Q.  And where did this issue with the paddle arise?

19  Where were you?

20      A.  I was at my sister's house, Jeanea's.

21      MR. PATTERSON:  Judge, can we go incrementally

22  here to establish the foundational requirement for this

23  particular area of inquiry?

24      THE COURT:  Sustained.

25      Rephrase the question.

124

1      Q.   BY MR. MARTINEZ:  You were at Jeanea's house when

2   you had this conversation, correct?

3      A.   Yes.

4      Q.   And she was relating an incident to you, correct?

5      A.   Yes.

6      Q.   What was the time frame of the incident that she

7   was relating to you?  In other words, when did it happen?

8      A.   In the summer of 2000.

9      Q.   So in the summer of 2000.  Where did it happen,

10  the Apartment 132?

11     A.   Yes.

12     Q.   And about what time of day was it that it

13  happened?

14     A.   It was probably -- I think -- I believe it was a

15  Saturday morning.

16     Q.   And so, why don't you tell us what she told you

17  about that Saturday morning in the summer of 2000, how it

18  related to the paddle.

19          MR. PATTERSON:  Can we approach, please?

20          (Bench conference was held outside the hearing of

21  the jury.)

22          MR. PATTERSON:  I still don't think he's laid

23  foundation.  This other lady observed this or did she hear

24  this from someone else?  I think we need to establish

25  further foundation before we get hearsay upon hearsay upon

125

1    hearsay.

2         THE COURT:  Okay.  Lay some foundation.

3         (Bench conference concluded.)

4         THE COURT:  Mr. Martinez.

5         Q.   BY MR. MARTINEZ:  Did Jeanea indicate to you that

6    she actually saw, perceived this event with her own eyes?

7         A.   Yes.

8         Q.   Tell us what she said she perceived.

9         A.   Nicholas was not listening to what Wendi wanted

10   him to do and so she took the paddle and swatted him on the

11   bottom with it.

12        Q.   Subsequent to that, did she ever talk about or

13   brag about that this was a way to discipline kids?

14        A.   Wendi and I had had a discussion.

15        Q.   When did you have this discussion?

16        A.   Spring of 2000, March.

17        Q.   Where did you have this discussion?

18        A.   In her apartment.

19        Q.   Okay.  And what was the nature of that discussion

20   as it relates to what we're talking about?

21        A.   Well, there is a paddle and I kind of was

22   interested in what it was.  And she said it was a paddle

23   that was used that was Brandon's, that their parents had

24   given to them to use.

25        Q.   And did she indicate anything else about that,

126

1   about being used for discipline?   Is that what it was used

2   for?

3      A.   Yes, she said it was used for discipline.   I

4   just -- I remember it so vividly because of the Bible

5   versus that was on the paddle.

6      Q.   In all the time, did you ever see or did you

7   visit them when any of the kids were in diapers?

8      A.   Yes.

9      Q.   And which one of the kids was in diapers?

10      A.   Both of them.

11      Q.   And when you saw the defendant around Nicholas

12   and he was in diapers, who would change the diapers for

13   Nicholas?

14         MR. PATTERSON:   Objection, Judge.   Point in

15   time.

16         THE COURT:   Sustained.

17         Lay some foundation.

18      Q.   BY MR. MARTINEZ:   When you say that you saw

19   Nicholas when he was in diapers and saw the defendant, when

20   was it?

21      A.   In spring of 2000, when we were visiting in

22   March.

23      Q.   Okay.   Was Ashley also in diapers at that time?

24      A.   Ashley was in diapers.

25      Q.   How long did you stay out here visiting?

127

1      A.   Probably ten days.

2      Q.   Where did you stay?

3      A.   I stayed some at my parents' house.  We stayed,

4   my children and I stayed at Wendi's and Joe's apartment for

5   three days.  And then we stayed at my sister Jeanea's

6   house.

7      Q.   When you stayed at the defendant's house, you

8   indicated that the kids were in diapers.  Did you ever see

9   the defendant change diapers?

10     A.   I did not.

11     Q.   Who was primarily responsible for changing the

12   diapers?

13     A.   Joe was.

14     Q.   And in terms of bathing, who was primarily

15   responsible for that?

16     A.   Joe.

17     Q.   Ever have occasion to talk to the defendant or

18   discuss with the defendant whether or not she wanted Ashley

19   to -- she wanted -- whether or not the decision was hers to

20   have Ashley as a child?

21     A.   Yes, I did have a discussion with Wendi about

22   that.

23     Q.   And when was that?

24     A.   Shortly after she was pregnant with Ashley.  So

25   it would have been in spring of '98.

128

1    Q.   And what did she tell you about that pregnancy?

2    A.   She wasn't planning on being pregnant at that

3 time.  And she just wasn't ready to have another baby.

4 Nicholas was so young, she just wasn't really ready to have

5 another baby.

6    Q.   Did she ever indicate anything about her body?

7    A.   She didn't want to have to get fat again.

8    Q.   Now, one of the things we know is that there was

9 a bar-b-que that was at your parents' house on Saturday

10 October 7th of the year 2000?

11   A.   Yes.

12   Q.   Have you talked to Jeanea Lambeth, your sister

13 about that?

14   A.   Yes.

15   Q.   When did you talk to her about this?

16   A.   October 8th.

17   Q.   About this fish fry or bar-b-que, you talked to

18 her about it on October 8th?

19   A.   Yes.

20   Q.   What time of the day did you talk to her about

21 it?

22   A.   That night.  It was after -- I was notified at

23 about seven o'clock my time so, it was probably eight

24 o'clock when I spoke with Jeanea.

25   Q.   Did you and Jeanea discuss this issue about the

129

1   trailer being hooked up to one of the cars during that

2   conversation?

3       A.   Not that conversation.   The discussion about the

4   bar-b-que came up several times.   That conversation was

5   just the fact of they were all together and couldn't

6   believe what happened.

7       Q.   Was she present at that occasion?

8       A.   Yes.

9       Q.   Did there ever come a situation when you

10  discussed with Jeanea about what happened that night at

11  that bar-b-que?

12      A.   Yes.

13      Q.   And when was that that you had this conversation

14  with Jeanea?

15      A.   Probably like October 10th.   It was later in that

16  week when I came to Phoenix.

17      Q.   And what did she tell you with regard to your

18  brother and this trailer.

19          MR. PATTERSON:   Judge, objection.   Beyond the

20  scope.   Not relevant to mitigation.

21          THE COURT:   Sustained.

22      Q.   BY MR. MARTINEZ:   Did she tell you who was taking

23  care of the kids that night?

24      A.   Yes.

25      Q.   Who was taking care of the kids that night?

130

1    A.    Jeanea, my mom and Joe would go and check on them

2    in between his resting on the sofa.

3    Q.    Did you ever have occasion to want to discuss

4    with your brother plans in the future about you doing this

5    or doing that?  Did you ever do that sort of thing, maybe

6    involving the kids.  May be not involving the kids.  But

7    let's focus on involving the kids.  Did you ever contact

8    him and say, you know, let's do this or that with regard to

9    the kids?

10    A.    Yes.

11    Q.    And what would he say?  What was his response?

12          MR. PATTERSON:  Judge, not relevant to mitigation

13    issue.

14          THE COURT:  Sustained.

15    Q.    BY MR. MARTINEZ:  With regard to that issue, in

16    terms of caring about the kids, did he indicate who

17    was -- during these conversations, did he ever indicate who

18    was the primary caretaker of the kids.

19    A.    He indicated that -- well, I know he took care of

20    them while Wendi was working and going out.  I mean, I was

21    there.  She would go out and Joe was the primary caretaker

22    and then baby-sitter.  He took care of them during the day.

23    Q.    With regard to September 27th of 2000, that was

24    the night that involved Travis Black, do you know where the

25    kids were that night?

1   A.   They were at Jeanea's.

2        MR. PATTERSON:  Objection.

3        THE COURT:  Sustained.  Lay some foundation.

4        MR. MARTINEZ:  Okay.

5   Q.   BY MR. MARTINEZ:  Did you talk to Jeanea Lambeth

6   about September 27 of the year 2000?

7   A.   Yes.

8   Q.   And was she present on September 27th of the year

9   2000?

10  A.   Yes.

11  Q.   And what did she tell you who took care of the

12  kids that night?

13       MR. PATTERSON:  Judge, when was this

14  conversation.

15       THE COURT:  Lay some foundation.

16  Q.   BY MR. MARTINEZ:  When did you have the

17  conversation with Jeanea about what happened on September

18  27th?

19  A.   Several times we've talked about it.  I mean, in

20  the last -- in the last year we've talked several times

21  about it.

22  Q.   And what did she tell you?

23  A.   She told me that Wendi took Joe and the children

24  to her house, to -- took them over there so Jeanea could

25  help take care of them.  And Wendi was there and she went

132

1   into the bathroom at Jeanea's house, borrowed Jeanea's

2   curling iron and tried to get all ready because she was

3   going out.

4       Q.   And who bathed the kids that night?

5       A.   Jeanea did.

6       Q.   Who fed the kids that night?

7       A.   Jeanea did.

8            MR. MARTINEZ:  I don't have anything else.

9            THE COURT:  Mr. Patterson.

10           MR. PATTERSON:  Thank you, Judge.

11

12                       CROSS-EXAMINATION

13   BY MR. PATTERSON:

14       Q.   Ms. Clayton, you're Joe's sister?

15       A.   Yes.

16       Q.   And I understand that you moved from the state of

17   Arizona in 1989, correct?

18       A.   Yes.

19       Q.   And the first place that you relocated was

20   Bowling Green -- wasn't Bowling Green.  What was the first

21   place you relocated at?

22       A.   Raleigh, North Carolina.

23       Q.   Since 1989, you have lived in states other than

24   Arizona, correct?

25       A.   Yes.

133

1    Q.   You come back periodically to visit family,

2  correct?

3    A.   Yes.  I come back regularly.

4    Q.   And how much time since 1989 have you actually

5  spent at the apartment of Joe and Wendi Andriano?

6    A.   In the year 2000 was the only time I stayed at

7  their apartment.  In March I was there three nights.

8    Q.   Wait, let me make a note.  Three nights in March?

9    A.   Yes.  And three nights in August.

10    Q.   Okay.  And then, they spent two days with you in

11  Memphis, correct?

12    A.   Joe spent seven nights.  He spent a week.  Wendi

13  spend two or three nights.

14    Q.   So in terms of actually cohabiting or coexisting

15  with Wendi and Joe in their environment, you spent

16  approximately eight days with them?

17    A.   Yes.

18    Q.   Eight or nine days.  Three in March, three in

19  August and two to three nights in September, correct?

20    A.   Yes.

21    Q.   And the three nights you spent in August were in

22  response to Wendi, basically, telling you that you better

23  get out here if you wanted to see your brother, right?

24    A.   Yes.

25    Q.   And that was a reference, obviously, to the fact

134

1    his condition was changeable, right, as a result of the

2    cancer?

3        A.   That's what I thought it was.

4        Q.   When you got out here, Joe, in fact, in August

5    was sickly, correct?

6        A.   Yes.

7        Q.   And so it was a good thing you came to see Joe in

8    August, correct?

9        A.   I'm glad I did come.  He wasn't quite as

10   much -- I didn't think it was quiet as an emergency as

11   Wendi made it sound.

12       Q.   You told us he lost weigh, he was weak and that

13   he tired easily?

14       A.   Yes.

15       Q.   I mean, he was in pretty bad condition as a

16   result of the cancer, correct?

17       A.   As a result of the chemotherapy.

18       Q.   Well, a combination.  The cancer had taken its

19   toll and the chemotherapy in and of itself was problematic

20   for his health, correct?

21       A.   Yes.

22       Q.   And during the August visit, you and Joe didn't

23   go out with Wendi on her birthday, correct?

24       A.   That's correct.  She didn't want us to.

25       Q.   Joe wasn't feeling too great any way that night,

135

1   was he?

2       A.   But she told us she didn't want us to go.

3       Q.   My question was Joe wasn't feeling too good that

4   night.  You told us he was sickly, he was weak, not feeling

5   to good.

6       A.   He was tired and but he was able to go.  We went

7   to dinner.

8       Q.   I understand.  But he didn't go out.  You and he

9   and mom didn't go out with Wendi that evening, correct?

10      A.   Right.

11      Q.   But you did have an opportunity to sit down with

12  Joe and reminisce about childhood things, right?

13      A.   Yes.

14      Q.   And you got a chance to talk with Joe, right?

15      A.   Yes.

16      Q.   Got a chance to spend some quality time with Joe,

17  right?

18      A.   Yes.

19      Q.   And your mom was there, as well?

20      A.   Yes.

21      Q.   And she had a chance to meet and see you.  She

22  hadn't seen you in a while, I assume, correct?

23      A.   Correct.

24      Q.   And you hadn't seen Joe in a while, correct?  I

25  mean, the last time you actually had face-to-face contact

1   with Joe was in March, right?

2       A.   I think that's correct.  I typically came in the

3   summer but I'm not sure if I came that summer or not.  I

4   seen my mom in July of 2000.

5       Q.   But you told us that you last remember seeing or

6   staying with Joe and Wendi in March of 2000?

7       A.   That's when I stayed in that apartment.

8       Q.   Okay.  And you may have seen him in July?

9       A.   I may have seen Joe and Wendi during that summer.

10      Q.   But you don't recall specifically?

11      A.   I don't.

12      Q.   In any event, it had been at least several months

13  since you last seen Joe face-to-face, right?

14      A.   Yes.

15      Q.   And you hadn't seen him since he started

16  chemotherapy, right?

17      A.   That's correct.

18      Q.   And so this is an opportunity in August to see

19  Joe face-to-face after at least a couple months after he

20  had started his chemotherapy regimen?

21      A.   Right.

22      Q.   And have you had opportunities other than these

23  eight times to see Wendi taking care of her kids?

24      A.   At every family gathering we had.

25      Q.   Any problems in other family gatherings?

1    A.  Well, especially in the later years '99, '98,

2  2000, once there were children, there was definitely any

3  opportunity to have someone else help her with the children

4  was welcome.

5    Q.  Okay.  I mean, she asked for help with the kids.

6  Anything else she did wrong in terms of mothering these two

7  children that you can tell us about?

8        MR. MARTINEZ:  Objection.  He's indicating she

9  said wrong things.

10       THE COURT:  Sustained.

11       Rephrase the question.

12    Q.  BY MR. PATTERSON:  I'm asking you've seen Wendi

13  interacting with her children at the family gatherings, are

14  there other issues other than asking for help?

15    A.  Well, she just seemed disinterested in them.

16    Q.  Okay.  How did that manifest itself?  Would she

17  not hold them, not touch them, would she not talk to them?

18    A.  If one of them was crying, it would be bothersome

19  towards her.  Instead of trying to console the child, she

20  liked to hand him, Nicholas or Ashley, to Joe for Joe to

21  calm them down.

22    Q.  All right.  Anything else that you observed that

23  indicates in your mind a neglectful or problematic mother?

24    A.  Well, just the fact she takes them to the

25  baby-sitter even on her days off.

138

1    Q.   Do you have a problem with day care, personally?

2    A.   No, I don't.

3    Q.   But there's a time and place for day care, right?

4    A.   There is.  But I know for me when I was working

5  and I was off, I spent every hour I could with my

6  children.

7    Q.   Okay.  Do you find women who don't do it your way

8  to be neglectful or problematic mothers?

9    A.   Well, when they do it regularly, I would find

10  that that might be an issue.

11    Q.   Okay.  Do you know for a fact that she regularly

12  dropped her kids off at day care?  At times when she wasn't

13  working or that Joe was at the lake, was there not some

14  meritorious reason for using day care services?

15    A.   When I visited in 2000, the year 2000, the days

16  off that I saw her, that I observed, the children went to

17  the baby-sitter even on her days off.  And those times that

18  I was visiting, Joe did not go to the lake.

19    Q.   Okay.  But we are talking about three nights in

20  August and two to three nights in March, that's what we're

21  talking about?

22    A.   I was there ten days in March but I stayed at

23  their apartment for three days.  Two weekends in March.

24    Q.   So in terms of observing the dynamics between Joe

25  and Wendi and the need, perhaps, for day care, that was

139

1    three nights in March and three nights in August, right?

2         A.   I'm sorry.   I'm not sure what you're asking me.

3         Q.   Well, you're telling us kind of in general that

4    she over used day care services.   Is that what you're

5    telling us, in your estimation?

6         A.   No, I just find it -- I just think that the fact

7    that even on a day off, the fact that the children will go

8    to a baby-sitter instead of spending the time with her that

9    that is something that is to be considered.

10        Q.   That is your judgment, is that what you're

11   telling us?

12        A.   That's my opinion.

13        Q.   Okay.   And that's based upon contact that you had

14   with Joe and Wendi and the children primarily in March and

15   August, right?

16        A.   In the year 2000.

17        Q.   Were there other times in the year 1999 where she

18   abused or over used, in your estimation, day care

19   services?

20        A.   In 1999, they didn't have a regular baby-sitter.

21        Q.   Well, we know Gia started in November or December

22   of '99?

23        A.   They lived at my parent's house until December.

24   And then moved, they moved in December to Ahwatukee.   And

25   when we visited in the summer of '99, I would stay at my

140

1    parents because they were in Casa Grande.

2        Q.   Back, again to my question.  Are there specific

3    incidents where she over used or abused day care services

4    and thus was, in your opinion, a neglectful mother?

5        A.   I felt sorry for Nicholas and Ashley that they

6    didn't get to spend more time.

7        Q.   Okay.  Can you give me specific incidents in that

8    regard?

9        A.   When she would take them to the baby-sitter on

10   Friday when she was off.

11       Q.   Okay.  How frequently did she do that, to your

12   knowledge, in the year 2000?

13       A.   Very frequently.  In discussing -- I was present

14   in March and August.  And my sister has lived here locally

15   and in discussing with Jeanea there were other times that

16   Wendi would take them to the baby-sitter on her day off.

17       Q.   Okay.  And this is information derived from your

18   sister?

19       A.   Yes.

20       Q.   Were there any times you personally observed

21   these things that you're describing for me?

22       A.   Yes.  Because -- yes, I met Gia.  I've been to

23   Gia's house.  I went with them sometimes when they would

24   drop the children off.

25       Q.   Okay.  How frequently?  I'm trying to get a sense

000008847

1   for how many times you may have done this.

2        A.    The times in 2000 that's when I was present in

3   Arizona.

4        Q.    Okay.  Again, you're referring back to the March

5   time frame and the August time frame?

6        A.    Yes.

7        Q.    Okay.  All right.  That evening when she went out

8   with the girlfriends, colleagues at work, did you observe

9   Joe and Wendi in the parking lot there at the San Riva

10  Apartments there that evening?

11       A.    No.

12       Q.    Did you ever observe either Joe or Wendi in the

13  Yukon, in the car that evening?

14       A.    No.

15       Q.    Wendi apparently was intoxicated that evening?

16       A.    Yes.

17       Q.    That evening, thereafter, you had a discussion

18  with Joe about his cancer?

19       A.    Yes.

20       Q.    And did he express to you that he had some

21  difficulty breathing or did you observe that in

22  independently?

23       A.    I did not observe him having trouble breathing.

24  He said -- he told me that Wendi talked about that he was

25  coughing more.  But he didn't see himself coughing more or

142

1   a lot.

2        Q.   All right.  The time they were in Memphis, your

3   husband Lawrence took Wendi to the store to purchase items

4   for the party?

5        A.   Yeah.

6        Q.   And did Wendi contribute or pay for the things

7   that were used at that birthday party?

8        A.   I don't know.

9        Q.   All right.  Have you ever seen this paddle with

10  the Bible versus on it?

11       A.   Yes.

12       Q.   Have you ever seen Wendi use it in a disciplinary

13  fashion with either of her two children?

14       A.   I did not.

15       Q.   And the indication you got from your sister was

16  that she had observed Wendi swat Nicholas on the bottom one

17  time.  Was that the substance of the story that she told

18  you?

19       A.   That's the one incident I told you about.

20       Q.   But the substance of the story was one swat on

21  the bottom?

22       A.   Yes.

23       Q.   And then finally, Ms. Clayton, how much time

24  between the delivery of Nicholas, birth of Nicholas, and

25  the conception of Ashley, how much time between the two?

143

1       A.    Between the birth of Nicholas?

2       Q.    Yes, ma'am.  How much time elapsed before she was

3  once again pregnant with Ashley?

4       A.    They're 15 months apart so. . .

5       Q.    So we have about six months between the birth of

6  Nicholas and the conception of Ashley?

7       A.    Yes.

8       Q.    Was it at or near this time that Wendi expressed

9  some reservations about the pregnancy and that kind of

10  thing?

11       A.    Yeah.

12       Q.    Shortly after the conception of Ashley?

13       A.    It was like February of the year 1998.

14       Q.    Okay.  Help me out in terms of elapsed time from

15  the birth of Nicholas to that conversation, what are we

16  talking about; six months, seven months, eight months?

17       A.    Seven months.

18       Q.    That's when she expressed reservations about

19  having another child, the responsibility of another child,

20  that kind of thing?

21       A.    Yeah.

22            MR. PATTERSON:  Thank you, Judge, I have nothing

23  additional.

24            THE COURT:  We'll go ahead and take our evening

25  recess at this time.  Remember the entire admonition I have

144

1  given you.  Including the fact you are not to discuss this

2  case with anyone.  Do not let anyone discuss the case with

3  you.  Do not do any research, investigation,

4  experimentation or testing on your own.  Avoid any and all

5  media coverage of the case.  Have a nice evening.

6        I will tell you the attorneys have indicated that

7  we'll probably get to the closing arguments on Wednesday.

8  The presentation of evidence should conclude tomorrow.

9  Have a nice evening.  We'll see everyone tomorrow at 1 p.m.

10        (Proceedings adjourned.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# APPENDIX N - Part 1



05-0502
Braccio

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

| | | |
|---|---|---|
| STATE OF ARIZONA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. CR2000-096032 |
| | ) | CR05 0005-AP |
| WENDI ELIZABETH ANDRIANO, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

BEFORE:  THE HONORABLE BRIAN K. ISHIKAWA

Mesa, Arizona
December 8, 2004

REPORTER'S TRANSCRIPT OF PROCEEDINGS
(Trial)

COPY

SHARON FLORES
CERTIFIED COURT REPORTER
50374

2

1

2

3                         A P P E A R A N C E S

4

5

6

7    For the State:

8                    Mr. Juan M. Martinez

9                    Deputy County Attorney

10

11

12

13

14   For the Defense:

15                    Mr. Daniel B. Patterson

16                    Mr. G. David Delozier, Jr.

17                    Office of the Public Defender

18

19

20

21

22

23

24

25

3

1

2                          I N D E X

3   WITNESSES:                                          PAGE

4

5     LAURA KING

6       Direct Examination by Mr. Patterson          64

7       Cross-Examination by Mr. Martinez            89

8       Redirect Examination by Mr. Patterson        114

9

10    GERALD PERRY

11      Direct Examination by Mr. Patterson          118

12      Cross-Examination by Mr. Martinez            130

13

14    JOYCE VAN EVERY

15      Direct Examination by Mr. Patterson          137

16      Cross-Examination by Mr. Martinez            144

17

18

19

20

21

22

23

24

25

4

1

2

3                    E X H I B I T S

4

5         (Exhibits were marked prior to trial unless

6  indicated.)

7

8  NUMBER:            DESCRIPTION                    ADMITTED

9    542              Photograph                        52

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

5

1              P R O C E E D I N G S

2

3            THE COURT:  This is Cause Number CR2000-096032,

4    State of Arizona versus Wendi Elizabeth Andriano.

5              The record will reflect the presence of the

6    defendant and counsel.  We're outside the presence of the

7    jury.

8              Counsel, let me go ahead and announce my

9    decisions on the issues that were argued yesterday.

10             With regard to the State's -- the issue of the

11   State calling Jana Clayton and Jeanea Lambeth as

12   witnesses.  The Court finds pursuant to A.R.S. Section

13   13-4420, a victim has a right to be present in court

14   proceedings in which the defendant is present.

15             Under A.R.S. Section 13-4401(19), that section

16   defines a victim as including a murder victim's immediate

17   family.

18             And A.R.S. Section 13-4401(11) defines immediate

19   family as including a victim's siblings.

20             Therefore, it is ordered denying the defendant's

21   motion to preclude the testimony of Jana, J-a-n-a, Clayton

22   and Jeanea, J-e-a-n-e-a, Lambeth because of the rule of

23   exclusion of witnesses.

24             With regard to the defendant's motion for

25   reconsideration on the issue of residual doubt, it is

6

1   ordered denying the defendant's motion for reconsideration

2   of the Court's ruling on the issue of residual doubt.

3           It is ordered affirming the Court's previous,

4   July 31, 2004, ruling granting the State's motion to

5   preclude evidence regarding residual doubt.  The defendant

6   is precluded from presenting evidence or arguing residual

7   doubt in the penalty phase.

8           With regard to the issue of mercy and witness

9   statements pertaining the appropriate sentence, with regard

10  to this issue, it is ordered that no witness, whether

11  called by the defense or by the State shall be asked about

12  nor are they to offer any opinion regarding the appropriate

13  sentence to be imposed in this case or make any request for

14  a specific sentence in this case.

15          Defense witnesses, however, may testify as to the

16  loss or impact that will result from the defendant's

17  execution.

18          With regard to the defendant's motion to preclude

19  the Pinal County matter involving Donna Ochoa and Alejo

20  Ochoa, the Court finds the issue involving Donna Ochoa and

21  Alejo Ochoa involving Pinal County Cause Number AD200100058

22  is not relevant to any of the mitigating circumstances

23  relating to this proceeding.

24          It is therefore ordered granting the defendant's

25  motion to preclude the State from arguing and/or presenting

1  evidence relating to Donna Ochoa and Alejo Ochoa and Pinal

2  County Cause Number AD200100058 and the minute entry dated

3  October 15, 2002 by the Honorable William J. O'Neil in

4  Pinal County Superior Court.

5          With regard to the issue of the defendant's

6  motion to preclude the presentation of evidence involving

7  the defendant's activities involving Cynthia Edwards, the

8  Court finds that the disclosure of these allegations

9  against the defendant relating to her activities with

10  Cynthia Edwards is untimely and the disclosure requirements

11  under Rule 15.1 is untimely under the disclosure

12  requirements under Rule 15.1 of the Arizona Rules of

13  Criminal Procedure.

14          It is ordered granting the defendant's motion to

15  preclude the State from arguing or presenting evidence

16  related to the defendant's activities with Cynthia Edwards

17  as referenced by the State in oral argument yesterday.

18          Now, with regard to the State's allegations that

19  the defendant committed thefts while employed at Casa

20  Grande Medical Center, Courtyard Apartments and San Riva

21  Apartments, it is ordered allowing the State to present

22  rebuttal evidence relating to these alleged thefts, if the

23  defendant asserts or presents evidence of its listed

24  mitigating factors of no criminal charges and good

25  employment history, or of the unlisted mitigating factor of

8

1   the defendant's honesty.

2            In light of the Court's ruling on this issue,

3   Mr. Patterson, do you have a request at this time?

4            MR. PATTERSON:  Yes, Your Honor.  I move to

5   delete the listed mitigated factors that were asked to be

6   incorporated into your preliminary instructions for Phase

7   3.  My recollection is they were Number 3 and Number 5, no

8   criminal charges and good employment history.  I would

9   request that they be removed from the preliminary

10  instructions.  We will not advance any arguments in support

11  of those mitigating factors.

12           THE COURT:  It is ordered granting the

13  defendant's request.  And the listed mitigating factors, no

14  prior criminal charge and good employment history, are

15  deleted from the jury instructions.

16           I've given counsel each a copy of the preliminary

17  jury instructions for Phase 3.

18           Is there anything further that the State would

19  like to put on the record with regard to those preliminary

20  jury instructions for Phase 3?

21           MR. MARTINEZ:  Yes, sir.  With regard to your

22  last issue about the thefts and the one involving Cynthia

23  Edwards, you did indicate the disclosure was untimely under

24  Rule 15.1.

25           I would move to preclude all of the witnesses

1    that were noticed by defendant approximately a week ago

2    including some people at the jail.  And, basically,

3    everybody for this hearing because they were not noticed

4    until approximately a week or two ago.  Additionally, by

5    pleading date of December 2nd and delivered to me on

6    December 3, two individuals, Mike Rochon and Jack Smith,

7    were noticed as witnesses.  I've never heard of them.  I

8    don't know who they are.  So I would move to preclude those

9    as untimely.

10            THE COURT:  What are those names?

11            MR. MARTINEZ:  Mike Rochon, R-o-c-h-o-n.  And

12    then the second one is Jack Smith.  They were noticed by

13    the pleading dated December 2nd.  I received it December

14    3rd.

15            Additionally, the Court indicated that the State

16    would not be allowed to present any evidence about the

17    thefts if no prior criminal charges or prior employment

18    history were deleted.  I would also ask that the Court then

19    delete no prior felony convictions and no prior misdemeanor

20    convictions.

21            And the reason I ask that is under State versus

22    Labor, in that particular case, there was an argument that

23    the Court improperly discounted mitigating circumstances of

24    lack of prior criminal or felony record by considering his

25    two prior arrests involving domestic violence situations.

1          What we have in this case is the same thing.  We

2  don't have any charges.  And we don't have any

3  convictions.  The same as it was in the Labor case.  In

4  that case, the Supreme Court disagreed and noted that the

5  prosecution and the defendant shall be permitted to rebut

6  any information received at the aggravation/mitigation

7  hearing and shall be given fair opportunity to present

8  argument.

9          In that case, the State introduced testimony by a

10  transcript that the defendant -- and that was to rebut his

11  mitigation of good character which is what they're

12  presenting in this case, it's not listed but that's

13  generally what's going on here, good character -- has been

14  a good father.  They indicate here under Number 4 she's

15  been a good mother and has no prior criminal record.

16          In that case, the Court indicated that the fact

17  that the defendant had beaten his wife a dozen times,

18  pointed a gun on her, and had an affair were relevant and

19  that would be admitted.

20          So for those reasons, I would ask that those two

21  be knocked out.

22          Additionally, I ask Number 3, good candidate for

23  rehabilitation be stricken because any individual that

24  commits these thefts, because she did steal from Casa Grand

25  Regional Medical Center, she did steal from the Courtyard

1  Apartments and she did steal from the San Riva Apartment
2  Complex.  And then while in the custody of the Maricopa
3  County jail, in May of 2000 is when they were finally
4  caught, the defendant was running a fraudulent scheme
5  involving checks where they were able to steal
6  approximately, not approximately, steal $40,800.  She was
7  the ring leader of that.  Anybody who has that prior record
8  and then also does that is not a good candidate for
9  rehabilitation.
10       Additionally, I do believe that she is not a good
11  mother.  And that's talking about her character.  In other
12  words, she's saying, "I'm of such good character that I'm a
13  good mother."  For that reason, I would ask that I would be
14  allowed to inquire into those or that that be stricken.
15       One of the things she also indicates is she has
16  strong religious beliefs.  I ask that that be stricken.
17  The reason that I ask that that be stricken is one of the
18  Ten Commandments or not the Ten Commandments, but one of
19  the tenants of a good strong religious conviction is that
20  you not steal and you not lie.  And that's one of the
21  things that we know that the defendant was doing when she
22  was running this fraudulent scheme.  By definition, by
23  legal definition, we know that stealing money from somebody
24  is considered a crime of dishonesty.  And so she's going
25  against her strong religious convictions by stealing from

1   the three enumerated employers.

2        Clearly, Number 10 should be stricken because she

3   never a good inmate in that jail.  Anybody who is able to

4   run an enterprise from the jail and able to steal $40,800

5   -- and we have the letters indicating that she was the one

6   that was actually directing that enterprise -- is certainly

7   not a good inmate.

8        They also indicate that she is no further threat

9   to the community.  I would disagree.  And the reason I

10  would disagree is that she was a threat to the community

11  before, whether she's a thief or whether she's a killer.

12       Additionally, once she is in custody even when

13  her movements are restricted, when you would think that she

14  would not do this sort of thing, she's goes and continues

15  to do that.  If she's ever allowed out into in the

16  community, she is definitely going to be a threat.

17       So, for those reasons, I would ask that those

18  mitigating factors be stricken.

19       On the other side, or the other side of the coin,

20  if that's not going to be allowed then I would ask that the

21  Court allow me to inquire as to those thefts as well as the

22  issue involving Cynthia Edwards.

23       I would note the issue of Cynthia Edwards did not

24  come to the State's attention until the Wednesday before

25  Thanksgiving.  On that same day we obtained -- and there

1   was never any referral by any agency to the Maricopa County

2   Attorney's Office to let us know of this connection, if you

3   will, between Cynthia Edwards and the defendant.  When it

4   did come to our attention on the Wednesday before

5   Thanksgiving, we obtained a presentence report along with a

6   letter implicating the defendant, those were turned over to

7   the defendant that same day.  There is no prejudice to the

8   defendant with regard to that disclosure.  They've had all

9   this time to review those documents and see what they stand

10  for.  Additionally, the reason there is no prejudice is

11  that it's the defendant who allegedly committed these acts

12  and who better to know about what happened.

13          I could understand if it involved some sort of

14  action not pertaining to her.  But, since she is the one

15  that's involved in this, I think that there is no

16  prejudice.

17          So, for those reasons I would ask, number one,

18  their witnesses be precluded.  Number two, should you allow

19  that, I would ask that these factors that I've enumerated

20  be stricken since they do all relate to honesty, they all

21  relate to the fact that she in fact stole from people and

22  that location is one that involves both being in jail and

23  also out of jail.  Thank you.

24          THE COURT:  Mr. Patterson.

25          MR. PATTERSON:  I don't need to make additional

14

1   record unless you're inclined to change your ruling.

2            THE COURT:  Anything you'd like to put on the

3   record?

4            MR. PATTERSON:  The fundamental problem we have

5   with the Cynthia Edwards issue is the Government was aware

6   of the potential problem when the county attorney was

7   advised by his case agent Detective Lucero there was

8   something going  on in the jail that may involve

9   Ms. Andriano.  You've read the presentence report of

10  Ms. Edwards.  There were five or six people indicted as a

11  result of the conduct.  Ms. Andriano was not indicted.  All

12  of the statements that she was the ring leader, if that

13  were the case, then obviously why wasn't she indicted.  She

14  wasn't.

15            To force us to scramble at this point to try to

16  determine the voracity or legitimacy of the claims is an

17  undue burden.  Particularly when he was aware or at least

18  the Government was aware of this conduct in the jail that

19  potentially involved Ms. Andriano.

20            I don't -- I ask you not to delete any further

21  mitigating circumstances.  What we are dealing with here is

22  the Government's need to directly rebut specific points.

23  They can't just call a certain point or characterize it as

24  involving dishonesty or involving something and then,

25  therefore, this is rebuttal.  That's not the rule.  That's

1   not the process we should employ at this time.

2          We've articulated that she is a good mother to

3   two children.  They are allowed to bring rebuttal evidence

4   that tends to show she's not a good mother, not that she's

5   a person of bad character.  That's not what we're providing

6   when we say one of the mitigating factors or circumstances

7   that the jury should take into account is that she has, in

8   fact, been a good mother to two children.

9          I ask that you not delete any additional

10  mitigating factors.  And I think that we understand the

11  rules at this point.

12         My only question is that you preclude the

13  Government from talking about the Pinal County case

14  involving the Ochoas.  I assume that also involves

15  reference to a Maricopa County case as well because it's

16  all tied in, it's all part of the same collateral issue

17  with regard to the credibility of those two individuals,

18  and not necessarily the credibility or believability of

19  them with regard to one case in Pinal County.

20         So I think they're both tied together and I ask

21  you to flesh that ruling out a little further.

22         With regard to disclosure, I had a transition

23  from one mitigation specialist to another.  Patrick

24  Linderman was the original mitigation specialist.  Scott

25  McCloud is now the current mitigation specialist.  He's

1   been scrambling to get up to speed, if you will, in this

2   case.  When the guilty verdict came down we immediately

3   went over what we believed was germane to the penalty

4   phase.  We became aware of persons at the jail and we

5   concluded her conduct in the jail is now germane.

6          As soon as I was aware of the those witnesses,

7   Laura King, Dr. Perry and a nurse by the name of Van Every,

8   I think is her name, we immediately disclosed them.  Told

9   the county attorney that they were locatable in the jail,

10  Durango jail facility.  And the one person who had moved on

11  to Albuquerque, we gave them a phone number.  He's had

12  ample time to address any issues that these additional

13  witnesses have.

14         And preclusion at this point is an extraordinary

15  sanction in light of the issues in this particular case, a

16  capital case issues.  So I ask we be allowed to elicit

17  testimony from those persons.

18         To that end, we also got a court order from this

19  court trying to get a complete set of medical records.  I

20  now have that.  I will photocopy that for

21  Mr. Martinez and give it to him immediately.  I ask that

22  those witnesses not be precluded.

23         THE COURT:  With regard to testimony Court's

24  order relating to the issues involving Donna Ochoa and

25  Alejo Ochoa that ruling will include the related Maricopa

1  County cause.  That's to clarify the Court's ruling not

2  only the Pinal County cause, but the related Maricopa

3  County cause.

4         As to the State's motion to delete the mitigating

5  circumstances of no prior felony convictions, no

6  misdemeanor convictions, good candidate for rehabilitation

7  strong religious convictions, no further threat to the

8  community, I'm going to order denying the State's motion.

9         I'm also going to deny the State's motion

10  precluding witnesses, Mike Rochon, R-o-c-h-o-n, and Jack

11  Smith.

12         I discussed with counsel yesterday the issue

13  involving Juror Number 1.  As I indicated yesterday, what

14  we'll do is before we bring the entire jury in, we'll have

15  Juror Number 1 brought in and we'll ask her some additional

16  questions about her note and her schedule.

17         Then what I'm going to do after that is I'm going

18  to have the jury brought in here and the first thing I'm

19  going to do is, I'm going to ask the jury whether they will

20  be available to have trial on Fridays from 1:00 to 5:00

21  p.m.

22         And, counsel, based upon the Court' ruling and

23  everything that I've heard related to the presentation of

24  page 3, it appears that if we have trial on Friday from

25  1:00 to 5:00, that the case can go to the jury by probably

1   Wednesday.

2           Does that sound relistic?

3           MR. MARTINEZ:  We'll do our best.  I know we

4   discussed that in chambers.  I know I also indicated that

5   perhaps Monday or Tuesday would be our best.

6           THE COURT:  I want to keep the case moving along

7   in an efficient manner.

8           And Mr. Delozier is going to be presenting the

9   opening statement on behalf of the defendant.

10          How long do you expect your opening statement to

11  take, Mr. Delozier?

12          MR. DELOZIER:  Your Honor, I estimate 15 to 20

13  minutes.

14          THE COURT:  Mr. Martinez?

15          MR. MARTINEZ:  As I previously indicated, it

16  would be no more than the hour but that means at the

17  outside.  I expect it will be approximately 30 minutes.

18          THE COURT:  In light of all the circumstances and

19  what I feel is realistic and appropriate time restraints,

20  I'm going to limit each side to 30 minutes with regard to

21  the opening statements for Phase 3.

22          I thought there is one other matter we need to

23  discuss.  Just give me a moment.  Oh, with regard to the

24  victim impact statement, it's my understanding that

25  Mr. and Mrs. Andriano will be giving a victim impact

1    statement.  What is the State's position with regard to

2    having the victim impact statement made under oath?

3              MR. MARTINEZ:  I don't think that it's required.

4              THE COURT:  Mr. Patterson?

5              MR. PATTERSON:  Nor do I, Your Honor.

6              THE COURT:  Okay.  Then I'm not going to have

7    either Mr. Andriano or Mrs. Andriano sworn.  I'm going to

8    have them make the victim impact statement from the witness

9    stand.  And I will tell the jury that the victim's

10   survivors may make a statement relating to the

11   characteristics of the victim and the impact of the crime

12   on the victim's family but may not have any opinion

13   regarding the appropriate sentence to be imposed.

14             Is there anything else we need to discuss before

15   we bring in Juror Number 1 in to discuss the note she

16   provided with regard to her schedule?

17             MR. MARTINEZ:  No, sir.

18             MR. PATTERSON:  No, Your Honor.  I can think of

19   no other loose ends.

20             THE COURT:  We'll have Juror Number 1 brought

21   into the courtroom.

22             (Juror Number 1 enters the courtroom.)

23             THE COURT:  Please be seated.  This is Cause

24   Number CR2000-096032, State of Arizona versus Wendi

25   Elizabeth Andriano.  The record will reflect the presence

1   of the defendant and counsel and Juror Number 1.

2           Good afternoon, Juror Number 1.  We received a

3   note from you on Monday and I've had the opportunity to

4   discuss this note with counsel.  In the note you indicated:

5   I have company coming on Wednesday 12 noon and staying

6   until the following Wednesday, the 15th.  Is it possible

7   for me to be excused from jury duty.

8           Is there anything further that you'd like to add

9   to that note?

10          JUROR NUMBER 1:  Well, you can forget that

11  because I called my nephew last night and they're getting

12  here Wednesday.  Friday morning they're going to Silver

13  City, the three of them, and they won't be back until

14  Monday.

15          THE COURT:  Okay:

16          JUROR NUMBER 1:  If that's not a problem then

17  I'll just stay on.

18          THE COURT:  Okay, then we won't make any further

19  inquiry then.

20          Any anything further from either counsel with

21  regard to Juror Number 1?

22          MR. MARTINEZ:  No.

23          MR. PATTERSON:  No.

24          THE COURT:  Why don't we go ahead and have the

25  rest of the jury brought in at this time.

21

1          (The remaining juror entered the courtroom.)

2          THE COURT:  Please be seated.  This is Cause

3  Number CR2000-096032, State of Arizona versus Wendi

4  Elizabeth Andriano.

5          The record will reflect the presence of the

6  defendant, counsel and the jury.

7          Ladies and gentlemen of the jury, let me make

8  inquiry of you at this time.  We're going to begin the

9  Penalty, Phase 3, here today.  Is there anyone who would be

10  unable to be here on Friday from 1:00 to 5:00?  Is there

11  anyone who would object to having trial even on Friday from

12  1:00 to 5:00?  No one has raised their hand to the

13  question.

14          What we're going to do then is we're going to

15  have trial this Friday from 1:00 to 5:00.

16          Let me give you the anticipated idea how we're

17  going to go about the schedule.  In speaking with counsel,

18  it's anticipated that if we have trial on Friday from 1:00

19  to 5:00 also, this case can be given to the jury for a

20  decision perhaps Wednesday of next week.  Okay.  But we

21  would, in light of everything, we will meet on Friday so we

22  can continue with the trial in a timely manner.

23          I'm aware of the fact we're coming upon the

24  holidays.  I'm sure you have some shopping to do just like

25  I do but is there anyone who would disagree or object to

22

1    having Friday from 1:00 to 5:00 added to the schedule?

2              Yes?  This is Juror Number 9.

3              JUROR NUMBER 9:  It would just be this Friday?

4    It won't be next week?

5              THE COURT:  Once the case is presented to the

6    jury for decision, okay, once the case is presented to the

7    jury for decision, the jury can decide what their

8    deliberation schedule will be with the approval of the

9    Court.  But if we have trial this Friday, it's anticipated

10   that the case will be given to you for decision Wednesday,

11   perhaps Thursday at the latest, based upon what the

12   attorneys have told me.

13             No other hands to have any problems with the

14   schedule.  Thank you.

15             At this time, I'm going to have the bailiff pass

16   out to each of juror a copy of the preliminary instructions

17   for Phase 3.

18             I'm going to ask everyone to follow along as I

19   read the preliminary instructions for Phase 3.

20             Preliminary instructions for Phase 3.  Let's go

21   past the index for your reference.

22             Introduction to preliminary instructions.  We are

23   about to begin the third phase of the trial.  It is called

24   the "penalty phase".  The directions in the preliminary

25   instructions for the first phase of the trial regarding the

1   following topics remain in full force and effect unless

2   changed by these instructions:  Preliminary instructions

3   concerning juror contact, bench conferences, preliminary

4   instructions concerning the law.  You are allowed to

5   discuss the case among yourselves during deliberations.

6   Effective immediately, permission for you to discuss the

7   case is suspended.  Do not discuss the case among

8   yourselves or with anyone else during the penalty phase.

9   Follow all the admonitions I have given you previously.

10        Order of penalty phase.  The penalty phase,

11  unless otherwise directed by the Court, will proceed as

12  follows:  One, the defense may make an opening statement.

13  The State may then make an opening statement or may defer

14  it until the close of the defense case.

15        Again, what the attorneys say in opening

16  statement is not evidence.

17        Two, the victim's survivors may, if they wish,

18  make a statement relating to the characteristics of the

19  victim and the impact of his murder on the victim's

20  family.  They're not allowed to offer any opinion or

21  recommendation regarding an appropriate sentence.

22        Three, the defendant will offer evidence in

23  support of mitigation.

24        Four, the State may then make an opening

25  statement if it was deferred and may then offer evidence in

1   rebuttal to the defendant's mitigation evidence.

2          Five, the defendant may offer evidence in

3   rebuttal or other evidence if the Court allows such to be

4   presented.

5          Six, the defendant may make a statement to you

6   but she is not required to do so.  You cannot hold this

7   against her if she chooses to not make a statement.

8          Seven, the parties will present final arguments

9   with the defense having the opportunity to make an opening

10  and closing argument.

11         Eight, the Court would then give you the final

12  instructions on the law.

13         Nine, you will then deliberate to decide on a

14  verdict.

15         Once you agree upon a verdict, it will be read in

16  court with all parties present.

17         Evidence to consider.  In deciding the issues in

18  the penalty phase, you are to consider all the evidence

19  presented in this phases as well as the evidence presented

20  in both proceeding phases.

21         Overview of penalty phase.  In the penalty phase

22  we will address the sentence to be imposed.  During the

23  penalty phase, the parties may present information relevant

24  to any mitigation circumstances.

25         A mitigating circumstance is any factor relevant

1   in determining whether to impose a sentence less than death

2   including any aspect of the defendant's character,

3   propensity or record, or any of the circumstances of the

4   offense including but not limited to the following:

5          One, no prior felony convictions.

6          Two, no prior misdemeanor convictions.

7          Three, good candidate for rehabilitation.

8          Four, good mother to two children.

9          Five, married for eight years.

10         Six, good student at school, awards.

11         Seven, good student in school, grades.

12         Eight, missionary work for church in Mexico.

13         Nine, strong religious convictions.

14         Ten, good inmate in jail.

15         Eleven, helpful to staff and other inmates in

16  jail.

17         Twelve, cooperative with authorities after

18  arrest.

19         Thirteen, domestic violence victim.

20         Fourteen, emotional abuse victim.

21         Fifteen, sexual abuse victim.

22         Sixteen, stress of husband's cancer.

23         Seventeen, stress of misdiagnosis of husband's

24  cancer.

25         Eighteen, stress of terminal illness.

1          Nineteen, stress of economic difficulties.

2          Twenty, no future threat to community.

3          Twenty-one, remorse.

4          Twenty-two, impact on defendant's family members

5     and friends.

6          Twenty-three, age.

7          Burden of proof in penalty phase.  As to the

8     existence of mitigating circumstances, the defendant bears

9     the burden of proof.  The defendant must prove the

10    existence of the mitigating circumstances by a

11    preponderance of the evidence.

12          Proof by a preponderance of the evidence means

13    that a fact is more likely true than not.  This is a lesser

14    burden than proof by clear and convincing evidence and

15    proof beyond a reasonable doubt.

16          In the guilt phase of the trial, the jury

17    unanimously found beyond a reasonable doubt that the

18    defendant committed first-degree murder.  In the

19    aggravation phase, the jury unanimously found beyond a

20    reasonable doubt that one aggravating factor was proven.

21    These issues have been finally decided and you're not to

22    consider these verdicts.

23          In addition, you cannot consider any victim's

24    statements or victim impact evidence as a new aggravating

25    factor.  However, it is something you may consider in

1   assessing the mitigation presented.

2          The jurors do not have to agree unanimously that

3   a mitigating circumstance has been proven to exist.   Each

4   juror may consider any mitigating circumstance found by

5   that juror in determining the appropriate penalty.

6          The possible sentences on first-degree murder are

7   the death penalty or life imprisonment.   The question to

8   ultimately to be decided by the jury at the end of penalty

9   phase, Phase 3 is:   Should the defendant be sentenced to

10  death or life imprisonment for her conviction of the

11  first-degree murder of Joseph Andriano, Jr.

12          In answering the question, you must individually

13  decide whether there is mitigation and whether it is

14  sufficiently substantial to call for the imposition of a

15  life sentence rather than a sentence of death.   Any verdict

16  imposing the sentence of life or death must be unanimous.

17          Defendant need not testify.   The defendant is not

18  required to testify or make any statement and you are

19  precluded from drawing any inferences against the defendant

20  should she decide not to testify or make a statement.   The

21  decision on whether or not to testify or make a statement

22  is left to the defendant acting with the advise of her

23  attorney.   You must not let this choice affect your

24  deliberations in any way.

25          Conclusion.   The rules of law I have just shared

1   with you are preliminary only.  At the end of this phase, I

2   will give you final and more detailed instructions that

3   must be applied.  In deciding the case, you must be guided

4   by the final instructions.

5        At this time, the attorneys will be permitted to

6   make their opening statements if they wish.  What the

7   attorneys say in their opening statements is not evidence.

8   It is simply an outline of what the attorney thinks the

9   evidence will be.  And it's offered to help you to

10  understand and follow anticipated evidence during Phase 3.

11        Mr. Delozier.

12        MR. DELOZIER:  Thank you, Your Honor.

13        Good afternoon.  What we've done is reproduced

14  the list that's in your preliminary instructions, what the

15  Judge just read for you.  That's what this chart is

16        Obviously, at this point as you've just been

17  told, we've reached the third and final stage.  And what we

18  have now is Wendi's life hangs in the balance.

19        In this stage, you'll be asked to determine

20  whether this young woman has lived a life that's worthy of

21  death or whether she deserves to continue living, albeit in

22  a prison cell.

23        Throughout the trial what we have worked to do is

24  present to you evidence not only of what happened that

25  dreadful morning of October 8th, but also of the life that

1   preceded that.

2          I'm not going to go into all the things we talked

3   about during that time nor am I going to repeat all the

4   things that I told you in my opening statement.  But I am

5   going to give a thumb nail sketch of some of those things.

6          We described to you her religious training and

7   religious experiences.  We told of a little girl who grew

8   up in what most of us would consider unusual circumstances,

9   including traveling with her parents for several years as a

10  vagabond, I guess is the right word, street preacher.

11         She attended this strict, isolated religious

12  school.  And, of course, living with a stepfather who was

13  loving but yet oppressive and sometimes abusive.

14         Her first job as you might remember right out of

15  high school was serving as a teacher's aide at that same

16  religious school.  After that, she gave up six months of

17  her life to be a missionary in Mexico.  She attended the

18  local community college.  And from what we see, there was

19  no problems there.  She made good grades.  She worked at a

20  hospital.  And then, of course, she did what most of us do,

21  started finding out about the rest of the world.  She met

22  Joe and found him to be fun and attractive and quite

23  different from the folks she'd been associating with up to

24  that time.  He was part of the Casa Grande in-crowd and had

25  a lot of fascination for this, what we consider to be an

1   innocent young girl at the time, who lived a sheltered

2   life.

3          He became, what we describe and she described, as

4   the love of her life.  Wendi did find Joe to be someone who

5   she thought needed her love.  He needed her to help wash

6   away, as she described it, the isolation he felt from some

7   of the people that he was close to or normally would be

8   close to.  He appeared to be happy-go-lucky in public but

9   in private she tells us and others that he cried and had a

10  deep sense of sadness within.  She then decided to marry

11  him.  She believed that if she loved him enough, everything

12  would get better for both of them.

13          She continued to believe that loving him would be

14  enough when he became verbally and physically abusive

15  toward her.  She continued to believe loving him enough

16  would be good enough when his businesses failed, and

17  remember we described several of those.  She continued to

18  believe that loving him would be enough when she was placed

19  in the role of sole wage earner, when Joe couldn't or

20  wouldn't hold a steady job.

21          She believed that loving him enough would be good

22  enough when he got the cancer.  You might remember even

23  going to the church as an exercise.  If she could just love

24  him enough maybe he'd get well.  These are thoughts that

25  she believed.

1          She believed loving him would be enough when he

2     made the decision to end his own life.  Loving him, that

3     meant doing what he wished and supporting him in that

4     decision, as well.  Perhaps her biggest failing is she

5     loved him too much.  She loved enough to keep the secret

6     about the abusive nature of her husband.

7          Wendi was not alone in that category of people

8     who love their family members afflicted with cancer so much

9     they feel compelled to assist in their suicide plan.  We

10    hear about that regularly.

11         As many loved ones do, she loved enough to go

12    along with this elaborate plan which was devised by him for

13    him to commit suicide so he did not suffer a long and

14    agonizing death of cancer.  Through her husband, Joe, she

15    understood that Catholics believe that anyone who commits

16    suicide would not be with the Lord.  Even after Joe's

17    death, she loved him enough to keep her promise about

18    keeping his suicide a secret, even when she was arrested.

19         She did not profit from his death.  There is no

20    life insurance that she is named a beneficiary.  And, of

21    course, as you heard, the malpractice case did not go

22    anywhere.  In fact, she lost everything when he died.  She

23    lost her husband and her future.  She lost her freedom.

24    She lost her children, Nicholas and Ashley, who she hasn't

25    seen now in over four years and she will likely never see

1   or talk to them again.

2           In this phase we will also present testimony

3   about who Wendi has become while she's been in jail these

4   last four-plus years.  You will hear how she has been

5   helpful and supportive to those people who have been

6   overseers of her.  How, in fact, those overseers have come

7   to depend on her.  She's helps them manage those within the

8   jail who need special care.

9           Again, this is Wendi hoping to help someone

10  simply through her loving and caring.  She has no secondary

11  gain from any of these acts of kindness.  You heard about

12  secondary gain through part of the first phase.  There's no

13  secondary gain here.  You might consider commissary

14  benefits, but those are not anything you'll hear she took

15  advantage of either.  It's simply that she's a person who

16  is caring and wanted to help.

17          Wendi has begun, through counselors -- and she's

18  had quite a bit of counseling while she's in the facility,

19  not only from the facility itself but from outside folks --

20  to understand what happened to her during the eight years

21  of marriage.  And we believe -- she believes she's

22  returning to the woman she once was, before she was faced

23  with a life filled with, what I would call, desperation.

24          On October 8, she was a young woman pushed to an

25  act of desperation out of very pitiful circumstances.  She

33

1   was working long hours.  She worked hard to support her

2   family.  She carried the financial burden alone.  She

3   raised two growing babies.  And, of course, she was caring

4   for Joe who was dying of cancer.

5          All those things happening right before her eyes,

6   essentially.  And she was essentially helpless to change

7   any of it.  No matter what she tried, nothing worked.  She

8   sought other friendships during this later period to

9   somehow help her cope.  That's how she saw it anyway.  And

10  not all of those friendships obviously were appropriate.

11  Sometimes she drank too much as you heard.

12          Without a doubt, she made some bad choices,

13  especially on the morning of October 8.  She is now working

14  to accept those choices that she made through her marriage

15  and understand better why she made those choices.  We

16  worked to present to you evidence not only of October 8 but

17  also of her life before that night.

18          As you consider her fate, we ask that you

19  consider the whole person, to look at her whole life.  Who

20  she once was.  Who she became during the years of marriage

21  with Joe.  And who she has been while sitting in jail for

22  the last four years.  Actually, over four years now, four

23  years and two months.

24          She is not a career criminal.  She has no history

25  of being in and out of jail.  She has no history of

1  initiating violence either before or since that terrible

2  night with Joe. She's simply a mortal being. A woman who

3  has made mistakes, errors in judgement, as, I suspect, we

4  all have.

5         But should she be condemned to death for those

6  choices or those decisions? I hope that you will see a

7  desperate and defenseless woman who acted wrongfully at the

8  time and made bad choices but hopefully that a person who

9  should be condemned to death for those choices and

10  decisions.

11         I beg you that you find that death is not an

12  appropriate choice to make for her. She has no choice

13  about her future. Only you do. Grant her the ability to

14  make choices that lead to life and not death.

15         Mr. Martinez wants you to believe that she

16  believed by killing Joe she would be able to acquire

17  millions which we know that theory has no basis. She lost

18  everything. She gained nothing. So obviously that theory

19  has no basis.

20         He also told you of fictional characters that

21  also had no meaning in this case, saying that Wendi was

22  living in an unreal world. The choices she made during the

23  time she was living with Joe did not show you a person who

24  was seeking gain for herself. She only made these choices

25  to support her family due to the will of her husband. The

1   world she occupied was a very real world.  A world filled

2   with desperation and never-ending, yet escalating, one of

3   desperation.  It's not one of fictional characters but one

4   of a world of endless and continued real characters in a

5   very real-life drama.  Continually filled with an ever

6   increasing dilemma that none of us would wish on anyone.

7   She lived it and she saw it.  And her efforts, all of her

8   efforts, ended in frustration and failure.  Actually, her

9   expenses at the county jail for the last four years have

10  largely been a source of refuge and peace for her.

11          Finally, she did not have to perform for Joe's

12  benefit.  His brutality could harm her no more.  And she

13  was safe from all those wrong choices and did not have to

14  make any more for him.  She found peace in a very unusual

15  place:  In jail.  She began, through the help of

16  counselors, to understand what happened, as I said a moment

17  ago, in those years.  She began to understand what happened

18  to her and admitted the wrongs she has done that were

19  basically out of character.  She's not the same person she

20  was when the police arrested her on October 8th.  She

21  believes she's learned to be in character.  Some may even

22  say she's been reformed.  She never intended to harm

23  anyone, especially the love of her life.  She has not

24  harmed anyone while she's been in jail the last four

25  years.  It's unlikely she'll ever harm anyone in the

1  future.  I urge you to vote for life for her.

2          As a whole, and individually, you have held Wendi

3  responsible to those few moments that resulted in Joe's

4  death by finding her guilty of first-degree murder.  She's

5  already paid a great price for the losses that she has

6  suffered.  In the final analysis, we should be judged for

7  our whole life, not judged for a few moments of very bad

8  choices.  I beg you to find that death is not the choice

9  that you make.  She has no choice as I said about her

10  future, only you do.  Grant her the opportunity to make

11  choices from this day forward that can be redemptive for

12  her.

13  ~~Now, my purpose in doing the summary, as I told~~

14  about the chart, I tried to touch on those without pointing

15  to them but there are specific ones that obviously are

16  enumerated there.  I believe that we felt, we've hit the

17  majority of them.

18          We obviously talked about the stress of the

19  husband's cancer.  We stressed -- you heard of the

20  misdiagnosis and the stressed that caused.  The euphoria

21  that it had to bring when they found it is not malignant.

22  Obviously, the despair that had to come when they found it

23  was terminal illness.

24          You heard of the stress of the economic

25  difficulties.  You heard of the first counseling that

1   occurred in 1996 that involved Wendi getting counseling on

2   her own for stress that she had for a family situation.

3        We'll show you in due course the grades.  They

4   are very good grades, 3.76 is what you'll see when we show

5   you that.  You're also going to hear from Laura King and

6   Dr. Perry and I think one other person from the jail about

7   how helpful she's been while she's been in there with some

8   of the things that needed assistance.

9        I appreciate your listening to us and urge you to

10  give her a chance to live out her natural life.  Thank

11  you.

12        MR. MARTINEZ:  May we approach?

13        THE COURT:  Yes.

14        (Bench conference was held outside the hearing of

15  the jury.)

16        MR. MARTINEZ:  One of the things that

17  Mr. Delozier alluded to was that she is quote, unquote not

18  at career criminal.  I suggest that he has now opened the

19  door.  I should be allowed to ask about the issues

20  involving the thefts and issue involving Cynthia Edwards.

21  They were forewarned in advance.  I should be allowed to

22  rebut those issues in my opening statement.

23        THE COURT:  I'm going to deny the State's

24  motion.  It's a lack of felony convictions.

25        (Bench conference concluded.)

000008514

1          THE COURT:  Mr. Martinez.

2          MR. MARTINEZ:  Good afternoon.  In the first

3   phase of these proceedings, you were presented with a set

4   of facts.  You were presented with a lot of evidence that

5   came from that witness stand.  And to aid you or to lead

6   you or guide you during your deliberations you were

7   provided with a set of jury instructions which was the law

8   that you were to follow with regard to that first phase of

9   the proceedings.

10          And after some deliberation and after a

11   consideration of the evidence and the law that was given to

12   you, you came back with a decision.  And that decision was

13   that Wendi Elizabeth Andriano was guilty of premeditated

14   murder, first-degree murder of her husband Joseph

15   Andriano.

16          Shortly after that, you were asked to sit through

17   a second phase.  And that second phase and, in that second

18   phase, you were also presented evidence that came from the

19   witness stand.  You were also told that you could consider

20   the other evidence that had been presented to you during

21   the first part of these proceedings during the guilt

22   phase.

23          Additionally, before you went back to deliberate,

24   you were given another set of instructions, the law for you

25   to follow.  And you went back there and you did just that,

1   you followed the law.  You applied it to the facts and you

2   came back with a decision indicating that this particular

3   murder of Joseph Andriano was cruel.  That it was beyond

4   the norm.  That was your decision and that was after

5   applying the facts to the evidence that was presented to

6   you.

7           And now we come to the last, the final, the third

8   phase.  And, again, you will be given evidence, just like

9   you did in the previous two.  And just like in the previous

10  two, you will also be given the law that you indicated that

11  you would follow regardless of your personal feelings.  And

12  that is the law that you will take back with you to

13  deliberate and talk about Wendi Elizabeth Andriano.  The

14  procedure is no different.  The law is given to you, the

15  facts are presented to you and you are asked to

16  deliberate.  You are, each and everyone one of you, as

17  before, is asked to apply the law to the facts.  And that

18  you would do that, you indicated that you would do that and

19  that you would apply the law to the facts regardless of

20  what your feelings were.

21          So in this particular case, one of the factors,

22  there are certain factors that the defense want you to

23  consider.  And in considering those factors, I want you to

24  keep in mind that everything that has been presented up to

25  this point is not to be disregarded.  It's something that

1  you take back with you.  It's something that you have

2  already assimilated and it is something that is there for

3  your consideration.

4        One of the things that speaks to you when you go

5  back to the deliberation room or when you consider this

6  case, is the defendant's character.  That was pointed out

7  to you as part of the instructions.  One of the things that

8  you cannot forget about this case, and one of the things

9  you cannot put aside, is that when it's to the defendant's

10 benefit she always tried to find a way out of it.  She's

11 trying to find a way out of things now.

12        If it's to her benefit, she will stop at

13 nothing.  Perhaps, that may happen here.  She will resort

14 to lying.  She will resort to violating the tenants of her

15 religion.  She will do anything earthly that is available

16 to her, including taking a knife and sticking it in her ill

17 husband's neck.

18        That is something that you need to consider and

19 that is sort of, if you will, the overall conundrum for you

20 to take back with you in considering the so-called

21 mitigating circumstances.  Because, after all, you are

22 going to be asked to consider whether or not they are

23 sufficiently substantial, these mitigating factors, in

24 order to warrant leniency; in order, if you will, that the

25 death penalty not be imposed.

1        But, again, when you are making that

2  consideration, please consider everything that has been

3  said.  Please consider the type of person that you are

4  dealing with and the type of person that you are dealing

5  with before.  Because just because you happen to be in a

6  jail, you just don't change overnight or you don't change

7  at all.

8        And in this case, we have somebody who was taught

9  between right and wrong, who was taught about the Bible.

10  According to her, was taught about Christian values and

11  knew right from wrong, knew you shouldn't kill, knew you

12  shouldn't lie, knew you shouldn't cheat.  Knew all of

13  that.  Yet, chose to disregard all of that.

14        So, again, when you go back to consider these

15  mitigating, so-called mitigating circumstances -- which the

16  State maintains they are not -- take a look at that and

17  keep that in mind.

18        Let's talk about the first three that they

19  presented to you; no prior felony convictions, no prior

20  misdemeanor convictions, good candidate for

21  rehabilitation.  Those can be taken as a group.  The reason

22  I say that they can be taken as a group is because they're

23  telling you, well, up to this point, when this happened,

24  she had not been convicted or gone through the process of

25  the law before.

1        But that doesn't take into account as I told you

2   before, all the other misdeeds she has committed.  For

3   example, the infidelity.  We talked about it so much that

4   you perhaps are a little bit calloused about Joseph

5   Andriano's condition.  We talked about it over and over so

6   that it gets to the point where it becomes somewhat

7   callous.  But to him it wasn't callous.  To him, losing his

8   life, it wasn't callous.  To him, it was a situation where

9   he is fighting for his life.

10        So, again, you go back there and you take a look

11   at that.  And you take a look at this individual that says,

12   well, I hadn't committed anything that's a violation of the

13   law.

14        Well, but does that make it okay?  Does that mean

15   that just because you have no prior felony convictions

16   everything's okay in light of everything that you've done?

17   For example, she lied on her federal student loan.  Well,

18   they didn't choose to prosecute her.  Does that mean it's

19   not a prior felony conviction?  The other thing we know is

20   that --

21        MR. DELOZIER:  Your Honor, no argument.  He's

22   been venturing into argument.

23        THE COURT:  Don't argue, Mr. Martinez.  Just give

24   the jury a presentation of what you feel that the evidence

25   will be presented here at the penalty phase and the

1   previous phases.  No argument.

2          MR. MARTINEZ:  The evidence is that she did lie

3   to the federal government.  You have that document that

4   indicates that.  Lying is a crime.  Of course, she doesn't

5   have a felony conviction.

6          Additionally, the other thing that you know about

7   her is that when push came to shove, she chose to drive

8   without a license because her license was suspended.  In

9   and of themselves, that indicates, well, those aren't that

10  big of a deal.  But they want you to come in and believe

11  that this person is white as the driven snow when, in fact,

12  she really isn't.

13          Again, we go back to the morning of October 8th

14  of 2000.  The reason that's important when we take a look

15  at where it says no prior felony convictions, that's

16  absolutely wrong.  And you know that that's absolutely

17  wrong.  Because she does have, as she sits before you, one

18  felony conviction.  And it is the worst of the worst.

19  There is nothing worse that an individual can do.  And that

20  is to commit first-degree murder.  And beyond that, to make

21  it unusually cruel in the way that she committed that

22  first-degree murder.

23          So you look at the felony -- no felony

24  convictions, but you also have to look at what she did.

25  When she did, if you will, come to attention of law

1    enforcement in the sense of being arrested, she went

2    straight to the top.  So do you give her the benefit of the

3    doubt?  Does that mean that the crime is any less cruel?

4    Does it mean that Joseph Andriano suffered any less?  It

5    does not.  It just means that up to that point there was no

6    prior felony convictions.

7              Is she a good candidate for rehabilitation?

8    Well, we know that she now has a prior felony conviction.

9    We also know that, again, when it's to her advantage, when

10   push comes to shove, even as to the most important matter,

11   as to the most important decision that an individual can

12   make in this life, whether or not someone lives or dies,

13   what does she do?

14             MR. DELOZIER:  Your Honor, he's continuing to

15   argue.

16             THE COURT:  No arguments, Mr. Martinez.  Let's

17   get straight to what the anticipated evidence is.

18             MR. MARTINEZ:  There is no -- can't be

19   rehabilitated.  Because as I told you before, she will take

20   the low road and you know that.  You saw evidence of that

21   in the guilt phase.

22             MR. DELOZIER:  Same thing, Your Honor.

23             THE COURT:  Continued objection.  No argument,

24   Mr. Martinez.

25             MR. MARTINEZ:  So they also talk about the other

1   factors.  Well, they claim that she's been a good mother to

2   two children.  That's what they say.  Good mother to two

3   children.  How good of a mother is she to two children when

4   she takes away their father from them.

5              Additionally, how good of a mother is she if when

6   Ashley is about to be born she says, "You know, I can't

7   stand the fact that I'm pregnant.  I just hate the fact

8   that I'm pregnant.  Because you see it's going to ruin my

9   body.  I'm going to get fat."

10             How good of a mother is she if she has a special

11  paddle for Nicholas that has a Bible verse on it.  So that

12  when he is two years old and says continuously to her no,

13  no, as babies are wont to do, she takes that paddle to

14  him.  Is that being a good mother?  And how good of a

15  mother is she when at least twice a week she's out with

16  other people, with other men.  How good of a mother is

17  she?

18             We also know that the individual who actually

19  took care of these two children was Mr. Andriano.  It

20  wasn't her.  So how is it that she can be a good mother?

21  She was not a good mother.  We know that.  Because it was

22  Mr. Andriano who actually took care of those kids.

23             They claim she's been married for eight years.

24  That's absolutely untrue.  You know that the marriage was

25  on January 22nd of 1994, the mathematics proves out that on

1   October 8th of the year 2000 it was only six years and nine

2   months.  They want to make it longer.  They want to stretch

3   it out, make it seem better.

4           They do claim she was a good student in school

5   and received awards and grades.  That's true.  But, rather

6   than calling for leniency, that calls for otherwise because

7   she knew better.

8           MR. DELOZIER:  Your Honor, I'm --

9           THE COURT:  Let me see counsel at the bench.

10          (The following conference was held outside the

11  hearing of the jury:)

12          THE COURT:  Mr. Martinez, I said three times to

13  state what the evidence will show.  You're asking questions

14  that are basically argument.  I want you to stop or I will

15  stop you right now.  So you just tell the jury what the

16  anticipated evidence is, what the evidence will present.

17  No argument.  No questioning.  That's argument, okay?

18          MR. MARTINEZ:  All right, Judge.

19          THE COURT:  You hear me?

20          MR. MARTINEZ:  All right.

21          (Bench conference concluded.)

22          THE COURT:  Mr. Martinez.

23          MR. MARTINEZ:  The evidence will show that she

24  did receive good grades.  She did receive awards.  She

25  received good schooling.  That she received the knowledge

1   that tells her right from wrong from when she was a little

2   girl.  Even from back then, she knew right from wrong.

3           The other factor they want you to consider is the

4   fact that she did some missionary work for her church in

5   Mexico.  And that can be put together with a strong

6   religious conviction they want you to consider.  Those were

7   strong religious convictions that she was taught indicated

8   that thou shall not kill, indicated that thou shall not

9   lie, indicated that you are not to cheat.  Before you, you

10  have a killer.  You have somebody who lied.  And you have

11  somebody who would cheat.

12          You have information that she's a good inmate in

13  the jail.  You will also hear about the conditions in the

14  jail.  There is no other recourse.  If you are not a good

15  inmate, there are things that can be done to you.

16          They have additionally she's helpful to the staff

17  and other inmates in the jail.  That may be true but

18  they're not convicted of murder.

19          Then, they indicated she was cooperative with the

20  authorities after arrest.  She had no option but to be

21  cooperative.  The people that arrested her had guns.  The

22  people that arrested her can arrest people and take them

23  where they need to take them.  You did see a three and a

24  half hour tape in which she spoke with the police about

25  this issue.  And during that conversation with the police,

1   you could see that she was not cooperative.  She was a

2   liar.

3           Additionally, the next three are domestic

4   violence victim, emotional abuse victim and a sexual abuse

5   victim.  The truth is that actually it was Joseph Andriano

6   that was the victim of domestic violence.  You will hear

7   whenever any member of his family would ask him, "Joe,

8   let's do this" or "let's do that" or "let's go here" or

9   "let's go there" or "let's do this thing" or "let's do

10  that thing," he would answer, "You know what, let me check

11  with Wendi because I don't want her to get mad at me."

12          You will hear that on Saturday, October 7th,

13  2000, when they were having that steak fry over at his

14  parents' house that he was, in fact, on the couch, and he

15  was lying there on the couch and at some point somebody

16  wanted to hook a trailer up to one of the trucks or one of

17  the cars that was there.  And Joseph Andriano was still

18  lying down on the couch when Wendi Andriano screamed from

19  across the room and said, "Get up, Joe.  You need to go out

20  there and help them."  His sister said, "No, you just had

21  chemotherapy.  You're feeling bad.  Go ahead and lay

22  back."  Well, he said, "No, I better get up.  I better get

23  up because I don't want her to get mad at me."

24          So the only individual here that was the subject

25  of any domestic violence was Joseph Andriano.  And he paid

1   the ultimate price.

2            She claims to have stress from her husband's

3   cancer.  Stress from the misdiagnosis of the cancer.

4   Stress of terminal illness.  And stress of economic

5   difficulty.  All of them are tied together.  But the facts

6   will show otherwise.  As you've already seen, she was able

7   to go out at least twice a week.  She was able to go out

8   with her friends and she was able to have affairs.  So that

9   will not be borne out.

10            They also indicate that she is no future threat

11   to the community.  With regard to that particular factor,

12   all you need to look to is what she already did.  And in

13   this case, what did she already do, well, when push came to

14   shove, she was going to be caught by the police, she

15   resorted to the knife, she resorted to the stool and lamp.

16   She staged the scene.  And when the police took her down

17   for questioning, she lied to them.

18            And then, they also talk about remorse.  There is

19   no remorse in this case.  She continues to maintain, even

20   through opening statement, that Mr. Andriano wanted to

21   commit suicide.  So, again, how can you be remorseful if

22   you don't think that you did anything wrong.  And she

23   doesn't think that she did anything wrong.  That's what

24   they just told you.  So you cannot have any remorse here

25   and you cannot find it.

1           Impact on the defendant's family.  Well, there

2   are certain consequences that one must accept as a result

3   of the actions.  And one of those is the impact on her

4   family.

5           MR. DELOZIER:  Your Honor, approach?

6           THE COURT:  Overruled.

7           Continue on.

8           MR. MARTINEZ:  And finally, the last factor that

9   they want you to consider is her age.  Her age at the time,

10  she was born on August 26, 1970, is 30 years old.  An

11  individual as her, who has had this schooling, according to

12  them she had a 3.7 average.  According to them she

13  graduated at the top of her class and has had the benefit

14  of experience.  It isn't like she was 17, she was 30 years

15  old.  At 30 years old, she had already had schooling.  At

16  30 years old she had already been married.  At 30 years old

17  she had already had kids.  At 30 years old she had already

18  been working.  She was sophisticated.  She knew right from

19  wrong.

20          So those are the factors they want you to

21  consider as mitigating circumstances.  The State would

22  submit to you that we want you to do the same thing that

23  you did with regard to the previous phases:  Take a look at

24  the law that the Judge gives you, take a look at the facts

25  that are presented and apply them.  And once you do that

# APPENDIX N - Part 2

1   and once you consider the cruel way in which Joseph

2   Andriano was killed --

3           MR. DELOZIER:  Objection, Your Honor.

4           THE COURT:  Overruled.

5           MR. MARTINEZ:  Mr. Andriano laid there for at

6   least an hour and a half, suffering while she sat and

7   watched.  Mr. Andriano was down on the ground, face down,

8   when she struck him with that bar stool and lamp.  And

9   Mr. Andriano was down on the ground when she stuck that

10  pillow in his mouth so people outside wouldn't hear.  And

11  he was defenseless when she stuck that knife in his neck.

12          A person of the age of 30 is now asking that you

13  find that there are mitigating circumstances sufficiently

14  substantial to warrant leniency.  In light of all that, the

15  State submits to you now that, and we will discuss it again

16  later, that an appropriate sanction is the ultimate

17  sanction, one she extracted, the death penalty.  Thank

18  you.

19          THE COURT:  Ladies and gentlemen, turn to the

20  preliminary jury instructions on page 3 there is a

21  typographical error.  On page 3, paragraph 2, it talks

22  about preliminary instructions concerning juror it says

23  "contact" but it should be "conduct."  So go ahead and

24  correct that on the preliminary jury instructions.

25          Is that agreeable to counsel?

1        MR. MARTINEZ:  Yes, sir.

2        MR. PATTERSON:  Yes, Your Honor.

3        THE COURT:  Thank you.

4             At this time, the victim's survivors will make a

5   statement related to the characteristics of the victim and

6   the impact of the crime on the victim's family but may not

7   offer any opinion regarding the appropriate sentence to be

8   imposed.

9             Mr. Martinez?

10        MR. MARTINEZ:  Before we start, I would like to

11  move into evidence Exhibit Number 542.

12        THE COURT:  Counsel, approach.

13             (Bench conference was held outside the hearing of

14  the jury.)

15        MR. DELOZIER:  I have no objection to the

16  introduction of this exhibit.  But I'm going to ask how

17  it's going to be used in the context of the victim impact

18  statement.

19        THE COURT:  Are you going to hold the

20  photograph?

21        MR. MARTINEZ:  At the end, not during.

22        MR. DELOZIER:  That's fine.

23             (Bench conference concluded.)

24        THE COURT:  Exhibit 542 for identification is

25  admitted into evidence.

1        MR. MARTINEZ:  The State calls Jeanette Andriano

2   to the stand.

3        THE COURT:  Please make yourself comfortable on

4   the witness stand.  Please speak right into the microphone

5   there in front of you.  Also please remember to speak

6   loudly and clearly so everybody can hear you.

7        Why don't you go ahead and state your full name

8   for the record.

9        MRS. ANDRIANO:  My name is Jeanette Andriano.

10       THE COURT:  You may proceed.

11       MRS. ANDRIANO:  Ladies and gentlemen of the jury,

12   I know that you will be making your decision on the facts

13   of this case and the laws that you are given.  However, I

14   would like you to consider some of the following things.

15   Nothing in my background has prepared me for the purpose of

16   speaking to you today in this courtroom about the shocking

17   and cruel murder of my son, Joe.

18       I have been in court every day listening to the

19   facts of this case and I just still have problems believing

20   that this horrible crime happened.  I still can't believe

21   all that he had to endure.

22       It was four long years ago when two members of

23   the Phoenix Police Department came to our home in Casa

24   Grande to tell us of the horrible tragedy at San Riva

25   Apartments.  It has changed our family's life forever.

54

1     It was October 8th, 2000.  It was a Sunday

2  evening.  My husband Joe and I were having a very quiet

3  dinner.  It was the first and the last time that the police

4  have had to come to our home.  Immediately, I knew that it

5  had to be bad news.  Mother's instinct.  I just quickly

6  reviewed our children's whereabouts.  Jeanea was with her

7  husband in Gilbert.  Jana and her husband live in Memphis.

8  James had gone to a friend's home in Casa Grande.  And, of

9  course, Joe was with Wendi, his wife, in Ahwatukee.

10     As the policeman proceeded I heard him say that

11  my son Joseph had been murdered and that this wife did it.

12  My heart stopped for an eternity.  I could not believe

13  something this horrible could happen.  And I have to tell

14  you it's true.  A mother should not have to bury her eldest

15  son.

16     Later, after time has passed, I felt betrayed

17  that his wife could have done this horrible thing.  Joe

18  brought her into our family and we accepted her.  This kind

19  of horrible, terrible tragedy happens to other families.

20  And now it's happened to mine.

21     Our son, Joe, suffered terribly with cancer.  He

22  did not share his pain with us.  He tried to shield us from

23  seeing him in pain.  That, in itself, was painful to

24  watch.  He told me once that it didn't help to complain

25  about the pain.  So he would suffer in silence.  Even

55

1   though he had a twinkle in his eyes, he was still

2   suffering.  And as his mother, I knew he was suffering.

3          During the chemotherapy treatment that I

4   attended, he would encourage others and would joke with the

5   patients that he had met there previously.  There was a

6   camaraderie with the nurses and the patients.  And I could

7   see that twinkle in his eyes and that little smile that was

8   mischievous.  And I'll never see that again.

9          During that time he lost his hair.  His body was

10  giving out.  He lost a lot of weight.  His strength was

11  gone but he had not lost his spirit.  Because of the

12  cancer, he tried to live each day to the fullest.

13  The cruel and brutal way that he died is just

14  very hard for our family to accept.

15          I heard testimony in court that he was ashamed of

16  his bald head.  Nothing is further from the truth.  Joe was

17  to have been in his friend's wedding in November of 2000.

18  Unfortunately, he never made it.  But he joked about buying

19  a wig to wear to the wedding.  We encouraged him to go like

20  he was because he was so handsome.  We also joked that

21  everyone would be looking at the bride and groom and that

22  they wouldn't really notice him.  It was all just good

23  fun.  And she took that from us.

24          When I think of the horrific and painful way that

25  his last minutes were spent, it just makes me cry.  I would

56

1  just never ever be able to accept it.  And I've seen the

2  pictures, just like you.  The back of his head and things

3  over and over.  How I wish he had not suffered so.

4        I heard the defendant tell how she was ashamed of

5  Joe because he was gross and skinny.  And, on the other

6  hand, he just loved her so much.  He was grateful that he

7  was alive and he could spend some time with her and his

8  children.  He always took pride in his demeanor.  He kept

9  himself looking good.  He was always looking for the

10  brighter side of life.

11        And as these holidays approach, because Christmas

12  is difficult for our family now, it's always been a special

13  time for us.  I have special ornaments that I got for each

14  of the children as they were growing up.  And each year Joe

15  would jokingly check to make sure that I hadn't lost any or

16  forgotten any.  Especially his boat, his Snoopy and his

17  skis.

18        I set the tree up this weekend.  And I've added

19  an angel holding a blue flower to remember him.  But I

20  still put the other ornaments up, too.

21        As a child, Joseph was mechanically minded and he

22  liked to take things apart.  He would change parts around

23  to make things go faster.  I recall Joe as a little boy

24  when he received his first bicycle early in the morning.

25  By afternoon he had it taken apart because he was going to

1   improve something.  I always found it funny and ironic that

2   his father had spent most of the evening before trying to

3   put the bike together and amazingly Joseph had no parts

4   left over.

5           I have many things that remind me of Joe.  When

6   Joe had just gotten out of high school he and some friends

7   reroofed our house after a storm.  It was interesting to

8   watch them to do this job.  And they really did an

9   excellent job.  Now, almost 20 years later, we've had to

10  replace the roof.  And that's another thing that reminds me

11  of Joe that is now gone.

12          Joe was a good welder.  He made gates and

13  security covers for our windows to be sure that we were

14  safe.  Too bad I couldn't do the same for him.  We still

15  have the covered trailer that he made for the four

16  wheelers, remembering the joy that he had in going to the

17  dunes.

18          When I go to Oklahoma to our family farm, I see

19  several pieces of equipment that he repaired or welded

20  together.  It breaks my heart.  I should probably get rid

21  of them but I just can't.  He loved going to the farm in

22  Oklahoma.

23          One of these trips he took Nicholas and Ashley

24  with him.  He was so proud to take the children and show

25  them the things and the people that he loved.  He wanted

58

1   his children to be a part of the farm.  That's impossible

2   now.  She took the last months on earth from him.

3          Saturday, October the 7th, 2000, was the last day

4   that I spent with Joe.  I was trying to remember everything

5   that he said or we did.  When this date rolls around, I

6   ponder and I sift through all the "what ifs."  I know I

7   cannot change things that happened that night but I sure

8   wish I could.

9          That day, Joe wanted to go to the swap meet to

10  pick up a tricycle that had two seats so Nicholas could

11  peddle and Ashley could ride on the back.  It brought him

12  such joy to see both children riding together.  The

13  children have out-grown it now.  But I've kept the bike

14  anyway.  Makes me feel close to him.  The children

15  sometimes dig it out of the storage room and play with it.

16  It just eats at me that Joseph didn't get to help these

17  children to learn to ride their first bike or to

18  skateboard.  It makes no sense to me that the children have

19  missed the opportunity to have him guide them on all the

20  toys that he loved.  At least, he would have had a few

21  months more.

22          That Saturday evening we had a family steak fry.

23  The grandchildren played outside while the adults enjoyed a

24  football game on TV.  Joe had brought his favorite German

25  chocolate pie from Marie Calendar's for all of us to

1  enjoy.  He had the same little twinkle in his eye that told

2  me he was really enjoying eating the pie with all of us

3  around him.

4           I really miss having these get-togethers with all

5  the families.  It's just not the same.  One family is

6  missing.

7           Before he left that evening, I shared with him

8  that there was a possibility that the school district would

9  close the school that I had taught in for 20 years and I

10  shared my reluctance to my retiring.  Joseph spoke right up

11  saying that he was sure that I would continue to work with

12  children, teaching them to read and sharing a love of books

13  with others.  He knew where my heart was.  I really miss

14  his encouraging words.

15           I have sat in this courtroom these many weeks

16  listening to witnesses describe the murder scene.  I saw

17  pictures of him lying on the floor in a pool of blood.  I

18  saw pictures of my son's head that had been struck 23 times

19  with a bar stool and the parts of the lamp.  I saw the

20  vomit on the floor.  I saw the wound to his neck.  This is

21  the kind of things that mothers should not have to see.  It

22  was my flesh and blood that had been savagely brutalized.

23           All this has been painful and hurtful for me to

24  see.  But I cannot imagine the hurt, the pain, the betrayal

25  Joe must have felt as his blood was squirting everywhere,

1  as he was losing consciousness, to see that his attacker

2  was his wife.  This woman he had vowed to love until death

3  do us part.  As he was being struck on his head, he must

4  have lifted his arms to protect himself from the blows.

5  The arms that he had held her in tender embrace.  I just

6  can't image the feeling of betrayal that he felt.  I can't

7  even imagine.

8          I know that my boy isn't the one on the floor

9  covered in blood or the one on the coroner's table.  This

10  is my boy.  This is how I will remember my boy.  And he's

11  going to be my boy forever.  Thank you.

12          MR. MARTINEZ:  The State calls Joseph Andriano.

13          THE COURT:  Sir, please step forward and take the

14  witness stand.  Remember to speak loudly and clearly into

15  the microphone so everyone can hear you.

16          MR. ANDRIANO:  Ladies and gentlemen of the jury,

17  I can't tell you how angry and hurt I am about my son's

18  murder.  Instead, I'll tell you about, only about the pain

19  and the emptiness that I'll live with for the rest of my

20  life.

21          It's painful every time that I go out in town,

22  eating and shopping and seeing young fathers and families

23  interact with each other, husbands and wives.  The

24  modern-day dads are really involved in raising their kids.

25  It's rough every time I go out.  It's difficult to go to

61

1   town.

2          Every weekend in the spring, as his friends and

3   others drive through town to the gas stations and on the

4   way to the lake, I notice a crew and a boat missing, and

5   it's Joe's.  One Father's Day, Joe and I went to the lake

6   and he'd asked me earlier in the week, he said, "Dad, I

7   don't know what to get you.  Would you like just the two of

8   us to go to the lake together?"  And we did and that was

9   one of the best Father's Days I probably ever had.  He'd

10  given up time with his friends and buddies to spend the

11  day, the weekend with me.  That will never be again.

12         The days at home on the farm are constant

13  remainders of Joseph.  The things he did.  His mother

14  mentioned the security windows.  I can see things in the

15  shop and things that he built.  And I find myself, if

16  something is broken or something, wanting to call him.

17  That's tough.  I'll never be able to talk to him again.

18         When Joe was last coming in from out of town

19  sometimes he'd give me a call and once in a while he'd have

20  Nicholas with him.  When he was in the area we'd go to

21  lunch and spend a little time in between jobs.  The time we

22  had time together was special and that no longer will be.

23         When I see his children, especially Nicholas,

24  which is the spitting image of Joseph when he was that age,

25  it's just a huge void in my life.  Joe was a loving father

1  who really loved his family and enjoyed giving them

2  undivided affection.  He was proud to show them off, always

3  come and visit me at work.

4         Shortly before she killed him, I remember Joe

5  talking about taking a trip to Disneyland with his kids so

6  he could see their eyes light up when they saw the magic

7  world of Disney.  He also spoke about how honored and

8  anxious he was to being in Brandon's wedding, bald or not.

9  He was looking forward to that in November.  Neither of

10  these events included Joe.

11         So now I have to go through the motions of living

12  without Joe.  His children will no longer be able to see

13  him.  They don't get to play and splash with him when he

14  gives them their baths in the tub, which he did so often.

15         Saturday, October 7th, we had a steak fry at the

16  house with Joe and his family, Jeanea and Brandon and their

17  family.  Joe wasn't able to get out in the yard and play

18  with them like he normally did.  He just wasn't up to it

19  but he come out and watched a while and then he goes back

20  in the house and rest.  And but he would check on them.  He

21  came out and took pictures of the kids playing.

22         I know that last night when he left was the last

23  hug and "I love you" that I'll ever hear from him.  He came

24  in, woke me up because I usually go to bed a little earlier

25  than the rest of them.  Those days are gone forever.

1       Since he was murdered, Thursdays are the most

2   difficult days of the week.  He used to come down, we'd go

3   to lunch on Thursday and I'd spend time with him and most

4   of the time he'd bring the kids with him and we'd go eat

5   and then ride around and visit.  Thursdays are hell.  They

6   are filled with emptiness and pain, four Thursdays a

7   month.  We only had too few of those Thursdays left.  And

8   those were taken away from me, to be gone forever.

9       On October 8 of 2000, my life changed for the

10  worse.  And Wendi Andriano is responsible for that.

11  Because he stayed with her, even though he should have left

12  her, that cost him his life.

13       THE COURT:  Mr. Patterson, you may call your

14  first witness.

15       MR. PATTERSON:  Thank you, Judge.  Defense calls

16  Laura King.

17       (Witness sworn.)

18       THE COURT:  Please make yourself comfortable in

19  the witness stand.  Please speak clearly and loudly so

20  everyone can hear you.  Wait until the question is

21  completed before you answer the question.  And please make

22  sure you give a verbal response.

23       Is that agreeable to you?

24       THE WITNESS:  Yes.

25

1                              LAURA KING,

2    called as a witness herein, having been first duly sworn,

3    was examined and testified as follows:

4

5                         DIRECT EXAMINATION

6    BY MR. PATTERSON:

7         Q.   Would you give us your name, ma'am?

8         A.   Laura King.

9         Q.   And by whom are you currently employed?

10        A.   At the time I am not currently employed but I'm

11   going to work for the State of New Mexico, correction's

12   department.

13        Q.   When do you anticipate commencing that particular

14   job?

15        A.   20th of December.

16        Q.   And what will that job entail?

17        A.   I will be performing counseling services and

18   assessment services for inmates at the central New Mexico

19   correctional facility.

20        Q.   And prior to taking the job, where were you

21   employed?

22        A.   I was employed with Correctional Health Services

23   at the Durango jail, psychiatry unit, at Maricopa County,

24   official employer.

25        Q.   And did you work on site at the Durango

1  psychiatric facility?

2      A.   I did.

3      Q.   And what was your job description or title at

4  that particular location?

5      A.   My title there was counselor.  And you want me to

6  tell you what I did?

7      Q.   What were your job description activities as a

8  counselor there at Durango?

9      A.   My activities are assessment of inmate patients

10  coming on to our unit, development of treatment plans,

11  one-to-one counseling, group counseling, crisis

12  intervention, discharge planning.

13      Q.   And how long were you employed in that capacity

14  with Correctional Health Services?

15      A.   For three years.

16      Q.   What educational background or experience do you

17  have that allows you to participate in that kind of job?

18      A.   I have a master's in Social Work from Arizona

19  State University.

20      Q.   And a bachelor's from where?

21      A.   I have a bachelor's in Fine Arts from New York

22  University.  And then following that I took a number of

23  hours in postgraduate psychology classes.  And through the

24  master's program I worked an internship with a federal

25  public defender's office on the habeas corpus unit doing

1  interviewing, research and review.

2      Q.   Okay.  Was one of the client's that was on your

3  case load during the time that you worked at the Durango

4  psychiatric unit Wendi Andriano?

5      A.   Yes, she was.

6      Q.   And when did she first become part of your case

7  load?

8      A.   She became part of my case load at the end of

9  September in 2003.

10     Q.   Okay.  And describe the unit for me.  I assume

11  there are various jails in the county, correct?

12     A.   Yes.

13     Q.   Approximately how many jails are there?

14     A.   There's Durango, Towers, Estrella, Madison and

15  Estrella tents.  Those are the adult facilities.

16          In Durango we have a unit dedicated to inpatient

17  psychiatry.  We house both men and women there.  And we are

18  the only inpatient psychiatric unit for females within the

19  county jail system.  We have, at any given time, in terms

20  of women patients there, we have probably between 20 and 40

21  people.

22     Q.   Okay.  Once again, refresh my recollection, what

23  date did you acquire Wendi?

24     A.   On the 28th of September, 2003.

25     Q.   And to your knowledge, Wendi had been in the

67

1    system, the jail system, since approximately October 8th of

2    the year 2000?

3          A.   Yes, she had been in custody approximately three

4    years.

5          Q.   During that three year period, what facility was

6    she detained in?

7          A.   She was held in Estrella, the women's facility.

8          Q.   And did she have a different counselor during

9    that period of time she was in that facility?

10         A.   In the Estrella facility, contact with

11   psychiatric staff is provided on an as needed basis.  There

12   is no routine -- there is no routine encounters unless

13   someone is taking medication and periodically the

14   prescriber of the medication will have to meet with the

15   client.  Or, if the client is having some kind of crisis,

16   they can self refer and a counselor will meet with them.

17   Or oftentimes detention will notify psych that that person

18   is having a rough time and a counselor will come and see

19   that person.

20         Q.   Okay.  But there aren't counselors assigned full

21   time at that facility?

22         A.   They are but not to particular individuals.

23         Q.   Assigned to the facility but not a client case

24   load?

25         A.   Correct.

68

1    Q.  Tell me about the Estrella facility, what kind of

2  inmate population is housed there?

3    A.  At the Estrella facility there would be all of

4  the female inmates who would be there, both sentenced and

5  unsentenced, for any variety of things, all the way from

6  unpaid parking tickets to the most significant felonies.

7  The way they would be housed at Estrella would be according

8  to their security classifications.

9        And then, of course, there is our unit which is

10  another, the only other place where women are routinely

11  housed, the inpatient psych unit.

12    Q.  How is it that Wendi was transferred from

13  Estrella to the psych unit in September of 2003?

14    A.  Wendi made a suicide attempt which was actually

15  quite significant.  She was -- there was a lot of concern

16  that she might continue to be a danger to herself.  And so,

17  she was sent to our unit for evaluation and assessment and

18  stabilization.

19    Q.  What was the manner or method of the suicide

20  attempt?

21    A.  I believe that she inserted a pencil into a vain

22  in her arm.

23    Q.  So, that is one of the reasons or basis that a

24  person is taken from general population environment and

25  placed in the Durango psychiatric unit?

1      A.    That is one of the circumstances that would lead

2  to that, correct.

3      Q.    All right.  And upon arrival at your location,

4  you told us about one of your tasks is to do assessments.

5  What, essentially, is a social worker assessment of the

6  client?

7      A.    We would talk to the client about their

8  background issues and currently what they're experiencing.

9  We would try and ascertain whether the person was an

10  immediate risk to themselves still.  We would try and find

11  out if there were any significant symptoms that indicated

12  mental illness.  We would look at a full sort of

13  psychosocial background, where they come from, what the

14  stressors were that they were involved with right now.

15          In Wendi's case, because of the seriousness of

16  the charge, there were a number of things which we couldn't

17  speak to her about because it would be -- it would be

18  contrary to our mission.  We don't want our clients -- we

19  don't talk about anything related to the case or the thing

20  they're focused on because that's just not our purpose and

21  it's considered detrimental to the client.

22      Q.    So you didn't discuss with Wendi the facts and

23  circumstances of Joe's death?

24      A.    No.

25      Q.    Did you discuss or formulate treatment plans,

1  group facilitation plans, those kinds of things?

2      A.   Yes.

3      Q.   What are those all about?

4      A.   It's about identifying for the client while

5  they're on our unit what kind of things we can work on with

6  them to help increase coping skills, to ensure that there

7  is not another suicide attempt, to identify if there might

8  be ways to mitigate some of the more significant stressors

9  for someone.  So those are the kinds of things we would

10  have done.

11      Q.   Did you find in the context of your assessment

12  that the facility, Estrella facility, had created part of

13  the problem for Wendi?

14      A.   I believe that that's -- I believe that's the

15  case.

16      Q.   Well, tell me about that.

17      A.   Well, Wendi was classified as a maximum security

18  inmate, not because her of behavior, but because of the

19  severity of her charge.  So, when she went into Estrella,

20  when she was placed in Estrella, she was housed with the

21  other maximum security inmates.

22      Q.   In general, what kinds of folks are those people?

23      A.   They are people that either have significant and

24  ongoing behavioral problems while in custody for any number

25  of reasons.  And they tend to be people who have engaged in

1   a lot of sort of ongoing habitual criminal behavior.

2           A lot of times we see people who have significant

3   personality disorders.  People who are oftentimes

4   predators.  People who are facing very serious charges.  So

5   you'll have, it's sort of -- it's the toughest place in the

6   women's jail.

7       Q.   Okay.  Contrast that, if you will, to the

8   population of Estrella with the population for Durango,

9   your psych unit?

10      A.   On our unit we provide services for the people

11  who are chronically mentally ill, acutely mentally ill who

12  experience some kind of various severe stressors that lead

13  us to believe that they would have difficulty coping in the

14  general population.

15          Sometimes, as in Wendi's case, in combination

16  with that we will keep people on the unit if they're

17  particularly supportive or helpful with other patients or

18  inmates of the unit.  Those kinds of people not only are

19  struggling with tremendous stressors for a number of

20  reasons but are also helpful with other patients and

21  provide a stabilizing force in the unit.  So we'll have

22  people remain there for that reason.

23      Q.   Okay.  During the course of your assessment or

24  discussion with Wendi, was she ever diagnosed with any

25  serious mental illness?

72

1      A.   No.

2      Q.   Okay.  What was her principle issue during the

3  period of time she was in the Durango psychiatric unit?

4      A.   Wendi has a couple of issues that were, that we

5  were -- there are issues that are sort of two separate

6  things.  In terms of diagnosis, she had issues with

7  depression and with severe anxiety.  With regards to

8  treatment planning, the things that we wanted to work on

9  with her while she was there were learning to define

10 boundaries with other people, learning skills and

11 assertiveness.  This takes increments.

12     Q.   Defining boundaries for other people.  What was

13 the principle difficulty in that skill, if you will?

14     A.   My experience with Wendi, she has a very

15 difficult time saying no to anyone who is in distress.

16 Anyone who has a need, whether it be real and immediate or

17 sometimes even when it's feigned by people -- we have

18 people there that do that, too -- Wendi will immediately

19 step in and try and resolved or assist that person in

20 resolving that.  Sometimes it's to her detriment where she

21 became, in a number of cases, very overwhelmed by the

22 demands that certain peers were making on her in terms of

23 providing them support.  You have people who would talk for

24 12 hours straight about suicide.  And Wendi seemed to have

25 very little capacity to say, "Please stop talking.  I can't

000008549

1   listen to this any more."  And so, in terms of boundaries,

2   those were the kinds of things we are trying to help her

3   learn to establish in a way that it would be positive.

4        Q.   Let me understand what's also related to that.

5   If someone would ask for her assistance and she would try

6   to give them her assistance but fail in the process, how

7   would she act in that situation?

8        A.   The cases in which I would say she failed in the

9   process are people who had chronic problems with inability

10  to calm themselves from the inside.  They were people who

11  had significant personality disorders.  So the failure

12  would be not in that Wendi failed but in that there was

13  nothing that, for these folks, would have altered that

14  circumstance.  And, in fact, probably having someone who

15  listened as attentively as Wendi did might have even

16  magnified that for them.

17       Q.   But if she felt that she couldn't help this

18  person, did she have some --

19       A.   She would come to staff.  There were times when

20  she came to me -- I can't say about other staff -- but she

21  came to me and she was deeply upset by the fact that she

22  couldn't help these people.  There were several times where

23  she was openly weeping.  She said, "I can't, I don't know

24  what to do.  I can't stop.  I can't help this person but I

25  can't stop myself from trying to help them.  And I don't

1  want to but I can't.  I just can't stop trying to help

2  someone when they're in need."  And she was extremely

3  distressed in those cases.

4     Q.  You indicated to me previously that she was

5  easily manipulated by the other inmates?

6     A.  Wendi is a smart gal, so when -- I don't want to

7  set it -- I don't want to -- I don't want to insinuate

8  that, you know, that she is sort of a shrinking flower,

9  that she is completely naive to everything around her.  But

10  there are -- when people would express a need, for me

11  whenever someone gives me information, I'm skeptical

12  because I'm in a jail setting because people lie to me all

13  the time.  So I want to find out, even if someone's crying

14  to the degree to which they're actually in need or are they

15  trying to get me to do something for them.

16        With Wendi, she accepted most of those people at

17  face value.  And so, there were a couple of times when gals

18  were there and said they were pregnant and they weren't

19  pregnant.  And Wendi gave them extra food and made sure

20  they were taken care of and advocated with us to get them

21  extra medical attention.  And, you know, she would then

22  discover that these people weren't who they said they

23  were.  And this happened probably, you know, it happened a

24  number of times.

25        So, she wasn't -- when someone presented

1   themselves as being in need, she didn't have that cynicism

2   or skepticism, even though she'd been in jail a number of

3   years, she was -- her immediate response was to be of

4   assistance.

5       Q.   Was she helpful to the staff?  If so, in what

6   regard?

7       A.   She was with the detention officers.  Wendi did a

8   lot of janitorial work.

9       Q.   For instance?

10      A.   For instance, she was on the higher functioning

11  ladies pod, C pod.  There's a lower functioning pod, D pod,

12  in which we have women who are very, very psychotic, very

13  unwell.  People would plug the toilets all the time, the

14  toilets would overflow and fill the pod.  Wendi cleaned

15  that up.  If someone had been sick, she would clean that

16  up.  She would clean the day room.  She would do trash.

17  She would do windows.  She would assist officers if there

18  were females that had a fear or distrust of officers

19  because they were in uniform.  Wendi would help to get them

20  dressed out in the jail clothing with the officer present.

21  So those were some of the things with the officers, with

22  guards.

23           The psych staff, Wendi routinely would tell us if

24  someone hadn't been taking their medication, which means

25  they would likely decompensate and get sick, show signs of

EXHIBIT YY

1    illness.  People who were, may be had conditions that they

2    were ashamed to talk about.  We had a couple older ladies

3    who were incontinent and didn't want to tell us they needed

4    extra assistance and Wendi let us know so we could help

5    those people.

6              If people were crying and didn't want to talk to

7    staff, if they were feeling suicidal, if they had any means

8    to harm themselves, she would let us know.  She routinely,

9    you know, engaged in activities in the pod that included

10   other people, board games, letter writing.  She would help

11   people contact, you know, legal people.

12             She would -- just she is kind of, in a way

13   without being -- I mean she wasn't short of a goody two

14   shoes who was reporting everything everyone did, but she

15   would report things that because we weren't there all the

16   time on the pod that we couldn't see, she would let us know

17   about them so that we could provide those people with

18   assistance so we would intervene before something became

19   problematic.

20             There was a gal who was going to make a plea

21   bargain and she completely did not understand what was

22   going on and had been embarrassed to tell her attorney she

23   didn't know what was happening.  Wendi let us know about

24   that so we could pass that on to that patient's attorney.

25   So that patient didn't end up signing a plea bargain and

1   having no idea what they were signing.  So things like

2   that.

3        Q.   The information that she supplied to staff about

4   the other inmates was not supplied for her benefit but

5   rather for the benefit of that inmate?

6        A.   Yeah.  And with regards to the officers, too, I

7   mean, a lot of times inmates would work for extra food,

8   work for things and Wendi routinely had commissary.  So

9   those things, those benefits that you could consider a

10  benefit in the jail if you didn't have access to other

11  resources, Wendi already had those resources so there is

12  really nothing in it for her in terms of gain.

13       Q.   Are you talking about altruistic behavior?

14       A.   I think it helped keep her mind off things

15  because she certainly didn't have to do those things, you

16  know.  And the rewards that she would get were not rewards

17   -- they were not anything that she didn't already have.

18            So I would say that the behavior was more to

19  benefit and participate in being a positive influence in

20  that small community of the psychiatric unit.

21       Q.   Okay.  She remained and still to this day is in

22  that particular unit, correct?

23       A.   Yes.

24       Q.   And were you able to deal with the attempted

25  suicide and kind of move her away from that ideation?

1    A.    Yes.

2    Q.    Tell me about that.

3    A.    With regards to the suicide, as I said before, in

4    the Estrella jail there is a very limited space that the

5    gals who have maximum security designation can be housed.

6    Oftentimes, especially when you've been in custody for a

7    while, people pick on people, people get into arguments and

8    it's nothing that you get really in trouble for but you

9    have to sort of move your population around.  And sometimes

10   there is not enough space for people.  So, Wendi ended up

11   being placed involuntarily in a segregation room.  It was

12   merely a housing issue.  It had nothing to do with her

13   having done anything wrong.  And she had been told that she

14   was going to be there temporarily.  She thought her trial

15   was coming up immediately at that time and she was going to

16   be in isolation during the course of her trial and she

17   panicked.  She didn't have anyone to talk to.  She didn't

18   have anyone to do any reality testing, didn't have anyone

19   to look towards the future with.  And so she panicked and

20   tried to suicide.  So when she came to us.  We knew that

21   there were, and from talking with her, that there were,

22   that Wendi was someone who was extremely social, really

23   needed a lot of routine feedback from people.  She needed

24   to check things out with people that she could trust and

25   knew weren't trying to exploit her very regularly.

1          So, after she had been on the unit for a month,

2    two months, she started to, I don't know how else to say it

3    other than sort of decompress.  She started recognizing

4    that she felt more like herself.  That the experiences she

5    had over at Estrella were actually -- she had actually sort

6    of been in a vigilant, guarded mode for most of the time

7    she was over there to survive.

8          When she came to us, she started being able to,

9    because of the support and the situation, be more

10   vulnerable and more open so we could start talking about

11   the issues that she was having with regards to the

12   boundaries, with regards to the assertiveness, with regards

13   to the passivity and, you know, doing anything to be

14   liked.  Those kinds of things we were able to talk to her

15   about.  And that moved her away from the suicidal thinking

16   which was something that was a stress response because she

17   had no coping skills to survive in that circumstance.

18       Q.   And in the year since she's been in the psych

19   unit, there has been no effort at suicide, any problems of

20   that nature?

21       A.   No.

22       Q.   Was she on medications while at the Estrella

23   facility?

24       A.   Yes.

25       Q.   Were those adjusted somewhat once she became a

1   resident of the psych unit?

2        A.   I believe that they were.

3        Q.   Do you know currently what medications have been

4   prescribed for her while on the psych unit?

5        A.   At this point in time that I'm sitting here,

6   because I've been gone since September, I can't tell you.

7        Q.   At the time you were back with her?

8        A.   Yes.

9        Q.   What would the medications be?

10       A.   I believe that she was on some Seroquel.

11       Q.   What is that?

12       A.   Seroquel is an antipsychotic.  But it's also used

13   for depression.  We use it for sleep.  It's something

14   that's kind of used to stabilize moods.

15            THE COURT:  Would you spell that?

16            THE WITNESS:  S-e-r-o-q-u-e-l.

17       Q.   BY MR. PATTERSON:  Other medication?

18       A.   I believe that she was on an antidepressant,

19   though, I'm not sure which one.

20       Q.   Was she was on Ativan?

21       A.   She was on Ativan.

22       Q.   What is that?

23       A.   Ativan is an antianxiety medication.

24       Q.   Would you spell that for the court reporter?

25       A.   A-t-i-v-a-n.

1    Q.    And any other medications?

2    A.    Other than the Seroquel, the antidepressant and

3    the antianxiety, no.

4    Q.    All right.  While she was at the psychiatric unit

5    there at Durango, were there beds available for other

6    persons who were seriously mentally ill?

7    A.    Yes.

8    Q.    What was the setup there?

9    A.    The setup there, there is a lower functioning

10   women's pod and a higher functioning women's pod.  For the

11   majority of the time Wendi was there, she was on the higher

12   functioning women's pod, which was never full.  So, she was

13   never taking up a bed for someone else that needed it

14   because most of the time when we get people in and we're

15   short of beds, it's in the more acutely ill D pod.

16   Q.    Okay.  While she was in the Durango facility, she

17   did receive a write-up for contraband?

18   A.    Yes.

19   Q.    What was that about?

20   A.    The officers, in doing a routine search of the

21   cells, came across some, I think lipstick and eye shadow

22   and a pen.

23   Q.    And why is that stuff, in your unit, considered

24   contraband?

25   A.    Well, it's considered contraband because we have

1   people that tend to be more impulsive, that have a history

2   of harming themselves.  And things that are, like a pen

3   which is longer or things like eye shadow which may have

4   some material in it that could be used to make a sharp edge

5   are considered -- they're considered dangerous if someone

6   were to get ahold of them.

7          But, I understand that those things are -- a

8   certain degree of flexibility and discretion is exercised

9   in the general population which we do not have on our unit.

10      Q.   Okay.  And G.P. would be or general population

11   would be the circumstances --

12      A.   Estrella.

13      Q.   she found herself in in Estrella?

14      A.   Yes.

15      Q.   So, a little stricter scrutiny of those items in

16   your unit because of the suicidal problems?

17      A.   Yes.

18      Q.   Was there also a write-up for having a Seroquel

19   pill?

20      A.   Wendi and some other inmates were going through

21   one of the pods.  They had their bedding with them and a

22   Seroquel pill rolled out.  The officers claimed that it was

23   Wendi's pill but we don't know if it was Wendi's pill or

24   not.  But the officers were very angry about the contraband

25   issue.  So they wrote Wendi up for the Seroquel.  Without

1    that, they never would have written her up.  We routinely

2    have -- I mean, I'm not saying it's a good idea but that

3    often happens that people have, they pocket one of their

4    pills or what not.  Especially because on our unit the

5    medication that's given for sleep is given at 5:00 in the

6    afternoon.  And you must take it at that time.  It leads to

7    a lot of sleep disturbance for people because they're

8    unconscious by 6:00 and they awake up at 2:00 in the

9    morning and are not allowed to get up.

10          So even though it is not part of the protocol at

11   all, oftentimes people do palm their sleeping medication

12   and save it until night time.

13         Q.   Okay.  Is there trafficking in this kind of pill,

14   Seroquel, within the jail?  Does it have any value?

15         A.   I'm sure there is.  There's a trafficking of

16   everything in the jail, things that we think are

17   ludicrous.  But, with a single pill, it's not -- and a

18   single instance, that wouldn't be a concern to us.

19         Q.   Okay.  So it's a sleep aid that can be used at a

20   later time when you actually want to go to sleep?

21         A.   Yes.

22         Q.   You told us that Wendi was often visibly

23   emotional about other people's problems.  Can you tell me

24   about that?

25         A.   In the cases where Wendi would talk with me about

1    her concerns for other inmates she was very tearful.  Wendi

2    is a person who is very tearful.  She has a very difficult

3    time keeping her emotions on the inside.  Usually -- in the

4    beginning, she tries to keep things down and tries to

5    present a very cheerful front but that doesn't last very

6    long.  So, when she would start to explain what a certain

7    person's problem was or why we needed to give them special

8    consideration or why we needed to pay attention to them,

9    she would usually become very tearful.

10       Q.   Did you assess Wendi for behavioral aptitudes?

11       A.   Can you be more specific?

12       Q.   Well, my notes say  you assessed her for

13   behavioral aptitudes, things that she was capable of doing,

14   strengths, weaknesses, those kind of things?

15       A.   Well, going to just behavior aptitude, I think --

16   I'm not exactly sure what you mean by that term.

17       Q.   Well, I have it in my notes.  I'm sorry, if you

18   don't understand that question.  Do you have any sense of

19   it?

20       A.   My senses are you're asking about her behavior

21   and her interaction with other people and her sort of daily

22   interaction with others.  That's the sense of what I'm

23   guessing you're asking me.

24       Q.   Please tell us.

25       A.   As I said before, Wendi is very much a caretaker

1    of other people.  Even when it's to her detriment.  She's

2    much more comfortable focusing on what other people need

3    assistance with than on what she needs assistance with.

4    And it's very difficult for Wendi to say no.  She's

5    extremely uncomfortable when she perceives that someone

6    doesn't like her and will go out of her way to either avoid

7    that person, or those people, or will go out of her way to

8    try and prove to that person that there is no problem.

9              For example, when she was written up for the

10   Seroquel pill, there was an officer on our unit that I

11   think was extremely judgmental of her in a way that was not

12   toward other inmates.  And Wendi's way of addressing that

13   problem with the officer was she started staying up all

14   night and sleeping through the officer's shift in the day

15   so she could entirely avoid that person.

16             So there are a lot of issues with avoidance.  For

17   example, when talking to Wendi, things would come up and

18   there would be situations where any person might be angry

19   about an inequity of a situation or being moved or being

20   housed, Wendi had a really hard time saying, "I'm angry

21   with you."  We said you can be angry at us.  There's no

22   problem.  You're not getting sent anywhere.  Could not

23   verbalize, "I am angry."  Very difficult time expressing

24   any negative emotions.  She engages in a lot of avoidance

25   and denial of issues.  Even when you say to her, "How are

1  you?"  "Oh, I'm fine."  And then you sit and talk to her

2  for ten minutes and you'll find out she was entirely not

3  fine.  Unless she was advocating for someone else, then it

4  was an entirely different story.

5      Q.   Okay.  Can you characterized for me her

6  personality?  Was it friendly, amiable, those kinds of

7  things?

8      A.   Wendi's always been extremely cooperative, very

9  forthcoming.  As I said, very pleasant.  She is more likely

10  to try and ask anybody else how they are doing rather than

11  talk about herself.

12      Q.   Is this unusual for persons who spend a great

13  deal of time in custody, in your experience?  Sunny

14  disposition?

15      A.   I think, well, it depends on the person.  What I

16  can tell you is that when people stay -- it has been my

17  experience when people are on the unit and they are

18  constantly being watched and they have people supervising

19  them 24 hours a day, if you are a person who is extremely

20  antisocial, if you are a person who is predatory, if you

21  are a malingering person, a person trying to make good, you

22  cannot maintain that for an ongoing period of time without

23  being found out.  It just doesn't happen.  We see people

24  who are extremely good at deception, extremely good, and

25  they eventually get found out.  Everybody always does.  And

1  there has never been anything that was inconsistent with

2  Wendi's behavior.

3      Q.    Anything about her behavior that led you to

4  believe she was malingering or trying to deceive staff?

5      A.    No.

6      Q.    Have you seen growth and development during the

7  year or so you've worked with Wendi?

8      A.    Yes.

9      Q.    What is that?

10      A.    Wendi became better able to verbalize when she

11  was having a problem with someone.  She became better able

12  to identify the feelings that were there.  In the beginning

13  mostly it was about stress, stress, stress.  So everything

14  was generally about stress.  There wasn't really any sort

15  of distinguishing between I'm angry or I'm sad or I'm

16  afraid.  She became better able to identify the emotions

17  that she was experiencing.  She became better able to

18  problem solve.  She became able to remove herself from

19  circumstances with peers who were having difficulties.  She

20  became better able to define boundaries.

21          But I think that's -- again, I just want to say

22  that on our unit we thought routinely that Wendi was going

23  to trial next month or the month after that or a couple of

24  months later.  So, one of our goals was to help her remain

25  as stable as possible for trial.  And, when you're doing

1    that, you don't start digging around and stirring a lot of

2    stuff up and go into deep background things.  You don't do

3    that because it doesn't serve people if you sort of crack

4    open the facade that someone has.  You know, you can disarm

5    them and really put them at a disadvantage when they need

6    to be at their most.

7         Q.   But the fact that she is educable and appears to

8    be able to change her behaviors, does that bode well for

9    the time she is about to spend in prison?  She is educable

10   and rehabilitable, those kind of things?

11        A.   I believe so.  Absolutely.

12        Q.   During the time that you met with Wendi and knew

13   Wendi, did she ever speak badly of Joe Andriano?

14        A.   No.  She always referred to him as "my husband,

15   Joe" or "Joe." Absolutely no anger, no resentment.  It's as

16   if she was describing someone who was still alive.

17        Q.   Did she ever blame Joe for her circumstances, the

18   fact that she was in custody and a client of yours?

19        A.   No, absolutely not.

20             MR. PATTERSON:  Judge, I have no additional

21   questions at this time.  Thank you.

22             THE COURT:  We'll take our afternoon break at

23   this time.  Take 15 minutes.  Remember the entire

24   admonition I've given you including do not talk about the

25   case with each other and do not let anyone talk about the

1   case with you.  Keep an open mind.  I'll see you in 15

2   minutes.

3              (Recess taken.)

4              THE COURT:  This is CR2000-096032, State of

5   Arizona versus Wendi Elizabeth Andriano.

6              The record will reflect the presence of the

7   defendant, counsel and the jury.

8              Laura King is on the witness stand with

9   cross-examination by Mr. Martinez.

10

11                    CROSS-EXAMINATION

12   BY MR. MARTINEZ:

13      Q.  Ma'am, one of the things that's striking about

14   your testimony was that it seemed like you didn't have a

15   bad thing to say about the defendant.  That would be fair

16   to say, right?

17      A.  Not as regards to the questions that were asked

18   me.

19      Q.  And not only did you not have a bad thing to say

20   about her, it seemed like you and she became friends,

21   didn't you?

22      A.  No, we did not.

23      Q.  So you didn't really think highly of her at all

24   then, right?

25      A.  I think Wendi has a lot of strengths.

1  There are things about her that I think are admirable.

2  There are some things about her that I do think are

3  admirable and there are things about her that are very

4  likeable.

5      Q.  You think she's admirable.  One of the things is

6  that she's admirable, right?

7      A.  In some ways, yes.

8      Q.  And she's likeable, correct?

9      A.  In some ways, yes.

10     Q.  One of the things you told us was that according

11 to you, she never told any of you a lie, right?

12     A.  No, I didn't say that.

13     Q.  Well, you did indicate to us, didn't you, that

14 when she dealt with the staff, there was nothing

15 inconsistent with Wendi's behavior.  Do you remember

16 telling us that?

17     A.  Correct.

18     Q.  You also told us she never tried to deceive

19 staff.  Do you remember that?

20     A.  Yes, I do.

21     Q.  So you're vouching for her honesty, aren't you?

22     A.  I'm vouching for her behavior for the time she

23 was on our unit.

24     Q.  No, ma'am.  When you say, "never tried to deceive

25 staff," you're not talking about behavior, you're talking

1   about somebody who is either honest or dishonest, wouldn't

2   you agree?

3           MR. PATTERSON:  That's not what she testified to

4   Judge.

5           THE COURT:  Overruled.

6           Go ahead and answer the question if you can.

7           THE WITNESS:  I maintain that Wendi did not

8   engage in behavior or verbalization that was intended to

9   deceive staff.

10      Q.  BY MR. MARTINEZ:  That's what you mean when you

11  said she never tried to deceive staff, right?

12      A.  Correct.

13      Q.  And if she never tried to deceive staff, you're

14  telling us that she was honest in her dealings with staff?

15      A.  I would say for the most part.  I can't say,

16  I -- I can't say equivocally to every word that was spoken.

17      Q.  But your opinion of her is that she's an honest

18  individual in regards to dealing with staff, right?

19      A.  During the period of time she was on our unit, I

20  experienced her as being most honest, yes.

21      Q.  So the answer is yes?

22      A.  Yes.

23      Q.  And the period that you dealt with her was

24  September of 2003 until September of 2004, correct?

25      A.  Correct.

1    Q.   And you did not deal with her when she was in the

2    area in Estrella, did you?

3    A.   No.

4    Q.   And you didn't deal with her before you started

5    -- before she was transferred to your unit, right?

6    A.   No.

7    Q.   And the unit that she was transferred to, I've

8    heard it variously referred to but it's called the psych

9    unit, right?

10    A.   Correct.

11    Q.   But she doesn't have any mental health problems,

12    right?

13    A.   She doesn't have a serious mental illness. She

14    does have mental health issues.

15    Q.   Well, some of those that you indicated were

16    depression, correct?

17    A.   Correct.

18    Q.   Isn't it fair to say that an individual who is

19    facing first-degree murder charges and murder of their

20    husband has a reason to be a little bit depressed?

21    A.   Sure.

22    Q.   Wouldn't it be fair to say that a person who is

23    incarcerated has a reason to be depressed?

24    A.   Absolutely.

25    Q.   And you also mentioned anxiety, right?

1      A.   Correct.

2      Q.   Isn't it true that under the same circumstances

3  somebody who is facing a trial may be anxious about that,

4  right?

5      A.   Correct.

6      Q.   So you're not telling us the reasons why she was

7  depressed, are you?

8      A.   I can't tell you specifically with a bright line

9  exactly what was depressing Wendi or giving Wendi anxiety

10  at any specific given point in time.  The depression and

11  the anxiety certainly, the circumstances it would be

12  entirely and is entirely appropriate to be very upset.

13  However, the degree of impairment, that being

14  depressed or anxious, the degree of coping that a person

15  can muster in response to that depression or anxiety, that

16  is what would be -- that is what would be significant and

17  that is why Wendi remains in our unit.

18      Q.   I'm not asking you why she remained on your

19  unit.  I'm asking you whether you know a reason for her

20  depression or anxiety and the answer to that is no, isn't

21  it?

22      A.   I believe I've given you some of the reasons for

23  her depression and anxiety.

24      Q.   One of them could be that she is facing

25  first-degree murder charges, right?

1      A.   Correct.

2      Q.   One of the them could be that she is in a jail,

3   right?

4      A.   Correct.

5      Q.   One of the other things that you told us was that

6   you didn't conduct any tests, did you?

7      A.   I'm not qualified to do psychology testing.

8      Q.   You're just a social worker, aren't you?

9      A.   I am.

10      Q.   What that means is that you go in there, you try

11   to help, try to help based on your education, the

12   individuals that are transferred to your unit, right?

13      A.   That's correct.  But, actually, I believe in the

14   Arizona Revised Statutes, social work is the practice which

15   includes diagnosis and treatment of mental and emotional

16   disorders.

17      Q.   But you didn't do any tests, right?

18      A.   An assessment does not require -- an assessment

19   does not require specific testing, test instruments.

20      Q.   An assessment is basically you sitting down and

21   talking to her, right?

22      A.   That's part of an assessment, correct.

23      Q.   And then it requires you to vouch for her honesty

24   then, doesn't it?

25      A.   Wendi's honesty is not at issue with regards to

1   an assessment of depression or anxiety.  They're separate

2   things.

3        Q.   Well, you have to sit there and talk to her,

4   don't you?

5        A.   Sure.

6        Q.   And one of the things you told us about when you

7   sat down and talked to her was she was an emotional woman

8   and quick to cry.  Didn't you tell us that?

9        A.   I did.

10       Q.   That is your opinion, isn't it?

11       A.   That is what I observed.

12       Q.   And that is your opinion, right?

13       A.   The fact that she cried many of the times that I

14   sat and talked with her, that is a fact.

15       Q.   It may be a fact, so it leads to your opinion, as

16   you gave it to us, that she is visibly emotional and she is

17   very tearful and has a difficult time keeping emotions

18   inside.  That's your impression of her based on the year

19   that you treated her, right?

20       A.   Correct.

21       Q.   Did you ever view a videotape of her speaking to

22   the police on any occasions shortly after the murder?

23       A.   I did not.

24       Q.   Would it come as, being a social worker, would it

25   come as a surprise to you that she was laughing, flirting

1   with the police officer four hours after she killed her

2   husband?

3       A.   I do not have enough information to be able to

4   address that.  People respond in very different ways to

5   certain circumstances.  From the way you described that, it

6   sounds --

7       Q.   If you don't have --

8       A.   -- it sounds pretty cold.

9       Q.   If you don't have the information, you can't give

10   me an answer as to what was happening, right?

11       A.   Then I can't tell you that I would be surprised.

12       Q.   And the other thing is you don't have the

13   qualifications for that, do you?  You don't have a Ph.D.,

14   do you?

15       A.   I'm sorry, I don't have the qualifications?

16       Q.   To give us the opinion, right?

17       A.   Which opinion is that?

18       Q.   The opinion as to why she would engage in that

19   sort of conduct with a police officer shortly after the

20   killing?

21       A.   I could give you an opinion that would be a

22   professional opinion based on my status as a social

23   worker.  I don't need a Ph.D. to give you an opinion on

24   this issue.

25       Q.   One of the things you told us about her, just so

1   we found out how she is in that psych unit, is that if

2   there was something going on wrong, she would come to you

3   and tell you things about the other inmates, right?

4        A.   At times, yes.

5        Q.   There's a word for that called a "snitch," isn't

6   it?

7        A.   No.

8        Q.   Well, isn't -- let's go over -- you're familiar

9   with the term "snitch," aren't you?

10       A.   I am familiar with the term "snitch."

11       Q.   A snitch is somebody who tells on someone else,

12  don't they?  A figure of authority?

13       A.   A snitch is someone who tells on someone else in

14  order to gain some kind of -- some kind of reward or in

15  order to harm another inmate, in order to gain some kind of

16  favoritism.  Usually those things that are snitched on are

17  things that people are doing that are illegal and will

18  cause them trouble.  A snitch does not relay information in

19  order to be helpful to other people.  So she didn't -- her

20  behavior doesn't meet the definition of snitching.

21       Q.   A snitch is an individual, according to you, who

22  relays information, right?  Yes or no, that's what you

23  said?

24            MR. PATTERSON:  Objection.  That's not what she

25  said.

1           THE COURT:  Sustained.

2       Q.   BY MR. MARTINEZ:  With regard to this individual

3    who was a snitch, you indicated that they do speak to other

4    people about activities that they know about, right?

5           MR. PATTERSON:  Judge --

6           THE WITNESS:  That is part of the action.

7    However, in everyday living --

8           MR. MARTINEZ:  She's not being responsive.

9           THE COURT:  Overruled.  Go ahead and restate the

10   question if you'd like.

11      Q.   BY MR. MARTINEZ:  That's what she was doing, she

12   was providing you information.  Yes or no?

13      A.   If you're asking me if providing information

14   defines her as a snitch, the answer is no.

15      Q.   No, I'm asking you whether or not she was

16   providing you information on other inmates.

17      A.   She did provide information on other inmates,

18   yes.

19      Q.   And that's part of the reason why you liked her,

20   right?

21      A.   It's one of the reasons that she was a

22   stabilizing force on our unit.

23      Q.   And part of the reason why you liked her, right?

24      A.   I did admire the fact that she was looking out

25   after other people that were too fragile to look out after

1   themselves, yes.

2        Q.   So you admire her also in addition to liking her?

3        A.   I admire and like the fact that she was looking

4   out after other inmates.

5        Q.   I'm asking you isn't it true that you admire

6   her?

7        A.   I like the fact that and admire the fact that she

8   was looking out after other inmates.

9        Q.   Are you saying you don't admire her?

10       MR. PATTERSON:  Objection, Judge.

11       THE COURT:  Sustained.  Let's move on.

12       Q.   BY MR. MARTINEZ:  Ma'am, I don't know if you

13   admire her or not.  Can you tell me if you do or not?

14       MR. PATTERSON:  Objection.

15       THE COURT:  Let's move on.  Sustained.

16       Q.   BY MR. MARTINEZ:  Ma'am, when you were in the

17   jail, one of the things that, I guess that happens, is you

18   take notes of what's going on, right?

19       A.   Correct.

20       Q.   Where are your notes?

21       A.   My notes are in the file.

22       Q.   Where is that file, ma'am?  How come the State

23   doesn't have it?

24       A.   Well, you would have to ask -- you would have to

25   ask someone else.  It's not my job to provide the file.

100

1    Q.   But there are notes, right?

2    A.   Correct.

3    Q.   Now, one of the things that you told us was that

4  there was a suicide attempt, right, with a pencil, right?

5    A.   Yes.

6    Q.   That pencil is not a normal size pencil, is it?

7    A.   No.

8    Q.   That pencil is about this big, about two inches

9  long, isn't it?

10   A.   Correct.

11   Q.   Has a dull -- usually a dull point to it, right?

12   A.   Not if it's been sharpened in a pencil sharpener.

13   Q.   But the pencil sharpeners provided by the jail do

14  not provide for a very long point, they do?  They provide

15  for a very small point, don't they?

16   A.   I don't have specific knowledge of the pencil

17  sharpeners over at Estrella.

18   Q.   You worked there a year, right?

19   A.   No, I worked at the Durango psychiatric unit for

20  three years.

21   Q.   Now, and are you saying that perhaps the pencils

22  that are used at Estrella are different than the ones used

23  at Durango?  Is that what you're saying?

24   A.   At Durango we have a pencil sharpener in the

25  all-purpose room which is available to inmates at the

# APPENDIX N - Part 3

1  officer's discretion.  It's allows for an extremely sharp

2  point.

3      Q.   But you don't know if that's true with regard to

4  inmates at Estrella, do you?

5      A.   I do not.

6      Q.   This so-called suicide attempt, that got her out

7  of Estrella, didn't it?

8      A.   It did.

9      Q.   It got her out of isolation, didn't it?

10     A.   It did.

11     Q.   Tell me a little bit  -- since we don't have your

12  notes -- tell me a little bit more about the suicide

13  attempt?

14     A.   I was not -- I was not present.

15     Q.   But you had the notes.  You read them, didn't

16  you?

17     A.   Uh-huh.

18     Q.   Is that yes?

19     A.   Yes.

20          THE COURT:  Make sure you give a verbal response

21  ma'am.

22     Q.   BY MR. MARTINEZ:  Tell me what the notes said?

23     A.   The notes said that Wendi inserted a pencil into

24  her arm, that there was a lot of blood loss, that she was

25  taken to the hospital to the emergency room at Maricopa

1   Medical Center and that her arm was sutured.

2        Q.   How many stitches did it require?

3        A.   I do not recall.

4        Q.   Where was the pencil put?

5        A.   I do not know.

6        Q.   Would you agree, if you know this, tell me yes or

7   no, some areas are more vascular than others and result in

8   more bleeding than others?  Would you agree to that or if

9   you don't know, tell me that?

10       A.   I would agree to that.

11       Q.   And do you know what part of her arm she put that

12   pencil in?

13       A.   I do not know, specifically.

14       Q.   So it could have been her shoulder?

15       A.   I believe it was on her forearm.

16       Q.   But you just told me you didn't know?

17       A.   I know that it was somewhere on her forearm.

18       Q.   Is that based on the notes?

19       A.   Correct.

20       Q.   Would that be near her elbow?

21       A.   I don't know.

22       Q.   So you really don't know if it was a real suicide

23   attempt because you don't even know where that pencil went,

24   right?

25       A.   If it had not been -- if there had not been a

1    significant injury, she would not have been transported to

2    the emergency room in Maricopa Medical Center.

3         Q.   You don't make that decision, do you?

4         A.   I don't.   That's just in my experience.

5         Q.   You weren't there, were you?

6         A.   No.

7         Q.   You didn't see how much blood loss there was?

8         A.   I did not.

9         Q.   You can't even tell me what the notes say, right?

10        A.   Not that specifically, no.

11        Q.   You were talking about some of the items that she

12   was caught with and one of the things that you indicated as

13   part of that was that one of the other officers didn't like

14   her.  Do you remember saying that, he was judgemental, I

15   think is what you said?

16        A.   I do.

17        Q.   So it's not Wendi's fault with regards to

18   whatever issue arose, it's his fault because he is being

19   judgmental, right?

20        A.   No.

21        Q.   He was wrong and she was right, correct?

22        A.   No.   I believe what I said was that the issue for

23   which Wendi was written up, in my experience while on the

24   unit, other inmates would not have been written up for that

25   same experience, for the same incident.   I heard the

1    officer on a number of occasions speak about Wendi in a

2    negative way.  And so it was at the officer's discretion to

3    write her up.  It was completely within the boundaries of

4    being appropriate, you know.  They didn't doing anything

5    wrong.

6        Q.   You don't know why he thought negatively of her,

7    do you?

8        A.   I can only tell you according to the things that

9    I heard.

10       Q.   Yes, you can tell us that but you don't know why

11   he acquired this information about her as to why he would

12   believe negative things about her, do you?

13       A.   Well, actually, I kind of do.

14       Q.   Did you see those things with your eyes?  Do you

15   know what he's thinking?

16       A.   No, I can tell you what she said.

17       Q.   You can tell us what she said?

18       A.   Yep.

19       Q.   It's a female guard, correct?

20       A.   It is.

21       Q.   And one of the things that we know is that she

22   had some contraband with her, right?

23       A.   Correct.

24       Q.   And you're trying to tell us that it is no big

25   deal, right?

1    A.   I would say no big deal is a little bit too

2  casual.  But it was not -- it was not -- it was not

3  something that is intended to harm someone else.  It is not

4  something that was intended to harm herself.  It was not

5  something that would have been used in an escape.  So when

6  I say -- so the degree to which it was of concern was not

7  high as sometimes a write-up or disciplinary issue might

8  be.

9    Q.   You don't know what she was going to use those

10  for, do you?  So you can't say it wasn't going to be used

11  for escape or for favor, can you?

12    A.   No, I guess I can't.

13    Q.   And with regard to the items, what were the items

14  that you told us about?

15    A.   I believe there was an eye shadow and a lipstick.

16    Q.   Okay?

17    A.   And a pen.

18    Q.   With regard to the eye shadow, does the

19  commissary sell that?

20    A.   I don't believe they do.

21    Q.   No, they don't, right?  So somehow she was able

22  to get that from the outside world, wasn't she?

23    A.   Yes.

24    Q.   And that's not a good thing, is it?

25    A.   I don't think so, no.

1      Q.   No.  And that's really a violation of security

2    there at the jail, right?

3      A.   I agree.

4      Q.   And this honest person who never tried to deceive

5    the guards was able to surreptitiously get the eye shadow

6    in there, right?

7      A.   I believe that someone brought it in to her who

8    shouldn't have.

9      Q.   So you're saying it's not her fault?

10      A.   I'm not saying it's not her fault.  But, I'm

11    saying -- I'm saying that -- I'm saying there was

12    collusion, I guess.

13      Q.   There was collusion between her and somebody

14    else, right?

15      A.   I guess so.

16      Q.   Well, you said there was collusion.  Collusion

17    implies more than one person, right?

18      A.   Yes.

19      Q.   And she was the one that had it so it was her and

20    somebody else, right?

21      A.   Yes.

22      Q.   Now, what was the other item?

23      A.   A lipstick.

24      Q.   Again, does the commissary sell that?

25      A.   They do but not that lipstick.

1      Q.    And so that one was also smuggled into the jail,

2   right?

3      A.    Correct.

4      Q.    And, again, that implies that there's an issue

5   with security, right?

6      A.    Correct.

7      Q.    And this was during your watch, between September

8   of 2003 and September of 2004, right?

9      A.    Correct.

10      Q.    Even though there was this breach of security,

11   you thought they were not any big deal and so you allowed

12   her to remain there?

13      A.    There is some -- there is -- that's too general a

14   summation.  The fact is that in response to having the

15   contraband items she was transferred to the lower

16   functioning pod for 30 days and had some restrictions.  And

17   I don't think it was not a big deal but when you're looking

18   at all of the different issues that happen in a jail and

19   that take place in a jail and that take place on our unit,

20   that was not -- that particular contraband was not

21   extremely high on the scale.

22           The concern for security was, and absolutely

23   should have been, was to prevent something like that from

24   happening again.  They recognized that their security had

25   been -- there was a security issue and they needed to

1  address that, certainly it was.

2      Q.    In terms of punishment, that wasn't your call,

3  was it?

4      A.    It was a team decision.  We work as a team.  So

5  it was a team.  And then we conferred with detention as

6  well, but I was part of that decision.

7      Q.    It wasn't your call but you were part of that

8  decision?

9      A.    Yes.

10      Q.    The other thing you told us about was a pen,

11  right?

12      A.    Yes.

13      Q.    And, again, that's not something that she's

14  allowed to have, right?

15      A.    No.

16      Q.    And you told us that they are allowed to have

17  pencils but not pens, correct?

18      A.    Correct.

19      Q.    Staff's allowed to have pens on that unit?

20      A.    Yes.

21      Q.    Do you know what kind of pen it was?

22      A.    I believe it was a ball point pen.

23      Q.    And it was the kind you guys use, the staff uses?

24      A.    We don't have a specific single pen.  I mean, the

25  variety of pens is as diverse as it is in the community.

1    Q.   And she could have stolen it from somebody,

2  right?

3    A.   She could have but we don't believe that she did.

4    Q.   You don't believe that she did, right?

5    A.   I don't believe that she did, no.

6    Q.   Because you trust her because she's never been

7  deceptive, right?

8    A.   No, that's because I believe I know who gave her

9  the pen.

10   Q.   And she accepted that pen, right?

11   A.   Yes, she did.

12   Q.   She knew the rules, didn't she?

13   A.   She did.

14   Q.   And the other thing is is that should have caused

15  you great concern, shouldn't it, that she had a pen?

16   A.   It did cause me concern.

17   Q.   No, I mean great concern, is the way I phrased

18  it?

19   A.   Yes, great concern.

20   Q.   And part of the reason that it should have caused

21  you great concern is that you just told us that she used an

22  itty bitty little pen to poke herself in the arm and

23  attempted suicide, right?

24   A.   Yes.

25   Q.   And now she has this big pen and she could have

1  done real damage with it, right?

2      A.    She could have if she'd been suicidal at that

3  point in time.

4      Q.    She could have and more importantly she could

5  have done damage to the staff, right?

6      A.    She could have.

7      Q.    That has metal in it, doesn't it?

8      A.    I think it was a plastic pen.

9      Q.    So the interior of it didn't have any metal in

10  it?

11      A.    I would have to say I don't think so.  I think it

12  was a Bic plastic pen that was without the cap.

13      Q.    And the front of it does not have any metal on

14  it, right?

15      A.    I guess around the nib, maybe it has a little

16  metal bit.

17      Q.    With regard to her being in the Estrella jail,

18  you indicated that's probably the tougher of the two jails

19  to be in, right?

20      A.    I think so, yes.

21      Q.    And so it was sort of a good thing for her, if

22  you will, that she was transferred to Durango because she

23  didn't have to deal with some of the things that happened

24  in the Estrella jail, right?

25      A.    Correct.

1      Q.   And yet she did not technically belong on the

2   psych word, did she?

3      A.   No, that's incorrect.

4      Q.   Well, she didn't have any mental illness that you

5   told us about, right?

6      A.   She didn't have a serious mental illness but she

7   had significant mental health issues.

8      Q.   Those were depression and anxiety right?

9      A.   Those were depression and anxiety, but there was

10  also the fact that she had a very difficult issue with

11  regard to copping skills.  She had, I think, experienced a

12  lot of, I guess I would say traumatization having gone into

13  jail and having been through or committed the actions for

14  which she's been found guilty.  And those things were never

15  dealt with in anyway.

16     Q.   So you're saying she was traumatized because she

17  killed her husband?

18     A.   You bet.

19     Q.   Even though she did it herself?

20     A.   Yes.  Absolutely.

21     Q.   One of the things that you told us was that this

22  was a tougher jail, the Estrella jail.  But you don't know

23  how she got along in that other jail, do you?  Were you

24  there on a daily basis?

25     A.   No.

112

1     Q.   Did you see how she interacted with the other

2   inmates?

3     A.   No.

4     Q.   You don't know, for example, that she could be,

5   you know, like somebody that is a ring leader as opposed to

6   somebody who is a bully?

7     A.   Absolutely.

8     Q.   You claim she's easily manipulated by others.

9   You told us that, right?

10    A.   I think -- I think I characterized that a little

11  bit differently.  I think she can be gullible and naive.  I

12  think that's different than being easily manipulated.

13    Q.   Ma'am, I wrote it down.  You said, "She is easily

14  manipulated by other inmates."  Did you want to move away

15  from that now?  We'll move on.

16    A.   I would say gullible and naive.  I don't

17  want to -- I'm not trying to be difficult.  I just want to

18  be precise.  In certain circumstances she may be

19  manipulating but I'd say it's more gullible and naive with

20  regards to the way people present things to her.

21    Q.   Did you say, yes or no, she was easily

22  manipulated by other inmates?

23         MR. PATTERSON:  She's not required to say yes or

24  no.  She's explained her answer.

25         THE COURT:  Sustained.  Move on.

000008590

1      Q.   BY MR. MARTINEZ:   How do you know she was easily

2   manipulated in the Estrella jail?

3      A.   I couldn't speak to Estrella jail.   I don't have

4   enough information right now to give you anything but a

5   general overview.

6      Q.   One of the things that you told us was that

7   inmates lie.   Do you remember telling us that?

8      A.   Absolutely.

9      Q.   And then, on the other hand, you presented this

10  picture to us of the defendant that, in your view, does not

11  lie, correct?

12     A.   With regards to the things she told us about

13  other inmates, with regards to the information she gave

14  us.   I'm not going to tell you that Wendi never lies.   I

15  mean that's. . .

16     Q.   No.   No, you did indicate to us, didn't you, that

17  she never lied to the staff, wasn't deceptive, didn't you

18  tell us that?

19     A.   I told you she was not deceptive to staff when

20  she told us about other inmates, when she spoke with us.   I

21  don't, you know, she may have -- I would say that lying,

22  more than anything if there would be issues of lying, it

23  would be omission of information.

24     Q.   So what you're telling us is that she, based on

25  what you saw of her that year and based on the information

1  that she's provided, is that she's somebody that's

2  trustworthy to you, right, and that you admire.

3        A.   I would say that in most circumstances, my

4  experiences with her were that she was trustworthy and

5  there were behaviors that she engaged in that I found

6  admirable.

7             MR. MARTINEZ:  I don't have anything else.

8             THE COURT:  Mr. Patterson.

9

10                     REDIRECT EXAMINATION

11  BY MR. PATTERSON:

12        Q.   So we understand what you're telling us,

13  Ms. King, there's a number of items that are classified as

14  contraband in a jail setting?

15        A.   Correct.

16        Q.   Drugs.

17        A.   Correct.

18        Q.   Weapons?

19        A.   Yes.

20        Q.   I gather you're telling us in the continuum of

21  contraband what she was found with is on the lower end on

22  the continuum?

23        A.   Correct.

24        Q.   And she was sanctioned or penalized as a result

25  of having the contraband?

1    A.   Yes.

2    Q.   You said it was 30 days in -- what's the D pod?

3    A.   It was in the lower functioning female pod.  She

4  was on what's called "full restriction."  And that was

5  something the officers wrote up.  They could have chose to

6  put in a request for disciplinary segregation, lock down.

7    Q.   And it was appropriate for the circumstances?

8    A.   Yes.

9    Q.   That was a team decision?

10    A.   It was a team decision with the psychiatric staff

11  and we talked with the officers about it and they thought

12  it was appropriate as well.

13    Q.   So with regards to a team decision?

14    A.   Yes.

15    Q.   You mentioned that there was one guard that had a

16  negative impression or things to say about Wendi.  Was that

17  the only guard in that entire unit that had that position?

18    A.   To that degree, I would say.  One of the issues

19  was a number of the mental health staff felt that -- we

20  felt that it was important that Wendi stay on the unit

21  because we felt that she would benefit from being there.

22  Other officers who where there -- and this is not true with

23  regards to Wendi alone -- many times we have discussed

24  about who should stay and why they should stay.  Sometimes,

25  you know, some people feel that we should only have people

1    who are just completely screaming at the moon and strip

2    naked and that as soon as someone is willing to keep their

3    clothes on they should be shipped back to general

4    population.  So on the unit we have a population that's

5    very mixed.  It really depends on the population of inmates

6    at the time, who's working with whom, what the census is.

7    Depends on a lot of different things.  There's no bright

8    line into who should stay or who should go unless someone

9    is very predatory or is malingering or really, is really

10   making a lot of trouble.  But other than. . .

11        Q.   That wasn't Wendi?

12        A.   No, that wasn't Wendi.

13        Q.   She's not predatory or not malingering or

14   creating difficulties for the staff or other inmates?

15        A.   No.

16        Q.   So this one guard's negative perception is based

17   upon her belief that she should be sent to general

18   population?

19        A.   Correct.

20        Q.   Just so we're clear, essentially, you were

21   employed by the jail or were employed by the jail system

22   back at that time, right?

23        A.   I was employed with Correctional Health

24   Services.  I work within the county jail system.

25        Q.   You have no connection with the officers?

117

1      A.    No.

2      Q.    And we've not agreed to pay you anything for this

3  testimony?

4            MR. MARTINEZ:  Objection, beyond the scope.

5            THE COURT:  Overruled.

6            Answer the question.

7            THE WITNESS:  I haven't been offered anything,

8  yet.

9      Q.    BY MR. PATTERSON:  You've got a plane ticket to

10  Albuquerque?

11     A.    Yeah.

12     Q.    And lastly, do you know any of Wendi's immediate

13  family?  Are you friends with Alejo Ochoa or Donna Ochoa?

14     A.    I don't know any of those people.

15           MR. PATTERSON:  That's all I have, Your Honor.

16           THE COURT:  Are there any questions for the

17  witness from the jury?  If so, raise your hand.  No one

18  raised a hand.

19           May this witness be excused?

20           MR. MARTINEZ:  I need to review my notes.  Yes.

21           MR. PATTERSON:  Yes, Your Honor.

22           THE COURT:  You may step down.  Thank you.

23           MR. PATTERSON:  Call Dr. Perry.

24           THE COURT:  Please step up here.

25           (Witness sworn.)

1          THE COURT:  Have a seat on the witness stand.

2   Make yourself comfortable on the witness.  Please remember

3   to speak loudly and clearly so everyone can hear you.

4   Please wait until the question is completed before you

5   answer the question.  And please make sure to give a verbal

6   response.

7          Is that agreeable to you?

8          THE WITNESS:  Yes.

9          THE COURT:  Mr. Patterson, you may proceed.

10          MR. PATTERSON:  Thank you, Judge.

11

12                    GERALD PERRY,

13   called as a witness herein, having been first duly sworn,

14   was examined and testified as follows:

15

16                   DIRECT EXAMINATION

17   BY MR. PATTERSON:

18       Q.   Your name, sir?

19       A.   Dr. Gerald Perry.

20       Q.   P-e-r-r-y?

21       A.   That's correct.

22       Q.   And by whom are you employed?

23       A.   Correctional Health Services, Maricopa County.

24       Q.   How long you been with Correctional Health

25   Services?

1      A.    Since October of 2003.

2      Q.    What do you do at Correctional Health Services?

3      A.    I'm a clinical psychologist, the psych unit,

4  basically.  Clinical psychologist is charged with the

5  management of patient assessment, suicide treatment.

6      Q.    Tell us what you did prior to taking a position

7  with Correctional Health Services?

8      A.    Well, for the previous nine years I was in

9  private practice in Philadelphia.

10     Q.    What kind of private practice?

11     A.    General adult practice, specialized in eating

12 disorders, the rest of my practice was general practice for

13 adults.

14     Q.    What educational background do you have for your

15 profession?

16     A.    I have a Doctor of Psychology degree, clinical

17 psychologist from Hahnemann University, Bachelor's of

18 Science.  I went to Penn State University for two years

19 prior to that as a Psychology major.

20     Q.    Can you describe for me in general the

21 psychiatric unit at Durango, what that encompasses?

22     A.    Well, it's male and female.  There are four,

23 what's called "pods" with approximately, maybe 15 or so, 20

24 patients.  Two pods for males and two for females at

25 opposite ends of a large multipurpose room.  There is a

120

1    wooden area which to goes up to practically, well, probably

2    ten, 15 feet high separating the males and females.

3         And then there is an office area in the back with

4    different counseling offices and that's where the staff

5    works.

6    Q.    Okay.  Is there a second division made between

7    inmates based upon the functioning levels?

8    A.    Yes, somewhat.  There are pods for each males and

9    females and there is one pod usually for actually more

10   severely disturbed inmates and one for more stable inmates.

11   Q.    So is, at some point in time, did Wendi Andriano

12   become a person on your case load?

13   A.    Yes.  Wendi was admitted prior to my being hired

14   there from the general population by Dr. Garcia who had

15   been seeing her in an outpatient department when I came on

16   the D 2, inpatient unit.  I had picked up Wendi's case when

17   Dr. Hofford left, who was my predecessor.

18   Q.    Do you know the facts and circumstances that gave

19   rise to her winding up in the psychiatric unit at Durango?

20   A.    Yes.  I reviewed the chart and I also talked with

21   Dr. Garcia who sent her over and she had a pretty serious

22   suicide attempt while in the general population.  Had cut

23   an artery in her arm and lost significant amount of blood.

24   It was a very serious attempt.  She could have died if she

25   hadn't gotten treatment.

1      Q.    What kind of treatment was rendered for her?

2      A.    She was given medical treatment.   I believe she

3   was sent to the hospital and treated there.   Had sutures,

4   came back and was sent to the psychiatric unit for

5   observation and treatment.

6      Q.    When you acquired her as a patient on your case

7   load, what was your initial efforts in that with regard?

8   What do you do to become familiar with the patient and the

9   patient's needs?

10     A.    We assess and review the chart and talk with

11   Dr. Garcia.   I also met with Wendi and did the basic

12   admission evaluation where I went over her history and did

13   mental status examination and diagnosis and treatment plan.

14     Q.    Okay.   Let's take that incrementally.

15           What's a mental status evaluation?

16     A.    It's basically similar to what medical doctors do

17   which is called a "review of symptoms."   They look at your

18   eyes, your ears and throat and so forth, go through the

19   different parts of the body.   A mental status examination

20   is basically looking at a different area of cognitive and

21   emotional functioning, social functioning and so forth.

22     Q.    Okay.   Have you ever found her to be suffering

23   from a major mental illness?

24     A.    No.

25     Q.    And what -- give me, for example, if you will,

1   what a major mental illness would be?

2        A.   Well, probably the majority of the patients come

3   to a psychotic break with reality.  They don't understand

4   reality as we know it.  They're often paranoid,

5   delusional.  Many of them are hearing voices.  That would

6   be a major mental illness.  Schizophrenia or bipolar with

7   psychotic features.

8        Q.   Wendi didn't suffer from that kind of

9   symptomatology, as we speak today?

10       A.   That's correct.

11       Q.   But she did have a mental health issue?

12       A.   Yes.  The issues that are primarily a response to

13   her situation, the stress of being in general population,

14   the stress of the charge, the stress of being away from her

15   life as she knew it, and it just came to an abrupt kind of

16   ending.  In general population, when she made the suicide

17   attempt, the thing that concerned me was there was no

18   warning.  Usually people will threaten suicide, they will

19   talk about it and so forth and there is no mention of that

20   at all.  And she had been followed by both counseling from

21   the outside, who was coming in to see her on a regular

22   basis, and being followed by one of our counselors in

23   jail.  It happened so abruptly that I think that that

24   certainly concerned me.  She didn't really give a lot of

25   warning.  No signs.

000008600

1        Q.   And those that give warning, they're generally

2    less serious about the suicidal effort or can you draw any

3    kind of conclusion in that regard?

4        A.   Well, people that have serious suicides, or

5    suicide attempts, often do threaten suicide before that

6    incident.  It's not accurate that a lot of the people will

7    say, well, if you talk about it maybe you're not going to

8    do it.  That's not true.  People do do it.  But, the thing

9    that's concerning is that there was no barometer for the

10   amount of suicide potential that could exist at any given

11   time.

12       Q.   Okay.  So, I guess what I'm getting at, as a

13   potential you couldn't address it or deal with it or make

14   an effort to preclude its happening, is that what you're

15   telling us?

16       A.   In the sense, well, we did make, I mean, the

17   potential was there, the potential as I said it was for an

18   abrupt suicide attempt, without warning, which is why she

19   stayed on the psychiatric unit and why she was bunking with

20   a cell mate and at the time put on check.

21       Q.   What did you do, then, to help her deal with that

22   suicidal ideation?

23       A.   Well, it seems to have been what I would call a

24   "brittle response to stress" that she just had abruptly

25   took over.  What I had seen in her subsequent is not

1   something that she talked about or was even conscious of.

2   It was something that was on her mind afterwards.  So it's

3   really been much of an issue afterwards.  It is the

4   potential reason, more the issue than actually her talking

5   about it or anything.

6        Q.   What was your treatment methodology you employed

7   to assist her in that regard?

8        A.   I saw Wendi on a weekly basis and she was also

9   seen by a counselor, Ms. King, who I believe testified

10  earlier.  And she was also seen by a psychiatrist and put

11  on medication to help with depression and also with stress.

12       Q.   Okay.  And talk to me about her depression.  Is

13  there depression evident in her situation?

14       A.   I think Wendi has a degree of depression that is

15  not as obvious as it is for many people.  She tends to

16  smile, be pleasant, she's very cooperative and easy to work

17  with and seems to want to please people.  Yet, when I would

18  talk to her and ask her some very basic questions, she'd

19  often break into a stare while she was smiling.  So her

20  feelings are just under the surface beneath this kind of

21  pleasant smiling exterior.  She would cry very easily.

22       Q.   Is she on any medication currently?

23       A.   Yes.  I believe she's on Zoloft, Ativan and

24  Seroquel.

25       Q.   What is Zoloft?

125

1      A.   An antidepressant.  We have Ativan, which is

2   anxiety and Seroquel is also anxiety medication.  It's also

3   as sedative.

4      Q.   Seroquel is also a sleep aid?

5      A.   It can be used as such.  Such side effect is also

6   common side.

7      Q.   So describe to me Wendi, in terms of mental

8   personality.  Start with intelligence?

9      A.   I didn't test her intellectually but just in

10  getting to know her this past year I would say she's

11  probably above average.  She's articulate.  She's has a

12  good use of vocabulary.  She's able to understand fairly

13  complete sophisticated abstract concepts.

14     Q.   Was she cooperative with the folks in charge

15  there at the psych unit?

16     A.   She's always been cooperative with me and

17  cooperative with the staff that I know of.  She's, as I

18  said, she has a tendency to want to please people and

19  always basically smiling and pleasant.  She's very

20  amiable.

21     Q.   How does she deal with controversy or

22  confrontation?

23     A.   Wendi is not somebody who really deals well with

24  that.  She has or has had at least a passive response to

25  confrontation.  In the past she would often isolate or hold

1   back her feelings.  One of the things, in fact, we worked

2   on her with was learning assertiveness skills so she could

3   deal with confrontation.  The more direct manner would

4   escalate the situation.

5        Q.   And in that regard, what do you teach or counsel

6   with regard to development of assertiveness skills?

7        A.   Well, I don't know how far you want to go into

8   this.  I talked to about doing some assertiveness training

9   exercises with Wendi and I believe she did basically.

10  There's three responses.  There is an aggressive response,

11  passive response and assertive response, which most people

12  have to confrontation.  Assertive, would be to get your

13  point across without escalating the situation or be in any

14  way personally vindictive or damaging and she has a lack of

15  those skills.  First, she would tend to be very passive.

16       Q.   Seen in the jail setting assisting other inmates?

17       A.   Yes.

18       Q.   Tell me about that?

19       A.   Well, she's in the pod that is a more stable

20  pod.  And we nevertheless get people that are very fragile

21  emotionally.  We've had a gal in there who was pregnant and

22  away from her family and going through a lot of emotional

23  stress and she would often be emotionally comforting and

24  help every time to the degree that wasn't good for her.

25  She would say if she would withhold what she felt was more

1    support than enough, she would feel guilty.   No

2    assertiveness to be able to say no to people and not try to

3    meet everybody's needs.

4         Q.   Would she serve as intermediary, if you will,

5    between inmates who had problems but weren't capable of

6    voicing them to the staff and communicating their need with

7    Wendi and she would come to you folks and talk about other

8    inmates needs?

9         A.   Yes.   There were a few occasions where someone

10   had confided in her that they're fooling suicidal or were

11   cutting themselves surreptitiously and she would come to

12   staff and tell us so we could handle the situation.

13        Q.   Did you sense that she is doing that for her own

14   benefit?

15        A.   I had a sense that she was doing it because she

16   would feel guilty if she didn't do it.

17        Q.   If she failed to help these persons in their time

18   of need?

19        A.   Yeah, I think she just thought it was the right

20   thing to do.   I don't think she got anything back for it.

21        Q.   Any compensation?

22        A.   No.

23        Q.   Did you see Wendi assist in terms of clean up,

24   taking care of messy cell situations?

25        A.   Yeah.   Well, one of our rules is that the inmates

1   in there do clean their own pod and own cells.  She would

2   always take -- she's higher functioning than a lot of

3   people would be.  She often takes more of a lead for people

4   who need a little bit of help in structure.

5        Q.    Have you seen any growth and development in Wendi

6   from the point in time you first acquired her as your

7   patient to today?

8        A.    Yes, I have in terms of assertiveness.  We talked

9   about in terms of her not feeling guilty for having to meet

10  everybody's need.  I think she's grown with regard, of

11  course, she's been in jail for four years.  I haven't known

12  her prior.  My experience is limited to the last year.

13       Q.    What I mean is in the period of time you have had

14  contact with her as a patient, have you seen growth and

15  development?

16       A.    Yes, I have.

17       Q.    And educable in terms of accepts instruction and

18  building from it and applies what she's been given from

19  professionals like you?

20       A.    Yeah, she's become very receptive and motivated

21  to anything you presented to her.

22       Q.    Does she manifest any kind of naivete or

23  gullibility?

24       A.    Yeah, to some degree she does.  In fact, one of

25  the stressors for her being in the general population is

1    the majority of the people are repeat offenders who have

2    certain street-wise abilities that Wendi doesn't have.   I

3    think it was hard for her to maintain herself in general

4    population.   But you have to kind of be tough and you have

5    to not cry all of the time and so forth.   I think that it

6    was very difficulty for Wendi.   So that's another stressor

7    in the general population.

8         Q.    Okay.   Were you aware that she was caught with

9    contraband on one occasion?

10        A.    Yes.

11        Q.    Some cosmetics?

12        A.    Yes.

13        Q.    Where did that fall in the psychiatric unit?

14        A.    The contraband on the psychiatric unit is a

15   little bit more serious than it is in general population.

16   We have people who are suicidal.   The general population

17   people, with some compact mirrors, they don't abuse them

18   but in the psychiatric unit, that could be a weapon to help

19   have somebody hurt themselves.

20        Q.    Is that why she was sanctioned for possession

21   that contraband?

22        A.    Yes.

23        Q.    You were involved in that sanctioning decision?

24        A.    No, I don't get involved in that.   The detention

25   officers take care of that.

000008607

1     Q.   And, again, you are employed by the Correctional

2  Health Services people?

3     A.   That is correct.

4     Q.   Not employed by the Office of the Public

5  Defender?

6     A.   No.

7     Q.   And you have no expectation of being paid for

8  your testimony today?

9     A.   No.

10          MR. PATTERSON:  That's all I have, Judge.  Thank

11  you.

12          THE COURT:  Mr. Martinez.

13

14                    CROSS-EXAMINATION

15  BY MR. MARTINEZ:

16     Q.   This issue of the contraband, what contraband was

17  it?

18     A.   I believe -- I didn't see it directly but I think

19  I believe the officer said it was a lipstick and compact.

20     Q.   Anything else?

21     A.   No, that's all I'm aware of.

22     Q.   So it was just lipstick and compact?

23     A.   As far as I know.

24     Q.   You indicated that she was not street-wise and

25  that may have contributed to the problem she had in the

131

1  Estrella jail, correct?

2      A.   Yes, I think it increases the stress for her.

3      Q.   But you're not sure of that because you weren't

4  even on staff when she was there, correct?

5      A.   I didn't witness that directly, you're right.

6      Q.   And you don't know how she interacted with the

7  other people, do you?

8      A.   No, I don't.

9      Q.   In other words, she could have been the director

10 of, instead of the person that was, as you put it, bullied

11 around, right?

12     A.   I'm sorry?  I didn't hear you.

13     Q.   She could have been the person who actually was

14 doing the directing rather than her being bullied around,

15 right?

16     A.   It's not consistent with what I know of her.  But

17 as in anything else, I can't talk about what I didn't see.

18     Q.   You can't talk about what you don't know.  In

19 other words, you don't know what actually happened in the

20 Estrella jail, right?

21     A.   That's correct.

22     Q.   And when did you come over to CHS or Correctional

23 Health Services?

24     A.   Was in October of 2003.

25     Q.   Tell me about the suicide attempt.  Where did

1  it -- what was used as a implement?

2      A.   I believe it was a compact mirror had been

3  broken.

4      Q.   And that was used in the suicide attempt, right?

5      A.   Yes.

6      Q.   You know where on this compact mirror she used it

7  on herself?

8      A.   I believe it was on her arm, around the crack of

9  her forearm.

10     Q.   And could it have been somewhere else?

11     A.   No, I don't think so.  I think in that general

12  area.

13     Q.   And the crack of the forearm would be near the

14  elbow?

15     A.   Yeah.

16     Q.   And what kind of -- you indicated there was an

17  artery that was cut, I think?

18     A.   Well, I think the amount of blood that was lost

19  would have probably had to have been arterial.

20     Q.   But there was some blood loss.   You didn't see

21  the scene, right?

22     A.   No, I didn't.

23     Q.   You don't really know how much blood was lost,

24  right?

25     A.   Just what was in the chart.

1    Q.    Was there some indication in the chart that there

2    was blood, right?

3    A.    That's correct.

4    Q.    And after she cut herself with the compact, then,

5    she was taken over to Maricopa Medical Center, right?

6    A.    Yes.

7    Q.    And do you know what kind of treatment she

8    received, if anything?

9    A.    Well, I know she received sutures and I guess --

10   I don't know what else she received, no.

11   Q.    You tell us that this suicide attempt was that

12   she is suffering from stress, right?

13   A.    Yes.

14   Q.    And stress brought on by the charges, I believe

15   you indicated, right?

16   A.    Yes.

17   Q.    The stress brought on by being in the general

18   population, correct?

19   A.    Yes.

20   Q.    And being away from others in her family?

21   A.    Yes.

22   Q.    Then you indicated that once she is transferred

23   over to the psych pod -- see if I have it right -- it is

24   not on her mind any more but after it was done and she's in

25   the psych ward, I got the impression you said she was okay?

1    A.    No, I didn't say she was okay.  What I said was

2  that I didn't think that it was ongoing activity, part of

3  what she was thinking that she was intending to hurt

4  herself.

5    Q.    And from what I understand, it was an isolated

6  incident.  She did suffer some sort of -- she didn't suffer

7  major medical -- not medical.  She didn't have major mental

8  issues, correct?

9    A.    That's correct.

10    Q.    She suffered from, I guess, depression and

11  anxiety?

12    A.    Yes.

13    Q.    That would be fair?

14    A.    Yes, that's fair.

15    Q.    And there was some disagreement about whether she

16  should stay in the psych ward, wasn't there?

17    A.    Yes, there was.

18    Q.    Part of the reason she stayed there was that

19  people liked her, right?

20    A.    Well, I don't think that was -- I mean, people

21  did like her but that wasn't why she stayed.

22    Q.    I guess the impression from you and also from the

23  previous witness that she was a little bit of a favored

24  child.  In other words, she's best in the psych word; is

25  that true?

1     A.   She is the highest functioning, pleasant person

2 that we worked with there, yeah.

3     Q.   And highest.  You didn't test Wendi

4 intelligence.  Just from talking, you indicated whether or

5 not she was above average in intelligence?

6     A.   I would estimate that, yes.

7     Q.   You indicated that her emotions were right

8 underneath the surface, correct?

9     A.   That's correct.

10    Q.   And that if something was really traumatic then

11 they would come to the surface and she would begin to cry?

12    A.   It didn't even have to be traumatic.

13    Q.   So minor stuff, what you consider minor, that

14 would make her cry?

15    A.   If you asked how she was doing, she would cry

16 when she first come over.  I mean, it didn't take much.

17    Q.   How has she been later?

18    A.   Later she still tended to cry easily but not --

19 she wasn't quite as fragile in the sense as she was when

20 she first came in.

21    Q.   Would it still be minor stuff that she would cry

22 over?

23    A.   Not that minor as that example I gave, but, for

24 example, if I asked her, if she started talking about her

25 children, she would cry.

1    Q.   And you were there at the jail when you come on?

2    A.   I'm sorry?

3    Q.   When did you come on as head of CHS?

4    A.   No, no I'm just a clinical psychologist on the

5  inpatient unit.

6    Q.   Did you ever give her any tests or any MMPI or

7  anything like that?

8    A.   No.

9    Q.   That's because it wasn't called for, right?

10    A.   That's correct.

11         MR. MARTINEZ:  And I don't have any further

12  questions.

13         THE COURT:  Redirect.

14         MR. PATTERSON:  I have no further questions.

15         THE COURT:  May this witness be excused?

16         MR. MARTINEZ:  Yes, sir.

17         THE COURT:  No objection, Judge.

18         Mr. Patterson, you may call your next witness.

19         MR. PATTERSON:  Thank you, sir.

20         THE COURT:  Please step forward right here to the

21  clerk.  She will swear you in.

22         (Witness sworn.)

23         THE COURT:  Please have a seat on the witness

24  stand.  Please make yourself comfortable on the witness

25  stand.  Please remember to speak loudly and clearly so

1    everybody can hear.  Please wait until the question is

2    complete before you answer the question.  And please make

3    sure you give a verbal response.

4              Is that agreeable to you?

5         THE WITNESS:  Yes.

6         THE COURT:  Mr. Patterson, you may proceed.

7

8                    JOYCE VAN EVERY,

9    called as a witness herein, having been first duly sworn,

10   was examined and testified as follows:

11

12                  DIRECT EXAMINATION

13   BY MR. PATTERSON:

14        Q.   Would you introduce yourself, ma'am?

15        A.   I'm Joyce Van Every.

16        Q.   Would you spell your last name for us?  It's not

17   a common name like Smith.

18        A.   It's V-a-n, E-v-e-r-y.

19        Q.   By whom are you employed?

20        A.   Maricopa County.

21        Q.   And in what capacity do you work for them?

22        A.   Lead nurse at Durango psychiatric unit.

23        Q.   And how long have you been a person in that job?

24        A.   Well, I've been with Correctional Health for two

25   and a half years.  I've been the lead nurse at Durango unit

1  since January of this year.

2      Q.    What qualifies you to serve as nurse in Durango

3  psych facility?

4      A.    Well, I have B.S. in Nursing.  I have 25 years of

5  psychiatric experience.

6      Q.    Tell me a little bit about your work in the

7  psychiatric nursing business?

8      A.    I started out at Eastern State Hospital in

9  Oklahoma.  I went to another in Missouri.  I worked a

10  32-bed psychiatric unit.  Then I went to a 125 bed

11  psychiatric unit in Oklahoma.  Then I worked eight years in

12  the state hospital here in Arizona.  I worked one year at

13  Perryville State prison, psychiatric nurse.  I was

14  assistant director of nursing in Tennessee.  I then ended

15  up in Correctional Health.

16      Q.    What do you do as a lead nurse at the Durango

17  psych facility?

18      A.    Well, I do scheduling.  I do payroll.  I also

19  have a patient load that I see.  I assist the doctors, both

20  medical and psychological.  Take care of emergencies, man

21  downs.  I do a little bit of everything.

22      Q.    Tell us about the facility there at the Durango

23  jail, the psych unit?

24      A.    The psychiatric unit is known as, we're kind of

25  the kinder, gentler psychiatric unit of the jail.  We do

139

1    have all female prisoners.  There are four pods A, B, C and

2    D.  The A, B pods are the males.  All males start out in A

3    pod and progress.  As they get stable, they go to B pod.

4    The females start on D pod and as they progress they go to

5    C pod.

6        Q.   Okay.  What then -- well, let's go on then.   Is

7    there a patient on your case load or patient load by the

8    name of Wendi Andriano?

9        A.   Yes, sir.

10       Q.   And it's the lady seated behind me?

11       A.   Yet.

12       Q.   When did you first acquire Wendi on the patient

13   case load?

14       A.   January of this year.

15       Q.   When you came on?

16       A.   Yes.

17       Q.   And what do you do on a daily basis with Wendi

18   Andriano?

19       A.   I see her every day that I'm there.  Check with

20   her, see how she's doing.  At least once a week I sit down

21   with her, have what we call a one-to-one talk about what's

22   going on.  How is the medication.  How is she feeling.

23       Q.   Let's talk, start with the medication, what

24   medication is she currently taking?

25       A.   She's taking an antidepressant, Seroquel, and

1   Ativan, antianxiety, and Zoloft.

2       Q.   What exactly is Zoloft?

3       A.   It is a pill to help with the depression.   You

4   have to take it for a while before it helps the depression

5   symptoms.   It doesn't alleviate the depression just helps

6   you kind of manage the depression.

7       Q.   Just deal with it?

8       A.   Yes.

9       Q.   All right.   How about Seroquel?

10      A.   Seroquel has got stronger effects.   It can help

11  calm racing thoughts.   And in Wendi's case, that's probably

12  for what it was used for.

13      Q.   And Ativan?

14      A.   Ativan is antianxiety.

15      Q.   And this group of medications are generally

16  administered to what kinds of a patient?

17      A.   Psychiatric patients.

18      Q.   And patients that manifest certain kinds of

19  symptomatology need some medication, are designed to deal

20  with?

21      A.   Symptoms of depression, symptoms os anxiety, such

22  as crying, sleeplessness, unable to cope.

23      Q.   Have you talked with Wendi at times about her

24  husband, Joe?

25      A.   Yes, I have.

1     Q.   What is her demeanor and her attitude when you

2   talk about Joe?

3     A.   Wendi has been very tearful, has been very

4   depressed.  She would cry during the interview at times.

5     Q.   Did she ever blame Joe for her circumstance?

6     A.   No, sir.

7     Q.   Did you talk about her children?

8     A.   Yes.

9     Q.   What kind of emotional response did you observe

10   at that time?

11     A.   Wendi was extremely emotional about her

12   children.  I've seen her when it was her kids' birthdays

13   and she was crying, very distraught, you know.  This is

14   another birthday she had missed, another passing.

15     Q.   Did she talk to you about Joe's cancer?

16     A.   Yes, sir, she did.

17     Q.   What did she talk about in that regard?

18     A.   We talked about people with cancer.  Having to

19   live with people with chronic illnesses and how difficult

20   that can be.  At the time, she said Joe had talked about

21   suicide.  We talked about that that was common with people

22   with chronic illnesses.  Just how hopeless she felt.

23     Q.   Okay.  Did she feel that helpless in the sense

24   she couldn't help him with his situation?

25     A.   Yes.  She said it was very hard to watch somebody

1   in that situation.

2       Q.   Talk to me about Wendi's interaction with other

3   inmates there at the psych facility.  What did you observe

4   in that regard?

5       A.   Wendi has been almost a model inmate.  She is in

6   C pod.  She attends groups when they are given.  She has

7   acted as a baby-sitter, for lack of a better word, for

8   people that have been suicidal.  We need somebody to kind

9   of watch them besides the staff, somebody that is there all

10  the time.

11          She can be kind of naive about inmates.  She had

12  some problems.  We had a couple of inmates that came in and

13  told us they were pregnant.  And Wendi give away her

14  blanket and gave away food.  And was kind of babying them

15  and they turned out not to be pregnant.  Staff knew that,

16  but you can't break confidentiality.

17      Q.   Is that part of what motivates Wendi is to be

18  helpful in assisting other persons?

19      A.   What I saw with Wendi was she tries to be helpful

20  and she alerts us to problems on the unit with other

21  inmates.  If she notices a change in a peer's behavior, she

22  would tell us about that.  She had a real tendency to

23  mother patients.

24      Q.   Did she receive any benefit from staff, extra

25  commissary, that kind of thing as a result of her

1  assistance to staff?

2       A.   Staff can't do that.

3       Q.   Okay.   The answer?

4       A.   No.

5       Q.   Did Wendi suffer from any serious mental

6  disorder?

7       A.   Are you talking about schizophrenia?

8       Q.   Yeah.

9       A.   Not to my knowledge.

10      Q.   Nothing in the chart?

11      A.   I have seen her depressed.   I have seen her

12 anxious.   And I believe she was diagnosed of that.

13      Q.   Okay.   Would you use the term "naive" to describe

14 Wendi's behaviors?

15      A.   Yes.

16      Q.   Tell me about that.

17      A.   Just she seemed to fall for any sob story.   After

18 you work in the jail for a while, you have repeat offenders

19 that come in almost on a routine basis.   They would tell

20 Wendi, you know, their boyfriend had left her or, you know,

21 like having a baby.   And Wendi would kind of fall for the

22 story.   Like I said, she tended to baby them.   Would gave

23 them extra food.   Food is a very precious item in jail and

24 to share food is very rare.   That's not something that

25 usually you do.   You usually keep your food for yourself.

144

1   An extra blanket is like gold.  You get one blanket, one

2   sheet.  And if you have an extra blanket, it has to be for

3   a medical condition that you have.  For Wendi to give her

4   blanket up was something special.

5           MR. PATTERSON:  Thank you, Judge, I have nothing

6   additional.

7           THE COURT:  Mr. Martinez.

8

9                   CROSS-EXAMINATION

10  MR. MARTINEZ:

11      Q.   You think the defendant is something special?

12      A.   I think her behavior at times was special, yes.

13      Q.   But aren't we also talking, in the grand scheme

14  of things, she's special to you, right?

15      A.   No.  I said part of her behavior was special in

16  the context that it was something that was not usually done

17  in jail.

18      Q.   And she -- actually, there was a dispute about

19  whether she should be in that psychiatric unit, right?

20      A.   With who?

21      Q.   Amongst the staff?

22      A.   Some felt she should be back in general

23  population.  Others felt not.  As far as I know, there was

24  some detention officers that felt that she should be in

25  general population.  But detention officers do not usually

145

1    have a say in who stays on the psychiatric unit.

2          Q.    Do you know who Dr. Gerald Perry is?

3          A.    Yes, sir.

4          Q.    Does he work at the same unit that you do?

5          A.    Yes, sir.

6          Q.    Is he privy to generally the same things that you

7    are?

8          A.    Yes, sir.

9          Q.    You indicate that, well, she alerts you as to

10   other inmates, she tells you things about other inmates,

11   right?

12         A.    Yes, sir.

13         Q.    And you said that she didn't receive any benefit

14   for it, right?

15         A.    Not to my knowledge.

16         Q.    She was allowed to stay in the unit, wasn't she?

17         A.    That's because of her condition.  That's not

18   because of her information.

19         Q.    And her condition was that she's anxious and

20   depressed, right?

21         A.    Yes, sir.

22         Q.    Are you familiar -- you work, right?

23         A.    Yes, sir.

24         Q.    People that have a job, they get anxious, don't

25   they?

146

1    A.    Sometimes people do.

2    Q.    If they're in trial they get depressed if they

3    lose, don't they?

4    A.    Usually.

5    Q.    They get anxious when the case is in the middle

6    of it, right?

7    A.    I would think so.

8    Q.    That's what she was suffering from, wasn't it?

9    A.    No, sir.

10    Q.    Something more than that, according to you?

11    A.    Yes, I guess some traumatic event.

12    Q.    The traumatic event was the death of -- not the

13    killing of her husband -- but the death of her husband?

14    A.    I'm never privy -- I'm going on what I know.

15    Q.    You told us she told you that he committed

16    suicide, didn't you tell us that?

17    A.    No, I said he contemplated suicide.

18    Q.    She never told you that he actually carried that

19    out?

20    A.    No, sir.

21    Q.    Indicated that she was tearful during some of the

22    interviews, right?

23    A.    Yes, sir.

24    Q.    Except when talking about the kids, right?

25    A.    Yes.

1      Q.    And specifically about the birth dates, right?

2      A.    Yes.

3      Q.    Do you know that when the daughter, Ashley, was

4   two years old this defendant refused even to give a

5   birthday party because it was no big deal, Ashley wouldn't

6   even remember.  Did she tell you about that?

7      A.    No, sir.

8      Q.    You didn't do any tests on the defendant either,

9   did you?

10     A.    I'm a nurse.

11     Q.    Right.  But the question is: You didn't do any

12  tests, did you?

13     A.    No.

14     Q.    And are you aware of any tests that was done?

15     A.    No, sir.

16     Q.    Are your notes kept?

17     A.    The progress notes.

18     Q.    You've been contacted by someone at the Maricopa

19  County Attorney's Office about this case, weren't you?

20     A.    Yes, sir.

21     Q.    And did you tell all these things that you have

22  told us now?

23     A.    I answered their questions.

24     Q.    Did you say that you told them that she is

25  helpful and that you couldn't tell us any more.  Is that

148

1  not what you said?

2      A.   No, they sat there and they asked if I remember

3  what her behavior was on the unit.  I said that I knew she

4  was a good inmate.  They said was there anything negative

5  and I said not to my knowledge.

6      Q.   And they asked you for notes, didn't they?

7      A.   No, sir, they did not.

8      Q.   And you have any idea are you -- you prepare

9  notes, right?

10     A.   Excuse me.

11     Q.   When you treated or spoke with the defendant, you

12  prepared notes, right?

13     A.   No.

14     Q.   So you never wrote any notes down anywhere?

15     A.   Are you talking about in the chart?

16     Q.   Yes, in the chart?

17     A.   Oh, yeah.  Those notes were kept in the chart.

18     Q.   Where is the chart kept on the unit and who has

19  access to it?

20     A.   The staff.

21     Q.   Do you know whether or not it's been copied to be

22  provided to the lawyers?

23     A.   I know that the defense attorneys or actually I

24  take that back.  Scott McCloud did ask for a copy of the

25  chart.

149

1    Q.    That's with the defense attorneys, right?

2    A.    Yes.

3    Q.    Do you know when those were turned over to them?

4    A.    I believe he got them today.

5    Q.    Did you ever speak to Mr. Patterson about this or

6    just to Scott?

7    A.    No, I did not speak to Mr. Patterson.

8    Q.    One of the things you also told us is that she is

9    naive, the defendant was naive, right?

10    A.    I felt she was.

11    Q.    And that's based on your observation, talking to

12    her, right?

13    A.    And her behavior.

14    Q.    And that was from January of this year until now,

15    right?

16    A.    Approximately.

17    Q.    Approximately a year, correct?

18    A.    Yes.

19    Q.    Did she ever -- so what you're telling us based

20    on what happened, you spoke to her, you're basically

21    telling us that if she did some special things that you

22    believed what she told you, right?

23    A.    What Wendi told me about other inmates I found to

24    be true.  So, yes, in that sense, I found her to be

25    truthful.

000008627

1     Q.   And people that tell on inmates, they call them

2  "snitches" don't they?

3     A.   Depends if someone's life is in jeopardy and you

4  tell somebody.  I don't call that snitching, no, sir.

5     Q.   One time she would come to talk to you would be

6  when somebody was contemplating suicide, right?

7     A.   Or were taking elicit drugs.

8     Q.   In other words, the other inmate was using

9  drugs?

10    A.   Yes, sir.

11    Q.   That's kind of like snitching, isn't it?

12    A.   I don't consider that snitching, I'm sorry.

13    Q.   Well, she was telling on someone using drugs,

14  isn't that what you just said?

15    A.   Yes.

16         MR. MARTINEZ:  I don't have anything else.

17         MR. PATTERSON:  That's all I have, Judge.  Thank

18  you.

19         THE COURT:  Any further questions of the witness

20  by the jury?  If so please raise your hand.  No one raised

21  their hand.

22         May this witness be excused?

23         MR. MARTINEZ:  Yes, sir.

24         MR. PATTERSON:  Yes, sir.

25         That's all the witnesses I have today.

1          THE COURT:  We are taking the evening recess at

2     this time.  During the recess, remember the entire

3     admonition I have given you including you are not to

4     discuss the case with anyone.  Don't let anyone discuss the

5     case with you.  Do not do any research, investigation,

6     experimentation or testing on your own.  Avoid any and all

7     media coverage.  Keep an open mind.

8          Have a nice evening and we'll see you tomorrow at

9     one p.m.

10         (Jurors exited.)

11         THE COURT:  Please be seated.  This is Cause

12    Number CR2000-096032, State of Arizona versus Wendi

13    Elizabeth Andriano.

14         The record will reflect the presence of the

15    defendant and counsel.  We're outside the presence of the

16    jury.

17         Just a reminder, make sure that we have enough

18    witnesses to fill up the entire time tomorrow.  We don't

19    want to run short.

20         MR. PATTERSON:  Yes, Judge.

21         THE COURT:  Have a nice evening.  See everyone

22    tomorrow at 1 p.m.

23         (Proceedings adjourned.)

24

25

# APPENDIX O

05-0002
Braccio



IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| STATE OF ARIZONA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. CR2000-096032 |
| vs. ) | CR05 0005-AP |
| ) | |
| WENDY ELIZABETH ANDRIANO, ) | |
| ) | |
| Defendant. ) | |

BEFORE:  THE HONORABLE BRIAN K. ISHIKAWA

Mesa, Arizona
December 15, 2004

REPORTER'S TRANSCRIPT OF PROCEEDINGS
(Trial)

COPY

SHARON FLORES
CERTIFIED COURT REPORTER
50374

000008968

2

1

2

3                          A P P E A R A N C E S

4

5

6

7      For the State:

8                          Mr. Juan M. Martinez

9                          Deputy County Attorney

10

11

12

13

14      For the Defense:

15                          Mr. Daniel B. Patterson

16                          Mr. G. David Delozier, Jr.

17                          Office of the Public Defender

18

19

20

21

22

23

24

25

3

1

2

3                           I N D E X

4   WITNESSES:                                    PAGE

5

6      MICHAEL BRAD BAYLESS

7         Direct Examination by Mr. Martinez        12

8         Cross-Examination by Mr. Patterson        27

9         Redirect Examination by Mr. Martinez      38

10        Recross Examination by Mr. Patterson      44

11        Redirect Examination by Mr. Martinez      46

12        Examination by the Court                  48

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1

2

3                               E X H I B I T S

4

5

6     NUMBER:              DESCRIPTION           MARKED      ADMITTED

7     550                  Photographs                         75

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

5

1                P R O C E E D I N G S

2

3          THE COURT:  This is Cause Number CR2000-096032,

4    State of Arizona versus Wendy Elizabeth Andriano.

5          The record will reflect the presence of the

6    defendant and counsel.  We're outside the presence of the

7    jury.

8          I provided counsel with the final instructions

9    for Phase III.

10         I just received a few minutes ago, a few moments

11   ago, a written objection to the burden of proof instruction

12   -- I haven't read this -- from Mr. Martinez.

13         I'll hear from counsel.

14         Mr. Martinez.

15         MR. MARTINEZ:  What I'm objecting to is the

16   language that says neither the State nor the defendant has

17   the burden of proving that the weight of the mitigation is

18   or is not sufficient to call for leniency.  I believe that

19   misstates the law.

20         In doing my research, I believe that comes from

21   State versus Strasel (phonetic) in which the Supreme Court

22   was conducting its de novo review.  I believe that's where

23   the plank comes from.  That's where I was able to pick it

24   up from.

25         But the holding with Strasel was not that the

6

1   burden of proof changes, the burden of proof still stays

2   with the defendant.  And so, I believe that's a

3   misstatement of the law.

4          Otherwise, I guess if that weren't the case, they

5   wouldn't go first and then go last because they still have

6   the burden of proof.  So what I'm saying, I guess, is the

7   procedure reflects the state of the law which is that they

8   have the burden of proof by a preponderance of the evidence

9   to prove that the factors are sufficiently substantial to

10  warrant leniency.

11         THE COURT:  Thank you.

12         Mr. Patterson?

13         MR. PATTERSON:  Judge, I was just presented with

14  this issue.  I was just -- Mr. Delozier did point out an

15  internal apparent inconsistency with the proposed

16  instructions.  If you look at the top of page 6, you do

17  describe the defendant has had the opportunity to prove

18  existence of mitigating circumstances by the preponderance

19  of the evidence.  Then when you go to page 10, it says

20  neither the State nor the defendant has the burden of

21  proving whether the mitigation is sufficiently substantial

22  to call for leniency.

23         So, that does appear to be internally

24  inconsistent.

25         THE COURT:  You know, I think you're -- let me

1   see counsel at the bench for just a moment.      Not on the

2   record.

3            (Bench conference was held outside the hearing of

4   the court reporter.)

5            THE COURT:  Back on the record.

6            Mr. Patterson.

7            MR. PATTERSON:  It seems to me the more I look at

8   it, you may be addressing two different propositions with

9   those two ideas or issues.  One is proving mitigating

10  circumstances.  And then, that may be our burden making

11  proof by a preponderance of the evidence that this

12  mitigating factor exists.

13           The jury then moves to the next step, whether the

14  collective weight of mitigation outweighs or argue, if you

15  will, for a leniency sentence, a life sentence.

16           So, the more I look at it, I don't know if they

17  are internally inconsistent.  I think that they are

18  addressing two different propositions.

19           With regard to the specifics Mr. Martinez was

20  making in terms of his case analysis and the argument he

21  made, I haven't had time to sit down and think about it,

22  Judge.  So, I can't give you a good response to

23  Mr. Martinez at this time having just been presented with

24  this significant legal issue.

25           THE COURT:  Why don't you put on the record

1   whatever else you want to put on the record with regard to

2   the final jury, Mr. Martinez?

3           MR. MARTINEZ:  That's the only issue that I had.

4           THE COURT:  Mr. Patterson?

5           MR. PATTERSON:  Yes, Your Honor.  As we discussed

6   informally yesterday, I'm going to draw upon the old set, I

7   notice that you did eliminate some things.  You did

8   apparently capitalize Defendant as well as State.  That's

9   acceptable.  I'd still like you to uncapitalize

10  first-degree murder.  I would still like you to substitute

11  Wendi Andriano for defendant.  I would like you to

12  substitute life sentence for the concept or term leniency.

13  I would like you to change the phase names from guilt

14  phase, penalty phase, to numerical Phase I and Phase III.

15  You have changed the language from defendant claims the

16  following is mitigation to the mitigating circumstances

17  offered by Wendi Andriano are as follows, although you call

18  her "defendant" and not Wendi Andriano.

19          So, with the exception that I would wish that you

20  substitute her name for "the defendant," that change is

21  acceptable.   You've eliminated the defendant does not

22  need to testify because it's our belief she will exercise

23  her right to allocution.

24          And one final thing I didn't discuss with you

25  informally, I would ask that you remove completely the

1   paragraph that begins on old page 10.  I guess it's still

2   on page 10, Your Honor.  And it's the second line at the

3   second paragraph on that page begins:  If you unanimously

4   find that no mitigation exists then you must return a

5   verdict of death.

6           And all the lines that follow, all the way to the

7   end of that paragraph, I don't believe that that is an

8   accurate recitation of death penalty law.  I don't believe

9   that they need to go through that process.  I don't believe

10  the law requires them to essentially go through those steps

11  in order to achieve a verdict in this case.  And I think

12  it's redundant and it's accumulative instruction.  You've

13  already given them the things they need to do in this case

14  in determining the appropriate penalty at this phase of the

15  proceedings.

16          Again, I would ask you to delete page 10, second

17  paragraph commencing at "If you unanimously find," through

18  the end of that paragraph.

19          THE COURT:  Anything else, Mr. Martinez, you want

20  to place on the record with regard to some of the things

21  Mr. Patterson stated?

22          MR. MARTINEZ:  Yes.  With regard to the issue of

23  what is our page 10, if you unanimously find that

24  mitigation exists and it is sufficiently substantial to

25  call for leniency, you must return a verdict of life.  That

1  is the law.  And so, anything after that I think remains

2  there.

3          I was having some trouble following his pages.

4  But where he mentioned life sentence versus leniency, the

5  statute calls for leniency.  So, I'm comfortable or

6  actually I would request that what the Court has here

7  remain there.  I think the changes he calls for, I don't

8  think are appropriate.  I think the way you have them with

9  State and defendant is appropriate.

10         What he is asking would be akin to represented by

11 Mr. Martinez and Wendi Andriano and that sort of thing.  I

12 don't think that is appropriate here.  So the way you have

13 them with the exception, with the one exception, is

14 appropriate.  They are fine with me.

15         THE COURT:  I'm going to leave the final jury

16 instructions as is except for the issue that Mr. Martinez

17 brought up.  I want to read the written objection and also

18 give Mr. Patterson the opportunity to read that objection

19 and we can discuss it further a little bit later.

20         But in the mean time, I'll take a recess and do

21 whatever you need to do to get set up for the presentation

22 of the evidence, the conclusion of the presentation of

23 evidence to make sure everything is in order with any

24 technical equipment, that type of thing.  We'll begin with

25 the jury at one p.m.

1          I'm looking at the clock.  The clock in the

2     courtroom is off.  So, it's actually a few minutes before

3     one o'clock.  So do whatever you need to do at this point

4     in time and we'll try to get started with the jury promptly

5     at one p.m.  But, check whatever technical equipment, that

6     type thing so we don't have any unnecessary delays.  I'll

7     step off the bench for a few minutes here.

8          (Recess taken.)

9          THE COURT:  This is the trial in Cause Number

10     CR2000-096032, State of Arizona versus Wendi Elizabeth

11     Andriano.

12          The record will reflect the presence of the

13     defendant, counsel and the jury.

14          Mr. Martinez.

15          MR. MARTINEZ:  State calls Michael Bayless.

16          THE COURT:  Sir, please step forward and give

17     your name to the clerk and she will swear you in.

18          (Witness Sworn.)

19          THE COURT:  Please have a seat on the witness

20     stand, sir.  Just as a note, if you're a clock watcher, pay

21     no attention to the clock in the courtroom.  The batteries

22     went out so the time isn't correct on the courtroom clock.

23          Please make yourself comfortable on the witness

24     stand.  Please remember to speak loudly and clearly into

25     the mike so everyone can hear you.  And also please wait

1    until the question is complete before you answer the

2    question.  And please make sure that you give a verbal

3    response.

4              Is that agreeable to you, sir?

5              THE WITNESS:  Yes, sir.

6              THE COURT:  Mr. Martinez, you may proceed.

7

8                    MICHAEL BRAD BAYLESS,

9    called as a witness herein, having been first duly sworn,

10   was examined and testified as follows:

11

12                    DIRECT EXAMINATION

13   BY MR. MARTINEZ:

14        Q.   Your name, sir?

15        A.   Michael Brad Bayless.

16        Q.   You're the same individual that previously

17   testified in this case, correct?

18        A.   That is correct.

19        Q.   My understanding is that you're a psychologist,

20   correct?

21        A.   That is correct.

22        Q.   That you've -- just sort of a refresher -- that

23   you work on hundreds of cases involving defendants in

24   Superior Court, correct?

25        A.   That is correct.

1      Q.   And I think you also told us that you work for

2   both defense and the State, correct?

3      A.   Yes, sir.

4      Q.   Have you ever worked with Mr. Patterson before on

5   cases?

6            MR. PATTERSON:  Relevance, objection.

7            THE COURT:  Overruled.

8            THE WITNESS:  Yes.

9      Q.   BY MR. MARTINEZ:  With regard to the defendant,

10  Wendi Andriano, as part of your work in the case, did you

11  go visit her in the jail?

12     A.   Yes, sir.

13     Q.   Did you conduct a clinical interview?

14     A.   Yes, sir.

15     Q.   Anything unusual happen during that clinical

16  interview between you and her?

17     A.   Other then the fact that, I think that -- well,

18  my initial interview with her was -- I had two

19  psychologists who work for me with me.

20          MR. PATTERSON:  Judge, please, the question is

21  specific and he's going afield.

22          THE COURT:  The objection is sustained.  Answer

23  the question that's asked.

24          Repeat the question.

25     Q.   MR. MARTINEZ:  Did anything unusual happen during

1   your first interview with her?  Just answer yes or no.

2       A.   Yes.

3       Q.   And who was present with you during that

4   interview?

5       A.   Doctor Lopez and Dr. Amico.

6       Q.   Do they work for you?

7       A.   Yes.

8       Q.   And tell me what happened that you considered to

9   be unusual?

10      A.   When we were leaving the interview, Dr. Amico --

11      Q.   No, not what do you think happened.  Tell us what

12  you saw?

13      A.   Okay.  I felt as though Mrs. Andriano was being

14  very flirtatious.

15      Q.   And was this in the course of this interview that

16  you did with her where you were seated just talking about

17  things?

18      A.   Yes.

19      Q.   Was she tearful during that interview?

20      A.   No.

21      Q.   And you indicated that there was two individuals

22  that were present with you.  Did they make a comment about

23  her demeanor as unusual?

24      A.   Yes.

25      Q.   What was that comment?

1       A.    They asked me very quizzically, "Was she flirting

2   with you?"

3       Q.    Have you had occasion to review the notes that,

4   the nurse notes, that are kept at the Correctional Health

5   Services?

6       A.    Yes.

7       Q.    With regard to the area where she is housed,

8   we've been told it's Durango, are you familiar with that

9   area?

10      A.    Very much so.

11      Q.    And why do you say, "very much so?"

12      A.    Over the course of the last 28 years, I've

13   probably been at Durango hundreds of times.  In the old

14   days, we would often do our examinations there on the psych

15   unit which is called D2.  But I've been to every pod in the

16   Durango facility as well as the rest of the facilities in

17   the county jails.

18      Q.    Are you familiar with the Estrella jail?

19      A.    Yes.

20      Q.    Is there a difference, if you will, between D pod

21   and the Estrella jail?

22      A.    Yes.

23      Q.    What's the difference?

24      A.    Well, in the interview room, there is, in

25   Estrella jail, there is a cage between you and the

1  defendant.  Estrella jail typically, I think, is general

2  population over there.  Other than that, I can't really say

3  there's a whole lot of difference in terms of procedure.

4      Q.  How about in terms of the amount of freedom,

5  perks, if you will, between the D 2 and let's say general

6  population.

7          MR. PATTERSON:  Judge, may we have foundation for

8  his assessment in this regard?

9          THE COURT:  Lay some more foundation.

10     Q.  BY MR. MARTINEZ:  Do you know if there is a

11  difference between if there are perks in D2 and Estrella?

12     A.  Yes.

13     Q.  And if so how is it that you acquired that

14  knowledge?

15     A.  As a psychologist working with the correctional

16  health facility, I've been one of the psychologists on the

17  Rule 11 list for over 20 years and have been involved in

18  doing evaluations in the psych unit at Madison and at

19  Durango for over twenty years.  I'm very familiar with the

20  procedures at Durango in the D2 psych unit as opposed to

21  what goes on in general population.

22     Q.  We've been told, for example, that in D2 there

23  are VCR movies and they don't in general population.  Are

24  you familiar with that?

25     A.  I've seen that, yes.

1      Q.   And with regard to the D2 pods, some of the --

2   pods, I guess, have a patio where as in Estrella no one

3   gets to go out.

4           MR. PATTERSON:  He's suggesting what the answer

5   is.  He's leading.

6           THE COURT:  Sustained.  Don't lead.

7      Q.   BY MR. MARTINEZ:  Are you familiar with any of

8   the differences?

9      A.   Yes.

10      Q.   What are they?

11      A.   Well, the movement within the D2 pod is much less

12   restrictive.  There's a day room.  There is an outside

13   patio area.  Also, the amount of activity that is allowed

14   to go on in there, for example, oftentimes they're allowed

15   to have more reading material.  There are more programs

16   going on in D2 because it is a psych unit.  It's more

17   comfortable there.  You've got medical staff there.  It's

18   not in general population -- it's not as much of a

19   restrictive environment as it is in general population.

20      Q.   Were you able to take look at the progress notes

21   for the defendant, specifically on December 5 of 2003.  And

22   specifically I want to take a look at the notes from the

23   psychologist, Gerald Perry, number 325, beginning with the

24   word "she."

25           MR. PATTERSON:  May I catch up, please?

1          THE COURT:  Yes.

2          MR. PATTERSON:  Thank you, Judge.

3      Q.   BY MR. MARTINEZ:  Starting with the word "She"

4  what does it say?

5      A.   It says, "Patient asked to see me."

6      Q.   Right.  But if you can go to the, about the --

7  well, read the whole thing?

8      A.   "Patient asked to see me.  Upset and tearful that

9  she was moved to D pod for disciplinary reasons by

10  detention staff secondary found with contraband including

11  makeup mirror and staples.  She asked me to move her to the

12  G P for the 30-day disciplinary period where she knows

13  people."  I can't hardly read this.  "Does not seem to want

14  to acknowledge seriousness potential nature of accepting

15  the contraband."

16      Q.   And this -- before you go any further.  Yesterday

17  we had evidence in the form of Exhibit Number 548 that

18  there was a violation?  Can you just give us the date on

19  that one on the upper right-hand corner?

20      A.   Date and time was 12/3/03.

21      Q.   And this note here is 12/5, correct?

22      A.   That is correct.

23      Q.   So she's asking to be moved from where she is to

24  G P, general population, in lieu of the 30-day disciplinary

25  period, right?

19

1      A.   That's correct.

2      Q.   What do you make of that, using your interview

3  with her, as well as any of the other materials that you

4  have reviewed, including the police report and Sharon

5  Murphy's report, what do you make of that, taking those

6  three things into account?

7      A.   Well, I think she's using her -- and she says it

8  very clearly -- where she knows people.  She wanted to be

9  in an environment where she was more comfortable.  It was a

10  manipulative attempt to get away from the disciplinary

11  process.

12      Q.   Even though it would mean she would have to go

13  back to general population?

14      A.   That's correct.

15      Q.   If you take a look down there at December 6

16  of '03 at 1330 and why don't you read that nurse's note?

17      A.   "The patient states, 'It's hard being on

18  restriction but I've been through this before.'"  O means

19  observation. "Patient was fearful at present.  Was in her

20  room on her bed."  States, "I need a serious attitude

21  adjustment."

22      Q.   It says, "The patient is fairly neat and clean"

23  is that what it says, right?

24      A.   Right.

25      Q.   Now, if we move forward to those same notes to

1    January 27th at 2004 at 1700 hours. Are you there yet?

2       A.   Yes, sir.

3       Q.   If you could go to the area where it refers to

4    whether or not she -- general population or G P is

5    involved. Six lines from the bottom paragraph?

6       A.   Said, "Patient torn between requesting to go to G

7    P," meaning general population and.

8       Q.   Remain?

9       A.   Yeah, "remaining on unit while she feels she may

10   be bored here, she does not feel she can tolerate the toxic

11   environment of G P."

12      Q.   Let me ask you this:  We just read a situation

13   or a note indicating that she wants to go to general

14   population. Now she says that she doesn't want to go. Can

15   you, again, having spoken to her, having read all the

16   materials that are provided here, do you have an opinion as

17   to that?

18      A.   Yes.

19      Q.   What is that?

20      A.   Well, I think that it was based on what her needs

21   are at the moment and what is, whatever it is that would

22   make her most comfortable at any given time.

23      Q.   Now, about this go to February 13th of 2004 at

24   ten o'clock. After the S, read to us what the quote is.

25      A.   I'm sorry, I can't find it. I'm missing February

1   13th.

2        Q.    Okay.  What does it say after the S?

3        A.    "I'm down to 112 pounds.  I'm so happy."  States

4   "Zoloft is helping."

5        Q.    Okay.  I'm going to have some questions about

6   that statement.

7              She indicates that she's happy that she's losing

8   weight, doesn't she?

9        A.    Yes.

10       Q.    Again, we've been talking about her flirting with

11  you.  Now we're talking about wanting to go to general

12  population, not wanting to go to general population and now

13  is happy that her weight is dropped.

14             What does what tell you about her?

15             Again, every question that I ask is prefaced on

16  the interview that you had with her, the clinical interview

17  and the police reports as well as these notes.  What does

18  that tell you?

19             MR. PATTERSON:  Judge, object.  Beyond the scope

20  of your ruling.

21             THE COURT:  Overruled.  Go ahead and answer the

22  question.

23             THE WITNESS:  What that tells me is that there's,

24  just by simply that note alone, it tells me there is some,

25  typically some reason why she wants to be down to 112

22

1    pounds.  One could speculate --

2        Q.  BY MR. MARTINEZ:  Don't speculate.  But there is

3    a reason why she wants to go down.  That's what it appears

4    to be, right?

5        A.  Yes.

6        Q.  And we don't know the reason, but it appears that

7    there is a secondary motive here, right?

8        A.  Yes.

9            THE COURT:  Don't lead.

10       Q.  BY MR. MARTINEZ:  One of the things that was

11   introduced was Exhibit 544.  In it, it says in part it

12   states March 6 of 1996, it says, "She reports she signed a

13   release form which was faxed to you even though she was

14   dismissed from her job on Monday, March 4th.  She started

15   on antidepressants," and it goes on.  And it also has a

16   provisional diagnosis date of 3/1/96 and it says one of

17   major depression.

18           It basically indicates that she is depressed,

19   right?

20       A.  Yes.

21       Q.  The fact that an individual is dismissed or fired

22   from work, could that lead to depression?

23       A.  Yes.

24       Q.  So just by looking at this, we don't really know

25   what the cause of her depression is, whether it's dismissal

1   or something else.

2           Take a look at Exhibit 544.

3       A.   There is an indication in this note for some

4   reason, not from the depression but possibly not having

5   depression.

6       Q.   What is that?

7       A.   She stated that on some antidepressants she

8   started on some but has had bad reactions but plans to

9   recontact her doctor.

10           Typically individuals who are not depressed or

11   who do not have serious depression do not do well on

12   antidepressants.  They're very woozy.  Sometimes they get a

13   negative reaction in terms of feeling dizzy.  Seeming not

14   all there, so to speak.  They complain about it.  And which

15   suggests that possibly their depression is not as one

16   reports.

17       Q.   One of the other things we had in this case was

18   that we had somebody by the name of Sharon Murphy opine

19   with regard to the defendant's behavior when she spoke or

20   gave an interview for the police on October 8th, 2000.  And

21   one of the things she indicated was that as a victim or a

22   battered woman, that could explain why she was being, if

23   you will, just speaking back and forth with the police

24   officer laughing, and not shedding any tears.

25           Is that your opinion based on your experience?

1      A.   No.

2      Q.   And what is your opinion of what was going on

3   there?

4      A.   I think that there really wasn't an attachment as

5   to what really had taken place.  I think there was a,

6   again, a secondary gain to her behavior.

7      Q.   When you say "secondary gain to her behavior"

8   what do you mean?

9      A.   Well, when she had interviewed with the police

10  officers and was talking to them, according to information

11  I read, there seemed there was a relatively calmness and

12  even to the point of her laughing at different times.

13  There also seems like a lack of remorse or any type of

14  anxiety reaction that one would expect in this domestic

15  violence situation where a death occurred.

16     Q.   Additionally, one of the things that Sharon

17  Murphy indicated that in striking Mr. Andriano, that the

18  defendant was manifesting something called "Battered

19  Woman's Syndrome"?

20          MR. PATTERSON:  Objection.  That term was never

21  used by Dr. Murphy.

22          THE COURT:  Sustained.

23          Rephrase the question.

24     Q.   BY MR. MARTINEZ:  She has battered woman.  Are

25  you familiar with the term "battered woman?"

1      A.    Yes.

2      Q.    What is it?

3      A.    "Battered woman" is a term that was actually

4    coined by Dr. Walker.  It is pretty much akin to a symptom

5    picture allegedly as to posttraumatic stress disorder.

6    There are some symptoms that a battered woman may have that

7    does not fit the full criteria for PTSD.  But battered

8    women typically have a symptom picture of intrusive

9    recollections of events.  There may be a psychic numbing

10   process.  There is a tendency to have an exaggerated

11   startle response.  So forth and so on.  There are several

12   symptoms of quote unquote battered women.

13      Q.    In this case, in your review, again, of the

14   materials and what you know about this case, would you

15   concur with Ms. Murphy that that's what was happening here,

16   nothing more than battered woman?

17      A.    No.

18      Q.    Why not?

19      A.    I did not see nor did the materials in which I

20   reviewed nor during my clinical interview substantiate any

21   of those types of symptoms at this type of symptom

22   picture.  I did not see the symptom picture that one would

23   expect to see with battered women.

24      Q.    With regard, other people have indicated that she

25   tears up frequently.  Did she tear up frequently with you

1    when you were doing your clinical interview?

2         A.    No.

3         Q.    Did you touch upon subjects such as her children

4    when you were doing this interview?

5         A.    Yes.

6         Q.    Did you touch upon on her husband when you were

7    doing this interview?

8         A.    Yes.

9         Q.    And through all of that, she did not tear up with

10   you?

11        A.    No.

12        Q.    We have other people, for example, the health

13   care worker she worked with who indicated she teared up

14   frequently.  We also have Sharon Murphy indicated that she

15   tears up frequently.

16             Based on your experience with her and having read

17   the documentation in this case, do you have an explanation

18   as to why she tears up with them and not with you?

19        A.    Again, I believe that's secondary gain.

20        Q.    What does that mean?

21        A.    It means she's going to get something from it.

22   That she is able to use that as a manipulative way to get

23   people to respond to her positively.

24        Q.    The other thing, are you familiar with the

25   documentation involving the supposed attempted suicide in

1   this case?

2        A.   Yes.

3        Q.   And did you read both the materials from the

4   Correctional Health Services nurses notes as well as the

5   report from the Maricopa Medical Center to which she was

6   taken to be treated?

7        A.   Yes.

8        Q.   In your opinion, was that a serious suicide

9   attempt?

10       A.   No.

11            MR. MARTINEZ:  I don't have anything else.

12            THE COURT:  Mr. Patterson.

13            MR. PATTERSON:  Thank you, Judge.

14            If I can ask to have a moment to get organized?

15            THE COURT:  Yes.

16

17                      CROSS-EXAMINATION

18   BY MR. PATTERSON:

19       Q.   You have the medical information there,

20   Dr. Bayless?

21       A.   Correctional Health Services?

22       Q.   Yes, sir.

23       A.   Yes.

24       Q.   There's a note dated 9/27/03, 2210 hours?

25       A.   Yes, sir.

1    Q.   Says "man down", quote, seizure position, close

2  quote?

3    A.   Yes.

4    Q.   It says, "O," which means observation, right?

5    A.   Yes.

6    Q.   "Inmate found lying on floor."  The inmate in

7  this note is Wendi Andriano, correct?

8    A.   I assume that's the case, yes.  It doesn't say

9  here.

10    Q.   These are Wendi Andriano's progress notes, if you

11  look at the top, correct?

12    A.   Yes.

13    Q.   So you have no reason to believe that's not

14  talking about this particular inmate, do you?

15    A.   That's correct.

16    Q.   "Inmate found lying on floor.  D O," detention

17  officer, "is holding pressure over a," quote, "laceration

18  on left hand," close quote, "from 5th digit forward,"

19  correct?  Am I reading it accurately?

20    A.   Says, "from 5th digit to wrist."

21    Q.   "Left hand," right?  LAC is laceration, right?

22    A.   Yes.

23    Q.   So it says, "laceration on left hand from 5th

24  digit forward," correct?

25    A.   No.  It says, "from 5th digit toward wrist."

1    Q.   I'm sorry.  I said forward not toward.

2         "Approximately 200 CCs," right?

3    A.   Yes.

4    Q.   What's EBL?

5    A.   I'm not familiar with that.

6    Q.   "Appears there are 200 CCs of blood on the bed

7    and on the floor."  Is that a fair reading of that note?

8    A.   It says, "EBL on the bed and on floor."  I'm

9    assuming that means blood.

10   Q.   Correct.  How big is a CC?  About a quarter of an

11   inch?

12   A.   One centimeter is about -- yeah, if that.  A

13   little less than a quarter inch.

14   Q.   Squared?

15   A.   Not squared.

16   Q.   Cubic?

17   A.   Well, a quarter of an inch is probably about like

18   that.

19   Q.   But a CC is cubic centimeter, right?

20   A.   Cubic centimeter of volume, yes.

21   Q.   That's what the note says, "Approximately 200

22   CCs"?

23   A.   Yes.

24   Q.   Okay.  So we multiply this dimension by 200?

25   A.   No.

1    Q.   How much is 200 CCs of blood?

2    A.   About that much.

3    Q.   That's quite a bit of blood, don't you think?

4    A.   No, not really.  Depends on -- I mean, wounds are

5 wounds.  You say it's a lot blood, I mean, no.

6    Q.   Okay. "Inmate is awake, eyes closed and she was

7 stating help me," correct?

8    A.   Yes.

9    Q.   Okay.  "Skin is pale and dry?"

10    A.   Yes.

11    Q.   Looks like, what is that Bucca, is that bucal

12 membrane?

13    A.   Yes.

14    Q.   "Dry and pale?"

15    A.   Yes.

16    Q.   What does that mean?

17    MR. MARTINEZ:  I'm going to object.  Beyond the

18 scope.  He's not a doctor.

19    THE COURT:  Overruled.  Go ahead and answer if

20 you can.

21    THE WITNESS:  I'm not sure.

22    Q.   BY MR. PATTERSON:  Okay.  "Bleeding to left hand

23 controlled with D O pressure something."  Right?  So it

24 appears the D O is holding her hand in an effort to staunch

25 the bleeding?

1      A.   Yes.

2      Q.   Puncture wound, left," it says, "A C area.

3   Bleeding," correct?

4      A.   Yes.

5      Q.   "Open area approximately one centimeter,

6   rounded," correct?

7      A.   That's correct.

8      Q.   So it appears that she has another laceration in

9   the upper area of this left arm, about one centimeter in

10   dimension, correct?

11      A.   That's what it looks like.

12      Q.   Okay.  "Nine-one-one call." What does that

13   suggest?

14      A.   That there is an injury.

15      Q.   An emergency, medical attention is necessary,

16   correct?

17      A.   Yes.

18      Q.   "I M transported in timely manner to Maricopa

19   Medical Center emergency room for evaluation of

20   self-inflicted wound."  Is that what that note says?

21      A.   Yes, sir.

22      Q.   So nine-one-one was called.  Wendi was

23   transported to the Maricopa Mental Center for medical

24   treatment, correct?

25      A.   Yes, sir.

1      Q.    They also found that, below that note, O again
2  that means observation, right?

3      A.    Yes.

4      Q.    "Inmate," again referring to Wendi Andriano, "has
5  written a suicide note which is a top the," -- I can't read
6  that word?

7      A.    Bunk.

8      Q.    "Surrounded by various pictures of children
9  reportedly inmate's children."  Did I read that accurately?

10      A.    Yes.

11      Q.    So left a suicide note, correct?

12      A.    Yes.

13      Q.    And around that note, she apparently placed
14  photographs of her children?

15      A.    Yes.

16      Q.    Okay.  The first note that you read on direct was
17  from 12/3, correct?

18      A.    Yes.

19      Q.    Okay.  I'm sorry.  It was 12/5 I believe was the
20  first note you read from, correct?

21      A.    No, it was 12/3.

22      Q.    Was it 12/3?

23      A.    Yes.  Maybe it was the first note.  I read 12/3
24  too, I'm sorry.  You're accurate.

25      Q.    I think it was 12/5?

1    A.   Yes, you're accurate.

2    Q.   "Patient asked to see me.  Upset and tearful that

3  she was moved to D pod for disciplinary reason by detention

4  staff."  Is that accurate?

5    A.   Yes.

6    Q.   "After being found with contraband including a

7  makeup mirror and staples, she asked me to move her to PG,

8  general population, for the entire 30-day disciplinary

9  period where she knows people."  That's what you read,

10  correct?

11    A.   That's what it looks like to me.

12    Q.   And then you also had, "Does not seem to want to

13  acknowledge serious potential nature of accepting

14  contraband," correct?

15    A.   Yes.

16    Q.   And then reading on it says, "Maintain on D2 as

17  L R E on D pod 30 days.  Not stable for move to general

18  population." Correct?

19    A.   That's correct.

20    Q.   And this was Dr. Perry's notes?

21    A.   Yes.

22    Q.   And it's his assessment on December 5, '03 that

23  she was not stable to move to general population, correct?

24    A.   That's what it says.

25    Q.   And then nursing notes that follow that in

1   sequence says, "The patient states, quote, 'It's hard being

2   on restriction but I've been through this before.'"

3            Here the patient is tearful and at present was in

4   her room on her bed.  States, quote, I need a serious

5   attitude adjustment, close quotes.  Yes?

6       A.   Yes.

7       Q.   The next note that you read was January 27, '04,

8   correct?

9       A.   I believe that was the one that Mr. Martinez

10  showed me.  I don't have it in my notes.

11      Q.   Okay.  At the close of that note it says,

12  "Patient benefiting from therapeutic environment."  Do you

13  see that?

14      A.   Again, I don't have that note in my records.

15      Q.   Okay.

16      A.   If you can show it to me.

17      Q.   Yeah.  At the base of that note it says, "Patient

18  appears to be benefiting from the therapeutic environment,"

19  correct?

20      A.   Yes.

21      Q.   And then read the line right above that.  That

22  too has some reference to some medical therapeutic

23  conclusion that the staff is making with regard to that

24  particular patient, doesn't it?

25      A.   I'm sorry, what's the question?

1     Q.    The line above it, would you read that for us,

2  too?

3     A.    "Need for psych stabilization justifies D2 and

4  LRE."

5     Q.    Is that again a confirmation that she had a

6  medical need to remain in that particular unit in the

7  opinion of this note taker?

8     A.    In the opinion of the note taker, that's true.

9     Q.    Okay.  And then the last reference you made to

10  the medical notes were 2/13/04, you have that one, right?

11     A.    Your question?

12     Q.    You have the note before you?

13     A.    On 2/13/04?

14     Q.    At ten o'clock.

15     A.    Yes.

16     Q.    That note was read to you -- that portion was

17  read to you earlier, weekly nursing note, quote, "I'm down

18  to 112 pounds.  I'm so happy."  Is that what you read for

19  us earlier?

20     A.    Yes.

21     Q.    Continuing with that entry it says, states,

22   "Zoloft is helping."

23        What is Zoloft?

24     A.    Antidepressant.

25     Q.    So "I'm so happy" and then states, "Zoloft is

1   helping."  That suggests that the medication is doing what

2   it was designed or intended to do, correct?

3       A.   That's what it says.

4       Q.   Further reading on, it says, "It's allowing her

5   not to obsess over things."  Is that what it says?

6       A.   Correct.

7       Q.   Zoloft appears to be working, correct?

8       A.   Yes.

9       Q.   Reading down -- well, let's read it all.  "Denies

10  problems on unit.  Is medically or med compliant."

11          Again, observations from the nurse.  "Alert,

12  oriented, good hygiene."  Next line says, "remains

13  fragile."

14          What does that mean in a psychological sense?

15      A.   Emotionally fragile.

16      Q.   Can you explain what that means?

17      A.   Hypersensitive.

18      Q.   Reading on, it says, "Easily tearful."  Is that

19  related in some fashion to being emotionally fragile?

20      A.   Yes.

21      Q.   "Social with peers, cooperative, articulate,

22  compliant with treatment."  That's right?  Am I reading

23  that correctly?

24      A.   That's correct.

25      Q.   "Patient continues" -- what's "SVTP" mean?

1     A.   I believe that means continue treatment.

2     Q.   In February of '04, she's on a treatment plan

3  she's taking the Zoloft.  It appears to be working.  But

4  she's still emotionally fragile.  Is that the sum and

5  substance of that note?

6     A.   That's what it says.

7     Q.   Okay.  All right.  You told us that often in your

8  experience patients who resort to tears are often trying to

9  manipulate the observer?

10    A.   No, I don't think I said that.

11    Q.   How are tears germane to anything in this

12  particular case, in your opinion?

13    A.   What I said was that an individual could use

14  tears or use their seemingly fragile state as a means of

15  manipulation.  That's what I said.

16    Q.   Are you saying that's what she's doing?

17    A.   Yes.

18    Q.   But you tell us that she didn't manifest any

19  tears during the period of time you were with her, right?

20    A.   That's correct.

21    Q.   Wouldn't you agree that she had the most to gain

22  in this case from convincing you that she was a victim of

23  domestic violence?

24    A.   How are tears going to convince me of that?

25    Q.   Would you agree with the proposition that she had

1    a great deal of gain, potentially, if she could persuade

2    you that she was a victim of domestic violence being the

3    expert retained by the Government on that proposition?

4         A.   She certainly told me a lot of things.

5         Q.   My question calls for yes or no.  Do you feel she

6    had a great deal to gain from trying to convince you that

7    she was a victim of domestic violence?

8         A.   Yes.

9         Q.   Did she used any tears in that regard to try and

10   convince you that she was a victim of domestic violence?

11        A.   No.

12             MR. PATTERSON:  Thank you, Judge.  That's all I

13   have.

14             THE COURT:  Mr. Martinez.

15

16                   REDIRECT EXAMINATION

17   BY MR. MARTINEZ:

18        Q.   What did she use to try to convince you?

19        A.   She told me a lot of different --

20        Q.   Let me be more direct.  Did she flirt with you?

21        A.   Yes.

22        Q.   Is that a way to manipulate you?

23        A.   Yes.

24        Q.   Is that a way to try to convince you?

25        A.   Yes.

39

1     Q.    Are tears the only way that people use to

2     manipulate other people?

3     A.    No.

4     Q.    And is flirtation one of the ways that people can

5     manipulate other people?

6     A.    Yes.

7     Q.    And is that something that you run across not

8     only in this case but in other cases?

9     A.    Often.

10    Q.    With regard to the issue of February 13, '04, can

11    you go to that note, please?

12    A.    Okay.

13    Q.    Can you read who wrote that?

14    A.    Looks like Joyce Van Every.  I assume Van Every,

15    E-v-e-r-y.

16    Q.    It does say, "I'm down to 112 pounds.  I'm so

17    happy," right?  Is that what it says?

18    A.    Yes.

19    Q.    Is the issue of the Zoloft part of her quote or

20    is that something that's added by the writer after that?

21    A.    That's added by the writer.

22    Q.    The quote is, "I'm down to 112 pounds.  I'm so

23    happy," right?

24    A.    That is correct.

25    Q.    Did it imply she previously had been unhappy with

40

```
 1   the amount of weight she had gained?

 2        A.   Certainly does.

 3        Q.   If we go to 1/27/04, if you have that?

 4        A.   I have it.

 5        Q.   You do have that?  Who wrote that note?

 6        A.   Wow, 1/27?

 7        Q.   Let me show you mine.

 8        A.   L. King.

 9        Q.   In all the times that you have -- how long have

10   you been practicing?

11        A.   Twenty-eight years.

12        Q.   In those 28 years you've been practicing, have

13   you ever made it a special effort to go in on your time to

14   comb somebody's hair?

15             MR. PATTERSON:  Judge, objection.  Beyond the

16   scope

17             THE COURT:  Overruled.

18             You can answer the question.

19             THE WITNESS:  No.

20        Q.   BY MR. MARTINEZ:  Do you have the note from 1/25,

21   from 12/5/05?  Do you have that note?

22        A.   12/5/05?

23        Q.   Yes. '03.  I'm sorry, '03.

24             THE COURT:  12/5/03?

25             MR. MARTINEZ:  Correct.  I'm sorry.
```

1             THE WITNESS:  Yes, sir.

2        Q.   BY MR. MARTINEZ:  You were asked whether or not

3    it indicates by the writer that she was not stable to move

4    to G P or general population, correct?

5        A.   That's correct.

6        Q.   Even though he feels she's not stable to move to

7    G P, she's still asking for it, isn't she?

8        A.   Yes.

9        Q.   He's saying, "She asked me to move her to G P,

10   general population, for the 30-day disciplinary period

11   where she knows people," right?

12       A.   That's correct.

13       Q.   And she wants to avoid this disciplinary action,

14   right?

15       A.   Correct.

16       Q.   And according to him does not --

17            MR. PATTERSON:  Wait.  Wait.  Objection to the

18   form of the question.  Doesn't suggest that she wants to

19   avoid it.

20            THE COURT:  Sustained.

21            Rephrase the question.

22       Q.   BY MR. MARTINEZ:  Just read what it says before

23   that. "S O" and than read the part starting "patient."

24       A.   "Patient asked to see me.  Upset and tearful that

25   she was moved to D pod for disciplinary reasons by

1  detention staff.   Secondary to being found with contraband

2  including makeup mirror and staples."

3      Q.   Read what continues after that?

4      A.   "She asked me to move her to general population

5  for the 30-day disciplinary period where she knows people."

6      Q.   Go ahead.

7      A.   "Assessment, does not seem to want to acknowledge

8  serious, potential nature of accepting the contraband."

9      Q.   Okay.   That was the point I wanted to make.

10      You were asked about the supposed suicide

11  attempt?

12      A.   Yes.

13      Q.   Take a look at your notes of September 29, '03 at

14  six p.m. by Laura King, September 29.   What did she say

15  about this suicide attempt?   It's 1800 if you have that.

16  Let me point it out to you.   Right there.

17      A.   Says, "I guess I just panicked.   That officer

18  lied to me and I felt trapped.   I knew I would be in lock

19  down during my trial and I just couldn't do it.   I just

20  freaked out."

21      Q.   That's also talked about a suicide note.   Doesn't

22  she also say that it was an impulsive act?

23      A.   Yes.

24      Q.   And, again, is this something that you considered

25  in determining whether or not you considered this to be a

43

1   real, if you will, suicide?

2        A.   Yes.

3        Q.   And you indicated that you didn't think it was a

4   real suicide.  Why is that?

5        A.   Well, there's many ways to harm yourself.

6   Attempting to kill yourself with a pencil, a leaded pencil

7   in the jail  -- I don't know if you've ever played golf,

8   it's like those golf pencils, a tiny pencil for the golf

9   card.

10       Q.   Take a look at Exhibit 549.  Is that what it is?

11       A.   Yes.  That's very difficult to kill yourself

12   with.  Stab yourself in the arm with that or to -- and I

13   questioned -- if you look at the records on that, I kind of

14   questioned that also because the laceration was not

15   jagged.  The medical record indicate that the laceration

16   was sutured and smooth.  There is no indication of jagged

17   or ripping or tearing.  In order for you to rip your arm, I

18   think there was a two or three centimeter cut.  One would

19   have to put the pencil in and rip the arm.  There is no

20   ripping in this situation.

21       Q.   Additionally, one of the things you were asked

22   about was 200 CCs of blood?

23       A.   Yes.

24       Q.   It does say "approximately," doesn't it?

25       A.   That's correct.

1     Q.   Do you know whether or not there was anybody

2   measuring it to see how much blood she actually lost?

3     A.   I questioned that.  You know -- I don't know how

4   they measure that.

5           MR. MARTINEZ:  I don't have any other questions.

6           MR. PATTERSON:  For completeness, can I just read

7   into the record the balance of the note from 9/29/03?

8           THE COURT:  What date?

9           MR. PATTERSON:  9/29/03 was raised the first time

10  on redirect.

11          THE COURT:  That's fine.

12

13                    RECROSS-EXAMINATION

14  BY MR. PATTERSON:

15     Q.   You have the note before you, Dr. Bayless?

16     A.   9/29/03?

17     Q.   Yes.  This is about one, two -- six lines down.

18  Starts, "she came?"  See where I'm reading?

19     A.   9/29/03?

20     Q.   Says 1800 hours.  One you just read from.

21     A.   Okay.  She came to D2.

22     Q.   Yes.  That says, "She came to D2 after panicked

23  and impulsive suicidal gesture which was too successful."

24     A.   Yes.  That's what it says.  I mean, that says

25  "gesture" meaning that --

1    Q.   I understand what it says.  But the word is t-o-o

2   successful, meaning a range or an extreme, so to speak?

3           MR. MARTINEZ:  Objection.  The word speaks for

4   itself.

5           THE COURT:  Sustained.

6    Q.   BY MR. PATTERSON:  As opposed to t-w-o or t-o,

7   correct?

8    A.   I think the operative term here is that she

9   panicked and impulsive suicidal gesture which says in the

10  first place it wasn't a real suicidal attempt.

11   Q.   But this gesture that's described here, according

12  to this note taker, was too successful, t-o-o successful.

13  So it may have started out as a gesture, it had potential

14  consequences, according to this note taker, correct?

15   A.   I'm not sure what you mean by "consequences."

16   Q.   Well, it was an effort that was too successful,

17  according to this note taker?

18   A.   Well, it got other people's attention, that's for

19  sure.  If you look further back at the other notes at the

20  medical center when she went to MCC, the amount of sutures

21  and the care that it took to deal with this was very

22  minimal.

23   Q.   In any event, it says that this effort was "too

24  successful?"

25   A.   That's was, L. King's perception.

46

1          MR. PATTERSON:  Thank you.

2          THE COURT:  Are there any further questions?

3          MR. MARTINEZ:  Judge, may I complete the

4   thought.

5          THE COURT:  Very briefly.

6

7                    REDIRECT EXAMINATION

8   BY MR. MARTINEZ:

9     Q.   Later on down there doesn't it say, "Patient has

10   degree in accounting and real estate license."

11          MR. PATTERSON:  Wait.  Wait.  That's beyond the

12   scope of --

13          THE COURT:  Let me have counsel approach.

14          (Bench conference was held outside the hearing of

15   the jury.)

16          MR. PATTERSON:  It doesn't relate to suicide.

17          MR. MARTINEZ:  He did raise that part of what she

18   said.  It's right there and mine is at the bottom of the

19   note.

20          THE COURT:  Does it relate to the suicide attempt

21   note, what you're talking about?

22          MR. MARTINEZ:  What I'm saying is that if she is

23   making these observations, too successful, based on

24   information that's erroneous.

25          THE COURT:  I'm going to sustain the objection.

000009013

47

1          (Bench conference concluded.)

2          THE COURT:  Are there any further questions of

3   the witness by the jury?

4          (Bench conference was held outside the hearing of

5   the jury.)

6          THE COURT:  The jury question is:  At any time

7   that you spent with Wendi, did she ever express any remorse

8   or responsibility for what happened to Joe?

9          MR. MARTINEZ:  No objection.

10         MR. PATTERSON:  I object.  At this point it would

11  have not been relevant to his evaluation at the time.

12         THE COURT:  I'll sustain the objection.

13         Next question:  Did Wendi flirt with either of the

14  other two associates on your first meeting?

15         Mr. Martinez.

16         MR. MARTINEZ:  No objection.

17         MR. PATTERSON:  No objection.

18         THE COURT:  Next question:  Could this

19  flirtatious behavior be considered a coping device?

20         MR. MARTINEZ:  No objection.

21         MR. PATTERSON:  No objection.

22         THE COURT:  Is it unusual for an inmate to ask to

23  be returned to a prior prison location?

24         MR. MARTINEZ:  He doesn't know, I don't think.

25         MR. PATTERSON:  It's beyond the scope.

1          THE COURT:  I'm not going to ask that.

2          THE COURT:  Next question:  Was Wendi aware that

3    everything she said to doctors while in prison would be

4    used in court proceedings?

5          MR. MARTINEZ:  Yes.

6          MR. PATTERSON:  That's fair.

7

8                        EXAMINATION

9    BY THE COURT:

10         Q.   Sir, I have some additional questions here from

11   the jury.

12              They read as follows:  Did Wendi flirt with

13   either of the other two associates on your first meeting?

14         A.   They're female, no.

15         Q.   Next question:  Could this flirtatious behavior

16   be considered a coping device?

17         A.   Coping typically refers to a way in which one

18   manages or handles stress.  This was not a way of managing

19   or handling stress.  This was a process of manipulative

20   behavior, so no.

21         Q.   Next question:  Was Wendi aware that everything

22   she said to doctors while in prison would be used in this

23   court proceedings?

24         A.   Yes.  I have -- well, I don't know about the

25   other doctors -- but before I do my examination on any

```
 1   patient or client or inmate, the nature of the service, my

 2   role in the service, is completely discussed with the

 3   individual.  The purpose of my evaluation is discussed with

 4   the individual, her limits of confidentiality.  That

 5   information from my evaluation may be things that she tells

 6   me and may be memorialized in a report and reported to

 7   others.  And I also have them sign that form stating that

 8   they themselves are making sure they understand the purpose

 9   of the evaluation and their confidentiality rights, which

10   there really are none.

11             THE COURT:  Are there any further questions by

12   the jury?  If so, please raise your hand.  No one raised a

13   hand.

14             Are there any follow-up questions?

15             Mr. Martinez?

16             MR. MARTINEZ:  No, sir.

17             THE COURT:  Mr. Patterson?

18             MR. PATTERSON:  No, Your Honor.  Thank you.

19             THE COURT:  May this witness be excused?

20             MR. MARTINEZ:  Yes, sir.

21             MR. PATTERSON:  Yes, Judge.  Thank.

22             THE COURT:  You're excused.

23             Mr. Martinez.

24             MR. MARTINEZ:  State rests.

25             THE COURT:  Mr. Patterson.
```

1          MR. PATTERSON:  We have no rebuttal.

2          THE COURT:  Let me see counsel here at the

3    bench.

4          (Bench conference was held outside the hearing of

5    the jury.)

6          THE COURT:  Is she going to make a statement?

7          MR. PATTERSON:  Yes.

8          THE COURT:  Are you going to do it at this time?

9          MR. PATTERSON:  Yes.

10         (Bench conference concluded.)

11         THE COURT:  Mr. Patterson.

12         MR. PATTERSON:  Your Honor, we ask that my client

13   be allowed to make a statement to the jury?

14         THE COURT:  Please step over to the witness

15   stand.

16         MR. PATTERSON:  She prefers to stand.

17         THE COURT:  We need the podium and mike.

18         You can stand here in the middle of the

19   courtroom.

20         THE DEFENDANT:  This is my first opportunity to

21   address you guys.  I've talked to the lawyers and I want to

22   thank you very much for all of your time that you sat here

23   and had to listen to all of this stuff.  The decisions that

24   you had to make are not easy.  I'm sorry that you're in a

25   position to have to do this.

51

1       I want to comment on a couple of things that

2   happened yesterday.  I had two officers that I've known for

3   a year take the stand and say certain things about me but

4   not everything.  In my four years in jail, I've worked or I

5   have been supervised by hundreds of detention officers.

6   And in my four years, they found two that I've had a

7   problem with or they've had a problem with me.

8       Last night I went back to my housing unit and I

9   spoke to the sergeant because I was so upset about that.

10  And the sergeant told me, you know, people have different

11  personalities, they like other inmates, they like this

12  inmate, they don't like that inmate.  That's just the way

13  jail is.  You know that's the way jail is and you just have

14  to deal with it.  And I do and I understand that.

15      Those two officers didn't feel like I belonged on

16  the psychiatric unit and they wanted me out of there.  But

17  they weren't the ones that were giving me counseling.  They

18  weren't the ones that knew my emotional state or what was

19  going on with me.  They just felt that because I was higher

20  functioning and I wasn't a paranoid schizophrenic or

21  hearing voices that I didn't need to be there.  So every

22  effort on their part they tried to get me to go.

23      Even as the notes show, I tried to go because I

24  knew I was going to get write-up after write-up after

25  write-up if I didn't try to get out of there.  That's

52

1   something that you learn in jail. If an officer doesn't

2   like you, you just try to remove yourself from there. You

3   know, get out of their area or whatever.

4           And Dr. Perry wouldn't let me. He says you're

5   not stable enough to go so you have to stay here. So

6   during the year, I did my best to put away laundry for

7   them, clean up people's vomit on the floor, go to the cells

8   when the people that are mentally, seriously mentally ill,

9   smeared their feces on the wall, have blood everywhere and

10  I would clean that up for them. I was just surprised they

11  took the stand and had only negative things to say about me

12  because it wasn't the whole story.

13          It was also mentioned yesterday that my mom had

14  only been to see me four times in a certain period of

15  time. My mother, most of all, has a hard time coming to

16  see her only daughter in jail. We have to sit behind

17  glass. We can't touch each other. Every word you say is

18  recorded. And it's difficult. It's just hard. And so I

19  tell her to stay home and not to come see me all the time.

20  I'd rather speak to her on the phone. It's easier. So I

21  call my mom almost on a daily basis and I talk to her and

22  we share what's going on.

23          I had Officer Baker pull up my visits for the

24  whole four years that I've been in jail to give you a

25  better picture, a complete picture, of what the truth is.

1   And he said he stopped counting at a hundred.  He said I

2   had well over a hundred visits in the four years I've been

3   in jail.  It's been by my mother, my father, my cousin, my

4   aunt, my family members.  Okay?  So, I just wanted you to

5   see the whole picture.  I don't think it's fair that only a

6   part of it is told.

7           I also wanted to discuss the jail environment,

8   how they're portraying that the psych unit is a more

9   privileged or better place to be.  It's not.  You're

10  surrounded by people who hear voices.  They're constantly

11  wanting to commit suicide.  Who make accusations to you

12  that -- because they're delusional, I mean, you can't have

13  a normal conversation with anybody.  So for a year, I've

14  been surrounded by people with serious mental illnesses

15  that I couldn't have a normal conversation with.  All they

16  needed from me was help.  If they were suicidal, I would go

17  to the officers and tell them that.  If they were -- we

18  have a lot of older ladies that wear adult diapers and are

19  embarrassed about it so I go get diapers for them so they

20  don't have to do it.  It's been one of just helping out,

21  filling in where I could.

22          And what I've done for stimulation is read books,

23  you know.  I had my mom and dad mail me books in.  The

24  psych staff has brought me books in.  And, in fact, last

25  night when I arrived there, there was another book from

1   Dr. Perry waiting for me.  And the officers gladly handed

2   it to me.  They had no problem with it.  For some reason,

3   Loris and Harris do have a problem with it.  But the people

4   who supervise the unit, the sergeants, don't have a problem

5   with it.  I'm allowed to have books to read.  There is

6   nothing wrong with it.  There is no harm in it.  It's not

7   violating any law.

8           I was made privy to the fact that this one inmate

9   called me a "control freak."  In C pod there are certain

10  rules we have to abide by because it's a higher functioning

11  pod.  What happens is there's D and there is C.  In D pod

12  you have all the people who are trying to get stabilized on

13  their medication.  Once they get stabilized, they're moved

14  to C pod.  And they are more normal, they're more

15  stabilized and can sweep and mop and clean toilets, things

16  like that.

17          So everyday the sergeant puts up a list of items

18  that need to be accomplished by everybody in the pod and

19  we're supposed to act as a group.  Well, when everybody

20  doesn't have the mental ability to read that note and to

21  carry out the chores that are assigned to us, I would step

22  in and I would tell somebody, well, could you please clean

23  the bathroom, could you do this, that way we're all doing

24  it.  Because it becomes an issue when we don't and then we

25  get put on restriction and it's a mess.  So somebody has to

1  make sure it gets done. So I was asked by Margaret, the

2  head counselor, if I would do that role. And so for the

3  one inmate to call me a control freak, that may be how she

4  saw me but I was just following out what I was told to do.

5         I did ask to go back to general population

6  because I knew that as long as I stayed there Harris and

7  Loris would just try to make things difficult for me but

8  Dr. Perry would never let me go back. He knew the stress

9  that I was under and didn't think it was a wise thing for

10  me to go back to general population.

11         And now I need to say something about

12  Dr. Bayless. I have never flirted with that man. In fact,

13  when he came to the jail to visit me, he did have two other

14  females with him. They told me the purpose of why they

15  were there. I was advised by my lawyer what I could talk

16  about and what I could not talk about. I'd never met this

17  man before. I'd heard lots about him, just never met him.

18  And he said that he was here to interview me and he was

19  going to be giving me some tests and whatever and I was

20  told to cooperate, so I did. But I had one question for

21  him. I said, "Is your job here to help Mr. Martinez put me

22  to death?" And he started laughing. He said that's his

23  job.

24         From that point on, I did not take our interview

25  seriously. I had no desire to participate but I had to

56

1    under court order. And for Dr. Bayless to sit up there and

2    say that I flirted with him is just disgusting.

3           So, I want to address you guys now. I just had

4    to make comments to those things that happened in the last

5    couple days so you can understand everything because it's

6    not right when part of the story is told and not all of it.

7           I'm Wendi Andriano. I'm the wife of Joseph

8    Andriano. I'm the mother of Nicholas, who is seven and

9    Ashley who is six years old now. I've had absolutely no

10   contact with them in the four years that I've been

11   incarcerated.

12          Six years ago, my family was inseparable. We

13   went everywhere together and we did everything together as

14   a family. My babies were attached to my hip. From the

15   minute I come home from work I was holding Ashley and

16   Nicholas was sitting on the counter while I made dinner.

17   And I gave them all of my attention until it was time for

18   bed. I gave them a bath every night. Read to them every

19   night. Put them to bed every night and said prayers with

20   them. I have a wooden rocking chair and I would rock

21   Ashley to sleep because she was still a small baby. And

22   Nicholas would get his turn after that.

23          The references to me being a bad mom are just not

24   true. I love my children more than anything. And they're

25   the ones that have kept me going for four years in this

1   jail.

2          The three of us, we followed in daddy's shadow.

3   But it was a shadow filled with complex emotions that even

4   I, his wife, his confidant, his best friend, could not

5   fully understand.  He had incurable cancer, a history of

6   failed remedies and what he considered the worst:  A

7   complete abandonment by God.

8          We had seen other people healed through prayer.

9   But when he'd go up for prayer, nothing would happen.  So

10  why was God not healing him?  He always asked me why me.

11  Why me.  That question dominated his life.  More than

12  anything in the last years he felt completely hopeless and

13  completely angry at the world.  His life was being taken

14  away from him on a daily basis.  Excuse me.  Excuse me.

15  I'm sorry.

16          I met Joseph on Saint Patrick's Day in 1992.  He

17  was at a table laughing and drinking and having a great

18  time.  And I was instantly drawn to the sparkle in his eye,

19  his boyish charm.  I couldn't help but watch the boy who

20  was the life of the party, his laughter and mischievous

21  eyes, his gorgeous smile.  It brightened my face.  My

22  friend who was with me, Maureen, she'd never seen me like

23  that.  She went over to his table and brought him to the

24  bar.  I was shy.  I'd hoped he couldn't tell how my heart

25  was racing and my palms were moist.  It was funny how we

1    instantly fell into conversation.  It was like we'd known

2    each other for a long time.  We were in a world of our

3    own.  This wasn't the normal, trite, pick-me-up scenario

4    that you see in most bars.  This was different.  We wanted

5    to know everything about each other.  He told me about his

6    failed relationships.  About tragedy in his family.  How he

7    felt like he didn't belong.  And that no one loved him just

8    for him.  That night my heart went out to him.  I wanted to

9    take him in my arms, into the warmth of my family and

10   protect him from any more hurt.

11       And as I look back now, we were two damaged souls

12   who recognized the missing pieces in each other.  That's

13   how we connected.  And because neither one of us had been

14   raised in a healthy environment, it was a perfect match for

15   disaster.  It has taken me four years of counseling to

16   recognize this.

17       Over the four years I've grown emotionally and

18   I've gained wisdom to know that if I'm not healthy inside,

19   then I can't be in a healthy relationship.  It just doesn't

20   work.  So it was very unfair for both of us to get into a

21   relationship with all the problems that we had but we

22   didn't know any better.

23       The next two years we spent dating each other

24   cemented the roles we would live out in our marriage.

25   Excuse me.

1       As I had all my life with people around me,

2  children and church and school and the orphans in Mexico, I

3  gave my all to Joe.  I loved to pamper and spoil him.

4  Besides the normal housekeeping, I'd give him manicures,

5  massages, plucked his eyebrows and set out his clothes for

6  the next day.  He always joked around and told me he was

7  color blind but I think he just liked me to pick out his

8  clothes.  I'll never forget the time he let me give him a

9  facial peel.  He said it was such a girlie thing and it

10  took me a while to convince him but we had fun that night.

11  I put on one of those cucumber peels and we laughed all

12  night about that because it was just something fun for us.

13       Weekends we spent at the lake with his friends.

14  It was all new and exciting for me.  I wanted to be the

15  best for Joe.  So I found myself responding to his strongly

16  expressed wishes.  I cut and colored my hair.  I bought

17  clothes that he approved of.  I wanted Joe to love me for

18  me.  And that desire motivated me to give more of myself

19  than was healthy.  When he wanted a full-size Chevy truck,

20  I gave him my car.  This left me dependant on him even

21  more.  But you know what, I didn't mind.  I just really

22  wanted him to be happy.

23       Only after he was drinking a few beers was Joe

24  ever able to really open up and share his emotions with me

25  and the one dominating fact, that he missed his grandpa.

60

1   He would tell me so many stories about being in Oklahoma

2   with him.  His grandpa gave Joe the special attention that

3   every child needs to grow.  Joe was his grandpa's

4   favorite.  Then one terrible day, his grandpa left him.

5   Committed suicide.  That created in Joe a never ending well

6   of pain that lasted throughout his life.

7          I tried to make up for the lack of love in his

8   life.  I would do anything that helped him feel love, to

9   help him succeed in life.  I thought if I could somehow

10  absorb his pain, it would help him heal.  Then, Joe was

11  diagnosed with cancer and my need to be a perfect wife

12  intensified a hundred fold.  The cancer ripped a giant hole

13  in how we pictured our lives to be.  It stole our dreams

14  away.  Joe lost hope in the future and became angry and

15  bitter.  Not just at the world, but at me; the one he was

16  used to taking care of him and solving his problems.  He

17  wanted me to find a cure for his cancer.  I tried but I

18  couldn't.  No one could.

19         Like a pressure cooker, he would let off steam of

20  which I was the recipient.  Every time Joe was hurt by

21  outside influences, he would come home and release his

22  anger on me.  And this became normal in our lives.  But how

23  was I to blame him?  Everyone asked me why didn't you leave

24  him.  Why all this sort of stuff.  He didn't ask for this

25  cancer.  We were stuck in a cycle of emotions and we didn't

1   know from one moment to the next if we were going up or we

2   were going down.  And even in the middle of all this chaos,

3   I was told over and over again that what I was doing wasn't

4   good enough.  That I wasn't doing enough.  That I needed to

5   try harder.  I believed him, so I did.

6        The reality of our lives became so painful and

7   distorted that I just went away mentally.  I tried to keep

8   up appearances but things just got worse.  And in the

9   Spring of 2000, I made a terrible and devastating choice:

10  I turned to another man for my emotional needs.  I had no

11  right to do this.  I violated our marriage vows.  I

12  violated our family.  I violated my own morals.  And Joe,

13  I'm so sorry.  I could give you a million excuses but they

14  don't mean anything.  I was wrong.  And, Joe, I wish we

15  could step back in time and do things different.  I know in

16  my heart that if life would have just given us one break,

17  just one, we could have pulled ourselves up and survived.

18  But now our family is torn apart.  Why our family?

19        I keep thinking about the night when we found out

20  that the tumors in his lungs had doubled in size.  We sat

21  on the bed, we had cat scans spread all around us, laughing

22  in our faces.

23        Joe, you asked me to stay strong for our babies

24  and not let them forget you.  Maybe I didn't want to accept

25  that you were saying good-bye.  But today I know that is

1   what you were doing.  From that day forward, you shut off a

2   big part of yourself from me.  You even quit playing with

3   our babies and maybe you thought it would make your passing

4   easier on us.  But, Joseph, it made it worse.  I felt so

5   lost and alone.  The only emotion you showed me was your

6   anger and your depression.  I no longer knew how to make

7   you happy.  So when you asked me about the suicide, I

8   thought you were crazy.  But you wouldn't let it go.  I let

9   my guilt persuade me to help you.  So you sent me on a

10  mission to help end your life.

11          Standing here today, I am so angry at myself.  I

12  am so angry that I agreed to help because life is something

13  to live.  It's not something to take away.  I feel sick

14  about it.  I feel dirty.  I feel stained for participating

15  in that.  How can I put into words the self-loathing that I

16  feel every day.  Joseph, please forgive me.  I only wanted

17  to love you, not to hurt you.  But I made the terrible

18  choice to help.  Joe, you and I needed professional help,

19  not a suicide plan.  I'm sorry for making the wrong choice,

20  for failing you.

21          On October 8th, that night, I saw a man that I

22  had never seen before.  I've been with him for eight

23  years.  I saw a man who I was convinced was intent on

24  killing me.  And I believe that now as I stand before you.

25  And I will believe that for the rest of my life.  I reacted

1   and engaged in conduct that I never in my life thought I

2   was capable of and I have never done since or before that.

3   I've never harmed a sole in my life.  And that night haunts

4   me every single moment of my life.  The picture will never

5   leave my head.  I've never been a violent person.  And when

6   I look back at that night, I'm sickened by what happened.

7   I made a horrible, horrible, horrible choice on that

8   night.  The choice that has forever hurt and changed my

9   family, my babies, and most of all the Andrianos.  I hurt

10  them in a way that nobody deserves.

11          I have only begun to understand why I reacted in

12  violence.  And I need to say that I would give anything to

13  change what happened but I can't.  And I really apologize

14  with all my heart for my actions that night for my

15  participation in the death of my husband.  I can't pretend

16  to fully understand why.  That was conduct so unlike me, so

17  foreign to me.  The only way I know how to make amends is

18  to continue with the counseling and try to live every day

19  that I do have helping others.  I can't give Joe back his

20  life.  All that I can do is give the rest of my life,

21  sharing my experiences with other people who are damaged

22  also and maybe prevent them from something this horrible.

23          Speaking to you right now is the hardest thing

24  I've ever had to do.  You are the 12 people who hold my

25  life in your hands.  You are the 12 people that have heard

1  things about me.  Some of them are true, some of them are

2  outright lies.  And I have to hope and believe that you can

3  find the truth somewhere in the middle of all this drama

4  that has been the main focus of the prosecutor.

5        You have found me guilty of first-degree murder.

6  You decided that my actions that night were not justified.

7  So that brings us to today.  Today you have to decide

8  whether or not you want to kill me or whether or not you

9  want to spare my life.

10        For four years, I have lived in jail, away from

11  my children, away from my loved ones and away from daily

12  life as you know it.  My children, Nicholas and Ashley, are

13  facing life without a mom, without a dad.  They're going to

14  grow up with unanswered questions.  Questions that other

15  family members cannot answer for them.  And when that time

16  comes, when they're old enough to have the questions, I'd

17  like to be able to be there to answer those questions.  I

18  want to tell them all the memories that only I can share,

19  their births, the joy we had over their first steps, first

20  words they ever said.  I want to tell them that even if I

21  was not with them physically, that they were constantly in

22  my thoughts, my prayers and in my dreams.

23        I'm pleading with you for my life, even if it is

24  behind bars.  It's a life unlike anything that you know.  I

25  can never touch my mother's hand, give a hug to my father,

1   see or talk to my children.  I will live with career

2   criminals, wear bright orange suits, be told when I can

3   eat, when I can sleep, when I can go outside.  Every action

4   that I make will be regulated.  But even in the middle of

5   all this, I still want to help in whatever way I can.  It's

6   the only way that I know to maybe make amends for some of

7   the terrible choices that I made; for all of the pain and

8   the hurt that I caused so many families; for ruined

9   Christmases; the loss of their children.

10          I wish with everything in me that I could say the

11   words to express how sorry I am but I can't find the

12   words.  They're just not enough.  I carry this guilt and

13   sadness and the loss with me every day.  It's what

14   motivates me to reach out to other people and help.

15          So I'm asking you to please give me that chance

16   to continue to do this.  It's all I know.  It's the only

17   way I can think of to try to make amends in some small

18   way.  So I'm asking each and every one of you to please

19   spare my life.  I promise to give back, to live in a way

20   that isn't dangerous to people because I'm not a danger to

21   people.  I really am not.  And if I could have the chance

22   to share my experiences with other women and help prevent

23   some of this stuff that went on in my life, that's what I'm

24   asking for.  Thank you.

25          THE COURT:  Mr. Patterson, anything further?

1        MR. PATTERSON:  Not at this time, Your Honor.

2        THE COURT:  At this time we're going to take the

3   afternoon break.  After the afternoon break, you will hear

4   the closing argument of counsel.

5        So during the break remember the entire

6   admonition I have given you including you are not to

7   discuss the case with anyone and do not let anyone discuss

8   the case with.  Keep an open mind.  Have a nice break.  I'm

9   going to stay here with counsel.

10        (jurors exited.)

11        THE COURT:  Please be seated.  This is Cause

12   Number CR2000-096032, State of Arizona versus Wendi

13   Elizabeth Andriano.

14        The record will reflect the presence of the

15   defendant and counsel.  We're outside the presence of the

16   jury.

17        What I'm going to do is I'm going to take a short

18   break here to allow Counsel to read the written objection

19   filed by Mr. Martinez with regard to the burden of proof

20   instruction.  And we'll reconvene in about five minutes and

21   I'll make a ruling on that.  Also, I will give counsel the

22   verdict form to review and we'll discuss that further.

23        We'll be in recess for a few minutes.

24        (Recess taken.)

25        THE COURT:  This is Cause Number CR2000-096032,

1   State of Arizona versus Wendi Elizabeth Andriano.

2           The record will reflect the presence of the

3   defendant and counsel.  We are outside the presence of the

4   jury.

5           Mr. Patterson?

6           MR. PATTERSON:  With regard to the issue raised

7   by Mr. Martinez in his written motion, I would request the

8   Court not modify the final instructions for Phase III in

9   the fashion that he requests.  I think that what you

10  currently have is an accurate statement of the law with

11  regard to burden of proof, with regard to proving

12  mitigating factors.  The issue he raised is not about

13  proving mitigating factors but what weight should be

14  ascribed to the mitigating factors when the jury does its

15  assessment of the appropriate penalty.  So I think what you

16  have is certainly not prejudicial to the Government's

17  position.

18          I have some questions in my own mind about

19  whether you can relieve the State of its burden of not --

20  well, how do I state this.  I believe the proper

21  instruction requires the State to prove that the mitigating

22  circumstances are not sufficiently substantial.  I think

23  they have that burden under the Constitutional system but I

24  don't have a case to support that proposition.

25          THE COURT:  Thank you.

1          Mr. Martinez?

2          MR. MARTINEZ:  That's an improper statement of

3   the law.  I don't have anything to add.

4          THE COURT:  I've had an opportunity to review the

5   State's written objection to the burden of proof

6   instruction.  I do believe it's a correct statement of the

7   law.  I'm going to deny the State's objection to burden of

8   proof instruction.

9          MR. PATTERSON:  Judge, at this time we'd ask to

10  reopen briefly for the purpose of moving into admission a

11  computer time line presentation that Mr. Delozier will

12  incorporate in his close argument.  It includes photographs

13  that were not admitted into evidence.  So I would move at

14  this time to admit a disk of this presentation which we

15  will generate when we get back to the office and add that

16  as part of the record as an exhibit in this case.

17         THE COURT:  What don't you state for the record

18  what the photographs involve.

19         MR. PATTERSON:  Eighteen photographs.  They are

20  of Wendi Andriano at various stages of her life.  They show

21  her in the company of her children.  They show her in the

22  company of Barbara Mitchell who testified earlier.  They

23  show like vacations with the family on a cruise ship.  A

24  holiday.  There is what appears to be a portrait of her in

25  her junior, senior year in high school.  Relatively

1  innocuous photographs.

2           MR. MARTINEZ:  Mr. Martinez?

3           MR. MARTINEZ:  I would object.  First of all, as

4  a matter of procedure, the motion to reopen, I guess, and

5  reopening has to be done in front of the jury.

6           Second of all, I've had no notice.  I haven't

7  seen these photographs.  I think that it's unfair that at

8  this point they spring them on me.  I understand that the

9  rules allow their admission.  If the rules allow their

10 admission then I know the State has an ability to challenge

11 them.  But since they've chosen at this late date to do

12 that, I have no ability to challenge them.

13           MR. PATTERSON:  There's no intent to deceive

14 Mr. Martinez.  I just didn't supervise or oversee the

15 production of the time line by my mitigation specialist,

16 Mr. McCloud.  It just came to my attention ten minutes ago

17 that there was a potential issue here.  I apologize to

18 Mr. Martinez.  There is no intent to deceive him.  I think

19 the photographs are somewhat innocuous.  They would have

20 been admissable had I brought them in at the right time

21 anyway.

22           THE COURT:  What I'm going to de, I'm going to

23 allow Mr. Patterson to reopen formally in front of the jury

24 and admit Exhibit 550 for identification admitted into

25 evidence.

1       And based upon all the circumstances and because

2   of the rules set forth for Phase III, I'm going to allow

3   them to be admitted into evidence.  However, we're going to

4   have to discuss what will be given to the jury as far as

5   the photographs.

6       MR. PATTERSON:  Well, that presents the problem.

7   That's why we didn't expect to make them an exhibit, at

8   least until we discussed this in chambers.  If they can be

9   used as an aid in his presentation and not be made

10  exhibits, it would probably be just cleaner and easier.

11      THE COURT:  Is everybody agreeable?  I know,

12  Mr. Martinez, you object to it that they can be used for

13  demonstrative purposes only during the closing arguments.

14      MR. MARTINEZ:  Well, no.  I have a different

15  objection.  You are denying the defendant a fundamental

16  right, you are showing them exhibits and then you are not

17  allowing the jury to consider them.

18      You're correct, I am unhappy but even my

19  unhappiness, it just seems to me that if we do that and

20  then we don't give it to them, that somebody later on down

21  the road is going to say that there is a problem here if

22  there's a conviction.

23      MR. PATTERSON:  All right.  Kind of thinking out

24  loud here, Judge, we would allow the entire laptop -- may I

25  have a moment?

1        It doesn't appear there's any other data on the

2    laptop other than this presentation.

3        MR. MARTINEZ:  That's not true, Judge.  I'm

4    looking at it.  It has writing on it.  If you want to look

5    at it, you can.  It's got statements by him.  That would

6    highlight his statements.  That's not fair.  If you want, I

7    can put in my closing argument to go back with them, too.

8        MR. PATTERSON:  I don't want to quibble about

9    this.  What does the Government think is the best way to

10   get the pictures in?  I don't know what the answer is,

11   Judge.

12       MR. MARTINEZ:  It's not my problem, it's theirs.

13   They can solve it.

14       MR. PATTERSON:  Then I will say we wish to use it

15   as a demonstrative exhibit that will assist in

16   Mr. Delozier's presentation.  I do not choose to make it an

17   exhibit at this time.  And I will state the waiver or

18   whatever is necessary that it's a decision on my part to be

19   used for demonstrative purposes only.

20       MR. MARTINEZ:  Judge, it's a fundamental right

21   they are making a decision now based on all of the

22   photographs.  Obviously, I don't want them to have the

23   photographs but fairness pushes me in the direction of

24   asking you to make sure they do have the photographs.  I

25   know what happens down the road.

72

1          MR. PATTERSON:  The photographs apparently are

2    accessible.

3          THE COURT:  Do you have the photographs?

4          MR. MCCLOUD:  Yes, Judge, I do.  I can take the

5    photographs and copy them to another file on the laptop to

6    which the jury would not see the box that are entered on

7    the time map program.  So they could view the pictures on

8    the laptop without seeing anything I've written or any of

9    my team has written.

10          MR. MARTINEZ:  Judge, the pictures will have

11    writing on them.  That's the problem.  So let's just get

12    to --

13          THE COURT:  What writing?

14          MR. MCCLOUD:  The only writing on the pictures

15    say what the picture is.

16          THE COURT:  Identify yourself for the record.

17          MR. MCCLOUD:  Scott McCloud.  The only things

18    that are on those pictures are identifying what the picture

19    is.  There is no narrative on the picture, whatsoever.  I

20    have the photographs back in my office.

21          THE COURT:  What I'm going to do is I'll allow

22    you to reopen in front of the jury and you move to have the

23    photographs admitted into evidence as Exhibit Number 550.

24    Then we'll deal with it after that.

25          Ready for the jury -- oh, the last thing I wanted

1    to ask counsel is this:  I've shared with counsel the forms

2    of verdict, the form of verdict.

3              Any objection from the State?

4         MR. MARTINEZ:  No, sir.

5         THE COURT:  Any objection?

6         MR. PATTERSON:  None, Judge.

7         THE COURT:  Are we ready for the jury?

8         MR. MARTINEZ:  Actually we have an issue about

9    the time.

10             THE COURT:  Go ahead.

11             MR. MARTINEZ:  When we were in chambers the Court

12   indicated I would be restricted to an hour and 15 minutes.

13   I don't think that in a case that is as serious as this,

14   when the defendant has spoken for approximately one hour to

15   the jury, that I should be restricted in time.  I

16   previously indicated to the Court yesterday that I did not

17   think it was going to go over two hours.  I don't think

18   that's unduly on my part to ask that I be given the two

19   hours.

20             THE COURT:  Mr. Patterson, or Mr. Delozier,

21   you're going to be giving closing arguments for your

22   client.

23             MR. DELOZIER:  Yes, sir.

24             THE COURT:  How much time do you anticipate your

25   closing argument will be?

1          MR. DELOZIER:  Both parts, no more than an hour

2   and 15 minutes.

3          THE COURT:  I'm going to restrict both sides to

4   an hour and 15 minutes.

5          Counsel, let me tell you something.  The jury has

6   been sitting here for 16 weeks.  They know the case better

7   than you do.  They've been attentive.  They've been

8   patient.  An hour and 15 minutes is more than enough time

9   to emphasize what you need to emphasize.  That would

10  actually be to your benefit if you get right to the point.

11         I've been watching this jury, they've been

12  attentive.  They know this case.  I'm going to restrict

13  each side to an hour and 15 minutes, then.  That's more

14  than enough time.

15         Ready for the jury?

16         MR. MARTINEZ:  Yes, sir.

17         MR. DELOZIER:  Yes, Your Honor.

18         THE COURT:  We'll bring the jury in in just in

19  just a few moments.

20         (Jurors entered.)

21         THE COURT:  Please be seated.  This is Cause

22  Number CR2000-096032, State of Arizona versus Wendi

23  Elizabeth Andriano.

24         The record will reflect the presence of the

25  defendant, counsel and the jury.

1          Ladies and gentlemen of jury, at this time

2     counsel will have the opportunity to give their closing

3     arguments.

4          Mr. Delozier on behalf of the defendant will have

5     the opportunity to open and close the argument.  Remember

6     what the attorneys say in closing arguments is not evidence

7     but it may help you to understand the law and the

8     evidence.

9          Mr. Delozier.

10         I'm sorry.  I was going to allow Mr. Patterson to

11    reopen.

12         MR. PATTERSON:  Yes, Judge.  I would ask leave of

13    the Court to reopen briefly.  I neglected to introduce the

14    photographs that have been incorporated into the power

15    point presentation, the time line.  I would move the

16    photographs, the actual photographs as an exhibit to

17    supplement the presentation that's going to be made at this

18    time.

19         THE COURT:  Anything further from Mr. Martinez on

20    behalf of the State?

21         MR. MARTINEZ:  I've already made my record with

22    regard to that procedure.

23         THE COURT:  Exhibit 550 for identification is

24    admitted into evidence.

25         Mr. Delozier.

# APPENDIX P





IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

STATE OF ARIZONA,        )
                         )
            Plaintiff,   )
                         )
    vs.                  )    No. CR2000-096032
                         )        CR05 0005-AP
WENDI ELIZABETH ANDRIANO,)
                         )
            Defendant.   )
_____)

BEFORE:  THE HONORABLE BRIAN K. ISHIKAWA

Mesa, Arizona
December 14, 2004

REPORTER'S TRANSCRIPT OF PROCEEDINGS
(Trial)

COPY

SHARON FLORES
CERTIFIED COURT REPORTER
50374

2

```
 1

 2

 3                    A P P E A R A N C E S

 4

 5

 6

 7     For the State:

 8                    Mr. Juan M. Martinez

 9                    Deputy County Attorney

10

11

12

13

14     For the Defense:

15                    Mr. Daniel B. Patterson

16                    Mr. G. David Delozier, Jr.

17                    Office of the Public Defender

18

19

20

21

22

23

24

25
```

3

1

2                                I N D E X

3    WITNESSES:                                            PAGE

4

5    JANA CLAYTON

6       Redirect Examination by Mr. Martinez              19

7       Examination by the Court                          22

8

9    TIMOTHY LEE

10      Direct Examination by Mr. Martinez                24

11      Cross-Examination by Mr. Patterson                27

12      Redirect Examination by Mr. Martinez              31

13

14   DAWNA HARRIS

15      Direct Examination by Mr. Martinez                48

16      Cross-Examination by Mr. Patterson                82

17      Redirect Examination by Mr. Martinez              96

18      Examination by The Court                          101

19      Further Redirect Examination by Mr. Martinez      102

20

21   BONNIE LOSE

22      Direct Examination by Mr. Martinez                104

23

24

25

4

1

2

3                          E X H I B I T S

4

5           (Exhibits were marked prior to trial unless

6    indicated.)

7

8    NUMBER:              DESCRIPTION        MARKED    ADMITTED

9     548                 Disciplinary Report           65

10    549                 Pencil                        77

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2

3          THE COURT:  This is Cause Number CR2000-096032,

4    State of Arizona versus Wendi Elizabeth Andriano.  The

5    record will reflect the presence of the defendant and

6    counsel.  We're outside the presence of the jury.

7          Mr. Patterson, you wanted to bring something up?

8          MR. PATTERSON:  Yes, Your Honor.  I move in

9    limine to preclude in its entirety the testimony of

10   Dr. Bayless or in the alternative to severely limit the

11   scope of the testimony to that which is true rebuttal in

12   this case.

13          By way of factual background, we presented no

14   psychological testimony in our presentation of mitigation.

15   Dr. Murphy is not a psychologist, a point which was made on

16   cross several times by Mr. Martinez.  She did not base her

17   testimony in any fashion on any instruments, psychological

18   tests like an MMPI II or personality projected tests at

19   all.  I would ask, then, that you not allow Dr. Bayless to

20   render any opinion or testimony based upon the imposition

21   of the MMPI II in this case.

22          I also feel that there is a 5th Amendment issue.

23   We previously, in this case, filed a motion to preclude the

24   Government from giving this test to my client because it

25   had no application, we believe, in the context of the

1   justification defense, domestic violence defense we

2   raised.  You overruled that motion at the time, directed

3   that she comply and that she, to the extent necessary,

4   waive her 5th Amendment privilege.

5           We so did and we took the MMPI II but it was a

6   limited waiver for purposes of domestic violence issues.

7   He has completely testified in the trial about the domestic

8   violence issues.  And I think that's the extent of his

9   relevant testimony in this case.

10          The proposed testimony that the Government seeks

11  to elicit from this gentleman, they're going to ask him for

12  his opinion with regard to her truthfulness.  They're going

13  to ask questions about future rehabilitation and all these

14  things.  And it is based upon, my belief, the projected

15  test, the MMPI II, that he administered to my client over

16  our objection.

17          So, again, I ask that you completely preclude

18  it.  If you don't, then I ask that you limit it to issues

19  like why she may be depressed, why there may be some

20  benefit moving from one pod to another.  Those kinds of

21  things because he does have a familiarity with the layout

22  of the jail and the Correctional Health Services system.

23  But to allow him to opine beyond that scope and render an

24  opinion based on upon the administration of an MMPI II is

25  error.  I ask you to limit him.

7

1          THE COURT:  Mr. Martinez.

2          MR. MARTINEZ:  The main thrust of their objection

3  is that he administered an MMPI II and that somehow that

4  was something that is not within the realm of domestic

5  violence.  But if the Court remembers the testimony of

6  Mindy Mechanic, one of the things his expert of all experts

7  who was beyond any expert in this courtroom said that in

8  every single case of domestic violence she does give this

9  MMPI II.  So for them to say, well, it's okay for our

10  expert, who is smarter and better than Dr. Bayless to give

11  this MMPI in every domestic violence case, but it's not

12  okay for a lesser expert to do that.  Well, there is no

13  legal basis for that particular argument.

14          They spent the majority of their remarks to you

15  just now arguing that somehow the MMPI is not relevant to

16  the domestic violence inquiry, when, in fact, their own

17  expert says that it is.  And whatever results they get from

18  that, whatever opinions, or whatever their experience tells

19  them the results of this MMPI II is of value because they

20  submitted to this test because they brought up the issue of

21  domestic violence.  In the area of domestic violence,

22  according to their expert, that is something that, if

23  you're a psychologist, you give.  That's what he did.

24          So I don't, number one, I don't see that that is

25  problematic because their own expert uses it.  Number two,

000008859

1   I don't see there is any Constitutional problem with it

2   because, again, their expert opined and their expert said

3   that the MMPI II is something that needs to be given, she

4   gives it in every case.

5           She did indicate that if she needed to cut

6   something, that would be something she would cut.  But she

7   did opine on every case she ever worked in domestic

8   violence, she gave it.  So, I don't believe that that's

9   well taken.

10          Additionally, they claim, well, he's -- this

11  isn't their word -- but he's only a psychologist where ours

12  is a social worker.  That just goes to the weight.  That

13  just goes to the qualification.  It doesn't go to the

14  admissibility of the opinion.  I can, for example, then

15  say, well, he's done more first-degree murder cases.  He's

16  done more cases in court than Sharon Murphy has.  That

17  doesn't necessarily render her opinion invalid.  It just

18  goes to the weight of it.  It doesn't go to admissibility.

19  So, again, I don't think that portion of the argument has

20  any merit.

21          I did provide an overview for the Court what I

22  expected Dr. Bayless to talk about.  One of the things they

23  admitted yesterday was Exhibit 544 in which it indicates

24  that, quote, the defendant reports she signed a release

25  form which was faxed to you even though she was dismissed

1   from her job on Monday, March 4th.  One of things that that

2   packet also includes is an indication that she's suffering

3   from Axis I, major depression.

4            As an expert, no one can doubt that he can give

5   the opinion that part of the reason that she is depressed,

6   or in his opinion, in what he has seen in the past, it's

7   consistent with having been fired from your job or

8   dismissed, whatever term you want to use.  So that it's not

9   unusual for her to have this depression.  And it doesn't

10  necessarily have to do with her husband.  It has to do with

11  the fact that she was dismissed from her job.

12           Additionally, they brought in three witnesses

13  that, I believe, vouched for the defendant.  Basically,

14  they came in and the tenor of their testimony was that they

15  believed the defendant.  They admired her.  They said she

16  was special.  These three individuals were Laura King,

17  social worker, Gerald Perry, a psychologist, and Joyce Van

18  Every who is a registered nurse.  They indicated that they

19  admired the defendant.  That she was special.

20           And especially Laura King indicated that the

21  defendant never tried to deceive the staff.  And when

22  pressed to explain what she meant by that on direct

23  examination, she said, "I'm vouching for her honesty."

24  That's what she said.  "I find her to be honest."  I think

25  that is something we can explore with Dr. Bayless.

10

1          Additionally, they indicated that there was no

2   benefit to the defendant by being in this pod.  Of course,

3   there are benefits.  He's been there.  He knows what the

4   benefits are.  In fact, they, themselves, alluded to these

5   benefits by saying, well, she never takes a bed that does

6   not -- that is assigned to somebody else.  She never takes

7   anybody else's space who needs it.  Implying, of course, if

8   there was somebody, they would have to remove her and place

9   her in general population.

10          They also talked about how Estrella is one of the

11  toughest places in the women's jail.  So that goes, again,

12  to the benefit that she is garnering by staying in this

13  area.  That is, that she doesn't have to go to the Estrella

14  jail.

15          In all candor, at some point, she indicates that

16  when she is going to be disciplined for the contraband, she

17  indicates, well, is there any way that I could just go back

18  to Estrella.  I'd rather go back to Estrella then serve out

19  my punishment here.  So, again, it shows that to her it

20  indicates there is that benefit here.

21          Also, he'll talk about the fact he agrees with

22  that there is this depression.  But he's going to say this

23  depression is because of her charges or because of the

24  environment.  That it doesn't necessarily have to do with

25  the fact that she's upset about her children or upset about

1   killing her husband.  Although, I have not discussed that,

2   I think that I'm not going to ask him that.

3          Additionally, the issue of the defense witness

4   indicated that the defendant was very tearful.  Every time

5   she was asked a question, she would break down and cry.

6   What he is going to say that because of what he found

7   pursuant to the MMPI and the clinical interview that she

8   has a borderline antisocial personality disorder.  That may

9   by true that she cried but to him those were tears of

10  manipulation rather than tears of anxiety or depression.

11          To him that sort of segues into the next area.

12  And what he's going to talk about is that he's going to say

13  one of the things Sharon Murphy indicated was that she's

14  not a future threat to the community.  And he's going to

15  say, no, based on my examination of things, that's not

16  true.  This attack that Sharon Murphy characterized as

17  PTSD, posttraumatic stress disorder reaction is not that at

18  all.  It's not a battered woman's response at all.  What it

19  is is an antisocial personality disorder.  She is a future

20  threat to the community.  She is not a good candidate for

21  rehabilitation because of those two incidents that have

22  been highlighted to the jury, the one involves her

23  husband.  It is clear that she is a danger.

24          Additionally, when she was involved with another

25  man by the name of Rick Freeland, when things didn't go her

1   way she stood outside, pounded on the door, threatened to

2   get a pass key which is, again, an indication that, number

3   one, she's not a good candidate for rehabilitation and she

4   is a future threat to the community because what's welling

5   underneath is not tears.  What's welling underneath is a

6   propensity for violence.

7           Additionally, because of that, she does not have

8   any remorse.  We have presentation here where the defense

9   asked the jury to reconsider, if you will, its position of

10  domestic violence.  In other words, what they're saying is

11  she's a victim of domestic violence.  If she is a victim of

12  domestic violence, then she didn't do anything wrong.  We

13  haven't seen any remorse from the defendant and he's going

14  to say that a person with a borderline antisocial

15  personality disorder does not have any remorse.

16          The reason they don't have any remorse is because

17  to them it's all about self-gratification.  It's all about

18  manipulation.  It's all about getting what they want which

19  is what we've seen through this trial with this defendant.

20  We've seen she's gotten the poison.  We've seen she's lied

21  to get her ends.  We've seen things like that.  There is no

22  remorse.  And it is one of the components of this

23  disorder.

24          Also, one of the things that Sharon Murphy talked

25  about was that the defendant was cooperative with the

1  police department and that's what she said.  The fact she

2  didn't cry was just an indication she is suffering again

3  from battered woman's syndrome, posttraumatic stress

4  disorder.  What Dr. Bayless is going to say and just as

5  plausible an explanation for that is that, again, a person

6  with antisocial personality disorder, somebody who is not

7  cooperating but trying to deceive, trying to manipulate in

8  the case, trying to manipulate the police department into

9  not bucking her or filing charges.

10         Finally, one of the other issues that he is going

11  to address is this issue about the suicide.  He is going to

12  say that he reviewed the reports, he's seen what happened.

13  And, again, based on the tests that he did in his clinical

14  interview that what this was, was nothing more than a

15  manipulation on her part.  The notes are real clear on

16  that.  I could probably testify as to that.  But the notes

17  in the case, she says, you know, I just didn't want to go

18  and do what the D.O. told me.  And so because I didn't want

19  to do what the D.O. told me, this was my way to get around

20  it.  If that's the case, then he can opine and say, well,

21  you know this really wasn't a real suicide.

22         Additionally, he can say afterwards the measures

23  they undertook after she supposedly had this attempted

24  suicide are not consistent.  And if it was really a suicide

25  other than manipulative, then other things would have

000008865

1   happened.  And I think that's all that he's going to say.

2              MR. PATTERSON:  Judge, the fundamental issue in

3   this case, we are at the rebuttal of mitigation phase.  And

4   he is limited to witnesses that truly rebut the issue that

5   we raised during the course of mitigation.  We have never

6   advanced a psychological evaluation of our client as

7   mitigation.  We have never presented this jury with

8   psychological bases for her conduct or psychological

9   reasons to show leniency.  We had no psychologist testify

10  in this regard.

11             What the Government is trying to do is tell you

12  they're focused on certain issues raised in mitigation.

13  What they want to do is put a psych eval before the jury

14  which -- and if you look at Dr. Bayless's report, the

15  Government continues to overstate his findings.  The Axis

16  II, he says there is a personality disorder.  And NOS is a

17  significant term in this history.  It means Not Otherwise

18  Specified.  Which means all the criteria are not there for

19  any particular personality disorder.  And he says there are

20  antisocial and borderline traits.  And traits are not

21  disorders.

22             And so what the Government says he has given the

23  test and he is now prepared to testify to a degree of

24  medical certainty or psychological certainty, that the

25  conduct of my client is founded upon results of this MMPI

1   II is overstating his credentials and overstating what he

2   said in this case.

3          With regard to this particulars, he wants to

4   discuss with Dr. Bayless, why depressed.  I don't have any

5   problem talking about, I believe it was Exhibit 545, when

6   she went to Casa Grande and one of the reasons specified

7   was that she was dismissed from her job.  She said she was

8   also having marital problems.  That doctor can say that

9   dismissal from a job would precipitate depressive

10  symptomology in a person, I don't have any problem with

11  that because it's within the scope of his medical or

12  psychological background.

13         But in trying to rebut the detention officer's

14  testimony with his expertise, it's misplaced.  He's

15  bringing in two D.O.s the detention officers to

16  specifically rebut the contention made by Ms. King, Nurse

17  Van Every and Dr. Perry.  Yeah.  And that's fine.  These

18  D.O.s can come in and talk about this setup there in the

19  psych ward, what they think was problematic in retaining

20  her there.  Why they think that the doctor's wrong and why

21  they think the counselor is wrong.  That's squarely

22  rebutting the allegations that we made during the course of

23  mitigation.  But to allow some psychologist to come in and

24  say there are vouching issues here that he's going to rebut

25  is not true rebuttal.  It's beyond the scope of his

1    expertise.

2           He purports to be an expert on the layout of this

3    particular jail and why one would not want to be in

4    Estrella and why one would prefer the psych unit.  That's

5    beyond his ken, that's beyond his scope.  Again, that's the

6    proper subject matter of the two D.O.s that he's bringing

7    in.  And that's appropriate rebuttal with regard to the

8    D.O.s.

9           Depression, there may be other causes.  Again, I

10   think the depression issue is within the scope of his

11   expertise.  He could be allowed to say that there are,

12   through the pendency of the charges, her current

13   circumstances, the fact she's incarcerated, may, in fact,

14   precipitate depression in a patient.  I don't haven't any

15   problem with that.

16          The tears she showed, and his opinion as to why

17   she manifest those tears, again, that's based on the MMPI

18   II.  That is, again, a test that was given over our

19   objection.  And it is not proper rebuttal because we didn't

20   present any psych eval in this particular case.

21          Dr. Murphy testified about the focus threat that

22   the domestic violence victims often, or not often, but do,

23   in fact, rebel against the abuser.  And do engage in

24   contact that is focused on the abuser.  That's why she says

25   that she's not a threat to the other population or citizens

1   of our community.

2           For him to say contrarily, again, is based upon

3   the MMPI II.  That's not proper rebuttal in my estimation.

4           Again, her cooperative attitude.  He's the one

5   that's using PTSD.  We never mentioned posttraumatic stress

6   disorder in mitigation.  We never mentioned it in the

7   case-in-chief.  For them to suggest that is, in fact, what

8   Dr. Murphy was talking about, it's their burden, not ours,

9   Judge, and to allow him to rebut an issue that they create,

10  again, is not proper rebuttal.

11          And finally, the suicide.  I think, may, in fact,

12  be manipulative, he says that he alone can argue that

13  without need for expertise on this particular issue, the

14  facts were so apparent.  Well, he should have elicited

15  these facts through the D.O.s and then argue it.  It's not

16  the kind of subject matter that requires the expertise of

17  an expert and not the kind of subject matter that an expert

18  would assist the finder of fact in resolving this issue.

19          So, again, Judge, he is here basically as a kind

20  of self-proclaimed lie detector who is going to say all the

21  things we presented in mitigation are wrong because she has

22  a condition that he discerns as a result of giving the MMPI

23  II.  It's just inappropriate for him to testify with regard

24  to that scope.

25          THE COURT:  Mr. Martinez, are you plan on calling

1   Dr. Bayless as soon as this witness is concluded that's on

2   the witness stand?

3          MR. MARTINEZ:   Actually, I went outside and

4   talked to my other witnesses, Timothy Lee, Dawna Harris

5   Bonnie Lose.   In terms of time, I would assume no more than

6   five to ten minutes.

7          And I have Ms. Clayton that will take

8   approximately five minutes.   And then I know I have Mr. Lee

9   who includes cross-examination.   I believe we will take at

10  the most 15 minutes so, we're talking 20 minutes.

11         THE COURT:   Let's get started with testimony and

12  then what I'll do, after the witness is concluded, the one

13  that's schedule before Dr. Bayless, we'll take a break and

14  I'll notify you of my decision after the break.

15         Are we ready for the jury?

16         MR. PATTERSON:   Yes.

17         MR. MARTINEZ:   Yes.

18         (Jurors entered.)

19         THE COURT:   Please be seated.   This is Cause

20  Number CR2000-096032, State of Arizona versus Wendy

21  Elizabeth Andriano.

22         The record will reflect the presence of the

23  defendant, counsel and the jury.

24         Yesterday when we took our recess, Jana Clayton

25  was on the witness stand and we'll begin the redirect

1   examination by Mr. Martinez.

2

3                        JANA CLAYTON,

4   called as a witness herein, having been previously duly

5   sworn, was examined and testified as follows:

6

7                    REDIRECT EXAMINATION

8   BY MR. MARTINEZ:

9       Q.   And you are Jana Andriano Clayton?

10      A.   Yes.

11      Q.   You are the same individual that testified

12  yesterday?

13      A.   Yes.

14      Q.   In response to some of the questions on

15  cross-examination, you indicated that as part of your

16  opinion as to how the defendant dealt with her children was

17  based in part on some of the social gatherings that you

18  were privy to in 1998 and 1999?

19      A.   Yes.

20      Q.   Specifically, what were you referring to?

21      A.   One incident was in May of 1998, my daughter

22  Catherine was baptized in Casa Grande and Joe and Wendi and

23  Nicholas had attended that.  And after the baptisms we had

24  luncheon at Serano's restaurant and at that luncheon, Wendi

25  would repeatedly give Nicholas to Joe and asked him to deal

1  with him.

2      Q.   And any other incidents in '99 that you based it

3  on?

4      A.   In 1999 we went to the zoo, my family, Wendi, Joe

5  and Nicholas and Ashley.

6           MR. PATTERSON:  Judge, may we have a month,

7  please?

8           THE WITNESS:  December of 1999.

9           MR. PATTERSON:  Thank you, Judge.

10          THE WITNESS:  And Jeanea Lambeth and her family

11 and Jeanette and Joe Andriano were also there.  And we went

12 to the Phoenix Zoo.  And there were several times that

13 Wendi would say she was tired of listening to the kids

14 would hand them over to Joe for him to deal with them.

15     Q.   One of the things you were asked about was the

16 amount of time that you may have spent with them in 2000.

17 Do you remember those questions?

18     A.   Yes.

19     Q.   And I think you indicated that in March you were

20 out here for ten days, right?

21     A.   Yes.

22     Q.   And then in August you were out here for three

23 nights and four days?

24     A.   Yes.

25     Q.   For those three nights and four days, how many

1   times did Wendi Andriano go out?

2       A.   Two nights.

3       Q.   And during those two nights, who took care of the

4   kids?  One night you already told the parents took care of

5   the kids.  What about the other night?

6       A.   Joe and I did.

7       Q.   But even though you didn't live out here, you

8   would also have occasion to speak to your family about what

9   was going on, who was the primary caretaker, if you will,

10  of the children?

11      A.   Yes.

12      Q.   And who is it that you would have occasion to

13  speak to throughout, let's say, 2000?

14      A.   Joe was the primary caretaker.

15      Q.   Who would you speak to, though?

16      A.   I would speak with -- I spoke with my sister

17  Jeanea.  I spoke with my parents, Jeanette and Joseph

18  Andriano.

19           MR. MARTINEZ:  I don't have any anything else.

20           THE COURT:  Are there any further questions of

21  this witness by the jury.  If so, please raise your hand.

22           (Bench conference was held outside the hearing of

23  the jury.)

24           THE COURT:  Question:  Did you witness your

25  brother changing his children's diapers.  Was this more

1    than just occasionally.

2         MR. MARTINEZ:  No objection.

3         MR. PATTERSON:  No objection.

4         THE COURT:  Next question:  On Friday night,

5    paren birthday, the door Wendi comes in after this limo

6    ride home, did she come in the front door.

7         MR. MARTINEZ:  No objection.

8         MR. PATTERSON:  Well, it's redundant and doesn't

9    have any relevance to the basic issue, so I object.

10        THE COURT:  I agree with you.  It's not relevant

11   to mitigation.

12        So I'll ask the one.

13        (Bench conference concluded.)

14

15                    EXAMINATION

16   BY THE COURT:

17        Q.   I have a question here from the jury.

18             Did you witness your brother changing his

19   children's diapers?

20        A.   Yes.

21        Q.   Was this more than just occasionally?

22        A.   Yes.

23        THE COURT:  Are there any further questions of

24   this witness by the jury?  No one raised their hand.

25        Mr. Martinez, do you have any follow-up questions

23

1    for this specific question?

2            MR. MARTINEZ:  No, sir.

3            THE COURT:  Mr. Patterson?

4            MR. PATTERSON:  No, Your Honor.  Thank you.

5            THE COURT:  May this witness be excused?

6            MR. MARTINEZ:  Yes, sir.

7            THE COURT:  Thank you very much.  You're excused.

8            THE COURT:  Mr. Martinez?

9            MR. MARTINEZ:  State calls Timothy Lee.

10           THE COURT:  Sir, please step right over here to

11   the clerk and she will swear you in.

12           (Witness sworn.)

13           THE COURT:  Please have a seat on the witness

14   stand.  Please be as comfortable as you can.  Please pull

15   the microphone close to you.  Please speak loudly and

16   clearly so everyone can hear you.  Please wait until the

17   question is complete before you answer the question.  And

18   please remember to give a verbal response.

19           Is that agreeable to you, sir?

20           THE WITNESS:  Yes.

21           Mr. Martinez, you may proceed.

22

23

24

25

24

```
1                      TIMOTHY LEE,
2    called as a witness herein, having been first duly sworn,
3    was examined and testified as follows:
4
5                      DIRECT EXAMINATION
6    BY MR. MARTINEZ:
7        Q.   Your name, sir?
8        A.   Timothy Lee.
9        Q.   Where are you currently employed?
10       A.   I own and operate Casa Grande Property
11   Management.
12       Q.   Drawing your attention back to 1999, where were
13   you employed?
14       A.   Somac Property Management Mortgage, SPF.
15       Q.   What were your duties back them?
16       A.   I was the vice president of operations and the
17   general area man for the Phoenix, Casa Grande area.
18       Q.   Did you have under your umbrella the Courtyard
19   Apartments?
20       A.   Yes, I did.
21       Q.   Did an individual by the name of Wendy Andriano,
22   again, back in '99 , was she someone that worked for you at
23   the Courtyard Apartments?
24       A.   Yes, she was.
25       Q.   What was her title?
```

25

1      A.   She was the property manager, community director.

2      Q.   Was there one occasion in which, that you

3   remember, in which she received a telephone call involving

4   an injury to Nicholas, her son?

5      A.   Yes.

6      Q.   And about when was that in 1999?

7      A.   I don't recollect off hand.

8      Q.   Was it summer?

9      A.   Summerish because the injury was due to a boat

10   prop or boat prop or engine.

11     Q.   If you remember, what were you and she doing when

12   she was notified?

13     A.   Well, traditionally, every Wednesday I was in

14   Casa Grande the entire day to take care of property

15   management duties as we have properties in Casa Grande.

16   And we would have lunch and then we would go to individual

17   properties and I would go over the matters of the business

18   of the property.  And we would do what we needed to do and

19   have discussions of invoices, those kinds of thing.

20     Q.   And during that day when you and she may have

21   been speaking, did she receive a telephone call?

22     A.   Yes, she did.

23     Q.   And who was that telephone call from, do you

24   know?

25     A.   I believe it was her husband, Joe.

1    Q.    And what did he tell her?

2    A.    What was translated to me was after she hung up

3  was that the child had injured himself somehow on a,

4  translated to me, on a boat prop.  And that he had injured

5  himself on his leg.  And that it was a pretty severe

6  injury.

7    Q.    And what was her demeanor, if you will, at the

8  time?

9    A.    Well, as she was on the phone she screwed up her

10  face a little bit.  And, you know, I was concerned.  And

11  then, of course, she hung up.  I mean, I didn't really get

12  the gist of the message until after she hung up.  And she

13  hung up and she transmitted the conversation to me which

14  was that the child had fallen on a boat prop and pretty

15  severely injured his leg.  Her husband would take care of

16  it.

17    Q.    How would you describe her attitude at that

18  point?

19    A.    Very cavalier.

20    Q.    Did you offer to let her go and take care of it?

21    A.    Yes.  Family matters are very important to me and

22  to our company, still are.  And anything that happens to a

23  family member, you know, even when Wendi had the birth of

24  her new child, the child was brought into the office.  It's

25  very important issues, family matters.  So she was told to

1   go and do what she needed to do.  At which point she said,

2   "That's okay.  Joe will take care of it."

3        Q.   Did she ever leave that day?

4        A.   No, not during the time that I was there.

5        Q.   How late were you there?

6        A.   I'm usually in Casa Grande until four o'clock.  I

7   don't recall the exact time, four, 4:30, five o'clock.

8             MR. MARTINEZ:  Thank you.  I have nothing else.

9             THE COURT:  Mr. Patterson.

10            MR. PATTERSON:  Thank you, Judge.

11

12                       CROSS-EXAMINATION

13  BY MR. PATTERSON:

14       Q.   You were Wendi's boss back then?

15       A.   Yes.

16       Q.   And I guess each Wednesday the boss comes to the

17  property site and you go over particulars or issues that

18  are relevant to that particular property site?

19       A.   That's correct.

20       Q.   So this is an important meeting that you're

21  having with the resident manager, correct?

22       A.   Yes, on a weekly basis.

23       Q.   And the information that you're seeking is that

24  which you derive from the resident manager, right?  I mean,

25  her input is important at this particular meeting, right?

28

1     A.   Well, Yes, it is.  She runs the property.

2     Q.   Yeah.  And she's the one that needs to give you

3  the information about how that property is doing for that

4  particular week, right?

5     A.   Sure.

6     Q.   So, this is an important meeting you're having

7  with her, correct?

8     A.   Well, it's weekly.

9     Q.   I understand.  But it's an important meeting?

10    A.   Business meeting.

11    Q.   It's an important meeting?

12    A.   Yes.

13    Q.   And it's essential that she meets with you to

14  give you the information that you need?

15    A.   Sure.

16    Q.   At some point during the course of this meeting,

17  she received a phone call, correct?

18    A.   Correct.

19    Q.   And of what duration is this phone call?

20    A.   It was very short.

21    Q.   So she got a little bit of information about the

22  condition of her child and the only information she got was

23  as a result of that phone call, right?

24    A.   The information that I talked about is all I

25  know.

1    Q.  I understand.  But the only information she had

2 concerning her child's condition was what she received by

3 telephone?

4    A.  I would imagine so, yes.

5    Q.  Well, was there any other source of information

6 at that point?

7    A.  No, not to my knowledge.

8    Q.  And it was a conversation of very short duration?

9    A.  Correct.

10    Q.  You don't know what Joe said to her in that

11 conversation other than what she reported to you afterward,

12 correct?

13    A.  Correct.

14    Q.  You don't know whether Joe minimized the extent

15 of the injury in the course of the phone call, do you?

16    A.  No, of course not.

17    Q.  And as a result of that phone call, she told you

18 that she felt Joe could handle it?

19    A.  Sure.  That's what she said to me.

20    Q.  And that was based upon a conversation she had

21 with Joe on the phone, right?

22    A.  Yes.

23    Q.  And she'd only been employed by you at that

24 point, what, two months?

25    A.  Oh, Wendi was employed by us.

1     Q.   I'm sorry.  A bad question.

2          At the point that the telephone call came in, how

3 long had she been with your business?

4     A.   Since 1998.

5     Q.   And so how long was that?

6     A.   This was 1999.

7     Q.   What month, do you recall exactly?

8     A.   Well, boat month.  I'm not sure.  You know, the

9 child got injured on a boat.  So a boat was out.  Had to be

10 a good boat month.

11    Q.   All right.  So Wendi worked for you.  Do you know

12 exactly how many months?

13    A.   She began with us in the spring of 1998.  This

14 was in the summer of 1999.  It had to be well over a year.

15    Q.   As a supervisor, you're the one to give her an

16 evaluation?

17    A.   Yes.

18    Q.   And those kinds of things.  You say you left the

19 office about four o'clock?

20    A.   I'm not sure.  I normally leave Casa Grande at

21 that time.  I used to leave.  I'm now living in Casa

22 Grande.  But at that time I used to leave between four or

23 five.

24    Q.   She was still on site at the time you were

25 there?

31

1      A.   She lived on site.

2      Q.   I'm sorry.  She was still in the office as of the

3  time you were there; is that correct?

4      A.   At the time I was there, yes.

5      Q.   You don't know where she went after you departed?

6      A.   I have no idea.

7           MR. PATTERSON:  Thank you, I have nothing more,

8  Judge.

9           THE COURT:  Mr. Martinez.

10          THE COURT:  Thank you, sir.

11

12                    REDIRECT EXAMINATION

13  BY MR. MARTINEZ:

14     Q.   You indicated that this was a weekly meeting?

15     A.   Yes, it was.

16     Q.   Was it totally imperative, 100 percent that she

17  stay at this meeting?

18     A.   No, because we normally have group meetings, and

19  then the individual items, we don't want to waste time, the

20  general items were discussed at a group meeting in the

21  morning between 11 and one.  And we discussed general items

22  at that time period.  And then, I would go through the

23  individual, four different properties, and we would discuss

24  things of a nature specific to those properties.

25     Q.   Was it something that could have been

1    rescheduled?

2        A.   Sure, there was an assistant manager there, too,

3    a leasing agent.

4        Q.   Now, one of the things they asked about was the

5    severity of the injury.  What was it that she communicated

6    to you about the injury?

7        A.   That the injury was on the leg and that he had

8    fallen on a boat prop.  That, to me, indicated a pretty

9    serious injury.

10       Q.   And did she ever ask to leave and say, you know,

11   I need to go or anything like that?

12       A.   No.

13       Q.   And what was her attitude?  Was it preoccupied?

14   How would you describe it?

15       A.   She was not preoccupied with it.  It had been

16   filed but continued to do our business.

17           MR. MARTINEZ:  I don't have anything else.

18           THE COURT:  Any further questions of this witness

19   by the jury?  If so, please raise your hand.  No one raised

20   a hand.

21           May this witness be excused?

22           MR. MARTINEZ:  Yes, sir.

23           THE COURT:  Thank you very much.  You're

24   excused.

25           Ladies and gentlemen, I'm going to take a

1   ten-minute break.   Remember the admonition.

2          (Jurors exited.)

3          THE COURT:   Please be seated.   This is

4   CR2000-096032, State of Arizona versus Wendy Elizabeth

5   Andriano.

6          The record will reflect the presence of the

7   defendant and counsel.   We're outside the presence of the

8   jury.

9          The Court has considered the defendant's oral

10  motion to preclude or in the alternative a motion in limine

11  relating to Dr. Bayless.

12         The Court will note for the record initially it

13  allowed the MMPI testing of the defendant, specifically for

14  the issue of whether or not the defendant's characteristics

15  were consistent with those of domestic violence victims.

16         Therefore, I'm going to order precluding the

17  State from eliciting testimony from Dr. Bayless which

18  relates to the opinion based on the MMPI II testing.   Also

19  about opinions relating to the defendant's honesty and

20  truthfulness and credibility as they are not directly

21  related to the factors listed by the defendant with regard

22  to mitigation.

23         Any questions on the Court's ruling?

24         MR. MARTINEZ:   No, sir.

25         MR. PATTERSON:   No, thank you.

34

1        THE COURT:  Go ahead and notify Dr. Bayless on

2   the Court's ruling.

3        You're ready with your next witness; is that

4   correct?

5        Why don't you notify him of the Court's ruling.

6   I'll let you bring him in and verify that on the record.

7        MR. MARTINEZ:  I'm going to call him.

8        THE COURT:  Mr. Martinez.

9        (Mr. Bayless entered.)

10       MR. MARTINEZ:  I've talked with Dr. Bayless.  He

11   indicated that his opinion can be predicated on just the

12   clinical interview.  Additionally, I think that he and I,

13   or I, need more guidance.  I laid out for the Court the

14   factors that I thought I was going to get into.  And I know

15   that some I can, for example, regional counseling document

16   he can address that.  I think he can also address the

17   suicide.  I think it's borderline.  I do not want to create

18   an issue at this stage of the proceedings as to whether or

19   not he can say whether or not she is a future threat to the

20   community or a good candidate for rehabilitation, remorse

21   or cooperative with the enforcement officers.

22       Additionally, I'm not sure that he will be able

23   to rebut, although he indicated he would be, what Sharon

24   Murphy said.  And you did indicate something about he can't

25   say anything about honesty.  So that would mean, if I read

1    it correctly, that the fact that Laura King admired her, he

2    can't go into that.  The fact that she, Laura King,

3    indicated that the defendant was honest and never tried to

4    deceive anybody, I don't think I can go into that.

5         I do think he may be able to address the issue of

6    benefit.  He may be able to address the issue of secondary

7    gain and whether or not what the motive was.  I'm not sure

8    he can say she didn't have mental issues.  I think that's

9    based in the MMPI.  I don't think he can comment on that

10   but I'm just not sure about that.  I don't want to go

11   forward with that.

12        In terms of tears, her motivation for crying,

13   it's his belief that she is being manipulative.  If that's

14   case, if that goes to honesty then I can't go there.

15        I guess what I'm saying is I'm asking for

16   guidance and in front of Dr. Bayless so we do not run afoul

17   of your order.

18        THE COURT:  So basically from what I've heard, is

19   you would like to bring in some testimony with regard to

20   the benefit of being in a certain pod, correct?

21        MR. MARTINEZ:  Well, that's one of the issues.  I

22   also want to talk about the Casa Grande Medical Center.

23        THE COURT:  The issue as far as depression?

24        MR. MARTINEZ:  Right.  I don't think has -- I may

25   touch on it.  Then, the other thing I want to talk about

1   are the factors involving the future threat to the

2   community, a good candidate for rehabilitation, the

3   remorse, whether or not she is cooperative.  And then also

4   the suicide.

5          THE COURT:  With regard to the testimony as far

6   as benefits, being in a certain pod, if there is proper

7   foundation provided, then I may allow that.  I mean based

8   upon Dr. Bayless' experience as far as being in a certain

9   unit.  I may allow that.

10          But with regard to the depression issue at Casa

11   Grande, that's referred to Exhibit Number 445 and I'm not

12   going to allow that.  I believe it goes to being dismissed

13   and related to being dismissed, is that correct?

14          MR. MARTINEZ:  Yes, sir.

15          THE COURT:  Then I'll not allow that.

16          As far as the you mentioned future threat, I'm

17   not sure what Dr. Bayless would be basing his opinion on,

18   whether the defendant is a threat.

19          MR. MARTINEZ:  He indicated that when I spoke to

20   him just now it would be based on the clinical interview.

21   I just want to make sure that he understands what was going

22   on if that's still his position, I would go ahead.

23          THE COURT:  Dr. Bayless?

24          DR. BAYLESS:  My position would be based on, not

25   only my clinical interview but the collateral records that

1  I reviewed in this particular matter as well as the results

2  of the complex sentence and results of Shipley Living

3  Scales, Williamson Sentence Completion Test.

4        THE COURT:  I'll come back to that.  And the

5  other one was remorse?

6        MR. MARTINEZ:  Yes.  Remorse.  And then the other

7  one was cooperative behavior with the police.

8        THE COURT:  Is that all based on your clinical

9  interview?

10       DR. BAYLESS:  And an collateral information.

11       THE COURT:  And then, tell me specifically what

12  your opinion is as far as the suicide attempt.

13       DR. BAYLESS:  What is my opinion about the

14  suicide attempt?

15       THE COURT:  What is your expected testimony on

16  the suicide attempt.

17       DR. BAYLESS:  My expected testimony on that is

18  that, one, there was evidence indicated based on the

19  collateral information in the medical records, that

20  initially there was, it was thought that she stabbed

21  herself with a pencil.  But, based on the cuts and

22  everything else it looks like it was -- there was a compact

23  case that was contraband that would had been sneaked into

24  the jail.  The wound that she sustained was a two

25  centimeter wound that was very superficial and really was

1   not a true suicide attempt.

2   　　　　THE COURT:  Based upon reading the records, the

3   medical records and reports about the incident?

4   　　　　MR. BAYLESS:  Yes.

5   　　　　MR. MARTINEZ:  For purposes of the record that

6   she's taking down, I provided him or he has read a copy of

7   the report from the Maricopa County Medical Center which is

8   where she was taken as well as the, I think they're called

9   progress notes from the jail that were provided to me.

10   　　　　THE COURT:  Anything else?

11   　　　　MR. MARTINEZ:  The other issue we want to address

12   is this issue of the tears.  One of the things that she

13   said was that she cries all the time.  And my understanding

14   was what he tells me is that she didn't cry at all during

15   the  clinical interview.  In reviewing of the, again, the

16   notes that we have here and based on my experience, he's

17   going to be able to say that the opinion -- I'll let him

18   say what his opinion is going to be.

19   　　　　THE COURT:  Dr. Bayless.

20   　　　　DR. BAYLESS:  I think that her tears are, in many

21   situations, are manipulative.  That they are used to gain

22   favor and to gain sympathy from others.  That the times

23   when one would expect her to be tearful, she's not.  There

24   is inconsistency.  So I think it's a manipulative attempt

25   to gain favor from others.

39

1          THE COURT:  What do you base that opinion on?

2          DR. BAYLESS:  On the records from the

3   correctional health facility.

4          THE COURT:  And your observations?

5          DR. BAYLESS:  And my observations, correct.

6          THE COURT:  Anything else, Mr. Martinez?

7          MR. MARTINEZ:  He also indicated that without

8   having to apply anything that he used in the MMPI, it is

9   his opinion based, again, on the notes that we have here as

10  well as his clinical interview, that and additionally he

11  believes that Sharon Murphy is wrong when she finds that

12  this is battered women's syndrome.  He indicated to me that

13  battered women's syndrome is nothing more than

14  posttraumatic stress disorder which is something he is very

15  familiar with.  It's not something that is consistent with

16  Ms. Murphy's characterization of what happened inside the

17  apartment with Ms. Andriano.

18          And so, with that, he is then going to say she is

19  a future threat to the community and she is not a good

20  candidate for rehabilitation because she has the propensity

21  for violence.

22          THE COURT:  Anything further?

23          MR. MARTINEZ:  No, I think that's it.

24          THE COURT:  Is I indicated, I'm going to allow

25  Dr. Bayless to testify with regard to the benefits, if any,

1  of being in a certain pond in the unit.  And that if a

2  proper foundation is provided, I'm going to allow him to

3  testify with regard to the issue of depression out of those

4  Casa Grande medical records.  I'm going to allow him to

5  testify about the suicide incident and what Dr. Bayless

6  just related on the record about the suicide incident.

7  That being he indicated in the medical records that they

8  initially thought she was stabbed with a pencil but

9  actually some over -- it was a compact.

10         MR. MARTINEZ:  It appeared to be chards from the

11 compact.

12         THE COURT:  Okay.  And then, now my recollection

13 of Sharon Murphy's testimony the other day was the fact she

14 did bring up this posttraumatic stress disorder.  And she

15 nay not have called it that, but I think she brought it up

16 relating to being a future threat.

17         And are you able to make that opinion, whatever

18 opinion it may be, without basing it upon MMPI II testing?

19         DR. BAYLESS:  Yes, sir.

20         THE COURT:  Just a moment, I just want to check

21 my notes.

22         Dr. Murphy testified -- she didn't use the

23 specific term that I recall, posttraumatic stress disorder,

24 but she did describe events leading up to this outburst.

25 And she described this outburst and the fact that the

1   defendant misperceived the magnitude of the threat.  And

2   that she testified that this type of outburst was such that

3   she didn't constitute -- that the defendant did not

4   constitute a danger to fellow community members.  Okay.

5           So I'm going to allow Dr. Bayless, as long as his

6   opinion is not based upon MMPI II testing, to opine in

7   those terms of whether she is a danger to her fellow

8   community members, you know, in direct rebuttal to what

9   Dr. Murphy testified to.  But it's limited to that.

10          MR. MARTINEZ:  One of the things that -- there's

11  two things that Dr. Bayless indicated to me.  He indicated

12  that the reason he can do this is more for purposes of an

13  appeal should there be one.  He indicated that the MMPI was

14  not used to reach the opinion.  That what the MMPI does in

15  this case is confirm his opinion.

16          Additionally, he reminds me that he does have a

17  three o'clock.  So what I want to let the Court know is

18  that I'm going call my other two witnesses.  So I'll ask

19  him to perhaps if he could call up there right now so he

20  could get that.

21          THE COURT:  If he can coordinate with my judicial

22  assistant.  For the record Dr. Bayless, has been I guess

23  ordered or instructed by one of the Superior Court judges

24  in Coconino County to call in.

25          DR. BAYLESS:  They're going be calling me at

1    three o'clock.

2              THE COURT:  Do they have your cell phone number?

3              DR. BAYLESS:  Yes, sir.

4              THE COURT:  And okay.  So for the record, then,

5    Dr. Bayless will be able -- be allowed to testify about the

6    benefits of being in a certain pod, the depression issue

7    relating to the Casa Grande medical records, the suicide

8    attempt, the issue of whether the defendant is a danger to

9    the community in terms, in direct rebuttal to what

10   Dr. Murphy testified to, a building up of this, basically,

11   explosion is what she testified to and how it was probably

12   an isolated incident and it would not cause a threat to the

13   community in the future.  Okay.

14             I will allow you to testify about the -- allow

15   you to testify about the cooperative behavior I think --

16   did she have cooperative behavior in the jail and suicide

17   attempt to gain favorable treatment?  Is that what you

18   said?

19             MR. MARTINEZ:  I was talking about Ms. Murphy

20   indicated that the defendant was cooperative with the

21   authorities.  And she indicated that, well, somebody who is

22   suffering from this battered women's syndrome, one of the

23   things they do is they don't cry or they do cry, I forget

24   what they say.

25             THE COURT:  Well, I will allow Dr. Bayless to

1  testify and opine with regard to the tears as far as using

2  it to gain sympathy and favor.  But not in terms of honesty

3  or truthfulness and credibility.  I think there's a little

4  bit of difference there.

5          MR. MARTINEZ:  One of the things Dr. Bayless

6  indicated to me is that, I don't know, I'm just asking if

7  he could point out the fact his diagnosis, he said, again,

8  the diagnosis is based on the clinical interview and review

9  of the records and that the MMPI just confirms it.  He

10  doesn't know -- I just want to make sure I know whether or

11  not to ask.

12          THE COURT:  What that's specifically?

13          MR. MARTINEZ:  The diagnosis.  In other words,

14  that I think he indicated that she is a borderline

15  antisocial.

16          THE COURT:  Go ahead, Dr. Bayless.

17          DR. BAYLESS:  My diagnosis on her was personality

18  disorder, NOS, with borderline antisocial traits.  The MMPI

19  confirmed my diagnosis.  However -- and I can read to you

20  off the front of the MMPI where it says very clearly, Your

21  Honor, and this is based on what the MMPI says, not based

22  on my opinion, necessarily, but it's based on the cannons

23  of how we utilize this particular instrument and it says

24  very clearly:  The interpretive information contained in my

25  report should be viewed only as one source of hypothesis

1    about the individual being evaluated.  No decision should

2    be based solely on the information contained in this

3    report.  This material should be intergrated with all other

4    sources of information in reaching a professional decision

5    about this individual.  This report is confidential and

6    intended to be used by qualified professionals only.  It

7    should not be released to individuals being evaluated.

8            What this says, basically, is that the MMPI is a

9    tool, a source of information that gives us better

10   confirmation.  But the clinical interview, the experiential

11   process of doing an evaluation and analysis of an

12   individual lies solely in the preview of clinical

13   interview.

14           Now, this is also true with psychiatrists.

15   Psychiatrist do not use MMPI.  And they use their clinical

16   interview.  We, as psychologist, do the same thing.  We

17   have the advantage of utilizing psychological testing to

18   confirm our opinions.

19           However, our opinions are based on our clinical

20   decisions, based on interviews, collateral data, other

21   information, other sources of information as well as

22   psychological testing.  Psychological testing is just one

23   part.  My decisions are not solely based on that.  My

24   clinical decisions or clinical opinion concerning her

25   diagnosis is based on my clinical interview and my

1   assessment of her.

2           THE COURT:  Anything further, Mr. Patterson?

3           MR. PATTERSON:  Our position in this case, she

4   has never presented psych eval information to this jury.

5   We're at the mitigation phase of the proceeding.  He is

6   giving, has given already a psych eval.  And one of the

7   continuing parts of the psych eval was the MMPI II which is

8   limited probative with regards to the issue whether or not

9   she's a domestic violence victim.

10          They are attempting now to bootstrap that

11  opportunity they had to talk to my client and allow this

12  gentleman to give psychology opinions that are psych eval

13  opinions which were not the subject matter of our

14  mitigation presentation.

15          And for him to suggest that after a two-hour

16  clinical interview, he came to these conclusions about the

17  disorders my client purportedly had and that the MMPI II is

18  confirmatory rather than a critical essential component of

19  the diagnosis process is disingenuous on this gentleman's

20  part.

21          THE COURT:  What I'm going to do is I'm going to

22  emphasis the Court's ruling that the State is precluded

23  from eliciting testimony from Dr. Bayless about his

24  opinions relating to the defendant's honesty, truthfulness

25  and credibility and the opinions based upon the MMPI II

1  testing.

2          I'm going to allow Dr. Bayless to testify about

3  the benefits issue being in a certain pod in the unit, the

4  depression issue regarding the Casa Grande medical records,

5  whether or not the defendant is a threat, future threat to

6  the community.  And that is in direct rebuttal to the

7  testimony of Sharon Murphy's.  That line of testimony was

8  essentially that things had been building up.  This was an

9  explosion that was an isolated incident.  That because of

10  that, the defendant is not a threat in the future to the

11  community.

12          I'll allow Dr. Bayless to talk about tearing and

13  not so much in terms of honesty and truthfulness and

14  credibility, but in terms of gain, gaining favor or gaining

15  sympathy.

16          I'll allow law Dr. Bayless to testify about the

17  suicide attempt and his understanding of what that involves

18  based on his reading of the report.

19          As such, I'm going to preclude Dr. Bayless from

20  testifying with regard to any diagnosis of the defendant.

21  Okay.

22          Any questions about the Court's ruling?

23          MR. MARTINEZ:  No, sir.

24          THE COURT:  Why don't we have the bailiff escort

25  Dr. Bayless to the back here and he can, in the next

1   several minutes, wait for his call from Coconino Superior

2   Court.  And then in the meantime, we'll have the other

3   witnesses here.  Thank you.

4               Ready for the jury?

5               MR. MARTINEZ:  Yes.

6               MR. PATTERSON:  Yes.

7               THE COURT:  As soon as the bailiff gets back in

8   here, we'll have the jury brought in.

9               Ready for the Jury?

10              MR. MARTINEZ:  Yes.

11              MR. PATTERSON:  Yes.

12              THE COURT:  Apparently, the jury would like to

13  take a break since they've been in there several minutes.

14  We'll take a 20-minute break at this point in time.

15              (Recess taken.)

16              THE COURT:  This is CR2000-096032, State of

17  Arizona versus Wendi Elizabeth Andriano.

18              The record will reflect the presence of the

19  defendant, counsel and the jury.

20              First of all, let me apologize.  I should never

21  say ten minutes.  Let me apologize.  I think all of you

22  understand that I need to make sure that things are done in

23  a proper manner and in an official manner.  So I apologize

24  for that.  I just want you to know I am aware of how

25  important your time is.  And I tried my best not to abuse

48

1   the time you've given us.

2           Mr. Martinez.

3           MR. MARTINEZ:  State calls Dawna Harris.

4           THE COURT:  Please step forward right up here to

5   the clerk and she will swear you in.

6           (Witness sworn.)

7           THE COURT:  Please have a seat on the witness

8   stand.  Please pull the microphone close to you. Remember

9   to speak loudly and clearly so everyone can hear you.

10  Also, wait until the question is completed before you

11  answer the question.  And please make sure you give a

12  verbal response.

13          Is that all agreeable to you?

14          THE WITNESS:  Yes.

15          THE COURT:  Mr. Martinez, you may proceed.

16

17                   DAWNA HARRIS,

18  called as a witness herein, having been first duly sworn,

19  was examined and testified as follows:

20

21                 DIRECT EXAMINATION

22  BY MR. MARTINEZ:

23      Q.   State your name, please?

24      A.   Dawna Harris.

25      Q.   And who do you work for?

1    A.    Maricopa County Sheriff's Office.

2    Q.    How long have you been working for the Maricopa

3  County Sheriff's Office?

4    A.    Seventeen years, four months.

5    Q.    And when have you -- with regard -- where do you

6  work at?

7    A.    I'm now at Durango D2.

8    Q.    How long have you been at Durango D2?

9    A.    Four years.

10    Q.    Do you know an inmate by the name of Wendi

11  Elizabeth Andriano?

12    A.    Yes, I do.

13    Q.    Is she in court today?

14    A.    Yes, she is.

15    Q.    Tell me where she is seated and what she is

16  wearing?

17    A.    She's is seated between the two gentlemen at that

18  table, wearing a purple sweater.

19          MR. MARTINEZ:  May the record reflect the

20  identification of the defendant by the witness?

21          THE COURT:  The record will reflect the

22  identification of the defendant by the witness.

23    Q.    BY MR. MARTINEZ:  You indicated that you worked

24  at D2 Durango facility.  Can you tell me a little bit about

25  that facility?

1     A.   It's a psychiatric facility.   It's unique in that

2  it houses both males and females.

3     Q.   And do the males and females get to sleep on the

4  same side?  How does that work?

5     A.   No, it is separated.

6     Q.   And so one side is directed towards males and one

7  side to females?

8     A.   That's correct.

9     Q.   Do they associate or do they socialize during the

10  day hours or how does that work?

11     A.   No.  We try to keep them apart as much as

12  possible.

13     Q.   What are your duties with regard to that facility

14  at Durango?

15     A.   My duties are to keep everyone safe at all times,

16  the facility secure.

17     Q.   And you've been doing that I think you said four

18  years, correct?

19     A.   In that facility, yes.

20     Q.   And how is it -- Is there also a mental health

21  staff that forms a component of the unit there at Durango?

22     A.   Yes, there is.

23     Q.   Is one of the people there somebody by the name

24  of Joyce Van Every?

25     A.   Yes, she is.

1      Q.   How about Gerald Perry, does he also work there?

2      A.   Yes.

3      Q.   And somebody by the name of Laura King, does she

4   work there sometimes?

5      A.   She did but no longer does.

6      Q.   Do you know when she left?

7      A.   I believe it was about three months ago.

8      Q.   They also work for the sheriff's office but they

9   are different than you, correct?

10      A.   They are County Health Service, but yes.

11      Q.   And what is your job in comparison to what they

12   do.  What is it that you do in comparison to what they do?

13      A.   I just keep the place secure and they do

14   counseling therapy and medical services.

15      Q.   How it is that -- is there a specific way in

16   writing that you communicate with them on a day-to-day

17   basis?

18      A.   Yes.

19      Q.   What is that?

20      A.   We have a spiral notebook that we make notations

21   in if we see things are awry or need attention.  And that

22   gets passed along to the staff.

23      Q.   What is your shift?

24      A.   6:30 to two.

25      Q.   Let's say there is an issue that arises, do you

52

1    then go to the spiral notebook during your shift and write

2    whatever is of concern to you?

3         A.    Yes, I do.

4         Q.    How -- and where is this notebook?

5         A.    It's kept in our control booth.

6         Q.    And is it a requirement or policy or custom that

7    the health people then come over and take a look at it?

8    How is it they get the messages that are in that book?

9         A.    Every day they have a meeting at 10:30.   They

10   come into the control booth and get the spiral notebook and

11   take to their staff meeting.

12        Q.    I'm showing you Exhibit 546 and ask you if you

13   recognize what's here.

14        A.    Yes, I do.

15        Q.    And that's referring to an entry back on February

16   25th of 2004 and February 26, 2004, as it relates to Wendi

17   Elizabeth Andriano, correct?

18        A.    Correct.

19        Q.    Did you write those notes?

20        A.    I wrote the bottom one.

21        Q.    And the top one, do you know who wrote that one?

22        A.    That appears to be Officer Lose's handwriting.

23        Q.    But it's part of this same book or same page of

24   the book that we've been talking about, correct?

25        A.    Yes, it is.

1      Q.    And you were the one that actually made the copy,

2   right?

3      A.    Yes, I am.

4            MR. MARTINEZ:   I move for the admission of

5   Exhibit Number 546.

6            MR. PATTERSON:   Judge, we need to approach.

7            (Bench conference was held outside the hearing of

8   the jury.)

9            MR. PATTERSON:   This is one of the things I just

10  got today.   We made requests for all of the medical and

11  jail records from the county jail.   They never sent this to

12  us.   This apparently is something, a spiral notebook that

13  they keep personally and that had some entries in it that

14  are germane.   They should have disclosed this to us

15  pursuant to the order that you signed weeks ago.   It should

16  have been submitted to us.

17           Secondly, it pertains to an allegation of one

18  inmate having some problems with Wendi and not wishing to

19  be in the same pod.   And it's information that should be

20  more properly presented perhaps by that person rather than

21  through this lady because it injects collateral issues into

22  the case I can't adequately defend against just having been

23  notified this existed today.

24           THE COURT:   Mr. Martinez?

25           MR. MARTINEZ:   She indicated that that's not her

1   personal note because everybody writes in it, including the

2   other D.O.s that are there.  So it's not her own notebook.

3   But additionally with the complaint, we bring in the person

4   that made that comment.  You know, the rules don't require

5   us to do that at this point.

6            Additionally, she said she wrote it.  So she has

7   personal knowledge of it.  Why the jail doesn't give him

8   this information, I don't know.  But that's all I know.

9   After Joyce Van Every testified the next day I just can't

10  remember what the dates were but after she testified, I

11  asked the paralegal to contact Joyce Van Every for the name

12  of the officer that they indicated to us was unhappy or had

13  something to say.  And as a result of that, I just sent

14  them a subpoena and asked them to provide me with all

15  correspondence naming Wendi Andriano.  I received it this

16  morning when they came to court today at ten.

17           THE COURT:  I'm going to allow you to elicit

18  testimony about the information here.  But I'm not going to

19  allow it to be admitted to.  I'll allow you to elicit

20  testimony.

21           MR. MARTINEZ:  Can she read it?

22           THE COURT:  No.  But she can testify about the

23  events.

24           MR. MARTINEZ:  Judge, I think that Rule 703

25  allows me to do that.  I'm not arguing with you.

1          THE COURT:  I'm not allowing you to admit it

2          (Bench conference concluded.)

3     Q.   BY MR. MARTINEZ:  Ma'am, are you the one who made

4   the entries on February 26, 2004?

5     A.   Yes, I am.

6     Q.   Did you write that entry as a result of a

7   conversation that you may have had with someone?

8     A.   Yes.

9     Q.   You had a conversation with whom?

10    A.   Her name is Long Horse.

11    Q.   Is that who?  Is that an inmate?

12    A.   Yes, it is.

13    Q.   And where was this inmate?  Where was she housed?

14    A.   She was housed in D pod.

15    Q.   And you and she had a conversation and what did

16  she tell you?

17    A.   Well, the conversation was initiated because the

18  staff wanted her to move to C pod.

19    Q.   Who is a resident on C pod?  Who is a resident of

20  C pod back then?

21    A.   Andriano.

22    Q.   Go ahead.

23    A.   And when I tried to convince her to move to C

24  pod --

25    Q.   From where was she?

1    A.   D pod.

2    Q.   Go ahead.

3    A.   -- to C pod because that was the staff's wishes,

4  she informed me that she did not, in fact, want to go over

5  there as long as that quote control freak, was still living

6  in that pod.

7    Q.   Which control freak was she talking about?

8    A.   Andriano.

9    Q.   Did she specifically say Andriano or was that

10  something you came up with?

11    A.   She called her Wendi.  There was only one Wendi

12  there at the time.

13    Q.   And did he also indicate that she was willing to

14  put up with any bullying by other members as long as she

15  didn't have to be housed with the defendant?

16    A.   That's correct.

17    Q.   You indicated there is also some more writing at

18  the top.  You indicated that may have been written by

19  someone else.  It may have been Officer Lose, I think you

20  said?

21    A.   Yes.

22    Q.   But it does refer to somebody by the name of

23  Candy Rohde?

24    A.   Yes.

25    Q.   How is Candy Rohde related or associated with the

EXHIBIT BBB

000008909

57

1  defendant?

2      A.   I'm not sure.  For some reason, the staff was

3  allowing this woman to come into the unit to have

4  counseling sessions of some sort with her that were contact

5  visits, which is unprecedented.

6      Q.   When you say "unprecedented" what do you mean?

7      A.   We have a visitation facility and those visits

8  were taking place up there.

9      Q.   Were you under the impression she was a lawyer?

10     A.   I was under the impression she had something to

11 do with legal staff.

12     Q.   And  as a result of one of those visitations did

13 something occur with regards to the defendant?

14     A.   Yes.

15     Q.   Tell me about that?

16     A.   Right after she had a visit with her --

17     Q.   Right after Andriano had a visit with Ms. Rohde?

18     A.   Correct.  We were doing cell searches.

19     Q.   You searched cells?

20     A.   We did at C cell, in C pod.

21     Q.   All right?

22     A.   And when I searched Andriano just lightly, I

23 discovered a compact case in there with a glass mirror.

24     Q.   And this --

25          MR. PATTERSON:  Judge, can we approach, please?

1          (Bench conference was held outside the hearing of

2    the jury.)

3          MR. PATTERSON:  I don't know where she came from

4    but this lady is not a member of my legal staff.  And for

5    her to suggest that she is now associated with my office,

6    and thereafter brought some contraband into our client is

7    just outrageous.

8          THE COURT:  Who is the lady?

9          MR. PATTERSON:  She is a counselor who was hired

10   by the mother to give counseling services to the client.

11   She is not a member of our staff.  There is nothing to do

12   with legal staff.

13         THE COURT:  Okay.

14         MR. PATTERSON:  So could you direct that that be

15   cleared it up so we don't have to -- I don't have to --

16         MR. MARTINEZ:  I stipulate that's not -- I don't

17   have a problem with that.

18         THE COURT:  You both will to stipulate that this

19   person is not associated with?

20         MR. PATTERSON:  Anything to clear this issue up

21   right now.

22         THE COURT:  And her name is Candy Rohde?

23         MR. MARTINEZ:  Candy is the first name.

24   R-o-h-d-e.

25         THE COURT:  And have you both stipulated?

1          MR. PATTERSON:  She is not a member of the public

2    defender's staff, a legal representative and not a lawyer.

3    She has nothing to do with the legal defense of this case

4    or even my staff.

5          MR. DELOZIER:  She's a professional counselor

6    provided by the mother and father.

7          MR. MARTINEZ:  Just not associated.  We don't

8    know who she was hired by.

9          MR. PATTERSON:  But she wasn't hired by my

10   office.  She wasn't hired by his office.

11         THE COURT:  This Candy Rohde is not associated

12   with the public defender's office or staff of either

13   Mr. Delozier or Mr. Patterson's office.

14         MR. PATTERSON:  That's fine.

15         MR. DELOZIER:  Okay.

16         (Bench conference concluded.)

17         THE COURT:  Ladies and gentlemen, the parties

18   stipulate to the following:  That this Candy Rohde that's

19   been mentioned is not associated in any way with the

20   Maricopa County Public Defender's Office or Mr. Patterson's

21   or Mr. Delozier's offices.

22         The parties stipulate that this person that was

23   mentioned, Candy Rohde, is not associated in any way with

24   the Maricopa County Public Defender or with Mr. Patterson's

25   or Mr. Delozier's office.

1          Mr. Martinez.

2     Q.   BY MR. MARTINEZ:  To get back to Ms. Rohde, one

3  of the things you told us was she was getting visitation

4  that was face-to-face, correct?

5     A.   Yes.

6     Q.   That implies that the visitation with everybody

7  else was different or otherwise?

8     A.   Yes.

9     Q.   How is that?  In other words, how does that take

10  place?  Was it through a glass?

11     A.   Well, no, it was in that conversation booth about

12  this size, maybe twice this size, with plexiglas walls and

13  with full vision from our office.

14     Q.   And could the two people touch each other?

15     A.   They could.

16     Q.   In other words, they could just extend and do

17  whatever?

18     A.   That's correct.

19     Q.   Prior to coming to court, did you have occasion

20  beginning in June of 2004 to present, to take a look at the

21  records to determine how many times someone by the name

22  Donna Ochoa had visited the defendant in the last six

23  months?

24     A.   There were four visits total.

25     Q.   And that's beginning in June of 2000?

1     A.   June 1 until December 3rd.

2         Q.   Do you remember what dates those visits were,

3   what month they were?

4     A.   There was one on June 1st, there was another

5   towards the end of October.  Another towards the end of

6   November and then December 3rd was the other one.

7         Q.   One of the things that's in Exhibit 546 that's

8   related to us about indicating something about a control

9   freak.  Did you have occasion to see the defendant, Wendi

10  Andriano, interact with the other inmates in her pod?

11    A.   Yes.

12        Q.   And in terms of the person who was in charge, if

13  you will, do you have an opinion as to who was in charge

14  involving the defendant and the other inmates?

15    A.   I didn't actually see her controlling them.  I

16  got many, many complaints from inmates saying that

17  different things were going on and all of these things seem

18  to come back to Wendi Andriano.

19        Q.   As a result of those complaints and the things

20  that were coming back, did you form an opinion as to who

21  was in charge?

22    A.   Yes.

23        Q.   Who was that?

24    A.   Wendi.

25        Q.   Now, was there also a situation where there was

1  movement in and out of this pod of the inmates that were

2  there?

3      A.   Yes.

4      Q.   Did you then have occasion over the last year

5  let's say, were there many movements in and out of that

6  facility?

7      A.   Several.

8      Q.   And with regard to those movements, did you then

9  question the staff involving Mr. Perry, Laura King,

10  perhaps, Ms. Van Every about what was going on?

11      A.   Yes, I did.

12      Q.   And what is it that they would tell you?

13      A.   They just said they had received information

14  about inmates that led them to believe that that inmate was

15  not conducive for that environment and needed to go back.

16      Q.   Then did you press them on what that information

17  was?

18      A.   I asked where they got the information.

19      Q.   And what did they tell you?

20      A.   They told me Andriano was telling them.

21      Q.   As a result of this information she was

22  providing, people were being moved?

23      A.   That's correct.

24      Q.   We had left off with Ms. Rodhe and we were

25  talking about the compact.  Do you remember that?

1     A.   Yes.

2     Q.   Is a compact something that's allowed in that

3  particular pod?

4     A.   No, it is not.

5     Q.   Is it allowed in the jail-wide facility?

6     A.   No.

7     Q.   Is it something that they can buy from the

8  commissary?

9     A.   No.

10     Q.   Does the compact that you're talking about, did

11  it have glass in it?

12     A.   Yes, it did.

13     Q.   Is that something that is a potential hazard

14  either to this inmate or perhaps to other inmates?

15     A.   Yes, it is.

16     Q.   Why is that?

17     A.   Because anyone could break it out.  It was a

18  psychiatric unit and a lot of people were very emotionally

19  fragile.

20     Q.   It could be used as a weapon, I think that's what

21  you're telling me, right?

22     A.   Yes.

23     Q.   Did you have occasion, at one point, take a

24  disciplinary action against the defendant, Wendi Andriano?

25     A.   Yes, I did.

64

1    Q.   And was that put in writing?

2    A.   Yes, it was.

3    Q.   Let me show you.  This is Exhibit Number 548.

4         Is this a report that you wrote?

5    A.   Yes, it is.

6    Q.   And what's the date on it?

7    A.   12/3 of '03.

8    Q.   And our understanding is that she arrived there

9    about July of '03, is that when she arrived?

10   A.   I don't recall, exactly.  I thought it was

11   September.

12   Q.   And with regard to this, what is it that she did

13   that caused you to write this report?

14   A.   She had tried to conceal various makeup items

15   that had been brought in from the outside.

16   Q.   Is this the same time that we are taking about

17   with the compact that is referenced here on Exhibit Number

18   546 that's dated 2/25/04?

19   A.   Yes.

20   Q.   What's the date of this again?

21   A.   12/3/03.

22   Q.   That appears to be happening -- I see what you're

23   saying.  Okay.

24        I move for the admission of Exhibit 548?

25        MR. PATTERSON:  No objection.

000008917

1            THE COURT:  Exhibit 548 for identification is

2    admitted into evidence.

3        Q.   BY MR. MARTINEZ:  Why don't you read for us the

4    items that were allegedly contraband, that you found to be

5    contraband?

6        A.   Just list the items?

7        Q.   Yes.  The items that you found.

8            MR. PATTERSON:  May I have the exhibit number?

9            THE COURT:  Exhibit 548.

10            MR. PATTERSON:  Thank you, sir.

11            THE WITNESS:  Besides the compact case with glass

12    mirror, were two black pens, new lipstick in a little case,

13    lib gloss and eye liner.  All of them still had the

14    store-brought wrapping on them so they were very new.

15        Q.   Was there an investigation as to how they got in?

16        A.   No.

17        Q.   Any idea how they got in?

18        A.   We believe that Candy Rohde was bringing them in.

19        Q.   That's why on February 25th, '04 was the notation

20    that she's not allowed?

21        A.   That's correct.

22        Q.   Drawing your attention back to mid July of 2004.

23    Did you have occasion to be working double shifts back

24    then, say, July 24th of 2004?

25        A.   I actually worked about two and a half hours

1   over.

2        Q.   And when you were working those two and a half

3   hours over, if you started at two that would have taken you

4   to 4:30?

5        A.   Approximately 4:30.

6        Q.   And did you have occasion, again on July 24th of

7   2004, to speak to somebody by the name of Joyce Van Every?

8        A.   Yes, I did.

9        Q.   Who is she?

10       A.   She's the  R.N. for the unit.

11       Q.   When she came up to you, what is -- First of all,

12   tell us what her demeanor was like upon seeing you there.

13       A.   She was agitated.

14       Q.   And then, did she say anything to you?

15       A.   Yes, she did.

16       Q.   What did she say?

17       A.   She asked me when I was going to leave.

18       Q.   And what did you say?

19       A.   I said, "I don't know.  I'll be here for a

20   while.  I may work a double."

21       Q.   And then what happened?

22       A.   She said, "Well, I've got to go in and see Wendi

23   before I go home."

24       Q.   Did she have anything in her possession when she

25   was going to go see Wendi before she went home?

1    A.    Yes, she did.

2    Q.    What did she have?

3    A.    She had a white plastic shopping bag.

4    Q.    And is it the kind that you get like at Fry's or

5  something?

6    A.    Yes, it is.

7    Q.    And was there items in that shopping bag?

8    A.    The bag was probably three quarters full.

9    Q.    So, she takes this bag in and says she needs to

10  see Wendi.  Then what happens?

11   A.    I let her into C pod and she went out of sight of

12  the camera monitor at that point.

13   Q.    How long was she gone before you saw her again?

14   A.    Just minutes.

15   Q.    And then what happened?

16   A.    When she exited the C pod, that bag was better

17  than half empty.

18   Q.    And what conclusion did you draw from that?

19   A.    I decided that she had passed something to the

20  inmate.

21   Q.    Did you then go and check to see what that was?

22   A.    No.  Because by the time we discovered it, it was

23  too late for me to go in.  Plus, I was noncontact at the

24  time because of an accident that happened so I couldn't

25  personally do it.

1      Q.    What does "noncontact" mean?

2      A.    That means I had an injury that left me

3  vulnerable.  So I had no contact, physical contact.

4      Q.    When she came out, did she, I'm talking about

5  Joyce Van Every, did she say anything to you?

6      A.    No.  Just said she's going home and I let her

7  out.

8      Q.    One of the things when the defendant was there,

9  did Joyce Van Every and the defendant have contact on a

10  frequent basis?

11      A.    Daily.

12      Q.    And with regard to the other inmates that were

13  there, did Joyce Van Every have daily contact with them

14  like she did with the defendant?

15      A.    No.

16      Q.    When you say she had daily contact with the

17  defendant, explain that to me?

18      A.    She would go over to C pod and ask us to open the

19  door.  We would open the door and she would have Andriano

20  exit the pod.

21      Q.    And they would sit and talk?

22      A.    Yes.

23      Q.    Where would they talk?

24      A.    Most of the time at the round table just outside

25  of C pod.

1      Q.     Would it be unusual for her to talk to her every

2  day?

3      A.     That is an unusual practice.

4      Q.     Let's say she's talking to her and you perhaps

5  need her for something.  Was it something that she would

6  leave Ms. Andriano and go back to whatever you're talking

7  about or was it something that she would continue talking

8  to Ms. Andriano?

9      A.     She would refer me to someone else.

10     Q.     How about Dr. Perry, do you know whether or not

11  there were any notes kept of what appears to be daily

12  conversations?

13     A.     I don't know.  I wasn't privy to the nurse's

14  notes.

15     Q.     How about Dr. Perry, did he spend some time with

16  the defendant?

17     A.     When he was there and she was there, it was

18  daily.

19     Q.     And, again, is that something that he did with

20  the other inmates?

21     A.     No.

22     Q.     How about Laura King, did she spend some time

23  with her?

24     A.     Yes, she did.

25     Q.     And, again, was it as frequent as it was with

70

1   Ms. Van Every and Mr. Perry?

2       A.   Yes, it was.

3       Q.   And do you know whether or not they kept notes on

4   that?

5       A.   No, I don't.

6       Q.   What about this issue about -- are books allowed

7   to go into an inmate without you first inspecting them?

8       A.   No.

9       Q.   Why is that?

10      A.   Because in the past things have been hidden

11  within the leaves of the book.

12      Q.   And do you know whether or not the defendant ever

13  was in possession of items, such as books without first

14  having been inspected by you?

15      A.   Yes, I do.

16      Q.   And do you know who brought them in?

17      A.   Both Joyce Van Every and Roberto Escobar.

18      Q.   Who is Roberto Escobar?

19      A.   He's another R.N. on the unit.

20      Q.   Wasn't the defendant there because of a suicide

21  attempt?

22      A.   Yes, she was.

23      Q.   Wouldn't it be possible to hide some sort of a

24  weapon in these books?

25      A.   Yes, it would.

1    Q.    Speaking about books, was there ever a situation

2   or something that came to you about whether or not the

3   defendant was writing a book with Joyce Van Every?

4    A.    I was told that.

5    Q.    And who were you told that by?

6    A.    By Andriano's cell mate, at the time Anthony

7   Gonzales.

8    Q.    Was the defendant present when he told you that?

9    A.    No.

10   Q.    One of the things that we were told about, well,

11  let me ask you, is clothing distributed on a daily basis in

12  this pod?

13   A.    No, once a week.

14   Q.    And when we're talking about clothing, what are

15  we talking about.

16   A.    We're talking about the striped shirt on the top

17  and striped pants on the bottom and underwear, change of

18  socks.

19   Q.    With regard to the items in the uniform, would

20  you give these items to the defendant?

21   A.    I handed them to them, yes.

22   Q.    Was there ever any issues with the defendant

23  involving the garments that you were giving out on a weekly

24  basis?

25   A.    She was very fussy about the colors of the

72

1   stripes.

2       Q.    What do you mean she was fussy about the color of

3   the stripes?  They are black and white, right?

4       A.    Correct.

5       Q.    What was she fussy about?

6       A.    She was fussy if the top did not match the

7   bottom.  And color as far as density.

8       Q.    So what would happen if you would give her

9   something that doesn't match?

10      A.    She would get upset with me and beg me to give

11  her something that would match.

12      Q.    What did you do?

13      A.    I'd finally just say you show me what matches and

14  I would hand it to her because it would take too long.

15      Q.    Is this something that happens on a weekly basis

16  with her?

17      A.    Yes.

18      Q.    And it still continues?

19      A.    Yes.

20      Q.    We talked a little bit about Donna -- I'm sorry

21  about Laura King.  You know who she was, right?

22      A.    Yes.

23      Q.    Did she seemed to have a somewhat special

24  relationship with the defendant?

25      A.    Yes, she did.

1    Q.   How do you mean that she had a special

2   relationship with the defendant.  How did that manifest

3   itself?

4    A.   They would be seen a lot joking and kidding

5   around and spending a lot of time conversing.

6    Q.   And in anticipation of this trial, do you know

7   whether or not Ms. King would come in in her own time to

8   assist the defendant?

9    A.   Yes, she did.

10    Q.   Explain that to me?

11    A.   She came in in the evening to do her hair and

12   makeup the day before she had to come to trial.

13    Q.   How many times would she do that?

14    A.   I can't be certain of that.

15    Q.   Ma'am, these people that we're talking about,

16   Ms. King, Mr. Perry and Ms. Van Every, are they bound by

17   the same rules of the jail as you are?  In other words, not

18   to bring in items that you don't check, not to bring in

19   contraband, basically, worry about the safety of the

20   inmates as well as themselves?  Are they bound by the

21   policies of the jail?

22    A.   Yes, they are.

23    Q.   It's not like, or is it, that they have their own

24   rules that aren't applied to them?

25    A.   No.

1    Q.    Are you familiar with the policy of CP 2, the

2  code of conduct involving employees of the sheriff's

3  office?

4    A.    Yes, I am.

5    Q.    And, specifically, does that section CP 2, number

6  19, talk about association and fraternization with

7  prisoners?

8    A.    Yes, it does.

9    Q.    Does it talk about employees shall not indulge in

10  undue familiarity with inmates?

11    A.    Yes, it does.

12    Q.    It's forbidden?

13    A.    Yes, it is.

14    Q.    Why?  Do you know it's forbidden?  I know you've

15  been there about 17 years, can you tell us why, if you can,

16  and if you can't, that's okay?

17    A.    Because it puts you in a compromising position.

18    Q.    How does it put you in a compromising position?

19    A.    It puts you in a position where you can be

20  manipulated if you become too familiar.

21    Q.    How about, it also indicates that employees shall

22  not do favors for or accept favors from somebody who is an

23  inmate.  Is that something that you're familiar with?

24    A.    Yes.  This thing with Ms. King coming in and

25  providing this thing with the hair and talking to her and

1   engaging in this conduct with her, is that something that

2   you think is covered by this?

3           MR. PATTERSON:  Objection.  Her opinion.

4           THE COURT:  Sustained.

5       Q.  BY MR. MARTINEZ:  Ma'am, you are charged with

6   keeping order there, aren't you?

7       A.  Yes, I am.

8       Q.  You are charged with enforcing these, aren't you?

9       A.  Yes, I am.

10      Q.  Did you speak to them about this?

11      A.  Yes, I did.

12      Q.  And with regard to Ms. King, what did she say?

13      A.  That it was unimportant, not a problem.

14      Q.  Even though you talked to her about it?

15      A.  Yes.

16      Q.  Even though you perceived it to be a problem?

17          MR. PATTERSON:  Objection.  Leading.

18          THE COURT:  Don't lead.

19      Q.  BY MR. MARTINEZ:  Did you perceive it to be a

20  problem?

21      A.  Yes, I did.

22      Q.  How about with Ms. Van Every, did you perceive

23  the fact that she was bringing in books a problem?

24      A.  Yes, I did.

25      Q.  And did you ever discuss that with her?

1     A.   Yes, I did.

2     Q.   What was her response to that?

3     A.   She said I didn't know what I was talking about.

4     Q.   Is there a policy, for example, that says

5 employees shall not provide inmates with books from outside

6 the jail?

7     A.   Yes, there is.

8     Q.   What's the procedure for getting a book to an

9 inmate?

10     A.   In general population the books have to be

11 donated to the library.  There has been exceptions made in

12 D2 because the staff there has been very insistent on being

13 able to bring in magazines and books for the inmates.  So

14 in order to accommodate them, we have agreed to allow them

15 to bring in paperback books from home as long as they are

16 dropped off in our control booth to at least be sure we are

17 able to check them over for any kind of contraband that may

18 be coming in.

19     Q.   And did Ms. Van Every comply with that modified

20 rule of security?

21     A.   No, she did not.

22     Q.   One of the things that has been raised in this

23 case is that the defendant potentially, possibly, may have

24 attempted suicide sometime in, I guess it was September of

25 2003.  And one of the allegations is that perhaps that she

77

1    may have used a pencil for that.  Are you familiar with the

2    pencils that are given to inmates?

3         A.   Yes.

4         Q.   Were you asked to bring a sample pencil with you?

5         A.   Yes, I was.

6         Q.   Do you have it with you?

7         A.   Yes, I do.

8         Q.   May I take a look at it?

9         A.   (Witness complies.)

10        Q.   Showing you what's been marked for identification

11   as Exhibit Number 549.  Do you recognize it?

12        A.   Yes, I do.

13        Q.   And is that type of pencil -- or you tell me.  Is

14   that the type of pencil the jail used and provided to

15   inmates back in September of 2003?

16        A.   Yes, it is.

17             MR. MARTINEZ:  I move for the admission of

18   Exhibit 548.

19             MR. PATTERSON:  No objection.

20             THE COURT:  Exhibit Number 549 for identification

21   is admitted into evidence.

22        Q.   BY MR. MARTINEZ:  Did you ever have occasion to

23   work outside of what I guess is called the psych ward?

24        A.   Yes, I have.

25        Q.   And were you familiar with these pencils when you

78

1   were out in the psych ward?

2       A.   Yes.

3       Q.   Awe how is it that they were sharpened?  Was

4   there a special sharpener?  Who did the sharpening?  Do you

5   know?

6       A.   There was a pecil sharpener attached to the wall

7   that was provided.

8       Q.   Are you familiar with -- I think you mentioned an

9   R.N. by the name of Escobar.  Do you know who he is?

10      A.   Yes, I do.

11      Q.   What's his first name?

12      A.   Roberto.

13      Q.   Are you familiar with a situation involving him

14  and some shampoo and the defendant?

15      A.   Yes, I am.

16      Q.   Tell me about that?

17      A.   The following day of the incident, my partner

18  told me that --

19      Q.   Your partner is Bonnie?

20      A.   Lose.

21      Q.   Is she the person that's outside?

22      A.   Yes.

23      Q.   Go ahead.

24      A.   And she told me that Roberto was trying to bring

25  in some shampoo for Andriano, specifically for her.

1    Q.   And is that something that the rules allow?

2    A.   No.

3    Q.   What happened when he tried to bring it in?  Did

4    one of the other nurses get wind of it?

5    A.   Yes.  Donna Anderson came to the office and told

6    her what was happening and that she was uncomfortable with

7    it.

8    Q.   And then what happened after this conversation

9    between Donna Anderson and Bonnie Lose?

10   A.   Bonnie told her that she needed to go back to the

11   office and let them know how she felt about it.  And make

12   sure that it did not ever make it into the pod.

13   Q.   What was Escobar's response to that?

14   A.   His response was it's part of her treatment

15   plan.  It will just be our little secret.

16   Q.   Well, if that's their little secret, is that

17   something that, from a security standpoint, that's

18   something that should be countenanced?

19        MR. PATTERSON:  Wait, Judge.  Your Honor, he's

20   using --

21        THE COURT:  Sustained.

22   Q.   BY MR. MARTINEZ:  Is this something that's

23   allowed by the rules to, I guess, secretively give an

24   inmate anything, including hair products?

25   A.   No, these are provided in a generic form.

80

1      Q.   Why is that a security issue?

2      A.   Because if they're doing anything like that

3  secretively, without us knowing, there is no way for us to

4  be able to know what is coming in besides that.

5      Q.   Since the defendant has arrived there, do you

6  have an opinion, based on your observations of her -- how

7  many days a week do you work?

8      A.   Five.

9      Q.   Do you have any observations based on your five

10  days a week that you have there, whether or not the

11  defendant receives preferential treatment in that pod?

12      A.   Yes, she does.

13      Q.   Aid, specifically, who provides her preferential

14  treatment?

15      A.   Dr. Perry, Roberto Escobar and Van Every.

16      Q.   And when Ms. King was there, did she also provide

17  preferential treatment to her?

18      A.   Yes, she did.

19      Q.   Do you remember a situation when -- what was the

20  defendant's -- Anthony Gonzales was the defendant's cell

21  mate?

22      A.   Cell mate, yes.

23      Q.   Was there a situation when the defendant came to

24  you about 8:30 in the morning -- or at least he came to you

25  about using the telephone?

81

1      A.   Yes.

2      Q.   And what did you tell him as it applied?   What

3  did you tell him?

4      A.   He asked me if he could make a phone call but the

5  phone was not turned on yet.   I said no it was too early.

6      Q.   Then what happened?

7      A.   Then immediately after that --

8      Q.   By immediately, how much time passed?

9      A.   A matter of seconds.

10     Q.   Then what happened?

11     A.   Ms. Andriano came immediately to the window.   She

12  rang the buzzer and told me that she wanted the phone on

13  because she needed to make a legal phone call.

14     Q.   And did you continue to observe Ms. Andriano

15  immediately after her making that request?

16     A.   Yes.

17     Q.   And for how long did you observe her?

18     A.   As often as I could throughout the day.

19     Q.   And at any time throughout the day did you ever

20  see her using that phone?

21     A.   No, I did not.

22     Q.   How about Anthony Gonzales, did you see him using

23  the phone?

24     A.   Yes.   As soon as the power to the phone was on,

25  Anthony made a phone call.

1    MR. MARTINEZ:  I don't have any other questions.

2    THE COURT:  Mr. Patterson.

3    MR. PATTERSON:  Thank you, Judge.

4

5                    CROSS-EXAMINATION

6  BY MR. PATTERSON:

7    Q.   Are you a detention officer or a deputy sheriff?

8    A.   Detention.

9    Q.   And what is your rank at the facility?

10   A.   Detention officer.

11   Q.   Okay.  Do you have supervisors there at that

12  facility?

13   A.   Sometimes.  There are some scheduled there.

14   Q.   And would they be given rank, sergeant, that kind

15  of thing, lieutenant?

16   A.   Sergeant would be the only one that would be in

17  that facility.

18   Q.   And so who is your immediate supervisor, again?

19   A.   Right now?

20   Q.   Yes.  Well, back when -- yeah, currently and at

21  the time that you were in D2?

22   A.   We've had numerous.  But right now it's Sergeant

23  Frank Valenzuela.

24   Q.   The things that you observed that were done by

25  Dr. Perry and Joyce Van Every, Laura King, did you report

1    this conduct to your supervisor?

2       A.   Yes, I did.

3       Q.   Was there ever any disciplinary action commenced

4    against these people for the allegations you made?

5       A.   They're not directly over them and they informed

6    me they had gone to Ms. Van Every's supervisor, who is the

7    Laurie Saint Lewis.

8       Q.   Was she disciplined as a result of this?

9       A.   I don't know.

10      Q.   Was she removed from her position as head

11   psychiatric nurse there?

12      A.   No.

13      Q.   She stills remains today as the head psychiatric

14   nurse?

15      A.   Yes, she does.

16      Q.   Dr. Perry, the complaints that you made that he

17   was visiting with Ms. Andriano or fraternizing, I think you

18   were suggesting, did you make the complaint to the powers

19   that be about Dr. Perry?

20      A.   Yes.

21      Q.   Was he ever disciplined or removed from the

22   staff?

23      A.   No.

24      Q.   And this particular pod that you're in is a

25   medical pod, right?

1     A.   No, it's psychiatric.

2     Q.   But it has -- the people are there because they

3  have psychiatric issues, right?

4     A.   Yes.

5     Q.   And these issues the inmates have are dealt with

6  by professionals like Dr. Perry and Counselor Laura King

7  and Psychiatric Nurse Joyce Van Every, right?

8     A.   Yes.

9     Q.   And do you have any kind of medical background or

10  degree that we should be aware of?

11     A.   I've had a number of hours of training for the

12  psychiatric unit.

13     Q.   I know but do you have a doctorate?

14     A.   No.

15     Q.   Do you have a psychiatric degree?

16     A.   No.

17     Q.   Do you have a psychology degree?

18     A.   No.

19     Q.   Do you have a nursing degree?

20     A.   Nope.

21     Q.   So decisions are made by nursing staff and

22  doctors staff that affect these patients that are on that

23  particular unit, correct?

24     A.   That's correct.

25     Q.   There are also issues involving security that

1   you're more involved with, correct?

2       A.   Correct.

3       Q.   And it seems to me that there's inherent tension

4   between the security staff and the medical staff, is that a

5   fair statement?

6       A.   Yes.

7       Q.   From what you could observe, Wendi apparently got

8   along very well with the medical staff there in the pod,

9   correct?

10      A.   Most of them.

11      Q.   Well.  Laura King, correct?

12      A.   Yes.

13      Q.   Dr. Perry?

14      A.   Yes.

15      Q.   Joyce Van Every?

16      A.   Yes.

17      Q.   Roberto Escobar?

18      A.   Yes.

19      Q.   Are there other medical staff that she didn't get

20   along with?

21      A.   There are many other people from that staff who

22   complained about what went on.

23      Q.   Okay.

24      A.   There was an R.N. there, Donna Anderson, who did

25   not believe that the activity is ethical.  She expressed

1   that many times.

2        Q.   Has she complained to the powers that be over

3   there?

4        A.   No, because she is an underling to Joyce.

5        Q.   Joyce Van Every is a supervisor there?

6        A.   Yes.

7        Q.   She makes decisions that relate to the patients

8   that are on the pod, correct?

9        A.   Yes.

10       Q.   You may not always agree with those decisions,

11  correct?

12       A.   That's correct.

13       Q.   I suspect she probably doesn't always agree with

14  everything you do in that pod, correct?

15       A.   That's correct.

16       Q.   Okay.  You did write up a report about the

17  incident of December 3, is that correct?

18       A.   Yes, that incident in December.

19       Q.   Exhibit 53 -- Exhibit 548.  Let's talk about some

20  of the things that are on this exhibit.

21            One of the reasons the compact was problematic in

22  this instance is because Wendi had previously made, in your

23  words, "a serious attempt at suicide by cutting?"

24       A.   Yes.

25       Q.   And that's your verbiage and right from the

1  exhibit, right?

2       A.   Yes.

3       Q.   And that's why the compact was problematic?

4       A.   Yes.

5       Q.   She apparently admitted responsibility, correct?

6       A.   I don't recall.

7       Q.   "I've been informed of the offenses listed here

8  on.  I acknowledge receipt of the report and plead," and

9  then there's two check marks available, guilt, not guilty?

10       A.   That would have been between her and the hearing

11  officer.

12       Q.   Let's talk about the exhibit.  You can read the

13  exhibit for us?  Isn't there a spot there it says she's

14  given an opportunity to plead, correct?

15       A.   Yes.

16       Q.   Looks like she admitted responsibility, pled

17  guilty, right?

18       A.   Yes, that's what it says.

19       Q.   And signed it, correct?

20       A.   Yes.

21       Q.   Let's look at it on the ELMO.  It says right

22  here, "I've been informed of the offense listed here on.  I

23  acknowledge receipt of the report and plead, guilty, not

24  guilty".  And looks like the x is on the guilty.

25       A.   Correct.

1      Q.   So she accepted responsibility.  You recommended

2  that she receive 30 days full restrictions, right?

3      A.   Yes.

4      Q.   But the hearing office or the person that

5  resolves these things gave her 20 days restriction, right?

6      A.   Yes.

7      Q.   Okay.  So, this person didn't abide by your

8  recommendation, correct?

9      A.   Correct.

10      Q.   You told us about an episode where Joyce Van

11  Every had a shopping bag.  At any point in time did you

12  look inside the shopping bag?

13      A.   No.  She's staff.

14      Q.   You don't know what the contents were in the

15  shopping bag?

16      A.   No.

17      Q.   Did you examine the shopping bag after she left?

18      A.   Only could see that it was much less.

19      Q.   Okay.  Do you know what contents were remaining

20  in the shopping bag?

21      A.   No.

22      Q.   Do you know what contents, if any, were removed

23  from the shopping bag?

24      A.   No.

25      Q.   Do you know where those contents wound up?

1    A.   I saw her walk directly to Andriano's room and

2  leave from Andriano's room.

3    Q.   Did anybody from your staff search that room

4  thereafter in an effort to find what contents may have been

5  left there?

6    A.   No.

7    Q.   So we don't know what, if anything, was left in

8  the room of Ms. Andriano, do we?

9    A.   No.

10    Q.   And were staff available -- I know I told us you

11  had medical issues that precluded you from doing it

12  yourself -- but was there other staff available, security

13  staff, available to go and check the contents that may have

14  been left behind?

15    A.   Not soon enough for it to be effective.

16    Q.   Meaning?

17    A.   Meaning my partner was busy in another pod doing

18  something else for several minutes before I could tell him

19  what happened.

20    Q.   Okay.  So time elapses?

21    A.   Correct.

22    Q.   But even with the elapse of time, there was no

23  effort made to go into the room and see if something was

24  there that shouldn't be there?

25    A.   I don't know.  I was only there a couple hours.

1    I don't know if anything occurred after that.

2        Q.    What I'm trying to understand, if you thought it

3    was of such consequences that something was in her room

4    that could constitute a safety hazard either to herself, to

5    other inmates or to your staff that no one in that building

6    made an effort to try and find out what may be inside that

7    room?

8        A.    I can't make anybody do something they don't want

9    to do.

10        Q.    Well, but, did you make any effort to contact

11    anybody to get someone to go in there and check it out?

12        A.    Yes, I did.

13        Q.    And, what, you asked your partner and she was

14    busy?

15        A.    That's correct.

16        Q.    Did you do anything beyond that?

17        A.    I reported it to my supervisor the next day.

18        Q.    Okay.  Did the supervisor follow up on that?

19        A.    She reported it to her supervisor, Joyce Van

20    Every.

21        Q.    Just kind of kept going on up the ladder?

22        A.    I'm afraid that's the way it happened.

23        Q.    And nobody went to check the room?

24        A.    Not that I'm aware of until the next cell

25    searching were done.

1    Q.   You talk about books being potential contraband

2  issue.

3         Did you ever find Wendi in possession of

4  contraband that had been spirited in, squirreled in, in the

5  books?

6    A.   I have no way of know how that got there.

7    Q.   Did you ever find her in possession of contraband

8  that had been brought by the book?

9    A.   No.

10    Q.   Are you telling us that she has an issue that her

11  top and bottom should match?

12    A.   Yes.

13    Q.   That suggests to me that she has pride in her

14  appearance.  That should not be rewarded in the jail

15  environment?

16    A.   No.

17    Q.   Why does it create a problem for you that she

18  wants her uniform to match?

19    A.   Because it takes too long to accomplish a change

20  out of 25 women when one is going to be very picky.

21    Q.   But you accommodate her, allow her to do it her

22  way, it seems to expedite the process, right?

23    A.   No.  I don't let any inmates handle the clothing

24  personally.  So since I have to do that for her, it does

25  not expedite things.

92

1     Q.   But if you said to her -- it seems to me if you

2  accommodated her need to have pride in her appearance by

3  saying why don't you pick out two that you want, how does

4  that create a problem for you?

5     A.   I don't like to treat somebody more special than

6  someone else.

7     Q.   Okay.  And when you see other persons in your

8  unit treating inmates specially, that creates a problem for

9  you?

10    A.   It creates a problem in the unit.

11    Q.   And it creates a problem for you personally, it

12  appears?

13    A.   Yes, because of the other problems it creates.

14    Q.   Now, you talked about Inmate Long-Horse.  Is that

15  like a Native American name, Long-Horse?

16    A.   It's a hyphenated name.

17    Q.   Is that Horse, is that last name?

18    A.   Yes.

19    Q.   Now, this person is in D2 because of mental

20  health issue?

21    A.   She is.

22    Q.   And does this inmate have issues with other

23  inmates or patients in the D2 pod?

24    A.   Not to that extent.

25    Q.   But she did have issues with other inmates?

1    A.   Yes.

2    Q.   And what she apparently didn't like is that Wendi

3  directed her to do certain things or controlled her

4  behaviors, correct?

5    A.   Yes.

6    Q.   There was no complaint made that she was violent

7  towards her, right?

8    A.   No.

9    Q.   Or that she jeopardized her safety or anything

10  like that, right.

11    A.   No.

12    Q.   Now, you talked about a special visitation

13  arrangements that was enforced as with regard to Ms. Rohde,

14  and Ms. Andriano?

15    A.   Yes.

16    Q.   I assume that special arrangement was approved by

17  the supervisor in your unit, correct?

18    A.   Yes it was.

19    Q.   And I assume it was also authorized or approved,

20  if you will, by the medical staff at the unit, correct?

21    A.   Yes.

22    Q.   You just disagreed with it?

23    A.   We were misinformed as to who she was.   It

24  appeared to be a cover up.

25    Q.   Well, I understand that.  But what you're saying

1   at this point, was the decision was made to allow that

2   arrangement to occur in the jail setting, correct?

3       A.   Correct.

4       Q.   And those decisions were made by supervisory

5   staff at the unit, correct?

6       A.   Based on misinformation.

7       Q.   Okay.  The conduct that you find problematic with

8   Laura King was that at some point during the course of this

9   trial, I guess, Ms. King assisted her with her hair and

10  makeup the night before?

11      A.   Yes.

12      Q.   And that happened on one occasion?

13      A.   I am not aware of how many occasions.  I'm only

14  aware of one.

15      Q.   I assume in the unit there are a host of things

16  that are classified as contraband, correct?

17      A.   Yes.

18      Q.   Weapons?

19      A.   Yes.

20      Q.   Drugs?

21      A.   Yes.

22      Q.   Can you give me other examples of what

23  constitutes contraband in the jail setting?

24      A.   Anything that cannot be purchased from the

25  commissary and anything that is brought in from the outside

1   without been authorized.

2       Q.   Okay.  Was Wendi ever found to be in possession

3   of street drugs, like marijuana?

4       A.   Not that I'm aware of.

5       Q.   Was she ever found to be in possession of any

6   weapons?

7       A.   No.

8       Q.   And you talked about Nurse Escobar attempting to

9   bring the shampoo for Ms. Andriano?

10      A.   Yes.

11      Q.   Was she ever written up for that?

12      A.   No.

13      Q.   Did you ever discuss it with her as to whether or

14  not she knew why Nurse Escobar was doing this kind of thing

15  or trying to do this kind of thing?

16      A.   No.

17      Q.   Didn't get her side of the story?

18      A.   No.

19      Q.   So you have no evidence or indication she was

20  even aware that Nurse Escobar was doing this?

21      A.   No.

22           MR. PATTERSON:  Judge, I have nothing further.

23  Thank you.

24           THE COURT:  Mr. Martinez.

25

REDIRECT EXAMINATION

1

2  BY MR. MARTINEZ:

3    Q.  With regard to this Nurse Escobar, what is his

4  first name, again?

5    A.  Roberto.

6    Q.  With regard to Roberto Escobar, did you ever find

7  out that he ever brought in shampoo for any other inmates

8  that was in that pod?

9    A.  To my knowledge, he did not.

10    Q.  Did anybody talked about him ever doing that or

11  anything other than the defendant?

12    A.  No.

13    Q.  With regard to Laura King, was there ever another

14  occasion that you know of that she came in to fix another

15  inmate's hair?

16    A.  No.

17    Q.  This Long Harris inmate you talked about.  You

18  did indicate she did not want to be in the same pod as

19  Andriano?

20    A.  Yes.

21    Q.  And what was the term she is used?

22    A.  She called her a control freak.

23    Q.  In terms of your asking about whether or not

24  somebody was written up for the shampoo being brought in by

25  Escobar, you were asked if you wrote her up.  Do you write

000008949

1    up nurses for whatever they do or is that someone else's

2    job?

3          A.    All we can do is report it their superiors.

4          Q.    And did you do it that way?

5          A.    Yes.

6          Q.    You also were asked about the clothing and

7    everything and you were asked as long as you do it her way

8    wouldn't it just be more efficient?  Do you remember that

9    question?

10         A.    Yes.

11         Q.    Would it really be more efficient if the jail ran

12   that particular area the defendant's way?

13         A.    No.

14         Q.    Why not?

15         A.    It would be too time consuming if I had a problem

16   with every one of them.

17         Q.    How about if she wants to take a different meal

18   at a different time, would that?

19         A.    That would not be convenient.

20         Q.    Does it, at some point, effect the security of

21   the area?

22         A.    Yes, it does.

23         Q.    Does it make everybody happy if, you know, that

24   somebody is getting preferential treatment?

25         A.    No.

1    Q.   Does it make things more difficult to do your job

2  if somebody is getting preferential treatment?

3    A.   Yes, it does.

4    Q.   How come?

5    A.   Because, they ask for things they should not

6  receive; they know they should not receive.  And I have to

7  tell them no and the general response is why does Wendi get

8  it.

9    Q.   In terms of the bag that Ms. Van Every may have

10  had, you indicated that it appeared three quarters full

11  when she took it in, right?

12    A.   Yes.

13    Q.   Then it appeared to be emptier when she came out?

14    A.   Yes.

15    Q.   How full was it when she came out?

16    A.   I would say a quarter.

17    Q.   And did you report that?

18    A.   Yes, I did.

19    Q.   In terms of treatment, you say that perhaps there

20  may be some tension between treatment and security.  You

21  were asked about that.  Do you remember that?

22    A.   Yes.

23    Q.   And one of the things we know is that she, the

24  defendant, was moved there because of a suicide attempt.

25  Do you remember that?

1    A.   That's correct.

2    Q.   And there being this tension, do you know whether

3  or not the defendant ever was in possession of scissors?

4    A.   Yes, she was.

5    Q.   And were they the scissors that were provided by

6  these people that were providing treatment for attempted

7  suicide?

8    A.   I was told they were medical scissors.

9    Q.   Anyway that -- When people come into the jail, do

10  you know if they are screened?  How is it that it works?

11    A.   As far as?

12    Q.   For visitation.

13    A.   For visitation?

14    Q.   Uh-huh?

15    A.   They go through metal detectors.  They can't take

16  anything in in their hands.

17    Q.   Can't bring in scissors?

18    A.   No, they cannot.

19    Q.   In terms of Exhibit 548, which was the one

20  involving the compact that you wrote up and asked for 30

21  days.  Do you remember that?

22    A.   Yes.

23    Q.   One of the things you were asked about was she

24  only got 20 days instead of 30?

25    A.   Yes.

1  Q. Does that mean that she wasn't guilty just

2 because she got less than you requested?

3  A. No.

4  Q. One of the other issues was that perhaps you were

5 being unduly harsh on the defendant.  In other words, that

6 you may have a problem with her.  If you do have a problem

7 with her, is it related to your job or is it a personal

8 thing?

9  A. It's related to my job.

10  MR. MARTINEZ:  I don't have anything further.

11  THE COURT:  Does the jury have any questions of

12 the witness?

13  (Bench conference was held outside the hearing of

14 the jury.)

15  THE COURT:  Question:  Is Anthony Gonzales a male

16 or female.

17  If a male, please explain the term used "cell

18 mates."

19  MR. MARTINEZ:  No objection.

20  MR. PATTERSON:  I think he's a transitional

21 person, if you know what I mean.  Undergoing sex change

22 therapy.

23  THE COURT:  I guess we'll find out.

24  Next question:  Do males and females share rooms

25 or cells within the unit?

1          MR. MARTINEZ:  I have no objection.

2          MR. PATTERSON:  Same question.

3          THE COURT:  I'll go ahead and ask that.

4          MR. PATTERSON:  It's the same question.  This

5    goes to the same issue.

6          THE COURT:  Okay.  To what does the term "cell

7    mate"" refer?

8          MR. PATTERSON:  Same question.

9          MR. MARTINEZ:  No objection.

10          THE COURT:  Next question:  When Laura King is

11    not there to assist with Wendi's hair and makeup, does

12    Wendi have access to items herself to do her hair and

13    makeup?

14          MR. MARTINEZ:  No objection.

15          MR. PATTERSON:  That's fine.

16          (Bench conference concluded.)

17

18                         EXAMINATION

19    BY THE COURT:

20          Q.   I have some questions for you.  The first

21    question reads as follows:  Do males and female share rooms

22    or cells within the unit?

23          A.   No.

24          Q.   To what does the term "cell mate"" refer?

25          A.   The person that they share their cell with.

1    Q.   Is Anthony Gonzales a male or female?

2    A.   As this point, a female.

3    Q.   Next question:  When Laura King is not there to

4 assist with Wendi's hair and makeup, does Wendi have access

5 to items herself to do her hair and makeup?

6    A.   She can purchase hair rollers and those kinds of

7 items through the commissary.

8    THE COURT:  Are there any further questions of

9 this witness by the jury?  No one has raised a hand.

10    Any follow-up questions by Mr. Martinez to these

11 specification questions?

12

13             FURTHER REDIRECT EXAMINATION

14 BY MR. MARTINEZ:

15    Q.   The issue involving Anthony Gonzales, was there

16 ever an issue involving the beds of Anthony Gonzales and

17 Wendi Andriano?

18    A.   There were a few times when we had to say

19 something about the beds having been pushed together.  And

20 when Andriano would sit cross-legged with Anthony's head in

21 her lap while she was massaging her head.  That kind of

22 touching is prohibited.

23    MR. MARTINEZ:  I don't have any other questions.

24    THE COURT:  Mr. Patterson?

25    MR. PATTERSON:  No questions.

1          THE COURT:  May this witness be excused?

2          MR. MARTINEZ:  Yes.

3          MR. PATTERSON:  No objection.

4          THE COURT:  Thank you very much.  You're

5     excused.

6              Mr. Martinez?

7          MR. MARTINEZ:  State would call Bonnie Lose.

8          THE COURT:  Please step forward right over here.

9     Give the clerk your name and she will swear you in.

10             (Witness sworn.)

11         THE COURT:  Please have a seat on the witness

12    stand.  Please pull the microphone close to you.  Please

13    remember to speak loudly and clearly so everyone can hear

14    you.  Please wait until the question is complete before you

15    answer the question.  And please make sure you give a

16    verbal answer.

17             Is this agreeable to you?

18         THE WITNESS:  Yes.

19         THE COURT:  Mr. Martinez, you may proceed.

20

21

22

23

24

25

1                          BONNIE LOSE,

2    called as a witness herein, having been first duly sworn,

3    was examined and testified as follows:

4

5                       DIRECT EXAMINATION

6    BY MR. MARTINEZ:

7         Q.   Your name, please?

8         A.   Bonnie Lose.

9         Q.   Who do you work for?

10         A.   The Maricopa County Sheriff's Office.

11         Q.   What do you do for them?

12         A.   Detention officer.

13         Q.   And how long have you been so employed as a

14    detention officer?

15         A.   Fourteen years.

16         Q.   And are you familiar with the psych unit at

17    Durango?

18         A.   Yes, I am.

19         Q.   Are you assigned there?

20         A.   Yes, I am.

21         Q.   How long have you been assigned to that unit?

22         A.   About four years.

23         Q.   What are your hours of work?

24         A.   6:30 in the morning to 2:30 in the afternoon.

25         Q.   Do you work with somebody by the name of Dawna

1  Harris?

2      A.   Yes.

3      Q.   Ma'am, back in September of 2003, an inmate by

4  the name of Wendy Andriano was transferred to the psych

5  unit, right?

6      A.   Yes.

7      Q.   And this was after an appeared, or what could be

8  termed an attempted suicide.   Is that what you were told?

9      A.   Yes.

10     Q.   Did you have occasion to look at where the injury

11  was on the attempted suicide?

12     A.   Yes.

13     Q.   Why don't you, by pointing to your hand, if you

14  would stand up, show us where you saw the injury?

15     A.   (Witness complies.) Left elbow.

16     Q.   You're pointing right, sort of in the crook of

17  the elbow?

18     A.   Yes.

19     Q.   And you were never able to see the actual injury

20  itself, were you?

21     A.   No.

22     Q.   That's where the bandages were, right?

23     A.   Right.

24     Q.   Ma'am, this past Sunday, did you have occasion to

25  see Joyce Van Every and the defendant conversing or looking

1   over some paperwork?

2        A.   No.

3        Q.   Did you have occasion to have her take a look at

4   a letter or something like that, the defendant?

5        A.   She had a letter, yes.

6        Q.   And did you have occasion to see whether or not

7   someone by the name of Escobar was looking at the letter

8   for her?

9        A.   Yes.

10       Q.   What is his name, again?

11       A.   Roberto Escobar.

12       Q.   Is he a registered nurse there?

13       A.   Yes, he is.

14       Q.   And were you able to hear that conversation

15   involving this letter?

16       A.   Part of it.

17       Q.   And what part did you hear?

18       A.   I heard Escobar telling her that she should not

19   read it as it was rehearsed.

20       Q.   What are you talking about, the statement that

21   she had there?

22       A.   Right.

23       Q.   And where was this conversation taking place?

24       A.   Just outside C pod.

25       Q.   Do you know what reading they were talking about

1    that should not be read as rehearsed?

2            MR. PATTERSON:  Can we approach, please.

3            (Bench conference was held outside the hearing of

4    the jury.)

5            MR. PATTERSON:  My sense is that this discussion

6    pertains to her allocution, the statement she's going to

7    make tomorrow.  It's nothing privileged at this point just

8    seems to me that she has a right to some reasonable

9    expectation of privacy when she was talking with people

10   about her legal presentation; albeit not necessarily with a

11   lawyer.  It's just there has to be some limitation where

12   you can go.  These guys were eavesdropping on my client.

13           THE COURT:  Mr. Martinez.

14           MR. MARTINEZ:  The place is a jail.  One of the

15   things they want the jury to believe is that she is this

16   young woman who is absolutely -- I'm going to use the term

17   "angelic" who is to be admired, is a very special person.

18           I just want to show that she is being treated

19   differently.  That's contrary to what their witnesses

20   testified.

21           THE COURT:  You made your point.

22           I'll sustain the objection.

23           (Bench conference concluded.)

24           THE COURT:  Mr. Martinez, ask another question.

25       Q.  BY MR. MARTINEZ:  Did there ever come a time when

1   you also saw some papers being spread out all over the

2   table that were legal papers?  This might have been in July

3   of 2004, involving the defendant?

4        A.   Yes.

5             MR. PATTERSON:  Judge, same objection.

6             THE COURT:  Sustained.  Let's move on.

7        Q.   BY MR. MARTINEZ:  That was a different

8   individual, though, that you saw, not Mr. Escobar?

9        A.   Right.

10       Q.   Was there ever a time when the movie Double

11  Jeopardy was shown to the people in C pod or the psych

12  unit?

13       A.   Yes.

14       Q.   How about the people in the general population,

15  do they get a VCR movie screen shown to them?

16       A.   No.

17       Q.   So it's probably, if you want to watch a movie, I

18  guess -- is the treatment a little bit better in the psych

19  unit than it is in the rest of the facility?

20       A.   They get a few different privileges than the

21  general population.

22       Q.   Such as what, movies, we just talked about.  What

23  else?

24       A.   Movies, they get patio access.

25       Q.   What's patio access?

1    A.    We open up the patio doors and they can go out on

2  the patio for an hour or more.

3    Q.    One of the things we have in front of us the one

4  of the inmate by the name of Long Hair Horace.   Said that

5  she would give up patio, all of the c pod perks.   Patio is

6  going outside?

7    A.    Right.

8    Q.    What other C pod perks are there beside movies?

9    A.    They get groups.   They get to do activities,

10  coloring on paper.

11    Q.    And was there ever a time when Ms. Van Every

12  showed a movie?

13    A.    Yes.

14    Q.    Do you remember the movie, Double Jeopardy?

15    A.    Yes.

16    Q.    What is this movie about?

17    A.    It's about a woman that goes on and kills her

18  husband.

19    Q.    What was Ms. Every's comment after this movie

20  plaid.

21         MR. PATTERSON:  Objection.  Relevancy.

22         THE COURT:  Sustained.  Let's move on.

23    Q.    BY MR. MARTINEZ:  Did it pertain to Ms. Andriano

24   --

25         MR. PATTERSON:  Objection.

1          THE COURT:  Sustained.  Let's move on.

2      Q.   BY MR. MARTINEZ:   In terms of Roberto Escobar and

3   this issue about the shampoo, were you privy to that?

4      A.   No.

5      Q.   In other words, did somebody by the name of Donna

6   Anderson come to you?

7      A.   Yes, she did.

8      Q.   And what did she tell you?

9      A.   She told me that she wanted to speak to me about

10  something.

11     Q.   What was that?

12     A.   She was telling me he brought in some shampoo for

13  Andriano.

14     Q.   Okay.  And?

15     A.   That it was going to be part of her treatment and

16  that it would be their secret.

17     Q.   Why was she coming to you if it was part of the

18  treatment?

19     A.   Because she didn't -- she knew that it shouldn't

20  go in without it going to everybody, not just Andriano.

21     Q.   Was there ever a conversation that you had with

22  Andriano about her writing a book?

23     A.   Yeah.

24     Q.   And what did she say?

25     A.   She said that she was writing a book with Joyce.

1      Q.    Joyce who?

2      A.    Van Every.

3            MR. MARTINEZ:  I don't have anything else.

4            THE COURT:  Mr. Patterson?

5            MR. MARTINEZ:  I have no questions, Judge.  Thank

6  you.

7            THE COURT:  Are there any further questions of

8  the witness by the jury.  If so please raise you hand.  No

9  one has raised their hand.

10           May this witness be excused?

11           MR. MARTINEZ:  Yes, sir.

12           MR. PATTERSON:  Yes, thank you very much.

13           THE COURT:  You are excused.

14           Mr. Martinez.

15           MR. MARTINEZ:  State calls Brad Bayless.

16           Judge, may we approach?

17           (Bench conference was held outside the hearing of

18  the jury.)

19           MR. MARTINEZ:  He was sitting outside.  When I

20  went to get him now he's not there.  I told him to make

21  sure you don't leave.  I checked the bathroom.  I don't

22  know where he is.

23           THE COURT:  Did you check the stalls?

24           MR. MARTINEZ:  Yes, sir.  I went everywhere.  I

25  couldn't find him, sir.

112

1          MR. MARTINEZ:  I have his cell phone.  I can call

2   him.

3          MR. MARTINEZ:  He was under the impression he

4   would leave to the parking lot and come back each.  It's

5   going ot be five minutes for him to walk up.

6          THE COURT:  Okay how long is he going to be on

7   direct examination?

8          MR. MARTINEZ:  Half an hour to 45 minutes.

9          (Bench conference concluded.)

10          THE COURT:  Ladies and gentlemen, we're going to

11   take our evening recess at this point in time.  During the

12   recess, remember the entire admonition I have given.  Don't

13   discuss the case with anyone.  Don't let anyone discuss

14   with you.  Don't do any research, investigation,

15   experimentation or testing on your own.  Avoid any and all

16   media of this case.  Keep an open mind.

17          We'll see you tomorrow at 1 p.m.

18          I'll stay here with counsel.  Have a nice evening

19   here.

20          (Jurors exited.)

21          THE COURT:  Please be seated.  This is Cause

22   Number CR2000-096032, State of Arizona versus Wendi

23   Elizabeth Andriano.

24          The record will reflect the presence of the

25   defendant and counsel.  We're outside the presence of the

000008965

113

1   jury.

2           I've given counsel yesterday copies of the draft

3   final instructions relating to Phase III.  Was there

4   anything either one of you wanted to put on the record in

5   that regard?

6           MR. MARTINEZ:  Judge, I don't have them with me

7   and quite frankly, I haven't reviewed them.

8           MR. PATTERSON:  My suggestion, Judge, we not do

9   go on the record at this point.  I made notes on your

10  draft.  When we sit informally I'll tell you what I think

11  is appropriate.

12          THE COURT:  That's fine.  We'll go ahead and

13  recess at this point in time.  I'll meet with counsel

14  informally in chambers and then give you a full opportunity

15  to put any objection on the record with regard to

16  instructions.

17          We'll be in recess.

18          (Proceedings adjourned.)

19

20

21

22

23

24

25

# APPENDIX Q

05-0002
Braccio

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

STATE OF ARIZONA,                    )
                                     )
                Plaintiff,           )
                                     )
        vs.                          )       No. CR2000-096032
                                     )           CR05 0005AP
WENDY ELIZABETH ANDRIANO,            )
                                     )
                Defendant.           )
_____)

BEFORE:  THE HONORABLE BRIAN K. ISHIKAWA

Mesa, Arizona
December 7, 2004

REPORTER'S TRANSCRIPT OF PROCEEDINGS
(Trial)

COPY                                    SHARON FLORES
                                    CERTIFIED COURT REPORTER
                                            50374

2

1

2

3                              A P P E A R A N C E S

4

5

6

7        For the State:

8                          Mr. Juan M. Martinez

9                          Deputy County Attorney

10

11

12

13

14        For the Defense:

15                          Mr. Daniel B. Patterson

16                          Mr. G. David Delozier, Jr.

17                          Office of the Public Defender

18

19

20

21

22

23

24

25

```
 1              P R O C E E D I N G S

 2

 3         THE COURT:  This is Cause Number CR2000-096032,

 4   State of Arizona versus Wendy Elizabeth Andriano.  The

 5   record will reflect the presence of the defendant and

 6   counsel.  We are outside the presence of the jury.

 7         I've shared with counsel a note that we received

 8   from one of the jurors yesterday, Juror Number 1.  That

 9   note reads as follows: I have company coming on Wednesday,

10   12 noon and staying until the following Wednesday, the

11   15th.  Is it possible to me to be excused from jury duty?

12   It's signed by Juror Number 1.

13         Mr. Martinez, what is the State's position?

14         MR. MARTINEZ:  Your Honor, I think with the way

15   the trial is proceeding and the amount of time we are

16   requesting of them -- I do understand that it's been a long

17   haul -- but I think perhaps the Court should inquire of her

18   if this is truly a hardship, something extraordinary.  If

19   not, then my position would be that she should not be

20   excused.

21         THE COURT:  Mr. Patterson?

22         MR. PATTERSON:  For the first time in this trial,

23   I concur completely with Mr. Martinez.

24         THE COURT:  I don't think that's the first time

25   but we'll note that the parties concur with regard to Juror
```

4

1  Number 1.

2        What I'll do tomorrow is before we bring the jury

3  in here, I'll have Juror Number 1 come in here individually

4  and we'll ask some additional questions.  But it would be

5  the court's inclination not to excuse her from service on

6  this jury.

7        THE COURT:  With regard the scheduling, I brought

8  up informally with counsel the fact that we've been in

9  trial for 15 weeks and I have a general idea of what may be

10  presented by the parties during Phase 3.  I've asked

11  counsel informally whether they would be opposed to perhaps

12  lengthening the days to starting at 12:00 and going until

13  5:00 and then even having court on Fridays.

14        Mr. Martinez?

15        MR. MARTINEZ:  I don't have any objection to

16  that.  Of course, I want to say we did discuss the caveat

17  if that would be appropriate for the jurors.

18        THE COURT:  Mr. Patterson.

19        MR. PATTERSON:  My position is the same as

20  Mr. Martinez, again.

21        THE COURT:  Okay.  What I'm going to do tomorrow

22  is I'm going to ask the jury whether any of them would be

23  opposed or unable to have a trial schedule of 12:00 until

24  5:00 p.m. Monday through Friday.

25        I've given to each counsel a copy of the draft

1   preliminary instructions for Phase 3.

2           Mr. Martinez, was there anything you wanted to

3   bring up with regard the Phase 3, preliminary

4   instructions?

5           MR. MARTINEZ:  No, sir, I don't have any

6   objection to them.  The only thing we need to do is plug in

7   the factors that are listed by defense counsel in its

8   pleading dated December 7th, 2004.

9           I do, however, have an issue with regard to one

10  of the factors.  That's Number 25, that's residual doubt.

11  I think we've already briefed that for the Court.  I'm

12  going back in my memory.  I don't think that's one of the

13  factors that we can ask them to consider.  And like I said,

14  I think there was perhaps a motion that was filed with the

15  Court.  I think you may already have ruled on it.

16          THE COURT:  Mr. Patterson.

17          MR. PATTERSON:  We did brief this issue.  You

18  didn't rule on it.  I reurge it at this time that it be

19  included.  I make no additional argument.  I believe it's

20  that space between beyond a reasonable doubt and beyond all

21  doubt is an area we can go into in terms of mitigation.

22  I'd like it to be included at this time.

23          THE COURT:  Let me make sure I understand,

24  Mr. Martinez.  You don't have any objection to listing all

25  of the mitigating factors for Mr. Patterson set forth in

1   the list of mitigating factors filed on this date.  Your

2   only objection would be Number 25 related to residual

3   doubt, correct?

4           MR. MARTINEZ:  Let me take a look very quickly

5   just to make sure.

6           I'm not sure that mercy can be included.  I'd

7   have to research that.  I know that one that stood out was

8   residual doubt.  I'm going to call and ask and I'll let you

9   know because I'm not sure that can be included.  That

10  appeals to that.  In other words, we tell them they're

11  going to decide this without, you know, resorting to

12  sympathy or bias and this is sort of what that's appealing

13  to.

14          THE COURT:  Mr. Patterson, did you want to

15  address those any further?

16          MR. PATTERSON:  No.  If he interposes a case,

17  that's something I'll address at that time.  But mercy is

18  synonymous with leniency.  That's what we're talking about

19  at this juncture.  There is a case out there that says

20  mercy alone is not sufficient to support a life sentence.

21  But, mercy coupled with any one mitigating factor, is

22  sufficient.  So I think it needs to be included.

23          Judge, with regard to preliminary instructions, I

24  have some suggested changes.

25          THE COURT:  Go ahead.

7

1          MR. PATTERSON:  And the logic for my request is

2   based on the fact that now being in Phase 3 the

3   U.S. Constitutional law is that the sentencing decision of

4   the jurors can be an individualized decision.  They're

5   under no obligation to deliberate and reach a collective

6   position with regard to sentence.  What is individually

7   appropriate with regard to conscience of each

8   individualized juror is the sentence that that person is

9   entitled to return.

10          So, up to this time, we've used the term "you" in

11   a collective fashion.  What I'd like to do at this point

12   when you use the term "you," last line, page 3, that you

13   add the term individually after each "you," such that it

14   would read: Third, the attorneys will make closing

15   arguments to tell you, individually, what they think the

16   evidence shows.

17          Continue on to page 4:  And how they think you,

18   individually, should decide the case.

19          In paragraph C, there is a similar situation.

20   And I would ask that it be changed to read:  In making your

21   decision regarding Phase 3 of the trial you, individually,

22   are to consider the evidence presented in all three phases

23   of the trial.

24          I would also suggest a correction in paragraph D,

25   beginning in the third sentence of that paragraph:  A

8

1   mitigating circumstance is any factor relevant in

2   determining the appropriate sentence.

3            Deleting whether to impose a sentence less than

4   death.  And reading on:  Including any aspect, et cetera.

5            And then, on the last page, page 5, the second

6   paragraph should read, in my estimation:  The possible

7   sentences on first-degree murder are the death penalty or

8   life imprisonment.  The question to ultimately be decided

9   by each juror, instead of the jury, at the end of the

10  penalty phase, Phase 3, is whether there is a mitigating

11  circumstance sufficient to call for a life sentence.

12  Deleting necessarily the words "that are mitigating

13  circumstances sufficiently substantial to call for

14  leniency."

15           Those are corrections I propose.  And like I say,

16  the authority for those corrections are the

17  U.S.  Constitution and the Supreme Court decision.  We

18  don't have any decisions here in Arizona post Ring that

19  give us any guidance whatsoever on the appropriate language

20  at this stage of the proceedings because there's been no

21  reported cases post ring dealing with jury sentencing.

22           THE COURT:  Mr. Martinez.

23           MR. MARTINEZ:  It is true that there is no law

24  that would warrant making the changes that he proposed

25  specifically that we change "you" to "you, individually."

1   So I would object to that.  What is happening there is a

2   veiled request for a hung jury.

3          In other words, don't sit back there and

4   deliberate with the rest of the folks as you've already

5   instructed them during their deliberations.  But, be

6   intransigent and come back with a hung jury.

7          I would note that that sort of language troubles

8   me, but it troubles me for a reason that probably is not

9   that evident.  And the reason that that troubles me is,

10  let's say we have a juror who, for whatever reason, refuses

11  to deliberate because he believes that the death penalty is

12  appropriate.  Then we have a situation where it's the other

13  side of the coin.  And I don't think that the courts are

14  going to look favorably on a situation where we encourage a

15  juror who is pro-death penalty to say I'm not going to look

16  at the facts. I'm just going to decide the death penalty is

17  appropriate and then I'm going to go forward with it.

18  That's the other side of the coin on his proposal.

19         Additionally, there is no legal precedent for

20  it.  And I think we're venturing into areas that are

21  problematic and are of fundamental fairness.  I request

22  that that change not be made.

23         Additionally, he mentioned paragraph D and

24  something about the appropriate sentence -- I don't have

25  the specific language in front of me -- but, with regard to

1    this phase of the proceeding, they are not determining the

2    appropriate sentence.  What they are deciding is whether or

3    not death is appropriate.  They are not deciding whether or

4    not the appropriate sentence is life or life with the

5    possibility of parole or death.  There is only one decision

6    for them and that is whether or not the death penalty is

7    appropriate.  So I would object to that change.

8            And the other change that he mentioned is

9    indicating that whether or not one mitigating circumstance

10   is sufficient to call for a life sentence.  I'm not sure

11   that's the state of the law.  I think that in light of all

12   these mitigating circumstances that we are advising them

13   on, I think that if we're restricted to say there is one

14   exclude everything but only concern one, that can be read

15   to say, well, for whatever reason I think you should only

16   consider one.  I just think it's confusing.  I think the

17   way you have it is much better.  That does reflect the

18   state of the law as opposed to making it more narrow.

19           Basically, what's going on is he is trying to

20   make it a shorter field for them to work with by saying,

21   well, you know, of all of these 20 -- it's probably going

22   to turn out to be 25 -- of these 25, you only have to find

23   one.  Well, that's the argument and that's the comment but

24   that's not the state of the law.

25           So, for those reasons, I would ask that the

1   proposed changes not be made.

2           THE COURT:  Anything further from Mr. Patterson

3   on the proposed preliminary jury instructions?

4           MR. PATTERSON:  No, Your Honor.  I've made my

5   record.  Thank you.

6           THE COURT:  What I'm going to do, I'll think very

7   carefully what the two of you said.  What I'll do is make

8   any changes I feel are appropriate, if any.  And then, I'll

9   have Jim e-mail or make available for you to pick up the

10  final preliminary instructions.

11          And then, I guess, this afternoon, why don't you,

12  Mr. Martinez, you wanted to look at the issue further on

13  mercy?

14          MR. MARTINEZ:  Right.

15          THE COURT:  I'll give you the opportunity.  But,

16  get something by e-mail, I guess, to Mr. Patterson and to

17  the Court before the end of the day, okay?

18          MR. MARTINEZ:  Okay.

19          THE COURT:  Mr. Patterson, was there something

20  you wanted to bring up?

21          MR. PATTERSON:  In terms of the order of

22  presentation, I think Rule 19 does govern.  So I think

23  that's the process we should employ.

24          MR. MARTINEZ:  It's 19.1.

25          THE COURT:  Right.  In looking at Rule 19.1 of

1   the Rules of Arizona, Rules of Criminal Procedure under

2   19.1 (D), the order will be as follows:  The defense may

3   make opening statement.

4          The State may then make an opening statement or

5   may defer such opening statement until the close of the

6   defendant's evidence.

7          Then, the victim's survivors may make a statement

8   related to the characteristics of the victim and the impact

9   of the crime on the victim's family but may not offer any

10  opinion regarding the appropriate sentence to be imposed.

11  I want to emphasize that.

12         MR. MARTINEZ:  Judge, I think that binds

13  everybody including Mr. and Mrs. Ochoa and all other

14  witnesses.  I think that's best.

15         MR. PATTERSON:  I don't know of a case that shows

16  that my witnesses are not allowed to ask for or specify a

17  sentence.  I've never heard of that before.

18         THE COURT:  At this point in time, I won't make a

19  ruling as far as the Ochoas are concerned.  But if you can

20  give me some case law or authority I'll address it before

21  they testify.

22         MR. PATTERSON:  Okay.

23         THE COURT:  But at this point in time, as far as

24  the victim's survivors, they may not offer any opinion

25  regarding the appropriate sentence to be imposed but may

13

1    make a statement relating to characteristics of the victim

2    and the impact of the crime on the victim's family.  Okay.

3                And in --

4                MR. PATTERSON:  May I may talk to Mr. Martinez

5    for a minute?

6                THE COURT:  Yes.

7                MR. PATTERSON:  Thank you, judge.

8                THE COURT:  And then, following that, the defense

9    shall offer evidence in support of mitigation.  And then

10   the State may then make an opening statement if it was

11   deferred and offer any relevant evidence relevant to

12   mitigation.

13                The defense may offer evidence in rebuttal unless

14   the Court, upon a showing of good cause, allows the case in

15   chief to be reopened.

16                The defendant may present statements, elocution

17   to the jury.

18                The parties may present argument.  The defendant

19   having the opening and the closing.

20                And then the Judge shall charge the jury with

21   final jury instructions.  Okay.

22                We'll follow the procedure under Rule 19 of the

23   Arizona Rules of Criminal Procedure unless by stipulation

24   the Court allows otherwise.  Okay?

25                Anything else we need to discuss?

14

1          MR. MARTINEZ:  We also talked about Rule 703 (C)

2    which is A.R.S. 13-703 (C), appears to be -- well, I'll

3    just read the statement:  At the penalty phase of the

4    sentencing proceeding that is held pursuant to 13-703.01,

5    the prosecution or the defendant may present any

6    information that is relevant to any of the mitigating

7    circumstances, included in subsection G of this section

8    regardless of its admissiblity under the rules governing

9    admission of evidence at trials.

10          Additionally, there's a case, State versus Labors

11    from 1991, 168 Arizona 376, and that court indicated as

12    follows: The transcript revealed that the defendant had

13    beaten his wife a dozen times and pointed a gun at her and

14    had affairs.  Relying on 13-703 (C) we held that any

15    relevant evidence may be used to rebut the defendant's

16    mitigating circumstance regardless of its admissibility at

17    trial.

18          So, that seems to be the law here in the state of

19    Arizona and has been for quite some time.

20          Additionally, the other issue we addressed, sort

21    of part and parcel with this it's under 13-703 (B),

22    basically any relevant evidence is admissible.  Where the

23    fact that the State intended to introduce evidence that the

24    Court previously had ruled was inadmissible, specifically

25    where the defendant is a thief and she has been fired and

1   she has stole from every one of the employers she worked

2   at.

3               Additionally, when she has been in custody, the

4   defendant was involved with a pastor, a female pastor, who

5   had come to visit her.  And the defendant and this pastor

6   somehow got together in a fraudulent scheme and were able

7   to pass checks -- and it was the defendant's idea -- in the

8   amount of $40,800.

9               THE COURT:  How much?

10              MR. MARTINEZ:  $40,800.  This was while the

11  defendant was in custody.

12              The other issue that I presented for the court's

13  consideration was that I know that the Court had already

14  indicated that during the previous guilt proceedings that I

15  should not question Donna and Alejo Ochoa with regard to

16  the proceedings in the Pinal County Superior Court and date

17  of those issues was on or about October 15 of 2002.

18              Basically, what happened with regard to that is

19  that Donna and Alejo Ochoa were unhappy with the ruling of

20  the Maricopa County Superior Court.  What they did,

21  basically, is they lied.  They went to the Pinal County

22  Superior Court indicating that there was no other action

23  pending just because they didn't like the ruling of the

24  Maricopa County Superior Court when -- and then they filed

25  an action for adoption indicating that there was

1  nothing -- there was nothing that was pending in another

2  jurisdiction. Which was a lie. And as a result of that,

3  they were fined $9000.

4        And so I now ask leave of the Court in the light

5  of Rule 703 (C) and (D), that I be allowed to question them

6  about that when they take the stand. Their credibility is

7  now centrally at issue. We have an individual, the father,

8  who the State, I believe, has proven beyond a reasonable

9  doubt helped the defendant stage the scene.

10        We also have an individual who took the stand and

11  perjured himself. I think it would be relevant to that.

12        Especially, the defendant's mother also perjured

13  herself on the scene. That was with regard to the Mazda

14  and when the call was received.

15        So, I believe this is relevant to show that to

16  them it doesn't matter if they hold their hand up in the

17  courtroom and swear to tell the truth because they've

18  already been proven that means nothing. They will lie to

19  try to get their way. And that's with regard to that. I

20  have other issues but if we want to restrict it to that.

21        THE COURT: Mr. Patterson.

22        MR. PATTERSON: We're going to have to have

23  full-blown hearings on those issues. The avowals are

24  simply not enough. The facts are so complex in both

25  issues.

1           Mr. Delozier was counsel for the mother and

2    father, the grandparents, in that proceeding.  There are

3    pleadings that you need to review.  Avowals are not

4    enough.  So if he wants to go into those collateral issues,

5    we're are going to have to have full-blown, factual

6    hearings with witnesses and testimony.

7           With regard to his allegation she was involved in

8    misconduct in the jail, I have the presentence report he

9    was kind of enough to give to me.  Again, she was an

10   investigative lead.  She was never a defendant in that

11   proceeding.

12          THE COURT:  The presentence report is on who?

13          MR. PATTERSON:  On a person who was convicted of

14   that misconduct in passing the checks.  And she implicates

15   Ms. Andriano.  But, again, it's fact intensive.  She was

16   never charged with the crime.  She's noted as an

17   investigative lead in the sheriff's department's

18   investigation of the case.

19          This person, in order to minimize her

20   culpability, attributes things to Ms. Andriano that just

21   aren't true.

22          Again, in order to get into that area, we're

23   going to have to have a full-blown hearing.  We'll have to

24   bring in the investigator from the sheriff's department.

25   He's going to have to testify.  You just can't make

1   decisions, Judge, on these issues on avowals because they

2   are very complex, factually.

3            THE COURT:  Mr. Martinez?

4            MR. MARTINEZ:  I disagree with that.  What's so

5   complex about it?  We don't need a hearing.  He indicates,

6   for example, that we need to call the investigator to sort

7   this out.  He can call him in his case in chief.  He can

8   take care of it that way.

9            What we have is a situation where Cynthia

10  Edwards, in written form, indicates that it was the

11  defendant's idea to get the checks cashed.  What's so

12  complex about that?  There is nothing complex about it.

13  They can cross-examine her about it, about her bias and say

14  well, you're a defendant.  You were the one that was

15  charged.

16            He claims that his client has never been

17  charged.  Not yet.  That doesn't mean she's not going to be

18  charged later.  I harken back to State versus Labor which

19  is what I just read to the Court.  It indicates that the

20  State introduced a transcript of the defendant's wife's

21  testimony to rebut his mitigation testimony that he was of

22  good character, had been a good father and had no prior

23  criminal record.  It doesn't say that there has to be a

24  charge filed.  It doesn't say that there has to be any

25  proceeding instituted.  It's not complex.

1        The bottom line, somebody is saying that she did

2    something and they can cross-examine her.  So I would

3    disagree we need to have a hearing.  It isn't just the

4    presentence report.  It's a letter that was written and

5    signed by this defendant, her last name is Edwards, who

6    indicated that that's how this happened.  So, I don't see

7    that at all.  And that is relevant because as the Court has

8    noted, you're going to conclude she has no prior felony

9    convictions, no prior misdemeanor convictions and no prior

10   criminal charges.  That's all relevant to that.  And,

11   again, that's relevant and admissible pursuant to Rule 703

12   (C) and (D).  That indicates that that's the kind of

13   evidence that you get in.  You don't need a hearing.  You

14   don't need these safeguards where you're worried about what

15   the jury is going to hear because they're going to hear

16   anything anyway.  That's what the rules say.

17        With regards to the issue in the Pinal County

18   Superior Court, the same logic I already indicated to the

19   Court applies.  If they disagree, they can bring in the

20   rest of the file because the rules of evidence don't apply

21   any more.  So what they can do is they can bring in all of

22   that file, show it to the jury and say what Mr. Martinez

23   asked is not true.

24        Additionally, they can be asked about it when

25   they are up on the stand.  We don't need a hearing.  Again,

1   Rule 703 (C) and Rule 703 (D) says that's the kind of stuff

2   that comes in at these hearings because we didn't want to

3   not have the jury make this very weighty decision by

4   pooling up stuff that could be very relevant.  I disagree.

5          The other thing that I did indicate was that

6   Mr. Delozier was fined $6,000.  I did indicate in that case

7   because he was the attorney that filed it, I indicated that

8   I was not going to mention him and I was not going to bring

9   it up.

10          Probably, the more cautious approach is for them

11  to instruct Mr. And Mrs. Ochoa they are not to mention who

12  the lawyer was.  I don't have any problem with that because

13  it's not about him.  It's about what they did and how they

14  go about lying to people.

15          So for those reasons, I don't think that defense

16  counsel's request is well taken.

17          MR. PATTERSON:  Judge, the threshold is

18  relevancy.  I think that's where your intervention is

19  required to determine whether or not this

20  throw-everything-on-the-wall approach is relevant to the

21  issues in this case.

22          THE COURT:  The other person that you mentioned,

23  was that Cynthia Edwards?

24          MR. MARTINEZ:  Yes.  That's the person that was

25  charged.  That's the pastor.

1          THE COURT:  What do you have?  You have the

2   presentence report and you mentioned some type of letter?

3          MR. MARTINEZ:  What happened was she was being

4   sentenced and she wrote a letter to the presentence

5   writer.

6          MR. PATTERSON:  It's appended, Judge.

7          THE COURT:  It's part of the presentence report?

8          MR. MARTINEZ:  Yes, it is.

9          THE COURT:  Let's do this -- and copies have been

10  provide or made available to Mr. Patterson -- let's do

11  this:  Before you leave today, why don't you make a copy of

12  that for, well, make a copy of all of that for the Court.

13          MR. MARTINEZ:  I also have the minute entry you

14  indicated you wanted a copy of.  I can make a copy for you

15  as well as one for me as well as for defense counsel.

16          THE COURT:  Okay.  What else do we need to

17  discuss here?

18          MR. MARTINEZ:  Judge, under --

19          MR. PATTERSON:  Before we go to something else,

20  will you give me until 10 o'clock tomorrow to address the

21  change?  Because it's clearly a change in Arizona 13-703.

22  The pre-Ring standard was that the Rule of Evidence

23  governed the presentation of evidence by the government.

24  It did not cover presentation by the defense.  I've read

25  the statute.  It's clearly changed.  I need to talk to

1    folks in my office and find out whether there's a case that

2    bears upon that.   I can't believe Labor is dispositive of

3    the issue.   That's a '91 case when the law was that Rules

4    of Evidence governed the presentation of evidence by the

5    State.

6            So, if you'll give me until 10:00 tomorrow to

7    come up with some input on that.

8            THE COURT:  Email that to Mr. Martinez.

9            MR. PATTERSON:  Yes, sir.

10           THE COURT:  Go ahead.

11           MR. MARTINEZ:  Judge, with regards to 13-703.01

12   (S)(2) that indicates that victim means the murdered

13   person's spouse, parent, child, other lawful representative

14   except a spouse, parent, child or lawful representative is

15   in custody for an offense previously accused.

16           The reason that I cite that is that restricts me

17   in terms of the victim impact statement to the jury.   It

18   indicates -- it's very narrow.   It says that the parents

19   can address the jury and that is the only people that are

20   going to address the jury with regard to the victim impact

21   statement.

22           But under Rule 39 of the Arizona Rules of

23   Criminal Procedure, the victim is defined a bit more

24   expansively.   And that is defined to mean the following --

25   that indicates that -- as used under Rule 39 (A)(1), as

1    used in this rule, a victim is defined as a person against

2    whom a criminal offense as defined by 13-4401 has allegedly

3    been committed.  And then it goes on.

4           And if we take a look at the definition, if you

5    will, under 13-4401.  That's 13-4401 (19), it says "victim"

6    means a person against whom the criminal offense has been

7    committed or if a person is killed or incapacitated, the

8    person's immediate family or other lawful representative

9    except if the person is in custody.

10          The only reason I'm citing that is I wanted to

11   give notice I intend to call on Jana Clayton, who is the

12   victim, Joseph Andriano's sister, as well as Jeanea

13   Lambeth, who is also the defendant's sister as witnesses.

14   Normally, that's not something that I should bring to this

15   Court's attention but for some or part or maybe all they

16   have been present for the proceedings.  And as the victims,

17   they are not excludable and can remain in the courtroom and

18   then provide testimony.  So, I believe that given the

19   expansive definition of "victim" they can testify at this

20   particular hearing.  But, of course, because of the

21   narrowed scope under 13-703.01 I believe they cannot give a

22   statement, the victim impact statement, but they can

23   testify even though they have been in the courtroom.  I'm

24   asking the Court's permission to do so.

25          THE COURT:  Why don't you spell their full names

1    for the court reporter.

2           MR. MARTINEZ:  Jana is J-a-n-a.  Clayton is

3    C-l-a-y-t-o-n.  Jeanea is J-e-a-n-e-a.  And Lambeth is

4    L-a-m-b-e-t-h.

5           THE COURT:  Thank you.  And for what purpose do

6    you intend to call them?  Is this rebuttal?

7           MR. MARTINEZ:  They may.  But the ones that jump

8    to mind is one of the things that she indicated is to that

9    of being a good mother to her children.  Actually, that's

10   not true.  There have been many occasions where the

11   defendant, a least with regard to Ashley, has indicated, "I

12   don't want to have this kid.  It just makes me fat.  And I

13   just hate the fact that he got me pregnant.  He's the one

14   who wants the kid.  I don't want the kid."

15          Additionally, whenever a diaper needed to be

16   changed it was always, "Joe, you need to do it.  I'm not

17   going to do it.  I'm not going to get myself dirty.  Those

18   poopy diapers are yours." Things to that effect.

19          There are other factors that, for example, the

20   night that the defendant came back from her limousine ride,

21   one of the things she indicated was that Jana was taking

22   care of the kids.  Actually, her parents were taking care

23   of the kids.

24          Additionally, the reason that Mr. Andriano was

25   not with her was because she refused to allow him to go as

1   opposed to her saying that he didn't want to take her out.

2   These are all the things that now have become relevant or I

3   see as relevant because she's going to posit herself as

4   this, according to her married for eight years, a good

5   wife.

6          Additionally, during the three days that Jana

7   Clayton was in town, the defendant went out two of those

8   nights, two out of three nights she was out.  And the night

9   of the defendant's birthday she refused to go to dinner

10  with them instead of just saying, "I don't want to go with

11  you guys."  Basically, she just hates this guy.  Doesn't

12  want to be around him.  She claims that she loves him.  She

13  claims they had this marriage, all that stuff.  So I think

14  that's relevant to all that.

15         THE COURT:  Mr. Patterson?

16         MR. PATTERSON:  Well, the timing is

17  extraordinary.  This is the kind of issue that should have

18  been fleshed before we started the trial so you could have

19  decided whether or not she was allowed to stay in the

20  courtroom and listen to all the testimony.  At this

21  juncture, I think that it's untimely and it's an effort to

22  circumvent the Rule of Exclusion of Witnesses.  For that

23  reason, I would ask that they not be allowed to testify.

24         THE COURT:  Mr. Martinez.

25         MR. MARTINEZ:  Quite frankly, no disrespect to

1   the bench, but the law is the law.  And the law says you

2   can't exclude them.  And whether I make the argument now or

3   made the argument earlier, I mean, we have pretty strong

4   law when it comes to victims and it's there for a reason so

5   that they can see the events as they unfold and then not be

6   precluded from testifying later.  The law couldn't be more

7   clear on this issue, whether I raise it now or later.   In

8   fact, I wasn't even going to raise it.  I just wanted to

9   make sure we're all on the same page.  We've come a long

10  way.  I just don't want to create any issue whatsoever

11  without discussing it with all parties.

12          THE COURT:  Any other discussion as far as any

13  other issues that need to be brought up before tomorrow?

14          MR. MARTINEZ:  No, sir.

15          MR. PATTERSON:  No, Your Honor.

16          THE COURT:  Okay.  I'll think about the issues

17  presented to the Court.  I've given each side an

18  opportunity to give the Court additional information for

19  its consideration of these issues.

20          What I'll do, I've given Mr. Patterson until

21  10:00 tomorrow on the issue relating to Rule 703 (C) and

22  (D) and given Mr. Martinez an opportunity to look at the

23  issue of mercy.

24          Anything further?

25          MR. MARTINEZ:  Is that the only issue that you

1    wanted me to look at?  It seems there may be something

2    else.  I can't remember what it is.

3            THE COURT:  That's what it is.

4            Go ahead and make sure that Mr. Martinez gets

5    what you send to me and vice versa.  Okay?

6            MR. PATTERSON:  Okay.

7            THE COURT:  We'll have the bailiff make copies

8    for Counsel and Court.

9            (Proceedings adjourned.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# APPENDIX R

**LEON THIKOLL**
ATTORNEY AT LAW

239 N MEYER
TUCSON, AZ 85701
TELEPHONE (520) 884-7997

State Bar No 01467
Pima County Computer No 57060

Attorney for

Alejo and Donna Ochoa
and Wendi Andriano

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

| In the Matter of the Guardianship of | ) | Case No PB 2000-004531 |
|---|---|---|
| | ) | |
| | ) | |
| NICHOLAS ANDRIANO and | ) | WITHDRAWAL OF CONSENT |
| ASHLEE ANDRIANO | ) | TO GUARDIANSHIP |
| | ) | |
| Minor Children | ) | |

COMES NOW Wendi Andriano, natural mother of Nicholas and Ashlee Andriano and does hereby state to the Court that she withdraws her previously granted consent to guardianship

Wendi Andriano now seeks an Order of Appointment of her parents, DONNA OCHOA and ALEJO OCHOA, husband and wife, to be the guardians of her children

DATED this 19 day of March, 2001

_Wendi Andriano_
Wendi Andriano

E000000099

# APPENDIX S

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                             11/10/2004


                                              CLERK OF THE COURT
HONORABLE BRIAN K. ISHIKAWA                          M. LeSueur
                                                       Deputy

                                              FILED: 11/22/2004


STATE OF ARIZONA                              JUAN M MARTINEZ

v.

WENDI ELIZABETH ANDRIANO                      DANIEL B PATTERSON
                                              G DAVID DELOZIER JR.

                                              VICTIM SERVICES DIV-CA-SE



                        TRIAL MINUTE ENTRY
                              DAY 41


        State's Attorney:         Juan Martinez
        Defendant's Attorney:     Daniel Patterson and David Delozier
        Defendant:                Present
        Court Reporter:           Sharon Flores


        1:08 p.m. Trial to Jury continues from November 9, 2004.

        The Jury is not present.

        The Court previously took under advisement the matter re: Defendant's Motion to
Preclude Testimony of Dr. Michael B. Bayless.

        IT IS ORDERED denying the defendant's Motion to Preclude Testimony of Dr. Michael
B. Bayless.

        IT IS ORDERED that the State may elicit testimony from Dr. Bayless in the following
areas:

Docket Code 012                      Form R012                             Page 1

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                           11/10/2004

- His opinion of whether the defendant's characteristics are consistent with those of domestic violence victims.
- What the characteristics of a person who has been the victim of domestic violence are.
- Secondary gain.
- The tests conducted.

IT IS ORDERED precluding the State from eliciting testimony from Dr. Bayless relating to:

- Whether Dr. Bayless believes the defendant or whether he has an opinion as to whether the defendant is credible or truthful.
- A regurgitation of the police reports he reviewed.
- The allegation of the defendant committing a theft from her employer.
- The fact that the defendant is in jail.
- The issue of the children and severance of parental rights.
- The defendant's alleged suicidal thoughts and alleged suicide attempt.
- A discussion of clients with a profile of this type characterized by poorly controlled anger and hostility and violent outbursts.

The Jury is now present.

State's Exhibits 535 through 540 are marked for identification.

State's rebuttal continues.

Dr. Michael Brad Bayless is sworn and testifies.

Let the record reflect that the witness has made an in-court identification of the Defendant.

Let the record reflect that the Court has received written questions from the jury. Same are discussed with counsel at a bench conference and asked of the witness.

FILED: Jury questions (6)

The witness is excused.

3:25 p.m. Court stands at recess.

4:00 p.m. Court reconvenes.  Court, Counsel, and Defendant are present.

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                            11/10/2004

Court Reporter, Sharon Flores, is present.

The Jury is present.

State's Exhibits 471, 472, and 473 are received in evidence.

Justin Roberts is sworn and testifies.

The witness is excused.

Joseph C. Andriano Sr. is sworn and testifies.

The witness is excused.

The State rests.

The Jury is excused for the weekend.

Court and Counsel remain to discuss trial issues regarding jury instructions and exhibits.

4:32 p.m. Court stands at recess until 1:00 p.m., November 15, 2004.