# TABLE OF CONTENTS (INTERACTIVE)

| VVVVVVVVVVV PART 3 | State's Response to Petition for Review and Appendices |
|---|---|
| | Appendix T |
| | Appendix U PART 1 |
| | Appendix U PART 2 |
| | Appendix U PART 3 |
| | Appendix V PART 1 |
| | Appendix V PART 2 |
| | Appendix V PART 3 |
| WWWWWWWWWWWW | Unopposed Motion for 30-Day Extension to File Reply |
| XXXXXXXXXXX | Order 7-16-15 RE:  Granting Extension |
| YYYYYYYYYYY | Reply in Support of Petition for Review |
| ZZZZZZZZZZZ | Motion to File Overlength Brief |
| AAAAAAAAAAAA | Order 8-24-15 RE:  Granting Motion to Exceed Page Limit |
| BBBBBBBBBBBB | Order 4-11-16 RE:  Denying Petition for Review |
| CCCCCCCCCCCC | M.E. 10-30-12 – Petition Ruling |
| DDDDDDDDDDDD | M.E. 10-30-12 RE: Appointing Counsel |
| | |
| | |
| | |
| | |

# EXHIBIT VVVVVVVVVV PART 3

# APPENDIX T

MICHAEL K. JEANES, CLERK
BY _____ DEP
FILED

2005 FEB -2 PM 3: 35

DANIEL B. PATTERSON
Deputy Public Defender
11 West Jefferson, Suite 5
Phoenix, AZ   85003
(602) 506-6463
Bar No. 005743
Attorney for Defendant

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
IN AND FOR THE COUNTY OF MARICOPA

STATE OF ARIZONA,

                Plaintiff,

v.

WENDI ELIZABETH ANDRIANO,

                Defendant.

No. CR2000-096032

**FACTUAL SUPPLEMENT TO MOTION FOR NEW TRIAL: PHASE III**

(Honorable Brian Ishikawa)

(Oral Argument Requested)

     Defendant Wendi Elizabeth Andriano, through counsel undersigned, pursuant to the Rule 24.1 of the Arizona Rules of Criminal Procedure, and the 5th, 6th, 8th and 14th Amendments to the U.S. Constitution, files the attached article from the Arizona Republic as a factual supplement to the Motion for New Trial: Phase III, filed on January 25, 2005.

     DATED this ___2 nd___ day of February, 2005.

               MARICOPA COUNTY PUBLIC DEFENDER

               By _____
                  DANIEL B. PATTERSON
                  Deputy Public Defender

A000000363
0999A

Copy of the foregoing
delivered this __2nd__ day of
February, 2005, to:

HONORABLE BRIAN ISHIKAWA
Judge of the Superior Court
Southeast Court Building, 4th Floor
222 East Javelina
Mesa, Arizona  85210
FAX:  (602) 506-5980

JUAN MARTINEZ
Deputy County Attorney
301 West Jefferson, Suite 800
Phoenix, Arizona 85003

DAVID DELOZIER
Attorney At Law
4016 E Forest Pleasant
Cave Creek   AZ   85331-5439
(480) 575-6661

By _____
     DANIEL B. PATTERSON
     Deputy Public Defender
     11 West Jefferson, Suite 5
     Phoenix, AZ   85003

DBPcb020205H

-2-

A000000364



**Email this article**                                    **Click to send**
**Print this article**                                    **Click to print**
**Most popular pages**                                    **Today | This Week**

# Deciding life, death takes toll on jurors

**Jim Walsh**
The Arizona Republic
Jan. 24, 2005 12:00 AM

One juror felt his knees shaking as he sat down to decide if an Ahwatukee Foothills woman should live or die.

Another says she spent the evening before the death penalty deliberations eating saltines and vomiting.

A third says she flashes back to the case, which featured a murder inside an apartment, every time she drives past an apartment complex.

Such is the emotional cost of Arizona's 2 1/2-year-old death penalty law under which ordinary people - jurors, not judges - make the toughest decision in the law, life or death, a choice no one would voluntarily make.

Since Arizona revamped its law because of a landmark U.S. Supreme Court ruling that juries must determine mitigating factors in death penalty cases, Maricopa County juries are voting for death far more often than their peers in four other states affected by the ruling. They are also dishing out death sentences more often than judges did in the past.

Including the jury in the Ahwatukee case, the trial of Wendi Andriano, Valley juries have voted the death penalty for 14 of 18 defendants since Aug. 1, 2002.

That 78 percent rate contrasts sharply with the sentences of Maricopa County Superior Court judges, who imposed death in 15 percent of cases from 1995 to 1999, according to 2002 report by the state Capital Case Commission.

While Arizona legal experts say it still may be premature to determine how the change is working, jurors in the Andriano case told *The Arizona Republic* that they believe juries should make the choice, even though they felt enormous pressure and anguished over their death penalty verdict.

## 'This is your duty'

In all, 15 jurors in Maricopa County Superior Court in Mesa spent four months hearing the case against Andriano, 34, who was charged with killing her terminally ill husband, Joe, 33. He was poisoned, bludgeoned and stabbed in their apartment Oct. 8, 2000, while their children, then 2 and 3, slept in a bedroom.

Six of the 12 jurors who voted last month to execute Andriano were interviewed, along with two of the three alternates.

"The first couple of weeks, it was kind of interesting," said juror Tanner Catalano, 27, of Gilbert.

"After it started to set in that you had to make a decision like this, it became overwhelmingly stressful."

Catalano and some of his peers on the jury argued that it is fairer for 12 everyday people to decide a death sentence than one judge. "A lot of things in life are hard.

A000000365
000003781

This is your duty," he said.

Catalano played ice hockey to relieve the tension but said a rule that bars jurors from discussing a case with others forced him to keep his emotions private.

"I'd walk around in a daze and people would say, 'What's wrong with you?' You can't tell them why," he said.

The jury found Andriano guilty Nov. 18, about 15 minutes after they went into the jury room, said juror Jay Erke, 48, an airline mechanic foreman from Mesa.

Juror Linda Percy, 63, a Realtor from Mesa, said jurors didn't believe Andriano's testimony, given over nine days on the stand, that she poisoned her husband as part of a suicide pact, and that she hit him 23 times in the head with a bar stool in self-defense to stop him from reaching for a knife.

"The defense didn't have a lot of evidence, period," Percy said. "I don't think the defense had a lot to work with."

But the decision to execute Andriano was far more difficult, she and the five other jurors all said.

## Reaching guilty verdict

After they reached the guilty verdict, jurors heard a week of testimony on why Andriano should be executed, the aggravating factors that go into a death penalty decision.

They deliberated for four hours before finding the slaying was especially cruel, qualifying her for the death sentence.

They then heard six days of testimony on mitigating factors, reasons her life should be spared.

They gathered in the jury room Dec. 16 to consider whether there were reasons for sparing Andriano's life.

It took four days.

The sometimes-heated deliberations dramatically changed the case's outcome, with a split jury gradually shifting toward the death verdict.

When the deliberations began, the nine women and three men took a vote. Only three supported a death sentence, with four favoring a life sentence and the others undecided, said juror Mary Fobes, 74, of Mesa.

Catalano said he wasn't sure.

"I still hadn't made up my mind. I was giving her the benefit of the doubt," he said.

After one day, the jury went home for a three-day weekend that some called full of soul searching.

When they reconvened, Catalano gave a pivotal speech outlining his reasons for supporting a death sentence, and the vote swung to 11-1 in favor of execution, Fobes said.

"It was very passionate on why he thought she deserved the death penalty," Fobes said. "The more I thought about it, how could she be so brutal? She must have totally flipped her wig. I don't know how anyone could do that."

But the jury was on the verge of a deadlock, with one holdout, a senior citizen from Gilbert, saying he was adamantly against the death penalty.

On the third day of deliberations, jurors took turns discussing each of 23 reasons listed by the defense for sparing Andriano's life, the mitigating factors, weighing whether they were sufficient cause for leniency.

A000000366

000003782

Deciding life, death takes toll . ...jurors

They included that Andriano was a good mother to her children and had signed up at age 19 for missionary work when in Mexicali, Mexico, for the 91st Psalm Church, now the Harvest Family Church in Casa Grande.

Catalano said he gave all the mitigating factors some weight, but in the end, they were not enough.

"Does a good mother brutally murder her husband?" he said.

Percy said she also considered the arguments against execution, but on balance, "we could not find mitigating factors that overwhelmed the cruelty. To me, to everybody there, the knife wound was the crowning blow. She had three chances to back off."

While jurors were discussing whether to execute Andriano, they considered that they would have no control over whether the trial judge, Brian Ishikawa, would give her life in prison with or without parole, she said.

Jurors did not want to see a 25 years to life sentence.

"We also knew with the death penalty that she has an automatic appeal," Percy said.

Different parts of the case resonated with jurors. Some said they were moved by Andriano's plea for life during the mitigation phase on Dec. 16, just before the final deliberations, while others considered it an Academy Award acting job.

"I just thought, 'What an act you're putting on, honey,' " Fobes said. "She was such a liar. How could you believe anything she told you?"

The emotional impact of Andriano's 45-minute plea, in which she admitting making "a horrible choice that night" but insisted her cancer-stricken husband wanted to commit suicide, may have waned as days passed and jurors focused on the details of the case, Fobes said.

Erke was moved.

"Her speech was heartfelt. It teared me up," he said. But "I thought she was more sorry for the consequences of what she did than for the actions."

Others cited a videotape recording of the police interview with Andriano, only a few hours after the murder, as among the most incriminating evidence. The tape showed a relaxed Andriano talking to a Phoenix police detective, casually holding her knees against her chest.

"I can't imagine being so calm and collected and having no emotions," Percy said. "She never cried, she never asked about her kids, she seemed flirtatious."

## Manipulation

As the third day of deliberations ended, Fobes said she told the holdout juror, a Gilbert senior citizen, "Wendi has manipulated you. He said, 'Yes, I know.' "

The next day, the holdout gave a short speech saying he changed his mind. He declined two requests for an interview.

The jury delivered the death penalty verdict Dec. 22.

"Walking in there with that verdict, I was shaking like a leaf," Erke said, the daunting power of deciding if someone lives or dies overwhelming him. "It's 'Oh, my God, it's really happened.' "

Most are still mulling over their decision, but only one juror, a young nurse, expressed doubts.

"Sometimes, I think I'm too hard-hearted," Fobes said. "But she didn't feel any sympathy for him (the husband)."

A000000367

000003783

Deciding life, death takes toll on jurors                                    Page 4 of 4

Percy said a telling look from Andriano was reassuring after a clerk read the verdict.

"She gave us a look like, 'How dare you?' " Percy said. "I thought, 'I made the right decision.' "

Reach the reporter at jim.walsh@arizonarepublic.com.

**Email this article**                              **Click to send**
**Print this article**                              **Click to print**
**Most popular pages**                              **Today | This Week**

A000000368

000003784

# APPENDIX U - Part 1

DP

DS-0002 1
Braccio



1          IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

2              IN AND FOR THE COUNTY OF MARICOPA

3

4    STATE OF ARIZONA,              )
                                    )
5              Plaintiff,           )
                                    )
6    v.                             )    No. 1 CA-CR 04-0731
                                    )    MARICOPA COUNTY
7    WENDI ELIZABETH ANDRIANO,      )    No. CR 2000-096032
                                    )
8              Defendant.           )
     _____    )

9

10

11

12                         Mesa, Arizona
                         October 13, 2004
13

14

15

16          BEFORE:  The Honorable BRIAN K. ISHIKAWA

17

18          REPORTER'S TRANSCRIPT OF PROCEEDINGS

19                       TRIAL DAY 27

20

21

22

23

24   ORIGINAL Prepared for APPEAL by:
     TRACI L. WHEELER, CSR, RPR
25   Certified Court Reporter, No. 50313


     TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

2

1                    A P P E A R A N C E S

2    FOR THE STATE:       JUAN M. MARTINEZ,
                          Deputy County Attorney
3
     FOR THE DEFENDANT:   DANIEL B. PATTERSON,
4                         Deputy Public Defender
                               and
5                         G. DAVID DELOZIER,
                          Attorney at Law
6

7          I N D E X   O F   E X A M I N A T I O N

8    WITNESS                                          PAGE

9    MURPHY, SHARON, Called to testify by the Defense
          Continued Direct Examination by Mr. Patterson    3
10        Cross-examination by Mr. Martinez               44
          Continued Cross-examination by Mr. Martinez     92

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

        TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

3

1               MESA, ARIZONA, WEDNESDAY, OCTOBER 13, 2004

2

3               THE COURT:  Good afternoon.  This is cause number CR

4      2000-096032, State of Arizona versus Wendi Elizabeth

5      Andriano.  The record will reflect the presence of the

6      Defendant, Counsel and the jury.  Sharon Murphy is on the

7      witness stand.  And we'll continue with the examination by

8      Mr. Patterson.

9                    Mr. Patterson?

10              MR. PATTERSON:  Thank you, Judge.

11

12     CONTINUED DIRECT EXAMINATION BY MR. PATTERSON:

13              Q.     You are Dr. Sharon Murphy?

14              A.     Yes.

15              Q.     You are the same Dr. Murphy that was testifying

16     yesterday?

17              A.     Yes.

18              Q.     You realize you're still under oath?

19              A.     Yes.

20              Q.     Let's try to pick up where we left off

21     yesterday.  Did Wendi relate to you what life was like in the

22     summer, late summer of 2000?

23              A.     Yes.  The months prior to the death of Joe?

24     She described life as a pressure cooker, full of pins and

25     needles, walking on egg shells, not knowing when his rage

4

1  would erupt, not knowing which Joe would be there when she

2  opened the door.  Those kinds of things.

3       Q.   Okay.  Did she relate to you whether she began

4  to feel she didn't know how to make him happy any longer?

5       A.   Yes.

6       Q.   Okay.  Now, also during the summer at some

7  point there were continuing economic difficulties, correct?

8       A.   Correct.

9       Q.   All right.  And one specifically we touched on

10  yesterday had to do with Joe's boats?

11       A.   Yes.

12       Q.   And there was a significant need for income to

13  pay for parts?

14       A.   Correct.

15       Q.   Tell me a bit about that?

16       A.   There was a $6000 bill that had been incurred

17  through the use of credit cards.  I believe to pay for parts

18  for one of the boats, and he had asked her to get the money,

19  to find the money, whatever, to help pay that credit card

20  bill.

21       Q.   Okay.  And did Wendi relate to you what her

22  response was?

23       A.   She -- she said no, that she was not going to

24  do it.

25       Q.   Okay.  Now, this was kind of an atypical

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

5

1    response?

2         A.    Very atypical.

3         Q.    Okay.  But in the research, in your clinical

4    experience, do abused persons periodically say "no" to their

5    abuser?

6         A.    Yes.

7         Q.    Okay.  And she had done this in the past on

8    other occasions, specifically the -- she was informed not to

9    tell the gentleman that his life was at risk?

10        A.    Correct.

11        MR. MARTINEZ:  Objection.  Leading.

12        MR. PATTERSON:  Trying to refer her to --

13        THE COURT:  Sustained.  Don't lead.

14        MR. PATTERSON:  -- that particular incident.

15        THE WITNESS:  With Jerry Robles, yes.

16   BY MR. PATTERSON:

17        Q.    All right.  Did anything told to you by Wendi

18   lead you to believe there was any significant change in the

19   status or her personality in the summer of 2000?

20        A.    The only thing that I remember her saying about

21   that was that up to this time when Joe's eruptions became

22   more frequent, she had always felt that she could handle

23   things, that she could do whatever to appease him, and at

24   this point in time she was unable to do that.  She couldn't

25   make him happy.

6

1      Q.    Okay.  We touched on -- I think we explored

2   thoroughly yesterday the incident involving the Kool Aid and

3   the broken bed, right?

4      A.    Yes.

5      Q.    Was there anything else you needed to relate to

6   us in terms of the substance of that incident?

7      A.    I don't believe so.

8      Q.    Okay.  Again, does that incident enter into

9   your assessment in your opinion in this regard?

10     A.    Yes.

11     Q.    Okay.  Next category we need to talk about is

12  what you described as ongoing sexual abuse.  We're still

13  talking, what, in the summer of 2000, late summer 2000?

14     A.    Yes.

15     Q.    Okay.  There -- it was reported to you by Wendi

16  that the sexual abuse continued at that time?

17     A.    Correct.

18     Q.    Describe the particulars of that particular

19  period of time between the parties.

20     A.    Well, the ongoing part of that was Joe's demand

21  for daily sex.  That continued, so she was still dealing with

22  that.  But the additional piece that occurred was Joe

23  bringing sex toys into their marriage which he had not

24  previously done.  So now there were objects that he was

25  purchasing which he used to engage in sexual acts by putting

1    them inside of her.

2         Q.    Okay.  So in that context then, were these

3    objects that were designed to assist the pleasure of the

4    female or the male?  What kind of objects are we talking

5    about?

6         A.    I don't know the names of them.  I only know

7    that Wendi reported them as sex toys.

8         Q.    Okay.  Did Wendi report to you whether or not

9    she initiated that conduct or requested that conduct?

10        A.    She reported that that was what Joe purchased

11   and he used them for that end and that she did not want that

12   to happen.

13        Q.    Okay.  And did she relate to you a situation

14   where there was some give and in return for some -- allowing

15   him to do and engage in activities with those toys?

16        A.    There was an incident in which some of her

17   female friends had asked her to go out with them on a

18   particular evening, and so she told Joe that she wanted to do

19   this and he didn't want her to and she asked again.  And he

20   basically made a deal that she could go if she would return

21   in three hours and he would have a surprise for her.

22        Q.    Okay.  And what was that surprise?

23        A.    The surprise was the use of the 130 -- he

24   purchased $130 worth of sex toys.

25        Q.    And did he then use them of a fashion with

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    Wendi?

2             A.    Yes.

3             Q.    Okay.  And was it with the consent of Wendi?

4             A.    No.

5             Q.    Have we essentially concluded the unstructured

6    interview portion of your assessment process?

7             A.    I believe so, yes.

8             Q.    Let's turn then to the structured interview.

9    And, again, give me an overview of what the structured

10   interview entails?

11            A.    The structured interview follows the

12   unstructured interview, and it's basically the use of a

13   variety of assessment tools that help clarify and define the

14   nature of the relationship.

15            Q.    Okay.  Now, was the structured interview given

16   upon the completion of the unstructured, or was there -- why

17   don't you explain to me the chronology and how the

18   structured, unstructured relate in terms of times given?

19            A.    Okay.  The structured part of the interview was

20   actually interwoven in with the unstructured.  So I began the

21   interviewing process.  I believe that first interview was two

22   hours.  Then on my second visit I introduced the first tool,

23   which was the power and control wheel.

24            Q.    Okay.  Would that be a good place to start in

25   terms of the unstructured interview?

1          A.     Sure.

2          Q.     Again, the power and control wheel was

3     displayed on the ELMO and it wasn't wholly visible to me, so

4     why don't you tell us what you did with this particular

5     instrument and how you go about testing an individual using

6     it?

7          A.     I have a paper copy of it.  I don't know if you

8     want to put it up there.

9          Q.     See if we could get it --

10         (Pause in proceedings.)

11    BY MR. PATTERSON:

12         Q.     All right.  Does it start at any particular

13    point, 12:00 o'clock and go around or just in general?

14         A.     You go around, right.

15         Q.     Okay.  This is the -- is this a verbatim copy,

16    if you will, of the instrument that you gave to the client?

17         A.     The one that you have there does not have

18    around the outside of the circle the names of the physically

19    violent act --

20         Q.     Okay.

21         A.     -- that other power and control wheels have.

22         Q.     Okay.

23         A.     But other than that I don't believe there is

24    any difference, what's written inside is the same.

25         Q.     Okay.  And do you hand this instrument to the

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    client?

2           A.    Yes.

3           Q.    Okay.  And then you, what, leave them alone and

4    allow them time to look through it and respond to it?

5           A.    Basically.  I don't say anything about it.  I

6    just say -- I hand it to them and say have you ever seen this

7    before?

8           Q.    Okay.

9           A.    In Wendi's case she hadn't.  I asked her if she

10   would take her time and read each of the pieces inside those

11   eight pieces of pie, and if anything sounded like it

12   reflected or referred to something that happened in her

13   relationship with Joe, I asked her to write an example

14   outside of the wheel.  Or sometimes I give the person paper.

15   And I don't remember now which -- I think she actually wrote

16   on the wheel.

17          Q.    Do you actually have her wheel or leave that

18   back in the office?

19          A.    Yeah, I don't have it here.

20          Q.    Okay.  But did you incorporate her responses

21   into your report?

22          A.    Yes.

23          Q.    Okay.  How would you go about discussing this?

24   Let's start with a piece of the pie and then you tell me how

25   she responded and what kind of scores she generated as a

1    result of that?

2          A.     There are no scores with this.

3          Q.     Okay.

4          A.     It's really just getting examples from her.

5          Q.     Okay.  Let's talk about using coercion and

6    threats.  How did she respond to that particular piece of the

7    pie?

8          A.     She described the incident that I spoke about

9    yesterday where Joe had the gun in his hand when she said

10   that she was going to tell Jerry about his plan to kill him

11   and he held the gun to her and threatened her life.  That was

12   an example.

13         Q.     Okay.  Did she give other examples?

14         A.     There isn't a lot of space.  It's an

15   8-and-a-half by 11 sheet of paper.  So what she did was she

16   wrote one example next to the pieces that fit her experience.

17         Q.     Okay.  And what are you looking for by using

18   this particular instrument?

19         A.     Well, basically I need to know whether or not

20   this relationship is overshadowed to a great extent by the

21   very issue of power and control.  So these -- these pieces

22   outside of the inside of the big circle are the tactics of

23   control that an individual can use against his or her

24   intimate partner, so I'm looking to see did this exist in her

25   relationship.

1       Q.    All right.  Using intimidation?

2       A.    Intimidation, one example was his telling her

3  the story about what his previous girlfriend or fiance did

4  and his warning to her not to do the same, and that was that

5  she had cheated on him.

6       Q.    Okay.  All right.  In your report you said

7  there were seven of eight tactics --

8       A.    Correct.

9       Q.    -- related or answered in the affirmative?

10      A.    Correct.

11      Q.    Which one of the eight was not part of their

12  relationship?

13      A.    Using the children was not.

14      Q.    Okay.  And that's down -- down here at the

15  bottom, this piece here?

16      A.    Correct.

17      Q.    Okay.  So Wendi -- what did she relate to you

18  in that regard so we could eliminate that as one of the

19  issues in this case?

20      A.    About using the children, she just said he did

21  not do that.

22      Q.    Okay.  All right.  Let's talk about the other

23  ones that were existent in their relationship.  We've done

24  the first two on the top.  How about using emotional abuse?

25      A.    Emotional abuse to Wendi was what happened to

13

1    her through the use of his language.  The language that he

2    talked to her in, the name calling, the words such as "bitch"

3    and "fuck" and things like that that she found very hurtful.

4            Q.    Okay.  Were there other examples of emotional

5    abuse?

6            A.    Overall I believe that she referred to just his

7    general treatment of her.

8            Q.    Okay.  Using isolation?

9            A.    The example that she wrote on the wheel was the

10   one that I talked about yesterday where she had picked out a

11   female friend to be in her bridal party, and Joe made her

12   change that and put a sister in that person's place.

13           Q.    Minimizing, denying and blaming?

14           A.    What she talked about there was his general

15   attitude towards everything he did.  She couldn't even talk

16   about it because in fact he didn't do anything, meaning you

17   know, breaking the door, punching the holes in the walls,

18   those kinds of things.  It was a constant lack of

19   responsibility for any of those actions.

20           Q.    Okay.  Using male privilege?

21           A.    That was the demands that Joe would make on

22   her, the cooking, the cutting of his toe nails, the laying

23   out of his clothing, those kinds of things.

24           Q.    Okay.  Using economy abuse -- or economic

25   abuse?

1          A.      In this case, which is different from other

2     cases, typically it's the man who's earning the income and

3     then, you know, doles it out in a very piecemeal fashion to

4     the woman.  In this case Wendi was actually the one who was

5     earning the majority of the income, but he still controlled

6     it in that such a portion of the income she was earning was

7     going to pay for the expensive boats and the expensive trucks

8     and things like that that they couldn't actually afford.

9          Q.      All right.  This particular instrument is not

10    scaled.  It doesn't give you a score --

11         A.      Right.

12         Q.      -- in that sense.

13              Do you basically use this integrated with your

14    experiences, your background, your educational background.

15    Is that how this is best utilized?

16         A.      Yes.

17         Q.      Okay.  This -- is this in a sense a screening

18    device to see if there's any needing --

19         MR. MARTINEZ:  Objection.  Leading.

20         THE COURT:  Don't lead.

21    BY MR. PATTERSON:

22         Q.      What kind of device is this in the scheme of

23    things?

24         A.      I refer to it in my own thinking as sort of the

25    first cut.  It's like the litmus paper test.  You know, if

1    you don't pass this one, there probably isn't much reason to

2    continue.  Depends on the answers to this as to where I'm

3    going to go next.

4              Q.    Okay.  Have we exhausted the relevancy of this

5    particular instrument?

6              A.    I believe so.

7              MR. MARTINEZ:  Judge, may we have it marked as an

8    exhibit?

9              THE COURT:  Any objection?

10             MR. PATTERSON:  None.

11   BY MR. PATTERSON:

12             Q.    And this has been marked as Exhibit 448 for

13   identification.  Where do we go now?  Partner abuse scale?

14             A.    We could do the nonphysical.  That was the

15   way -- you want to go through them the way I did them?

16             Q.    That's right.  What's -- what we were going

17   to --

18             A.    Go through them --

19             Q.    -- do is go through them chronologically.

20             A.    Yes.

21             Q.    You did the measure of the unstructured

22   interview, then you did the structured power and control

23   wheel.  What did you do next in the context of the structured

24   interview?

25             A.    Okay.  That was the partner abuse scale,

1    nonphysical.

2         Q.    Okay.  Again, what is that all about?

3         A.    It's a one-page test assessment tool.  I

4    believe this has 26 items.  You -- the person who's taking

5    the test just reads the very simple directions.  This is one

6    of two tests that I described yesterday as having a sixth

7    grade reading level.  And basically it instructs the

8    participant to score each question on a scale of 1 to 7, with

9    1 meaning rarely and 7 meaning most of the time.  I think

10   "most of the time" is the words they use.

11        Q.    Do you have an example of that test with you

12   today?

13        A.    No.

14        Q.    Okay.  Can you give me your recollection of one

15   of the kinds of questions that are presented on that

16   particular instrument?

17        A.    Well, this -- this particular one is looking to

18   measure verbal abuse, nonphysical violence, emotional abuse,

19   and there are a couple of questions about sexual abuse on it

20   also.

21        Q.    Okay.  Is this test capable of being scored?

22        A.    Yes.

23        Q.    Okay.  And how is it scored?

24        A.    There's a scoring manual that comes with it or

25   there's also a computer assisted software package that you

1    can purchase.

2         Q.   Okay.  Which scoring mechanism did you use?

3         A.   I hand score because I'm only given two.

4         Q.   Okay.  Tell me about the results of this

5    particular test in terms of raw score?

6         A.   She -- the raw score on it was 60.

7         Q.   Okay.  And what's the range here from, say, non

8    abused to significantly abused.  Is there a range here?

9         A.   Yes.  If -- if the person scores under 15, then

10   that tells me that there's a nonsignificant finding.

11        Q.   Okay.  With regard to nonphysical?

12        A.   Nonphysical violence, correct.

13        Q.   Okay.  And what is the top end, worst case

14   scenario?

15        A.   I don't know that the creator of the test gave

16   that and I never tried to figure it out myself --

17        Q.   Okay.

18        A.   -- what the top end might be.

19        Q.   In any event, what was Wendi's score in this

20   one?

21        A.   60.

22        Q.   Okay.  What does that indicate to you?

23        A.   That would indicate a severe level of

24   nonphysical violence.

25        Q.   Okay.  And, again, what -- what falls within

1      that context?

2            A.    What kinds of items?

3            Q.    Yes, constitutes nonphysical abuse?

4            A.    Okay.  Any of the forms of emotional or

5      psychological abuse.  I can read a couple of them because

6      they're part of my report.

7            Q.    Okay.

8            A.    Well, she scored high in -- on two of the

9      questions.  One was my partner demands obedience to his

10     whims, and high means a 7.

11           Q.    Okay.

12           A.    And the second one that she marked 7 was my

13     partner demands that I perform sex acts that I do not enjoy

14     or like.

15           Q.    And that too was a 7?

16           A.    That too was a 7.

17           Q.    Okay.  Just below the 7, did she score sixes on

18     other issues?

19           A.    Yes.  And 6 on this test is equal to "most of

20     the time."

21           Q.    Okay.

22           A.    And the response to the questions she's marked

23     6 were my partner belittles me; my partner does not want me

24     to have any male friends; my partner acts like I am his

25     personal servant; my partner does not want me to socialize

1  with my female friends; and lastly, my partner demands sex

2  whether I want it or not.

3      Q.   All right.  That last entry is somewhat

4  different than the 7, although it does relate to sex.  Is it

5  somewhat different?

6      A.   It is a little bit different and often

7  researchers when they're crafting their tool, they're trying

8  to get at similar information in a variety of ways.

9      Q.   Okay.  Does that exhaust all that was relevant

10  about the partner abuse scale nonphysical?

11      A.   Yes.

12      Q.   Okay.  In terms of chronology then, which of

13  the instruments did you use in the structured portion of the

14  interview?

15      A.   Okay.  So the next test then was the partner

16  abuse scale physical, also by the same author.

17      Q.   Okay.  And, again, can you give me an overview

18  of that particular instrument?

19      A.   This one is clearly looking at acts of physical

20  violence.  Again, this test creator included a couple of

21  questions about sexual abuse.

22      Q.   All right.  And, again, is there a scale or a

23  scorable --

24      A.   Yes.

25      Q.   -- measure here?

1          Okay.  And, again, is it scored in what

2   fashion?  How do you score it?

3          A.    The same exact way you could use either, a

4   computer assisted or there's a scoring manual that you

5   purchase when you purchase packets of the tests themselves.

6   And I have -- I have the scoring manual.

7          Q.    Okay.  And so you scored this one in what

8   fashion?

9          A.    Her -- her raw score was 16.66.

10         Q.    And that was done by hand as you said earlier?

11         A.    Yes.

12         Q.    Again, what does that indicate?

13         A.    The threshold number is 15, so it indicates a

14   significant finding of physical abuse.  However, as compared

15   to the nonphysical abuse scale, she obviously has scored a

16   lot lower.

17         Q.    Okay.  And is this circumstance consistent with

18   research or your clinical experience?

19         A.    My experience says women are all over on these

20   tests.  You can have somebody with a very elevated

21   nonphysical scale score and someone with a fairly low one as

22   this case is.  There's -- if you find -- if there is a

23   finding of physical abuse, then there's always a finding of

24   the nonphysical.  You can't have physical without the

25   nonphysical.

1      Q.     Okay.

2      A.     But you can have nonphysical without a high

3   level of physical.

4      Q.     Okay.  And how does that relate, if you will,

5   to the relationship between the abuser and the abused.  Are

6   there different mechanisms for control, different means or --

7      A.     Well, the way this particular test was crafted,

8   because I've used it so many times, I know from a person's

9   story almost when I give it to them where they'll fall.

10  Because of the way this test was created, the only way you

11  can score high is to have a high number of actual physically

12  violent incidents.  And Wendi's story, although the acts are

13  severe, we're not talking about, you know, 100 acts.  We're

14  talking about a much smaller number, so I had a sense.

15     Q.     Okay.  So this result in the partner abuse

16  scale physical, is it consistent or inconsistent with the

17  unstructured interview that you had?

18     A.     I was somewhat surprised, not terribly, but

19  somewhat surprised, not at this point when I gave it to her

20  but at the end after I had given her all of the assessment

21  tools and after I had completed all the, you know, 20 hours

22  of interviewing.  I would have anticipated that the score

23  even higher than it is, but it is what it is.

24     Q.     Okay.  Does the concept of denial on the part

25  of the abused person enter into the taking of these tests?

1      A.   Sure.   If -- if at the present time the

2  person's taking a test and they're still minimizing what that

3  abuse was like, they're going to answer that way so they're

4  not going to have a lot of 7s.   They may have a lot of 4s.

5      Q.   All right.   In any event, do you have any

6  reason to believe that she overstated her responses to the

7  partner abuse scale physical?

8      MR. MARTINEZ:   Objection.   Vouching.

9      THE COURT:   Sustained.

10  BY MR. PATTERSON:

11     Q.   All right.   Were the specific responses that

12  you could talk about -- well, again, let's talk about what

13  constitutes physical abuse used in the sale?

14     A.   Okay.   This scale talks about forcing sex,

15  hitting, punching, kicking, breaking bones, using

16  intimidation to the point of making a person fear for their

17  life and also injuring sexual parts of the body.

18     Q.   Okay.   Do we use the same score high to low?

19     A.   Right, 1 to 7.

20     Q.   Okay.   And 1 being --

21     A.   Rare, the lowest.

22     Q.   Okay.   And 7 being --

23     A.   The high, most of the time.

24     Q.   Okay.   Or all the time?

25     A.   All the time, sorry.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          Q.     Okay.  What was the high  score that Wendi put

2     down on this particular test to any given answer?

3          A.     A 4, which is equal to "some of the time."

4          Q.     All right.  And in that regard she indicated

5     that Joe some of the time did what to her?

6          A.     My partner pushes and shoves me around

7     violently; my partner physically throws me around the room;

8     my partner twists my fingers, arms or legs; my partner tries

9     to suffocate me with pillows, towels or other object.

10         Q.     And then there were other items that you denote

11    in your report that she assigned a 3 to.  Now, what does a 3

12    mean?

13         A.     A little of the time.

14         Q.     Okay.  And what then were those responses?

15         A.     My partner makes me afraid for my life; my

16    partner tries to choke or strangle me; my partner badly hurts

17    me when we're having sex; my partner injures my breasts or

18    genitals.

19         Q.     Okay.  Have we exhausted that particular

20    instrument?

21         A.     We have if you think that it's clear what those

22    numbers mean.

23         Q.     Okay.  Again, please explain to me what the

24    numbers mean?

25         A.     Well, I think it can be confusing.  I don't

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    know if that's true, but I think it can be because when

2    someone writes "a little of the time," in my mind that could

3    almost be interpreted as this wasn't so bad as opposed to

4    what it really is -- what the test is asking for, did this

5    happen a lot.  So her response to a little of the time means

6    these things happened, but they didn't happen --

7              MR. MARTINEZ:  Objection.  Vouching.  Speculation.

8              THE COURT:  Sustained.

9    BY MR. PATTERSON:

10             Q.    Well, let me ask you, are the definitions on

11   the front side of the test explain what some of the time, all

12   the time, part of the time mean?

13             A.    No.

14             Q.    Okay.  All right.  In terms of chronology, what

15   instrument did you next give to Wendi?

16             A.    The response to violence inventory strategies

17   to escape, avoid and survive abuse by Marian Dutton.

18             Q.    Okay.  And at what point was this particular

19   test administered?

20             A.    This was much later.  This was, I think, April

21   11 and the earlier one, the power and control wheel, and the

22   nonphysical and physical abuse scales were administered, I

23   believe it was, either the 26th or the 27th of March.

24             Q.    Okay.  So how much time elapsed between your

25   first meeting and the presentation of this particular

1    instrument?

2           A.    That would be three weeks.

3           Q.    Okay.  In that intervening three weeks, what

4    transpired in terms of the assessment?

5           A.    Just more of the clinical interview.

6           Q.   ·Okay.  All right.  Again, what is this in

7    general?

8           A.    This is -- this assessment tool is based on the

9    researcher's understanding that battered women often times

10   use multiple ways of surviving.  And the reason it's

11   important to even know that is because there are so many

12   myths about the fact that, you know, she stays because she

13   likes it or she deserves it, or whatever those myths are.  So

14   what we're trying to do here is elicit that information, how

15   did an individual person work at surviving, escaping the

16   abuse.

17          Q.    Okay.  Is it a pencil and paper test --

18          A.    Yes.

19          Q.    -- as well?

20          A.    Yes.

21          Q.    Okay.  And in general what kind of questions

22   are stated and in what format?

23          A.    They are -- there's a column on the left, a

24   column on the right and a statement in between.  So the

25   statement might say have you ever called the police.  On the

1    left you're supposed to write down the frequency, how many

2    times you've called the police.  On the right you're

3    supposed to answer in a positive or negative fashion.

4    There's numbers listed that you choose from, how helpful that

5    was because the assumption is calling the police should be

6    helpful.

7            Q.    Okay.  And are there definitions or

8    descriptions as to what constitutes the frequency of those

9    responses?

10           A.    There's a very short paragraph at the top.

11           Q.    What does that say?

12           A.    Basically, it's just directing the abused

13   person to respond with their best memory or recall to each of

14   the items.  There aren't -- really aren't definitions for how

15   to do this.

16           Q.    All right.  And does the client just pick a

17   number and plug it into the right side?

18           A.    There's a range --

19           Q.    Okay.

20           A.    -- above that, so there's that.

21           Q.    Okay.  Are the ranges defined or described?

22           A.    Yeah.  That's fairly clear.  Actually, you

23   know, when they're asking about how many times, that's a

24   count.

25           Q.    Right.

1       A.      When they're asking about how helpful was this,

2    there's a range at the top, and I think it goes plus 1, plus

3    2 or minus 1, minus 2.

4       Q.      Okay.

5       A.      So it's a regulative response and a

6    significantly relative response you would choose a regulative

7    2.

8       Q.      Okay.  On the other side of the column where it

9    has the ranges, can you describe the actual ranges described

10   there?

11      A.      That range is not described because that's how

12   many times are you putting down an exact count.

13      Q.      Okay.  How did you score this particular

14   instrument?

15      A.      This is not scored.  There's --

16      Q       Okay.  What is it useful for in terms of what

17   is ultimately concluded upon your evaluation of this

18   particular test?

19      A.      Well, it tells me what she did or what any

20   victim did in order to survive the situation that they had

21   previously described to me.

22              So I want to know did you call the police; did

23   you get an order of protection; do you have a restraining

24   order; have you gotten mental-health counseling; did you go

25   to a shelter; if you did, how long did you stay; did you seek

1    to help prosecution.  Those are the types of questions.  So

2    all this is doing is rounding out my knowledge about a

3    particular person and how they lived through this period of

4    time.

5         Q.    All right.  That being the focus of this

6    instrument, what was -- what were your findings as a result

7    of it?

8         A.    Basically that Wendi said that she used three

9    different ways to survive.  And she -- or, actually, I'm

10   sorry, four.  They were escaping, threatening, violent

11   situations.  She wrote down that she tried to do that 11 to

12   20 times.  And she wrote I would hide in the bathroom until

13   my husband's temper cooled, so that was the hiding piece.

14   She also wrote under hiding and disguising, she did that 11

15   to 20 times.  And she wrote as long as I wasn't in his view

16   he would destroy furniture instead of putting his hands on

17   me.  In compliance with demands anticipation of the times,

18   she wrote more than 20 times as long as I did everything he

19   wanted, including sex, he wouldn't get upset.  And then I

20   think this is the last one -- yes.  When asked if there were

21   any other strategies she used to escape avoid and protect

22   herself, she wrote I would also try to pacify him and keep

23   him calm.  I would do my best to come up with a solution to

24   whatever was bothering him.

25        Q.    Again, have we exhausted that particular

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000007462

1    instrument?

2          A.    Yes.

3          Q.    Okay.  Were there other instruments employed in

4    your assessment?

5          A.    Yes.  There were two more.

6          Q.    Okay.  In terms of chronology, what was the

7    next one?

8          A.    Abusive observation checklist, again, by

9    Dutton, the same author as the previous one.

10         Q.    Again, give me an overview of what this

11   particular test does.

12         A.    This test was in part designed by using the

13   power and control wheel.  Now, what I mean by that is the

14   author, Marian Dutton took a variety of tactics of control

15   that one person could use against another and created

16   examples for just about anything that you can think of that

17   would be considered an abusive act, so it's quite lengthy.

18         Q.    All right.  And that's presented in its

19   totality on the client?

20         A.    Right.

21         Q.    Okay.  And then what is she expected to do?

22         A.    It -- it simply states across the top that

23   you're supposed to fill this out to the best of my

24   recollection and it asks -- there are columns and you're

25   supposed to place a check mark in the appropriate column next

1   to the act.  So, for example, if an -- if an act is my

2   partner punches, kicks or beats me, you -- if that's an issue

3   or experience you'd follow it over to the column that has the

4   correct number of times and make a check mark.

5          Q.    Okay.

6          A.    And those column readings are one -- well,

7   there's a 0 and then 1 to 3 times, 3 to 10, I think it's 10

8   to 49, and then anything greater -- 50 plus I think is how

9   it's worded.

10          Q.    And based upon that client's experience, they

11   would place a check mark in the appropriate column alongside

12   the conduct?

13          A.    Right.

14          Q.    Okay.  With this particular case did you

15   explain to Wendi there were any right answers, wrong answers,

16   anything of that nature?

17          A.    Usually, I don't give any explanation at all.

18   I just give the paper -- in this case there's several

19   pages -- and I say I'd just like to you to read the

20   description at the top and fill it out to the best of your

21   ability and the person fills it out.

22          Q.    Is that consistent with the instructions you

23   made with all the other instruments in this case?

24          A.    Yes.

25          Q.    What were the findings of the result -- well, I

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000007464

1    guess is this scored in the -- is it hand scored or a

2    computer program?

3              A.    No.

4              Q.    What, do you just aggregate the responses?

5              A.    Exactly.

6              Q.    What did this particular instrument disclose

7    with regard to the conduct of Joe and Wendi?

8              A.    The first category of the test is physical

9    abuse, and so I reported the things that she checked on that

10   test, so what I have here is the one category.  Now, I've

11   copied them exactly as they were on the test so the first one

12   said pushed, grabbed or shoved, and you -- she checked the

13   box 10 to 49 times.  Second one, punched you somewhere on the

14   body, not the face, 10 to 49 times.  Pulled your hair, 10 to

15   49 times.  Physically restrained you by holding, 10 to 49

16   times.  Dragged you or pulled you, 10 to 49 times.  Threw

17   something at you, 3 to 10 times.  Slapped you, 3 to 10 times.

18   Hit or tried to hit you with something, 3 to 10 times.

19   Wrestled you, 3 to 10 times.  Attempted to smother,

20   strangle, or hang with you an object, 3 to 10 times.  Minor

21   bruises, 3 to 10 times.

22             Q.    Is this for the time period throughout the

23   relationship from first time to taking of the test?

24             A.    Correct.

25             Q.    Okay.  What other significant findings were

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    made?

2         A.    The next category was sexual abuse, and the

3    first item in the test is vaginal intercourse and the

4    response that she checked was more than 50 times.

5         Q.    Okay.  Now explain to me was there some

6    distinction made between willing or wanted vaginal

7    intercourse and unwanted vaginal intercourse?

8         A.    Right, because at the time of the test, the

9    instructions about recalling abusive acts, so many -- the

10   test taker knows that what they're responding to are acts

11   that were unwanted.

12        Q.    Okay.

13        A.    The second one was unwanted objects were

14   inserted into your vagina or rectum.  She wrote or checked

15   the box 3 to 10 times.  The next one is threaten negative

16   consequence other than physical, 10 to 49 times.

17        Q.    And what does that mean?

18        A.    That if you don't comply something, something

19   bad will happen.

20        Q.    Okay.  And, again, her response there?

21        A.    10 to 49 times.  The last one, he used social

22   pressure to comply sexually, and she checked the box more

23   than 50 times.

24        Q.    What does that mean?

25        A.    She felt she didn't have a choice and the

1    socially here, by upping the way she explained it to me his

2    -- if you were any kind of wife, that signed her social

3    pressure then you would want to.

4        Q.    Okay.  Next category of entries entitled

5    psychological abuse, describe that for me.

6        A.    If you recall for a minute the power and

7    control wheels of psychological abuse is really part of the

8    broader category that a lot of other things subsumed or

9    subsumes, rather, and so the first category is coercion and

10   threats.  So underneath this was an exit that says attempted

11   to get you to engage in illegal activities.

12       Q.    She checked the box 3 to 10 times?

13       A.    Correct.  Again, this is still under

14   psychological abuse and activity, instilled fear in you by

15   looks, gestures, actions, she checked the box 10 to 49 times;

16   abused family pets, 1 to 3 times; displayed weapons, one to

17   3 times.

18            Emotional abuse, insulted you or used put

19   downs, 10 to 49 times; humiliated you with words or gestures,

20   10 to the 49 times; attempted to make you feel guilty, 10 to

21   49 times; verbally raged at you, 10 to 14 times; called you

22   names, 3 to 10 times; attempted to make you feel crazy, 3 to

23   10 times.

24       Q.    Okay.  Next category?

25       A.    Isolation, attempted to control you, 10 to 49

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    times; attempted to limit involvement with others, 10 to 49

2    times; restricted your use of the phone, 3 to 10 times;

3    restricted your leaving the house, 10 to 49 times.

4         Q.    Next category?

5         A.    Minimization, Denial and Blaming.

6    Shifted responsibility for abusive behavior onto someone

7    else, 10 to 49 times.

8         Q.    Okay.  And next category is use of male

9    privilege.  What's that?

10        A.    Treated you like a servant, 10 to 49 times;

11   made major decisions without your equal participation, 10 to

12   49 times; acted like the master of the castle, 10 to 49

13   times; unilaterally defined male slash female roles, 10 to 49

14   times.

15        Q.    Okay.  And the next category?

16        A.    Economic, resource abuse.  Took money from you,

17   10 to 49 times; controlled your use of money, 10 to 49 times;

18   restricted your access to transportation, 10 to 49 times;

19   locked you out of the house, 10 to 49 times.

20        Q.    Does that cover that particular instrument?

21        A.    Yes.

22        Q.    Okay.  Was there a final test or instrument

23   that you employed in your evaluation and assessment here?

24        A.    Yes.

25        Q.    Okay.  What test is this?

1        A.      That's the lethality assessment the Arizona

2    Coalition of Domestic Violence designed.

3        Q.      Okay.  And what is that structured to inquire

4    into?

5        A.      I believe yesterday I said that typically you

6    give this when the person is still in the relationship and

7    you're trying to elicit the level of dangerousness.

8    Obviously that was not the case here.  What I was trying to

9    elicit and to understand was how dangerous had the situation

10   become up until the final time.

11       Q.      Okay.  Give me the overall structure of this

12   particular test.

13       A.      Just 14 statements, and you write yes or no,

14   you know, next to one of them.

15       Q.      Okay.

16       A.      So, again, there's not a score.

17       Q.      Okay.  14 questions?

18       A.      Yes.

19       Q.      Okay.  And no way to score it, but you're

20   looking for what?

21       A.      I'm looking to see how many of these are

22   present in their life.

23       Q.      In the --

24       A.      Or were in their life.

25       Q.      Let's go through each of the questions one by

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000007469

1      one.  Number 1, first question?

2             A.     What I wrote in the right were the ones she

3      said "yes" to.

4             Q.     Okay.  So there are how many of those?

5             A.     10.

6             Q.     Did she have the four she didn't respond to --

7             A.     No.

8             Q.     These are the ten that she responded "yes" to?

9             A.     Correct.

10            Q.     Do you give us to this?

11            A.     "Does the abuser seem preoccupied or obsessed

12     with the victim?"  And in parentheses it says for an example

13     "following, monitoring her whereabouts, stalking or very

14     jealous."  That was answered in the affirmative.  "Does the

15     abuser own, carry or have ready access to a gun?"  The answer

16     was yes.  The next one is "Have the abuser's assaults become

17     more violent, brutal and/or dangerous?"  And the answer was

18     yes.  "Has the abuse ever choked the victim?"  And the answer

19     is yes.  "Has the abuser ever injured or killed a pet?"  The

20     answer, response was yes.  "Does the victim believe the

21     abuser may seriously injure or kill her?"  "Is the victim

22     extremely protective of the abuse, trying to change or

23     withdraw statement to police, reduce bail charges, etc."  She

24     responded yes.  "Has the victim separated or tried to

25     separate from the abuser in the past 12 months?"  And she

1    wrote only one time about three years prior to Joe's death.

2           Q.    Okay.  So she answered yes but clarified?

3           A.    She clarified that one, yes.

4           Q.    Okay.  And the time frame that she listed in

5    her response was outside the 12-month period?

6           A.    Correct.

7           Q.    Okay.

8           A.    The next one was "Does the abuser drink

9    excessively?"  She answered yes.  And the last one that she

10   answered affirmatively to is "Has the abuser ever threatened

11   to kill the victim?"

12          Q.    Was that the last of the instruments used in

13   the structured portion of the interview?

14          A.    Correct.

15          Q.    Okay.  Let's go back then over them and let me

16   ask you one question pertaining to each of them.  Did the

17   power and control wheel, the responses thereto, serve as, in

18   some part, the basis of your opinion in this case?

19          A.    Yes.

20          Q.    Did the partner abuse scale nonphysical, did

21   that instrument, the results to that instrument, lay a part

22   in your opinion in this case?

23          A.    Yes.

24          Q.    Okay.  The partner abuse scale physical, that

25   test, did that play a part in your opinion in this case?

1           A.     Yes.

2           Q.     Response to violence inventory, that

3    instrument?  Did that serve as basis of part of your opinion

4    in this case?

5           A.     Yes.

6           Q.     The acute observations checklist, the answers

7    derived from that particular test, did they serve in part as

8    the basis for your opinion in this case?

9           A.     Yes.

10          Q.     And the lethality assessment, that too, did

11   that play a part in your opinion in this case?

12          A.     Yes.

13          Q.     Okay.  Did the answers that you received in the

14   unstructured interview, did they serve as part of the basis

15   of your opinion in this case?

16          A.     Yes.

17          Q.     Okay.  Earlier when you --

18          MR. PATTERSON:  Judge, I'm going to have these

19   marked.

20                 (Pause in proceedings.)

21   BY MR. PATTERSON:

22          Q.     When you gave us an overview of domestic

23   violence, these were some of the slides that you showed us

24   earlier.  Show you 450 marked for identification.  These are

25   common abuser characteristics.  Based upon the unstructured


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    interview and structured interview in this case, did you find

2    these characteristics to be true with regard to Joseph

3    Andriano?  And we'll go through each one.  Low impulse

4    control?

5           A.    Yes.

6           Q.    Okay.  Can you recall a specific instance of

7    low impulse control?

8           MR. MARTINEZ:  Objection.  Asked and answered.

9           THE COURT:  Sustained.

10   BY MR. PATTERSON:

11          Q.    Okay.  In general, limited tolerance for

12   change?

13          A.    Yes.

14          Q.    Did not cope well with stress?

15          A.    Yes.

16          Q.    Again, with regard to Joseph Andriano, did you

17   find the characteristics described here independent, insecure

18   and fear of abandonment?

19          A.    Yes.

20          Q.    Little tolerance for delayed reinforcement?

21          A.    Yes.

22          Q.    Low self esteem?

23          A.    Yes.

24          Q.    Did it appear that he was from a dysfunctional

25   family?

1          A.    I have to qualify that.

2          Q.    Okay.

3          A.    This also adds violence between parents and I

4    don't have any knowledge about that.  The dysfunctional

5    family, the only thing I know is according to Wendi that

6    there seemed to be a serious alcohol --

7                MR. MARTINEZ:  Objection.  Asked and answered.

8                THE COURT:  Overruled.  Go ahead answer the question.

9                THE WITNESS:  That there was a serious alcohol

10   problem on the part of the dad.

11   BY MR. PATTERSON:

12         Q.    Okay.  And that caused consequences to Joseph

13   Andriano as reported by Wendi?

14         A.    Correct.

15         Q.    Okay.  Avoids responsibility by rationalizing

16   and blaming others.  Did you see that characteristic in the

17   information supplied to you in either the structured or

18   unstructured interview?

19         A.    Yes.

20         Q.    With regard to Joe Andriano, avoids facts, I

21   think it is this way so it is?

22         A.    I can't -- this one I don't have a clear

23   example in my mind for.

24         Q.    Okay.  With regard to Joe Andriano, believes

25   they're better or different than others?

1      A.    Yes.

2      Q.    Uses anger to intimidate, control others?

3      A.    Yes.

4      Q.    Okay.  With regard to Joe Andriano, holds

5    traditional views on women, and I believe that's family?

6      A.    Yes.

7      Q.    Families?

8      A.    Yes.

9      Q.    Cannot express or acknowledge feelings?

10     A.    The knowledge that I have about that is

11   dependent upon Wendi's telling me about the only time that he

12   could was when he was drinking.

13     Q.    Okay.  And finally abuse of family in terms of

14   ownership?

15     A.    Yes.

16     Q.    Okay.  Referring back to one of the slides you

17   showed us earlier, this is Exhibit for identification 449.

18   It's entitled common characteristics of battered women.

19   Based upon your structured and unstructured interviews,

20   assessment in this case with regard to Wendi Andriano, did

21   you find evidence of low self esteem?

22     A.    Yes.

23     Q.    Did you find that she was a believer in family

24   unit?

25     A.    Yes.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1        Q.     Did you find that she accepts responsibility

2    for the abuser's actions?

3        A.     Yes.

4        Q.     Did you find that she suffers from guilt yet

5    denies feelings of terror and anger?

6        A.     Yes.

7        Q.     Did you note any severe stress reactions?

8        A.     I don't have a clear example in my mind about

9    how she did that.

10       Q.     Did you find with regard to Wendi Andriano that

11   she believed no one can help, places responsibility on

12   herself for fixing it?

13       A.     Yes.

14       Q.     Did you find that she too had a history of

15   family violence?

16       A.     Yes, although I qualified that because, again,

17   I don't know that there was physical.  What she reported was

18   verbal.

19       Q.     Okay.  That -- the father, Alejo, yelling, that

20   kind of thing?

21       A.     Right.

22       Q.     Okay.  Did you find with regard to Wendi

23   Andriano that she had unrealistic hope that change was

24   imminent that she believed in Joe Andriano's promises?

25       A.     Yes.

1    Q.    Okay.  Was there any evidence that she suffered

2    from depression?

3    A.    You know, I'm seeing her so much after the

4    fact.

5    Q.    Okay.

6    A.    In my questions of her on the face of it, I

7    want to be clear, on the face of it, she was certainly able

8    to do what she needed to do to take care of her family.  That

9    doesn't mean that there was depression, but she was able to

10   work, take care of the kids, and do everything that Joe

11   needed.

12   Q.    Okay.  Are there circumstances where depression

13   is in existence but not totally disabling?

14   A.    Sure.

15   Q.    Okay.  Did you find with regard to Wendi

16   Andriano that she had in fact, by virtue of the conduct of

17   Joe Andriano, been isolated from others?

18   A.    Yes.

19   Q.    And, again, just in general, these

20   characteristics are not -- these aren't all the

21   characteristics?

22   A.    Correct.

23   Q.    These are some of the characteristics?

24   A.    Correct.

25   Q.    Earlier in your overview one of the slides now

1    described as Exhibit 451 for identification, and this is the

2    one definition for domestic violence, okay?  Is this the one

3    that you use in order to come to certain conclusions with

4    regard to certain issues in this case?

5          A.    Yes.

6          Q.    Okay.  Once again, what is this definition of

7    domestic violence?

8          A.    Domestic violence is a pattern of assaultive

9    and coercive behaviors often including physical, sexual and

10   psychological attacks as well as economic coercion that

11   adults and adolescents use against their intimate partners.

12         Q.    Okay.  Using that as the definition and

13   based -- your assessment in this case, do you have an opinion

14   with regard to the issue of whether or not Wendi Andriano was

15   the victim of domestic violence?

16         A.    Yes, I have an opinion.

17         Q.    And what is that opinion?

18         A.    That Wendi Andriano was in fact a victim of

19   domestic violence at the hands of Joseph Andriano.

20         MR. PATTERSON:  That's all I have at this point,

21   Judge.  Thank you.

22         THE COURT:  Mr. Martinez?

23

24   CROSS-EXAMINATION BY MR. MARTINEZ:

25         Q.    Ma'am, as part of your job in this case you

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

```
 1    spent 20 hours with the defendant, Wendi Andriano, correct?

 2            A.    Correct.

 3            Q.    And additionally you also spent 5 hours with

 4    other people, right?

 5            A.    Right.

 6            Q.    Some of them being Donna Ochoa, right?

 7            A.    Yes.

 8            Q.    Alejo Ochoa, correct?

 9            A.    Yes.

10            Q.    Somebody named Archuletta, correct?

11            A.    Yes.

12            Q.    And then Barbara Mitchell, correct?

13            A.    Yes.

14            Q.    And the bottomline with regard to this

15    particular test is that what you did is she talked to you and

16    you listened, right?

17            A.    Yes.

18            Q.    You took notes, right?

19            A.    Yes.

20            Q.    And then you also administered some tests,

21    right?

22            A.    Not to the collaterals, but --

23            Q.    Right.

24            A.    -- to Wendi.

25            Q.    Right.
```

46

1          A.     Yes.

2          Q.     You administered some tests and basically what

3     that required was for her to fill paperwork out?

4          A.     Fill out the test.

5          Q.     Right.

6          A.     Yes.

7          Q.     You took all of that and you put together a

8     report, right?

9          A.     Yes.

10         Q.     And that's what you've sort of been providing

11    to us throughout the course of your testimony, right?

12         A.     Right.

13         Q.     Your conclusions that are in the report, right?

14         A.     Yes.

15         Q.     And one of the things that you did in your

16    report that I noticed was that you highlighted certain

17    things.  You bolded them, right?

18         A.     Yes.

19         Q.     And then others you didn't bold, right?

20         A.     Uh-huh.

21         THE COURT:  Is that a "yes"?

22         THE WITNESS:  Yes, sorry.

23    BY MR. MARTINEZ:

24         Q.     And there's a reason for that, isn't there?

25         A.     Yes.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000007480

1          Q.     And the reason that you bold some things and
2     you don't bold others, you consider some to be more important
3     than the others, right?
4          A.     Yes.
5          Q.     And one of the things that you bolded, one of
6     the things that you bolded was the issue involving Shawn
7     King.  You bolded that, didn't you?
8          A.     Yes.
9          Q.     And you indicated that, well, she had not filed
10    a police report with regard to Shawn King coming over and
11    breaking out the windows of her car.  Do you remember that?
12    Your report reflects that, right?
13         A.     Yes.
14         Q.     And that was very important that there was no
15    report filed, right?
16         A.     Yes.
17         Q.     And the reason it was important -- why don't
18    you tell us why you think it was so important that you bolded
19    it in your report that no report was filed?
20         A.     Well, what's important is more than just no
21    report being filed.  What's important is that's the first
22    time that there was any violence that was physical that she
23    could see.
24         Q.     But you bolded no report filed, didn't you?
25         A.     I'm going to check.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          Q.    All right.  You go ahead and check.  If you

2     need a reference I'll tell you where it is.

3                (Pause in proceedings.)

4     BY MR. MARTINEZ:

5          Q.    How about page 4 at the top?

6          A.    I see that, but actually there's --

7          Q.    Ma'am, does that, page 4 at the top, does it

8     say she did not report this incident to the police?

9          A.    It does say that.

10         Q.    Okay.

11         A.    More than that is bolded however.

12         Q.    Right.  Right above it and we'll get to that?

13         A.    Okay.

14         Q.    But it does say she did not report this

15    incident to the police, right?

16         A.    Yes.

17         Q.    And that's very important to you and that's why

18    you bolded it, right?

19         A.    Yes.

20         Q.    And you obtained the information and then you

21    went ahead and you wrote it in your report, right?

22         A.    Correct.

23         Q.    And the report, that's what you used to form

24    some of the opinions that you've been giving us today, right?

25         A.    Yes.

1         Q.   And -- but what if I told you the Casa Grande

2    Police Department does have a report of that incident?

3         A.   Then I don't know that.

4         Q.   And wouldn't that have a tendency to upset the

5    apple cart at least a little bit with regard to that

6    particular aspect?

7         A.   It upsets the apple cart in one way and that

8    is --

9         Q.   The answer is yes or no, does it or doesn't it?

10        A.   Yes.

11        Q.   Would you like to see the report?

12        A.   Certainly.

13        Q.   Okay.  Let me go ahead and mark it as an

14   exhibit so you could take a look at it.

15                  (Pause in proceedings.)

16   BY MR. MARTINEZ:

17        Q.   Go ahead and take your time.  This is exhibit

18   452.

19             MR. PATTERSON:  Judge, I need to see it, please.

20             THE COURT:  Can you show that to --

21             MR. MARTINEZ:  Sure I will.  There's another copy.

22                  (Pause in proceedings.)

23             THE WITNESS:  I have finished.

24   BY MR. MARTINEZ:

25        Q.   It does reference this break of the windows by

50

1       Shawn King, doesn't it?

2              A.     Yes, it does.

3              Q.     It does reference Wendi and Joe, correct?

4              A.     Correct.

5              Q.     That is, Wendi Andriano prior to their being

6       married, correct?

7              A.     Yes.

8              Q.     So we now know there was a report filed, wasn't

9       there?

10             A.     Yes.

11             Q.     The other thing that you wanted to talk to us

12      about was the statements that are above there that are also

13      bolded, right?

14             A.     Right.

15             Q.     She indicated according to you that during the

16      meeting -- this was during the meeting in which she told him

17      she wanted more freedom to date others and then he took off

18      the --

19             A.     Right.

20             Q.     Right.  Well, ma'am, did you know that actually

21      when she was dating the pastor's son, she was also having sex

22      with other individuals?

23             A.     No.  I did not know that.

24             Q.     Did you know that it was more than one?

25             A.     No.

1          Q.     Did you know that it was more than two?

2          A.     No.

3          Q.     Did you know that part of the reason that Mr.

4    King actually broke up with her was because he came over to

5    the apartments, which were the Quail Apartments, and he

6    caught her in front of the television in a state of undress

7    with another male.  Did you know that?

8          A.     No.

9          Q.     But to you it's very important and so you

10   bolded that, right?

11         A.     Correct.

12         Q.     But that's an error also, isn't it?

13         A.     As you are now telling me, yes.

14         Q.     The point being you didn't get that information

15   from anywhere else.  You just got some information and you

16   put it down in your report, didn't you?

17         A.     Correct.

18         Q.     And the bottom line, ma'am, with regard to what

19   I'm going through with you, that illustrates the weakness of

20   the approach that you took in this case, doesn't it?

21         A.     Well, I don't agree.

22         Q.     Well, you are reliant in reaching your opinion

23   on what others are telling you, right?

24         A.     Yes.

25         Q.     And if they don't tell you the truth, wouldn't

1  you agree that perhaps there may be a problem with the

2  opinion that you are rendering if they don't tell you the

3  truth?

4      A.    There's more than just the person telling the

5  story that goes into this though.

6      Q.    Right.  But the person telling the story is a

7  very integral part, wouldn't you agree?

8      A.    Yes.

9      Q.    They're the ones in the intimacy of the home,

10  aren't they?

11     A.    Yes.

12     Q.    They're the ones suffering if there any sexual

13  acts perpetrated upon them, correct?

14     A.    Yes.

15     Q.    They're the ones saying whether or not Max, the

16  dog, is being kicked, right?

17     A.    Yes.

18     Q.    So that is a very important part of your report

19  right?

20     A.    Yes.

21     Q.    In fact if we were to throw that out of your

22  report you would have a very difficult time, wouldn't you, if

23  you threw out the defendant's statement.  You'd have a very

24  difficult time reaching a decision in this case, wouldn't

25  you?

1           A.    If you threw out the entire statement?

2           Q.    Yes.

3           A.    Yes.

4           Q.    Right. We're just talking about some of the

5    things she told you right now.

6           A.    We talked about Shawn King.

7           Q.    While we're talking about Shawn King, one of

8    the things that you answered with regard to this issue was

9    that, well, she had never had sex with Shawn King the

10   pastor's son, right?  You told us that right?

11          A.    To the best of my knowledge she hadn't.

12          Q.    Well, ma'am, everything that you tell us is to

13   the best of your knowledge, isn't it?

14          A.    Yes, it is.

15          Q.    You're not coming up here and saying, well,

16   this is halfway to the best of my knowledge.  Everything's to

17   the best of your knowledge, right?

18          A.    Right.

19          Q.    And so you indicated to us previously that you

20   thought that when she married or not -- when she had sexual

21   relations with Joseph Andriano, you thought that she was a

22   person that was chaste, that hadn't had relations before,

23   correct?

24          A.    Correct.

25          Q.    At that time when you thought that, that added

1    to your opinion because what we have then is a woman who's

2    naive to the ways of men, right?

3            A.    I don't know if having or not having sex

4    determines whether or not a woman is naive.

5            Q.    Well, here's the point.  If a woman hasn't had

6    sexual intercourse with a man, wouldn't you say she has less

7    experience than a person who has sex with men five, six,

8    seven, eight times?  Would you say she knows less?

9            A.    Knows less sexually.

10           Q.    Yes.

11           A.    Yes.

12           Q.    That's what we're talking about here.  Wouldn't

13   you agree they have less experience, they're probably more

14   impressionable than somebody who has had a wide range of

15   experiences?

16           MR. PATTERSON:  Judge, can we approach please?

17

18               (The following proceedings were held at the

19   bench:)

20

21           MR. PATTERSON:  I don't know where he's getting all

22   of this information from.  I guess it's from a gentleman by

23   the name of Shawn King.  I interviewed this gentleman and he

24   didn't tell me any of these things.  So my objection is that

25   this gentleman needs to be certain he's making a good faith

55

1    representation of what he believes Mr. King is going to say,

2    and there's a wide range of sexual experiences that he just

3    alluded to.  It better be demonstrable through testimony of

4    some witnesses, otherwise we have grounds for mistrial here.

5            THE COURT:  Mr. Martinez?

6            MR. MARTINEZ:  I absolutely do.  I absolutely do.  If

7    he wants, I could go back and get the names.  One of them is

8    a person named Dido, is the first name.  The last name I

9    think is Gamez.  Mr. Murios also indicated he had intercourse

10   with her.  And I have names of another -- I have the name

11   written down.  I spoke with him and he indicated that he had

12   intercourse with her, so these are three people I know for a

13   fact have had intercourse with her.  Mr. King, I spoke with

14   him.  He indicated did not have intercourse with her and I've

15   never indicated that.

16           MR. PATTERSON:  Well, and that's why there's a

17   problem because he's used Shawn King as the predicate for one

18   of the questions that he posed, and now my information is

19   that Shawn King never had sex with my client.

20                   Secondly, one of those people that he

21   purports to have as witnesses have never been listed in the

22   State's case in chief or rebuttal, and I object to him using

23   information derived from witnesses who have not been

24   disclosed as the predicate for questions to this witness.

25           MR. MARTINEZ:  It's clear with regard to issues of

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000007489

# APPENDIX U – Part 2

1    rebuttal the State does not have to list them in advance.

2    They don't know what we're going to say.  If she had been

3    honest, it wouldn't have been an issue.

4           THE COURT:  What I hear from Mr. Martinez is he

5    indicates he has a good faith belief in going into these

6    areas.  Let's move on.

7           MR. MARTINEZ:  Okay.

8           THE COURT:  You've made your record.  Let's move on.

9

10          (The following proceedings were held in open

11   court:)

12

13   BY MR. MARTINEZ:

14          Q.   The point being with regard to this is she was

15   not, if you will, as inexperienced as you painted her out to

16   be.

17          A.   Inexperienced sexually, correct.

18          Q.   Let's talk a little bit about a couple more

19   items that you indicated about in your report.  You indicated

20   that Mr. Andriano contacted or hired an attorney by the name

21   of Jeff Miller on July of 2000.  That's what your report

22   indicates, right?

23          A.   Do you know what page that is?

24          Q.   Yes, ma'am.  Page 15.

25          A.   Correct.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          Q.     So according to you, Mr. Andriano initially

2     spoke in July 2000 with Mr. Miller, right?

3          A.     Yes.

4          Q.     And you obtained that information from --

5          A.     Wendi.

6          Q.     Right.  But we've -- do you know we've had Mr.

7     Miller here in court?  Did you know that?

8          A.     No.

9          Q.     Did you know he told us it was actually 1998

10    when he was actually contacted?

11         A.     No.

12         Q.     Did you know that one of the ways that the

13    relationship worked, according to Mr. Miller, was that if he

14    had a problem he would call up and ask to speak to Mr.

15    Andriano, and that when he would ask him some questions or

16    have something to do with the lawsuit, that Mr. Andriano

17    would say no, just talk to Wendi about that.  Did you know

18    that?

19         A.     No.

20         Q.     That indicates that Ms. Andriano was the person

21    that was in charge if anything, at least of the lawsuit,

22    right?

23         A.     I don't know that's what that indicates.

24         Q.     Well, according to Mr. Miller, anything having

25    to do with the lawsuit he would turn the phone over and she

1  would deal with it.  Doesn't that indicate that she's at

2  least a caretaker to some degree because she's now dealing

3  with Mr. Miller?

4          A.    Well, she was a caretaker for a lot of -- lot

5  of things about Joe, so okay, yeah.

6          Q.    So she is -- okay.  The other thing that -- so

7  it wasn't like -- the point being, it wasn't like she

8  couldn't think for herself.  It wasn't like she wasn't

9  functioning in that relationship, was she?  I mean, she was

10 functioning in that relationship, wasn't she?

11         A.    Functioning, going to work?  Is that what you

12 mean?

13         Q.    Going to work.

14         A.    Functioning with life.

15         Q.    Dealing with Mr. Miller, Those sorts of things,

16 right?

17         A.    Um-hmm.

18         Q.    The normal day-to-day things, right?

19         A.    Yes.

20         Q.    She did go to work?

21         A.    Yes.

22         Q.    She did socialize, right?

23         A.    Yes.

24         Q.    She, according to you, may have cooked on

25 occasion, right?


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

59

1        A.    Yes.

2        Q.    You didn't tell us how often she cooked, but

3    you indicated that she cooked on occasion, right?

4        A.    Yes.

5        Q.    But we do know some things.  For example, did

6    you know she refused to take care of his wounds, dress them

7    after surgeries?  Did you know that?

8        A.    I -- what I recall is that she elicited the

9    help of her parents to come and do that.

10       Q.    Ma'am, actually, we've had Ms. Ochoa, Donna

11   Ochoa, here who indicated she would leave work four times a

12   day to change the dressing because Ms. Andriano wouldn't do

13   it for whatever reason.  Did you know that?

14       A.    I did know that, but you're putting a different

15   spin on it.

16       Q.    So the answer is you did know it?

17       A.    I knew that Donna was coming to do that.

18       Q.    Did you also know that Mr. Alejo Ochoa was also

19   helping out?

20       A.    Yes.

21       Q.    Okay.  But it wasn't the defendant who was

22   being the caregiver with regard to at least those -- that

23   incidence, right?

24       A.    That's correct.

25       Q.    Now, the other thing that you indicate in your

60

1    report was that in May 2000 is when Mr. Andriano began

2    chemotherapy.  That's what you indicate in your report,

3    right?

4            A.    Yes.

5            Q.    Well, we actually had the doctor who conducted

6    this chemotherapy, and he actually indicated it was on July

7    11 of the year 2000 when the chemotherapy actually started.

8    So your report is wrong about that too, isn't it?

9            A.    Yes, it is.

10           Q.    And you got that information from the

11   defendant, right?

12           A.    Wendi, yes.

13           Q.    And one way of looking at it is that if he is

14   going from May to October with chemotherapy, it could mean

15   that's actually having five months of terrible time, right?

16           A.    It could mean that, yes.

17           Q.    During the time in which you've indicated when

18   he was receiving his chemotherapy where things were just

19   getting worse and worse and worse, right?

20           A.    Yes.

21           Q.    And what that could indicate, if you move this

22   up a couple of months, was that according, from your

23   perspective, she was suffering two months longer because the

24   chemotherapy then stretched out five months, right?

25           A.    Yes.

1          Q.    But actually it -- if it only started in

2     September -- in July, then what that means is if there was

3     any suffering, if there was any problems, it was of a much

4     lesser duration, correct?

5          A.    Yes.

6          Q.    Now, what that also tells us, and these are

7     just examples, and we'll talk a little bit more about what's

8     in your report, but what that also tells us is that with

9     regard to your opinion, and if we just take these three items

10    here, you took them as true when you rendered your opinion in

11    the report, didn't you?

12         A.    Yes.

13         Q.    These clearly indicate that they -- that you

14    were wrong, right?

15         A.    That's not the whole story.

16         Q.    I know that's not the whole story, but I'm just

17    taking about these three?

18         A.    Yes.

19         Q.    They show your -- you were wrong?

20         A.    Correct.

21         Q.    And in addition under number A you even bolded

22    that in your report because it was very important to you?

23         A.    Yes.

24         Q.    So even with that, you still stay with your

25    opinion?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          A.     Yes.

2          Q.     Okay.  Let's talk a little bit more about your

3     report even though those facts we now know are inaccuracies,

4     right?  Let's --

5          MR. PATTERSON:  Judge, that question is

6     argumentative.  It's been asked three times.

7          THE COURT:  I'll sustain the objection.

8     BY MR. MARTINEZ:

9          Q.     We have some more facts I want to talk to you

10    about the report, okay?  One of the things you tell us in

11    your report was that the defendant reported to you, and also

12    some of the tests that you gave her, something to the effect

13    of "I'm not one who likes arguments, I just let it go"?

14         A.     Yes.

15         Q.     I mean, if you want a reference, that's page 8

16    of your report.

17              Well, we heard from an individual by the name

18    of Rick Freeland.  Are you familiar with him?

19         A.     I know the name and I know the story.

20         Q.     Well, then you also know, you know, part of the

21    story, do you know that she would stand outside of his house,

22    according to Mr. Freeland, for at least an hour making noise,

23    knocking, wanting to get into his apartment.  Did you know

24    that?

25         A.     Not that specifically.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1        Q.    Didn't make it to your report, did it?

2        A.    No.

3        Q.    When you say "not that specifically," it means

4    that you might know that generally?

5        A.    What I know is that she was upset about the

6    break -- breaking off that relationship.  That's the part

7    that I really know.

8        Q.    Okay.  So that means that specifically, just so

9    we're clear, you don't know that she would stand outside his

10    door on more than one occasion and stand out there at least

11    on one occasion for at least an hour asking to be let in?

12        MR. PATTERSON:  Judge, I'm going to object to the

13    form of that question.  Misstates the evidence.  It was

14    clarified, but I would ask him to be directed to restate it

15    so it's certain.

16        THE COURT:  I'll sustain the objection.  Restate the

17    question.

18    BY MR. MARTINEZ:

19        Q.    Did you know she stood outside of Rick

20    Freeland's apartment after they broke up for an hour on the

21    phone asking him to let her in?

22        A.    No, I do not know that.

23        Q.    And did you know that this occasion when she

24    was doing it was in the early morning hours?

25        A.    No.  Of course, I don't know that.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

64

1          Q.     And did you know that -- well, you now know she

2    wasn't taking care of her kids.  Did you know that at that

3    time?

4          A.     No.

5          Q.     That would mean that Mr. Andriano, if those

6    facts are true, was the caretaker on that date and time,

7    right?

8          MR. PATTERSON:  Judge, objection.  That assumes facts

9    not in evidence.  Calls for speculation.

10         THE COURT:  Sustained.  Let's move on.

11   BY MR. MARTINEZ:

12         Q.     The other thing we know about that, did you

13   know that she threatened to use the pass key to get inside

14   his apartment?  Did you know that?

15         A.     No.

16         Q.     Did you know that this was after having gone

17   out to a bar called the Sanctuary where Mr. Freeland actually

18   left because she wouldn't leave him alone?

19         A.     Are you asking me if I know that?

20         Q.     Yes.

21         A.     No, I don't know that.

22         Q.     This woman that you've been presenting to us is

23   this woman who is nonaggressive.  You've told us that, right?

24         A.     Correct.

25         Q.     Nonargumentative, right?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          A.     Correct.

2          Q.     Avoiding confrontation, right?

3          A.     Yes.

4          Q.     That's not the picture of her as I -- I've just

5    painted to you, is it?

6          A.     Correct.

7          Q.     Now, you also said that, well, you know, it was

8    a sad day for her when she broke up with Mr. Freeland because

9    it was as if -- as if she'd lost a friend, right?

10         A.     Right.

11         Q.     Wouldn't you agree that this conduct that we're

12   talking about is not one that friends do amongst each other

13   when they obsess over them, they want to be with them?

14         A.     I think you're asking me about friendship and

15   how one person might effect a person.   Is that what your

16   question is?

17         Q.     I'm asking you whether or not friends go and

18   stand in front of each other's door and, the whole thing I

19   laid out for you, wanting to get together with them and have

20   sex?

21         MR. PATTERSON:  Judge, again, that's assuming facts

22   not in evidence.

23         THE COURT:  Sustained.

24         MR. PATTERSON:  That was never testified to.

25         THE COURT:  Sustained.  Ask your next question.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000007499

1    BY MR. MARTINEZ:

2         Q.    Did you know she would, according to Mr.

3    Freeland, she would not take no for an answer?

4         MR. PATTERSON:   Again, objection.   That's not within

5    the context that she not take no for --

6         THE COURT:   Sustained.   Rephrase your question.

7    BY MR. MARTINEZ:

8         Q.    Did you know that she wouldn't take no for an

9    answer with regard to the relationship being over?

10        A.    No.

11        Q.    And that -- doesn't that depict a woman who's

12   very aggressive and assertive?

13        A.    In the example that you are giving me, it

14   sounds like she was actively pursuing Rick Freeland.   I'm not

15   sure I'd use your definition.   I wouldn't say she was

16   actively pursuing him the way you're describing it.

17        Q.    But in your report you did not include that

18   factor as part of the equation of what you made the

19   determination or made your opinion that she was a victim of

20   domestic violence, right?

21        A.    That's correct.

22        Q.    And that would have been helpful to know,

23   wouldn't it?

24        A.    You're asking -- I'm supposed to answer that

25   question?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1        Q.     You're not supposed to answer anything, only if

2    you know.

3        A.     Excuse me?

4        Q.     Do you know?

5        A.     Do I know what?

6        Q.     Whether or not having a better picture, a more

7    well rounded picture of the person you are assessing is

8    better than having a very narrow, straight sort of picture.

9    Which one is better?

10       A.     The obvious well-rounded picture.

11       Q.     And from what we're talking about so far, it's

12   clear that there are certain things that you missed, right?

13       A.     Correct.

14       Q.     We were talking about how, and you indicated

15   that -- that there were these issues that she had with sex

16   involving Mr. Andriano, do you remember that?

17       A.     Yes.

18       Q.     And you indicated, you became very graphic, and

19   you indicated she even had to use lubricant with him.  Do you

20   remember telling us that?

21       A.     Yes.

22       Q.     That's nowhere in your report, is it?

23       A.     I don't remember.

24       Q.     It is your report, right?

25       A.     This?  Yes.

1        Q.    You are familiar with it, right?

2        A.    Yes.  But I don't remember if I put lubricant

3   in it.

4        Q.    Do you want to take time to read it to see it

5   doesn't include it or we could do that at the break and --

6        A.    We could do that at the break, sure.

7        Q.    Now, did you know that the reason that she had

8   to use this lubricant was because according to something that

9   she told to Erik Vaillant.  According to Erik Vaillant who

10  had a conversation with her, the reason she had to use

11  lubricant was she thought Mr. Andriano was gross and skinny.

12  Did you know that?

13       A.    No.

14       Q.    That had nothing to do with any domestic

15  violence if in fact what she told Mr. Vaillant is true,

16  right?

17       A.    That's correct, if it's true.

18       Q.    Right.  The fact that I -- somebody may have a

19  predilection for tall women has nothing -- or short women,

20  whatever, that has nothing to do with domestic violence,

21  right?

22       A.    Right.

23       Q.    Do you know whether or not she had to use any

24  lubricant with regard to Rick Freeland?

25       A.    I don't know.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1      Q.    Don't you think it would have been important to

2    this inquiry to see whether or not she actually needed

3    lubricant with Rick Freeland to determine whether or not it

4    was just sex that she indicated or it was just sex with an

5    icky, gross guy?

6      A.    As I recall, the purpose of my questioning her

7    and interviewing her was to get a picture, and I didn't ask

8    specifics about the nature of the sex acts with Rick

9    Freeland.

10     Q.    But you did get specifics of the nature of the

11   sex acts with Joe Andriano, right?

12     A.    Yes, I did.

13     Q.    Okay.  While we're talking about sex and the

14   defendant, did you know that when she went out to bars that

15   she was constantly kissing on men?

16     A.    No.

17     Q.    Did you know that according to the women that

18   she went out with that they almost became embarrassed

19   because, according to them, Wendi had to be the center of

20   attention, and if she wasn't, then she was coming on to men?

21     MR. PATTERSON:  Judge, these questions incorporate a

22   host of things that have happened during the course of this

23   trial.

24     THE COURT:  Sustained.  Sustained.

25   / / / / /

1    BY MR. MARTINEZ:

2           Q.    The point is, you didn't know how she was

3    socially then, right?

4           A.    I did not interview the people that you

5    interviewed.

6           Q.    You interviewed the defendant and she was

7    there, wasn't she?

8           A.    Yes.

9           Q.    And presumably she would have told you

10   everything that was important to this case, right?

11          A.    Presumably, yes.

12          Q.    And she didn't tell you any of that, did she?

13          A.    I did not know that.  You are correct.

14          Q.    Okay.  Did she also tell you that on September

15   27 of the year 2000 she met somebody by the name of Travis

16   Black?

17          A.    Yes.

18          Q.    It's in your report, is it?

19          A.    It's in the addendum.

20          Q.    Well, ma'am, the State didn't receive that

21   addendum so it's not in your report, is it?

22          A.    Do you want me to look at my report?  This will

23   take time.

24          Q.    Go ahead, take a look at it, and see if it's

25   there.

1           (Pause in proceedings.)

2           THE WITNESS:  It is not here.

3    BY MR. MARTINEZ:

4           Q.    But you indicated that you now know or that

5    along the way you knew about Rick -- of Travis Black, right?

6           A.    Because of my addendum, yes.

7           Q.    Right.  The one that wasn't provided to the

8    State or isn't part of that report, right?

9           A.    I guess that's correct.

10          Q.    Now, with regard to Mr. Black, when did she

11   have intercourse with him?

12          A.    Can I read the addendum?

13          Q.    Just read it to yourself.  If you could tell

14   me -- I don't want you to read it.  I want you to take a look

15   at it and then tell me.

16          A.    Okay.

17          (Pause in proceedings.)

18          THE WITNESS:  I have during a weekend --

19   BY MR. MARTINEZ:

20          Q.    Ma'am, don't read it.  Read it to yourself.

21   Once you've read it, if it says the date, tell me.  If it

22   doesn't, tell me that also.

23          A.    The only date it says is September 2000.

24          Q.    We've had testimony from Mr. Black that it was

25   actually September 27, 2000, okay, ma'am?


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          A.     Okay.

2          Q.     Added to this set of circumstances that I want

3    to talk to you about, we also know that Mr. Andriano,

4    according to Dr. Kellogg, had chemotherapy on September 26,

5    2000, the day before.  You have described for us a woman who

6    was overboard in caring for her husband, haven't you?

7          A.     Yes.

8          Q.     That she would come home and be worried about

9    what dinner she was going to prepare, right?

10         A.     Yes.

11         Q.     That she would need to walk on eggshells around

12   him?

13         A.     Yes.

14         Q.     That he would fly off the handle and she

15   wouldn't know what the reason was?

16         A.     Yes.

17         Q.     That doesn't sound like a woman that goes out

18   and does this.  That's really subserviant to him, does it?

19         A.     I think she could have been subserviant in a

20   lot of ways.

21         Q.     But just not that way, right?

22         A.     In which way?

23         Q.     In other words, you indicated that she was a

24   Christian woman, right?  Her Christian beliefs were very

25   important to her, right?

```
 1          A.    Yes.

 2          Q.    And one of the things you also indicated in the

 3    power and control wheel, she would do anything because that's

 4    what the Bible tells her to do?

 5          A.    Yes.

 6          Q.    But it's clear, ma'am, if she's doing what

 7    she's doing with Mr. Black, she's not taking care of him in a

 8    Christian sense as she defined it to you, is she?

 9          A.    That's correct.

10          Q.    One of the other things that I want to talk to

11    you about is page 12 of your report, and it talks about the

12    defendant in August of 1999, doesn't it?

13          A.    Yes.

14          Q.    And in it, your report indicates that according

15    to the defendant she went on vacation with -- with

16    Mr. Andriano's family, right?

17          A.    I think it was Wendi's parents.

18          Q.    All right.  She went on vacation with

19    somebody's parents, right?

20          A.    Yes.

21          Q.    And when she returned she discovered that her

22    job was gone, right?

23          A.    Right.

24          Q.    Because of new management, right?

25          A.    Right.
```

74

1          Q.    And that was the Courtyard Apartments, wasn't

2     it?

3          A.    Yes.

4          Q.    And after that is when you told us that she

5     took at least what appeared to be a one-month job at some

6     apartments on Camelback, right?

7          A.    Yes.

8          Q.    And then after that is when she went to the San

9     Riva apartment, right?

10         A.    Right.

11         Q.    The reason that she gave you for leaving the

12    Courtyard Apartments in 1999 was that there was a change in

13    management, right?

14         A.    Right.

15         Q.    That's not true, is it?

16         A.    I don't know that it's not true.

17         Q.    Did you know --

18         MR. PATTERSON:  Judge, could we approach?

19

20              (The following proceedings were held at the

21    bench:)

22

23         MR. PATTERSON:  I think he's going into 404 (B) areas

24    and you told him he couldn't go there, and I didn't open this

25    door.  I glossed over this particular issue.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          MR. MARTINEZ:  Judge, it's part of the report.  She

2     used it to base her opinion.  I can't -- you know, the Rules

3     of Evidence are clear.  I can go into any area I want to if

4     it's in that report.  Just because he doesn't go it doesn't

5     mean I don't have the right to go into it.  She discussed

6     that as part of her opinion specifically, and he said, if the

7     Court remembers, she said with regard to that month that she

8     was at Camelback, she took that because she was the one that

9     was forced to leave.

10          THE COURT:  What was the reason why she left

11     Camelback?

12          MR. MARTINEZ:  The reason that she left was --

13          THE COURT:  Whisper.

14          MR. MARTINEZ:  The reason she left was, there were

15     discrepancies, she was using some of the caretakers there,

16     her personal assistants, to do extra work and all that stuff.

17          THE COURT:  What I'm going to do, I'm going allow you

18     to ask the question in this fashion, if that was not the

19     reason that she left, would that be important in the basis of

20     your opinion, and let's move on.

21

22          (The following proceedings were held in open

23     court:)

24     / / / / /

25     / / / / /


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    BY MR. MARTINEZ:

2         Q.    Ma'am, if that wasn't the reason that she left,

3    the fact there was a change in management, wouldn't that be

4    important in this whole picture that we're trying to get of

5    this person?

6         A.    I suppose it depends on what the reason is.

7         Q.    Well, let's assume that what you have there is

8    not the truth.  If it isn't the truth and we're just trying

9    to get a picture of this individual, wouldn't that be

10   something that you would consider?  Wouldn't that be?

11        A.    Yes.

12        Q.    Okay.  You indicated, and I'm trying to get a

13   feel for this, you indicated that Mr. Andriano required daily

14   sex.  You said that on more than one occasion.  Do you

15   remember that?

16        A.    Yes, I do.

17        Q.    And just so that we get a sense of it,

18   according to you, I know what daily mean, but when in the

19   relationship did he want daily sex?

20        A.    My recollection from Wendi is that it was

21   pretty -- a pretty significant period of time across the

22   relationship.  I know that there was a period of time when he

23   was ill that that wasn't happening.  I remember distinctly

24   that she told me it resumed on a daily basis after she

25   returned from Colorado.  That's a particular point in time.

1          Q.    How about when she was having sex from Rick

2    Freeland?  Did he also ask for sex on a daily basis then?

3          A.    I don't believe I asked her for dates of

4    when -- when it was daily and when it wasn't.

5          Q.    Wouldn't it be important to know if she was

6    having sex, for example, with Rick Freeland today and her

7    Husband was then asking for sex in the evening because maybe

8    she didn't want to have sex with her husband because she'd

9    already had it.  Wouldn't that be important to know?

10          A.    Yes.

11          Q.    Because it wouldn't be -- then it wouldn't be

12    domestic violence.  It would then be that she'd already had

13    her fill, right, one of the reasons, right?

14          A.    It's just the way you said that.

15          Q.    Ma'am, why don't you go ahead and answer the

16    question for me.

17          A.    That she may not want to engage in sex for a

18    second time in a day, yes.

19          Q.    Okay.  And you indicated that you didn't like

20    the way that I said it.  Ma'am, the bottomline is, let's be

21    open about this.  She was having sex with Rick Freeland,

22    wasn't she?

23          A.    Yes.

24          Q.    And you did say that Mr. Andriano did want sex

25    on a daily basis, right?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          A.     Yes.

2          Q.     You did indicate that was one of the important

3   -- or one of the issues that indicated to you that there was

4   domestic violence, right?

5          A.     Yes.

6          Q.     So the reason why she doesn't have sex with Mr.

7   Andriano is very relevant.   Isn't it is very important?

8          A.     If that's the period of time that we're talking

9   about.

10          Q.     Well, you're  -- you're the one, ma'am, that

11   said he wanted sex on a daily basis, and you made it seem

12   like he wanted sex on a daily basis throughout the marriage.

13   Are you backing away from that position?

14          A.     No, sir.

15          MR. PATTERSON:   Objection.   Misstating her response.

16   She said there was a period of time.

17          THE COURT:   Sustained.

18          MR. PATTERSON:   Thank you.

19          THE COURT:   Rephrase the question.

20   BY MR. MARTINEZ:

21          Q.     Okay.   You said he came back from Colorado.   Do

22   you remember --

23          A.     Yes.

24          Q.     And that he resumed sex on a daily basis?

25          A.     Yes.

79

1          Q.    Rick Freeland and her had an affair after she

2   turned from Colorado, right?

3          MR. PATTERSON:  Judge, this also misstates the time

4   frame with which the testimony has been that she had a

5   relationship with Mr. Freeland.

6          THE COURT:  She could answer that if that's -- if you

7   know, go ahead and try to answer the question if you know.

8          THE WITNESS:  The only way I'm going to know is to go

9   back to my notes because I don't remember dates.  Like I

10  can't tell you when she was in the affair with Rick and when

11  he was in Colorado.

12  BY MR. MARTINEZ:

13         Q.    With regard to notes are you talking about your

14  report?

15         A.    Yes.

16         Q.    Why don't you look at your report then?

17         A.    Do you have a page number I could start at?

18         Q.    Why don't you look through your report.  It's

19  your report because I don't know when she had sex on a daily

20  basis.

21                (Pause in proceedings.)

22         THE WITNESS:  I found one part of the answer.

23  BY MR. MARTINEZ:

24         Q.    What's that?

25         A.    That they returned from Colorado, excuse me, it

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    would have been late 1998.

2          Q.    Okay.   That's in '98 that he wants sex on a

3    daily basis.   Any other references there?

4          A.    I'm looking for the part in which she engaged

5    in the relationship with Rick Freeland.   Okay.   That's spring

6    of 2000.   So those are different periods of time.

7          Q.    Sure.

8          A.    I don't know for a fact that the daily sex went

9    from 1998 through Spring of 2000.   I assumed it did.

10          Q.    Wait a minute, ma'am.   If you're assuming

11    things, you didn't get that from anybody, did you? It came

12    from your head, right?   When you assume things, it comes from

13    your head, doesn't it?

14          A.    Assumed based on the word "daily."

15          Q.    Right.   But it doesn't say daily for years,

16    does it?

17          A.    No.   It just says "daily."

18          Q.    Right.   But nowhere in that report does it say

19    that he wanted daily sex toward the end of the relationship,

20    does it?

21                (Pause in proceedings.)

22          THE WITNESS:   What I found is one month prior to

23    Joe's death was the incident with the softball game and the

24    violence that followed that evening.

25    / / / / /

EXHIBIT PP

000007515

1   BY MR. MARTINEZ:

2        Q.    But that doesn't say --

3        A.    It does not say.

4        Q.    So the point here is you've come out and you've

5   told us that you believe that this requiring of sex on a

6   daily basis was one of the factors you considered in deciding

7   whether or not there had been domestic violence in this

8   relationship, right?

9        A.    Yes.

10       Q.    But you can't tell us if at the end Mr.

11  Andriano was requesting sex on a daily basis, right?

12       A.    Right.

13       Q.    You can only tell us that he was requesting sex

14  on a daily basis back in '98, right?

15       A.    That's the -- the factual information that I

16  have, correct.

17       Q.    Now, you indicated something, I assumed that --

18  that he wanted sex on a daily basis.  Do you remember telling

19  me that?

20       A.    Yes, because the word "daily" was said to me.

21       Q.    Right.  Sure.  One of the other things you told

22  us on direct examination was that even though you could find

23  nothing to support it, you still sat up there and told us,

24  well, the defendant may have been sexually abused by her

25  biological father.  Do you remember telling us that?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          A.     Yes, I certainly do.

2          Q.     But you have absolutely nothing of any concrete

3     basis?

4          A.     I think I said that that was just reported to

5     me through the mom telling Wendi.

6          Q.     So then if it means nothing to you, why do you

7     hold it out to us and say, oh, she may have been, if it has

8     nothing to do with this?

9          A.     It's just part and parcel trying to get as much

10    information as I can from the beginning of Wendi's life.

11         Q.     Do you filter any of this information out?  If

12    they'd have told you she was attacked by Bigfoot, would you

13    also have told us that?

14         MR. PATTERSON:  Objection.  Argumentative.

15         THE COURT:  Sustained.

16    BY MR. MARTINEZ:

17         Q.     Do you filter any of this information out and

18    say, well, no, that's not something I'm going to consider?

19         A.     Actually, the filter many times becomes the

20    collateral interviews, the reading of the record, the 20

21    hours, that's the filter.

22         Q.     And in this case you chose not to filter that

23    out, right?

24         A.     No, that's not correct.

25         Q.     Well, you put it in your report, didn't you?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000007517

1          A.    Yes.

2          Q.    And you put it very early on in the report,

3     right?

4          A.    Because it was something that would have

5     happened early on.   It's chronological.

6          Q.    You don't fill this report with useless

7     matters, do you?

8          A.    No.

9          Q.    You put things here that you think are

10    important, don't you?

11         A.    Yes.

12         Q.    So you consider that to be important even

13    though you could find no basis for it, right?

14         A.    I considered it as important information from

15    mom to daughter that was then reported to me.   But it's clear

16    in there that I don't know that to be fact.

17         Q.    And, bottomline, if it even happened, it

18    happened when she was about one year old, right?   If it even

19    happened?

20         A.    She would have been young.   I don't know how

21    young.

22         Q.    Throughout this report that you're talking to

23    us about you also talk about these financial issues, and

24    basically they were in trouble throughout the marriage,

25    right?

1        A.    Yes.

2        Q.    And the other thing in your assessment of it,

3   it's all Mr. Andriano's fault, right?

4        A.    Yes.

5        Q.    He's the one that needed money from her for the

6   boat, right?

7        A.    Right.

8        Q.    He was the one that acted like a child and

9   couldn't hold back, right?

10       A.    Right.

11       Q.    He's the one that needed these silly cancer

12   operations.

13       THE WITNESS:  No.

14       MR. PATTERSON:  Again, form of the question.

15       THE COURT:  Sustained.

16       MR. PATTERSON:  Highly argumentative --

17       THE COURT:  Sustained.

18       MR. PATTERSON:  -- and inappropriate.

19       THE COURT:  Sustained.

20   BY MR. MARTINEZ:

21       Q.    He's the one that required money for cancer

22   operations, right?

23       A.    Yes.

24       Q.    He's the one that didn't work, right?

25       A.    Yes.

1        Q.    Or worked intermittently.

2        A.    Right.

3        Q.    But wasn't she also a little bit guilty of that

4    spending too when she shouldn't have spent?

5        A.    I don't know what you're referring to.

6        Q.    Well, did you know that in the summer of the

7    year 2000 she was involved with somebody by the name of Rick

8    Freeland?

9        A.    Yes.

10       Q.    Did you know that she used the money from the

11   community or money that she earned to furnish his apartment?

12       MR. PATTERSON:   Judge, we don't know that to be true.

13   Mr. Freeland was uncertain as to the source of that

14   particular furniture.

15       THE COURT:   Sustained.

16   BY MR. MARTINEZ:

17       Q.    Did you know that Chris Hashisaki was a witness

18   in this case who indicated that Ms. Andriano paid for that

19   furniture that she gave to Rick Freeland?  Did you know that?

20       MR. PATTERSON:   Again, that misstates the testimony.

21       THE COURT:   Overruled.  Go ahead, answer the question

22   if you can.

23       THE WITNESS:   I have no information about what that

24   woman said on the stand.

25   / / / / /

1    BY MR. MARTINEZ:

2        Q.    But the point being, if we assume, because

3    everybody comes in here and swears to tell the truth, if we

4    assume that's true, that's something you didn't know about,

5    right?

6        A.    If we assume that's true, you are correct.  I

7    didn't know it.

8        Q.    And that would be important to at least get a

9    glimpse of how the money was being handled in that

10   relationship, wasn't it -- wouldn't it be?

11       A.    Yes.

12       Q.    You've told us Mr. Andriano was jealous per her

13   report, right?

14       A.    Yes.

15       Q.    You've indicated that she was the one that was

16   doing the work, right?

17       A.    Yes.

18       Q.    You've indicated that Mr. Andriano was

19   receiving some sort of welfare from the federal government,

20   supplemental security income?

21       A.    No, never said that.  I don't know that.

22       Q.    You don't know that?  Okay.  But you do know

23   that she was working, right?

24       A.    Yes.

25       Q.    You don't think that he would say it's okay for

87

1    her to go out and give Rick Freeland money, would you?

2          MR. PATTERSON: Wait, wait, wait.  Asking this

3    question --

4          THE COURT:  Sustained.

5          MR. PATTERSON: -- or that question --

6          THE COURT:  Sustained.

7          MR. PATTERSON:  -- calls for speculation.

8          THE COURT:  Sustained.

9    BY MR. MARTINEZ:

10         Q.    Given the fact that you've now labeled Mr.

11   Andriano as somebody who suffers from domestic violence and

12   is the batterer, and you went over all of those

13   characteristics that was in those exhibits.  Do you remember

14   that?

15         A.    Yes.

16         Q.    Do you think that that person that you

17   described to the jury would have said to the defendant,

18   That's all right, go ahead and give Mr. Freeland the

19   furniture with the money you bought.

20         MR. PATTERSON: Objection.  Calls for speculation,

21   beyond the scope of this witness.

22         THE COURT:  Sustained.

23   BY MR. MARTINEZ:

24         Q.    Well, ma'am, you give us a lot of

25   characteristics about Mr. Andriano, right?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000007522

1        A.    Yes.

2        Q.    And all of them were that he was jealous, he

3    didn't want her hanging around with guys, all that stuff,

4    right?

5        A.    Yes.

6        Q.    And you've also indicated that she wouldn't

7    stand up to him, that she was just trying to, if you will,

8    pacify the situation, right?

9        A.    Yes.

10       Q.    If in fact she gave him furniture and bought

11   and gave some furniture to somebody else, do you think that's

12   a way to pacify the situation in the relationship?

13       A.    I don't know how the two go together.

14       Q.    Well, you said that she would try to obey him

15   the best that she could?

16       A.    Yes.

17       Q.    Disobeying him with regard to something like

18   that, don't you think that that has a tendency to incinerate

19   the situation rather than pacify it in a domestic violence

20   situation?

21            MR. PATTERSON:  Judge, that hypothetical has no --

22            THE COURT:  Sustained.

23            MR. PATTERSON:  -- basis in facts in this case.

24            THE COURT:  Sustained.  Let's move on.

25   / / / / /

1    BY MR. MARTINEZ:

2         Q.    All right.  Doing what she was doing, having an

3    affair, do you think that would incinerate a situation or

4    have a tendency to calm it?

5         A.    Incinerate.

6         Q.    Did you know that -- you indicated that you did

7    know about Mr. Black, right?

8         A.    Yes.

9         Q.    Did you know that one of the things that the

10   defendant told Mr. Black was that her husband had already

11   died of cancer.  Did you know that?

12        A.    I don't believe I know that.

13        Q.    But if in fact that were true, wouldn't that

14   show you that she wasn't this person who was subservient to

15   Mr. Andriano because she's going out there now and just

16   thinking things out for herself, doesn't that show that?

17        A.    You raised the issue a little while ago about

18   good Christian woman and sexual affairs outside of the

19   marriage.

20        Q.    Okay.

21        A.    And I think what we're talking about now is --

22        Q.    Statements.

23        A.    Excuse me?

24        Q.    Statements?

25        A.    Statements are related to that earlier

1    conversation.

2         Q.    Okay.  But I'm just talking about statements,

3    not physical acts right now.

4         A.    Okay.  Then I have to ask you to repeat your

5    question.

6         Q.    With regard to statements that a person makes,

7    isn't it true that's indicative of what they're thinking most

8    of the time?

9         A.    Yes.

10        Q.    And in fact in this case that's what you're

11   telling us, because she made statements to you and that's

12   what she was thinking, right --

13        A.    Yes.

14        Q.    -- when she made those statements.

15              Making the statement per Mr. Travis Black that

16   her husband had already died of cancer, isn't that an

17   indication of a woman who's free thinking and not going to be

18   subjugated or dominated by somebody?

19        A.    That information came to you from Mr. Black?

20        Q.    Yes.

21        A.    Okay.

22        Q.    In court, actually.

23        A.    Again, I wouldn't know that.

24        Q.    Don't you think that would be important for

25   your report to know then?

1      A.    What I meant was I don't know what he said in
2  the courtroom.
3      Q.    Well, what I'm saying is that's what he said.
4  Wouldn't that information be important for your report in
5  forming your opinion?
6      A.    Yes.
7      THE COURT:  Why don't we go ahead and take our
8  afternoon break at this point in time.
9           Ladies and gentlemen, we'll go ahead and take
10  our afternoon break at this point in time.  During this break
11  remember the entire admonition I have given you including the
12  fact you're not to discuss this case with anyone, do not let
13  anyone discuss this case with you, keep an open mind.  And
14  we'll see you in -- in about 20 minutes.  We'll be in
15  recess.
16
17           (Recess.)
18
19      THE COURT:  This is cause number CR 2000-096032,
20  State of Arizona versus Wendi Elizabeth Andriano.  The record
21  will reflect presence of the Defendant, Counsel and the jury.
22  Ms. Sharon Murphy is on the witness stand.  We'll continue
23  with the examination by Mr. Martinez.
24           Mr. Martinez?
25      MR. MARTINEZ:  Thank you.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    CONTINUED CROSS-EXAMINATION BY MR. MARTINEZ:

2         Q.    Ma'am, I just want to get a feel for the

3    process on which you undertook in reaching your opinion.  My

4    understanding is you spent a substantial amount of time with

5    the defendant, correct?

6         A.    Correct.

7         Q.    And that it was a total of 20 hours as

8    reflected by your report, correct?

9         A.    Correct.

10        Q.    Then you spent another five hours talking to

11   various other people for a total of 25 hours, correct?

12        A.    Correct.

13        Q.    And that is part of your 50 hours that you

14   spent with the defendant, that included filling out the

15   various tests that you administered to her, correct?

16        A.    Correct.

17        Q.    And as I understand it, you do have a PhD, but

18   it's a PhD in social work.  Is that correct?

19        A.    Correct.

20        Q.    You do have a masters, but that's also a

21   masters in social work, correct?

22        A.    Correct.

23        Q.    And your undergraduate degree, I assume, is

24   also in social work?

25              A.    English.

```
 1              Q.      English?  And you're not a psychologist,
 2      correct?
 3              A.      Correct.
 4              Q.      You're not a psychiatrist, correct?
 5              A.      Correct.
 6              Q.      And in fact you, as part of your practice, you
 7      do not administer tests to individuals, do you?  For example,
 8      the MMPI-2.  You don't administer that, do you?
 9              A.      Correct.
10              Q.      What is the MMPI-2?
11              A.      It's a psychological inventory.
12              Q.      Okay.  What do the initials MMPI --
13              A.      Minnesota Multiphasic Inventory.
14              Q.      Okay.  You don't do any of those kinds of
15      tests.  You do other sorts of things, correct?
16              A.      That's correct.
17              Q.      And the test that you administered, for
18      example, we were talking about the wheel and -- power and
19      control wheel, require the person that's being talked to to
20      sit down and actually just write something down on the power
21      and control wheel, right?
22              A.      Right.
23              Q.      In the other tests, the Lethality Test, for
24      example, requires them to answer yes or no, right?
25              A.      Yes.
```

1       Q.    All the other tests you have, one requires her

2    to put a check mark, correct?

3       A.    Right.

4       Q.    So the bottomline, what I'm seeing, and correct

5    me if I'm wrong, is you're getting a lot of information in

6    this case from Wendi Andriano?

7       A.    Yes.

8       Q.    And is Wendi Andriano here in court today?

9       A.    Yes.

10       Q.    Can you point her out for me?  What's --

11       A.    Sitting next to Mr. Patterson.

12       Q.    What's the color of her top?

13       A.    I can't see it.

14       Q.    Okay.  Why don't you stand up and look at it

15    for me, please?

16       A.    She has a beige top on and I can't tell if

17    that's a brown -- some sort of sweater.

18       MR. MARTINEZ:  Your Honor, may the record reflect the

19    identification of the defendant?

20       THE COURT:  The record may reflect identification of

21    the defendant by the witness.

22    BY MR. MARTINEZ:

23       Q.    And, ma'am, with regard to Ms. Andriano, one of

24    the things that your report doesn't indicate is that Mr.

25    Andriano ever forced her to wear her hair any -- in any

1    fashion, does it?

2         A.    Yes, it does.

3         Q.    What part of the report?  Show me that.

4         A.    I have to think about where that would be.

5         Q.    Show it to me.

6               (Pause in proceedings.)

7          THE WITNESS:  I don't see it in the report.  It must

8    have been in the collateral interview.

9    BY MR. MARTINEZ:

10        Q.    Bottomline is it's not in the report, right?

11        A.    I didn't see it when I just tried to review it

12   quickly.

13        Q.    So my question is, after reviewing the report,

14   it's not in there, is it?

15        A.    I did not find it.

16        Q.    And since we know that you couldn't find it

17   right now, don't you think that would be an important thing

18   that you would stick in the report because that would show

19   that Mr. Andriano had a lot of control over her?

20        A.    Somehow I have that information, so it must

21   have come to me through a collateral source because I have

22   it.  I know what the information is.

23        Q.    It may have come from a collateral source, but

24   you're fighting my question.  The question is this.  That's

25   such an important thing that the husband can make a woman

1    wear her hair the way he wants because that's a way of

2    control, correct?

3              A.    Yes.

4              Q.    So wouldn't you think you would stick it in

5    your report in bolded letters saying not only was he a person

6    in control, but forced her to wear her hair a certain way?

7              A.    There are a lot of pieces of information that

8    come out in 20 hours.

9              Q.    I understand that.  But you're the expert,

10   right?

11             A.    Yes.

12             Q.    You're the one that has all this education,

13   right?

14             A.    Yes.

15             Q.    You're the one that can enlighten us about the

16   characteristics of domestic violence, correct?

17             A.    Yes.

18             Q.    And you, who are this expert, wouldn't you

19   agree with me that's an important piece to stick in your

20   report?

21             A.    Yes, it's important.

22             Q.    And you didn't find it as you reviewed it

23   today?

24             A.    That is correct.

25             Q.    Now, we were talking about how you conducted

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    your -- your evaluation in this case, and we talked about

2    that you interviewed the defendant and that you interviewed

·3    the collateral sources, and we talked a little bit, just to

4    bring you up to speed, we talked about the fact you're not a

5    psychologist or psychiatrist.  It seems to me that in this

6    particular case what you did basically is you spent the

7    majority of your time, 20 hours, with the defendant.  Isn't

8    that true?

9           A.    Yes.

10          Q.    And in that majority of the time, you got her

11   side of the story, right?

12          A.    Yes.

13          Q.    And then it appears in the report, correct?

14          A.    Yes.

15          Q.    Most of it, right?.

16          A.    Yes.

17          Q.    Now, I was struck because you were asked to

18   give the characteristics in Exhibit 450 of the abuser.  Do

19   you remember that?

20          A.    Uh-huh.

21          THE COURT:  Is that "yes"?

22          THE WITNESS:  Yes, sorry.

23   BY MR. MARTINEZ:

24          Q.    You went through a lot of them, didn't you?

25          A.    Yes.

1          Q.    And you talked about low impulse control, those

2   sorts of things, right?

3          A.    Yes.

4          Q.    By the way, which book does this come from,

5   these abuser characteristics?  Where do they come from?

6          A.    Many different texts.

7          Q.    In other words, what you're telling us is you

8   put this together based on your education and experience?

9          A.    Yes.

10          Q.    And with regard to the common characteristics

11   of a battered woman, you also put those together based on

12   your experience and education, correct?

13          A.    Correct.

14          Q.    They're not in any one book, right?

15          A.    They're in lots of different books.

16          Q.    With regard again now to how you put this

17   together, one of the things that -- and, again, you gave us

18   the characteristics of the abuser, it begs the question

19   though, ma'am, you never spoke, in your lifetime, while he

20   was alive, to Mr. Andriano, right?

21          A.    Correct.

22          Q.    You don't know what his responses might have

23   been to some of the things that you were told by the

24   defendant?

25          A.    Correct.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1      Q.    You don't know what he might have told you at

2  all, correct?

3      A.    Correct.

4      Q.    And wouldn't you agree that's probably

5  something that's important?

6      A.    It rarely happens that I'm able to do that.

7      Q.    Ma'am, we're having trouble communicating.  Did

8  I ask you whether or not you would do that?

9      A.    It would be important, yes.

10      Q.    So, for example, if you asked him something

11  about the financial aspects of it, he may, for example,

12  dispute that, right?

13      A.    He could.

14      Q.    He could dispute who takes care of the kids,

15  right?

16      A.    Right.

17      Q.    Who cooks him dinner, right?

18      A.    Right.

19      Q.    Who takes care of them when she's out at night

20  two times a week.  He might dispute some of that stuff,

21  right?

22      A.    He might.

23      Q.    Now, getting back to some of the questions that

24  I was asking you and some of the statements that you may or

25  may not be familiar with, one of the things that the -- the

1    feeling that you gave us was that the defendant was very

2    caring for Mr. Andriano as he was going through this battle

3    with  this terminal illness.  That's what you told us, right?

4         A.    Yes.

5         Q.    Did you know, for example, that Donna DeAngelis

6    was her hair dresser?  Did you know that?

7         A.    No.

8         Q.    Did you know that she told her, the defendant

9    told her when asked about this, well, quote, I'm over it.  I

10   wish he would just die so I could get on with my life.  Did

11   you know about that statement?

12        A.    No, I don't.

13        Q.    That, of course, would be important because it

14   would affect what you've just been told about how caring this

15   person is, right?

16        A.    Yes.

17        Q.    We also had somebody by the name of Shannon

18   Sweeney who testified, and she indicated words to the effect

19   that when she began to work at the San Riva apartments, she

20   approached the defendant and the defendant just giggled and

21   said, "You know what?  It's no big deal."  That would be

22   important to consider, wouldn't it?

23        A.    What's no big deal?

24        Q.    The cancer.

25        A.    Oh, yes.  That would be important.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1     Q.    Because that shows she's not the caring person

2   that sort of hovers over him like a -- to take care of his

3   needs, right?

4     A.    If those statements are true, you are correct.

5     Q.    Now, some of the -- again, some of the other

6   things you told us was that she was the individual that was

7   sort of at his -- at his whim.  It was his caprice that

8   counted, right?

9     A.    Yes.

10    Q.    And we have had people, for example, like Jimmy

11  Yost that came in and they've indicated that in their view

12  the defendant wore the pants in the family.  Did you know

13  that?

14    A.    No.

15    Q.    Did you know that Shannon Sweeney described the

16  defendant as being dominant?

17    A.    No.

18    Q.    Did you know that Chris Hashisaki, who she

19  worked with also at the San Riva, described her as being in

20  charge?

21    A.    No.

22    Q.    And that Mr. Andriano's demeanor was sort of

23  always quiet.  Did you know that?

24    A.    No.

25    Q.    That would be important to know as part of your

1    report, wouldn't it?

2         MR. PATTERSON:  Judge, he needs to complete that

3    question the way those statements were made, were these

4    people in public?

5         MR. MARTINEZ:  That's something for redirect, Your

6    Honor.

7         MR. PATTERSON:  It's a misleading question.

8         THE COURT:  I'll sustain the objection.  Restate the

9    question.

10   BY MR. MARTINEZ:

11        Q.   All of those statements were made here in

12   court, they were made in public, these were people she knew.

13   Wouldn't that be something for to you consider, you think?

14        MR. PATTERSON:  Judge, I'm sorry.  Apparently he

15   didn't understand my objection, that they observed her

16   conduct in public.

17        THE COURT:  Sustained.  Restate the question.

18   BY MR. MARTINEZ:

19        Q.   Ma'am, these were observations made in public.

20   Would that be important for you to know that that's how she

21   acted in public?

22        A.   I wouldn't have had access to those people to

23   interview.

24        Q.   I know you didn't have access.  I'm asking you

25   would that be something you would want to know?

1          A.     Sure.

2          Q.     Wouldn't -- it would be important because it

3    shows the dynamics of the relationship, doesn't it?

4          A.     Yes.

5          Q.     It might affect what you ultimately conclude,

6    correct?

7          A.     Yes.

8          Q.     You talked to us a little bit about this

9    birthday incident, the one where this woman made out on

10   the -- the defendant went out for her birthday.  Do you

11   remember talking to us about that?

12         A.     Yes.

13         Q.     And let me see if I've got it right, just so

14   there's no misunderstanding.  You indicated in your report

15   per the defendant that it was actually Mr. Andriano who

16   refused to take her out so she went out with her friends from

17   work?

18         A.     Yes.

19         Q.     Did you know that's been disputed in court by

20   witnesses?

21         A.     No.  I would have no idea about that.

22         Q.     According to you, she was 10 minutes late

23   returning to the apartment and found Joe waiting for her in

24   the office.  That's according to what she told you, right?

25         A.     Right.

1    Q.    Did you know that on the way home that the

2    defendant actually stopped and picked up another man?

3    A.    No.

4    Q.    Per the other witnesses, did you know that on

5    the way home that she was kissing this other man?

6    A.    No.

7    Q.    Now, you also indicate that he had left the

8    children alone and asleep in the apartment so he could wait

9    for her in the office.  You wrote that in your report, didn't

10   you?

11   A.    Yes.

12   Q.    Did you know that there was actually a

13   babysitter in the apartment?

14   A.    No.

15   Q.    And all of this is coming from the defendant,

16   correct?

17   A.    Correct.

18   Q.    You also indicated that Wendi has a cell phone

19   and a wine cooler in her hands.  And then, according to you,

20   he grabbed the phone and smashed it while screaming in her

21   face.  We've had other people who were there, ma'am, who

22   dispute that account.  Would -- would that surprise you?

23   A.    Would it surprise me?

24   Q.    Yes.

25   A.    Yes.

1          Q.     And it surprises you because you've already had

2     a focus, you had your mind set up when you started to do this

3     report, didn't you?

4          A.     No, sir.

5          Q.     Well, we had, for example, Shannon Sweeney who

6     was right there who indicated that there was no screaming.

7     Would that make a difference to your assessment if you knew

8     he wasn't screaming?

9          A.     If I had the information prior to writing the

10    report?  Is that what you're asking me?

11         Q.     Right, Uh-huh.

12         A.     Yes.

13         Q.     And that in fact what happened is he didn't

14    throw the phone at anybody.  He threw it down on the

15    ground -- "he" being Mr. Andriano -- and walked away.

16    That's what the witnesses that were there said.  Did you know

17    that?

18         A.     No.

19         Q.     And that all that he said was "Wendi, what are

20    you doing?"  Did you know that?

21         A.     No, I did not.

22         Q.     And that he walked back to the apartment --

23    according to the witnesses, did you know that he walked back

24    to the apartment and it was she that ran after him saying,

25    "Let me explain, let me explain."  Did you know that?

1       A.      I don't think I know that.

2       Q.      And since you didn't know that, don't you think

3   that would be important since you do place some importance on

4   that event by placing it in your report?

5       A.      Yes.

6       Q.      And it's something that could ultimately or

7   conceivably have even a miniscule effect in how you view the

8   facts?

9       A.      Yes.

10      Q.      You also say that after he smashed the phone

11  with his foot, he then dragged her home.  That's what you

12  wrote, right?

13      A.      Yes, it is.

14      Q.      That's not what you told us yesterday though,

15  right?

16      A.      I don't know.  What are you saying that I said?

17      Q.      Yesterday you said that he took her home.  Do

18  you remember telling us that yesterday?

19      A.      No.  I don't remember that word.

20      Q.      And you were asked -- do you remember being

21  asked specifically, well, was there any physical touching,

22  and you said I remember that he may have grabbed her arm.  Do

23  you remember telling us that late yesterday?

24      A.      I am sorry, but I do not remember that specific

25  comment.

1          Q.     You don't back away from the fact that in your

2     opinion this story, as it was related to you, he dragged her

3     away?

4          A.     Correct.

5          Q.     Now, one of the other times that in addition to

6     her going out, that one of the other times that you reference

7     was the softball game.  Do you remember that?

8          A.     Yes.

9          Q.     And with regard to the softball game, it

10    appears the reason the parties got upset with each other was

11    because she said to him, you know, "no, I'm not going to get

12    you a cheese crisp," according to you, right?

13         A.     Yes.

14         Q.     According to your report, she was sick of

15    changing her routine for him and she was going to stand up to

16    him at least on this occasion, right?

17         MR. PATTERSON:  That is not what she testified to.

18         THE COURT:  Overruled.  She could answer the

19    question.  Go ahead, answer the question if you can.

20         THE WITNESS:  I remember asking that and talking

21    about sort of the cheese crisp and the call and Wendi saying

22    "no, I'm not going to stop and change my schedule and go and

23    buy you a cheese crisp."  I remember that.

24    BY MR. MARTINEZ:

25         Q.     Okay.  Well, your report indicates, just so

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    we're clear about the cheese crisp, that, quote, "she asked

2    him to get it himself because he was always interrupting her

3    own schedule to do what he wanted."  Isn't that what your

4    report says?

5           A.    Yes, it does.

6           Q.    That was based on what she told you, right?

7           A.    Correct.

8           Q.    She stood up to him on that occasion, right?

9           A.    Yes.

10          Q.    Wouldn't you agree asking somebody to get you a

11   cheese crisp is a real minor sort of thing?

12          A.    Not necessarily in the context.

13          Q.    So in this context, is it your view that, in

14   this context, it was a big deal?

15          A.    It could have been.

16          Q.    Well, no, no, no.  I'm asking you for your

17   opinion because you did write that?

18          A.    Yes, I did right that.

19          Q.    Right.  And the point of this is that you can't

20   look at discrete acts or events.  We have to look at the

21   whole picture, but this forms a part of the whole picture,

22   right?

23          A.    Yes, it does.

24          Q.    So in looking at this as part of the big

25   picture, that's no big deal.  Is that --

1       A.      I can't agree with you on that.

2       Q.      So if you can't agree, it is a big deal?

3       A.      It can be a big deal dependent upon the full

4    picture.

5       Q.      So you have the full picture here, don't you?

6       A.      Yes, I do.

7       Q.      So in light of the whole picture, isn't this a

8    big deal that --

9       A.      I'm struggling with my answer, not because I'm

10   choosing to not answer you.  But because I understand

11   domestic violence to mean that, I must look at everything

12   within the context.  This particular incident may or may not

13   have been crucial in her standing up.

14      Q.      Let me put it this way.  One of the things you

15   told us was they paid you a bunch of money for you to come

16   down here and explain to us everything you've done in this

17   case, right?

18      A.      Yes.

19      Q.      You've told us you spent a lot of time,

20   whatever time it is, right?

21      A.      Yes.

22      Q.      And you've also spent a lot of time giving us

23   your qualifications, right?

24      A.      Yes.

25      Q.      And giving us the definition of domestic

1        violence, right?

2                A.      Yes.

3                Q.      So in that world of yours that you now have and

4        that you -- you know about because you're the expert, was

5        that a big deal or was that nothing -- I mean, that's what

6        you're here for, to give us opinions.

7                A.      I would say that it was an important event.

8                Q.      And if it is an important event, ma'am, it was

9        really important that she stood up to him, right?

10               A.      Yes.

11               Q.      So now we have somebody who about a month

12       before his death is standing up to him with regard to

13       important event, right?

14               A.      On this occasion, that is correct.

15               Q.      Now, on this occasion you also indicated that

16       there was a -- a problem when she came home and there was a

17       fight, right?

18               A.      Yes.

19               Q.      And one of the things that you indicated to us

20       was that there was some screaming, accusations about her

21       being with other guys, that sort of thing, right?

22               A.      Yes.

23               Q.      And according to her, according to your report,

24       she tried to pacify him, and rather than pacify him, he

25       dumped some Kool Aid on her, right?

1      A.   That was one of the things he did, right.

2      Q.   Right.  I'm going on.  And according to you

3   then after the Kool Aid, quote, "he began pounding on the

4   dresser with his fists."  That's what it says, right?

5      A.   Yes.

6      Q.   And punched holes in it, right?  That's what it

7   says, right?

8      A.   Yes.

9      Q.   So according to you, based on what she told

10  you, he started pounding on the dresser with his fist, right?

11     A.   Right.

12     Q.   Let's take a look at that dresser.  I'm going

13  to show you Exhibit 436, and I -- I'd like you to step down

14  so you could just take a look at these.

15     A.   Okay.

16     Q.   You're saying per your report that these gashes

17  here, my characterization, were done with fists, right?

18     A.   I can't see the whole dresser, so I don't know

19  if there's more than this.

20     Q.   Ma'am, these were taken by the defendant's

21  father and these are his pictures and so that's all I have

22  to show you.  But --

23     A.   Okay.

24     Q.   -- based on that, you're saying that this is

25  the dresser and these are the -- you're saying those were

# APPENDIX U – Part 3

1   fist strikes?

2          A.    If those are the only marks on that dresser,

3   yes, I'm saying that.

4          Q.    Those are the only marks on the dresser, ma'am,

5   and you are saying that, right?

6          A.    Okay.

7          Q.    You also talked to us about a -- a trip that

8   may or may not have taken place to Las Vegas, Nevada.  Do you

9   remember telling us about that yesterday?

10         A.    Yes.

11         Q.    Ma'am, that also isn't in your report, is it?

12         A.    It must have been in a collateral interview

13  because I have the information.

14         Q.    Well, go ahead and take a look at it because

15  we'll proceed after you've had a chance to take a look

16  through your report.

17                (Pause in proceedings.)

18         THE WITNESS:  It's in the collateral interviews.

19  BY MR. MARTINEZ:

20         Q.    Ma'am, so the point is it's not in your report,

21  right?

22         A.    That's correct.

23         Q.    And, again, no one rushed you in the

24  preparation of this report, right?

25         A.    Correct.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

113

1        Q.    I mean, this was done on September 22nd of

2    2003, correct?

3        A.    Yes.

4        Q.    And the interviews that you did started on

5    March 25, 2003, and went all the way to June 4 of 2003,

6    right?

7        A.    Right.

8        Q.    So looks like it's about three months worth of

9    work, right?

10        A.    Right.

11        Q.    And so the point is is that you weren't

12    restricted in the number of pages that you could write, were

13    you?

14        A.    There was no restriction.

15        Q.    There was no restriction in the information

16    that you could put in there, right?

17        A.    Right.

18        Q.    Yet you -- you took the stand and you told us

19    about this Las Vegas trip and it's not in your report.  Is it

20    because you didn't consider it important enough to put in the

21    report?

22        A.    No, sir.

23        Q.    But it didn't make it to the report, right?

24        A.    I didn't know it then.

25        Q.    So this is other information you've been

1    gathering?

2         A.    This is the collateral interviews that I

3    conducted.

4         Q.    So you prepared your report even though you

5    didn't have all of the information ready to go then.  Is that

6    what you're telling me?

7         A.    No, sir.

8         Q.    This report is premature in its -- it's not

9    well thought out.  Is that what your telling me?

10        MR. PATTERSON:  Judge, objection.  Argumentative.

11        THE COURT:  Overruled.  You can answer the question

12   if you can.

13        THE WITNESS:  I engaged in collateral interviews.

14   The information that I gathered was written up per the

15   collateral interview with that particular person.  So the

16   information is there, but it's in the interview with that

17   person.

18   BY MR. MARTINEZ:

19        Q.    But this report is -- is the complete, if you

20   will, presentation of what you think is important to the

21   answers as to whether or not there was domestic violence

22   here, right?

23        A.    If that were the whole story, I wouldn't have

24   bothered doing collaterals.

25        Q.    Well, ma'am, you wrote a report and it's dated

1    September 22nd, 2003, right?

2         A.    Right.

3         Q.    At the very end on page 22 you give you a

4    summary, don't you?  Don't tell us what the summary is, but

5    you do give us a summary, don't you?

6         A.    Yes.

7         Q.    And on it you basically indicate the same

8    things you told us today, that the defendant is a victim of

9    domestic violence by Joseph Andriano, the same thing you told

10   us today, right?

11        A.    Yes.

12        Q.    So you had already reached that conclusion

13   before you went out and did all these other interviews,

14   right?

15        A.    I had --

16        Q.    The answer is "yes" or "no"?

17        A.    I had ample information.

18        Q.    But you're not answering my question.  My

19   question is you had already reached your conclusion, if you

20   will, in the form of a summary before you did this other

21   collateral interview stuff, right?

22        A.    Actually, the collaterals were before the

23   completion.

24        Q.    Okay.  If they were before the completion,

25   wouldn't you think -- well, they were important, right?

1          A.     Right.

2          Q.     And they were so important that you wrote some

3    of the stuff down, right?

4          A.     Correct.

5          Q.     But it wasn't important enough to be included

6    in the report, right?

7          A.     No, that's not right.

8          Q.     Well, it isn't in the report is it?

9          A.     Perhaps my understanding about what's important

10   and yours is different.

11         Q.     Well, let me tell you what's important.

12   Determination of whether or not there's been domestic

13   violence in this case.  Is it your understanding that's

14   important?

15         A.     That is important.

16         Q.     And one of the things that you indicated to us

17   yesterday that was important to you in reaching that

18   determination was this trip to Las Vegas and the return?

19         A.     Correct.

20         Q.     It didn't make it to this report that includes

21   your conclusion, did it?

22         A.     That is correct.

23         Q.     You also indicated to us that, well, it got to

24   the point where the defendant didn't even choose her own

25   entertainment.  Do you remember telling us that?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000007551

1        A.    I'm sorry.  Can you repeat it?

2        Q.    You told us before it got to the point where

3   the defendant didn't even choose her own entertainment.  The

4   victim chose it or Mr. Andriano chose it?

5        A.    Yes.

6        Q.    You gave us an example, the trips to the lake,

7   right?

8        A.    Yes.

9        Q.    But when you made that statement, you were

10  already aware that the months proceeding all of this she was

11  going out two nights a week to bars.  Didn't you know that?

12       A.    I don't remember writing in my report two

13  nights a week.  I knew she was going out, yes.

14       Q.    He wasn't choosing that for her, was he?

15       A.    No.

16       Q.    In fact he was resistant to that pursuant to

17  the reports that you reviewed, right?

18       A.    Yes.

19       Q.    So when is it that you think that he was

20  choosing her entertainment?

21       A.    Well, the trips to the lake that she had, that

22  was just part of what she needed to do.

23       Q.    Right.  But those were maybe one time a month.

24  Did you know that?

25       A.    I -- no, I don't know that.  I don't know how

1    often they were.

2          Q.    And yet we know that on a weekly basis she

3    would go out at least two times a week?

4          MR. PATTERSON:  What time frame, Judge?

5          THE COURT:  Sustained.

6    BY MR. MARTINEZ:

7          Q.    Right before her -- right in the months before

8    his death, she would go out two times a week.  Did you know

9    that?

10         A.    I don't know that it's two times a week.  I do

11    know that it was the latter part of the relationship, so not

12    the whole relationship.

13         Q.    The people that have come in to testify, and

14    I'm speaking specifically about Shannon Sweeney, Chris

15    Hashisaki, Stephanie Koeppen, the people that went out on

16    with her, indicated it was at least two times a week.  Now,

17    having said that, doesn't that sort of argue against him

18    picking her entertainment?

19         A.    Not for the eight years.

20         Q.    Not asking about the eight years because what's

21    important, partly important, is what was happening there at

22    the end.  Don't you agree that that's important there to --

23         A.    Yes.

24         Q.    Okay.  You just told us she told him no to the

25    cheese crisp.  You told me that, right?

1        A.    I said that was important.

2        Q.    Right.  So you have things important towards

3   the end of his life so they're not entitled to any less

4   weight or any more weight just because they happened months

5   before he passed away, are they?

6        A.    Except you're making it sound like it was the

7   whole eight years she was going out twice a month or week.

8        Q.    No.  I said in the summer, summer preceding his

9   death --

10        A.    Okay.

11        Q.    -- she was going out twice a week?

12        A.    Okay.

13        Q.    Couple that with the fact that this cheese

14   crisp incident, doesn't that indicate she's sort of asserting

15   herself?

16        A.    To some degree, yes.

17        Q.    Okay.  He also indicated that he used the word

18   "fucking" and that he cursed.  Do you remember telling us

19   that?

20        A.    Yes.

21        Q.    And that she found it particularly offensive,

22   correct?

23        A.    Yes.

24        Q.    And I guess what you're telling us is that's

25   not a word that she would use, correct?

1        A.      I think it's the way it's used.

2        Q.      So she has no problem with the word, it's just

3     the way he was using it.  Is that what you're telling us?

4        A.      I have to tell you, I never asked her if she

5     had a problem with the word itself or the way it was being

6     used at her.

7        Q.      So she has -- you don't know if she has a

8     problem with the word.  Is that what you're saying?

9        A.      That's right.

10       Q.      If she did have a problem with just the word,

11    that would mean she didn't use it, right, because she had a

12    problem with it, right?

13       A.      Right.

14       Q.      Okay.  One of the other things that you told us

15    was also in addition to these, this word that she never

16    badmouthed him to people.  Remember telling us that?

17       A.      Yes.

18       Q.      She went to counseling and didn't badmouth him

19    there, right?

20       A.      Correct.

21       Q.      Didn't badmouth him to his -- her parents,

22    right?

23       A.      Right.

24       Q.      Didn't badmouth him to anybody, right?

25       A.      I don't know what transpired between her and

1    Chris because it seemed from her story that Chris knew

2    something, but I don't know if she badmouthed him or not.   I

3    just know that Chris knew something.

4              Q.    Generally speaking, she didn't badmouth him in

5    a public way, right?

6              A.    Right.

7              Q.    There could be a number of explanations for

8    that, right, why she didn't do it, right?

9              A.    Yes.

10             Q.    One of them could be as you asserted was that

11   she was a victim of domestic violence and victims don't

12   badmouth their batterers, right?

13             A.    Often they do not.

14             Q.    That was one of the things you told us or the

15   explanation could be that there was no reason for her to

16   badmouth him, right?

17             A.    That's a possibility.

18             Q.    Just like yours is a possibility, right?

19             A.    Correct.

20             Q.    One of the things you told us was that she

21   didn't stand up to him very much and never told him no very

22   much, right?  You told us that, right?

23             A.    Right.

24             Q.    With regard to that issue, in your report alone

25   there are five or six instances where she does tell him "no,"

1    aren't there?

2          A.    Did you count them?  Because I don't know.

3          Q.    Well, ma'am, no, I'm asking you if you know.  I

4    mean --

5          A.    I don't know if there's five or six.  I'm

6    thinking about the ones you just mentioned.

7          Q.    Well, okay.  The cheese crisp she told him no.

8          A.    Right.

9          Q.    In a sense her refusal was saying I'm standing

10   up to him, right?  That's the same thing as saying no?

11         A.    I don't think that's standing up.

12         Q.    So you think that that sort of behavior means

13   that she is still subserviant and dominant to him?

14         A.    No, sir.  That's not what I meant.

15         Q.    Well, the reason I ask it that way is because

16   you brought out the fact that Mr. Andriano had a -- a girl

17   friend by the name of Shelly.  Do you remember telling us

18   that?

19         A.    Yes.

20         Q.    And that he discussed with Ms. Andriano the

21   fact she had been unfaithful to him?

22         A.    Correct.

23         Q.    And one of the things he added, and you put it

24   in bold in your report, was that, well, never do that to me,

25   right?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1      A.    Right.

2      Q.    In other words he's dictating to her, he's

3  telling her, don't do that, right?

4      A.    Right.

5      Q.    And if you are a Christian, subservient

6  Christian, whatever term you want to use, person that is

7  underneath him, you won't do it?

8      A.    That's what you would see, yes.

9      Q.    And if you do do it, that's in a sense

10  repudiating him or saying no, you're not going to tell me to

11  do this, this or this.  I'm going to do it my way and this is

12  what I'm going to do?

13      A.    Yes.

14      Q.    And you -- you have two examples of where she

15  had sexual intercourse with men, right?

16      A.    Correct.

17      Q.    And there are many examples of her kissing men

18  on dance floors.  You knew about that, right?

19      A.    I'm not sure I know that.

20      Q.    And you don't know anything about the limo of

21  her kissing anybody in the limo, right?

22      A.    No, sir.

23      Q.    So we have those two examples, and you also

24  told us he asked her to borrow money and she refused.  Do you

25  remember telling us that?

1          A.     Are you referring to the time when he asked her

2    to borrow money from his sister and that was over the

3    telephone perhaps?

4          Q.     I'm talking about page 12 of your report. Why

5    don't you take a look at it?

6                 I'm sorry.  Did I say 12?  I meant 16, sorry.

7                 (Pause in proceedings.)

8          MR. MARTINEZ:  It's in the middle.

9          THE WITNESS:  Yes, I see it.

10   BY MR. MARTINEZ:

11         Q.     Okay.  So that's a third time that she's told

12   him no, right?

13         A.     Yes.

14         Q.     With regard to the Las Vegas trip, do you

15   remember what you told us about that?

16         A.     Yes.

17         Q.     You told us that he called a day early and said

18   come home and she said, "No, I'm not changing my plans,"

19   right?

20         A.     Yes.

21         Q.     That's another example, right?

22         A.     Yes.

23         Q.     That was in May of 2000, right?

24         A.     I believe that is the right date.

25         Q.     How about the borrowing money?  When was that?

1          A.     The borrowing money?

2          Q.     Right.

3          A.     Which time?

4          Q.     Page 16, ma'am.

5          A.     The summer of 2000?  Is that the one?

6          Q.     Okay.

7          A.     Is that the one you're looking at?

8          Q.     That's the one that indicates it, doesn't it?

9          A.     Okay.

10         Q.     And this cheese crisp incident, is that in the

11   Summer of 2000?

12         A.     It was.  I have down one month prior to his

13   death.  That would have been September, right?

14         Q.     Okay.  And then we also have the infidelity

15   that you said was in the Spring of 2000, right?

16         A.     I believe that's true.

17         Q.     And then we also have the infidelity with

18   Travis Black which you indicated we know was in September of

19   2000, right?

20         A.     Yes.

21         Q.     All right.  Then you -- that's at least right

22   or shortly before his death during the summertime, right?

23         A.     Yes.

24         Q.     But even before that, she had been able to tell

25   him no, hadn't she?

1        A.      Yes.

2        Q.      This issue about him and the gun, do you

3    remember that?

4        A.      Which time?

5        Q.      The one where, according to her, he threatened

6    to kill the silent partner?

7        A.      Yes.

8        Q.      And according to your narration as presented to

9    you by her, he even pointed the gun at her, right?

10       A.      Yes.

11       Q.      And for whatever reason, she said I'm -- even

12   though you tell me no, I'm still doing it, right?

13       A.      Yes.

14       Q.      And then you said well, there could be three

15   reasons why or two reasons why she did that, right?

16       A.      Yes.

17       Q.      Do you remember that?

18       A.      Yes.

19       Q.      One of them was a moral issue, right?

20       A.      Yes.

21       Q.      The other one she didn't care or --

22       A.      She didn't believe him.

23       Q.      There's a third reason though, right, which

24   could be she wasn't scared of him, right?

25       A.      That's what I meant by didn't believe him,

1    didn't believe he would do it.

2         Q.    That's different than not being scared of him,

3    right?  You can believe they're going to do it, but you're

4    just not scared of them, right?

5         A.    Okay.  Yes.

6         Q.    That's a sign of strength, isn't it?

7         A.    Yes.

8         Q.    And what date did that occur?

9         A.    I don't know.

10        Q.    Why don't you take a look at it and let me know

11   so we could get the dates.

12                    (Pause in proceedings.)

13        THE WITNESS:  It's on page 9 and it's -- I don't

14   have a clear date.

15   BY MR. MARTINEZ:

16        Q.    Let's go to page 8 and let me see if that works

17   for you, where it says, we're at July 1996, Joe required

18   angioplasty?

19        A.    Right.

20        Q.    Would that have been 1996 because that's when

21   we're talking about?

22        A.    Yeah.  I don't -- I don't know if that was

23   still '96.  That's my only question and I don't see another

24   date.

25        Q.    So it could be '97, right?

1          A.     Could be.

2          Q.     And so even in '97 up to right before his

3 death, she was telling him "no," right?

4          A.     She told him "no" then, yes.

5          Q.     The other question that I have for you is, and

6 you -- this involves the gun. There was no police report

7 filed with regard to that, was there?

8          A.     When he pointed the gun at her?

9          Q.     Right.

10         A.     Right, there was no police report.

11         Q.     Also, you told us about the situation that she

12 relayed to you about this person who was going to repossess

13 the van. Do you remember about that?

14         A.     Yes, I do.

15         Q.     And one of the things you told us was that he,

16 Mr. Andriano, ran after the person while he was driving away

17 from the van, right?

18         A.     Yes.

19         Q.     And he was able to catch up to the driver,

20 right?

21         A.     Yes.

22         Q.     And when he caught up to him, he pointed a gun

23 at him, right?

24         A.     Yes.

25         Q.     The person was already driving away, right?

1      A.    Yes.

2      Q.    Even though the person was in a car and could

3   easily outrun or outbeat Mr. Andriano, he still, it's your

4   understanding, that he stopped the car?

5      A.    That is my understanding.

6      Q.    And were you able to find any police report as

7   to that incident?

8      A.    No, sir.

9      Q.    How about the incident where Mr. Andriano

10  supposedly or allegedly ran over another individual and

11  caused great bodily harm with his truck?

12      A.    That was an incident that was reported to Wendi

13  as I recall.

14      Q.    Right.  And then she related it to you?

15      A.    Correct.

16      Q.    Were you able to find a police report with

17  regard to that incident?

18      A.    No.

19      Q.    It's fair to say, ma'am, there were no police

20  reports that you were able to come up with -- for any of Mr.

21  Andriano's behaviors?

22      A.    Correct.

23      Q.    And this thing about him spinning his tires and

24  causing rocks to strike windows, you seem to place some

25  importance on that, didn't you?

1          A.     It was important enough to get into the report.

2          Q.     Right.  And to you it was important because

3    apparently the rocks went flying into the Circle K window,

4    right?

5          A.     Right.

6          Q.     How does that have anything to do with domestic

7    violence?  If she's not there, you know, we don't -- it's

8    anecdotal, isn't it actually?

9          A.     Yes.  A lot of those things were anecdotal.

10   They were told to Wendi at the onset, I believe, of the

11   relationship probably to scare her, to keep her afraid.

12         Q.     The point is this.  You're indicating they had

13   motives to ask her to stay away, right?

14         A.     It seems that way, right.

15         Q.     There was malevolent purpose out there that

16   didn't want her to be with Mr. Andriano?

17         A.     Right.

18         Q.     But there were no reports of windows being

19   broken by Mr. Andriano, are there?

20         A.     True.

21         Q.     There's no similar reports of him chasing

22   boyfriends with a bat, is there?

23         A.     True.

24         Q.     Ma'am, I want to talk to you how important you

25   think this religion is to her because you indicated part of

1    your report that the way a person is raised is very

2.   important, right?

3          A.    Correct.

4          Q.    You indicated to us early on she went to 91st

5    Psalm school, not initially, but after she was getting older,

6    right?

7          A.    Yes.

8          Q.    You also indicated she ran away when she was 15

9    years of age.

10         A.    Right.

11         Q.    Who did she run away with?

12         A.    A girlfriend.  I don't know who.

13         Q.    Isn't it true she actually stayed at that

14   girlfriend's house?

15         A.    Yes.

16         Q.    How long did she stay away for?

17         A.    I'd have to look back.

18         Q.    Go ahead --

19         A.    I don't know.

20         Q.    -- please.  It's toward the beginning of your

21   report.

22               (Pause in proceedings.)

23         THE WITNESS:  You -- are you referring to page 3

24   about the middle, fourth and fifth line?

25   BY MR. MARTINEZ:

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1        Q.    Yes.

2        A.    Doesn't say how long.  It just says that she

3   was 15 and she recalls staying at a friend's home.

4        Q.    But she actually stayed away at the friend's

5   house.  It wasn't like she was walking down the road, her mom

6   saw her and said come on back.  That's not what she related,

7   right?

8        A.    My recollection is only what I have written

9   here that she recalled staying at the friend's home.

10       Q.    Okay.  And she did go to this religious school

11  until she graduated at the age of 18 in 1987, correct?

12       A.    Right.

13       Q.    So she was embued with her learning in her,

14  correct?  That's something very important to her, right?

15       A.    Right.

16       Q.    Being a good Christian woman, right?

17       A.    Right.

18       Q.    Being whatever that entails.  I mean, being a

19  good mother, I guess, right?

20       A.    That would be part of it.

21       Q.    Okay.  Being a good wife, right?

22       A.    Right.

23       Q.    Being a good, I don't know, person generally in

24  society and not lying and cheating, right?

25       A.    Right.

1        Q.    Ma'am, how is it that you square that fact that

2    here we have a situation where we have somebody that was

3    brought up that way, okay, and then we have somebody who is

4    doing some of the things that we've described?  Wouldn't you

5    agree that's not consistent?

6        A.    You've described a lot of things that I don't

7    have knowledge about.

8        Q.    Well, let's do some of the things you do have

9    knowledge about.

10       A.    Okay.

11       Q.    You know about Rick Freeland, right?

12       A.    Yes, I do.

13       Q.    That's infidelity?

14       A.    Yes.

15       Q.    According to her father, that comes from

16   Exodus.  It's one of the ten commandments, okay?

17       A.    Okay.

18       Q.    She was brought up in a religious home, right?

19       A.    Yes.

20       Q.    There should be no doubt she knew that one,

21   right?

22       A.    Yes.

23       Q.    How could you square that then?  Is she just

24   using religion as a crutch when it benefits her?

25       A.    That is not how I saw or heard her story at

1    all.

2         Q.    Well, you would agree that infidelity is

3    something that is not sanctioned by the Christian religion?

4         A.    I would agree with that, yes.

5         Q.    Saying there is a police report when there

6    isn't, basically being untruthful, that is something not

7    sanctioned by the Christian faith?  If you know.

8         MR. PATTERSON:  Judge, again, that's not based upon

9    any testimony --

10        THE COURT:  Sustained.

11        MR. PATTERSON:  -- we have in this --

12        THE COURT:  Sustained.  Ask your next question.

13   BY MR. MARTINEZ:

14        Q.    Well, Mr. Ochoa indicated in the Bible one of

15   the things they don't condone is lying and cheating.  That's

16   what he told us.  You told us she was raised on the Bible.

17   Even you agree that having that as a precept, that just

18   doesn't square?

19        A.    Hard to comprehend.

20        Q.    But it does show that it is a woman who can

21   stand up to authority, doesn't it, right?

22        A.    When you talk about the affairs, my

23   understanding of both of them is that they were done in

24   secret.  If she had wanted to stand up to her husband, she

25   might have let him know that she was doing it.

135

1        Q.    But I thought in the Christian faith God knows

2   everything, ma'am.  Isn't that what the Christian faith

3   holds?

4        A.    I'm sorry.  I was talking about Joe.

5        Q.    I'm talking about her selective use of the

6   Christian faith.  Isn't that what we have here?

7        A.    She did it, you're right.

8        Q.    One of the things that you showed to us earlier

9   was this power and control wheel.  This is Exhibit 448.

10       A.    Yes.

11       Q.    And you asked her to complete it, didn't you?

12       A.    Yes.

13       Q.    And she wrote some things on it, didn't she?

14       A.    Yes.

15       Q.    How come the copy that I have is different than

16   yours?  Is the power and control wheel something you just

17   could put whatever you want on it?

18       A.    No.  When I handed that out, I said that the

19   one that we had on the screen --

20       Q.    Uh-huh.

21       A.    -- had, first of all, was blank --

22       Q.    Right.

23       A.    -- and it had the different examples of

24   violence around the outside.

25       Q.    Right.

1      A.    But that the interior --

2      Q.    Right.

3      A.    -- was the same, intimidation, those eight

4   takes.

5          Q.    Are you sure the interior is -- are you as

6   positive of that as you are of your opinion today that this

7   is a domestic violence situation?

8          MR. PATTERSON:  Objection.  Argumentative, compound,

9   multiple questions.

10         THE COURT:  Sustained.  Restate the question.

11   BY MR. MARTINEZ:

12         Q.    Are you as positive of that conclusion about

13   the power and control wheel as you are about your conclusion

14   involving domestic violence in this case?

15         A.    Would you like to show it to me?

16         Q.    No.  I'm asking you a question about how

17   positive you are of your -- or how strong you are in favor of

18   your conviction?

19         A.    The power and control wheel that we tried to

20   show was very unclear.  I knew that it was unclear and I

21   wanted to have another copy so I found another copy that had

22   the white background rather than the black.  Did I check to

23   see if it was the same exact internal consistency?  No,

24   because I assumed the power and control wheel was the same

25   power and control wheel, just like this.  I do know there's

137

1    multiple variations.

2           Q.    Ma'am, you're the expert.  We don't know

3    anything.  We're trying --

4           A.    I know that.

5           Q.    The point is this.  You gave us a power and

6    control wheel in Exhibit Number 448, right?

7           A.    Uh-huh.

8           THE COURT:  Is that a "yes"?

9           THE WITNESS:  Yes.

10   BY MR. MARTINEZ:

11          Q.    And you talked about all of the factors that

12   were inside there.  You went over them with Mr. Patterson,

13   didn't you?

14          A.    Right.

15          Q.    And you said that's what applied to this case,

16   right?

17          A.    Yeah.

18          Q.    And in fact this -- one of the things that was

19   used -- that is used, because women who have been victims of

20   domestic violence help police or social workers put it

21   together, right?

22          A.    Correct.

23          Q.    Right.  But you're not sure as you sit there

24   that the same power and control wheel that I have that she

25   filled out is the same internally, are you?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000007572

1        A.    No, because I can't see it.

2        Q.    But the point is, if this is going to be a

3    valid test, ma'am, shouldn't you think that the power and

4    control wheel should stay the same so that you could go from

5    one to the other case so that you could compare and say, you

6    know what, yeah, this does fit the power and control or no,

7    this doesn't?

8        A.    But you have the real one that was used with

9    her.

10       Q.    Ma'am, I'm asking -- the point I'm trying to

11   make with you is that it appears that the power and control

12   wheel changes with whatever you want to put in the slices of

13   the pie, doesn't it?

14       MR. PATTERSON:  Judge, it appears fair.  He needs to

15   show her what he is talking about and let her make a

16   comparison.

17       THE COURT:  Overruled.  Go ahead, answer the question

18   if you can.

19       THE WITNESS:  There's multiple versions of the power

20   and control wheel, but they're all very basically the same.

21   They were all designed by that group in Duluth.  You have the

22   one that she filled out on your table.

23   BY MR. MARTINEZ:

24       Q.    And this power and control wheel that you have

25   in front of us is not normed then, Exhibit 448, is it?

1      A.   I don't know because I don't know how it's

2   different.

3      Q.   Well, no, I'm asking you.  You presented this

4   for the jury's consideration.  Exhibit 448, is that a normed

5   power and control wheel?  Is that something that's been

6   normed?  Is there a standard?

7      A.   Do you have -- I know you have it.  May I see

8   the one that she filled out?

9      Q.   Ma'am, I'm just asking you if the one you

10   presented to the jury is normed.  That's all I'm asking.

11      MR. PATTERSON:  Judge --

12      THE WITNESS:  These are all the same things.

13      THE COURT:  Hold on a second.  Go ahead, answer the

14   question.

15      THE WITNESS:  It's the same.

16      THE COURT:  Ask your next question.

17   BY MR. MARTINEZ:

18      Q.   I take that to be a "yes"?

19      A.   Yes.

20      Q.   Okay.  And how can it be normed then if they

21   are different?  I will now show you the other one.

22           Okay.  I'll read the pieces of the pie for

23   you, okay?

24      A.   All right.

25      Q.   Emotional abuse.  Is it on there?

1     A.     Using emotional abuse is on here.

2     Q.     So the answer is "yes"?

3     A.     Correct.

4     Q.     Isolation, is that on there?

5     A.     Using isolation is on here, correct.

6     Q.     Intimidation?

7     A.     Yes.

8     Q.     Using male privilege?

9     A.     Yes.

10    Q.     Threats?

11    A.     No.

12    Q.     Using children?

13    A.     Yes.

14    Q.     Sexual abuse?

15    A.     No.

16    Q.     Economic abuse?

17    A.     Yes.

18    Q.     And I don't know if I asked you emotional

19 abuse.  I think you said yes?

20    A.     Yes, I did.

21    Q.     Okay.  If I may have that back so you could

22 take a look at it.  This is Exhibit Number 453.

23               (Pause in proceedings.)

24        THE WITNESS:  So the parts that are missing from

25 this one are threats and sexual abuse.

1    BY MR. MARTINEZ:

2          Q.    Okay.  And you administered others that were

3    substituted onto Exhibit Number -- what's the Exhibit Number?

4    448?  What are they -- what is there that weren't here in

5    Exhibit 453?

6          A.    I don't know.  Can I read them out to you?

7          Q.    Why don't you make a comparison, please.

8                (Pause in proceedings.)

9          THE WITNESS:  On the one today there is one called

10   minimizing, denying and blaming.

11   BY MR. MARTINEZ:

12         Q.    Okay.

13         A.    And using coercion and threats.

14         Q.    Okay.  Let me go ahead and have those back,

15   please.

16               I want to talk to you a little bit about this

17   power and control wheel, and then we'll talk about each of

18   these aspects to see what is met and what is not met.  I'm

19   going to use Exhibit Number 453 as my guide because it

20   appears that has some writing on it.  You would agree that

21   the defendant wrote those, right?

22         A.    Yes.

23         Q.    And let's go up here to this.  It's called

24   emotional abuse.  And if you need to take a look at it, let

25   me know, okay?

1    A.    Are you asking me for her answer?

2    Q.    No.  I'm asking you whether or not that piece
3    of the pie as set out in Exhibit 453 is emotional abuse?

4    A.    I -- obviously, I have to see it.

5    Q.    Okay.

6    A.    Correct.

7    Q.    And what does it say that emotional abuse is?

8    A.    Putting her down or making her feel bad about
9    herself, calling her names, making her think she's crazy,
10   mind games.

11   Q.    I'm going so show you what's already been in
12   evidence as Exhibit Number 226.  You may want to step down
13   and look at this.  The outside of the envelope says -- can
14   you see that?

15   A.    Yes.

16   Q.    What does it say, ma'am?

17   A.    Wendi.

18   Q.    The inside says -- I want you to read the whole
19   thing to me, okay?

20        MR. PATTERSON:  Judge, the exhibit speaks for itself.

21        THE COURT:  Just read it silently and then ask your
22   question.

23             (Pause in proceedings.)

24   BY MR. MARTINEZ:

25   Q.    Have you read that part, ma'am?

1        A.    Yes.

2        Q.    Is -- this was based on what we're going to see

3    on the inside, the birthday card that was given by Mr.

4    Andriano to Mrs. Andriano that was found in her closet,

5    okay?

6                   (Pause in proceedings.)

7    BY MR. MARTINEZ:

8        Q.    All right.

9        A.    Okay.

10       Q.    Why don't you go ahead and have a seat.  If I

11   may have the power and control wheel.

12            MR. PATTERSON:  What was that exhibit number again,

13   Judge?

14            THE COURT:  That was Exhibit 226.

15            MR. MARTINEZ:  That is correct.

16            MR. PATTERSON:  Thank you, sir.

17   BY MR. MARTINEZ:

18       Q.    Do you think that card is putting the defendant

19   down?

20       A.    At the moment in time it was written, no.

21       Q.    Do you think that's a form of emotional abuse?

22       A.    No.

23       Q.    Wouldn't you agree that what people do in

24   moments in time is an indication of what they think?

25       A.    In that moment of time, yes.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

144

1      Q.    But it is an indication, right?

2      A.    Yes.

3      Q.    It could be an indication of what they were

4   thinking for months previously too, couldn't it?

5      A.    I have no idea.

6      Q.    It could though, right?

7      A.    It could, yes.

8      Q.    It could also be what we're thinking months

9   later, right?

10     A.    It could.

11     Q.    And just so that we're fair to you, it does say

12  it's from Joe, right?

13     A.    Yes.

14     Q.    So then let's go up here to that power and

15  control wheel.  And on top of emotional abuse, since it

16  doesn't seem to fit the definition of putting her down, why

17  don't we put it up here and say -- call it the I love you

18  card.

19     A.    But it does say putting her down or making her

20  feel bad about herself.

21     Q.    Ma'am, you would agree, and I think you told

22  us, 15 percent of the people that are victims of domestic

23  violence are men, aren't they?

24     A.    Approximately, yes.

25     Q.    Well, do you think that having an affair is

1    akin to putting him down or making him feel bad about

2    himself?  Feeling inadequate?

3         A.    Could.

4         Q.    Okay.  Okay.  So how about we put that in here

5    for Mr. Andriano.  And -- but the wife is having not one but

6    two affairs.

7              Let's also talk about some of her descriptions

8    of him, things like "he's gross and icky," and "I don't want

9    to have sex with him."  Do you think that's something that

10   would put him down or make him feel really bad about himself?

11             MR. PATTERSON:  Judge, there's no evidence that she

12   stated that to the decedent.  It misstates the evidence.

13             THE COURT:  Sustained.

14   BY MR. MARTINEZ:

15        Q.    Well, ma'am, one of the things that we have in

16   this particular case, you told us this, was that she didn't

17   want to have sex with him, right?

18        A.    Correct.

19        Q.    And one of the reasons that you previously

20   agreed that she wouldn't want to have sex with him was that

21   he was gross or icky?

22        A.    No, sir.  I never said that.  I don't know that

23   information.

24        Q.    Okay.  How about if we go back to putting

25   her -- him down or making him feel bad about himself.  How

1   about her turning him down a constant basis.  You think that

2   made him feel good?

3           MR. PATTERSON:  Judge, again, there's no evidence --

4           THE COURT:  Sustained.

5           MR. PATTERSON:  -- of that.

6           THE COURT:  Sustained.  Let's move on.

7           MR. MARTINEZ:  I'm going to put that right here,

8   refuse another --

9           MR. PATTERSON:  I'm going to object because it's not

10  related from this witness.

11          MR. MARTINEZ:  There was a refusal on her part to

12  have sex with him.

13          MR. PATTERSON:  There's no evidence of that, Judge.

14          THE COURT:  Wait.  She could answer the question.

15  Answer the question if you can.

16          THE WITNESS:  I know there was at least one refusal,

17  the incident with Max the dog.

18  BY MR. MARTINEZ:

19          Q.   You -- let's take a look at your report,

20  ma'am.  Page 17, just so we could get it straight, ongoing

21  sexual abuse.  I want you to read with me.  Ready?  Ready?

22          A.   Are you talking about out loud?

23          Q.   I'm going to read it.  It says Joe insisted on

24  daily sex even though --

25          THE COURT:  Hold on a second.

1      MR. PATTERSON:  Objection.  This is improper

2   impeachment.

3      THE COURT:  Sustained.

4   BY MR. MARTINEZ:

5      Q.    Part of your report says that he insisted on

6   daily sex even though Wendi let him know she did not want to

7   participate.  That's what it says, right?

8      A.    That's correct.

9      Q.    If we put that in here, did not want to

10  participate in sex, okay?

11            Let's continue on with this power and control

12  wheel that we have here.  The upper left says isolation.  Why

13  don't we go ahead and take a look at it.

14     A.    Do you want me to read it?

15     Q.    Does it say that?

16     A.    Yes.

17     Q.    And what the controlling -- what does she --

18  who she sees and talks to, where she goes.  If I may have

19  that back?

20            We've already talked about in controlling, what

21  she does.  We've already talked that she went out, at least

22  in the summer right before his death, she went out twice a

23  week to bars.  We've talked about that?

24     A.    Yes.

25     Q.    So we have that up there.  That's not him

```
 1    controlling her, right?

 2           A.    Correct.

 3           Q.    And also says controlling, what she does, who

 4    she sees.  He couldn't control her seeing these men could

 5    she?

 6           A.    No.

 7           MR. PATTERSON:  Objection.  Move to strike.  There

 8    was no evidence introduced that he was aware --

 9           THE COURT:  Sustained.

10           MR. PATTERSON:  -- of the contact with Mr. Freeland

11    and Mr. Black.

12           THE COURT:  Sustained.

13    BY MR. MARTINEZ:

14           Q.    You would agree based on your discussions with

15    her that's what happened?

16           A.    Say it again to me.

17           Q.    That she had affairs with Rick Freeland and

18    Travis?

19           A.    Yes.

20           Q.    Okay.  Let's call it seeing other men.  Social

21    contact.

22           MR. PATTERSON:  Again, it takes it out of context,

23    Judge.  This was never communicated to the decedent, and

24    that's a critical basis for her opinion.

25           THE COURT:  Let me see Counsel here at the bench.
```

1                 (The following proceedings were held at the

2     bench:)

3

4                 THE COURT:  Go ahead.

5                 MR. MARTINEZ:  It doesn't matter if it was

6     communicated to him.  She's given an opinion that this is

7     domestic violence because in Exhibit 453 she meets all of

8     those prongs.  I can show that --

9                 THE COURT:  I think you're talking about the issue of

10    isolation and if in fact she was having these relationships I

11    think is the point she's not being isolated.  Isn't that the

12    point you're trying to --

13                MR. MARTINEZ:  That's what --

14                MR. PATTERSON:  That's not what I'm getting from this

15    line of questioning.

16                THE COURT:  That's the way I take it.

17                MR. PATTERSON:  If that's where it's going.  It's my

18    belief he's suggesting somehow that he's the victim because

19    of this conduct.

20                MR. DELOZIER:  Not --

21                MR. PATTERSON:  That's exactly where he's going.

22                THE COURT:  Hold a second.  If it's just what I just

23    discussed, I'll allow you to state the question.  I don't

24    want to go into the area that Mr. Patterson --

25                MR. MARTINEZ:  Right.

1          THE COURT:   -- is discussing here, okay?  If it's

2     going to the issue of the fact she was having these

3     relationships that's fire, but I don't want it to converge on

4     whether he knew or --

5          MR. MARTINEZ:  I'm not going ask her whether he knew

6     or not.  What I'm doing, as the Court has probably already

7     figured out, I'm showing she doesn't meet this power and

8     control wheel.

9          THE COURT:  Right.

10          MR. MARTINEZ:  And second of all what I'm saying is

11     that he does, but not because of what I'm putting outside but

12     because of what I'm putting inside.  And that's just to say

13     that the test is invalid, it's not normed.

14          THE COURT:  Go ahead.

15          MR. PATTERSON:  That's why he's confusing apples and

16     peaches here.  He needs to go one way, only one way, and he

17     couldn't make these inferences that are not supportable by

18     the evidence adduced at this trial.

19          THE COURT:  Okay.  Let's continue along the lines

20     I've discussed.

21          MR. MARTINEZ:  Right.  But I -- you're going to allow

22     me, I don't want to, you know, seem I'm not following your

23     order, what I'm saying is I want to still continue talking

24     about some of the things that are in her report about him as

25     told her by Ms. Andriano.  And I can stick them anywhere I

1    want to, she could agree or disagree to show how valid that

2    test is.

3              THE COURT:  I know, but the way you're asking that

4    question at times is mixing apples and things the way Mr.

5    Patterson suggested.

6              MR. MARTINEZ:  I see what you're saying.

7              THE COURT:  Make it clear and you can ask it.

8              MR. MARTINEZ:  I'll do that.

9

10             (The following proceedings were held in open

11   court:)

12

13             THE COURT:  Mr. Martinez.

14   BY MR. MARTINEZ:

15        Q.   What we're trying to do is see whether or not

16   she meets this power and control wheel.  She was, according

17   to her own admission, seeing other men, right?

18        A.   Yes.

19        Q.   And when she would go out to these bars, he did

20   not tell her which friends to take, did he?

21        A.   No.

22        Q.   Okay.  So she was free to choose whatever

23   friends who would go.

24             One of the other things --

25             MR. PATTERSON:  Judge, is that a question or a

1    statement?

2             THE COURT:   Is that a question?

3             MR. MARTINEZ:   She answered it, so I'll leave it

4    there.

5             MR. PATTERSON:   Well, the statement she was free to

6    see -- choose whom she went out with --

7             THE COURT:   Is that a question?

8             MR. MARTINEZ:   It is a question.

9             THE COURT:   What is the answer if you could answer

10   it?

11            THE WITNESS:   Could you -- could I get it as a

12   question?

13            THE COURT:   Why don't you restate the question.

14   BY MR. MARTINEZ:

15       Q.   With regard to going out two times a week, did

16   he dictate to her who she could go with, which women she

17   could go with?

18       A.   There were a couple things in there.  I don't

19   know that she went out two times a week.

20       Q.   Assume that for a hypothetical that's what's

21   been testified to in court.

22       A.   Okay.  Did he tell her who she could go with?

23   You know, I don't know the answer to that.

24       Q.   It could be, I want you to go out with Shannon

25   Sweeney?

1    A.    He could very well have dictated that employee

2    group as her group.

3    Q.    Right.  But since you don't know if he dictated

4    that group, you can't use it as part of the power and control

5    wheel to say that he isolated her and said these are the

6    friends that you need to go out with, right?

7    A.    Right.  There's other examples.

8    Q.    Right?

9    A.    I'm -- I'm just talking about these people that

10    she used to go out with.

11    Q.    All right.  Now, with regard to isolation, it

12    does say controlling what she does, who she sees and talks to

13    and where she goes.  When you testified yesterday, you

14    indicated to us that Mr. Andriano was dependent.  Do you

15    remember telling us that?

16    A.    Yes.

17    Q.    Okay.  So if somebody is dependent, that means

18    that -- well, what is your definition of dependent?

19    A.    He needed her.

20    Q.    He needed her?

21    A.    For a variety of reasons.

22    Q.    He didn't need other women, didn't need

23    anything else.  He needed her?

24    A.    I don't know if he needed anything else.  I

25    know he needed her.

154

1          Q.     Okay.  So it was your term that he was

2     dependent.  Additionally, we know that he wasn't working,

3     right?

4          A.     Right.

5          Q.     Didn't have a job for most of the time, right?

6          A.     Right.

7          Q.     We know that he went to the lake maybe once a

8     month, right?

9          A.     I know he went to the lake.

10          Q.     You don't have any examples of him later on as

11     death approaches of him going out, do you?

12          A.     He went out the weekend that she had the one

13     night affair with Travis.

14          Q.     So you think that the night that she had the

15     affair with Travis, he was out?

16          A.     Yes.  It may have been at the lake, but he

17     wasn't home.  He was out.

18          Q.     And he was out doing whatever it is that he

19     does, right?

20          A.     Right.

21          Q.     Ma'am, do you know that he had just had

22     chemotherapy that day and that he probably -- that he was

23     probably --

24          MR. PATTERSON:  Judge, misstates the evidence.

25     There's no testimony that that day he had chemotherapy.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000007589

1      THE COURT:  The jury can rely upon their collective

2  memory.  Go ahead, finish the question.

3  BY MR. MARTINEZ:

4      Q.   You're telling me even though he had

5  chemotherapy that day, he was out doing something.  That's

6  what you're telling me, right?

7      MR. PATTERSON:  Judge, how could she answer that

8  question?

9      THE COURT:  I'll sustain the question -- or I'll

10  sustain the objection.  Let's move on.

11  BY MR. MARTINEZ:

12      Q.   Did you know he had chemotherapy that day, yes

13  or no?

14      MR. PATTERSON:  Judge, there's no evidence in that

15  regard.

16      THE COURT:  The jury can rely upon their collective

17  memories.  You can answer the question if you can.

18      THE WITNESS:  No, I did not know he had chemotherapy

19  that day.

20  BY MR. MARTINEZ:

21      Q.   And you do know though he was terminally ill

22  though, right?

23      A.   Correct.

24      Q.   So we have an individual who is not employed,

25  right?

1          A.     Right.

2          Q.     Working or -- chemotherapy or is ill -- how

3     about that, ill?

4          A.     Okay.

5          Q.     And you did talk to the defendant.  He didn't

6     have any other women that he had sex with, did he?

7          MR. PATTERSON:  Objection.

8          THE COURT:  Restate the question.

9     BY MR. MARTINEZ:

10         Q.     Was he having an affair?

11         THE COURT:  Wait.  Who are you talking about?

12         MR. MARTINEZ:  Mr. Andriano.

13         THE WITNESS:  To my knowledge he was not having an

14    affair.

15    BY MR. MARTINEZ:

16         Q.     Well, you asked her in one of your tests,

17    didn't you?

18         A.     If he was?

19         Q.     Yes, uh-huh.

20         A.     I could have.

21         Q.     Well, in one of the tests she filled out, isn't

22    that one of the questions you asked her in one of the tests

23    she filled out?

24         A.     I don't remember.

25         Q.     Let's take a look at it then.  Just -- this is

1    what you labeled Abusive Observation Checklist?

2        A.    Right.

3        Q.    I'm going to refer you to the bottom of page

4    161.  It says engaged in extra marital affairs.  There's a

5    number there for her, right?

6        A.    Yes.

7        Q.    You ask about the partner there too, for him?

8        A.    Right.

9        Q.    And for him he did not engage in any

10    extramarital affairs, right?

11        A.    Correct.

12        Q.    According to her she did, right?

13        A.    Right.

14        Q.    She didn't tell you she had two extra marital

15    affairs, did she?

16        A.    She told me about Rick Freeland, and in the

17    addendum she told me about Travis.

18        Q.    Right.  I -- you know, I'm not talking about

19    the addendum.  I'm just showing you the abusive objection

20    checklist which she filled out, according to you, in April.

21    Take a look.  It says that engaged in nondangerous extra

22    marital affairs, there's a number there right by that for

23    her?

24        A.    Yes.

25        Q.    Okay.  If I may have that back.  How many did

1   she answer that she had?

2        A.   One.

3        Q.   That's not true based on your subsequent

4   conversations with her, right?

5        A.   Right.

6        Q.   And, again, that illustrates the point that

7   I've been trying to make to you, that these tests, if you

8   will, that you gave to her are only as valid or only as good

9   as the person who's answering them, right?

10       A.   Yes.

11       Q.   In other words, there's even a term for it in

12  the scientific -- in your community, isn't there, for this

13  sort of type of test that we're talking about, this

14  phenomenon I'm talking about, isn't there?

15       A.   I don't know what you're talking about.

16       Q.   Are you familiar with the term called secondary

17  gain?

18       A.   Yes.

19       Q.   What is secondary gain?

20       A.   She has something to gain by lying.

21       Q.   In this particular case, we do have her not

22  being totally truthful about the number of affairs.

23            MR. PATTERSON:  Objection, Judge.  It depends on the

24  definition of affair.

25            THE COURT:  Sustained.

159

1    BY MR. MARTINEZ:

2        Q.    Nowhere in any of the documentation that you

3    provided to me, including this, does it ever say she had

4    sexual intercourse with two men out of marriage, does it?

5        A.    That is correct.

6        Q.    Let's keep on with the power and control wheel

7    to see whether or not she matches up under economic abuse.

8    And that's Exhibit 453.  What is that definition?

9        A.    Trying to keep her from getting a job, give her

10   allowance, taking her money.

11       Q.    Okay.  In this case trying to get her -- trying

12   to keep her from getting a job, isn't it just the opposite?

13   You told us he always wanted her to have a job, didn't he?

14       A.    Right.  There was one occasion where I believe

15   he interfered with her keeping a job.

16       Q.    And which circumstance was that, ma'am?

17       A.    That was one where their apartment didn't come

18   along with the management position.

19       Q.    That was right before she transferred to San

20   Riva, right?

21       A.    Yes.

22       Q.    But other than that one isolated incident, he

23   always wanted her to have a job, right?

24       A.    Yes.

25       Q.    All right.  Okay.  She was also the person that

160

1    was the bread winner, wasn't she?

2         A.    Yes.

3         Q.    Even though he may have been employed, it was

4    sporadic according to you, right?

5         A.    Yes.

6         Q.    Additionally, did you know that he was

7    receiving supplemental security income because of his

8    condition?

9         A.    No, sir.

10        Q.    Did anybody tell you that?

11        A.    No.

12        Q.    So as far as you know, he wasn't getting any

13   money from anybody though, right?

14        A.    Except for the sporadic employment.

15        Q.    Right.  So it's fair to say that she was the

16   one that from all outward appearances since she brought the

17   check home she controlled the economic strings didn't she?

18        A.    That's not necessarily true because I think

19   controlling the economic strings and earning the income could

20   be very different.

21        Q.    Did you ever check their checking account to

22   see who wrote the majority of the checks?

23        A.    No, sir.

24        Q.    Did you ever check to see when she went out on

25   those twice a week things, who paid for the drinks?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1       A.      No.

2               Q.      Did you ever check, on her birthday, whether or

3       not it was her who paid for the limousine?  Did you check

4       that out?

5       A.      No.

6               Q.      So what you're saying to us is that he

7       controlled the purse strings because that's what you were

8       told, right?

9       A.      I was told that he spent a lot of money on

10      things not related to the household.

11              Q.      Right.  The point is that's what somebody told

12      you, right?  You didn't check it out yourself, right?

13      A.      You are absolutely correct.

14              Q.      And we have seen that there are some errors

15      in your report, haven't we?

16      A.      Which ones are you referring to?

17              Q.      Well, do you think that it was correct that she

18      did not report the Shawn King incident to the police?  Did

19      you think that was correct?

20      A.      You are correct that I did not know that.

21              Q.      So in other words, what I'm saying is your

22      report contains what she told you and what your collateral

23      sources may have told you, correct?

24      A.      That's true.

25              Q.      Now, if we're talking about economics and

```
 1    somebody being reliant on somebody else, if we look at it --

 2    and just to be fair to you, he was receiving supplemental

 3    security income -- the person that wasn't getting any money

 4    and that needed help, if you will, was him, wasn't it?

 5         A.    I don't know what you mean.

 6         Q.    Well, the apartment that they lived in was

 7    free, right?

 8         A.    Yes.

 9         Q.    The reason the apartment was free was because

10    she worked there, right?

11         A.    Right.

12         Q.    It wasn't because of him, right?

13         A.    Right.

14         Q.    If she didn't work there, he'd be out, right?

15         A.    Right.

16         Q.    So everything in his life, economically

17    speaking, was dependent on her, wasn't it?

18         A.    Other than the --

19         Q.    Borrowing.

20         A.    -- borrowing and the supplemental security

21    income that you're telling me about.

22         Q.    Right.  You didn't know that, but aside from

23    all that, he was dependent on her, right?

24         A.    Yes.

25              MR. MARTINEZ:  Judge, I have quite a ways to go.
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1              THE COURT:  Let's go ahead and take our evening

2      recess at this point in time.

3              Ladies and gentlemen, we'll go ahead and take

4      our evening recess at this point in time.  During this

5      recess, remember the entire admonition I have given you

6      including the fact you're not to discuss this case with

7      anyone, do not let anyone discuss the case with you.  Do not

8      do any testing on your own.  Avoid any coverage about the

9      case.  Keep an open mind.  I want to you have a nice evening.

10     We'll see everyone tomorrow at 1:00 p.m.

11              We'll be in recess until that time.

12

13              (Evening recess.)

14

15

16

17

18

19

20

21

22

23

24

25

164

1

2

3                      CERTIFICATE OF REPORTER

4

5    STATE OF ARIZONA        )
                             )
6    COUNTY OF MARICOPA      )

7

8              I, Traci L. Wheeler, CSR, RPR, an official

9    and certified reporter in the Superior Court of the State

10   of Arizona, in and for the County of Maricopa, hereby

11   certify that I made a shorthand record of the proceedings

12   had in the within case, and that the foregoing transcript

13   is a full, true, and correct transcription of the

14   proceedings in this case.

15             Dated this 12th day of May, 2005.

16

17

18                                   _____
                                     Traci L. Wheeler, CSR, RPR
19                                   Certified Court Reporter No. 50313
                                     Official Court Reporter
20

21

22

23

24

25


         TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

# APPENDIX V – Part 1



05-0002
BracCo


IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

STATE OF ARIZONA,            )
                             )
          Plaintiff,         )
                             )      No. 1 CA-CR 04-0731
     v.                      )      MARICOPA COUNTY
                             )      No. CR 2000-096032
WENDI ELIZABETH ANDRIANO,    )
                             )
          Defendant.         )
                             )

Mesa, Arizona
October 14, 2004

BEFORE:  The Honorable BRIAN K. ISHIKAWA

REPORTER'S TRANSCRIPT OF PROCEEDINGS

TRIAL DAY 28

ORIGINAL Prepared for APPEAL by:
TRACI L. WHEELER, CSR, RPR
Certified Court Reporter No. 50313

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

2

1                    A P P E A R A N C E S

2   FOR THE STATE:        JUAN M. MARTINEZ,
                          Deputy County Attorney
3
    FOR THE DEFENDANT:    DANIEL B. PATTERSON,
4                         Deputy Public Defender
                                   and
5                         G. DAVID DELOZIER,
                          Attorney at Law
6

7           I N D E X   O F   E X A M I N A T I O N

8   WITNESS                                          PAGE

9   MURPHY, SHARON, Called to testify by the Defense
             Continued Cross-examination by Mr. Martinez    3
10           Redirect Examination by Mr. Patterson         76
             Continued Redirect Examination by Mr. Patterson 108
11           Follow-up Questions by Mr. Patterson         128
             Follow-up Questions by Mr. Martinez          130
12

13

14

15

16

17

18

19

20

21

22

23

24

25


        TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

```
1              MESA, ARIZONA, THURSDAY, OCTOBER 14, 2004
2
3              THE COURT:  Good afternoon.  This is trial in cause
4   number CR 2000-096032, State of Arizona versus Wendi
5   Elizabeth Andriano.  The record will reflect the presence of
6   the Defendant, Counsel and the Jury.  Sharon Murphy is on the
7   witness stand, and we'll continue with the examination by Mr.
8   Martinez.
9                    Mr. Martinez?
10
11                   SHARON MURPHY,
12             CALLED TO TESTIFY BY THE DEFENSE,
13      HAVING PREVIOUSLY BEEN DULY SWORN, TESTIFIES FURTHER:
14
15  CONTINUED CROSS-EXAMINATION BY MR. MARTINEZ:
16         Q.    Ma'am, you're Sharon Murphy?
17         A.    Yes.
18         Q.    You're the same individual who was testifying
19  yesterday?
20         A.    Yes.
21         Q.    One of the things we discussed yesterday was
22  whether or not your report that's dated September 22nd, 2003,
23  whether or not that report included any mention of the
24  defendant's hair and how she had to wear it.  Do you remember
25  that line of questioning yesterday?
```

1          A.    I do.

2          Q.    And yesterday you indicated to me that you made

3    a very quick sort of review of the report to determine

4    whether or not there was any mention of any wearing of hair,

5    correct?

6          A.    Correct.

7          Q.    And you didn't find any yesterday, correct?

8          A.    Correct.

9          Q.    Have you had a chance to review it since last

10   night?

11         A.    Yes.

12         Q.    And there is no mention of hair in there, is

13   there?

14         A.    There is no mention, correct.

15         Q.    Now, the other thing we were talking about

16   yesterday, and this will be at the top of page 17 of your

17   report, we were talking also yesterday a little bit about the

18   limousine date, if you will, where the defendant went out

19   with her friends in a limousine.  Do you remember talking

20   about that?

21         A.    Yes.

22         Q.    And, additionally, one of the things we talked

23   about was that she came home a little bit late, but the point

24   was that he, Mr. Andriano, began pounding on the dresser with

25   his fists.  Do you remember that?

1          A.     Yes.

2          Q.     The rest of that, though, indicates that he

3  punched holes in it.  And by punching holes in it, that means

4  he punched holes in the dresser drawer or what?

5          A.     Well, it says "punched holes in it, breaking

6  some of the drawers."

7          Q.     But definitely it does say he punched some

8  holes, right?

9          A.     Yes, it does.

10          Q.     I'm going to show you Exhibit Number 436.  I

11  think we may have looked at it yesterday, and can you see

12  that 436?

13          A.     Yes.  It's the one you showed me yesterday.

14          Q.     Right.  It's clear there are no holes punched

15  in it, correct?

16          A.     I have no idea if those are punched hole marks

17  from that photograph.

18          Q.     Right.  The point being, though, in your report

19  it does say that he began pounding on the dresser.  That's a

20  dresser, right?

21          A.     It appears to be a dresser.

22          Q.     Okay.

23          A.     It's kind of hard to tell.

24          Q.     Let's take a look at Exhibit 440.  Same item,

25  holds the characteristics of a dresser, correct?

6

1          A.    Yes.

2          Q.    Doesn't look like that dresser, as you look at

3    it from here, that it has any holes in it, does it?

4          A.    It has some markings.

5          Q.    Right, but they don't appear to be holes.

6    Holes are something that goes from one end past whatever item

7    it is to the other side, correct?

8          A.    Right.

9          Q.    And that doesn't seem to have it, does it?

10          A.    It doesn't have the markings that you are

11    defining for me.  It has some kind of markings.

12          Q.    And the markings that I am defining for you are

13    coming straight out of page 17 of your report, correct?

14          A.    Yes.

15          Q.    And it also indicates that there was the

16    breaking of some drawers, right?

17          A.    Yes.

18          Q.    Okay.  And we can't tell, but everything

19    seems -- Exhibit 440, everything seems to be lined up,

20    doesn't it?

21          A.    It appears that way.

22          Q.    The other thing that your report indicates on

23    page 17 is that there was a post that was broken on the bed,

24    right?

25          A.    Right.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000007606

1      Q.    And you also indicated that he also broke the

2  foot board in half causing the bed to crash down to the

3  floor, right?

4      A.    Right.

5      Q.    Is that also with his fist?  How did he do it?

6      A.    I don't know.

7      Q.    Were you told what happened that night, whether

8  it was fixed, what happened, or they just slept on a bed that

9  was broken, or what?

10      A.    I don't remember asking what happened after

11  that.

12      Q.    Okay.  And you weren't told, for example, that

13  she had to sleep on the couch and he had to sleep in the

14  baby's room, anything like that?

15      A.    Right.  I wasn't told any of that.

16      Q.    One of the other things we were talking about

17  yesterday was this power and control wheel, and that's

18  Exhibit Number 453.  And let me just show it to you so that

19  you could see what I'm talking about.

20      A.    Yes.

21      Q.    Ma'am, as I went up there to show you this, it

22  appears you have some notes.  Could you tell me what those

23  notes are?

24      A.    My power and control wheel is the same one you

25  have.

1          Q.    Are there notes on the back of it or in your --
2    no, no, no.  In your pad.  You were looking at some notes.
3    These notes.
4          A.    Oh, that's what I wrote in my report.
5          Q.    So those are the notes reflected in your
6    report?
7          A.    Yeah, what I've done in preparation for trial.
8          Q.    Is that a "yes"?  Is that a "yes"?
9          MR. PATTERSON:  Judge, she's explaining what he
10   asked.
11         THE COURT:  Repeat the question.
12   BY MR. MARTINEZ:
13         Q.    Are those the notes that are incorporated into
14   the report?
15         A.    These are notes that I have made in the margin
16   to remind me of things that are in my report.
17         Q.    When did you create those notes, ma'am?
18         A.    Probably within the last two weeks in
19   preparation for trial.
20         Q.    Okay.  But there are other notes besides those,
21   correct?  In other words, did you use any notes to prepare
22   your report?
23         A.    Oh, when I -- when I was doing the
24   interviewing?
25         Q.    Right.

9

1         A.    Oh, yes.

2         Q.    Okay.  Let's talk about then about -- why don't

3    we go down here in this area right here called "threats."

4    And it now appears that you have a power and control wheel

5    that is identical to the one you used for testing, correct?

6         A.    Correct.

7         Q.    How did you acquire it?  Did you make a copy of

8    mine or get it faxed from your office?

9         A.    No.  This is the actual one that she filled

10   out.

11        Q.    I think that you indicated to us yesterday that

12   you didn't have it with you, right?

13        A.    That is correct.  I didn't have it in my bag.

14        Q.    Okay.  So you had it with you on the trip, but

15   didn't have it with you on the stand?

16        A.    Correct.

17        Q.    All right.  Now, with regard to threats then,

18   it says making or carrying out threats to do something to

19   hurt her and we could include him there, "her" or "him"

20   emotionally.  It does say that, right?

21        A.    Yes.

22        Q.    Would you agree if somebody says to you "I am

23   going to leave you," that's a threat to hurt somebody

24   emotionally?  Don't you agree?

25        A.    Not necessarily a threat.  It's a statement.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1      Q.    So if -- in this particular case, isn't that

2   what the defendant told her husband, Mr. Andriano?

3      A.    That she was going to leave him?

4      Q.    Right, mm-hmm.

5      A.    That I believe is written in a note.

6      Q.    Which is the same thing.  It's, communication

7   isn't it?

8      A.    Yes.

9      Q.    He knew she was going to leave him, right?

10     A.    Yes.

11     Q.    And he started to cry, right?

12     A.    Yes.

13     Q.    And he begged her not to go, right?

14     A.    Correct.

15     Q.    So that is something that is going to hurt him

16  emotionally based on what the defendant reported, right?

17     A.    All right.

18     Q.    Is that "yes" or "no"?

19     A.    Yes.

20     Q.    One of the other things that you noted for us

21  on various occasions yesterday was that he was very jealous.

22  Do you remember telling us that?

23     A.    ,Yes.

24     Q.    And that he was jealous and he constantly asked

25  her about men and whether or not she was seeing other men and

1    things like that, right?

2         A.    Yes.

3         Q.    And in fact this thing with the bed may have

4    happened because he was worried that she was out at this

5    baseball or softball game with a man, right?

6         A.    He had been worried about that.

7         Q.    Well, isn't that what your report indicates

8    that he was worried about?

9         A.    Well, what I recall is that she was late and so

10   he was angry that she was late.

11        Q.    All right.  Well, why don't you go to page 16,

12   the second to last sentence down there, all right?  Are you

13   there?

14        A.    Yes.

15        Q.    It says "She returned home and he started

16   screaming at her about why did it take so long for her to get

17   home and accused her of being with a man."  That's true,

18   right?

19        A.    Yes.

20        Q.    So this fight you're talking about, was he was

21   worried about her being with a man, right?

22        A.    Yes.

23        Q.    And one of the things that we know is that she

24   was at a softball game where an individual by the name of

25   Rick Freeland was the captain of the softball team.  Did you

1     know that?

2          A.     No, I didn't know that.

3          Q.     Well, he's accusing her of being with another

4     man.  Don't you think that's an emotional issue for him?  In

5     other words, that's hurting him believing that she may be

6     with another man at this softball game?

7          A.     He at this point in time would have had no

8     knowledge of her relationship with Rick Freeland.

9          Q.     That is correct, but he had some knowledge that

10    she was with another man.  He may not have known the name,

11    right?

12         A.     No.  I don't know that.

13         Q.     Well, your report does say, though, we need to

14    read it again, it says "accused her of being with a man,"

15    right?

16         A.     Are you still on page 16?

17         Q.     That's correct.

18         A.     Okay.

19         Q.     He did accuse her of being with a man?

20         A.     Right, but that's a sign of jealousy.  We have

21    no way of knowing that he knew about Rick Freeland.  In fact,

22    I don't think he did.

23         Q.     But the point is he was suffering some angst

24    with regard to her fidelity, wasn't he?

25         A.     Yes, he was.

1      Q.    Okay.  On the other hand, there's never any

2 indication that he ever threatened to leave her, correct?

3      A.    Correct.

4      Q.    There's never any indication that he threatened

5 to take the children, right?

6      A.    Right.

7      Q.    And according to her own report there's no

8 indication that he was ever unfaithful, correct?

9      A.    I don't have any information about that.  Wendi

10 never reported that.

11      Q.    In other words, she indicated that he was not

12 unfaithful to her, correct?

13      A.    She would -- yes, she reported that he was not

14 unfaithful.

15      Q.    Right.  The other one that we have there is

16 using male privilege.  That's right here, correct?

17      A.    Correct.

18      Q.    So let's use using male, female privilege.  And

19 one of the things that tells us is that treating him or her

20 like a servant, and I think servant is misspelled, but making

21 all the big decisions, acts like the master of the castle.

22 That's what it says, right?

23      A.    Right.

24      Q,    Well, in this particular situation, she made

25 the decisions for him with regard to the lawsuit, didn't she?

1          MR. PATTERSON:  Misstates the evidence, Judge.

2          THE COURT:  Sustained.  Rephrase the question.

3     BY MR. MARTINEZ:

4          Q.    Ma'am, one of the people that testified for us

5     is an individual by the name of Jeff Miller, the lawyer in

6     the medical malpractice suit.  He indicated to us that when

7     he would call and want to speak with Mr. Andriano about

8     making decisions about something, that he would say talk to

9     Wendi about it and then it would be taken care of.  Would you

10    agree or disagree that that is an indication of her making

11    decisions in that relationship?

12         A.    I would say that Joe Andriano expected and

13    demanded that Wendi Andriano make a lot of decisions.

14         Q.    You're not answering my question.  I'm not

15    asking about those other questions.  I'm asking you

16    specifically about the Jeff Miller incident or the Jeff

17    Miller circumstance.  Can we focus on that?

18         A.    I will do my very best.

19         Q.    Good.  So with regard to that, would you agree

20    or disagree that if he says Wendi will take care of it or

21    words to that effect, because we don't have the exact words,

22    and he would hand the phone over to her, she would speak to

23    Mr. Miller and he would let her know what was needed with

24    regard to the lawsuit.  Wouldn't you agree that was some

25    decision making on her part?

1       A.    I cannot agree to that.  I can agree that she

2  would have been the filter.

3       Q.    Okay.  And so you wouldn't agree that she was

4  making decisions for him?

5       A.    Right.  Based on that, I cannot agree to that.

6       Q.    Okay.  The other thing that we know was that

7  she, according to other people, and we've mentioned this

8  yesterday, Chris Hashisaki, Shannon Sweeney, James Yost, they

9  all indicated that she was the person that was the dominant

10  one, that she was the one that -- what was the term?  She

11  wore the pants in the family, that sort of the thing.

12          Would you agree then that somebody who is

13  seeming -- and I understand that it wasn't inside their

14  bedroom, it was only in public -- but that's an indication,

15  wouldn't you agree, that's an indication of being the

16  mistress of the castle?

17       A.    I would say that those three people that you

18  just told me about saw her in that light.

19       Q.    Right.

20       A.    There's a public and private self.

21       Q.    So it's public.  I'll put that up here,

22  mistress of the castle.

23          Additionally, we talked a little bit about the

24  sex.  And one of the things that your report indicates,

25  toward the end of it, that even though she may not be having

1    sex with him daily, you believed that she did, but according

2    to your report page 17 "Joe insisted on daily sex even though

3    Wendi let him know she did not want to participate," right?

4          A.    Correct.

5          Q.    So that's somebody who knows her body and

6    letting the other person know what they want, right?

7          A.    When she felt strong enough to do so, yes.

8          Q.    Well, ma'am, take a look at that sentence.

9    Read it to yourself, and once you've read it, tell me if it

10    says when he felt strong enough?

11          A.    It does not say that.

12          Q.    That's something you added, right?

13          A.    Yes.

14          Q.    Did you also assume that just like you assumed

15    the fact they had sex on a daily basis up until the time he

16    died?

17          MR. PATTERSON:  Judge, that misstates her testimony.

18          THE COURT:  Hold on.

19          MR. PATTERSON:  Her testimony is he demanded, not

20    that they performed, on a daily basis.

21          THE COURT:  Overruled.

22          MR. PATTERSON:  That's a distinctive question.

23          THE COURT:  Overruled.  Answer the question if you

24    can.

25          THE WITNESS:  Okay.  Can you repeat it?

1    BY MR. MARTINEZ:

2         Q.    Did you assume as to what you just told us on,

3    dangling participle on that sentence, did you assume that

4    just like you assumed you told us yesterday that they had sex

5    on a daily basis until his death?

6         A.    I believe that what I said was that we knew for

7    certain that the daily sex resumed after they returned from

8    Colorado.  I can't say that they had sex every day for eight

9    years because I think that was the length of the entire

10   relationship.

11        Q.    Yesterday you told us that from 1998 until he

12   died she had to deal with the fact that he wanted sex on a

13   daily basis and that she submitted to it?

14        A.    That is true.

15        Q.    But I'm asking you now, the question is the

16   sentence says "Joe insisted on daily sex even though Wendi

17   let him know she did not want to participate."  She was

18   strong enough to let him know I do not want to participate,

19   right?

20        A.    That doesn't mean that she didn't.

21        Q.    Is that right or not, that's what it says?

22        A.    Yes.

23        Q.    You're saying that it doesn't mean that she

24   didn't.  That's what you just told me, right?

25        A.    Right.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1       Q.      Doesn't mean she did either, right?

2       A.      Okay.

3       Q.      So you're telling me based on what you're  --

4  what I'm hearing you say, and I don't want to be too

5  indelicate, that even in that time of the month according to

6  you the way you're interpreting it, they had sex during that

7  too.  That's what you're telling me?

8       A.      I did not ask Wendi specifically about the time

9  of the month when she was menstruating whether or not she had

10 sex.

11      Q.      I'm not asking you if you asked her or not.

12 I'm asking you what you're telling me, which is something

13 different, okay?  Are you telling me that as you sit there

14 today, it is your opinion as an expert that they had sex on a

15 daily basis from 1998 until the date of his death?

16      A.      I am telling you that what was reported to me

17 by Wendi Andriano is that Joe demanded sex on a daily basis.

18      Q.      Even until his death, right?

19      A.      Correct.

20      Q.      But now, to get to my question, she let him

21 know that she didn't want it, right?

22      A.      Right.

23      Q.      And so that would mean that basically that she

24 was in charge of her body or her mind enough to let him know

25 that she didn't want sex, right?  Right?

1          A.    I'm struggling with the -- with the response to

2    this for a very particular reason.  You are creating a person

3    that appears on the face of it to be strong.

4          Q.    I'm not creating anything.  Am I not taking

5    everything from this report of yours that you prepared back

6    on September 22nd, 2003?

7          A.    You are out of context, however, and that's

8    what makes it so difficult for me to respond to specific

9    sentences.

10         Q.    Right.  But, ma'am, it is from your report,

11   right?

12         A.    Yes, it is.

13         Q.    Is it something that you wrote?

14         A.    Yes, I did.

15         Q.    And you don't think it's unfair for me to ask

16   you questions about what's in your report?

17         A.    No, sir, except when you take them out of

18   context.

19         Q.    You know what?  There's redirect.  I don't know

20   if you know that.

21         MR. PATTERSON:  Judge, he's being --

22         THE COURT:  Hold a second.

23         MR. PATTERSON:  -- argumentative with this witness.

24         THE COURT:  Hold a second.  Continue on.

25   / / / / /

BY MR. MARTINEZ:

1    Q.    Now, one of the other things that we know is

3    that Mr. Andriano, as we know before, was not employed, and

4    if he was, it was sporadic.  We know about that, right?

5    A.    Yes.

6    Q.    And basically what we also know about him and

7    that the apartment that he was living in was being provided

8    through defendant's employment, correct?

9    A.    Correct.

10    Q.    So that he, again, we talked a little bit about

11    this yesterday, so that if he -- if they broke up or

12    whatever, it's clear that she would stay and he would be out

13    because he would had no connection to San Riva, correct?

14    A.    Correct.

15    Q.    And so that being the case, that place that he

16    was living in, really, if we look at it that way, was only

17    his castle by marriage.  Wouldn't you agree?

18    A.    Okay.

19    Q.    Sexual abuse.  Let's talk about that.  You've

20    described for us a situation and I'm going to page 17, again,

21    where there's an indication given to you by the defendant

22    that Mr. Andriano demanded sex on a daily basis, right?

23    A.    Yes.

24    Q.    And one of the things that your report

25    indicates in a sentence is that she let him know she did not

1   want to participate, correct?

2           A.    Correct.

3           Q.    And as you sit here today, you cannot tell us

4   that either he forced himself on her or not because you

5   really don't know, right?

6           A.    Physically forced himself.  Is that what you

7   mean?

8           Q.    Yeah, uh-huh.

9           A.    I don't believe he physically forced himself.

10          Q.    And then we're going to go over to

11  emotionally.  You don't know each and every -- that each and

12  every time because she didn't tell you that each and every

13  time that he demanded sex that he got his way, do you?

14          A.    That's correct.

15          Q.    Okay.  Question mark.  We don't know.  But we

16  do know that if there was anybody in the relationship that

17  did want to have sex with the other partner, it was him with

18  her, correct?

19          A.    Correct.

20          Q.    But the same is true, even though you've

21  described him as a spoiled child, we don't know that every

22  time that he wanted to have sex, we don't know because the

23  same is true if he -- if she allowed him to every time or if

24  she submitted every time, right?

25          A.    Right.

1        Q.    With regard to the other prong of this wheel,

2   there is something called "using children," right?

3        A.    Right.

4        Q.    You previously indicated to us that there's no

5   indication that he ever did that with her, correct?

6        A.    That's right.

7        Q.    On the other hand, you have told us that there

8   were complaints about his parenting skills, correct?

9        A.    Yes.

10       Q.    One of the things that you told us was that he

11  wouldn't change the diapers, right?

12       A.    That he would call her to come home, yes.

13       Q.    The other thing that -- the other thing that

14  you told us was that, or at least your report indicates that,

15  was that Joe never helped with the baby, right?

16       A.    Right.

17       Q.    So if there's really anybody sort of -- that is

18  being communicated to about the children, it's him because

19  he's not pulling his weight.  That's sort of the

20  understanding, right?

21       A.    Right.

22       Q.    And the other prong that we have left is

23  "intimidation," correct?

24       A.    Correct.

25       Q.    And before we get into what that actually

1    means, intimidation is not the same thing as fear, correct?

2          A.    If there's intimidation, I believe there is

3    fear, but you can have fear without intimidation.

4          Q.    You can have fear without intimidation but you

5    can't have intimidation without fear?

6          A.    Right.

7          Q.    Let's give you an example.  We have a hockey

8    team and psychologically they're defeated before they even

9    take the floor.  They're intimidated, aren't they?

10         A.    They could be.

11         Q.    It doesn't mean they're afraid of them.

12   Nothing is going to happen to them, right?

13         A.    It could mean that.

14         Q.    It could.  That's the point I'm trying to make,

15   that you can have intimidation without fear, right?

16         A.    I don't know if using an example of a hockey

17   team is the same as using an example of domestic violence.

18         Q.    But what I'm saying is you can have

19   intimidation without having fear.  In other words, a person

20   can be intimidated by the presence of somebody else like,

21   let's say, a courtroom.  I mean, a judge can be very

22   intimidating to lawyers, but that doesn't mean they're afraid

23   of him.  It's just a respect thing, isn't it?

24         A.    I don't agree with you.

25         Q.    Okay.  So you are saying that intimidation

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    always equals fear?

2         A.    I think intimidation always provokes some kind

3    of emotional response.

4         Q.    Yeah, but an emotional response is different

5    than fear, wouldn't you agree?

6         A.    Fear is the emotion that comes to mind for me

7    when I think of intimidation.

8         Q.    Right, but it could be I don't to play the game

9    or be in that courtroom, right?

10        A.    That's a logical thought and not an emotional.

11        Q.    Right.  That may be so, but what we're talking

12   about here is what intimidation means, right?  And let's do

13   it this way.  Are you going to agree or disagree that you

14   could have intimidation without fear.  And you may choose not

15   to agree to that, it's up to you.

16        MR. PATTERSON:  Judge, I believe she's answered that

17   question already.

18        THE COURT:  Go ahead.  I'll overrule the objection.

19   Go ahead and answer it if you can.

20        THE WITNESS:  I believe there is fear associated with

21   intimidation.

22   BY MR. MARTINEZ:

23        Q.    And so in this case when it says putting her in

24   fear by using looks, actions, gestures, loud voices, smashing

25   things, destroying her property, you're indicating that every

```
 1    time that he looks at her, for example, if they're at a dance

 2    and he looks at her, then I guess if they have that sort of

 3    relationship that she's going to be in fear?

 4           A.    In the context of domestic violence there is a

 5    look, not just any look, but there's a look that the woman

 6    learns.

 7           Q.    Okay.  And in this case you believe that he had

 8    the look that would put her in fear?

 9           A.    Yes, I do.

10           Q.    And this is in the private setting, isn't it?

11           A.    Not necessarily.

12           Q.    Well, no, I'm talking about private setting

13    right now.

14           A.    Okay.

15           Q.    And he had that in the private setting, right?

16           A.    I would assume so, yes.

17           Q.    Well, I don't want you to assume things because

18    I want you to go by what you know.  It was never described to

19    you by the defendant as him having that look in a private

20    setting?

21           A.    I am trying to recall if that was one of the

22    items on the abusive behavior checklist.

23           Q.    Okay.  And --

24           A.    Can I refer to it?

25           Q.    Sure.  Go ahead.
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          A.     All right.  I'm looking at that form right now.

2    It's -- the pages are marked sideways.  It's on 161.

3          Q.     Okay.

4          A.     And there is a category called "intimidation."

5          Q.     Okay.

6          A.     And the very first one item says "instilled

7    fear in him/her by looking, gestures, actions," and she's

8    marked under 10 to 49 times.

9          Q.     Okay.

10         A.     So I can't say whether it's in the bedroom or

11   not.  I can say that he did it 10 to 49 times.

12         Q.     Right.  But you can't say it was in private?

13         A.     I can't.

14         Q.     And by the same token you can't say if it was

15   in public either?

16         A.     Right.  I could just say it happened.

17         Q.     But that same page 161 is the same page as the

18   category "engaged in extra marital affairs," right?

19         A.     Yes.

20         Q.     And it says one not two?

21         A.     Yes, it does.

22         Q.     Now, with regard to that particular look, we've

23   received information from other people in a public setting he

24   was the quiet one, wouldn't say anything, and that basically

25   she was the one that was in charge.  So is this look

1 something that other people could pick up or just something

2 that the person that's perceiving the look would pick up?

3     A.   The way it's been described to me by other

4 battered women, it's something the battered woman knows, not

5 something anybody else would see.  That's what a battered

6 woman would tell you.

7     Q.   I'm interested in what the defendant told you.

8     A.   About the look?

9     Q.   Right, uh-huh.

10     A.   I just -- I don't recall having that specific a

11 conversation with her about the look.

12     Q.   And in fact in your report there's no

13 indication other than in what you call the abusive

14 observation checklist, other than that, that she describes

15 the look in any of your report, right?

16     A.   Right.

17     Q.   One of the things you did tell us about this

18 power and control wheel, that it was sort of something that

19 you used to see what other tests you might use, correct?

20     A.   Right.

21     Q.   This is just an indication of whether or not

22 there is domestic violence, right?

23     A.   It's a really good indication, but yes, it is

24 an indication.

25     Q.   Right.  And this is done after you've already

1    done what you called the clinical interview, right?

2         A.    Not in this -- well, in this case I only saw

3    her for two hours prior to administering this one.

4         Q.    But this was shown after you've done part of

5    the clinical interview, right?

6         A.    Very brief part.

7         Q.    And the clinical interview, as I understand it,

8    she sits across from you, you set across from her, and you

9    guys talk and you take notes, right?

10        A.    Right.

11        Q.    That is what the clinical interview is, a

12   series of asking questions, right?

13        A.    Getting answers.

14        Q.    Right.

15        A.    Yes.

16        Q.    All right.  And then you have had 2 hours of

17   that, and then you gave the power and control wheel?

18        A.    On the next visit, right.

19        Q.    So that would be the fifth hour or, really, the

20   third hour?

21        A.    Third hour, right.

22        Q.    So you believed there was some indication of

23   domestic violence based on --

24        A.    Well, I also had when I said yes, this sounds

25   like it, I'll go check.

1      Q.     In other words, you took not the word, but you

2   already had information from another source that wasn't there

3   that you -- you considered and said, yeah, you know, that's

4   valid, and it affected your opinion going into talking to

5   her, didn't it?

6      A.     It didn't affect my opinion.

7      Q.     Well, then why move so quickly?  Why don't you

8   go two hours and right away start with a power and control

9   wheel, which is basically a filtering device, to determine

10  what other tests you're going to give?

11     A.     Why not?

12     Q.     Well, because that means you've already made up

13  your mind going in that she is somebody who is the victim of

14  domestic violence.

15     A.     No, sir.  It doesn't mean that at all.

16     Q.     You didn't make that determination early on?

17     A.     No, sir.  I did not.

18     Q.     In the range of all of these interviews that

19  you had with her, when did you make the determination that

20  she was the victim of domestic violence?

21     A.     What date?

22     Q.     Generally.

23     A.     I can't tell you the date.

24     Q.     Generally?

25     A.     Well, I gave her -- I gave her two or three

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    tests during that third and fourth hour.

2         Q.    Okay.

3         A.    That was the first one.

4         Q.    What was the second one?

5         A.    I'm going to have to check my notes.

6         Q.    Please.

7         A.    The same day that I did the power and control

8    wheel, which is March 26, 2003.  I also administered the

9    partner abuse nonphysical and the partner abuse physical

10   scales.

11        Q.    Okay.  Those tests that you are talking about

12   here are given to somebody who is perceived by you to be

13   suffering from domestic violence, aren't they?  Why give it

14   to them and ask them?  Why give it to them and say did he

15   physically abuse you or does he just emotionally abuse you?

16        A.    The answer is no and the explanation is this.

17   One of the reasons that I really like those two tests in

18   particular is because they have a very high discriminate

19   validity rate.  What I mean by that is the whole purpose of

20   the researchers designing it was to find out can we

21   discrimate abused from non abused.  So really those two tests

22   just add to my knowledge about whether or not she is or she

23   isn't, so they go really well giving them the same day as the

24   power and control wheel.

25        Q.    And, again, just so we're clear, the person

31

1    who's filling out those numbers and we'll talk about that in

2    a little bit, is the person who's being studied, right?

3           A.    Absolutely.

4           Q.    In this case the person scoring without any

5    help from you is the defendant, right?

6           A.    Yes.

7           Q.    So she's the one in her mind tells you and puts

8    a number down there.  You don't help her with that, do you?

9           A.    That's correct.

10          Q.    With regard to this power and control wheel,

11   you also indicated to us that the person who is the victim of

12   domestic violence does not have to meet all of the prongs?

13          A.    Right.

14          Q.    So in this case I have Mr. Andriano, meeting

15   one, two, three, four, five, six -- perhaps meeting seven or

16   eight, don't I?  I do up there, don't I?

17          A.    You do up there.

18          Q.    And we also have, as we take a look at it, we

19   don't have her meeting any of them other than perhaps the

20   sexual abuse and maybe perhaps the intimidation if it equals

21   fear?

22          A.    On your wheel, that's correct.

23          Q.    And this is a wheel you and I discussed

24   yesterday and it's a wheel we've discussed today, right?

25          A.    Correct.

1      Q.     So on this wheel, if we take a look at it, it

2  doesn't look like she is a person who has -- is suffering

3  from domestic violence, wouldn't you agree?

4      A.     On your wheel, that's correct.

5      Q.     But, again, this is the wheel that you and I

6  constructed together here in court, correct?

7      A.     I have another one in my hand.

8      Q.     I know you do and we'll discuss that in a

9  minute.  But that's the one that you and I constructed here

10  in court, right?

11      A.     Yes.

12      Q.     Now, the one that you have in your hand, I want

13  to talk a little bit about it and if we, as I understand it,

14  the way that you presented it to her was, it was a blank

15  power and control wheel.  It is -- the gender of it is geared

16  to her.  In other words, it says "putting her in fear,"

17  "controlling what she does."  In other words, it's not suited

18  for a male, right?

19      A.     Right.  I would have to do something with this

20  if it were going to be given to a male.

21      Q.     Right.  And what it does do is it puts out for

22  her to consider certain things, doesn't it?

23      A.     Yes.

24      Q.     In other words with regard to sexual abuse, it

25  says making her, or you, do sexual things against her will,

1    right?

2         A.    Right.

3         Q.    And if she didn't have that in her mind or if

4    she had never even described it before or thought about it

5    before, she sees that and she can say yeah, that did or

6    didn't happen to me, right?

7         A.    Yes.

8         Q.    In other words, this scenario is suggested to

9    her in this power and control wheel, isn't it?

10        A.    Yes.  These are examples.

11        Q.    Right.  And in this particular case what she

12   did is that she wrote certain things, right?

13        A.    Correct.

14        Q.    And, for example, with regard to sexual abuse,

15   she wrote "I never liked to have sex," right?

16        A.    Right.

17        Q.    She doesn't describe how many partners she had

18   before him or anything like that.  She just tells you she

19   doesn't like sex, right?

20        A.    Right.

21        Q.    That would presumably include sex with Travis

22   Black and Rick Freeland, right?

23        A.    Right.

24        Q.    "But I could not deny him."  She's talking

25   about Joe Andriano in that, right?

1          A.    Right.

2          Q.    I was -- I can't read it very well.  I believe

3    it says, "I was trained from the age of 4 to obey your

4    husband no matter what" is what it says, right?

5          A.    That's right.

6          Q.    Of course that doesn't take into account the

7    fact she disobeyed him with regard to a number of some of the

8    things we discussed yesterday.  When she told him now about

9    the cheese crisp, she disagreed with him there, right?

10         A.    Yes.

11         Q.    She disagreed with him with regard to not

12   having an affair.  Those guys there were some examples.

13         A     I think there were five or six that you went

14   over.

15         Q.    Okay.  And it also says "I also was taught to

16   never be angry."  Let me ask you about that.  Do you think

17   it's possible that a person will never show their anger ever

18   in their life?

19         A.    Well, this says "taught."

20         Q.    Right.

21         A.    It doesn't say she never did it but she was

22   taught to not express anger.

23         Q.    Right.  You're taught to never show your anger.

24   Do you think it's possible to go through life without ever

25   expressing your anger?  In other words, like raising your

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    voice or cursing or anything?

2           A.    I don't think it's possible to never feel

3    anger.  I don't know about expressing anger.

4           Q.    Do you think that she's, if you can answer

5    this, or it may be beyond the scope of your -- of your

6    knowledge of her, that she's gone through her whole life

7    without ever expressing anger vocally?

8           A.    I do not know that.

9           Q.    Okay.  It does say "I also was taught to never

10   be angry, never argue."  That's what it says, right?

11          A.    Yes.

12          Q.    We did talk about a situation involving Rick

13   Freeland where she did want to confront him and argue?

14          A.    She wanted to confront who?

15          Q.    Rick Freeland.

16          A.    Confront him?

17          Q.    Right, argue with him, standing outside his

18   door for an hour?

19          A.    Oh, that's what you say someone had reported

20   evidently.

21          Q.    Right.  That goes against never arguing,

22   doesn't it?

23          A.    If that's true, yes.

24          Q.    Always love and be nice.  I think is what it

25   says, right?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1      A.    Yes.

2      Q.    Unconditionally, right?

3      A.    Yes.

4      Q.    And then it says "In the Bible it states

5  specifically to never say no to your husband's request for

6  sex," right?

7      A.    Yes.

8      Q.    But we do know that on page 17 of your report

9  it does say Joe insisted on daily sex even though Wendi let

10 him know she did not want to participate, right?

11     A.    Yes, it does.

12     Q.    And with regard to economic abuse she indicated

13 that for her the abuse was always he wanted me to have a good

14 job?

15     A.    Right.

16     Q.    That's not really a bad thing, is it?

17     A.    You're taking it out of context.

18     Q.    Ma'am, we've gone over the power and control

19 wheel, haven't we?

20     A.    Yes.

21     Q.    We've defined what economic abuse was.  We read

22 it, didn't we?

23     A.    Yes.

24     Q.    And we've now read her comment to the side,

25 right?

1        A.    Yes, we have.

2        Q.    Then it says emotional abuse.  It says "In any

3    argument I would start out knowing my husband was in the

4    wrong.  By the time he finished he had me convinced I was

5    wrong.  I would be the one apologizing," right?

6        A.    Right.

7        Q.    But we don't know what the arguments were

8    about, do we?

9        A.    I think we probably only know about a couple

10   that are in my report.

11       Q.    Even if we know about the ones in your report,

12   we don't know what she's referring to here, which arguments

13   she's referencing?

14       A.    That's correct.  We don't know that.

15       Q.    It could be he was right, couldn't it?

16       A.    It could be.

17       Q.    Then we have isolation.  It says, "Every time I

18   get close to a girl he would start complaining about them."

19   What girls in your report did he complain about, other than

20   the bridesmaid, according to her?

21       A.    The only example that comes to mind are of the

22   females friends that came to visit when she had a baby.

23       Q.    Other than that?

24       A.    I don't recall other than that.

25       Q.    The first one, if we're going to take this at

1    face value, the first one was at her wedding which was on

2    January 22nd, 1994, right?

3         A.    Right.

4         Q.    And the other one was after Nicolas was born,

5    which was in sometime in 19 -- what, '97?

6         A.    '97, I think.

7         Q.    Okay.  So after '97 or '98, there are no

8    examples that she provided to you about him complaining about

9    any girls that were close friends of hers, right?

10        A.    I will agree with you.

11        Q.    And additionally he even knew about a close

12    friend that was living out of state with whom she planned to

13    go stay with after she left him, right?  He knew about that?

14        A.    I don't know that he knew that.

15        Q.    Okay.  In the note, she may or may not ever

16    have said that.  Is that what you're saying?

17        A.    Right.

18        Q.    Okay.  Then it also says, "He'd find reasons to

19    not like them, refuse to allow me to see them."  There really

20    is no example you could give me of anybody that he refused to

21    allow her to see, is there?

22        A.    The issue of controlling her was pervasive, so

23    I don't know that he had to do much more than that.

24        Q.    The point is -- that's not the question.  The

25    question is can you give me an example of a situation where

1   he refused to allow her to see any girlfriends?

2          A.    No, I cannot.

3          Q.    And it does indicate the situation involving

4   the bridesmaid, right?

5          A.    Right.

6          Q.    That was back in 1994, right?

7          A.    Right.

8          Q.    And according to her she's the one that -- that

9   was forced out of the wedding per his request, right?

10         A.    Right.

11         Q.    And then we have intimidation and she

12  indicated, "He always threw things, broke furniture smashed

13  doors," and then she says, "Even while working on his own

14  stuff, he would throw tools," right?

15         A.    Right.

16         Q.    And presumably if he's -- I think you may have

17  given the example of him working on the boat where he would

18  get frustrated and he would throw a wrench.   Something like

19  that, right?

20         A.    Yes.

21         Q.    That's the example that she was intimidated by

22  and that put her in fear?   Sorry.

23         A.    Well, the -- it's that whole sentence.

24         Q.    Well, no.   I mean, if we take a look at it,

25  throwing your tools is something different than throwing

1    furniture and breaking furniture, isn't it?

2         A.    Yes.

3         Q.    So one of them is mostly outside.  I mean, the

4    one we're talking about was outside?

5         A.    The tools?

6         Q.    Yes.

7         A.    Yes.

8         Q.    He's working on his boat, right?

9         A.    Yes.

10        Q.    Something doesn't come out right with the boat,

11   right?

12        A.    Right.

13        Q.    It breaks, he gets frustrated?

14        A.    Could be.  That's the scenario.

15        Q.    Right.  That's what the report says, right?

16        A.    Right.

17        Q.    And he gets upsets and throws the tools, right?

18        A.    Right.

19        Q.    That puts her in fear according to you?

20        A.    What about the first part of the sentence?

21        Q.    What about my question?

22        A.    What about your question?

23        Q.    Answer it, please.

24        A.    I am really trying so hard to do that.

25        THE COURT:  Just answer the question if you can.

1          MR. PATTERSON: Well, you're free to say "I can't

2     answer the question" if you don't understand it.

3          THE WITNESS: I don't understand your question.

4     BY MR. MARTINEZ:

5          Q.   Okay.  Well, then, let's go over it a little

6     bit more slowly.  You indicated to me that intimidation

7     always includes fear, correct?

8          A.   Yes.  I did say that.

9          Q.   They're synonymous for --

10         A.   One indicates the other, yes.

11         Q.   So instead of saying "intimidation," let's say

12    "fear," all right?

13         A.   Okay.

14         Q.   One of the things she wrote, "He always threw

15    things, broke furniture, smashed doors," right?

16         A.   Yes.

17         Q.   Those were events that happened, not at the

18    same time, right?

19         A.   Right.

20         Q.   According to her, she doesn't tell you what

21    things, "He always threw things."  We don't know a time frame

22    for that when he threw those things, right?

23         A.   Right at this time --

24         Q.   Right.

25         A.   -- when she's filling this out, right.

1          Q.    We don't know what things he threw?

2          A.    Right.

3          Q.    Then she says, "He broke furniture."  We know

4    what that means?

5          A.    Yes.

6          Q.    So the breaking of the furniture caused her

7    fear, right?

8          A.    Yes.

9          Q.    And smashing doors caused her fear, right?

10         A.    Right.

11         Q.    So then we get to "While working on his own

12   stuff, he would throw tools."  That caused her fear too,

13   right?

14         A.    I think it's the whole sentence.

15         Q.    Well, let -- ma'am, you had no problem saying

16   "yes" to breaking furniture, right?

17         A.    Right.

18         Q.    You have no problem to fear, her being in fear

19   when doors were smashed, right?

20         A.    Right.

21         Q.    But you do have a problem saying that she was

22   in fear when he threw tools while working on his boat

23   outside?

24         A.    I see it as a sentence, as a full sentence.  To

25   take one piece of it doesn't make any sense to me.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          Q.    I -- it may not make any sense to you, but

2     would you agree or disagree with me, as we were going through

3     this earlier, that what you said was breaking furniture did

4     cause her fear.  You did tell me that earlier, right?

5          A.    Yes, I did.

6          Q.    Smashing doors.  You told me that did cause her

7     fear, right?

8          A.    Yes.

9          Q.    And then I come to the third part of the

10    sentence, "Throwing tools while he's working on the engine,"

11    you can't tell me if that caused her fear.  Is that what

12    you're saying?

13         A.    I will say that it caused her fear because it's

14    part of the sentence that describes more heinous kinds of

15    things.

16         Q.    Let's go over to using male privilege now.  It

17    says, "On Sundays I had to work for five hours."  That's what

18    it says, right?

19         A.    Yes.

20         Q.    That really has -- does that have to -- does

21    that have anything to do with using male privilege?

22         A.    No.  It's a sentence that precedes the rest of

23    the paragraph.

24         Q.    Right.  But that sentence itself doesn't have

25    anything to do with male privilege, right?

```
 1          A.    That's correct.
 2          Q.    Then it says, "Sometimes Joe had to watch the
 3    babies," right?
 4          A.    Right.
 5          Q.    I think it then says, "He would do this
 6    grudgingly"?
 7          A.    Right.
 8          Q.    So she's complaining a little bit with him
 9    there?
10          A.    About his grudgingly wanting to watch the baby,
11    yes.
12          Q.    So the answer is "yes," right?
13          A.    Yes.
14          Q.    "Whenever they would need their diapers
15    changed, he would" -- I think it says -- "call me at work"?
16          A.    That's what it says.
17          Q.    So whenever they would need their diapers
18    changed, he would call her at work, right?
19          A.    Right.
20          Q.    Did it say how many occasions he did that?
21          A.    No, it doesn't.
22          Q.    It could be one time, right?
23          A.    I suppose it could be one time.
24          Q.    Or a whole bunch of times, right?
25          A.    Correct.
```

1          Q.     And we know it only happened on Sunday, if
2     we're going to take the first sentence into account?
3          A.     That's the way she's written it, correct.
4          Q.     So for the rest of the week when she was
5     working, whether it be Monday through Thursday or Monday
6     through Friday, whatever it was, he wouldn't do it, right?
7     Because she specifically mentioned Sundays, right?
8          A.     She did specifically mention Sundays.
9          Q.     Then it says, "I would" -- I believe it says --
10    "have" --
11         A.     Right.
12         Q.     -- "to drive home, change them, then sneak out
13    of the" -- you're going to have -- it's cut off --
14         A.     House.
15         Q.     " -- out of the house to get back to work,"
16    correct?
17         A.     Correct.
18         Q.     It specifically references a house, right?
19         A.     Yes, it does.
20         Q.     So this changing of diapers that she's talking
21    about did not occur at the San Riva apartment complex, did
22    it?
23         A.     I suspect she's using "house" to refer to
24    "home," meaning wherever you're living.
25         Q.     Ma'am, what you're doing when you suspect

# APPENDIX V – Part 2

1    things is when you suspect things, agree or disagree, is the

2    same thing as when you assume things, isn't it?  You really

3    don't know?

4           A.    Should we look at when the children were born

5    and where they were --

6           Q.    Ma'am, that wasn't my question.  The question

7    is when you say "I suspect," it means that you really don't

8    know.

9           A.    You're right.

10          Q.    And the point is they did live in a house at

11   one point and that was when they lived in Casa Grande, right?

12          A.    That's right.

13          Q.    And after that they moved into the apartment,

14   right?

15          A.    Right.

16          Q.    And then from then on they lived in an

17   apartment, right?

18          A.    Right.  We'd have to go back and check the date

19   of when they lived in the house.

20          Q.    I understand that, but I'm trying to get the

21   basics here.

22          A.    Okay.

23          Q.    And when they were at the San Riva apartment

24   complex, they lived in Apartment 132, we know that.  Will you

25   accept that?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          A.    Yes.

2          Q.    And will you accept that their apartment was

3    within walking distance of the office, of the leasing office

4    as most apartment complexes go?

5          A.    I don't believe I ever saw a layout.  I don't

6    know where that apartment was in connection to the leasing

7    office.

8          Q.    But you would agree it is part of the San Riva

9    complex?

10         A.    Yes.

11         Q.    Okay.  And what she -- what she's telling you,

12   if we take your interpretation of it, is that she would get

13   in her car that was parked, I guess, and I would assume she

14   would have to drive from her apartment number 132 to her

15   office, right?

16         A.    If that's where they were living at the time

17   that she's referring to.

18         Q.    Right.  And then if it was lunch time she

19   wanted to go home, she would get in her car and drive what

20   appears to be a short distance, from what we've seen before,

21   a short distance away to her apartment.

22         A.    I suppose she could have.

23         Q.    But does that make sense that somebody would,

24   if it's within, you know, walking distance, there's a couple

25   buildings there, they would take the car every time to go to

```
 1    work?  It's just easier to get up and walk to work?

 2              A.    You know, I just don't know.

 3              Q.    Just like you don't know that "house" actually

 4    means "apartment"?

 5              A.    Right.

 6              Q.    But they did once live in a house, right?

 7              A.    Right.

 8              Q.    And that was back in the '90s, right?

 9              A.    Right.

10              Q.    So if we then get back to the apartment living

11    for a minute and go back to your report, it does say that he

12    would come drive to her apartment and lay on the horn, right?

13              A.    Drive to her office --

14              Q.    To her --

15              A.    -- and lay on the horn?

16              Q.    Sorry, to the office and lay on the horn,

17    right?

18              A.    Right.

19              Q.    If we're using this as the basis, it would mean

20    this action happened back in the '90s, if it happened at all,

21    right?

22              A.    Help me go through that one again.  I think you

23    lost me.

24              Q.    Well, one of the things that we know is that

25    they lived very close, in apartment 132, to where she worked
```

1      her office.  We know that.

2              A.    I'll accept it if you're telling me that.

3              Q.    Right.

4              A.    Okay.

5              Q.    Also, it's more convenient to walk to her

6      work.  That's -- that's part of why they give her the

7      apartment.

8              MR. PATTERSON:  Well, wait, wait, wait.  That's an

9      assumption.

10             THE COURT:  Sustained.

11             MR. PATTERSON:  Not founded in any testimony.

12             THE COURT:  I'll sustain the objection.  Let's move

13     on.

14     BY MR. MARTINEZ:

15             Q.    Having said that, that is within a short

16     distance to walk?

17             A.    Okay.

18             Q.    And having indicated here that it says "house"

19     not "apartment," then we can say that, look at this, and one

20     of the things that's consistent with this is that it happened

21     while they lived in Casa Grande, right, not at the apartment?

22             A.    Because of the word "house"?  Is that why

23     you're saying that?

24             Q.    And because of the distance.

25             A.    I don't have any way to know which -- it makes

1      sense to me, people often refer to where they're living at

2      their house or their home, whether they're in an apartment or

3      condo or whatever, so I would have to guess that's what she's

4      referring to here.

5              Q.    Okay.  So the bottomline is you can't -- you

6      can't do that, right?

7              A.    Right.

8              Q.    So you can't tell me that this laying of the

9      horn occurred at the San Riva apartments, can you?

10             A.    I can do that if I can go back and read where I

11     wrote that.

12             Q.    Why don't you go ahead and review your report,

13     okay, and tell me where it says it.

14                   (Pause in proceedings.)

15     BY MR. MARTINEZ:

16             Q.    Why don't you just try page 16, second

17     paragraph from the top?

18             A.    Okay.  On page 12 I found when they moved into

19     San Riva.

20             Q.    Okay.  You already told us previously that was

21     in the Fall of 1999.  I think you may have referenced October

22     or September of 1999, correct?

23             A.    Correct.

24             Q.    So go to page 16?

25             A.    Okay.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          Q.     Second paragraph from the top.  It follows the

2     issue of the birthday, the limousine, and the birthday,

3     right?

4          A.     Correct.  So that's San Riva.

5          Q.     So pursuant to your notes, this laying on the

6     horn occurred at the San Riva apartment complex?

7          A.     That is correct.

8          Q.     Then the threats.  We may have discussed this,

9     but I don't think so, it indicates "He told me if I ever had

10    an affair, he would never forgive me and he would make sure I

11    couldn't do it again."  That's what that says, right?

12         A.     Yes.

13         Q.     That was one of the threats he made to her,

14    right?

15         A.     Right.

16         Q.     And I guess that is something that she did not

17    feel intimidated by, right, not afraid of that, right?

18         A.     That would be correct.

19         Q.     "And if he was drinking and I made him angry, I

20    knew he would break things, push me around and cuss me out,"

21    right?

22         A.     Right.

23         Q.     "Seems like every time he would drink he would

24    engage in that conduct," correct?

25         A.     I would assume that from what she has written.

1      Q.     But that may not be the case though, correct?

2      A.     I think people make statements all the time

3  that are kind of global when they really might not mean

4  global.  I don't know what was in her mind when she wrote

5  that.

6      Q.     Then it says I know -- "I knew he'd break

7  things, push me around, and cuss me out, so I did my best

8  never to make him upset," right?

9      A.     That's what it says.

10      Q.     In other words, what it says throughout their

11  marriage -- "never" is an all encompassing word isn't it?

12      A.     Yes.

13      Q.     And throughout the whole marriage, in

14  everything she did, she tried to never to make him upset.

15  That's what she's telling you, right?

16      A.     That is what she's telling me.

17      Q.     That paints a pretty rosy picture of somebody

18  who's very, very honest, faithful, there all the time,

19  willing to get him cheese crisps, all that sort of thing,

20  right?

21      A.     It paints the picture of an idealized

22  relationship, I suppose.

23      Q.     One of the things that you presented for us

24  during direct examination was the abusive observation

25  checklist, right?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          A.     That's right.

2          Q.     And that was something that was administered

3     back on April 11 of 2003, correct?

4          A.     Yes.

5          Q.     And I'm just going to mark it as an exhibit

6     because I want to talk to you about some of the things on

7     it.  Well, actually we could just look at it.  Then I'll mark

8     it.

9                 At the bottom of it is page 164 --

10               THE COURT:  Let's have it marked for identification.

11               MR. MARTINEZ:  Okay.

12                (Pause in proceedings.)

13    BY MR. MARTINEZ:

14         Q.     Take a look at this test that you

15    administered.  This is one of the ones that's not scored,

16    correct?

17         A.     Correct.

18         Q.     It does say 164 on the side, doesn't it?

19         A.     Right.

20         Q.     Okay.  And basically there's a topic on the

21    left, right?

22         A.     Correct.

23         Q.     And then it says "You did to your partner" at

24    the top and then it says "Partner did to you," and then it

25    says "Previous partner," correct?

1          A.    Correct.

2          Q.    And just for -- I'm going over this for

3    illustrative purposes.  Then it says "You did to your

4    partner" and it has zero, 1 to 3, 3 to 10, 10 to 49, more

5    than 50, right?

6          A.    Right.

7          Q.    And then it says "Partner did to you," and it's

8    the same sort of thing, right?

9          A.    Right.

10          Q.    It's zero, 1 to 3, 3 to 10, 10 to 49, and then

11    more than 50, right?

12          A.    Right.

13          Q.    And then it says "Previous partner did to you

14    ever," right?

15          A.    Right.

16          Q.    And it says "yes" or "no," right?

17          A.    Correct.

18          Q.    And basically what happened in this case is you

19    gave this to her and then it has a number of items that are

20    there and they actually trail some of the items that are in

21    the power and control wheel, right?

22          A.    Right.

23          Q.    And she went ahead and she answered some of

24    them, right?

25          A.    Right.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

55

1          Q.     Answered all of them, right?

2          A.     Yes.

3          Q.     Let's just, without looking at the topics, I

4    just want you to take a look, for example, at Page 156, and

5    we'll make it wider.  This is basically what she did.  If it

6    was zero, she went all the way down and did all the arrows,

7    right?

8          A.     Right.

9          Q.     And then whatever it was on the right side,

10   that's what she did, and then one, five, seven, we have the

11   same sort of structure, right?

12         A.     Correct.

13         Q.     If we go to page 158, again, I'm looking at the

14   checks and arrows, you see that they're all checked right

15   here on the left, you did to your partner, partner did to you

16   on the right, right?

17         A.     Correct.

18         Q.     The one concern that I have, and my question is

19   this, when "previous partner did to you ever," there's no

20   checkmarks.  They're just to the side.  Did you put those in

21   there?

22         A.     Me?

23         Q.     Yes, you.

24         A.     No, sir.

25         Q.     So she changed from straight checkmarks here

1   and then under "Previous partner did to you ever," started

2   going to the side, right?

3          A.     I guess so, yeah.

4          Q.     And then if we go over to 160, we see all the

5   checkmarks here on the left, right, and then on the right?

6          A.     Right.

7          Q.     And now instead of going over to the side, the

8   line comes straight down.  Did you do that line?

9          A.     No, sir.

10          Q.     Okay.  Let's go to page 161.  See all the

11   checkmarks there on the left?

12          A.     Yes.

13          Q.     And this is the one where I engage in extra

14   marital affairs.  There's the one, right?

15          A.     Right.

16          Q.     Then it says "Partner did it to you," there's

17   the checkmarks, then there's a line all the way down here,

18   right?

19          A.     Right.

20          Q.     And then the checkmark there is much larger

21   and have a different consistency if you will.  Did you put

22   that there?

23          A.     No, sir.

24          Q.     And just so that we can complete the picture,

25   162, all the checkmarks there then a line straight down and

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    that changes from the going side to side we saw before, same

2    page, with regard to page 163, right?

3          A.    Right.

4          Q.    How long did it take her to complete this?

5          A.    I don't think I know -- well, let me see.

6    Wendi filled out this one, the response to violence inventory

7    and lethality assessment all on the same day.

8          Q.    Okay.

9          A.    That's 4-11, and what I have marked on my

10   invoice is that I was with her for two hours.  So I can't

11   tell you.  All I know it was two hours, she did those three.

12   They rarely take two hours to do --

13         Q.    Okay.

14         A.    -- so --.

15         Q.    But she does tell you on page 158 that she

16   never required medical treatment, outpatient or clinic,

17   right?

18         A.    Correct.

19         Q.    She also told you that she never -- it says,

20   "You required medical treatment but received none."  That

21   never happened to her right?

22         A.    Right.

23         Q.    And then it says that she required no medical

24   treatment and all the time, right?  That's what it says,

25   right?

```
1          A.    Right.

2          Q.    And there was never permanent injury and it

3    defines it as blindness, loss of hearing, disfigurement

4    chronic pain, none of that, right?

5          A.    Right.

6          Q.    No internal injuries, no contusions, right?

7          A.    Right.

8          Q.    No broken bones, right?

9          A.    Right.

10         Q.    No broken nose or jaw.  Then it goes on, right?

11         A.    Yes.

12         Q.    No black eyes, right?

13         A.    Right.

14         Q.    No severe bruises, right?

15         A.    Correct.

16         Q.    No severe cuts, no minor burns.  She does

17   indicate that she did bruise on occasion, right?

18         A.    3 to 10 times, yes.

19         Q.    She does indicate that, right?

20         A.    Right.

21         Q.    But this isn't subject to scoring, right?

22         A.    That's right.

23         Q.    One of the ones you did say was subject to

24   scoring was the partner abuse scale, right?

25         A.    Yes.
```

1          Q.     Nonphysical?

2          A.     Yes.

3          Q.     And basically what that does under the -- I'm

4     going to mark this as an exhibit.

5                 (Pause in proceedings.)

6     BY MR. MARTINEZ:

7          Q.     It doesn't give us any of the information

8     provided on there, just shows the head, right?

9          A.     Yes.

10         Q.     It says this questionnaire is designed and

11    tells them what it's designed to do, and 1, none of the time,

12    and lays it out there basically 7, all of the time, correct?

13         A.     Right.

14         Q.     And you indicated that with regard to Exhibit

15    1 -- 456, the abuse scale nonphysical, that she scored a 60,

16    right?

17         A.     Correct.

18         Q.     I notice in the scoring there's a figure of

19    9000.  What does that mean?

20         A.     9000?

21         Q.     Yes, ma'am.

22         A.     Oh, down towards the bottom?

23         Q.     Uh-huh.

24         A.     Well the scores manual gives you instructions

25    about how to score this, and I'm trying to remember how you

1    add them all up.  You subtract any that are not completed --

2    I'd have to go back to the scoring manual.  You divide --

3    there's four or five steps in the scoring.  9000 was some

4    number that I was following in the directions that got

5    divided by 150 to get the 60.

6           Q.    And those are directions that you followed,

7    right?

8           A.    In the manual, right.

9           Q.    Right.  And in part that requires your

10   interpretation, doesn't it?

11          A.    Well, it's just adding, subtracting,

12   dividing -- that's all.  It's just simple math.

13          Q.    And with regard to this particular 456 that we

14   have, that's the one that actually puts the numbers --

15          THE COURT:  Mr. Martinez, actually it's been

16   mismarked.  It should be 455 for identification.

17          MR. MARTINEZ:  Okay.

18          THE COURT:  Hold on a second.  Hold on a second.

19   We'll have the clerk do that.  So when you or the witness has

20   made reference to Exhibit 456 for identification, you're

21   referring to 455 for identification.  Thank you.

22   BY MR. MARTINEZ:

23          Q.    And the numbers, it's like there's 1 to 25

24   questions on it, right?

25          A.    Correct.

1      Q.    And numbers are put on there, right?

2      A.    Her answers you mean?

3      Q.    Right.

4      A.    Yes.

5      Q.    You didn't put those there, right?

6      A.    No.

7      Q.    She's the one that provided all the information

8  on that, right?

9      A.    Right.

10     Q.    She's the same person on whom the report was

11  based, right?

12     A.    Right.

13     Q.    Okay.  And the same thing is true with regard

14  to the partner abuse scale physical, right?

15     A.    Right.

16     Q.    Same sort of thing, she puts the numbers down,

17  then you go through the computation, right?

18     A.    Right.

19     Q.    Then the other one that you have is the

20  response to violence inventory, right?

21     A.    Right.

22     Q.    And basically on the left-hand side you have

23  the frequency, right?

24     A.    Right.

25     Q.    And you put numbers there, right?

1         A.     She did, right.

2         Q.     Right.  And, for example, calling the police,

3    it asks you the frequency.  In her case she answered zero,

4    right?

5         A.     Right.

6         Q.     Then it gives her the effectiveness ratings of

7    whatever happened, right?

8         A.     Right.

9         Q.     And you do not score this, right?

10        A.     Correct.

11        Q.     But in this one it does say, on the second page

12   of the notes that you provided me, that "fighting back" she

13   indicated zero, "I don't like confrontation," right?

14        A.     Where are you reading from now?

15        Q.     I'm reading from the second page --

16        A.     Yes.

17        Q.     -- of the --

18        A.     Yes.

19        Q.     "I don't like confrontation," right?

20        A.     Right.

21        Q.     And the assessing dangerousness questions

22   basically is just a form like this, right?

23        A.     Right.

24        Q.     It has a question, for example number 1, "Has

25   the abuser ever injured the victim so badly she needed

1    medical attention," and she says no, yes, or whatever, right?

2         A.    Yes.    This is my handwriting.    This is not

3    hers.

4         Q.    Okay.

5         A.    It's the only one that's my handwriting.

6         Q.    And why did you fill this out instead of her?

7         A.    I don't recall what was happening as to

8    whether -- why I did it.

9         Q.    Could it be that you filled it out from

10   information that she had already previously given you?

11        A.    No, sir.    I was sitting with her when I

12   administered all of these.    She did all of those and I filled

13   this one out, but I can't -- I just don't recall.

14        Q.    One of the things that -- well, we'll leave it

15   at that.    In other words, she told you and you filled it out,

16   right?

17        A.    Right.    I read the questions.    As I recall, I

18   read the questions, she answered, and I wrote it down.

19        Q.    Now, in the power control wheel we had here

20   yesterday, Exhibit 448, the one that differs from my -- or

21   one you used in this case which is Exhibit 453, and it

22   doesn't even look the same, where did you get this one, this

23   power and control wheel?

24        A.    When I -- when that black one didn't show up

25   very well, I remember that I got on the internet.    I got a

1    bunch of power point slides from previous presentations that

2    I had done, and what I did was I downloaded that on to a disk

3    and printed it because it was better quality.

4         Q.    Do you then -- that means you were the one that

5    created the pieces of the pie or labelled the piece of the

6    pie, right?

7         A.    No.    That was -- that was a slide that I

8    already had.    I didn't create -- I didn't create the wheel.

9         Q.    Right.    I know you didn't create the wheel, but

10   you created the pieces of the pie.    I'm asking you whether or

11   not you created the pieces of the pie?

12        A.    You mean, put things inside it?

13        Q.    Right.    For example, one of them here,

14   minimizing, denying and blaming, right?    That's on Exhibit

15   448?

16        A.    Right.

17        Q.    On Exhibit 453 that is not included, correct?

18        A.    That's correct.

19        Q.    On 453 it says on the lower right hand corner,

20   "Originated by the Domestic Abuse Intervention Project,"

21   right?

22        A.    Right.

23        Q.    This doesn't have any of that.    So my question

24   is did you create this from your experience?

25        A.    No, I did not create that from my experience.


             TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1        Q.    Where -- then where does it come from?

2        A.    I don't -- I don't remember the origination of

3    it.  I -- I used it in a power point presentation in a

4    workshop that I did at some point in time.  I have some notes

5    on my hard drive and I was looking for a new power and

6    control wheel because the other one was so poor.

7        Q.    But does that mean that in order for it to be

8    an effective power and control wheel you could just sort of,

9    given your experience and education, you could start creating

10    these different sorts of pieces of the pie?

11        A.    Could I?

12        Q.    Yeah.

13        A.    Sure, I could.  I suppose I could.  I didn't.

14        Q.    But what I'm saying and the test would then be

15    valid then still?

16        A.    If I created it?

17        Q.    Yeah.

18        A.    If it was different, then no.

19        Q.    Well, this --

20        A.    That's at any time one that got administered.

21        Q.    This one, Exhibit 448.  I think what you're

22    telling us is you could have always used that in this case,

23    right?

24        A.    I wouldn't have.

25        Q.    I know you wouldn't have, but I brought it into

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    court.  Could you have used it?

2           A.    Is it possible, yes.  Would I have?  No.

3           Q.    So if you could have used it, then go between

4    that one and Exhibit Number 453, the things that are in

5    common, 448 and 453, there's "intimidation," right?

6           A.    Right.

7           Q.    There's also "emotional abuse."  We've got

8    those, right?

9           A.    Uh-huh.

10          THE COURT:  Is that a "yes"?

11          THE WITNESS:  Yes, sorry.

12   BY MR. MARTINEZ:

13          Q.    We've got "male privilege," right?

14          A.    Yes.

15          Q.    We've got "using children," right?

16          A.    Yes.

17          Q.    And we have "economic abuse," right?

18          A.    Correct.

19          Q.    The only two that -- and given what you told us

20   before that you don't have to meet all of the pieces of the

21   pie, that could mean that this could be just as effective,

22   Number 448, as Number 453, right?

23          A.    When you say "effective," what are you meaning?

24   Effective in eliciting the information?

25          Q.    Effective in your assessment as you did with

1   regard to Exhibit 453?

2          A.    I suppose it could be.  I didn't do that, but

3   it could be.

4          Q.    No one's accusing you of doing that.  I'm

5   asking you as an expert, is that what could happen?  Would

6   Number 448 be an effective tool just like Exhibit Number 453

7   in determining whether or not there was domestic violence

8   perpetuated on the defendant?

9          A.    It could be used as effectively.

10         Q.    So then it really doesn't -- these have not

11  been normed.  Do you know what I mean when I say "normed"?

12         A.    I'm quite well aware of research terminology,

13  sir.

14         Q.    Okay.  I know that yesterday we talked about

15  secondary gain and what I was thinking.  That's the reason I

16  phrased it that way, so I apologize.  But have any of these

17  been normed, these wheels?

18         A.    If you -- if you want to use the term "norm" in

19  a very specific research way.

20         Q.    Right.

21         A.    I would say no.

22         Q.    Okay.  And when you say that in a research way,

23  what do you mean by that?

24         A.    I mean that scientific empirical testing would

25  have been done probably with a control group, probably with a

1   research group, a group that had been identified as battered

2   women already, and testing would have been done and we would

3   have gotten norms.

4           Q.    And that -- that hasn't been done in this?

5           A.    I don't believe so.

6           Q.    One of the things or flavor I got from reading

7   from your report was when it came to the affair, when it came

8   to the relationship with Mr. Andriano and those sorts of

9   things, that none of this was the defendant's fault.  That's

10  the flavor that your report gives me.  Would you agree or

11  disagree with that?

12          A.    Are you referring to a particular passage?

13          Q.    I'm referring to the overall feel of the report

14  that nothing the defendant did in this case is really her

15  fault because she's the victim of domestic violence.  And I'm

16  talking about saying in this case, I'm talking about the

17  relationship with Rick Freeland and the relationship with Joe

18  Andriano.  And I'm talking about the relationship with her

19  co-workers and employment, all of that stuff up to, let's

20  say, you know, the first part of October, October 1 to the

21  present.

22          A.    Fault, that's the operative word here.

23          Q.    Well, that she was a victim of circumstance

24  then?

25          A.    The process that I use focuses around whether

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    or not a person is a victim of domestic violence.  Then looks

2    for levels of severity and then uses that as an explanation

3    for the court --

4         Q.    Okay.  Well --

5         A.    -- for behaviors, so I'm struggling with how

6    you're using "fault."

7         Q.    Well, then let's go with specifics.  On page 6

8    it talks a little bit about the financial quandary that the

9    Andrianos found themselves in.  Talks about the beginning of

10   the marriage?

11        A.    Yes.

12        Q.    And one of the things that you said was, "Joe

13   liked keeping up with the Joneses by trading in his truck

14   every year for a new model," right?

15        A.    Right.

16        Q.    Since he wasn't working at a very good job, she

17   had her job but it didn't pay probably as much has they

18   needed, this was creating financial hardship on the marriage,

19   right?

20        A.    Right.

21        Q.    So it was his fault?

22        A.    That he wanted to keep up with the Joneses.

23        Q.    No.  It was his fault for creating this

24   financial quandary that's what you say there, right?

25        A.    Yes.


                TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1        Q.    And it was because he wanted to keep up with

2   the Joneses, right?

3        A.    Right.

4        Q.    The other thing that you say is on page six of

5   the report you also say, "Even from the beginning or early

6   parts of the marriage, he," being Joseph Andriano, "began to

7   isolate Wendi Andriano from her friends," right?

8        A.    Right.

9        Q.    Even though earlier you couldn't tell me the

10   name of any friend whatsoever, right?

11        A.    A particular friend, correct.

12        Q.    Right.  And if he is beginning to isolate her,

13   then it really isn't her fault how she's beginning to feel

14   about him because he's isolating her, right?  These -- this

15   is the start of the domestic violence trail, right?

16        A.    I suppose that's true, that would be the

17   beginning.

18        Q.    Okay.  And so she's in a situation, he's doing

19   this to her, so whatever comes what may, it won't be her

20   fault because he put her there, right?

21        A.    I don't think I ever said that.

22        Q.    No.  I'm asking you isn't that what that's

23   indicating?

24        A.    It doesn't say that.

25        Q.    It does say, ma'am, from the early days of

1    their marriage Joe began to isolate Wendi from her friends.

2    Doesn't it say that?

3         A.    Yes, it does.

4         Q.    And we -- you've indicated that's -- that's one

5    of the ways that a batterer gains control over the other

6    person, right?

7         A.    Right.

8         Q.    Okay.  So it's his doing, isn't it?

9         A.    Yes.  The isolation is his doing, right.

10        Q.    Right.  So it's -- so he has to not accept the

11   consequences, but it's something that he's embarked on,

12   right?

13        A.    Right.

14        Q.    Okay.  Also there you tell us, next paragraph,

15   was that Wendi states that "Joe was often like a spoiled

16   child who expected her to take care of him no matter what the

17   cost," right?

18        A.    Right.

19        Q.    So if it meant she lost her job, got in trouble

20   at work, whatever, it was his fault because he was demanding

21   it, right?

22        MR. PATTERSON:  Judge, could we approach please?

23        THE COURT:  Yes.

24

25             (The following proceedings were held at the


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    bench:)

2

3         MR. PATTERSON:  The county attorney continually

4    misstates the report.  The report describes conduct or facts,

5    not --

6         THE COURT:  Not so loud.  Whisper.

7         MR. PATTERSON:  It doesn't describe fault, which is

8    an issue for the jury, and it's kind of a moral condemnation

9    not present in this particular report.  So I object.  I

10   object to this continued line of questioning that seems like

11   she's describing fault to either party.

12        THE COURT:  Mr. Martinez, let's move on.  You can

13   make your record, but let's move on.

14        MR. MARTINEZ:  Okay.

15        THE COURT:  You're beating a dead horse.

16        MR. MARTINEZ:  The bottomline is this person is

17   biased and that's the point I'm trying to drive home.  She's

18   biased and it indicated in her report nothing the defendant

19   ever did no matter, how heinous, how terrible, specifically

20   having an affair, no matter what she did, it's okay, so she's

21   biased.

22        THE COURT:  You're beating a dead horse.  Let's move

23   on.

24        MR. MARTINEZ:  Okay.

25   / / / / /

1                    (The following proceedings were held in open

2     court:)

3

4     BY MR. MARTINEZ:

5              Q.    With regard to the working, it was Mr. Andriano

6     that wasn't working, right?

7              A.    Right.

8              Q.    Or if he did it was sporadic, not her, right?

9              A.    Right.

10             Q.    The debt began to mount because of his spending

11    money on the boats, not her, right?

12             A.    I believe that's true.

13             Q.    With regard to when she met Rick Freeland part

14    of it, the reason she went with him, according to her, was

15    because -- was because Joe provided the opportunity when he

16    took the children to his parents' home, right?  And Rick

17    invited her to a barbecue, right?

18             A.    Provided her with the opportunity meaning he

19    was not home?

20             Q.    Right.

21             A.    Is that what you mean?

22             Q.    Right.

23             A.    Right, he was not home.

24             Q.    Okay.  And according to Wendi, or the

25    defendant, it was always Rick who found a reason to talk

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    to -- with her, either in the office or he would call her at

2    work, right?

3          A.    That's what I've written, correct.

4          Q.    And initially she didn't agree.  She didn't

5    want to go out, but then she finally agreed to go out with

6    Rick, right?

7          A.    Right.

8          Q.    And then she did, that same day after the

9    barbecue, she went with Rick to Rockin' Rodeo, right?

10         A.    Right.

11         Q.    And she recalls dancing and that's something

12   Joe wouldn't do with her but Rick would, right?

13         A.    Right.

14         Q.    So the bottomline, the tenor of this whole

15   thing, is that in your opinion she is a victim of domestic

16   violence, right?

17         A.    Yes.

18         Q.    And all of these -- all of this conduct that

19   we've been talking about is -- is really as a result of

20   something Mr. Andriano did, right?

21         A.    Domestic violence is the act of aggression.  It

22   sets up an experience for the victim.

23         Q.    But she is a victim of domestic violence at the

24   hands of Mr. Andriano and that's why she did the things she

25   did, right?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          A.     Basically, yes.

2          Q.     And she continued -- she continued to be a

3    victim of domestic violence.  And in fact when you talked to

4    her about the report, for example, the reason she didn't tell

5    you about reporting the incident to the Casa Grande Police

6    Department was because she was a victim of domestic violence,

7    right?

8          A.     I never had a conversation with her about why

9    she didn't.  I didn't know there was a report.

10         Q.     The point is there's no reason why she didn't

11   tell you about the report to the police in Casa Grande,

12   right?

13         MR. PATTERSON:  Judge, I'm sorry.  I've lost track

14   here.  What incident are we talking about?

15         MR. MARTINEZ:  The one involving Mr. King, Shawn

16   King.

17         MR. PATTERSON:  Okay.  Objection.  She wasn't called

18   upon to evaluate the relationship between Mr. King and my

19   client.

20         THE COURT:  I'll sustain the objection.  Let's move

21   on.

22   BY MR. MARTINEZ:

23         Q.     With regard to the relationship with Mr. King,

24   you found that important for your report, right?

25         A.     In the beginning?


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1           Q.     Right.

2           A.     Yes.

3           Q.     So she didn't tell you that she did report what

4    Mr. King did to the police, did she?

5           A.     She did not tell me that, correct.

6           MR. MARTINEZ:  Nothing further.

7           THE COURT:  Mr. Patterson?

8

9    REDIRECT EXAMINATION BY MR. PATTERSON:

10          Q.     Dr. Murphy, in the course of the Government's

11   cross-examination of you, they talked a lot about domestic

12   violence, so I think we need to start all over again of a

13   fashion here.  I'm not going to try to redo everything here,

14   but I think we need to go back to the definition that you use

15   as the working definition for your analysis in this case,

16   okay?

17          A.     Right.

18          Q.     Again, what is that domestic violence

19   definition that you used as kind of the baseline for your

20   evaluations in this case?  Thank you.  There we go.  It's on

21   the ELMO now.  Is that it?

22          A.     Yes, that's it.

23          Q.     What does it say?

24          A.     Domestic violence is a pattern of assaultive

25   and coercive behaviors often including physical, sexual and

1    psychological attacks as well as economic coercion that

2    adults and adolescents use against their intimate partners.

3              Q.     What is there in the parentheses?

4              A.     This definition was adopted in 1998 by the

5    National Counsel of Juvenile and Family Court judges.

6              Q.     Okay.  So is it a social worker definition or a

7    judicial definition?

8              A.     I would say this is judicial.

9              Q.     Okay.  And that's the definition that you use

10   as the foundation for your evaluation in this case?

11             A.     Right.

12             Q.     Okay.  Now, let's talk about the first part of

13   the definition, pattern of assaultive and coercive

14   behaviors.  What exactly does that involve?

15             A.     Well, "pattern" means I can't call it domestic

16   violence if it's once.  I'm looking for a series.

17             Q.     Okay.

18             A.     "Assaultive" is a physical attack of some sort.

19   "coercive," control.  These are behaviors that I'm looking

20   at.

21             Q.     Okay.  Now, these are behaviors found in the

22   abuser?

23             A.     In what the abuser has done too, yes.

24             Q.     Okay.  Now, let me ask you, in your experience

25   and research are these behaviors most often manifested by the

1    abuser on the abused in a public or private context?

2         A.    Private.

3         Q.    Okay.  All right.  Is that one of the reasons

4    that domestic violence has a great deal of myth about it and

5    a great deal of --

6         MR. MARTINEZ:  Objection.  Leading.

7         THE COURT:  Don't lead.

8    BY MR. PATTERSON:

9         Q.    Okay.  Does that result in certain

10   misapprehensions about domestic violence?

11        A.    Yes.

12        Q.    Okay.  And what are they or why is that so?

13        A.    Because domestic violence for the most part

14   occurs behind closed doors.  We don't have witnesses like you

15   might to a robbery.  So trying to elicit information about

16   what's gone on behind those closed doors necessarily comes

17   from the victim.  Sometimes we get lucky, and by that I mean

18   she's told one or two people or somebody happens to see

19   something.  I don't often have victims that are fortunate in

20   that way.

21        Q.    Okay.  And certainly there's a range of

22   behaviors that you're assessing here, right?

23        A.    Right.

24        Q.    On the part of the abused -- abuser?

25        A.    Right.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          Q.     In your research in your clinical experience,
2     do you find that the more extreme behaviors like violent
3     behavior are manifested in a public setting or in a private
4     setting?
5          A.     In my experience it's private.
6          Q.     Okay.  For instance, actual physical violence,
7     does that often or frequently happen in the public sector in
8     view of other witnesses?
9          A.     No, it does not.
10         Q.     Okay.  Where does that generally occur?
11         A.     Inside the home.
12         Q.     All right.  In your experience, according to
13    the research, is there a difference, if you will, between the
14    behavior of the abused person in the presence of the
15    controlling person or abuser as opposed to being in the
16    presence of persons who are not the abuser in the
17    relationship?
18         A.     Yes, there's a difference.
19         Q.     Okay.  In your research and in your clinical
20    practice, based upon what you know about this issue, would
21    you expect to see the abuser resort to the controlling
22    behaviors in the public sector in the presence of other
23    witnesses?
24         MR. MARTINEZ:  Objection.  Asked and answered.
25         THE COURT:  Overruled.  Go ahead, answer the

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000007679

1    question.

2          THE WITNESS:  Can you repeat it?

3    BY MR. PATTERSON:

4          Q.    Okay.  In your -- in the research in your

5    clinical experience, would you expect to see the controlling

6    behavior of the abuser obviously manifest itself in the

7    public context in front of other witnesses?

8          A.    Okay.  The answer is sometimes.

9          Q.    Okay.

10         A.    And there's a specific reason for an abuser to

11    do that in the public setting.

12         Q.    Okay.  And what is that reason?

13         A.    One way of controlling a victim in public is by

14    the use of a look.  He doesn't have to say anything.  He

15    gives her the look.  The only person who knows that look for

16    sure usually is the victim unless somebody else has seen that

17    happen to her.  So that is a method of control that's often

18    used in a public place.

19         Q.    Okay.  That look then would not be appreciated

20    by the general public that was observing them together?

21         A.    Correct.

22         MR. MARTINEZ:  Objection.  Leading.

23         THE COURT:  Don't lead.

24    BY MR. PATTERSON:

25         Q.    Okay.  Would you find it unusual in your

1   experience or in the research that co-workers of Ms.

2   Andriano, in fact her subordinates, if you will, did not

3   observe Joe Andriano, the abuser in this case, publicly abuse

4   his wife in their view?

5           MR. MARTINEZ:  Objection.  Lack of foundation.  She

6   doesn't have how they observed her.

7           THE COURT:  Overruled.  Answer the question if you

8   can.

9           THE WITNESS:  I would not expect Wendi's subordinates

10   to see that.

11   BY MR. PATTERSON:

12           Q.    Okay.  In your experience, according to the

13   research, it would be unusual for colleagues to witness the

14   abuser abusing the person?

15           MR. MARTINEZ:  Objection.  Leading.  Asked and

16   answered.

17           THE COURT:  Sustained.  Don't lead.

18   BY MR. PATTERSON:

19           Q.    Okay.  According to the research, what would be

20   unusual in that context?

21           A.    I got lost with all of that.  Can you repeat

22   it?

23           Q.    Okay.  I'm just trying to ascertain from you

24   according to the research, in your clinical experience, we

25   posed as a -- as a fact in this case that persons working

1    with Wendi called her the person in charge, the person who

2    wore the pants.  Those are his words, okay?  Do you find that

3    observation by subordinate co-workers to be unusual in the

4    context of domestic relations or domestic violence?

5         A.   I'm actually not surprised to hear they might

6    see it that way because that actually appears, from her

7    report, she was the one who was taking care of everything.

8    Joe was pretty dependent upon her for income and livelihood

9    and household and all of that, so that could appear on the

10   surface of things, without knowing what's going on behind

11   closed doors, she could appear to be a strong woman.

12        Q.   Okay.  In your experience according to the

13   research are there differences in characteristics or conduct

14   of the abused woman in the public sector when she's away from

15   the controlling person?

16        A.   There would be.  I would expect to find

17   differences in the public versus private.

18        Q.   Okay.  Let's talk specifically about the Rick

19   Freeland circumstance.  Did you find any evidence based upon

20   what was told to you or what you read in this case that Rick

21   Freeland was an abusive personality or abuser in the

22   relationship that he had with Wendi?

23        MR. MARTINEZ:  Objection.  Relevance.

24        THE COURT:  Sustained.

25        MR. PATTERSON:  No, no.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          THE COURT:  Let me see Counsel here.

2

3                  (The following proceedings were held at the

4     bench:)

5

6          THE COURT:  Go ahead.

7          MR. PATTERSON:  He made many, many times the point

8     that she stood outside and pounded on his door and stood up

9     to him.  It's a completely different circumstance when a

10    person stands up to a nonabusive personality.  She would

11    never do this to Joe and --

12         THE COURT:  Hold on a second.

13         MR. PATTERSON:  -- that's going to be the follow-up

14    questions.

15         THE COURT:  Hold on a second.  Repeat your question

16    for me again.

17         MR. PATTERSON:  Can you find any evidence of abusive

18    relationship between Rick Freeland and Wendi.

19         THE COURT:  Okay.  Mr. Maritnez?

20         MR. MARTINEZ:  How is that relevant?  He could

21    certainly --

22         THE REPORTER:  Step closer to the mic, Counsel.

23         THE COURT:  Come up here.

24         MR. MARTINEZ:  Sorry.  How is that relevant whether

25    or not he was a batterer or not?

1          MR. PATTERSON:  Because he's not a batterer she could

2     stand up to him.  The batterer is who she couldn't stand up

3     to.

4          THE COURT:  Okay.  I understand what you're asking.

5     I'll overrule the objection.

6

7               (The following proceedings were held in open

8     court:)

9

10         THE COURT:  The objection is overruled.

11              Mr. Patterson, can you repeat the question?

12    BY MR. PATTERSON:

13         Q.    In your evaluation of this case did you find

14    any evidence to conclude that the relationship Wendi had with

15    Rick Freeland was an abuser-abused victim relationship?

16         A.    No evidence.

17         Q.    Okay.  Is there a difference then between the

18    relationships that an abused person has with other

19    individuals as opposed to the relationship she has with the

20    abuser?

21         A.    Certainly.

22         Q.    Okay.  Do you find it unusual then that Wendi

23    on one occasion stood outside Mr. Freeland's door and

24    insisted that he come out and speak with her about certain

25    issues that they had concerning the relationship in light of

1    the fact that Mr. Freeland was not an abuser of her?

2         A.    In light of the fact that the relationship she

3    had with Rick Freeland appears to be quite different from

4    because of the lack of abusiveness and violence, I would

5    anticipate that she would act differently in a relationship

6    with a nonabuser, so am I struck by her banging on the door

7    or whatever it was that we've heard that she has done?   I

8    think there's a wide range of behaviors she could engage in,

9    and that is one that she's now free to do.

10        Q.    All right.  Would you expect to see that same

11   kind of behavior with Joe Andriano?

12        A.    No.

13        Q.    Okay.  Let's talk about those five or six times

14   that the Government attorney suggested that, I think his

15   words were signs of strength where she actually disobeyed an

16   order, if you will, of Mr. Andriano.  Of what duration did

17   you examine this relationship?  What length is this

18   relationship?

19        A.    Eight years.

20        Q.    Okay.  If as he suggests it's five or six times

21   that she displayed some sign of strength, do you find that

22   unusually or extremely frequent in the eight year period

23   you're evaluating?

24        A.    Five or six times out of eight years is

25   infinitesimal, I would think.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1   Q.  Is there any way to calculate what percentage

2 that is in terms of their interpersonal relationship?

3    A.  I wouldn't know how to do that.

4   Q.  All right.  Let's talk about the specifics then

5 of these particular incidents where he, quote, showed signs

6 of strength, closed quote.  The cheese crisp incident.  In

7 your report, page 16, you reflect that Wendi told you that

8 Wendi's friend Chris picked her up to take her to the game?

9    A.  Right.

10   Q.  Okay.  What did she mean by that?  What did --

11 what was the fact that was delivered to you by Ms. Andriano

12 in that regard?

13    A.  That she must have ridden with her.

14   Q.  Okay.  Knowing then that it may have presented

15 an inconvenience to the driver, is that something that needs

16 to be factored in here in terms of whether or not she

17 actually stood up to Mr. Andriano?

18    MR. MARTINEZ:  Objection.  Speculation as to whether

19 or not it was inconvenient to Ms. Hashisaki.

20    THE COURT:  Overruled.  Go ahead, answer the question

21 if you can.

22    THE WITNESS:  There's an assumption then she would

23 have to say to her friend, "Can you turn around, take me to

24 the restaurant or store," whatever, "drive me back home and

25 then we'll go to the game."

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    BY MR. PATTERSON:

2         Q.    Okay.  And what was the response apparently of

3    Mr. Andriano when she declined to do as he instructed?

4         A.    He kept calling her cell phone and started

5    screaming at her to come home.

6         Q.    When she ultimately arrived home, what

7    happened?

8         A.    He screamed at her about why it took her so

9    long and accused her of being with a man.

10        Q.    Okay.  Did the violence escalate?

11        A.    Violence escalated as they went into the

12   bedroom.

13        Q.    And what happened?

14        A.    He followed her in screaming accusations, she's

15   trying to pacify him -- I'm sorry, what do you want me to

16   do -- keep the peace while she's getting into bed.  And it

17   was at that point somewhere in that time period that he

18   poured the pitcher of Kool Aid over her while yelling at her,

19   pounding on the dresser punching holes in it, breaking some

20   of the drawers, breaking the post on the bed, et cetera.

21        Q.    Okay.  Now, in your evaluation and assessment,

22   do you look at the whole pattern of behavior in terms of

23   determining whether or not there's a problem here?

24        A.    Yes.

25        Q.    Okay.  Is that why you cited this particular

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1      instance?  Did you use it to show his response?

2              MR. MARTINEZ:  Objection.  Leading.

3              THE COURT:  Don't lead.

4      BY MR. PATTERSON:

5          Q.    Okay.  Talk to me about why it's important when

6      she did do one thing, okay, decline to go get him the cheese

7      crisp and then the resulting behavior, why that's important

8      in your assessment in this case?

9          A.    I have to operate while doing an assessment

10     from the knowledge that I have about domestic violence in

11     general, about what the research says, based on my clinical

12     experience in addition to the research, et cetera.  So I

13     know that what I'm looking for is how do women or a

14     particular woman respond to the violence.  I'm looking for

15     first assault, worst assault, sometimes worst and last are

16     the same.  I'm looking at how she's responding to that, what

17     has she learned about that violence and abuse.

18         Q.    Okay.  And what lesson did she learn as a

19     result of this particular behavior on the part of Mr.

20     Andriano?

21         A.    That I better do what I'm told.

22         Q.    Okay.

23         A.    Don't be late.

24         Q.    Okay.  All right.  Let's talk about the Las

25     Vegas trip.  She went to Las Vegas with her mother, okay, and

1    then at a later time her girlfriend, Barbara showed up, okay?

2    These were prepaid tickets, okay, over and back.  Knowing

3    that, does that play into your assessment here as to whether

4    or not this was a time that she showed a sign of strength and

5    said no to Mr. Andriano?

6              MR. MARTINEZ:  Objection.  Assuming facts not in

7    evidence.

8              MR. PATTERSON:  Good faith basis, Judge.

9              THE COURT:  Overruled.  Go ahead, answer the

10   question.

11             THE WITNESS:  Okay.  She already had the ticket.

12   She's with mom and Barbara, who I think is a cousin.

13   BY MR. PATTERSON:

14        Q.    Right.

15        A.    She's on the trip.  He knows when she's coming

16   home.  He's asking her to come home a day early.  Am I

17   surprised she said no?  I'm not surprised she said no.

18        Q.    Okay.  In your estimation was there a sign of

19   strength where she actually stood up to Joe Andriano?

20        A.    I don't know that "strength" is the right word.

21        Q.    Okay.  There may have been other factors that

22   played into this decision?

23        A.    Yeah.  She's got two support people with her.

24        Q.    All right.  In any event, as a result of that

25   decision were there adverse consequences at least in terms of

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1   the behavior of Mr. Andriano?

2           A.    Yes.

3           Q.    What happened?

4           A.    He pulled up into the airport, stopped the

5   vehicle in a lane in which there was moving traffic, grabbed

6   their suitcases, threw them into the vehicle, and then drove

7   home at somewhere around 100 to 110 miles per hour on the

8   freeway.

9           Q.    Okay.  Again, that behavior on the part of Mr.

10  Andriano, does that factor into your assessment in this

11  particular case?

12          A.    Yes.

13          Q.    And why is that?

14          A.    Well, number one, it's abusive and violent

15  behavior.  Number two, there's an intended victim, only in

16  this case there were three intended victims because there

17  were three people in the vehicle besides himself.  There's no

18  thought about consequences.  Those are all -- that's part of

19  the picture.

20          Q.    Okay.  Do we see a recurrent pattern in these

21  episodes?  When Mr. Andriano doesn't get his way, there are

22  consequences to Mrs. Andriano.

23          MR. MARTINEZ:  Objection.  Leading.

24          THE WITNESS:  Yes.

25          THE COURT:  Overruled.


          TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

# APPENDIX V - Part 3

```
 1    BY MR. PATTERSON:

 2         Q.    All right.  We talked about the concept of

 3    isolation.  Is that -- is there an ongoing kind of dynamic

 4    here in terms of isolation over the course of the

 5    relationship?

 6         A.    Yes.

 7              MR. MARTINEZ:  Objection.  Leading.

 8              THE COURT:  Overruled.

 9              THE WITNESS:  Yes.

10    BY MR. PATTERSON:

11         Q.    Tell me about that?

12         A.    Well, from the -- from Wendi's words, it

13    started at the time of the planning for the wedding.

14         Q.    Okay.

15         A.    So that's pretty early on in the relationship.

16    And he allowed certain people in --

17         Q.    Okay.

18         A.    -- her life, her parents in particular, and he

19    disallowed other people so that her circle was her parents,

20    sometimes his parents, because they were apart, sometimes his

21    sisters.  Because they were apart at different periods in

22    their history, the -- he allowed in the people she worked

23    with, but it -- nowhere did she ever talk about any other

24    relationships.

25         Q.    Okay.  Would you expect to see a continuous
```

1    pattern of the abuser saying to the abused victim no, you

2    can't this person and next week no, you can't this person and

3    then -- I mean, or is there a point in time when the abused

4    victim says Okay, I know he ain't going to let me do it

5    anyway, I quit?

6             A.    In my experience it doesn't take a real long

7    time for a woman to learn what she can and cannot do, so

8    oftentimes women just give up in that process.

9             Q.    Okay.  According to the information you've been

10   able to uncover in this case, the reports of Wendi, did she

11   have any significant male friends that were known by Mr.

12   Andriano and approved by Mr. Andriano?

13            A.    I don't remember her mentioning any men in her

14   employ.

15            Q.    Correct.  Any other social friends that were

16   known to Mr. Andriano and approved by Mr. Andriano?

17            A.    You know, Joe had male friends and so when they

18   would go to the lake there must have been a lot of males

19   there.  They were Joe's friends.  I don't remember Wendi ever

20   talking about them as her friends.  Other males?  I don't

21   recall any other males.

22            Q.    Okay.  Is that something of significance in the

23   concept of isolation?

24            A.    Certainly.

25            Q.    Okay.  All right.  On those times where she

1   would go out with her female colleagues, okay, is the fact

2   that he would call her cell phone constantly during those

3   times when she was away from him significant?

4          A.    Yes.

5          Q.    Okay.  And why is that?

6          A.    Well, it's another form of control.  When the

7   person's not near you, you've got to find another way to

8   control them.  Cell phones today are a great way to control

9   your victim.

10         Q.    Okay.  Let's talk about the economic abuse.

11  Mr. Andriano's employment history was sporadic at best,

12  correct?

13         A.    Correct.

14         Q.    Okay.  Is the fact that she apparently was

15  allowed to write checks to APS or to the supermarket for

16  groceries, as Mr. Martinez described, controlling the

17  checkbook?  Is that -- if those checks were used for those

18  purposes, is that significant in terms of not finding her to

19  be subject to economic abuse in this case?

20         A.    There are several parts to your question.

21         Q.    It was a poorly drafted question.  If you want

22  me to do it again, I will.

23         A.    Yes, please.

24         Q.    Talk to me again about economic abuse?

25         A.    The way it's generally used in our society, the

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    man is the bread winner and controls the money and doles it

2    out.   In an abusive relationship typically money is given to

3    the woman to do the things she has to do like go to the

4    grocery store, and there's a million case histories about

5    having to account for each penny when she comes home.   In

6    this relationship, the money is a little bit different

7    because it appears Wendi is the bread winner.

8            Q.    When that money comes into the family --

9            A.    Right.

10           Q.    -- for discretionary expenditure?

11                 Okay.   Who apparently was making those

12   decisions?

13           A.    Joe Andriano.

14           Q.    Okay.   And towards what end was he making those

15   expenditures?

16           A.    To the toys, the boats, the parts, those kinds

17   of things.

18           Q.    Okay.   And how is that in this case abusive of

19   Wendi Andriano?

20           A.    Well, if it's benefitting only one party, that

21   money is being taken away from the household expenses and

22   paying bills.

23           Q.    Okay.   Is that essentially the same thing that

24   happens when the man is the bread winner in terms of making

25   the discretionary expenditure decisions?

1          A.     Right.

2          Q.     When he makes it, he spends it in a manner that

3     he wants?

4          A.     Right.

5          Q.     Okay.  And we're saying the same thing in this

6     case?

7          A.     Right.

8          Q.     All right.  You did a number of things in this

9     case.  The things you did in this case, were they generally

10    accepted in your profession in order to come to conclusions

11    about whether or not domestic violence exists in a particular

12    relationship?

13         A.     Yes, in two ways.

14         Q.     Okay.  How's that?

15         A.     Well, first of all, I am a social worker and I

16    have to abide by that particular code of ethics.  That's one

17    arena, but I'm also conducting a domestic violence assessment

18    for the Court.

19                There is no license for a domestic violence

20    expert.  You know, you can get a license for social work and

21    license for psychology, but as far as I know there's no

22    license for domestic violence assessment.  So my job is to

23    know the literature, to understand the research, to have a

24    good strong background in clinical practice, to understand

25    what women are saying when they say it, to learn how to put

1    things in context, to understand the nature of the

2    relationship.  To that end, I need to use the best tools that

3    I know of.

4              What we have isn't perfect.  Neither are any

5    psychological tests perfect.  I have to look for tools. When

6    they are scored instruments, I've got to look to make sure

7    they are valid and reliable, that's number 1.  Then, number

8    2, are they doing what they set out to do.  That's one

9    piece.  I don't put phenomenal stock in things just because

10   they get a score.  26 items cannot possibly tell in full the

11   story of physical abuse or nonphysical abuse.  It's

12   impossible.  That's why I have to use multiple tools.  I

13   can't imagine if you asked every domestic violence expert --

14            MR. MARTINEZ:  Objection.  Narrative.

15            THE COURT:  Sustained.  Ask your next question.

16   BY MR. PATTERSON:

17       Q.    Why is it important to do it in the fashion

18   that you're doing it this way?

19       A.    To the very best of my knowledge, people who do

20   this work put a tremendous stock in the clinical interview.

21   That's where the story unfolds.  That's what dictates what

22   tools I use, where I go, how I do it, how long I need to do

23   it for.

24       Q.    Okay.  Let me ask you then, there's some

25   suggestion you didn't use the MMPI?

1          A.    Correct.

2          Q.    Minnesota Multiphasic Personality Inventory.

3    Is that an instrument that's generally accepted in your

4    industry?

5          A.    Well, first of all, I couldn't use it because

6    the only people allowed to use it are licensed psychologists

7    and I am not.

8          Q.    Okay.

9          A.    So that would rule it out for me anyway.

10         Q.    All right?

11         A.    But besides that, there's a tremendous amount

12   of material written about the MMPI-I or II, whichever one we

13   want to talk about, that clearly indicates that it's not the

14   tool of choice.  However, having said that, there is a

15   subscale that does look at PTSD.

16         Q.    Okay.  You -- that's an acronym.  Tell us what

17   that means?

18         A.    Post Traumatic Stress Disorder.

19         Q.    Okay.  So it has a narrow application in PTSD

20   evaluation?

21         A.    Right.

22         MR. MARTINEZ:  Objection.  Leading.

23         MR. PATTERSON:  I'm just reiterating what she said.

24         THE COURT:  Overruled.

25         THE WITNESS:  There may or may not be information.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1            MR. MARTINEZ:  Objection.  Lack of foundation that

2  she knows about these type of tests.

3  BY MR. PATTERSON:

4            Q.    Have you researched this issue in this

5  particular?

6            A.    I have.

7            Q.    Are there articles pertaining to this

8  particular --

9            A.    There are.

10           Q.    Based on the articles, what is your opinion in

11  that regard?

12           A.    My opinion is the MMPI --

13           MR. MARTINEZ:  Objection.  She's not an expert in

14  that area.

15           THE COURT:  Overruled.

16           THE WITNESS:  My opinion is that the MMPI-II,

17  although a wonderful instrument for many other reasons,

18  cannot possibly give you information about a domestic

19  violence history.  It wasn't created to do that.  It wasn't

20  normed in that way.

21  BY MR. PATTERSON:

22           Q.    Okay.  Using that term again, "normed."  What

23  do you mean by that?

24           A.    Would have to be tested with a group of people

25  who are known to not be victims of domestic violence and a

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    group who are known to be.  Then you look at the result.

2    There's a number of statistical analytical formalities you

3    have to go through and come up with a norm, meaning a score.

4         Q.    Okay.  Any other information in the MMPI that's

5    relevant to our circumstances here?

6         A.    What I would say is that the MMPI-II can

7    certainly be used in doing an assessment for domestic

8    violence if it is used in conjunction with a good solid

9    clinical interview and other appropriate tools directly

10   relevant to domestic violence, which the MMPI-II is not.

11        Q.    Okay.  Now, the county attorney suggested the

12   concept of secondary gain, and in fact a client may lie to

13   you for other purposes?

14        A.    Right.

15        Q.    Were you mindful of that concept before you

16   engaged in your discussions with Wendi Andriano?

17        MR. MARTINEZ:  Objection.  Vouching.

18        MR. PATTERSON:  Opened the door.

19        THE COURT:  Let me see Counsel at the bench.

20

21             (The following proceedings were held at the

22   bench:)

23

24        THE COURT:  Go ahead.

25        MR. MARTINEZ:  She's now going to say she was mindful

1   which means she is now a lie detector.  I specifically asked

2   her in your report it says this, in your report it says that.

3   I never asked her if she believed it or not believed it.  We

4   just went over what the statement was and whether or not

5   there were any inconsistencies.  I never asked her if she

6   believed or not.  If we are allowed to get into this

7   particular area, she, of course, is going to, per her

8   interview, say that she spends too much time because she

9   could then get a feel for the person and because of that she

10  could then turn around and say they're being truthful or not.

11          THE COURT:  Mr. Patterson?

12          MR. PATTERSON:  I told you this was coming, Judge.

13  He suggested that the only reason she came to these

14  conclusions is based upon the information supplied by my

15  client and that my client was lying to her.  Her opinions are

16  invalid.  I told you that was going to happen.  He did do

17  that.  He opened the door wide open.  I'm not -- she's not

18  going to say "I think she was telling me the truth."  She's

19  going to say I asked for the sorry -- or asked for the story

20  in several different manners and I reasked questions.  I go

21  over certain areas and I do that to determine whether or not

22  there is lying in the case.  That's not vouching for the

23  client in any fashion.  It's the methodology of her work that

24  he's already attacked.

25          THE COURT:  Go ahead.

1       MR. MARTINEZ:  I never asked her whether or not her

2   client was lying.  I asked her about specific instances in

3   the report and then I tested them against other evidence that

4   had already been produced in court.  I never indicated to

5   her, well, how was -- weren't you -- in other words, I didn't

6   say to her, are you sure she was telling you the truth, and

7   then the door would have been open.  I never did do that.

8       THE COURT:  I'll give you the final word.

9       MR. PATTERSON:  He doesn't have to ask expressly was

10  she telling the truth or not.  He said in one of his

11  questions, one of his questions, you're whole report is based

12  upon the validity of what she told you, isn't it?  And that's

13  what I need to be allowed to ask her.  She's going through

14  different methodology to eliminate it.

15      THE COURT:  Okay.  I'm going to let you -- I'm going

16  to let you ask the question you just asked, which was

17  basically whether if she was mindful of the possibility of

18  second --

19      MR. MARTINEZ:  Secondary gain.

20      THE COURT:  Secondary gain, period.

21      MR. MARTINEZ:  Yes or no.

22      THE COURT:  Don't go any further than that.

23      MR. PATTERSON:  I need to be allowed to ask her

24  whether she -- when she conducted her unstructured interview

25  in a fashion to minimize that possibility.

1          MR. DELOZIER:  And what it is.

2          THE COURT:  I'll let you ask the previous question

3     that you asked and that question.  Don't go beyond that.

4          MR. PATTERSON:  Okay.

5          MR. MARTINEZ:  And, Judge, the first question calls

6     for a yes or no answer.  I don't want her to go --

7          THE COURT:  I'm going to let you lead.  Just have her

8     answer yes or no.

9          MR. DELOZIER:  To the first one?

10         THE COURT:  To both.

11         MR. PATTERSON:  Well, I'm allowed in this context to

12    explain or have her explain what the concept of secondary

13    gain is and then follow-up with the efforts she made to

14    minimize that possibility.

15         THE COURT:  She already explained it yesterday.

16         MR. PATTERSON:  Well, we've been up here for 20

17    minutes.

18         THE COURT:  She didn't know what it was yesterday

19    basically until he pressed her on it.

20         MR. PATTERSON:  She acknowledged that.

21         THE COURT:  So it's already out there.  Just ask the

22    two questions that we just discussed.

23         MR. PATTERSON:  All right.

24         THE COURT:  Lead.

25     / / / / /

1              (The following proceedings were held in open

2      court:)

3

4              THE COURT:   Mr. Patterson.

5      BY MR. PATTERSON:

6              Q.     You stated yesterday in response to the county

7      attorney's question that the possibility exists when a

8      client's telling you the story, okay, that there will be the

9      potential for secondary gain and they may be fabricating,

10     correct?

11             A.     Yes.

12             Q.     Okay.  Do you employ efforts or techniques in

13     your unstructured interview process to minimize the potential

14     or probability of that phenomenon occurring?

15             A.     Yes.

16             Q.     Okay.  Do you employ efforts in the process of

17     the assessment of collateral interviews?

18             A.     Yes.

19             Q.     Okay.  And what are they?

20             A.     Those are interviews with outside persons that

21     may have witnessed or had some knowledge of, in this case,

22     domestic abuse.

23             Q.     Okay.  And why do you do that collateral

24     interviewing process?

25             A.     To see if there's corroboration.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          Q.     Let's talk about this power and control wheel.

2     What part does that play in the totality of the assessment?

3          A.     It's just the beginning.  It helps me to make

4     some initial thoughts about am I going to find what I'm going

5     to find here or, you know, do we end now or is there enough

6     information that I need to proceed.  It's -- it's how I

7     start.  You know, we do a couple hours of clinical interview

8     when we do that.

9          Q.     Okay.  Have there been circumstances -- how

10    many assessments have you done?

11         A.     I'd have to go back to my notes.

12         Q.     I'm not talking about the ones in court but the

13    ones in general?

14         A.     Oh.  Over 1000.

15         Q.     Okay.  Were there objections in those other

16    sessions or assessment situations where using the power

17    control wheel you stopped and determined that there was no

18    need to go any further based upon the results of the power

19    and control wheel?

20         A.     Yes.

21         Q.     And typically what kind of responses would you

22    see to the power and control wheel that led you to believe

23    there was no need to go any further?

24              MR. MARTINEZ:  Objection.  Relevance.

25              THE COURT:  Overruled.  Go ahead, answer the question

1    if you can.

2            THE WITNESS:   Well, I'm looking to see if there's

3    examples.   If there's no examples to those items or at least

4    the majority of them, it doesn't look like I'm going to find

5    domestic violence.

6    BY MR. PATTERSON:

7            Q.    Okay.  So similar to what we have here, you

8    give the power and control wheel to these other individuals

9    and they didn't cite to you specific concrete examples of

10   circumstances that the client fit into the wheel?

11           A.    Right.

12           Q.    Okay.  In this case with Wendi, was that the

13   case or is there something different at work here?

14           A.    Well, no, because she had examples for seven

15   out of eight.

16           Q.    Okay.  And is it important they give you any

17   number of specific examples for each portion of the pie?

18           A.    Actually, I directed her to just give me one.

19           Q.    Okay.  So what could you do if you find that

20   there are a number of responses to the various portions of

21   the pie?

22           A.    Well, sometimes the person will actually say

23   that you just want one?  Because there's an indication there

24   must be more than one.  And it depends, if I'm doing an

25   assessment for court then I'm probably going to want more


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000007705

1      than one, but I don't need more than one right now at this

2      moment to make a decision.  If you didn't have -- you've  got

3      examples for 7 out of 8, let's say, then that gives me

4      information.  I'm going to go forward.  I'm going to get that

5      information in the context of the story.

6                Q.    Okay.  Now, in those circumstances where you

7      gave the power control wheel and based upon the responses

8      included therein, you determined there was no need to go any

9      further?

10               A.    Right.

11               Q.    Did you call the attorney in that regard if

12     there was one?

13               A.    Yeah.

14               Q.    And essentially did you tell them there's no --

15               A.    That he didn't have a domestic violence case.

16               Q.    Okay.  All right.  Let's talk about --

17               THE COURT:  Let me see Counsel here at the bench for

18     just a moment.

19

20                     (The following proceedings were held at the

21     bench:)

22

23               THE COURT:  Sounds like you're going to be a little

24     bit more.

25               MR. PATTERSON:  Yeah, it's --


                 TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

```
 1            THE COURT:  We'll take our afternoon break at this

 2     point in time.

 3            MR. PATTERSON:  Okay.

 4

 5            (The following proceedings were held in open

 6     court:)

 7

 8            THE COURT:  Let's take our afternoon break at this

 9     point in time.  Remember this entire admonition including the

10     fact you're not to discuss this case with anyone, do not let

11     anyone discuss the case with you, keep an open mind about the

12     case.  We'll see you in about 20 minutes.  We'll be in

13     recess.

14

15            (Recess.)

16

17            THE COURT:  This CR 2000-096032, State of Arizona

18     versus Wendi Elizabeth Andriano.  The record will reflect the

19     presence of the Defendant, Counsel and the jury.  Sharon

20     Murphy is on the witness stand.  We'll continue with the

21     examination by Mr. Patterson.

22            Mr. Patterson?

23            MR. PATTERSON:  Thank you, Judge.

24     / / / / /

25     / / / / /
```

1    CONTINUED REDIRECT EXAMINATION BY MR. PATTERSON:

2         Q.    You are Dr. Murphy?

3         A.    Yes.

4         Q.    And you're the same Dr. Murphy that was

5    testifying before the break?

6         A.    Yes.

7         Q.    You realize you're still under oath?

8         A.    Yes.

9         Q.    Before we move to Shawn King, let me ask you a

10   follow-up question to what we were discussing earlier.  I

11   said on some cases at the point in time when you got to the

12   power and control wheel you decided nothing was there, you

13   called the attorney and backed off.  Were there other cases

14   when you went farther into the process and discovered there

15   was no domestic violence issue in that case and informed the

16   responsible attorney in those regards?

17        A.    Yes.

18        Q.    Okay.  Was there a time when you actually got

19   to the end and completed the process and told that attorney

20   what you had found?

21        A.    Yes.

22        Q.    Okay.  So in your discipline, are you free

23   to -- to render whatever opinion you feel is appropriate at

24   all parts of the assessment?

25        A.    Yes.

1     Q.    Okay.  Shawn King was the pastor's son and

2  apparently Wendi reported that he was her first real

3  boyfriend, right?

4     A.    Yes.

5     Q.    She never reported to you that it was a sexual

6  relationship with him, did she?

7     A.    She never reported that.

8     MR. MARTINEZ:  Objection.  Leading.

9     THE COURT:  Overruled.

10    MR. PATTERSON:  Did she ever --

11    THE COURT:  Overruled.  Go ahead and answer.

12    THE WITNESS:  She never reported that.

13  BY MR. PATTERSON:

14     Q.    Okay.  There was a time when there was a break

15  up of that relationship?

16     A.    Correct.

17     Q.    What were the circumstances as reported to you

18  by Wendi?  Page 4, I believe, of your report.  Actually, 3

19  going into 4.

20     A.    She came home from Mexico from the missionary

21  work.  She had made a decision about not being a couple with

22  him again.  Evidently told him about that.  She told him she

23  wanted to date other people.  He pulled the ring he had given

24  her off her finger.  He bit the ring causing the stone in her

25  ring to fall out, then smashed two of her car windows with a

1    rock.

2           Q.    All right.  How is that episode in the context

3    of a domestic violence assessment important?

4           A.    It's actually the first story that I have about

5    domestic violence.

6           Q.    Okay.  And is it something that -- you talked

7    about the term "conditioning".  Would it have some

8    relationship to that concept of conditioning?  First time she

9    breaks up with a boy, he breaks her windshield?

10          A.    Yes.  I remember mentioning, several days ago I

11    think, about the cumulative so this was the first of many and

12    most people learn about responses and it's something you tuck

13    away.

14          Q.    Okay.  And just so we understand the precise

15    verbiage that you provided in your report, would you read us

16    that last line relating to that incident?

17          A.    She did not report this incident to the police.

18          Q.    Okay.  Did she tell you that it was not

19    reported or that she did not report the incident?

20          A.    She did not report the incident.

21          Q.    Okay.  There were some errors in terms of dates

22    in your report, specifically in terms of times that may have

23    occurred.  Are there -- are there errors of that import in

24    your report?  He brought to your attention certain dates that

25    were inaccurate.  Are there any dates that you wish to

1    change?

2         A.    I don't remember dates that were inaccurate.

3         Q.    Okay.  There was a time when you relate that

4    Joe hired an attorney, and that's on page 12 of the report?

5         A.    Yes.

6         Q.    Okay.  At what point in time was that decision

7    made to retain an attorney according to your report?

8         A.    Well, the only thing I have to go by is the

9    preceding paragraph.  I have written Fall of 1998.  Then the

10   next paragraph goes into resuming life, fairly positive about

11   recovery, he hired an attorney to assist, et cetera.  Then a

12   couple sentences down from that, at this point, and I have

13   1999 or August of 1999, things began getting crazy again.

14        Q.    In the context of your report when do you

15   think that occurred?

16        A.    Between late '98 and the summer of '99.

17        Q.    Okay.  And Mr. Martinez talked to you about Mr.

18   Miller trying to get a hold of the parties, getting Mr.

19   Andriano on the phone and Mr. Andriano would pass the phone

20   then on to Wendi.  You said that there were a couple of

21   decisions being made in this process.  What did you mean by

22   that?

23        A.    Decisions.

24        Q.    Well, he suggested the decisions were being

25   made by Wendi and you resisted that ability to agree with

1   him.  Why do you resist?

2          A.    Because it fit the pattern that I had been

3   seeing that things that Joe didn't really want to have to

4   deal with he gave to Wendi to deal with, like getting more

5   money, going to work, those kinds of issues, so I wasn't

6   surprised to hear that he handed the thing -- the he wanted

7   the doctor to speak to Wendi.

8          Q.    And is there is a decision in that process

9   being made by Joe as to what things Wendi should be doing?

10         A.    Absolutely.

11         Q.    Okay.  Okay.  And there was some issue with

12  regard to the term "house" used in the power and control

13  wheel.  Please explain to us why the term "house" caused you

14  no -- no concern, it's not a big issue here?

15         A.    Okay.  This was an example of the statement

16  that she wrote outside of the piece using male privilege. And

17  I think that's the one we're talking about.  Is that correct?

18         Q.    Uh-huh.

19         A.    Have to drive home -- is that the one you're

20  referring to?

21         Q.    Leave the house secretly?

22         A.    To change diapers.

23         Q.    Right.

24         A.    Yeah, okay.  So the question is why was I --

25         Q.    The term "house," why do you -- why does that

1    lead you to believe it was at the San Riva and not at the

2    farm setup?

3         A.    Oh, you know, this is being said, she's writing

4    it and then gives it to me and then I give her the next

5    assessment tool.  I read that and I didn't think anything of

6    it because I know people use the word "home" to mean wherever

7    it is they're living.

8         Q.    Okay.

9         MR. MARTINEZ:  Objection.  Lack of foundation, how

10   she knows "house" and "home."

11        THE COURT:  Overruled.

12        MR. PATTERSON:  Go -- please continue your answer.

13        THE WITNESS:  So I wasn't thinking about which exact

14   location she was talking about, whether it was an apartment

15   or whether it was the house on the farm.

16        Q.    Okay.  But it was some information with regard

17   to the fact there were babies involved that led you to

18   conclude that it must have been at a certain location?

19        A.    That happened later.

20        Q.    Because according to the information supplied

21   to you by Ms. Andriano, where were they living after the

22   babies were born?

23        A.    I know they couldn't have been at the farm.

24        Q.    Okay.

25        A.    So they were at one of the apartments.

1          MR. PATTERSON:  Okay.  Judge, that's all I have.

2     Thank you.

3          THE COURT:  Are there any further questions of this

4     witness by the jury?  If so, please raise your hand.

5

6               (The following proceedings were held at the

7     bench:)

8

9          MR. PATTERSON:  I'll stand on this side because it's

10    my witness.

11         THE COURT:  Question, "Based on information presented

12    to you in court, does your picture, analysis of Wendi

13    change?"

14         MR. PATTERSON:  Fair question.

15         THE COURT:  No objection?

16         MR. MARTINEZ:  I'm not -- I'm not clear as to -- is

17    it the stuff that happened in court, if it's based on the

18    information presented in court, okay, yeah, I have no

19    objection.

20         THE COURT:  Okay.  Next question, "In your opinion is

21    it possible that Joe was a victim of domestic violence at the

22    hands of Wendi?"

23         MR. MARTINEZ:  No objection.

24         MR. PATTERSON:  No objection.  I think I'm supposed

25    to go first.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1      MR. MARTINEZ:  Oh, I'm sorry.

2      THE COURT:  Question, "What percentage of the

3  population of the United States, Arizona, would you expect to

4  be victims of domestic violence?"

5      MR. MARTINEZ:  I don't know how that's relevant in

6  this case.  Let's assume it's one percent.  How is that

7  relevant?

8      MR. PATTERSON:  I oppose it.

9      THE COURT:  What?

10      MR. PATTERSON:  I object.

11      THE COURT:  Okay.  I'm not going to ask that

12  question.

13          Next question, "How many persons, clients,

14  victims of domestic violence have you worked with as part of

15  your clinical practice?"

16      MR. PATTERSON:  Fair question.

17      MR. MARTINEZ:  Yeah, I agree.

18      THE COURT:  Next question, "Is it typical for victims

19  of domestic violence to go out or be allowed to go out with

20  friends socially on a weekly or more frequent basis?"

21      MR. MARTINEZ:  No objection.

22      MR. PATTERSON:  No objection.

23      MR. MARTINEZ:  Sorry.

24      THE COURT:  Next question, "Is it typical for victims

25  domestic violence to work full time outside the home?"

1          MR. PATTERSON:  No objection.

2          THE COURT:  Next question, "Do you consider yourself

3     to have a good strong clinical background?"

4          MR. PATTERSON:  No objection.

5          MR. MARTINEZ:  No objection.

6          THE COURT:  Next question, "Can a person give false

7     answers, give answers to make themselves look, quote, abused,

8     end of quote?"

9          MR. PATTERSON:  It's a fair question.

10         MR. MARTINEZ:  No objection as long as it's a yes or

11    no answer.

12         THE COURT:  Next question, "In domestic violence

13    assessment is the -- in the domestic -- in domestic violence

14    assessment is the unstructured interview a sworn statement?"

15         MR. PATTERSON:  That's a fair question.

16         MR. MARTINEZ:  No objection.

17         THE COURT:  Next question, "Can the, quote, abused,

18    end of quote, also become the, quote, abuser, end of quote?"

19         MR. PATTERSON:  I have no objection.

20         MR. MARTINEZ:  No objection.

21         THE COURT:  Next question, "In your opinion is,

22    quote, abuse, end of quote, ever an excuse, end of quote?"

23         MR. PATTERSON:  Well, that's a legal question.  I

24    object to that.

25         MR. MARTINEZ:  An excuse for what?


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          MR. DELOZIER:  What?

2          MR. MARTINEZ:  Know what I mean?  I object on the

3    grounds it's not clear.  As an excuse for what?

4          THE COURT:  I'm not asking that question.

5             Next question, "Is it common for women who are

6    victims of domestic violence to have affairs even though they

7    are fearful of their abuser?  If yes, in general why?"

8          MR. PATTERSON:  I don't know if that's a common

9    knowledge kind of knowledge she would have an answer to, so I

10   object to it.

11         MR. MARTINEZ:  If she knows.  That's the kind of

12   thing we've talked about.  If she knows.

13         THE COURT:  Do you object?

14         MR. MARTINEZ:  No objection.

15         THE COURT:  Next question, "1. You put a list of

16   behaviors that you" -- what is that word?

17         MR. MARTINEZ:  Termed.

18         MR. PATTERSON:  Termed.

19         THE COURT:  Termed?  Okay.  "You put a list of

20   behaviors that you termed abusive, paren, ie. anger, silence,

21   raise your voice, et cetera, end of paren, yet these

22   behaviors are used by all people.  How do you determine when

23   is" -- when -- it says "when is."

24         MR. MARTINEZ:  When it becomes?

25         THE COURT:  It says "is".


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          MR. MARTINEZ:  Right.

2          THE COURT:  Or looks like "is."  "How do you

3    determine when it becomes domestic violence?"

4          MR. PATTERSON:  No objection.

5          MR. MARTINEZ:  No objection.

6          THE COURT:  Next question, doesn't the one-sidedness

7    of the test of characteristics of victim and abuser raise a

8    question, ie. all of Wendi's --

9          MR. MARTINEZ:  Looks like "were".

10         THE COURT:  Were?  No.

11         MR. MARTINEZ:  Use?

12         THE COURT:  Sorry, Wendi's use no cases except of

13   adult -- adultery -- except one of adultery.

14                 Doesn't the one-sidedness of the test of

15   characteristics of victim and abuser raise a question, ie.

16   all of Wendi's use --

17         MR. MARTINEZ:  She's saying all of Wendi's, no cases

18   except of adult -- one of adultery --

19         THE COURT:  And must -- mostly all infringements

20   where the husband's --

21         MR. MARTINEZ:  Only.

22         MR. PATTERSON:  I have no idea.  What is that? It's

23   unintelligible.

24         THE COURT:  I'm not asking that question.  I don't

25   understand it.

1           Next question, Did Wendi indicate --

2               MR. MARTINEZ:  How.

3               THE COURT:  Oh, man.  My eyes are bad.  "Did Wendi

4    indicate how the relationship with Rick Freeland ended?"

5           MR. PATTERSON:  That's fine.

6               MR. MARTINEZ:  No objection.

7               THE COURT:  Next question, "If so, who initiated the

8    breakup and why did it end, if you know?"

9               MR. PATTERSON:  Same, no objection.

10              MR. MARTINEZ:  No objection.

11              THE COURT:  Next question, "In your opinion do you

12   feel Wendi acted more independently at the end of her

13   relationship with Joe, ie. 2000?"

14              MR. PATTERSON:  No objection.

15              MR. MARTINEZ:  No.

16              MR. PATTERSON:  There's a "thank you" on there.

17              MR. MARTINEZ:  There's a "thank you" on there.  The

18   only one.

19              THE COURT:  Oh.  Thank you?  That juror's polite.

20                  Next question, "How can Joe have felt better or

21   superior to others and have" --

22              MR. MARTINEZ:  Low self esteem.

23              THE COURT:  -- low self esteem?  "How could Joe have

24   felt better or superior to others and have low self esteem?"

25              MR. PATTERSON:  No objection.

1          MR. MARTINEZ:  No objection.

2          THE COURT:  Next question, "Can both partners in a

3     marriage abuse each other?"

4          MR. PATTERSON:  No objection.

5          MR. MARTINEZ:  No.

6          THE COURT:  Next question, "In your opinion was Joe a

7     victim of domestic violence?"

8          MR. PATTERSON:  Objection.  It's --

9          MR. MARTINEZ:  Yeah.

10          MR. PATTERSON:  It's duplicative.

11          THE COURT:  "Was there a reason why you did not

12     interview either of Joe Andriano's parents or other family

13     members?"

14          MR. PATTERSON:  Well, that brings in victim's bill of

15     rights and I don't think they would have agreed to an

16     interview, so I -- I don't think she could answer that.

17          MR. MARTINEZ:  There was no request, so I don't

18     know.

19          THE COURT:  I'm not going to ask that question. As

20     long as everyone's up here, we're going to recess after this?

21          MR. PATTERSON:  Right.

22          MR. MARTINEZ:  Right.

23          THE COURT:  Okay.

24

25          (The following proceedings were held in open


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    court:)

2

3         THE COURT:  I have some additional question here for

4    you from the jury.  First question reads as follows.  "Based

5    on information provided to you in court, does your overall

6    picture analysis of Wendi change?"

7         THE WITNESS:  No, it does not.

8         THE COURT:  "In your opinion is it possible that Joe

9    was a victim of domestic violence at the hands of Wendi?"

10        THE WITNESS:  No, I believe that's not possible.

11        THE COURT:  Next question reads as follows.  "How

12   many patients, clients, victims of domestic violence have you

13   worked with as part of your clinical practice?"

14        THE WITNESS:  At some point during the testimony I

15   said over 1000.  That's -- that number comes predominantly

16   from clinical practice.  I've only done 14 actual cases that

17   were within the criminal or civil court system.

18        THE COURT:  Next question reads as follows.  "Is it

19   typical for victims of domestic violence to go out or be

20   allowed to go out with friends socially on a weekly or more

21   frequent basis?"

22        THE WITNESS:  I think it's important to remember that

23   we're talking about human beings.  And although we create

24   lists, "we" meaning people who work in the field or

25   researchers, create these lists of characteristics that you

1    saw, they're not all inclusive and they don't tell the entire

2    picture.  Every person who batters and every person who's a

3    victim is an individual first.  And so we have these

4    amorphous lists that don't necessarily pertain to every

5    single person.  That's why not every characteristic fits.  So

6    is it possible for one batterer to allow what might look like

7    a lot of freedom?  Yes, of course that's possible.  There

8    might be controls in other areas.

9              THE COURT:  Next question reads as follows.  "Is it

10   typical of victims of domestic violence to work full time

11   outside the home?"

12             THE WITNESS:  Whoever wrote that question might be

13   thinking about the traditional family values and mom stays

14   home and dad works.  And in this case it, of course, was

15   different because dad didn't work a portion of the time so

16   mom needed to work, and he in fact wanted Wendi to do the

17   work.  Is that different?  If I had to make an estimate of

18   the number of cases that I've had and looked at home in terms

19   of traditional family roles, I would say that the majority of

20   them fit the traditional role, meaning dad works, mom stays

21   home.  However, that doesn't mean they all do.  There was a

22   sizeable portion and now as we're in the 2000s and more women

23   are actually working anyway, I expect to see that, in the

24   future research, to be quite a significant change over 20

25   years ago.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          THE COURT:  Next question reads as follows.  "Do you

2   consider yourself to have a good strong clinical background?"

3          THE WITNESS:  Yes, I do.

4          THE COURT:  Next question reads as follows.  "Can a

5   person give false answers, give answers to make themselves

6   look, quote, abused, end of quote."  And that's a "yes" or

7   "no" question.

8          THE WITNESS:  Yes.

9          THE COURT:  Next question reads as follows.  "In

10  domestic violence assessment is the unstructured interview a

11  sworn statement?"

12         THE WITNESS:  No, it is not.

13         THE COURT:  Next question read as follows.  "Can the,

14  quote, abused, end of quote, also become the, quote, abuser,

15  end of quote."

16         THE WITNESS:  It can or they can.  There's a very

17  small percentage of women in particular that turn around and

18  become the abuser, but there is a small percentage.

19         THE COURT:  Next question reads as follows.  "Is it

20  common for women who are victims of domestic violence to have

21  affairs even though they're fearful of their abuser?  If yes,

22  in general, why."

23         THE WITNESS:  Is it common?  It's not common in my

24  experience.  Have I seen it?  Yes.  The question about fear,

25  if fear is really there why would they take that risk, I

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    assume that's where the fear comes from.  I think that

2    because of the overriding, overarching issue of power and

3    control where the abuser is trying to control the life of the

4    victim, I have seen victims who -- who might act out in that

5    way by having an affair as a way to provide some semblance of

6    what they might find normal, meaning engage in a relationship

7    in which they're seen as having some worth because they're

8    not seen that way in the primary relationship.

9         THE COURT:  Next question reads as follows:  "You put

10   a list of behaviors that you termed as abusive, ie., anger,

11   silence, raising your voice, et cetera, yet these behaviors

12   are used by all people.  How do you determine -- how do you

13   determine when it becomes domestic violence?"

14        THE WITNESS:  If it's domestic violence, the issue of

15   power and control must be present.  I have never seen a case

16   of domestic violence in which that wasn't one of the primary

17   issues, so there's a big difference between somebody giving

18   her husband or wife the silent treatment today and somebody

19   else who tries to dominate and control their partner's life.

20   Very different.  Both people might use the silent treatment,

21   but if there's no issue of power and control, it's not going

22   to probably be domestic violence.

23        THE COURT:  Next question reads as follows.  "Did

24   Wendi indicate how the relationship with Rick Freeland

25   ended?"


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000007724

1          THE WITNESS:  Can I go back to my notes?

2          THE COURT:  Yes.

3          MR. MARTINEZ:  I'm going to object, Your Honor, with

4     regard to the issue that we talked about.

5          THE COURT:  I'll allow you to --

6          MR. PATTERSON:  Do you need to use your report?

7          THE WITNESS:  Yes, I used notes.

8          THE COURT:  You're going to review your report?

9          THE WITNESS:  Correct.

10          THE COURT:  I'll allow you to review your report.

11     After you review your report, let me know when you've

12     finished and I'll repeat the question for you to answer.

13               (Pause in proceedings.)

14          THE WITNESS:  I'm finished.

15          THE COURT:  And let me repeat the question here.

16     "Did Wendi indicate how the relationship with Rick Freeland

17     ended?"  Were your notes able to refresh your recollection?

18          THE WITNESS:  All I have in the report is that the

19     affair lasted approximately 6 weeks and she reported feeling

20     like she lost her best friend.  I didn't write in the report

21     and I don't remember what Wendi might have said to me about

22     how it ended.

23          THE COURT:  So you're unable to say what she said as

24     far as who initiated the breakup and why it ended?

25          THE WITNESS:  Right, I'm unable to answer that.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1        THE COURT:  Next question reads as follows.  "In your

2   opinion do you feel Wendi acted more independently at the end

3   of her relationship with Joe ie., 2000?"

4        THE WITNESS:  I think on the face of it it might

5   appear that way because she was going out, able to go out

6   with her girlfriends, and so that looks like it could easily

7   look like she was stronger or empowered somehow, but in

8   reality, she was still being controlled in every other aspect

9   of her life.  And in fact that going out on at least one

10   occasion that was reported to me there was a very serious

11   trade off for her.  In order for her to go out, she had to be

12   back in three hours and he told her he would have a surprise

13   for her, and that surprise was the purchase, while she was

14   out, of $130 worth of sex toys and then she had to succumb to

15   his using those on her.

16        THE COURT:  Next question reads as follows.  "How can

17   Joe have felt better or superior to others and have low self

18   esteem?"  Let me repeat that.  "How could Joe have felt

19   better or superior to others and have low self esteem?"

20        THE WITNESS:  I'm assuming that the phrase feeling

21   superior to others is one of the ones that you remember from

22   the list.  How did he have low self esteem and feel

23   superior.  Low self esteem is something that's quite

24   internal.  It's how I feel about myself.  Somebody can have a

25   real sense of loss internally and act on the surface as

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    though everything is just fine.  In fact there's probably

2    many of us in the world that walk around like that everyday.

3    So feeling superior, you know, to me from her story comes

4    from a sense of being owed something.  And by being owed

5    something, that set him apart.  So I would use superior as --

6    as Joe seeing himself as being set apart from others.

7            THE COURT:  Next question reads as follows.  "Can

8    both partners in a marriage abuse each other?"

9            THE WITNESS:  Right now there are numerous police

10   districts that are collecting data that we request as

11   citizens in the last 10 years since a policy called mandatory

12   arrest was adopted, meaning the victim no longer has the bear

13   the onus of making the report, some -- if the police show up,

14   whether she calls them or a neighbor calls, if she doesn't

15   want to press charges, if the police have a significant

16   reason to believe that there was domestic violence there, the

17   police charge the person.  She doesn't have to.

18            Since that's happened, in many communities

19   across the country, we now have arrest statistics on dual

20   arrests, meaning both parties being arrested.  Police often

21   will say that they can't make the distinction about who's at

22   fault because she has marks and he has marks, and so rather

23   than make a decision, standing in the household, about who

24   did it, often times both parties get arrested.  So we do have

25   statistics on duel arrest.  They're a small portion of the

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    overall domestic violence arrest statistics generally.

2             Can both people truly be battering one

3    another?  Yes.

4           THE COURT:  Are there any further questions of this

5    witness by the jury?  If so, please raise your hand.

6             (No audible response.)

7           THE COURT:  No one has raised their hand.

8             Mr. Martinez, do you have any follow-up

9    questions to those jury questions?

10          MR. MARTINEZ:  It's his witness.

11          THE COURT:  Sorry, Mr. Patterson.

12          MR. PATTERSON:  That's okay.

13          THE COURT:  Mr. Patterson, do you have any specific

14    follow-up questions?

15          MR. PATTERSON:  Yes, I do.

16

17    FOLLOW-UP QUESTIONS BY MR. PATTERSON:

18          Q.   One of the questions just said can the

19    abuser -- can -- yeah, the abuser turn into the abused in

20    certain circumstances.  Remember that question?

21          A.   Yes.

22          Q.   Do you have any evidence in this particular

23    case that Joe Andriano became the abused at some point in

24    this process?

25          A.   No.

1    Q.    One of the questions pertained to behaviors of

2    human beings that under certain circumstances can be

3    innocuous -- yelling, screaming.  Again, is the concern as I

4    understand it between domestic violence and use of those

5    behaviors and otherwise innocuous contacts is, that the

6    abuser uses those things to control or dictate the conduct of

7    the abused victim?

8    A.    Yes, and that's a significant difference.

9    Q.    Is that what we have in this case?

10   A.    Yes.

11   Q.    Can you give me a for instance.  Using anger,

12   how is Joe's use of anger in his relationship with Wendi

13   different than if I go home and yell at my wife today --

14   MR. MARTINEZ:  I'm going to object.  We don't know

15   that he abuses his wife.

16   THE COURT:  We don't want to assume that fact in

17   evidence, Mr. Patterson.

18   BY MR. PATTERSON:

19   Q.    Okay.  That a certain person who has a history

20   of abusive behavior towards his spouse goes home and yells at

21   his wife.

22   A.    Sorry to ask you this, but because of the talk

23   I -- I lose the focus.

24   Q.    Yeah.

25   A.    Can you just repeat it?

1          Q.     How is Joe's use of anger in his relationship

2     with Wendi different than a person who has no history of

3     spousal abuse, that person goes home and yells at his

4     other -- significant other?

5          A.     Okay.  The important piece here is that there's

6     a history and so the victim learns from the first abusive act

7     or assault, what to look for and learns a response.  So if

8     the victim learns that by yelling back, I'm going to get him

9     to stop, she might continue that pattern.  If she learns by

10    yelling back things are going to get worse, she stops.  So

11    anger to a domestic violence victim is one of the facets of

12    how that person controls her.  That's different from any of

13    us going home and just yelling at our spouse if that power

14    and control is not present and there's not be a pattern of

15    abusive and assaultive behaviors.

16         Q.     Okay.  One of the questions posed kind of

17    mutual abuse and you talked about some statistics.  Any

18    evidence in this case of mutual abuse where Wendi abused Joe?

19         A.     No.

20         MR. PATTERSON:  Okay.  Thank you, Judge.  That's all

21    I have.

22         THE COURT:  Mr. Martinez?

23

24    FOLLOW-UP QUESTIONS BY MR. MARTINEZ:

25         Q.     With regard to whether or not Mr. Andriano was

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    the victim of domestic abuse, you were asked a couple of

2    questions about that.  We did go through the power and

3    control wheel, didn't we?

4            A.    Yes.

5            Q.    And there were indications on that that he was

6    a victim of domestic violence as set out in that power and

7    control wheel, weren't there?

8            A.    You and I bantered quite a lot.

9            Q.    No, ma'am.  Was there, yes or no?

10           A.    Not in my perception.

11           Q.    So even though he fit those parts of the pie,

12   you are indicating that not in your perception was he a

13   victim of domestic abuse, right?

14           A.    You are turning the pieces of the pie --

15           Q.    That's not my question.  Even though he met

16   those pieces of the pie, in your opinion as an expert, he did

17   not meet the guidelines and so he was not a victim of

18   domestic violence?

19           A.    I did not find that he met the pieces of the

20   pie.

21           Q.    All right.  Even though they -- we went over

22   them, you and I, right?

23           A.    Yes.

24           Q.    You also were asked about whether it's possible

25   to be a victim of domestic violence and still go out once or

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000007731

1    twice a week.  You were asked about that and you said well,

2    you talked about other cases that it could happen.  I'm

3    specifically asking, in this case, is it possible in your

4    opinion that she was a victim and not under his power and

5    control and still able to go out twice a week with people

6    that he didn't know she was going out with?

7              MR. PATTERSON:  Objection.

8              THE COURT:  I'll sustain the objection.  Restate the

9    question.

10   BY MR. MARTINEZ:

11        Q.    Is it possible for her to go out twice a week

12   and still be the victim of domestic violence in this case?

13   Not in theory, but in this case.

14        A.    Yes.

15        Q.    Why is that?

16        A.    Because he chose what he controlled, so if he

17   didn't choose to control that she could go out during the

18   week, then that was an area that he was letting her go on.

19        Q.    But isn't it true that nowhere in the report

20   does it indicate that he chose to let her go out?

21        A.    That's true.

22             MR. MARTINEZ:  I don't have anything else.  Thank you.

23             THE COURT:  May this witness be excused?

24             MR. MARTINEZ:  Yes, sir.

25             MR. PATTERSON:  Yes, Your Honor.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          THE COURT:  Thank you very much.  You're excused.

2               Ladies and gentlemen, we're going to go ahead

3     and take our evening and weekend recess at this point.

4     Remember we don't have trial on Friday, tomorrow.  And we'll

5     resume the trial on Monday, which is October 18, at 1:00 p.m.

6               During this extended weekend recess remember

7     the entire admonition I have given you including the fact

8     you're not to discuss this case with anyone, do not let

9     anyone discuss the case with you, do not do any research,

10    investigation, experimentation or testing on our own, avoid

11    any media coverage of this case, keep an open mind.  I want

12    you to have a nice weekend.  We'll see you at 1:00 p.m. on

13    Monday.  Have a nice weekend.  We'll be in recess.

14

15               (Evening recess.)

16

17

18

19

20

21

22

23

24

25

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1

2

3                        CERTIFICATE OF REPORTER

4

5     STATE OF ARIZONA      )
                            )
6     COUNTY OF MARICOPA    )

7

8               I, Traci L. Wheeler, CSR, RPR, an official

9     and certified reporter in the Superior Court of the State

10    of Arizona, in and for the County of Maricopa, hereby

11    certify that I made a shorthand record of the proceedings

12    had in the within case, and that the foregoing transcript

13    is a full, true, and correct transcription of the

14    proceedings in this case.

15               Dated this 12th day of May, 2005.

16

17

18

19               Traci L. Wheeler, CSR, RPR
                 Certified Court Reporter No. 50313
20               Official Court Reporter

21

22

23

24

25


         TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

# EXHIBIT
# WWWWWWWWWWW

# ARIZONA SUPREME COURT

| | |
|---|---|
| STATE OF ARIZONA | ) CR-15-0115-PC |
| | ) |
| RESPONDENT, | ) |
| | ) |
| | ) Maricopa County Superior Court |
| v. | ) No. CR2000-096032-A |
| | ) |
| WENDI ELIZABETH ANDRIANO | ) |
| | ) |
| PETITIONER. | ) |
| | ) |
| | ) |

## UNOPPOSED MOTION FOR 30-DAY EXTENSION OF TIME TO FILE REPLY IN SUPPORT OF PETITION FOR REVIEW

## (CAPITAL CASE)

Petitioner Wendi Andriano respectfully requests a 30-day extension of time to file her reply in support of her petition for review, which is presently due on July 23, 2015 pursuant to the 10-day reply deadline set forth in Arizona Rule of Criminal Procedure 32.9(a). Petitioner's counsel has conferred with counsel for the State with regard to this motion, and the State's counsel has confirmed that the State does not oppose this motion.

This petition for review arises from a post-conviction relief proceeding in a capital case and presents a number of record-dependent issues, as this Court recognized in granting Petitioner's request to file an overlength opening brief, granting the State the same right to file an overlength response, and granting the State multiple extensions of time to file its response brief. The State ultimately

filed its 56-page response brief on July 13, 2015.  In light of the length of the brief

and record-dependent nature of the arguments – as well as the fact that the

undersigned Attorneys Bennett and Arntsen are unavailable this week due to

family vacations scheduled before the most recent extension of the State's response

deadline – Petitioner's counsel reasonably believes that an extension of the 10-day

reply deadline is necessary and warranted in this matter.  Therefore, Petitioner

respectfully requests that this Court grant her motion for a 30-day extension of

time, which would extend her reply deadline to August 24, 2015.

Respectfully submitted this 15th day of July, 2015.

By:  _/s/ Scott M. Bennett_
Scott M. Bennett (Bar No. 022350)
COPPERSMITH BROCKELMAN PLC
2800 North Central Avenue
Phoenix, Arizona  85004
(602) 224-0999 (office)
(602) 224-6020 (fax)
sbennett@csblaw.com

Allen A. Arntsen, admitted pro hac vice
Matthew R. Lynch, admitted pro hac vice
FOLEY & LARDNER LLP
150 E. Gilman Street
Madison, Wisconsin 53703
(608) 257-5035 (office)
(608) 258-4258 (fax)
aarntsen@foley.com
mlynch@foley.com

Attorneys for Petitioner Wendi Andriano

# EXHIBIT XXXXXXXXXXX

SUPREME COURT OF ARIZONA

| | |
|---|---|
| STATE OF ARIZONA, | ) Arizona Supreme Court |
| | ) No. CR-15-0115-PC |
| Plaintiff, | ) |
| | ) Maricopa County |
| v. | ) Superior Court |
| | ) No. CR2000-096032 |
| WENDI ELIZABETH ANDRIANO, | ) |
| | ) **FILED 7/16/2015** |
| Defendant. | ) |
| | ) |
| _____ | ) |

**O R D E R**

An "Unopposed Motion for 30-Day Extension of Time to File Reply in Support of Petition for Review" having been filed on July 15, 2015,

**IT IS ORDERED** granting a first extension of time to file the Reply in Support of Petition for Review on or before August 24, 2015.

DATED this _____ day of July, 2015.

_____
Janet Johnson
Clerk of the Court

```
Arizona Supreme Court No. CR-15-0115-PC
Page 2 of 2

TO:

Lacey Stover Gard
Gregory Michael Hazard
Scott M Bennett
Allen A Arnsten
Matthew R Lynch
Wendi Elizabeth Andriano, ADOC 191593, Arizona State
      Prison, Perryville - Lumley/San Juan Unit
Dale A Baich
Diane Alessi
Amy Armstrong

tel
```

# EXHIBIT YYYYYYYYYYY

# IN THE ARIZONA SUPREME COURT

|                                      |     |                                               |
| ------------------------------------ | --- | --------------------------------------------- |
| STATE OF ARIZONA                     | )   | ARIZONA SUPREME COURT CR-15-0115-PC           |
| RESPONDENT,                          | )   |                                               |
|                                      | )   |                                               |
| v.                                   | )   | Maricopa County Superior Court                |
| WENDI ELIZABETH ANDRIANO             | )   | No. CR2000-096032-A                           |
| PETITIONER.                          | )   |                                               |
|                                      | )   |                                               |

## REPLY IN SUPPORT OF PETITION FOR REVIEW OF DENIAL OF POST-CONVICTION RELIEF (CAPITAL CASE)

Scott M. Bennett (Bar No. 022350)
COPPERSMITH BROCKELMAN PLC
2800 North Central Avenue
Phoenix, Arizona  85004
(602) 224-0999 (office)
(602) 224-6020 (fax)
sbennett@cblawyers.com

Allen A. Arntsen, admitted pro hac vice
Matthew R. Lynch, admitted pro hac vice
FOLEY & LARDNER LLP
150 E. Gilman Street
Madison, Wisconsin 53703
(608) 257-5035 (office)
(608) 258-4258 (fax)
aarntsen@foley.com
mlynch@foley.com

# TABLE OF CONTENTS

TABLE OF CONTENTS ...........................................................................i

TABLE OF AUTHORITIES ................................................................. iii

ARGUMENT .........................................................................................1

I.   ANDRIANO'S PETITION SHOULD BE GRANTED AS TO HER CONFLICT OF INTEREST CLAIM................................................................................1

    A.   The Conflict Claim is Properly First Raised in a Petition for Post-Conviction Relief .........................................................2

    B.   DeLozier's Concurrent Representation Of The Ochoas And Andriano Created An Actual Conflict Of Interest ................................3

    C.   Because Of His Conflict Of Interest, DeLozier Failed To Pursue The Plausible Alternative Defense Strategy Of Investigating and Presenting Andriano's History of Childhood Abuse ..........................................................................7

II.   ANDRIANO'S PETITION SHOULD BE GRANTED AS TO HER INEFFECTIVE ASSISTANCE OF COUNSEL CLAIM – PENALTY PHASE (Claim I(A)).................8

    A.   Prevailing Norms Require A Proactive And Extensive Mitigation Investigation Into Mental Health And Childhood Trauma.........................................................................8

    B.   The State's Narrow View Of The Relevance of Mental Health Evidence to Mitigation Is Contrary To Law .......................................13

    C.   The State's Arguments Mischaracterize The Record .........................15

III.   OTHER CLAIMS ........................................................................19

    A.   Failing To Object To The State's Aggravator Phase Argument That Andriano "Poisoned" Joe (Claim I(B)).......................................19

    B.   Ineffective Assistance - Guilt Phase (Claim I(C)) .............................20

        1.   Evidence of Mental Illness.....................................20

        2.   Corroborating Evidence Regarding Life Insurance.................22

3.      Corroborating Evidence That Joe Was Suicidal ........................23

C.    Prosecutorial Misconduct (Claim III) .................................................24

D.    Juror Misconduct (Clam IV) .............................................................25

E.    The PCR Court's Denial of Andriano's Motion to Admit
      Additional Mitigating Evidence ..........................................................26

CONCLUSION ............................................................................................26

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Correll v. Ryan*,
   539 F.3d 938 (9th Cir. 2008) .......................................................................11, 18

*Cuyler v. Sullivan*,
   446 U.S. 355 (1980)..........................................................................................1

*Deutscher v. Whitley*,
   884 F.2d 1152 (9th Cir. 1989) ..........................................................................11

*Porter v. McCollum*,
   558 U.S. 30 (2009) (per curiam).......................................................................18

*Puiatti v. Secretary, Florida Department of Corrections*,
   732 F.3d 1255 (11th Cir. 2013) (State's Br. )..................................................9, 10

*Wood v. Georgia*,
   450 U.S. 261 (1981).........................................................................................2

**State Cases**

*State v. Bocharski*,
   218 Ariz. 476 (2008)...................................................................................18, 21

*State v. Christensen*,
   129 Ariz. 32 (1981).........................................................................................22

*Doe v. Roe*,
   191 Ariz. 313 (1988).........................................................................................7

*State v. Martinez-Serna*,
   166 Ariz. 423 (1990).........................................................................................3

*State v. Moody*,
   208 Ariz. 424 (2004).......................................................................................21

*State v. Spreitz*,
   202 Ariz. 1 (2002) ...................................................................................................2

**State Statutes**

A.R.S. § 13-751(G)(1) .........................................................................................13, 14

Ariz. Rev. Stat. § 13-751(C) ...................................................................................26

**Other Authorities**

Sixth Amendment ...................................................................................................1, 3

Ariz. R. Evid. 803(3) ................................................................................................23

## ARGUMENT

### I.   ANDRIANO'S PETITION SHOULD BE GRANTED AS TO HER CONFLICT OF INTEREST CLAIM

Before, throughout and after Wendi Andriano's capital murder trial,[1] Attorney David DeLozier represented Andriano's parents in their bid to obtain custody of their grandchildren and also accepted payment from the Ochoas for Andriano's representation.  As a result, DeLozier labored under multiple conflicts of interest, including his inability to view the Ochoas critically, his ethical obligation not to use information he learned against the Ochoas, and his personal interest in obtaining payment from the Ochoas.  DeLozier admits that these conflicts blinded him, preventing him from providing Andriano with the unbiased and undivided loyalty required by the Sixth Amendment.  As a result, DeLozier disregarded critical evidence of neglect, exploitation, and abuse of Andriano as a child, instead pursuing a mitigation theme that the Ochoas provided Andriano with a wholesome, loving, Christian upbringing.  Because DeLozier had actual conflicts of interest that adversely affected Andriano's representation, Andriano is entitled to relief.  *Cuyler v. Sullivan*, 446 U.S. 355, 350 (1980).[2]

---

[1]  The State incorrectly states that DeLozier represented the Ochoas "[f]rom July 12, 2001, to July 31, 2002[.]"  (State Br. at 18.)  In fact, he continued to represent the Ochoas until 2005.  (*See* Pet. for Review ("Pet.") at 20-21.)

[2]  In a footnote, the State argues that the *Strickland* prejudice standard—rather than

**A.    The Conflict Claim is Properly First Raised in a Petition for Post-Conviction Relief**

The State argues that Andriano's conflict claim is precluded because she did not "raise[ ] her conflict-of-interest claim at trial or on direct appeal."  (State Br. at 23.)  However, in *State v. Tucker*, this Court emphasized that any request for relief from the defendant's death sentence because of an attorney's conflict *must* be addressed in PCR proceedings.  205 Ariz. 157, 163, ¶ 26, 68 P.3d 110, 116 (2003) (whether attorney "did not pursue a third-party defense [because of a conflict of interest] can only be developed at an evidentiary hearing in a post-conviction relief proceeding"); *State v. Spreitz*, 202 Ariz. 1, 6-7, ¶ 9, 39 P.3d 525, 527 (2002) ("[W]e reiterate that ineffective assistance of counsel claims are to be brought in Rule 32 proceedings.  Any such claims improvidently raised in a direct appeal, henceforth, will not be addressed by appellate courts regardless of merit.").

---

the *Sullivan* adverse effect standard—applies to Andriano's conflict claim.  (State Br. at 24 n.10.)  In support, the State asserts that the Supreme Court "recently declined the opportunity to expressly extend [*Sullivan*] to conflicts stemming from successive representation."  (*Id.* (quoting *Mickens v. Taylor*, 535 U.S. 162, 174-75 (2002)).)  However, nothing in *Mickens* suggests that *Sullivan* applies only to cases involving the joint representation of co-defendants.  *See*, *e.g.*, *Wood v. Georgia*, 450 U.S. 261, 271 (1981) (applying *Sullivan* in case involving a conflict created by a non-client's payment of the defendant's attorney fees).

Moreover, in *State v. Jenkins*, this Court applied *Sullivan* to a defendant's PCR request based on his attorney's concurrent representation of a witness—not a co-defendant—in the witness's divorce case.  148 Ariz. 463, 465, 715 P.2d 716, 718 (1986).  Thus, *Jenkins* applies *Sullivan* to the same type of conflict at issue here.  *Id.*

The State cites cases for the proposition that conflict claims are "cognizable" on direct appeal, but none of those cases support the State's preclusion argument. (State Br. at 22.)  In *State v. Moore*, the defendant argued on direct appeal that the trial court erred in denying his counsel's motions to withdraw due to an alleged conflict.  222 Ariz. 1, 36, ¶ 76, 213 P.3d 150, 164 (2009).  Andriano's conflict claim, by contrast, is not challenging any trial court ruling; she is arguing that her conviction violates the Sixth Amendment right to an attorney with undivided loyalty.  Thus, Andriano properly raised her conflict claim in PCR proceedings.

Moreover, the cases the State cites—*Moore*, *Jenkins* and *State v. Martinez-Serna*, 166 Ariz. 423, 424-26, 803 P.2d 416, 418-19 (1990)—do not address preclusion at all, and contain no discussion even suggesting that a conflict claim is precluded if not raised on direct appeal.

**B.    DeLozier's Concurrent Representation Of The Ochoas And Andriano Created An Actual Conflict Of Interest**

The State argues that there was no actual conflict of interest because Andriano wanted her children to be with the Ochoas, and therefore her interests were aligned with the Ochoas'.  (State Br. at 25-26.)  This misstates Andriano's interest in her capital murder trial.  Andriano's "interest was in seeking leniency" and she depended on DeLozier to investigate and inform the jury about "anything from childhood that might help the jury understand how she could have behaved the way she did at the time of the offense and in this case in the months preceding

the offense." (2/11/14 Tr. at 164 (P-App 1816).)  In contrast, the Ochoas' effort to gain custody of their grandchildren would have been severely damaged by investigation and disclosure of the abuse and neglect Andriano experienced as a child.  (*Id.*; *see also* 2/10/14 Tr. at 74-75 (P-App 1538-39) (Ochoas retained DeLozier to present them as "honorable people" and "appropriate parties to have some time with their grandchildren").)

Next, the State asserts that there was no actual conflict of interest because "DeLozier reasonably did not perceive any 'red flags' warranting investigation into whether Alejo abused Andriano." (State Br. at 27-28.)  The State cites no authority to support its contention that the allegedly conflicted attorney is the arbiter of whether a conflict exists, and that is not the standard.  Arizona's professional rules do not excuse conflicted representation simply because the attorney unreasonably failed to appreciate the conflict.  *See* ER 1.7, Ariz. R. Prof'l Conduct.

Moreover, this argument fails because DeLozier was confronted with multiple indicators of Andriano's childhood abuse, yet did nothing to investigate and present this abuse to the jury.  For example, the Lambeths' child abuse allegation against the Ochoas raised the issue of whether Andriano was likewise abused, and should have prompted a diligent investigation that would have uncovered the additional evidence presented during the PCR hearing.  DeLozier's only reason for not investigating was his disbelief that the Ochoas were anything

other than excellent parents and grandparents.  (2/10/14 Tr. at 138-39 (P-App 1602-03).)  By his own admission, DeLozier's inability to view the Ochoas objectively was the result of his advocacy for them in the guardianship and adoption cases.  (*Id.*)

The State attempts to downplay the significance of the abuse allegation, suggesting that it was not worth investigating.  (State Br. at 27.)  However, DeLozier's co-counsel, Dan Patterson, admitted that the allegation "bears upon potential areas of mitigation that should have been developed at a bare minimum under *Wiggins*."  (2/7/14 Tr. at 36 (P-App 1319).)[3]  Furthermore, there were several other red flags that should have prompted DeLozier to investigate the possibility of childhood abuse.  (*See* Pet. at 29 n.12.)  For example, DeLozier knew that Alejo solicited sex stories from Andriano to post on the Internet.  (2/10/14 Tr. at 131-32 (P-App 1595-96).)  In addition, Rohde reported Andriano's tendency to dissociate, pervasive memory problems, and lack of sexual responsiveness.  (*Id.* at 112, 122-27 (P-App 1576, 1586-91); Ex. 230 at 5 (P-App 7071); Ex. 7.002 at 1 (P-App 2483).)  Murphy similarly noted Andriano's dissociation.  (2/10/14 Tr. at 132-33 (P-App 1596-97); Ex. 52 (P-App 3308).)  Although he seized on these

---

[3]  The State argues that "Patterson had no conflict and did not perceive the need to investigate whether Alejo abused Andriano" (State Br. at 29), but ignores the fact that DeLozier was charged with handling the mitigation portion of Andriano's defense, and Patterson neither tried to evaluate whether the Ochoas abused Andriano, nor was he in the position to do so.  (*See* Pet. at 22.)

psychological features as important evidence of childhood sexual abuse in his

cases against the Catholic Church, which he commenced prior to Andriano's trial,

DeLozier did nothing to investigate the possibility of childhood sexual abuse in

Andriano's case.  (2/10/14 Tr. at 90-97, 102 (P-App 1554-61, 1566).)  Finally, both

Rohde and Murphy specifically reported their suspicions of childhood trauma and

abuse to DeLozier.  (*Id.* at 122-24, 132-33 (P-App 1586-88, 1596-97); Ex. 7.002 at

1 (P-App 2483); Ex. 52 (P-App 3308).)  Thus, DeLozier obtained ample evidence

suggestive of Andriano's childhood abuse even without the Lambeths' allegation.

The State also argues that "Andriano's argument incorrectly assumes that

Andriano had no right to limit her mitigation presentation."  (State Br. at 29.)

However, in order for Andriano to have made a fully informed decision about how

DeLozier should proceed, it would have been necessary for DeLozier to:

(a)  investigate sources of potential mitigation including the possibility that the Ochoas had abused Andriano;

(b)  once that investigation was completed, explain to Andriano that the concurrent representation and payment by the Ochoas could impair his ability to advance her interests in avoiding the death penalty; and

(c)  explain to Andriano that presenting evidence regarding abuse by the Ochoas could strengthen Andriano's mitigation case, but that he would be unable to do so without breaching his ethical obligations to the Ochoas.

(2/11/04 Tr. at 163-66 (P-App 1815-18).)  DeLozier took none of those steps to

obtain informed consent to the conflict.  Indeed, DeLozier never raised the

possibility of a conflict at all.  (*Id*.)  Therefore, even if Andriano had a generalized

desire to have her children raised by the Ochoas, that does not constitute an

informed waiver of the conflict created by DeLozier's concurrent representation of

the Ochoas and Andriano.  *See* ER 1.7, Ariz. R. Prof'l Conduct (requiring

informed consent, confirmed in writing).

### C.   Because Of His Conflict Of Interest, DeLozier Failed To Pursue The Plausible Alternative Defense Strategy Of Investigating and Presenting Andriano's History of Childhood Abuse

In the Petition for Review (at 28-32), Andriano explained the ways in which

DeLozier's conflict adversely affected Andriano's representation.  In response, the

State argues that because Andriano "failed to prove that evidence of Alejo's

purported abuse was available to counsel," there was no plausible alternative

defense strategy.  (State Br. at 31.)[4]

To the contrary, as discussed in the Petition and below, every piece of

mitigating evidence identified in the PCR hearing was available to DeLozier, if he

had undertaken any reasonable investigation into Andriano's childhood.

The mere fact that the abusers and their victim did not report the abuse to

DeLozier does not mean that this abuse could not have been discovered.  Because

---

[4] The PCR Court states that the mitigating evidence offered at the PCR hearing "was not 'available' to trial counsel," but its only basis for that statement was the Andriano herself could not recall the abuse.  (11/3/14 Order at 15 (P-App 22).) That is common in childhood sexual abuse cases, as this Court has recognized.  *See Doe v. Roe*, 191 Ariz. 313, 322, 955 P.2d 951, 960 (1988).

DeLozier had evidence of abuse from multiple other sources and could have obtained additional evidence, investigating and presenting Andriano's history of abuse was a plausible alternative defense strategy.

## II.   ANDRIANO'S PETITION SHOULD BE GRANTED AS TO HER INEFFECTIVE ASSISTANCE OF COUNSEL CLAIM – PENALTY PHASE (Claim I(A))

The State's defense of the cursory investigation of Andriano's trial counsel rests upon:  (1) the assumption that trial counsel has no duty to affirmatively *investigate* potentially mitigating evidence; (2) the assumption that mental health evidence has no relevance unless the defendant has lost the ability to recognize the illegality of her conduct; and (3) mischaracterizations of the trial and PCR record.

### A.   Prevailing Norms Require A Proactive And Extensive Mitigation Investigation Into Mental Health And Childhood Trauma

Neither the State nor the PCR Court identified *any* affirmative steps that trial counsel undertook to investigate mitigating evidence relating to Andriano's childhood and social history, nor could they:  Andriano's trial counsel candidly admitted that they made no such efforts.[5]  The same is true with regard to Andriano's mental health:  with the exception of a single interview with one psychologist who was provided no information regarding Andriano's background,

---

[5] *See* 2/7/14 Tr. at 42-44, 62, 64-65, 68, 78-79, 89, 130 ("I didn't compel her to discuss things that she found distasteful."), 162-63, 170-71 (P-App. 1325-27, 1345, 1347-48, 1351, 1361-62, 1372, 1413, 1445-46, 1453-54); 2/10/14 Tr. at 126-27, 131-35, 143-44 (DeLozier did not interview witnesses regarding mitigation because "I wasn't asked to interview anybody"), 149 (P-App 1590-91, 1595-99, 1607-08, 1613).

they admit taking no steps to investigate her mental health despite numerous red flags.[6]

Rather than trying to justify these failures under *Wiggins* and other applicable standards (including the ABA Guidelines), the State applies a much more lenient standard:  that Andriano's trial counsel had no duty to investigate (a) potential childhood abuse unless the client or the perpetrators volunteered that it occurred (State Br. at 34-35); or (b) mental health unless a doctor recommended "testing" and/or their own lay observations suggested that the client was mentally ill.  (*Id*. at 35).  In fact, the duty to investigate mitigating evidence demands far more of trial counsel[7]—as the only case the State cites for the proposition that counsel need not investigate the possibility of childhood abuse or mental health issues, *Puiatti v. Secretary, Florida Department of Corrections*, 732 F.3d 1255 (11th Cir. 2013) (State's Br. at 34-35), amply demonstrates.

---

[6] *See, e.g.*, 2/7/14 Tr. at 69-70, 73-74, 81, 84, 87, 94, 137-38, 169 (P-App 1352-53, 1356-57, 1364, 1367, 1370, 1377, 1420-21, 1452); 2/10/14 Tr. at 70, 112-14, 118-21, 123-24, 150-51 (P-App 1534, 1576-78, 1582-85, 1587-88, 1614-15).

[7] A mitigation investigation requires an "*unparalleled* investigation into the defendant's personal and family history," including interviews of "virtually everyone . . . who knew the client and h[er] family" to compile a thorough "[f]amily and social history."  (ABA Guidelines (Ex. 76) at 80-81, 83 (emphasis added) (P-App 3522-23, 3525).)  Because "[n]eurological and psychiatric impairment, combined with a history of physical and sexual abuse, are common among persons convicted of violent offenses" (*id.* at 30 (P-App 3472)), trial counsel are required to investigate whether the defendant suffered "physical, sexual, or emotional abuse" in her childhood and whether she has "cognitive impairments" or a "family history of mental illness."  (*Id.* at 81 (P-App 3523).)

Defense counsel in *Puiatti* undertook a thorough mitigation investigation, including:

(1)     multiple interviews with their client regarding his childhood and life history, *id.* at 1260-61;

(2)     interviews with family members and others on multiple occasions in individual settings, *id.* at 1261-63;

(3)     gathering "voluminous records of Puiatti's life," *id.* at 1263;

(4)     working with two mental health experts (a forensic psychologist and a psychiatrist) for the purpose of "perform[ing] an 'in-depth review' of Puiatti's background," *id.* at 1263-64;

(5)     providing those experts with the social history that trial counsel's investigation had developed through extensive interviews and records, *id.* at 1264; and

(6)     having one of those experts interview both the defendant and his parents and "remain in close contact with Puiatti throughout the pre-trial period," *id*.

Only after that extensive investigation uncovered no evidence "suggest[ing] that Puiatti was abused as a child" did the Eleventh Circuit conclude that Puiatti's counsel was not ineffective for failing to investigate further. *Id.* at 1282. Thus, *Puiatti* stands for the undisputed proposition that an attorney is not ineffective if she actively engages in a thorough investigation of a client's background that fails to uncover childhood abuse. It does *not* stand for the proposition that trial counsel may dispense with a thorough investigation into their client's background altogether, as the State suggests.

As explained in Andriano's Petition (and Post-Hearing Mem. at 52-99 (P-

App 355-402)), Andriano's trial counsel performed *none* of the steps of the

extensive mitigation investigation undertaken in *Puiatti*.  Their deficient

investigation is especially egregious because, unlike Puiatti's counsel, Andriano's

trial counsel received numerous red flags regarding abuse, discussed above.  (*See*

*also id.* at 80-96 (P-App 383-99).)  As Andriano's counsel concedes, there was no

strategic basis for failing to undertake such an investigation,[8] and the State cites no

case suggesting otherwise.[9]

In addition, the State's contentions that trial counsel could forgo

investigation of childhood sexual abuse by Alejo because Andriano denied

memory of it (State Br. at 29, 38), and forgo investigation of mental health because

her trial counsel's "own observations of Andriano led [them] to believe that

additional investigation was unnecessary" (*id*. at 35) are unavailing.  As early as

March 2001, more than *three years* before her trial, defense counsel were placed

---

[8] *See* 2/7/14 Tr. at 75, 177-78 (D. Patterson) (P-App. 1358, 1460-61).

[9] *See Correll v. Ryan*, 539 F.3d 938, 949 (9th Cir. 2008) ("An uninformed strategy is not a reasoned strategy.  It is, in fact, no strategy at all."); *Deutscher v. Whitley*, 884 F.2d 1152, 1160 (9th Cir. 1989) ("Counsel could not have chosen to avoid psychiatric evidence because of potentially damaging rebuttal testimony.  Counsel did not even know what evidence was available."), *vacated on other grounds*, 111 S. Ct. 1678 (1991), *and subsequently reaffirmed*, 16 F.3d 981 (9th Cir. 1994).  Thus, the State's contention that the introduction of mental health evidence "would have opened the door" to damaging rebuttal (State Br. at 40) is irrelevant to Andriano's PCR claims.  Andriano's trial counsel could not weigh such considerations because they did not even know what mitigating evidence existed in the first place.

on notice by a counselor that Andriano "was unable to recall large sections" of her childhood and that she may be have been the victim of sexual molestation. (Ex. 7.002 (P-App 2483-84).) Further, capital defense counsel have been cautioned that their own assessments of clients are never a substitute for a thorough mental health investigation (Ex. 76 at 31 (P-App 2473), including investigation of the social history that all experts in the PCR hearing (including the State's expert) agreed was necessary to make an accurate diagnosis.[10]

Finally, the State cites no support for its assertion that "if the allegations [of childhood sexual abuse] are true, Andriano and her family actively concealed them from discovery." (State Br. at 38.) Though no reasonable trial counsel should be surprised that the perpetrators of childhood abuse and neglect fail to volunteer it— or that the victim represses memory of it—in this case Andriano and her family could not have "actively concealed" any negative facts regarding Andriano's upbringing, because trial counsel *never asked them to provide any negative information regarding her childhood.* (2/10/14 Tr. at 135 (P-App 1599); 2/7/14 Tr. at 43, 130, 162-63 (P-App 1326, 1413, 1445-46).) Trial counsel here simply failed to give any indication that they had any interest in learning any information about

---

[10] *See* 2/5/14 Tr. at 49-51 (P-App 1095-97); 2/6/14 Tr. at 72-73 (P-App 1263-64); 2/7/14 Tr. at 49-50 (P-App 1332-33); 2/11/14 Tr. at 60-61 (P-App 1712-13); 2/14/14 Tr. at 43, 44-45, 72-73 (State's expert acknowledging that "you have to review" a subject's mental health history, records of that history are "important," and psychiatrists rely upon them in their diagnoses) (P-App 1890-92, 1919-20).

potential childhood abuse, or that it could be pertinent—a message that they

reinforced when they declined to interview Andriano's biological father, who was

in prison for child molestation, even though Donna provided them with his prison

contact information.  (Ex. 57 (P-App 3352); 2/7/14 Tr. at 170-71 (P-App 1453-54);

2/10/14 Tr. at 128 (P-App 1592).)

### B.   The State's Narrow View Of The Relevance of Mental Health Evidence to Mitigation Is Contrary To Law

The State argues that "expert testimony to establish the A.R.S. § 13-

751(G)(1) factor . . . *requires* proof that the defendant's ability to appreciate her

conduct's wrongfulness was impaired."  (State Br. at 40-41 (emphasis added).)

This argument—which is fundamental to the State's position, given that its expert

at the PCR hearing limited his opinions to whether Andriano had "a mental disease

or defect whereby she couldn't appreciate the wrongfulness of her conduct"

(2/14/14 Tr. at 114 (P-App 1961)—is contrary to the plain language of the statute.

Ariz .Rev.Stat. § 13-751(G)(1) states:

> The trier of fact shall consider as mitigating circumstances **any** factors
> . . . including but not limited to . . . [t]he defendant's capacity to
> appreciate the wrongfulness of h[er] conduct **or** to conform h[er]
> conduct to the requirements of the law was significantly impaired, but
> no so impaired as to constitute a defense to prosecution.

(Emphasis added.)  Andriano's mental health experts provided extensive opinions

regarding the second half of § 13-751(G)(1) (*i.e.*, Andriano's reduced capacity to

conform her conduct to the requirements of the law)[11] as well as testimony explaining Andriano's pre-offense conduct in light of her mental disorders; the State's expert offered no rebuttal to these points, limiting his opinion to the first half of § 13-751(G)(1) (*i.e.*, Andriano's capacity to appreciate the wrongfulness of her conduct).[12]  Thus, to excuse the narrowness of its own expert's opinions, the State essentially asks this Court to delete the words "any" and "or" from § 13-751(G)(1).

The State's incorrect view of mental health evidence also pervades its defense of trial counsel's cursory investigation into Andriano's mental health and dismissal of the preliminary mental health information that came to their attention. The State addresses none of the numerous mental-health red flags brought to trial counsel's attention (*see* Post-Hearing Mem. at 80-96 (P-App 383-99)), other than to make the unexplained *ipse dixit* assertions that the preliminary findings of Dr. Rosengard, who interviewed Andriano once without any social history information, were "not helpful" and did not "place counsel on notice that further

---

[11] *See* Post-Hearing Mem. at 34-44 (P-App 337-47).

[12] The State asserts that one of its experts "also opined that Andriano . . . could conform [her conduct] to the law" (State Br. at 20 (citing 2/14/14 Tr. at 25-26)), but that is incorrect.  The State's expert said that Andriano "knew the difference between right and wrong and she knew what was not in conformance with the law at the time."  (2/14/14 Tr. at 25-26 (P-App 1872-73).)  In other words, he opined that Andriano knew the difference between legal and illegal conduct; he did not opine as to whether Andriano's capacity to conform her conduct to the law was impaired, the second alternative under § 13-751(G)(1).

evaluation was necessary." (State Br. at 35.)  The State's argument is puzzling,

because even without any social history information or the benefit of any of the

observations of others with mental-health qualifications who urged trial counsel to

investigate further (*see* Post-Hearing Mem. at 81-93 (P-App 384-96), Dr.

Rosengard *still* provided significant cause for further investigation.  Though he

indicated that his conclusions were tentative (labeling them as "diagnostic

impressions"), he identified Andriano as likely suffering from post-traumatic stress

disorder, panic disorder, and "major affective disorder – depression." (Ex. 6.003 at

5 (P-App 2444).)  He further noted that Wendi's psychiatric disorders originated

from childhood and would "more than explain[] [her] response [to the offense],

particularly in light of the fact that she had a past history, apparently, of being

abused and symptoms consistent with post-traumatic stress disorder." (*Id.* at 3

(noting "panic attacks since childhood," possible childhood molestation, and that

Andriano was "particularly upset in finding out and dealing with children that were

sexually abused"), 5 (P-App 2442, 2444).)

### C.    The State's Arguments Mischaracterize The Record

The State also distorts the trial and PCR hearing records.  For example, the

State asserts that trial counsel made "a thorough investigation of Andriano's

background" (State Br. at 34) and specifically "investigated Andriano's

upbringing, as evidenced by their mitigation theme" that Andriano "had an

impoverished early childhood" and was "raised in a controlling religious

environment." (State Br. at 33, 37.) Yet it cites *no* actions that trial counsel took

to "thorough[ly] investigat[e]" Andriano's background, nor can it: as noted above,

trial counsel admit they made no effort to investigate any negative aspects of her

childhood, and they did not even request records regarding Andriano's life until

*after* she was found guilty of murder, less than *three weeks* before the penalty

phase began. (Ex. 54 (P-App 3339-3344).) And an "impoverished early

childhood" and "controlling religious environment" were not trial counsel's

mitigation themes; they described their mitigation themes as contending that

Andriano was "a good woman, she's a good mom, she's a hard worker, she

provides for the family, those kinds of things." (2/7/14 Tr. at 32, 48-49 (P-App

1315, 1331-32).)

Likewise, the State contends that: (a) trial counsel received information that

Andriano may have been molested by her biological father or other members of his

family when she was a very young child, and that this information was "presented

at trial" (State Br. at 34); and (b) the evidence adduced at the PCR hearing would

have had no impact on the jury, because "[*c*]*hanging the number of times Andriano*

*was abused, and the identity of the perpetrator, would not have made Andriano's*

*status as a molestation victim any more compelling*." (State Br. at 38-39 (emphasis

added).)

The State's first proposition is untrue, and the second incredible.  Though trial counsel were told of rumors that Andriano may have been molested by her biological father's family—indeed, her biological father and uncle were both incarcerated before and during Andriano's trial for molesting another child—trial counsel made no attempt to verify those rumors, and did not even interview her biological father.  (Ex. 56 at PCR307 (P-App 3349); 2/7/14 Tr. at 170-71 (P-App 1453-54); 2/10/14 Tr. at 128, 134-35 (P-App 1592, 1598-99).)  Thus, trial counsel could not and did not elicit evidence that Andriano had been sexually abused as a child; the only testimony on that subject was a social worker noting there was "just some conjecture" that Andriano may have been molested by her paternal father or grandfather at some point in her "very early years."  (10/12/04 Tr. at 39-40.)

By contrast, had trial counsel actually performed a thorough investigation of Andriano's background, they would have found hard evidence that Andriano suffered repeated, ritualistic sexual abuse at the hands of her stepfather (Alejo) far beyond her "very early years," including the eyewitness testimony of fellow victims with no plausible reason to lie.[13]

It defies belief for the State to equate a witness's self-described "conjecture" regarding sexual abuse before Andriano was two years old with eyewitness

---

[13] Witnesses Kyre Lorts and Jeri Lynn Cunningham were childhood friends of Andriano, but had virtually no contact with her as an adult.  (2/4/14 Tr. at 61-62, 236-38 (P-App 862-63,  1037-39).)

testimony of Alejo's relentless sexualization and abuse (including taking a pre-teen Andriano to purchase lingerie, having Andriano pose as a mid- to late teen for photographs in a bikini on her hands and knees and other suggestive poses (*see* Pet. at 16), rub his nearly naked body, and physically molest her and her friends) throughout her childhood.[14]

Similarly, the State contends without explanation that "Andriano's mental-health evidence [presented at the PCR hearing] carries little weight given its lack of connection to Joe's murder."  (State Br. at 41-42.)  It is unclear how the State draws this conclusion.  Three testifying experts—a psychologist specializing in childhood trauma, a neuropsychologist, and a psychiatrist—testified at the PCR hearing regarding the direct connection between Andriano's disorders and her behavior leading up to and including the offense itself.  From Andriano's Type II complex PTSD (which causes dissociation and severe over- and under-responses in emotionally charged situations) to her bipolar disorder (which causes "significantly

---

[14]  *See Porter v. McCollum*, 558 U.S. 30, 33 (2009) (per curiam) ("Unlike the evidence presented during [the defendant's] penalty hearing . . . the new evidence described his abusive childhood," his post-traumatic stress disorder, "and his impaired mental health and mental capacity"); *id.* at 43 (evidence of childhood abuse "may have particular salience" in a case involving the murder of a loved one); *Correll*, 539 F.3d at 950-51 (evidence of childhood abuse and neglect, incest, and impulse control problems and impaired judgment are "precisely th[e] type of evidence that the Supreme Court has deemed as 'powerful'" mitigating evidence); *State v. Bocharski*, 218 Ariz. 476, 497-99, ¶¶ 101-105, 112, 189 P.3d 403, 424-26 (2008) (reducing sentence on independent review due to mitigating evidence that the defendant "suffered severe physical, mental and sexual abuse during his childhood" and "came from a severely dysfunctional family").

impaired judgment" and impulsive behavior) to her cognitive deficits in executive

functioning (which impair impulse control) and dependent personality disorder

(which can cause violent outbursts when the sufferer is unable to meet the needs of

loved ones), all three experts found direct connections between Andriano's

disorders and her violent behavior on the night of the offense.  (*See* Post-Hearing

Mem. at 36-48 (P-App 339-51).)

Finally, as explained in the Petition (at 40-43), trial counsel's failure to

perform an adequate investigation into potential sources of mitigation prejudiced

Andriano, and left them unable to contextualize her actions both before and during

Joe's murder, or to explain how she became the promiscuous, hypersexualized and

mentally ill person that the State vilified at trial.  (*See id.* at 5-8.)

## III.   OTHER CLAIMS

The State offers only brief responses to each of Andriano's other PCR

claims, and to Andriano's appeal of the PCR Court's denial of her motion to admit

certain sworn declarations into evidence.

### A.   Failing To Object To The State's Aggravator Phase Argument That Andriano "Poisoned" Joe (Claim I(B))

The State asserts that Andriano "poisoned" Joe with sodium azide (*see* State

Br. at 49, 51), as it must:  if Joe took the sodium azide voluntarily as part of a

botched plan to commit suicide before his terminal cancer became more painful, as

Andriano testified, then the State's primary evidence of premeditation and cruelty

would evaporate.  (*See* 11/30/04 Tr. at 58-59, 63-66, 69 (medical examiner noted that any one of the first several blows with the barstool would have rendered Joe unconscious).)  Yet the State does not dispute that its theory of surreptitious poisoning was *impossible*, in terms of simple math.  (*See* Pet. at 48-49.)

Instead, the State contends that, because the sodium azide evidence was admissible during the guilt phase, the State was free to argue its poisoning theory during the aggravator phase.  (State Br. at 49-50.)  The State misses the point.  The *evidence* that Joe ingested sodium azide was undisputed and admissible; trial counsel was ineffective for failing to contest *argument* that Andriano secretly poisoned Joe in a manner that directly contradicted that evidence.  The State is not free to argue for a theory of cruelty that is simply impossible, and Andriano's trial counsel was constitutionally ineffective in failing to object.

### B.      Ineffective Assistance - Guilt Phase (Claim I(C))

####         1.      Evidence of Mental Illness

The State contends that trial counsel's failure to make more than a cursory investigation into Andriano's mental health caused no prejudice, for two reasons: (1) the defendant's mental health is irrelevant to whether she committed the murder in an "especially cruel" manner (State Br. at 47-48 (citing *State v. Bocharski*, 218 Ariz. 476, 189 P.3d 403 (2008)); and (2) "the evidence belies any claim that Andriano acted reflexively in killing Joe" (State Br. at 51-52).  The State

is incorrect on both counts.

*First*, as the State acknowledges, the "especially cruel" aggravator has an "intent requirement." *Bocharski*, 218 Ariz. at 494, ¶ 85 n.15.  Thus, to prove the necessary intent, the State must show that the *defendant*, with all her characteristics—not some hypothetical mentally healthy person—"knew or should have known" that the manner of death was especially cruel.  *Id.  See also State v. Moody*, 208 Ariz. 424, 472, ¶ 226, 94 P.3d 1119, 1167 (2004) ("However, [case law] contains an additional requirement:  that 'the defendant knew or should have known that suffering would occur.'  *Because evidence was presented that Moody was in a 'dissociated state'* [at the time of the offense], we cannot conclude beyond a reasonable doubt that a reasonable jury" necessarily would have found the murder to be especially cruel) (emphasis added; internal citation omitted).

*Second*, the State's *ipse dixit* assertion that Andriano was not prejudiced by the failure to develop and introduce evidence of her mental health disorders at the guilt phase simply ignore the facts of the homicide itself.  Joe did not die from the sodium azide he ingested; according to the medical examiner who testified at trial, Andriano killed Joe in a frantic attack with a barstool and knife (11/30/04 Tr. at 58-59, 63-66; Ex. 65 (P-App 3382-3395)), only after calling a neighbor and the paramedics to take Joe to the hospital and after suffering numerous injuries of her own (including fistfuls of her hair ripped out from the roots (Ex. 66 (P-App 3398-

3404); 9/13/04 Tr. at 121; 9/14/04 Tr. at 41; 9/23/04 Tr. at 107-08)).  There was

nothing "calculated and premeditated" about that manner of homicide; it makes no

logical sense whatsoever unless Andriano were impulsively overreacting as a result

of her mental disorders, as outlined above.

Had trial counsel responded to all of the red flags noted in the Petition and

thoroughly investigated their client's mental health, in the guilt phase they could

have explained her apparent overreaction as a predictable consequence of her

untreated mental disorders, *see State v. Christensen*, 129 Ariz. 32, 35-36, 628 P.2d

580, 583-84 (1981), and at the very least sought an instruction regarding lesser

included offenses.

### 2.    Corroborating Evidence Regarding Life Insurance

The State's argument for premeditation also relied heavily upon evidence

that Andriano unsuccessfully sought life insurance for Joe prior to his death, on the

theory that Andriano secretly sought to profit from his death.  (State Br. at 2-3.)

Trial counsel could have rebutted that theory with evidence from the Andrianos'

babysitter, who was privy to discussions between Joe and Andriano in which Joe

expressed his desire to obtain a life insurance policy notwithstanding his cancer

diagnosis, but trial counsel inexplicably failed to interview the babysitter regarding

any matters of substance prior to her testimony.  (Ex. 31 ¶¶ 8, 26 (P-App 2946,

2951).)  Indeed, when she was called to testify, she did not even know it was a

murder trial; she thought she was testifying in a custody dispute regarding the Andrianos' children.  (*Id.*)

The State asserts no prejudice from trial counsel's ineffectiveness, on two grounds.  *First*, it claims that the babysitter's testimony regarding Joe's intent to obtain a life insurance policy would have been inadmissible.  That is incorrect:  it would plainly fall within the hearsay exception for statements "of the declarant's then-existing state of mind (such as motive, intent, or plan)."  Ariz. R. Evid. 803(3).  *Second*, the State asserts that the timing of Joe's conversation regarding life insurance may have been a year prior to his death, and thus would not have been persuasive.  (State Br. at 52-53.)  But this evidence would have fully corroborated Andriano's testimony:  that Joe wanted life insurance for the family and that Andriano unsuccessfully attempted to obtain it.  (10/27/04 Tr. at 32-42.) Had trial counsel made the effort to interview the babysitter, her testimony could have persuaded at least one juror that Andriano was seeking a life insurance policy because it was what Joe wanted—not part of a murder plot.

### 3.    Corroborating Evidence That Joe Was Suicidal

The State does not dispute that trial counsel could have used the hearsay exception for statements of the declarant's then-existing state of mind, Ariz. R. Evid. 803(3), to elicit key testimony from Joe's attorney that Joe had been contemplating suicide in the weeks leading up to his death.  Instead, it argues that

the evidence would not have mattered, because Joe also told the attorney "he had

no intention of killing himself *and compromising his family's lawsuit*" for medical

malpractice.  (State Br. at 54 (emphasis added).)

The State's reasons for disregarding this evidence are the same reasons it

was crucial.  Andriano testified that Joe asked her to research means of committing

suicide that *would not compromise his family's lawsuit* for medical malpractice,

and that she was (erroneously) informed that sodium azide was a potential means

for doing so.  (10/27/04 Tr. at 84-87, 91-93.)  Again, trial counsel failed to elicit

evidence that would have corroborated Andriano's testimony on a key point.

### C.    Prosecutorial Misconduct (Claim III)

The State asserts that any issues of prosecutorial misconduct in Andriano's

trial were waived by Andriano's trial and/or appellate counsel (State Br. at 43-44),

but that is Andriano's point.  Andriano's PCR claim is that her trial counsel was

ineffective in failing to object to the numerous instances of prosecutorial

misconduct during the course of the trial, which could have preserved those claims

for this Court's review on direct appeal.  The State's assertions of waiver on direct

appeal only demonstrate the prejudice that resulted from trial counsel's

ineffectiveness in failing to timely object.

In addition, the State notes that Andriano's affairs were admitted as evidence

of motive, and "nothing presents [sic] the State from suggesting more than one

motive for the offense."  (State Br. at 44.)  But this was not a "dual motive" case:
when the prosecutor expressly disavowed (and urged the jury not to find) her
affairs as the motive for the offense during the aggravator phase (11/30/04 Tr. at
20; 12/1/04 Tr. at 10-11), he eliminated the sole rationale for the trial court's
admission of that evidence.  It was misconduct for the prosecutor to continue to
inundate the jury with references to Andriano's affairs in the aggravator and
penalty phases, to urge the jury to condemn her for adulterous behavior.

### D.    Juror Misconduct (Clam IV)

The State does not dispute that juror misconduct occurred during the
deliberations of Andriano's trial, but asserts that the PCR Court was correct in
concluding that a post-trial newspaper article should have placed trial counsel on
notice of the potential misconduct.  (State Br. at 45-46.)  But neither the State nor
the PCR Court explain why a newspaper article with a vague juror quotation
stating that the jury did not want Andriano to get out of prison should have alerted
trial counsel that the jury found the *aggravator* met based on sentencing
considerations, or that the jury made a chart of such potential outcomes during
deliberations over the aggravator.  Moreover, if the State and PCR Court were
correct that the newspaper article placed trial counsel on reasonable notice of
potential juror misconduct, then trial counsel were constitutionally deficient in
neglecting to preserve that fundamental right.

**E.      The PCR Court's Denial of Andriano's Motion to Admit Additional Mitigating Evidence**

In the PCR hearing, Andriano moved to admit a number of sworn declarations of additional witnesses corroborating childhood abuse and neglect of Andriano (including sexual abuse by Alejo) and her family mental health history. The State argues that the jury could have considered such evidence in the penalty phase of Andriano's trial, in which the Rules of Evidence are inapplicable, Ariz. Rev. Stat. § 13-751(C), but that the PCR Court could not, because the Rules of Evidence are applicable in PCR proceedings.  (State Br. at 42.)

The State's argument would create a legal loophole.  If the PCR Court is presented with mitigating evidence that would have been admissible at the penalty phase of Andriano's jury trial, then that evidence must be considered in assessing whether trial counsel was ineffective in failing to develop and present it.  To hold otherwise would leave defendants with no remedy for trial counsel's ineffectiveness in failing to develop mitigating evidence unless that mitigating evidence is admissible under the Rules of Evidence—rules that expressly *do not apply* to the penalty phase of capital trials.

## CONCLUSION

For the reasons stated, Andriano's Petition should be granted.

DATED:  August 24, 2015          By:  _/s/   Scott M. Bennett_____
                                       Scott M. Bennett (022350)
                                       COPPERSMITH SCHERMER & BROCKELMAN PLC
                                       2800 North Central Avenue
                                       Phoenix, Arizona  85004
                                       (602) 224-0999 (office)
                                       (602) 224-6020 (fax)
                                       sbennett@cblawyers.com

                                       Allen A. Arntsen, admitted *pro hac vice*
                                       Matthew R. Lynch, admitted *pro hac vice*
                                       FOLEY & LARDNER LLP
                                       150 E. Gilman Street
                                       Madison, WI 53703-1481
                                       (608) 257-5035 (Office)
                                       (608) 258-4258 (Fax)

                                       *Attorneys For Petitioner Wendi Andriano*

# EXHIBIT ZZZZZZZZZZ

# IN THE ARIZONA SUPREME COURT

| | |
|---|---|
| STATE OF ARIZONA | ARIZONA SUPREME COURT |
|     RESPONDENT, | CR-15-0115-PC |
| v. | |
| WENDI ELIZABETH ANDRIANO | Maricopa County Superior Court |
|     PETITIONER. | No. CR2000-096032-A |

## PETITIONER'S MOTION TO FILE OVERLENGTH BRIEF
## (CAPITAL CASE)

Petitioner Wendi Andriano moves for leave to file a reply brief in support of her petition for appellate review of post-conviction relief proceedings in excess of the page limit set forth in the Arizona Rules of Criminal Procedure, Rule 32(c)(1). This motion is made in good faith, not for the purposes of harassment or delay, and is brought pursuant to Andriano's state and federal constitutional rights to due process, effective counsel, a full and fair appeal, equal protection and freedom from cruel and unusual punishment. U.S. Const. Amends. V,VI,VIII,XIV; Ariz. Const. Art. 2, §§4,10,13,15,23,24,32,33; *Evitts v. Lucey*, 469 U.S. 387 (1985).

Ariz. R. Crim. P. 32(c) generally limits a petition seeking appellate review of post-conviction relief proceedings to 20 pages, and a reply brief to half that size (10 pages). Due to the complexity, extensive record, and stakes of this capital case, Andriano sought and obtained leave to file an opening petition of 57 pages.

The State followed suit with an opposition brief of 56 pages.

The undersigned counsel have diligently limited their reply arguments and kept them concise, but they have been unable to comply with the 10-page limit in light of the complexity and volume of appellate issues and arguments relating to Andriano's Petition for Post-Conviction Relief—which required almost 500 pages of briefing between the two parties in the Superior Court for Maricopa County (P-App 41-125, 171-562).

To avoid any potential waiver, and to address the multiple legal issues and extensive record before this Court in a manner that will be of assistance in its review, Andriano seeks leave to file a reply brief of 26 pages in support of her petition.  While Andriano seeks leave to file a reply in excess of the 10-page limit of Rule 32.9(c), her request does maintain the Rule's proportionality:  the 10-page limit of Rule 32(c) is one-half of the 20-page limit for the State's response brief, and Andriano's reply brief is less than one-half of the pages in the State's 56-page response brief here.

This Court has the power to extend the page limits for this reply. *See State v. Payne*, No.CR-09-0081-AP, Order (6/29/2012) (granting motion to exceed word limit for reply brief for a total of 18,336 words); *State v. Wallace*, No. CR-09-0341-AP, Order (08/04/2011) (granting motion to exceed word limit for reply brief for a total of 20,000 words).  Andriano respectfully requests that the Court do so

here to provide her with an opportunity for full and fair review and to protect her constitutional rights in this capital case.  *Lockett v. Ohio*, 438 U.S. 586, 604 (1978); *Turner v. Murray*, 476 U.S. 28, 37 (1986) (procedures that create unnecessary risk of arbitrary imposition of capital sentence violate Eighth Amendment); *Boddie v. Connecticut*, 401 U.S. 371, 378 (1971) (due process guarantees meaningful opportunity to be heard); *Dobbs v. Zant*, 113 S. Ct. 835, 836 (1993) (noting "importance of reviewing capital sentences on a complete record").

## CONCLUSION

Andriano respectfully requests that this Court allow her to file a reply brief in support of her petition of 26 pages. Should this Court decide to deny this motion in whole or in part, Andriano respectfully requests this Court to: 1) order the reply brief filed with this motion as part of the record, and 2) allow counsel sufficient time to file a revised reply brief in compliance with this Court's order.

Respectfully submitted this 24th day of August, 2015.


By:  _/s/      Scott M. Bennett_____
Scott M. Bennett (Bar No. 022350)
COPPERSMITH BROCKELMAN PLC
2800 North Central Avenue
Phoenix, Arizona  85004
(602) 224-0999 (office)
(602) 224-6020 (fax)
sbennett@cblawyers.com

Allen A. Arntsen, admitted pro hac vice
Matthew R. Lynch, admitted pro hac vice
FOLEY & LARDNER LLP
150 E. Gilman Street
Madison, Wisconsin 53703
(608) 257-5035 (office)
(608) 258-4258 (fax)
aarntsen@foley.com
mlynch@foley.com

Attorneys for Petitioner Wendi Andriano

# EXHIBIT AAAAAAAAAAA

SUPREME COURT OF ARIZONA

| | |
|---|---|
| STATE OF ARIZONA, | ) Arizona Supreme Court |
| | ) No. CR-15-0115-PC |
| Plaintiff, | ) |
| | ) Maricopa County |
| v. | ) Superior Court |
| | ) No. CR2000-096032 |
| WENDI ELIZABETH ANDRIANO, | ) |
| | ) |
| Defendant. | ) |
| | ) **FILED 8/24/2015** |
| _____ | ) |

**O R D E R**

A "Petitioner's Motion to File Overlength Brief (Capital Case)" (Defendant Andriano) having been filed, and the Clerk of the Court having been authorized by the Supreme Court to enter orders granting or denying requests for extended pagination,

**IT IS ORDERED** granting Defendant's motion to exceed the page limit on the Reply to the Response to the Petition for Review by 16 pages, for a total of 26 pages.  The Reply shall be filed this date.

DATED this 24th day of August, 2015.

_____
Janet Johnson
Clerk of the Court

TO:
Lacey Stover Gard
Scott M Bennett
Allen A Arnsten
Matthew R Lynch
Wendi Elizabeth Andriano, ADOC #191593, Arizona State
    Prison, Perryville - Lumley/San Juan Unit
Dale A Baich
Diane Alessi
Amy Armstrong
bp

# EXHIBIT BBBBBBBBBBB



SCOTT BALES
CHIEF JUSTICE

JANET JOHNSON
CLERK OF THE COURT

# Supreme Court

**STATE OF ARIZONA**
**ARIZONA STATE COURTS BUILDING**
**1501 WEST WASHINGTON STREET, SUITE 402**
**PHOENIX, ARIZONA 85007-3231**

**TELEPHONE: (602) 452-3396**

April 11, 2016

**RE:   STATE OF ARIZONA v WENDI ELIZABETH ANDRIANO**
       Arizona Supreme Court No. CR-15-0115-PC
       Maricopa County Superior Court No. CR2000-096032

GREETINGS:

The following action was taken by the Supreme Court of the State
of Arizona on April 11, 2016, in regard to the above-referenced
cause:

**ORDERED: Petition for Review of Denial of Post-Conviction Relief
(Capital Case) = DENIED.**

Janet Johnson, Clerk

TO:
Lacey Stover Gard
Gregory Michael Hazard
Scott M Bennett
Allen A Arnsten
Matthew R Lynch
Wendi Elizabeth Andriano, ADOC 191593, Arizona State Prison,
      Perryville - Lumley/San Juan Unit
Dale A Baich
Diane Alessi
Amy Armstrong
bp

# EXHIBIT CCCCCCCCCCC

Michael K. Jeanes, Clerk of Court
*** Filed ***
10/31/2012 8:00 AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                    10/30/2012


                                          CLERK OF THE COURT
HONORABLE BRIAN K. ISHIKAWA                L. Mooney
                                              Deputy



STATE OF ARIZONA                        LACEY ALEXANDRA STOVER GARD

v.

WENDI ELIZABETH ANDRIANO (A)            JAMES J BELANGER
                                        SCOTT M BENNETT
                                        ALLEN A ARNTSEN
                                        MATTHEW R LYNCH

                                        APPEALS-PCR
                                        CAPITAL CASE MANAGER
                                        COURT ADMIN-CRIMINAL-PCR


**MINUTE ENTRY**


        The Court has reviewed the defendant's Petition for Post-Conviction Relief, the State's Response to Petition for Post-Conviction Relief, and the defendant's Reply, as well as the Court's file. This is the defendant's first Rule 32 proceeding following the Arizona Supreme Court's affirmance of her conviction and death sentence in *State v. Andriano*, 215 Ariz. 497, 161 P.3d 540 (2007).

        The defendant was convicted by a jury of one count of first degree murder. *Andriano*, 215 Ariz. at 501, 161 P.3d at 544. The jury unanimously found at the aggravation phase that the defendant committed the murder in an "especially cruel manner," in violation of A.R.S. § 13-751(F)(6),[1] but did not find that she committed the offense "in expectation of the receipt … of anything of pecuniary value," in violation of A.R.S. § 13-751(F)(5). Following a penalty phase, the jury determined that the mitigation presented was not sufficiently substantial to call for leniency and returned a verdict of death.

---

[1] Citations are to the current versions of the statutes (A.R.S. § 13-751 *et seq*.) rather than the historical versions (A.R.S. § 13-703 *et seq*.).

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                    10/30/2012

On direct appeal, the defendant raised eleven claims of error:

    (1) the trial court violated her constitutional rights and the Arizona Rules of Evidence by admitting evidence of her extramarital affairs and attempts to obtain life insurance;

    (2) fundamental error occurred when the trial court failed to *sua sponte* instruct the jury on second-degree murder and manslaughter as lesser-included offenses of first-degree murder;

    (3) the A.R.S. § 13-751(F)(6) "especially cruel" aggravating factor is facially vague;

    (4) the trial court's jury instruction defining cruelty was insufficient to channel the jurors' discretion;

    (5) the evidence was insufficient to support the jury's finding of cruelty;

    (6) the trial court violated her constitutional rights by precluding evidence of residual doubt as mitigation;

    (7) the trial court violated her constitutional rights by refusing to permit mercy as mitigation;

    (8) the trial court violated her constitutional rights by erroneously instructing the jurors regarding the need for finding mitigation unanimously;

    (9) the trial court coerced a death verdict by giving the jury an impasse instruction prematurely;

    (10) the trial court violated her constitutional rights by instructing the jury about its duty to deliberate in the penalty phase; and

    (11) Arizona's statute providing for execution by lethal injection constitutes cruel and unusual punishment.

The defendant raises the following five claims in her petition:

I.    The defendant's right to effective assistance of counsel was violated by defense counsel's deficient performance, resulting in prejudice during all phases of the trial;

II.    Defense counsel in charge of the defendant's penalty phase had an actual conflict of interest that affected the adequacy of the defendant's representation;

III.    Defense counsel's failure to object to pervasive instances of prosecutorial misconduct deprived the defendant of due process and violated her right to effective assistance of counsel;

IV.    The jury's consideration of a non-statutory aggravating factor violated due process;

V.    The defendant was denied the effective assistance of counsel on her direct appeal.

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                          10/30/2012

Pursuant to Rule 32.6(c), the Court first identifies all claims that are procedurally precluded from Rule 32 relief. An issue is precluded if it was raised, or could have been raised, on direct appeal or in prior Rule 32 proceedings.  *State v. Towery,* 204 Ariz. 386, 64 P.3d 828 (2003); *Stewart v. Smith*, 202 Ariz. 446, 46 P.3d 1067 (2002); *State v. Mata*, 185 Ariz. 319, 334, 916 P.2d 1035 (1996).

Pursuant to this authority and Rule 32.2(a), the Court finds the defendant's claims III and IV to be precluded from relief.

In claim III, the defendant alleges that numerous instances of prosecutorial misconduct deprived her of due process and violated her right to effective assistance of counsel. Specifically, she claims that references to her extramarital lifestyle were improper.  However, the defendant raised and the Supreme Court addressed the admissibility of other act evidence regarding her extramarital affairs on direct appeal.  That Court concluded that this Rule 404(b) evidence served to establish a motive for the murder and to rebut the defendant's domestic violence victim/self-defense theory. *Andriano*, 215 Ariz. at 503, 161 P.3d at 546.  Comment upon properly-admitted evidence by a prosecutor is appropriate.

Although noting that the defendant did not allege prosecutorial misconduct on appeal, the Supreme Court nonetheless addressed the prosecutor's statements about defendant's actions and observed that the majority of them occurred during the guilt phase closing arguments. *Id*. at 503 & n.3.  The Court noted that "[c]omments in closing arguments, however, are not evidence, as the jury was instructed, and thus the comments do not render unfairly prejudicial evidence that is otherwise properly admitted." *Id*. A claim of prosecutorial misconduct could have been raised on appeal, and as it was not, it has been waived pursuant to Rule 32.2(a)(3).

In claim IV, the defendant alleges that "the jury improperly considered, and was influenced by, an impermissible consideration unrelated to the nature of the crime. During deliberations at the aggravator stage, the jurors 'made a chart outlining the different possible outcomes ... depending on whether they found an aggravator, which made their decision 'a lot clearer.'" (Memorandum in Support of Petition at 69). As noted by the State, the defendant had notice of facts related to this allegation of jury misconduct and could have investigated and raised the issue at an earlier stage:  in a Motion for New Trial (Rule 24.1(c)), a Motion to Vacate Judgment (Rule 24.2(a)), or on direct appeal. (State's Response at 16-17).  Because the claim of jury misconduct could have been raised at an earlier stage or on appeal, and was not, it has been waived pursuant to Rule 32.2(a)(3).

In her remaining claims (I and V), the defendant alleges that she was denied effective assistance of counsel at trial and on direct appeal. To avoid summary dismissal and achieve an evidentiary hearing on a post-conviction claim of ineffective assistance of counsel, a defendant

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                    10/30/2012

must present a colorable claim (1) that counsel's representation was unreasonable or deficient under the circumstances and (2) that she was prejudiced by counsel's deficient performance. *State v. Fillmore,* 187 Ariz. 174, 180, 927 P.2d 1303, 1309 (App.1996), *citing* Ariz. R.Crim. P. 32.6(c) ("court shall order … petition dismissed" if claims present no "material issue of fact or law which would entitle defendant to relief"), 32.8(a)(evidentiary hearing required "to determine issues of material fact"); *see also Strickland v. Washington,* 466 U.S. 668, 687 (1984)(to prevail on claim of ineffective assistance of counsel, defendant must show both deficient performance and resulting prejudice).

A colorable claim entitling the defendant to an evidentiary hearing is one which, if taken as true, "might have changed the outcome." *State v. Schrock,* 149 Ariz. 433, 441, 719 P.2d 1049, 1057 (1986). Like the ultimate decision whether to grant or deny post-conviction relief, whether a claim is colorable, warranting an evidentiary hearing "is, to some extent, a discretionary decision for the trial court." *State v. D'Ambrosio,* 156 Ariz. 71, 73, 750 P.2d 14, 16 (1988).

In claim I(A), the defendant alleges that her trial counsel was ineffective in the penalty phase by failing to investigate and present expert testimony regarding her mental illness and by failing to investigate and present evidence regarding her harrowing childhood. The Court finds that the defendant has raised a colorable claim warranting an evidentiary hearing concerning this claim.

In claim I(B), the defendant alleges that her trial counsel was ineffective in the aggravation phase by failing to investigate and present expert testimony regarding her mental illness and by failing to object to the jury's consideration of evidence related to sodium azide poisoning. The Court finds these claims are not colorable. As noted, the sole aggravator was "especially cruel." This aggravator focuses on the physical and mental suffering of the victim rather than on the actions or mental state of the defendant. It is determined by reference to an objective standard, and whether the defendant was aware or should have been aware of the victim's suffering is judged from the perspective of a reasonable person in the defendant's position. *State v. Carlson,* 202 Ariz. 570, ¶ 44, 48 P.3d 1180 (2002)("Foreseeability in connection with the cruelty factor has been based on an objective rather than subjective standard. We have held that the physical pain or mental anguish suffered by a victim before death must only be reasonably foreseeable, regardless of whether the defendant actually foresaw it. *State v. Djerf,* 191 Ariz. 583, 595 ¶ 45, 959 P.2d 1274, 1286 ¶ 45 (1998); *State v. Adamson,* 136 Ariz. 250, 266, 665 P.2d 972, 988 (1983).")).  Thus, the defendant's mental health evidence would not have been relevant or admissible in the aggravation phase and trial counsel was not ineffective for failing to present it.

Similarly, trial counsel was not ineffective for failing to seek an order precluding the jury from considering Joe's ingestion of sodium azide in determining whether cruelty was

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                    10/30/2012

established. The defendant did not contest the admissibility of this evidence in the guilt phase because it played a key role in her self-defense theory. Pursuant to A.R.S. § 13-752(I), any evidence admitted in the guilt phase is deemed admitted as evidence in the aggravation phase. Thus, counsel could not allow evidence to be admitted in the guilt phase without objection and subsequently seek its preclusion in the aggravation phase.

In claim I(C), the defendant alleges that trial counsel provided ineffective assistance in the guilt phase by failing to (1) present evidence of her mental illness; (2) present evidence that Joe was aware of her efforts to obtain life insurance; (3) present evidence that Joe was depressed; and (4) seek a jury instruction on lesser-included offenses. Concerning the mental illness evidence, the defendant argues that this evidence would have established "whether she formulated the mental state necessary to be convicted of first-degree murder." (Memorandum in Support of Petition at 59-60). However, because she did not raise an insanity defense, evidence of mental illness was inadmissible to negate the *mens rea* element of the charge. *State v. Mott*, 187 Ariz. 536, 541, 931 P.2d 1046, 1051 (1997). Thus, counsel was not ineffective for failing to seek admission of evidence precluded by Arizona law.

The defendant's assertions about Joe's awareness of life insurance applications and Joe's depression also are not colorable. Gia Palicki's purported testimony relates to a conversation she had with defendant and Joe in the summer or fall of 1999 and therefore was remote in time to the murder and would not have rebutted the defendant's later attempts to obtain life insurance for Joe without his knowledge. Jeffrey Miller's testimony about Joe's depression was excluded because it was inadmissible hearsay. Similarly, Chris Weaver's purported testimony does not establish that Joe was depressed. Decisions concerning trial strategy and tactics, including what witnesses to call, motions to file, and objections to make, are entrusted to trial counsel. *State v. Lee*, 142 Ariz. 210, 689 P2d 153 (1984). The Court finds that the defendant has failed to show a colorable claim of deficient performance or prejudice regarding these trial strategies.

As to the alleged failure to seek a jury instruction on lesser-included offenses, the defendant raised this issue on appeal and the Supreme Court held that the evidence did not support any lesser-included offenses. *Andriano*, 215 Ariz. at ¶¶32-36. Therefore, defense counsel was not ineffective for failing to request such instructions.

In claim II, the defendant alleges that defense counsel DeLozier, who was in charge of investigation of penalty phase mitigation, had an actual conflict of interest that affected his representation of her. This claim is related to the defendant's claim I(A) of ineffective assistance of counsel in the penalty phase, which the Court has found to be colorable. Because the issue was not raised at trial and both parties assert facts that are outside the record, an evidentiary hearing also is warranted on this claim.

Docket Code 595                    Form R000A                    Page 5

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                    10/30/2012

In claim V, the defendant asserts that her appellate counsel provided ineffective assistance because he failed to raise on appeal trial counsel's conflict of interest, the alleged prosecutorial misconduct asserted in claim III, and the trial court's ruling on witness Jeffrey Miller's testimony in defendant's direct appeal.  (Memorandum in Support of Petition at 70).

To avoid summary dismissal and achieve an evidentiary hearing on a post-conviction claim of ineffective assistance of appellate counsel, the defendant must demonstrate a reasonable probability that but for counsel's deficient performance, the outcome of the appeal would have been different.  *State v. Herrera*, 183 Ariz. 642, 647, 905 P.2d 1377, 1381 (App. 1995). Appellate counsel is not ineffective for selecting some issues and rejecting others.  Once the issues have been narrowed and presented, appellant counsel's waiver of other possible issues binds the defendant. *Id. See also, State v. Febles*, 210 Ariz. 589, ¶¶18-19, 115 P.3d 629 (App. 2006).

The Court finds that respecting appellate counsel, none of these claims have merit. Regarding any alleged prosecutorial misconduct, as previously noted in rejecting the defendant's claim III, the prosecutor did not commit misconduct. Therefore, the Supreme Court would not have reversed the defendant's conviction on that basis. Similarly, although the defendant characterizes this Court as having "excluded" Mr. Miller's testimony, in fact, Mr. Miller took the stand and testified.  After discussion at the bench, the Court sustained the prosecutor's objection to hearsay testimony. Because the testimony would have elicited inadmissible hearsay, the Supreme Court would have found no error in this Court's ruling. Finally, regarding defense counsel's alleged conflict of interest, because the issue was not raised at trial and both parties assert facts that were not before the court at trial, it is not an issue that could have been raised on appeal. *State v. Spreitz*, 202 Ariz. 1, 39 P.3d 1263 (2002). In any event, the Court has determined that an evidentiary hearing is warranted on defendant's related claim II.  The defendant has failed to make a colorable claim that the outcome of her appeal would have been different.

Based on the foregoing,

IT IS THEREFORE ORDERED dismissing claims I(B) and (C), III, IV and V.

IT IS FURTHER ORDERED granting an evidentiary hearing regarding claims I(A) and II.

IT IS FURTHER ORDERED setting an Informal Conference on **November 29, 2012 at 3:00 p.m.** before Judge Brian K. Ishikawa to address scheduling of the evidentiary hearing. Pursuant to Rule 32.7, the defendant need not be present at this conference as she is represented by counsel.

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                    10/30/2012


DATED this 30th day of October, 2012.


_____
HONORABLE  BRIAN K. ISHIKAWA
JUDGE OF THE SUPERIOR COURT

Michael K. Jeanes, Clerk of Court
*** Filed ***
10/31/2012 8:00 AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                            10/30/2012


                                            CLERK OF THE COURT
HONORABLE BRIAN K. ISHIKAWA                      L. Mooney
                                                  Deputy



STATE OF ARIZONA                        LACEY ALEXANDRA STOVER GARD

v.

WENDI ELIZABETH ANDRIANO (A)            JAMES J BELANGER

                                        APPEALS-PCR
                                        CAPITAL CASE MANAGER
                                        COURT ADMIN-CRIMINAL-PCR
                                        MELISSA S HO
                                        POLSINELLI SHUGHART PC
                                        CITYSCAPE ONE EAST WASHINGTON
                                        STREET, SUITE 1200
                                        PHOENIX AZ  85004-2568
                                        MARK V DANIS
                                        MORRISON FOERSTER, LLP
                                        425 MARKET STREET
                                        SAN FRANCISCO CA  94105
                                        EFRAIN STAINO
                                        MORRISON FOERSTER, LLP
                                        425 MARKET STREET
                                        SAN FRANCISCO CA  94105
                                        NATALIE WHEATFALL
                                        MORRISON FOERSTER, LLP
                                        425 MARKET STREET
                                        SAN FRANCISCO CA  94105
                                        DIANA B KRUZE
                                        MORRISON FOERSTER, LLP
                                        425 MARKET STREET
                                        SAN FRANCISCO CA  94105


**MINUTE ENTRY**

Docket Code 023                    Form R000A                         Page 1

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                    10/30/2012

The Court has received and considered:

- Motion to Associate Counsel *Pro Hac Vice*
- Legal Momentum's Motion for Leave to File Amicus Curiae Brief in Support of Petitioner
- The State's Response in Opposition to Legal Momentum's Motion for Leave to file Amicus Curiae Brief on Behalf of Petitioner
- Legal Momentum's Reply Brief in Support of Motion for Leave to File an Amicus Curiae Brief

Legal Momentum seeks leave to file an *amicus curiae* brief in support of the defendant's Petition for Post-Conviction Relief. As conceded by Legal Momentum, although Rule 31.25(a) applies to appeals from Superior Court, the Rule makes no provision for use in connection with a petition for post-conviction relief. By its terms, the Rule applies to an appeal from superior court, with a reference in Rule 31.25(b) to the time applicable to an *amicus* brief for a special action petition. Where permitted, an *amicus* brief requires either (1) written consent of all parties or (2) leave of court. Rule 31.24(a).

In connection with the defendant's case, written consent has not been provided; in fact, the State has filed its opposition. Consequently, an *amicus* brief may only be filed with the court's permission.

Arizona courts have permitted *amicus curiae* to file a brief to address issues of statewide importance (*State v. Arellano*, 213 Ariz. 474, 143 P.3d 1015 (2006)); to address constitutional issues (*State v. Fowler*, 156 Ariz. 408, 409-410, 752 P.2d 497, 498-499 (Ariz.App.,1987)); to provide historical background (*Schecter v. Killingsworth*, 93 Ariz. 273, 278, 380 P.2d 136, 139 (1963)); and to provide supplemental background and context for the court's decision (*State v. McCall*, 139 Ariz. 147, 677 P.2d 920(1983).

Arizona Courts have declined to permit *amicus* counsel to raise issues which have not been raised by the parties (*Town of Chino Valley v. City of Prescott* 131 Ariz. 78, 84, 638 P.2d 1324, 1330 (1981)); to inject new issues into a case on appeal (*City of Tempe v. Prudential Ins. Co. of America*, 109 Ariz. 429, 432, 510 P.2d 745, 748 (1973)); or to create, extend, or enlarge issues beyond those raised and argued by the parties (*Tempe, id.*).

In its brief, Legal Momentum claims (1) The prosecutor's repeated references to the defendant's sexual activities played into gender stereotypes, was unduly prejudicial, and violated

# EXHIBIT DDDDDDDDDDD

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                          10/30/2012

her constitutional right to due process (the statements were prejudicial and had little relevance; the jury was negatively influenced by the statements) and (2) Defense counsel allowed pervasive references to her sexual activities in violation of her Sixth Amendment right to effective assistance of counsel.

The *amicus* brief's first claim effectively alleges prosecutorial misconduct, a claim which parallels that of the defendant's post-conviction relief claim and which, although not raised on direct appeal, could have been raised and, even though not raised, was in fact addressed by the Arizona Supreme Court in its decision.  *State v. Andriano*, 215 Ariz. 497, 503, 161 P.3d 540, 546 (2007). The *amicus* brief's second claim, ineffective assistance of counsel, is grounded in failure to object to the "prosecutorial misconduct," which has been addressed.  In addition to its concerns as to the defendant's PCR, Legal Momentum provides background, information and research related to gender bias, defined as "behavior or decision-making that is based on stereotypical attitudes and cultural perceptions [that] can range from simple ill will to intentional bias."   The particular concern appears to be related to trivializing domestic violence issues. The Court is cognizant of its responsibility for the effective administration of justice to address and eliminate gender bias.

IT IS ORDERED:

- Denying the Motion to Associate Counsel *Pro Hac Vice*
- Denying Legal Momentum's Motion for Leave to File Amicus Curiae Brief in Support of Petitioner

DATED this 30th day of October, 2012.

_____
Honorable Brian K. Ishikawa
Judge of the Superior Court