*Wendi Elizabeth Andriano v. Charles Ryan, et al.*
No. CV-16-01159-PHX-SRB
Index to Exhibits to Motion for Evidentiary Development

**Records Regarding Trial Counsel**

Exhibit 1   *In the Matter of a Member of the State Bar of Arizona, G. David DeLozier, Jr.*, State Bar File No. 00-1963

Exhibit 2   Minute Entry Ruling Under Advisement Re Sanctions, *In the Matter of the Adoption of [Andriano Children]*, No. AD200100058 (Pinal Cty. Super. Ct. Oct. 15, 2002)

Exhibit 3   Transcript of interview with David DeLozier by post-conviction counsel

Exhibit 4   Article from David DeLozier to Daniel Patterson regarding sodium azide, October 28, 2001

Exhibit 5   David DeLozier letter to Andriano, April 25, 2003

Exhibit 6   Patterson email regarding meeting with Andriano, November 13, 2004

**Records Regarding Trial Experts**

Exhibit 7   Documents regarding Michael Sweedo

Exhibit 8   Documents regarding William Joe Collier

Exhibit 9   Documents regarding Michael Brad Bayless, Ph.D.

**Documents from Appellate Counsel's Files**

Exhibit 10   Documents regarding possible issues with Peg Green's notes

Exhibit 11   Documents to Brent Graham and Peg Green from the Arizona Capital Representation Project regarding issues with the appellate brief

## Social History Documents

**Wendi Robertson Ochoa Andriano:**

Exhibit 12    Birth Certificate

Exhibit 13    Decree of Adoption

Exhibit 14    Marriage Certificate for Joseph Andriano and Wendi Ochoa

Exhibit 15    Employment records from Fairfield Properties

Exhibit 16    Employment records from The Schomac Group

Exhibit 17    Chandler Regional Hospital records

Exhibit 18    Interview with Jeannette McCourt, October 18, 2000, Phoenix Police Department Departmental Report No. 2000-01797849, Supplement 118

**Joe Andriano:**

Exhibit 19    Mayo Clinic records

**Donna Robertson Ochoa:**

Exhibit 20    Decree of Dissolution of Marriage for Donna Robertson and Shelby Robertson

Exhibit 21    Marriage License for Alejo Ochoa and Donna Robertson

**Shelby Robertson:**

Exhibit 22    United States Marine Corps records

Exhibit 23    Letter from Attorney Nick Durback re *State of Ohio v. Shelby Robertson*, May 26, 1971

Exhibit 24    Report of Paraphiliac Assessment, June 9, 1993


## Declarations and Expert Reports

Exhibit 25    Declaration of Karen Clark, Esq., November 21, 2017

Exhibit 26    Report by Diana Lynn Barnes, Psy.D, November 20, 2017

Exhibit 27    Declaration of Marlene Winell, Ph.D., December 4, 2017

Exhibit 28   Declaration of Eric Betterton, Ph.D., November 30, 2017

Exhibit 29   Declaration of Margaret (Peg) Green, December 1, 2017

Exhibit 30   Declaration of James Yost, November 29, 2017

## Records Regarding Juan Martinez

Exhibit 31   *In the Matter of a Member of the State Bar of Arizona, Juan M. Martinez*, State Bar File No. 15-3363 [DVDs filed separately as a non-electronic exhibit]

Exhibit 32   *In the Matter of a Member of the State Bar of Arizona, Juan M. Martinez*, PDJ No. 2017-9044

Exhibit 33   Arizona traffic ticket and complaint for Juan Martinez, No. 6098844

Exhibit 34   Articles regarding Juan Martinez

## Documents Related to Sodium Azide

Exhibit 35   Phoenix Police Department Departmental Reports, Supplements 8, 13, 20, 32, 67, 82, 94, 134, 154, 155

Exhibit 36   West Coast Analytical Services test results

Exhibit 37   Articles regarding sodium azide and relevant tests

## Articles on the Deterrent Value of the Death Penalty

Exhibit 38   National Institute of Justice, *Five Things About Deterrence*, May 2016

Exhibit 39   National Research Council, *Deterrence and the Death Penalty*, April 18, 2012

Exhibit 40   Death Penalty Information Center, *Smart on Crime: Reconsidering the Death Penalty in a Time of Economic Crisis*, October 2009

# EXHIBIT 1

*Andriano v. Ryan*, Case No. CV-16-01159-PHX-SRB
Motion for Evidentiary Development



70 YEARS OF SERVICE
1933-2003
STATE BAR
of ARIZONA

Direct No. (602) 340-7278

June 28, 2004

Anthony P. Sodroski
Office of Disciplinary Counsel
District 1 Office
1635 Market Street
Philadelphia, PA 19103

Re:     File No. 01-2071
        G. David DeLozier, respondent

Dear Mr. Sodroski:

This will acknowledge receipt of your June 21, 2004 letter.

I have enclosed copies of documents from our public file that explains the conduct for which Mr.
DeLozier was sanctioned.  Please let me know if you need anything else

Sincerely,

/S/

Shauna R. Miller
Senior Bar Counsel

SRM/
Enclosures

THE DISCIPLINARY BOARD

**OF THE**

## SUPREME COURT OF PENNSYLVANIA

Paul J. Killion
Chief Disciplinary Counsel

Paul J. Burgoyne
Deputy Chief Disciplinary Counsel



**OFFICE OF DISCIPLINARY COUNSEL**

DISTRICT I OFFICE
16th Floor
Seven Penn Center
1635 Market Street
Philadelphia, PA 19103
(215) 560-6296
Fax (215) 560-4528
www.padisciplinaryboard.org

**DISTRICT I**

Disciplinary Counsel-in-Charge
Anthony P. Sodroski

Disciplinary Counsel
Richard Hernandez
Donna M. Snyder
Gloria Randall Ammons
Harriet R. Brumberg
Ramona Mariani

June 21, 2004

PERSONAL AND CONFIDENTIAL

Loren J. Braud, Esquire
Deputy Chief Bar Counsel
State Bar of Arizona
111 West Monroe, Suite 1800
Phoeniz, AZ  85003-1742

Re:  *G. David Delozier, Esquire*

Dear Ms. Braud:

Recently, this office received notice through the National Lawyer Regulatory Data Bank that the above-referenced attorney, who is admitted to practice in Arizona and Pennsylvania, was disciplined in your jurisdiction by Order dated March 25, 2004 at No. 01-2071. The discipline imposed was "Public Reprimand/Censure, Probation, Costs."

I would appreciate your sending to my attention any document that explains the misconduct and identifies the disciplinary rules violated, such as a court opinion, disciplinary review board report, formal charging document, or stipulation for discipline.

Thank you for your attention to this matter.

Very truly yours,

Anthony P. Sodroski
Disciplinary Counsel-in-Charge

APS/me
**RECEIVED**

JUN 2 5 2004

STATE BAR OF ARIZONA.

# MILLER LASOTA & PETERS PLC

Tel 602 248 2900
Fax 602 248 2999
5225 North Central Avenue, Suite 235
Phoenix, Arizona 85012

DONALD M. PETERS
don@mlp-law.com

November 24, 2003

HAND DELIVERED

Shauna R. Miller
Senior Bar Counsel
State Bar of Arizona
111 West Monroe, Suite 1800
Phoenix, Arizona 85003-1742

>       Re:     File No. 01-2071
>               G. David DeLozier, Respondent

Dear Ms. Miller:

Please find enclosed a Joint Memorandum in Support of Agreement by Consent and a Tenders of Admissions and Agreement for Discipline by Consent, both of which have been executed by Mr. DeLozier.

If I can be of any additional assistance, please do not hesitate to contact me.

Thank you.

Sincerely,

Elizabeth Gush
Secretary to Donald M. Peters

/wp
Enclosures



70 YEARS OF SERVICE
1933-2003
STATE BAR
*of* ARIZONA

Direct No. (602) 340-7278

November 20, 2003

Donald M. Peters
Miller, LaSota & Peters, LLC
5225 N. Central Avenue, Suite 235
Phoenix, AZ 85012-1452

Re:    File No. 01-2071
       G. David DLozier, respondent

Dear Don:

Enclosed you will find the original Tender of Admissions and Agreement for Discipline by Consent and the original Joint Memorandum in Support of the Agreement for Discipline by Consent. I am not sending the exhibits with the documents, as at least one is quite bulky. I will make sure the exhibits are attached prior to filing them with the disciplinary clerk.

After you and Mr. DeLozier sign the documents, please return them to me no later than Monday November 24, 2003. I will have them filed and will mail you a date stamped copy.

Let me know if you have any questions.

Sincerely,

/ s /

Shauna R. Miller
Senior Bar Counsel

SRM/
Enclosures



70 YEARS OF SERVICE
1933-2003

STATE BAR
of ARIZONA

Direct No. (602) 340-7278

November 6, 2003

Donald M. Peters
Miller, LaSota & Peters, LLC
5225 N. Central Avenue, Suite 235
Phoenix, AZ 85012-1452

Re:     File No. 01-2071
        G. David DLozier, respondent

Dear Don:

Enclosed you will find a draft copy of the Tender of Admissions and Agreement for Discipline by Consent and draft copy of the Joint Memorandum in Support of the Agreement for Discipline by Consent. I am also emailing these to you so you can make any revisions directly to the documents. I have turned on the tracking feature so we can follow what changes are made.

If there are significant problems with the draft documents compared to what has been discussed, please feel free to call so we may discuss them.

I have also included a copy of the State Bar's cost statement that needs to be submitted with the consent documents.

Sincerely,

/S/

Shauna R. Miller
Senior Bar Counsel

SRM/
Enclosures

# MILLER LASOTA & PETERS PLC

Tel 602 248 2900
Fax 602 248 2999
5225 North Central Avenue, Suite 235
Phoenix, Arizona 85012

RECEIVED

OCT 1 7 2003

State Bar of Arizona

DONALD M. PETERS
don@mlp-law.com

October 16, 2003

Karen Clark
Senior Bar Counsel
State Bar of Arizona
111 West Monroe, Suite 1800
Phoenix, Arizona 85003-1742

> Re:   File No. 01-2071
>       G. David DeLozier, Respondent

Dear Karen:

The purpose of this letter is to explain why David DeLozier's clients were not hurt by his admittedly deficient record-keeping with regard to his trust account.

What happened with regard to Mr. DeLozier's trust account, in general, was the following. On a number of occasions when Mr. DeLozier had earned the client funds that were in trust, he never actually transferred those funds to himself. Instead, he treated the funds as fully earned and used them for other purposes.

Because of this practice, Mr. DeLozier's records show positive trust balances for some clients who really did not have a positive balance. To put it otherwise, the records would indicate that client X still had $1,000 in trust because Mr. DeLozier never wrote a check to himself in that amount after the funds were fully earned.

Mr. DeLozier has put together the following explanations and has assembled the attached supporting data to show that many clients who apparently had such positive balances in fact did not, because the funds had been fully earned by Mr. DeLozier's firm.

1) *Andriano*: In March of 2001, the parents of Wendi Andriano paid a flat fee of $15,000.00 for services in a criminal case. The balance shown on the ledger, $4,000.00, was earned by the firm, but not paid out to the firm. The $4,000.00 was not paid out from the trust account. The Andriano case goes to trial in November 2003.

Karen Clark
Page 2
October 16, 2003

2) *Bablo*:  The $300.00 received was for advanced costs of litigation in a personal injury case. The costs were for filing fees in the superior court and for process service on the defendants. The funds were not paid out to the firm, but were allocated as an offset and not paid out from the trust account.

3) *Bistodeau:* According to the attached billing statements, the $3,000.00 retainer received from the client was fully earned and an ending balance owed by the client was $1,883.81. Thus, the amount reflected as an account balance on the client ledger sheet, $1,000.00, had been earned by the firm but not paid out to the firm and was used as an offset.

4) *Church:* Amber Church paid a refundable, unearned advanced fee of $1,500 in November 2001. Mr. DeLozier's billing dated January 12, 2002, reflects the full fee was earned and that Church owed the firm $732.50.  See attached.  The amount reflected as an account balance on the client ledger sheet, $1,000.00, was earned by the firm but not paid out from the trust account.

5) *Fraser, Marvin & Diane:*  $13,949.00 in funds was received in April 2001 from settlement of lawsuit against American Community Insurance Company.  Disbursements were made to the Bureau of Medical Economics and to the clients.  The firm's QuickBooks accounting records reflects and additional $2,050.00 was received prior to the dates reflected on the State Bar's ledger sheet.  The amount reflected as an account balance on the State Bar's client ledger sheet, $3,061.01, or the amount shown on the firm's QuickBooks accounting records, $5,111.01, was earned by the firm but not disbursed.

6) *Imgarten, Judi:* Ms. Imgarten made an advanced fee payment of $2,500.00 in October 2001, which was fully earned by the firm during October 2001.  See the attached statements reflecting a balance due on the December 10, 2001 statement of 957.50.  The amount reflected as an account balance on the client ledger sheet, $2,500.00, was earned by the firm but not disbursed.

7) *Lal:*  Mr. Lal and Mr. Singh [see #13, below], were involved in a minor personal injury claim from an automobile accident, which resulted in a payment of $2,000.00 from the settlement.  The doctors were owed more than the settlement amount.  See the attached letter to Dr. Iversen dated September 6, 2001, confirming the distribution of the $2,000.00. Mr. Lal accepted the distribution to the doctors and received a lien release from them. The amount reflected as an account balance on the client ledger sheet, $500.00, was earned by the firm but not disbursed.

8) *Lech:*  Mr. Lech paid advanced fees in December 2001 of $1,500.00; on the February 4, 2002 statement, see attached, Mr. Lech owed the firm $285.00. The amount reflected as an account balance on the client ledger sheet, $1,500.00, was earned by the firm but not disbursed.

Karen Clark
Page 3
October 16, 2003

9) *Mdanat:* Mr. Mdanat was injured in an automobile collision; the case was settled for $8,900.00; fees were reduced by the doctor and Mr. DeLozier's firm, with Dr. Khoury receiving $3,305.00, Mr. Mdanat receiving $3,085.21, with the balance, $2,509.79 to the firm. See the attached documents. The amount reflected as an account balance on the client ledger sheet, $2,509.79, was earned by the firm but not disbursed.

10) *Ridgeway:* Mr. Ridgeway, while in the Maricopa County jail received a disbursement from Security Title from the sale of his home, and requested that Mr. DeLozier's firm hold and disburse funds for him at various times. In November 2001, the firm received $4,719.34 and disbursed all of it to Mr. Ridgeway, except for fees he authorized us to be paid from those funds. See the attached sheets, including a transaction by transaction handwritten ledger. Since the county jail only accepts cash, checks were written and cash taken to the jail. Some of the disbursements were from trust account checks, others were from the law firm operating account. See the enclosed documents. Additionally, see several of the deposits made directly to Mr. Ridgeway's account at the jail. The amount reflected as an account balance on the client ledger sheet, $2,594.34, was disbursed to him or earned by the firm and not disbursed.

11) *Roberts:* In June 2001 Ms. Roberts made an advanced fees deposit of $2,500.00. The August 31, 2001 billing statement reflects that the $2,500.00 was fully earned and she owed the firm a balance of $268.80. The amount reflected as an account balance on the client ledger sheet, $1,129.75, was earned by the firm but not disbursed.

12) *Robles:* This account involved an automobile collision involving five people; the receipts totaled $17,850.00. The disbursements to the family, as proposed, are reflected on the attached letter dated September 5, 2001; adjustments were made amount the family members and were finalized as reflected in the client ledger sheet. The amount reflected as an account balance on the client ledger sheet, $4,760.06, is the amount of the legal fees, see letter dated September 5, 2001, which were earned by the firm but not disbursed.

13) *Singh:* Mr. Singh and Mr. Lal [see #7 above] were involved in a minor personal injury claim from an automobile collision, which resulted in a payment of $2,000.00 from the settlement. The doctors were owed more than the settlement amount. See the attached letter to Dr. Iversen, in Lal's #7, above, dated September 6, 2001, confirming the distribution of the $2,000.00. Mr. Singh had left the state and had returned to India, his home country, and the litigation was unable to proceed, other than to settlement. Mr. Singh accepted the distribution to the doctors and received a lien release from them. The amount reflected as an account balance on the client ledger sheet, $500.00, was earned by the firm but not disbursed.

14) *Stewart:* Mrs. Stewart made a deposit of $10,000.00 in June 2001. According to the firm's

Karen Clark
Page 4
October 16, 2003

billing statements, attached, the July 31, 2001 statement reflected a balance owed to the firm by Mrs. Stewart totaling $1,011.25. The amount reflected as an account balance on the client ledger sheet, $8,403.75, was earned by the firm but not disbursed.

15) *Williams, Dawn:* Mrs. Williams made a deposit of $2,500.00 in January, 2001. As reflected in the firm's billing statements, as of September 30, 2001, Mrs. Williams owed the firm $790.35. The amount reflected as an account balance on the client ledger sheet, $500.00, was earned by the firm but not disbursed.

Also attached is a letter from accountant Jeri Erwin, who examined Mr. DeLozier's records in detail in connection with this investigation. Mr. Erwin points out that Mr. DeLozier had accounts with both positive and negative balances. She comments that some of the apparently negative balances were actually not negative; prior year's balances had not been carried forward in the State Bar's analysis. There were some genuinely negative balances. As Ms. Erwin's letter suggests, these negative were offset, as a practical matter, by the matters that appeared to have positive balances but where the funds had actually been fully earned.

In short, as the attachments substantiate, what appeared to be client funds in trust were often funds that Mr. DeLozier had earned but had not taken. He used those funds--which were actually his--on matters where he paid out far more on a client's behalf than what the client actually had in trust. This is not a remotely appropriate way to keep records of trust funds. It was not, however, an approach that hurt clients. Further substantiation for that conclusion is provided by the fact that neither the State Bar nor Mr. DeLozier have received any complaints from clients who believed that they had been shortchanged.

Sincerely,

Donald M. Peters

DMP/jp

Enclosures



70 YEARS OF SERVICE
1933-2003
STATE BAR
of ARIZONA ®

*DIRECT LINE:  602-340-7247*

September 19, 2003

Donald M. Peters, Esq.
5225 N. Central Avenue, Suite 235
Phoenix, AZ 85012

Re:     File No.  01-2071
        G. David DeLozier, Respondent

Dear Mr. Peters:

Pursuant to our telephone call this date, enclosed please find a copy of the report done by the staff examiner in this case.

Also enclosed is a copy of a report done by the examiner in another trust account case recently prosecuted by this office.  What follows is a letter from respondent's counsel in that case, explaining the deficiencies, and showing that no client funds were placed at risk.  If we are going to reach a consent in this case, we are going to have to show, to the best of our ability, that no client funds were at risk, in order to avoid a more serious sanction that would otherwise result.

As I told you today, I will be staffing this case next week concerning our position for settlement. I will call you as soon as I have that information.

Sincerely,

Karen Clark
Senior Bar Counsel

KC/mn

Enclosures



70 YEARS OF SERVICE
1933-2003
STATE BAR
of ARIZONA

*DIRECT LINE: 602-340-7247*

August 5, 2003

Donald M. Peters, Esq.
5225 N. Central Avenue, Suite 235
Phoenix, AZ 85012

Re:     File No.  01-2071
        G. David DeLozier, Respondent

Dear Mr. Peters:

Pursuant to our telephone call this date, enclosed please find a copy of the Complaint as filed with the disciplinary clerk in the above-captioned matter. Also, enclosed is an original Acceptance of Service form. If you wish to accept service, please sign the Acceptance of Service in front of a notary public, return the original to me so I can forward it to the disciplinary clerk for filing.

Sincerely,

Mirna Nemr
Assistant to Karen Clark

Enclosures

BEFORE THE PROBABLE CAUSE PANELIST
OF THE STATE BAR OF ARIZONA

**FILED**

FEB 2 3 2001

STATE BAR OF ARIZONA
BY _Ⴑ. Ⴒⴎⴟⴟⴎⴑ_

IN THE MATTER OF A MEMBER ) No. 00-1963
OF THE STATE BAR OF ARIZONA )
 )
**G. DAVID DeLOZIER, JR.** ) **ORDER OF INFORMAL**
Bar No. 005237 ) **REPRIMAND AND COSTS**
 )
Respondent. )
_____ )

    The undersigned Probable Cause Panelist of the State Bar, having reviewed this

matter pursuant to Rule 53(b), Ariz.R.S.Ct., finds that probable cause exists to believe

that respondent has violated Rule 42, Ariz.R.S.Ct., to wit:

        The statements Respondent made to the Honorable Jeffrey S. Cates
        violated Rule 41(g), Ariz.R.S.Ct., Rule 42, Ariz.R.S.Ct., and ER 8.4(d).

IT IS THEREFORE ORDERED that:

    (1)    Pursuant to Rules 52(a)(5) and 53(b), Ariz.R.S.Ct., respondent is reprimanded

for such conduct.

    (2)    Pursuant to Rules 52(a)(5) and 54(k)(4), this order will be entered in the

respondent's permanent record at the State Bar and, pursuant to Rule 61(a)(2), is not

confidential.  It may also be considered by a hearing officer or committee, the Disciplinary

Commission or the Supreme Court in recommending or imposing discipline in a subsequent

disciplinary proceeding against respondent.

    IT IS FURTHER ORDERED, pursuant to Rule 52(a)(8), Ariz.R.S.Ct., that the

costs and expenses of these proceedings in the sum of $300.00 are imposed against

respondent, payable within twenty (20) days after receipt of this order.

PURSUANT to Rule 53(b)(5), Ariz.R.S.Ct., you have the right to contest this order of reprimand and, instead, demand that a formal proceeding be instituted. Your demand should be lodged with the bar counsel assigned to this matter within ten (10) days of service of this order of reprimand.

DATED this _1*6*_ day of _February_, 2001.

_Ernest Calderón_
Ernest Calderón
Probable Cause Panelist
State Bar of Arizona

Copies mailed by regular first class mail
and by certified mail this _2_ day
of _March_, 2001, to:

Leslie I. Tennen, Esquire
Sterns & Tennen
849 North Third Avenue
Phoenix, Arizona 85003-1439
Counsel for Respondent

by: _Cathy A. McGuligie_
_RA/cam_

Direct Line (602) 340-7276

March 2, 2001

Honorable Jeffrey S. Cates
Superior Court of Arizona
125 West Washington, Suite 101
Phoenix, Arizona 85003

Re:     File No. 00-1963
        G. David DeLozier, Jr., Respondent

Dear Judge Cates:

This is to inform you that your complaint has been resolved by the Probable Cause Panelist of the State Bar under the authority of Rules 53(b)(2) and (3), Ariz.R.S.Ct.

The Panelist has issued an order of reprimand, a copy of which is enclosed.  An order of reprimand is an admonition that is a permanent part of the attorney's record with the State Bar.

The lawyer may choose not to accept the order of reprimand and, instead, demand a formal hearing.  I will let you know if the lawyer takes this action.

Thank you for bringing this matter to our attention.

Sincerely,

Ralph Adams
Senior Bar Counsel

RA:cam

Enclosure

Direct Line: (602) 340-7276

December 21, 2000

Honorable Jeffrey S. Cates
Superior Court of Arizona
125 West Washington, Suite 101
Phoenix, Arizona 85003

Re:   File No. 00-1963
      G. David DeLozier, Jr., Respondent

Dear Judge Cates:

I am enclosing for your information a copy of a recent letter that we received from Leslie
I. Tennen, counsel for G. David DeLozier, Jr.  It is not necessary for you to comment on
this latest letter, but you are welcome to reply if you so wish.

This matter is now at the stage at which I must determine whether this matter should be
dismissed or presented to the Probable Cause Panelist.  I will advise you of the decision
once it is made.

Thank you for your continued cooperation and patience.

Sincerely,

Ralph Adams
Staff Bar Counsel

RA:cam

Enclosure

**LAW OFFICES OF**
**STERNS AND TENNEN**
**ATTORNEYS AND COUNSELORS AT LAW**

State Bar of Arizona
RECEIVED

DEC 1 4 2000

**LESLIE I. TENNEN**
**PATRICIA MARGARET STERNS**

December 13, 2000

**HAND DELIVERED**

**849 North Third Avenue**
**Phoenix, Arizona  85003-1439  U.S.A.**
**Telephone (602) 254-5197**
**Facsimile (602) 253-7767**

Ralph Adams, Esq.
State Bar of Arizona
111 West Monroe
Suite 1800
Phoenix, Arizona 85003

Re: *G. David DeLozier*
File No. 00-1963

Dear Mr. Adams:

Thank you for your letter of November 28, 2000, enclosing a copy of Judge Cates' correspondence of November 17, 2000, regarding the above referenced matter. It is noted that Judge Cates forwarded to you a copy of the transcript of the proceedings of October 13, 2000, and a copy of Mr. DeLozier's letter to Judge Campbell. The transcript reflects that the presentation made on behalf of our client to the court was consistent with the position expressed in my letter to you of November 8, 2000. In the interest of providing a complete record of those proceedings, enclosed please find a copy of the minute entry of Judge Cates filed on October 16, 2000.

It is further noted that the letter to Judge Campbell was addressed to the recently adopted procedures in Maricopa County for continuances in criminal proceedings. The letter to Judge Campbell was not intended to be a complete discussion of the hearing conducted before Judge Cates on the request for a continuance in the underlying criminal case, nor would such a discussion have been appropriate in the context of that letter. Accordingly, the letter to Judge Campbell is not material to this matter.

Finally, it is noted Judge Cates did not express any objection in his correspondence to a resolution of this matter pursuant to Rule 56(a), Arizona Rules of the Supreme Court, as set forth in my letter of November 8, 2000. For these reasons, we again urge that this matter be resolved and concluded pursuant to Rule 56(a), Arizona Rules of the Supreme Court.

Sincerely yours,

STERNS AND TENNEN

Leslie I. Tennen

LIT\ab
cc:  G. David DeLozier, Esq.

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

**COPY**

10/13/2000

CLERK OF THE COURT
FORM R000

HONORABLE JEFFREY S. CATES

C. I. Miller
Deputy

CR2000-001489

FILED:  OCT 1 6 2000

STATE OF ARIZONA

COUNTY ATTORNEY
BY:  MICHAEL G BAILEY

v.

JOHN JAY MC GREGOR

G DAVID DELOZIER #005237

LESLIE I. TENNEN #004913

JUDGE LOUIS ARANETA

MINUTE ENTRY

9:32 a.m.   This is the time set for the punishment phase of the contempt proceedings pursuant to Rule 33.2(b), arising from the direct criminal contempt citation that was issued on September 14, 2000 against G. David DeLozier. Attorney, David DeLozier, is present with counsel, Leslie Tennen.   Also present is Deputy County Attorney, Michael Bailey.

Liz Urraro, Court Reporter, is present.

The court addressed Mr. DeLozier, and advised him of the reasons for the court's contempt citation.   The court also read into the record the Direct Criminal Contempt Citation which was set out in its entirety in the minute entry order dated September 14, 2000.

Mr. Tennen, Mr. Bailey and Mr. DeLozier make statements to the court regarding Mr. DeLozier's conduct which occurred on September 14, 2000, and the circumstances surrounding same.

Mr. Tennen moves to dismiss the citation and cites that the proceedings should be heard pursuant to Rule 33.2(a).

IT IS ORDERED denying the motion to dismiss for the reasons stated on the record.

Docket Code 005

Page 1

1019

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

**COPY**

10/13/2000

CLERK OF THE COURT
FORM R000

HONORABLE JEFFREY S. CATES

C. I. Miller
Deputy

CR2000-001489

The court advised that it does not intend to take any action as punishment against Mr. DeLozier, but instead defer to action which may be taken by the State Bar, arising out of this court's complaint against Mr. DeLozier, mailed to the State Bar on September 14, 2000.

10:00 a.m.  Matter concludes.

\*   \*   \*

**LATER:**

On a parenthetical note, the court commends Mr. Tennen for his arguments and the professional manner in which he handled the representation of his client, Mr. DeLozier.

1019

Direct Line (602) 340-7276

December 18, 2000

Leslie I. Tennen, Esquire
Sterns and Tennen
849 North Third Avenue
Phoenix, Arizona 85003-1439

Re:     File No. 00-1963
        G. David DeLozier, Respondent
        Honorable Jeffrey S. Cates, Complainant

Dear Mr. Tennen:

This will acknowledge receipt of your correspondence dated December 13, 2000, in which you respond on behalf of respondent to the charges of the Honorable Jeffrey S. Cates.

A copy of your response will be forwarded to the complainant.  You will be sent a copy of any reply we receive from the complainant and provided an opportunity to respond.  After our investigation is completed, this matter may be dismissed by bar counsel or a recommendation for discipline or diversion made to the Probable Cause Panelist of the State Bar.  You will be advised of the decision.

Sincerely,


Ralph Adams
Staff Bar Counsel

RA:cam

Direct Line (602) 340-7276

December 18, 2000

Honorable Jeffrey S. Cates
Superior Court of Arizona
125 West Washington, Suite 101
Phoenix, Arizona 85003

Re:   File No. 00-1963
      G. David DeLozier, Respondent

Dear Judge Cates:

I am enclosing a copy of the response to your correspondence, received from Leslie I.
Tennen, counsel for respondent.

Please review this response at your earliest convenience and let me know whether the
facts and explanation of the lawyer differ from your knowledge of this matter.  If I do not
receive a reply from you within 15 days of the date of this letter, I will assume that you
do not wish to make further comments or observations.  The matter will then be reviewed
and a disposition decision made.

You will be notified of that decision.

Sincerely,

Ralph Adams
Staff Bar Counsel

RA:cam

Enclosure



STATE BAR
*of* ARIZONA
www.azbar.org

Direct Line (602) 340-7276

November 28, 2000

Honorable Jeffrey S. Cates
Superior Court of Arizona
125 W. Washington Suite 101
Phoenix, AZ 85003-2223

Re:     File No. 00-1963
        G. David DeLozier, Respondent

Dear Judge Cates:

This will acknowledge receipt of your correspondence dated November 17, 2000.

This matter is now at the stage at which I must gather any necessary additional information to determine whether this matter should be dismissed or presented to the Probable Cause Panelist. Due to the large volume of complaints received, we are not always able to complete this part of the process as quickly as we would like.

If I need any additional information from you, I will let you know.  Otherwise, I will advise you of the decision once it is made.

Thank you for your continued cooperation and patience.

Sincerely,


Ralph Adams
Staff Bar Counsel

RA:ps



STATE BAR
*of* ARIZONA
www.azbar.org

Direct Line (602) 340-7276

November 28, 2000

Mr. Leslie I. Tennen
Sterns and Tennen
849 N. Third Ave.
Phoenix, AZ 85003-1439

Re:    File No. 00-1963
        G. David DeLozier, Jr., Respondent
        Hon. Jeffrey Cates, Complainant

Dear Mr. Tennen:

Enclosed for your review is a copy of Judge Jeffrey Cates's correspondence dated
November 17, 2000.

If you wish to submit any additional comments concerning this matter, please do
so within 15 days of the date of this letter.  Thank you.

Sincerely,

Ralph Adams
Staff Bar Counsel

RA:ps

Enclosure

# Arizona Superior Court

### Old Courthouse
125 W. Washington
Phoenix, Arizona 85003

**Jeffrey S. Cates**
Presiding Judge
Arizona Tax Court

Tel: 602-506-3551
Fax: 602-506-5138

November 17, 2000

Mr. Ralph Adams
Staff Bar Counsel
State Bar of Arizona
111 West Monroe, Suite 1800
Phoenix, AZ  85003-1742

     Re:  File No. 00-1963
         G. David DeLozier, Jr., Respondent

Dear Mr. Adams:

    In response to your letter to me dated November 9, 2000 I am enclosing a transcript of the proceeding held before me on October 13, 2000 as well as a letter authored by Mr. DeLozier on September 21, 2000.

    Thank you for your attention to this matter.

                    Sincerely,

                    Jeffrey S. Cates

JSC:arl

Enclosures

RECEIVED

NOV 2 7 2000

STATE BAR OF ARIZONA

## Law Offices of G. David DeLozier, P.C.

*4016 East Forest Pleasant Place, Cave Creek, Arizona 85331*
*E-Mail: gddelozier@aol.com*
*Phone (480) 575-6660   Facsimile (480) 575-6661*

G. David DeLozier SBAZ #05237
*(Admitted in AZ, PA, TX & Federal Courts)*
Kathy M. O'Quinn SBLA #14195
*(Admitted in LA & Federal Courts)*
David Hampton
*(Arizona bar admission pending)*

**Legal Assistants:**
*General:*
*Ronald Ramirez*
*Ed E. Engel*
*Personal Injury:*
*Shara J. Engel*

September 21, 2000

Honorable Colin F. Campbell
Presiding Judge
Maricopa County Superior Court
201 W. Jefferson St.
Phoenix, Arizona 85013

    Re: Administrative Order No. 2000-030

Dear Judge Campbell:

        I have reviewed the Administrative Order No. 2000-030. While the stated goal of this order is to provide a ". . .fair and uniform policy regarding trial continuances. . .", I have observed that the real world results of the procedures imposed through this order are less than efficient and fair.

        Initially, although the order indicated it was disseminated to, "All Lawyers, Judges and Commissioners," I have been made aware that this order was not mailed and/or delivered to "all" lawyers. Specifically, although my law firm's address is listed with the Arizona Bar Center, and remains current and updated, a copy of this Administrative Order was not delivered to my office.

        After filing a Motion for Continuance in a criminal matter, I was informed of the existence of the order by the Assistant County Attorney assigned to prosecute the case. I was faxed a copy of the order by Judge Araneta's staff.

        Subsequently a second Motion to Continue was filed with Judge Araneta's court. I appeared at Judge Araneta's courtroom and was advised that I should locate the prosecuting attorney and that both of us, along with my client, were to appear before the Honorable Jeffrey S. Cates, Judge, to discuss the continuance, which had preliminarily been denied. Michael Bailey, Assistant County Attorney, my client, John McGregor, and I met at Judge Cates chambers.

        Judge Cates appeared to be quite disturbed at my presentation of this motion, noting that I must have thought all I had to do was to drop it off and it

Honorable Judge Colin F. Campbell
Administrative Order No. 2000-030
September 21, 2000
Page 2

would be granted automatically.  Judge Cates' demeanor was extremely rude,
abrasive, and almost Napoleonic in his efforts to be demeaning toward me.  He
would look straight at me, with glaring eyes, and when I would respond, he
interrupted me, to say he was not talking to me.  I had the impression that he
was significantly irritated at either having to perform this function or felt it his duty
to cause me to never file another motion to continue.  Of course, his not having
any experience with the case could have added to the confusion, and perhaps
his frustration, which may have led to his stating that he was citing me for
contempt.

But, upon exiting the Judge's chambers, I was advised by Mr. Bailey that
the atmosphere in the oral arguments for continuances are virtually the same as
we experienced at the one conducted by Judge Cates.  I am quick to admit that
this was my first oral argument for a continuance.  And, assuming Mr. Bailey's
assessment is true, I will certainly endeavor to try not to let myself ever be in the
posture of finding my client's best interests being placed above those of the "grist
mill" needs of the court.

I should like to further comment on the atmosphere in Judge Cates
chambers.  As Judge Cates began to address me, it became quite apparent that
I was being singled out as the "poster boy" for those attorneys who have
misused the process of obtaining continuances. I have been a member of the
bar in Arizona for 23 years [before that Texas and Pennsylvania, including work
at the American Law Institute], and have practiced law before this Court for the
majority of those years.  However, I felt Judge Cates was inappropriately quick to
judge the situation, and I continue to remain puzzled and perplexed by his need
to rebuff and belittle me, and take it to such an unprofessional level, especially in
front of my client.

While there are certainly those attorneys who have abused our previous
system of obtaining continuances, and this Court's goal in ensuring that
continuances are given fairly and more uniformly is certainly valid, one must also
not be so quick to judge the innocent along with the guilty. As a member of the
bar, I am constantly reminded of my oath and obligation as an officer of this
Court. I have never sought to create confusion, or violate the rules of this Court.
In fact, I agree that there should have been an overhaul of the previous manner
in which continuances were granted. However, the procedures provided through
the order seem draconian, inflexible, and based on a premise that the lawyer
who seeks a continuance is engaging in nothing more than an undue dilatory

Honorable Judge Colin F. Campbell
Administrative Order No. 2000-030
September 21, 2000
Page 3

tactic for his own unsavory reasons. This prejudice is imposed on each and every lawyer who seeks a continuance, until he has shown "good cause" for such a continuance. However, as the order stands now, it appears that the Superior Court judiciary considers the lawyers who seek continuances lazy or unprepared.

In keeping with this conclusion, I must hearken back to my recent experience before Judge Cates. While I am sure the Judge's goals were certainly lofty, and meant to further the aims of the Administrative Order, I was undeservedly chastised before the Court [and in the presence of my client], who was as bewildered as I was at the intensity and negative tone of the entire encounter.

Upon my return to Judge Araneta's courtroom, and at the conclusion of the scheduling discussions of the case involved, State v. John J. McGregor, CR2000-001489, my client and I went on record concerning these events. I should like request your review of the proceedings, including our comments, which were recorded before Judge Araneta by the Court Reporter, where I was allowed to speak.

Based on Mr. Bailey's comments, it appears that I am not the only attorney who has had difficulties as a result of the procedures within the order. Assuming such is true, I urge this Court to reconsider its content and develop an alternative procedure to ensuring that continuances are fairly and uniformly granted.

Very truly yours.

G. David DeLozier

cc:   The Honorable Thomas W. O'Toole, Judge
      The Honorable Judge Jeffrey S. Cates, Judge
      The Honorable Judge Louis A. Araneta, Judge
      Michael Bailey, Esquire
      John J. McGregor

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA


STATE OF ARIZONA,                    )
                                     )
            Plaintiff,               )
                                     )
        vs.                          )   NO. CR00-001489
                                     )
JOHN MCGREGOR,                       )
                                     )
            Defendant.               )
_____)


Phoenix, Arizona
October 13, 2000
9:30 o'clock a.m.


BEFORE THE HONORABLE JEFFREY S. CATES
Judge of the Superior Court


REPORTER'S TRANSCRIPT OF PROCEEDINGS
CONTEMPT HEARING


(Original)

Elizabeth A. Urraro, RPR
Certified Court Reporter (AZ 50214)


CLARK CERTIFIED COURT REPORTERS
REGISTERED PROFESSIONAL REPORTERS
3910 S. RURAL RD. SUITE C • TEMPE, ARIZONA 85282
TELEPHONE (480) 966-3001 • (800) 352-4593
FAX (480) 966-1833 • E-MAIL CCCREPORT@JUNO.COM

NCRA.
MEMBER
Guardians of the Record

1                      A P P E A R A N C E S

2

3        For the State:
             Mr. Michael Bailey
4            Deputy County Attorney

5

6        For Attorney G. David. DeLozier Jr.:
             Mr. Leslie Tennen
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                       P R O C E E D I N G S

 2

 3              THE COURT:  This is in Criminal Case

 4     2000-01489.

 5         Would counsel indicate their appearances.

 6              MR. TENNEN:  Good morning, Your Honor.

 7     Leslie Tennen on behalf of Mr. DeLozier.

 8              THE COURT:  Okay.  Mr. DeLozier is here.  I

 9     asked my JA to telephone Michael Bailey and ask him to

10     be here.  Mr. Bailey is here, too.

11              MR. BAILEY:  Yes, Your Honor.

12              THE COURT:  Pursuant to Criminal Rule

13     32.2(b), Mr. DeLozier, you're advised that a citation of

14     contempt was issued against you on September 14, 2000,

15     based upon the following, and this was recited in my

16     minute entry of September 14, 2000:

17              That immediately after I announced my ruling

18     granting the 29-day continuance and denying the request

19     for a 60-day continuance, Mr. G. David DeLozier stated

20     directly to me, from approximately five feet away and in

21     the presence of the defendant and State's counsel, "Now,

22     which part of your anatomy do you want me to kiss?"

23              Immediately upon hearing this remark and in the

24     presence of Mr. DeLozier, I informed Mr. DeLozier that

25     the Court was citing him for direct contempt for making
```

4

1    this remark, and further informed Mr. DeLozier that his

2    making this remark to the Court in the presence of his

3    client was an embarrassment to the legal profession.

4         Based upon what I've just said, I found Mr.

5    DeLozier's conduct was willfully contemnatious and

6    lessened the dignity and authority of the Court.

7         And I found and reaffirmed that Mr. DeLozier

8    was in direct criminal contempt of Court pursuant to

9    Rule 33.2(a) of the Arizona Rules of Criminal Procedure.

10        Mr. Tennen, is there any input that you wish to

11   present, either from you or that your client wishes to

12   present?

13        MR. TENNEN:   There is, Your Honor.   And

14   before I do that, there is a preliminary matter or two

15   that I wanted to raise, if I may.

16        Based on what the Court has just cited, as set

17   out in the minute entry, it appears that the charges

18   against Mr. DeLozier involve allegations at least of

19   gross disrespect or a personal attack upon the character

20   of the judge.

21        THE COURT:   No, it has nothing to do with

22   me.   It's the position that I hold.   I have no problem

23   with Mr. DeLozier myself.   This is between him and the

24   profession, and by that I'm referring to the position I

25   hold.

1              MR. TENNEN:  Yes, and I can appreciate

2     that.

3              THE COURT:  I do not take offense

4     personally.

5              MR. TENNEN:  And I can appreciate that, as

6     well.  However, given the nature of the charges against

7     Mr. DeLozier, it appears that the nature of those

8     charges is such that they fall within the confines of

9     Rule 34.4(b), the portion that I just quoted, as well as

10    the next portion, as I understand how the situation

11    arose.

12             So that at least from my perspective, coming

13    into this -- and I must confess that I'm coming in very

14    late into this process.  I first learned of this whole

15    situation less than 48 hours ago.  I have been out of

16    the country on business and had just returned when I

17    learned of this unfortunate situation.

18             But the rule speaks both to situations which

19    may involve gross disrespect or a personal attack on the

20    character of the Court or of the judge if the judge's

21    conduct is to be integrated with the contempt that the

22    judge contributed to or was otherwise involved in it.

23             While I don't mean to imply that the Court was

24    engaged in any improper activities, it does appear that

25    the nature of the charges are such that under Rule

1    33.4(b), it would be appropriate for another judge to be

2    hearing these charges, so that this Court, under that

3    rule, should recuse itself.

4              THE COURT:  That request is denied.  Two

5    reasons:  One is the rule that your client was cited

6    under requires me to preside over the punishment phase.

7    And, number two, as I've already indicated to you, I

8    personally have no problem with your client.

9              I think your client, if he were candid with

10   you, would advise you that when he did what I said he

11   did, I do not believe I expressed anger.  I just did

12   what the law required I do.

13             I have no problem with presiding.  I do feel I

14   could be fair.  And I do not intend to disqualify

15   myself.

16             MR. TENNEN:  If I may, then, raise the

17   second preliminary matter, also under the rules, this

18   time relating to Rule 33.2(b), which states that a

19   decision concerning the punishment to be imposed shall

20   be made during the course of the proceeding at which the

21   contempt occurs, unless prompt punishment is imperative.

22             I don't believe that last phrase applies here

23   given the circumstances that are present.  However, the

24   underlying criminal case is still pending and is set for

25   trial next Tuesday.

1              THE COURT:  The proceeding that that rule

2     refers to is the proceeding that gave rise to the

3     contempt finding, and that was back on September 14,

4     2000.  That's why I didn't do it then.

5              The rule required me to set it for a time in

6     the future, which I did 29 days away, so that Mr.

7     DeLozier would have an opportunity to reflect upon what

8     happened, to obtain counsel, and to gather his thoughts

9     and be adequately prepared.  So I don't feel that

10    holding it today is in violation of anyone's rights or

11    that rule.

12             MR. TENNEN:  Although there is,

13    fortunately, not a great deal of case law in this area,

14    in the state at least, my understanding, based on the

15    review that I've been able to do, is that,

16    traditionally, situations like this have been deferred

17    until the end of the underlying proceedings.

18             When it has happened in the middle of a

19    criminal case, such as this, generally it has been put

20    off until the criminal case has been completed.

21             THE COURT:  It may well be, but the problem

22    here is I'm not the judge presiding over the criminal

23    trial, so that argument doesn't pertain to me.  The

24    judge presiding over the criminal trial is Judge

25    Araneta.

1           Any other preliminary matters?

2                MR. TENNEN:  Not preliminary, no.

3                THE COURT:  Does your client or do you, on

4      behalf of your client, have any dispute with what I've

5      set forth in the September 14, 2000, minute entry as to

6      what, in fact, happened?  Is there any inaccuracy in

7      what I said?

8                MR. TENNEN:  If I may respond in this way,

9      it is not my intention today nor my purpose to try to

10     either dispute or to attempt to justify what happened.

11               THE COURT:  I'm going to get into your

12     position on justification in a moment but, I think, in

13     fairness, if there is an error in what I set forth in my

14     minute entry of September 14th as to what happened, we

15     ought to deal with it at this point in time.

16               MR. TENNEN:  I believe that your minute

17     entry accurately states what you believe transpired that

18     day, and --

19               THE COURT:  I'm not asking --

20               MR. TENNEN:  And I am not taking issue with

21     what is set forth in the minute entry.

22               THE COURT:  Okay.  It's not just my

23     belief.  If your client feels that he did not say to me

24     what I indicated in the minute entry what I say he said

25     to me, I'd like to know about it.

1              MR. TENNEN:  And I'm not here to dispute

2       the accuracy of what is set out in the minute entry.

3              THE COURT:  To complete the record, even

4       though I don't feel this is necessary, because we were

5       not before a court reporter at the time, after Mr.

6       DeLozier said to me what I indicated in the minute entry

7       he said, I asked him to repeat himself.  And he did, in

8       fact, repeat what he said the first time.

9              As I indicated a moment ago, I told Mr.

10      DeLozier that his comment was a disgrace to the

11      profession, particularly because it was in front of his

12      client.  And Mr. DeLozier responded to me, "You are the

13      disgrace to the profession."

14             This doesn't necessarily add to anything that

15      happened.  I just wanted to complete the record.

16             Mr. Bailey, I know that you've got another

17      matter to be present at.  On the way out of the hearing,

18      you asked me if there was anything that I wanted you to

19      do; is that correct?

20             MR. BAILEY:  Yes, Your Honor.

21             THE COURT:  And what was it that I said to

22      you?

23             MR. BAILEY:  You asked me to write some

24      notes on what had happened.

25             THE COURT:  Okay.  Have we had any other

1    contact since?

2              MR. BAILEY:  Have you and I had any other

3    contact?

4              THE COURT:  Yes.

5              MR. BAILEY:  No, apart from I sent you an

6    E-mail after receiving Mr. DeLozier's letter.

7              THE COURT:  Is anything I've said that

8    occurred on September 14th, 2000, incorrect, or that you

9    want to change or add to?

10             MR. BAILEY:  Judge, my recollection of what

11   happened was -- let me go ahead and give you a summary

12   of what I recall happening and indicate other factual

13   issues for the record.

14             I recall you asking if there was anything else

15   that needed to be addressed.  Mr. DeLozier asked you

16   what part of your anatomy did you want him to kiss

17   before he left.  I don't recall at that point whether it

18   was repeated or not.  I am not saying it wasn't.  I just

19   don't recall.

20             The next thing I remember is you indicating to

21   Mr. DeLozier that that was unprofessional conduct on his

22   part, especially in front of his client, and he

23   indicated back to you that he believed your conduct was

24   unprofessional in front of his client.  And I don't know

25   if those were the exact words, but that was the gist of

1    what was said.

2              THE COURT:  Is there anything else you

3    wanted to add?

4              MR. BAILEY:  Just that on top of that,

5    again, I don't remember either way on other issues as to

6    what was said, but that's what I specifically recall

7    being said.

8              THE COURT:  Mr. Tennen, I have no problem

9    with your eliciting from Mr. Bailey anything that you

10   feel is pertinent to the proceedings today before he

11   leaves, but I've indicated to him through my JA that I

12   would only have him over here as long as needed because

13   he does have another matter to be at.

14             MR. BAILEY:  Your Honor, I apologize.  I

15   addressed that matter at 9:15, so I --

16             THE COURT:  Okay.

17             MR. BAILEY:  -- do have some time if you

18   need me.

19             THE COURT:  Okay.  You're free to leave

20   whenever you want.

21          Is there anything that you want to elicit from

22   Mr. Bailey?

23             MR. TENNEN:  There are a couple of points

24   that I would like to address, if I may, Your Honor.

25             THE COURT:  Before you deal with Mr.

1    Bailey -- let me have you deal with Mr. Bailey right

2    now.  Go ahead.

3              Mr. Bailey, do you want to come forward.

4              And do you want him under oath, or do you want

5    him on the witness stand?  What do you want?

6              MR. TENNEN:  As the Court prefers.

7              THE COURT:  It's whatever's comfortable for

8    you.

9              MR. TENNEN:  I'm content to just ask him

10   the question or two where he stands.

11             THE COURT:  Why don't you be seated.

12             MR. TENNEN:  Thank you, Your Honor.

13        Mr. Bailey, we spoke yesterday afternoon

14   briefly about this matter?

15             MR. BAILEY:  Yes.

16             MR. TENNEN:  During that conversation, did

17   you indicate to me that you had dealt with Mr. DeLozier

18   on numerous occasions; although, I believe, only about

19   this particular underlying criminal case?

20             MR. BAILEY:  I have had regular contact

21   with him on this case.  I've seen him in court on other

22   occasions, yes.

23             MR. TENNEN:  Both before and after

24   September 14th, you've had dealings with him or where

25   you've seen him?

```
1                    MR. BAILEY:  Yes.

2                    MR. TENNEN:  Other than the date and the

3      incident in question here, have you seen Mr. DeLozier

4      act in a professional manner throughout those particular

5      situations where you have observed him?

6                    MR. BAILEY:  Yes, I've found him to be

7      professional and collegial throughout my contact with

8      him, apart from the 14th of September.

9                    MR. TENNEN:  Has he always been courteous

10     to you?

11                   MR. BAILEY:  Yes.

12                   MR. TENNEN:  Has he always been respectful

13     of you?

14                   MR. BAILEY:  Yes.

15                   MR. TENNEN:  Has he always been courteous

16     and respectful of the Court?

17                   MR. BAILEY:  Yes.

18                   MR. TENNEN:  As you have seen, of course?

19                   MR. BAILEY:  Again, yes.

20                   MR. TENNEN:  Would it be fair to say that

21     the behavior you witnessed on September 14th was unusual

22     for Mr. DeLozier, given what you had observed prior to

23     that?

24                   MR. BAILEY:  Yes.

25                   MR. TENNEN:  As I understand it, Mr.
```

1   Bailey, the hearing related to a request Mr. DeLozier

2   had filed for a continuance on the underlying criminal

3   matter?

4            MR. BAILEY:  That's right.

5            MR. TENNEN:  It's also my understanding

6   that fairly recently there have been some procedural

7   changes regarding the manner in which continuances may

8   be obtained or requested?

9            MR. BAILEY:  Yes.

10            MR. TENNEN:  And am I correct in

11   understanding that there was some difficulty encountered

12   by Mr. DeLozier in terms of dealing with that procedure

13   leading up to the hearing in front of Judge Cates on the

14   14th?

15            MR. BAILEY:  You know, I can't really

16   address that.  I understand that Mr. DeLozier had been

17   in front of Judge Araneta and was told at that time that

18   he needed to go see Judge Cates, at which time I was

19   actually advised to go see Judge Cates, as well.

20            I don't recall whether I had sent my file with

21   coverage over to Judge Araneta's court.  But it was

22   apparent to me that -- strike that.

23            I thought that perhaps Mr. DeLozier had not

24   known of the continuance panel procedures at that time.

25            MR. TENNEN:  Did it also appear to you,

1    sir, that Mr. DeLozier's level of frustration was rather

2    high that day?

3                    MR. BAILEY:  Yes.

4                    MR. TENNEN:  And, sir, did it appear to you

5    from Mr. DeLozier's perspective that the Court was

6    somewhat stern or harsh in its feelings towards him?

7                    MR. BAILEY:  The Court was examining deeply

8    the need for a continuance in the case.  I don't know

9    when you say -- what do you mean by stern or harsh?  Did

10   you use the word harsh?

11                   MR. TENNEN:  I did.  Did it appear to you

12   from Dr. DeLozier's perspective that he could believe

13   that and he was being embarrassed in front of his

14   client?

15                   MR. BAILEY:  You know, that's a -- that's a

16   hard question to answer.  I'm sure it was difficult

17   having a client present to have the worry that you might

18   not get your continuance.

19                   In addition, I think, I probably, personally,

20   put on a patronizing attitude to some extent, because I

21   recall advising the Judge that I didn't believe Mr.

22   DeLozier was familiar with the process, and I'm sure

23   that did not contribute to competence in front of his

24   client.

25                   MR. TENNEN:  Finally, sir, did it appear to

1    you that the remarks that were made at the end of the

2    proceedings were a reaction to what had happened during

3    the proceedings?

4              MR. BAILEY:  It appeared that the remarks

5    were a reaction to what happened during the proceeding.

6    But I did not believe in any way that what happened in

7    the proceeding was justified.

8              MR. TENNEN:  And I'm not asking you that.

9    But --

10             MR. BAILEY:  Okay.  I understand.

11             MR. TENNEN:  But at the beginning of the

12   proceedings, did Mr. DeLozier's demeanor change from the

13   beginning to the end of the proceedings?

14             MR. BAILEY:  He appeared to become more and

15   more frustrated as the proceedings went on, yes.

16             MR. TENNEN:  He was not belligerent at the

17   beginning of the proceedings?

18             MR. BAILEY:  No.

19             MR. TENNEN:  Was he respectful of you at

20   the beginning of the proceedings?

21             MR. BAILEY:  He was continuously respectful

22   of me.

23             MR. TENNEN:  And at the beginning of the

24   proceedings, was he also respectful of the Court?

25             MR. BAILEY:  I believe so.

1          MR. TENNEN:  Thank you.

2          THE COURT:  The purpose of the hearing

3    today is to allow the respondent a brief opportunity to

4    present evidence and argument relevant to the punishment

5    to be imposed.

6          Is there any input that you want to present,

7    either you on behalf of your client and/or your client?

8          MR. TENNEN:  There is, Your Honor.  And if

9    I may, I would do so on behalf of my client.  And I

10   would like to begin addressing the substance, if I may,

11   by stating how much I personally regret having to be

12   here today.

13         THE COURT:  That makes two of us.

14         MR. TENNEN:  And I have an idea that that

15   is the case for everybody in this room.  They would all

16   prefer to be somewhere else, doing something else.  It

17   is most unfortunate that we are here today, especially

18   under these particular circumstances.

19         The second thing I would like to state is that

20   Mr. DeLozier is deeply and profoundly apologetic for

21   what happened.  He is remorseful and contrite.  It

22   should not have happened.  He regrets that it did.

23         As Mr. Bailey just indicated, at the beginning

24   of the proceedings, Mr. DeLozier was respectful of

25   opposing counsel and the Court.  He certainly had no

1    intention, when he entered the courtroom that day, of

2    being disrespectful to you or any other member of the

3    bench or the bar.

4         I will not attempt to justify what happened

5    that day.  However, I do believe that there are certain

6    factors that may help to explain in mitigation what had

7    happened that day, and not to excuse it or to justify

8    it, but to try to help the Court to understand why it

9    occurred, because I think that is important in these

10   proceedings.

11        Mr. DeLozier has been practicing for more than

12   20 years in this state as well as other states.  He has

13   never been in a situation such as this before.

14   Hopefully, he will never be in a similar kind of a

15   situation.  And I say, without any hesitation, that I

16   know he has learned a very strong lesson from what has

17   happened here.

18        On the particular day in question, Mr. DeLozier

19   was suffering from a physical problem with his shoulder,

20   which resulted in substantial pain and discomfort to

21   him.

22        I know that was not communicated to the Court

23   at that time.  It was not something the Court could be

24   aware of, but it is a factor that, in my understanding

25   of what had transpired, contributed to the unfortunate

1    events.

2           As Mr. Bailey indicated, there was also a very

3    high level of frustration, which actually began before

4    the hearing, in the process for filing and seeking the

5    continuance.

6           Mr. DeLozier was required to run back and forth

7    between courtrooms and was having difficulty in trying

8    to get the proper documents to the proper place so that

9    his request could be heard.  His frustration level was

10   running exceedingly high, coupled with the physical

11   discomfort.

12          The charges in the underlying criminal case are

13   very, very serious.  Mr. DeLozier believes firmly in the

14   innocence of his client.  And he was trying to represent

15   his client zealously and to the best of his ability.

16          Rightly or wrongly, he felt that he was not

17   treated fairly by the Court during the course of those

18   proceedings.

19          He felt that the Court took an unnecessarily

20   harsh tone with him and, from his perspective, again

21   rightly or wrongly, from his perspective, he had the

22   feeling that he was trying to be embarrassed in front of

23   his client.

24          The behavior that occurred at the end of the

25   hearing was a result and a reaction to that.  It was an

1    emotional reaction.  It was something that should not

2    have occurred and, unfortunately, it did occur.

3          But it was an aberrational response.  It was an

4    aberrational incident for Mr. DeLozier for his character

5    and for his history, as indicated by Mr. Bailey in his

6    prior dealings with Mr. DeLozier.

7          Up until this point in time, Mr. DeLozier has

8    had and enjoyed a good reputation within the community

9    and within the bar.

10          He deeply regrets and profoundly apologizes for

11    what had occurred.  If he could change it, he would.

12    Unfortunately, that is not possible, and we find

13    ourselves here today.

14          He was trying to stand firm against what he

15    perceived to be an unfair situation in the way he was

16    being treated.

17          From my perspective, I can objectively say that

18    it seems clear to me that he overreacted to those

19    circumstances, whatever he may have perceived them to

20    be.

21          And while it doesn't justify and doesn't excuse

22    it, we hope that the Court will find that these

23    particular factors, that the level of frustration,

24    physical discomfort, the seriousness of the underlying

25    charges, and the seriousness of the necessity for the

1   request of the continuance, that the Court will take all

2   of those factors into consideration in imposing a

3   sentence and sanction.  And we would urge that any

4   sanctions to be imposed be a monetary sanction only.

5           THE COURT:  Mr. DeLozier, is there anything

6   that you want to add?

7           MR. DELOZIER:  Yes, Your Honor.  I

8   apologize deeply.  I'm extremely embarrassed by this.

9   I -- the things that he said is only part of the matrix,

10  I'm sure, that caused that outburst that day.

11          I have no -- I don't know why I -- I -- it

12  shouldn't have happened, and if I could make amends in

13  any way to you personally and to the system, I would.

14          I have spent my life in this system.  And I

15  have a great deal of respect for it.  I have enormous

16  amount of efforts through my small offices to see that

17  people comply with what the law is, and there's no

18  excuse for a stupid remark.  That's all I can say is it

19  was absolutely stupid for me to do that.

20          THE COURT:  Thank you.  Before I proceed,

21  for what it's worth, Mr. DeLozier, in the 21-and-a-half

22  years I've been a judge, I've never even thought of

23  holding an attorney in contempt.  And the incident that

24  occurred on September 14th was as much of a -- it was

25  probably one of the low points of my career as a judge.

1          MR. DELOZIER:  Mine, too.

2          THE COURT:  What I intend to do today is

3    not affected by what I've heard today.  It was my intent

4    to do this before I had any input.

5          The purpose of punishment is to change

6    behavior.  And if Mr. DeLozier has not learned from the

7    incident that we're here on today, there's nothing I can

8    do, either by way of a fine and/or incarceration, that's

9    going to change anything for Mr. DeLozier.

10         I do not intend to take any action against Mr.

11   DeLozier.  I am going to, as punishment, defer to the

12   good discretion of the State Bar.

13         And, as you know, I filed a complaint against

14   Mr. DeLozier on the day that this unfortunate event

15   occurred.  And I think the best thing that can be done

16   is for the matter to play out before the State Bar.  So

17   there's nothing that I intend to do with Mr. DeLozier.

18         MR. TENNEN:  Thank you, Your Honor.

19         (The Court stood in recess.)

20

21

22

23

24

25

1

2

3

4

5          BE IT KNOWN that the foregoing matter was taken

6    before me, Elizabeth A. Urraro, RPR, a Certified Court

7    Reporter, in and for the County of Maricopa, State of

8    Arizona.

9          I hereby certify that the foregoing 22 pages

10   are a true and correct transcript had of all

11   proceedings, all done to the best of my skill and

12   ability.

13         Dated at Phoenix, Arizona, this 22nd day of

14   October, 2000.

15

16              Elizabeth A. Urraro, RPR

17              Certified Court Reporter (AZ 50214)

18

19

20

21

22

23

24

25

Direct Line (602) 340-7276

November 9, 2000

Leslie I. Tennen, Esquire
Sterns and Tennen
849 North Third Avenue
Phoenix, Arizona 85003-1439

Re:    File No. 00-1963
       G. David DeLozier, Jr., Respondent
       Honorable Jeffrey S. Cates, Complainant

Dear Mr. Tennen:

This will acknowledge receipt of your correspondence dated November 8, 2000, in which
you respond on behalf of respondent to the charges of the Honorable Jeffrey S. Cates.

A copy of your response will be forwarded to the complainant.  You will be sent a copy of
any reply we receive from the complainant and provided an opportunity to respond.  After
our investigation is completed, this matter may be dismissed by bar counsel or a
recommendation for discipline or diversion made to the Probable Cause Panelist of the State
Bar.  You will be advised of the decision.

Sincerely,


Ralph Adams
Staff Bar Counsel

RA:cam

Direct Line (602) 340-7276

November 9, 2000

Honorable Jeffrey S. Cates
Superior Court of Arizona
125 West Washington, Suite 101
Phoenix, Arizona 85003

Re:     File No. 00-1963
        G. David DeLozier, Jr., Respondent

Dear Judge Cates:

I am enclosing a copy of the response to your correspondence, received from Leslie I. Tennen, counsel for respondent.

Please review this response at your earliest convenience and let me know whether the facts and explanation of the lawyer differ from your knowledge of this matter. If I do not receive a reply from you within 15 days of the date of this letter, I will assume that you do not wish to make further comments or observations. The matter will then be reviewed and a disposition decision made.

You will be notified of that decision.

Sincerely,


Ralph Adams
Staff Bar Counsel

RA:cam

Enclosure

**LAW OFFICES OF**
**STERNS AND TENNEN**
**ATTORNEYS AND COUNSELORS AT LAW**

| | | |
|---|---|---|
| **LESLIE I. TENNEN**<br>**PATRICIA MARGARET STERNS** | November 8, 2000<br><br>HAND DELIVERED | **849 North Third Avenue**<br>**Phoenix, Arizona 85003-1439 U.S.A.**<br>**Telephone (602) 254-5197**<br>**Facsimile (602) 253-7767** |

**RECEIVED**

NOV − 8 2000

**State Bar of Arizona**

Ralph Adams, Esq.
State Bar of Arizona
111 West Monroe
Suite 1800
Phoenix, Arizona 85003

Re:  *G. David DeLozier*
File No. 00-1963

Dear Mr. Adams:

Please be advised that this office has been contacted for assistance by G. David DeLozier, Esq., regarding the above referenced matter. We appreciate the grant of an extension of time to respond to your letter of September 28, 2000. Please note that this response is being made pursuant to Rules 53(b)(2) and 56(a) of the Arizona Rules of the Supreme Court. Accordingly, at this time, the facts are not disputed. Furthermore, our client will endeavor to make every effort possible to cooperate fully with your office to resolve and conclude this matter.

On behalf of our client, we restate and reiterate the apology expressed to Judge Cates in open court both by counsel and by Mr. DeLozier personally. Our client deeply regrets having made an insulting remark to the court, and is sincerely remorseful. We acknowledge that making an insulting remark to a court is a breach of a lawyer's obligation to refrain from offensive personality, Rule 41(g), Arizona Rules of the Supreme Court; *see also id.* at Rule 41(c).

The conduct complained of was inexcusable. It was not, however, a violation of an express provision of the Rules of Professional Conduct, particularly ER 3.5(c) or ER 8.4(d), as referenced in your letter. It is my belief that the circumstances of this unfortunate matter demonstrate that the conduct, while unprofessional, was not unethical misconduct. Therefore, pursuant to Rule 56(a), we urge that a sanction of an informal reprimand incident be imposed on our client. An informal reprimand would be appropriate for the following reasons:

1.  The present matter was an isolated incident. Mr. DeLozier was appearing in chambers before Judge Cates pursuant to the criminal trial continuance panel procedures recently instituted in Maricopa County. Our client had experienced substantial and repeated frustration in determining the substance of the new procedures in seeking a continuance in a pending criminal matter, as well as in his efforts to comply therewith. These feelings of

Ralph Adams, Esq.
Re:  G. David DeLozier, Esq.
November 8, 2000

Page TWO

frustration were heightened and exacerbated by physical pain that Mr. DeLozier was experiencing that day with his shoulder.  He was respectful and professional to the court and opposing counsel at the commencement of the proceedings, and he had no intention of being anything but respectful and professional as he entered the courthouse that day.  The underlying criminal charges against Mr. DeLozier's client were very serious, and Mr. DeLozier firmly believed that the requested continuance was necessary and essential for the administration of justice.  As the hearing proceeded, however, Mr. DeLozier had the strong feeling that he was being unfairly chastised for seeking a continuance, and he perceived that an effort was being made to embarrass him in the presence of his client.[1]  We wish to stress that this is not to suggest or imply in any way that the court acted in an inappropriate manner.  Rather, in the context of these circumstances, our client reacted with an emotional statement at the conclusion of the proceedings.  He deeply regrets and profoundly apologizes for having so done.

2.    The statement was not ethical misconduct contrary to the express provisions of ER 3.5(c) or ER 8.4(d).  ER 3.5(c) requires that "[a] lawyer shall not: (c) engage in conduct intended to disrupt a tribunal."  ER 8.4(d) provides that "[i]t is professional misconduct for a lawyer to: (d) engage in conduct that is prejudicial to the administration of justice; . . ."  As noted above, the unfortunate remark was made at the conclusion of the proceedings, after the court had ruled on the request for a continuance.  There was no issue regarding the continuance or any other aspect of the underlying criminal case which remained for decision by the continuance panel judge.  Therefore, there were no proceedings remaining before the continuance panel judge which could be disrupted, or for which the administration of justice could be prejudiced.  The court, of course, continued to have jurisdiction over the parties while they were in chambers.  However, the making of the remark, particularly at the time it was made, does not constitute ethical misconduct in violation of the express provisions of ER 3.5(c) or ER 8.4(d).

3.    An informal reprimand is consistent with the recommendations set forth in the AMERICAN BAR ASSOCIATION, STANDARDS FOR IMPOSING LAWYER SANCTIONS (1986).  The ABA Standards generally recommend an admonition, that is, an informal reprimand, for lawyer misconduct which is negligent or an isolated incident, and causes little or no actual or potential injury to a client.  Although the Standards do not expressly address a counterpart to Rule 41(g), Arizona Rules of the Supreme Court, this general recommendation is applicable to circumstances which may involve violations of ER 3.5(c) or ER 8.4(d), *see* Standards, § 6.0 (Violations of Duties Owed to Legal System), particularly where the conduct causes little or no adverse or potentially adverse effect on the legal proceeding.  As noted above, the conduct of our client was an isolated incident and an aberration.  The court had issued its ruling on the request

---

1. *See* Comment, ER3.5(c)("A lawyer may stand firm against abuse by a judge, but should avoid reciprocation; . . .").

Ralph Adams, Esq.
Re:  G. David DeLozier, Esq.
November 8, 2000

Page THREE

for continuance, and the legal proceeding thereby had been concluded.  There was no injury or potential injury to the client, nor was there any adverse or potentially adverse effect on the legal proceeding.  Thus, it appears that the general recommendation of the Standards would be for the imposition of an informal reprimand.

The Standards also consider the presence of any aggravating or mitigating factors.  Mr. DeLozier has practiced for a substantial period of time, and has enjoyed a good reputation within the bar and the community.  He does not have any previous history of discipline.  The Standards recognize that substantial experience in the practice of law can be considered as an aggravating factor.  Nevertheless, it has been held that the absence of a prior history of discipline is a counter-balancing mitigating factor.  *See In Re Shannon*, 179 Ariz. 52, 876 P.2d 548 (1994).  Mr. DeLozier personally expressed his deep regret and apology to the court.  He further has expressed his profound remorse.  The Standards recognize remorse can be a mitigating factor.

4.   An informal reprimand is consistent with sanctions imposed in previously reported cases of misconduct.  It is fortunate that reported cases involving insulting or unprofessional behavior are not numerous, but there are certain examples which demonstrate that an informal reprimand would be an appropriate sanction.  Although not a case arising from disciplinary proceedings, the attorney in *Wilburn v. Reitman*, 54 Ariz. 31, 91 P.2d 865 (1939), was reprimanded for utilizing an appellate brief as a means to vilify the trial court and opposing counsel.  In *In Re Hansen*, 179 P.2d 229, 877 P.2d 802 (1994), the lawyer was censured for lying to the court to cover up her mistake in prematurely releasing a witness from trial.  Clearly, affirmative misrepresentations to a court, motivated by personal benefit, are significantly more serious in nature than an emotional, albeit insulting remark as a reaction to a ruling at the conclusion of a proceeding.  Accordingly, a sanction less severe than the censure imposed in *Hansen* would be appropriate.

5.   An informal reprimand would serve the purpose of disciplinary proceedings.  It is well recognized that the purpose of discipline is not to punish the lawyer, but rather to protect the public, the profession and the administration of justice.  A sanction, however, should also have the effect of deterring similar conduct in the future. Mr. DeLozier was cited by the court for criminal contempt.  He has experienced substantial shame and embarrassment. There can be no doubt that Mr. DeLozier has learned a harsh lesson from this unfortunate circumstance, and there is no substantial danger that similar conduct will occur in the future. This entire matter already has had the desired deterrent effect, and a more severe sanction is not necessary for the protection of the public, the profession or the administration of justice.

Ralph Adams, Esq.
Re:  G. David DeLozier, Esq.
November 8, 2000

Page FOUR


              For the foregoing reasons, we urge that this matter be resolved and concluded as provided in Rule 56(a), Arizona Rules of the Supreme Court, and that the sanction of an informal reprimand be imposed.  Thank you for your consideration.

              Sincerely yours,

              **STERNS AND TENNEN**

              Leslie I. Tennen

LIT\ab
cc:  G. David DeLozier, Esq.

## FACSIMILE TRANSMISSION COVER SHEET

**DATE**: October 16, 2000

**TIME**:

**Number Of Pages**, including this
Cover Sheet:

**FROM**:        LAW OFFICES OF
                **STERNS AND TENNEN**
                849 North Third Avenue
                Phoenix, Arizona 85003-1439

                Telephone: 602/254-5197
                Telefax:   602/253-7767

**TO :**        State Bar of Arizona
                Attention: Kathy

                **\*\*\*\* THIS IS A PRIVILEGED AND CONFIDENTIAL LEGAL
COMMUNICATION BETWEEN ATTORNEY AND CLIENT. IF ANY INDIVIDUAL
SHOULD RECEIVE THIS TELEFAX, OTHER THAN THE PERSON TO WHOM IT IS
ADDRESSED, IMMEDIATELY RETURN THE ENTIRE TELEFAX TO THE LAW
OFFICES OF STERNS AND TENNEN, VIA THE U.S. POSTAL SERVICE. THANK
YOU.**

\*\*\* Please contact 602/254-5197 if you do not receive all pages indicated, or if there is any other
difficulty in your receipt of this transmission.

**MESSAGE**: Re: Delozier      # 0019063

                This will confirm my conversation with you, on the above date, wherein
you advised that you were giving Mr. Tennen until November 8, 2000, to respond to the
complaint has been filed. If you have any questions please do not hesitate to contact our office.
Thank you.

\*\*\* Original attached pages to follow via U.S. or International Postal Service [ yes ] [ no ]



**STATE BAR** *of* **ARIZONA**
www.azbar.org

Direct Line (602) 340-7276

September 28, 2000

The Honorable Jeffrey S. Cates
Superior Court of Arizona
125 West Washington, Suite 101
Phoenix, AZ 85003

Re:   File No. 00-1963
      G. David DeLozier, Respondent

Dear Judge Cates:

We have received your submission to the State Bar regarding the above-named lawyer. I have sent a copy of your correspondence to G. David DeLozier with a request that he submit a written response.

Under Rules 46(g)(3) and 46(g)(5), Ariz.R.S.Ct., you are technically the complainant in this matter. However, you are not required to appear as the *named* complainant, even though the lawyer knows or will know who referred the matter to us. As a courtesy, we ask each judge who has referred a matter to this office what level of participation, if any, he or she would like to undertake. Please check one of the following options and return a copy of this letter to me.

| ✓ | want to appear as the named complainant, to receive the lawyer's response, and be advised of the ultimate disposition of the case. |
|---|---|
| | I do not want to be the named complainant and do not wish to receive any further information about the case. |
| | I do not want to be the named complainant, but I would like to receive the lawyer's response and be informed of the disposition of the case. |

**Please note that, if you do not advise me of your selection, you will not appear as the complainant in this matter and will not receive further information about it. In that event, Yigael M. Cohen, Director of Lawyer Regulation, will be listed as the complainant.**

The Honorable Jeffrey S. Cates
September 28, 2000
Page Two


Each year, the State Bar receives more than 2,000 complaints, each of which is carefully reviewed and evaluated. Regardless of the option you select, if, at any time, you would like to check the status of this case, please feel free to contact me.

Thank you for bringing this matter to the attention of the State Bar.

Sincerely,


Ralph Adams
Staff Bar Counsel

RA:ps

Direct Line (602) 340-7276

September 28, 2000

The Honorable Jeffrey S. Cates
Superior Court of Arizona
125 West Washington, Suite 101
Phoenix, AZ  85003

Re:     File No. 00-1963
        G. David DeLozier, Respondent

Dear Judge Cates:

We have received your submission to the State Bar regarding the above-named lawyer.  I have sent a
copy of your correspondence to G. David DeLozier with a request that he submit a written response.

Under Rules 46(g)(3) and 46(g)(5), Ariz.R.S.Ct., you are technically the complainant in this matter.
However, you are not required to appear as the *named* complainant, even though the lawyer knows or
will know who referred the matter to us.  As a courtesy, we ask each judge who has referred a matter
to this office what level of participation, if any, he or she would like to undertake. Please check one of
the following options and return a copy of this letter to me.

| | |
|---|---|
| | I want to appear as the named complainant, to receive the lawyer's response, and be advised of the ultimate disposition of the case. |
| | I do not want to be the named complainant and do not wish to receive any further information about the case. |
| | I do not want to be the named complainant, but I would like to receive the lawyer's response and be informed of the disposition of the case. |

**Please note that, if you do not advise me of your selection, you will not appear as the
complainant in this matter and will not receive further information about it.  In that event,
Yigael M. Cohen, Director of Lawyer Regulation, will be listed as the complainant.**

The Honorable Jeffrey S. Cates
September 28, 2000
Page Two

Each year, the State Bar receives more than 2,000 complaints, each of which is carefully reviewed and evaluated. Regardless of the option you select, if, at any time, you would like to check the status of this case, please feel free to contact me.

Thank you for bringing this matter to the attention of the State Bar.

Sincerely,


Ralph Adams
Staff Bar Counsel

RA:ps



STATE BAR
*of* ARIZONA
www.azbar.org

Direct Line (602) 340-7276

September 28, 2000

G. David. DeLozier
Attorney at Law
4016 E. Forest Pleasant
Cave Creek, AZ  85331-5439

Re:      File No. 00-1963
         Yigael Cohen, Complainant

Dear Mr. DeLozier:

Information concerning your professional conduct has come to the attention of the State Bar.  A copy
of that information is enclosed.  I have been assigned to investigate this matter pursuant to Rule 53(b),
Ariz.R.S.Ct.  Please include the above-referenced file number on all correspondence concerning this
matter.

Please provide this office with a written response to the enclosed information.  The ethical rules that
should be addressed include, but are not limited to:  ERs: 3.5(c), 8.4(d) and Rule 41(g).

Your response must be filed, **IN DUPLICATE**, within 20 days of the date of this letter.  If you cannot
file a timely response, you should contact my office immediately.

A copy of your response must be supplied to the complainant, if applicable, pursuant to Rule 54(f),
Ariz.R.S.Ct. and will become public record upon disposition of the matter pursuant to Rule 61,
Ariz.R.S.Ct.  If there is no complainant referenced, the complainant is the State Bar.  **You may
request confidentiality for information pursuant to Rule 54(f) and Rule 61(g), Ariz.R.S.Ct.
Any such request must be made in a letter separate from your response and must set forth the
factual and legal basis therefore.**  You must specify whether you want to keep the information from
the public (but not the complainant [if other than the State Bar]) or from both the public <u>and</u> the
complainant.  At the time you make such a request, you must submit the information for which
confidentiality is requested as part of your request.  Do <u>not</u> put information for which confidentiality is
requested in your response or you will be deemed to have waived any claim of confidentiality as to the
same.  Rule 54(f) and 61(g), Ariz.R.S.Ct. set forth the criteria which determine whether or not
confidentiality will be approved and a protective order issued.  Requests for confidentiality are only
granted sparingly and only upon good cause shown.  If your request for confidentiality is denied, the
information or documents in question will not be returned to you, but will be sent to the complainant, if
applicable, and will become public upon disposition of the matter.

G. David. DeLozier
September 28, 2000
Page Two


The procedure pertaining to discipline proceedings is found in Rules 51 through 58, Ariz.R.S.Ct.  At this point, this matter is not generally open to the public.  However, the State Bar may confirm to anyone inquiring that a complaint against you has been received and is being investigated.  When the State Bar has completed its investigation and a decision made about whether to pursue formal charges, then the complainant's submissions, your responses and, perhaps, other documents in the file become open to the public.  See Rule 61(a), Ariz.R.S.Ct.

The State Bar has a diversion program which may provide an alternative to traditional discipline. Diversion is a rehabilitative program available to lawyers whose ethical misconduct is of a non-serious nature and who may benefit from one or more of the State Bar's remedial programs, such as the Member Assistance Program (MAP) or the Law Office Management Assistance Program (LOMAP). Diversion is not available in cases of serious misconduct or for conduct involving dishonesty, self-dealing, or breach of a fiduciary duty. Participation in diversion is voluntary.  Lawyers who are placed in diversion must enter into an agreement called a memorandum of understanding.  Those who decline diversion will have their cases processed through the traditional procedures.  If you would like more information about diversion, please contact my office for a copy of the diversion guidelines.  If, after reviewing the guidelines, you believe your case may qualify for diversion, please submit a written request with a statement of why you believe diversion is appropriate.

Pursuant to Rule 51(h) and (i), Ariz.R.S.Ct., you have a duty to cooperate with disciplinary investigations.  I also refer you to Rules 54(f) and (g) regarding the status of the complainant, if applicable, and non-abatement in disciplinary matters.

Thank you for your anticipated cooperation.

Sincerely,



Ralph Adams
Staff Bar Counsel

RA:ps

Enclosures

**SUPERIOR COURT OF ARIZONA**
MARICOPA COUNTY
125 WEST WASHINGTON, SUITE 101
PHOENIX, ARIZONA 85003

Jeffrey S. Cates
Judge

Telephone: 506-3551
FAX: 506-7867

September 14, 2000

Attorney Consumer Assistance Program
State Bar of Arizona
111 W. Monroe, Suite 1800
Phoenix, AZ 85003-1742

      Re:  G. David DeLozier

Dear Sir and Madam:

      This letter should serve as an ethics complaint against attorney, G. David DeLozier, of Cave Creek, Arizona.

      This morning I conducted an informal hearing in my office to consider grounds stated in Mr. DeLozier's Motion to Continue a trial in State v. John McGregor, CR 2000-001489.  Present besides myself were Mr. DeLozier, his client and the prosecuting attorney, Michael Bailey.  There was no court reporter present.  After my ruling Mr. DeLozier stated to me "[N]ow what part of your anatomy do you want me to kiss?"

      I am available to answer any questions you may have.

Very truly yours,

Jeffrey S. Cates

JSC:arl

Cc:  G. David DeLozier

Enclosure:  Minute Entry dated 9-14-00

RECEIVED

SEP 1 8 2000

STATE BAR OF ARIZONA

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

**COPY**

09/14/2000

CLERK OF THE COURT
FORM R000

HONORABLE JEFFREY S. CATES
FOR:  HONORABLE LOUIS ARANETA

C. I. Miller
Deputy

CR2000-001489

FILED: _____SEP 1 4 2000_____

STATE OF ARIZONA

COUNTY ATTORNEY
BY:  MICHAEL G BAILEY

v.

JOHN JAY MC GREGOR

G DAVID DELOZIER #005237


VICTIM WITNESS-CCC

JUDGE LOUIS ARANETA


MINUTE ENTRY


IN CHAMBERS:  This is the time set for hearing oral argument on Defendant's Motion to Continue Trial.  The State is represented by above-named counsel.  Defendant John Mc Gregor is present with above-named counsel.

No court reporter is present.

After discussion and learning information, beyond what was in Defendant's Motion to Continue, this court finds extraordinary circumstances exist and that a 29 day delay of the trial date is indispensable to the interests of justice, to allow Dr. Gray or some other doctor a reasonable opportunity to submit a report concerning Defendant, to facilitate a plea agreement being entered into, considering the seriousness of the charges, and the harsh consequences to Defendant as a result of a conviction.

IT IS ORDERED denying Defendant's request in his Motion to Continue for a 60 day continuance; however, granting the Motion to Continue to the extent of a continuance of 29 days.

Defendant waives the applicable time limits.

IT IS ORDERED continuing the Trial Date of September 18, 2000, to a Firm Trial Date of **October 17, 2000, at 9:30 a.m., before Judge Louis Araneta.**

Docket Code 064

Page 1

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

**COPY**

09/14/2000

CLERK OF THE COURT
FORM R000

HONORABLE JEFFREY S. CATES
FOR: HONORABLE LOUIS ARANETA

C. I. Miller
Deputy

CR2000-001489

IT IS FURTHER ORDRED excluding all time from September 18, 2000, through October 17, 2000.  (29 days).

**NEW LAST DAY:  November 8, 2000.**

Counsel are to advise the court within two (2) days after receipt of this minute entry, if the Last Day calculation is incorrect.

IT IS FURTHER ORDERED affirming the prior release orders.

Matter concludes.

\*   \*   \*

**DIRECT CRIMINAL CONTEMPT CITATION**

The record will reflect that immediately after Judge Cates announced his ruling granting the 29-day continuance (and denying the request for a 60-day continuance), Mr. G. David DeLozier stated directly to Judge Cates, from approximately 5 feet away and in the presence of defendant and State's counsel, "[N]ow, which part of your anatomy do you want me to kiss?"

Immediately upon hearing this remark, and in the presence of Mr. DeLozier, Judge Cates informed Mr. DeLozier that the court was citing him for direct contempt for making this remark, and further informed Mr. DeLozier that his making this remark to the court, in the presence of his client, was an embarrassment to the legal profession.

Based upon the foregoing, and finding that Mr. G. David DeLozier's conduct was willfully contumacious and lessened the dignity and authority of the court, this court found, and now reaffirms G. David DeLozier to be in direct criminal contempt of court, pursuant to Rule 33.2(a), A.R.Crim.P.

IT IS THEREFORE ORDERED, pursuant to Rule 33.2(b), A.R.Crim.P, setting a hearing before Judge Cates on **October 13, 2000, at 9;30 a.m.** , to give respondent, G. David DeLozier the opportunity to briefly present evidence or argument relevant to the punishment to be imposed for his contumacious conduct, and the resulting finding of contempt of court.

# EXHIBIT 2

*Andriano v. Ryan*, Case No. CV-16-01159-PHX-SRB
Motion for Evidentiary Development

# IN THE SUPERIOR COURT

PINAL COUNTY, STATE OF ARIZONA

**Filed** in Court
Record
Date Filed: 10/16/2002
Time Filed: 01:27 PM

## Date: 10/15/2002

| | |
|---|---|
| THE HON WILLIAM J O'NEIL<br>Division 1<br>Court Reporter: NONE | ALMA JENNINGS HAUGHT, CLERK<br><br>By, GINA M. LAUGHLIN Deputy Clerk |

|  |  |
|---|---|
| IN THE MATTER OF THE<br>ADOPTION OF:<br><br><br>███████ ANDRIANO and<br>██████ ANDRIANO,<br>Minor Child(ren) | AD200100058<br><br>MINUTE ENTRY ACTION:<br><br>RULING ON MOTION(S) /<br>ISSUE(S) |

PRESENT:

## RULING UNDER ADVISEMENT

This matter was set for Evidentiary Hearing by the Court at the request of Petitioners/Maternal Grandparents. The Court permitted both counsel of record, G. David DeLozier, and their counsel in a Maricopa County cause, Daphne Budge, to submit statements, avowals and to make argument. Thereafter, a Substitution of Counsel was submitted and a "Motion for Order Denying Monetary Sanctions" was submitted. This Court previously rejected the ex parte communications submitted by Ms. Budge and the Court having already conducted the evidentiary hearing and having the matter under advisement does summarily deny the Motion for Order Denying Monetary Sanctions.

The Court's orders in this action were clear and unequivocal. Likewise, the avowal of Ms. Budge in her closing statements makes clear that the grandparents believe the Court in Maricopa County acted improperly; that counsel appointed for the children in that action acted improperly and that as they were not getting the result they wanted, they chose to file the adoption. The Court finds it impossible to accept that they did not contemplate that the methodology by which these pleadings were submitted and the timing of them would result in paternal interest being severed permanently. The Court finds counsel G. David DeLozier intentionally and surreptitiously avoided this Court's orders with the intentions of permanently severing the paternal interest of the children and that he intentionally disregarded this Court's orders.

IT IS ORDERED that a copy of the transcript of the hearing be prepared.

IT IS FURTHER ORDERED as a sanction that G. DAVID DELOZIER pay for such transcript, a copy of which will be forwarded to the State Bar of Arizona for review to determine if unethical behavior was conducted by him. As a further sanction, he is ORDERED to pay attorney fees of the paternal aunt and uncle/guardians in the amount of $6,000.00, which sum is reduced to judgment.

Further, the Court finds the Petitioners/Maternal Grandparents, Donna and Alejo Ochoa, knew the orders were not being abided by, that the actions were done to thwart the orders of the Maricopa Superior Court. A copy of this minute entry shall be forwarded to this Court's sister court in Maricopa County, cause PB20000-004531, with a copy to the assigned Judge. As a sanction, the Petition to Adopt by Donna Ochoa and/or Alejo Ochoa is dismissed with prejudice.

Signed this 18TH day of October , 2002.

WILLIAM J. O'NEIL

JUDGE OF THE SUPERIOR COURT

**Mailed/distributed copy:** 10/15/2002

cc:
G DAVID DELOZIER JR – PETITIONERS/
MATERNAL GRANDPARENTS

JOHN J JAKUBCZYK – CSL FOR
GUARDIANS IN MARICOPA COUNTY CASE

DAPHNE BUDGE – CSL FOR MATERNAL
GRANDPARENTS IN MARICOPA COUNTY
CAUSE PB20000-004531

# EXHIBIT 3

*Andriano v. Ryan*, Case No. CV-16-01159-PHX-SRB
Motion for Evidentiary Development

G. David DeLozier

M:  I feel like we've been going at it that long.

D:  At any given time our firm has approximately 100-115 cases, 120 cases and about a third of those are criminal.

M:  Okay.

D:  Okay – at any given time. This has been going on since – the Court *[unintelligible]* 95. The best of mix we normally see.

M:  Okay.

D:  So if you've got 30 a year – choosing a conservative number – 30 a year for 10 years is 300?

M:  Sure. I was just curious. I mean going from this tax interest and everything else to taking over litigation and I agree – its more exciting. How did that happen?

D:  How it happened was that I did not have a practice and I started literally by volunteering to do family law cases for people who couldn't afford lawyers because – I told you *[unintelligible]* by the Court. So the first time I needed a lawyer was going to Court. Where's the building? My first case actually was a former law professor's ex-wife had moved here and he was chasing her after some silly thing. I don't remember now what it was – something about furniture – some gawd-awful thing and my legal assistant or former legal assistant had to basically take me by the hand and show me where the building was. So yeah, it was one of those *[unintelligible]*. But that's how it started I got hold of paralegals in my neighborhood and said you got clients that can't afford lawyers obviously because they were hiring you instead of *[unintelligible]* me. I need to learn how to do this if you will do the documents I'll go to Court. So just get me ready. So I became known as a gunslinger of sorts. Go in for that particular hearing and we're done ya know. We're through. One shot deal. So when that's – that's sort of the beginning of the process and then of course as you know – I'm not sure how your firm works but – the way mine worked was those people would refer somebody else – it's a good thing. So now you've got a practice again.

M:  Right. So kind of using the pro bono base to build up.

D:  Exactly. I start volunteering for the free legal services that the County Bar has – one day a week spent a half a day down there and *[unintelligible]* over 30 minutes so I learn pretty quick and – well I had a lot of court experience to do all that and then the first thing you know is you've got this kind of a case and you go to your friends that do that kind of work and say help me out here – I gotta learn this – you know that thing – and

then I had an old lawyer who use to do capital murder cases all the time that retired to be with his mama and he was my mentor in that area.

M:   Who was it?

D:   Ben Martin.  He moved to *[unintelligible]* Missouri.  He's probably deceased by now.  I was on the phone with him all the time because that was his specialty – capital murder and all *[unintelligible]* criminal background was his specialty.

M:   Well I guess that kind of brings us up to the time when you got involved with Wendi's case.

D:   Pretty much I guess.  I haven't mentioned the civil cases that we do are also complex largely.

M:   Sure.

D:   Med-mal Catholic sexual abuse cases *[unintelligible]*  So a lot of cases in Arizona don't go to trial – criminals do usually unless its – I mean we've got some cases that didn't – for some reason I don't know why.  But 90% of the rest of them  *[unintelligible]* so when you say – I always act as if we're going to trial from the git go *[unintelligible]*.  We also basically never have any crime scenes around here.  We're always so far ahead of the schedule that it *[unintelligible]*.

M:   I take it from the caseload and everything you've been telling me that you've had several trials.  I can sure tell and that this one came around.

D:   Yeah well we've had quite a few and it depends on what you call trial – you know – I don't know if you're talking family law for example – it can be a one hour trial.  It can be a 3 day trial – a half day trial.  So we've done a lot of those of course and in the civil area we've done several too.  In the criminal we've done quite a few – like I've said most of those settled because the guy doesn't have a defense and you work out a deal -- *[unintelligible]* last Friday the guy was facing 5-6 counts and we proposed immediately the things the county attorney asked us to do ahead of time and those *[unintelligible]* waiting for her to talk to her supervisor to come back with a deal – he got attempted computer tampering.  Classics undesignated felony.  He was charged with five Class 2 Felony.  He took photographs of his girlfriend and put them on the internet.

M:   Okay.

D:   So he was looking at a long time in jail and he got no time in jail.  That's just *[unintelligible]*  But yeah I don't remember now how I met Wendi's parents.  I wish I did.  But I can remember meeting her father at a gas station up there on ___ Highway.

M:   Okay.  And how long after the – I mean was that before the incident?  Before Joe's death?

2

D:      No… no… I didn't meet him until after she was already in prison.  Okay .. their lawyer has been Leon Thikoll.

M:      Yes.

D:      You know that name probably.  And Leon had gotten sick – had a heart attack – something happened – I don't know and initially it was going to be I was going to help him while he recovered but I guess Leon never recovered or whatever.  So I met him I think I met his wife too but I'm not certain before Donna – before I went to see Wendi again *[unintelligible]*.  But anyway it was hard *[unintelligible]* git go with ___ counsel.  I think I've explained to you …

M:      Yes.

D:      Okay.

M:      Do you have any idea when that would have been?

D:      I would think it'd have to be 2 out of the 3.

M:      Okay – so not until then.

D:      I could find out for you if you wanted me to.

M:      No.  I mean – the only reason that I asked would kind of try to get – put together a time line of who was involved and when since the murder in 2000.

D:      Pardon me?

M:      Since the murder in 2000 all the way through.

D:      I'd have to look at the computer.

M:      Okay.  It looked like for some period of time there was some cooperation – working together between you and Leon.  Correct?  It seemed like there were a few emails going back and forth ….

D:      There were some exchanges of information – some phone calls I remember that but at some point I don't know why Leon was no longer involved.  I don't recall why that was.  Again I would have to look at the computer to figure it out.

M:      Okay.  And then getting back to your initial involvement – your meeting with Alejo at the gas station.  What was the arrangement?  Was it an hourly fee – was it pro bono?

D:      He said he could raise $30,000.00.  And I thought I was going to be Knapp counsel so I figured that was ok and I think I probably got paid that *[unintelligible]* and I don't know

if he brought it all that day or brought it at different times. *[unintelligible]* was a photographer or is I guess – if he's still not hiding in a hole somewhere. I don't mean anything negative toward him – he's *[unintelligible]*. But he's a photographer and he use to come out and photograph our horse shows *[unintelligible]* so I also got to know Donna real well and *[unintelligible]* (work with them).

M:   I do want to talk a little bit more about all these people and your impressions in detail – I just want to get this chronology set forth here. So after – after Leon ....

D:   Why don't you put that on hold for a second and let's go over to my office and look at the computer ...

M:   Sure.

D:   If that's what you need I'm not prepared.

M:   Back on here. Okay so you had a chance to go through records and you know look at some of the time lines and its your understanding that you were involved roughly around December 2000.

D:   I would have been involved before that – probably not much before that.

M:   Okay.

D:   I don't remember when I filed an of counsel – I could look that up – but I didn't document – but

M:   And it was you and Leon Thikoll

D:   Thikoll.

M:   Thikoll. Until about March 2001 then.

D:   Right.

M:   You withdrew maybe because of health reasons.

D:   Yes. It was my understanding that *[unintelligible]*

M:   Right. Who was involved with you. I mean was it .. was it you on your own for a while?

D:   I was – I didn't have anyone else on the case until they brought in Dan Patterson.

M:   Okay.

D:   Whenever Dan came along – I don't know when it was – probably 2003.

4

M:   Yeah I think that's what our records show – 2003.  There was another person from the
     State Public Defender's office involved before that or at least in May but as I recall he
     wasn't doing a whole lot of work on the case – he had some other cases that were coming
     first – you

D:   Peterson?

M:   That may have been the name.

D:   They would also have him come to the courtroom to explain or assist or whatever
     primary decision – at one point they made him come to the court and told him to go find
     somebody to take over the case as lead counsel.  Okay?  And my understanding is that
     Patterson was in private practice *[unintelligible]* (quit) was going back to the Public
     Defender's office – that's what I was told and it took a while because the Court had this
     man basically *[unintelligible]* (my words) to Wendi and her parents.  Because the
     controversy was always over meeting back in the courtroom asking for experts.  Okay?
     And their version of it is that public defenders are set up for that and you don't have to
     keep bothering the court essentially every time you want a new expert.  Because I was
     not on the County's approved list to get paid as a county contract lawyer.

M:   Okay.  So if you were to seek an appointment …

D:   If I wanted anybody to help with this case I had to go ask the judge to force the county to
     pay for it.  And we did that fairly regularly and got tired of seeing me in the courtroom I
     guess and decided there was a much more efficient way to do it was through the county's
     public defender's office (?)  So that's when they brought and that's *[unintelligible]*

M:   What was going on in the case – I mean what was it like in that interim period where
     basically it was just you working on this matter for almost 2 years.

D:   Yeah.  Basically what I was doing was going back to court on a regular basis asking for
     them to let me hire somebody with expert, non-expert so forth and so on.

M:   What kind of experts were you looking for?

D:   Well a reconstruction guy was one of the first and I had a guy somewhere down south –
     Sierra Vista sounds right and I can't even remember his name now – who was known in
     the circle (?) as the best for that kind of reconstruction.  Part of the problem was – with
     the crime was whether it would have been manufactured or whether it existed as it was
     found to be when the cops got there.  Because here's Wendi sitting farther against one of
     their walls – basically waiting for the cops to come.  Okay?  She didn't make any attempt
     to flee, run to Mexico or any of those other things she had experienced going to Mexico
     as a missionary so your typical guilty person idea is you're going to flee.  Well she sat
     there and waited for them to come.  Your question was whether the blood (?) was on top
     of the knife or the knife had been moved or whatever.

M:    Right.  To make it look as if there had been more of an attack than there was.

D:    Did she also state that breaking of the pictures and slamming stuff on the floor, etc. etc. etc.  Okay – blood splatter issue was a big one too.  This guy said he could also help with that and run over everything – the notes are in the file somewhere.  And let's see – I don't know point in time we were talking to Sharon Murphy (?) -- that may have come through Kandy Rhode – I can't remember who – who contacted her.

M:    Okay.

D:    But part of the whole deal was Wendi had said that her life was controlled by him by her deceased husband.  Essentially she did everything he asked her to do and he did whatever he felt like doing.  Play with his boats, play with his cars and doing so many other things.  So it seemed to me that wasn't a very important area to develop – was their relationship and then the question became who else knew about it because she never filed a police report for the things he did to her – her explanation was that when she was manager of these apartment complexes if she did that she was young – okay – so – she didn't do that.

M:    These were kind of your original theories of the case during the time prior to Patterson's involvement.

D:    Oh yeah.  They – well you can see from the first letter *[unintelligible]* in December of 00 we had – that was the direction that I thought we needed to go and then I don't remember when the domestic violence thing came up because it wasn't something I would have known *[end of tape]*

*Monday – October 5, 2009 – at the offices of David DeLozier.  (Side 2)*

M:    This is Matt Lynch and I'm here speaking with Mr. DeLozier.  We're here to talk about post-conviction relief with regard to Wendi Andriano and I guess what I'd like to start with taking this chronologically even before taking Wendi's case – is your background – legal background – I mean what sort of law practice did you have?

D:    Starting when?

M:    Well – I mean what did you start practicing law?

D:    Ok my first employment as a lawyer was counsel to the Minority Leader at The House of Representatives for the State of Tennessee.  And also his business law counsel and also his business law counsel for his business.  That was in – probably 1971ish – somewhere in there.

M:    So that was mostly dealing with business issues.

6

D:    The man must have had his own business – but he was also the Minority Leader of the House.  So we'd live in Nashville during the legislative session so I wrote (?) bills and so forth and so on and dealt with constituent problems *[unintelligible]* business whatever legal issues that they had – at that time – was not finished law school – I was still in law school and then I continued to do that for a short period of time after I was out of law school and became an Assistant Attorney General for the Department of Mental Health and the State of Tennessee – I only did that for like 3-4 months.  But I went to the School of the University of Tennessee for law school and *[unintelligible]* law review and editor for a while and so forth.  I move to Houston, Texas after counseling with one of my professors at the University of Tennessee and went to work for a tax and securities firm.  That was my area of interest – was tax and securities.  And I did that for about a year plus and realized that I would still being in the back room doing wills if I stayed there so I decided to move to Philadelphia and took a job with the American Law Institute and traveled around the country putting on seminars for lawyers that is the host – I wasn't (?) the speaker obviously.

M:    What time did you move to Philadelphia?

D:    What was that – '75 I think that was.

M:    Okay.

D:    Yeah – '74/'75.  I got licensed in Texas and practiced in that firm for about a year I guess.  Went to night school at Temple University for a Master's in Taxation.  Didn't finish it – I got bored traveling across the country putting on these seminars so I talked to one of the guys that was one of my regular speakers in the Texas securities area and he was at that time a lawyer in one of the fairly good sized law firms in Phoenix and I said I'm bored – got any ideas?  He said come and interview because I need somebody to work with me.  So I did and moved out immediately – took the job – moved here in August '77 and stayed with that firm – we did mostly tax planning, tax shelters, pension plans for *[unintelligible]* general contractors – people like that.  I didn't know where the courthouse (?) was.  In other words I was a lawyer.

M:    What was the name of the firm?

D:    Schimmel Hill Bishop and Rudger (?).  Its no longer in existence – it sort of down floated – what's left – about 6 months after I moved here my mentor left and I inherited the tax department – it almost killed me.  Moved on to general counsel for a construction company and I did that for a while until the real estate market went through *[unintelligible]*.  And it was the first time in my life *[unintelligible]* and that job was no longer available because he was out of business.  And I moved then to San Diego and went to work for an international investment firm that I can't remember the name of it now but I think its out of business – that primarily did tax shelters and other forms of investments and I did that for a couple of years.

7

M:     Okay – so backing up – you've got Schimmel and the construction company – those were *[unintelligible]*.

D:     Right. Right.  And I was starting my own firm or a little while with another guy that – in fact one of my law clerks was at Schimmel Hill and *[unintelligible]* from Scottsdale and we functioned as a very small – primarily planning type organization – he did some litigation – I still didn't know where the courthouse was (?)  Then I moved back from California and went into a business of my own where all what we were doing was investment planning through various investments that we developed – so I was a principal and  *[unintelligible]* -- two corporate subsidiaries and was *[unintelligible]* partnership by the time we finished in 1986 – the tax reform of 1996 destroyed my practice. (?)  Even as a – my own business.  As you may not know *[unintelligible]* basically took all of the tax shelters out of the tax law -- *[unintelligible]*.  So I started out after that period inspired – I think I didn't – the businesses really didn't stop operating until (?) 1989?  Lost a lot of money and I had four years of audits from the IRS *[unintelligible]*.

M:     I can imagine.

D:     That is kind of amusing – I had an auditor who *[unintelligible]* visited my place almost every day and I thought he was probably working on making sure he gets his retirement fund.  And found out while at one of our discussions that that was his second federal job – you know he got his pension from the other one – now we're going to second this (?)  I told him when we started what he needed to know and who was responsible for the taxes?.  Of course he found out that wasn't accurate so I appealed it *[unintelligible]*.  So at that time the business was done and I had maybe been in practice for seven years – I did my own activities – so I started over on my own – one man show and primarily was doing family law and small civil stuff.

M:     This would have been in the early '90's.

D:     Yeah – late '80's, early '90's.  And by 2-3 years after that I had a staff of 4 or 5 and had moved into a larger office down south of *[unintelligible]*.  We had *[unintelligible]* so when some of my memories of dates are affected because I ended up with *[unintelligible]*.

M:     What did they have?

D:     Mold and fungus of various forms and I also had legionnaires disease.

M:     Did you – was a lawsuit – I mean –

D:     Yep.

M:     It's alright.  You could look at it from a litigation –

DI_2077842.1

D:    Yeah – I had lymphoma when I was out in Tucson – I had an experience with mold – tested until they found *[unintelligible]*—

M:    What affect did that have?

D:    Well during the time that I was still and able – that I was in difficult straights because the medical profession couldn't figure out what was wrong with me.  I was diagnosed with MS – I was diagnosed with half a dozen things none of which I had.  Finally found a doctor who said nobody's taking your blood – *[unintelligible]* is in the blood.  And he's *[unintelligible]* – but the kinds of things that are going on – and I had a couple of legal assistants that also got sick – I had one client that got sick – I had another – the guy that came in and turned on my computer system got sick so I had 6 – 5 other people who were part of my own group that *[unintelligible]*.  And no one of course could afford to find out what was wrong with us – so I was the guinea pig.  I spent 18 months and about $20,000.00 bucks trying to figure it out.  Once I found the right doctor and got the right medication – then it was done – but it was really a strange time because I had pneumonia for the time and stayed in the bed for over 30 days one period.  Fortunately I had very good lawyer buddies and I one paralegal or two that managed to keep the practice without completely going down the toilet again because we build it up fairly quickly and fairly well.  In any event during those times we were still doing family law and civil cases and *[unintelligible]* and stuff like that.

M:    Right.

D:    The …..

M:    So not a lot of criminal work?

D:    No.  I don't – can't remember when that – when that actually started.  Probably mid '90's I would guess – maybe before that – but it's hard to –

M:    Yeah.

D:    But one of the symptomologies (?) was I had been to something I needed to do and I'd get up in the chair *[unintelligible]* – it was really a bazaar time.

M:    When did those symptoms go away?  Was it

D:    Essentially they went away after I got Legionnaires -- *[unintelligible]* this doctor gave me.

M:    Should have been mid '90's probably?

D:    Oh probably before that – my wife would probably know.  But I had so many doctors its somewhat of a blur to get it down.  Its been at least 15 years – maybe more – but you know – anyway the kind of things that happened was the development of the practice was

DI_2027842.1

that we had folks that were referring us business. I didn't advertise and essentially the – what would happens is I would get hard luck families like in Wendi's case to sort of keep an eye on things. I really didn't do much in the way of misdemeanors and DUI's and things for the smaller cases – it was usually ones of a larger nature – I started being second chair with cases – second degree murder cases – first degree murder cases so forth – probably in the late '90's and sometimes those lawyers would allow me to have a role – and sometimes they didn't. Often I would just sit there and they do the thing. You know I didn't get offended one way or the other – I was there to help if they wanted it. We were – at that point had fairly decent balance between civil cases and criminal cases by the early 2000's. Quinn (?) might know because she's been with me for about 15 years – when we started doing criminal because she's a former prosecutor. (background – where did Quinn go?)

D:      '95?

Q:      '95 – that was '89 *[unintelligible]*.

D:      *[unintelligible]* started doing criminal?

Q:      Yes.

D:      And we were doing family law of course too.

Q:      Yeah – we did it all – civil, criminal, family, contracts *[unintelligible]*, litigation.

M:      Okay. And this was ___ criminal too … right?

Q:      Yeah.

D:      We didn't do any misdemeanors.

Q:      uh uh – it was felony. That was criminals -- *[unintelligible]*

D:      It was white collar crime. *[unintelligible]*

Q:      *[unintelligible]* – then we picked up Wendi somewhere along the line. But there were some more *[unintelligible]*

*Discussions between Quinn and DeLozier but very hard to understand what they are saying.*

M:      Okay – thank you.

D:      I'd really have to look back in my computer for more specific details *[unintelligible]*. But prior to Wendi we had – I had been second chair for similar cases – shootings things like that. Is this the guy that shot you? *[unintelligible]*

10

M:     So it would have been like manslaughter, murder.

D:     Yeah – one defendant I'm thinking of now is a Vietnamese kid who got 25 to life. *[unintelligible]* died in the intersection – he ran into the car and *[unintelligible]* was convicted of anyway.  Whether it was him or not – she said it wasn't.  You know .. but – we lost.

M:     Do you have any idea – roughly – how many cases – criminal?

*(End of Tape 1)*

*(Note to Matt—I don't think this is DeLozier who is speaking here… but I didn't do this part of the tape – Jo)

A:     Give me time to catch up with you anyway.  *[unintelligible]* I'll file the application for funds to properly represent defendant.  You got that down?

M:     Yep.  You want me to take it off?

A:     No No.

M:     Ok.

A:     Application of funds to properly represent defendant previously with the court on January 23, 01.

M:     Ok.  See I would…

D:     Ok?  According to this.  And my… now I am saying a request for expedite consideration of that application.  Ok?

M:     So that would make sense that you had started on the case sometime around December and then were looking for reimbursement of those funds.

D:     No, I am asking for… to authorize payment of those funds to the experts.  Ok?  And I'm going through this… *[unintelligible]* office of court appointed counsel.  Um, and I keep talking about time is of the essence in obtaining these expert witnesses and so forth. Michael Sweeto… there's the guy's name… retaining Michael Sweeto expert witness consultant qualified to testify in many areas of the crime scene investigation including crime scene reenactments, blood spatter analysis, finger print analysis, and so forth. Mark Jones of Jones Investigative Services assisted with witness interviews.  Jones is a retired police officer, etc. *[unintelligible]* assists with the collection of trial preparation and so forth.  I was trying to get some money here… to pay for this thing.  So that was filed sometime in February 01.  …*[unintelligible]* but then it went to trial. *[unintelligible]* carrying charges so that helps clarify it a little bit more for me as we were asking for these experts including Sweeto very early on in 01.

11

M:     Right and those are names that ring a bell just because of the documents you sent, and –
       but they don't ring a bell from the trial transcript.  Why was it that Sweeto ended up not
       offering an opinion?

?:     No idea.  Because once they… see what happened here is OCAC basically… the people
       from OCAC basically put their foot down and tell the court that I shouldn't be involved
       in the case at all.  Ok?  That this was irregular… highly irregular… and…

M:     These were people from…

D:     The Office of Court Appointed Counsel

M:     Ok

D:     Okay.  And there is no reason for this to be done this way and there is no reason to take
       money out of their budget because the budget in the public defender's office already was
       there.  OK?  Etc., etc., etc.  OK?  So eventually that argument prevailed, and basically
       they forced me to ___ Knapp counsel or second chair or whatever you want to call it.
       Okay?

M:     Sure.

D:     And, convince the family—I convinced the Court that the least the family ought to be
       able to approve of them doing this and being _____ Wendi and after some consultation
       with them, I have no idea how much, I was not asked to be a part of it okay?  Don't know
       what was said to hurt them by whom – I just knew and *[unintelligible]*.  Okay – that's
       when Patterson came on – I don't know for sure when that was.

M:     Okay.  So, basically you were asking for the family to be able to have you as counsel but
       also to retain these experts?

D:     Okay, under of counsel rules, the way it's been developed by the State of Arizona's
       Superior Court, is that Knapp counsel can request at County's expense, experts to assist
       in the preparation of the defense of the case.  So I was going through the normal things
       that an of counsel are allowed to do – when an of counsel is the lead counsel, okay?
       When an of counsel is second chair, he just sits there and does whatever the lead guy asks
       him to do little or nothing or a lot.  It's how comfortable the lead counsel is with that
       person sitting there next to him.

M:     Sure.  So, at the end of the day, Mr. Sweeto, Mr. Jones – were they involved, at all?

D:     *[unintelligible]*.

M:     They were not?

12

D:     No.

M:     Okay.

D:     I don't know who else I was asking for but I was *[unintelligible]* because I was looking for Sweeto's name. In fact, I don't even think we've had a crime scene analysis expert at all. *[unintelligible]* I'm not sure why, but, that wasn't part of the strategy that I was asked to develop.

M:     Right and that's actually something that I noticed as well. That, you know, there were a number of state people, you had a couple of county PDs, or, not public defenders, but police department, or the City of Phoenix police department coming up there, with testimony that there was some effective cross-examination or other, but not coming forward with.

D:     Didn't have anybody *[unintelligible]* sort of, *[unintelligible]* for the defense -- yes.

M:     Correct.

D:     Correct. We did have a toxicologist I thought did a good job. That they used. I don't know who's suggestion that was, but I sort of *[unintelligible]* I couldn't figure out if he was *[unintelligible]*. He was a retired Phoenix PD toxicologist.

M:     Okay. So, basically, just taking it back during this time – this you know – roughly two years or so where its just you, a lot of that was just involved in a lot of these administrative battles over ongoing pay for the experts, who were supposed to be involved in this case.

D:     Exactly. *[unintelligible]*

M:     Okay. What other work was going on at that time? Can you recall anything?

D:     Well, I was meeting with Wendi gathering whatever we could gather, and I was of course basically, doing it all myself because we didn't have any ability to retain anybody's assistance – I don't know how much, you know, *[unintelligible]* wasn't involved anyway. I'm sure I was to pay her regardless. What all we did, you know, it was lots and lots of stuff, interviewing witnesses and competent family and developing, you know, whatever we could on various aspects of it. Basically the court time was simply going in there and trying to convince them to let me do something besides go through the motions. Sharon Murphy came along sometime in – looks like our *[unintelligible]* started making noise about her in April of 2002. Don't know how I got to her though – I can't tell you that. *[unintelligible]* more analysis again in the computer – Excuse me while I …

M:     Sure.

DI_2077842.1

D:    I just saw Murphy's – oh here we go… yeah, 4/8/02.  The two domestic violence acts that I was talking about, *[unintelligible]*  and Sharon Murphy *[unintelligible]*

M:    What is, what is the date of that?

D:    Well, I'm talking to somebody, in April 8 of 2002.

M:    Okay.

D:    And this was sort of a note to myself, I guess.  But I didn't say who we, who I was talking to.

M:    But Sharon Murphy was on the radar, apparently early on then.

D:    Um-hum.  Yes, yes, I just, e-mail from Murphy February 23, 03, meeting with Dan Orwell, so apparently Dan was on board by that time, because she's e-mailing me.

M:    You know, I think that's probably close enough for our timeline purposes.  I'm not sure how, how important Sharon Murphy is going to be in this, this next step.  I mean.

D:    I was starting to get your timeline for you so that's fine whatever.

M:    Yup, okay.

D:    It looks like at one point I *[unintelligible]*  February 1, I did that too.  *[unintelligible]*

M:    Okay.  So Dan Patterson, is after this, these tangles with the court and finally, you know, convincing Alejo and Donna, whoever it was, to—

D:    I know, I know Peterson was involved in that.  One of the two Peterson brothers.  And its his job to convince the family to let the PD take over.

M:    Okay.

D:    Okay?

M:    And so ultimately they did, and it sounds like that was early 2003.

D:    Well, here's a fax to Patterson, that's what I was trying to find – March '02.  D̄an, those fingerprints should be dusted on the following: *[unintelligible]*  I'll print that for you.

M:    So maybe pushing up the Patterson timeline by a year?

D:    Yeah, it looks like he was involved at least by 2/02.

14

M:      Okay.  And what were your feelings about this whole pushing the, pushing the Ochoas to get the PD's office involved?  Was that something that was--?

D:      Well, you know, I'd gotten to know them and they'd gotten to know me and I'd gotten to know Wendi real well, and you know, I just didn't understand why the system couldn't accommodate, you know, the way it was, but I, feel like, by the time I had – time we went through all this, we were all worn out from it.  Okay?  And if this was going to be more efficient way to do it, you know, I was going to go along with it.

M:      Sure.

D:      You know, you can't fight city hall, as they used to say when we were kids, you know.  And it's one of those kind of things where it was a bloody mess trying to do it the way that I was trying to do it.

M:      So ideally for you, I mean, the ideal situation would have been you get the funds you need from the County and try the case yourself—

D:      Yeah.

M:      As opposed to getting a –

D:      Yeah.

M:      Getting co-counsel involved.

D:      See they, they, they really, you know, especially after *[unintelligible]* should have given me a second chair, first chair first, okay, and that was part of what I was trying to say – if *[unintelligible]* give me a second chair guy because I'm the one that the family selected – we could do it that way – you know – *[unintelligible]* -- so what do you do?

D?      You gotta go on the fly.

D       I thought Dan was a pretty good guy, actually.  You know, but when – I don't know how much more involvement I had after getting him sort of up to speed on what I had been doing --

M:      Well, tell me a little bit about that.  I mean, Dan got involved and then, I mean, I assume you had some meetings and just sort of brought him up to speed on the case?

?:      Oh, wait a minute.  Hang on a minute – I apologize – it looks like it some stuff even earlier – here's some stuff from '01.  Oh boy – maybe it didn't take as long as I thought it did.  Now that Peterson – see – Wesley Peterson – this is what *[unintelligible]* trying to push that idea on him.

M:      Okay --

M:     Okay.  So between —

D:     *[unintelligible]* Patterson/Peterson to close in the computer I guess.

M:     So between Thikoll's withdrawal and Patterson entering in 2002, it was Peterson on the
       sidelines in the Public Defender's office.

D:     He was the guy that they were talking to, yeah.  There was a Patterson fax as early as
       7/30/01.  So let's see what that says.  [long silence]  *[unintelligible]*  It looked like had
       some training cases *[unintelligible]* 10/28/01.  *[unintelligible]*.  But then apparently he
       got in there fairly quickly – I thought it took longer than that.

M:     I mean it's possible that—

D:     He's there in there -- in 2001.

M:     And it may be, and I have to clear this up with Dan, that he was, you know, doing some
       limited elements to the case as Peterson was the, the lead guy, and—

D:     Well Peterson was not the lead guy.  I apologize.  Let me clarify.  All Peterson was, was
       at the time, head of the Public Defender's office in Mason.  He was the one they kept,
       that the court, kept bringing him back to court to try to, convince, giving him the job to
       go convince the family to let the Public Defender's office take over.  But he really didn't
       have anything to do with the case other than that.  Peterson.  Peterson, I understood
       brought Patterson in from private practice.  One of the cases he was assigned was this one
       – that's part of the deal they made with him – whatever deal they made, I don't know, I
       don't have any idea.

M:     Okay.

D:     But I, I, it looked like Patterson indicates as early as August, July of 2001, for some
       reason I don't have what we are now doing and keeping up with all this stuff.
       *[unintelligible]* my file so I don't know where --

M:     Sure.  Yup.  And I'm sure we can, we can pin that down.

D:     I guess it only went on for like 6 or 7 months – it felt like a lot longer than that --
       *[unintelligible]* believe that it was that short of a time.

M:     And after bringing Patterson up to speed, what was your involvement in the case over,
       you know, between late '01, '02, '03?

D:     Still just talking to Wendi periodically, but then it became, as we got closer and closer to,
       to a trial, was developing the, working with the mitigation guy and when we got to trial,

16

he basically told me which people he wanted before we got to trial.  Told me which people he was going to have me do – any kind of examination with at the trial.

M:   What was your input on any of the, either trial decisions – who was going to be called, mitigation?

D:   Well, I had mitigation witness interviews and closing.  Okay – that's my job.

M:   Okay.  I saw a draft of an opening statement as well in –

D:   Yeah, it might have been – I can't imagine *[unintelligible]*

M:   Okay.  So – was that a clean division of labor – I mean was it --

D:   I got a draft opening statement as early as February 2001 – another one is April 2004.  8/27/04 is the last time that I looked at it it looks like.  Anyway …

M:   Okay.

D:   Is there a  fair division of labor?

M:   Or a clean division of labor, What I mean ….

D:   Basically, what, what was, what I did was whatever he asked me to do.  And that was limited to working with the mitigation guy on developing what we were going to do there – and how to present it – power point stuff and whatever – seems like I did a, seems like I did the examination of what you would call friendly witnesses.  That's what I remember.

M:   Yes, I think that's, that's right.  You, you did examine a number of family members.

D:   Yeah.  Yeah, and friends.  I don't recall that I did any, any cross of any of the cops or anything like that, or any of their experts.

M:   Okay.

D:   I don't recall doing any of that.

M:   Sounds like sort of a division between the liability stage and the mitigation stage?

D:   Probably, the right way I would classify it, yeah.

M:   Okay.  So, how often were there, you know, meetings, conversations with Dan Patterson during this whole pro-representation?

D:   You know, I think I went down to the Public Defender's office maybe, maybe twice.  Three times at most.

17

M:    Okay.

D:    Not very much.

M:    You mean you basically just said you take care of this and, you know, we'll, we'll chat later.

D:    We had done some interviews already.

M:    Okay.

D:    Before he, I think, we got involved or at least I got assigned to do some of those.  Some of Joe's history, and things like that.  I got from Donna – for example.  The, it was basically in my mind, you know, we had, we had Rhode on board in those days – Ken Rhode –

M:    That actually brings up another question.  Why didn't she testify?

D:    I don't know.  I wasn't in charge of who testified.

M:    Okay.  So those decisions were all ultimately Patterson --

D:    Yeah.

M:    Patterson said this person is going to testify or Scott McCloud the mitigation specialist.

D:    Right.

M:    I want this person to testify—

D:    Well I was told who was going to testify.  Get ready for this person.

M:    Alright.  Okay.

D:    Yeah.

M:    So, you—

D:    I didn't have any …

M:    … don't feel you had a whole lot of input into any, strategic decisions here.

D:    I didn't have any.  *[unintelligible]*.

M:    Okay.

18

D:   I might have lobbied for, for people like Murphy, because I was pretty, pretty fond of her I and thought she could do a good job.  Joe, oh what was Joe's name, -- Joe Collier – was one of my, one of my buddies.  He's a toxicologist.

M:   Right.

D:   I probably lobbied for him.  I would have had somebody to counter the idiot psychologist *[unintelligible]*

M:   *[unintelligible]*

D:   We also didn't have anybody to cross on the coroner.  28 strikes to the head – That's what *[unintelligible]* -- impossible.  Like when Dan kept saying how are we going to counter that?  He never had an answer for that – his own question.

M:   Right.

D:   You know, it's uh.

M:   Right and actually …

D:   *[unintelligible]* so we didn't have the crime scene *[unintelligible]* so that, the whole theory was that we needed all these expert, from the git-go with me – to prove the case. At least have a try at proving a case, and what I could see we didn't have anything.

M:   Why do you—

D:   Collier and Murphy.

M:   Right.  Why do you think the PD's office didn't go down that road?

D:   I have no clue.  No clue.

M:   I mean, there was no, there was no sense of financial issues with, with the county or anything like that?

D:   Not that I was aware of.  Of course, I don't, I don't get involved in that, I never have been a pubic defender so I don't what their world consists of.

M:   Sure.

D:   Maybe Dan couldn't get approval.  I don't know.  I certainly couldn't get approval.

M:   Okay.  So during this time, I mean, I know what, I'm sure that this varied from, you know, zero hours to 50 or more, but can you give me a sense of how many hours a week

19

you were spending on the case?  Over the, you know, just generally speaking, this time frame I was doing?

D:    Oh, we've got printouts of all of it somewhere.

M:    Okay.

D:    Probably it's in the computer, I would imagine, but, you know, I don't *[unintelligible]* know what the hours were.  Obviously, the trial lasted 17 weeks, so – You know, its a huge amount of time that unfortunately the judge let us do in the afternoon -- *[unintelligible]* … lengthened it also.

M:    Sorry, I had to – one of you did mention that to me, so—

D:    Yes.  29 year old *[unintelligible]* bright kid who I met while serving as of counsel while he was in the PD's office.  We get to know each other – he wasn't offended by me being there *[unintelligible]*

M:    Would, would you put Dan Patterson in that category?  Somebody who would—

D:    No, he didn't appear to be at all.

M:    He didn't seem bothered, he was just sort of—

D:    I was just another one of the team players, told to do whatever, I get assigned to do.

M:    Right.  But there was, there was a clear chain of command.  This was Dan Patterson's—

D:    Oh, he's in charge of it.  Yeah.

M:    Okay.

D:    Yeah, it's really one of those things that I had to convince him by recognizing (?) early on.

M:    Were there any theories that you had about the case?  I mean, I know we, we previously talked about, the idea that Wendi was not actually the person who stabbed Joe --

D:    Right.

M:    Were there any theories that you presented that were ultimately rejected?

D:    You know what I would have done that during this early stage, what *[unintelligible]* right there?  Okay.  I gave him, *[unintelligible]* whatever it was, this one, Joe's finger prints should be tested – well there never were any finger prints tested as far as I know.

20

M:      Yep … the …

D:      From – well here I am, I didn't know he was even in the case at that time, but obviously he was.  In March of 2002 I went down – the other thing that I was exploring is, not the cut across the larynx – now maybe he researched some of this and he couldn't find anybody that agrees with my position – I don't know – but I just don't know.  But you know … I don't think that you're going to find that the damages to his neck were caused by her straddling him like the police said he was.  Okay?  Its unnatural.  Okay?  From my point you know… I'm not an expert at this stuff but that's what I was looking for but it would be natural for a right-hand person to cut it on the left side of the neck where the cut was.  He should, it would be abnormal for a right handed person to cut himself across the middle.  And neck, of the neck and larynx.  *[unintelligible]*

M:      Yes.

D:      That's one of the things, *[unintelligible]* contact with the *[unintelligible]* guy.  So I guess we were having some communication about strategy.

M:      Okay.  So now you're, actually, your, your files are pretty helpful because it's difficult to, just looking at the police report, to get a picture of the crime scene.

D:      Right.

M:      We definitely, tried our best, we're working on it.

D:      Yeah.

M:      So—

D:      Of course your reconstruction man will be addressing this theory.  So apparently he was talking to somebody.  Or Joe's prints on the knife -- I don't, I never heard an answer to any of this.

M:      Okay.

D:      Except we did explore this sodium azide deal through Joe Collier.

M:      Right.  Through the amount of sodium azide and  … right.

D:      And the quantity and …

M:      Yeah.

D:      The curious part of that is, of course, is they showed, and apparently their expert said it was in all of, all the food in the house practically.  So *[unintelligible]* it was on the stove and every where else.  We never had anybody counter that either.

21

M:     Now what are, what are your thoughts about that?

D:     I think Joe was trying to kill everybody else in the family too since he was going, he was going to take them all with him.  That's what *[unintelligible]*.

M:     Right.

D:     So I think, he, he was trying to kill everybody.

M:     Yeah.  I know Wendi was yeah, I think the record reflects that she was quite shocked by --- the fact that the poisoning was in the food.  Well, I guess, I'd just like to talk about some various members of this cast of characters here.

D:     Okay.

M:     Who were involved.  First of all, Kandy Rohde.

D:     Yeah.

M:     How did, how did you end up getting her involved or was it the family that got her involved?

D:     I did not have her get, get involved.  I don't know, I don't know for sure how she got involved.  But she was a huge help to Wendi during that time and I think probably to some of the other family members too.  Let's see, what we've got, two 19 year old warrants – looks like – I've been meeting with Wendi and I recommend that a psychiatrist be called to examine her.  That to me – some – that's a personality disorder, disassociation, but—

M:     That was February 2001, and—

D:     Yes.

M:     After that, in roughly a year after that, was when the Sharon Murphy discussion started, correct?

D:     Well, Sharon Murphy is not, is not the person she was talking about.  Sharon is not a psychiatrist.

M:     Okay.

D:     Sharon's a domestic violence expert.  A psychiatrist obviously would be a MD, PhD or perhaps might be able to go with PhD only.

22

M: Okay. So following up, I'm sorry, just getting back to that letter, I mean, did you, did you follow up on that by requesting from the court? My guess would be that there were probably a lot of other requests going on at the same time.

D: Yes – that's what I'm looking for – I don't seem to find any pleadings along those lines *other than the ones* (?) I've already shown you. I didn't even find the earlier one -- *[unintelligible]* they are today, 10 years ago. Well I wasn't as good at keeping up with *[unintelligible]* better stuff *[unintelligible]*. Well, let me see -- a motion to appoint counsel and experts. Let's see what that one says. No. I guess I didn't come in as an of counsel originally. Leon was. Well here we go, provided a second chair. Forensic pathologist to review medical examiner's report and other medical files. Since the time of death did not suggest to the medical examiner's report based on prior interviews *[unintelligible]* and so forth. Cause of death is blunt force trauma. *[unintelligible]* have our expert render an opinion on this matter. Medical examiner reported two things consistent with *[unintelligible]* Oncologist, Dr. Christopher Kellogg. *[unintelligible]* I found seeing the same knife to cut the telephone cord. You know what I mean? I, uh.

M: Yeah.

D: As March 2001 (?)

M: Sure. Okay.

D: Now, did we have a psychologist there? It didn't look like it, so, along with everybody else. So.

M: I noticed in the, in the files, in the initial, just sort of standard forms for initial defenses, one of them raised was temporary insanity defense, other types of psychiatric, psychological defenses.

D: Right -- That would be my Rule 11 motion.

M: Right. Did those—

D: Never went anywhere.

M: Yeah. Those defenses, did they stay, uh—

D: Oh yeah, they stayed on—

M: Forefront of—

D: Yeah, *[unintelligible]* they were always there.

M: Okay. Well I guess, what I'm getting at more is, any discussions about the, the case and how to try it, either between you and Patterson or you and Thikoll.

23

D:     In March 2001 I'm filing a supplemental disclosure statement – that's what I was trying to find out  These are all the witnesses.  So we've been already talking to all these people – and you have that I assume.

M:     Sure.

D:     So. *[unintelligible]* the other one was.  That was the defense material.  Signed temporary *[unintelligible]* lack of intent, no criminal intent , self defense, and of course you know *[unintelligible]* names and addresses of experts, *[unintelligible]* pathologist, psychologist, and so forth *[unintelligible]*because I thought we ought to have them.

M:     Well I guess, kind of what I'm getting at is, where the psychiatric, psychological defense was during discussions of strategy and,

D:     Dr. Dan came on, in, as far as I can recall – it never came up.  You know, I called  (or filed) it that way *[unintelligible]*and Kandy obviously thought what she thought, and what she told Anna I have no idea.  What they decided, I don't know.

M:     Okay.

D:     I never was a party to any of their conversations.

M:     Okay.  I mean the, alright, how about—

D:     *[unintelligible]* The rest of that probably looks like all the work I did with you folks. Whatever.

M:     Alright.  I wouldn't say that.

D:     No, no, I mean that, we didn't do anything that I thought more important to be done. They were not done.  There were people we had *[unintelligible]* And of course you had Sharon  Murphy.  That maybe had somebody, but, you know when you get accused of being a black widow – its kind of hard to overcome that.  With domestic violence even. And of course there was no proof of, no independent verification of that.

M:     Just to, to summarize those things that weren't done that, you were pushing for, it would be forensic analyst, fingerprints analysis, someone to deal with the, the knife marks, potentially a psychologist or psychiatrist.

D:     Yep.  I just printed it – it'll just make it easier.  In my March, '01, I asked the court for a forensic pathologist to review the medical examiner's report and any other medical files, a hematologist to examine blood evidence, a forensic chemist relating to those *[unintelligible]* and other *[unintelligible]*-- expert to examine the knife found – the knife related issues, a computer expert because they felt if *[unintelligible]* there was evidence *[unintelligible]* computer and we needed a computer *[unintelligible]* expert.

24

M:   What were you, what were you hoping to determine with the computer expert. I mean, was that more without knowing the … what the state had found on the computer yet or was it … something different?

D:   We had her buying stuff, okay. Trying to buy life insurance, trying to buy the Sodium Azide poison, her allegedly searching various place sites in the computer, Okay, and you never know, you never know for sure what she's doing, he's doing, and who's doing, but its on the home computer. And its on her office computer as well. And some of that kind of activity may well prove that it, what the theory is, that the state is going to allege, that she was doing this when in fact it would not be accurate. Because they're basically trying to say that she was buying insurance or trying to buy all this stuff and he didn't know anything about it.

M:   You're hoping to show that Joe was the one who was, working the computer—

D:   Shopping.

M:   Okay.

D:   Trying to find at least that -- or perhaps finding stuff that was, would demonstrate that there's maybe more than they are trying to say. How broad is that subject once you start opening the door?

M:   Okay.

D:   Let's see, the, some of the other things I told Dan in March of 2002 *[unintelligible]* iis Joe's fingerprints should be tested for smears on the kitchen counter, the refrigerator blood smears – inside the front door – also *[unintelligible]* computer *[unintelligible]*. That was never even done. I mean if we had his fingerprints on the box of Sodium Azide – then he obviously was participating in it at some point. At least had his hands on the box – the pill bottle used to contain the capsules. The four dishes, which were on the kitchen counter and the refrigerator were tested and the knife. One of the reasons for the knife is the location of the incision strikes me as very strange – and we went through all that one together. Who we needed somebody that could do that. And we just – we also needed a, somebody to counter the coroner who said that she was hit 28 times – didn't have anybody. A reconstructionist *[unintelligible]* Sweeto – was the guy that I was *[unintelligible]* He apparently was talking to some guy in Apache Junction about some of this because I *[unintelligible]* file a motion for a competency determination. Rule 11. *[unintelligible]* called it.

M:   As, as I understand the record, that competency determination was actually performed.

D:   You may be right. We also had in an earlier filing – sometime in early '01 was forensic pathologist/psychologist and others *[unintelligible]* disclosure statement. So, yeah, we had to let a lot of people *[unintelligible]* get involved but didn't happen.

DI_t077842.1

M:   And, when we're talking about the fingerprints, it kind of brings up – one – you mentioned if he had his fingerprints on the box of poison that that's evidence that he was involved in the plot—were there ever any witnesses that you, either interviewed or searched for that would have corroborated the suicide plan?

D:   No.  Nope.

M:   Did you ever talk to Shawn King?  I know, he was one of the

D:   Shawn did have some information that was somewhat helpful – but Shawn had had an accident and he had brain damage, as I recall.  And—

M:   I think that's right.

D:   And I believe during that period of time he was unable to *[unintelligible]*.

M:   Okay.

D:   You know, but, that's right – there was – may have been some – some knowledge of.

M:   Okay.

D:   That Wendi told us about.  I think that she used his computer for some part of this, but he was, he was going to get charged in some way, as I recall too and that may part of why he didn't, he didn't cooperate.  I can't remember now—

M:   Okay.

D:   *[unintelligible]*

M:   I mean, was, communication with Shawn King through Wendi's parents or did you attempt to contact him?  Or ever have a chance to talk with him where he said "look, I'm scared."  Because your recollection is, is reflected in, in the documents we have that he, was hesitant to testify because he was afraid of being named as a co-conspirator.

D:   Right.  See if I find anything in here at all.  Memos.  *[unintelligible]*.

M:   *[unintelligible]*.

D:   Yeah.

M:   That actually brings up a bigger question – in your witness interviews I understand most of them were friendly witnesses – did you ever have any sense of pressure from external sources, be it the prosecutor's office, the Andrianos—

D:   I'm not following you.

26

M:   Well, any sense that any of these witnesses may have been pressured, either by the Andrianos or the prosecutor's office to, not talk or to give certain answers?

D:   No, I felt like, that some of the state witnesses had, but I didn't have any proof of that, of course. But that based on some of the stuff that they said on the stand, I felt that way. That there had been tampering by the prosecution.

M:   But those were witnesses you hadn't interviewed prior to trial.

D:   No. No. They were witnesses that Dan had interviewed prior to trial.

M:   Right.

D:   Okay. For example, one of the ladies said something, or, the hairdresser called her a cold bitch, okay? We never said *[unintelligible]* you never asked me. It was almost like they were hostile towards our, our side. There was no reason to be hostile. Okay?

M:   And one of those witnesses actually—

D:   I mean you know *[unintelligible]*. Talk about her flirtin' with him. I don't *[unintelligible]* I mean that, that guy's a *[unintelligible]*

M:   Well, one of those witnesses, someone we may want to talk to a little bit more, is her name is Chris Hashisaki.

D:   Yeah.

M:   Do you recall her?

D:   Absolutely.

M:   Did you ever interview her outside of, court? Okay.

D:   No. She, she got interviewed, I'm sure by Dan though.

M:   Okay.

D:   See, I didn't do, I basically did interviews that I, you know, of friendly people, really true friendly people

M:   Okay.

D:   I didn't go on interviews with him, and, part of what he was telling was there was no sense in me, you know, spending all the money that I've alreaedy spent on this case, he, he'd take care of *[unintelligible]*

27

M:     Sure. So really, you know, before Dan's involvement, it was mostly you know, getting the funding, the interviews and then seeking the experts —

D:     Yeah.

M:     That was the big part and then once Dan got involved—he took control and --

D:     Yes. Doing the research.

[end of Side 1]

D:     --- call my – excuse me – better call my ...

M:     As before I was just asking about a sense of and maybe you don't have this sense after Patterson became heavily involved with – the periods where the case was really hot and lots of work was going on or periods where it was cold. Just sort of a sense of ...

D:     Well actually Fall – I mean December – November/December of 2000 and up until I don't know March, April, May of 2001, you know was a pretty active period. I thought it was a lot longer than that – it sure was a lot *[unintelligible]* for a short period of time when – and then I thought we were fairly active for the next year – 9 months or so – of maybe shorter getting him on board with my thoughts – you know – so forth. But then it seemed like it went pretty cold for me anyway. I know they were out there doing stuff – I'd periodically hear from them – most of the time I was initiating the contact as I recall. I was still see Wendi on a fairly regular basis because that was sort of a pattern she and I developed.

M:     What do you mean by that. Every couple of weeks – every month?

D:     Seemed like at least every 2 weeks. Yeah.

M:     Okay.

D:     And I would say that and then Kandy of course was gone on a regular basis too so she and I would try to alternate and never run on top of each other. I'd call her when I got out of jail and tell her what the latest is and she'd do the same thing for me. We stayed pretty tight so – its all kind of involved when you're talking about – I don't feel like I had a whole lot of input in the case though – for probably a couple of years. I guess on my activity level would have probably been demonstrated largely on these and whatever I've gotten – that's weird. I'm trying to get – We got a lot of activity in '04 – lot of activity in '01.

M:     '01 would have been jumping into the case – '04 would have been – trial

D:     '01 and '04 would have been the trial yeah. There's '01, there's '04 – see my point?

DI_2077842.1

M:  Yeah.

D:  Murphy's report came out in '03 so I guess I was aware of that. *[unintelligible]* '03 stuff gathering notes from Donna and getting facts about Joe's anger and school information.

M:  So that would have been the mitigation.

D:  Yeah – I was sort of left to deal with Donna and Alejo.  Notes on closing on Wendi's house – Joe's a user – Joe's friends – all this stuff is '03.  Life insurance – notes on witnesses.

M:  So your work on mitigation was mostly limited to dealing with Donna?

D:  And Sharon and Karen and Rhode.

M:  Right.  With regard to Kandy Rhode and any other witness or any other decision in this matter – were there ever – did you ever voice any disagreements with Patterson's choices?  Or was it mostly easy *[unintelligible]*

D:  Yeah – here's a request for *[unintelligible]* filing that.  June 2001 I requested a status conference due to the approaching deadline by the Court for a completion of certain discovery matters.  Why would I have been doing that?  *[unintelligible]* was already on.  Oh Peterson's still there (?)

M:  You understand our confusion?

D:  Yeah.  I certainly do.

M:  Okay – how about Wendi's treatment at trial by the other side.  Were you at counsel table – just listening to some of the things Martinez was doing?

D:  He is known to behave in the way he did in this trial.  Its just trial strategy and – for the *[unintelligible]* per my characterization but I thought he was vicious and I thought he mischaracterized her significantly.

M:  Oh there's no question.

D:  Come home every night – how are you going to sleep tonight.  The way that person behaved.  It was totally unnecessary.

M:  I mean – did it seem to you at portions – well let me back up there – for objections – I mean was it only Patterson could object if it was his witness – you could object if it was yours I imagine?

D:  Exactly.

29

M:   Were there moments where you would have jumped in and objected when Martinez was going a bit far?

D:   We had some discussions with the bench about some things I recall.  Was Dan as aggressive as I might have been?  I don't know – with objections.  The bizarre – I guess is my word – bizarre behavior pattern that this man demonstrated though seem to limit itself to more than we were doing – and whether (?) I was sharp enough to being more quick on my feet than Dan was – I don't know.  I know Dan was really disgusted at himself at various points by some of the things the witnesses would say or some of the things Juan Martinez was doing.  I would say generally frustrated about the same – like I was.

M:   Well generally coming – from just reading the transcript it seemed pretty obvious to me that his strategy from the start was to paint Wendi as a whore and …

D:   Yeah.

M:   Get the jury to hate her enough to convict her of death.

D:   Yeah.  Oh I think there's no doubt about that.  Could he have objected more – (background talk) – insurance group myself – to give you an evaluation *[unintelligible]* brain is not where it was then.

M:   Sure.

D:   *[unintelligible]* was certainly not happy.  Let's just put it that way.

M:   What do you mean?

D:   I was just appalled at the way this guy ran that case – for the prosecution.  I just don't see that kind of behavior necessary.  That he tells the same old stupid windmill story on how to solve these cases.  Don Quito (?) or whatever the hell it was.

M:   I remember that too.  I noticed in one of the drafts of your opening statements – you might actually have it there – you do mention Wendi's biological father – in the opening statement that was ultimately made – and I believe it was Patterson who gave it but it did track a lot of your opening statement that wasn't in there.  And I was just wondering if there was any reason for taking that out.

D:   I don't know.  Guess I'd better try another way – father is not working.  Too many fathers (?)  That's not working either.

M:   It might have been an earlier draft and it might be a different draft --

D:   Try natural father.

30

M:    than what you have.

D:    Its not in that draft.  There's where they get those slides and all that crap.

M:    I guess what I'm getting at is –

D:    Yeah – go ahead –

M:    where there any worries that that sort of information would be prejudicial to Wendi's case in some way?

D:    I don't recall that ever being raised by anybody.

M:    And then – actually the final thing I have for you is coordination between the liability side and the mitigation side.  Was there much – it seems to me from what you've said that you were sort of pigeoned-holed and given certain tasks and that was the extent of your involvement and maybe this is a better question for Patterson and McCloud but any sense of strategy between liability and whereas well if we argue this in liability it may come back to haunt us in mitigation or vice versa.

D:    That's never a problem.

M:    Okay.  Was it a pretty clear delineation?

D:    I don't remember anything like that being discussed – let's put it that way.

M:    Okay.

D:    I felt like – whatever Dan was – or the lawyer that was assigned to do the thing and I was there to do anything he wanted me to do – as far as I could help and try to keep the family involved.

M:    Okay.

D:    It was kind of strange to keep wondering – asking Wendi how we going to defend ourselves against 28 hits?  That didn't have any defense *[unintelligible]*

M:    Sure.

D:    Whether that's all retrospect stuff – you know – any little thing and frankly I feel like – ok trial starts next week – you know.  Okay – what are you going to do – what do you want me to do – I had plenty of time to get ready to do what he's given me to do – even when the trial's going on – you know – so there wasn't a whole lot I needed to do in advance and we really didn't have much.  I can't remember when we were not meeting during the trial with the two or three meetings I was mentioning.  They were during the trial.  I don't know.

M:     So you must have met though before certain witnesses.  I mean at least you –

D:     Yeah.  Yeah but it could have been during the trial – is what I'm saying.

M:     Okay.

D:     Because there's always those things that you do during a trial that – we didn't have trial in the mornings – they're not open to continue to do – and they don't have trials on Fridays so you also have that.  Monday, Tuesday, Wednesday, Thursday – trial dates which complicates -- *[unintelligible]* Maricopa County at least – so there's all kind of time – especially with an afternoon only trial to do all kinds of preparation during trial.

M:     So how did you feel – I mean just the first day of trial having so little interaction with co-counsel.  Did you feel comfortable that you knew where this was going and what all these witnesses were going to say or were you in the dark on some of them?

D:     I never got – I never had a copy of any interviews – of any of the people they interviewed – that Dan had just had interviewed.  Is that what you mean?

M:     Right.  I mean it seems like there's a pretty – kind of a black hole there on a certain part of the case – they hadn't provided you.

D:     Well that doesn't really has never really bothered me because I was second chair where I got to do nothing – Okay?  And all I know about was the police reports and whatever I was provided so it really wasn't anything unusual – so my apology.  Okay?  You're on your own and I figured he knew what he was doing – *[unintelligible]*

M:     Right.

D:     So I'll do whatever I can to help.

M:     Yep.  So you reviewed your role basically as this is your case – I'll do whatever you want me to do.

D:     Well that's the way it was – yeah.

M:     Okay.  Okay.  Well I think that's covered just about everything that I was hoping to talk about and get down on paper.  If there's anything else that comes to mind though –

D:     Yeah.  Well, it might be beneficial to talk to *[unintelligible]* – what's his name ….

M:     Patterson.

D:     Patterson – because frankly I have a tendency to let yesterday go more than some people do.

32

M:   Sure.

D:   And this was so painful to me to lose that I couldn't go see her for almost 5 years. Okay?

M:   Yeah.

D:   So –

M:   I know she very much appreciated the recent visit.

D:   I couldn't go. I wasn't strong enough to go.

M:   Yeah.

D:   I finally was okay. So I got to like her a great deal and her family and my point of view is its one of the worst tragedies I've ever seen. Not only children being separated from their grandparents – okay? But that too so you know the whole matrix here is very hard on me. Then I had my little law partner buddy murdered during the trial – you know so I had a tragedy on top of tragedy basically. And you know its – so I'm not real -- *[unintelligible]* have to go back.

M:   Yep.

D:   But I didn't look at the file – I had it boxed up and shipped to you without looking at it. You asked me questions on the phone – I tried to help you today but so much of it is the way it really was versus the way I want it to be.

M:   Okay.

D:   Memories have a tendency to mold themselves after a while into a category that's safer.

M:   I understand that and –

D:   Okay.

M:   hopefully we can get some justice here.

D:   God I hope so too. I'll do anything to help that little girl as you probably know – short of illegal. I wouldn't do that – but you know …

M:   Of course.

D:   Well I'm not trying to throw rocks at Dan or anybody else – my recollection is though – that's the way it went down. He was in charge – I'd do whatever he asked me to – meeting him whenever he asked me to meet him – how many times it was – I don't know

33

and how much involvement did I have with McCloud? Very little if any. I know that we were doing things while the trial was going on to finalize the mitigation stuff and still organizing this thing – what do you call it – power point deal. I know we were still working on that during trial even though I know we got a lot of it done ahead of time. But I didn't interview any of the people – they interviewed them all. Except for the ones I mentioned to you. And I *[unintelligible]* except maybe Murphy and Joe Collier. But you know – those were my people anyway. And Donna of course. Donna *[unintelligible]* …

M:    I understand.

D:    You know but beyond selection of who you are going to use and how you are going to use it – I'd laid down my game plan and my pleadings – I assumed he had all the pleadings for whatever reason he chose not to do some of the things that I thought were necessary to do. There may be a perfectly good reason – there may be people that he hired that weren't helpful – I don't know – see my point – I don't know what he did with all of that stuff.

M:    Absolutely.

D:    But if you find out you have anything you want to talk to me about after you get back – if you want me to – my door's open – always open.

M:    Great. I appreciate that.

D:    Glad that you guys are helping.

*End of Tape – Side 2 of Tape 2.*

34

# EXHIBIT 4

*Andriano v. Ryan*, Case No. CV-16-01159-PHX-SRB
Motion for Evidentiary Development

# Law Offices of G. David DeLozier, P.C.

4016 East Forest Pleasant Place, Cave Creek, Arizona 85331
E-Mail: gddelozier@aol.com
Phone (480) 575-6660   Facsimile (480) 575-6661

FACSIMILE  MESSAGE

Date:    10-28-2001                                                          Time:

TO:                     Dan Patterson, Esquire

COMPANY:                Office of the Maricopa Public Defender

FAX NUMBER:             (602) 506-2865

FROM:                   G. David DeLozier

SUBJECT:                State v. Andriano, CR 2000-096032
                        Sodium Azide chapter

NUMBER OF PAGES (INCLUDING COVER SHEET):                        9

Message:

**Dan: Attached please find a chapter on Sodium Azide from the book Clinical**
**Environmental Health and Toxic Exposures.  One of the authors, John B.**
**Sullivan, Jr., M.D., is a witness in an environmental building sickness case in**
**which we represent the Plaintiff.  At a recent meeting with him I decided to**
**order his book. Note particularly that his article says ". . . A fatal ingestion**
**can be as little as 1 to 2 g." See page 491.**                    **David.**

Please call (480) 575-6660 if this document is not received in its entirety.

Original sent via first class mail: Yes____ No_x_ .

*NOTICE:  THE INFORMATION CONTAINED IN THIS FACSIMILE MESSAGE MAY*
*CONTAIN ATTORNEY-PRIVILEGED AND CONFIDENTIAL INFORMATION.   THIS*
*MESSAGE IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY*
*NAMED ABOVE.  IF THE READER OF THIS MESSAGE IS NOT THE INTENDED*
*RECIPIENT,  YOU  ARE  HEREBY  NOTIFIED  THAT  ANY  DISSEMINATION,*
*DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED.*
*IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE IMMEDIATELY*
*NOTIFY US BY TELEPHONE AND RETURN THE ORIGINAL MESSAGE TO US AT THE*
*ABOVE ADDRESS VIA THE U.S. POSTAL SERVICE.*

# Clinical Environmental Health and Toxic Exposures

### Second Edition

John B. Sullivan, Jr., M.D.

Associate Dean for Clinical Affairs,
Associate Professor of Emergency Medicine,
University of Arizona Health Sciences Center,
Tucson, Arizona

Gary R. Krieger, M.D., M.P.H., D.A.B.T.

Associate Adjunct Professor of Toxicology,
University of Colorado School of Pharmacy;
Department of Molecular and Environmental Toxicology,
University of Colorado Health Sciences Center,
Denver, Colorado



LIPPINCOTT WILLIAMS & WILKINS
A Wolters Kluwer Company
Philadelphia · Baltimore · New York · London
Buenos Aires · Hong Kong · Sydney · Tokyo

23. Locati G, Fantuzzi A, Consonni G, Li Gotti I, Bonomi G. Identification of polycyclic aromatic hydrocarbons in carbon black with reference to carcinogenic risk in tire production. Am Ind Hyg Assoc J 1979;40:644–652.

24. Mirvish SS. Formation of N-nitroso compounds: chemistry, kinetics and in vivo occurrence. Toxicol Appl Pharmacol 1975;31:325–351.

25. Dippie A, Micheida CJ, Weisburger EK. Metabolism of chemical carcinogens. Pharmacol Ther 1985;27:265–296.

26. Monson RR, Fine LJ. Cancer mortality and morbidity among rubber workers. J Natl Cancer Inst 1978;61:1047–1053.

27. McMichael AJ, Andjelkovic DA, Tyroler HA. Cancer mortality among rubber workers: an epidemiologic study. Ann N Y Acad Sci 1976;271:125–137.

28. Parkes HG. Veys CA, Waterhouse JAH, Peters A. Cancer mortality in the British rubber industry. Br J Ind Med 1982;39:209–220.

29. Mancuso TF. Problems and perspective in epidemiological study of occupational health hazards in the rubber industry. Environ Health Perspect 1976; 17:21–30.

30. Delzell E, Manson R. Mortality among rubber workers: III. Cause-specific mortality, 1940–1978. J Occup Med 1981:23:677–684.

31. Delzell E, Monson RR. Mortality among rubber workers: VII. Aerospace workers. Am J Ind Med 1984;6:265–271.

32. Delzell E, Monson RR. Mortality among rubber workers: X. Reclaim workers. Am J Ind Med 1985;7:307–313.

33. Delzell E, Louik C, Lewis J, Monson RR. Mortality and cancer morbidity among workers in the rubber tire industry. Am J Ind Med 1981;2:209–216.

34. Fox AJ, Lindars DC. Owen R. A survey of occupational cancer in the rubber and cablemaking industries: results of five-year analysis, 1967–1971. Br J Ind Med 1974;31:140–151.

35. Kilpikari I. Mortality among male rubber workers in Finland. Arch Environ Health 1982;37:295–298.

36. Delzell E, Andjelkovich D, Tyroler HA. A case-control study of employment experience and lung cancer among rubber workers. Am J Ind Med 1982; 2:393–404.

37. Norseth T, Andersen A, Giltvedt J. Cancer incidence in the rubber industry in Norway. Scand J Work Environ Health 1983;9:69–71.

38. Meinhardt TJ, Lemen RA, Crandall MS, Young RJ. Environmental epidemiologic investigation of the styrene-butadiene rubber industry: mortality patterns with discussion of the hematopoietic and lymphatic malignancies. Scand J Work Environ Health 1982;8:250–259.

39. Matanoski GM, Santos-Burgoa C, Schwartz L. Mortality of a cohort of workers in the styrene-butadiene polymer manufacturing industry (1943–1982). Environ Health Perspect 1990;86:107–117.

40. McMichael AJ, Spirtas R. Kupper LC. An epidemiologic study of mortality within a cohort of rubber workers, 1964–1972. J Occup Med 1976;18:178–185.

# CHAPTER 36
# Automobile Airbag Hazards

## J. Michael Hitt

Although the inclusion of automobile airbags in motor vehicles was federally mandated in the 1990s, the concept and research date to the 1960s. Concern for the effectiveness and safety of the device was originally tested by placing a baboon in a cockpit of a simulated aircraft crashing at 120 miles per hour. Research on the safety of the device has continued since that time.

There is no question that airbags perform the function for which they were designed: to protect the driver in moderate- to high-speed frontal crashes. Studies demonstrate that driver fatalities in airbag-equipped cars were reduced by 24% in frontal crashes relative to comparable cars equipped only with manual belts (1). In 1991, nonpedestrian motor vehicle crashes claimed 36,500 lives, with the total cost of all fatal motor vehicle accidents estimated to be $96.1 billion, excluding the inestimable human loss. Uninjured survivors of fatal crashes were three times more likely to have been restrained. Only 28.9% of fatalities were restrained by either seat belts or airbags or both. I would conservatively estimate that 4,000 lives are saved annually in the United States specifically as a result of the presence and deployment of airbags.

The Federal Motor Vehicle Safety Standard Number 208, Occupant Crash Protection, requires that all passenger cars manufactured after September 1, 1989, be equipped with automatic crash protection. This requirement has generally been met by providing airbags on all new passenger vehicles since that time. This has opened up a new field of applied toxicology. Thousands of airbag deployments now occur every year. Most generate no toxicologic concern; however, some individuals have reported physical and metabolic injury as the result of these deployments. The popular press has been keenly interested in the subject, as is evidenced by a quotation found in the newspaper USA Today: "At least 32 children and 20 adults have been killed by the explosive force of air bags in the USA since mid-1990" (2).

Thousands of workers in the United States and other countries are involved in the production of automobile airbags. Airbag-related industrial injuries occur every year, and some years' fatalities are the direct result of manufacturing process.

The body of knowledge of the toxicologic effects of automobile airbags and their components on both workers and consumers is rapidly growing. It is increasingly becoming a fascinating topic to physicians, environmental health experts, regulators, lawmakers, and attorneys.

This product will eventually be in the possession of 80% of adult Americans. As with any common product containing chemicals, questions as to potential toxic effects have been and continue to be raised.

The deployment of the airbag requires a controlled rapid generation of gas within centimeters of the driver's face. In newer vehicles, the same scenario is true for the passenger. This results in the release of the products of combustion and creates a unique and potentially hazardous situation within the confines of the passenger compartment. Previously, automotive reactions of this nature had been isolated to the engine compartment and, in the case of the internal combustion engine, shielded by massive metal blocks. The airbag, however, aims a high-speed chemical reaction of similar intensity directly at the automobile occupant. Instead of massive steel shielding, the airbag offers only the protection of a cloth bag, fiber screens, and a thin metal inflator body. The engineering required to protect humans from this protective device is substantial and impressive. The record largely bears out the fruits of the scientific work that went into its development.

## AUTOMOBILE AIRBAG MODULE

Figure 36-1 demonstrates the major components of a driver's side automobile airbag module. A passenger side airbag is similar. This system operates by placing the module in the center of the steering wheel. The back side of the inflator is attached to the steering wheel, and the opposite side, facing the driver, contains the airbag, housed within a plastic container and cover. The module is connected to crash sensors at the front, sides, and possibly the passenger compartment of the vehicle (Fig. 36-2). The sensor, which typically consists of an accelerometer, will detect an extremely rapid deceleration and send an electric current to activate the inflator.

The inflator is the heart of the driver's side system. It consists of a lightweight, stainless steel, or aluminum housing, which contains a stack of gas-generating disks or pellets composed primarily of sodium azide and an oxidizer (Fig. 36-3). The gas-generating material is housed within a combustion chamber. The inflator walls are permeated by holes or ports, which allow gas to escape. These holes are screened by a final filter, which serves to cool the gases and protect the airbag itself from particles that might burn or rupture. The entire inflator sits within the circular opening of the airbag. The bag is woven of soft, porous fabric, allowing rapid inflation and deflation.



Figure 36-1. Major components of a driver's side supplemental restraint system (SRS), automobile airbag module. (Reprinted with permission by TRW Safety System, Mesa, Arizona.)

Combustion occurs when an electronically activated squib ignites the enhancer (booster) charge, which ignites the main charge placed within the material.

Beginning in 1996, some automobile models were delivered with a simpler deployment system containing less toxic materials. These vehicles contain azide-free generators, allowing for a module that is lighter than previous airbag modules. Hybrid systems and a pyrotechnic heater are also being used. The hybrid systems, however, use the best qualities of both systems: A small, nontoxic propellant charge breaks open the seal on the gas canister, and the high-pressure contents rapidly flow out. Some hybrid systems generate little heat, allowing for a lighter-weight airbag and virtually no chance of vehicle occupant burns. As an adjunct to these systems, new sensing mechanisms (Fig. 36-4) are being developed to further protect vehicle occupants (3).



Figure 36-2. Operation of an automobile airbag module. At extremely rapid deceleration, the sensor will signal, causing an electrical current to activate the inflator. (Reprinted with permission by TRW Safety System, Mesa, Arizona.)



Figure 36-3. Driver inflator component of an automobile airbag module. (Reprinted with permission by TRW Safety System, Mesa, Arizona.)

## CHEMICAL CONSTITUENTS AND TOXICITY

Table 36-1 illustrates some of the typical components of airbags along with the associated toxicologic effects. Components vary by manufacturer. Most airbags contain sodium azide ($NaN_3$) salt. This is the major functional component and the one with



Figure 36-4. Smart air bags. (Used with permission by USA TODAY. Copyright 1996.)

TABLE 36-1. Chemical hazards of airbag industry

| Agent | Use | Exposure | Hazard |
|---|---|---|---|
| ...um azide salt | Propellant and source of detonation | Ingestion of salt or inhalation of hydrazoic acid | May affect cardiovascular, neurologic, and pulmonary systems and blood. Blocks cytochrome oxidase and mitochondrial phosphorylation. Can cause hypotension, syncope, headache, muscular weakness, seizures, metabolic acidosis, pulmonary edema, methemoglobinemia, angina, cardiac dysrhythmias, cyanosis. |
| ...mic fibers | Filter assembly | Inhalation, dermal, ingestion | Irritant to skin and mucous membrane. Nausea, vomiting, and diarrhea may occur following fiber ingestion. |
| ...on | Enhancer present as boron potassium nitrate | Dermal, inhalation | Irritant to eyes and mucous membranes in aerosolized form |
| ...ssium nitrate | Enhancer assembly | Dermal, ingestion | Dermatitis, methemoglobinemia, vasodilator, hypotension, syncope, angina |
| ...ocellulose | Enhancer assembly | Inhalation, dermal, ingestion | None |
| ...lybdenum disulfide | Oxidizer | Inhalation, dermal | Fatty degeneration of liver |

...e greatest potential for toxicity. Sodium azide is the primary constituent that reacts to produce the nitrogen gas. Boron and potassium nitrate are commonly used as the primary ignition material. Nitrocellulose and other materials may be used as enhancers or as an autoignition material. Together, they ignite the propellant, initiating the chemical reaction that ultimately leads to inflation and off-gassing of combustion products. Other chemical components frequently present are sulfur, molybdenum disulfide, iron oxide, or silicon dioxide. The products of combustion are present in gaseous and particulate form. Tables 36-2 and 36-3 summarize the chemical products present from the deployment of a driver's airbag using a sodium azide-based gas-generating agent.

The principal chemical component of the entire system—and certainly the major toxic raw material—is sodium azide, which makes up the bulk of the gas-generating disks. These disks are securely contained in a metal housing, leaving little potential for toxic exposure in the context of their use in automobiles. As noted in Tables 36-2 and 36-3, the products of combustion in a normal airbag deployment are safe and well below the American Conference of Governmental Industrial Hygienists limits of exposure.

In other settings, such as laboratories and manufacturing plants, sodium azide toxicity can occur from inhalation of azide gas (hydrazoic acid), which is released through hydrolysis in aqueous solutions of the azide salt or from ingestion of the sodium azide salt. Respiratory toxicity can involve respiratory failure and pulmonary edema. Methemoglobinemia can occur as a result of oxidation of hemoglobin similar to nitrites.

Clinical signs and symptoms of toxicity are dose dependent. Ingestions of 40 mg and less have produced headache. Doses of up to 60 mg have resulted in syncope and hypotension. Doses of 80 to 150 mg have resulted in angina, dyspnea, tachycardia, nausea, vomiting, diarrhea, and headache (4). A fatal ingestion can be as little as 1 to 2 g (5).

Sodium azide has caused at least seven fatalities after ingestion (6). It is a chemical of highly acute toxicity with an unknown mechanism of action. It has some chemical properties and biological effects similar to cyanide, but its lethality is not because of inhibition of cytochrome oxidase. A clinical picture similar to cyanide intoxication may occur in large doses with metabolic acidosis, severe hypotension unresponsive to fluids, and vaso-

TABLE 36-2. Analysis of typical atmosphere in vehicle after airbag deployment for one type of inflator

| Component | Range of typical concentrations (ppm) | ACGIH TLVs-STEL (ppm) |
|---|---|---|
| Carbon dioxide | <500-2,170[a] | 30,000 |
| Hydrogen | 100-408 | N/A[b] |
| Carbon monoxide | <5.0-60.3 | 400 |
| Ammonia | <2.0 | 35 |
| Hydrogen sulfide | <1.0-2.3 | 15 |
| Nitric oxide | <5.0 | 125 |
| Nitrogen dioxide | <5.0 | 5 |
| Benzene | <0.10-0.45 | 50 |

ACGIH, American Conference of Governmental Industrial Hygienists; STEL, short-term exposure limits, 1991-1992; TLVs, threshold limit values.
[a]Tested in a 100-cubic-foot chamber. Analysis excludes $N_2O_2$ and water vapor which will remain close to predeployment levels.
[b]Indicates that the numerical value following it is the lower limit of detection for that species and that the actual level present is less than this value.
Not applicable for one-time exposure, or chemical species is an ACGIH unlisted substance.
Automotive Safety Products. Driver air bag technical data sheet, revision 3. Ogden, UT: Morton International, Inc., July 29, 1996. Used with permission

TABLE 36-3. Analysis of solid particulate levels in typical vehicle atmosphere after airbag deployment for one type of inflator

| Category | Range of typical concentrations (mg/m³) | ACGIH TLVs-STEL (mg/m³) |
|---|---|---|
| Total particulate | 24.2-92.2 | N/A[a] |
| Respirable particulate | 21.9-86.2 | N/A |
| Sodium[b] | 4.73-29.30 | N/A |
| Acetate | 2.05-3.70 | N/A |
| Potassium | <0.10-1.23 | N/A |
| Nitrate | 0.23-0.72 | N/A |
| Nitrite | <0.100-0.327 | N/A |
| Sulfate | <0.10-0.14 | N/A |
| Lead | <0.040-0.043 | 0.75 |
| Sodium azide | <0.0031-0.0044 | 0.29 (ceiling limit) |

ACGIH, American Conference of Governmental Industrial Hygienists; STEL, short-term exposure limits, 1991-1992; TLVs, threshold limit values.
Tested in a 100-cubic-foot chamber. Chemical analysis provided of respirable particulate fraction.
[a]Not applicable for one-time exposure, or chemical species is an ACGIH unlisted substance.
[b]Some of the sodium may be present as sodium hydroxide, which has a TLV ceiling limit of 2 mg/m³.
Automotive Safety Products. Driver air bag technical data sheet, revision 3. Ogden, UT: Morton International, Inc., July 29, 1996. Used with permission.

constrictors and seizures. In unknown ingestions, sodium azide poisoning may be mistaken for cyanide poisoning. Possibly, its toxicity is due to its metabolic conversion to nitric acid (6).

Sodium azide is a common preservative for laboratory reagents and is widely used in the explosives industry. Sodium azide is a white crystal. The $pK_a$ of sodium azide is 4.8, so in acidic fluids such as gastric juice, a large amount of hydrazoic acid $HN_3$ will be present (7).

In the industrial setting, the two most common routes of exposure are inhalation and skin absorption. Sodium azide is easily absorbed through the skin, and this can create a significant exposure for workers and consumers who might tamper with or otherwise come in contact with the salt (8). Low-level exposure over long periods of time is likely to produce diarrhea and a mild lowering of blood pressure. More acute low-level exposure may also produce hypotension, as in the case of nine dialysis patients who suddenly developed low blood pressures within 30 minutes of receiving dialysis from a system using glycerine-preserved ultrafilters that had not been rinsed before use (9). Sodium azide shares certain cardiovascular effects with nitrites, and human deaths from it appear to be due to cardiovascular collapse (10). One such case, involving an accidental ingestion of approximately 1 g of sodium azide, resulted in acute myocardial infarction in a 29-year-old individual. This progressed to cardiomyopathy and death within 48 hours (11).

Sodium azide has been studied as an antihypertensive drug in human clinical trials. It appears to be an effective pharmaceutical agent with no adverse effects noted in 25 years of study, when dosages were kept below 0.75 mg per day. This dose is significant, because it represents the approximate daily dose of an industrial worker working one shift at the ceiling exposure limit of 0.3 mg per $m^3$ (12). For this reason, mild depression of blood pressure may be expected in sodium azide workers. Anecdotal reports cite a greater hypotensive effect in hypertensive workers as compared to normotensive workers. There have been no reports of rebound hypertension on weekends or vacations. In animal studies, however, toxic doses of azide have resulted in centrally mediated *hypertension*, tachycardia, cardiac arrhythmia, respiratory depression, seizures, and death (13). Hypertension after sodium azide ingestion has also been demonstrated in humans, as in the case of a 30-year-old who intentionally ingested 15 to 20 g of the substance and who later died from a combination of acidosis, respiratory depression, and ventricular fibrillation (14).

Diarrhea appears to be a common symptom of sodium azide workers. Nausea, vomiting, and abdominal pain have also been noted (12).

Sodium azide is not listed as a carcinogen, although it is a known plant mutagen. Some conflicting animal studies have been performed with no clear evidence of animal mutagenicity (15). There is no evidence of teratogenic effects in humans. Only one study has demonstrated any teratogenic effects. This experiment was performed on pregnant golden hamsters by subcutaneously implanting osmotic minipumps containing 400 mg per mL of sodium azide over 7 to 9 days, delivering a total dose of 6 × $10^{-4}$ mmol per kg per hour. This dose produced obvious toxicity in the animal but also resulted in an increased incidence of gross malformations in the form of encephaloceles and caused resorptions of embryos (16).

The neurotoxicity of sodium azide is significant. In animal studies, chronic administration of sodium azide induced progressive movement disorders and central nervous system necrosis (17). Striatal necrosis has been experimentally induced in rats via sodium azide injections (18). Cerebellar cortical degeneration has been demonstrated by injecting monkeys with a single dose of sodium azide, ranging from 8 to 13 mg per kg. Most of the animals demonstrated, at a minimum, transient ataxia, with most having more persistent ataxia. All symptomatic monkeys demonstrated cerebellar changes (19).

Sodium azide exposure on a chronic basis produces behavioral changes in animals and has been considered to be a model for some aspects of Alzheimer's disease (20).

From a practical perspective, the components of airbag modules offer little potential for toxicity. The public is at little risk from any of the chemicals, because the chemicals are sealed in metal and not easily accessible for tampering. The public's principal risk of exposure is when an airbag is deployed; however, the thermal degradation destroys the module's chemical components and yields principally nitrogen gas with traces of other gases and particulates (see Tables 36-2, 36-3).

The other chemicals contained in airbags do offer potential for toxicity during the manufacturing and repair process and possibly, under certain conditions, during and after the deployment of the airbag. One of these hazards is ceramic fiber. The ceramic fiber used in the module consists of vitreous luminosilicate fibers. These fibers are used as components of the filter assemblies. No known chronic health effects occur in humans from long-term exposure to ceramic fibers. Ceramic fibers have been injected into the peritoneal cavity of laboratory animals, as well as into the pleural cavity, and tumors have been produced. This is not a unique effect, and similar results have been detected in various fibrous materials.

Several studies have suggested a low order of potential of inducing pulmonary tumors in animals, whereas others have contradicted this. The International Agency of Research on Cancer classified fibrous glass wool, mineral wool, and ceramic fiber as group 2B carcinogens. Group 2B agents are possibly carcinogenic to humans (21).

Ceramic fibers also are irritating to skin and mucosal membranes. Ingestion may cause gastrointestinal disturbances, such as irritation, nausea, vomiting, and diarrhea.

The enhancer assembly contains powdered ignition and enhancer material, commonly consisting of boron potassium nitrate, nitrocellulose, and 2,4-dinitrotoluene. Boron potassium nitrate has toxic properties similar to any nitrate and also is mildly irritating to mucous membranes. Environmental monitoring in the enhancer assembly operation has demonstrated that exposure to all propellant dusts and particles is well below Occupational Safety and Health Administration standards. Heavy exposures to processes involving potassium nitrates can cause dermatitis and dermal burns, and chronic exposure to low levels can cause chronic coronary vessel dilation. This coronary artery dilation can be a problem during worker furlough, on weekends, and during holidays, because the possibility of reflex constriction or spasm of the coronary vessels may occur. However, this only happens in long-term, heavy exposures.

Ingested nitrates can be converted by enzymatic activity to nitrites, which can cause methemoglobinemia. Nitrites can also be converted by the body into nitrosamines. Several members of this class of compounds have been identified as carcinogens and potential carcinogens. Boron itself is relatively nontoxic and is a mild irritant.

2,4-Dinitrotoluene, which is used by a minority of airbag manufacturers, is toxic by inhalation and ingestion. It is a mucous membrane irritant and may cause methemoglobinemia. In animals, central nervous system, reproductive, and bone marrow abnormalities have been noted. 2,4-Dinitrotoluene is an animal carcinogen. Tests for mutagenic activity of this compound are ambiguous.

In industry, the principal effects are mucous membrane and skin irritation, but in large exposures, cyanosis, weakness, and shortness of breath are common findings. Workers occasionally have nonspecific symptoms such as nausea, headache, confu-

incoordination, loss of consciousness, cough, and joint pain. Interestingly, the compound appears to permeate the skin to a significant extent. Workers with preexisting central or peripheral nervous system, lung, or reproductive disorders may have increased susceptibility to 2,4-dinitrotoluene exposure. The International Agency of Research on Cancer, Occupational Safety Health Administration, and the National Toxicology Program have not rated 2,4-dinitrotoluene as a carcinogen. Nitrocellulose is not known to have harmful toxic effects in humans (22). Cupric oxide, also rarely used by modern airbag manufacturers, is occasionally a component of the airbag inflator module. This chemical has a low inherent toxicity, but exposure to copper-containing material may cause ulceration and perforation of the nasal septum over time. Sensitization to copper also occurs in the newly reported cases of dermatitis associated with copper.

As airbags become more common, the scrapping of cars is a potential source for exposure to all the chemical components of the module (23). Reassuringly, azides are quickly detoxified by bacteria and fungi and in fact are commonly used in the agricultural industry and in fungicides, herbicides, and nematodicides. More concern is present for the rapid release of gas during scrapping operations, tampering, and repair. Azide toxicity, however, should not be a problem in these circumstances.

## POSTDEPLOYMENT VEHICLE OCCUPANT INJURY AND TOXICITY

The medical literature has become replete with anecdotal reports of orthopedic, ocular, and cardiothoracic injuries and deaths associated with airbag deployment. These have even occurred at speeds as low as 15 miles per hour. Such injuries occur because of the physical force of the inflating airbag, which at its maximum speed travels between 50 and 200 mph (24). The Transport Department of Canada has undertaken a study that appears to indicate that airbags cause, rather than preclude, morbidity in crashes that occur at the lower end of the collision severity spectrum, when the occupant is wearing a seat belt. The seat belt alone would have been expected to protect the occupant. Their conclusion is that the airbag deployment threshold is set too low, at least for belted occupants (25).

One of the most common groups of physical injuries are those that damage the eyes, orbits, and facial structure of the vehicle occupant. There is a considerable variation in the type of injury reported, but some individuals have been blinded by the impact of the bag (26). One detailed study of ten level 1 trauma center patients who had incurred substantial lower extremity trauma in vehicles equipped with airbags concluded that airbags do not prevent injuries to the lower extremity (27).

Perhaps the most troubling data about airbag morbidity and mortality are the reports of injury and death, including decapitation, that occur when infants and small children encounter a deployed airbag. Warnings have been issued regarding children riding in the front seats of passenger airbag–equipped vehicles (28). Considerable testing is now being performed regarding this issue. Simulated crashes and full-blown crash tests using baboons in various positions and unembalmed human cadavers are being undertaken to explore this issue further.

Of more relevance to the field of toxicology are the potential chemical hazards to automobile occupants that can be encountered after activation or deflation of an airbag. Similar hazards may be encountered by paramedical personnel responding to an accident. Exposure to irritating gas on deflation of an airbag can occur. The airbag is inflated with nitrogen, which is produced when approximately 80 g total of sodium azide is detonated. By-products of detonation of sodium azide include sodium hydrox-

ide and nitrogen (see Tables 36-2, 36-3). These gases and particles have been demonstrated to be within the recommended guidelines for human exposures, but no guidelines exist for particle exposures of this magnitude (150 to 220 mg per m³). Powder residue can produce ocular and nasal irritation. On detonation of the sodium azide, nitrogen gas inflates the bag. Nitrogen gas is also vented to the sides of the steering column toward the driver's feet. The nitrogen gas is warmed by the explosion, sometimes to temperatures high enough to physically burn the occupant's extremities or face (29).

Additionally, an alkaline powder will be present around the driver's compartment. This powder can produce injuries that are most commonly manifested as chemical keratitis and other eye burns (30). The powder consists of talc and sodium hydroxide. It has been suggested that all occupants who have been passengers in a vehicle in which an airbag has deployed undergo thorough skin irrigation to decrease the potential for dermal irritation or burns (29).

Those occupants with lung disease, particularly asthmatics, may be more prone to aggravation of their preexisting disease. Significant asthmatic reactions have occurred in some asthmatic individuals after airbag deployment. One study placed 24 patients with histories of asthma in the rear seats of vehicles equipped with airbags. The airbags were deployed, and the subjects remained in the vehicle with no outside ventilation for 20 minutes or until they perceived or demonstrated signs of chest tightness and bronchoconstriction. Ten of the individuals demonstrated clinically significant bronchoconstrictive episodes (31).

In rare instances, the airbag may not properly or completely inflate. In the only case of this occurring to my knowledge, the effects on the occupant of the vehicle were difficult to delineate and confirm. This case—in which I had personal involvement— was one in which a previously healthy 27-year-old woman remained in the passenger compartment for approximately 10 minutes after the apparently faulty deployment of the airbag. She reported seeing a "snakelike" device emerge from the steering column some 30 seconds after the crash. The vehicle interior filled with a grayish smoke, and a grayish powder residue was propelled into the passenger compartment. She relates a momentary loss of consciousness with an essentially normal checkup at her physician later the same day. A skin burn was noted and treated. A minor cough ensued, and progressively, over months, the individual developed cognitive difficulties and intolerance of many types of normal household chemical exposures. Neuropsychological testing revealed motor and cognitive slowing, balance difficulties, and problems with immediate recall of information. A magnetic resonance imaging scan of the brain was negative, and single-photon-emission computed tomography scans demonstrated temporal lobe asymmetry, mild diminution of global cerebral perfusion, left temporal hypoperfusion, and bilateral orbitofrontal hypoperfusion.

## WORKER PROTECTION

Clearly the most hazardous component of the airbag manufacturing industry is that of fire or explosion. Automobile airbags are much more than channeled rapid chemical reactions attached to cloth bags. They represent a vast amount of engineering effort, stress analysis, and finite element analysis. Despite the superb engineering used by this industry, the potential for explosion throughout the manufacturing process is inevitably present. Raw materials must be ground to appropriate size, mixed with other chemical constituents, pressed into appropriate form, and packaged with other components. All of these parts of the process have some inherent risk associated

001641

with them. Workers need to be isolated from the most hazardous parts of the process. These components (principally grinding, pressing, and blending) can be done by automated equipment behind reinforced concrete walls and monitored by closed-circuit television.

The dust generated from the grinding and pressing process is a potential health hazard, both from inhalation and skin exposure. Workers cleaning and servicing equipment, as well as working around the grinding process, should have dermal protection with appropriate garments. The appropriate respiratory protective device is also required. Worker protection is required until the disk is sealed into the canister.

Employees who cut or manipulate the ceramic fiber may be exposed to airborne fiber components and should wear respiratory protection or perform such work in appropriately hooded work stations. Air flows should be adjusted so that the fiber products are not released into the environment at levels exceeding the threshold limit value.

Care should be taken to electrically ground the entire manufacturing process from start to finish. This precaution, however, may not be totally necessary, because the sodium azide propellant is not very static sensitive. Ignition of sodium azide requires 250 times the Department of Defense standard for electrostatic discharge sensitivity. No fire or explosive accident involving sodium azide–based propellant has been clearly linked to electrostatic discharge. Nonetheless, explosions and fatalities do occur in airbag manufacturing plants.

## MEDICAL MONITORING

Not all workers in the manufacture of airbags need to be medically monitored. Only those employees whose jobs require the use of respirators—that is, those directly involved in the manufacture, grinding, pressing, and to a lesser extent, the packaging of the explosive components—require monitoring. The only additional job classification personnel that would require such monitoring would be those working around ceramic fiber. The current industry standard would dictate that all of the above classifications of employees need to have periodic respirator examinations.

The American National Standard for Respiratory Protection-Respirator Use specifies that any employee who is required to wear a respirator in the course of his or her duties must be appropriately medically monitored. Industrial hygienists and safety engineers must establish the type of respirator indicated for the particular components being used. The physician will then classify each employee as class I, II, or III. Class I individuals have no restrictions on respirator use. Class II individuals have some restrictions. Class III individuals are restricted from respirator use. The physician must perform a medical evaluation, stressing cardiac, pulmonary, auditory, and psychological factors. The employee must be examined for facial deformities, adequate hearing, tympanic membrane ruptures, adequate respiratory and cardiovascular function, endocrine disorders, neurologic disorders, and psychological conditions.

Assessment is necessary of any medications that the employee may be taking, including legal and illegal drugs and alcohol. Generally, the physician will want to perform spirometry and may occasionally require an exercise stress test, depending on the type of respirator used and the conditions under which the use occurs, as well as the employee's physical condition. These examinations may be repeated as often as the physician feels necessary, but generally this type of examination is not required any more frequently than every 5 years in those younger than

age 35 years, with exams every 2 years in those age 35 to 65 years, and annually thereafter. More frequent examinations may be necessary for employees who smoke, have known lung disease, or have cardiac disease. Examination on termination is usually advisable, as well as on return from prolonged absence or disability (21a).

Workers who have potential skin or inhalation exposure to sodium azide should have periodic blood pressure screening. Hypertensive individuals should be identified, and their blood pressure should be monitored weekly. Other individuals not found to be hypertensive initially should be monitored weekly for 4 weeks until a baseline is obtained, then every 2 to 4 weeks thereafter. Monitoring is for the purpose of identifying hypotension, which may or may not be symptomatic in individuals exposed to sodium azide.

Individuals with heart disease or who are at high risk for heart disease should be restricted from working with sodium azide and potassium nitrate. Both of these chemicals potentially could exacerbate preexisting cardiac conditions.

Preplacement physicals should be performed on all workers in these areas to identify cardiac, pulmonary, dermatologic, neurologic, and any other medical conditions that might place a worker at increased risk in this environment.

As with any plant environment, periodic audiograms should be performed in any areas identified as noisy or borderline noisy. Noise-level monitoring in a work environment should be routinely performed as good industrial hygiene and safety practice dictates.

## CUMULATIVE TRAUMA DISORDERS

In this era of prevalence and concern for cumulative trauma disorders, no discussion of any manufacturing process would be complete without some mention of this problem. The automobile airbag industry, like most industries, involves some jobs that require repetitive use of the upper extremities. Most of the positions within the automobile airbag industry are automated so that repetitive use of the hands and wrists is minimal. One area of concern, however, is a very traditional function—that of sewing. In some plants, the airbags themselves are hand sewn by workers sitting or standing at an industrial sewing machine. This work usually involves repeated ulnar and radial deviation of the hands throughout an 8-hour day. There is also some flexion and prolonged gripping in this process. Individuals with histories of carpal tunnel syndrome; tendinitis; or neck, shoulder, and elbow problems should be restricted from duty in this area. Individuals who become symptomatic with any of these problems while working in the sewing area should be taken off work or transferred, at least temporarily, to a different function within the plant. The module assembly operation also has ergonomic implications, considering the repetitive use of the hands and arms.

## SUMMARY

The automobile airbag industry is a uniquely new manufacturing process using several potentially hazardous chemicals (see Table 36-1). As the deployment of airbags progresses under federal mandate, this industry will grow, and so will work-related and non–work-related medical conditions. The most probably be identified. There are considerable concerns as to the safety of airbag deployment for children riding in the front seat of vehicles. There are also a number of other injuries and fatalities caused by airbag deployment. Occasional

...logic problems occur after deployment in rare cases. Still, the automobile airbag saves a great many more lives than it costs, even though definable morbidity and mortality are associated with its use. New versions and designs of the airbag may significantly decrease some of the problems noted with it.

## REFERENCES

1. Lund AK, Ferguson SA. Driver fatalities in 1985–1993 cars with airbags. J Trauma 1995;38:469–475.

2. Canada joins search for solutions. USA Today 1996;15(73):2B.

3. Wanted: smart air bags. USA Today 1996;15(73):16.

4. Lott AL. Material safety data sheet—airbag inflators/module. In: TRW safety systems. Mesa, AZ: 1989.

5. Klein-Schwartz W, Gorman RL, Oderda GM, Massaro BP, Kurt TL, Garriott JC. Three fatal sodium azide poisonings. Med Toxicol Adverse Drug Exp 1989;4:219–227.

6. Smith RP, Louis CA, Kruszyna R, Kruszyna H. Acute neurotoxicity of sodium azide and nitric oxide. Fundam Appl Toxicol 1991;17:120–127.

7. Abrams A, El-Mallakh JL, Meyer R. Suicidal sodium azide ingestion. Ann Emerg Med 1987;16:1378–1380.

8. Layne RD. Sodium azide exposure from canisters used to inflate safety air bags. Washington: Occupational Safety and Health Administration, 1980.

9. Gordon SM, Drachman J, Bland LA, Reid MH, Favero M, Jarvis WR. Epidemic hypotension in a dialysis center caused by sodium azide. Kidney Int 1990;37:110–115.

10. Smith RP, Wilcox DE. Toxicology of selected nitric oxide–donating xenobiotics, with particular reference to azide. Crit Rev Toxicol 1994;24:355–377.

11. Judge KW, Ward NE. Fatal azide-induced cardiomyopathy presenting as acute myocardial infarction. Am J Cardiol 1989;64:830–831.

12. Sodium azide. Material safety data sheets; 1989. [EXP 0064/88D].

13. Kaplita PV, Borison HL, McCarthy LE, Smith RP. Peripheral and central actions of sodium azide on circulatory and respiratory homeostasis in anesthetized cats. J Pharmacol Exp Ther 1984;231:189–196.

14. Abrams A, El-Madakh JL, Meyer R. Suicidal sodium azide ingestion. Ann Emerg Med 1987;16:1378–1380.

15. Fung VA, Huff J, Weisburger EK, Hoel DG. Predictive strategies for selecting 379 NCI/NTP chemicals evaluated for carcinogenic potential: scientific and public health impact. Fundam Appl Toxicol 1993;20:412–436.

16. Sana TR, Ferm VH. Smith RP. Sodium azide (NaN₃) has weak teratogenic effects in the golden hamster. Toxicology 1990;10:124.

17. O'Donoghue JL. Carbon monoxide, inorganic nitrogenous compounds, and phosphorus. In: O'Donoghue JL, ed. Neurotoxicity of industrial and commercial chemicals, vol 2. Boca Raton, FL: CRC Press, 1985:193–203.

18. Miyoshi K. Experimental striatal necrosis induced by sodium azide. Acta Neuropathol (Berl) 1967;9:199–216.

19. Mettler FA, Sax DS. Cerebellar cortical degeneration due to acute azide poisoning. Brain 1972;95:505–516.

20. Bennett MC, Rose GM. Chronic sodium azide treatment impairs learning in the Morris water maze task. Behav Neural Biol 1992;58:72–75.

21. Fiberfax Material safety data sheets. The Carborundum Company—Fibers Division; 1980. [MSDS no AVP/B07-2].

22. American National Standards Institute. American national standard for respiratory protection—respirator use—physical qualifications for personnel. New York, NY: ANSI, 1994.

23. Single base smokeless powder. Material safety data sheets. Extro Chemical Products Company 1988.

24. Pietz JF. Problem considerations of using sodium azide in the air cushion restraint system. In: Talley Industries of Arizona. Mesa, AZ: 1978. [Report no 11988].

25. Schreck RM, Rouhana SW, Santrock J, et al. Physical and chemical characterization of airbag effluents. J Trauma 1995;38:528–532.

26. Dalmotas DJ, et al. Airbag deployments: the Canadian experience. J Trauma 1995;38:476–481.

27. Onwuzuruigbo CJ, Fulda GJ, Larned D, Hailstone D, et al. Traumatic blindness after airbag deployment: bilateral lenticular dislocation. J Trauma 1996;40:314–316.

28. Burgess AR, Dischinger PC, O'Quinn TD, Schmidhauser CB. Lower extremity injuries in drivers of airbag-equipped automobiles: clinical and crash reconstruction correlations. J Trauma 1995;38:509–516.

29. From the Centers for Disease Control and Prevention. Air-bag–associated fatal injuries to infants and children riding in front passenger seats—United States. JAMA 1995;22:1752–1753.

30. Swanson-Biearman B, Mrvos R, Dean BS, Krenzelok EP. Air bags: lifesaving with not potential? Am J Emerg Med 1993;11:36–39.

31. Smally AJ, Binzer A, Dolin S, Viano D. Alkaline chemical keratitis: eye injury from airbags. Ann Emerg Med 1992;21:1400–1402.

32. Gross KB, Haidar AH, Basha MA, et al. Acute pulmonary response of asthmatics to aerosols and gases generated by airbag deployment. Am J Respir Crit Care Med 1994;150:408–414.

# CHAPTER 37

# Aerospace Industry Exposure Hazards

Bradley Y. Dennis

Aerospace manufacturing and repair present numerous potential hazardous exposures. Many workers and employers are unaware of these health risks.

This chapter deals primarily with advanced composites and solvents but also covers other common chemical hazards found in the aerospace industry. Specific health and safety information concerning several chemicals is provided. It also is important to consider basic health and safety issues. Hazardous exposure may occur through oral ingestion, dermal contact, or inhalation. Because the industrial setting does not lend itself to frequent oral ingestion, data from skin contact and inhalation studies are more relevant than readily available information on the oral toxicity of a compound.

Regardless of a substance's hazard or toxicity, careful steps should be taken when handling any chemical to minimize individual exposure. If chemicals are handled correctly, even the most toxic substances pose little hazard to the worker.

Material-safety data sheets furnished by a supplier are helpful. Control measures also are available to ensure a safe work environment on an individual basis. For instance, administrative controls are provisions made by a company's management to control hazards. They include material handling, training, isolation of operations (lunch areas separated from work areas), personal protective equipment, personal hygiene (hand washing before eating, drinking, and smoking), warning labels, housekeeping, work practices for chemical storage and transportation, and emergency instructions. Engineering controls, such as closed-system processing and effective ventilation, should provide, as nearly as possible, complete containment of dusts, fumes, and vapors from hazardous materials. When general ventilation is not sufficient to control airborne exposures, engineering controls, such as local exhaust ventilation at the emission source, should be provided and supplemented by personal protective equipment, when necessary.

Workers should not be exposed to airborne contaminants in excess of threshold limit values set by the American Conference of Governmental Industrial Hygienists or the Occupational Safety and Health Administration (OSHA) permissible exposure limits. Air monitoring of personal breathing zones should be considered to establish baseline exposure levels, with periodic assessments in areas where toxic chemicals are processed, unusual odors exist, or heavier than normal visible contamination appears.

## ADVANCED COMPOSITES

A composite is a material made from several components. An early example of a composite is reinforced concrete, in which a reinforcement is embedded in a type of matrix. A composite is expected to have mechanical properties superior to those of its components. The 1950s saw the modern era of composite materials begin with the introduction of metal alloys, fiberglass, and plastics. Lightweight materials with increased strength, stiffness, and resistance to high temperatures were not introduced until the more recent development of carbon and graphite fiber composites. Since the early 1960s, use of carbon and graphite composites has

001643

# EXHIBIT 5

*Andriano v. Ryan*, Case No. CV-16-01159-PHX-SRB
Motion for Evidentiary Development

## *Law Offices of G. David DeLozier, P.C.*

*4016 East Forest Pleasant Place, Cave Creek, Arizona 85331*
*E-Mail: gddelozierazlaw3@aol.com*
*(480) 575-6660  Facsimile (480) 575-6661*

April 25, 2003

Ms. Wendi E. Andriano
Booking #A631830
Estrella Facility MCSO
2939 West Durango
Phoenix, Arizona 85009

Dear Wendi:

Thank you for your lovely and kind letter dated April 13, 2003; I am flattered to be your "special friend". I may have shocked your system, and I am glad you considered it a "good thing", but, I believe what I said, too. Thanks, also, for your comments about Jill; she is truly blessed and I am just in awe of the things that God does through her.

You are also right about being amazed at how good God is. It is simply astonishing!! And, I am becoming known by a few people as the one who continues to say "you can't out give God". I am very pleased that He gave me that "moniker".

You say you always wonder how I do it. The truth is that whenever the urge comes and I follow it, I know it is true; whenever the urge comes to not do something that the Word says to do, I know that is the evil force, and all I have to do is follow the Word and go for it. It really is simple, almost like "gravity". One of our mentors says, "When you know that you know, then you will know that you know". There is that realization that the unseen is more real than the seen; or, we are to follow His Word regardless of what the circumstances appear to be. It is giving the Lord the opportunity to work through us the things He wants to do in someone else's life.

Fear and worry are evil spirits; whenever they are present, I realize that they are "worried" about what I am about to do. That is a clear signal, but only one of them, for me to go forward with whatever is about to happen when fear and worry show their ugly heads. So, I go forward, rebuking the evil spirits, by name when known, and ask the Holy Spirit to send in the good spirits, naming them if possible, to occupy the space formerly attempted to be occupied by fear and worry, and march on to do the thing the Lord has directed me to do. As you say, childlike trust may be the correct term. I just know that there is nothing to fear if I do it His way. His Word says He will supply all of my needs; and He does, just fine, and I am delighted to have learned that He does. It is so much easier His way. But, if one takes even a cursory look at the Bible, and believes that the

Ms. Wendi E. Andriano
April 25, 2003
Page 2.

Word is true, one can readily see that none of His children went begging for bread, or anything else.  He has always provided for His children.  And, it appears to me that He is much more generous with those of His children who are themselves generous.  At one place His Word says to be imitators of Him.  That is my prayer request that He will continue to show me how to be an imitator of Him in every walk of my life.

I do not know how to express how much you have meant to me, also.  Words fail me, which is hard to believe.  You have been and continue to be an inspiration to me.  I am continually searching how to find ways to help you with the current dangers in your life.  That is why I so richly enjoy Hebrews 1:14.  "Soteria", deliverance from today's temporary evils and dangers, has become such a part of my life, over the years, that it has solidified whatever wavering I have had and/or have on a daily basis.  Anytime there is even an opportunity for danger, whether heightened or otherwise normal events of the day, the Word flows out of me to obtain the protection that I am entitled to as a member of the family of God.  Over the past few weeks, with a growing sense of urgency, I have found myself pondering how to prove what you and I discussed about that night.  I believe it requires another expert witness.  I am searching to find that person; I do not have that person at this writing; nor are the resources presently available to hire the person, but that matter and will not deter, once the person is identified, the funds will be available.

It is my goal to see your family reunited.  That should be everyone's prayer and perhaps we should all stop focusing on the details and leave those to the "Big Guy".

My very best wishes and fond regards.

G. DAVID DELOZIER, P.C.

G. David DeLozier

# EXHIBIT 6

*Andriano v. Ryan*, Case No. CV-16-01159-PHX-SRB
Motion for Evidentiary Development

Subj:     **FW: lesser included offenses**
Date:     11/12/2004 9:54:07 PM US Mountain Standard Time
From:     grandmaochoa@hotmail.com
To:       GDDeLozier@aol.com


>From: "Daniel Patterson" <dbpazlawyer@msn.com>
>To: grandmaochoa@hotmail.com
>Subject: lesser included offenses
>Date: Sat, 13 Nov 2004 01:35:28 +0000
>
>Donna-  I met with Wendi this morning- she and I discussed the topic of
>lesser included offenses-she convinced me that we should present the case
>as only guilty not guilty on first degree murder-I respect her logic, her
>spirituality and her position and I have informed the court that I will not
>seek leeser included forms of verdict- she said to me when I met her that
>she was tired and would probably not get up to meet visitors that afternoon
>so tell Alejo that she declined the visit because she was tired-thanks for
>your support-Dan P.
>
>_____
>Don't just search. Find. Check out the new MSN Search!
>http://search.msn.click-url.com/go/onm00200636ave/direct/01/
>

# EXHIBIT 7

*Andriano v. Ryan*, Case No. CV-16-01159-PHX-SRB
Motion for Evidentiary Development

FROM : G. David DeLozier,P. C.    PHONE NO. : 602 867 5894    Jan. 19 2001 01:13PM P1

Jan-19-01 12:17P                                              P.01

## PRO/CONSUL, INC.

**Technical & Medical Experts**
1714 E. Bethany Home Road
Phoenix, AZ 85016-2536
(602) 279-2422   FAX (602) 604-9454
(888) 9EXPERT
expertez@msn.com

<u>Technical</u>

ACCIDENT RECONSTRUCTION
ARCHITECT
AUTOMOTIVE ENGINEER
BIOMECHANICS
CONSTRUCTION DEFECT
ECONOMICS
ELECTRICAL
ENGINEERING
ENVIRONMENTAL
FAILURE ANALYSIS
FIRE INVESTIGATION
FORKLIFTS/CRANES
HUMAN FACTORS
METALLURGY
POLICE PROCEDURES
PRODUCT LIABILITY
QUESTIONED DOCS EXAMINER
SAFETY
SCAFFOLDING
SECURITY

<u>Medical</u>

CHIROPRACTIC
DENTISTRY/ORAL SURGERY
EAR, NOSE, THROAT
EMERGENCY MEDICINE
GASTROENTEROLOGY
INTERNAL MEDICINE
LONG-TERM CARE
NEUROLOGY/NEUROSURGERY
NURSING CARE
OB/GYN
ONCOLOGY
OPHTHALMOLOGY
ORTHOPEDICS
PAIN MANAGEMENT
PATHOLOGY
PEDIATRICS
PSYCHOLOGY/PSYCHIATRY
REHABILITATION
TOXICOLOGY
UROLOGY



# FAX TRANSMITTAL

**DATE: January 19, 2001**            **FAX #: (480) 575-6661**

**ATTN: Kimberly Birdsong assistant to Dave Delozier, Esq.**
**FIRM: Law Offices of Dave Delozier**

**FROM: Priya Das, Case Coordinator**      **TOTAL PAGES: 3 INCLUDING COVER**

**CASE CAPTION: State v. Andriano, Wendy**

**RE: Michael J. Sweedo**

Dear Ms. O'Quinn & Mr. Delozier:

Appended is the curriculum vitae of Michael J. Sweedo, a crime scene analyst. Mr. Sweedo has experience in all aspects of crime scene investigations and reconstructions. He stated that to provide a thorough analysis he will require pictures of the crime scene and the reports by officers and detectives who were at the site. He is available to assist as necessary.

The fees for this expert's services are $130/hr. for review, consultation and report; $180/hr. for deposition (2-hour minimum);and $180/hr. arbitration and trial testimony (4-hour minimum). A retainer will be required, to cover the scope of an initial review. In addition, Pro/Consul's $200 Case Fixed Cost Fee will be included.

Please let me know if you are interested in speaking with this expert witness. I will be happy to make the necessary arrangements.

Thank you.

Best regards,

*Priya*

Cc: Leon A. Thikoll, Esq.

001475

FROM : G. David DeLozier,P.C.        PHONE NO. : 602 867 5894        Jan. 19 2001 01:13PM P2

Jan-19-01 12:17P                                                                              P.02

| TECHNICAL | MEDICAL |
|---|---|
| Accident Reconstruction | Chiropractic |
| Architecture | Dentistry/Oral Surgery |
| Automotive Engineering | Ear, Nose, Throat |
| Biomechanics | Emergency Medicine |
| Construction Defect | Gastroenterology |
| Economics | Internal Medicine |
| Electrical | Long-Term Care |
| Engineering | Neurology/Neurosurgery |
| Environmental | Nursing Care |
| Failure Analysis | OB/GYN |
| Fire Investigation | Oncology |
| Forklifts/Cranes | Ophthalmology |
| Human Factors | Orthopedics |
| Metallurgy | Pain Management |
| Police Procedures | Pathology |
| Product Liability | Pediatrics |
| Questioned Docs Examiner | Psychology/Psychiatry |
| Safety | Rehabilitation |
| Scaffolding | Toxicology |
| Security | Urology |

# Pro/Consul, Inc.

### TECHNICAL AND MEDICAL EXPERTS
### FOR ATTORNEYS & INSURANCE COMPANIES

1714 E. Bethany Home Road
Phoenix, AZ 85016-2536
Phone: (602) 279-2422
FAX:   (602) 604-9454
expertez@msn.com

## Michael J. Sweedo

### QUALIFICATIONS

**PROFESSIONAL CERTIFICATIONS**
Certified by International Association for Identification as:
CERTIFIED LATENT PRINT EXAMINER since 1988
SENIOR CRIME SCENE ANALYST since 1990

**PROFESSIONAL TRAINING**
ADVANCED RIDGEOLOGY, IAI , May, 1997
TRAINING SYMPOSIUM, IABPA & ACSR, 1996
TRAINING SYMPOSIUM, AZ Identification Council, 1996, 1997, 1998
FORENSIC FIREARMS, AZ Homicide Investigators Assn., 1996
INTL. ASSN. FOR IDENTIFICATION EDUCATIONAL SEMINAR, 1995
FOOTWEAR & TIRE TRACK CONFERENCE, AZ Identification Council, 1994
BLOODSTAIN PATTERN ANALYSIS WORKSHOP, Metro Dade PD, 1993
ADVANCED BLOODSTAIN PATTERN INTERPRETATION, AZ Homicide Investigators Assn., 1993
TRAINING SYMPOSIUM, AZ Identification Council, 1993
TRAINING CONFERENCE, AZ Identification Council, 1992, 1993, 1994
DEMYSTIFYING PALM PRINTS, Seminar, 1991
COLLECTION AND PRESERVATION OF PHYSICAL EVIDENCE SCHOOL,
FBI Academy, Quantico, VA, 1989
IDENTIKIT (Composite) Seminar, 1988
ADVANCED LATENT FINGERPRINT COURSE, 1987
FBI ADVANCED LATENT FINGERPRINT SCHOOL, 1982
FBI FINGERPRINT CLASSIFICATION SCHOOL, 1982
CIVIL AND CRIMINAL IDENTIFICATION AND INVESTIGATION COURSE, American
Institute of Applied Science, 1982

**SPEAKER**
Arizona Attorneys for Criminal Justice Annual Conference
Arizona Association for Licensed Private Investigators
Arizona Society for Industrial Security
Tennessee Association of Criminal Defense Lawyers

**PROFESSIONAL ASSOCIATIONS**
Member of International Association for Identification
Member of Arizona Identification Council
Executive Committee - Past Member
Latent Print Certification Committee • Past Member & Past Chairman
Member of International Association of Bloodstain Pattern Analysts
Past member of Professional Photographers of America, Inc.

**EDUCATION**
B.S. Business Administration, University of Arizona, 1972
MEd Educational Media, University of Arizona, 1979

**EXPERIENCE**
Sixteen years experience testifying in federal, state and city courts. Experience supplemented by
teaching and educational media background.
Eleven years experience with Tucson Police Department as an Identification Technician and  Senior
Identification Technician.  Job duties included processing crime scenes for latent prints, evidence collection,
latent print comparisons, John & Jane Doe identification, evidence processing, crime scene photography, crime
scene analysis, photo darkroom work and section management.
Independent fingerprint consultant since May, 1992.  During this time I have worked cases for defense
and prosecuting attorneys, private investigators, government agencies and private individuals - both nationally
and internationally.  My work as an independent consultant has included testifying in federal and state courts,
primarily for the defense, but also for the prosecution.

Long Beach, CA • (800) 392-1119                                    The Bay Area • (510) 733-2220

001476

## SERVICES PROVIDED
not limited to the following:

**Case Consultation:**
My eleven years experience working crime scenes with detectives for Tucson Police Department gives me a perspective that could be valuable to your case.

**Prints:**
Latent print examinations, comparisons
Fingerprinting
Processing for latent prints - on site or in my laboratory
Review of reports regarding fingerprinting done or not done
Consultation on fingerprinting and fingerprints
Footwear examinations
Tireprint examinations

**Crime Scenes:**
Review of reports regarding crime scene investigation
Consultation on crime scene investigation

**Bloodstain Patterns:**
Bloodstain pattern analysis and reconstruction

**Physical Evidence:**
Review of reports regarding physical evidence and physical evidence collection
Consultation on physical evidence and physical evidence collection

**Photography:**
Review of reports regarding photography done or not done
Consultation on photography - what the photos do and do not tell

**Conference Speaker**

My services include a full written report, phone or personal consultation and written notes on thoughts that occur to me as I am doing my work that might be relevant to your case or line of questioning. My work is honest, timely, thorough, and confidential.

01/01/1995   05:37   5204555697          MICHAEL J SWEEDO                    PAGE   01

# CONFIDENTIAL

From: MICHAEL J. SWEEDO, CLPE
520-455-5697

## CAUTION - CONFIDENTIAL

## THIS DOCUMENT IS BEING TELECOPIED TO YOU AND MAY CONTAIN INFORMATION PROTECTED BY ATTORNEY-CLIENT OR WORK PRODUCT PRIVILEGES!

The document which follows is only intended for the person to whom it is addressed. If you are not the intended recipient or authorized agent, then this is notice to you that dissemination, distribution or copying of this document is prohibited. If this document is received in error, please call the sender at once and destroy document.

TO:   David DeLozier                                        02-24-01
      f:480-575-6661

TOTAL PAGES:                      14 including cover sheet

David:
        I note that you have an email address. If you think it is secure enough, I can email drafts, etc to you. My email address is:
                        fingers@dakotacom.net

Attached is a preliminary draft until we talk about it. When you have the processing reports per your 2-13 request, please send me the results.

        Please feel free to call me anytime should you have additional questions.

                        Michael

nfi

                If problems with transmission today, please call 520-455-9303 and leave message.
                                        Thanks.

009412

David DeLozier:

NOTES:
Re:   State v. Andriano

In going over the autopsy report, I find several points to be of interest:
1-     Injuries to head - on the surface do not appear to have been fatal by themselves.
2-     Injuries to head - several appear to have been possibly made by the knife.
3-     Knife wound to neck indicates a "branch" of the artery cut. Unknown what is meant by this other than he did bleed from the wound in a "gushing manner".
4-     Sodium Azide is found in the gastric (stomach) contents but not listed in the blood analysis.

It is very important to read the definitions used by the detective as his "arterial gushing" when not first heard sounds much worse than it is.

The analysis done by the detective basically matches the photos and other information in the reports. I find a slight disagreement with his use of directions in several of his statements against the scene diagram of north. I personally take these to be minor though.

All of the bloodstains on the walls refer back to the general location of the deceased and come from what I would call two main sources: blood cast off from items hitting the deceased and blood cast off from the deceased when hit.

The bloodstained pillow was moved to the chair after being bloodied on the floor most likely in proximity with the head. Perhaps the pillow was being used as a head support when the deceased was vomiting on the floor. There is an apparent void (lack of blood) in between the two major bloodstains on the floor that approximates the pillow in size and shape.

The blood (drops on the floor) in the kitchen tend to trail to the livingroom area and possibly could have come from injuries to the deceased if as Wendy says she cut the cellular phone cord in two while Joe was allegedly strangling her with it. This might account for the "defensive wounds" to his hands. You might recheck your interview and the detective interview of her about this portion of the night. Could prove most interesting.

Unfortunately, I have found no information on how rapidly sodium azide reacts when ingested so I cannot address whether the deceased and Wendy were able to struggle prior to the living room incident versus the kitchen strangling incident. The photos note a container or dish of popcorn in the living room and a bag of popcorn with what appears to be a bloody barette around it.

At this point I don't believe there is anyway to dispute the detective's bloodstain (pattern) analysis. It appears to be rather thorough and competent.

An area that might prove interesting to explore is how did the sodium azide get into the food stuffs in the refrigerator when we were discussing the use of capsules to deliver the sodium azide to Joe. This is an almost direct contradiction and might indicate that Joe had a change of heart and decided to take everyone with him. And perhaps he got the tainted food by mistake and when Wendy realized it, she lost it and did exact the battered wife upon a now available spouse.

So the fingerprints on the footstuff containers, azide bottle, packaging, capsules, etc., may prove to be of greater significance than originally suspected. The paperwork that came with the sodium azide needs to be processed for fingerprints if not already done or requested to be done ( your memo to Grant S 2-13-01).

An issue we discussed briefly that I believe has the most area for supporting Wendy's version of what happened lies along the lines of what fingerprints were or were not found on the food items in the refrigerator containing sodium azide, fingerprints on the sodium azide and capsule containers.

Have you talked with Wendy yet as to how the sodium azide got into the foodstuffs in the refrigerator?

Was the popcorn ever tested, both that in the bag and that in the bowl in the livingroom?

I was not clear on whether the children were in the house sleeping when this event went down. That might have some bearing on state of mind and prior intent versus a last minute reaction.

This might seem odd but as we discussed that Joe was demanding sex all the time, was Wendy ever tested (ie like a rape kit) regarding either sex or forced sex before the first call to 911? I remember the photos of her for her injuries but not a mention of any medical checkup on this.

I look forward to talking with you soon.

009414

http://www.jtbaker.com/msds/s2906.htm

SODIUM AZIDE

MSDS Number: S2906 --- Effective Date: 07/27/99
1. Product Identification

    Synonyms: Azide; Azium; Smite
    CAS No.: 26628-22-8
    Molecular Weight: 65.01
    Chemical Formula: NaN3
    Product Codes:
    J.T. Baker: 5262, V015
    Mallinckrodt: 1953

2. Composition/Information on Ingredients

| Ingredient | CAS No | Percent | Hazardous |
| --- | --- | --- | --- |
| Sodium Azide | 26628-22-8 | 90 - 100% | Yes |

3. Hazards Identification
    Emergency Overview
    --------------------------

    POISON! DANGER! MAY BE FATAL IF SWALLOWED OR ABSORBED THROUGH
SKIN. HARMFUL IF INHALED. HAZARDOUS SOLID. CONTACT WITH OTHER
MATERIAL MAY CAUSE FIRE OR EXPLOSION. CAUSES IRRITATION TO SKIN, EYES
AND RESPIRATORY TRACT. AFFECTS CENTRAL NERVOUS SYSTEM, KIDNEYS,
AND CARDIOVASCULAR SYSTEM.

    J.T. Baker SAF-T-DATA(tm) Ratings (Provided here for your convenience)
-----------------------------------------------------------------------------------------------------
Health Rating: 3 - Severe (Poison)
Flammability Rating: 2 - Moderate
Reactivity Rating: 4 - Extreme (Explosive)
Contact Rating: 3 - Severe (Life)
Lab Protective Equip: STOP SIGN - SEE SECTION 8 FOR PRECAUTIONS
Storage Color Code: Yellow Stripe (Store Separately)
-----------------------------------------------------------------------------------------------------

Potential Health Effects
    Inhalation:
    May cause irritation to the respiratory tract and mucous membranes, sore throat, coughing,
dizziness, shortness of
    breath, and fainting. May be absorbed through inhalation. Symptoms may parallel ingestion.
    Ingestion:

009415

Highly Toxic! May cause breathlessness, pulmonary edema and rapid heart beat within 5 minutes. Nausea, vomiting, headache, restlessness, and diarrhea may occur within 15 minutes. Other symptoms may include low blood pressure, abnormal breathing, reduced body temperature, reduced body pH, convulsions, collapse and death.

Skin Contact:

Highly Toxic! Causes irritation, redness, and pain. May be absorbed through the skin; symptoms may parallel ingestion.

Eye Contact:

Causes irritation, redness, pain, and blurred vision.

Chronic Exposure:

No information found.

Aggravation of Pre-existing Conditions:

No information found.

4. First Aid Measures

Inhalation:

Remove to fresh air. If not breathing, give artificial respiration. If breathing is difficult, give oxygen. Get medical attention immediately.

Ingestion:

Induce vomiting immediately as directed by medical personnel. Never give anything by mouth to an unconscious person. Get medical attention immediately.

Skin Contact:

Wipe off excess material from skin then immediately flush skin with plenty of soap and water for at least 15 minutes. Remove contaminated clothing and shoes. Get medical attention. Wash clothing before reuse. Thoroughly clean shoes before reuse.

Eye Contact:

Immediately flush eyes with plenty of water for at least 15 minutes, lifting lower and upper eyelids occasionally.  Get medical attention immediately.


Note to Physician:

Accidental ingestion of sodium azide is potentially life threatening. Treatment includes gastric lavage, followed by saline catharsis. EKG and blood pressure monitoring and support are recommended.


5. Fire Fighting Measures

Fire:

Combustible solid. May pose a fire hazard upon heating, shock, concussion, or friction.

Explosion:

Decomposes explosively upon heating, shock, concussion, or friction. Reacts with both copper and lead to produce explosive azides. Explosions in laboratory plumbing containing these metals is possible. Sensitive to mechanical impact.

Fire Extinguishing Media:

Water spray, dry chemical, alcohol foam, or carbon dioxide.

Special Information:

In the event of a fire, wear full protective clothing and NIOSH-approved self-contained

breathing apparatus with full facepiece operated in the pressure demand or other positive pressure mode. Water spray may be used to keep fire exposed containers cool. Poisonous gases are produced in fire, including nitrogen oxides.

6. Accidental Release Measures

Remove all sources of ignition. Ventilate area of leak or spill. Wear appropriate personal protective equipment as      specified in Section 8. Spills: Clean up spills in a manner that does not disperse dust into the air. Use non-sparking tools and equipment. Reduce airborne dust and prevent scattering by moistening with water. Pick up spill for recovery or disposal and place in a closed container. US Regulations (CERCLA) require reporting spills and releases to soil, water and air in excess of reportable quantities. The toll free number for the US Coast Guard

National Response Center is (800) 424-8802.

7. Handling and Storage

Store in a tightly closed container. Store in a cool, dry, ventilated area away from sources of heat or ignition.  Protect container from physical damage. Isolate from incompatible substances. Containers of this material may be hazardous when empty since they retain product residues (dust, solids); observe all warnings and precautions listed for the product.

8. Exposure Controls/Personal Protection

Airborne Exposure Limits:

-NIOSH Recommended Exposure Limit (REL):

0.1 ppm skin as HN3, 0.3 mg/m3 skin as NaN3 (Ceilings)

-ACGIH Threshold Limit Value (TLV):

0.11 ppm as HN3, 0.29 mg/m3 as Na N3 (Ceilings), A4 Not classifiable as a human carcinogen.

Ventilation System:

A system of local and/or general exhaust is recommended to keep employee exposures below the Airborne Exposure Limits. Local exhaust ventilation is generally preferred because it can control the emissions of the contaminant at its source, preventing dispersion of it into the general work area. Please refer to the ACGIH document, Industrial Ventilation, A Manual of Recommended Practices, most recent edition, for details.

Personal Respirators (NIOSH Approved):

If the exposure limit is exceeded, wear a supplied air, full-facepiece respirator, airlined hood, or full-facepiece  self-contained breathing apparatus. This substance has unknown warning properties.

Skin Protection:

Wear impervious protective clothing, including boots, gloves, lab coat, apron or coveralls, as appropriate, to prevent skin contact.

Eye Protection:

Use chemical safety goggles and/or full face shield where dusting or splashing of solutions is possible. Maintain eye wash fountain and quick-drench facilities in work area.

9. Physical and Chemical Properties

| | |
|---|---|
| Appearance: | Colorless crystals. |
| Odor: | Odorless. |
| Solubility: | 42 g/100 g water @ 17C (63F) |
| Specific Gravity: | 1.85 |
| pH: | No information found. |
| % Volatiles by volume @ 21C (70F): | 0 |
| Boiling Point: | Not applicable. |
| Melting Point: | 275 (decomposes to sodium and nitrogen) |
| Vapor Density (Air=1): | 2.2 |
| Vapor Pressure (mm Hg): | No information found. |
| Evaporation Rate (BuAc=1): | No information found. |

10. Stability and Reactivity

Stability:   Stable under ordinary conditions of use and storage. Decomposes explosively upon
heating, shock, concussion, or friction.

Hazardous Decomposition Products: Explodes upon decomposition liberating nitrogen gas
$(N2)$ and sodium $(Na)$.

Hazardous Polymerization: Will not occur.

Incompatibilities: Benzoyl chloride plus potassium hydroxide, bromine, carbon disulfide,
chromyl chloride, copper, dibromalononitrile, dimethyl sulfate, lead, barium
carbonate, sulfuric acid, water, and nitric acid.

Conditions to Avoid: Heat, flames, ignition sources and incompatibles.

11. Toxicological Information

Oral rat LD50: 27 mg/kg Skin rabbit LD50: 20 mg/kg. Investigated as a tumorigen and
mutagen.

```
--------\Cancer Lists\-----------------------------------------------
                          ---NTP Carcinogen---
Ingredient                    Known   Anticipated   IARC Category
------------------------------ -----  -----------   -------------
Sodium Azide (26628-22-8)       No        No           None
```

12. Ecological Information

Environmental Fate:  When released into the soil, this material is not expected to biodegrade.
When released into the soil, this material is expected to leach into groundwater. When
released into the air, this material may be moderately degraded by photolysis.

Environmental Toxicity:  This material is expected to be very toxic to aquatic life. The
LC50/96-hour values for fish are less than 1 mg/l.

13. Disposal Considerations

Whatever cannot be saved for recovery or recycling should be handled as hazardous waste and
sent to a RCRA approved waste facility. Processing, use or contamination of this product may
change the waste management options. State and local disposal regulations may differ from
federal disposal regulations. Dispose of container and unused contents in accordance with federal,

state and local requirements.

14. Transport Information
    Domestic (Land, D.O.T.)
    -----------------------
    Proper Shipping Name: SODIUM AZIDE
    Hazard Class: 6.1
    UN/NA: UN1687
    Packing Group: II
    Information reported for product/size: 5KG

    International (Water, I.M.O.)
    ----------------------------
    Proper Shipping Name: SODIUM AZIDE
    Hazard Class: 6.1
    UN/NA: UN1687
    Packing Group: II
    Information reported for product/size: 5KG

15. Regulatory Information
    --------\Chemical Inventory Status - Part 1\---------------------------------

| Ingredient | TSCA | EC | Japan | Australia |
|---|---|---|---|---|
| Sodium Azide (26628-22-8) | Yes | Yes | Yes | Yes |

--------\Chemical Inventory Status - Part 2\---------------------------------

| Ingredient | --Canada--<br>Korea | DSL | NDSL | Phil. |
|---|---|---|---|---|
| Sodium Azide (26628-22-8) | Yes | Yes | No | Yes |

--------\Federal, State & International Regulations - Part 1\----------------

| Ingredient | -SARA 302-<br>RQ | TPQ | ------SARA 313------<br>List | Chemical Catg. |
|---|---|---|---|---|
| Sodium Azide (26628-22-8) | 1000 | 500 | Yes | No |

--------\Federal, State & International Regulations - Part 2\----------------

| Ingredient | CERCLA | -RCRA-<br>261.33 | -TSCA-<br>8(d) |
|---|---|---|---|
| Sodium Azide (26628-22-8) | 1000 | P105 | No |

Chemical Weapons Convention: No    TSCA 12(b): No    CDTA: No
SARA 311/312: Acute: Yes    Chronic: No   Fire: Yes Pressure: No

Reactivity: Yes      (Pure / Solid)

Australian Hazchem Code: 2X
Poison Schedule: No information found.
WHMIS:
This MSDS has been prepared according to the hazard criteria of the Controlled Products Regulations (CPR)
and the MSDS contains all of the information required by the CPR.

16. Other Information
NFPA Ratings: Health: 3 Flammability: 1 Reactivity: 3
Label Hazard Warning:
POISON! DANGER! MAY BE FATAL IF SWALLOWED OR ABSORBED THROUGH SKIN.  HARMFUL IF INHALED. HAZARDOUS SOLID. CONTACT WITH OTHER MATERIAL MAY CAUSE FIRE OR EXPLOSION. CAUSES IRRITATION TO SKIN, EYES AND RESPIRATORY TRACT.  AFFECTS CENTRAL NERVOUS SYSTEM, KIDNEYS, AND CARDIOVASCULAR SYSTEM.
Label Precautions:
Do not get in eyes, on skin, or on clothing.
Do not breathe dust.
Keep container closed and away from acids.
Use only with adequate ventilation.
Wash thoroughly after handling.
Keep away from heat, sparks and flame.
Avoid friction or rough handling because of fire and explosion hazard.
Label First Aid:
If swallowed, induce vomiting immediately as directed by medical personnel. Never give anything by mouth to an unconscious person. Get medical attention immediately. If inhaled, remove to fresh air. If not breathing, give artificial respiration. If breathing is difficult, give oxygen. In case of contact, wipe off excess material from skin then immediately flush eyes or skin with plenty of water for at least 15 minutes. Remove contaminated clothing and shoes. Wash clothing before reuse. In all cases, get medical attention.
Product Use:
Laboratory Reagent.
Revision Information:
MSDS Section(s) changed since last revision of document include: 1.
Disclaimer:
*******************************************************************************
Mallinckrodt Baker, Inc. provides the information contained herein in good faith but makes no representation as to its comprehensiveness or accuracy. This document is intended only as a guide to the appropriate precautionary handling of the material by a properly trained person using this product.  Individuals receiving the information must exercise their independent judgment in determining its appropriateness for a particular purpose. MALLINCKRODT BAKER, INC. MAKES NO REPRESENTATIONS OR WARRANTIES, EITHER EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION ANY WARRANTIES OF MERCHANTABILITY,

FITNESS FOR A PARTICULAR PURPOSE WITH RESPECT TO THE INFORMATION SET
FORTH HEREIN OR THE PRODUCT TO WHICH THE INFORMATION REFERS.
ACCORDINGLY, MALLINCKRODT BAKER, INC. WILL NOT BE RESPONSIBLE FOR
DAMAGES RESULTING FROM USE OF OR RELIANCE UPON THIS INFORMATION.
*******************************************************************************

Prepared by: Strategic Services Division
Phone Number: (314) 539-1600 (U.S.A.)

http://www.biotech.ufl.edu/~fccl/pbs.html

ICBR Flow Cytometry Core Laboratory
Formula for PBS

There are many formulae for PBS, or phosphate-buffered saline. This one is from the
Becton-Dickinson Monoclonal Antibody Source Book. Sodium azide is often added to solutions
to keep bacterial or fungal growth surpressed or to prevent shedding or internalization of
antigen/antibody complexes when labeling cell membranes antigens.

WARNING: Sodium azide under acid conditions yields hydrazoic acid, an extremely toxic
compound. Azide compounds should be diluted with running water before being discarded.
Theses conditions are recommended to avoid deposits in plumbing where explosive conditions
may develop.

25X Stock Solution
188 g. $K_2HPO_4$
33 g. $NaH_2PO_4$* $H_2O$
180 g. NaCl

Dissolve in 1 liter distilled water.

1X Working Solution
Add 40 ml. of the 25X Stock Solution to 960 ml. of distilled water.
For the version with sodium azide, add 1 g. sodium azide.

Reference
1.Lanier, L.L., and Warner, N.L.: Paraformaldehyde fixation of hematopoietic cells for
quantitative flow cytometry (FACS) analysis. J. Immunol. Meth., 47:25, 1981.

http://www.qrc.com/hhmi/science/labsafe/lcsstxt/lcsstx78.htm

LCSS: SODIUM AZIDE

Substance     Sodium azide (Hydrazoic acid, sodium salt) CAS 26628-22-8

Formula      NaN

Physical Properties  Colorless crystalline solid  mp >275 ˚C (decomposes)
    Readily soluble in water (41.7 g/100 mL at 17 ˚C)

Odor    Odorless solid

Toxicity Data  LD oral (rat)  27 mg/kg

LD skin (rabbit)  20 mg/kg

TLV-TWA (ACGIH)  0.29 mg/m (ceiling)

Major Hazards:      Highly toxic by inhalation, ingestion, or skin absorption.
Toxicity            The acute toxicity of sodium azide is high. Symptoms of exposure include
                    lowered blood pressure, headache, hypothermia, and in the case of serious
                    overexposure, convulsions and death. Ingestion of 100 to 200 mg in
                    humans may result in headache, respiratory distress, and diarrhea. Target
                    organs are primarily the central nervous system and brain. Sodium azide
                    rapidly hydrolyzes in water to form hydrazoic acid, a highly toxic gas that
                    can escape from solution, presenting a serious inhalation hazard. Symptoms
                    of acute exposure to hydrazoic acid include eye irritation, headache,
                    dramatic decrease in blood pressure, weakness, pulmonary edema, and
                    collapse. Solutions of sodium azide can be absorbed through the skin.

Sodium azide has not been found to be carcinogenic in humans. Chronic, low-level exposure may
cause nose irritation, episodes of falling blood pressure, dizziness, and bronchitis.

Flammability and Explosibility:          Flammability hazard is low, but violent decomposition can
                                         occur when heated to 275 ˚C. Decomposition products
                                         include oxides of nitrogen and sodium oxide.

Reactivity and Incompatibility           Sodium azide should not be allowed to come into contact
                                         with heavy metals or their salts, because it may react to
                                         form heavy metal azides, which are notorious
                                         shock-sensitive explosives. Do not pour sodium azide
                                         solutions into a copper or lead drain. Sodium azide reacts
                                         violently with carbon disulfide, bromine, nitric acid,
                                         dimethyl sulfate, and a number of heavy metals, including
                                         copper and lead. Reaction with water and acids liberates
                                         highly toxic hydrazoic acid, which is a dangerous explosive.
                                         Sodium azide is reported to react with CHCl in the presence
                                         of DMSO to form explosive products.

Storage and Handling                     Because of its high toxicity, sodium azide should be handled
                                         in the laboratory using the "basic prudent practices" of
                                         Chapter 5.C, supplemented by the additional precautions for

work with compounds of high toxicity (Chapter 5.D). In particular, work with sodium azide should be conducted in a fume hood to prevent exposure by inhalation, and appropriate impermeable gloves and splash goggles should be worn at all times to prevent skin and eye contact. Containers of sodium azide should be stored in secondary containers in a cool, dry place separated from acids.

Accidents

In the event of skin contact, immediately wash with soap and water and remove contaminated clothing. In case of eyecontact, promptly wash with copious amounts of water for 15 min (lifting upper and lower lids occasionally) and obtain medical attention. If sodium azide is ingested, obtain medical attention immediately. If large amounts of this compound are inhaled, move the person to fresh air and seek medical attention at once.

In the event of a spill, cover sodium azide with sand, sweep up, and place in a container for disposal. Soak up spilled solutions with a spill pillow or absorbent material, place in an appropriate container, and dispose of properly. Respiratory protection may be necessary in the event of a large spill or release in a confined area.

Disposal

Excess sodium azide and waste material containing this substance should be placed in an appropriate container, clearly labeled, and handled according to your institution's waste disposal guidelines. For more information on disposal procedures, see Chapter 7 of this volume.

The information in this LCSS has been compiled by a committee of the National Research Council from literature sources and Material Safety Data Sheets and is believed to be accurate as of July 1994. This summary is intended for use by trained laboratory personnel in conjunction with the NRC report Prudent Practices in the Laboratory: Handling and Disposal of Chemicals. This LCSS presents a concise summary of safety information that should be adequate for most laboratory uses of the title substance, but in some cases it may be advisable to consult more comprehensive references. This information should not be used as a guide to the nonlaboratory use of this chemical.

Copyright© 1995 National Academy of Sciences. All rights reserved.

http://www.orcbs.msu.edu/chemical/chp/appendixi.html

APPENDIX I

009423

## SHOCK SENSITIVE AND EXPLOSIVE CHEMICALS

Shock sensitive refers to the susceptibility of a chemical to rapidly decompose or explode when struck, vibrated or otherwise agitated. Explosive chemicals are those chemicals which have a higher propensity to explode under a given set of circumstances than other chemicals (extreme heat, pressure, mixture with an incompatible chemical, etc.). The label and MSDS will indicate if a chemical is shock sensitive or explosive. The chemicals listed below may be shock sensitive or explode under a given number of circumstances and are listed only as a guide to some shock sensitive or explosive chemicals.

Follow these guidelines: Write the date received and date opened on all containers of shock sensitive chemicals. Some chemicals become increasingly shock sensitive with age. Unless an inhibitor was added by the manufacturer, closed containers of shock sensitive materials should be discarded after 1 year.

Wear appropriate personal protective equipment when handling shock sensitive chemicals.

| | | |
|---|---|---|
| acetylene | fulminate of mercury | |
| nitroguanidine | acetylides of heavy metal | |
| fulminate of silver | nitroparaffins | |
| amatex | ethylene oxide | |
| nitrourea | amatol | |
| ethyl-tetryl | organic nitramines | |
| ammonal | fulminating gold | |
| ozonides | ammonium nitrate | |
| fulminating mercury | pentolite | |
| ammonium perchlorate | fulminating platinum | |
| perchlorates of heavy metals | | ammonium picrate |
| fulminating silver | | peroxides |
| azides of heavy metals | | gelatinized nitrocellulose |
| picramic acid | | baratol |
| guanyl | | picramide |
| calcium nitrate | | guanyl nitrsamino |
| picratol | | chlorate |
| guanyltetrazene | | picric acid |
| copper acetylide | | hydrazine |
| picryl sulphonic acid | | cyanuric triazide |
| nitrated carbohydrate | | silver acetylide |
| cyclotrimethylenetrinitramine | | nitrated glucoside |
| silver azide | | dinitrophenol |
| nitrogen triiodide | | tetranitromethane |
| dinitrophenyl hydrazine | | nitrogen trichloride |
| dinitrotoluene | | nitroglycerin |
| ednatol | | nitroglycide |
| erythritol tetranitrate | | nitroglycol |

Mixtures:

| | |
|---|---|
| germanium | tetracene |

009424

| | |
|---|---|
| hexanitrodiphenyamine | tetrytol |
| hexanitrostilbene | trimethylolethane |
| hexogen | trimonite |
| hydrazoic acid | trinitroanisole |
| lead azide | trinitrobenzene |
| lead mononitroresorcinate | trinitrobenzoic acid |
| lead styphnate | trinitrocresol |
| mannitol hexanitrate | trinitroresorcinol |
| sodium picramate | tritonal |
| tetranitrocarbazole | urea nitrate |

References: Material Safety Data Sheets, various chemical companies

http://www.lemurzone.com/airbag/inflate.htm

INFLATORS

This is the Rocket Science part.     Sodium Azide is Rocket Fuel.

Sodium azide is the fuel of choice for a number of reasons. It is a solid propellant with a very high gas generation ratio. It is very stable in this application.

When Sodium azide burns, it's major product is Nitrogen gas, which makes up around 78% of the Earth's atmosphere. One of the other by-products is sodium hyxdroxide. This is commonly known as Lye, which is a caustic compound. The quantities produced are very small and present a very small risk of burns. The white powder residue seen after inflation is common corn starch, used as a lubricant for expansion of the airbag. Testing is underway with inflators that release argon gas.

Longevity

Around 1991 TRWTM, the company that makes a large number of the airbags in vehicles in use, located one of the first 1973 Chevrolet Impalas that was made with a driver's side airbag. They reconnected the battery and stimulated the crash sensors. Lo and Behold the airbag worked perfectly. There is not a whole lot else on a car that, with no maintenance required,  will last 18+ years.

009425

# EXHIBIT 8

*Andriano v. Ryan*, Case No. CV-16-01159-PHX-SRB
Motion for Evidentiary Development

# *Law Offices of G. David DeLozier, P.C.*

*4016 East Forest Pleasant Place, Cave Creek, Arizona 85331*
*E-Mail: gddelozier@aol.com*
*Phone (480) 575-6660    Facsimile (480) 575-6661*

FACSIMILE  MESSAGE

Date:    05-15-2003                                                    Time:    2:00 pm

TO:                      Dan Patterson, Esquire

COMPANY:           Office of the Maricopa Public Defender

FAX NUMBER:      (602) 506-2865

FROM:                  G. David DeLozier

SUBJECT:            State v. Andriano, CR 2000-096032

NUMBER OF PAGES (INCLUDING COVER SHEET):              2

**Dan:**

**Attached is Joe Collier's biography. Call me with questions, etc.**

*NOTICE:   THE INFORMATION CONTAINED IN THIS FACSIMILE MESSAGE MAY
CONTAIN ATTORNEY-PRIVILEGED AND CONFIDENTIAL INFORMATION.   THIS
MESSAGE IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY
NAMED ABOVE.   IF THE READER OF THIS MESSAGE IS NOT THE INTENDED
RECIPIENT,  YOU  ARE  HEREBY  NOTIFIED  THAT  ANY  DISSEMINATION,
DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED.
IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE IMMEDIATELY
NOTIFY US BY TELEPHONE AND RETURN THE ORIGINAL MESSAGE TO US AT THE
ABOVE ADDRESS VIA THE U.S. POSTAL SERVICE.*

## BIOGRAPHY

### WILLIAM JOE COLLIER
### CONSULTANT IN FORENSIC SCIENCE

Mr. Collier was the Director in charge of the Phoenix Police Scientific Crime Detection Laboratory for over 29 years. For eight years he was on the staff of the Department of Police Science at Phoenix College where he taught courses on Drugs, Narcotics and Criminalistics. He also taught courses at Glendale Community College, lectured at Arizona State University and the Phoenix Police Academy. He is a graduate of Baylor University and has attended several FBI Academy Seminars.

Mr. Collier has worked in the fields of Toxicology, Drugs, Forensic Chemistry and Criminalistics for over 40 years and is a nationally recognized expert in Forensic Science.

Mr. Collier has consulted on Forensic Science evidence in Arizona, California, Nevada, Montana, Florida, Texas, Utah, and New Mexico. Cases have been examined for a number of Federal Agencies, the D.E.A., F.B.I., U.S. Customs, U.S. Postal Service, Military Investigative units as well as state and local government and Police Agencies.

He has appeared as an expert witness in Military Courts, U.S. District Court, Federal Immigration Hearings, Superior Courts, Justice and Municipal Courts on scientific evidence, toxicology, drugs, narcotics, criminalistics and firearm identification.

He has lectured on the combined effects of alcohol and drugs on driving skills and Dram Shop evidence.

Mr. Collier is a Fellow in the American Academy of Forensic Sciences, a member of the California Association of Criminalists, Association of Firearm and Tool Mark Examiners, American Chemical Society and many other professional and scientific organizations. He has presented a number of scientific papers in Forensic Science and Law enforcement.

14612 N. 25th Street
Phoenix, AZ 85032-4942
602-787-8281

003482

# Law Offices of G. David DeLozier, P.C.

*4016 East Forest Pleasant Place, Cave Creek, Arizona 85331*
*E-Mail: gddelozier@aol.com*
*Phone (480) 575-6660   Facsimile (480) 575-6661*

---

FACSIMILE  MESSAGE

Date:___05-19-2003___                                    Time:___10:30 am___

TO:                          Dan Patterson, Esquire

COMPANY:                     Office of the Maricopa Public Defender

FAX NUMBER:                  (602) 506-2865

FROM:                        G. David DeLozier

SUBJECT:                     State v. Andriano, CR 2000-096032

NUMBER OF PAGES (INCLUDING COVER SHEET):                          1

**Dan:**

**Mr. Collier and I discussed that he would need to review all photos, all police reports, and the medical examiner's report(s).  We discussed his review would include an analysis of (1) the cause of death, (2) the sodium azide being in food containers on the counter and in the refrigerator, (3) crime scene analysis with emphasis on the stool and the knife, and (4) possibly fingerprint analysis.  His fee request is $1,500.00 @ $150.00 per hour, which does not include trial time.  If you wish more detail, please let me know.  Call me with questions, etc.**                                   David

*NOTICE:  THE INFORMATION CONTAINED IN THIS FACSIMILE MESSAGE MAY CONTAIN ATTORNEY-PRIVILEGED AND CONFIDENTIAL INFORMATION.  THIS MESSAGE IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY NAMED ABOVE.  IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE IMMEDIATELY NOTIFY US BY TELEPHONE AND RETURN THE ORIGINAL MESSAGE TO US AT THE ABOVE ADDRESS VIA THE U.S. POSTAL SERVICE.*

THIS FORM MUST BE USED TO REQUEST EXPERT WITNESS FEES; TRANSCRIPT FEES; AND ANY OTHER EXPENSES PAID BY THE MARICOPA COUNTY PUBLIC DEFENDER.
(Bolded areas must be filled out completely, or form may be returned to you for complete information)

Name of Attorney *Daniel Patterson*  CR No *00-9632* Date *9/10/03*

Name of Defendant *Andriano, Wendi*  Charge(s) *Murder 1°*
             Last      First

Type of Request: ☒ Expert Witness ☐ Witness ☐ Transcript ☐ Other

Name of Expert *Joe Collier*   criminalist   Amount Requested $ *1,000.00*

Can defendant or interested parties pay all or some of the cost? ☐ Yes ☒ No
                                      If yes, how much? $_____

      (If you are submitting part of the costs from the defendant
      or interested parties, please contact Ellen for blue form)

Reason for request: (required) *Testify in Court re: Crime Scene*
*+ poisoning issue.*

What has the expert agreed to provide? (Required): *Court Testimony*

## Authorization

☐ Approved    ☐ Disapproved    $_____

☒ Approved    ☐ Disapproved    $ *1000*
                                Group Supervisor
                                    Chief Trial Deputy/Public Defender
                                    or Designee

Requests of $400 or less must be approved by the Group Supervisor.

Requests over $400 to $999.00 must be approved by the Group Supervisor and the Chief Trial   *Laura C.*

Requests over $1,000 must be approved by the Public Defender.

# OFFICE OF THE PUBLIC DEFENDER
## MARICOPA COUNTY

**JAMES J. HAAS**
**Public Defender**

PAUL J. PRATO
Chief Trial Deputy

LANCE ANTONSON
Group C Supervisor

September 10, 2003                                    (602) 506-2209

W. Joe Collier
14612 N. 25th St.
Phoenix, AZ  85032

Re:   CR2000-096032; State of Arizona v. Wendi Elizabeth Andriano

Dear Mr. Collier:

The Maricopa County Public Defender's Office has approved payment to you up to the amount of $1000.00 (One Thousand Dollars) in the above-cited matter.  Due to budget restrictions, we are unable to pay a greater amount without supplemental written approval, in advance, by office management.

If you believe the costs of your services will exceed the approved amount, you must advise me at the earliest possible date and prior to any additional work being done.  If necessary and appropriate, I will request supplemental approval from office management for the additional amount needed.  If approved, you will receive written confirmation of the supplemental approval. **You will not be paid for services or costs in excess of the amount for which you have received written approval from this office.**

In addition, we will need an itemized statement of your fees and costs at the conclusion of your involvement in the case, in order to be able to pay you.

Like most government agencies, we are doing our best to control costs.  We appreciate your assistance and hope that these additional steps are not a major inconvenience to you.

Please let me know if you have any questions.  Thank you for your consideration.

Sincerely,

MARICOPA COUNTY PUBLIC DEFENDER

LANCE ANTONSON
Trial Group Supervisor

LA:ldc

cc    Daniel Patterson, Attorney for Wendi Andriano
      Ellen Hudak, Admin. Coordinator

**LAW FIRM**
**Southeast Facility • 1750 S. Mesa Drive, Suite 150 • Mesa, Arizona 85210-6211**
**(602) 506-2200 • (FAX) 506-2865 • (TT) 506-1646**

*Delivering America's Promise of Justice for All*

000724