# EXHIBIT 9
# (part 2)

*Andriano v. Ryan*, Case No. CV-16-01159-PHX-
SRB Motion for Evidentiary Development

# A Clinical Study of Specific Personality Traits of Enuretic Children and Their Parents
## by
## Michael Brad Bayless

# December 1976

## INFORMATION TO USERS

This material was produced from a microfilm copy of the original document. While the most advanced technological means to photograph and reproduce this document have been used, the quality is heavily dependent upon the quality of the original submitted.

The following explanation of techniques is provided to help you understand markings or patterns which may appear on this reproduction.

1. The sign or "target" for pages apparently lacking from the document photographed is "Missing Page(s)". If it was possible to obtain the missing page(s) or section, they are spliced into the film along with adjacent pages. This may have necessitated cutting thru an image and duplicating adjacent pages to insure you complete continuity.

2. When an image on the film is obliterated with a large round black mark, it is an indication that the photographer suspected that the copy may have moved during exposure and thus cause a blurred image. You will find a good image of the page in the adjacent frame.

3. When a map, drawing or chart, etc., was part of the material being photographed the photographer followed a definite method in "sectioning" the material. It is customary to begin photoing at the upper left hand corner of a large sheet and to continue photoing from left to right in equal sections with a small overlap. If necessary, sectioning is continued again — beginning below the first row and continuing on until complete.

4. The majority of users indicate that the textual content is of greatest value, however, a somewhat higher quality reproduction could be made from "photographs" if essential to the understanding of the dissertation. Silver prints of "photographs" may be ordered at additional charge by writing the Order Department, giving the catalog number, title, author and specific pages you wish reproduced.

5. PLEASE NOTE: Some pages may have indistinct print. Filmed as received.

**University Microfilms International**
300 North Zeeb Road
Ann Arbor, Michigan 48106 USA
St. John's Road, Tyler's Green
High Wycombe, Bucks, England HP10 8HR

77-3088

BAYLESS, Michael Brad, 1948-
A CLINICAL STUDY OF SPECIFIC PERSONALITY
TRAITS OF ENURETIC CHILDREN AND THEIR PARENTS.

Arizona State University, Ph.D., 1976
Psychology, clinical

**Xerox University Microfilms,** Ann Arbor, Michigan 48106

# A CLINICAL STUDY OF SPECIFIC PERSONALITY TRAITS

## OF ENURETIC CHILDREN AND THEIR PARENTS

by

**Michael Brad Bayless**

A Dissertation Presented in Partial Fulfillment
of the Requirements for the Degree
Doctor of Philosophy

ARIZONA STATE UNIVERSITY

December 1976

A CLINICAL STUDY OF SPECIFIC PERSONALITY TRAITS

OF ENURETIC CHILDREN AND THEIR PARENTS

by

Michael Brad Bayless

has been approved

September 1976

APPROVED:

_____ , Chairman
_____
_____
_____
_____

Supervisory Committee

ACCEPTED:

_____
Department Chairman

_____
Dean, Graduate College

## ABSTRACT

The purpose of this study was to investigate the
relationship between specific personality traits and
abnormal symptom-habits of enuretic children and their
parents.  The population for this study consisted of 20
enuretic children and their participating parents who
were inactive out-patients over the past 10 years at a
major mental health clinic.

The policy at this clinic required that psychologi-
cal and personal data be included in the file.  One of the
instruments that had been administered to all participants
was the Bender Motor Gestalt Test.

The Bender Motor Gestalt Test reproductions were
rated by three psychologists on the predominance of four
specific personality traits:  independence, dependence,
passiveness, and aggressiveness.  In addition, the case
studies were clinically analyzed to determine the type
and frequency of abnormal symptom-habits exhibited by the
participants.

Six investigative expectations were tested.  The
first three expectations related to:  (a) specific person-
ality traits of enuretic children, (b) specific personality
traits of participating parents, and (c) the relationship
between specific personality traits of enuretic children

iii

and their participating parents.  The results of the ratings on the <u>Bender Motor Gestalt</u> reproductions suggested that there is a relationship between personality traits of enuretic children and/or their parents.  However, there was not sufficient evidence to state that a particular combination of personality traits had a higher tendency to produce enuresis.

The fourth, fifth, and sixth expectations dealt with the relationship between abnormal symptom-habits exhibited by the enuretic children and their participating parent(s). The results indicated that the children and their participating parent(s) were functioning in a high state of anxiety. This anxiety appeared to be a manifestation of faulty parent-child relationships with the enuretic child.  The parents' anxiety seemed to be the result of many variables:  marital problems, economics, apathy by one or both parents, etc.

The findings indicate that enuresis is not an isolated illness; rather it appears to be a symptom of a complex family problem.  The results suggested that the etiology of nocturnal enuresis is the same as any other psychosocial somatic disorder.  Thus, treatment of enuresis as a separate, unrelated illness does not completely cure the problem.  The findings indicated that the total family should be involved in the therapeutic process.

Recommendations for future research included further investigation of the role of personality traits in the

iv

development of emotional disorders and the investigation
of alternative treatment methods for nocturnal enuresis.

## ACKNOWLEDGEMENTS

I wish to express my appreciation to my chairman,
Dr. Luis Casaus, for his guidance, support, and sincere
interest in me as a person during this study and throughout
my doctoral program. Also, the guidance and suggestions
offered by the members of my committee: Dr. Calvin Daane,
Dr. Robert Heimann, Dr. Morrison Warren, and Dr. Robert
Ripley, who greatly enriched my experiences while conduct-
ing and reporting this research.

This study could not have been completed without the
cooperation of the staff at the Jane Wayland Child Guidance
Center. Special thanks is given to the three psychologists
at this Center who were judges in one of the measurements
used in this study.

I would like to also thank all my friends and relatives
for their encouragement and help. This confidence in me
provided the motivation needed to successfully complete my
doctoral experience. In addition, recognition and thanks
to Teri Meri for her typing assistance and willingness to
be of help.

Finally, I wish to express my sincere appreciation and
love to Richie I. Campbell for her patience, understanding,
and encouragement. The faith and support that she

vi

unconditionally provided has been the driving force I
needed to complete my doctoral studies.

TABLE OF CONTENTS

Page

LIST OF TABLES . . . . . . . . . . . . . . . . . .   x

LIST OF FIGURES  . . . . . . . . . . . . . . . . .   xi

Chapter

    I.   INTRODUCTION . . . . . . . . . . . . . . .   1

            Statement of the Problem . . . . . . . . .   5
            Investigative Expectations . . . . . . . .   7
            Need for the Study . . . . . . . . . . .   7
            Definition of Terms  . . . . . . . . . .   8
            Theoretical Rationale  . . . . . . . . .   9
            Limitations of the Study . . . . . . . .   11

    II.   REVIEW OF THE LITERATURE . . . . . . . . .   13

            Definition of Enuresis . . . . . . . . .   14
            Incidence of Enuresis  . . . . . . . . .   16
            Clinical and Emotional Classification
              of Enuresis  . . . . . . . . . . . . .   17
            Sleep and Enuresis . . . . . . . . . . .   22
            Theory and Treatment of Enuresis . . . .   23
            Parent Personality and the Enuretic
              Child  . . . . . . . . . . . . . . . .   31

   III.   METHODS AND PROCEDURES . . . . . . . . . .   34

            Population . . . . . . . . . . . . . . .   34
            Selection of Subjects  . . . . . . . . .   35
            Data Collection  . . . . . . . . . . . .   36
            Instrumentation  . . . . . . . . . . . .   37
            Data Analysis  . . . . . . . . . . . . .   40

    IV.   RESULTS AND DISCUSSION . . . . . . . . . .   42

            Results  . . . . . . . . . . . . . . . .   43
            Discussion . . . . . . . . . . . . . . .   51

**Chapter**                                                        **Page**

     V.   SUMMARY, CONCLUSIONS, AND RECOMMENDATIONS  .   56

         Summary  . . . . . . . . . . . . . .  56
         Conclusions  . . . . . . . . . . . .  58
         Recommendations  . . . . . . . . . .  60

BIBLIOGRAPHY . . . . . . . . . . . . . . . . . .  62

APPENDICES . . . . . . . . . . . . . . . . . . .  69

ix

LIST OF TABLES

Table                                                                 Page

1.  Frequency and Sex of Enuretic Children
       and Their Participating Parents
       Used in This Study . . . . . . . . . . .   35

2.  Coefficients for Each Specific Personality
       Trait as Measured by Ebel's Interclass
       Correlation  . . . . . . . . . . . . . . .   43

3.  Frequency of Abnormal Symptom-Habits
       Exhibited by Enuretic Children as
       Noted in the Case Studies  . . . . . . .   49

4.  Frequency of Abnormal Symptom-Habits
       Exhibited by Participating Parents
       of Enuretic Children as Noted in
       the Case Studies . . . . . . . . . . . .   50

## LIST OF FIGURES

<u>Figure</u>                                                    <u>Page</u>

   1.   Graphic Comparison of Male Enuretic
            Children on Selected <u>Bender Motor
            Gestalt Test</u> Characteristics . . . . . .   44

   2.   Graphic Comparison of Female Enuretic
            Children on Selected <u>Bender Motor
            Gestalt Test</u> Characteristics . . . . . . .   45

   3.   Graphic Comparison of Male Parents of
            Enuretic Children on Selected <u>Bender
            Motor Gestalt Test</u> Characteristics . . . .   46

   4.   Graphic Comparison of Female Parents of
            Enuretic Children on Selected <u>Bender
            Motor Gestalt Test</u> Characteristics . . . .   47

CHAPTER I

INTRODUCTION

Enuresis has been a problem that has affected children and their families for generations.  It is not known when enuresis became a medical problem, but it has been recognized as a disturbance of childhood necessitating medical treatment since the time of the Papyrus Ebers dated 1550 B.C. (Glicklich, 1951).  It becomes evident from reviewing the literature that historically a variety of therapies has been employed to relieve enuresis.  However, reports indicate that few approaches have been more than moderately successful in curing this serious problem.

Theories as to the etiology of enuresis have varied throughout the years.  Glicklich indicated that among primitive peoples treatment involved supernatural forces and was designed to exorcise evil spirits.  A treatment method used among the Bartu (Zulus) of South Africa was to scarify the skin over the cheeks and allow the "bad blood" to escape (Glicklich, 1951).

Enuresis has been regarded by some urologists as a symptom of organic defects in the urogenital tract.  In patients resistant to the usual therapeutic procedures, a number of abnormalities in the bladder and urethra were

demonstrated.  Another popular view several years ago was
that enuresis was an undesirable habit and represented per-
sistance of an infantile form of behavior.  More recently,
the most widely accepted causal factor of enuresis has been
emotional disturbance.

Nocturnal enuresis has been defined in the literature
as the involuntary discharge of urine during sleep after
the age of three to four years in the absence of organic
pathology (Lovibond, 1964).  Although the four-year age
limit was chosen arbitrarily, concern prior to four years
was deemed unnecessary because of physiological variation.

The term enuresis is usually used for describing night-
time wetting only (nocturnal enuresis); diurnal enuresis
refers to involuntary voiding during both day and night.
Both terms are restricted to persistent wetting, not
infrequent accidents due to excitement or some temporary
psychological stress.

Although the etiology of persistent childhood enuresis
has been a debatable issue, psychiatrists have indicated
that enuresis can be diagnosed, in most cases, as a manifes-
tation of emotional disturbance due to family problems.
Bindelglas (1974) noted that enuresis has been associated
with passive-aggressive behavior, an assertion of one's
individuality, and an expression of hostility toward
parents.  Although a significant number of studies has
indicated that one of the main causes for enuresis may

involve the parents and the child, almost all research and
treatment has been focused solely on the child.

Kolvin, Taunch, Curran, Gorsid, Nolan, and Shaw (1972)
reported that the personalities of both parents in their
study were skewed in similar directions.  Frary (1935),
Hallgren (1957), Stockwell and Smith (1940), and Bakwin
(1961) noted data that indicated in a significant percentage
of cases both parents were also enuretic.  Although there
has not been sufficient evidence to support the concept of
heredity as the basis for enuresis, ample evidence has been
found that supports a relationship between parental malad-
justments, family dynamics, and enuresis.  Bindelglas, Dee,
and Enos (1968) reported the following data concerning fam-
ily dynamics which were significant at the .01 level:

1.   The fathers were more accepting of the enuretic
     child than were the mothers.
2.   The mothers were the dominant members of the
     family.
3.   The fathers were the submissive members of the
     family.
4.   The fathers liked the enuretic child better
     than they did the other children in the family.

The following were significant at the .05 level:

1.   The mothers liked the enuretic child less than
     they did the other children.

4

2. As a newborn infant, the child was more active
   than the other children.

3. The child cried less than the other children in
   the family.

Parents' behavior and attitudes toward parenthood seem
to have been greatly influenced by their own parents.
Since an individual's own parents are probably the only per-
sons he/she has observed intimately in the parental role,
they serve as the models for his/her own behavior as a
parent.  Research has noted that personality development
and adult character of parents have been greatly influenced
by their parents.  Thus, it may be that parents pattern
their reactions by those of their own parents and estab-
lish similar relationships with their children.

If personality is the sum of an individual's character
traits, attitudes, and values, the personality of a parent
may be expected to influence the total development of the
child.  It may be that parents with certain dominant per-
sonality characteristics promote and/or foster enuresis
in their children.  The study of comparison between the
parent's personality characteristics and the enuretic
child may yield valuable data concerning the treatment of
nocturnal enuresis.

## Statement of the Problem

Despite the recognition that most enuretic children
have a family history of enuresis, researchers have over-
looked family dynamics by directing treatment and research
procedures mainly toward the child.  Yet the high percentage
of parents, siblings, aunts, uncles, and grandparents who
have or have had enuresis suggests there is a pattern of
family dynamics with enuresis.  Further, research has indi-
cated parents' personality and attitude play an important
role in the control of enuresis.

Specifically, these questions were asked:

1.  Do parents of enuretic children have similar per-
    sonality traits as measured by ratings on the
    Bender Motor Gestalt Test?

2.  Do enuretic children have similar personality
    traits as measured by ratings on the Bender Motor
    Gestalt Test?

3.  Do fathers of enuretic children have similar per-
    sonality traits as measured by ratings on the
    Bender Motor Gestalt Test?

4.  Do mothers of enuretic children have similar per-
    sonality traits as measured by ratings on the
    Bender Motor Gestalt Test?

5.  Do male enuretic children have similar personal-
    ity traits as measured by ratings on the Bender
    Motor Gestalt Test?

6.  Do female enuretic children have similar personal-
    ity traits as measured by ratings on the <u>Bender
    Motor Gestalt Test</u>?

7.  Do parents of enuretic children have similar
    abnormal symptom-habits?

8.  Do fathers of enuretic children have similar
    abnormal symptom-habits?

9.  Do mothers of enuretic children have similar
    abnormal symptom-habits?

10. Do enuretic children have similar abnormal
    symptom-habits?

11. Do male enuretic children have similar abnormal
    symptom-habits?

12. Do female enuretic children have similar abnormal
    symptom-habits?

13. Do male enuretic children have abnormal symptom-
    habits similar to his father and/or mother?

14. Do female enuretic children have abnormal symptom-
    habits similar to her mother and/or father?

The problem, thus, was stated as a study designed to
determine whether parents of enuretic children and their
children have similar specific personality traits.  Where
these traits were manifested in the reproductions of the
<u>Bender Motor Gestalt Test</u> and overt behavior, this study
attempted to propose the existence of a relationship of
specific personality traits of enuretic children and their
parents.

## Investigative Expectations

In consideration of the literature presently available
on enuresis, one would expect to find the following:

1.  Enuretic children have similar specific personal-
    ity traits.

2.  Parents of enuretic children have similar specific
    personality traits.

3.  Enuretic children have similar specific personal-
    ity traits as their parent(s).

4.  Enuretic children have similar abnormal symptom-
    habits.

5.  Parents of enuretic children have similar abnormal
    symptom-habits.

6.  Enuretic children exhibit similar abnormal
    symptom-habits as their parents.

## Need for the Study

The fact that parents have a significant influence in
the lives of their children is an area which warranted
investigation and discussion by some of the top personality
theorists and researchers.  Specifically, as Bindelglas
(1975) suggested, one reason for the usual failure of
psychotherapy with enuresis is that the personality of the
parent(s) unconsciously or consciously strives to keep the
child enuretic.

Currently, science is still debating on how enuresis is to be treated.  Although most therapists are using drug and/or conditioning therapy, most agree that further knowledge is needed so that each child can be provided optimal treatment.  Recognizing that enuresis affects 15 to 25 per cent of children, it is a clinical problem that warrants further investigation.  Thus, to enhance the effectiveness of diagnosis and treatment, further knowledge concerning the etiology and pathogenesis of enuresis is needed. Through examining the child's and parents' clinical picture and personality characteristics, this study provides some extra light on the etiology of enuresis.  It also enables the psychologist to make a more detailed treatment plan.

### Definition of Terms

The following is a list of terms and their definitions as used in this study:

Nocturnal enuresis:  the involuntary discharge of urine during sleep after the age of four years in the absence of organic pathology.

Diurnal enuresis:  the involuntary discharge of urine both day and night without organic pathology.

Primary enuresis:  when the child has not been dry for any significant period of time.

Secondary enuresis: when the child has been dry for a significant period of time and then relapses.

Independence: not requiring or relying on something else or somebody else; impatience with or annoyance at restriction.

Dependence: when an individual relies on another for support.

Aggression: the practice of making attacks, i.e., acting out behavior, temper tantrums.

Passiveness: not active, submissive; when an individual is non-aggressive.

Abnormal symptom-habit: learned responses to stimuli of some sort, i.e., facial tics, handwashing compulsions, enuresis, impotence, intense overt anxiety, etc.

Personality traits: measures of Bender Motor Gestalt Test scores on scales designed to measure specific characteristics of the personality.

## Theoretical Rationale

Bindelglas (1974) and Bowlby (1960) indicated that the emotional status of the child is affected by the personality of the parent. If there is a conflict between the parent and the child and it is not resolved, underlying anxiety may be manifested in the child's behavior.

Faulty parent-child relationships have been noted to be the causal factor in many common psychosocial somatic

disorders. Specifically, it appears to be certain person-
ality traits of the parents, which are manifested in their
behaviors, that play an important role in the development
of psychosocial somatic disorders in their children.

The parents of enuretic children seem to display spe-
cific behaviors and attitudes toward the enuretic child.
Also, enuretic children have appeared to show similar sympt-
oms. Thus, one may conclude that the enuretic behavior and
parents' attitudes and behavior are related. Specifically,
this researcher viewed enuresis as a result of dependency in
the child created by one or both parents. Bindelglas, Dee,
and Enos stated that one parent (usually father) is passive
and the other parent (usually mother) is aggressive and
rejecting.

This research attempted to determine whether the fol-
lowing traits were dominant among parents of enuretic chil-
dren and their enuretic child as measured by the Bender
Motor Gestalt Test: (a) aggressiveness, (b) passiveness,
(c) dependency, and (d) independency.

In order to make the necessary comparisons, the Bender
Motor Gestalt Test reproductions were analyzed by three
certified psychologists. Each psychologist rated the degree
to which each trait was present within each Bender Motor
Gestalt Test.

The raters (psychologists) judged the specified per-
sonality traits present within the Bender Motor Gestalt

Test reproductions on a five-point scale.  The scale was interpreted as follows:  1 = very low; 2 = below average; 3 = average; 4 = above average; and 5 = very high.

## Limitations of the Study

The Bender Motor Gestalt Test reproductions selected belonged to persons that were or had been patients at a local child mental health clinic.  Both parents' and their enuretic child's Bender Motor Gestalt Test reproductions were selected over the past ten years.  Although the total population of parents and their enuretic child with Bender reproductions was selected, this was still a biased population.  The parents were probably the most concerned with the problem and were considered as the most aggressive parents in seeking help for their enuretic child.

All parents chosen met the following criteria:

1.  One or both parents must be living at home with the enuretic child.

2.  The parents must have been administered the Bender Motor Gestalt Test within the last ten years.

The children selected met the following criteria:

1.  The child must be between the ages of 6 and 15 years of age inclusively.

2.  The enuretic child must have been examined medically and found to have no organic defect of the urinary system.

12

3.   The child must be living at home with one or both
     parents.

4.   The child must have been administered the <u>Bender
     Motor Gestalt Test</u> within the last ten years.

In addition, the case studies were taken from the
files of participants in the study.  These case studies
were written by the professional staff of the mental health
clinic and are presented in the words of the original
authors.  Thus, conclusions concerning the development and
maintenance of enuresis were based on observations made by
a therapist with whom this investigator has had no contact.

## CHAPTER II

### REVIEW OF THE LITERATURE

Successful management of the enuretic child has been a challenge for centuries and continues to be a problem despite the advances of modern research.  Many theories have been proposed and treatment plans implemented; however, only a few have had significant results.  The following survey of theories and research was designed to help the reader understand the enuretic child.

The growth of the child is a continuous process.  The movement of the child toward maturity involves a total mixture of many variables.  The solutions to problems of early childhood, positive or negative, exert an influence over the subsequent course of development.  Thus, when poorly adjustive solutions are reached in childhood, there will be difficulty in meeting similar situations in later years.

The underlying assumption of this chapter was that current research has neglected to fully look at the relationship between parent(s) personality and the development and maintenance of enuresis in their children.

The review of literature covers six areas which were relevant to this study:  (a) definition of enuresis, (b) incidence of enuresis, (c) clinical and emotional

classification of enuresis, (d) sleep and enuresis, (e)
theory and treatment, and (f) parents' personality and
enuresis.

## Definition of Enuresis

Although the literature on nocturnal enuresis is exten-
sive, there does not seem to be complete agreement as to how
it is to be defined.  Lovibond (1964) noted that any child
who wets the bed after the age of three or four years is
enuretic.  Yet, using age in defining enuresis is a definite
problem because bladder control depends on a variety of
factors (developmental tempo, training procedure, personal-
ity of child, etc.).  In addition, other factors such as
frequency of wetting must be included in a sound definition.
Young and Morgan (1972) defined a bedwetter as a child age
four years or older who urinates in bed at least two nights
per week.

Although the term enuresis is usually used for describ-
ing nighttime wetting only (nocturnal enuresis), some
investigators have included daytime wetting in their defi-
nitions.  Involuntary voiding both day and night is referred
to as diurnal enuresis.  Both of these terms are restricted
to persistent wetting, not to infrequent accidents due to
excitement or other temporary psychological stress.

Further difference is noted between primary enuresis
(a patient who since infancy has not been consistently dry

for at least one period of several months) and secondary
enuresis (a patient who has been consistently dry for at
least one period of several months and then relapses).
Bakwin (1961) stated that in one group of secondary enure-
tics there was demonstrable organic pathology, usually of
the central nervous system or genitourinary tract.  It has
been estimated that these cases comprise three to ten per
cent of all bedwetters (Lovibond, 1964).  However, in pri-
mary enuresis no definitive organic cause for the enuresis
has been found.  Most often psychogenic factors appear to
be the agent operating in primary enuresis (Ritvo, Ornitz,
Gottlieb, Poussaint, Maron, Ditman, & Blinn, 1969).

Yates (1970) noted that, contrary to the popular belief,
an organic factor involving the lower urinary tract had been
the cause of simple enuresis in ten per cent of enuretic
children.  However, Bindelglas (1974) indicated that, even
when genitourinary disease exists, other factors are in-
volved.  Thus, it seems that the definition of nocturnal
enuresis should include those children who suffer from
psychogenetic factors as well as organic factors.

It is doubtful that an absolute definition of nocturnal
enuresis can emerge until further research isolates the
causal factors.  It seems necessary to emphasize the need
to define enuresis within the framework of the culture in
which the enuretic child lives.  In Western societies, most
children are expected to stop wetting the bed by age three.

Thus, any child still nightly wetting the bed after age four, with or without organic defect, should be considered nocturnally enuretic.

## Incidence of Enuresis

Bindelglas (1975) quoted a review by Crosby (1950) to show an incidence of approximately 40 per cent of children at age 3, 22 per cent of children at age 5, 10 per cent at age 10, and 3 per cent at age 15. He also found 1 to 2 per cent enuresis at age 20. However, Bakwin (1961) and Yates (1970) both noted the following difficulties in establishing figures on the incidence of enuresis:

1.  There are differences in defining enuresis, principally as to the age at onset and the frequency of wetting.
2.  There are differences in the age groupings.
3.  There are differences in the source of material, whether from the general population or from child guidance clinics.
4.  There are differences in socio-economic status.

Hallgren (1957) indicated that the populations generally sampled are biased toward middle-income children or those who come to a clinic for treatment. Bakwin (1961) noted that middle-to-high income parents tend to look upon bedwetting as a mark of negligence, while poorer families in general take it as a matter of course. Thus, middle

and high income parents, motivated by the anxiety created
by their enuretic child, will usually seek help more often
than the lower-income parents and, thereby, find their way
into sample populations in disproportionate numbers.

Research indicated that males have a higher incidence
of enuresis than females. Blomfield and Douglas (1956)
found that the higher frequency of enuresis in males is
related to socio-economic status. Interestingly, their
study found a higher incidence of male enuresis to be sta-
tistically significant only in more prosperous families.

Consequently, established actual data concerning the
incidence of enuresis were not present at this time. How-
ever, recognizing that enuresis may affect 15 to 25 per
cent of children, it is definitely a problem that warrants
further research which will improve current treatment prac-
tices.

### Clinical and Emotional Classification of Enuresis

Enuresis has been distinguished from urinary inconti-
nence in which bladder control has been lost and the passage
of urine is automatic. The enuretic subject is aware of
bladder distention and can control its emptying, but with
greater difficulty than normal individuals (Bakwin, 1961).

Jones (1960) indicated that in most children night
wetting is frequently continuous from infancy. Indeed,
research has noted that children rarely remain dry for a

significant period of time and then lose their bladder con-
trol. However, in those who do revert back to wetting the
bed, emotional factors are usually the cause. In addition,
Crosby (1950) and Bakwin (1961) stated that both primary
and secondary enuretics usually wet repetitively right
through the night.

Most so-called normal, healthy children who have noc-
turnal enuresis have been shown to have small capacity
urinary bladders (Esperanca & Gerrard, 1969). This may
account for the common symptoms of urgency and frequqency.
Bindelglas (1974) indicated that children with urologic
abnormalities many times have the symptoms of frequent
urination and urgency. Varying degrees of urgency often
persist throughout life even after bedwetting has ceased
(Bakwin, 1961).

Research and writings of Mowrer and Mowrer (1938) indi-
cated that anxiety can act as a drive. Also, it has been
reported that urination may occur as the result of over-
excitement or some kind of fearful traumatic experience.
Thus, the symptom of urgency may also be the result of
overwhelming anxiety.

Some theorists have hypothesized that the anxiety the
enuretic child experiences because of faulty parent-child
interaction is repressed, and this anxiety may find expres-
sion in enuresis. Indeed, if the child has a small bladder
and has a faulty, anxiety-producing relationship with the
parents, enuresis is emminent.

Bindelglas, Dee, and Enos (1968) stated that neither the parent nor child is necessarily markedly neurotic or emotionally disturbed.  The child's emotional reaction to nocturnal enuresis is usually not extremely intense.  However, anxiety is noted concerning the stigma of being a bedwetter, problems in visiting peers, and fear that it will continue into adulthood.  Parental attitudes definitely seem to influence the child's emotional reaction.

Ritvo and his colleagues (1969) found from their observations that children with nocturnal enuresis are characterized by the presence of other neurotic symptoms, i.e., fire-setting, stealing, poor peer relationships, poor school adjustment, and day wetting.  These researchers also listed a history of sporadic wetting, anxiety, and other manifestations which suggest that the symptoms are ego-dystonic; too much parental concern and, perhaps, over-involvement with infantilization of the patients.  Ritvo, et al. further indicated that the most common incidence of wetting happens in the early morning just prior to arising.

It has been established that the emotional status of the child is affected by the general personality of the parent.  Thus, the work of Spitz (1949), Burlingham and Freud (1942), Goldfarb (1945), and Bowlby (1960) provided an avenue to link parental personality through emotional impact on the child to enuresis.

Children normally find outlets for emotional tensions as a means of coping with severe stress. Whether produced biologically, psychologically, or socially, this stress usually is released through physiological reactions. In many children these physiological reactions manifest themselves as physical ailments or other symptoms without underlying organic pathology (Lugo & Hershey, 1974). Thus, enuresis can be seen as a psychosocial somatic disorder.

Various faulty parent-child relationships may be the underlying factors creating such ailments. Anxiety over possible loss of parental acceptance may be seen in the "psychological crying" for nurturance by the asthmatic child (Lugo & Hershey, 1974). Enuresis, too, may be seen in the same light, in that it also may occur as a result of anxiety over possible loss of parental acceptance. Research noted that long term psychosocial somatic disorders exhibited by one child may also develop in other siblings.

Another faulty parent-child relationship noted by Lugo and Hershey occurs when a mother who is domineering and over-protecting restricts the child striving toward autonomy. The child, especially if a male and if his father is passive and dependent, may attempt to suppress his anger and hostility. Thus, the anger and hostility may manifest itself in a psychosocial somatic disorder (enuresis).

The importance of correctly diagnosing the disorders and removing the causes of extremely prolonged emotional stress is undeniable.  Lugo and Hershey offered four guidelines for hypothesizing that a child's ailment is psychosocial somatic rather than organic:

1.   The child's emotional state should match the illness.

2.   The child's present life situation should be studied.  If there is evidence of an unresolved problem, the kinds, severity, and extent of the ailment present may represent the psychological solution to the biological problem.

3.   There is repeated failure by the family doctor to cure the physical symptom because the excessive emotional stress remains unrelieved.

4.   Sincere efforts should be made to help the child with unresolved problems.  If this procedure does not work, a total-push effort should perhaps be started to make the child feel more wanted and loved.  If the symptoms become somewhat less aggravated, this alone could be a sign that the problem is a psychosocial somatic disorder.

It seems that the anxiety created by the parent-child relationship is repressed by the enuretic child.  The anxiety may inhibit bladder control, especially in those with

small bladder capacity, and result in the psychosocial somatic disorder of enuresis.

### Sleep and Enuresis

Often deep sleep is offered as a causal factor of enuresis.  Many investigators (e.g., Kales & Kales, 1974; Arnold & Ginsberg, 1973) suggested that due to deep sleep the enuretic child is less sensitive to bladder pressure which precedes reflex voiding.  Recent reports on all-night EEG monitoring of enuretic children have demonstrated that some children will indeed urinate while remaining deeply asleep.  However, Bindelglas (1975) reported that some enuretics showed signs of arousal prior to wetting and some enuretics were actually awake at the time of urination.  Noteworthy is that those children who were aroused or awake prior to the wetting showed evidence of other neurotic conflicts.

What we have traditionally called sleep is far from being a single, uniform state.  It consists of regularly alternating periods of rapid eye movement (REM), which are associated with highly distinctive physiological and psychological activity and the non-rapid eye movement (NREM) periods (Lowry, 1970).  Research has indicated that enuresis occurs when the child suddenly moves from deep (REM) to light sleep (NREM).  If the child is left wet, he may incorporate the wetness into an REM-period and in the morning

actually believe that the enuresis occurred while he was
dreaming (Kales & Kales, 1974).  This research explains
the incorrect notion that there is a one-to-one causal rela-
tionship between enuresis and dreaming.  In fact, research
gathered from the work of Forrester, Stein, and Susser
(1964) and Boyd (1960) stated that enuretic subjects did
not sleep more deeply than other children.

In conclusion, it seems that deep sleep and dreaming
and not directly responsible for enuresis.  In fact, the
research appears to support the hypothesis that enuresis
in most children is the result of emotional conflict.

### Theory and Treatment of Enuresis

Almost as many hypotheses as methods of care have been
proposed to explain why children wet the bed (Bakwin, 1961).
Investigators have attributed enuresis to a pregenital form
of sexual gratification to be replaced later by nocturnal
emissions in adolescence, immaturity with references to
bladder control, unconscious resentment against parents,
urinary abnormalities, and a number of other conditions.

Glicklich (1951) reported that some researchers have
noted other neurotic trends present with enuresis.  Nail-
biting, thumb-sucking, temper tantrums, speech impediments,
eating problems, and enuresis are noted in the research as
traits which tend to occur more often in combination than
alone.  It has been hypothesized that these traits are the

child's unconscious wishes to return to a more infantile
state.

Psychoanalysts have reported enuresis as a form of
urethral eroticism and have associated it with the tendency
to repress infantile sexuality in our culture (Bindelglas,
1975). Glicklich (1951) and Bakwin (1961) quoted Gerard's
studies in which she found that there is a difference in
personality and motivation of the male as opposed to the
female enuretic child. She described the male behavior as
a fear of women, who were seen as threatening figures. To
overcome this fear, the male child employs a mechanism
whereby he identifies himself with the female by assuming
the role of a passive individual who avoids the active male
role. Urination is considered by the male as a passive act.
Noteworthy is that in Gerard's studies the mothers were
basically very cold and rejecting toward the male enuretic
child.

An analysis of Gerard's work indicated that enuretic
females had a fear of man as a destructive aggressor. They
identified with the active male rather than with the passive
female. Thus, urination represents a passive flow in the
male and an active aggressive process in the female.

According to Bakwin (1961), Gerard hypothesized that
enuresis acts as a substitute for masturbation, associated
in the female with fantasies of activity, in the male with
fantasies of passivity. Gerard attributed the cessation

of enuresis at puberty to the growth in sex interest and, consequently, the frequent practice of masturbation at this age period, thereby eliminating the need for the substitute activity of enuresis.

Inherent inferiority of the urinary system is offered as an explanation of enuresis by the Adlerian school. This enables the child to obtain a variety of goals, parental affection, and care through the night and removes attention from rival sibling(s). It has secondary gain in that it relieves the child from certain responsibilities as well as allows him to regress to the uninhibited behavior of infancy (Glicklich, 1951).

Although Jones (1960) cited research that suggests contradiction as to the causative factors of enuresis, Bindelglas (1975) stated that by far the most commonly accepted causative factors are psychological or emotional problems.

After reviewing studies which appeared in the Psychological Abstracts between 1929 and 1961, Lovibond (1964) concluded that the effectiveness of psychotherapy in the treatment of enuresis still results in many unanswered questions.

Esperanca and Gerrard (1969) reported that most children who have nocturnal enuresis have small capacity urinary bladders. Because bladders are small, these children

tend to pass urine more frequently during the waking hours
than do their normal dry counterparts.

In considering possible explanations for the small-
capacity bladder, two seem plausible.  The first is that
the anomaly is developmental, in which case no treatment
other than encouraging the child to stretch his bladder by
voiding as infrequently as possible, is likely to be suc-
cessful; and the second is that the small capacity is due
to spasm of the smooth muscle in the bladder wall (Esper-
anca & Gerrard, 1969).

Muellner (1960) supported the theory of small bladder
capacity and noted specific steps that a child must go
through to achieve adult control.  Muellner's steps are
as follows:

1.  The child must perceive stimulation arising from
    increasing bladder tension.  These sensations
    result from the maturation of parasympathetic
    nerves which carry bladder sensations.  Such per-
    ceptions occur between the ages of one and two.

2.  He must be able to hold urine briefly when the
    bladder is full, which is accomplished through
    the control of the levator ani and its pubococcy-
    geus.  This stage is reached by the time a child
    is three years old and is improved as day control
    becomes well-established.

3.  He must develop the ability to start the urine
    flow from a full bladder.  This comes about through
    the interplay of the thoracic diaphram and the
    abdominal musculature and is completed by age three
    to four.

4.  He must be able to start the urinary stream from a
    bladder that is less than full.  This is accom-
    plished through the coordinate use of the thoracic
    diaphragm, the abdominal musculature, and the leva-
    tor ani and pubococcygeus.  The child is usually
    six years of age·before reaching this level of
    development.

Muellner's treatment plan was focused at increasing bladder
size through discouraging voiding as long as possible after
the intake of fluid.

Some research indicated that enuresis starts from
faulty toilet-training practices or other causes and then
persists as a habit, even though the original cause no
longer exists (Bingelglas, 1974).  Ferster (1968) noted that
support for the theory of habituation comes from the treat-
ment of enuresis based upon the learning principles of
classical and operant conditioning.

The first attempt to use the method of direct condi-
tioning was done by Mowrer in 1938.  Basically, this condi-
tioning apparatus provides an alarm system which is designed
to wake the child at the onset of urination.  This device

consists of pads containing electrodes, which are placed in the genital region, and a bell or light or buzzer as an alarm system.  When urine contacts the pad on which the child is lying, the bell (alarm system) is activated and thereby awakens the child.  The respondent conditioning diagram is as follows:

Bladder Tension                    Constriction of Sphincters
        Conditioned Stimulus──→ Conditioned Response
     Unconditioned Stimulus───────→ Unconditioned Response
Bell                                       Arousal Reaction

Bindelglas (1974) listed four disadvantages of this approach:

1.  The child has to sleep nude from the waist down with the pads attached.

2.  The noise and disturbance frequently will disturb not only the child's sleep but the sleep of the entire family.

3.  If the child is a deep sleeper, he will often continue to sleep while the rest of the family will be awakened.

4.  There is potential hazard of fairly marked burns in the area where the electrodes have been positioned in close proximity to the skin.  These burns have occurred when the child wet, but did not awaken to turn off the machine; the current

continues to flow and occasionally can produce
burns.  Such instances are rare, and this form
of treatment has been reported to be quite safe
and effective.

In addition to the use of conditioning therapy, chemotherapy
has been shown to be of benefit to the child with enuresis.

The literature is full of various kinds of drugs that
have been used to help eliminate enuresis.  Amphetamines
have been used to lighten sleep, anticholinergic drugs like
Belladonna, Atropine, and Propanthelime have also been used
with relatively little success.  Today, the most widely
used drug in the treatment of enuresis is Imipramine HCL
(Tofranil).  The use of Imipramine HCL in the treatment of
enuresis dates back to 1960, when MacLean, in a brief, un-
controlled study, reported it to be effective in relieving
nocturnal enuresis in children (Bindelglas, 1974).  Many
controlled studies have been reported and Imipramine HCL
has proven to be effective.  Bindelglas (1974) stated boldly
in his journal article, "Healing the Enuretic Child," that
when Imipramine HCL is used properly, it is one of the most
effective means available for treating enuresis.

Imipramine HCL and conditioning therapy at present
seem to be the most successful forms of treatment for enu-
resis (Bindelglas, 1974).  Bindelglas also placed emphasis
on the fact that the treatment of enuresis should focus on
the attitudes of the enuretic child and the attitude of

his family.  In some cases the parents and child are resis-
tant to treatment and have an apathetic attitude about the
enuresis.  It should be noted that Bindelglas recomended
that in such cases it may be best to do nothing about the
enuresis.  Conditioning therapy is recommended if there is
a bias against medication, provided they do not live in
cramped housing.  In his closing, Bindelglas (1975) added
these words of caution:

> It should be remembered that because enruesis
> is a complex condition, one should neither be
> dogmatic about its etiology nor rigid in treat-
> ment approaches, but rather should tailor the
> treatment as an individual prescription to the
> particular child's needs.  (p. 380)

Regardless of the theoretical position or treatment
plan implemented, most investigators recommended counseling
with the parent about their behavior and relationship with
the enuretic child.  Bakwin (1961) felt the first step in
treatment of the child with enuresis should be an explana-
tion to the parents of the complex nature of the disorder.
Bakwin further warned that scoldings, shamings, threats,
and punishments are generally useless.  The parent instead
should incorporate the attitudes of being helpful and coop-
erative.  An attempt should be made to neutralize any ten-
sions between parent and child that may surround this
symptom (Bindelglas, 1974).

Although there may be different causal conditions for
enuresis, most therapists believe that enuresis is in most

cases a manifestation of emotional disturbance.  Whether
the enuresis is caused by the behavior and/or attitude of
the parent(s), playmates, general environment, the child
or a combination of, is still debatable.

Each type of treatment has had its disciples and its
successes, but enuresis remains a significant problem.  It
appears that the treatment of enuresis has been disappoint-
ing due to the lack of definite knowledge concerning its
etiology and pathogenesis.

### Parent Personality and the Enuretic Child

If personality is the sum of an individual's character
traits, attitudes, and values, many of which have been taken
from those closest to us, the personality development of the
child may be expected to have been influenced by the parent
(Johnson & Medinnus, 1969a).

A number of studies noted similarities between parents
and children as to the nature of personality disturbances.
The origin of these similarities are unknown.  Most person-
ality theorists believe that each individual's personality
is directly influenced by childhood.  One may theorize per-
sonality disturbances are the result of the child modeling
his behavior after the parents.  One may also theorize the
parent's behavior toward the child, dictated in part by
his own unresolved psychological needs, in turn, produce
like disturbances in the child (Johnson & Medinnus,

1969a).  They related the following case study to support
their position:

> Tom, age six, was referred because of enuresis,
> and this was the behavior which concerned the
> mother most.  The interviews finally brought
> out that the mother had been enuretic until she
> began to menstruate, that . . . "people used to
> kid me about it."  The mother recalled in this
> context that as a child she had been so afraid
> that she would wet the bed, she would lie awake
> for long periods of time disturbed over possible
> bedwetting.  (p. 378)

Contrary to common belief that it is only overt child
rearing practices that influence personality development in
the child, there is evidence that less tangible factors
such as the personality of the parent, are of major impor-
tance (Johnson & Medinnus, 1969b).

How parents meet or frustrate a child's early depend-
ency needs will determine how long they continue.  Thus, if
parents strongly, because of their own needs, reward depend-
ent behavior and thereby prevent or discourage achievement-
oriented (independent) behavior, dependency will continue.
On the other hand, frustration of the infant's needs for
dependence might intensify the need for dependency.
Researchers have documented that mothers who punish their
children for dependency through rejection and the with-
drawal of love observed an increase of dependency with
their children.  Johnson and Medinnus (1969a) claimed such
rejection stimulates the child to win parental attention,
which may take the form of refusal to eat, refusal to

talk, temper tantrums, <u>bedwetting</u>, and other attention-getting behaviors.  In consideration of the data presented, enuresis can be seen as an emotional response of dependency which is a manifestation of feelings of insecurity in the parent-child relationship.

One important challenge for research is to determine the exact mechanisms through which parental personality affects the personality of the enuretic child.

In consideration of the material presented in this chapter, enuresis remains a significant problem.  Attitudes toward the etiology and treatment of enuresis have tended to follow the medical opinions and fashions of the particular ages.  Today, enuresis is variously attributed to genitourinary tract pathology, sleep disturbances, neurologic disturbances, and psychologic problems.

Bindelglas (1974) stated that enuresis is a symtom--like a cough--that can have any of a variety of causes.  Thus, enuresis should be considered a complex condition and one should form a treatment plan tailored to meet each individual's need.  In addition to treating the child, the parents should also be included as a major part of the treatment plan.

CHAPTER III

METHODS AND PROCEDURES

This descriptive study was designed to determine
whether or not enuretic children have a high tendency to
manifest specific personality traits which are similar to
their parents.  Further, the study attempted to determine
whether children who were enuretic tended to have similar
clinical symptoms as their parents, and whether the clinical
symptoms tended to be the result of the relationship be-
tween specific personality traits of the enuretic child and
specific personality traits of their parents.

## Population

The population used for this study consisted of all
enuretic children and their parents who had been adminis-
tered the Bender Motor Gestalt Test within the last ten
years.  The population was drawn out of the inactive out-
patient files at a local child mental health clinic.  This
population was comprised of 20 families.  The number of
male and female enuretic children and their participating
parents used in the study is presented in Table 1.  Several
different racial and economic groupings were represented,

TABLE 1

FREQUENCY AND SEX OF ENURETIC CHILDREN
AND THEIR PARTICIPATING PARENTS
USED IN THIS STUDY

| Enuretic Children | | Frequency | Parents | | Frequency |
|---|---|---|---|---|---|
| Male | | 14 | Male | | 9 |
| Female | | 6 | Female | | 20 |
| | Total | 20 | | Total | 29 |

"white" with below-average income having the largest representation.  The demographic data are reported in Appendix A.

### Selection of Subjects

All enuretic children and their parent(s) who had had a Bender Motor Gestalt Test administered over the last ten years were selected from the inactive out-patient files at a major Phoenix metropolitan area child mental health clinic. During the past ten years, there had been numerous adults and children tested.  One of the most common diagnostic tools used was the Bender Motor Gestalt Test.

The guidlines used in the selection of subjects were as follows:

1.    The children had to be between the ages of 6 and
      15 years of age inclusively.

2. The enuretic children must have been examined medically and found to have no organic defect of the urinary system.

3. The enuretic children must be living at home with one or both parents.

4. The enuretic children must have been administered the Bender Motor Gestalt Test.

5. The parent(s) of the enuretic children must be living at home with their enuretic child.

6. The parent(s) of the enuretic children must have been administered the Bender Motor Gestalt Test.

This investigator found 192 inactive out-patients who were enuretic out of a total of 1,272 cases. Thus, approximately 15 per cent of the mental health clinic's out-patients were enuretic. Of the population of enuretics, 20 cases met the guidelines noted above. This was approximately ten per cent of the population of enuretic children.

## Data Collection

With the assistance of the director of the mental health agency, the experimenter requested permission to review the existing inactive out-patient files over the last ten years. The charts of all enuretic children and their parent(s) who had had a Bender Motor Gestalt Test administered were selected from the files.

The <u>Bender Motor Gestalt Test</u> reproductions of the children and their parent(s) were assigned a number and at no time were names associated with these numbers.  The subjects' <u>Bender Motor Gestalt Test</u> reproductions were rated by three of the mental health agency's certified psychologists on the predominance of the following specific personality traits:  (a) independence, (b) dependence, (c) passiveness, and (d) aggressiveness.

The predominance of each trait was rated from a low of "1" to a high of "5."  The certified psychologists were not given any information as to who the authors of the <u>Bender Motor Gestalt Test</u> reproductions were.  The psychologists were given only data describing the subjects' age and sex.

In order to ascertain reliability among judges, Ebel's interclass correlation for interrater reliability was computed for each specific personality trait.  A coefficient of .60 was considered significant in this study.  The data obtained were analyzed and shown graphically.

Since each subject had had a complete social history, family history, and psychological report; clinical analysis of that data was also reported.

Instrumentation

The instrument used in this study was the <u>Bender Motor Gestalt Test</u> and had been administered to all subjects selected for this study.  The Benders were rated by three

certified psychologists to determine the predominance of specific personality traits.

The Bender Motor Gestalt Test was devised by Lawretta Bender (1938) for the purpose of providing an index of perceptual motor maturation. She believed that measurement of this type of maturation could be accomplished by the use of patterns with different degrees of complexity and organizational principles (Appendix B).

These patterns with their varied contours, degrees of complexity, and line qualities have been used in series to study the integrative state of the organism at different levels of maturation and in different organic and functional disorders. The Bender Motor Gestalt Test has been related to maturation, mental functions, learning problems, organic disorders, and emotional disturbance.

Clinical and research data reported by Hutt (1960), Koppitz (1960), and Zolik (1958) support the position that interpretive hypotheses regarding pressure, stroke, or line characteristics, size, etc. generally apply to both projective drawings and Bender Gestalt reproductions. To these interpretive hypotheses are added those associated with unusual modes of reproducing the Bender and those related to each specific Bender stimulus figure.

Pascal and Suttell (1951) attempted standardization and quantification of the Bender Motor Gestalt Test on adult and child populations. On the basis of the drawing

errors that significantly differentiated between matched
samples of normals and abnormals, a relatively objective
scoring key was developed.  Cross-validation of this key
on new samples of 474 normals, 187 neurotics, and 136
psychotics yielded data that clearly differentiated the
psychotics and neurotics from the normals.  Goldberg (1957),
in a later study with small groups of children, found that
the Bender Motor Gestalt Test significantly distinguished
normals from schizophrenics and mental defectives.

Retest reliabilities of .70 were found in normal sam-
ples over a period of 24 hours.  Scorer reliabilities of
.90 were reported for trained scorers.  Although a vast
amount of research has been reported on the Bender, the
normative sample is rather restricted geographically, edu-
cationally, and in other ways.  Extension and revision of
the norms on the basis of a larger and more representative
sample would be desirable.  Further, checking of validity
in different samples and against other criteria would like-
wise be of interest.

Research is slowly accumulating which supports the
view that one's body image itself is a perceptual motor
gestalt which will be reflected in all perceptual motor
experiences including those evoked by the Bender Motor
Gestalt Test.  For a more detailed orientation, the reader
is referred to Bender's original monograph.

40

The <u>Bender Motor Gestalt Test</u> has served a number of clinical purposes.  It may provide information not always obtainable from other clinical instruments, especially from those which rely heavily on verbal abilities.  It has been extremely useful in cases where emotional factors may be suspected of masking and/or inhibiting learned behavior. Thus, when verbal habits tend to hide psychological diffi- culties, the Bender has proven to be very useful in teasing out the emotional state of the individual.

Finally, the widespread usage of this test for diagnos- ing fixations at the oral and anal periods of personality development and personality changes due to maturation, changed environment, or parent training procedures should be emphasized.

## Data Analysis

The <u>Bender Motor Gestalt Test</u> and the clinical infor- mation obtained from the subjects' charts were used to elicit the data for the tests of six investigative expecta- tions.  The first three expectations stated that enuretic children have similar specific personality traits, parents have similar specific personality traits, and enuretic children have similar specific personality traits as their like-sex parent.  The data obtained from the ratings by the three certified psychologists on the Bender were analyzed and shown graphically to determine whether these expecta- tions were valid.

41

The fourth, fifth, and sixth expectations stated that
enuretic children have similar abnormal symptom-habits,
parents have similar abnormal symptom-habits, and enuretic
children manifest similar abnormal symptom-habits as their
parents.  The psychological and personal data analyzed from
the clinical charts in the words of the original
authors.  These data were analyzed and reported to determine
if these expectations were present.  In addition, the 14
questions noted in the statement of the problem were answered
in conjunction with the investigative expectations.

CHAPTER IV

RESULTS AND DISCUSSION

This descriptive study investigated the clinical rela-
tionship between specific personality traits and abnormal
symptom-habits of 20 enuretic children and their participat-
ing parents.  Six investigative expectations were tested by
use of graphic representation of ratings obtained from
Bender Motor Gestalt Test reproductions and the information
obtained from the clinical case studies of each family.  In
the first three expectations, the ratings from the Bender
Motor Gestalt Test were used to investigate the relation-
ship between specific personality traits of enuretic chil-
dren, specific personality traits of participating parents,
and specific personality traits of enuretic children and
their participating parents.  The remaining three expecta-
tions were analyzed by use of the clinical case studies of
each family to determine whether enuretic children have
similar abnormal symptom-habits, parents of enuretic chil-
dren have similar abnormal symptom-habits, and whether
enuretic children have abnormal symptom-habits similar to
those of their participating parent(s).

## Results

The first three expectations of this study dealt with the question of the relationship between specific personality traits of enuretic children and participating parent(s). Since each trait was measured by ratings obtained from clinical observations of the Bender Motor Gestalt Test reproductions, Ebel's interclass correlation was used to measure reliability among judges. The coefficients for each specific personality trait as measured by Ebel's interclass correlation are presented in Table 2.

TABLE 2

COEFFICIENTS FOR EACH SPECIFIC PERSONALITY TRAIT
AS MEASURED BY EBEL'S INTERCLASS CORRELATION

| Personality Trait | Coefficient |
|-------------------|-------------|
| Independence | .73* |
| Dependence | .77* |
| Passiveness | .75* |
| Aggressiveness | .82* |

*significant at .60 level

The results of the ratings on the Bender Motor Gestalt Test reproductions of the enuretic children showed that male enuretic children were rated above average on the dependent

44

and passive characteristics; whereas on the aggressiveness
and independence characteristics, the male enuretic children
were rated below average.  The results of the ratings on the
Bender Motor Gestalt Test for male enuretic children are
presented graphically in Figure 1.



Figure 1.--Graphic Comparison of Male Enuretic Children on
     Selected Bender Motor Gestalt Test Characteris-
     tics

The female enuretic children were rated predominately above average on the passiveness, aggressiveness, and dependence characteristics.  The ratings on the independence characteristic was predominately below average.  The results of the ratings on the <u>Bender Motor Gestalt Test</u> for female enuretic children are presented graphically in Figure 2.



Figure 2.--Graphic Comparison of Female Enuretic Children on Selected <u>Bender Motor Gestalt Test</u> Characteristics

Case 2:16-cv-01159-SRB   Document 45-3   Filed 12/04/17   Page 61 of 421

46

The results of the ratings on the <u>Bender Motor Gestalt</u> <u>Test</u> reproductions of the participating parents showed that fathers were rated above average on the independence characteristic. Dependence, passiveness, and aggressiveness characteristics were rated below average. The ratings on the <u>Bender Motor Gestalt Test</u> reproductions for participating fathers are presented graphically in Figure 3.



Figure 3.--Graphic Comparison of Male Parents of Enuretic
        Children on Selected <u>Bender Motor Gestalt Test</u>
        Characteristics

The mothers were rated above average on the independence and aggressiveness characteristics. The ratings on the dependence and passiveness characteristics were predominately below average. The ratings on the Bender Motor Gestalt Test reproductions for participating mothers are presented graphically in Figure 4.



Figure 4.--Graphic Comparison of Female Parents of Enuretic Children on Selected Bender Motor Gestalt Test Characteristics

The last three expectations of this study were con-
cerned with the question of the relationship between
abnormal symptom-habits exhibited by the enuretic children
and their participating parent(s).  Specifically, expecta-
tion four stated that enuretic children have similar abnor-
mal symptom-habits.  The fifth expectation stated that
parents of enuretic children have similar abnormal symptom-
habits.  Expectation six noted that enuretic children and
their participating parent(s) have similar abnormal symptom-
habits.

Evidence of abnormal symptom-habits exhibited by the
enuretic children and their participating parent(s) were
taken from the information noted in the case studies.
These case studies are presented in Appendix C.

The analysis of the case studies revealed that the enu-
retic children had one predominate abnormal symptom-habit:
intense anxiety.  The most frequent abnormal symptom-habits
noted in the case studies of the enuretic children are pre-
sented in Table 3.  The analysis of the case studies indi-
cated that the participating parent(s) also showed anxiety
as the most frequently exhibited abnormal symptom-habits.
The most frequent abnormal symptom-habit noted in the case
studies exhibited by the participating parents are presented
in Table 4.

49

TABLE 3

FREQUENCY OF ABNORMAL SYMPTOM-HABITS EXHIBITED BY
ENURETIC CHILDREN AS NOTED IN THE CASE STUDIES

| Abnormal Symptom-Habit | Male N-14 | Female N=6 | Total N=20 |
|---|---|---|---|
| Intense anxiety | 11 | 4 | 15 |
| School adjustment problems | 7 | 5 | 12 |
| Temper tantrums | 9 | 2 | 11 |
| Poor peer relations | 8 | 2 | 10 |
| Dependency | 6 | 3 | 9 |
| Immaturity | 6 | 3 | 9 |
| Hyperactivity | 5 | 3 | 8 |
| Impulsiveness | 5 | 3 | 8 |
| Lying | 6 | 2 | 8 |
| Stealing | 6 | 2 | 8 |
| Nightmares | 6 | 1 | 7 |
| Headache | 2 | 3 | 5 |
| Vomiting | 3 | 2 | 5 |

TABLE 4

FREQUENCY OF ABNORMAL SYMPTOM-HABITS EXHIBITED BY
PARTICIPATING PARENTS OF ENURETIC CHILDREN
AS NOTED IN THE CASE STUDIES

| Abnormal Symptom-Habits | Fathers N=9 | Mothers N=20 | Total N=29 |
|---|---|---|---|
| Anxiety | 5 | 9 | 14 |
| Strict discipline | 3 | 8 | 11 |
| Inconsistent discipline | 3 | 7 | 10 |
| Explosive temper | 7 | 2 | 9 |
| Double messages | 2 | 4 | 6 |
| Mental illness | 0 | 6 | 6 |
| Over-protecting | 0 | 6 | 6 |
| Depression | 3 | 1 | 4 |
| Headaches | 2 | 1 | 3 |

## Discussion

The ratings on the Bender Motor Gestalt Test reproduc-
tions were designed to differentiate between specific per-
sonality traits present within enuretic children and their
parents.  Although the judges' ratings were statistically
reliable, this investigator noted that only 42 per cent of
the ratings corroborated with the psychological descriptions
of the subjects' personalities as observed in the case
studies.  Apparently the judges did not rate each trait
independently.  If the judges rated a reproduction high on
independence, the opposite personality trait, dependence,
was almost automatically rated equally low.  This appeared
to be especially true with the ratings on male and female
children's reproductions.  Consequently, this investigator
concluded that the Bender Motor Gestalt Test was too inher-
ently subjective and, thus, was not objectively sensitive
enough to completely tease out and differentiate between
each specific personality trait.  However, the ratings on
the Bender Motor Gestalt Test reproduction and information
gathered from the case studies did provide ample evidence
to warrant further investigation as to the interaction of
personality determinants between parents and their chil-
dren in the development and maintenance of enuresis.

The results of the ratings on the Bender Motor Gestalt
Test indicated that the male enuretic children predominantly

showed passiveness and dependence as dominant personality
traits.  This investigator observed that only 50 per cent
of the male children had fathers that participated in the
therapeutic milieu.  Also, of the participating fathers,
only one was rated above average as to the predominance of
aggressiveness.  Conversely, the mothers of the male chil-
dren were rated above average as to the predominance of
aggressiveness in 93 per cent of the cases.  Thus, conclud-
ing that the male enuretic children were passive and depend-
ent as a result of the lack of a forceful father figure, and
the presence of a dominant, aggressive mother figure appeared
logical.  After careful analysis of the case studies, this
investigator found that the majority of male enuretic chil-
dren did, indeed, overtly show passiveness and dependence.
However, aggressive acting-out behaviors such as temper
tantrums, poor school adjustment, sibling fighting, and
destruction of others' belongings were also observed.
Consequently, this investigator concluded that underlying
the veneer of passive-dependence, the male enuretic child
was in a state of anxious frustration.

The results of the ratings on the Bender Motor Gestalt
Test indicated that the female enuretic children were also
predominantly passive.  The case studies indicated that the
female and male enuretic children were similar.  The female
children exhibited temper tantrums, poor school adjustment,
etc. like that observed in the male children.  The parents

of the female enuretic children and the general home environ-
ment were also similar in design to that of the male enure-
tic children.  Consequently, the female enuretic children
also appeared to be in a state of anxious frustration.

The inadequate relationship between the children and
their parents appeared to be the major cause of frustration
in the children.  This investigator observed that in over
75 per cent of the case studies, the enuretic children were
diagnosed as suffering from unmet nurturance.

In consideration of the data presented, this investi-
gator offers the following clinical picture as an explana-
tion of how enuretic behavior develops.

The clinical data from the case studies revealed that
the fathers were less involved than the mothers with family
problems.  The fact that only 9 fathers out of 20 families
participated in therapy may be an indication of their low
level of involvement.  Also, 50 per cent of the fathers
that came for therapy felt that they did not need therapy.
The mothers were expected to control, discipline, and
generally take care of all of the children's needs.  Con-
sequently, the mothers expressed feelings of being over-
whelmed by the responsibilities of the home.  In an attempt
to control the children, the mothers either incorporated
strict discipline or became over-protective with their
children.  The fathers, when involved, almost always used
strict and harsh discipline as a means of control.  As a

result, the children lacked the nurturance needed or became overly dependent on his/her parent(s).

The children tended to react to the strict discipline and lack of attention with passiveness.  This was noted in the rating on the Bender Motor Gestalt Test and also within the data in the case studies.  However, the children's passiveness appeared to be only a surface trait and/or a psychological defense.  The results of the analysis of the case studies show temper tantrums, poor school adjustment, and pervasive anxiety to be present in the majority of the enuretic children (see Table 4, page 50).  Thus, it appears that enuresis is not an isolated illness, but rather an abnormal symptom-habit occurring as a result of a faulty parent-child relationship which created anxiety in the child.  This anxiety found expression in various abnormal symptom-habits, including enuresis.

In conclusion, the findings obtained from the ratings on the Bender Motor Gestalt Test reproductions and the findings obtained from the case studies gave evidence which suggested that there is a relationship between personality traits of enuretic children and/or their parents.  The data did show that enuretic children tended to react to over-control, strict discipline, and inconsistent child management with passiveness and anxiety.  The findings suggested that enuretic children, in an attempt to gain needed nurturance from their parents, incorporated regressive abnormal

Case 2:16-cv-01159-SRB   Document 45-3   Filed 12/04/17   Page 70 of 421

symptom-habits.  It seems that all of the abnormal symptom-habits exhibited by the enuretic children were a function of anxiety created by faulty parent-child relationships. The enuretic behavior was not an isolated illness; it appeared to be a regressive abnormal symptom-habit incorporated by the child in an attempt to gain nurturance from the parental figures.  Thus, the results of this study indicated that enuresis was a psychosocial somatic disorder.

CHAPTER V

SUMMARY, CONCLUSIONS, AND RECOMMENDATIONS

<u>Summary</u>

The purpose of this study was to investigate the clinical relationship between specific personality traits of enuretic children and specific personality traits of their parent(s).  In addition, the study was concerned with the relationship between abnormal symptom-habits exhibited by enuretic children and abnormal symptom-habits exhibited by their parent(s).

The population for this study was 20 families, selected from the inactive files at a major metropolitan child mental health center.  All enuretic children and their parents who had been administered the <u>Bender Motor Gestalt Test</u> within the last ten years were used in this study.  The population was comprised of 14 male and 6 female enuretic children. The population of participating parent(s) was comprised of 20 mothers and 9 fathers.  Although a variety of racial and economic groups were represented, white low-middle-class was the most frequent.  The age range of the enuretic children was from 7 to 15 years, with a mean age of 9.6.  The age range of the participating parents was from 25 to 53 years, with a mean age of 37.1.

The data were gathered from the ratings on the Bender Motor Gestalt Test reproductions and the case studies of each family.  Three clinical psychologists were asked to rate the Bender reproductions completed by the enuretic children and their parent(s) on the predominance of four specific personality traits:  independence, dependence, passiveness, and aggressiveness.  In addition, data were obtained concerning the presence of abnormal symptom-habits exhibited by the enuretic children and their participating parent(s) from the case studies.

The ratings on Bender Motor Gestalt Test reproductions were represented graphically to determine if there was any similarity between specific personality traits of enuretic children and/or their participating parent(s).  The case studies were clinically analyzed to determine if there was similarity between abnormal symptom-habits exhibited by the enuretic children and/or their participating parent(s).

Six expectations were considered.  Of the first three, the enuretic children were rated similar on the passiveness characteristic and the participating parents were rated similar on the independence characteristic.

The fourth, fifth, and sixth expectation dealt with the exhibiting of abnormal symptom-habits by the enuretic children and their participating parent(s).  The enuretic children and their parent(s) were found to have a variety of

similar abnormal symptom-habits, with intense anxiety being
the most frequent.

## Conclusions

The results of this study support the theoretical
assumption that there is a relationship between the per-
sonality traits of enuretic children and the personality
traits of their parent(s). However, the results did not
give enough evidence to support the position that parent(s)
with specific personality traits have a higher tendency to
produce enuretic children.

The etiology of nocturnal enuresis appears to be dif-
ferent with each individual. How a child will interpret
his or her environment, family and personal self, depends
on a host of variables. However, the results did indicate
that particular combinations of faulty parent-child rela-
tions had a tendency to produce enuresis as well as other
neurotic symptoms.

In this study the marriage relationship between the
parent(s) was almost always unhealthy. The majority of the
fathers were not involved to a large degree with the rearing
of the children. As a matter of fact, most of the fathers
were apathetic toward family matters. Consequently, the
mothers, in response to the fathers' apathy, appeared to
take control of the family. It seemed that mothers exhib-
ited unconscious resentment to their response at assuming

a dominant role with the family.  Thus, this anxiety and
resentment stemming from a faulty marriage seemed to find
its expression in inadequate child management.  Indeed,
rigid, restricting, dependency-producing and inconsistent
affection were qualities incorporated by the parent(s)
which this researcher believes was the underlying basis
for enuresis in the children.

The children appeared to react to their parents' rela-
tionship with pervasive anxiety and uncertainty.  Feelings
of not being wanted resulting from over-control appeared to
motivate and reinforce the child's enuresis.  Thus, attention-
getting behaviors such as temper tantrums, poor school ad-
justment, enuresis, etc. seemed to be regressive attempts
at gaining parental acceptance.

Enuresis, therefore, did not appear to be an isolated
disease or mental disorder.  It seemed to be one of many
symptoms which tended to surface whenever a child's emo-
tional nurturing needs were thwarted by hostile, over-
controlling, and dependency-producing parents.

In consideration of the present research, the treatment
of enuresis must be geared not only toward the child, but
also toward the parents.  Merely extinguishing the symptom
of nighttime wetting through the prescription of drugs
and/or conditioning therapy does not fully cure the prob-
lem.  In fact, the attention that the child obtains from
these therapeutic techniques may reinforce the enuresis.

Other symptoms such as temper tantrums, poor peer rela-
tions, etc. appear to have the same etiology as enuresis.
Therefore, merely attending to the symptom, enuresis, will
not totally cure the patient.  The therapist must go to the
original source of the problem, which is the parent-child
relationship.  Change must take place at the root of the
problem, not just on a single symptomatic level.  Thus,
there was strong indication that enuresis was a manifesta-
tion of a deeper, more complex, family conflict.

### Recommendations

The particular instrument and method used to measure
specific personality traits may not be sufficiently refined
to tease out all the elements necessary to make accurate
judgments concerning personality traits.  However, the con-
cept of personality traits affecting and possibly producing
emotional disorders is important and needs to be further
investigated in future studies.

The area of parent counseling as an important part of
the therapeutic milieu when working with emotional disorders
of childhood has previously been ignored and/or not empha-
sized.  Future studies in this area have much potential for
significant contributions toward understanding the effects
of the relationship between parent and child.

Future research should also examine whether enuretic
children and their parent(s) respond better to a particular

61

therapeutic approach.  In addition, studies are needed to
investigate whether families with one parent have a higher
potential for producing enuresis in their children.

This researcher notes that the use of projective tests
such as the Bender Motor Gestalt Test leaves much to be
desired.  The judging and interpretation of these tests are
so variable that the results are extremely questionable.
However, the use of case studies proved to be an excellent
means of collecting valuable data.  Thus, case studies
should be explored and used more frequently as a means of
investigation.

In conclusion, research geared at understanding the
parent's role in childhood disorders would not only contri-
bute to greater understanding of the childhood disorder,
but also has the potential of enhancing all family rela-
tionships.

**BIBLIOGRAPHY**

# BIBLIOGRAPHY

Arnold, S., & Ginzberg, A.  Enuresis:  Incidence and per-
    tinence of genitourinary disease in healthy enuretic
    children.  Urology, 1973, 2(4), 437-443.

Arnold, S., & Ginzberg, A.  Enuresis:  Treatment with imi-
    pramine.  Journal of American Medical Association,
    1974, 228(3), 289-290.  (a)

Arnold, S., & Ginzberg, A.  Radiographic and photoendo-
    scopic studies in posterior urethral valves in enu-
    retic boys.  Urology, 1974, 4(2), 145-154.

Bain, D. J. G.  A criticism of the use of tricyclic anti-
    depressant drugs in the treatment of childhood enuresis.
    Journal of Royal College of General Practice, 1973,
    23, 222-224.

Bakwin, H.  Enuresis in children.  Journal of Pediatrics,
    1961, 58, 806-819.

Baroff, G. S.  Bender-Gestalt visuo-motor function in mental
    deficiency.  American Journal of Mental Deficiency,
    1957, 61, 753-760.

Bernard, H. W.  Human development in western culture.
    Boston:  Allyn & Bacon, 1970.

Bindelglas, P.  (Letter)  Doctor Bindelglas replies.
    American Journal of Psychiatry, 1968, 2, 266-267.

Bindelglas, P.  Enuresis update.  Medical Challenge, 1974,
    6, 44-46.

Bindelglas, P.  Problems in family practice, the enuretic
    child.  Journal of Family Practice, 1975, 2, 375-380.

Bindelglas, P., Dee, G., & Enos, F.  Medical and psycho-
    social factors in enuretic children treated with
    imigramine hydrochloride.  American Journal of Psy-
    chiatry, 1968, 8, 1107-1112.

Blomfield, J. M., & Douglas, J. W. B.  Bedwetting:  Preva-
    lence among children aged 4-7 years.  Lancet, 1956,
    1, 850-852.

64

Bowlby, J.  Separation anxiety.  International Journal of
    Psychoanalysis, 1960, 41, 89-113.

Boyd, M. M.  The depth of sleep in enuretic school-children
    and in non-enuretic controls.  Journal of Psychosomatic
    Research, 1960, 4, 274-281.

Braithwaite, J. V.  Some problems associated with enuresis.
    Proceedings of the Royal Society of Medicine, 1955, 49,
    33-38.

Bransby, E. R., Blomfield, J. M., & Douglas, J. W. B.  The
    prevalence of bed-wetting.  Medical Officer, 1955, 94,
    5-7.

Burlingham, D., & Freud, A.  Young children in war-time:
    A year's work in a residential war nursery.  London:
    Allen & Unwin, 1942.

Campbell, D. T.  Experimental and quasi-experimental designs
    for research.  Chicago:  Rand McNally, 1963.

Clawson, A.  The Bender Visual Motor Gestalt Test for Chil-
    dren.  Kansas:  Western Psychological Services, 1968.

Cooper, M. A.  Imipramine, sleep and enuresis.  Journal of
    American Medical Association, 1974, 228(5), 569.

Cronbach, L. J.  Essentials of psychological testing.  New
    York:  Harper & Row, 1970.

Crosby, N.  Essential enuresis:  Successful treatment based
    on physiological concepts.  Medical Journal of Aus-
    tralia, 1950, 2, 533-543.

Davidson, J. R., & Douglass, E.  Nocturnal enuresis:  A
    special approach to treatment.  British Medical Jour-
    nal, 1950m 1, 1345-1347.

Esperanca, M., & Gerrard, J. W.  Nocturnal enuresis--
    Comparison of the effect of imipramine and dietary
    restriction on bladder capacity.  Journal of Canadian
    Medical Association, 1969, 101, 721.

Feldman, I.  Psychological differences among moron and bor-
    derline mental defectives as a function of etiology:
    I.  Visual-motor functioning.  American Journal of
    Mental Deficiency, 1953, 57, 484-494.

Ferster, C. B.  Behavior principles.  New York:  Appleton-
    Century-Crofts, 1968.

Forrester, R. M., Stein, Z., & Susser, M. W.  A trial of
      conditioning therapy in nocturnal enuresis.  Develop-
      ment of Medical and Child Neurology, 1964, 6, 158-166.

Frary, L. G.  A genetic study.  American Journal of Dis-
      turbed Children, 1935, 59, 557.

Gerrard, J. W., Jones, B., and others.  Allergy and urinary
      infections:  Is there an association?  Pediatrics,
      1971, 48, 994-995.

Glicklich, L.  An historical account of enuresis.  Pedia-
      trics, 1951, 8, 859-876.

Goldberg, F. H.  The performance of schizophrenic, retarded,
      and normal children on the Bender-Gestalt test.  Ameri-
      can Journal of Mental Deficiency, 1957, 61, 548-555.

Goldfarb, W.  Effects of psychological deprivation in
      infancy and subsequent stimulation.  American Journal
      of Psychiatry, 1945, 102, 18-33.

Hallgren, B.  Enuresis:  A clinical and genetic study.
      Acta Psychiatrica Scandinavica, 1957, 32, 114.

Hodes, C.  Enuresis:  A study in general practice.  Journal
      of Royal College of General Practice, 1973, 23, 520-
      524.

Hurlock, E. B.  Developmental psychology.  New York:  McGraw-
      Hill, 1968.

Hutt, M. L., & Briskin, G. J.  The clinical use of the
      revised Bender Gestalt Test.  New York:  Grune & Strat-
      ton, 1960.

Inhof, B.  Enuretics in child guidance.  Psychological
      Abstracts, 1957, Whole No. 8322.

Johnson, R. C., & Medinnus, G. T.  Child and adolescent
      psychology.  New York:  John Wiley, 1969.  (a)

Johnson, R. C., & Medinnus, G. R.  Child psychology.  New
      York:  John Wiley, 1969.  (b)

Jones, H. G.  The behavioral treatment of enuresis noc-
      turna.  In H. J. Eysenck (Ed.), Behaviour therapy and
      the neuroses.  Oxford:  Pergamon Press, 1960.

Kales, A., & Kales, J.  Sleep disorders.  New England Jour-
      nal of Medicine, 1974, 290(9), 487-499.

Kennedy, W. A.  Child psychology.  Englewood Cliffs, NJ:
    Prentice-Hall, 1971.

Kerlinger, F. N.  Foundations of behavioral research.  New
    York:  Holt, Rinehart & Winston, 1964.

Kimble, G. A.  Hilgard and Marquis, conditioning and learn-
    ing.  New York:  Appleton-Century-Crofts, 1961.

Kolvin, I., Taunch, J., Curran, J., Gorside, R., Nolan, J.,
    & Shaw, W. B.  A descriptive analysis and a controlled
    trial.  Developmental Medical Child Neurology, 1972,
    14, 715-726.

Koppitz, E.  The Bender Motor Gestalt Test for children:
    A normative study.  Journal of Clinical Psychology,
    1960, 16, 432-435.

Lowry, F.  Recent sleep and dream research:  Clinical impli-
    cations.  Journal of Canadian Medical Association, 1970,
    102, 1069-1077.

Lovibond, S. H.  Conditioning and enuresis.  New York:
    Macmillan, 1964.

Lovibond, S. H.  The mechanism of conditioning treatment of
    enuresis.  Behavior Research and Therapy, 1963, 1, 17-
    21.

Lugo, J. O., & Hershey, G. L.  Human development.  New York:
    Macmillan, 1974.

MacLean, R. E. G.  Imipramine hydrochlorida (Tofranil) and
    enuresis.  American Journal of Psychiatry, 1960, 117,
    551.

Mahony, D. T.  Treatment of enuresis.  Journal of American
    Medical Association, 1973, 226(8), 1010-1011.

McCandless, B. R., & Evans, E. D.  Children and youth:
    Psychosocial development.  Chicago:  Dryden Press,
    1973.

Morgan, J. J. B., & Witmer, F. J.  The treatment of enuresis
    by the conditioned reaction technique.  Journal of
    Genetic Psychology, 1939, 55, 59-65.

Mowrer, O. H., & Mowrer, W. M.  Enuresis:  A method for its
    study and treatment.  American Journal of Orthopsychi-
    atry, 1938, 8, 436-459.

Muellner, S. R.  Development of urinary control in children: A new concept in cause, prevention and treatment of primary enuresis.  Journal of Urology, 1960, 84, 714-716.

Muellner, S. R.  Primary enuresis in children.  Journal of Medical Science, 1963, 13, 707.

Munsinger, H.  Fundamentals of child development.  New York: Holt, Rinehart & Winston, 1971.

Mussen, P. H., Conger, J. J., & Kagan, J.  Child development and personality.  New York: Harper & Row, 1969.

Nigam, P., & Tandon, V. K.  Enuresis:  Its background and management.  Journal of Pediatrics, 1973, 40, 180-187.

Nilson, A., Almgren, D. E., Kohler, E. M., & Kohler, L. Enuresis:  The importance of maternal attitudes and personality.  Acta Psychiatric Scandinavia, 1973, 49, 114-130.

Pascal, G. R., & Suttell, B. J.  The Bender-Gestalt test: Quanitification and validity for adults.  New York: Grune & Stratton, 1951.

Pierce, C. M., & Lipson, H.  Clinical relationship of enuresis to sleepwalking and epilepsy.  Archives of Neurology and Psychology, 1956, 76(3), 310-316.

Pierce, C. M., Whitman, R. M., Maas, J. W., & Gray, M. L. Enuresis and dreaming:  Experimental studies.  Archives of General Psychiatry, 1961, 4, 166-170.

Ritvo, E., Ornitz, E., Gottlieb, F., Poussaint, A. F., Maron, B. J., Ditman, K. S., & Blinn, K. A.  Arousal and non-arousal enuretic events.  American Journal of Psychiatry, 1969, 126(1), 77-84.

Ritvo, E., Ornitz, E., LaFranchi, S., & Walter, R. D. Effects of imipramine on the sleep-dream cycle:  An EEG study in boys.  American Journal of Psychiatry, 1967, 126(22), 465-468.

Sheppard, W. C., & Willoughby, R. H.  Child behavior. Chicago:  Rand McNally, 1975.

Spitz, R. A.  Motherless infants.  Child Development, 1949, 20, 145-155.

68

Stockwell, L., & Smith, C. K. Enuresis: A study of causes, types and therapuetic results. *American Journal of Disturbed Children*, 1940, *59*, 1013.

Stone, L. J., & Church, J. *Childhood and adolescence*. New York: Random House, 1973.

Yates, A. J. *Behavior therapy*. New York: John Wiley, 1970.

Young, G. C., & Morgan, R. T. Overlearning in the conditioning treatment of enuresis. *Behavior Research and Therapy*, 1972, *10*, 147-151.

Young, G. C., & Morgan, R. T. Conditioning techniques and enuresis. *Medical Journal of Australia*, 1973, *2*, 329-332. (a)

Young, G. C., & Morgan, R. T. Rapidity of response to the treatment of enuresis. *Developmental Child Nuerology*, 1973, *15*, 488-496. (b)

Young, G. C., & Turner, R. K. CNS stimulant drugs and conditioning treatment of nocturnal enuresis. *Behavior Research and Therapy*, 1955, *3*, 93-101.

Zolik, E. S. A comparison of the Bender Motor Gestalt reproductions of delinquents and non-delinquents. *Journal of Clinical Psychology*, 1958, *14*, 24-26.

**APPENDICES**

**APPENDIX A**

TABLE A1

DEMOGRAPHIC DATA OF ENURETIC CHILDREN AND THEIR PARTICIPATING PARENTS
AS REPORTED IN THE CASE STUDIES

| Case No. | Enuretic Child | | | Participating Parent | Age | Parent Ethnicity | Economic Status |
|---|---|---|---|---|---|---|---|
| | Age | Sex | Ethnicity | | | | |
| 1 | 7 1/2 | Female | White | Mother | 28 | White | Below Average |
| 2 | 14 | Female | Mexican | Mother | 32 | Mexican | Average |
| | | | | Father | 36 | Mexican | |
| 3 | 7 | Female | White | Mother | 28 | White | Below Average |
| 4 | 7 | Female | White | Mother | 27 | White | Below Average |
| | | | | Father | 38 | White | |
| 5 | 8 1/2 | Female | White | Mother | 30 | White | Average |
| 6 | 13 | Female | White | Mother | 46 | White | Average |
| 7 | 15 | Male | White | Mother | 48 | White | Below Average |
| | | | | Father | 46 | White | |
| 8 | 10 | Male | White | Mother | 39 | White | Average |
| 9 | 7 | Male | White | Mother | 32 | White | Average |
| | | | | Father | 34 | White | |
| 10 | 12 | Male | White | Mother | 35 | White | Average |
| | | | | Father | 35 | White | |
| 11 | 9 | Male | Mexican | Mother | 50 | White | Below Average |
| 12 | 7 | Male | White | Mother | 53 | White | Average |
| 13 | 9 | Male | White | Mother | 44 | White | Below Average |
| | | | | Father | 47 | White/Indian | |
| 14 | 9 | Male | White | Mother | 30 | White | Below Average |
| | | | | Father | 25 | White | |

71

Table A1 - continued

| Case No. | Age | Enuretic Sex | Child Ethnicity | Participating Parent | Age | Parent Ethnicity | Economic Status |
|---|---|---|---|---|---|---|---|
| 15 | 8 | Male | White | Mother | 48 | White | Below Average |
| 16 | 9 | Male | Black | Mother | 32 | White | Below Average |
| 17 | 9 1/2 | Male | White | Mother | 29 | White | Average |
|  |  |  |  | Father | 32 | Black |  |
| 18 | 15 | Male | White | Mother | 42 | White | Average |
|  |  |  |  | Father | 47 | White |  |
| 19 | 8 | Male | White | Mother | 35 | White | Below Average |
| 20 | 7 1/2 | Male | White | Mother | 28 | White | Average |

**APPENDIX B**

## Instructions

Please rate the following Bender Motor Gestalt
Reproductions on the predominance of the following
personality traits:

      1.    Independence

      2.    Dependence

      3.    Passiveness

      4.    Aggressiveness

Please rate the specified personality traits present
within the Bender Motor Gestalt Test reproductions on a five
point scale.  The scale will be interpreted as follows:

      One    -  Very low

      Two    -  Below average

      Three  -  Average

      Four   -  Above average

      Five   -  Very high

Each trait must receive a rating.  Simply make a check
mark on the attached rating sheet for each personality trait
in the space provided.

The age and sex of each patient will be in the top left
hand corner of the rating sheet.

RATING SHEET



Independence

1    2    3    4    5

Dependence

1    2    3    4    5

Passiveness

1    2    3    4    5

Aggressiveness

1    2    3    4    5

## Bender Motor Gestalt Test

76



**APPENDIX C**

CASE NO.: 01                                                 78

W.G.

AGE: 7-1/2

SEX: Female

PERSONS PRESENT FOR INTERVIEW & THERAPY:

Mrs. G., the natural mother, and patient, W.

REFERRAL SOURCE & PROBLEM:

W. was referred here by Dr. M., her school psychologist, for

immature behavior verging on hyperactive behavior.  Mother

reports that W. is always "wound up" and throws frequent

temper tantrums at home.  Mother reports W. is also enuretic.

FAMILY CONSTELLATION:

Family consists of Mrs. G., the natural mother, age 28, P.,

age 2-1/2, and patient, W.  The father, Mr. G., is separated

from his wife and is living away from home.

MEDICAL & DEVELOPMENTAL HISTORY AS REPORTED BY PARENT:

During her pregnancy with W., Mrs. G. had several infections

and was very ill.  Two and one-half months before delivery, she

started hemorrhaging and had to be hospitalized.  W. was born

with instruments.  Right after her birth, W. pushed herself up

on her hands and ever since then has been pushing herself to

excel.  She walked at the age of 6 months.  Mother reports that

W. has always been very "keyed up".  At the age of three, she

would not go to sleep until after 11 at night.  Finally, in

desperation, mother took her to the doctor who put her on

79

W.G.

Page 2

tranquilizers but this did not seem to help.  Between the ages
of 2-1/2 and 3, W. would scream all night long.  Her eyes would
be open and it seemed as if she was awake, however, she could
never remember her behavior the day after.  After 8 months of
this behavior, she finally quit screaming but would often cry
at night.  At the age of three, W. became ill with chronic
nephritis.  She took cortisone for several months, but has not
had an attack of nephritis for about 18 months now.  Last
November, W. had rheumatic fever, and is presently taking pen-
icillin which she will have to take the rest of her life.  Every
two weeks or so W. has a migrain headache which is accompanied
by severe vomiting.  Mother reports that they seem to come at the
end of a day at home, or on a Monday morning.  These times are
usually after W. tries to be good.

W's behavior at home is very difficult for her mother to cope
with.  She has several screaming temper tantrums and mother
reports her to be very keyed up and nervous.  It seems as if the
child is all right when some one is with her constantly.  Mother
claims that W. demands more attention than any child she has ever
known.  W. is very hard to discipline and spanking never seems
to help her.  When she throws a temper tantrum, mother puts her
outside in the car and ignores her because she cannot put her
in a bedroom to ignore her for W's screaming would then bother
the neighbors.

W.G.                                                                  80

Page 3

W. is now in the second grade and has been in Phoenix for
about 6 months.  During the second grade at Phoenix she received
speech therapy at school.  Teachers describe W. as a cut-up and
a class clown but she has not been a severe discipline problem
in the classroom, according to mother.  W. does not know how to
play with other children and does not have any friends at school.
She apparently does very well in reading, being about 1 year
ahead of herself in reading, but is doing badly in math.

Mother thinks that W. is subsconsciously planning her temper
tantrums as a manipulative device.  The girl has had a lot of
trouble accepting her little brother.  Mother seems to think
that W. thinks of herself as being small and little, and that
she acts like a 4 year old rather than like a 7 year old.  She
seems to be jealous of little ones for the attention they get.

FAMILY HISTORY AS REPORTED BY PARENT:
Mr. and Mrs. G. are presently separated and are in the process
of getting a divorce.  They have declared bankruptcy and are
waiting for this to be taken care of.  Mrs. G. says that she
and her husband have always had difficulties in their marriage.
She describes her husband as a lot like W. -- that is, he gets
angry and throws fits.  Mrs. G. thinks that her husband was a
hyperactive child and she does not want W. to grow up like him.
W. does not know that her parents are separated.  She thinks

81

W.G.

Page 4

that her father is working out of town at the present time.
Mr. G. frequently comes to visit the family here in Phoenix.

PSYCHOLOGICAL FINDINGS:

W. is presently functioning in the average range of ability.
However, there is a great discrepancy between verbal scale IQ
score of 111 and the performance IQ score of 85.  It appears
that this may be partly due to some possible central nervous
system involvement.  This may be substantiated by looking at the
early medical history and the numerous difficulties that she
had both as an infant and in her later years too.  The Bender
response indicates that she probably has a difficult time inter-
personally and that there may be a combination of things causing
difficulties, including significant perceptual motor deficits,
particularly fine motor coordination.  Considering that erratic
performance and the great scatter among the WISC tests and the
fact that she repeated digits to herself both in the arithmetic
and the digit span, she seems to be erratic and trying to cue
herself as to how to respond.  It is recommended that an EEG
be considered as a possibility to determine the extend of any
possible central nervous system involvement.

CASE NO.: 02

S.A.

AGE: 14

SEX: Female

82

PERSONS PRESENT FOR INTERVIEW & THERAPY:

Mother, father, patient.

REFERRAL SOURCE & PROBLEM:

This is a self-initiated referral. S. is a slow learner. She
is now in the 7th grade and getting "4's" and "5's". She has
always received social promotions, and has never received good
grades. She appears to be somewhat depressed. The parents
feel she needs help with her learning habits. In addition, S.
is enuretic both day and night.

FAMILY CONSTELLATION:

Mother, age 32. Father, age 36. A., 13. E., age 12. R., age 10.

SOCIO-ECONOMIC STATUS:

Mr. A. is a maintenance linen worker. He earns between $9,000
and $10,000 a year.

SCHOOL HISTORY:

S. entered the first grade when she was six years old. Appar-
ently, she got along fairly well with her peers but she was
unable to do the school work. She had a poor memory and would
daydream. She had a great deal of difficulty concentrating.
The parents describe her at that time as being mildly hyperactive.
She had to repeat both first and second grades as she was unable
to do the work. She has never learned to read. Even now, in

S.A.

Page 2

what little writing she does, she reverses letters.  Since
repeating the second grade, she has been given social promotions
in school.  In spite of this, S. claims that she enjoys school.
The parents state that she has friends in her class.

FAMILY HISTORY AS REPORTED BY PARENTS:

Parents state that at home S. is very quiet and passive.  She
is very slow around the house and anything she does is done
slowly.  Even now, the mother occasionally has to bathe her in
order to get her out of the tub or she will sit in there for
three hours.  The parents state that the only thing she seems
to like to do is to dance.  She has a good ear for music.  It
appears that the mother tends to do things for S. and she
becomes very impatient when the girl takes so long.

The family has lived in Phoenix for the last three years.  They
have moved quite a bit, due to the father's attempts to get a
job.  Because of this, S. has been in many schools.

PARENTS HISTORY:

Mother - Mrs. A. has seven siblings.  She is the third youngest.
She states that her parents had 13 children, but five of them
died.  Mrs. A. describes her mother as being like S.  Both of
them like to stay at home.  She went on to describe her mother
as active, but not terribly bright.  She states that she is a
very hard worker and she describes her as being hyperactive.

S.A.

Page 3

She described her father as a very strict man who was very
quiet and non-verbal.  She was unable to discuss her parents
and appeared to begin to cry when doing so.  She did feel that
they had a good marriage.

Father - Mr. A. had five siblings.  He was the oldest.  He was
born and raised in Mexico and did not come to the United States
until he was 21.  He describes his family as very close and as
being full of fun.  He stated that his father was very strict.

Mr. and Mrs. A. have been married for 15 years.  They feel that
they have had a good marriage.  Mrs. A. feels that what problems
there have been in the marriage she has caused.  She describes
herself as being very nervous, and with a temper.  She screams
a great deal and crys easily.  Mr. A., on occasion, will become
drunk, and when he does so, he prefers to be by himself.  He
went on to state that people seem to feel that he is "mean", but
he does not understand this.  The parents also went on to state
that they also have some troubles with E., one of their sons
who is also a slow learner.  They feel, though, that he is much
more outgoing than S.

IMPRESSIONS:

S. is a very quiet, passive, depressed, 14-year-old girl.  She
was practically non-verbal during the interview, and often seems
to be moving in slow motion.  She was very uncomfortable when

S.A.

Page 4

her parents were discussing her.  It was also noted that her
nails were bitten quite short.

Mrs. A. is a very verbal woman, who appeared to be very nervous
and tense.  She described herself as being moody and she seems
to feel a great deal of guilt about this.  She often becomes
impatient with S. and probably with the other children.  There
is some indication that she tries to overprotect the girl and
probably gives her double messages in terms of expectations.

Mr. A. was much more quiet than his wife.  He spoke with a
noticeable Spanish accent, and seemed to have difficulty express-
ing himself in English.  He did not want to speak in Spanish,
as he stated that he needed to practice his English.  Apparently,
language has been difficult for him for a long time.

MEDICAL & DEVELOPMENTAL HISTORY AS REPORTED BY PARENTS:
S. was the mother's first pregnancy.  She states that it was
normal, but in the eighth month the mother suffered a minor
accident.  She was not injured.  Birth was at the full nine
months and it was completely normal.  Between the ages of one
year and nine years, S. has suffered from severe bronchitis
and enuresis.  At age two years, S. had a high temperature,
which caused her to have convulsions.  At age four she fell out
of a moving car and was injured.  At the present time, she
wears glasses and needs exercises for her eye muscles.  Recently

S.A.

Page 5

she has complained of dizziness.  She says that she hears a
buzzing in her right ear, and she often smells smoke with no
fire.  Her gross and fine motor coordination appear to be
rather poor.  The parents describe frequent lapses in conscious-
ness.

S. learned to walk at age one year, three months.  She talked
in words at age two years, but did not talk in sentences until
age seven.  At home the family speaks basically Spanish, but
all of the children speak English.  The father appears to be
the only member of the family with some problem in speaking
English.

PSYCHOLOGICAL FINDINGS:

S. was brought to this agency by her parents because of very
poor academic performance; this girl repeated the first two
grades of school and apparently has never done adequately in
academic work.  Her parents were also concerned about her slow-
ness at home.  The test results indicate that currently, this
girl is functioning in the mildly retarded range, with a signi-
ficantly lower performance in the Verbal area.  Achievement
test scores show that she is functioning 4 to 5 years below her
current grade placement and this performance would be even
poorer if she were compared with other children of her chron-
ilogical age.  There are several indications that this child
does not have some organic impairment.  This child does seem

S.A.

Page 6

to be aware of her limitations and it is likely that she
experiences anxiety and depression in relation to this.  I
think that it would be important to work with the parents and
school in making some plans for this girl probably to get some
kind of vocational training and take her out of the regular
classroom, where it is unlikely that she can experience any-
think but failure.  I would see working with the parents to do
some concrete planning for this child as the major goal at
present.

CASE NO.: 03

F.B.

AGE:  7

SEX:  Female

88

## PERSONS PRESENT FOR INTERVIEW & THERAPY:

Mother, grandmother, and F.

F. is an attractive looking youngster who clung to grandmother
during much of session.  I noticed that grandmother seemed more
relaxed and comfortable with her than did mother, who did most
of the talking.  Grandmother is a short, obese, red haired
woman with very white skin.  Her daughter is taller and darker
and spoke incessantly without any change of expression.

## REFERRAL SOURCE & PROBLEM:

Mother comes here because of difficulty with F. but it sounds
as though everyone of the immediate and extended family have
problems and are in need of help.  It is unclear as to why F.
has been selected out or why help is being sought at this time.
Difficulties have obviously existed for many years.

Present problems are as follows:  Family moved from Connecticut
in January of this year and F. has been doing poorly in school
ever since she was enrolled here.  Mother believes she can do
the work if she wants to but she just won't try.  In addition,
F. has temper tantrums, has threatened to kill or beat up her
younger brother, age four.  She steals from stores, lies, and
has had periodic bed wetting and thumb sucking and has problems
almost all the time with insomnia.

F.B.

Page 2

Mother relates the onset of many of these symptoms to the bad
influence of father from whom she separated when F. was two
and a half.  She said that he was never any good, ran around
with other women, and she had to work to support the family.
He used to stay home minding F. and his way of handling her
was to put her to bed and let her stay there, often without
giving her food.  Mother thinks this is why F. can't stand bed
now and has such difficulty sleeping.  On occasion they would
hire a babysitter, a fifteen year old girl, and mother is
pretty sure that father would pay the babysitter by sleeping
with her, probably doing this in front of F.  I gathered that
father had been engaged in criminal activity most of his life.
He had gone to prison for six months when F. was one month old.
Among other things he used to shoplift and mother considers
it quite likely that he taught F. to do this.  After separating
from him mother lived with her mother who later took in her
brother's four problem children for a period of time.  Evidently
brother's wife had taught these children to steal and the boys
were a bad influence on F. who started bedwetting soon after
their arrival.

<u>FAMILY CONSTELLATIONS</u>:

Living in the household now are the following people:

    Mother, age 28.

    Our patient, F.B., age 7.

    Brother, T.B., age 4.

90

F.B.

Page 3

    Maternal grandmother, E.E., age 46.

    (Mother's sister, G.E., age 19, mentally retarded).

    Uncle (mother's brother) W.E., age 23, just separated

        from wife.

    Cousin, D.E., age 2.

    Grandmother's sister, N.T., age 60.

All eight family members occupy a one bedroom cottage at a
motel unit.  Until last week they had spread out into a camper
but this was confiscated because of nonpayment of monthly
charges.

SOCIO-ECONOMIC FACTORS:

Family owes at least $1,200 to various loan companies.  They
have no regular source of income except what is given to them
by N.T., who sold her home in Connecticut to join them.  Proceeds
from this sale together with small savings and her VA and Social
Security Allowance are all she has, and trying to provide for
eight people is "running her down."  They are staying in the
motel free of charge because a male friend of Mrs. B's owns the
place.  However, she indicated that the motel manager hates
them being there and is already creating trouble.

FAMILY HISTORY AS REPORTED BY PARENT:

The family moved here from Connecticut for health reasons.
Grandmother suffered from asthma.  She is also very obese and
is trying unsuccessfully to lose weight.  Mother has several

91

F.B.

Page 4

medical problems also.  She hasn't had a period for nine
months and may require a hysterectomy.  Currently she is under
the care of Dr. C. and we have her permission to obtain records
from him.  Mother says that her medical problems prevent her
from working.  She described herself as an exotic dancer and
photographer's model and says that if she were well she would
be working in Las Vegas now earning good money.  She used to
dance in New England states and has a reputation (and papers
to prove it) as one of the best dancers of the east.  Since
arrival here she started to get work although physically didn't
feel up to it.  In point of fact, she may have real problems in
getting a job as she is not too attractive and she admits her
legs are flabby and out of shape.

Mother also expressed concern about G., the nineteen year old
retarded aunt who was recently raped by six men (I'm unclear
as to whether this was reported to the police.)  G. gets
occasional jobs babysitting and making and selling flowers but
she needs something to do on a day-to-day basis.  She was in
a training school in Connecticut and they would like something
similar for her here.  Uncle is just back from Viet Nam.  His
"psycho" wife has just left him, leaving the child, D., in his
care.  He is currently looking for work but hasn't found any-
thing and may decide to return to Connecticut where he knows
he could get a job.

92

F.B.

Page 5

To add to their problems, the camper they bought new to travel
out here is now falling to pieces. While there were in the
process of getting a lawyer to sue the dealer in Connecticut
the camper was confiscated for nonpayment of charges. As one
might anticipate, the family neglected to obtain a guarantee of
sale from the deal and any proceedings will be difficult.

I sensed that mother had some difficulty discussing her own
childhood in front of her mother. She related that father drank
and was rarely home and that she had developed "psychosomatic
problems" and wouldn't go to school. I can't remember if she
gave details of these. In any event, her mother placed her in
a foster home from age thirteen to age sixteen and then in a
school from age sixteen to eighteen. It was here that she met
her husband. At the time she said she believed the school was
for unwanted and unloved children and said for a long time she
had "communication problems" with her mother. She didn't think
her mother loved her. Now this is all cleared up and they
have a good understanding. In response to my general question
about the effectiveness of foster homes she quickly related it
to F. and said she wouldn't want her to be placed.

INITIAL IMPRESSIONS:

This sounds like a family of character disorders with extensive
and, probably for the most part, untreated pathology. The three

93

F.B.

Page 6

young children in the home are currently at risk and a plan of care for the entire family needs to be instituted. Target areas will include health (medical and psychological), vocational, financial, and residential, and we shall need to draw in other appropriate agencies. For example: schools, hospitals, Department of Welfare in providing care. It should be noted however, that the family has been in the state for less than a year and may not be eligible for many welfare benefits.

CASE NO.:  04                                                    94

K.G.

AGE:  7

SEX:  Female

PERSONS PRESENT FOR INTERVIEW & THERAPY:

Total family.

REFERRAL:

Referred by several family service agencies because of parent's
concern that the child doesn't talk the way she should.

FAMILY CONSTELLATION:

Mrs. G., 27.  Mr. G., 38.  K., 7.  P., 5.

FAMILY FINANCES:

Father is a cook, $4,800.

MEDICAL HISTORY AS REPORTED BY PARENTS:

Mother had had kidney trouble before pregnancy, could not become
pregnant, osteopath did a uterus suspension operation and felt
that she was not healed inside at the time she became pregnant.
She developed a kidney infection, had a lot of medication, does
not know what kind.  It was a forceps delivery, the cord was
wrapped around twice and had to be cut before the head would
come out.  The child had some bruises on her forehead and a
knot on her head.  When she was two, she had 102° temperature
with a convulsion described as a grand mal seizure, and mother's
youngest sister has had epilepsy.  E.E.G. done through a child
development agency.  This was normal.  Since then the mother
describes the child as having, in general, unusually good health.

K.G.

Page 2

Since the previous agency did a very thorough history, this
interviewer will stick to the current situation.

Father works 11:30 a.m. to 8:30 p.m. so he therefore sees the
children very little.  He has Monday off but the children go
to school.  He tends to punish K. by making her sit in a chair
whereas mother whips her.  Mother did not take too well to any
suggestion about other types of deprivation of privileges rather
than physical punishment.  She felt that she got a lot of help
by hospitalization.  She had been going out-patient to Arizona
State Hospital for a long period of time before she was hospital-
ized for 4 months and received shock treatment and now has some
lapses in memory.  She sought treatment because of her irrita-
bility and paranoid ideas, particularly related to the husband.
When she was hospitalized, although it was a voluntary admission
on her part, she and her mother believed that her husband had
put her away forever.  During K's life, the maternal grandmother
has lived with the family on and off for some three years.  Mrs.
G says, "I am the way my mother is, I couldn't talk to my mother,
and K. couldn't talk to me."  "I have come here because I want
to be the kind of person she can come to, I am looking for help
for myself so I can help her."  Mrs. G's sister, 7 years younger,
has lived with the family a good deal and she says with no
animosity that K. has warmer feelings toward her sister than
toward herself.  Sister is now married and both her mother and

K.G.

Page 3

her sister live in another part of the state.  Mrs. G. is seen
out-patient once a month by Dr. K. and is on medication.  Her
husband says he thinks she is better than she has ever been in
her life.  Incidentally, she had a previous marriage which
lasted 2-1/2 weeks.  She didn't love her first husband because
he was a "mama's boy" and she didn't love her second husband
but married him for security and because her mother wanted her
to marry him; then her mother disliked him.  Since the hospital-
ization mother has warmer feeling toward him.  While mother was
hospitalized, father at one time had a homemaker and then the
children were placed in a foster home for a month and he feels
they got along well and, indeed, in the playroom here the two
children played quietly and amicably and K. certainly commun-
icated with her brother as understandably as any other child
her age but did not communicate with interviewer or her parents.
She just acted as if she didn't hear and father says this is
the way she is in the home when she doesn't want to do something
but that the hearing was tested through Child Development and
found to be normal.

For a long time father didn't see any point in going anywhere
to get help for this child.  Incidentally, the mother first
went to Family Service who referred them to another agency
and now here.  However, at the present time father sees that
the child is not accomplishing in even the lowest section of

K.G.

Page 4

the first grade and will not be passed on next year, that she
traces pictures and then colors them instead of completing the
work and he came here hoping that we would help the child learn
that she must do her work at school.  K., for the most part,
keeps her feelings in when she is angry.

Mother says that she had her first pregnancy, "because I was
selfish, I wanted to hold the marriage together, I was very
physically ill during the pregnancy, I wanted a boy so badly
that the doctor was afraid to tell me it was a girl and then
I had a horrible fear of becoming pregnant again and did
everything I could do to get rid of the second pregnancy and
P. was jaundiced and I was overcome with guilt and all my
attention went to him and away from K."  "I don't have any love
for K. but people tell me I must take her places for help."
Mother feels the cause of her breakdown and hospitalization
was worry about K. and the fact that the child rejected her
and would not talk to her.  She talks about tantrums if she
tries to get the child to do anything.  Mother was very upset
when the child, at an early age, began to suck a blanket.  She
tried everything to stop her but this was impossible to do.
The mother speaks of the child stopping talking at the time of
P's birth and her jealousy and hitting him with toys.  A year
later her constant companion, a cat, disappeared and she stopped
talking again.  She then began to play by pretending that she

K.G.

Page 5

98

was a horse or a dog and crawling on all-fours. For two weeks
she would bark under the bird's cage and not talk. This upset
the mother because she thought the child would stop walking as
well as stop talking and the mother would scream and whip her.
The mother says that she beat this child unnecessarily in her
early years but she wanted to make her the perfect child. She
constantly provoked fights with her husband which K. witnessed.
If her husband were five minutes late she would image that he
was drinking or out with another girl. Of this Mr. G. says
that he used to hate coming home but since his wife returned
from the hospital he enjoys coming home.

The family has just begun to get out of debt because in 7 years
mother filed for divorce three times, which cost them $1,000 and
father says he didn't see any sense in splitting up even though
things weren't going along well and he did not understand that
she was emotionally disturbed until she was hospitalized.

IMPRESSION OF K:

K. is a non-communicative blond child who, according to her
parents, gets along very well with the children at school and
in the neighborhood and they have no difficulty understanding
her and enjoy her. She relates very well to her brother and
certainly communicates with him.

K.G.

Page 6

## IMPRESSION OF FATHER:

Father is a tall, slim, unattractive man who looks older than
his years who is a rather passive, non-verbal person who allows
his wife to completely take over, but in this interview I had
to structure it very carefully so that I could get full parti-
cipation from him.  He was willing to do this but had some
difficulty putting his thoughts into words.  From the history
one would have to assume that he is pretty masochistic.  As he
left the office he left warmly putting his arm around K. who
was not too happy about his closeness and tried to push his arm
away.

## IMPRESSION OF MRS. G:

Mrs. G. is an attractive, young woman quite intense and pene-
trating in her gaze and manner, who speaks very openly about
the destructiveness she has caused with this child and her desire
to do something about it. I would question our working with her
in this setting as she is obviously still manifesting a lot of
paranoia and the schizophrenia stands out all over.  She is
openly asking for help for herself which I would agree she needs.
In addition, I would question our facility for treating K. so
long as she remains in her household with a seriously disturbed,
openly rejecting mother to whom she is obviously rejecting.
Perhaps this child could benefit from outside placement, prefer-
ably where she would be getting treatment and the mother to

100

K.G.

Page 7

continue on a more intensive basis with a family service agency
and with the State Hospital until an adult mental hygiene
clinic is set up.

PSYCHOLOGICAL FINDINGS:

K.G. is an attractive, blond, gray eyed, freckle faced, 8-1/2
year old girl.

When first seen, K. was playing quietly by herself with the
puzzles in the playroom while her mother was reading.  The
examiner spoke to K. but she refused to even glance at him, but
kept on playing with the puzzle.  The examiner then indicated
that he wanted to spend some time talking to her mother and
asked her if it was all right and would she mind waiting.  She
nodded without looking up.

Mrs. G. is a rather attractive, bond, 29-year-old white female.
Within two minutes after she was in the examiner's office, the
examiner was aware that this was a person completely filled
with anger and hostility that was directed at the world around
her.  Anger was just seething through her in terms of her verbal
expression, the way she carried herself, etc.  The mother
immediately launched into a very long and somewhat rambling
description of both K's problems and the problems she herself
is experiencing.  The mother gave every evidence that she has
never felt any real love for K. but now is developing a very

K.G.

Page 8

peculiar mixture of hate, admiration for and guilt feelings
about her own feelings towards K.  The mother indicated that
she knows that she often punishes K. unduly for things that are
not at all related to problems that K. has.

Mrs. G. spent considerable time on her own background indicating
how she "had been" mentally ill.  She spent some four months
in the State Mental Hospital during which time she had shock
therapy,  escaped four times, and finally left against medical
advice.  She also discussed in considerable detail the problems
she is having with her husband and how on two occasions she
came very close to killing him, once with a hammer and once
with a knife.

Apparently this woman has had these problems for many years.
She described one incident that occurred when she was 10-years-
old when she attacked another 10-year-old girl.  She physically
kidnapped her and dragged her off to a pond in the woods where
she first beat her up and then attempted to drown her by holding
her head under water.  At this point the girl became blue and
Mrs. G. then let her up.  Mrs. G. said that all the time she
knew she was doing something wrong.  She felt very sorry for
the girl she was attempting to harm who, although a complete
stranger to her, she knew came from a very bad section of town
and had no good clothes and alcoholic parents.  Even though she

K.G.

Page 9

felt sorry for the girl she wanted to cry, she could not help
herself or stop herself from attempting to punish or kill this
girl.  Apparently she has many of these same feelings towards K.

Although the mother indicated that she is now much better than
she was before she went to the hospital, she has periods of
intense anger, periods of extreme depression and very often
blacks out.  For example, twice last night it was "like somebody
wiped the blackboard off" and she could not recall what she
had been doing for short periods of time.

Mrs. G. further indicated that she is now attending group therapy
sessions every week at the State Hospital and is on some type
of tranquilizer which she now feels is helping her.

In describing K's background, she gave the same old stories that
have been indicated several times in previous reports of the
girl's early precocious development then regression at the age
of 2, losing her speech, going back to a crawling stage, enuresis,
etc.

The mother was so wound up in her many discussions of her
expressions of hostility, anger that she did not want to terminate
the interview but this examiner insisted upon ending the inter-
view in order to see K.

103

K.G.

Page 10

K. came with the examiner without a backward glance at the
mother.  She walked down the hall, like a rather prim old
lady, glancing neither to the right nor to the left.  She was
cooperative, pleasant but unsmiling and obviously a little shy
and uncomfortable.  She worked very quietly and with good
attention span and concentration at the drawings that the
examiner asked her to do.  She produced three very appropriate
drawings and after the first one she was beginning to warm up
and said to the examiner, "I like to color," thereupon he got
her a box of color crayons and she did the second production,
a boy and then a house, first, in pencil and then in coloring.
In doing the coloring, she was obviously much more relaxed and
was starting to draw with broad sweeps and apparently forgetting
her shyness in the pleasure of this type of activity.

The examiner next switched to the Performance Scale of the
Children's Wechsler.  K. found this interesting and started to
speak first in one or two words and then in sentences express-
ing her pleasure at her own success.  By this time, she was
fairly relaxed and enjoying herself but at no time was she
very verbal.

This situation abruptly reversed itself when the Verbal Scale
of this test was attempted.  The Verbal Scale is a "I ask a
question - you answer it" situation.  Again, K. was extremely
uncomfortable and quickly became difficult for her to commun-

K.G.

Page 11

icate adequately, hence, this phase of the test was stopped.
On the Wechsler she earned the following:

Performance Scale IQ   104

This test was seriously reduced because of her poor perform-
ance on the picture completion test.  It was almost as if the
girl did not want to observe or become aware of the parts of
this test and hence did very poorly.  If the other parts of
the test were prorated she would have achieved an IQ of 114.
This IQ in the Bright-Normal range seems to be consistent with
the total impression that the examiner received from the child.

After stopping the formalized part of the Intelligence Test,
the two of us went to the play therapy room.  K. immediately
relaxed and entered into a variety of spontaneous play activities.
The first of which was lining up a family of four dolls, mother,
father, brother, sister and promptly shooting down brother and
then mother and father.  From here the play became very spon-
taneous, she included the examiner into her shooting games,
her dart games, her doll play and functioned very much like
any normal healthy outgoing child.  She was obviously enjoying
herself and enjoying the new relationship with the examiner.
She did not want to terminate this or to go back to the mother
who was waiting in the other building and found several excuses
to delay ending the games.

K.G.

Page 12

The impression is that this is an extremely sensitive girl of better than average intelligence who is reacting in an almost predictable way to a very unhealthy home situation. She has learned to protect herself from additional harm by occasional periods of regression, periods of being able to shut off those incidences that seem to be anxiety arousing in her. The amazing thing is the degree of stability, the capacity to bounce back into a healthy interpersonal relationship even for short periods of time when such a relationship is offered and the innate toughness that this child has exhibited. However, if is not logical to expect this degree of resilience to continue under the present home situation or in the mother who consciously and subconsciously hates her and the situation that she symbolizes. Sooner or later, K., like any child, will breakdown under this pathological condition and be harmed even further by it. It is the examiner's impression that K. can be helped and sustained through much difficulty at home by pro- viding her with a regular period of play therapy where she can get rid of many of her "bad" feelings and develop a healthy positive relationship with an adult. However, this kind of therapy for K. would only be a supportive mechanism and would not resolve the basic problem - the illness of the mother. Mrs. G. has formerly been diagnosed as a schizophrenic reaction, paranoid type with no indication of currently being in a state

K.G.

Page 13

remission.  She is, however, able to function to a certain
extent outside of an institution but not to the extent where
she can give K., and presumably her youngest boy, P., the
sufficient warmth, attention, that the child needs.  Nor does
the mother have the capacity to exercise rational control over
herself.  There is a marked possibility that if this family
constellation is maintained as it now is, without any inter-
vention and/or outside support K. is going to be hurt either
physically or psychologically.

CASE NO.: 05

F.F.

107

AGE: 8-1/2

SEX: Female

PERSONS PRESENT FOR INTERVIEW & THERAPY:

Mother and patient.

This child was referred by Dr. D.G.C., D.O., because of hyper-
activity, fidgety behavior, clinging, hovering over mother,
poor school work and enuresis.  Teachers complain she cannot
sit still at school.  Mother finds herself yelling at the child
a great deal.  A trial of Ritalin did not work as the child
could not sleep nights.  The mother stated that Benedril seemed
to help more.  (Doctor in Alaska in 1970 gave her this).  The
child has slight allergies, poor eyesight corrected by glasses.

F. is a cute little girl who wears glasses and is so hyperactive
that she can hardly sit still during an interview.  She sat
clinging to mother, rubbing mother's arm, yet was willing to
separate when asked to do so.  The child had a traumatic birth
history, was 3 lbs., 15 ozs. and lungs were filled with fluid,
was in an air lock for 4 days.  She continued to have a rough
time until she was about 1 year of age, having allergies to
the milk.  She was in and out of the hospital and there were
ear infections many times prior to a tonsillectomy in 1970.

During the time that the family was in Alaska, 1969 and 1970,
mother received psychiatric treatment for depression and
phobias and migraines.  She felt she was helped tremendously

F.F.

Page 2

and for the last year of the time, her husband accompanied her
to group therapy.  During this period of time, F's behavior
seemed to reflect mother's pathology in that she had most of
the same symptoms that mother had, including nightmares and
phobias.  These things seem to have cleared.  The mother states
that the child has always been dependent upon her.  She and
her husband spoiled the youngster because of the youngster's
illnesses until the child was 4.  At that point the younger
brother, K., supplanted patient and he too was ill a great deal,
so that mother quickly began to give the infant all of the
attention, taking it away from F. which mother now thinks was
a mistake.  She finds herself becoming overwhelmed easily and
will fly off the handle and yell at the child, even has night-
mares of killing the youngster.

She indicates that she herself was as dependent and clinging
to her own mother as the patient is to her.  She thinks that
her mother was the ideal person, the best mother in the world
and that she could never measure up to this woman.  At the same
time she indicates that her mother had a need to be married to
a weak man.  Her father was a weak person who would threaten
suicide if mother did not come home from work on time and would
talk of fears that her mother was running around with other men.
Mrs. F. herself could not separate from her own mother to allow
mother to go to work without her, and the mother used to take

F.F.

Page 3

her along with her when she called on customers (she was a
cosmetics sales woman). A sister, 6 years older, was father's
by first marriage and, according to Mrs. F., her mother never
made a difference between the two and both continued to hold
mother in highest esteem. When Mrs. F. was giving birth to her
daughter, T., in 1960, her own mother divorced the father, is
now married to another man equally as weak. Once Mrs. F. asked
her mother why she married such men and her mother said that it
made her feel stronger.

Mrs. F. says that her daughter does not seem to make friends
with little girls but rather with little boys and when playing
house, her daughter wants to play the part of the father or
the boy.

There are indications that Mr. F. is a stable, firm man on which
his wife can lean and who is better able to discipline the
children than is his wife.

In an interview with me, the patient drew a picture of herself
and the other siblings. For three wishes she asked for a bike,
a picture by an artist, a boat and for a fourth and fifth wish,
a new house and a new couch. For the desert island question
she answered she would take clothing, my dog Pepper, my doll
and when I asked who she would take, she said, "My sister, one
of my friends, and shoes."

110

F.F.

Page 4

IMPRESSIONS:

This little youngster seems to be having a problem of organicity in conjunction with some real emotional problems mostly related to her mother.  Mother's own over-dependency, phobia and ambivalence regarding her relationship with her own mother seems to be re-enacted here in the relationship with F.  In addition, the fact that mother was so seriously ill emotionally at a critical time in the child's life must have affected the child and possibly deprived her of needed nurturing at that time.  Indications are that the father has many more strenghts and should be interviewed also.

PSYCHOLOGICAL FINDINGS:

F. is a child who is almost 9 years old, and who is in the second grade.  She was referred by the family osteopath because of hyperactive behavior and difficulty in functioning at school. Test results indicate that this girl is functioning in the borderline retarded area intellectually.  Achievement test results indicate that she is functioning almost up to grade level in arithmetic but is a year behind in reading and spelling. This child appears to have serious perceptual motor difficulties and there are strong indications of neurological impairment. The girl does seem to have made some academic progress.  She can make all of her letters, read many words, and do simple arithmetic.  With the serious perceptual problems and borderline

111

F.F.

Page 5

IQ, however, it is likely that this child will have great
difficulty functioning in a regular classroom.  She attends
school in a district where the possibility of placing her in
a special class, perhaps one for the educable retarded should
be explored.

Information in the chart suggests that Ritalin was given to
this child at one time, but caused her not to be able to sleep
at night.  It would be worthwhile to explore other alternative
medications that might be of help to this girl.  At the
present time the organic problems would appear to be the major
difficulty that this child is having.  Certainly with these,
she is likely to develop some feelings of herself as inadequate
and unable to compete in school.  There are some indications
that this child has many fears and their effect on her function-
ing possibly should be explored.

112

CASE NO.:  06

J.B.

AGE:  13

SEX:  Female

PERSONS PRESENT FOR INTERVIEW & THERAPY:

J. and mother, Mrs. B.

REFERRAL SOURCE AND PROBLEM:

J. was referred by Protective Services.  Mrs. B. would like
help on how to handle J.  J. seems to act very immaturely and
has difficulty getting along with those her own age.  Mrs. B.
reported that she is unable to follow through on even simple
chores.  She does very poorly in school and has had a long
history of poor school attendance.  J. is also enuretic.

FAMILY CONSTELLATION:

Mr. B., age 44; Mrs. B., age 46; J's natural sister, M., 18;
J., age 13; and the B. children:  R., 7; V., 5; M., 4; and G.,
1.  J. also has a natural brother, L., 16, who lives with Mrs.
B's sister.  J's mother died when she was 5 months old.  Her
father is in the area, but has remarried and wants nothing to
do with J. and her siblings.  The court has legal custody of
the children, and the B's have been awarded physical custody
of J. and M.

ECONOMIC FACTORS:

Mr. B. is in the Air Force and earns about $7,000 a year.  J's
father provides no money for child support.

J.B.                                                                113

Page 2

## MEDICAL AND DEVELOPMENTAL HISTORY AS REPORTED BY PARENTS:

Mrs. B. knew little about J's birth history.  Mrs. B. recalled
that J. was sick a great deal when she was an infant.  She
thought that she had had pneumonia a couple times.  J. had an
appendectomy just before Christmas of last year.  Mrs. B. felt
that J. might have asthma, as she breathes very heavily, but
the doctor did not see the breathing problem as a serious one.

## SCHOOL HISTORY:

The past school year J. attended T.G. School and was in the 7th
grade.  However, the last four months of school, J. refused to
attend.  At first, Mrs. B. was unaware that J. was not attending
school, as J. would leave with the other children and return
in the afternoons.  Later, when Mrs. B. discovered this difficulty,
she tried to force J. to go to school, but rather unsuccessfully.
Mrs. B. reported that J. had a long history of ditching school.
J. has always done poorly in school.  Mrs. B. remembered that
when she was in third grade she still did not know her ABC's.
Mrs. B. reported J. was unable to do the work of her daughter,
who just completed fourth grade.

J. also has a great deal of difficulty getting along with peers.
Mrs. B. reported that she gets along well with children much
younger than herself, but fights with those her own age.  For
instance, she was recently stabbed in the side with a broken
pop bottle in a neighborhood fight.

J.B.                                                            114

Page 3

FAMILY HISTORY AS REPORTED BY PARENTS:

Mrs. B. has some questions as to how much J. is able to under-
stand and follow through on simple directions.  Although J. has
been shown repeatedly how to do the dishes, she cannot do it
correctly without constant supervision.

Mrs. B. reported that she has tried many forms of discipline,
but none of them have proved effective.  She realizes that at
times she has been inconsistent with J. because she feels sorry
for her.  She also wonders if her expectations of J. are beyond
her capabilities.  Mrs. B. is mainly responsible for discipline,
as Mr. B. is frequently out of the home.  Presently, he is
stationed overseas.  Mrs. B. reported that Mr. B. is accepting
of J's presence in the home, and her behavior does not bother
him because he has seldom been around her for any length of time.

IMPRESSIONS AND RECOMMENDATIONS:

Mrs. B. seems to be genuinely concerned about J. and wants
help in understanding and handling J.

J. is a tall, rather unattractive girl of thirteen who was shy,
but seemed anxious for attention.  It was difficult for her to
answer questions requiring more than a yes or no.

PSYCHOLOGICAL FINDINGS:

In looking at J's performance on the intelligence test and the
academic subject achievement score, it is not surprising to

Page 4

learn she is having difficulty in school.  Her intelligence

test scores in the verbal area suggest that her difficulty in

school is of a long standing nature; she possesses little in

the way of general knowledge about her environment and she finds

it extremely difficult to apply an everyday situation with what

knowledge she does have.  Her overall verbal intellectual

potential is at the 3rd percentile, a fact which puts her at

a distinct disadvantage when competing with classmates of average

or above average intelligence.  In areas of intelligence which

are not dependent solely upon the manipulations of words or

numerical symbols, J. shows considerably more potential, but

even at that, her non-verbal capabilities barely approach the

average range and still place her at the 25th percentile with

respect to her peers.  She demonstrates above average potential

only in the area of routine copying of symbolic material (coding-

subtests).  With respect to academic achievement, J. demonstrated

a word recognition level at the 2.2 grade level.  It was evident

from the beginning that J. is not at all yet clear of the

phoemic patterns on all of the initial, medial and final indi-

vidual vowel and consonant sounds, but she is almost completely

unaware of the auditory equivalence of various phoneme blends.

It was very difficult then for her to attempt to sound out words

of which she had no previous first hand acquaintance.  Although

she professed to be quite proficient in the area of arithmetic,

mathematical computational abilities were roughly at the mid-5th

J.B.                                                                116

Page 5

grade level.  She appears to have a fundamental grasp of the
four basic arithmetic operations but had trouble with fractions,
the principles of regrouping and decimals.  Although her math-
ematical achievement level is somewhat behind her current grade
placement, it is very much in keeping with the low average in
verbal potential that she possesses.  In addition to her con-
siderable deficiencies in substative academic areas, she also
displays some rather severe visual perceptual and visual motor
integrative skill deficiencies.  She has difficulty representing
with a prencil geometric figures which are presented to her
visually.  Such deficiencies could lie at the base of her
difficulties with reading and writing at school.

Emotionally, J. is a young girl who currently appears to be
actively denying her feminine characteristics and developments.
She tends to seek and cultivate activites which are male oriented
and which are primarily involving males.  J. tends to keep other
people at a distance fearing that they will betray her in some
fashion.  Her difficulty in relating to others stems primarily
from the fact that, for the most part. J's affective interests
are centered primarily around herself.  Because of this it is
very difficult for her to show affection in any direction even
to parents and to siblings.

In sum, given J's rather limited intellectual potential and
her consequently low level of achievement in school, it is not

J.B.                                                            117

Page 6

surprising she has been increasingly resistive to attending
school.  It is felt that J. is going to need very specialized
academic placement which centers around her obtaining very basic
skills in traditional academic areas.  Particular attention is
going to have to be paid to assessment of vocational interests
and aptitude so that special vocational training can be begun
as soon as possible.  It is not reasonable at this time to
expect that J. will be able to successfully compete in the
regular high school curriculum.  It also might be beneficial
with J. to become involved with other youngsters her own age
and sex so that she might learn better how to relate to peers
as well as to hopefully work through some of the sex identity
problem she is experiencing at the moment.

118

CASE NO.: 07

A.B.

AGE: 15

SEX: Male

<u>PERSONS PRESENT FOR INTERVIEW & THERAPY:</u>

Mr. and Mrs. B. and A.

<u>REASON FOR REFERRAL:</u>

The family first came to this agency  in February, 1967 when
A. was ten years old.  The presenting problems at the time were
focused on problems in school, both academic and behaviorial.
Other problems were lying, stealing, and enuresis.

Psychological testing was given on both February 7, 1967 and
May 15, 1968.  The first testing session revealed average
intellectual functioning, and projective probes showing a boy
who has been over-controlled by parental figures, but who craves
nurturence and understanding.  There were also indications of
minimal cerebral dysfunction.  The later testing further revealed
that the boy had no significant emotional pathology and that
involvement with pranks, etcetera, were a way of letting off
steam.

The staff on March 1, 1967 provided a diagnosis of Passive-
aggressive personality, and it was recommended that the parents
be involved in a group therapy session.  The parents attended
several sessions, but felt that the group was not meeting their
needs and they dropped out of it.

A.B.

Page 2

CURRENT SITUATION:

Mr. and Mrs. B. called this agency at the present time at the suggestion of C.J., a Juvenile Probation Officer.  A. had recently become involved in two stealing episodes - he had taken a radio from his father's place of employment and seven dollars from the YMCA.  With the exception of these two incidents, the parents maintained there have been no particular problems with him over the past five years at home.  However, there does seem to be a great deal of passive-aggressive behavior, although the parents do not see it as being a problem.

In school, A. has had periodic problems with attendance and with the Mother Superior.  These seem to be resolved at the present time.  He receives a three point grade average and is not a behavior problem.  The one problem he does seem to have in regard to academics is that he reads from right to left instead of the normal way of left to right.  He is currently in the tenth grade at a private parochial school.

There have been two new medical developments in the past five years.  Last year A. was given an EEG at the doctor's suggestion, although the parents were not sure why this was done or what the results were.  However, A. was placed on Ritalin, 30 mg. daily, but Mrs. B. claims he would not sleep or eat well while on it.  He has been off the medication since September as the

A.B.

Page 3

parents did not feel any need for using it any longer.  The
second medical problem involves the necessity for the use of
a back brace to correct a curvature of the spine and this has
curtailed some of his physical activities such as football.  A.
has worn the brace for about a year and must continue to wear
it for another year or so.

A. is a tall, slender, clean cut looking boy who sits somewhat
rigidly due to the back brace.  He is quiet, but seems cooper-
ative.  Mrs. B. is a tiny woman of Italian-French descent, who
speaks with a French accent.  Mr. B. is a short man of French-
Canadian descent, who wears very thick glasses.  Mr. B. spent
much of the time trying to convince me that he was behind his
son, but he just couldn't understand his stealing.  Apparently
the relationships at home are somewhat strained now as Mr. B.
has a tendency to be very strict with him; he maintains he
mostly loses his temper and yells and keeps bringing up problems
from the past.  At home A. is moody and at times doesn't want to
talk with his parents although his relationship in general is
better with his mother than with his father.

Psychological testing has been requested as it is felt there
are more problems than are evident on the surface.  It should
be noted that the MMPI on the father showed a very disturbed,
near psychotic man, and on the surface he does seem to be in a
much more stable emotional condition at this time.

A.B.

121

Page 4

## FAMILY CONSTELLATION:

A.B., 46. U.B., 48. Siblings: M., 20. E., 19. D., 17. A., 16.
A., 15.

## INCOME AND FEE:

Father is a ground man at a large company earning around $6,000
per year. Diagnostic fee: $18.00, treatment: $3.00. The father
signed a financial agreement form.

## MEDICAL & DEVELOPMENTAL HISTORY AS REPORTED BY PARENTS:

A. was the mother's fifth pregnancy, normal in every way, no
complications at birth. According to mother, the developmental
history was normal and no complications. He has had some high
fevers and headaches but is usually regarding to fever. A. is
left-handed, is a restless sleeper, and said there are times
when he gets up to go the the bathroom, wanders into the
brother's bedroom to sleep. They felt he sleeps much better
by being in the room himself. He was a bed wetter for a time
but this is extremely rare at the time. He is described as a
hyperactive child, they said that the only time that he seems
to be quiet is when he is watching television.

A. is left-handed but they said that he can write some with
his right hand. He has no co-ordination in learning to play
an accordian as he wanted to take the lessons. They said that
he did learn to sing and dance very quickly and at age 2-1/2

122

A.B.

Page 5

when the family was visiting in Italy he picked up Italian
and French very easily.  He does not listen to the parents.
They described him as wearing clean clothes on the outside but
would wear dirty ones underneath.  He has no patience to put
models together and is very messy about his homework and school
work.  They say that the only time the teacher says he's neat
is when she stands over him.  They tried him on medication at
one particular time, the mother could not remember the exact
age, was a small yellow pill.  It was fine for the first two
weeks and then he wanted to depend on it so they took him off
of the medication.  There have been many times, when the father
in anger has punished A. and then feels very guilty about it
and then will relent on the discipline.  An example has been,
he made the boy kneel on a concrete slab, then he felt that he
was being too cruel.  A. plays with children two or three years
younger than he is and there was a time when he was playing
with younger children that he did revert to wetting his pants.

On one of our forms they checked lying, stealing, fighting
and behavior problems, and she checked hallucinations but said
that this should have been inability to concentrate.  He has a
low energy level and does poor school work, very few friends,
hard to listen and to obey.

A.B.

Page 6

### HISTORY OF NATURAL PARENTS:

Mr. B. was the oldest of four children, grew up in New Hampshire, his parents were French-Canadian, French was spoken in their home.  His father was a carpenter and he said was very strict about behavior, and while his mother spoke only French the father could speak English but they were unable to help him with his school work.  He said that there was not much affection shown in the family.  They had very little between father and the children.  He quit school and joined the C.C.C. In 1939 he joined the army until 1945.  He was in Europe three years and there is where he met his present wife.  After being discharged from the service he traveled back and forth between New Hampshire and Cleveland and said that he was kind of like a black sheep, very quick tempered, did not want to give in, and decided then after hearing from his wife that he wanted to get married, returned to Italy for this.  They lived in New Hampshire after the marriage, there have been frequent trips to Italy to visit her family.

Mrs. B. has three sisters and said that her father was a lawyer and very strict.  Her mother had a nervous breakdown after she had three miscarriages, so all the girls had to be quiet as they did not want to send the mother to an institution.  She did not want to be alone.  After high school she obtained two years of language schooling, speaks French, German, Italian,

124

A.B.

Page 7

and English.  Until she learned English, she and Mr. B.
communicated in French.

Mr. B. worked in a paper factory in New Hampshire, but in 1961
he came to Arizona and has had steady work with a large company.
He says that he has been warned several times about his temper
with some of the fellow employees that he may lose his job.

IMPRESSIONS:

Mr. and Mrs. B. apparently were very honest in talking about
themselves and some of their problems in relation to A.  They
said that they were very rigid and strict with him, the mother
more lenient but the child may be so confused as he cannot
predict parents.  The father gets very angry with his quick
temper and says that he punishes in anger, "gets me burn up,
gets me burn up fast".  He also feels that what was good for
his father is good enough for the children and he tries to be
this strict in this area.

A. is the youngest of their five children, has been teased a
lot, spoiled a lot, but a lot of demand made on him that he may
not be able to do.

PSYCHOLOGICAL FINDINGS:

A. scored a prorated Verbal Scale IQ of 90, a Performance Scale
IQ of 131 and a Full Scale IQ of 118.  There is a significant

125

A.B.

Page  8

discrepancy between Verbal and Performance IQ which was not
present at the WISC testing five years ago.  Scatter on the
WISC shows that A's understanding of social practices and
customs has deteriorated during the five year interim period.
In addition, he has become much more sensitive and alert to
environmental stimuli.  Such a pattern suggests increasing
difficulties with social relationships and emotional problems
rather than a clearly discernible learning disability.

Projective probes show that A. is suffering from long standing
deprivation of dependent nurturance security needs.  As a con-
sequence, hostile aggressive impulses are not expressed openly
but are manifested in a passive-aggressive sullen veneer.
Sexual impulses arising now in puberty are adding to general
anxiety and restimulating long standing feelings of hostility
and resentment over the non-satisfaction of nurturance security
needs.  The threat from poorly differentiated sexual aggressive
impulses is defended against by obsessive intellectual control
and compensatory gruffness and power strivings.  A spinal
curvature and the need to wear a back brace exacerbates feelings
of sexual inadequacy and blocks A's compensatory strivings for
success in such masculine endeavors as football and boxing.
A. feels quite rejected and hostile, particularly towards
females.  This hostility plus a strong identification with
mother results in much confusion and apprehension over sexual

126

**A.B.**

**Page  9**

impulses and identity.  A. sees his life as one in which peace
and tranquility is being continually disrupted by chaotic events
that are never ending and uncontrollable.

CASE NO.: 08

K.G.

AGE: 10

SEX: Male

PERSONS PRESENT FOR INTERVIEW & THERAPY:

Mother and K., age 10.

REFERRAL SOURCE & PROBLEM:

Mr. D., marriage counselor who has been seeing Mr. and Mrs. G.
suggested they bring K. for therapy.      K. has, for the last
year-and-a-half, been pulling out the hair on his head and
eyebrows. (He sometimes eats this hair.) He also chews on
his fingernails and fingers. He first started pulling out his
hair when an older brother's wife and son came to stay with K.
and his parents. When they left, he stopped pulling out his
hair. They came again to visit in September of 1969 and K.
started pulling out his hair again. They left over a month ago
but this time he has not stopped. K. is also enuretic.

FAMILY CONSTELLATION:

Father, J., age 45. Mother, Y., age 39. K., age 10. K. has
two older half-brothers who no longer live at home. They are
21 and 22 years old.

MEDICAL & DEVELOPMENTAL HISTORY AS REPORTED BY PARENTS:

This was Mrs. G's first pregnancy, had trouble throughout the
pregnancy. The first five months she had I.V.'s off and on as
she was vomiting so much she became dehydrated. At that time

K.G.

Page 2

she would throw up so hard that blood vessels in her neck were
broken.  During the last three months of pregnancy a daily
suppository kept her stomach from being upset.  She stated
that her mother had the same problem with all of her preg-
nancies.  K. had a very large head at birth and an apesiotomy
was required for delivery.

### EARLY PERSONALITY HISTORY:

K. spoke his first word at three months, some word phrasing at
six months.  He sucked on a pacifier from birth.  At three
months mother noted that when the pacifier dropped from his
mouth he dropped his arms and hands around looking for it.
Later when the pacifier was taken away, he began sucking on
his thumb.  At age 3 and 4 he would not play, but just walked
around sucking his thumb.  Parents tried everything to stop
the thumb sucking.  Finally Tobasco sauce put on the thumb
stopped it, but faily shortly he started wetting the bed.  K.
has a very good imagination.  In a dark room, he can imagine
that certain objects are monsters or scary things.  He often
has nightmares, many times they are about accidents he has
seen or movies.  He talks, kicks his covers off and sometimes
wakes himself up.  K. states that at times it is hard for him
to go to sleep, as he is afraid of having another nightmare.
He went into quite a bit of detail, telling me colors and
objects he saw after a sudden bright light.  He seems to have

K.G.

Page 3

very keen senses.  He also has excellent memory of many things
that happened when he was younger.

<u>SCHOOL HISTORY</u>:

K. went to pre-kindergarten because he was so dependent on
mother.  The first day he really threw a fit, screaming and
crying and would not do anything.  After several days he
realized mother would always come back and get him and then he
was okay.  He went to Kindergarten at age 4-1/2 and made
straight "B's".  Until last year his grades were very good.
This year is the first year he has made anything lower than a
"C".

<u>FAMILY HISTORY AS REPORTED BY PARENTS</u>:

Mr. and Mrs. G. were married in 1952.  This was Mr. G's second
marriage.  He had been married in 1946 to a woman he met while
in the service.  K's two older brothers are Mr. G's by a former
marriage.  The boys were visiting their father and step-mother
in 1955 when their mother shot and killed her husband.  She
was not found guilty, but Mr. G. obtained custody of the boys.
The family was living in California at that time.  They moved
to Phoenix in 1958.

K. is very close to his half brothers, especially the oldest, J.
J. has always paid him a lot of attention and K. has argued
with his parents that brothers are closer than anything.  When

130

K.G.

Page 4

K. was quite young, J. was in high school and gave his parents
a lot of trouble. J. was very demanding, uncontrollable, etc.
Both Mr. and Mrs. G. admit that during these years they were
most concerned with J. and though K. was not neglected, he was
not especially given a lot of attention. J. went to the service
after high school. Parents stated that K. wrote letters two or
three times a week to his brother. J. apparently met and
married a girl while stationed away from Phoenix. When his
wife and baby came to visit the family, K. was obviously angry
at the baby. If Mrs. G. ever held the baby when K. was around,
he would have to hold him too. This was the first time that
he had began pulling out his hair. J. went overseas, and Mr.
and Mrs. G., K. and J's wife and son all went to the airport to
meet him when he returned this fall. K. was so excited he ran
to the plane to greet his brother. Mr. and Mrs. G. noted that
as J. paid more attention to his wife and son, K. could not
understand it and was quite hurt. Brother and family stayed
with the G's for a couple months at that time. This is when K.
began to pull out his hair again. J. found a job in California
and he and his family moved there several months ago. This
time K. did not stop pulling out his hair.

K. does not know that his father was married before or that his
brothers are half-brothers. Parents have always felt it would
be better not to tell him.

K.G.

Page 5

IMPRESSIONS:

This is a delightful 10-year-old boy.  He spoke readily and
freely in the interview.  He appeared quite intelligent and I
think will respond quite well to anyone who shows interest in
him.  He is sensitive and very concerned about his problem.
When mother was telling me about the bed wetting, he was quite
embarrassed and cried.

Mr. and Mrs. G. both seemed very concerned about K.  Mr. G.
spends a good part of his winter months in California with his
job.  He does come home on weekends and did come in to talk with
me on Saturday morning.

PSYCHOLOGICAL FINDINGS:

On the WISC administered, K. obtained a Verbal Scale IQ - 87.
Performance Scale IQ - 93.  Full Scale IQ - 89.  Measured
Intelligence, Dull normal.  K's performance was quite incon-
sistent on the various subtests, and among the various subtests
scaled scores.  The lowest scaled score was 5 on Comprehension
and the highest was 13 on Picture Completion.  On the Wide
Range Achievement Test, K. obtained a reading grade level of 4.4,
spelling grade level, 6.5, arithmetic grade level, 4.7.  This
is a disorganization pattern, often associated with personal
difficulties.  K's level of achievement is considerably
higher than is his present level of functioning.  Undoubtedly,

K.G.

Page 6

this child has experienced a good deal of pressure for per-
formance and achievement.  Up to this time he has been able
to conform but is beginning to have difficulties in this area.

The Projective Testing suggests that K. is quite an anxious
young lad with many fears and aggressions.  He is quite angry
with his mother but cannot acknowledge this, and fears any
retaliation and thus has become quite dependent upon her.
This does appear through the various nightmares and scenes that
he sees when looking out his window where he or his mother is
being attacked and killed.  Also, K. seems to view his whole
world as a very threatening and frightening place and experiences
much anxiety and fear of attack by both people and natural
phenomenon.  Thus, there is a great deal of displacement about
his own aggressive impulses.  K. is experiencing some difficulty
with his own reality testing and judgement.  At times, they are
adequate, but at other times, they are not, and K. seems to
personalize many things at that time.  K. seems to view adults
as rather punitive and not meeting his needs for attention and
affection.  However, K. seems to be somewhat involved in a self-
defeating cycle because many times he brings on the punitiveness
that he experiences from adults.  Probably, he does not know
how to interact more successfully and thus gain positive attention
rather than constantly obtaining negative, as he does.  The lack
of knowledge on how to deal with adults also seems to generalize

133

K.G.

Page 7

somewhat to peers and he does have some difficulty in peer
relationship also.

CASE NO.: 09

J.C.F. III

AGE: 7

SEX: Male

134.

PERSONS PRESENT FOR INTERVIEW & THERAPY:

Mr. and Mrs. F., the natural parents, and patient, J.

REFERRAL SOURCE & PROBLEM

J. was referred to the agency by a woman who brings her child
here. Mother reports that J. has been on Ritalin since October
of 1971, and although this has helped him some, he continues to
have somewhat hyperactive behavior. However, the main problem
at the present time seems to be J's fighting at school and
arguing with friends in the classroom. Teachers report J. to
be like a volcano. His grades have been falling in school.

Parents deny J. having any problems with the reversals of letters
or writing backwards; however, he sometimes skips over words
while reading. Parents claim that he does not seem unduly
uncoordinated.

Last year J. was in a special education class at school. When
he went on the Ritalin, the teacher felt that he had improved
to the extent that he would be ready to go into a regular class
in the second grade. However, while being in the second grade
in a regular class, he has continued to have many problems with
fighting. He has his good and bad days, and there is a definite
difference in his writing, performance, and behavior between
his good and bad days. J. seems to make friends easily enough,

135

J.C.F. III

Page 2

but does have some trouble keeping them because he fights with
them.  Two of J's third grade teachers do not want him in their
room next year.  It seems as if he has built up quite a negative
impression for himself at school.  J. also wets the bed nightly.

MEDICAL & FAMILY HISTORY AS REPORTED BY PARENTS:

The birth and pregnancy were normal, although J. was one month
overdue.  J. was born in Kingman and the family moved to Phoenix
when he was nine days old.  At that time he got colicky and fussy
and cried a lot.  He did like to be held.  He started teething
at 3-1/2 months and was very fussy then.  As a young child, J.
was always getting into things, was always touching and could
not sit still.  He had to be touching, hitting, or tripping.
Walking and talking were normal, but mother claims that toilet
training was impossible.  J. was 11 months old when his sister
was born, and he refused to toilet train, until he trained
himself when Mrs. F. trained her daughter.  He wets the bed four
to five times weekly.  He sleeps well at night, but wakes up
quite early in the morning.  J. has run several high fevers
with ear infections but has had no other major illnesses.  Mrs.
F. reports that J. has driven her crazy.  She says that they
clash, as she, herself, is very slow-paced and he is so hyper-
active.  J. has had problems immediately since starting school.

J. has two sisters, one about two years older than himself and

J.C.F. III

Page 3

one 11 months younger.  He fights frequently with the older
sister.  When the youngest boy was born, J. seemed to have
matured somewhat.  Parents claimed that J. minded them pretty
well.  Discipline is handled mostly by the mother and consists
mainly of sending him to his room.

Mr. and Mrs. F. claim that they have a good marriage and get
along well with each other.  Mrs. F. feels that one problem is
that J's father fights and wrestles with the boy in a playing
manner until J. winds up crying.  Father intends this wrestling
to be playing, but the boy seems to take it more seriously.  Mr.
F. used to be a fighter, and according to them, used to have a
violent temper, but no longer does.  This last statement is
questionable, as it seemed he may still have a violent temper.

IMPRESSIONS:

J. is a cute, verbal, cooperative boy who says that he becomes
upset because his sisters blame him for doing things and his
parents always believe them and blame him.  He says that he
gets spanked a lot and his sisters never do.  Mrs. F. is a
somewhat heavyset woman who did most of the talking and seemed
somewhat angry at times, but would not admit it and would not
let her anger come out.  Mr. F. is a large built, muscular man
with a speech impediment.  He did not talk very much, but did
join in at times.  It was a little hard to get out of the couple

137

J.C.F. III

Page 4

exactly why they came to the agency.  It seems mainly as if
they want an evaluation to see if anything can be done to help
control the boy's hyperactivity and his fighting at school.
Mrs. F. was originally interested in our CIBA Program but when
this did not manifest itself, she decided to come for an
evaluation.

PSYCHOLOGICAL FINDINGS:

J. is a boy of average intelligence who has learned a defensive
posture of reading social cues in order to avoid getting into
trouble.  This is becoming ineffective though, as he is very
anxious, and likely acts impulsively, which results in negative
feedback from others.  There is probably considerable marital
strife, with mother being overly concerned about controlling
the children and father being too passive to suit her.  The
home environment provides little nurturance and affection, and
he is becoming the family scapegoat, as well as the school
troublemaker.

The primary thrust should be with Mrs. F. who is trying to
control J. and is becoming quite unhappy with his attempts to
resist her.  J. should be seen for a medical re-evaluation, as
Ritalin may be the wrong drug for him.  There is evidence he
becomes shaky when taking Ritalin.  After the parents are
involved, the therapist can decide if J. needs individual or
group therapy.

CASE NO.: 10

G.M.F.

138

AGE:  12

SEX:  Male

PERSONS PRESENT FOR INTERVIEW & THERAPY:

Father, Mother and M.

REFERRED BY:

Dr. V., Northwest Clinic for Children.  Parents had taken M.
to see Dr. V. to determine if there were any physical reasons
for his problems.  M. expresses concern about feeling very
down in the dumps one day and happy the next, for no apparent
reason.  Parents' main concern is that M. dislikes school and
is not achieving academically.  Teachers report that at school
M. is unwilling to work and will not follow directions.  His
grades have always been average and below, although parents
have been told in the past that he could do a great deal better.
Parents describe M. as an easily frustrated child who cries a
lot and is extremely sensitive to correction.  M. and his
parents both state that he is unhappy a great deal of the time.
M. is also enuretic.

FAMILY CONSTELLATION:

Father and Mother both 35 years of age, and M., age 12.

SOCIO-ECONOMIC STATUS:

Father is employed as a distribution clerk for the Post Office
and mother works as an electronic technician.  Combined gross
income is approximately $12,500 annually.

G.M.F.

Page 2

MEDICAL & DEVELOPMENTAL HISTORY AS REPORTED BY PARENTS:

M. is an only child and mother reports no problems during
pregnancy or birth.  Developmental history is essentially
normal with the exception of some difficulties in toilet
training.  Although parents checked most of the somatic
complaints listed on the check sheet, when these were further
explored, none seemed to be of a continuing nature or extremely
severe.  They did report one incidence of high temperature
with roseola at age 6 months.  As a child M. also had a head
injury requiring stitches when another child threw a rock at
the back of his head.  Parents describe M. as a good baby,
but a nervous child who has a continual habit of twirling his
hair.  He is also short for his age and very self-conscious
about this.

M. has always disliked school.  In the first grade he had many
problems with his teacher and the family finally moved from
Tolleson to Phoenix to get out of that school.  He has been
attending Sutton for the last five years, and is unable to
identify what it is he doesn't like.  He had some behavior
problems in school in the past although these seem to have
disappeared during the last year.  The concept of an education
is very important to both M's parents and they have pressured
him about school work, and have been encouraged by teachers
to do so.

G.M.F.

Page 3

FAMILY HISTORY AS REPORTED BY PARENTS:

Mrs. F. is the second to the youngest of four children.  She
lived with her natural parents until she was six years old, at
which time they divorced and she remained with her grandparents
for the next two years.  Following that she went to live with
her father and step-mother, as her natural mother could not
support the children.  She dropped out of school after the
ninth grade and completed her high school education through a
correspondence course.  Following this she worked in a factory
and married her present husband at age nineteen.

Mr. F. was an only child.  He talks about a good relationship
with his father and a poor relationship with his mother.  When
he was 13, his mother had a nervous breakdown and he lived with
his aunt for a little less than a year because "his mother didn't
want him".  He graduated from high school and went into the
Service.  He remained for approximately 10 years.  The family
moved to Arizona in 1962 because father developed asthma early
that year.  After they moved to Arizona, father's asthma dis-
appeared.

Mr. and Mrs. F. describe their marriage as an average one.
They were somewhat hesitant in talking about marital conflicts,
but in discussion father expressed his dissatisfaction with
Mrs. F's griping at him all the time and Mrs. F. complained
about the fact that her husband was not willing to work around

G.M.F.

Page 4

the house.  They both see themselves as fairly strict parents,
and state they wonder if at times they are not too strict.

IMPRESSIONS:

M. is a short, stocky 12 year old, who put on an air of bravado
when he came into the office.  Although his parents stated that
he was extremely upset over the idea of coming here, when I saw
him, he was trying very hard to cover up any anxiety or appre-
hension.  Underneath this, however, he appeared to be a very
anxious, somewhat depressed child.  Parents' main concern is
over M's dislike of school, and M. states his concern is over
feeling very sad at times for no reason at all.  He presently
presents no behavior problem in the classroom.  At home, parents
report that he is occasionally somewhat destructive, two months
ago he set fire to his mother's wig, and they also state that
he has an extreme curiosity about gory things such as accidents,
fires, etc.  In talking with M., he expressed concern over things
that seem to concern children older than he these days, such as
air pollution, the "bad things that people do", war in Vietnam,
etc.  Mr. and Mrs. F. seem to be well-meaning, concerned parents
who may put too much pressure on M. and who may possibly try too
hard to be "perfect parents."  Underneath the facade that M.
attempted to present to me, and perhaps behind the depression
his parents talk about, this child has a lot of angry feelings.
At this time he seems to be somewhat over-controlled, and I feel

G.M.F.                                                          142

Page 5

that if he does not get some help, he may turn to more acting

out activities as he enters his teens.  In my opinion, M. could

benefit from individual therapy and parents could use some

short-term directive sessions on child management.

PSYCHOLOGICAL FINDINGS:

This is an essentially normal 12-1/2 year old boy, whose surface

demeanor conceals sadness, frustration, and anger.  Intellectually

he is a somewhat compulsive, "molded" boy of average endowment

who is suppressing spontaneity and a fairly rich inner life.

There are indications he is reaching the stage of development

where questions of identify and sexual role requirements are

assuming some urgency for him.  He is not at all sure just who

he is, and seeks external acceptance at the same time, rejecting

pressures to conform.  If anything, he may have learned too well

the nature of pressure, and perhaps his response is not

altogether unhealthy.

From the picture the boy presents, focus on the parents would

seem an appropriate approach.  While participation in an activity

group might provide him an outlet for greater involvement with

peers, working with his parents to "loosen up" appears more

relevant.

CASE NO.: 11

143

T.F.

AGE:  9

SEX:  Male

PERSONS PRESENT FOR INTERVIEW & THERAPY:

Mrs. F., the natural mother, and patient, T.

REFERRAL SOURCE & PROBLEM:

T. was referred her by his mother and by himself because he
wanted play therapy.  He has been in group therapy in Oregon
for about one and a half years and liked it very much.  His
problem has been temper tantrums and destructiveness to toys
and hostility directed toward his mother and sister.  He also
has been shoplifting, but has been caught only by his mother.
An EEG was run on T. eight months ago and he was found to have
a minimal cerebral dysfunction and some form of epilepsy and
psychomotor problems.  He is presently on Dilantin and Dexe-
drine which seem to help him, according to mother.  Mother is
afraid of T's temper tantrums or seizures in which he will grab
her or his sister with such force that he knocks them down.  T.
also has minor speech problems and is enuretic.

FAMILY CONSTELLATION:

The family consists of Mrs. F., the natural mother, age 50;
T., age 8, and patient, T., age 9, all of whom live in the home.
Two older children by a former marriage, C., age 22, and R.,
age 27, are married and live in different states.

T.F.                                          \                          144

Page 2

MEDICAL & DEVELOPMENTAL HISTORY AS REPORTED BY PARENTS:

The pregnancy was difficult and Mrs. F. had to take Pevaria
eight months before T's birth due to hemorrhaging.  T's birth
was forced and he was born by instruments.  Mother does not
know whether there was any birth injury.  Mother reports that
T. was slow at walking, talking and that he was difficult to
toilet train.  He looked like he was devoted to his father from
the time he was born--i.e., he said "Da Da" very early but
would not say "mama" until he was much older.  This seemed to
upset mother quite a bit.  About the age of three months, T.
started gaining weight very fast and at five months he could no
longer wear baby shoes.  This was very embarrassing to mother.
Mother describes T. as a happy, laughing baby until the age of
five months when his father went beserk and choked the mother
while T. was in her arms.  From that time on, mother feels that
T. was frightened and sad.  T. suffered from bronchial asthma
from the age one year to the age of six and a half years and
was on adrenalin and Penicillium constantly.  Since moving to
Oregon two years ago, the problem seems to have ceased.  Mother
reports that T. has headaches, stomach aches, dizziness, staring
episodes, hears noises, wets bed, and vomits when he's scared.
At the age of seven, T. had pancreatitis which was felt to be
due to his nerves.

T. had an EEG run on him eight months ago and reportedly had an
abnormal reading.  Mother reports that the child has some form

145

T.F.

Page 3

of epilepsy and psychomotor problems.  He is presently on
Dilantin and Dexedrine and at times has blacking out periods.
He has been in play therapy since the fall of 1970 at a
clinic in Oregon, and the reports are in the file.

Reports from the school in Oregon City, Oregon, indicate that
the school was not concerned about T.  In general, it was felt
that although T. had some problems in school, he was not a
disturbing child in the classroom.  The biggest problem seemed
to be with mother who sent her children late to school or not
at all or withdrew them early.  She is described as a manipula-
tive woman who tries to run the teachers and principal.  The
school reports that T. has done average work on a third-grade
level, although he has some difficulty in completing work.  He
is reported to be a good reader.

FAMILY HISTORY AS REPORTED BY PARENTS:
During Mrs. F's first marriage, she had two children, a boy
and girl, and one child who died as an infant due to an
insufficient placenta.  She described her first husband as kind,
but a playboy.  When he tried to give her away to other men,
she divorced him.  Her second marriage was to T. and T's father.
This man she described as having "wonderful, wholesome qualities"
but bad temper tantrums also.  There have been many tremendous
strains in the household due to T's father's violent temper
and his mother's sickness from arthritis and nephritis.  Mrs.

T.F.

Page 4

F. divorced her second husband in July of 1970, and has not
remarried. It is reported that after T's father left the home,
T. would not mind, would not help, was quite abusive physically
to his sister and mother, and would often tear up his toys and
damage other articles. T's father supposedly has organic
brain damage and is presently on medication and is receiving
psychiatric care from the V.A. hospital in Oregon. It is
possible that a combination of factors, both environmental
and hereditary, are affecting T's present behavior. His father
was a violent man at times, would attempt to choke and beat
his wife or T. and would threaten to kill T. and bury him.
It seems as if T. were singled out by his father for his temper
tantrums, because T. would often blank out things and could not
remember orders that his father had given him.

Mrs. F., T. and T. moved to Phoenix about a month and a half
ago in hopes of finding a better climate for Mrs. F's arthritis
and nephritis. Mrs. F. is presently supporting her family on
her social security benefits and is unable to work. She has
been very sick, is on medication, and describes herself as
having amnesia and blanking out spells herself. During the
interview, she was very scrambled and rambled on and on and on,
skipping from one subject to the other and not focusing on any
one point. It is possible that she has some form of epilepsy
herself. The mother seems to be very dependent upon T. as the

T.F.

Page 5

man of the house and is, indeed, very dependent upon both of
the children for her survival at this time.  She is feeling
quite unable to cope with the present situation and with T's
behavior, and cried much of the interview due to her distress.

IMPRESSIONS:

T. was seen as a cute, somewhat quiet, cooperative nine year
old boy who is fairly large physically for his age.  He looks
to be about the age of thirteen or fourteen, and is often
mistaken for that age.  He speaks quite freely of wanting play
therapy as he found it to be a positive experience in Oregon.
I feel that perhaps the child is looking for a parental figure
who offers him positive support and guidance and who is con-
sistent in his demands.  The boy seems to be fairly bright,
and in fact, it seems as if he remembers and knows things
better than his mother.  When asked what kind of medication
he was taking and what dosage, the mother could not remember
but T. could.

The mother seems to be an emotionally disturbed hypochondriac
with accompanying physical problems.  She is very dependent
upon T. and is a manipulator in about any situation you could
find her in.  During the interview, she put out many mixed
messages in how she felt about T.  At times she described him
as a very nice, good little boy and at other times as being
like the devil himself.  Mrs. F. has made herself very helpless,

T.F.                                                              148

Page 6

due partly to her physical conditon, and partly to her

emotional state.  She is confined to a wheelchair at the present

time and is looking for sympathy and support from her children.

In other words, it seems as if she is expecting the children

to be her parents while she can be the child who can be cared

for.  I feel that this woman needs a lot of help, and although

she seemingly would probably be willing to come in for therapy

herself, she would be quite resistant to change.  However, it

may help her at this time, in her life, to have someone to talk

to.

T. is a little boy who is having both emotional and organic

problems, and I feel that he could benefit from a therapeutic

situation.  T. and Mother have been recommended for psycholog-

ical testing.

PSYCHOLOGICAL FINDINGS:

T. is presently functioning in the Average Range of Intell-

igence as measured by his Full Scale IQ score of 103.  There

was a large discrepancy between his Verbal IQ score of 111 and

his Performance IQ score of 93, which can be attributed to the

minimal cerebral dysfunction indicated by the EEG examination.

T. has numerous aggressive feelings especially towards his

mother, which is not too unusual considering the behavior of

the father who attacks the mother, and in light of the over-

T.F.

Page 7

controlling, dominating behavior of his mother.  He seems to
get blamed for numerous things, and they don't seem to speak
positively of him at all.

This is a very mixed-up home life with the father about to
enter the V.A. hospital and the mother disabled, extremely
anxious, and experiencing difficulties managing the children.
In addition T. is attempting to compensate for his minimal
cerebral dysfunction and wishes to return to a play therapy
setting like he had in Oregon.  Due to the very mixed-up home
life, this examiner believes perhaps a foster home placement
would be the best solution.  It is doubtful however, whether
mother will give up her children again, as she speaks very
angrily about the previous foster home placement.  Both parents
seem too sick to work with at the present time.  There are a
couple of possibilities to help T.  One, he could be placed
again in a play therapy setting where he will be given an
opportunity to express some of these angry feelings that he
has.  Another possibility will be to place him in the Day
Treatment Program where he will be able to have the structure
suggested by his teacher in Oregon.  All reports indicate that
Mrs. F. is extremely manipulative and could undermine any
therapeutic approach we may undertake.

CASE NO.: 12                                                    150

M.A.

AGE:   7

SEX:   Male

PERSONS PRESENT FOR INTERVIEW & THERAPY:

Mrs. A. and M., age 7.

REFERRAL SOURCE & PROBLEM:

The A's were referred here by the social worker at the Grace
Court School because of hyperkinetic and disruptive behavior
that M. exhibits in class.  About six months ago M. was
evaluated and a complete social history, pediatric history,
psychological testing, as well as nutritional study were done.
Basically they found that M. was not retarded but was in the
slow average range.  They felt he did have much organicity
though.  Mr. and Mrs. A. are involved in group therapy on a
weekly basis but feel at this time that nothing is being done
to help M.  I explained that we would be glad to evaluate the
problems but if this turns out to be purely an organic difficulty
with no emotional factors, we would not be the proper agency to
handle this, as this would be a problem for their family physi-
cian.  Mrs. A. agreed and decided that there may be some
emotional factors involved and wished us to go ahead to evaluate.

Mrs. A. is a light complected woman in her fifties, who has
had much physical difficulty over the past years.  She's had
three very serious surgeries including intestinal surgery where
three feet of her lower intestine were removed, surgery because

M.A.                                                                    151

Page 2

of a bowel obstruction, and most seriously open heart surgery
about a year and a half ago where two valves were replaced.
She is somewhat slow moving now, has swollen veined legs with
some sort of dermatological condition.  M. is a wiry, very dark
complected, nice looking youngster of Mexican parentage.  He
has an obvious speech defect and mother states that she was
told he has a high palette.  He does manage though to use as
many substitute words as he can to avoid the sounds he cannot
pronounce.  Mother sees the child as having a school problem
in that he has a short attention span and is disruptive in class.
The teacher has tried to isolate him in the class and mother feels
somewhat hostile toward her.  Last summer he was in a headstart
program but became extremely tense and began vomiting so mother
removed him from this program.  M. is destructive and will fre-
quently smash his toys together.  He fears the dark, is also
afraid that someone is going to die.  Mother traces this back to
all of the fears he has had because of her illnesses.  She states
that he has staring episodes where he seems completely out of it.
He's been on many different medications including Ritalin and
Stelazine but mother said that he cried all the time on these
and his activity level did not change thus she has him off all
medications at this time.  M. walked at about 15 months, talked
at two years and was toilet trained by 2-1/2 years, however, he
is still a bed-wetter.  He was adopted in infancy and mother
obviously attributes many of his problems to his delivery which

M.A.                                                                          152

Page 3

was precipitus though doctors evaluating this have felt that
it is not significant.  Mrs. A. is married to a man of Mexican
American descent and in her own way seems somewhat prejudiced
against her husband and son.  She sees herself as a quiet,
refined lady-like person and describes husband and son as being
more loud and aggressive "the way all Spanish people are."
Father loses control in disciplining the child much easier than
she and she says she always manages to think rationally here.

In summary, this appears to be a cute well-developed little boy
of Mexican-American descent who was adopted at birth, yet his
adoptive mother has never been able to forget his early begin-
nings.  Mother is quite ambivalent toward this child and seems
to combine both unrealistically high expectations with expecta-
tions that he will fail.  For example, she seemed quite convinced
that he was retarded when she took him for evaluation and also
checked almost every problem in the behavior check list here
even though many of these were things that were very insignifi-
cant or done when he was just an infant and never really were
troublesome.  On the other hand, her wishes for this child were
well expressed when she stated that he wants to go to college
and be an engineer.  It's unlikely that this small, immature,
somewhat dull seven year old even knows what an engineer is and
that these are more of mother's expectations.  Father was not
able to come in at this time, though he is involved though some-
what marginally in M's evaluation.  Father apparently resents

M.A.                                                                    153

Page 4

going to CEC because most of the families there have retarded

children and he doesn't feel that they belong.  On the other

hand, mother finds it helpful and somehow still uses this to

hang onto the idea that her child is retarded.  There seem to

be many differences between husband and wife which need to be

resolved.  It would certainly be expected that a youngster whose

mother has been so seriously ill so much of his life would

develop many fears and during the session he exhibited a lot of

interest in body in that he would emphasize every little cut

and scrape that he had on his hands.

PSYCHOLOGICAL FINDINGS:

M. was referred to this agency in September 1970 because he was

identified as a slow learner in school.  The psychological

summary by K.D., psychologist, at that time reflected intellec-

tual functioning in the low average range based on a Stanford-

Binet IQ score of 84.  Dr. D. noted that there was some indication

of perceptual motor immaturity but not of a significant degree.

He also suggested that the parents' expectations of this youngs-

ter seem to be too high and they compare him unfairly with the

older daughter.  It was his recommendation that M. be placed in

a slow learner classroom (September 21, 1970).  In the CEC

evaluation report of November 2, 1970, it was recommended that

the parents could profit from attending a group which was set

up specifically for discussing the problems of children and

M.A.                                                            154

Page 5

their management at home.  It was noted that the youngster was
not mentally retarded and that there were indications of minimal
cerebral dysfunction.

The responses to selected Michigan Picture Cards, the figure
drawings and the reproductions of the Bender designs are often
associated with inadequate, insecure acting-out youngsters.
Utilizing the Koppitz scoring system, M's maturation level in
visual-motor-perceptual tasks is at about the 5-1/2 year old
level.  This places him nearly two years below his age level;
in addition, there are several signs which are usually associated
with organicity.

SUMMARY & IMPRESSIONS:
M. is a youngster who appears to be functioning in the dull-
normal range.  There are indications of minimal cerebral dys-
function and visual-motor-perceptual immaturity.

In light of M's handicap, it is understandable that the parents
would have some difficulty accepting his limitations.  The
mother seems to be shopping for some additional medical finding
that would readily explain M's behavior.  In view of the exten-
sive medical, social and psychological findings, maybe a very
direct approach would be most helpful to her at this point and
time.  She appears to be looking for extraneous reasons for his
behavior, rather than looking at the family dynamics and the

M.A.                                                          155

Page 6

influence of the parents in M's development.   Therefore, in
any treatment consideration, I think it is important that M's
limitations not be identified as the only concern.

Also, it is imperative that any medication for this youngster
be closely supervised in order that the effects can be explained
and questions readily answered about the short-comings of a
medical solution to the problem.

CASE NO.: 13                                               156

H.A.

AGE:  9

SEX:  Male

PERSONS PRESENT FOR INTERVIEW & THERAPY:

Mother, Father and H.

REFERRAL SOURCE & PROBLEM:

This family was referred to our agency by the Juvenile Proba-
tion Office.  Both mother and father agree that H. has been
trying to get away from their home into a foster home, and he
has thought that he could steal things and be placed out of
their home.  Father states that the charges for theft -- for
stealing walnuts and a radio -- have been dismissed but that
the Juvenile Probation officer referred them to this agency
and strongly suggested that they come.

H. has been skipping school, although parents state that he
makes good grades and even made up one year that he had lost
due to illness.  Information is not available from the school,
but I plan to attempt to get it.

H. is described as having temper tantrums and is destructive
with toys and anything that is in his way when he is mad.  When
he is disciplined he runs off swearing and will smash things on
the table or whatever's in his way.  Mother hastens to say this,
and his dad does, too.

H.A.                                                              **157**

Page 2

H. has trouble with enuresis, and both parents started to speak
at once that this runs in their family. Mother states that she
had problems with enuresis until she was nine years old. Father
states that he had this problem until he was in his second hitch
in the Army. He states that he has kidney troubles, that he has
had kidney stones, that he has taken medication that has dis-
solved the stones. He even mentions dreaming dreams where it
has taken him two hours to go to the bathroom only recently.
They indicate they have a fourteen-year-old daughter who still
has problems with enuresis.

They state that H. lies about everything and that he has problems
stealing. He recently stole some walnuts and a radio, and
father justifies this behavior by stating that he wants to be
in a detention home. Both parents indicate that H. is easily
influenced. He does what the other kids tell him to do.

It is also noted that he is clumsy. There was a very serious
automobile accident which occurred on the way home from school
when he was seven years of age. The automobile ran over him,
and within six weeks he was also run over by a truck. Father
indicates that while he was recovering from these accidents,
the children at school made fun of him. He walked different,
and doctors indicated that he bled internally. Mother verbalizes
that she believes he had some kind of brain damage. The doctors
did not officially give her this information, but this she
suspected.

H.A.                                                        158

Page 3

It is notable, however, that when H. was a young child he had
a speech defect.  Mother states he was three of four years old
before he started talking.  He could say words and babble, but
his words were not distinguishable until he was three or four.

Both parents indicate there is no consistency in the discipline
of the children, and they readily agree that this is part of the
problem.  Father is very hostile, and mother interrupts him
every time he starts to speak.  And the air is thick.

FAMILY CONSTELLATION:

In addition to mother, father, and H., there are six other
children ranging in age from sixteen to one.  Also a cousin,
age thirten, lives with them in the home.

SOCIO-ECONOMIC FACTORS:

This is a family that receives commodities from welfare.  Father
has a sixth-grade education.  He is quite hostile about receiving
welfare and thinks this makes him less worthy.  He states he is
able to work and earn enough to get by on if he doesn't have to
come to all these meetings.  Yet, at the same time, he admits
that they have a problem and while they could solve it, they  .
probably wouldn't solve it without help.

FAMILY HISTORY AS REPORTED BY PARENTS:

Father complains that mother is going from the home all the time,
taking kids to the doctor or doing something else.  She simply
manages to be away from the home, and he says that you can't

H.A.                                                                159

Page 4

raise children without the mother in the home.  And he indicates
that this has heppened consistently over the last four years.
Mother's side of the story is that father is jealous and doesn't
want her out of the home and that in the beginning when she'd
even wear a pair of shorts, he'd make her take them off and give
them away because he was so jealous.

It seems that this family has been overly involved with another
family in the neighborhood and only recently mother and the woman
got in a real fist-fight, and mother is wearing a neck cast.  It
seems that father had an affair with this woman some four years
ago, and in this period of time this family has come to their
home and eaten food consistently.  When asked why they tolerated
this practice from these people, they seemed to indicate that it
was impossible to run them off and other people in the neighbor-
hood and other friends had had similar difficulties.

Father says there is no sex in the marriage.  Mother admits she
does not care for sex; so this presents one of their basic prob-
lems in addition to the finances.  They scream and argue with
each other all the time.  They are not consistent in their dis-
cipline, and they admit that the oldest boy, D., had similar
problems to the ones H. is having.

Father is half Cherokee Indian from a family of thirteen; he
was the oldest boy in the family.  His father was a Pentecostal
preacher and a very rigid man.  Mother states that he was a woman-

H.A.                                                            160

Page 5

hater.  Father grew up in southern Illinois and met Mrs. A.
while he was in the service around Albuquerque, New Mexico.
He had a sixth grade education; he is very difiant of all
religions; and this does present a problem in their household
because mother is Seventh-Day Adventist and he is very adamant
against this religion.

Mother is one of two children of a broken home.  She states that
she was thrown from pillar to post, first with father, then
mother, then grandparents; and she never really felt secure in
growing up.  She felt she grew up like Topsy.  She went through
the freshman year of high school.  Her Seventh-Day Adventist
faith plays an important part in her life.

IMPRESSIONS:      -
This is a nine-year-old blonde boy whose hair was shaven to his
head.  He saw his problem as having to do with Maxine, the
woman his mother fought.  He was hyperactive and does not give
the appearance of being extra bright.

Father looks and acts angry, prefacing most of his conversation
with swear words.  Mother is a heavy-set woman who constantly
interrupts when her husband is trying to explain something.  They
openly admit to wide differences in their relationship.   They
openly admit that their problems probably affect the problems
of H. and the other children.

H.A.                                                          **161**

Page 6

Mr. A. made a point of having to spend time in an agency that really couldn't afford to take their time to be with him, and I dealt with this matter. He seemed to be speaking of the fact that this was not costing him anything, but he was certain it was costing someone. I was not sure whether he was angry because he could not pay or guilty because he could not pay. But he did admit that they had a problem and they could solve it, but they probably wouldn't without help. And he ended up telling me that he would be able to take time to come to the agency provided the agency found in their evaluation that this would be advisable.

PSYCHOLOGICAL FINDINGS:

This young man appears to be functioning in the normal range (full scale I.Q. score 104 on the WISC) with a potential for better academic performance. In light of his social-cultural background, this is quite remarkable. Apparently he is rejected by peers, and because of his lack of cleanliness, most adults would not readily warm up to him. He persists on tasks and seems to have confidence in his ability to resolve intellectual challenges, if not social ones. The family interaction is apparently heated, unpredictable, and not always understandable to H.

It appears that H. may be helped by having a positive relationship with an adult male. Involvement in a therapy group of

H.A.                                                    162

Page 7

age-mates might be a consideration at a later date.

It would be beneficial in the long run if parents would be made
to understand the social consequences of a shaved head and a
lack of cleanliness.  H's negativistic, hostil behavior may
reflect his only response to a harsh and inconsistent standard.

Specific treatment suggestions will have to come after evaluating
the total family structure.

CASE NO.: 14                                                    163

P.G.

AGE:  9

SEX:  Male

## PERSONS PRESENT FOR INTERVIEW & THERAPY

Stepfather, mother, and patient, age 9.

## REFERRAL SOURCE:

Self-referred because of lying and getting into things --
particularly sugar and honey.  The mother first applied in July
of this year for brother M, age 11, whose symptoms are described
as hyperactivity, specific learning distrubance, and generally
poor adjustment.  Discussion at that time revealed that mother
was in essence trying to compile evidence for a custody suit to
obtain custody of M. from natural father.  When mother was told
that she could not bring the child to the clinic unless she had
custody of him, she chose then to bring P., presenting the above
mentioned complaints, along with enuresis.

## FAMILY CONSTELLATION:

Stepfather, 25-1/2; mother, 30; M., 11; patient, 9; S., 8; and
K., 22 months.

## SOCIO-ECONOMIC FACTORS:

Stepfather had two years chiropractic training, decided that he
wanted to be a photographer and until he can get to do this he
is doing various kinds of jobs.  Particularly at this point he
works as an assistant manager for Jack-In-The-Box.  This necess-
itated working Sundays which causes the family to have to give

P.G.                                                              164

Page 2

up being Seventh-Day Adventists which is causing mother some
feeling of concern.

Mother works as a bookkeeper assistant for a jewelry company
part time.  Approximate income is $100 per week total.

MEDICAL & DEVELOPMENTAL HISTORY AS REPORTED BY PARENTS:
Mother had a strife ridden pregnancy with P., being extremely
unhappy with her marriage and close to a "mental breakdown."
While carrying him she did not want the baby because her marriage
was about to break up.  After his birth she found she loved him
and wanted him, does not admit to feelings of rejection until
she discovered that he would not allow her to pick him up without
crying.  She began to feel rejected and in turn became anxious
and less able to manage him; particularly it would upset her
when her husband was capable of dealing with the child and she
was not.  She found him to be an extremely obstinate boy.  Pottie
training was very difficult.  She had very little to give the
children and often she would put honey on a pacifier to keep P.
from crying.  She believes that this early period of frustration
is to blame for the problems that the boy now shows.  Now he is
better able to be controlled however, than ever before, usually
you can appeal to his decency, his sense of justice. Stepfather
in particular gets along well with the youngster.

SCHOOL HISTORY
Patient's grades have always been good.  This past year he made
straight A's.

P.G.                                                          165.·

Page 3

Peer relations have been good also and there have been no
complaints from teachers.

FAMILY HISTORY AS REPORTED BY PARENTS:

Mother ran away from home right after high school to get married,
to get out of an unhappy home situation.  The minute the ceremony
was over she knew she had made a mistake but continued living in
this marriage for nine years.  It was a stormy affair.  She had
not emancipated herself from her home yet was married to a man
she considered extremely dominating, and with a terrible temper.
She claims he tried to kill her three or four times and then
began to suggest suicide to her.  She was under the care of a
psychiatrist much of the time through the first marriage and at
many times was suicidal.  Instead of cooperating with the doctor
to help her, the ex-husband is said to have put medicine and
implements there, hoping that she would kill herself.  After the
two moved to Davenport, Iowa where her husband became a chiro-
practor, she was not able to run home to mother.  She was
gradually able to become more independent, moved out and began
working as a post office employee, hiring a babysitter and
managing her affairs.  Then after this she met her present
husband who was in chiropractic training there.  They married
within a short time after her divorce because first husband
kept continuing to come into the home, beat her and tried to
get custody of the children.  Parents state that this marriage

P.G.                                                166

Page 4

of three years duration has been excellent.  They moved to this
area to help rid Mrs. G. of bronchitis.  This has worked and she
feels much healthier, was able to lose twenty pounds prescribed
by the doctor, also.

Recently M. was back east visiting the natural father and prior
to that time, about two years ago, mother signed over custody
to the father so that the child could live in an "only child"
environment as she and stepfather understood the psychologist
had recommended at the child guidance center in Davenport.  She
and her present husband claim that the natural father did not
take the child for psychiatric help as planned but instead took
him to be hypnotized by a chiropractor.  Upon his recent visit
to the natural father M. was quite unhappy and claims he wants
to stay with the G's.  According to both Mr. and Mrs. G., all
the children relate better to stepfather than to natural father.

Mother:  Mother claims to have had a very unhappy childhood.
Her mother "ruled the roost," was hypochondriacal, a perfect
housekeeper, a person who had rules and regulations about every-
thing.  Father's goal was to keep mother happy regardless of the
feelings of anyone else.  Mrs. G. claims she was not allowed to
do anything, was over protected, and miserable at times.  She
was so dependent that even after her marriage when anything
went wrong her only resort was to go home to be dominated by
parents.  Only recently has she felt that she has begun to grow

P.G.                                                                167

Page 5

up and be independent and capable of managing her own affairs.

Stepfather:  Stepfather was raised by a mother who was dominating.
After the parents divorced he wanted to go live with his father
but was afraid to say so to his mother because he knew she wanted
him to stay there and he would have felt very guilty to have let
her know otherwise.  He claims to love his father very dearly
and thinks he is the greatest.  Both Mr. and Mrs. G. talked glow-
ingly of this man and his wonderful warm attitude.  Mr. G. went
to chiropractic school and really wanted to become a psychologist
or psychiatrist but expensive schooling was out of the question
and also he did not want to become an M.D. since he still has a
chiropractic orientation.  His goal now is to be a photographer
and most of the classes and work he is taking seem to be aimed in
that direction.

IMPRESSIONS OF PARENTS:

Mother is described as having had a depressive psychosis and
having on numerous occasions threatened and attempted suicide.
She has had in the past severe bronchitis and obesity.  At
present she is a slim, marginally attractive woman, who while
not having a great deal of warmth and maternal capacity in
dealing with children at least has been able to make changes in
her own coping ability.  Growth and maturity over a period of
a few years seem to be remarkable.  It's obvious that the
present marriage has been good for her.

P.G.                                                                    168

Page 6

Stepfather is in some ways immature and has a great deal of
hostility toward an over dominating mother.  However, he is a
very bright young man, perceptive, warm capable of making use
of therapy, I believe.  He and wife seem to be working together
on problems as they arise in the marriage and seem to have a
solid foundation to the marriage.

In terms of his feelings for the youngsters, although he may
have quite a lot to learn about child rearing, his feeling toward
them seems to be a good one.  In fact, he credits P. with having
been partly responsible for their marriage in that P. introduced
him to friends as going to be his new stepfather when Mr. G. had
been going with mother only for a very brief time.  Mr. G. feels
that he in particular has a good relationship with P. seeming to
have grown attached to him right away.

Patient is a cute masculine looking little youngster who seems
bright and alert, is proud of his ability at school and very fond
of his stepfather.  There is emotional insecurity as revealed
by some of his answers to questions.  He was capable of putting
into words the reasons why he was here, was noticeably anxious.
When asked for three wishes he said: 1. get help in stopping
lying, 2. get help in stopping taking things.  When pressed
he was finally able to come up with the third wish, to obtain
help in being a good boy.  When asked what he would take on a
desert island his eyes lit up and he said "lots of food, a radio,

P.G.                                                                      169

Page 7

blankets." He thought for a time and then said, "I would have
to have a ship, too."

SUMMARY:

This cute little nine-year-old boy is seemingly a healthy out-
going child despite the fact that he had rather traumatic and
stormy times in earlier years.  Complaints of lying and getting
into things seem to relate to need for maternal nourishing.
There may be some over-control on the part of parents.  Often
fear of punishment seems to be his reasons for lying.  His desire
to be a good boy probably results in some construction.  Alone,
mother was having much trouble in getting the child to mind and
cooperate.  Force didn't work and she was never able to come up
with anything that did until advent of the stepfather.  Now things
seem fairly under control.

Parents seem capable of using help.  They have shown ability in
the past to grow and mature and learn from their experience.
Both have quite a lot of hostility but seem to be bright.

One must not lose sight of the fact that the initial reason for
coming to obtain custody of M. and although the family knows
that we cannot become involved in this matter, they may attempt
to use the clinic in some matter to obtain what they want.  For
example, they have asked that a copy of the report sent to us by
the child guidance clinic in Davenport be sent to the family

P.G.                                                    170

Page 8

doctor, or, better still, copies be given to them directly.
When told that this could not be done they seemed rather upset.

PSYCHOLOGICAL FINDINGS:

On the WISC, P's Verbal Score was 63, the Performance Scale·
Score was 55, giving him a Verbal I.Q. Score of 116 and a
Performance I.Q. Score of 107.  His Full Scale I.Q. Score is 113.

Much of his energy appears to be taken up in impulse control.
There appear to be signs of P's having difficulty in differen-
tiating between essential and non-essential facts and he seems
to have to make a deliberate effort to sort out irrevelant
material.  Although at this moment he does not appear to be
sriously inhibited, it seems imperative that he not continue to
be placed in double-bind situations.  The stealing episodes and
the lying may reflect his only response to a feeling of "there's
no other way out."

In considering treatment possibilities, it would seem that a
discussion with the parents of behavior standards that are more
flexible and realistic would be most productive.

CASE NO.: 15                                              171

D.A.

AGE:  8

SEX:  Male

PERSONS PRESENT FOR INTERVIEW & THERAPY:

Mother, patient.

REFERRAL SOURCE & PROBLEM:

This was a self-referral by the mother.  She states that D.
suffers from encopresis.  He is belligerent and hyperactive.  He
has lately been copying his sister's temper tantrums and is also
enuretic.

FAMILY CONSTELLATION:

Mother, age 48; J., age 12.  The father, age 48, is divorced
from the mother and living out of the home, although he visits
frequently.

SOCIO-ECONOMIC STATUS:

The family receives Aid to Dependent Children.

MEDICAL & DEVELOPMENTAL HISTORY AS REPORTED BY PARENT:

D. was the mother's fourth child.  She states that she was quite
ill during her pregnancy and suffering from emotional problems.
She states that the baby was too large and very difficult for
her to carry.  He was born in the tenth month and the birth was
by instruments.  She states that there was a minor birth injury -
a crooked foot.  D. has needed to wear corrective shoes for this.
At the age of two he suffered from very high fevers up to 106°.

D.A.                                                                        172

Page 2

The mother states that he may have had convulsions.  Also when
he was two years old, she states, he was thrown down by his
father and lost consciousness for a period of time.  At the
age of four he fell out of bed and suffered a severe bruise to
his left testicle.  He had a tonsillectomy at age five.

At the present time D. complains of severe stomachaches.  He
claims to see white spots on occasion.  According to the mother,
he should wear glasses but he won't.  She also states that he
is hyperactive although he did not appear to be in the office.

D. began to walk at nine months but did not talk until three and
a half years of age.  Toilet training gave the mother a great
deal of trouble. ˙She began to train him when he was eight months
old and had little success.  She states that he became quite
hysterical, therefore, she waited until he was two years of age.
At that point he did become trained to some degree but still has
enuresis presently.

At the present time he still suffers from occasional enuresis
as well as the more frequent encopresis.  The encopresis used
to occur at school until the mother punished him quite severly
for this.  Now he no longer does it at school but does it at
home.

SCHOOL HISTORY:
He entered kindergarten at age five and the mother claims there
were no problems at that time.  In first grade he began to have

D.A.                                                           173

Page 3

problems with encopresis.  The teachers also complained that
he had poor concentration and his behavior was hyperactive.  His
grades have been fair and his peer relationships appear to be
good.  Problems have continued in second grade though particu-
larly in academics, he has a great deal of trouble with phonics
and is having difficulty learning to read.

FAMILY HISTORY AS REPORTED BY PARENTS:

The family situation is quite chaotic.  The parents have been
divorced for two years.  In spite of this, Mr. A. visits quite
frequently, although Mrs. A. would like very much for him to
no longer do so.  The parents do not agree on anything regarding
the children and their are innumerable arguments and fights.

D. and J. do not get along together well at all, and they are
constantly fighting.  Apparently D's only good relationship with
family has been with his father and this upsets the mother a
great deal.  Before the parents divorced he used to sleep in
his father's room.  The mother tried to discourage this and
finally told the children that their father was a child molester,
and she "warned" them not to have too much to do with him.  When
asked about this she stated that the father had tried to molest
one of her older daughters and this occurred even in front of
her.  At the present time D. has severe fears particularly of
the dark and being alone.  The mother states that he will not go
to bed alone, so he either sleeps with his sister or with his

Case 2:16-cv-01159-SRB   Document 45-3   Filed 12/04/17   Page 189 of 421

mother.  Mrs. A. would like to separate the brothers and
sisters, so she is going to get another bed and arrange to
have D. sleep in her room.

IMPRESSIONS:

D. is a rather large, overweight, eight year old boy.  He was
very quiet and uncomfortable during the interview.  He generally
kept his head down and answered in monosyllables.  He found it
almost impossible to discuss anything of a family nature and
became quite non-verbal when this was discussed.

Mrs. A. displayed much anger toward her husband and toward males
in general.  There was some manipulative behavior on her part
trying to get the agency to forbid Mr. A's visiting of the
children.  She, on occasion, displayed inappropriate affect,
laughing and smiling when under stress.  She has extremely
little insight into her own behavior and tends to project blame
onto others.

PSYCHOLOGICAL FINDINGS:

We are dealing with an anxious, dependent, passive-aggressive
child who, because of severe emotional trauma and perhaps some
environmental deprivation, has suffered cultural arrest with
attendant language and perceptual immaturities.  D's intellec-
tual and academic potential would appear to be higher than we
have observed.  Right now a phonics approach to reading through

D.A.                                                    175

Page 5

the visual modality would seem to be in order.  A straightening
out of the mother-father problems is essential if progress is
to be made.  It is also recommended that both mother and son
initially enter into group therapy.

CASE NO.: 16                                           176

D.A.

AGE:  9

SEX:  Male

PERSONS PRESENT FOR INTERVIEW & THERAPY:

Mother and patient, age 9.

REFERRAL SOURCE & PROBLEM:

Referred by Mrs. P., school nurse, at mother's request because
of the boy's stealing money from mother and from her Brownie
troop fund -- repeatedly.  Also, the boy seems to have few, if
any, friends his age.  Children at school tease him, and he is
unhappy about it.  D. is also a chronic bed-wetter.

FAMILY CONSTELLATION:

Mother, 32; K., 12; patient, 9; R., 8 (a girl); P., 7.

FINANCIAL STATUS:

Mother earns $110/week as a secretary.  Parents are divorced,
and there's little, if any, contact with the father.

MEDICAL & DEVELOPMENTAL HISTORY AS REPORTED BY PARENT:

Birth history was normal.  When patient was about eight months
of age, he was in the hospital with pneumonia, and fell from a
crib, receiving a hairline skull fracture.  In August, 1970, he
suffered a severe dog bite on the leg that required seventeen
stitches.

D.A.                                                              177

Page 2

## EARLY PERSONALITY HISTORY:

Active, affectionate.  Mother states that he has always found
it difficult to sit still, cannot even sit still through one
television program - always on the go.  She describes him as
being a child who is determined to get what he wants - bullheaded
(however, she does not seem to find this trait disaggreeable).

## SCHOOL HISTORY:

Grades are about average.  Intelligence test scores obtained
through the school show I.Q. to be 102.  Mother states the boy
has a reading problem, but not severe.

School nurse states he has not been referred to the psychologist.
He is not a real discipline problem; he is a quiet, loner-type
child.  (Patient's eyes teared in the interview when he talked
of not having friends and no one wanting to play with him and
the other children teasing him.)

## FAMILY HISTORY AS REPORTED BY PARENT:

Parents met when mother was a stewardess on an airline and
father a member of the ground crew.  The first child, K., was
born about seven months after the wedding, and K. was described
as "the apple of his father's eye."  (However, father sees none
of the children at this time.)  He did not want any more children
and was quite upset when Mrs. A. became pregnant with patient.
While the patient was in the hospital with pneumonia, the father
refused to go see him.  Mother states that she and her husband

D.A.                                                        178

Page 3

had many bloody battles over his rejection of the boy.  Grad-
ually, he grew to accept him but never did take him shopping
or to ball games like he did K.  Mother states it hurt her
very badly and that she's sure that her feelings rubbed off
on the children.  The husband wanted a girl child so was happy
when R. was born, but did not want more and was quite unhappy
when P. was born.

Mother indicates that although her husband left the family in
1966, it was her wish also that he leave because he had a
serious drinking problem and was running around with a couple
of women, and she did not want to bring her children up in such
a home.  When, two years ago, he came and wanted them to go back
together, Mrs. A. refused, stating she did not want to move to
New Jersey and raise children in such a crowded area.  (There
are indications that she really did not want to leave Minneapolis
where her own parents lived and that this was part of her reason
for refusing.)  She states that her husband has accused her many
times of trying to make him into a man like her father, and she
supposes that is so since she adored her father, always felt that
her father and mother had a perfect marriage.

After the father left, Mrs. A's own father took over the father
role with the children, and although they didn't live in the same
household, he took the boys hunting and spent quite a bit of time
with them.  Mrs. A. states that she and all the members of her

D.A.                                                                    179 :

Page 4

family have probably been guilty of comparing patient unfavor-
ably with K., who is a well-rounded, healthy, very intelligent,
well-adjusted boy.  Patient cannot stack up in any way to K.
and knows it.  Also, there are indications that the boy is
jealous of his next-to-the-youngest sibling, sister R., but
seems to get along better with the youngest one, P.

Mrs. A. and the children moved to the Phoenix area a year ago
last June because the company for which she worked opened up a
business here and wanted her to come.  She has a very favorite
aunt in Tucson and a sister in California, so does not feel
completely away from family.

She seems to think that her oldest son, K., and her two girls
are getting along fine and that it is only D. who is having
problems.  She feels guilty about D. because she feels that
somehow she has done something wrong to cause him to be having
these difficulties.

In trying to manage his symptom of stealing, she has talked to
him, paddled him, restricted him, and most recently, in despair,
she burned his fingers on the stove.  Nothing seems to have
worked.

She thinks of all the males in her family that patient reminds
her most of her youngest brother whom mother never attempted to
discipline and who was mischievous and into everything like patient.

D.A.                                                                    180

Page 5

MOTHER'S HISTORY:

Mrs. A. describes herself as "Daddy's girl," says that she
was spoiled rotten.  Even now she calls father on the telephone
when anything goes wrong and talks to him at length.  She used
to go hunting with him, was very companionable with him.  On
the other hand, her mother was someone whom whe could never
really reach, and she thinks her sister was something like
mother in this respect.  Both seem to be afraid of people,
afraid to let anyone get too close for fear of being hurt. Her
mother could look, in the morning at 6:00 a.m., as if she just
stepped out of a beauty shop, and her home was always perfectly
well kept -- not that she was a meticulous housekeeper, but
just well-organized and efficient.

Recently on a trip home, Mrs. A. wanted so much to be able to
sit down and talk problems over with her mother, but just couldn't.
There was just no reaching mother.  Instead, she calls her aunt
long-distance in Tucson and talks with her when there's something
worrying her.

She states that she was the oldest child, having one sister and
three brothers.  The oldest and the youngest brothers were
mother's favorite children and mother did not really discipline
either of them.  The oldest was quite rebellious toward his
father.  The youngest was completely spoiled.  (This is the one
that Mrs. A. says D. reminds her of.)  "My sister could always

D.A.                                                                181

Page 6

get along better with mother than I because she was quite a
lot like mother."

It should be remarked that Mrs. A., eleven months after her
husband left, was involved in a serious accident while riding
a motorcycle with a friend and was required to be in the
hospital for six months and has had five episodes of surgery
and quite a lot of physical therapy.  She walks with a limp
and says that her hip always has about the same amount of pain
as one might have with a toothache.  When the hip was set, she
had a staph infection; and ultimately the ball of the hip had
to be removed.

FATHER'S HISTORY:

According to Mrs. A., her husband was a minister's son, who
rebelled completely against the over-strict, religious training
yet had a tyrannical father.  He ended by drinking,.running
around with women, and gambling.  He has had little, if any,
contact with the children since he left, except for an incident
two years ago when he came back and wanted the family to join
him.

INTERVIEW WITH PATIENT:

Patient was interviewed alone briefly and with real feelings
asked for help in learning how to make friends and keep the
other kids from teasing him.  He is a small, rather pretty,
sensitive, and somewhat effeminate little boy, who seemed

D.A.                                                                182

Page 7

somewhat clinging in his behavior toward his mother and in
hers toward him.

In answer to the question about three wishes, he said he would
like an airplane for himself, an automobile for his mother,
and to have friends to play with.  When asked about who he
would take to a desert island, with no hesitation, he said,
"My mother."  When asked what, he said, "A house, a boat, and
a car."

IMPRESSIONS:

It's my impression that Mrs. A. may be re-enacting unresolved
early life conflicts thorugh D., whom she seemingly has equated
with her youngest brother, whom she thinks her mother spoiled.
She longs for a close, loving relationship with her own mother,
which she has never had.  And there is covert hostility noticed
in her interview eith me, suggestive of distrust of women.
There is also rebellion against authority noted in her refer-
ences to psychologists whom she has known who themselves were
"kooky."  It's my impression that quite a lot of this hostility
and distrust would have to be worked through before much head
way could be made in therapy with her.  On the positive side,
there is a great deal of anxiety and she already sees that
probably she is some way involved in her boy's pathology and
wants some help in working out a way for him to be better
adjusted and happy.

D.A. 183

Page 8

D. himself is effeminate in behavior and seems to have a
somewhat hostile, dependent relationship with his mother.  His
episodes of stealing seem to involve her or the Brownie troop,
of which he seems to be quite jealous.  The clinging behavior
between mother and child suggests unexpressed hostility that
will need to be brought to the surface and dealt with effectively
before a relationship between the two can be improved sufficiently.

PSYCHOLOGICAL FINDINGS:

As his school had reported at least average intellectual potential
on the group tests, no further intelligence testing was conducted.
While his visual-motor integration skills appear to be within
normal limits, there were strong indications that he feels
extremely anxious when doing such tasks.  There was also evidence
of mixed dominance; that is, he writes and eats with his right
hand but throws and kicks on the left side of his body.  He is
also still unsure of his dominance directions.

D. is an extremely anxious youngster who is now attempting bind
these feelings by retreat into a rather active fantasy world.
This world is peopled, however, by actual representatives of
significant others in his life.  Much of D's anxiety at this
point is his felt lack of external support and control of his
impulses in the wake of father's absence.  Grandfather's absence
in this case is also a significant contributing factor to D's
feelings of insecurity.  This concern with impulse control is

D.A.                                                            184

Page 9

a real issue for D. to demonstrate, at least at a pre-conscious
level, much potential for acting out in an aggressive and
hostile fashion.  Occasionally this is acted out more directly
when he does such tings as banging his head into a wall or by
kicking holes into a door.  It is exactly his awareness of this
potential for aggressive outbursts and his concurrent concern
with respect to no one's being there to provide the control,
that are combining to produce a sort of inner panic in D.  An
additional bind is that D. is made to feel guilty by mother for
mentioning or seeking out natural father in any fashion.  One
means by which D. is attempting to at least maintain some
semblance of identity is by installing himself in father's
place -- at least in his fantasy life and in his play.  His
tendency to identify with older boys is also felt to be a step
in this direction.

CASE NO.: 17                                                    185

M.F.

AGE:  9-1/2

SEX:  Male

PERSONS PRESENT FOR INTERVIEW & THERAPY:

12-6-71 -- Mother, father, and M.  12-8-71 -- Mother and father.

REFERRAL SOURCE:

Dr. L., who saw M. several times at Williams Air Force Base
School and referred him her for consideration in a day treatment
program.  M. has a long standing history of problems in school,
both academically and behaviorally.  He cannot stay at his desk,
has difficulty concentrating and does not do what he is told
either at home or at school.

FAMILY CONSTELLATION:

Mr. F. is a 32 year old Negro man and his wife is a 29 year old
anglo woman.  M. is the oldest of four siblings, the youngest
being 8 months old.

SOCIO-ECONOMIC STATUS:

Father is a Staff Sergeant in the Air Force and the family
reports their income is $7,000 a year.

MEDICAL & DEVELOPMENTAL HISTORY AS REPORTED BY PARENTS:

M. was his mother's first pregnancy.  His early history was
essentially normal and he achieved developmental milestones
at an average age.  He is enuretic which developed following the
birth of his brother.  M. has a vision problem and is far sighted

M.F.                                                            186

Page 2

and has glasses, although he does not like to wear them, and has
not been wearing them at school a great deal.  Mother and father
report no serious accidents or illnesses.  As previously noted,
M. has a history of school problems since kindergarten where
the teachers noted that he had problems getting along with others
and getting his work done.  He attended school for the first three
years in New York and has been at the Air Force Base School for
the last two years.  The parents and the school report similar
behavior problems; M. is a discipline problem, is disruptive, has
a short attention span, and his academic work is variable.  M.
seems to have a lot of friends, although his mother reports that
he feels he has to do things for them and buy them to keep them
as friends.

When I saw parents, they felt that things had improved since M.
had started to see Dr. L. and since the school was working more
closely with him.  They were a little hesitant about the idea of
the day treatment program as they felt that if he could improve
sufficiently in the public school, they would prefer to have him
remain there.  As they talked, however, it seemed as if this was
a multi-problem situation and the day treatment program would
probably be the treatment of choice for this child.

FAMILY HISTORY AS REPORTED BY PARENTS:

Mother had a very poor childhood.  Her parents divorced when she
was five and her father was given custody of the children, and

M.F.                                                                187

Page 3

she and her siblings grew up moving from one home to another.
They lived with relatives for awhile and were in and out of
childrens homes and Mrs. F. was finally adopted at age 10.
Mrs. F. remembers these years as very lonely and unhappy ones.
She reported that she didn't like her adoptive parents who
were older and very strict, but she agreed to be adopted
because she wanted a home and she "knew no one else would have
her." She completed high school and went to nursing school in
New York City, where she met her husband. Mr. F. was raised
in South Carolina with six brothers and sisters. He stated
that his family was close one and the children obeyed their
parents because that is what they were supposed to do. He
completed high school where he got average to above average
grades and then went to work. He entered the service several
years later and has been in the Air Force for the last ten years.

Mr. and Mrs. F. met in New York and were married for two years
when father joined the service. Mother wanted to go with him
and he didn't think she should, so she left him and got a divorce.
She lived with another man, whom M. thought was his father and
M. didn't find out the truth about this until he was five years
old, and the relationship between Mrs. F. and the other man
broke up. M. was very close to this man and was very angry
when he left the home. Mr. and Mrs. F. remarried a year and a
half ago, and they continue to have some serious marital problems.
Mrs. F. stated that her husband was "not used to being married,"

M.F.                                                          188

Page 4

but I was unable to get any additional information.  Neither
parent feels they know how to cope with M. and mother reports
that she knows she has no patience with the children when she
and her husband are having problems.

IMPRESSIONS:

The Intake Interview was an extremely difficult one for Mrs. F.
and she visibly broke down on numerous occasions when she was
talking about her memories of the past and about her marital
problems.  One may assume that Mrs. F. had to devote a lot of
energy to dealing with her own personal problems and the impact
her growing up years have had on her life and this does not
leave her much energy to cope with M.  In addition, she is
extremely upset over current marital problems the couple is
experiencing and she, herself, is able to verbalize that she
loses patience with the children and is quite inconsistent with
them.  When you add to this the organic factors that seem to be
involved in M's situation, it is not surprising that this child
is having trouble at home and at school.

When I saw M. he tried very hard to make a good impression and
related well.  Underneath, however, it is apparent that he has
a very poor self image and that he, himself, has experienced
rejection, first from his natural father and then from a man
whom he thought was his real father.  I feel that M. needs the
intensive approach of the day treatment program and that his

M.F.                                                                          189

Page 5

parents also need to be involved in treatment.

PSYCHOLOGICAL FINDINGS:

M. is emotionally disturbed.  There is much dissociative
thinking tied up with a myriad of conflicting and disturbing
emotions; i.e., sado-masochistic manipulation to obtain maternal
affect, then sadistic impulses towards a mother who is chron-
ically ill and who switched fathers on him, and thus deserves
to die - all this through a defensive system which is so intri-
cate as to manifest itself as an almost hysterical dissociative
narration.  There is much self-hatred with a future which
foresees self-fulfillment of failure, delinquency, a societal
burden, with frequent reference to eventual escape through
suicide.  M. feels complete parental rejection and fantasizes
aggression toward them through violent and dispassionate
homicidal action.  He also hints at deep-seated fears and night-
mares set against a traumatic early childhood.

M. is showing pathology in several directions; i.e., schizoid,
characterological, organic.  I feel that special education in
day treatment under a program of behavior modification, indivi-
dual therapy for M. plus therapy for his parents are imperative
procedures if any progress is to be made.

CASE NO.: 18                                                      190

J.G.

AGE:  15

SEX:  Male

## PERSONS PRESENT FOR INTERVIEW & THERAPY:

The mother, father and patient.

## REFERRAL SOURCE & PROBLEM:

Mr. and Mrs. G. came to this agency at the suggestion of S.W.,
a Juvenile Probation Officer who has had some contact with J.
The parents indicate that J. is totally out of control at home
and that he does not seem to show any sense of responsibility
or accountability to anyone.  The problems have developed since
Christmas time and they are now at the point of being almost
unbearable.  Among other things, J. has run away three to four
times and he has also been arrested for possession of a stolen
bicycle as well as curfew violations and hustling on campus.  The
police have also been involved with the family because J. has
threatened to hurt his sister and it was necessary to call the
police to intervene.  J. has also received counseling at the
University Counseling Service but this lasted for only nine visits
and apparently he fabricated a great many stories and was not
honest with the man.  J. is also enuretic.

## FAMILY CONSTELLATION:

The family is composed of the natural parents and the patient
as well as a sixteen-year-old girl.  The other children are
grown and out of the home.

J.G.                                                              191

Page 2

SOCIO-ECONOMIC STATUS:

Mrs. G. is employed as a teacher in the Adult Education Program
and Mr. G. is retired from the military and working on his
doctorate in business.

MEDICAL & DEVELOPMENTAL HISTORY AS REPORTED BY PARENTS:

Mrs. G. indicated that J. was a premature birth by a few weeks
and was born by caesarean section.  The developmental milestones
were normal with the exception of walking; J. was an extremely
chubby baby and he did not walk until he was sixteen months
old.  In general, he was small for his age until he was two years
old but he has since caught up.  At the age of three months J.
was able to flip from his back to his stomach and back again and
was quite active.  At the age of three, J. had eye surgery to
straighten out his eye muscles.

In regard to behavior, the parents noted that J. sucked his
thumb and wets the bed to this day and still has temper tantrums
where he will throw himself on the floor and flail about.  The
behavior also includes lying and stealing from both his parents
and from the stores; at home he steals drugs and money and
alcohol from his parents.  Apparently J. has been involved with
drugs and at one point was trying to grow his own marijuana
plants.  J. was also a fire-setter when he was younger, although
this does not occur very often now; the parents noted that on
one occasion he nearly burned the house down with himself inside
of it when a candle fell over on his bed.  When angry, J. is

quite destructive with possessions.  The parents indicate that
there are not any sexual problems to their knowledge, but until
recently Mrs. G. had some suspicions that J. may not have been
too interested in girls.

SCHOOL HISTORY:

J. has always had behavior problems in school but not academic
problems.  Many of these problems seem to revolve around hyper-
activity in the classroom.  In addition, he has been found drunk
on campus as well as stoned on drugs.  Mrs. G. has given J. the
Wide Range Achievement Test herself and found that he read on
the eleventh grade level.  J. was also in the S.P.A.R.C. Program
for a few months and seemed to function somewhat better with the
behavior modification techniques.  He has been attending Ritter
Elementary School and is in the eighth grade.  Part of the
problem at school also revolves around the fact that he is quite
impulsive and has been known to swing at his teachers.  J. says
he has friends at school but the parents feel that this is not
an accurate statement.

FAMILY SITUATION:

Mr. & Mrs. G. indicate that they have never believed in spanking
the children a great deal and have tried to talk with them instead.
However, J. is extremely difficult to discipline and they have
resigned themselves to the fact that he will not respond.  They
usually try to reason with him and when he becomes angry they in

J.G.                                                          193

Page 4

turn also become angry.  At the present time they are making
allowances for the boy and he in turn takes advantage of them
and eventually ends up physically attacking his parents or pro-
voking them into attacking him.  There are problems with his
siblings and they seem to pick fights with one another, as
well as J. goading them.  The parents do agree in regards to
child management and do not contradict one another in front of
the children, even if they do disagree.  Mr. G. indicates he is
home more often than his wife and consequently is more respons-
ible for the boy.  The parents indicate that their relationship
is quite good and Mrs. G. indicated that her husband is her best
friend.  At home J. is very moody and sometimes is withdrawn
and sometimes is quite verbose.  There have been other problems
in the family with the older girl who apparently acted-out a
great deal and was involved for some time in the Jesus movement.
However, she is now married and seems to have settled down.

PARENTS HISTORY:

Mother -- Mrs. G. indicated that she came from an unstable
background which included divorced parents.  Her first marriage,
which occurred when she was quite young, was to a man who was
never home and from this union two daughters were born.  In
1954 Mr. and Mrs. G. married and at that time they decided upon
a childrearing approach as they felt that neither one of them
had an appropriate background to draw upon.

J.G.                                                              194

Page 5

Father -- Mr. G. indicated that his mother died when he was
quite young and he was adopted by an aunt who held it over his
head that he owed her a great deal.  Apparently all his life she
forced him to feel obliged to her.  In addition, his brother
was favored by this aunt and he seemed to be left out.  Mr. G.
was in the military and retired from there and since that time
has been working on his college degrees.

IMPRESSIONS:

Mrs. G. is a woman who has long blond hair and dresses slightly
modishly for a woman of her age.  She is quite well educated and
quite verbal and tends to use very large words and psychological
terms.  Mr. G. is a heavy-set man who is also well educated but
much less verbal than his wife.  He gave the distinct impression
of being slightly depressed by the whole situation with his son
and had little eye contact unless he was addressed.  J. is a
tall, slender boy who spent the entire time with a baseball cap
pulled over his eyes; apparently he had been in a fight the day
before and his face was quite badly bruised and he was apparently
attempting to hide it.  He slouched in his chair and was almost
entirely non-verbal and in addition bit his nails.

It is quite apparent by his own words and by his actions that J.
does not want to be here and does not wish to cooperate with
the agency.  He would not agree to take any psychological testing
nor would he agree to come down again.  It is my feeling that

J.G.                                              195

Page 6

not much can be accomplished with this boy unless he wishes
to have some help, and it may take an out-of-home placement.
The only possible way of helping the family might be to deal
with the parents and help them to be more consistent in their
dealings with their son.

PSYCHOLOGICAL FINDINGS:

J.G. is a young man who presently functions within the normal
range of intelligence.  He appears to have some organically
based difficulty with visual-motor activities.  He also is
emotionally disturbed.  Basic features of this disturbance are
extreme problems with impulse control, basic feelings of hos-
tility and aggression, a tendency toward autistic thought and
eccentricity, as well as a well-defined passive-aggressive
orientation toward interpersonal conflict.  The origin of these
difficulties appears to reside in the relationship of this young
man with both parents.  It is possible that there is a long
history of frustration on the part of all involved.  Both
parents are well-educated, highly verbal individuals, who likely
have had high academic expectations for J.  However, this young
man has clearly been handicapped by a visual-motor problem for
some time.  This likely led to frustration, both for him and
his parents throughout his career in school.  On the basis of
past failure of family therapy and residential placement, as
well as the apparent learning disturbance, it is recommended
that J. G. be considered for a day treatment placement.  Should

J.G.                                                      196

Page 7

this not be possible, an adolescent group would also likely

benefit J.  The parents are definitely in need of marital

counselling.  However, at present, on the basis of social

history data, prognosis for this activity appears poor.

CASE NO.: 19                                                        197

C.B.

AGE:  8

SEX:  Male

PERSONS PRESENT FOR INTERVIEW & THERAPY:

Mother and patient.

REFERRAL SOURCE & PROBLEM:

Mrs. B. came to the agency at the suggestion of her counsellor
in the WIN Program.  She has become extremely concerned in the
past few weeks because C. has become so depressed that he cries
at the slightest provocation and even wakes up sobbing in the
middle of the night.  He has changed completely from the happy
boy that he was this summer to a very depressed boy who feels
that nobody loves him and he does not seem to be interested in
anything, not even school or his friends.  Mrs. B. is at a loss
to explain his behavior as he does not have any particular
problems at school and he has always had a great many friends
until recently.

SOCIO-ECONOMIC STATUS:

Mrs. B. is currently receiving ADC and is also enrolled in the
WIN Program.  She hopes to obtain her GED and go on to Nurse's
Aide or LPN training.

FAMILY CONSTELLATION:

The family is composed of the mother, age thirty-five, and five
children ranging in age from eight to seventeen.  C. is the
youngest of her children.

C.B.                                                              198

Page 2

MEDICAL & DEVELOPMENTAL HISTORY AS REPORTED BY PARENT:

Mrs. B. indicated that C. was her fifth pregnancy and that
there were no problems with the pregnancy or the birth.  The
developmental milestones were normal and for the most part C.
has been an extremely healthy boy.  She recalls approximately
three incidents where he has had temperatures of 104° with
such things as the flu, but this is all.  He had a complete
physical in May and the doctor found him to be quite healthy;
however, recently he has worked himself into such a state that
he is able to make himself throw up and usually this occurs
when he is trying to avoid going to school.  The only problem
which she noted is that he has a history of bed wetting and that
this continues to the present day.  At the present time, he is
taking Tofranil in order to alleviate this problem.

EARLY PERSONALITY HISTORY:

Mrs. B. indicated that C. was a very happy baby and that he was
exceptionally good.  As a baby, he loved to be cuddled and to
this day he still likes to be.  She does not recall anything
outstanding about his early life with the exception that he
has always been a very sensitive boy.

SCHOOL HISTORY:

C. entered kindergarten at the age of five and has never had
any problems in school until this past year.  He always received
good grades and excellent compliments from his teachers.  In

C.B.                                                        199

Page 3

addition, he had a great many friends in school until this
year.  He seems to like reading and has no problems reading
the material which is assigned.  C. is currently in the third
grade.  Neither Mrs. B. nor the teacher seem to have any idea
as to why this year C. does not like school.

FAMILY HISTORY AS REPORTED BY PARENT:

Mrs. B. indicates that she does not have a great many problems
with C. and that basically she has more problems with the other
children in regard to doing their chores around the house.  When
C. does do something wrong, she either spanks him or puts him
in his room and this seems to be quite effective as he doesn't
do it again.  There is some mild sibling rivalry mostly caused
by the fact that he is the youngest boy and there are three
older ones; his older brothers do tease him a great deal, but
he does not seem to respond much to this.  As a whole, he seems
closer to his eleven year old sister than to his brothers.

MOTHER'S HISTORY:

Mrs. B. indicated that her parents were divorced when she was
two and that she spent an early life in various foster homes
and living with her grandparents.  She was fairly close to her
grandmother and to this day is quite close to this woman.  In
fact, she allowed C. to spend seven weeks this summer with the
grandmother and he really seemed to enjoy himself.  She indica-
ted that she had her first child at seventeen and that she has

C.B.                                                              200.

Page 4

had two unsuccessful marriages; the latter one lasted only

six months and she indicates she married a man twenty years

older than herself for security reasons.

Mrs. B. indicated that although C. sees his father occasionally,

his father does not seem to want to pay much attention to him

and never has.  Basically he has always been rejecting of him

and C. does not really seem to want to see his dad.  Other

than his father, there was a stepfather in the family but C.

did not like him either and in fact was quite scared of him.

Other than the above statements, Mrs. B. was somewhat vague

about her own personal life and her ex-husband.

IMPRESSIONS:

Mrs. B. is a somewhat young looking woman of thirty-five who is

quite heavy set.  She seems to be quite concerned about her son

and relatively stable at this time although she was just recently

released from the hospital where she was hospitalized for nervous

exhaustion.  She indicates that she was so worried about C. and

financial problems and personal problems that she was not able

to cope with everything.  It should be noted that she was brought

to the agency by a welfare worker who indicated that part of the

reason for the hospitalization was that Mrs. B. had threatened

to kill her son and herself.  The welfare department has

decided to leave C. in the home for the time being but is con-

cerned about whether this is advisable.  Mrs. B. will be seeing

C.B.                                                              201

Page 5

C. at the Mental Health Center, as ordered by the court and one
month from today she will have a hearing to determine whether
or not she will again be hospitalized.

C. is a nice looking boy of eight with very large grey-blue
eyes. He was not particularly verbal and began to cry when I
mentioned he seemed to be kind of unhappy. He is not very co-
ordinated with his hands and had difficulty with the hand
coordination test and the verbal test for organicity.

It appears that we have a situation in which a mother is over-
whelmed by her own emotional conflicts and possibly her son is
reflecting her mental condition. There is a possibility that
the boy may be organic but this is not clear at this time.
Psychological testing will be requested before a definite
treatment plan is formulated.

PSYCHOLOGICAL FINDINGS:

C. is a youngster who only lately has had problems according
to mother. He has been an excellent student, has many friends,
and has presented no disciplinary problems at home. However,
he now cries easily and is resisting going to school. Neither
the teacher nor mother know why.

The testing shows several unique aspects. His facility to draw
figures and complete the Bender Design is excellent. Yet ther
is a strange confusion and distortion present, at least in the

C.B.                                                                    202

Page 6

Bender Designs.  The same thing occurs in the WISC subtest,
and there is great fluctuation from test to test.  While it
is difficult to say what is happening with this youngster, it
can be certain that is is creating innumerable problems for him
on several levels.  He should be seen immediately for intensive
individual therapy, in part to continue a diagnostic approach.
His mother should be seen for an extended interview to get a
better picture of what the youngster has been like in the past.
The pieces do not fall together easily and it seems unlikely to
this examiner that C. could have been so free of problems and
all of a sudden fall apart with no precipitating causes.

CASE NO.:   20

J.B.

AGE:   7-1/2

SEX:   Male

PERSONS PRESENT FOR INTERVIEW & THERAPY:

Mother and J.

REFERRAL SOURCE AND PROBLEM:

J. was referred to the agency by the family doctor.  Parents
report that his major problem is in school and that he frequently
disrupts the other children in class.  J. is presently in a 3rd
grade learning disability class.  The parents report that J.
does not want to listen to them and that disciplining the child
has always been a problem.  J. was seen by both of his parents
as a loner who has always been very jealous of his 6 year old
brother.  In addition, J. is a hyperactive as well as an enuretic
child.  Since September he has been on Ritalin 10 mgs. two times
a day and his motoric level as well as his attention span have
significantly improved.

FAMILY CONSTELLATION:

Mr. B. is an interior designer for a large corporation while his
wife is a homemaker.  Total gross income for this family is
reported at $10,000.

MEDICAL & DEVELOPMENTAL HISTORY AS REPORTED BY PARENTS:

J's delivery was caesarean and this occured with no complications.
With the exception of bedwetting, which occurs approximately

J.B.                                                                    204

Page 2

four times a week, parents see J. as a very healthy young man.
Mother reported that with the exception of being a slow talker,
developmental milestones occured within a normal range.  Some
perseveration was noted on the finger-thumb exercises and J.
had very poor balance doing heel-toe exercises forward and back-
ward.  In addition, the interviewer noted that J's right eye
appeared to be focusing inward, not in line with the child's
other eye.  When mentioned to mother, she apparently was unaware
of this condition.  Mother reported that J. has a great deal of
difficulty in releasing his anger and stated that he most
frequently holds it in.  Both J. and his 6 year old brother
frequently break each others' toys and both are reported to
instigate these fights.

In discussing J's fears, mother indicated that J. is very much
afraid to have his bed moved away from the wall.  J. has a
great deal of difficulty approaching people and mother indicated
that she too had been shy, and found difficulty in reaching out
to people.  In addition, one of J's greatest fears is that his
friends will call him names.  In a separate interview with J.,
the child indicated that the words "ass hole" and "blow hard"
were the names he detested the most.  Although it was reported
that J. was a loner he has recently been involved in Boy's Club
activities and especially enjoys playing football with the
other youngsters.

J.B.                                                       205

Page 3

SCHOOL HISTORY:

J. has been in a special education class since February 1973.
The most recent testing on J., done in February of 1972,
assessed the child to have an I.Q. of 100.  J. reported that
although his teacher is "pretty fine" he wants to return to
his old class.  In discussing what he didn't like about his
present class situation, he indicated that he didn't like when
the other kids would look at him and not do their work.  Mother
reported that J. is a half-year behind in his writing yet this
too has improved since the child has been on Ritalin.

FAMILY HISTORY AS REPORTED BY PARENTS:

The B's have been married for eight years and both agree that
there has been a good deal of tension in their relationship
because of J.  Mother indicated that their other son is a very
easy going child and probably does, in fact, get more positive
attention from his parents.  Presently, parents share in dis-
ciplining J.; mother reasons with the youngster while father is
more apt to spank him.  Mrs. B. indicated that she presently
was in need of new ways to discipline J.

IMPRESSIONS AND RECOMMENDATIONS:

J. is a blond haired, extremely serious, 7-1/2 year old child
whose fine features, wrinkled brow and missing teeth gave him
the appearance of being a worried looking old man.  Speech was
slow with little evidence of hyperactivity, probably a result

J.B.                                                          206

Page 4

of recent medication.  J. has a very narrow head and he is a
freckled face boy who appears to have rather large ears; this
alone may set him up for a good deal of peer ridicule.  In
addition, he in no way looks like his parents, which may be
a factor in the degree to which they can fully accept this
child.  J. was on the verge of tears towards the middle of the
interview and when told that it was alright to cry, the child
let go and the tears began to flow.

Mrs. B. appeared to be very rigid during the interview, evidenced
by her stiff body posture, with her arms crossed and her entire
body turned away from both father and son.  Although she was
able to loosen up towards the end of the session,  Mrs. B.
seemed to be a rather unhappy woman who may have some need to
place the burden of family dysfunction onto J.  Father too, may
be using J. as a scapegoat for possible marital dissatisfaction.
In any event, there appears to be many more things going on in
this family than were revealed during the initial interview.

J. appears to be in strong need of both parental and peer
acceptance.  J. could probably benefit by an activity group
where he would be involved in positive structural activities
with his peers.  In addition, mother seems to need help in
managing J. and it is suggested that she begin in a child
management group while it is the interviewer's opinion that
mother at this point is not ready or interested in dealing with
her marital situation.

J.B.                                                                    207

Page 5


<u>PSYCHOLOGICAL FINDINGS</u>:

J. is an anxious, angry, and lonely youngster who is quite
fearful.  His response during the testing was to be teary-eyed
and afraid and attempts at the structured tests were highly
motivated.  That is, he worked very quickly and was very eager
to do well.  Nevertheless, it is obvious that he has a great
weakness in processing and integrating information presented
auditorily.  He confuses questions and oftentimes, his anxiety
interferes with being able to grasp them, requiring that
directions be repeated.  His visual-motor integration is quite
good, despite a very uneven pattern.  J. is obviously an angry
youngster, who has not been able to express himself in effective
ways.  It seems that placement in a learning disabilities class
is an excellent recommendation and thus he should continue in
the class he is at present.  It is important that directions
be very concrete and very specific because he will have a very
difficult time processing information.  It probably would be
good to use his ability in visual motor tasks to motivate him
and to provide learning tasks through this media.  It seems
essential that J. and his parents become involved in some form
of therapy.  J. needs to learn to express his feelings appro-
priately and to deal with some of the anger, anxiety and
frustrations that he feels.  Perhaps an activity group will
provide him a constructive outlet for dealing with not only
his feelings, but with other youngsters.  His parents need to

J.B.                                                          208

Page 6

be involved in either conjoint or in a group therapy to help
them understand J. and to learn to help him deal with the
world.

## BIOGRAPHICAL SKETCH

Michael Brad Byless was born in Columbus, Ohio, on
June 7, 1948.  He received his elementary education in
Portsmouth (Ohio) public schools, and graduated from
Portsmouth High School.  After four years of undergraduate
study at Northern Arizona University, he graduated with a
Bachelor of Arts degree in Psychology in 1970.  The follow-
ing semester he entered graduate school and pursued a
master's degree in School Psychology at Northern Arizona
University.  For three years following graduation in
August, 1971, he was a faculty member at Scottsdale Com-
munity College in the Department of Psychology.  In 1974
he entered the Arizona State University, Department of
Counselor Education where he studied for the degree of
Doctor of Philosophy.

Petitioner's Appendix 5

Reporter's Transcript of Proceedings, Trial Closing Arguments, *State v. Martinez*, Maricopa Co. Sup. Ct. No. CR-1995-008782, July 31, 1998:

Testimony of Dr. Michael Bayless, Pages 4-40

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

```
STATE OF ARIZONA,               )
                                )
              Appellee,         )
vs.                             )       CR 95-08782
                                )
ERNESTO SALGADO MARTINEZ,       )       CR-98-0393-AP
                                )
              Appellant.        )
_____)
```

DEC 01 1998

PHOENIX, ARIZONA
July 31, 1998


Before:  THE HONORABLE CHRISTOPHER M. SKELLY, Judge.

REPORTER'S TRANSCRIPT OF PROCEEDINGS.





Prepared for Appeal:        By:  JANELL ROSE, CSR, RPR
                                 Official Court Reporter

SUPERIOR COURT

ER 1517

2

1                              <u>APPEARANCES</u>

2

        For the State:              Robert Shutts
3                                   Juan M. Martinez
                                    MARICOPA COUNTY ATTORNEYS
4                                   301 W. Jefferson
                                    Phoenix, Arizona  85003
5

6

        For the Defendant:         Emmett J. Ronan
7                                   Todd Coolidge
                                    MARICOPA PUBLIC DEFENDERS
8                                   222 E. Javelina, Suite 1300
                                    Mesa, Arizona  85210-6237
9

10

11

12

13

14

15

16

17

18

19

20

21

22
                               --oOo--
23

24

25

                            SUPERIOR COURT

ER 1518

3

1                                   INDEX

2    WITNESSES                                              · PAGE

3    DR. MICHAEL BRAD BAYLESS

4    Direct Examination by Mr. Shutts                            5
     Cross-Examination by Mr. Cooldige                          34
5    Redirect Examination by Mr. Shutts                         40

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**ER 1519**

Case 2:16-cv-01159-SRB   Document 153   Filed 12/04/17   Page 229 of 421
Case 2:05-cv-01561-ROS   Document 115-5   Filed 03/12/15   Page 229 of 322

4

1          THE COURT:  This is CR 95-08782.  State vs.

2     Ernesto Martinez.  The record will show the presence of

3     Mr. Shutts for the state, and Mr. Coolidge and Mr. Ronan

4     for Mr. Martinez, who's also present.  Mr. Shutts, you

5     want to begin?

6          MR. SHUTTS:  Yes.  We call Dr. Bayless to

7     the stand.

8          THE COURT:  Okay.  Doctor, come on up here,

9     please, right in front of Letha here, and she'll swear you

10    in.

11              MICHAEL BRAD BAYLESS,

12        (Whereupon, the witness was sworn and testified as

13    follows:)

14          MR. SHUTTS:  Your Honor, before we begin,

15    the state moves to reopen briefly our case-in-chief

16    regarding aggravating circumstances and request leave to

17    file a certified copy of the jury instructions in

18    CR 96-01528 regarding the defendant's previous convictions

19    for dangerous or deadly assault by a prisoner.  I have

20    filed a pleading to that effect and discussed this with

21    counsel for the defense, and I believe there is no

22    objection.

23          MR. RONAN:  Correct, Judge.  They advised

24    us they were going to do that at the beginning of the

25    presentations.

1       THE COURT:  Okay.

2       MR. SHUTTS:  I'd like this marked as an

3  exhibit.

4       THE COURT:  What are we on, Letha?

5       THE CLERK:  On 6.

6       THE COURT:  Okay.  Marked as 6.  No

7  objection.  It's ordered admitting 6.

8       (Whereupon, Exhibit 6 was admitted into

9  evidence.)

10       MR. SHUTTS:  And in my pleadings, I

11  referred to that exhibit as A-1, and it was attached to a

12  supplemental pleading.

13       THE COURT:  Okay.  Thank you.  All right.

14  You ready?

15       MR. SHUTTS:  Yes.

16

17               DIRECT EXAMINATION

18  BY MR. SHUTTS:

19       Q.    State your name please, sir.

20       A.    Michael Brad Bayless.

21       Q.    How are you employed?

22       A.    Psychologist.

23       Q.    Okay.  And can you briefly give us your

24  educational background?

25       A.    Certainly.  My educational career began in

SUPERIOR COURT

**ER 1521**

Case 2:15-cv-01159-SRB   Document 153   Filed 12/04/17   Page 231 of 421
Case 2:05-cv-01561-ROS   Document 153   Filed 03/12/15   Page 237 of 322

6

 1    North Arizona University where I completed my Bachelor of

 2    Science Degree in psychology and chemistry.  I then

 3    continued on at Northern Arizona University where I

 4    completed my master's degree in psychology.  I left there

 5    and became an instructor and professor of psychology at

 6    Scottsdale Community College where I taught courses in

 7    abnormal psychology, developmental psychology and general

 8    psychology.

 9              Then I went on to Arizona State University

10    and completed my Ph.D. degree in 1976.  I did my clinical

11    internship at the Janway (phonetic) Health Center.  At

12    that time I became interested in forensic psychology and

13    studied under Myer Tucker, who's a forensic psychiatrist,

14    for two years.

15              I got my post-doctorate board certified by

16    the Arizona Department of Psychologist Examiners in 1977.

17    Then I went directly into private practice at that time.

18         Q.      This is separate from your educational

19    background.  This is now your work history that you're

20    into?

21         A.      Yes.

22         Q.      Please continue.

23         A.      Sorry.  In 1981 -- I believe I was

24    appointed to the Arizona State Board of Psychologists

25    Examiners, which is the board that license psychologists

Case 2:15-cv-01159-SRB   Document 153   Filed 12/04/17   Page 232 of 421
Case 2:15-cv-01159-ROS   Document 153-5   Filed 03/12/15   Page 178 of 322

7

1      in the state of Arizona.  I served on the board.  I was

2      appointed by the Governor of Arizona, who was then Bruce

3      Babbit.  I spent five and a half years on the board and

4      served as secretary of the board.

5                I also am a member of the medical staff at

6      Good Samaritan Hospital.  I'm also a member of the

7      American Psychological Association.  I have been in

8      private practice -- my 22nd year in practice.

9                I currently own Mike B. Bayless &

10     Associates, which is a fully-licensed outpatient

11     rehabilitation clinic servicing children, adolescents and

12     adults for a variety of emotional and behavioral problems.

13               My current address is 3008 North Third

14     Street, Suite 200.

15               I'm also certified by the Arizona Superior

16     Court on their expert list providing Rule 11 evaluations

17     to Rule 26.5 evaluations, as well as have testified in the

18     Federal Court, as well as in other tribunals not only in

19     the state of Arizona but also in various other states in

20     the United States.

21          Q.     What is the current nature of your

22     practice?

23          A.     My personal practice is in forensic

24     psychology.  I also am the owner and operator of M.B.

25     Bayless & Associates, which I said before, which is a

8

```
 1     clinical practice.  So I do both.

 2            Q.        I assume you treat patients?

 3            A.        Yes.

 4            Q.        You also conduct court-appointed

 5     examinations?

 6            A.        Yes.

 7            Q.        And you've testified in superior court

 8     before?

 9            A.        Yes.

10            Q.        In what type of superiors?

11            A.        In criminal and civil, and also domestic

12     relations.

13            Q.        And you've testified in Rule 11 hearings?

14            A.        Yes.

15            Q.        And have you testified in sentencing

16     hearings?

17            A.        Yes.

18            Q.        Both as having been retained by the state

19     and the defense?

20            A.        Yes.

21            Q.        Okay.  Were you asked by the state and

22     retained by the state to examine Ernesto Martinez?

23            A.        Yes.

24            Q.        Okay.  And when did the examination or

25     exams of Ernesto Martinez take place?
```

**ER 1524**

9

1      A.      I saw Mr. Martinez on two separate

2  occasions, once on July 7th and another one on July 17th.

3      Q.      Okay.  Now, before you went to see Ernesto

4  Martinez, did you have factual memorandum to review

5  regarding Mr. Martinez's case?

6      A.      Yes.

7      Q.      What were the things -- what records did

8  you review prior to seeing Mr. Martinez?

9      A.      I had the factual background support of the

10  state's disclosure, which you just talked about, the

11  presentence report.  This was an older presentence report

12  not on this case.  Interviews of Eric Moreno, Oscar Fryer.

13  I also reviewed information from -- I believe her name is

14  Skelly, which is a criminal specialist, I believe.

15      Q.      This was the document submitted by the

16  defense?

17      A.      Yes.  Police reports.  And that's what I

18  had before I saw him.

19      Q.      Now, subsequently, did you have a chance to

20  review a report prepared by Susan Parrish, also a

21  psychologist?

22      A.      Yes.

23      Q.      Okay.  Now, and I apologize, now, you said

24  you saw Mr. Martinez on two separate occasions?

25      A.      Yes.

Case 2:06-cv-01159-SRB   Document 153   Filed 12/04/17   Page 235 of 421
Case 2:05-cv-01561-ROS   Document 153-5   Filed 03/12/15   Page 151 of 322

10

1    Q.    All right.  On those occasions, did you

2    administer any tests to Mr. Martinez?

3    A.    Yes.

4    Q.    Okay.  Tell us about the tests that you

5    administered to Mr. Martinez.

6    A.    Mr. Martinez was given the Shipley

7    Institute of Living Scale, the Thematic Apperception Test,

8    and the Williamson Sentence Completion Test.

9    Q.    Would you briefly describe the nature of

10    those tests to the judge?

11    A.    The Shipley Institute of Living Scale is

12    actually an I.Q. scan.  One of the things we wanted to

13    take a look at to see whether or not there was any kind of

14    organic or neurological impairment that could be

15    interfering with his ability to understand what was

16    happening.

17    The Thematic Apperception Test and the

18    Williamson Completion Test are what we call protection

19    tests, and they are tests of personality.  That gives us

20    insight as to how they think, how they respond to various

21    sentence probes, how to respond to stimuli.  We show them

22    pictures in their relationship to their overall

23    personality structure.

24    I also reviewed -- and was no reason for me

25    to repeat -- Dr. Parrish had given Mr. Martinez an MMPI,

SUPERIOR COURT

**ER 1526**

Case 2:15-cv-01159-SRB   Document 153   Filed 12/04/17   Page 236 of 421
Case 2:05-cv-01561-ROS   Document 1153-5   Filed 03/12/15   Page 182 of 322

11

1    MMPI-2, which I also utilized.

2          Q.       What is the MMPI-2?

3          A.       The MMPI-2 is a Minnesota Multiphasic

4    Personality Inventory, second edition.

5          Q.       And that was administered by Ms. Parrish;

6    is that correct?

7          A.       Yes.  Dr. Parrish gave it.

8          Q.       You reviewed those findings?

9          A.       Yes.

10          Q.       How long did you talk to Mr. Martinez on

11   these occasions?

12          A.       It was approximately two and a half hours

13   for the first session, and approximately two hours on the

14   second session.

15          Q.       Now, separate and apart from the test that

16   you administered to Mr. Martinez, did you have a

17   conversation with Mr. Martinez?

18          A.       Yes.  I did a clinical interview with him.

19          Q.       Okay.  And the purpose of the clinical

20   interview is what?

21          A.       Well, the purpose of the clinical interview

22   is to, one, learn about the individual's background

23   history, their overall basic areas of functioning.  Such

24   as:  Their employment history; what did they do in their

25   teenage years; how did they get along with their parents;

1    their early childhood development; relationships with

2    siblings; previous arrest record; educational history;

3    military history, if any; marriage, marital history, if

4    any; psychological history; whether or not they're

5    suffering from any kind of psychosomatic symptoms.

6         Q.      And these would be in the nature of

7    self-reporting; in other words, you would ask him if you

8    had some --

9         A.      Yes.  Typically what we do is we try to

10   find out if we have other related documentation.  What the

11   defendant may tell us is then correlated with other

12   information they've told other people.

13        Q.      Now, in terms of these tests that you

14   administered to Mr. Martinez, you have indicated the first

15   test was basically an I.Q. scan?

16        A.      Yes.

17        Q.      Tell us about your results on that.

18        A.      Mr. Martinez in the vocabulary section of

19   the Shipley he has -- raw score was 35, which gave him a

20   total I.Q. score of 127, which is in the superior range.

21             His score on the Abstract Section was 36,

22   which gave him a total I.Q. score of 125, which is also in

23   the superior range, which gave him a total I.Q. score of

24   127, which places him in the superior range, understanding

25   that this measures a person's vocabulary and abstract

SUPERIOR COURT

**ER 1528**

Case 2:15-cv-01559-SRB   Document 45-3   Filed 12/04/17   Page 238 of 421
Case 2:05-cv-01561-ROS   Document 1153   Filed 03/12/15   Page 184 of 322

13

1    reasoning ability.

2              When you extrapolate that, and there are

3    scales in the Wechsler, which is the formal I.Q. test,

4    we're looking at probably in the range of above average to

5    superior range of intellectual functioning.

6         Q.    Okay.  The Thematic Apperception Test, is

7    that something that you incorporated into your diagnosis,

8    or can you give us a separate finding on the Thematic

9    Apperception Test?

10        A.    Well, the findings on the T.A.T. or

11   Thematic Apperception Test, again, is a projective test,

12   which is a measure of personality.

13              What we're looking for there is what is the

14   individual's -- first of all, their imagination and their

15   inventiveness, number one, which correlates to their

16   intelligence.  The more intelligent they are, the more

17   imaginative and more inventive they are in terms of their

18   story and their themes.  And we're looking for basic

19   themes as to how this individual sees relationships

20   between people.  Because the pictures we show are pictures

21   of people doing things.  And we're looking for a general

22   theme as to whether or not there is a theme of depression,

23   whether a theme of aggression, whether or not a theme of

24   inadequacy, of anxiety, those kinds of things.

25              So the overall results from this particular

Case 2:06-cv-01159-SRB   Document 153-3   Filed 12/04/17   Page 239 of 421
Case 2:05-cv-01561-RCS   Document 153-5   Filed 03/12/15   Page 135 of 322

14

1      test indicates that, number one, is that here's a young

2      man who has a very good perception of reality, number one.

3                    Number two, he has a pretty good

4      imagination and inventiveness.  The pictures are very

5      bland pictures.  You have to tell a story about the

6      pictures, so you have to make up this thing.  We see an

7      individual who sees things in a very conflictual and kind

8      of aggressive manner.

9                    There is a tendency for him to be a bit

10     grandiose.  Winning is very important.  Some feelings of

11     inadequacy.

12           Q.      Okay.  Did you see any signs of depression?

13           A.      No.

14           Q.      Okay.  Were there any themes, such as

15     strong versus weak in the dialogue that you have regarding

16     the Thematic Apperception Test?

17           A.      Yes.

18           Q.      Okay.  And can you explain that in some

19     detail?

20           A.      He did not.  He saw himself as being the

21     strong person.  He always sees himself as identifying with

22     the strong individual.  He has contempt for those he sees

23     as being weak.

24           Q.      Now, was there a test that was administered

25     separate from the Thematic Apperception Test, not the

Case 2:16-cv-01159-SRB   Document 153   Filed 12/04/17   Page 240 of 421
Case 2:05-cv-01561-ROS   Document 1153   Filed 03/12/15   Page 180 of 322

15

1      MMPI?

2              A.      Yes.

3              Q.      What was that?

4              A.      That was the Williamson Completion Test.

5              Q.      What is the purpose of that?

6              A.      Primarily the same thing as the T.A.T.;

7      however, it gives us a little bit better idea as to an

8      individual giving leading sentence probes.  We give them a

9      half of a sentence or a third of a sentence, they have to

10     complete the sentence.  With that, you're able to get a

11     very good flavor as to how this individual relates to

12     other people in their environment.  What are some of their

13     wants; what are some of their desires; what are some of

14     their feelings of self, as well as how they see themselves

15     impacting their environment.

16             Q.      Okay.  Can you give us an example?

17             A.      Here's an example of his resentment towards

18     others and possible aggression:  He responded to the

19     sentence probe:  "I don't like people who" -- and to which

20     he answered, "think they are better than everyone."

21                     "I wish I could forget the time I" -- and

22     he says, "Doesn't apply to me.  I am who I am."

23             Q.      Now, in terms of your diagnosis, were you

24     able to make a clinical diagnosis of Mr. Martinez?

25             A.      Yes.

Case 2:16-cv-01159-SRB Document 153 Filed 12/04/17 Page 241 of 421
Case 2:05-cv-01561-ROS Document 115-5 Filed 03/12/15 Page 187 of 322

16

1        Q.       What was that diagnosis?

2        A.       Anti—social personality disorder.

3        Q.       Okay.  And why is that?

4        A.       Well, I think in order to make that

5     diagnosis, you have to have certain criteria.  And the

6     criteria that -- one of the major criteria and rights of

7     well-being of others are violated in and disrespted.  But

8     you have to have before the age of 17, before the age of

9     16, excuse me, you also have to have the evidence of a

10    conduct disorder in place.  And if you look at Mr.

11    Martinez's history, you see the evidence of a conduct

12    disorder, which is since age 11 has been fraught with

13    numerous violations and assaultive behavior.

14              The primary process here is what we see is

15    a young man who has a basic absence of anxiety and guilt.

16    He is concerned with feeding his appetite of the moment.

17    He has difficulty delaying immediate gratification for

18    future long-range goals.  He does not profit from his past

19    experience.  He sees himself as being separate and

20    distinct and a bit grandiose.  He has a tendency to take

21    advantage of others, and the relationships are typically

22    very superficial with little, if any, real depth or

23    intimacy.

24              Q.       Now, does this indicate a lack of empathy?

25              A.       Certainly.  The lack of remorse and guilt

SUPERIOR COURT

**ER 1532**

1    is part and parcel of that whole process.  One of the

2    primary areas --

3            Q.     The lack of remorse and guilt is one of the

4    criteria for your diagnosis?

5            A.     That's one of the criteria for anti-social

6    personality disorder, yes.

7            Q.     Now, and I apologize for interrupting your

8    train-of-thought, but something just occurred to me.

9                   Is this a diagnosis that is made of an

10   individual that has a psychopathic personality?

11           A.     Formerly?

12           Q.     Yes.

13           A.     No.  Sociopath, psychopath is a -- those

14   terms are synonymous with anti-social personality.

15           Q.     So there is no clinical diagnosis that says

16   psychopathic personality?

17           A.     No.

18           Q.     Back now on anti-social personality

19   disorder.

20                  Any other criteria you would like to share

21   with the Court, based on your testing and clinical

22   interview with the defendant?

23           A.     Well, if you look at the testing, if you go

24   back to the testing and you look at the history, the

25   history kind of speaks for itself in terms of behavioral

1   patterns.  You look at the behavior pattern.  You see the

2   rights of others being violated on a consistent basis from

3   early on.  It begins to escalate even in structured

4   therapeutic environments.  It escalated because there were

5   problems there also.

6          But if you look at where he is today in

7   terms of the total picture of where he's ended up, all you

8   have to do is look at the Minnesota Multiphasic

9   Personality Inventory.  It is very clear from the results

10   of that test, which he had a code-type, which we call

11   profile of 94.  Very typical classic anti-social

12   personality profile.

13          The write-up in the profile, which again is

14   Dr. Parrish's information, is clearly and talks about the

15   personality behavior.  It talks about the -- in a

16   personality behavior, the cognitive behavior, all of which

17   indicates anti-social personality disorder.  The data

18   speaks for itself.  There is not data that interprets this

19   data that is objective test data.

20          Q.       The report that was prepared by Susan

21   Parrish, the psychologist, indicated that the defendant

22   was suffering at the time of the event from post-traumatic

23   stress disorder.  Did you read that?

24          A.       Yes.

25          Q.       Okay.  Do you agree with that?

Case 2:16-cv-01159-SRB   Document 153   Filed 12/04/17   Page 244 of 421
Case 2:05-cv-01561-ROS   Document 153-5   Filed 03/11/15   Page 190 of 322

19

1          A.      No.

2          Q.      Why is that?

3          A.      Well, there are a lot of reasons why not.

4                  First of all, post-traumatic stress

5  disorder, commonly known as PTSD, is an anxiety-related

6  disorder.  The anxiety-related disorder immulates from a

7  traumatic experience that happens to an individual that

8  would be life-threatening or would be threatening to the

9  personal integrity to an individual or others.

10                 When you have PTSD, you have a series of

11  symptoms, startled responses, numbing responses, unable to

12  relive the event, flashbacks, a number of different

13  symptoms that go along with PTSD.  The problem with that

14  diagnosis in this particular situation is that she

15  correlates that diagnosis to early childhood development.

16                 When you look at the childhood development,

17  then one has to say:  When was the onset?  Because this is

18  an onset, if you look at the DSM-4, you have acute onset,

19  which means it has to happen within the first three months

20  of the stressor.

21                 Chronic onset happens in the last six

22  months or the delayed onset.  When did this onset occur?

23  If it happened, as she indicates that it was back when he

24  was a young boy as a result of family dysfunction, then

25  one would have seen symptoms of PTSD in his historical

Case 2:15-cv-01569-SRB   Document 153   Filed 12/04/17   Page 245 of 421
Case 2:15-cv-01569-RCS   Document 115-5   Filed 03/12/15   Page 151 of 322

20

1    data and clinical data from Dr. MacDonald, as well as

2    other people who have examined him.  We see nothing in the

3    file.  We see absolutely zero information concerning any

4    kind.  As a matter of fact, the absence of anxiety is

5    something that is being noted.  As a matter of fact, Dr.

6    MacDonald indicated and predicted that this young lad was

7    moving toward, at the time he saw him, towards a

8    full-blown anti-social personality disorder.

9             Q.      First of all, have you ever treated anybody

10   with PTSD?

11            A.      Yes.

12            Q.      And would that be Vietnam veterans or other

13   such individuals?

14            A.      Yes.  And I've also treated individuals who

15   have been in extremely severe car accidents where their

16   child was killed.  An individual who actually was

17   kidnapped by the desert fox.  If you remember the guy

18   escaped from Florence penetenciary, and they call him the

19   desert fox.  Danny -- searching for his name now.  One of

20   the victims that he took with him he kidnapped and clicked

21   guns in his mouth, did all kinds of things to him also had

22   PTSD.  Yes, I have treated people with PTSD.

23            Q.      You were telling us the difference between

24   PTSD as a diagnosis for the defendant and actually how you

25   perceive the defendant?

1    A.    When you have PTSD, this is pervasive

2    anxiety.  Anxiety at such a level that it does interfere

3    with your social and occupational functioning.  It is not

4    something that happens and goes away, happens and goes

5    away.  It is something that is pervasive.  That you will

6    find problems with individuals who have PTSD who on an

7    ongoing basis without treatment for this it grows.  It

8    doesn't get smaller.  It doesn't go away instantaneously.

9    There is no evidence in the file, whatsoever, that I could

10   find, to substantiate a diagnosis of PTSD with Martinez.

11   Q.    Did you talk to Mr. Martinez about his

12   childhood?

13   A.    Yes.

14   Q.    Did he exhibit when you talked to him about

15   his childhood any anxiety about those instances in his

16   childhood?

17   A.    No.

18   Q.    Okay.  Would you expect that to have

19   occurred if he had PTSD?

20   A.    Yes.  If that was the stressor that caused

21   the PTSD, then to bring back memory of that stressor would

22   cause anxiety.  That's one of the criteria.

23   Q.    Now, Susan Parrish also indicated that at

24   the time on August 17th, 1995, when Mr. Martinez murdered

25   Officer Bob Martin, that he was in a dissociative state.

1    Do you agree with that?

2              A.      No.

3              Q.      And why?

4              A.      Well, there's various kinds of dissociative

5    states.  Dissociative amnesia.  But in order to be in a

6    dissociative state, which is secondary to a PTSD

7    phenomena, would be what we call flashbacks where the

8    individual would flashback to a scenario of when they

9    were -- let's say if they were a Vietnam veteran in a

10   flight fight, for example, maybe because they heard maybe

11   a jet going over then they'd go under the bed and they

12   dive under their bed, or whatever, they think they're back

13   in Vietnam again.

14             The issue here would be that that

15   individual would think that they're in a different place

16   than they actually were consciously and perceptionally.

17             Q.      Somebody in Vietnam who suffered PTSD

18   because of some stressor would actually believe at that

19   time, which is current, that he's not here, he is actually

20   back in Vietnam?

21             A.      Correct.

22             Q.      And he would act out in some fashion?

23             A.      He would act out or hide or do whatever,

24   and his memory of that would be that he would be in

25   Vietnam.

**ER 1538**

1          Q.      Did you see any evidence of that with Mr.

2     Martinez?

3          A.      No.

4          Q.      Okay.  Now, were you able to talk to Mr.

5     Martinez about the events?

6          A.      No.  He would not talk to me about the

7     events.

8          Q.      That was on advice of counsel?

9          A.      I believe so, yes.

10         Q.      Okay.  So regardless, you weren't able to

11    actually talk to him about what happened on August 15th,

12    1995?

13         A.      That is correct.

14         Q.      Did you see any clinical indication that at

15    that time he may have been suffering from PTSD and in a

16    dissociative state?

17         A.      No.  Even when I brought it up, Mr.

18    Martinez was very aggressive with me concerning the

19    process of not talking about that, and there was no

20    indication of anxiety or fear or stress or anything else

21    associated with that.

22         Q.      Okay.  In terms of PTSD, you told us that

23    you don't believe he was in a dissociative state, that

24    PTSD is basically an anxiety-related mental disease or

25    defect; is that correct?

Case 2:05-cv-01159-SRB   Document 153   Filed 12/04/17   Page 249 of 421
Case 2:05-cv-01159-ROS   Document 115-3   Filed 03/12/15   Page 195 of 322

24

1          A.      Yes.  Anxiety disorder.  I mean, it is --

2    the primary central core of PTSD is anxiety.  And without

3    that, you can't have the disorder.

4          Q.      Okay.  Now, in terms of anti-social

5    personality disorder, is that recognized in DSM-4 as a

6    mental disease or defect?

7          A.      No.  It's not a mental disease or defect.

8    It's a personality disorder.

9          Q.      Okay.  So that is separate and apart from

10   the mental disease and defect?

11         A.      Yeah.  It's character logical.  We're

12   talking about defective character here.  We're not talking

13   about schizophrenia or bipolar defective disorder, totally

14   different, or PTSD.  Personality disorders are defects of

15   character and are ingrained characterological problems.

16   This is why they are not recognized as a mental disease or

17   defect.

18         Q.      Based on your testing and your clinical

19   interview of the defendant, as well as the documents that

20   you reviewed, was there a reason that you were able to

21   look to why Mr. Martinez killed Bob Martin on August 15th,

22   1995?

23         A.      Why he killed him?

24         Q.      Yes.

25         A.      I can only hypothesize, but it appears to

Case 2:06-cv-01159-SRB  Document 153  Filed 12/04/17  Page 250 of 421
Case 2:06-cv-01561-ROS  Document 153-5  Filed 03/12/15  Page 196 of 322

25

1    me that he did so because he didn't want to go back to

2    prison.

3         Q.    Okay.  And killing somebody because they do

4    not want to go back to prison, is there anything in that

5    which indicates that somebody would not appreciate the

6    nature of their acts and could conform their requirements

7    to the law?

8         A.    Absolutely not.  I mean, what that says is

9    that there is formulation of thought.  There is

10   formulation of behavior here.  There is, you know, there

11   is a conscious planning and organizing process of what I'm

12   going to do because I don't want to do X, Y and Z.

13              It's like saying -- my kids will do things

14   like they don't want to take out the garbage so they'll

15   say it's their brother's turn.  It's not like they don't

16   know they're supposed to take the garbage out, of course,

17   it's a conscious thought.

18        Q.    Okay.  Is this an example of Mr. Martinez's

19   acting in a self interest?

20        A.    Certainly.

21        Q.    Okay.  Were you able to form an opinion as

22   to whether or not Mr. Martinez, during this time frame,

23   was able to tell right from wrong?

24        A.    Oh, Mr. Martinez understands the difference

25   between right and wrong.  He's a very bright man.  He

Case 2:16-cv-01159-SRB Document 153 Filed 12/04/17 Page 251 of 421
Case 2:16-cv-01159-ROS Document 153 Filed 03/12/15 Page 251 of 322

26

1    understands the rules and regulations.  He just chooses

2    not to abide by them.

3         Q.      Okay.  And did you see any indication at

4    all at the time when you examined Mr. Martinez or anything

5    in his past to suggest he was suffering from a mental

6    disease or defect at this time, and I mean this time back

7    in August of 1995?

8         A.      No.  If he had any mental disease or

9    defect, they would still be there because he has not had

10   any treatment and he's not been on any medication.

11        Q.      And I believe I asked you if you saw any

12   sign of organic impairment in Mr. Martinez's development.

13   Did I ask you that?

14        A.      Was there any organic impairment?

15        Q.      Right.

16        A.      The answer to that is no, not that I'm

17   aware of.  There is no indication that he's ever had any

18   type of significant neurological disturbance.

19        Q.      You reviewed the documents that Dr.

20   MacDonald had, at least he didn't provide to us, but we

21   were able to take a look at some of his documents based on

22   his contact with Mr. Martinez; is that correct?

23        A.      Yes.

24        Q.      Okay.  Back in that time frame, when Mr.

25   Martinez was talking to Dr. MacDonald, would he have

Case 2:16-cv-01159-SRB   Document 153   Filed 12/04/17   Page 252 of 421
Case 2:05-cv-01561-ROS   Document 115-5   Filed 03/12/15   Page 198 of 322

27

1    benefited at all from any kind of counseling or any

2    treatmens; do you think?

3            A.      Would he have?

4            Q.      Yes.

5            A.      That's a very tough question.  Possibly if

6    he had chose to.  He was younger then.

7                    But, you know, it's my opinion that the

8    conduct disorder was already -- unsocialized conduct

9    disorder had already began to manifest itself.  And this

10   is what Dr. MacDonald saw also.  Treatment historically

11   and statistically has been not very good for those

12   individuals.

13           Q.      Okay.  Even so, did he have an opportunity,

14   based on your study of the documents, to participate in

15   treatment?

16           A.      Yes.  He went to treatment, family therapy,

17   yes.

18           Q.      And in terms of this family therapy, was

19   there anything that indicated to you that he just decided

20   he didn't want to do it?

21           A.      Well, yeah.  He was supposed to go to the

22   therapy, but he wouldn't get out of bed.  And another time

23   he ran away and said he didn't want treatment.

24           Q.      Now, does Mr. Martinez, based on your

25   contact with him and the things that you've told us about

Case 2:16-cv-01159-SRB   Document 153   Filed 12/04/17   Page 253 of 421
Case 2:05-cv-01361-ROS   Document 153   Filed 03/12/15   Page 259 of 322

28

1    before, have the capacity to act other than impulsively?

2           A.      Mr. Martinez has a very good ability to

3    plan and organize.  He's not strictly impulsive.  I mean,

4    he has the ability to think, process, organize, plan.

5    Impulsivity is part and parcel that you see in the

6    anti-social personality disorder, but it's all in the

7    framework.  They don't want to delay gratification.  It's

8    not an issue of not knowing or an issue where you find

9    impulsivity, for example, in a manic phase of a bipolar

10   disorder, that's totally different.  To say he's impulsive

11   and therefore does not understand or is reactive rather

12   than reflective is a misinterpretation of data.

13          Q.      Would you say that most of Mr. Martinez's

14   conduct is based on his self-interest at the time?

15          A.      Yes.

16          Q.      Now, Ms. Parrish indicated that she also

17   believed, I believe, that Mr. Martinez had anti-social

18   personality disorder; is that correct?

19          A.      I didn't hear her testimony, but it says so

20   in her report.

21          Q.      Right.  I know you didn't hear her

22   testimony, but assuming that that's in the report, that's

23   something she also indicated that she believed was a

24   problem with Mr. Martinez, and it was her testimony that

25   people generally, at the age of 40, start to mellow out

1    from their disorder; is that a fair statement?

2         A.       Well, there's been a lot of research over

3    the years concerning this.  We often see between ages of

4    45 and 55, give or take plus or minus five years, that

5    typically because of the brightness, people who typically

6    have anti-social personality disorder are often times

7    quite bright, are intelligent, that they begin to look

8    over their lives and they begin to see the problems that

9    they've caused themselves, as well as others, and they

10   tend to become somewhat less aggressive, somewhat less

11   self-absorbed.

12            But the anti-social personality, the core

13   is still there.  They just matured a little bit more, so

14   they use better judgment than they had when they were

15   younger.  When you say that it doesn't go away, it doesn't

16   remit, it doesn't stop, the core of the personality is the

17   personality.  That doesn't change dramatically by itself.

18   I mean, it just doesn't happen that way.

19        Q.       Do you believe or do you have an opinion

20   now as to whether Mr. Martinez is currently dangerous?

21        A.       Yes.

22        Q.       And what is that opinion?

23        A.       Yes, he is.

24        Q.       Okay.  And what is that based on?

25        A.       It's based on his behavior.  Based on his

1    history of -- one of the ways in which you determine what

2    a person may or may not do is what they've done in the

3    past in terms of practicability.  That's just not my

4    opinion.  Dr. MacDonald says the same thing.  Susan

5    Parrish says the same thing, that, yeah, this is a very

6    dangerous young man.

7          Q.    Do you have any other thoughts, based on

8    your contact with Mr. Martinez and your clinical interview

9    and the documents that you've reviewed, just general

10   comments about Mr. Martinez that you'd like to share with

11   the Court?

12         A.    I think an interesting fact is that Mr.

13   Martinez has a kind of unique way of rationalizing his

14   behavior in his overall defense mechanisms.  He saw

15   himself -- he's in the county jail at the present time,

16   and he saw himself as being in control, even in that

17   situation; whereas, the guards now are servicing him, he's

18   got a roof over his head, he gets three squares a day, and

19   they have to bring it to him rather than he has to service

20   them.  So it's kind of an interesting way of perceiving

21   the world to fit your own perception.

22               He said to me very aggressively, you know,

23   "You won't break me down."  You will not cause me to lose

24   face, basically.  I think that he has a real strong

25   opinion concerning whether or not he should ever show any

1    weakness.

2         Q.        One of the mitigating factors that has been

3    addressed in these hearings is contained in the Title 13

4    of Arizona Revised Statutes, and it's phrased in this

5    manner:  "The defendant's capacity to appreciate the

6    wrongfulness of his conduct or to conform his conduct to

7    the requirements of the law was significantly impaired but

8    not so impaired as to constitute a defense to

9    prosecution."  Now, may I approach, Your Honor?

10                  THE COURT:  Sure.

11        Q.        BY MR. SHUTTS:  I'd like you to take a look

12   at this, digest it for a moment, and give us your views

13   regarding whether that existed at the time on August 15th,

14   1995?

15        A.        It's a two-prong process, basically.  One,

16   is that the defendant's capacity to appreciate the

17   wrongfulness of his conduct.  Capacity is, in my mindset,

18   means that whether or not there was a mental disease or

19   defect operating that would interfere with an individual's

20   ability to understand the difference between right and

21   wrong.

22                  So it's such that they do not understand

23   how it is that they would be suffering from some type of

24   dilution or hallucination or some kind of disorder that

25   would interfere with their ability to make common-sense

Case 2:16-cv-01159-SRB  Document 153  Filed 12/04/17  Page 257 of 421
Case 2:05-cv-01561-ROS  Document 115-5  Filed 03/12/15  Page 203 of 322

32

1    judgments.  Mr. Martinez is not suffering from anything

2    that would cause that to occur.

3           Q.      Now, often times, Doctor, that is

4    postulated as a result of the acute influence of alcohol

5    or drugs.

6                   Is there anything in this circumstance to

7    indicate that he was under the acute influence of alcohol

8    or drugs at the time of this event?

9           A.      No.

10          Q.      Okay.  And the second prong?

11          A.      The second prong is to conform his conduct

12   to the requirements of law was significantly impaired.

13                  That assumes that you do not know what the

14   law is or what the rules and regulations of our society

15   are; that you cannot conform your conduct requirements of

16   the law because you're acting due to some other stimulus

17   or some other stimulus, meaning like the dilution mental

18   illness of some sort that is pushing you to towards

19   something that you do not understand the overall picture.

20                  Mr. Martinez clearly understood his

21   conduct.  Clearly understood what he was doing.  If you

22   look at the behavior immediately following the murder, you

23   see behavior that indicates that he was fully aware that

24   his behavior was wrong; that he knew the requirements of

25   the law, and he knew what was going on.  There is no

Case 2:16-cv-01159-SRB   Document 14-3   Filed 12/04/17   Page 258 of 421
Case 2:05-cv-01561-ROS   Document 145-5   Filed 03/17/15   Page 204 of 322

33

1    indication in my clinical interview or the testing-related

2    data, or otherwise, that would support either one of these

3    statements.

4            Q.      Okay.  Now, did you also review in the

5    documents that you received a statement from Eric Moreno?

6            A.      Yes.

7            Q.      Okay.  And this is the statement where Mr.

8    Martinez calls Mr. Moreno on the phone and explains to him

9    what occurred on August 15th of 1995; is that correct?

10           A.      Yes.

11           Q.      Okay.  And would you expect to see this

12   type of behavior in somebody who didn't understand the

13   nature and quality of his acts?

14           A.      No.

15           Q.      Would you expect this type of behavior in

16   somebody who has an anti-social personality disorder?

17           A.      Yes.

18           Q.      Okay.  And would you expect this type of

19   behavior in somebody that typically had purposeful conduct

20   and, for example, could relish in what he had done either

21   against or within the bounds of the law?

22           A.      He thought it was funny.  He laughed.  He

23   bragged about it.

24           MR. SHUTTS:  I have no further questions at

25   this time.

1          THE COURT:  Okay.  Mr. Coolidge?

2                    CROSS-EXAMINATION

3    BY MR. COOLIDGE:

4          Q.     Morning, Dr. Bayless.

5          A.     Morning.

6          Q.     A little while ago you stated that you saw

7    Mr. Martinez on July 7th and July 17th?

8          A.     You know, I didn't look at my calendar.  I

9    believe that's correct.

10         Q.     Okay.  And you think you saw him for two

11   and a half hours the first occasion and two hours on the

12   second?

13         A.     Something like that, yes.

14         Q.     Did you see him at all in between there?

15   Did you visit him at the jail in between those two dates?

16         A.     No.  I saw him two times.

17         Q.     Okay.  Could that second visit have been

18   less than two hours?

19         A.     It's possible.

20         Q.     Less than an hour?

21         A.     No.

22                MR. COOLIDGE:  Your Honor, could I approach

23   the doctor?

24                THE COURT:  Sure.

25         Q.     BY MR. COOLIDGE:  Doctor, I'm going to show

Case 2:05-cv-01561-ROS   Document 1153   Filed 03/12/15   Page 200 of 322

35

1      you a document we got from the jail regarding -- it's the

2      visitation log for Mr. Martinez.  Could you find the July

3      7th date?

4              A.      July 9th.

5              Q.      There's also July 7th at the bottom?

6              A.      My dates must be wrong.

7              Q.      The records indicate you did see him?

8              A.      Yeah.  I saw him twice.  I know I saw him

9      twice 7th and 9th.  I guess not the 17th.

10             Q.      Could you look at the times that you saw

11     him on the 7th?

12             A.      That cannot be correct.

13             Q.      Okay.  But the --

14             A.      I never saw him -- wait a minute.  I'm

15     looking at the wrong one here.  This cannot be correct.

16             Q.      The document indicates you saw him for 40

17     minutes; isn't that right?

18             A.      That's correct.  But that cannot be

19     correct.  I'm going to tell you why.  Because there's no

20     way we can do testing in 40 minutes.

21             Q.      The document also indicates you saw him on

22     the 9th?

23             A.      You sure that wasn't 15:42?

24             Q.      There's the document that was given to me

25     by the jail.

1        A.      That's not correct.

2        Q.      It also indicates you saw him on the 9th;

3  is that right?

4        A.      Yes.

5        Q.      Then it also indicates that you saw him on

6  the 17th; is that right?

7        A.      And that was for then.  I got that down for

8  three hours.

9        Q.      Okay.  Two hours and 43 minutes?

10       A.      I don't know if this is accurate or not

11  because I don't -- I saw him twice.  I did not see him --

12  I don't believe I saw him on the 9th.  I have only seen

13  him twice, two times.  That's it.

14       Q.      Okay.

15       A.      And the 17th looks accurate, but the other

16  two I'm not -- you know, I know for a fact that's not

17  accurate.

18       Q.      Okay.  Now, the information that you said

19  that you received, the aggravation memorandum from the

20  State, the presentence report of the assault, and then the

21  interviews of Oscar Fryer and Eric Moreno, you did not

22  discuss that information with Mr. Martinez, is that right,

23  on your visit with him?

24       A.      That's correct.

25       Q.      And after your visit with Mr. Martinez, or

1    between them, you didn't talk with his family?

2        A.    No.

3        Q.    Now, when I spoke with you during our

4    interview, didn't you tell me that it's possible that

5    long-term exposure to abuse within the family during the

6    early childhood development can be a cause of PTSD?

7        A.    If the abuse is towards that individual,

8    possibly.

9        Q.    Okay.

10       A.    You would see symptoms of that, it's

11   possible.

12       Q.    And you say that Mr. Martinez doesn't have

13   PTSD because you saw no symptoms of it; is that right?

14       A.    Not only myself, no one else did either.

15       Q.    Now, during the testing that you gave, the

16   T.A.T., the Sentence Completion Test, and the I.Q. test,

17   you stated that you thought Mr. Martinez was aggressive?

18       A.    Yes.

19       Q.    And one of the reasons you actually -- I

20   think you described it as pretty aggressive -- was based

21   on his statement during the Sentence Completion Test

22   that -- when he said he had the right to get mad when

23   people abuse authority and take advantage of him; is that

24   right?

25       A.    Yes.

**ER 1553**

1          Q.       Okay.  Dr. Bayless, you didn't write a

2   report based on this examination, did you?

3          A.       No.

4          Q.       And when you are hired to do Rule 11

5   examinations and make those findings known to the Court,

6   you do reports for that, don't you?

7          A.       Yes.

8                   MR. COOLIDGE:  If I could have just a

9   moment, Your Honor.

10                  THE COURT:  Sure.

11         Q.       BY MR. COOLIDGE:  Doctor, when you gave the

12  T.A.T. test, that's a test where you show an individual

13  some pictures; is that right?

14         A.       Yes.

15         Q.       And it's a personality test or projective

16  test, you want them to give you a story about those

17  pictures?

18         A.       Correct.

19         Q.       And during that testing, didn't you find

20  that Mr. Martinez was fairly optomistic?

21         A.       Yes.

22         Q.       Most of his stories were positive; is that

23  right?

24         A.       There was a theme about them, yes.

25         Q.       And, in fact, one of those stories, there

SUPERIOR COURT                    **ER 1554**

Case 2:16-cv-01159-SRB   Document 145-3   Filed 12/04/17   Page 264 of 421
Case 2:15-cv-01569-ROS   Document 145-3   Filed 03/12/15   Page 210 of 322

39

1    was an individual -- I think it was male -- that he

2    thought looked down or sad, and he said that he would try

3    and cheer him up; is that right?

4         A.    No.  He didn't say he would -- what he said

5    is that, "The dude is looking kind of sad, but he has a

6    smirk on his face.  Maybe something happened that caused

7    the guy to be down.  He would cheer him up.  Take it from

8    there."  I guess that's what he said.

9         Q.    He would cheer him up?  Who is he?

10        A.    The other person in the picture.  That's

11   card 7-BM-2.  People in a picture.

12        Q.    You also didn't talk to Dr. Parrish after

13   you reviewed her report, did you?

14        A.    No.

15        Q.    And before you saw Mr. Martinez for the

16   third time?

17        A.    I didn't see Mr. Martinez three times.  I

18   saw him twice, like I said, and I think I understand what

19   happened there.  And that is that I did go see Mr.

20   Martinez, I believe, on the 9th; however, Mr. Martinez was

21   either out or was unavailable or was in lock-down for some

22   reason and I did not get to see him.  And that's why I

23   went back on the 17th.  That's why the recording is there.

24   I did not see him on the 9th.

25        Q.    Okay.  It's the third time you went to the

1    jail then?

2         A.      Well, I went to the jail, yeah, but I

3    didn't see him.

4         Q.      All right.  So in answer to my question,

5    you didn't talk to Dr. Parrish about her report before you

6    went to the jail the third time to see Mr. Martinez?

7         A.      No.

8                 MR. COOLIDGE:  I have nothing further, Your

9    Honor.

10                THE COURT:  Okay.  Redirect?

11

12                      REDIRECT EXAMINATION

13   BY MR. SHUTTS:

14        Q.      Did Dr. Parrish call you?

15        A.      No.

16        Q.      Okay.  During the time that you conducted

17   the clinical interviews with Mr. Martinez in the jail, can

18   you describe his demeanor?

19                MR. COOLIDGE:  Beyond the scope.

20   Objection.

21                THE COURT:  Overruled.  You may answer.

22                THE WITNESS:  Cocky, aggressive,

23   self-assured, flippant, would be my adjectives I would

24   use.

25        Q.      BY MR. SHUTTS:  Any anxiety?

Petitioner's Appendix 6

Reporter's Transcript of Proceedings, Trial Closing Arguments, *State v. Martinez*,
Maricopa Co. Sup. Ct. No. CR-1995-008782, July 22, 1998:

Testimony of Dr. Susan Parrish, Pages 4-97

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

STATE OF ARIZONA,                    )
                                     )
                Appellee,            )
vs.                                  )      CR 95-08782
                                     )
ERNESTO SALGADO MARTINEZ,            )      CR-98-0393-AP
                                     )
                Appellant.           )
_____     )

PHOENIX, ARIZONA
July 22, 1998

Before: THE HONORABLE CHRISTOPHER M. SKELLY, Judge.

REPORTER'S TRANSCRIPT OF PROCEEDINGS.

COPY

Prepared for Appeal:        By:  JANELL ROSE, CSR, RPR
                                 Official Court Reporter

SUPERIOR COURT

**ER 1422**

4

1      THE COURT:  This is CR 95-08782.  State vs.

2  Ernesto Martinez.  Is the state ready?

3      MR. SHUTTS:  Yes, we are, Your Honor.  Bob

4  Shutts and Juan Martinez appearing for the state.  I might

5  add, you caught me with a cup of coffee here; is that

6  permissible?

7      THE COURT:  Oh, sure.  Absolutely.

8      State your presence for the record today.

9      MR. RONAN:  Emmett Ronan and Todd Coolidge

10  with Mr. Martinez, Judge.  We're ready.

11      THE COURT:  This is a continuation of the

12  mitigation/aggravation hearing.  What are your plans this

13  morning?

14      MR. RONAN:  Call Dr. Parrish, Judge.

15      THE COURT:  Okay.  Doctor, come on up, if

16  you would, ma'am.  Come up on here in front of Letha and

17  she'll swear you in first.

18

19      DR. SUSAN PARRISH,

20      (Whereupon, the witness was sworn and testified as

21  follows:)

22      MR. RONAN:  Can I proceed, Judge?

23      THE COURT:  Sure.

24      MR. RONAN:  Thank you.

25  / / / /  /

SUPERIOR COURT

**ER 1423**

```
 1                    DIRECT EXAMINATION

 2   BY MR. RONAN:

 3        Q.      Would you state your name please?

 4        A.      Dr. Susan Parrish.

 5        Q.      And could you give the Court a -- well,

 6   what kind of work do you do?

 7        A.      I'm a psychologist.

 8        Q.      How long have you been a psychologist?

 9        A.      For about 23 years.

10        Q.      Can you give Judge Skelly an idea of your

11   educational background?

12        A.      I have a BA in psychology, MA in

13   counseling, and a Ph.D. in educational psychology.

14        Q.      And when did you receive your Ph.D.?

15        A.      1976.

16        Q.      And where did you receive it from?

17        A.      Arizona State University.  I also did two

18   years of post-doctoral work in neuropsychology following

19   that.

20        Q.      Could you briefly summarize your work

21   history and experience as a psychologist?

22        A.      I started out working as a school

23   psychologist for various school districts, including

24   Superior, Casa Grande, and various districts in Phoenix

25   and also Arizona.
```

SUPERIOR COURT

**ER 1424**

Case 2:16-cv-01159-SRB   Document 153   Filed 12/04/17   Page 270 of 421
Case 2:05-cv-01561-ROS   Document 153   Filed 03/12/15   Page 270 of 322

6

1          And then after about five or six years of

2     doing that, I joined a group of psychologists, John

3     Landino & Associates, and also Tom Floyd & Associates, and

4     began doing private practice and eventually established my

5     own private practice.  And for about the last 17 years or

6     so I have -- part of my work has been therapy, and part of

7     my work has been evaluations, and some cases for the

8     courts and some cases private evaluations.

9          Currently I do evaluations for vocational

10    rehabilitation, private evaluations, as well as

11    evaluations for the courts.  For a while I had a contract

12    with Correctional Health to do their neuropsychological

13    evaluations.

14          MR. RONAN:  Judge, I neglected to do this

15    when I started.  Can I approach and give you a copy of her

16    report and her CV?

17          THE COURT:  Thank you.

18    Q.     BY MR. RONAN:  Do you belong to any

19    professional organizations?

20    A.     Yes, I do.  I'm a member of the Arizona

21    Psychologists Association.  Also the American

22    Psychologists Association, and the National Association of

23    Neuropsychologists.

24    Q.     So the present nature of your practice is

25    50-50 between therapy and evaluations?

SUPERIOR COURT

**ER 1425**

7

```
 1              A.      Probably about that, yes.

 2              Q.      And describe what kind of evaluations you

 3     do for the courts.

 4              A.      Frequently I do neuropsychological

 5     evaluations.  In some cases I just do general

 6     psychological evaluations.

 7              Q.      How many of those, just approximately,

 8     evaluations for the court have you done over the time

 9     you've been a psychologist?

10              A.      I would say over 100.  I don't know whether

11     it's hundreds.  It's 17 years or so.  It's more lately I'd

12     say in the last five years, it's probably maybe tripled.

13              Q.      And some of those are what we call Rule 11

14     examinations?

15              A.      I have done Rule 11 Evaluations.  I

16     currently don't do Rule 11 Evaluations.

17              Q.      So the evaluations you do now are for -- in

18     terms of the court evaluations are for use at sentencing?

19              A.      Generally, yes.

20              Q.      And have you, in addition to preparing the

21     reports, have you testified in court?

22              A.      Yes, I have.

23              Q.      And what courts have you testified in?

24              A.      Federal court and county.

25              Q.      And when you say federal, which federal
```

SUPERIOR COURT

**ER 1426**

8

1       court?  In Phoenix?

2               A.      In Phoenix, yes.

3               Q.      Okay.  And you've testified here in the

4       Maricopa County Superior Court?

5               A.      Yes, I have.

6               Q.      Have you testified or written any reports

7       or evaluations in Arizona outside of Maricopa County?

8               A.      Yes.  Gila County, and Coconino County.

9               Q.      And have you testified or written reports

10      in any other states other than Arizona?

11              A.      California.  And let's see, one report that

12      I did in Arizona was used in Illinois.

13              Q.      Have you previously testified in any cases

14      where the death penalty was available to the Court as an

15      option at the time of sentencing?

16              A.      Yes.

17              Q.      And how many?

18              A.      Two that I remember.

19              Q.      And you wrote reports in each of those?

20              A.      Yes.

21              Q.      Do you have any specific area of expertise?

22              A.      I think I have two areas of expertise.  One

23      is post-traumatic stress disorder and the other

24      neuropsychology.

25              Q.      And can you briefly describe what each of

Case 2:16-cv-01159-SRB   Document 453   Filed 12/04/17   Page 273 of 421
Case 2:06-cv-01561-ROS   Document 115-5   Filed 03/12/15   Page 219 of 322

9

1    those areas are?

2         A.       Well, post-traumatic stress disorder, PTSD,

3    is an anxiety disorder.  My experience is from working

4    with Vietnam veterans for about two years.  I was part of

5    a contract with the VA.

6              In addition to that, I'm no longer part of

7    that contract.  As far as I know, the group doesn't exist

8    anymore who had that contract.  And in addition, I still

9    have some veterans I see.  And I have individuals in my

10   therapy who suffer from post-traumatic stress disorder.

11             Neuropsychology -- I worked for two years

12   with Ralph Reitan who developed the Ralph Reitan

13   Neuropsychology Test Battery.  And for about 20 years or

14   so I have conducted neuropsychological evaluations.

15             I continue to stay in contact with Ralph

16   Ratan and continue to attend workshops in that area.

17        Q.       And were you retained by our office to

18   conduct a psychological evaluation on Ernesto Martinez?

19        A.       Yes, I was.

20        Q.       What information were you given prior to

21   your initial contact with Mr. Martinez?

22        A.       I spent about an hour and a half speaking

23   with you and Pam Davis.  And in addition, you gave me

24   records that I've listed in my report.

25             Do you want me to cite those?

Case 2:05-cv-01509-RSB   Document 153-3   Filed 12/04/17   Page 274 of 421
Case 2:05-cv-01509-RSB   Document 153-3   Filed 03/12/15   Page 220 of 322

10

1          Q.      No.  That's all right.  And in the

2    conversation or the conference you had with Pam Davis and

3    myself, did I summarize the facts of the case for you?

4          A.      Yes, you did.

5          Q.      Okay.  Did you read all of the departmental

6    reports that were prepared?

7          A.      Yes.

8          Q.      The police reports?

9          A.      Well, again, I read what I've listed in my

10   review of records.  I didn't read police reports, no.

11         Q.      In terms of the facts I have of the case, I

12   gave you the summaries, correct?

13         A.      Yes.

14         Q.      Okay.  Now, did you interview Ernesto

15   Martinez?

16         A.      Yes, I did.

17         Q.      And how many times did you interview him?

18         A.      On two occasions.

19         Q.      And do you know the dates?

20         A.      Yes.  June 5 and 8, 1998.

21         Q.      And the sum total of those interviews was

22   how long?

23         A.      I think about -- I think about three hours.

24         Q.      Together?

25         A.      Yes.

SUPERIOR COURT

**ER 1429**

Case 2:16-cv-01159-SRB   Document 153   Filed 12/04/17   Page 275 of 421
Case 2:05-cv-01561-ROS   Document 153-5   Filed 03/12/15   Page 221 of 322

11

1          Q.       All right.  Did you conduct any specific

2    tests?

3          A.       Yes, I did.

4          Q.       Okay.  And what were they?

5          A.       I used the two subtests of the Wechsler

6    Adult Intelligence Scale, third edition.  The

7    Comprehension and Matrix Reasoning Subtests.

8          Q.       Let me ask you a couple questions about

9    that.  What's the purpose of those tests?

10         A.       Those are tests that give me a sampling of

11   the individual's general ability.  One emphasizes verbal

12   ability, the other emphasizes visual ability.

13         Q.       And what are you looking for when you

14   administer those tests?

15         A.       I'm looking at intelligence.  Looking to

16   see if there is a -- retardation would be an issue, or

17   just to get some measure of intellectual ability.

18         Q.       And in this particular case, can you

19   summarize the results of those tests as to Mr. Martinez?

20         A.       Yes.  He did -- flip over.  See if I can

21   make sure I give the exact score.

22                  He was -- let's see, on the Comprehension

23   Subtest, he received a score of 14, which placed him at

24   the 91st percentile.  Which if you use that as an

25   estimate, just based on that test, an estimate of  his

12

1    I.Q. would be 120.  Excuse me, I mean a score of 120,

2    which 100 is average in the I.Q. test, so 120 would be the

3    superior range.

4              The Matrix Reasoning Subtest, again, that's

5    the comprehension motor subtest, he was at the 98th

6    percentile and would be equivalent of an I.Q. score of

7    130.  Those, of course, are just samplings.  It does not

8    mean if I gave the whole battery he would have those exact

9    scores.  I routinely give these tests, and those are very

10   high scores.  I don't often times test people who give

11   those kinds of scores.

12        Q.      Okay.  And in your experience, when you

13   give just a portion of the exam like you did here, are the

14   results relatively accurate?

15        A.      I think it's reasonable to say that he has

16   above-average ability.  Again, looking at the quality of

17   his answers to the comprehension subtests, I think that he

18   probably scores well above average.  And if I also then

19   look at, for example, Dr. MacDonald's I.Q. scores, the

20   scores battery might be a little higher.  They might be

21   close to that.  I doubt they'd be too much lower.

22        Q.      And Dr. MacDonald's report is one that was

23   done in 1991 in Gila County Juvenile Court, correct?

24        A.      Yes.

25        Q.      That's one of the documents you reviewed as

SUPERIOR COURT

**ER 1431**

1       part of your evaluation process?

2              A.      Yes.

3              Q.      What other tests did you conduct?

4              A.      I also gave the Trail Making Tests A and B,

5       which are part of the Halstead-Reitan Neuropsychological

6       Test Battery.

7              Q.      Why did you give those?  What's the

8       purpose?

9              A.      Because Dr. MacDonald had raised the issue

10      that perhaps Mr. Martinez had a learning disability.  And

11      so I was sampling his brain functions.  Trails A and B,

12      they don't take the place of a full neuropsyche eval, but

13      if he had trouble on those two tests, then I could have

14      either recommended a neuropsyche, or I could have given

15      him a couple of other tests.

16              So it was really just to check out

17      something that Dr. MacDonald -- an issue Dr. MacDonald had

18      raised.

19             Q.      And the bottom line in terms of your

20      evaluation of those tests is what?

21             A.      He had perfectly normal scores on both

22      Trails A and B; so, therefore, I didn't find evidence of a

23      learning disability.

24             Q.      What other tests?

25             A.      I also gave the Wide Range Achievement

14

1    Test-3, the reading subtest only just as a measure of

2    reading ability to make sure that he had adequate reading

3    skills to take the MMPI.

4          Q.      And did he?

5          A.      Yes, he did.

6          Q.      Okay.  And then you also administered the

7    MMPI, correct?

8          A.      Yes, I did.

9          Q.      Can you describe what that test is and how

10   you use it?

11         A.      The MMPI is a personality test.  There are

12   probably more than 5,000 articles that have been written

13   about the MMPI.  It is accepted as a measure of

14   personality, and it's -- I use it routinely.  I think it's

15   a reasonable assessment of someone's personality.

16         Q.      And is it used routinely by experts in the

17   mental health field?

18         A.      Yes, it is.

19         Q.      Are you looking for any specific thing in

20   the MMPI, any specific results or answers?

21         A.      No.  I'm looking for the information that

22   it will give.  I look to see if there's a correspondence

23   between what the MMPI is indicating and what I'm seeing

24   both in the clinical interview and also in the record.  So

25   it's just one piece of information I use.

SUPERIOR COURT

**ER 1433**

Case 2:05-cv-01159-SRB   Document 153   Filed 12/04/17   Page 279 of 421
Case 2:05-cv-01159-ROS   Document 153   Filed 03/12/15   Page 225 of 322

15

1       Q.      And what is the MMPI itself?  Is it

2    questions he fills out?

3       A.      It's 576 true-false questions.

4       Q.      And did you sit down with him when he

5    filled that out?

6       A.      No, I didn't.  I asked Pam Davis to sit

7    down with him.

8       Q.      And then he gave you the -- filled out the

9    form?

10      A.      Yes.

11      Q.      From time to time, do you get what you

12   might call invalid results on the MMPI?

13      A.      Yes.

14      Q.      And what does that mean?

15      A.      Essentially, when you get invalid results,

16   you really can't say why they're invalid.  There are

17   several validity indicators.  Sometimes there's great

18   inconsistency in responding.  Sometimes there seems to

19   be -- the person seems to endorse almost every symptom

20   that we know of.  Basically, the only thing you can say if

21   you have invalid results is that you really can't draw any

22   conclusions from the results.

23      Q.      Based on your review of the MMPI that

24   Ernesto Martinez took, do you think that's a valid

25   profile?

Case 2:16-cv-01159-SRB   Document 153   Filed 12/04/17   Page 280 of 421
Case 2:06-cv-01561-ROS   Document 115-5   Filed 03/12/15   Page 226 of 322

16

1        A.        The validity indicators were right in line

2    and indicated it was valid.

3        Q.        Now, taking into account the interviews

4    that you conducted with Ernesto Martinez, the records you

5    reviewed, the tests that you administered, overall, do you

6    think that that represents or your report represents a

7    valid representation of his functioning?

8        A.        I believe that it does.

9        Q.        What conclusions did you reach and

10   diagnosis?

11       A.        I diagnosed Mr. Martinez as having

12   Post-Traumatic Stress Disorder, and also Personality

13   Disorder NOS, Not Otherwise Specified.

14       Q.        And explain what Access 1 and Access 2 is.

15       A.        Access 1 covers most of the disorders that

16   are listed in the DSM-4, which is the handbook of

17   diagnostic categories.  Access 2 is reserved for mental

18   retardation and personality disorders.

19       Q.        And why is there a separate access for

20   those?

21       A.        I guess just to help organize diagnostic

22   labels and to make a difference between certain emotional

23   disorders and then certain disorders that tend to be

24   permanent.

25       Q.        What is post-traumatic stress disorder?

17

1    A.    It's an anxiety disorder.  It is someone's

2    response to a trauma.  And it has -- generally it's

3    associated with someone who's experienced something like a

4    rape or combat.  And there are really two levels of

5    trauma.

6         One is called a Level 1 trauma, which

7    refers to what I just talked about; and Level 2 trauma

8    would be something that has to do with a prolonged

9    situation that's ongoing, such as in this case, exposure

10   to an environment in which there was physical abuse, an

11   unsafe environment that would be traumatic.

12        One of the aspects of PTSD is that it would

13   be traumatic to pretty much anyone who would be exposed to

14   that trauma.  It is not -- in other words, it's not within

15   the individual.  It's not a peculiar response that they

16   make, but that any of us in that situation would probably

17   have a similar response.

18   Q.    And just so that I'm clear, the Level 1

19   trauma refers to an incident of maybe shorter duration and

20   more isolated; whereas, the Level 2 trauma refers to

21   something more prolonged?

22   A.    Yes.

23   Q.    And you've got the word chronic after that.

24   What does that mean?

25   A.    That means that it's not something that is

1    as opposed to acute, which would mean something that

2    happened just recently.  Chronic means it's something

3    that's been ongoing for a period of time; in other words,

4    he's had this disorder for a period of time.  It's not

5    something that's just a result of a recent trauma.

6         Q.     Now, briefly describe what you mean by

7    personality disorder.  And in a minute or two I'll have

8    you go into more detail, but just generally, what do you

9    mean when you say personality disorder?

10        A.     A personality disorder is a trait rather

11   than a state; in other words, anxiety is a state that may

12   come and go.  Personality disorder we're talking about

13   something that is on the level of character.

14        Q.     What do you see in Ernesto Martinez that

15   supports your conclusion and diagnosis that he suffers

16   from post-traumatic stress disorder?

17        A.     There are specific criteria.  The first is

18   the trauma and their -- let's see, "A person is

19   experienced, witnessed or confronted with an event or

20   events that involve actual or threatened to death or

21   serious injury and a threat to the physical integrity of

22   self or others.  The person's response involved intense

23   fear, helplessness or horror or in children disorganized

24   or agitated behavior."

25             So that's the first criteria that has to be

1    met.

2         Q.      And where are you getting those criteria

3    from?

4         A.      From the DSM-4.

5         Q.      And did you find those in this particular

6    case?

7         A.      Yes, I did.

8         Q.      What else did you find that supports your

9    conclusion that he suffers from post-traumatic stress

10   disorder?

11        A.      The criteria under Section B is that the

12   traumatic event is persistent, excuse me, persistently

13   re-experienced in at least one or more of the following

14   ways:  And there are five listed.

15               And what I found is intense psychological

16   distress and exposure to internal or external cues that

17   symbolize or resemble an aspect of the traumatic event,

18   and sociologic reactivity on exposure to internal or

19   external cues that symbolize or resemble an aspect of the

20   traumatic event.

21        Q.      Okay.  In layman's terms, what do both of

22   those mean?

23        A.      That means that in the case of something

24   that is prolonged, when -- for example, with Mr. Martinez,

25   when I asked him about some things that I knew that went

Case 2:16-cv-01159-SRB    Document 153    Filed 12/04/17    Page 284 of 421
Case 2:05-cv-01561-ROS    Document 153    Filed 03/12/15    Page 230 of 322

20

1    on, for example, I asked him about when he was 5 and his

2    father was beating his mother, and he tried to stab his

3    father, I asked him about that, and he said that -- I

4    asked him what he was thinking when that happened or what

5    he's feeling.  He said he didn't remember what he was

6    thinking or feeling.  He just wanted to make it stop.

7            And when he talks about -- when he talked

8    about that event, that was something that, when I observed

9    him, it appeared that that was a significant event to him.

10   He didn't really want to look back and try to remember how

11   he felt.  He didn't spend time.  He didn't elaborate on

12   it.  He didn't brag that he was 5 and trying to take his

13   father on.  It was something that -- what he seemed to

14   focus on was that he wanted it to stop, and he didn't know

15   how to make it stop at 5.

16           People who have gone through, who as

17   children who have been exposed to traumatic events, mainly

18   it's their whole perception of the world that has been

19   changed, their thinking, their way of perceiving, their

20   emotions are changed.

21           So you can go back and find these kinds of

22   things, but it's not the same.  It doesn't have the same

23   quality to it that it has if you have somebody who has

24   been raped, for example, or who's been in some horrendous

25   car accident.

SUPERIOR COURT

**ER 1439**

Case 2:16-cv-01159-SRB   Document 153   Filed 12/04/17   Page 285 of 421
Case 2:05-cv-01561-ROS   Document 115-5   Filed 03/12/15   Page 231 of 322

21

1    Q.    Now, did you explain both of the criteria

2    that you just talked about with that example?

3    A.    Okay.  The sociologic reactivity would be

4    sort of a sense of readiness to take some kind of action.

5    And one of the things that he said was that although he

6    respects his father, if his father tried to hit his mother

7    again, he wouldn't get a second swing.

8    Q.    And why do you find that particular

9    criteria in someone who's suffering from post-traumatic

10   stress disorder?

11   A.    Why do you find it?  Because they have been

12   in a situation in which the idea is you either take flight

13   or you fight.  And he was describing a situation in which

14   in both cases he tried to take some kind of action.  He

15   didn't just try to run away.  He tried to take that

16   action, and it was a -- he was able to, from that event,

17   he was able to sort of get himself geared up to take

18   action again if the situation were to arise.

19   Q.    So, as I understand it, of the five

20   criteria, you're able to place two of them or link two of

21   them to Ernesto Martinez's situation?

22   A.    Yes.

23   Q.    What other findings support your

24   conclusion?

25   A.    Persistent avoidance of a stimuli

Case 2:05-cv-01561-RCB Document 115-5 Filed 03/12/15 Page 282 of 322

22

1    associated with the trauma and numbing of general

2    responsiveness, as indicated by at least three or more of

3    the following:  And I cited "Efforts to avoid thoughts,

4    feelings or conversations associated with the trauma."

5              Again, he didn't want to elaborate on the

6    events.  He didn't want to talk about what went on.  He

7    even, more or less, dismisses all of that, all of those

8    things that happened.  He just dismisses that.

9              Also, the inability to recall an important

10   aspect of the trauma.  Again, when I asked him, "How were

11   you feeling?  What were you thinking?"  He said he didn't

12   know what he was thinking or feeling.  He just knew that

13   he wanted it to stop.  So he simply remembered a general

14   feeling and didn't offer any other details.  Didn't seem

15   to know any other specific details.

16             Feeling of detachment or estrangement from

17   others.  I think it's been noted by others who have said

18   that about him, and he has observed that people seem to be

19   wary of him, and that he seems to be unpredictable to

20   people.

21        Q.   And why do you find those characteristics

22   or those types of things in people who suffer from

23   post-traumatic stress disorder?

24        A.   Well, I think there are probably a lot of

25   theories, but, essentially, this is what a traumatic

**ER 1441**

Case 2:05-cv-01561-ROS   Document 1153   Filed 03/12/15   Page 283 of 322

1    experience -- this is the kind of impact that it has on

2    people.  It leaves people with a feeling that they are

3    different.  Again, it changes their whole perception of

4    the world, and there's a theory that talks about how

5    people have basically three assumptions about the world.

6              We go along as adults, and we end up with a

7    notion that, essentially, that the world is rational, the

8    world is benign as opposed to evil, and that, essentially,

9    we are good.

10             Children who suffer in an environment that

11   is not adequate but violent, unsafe, end up really not

12   developing those assumptions.  And as we go along, do we

13   know that the world is not perfectly rational?  Of course

14   we know that.  But we operate more or less day-to-day on

15   the assumption that it is.

16             Most of us try to eat somewhat reasonably,

17   maybe exercise, take care of our health, with the idea in

18   mind that that will lead to a longer life knowing that it

19   does not perfectly, but we have some reassurance.

20             Somebody who experiences the Level 1 trauma

21   has those assumptions sort of ripped away quickly.  A

22   child who's lived in this kind of environment with a Level

23   2 trauma never develops these assumptions.  They develop

24   other assumptions.

25             Q.      Which are?

ER 1442

Case 2:06-cv-01159-RRB   Document 1153   Filed 03/12/15   Page 288 of 322
Case 2:06-cv-01159-RRB   Document 1153   Filed 12/04/17   Page 288 of 421

24

1          A.       I think in this case, which would be that

2     the world is violent, that it's every man for himself.

3     And often times if you don't strike the first blow, you

4     won't be around to get a second chance.

5          Q.       Is there a difference in the post-traumatic

6     stress disorder, depending on whether it's the product of

7     a long-term situation; for instance, when someone is a

8     child versus, you know, the short-term maybe intense

9     situation of a rape of an adult?

10         A.       Well, recovery is not as good.

11         Q.       In which instance?

12         A.       It's not as good in the Type 2 trauma, in

13    the one that is prolonged, recovery is not as good.

14         Q.       Why is that?

15         A.       Well, because you have influenced

16    somebody's thinking over a longer period of time.

17               I think it's also -- I mean, just from the

18    standpoint of logic, it's a little harder to convince

19    somebody that the world isn't just filled with predators.

20    It's a place that there's sort of a balance between good

21    things happening and bad things happening.  It's a little

22    harder to convince somebody of that if they've had a

23    number of years in a very bad situation.  They have a lot

24    of evidence or data to support their notion that this is

25    not a safe place.

Case 2:15-cv-01159-SRB   Document 45-3   Filed 12/04/17   Page 289 of 421
Case 2:06-cv-01569-ROS   Document 115-5   Filed 03/12/15   Page 235 of 322

25

1        Q.        Now, in your report, at page 12 you talk

2    about certain associated features and disorders that are

3    associated with PTSD.  And you state that they're commonly

4    seen with interpersonal stressor.

5                  What is an interpersonal stressor?

6        A.        If there is something that happens in

7    somebody's life that's stressful, essentially.

8        Q.        And in this particular case, you're

9    referring to what?

10       A.        In this particular case, I'm referring to

11   the homicide and Ernesto's desire not to go back to

12   prison.

13       Q.        You listed a number of symptoms associated

14   with that, and you underlined several of them.  And your

15   intention in underlining them was to indicate that those,

16   in your opinion, apply to Ernesto Martinez's situation?

17       A.        Yes.

18       Q.        Can you describe what you mean by impaired

19   affect modulation?

20       A.        That has to do with control.  Once

21   emotions -- for example, being angry and expressing that

22   in some controlled fashion.  And let's go back.  I

23   misunderstood your previous question.

24                 May I correct something that I said?

25       Q.        Sure.

Case 2:06-cv-01159-RRB Document 145-3 Filed 12/04/17 Page 290 of 421
Case 2:06-cv-01159-RRB Document 145-3 Filed 03/12/15 Page 236 of 322

26

1      A.      This paragraph on page 12 where you're

2    talking about the interpersonal stressor.  This,

3    essentially, this paragraph is dealing with Type 2 traumas

4    and the interpersonal stressor in Ernesto's or Mr.

5    Martinez's case would be the 11 or 12 years of environment

6    in which there was domestic battery.

7             So there's really -- I was thinking that

8    you were going to go to another symptom.

9      Q.      Okay.  How does, for instance, in this

10   case, a child's experience to prolonged trauma in their

11   formative years, how does that create impaired affect

12   modulation?  And maybe if you can give an example of what

13   normal affect is and illustrate it in that fashion?

14     A.      Well, in the environment that Mr. Martinez

15   grew up in, there were many, I think, examples of

16   out-of-control emotion of people being angry, essentially,

17   and expressing that through violence.

18             With children, the idea is that they're

19   going to have emotions and feelings.  They're going to be

20   angry.  Sometimes they're going to be happy sometimes, and

21   the family is to provide ways to express those emotions in

22   ways that don't harm other people and don't harm the

23   individual either.  So it's a learning process with regard

24   to taking that emotion and learning to present it in a

25   civilized form.

Case 2:06-cv-01159-RCB Document 115-5 Filed 03/12/15 Page 237 of 322
Case 2:16-cv-01159-SRB Document 153 Filed 12/04/17 Page 291 of 421

27

1      Q.      And the example that was set for Ernesto

2    Martinez in this learning process was?

3      A.      Violence.  Essentially it was very much

4    acting out the feeling as opposed to talking about it and

5    looking at options.  This environment sounded to me as

6    though there weren't a lot of options.  The options tended

7    to be taking some action that was generally violent.  That

8    seemed to be the male role.  The female role was to flee,

9    try to survive.

10     Q.      The next thing that you underlined was

11   self-destructive and impulsive behavior.  And I think I

12   understand what those words mean, but can you just

13   elaborate a little bit?

14     A.      Self-destructive behavior can refer to the

15   most extreme suicidal behavior.  It can also refer to

16   taking actions that anyone would look at and say, you

17   know, "That's self-destructive," that the individual is

18   putting themselves at risk for harm.

19     Q.      Why do we see that characteristic in

20   someone who's been exposed to prolonged trauma as a child,

21   for instance?

22     A.      I think often times one of the personality

23   disorders that goes along with PTSD frequently is

24   borderline personality disorder.  And that's a disorder in

25   which often times there are suicidal attempts.  There's

Case 2:16-cv-01159-SRB   Document 153   Filed 12/04/17   Page 292 of 421
Case 2:05-cv-01561-RCB   Document 153-5   Filed 03/12/15   Page 238 of 322

28

1    very poor judgment with regard to interpersonal

2    relationships.

3              Dissociation is a symptom that's common

4    among borderline personality disorder people.  And also

5    people with PTSD and dissociated response is the failure

6    to integrate consciousness, memory, perception; therefore,

7    when somebody experiences dissociation, which often times

8    becomes a way of coping, we see very poor judgment, a very

9    narrowed sense of options.  They'll see one option when

10   there may be many.  It's a very goal-directed almost what

11   we would associate with child-like thinking because it's

12   so lacks perspective, so lacks a sense of context.

13        Q.    And why do you see that in someone who's

14   been the product or grew up in an environment of prolonged

15   trauma?

16        A.    Again, I think that largely it's because

17   they have not learned to have a perspective.  They haven't

18   learned the behaviors that go along with setting somebody

19   up so that they can exercise good judgment.

20              They tend -- somebody who's in an

21   environment that isn't safe and is violent tends to be

22   reactive.  They often times, as children, they don't have

23   time to think.  If they were able to think, their

24   experience is so limited that it probably wouldn't do them

25   a lot of good.

SUPERIOR COURT

**ER 1447**

1          Q.        You underlined the word hostility.

2                    Why do you see that in someone who's been

3    exposed to prolonged trauma?

4          A.        I think that it's —— well, in part, because

5    they have lived in an environment that's not predictable.

6    They tend to feel they can't count on anybody.  There's a

7    deep sense of betrayal, often times, that somehow the

8    world has failed them.

9          Q.        The last thing you underlined was impaired

10   relationships with others.

11                   Can you briefly describe what that is and

12   why we see it in someone?

13         A.        That's a hallmark of a borderline

14   personality disorder.  And, again, borderline personality

15   disorders are frequently associated with PTSD.  Because

16   one, you know, again, in this environment, who steps in to

17   protect this person?  The environment in Mr. Martinez's

18   case, the environment was so chaotic, his mother couldn't

19   really protect him.  She was trying to survive.  She was a

20   battered woman, essentially.

21                   So relationships generally don't have time

22   to evolve, and there's not the sense of predictability,

23   the sense of trust that can evolve.  And, also, the person

24   themselves don't have qualities that tend to lead to

25   smoothed relationships.  If you look at, again, the

30

1    difficulty with modulating their emotions or affect.  So

2    they can often times have very black and white views and

3    expectations that are unrealistic.  And when those

4    expectations are not met, again, they feel their options

5    are limited.

6         Q.    Then you go to discuss on page 12 the fact

7    that, in your opinion, he has certain characteristics

8    associated with the cluster B personality disorders.

9               First of all, what are the cluster B

10   personality disorders?

11        A.    There are a number of personality disorders

12   in cluster B.  I thought there were three that applied to

13   Mr. Martinez.  And one was anti-social personality

14   disorder.

15              Second was borderline personality disorder.

16              And a third was narcissistic personality

17   disorder.

18        Q.    First of all, explain what anti-social

19   personality disorder is.

20        A.    Anti-social personality disorder is -- it's

21   a pervasive pattern, according to DSM-4, of disregard for,

22   and violation of the rights of others since about the age

23   of 15.

24        Q.    And what characteristics do you see in

25   Mr. Martinez?

ER 1449

1        A.      Let's see, repeatedly performs acts that

2    are grounds for arrest.

3               Impulsivity or failure to plan.

4               Irritability and aggressiveness.

5               Reckless disregard for safety of self and

6    others.

7               And evidence of a conduct disorder by the

8    age of 15, and he's 18 years or older.

9        Q.      And are these observations common to people

10   who are also suffering from post-traumatic stress

11   disorder?

12       A.      It isn't unusual.  It would certainly be --

13   again, if you look at Level 1 trauma and Level 2 trauma,

14   these kinds of behaviors would be associated with someone

15   who comes from an environment where there was a prolonged

16   exposure to violence.  There you would expect -- yes, you

17   would expect this kind of response.

18       Q.      Now, you said, basically, that you found

19   characteristics associated with three different

20   personality disorders.

21               Is there -- and we'll talk about the other

22   two -- well, let's talk about them first, and then I'll

23   ask you the question.

24               Describe borderline personality disorder.

25       A.      Borderline personality disorder, according

32

1    to the DSM-4 again, is a pervasive pattern of instability

2    of interpersonal relationships, self-image, and affect,

3    and marked impulsivity that begins by early adulthood and

4    is present in a variety of contexts.

5         Q.       And is it surprising to find someone from a

6    prolonged traumatic background as a child with a

7    borderline personality disorder?

8         A.       No.  It's very commonly found.  As a matter

9    of fact, when you diagnose borderline personality

10   disorder, you know that you better look for the trauma and

11   see if the person has PTSD.

12        Q.       And what is it about the traumatic exposure

13   or the exposure to trauma as a child that results in one

14   of these personality disorders?

15        A.       I think that, basically, we're talking

16   about -- with a Level 2 trauma, we're talking about

17   something that is man-made.  It's not a tornado or airline

18   or automobile accident.  And there is, I think, a real

19   sense of betrayal.  A sense of distrust of people.  That's

20   why the borderline personality disorder it's essentially

21   people have very disturbing -- I was going to say lousy

22   relationships with others, but they are very disturbing,

23   very frustrating, lead to a great sense of sadness.

24        Q.       The third one that you found was

25   narcissistic personality disorder.  Can you describe that?

SUPERIOR COURT

**ER 1451**

1    A.    Narcissistic personality disorder is --

2    it's a -- basically it's a sense of entitlement.  It's a

3    sense of grandiosity.  It's a sort of a self-centered view

4    of the world.  A sense of entitlement, unrealistic

5    expectations with authority with automatic compliance with

6    one's expectations.  It's a sense of being special.

7    Q.    And is there some way to connect that

8    particular personality disorder with prolonged trauma as a

9    youth?

10   A.    I think that -- again, I'll look at this

11   case in particular because I think it illustrates this.

12        Mr. Martinez, I think, early on, looked at

13   the world as sort of being divided into people who are

14   strong and people who are weak.  And he felt that he had a

15   choice.  Again, he had, you know, two options.  He could

16   either be weak or he could be strong.  And I think that he

17   chose to be strong because that was when he felt, early,

18   on, really probably somewhere about 5 or 7, somewhere

19   between 5 and 7, decided that if he was going to survive,

20   he needed to be strong.

21        So I think that the narcissistic feature

22   indicates part of that decision.  I'm going to be larger

23   than life.  I'm going to be the strongest.  The best.  I'm

24   going to prevail.

25   Q.    Going back to the anti-social personality

Case 2:06-cv-01159-SRB  Document 453  Filed 12/04/17  Page 298 of 421
Case 2:06-cv-01159-ROS  Document 115-5  Filed 03/12/15  Page 244 of 322

34

1    disorder for a minute.  You talked in the report about

2    that it can often times be misapplied to somebody with

3    Ernesto Martinez's background.

4              Can you elaborate on that a little bit?

5        A.      That's the reason that I didn't diagnose

6    him as simply having anti-social personality disorder.  I

7    think he's a complex person, and I think that to give that

8    diagnosis I think would not fully represent the complexity

9    that I see in him.

10       Q.      Specifically referring to the anti-social

11   personality disorder, does it change with the passage of

12   time?

13       A.      Yes, it does.  It's something -- especially

14   in men and most people with anti-social personality

15   disorder tend to be men.  At about age 40 there's a

16   definite decrease.  It's almost part of the definition of

17   anti-social personality disorder.  They say that most of

18   us tend to mellow with age.

19       Q.      So in this particular case, you don't feel

20   it would be appropriate to attach the singular label of

21   anti-social personality disorder to Mr. Martinez?

22       A.      I think that as long as you identify the

23   features of that disorder that he has, that it's a more

24   comprehensive diagnosis to do what I have done, which is

25   to say he has a personality disorder.  But it has enough

Case 2:15-cv-01159-SRB   Document 153   Filed 12/04/17   Page 299 of 421
Case 2:06-cv-01561-ROS   Document 11-5   Filed 03/12/15   Page 245 of 322

35

1    features of these three that it makes more sense to

2    present the three and just list the features.

3              So it's not denying that he has those

4    qualities or those features, it's just saying that there's

5    more there.

6         Q.    Based on your interviews with Ernesto and

7    your conference with us and your review of the social

8    history that Pam Davis prepared, what's your opinion about

9    what were the significant events in his formative years?

10        A.    I think that there are at least three.  And

11   one is when he was 5, his being so disturbed by his father

12   beating his mother that he tried to stab his father.  I

13   think that's a very significant event.

14             Again, between 5 and 7, it's a time that

15   often times we make decisions about the world, and we

16   don't always review those decisions but operate on those

17   decisions as an adult.  That's one.

18             And, two, I think that when his father sold

19   his horse that he, I think, had raised or trained, and he

20   was about 11 then, I think there was a great sense of

21   betrayal that he felt.  I think that Mr. Martinez very

22   much bonded with animals.  I think that animals were more

23   predictable than people, and I think that his relationship

24   with the horse was probably one that he counted on.  And

25   when his father sold that horse, I think it was

Case 2:16-cv-01159-SRB   Document 153   Filed 12/04/17   Page 300 of 421
Case 2:05-cv-01561-ROS   Document 153-5   Filed 03/12/15   Page 346 of 322

36

1    emotionally devastating.

2              It was also at a time when the family was

3    moving.  There was a lot of chaos during that time.  So,

4    in essence, I don't think his father meant to do what he

5    did.  I don't think he realized how it affected Mr.

6    Martinez, but I think that in doing that, he more or less

7    took away something that was a source of comfort and

8    something that he could count on.

9         Q.    That seems like a relatively innocuous

10   event.  Why do you think it was so significant in this

11   particular case?

12        A.    One, because of the way that Mr. Martinez

13   talks about animals in general.  I mean, when he talked

14   about the roosters used in the cockfighting, he had great

15   admiration for the roosters.  I think it's with animals

16   that he has developed any sense of continuity in the

17   world, any sense of sort of justice.

18              He had a need for those kinds of feelings.

19   He couldn't with people.  People were not predictable in

20   his environment, at least for those first-level years.  So

21   he turned to animals.  And it's often times kids become

22   attached to their animals and can have traumatic events,

23   but we can grow from those things.  It's pain.  We learn

24   to accept loss.  This was something more than loss.  This

25   was a real sense of betrayal.  This was an authority

Case 2:15-cv-01159-SRB   Document 153   Filed 12/04/17   Page 301 of 421
Case 2:05-cv-01561-ROS   Document 115-5   Filed 03/12/15   Page 247 of 322

37

1    figure, somebody who had the power to do this, acted in a

2    way that totally disregarded his perception.

3              It's one of the factors that Dr. Linehan

4    talks about when he talks about an invalidating

5    environment.  An environment that fails to take into

6    consideration, the perspective, the feelings of the child.

7    And it was not -- it wasn't just the typical loss that

8    most of us have experienced with regard to an animal

9    either through death or having to be sold or given away or

10   whatever that could be traumatic to us.  We can always

11   remember it, but we don't have -- generally we don't have

12   that deep sense of betrayal that this is something that --

13   one of the few things that we could really count on

14   somebody arbitrarily took away.

15        Q.     What was the third?

16        A.     The third event was his incarceration for

17   about 13 months at Catalina Mountain Juvenile Facility or

18   Institution.  And I think that up until that point that

19   the criminal behavior that he had engaged in was

20   essentially non-violent.  I think when he was sent there,

21   it was another representation of an environment that is

22   violent, unsafe, that you have to look out for yourself,

23   and, again, you had better be ready to strike the first

24   blow.

25        Q.     Now, you've listed those three

1       specifically.

2                       You're not saying that those are the only

3       things that affected how he became to come in this

4       courtroom convicted of first degree murder, are you?

5                A.     No.

6                Q.     These are, in your opinion, the three most

7       significant, right?

8                A.     The three events that stand out as having

9       real significance in terms of his emotions, yes.

10               Q.     And more particularly, on the Catalina

11      Mountain Juvenile Facility, which he entered at about age

12      15, why is that significant?

13               A.     One, he is not a large person.  I think you

14      know presently he's something like 5'7", 135 pounds or so.

15      When he was just 15, one of the comments that he made to

16      Dr. MacDonald was that because he was small people wanted

17      to fight with him.  I think that he was a target for

18      people to try to beat up.  And I think being placed in an

19      environment with a number of juveniles -- I mean, he talks

20      about that period of time.  I think that he has had some

21      insight because he's talking about practical things.  And

22      I think that he is able to apply his intellect to that

23      period of time.  As to what happened to him as a younger

24      child, I don't think he has insight with regard to that.

25      But he said things like it was cool not to follow the

Case 2:06-cv-01561-ROS   Document 153   Filed 03/12/15   Page 249 of 322

39

1    rules.  And if you look at a situation in which you have a

2    lot of juveniles, and if you're going to follow the rules,

3    I think that you would be subject to some attention,

4    negative attention.

5              There again, he said that he learned that

6    there you could be weak or you could be strong.  Once

7    again, he decided that he was not going to be walked on.

8    He was going to be strong.  He was going to be a survivor.

9    People with PTSD are survivors.  They do not see

10   themselves as victims.  They very much reject the notion

11   of being victims.  So he was not going to be a victim in

12   that setting.

13             Q.     Let's talk about Dr. MacDonald's report for

14   a few minutes.  That was a report that was written for the

15   juvenile court in Gila County as part of the sentencing

16   process that resulted in him being sent to Catalina

17   Mountain, correct?

18             A.     Yes.

19             Q.     Can you summarize the essence of Dr.

20   MacDonald's findings first?

21             A.     Let me find those.  There's a quote here

22   that I think does a good job.  Let's see.  "This

23   youngster, in my opinion, is on the edge of a seriously

24   borderline personality style.  He appears to be an affect

25   starved, deeply angry youngster who has felt the ravages

SUPERIOR COURT

**ER 1458**

Case 2:06-cv-01159-SRB   Document 153   Filed 12/04/17   Page 304 of 421
Case 2:06-cv-01159-ROS   Document 153   Filed 03/12/15   Page 250 of 322

40

1    of rejection, guilt, and criticism rather strongly." And

2    I think that that really captures, I think, what he saw.

3          Q.      And what did he recommend to the Court in

4    that case?

5          A.      He recommended residential treatment that

6    would last as long as 18 months.

7          Q.      And in your opinion, why -- at that

8    particular point, why would that be an appropriate

9    recommendation?

10         A.      Because Mr. Martinez needed to be in a

11   controlled environment.  He needed to be in an environment

12   in which, one, he would be safe.  Again, people with PTSD

13   are very fearful of being emotional.  I mean, one of the

14   symptoms is numbing or withdrawing from feelings.  So if

15   you want to more or less re-educate someone with regard to

16   their feelings, they have to be in an environment in which

17   it's safe to express those feelings.

18                So if somebody -- you can't count on that

19   when they're not in a residential facility.  So that's it.

20   It would be to provide him with a controlled environment

21   and to be able to provide him with opportunities, to

22   explore certain things and more or less make sure that he

23   did.

24         Q.      Something else that you reviewed from

25   around that very same time frame is some progress notes

Case 2:05-cv-01159-SRB   Document 153   Filed 12/04/17   Page 305 of 421
Case 2:05-cv-01561-ROS   Document 115-5   Filed 03/12/15   Page 251 of 322

41

1    from a man named John Grossman who conducted several

2    counseling sessions from, I think, four or five from late

3    March until maybe a week before Mr. Martinez was sentenced

4    to the Catalina Mountain Facility.

5                    Why do you feel that was the appropriate

6    approach to take and why?

7            A.      I think that Mr. Grossman appeared to do an

8    excellent job.  Dr. MacDonald said that verbal

9    psychotherapy sessions were not going to be the way to go

10   with Mr. Martinez.  And I think that Mr. Grossman

11   certainly recognized that.  And what he did was to involve

12   the family.  And the family touched emotions in Mr.

13   Martinez that he couldn't really deny, that he had to deal

14   with.  I mean, he actually wanted to deal with those

15   feelings on one level.  So I think that the way that he

16   was going was the way to go.  Unfortunately, it was very

17   brief.

18           Q.      From what you have reviewed, did it appear

19   that Mr. Martinez was making progress with Mr. Grossman?

20           A.      I think that he was making progress in

21   that -- I mean, one of the events that came out was the

22   incident with the horse, with Mr. Martinez's father

23   selling the horse and the anger that was associated with

24   that event.

25                   The first emotion that generally you touch

42

1   with someone with PTSD is anger because it's underneath

2   that anger that then there are the other feelings that are

3   feelings of vulnerability or would make someone feel

4   vulnerable.

5   Q.      In your opinion, what would have happened

6   or what could have happened had the therapy that Mr.

7   Grossman was conducting -- whether it was by him or by

8   ultimately by somebody else -- and Dr. MacDonald's

9   recommendation for a year to 18 months of residential

10  treatment, what would have happened?

11  A.      Well, I think that it could have been very

12  successful.  One, Mr. Martinez has good general ability.

13  He's intelligent.  And I think, for example, has things

14  like has a sense of justice, has some qualities that we

15  associate with people making decisions to do good things

16  in the world.

17          I think given the ability that he has, I

18  think there was fertile ground there.  In other words, I

19  think he could have learned to handle his emotions.  I

20  think he could have learned to be somebody without

21  striking the first blow.  He could have learned other

22  options.  He could have created other options for himself.

23          The key was dealing with him in a way that

24  touched those emotions.  I think he is an emotional

25  person.  I think that's one of the reasons that we see

**ER 1461**

Case 2:16-cv-01159-SRB   Document 153   Filed 12/04/17   Page 307 of 421
Case 2:05-cv-01561-ROS   Document 115-5   Filed 03/01/15   Page 253 of 322

43

1    such violent behavior.  I think if he were less emotional,

2    there would be less violence.

3         Q.      Last week or a little over a week ago we

4    had another portion of the hearing, and Mr. Martinez's

5    sister was one of the witnesses.  And just for lack of a

6    better way of saying it, she was exposed to essentially

7    the same environment that we've been discussing for the

8    last hour.  And, also, for lack of a better way of saying

9    it, she's gone one path that's much different from where

10   Ernesto has gone.  She's been very successful in school.

11   She's been very successful in a career in the military.

12            How do you explain that?  They were both

13   exposed to the same invalidating environment, and yet they

14   have clearly gone different paths.

15        A.      I think that the most obvious difference is

16   gender.  I think that there are generally different

17   expectations for boys and girls or men and women.  I think

18   that's one element.

19            I would also say that -- I would say that

20   she's not out of the woods.  That I doubt that she will

21   take a path of violence, but I think that she might end up

22   having some difficulty at some point in her life with

23   interpersonal relationships.  It's hard for me to imagine

24   that being in this environment there isn't going to be --

25   she's not going to have some difficulty.

1          Maybe she's dealt with some of that already

2   or maybe it lies ahead.  But I think, generally -- again,

3   generally women don't get a diagnosis of anti-social

4   personality disorder.  Generally men.  So hormones may

5   have something to do with that.

6          Also, even though people are from the same

7   parents, there's an environment, and biologies interact

8   differently in different people.  So if you're going to

9   ask me:  Does she suffer, and will she suffer?  I would

10   say I'd be very surprised if she hasn't or doesn't or

11   won't.  So I think that that does lay ahead.

12          Q.      Separate and apart from that issue, though,

13   and assuming she may suffer from it, maybe now suffers

14   from it, why was her reaction, though, different to it

15   than Mr. Martinez's?

16          A.      Again, I think expectations were different.

17   I think that she probably wasn't challenged in terms of

18   people coming and looking for her to fight her.  I think

19   that in the family culture, in the world of Mr. Martinez,

20   he had to defend himself.  And, again, he was and is

21   small, so I think he experienced a different world in

22   terms of what that world expected or how that world came

23   to him outside of the family.

24          Q.      On page 14 of your report you talk about --

25   is it Linehan?

45

1          A.     Yes.

2          Q.     Okay.  And you've already used this term

3     earlier in validating environment.

4                 Can you explain what that is?

5          A.     That's an environment that fails to

6     recognize someone's perceptions, how they're experiencing

7     the world.  To use as an example, if you say, "You're sick

8     and have a fever," and someone says, "Oh, no, you don't."

9     You can take your temperature and say, "Look, it's right

10    here in black and white."

11                But with regard to emotions, for example,

12    again, I'll go back to the pony, you know, no way that Mr.

13    Martinez could really say, "Look, this is a big part of my

14    world you're taking away.  You're taking a piece of my

15    heart."  He couldn't prove that.  And I think his

16    father -- again, I don't think his father was intending to

17    do that.  I think his father was intending to discipline

18    him, was intending to be a father, be an authority.  But I

19    think that in doing that, I think that he lacked some

20    wisdom in how he exercised his authority.  And I think

21    that the invalidating aspect is really giving the person

22    the message that however they feel, whatever they think,

23    it doesn't really count.

24         Q.     So when you use that term or when that term

25    is used in your report, you're not just referring to the

1    incident with the horse, you're referring to the overall

2    long-term environment that he was in in his early years?

3         A.      Yes.  And again, at age 5 -- I mean, the

4    action that he took at age 5, most 5-year-olds don't do

5    that.  Although it's certainly something that I have heard

6    from other people who have been in environments where

7    their father beat their mothers, that the boys try to take

8    some action to protect the mother.

9         Q.      Now, why is either a validating

10   environment, which I assume is the other side of the coin,

11   why is it an invalidating environment or a validating

12   environment more particularly when you're talking about

13   childhood and growth and that type of thing?

14        A.      Because it's with an invalidating

15   environment we either have to decide that our feelings and

16   our thoughts are really not accurate, don't count, we

17   shouldn't rely on them.  We'd have to decide that or we

18   decide that we're going to say, you know, "To heck with

19   what anybody else thinks, I know."  You know, "They know

20   nothing.  I know everything."

21             And it tends to be -- as a child, you tend

22   to do that in a very black-and-white situation.  As an

23   adult you might say, "Well, okay, you know, I do agree

24   with this person, I don't agree with this person."  And so

25   you can balance and make judgments.

Case 2:06-cv-01159-SRB   Document 153   Filed 12/04/17   Page 311 of 421
Case 2:06-cv-01561-ROS   Document 153-5   Filed 03/12/15   Page 257 of 322

47

1                    Children tend to do sort of all or none.

2    You know, "All authority figures know nothing.  They do

3    not have my best interests at heart.  I can't count on

4    them."  Or you say, "They know everything and I know

5    nothing."

6            Q.       And how do you think that Ernesto Martinez

7    reacted to that environment?

8            A.       I think he decided that, you know, to heck

9    with authority figures, that he would rely on his own

10   ability.  And I think, in part, because he did have -- he

11   was and is intelligent and capable.

12           Q.       A little further down there you talk about

13   one result of living in a consistently invalidating

14   environment is a development of a condition which Linehan

15   calls emotional dysregulation and behavioral patterns.

16   What does that mean?

17           A.       That can be explosive emotions.  The not

18   acting in sort of appropriate, civilized, rational ways

19   but rather to be explosive with anger or with -- if you

20   want to talk about another emotion, I just saw a client

21   last night who the week before she was madly in love with

22   this person, you know, she was already arranging the

23   marriage, and this week she was talking about she's kicked

24   him out because, you know, he was perfect on the one hand

25   and now is perfectly unacceptable.

1    So it's those kinds of extremes in emotion

2    rather than kind of a modulated like, "I met this guy.  He

3    seems really like the guy for me and, you know, over time

4    I'll get to know him a little better."  No, it's, "I met

5    him.  He's perfect.  I'm in love.  And I'll spend the next

6    50 years with this person."

7        Q.      Okay.  And is that what you mean when you

8    say down here, "Never learns how to label and regulate

9    emotional arousal or how to tolerate emotional distress"?

10       A.      Yes.  The person tends to be reactive

11   rather than to have a feeling and live with it for a

12   little time and look at options.  Again, it's another way

13   of saying -- it's a very black-and-white view.  And with

14   black and white, we tend to see not many options.  So it

15   would be -- you'd see impulsive behavior, impulsive

16   emotional behavior.

17       Q.      Why does a traumatic childhood, a long-term

18   traumatic childhood, why does it create this kind of

19   thought process, I guess is the best way to say it?

20       A.      Because, essentially, these are the thought

21   processes of a child.  I mean, children see the world as

22   black and white.  Children tend not to see a lot of

23   options.  We raise children.  We teach them that there are

24   options.  We teach them self-control.  We teach them to

25   live in cooperation and in civilized ways.

SUPERIOR COURT

**ER 1467**

Case 2:16-cv-01159-SRB  Document 153  Filed 12/04/17  Page 313 of 421
Case 2:05-cv-01561-ROS  Document 1153  Filed 03/12/15  Page 259 of 322

49

1          Q.        The last paragraph on that page you talk

2    about Dr. Linehan referring to psychological disorders

3    being best conceptualized as systemic dysfunctions.   And

4    can you explain what that is?

5          A.        She's talking about there being multiple

6    rather than single case causes.   And she's recommending

7    that we not take a black-and-white view of disorders but

8    look at all of the factors.

9                    It's really what I try to do when I said

10   that I thought he had elements of the three personality

11   disorders.   I looked at his environment, and then also

12   looked at his ability.   It's the idea of trying to see the

13   whole picture and not just focusing on one aspect and

14   saying, "This is the cause."

15         Q.        And what do you mean or what does she mean

16   by the term constitutional predispositions?

17         A.        She's talking about the person's nature,

18   what they bring to the situation; and, for example, when

19   you were talking about Mr. Martinez and his sister, they

20   bring to the situation different constitutions, different

21   natures.

22         Q.        Well, how do you reconcile some of the

23   statements that Ernesto made to you now about his family

24   life back then with sort of the reality as we know it?

25         A.        He told me that he is here charged with

1   these behaviors not because of his family but because of

2   himself.  He takes full responsibility for what he's done.

3   That's one of the reasons that I think that anti-social

4   personality disorder does not fit perfectly.  He's not

5   projecting blame.  He's not saying that there's anyone to

6   blame but himself.

7                I think that's part of a growth process,

8   and it's part of, I think, a difference between how he is

9   now and how he was when he was 15.  Because Dr. MacDonald

10  said that he projected blame and at the time anger towards

11  his father.  I mean, he was very angry with his father,

12  even at this time; however, did not blame his mother and

13  presented his mother as somebody who certainly didn't

14  have, I think, the failings that she has said that she

15  had.

16       Q.     Using what you've described here as

17  Dr. Linehan's approach, what's the relationship, and can

18  you describe in some detail the relationship between the

19  systemic dysfunctions and the constitutional

20  predispositions and all of these things we've been talking

21  about, the relationship between that and what brings

22  Ernesto Martinez into court convicted of first degree

23  murder?

24       A.     Well, that's broad.  I'm not sure I

25  understand it fully.

Case 2:05-cv-01509-RRB Document 1453 Filed 12/04/17 Page 315 of 421
Case 2:05-cv-01509-RRB Document 1453 Filed 03/12/15 Page 261 of 322

51

1          I think that he's a product of his

2    environment and his nature.  And, again, given the

3    environment that he had, he had some decisions to make,

4    and those decisions -- I mean, the decision that I think

5    is the most salient is that he's going to survive.  I

6    think that he -- in a situation that involves stress, I

7    think that's the first thing that comes to his mind.  It's

8    the first thing I think with anyone who suffers from PTSD

9    is survival.  And all of a sudden the focus narrows, and

10   it becomes a life-and-death situation, when someone

11   without PTSD wouldn't necessarily look at something as

12   life and death.

13        Q.    That's the area that I want to talk to you

14   for a moment about is we gave you an interview that was

15   done with an individual named Eric Moreno, correct?

16        A.    Yes.

17        Q.    You've reviewed that; is that right?

18        A.    Yes.

19        Q.    So you're aware that that involves a

20   telephone conversation purportedly between Mr. Martinez

21   and Mr. Moreno shortly after his arrest in Indio,

22   California in August of '95, correct?

23        A.    Yes.

24        Q.    Describe -- or I guess give us your opinion

25   about what that means and why he did that.

SUPERIOR COURT

**ER 1470**

1      A.      I think that for most of us, if we are

2    involved in a situation that is dramatic or traumatic,

3    we're likely to seek out somebody and talk about what

4    happened.  And depending on our personality, we can either

5    present that as in a very excited sort of a histrionic

6    way, or we can present it in a kind of a -- or dumbfounded

7    by the whole experience.  But I think that when we

8    experience something that is really dramatic in our lives,

9    we tend to seek out others to rehash it.

10      Q.      What about the aspect that the state is

11    contending that he bragged about it, that he relished the

12    killing; what is your thoughts on that?

13      A.      When I read it, that is not what occurred

14    to me.  I think he was -- again, I think that he was doing

15    something that I think that is normal for most of us, to

16    talk about something that's dramatic.  Certainly it was

17    something that was very dramatic in his life.

18              I think it's also, in keeping with, again,

19    the personality disorders of being dramatic, the

20    narcissistic and the borderline personality, they are

21    dramatic.  To say that he presented it, that he was sort

22    of larger than life, you know, doing this, I think that's

23    part of the image that he has.  He has a very large sense

24    of pride and a sense of image, and I think that his image

25    with the individual he was talking with is that he's a

1    super macho fellow.

2         Q.      Do you have an opinion about whether he

3    should receive the death penalty?

4         A.      I don't think that the death penalty is

5    appropriate.

6         Q.      And why?

7              THE COURT:  At all or in this case?

8              THE WITNESS:  In this case.

9              THE COURT:  All right.

10             THE WITNESS:  I don't think that he is a

11   psychopath.  I think that he does have all of the

12   qualities of anti-social personality disorder.  The

13   difference with the psychopath is that they do not get

14   better, and anti-social personality disorder they change.

15   They can change over time.  They also can have empathy.

16   The distinguishing features between a psychopath and an

17   anti-social personality disorder is the ability to

18   empathize.  He does have the ability to empathize.

19             In this case I don't think that -- to

20   psychopaths I think that the death penalty may be

21   warranted, in this case I think this is an individual that

22   had his environment responded reasonably, not perfectly,

23   but reasonably, I think that he could be the opposite

24   person that he is today.  And I think that that is a

25   tragedy.  Certainly out of that he has created more

**ER 1472**

54

1    tragedy.  But I think that -- I don't think he began -- he

2    didn't enter the world with this capacity.  But was this

3    inevitable?  No.

4              He had an environment that I think taught

5    him, and then, essentially, I guess I would say forced

6    him.  Again, he could take one of those two choices, he

7    could either be weak, and I just don't think that that was

8    in his environment to make that choice, and his

9    environment, I think, was identifying more with the female

10   response.  And I think that that was -- in that

11   environment I just don't think that it was -- that would

12   be almost death.

13             MR. RONAN:  That's all I have, Judge.

14   Thank you.

15             THE COURT:  Okay.  Thank you.  Let's take

16   about 10 minutes, then come on back for cross-examination.

17   See you in 10 minutes.

18             (Whereupon, a brief recess was taken.)

19             THE COURT:  You ready, Mr. Shutts?

20

21                    CROSS-EXAMINATION

22   BY MR. SHUTTS:

23        Q.   Morning.

24        A.   Good morning.

25        Q.   We've met before.  I believe you testified

                      SUPERIOR COURT

**ER 1473**

55

1          on another case I was involved with; do you recall?

2                 A.       Yes.   I don't remember which case, but I do

3          remember you.

4                 Q.       Okay.   I'm going to kind of bounce around

5          here, so bear with me.   But do you believe as a

6          psychologist in your dealings with children that we're all

7          products of our environment, all of us here in this

8          courtroom are a product of our environment?

9                 A.       A product of our environment in interaction

10         with our basic nature, yes.

11                Q.       Okay.   And by basic nature, do you mean,

12         for example, if you're going to be a psychopath that's

13         from birth?

14                A.       I think that there may be some instances of

15         that.   For example, I think -- I guess I would say maybe

16         Jeffrey Daumer.   What I know, which is not too much of

17         that case, I think that he came into the world with a

18         predisposition that probably had more impact than

19         environment, is what I would guess, based on what I know

20         of that case.

21                Q.       Is that because Jeffrey Daumer wasn't

22         abused as a child?

23                A.       Again, my thought was that his environment

24         was fairly normal.   Now, if you tell me that I'm in error

25         there, I would say you're telling me something that I

1    didn't know.  From what I know, I thought his environment

2    was fairly normal.

3         Q.    You never interviewed Jeffrey Daumer, I

4    assume?

5         A.    No.

6         Q.    In your interviews with Mr. Martinez, did

7    you ever ask him about the events that took place back in

8    1995, the result of the death of the DPS Officer Bob

9    Martin?

10        A.    No, I didn't.

11        Q.    Okay.  So that your testimony today is

12   based on the standard of battery tests that you gave him,

13   plus information that was supplied by other sources; is

14   that correct?

15        A.    Yes.  The sources that I listed in my group

16   were.

17        Q.    And in your interviews with Mr. Martinez,

18   what are the types of things that you guys talked about?

19        A.    During the first interview I spent a lot of

20   time -- I just more or less let him talk.  I asked some --

21   let me look at my notes.  I asked him some standard

22   questions like about his school, about whether he

23   graduated from high school.  And then I'm not sure whether

24   I asked him about the game cockfighting or whether that

25   was something he just offered.  Then we spent time talking

Case 2:05-cv-01561-ROS Document 153-5 Filed 03/12/15 Page 287 of 322

57

1    about that.

2              Then I also asked him about authority

3    figures.  And then when I went back, I asked him -- I did

4    start to ask him about the events of August 15th, 1995,

5    but actually I had been instructed not to pursue that by

6    Mr. Ronan.  And, also, Mr. Martinez reminded me that he

7    really was not to talk about that.

8         Q.    Okay.  So that whatever it is that you're

9    telling us in court today is without any particular

10   insight by talking to Mr. Martinez as to what was going on

11   in his mind back on August 15th of 1995?

12        A.    Yes.

13        Q.    And so you make some evaluations based on

14   the other information that you had.  I believe that you

15   indicated towards the end of your report, and your report

16   summarizes -- what does your report summarize your

17   feelings as to why Mr. Martinez committed the murder of

18   Bob Martin?

19        A.    Yes.  My thought was that he did not want

20   to go back to prison, and, essentially, felt that if he

21   was caught by Mr. Martin, that that was the inevitable

22   result, was that he would be sent back to prison.

23        Q.    Okay.  And where did you come up with that

24   thought?

25        A.    In part, I think that it was mentioned --

**ER 1476**

1    it may have been mentioned in the interview with Eric

2    Moreno that he didn't want to go back.  Also, may have

3    been mentioned in Pam Davis's report.  And I think that

4    when I sat down and talked with Mr. Ronan and Ms. Davis,

5    we talked about -- I asked how long he would be going back

6    if he had been caught.  Because we talked about that

7    issue.  And my understanding is he would have been going

8    back for 10 or more years.  It would have been a lengthy

9    period.

10          Q.     Okay.  So what you're saying then, and

11   please correct me if I'm wrong, that if Mr. Martinez was

12   stopped by Officer Bob Martin, and he would have only gone

13   to prison for one year as a result of that, he wouldn't

14   have shot Bob Martin and killed him?

15          A.     I don't know if one year -- I don't know if

16   he would have if he was just facing one year.  I don't

17   know the answer to that.

18          Q.     And people who don't want to go back to

19   prison commit violent acts despite whatever childhood

20   they've had; is that a fair statement?

21          A.     They may.

22          Q.     Okay.  Now, in terms of your view of Mr.

23   Martinez, would you say that the environment that he

24   existed in that caused him to become violent was that

25   because of his homelife, other contacts with juveniles

1    through the school system, gangs that he hung out with, I

2    mean, what's the biggest factor here?

3         A.    I think the primary factor was the first 11

4    years of his life.  His parents, his father beating his

5    mother, the relationship that his parents had.  I think

6    that was the primary factor that then made it more likely

7    that he would be involved with gangs and get into trouble

8    with the law.

9         Q.    The first 11 years of his life?  What

10   happened after age 11 that was not consistent with 1

11   through 11?

12        A.    His father became transformed and became an

13   active member of a church.  And I think in my

14   understanding is did a complete turn-around with regard to

15   the behavior in terms of how he treated his wife, and his

16   drug use, and just behavior in general.

17        Q.    Okay.  Would you say that's because he got

18   into trouble after age 11; is that right?

19        A.    Ernesto?

20        Q.    Yes.

21        A.    Yes.

22        Q.    So he wasn't in trouble until what age,

23   basically, based on your review of his juvenile records?

24        A.    The review of juvenile records was around,

25   I believe, around 12.

1       Q.      Okay.  And that's when he was actually in a

2  different environment, and that's when his father was a

3  Christian acting differently and he was in a different

4  state; is that correct?

5       A.      Yes.

6       Q.      The abuse that you were led to believe

7  existed in the home was as a result of the interviews that

8  you conducted with anybody?

9       A.      No.  They were as a result of my

10  discussions with Mr. Ronan, and also my review of the

11  records, Dr. MacDonald's, Mr. Grossman's.  Also review of

12  a clipping out of a little -- I think it's called the

13  Silver Belt, little newspaper in Globe, Miami.

14       Q.      And this was after the event, this clipping

15  that you saw?  I mean, this wasn't something that was as

16  it occurred, or was it something that was written later

17  about Mr. Martinez?

18       A.      I'd have to look at the date.  Let's see,

19  the date of this is July 28, 1995.  It's when the article

20  was written.  Is that what you were asking?

21       Q.      Right.  So that article wasn't written

22  until 1995?

23       A.      Right.

24       Q.      Now, I believe in your report that you

25  indicated the abuse to Mr. Martinez, Ernesto Martinez was

Case 2:06-cv-01561-RRB   Document 1153   Filed 03/12/15   Page 325 of 322
Case 2:06-cv-01561-RRB   Document 153   Filed 12/04/17   Page 325 of 421

61

1    serious as well?

2                   I mean, is it your belief that Ernesto

3    Martinez was beaten as a child?

4         A.      It's my belief that he was beaten, yes.  He

5    didn't say that he was, but it's my understanding that he

6    was beaten.

7         Q.      By who?

8         A.      By his father.

9         Q.      With what?

10        A.      I don't know with what.  Hands.  And I

11   don't know if he used other things as well.

12        Q.      And who told you this?

13        A.      This was in Pam Davis's report.  And also I

14   believe that it's in the divorce, in the complaint that

15   his mother --

16        Q.      Did you ask Mr. Martinez about this?  And

17   when I say Mr. Martinez, unless I say the father, I mean

18   Ernesto Martinez.

19        A.      Yes.  I didn't ask him beyond what he told

20   me, which he said that his father did not beat him.  He

21   said his father disciplined him, and that he

22   specifically -- let me tell you exactly what he said.

23        Q.      This is from your notes or in your report?

24        A.      This is from my notes.  In some places I

25   quoted from my report.  I don't know if I did.  Okay.  He

SUPERIOR COURT

**ER 1480**

62

1    says, "My dad has changed -- not sure whether -- okay, "a

2    lot." He believes that the change was for the better.  He

3    said he loved his dad and he never doubted that his dad

4    loved him.  "Even though we weren't a family who hugged a

5    lot, my parents did the best they could for us.  They

6    didn't have to tell me they loved me.  They never beat me.

7    When I had discipline coming, I knew I had it coming.  No

8    matter what they did in front of me, I knew they loved

9    me."

10         Q.    So his father disciplined him?

11         A.    That's what Ernesto -- that's what he says.

12   That's his view of this.

13         Q.    Okay.  And did you, in your conversations

14   with him, make any attempt to pursue that further?

15         A.    No, I didn't.

16         Q.    Or just take him at his word?

17         A.    I took that to be his perception of what

18   happened.

19         Q.    Well, how about that's what happened?

20         A.    I don't think that matches with what his

21   parents have described, so I don't think that matches

22   with other descriptions of him.

23         Q.    Were you here for the testimony of his

24   parents?

25         A.    No, I wasn't.

1    Q.    Did you view a transcript of that?

2    A.    No.

3    Q.    Okay.  So we do know that there were

4    problems in the family and that Mr. Martinez, the father,

5    physically abused the mother?  And I think everybody who

6    testified agrees to that; is that correct?

7    A.    That's my understanding.

8    Q.    Okay.  And you didn't talk to Mrs.

9    Martinez?

10   A.    No, I didn't.

11   Q.    And you didn't talk to the daughter?

12   A.    No.

13   Q.    Although you believe that the daughter is

14   down the road going to have problems, you have not

15   interviewed her at all, have you?

16   A.    No, I haven't.

17   Q.    And you haven't given her any battery of

18   tests?

19   A.    No, I haven't.

20   Q.    Do you feel it's appropriate to indicate

21   what she may or may not be going through if you haven't

22   even seen her?

23   A.    I think that it's appropriate to say that

24   given what I think is accepted as this environment was

25   violent.  I mean, I also read the complaint that was

64

1      written by the mother in which she talked about the

2      children being terrorized.  She talked about her daughter

3      wanting to go for help and the father threatening to beat

4      her if she went for help for the mother.

5                 I think that given what she endured, what

6      my understanding is of what she endured, she may have, may

7      not have problems.  I certainly hope that she doesn't, but

8      I think it is reasonable to expect she will have some.

9            Q.      Is it your position that children who are

10     abused act out in an abusive fashion to others?

11           A.      Sometimes they may.

12           Q.      Sometimes?

13           A.      People who are -- that's one of the aspects

14     of say a PTSD or being in an environment which we consider

15     traumatic, they tend to create other victims.

16           Q.      I believe in your testimony today and early

17     on you indicated that one of the criteria for PTSD is that

18     the stressors that cause somebody to have PTSD would be

19     something that would cause any of us under those

20     circumstances to react the same in the same fashion; is

21     that correct?

22           A.      That's part of the criteria, yes.  That

23     doesn't mean that everybody has PTSD exactly the same or

24     that there aren't some people who somehow wouldn't end up

25     with PTSD.  Certainly that happens.

**ER 1483**

Case 2:05-cv-01159-RCS Document 145-3 Filed 12/04/17 Page 329 of 421
Case 2:05-cv-01159-RCS Document 145-3 Filed 03/12/15 Page 329 of 322

65

1    Q.    We do know that whatever Mr. Martinez went

2    through as a child, his sister went through the same; is

3    that correct?

4    A.    Yes.

5    Q.    Okay.  And there's nothing to indicate that

6    she has done anything but excel in her profession?  She

7    has stayed out of trouble, she hasn't had any difficult

8    encounters with authority figures that we're aware of, and

9    she testified -- and if that had been the case, she would

10   have said so and she didn't.

11         And you also know, do you not, that gender

12   and violence are not specific to a male; is that a fair

13   statement?

14   A.    Men are nine times more likely to commit

15   homicide than women.

16   Q.    Okay.  That wasn't my question.  I'm

17   talking about gender and violence.

18         Are you saying that women do not commit

19   violent acts?

20   A.    No.  I'm not saying that.

21   Q.    Okay.  And women are in gangs today; are

22   they not?

23   A.    Yes.

24   Q.    And women were in gangs 10 years ago,

25   right?

SUPERIOR COURT

**ER 1484**

1          A.      Yes.

2          Q.      And you treat children, do you not, and

3     some of those children are women?

4          A.      Yes.

5          Q.      Okay.  And some of those women, I believe,

6     are probably in gangs; is that a fair statement?

7          A.      Women I treat?

8          Q.      Yes.

9          A.      Some of the kids that I treat have been

10    associated with gangs.

11         Q.      Which is associated with violence?

12         A.      I'm thinking of one person in particular.

13    Yes, gangs certainly are associated with violence.

14         Q.      Now, your diagnosis of Mr. Martinez was

15    that he has PTSD, Post-Traumatic Stress Disorder; is that

16    correct?

17         A.      Yes.

18         Q.      Although you did say in your testimony that

19    you're not entirely sure of that diagnosis because he does

20    not fit the criteria completely; is that right?

21         A.      No.  I think he does fit the criteria

22    completely.

23              What I was saying is I don't think that the

24    criteria in the DSM-4 -- there's a section that says

25    associated features.  That's trying to accommodate the

Case 2:05-cv-01159-SRB   Document 153   Filed 12/04/17   Page 331 of 421
Case 2:05-cv-01159-ROS   Document 153   Filed 03/12/15   Page 327 of 322

67

1    people who have suffered from a Type 2 trauma as opposed

2    to a Type 1.

3              So what I was saying is he's not the same,

4    doesn't present the same picture that somebody who has

5    been raped or been in a tornado or even combat.  He

6    doesn't present quite that same picture, but he does meet

7    the criteria in the DSM-4.

8         Q.    All the criteria?

9         A.    The criteria necessary for giving the

10   diagnosis.

11        Q.    For you or under DSM-4?

12        A.    Under DSM-4.

13        Q.    Let's talk about that, if we can, for a few

14   moments.  Do you have your book with you?

15        A.    My DSM-4?

16        Q.    Right.

17        A.    Yes.  I do have it.  I also have the

18   criteria on something that's a little easier to look at.

19        Q.    Does that comport with page 427 of the

20   DSM-4?

21        A.    Well, it has the criteria A, B, C, D, E and

22   F.  I believe it's the same.

23        Q.    Okay.  I'll just refer to the copy that I

24   have, which is called Diagnostic Criteria for

25   Post-Traumatic Stress Disorder.

68

1       A.      Yes.

2       Q.      The person who's been exposed to a

3    traumatic event in which both of the following were

4    present:  Experienced, witnessed or was confronted with an

5    event or events that have involved actual or threatened

6    death or serious physical injury or a threat to the

7    physical integrity of self or others.

8       A.      Yes.

9       Q.      And I believe in your report that you

10   indicated that the household -- I believe you

11   characterized what happened in the household as horror; is

12   that correct?

13      A.      Sounded horrible to me.

14      Q.      But I mean absolutely horror?

15      A.      Yes.

16      Q.      And we're not quibbling here about Mr.

17   Martinez, the father, abusing his wife.  That is an awful

18   thing.  But when you say horror, this is somebody who is

19   physically struck, and all these events -- are you saying

20   that all these events occurred in front of Mr. Martinez,

21   the juvenile, at the time?

22      A.      Well, I think this was the environment in

23   the house.  It wasn't necessarily occurring every minute

24   of every day, but I think that it was happening with some

25   regularity.

SUPERIOR COURT

**ER 1487**

Case 2:05-cv-01561-ROS   Document 153-5   Filed 03/12/15   Page 279 of 322

69

1    Q.    Okay.  But not according to him.

2    A.    Well, but if you look at the sentence that

3  you just read, a threat to the physical integrity of self

4  or others.

5    Q.    I read that and I understand that.

6    A.    So it's not just that the beating would be

7  directed at him, but it's observing it happening to

8  others.

9    Q.    Okay.  And the person's response involved

10 intense fear, helplessness or horror?

11   A.    Yes.  In children disorganized or agitated

12 behavior.

13   Q.    Okay.  Now -- and I did hear you say that

14 in your earlier testimony, in children it was agitated

15 behavior?

16   A.    Disorganized or agitated behavior.

17   Q.    This was a child who performed well at

18 school during this time period though; is that correct?

19   A.    He performed well during some periods in

20 school.  In the 1st grade, I think, in the report he did

21 well.

22   Q.    I think in your report you said that he

23 performed well in 3rd and 4th grades as well?

24   A.    I think he had up-and-down behavior in 4th

25 grade.

**ER 1488**

1    Q.    Okay.  But 3rd grade?

2    A.    Did I say anything about 3rd grade?

3          Okay.  What I said in 3rd grade:  He was

4    measured to be above a 90th percentile in spelling,

5    language, expression and total language skills.  That

6    doesn't mean he may have gotten good grades in 3rd grade.

7    I don't think I was addressing that.  What that means is

8    that his knowledge with regard to language and overall

9    that he was at the 79th percentile among 3rd grade

10   students.  That's, I think, really associated with his

11   general ability, and it doesn't necessarily characterize

12   sort of an everyday functioning.

13   Q.    Okay.  But most of his problems occurred

14   when he moved to Arizona and became somewhat older, and

15   this was at a time when his father no longer beat his

16   mother?

17   A.    His difficulties with the law certainly

18   started, yes, at that time.

19   Q.    And his difficulties in school, if you

20   reviewed his school records?

21   A.    He started having difficulty in the --

22   well, started having difficulty in the 4th grade, I think,

23   and then in the 6th grade he really had difficulty.

24   Q.    Okay.  And I don't need to go through every

25   one of these things with you, but there is a -- under B

Case 2:15-cv-01159-SRB   Document 153   Filed 12/04/17   Page 335 of 421
Case 2:05-cv-01561-ROS   Document 155-5   Filed 03/12/15   Page 281 of 322

71

1     the traumatic event is persistently re-experienced in one

2     or more of the following ways.  And it talks about young

3     children in repetitive play may occur or which themes or

4     aspects of the trauma were expressed.

5                    Was there any information of repetitive

6     play, for example when Mr. Martinez would beat up younger

7     children in school, as he was experiencing this from his

8     father?

9          A.        Not that I noticed in the records.

10         Q.        So that doesn't exist?

11         A.        Right.

12         Q.        In children there may be frightening dreams

13    without recognizable content.

14                   Did you talk to him about any dreams that

15    he had back then?

16         A.        No, I didn't.

17         Q.        Okay.  In young children trauma-specific

18    re-enactment may occur.  We don't have any re-enactment

19    with him, are you aware of any?

20         A.        Not that he told me.

21         Q.        And I believe that you indicated that there

22    was intense psychological distress at exposure, this

23    internal or external cues that symbolize or resemble an

24    aspect of the traumatic event.

25                   Is that where you feel he fits under this

SUPERIOR COURT

**ER 1490**

1    category?

2         A.    Yes.

3         Q.    Well, what are these cues?

4         A.    When I talked to him about -- when I was

5    interviewing him and I talked to him about his father

6    beating his mother, and he talked about the time that he

7    tried to stab his father when he was 5 because he was

8    beating his mother.

9         Q.    No, no.  Intense psychological distress and

10   exposure to internal or external cues that symbolize the

11   event, not that are responsive to the event itself, but

12   something that symbolized that event.

13        A.    But just for him to talk about it, he was

14   distressed in talking about it.

15        Q.    But that's not what that says.  That's

16   talking about symbolizing an event.  Talking about an

17   event after it happened is entirely different than that;

18   is that a fair statement?

19        A.    But symbolizing meaning something that

20   stands for or reminds him of -- and I reminded him of

21   that.  So that may not seem to you that that would

22   symbolizes it, but that's how you can read that.

23        Q.    That's how you read that?

24        A.    Well, that's a reasonable interpretation of

25   that.  Because the main thing is is his response to

Case 2:16-cv-01159-SRB   Document 153   Filed 12/04/17   Page 337 of 421
Case 2:05-cv-01561-ROS   Document 153-5   Filed 03/12/15   Page 283 of 322

73

1    something that happened way in the past.

2            Q.      Okay.  Intense psychological reactive

3    exposure to internal or external cues that symbolize or

4    resemble an aspect of the traumatic event.

5            I mean, this is 1995, he's driving down the

6    highway, he's stopped by a police officer, and he shoots

7    him to death.  And you're drawing that connection between

8    the beating of his mother and that event years and years

9    later; is that correct?

10           A.      That is correct.

11           Q.      Okay.  And because of that beating of his

12   mother, he had no choice but to kill Officer Bob Martin;

13   are you saying that?

14           A.      I'm saying that because of the environment

15   in which he lived, which was not just one beating of his

16   mother, but because of that environment that so changed

17   his perception of the world, so influenced his perception

18   of the world, that when he was confronted with the

19   situation on the Beeline Highway, that it was -- he saw

20   that as a survival situation in which it was Officer

21   Martin or himself.  There was going to be one person who

22   survived that.  He saw that as his option, yes.

23           Q.      And you're saying that, of course, because

24   you asked him that?

25           A.      I did not ask him that.

1       Q.      Okay.  So you're saying that because you're

2   extrapolating from his environment that this could have

3   been his only response?

4       A.      I'm saying that based on what I understand

5   of that event that Officer Martin didn't threaten him,

6   that Officer Martin was simply doing his job, and that

7   what Mr. Martinez did was an unreasonable response to

8   Officer Martin.

9       Q.      An unreasonable response, but one that he

10  had a choice to either do or not do?  Do you believe he

11  had no choice that day?

12      A.      I believe that in his mind he didn't have a

13  choice.  I think absolutely he had other choices.

14      Q.      Who told you about the facts of this case?

15      A.      Mr. Ronan.

16      Q.      You did not read the DR's?

17      A.      No, I didn't.

18      Q.      Police reports?

19      A.      No.

20      Q.      But you're aware that Mr. Martinez was

21  pulled over because he was speeding?

22      A.      Yes.

23      Q.      And that people saw him sitting in a chair

24  or sitting in the car, much like this, as Mr. Martin

25  approached the car and was standing nearby to him; are you

1   aware of that?

2          A.      No.  The position that he was in wasn't

3   described to me.

4          Q.      Okay.  And that a car had to pass in order

5   to do that.

6                  Now, if somebody who's just reacting out of

7   having no choice, would he also have the ability to choose

8   his time when he was going to do this?

9          A.      I think that he would be -- the situation

10  in his mind wasn't that he was not using his intellect to

11  act in a way that would carry out the goal that he had

12  set.  I mean, I think that he did use his intellect to do

13  that.

14         Q.      The goal that he set was that, "I don't

15  want to go back to prison.  I'm being stopped by the

16  police officer, so I'm going to kill him."  Is that a fair

17  statement?

18         A.      I think that it probably was defined in

19  less sequence of steps than that.  I think it was really

20  more reactive.  "I'm not going back to prison.  This man

21  intends to put me in prison.  It's me or him."

22         Q.      Okay.  And when you say reactive, this is

23  the first time that that thought had ever occurred to him;

24  that's what you mean by reactive?

25         A.      No.  I think that he had a habit of being

1    in a situation in which he would look at the situation as

2    who's going to survive.

3         Q.     But he never told you that?

4         A.     No.

5         Q.     Okay.  And when you say "survive" -- I

6    mean, people survive in prison.  I mean, I perceive

7    survival as a life-and-death proposition; is that correct?

8         A.     Yes.

9         Q.     In fact, he's told you that he's very

10   comfortable in prison, and some of the finest people he's

11   ever known are in prison?

12        A.     I don't think he told me he was comfortable

13   in prison.  He said that prisoners -- some of the best

14   people that he has met have been prisoners.

15        Q.     This is not a survival situation.  This man

16   was not threatened with death.  He was going back to

17   prison, perhaps, or maybe he was just going to get a

18   traffic ticket; did you know that?

19        A.     I know that's the facts of the case.  I

20   don't think that that is how he saw it.

21        Q.     Okay.  Are you aware of the interviews that

22   he had or the conversations he had with one of his friends

23   before he left to ride down the Beeline Highway, a man

24   named Oscar Fryer?

25        A.     I'm not sure.  I know some of what he did

Case 2:16-cv-01159-SRB  Document 153  Filed 12/04/17  Page 341 of 421
Case 2:16-cv-01561-ROS  Document 153  Filed 03/12/15  Page 267 of 322

77

1    prior, but I don't know if I know in detail.

2         Q.     Okay.  And are you aware that Oscar Fryer

3    was told by Mr. Martinez that he had a warrant out for his

4    arrest and he wasn't going back to jail, and this was days

5    before this event, he had already made up his mind that

6    this wasn't going to happen?

7         A.     Yes, I did know that.

8         Q.     And that's not a reactive circumstance, is

9    it?

10        A.     That's a decision.

11        Q.     That's a decision that he made days before

12   this event?

13        A.     Yes.  He had made the decision that he was

14   adamant, he was not going back, yes.

15        Q.     You've indicated that you also believe that

16   Mr. Martinez has empathy, and I believe it was this

17   empathy that gave you pause both for the fact that you

18   believed he wasn't a psychopath and that he may not fit

19   entirely within this DSM-4 post-traumatic stress disorder

20   syndrome?

21        A.     No.  I said that he -- I don't think he's a

22   psychopath because he has the ability to empathize.

23               Also, he doesn't fit perfectly in the

24   narcissistic personality disorder because of that ability.

25   And, also, it's not a quality generally we don't associate

1    with anti-personality disorder.

2         Q.     And in this DSM-4, we talk about

3    post-traumatic stress disorder under the third category.

4    It is characterized by "Persistant avoidance of stimuli

5    associated with the trauma and numbing of the general

6    responsiveness."

7         A.     Okay.  Wait a second.  When you say the

8    third, I'm looking -- are you looking at C?

9         Q.     Yes.

10        A.     Okay.  C.  And then their inability --

11   okay.  Persistant avoidance, numbing of general

12   responsiveness, yes.

13        Q.     Okay.  "Efforts to avoid thoughts, feelings

14   or conversations associated with the trauma."  He's talked

15   to you about the trauma, is that correct --

16        A.     I have --

17        Q.     -- to his mother?

18        A.     I have here that he doesn't remember how he

19   felt or what he was thinking when he tried to stab his

20   father.

21        Q.     And the interview that you conducted was in

22   1998?

23        A.     Yes.

24        Q.     Okay.  And he's now how old?

25        A.     22.

Case 2:05-cv-01561-ROS   Document 153   Filed 03/12/15   Page 289 of 322

79

```
 1            Q.      Okay.  Is it unusual for somebody who's 22

 2     not to remember exactly how they were feeling when they

 3     were 5 years old in an event like this?

 4            A.      I think it is -- if somebody starts from

 5     PTSD, it's normal to not want to talk about those things.

 6     And part of this is my observing him when I'm talking

 7     about these things.  But it wasn't as though he didn't

 8     remember that.  I mean, if I remember correctly, he

 9     stopped looking at me.  He looked down and appeared to be

10     almost reliving that and said he didn't remember what he

11     thought or felt, which to me indicated that he was acting

12     in a situation that was traumatic to him and he was simply

13     taking action.  At 5 it wasn't calculated.

14                  So there again, I think that he didn't

15     really want to talk about that.  It wasn't out of passage

16     of time that he didn't remember because he remembered

17     trying to stab his father.  He remembered his father

18     beating his mother.  But he didn't remember how he felt.

19     Because I think at the time -- it's like combat vets will

20     say they didn't have time to feel sad or those tender

21     emotions.  They had to do whatever they were doing and go

22     on.

23            Q.      My only question was:  Is it understandable

24     for somebody who's 22 years old not to remember exactly

25     how they felt when they were 5?
```

**ER 1498**

1          A.       It depends on the person.  It depends.  And

2     I said somebody who suffers from PTSD, I think the memory

3     issue is different.

4          Q.       Okay.  Now, one of these categories is

5     efforts to avoid activities, places or people that arouse

6     recollection of the trauma.

7                   Now, you're aware that shortly before this

8     event where he murders DPS Officer Bob Martin he went to

9     visit his parents.  I mean, he visited his father, his

10    mother, talked to his brothers and sisters, you know,

11    worked with his dad on the car.  He respects his father?

12         A.       Yes.

13         Q.       His father -- to this day he believes his

14    father is a good authority figure to him.  His dad paid a

15    lot of attention to him when he was a kid; did he not?

16         A.       Yes, I think he did.

17         Q.       Played with the horses, taught him how to

18    ride, you know, always played with the animals with him,

19    taught him how to do the things necessary to survive as a

20    kid?

21         A.       Yes, he did.

22         Q.       Okay.  And yet --

23         A.       Taught him a lot.

24         Q.       And yet because he has PTSD, one of the

25    things he might be likely to do is to avoid seeing his

**ER 1499**

Case 2:16-cv-01159-SRB   Document 153   Filed 12/04/17   Page 345 of 421
Case 2:05-cv-01561-ROS   Document 115-5   Filed 03/12/15   Page 251 of 322

81

1    family, avoid spending time with his father that caused

2    all this harm?

3            A.      First of all, that's not one of the

4    criteria that I marked.

5                    And second of all, it isn't unusual for

6    people who have been in some way traumatized by family to

7    continue to associate with the family.

8            Q.      But it is one of the criteria that is

9    listed in DSM-4; is it not?

10           A.      It's one of the options.  It does not have

11   to be -- it's not a necessary criteria.

12           Q.      And I believe that you characterize there

13   were three events that occurred in this man's life that

14   led you to believe that he had no choice but to do what he

15   did on the highway, and that was his horse being taken

16   away from him; is that correct?  Is that one of them?

17           A.      There are three significant events in his

18   life that I think contributed to that.

19           Q.      And one of them was the horse?

20           A.      One was his father selling his horse, yes.

21           Q.      And why did his dad sell the horse?

22           A.      What I understood from the record is his

23   father sold his horse because Ernesto wouldn't do what he

24   said.

25           Q.      Wouldn't do what?

Case 2:15-cv-01159-SRB Document 153 Filed 12/04/17 Page 346 of 421
Case 2:05-cv-01561-ROS Document 155-5 Filed 03/12/15 Page 292 of 322

82

1          A.          It didn't specify.  It was in Dr.

2    Grossman's records.  It didn't specify.  It just said he

3    wouldn't follow his directions.

4          Q.          Did you ask him?

5          A.          No, I didn't.

6          Q.          But this is one of the three major events

7    in his life that led him to murder a DPS officer, and you

8    didn't ask him about it?

9          A.          I think it was a significant event in his

10   life that was a decision point for him.

11         Q.          My question was:  And you didn't ask him

12   about it?

13         A.          No, I didn't.

14         Q.          What were the other two?

15         A.          One was when his father was beating his

16   mother and he attempted to stab his father.  That was one.

17   And the other was placing him for 13 months in Catalina

18   Mountain Juvenile Facility.

19         Q.          Let's talk a little bit about the horse

20   thing.

21                      Although you didn't talk to him about the

22   horse, did you talk to him about his love of animals at

23   all?

24         A.          He talked to me about the roosters.  And it

25   was that conversation that I developed a notion that he

Case 2:06-cv-01159-SRB   Document 153   Filed 12/04/17   Page 347 of 421
Case 2:06-cv-01159-ROS   Document 153-3   Filed 03/12/15   Page 493 of 522

83

1    bonded with animals.

2          Q.       Okay.  Loved animals?

3          A.       Yes, I think truly loved animals.  Spent a

4    lot of time with animals.  Talked very tenderly about

5    these roosters.

6          Q.       Okay.  And I won't belabor this, but you

7    didn't talk to him at all about the horse stuff?

8          A.       No, I didn't.

9          Q.       Okay.  Now, but there was an event that

10   defined for him how he looked differently at the world,

11   one of the three major events?

12         A.       It was an event that was talked about by

13   Dr. Grossman, and I think that had not been talked about

14   by him.  I might not have thought there was any particular

15   significance there, but he said that was that -- I

16   remember that was the only specific thing that Mr.

17   Martinez talked about with his father and where the anger

18   really came out.  This was -- in therapy this was a moment

19   of significance in therapy the way Mr. Grossman presented

20   it.

21         Q.       Okay.  Are you familiar with Vision Quest?

22         A.       Generally.

23         Q.       What is it?

24         A.       I don't know if it still exists.  It's an

25   organization that takes troubled kids and they go across

1     the country in wagon trains.

2              Q.      Drawn by?

3              A.      Horses, I assume.

4              Q.      Horses?

5              A.      Yes.

6              Q.      Okay.  Would it surprise you to learn that

7     Mr. Martinez, while he was going through this troubled

8     time in his life, had an opportunity to participate in

9     Vision Quest and turned it down?

10             A.      I couldn't really draw any particular

11    significance from that.  I mean, it has horses involved,

12    but just because something has horses involved wouldn't

13    mean that -- I wouldn't know what particular significance

14    that would have.  There could be a number of reasons he

15    turned it down.

16             Q.      Prior to being committed -- and this is

17    from a report dated August 7th of 1992, State of Arizona

18    vs. Ernesto Martinez -- a presentence report trying to

19    figure out what to do with Mr. Martinez, on page -- it's

20    not really page number, but right before going through his

21    criminal record it indicated that prior to being committed

22    to DYTR; do you know what DYTR is?

23             A.      I know generally what it is.

24             Q.      Department of Youth -- what do the last two

25    initials stand for?

SUPERIOR COURT

**ER 1503**

Case 2:16-cv-01159-SRB  Document 153  Filed 12/04/17  Page 349 of 421
Case 2:05-cv-01561-ROS  Document 115-5  Filed 03/12/15  Page 295 of 322

85

1          A.          Rehabilitation.

2          Q.          Okay.  Ernesto was given an opportunity to

3     be placed in a residential facility, Ernesto chose DYTR.

4     He felt he would be home in two months and residential

5     would take between 12 and 18 months.

6                So he was given an opportunity to go to a

7     residential structure that you indicated, based on your

8     review of the reports, he needed.  He chose not to do

9     that; is that correct?

10         A.          Made a poor choice.  Perhaps I didn't know

11    what all was available there.

12         Q.          I mean, he chose not to do that.  That's

13    what it says in the report.  Do you have any argument with

14    that?

15         A.          Well, what I have argument with is that --

16    I always have argument when you look at someone with a

17    disorder, and you blame them for making poor choices with

18    regard to treatment.  Often times -- especially with

19    adolescents -- they don't make good choices with regard to

20    treatment.

21         Q.          Had he had those choices to make in

22    consultation with his parents, with a therapist, with a

23    probation officer, with everybody else; is that a fair

24    statement?

25         A.          Probably.

Case 2:16-cv-01159-SRB Document 153 Filed 12/04/17 Page 350 of 421
Case 2:05-cv-01561-ROS Document 153-3 Filed 03/12/15 Page 296 of 322

86

1    Q.      Okay.   Ernesto stated to this officer that

2    he ran this last time while on parole because DYTR was

3    going to place him in a residential treatment facility in

4    Tumbstone, Arizona.

5            Mr. Martinez stated that the parole officer

6    had a placement in Vision Quest arranged when Ernesto

7    absconded, and the minor was placed on 901 status.  What

8    that means is missing status, but he could have gone to

9    Vision Quest.  And this was probably long after or after

10   this accident with the horse and his father.  He could if

11   this was such a defining event in his life because of the

12   love of horses he had a chance to do this and chose not to

13   do it.

14   A.      You're drawing a connection that I don't --

15   that I wouldn't draw.  You're saying that -- I think

16   you're saying that because he liked horses that it would

17   be normal or it would be expected that he would choose to

18   do something that involved horses.

19           I think that certainly at 15 he was looking

20   for the shortest time.  He wanted out.  I don't know of

21   anybody who wants to be in residential care, adult or

22   child.  I mean, there are some who maybe feel so much at

23   risk for one thing or another, but most people don't want

24   to go to residential care.

25   Q.      But these are still choices that he made,

Case 2:15-cv-01159-SRB    Document 153    Filed 12/04/17    Page 351 of 421
Case 2:05-cv-01561-ROS    Document 115-5    Filed 03/12/15    Page 297 of 322

87

1    regardless of how old he was.  He had a choice and chose

2    something else; is that right?  Just yes or no please.

3    Yes or no.

4           A.    Yes.

5           Q.    Okay.  And then to Beeline Highway.  He had

6    choices he could have made and chose instead to murder a

7    police officer because he didn't want to go back to

8    prison?

9           A.    Yes, he did.

10          Q.    I believe that Mr. Ronan asked you some

11   questions about your sense of the taped interview of

12   Mr. Moreno when Mr. Martinez called him on the phone?

13          A.    Yes.

14          Q.    And just so we know, you didn't talk to

15   Mr. Martinez about his telephone conversation with

16   Mr. Moreno?

17          A.    No.

18          Q.    But you do know that in that conversation

19   Mr. Martinez laughed about killing the police officer; is

20   that correct?

21          A.    Yes.

22          Q.    I mean, he thought it was a lot of fun when

23   he talked to him on the phone; is that right?

24          A.    That's what he presented.

25          Q.    Okay.  Described it in detail for his

Case 2:16-cv-01159-SRB  Document 153  Filed 12/04/17  Page 352 of 421
Case 2:05-cv-01561-ROS  Document 115-5  Filed 03/12/15  Page 298 of 322

88

1    buddy.  He said he blasted a placa, shot him six times and

2    laughed about it?

3         A.      Yes.

4         Q.      Blasted a placa.  Had nothing to do with

5    it, was either him or me, he just blasted a placa and then

6    laughed about it?

7         A.      That was what was in the transcript.

8         Q.      Now, you indicate at some point -- and do

9    you have your report in front of you?

10        A.      Yes.

11        Q.      And I'd ask you to help me out here and try

12   to find it.  I believe there was a part where you make

13   recommendations in saying that you don't believe the death

14   penalty is appropriate because you don't believe that the

15   aggravating factors exist or something.

16             THE COURT:  Bottom of 13, top of 14.

17             THE WITNESS:  Yes.

18        Q.      BY MR. SHUTTS:  Okay.  "There are certain

19   conditions which must be considered in determining what is

20   to happen to Mr. Martinez in relation to the current

21   charge.  With regard to the aggravating circumstances, it

22   must be considered whether Mr. Martinez committed the

23   offense in an especially heinous, cruel or depraved

24   manner.  It's somewhat difficult to think that any

25   homicide is not heinous, cruel or depraved."  I mean,

Case 2:16-cv-01159-SRB   Document 153   Filed 12/04/17   Page 353 of 421
Case 2:05-cv-01561-ROS   Document 153-3   Filed 03/12/15   Page 299 of 322

89

1    that's correct, right?

2         A.      "Not heinous, cruel or depraved," yes.

3         Q.      "But to the extent Mr. Martinez has the

4    above specified mental disorders, his behavior was

5    reactionary and immediate, rather than planned and

6    drawn-out."

7              Well, we know that he talked about it

8    before that he's not going to go back to prison?

9         A.      He talked about not being willing to go

10   back to prison, yes.

11        Q.      And this is under circumstances where he's

12   sharing his thoughts with Mr. Fryer while Mr. Fryer is

13   aware that he has a revolver in his hand with black tape

14   around it, which was the gun that was used to kill

15   Mr. Martin?

16        A.      Yes.

17        Q.      That's the sort of circumstance around the

18   statement when the statement was made?

19        A.      I think that certainly says something about

20   his frame of mind.  Again, this is sort of black and

21   white.

22        Q.      But this certainly was also several days

23   before this happened?

24        A.      Yes.

25        Q.      So that rather than planned and drawn out,

Case 2:15-cv-01159-SRB   Document 153   Filed 12/04/17   Page 354 of 421
Case 2:05-cv-01561-RCB   Document 153-5   Filed 03/12/15   Page 360 of 322

90

1    you indicate that this was reactionary; but we know that

2    Bob Martin wasn't shot as soon as he left his car.  You

3    know and we know that people saw the two of them together

4    as they drove by, and Mr. Martinez didn't have a gun in

5    his hand at that point.

6              If somebody is reactionary and doesn't want

7    to go back to prison, isn't it more likely that when a

8    police officer first started to pull him over he would

9    have started to run away?

10         A.     I suppose that's something that he could

11   have done.  But, again, I think it's their notion of:

12   "It's me or him."  And I think the idea of a chase, you

13   know, is less of a me-or-him kind of a thing.

14         Q.     Okay.  So as soon as he saw the red lights,

15   he started thinking me or him; that's your assessment?

16         A.     I think that he had been thinking me or him

17   or me or them.  I think that's just part of his general

18   view of the world.

19              Again, even that, I think that there was a

20   warrant out.  I mean, I think that it probably started at

21   the point once there was a warrant.  It was not sort of if

22   he was going to be confronted but when.

23         Q.     Okay.  And why is it then that he killed

24   the store clerk in California?

25         A.     I think those are -- I think it's

SUPERIOR COURT

**ER 1509**

Case 2:15-cv-01159-SRB   Document 153   Filed 12/04/17   Page 355 of 421
Case 2:05-cv-01561-ROS   Document 115-5   Filed 03/12/15   Page 351 of 322

91

1    different.

2              MR. RONAN:  Objection.  Relevance, Judge.

3              THE COURT:  Overruled.  You may answer.

4         Q.    BY MR. SHUTTS:  The Judge is not going to

5    consider, you know, that he killed the store clerk in

6    California.  But, you know, you consider it and tell us

7    why you think that happened?

8         A.    I think that -- one, I think that given

9    what had happened, I think that his emotional state -- I

10   think he was even more reactionary than usual, and I think

11   that the store clerk -- what I understood from what was in

12   the Eric Moreno interview -- was the store clerk

13   threatened him with a chair or something, and I think --

14   I'd say that the store clerk really misread the situation

15   and didn't recognize -- I don't think he could recognize

16   what he was dealing with.  But I think it was somebody who

17   was under a great deal of stress, and, again, more

18   reactionary than he was even with Officer Martin.

19        Q.    Even more reactionary?  Chose a different

20   gun, went into the store to commit a robbery because he

21   needed money, and when the store clerk didn't take him

22   seriously, he shot him and killed him.  Okay?  Reactionary

23   once again?

24        A.    Sounds pretty reactionary to me.

25        Q.    The part about the gun, all that stuff, no

Case 2:16-cv-01159-SRB   Document 453   Filed 12/04/17   Page 356 of 421
Case 2:05-cv-01561-RCS   Document 115-5   Filed 03/12/15   Page 302 of 322

92

1    planning there?

2         A.    Well, I think he intended to come out with

3    money.  I think that he knew he had to have some way of

4    convincing this fellow to give him money, but apparently

5    the gun by itself --

6         Q.    But the store clerk is not an authoritative

7    figure, is he?

8         A.    Dr. MacDonald talked about his difficulty

9    with all males.  And I think that it's possible that, you

10   know, under certain circumstances he sees any male as an

11   authority figure.  I don't know more of the details about

12   this clerk, but I think the clerk by saying no was

13   exercising some authority.

14        Q.    So any of his playmates during that time,

15   had they said no to him should have been shot as well?

16        A.    I don't think that he saw his peers

17   necessarily as authorities, you know, apparently, he

18   didn't shoot them.

19        Q.    Okay.  Well, how about this:  How about --

20   maybe there's a person that's in this courtroom today that

21   just doesn't care about human life and goes through life

22   saying, "If it suits me and it suits my purposes, I'll

23   take a life."  Is that another way to look at this young

24   man?

25        A.    I don't think that fits with the

Case 2:05-cv-01159-SRB   Document 453   Filed 12/04/17   Page 357 of 421
Case 2:05-cv-01561-ROS   Document 153-5   Filed 03/12/15   Page 503 of 322

93

1    information that I gathered.

2             Q.        And I believe that in part of your

3    diagnosis that you indicated that you do feel he still

4    remains a danger to others; is that correct?

5             A.        I do.

6             Q.        That means he's also a danger to anybody he

7    comes in contact with in the Department of Corrections?

8             A.        I think depending on what the circumstances

9    are, I think he can be a danger.

10            Q.        And we know that because he's also got a

11   prior conviction for assaulting two officers from the

12   Sheriff's Department from this detention staff with a

13   shank; do you know that?

14            A.        Yes.

15            Q.        And that in his other events he's assaulted

16   officers before in juvenile facilities?

17            A.        Yes.

18            Q.        As well as juveniles themselves while he

19   was in DYTR?

20            A.        Yes.

21            Q.        So he remains a danger to anybody who comes

22   in contact with him under the appropriate circumstances?

23            A.        Under certain circumstances, yes, I think

24   that he is a danger, yes.

25            Q.        So that he could kill again?

1      A.      I think at this point in his life, under

2   certain circumstances, yes, he could.

3                  MR. SHUTTS:  I have no further questions.

4                  THE COURT:  Mr. Ronan?

5

6                  REDIRECT EXAMINATION

7   BY MR. RONAN:

8      Q.      Okay.  Mr. Shutts asked you a series of

9   questions about whether you spoke with Mr. Martinez

10   about -- specifically about the events of August 15th, and

11   you did not; is that correct?

12      A.      I did not.

13      Q.      Do you need to know from his mouth what

14   happened on August 15th to write your report and to draw

15   the conclusions that you have drawn?

16      A.      I don't believe that I needed that.

17      Q.      He asked you a couple of questions about

18   Ernesto's father's change in lifestyle around the age of

19   11 or 12, and he was fairly clearly trying to draw some

20   connection between that change being a positive thing and

21   Ernesto's trouble with the law, and that sort of thing.

22                  Based on what you know of the background

23   and the history, what's the significance to Mr. Martinez

24   making that significant change in his life at that point

25   after the previous 11 or 12 years?

Case 2:16-cv-01159-SRB   Document 153   Filed 12/04/17   Page 359 of 421
Case 2:05-cv-01561-ROS   Document 115-5   Filed 03/17/15   Page 359 of 322

95

1        A.        I think that -- I mean, adolescence is not

2    a time of great flexibility or tolerence of parents,

3    generally.  And when a parent would change like from night

4    to day, kind of change like that, I think that it would

5    not be viewed well by most adolescents.  And I think that

6    given how bad things had been, I think there would be real

7    anger with regard to, "What's the meaning of this?"  And

8    you go from being someone who terrorizes the whole family

9    to now all of a sudden you're saying that you're sort

10   of -- you walk with God.  You know, I think there could be

11   a sense, again, in that child's notion of justice that's

12   not right.  And it would be very disturbing.  Again, it

13   would promote a lot of anger.

14       Q.        And so the fact that his father made this

15   lifestyle change doesn't necessarily mean that Ernesto

16   Martinez, teenager, would just wake up one morning and

17   say, "Oh, things are all right," and life can go on,

18   correct?

19       A.        The damage had been done.

20       Q.        Some other questions Mr. Shutts was asking

21   you seemed to be implying or he seems to be insinuating

22   that you're simply drawing your connection and your

23   conclusion today based on Mr. Martinez witnessing a

24   beating of his mother.

25                 You're drawing the connection between an

1    11- or 12-year environment that he lived in, correct?

2          A.      Yes.

3          Q.      The beating of his mother, the drug usage

4    of his mother and father, the beating of his sister and

5    himself by his parents, by his father, correct?

6          A.      Yes.

7          Q.      And in terms of choices, you're not saying

8    that he had no choice on August 15th, correct?

9          A.      No, I'm not saying that.

10         Q.      You're saying, in his mind, he felt he had

11   no choice?

12         A.      Yes.

13         Q.      Why do people with disorders, mental

14   disorders, particularly juveniles, why do they make poor

15   choices about treatment?

16         A.      Because they don't necessarily acknowledge

17   that they have a problem.  Generally it's a professional

18   or a parent or an authority figure who is saying, "You

19   have a problem."  And for the adolescent, it's the rest of

20   the world that has the problem.  They're fine.

21         Q.      Okay.  You said in the last few questions

22   or in answer to the last few questions, depending on the

23   circumstances, he could be a danger to, for instance,

24   corrections officers.  What do you mean, "depending on the

25   circumstances"?

SUPERIOR COURT

**ER 1515**

1    A.    I think that he -- it's easy to push his

2    buttons.  If somebody wants to get a reaction from him, I

3    think that it would be fairly easy at this point.  I think

4    a little less easy now than it was certainly when he was

5    15.  I think that there is some change going on in his

6    view of the world.  But I think that if you want to get a

7    reaction from him, I think it would be fairly easy to do

8    it if you're an authority figure.

9    Q.    If you create the situation, in other

10   words?

11   A.    Yes.

12         MR. RONAN:  That's all I have, Judge.

13   Thank you.

14         THE COURT:  Okay.  Thank you.  Thank you,

15   ma'am.  Is that it for today then?

16         MR. RONAN:  Yes.

17         THE COURT:  You've got the funeral this

18   afternoon, I guess?  We're scheduled now to finish the

19   aggravation/mitigation hearing on July 31 at 10:00, and

20   we'll do whatever we need to do to make our arguments,

21   present whatever witnesses you wish to present, and we'll

22   finish up then.

23         You guys had both indicated last time that

24   you wanted to file sentencing memoranda.  And let me

25   suggest this, and you tell me if you think it's adequate:

Petitioner's Appendix 7

Report of Dr. Susan Parrish, July 16, 1998

## SUSAN DOWNS PARRISH, Ph.D.

Psychologist
3080 North Civic Center Plaza, Suite 9
Scottsdale, Arizona 85251
(602) 947–6757

**July 16, 1998**

Emmet J. Ronan
Deputy Public Defender
Southeast Facility
222 East Javelina Ave., Ste. 1300
Mesa, Arizona  85210-6201

      Re:   State v. Ernesto Martinez
             CR 95-08782
             Age: 22
             DOB: 11/17/75
             Dates of Evaluation:  June 5 & 8, 1998

Dear Mr. Ronan:

      In accordance with your request, I conducted a psychological evaluation of Ernesto Martinez. The evaluation took place at Madison Street Jail on June 5 and 8, 1998. The interview and testing with Mr. Martinez took place over approximately three hours. In addition, Pamela Davis of the Maricopa Public Defender's Office sat with Mr. Martinez at some time following June 8, 1998, while he completed the Minnesota Multiphasic Personality Inventory-2 (MMPI-2), the results of which were included in the data for the present evaluation. Mr. Martinez was cooperative throughout the evaluation, and the results were judged to be a valid representation of his current functioning. The results were as follows.

### METHODS OF EVALUATION

      Clinical Interview

      Review of Records

      Wechsler Adult Intelligence Scale-III (WAIS-III):
       Comprehension and Matrix Reasoning Subtests Only

      Trail Making Tests A and B

      Wide Range Achievement Test-3 (WRAT-3): Reading Subtest Only

      Minnesota Multiphasic Personality Inventory-2 (MMPI-2)

Ernesto Martinez Rpt          2          Susan Downs Parrish, Ph.D.
July 16, 1998

## CLINICAL INTERVIEW

Mr. Martinez was born in Indio, California. He was the second oldest of four children, two boys and two girls, ranging in age from 14 years to 23 years. He described himself as an average student in elementary school. He liked reading, but found math to be difficult. With regard to junior high, he said, "I don't know how I got through junior high." He had no idea why this was a difficult period for him. It was at this time that his family moved from Indio, California, to Globe, Arizona. With regard to school work, he said, "I didn't do any work." Mr. Martinez earned his GED while at Catalina Mountain Juvenile Institution (CMJI).

A detailed history of Mr. Martinez's life is presented in a report completed by Pamela Davis, Capital Mitigation Specialist for the Office of the Public Defender of Maricopa County. Ms. Davis' efforts will aot be duplicated in the present report. Two areas in the history have particular relevance for understanding Mr. Martinez. One of these areas is his participation in game cock fighting and the other includes his thoughts with regard to authority figures.

Mr. Martinez grew up around the sport of game cock fighting. He acknowledged that "some people think lt (game cock fighting) is cruel," but he never thought it was. He said, "It was sport to me."

Mr. Martinez discusssd his belief that "roosters have a lot of heart." He said, "Both roosters are dying, you pick them up, and the last one to peck is the winner." According to Mr. Martinez, after a rooster wlns thres matches, he is considered an ace and is not put in any more matches. The rooster is then used for breeding purposes. Mr. Martinez said, "To use him more would be just greed. He's already proved himself. I always admire the roster's heart. The one who shows game. The last one to show game is the winner. They are smart birds; they just have a lot of heart." Mr. Martinez talked about roosters wbo were cowardly. He said, "Sometimes a bird will get a head shot and will run. The owner will kill them on the spot." Mr. Martinez stated that fighting was natural to these birds. Apparently, a majority of the cock fights end with one bird dying, but this is not always the case.

Mr. Martinez stated that he stopped participating in game cock fighting one or two years after coming to Globe beeause of his father's religion. Mr. Martinez went on to say that his "little brother was always into animals, too." He then said that he didn't want his little brother to end up where he is, i.e., in prison. Mr. Martinez was then asked what could have made a difference in his life. His first response was that being sent to CMJI was tha turning point in his life. From his perspective, he had not

Ernesto Martinez Rpt                3        Susan Downs Parrish, Ph.D.
July 16, 1998

committed any serious offenses other than using marijuana. At CMJI, he "learned all kinds of things about crimes." He said, "a macho image may be just a front at first, but it becomes a part of them (the juveniles in detention)." He also said, "It becomes not cool to obey these rules." He harbored resentment toward the staff members at CMJI because he believed that they were just doing a job and did not care about the juveniles.

     Mr. Martinez talked about the structure among the juvenile inmates at a facility like CMJI. He said, "There are weak ones and strong ones. Once you become a carpet for one person, everyone will walk on you. I was a strong one. I would fight for anything. I had no respect for authority."

     Mr. Martinez talked about his views of authority figures. He said, "In CMJI, I could express rebellion. I respect authority if he respects me. I can get along with anybody, but I won't let someone step on me. I will not let someone demean me." When asked about police officers, he said, "They are in no way superior to me. I'm a man, and they are a man. If he does his job, I will do my time. I'm here as a punishment, not for a punishment. When I was younger, violence was the first thing that came to my mind when someone disrespected me. I'm a man ,and no one is above me. I will do what I need to do to defend my pride. I'm not going to let nobody get me. I love life too much."

     Mr. Martinez explained, "My philosophy developed out of juvenile incarceration. I always told myself that I would never be helpless to authority. I watched my father beat my mother, and I couldn't do anything. I cried for awhile, but then I didn't cry anymore. My father abused his authority. He shouldn't have done that. I respect my dad and his authority, but if he tried to hit my mom now, he could never get a second punch."

     Mr. Martinez reported that his father had changed a lot, and Mr. Martinez believed that the change was for the better. He said that he loved his father, and he never doubted that his father loved him. He said, "Even thought we weren't a family who hugged a lot, my parents did the best they could for us. They didn't have to tell me that they loved me. They never beat me. When I had discipline coming, I knew I had it coming. No matter what they did in front of me, I knew they loved me. Dad worked some pretty low jobs to support his family. Material things are not that important. I would rather be poor and know my family loves me than have money and not be loved by family."

     Mr. Martinez discussed his feelings about his mother and women in general. "I am closer to my mother than my father. When I was out there, I always had to have a woman around me. I have huge

Case 2:05-cv-01569-RGS  Document 453  Filed 03/04/15  Page 366 of 421

Ernesto Martinez Rpt               4        Susan Downs Parrish, Ph.D.
July 16, 1998

respect for mom. I would do anything for her. What bothers me most
is that my mom has to go through this. Mom is not vocal about
feelings. If I could take all her hurt, I would. It's not my
parents fault I'm here. It's no one's fault but my own."

     Mr. Martinez described the relationship he currently has with
his parents. He said, "My parents are wary of me because they don't
understand me." He stated that he did not share everything with his
parents. He then discussed how he felt about people in general. He
said, "Some of the best people I've met, I've met in prison.
Protective custody is full of people who come in puffing their
chest out and in a few weeks they are running off like women."

     Mr. Martinez spontaneously discussed the death penalty. He
stated that he believed in the death penalty. In his view, crimes
of rape and molestation are the most serious crimes and deserve the
death penalty. When asked to elaborate on his views, he stated that
when someone is raped or molested they never fully recover. Despite
having therapy, they carry the memories of the trauma forever.

REVIEW OF RECORDS

     The following records were reviewed:

          Probation Records of Gila County

          Gila County Juvenile Court Juvenile Profile
            03/19/98

          Jon Grossman Counseling Records of 1991

          Psychological Report by James A. MacDonald, Ph.D.,
            04/11/91

          School Records from Miami Unified School District
            Duncan Elementary Schools, Banning Unified School
            District

          Article from Arizona Silver Belt, 07/28/95

          Ernesto Martinez's Parents' Divorce Records

          Birth Certificate of Ernesto Martinez

          First and Second Draft of Report by Pamela Davis
            06/29/1998

     Ernesto Salgado Martinez, III, was born at Valley Memorial
Hospital in Indio, California, on November 17, 1975. At the end of

Ernesto Martinez Rpt                 5        Susan Downs Parrish, Ph.D.
July 16, 1998

the 3rd grade, Mr. Martinez was measured to be above the 90th
percentile in spelling, language expression, and total language
skills. For the whole battery of Comprehensive Tests of Basic
Skills, he was found to have a percentile score of 79, meaning that
out of 100 third-grade students, his score would be equal to or
above 79. In terms of grade-level scores, he was found to be
approximately one year ahead of his grade placement when all the
various subject measures were combined.

        His report card for his entire 4th-grade year showed some ups
and downs, but he got no grade lower than a C in his 4th quarter.
His teacher commented that his grades improved "all because he
tried." Unfortunately, by the 6th grade Mr. Martinez's academic
performance began to deteriorate. According to the results of the
Iowa Tests of Basic Skills, his reading grade level was 5.7, his
Total Language score was 7.1, his Work-Study Skills Total score was
5.3, his Total Math was 5.3, and his Complete Composite grade-level
score was 5.7. In most subject areas, he was scoring about one year
below grade placement.

        On June 18, 1987, Roberta Martinez, Mr. Martinez's mother,
filed an Application and Declaration For Order in Accordance with
the Domestic Violence Prevention Act. She stated that her husband,
Mr. Martinez's father, hit her "every other week" and on at least
one occasion, tried to choke her because she had not started his
breakfast. She further reported that her husband's eight brothers
and father lived with her and her husband in a three bedroom house.
She described her husband as going into rages and hitting her until
he became "more violent and then inflicted serious injury" on her
if she did not leave the house immediately. Mrs. Martinez described
one incident in which her daughter wanted to go to a neighbor's
home for help, but her father threatened to beat her if she did so.
According to Mrs. Martinez, her daughters were terrified of him. In
another incident, she described her husband as jumping in the back
of a truck driven by Mrs. Martinez with their three-year-old
daughter in front of the truck with her. Apparently, her husband
grabbed the steering wheel from the bed of the truck and forced
Mrs. Martinez off the road and into a neighbor's yard where she hit
a car. Her husband would not let go of the steering wheel. Mrs.
Martinez rolled the window up forcing her husband to let go of the
steering wheel. He broke the truck window and grabbed Mrs.
Martinez, but she drove to the fire department where the police
were waiting. According to Mrs. Martinez, her husband was choking
her and scratching her neck when she stopped the truck. In May of
1987 she was admitted to Loma Linda Hospital for surgery to repair
her nose which had been broken by her husband. In her statement,
Mrs. Martinez said that she feared for her safety and her
children's safety.

On April 11, 1991, Dr. James A. MacDonald evaluated Ernesto Martinez who was 15 years old at the time. Mr. Martinez was found to have a Verbal IQ score of 105, a Performance IQ score of 117, and a Full Scale IQ score of 111. These scores ranged from the Average range to the high end of the Bright Normal range. Dr. MacDonald made the following observations:

* Mr. Martinez told Dr. MacDonald, "Everybody wants to fight with me because I'm little."  At 15, he was 5' 6" and weighed 160 pounds.

* Mr. Martinez had a minimal relationship with his father. Mr. Martinez said, "He's a dick."

* With regard to Mr. Martinez's relationship with his mother, he described his relationship with his mother as "pretty good" stating that she abused neither alcohol or drugs.

* Dr. MacDonald characterized Mr. Martinez as having "exquisitely poor judgment." He further stated that his "social comprehension skills are diminished, his narcissism is very evident and, in my opinion, this is a young man who is growing into a potential serious threat to society." He described him as being a "law unto himself."

* Dr. MacDonald described Mr. Martinez as being extremely angry and dysfunctional, over bonded with his mother, and having little or no relationship with is father. Dr. MacDonald felt that Mr. Martinez had masculinity-gender identification problems and was "drifting rapidly toward either a Borderline Personality, full blown, or drifting toward a substantial anti-social position."

* According to Dr. MacDonald, Mr. Martinez was " a driven, careless, expansive, narcissistic and self-sabotaging youth."

* Dr. MacDonald saw "substantial anxiety" in Mr. Martinez.

* Dr. MacDonald concluded by describing Mr. Martinez as "a deeply angry, hostile, often inappropriate youngster who shows signs of substantial identity disorder and personality disorder. I do not believe that he is a true attention deficit, hyper-active disorder child, rather I see him as a personality dysfunctional individual."

  *Dr. MacDonald believed that Mr. Martinez blamed and
  projected all fault and responsibility for his
  difficulties on the other person. He saw him as utilizing
  denial, avoidance, and displacement as major defenses. He
  noted that Mr. Martinez did not trust adults and this was
  true, particularly adult males.

  * In reviewing the Minnesota Multiphasic Personality
  Inventory-2 (MMPI-2), Dr. MacDonald described Mr.
  Martinez as an "affect starved, deeply angry youngster
  who has felt the ravages of rejection, guilt, and
  criticism rather strongly."

  * Dr. MacDonald believed that Mr. Martinez had more
  depression, hysteroid-masculine doubts, agitation, and
  paranoia than his appearance suggested. He further stated
  that Mr. Martinez's "depression and masculine anxieties
  appear to drive his self-destructive behaviors. He has
  very little insight or self-understanding. Emotional
  blocking is one of the major items which will defeat
  psychotherapeutic attempts."

    Dr. MacDonald recommended that Mr. Martinez be placed in a
residential treatment center for a minimum of a year and possibly
for as long as 18 months. He felt that masculine bonding and
masculine affection were a very necessary part of any effective
treatment program. Dr. MacDonald was skeptical of the benefits of
psychotherapy because of Mr. Martinez's emotional blocking. He
further recommended investigation of the possibility of a
neurologically-based learning disability.

    In progress report notes, social worker Jon B. Grossman
described the events of some therapy sessions. In one note, Mr.
Grossman indicated that Mr. Martinez's family wanted him to return
to the family. Apparently, these sessions took place while Mr.
Martinez was in a detention setting. He was 15 at the time of this
session, which was March 13, 1991. Mr. Martinez's parents indicated
that if he were to return home, he needed to attend school, avoid
use of drugs, and attend church with the family. Mr. Martinez
refused to attend church. Another issue which came to light during
the therapy session was Mr. Martinez's anger with his father. Mr.
Martinez and his father discussed a time approximately three years
prior when Mr. Martinez was about 12. His father became angry and
sold Mr. Martinez's horse. Mr. Martinez was closely attached to the
horse because he had raised it. Mr. Martinez's father said that he
sold the horse because Mr. Martinez refused to follow through with
his father's directions. According to Mr. Grossman's note, the
relationship between Mr. Martinez and his father had become
increasingly distant and Mr. Martinez had become more rebellious
since the horse was sold.

Ernesto Martinez Rpt              8        Susan Downs Parrish, Ph.D.
July 16, 1998

    In Mr. Grossman's progress report note of April 28, 1991, he
mentioned the inclusion of siblings in a family therapy session.
Apparently, it was unusual to include siblings, but Mr. Grossman
obtained permission to include the siblings because he felt that it
was critical to do so. In the note, Mr. Grossman indicated that the
participation of the siblings was necessary in order "to reach Mr.
Martinez emotionally." Mr. Martinez's anger toward his father was
again noted. According to Mr. Grossman, Mr. Martinez was beginning
to discuss his anger and assess his decision making and anger
toward his father.

    In the therapy note of April 27, 1991, Mr. Grossman reported
what Mr. Martinez said that was meaningful to him. Mr. Martinez
talked about his relationship with his girlfriend, Cathy, as being
one of love. Mr. Martinez valued this relationship and hoped that
it would develop over time. He also discussed his relationship with
a friend named Rick. Mr. Grossman pointed out to Mr. Martinez that
there was a lack of congruence between his words and his behavior.
Mr. Grossman described Mr. Martinez as a "touch-and-go person" who
was "undependable." He also confronted Mr. Martinez with the idea
that he "takes advantage of these relationships." Mr. Grossman
suggested that the next therapy session include Mr. Martinez's
girlfriend and her parents and Mr. Martinez's father requested that
Rick and his parents also attend. It was Rick's father, ED, who had
urged Mr. Martinez to turn himself in when he was in trouble.

    A two-hour therapy session was held May 4, 1991. In attendance
were Mr. Martinez, his father, his mother, his sister, Ed (Rick's
father), Rick, Cathy (Mr. Martinez's girlfriend), Glen of the
Probation Department, and two peers. According to Mr. Grossman, the
session was very tense and all were tearful except Mr. Martinez.
Although Mr. Martinez did not cry and did his best to avoid
expressing emotion, it was clear that he "was emotionally moved by
the process." Each member of the therapy session told Mr. Martinez
that they saw him as indifferent, in denial, and removed and
distant." At the end of the session, Mr. Martinez's father moved
toward Mr. Martinez to hug him. Mr. Martinez refused the hug. Mr.
Grossman confronted Mr. Martinez's father as being removed and
"having a wall up" just as Mr. Martinez did. Mr. Grossman urged Mr.
Martinez's father to tell Mr. Martinez that he cared for him. Mr.
Martinez's father followed Mr. Grossman's suggestion and told Mr.
Martinez that he felt that he had lost his son just as he had lost
his own mother in death. Cathy, Mr. Martinez's girlfriend, told him
that she would leave him if he could not hug his father and show
emotion to her and his family. She then took Mr. Martinez's
father's hand and Mr. Martinez's hand and they united in a tearful
hug. All members of the session agreed to attend a future therapy
session. Unfortunately, there were no further therapy notes by Mr.
Grossman.

Ernesto Martinez Rpt                9        Susan Downs Parrish, Ph.D.
July 16, 1998

<u>TEST RESULTS</u>

<u>INTELLIGENCE</u>

The Comprehension subtest of the Wechsler Adult Intelligence Scale-III (WAIS-III) is a measure of common sense in everyday situations. Mr. Martinez earned a scaled score of 14, which placed him at the 91%ile which is one and one-third standard deviations above the mean. As a reference point, an IQ score which is one and one-third deviations above the mean is 120. Mr. Martinez's answers were intelligent and reasonable.

The Matrix Reasoning subtest of the Wechsler is a measure of non-verbal problem-solving ability. Mr. Martinez earned a scaled score of 16, which is at the 98%ile. His score was two standard deviations above the mean. As a reference point, an IQ score that is two standard deviations above the mean is 130.

<u>COGNITIVE PROCESSING</u>

Because Dr. MacDonald questioned whether Mr. Martinez had a neurologically-based learning disability, the Trail Making Tests from the Halstead-Reitan Neuropsychological Test Battery for Adults (HRB) were administered. The Trail Making Tests are general measures of brain functions. The Trail Making Tests do not substitute for the entire HRB, but they are tests which have been shown through research to be related to brain-behavior relationships. Mr. Martinez was in the perfectly normal range on both Trails A and Trails B.

<u>READING ABILITY</u>

Mr. Martinez earned a raw score of 48 on the Reading subtest of the WRAT-3. This score placed him at a high school level with regard to reading with a standard score of 103 (58%ile). This reading level was more than adequate to take the MMPI-2.

<u>EMOTIONAL STATUS</u>

Although Mr. Martinez was somewhat defensive, the profile was valid and he appeared to have responded frankly to items dealing with common human frailties. His responses indicated a willingness to admit to minor faults and shortcomings. The TRIN T-score of 57 indicated consistency of responses, a VRIN T-score of 34 indicated consistent, discriminating answers to items, and the Fb T-score of 46 indicated equal attention throughout the test.

Case 2:06-cv-01569-RSB Document 1553 Filed 10/30/17 Page 372 of 421

Mr. Martinez had a configural code-type of 94. The most salient characteristic of a 94 individual is a marked disregard for social standards and values. They are likely to get into trouble with the authorities because of antisocial behavior. They show poor judgment and have a low tolerance for frustration. They often appear to be moody, irritable, and caustic. They harbor intense feelings of anger and hostility, and these feelings are expressed in occasional emotional outbursts. Individuals with a 94 code tend to be ambitious, energetic, and restless. They are likely to seek out emotional stimulation and excitement. They are likely to keep others at an emotional distance. Beneath the facade of self-confidence and security, these individuals are immature, insecure, and dependent people who are trying to deny these aspects of themselves. A diagnosis of anti-social personality disorder is usually associated with the 94 code-type, although patients with this disorder are occasionally diagnosed as having a bipolar disorder.

Scale 4 is broken into four components and is considered to be a measure of antisocial characteristics. As a rule, younger subjects generally score higher than older subjects, and on the MMPI-2 normative samples, caucasians and Asian-American subjects scored somewhat lower on Scale 4 (5 to 10 T-score points) than African-Americans, Native-Americans, and Hispanic subjects. Scale 4 is a measure of rebelliousness, with higher scores indicating rebellion and lower scores indicating an acceptance of authority and the status quo. The highest scorers on this scale rebel by acting out in antisocial criminal ways; moderately high scorers may be rebellious, but may express the rebellion in more socially acceptable ways. Low scorers are more likely to be overly conventional and accepting of authority. Mr. Martinez's T-score of 69 on Scale 4 is high, but it is not considered to be extremely high (T greater than 75). The four factors in Scale 4 are: Familial Discord, Authority Problems, Social Imperturbability, and Social Alienation. Mr. Martinez was highest on Authority Problems (T-score=68). His score was moderately high and indicated that he resents societal and parental standards and customs, may have been in trouble in school or with the law, may have definite opinions about what is right and wrong, may stand up for what he believes in, and is not greatly influence by the values and standards of others.

Mr. Martinez received a T-score of 38 on Scale 5. This score indicated that he presented himself as very masculine. A score in this range represents inflexibility about masculinity. Associated features include emphasis on physical strength and possible doubts about masculinity.

Case 2:06-cv-01659-RSB   Document 1453   Filed 10/30/2175   Page 373 of 421

Scale 9 was originally developed to identify psychiatric patients manifesting hypomanic symptoms. Hypomania is characterized by elevated mood, accelerated speech and motor activity, irritability, flight of ideas, and brief periods of depression. Younger subjects typically obtain scores in a T-score range of 50 to 60. African-Americans, Native Americans, and Hispanic subjects in the MMPI-2 normative samples scored somewhat higher (5 to 10 T-scores) than Caucasian subjects. Mr. Martinez's score of 75 was high, but was not considered to be an extreme elevation (T-score greater than 80). Individuals with a T-score greater than 80 may be in the throes of a manic episode. Individuals with a more moderate elevation are not likely to exhibit frankly psychotic symptoms, but there is a definite tendency toward hyperactivity and unrealistic self-appraisal. High scorers are energetic and talkative and they are likely to prefer actions over thoughts. They become bored and restless very easily and their frustration tolerance is quite low. The components of Scale 9 are Amorality, Psychomotor Acceleration, Imperturbability, and ego-inflation. Mr. Martinez's highest score was on the Amorality factor which indicated that he reported perceiving other people as selfish, dishonest, and opportunistic and because of these perceptions he feels justified in behaving in similar ways. Also, he may derive vicarious satisfaction from the manipulative exploits of others.

## CONCLUSION AND RECOMMENDATIONS

### DIAGNOSIS: (DSM IV)

    Axis I      309.81    Posttraumatic Stress Disorder (PTSD)
                          Chronic

    Axis II     301.9     Personality Disorder, NOS

There is ample documentation of the violent, chaotic nature of Mr. Martinez's home for the first 12 or 13 years of his life. He was exposed to violent acts which threatened death or serious injury to himself and to his mother. All the children in the Martinez home felt fear, helplessness, and horror as they watched the violence between their mother and father. As a result of his experience, Mr. Martinez is physiologically and psychologically prepared to protect his mother if his father were to threaten her physically. This is the case in spite of the total transformation of his father which took place about ten years ago. Mr. Martinez avoids stimuli associated with his traumatic childhood and has a numbing of general responsiveness. Symptoms of this include diminished participation in family, feelings of detachment from others, and a restricted range of affect. Mr. Martinez has persistent symptoms of increased arousal as indicated by

Ernesto Martinez Rpt                    13        Susan Downs Parrish, Ph.D.
July 16, 1998

Personality Disorder make frantic efforts to avoid real or imagined abandonment (Criterion 1). The perception of impending separation or rejection, or the loss of external structure, can lead to profound changes in self-image, affect, cognition, and behavior. These individuals are very sensitive to environmental disturbances. They experience abandonment fears and inappropriate anger even when faced with a realistic time-limited separation or when there are unavoidable changes in plans...." The associated features with regard to BPD include childhood histories in which physical and sexual abuse, neglect, hostile conflict, and early parental loss or separation occur. Common co-occurring Axis I disorders include, among others, Posttraumatic Stress Disorder.

      The essential feature of Narcissistic Personality Disorder according to the DSM-IV is "a pervasive pattern of grandiosity, need for admiration, and lack of empathy that begins at early childhood and is present in a variety of contexts. One reason that Mr. Martinez does not fully fit the criteria for NPD is that he does have the ability to empathize. There are times that he appears to respond with a complete lack or empathy, but his behavior at these moments is more in accordance with a condition of dissociation. Mr. Martinez does seem to have a high need for admiration, particularly with regard to his masculinity. It is noted in the DSM-IV that individuals with NPD invariably have fragile self-esteem.

      Dr. MacDonald was disturbingly accurate in his assessment of Mr. Martinez and what his future held. Dr. MacDonald recommended treatment in a reeidential facility for as long as 18 months. Dr. Macdonald knew that weekly treatments through one hour of individual psychotherapy was inadequate to address Mr. Martinez's problems. Mr. Grossman provided therapy in the form of family therapy which appeared to be having the desired affect in terms of putting Mr. Martinez in a position in which he did experience emotions and was forced to deal with family and friends. Although the sessions appeared to be highly successful, there seemed to be too few of them over too short a period. It is most disturbing to think that had Dr. MacDonald's recommendations been followed and therapists like Mr. Grossman been able to work with Mr. Martinez over extended periods that Mr. Martinez could have developed differently and the heartbreak suffered by many could have been avoided.

      There are certain conditions which must be considered in determining what is to happen to Mr. Martinez in relation to the current charge of homicide. With regard to aggravating circumstances, it must be considered whether Mr. Martinez committed the offense in an especially heinous, cruel or depraved manner. It's somewhat difficult to think that any homicide is not heinous,

cruel, or depraved. But to the extent that Mr. Martinez has the above specified mental disorders, his behavior was reactionary and immediate, rather than planned and drawn-out.

In relation to mitigating circumstances, I believe that Mr. Martinez's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired, but not so impaired as to constitute a defense to prosecution.

In my opinion, it is probable that if Mr. Martinez shot Officer Martin, he was in a dissociative state. Dissociation is a PTSD symptom. Mr. Martinez is 22 years old and the first 12 years of his life were spent in an environment which biosocial theorists describe as an invalidating environment. In the Clinical Handbook of Psychological Disorders (1993) edited by David H. Barlow, Linehan describes an invalidating environment as being "defined by the tendency to negate and/or respond erratically and inappropriately to private experience and, in particular, to private experience not accompanied by easily interpreted public accompaniments (e.g., high temperature when feeling sick). When Mr. Martinez's father signed a paper allowing the school to use corporal punishment on his son, he was denying the role he had played in the difficulties that his son was having and his son's needs. Thus he failed to validate Mr. Martinez's emotions in relation to the environment in which he had lived. This report contains many instances of failures to validate Mr. Martinez's experience related to his environment. They have been included in the previous pages of this report and will not be restated.

According to Linehan, one result of living in a consistently invalidating environment is the development of a condition which she calls emotional dysregulation and behavioral patterns exhibited by the borderline adult. Having lived in this type of environment an individual never learns how to label and regulate emotional arousal or how to tolerate emotional distress. In a more optimal environment, public validation of one's private internal experiences leads to the development of a stable identity. In a family with the characteristics of the Martinez family, private experiences were responded to erratically and with insensitivity.

Dr. Linehan believes that psychological disorders are best conceptualized as systemic dysfunctions. A systemic dysfunction is characterized by several factors including the assumption that a psychological disorder results from multiple rather that single causes including some constitutional predispositions that create individual differences in susceptibility to emotional dysregulations and an environment which brings out a disorder in a vulnerable individual. This is a transactional model which looks at the transaction between the person with the disorder and the

Ernesto Martinez Rpt      15     Susan Downs Parrish, Ph.D.
July 16, 1998

environment. Since Mr. Martinez's environment was invalidating, unsafe, and violent, it is not surprising that he has numerous characteristics from Borderline Personality Disorder, Antisocial Personality Disorder, and Narcissistic Personality Disorder. From early on in his life, Mr. Martinez learned that the world is unsafe, unsupportive, and violent. Is it any wonder that he is a violent person. There is no question that society needs protection from Mr. Martinez, but there is a question as to whether he deserves the death penalty.

     Thank you for this referral. If there are any questions regarding this report, please call me.

                  Sincerely,

                  Susan Downs Parrish, Ph.D.

\jd

CREIGHTON CORNELL, P.C.
ATTORNEY AT LAW
14 E. SECOND ST.
TUCSON, AZ   85705
(520) 791-2239

CREIGHTON CORNELL #011433
ATTORNEY FOR DEFENDANT

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

ERNSTO S. MARTINEZ, III        )   No.  **CV-05-0561-PHX-EHC**
                               )
          Petitioner,          )   **AFFIDAVIT OF**
                               )   **SUSAN DOWNS PARRISH, PH.D.**
     vs.                       )
                               )
DORA SCHRIRO, et. al.,         )
                               )
          Respondents,         )
_____)

COMES NOW Affiant to swear and attest to the following:

1) I am Susan Downs Parrish, Ph.D., licensed by the Arizona Board of Psychologist
   Examiners. I evaluated Ernesto Martinez and testified at his mitigation hearing in July of
   1998.

2) I have recently reviewed my written evaluation and mitigation testimony, the testimony
   of Michael Brad Bayless, Ph.D., and a report by James A. McDonald, Ph.D.

3) It is my understanding that Dr. Bayless did not write a report. This is unfortunate for the
   following reasons:

   a.  It is standard in the field of forensic psychology for a psychologist to
       express his opinions and conclusions in a written report. I have rarely
       seen a psychologist not prepare a report in a case such as this. I cannot
       recall Dr. Bayless not generating a report when he testified in other cases;

1

b. Both parties are informed as to the conclusions of the psychologist and the basis for those conclusions when a report is generated;

c. A complete evaluation of the meaningfulness, validity, and reliability of the conclusions and opinions of a psychologist cannot be accomplished without specific information about how the underlying information was gathered.

4) The Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision (DSM-IV) is "a consensus of current formulations of the evolving knowledge in our field." It is a work in progress. Currently, there are sixteen major diagnostic classes, one of which is Anxiety Disorders. Posttraumatic Stress Disorder (PTSD) is a specific Anxiety Disorder. An understanding of what causes PTSD, how it affects people, how it should be diagnosed, and how it should be treated, is an ongoing area of research. Current research findings include the following:

a. There is a link between dissociation and PTSD. A. P. DePrince, A. Chu, and P. Visvanathan (2006) conclude: "Future progress depends upon careful consideration of the dissociation-PTSD relationship."

b. PTSD is a complex phenomenon, not easily diagnosed. C. Pain (2002) concluded that a diagnosis of PTSD as defined by the DSM-IV fails to describe the usual presentation of patients who chronically suffer from the disorder; it excludes from the diagnosis the extensive co-morbidity that invariably accompanies PTSD. She suggests conceptualizing chronic PTSD as "complex PTSD" or "disorder of extreme stress not other specified (DESNOS)." O. van der Kolk, D.L. Pelcovitz, S. Roth, F.S. Mandel, A. McFarlane, & J. Herman (1996) argue that one hundred years

of research has revealed a range of trauma-related psychological problems that are not represented in the criteria for diagnosing PTSD as specified in the DSM-IV. Van der Kolk et al. note that symptoms related to dissociation, complaints about physical ailments that are not explained by any known medical condition, and difficulties in controlling emotions reflect complex adaptations to trauma, particularly traumas that occur in childhood.

5) In my twenty years of experience in evaluating and treating persons with PTSD, I have seen many people with PTSD who had been previously misdiagnosed as APD or BPD alone;

6) PTSD is a complex disorder with a variety of symptoms. Donald Meichenbaum, Ph.D., a well-known author in the field of psychology, reports that depression is the most common co-morbid diagnosis in relation to PTSD. Borderline Personality Disorder (BPD) is found in about 2 % of the general population but in at least one study, one-third of subjects with BPD also had PTSD;

7) In my experience, PTSD is difficult to diagnosis, in part, because a person suffering with this disorder avoids talking about the traumas that he has experienced; talking about/re-living trauma is aversive. People with Anxiety Disorders go to great lengths to avoid reliving aspects of the traumas that they have experienced;

8) PTSD is an Anxiety Disorder, but a person with this disorder does not always present as someone who is anxious.  Anxiety is a state of mind.  Physical symptoms do not necessarily accompany this disorder. We cannot always tell by looking at someone whether he is anxious or might suffer from PTSD;

3

9) In my experience, there is a difference between the symptoms of PTSD resulting from growing up with domestic violence, as compared to the symptoms of PTSD in war veterans. There is ample evidence to support the existence of this difference, and the DSM-IV covers this difference in a section labeled Associated Features and Disorders, on page 465. The symptoms generally displayed by persons raised in an abusive/violent environment are not adequately covered by DSM-IV PTSD criteria. This is one reason why experts are calling for another diagnostic category. An expert in childhood abuse and PTSD can explain the exact nature of symptoms that develop in response to exposure to childhood trauma;

10) There has been a good deal of research since the 1990's regarding the effect of trauma and the structure and functioning of the brain. Refinements in technology associated with imaging techniques, such as positron emission tomography (PET) and magnetic resonance imaging (MRI), have allowed researchers to pursue the effects on the brain of various types of trauma, including prolonged exposure to stressful situations. What may have been theory in the mid to late 1990's has undergone additional research. There is no doubt that trauma is linked to changes in the brain that lead to alterations in a person's perception of the world;

11) Ernesto's MMPI was valid. None of his scores indicated that he was exaggerating his symptoms. He appeared to earnestly respond to the items on the test. The elevated Scale 9 (Hypomania) score reflects an agitated mind, as well as:

    a. A tendency toward hyperactivity;

    b. Low frustration tolerance.

12) The results of the 1998 MMPI and his lifestyle suggest that Ernesto typically acted

4

reflexively rather than with reflection, and when he did think about what he was doing,

he would not necessarily think of reasonable alternatives or consequences;

13) Placed in a highly structured environment such as prison, it is possible that Ernesto could

exercise restraint. Structure is likely to be comforting to him because it produces

predictability and order rather than uncertainty and chaos;

14) Ernesto's intelligence is well above average and translates into the ability to benefit from

experience, including effective treatment. Intelligence and emotional maturity and

perspective are not separate. A person's anxiety affects the application of their

intelligence;

15) "The essential feature of Antisocial Personality Disorder is a pattern of disregard for, and

violation of, the rights of others that begins in childhood or early adolescence and

continues into adulthood."(DSM-IV, p. 701) Although Ernesto had engaged in acts that

could be described as antisocial (prior arrests/convictions), a diagnosis of Antisocial

Personality Disorder (APD) did not adequately describe him in light of: culture,

relationships with members of his family, and symptoms identified by Dr. McDonald.

The diagnostic picture was too complex to be adequately covered by a diagnosis of APD

alone;

16) Ernesto did not project blame onto other people. He accepted responsibility for his

actions, which is inconsistent with a diagnosis of APD;

17) Dr. Bayless' testimony revealed that he diagnosed Ernesto with APD. There are several

problems with Dr. Bayless' conclusions about Ernesto, including:

  a. There is no evidence to indicate that Dr. Bayless took into account the warning

    in the DSM-IV about making a diagnosis of APD. "Concerns have been raised

5

that the diagnosis may at times be misapplied to individuals in settings in which

seemingly antisocial behavior may be part of a protective survival strategy."

(DSM-IV, p. 703);

b.  Nothing suggests that Dr. Bayless considered Ernesto's upbringing, extended

family or culture, when determining whether he had APD as opposed to PTSD.

For example, Dr. Bayless did not mention the amount of violence in the family

and extended family. Dr. Bayless' testimony revealed no awareness of Ernesto's

father's and uncle's examples;

18) The HARE Psychopathy Checklist is an objective way to assess the appropriateness of an

APD diagnosis. If a professional believes that a diagnosis of APD is warranted, the

HARE Psychopathy Checklist: Screening Version is a twelve-item measure that is easy to

complete. Dr. Bayless did not explain his omission of the HARE checklist and I cannot

imagine a reasonable explanation. I didn't conduct the HARE because I didn't find

Ernesto anti-social and there was no need to confirm that he wasn't anti-social;

19) I was not asked to be present for the testimony of Dr. Bayless, and I do not recall being

told about the basis for any of his opinions. I had no contact with any lawyer in the case

(Emmett Ronan, Todd Coolidge, Lawrence Matthew, David Lipartito) after the

sentencing.    I do not recollect being informed of the opinions of Dr. Bayless before I

recently reviewed his testimony;

20) I now understand that Dr. Bayless relied on Dr. McDonald's report for several substantive

purposes. I am disturbed by Dr. Bayless' methodology and conclusions. The McDonald

evaluation, in its best light, must be viewed as a set of hypotheses to be explored in

therapy. Dr. Bayless offered no criticism of McDonald's methodology or his written

6

evaluation;

21) Dr. McDonald's written report, and Dr. Bayless' reliance on Dr. McDonald's report, are

troubling in major respects:

    a.  Ernesto denied or minimized the abuse that he experienced. No effort was made

        to determine the true nature of Ernesto's environment. Denial does not rule out

        the existence of abuse/domestic violence. It is not uncommon for children who

        grow up in an abusive environment to deny that they have been abused. One

        theory is that such denial is related to a poor memory of events because of the

        impact of trauma on brain functions, particularly memory. Thus denial of, or a

        poor memory of the details of abuse, is often associated with a diagnosis of

        PTSD;

    b.  Nothing suggests that Ernesto was asked whether there was domestic violence in

        the house (e.g. violence directed toward his mother). A thorough examination

        should have included a discussion of family dynamics and the possibility of an

        abusive environment;

    c.  Nothing in Dr. McDonald's report indicated that he considered a diagnosis of

        PTSD, although he reported symptoms that were suggestive of the disorder;

    d.  Dr. McDonald described Ernesto as being "over bonded" with his mother, but he

        did not seem to question whether there was a logical reason for this condition. He

        assumed that it was pathological;

    e.  Dr. McDonald suggested that Ernesto suffered from "rejection, guilt and

        criticism" and pulled away from his father who had turned to Christianity. Dr.

        McDonald's report revealed no awareness of the abuse Ernesto endured for the

        first eleven years of his life. Dr. McDonald erroneously blamed Ernesto for failing

7

to bond strongly with his father;

22) Dr. Bayless relied on the Thematic Apperception Test (TAT), a projective measure. This test is not objectively scored. Pictures are shown, and responses are recorded. The evaluator interprets the meaning of the responses. Projective measures are thought to reveal aspects of an individual's personality because the person "projects" his personality characteristics onto ambiguous stimuli. This test can give free range to interpret with little or no accountability This test is a way to explore the thinking of an individual; it allows one to form hypotheses that should be confirmed or denied through other means including administration of objective measures, interviews of family members, etc. The TAT is a highly subjective test;

23) Dr. Bayless also used the Williamson Sentence Completion Test, another projective measure, wherein sentences are completed. It is my understanding that the Williamson Sentence Completion Test is no longer in print. The only completed sentence that is quoted in Dr. Bayless' testimony is: "I do not like"...and Ernesto responded with "most people who think they are better than me". (Testimony, p. 15). First, this response appears to be a reasonable statement (most people do not like others who think they are better themselves or other people). Second, there is nothing inherently aggressive in this statement, which is what Dr. Bayless maintained. One of the problems with projective measures like the TAT and the Williamson Sentence Completion Test is that the responses of a subject are open to various interpretations depending on the theoretical bent of the interpreter. I cannot offer a more thorough review of Dr. Bayless' application of the TAT or Williamson Test because no additional data has been provided;

24) Dr. Bayless was of the opinion that Ernesto did not suffer from PTSD because there was no indication of "onset" prior to August 1995. Dr. Bayless asserted that symptoms of PTSD, specifically anxiety and depression, would have been noted in Ernesto's history or

8

prior clinical interviews, and the absence of such evidence proves there was no onset of

PTSD, thus leaving APD as the diagnosis. His reasoning is fallacious because:

    a. Dr. McDonald noted that Ernesto had "substantial" and "considerable" anxiety.

       (Report, p. 4);

    b. Dr. McDonald noted depression on several levels, and assigned a diagnosis of

       Dysthymia, which is depression. (Report, p. 7);

25) Dr. Bayless pulled from the McDonald report what suited his opinion and ignored

contradictory evidence that undercut his opinion and/or supported a PTSD diagnosis;

26) Dr. Bayless' testimony discussed a dissociative state (flashback) typical of veterans, and

made no mention of the different clinical manifestations of dissociation typical of persons

who were abused as children. (Testimony, p. 22). This was misleading at best;

27) The prosecution alleged that Ernesto's older sister did not suffer from PTSD, despite

being raised in the same home, as a challenge to a diagnosis of PTSD. Differences

between Ernesto and his sister in regard to their behavior may be based upon gender.

Other explanations for a difference in behavior may exist (e.g. if the sister avoided the

father's side of the family as much as possible). Symptoms can manifest differently from

person to person. The sister should have been evaluated in 1998 to confirm PTSD and

rebut the prosecution's claim. Indeed, an evaluation at this time can still confirm the

symptoms of PTSD in the sister even if they have waned over the years;

28) It is always preferable for a psychologist to have face-to-face contact with family

members and/or hear them testify at a hearing regarding things such as abuse. I don't

know why I was not asked to be present for their testimony;

29) Growing up in an environment with domestic violence is not something that is undone

immediately or quickly. Children taken from abusive homes and placed in a safe

environment do not automatically shed all of the anxiety they have developed over the

9

years. Many years of living in a safe environment, combined with counseling or therapy, may be required to diminish their anxiety by any noticeable degree. That the effects of trauma can be enduring is confirmed by changes in basic brain functions;

30) The father's metamorphosis (finding religion and God) during the approximate 2 to 4 months of separation from Ernesto's mother served to exacerbate the mental anguish experienced by Ernesto. The 180° reversal may have produced greater confusion or confirmed a belief that something was very wrong with his father's prior behavior. In short, the father's about face may have taken the "normal" domestic violence and made it appear unforgivable. This would be especially true if there was no accountability in the form of an apology. If the father never apologized it would be reasonable for a boy like Ernesto to assume that his father did not take responsibility for all of the domestic violence that took place, thus creating a greater wedge between Ernesto and his father, the man who represented a blue print of what Ernesto could expect from authority figures;

31) Dr. Bayless is a robust man who projects an authoritative image. At the time of his evaluation, he would have towered over Ernesto, figuratively if not physically. Dr. Bayless' gender and presence would have triggered Ernesto's need to appear strong and formidable;

32) Dr. Bayless apparently initiated questions about the August 15, 1995 shooting, a line of questioning that Dr. Bayless was advised not to pursue. (Testimony, p. 23). Ernesto knew that such questioning was against the rules. For example, it was clear that I was not going to delve into that discussion based upon instruction from counsel. When Dr. Bayless broke the rules he signaled to Ernesto that he could not be trusted, and a lack of trust would have been manifested by a reluctance to cooperate and a lack of openness on Ernesto's part;

10

33) Someone with PTSD knows what it is to be a victim, i.e., to be at the mercy of another person/event. A situation or response that suggests that someone who has PTSD is a victim is likely to trigger a sharp response. (Testimony, p. 23);

34) I am unaware of any good reason why neither defense attorney would choose to consult me regarding the merits of Dr. Bayless' testimony and his observations, testing or opinions. I could have provided a clear means of challenging/rebutting the reliability of his work. Indeed, a much fuller and deeper review of his evaluation (e.g. access to all inquiries and responses) may bring to light equal or greater reasons to disregard his opinions.

AFFIANT FURTHER SAYETH NAUGHT.

Dated this 16 day of May 2006.

SUSAN DOWNS PARRISH, Ph.D.
Affiant

SUBSCRIBED AND SWORN to before me this 16 day of May 2006.

NOTARY PUBLIC

My Commission Expires:
6-29-07

DONNA L. NOLTE
NOTARY PUBLIC - ARIZONA
PINAL COUNTY
My Commission Expires
June 29, 2007

11

Petitioner's Exhibit 12

Declaration of Dr. Susan Parrish, Ph.D., February 26, 2015

## Declaration of Susan Downs Parrish, Ph.D.

I, Susan Downs Parrish, Ph.D., declare under penalty of perjury the following to be true to the best of my information and belief:

1.     I am a psychologist licensed to practice in Arizona. I evaluated Ernesto Martinez for capital sentencing in 1998. I was retained by his trial counsel, Emmet Ronan and Todd Coolidge. I wrote a report dated July 6, 1998, after I performed two clinical interviews with Mr. Martinez, administered various tests, and reviewed materials supplied by his counsel. I testified at Mr. Martinez's death penalty hearing on July 22, 1998.

2.     I reported and testified that Mr. Martinez suffered from Posttraumatic Stress Disorder ("PTSD") at the time of the homicide for which he was convicted and sentenced to death. I based that diagnosis on a thorough understanding of Mr. Martinez's social history, which I obtained from documents provided by Mr. Martinez's trial counsel, and from my clinical interviews with Mr. Martinez. I also diagnosed Personality Disorder, Not Otherwise Specified, secondary to PTSD.

3.     I was later retained by Mr. Martinez's former federal habeas corpus attorney, Creighton Cornell, to evaluate the sentencing hearing testimony of Michael Brad Bayless, Ph.D., a psychologist, who testified for the prosecution at capital sentencing. Dr. Bayless diagnosed Mr. Martinez with Antisocial Personality Disorder (ASPD) but not PTSD at the time of the homicide. Mr. Cornell provided me with a transcript of Dr. Bayless's testimony.

4.     I executed an Affidavit dated May 16, 2006, in which I assessed and criticized the methodology employed by Dr. Bayless in his evaluation of Mr. Martinez and his diagnosis. I also noted (at ¶ 19) that Mr. Martinez's prior trial counsel did not ask that I be present for Dr. Bayless's testimony and I was not shown the transcript of his sentencing hearing testimony, until I was contacted by Mr. Cornell.

5.     I stand behind my 1998 report and testimony, and my 2006 Affidavit as to the serious deficiencies in Dr. Bayless's evaluation, his rejection of the PTSD diagnosis, and his diagnosis of ASPD. As I noted in my 2006 Affidavit (at ¶ 28), "it is preferable for a psychologist to have face-to-face contact with family members and/or hear them testify at a hearing regarding things such as abuse. I don't know why I was not asked to be present for their testimony." I have now reviewed the sentencing hearing testimony of Mr. Martinez's parents, Ernie and Roberta Martinez, and his older sister Julia. That testimony contains additional powerful evidence of physical and emotional abuse of Mr. Martinez that would have supported my opinion that Mr. Martinez suffered from PTSD.

6.     I have been retained by Mr. Martinez's present habeas corpus counsel, Tim Gabrielsen, to elaborate on certain points contained in my 1998 report and 2006 Affidavit, and to consider my earlier work in light of the DSM-V, the Diagnostic and Statistical Manual of Mental Disorders (5th ed.), published in 2013. I diagnosed Mr. Martinez prior to sentencing using the DSM-IV, published in 1994. The DSM-IV-TR, published in 2000, was in use when I performed the evaluation of Dr. Bayless's work in 2006.

/ /

1

7.      In my 2006 Affidavit (at ¶ 17(a).), I was critical of Dr. Bayless's ASPD diagnosis of Mr. Martinez for several reasons, one was his failure to heed the caution of DSM-IV (at p.647) and DSM-IV-TR (at p.703-04), to wit: "(c)oncerns have been raised that the [ASPD] diagnosis may at times be misapplied to individuals in settings in which seemingly antisocial behavior may be part of a protective survival strategy." The DSM-V (p. 662) contains the same caution.   As I further noted, Dr. Bayless failed to consider Mr. Martinez's "upbringing, extended family or culture when determining whether he had ASPD as opposed to PTSD." Parrish 2006 Affidavit at ¶ 17(b).   My 1998 report and sentencing hearing testimony touched on Mr. Martinez's social history, which included his having suffered physical and emotional abuse by his father when Mr. Martinez was a child and that Mr. Martinez was exposed to the severe beatings of his mother by his father.  I describe additional facts below that support my PTSD diagnosis.

8.      For the first ten years of Mr. Martinez's life, he was exposed to antisocial behavior, including assault and drug use. He developed a "protective survival strategy" from an early age. For example, he attempted to protect his mother when he was about four. Mr. Martinez witnessed his father beating his mother, so he grabbed a knife from the kitchen and tried to ward off his father. The protective strategy he developed as a child is reflected in his behavior when incarcerated in juvenile and adult institutions from the age of approximately 11.

9.      Dr. Bayless failed to address in his testimony any of these "settings" that should have caused him significant pause or concern in diagnosing ASPD.  Dr. Bayless failed to mention the DSM-IV's caution in his testimony or indicate what caused him to overcome that concern in making the ASPD diagnosis.

10.     I also noted in my 2006 Affidavit that Dr. Bayless violated best practices in psychology by failing to write a report of his evaluation of Mr. Martinez.  In the absence of Mr. Martinez's trial counsel requesting that I sit through Dr. Bayless's testimony or producing that testimony to me for comment, the sentencing court was prevented from considering the critical flaws in Dr. Bayless's methodology and diagnosis when it credited Dr. Bayless's testimony, rejected a diagnosis of PTSD in favor of ASPD, and sentenced Mr. Martinez to death.  I was available to sit through Dr. Bayless's testimony or to review his sentencing hearing testimony of July 31, 1998, but was never asked to do so by Mr. Martinez's trial counsel.

11.     I further noted in my 2006 Affidavit, Dr. Bayless's diagnosis was flawed because he wrongly rejected the PTSD diagnosis in the mistaken belief that an earlier evaluation of Mr. Martinez by Dr. James MacDonald, Ph.D., at Catalina Mountain Juvenile Institution, failed to find Mr. Martinez suffered from anxiety, a symptom of PTSD.   Dr. Bayless testified at sentencing the "historical data and clinical data from Dr. MacDonald" not only failed to reflect symptoms of PTSD, but "the absence of anxiety is something that is being noted." Transcript, July 31, 1998, at p. 19-20.  That assertion was untrue.

12.     As I noted in 2006 (at ¶ 24), "Dr. MacDonald reported that Ernesto had 'substantial' and 'considerable' anxiety." In his report of April 11, 1991 (at p. 4), Dr. MacDonald stated that psychological testing revealed Mr. Martinez to suffer from "substantial anxiety" and that "(t)he early impression of this youngster, as we go through the WISC-R, is of a rather verbal but confused youngster whose social skills are poor and who suffers from considerable anxiety." Dr. MacDonald interpreted additional test data as reflecting "a youngster . . . suffering massive internal insecurities and anxieties. . . ." MacDonald at p. 7.  Dr. MacDonald was unaware of the

2

physical abuse of Mr. Martinez as a child, or his exposure to the abuse suffered by his mother, yet Dr. MacDonald still found that Mr. Martinez suffered from "emotional blocking" that would have interfered with therapy.  MacDonald at p. 7.

**Protective Survival Strategy**

13.     A protective survival strategy is a form of adaptive behavior, an ability mental-health practitioners study. The ability to adapt reflects the form of intelligence used in learning new things and benefiting from experience. When someone receives a head injury that causes damage to his brain, he may earn average or above scores on the Wechsler Adult Intelligence Scale (WAIS), if he is well-educated and previously high functioning, but do poorly on measures of adaptive intelligence, for example, the Category Test. In such cases, the WAIS scores reflect old learning and the Category Test reflects current ability to learn. A person has to have a good brain to develop an effective survival strategy in a dangerous environment. Dr. Bayless and I are on record for describing Mr. Martinez as having above-average intelligence—a capable brain.

14.     To avoid "misapplying" a diagnosis of ASPD, the clinician must consider context to rule out the possibility that antisocial behaviors are intelligent adaptations to a dangerous environment. On p. 19, DSM-5 provides clear guidelines for a clinician to follow in making a diagnosis. Ideally, a diagnosis is one part of arriving at a treatment plan. A treatment plan is not the goal of clinicians working in a forensic setting, but correct use of the Manual requires an awareness of this purpose. With this purpose in mind, the clinician is advised to pursue "a careful clinical history and concise summary of the social, psychological, and biological factors that may have contributed to developing a given mental disorder."  DSM-V at p. 19.Those inclined to ignore context and focus on the list of symptoms/criteria of a disorder are warned that "it is not sufficient to simply check off the symptoms in the diagnostic criteria to make a mental disorder diagnosis." DSM-V at p. 19. Yet, that appears to be what Dr. Bayless did, and, in so doing, he misdiagnosed Mr. Martinez.

15.     In the absence of a report, we are forced to rely on Dr. Bayless's sentencing hearing testimony to determine what records he considered prior to his interview of Mr. Martinez. During his testimony, Dr. Bayless listed "an older presentence report not on this case"; material submitted by the defense at sentencing from a person named "Skelly"; my 1998 report; police reports; and, police interviews with Eric Moreno and Oscar Fryer.  Transcript, July 31, 1998, at p. 9.  On cross-examination, Dr. Bayless was asked whether the presentence report was from Mr. Martinez's assault case, to which he replied affirmatively.  Transcript at p. 36.

16.     Dr. Bayless, in his testimony, failed to list my sentencing hearing testimony among the materials he considered, which occurred nine days earlier, on July 22, 1998, and the sentencing hearing testimony of Mr. Martinez's father, mother or sister, Julia, each of whom described pervasive physical abuse inflicted on Mr. Martinez and his mother by his father.  Which presentence report for Mr. Martinez Dr. Bayless considered is unclear.  He testified that he reviewed the report of a mitigation specialist named "Skelly," and while the sentencing hearing transcript reflects that the sentencing judge's name was "Skelly." I am not aware of a defense mitigation specialist in this case by that name.  In his confusion, Dr. Bayless could have been referring to the defense sentencing memorandum prepared by Pam Davis.  I also note confusion in Dr. Bayless's testimony, in the defense cross-examination, about the dates on which he claims to have evaluated Mr. Martinez and the length of those evaluations.  Transcript, July 31, 1998, at

3

p. 34-36. A report by Dr. Bayless might have reduced the likelihood of confusion as to the identity of the mitigation specialist and the dates and duration of interviews with Mr. Martinez.

**Dr. Bayless failed to adequately address Mr. Martinez's abusive childhood.**

17.     To the extent Dr. Bayless relied, even in part, for his ASPD diagnosis on the November 29, 1997, presentence report prepared by Maricopa County Adult Probation Officer Amy Gordon, I would point out that her report is misleading, incomplete and superficial, especially as it claims to contain a social history of Mr. Martinez. Ms. Gordon reported that Mr. Martinez declined an interview with her. For a social history, Ms. Gordon relied on a presentence report dated September 18, 1996. In that report, Mr. Martinez was said to have described his childhood as "relatively normal."

18.     The term "relatively normal" does not accurately characterize Mr. Martinez's childhood. The report of Capital Mitigation Specialist Pam Davis, dated August 6, 1998, shows that Mr. Martinez's early life was anything but normal. For the purpose of writing the Presentence Report, Ms. Davis conducted "extensive personal interviews with" Mr. Martinez, his parents, his older sister, Julia, and other members of the family and the community. At the time she wrote the report, she had graduated from Arizona State University and had spent two years with Arizona Department of Corrections and three years as a Maricopa County Adult Probation Officer. From 1988 to 1991, she worked as an Intensive Probation officer in Yavapai County. In 1991, she joined the Maricopa County Public Defender's Office as a sentencing specialist. Her experience largely consisted of assessing and supervising offenders and drafting related reports.

19.     Ms. Davis discovered that Mr. Martinez was exposed to traumatic stress in the form of domestic violence for the first ten years of his life. Mr. Martinez's father earned an Associate's degree and became a full-time counselor at Twin Pines Juvenile Corrections Facility, an institution in which he spent time on an attempted murder conviction (discharging a firearm at a person) when he was a juvenile. Although he counseled juveniles at Twin Pines, he testified at sentencing that he used marijuana and heroin regularly, and sold marijuana, methamphetamine and cocaine from home. Mr. Martinez's father testified at sentencing that he had been a member of a Southern California street gang.

20.     Mr. Martinez's father abused his wife for the first ten years of their marriage. Mr. Martinez has "vivid memories" of the abuse. The memories include: Dad shoving Mom through a wall, throwing a chair at her, and beating her. Once, when Mr. Martinez was about four, he tried to stab his dad with a kitchen knife to stop him from beating Mom. Julia, his sister, remembered Dad choking Mom almost to death. On another occasion, Julia and Mr. Martinez were in the car when Dad slugged Mom and broke her nose. In the next moment, he "repaired" her nose by hitting her from the other side. Sometime later, she had surgery on her nose, but no police report was filed. Apparently, no police reports were filed for any instance of domestic violence, although it was not unusual for Mom to flee the house fearing what Dad would do. Julia reported feeling frightened by Dad's attacks on Mom. Mr. Martinez felt angry and helpless to act.

//

4

21.    Mr. Martinez described in some detail, how he felt about the domestic violence he witnessed. He numbed himself to avoid painful feelings. He learned that he could not trust good feelings to last and that bad feelings hurt too much. He recalled many instances in which he shut down—primarily when his parents fought.

22.    Nor was Mr. Martinez spared from the abuse visited on his mother.  Julia testified at sentencing that her father hit Mr. Martinez with enough force that it left red welts on his legs and arms.  Julia testified that her father used a paddle and a belt to strike Mr. Martinez.  Mr. Martinez's father confirmed at sentencing that he used the paddle and belt.  The paddle was 15 inches-long and five inches-thick, according to Julia.  Julia testified she was "desensitized" to the frequent violence.  Julia spoke to an incident in which Mr. Martinez was beaten by his father after having told his father that his mother was visiting a girlfriend, but his father believed his wife was seeing a man.  Jealousy was described by Julia and her mother as a frequent basis for her father to beat her mother or drag her by her hair.

23.    Dad was not the only one who used drugs. Mom used crank (slang for a low purity, crystallized Methamphetamine) and cocaine. By the time he was five, Mr. Martinez recognized drug paraphernalia.

24.    In the Presentence Report, Ms. Gordon described Mr. Martinez as an average student, although he dropped out of school after the eighth grade because he was placed in Catalina Mountain Juvenile Facility.

25.    A few words from Ms. Davis give perspective to what was going on in Mr. Martinez's life, starting with the sixth grade. One day, Mom came to school and told him she was leaving Dad because the man threw a chair at her. Mr. Martinez cried after she left the room. About the same time Mom left, his paternal grandmother died. His grades dropped to D's, his attendance was poor, and he smoked marijuana daily.  The marijuana use constituted self-medication and was also part of a survival strategy. In the fourth quarter of his sixth-grade school year, Dad took Mr. Martinez and his brother, Ramon, to live in Duncan, Arizona, away from family and friends. In addition, to punish Mr. Martinez Dad sold the pony he had given Mr. Martinez and to which Mr. Martinez was devotedly attached. He completed sixth grade in Duncan.

26.    Sometime after completing sixth grade, Dad moved them back to Indio intending to reconcile with Mom. In June of 1987, Mom filed for divorce and was granted an order of protection. Dad almost immediately sought a legal separation and custody of his children. Mom was in hiding at the time because of the violence Dad inflicted on her. Looking for direction, Dad attended a revival meeting, found God, and vowed to spend the rest of his life serving God. Thus began the makeover of the Martinez family: no drugs, no sinning, and no TV because of the secular influence. The family moved to the Miami-Globe area. This transformation left Mr. Martinez angry and confused

27.    Shortly after the move to the Miami-Globe area, a neighborhood friend, Jeremy, committed suicide by shooting himself in the head. Mr. Martinez and Jeremy had taken Jeremy's father's car without permission and Jeremy drove into a ditch. Jeremy was terrified of his father's response and took his life.

5

**Dr. Bayless failed to adequately consider Mr. Martinez's behavior during incarcerations as protective survival strategy.**

28.     Behaviors in which Mr. Martinez engaged while incarcerated as a juvenile and young adult were part of a protective survival strategy.

29.     In the fall of 1987, Mr. Martinez enrolled in seventh grade. Before long, he was found with marijuana on the playground. The marijuana was his father's, and he had seen his father possess and sell the drug from the family home. He was suspended and placed on probation for one year. In a Transfer Investigation and Recommendation document of August 1992, Gila County Deputy Probation Officer Francis Nabity noted that Mr. Martinez was placed on probation for a year when he was eleven. Officer Nabity said nothing about when he returned to school or whether he was successful in fulfilling the requirements of probation.

30.     Officer Nabity noted Mr. Martinez's placement on a second probation three years later. After six months, Mr. Martinez was committed to the Department of Youth Treatment and Rehabilitation. Before being committed, he received "some counseling" and the Court wanted to place him in a residential treatment facility. Mr. Martinez preferred to go to Catalina Mountain Juvenile Institution ("CMJI"). He remained there for two months, then was paroled. After about a month of parole, he absconded and committed new offenses. He was sent back to CMJI where he stayed for about ten months. While at CMJI, he assaulted three staff members and more than twelve juveniles. Officer Nabity recommended transfer for criminal prosecution of escape from the Gila County detention center.

31.     When Mr. Martinez went to CMJI, he was small for his age and it was the first time he was separated from his family. As taught by his family, he took pride in not showing any fear; he thought he had to act tough so no one would pick on him.

32.     From September of 1990 through May of 1991, Mr. Martinez was placed in Gila County Detention Home for a few days to about two weeks on ten occasions. His memory of this time was of being locked up and always in trouble. His parents were highly involved with the church and wanted "the system" to take responsibility for redirecting him.

33.     For someone as bright as Mr. Martinez, school should have been a refuge. His sixth-grade teacher recognized a spark in him and commented favorably on his report card, though his grades were poor. He was forced to repeat seventh grade—a humiliating experience that led him to give up on school. He continued to attend school and associated mainly with delinquents with whom he fit; he gained a reputation as a troublemaker.

34.     He dropped out of school before completing ninth grade. Apparently, there was no time in school when he was tested to determine why he failed to make reasonable progress in school, and the family was not investigated. Records reflect that Mr. Martinez's early adult offenses included: incorrigibility, possession of marijuana, forgery and possession of stolen property, and escape in the second degree; he was arrested once for fighting and charged with assault, but the charges were later dismissed; none of his delinquent acts were violent or sophisticated. Ms. Gordon, without explanation, looked at the same list of offenses and characterized his criminal history as representing a "menacing pattern of violence towards authority figures which dates back to age sixteen."

6

35.     Ms. Davis noted that neither detention nor the threat to remand him to adult court worked, so Gila County had him evaluated by Dr. MacDonald. About the same time, weekly counseling sessions were provided by Jon Grossman, M.S.W. These sessions were the first time someone considered the "seriously dysfunctional and turbulent relationship" he had with his family. In May of 1991, two weeks after the last recorded session with Grossman, Mr. Martinez was committed to juvenile detention at Catalina Mountain. Ms. Gordon seemed to consider the time Mr. Martinez spent in Catalina Mountain, when he was fifteen, as one of the "numerous attempts to rehabilitate him as a juvenile."

36.     During his interview with Ms. Davis, Mr. Martinez described his experience as a fifteen-year-old at Catalina Mountain as one in which the institution did not protect him and he had to fight daily to prove himself. He characterized it as a "gladiator school" for delinquents; he had numerous major disciplinary problems, a few resulting in criminal charges, most dismissed later. He associated with Hispanic gang members while incarcerated. Finally, he connected with his academic talent.  Within eight months, he earned a GED and some college credits. Family and former girlfriends noticed a change in him after parole: he was angrier and more distant.

37.     Mr. Martinez was paroled in July of 1992 and by January of 1993, he faced a two-year sentence in the "adult system." At seventeen, he entered the Rincon Minors Unit in Tucson. A five-year term of Intensive Probation followed the two years of incarceration.

38.     Ms. Gordon, the probation officer, noted his escape status in Gila County at the time of the current offense.

39.     Ms. Gordon reported that community supervision and incarceration failed to deter Mr. Martinez's behavior. She cited an incident during his incarceration for the current offense as an indication of his propensity for violence. My understanding is that two detention officers entered Mr. Martinez's cell at night, with no warning, as he lay sleeping. Startled, he attacked the officers with a small nail. Ms. Gordon did not indicate that she knew that, as children, Mr. Martinez and his sister Julia slept with weapons in their bed because they feared their father. Roberta Martinez, Mr. Martinez's mother, testified at sentencing that Mr. Martinez slept with a knife in his bed and Julia slept with a hammer for protection from their father.

**Dr. Bayless's diagnosis of ASPD failed to adequately account for the loving and respectful relationships Mr. Martinez had with others.**

40.     The record shows that Mr. Martinez loved children and respected women.  When Mr. Martinez was seventeen, he dated Christine Olivera, an older woman whose young son Mr. Martinez loved and cared for as though he were the child's father.

41.     Mr. Martinez babysat for a former girlfriend's sister, Patricia Campos.  Ms. Campos reported that kids loved him and were crazy about him.

42.     When the Mitigation Report was written, Mr. Martinez was in a relationship with YadhiraSalaiz, a woman who had a son from a previous relationship.  Mr. Martinez claimed the child as his own and was strongly bonded with him.

//

7

**Dr. Bayless failed to develop rapport with Mr. Martinez.**

43.     During Dr. Bayless's interview of Mr. Martinez, Mr. Martinez said, "You won't break me down." This statement reflects Dr. Bayless's failure to establish rapport with Mr. Martinez. Dr. Bayless did not mention this failure, and seemed to go out of his way to antagonize his subject. Dr. Bayless violated the instructions he was given to avoid questions about the crime. When Mr. Martinez objected orally, Dr. Bayless characterized his behavior as "very aggressive." Specifically, he said: "Even when I brought it (the crime) up, Mr. Martinez was very aggressive with me concerning the process of not talking about that, and there was no indication of anxiety or fear or stress or anything else associated with that." Dr. Bayless does not provide detail about the behaviors he described as "very aggressive." Given Mr. Martinez's suspicion of Dr. Bayless's intention to "break me down," it is reasonable to conclude that Mr. Martinez was stressed, if not fearful and anxious. It also seems reasonable to conclude that Mr. Martinez was acting to protect himself.

44.     In his testimony of July 30, 1998, Dr. Bayless said that sociopath and psychopath "are synonymous with antisocial personality." Although DSM-IV and DSM-V refer to sociopathy and psychopathy, the term psychopath is not used in these manuals. Psychopath is a prejudicial label because of the way it has been defined in popular media. In the 1991, Academy Award-winning movie, *Silence of the Lambs,* Hannibal Lector is labeled a psychopath. He is a serial killer who eats his victims. A more recent example of a psychopath can be found in the NBC television serial drama, *Heroes.* In the first season, Gabriel Gray, aka Sylar, is the primary villain; in seasons two through four, he remains a threat to other characters. Sometimes, he is called a monster and at other times he is called a psychopath. He tortures his victims, and sometimes the script hints at the possibility that he might eat his victims. Although *Heroes* was canceled in 2010, *Heroes Reborn* will air in 2015. Monstrous, psychopathic characters continue to be popular when it comes to entertainment.

45.     In DSM-IV-TR and DSM-V reference is made to PTSD when differentiating a Personality Disorder from another mental disorder. On page 688 of DSM-IV-TR the following words appear:

> The clinician must be cautious in diagnosing Personality Disorders during an episode of a **Mood Disorder** or an **Anxiety Disorder** because these conditions may have cross-sectional symptom features that mimic personality traits and may make it more difficult to evaluate retrospectively the individual's long-term patterns of functioning. When personality changes emerge and persist after an individual has been exposed to extreme stress, a diagnosis of **Posttraumatic Stress Disorder** should be considered. . . .

The last sentence of the above quotation is identical in DSM-V, page 649.

46.     DSM-V introduces an Alternative Model for Personality Disorders, in a section labeled **Criteria E, F, and G: Alternative Explanations for Personality Pathology (Differential Diagnosis):**

> On some occasions, what appears to be a personality disorder may be better explained by another mental disorder, the effects of a substance or another medical condition, or a normal developmental stage (e.g., adolescence, late life) or the individual's sociocultural

8

environment. When another mental disorder is present, the diagnosis of a personality disorder is not made, if the manifestations of the personality disorder clearly are an expression of the other mental disorder. . . .(at p. 763)

This is a reminder that a diagnosis of Personality Disorder should be carefully considered, and should not be made if another mental disorder offers a better explanation. In Mr. Martinez's case PTSD offers a better explanation of his behavior than does ASPD.

47.    When I testified on July 22, 1998, I had no idea Dr. Bayless planned to forego writing a report.  Because it was standard practice to produce a report, I assumed he would do so, before he testified, on July 31, 1998. I did expect an ASPD diagnosis because of the crime, but did not know the methodology Dr. Bayless would use. No one asked me to refute a diagnosis of ASPD. Thus, I had no reason to address the cautionary statement about ruling out a "protective survival strategy," when diagnosing ASPD.  If I had been asked to rebut Dr. Bayless's testimony, I would have pointed out that he did not explain how he dismissed the notion that, in general, Mr. Martinez's behavior constituted an adaptation to a violent environment.


Signed this _26_ day of February, 2015, in the State of Arizona.


Susan Downs Parrish, Ph.D.

9

## DECLARATION OF SHALENE M. KIRKLEY, PH.D.

**I declare under penalty of perjury the following to be true and accurate to the best of my information and belief:**

1. I am a clinical psychologist, licensed to practice in Arizona.

2. In February 2009, I was working for Dr. M Brad Bayless when he interviewed and evaluated John Sansing. I was completing my post-doctorate residency at the time.

3. I was present during Dr. Bayless' clinical interview of John Sansing on Feb. 10, 2009, and during Dr. Bayless' deposition on Sept. 10, 2009.

4. I recall Dr. Bayless testifying at this deposition that Sansing had told us he raped the victim because her skirt flew up, exposing her vaginal area. I do not recall Sansing ever saying that the victim was wearing a skirt or a dress, or that it flew up, exposing her vaginal area.

5. When I heard Dr. Bayless make the statement about the skirt and the defense attorney mention on cross that the victim was wearing pants, I remember being surprised and embarrassed, because that was a big misstatement for my supvervisor to make.

6. No one from Sansing's defense team has interviewed me prior to now. If anyone had contacted me, I would have been willing to sign this declaration.

**I declare the foregoing to be true and accurate to the best of my information and belief. Signed this 17th day of November, 2011, at Phoenix, Arizona.**

Shalene M. Kirkley, PhD

FILED

2-27-15    5:00 PM

MICHAEL K. JEANES, Clerk

By _K. Schermerhorn_
K. Schermerhorn, Deputy.

1

**KENNETH S. COUNTRYMAN, P.C.**
Kenneth S. Countryman (#015682)

2

P.O. Box 11077
Tempe, AZ 85284

3

Phone: (602) 258-2928
Fax:    (602) 258-5070

4

kenneth@countrymanlaw.com
*Attorney for Defendant/Petitioner*

5

6

**IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**

7

**IN AND FOR THE COUNTY OF MARICOPA**

*Corrected and Adopted*

8

9

**STATE OF ARIZONA,**

Case No. CR-1993-008116

10

Plaintiff,

**PETITIONER'S AMENDED**

11

**PROPOSED FINDINGS OF FACT**
**AND CONCLUSION OF LAW**

V.

12

(Honorable Robert L. Gottsfield)

13

**DARREL P. PANDELI,**

**[DEATH PENALTY CASE]**

14

Defendant

15

16

    COMES NOW, Defendant, Darrel P. Pandeli, who, by and through

17

undersigned counsel, Kenneth S. Countryman, Esq., submits his Amended

18

19

Proposed Findings of Fact and Conclusion of Law.

20

    This Request is supported by the following Memorandum of Points and

21

authorities, and the court records and files, all incorporated herein by this

22

23

reference.

24

///

25

1

RESPECTFULLY SUBMITTED this 18th day of February 2015.

Kenneth S. Countryman
**Kenneth S. Countryman, Esq.**
Attorney for Defendant

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.  PETITIONER'S REQUESTED FINDINGS OF FACT.

1.   The hearing for the determination of effective assistance of counsel took place over the course of four days.

2.   The hearing took place on October 30th and 31st, 2014.   The hearing resumed on December 8, 2014 and concluded on December 9, 2014.

3.   Petitioner presented five witnesses during the course of the hearing. Petitioner presented three experts, Dr. Carlos Jones; Dr. Ricardo Weinstein and Attorney Michael Reeves.   Petitioner also presented trial attorneys Dawn Sinclair and Gary Shriver.

4.   The State presented no witnesses during the hearing.   They produced no expert witnesses and no attorneys, including attorneys who prosecuted and handled the original case.

5.   Dawn Sinclair and Gary Shriver were ineffective in their representation of Petitioner Pandeli during his aggravation and sentencing phase of the trial.

6.   Mr. Shriver, had done three or four capital cases prior to serving in Mr.

2

Pandeli's trial but operated his legal team as co-equals. Ms. Sinclair, had never tried a felony jury trial prior to this case. Ms. Sinclair had no experience in jury selection and had not received the proper training on picking capital juries.

7. The defense team failed to object to Dr. Keen testifying due to the fact that he was not the medical examiner, but was standing in for someone absent. The defense failed to object to Dr. Keen providing conclusions and opinions in regards to aggravators which were not his own.

8. The defense failed to provide an effective mitigation of the materials in this case.

   a. Neither counsel was qualified to interpret the mental health records in this case.

   b. Trial counsel had a mitigation specialist with no experience in criminal cases.

   c. The mitigation specialist was also not supervised by trial counsel. She was supervised by a non-attorney who overrode decisions of counsel.

   d. The mitigation specialist refused to do work assigned by trial counsel.

   e. The mitigation specialist did not review and interpret records to assist counsel.

3

f. As a result, trial counsel was unprepared to interview or cross-examine the State's expert, Dr. Brad Bayless.

9. During the course of trial, the State attacked the defense's mitigation presentation by arguing that the defense did not perform any tests on Petitioner's brain and using Dr. Bayless testimony.   Counsel was not prepared to present any rebuttal to these attacks.

10. Objective testing would have shown that Petitioner had frontal lobe impairment and it was causally connected to his childhood and development issues.

11. The experts retained did not present this information. There were neuropsychological and neurophysiological measures that explain behaviors that are casually related to behaviors that trial counsel neither understood nor presented to the jury because of the lack of mitigation specialist qualifications and their own inexperience in this area.

12. Trial counsel failed to present the causal relationship between brain impairment and the death penalty.  Trial counsel also failed to explain his conclusions.

4

13. The defense failed prepare to cross-examine Dr. Bayless or otherwise deal with the unsupportable conclusions that he made.  Dr. Bayless did not use any neuropsychological testing or imaging.  Dr. Bayless did not give any standardized testing or even a test for malingering.

14. Dr. Bayless is a state's witness who routinely testified for the state in death penalty cases.  In most cases, Dr. Bayless testifies that a defendant is psychotic and that there's no saving him.   Dr. Bayless frequently doesn't have any scientific basis for his opinion.  He used projective tests that are subjective and should not be used in a death penalty case. His testing was not appropriate and misleading.

15. Petitioner's counsel presented some information about frontal lobe dysfunction but failed to provide any information of its meaning. They also failed to rebut the State's attack through objective testing or a full understanding of brain functioning.  Petitioner's counsel also did not do any neurophysiological testing.

16. The brain can be looked at from four different perspectives.  One, is the psycho-social development history (developmental years).  Two, is the neuropsychological testing that allows us to relate brain function to the behavior of the individual.   Three, is the neurophysiological and

5

neurophysiology that is the science that studies the function of the brain (imaging).  Four, is the whole picture (ecological validation), which can tell you how this dysfunction manifests in real life.  Petitioner's counsel failed to present this whole picture in this case.

17. Petitioner's legal expert Michael Reeves provided numerous examples where trial counsel failed to meet the standard of care in a capital case:

a. Dawn Sinclair had no felony trial experience in picking a jury or handling witnesses and was not able to assist in several trial aspects of the case.

b. Gary Shriver did not comply with his duties as first chair to manage the day to day activities of the case.  He had no authority over the mitigation specialist who he admitted was not qualified.  He also did not manage Ms. Sinclair.

c. The attorneys did not appropriately have issues resolved by the court prior to jury selection, including whether the facts of Petitioner's prior murder was going to be admitted into the trial.

d. Counsel should have cross-examined Dr. Bayless or somehow dealt with the information and testimony he presented.  They did not counteract any information presented by Dr. Bayless.

6

e. Petitioner's counsel did not provide a competent nexus of the mitigation to the offense committed.

f. Petitioner's counsel failed to present numerous mitigating factors to the jury.

g. Petitioner's counsel was ineffective during jury selection due to inexperience, training and questioning.

18. Dr. Carlos Jones testified as an expert for Petitioner in this case. Dr. Jones testified:

a. Petitioner had a traumatic childhood with sexual abuse, instability, physical abuse, low intellectual functioning and family instability. He also had mental health issues and prior head trauma.

b. He testified that Petitioner is absolutely a product of his environment and upbringing and made him the person he was at the time of the offense. Petitioner doesn't grow out of his upbringing and psychological issues.

c. This is also impacted by sexual abuse, physical abuse, mental health issues and his intelligence limitations.

7

d. Dr. Jones testified that Dr. Bayless used two projective tests (TAT and Sentence Completion Test) that were inappropriate for use in a capital case.

e. Projective tests are subjective and do not have any protocol or guidelines.

f. Dr. Bayless misused the projective tests to measure Petitioner in a way the tests were not designed to measure.

g. Dr. Bayless' evaluation ~~was not only unprofessional but~~ unethical. In addition his methodology was inappropriate. *should not have been admitted or severely cross examined by Counsel-*

h. Dr. Bayless also made conclusions about Petitioner's expert, Dr. Mark Walter regarding frontal lobe disorder. Those conclusions were also inappropriate and unchallenged by Petitioner's counsel.

i. There is no science or research to support the conclusions Dr. Bayless made and his testimony misled the jury.

j. Dr. Bayless also made *an* inappropriate diagnosis of Petitioner with antisocial personality disorder. This also misled the jury because he described a different disorder. Dr. Jones classified this testimony as "extremely misleading."

~~k. Dr. Bayless also misled the jury regarding Petitioner's medications.~~

8

19. The State did not oppose Petitioner's experts or present any qualified person to counter the conclusions presented.

20. Gary Shriver testified that Barb Bumpus was the mitigation specialist and had never done mitigation on a capital case prior to Pandeli. She was not qualified to work on this case and he should have objected to her appointment. He testified that he and Sinclair were co-equals.

21. Shriver testified that the decision not to cross-examine Dr. Bayless was a spur of the moment decision and they did not do anything to counteract his testimony and they should have done so. He described the decision as "wrongheadedness."

22. Dawn Sinclair testified on December 9, 2014. She testified that:

    a. She had no training for jury selection prior to the Pandeli case. She did not have the skill to pick a capital jury in the Pandeli case.

    b. Mitigation specialist Barb Bumpus did not have the experience in mitigation for this case and did not understand what the job entailed.

    c. Barb Bumpus could not help the team guide the attorneys in mitigation on the case. She did not understand mitigation or how to do it.

    d. The attorneys got no assistance on Dr. Bayless' report. The attorneys did not know what to ask.

9

e. The attorneys did not get any assistance in obtaining the correct experts in this case.

f. Ms. Bumpus was asked to assist in a case map program and refused calling it "case crap."

g. Ms. Bumpus was eventually terminated or resigned in lieu of termination.

h. The Office of Legal Defender limited the attorney's ability to perform mitigation in the case and they had no supervisory authority over mitigation personnel.

i. This affected the preparation of the case and the preparation of Dr. Bayless cross-examination.

j. They were not fully prepared to deal with Dr. Bayless.

k. She is now fully aware that a lot of Dr. Bayless' testimony was misleading but was unprepared to deal with it at the time of trial.

l. They were not fully up to speed on the projective tests and how they applied to Dr. Bayless' conclusions.

m. She had never done a trial, not even a misdemeanor.

n. She was not qualified to perform jury selection.

10

o. They did not handle the court's failure to rule on pre-trial rulings prior to trial.

23. The defense waived cross-examination of Dr. Bayless because it wasn't something that they planned on doing. The defense described the sentencing segment of the trial as something they doing on the fly. It made a last second decision at trial to waive cross-examination. The defense concluded that his testimony was not "as bad as it usually is" and decided to not cross exam. However, they did not deal with the information presented by Dr. Bayless and both attorneys agreed that the decision was not strategic and a failure of counsel to adequately defend Petitioner.

24. The decision to not cross examine Dr. Bayless cannot be rationally classified as a reasonable tactical decision because he used projective tests which is subject to the interpretation of the test giver without a scientific basis.

25. Dr. Bayless testified that Mr. Pandeli was malingering in the absence of any testing for malingering. Dr. Bayless told the jury in layman's terms that Mr. Pandeli was faking his responses. However, Dr. Bayless used parts of some tests administered by other doctors, but the interpretation of those results were twofold, either, he could have been faking or the severity of his mental

11

illness was such that he wasn't faking and he was simply expressing a closely held personal opinion based on his mental illness.  The defense failed to cross-examine Dr. Bayless on this issue.   In contract, the state heavily cross- examined the defense expert witnesses attacking their conclusion.

26.  The defense permitted Dr. Bayless to interview the Mr. Pandeli without requesting to be present or at least filing a motion seeking to limit the scope of the questions that Dr. Bayless was allowed to ask.  This permitted Dr. Bayless to go into the facts of the case and receive confessions from Mr. Pandeli, regarding his guilt which was presented to the jury and used against Mr. Pandeli.

27.  The defense failed to file a Motion to Strike part of the report and preclude him from testifying into those areas where he violated the defendant's 5th Amendment Rights.

28.  The Defense failed to question Dr. Bayless regarding the reports the defense that were provided.   This allowed Dr. Bayless to undermine and attack the other experts and their findings in this case without challenge. This includes the conclusion given by Dr. Cunningham and Dr. Walters.

12

29. The defense failed to cross-examine Dr. Bayless regarding his testimony that the Shipley Institute of Living Scale was an IQ test; even though it is a projective test.

30. The defense allowed Dr. Bayless to classify the test that he did as normative *a* valid test, even though they were projected tests.

31. The defense permitted Dr. Bayless to use definitions in the DSM that were inapplicable to the testing they gave.

32. Dr. Walters diagnosed Mr. Pandeli with frontal lobe impairment.

33. The defense failed to cross-examine Dr. Bayless' testimony that Darrell Pandeli had minimal cerebral dysfunction and his testimony about the frontal lobes. They failed to cross-examine Dr. Bayless' testimony minimizing the extent of the Darrell Pandeli's frontage lobe dysfunction and brain dysfunction in his testimony. This was critical because Dr. Bayless did not perform any tests that were aimed at making a determination, whether or not there was any frontal lobe damage. The defense failed to object to Dr. Bayless giving opinions about the doctor who did that test.

34. Dr. Bayless testified without cross-examination about where morality comes from; discounting the scientific or actual neurological examinations of Mr. Pandeli, by saying basically hyperactive kids can ~~reuse~~ *operate* just like

13

anybody else and can do things just like anybody else; without having tested or having done any testing.

35. The defense failed to have psychological or neuropsychological evaluation done. The defense lawyers failed to use their experts properly to help them prepare for cross-examination of Dr. Bayless.

36. The defense permitted Dr. Bayless using a MMPI of Dr. Stonefeld earlier in the case that was actually done wrong. The test hadn't been scored and then it was later scored and found to have been administered improperly. Despite this, Dr. Bayless was permitted to use the test to show that Mr. Pandeli was malingering. Although the defense knew, before Dr. Bayless took the stand that the MMPI had been scored improperly, they failed to cross-examination him on it.

37. It was inappropriate for Dr. Bayless to use projective tests to make some of the conclusions that he made, regarding Mr. Pandeli. Dr. Bayles offered conclusion regarding Mr. Pandeli his self-destructive behavior and some other things without doing any normative testing. Thus, the Dr. Bayless conclusion lacked a scientific basis and were not the opinion of a scientist.

38. The defense failed to hire a psychologist or neuropsychologist to explore the various different aspects of how Mr. Pandeli's childhood was destructive

14

of his entire personality.  Mr. Pandeli was physically, sexually abused from a very early age.  The sexual abuse started as a very young child and that sexualization continued right up through adulthood.   Mr. Pandeli *was* sexually abused by adults and then he continued with very hypersexual behavior.

39.   The defense failed to develop a nexus between the psychologist's reports and Mr. Pandeli's crimes.  Moreover, by not cross- examining Dr. Bayless, he was permitted *to* negate any attempt to establish a bridge.

40.   The defense failed to present individual mitigating factors for Mr. Pandeli. Instead they submitted general categories of mitigators to the jury.   Thus, Mr. Pandeli was denied the opportunity for a juror to show leniency for any reason found to be sufficiently substantial to call for mitigation.  This failure to list them individually deprived Mr. Pandeli of the opportunity for a jury to consider them and vote for life.

41.   There were approximately 83 mitigating factors that were delineated in the petition that were not listed. The listing of mitigators individually should have been done.  Instead the defense listed five overly broad categories of mitigators.  For instance, the defense listed a category for physical abuse but did not list the individual incidents of physical abuse.

15

42. In Mr. Pandeli's case there was 21 or 22 different abusers. The defense should have submitted each mitigating factors to the jury for individual consideration. The abusers didn't include his mother, who was the enabler for the vast majority of the sexual abuse. She failed to seek proper attention for Mr. Pandeli who was a much damaged child. Psychologists told Mr. Pandeli's Mother that he needed to be on Ritalin from the time he started school, but she always refused to put him on it.

43. The defense was also inept in jury selection. The defense did not voir dire the jury to ask about the prejudices and to ask specific questions, such as would you automatically give the death penalty to somebody, who has been convicted of a murder, such as in this case of a sexually charged murder?

44. There were two phases of the trial, the aggravation phase and the penalty phase. During the aggravation phase, the defense failed to object to hearsay. It failed to challenge evidence of child molestation presented by the State. The defense failed to cross-examine a former friend of Mr. Pandeli's who testified that Mr. Pandeli had molested her daughter.

45. The defense also failed to cross-examine Chris Pandeli, the defendant's half-brother to bring out his biases. Chris Pandeli and the defendant share

16

a mutual father.   Chris Pandeli had some bias against Mr. Pandeli, regarding his issues with his father. Chris Pandeli testified that he basically wanted his brother, Mr. Pandeli, to get death.  The failure to cross-examine Chris Pandeli was extremely prejudicial.

46.  The defense failed to challenge the aggravators offered by the state.  This includes aggravators in regards to infliction of gratuitous violence, senselessness of the crime and the helplessness of the victim.

## II.   PETITIONER'S REQUESTED CONCLUSIONS OF LAW.

47.  The United States Supreme Court has identified the modern concept that "the punishment should fit the offender and not merely the crime." *Williams v. New York*, 337 U.S. 241, 247 (1949); see *United States v. Grayson*, 438 U.S. 41, 45–50, (1978). That Court has long recognized that the "fundamental sentencing principle" that the "'[sentencer] may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information [they] may consider, or the source from which it may come.'" United States v. Tucker, 404 U.S. 443, 446 (1972); see also *Pennsylvania v. Ashe*, 302 U.S. 51, 55 (1937). The Court in Tucker held that "misinformation of constitutional magnitude" requires a resentencing.

17

United States v. Tucker, at 447; *Townsend v. Burke*, 334 U.S. 736, 740–741 (1948). The Court did not define the term "constitutional magnitude."

48.  In *State v. Grier, 146 Ariz.* 511, 516 (1985), the Arizona Supreme Court explained its view of a due process violation under Tucker: Convicted defendants have a due process right to a fair sentencing procedure which includes the right to be sentenced on the basis of accurate information.

49.  "To perform effectively in the penalty phase of a capital case, counsel must conduct sufficient investigation and engage in sufficient preparation to be able to present and explain the significance of all the available mitigating evidence." *Correll v. Ryan*, 539 F.3d 938, 942 (9th Cir.2008) (internal quotation marks and alterations omitted) citing *Williams v. Taylor*, 529 U.S. 362, 396, (2000).   Counsel has "an obligation to present and explain to the jury all available mitigating evidence." *Hamilton v. Ayers*, 583 F.3d 1100, 1113 (9th Cir., 2009).

50.  Petitioner's representation ~~defense~~ fell "below an objective standard of reasonableness" in light of "prevailing professional norms." See *Strickland v. Washington*, 466 U.S. 668, 686, 688 (1984).  "The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Id.* at 688.   "In certain Sixth Amendment contexts,

18

prejudice is presumed." *Id.* at 692.   Thus, expert testimony is relevant on the issue of the professional norms prevailing when the representation took place.

51. The Court finds that not only did Petitioner's counsel fail to conduct sufficient investigation to present and explain the significant of all mitigating factors; they failed to prepare to cross-examine the state's expert in regards to his dubious conclusion or alternatively explain his misleading testimony.

52. Petitioner's counsel also had "a duty to conduct 'a thorough investigation of the defendant's background." *Williams v. Taylor*, 529 U.S. at 396. "It is imperative that all relevant mitigating information be unearthed for consideration at the capital sentencing phase." *Caro v. Calderon* ("Caro I"), 165 F.3d 1223, 1227 (9th Cir.1999).   "To that end, trial counsel must inquire into a defendant's social background, family abuse, mental impairment, physical health history, and substance abuse history; obtain and examine mental and physical health records, school records, and criminal records; consult with appropriate medical experts; and pursue relevant leads." *Hamilton v Ayers*, 583 F.3d 1100, 1113 (9th Cir. 2009) (internal citations omitted).

19

53. The Court finds that Petitioner's counsel did an insufficient investigation into Petitioner's background, to understand how it related to the offense. Petitioner's counsel did not have a qualified mitigation specialist and was not qualified to interpret the information themselves. The lack of understanding led to the lack of presentation of Nexus testimony and allowed misleading testimony to be to be presented by the state through Dr. Bayless.

54. The Court finds that Petitioner's counsel's actions were not the product of strategic choices. The strategic choices were not reasonable because they were not made after thorough investigation of law and facts relevant to plausible options and strategic choices made after less than complete investigation were not reasonable to the extent that reasonable professional judgments support the limitations on investigation. See *Strickland v. Washington*, 466 U.S. 668, 690–91 (1984).

55. The Court finds that deficits in the Petitioner's defense cited herein were not strategic decisions, but were the result of inexperience counsel and unprofessional judgment. Petitioner's counsel lacked the fundamental requisite understanding of the requirements for conducting a capital defense.

20

56. The Court finds that the decisions made by Petitioner's counsel not to cross-examine witnesses and not to present mitigation to the jury resulted simply from lack of understanding that the testimony being presented was misleading and false. It was also not planned.

57. The Court further finds that Petitioner's counsel conducted an insufficient mitigation investigation that fell short of prevailing professional norms. The Court further finds that failure to connect the mitigation to Pandeli'z circumstances is not reasonable.

58. The Court finds that the Petitioner has established prejudice, by demonstrating that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.

59. The Court finds that comparing the totality of the evidence that actually was presented to the jury with the totality of the evidence that might have been presented had counsel acted differently, makes it highly probable that the outcome of the proceedings might have been different.

60. The Court finds that Petitioner's attorneys failed to prepare and present the necessary information for trying a complex death penalty case such the instant one.   They failed to prepare witnesses, failed to list mitigators

21

1   property, failed to object to improper evidence, failed to prepare and cross-

2   examine expert's witness, failed to properly voir dire prospective jurors.

3
4   61.   The Court finds that the actions of Petitioner's attorneys constitute a breach

5   of professional standards for handling a death penalty case, rather than trial

6   strategy.  Thus, the Court finds that Petitioner was denied due process.

7
8   **III.   ORDERS REQUESTED**

9   62.   That this Honorable Court set aside the sentence of death and order a new

10   trial on the penalty and sentencing phase for the Petitioner.

11
12   RESPECTFULLY SUBMITTED this 18th day of February 2015.

13
14   Kenneth S. Countryman
    **Kenneth S. Countryman, Esq.**

15
16   2/27/15

17
18   **CERTIFICATE OF SERVICE**

19   I hereby certify that on February 18, 2015, I filed the Petitioner's Amended
20   Proposed Findings of Fact and Conclusion of Law with the Clerk of the Court for
    the Maricopa County Superior Court.
21
22   A courtesy copy of the foregoing is being delivered through electronic
    means or deposited for mailing to:
23
24   **Hon. Robert Gottsfield**
    Maricopa County Superior Court
25   201 West Jefferson

22

1  Phoenix, Arizona 85003–2243

2  **Nicholas Klingerman**

3  Assistant Attorney General
   Capital Litigation Section
4  400 West Congress, Bldg. S-315
5  Tucson, Arizona 85701-1367
   Telephone: (520) 628-6520
6  cadocket@azag.gov
7  (State Bar Number 028231)

8  **Jason B. Easterday**

9  Assistant Attorney General
   Capital Litigation Section
10  1275 W. Washington
11  Phoenix, Arizona 85007-2997
   Telephone: (602) 542-4686
12  cadocket@azag.gov
13  (State Bar Number 023191)

14

15                                        By:   /s/ Kenneth S. Countryman

16

17

18

19

20

21

22

23

24

25

23