# EXHIBIT 27

*Andriano v. Ryan*, Case No. CV-16-01159-PHX-SRB
Motion for Evidentiary Development

## DECLARATION OF MARLENE WINELL

I, Marlene Winell, declare under penalty of perjury, the following to be true to the best of my information and belief:

## I. PROFESSIONAL BACKGROUND

1.   I am a licensed psychologist. I received my Bachelor of Arts and Master of Arts in Social Ecology at the University of California, Irvine in 1975 and 1977 respectively. I received my Ph.D. in Human Development and Family Studies from The Pennsylvania State University in 1983.  I received my psychology license in 1987 and have been in private practice for 30 years, in the United States and Australia. My academic teaching has been at Penn State, Colorado State University, and University of California, Santa Cruz.  I have published extensively on the subject of religious trauma, including my book, *Leaving the Fold: A Guide for Former Fundamentalists and Others Leaving Their Religion.* My resume is included as Attachment A.

## II. REASON FOR REFERRAL

2.   I have been asked by counsel for Wendi Andriano to examine the degree to which religious trauma affected Wendi's mental state and behavior leading up to and at the time of the crime for which she is currently incarcerated. I have reviewed the materials outlined in Attachment B. I also conducted unstructured interviews of Wendi and her mother, Donna Ochoa, on May 22, 2017 and May 23, 2017, respectively.

3.   It is my professional opinion that Wendi Andriano suffered from Religious Trauma Syndrome as a result of her intensely religious upbringing and the resultant mental, emotional, and physical harm she endured. The impact of Religious Trauma Syndrome can be seen in her behavior leading up to the time of the crime for which she is currently incarcerated.

## III. LITERATURE ON IMPACT OF EXTREME RELIGIONS

4.   The potentially harmful impacts of extreme religious practice have been discussed for decades. In 1980, the renowned psychologist Albert Ellis declared that religion was a neurosis. He concluded that there exists an irrefutable causal relationship between religion and mental illness. He described the all-consuming nature religion can take: "In a sense, the religious person must have no real views of his own; and it is presumptuous of him, in fact, to have any. In regard to sex-love affairs, to marriage and family relations, to business, to politics, and to virtually everything else that is important in his life, he must try to discover what his god and his clergy would like him to do; and he must primarily do their bidding." (Ellis, 1980.) More and more mental health professionals have realized that religious harm can occur, especially with certain doctrines or practices. A list of references is included as Attachment C.

5.   The religions that cause harm to their followers carry the hallmarks of authoritarianism, causing members to give up their power. (Kramer and Alstad, 1993.) The result can be cult-like features. One such feature is mind control, or total control over all aspects of a

member's life. This takes the form of, for example, discouraging communications with those outside of the group and discrediting the outside world, measuring thoughts and behaviors against an ideological ideal, requiring confession rituals that elicit moral emotions like shame and guilt and create a heightened sense that someone is always watching, and placing doctrine over person by making members see their personal histories through the lens of ideology and convincing them they were bad prior to joining the group. (Lifton, 1989; Cohen 1986.) As explained by Valerie Tarico, a psychologist, each of these psychological mechanisms can be applied for either secular or religious purposes. (Winell and Tarico, 2014) When coupled with a charismatic authority figure, the legitimizing stamp of an ancient text, and socially sanctioned religious structure, their power cannot be overstated.

6.      These authoritarian religious sects teach certain doctrines that are especially toxic. First, they teach the theory of original sin, which presents children as inherently sinful and in need of a "firm hand" in order to be "brought up right." (Heimlich, 2011.) This doctrine creates a degraded sense of self, and a prohibition on feelings is a common feature. Psychology professor and attorney Edmund Cohen explains in his book *Mind of the Bible Believer* (1986), that once the believer is "hooked," the believer is brain-washed through the process of dissociation. A chief strategy is to make believers live in a constant state of fear of what is germane to their character. Feelings are wrong, except for guilt, which is useful for mind control. As Cohen puts it, "The inevitable guilt makes it impossible . . . to mobilize a healthy human response to such inhuman indoctrination." The normal emotion of anger is categorized as one of the seven deadly sins. But, as Wendell Watters, a psychiatrist and professor explained in 1992, unresolved anger creates anxiety, and at times the breakthrough of anger may take the form of a violent, antisocial act. Watters also discusses the attack on the self and self-esteem attendant with some theologies. Watters points out that psychologists and psychiatrists agree that self-esteem is one cornerstone of mental health: "People who are considered mentally sound generally have a high level of self-esteem; they feel reasonably competent and secure as people; they generally like themselves and feel capable of being liked and loved by others. People with high self-esteem are able to be appropriately assertive in trying to have their needs met in a non-manipulative, non-destructive way." Yet, he emphasizes that according to some religious teachings, the self is to be abased, not esteemed. (Watters, 1992.)

7.      Next, these groups rely on the concept of "hellfire" to create constant fear. As Cohen explains, "The bottom line in Christian brain-washing is, of course, fear. This fear is grounded in the punishment awaiting Christians who fail to subjugate their human intelligence and will to the (Christian authorities)." (Cohen, 1986.) In other words, believers are taught to be terrified of hell. As Richard Dawkins puts it, "if your whole upbringing, and everything you have ever been told by parents, teachers and priests, has led you to believe, really believe, utterly and completely, that sinners burn in hell (or some other obnoxious article of doctrine such as that a woman is the property of her husband), it is entirely plausible that words could have a more long-lasting and damaging effect than deeds. I am persuaded that the phrase 'child abuse' is no exaggeration when used to describe what teachers and priests are doing to children whom they encourage to believe in something like the punishment of unshriven mortal sins in an eternal hell." (Dawkins, 2006.)

8.      Third, these groups are highly patriarchal, and men hold considerably more power than women and even teach that women are the property of men. (Heimlich 2011; Tarico, 2006; Gaylor, 2004.) This results in, for example, mothers not being able to protect their children from men because they are to be silent and to submit to the men of the group. Sexual abuse and child molestation are also common. Tarico describes problematic theology and church practice in *The Dark Side: How Evangelical Teachings Corrupt Love and Truth* (2006). She explains the history of the subjugation of women in the Bible that has continuing repercussions. Watters, in discussing child molestation, explains that the "perpetrators tend to have a very fixed traditional attitude concerning how males should behave, especially toward women, attitudes often shared by the wife as well. In fact, many of them appear straight out of the Bible with their proprietary notions about their womenfolk. Many researchers report that the victimizer often comes from a very religious family, with marked preoccupation with God, sin, and punishment. . . Some studies report these men to be "hypersexual," intensely preoccupied with sex." (Watters, 1992; *see also* Meiselman, 1978.)

9.      Finally, these religious sects preach strict child-rearing, including corporal punishment. In Alice Miller's 2002 research on the serious long-term consequences of corporal punishment, a direct connection is made to parental authoritarianism in relation to the Fourth Commandment, "Honor thy father and mother." (Miller, 2002.) According to research on trauma, the most damaging traumas are those that are human-caused and involve interpersonal violence and violation, like corporal punishment. (Janoff-Bulman, 1992.) There is a belief in these groups that it is necessary to "break the wills" of children so that they will learn to submit to god, which can take the form of corporal punishment or emotional abuse such as spurning, isolating, and withholding love from the children. (Heimlich, 2011.)

## IV. RELIGIOUS TRAUMA SYNDROME

10.     I have been studying groups that share the characteristics outlined above since 1990 and have written a book and numerous articles on the subject. In the course of that work, I saw a recognizable set of symptoms experienced as a result of prolonged exposure to a toxic religious environment and/or the trauma of leaving the religion. I therefore developed the term Religious Trauma Syndrome (RTS) to describe the psychological injury suffered by these individuals. I published this work in a series of articles that appeared in *Cognitive Behavioural Therapy Today*. (Winell, 2011.) RTS is akin to Complex PTSD, which is a term used to describe individuals who have been exposed to extended periods of protracted and extreme trauma and who suffer from a host of interpersonal and emotional problems. RTS is, however, unique. With RTS, there is a specific understanding of etiology—harmful religion. In addition, there is a dual nature to the condition, that is, the trauma from exposure to the religion and the acute trauma of leaving.

11.     RTS is the result of a religion with several features similar to those outlined in the literature surveyed above. Such a fundamentalist religion has a closed system of logic and a strong social structure to support an authoritarian worldview. It can be a comfortable environment as long as a member does not question the structure. There are different churches in this category with beliefs and practices that vary, but core doctrines are consistent. All of the

major authoritarian religions have enormous psychological control because they are based on fear, which is the most primitive and powerful human emotion. Secondly, they emphasize shame; humans are bad and need redemption. So the basic meme complex passed on to each generation of children is that you need religion in order to survive and in order to be acceptable. Key doctrines include:

a. **Eternal punishment or eternal damnation (or annihilation) for all unbelievers.** The salvation formula is offered as a solution, but for many, it is not enough to ward off anxiety. Many adults remember trying to get "saved" multiple times, even hundreds of times, because of unrelenting fear.

b. **"Left behind" terror.** Another horrible fear is about missing "The Rapture" when Jesus returns. Many people recount memories of searching for parents and going into sheer panic about being left alone in an evil world. Given that abandonment is a primary human fear, this experience can be unforgettably terrifying. Some report this as a recurring trauma every time they could not find a parent right away.

c. **Surrounded by threat.** Believers simply cannot feel safe in the world if they take to heart the teaching about evil everywhere. In the fundamentalist worldview, "The World" is a fallen place, and a battleground for spiritual warfare. Children are taught to be very afraid of anything that is not Christian. Much of the outside world is condemned at church, and parents try to control secular influences through private or home schooling. Children grow up terrified of everything outside the religious subculture, most of which is simply unfamiliar.

d. **Self as bad.** Second to the doctrine of hell, the other most toxic teaching in fundamentalist churches is that of "original sin." Human depravity is a constant theme of fundamentalist theology, and children (and adults) internalize feelings of being evil and inadequate. One former believer called it "bait-and-switch theology — telling me I was saved only to insist that I was barely worth saving." To think you are good or wise or strong or loving or capable on your own is considered pride and the worst sin of all in this religious worldview. You are expected to derive those qualities from God, who is perfect. Anything good you do is credited to God, and anything bad is your fault. These religions promise to solve all kinds of personal problems, and when they do not, it is the individual that bears the paralyzing guilt of not measuring up.

e. **Cycle of abuse.** A believer can never be good enough and goes through a cycle of sin, guilt, and salvation similar to the cycle of abuse in domestic violence. When they say they have a "personal relationship" with God, they are referring to one of total dominance and submission, and they are convinced that they should be grateful for this kind of "love." Like an authoritarian husband, this deity is an all-powerful, ruling male whose word is law. The sincere follower "repents" and "rededicates," which produces a temporary reprieve of anxiety and perhaps a period of positive affect. This intermittent reinforcement is enough to keep the cycle of abuse in place. Like a devoted wife, the most sincere believers get damaged the most.

f. **Don't think, don't feel.** Fundamentalist theology is also damaging to intellectual development in that it explicitly warns against trusting one's own mind while requiring belief in far-fetched claims. Believers are not allowed to question dogma without endangering themselves. Critical thinking skills are undervalued. Emotions and intuitions are also considered suspect, so children learn not to trust their own feelings. With external authority the only permissible guide, they grow up losing touch with inner instincts necessary for decision making and moral development.

12. Added to these toxic aspects of theology are practices in the church and religious families that are damaging. Physical, sexual, and emotional harm is inflicted in families and churches because authoritarianism goes unchecked. Too many secrets are kept. Sexual repression in the religion also contributes to child abuse. The sanctioned patriarchal power structure allows abusive practices towards women and children. Normal childhood development is suppressed, and cognitive, social, emotional, and moral stages are arrested. Because information is limited and controlled, dysfunctional beliefs are taught, and independent thinking and feelings are condemned, a child's ability to think and feel healthily and independently are damaged and the self is not to be trusted. So while the religious community can appear to offer a safe environment, the pressures to conform, adhere to impossible requirements, and submit to abuses of power can cause great suffering, which is often hidden and thus more miserable.

13. Those who suffer from RTS exhibit cognitive, emotional, social, and cultural symptoms:

   a. **Cognitive:** Confusion, poor critical thinking ability, negative beliefs about self-ability & self-worth, black & white thinking, perfectionism, difficulty with decision-making.
   b. **Emotional:** Depression, anxiety, anger, guilt, grief, loneliness, difficulty with pleasure, loss of meaning.
   c. **Social:** Loss of social network, family rupture, social awkwardness, sexual difficulty, behind schedule on developmental tasks.
   d. **Cultural:** Unfamiliarity with secular world; "fish out of water" feelings, difficulty belonging, information gaps (e.g. evolution, modern art, music).

## V. WENDI'S LIFE AND RELIGIOUS TRAUMA

14. Wendi Andriano lived a childhood characterized by substantial neglect and emotional, physical, and sexual abuse. This has been the conclusion of other examiners, such as James Hopper and Sharon Murphy. After reviewing records and interviewing Wendi and her mother, I conclude that religious abuse must be added to this list. The other forms of abuse Wendi suffered were in fact directly related to her religious abuse. An overview of Wendi's life helps to understand the religious abuse and resultant trauma she suffered.

### A.    Early Childhood and the Fishers of Men

15. In 1970, Wendi was born to Donna Ochoa, a Bible-believing, conservative Christian. They moved from Groom, Texas to Phoenix, Arizona after one month. Wendi's father left the family. In 1974, Donna and Wendi moved to Casa Grande where Donna met Alejo Ochoa,

Wendi's step-father. They moved in together and then married in 1975. Wendi was four-and-a-half years old. Alejo became very active in church, and started acting out his biblical role as head of the house. Wendi went to public school for kindergarten and first grade. The family went to a Baptist church and then a Pentecostal one. For a while, they only had "home church," which is a church service held at home.

16.     Wendi became a believer at a young age. She was baptized at age 4. At age 5 or 6, Wendi "got filled with the Holy Ghost" and spoke in tongues with her parents at prayer meetings. The family didn't believe in doctors but expected healing from God. One time, at age 5, Wendi became very ill and had a high fever. At Wendi's insistence, her parents did not take her to a doctor.

17.     The family met and took up with Rick Miller and Al Farmer, two charismatic street preachers. They all went to Tucson, where they lived with three other families in one house. During the next few years Wendi was home-schooled using old school textbooks. The group did not go to church but had home church, where the men did the teaching. Wendi had no one to play with.

18.     On one occasion, they had a bonfire where they burned all their possessions that were deemed sinful, including books, photos because they were idolatry, record albums, school yearbooks, and clothing if it reminded them of someone they should not associate with. As an act of faith, Donna threw her glasses into the fire, believing God would heal her eyesight. There was no change.

19.     In 1978, the whole group, called Fishers of Men, traveled with their street ministry first to Walnut Creek, CA, for one year. They then went to Orange County and San Diego, and back to Orange County. They traveled in a caravan of vehicles, living an impoverished lifestyle. Fishers of Men was a strict, conservative, evangelical group.

20.     Everyone in the group did "witnessing" on the street, including Wendi, who was 7 and 8. She said,[1] "I did it with them, telling people they needed Jesus to be saved." It was "normal" and not scary. On the street they emphasized salvation. They handed out tracts and told people they were sinners and would go to hell if they didn't know Jesus. The group was very "letter of the law." They believed that even if you were already a believer and did bad behavior, you would go to hell. Donna reported, "You have to do the right thing, which puts a lot of guilt in you. If something bad happens, it was because you let the devil in." Wendi was convinced people would go to hell. Donna thought when she had a tumor and had to get a hysterectomy, it was because she did something bad.

21.     Life with the Fishers of Men was taxing. At 5 in the morning, Miller and Farmer went around to the vehicles people slept in, singing, "Rise and shine and give God the glory" to wake everybody up. The group members also were sent to bed late at night, so had little sleep.

---

[1] Unless otherwise noted, all quotes from Wendi Andriano and Donna Ochoa are from my interviews with them.

22. The men in the group dominated, doing all the preaching, handling all the money, and making all the decisions. For example, the women could not even go to the laundromat without a man. Wendi was disciplined with spanking, including some hard spanking by Miller. This was also considered normal. Miller also touched Wendi inappropriately while teaching her to play the guitar and exposed himself to her.

23. The strict rules, constant poverty, and Donna's inability to buy Wendi shoes caused Donna to doubt their role with the Fishers of Men, as she testified in 2014. In 1980, after three years, Donna, Alejo, and Wendi sought guidance from God and then left the group and went back to Casa Grande, Arizona. Donna testified in 2014 that despite their misgivings about the group, Alejo made them wait to leave the Fishers of Men until God told them they could do so. Wendi was 10 at the time they left the group.

24. Fishers of Men and Wendi's early experiences with religion contained several of the authoritarian aspects discussed above. For example, the group was run by charismatic leaders who required that the group be all-consuming. The Ochoas lived and traveled with the group and had to relinquish control—even over parenting—to the leaders. The Fishers of Men was very patriarchal, and Wendi experienced sexual abuse. She was taught about hell and made to proselytize, reinforcing the idea that outsiders of the group would suffer eternal punishment. Donna now recognizes the cult-like features of the group.

## B.      91st Psalms/Harvest Family Church

25. After returning to Casa Grande, the Ochoas got involved with a church called 91st Psalm, which had a school of the same name. In Casa Grande, Wendi went door-to-door giving out tracts, asking people if they wanted to be saved, and inviting them to church. The Ochoas were at the church 6 to 7 days a week. Everything was structured around church; there was no other world. They were to put God first and spend many hours in prayer and memorizing Bible verses. The church and its school dominated Wendi's adolescence because it came to control all aspects of the Ochoa's lives. Wendi said, "Your whole life belonged to the church. You weren't allowed any independent thought outside the church." With this new religious group, Wendi again was exposed to an all-controlling religious group that shunned outsiders and was led by those who punished others for not living up to ideals they themselves did not achieve. Because Wendi attended church at 91st Psalms, later renamed Harvest Family Church, and went to school there, she could not escape the group's religious tenets.

### i. The Church

26. The church in Casa Grande was initially pastored by Cal Lorts, who Donna described as charismatic. Later, the church got a new pastor, Tom King, who was more severe in his teaching and less liked by Wendi's family. His style was more "brimstone and condemning." Donna called him controlling, judgmental, and a chauvinist.

#### a. Subservience

27. Tom King's control extended not only to his own family—he kept his wife under his thumb—but to the lives of his congregants. For example, the Ochoas had to get his approval

before buying a car. He also was heavily involved in family dynamics. Women were to be subservient to men, and all families were to be subservient to the pastor; the church and King taught that the husband was the head of the household, and the pastor was the head of all the families. According to Donna, a main tenet of their religion was that "the head of the household makes rules and it's our place to follow the rules." Donna was told she was a "doormat" to her husband. She couldn't make a decision on her own. She had to make sure it came from God through her husband. Donna was supposed to get permission from Alejo about how to spend money, as well as daily decisions about where to go, what to do, who to see, and who to talk to. This patriarchal structure where women are subservient to their husbands and the leader of the church is a common feature of authoritarian religions. Women surrendered control to the head of their household—the man—and the family surrendered control to the head of the church.

28. The church also taught the idea that because of human depravity, the self can't be trusted. Wendi said, "Religion teaches you you are basically a bad person that needs to be saved. Your mind was of the devil. You needed to renew your mind with scripture and become more like God, but our human flesh was of the devil, in constant warfare between flesh and God." This teaching, that humans are guilty of original sin and that the self is inherently bad, is another common feature of authoritarian religions.

29. As a result of these doctrines, Wendi was taught to not trust herself. She was raised to believe that her own instincts could not be trusted and that she could not make any decisions for herself. As explained by Wendi, "I learned that women should be subservient. It taught me not to think for myself. It taught me to be a people pleaser." She had to defer to the men in her life—either her father or the pastor—and therefore lacked self-esteem. These feelings are a hallmark of RTS.

### b. Treatment of Children

30. The church also exhibited many of the attitudes toward child rearing that are common in fundamentalist groups that lead to RTS in their members. According to Donna, "Children had to be perfect whether they were Tom's kids or our kids. I put lots of pressure on Wendi from the time she was little, to do everything perfect. . . If she said something, I would say, 'Wendi stop saying that. God wouldn't want you to say that.'"

31. Children were also kept in line through physical abuse. According to "Pastor" Tom, in an audio-taped sermon for parents, children's misbehavior was "rebellion and defiance." A two-month-old who cries is demonstrating human "sin nature." He recommended spanking a baby with a spoon and pulling the diaper down to do so. He said crying is rebellion, and there is a need to break a child's spirit: "You have to spank hard enough so that they're not just angry; it has to go beyond that so you break them." He said it was acceptable to bruise a child's behind. He used a paddle with scripture written on it, called the "Rod of Correction," to beat children in the congregation. He warned that not spanking was allowing Satan to rule in the home: "Kids don't come to my house that I can't spank . . . Kids are not supposed to rule the home. They're to set there and obey. Train them to obey every command . . . If you aren't spanking your child, you're treating them like an illegitimate child." Pastor Tom encouraged the parents in the congregation to also

use a Rod of Correction and not be scared to use it. But, he said, because the husband is the high priest in the home, he should be spanking more than the wife. In addition to reflecting the patriarchal structure of this group, this directive shows that Pastor Tom ascribed to the belief that the wills of children had to be broken, even through physical force.

32.     Wendi therefore was spanked from the time she was a baby because of teachings like this, at home and at school. Her family had a paddle hanging on the wall, as well as a belt. Her parents always quoted scripture before a spanking, such as Proverbs 13:24, "Whoever spares the rod hates their children, but the one who loves their children is careful to discipline them."

### c. Isolation and Arrested Emotional Development

33.     The church also isolated its members from the outside world because if people were not believers, they were going to hell and might tempt a believer into sinning. As a child, Wendi was not allowed to play with anyone outside of church and church school. According to Donna, it was also hard to make friends in the church because "we were more strict and engaged Christians." As a result of this lack of socialization in youth, Wendi as an adult has difficulty socializing and feeling comfortable in groups. This technique of isolating group members reinforces the idea that anyone who does not strictly adhere to the church's teachings will be subject to eternal punishment, which can also lead to fear and anxiety about one's own status and being left behind in an evil world. Restricting interaction with the outside world teaches church members that the outside world is sinful and bad, meaning any desire to join or interact with the outside world is also sinful.

34.     The church further did not teach its members to be adept at discussing emotions. As Wendi described, "The church taught you live your life by faith, not by feelings. Feelings are not of God, feelings will steer you down the wrong path. You're not supposed to be mad ever; anger was of the devil. I never knew what you were supposed to do with your feelings, like don't allow yourself to be angry at all, that was something to ask forgiveness for. You can't be sad about something because that's not trusting God to make it right. Happiness has to be tied back to God. So I didn't know what to do with feelings in living a life of faith. They never explain to you what you do with your feelings. So you just push them down because that's what you've been doing year after year after year." Donna also explained that "Everything was wrapped around good or bad, and if it was bad it was sin and if it was good, you're doing what God's telling you to do. Black or white, not a lot of grey." By not teaching members to discuss or trust their own emotions, the church was able to control its members. The church told its members what God expected of them, and members were trained to follow this message blindly without giving credence to their own feelings. This is a classic form of control and use of the concept that emotions are sinful and that the self must be subjugated to the will of the group.

## ii. The School

35.   The school Wendi attended was also called 91st Psalm and then Harvest Christian Academy. It was a small school of 24 children, and Wendi was the only student in her graduating class.

36.   The curriculum was Accelerated Christian Education, or ACE. This conservative Southern Baptist program was entirely self-directed. Students were expected to work individually in cubicles, working through units of study called Paces. All subjects were biblically oriented. Evolution was not taught—only creationism. Bible study was mixed in with all the subjects, and Wednesdays were for church and devotions. Each month, a chapter of the Bible was assigned to memorize. The only music allowed was Christian. Like for members of the church, students were not allowed to be friends with anyone outside the school. TV was banned. The "5-foot rule" was to keep the boys and girls apart. There was no dating allowed. Modest dress was required and makeup was prohibited. The kids had to clean the school at the end of every day.

37.   A "Rod of Correction" was used liberally for punishment, as Tom King advocated in the church. In the school handbook, it said, "Obey them that have the rule over you, and submit yourselves" (Hebrews 13:17). Another verse is "Foolishness is bound in the heart of a child; but the rod of correction shall drive it far from him" (Proverbs 22:15). And "Chasten thy son while there is hope, and let not thy soul spare for his crying" (Proverbs 19:18). These verses were printed on paddles and quoted before punishments. Parents had to give the school permission to spank their children.

38.   Students were afraid of going to hell because of their lessons. The school taught, as recounted by Wendi, "You get saved, otherwise you're going to hell, and if you die in a state of not being forgiven, you might end up in hell too, so you're always being very watchful that you're not sinning and if you do sin, you need to ask for forgiveness. . . This gives you a big guilt complex and you're always trying to measure up to some ideal standard that is difficult to live up to, so you always feel like you're failing, that you're not enough, you're not good enough." Again, in school as well as in church, Wendi was being taught to fear hell and that those who do not strictly conform to the group's religious beliefs would be subject to eternal damnation.

39.   According to another student at the school and church, Jasper Neace, "Thinking back on my experience at 91st Psalm and Harvest, I realize that during the years I was growing up there, I was going through hell. The church made me think a certain way and it went so far it got to the point where it brainwashed me. The teachings of the church had me convinced that I was a sinner and was going to hell; they crammed it down your throat day in and day out. I truly believed that I was going to hell."

## iii. Conflicting Messages

40.   Although the church and school taught that its members should be obedient and dedicated, these expectations were not always met by those in positions of authority over Wendi. As a result, she was sent conflicting messages. On the one hand, she was taught that if she did

not strictly adhere to the religion's rules she would go to hell. On the other hand, those who taught her this message were themselves breaking the rules.

41. For a number of years, Alejo interacted with Wendi in sexually suggestive and inappropriate ways. Wendi had no idea she should or could object to her father's treatment. She witnessed Alejo losing his temper frequently at home. She and her mother waited for him to calm down, hiding in the bathroom, and then "made nice" to pacify him. For years Wendi had the job of massaging him and scratching his head while her mother read. They called this "ministering" to him.

42. Donna described her raising of Wendi thus: "I lived in my own fantasy world and was oblivious to what went on with Wendi. I believed what I wanted to believe – that we were a happy, upstanding church-going household and ignored anything that contradicted that." She also lamented that "I should've never hovered over her like we did. . . Because we kept such a thumb on her, she didn't have situations with consequences, or if she did, I would fix it."

43. The lessons Wendi learned in her childhood therefore were not always consistent. In a number of ways, Donna and Alejo contradicted their beliefs and thus confused Wendi. Aside from having an explosive temper, Alejo drank, smoked, and watched TV, all of which were forbidden. Donna bought things and hid them from Alejo instead of getting his permission like she was supposed to. Wendi called it a double standard: "You say you're a Christian and you obey your husband, but you go behind his back." This confusion taught Wendi that although she was being told that the rules were strict and immovable, sometimes they could be ignored.

44. Perhaps as a result, Wendi was not always "obedient." She ran away from home and school five times because of the spankings she endured. She desperately wanted to go to a public school and so got in trouble so that she would get expelled. But rather than sending her to public school, her parents and school authorities made her pull weeds around the school grounds for three months. She was 13. After that time, she went back to class and became "obedient, acquiescent, agreeable, and cheerful." She won a prize for memorizing the Book of Proverbs (which contains numerous verses about obedience and punishment). In her graduation speech, she praised the church authorities.

## C. Adulthood and Living in the Outside World

45. Leaving the sheltered environment of home/church/school was very challenging for students of Harvest Christian Academy. For example, Jasper Neace described his experience after being kicked out of school: "The life I lived there was so strange. Coming out of it was very hard. I remember watching television for five years trying to catch up on all that I missed . . . When I was eighteen, I went hog wild because I never had a chance to experience anything. My whole life had been about what I could not do; I never heard anything about what I could do . . . I turned to drugs to numb the pain and to forget about my impending fate in hell."

46. Wendi experienced her own difficulties when breaking away from the church's grip. After graduating school, Wendi stayed and worked at the school for a year. After that she wanted

to go to college, but after praying and getting spiritual guidance from church authorities, they convinced her to go to Mexico as a missionary. She spent two months in language study and then six months in Mexico. She had a car but was told God wanted her to give it away to a missionary in Mexico, which she did.

47.    When Wendi returned to Arizona, she got a job in an apartment complex and lived in one of the apartments. As a result, she started to be exposed to the world outside of her closed religious group. She lived alone for six months and enjoyed the freedom and wanted to experience things. With her cousin Barbara, she went to bars dancing and drinking. She got introduced to a new life and liked it. But her upbringing had not prepared her for independence. As she explained, "Everything I had been denied I wanted to go try it. I had terrible judgment and did not make good decisions. I didn't know how to make a good decision because it was never my place to make a decision. They had always been made for me . . . In my church you were not encouraged to trust yourself at all. It was trust in God and how he wanted you to live your life."

48.    Wendi struggled with reconciling her newfound freedom and the teachings of her youth. She would live her new life, drinking and going out, and then would go to church on Sunday to pray for forgiveness. She was therefore faced with the conflict of enjoying life on her own but feeling like she had failed as a Christian for having these feelings. As she explained, "I would show up to church on Sunday and ask God to forgive me and that would be ok. Forgiveness takes away the sense of consequences for your actions. The consequences you do get are because you failed to live a Christian life."

49.    Wendi did not feel prepared to live in the wider world. She had not been socialized to interact with those outside of her church, had not been taught to trust or be in touch with her own emotions, and had not been taught personal responsibility. As she explained, "I didn't know how to be responsible because of expecting God to take care of you instead of doing it yourself. Then if He doesn't come through, there's this guilt because I must be a bad person because I'm in this situation and God's not helping me out of it. That's not healthy to think you're a bad person all the time and feel guilty over it. Also being terrified, 'Am I being good, being a certain way or am I going to hell?' It makes you always afraid to do something."

50.    Then, Wendi met Joseph Andriano, and he moved in with her. She felt guilty and her parents disapproved, but the couple lived together anyway. Wendi continued going to church every week to confess her sins and get forgiven. Under pressure, Wendi and Joe finally got married in 1994, despite Wendi's serious doubts.

51.    At home, Wendi now mimicked the patriarchal familial structure she had been taught. She agreed Joe was the head of the household. Just like with her father, she catered to him, including his temper. Marriage was all about "What did Joe want." This included having sex with him every day despite not wanting to. Wendi believed it was her job as a woman to make the marriage work. For example, she one time sold her car so that Joe could buy a boat. Joe didn't allow Wendi to have friends, even though he did. In her marriage, Wendi therefore fell back into patterns of control and subjugation of the self that she had experienced in her youth.

52.     In addition to falling back into the patriarchal, controlling structure of her childhood in her own household, Wendi's religious upbringing impacted her interaction with society more broadly. Wendi had a problematic relationship with the law because she was taught that God's law was above human laws. If it was God's will, then mere human laws were secondary. Wendi took money from the hospital where she worked at a time when her family, including two children, was so poor they lacked food and shoes. Also, Joe had instructed her to do it, and he was to be obeyed. In her mind, it was also acceptable because God would forgive. She figured, "God will understand because I need it to pay bills, buy food, and if I pay it back later, God will forgive me. There's something about 'God will forgive you and it will be ok.' When you're raised, like when you get a spanking and then you pray and ask God to forgive you, well then life goes on and everything is ok; there aren't any more consequences for what you've done. But there are a lot of consequences. In the way I was raised they take that sense of responsibility from you. It's all about asking for forgiveness." This pattern was also seen when she was managing apartment buildings and gave a needy couple a free apartment, which got her fired. She rationalized her behavior because she was being kind, even though it was against the law. "I always thought that the need outweighed the fact that it was wrong."

53.     Wendi was thus navigating her life in the wider world, taking the beliefs instilled in her as a child with her. Another such belief was that if something bad happened to her, it was because she had done something wrong. She said that, "My first instinct is 'I must be disappointing God.'" For example in Wendi's house when money was an issue, she thought God was punishing them.

54.     Then, when Joe became ill with cancer, she expected God to heal him. She took him to church more, got him a Bible, and read to him from it, trying to get him worthy enough to heal. Wendi thought it was her fault that Joe was sick and not recovering. Joe also blamed her, and insisted she get God to heal him. She took him to church multiple times to get healed. Joe initially decided not to do chemotherapy. Instead he told Wendi to pray for him. When Joe later did chemotherapy without success, he made it Wendi's fault that God didn't heal him.

55.     During this time, Wendi felt that Joe did not love her. He was angry a lot, they were not affectionate, and he blamed her for his illness. Wendi sought someone to hold onto because she did not want to be left alone. She therefore had relationships with two other men. Even in these relationships, Wendi's patriarchal upbringing can be seen. For example, she testified at trial that in her relationship with Rick Freeland she sought friendship and emotional support but engaged in a sexual relationship because it "wouldn't have been right" for her to say no. (Tr. Oct. 27, 2004 at 66.)

56.     When Joe's illness became worse, Wendi helped Joe acquire poison in order to commit suicide. She said, "The only reason I agreed to help Joe with this was because I thought it was my fault God wasn't healing him and Joe would say, 'You promised me God would heal me.' It was hard, when you're responsible for your husband's happiness and he's dying of cancer and your god won't heal him. It was awful." She ordered the sodium azide because she was used to obeying her husband and taking care of him. She believed the cancer was because she wasn't good enough. She said, "I thought 'God's not healing him

so this must be the way we're supposed to do it.' It was ok because I was helping Joe do what he wanted done, so there was no responsibility on my end."

57.   Wendi's sense of right and wrong, legal and illegal, was confused because of her upbringing. She was following her husband's directions about a problem that she believed was her fault; doing what was "right" trumped doing what was legal. These behaviors and thought patterns are the result of the religious indoctrination of her youth.

## VI. CONCLUSIONS

58.   Many features of an authoritarian, fundamentalist religion are present in Wendi's life history. She was indoctrinated with the theories of eternal damnation and original sin and the idea that God's law is above human law. Wendi was taught that personal development is not important and that the hierarchy of authority, which is patriarchal, must be obeyed. She was held to impossible expectations by religious leaders, and herself as a result, which lead to her constantly feeling guilty and afraid for her salvation. This created ongoing anxiety and occasional rebellion. Wendi also suffered corporal punishment growing up and was isolated and denied contact with the wider world. When Wendi was with Fishers of Men, she was the only child in the group and was homeschooled. Later, at 91st Psalm and Harvest Christian Academy, she was not allowed to have friends or contacts outside the group. The school curriculum always had a Biblical focus and left out key areas of knowledge. This led to considerable ignorance of the world, as well as curiosity.

59.   As a result of these experiences, Wendi Andriano has exhibited a number of symptoms of Religious Trauma Syndrome, including:

   a.   Lack of identity

   b.   Poor critical thinking

   c.   Low awareness of emotions and poor emotional regulation

   d.   Poor decision-making

   e.   Confused sense of responsibility

   f.   Fear and guilt

   g.   Subservient role with husband

   h.   Immature moral development

60.   Together, these symptoms comprise a severe case of RTS. The authoritarian environment was one that breeds mental illness.  Wendi's childhood was saturated with religious indoctrination, much of which was highly toxic. The focus on God's retribution created a constant state of fear and guilt. This was enacted regularly through painful spankings from parents and school authorities. Developing a healthy sense of identity was impossible due to being taught to distrust her own thoughts and feelings. In the controlled environments of home and school, she had little opportunity to learn how to make her own good decisions, including moral ones. Her poverty of experience in making choices was also a product of learning to be subservient to men. The transition to living in the wider world was traumatic and marked with acting out behavior. After the sheltered environment of a high control group, the heavy demands on personal responsibility were often extremely challenging. Wendi was—in navigating the stresses of work, poverty, a troubled marriage, motherhood, and her husband's illness—operating with a traumatized psyche in an unfamiliar world. She had multiple mental health issues and important areas of arrested development. This is the experience of RTS.

61.   It is against this backdrop of RTS symptoms that Wendi Andriano's behavior at the time of the offense must be considered. Wendi was subjected to serious religious abuse that caused cognitive, emotional, and social deficiencies and dysfunctions continuing into adulthood. In particular, she was disabled in her skills for independent decision-making and skills for navigating the real world. This can be seen in her relationships with the men in her life as well as her tendency to do what she perceived as right even if her actions were prohibited by greater society.

62.   It is my professional opinion that these symptoms were present at the time of the offense, impairing Ms. Andriano's capacity to conform her behavior to the law, control and manage her emotions, and responses to the events as they unfolded, and judge right from wrong in determining how to "help" her terminally ill husband.

Signed this  4th day of December, 2017.

Marlene Winell
Name (Printed)

Signature

Alameda, California
City, State

# Exhibit A

# Marlene Winell, Ph.D.

Ph. 510-292-0509
mwinell@gmail.com
Alameda, CA 94501

## Education

B.A.     1975  Program in Social Ecology
         University of California, Irvine, CA

M.A.     1977  Program in Social Ecology
         University of California, Irvine, CA

Ph.D.    1983  Human Development and Family Studies
         The Pennsylvania State University, University Park, PA

Licensed Psychologist, Colorado, 1987-Present
Registered Psychologist, Queensland, Australia, 1994-1998

Provider of Relationship Enhancement Programs, registered with the National Institute for Relationship Enhancement, 2012.

## Summary of Employment

*Human services and academic positions:*
- University teaching and research
- Program design and evaluation, needs assessment, grant writing
- Case management & program administration in social service agencies; foster parent recruitment & training
- Residential work with adolescents and adults
- Psychotherapy:  individual, couples, group, family, multi-family, and milieu therapies
- Workshop instruction on numerous topics
- Authorship of journal articles, chapters, and a book
- Design of psychoeducational programs for human development
- Speaking and educating and organizing a service network for religious and spiritual recovery
- Writing, direction, and production of educational and social issue videos, films, and productions

## Academic Experience

2001   *Instructor*, College Nine, University of California, Santa Cruz, CA

1994 - 1996   *Consultant,* University of Queensland, St. Lucia, Queensland, Australia. Special campus-wide "Action Learning" project called "Developing Multiple Perspectives: Teaching that promotes tolerance, social justice, equity, and the appreciation of student diversity."

1992 - 1993 *Instructor and Consultant*, Oakes College, University of California, Santa Cruz, CA

1988 - 1989 *Instructor*,  Boulder Graduate School and Integral Therapy Institute, Boulder, CO.

1983 - 1984  *Assistant Professor*,  Human Development and Family Studies, Colorado State University, Fort Collins, Colorado

1982 - 1983 *Instructor and Teaching Assistant*,  Human Development and Family Studies, The Pennsylvania State University, State College, PA

1982 - 1983 *Dissertation Research*,  The Pennsylvania State University. "Patterns  of Personal Goal Hierarchies."  Series of studies over three years.

1979 - 1982 *Research Project Manager*,  The Pennsylvania State University, "Project AIMS:  Adult Intentional and Motivational Systems."

1976 - 1977 *Coordinator,*  Needs Assessment and Evaluation Project, Center for Counseling, Learning Skills, and Special Services, University of California, Irvine, CA.

**Professional Experience**

1998 – 2016 (present) *Psychologist, Human Development Consulting.* Oakland, CA.  *Director* of "Journey Free:  Resources for Recovery from Harmful Religion."

1994 – 1998  *Psychologist,* Private practice.  Queensland, Australia.

1991 - 1992 *Preceptor*,  College Eight, University of California, Santa Cruz.

1987 - 1991 *Director and Psychologist*,  Envision; Center for Psychotherapy and Personal Growth, Fort Collins, CO.

1984 - 1986  *Psychotherapist*,  University Counseling Center, Colorado State University, Fort Collins, CO.

1980 - 1980 *Trainer/Therapist*,  Individual and Family Consultation Center, The Pennsylvania State University, Relationship Enhancement Program.

1978 - 1979 *House Manager*,  Berkeley House, Boston, MA.  Supervision of psychiatric half-way house associated with McClean Hospital, Harvard University.

1978 - 1979 *Foster Homes Coordinator and Caseworker,*  Listen, Inc., Saugus, MA.

1977 - 1978 *Co-director*,  Monroe Street Shelter Program, Rockville, MD. Montgomery County Department of Social Services.

1976 - 1977 *Counseling Intern*,  Center for Counseling, Learning Skills, and Special Services, University of California, Irvine, CA.

1976 - 1977 *Resident Counselor*, The Shelter Program, Orange County Dept. of Mental Health, CA.

1974 - 1975 *Project Coordinator*,  The Shelter Program, Orange County, CA.

1972 - 1973 *Director*, Help Center, Newport Beach, CA.


**Publications and Presentations**

Winell, M.  (2016).  The Challenge of Leaving Religion and Becoming Secular. In Zuckerman, P. and Shook, J.R. (Eds.), *The Oxford Handbook of Secularism*. Oxford University Press, Oxford, England.

Winell, M. and Tarico, V. (2014)  The Crazy-Making in Christianity:  A Look at Real Psychological Harm.  In Loftus, J. (Ed.), *Christianity is Not Great:  How Faith Fails.*  Prometheus Books, Amherst, MA.

Winell, M.  (2011)  Religious Trauma Syndrome (Series of 3 articles), *Cognitive Behavioural Therapy Today*, London. http://www.babcp.com/RTS/, British Association of Behavioural and Cognitive Therapies.

Winell, M. (2011)  *Leaving the Fold*.  Presentation at the Exmormon Foundation 2011 Conference, Salt Lake City, Utah.

Winell, M. (2011)  *Religious Trauma Syndrome*.  Presentation at International Conference on Psychology and Religion, Bari, Italy.

Winell, M. (2010)  *Religious Trauma Syndrome.*  Presentation at the Texas Freethought Convention.  Dallas, Texas.

Winell, M. (2008)  Understanding fundamentalism.  The Chaplaincy Institute. Berkeley, CA.

Winell, M.  (1996)  *What About the Kids?  Nurturing Spirituality in Our Children*.  Sydney:  The Eremos Institute, Magazine Supplement No. 20.

Winell, M.  (1994)*.  Leaving the Fold:  A Guide for Former Fundamentalists and Others Leaving Their Religion*.  New Harbinger Publications, Oakland, CA.

Winell, M.  (1994).  *Surviving Fundamentalism:  The Attraction and the Trauma*.  Paper presented at the annual meeting of the Queensland Guidance and Counseling Association, Qld., Australia.

Winell, M. (1987).  Personal Goals:  Key to self-direction in adulthood.  In Ford, M. (Ed.), *Humans as Self-Constructing Living Systems:  Putting the Framework to Work*.  Erlbaum, Hillsdale, N.J.

Winell, M. (1987).  The Psychological Consequences of Fundamentalism. Paper presented at the American Psychological Association meetings, New York City.

Winell, M. (1987).  The Personal Goal Inventory:  An instrument for measuring personal goal hierarchies.  Unpublished manuscript.

Winell, M.  (1984).  Review of the Counseling Services Assessment Bank, and the Couple's Precounseling Inventory.  Buros Institute Database, Bibliographic Retrieval Services, Inc. (BRS).

Winell, M., & Timpson, W.  (1985)  Getting Unstuck:  Theater Games for Personal Development.  Presented at the American Psychological Association meetings, LA

(Note:  Name was previously Wadsworth)

Wadsworth, M.W. (1984).  Patterns of adult personal goal hierarchies.  Paper presented at the American Psychological Association meetings, Toronto.

Wadsworth, M.W. & Ford, D.H.  (1983).  The assessment of personal goal hierarchies.  *Journal of Counseling Psychology*, 30, 514-526.

Wadsworth, M.W. (1983).  Pursuing goals in adulthood:  Thriving instead of "coping."  Paper presented at the Eastern Psychological Association Meetings, Philadelphia.

Wadsworth, M.W. & Ford, D.H.  (1982).  The role of personal goals in human functioning.  Final report for NIMH Grant.

Wadsworth, M.W. & Ford, D.H.  (1982).  The measurement of personal goal hierarchies. Paper presented at the Eastern Psychological Association meetings, Baltimore.

Wadsworth, M.W.  & Ford, D.H.  (1980).  Project AIMS:  Adult Intentional and Motivational Systems.  Grant proposal for National Institute of Mental Health, Small Grant Program  (Funded Dec. 1981).

Wadsworth, M.W. & Saar-Skeen, S.  (1976).  The Shelter:  Youth and Family Center.  Grant funded through federal social program revenue funds.  Orange County Department of Mental Health, CA

# Exhibit B

**Index of Documents Reviewed**

**Trial Transcripts**

| | | |
|---|---|---|
| 1 | 2004.09.07 | State's opening and Defense opening (Trial Day 7) |
| 2 | 2004.09.08 | Defense opening continued (Trial Day 8) |
| 3 | 2004.09.08 | Hasisaki, Chris testimony (Trial Day 8) |
| 4 | 2004.09.09 | Hashisaki, Chris testimony (Trial Day 9) |
| 5 | 2004.09.13 | Freeland, Rick Testimony (Trial Day 10) |
| 6 | 2004.09.15 | Sweeney, Shannon Testimony (Trial Day 12) |
| 7 | 2004.09.15 | Koeppen, Stephanie Testimony (Trial Day 12) |
| 7A | 2004.09.16 | Black, Travis Testimony (Trial Day 13) |
| 7B | 2004.09.16 | Vaillant, Erik Testimony (Trial Day 13) |
| 8 | 2004.09.23 | Lind, Janice Testimony (Trial Day 17) |
| 9 | 2004.10.04 | Ochoa, Donna Testimony pm (Trial Day 22) |
| 10 | 2004.10.05 | Ochoa, Donna Testimony (Trial Day 23) |
| 11 | 2004.10.06 | Ochoa, Alejo Testimony (Trial Day 24) |
| 12 | 2004.10.07 | Murphy, Sharon Expert Testimony (Trial Day 25) |
| 13 | 2004.10.12 | Murphy, Sharon Expert Testimony (Trial Day 26) |
| 14 | 2004.10.13 | Murphy, Sharon Expert Testimony (Trial Day 27) |
| 15 | 2004.10.14 | Murphy, Sharon Expert Testimony (Trial Day 28) |
| 16 | 2004.10.21 | Ochoa, Brandon Testimony (Trial Day 30) |
| 17 | 2004.10.21 | Mitchell, Barbara Testimony (Trial Day 30) |
| 18 | 2004.10.25 | Andriano, Wendi Testimony (Trial Day 31) |
| 19 | 2004.10.26 | Andriano, Wendi Testimony (Trial Day 32) |
| 20 | 2004.10.27 | Andriano, Wendi Testimony (Trial Day 33) |
| 21 | 2004.10.28 | Andriano, Wendi Testimony (Trial Day 34) |
| 22 | 2004.11.01 | Andriano, Wendi Testimony (Trial Day 35) |
| 23 | 2004.11.02 | Andriano, Wendi Testimony (Trial Day 36) |
| 24 | 2004.11.03 | Andriano, Wendi Testimony (Trial Day 37) |
| 25 | 2004.11.04 | Andriano, Wendi Testimony (Trial Day 38) |
| 26 | 2004.11.08 | Andriano, Wendi Testimony (Trial Day 39) |
| 27 | 2004.11.08 | Ochoa, Alejo Testimony (Trial Day 39) |
| 28 | 2004.11.10 | Bayless, Michael Expert Testimony (Trial Day 41) |
| 29 | 2004.11.10 | Roberts, Justin Testimony (Trial Day 41) |
| 30 | 2004.11.10 | Andriano, Joe Testimony (Trial Day 41) |
| 31 | 2004.11.15 | Mechanic, Mindy Expert Testimony (Trial Day 42) |
| 32 | 2004.11.16 | State's Closing (Trial Day 43) |
| 33 | 2004.11.17 | State's Closing continued (Trial Day 44) |
| 34 | 2004.12.01 | Aggravation Phase (Trial Day 47) |
| 35 | 2004.11.30 | Aggravation Phase (Trial Day 46) |
| 36 | 2004.12.08 | Defense Opening Penalty Phase (Trial Day 50 - Penalty Phase) |

37    2004.12.08  State's Opening Penalty Phase (Trial Day 50 - Penalty Phase)-2
38    2004.12.08  Andriano, Jeanette and Joseph Victim Impact Testimony (Trial Day 50-Penalty Phase)
39    2004.12.08  King, Laura Testimony (Trial Day 50-Penalty Phase).
40    2004.12.08  Perry, Gerald Testimony (Trial Day 50- Penalty Phase)
41    2004.12.08  Van Every, Joyce Testimony (Trial Day 50-Penalty Phase)
42    2004.12.09  Vargas, Chris Testimony (Trial Day 51- Penalty Phase)
43    2004.12.09  Gaylon, Jimmy and Linda Testimony (Trial Day 51- Penalty Phase)
44    2004.12.09  Murphy, Sharon Expert Testimony (Trial Day 51 - Pen Phase)
45    2004.12.09  Ochoa, Donna Testimony (Trial Day 51- Penalty Phase)
46    2004.12.13  Ochoa, Donna Testimony (Trial Day 52 - Penalty Phase & Rebuttal)
47    2004.12.13  Inskeep, Lonnie Testimony (Trial Day 52- Penalty Phase & Rebuttal)
48    2004.12.13  Palinki, Gia Testimony (Trial Day 52- Penalty Phase and Rebuttal
49    2004.12.13  Mitchell, Barbara Testimony (Trial Day 52- Penalty Phase and Rebuttal)
50    2004.12.13  Ochoa, Alejo Testimony (Trial Da 52- Penalty Phase & Rebuttal)
51    2004.12.13  Andriano, Jana Clayton Testimony (Trial Day 52- Penalty Phase & Rebuttal)
52    2004.12.14  Andriano, Jana Clayton Testimony (Trial Day 53- Rebuttal)
53    2004.12.14  Lee, Timothy Testimony (Trial Day 53- Rebuttal)
54    2004.12.15  Bayless, Michael Brad Expert Testimony (Trial Day 54- Rebuttal)
55    2004.12.15  Andriano, Wendi Allocution (Trial Day 54)
56    2004.12.15  Defense Penalty Phase Closing (Trial Day 54)
57    2004.12.15  State's Penalty Phase Closing (Trial Day 54)
58    2004.12.16  State's Penalty Phase closing cont. (Trial Day 55)
59    2004.12.16  Defense Penalty Phase Closing (Trial Day 55)

**PCR Transcripts**
1    2014.02.03  James Hopper, Ph.D. - Expert Testimony (Day 1-AM)
2    2014.02.03  James Hopper, Ph.D. - Expert Testimony (Day 1-PM)
3    2014.02.04  James Hopper, Ph.D. - Expert Testimony (Day 2)
4    2014.02.04  Kyre Lorts Testimony (Day 2)
5    2014.02.04  Donna Ochoa Testimony (Day 2)
6    2014.02.04  Jeri Lynn Cunningham Testimony (Day 2)
7    2014.02.05  Jasper Neace Testimony (Day 3)

8      2014.02.05   George Woods, M.D. – Expert Testimony (Day 3)
9      2014.02.10   Joette James, Ph.D. – Expert Testimony (Day 6)
10     2014.02.10   Cynthia Schaider Testimony (Day 6)
11     2014.02.14   Karen Amin, Ph.D. – Expert Testimony (Day 8)
12     2014.02.14   Steven Pitt, D.O. – Expert Testimony (Day 8)

**Declarations**
Exhibit 9 (Wendi declaration 2.13.2012)
Exhibit 10 (Constance Boys declaration 11.9.2010)
Exhibit 11 (George Carlin declaration 11.11.2010)
Exhibit 12 (Jeri Lynn Cunningham declaration 11.11.2010)
Exhibit 13 (Mark Keating declaration 5.24.2011)
Exhibit 14 (Nancy Keating declaration 5.24.2011)
Exhibit 15 (Shawn King deposition 7.11.2011)
Exhibit 16 (Barry Lorts declaration 8.19.2010)
Exhibit 17 (Lee McGuffee declaration 9.9.2011)
Exhibit 18 (Marjorie Micek declaration 8.1.2011)
Exhibit 19 (Jeffrey Miller declaration 7.28.2011)
Exhibit 19.001 (Ex A - Miller letter re med mal claim)
Exhibit 20 (Sharon Murphy declaration 9.2.2011)
Exhibit 21 (Brenda Nagore declaration 11.9.2010)
Exhibit 22 (Frank Nagore declaration 11.8.2010)
Exhibit 23 (Jasper Neace declaration 6.7.2010)
Exhibit 24 (Alejo Ochoa declaration 6.19.2011)
Exhibit 25 (Alejo Ochoa declaration 10.26.2011)
Exhibit 26 (Brandon Ochoa declaration 5.20.2011)
Exhibit 27 (Donna Ochoa declaration 6.19.2011)
Exhibit 28 (Donna Ochoa supp declaration 9.11.2011)
Exhibit 29 (Donna Ochoa supp2 declaration 10.29.2011)
Exhibit 30 (Deblen Oke declaration 4.22.2011)
Exhibit 31 (Gia Palicki declaration 5.29.2011)
Exhibit 32 (Skip Robertson declaration 6.22.2011)
Exhibit 33 (Wade Robertson declaration 10.22.2010)
Exhibit 34 (Cindy Schaider declaration 5.19.2011)
Exhibit 35 (Steve Schaider declaration 10.18.2010)
Exhibit 36 (John Shaddle declaration 7.29.2011)
Exhibit 38 (Kimberly Wilson declaration 7.23.2011)

**Expert Reports and Medical Records**
1      2001.01.09   Notes from Certified Professional Counselor Kandy Rohde
                    Counseling sessions from January 2001 to April 2004

1A    2001.02.19, 2001.03.12   Letters from Certified Counselor Kandy Rohde to Trial Counsel
2     2001.03.28  Rule 11 Assessment Report by Jack Potts, M.D.
3     2002.08.27   Assessment by Richard J. Rosengard, D.O.
4     2004.08.04   Psychological Report by Michael B. Bayless, Ph.D. (State's Expert at Trial)
5     2004.11.08   Affidavit of Mindy Mechanic
6     2003.09.22   Domestic Violence Assessment Report by Sharon Murphy, Ph.D., CISW
7     2013.11.26   Transcript of Dr. Steven Pitt's (State's Expert at PCR) interview with Wendi Andriano
      2013.12.27 Report Re Forensic Psychiatric Evaluation by Dr. Steven Pitt
7A    2013.12.26   Neuropsychological Test Report by Dr. Karen Amin (State's Expert at PCR) to Dr. Pitt
7B    2013.12.13   Structured Inventory of Malingered Symptomatology Interpretive Report given by Dr. Karen Amin
8     2012.02.14   Executive Summary Report by James W. Hopper, Ph.D.
8A    Appendix to the Expert Report of James W. Hopper, Ph.D. (Full Report)
9     2011.07.11   Neuropsychological Report and Addendum by Myla Young, Ph.D., ABN
10    Review of Neuropsychological Evaluation by Joette James, Ph.D., ABPP-CN
11    2012.02.14   Expert Report of Dr. George W. Woods, Jr., M.D.
11A   Appendix B- Overview of Biopsychosocial and Psychiatric History of Wendi Andriano and Her Family by George Woods, Jr., M.D.
12    1996.02.28   Medical Records: Casa Grande Valley Counseling records for Wendi Andriano
13    Medical Records: Excerpted Medical Notes from Wendi Andriano's incarceration (Typewritten)
14    2003  Medical Records: Special Needs Treatment Plan from Durango Psychiatric Unit
15    2000- Medical Records: Correctional Health Jail Medical Records

**School and Church Records**
Harvest School docs received from Donna Ochoa, 03.22.11
Harvest Handbook
Harvest Times paper
Harvest Christian Academy records

# Exhibit C

## <u>References</u>

Bob Altemeyer, *The Authoritarians* (Winnepeg, Manitoba 2006), *available at* http://members.shaw.ca/jeanaltemeyer/drbob/TheAuthoritarians.pdf

Stephen Arterburn, and Jack Felton, *Toxic Faith: Experiencing Healing from Painful Spiritual Abuse* (Shaw Books, 2001)

Edward T. Babinski, ed., *Leaving the Fold: Testimonies of Former Fundamentalists* (Prometheus Books, Amherst, NY, 2003)

Dan Barker, *Losing Faith in Faith: From Preacher to Atheist* (Freedom from Religion Foundation, Madison, WI, 1992)

Ken M. Blue, *Healing Spiritual Abuse: How to Break Free from Bad Church Experience* (IVP Books, 1993)

Leo Booth, *Breaking the Chains: Understanding Religious Addiction and Religious Abuse* (SCP Limited, 1998)

Eric W. Cernyar, "The Good News Club: Not Safe for Children," www.intrinsicdignity.com

Edmund D. Cohen, *The Mind of the Bible Believer* (Prometheus Books, Amherst, NY, 1986)

Richard Dawkins, *The God Delusion* (First Mariner Books, 2006)

Albert Ellis, *The Case Against Religion: A Psychotherapist's View and the Case Against Religiosity* (American Atheist Press, 1980)

Albert Ellis, "Is religiosity pathological?" *Free Inquiry* 18, no 2 (Spring 1988)

Ronald M. Enroth, *Churches That Abuse* (Zondervan, 1992)

Annie Laurie Gaylor, *Woe to the Women—The Bible Tells Me So: The Bible, Female Sexuality and the Law* (Freedom From Religion Foundation, Ann Arbor, MI, 2004)

John A. Hammes, *Humanistic Psychology: A Christian Interpretation* (Grune and Stratton, New York, NY, 1971)

Steven Hassan, *Combating Cult Mind Control* (Freedom of Mind Press, Boston, MA, 1990)

Steven Hassan, *Releasing the Bonds: Empowering People to Think for Themselves* (Aitan Publishing, 2000)

Steven Hassan, Personal communication (2010), on file with the author

Janet Heimlich, Breaking *Their Will: Shedding Light on Religious Child Maltreatment* (Prometheus Books, Amherst, NY 2011)

Ronnie Janoff-Bulman, *Shattered Assumptions: Toward a New Psychology of Trauma* (Free Press, New York, NY, 1992)

David Alan Johnson and Jeff Van Vanderen, *The Subtle Power of Spiritual Abuse: Recognizing and Escaping Spiritual Manipulation and False Spiritual Authority within the Church* (Bethany House Publishers, 2005)

Joel Kramer and Diana Alstad, *The Guru Papers: Masks of Authoritarian Power* (Frog Books, Bombay, India, 1993)

Janja Lalich, J. and Madeleine Tobias, *Take Back Your Life: Recovering from Cults and Abusive Relationships* (Bay Tree Publishing, Pt. Richmond, CA, 2006)

Robert J. Lifton, *Thought Reform and the Psychology of Totalism* (Chapel Hill: University of North Carolina Press, 1989)

Karin C. Meiselman, *Incest* (Jossey-Bass, San Francisco, CA, 1978)

Alice Miller, *For Your Own Good:  Hidden Cruelty in Child-Rearing and the Roots of Violence* (3d ed. Farrar, Straus and Giroux, New York, NY 2002)

Alice Miller, *From Rage to Courage: Answers to Readers' Letters* (W.W. Norton, New York, 2009)

Michael Pearl and Debi Pearl, *To Train Up a Child: Turning the Hearts of the Fathers to the Children*. (No Greater Joy Ministries, Pleasantville, TN, 2011)

Howard E. Gruber and J. Jacques Vonèche, J., eds., *The Essential Piaget* (Basic Books, New York, NY, 1977).

Darrel Ray, *The God Virus:  How Religion Infects Our Lives and Culture* (IPC Press, Bonner Springs, Kansas, 2009)

Darrel Ray, *Sex and God: How Religion Distorts Sexuality* (IPC Press, Bonner Springs, Kansas, 2012)

Florence Rush, *The Best Kept Secret: Sexual Abuse of Children* (Prentice-Hall, Engelwood Cliffs, N.J., 1980)

Margaret Singer, *Cults in Our Midst: The Continuing Fight Against Their Hidden Menace* (Jossey-Bass, Hoboken, NJ, 2003)

Valerie Tarico, *The Dark Side: How Evangelical Teachings Corrupt Love and Truth* (2006)

Valerie Tarico, "Why Bible believers have such a hard time getting child protection right," AwayPoint (October 21, 2013), http://awaypoint.wordpress.com/2013/10/21/why-bible-believers-have-such-a-hard-time-getting-child-protection-right/

Wendell W. Watters, *Deadly Doctrine: Health, Illness, and Christian God-Talk* (Prometheus Books, Amherst, NY, 1992)

Marlene Winell, "Religious Trauma Syndrome: A series of three articles by Dr. Marlene Winell," *Cognitive Behavioural Therapy Today* (London, 2011), *available at* babcp.com/rts

Marlene Winell, Leaving *the Fold:  A Guide for Former Fundamentalists and Others Leaving Their Religion* (New Harbinger Publications, Oakland, CA, 1994)

Marlene Winell, *The Psychological Consequences of Fundamentalism*, paper presented at the American Psychological Association meetings (New York City, 1987)

Marlene Winell and Valerie Tarico, *The Crazy-Making in Christianity: A Look at Real Psychological Harm,* in *Christianity Is Not Great: How Faith Fails.* (Loftus, J., ed., Prometheus Books, Amherst, NY, 2014)

Marlene Winell, *The Challenge of Leaving Religion and Becoming Secular.*  in *The Oxford Handbook of Secularism* (Zuckerman, P. and Shook, J., eds., Oxford University Press, New York, NY, 2014)

Marlene Winell, *Christianity and Children*. Exchristian.net (2015), http://new.exchristian.net/2015/11/christianity-and-children.html

# EXHIBIT 28

*Andriano v. Ryan*, Case No. CV-16-01159-PHX-SRB
Motion for Evidentiary Development

## DECLARATION OF ERIC BETTERTON, Ph.D.

I, Eric Betterton, Ph.D., declare under penalty of perjury, the following to be true to the best of my information and belief:

### PROFESSIONAL QUALIFICATIONS

1. I am the Head of the Department of Hydrology and Atmospheric Sciences at the University of Arizona.  I also hold courtesy appointments in the Department of Chemical and Environmental Engineering and in the Division of Community, Environment and Policy at Zuckerman College of Public Health.  I have been a professor at the University of Arizona since 1988. I was an assistant professor at California State University, Northridge in the Department of Chemistry from 1987 to 1988. Previous to that I was a Research Fellow from 1985 to 1987 and a Visiting Associate from 1987 to 1988 at the California Institute of Technology in Pasadena, CA.

2. I received my Ph.D. in Chemistry in 1983 from the University of the Witwatersrand in Johannesburg, South Africa. I received my Bachelors of Science in Chemistry and Applied Chemistry from the University of Natal in Durban, South Africa in 1974.

3. I am the author or co-author of over 80 scholarly articles and over 100 scholarly presentations.

4. I received the Professor Leon and Pauline Blitzer Award for excellence in teaching physics and related sciences in 2012. I received the Leading Edge Award for innovative research from the University of Arizona in 2012.  I also received the College of Science Distinguished Teaching Award in 1996, and I was named a University Distinguished Professor in 2013.  This award honors faculty who have made sustained contributions of consistent educational excellence and have demonstrated outstanding commitment to undergraduate education.

5. I have consulted for the U.S. Department of Justice and for the U.S. EPA on the environmental fate of sodium azide. I have authored or co-authored four scholarly articles on the chemistry of azide:

   E. A. Betterton, J. Lowry, R. Ingamells, B. Venner, "Kinetics and Mechanism of the Reaction of Sodium Azide with Hypochlorite in Aqueous Solution", J. Haz. Materials, 182, 716-722 (2010).

Initials ___

J. H. Orlando, G. S. Tyndall, E. A. Betterton, J. Lowry, S. T. Stegall, "Atmospheric Chemistry of Hydrazoic Acid ($HN_3$): UV Absorption Spectrum, HO Reaction Rate, and Reactions of the $N_3$ Radical", Environ. Sci. Technol., 39, 1632-1640 (2005).

E. A. Betterton, "Environmental fate of sodium azide derived from automobile airbags", Crit. Rev. Env. Sci. Technol. 33, 423-458 (2003).

E. A. Betterton, D. Craig, "Kinetics and Mechanism of the Reaction of Azide with Ozone in Aqueous Solution: Evidence for the Formation of Hypoazidite", J. Air Waste Manag. Assoc., 1347-1354, 49 (1999).

6.   My curriculum vitae is attached as Exhibit A.

## <u>FOCUS OF ANALYSIS</u>

7.   I was retained by the Office of the Federal Public Defender for the District of Arizona's Capital Habeas Unit in the Wendi Andriano case to render an opinion on the use of sodium azide in this case, including the expert analysis and trial testimony on this topic. In this regard, I have had several conferences with Andriano's counsel and have reviewed relevant case documents provided by counsel, including:

Autopsy report
Philip Keen, Medical Examiner, defense interview (parts 1 and 2), May 5, 2002
Phoenix Police Department supplemental reports: 8 p.3; 32; 82 p.6; 94; 134; 154
Martinez opening statement (Trial Day 7), September 7, 2004
Philip Keen testimony (Trial Day 13), September 16, 2004
Barry Singelais testimony (Trial Day 15), September 21, 2004
John Knell testimony (Trial Day 16), September 22, 2004
Edward French testimony (Trial Day 17), September 23, 2004
Joseph Richmond (Trial Day 18), September 27, 2004
William Collier testimony pt 1 (Trial Day 29), October 20, 2004
William Collier testimony pt 2 (Trial Day 30), October 21, 2004
Martinez closing argument (pt 1) (Trial Day 43), November 16, 2004
Martinez closing argument (pt 2) (Trial Day 44), November 17, 2004

Initials *ref*

Martinez phase 2 opening statement (Trial Day 46), November 30, 2004

Martinez phase 2 closing (1) (Trial Day 54), December 15, 2004

Martinez phase 2 closing (2) (Trial Day 55), December 16, 2004

State Disclosure: a) report re: testing of food for sodium azide (Bates Nos. 000003-7); b) report re: testing victim's blood for sodium azide (Bates Nos. 000001-2); c) report re: testing victim's gastric contents for sodium azide (Bates Nos. 000008-9).

Defense Disclosure (Bates 010649-10721)

Chart of 224 Facts Linked to Sodium Azide

## PROPERTIES OF SODIUM AZIDE

8. Sodium azide is a white crystalline solid that readily dissolves in water to yield sodium ions ($Na^+$) and azide ions ($N_3^-$), neither of which is volatile, and neither of which is destroyed by boiling.

9. Both hydrazoic acid ($HN_3$) and sodium azide ($NaN_3$) are considered to be highly toxic. It is the azide itself, not the accompanying sodium ion or the hydrogen ion, that makes the mixture toxic. Because hydrazoic acid and azide interconvert quickly and easily in water, depending on the acidity of the aqueous solution, we do not distinguish between their relative toxicities.

10. The exact mechanism of azide toxicity is not well understood. (Trout et al., 1996, at 344 (attached as Exhibit B).) At one time, it was thought to act like cyanide, binding to oxygen-carrying hemoglobin and thus blocking oxygen transport in the blood. That is no longer our understanding. In fact, administering a cyanide antidote to azide-poisoned patients appears to hasten death. In any case, there is no antidote and no treatment for acute azide poisoning.

11. The first symptoms of sodium azide ingestion occur almost immediately. The effects of low doses are reversible, generally within about an hour. The effects of acute doses (e.g., several grams) cannot be reversed and lead to death.

12. An article in the *Forensic Science International* in 2012 from Le Blanc-Louvry et al., provides an example of when sodium azide was found in the human body. The report concerns a 35-year-old male who weighed 75 kg. He deliberately ingested approximately 6 g of sodium azide, which proved fatal within 5 hours. An autopsy was conducted 2 days later. Biological specimens were analyzed 16 days and 46 days after death. They

Initials

revealed elevated levels of sodium azide in the gastric fluid, bile, and urine, as well as in the cardiac and cerebral tissues, but not in the blood, serum, or in the liver or kidney tissue samples. The absence of azide in the blood, in spite of a high concentration of azide in the stomach, is noteworthy because it reveals that the presence of azide in the gastric fluids does not mean that azide should necessarily be found in the blood or other tissues.

13. These results also show that azide quickly deteriorates and is cleared in blood, with a half-life of about 2.5 hours. Consistent with this, azide levels in mouse blood dropped to half their initial levels within about 1 hour. (Smith et al., 1991.) Because of this fairly rapid loss, Le Blanc-Louvry et al., recommended that blood samples should be preserved by the addition of sodium fluoride and storage in the dark at −20°C. Forensic scientists commonly use this method to preserve biological samples more generally. The Le Blanc-Louvry et al., article is attached as Exhibit C. The Smith et al., article is attached as Exhibit D.

## CONCLUSIONS

14. Upon reviewing the records in the Andriano case, I came to the following conclusions.

15. Without proper collection and preservation, sodium azide will continue to decompose in the human body. There is no record of the Phoenix Police Department showing that the victim's biological samples were preserved in the manner suggested above, which would have maintained the sodium azide levels at the level that existed when the samples were taken. It is also unclear how long it took police to recover the biological samples after the death of Joe Andriano; it appears that samples were not taken until the autopsy, several days after the victim's death. Nor is there any record that the samples were shipped by the police department to the lab that would test them— West Coast Analytical—in a manner that would prevent decomposition. Therefore, the levels of sodium azide detected by West Coast Analytical in the samples of the victim's blood, gastric contents, and vomit as well as in the food samples are likely incorrect. Additionally, the sodium azide samples cannot be tested now because of the lack of proper preservation.

16. In addition to the preservation problems, West Coast Analytical used an AS10 column when testing the food samples taken from the kitchen of the Andriano residence. Under the analytical techniques employed by West Coast Analytical, an AS10 column might not have been able to separate azide from nitrate or bromide, which are potential contaminants. Therefore, when West Coast Analytical performed a spike by deliberately adding azide

Initials

to a sample, they might not have been able to distinguish the azide from nitrate or bromide. They should have performed separate tests to confirm that they could indeed separate azide from nitrate and bromide using their analytical technique. When it is not known what chemical compounds are in a mixture, then additional safeguards are needed. The AS9 or AS15 column should have been used, as these are known to be able separate azide from nitrate or bromide in mixtures. Without using an analytical technique that was demonstrated to be capable of separating azide from nitrate and/or bromide, the test results cannot definitively say the chemical detected was in fact azide and not nitrate or bromide. Nitrate is a widely used food additive and so could have been present in the soup samples.

17. Because the samples were not preserved or tested properly, the amount of sodium azide the victim ingested could not be determined. Nor could it be determined at what point the sodium azide was ingested. At trial, John Knell testified that 20.8 grams of sodium azide were missing from the container it was shipped in. The prosecutor then argued that the victim had consumed all of this missing sodium azide. If this were true, then the victim would not have been conscious, and potentially would not have been alive, one to two hours later, as the prosecutor stated he was.

18. The evidence presented by the defense at trial was similarly flawed. It is apparent that William Joseph Collier, hired by the defense at trial, was not an expert on the chemical, physical, or toxicological properties of sodium azide. Only someone with expertise in inorganic chemistry, particularly the acid/base chemistry of sodium azide, together with expertise in the toxicity of sodium azide would have been qualified to testify about this unusual substance. An expert with a different specialty, a general criminalist or crime scene analyst would not be qualified.

19. Collier made several misstatements in his testimony. For example, Collier testified, "In every sodium azide molecule there's one atom of nitrogen and three hydrogen." This is not correct. Mr. Collier recited the chemical formula for ammonia ($NH_3$), not sodium azide ($NaN_3$). Ammonia is a completely different substance from sodium azide, with one being a gas and the other a solid.

20. Collier responded to the question, "What is the pH of sodium azide" by saying, "Sodium azide is in the 4-point something." This is not correct because the question cannot be answered as posed. Sodium azide has no pH—it is a solid. Only when sodium azide is dissolved in water could one begin to answer the question of what is the pH of the aqueous solution after

Initials

the addition of sodium azide. No qualified expert would have answered the question as posed, but instead would have explained the flaw in the question itself.

21. Collier also testified that when sodium azide is mixed with other substances, including stomach acid and foods, the pH of the resulting solution will be 4.72. This is not accurate. The pH will depend on the buffer capacity of the liquid, the amount of sodium azide dissolved, and the amount of acid or alkali available.

22. Collier testified that "[t]he half-life of sodium azide in the blood is 4.5 days." But evidence in the literature on sodium azide suggests that the half-life of azide in the blood could be as short as 2.5 hours. (Le Blanc-Louvry et al., 2012.)

23. Finally, Collier testified that after ingestion of sodium azide, "[a]n airbag would be created in the stomach" and "as soon as the capsules hit the moisture, they would create this large volume of gas and you'd throw up." This is a baseless assertion. Collier appears to have confused the *explosive* properties of sodium azide with its *chemical* properties.

24. Collier thus made incorrect statements to the jury, so the evidence presented by the defense, like that from the prosecution, was not reliable, not based on sound scientific principles, and misleading.

25. Accurate information about the chemical properties of sodium azide and proper chemical analysis and biological specimen preservation methods was available at the time of Ms. Andriano's trial in 2004.

Signed this **30** day of November, 2017.

ERIC A. BETTERTON
Name (Printed)

_(signature)_
Signature

Tucson, Arizona
City, State

Page 6 of 6

# Exhibit A

# Eric A. Betterton



520-621-7120
better@email.arizona.edu
www.has.arizona.edu

**EDUCATION**

Ph.D. (Chemistry, 1983) University of the Witwatersrand, Johannesburg, South Africa.

Thesis Title: "Studies in the Properties and Reactions of Vitamin B12 Complexes".
> Advisor: Prof. J. M. Pratt.
> External examiners: Oxford University; University of California, Santa Barbara.

B. Sc. Honors (Chemistry, 1975); University of Natal, Durban, South Africa.

B.Sc. (Chemistry & Applied Chemistry, 1974); University of Natal, Durban, South Africa.

**EMPLOYMENT**
**Academic**
Head (2016 - ), Department of Hydrology and Atmospheric Sciences

Head and Director (2007 - 2016), Department of Atmospheric Sciences and Institute of Atmospheric Physics

Professor (2000-present), Department of Atmospheric Sciences and Institute of Atmospheric Physics

Associate Professor (1994-2000), Department of Atmospheric Sciences and Institute of Atmospheric Physics, University of Arizona.

Assistant Professor (1988-1994), Department of Atmospheric Sciences and Institute of Atmospheric Physics, University of Arizona.

Assistant Professor (1987-1988), Department of Chemistry, California State University, Northridge.

Visiting Associate (1987-1988), California Institute of Technology, Pasadena, CA.

Research Fellow (1985-1987), California Institute of Technology, Pasadena, CA.

**Industrial**
Assistant to Works Manager (1984-1985), Anglo-Alpha Cement Ltd., Ulco, South Africa.

Operations Engineer (1982-1984), Anglo-Alpha Technical Services, Johannesburg, South Africa.

Chief Chemist (1976-1979), Impala Platinum Limited, Springs, South Africa.

**AFFILIATIONS**
Professor (Adjunct), Department of Chemical and Environmental Engineering, University of Arizona

Professor (Adjunct), Division of Community, Environment and Policy, Zuckerman College of Public Health, University of Arizona

Member, American Meteorological Society

Member, American Geophysical Union

Member, American Chemical Society

**LEADERSHIP/SERVICE NARRATIVE**

Head of Department.  Led a ground-up initiative to merge the Department of Atmospheric Sciences with the Department of Hydrology to create the new Department of Hydrology and Atmospheric Sciences with the near-unanimous approval of the 20 core faculty members (July 1, 2016).  Currently, leading the effort to relocate all personnel into a single building, and to hire four new faculty.

Member of a National Academies committee to "examine the extent to which various sources contribute to environmental lead concentrations in areas at or near Superfund sites that are situated within or adjacent to lead-mining areas": 2016-2017.

Member of the Board of Trustees of the University Corporation for Atmospheric Research (UCAR), 2013-present, chair 2015-2017.  UCAR is a "nonprofit consortium of more than 100 North American member colleges and universities focused on research and training in the atmospheric and related Earth system sciences. UCAR manages the National Center for Atmospheric Research with sponsorship by the National Science Foundation."  While chair of the Board, led the change in senior leadership at UCAR, including the search for a new president.

Chair (2000 – present), Pima County Environmental Quality Advisory Council, appointed by County Board of Supervisors.  "The purpose of this council is to advise and consult with the Board of Supervisors, Department of Environmental Quality staff, and the Department of Environmental Quality Director in administering environmental quality matters."

Chair (2007-2010), American Geophysical Union, Committee on Public Affairs, 2004-2010.

Chair (2005-2009), National Research Council, Research Associateship Programs Review Panels, 1989-2009.  "The NRC Research Associateship Programs promote excellence in scientific and technological research conducted by the U.S. government through the administration of programs offering graduate, postdoctoral, and senior level research opportunities at sponsoring federal laboratories and affiliated institutions."

**AWARDS**

University of Arizona Distinguished Professor ("honors faculty who have made sustained contributions of consistent educational excellence and have demonstrated outstanding commitment to undergraduate education"), 2013.

Professor Leon and Pauline Blitzer Award for excellence in teaching physics and related sciences, 2012.

University of Arizona, Leading Edge Award, for innovative research, 2012.

College of Science Distinguished Teaching Award, 1996.

**SERVICE**

**Department**

Graduate Advisor, 1995-2001

Standing Committee on Faculty Status, 1997-2006.

**College**

College of Public Health, faculty search committees, 2009-10.

College of Science Honors Convocation ceremonies, 1998.

UA Honors College, National and International Scholarship Coordinator, UA Honors College, 1997-1999.

**University**

University Strategic Planning and Budget (SPBAC) committee, (elected) 2006-2012.

University Radiation Safety Committee, 2005-present; elected Chair 2012.

Global Change Ph.D. Minor Executive Committee, 1993-96.

UA Superfund Program Executive Committee, 2000-2010.

**Profession**

University Corporation for Atmospheric Research (UCAR), member, Board of Trustees 2013. Chair 2015 – 2017.

National Academies, National Academies' Committee on Sources of Lead Contamination at or near Superfund Sites, 2016 – 2017.

American Geophysical Union, Committee on Public Affairs, 2004-2010 (Chair 2007-10).

American Meteorological Society, Committee on Planned and Inadvertent Weather Modification, 2004-2007.

University Corporation for Atmospheric Research (UCAR), University Relations Committee, 1997-2003 (Chair 2002-2003).

National Research Council, Research Associateship Program Review Panels, 1989-2009 (Chair 2005-2009).

Technical advisor to U.S. Department of Justice and to the U.S. EPA, environmental fate of sodium azide, 2000-2002.

Presentation made to State of Oregon House Environment Committee (HB2507), "Sodium Azide in Automobile Airbags", March 1, 2005, resulting in landmark legislation controlling airbag disposal:  House Bill 2507.

**Community**

Advisory committee member (1996 - ): Sonora Environmental Research Institute, a not-for-profit organization "with a mission is to partner with low-income and minority communities throughout the southwest to protect the environment and improve community health."

Pima County Environmental Quality Advisory Council, appointed by County Board of Supervisors 2001-present.  Chair 2000 - present.

Technical advisor to Pima County Board of Supervisors – 1) beryllium oxide, 2) Rosemont mine.

**RECENT FUNDING HISTORY**
**Submitted for Review**
Ensemble-Based Prediction of High Impact Dust Episodes in the Southwest United States: Enhanced Forecast, Warning and Decision Support Capabilities, Funded by National Oceanic and Atmospheric Administration (July 1, 2017 - June 30, 2020) ($88,123.80), Submitted for Review, 2016

Risk and Remediation of Metal-Mining Wastes, Funded by National Institute of Environmental Health Sciences (April 1, 2017 - March 31, 2022) ($520,861.21), Submitted for Review, 2016,

Evaluation of a Dust Detection and Communication System, Funded by Arizona Department of Transportation (February 1, 2016 - September 30, 2016) ($49,173.60), Submitted for Review, 2015

**Funded - In Progress**
Facilitating Community Action to Address Climate Change and Build Resiliency in Southern Metropolitan Tucson, Funded by Agnese Nelms Haury Program in Environment and Social Justice Seed Charitable Grant Proposal (March 28, 2016), Funded - In Progress, Fall 2015

Renewable Power Forecasting, Funded by Arizona Public Service (September 9, 2016 - September 8, 2019), awarded September 9, 2016 ($131,880.00), Funded - In Progress, fall 2016

TEP R&D: Program Management and Forecasting Portal Project, Funded by Tucson Electric Power Company (January 1, 2016 - December 31, 2017), awarded January 1, 2016 ($79,325.40), Funded - In Progress, winter 2015

Relating Diesel Exhaust Exposure to Respiratory and Immune Outcomes in Early Life, Funded by National Heart, Lung, and Blood Institute (August 16, 2011 - July 31, 2017), awarded August 16, 2011, Funded - In Progress, Fall 2011

Hazardous Waste Risk and Remediation in the US Southwest, Funded by National Institute of Environmental Health Sciences (September 30, 2015 - March 31, 2018), awarded September 30, 2015 ($99,879.24), Funded - In Progress, fall 2015

Renewable Energy Network (REN) R&D, Funded by Tucson Electric Power Company (January 1, 2015 - December 30, 2016), awarded January 1, 2015 ($79,325.40), Funded - In Progress, winter 2014

**PUBLICATIONS**
**Book Chapter**
1.  E. A. Betterton, "Henry's Law Constants of Soluble and Moderately Soluble Organic Gases: Effects on Aqueous Phase Chemistry", chapter in "Gaseous Pollutants-Characterization and Cycling", Adv. Environ. Sci. Technol. Series, Ed. J. O. Nriagu, Wiley, New York; 1992; pp1-50.

**Peer Reviewed Journals**
2.  Y. Cao, W. Holmgren, M. Leuthold, A Lorenzo, E. A. Betterton, An evaluation of nine ARW-WRF bulk microphysics schemes using GOES imagery and surface observations for solar irradiance forecast in Arizona, submitted Journal of Applied Meteorology and Climatology, May 2017.

3. Michael Stovern, Hector Guzman, Kyle Rine, Omar Felix, Matthew King, Wendell Ela, Eric Betterton, Avelino Saez, Windblown dust deposition forecasting and spread of contamination around mine tailings, Atmosphere, January 2106.

4. Jong-sang Youn, Janae Csavina, Kyle P. Rine, Taylor Shingler, Mark Patrick Taylor, A. Eduardo Sáez, Eric A. Betterton, and Armin Sorooshian. Hygroscopic Properties and Respiratory System Deposition Behavior of Particulate Matter Emitted By Mining and Smelting Operations. Environmental Science & Technology 50, 11706-11713 (2016)

5. Chang Ki Kim, William F. Holmgren, Michael Stovern, Eric A. Betterton, Toward Improved Solar Irradiance Forecasts: Comparison of Downwelling Surface Shortwave Radiation in Arizona Derived from Satellite with the Gridded Datasets.  Pure and Applied Geophysics, 173, 2929-2943 (2016)

6. Chang Ki Kim, William F. Holmgren, Michael Stovern, Eric A. Betterton, Toward Improved Solar Irradiance Forecasts: Derivation of Downwelling Surface Shortwave Radiation in Arizona from Satellite. Pure and Applied Geophysics, 173, 2535-2553 (2016)

7. Chang Ki Kim, Michael Leuthold, William F. Holmgren, Alexander D. Cronin, Eric A. Betterton, Toward Improved Solar Irradiance Forecasts: a Simulation of Deep Planetary Boundary Layer with Scattered Clouds Using the Weather Research and Forecasting Model. Pure and Applied Geophysics, 173, 637-655 (2016).

8. Denise Moreno Ramírez, Mónica Ramírez-Andreotti, Lourdes Vea, Rocío Estrella-Sánchez, Ann Marie Wolf, Aminata Kilungo, Anna H. Spitz and Eric A. Betterton. Pollution Prevention through Peer Education: A Community Health Worker and Small and Home-Based Business Initiative on the Arizona-Sonora Border. Int. J. Environ. Res. Public Health, 12, 1, 2015.

9. Michael Stovern, Kyle P. Rine, MacKenzie R. Russell, Omar Félix, Matt King, A. Eduardo Sáez, Eric A. Betterton. Development of a dust deposition forecasting model for mine tailings impoundments using in situ observations and particle transport simulations. Aeolian Research, 18, 155-167, 2015.

10. Crosbie, E., Youn, J.-S., Balch, B., Wonaschütz, A., Shingler, T., Wang, Z., Conant, W. C., Betterton, E. A., and Sorooshian, A.: On the competition among aerosol number, size and composition in predicting CCN variability: a multi-annual field study in an urbanized desert, Atmos. Chem. Phys., 15, 6943-6958, doi:10.5194/acp-15-6943-2015, 2015.

11. Chang Ki Kim, Michael Leuthold, William F. Holmgren, Alexander D. Cronin, Eric A. Betterton, Toward improved solar irradiance forecasts: A simulation of deep planetary boundary layer with scattered clouds by using the Weather Research and Forecasting model, Pure and Applied Geophysics, March, 2015. DOI 10.1007/s00024-015-1072-3.

12. Eric A. Betterton, Benjamin Herman; E. Philip Krider, James J. Riley: Tribute to William D. Sellers (1928-2014), Bulletin of the American Meteorological Society, 96, 135-136, 2015.

13. Erik Rupp, Marty Willinger; Brian Barbaris; Eric A Betterton; Robert G Arnold; Avelino E Saez, Catalytic Dehalogenation of Chlorinated Hydrocarbons in the Presence of Oxygen and Propane, Chemical Engineering Journal, submitted Jan 2015.

14. Prabhakar, G., Betterton E. A., Conant, W., Herman, B. M., Effect of Urban Growth on Aerosol Optical Depth —Tucson, Arizona, 35 Years Later. J. Applied Meteorology and Climatology, 1876-1885, 53, 2014.

15. Omar Felix; Janae Csavina; Kyle Rine; Eric Betterton, Use of Lead Isotopes to Identify Sources of Metal and Metalloid Contaminants in Atmospheric Aerosol from Mining Operations, Chemosphere, 219-226, 122, 2015.

16. William F. Holmgren, Antonio T. Lorenzo, Michael Leuthold, Chang Ki Kim, Alexander D. Cronin, and Eric A. Betterton, An Operational, Real-Time Forecasting System for 250 MW of PV Power Using NWP, Satellite, and DG Production Data, Proceedings 40th IEEE Photovoltaic Specialists Conference, Denver, June 8-13, 2014.

17. A.T. Lorenzo, W. F. Holmgren, M. Leuthold, Chang Ki Kim; A. D. Cronin, A.D.; Eric A. Betterton, Short-term PV power forecasts based on a real-time irradiance monitoring network IEEE 40th Photovoltaic Specialists Conference (PVSC), Denver, 8-13 June, pp. 75-9, 2014.

18. Janae Csavina, Mark P. Taylor, Omar Félix, Kyle P. Rine, A. Eduardo Sáez and Eric A. Betterton, Size-Resolved Dust and Aerosol Contaminants Associated with Copper and Lead Smelting Emissions: Implications for Emissions Management and Human Health, Science of the Total Environment, accepted June 2014.

19. Michael Stovern, A. Eduardo Sáez, Eric A Betterton. Simulation of windblown dust transport from a mine tailings impoundment using a computational fluid dynamics model.  Accepted, Aeolian Research, February 2014.

20. Stovern M, Betterton EA, Sáez AE, Villar OI, Rine KP, Russell MR, King M., Modeling the emission, transport and deposition of contaminated dust from a mine tailing site. Rev Environ Health, in press, 2014. PMID: 24552963

21. Gouri Prabhakar, Armin Sorooshian, Emily Toffol, Avelino F. Arellano, Eric A. Betterton. Spatiotemporal distribution of airborne particulate metals and metalloids in a populated arid region. Atmospheric Environment 339-347, 92, 2014.

22. Janae Csavina, Jason Field, Omar Félix, D. Alba Yadira Corral Avitia, A. Eduardo Sáez, and Eric A. Betterton, Effect of Wind Speed and Relative Humidity on Atmospheric Dust in Arid to Semi-Arid Climates, Sci. Tot. Env., accepted March 2014.

23. Jong-Sang Youn, Zhen Wang, Anna Wonaschütz, Avelino Arellano, Eric A. Betterton, Armin Sorooshian, Evidence of Aqueous Secondary Organic Aerosol Formation from Biogenic Emissions in the North American Sonoran Desert, J. Geophysical Research, accepted June 2013.

24. Sorooshian, Armin; Csavina, Janae; Shingler, Taylor; Dey, Stephen; Brechtel, Fred; Sáez, Eduardo; Betterton, Eric, Hygroscopic and Chemical Properties of Aerosols collected near a Copper Smelter: Implications for Public and Environmental Health, Environmental Science and Technology, 46, 9473-9480 (2012).

25. Janae Csavina, Jason Field, Mark P. Taylor, Song Gao, Andrea Landázuri, Eric A. Betterton, A. Eduardo Sáez, A Review on the Importance of Metals and Metalloids in Atmospheric Dust and Aerosol from Mining Operations, Science of the Total Environment, 433, 58-73 (2012).

26. Theresa Foley, Eric A. Betterton*, Ann Marie A. Wolf; Ambient PM10 and metal concentrations measured in the Sunnyside Unified School District, Tucson, Arizona; J. Arizona-Nevada Academy of Science, 43, 67-76 (2012).

27. J. Csavina, A. Landázuri, A. Wonaschutz, K. Rine, P. Rheinheimer, B. Barbaris, W. Conant, A.E. Sáez and E.A. Betterton, Metal and Metalloid Contaminants in Atmospheric Aerosols from Mining Operations, Journal of Water Air and Soil Pollution, 221, 145-157 (2011).

28. Sorooshian Armin; Wonaschuetz Anna; Jarjour Elias G.; Bryce I. Hashimoto, Bret A. Schichtel, Eric A. Betterton; An aerosol climatology for a rapidly growing arid region (southern Arizona): Major aerosol species and remotely sensed aerosol properties. J. Geophysical Research – Atmospheres, 116, 20 pp. DOI: 10.1029/2011JD016197 (2011).

29. Theresa Foley, Eric A. Betterton*, Robert Jacko, John Hillery, Lake Michigan air quality:  the 1994 to 2003 LADCO Project, Atmos. Environ., 45, 3192-3202 (2011).

30. Eric A. Betterton, Joe Lowry, Robin Ingamells, Brad Venner, Kinetics and Mechanism of the Reaction of Sodium Azide with Hypochlorite in Aqueous Solution, J. Haz. Materials, 182, 716-722 (2010).

31. Willinger M, Rupp E, Barbaris B, Gao S, Arnold R, Betterton E, Sáez AE, Thermocatalytic destruction of gas-phase perchloroethylene using propane as a hydrogen source, J Hazard Mater. 2009 Jan 23. PMID: 19217713.

32. Rupp, Erik C., Betterton, Eric A. Arnold, Robert G. Saez, A. Eduardo "Interaction of Perchloroethylene with Cerium Oxide in Three-Way Catalysts", Catalysis Letters, 2009, 132, 153-8.

33. Gao, S.; Rupp, E.; Bell, S.; Willinger, M.; Foley, T.; Barbaris, B.; Saez, A. E.; Arnold, R. G.; Betterton, E., Mixed Redox Catalytic Destruction of Chlorinated Solvents in Soils and Groundwater. In Environmental Challenges In The Pacific Basin, 2008; Annals of the New York Academy of Sciences, Vol. 1140, pp 435-445.  PMID: 18991945

34. Örbay, O.; Gao, S.; Barbaris, B.; Rupp, E.; Saez, E.; Arnold, R. G.; Betterton, E. A., Catalytic dechlorination of gas-phase perchloroethylene under mixed redox conditions. Applied Catalysis B-Environmental 2008, 79, (1-2), 43-52.  PMID: 19234593

35. R. Matichuk, B. Barbaris, E. A. Betterton, M. Hori, N. Murao, S. Ohta, D. Ward, "A Decade of Mid-Tropospheric Aerosol and Gas Precursor Chemical Characterization at Mt. Lemmon, Arizona (1992 to 2002)", J. Met. Soc. Japan, 84, 653-670 (2006).

36. X. Ju, M. Hecht, R. Galhotra, W. Ela, E. Betterton, R. Arnold and A. Saez. "Destruction of Gas-Phase Trichloroethylene in a Modified Fuel Cell" Environ. Sci. Technol, 612-617 (2006).

37. J. H. Orlando, G. S. Tyndall, E. A. Betterton, J. Lowry, S. T. Stegall, "Atmospheric Chemistry of Hydrazoic Acid (HN3): UV Absorption Spectrum, HO Reaction Rate, and Reactions of the N3 Radical", Environ. Sci. Technol., 39, 1632-1640 (2005).

38. Li, H; Betterton, E. A.; Arnold, R. G; Ela, W. P.; Barbaris, B; Grachane, C; Convenient new chemical actinometer based on aqueous acetone, 2-propanol, and carbon tetrachloride, Environ. Sci. Technol., 39, 2262- 2266 (2005).

39. J. He, Wendell P. Ela, E. A. Betterton, Robert G. Arnold, and A. Eduardo Sáez, "Reductive Dehalogenation of Aqueous-Phase Chlorinated Hydrocarbons in an Electrochemical Reactor", Ind. Eng. Chem. Res., 43, 7965 -7974 (2004).

40. J. He, R. G. Arnold, A. E. Saez, E. A. Betterton, W. P. Ela, "Removal of aqueous phase TCE using membrane air stripping contactors", J. Env. Eng. 130, 1232-1241 (2004).

41. H. Li, R. G. Arnold, E. A. Betterton, W. P. Ela, B. Barbaris, "Comment on "The mechanisms of rate enhancing and quenching of trichloroethene photodecay in the presence of sensitizer and hydrogen sources", by Chu, W. and Choy, W. K. (2002) Water Research 36: 2525-2532", Water Res. 38, 2791-2 (2004).

42. J. He, A. E. Saez, W. P. Ela, E. A. Betterton, R. G. Arnold, "Destruction of Aqueous-Phase Carbon Tetrachloride in an Electrochemical Reactor with a Porous Cathode", Ind. Eng. Chem. Res. 43, 913-923 (2004 ).

43. E. A. Betterton, "Environmental fate of sodium azide derived from automobile airbags", Crit. Rev. Env. Sci. Technol. 33, 423-458 (2003).

44. S. Kommineni, W. P. Ela*, R. G. Arnold, S. G. Huling, B. J. Hester, E. A. Betterton, "NDMA treatment by sequential GAC adsorption and Fenton-driven destruction", Env. Eng. Sci. 20, 361-373 (2003).

45. G. Chen, E. A. Betterton, R.G. Arnold*, W.P. Ela, "Electrolytic Reduction of Trichloroethylene and Chloroform at a Pt- or Pd-Coated Ceramic Cathode", J. Appl. Electrochem. 33, 161-169 (2003).

46. Mohamed S. A. Hamza, Rudi van Eldik, Pascal L. S. Harper, John M. Pratt, and Eric A. Betterton, "Five-coordination and Adduct Formation in Co(III) Corrinoids: Dissecting Ligand Substitution into its Component Parts", Eur. J. Inorg. Chem., 580-583 (2002).

47. Z. Liu, R.G. Arnold*, E.A. Betterton, E. Smotkin, "Reductive dehalogenation of gas-phase chlorinated solvents using a modified fuel cell", Env. Sci. Technol., 35, 4320-4326 (2001).

48. E. A. Betterton*, D. J. Anderson, "Autoxidation of N(III), S(IV) and other species in frozen solution – a possible pathway for enhanced chemical transformation in freezing systems", J. Atmos. Chem., 171-189, 40 (2001).

49. E. A. Betterton*, N. Hollan, R. G. Arnold, S. Gogosha, K. McKim, "Acetone-Photosensitized Reduction of Carbon Tetrachloride by 2-Propanol in Aqueous Solution", Env. Sci. Technol., 1229-1223, 34 (2000).

50. Z. Liu, R.G. Arnold*, E.A. Betterton, "Electrolytic Reduction of Low-Molecular-Weight Chlorinated Aliphatic Compounds – Structural and Thermodynamic Effects on Process Kinetics", Env. Sci. Technol., 804-811, 34 (2000).

51. E. A. Betterton*, D. Craig, "Kinetics and Mechanism of the Reaction of Azide with Ozone in Aqueous Solution:  Evidence for the Formation of Hypoazidite", J. Air Waste Manag. Assoc., 1347-1354, 49 (1999).

52. Z. Liu, R.G. Arnold*, E.A. Betterton, K. Festa, "Electrolytic Reduction of CCl4 – Effects of Cathode Material and Potential on Kinetics, Selectivity and Product Stoichiometry", Env. Eng. Sci., 1-13, 16 (1999).

53. G. Chen, E.A. Betterton, R.G. Arnold*, "Electrolytic Oxidation of Trichloroethylene Using a Ceramic Anode", J. Appl. Electrochem., 961–970, 29 (1999).

54. B. A. Klimowski, R. Becker, E. A. Betterton*, R. Bruintjes, T. L. Clark, W. D. Hall, B. W. Orr, R. A. Kropfli, P. Piironen, R. F. Reinking, D. Sundie, T. Uttal, "The 1995 Arizona Program: toward a better understanding of winter storm precipitation development in mountainous terrain", Bull. Amer. Meterol. Soc., 799-813, 79 (1998).

55. Z. Hu, R. T. Bruintjes*, E. A. Betterton, "Sensitivity of Cloud Droplet Growth to Collision and Coalescence Efficiencies in a Parcel Model", J. Atmos. Sci., 2502-2515, 55 (1998).

56. T. Young, E. A. Betterton*, L. Saldivar de Rueda, "Photochemical box model for Mexico City", Atmosfera, 161-178, 10 (1997).

57. E. A. Betterton*, J. R. Robinson, "Henry's law coefficient of hydrazoic acid", J. Air Waste Manag. Assoc., 1216-1219, 47 (1997).

58. S. Philippin, E. A. Betterton*, "Cloud Condensation Nuclei Concentrations in Southern Arizona: Instrumentation and early observations", Atmospheric Research, 263-275, 43 (1997).

59. J. Johnson, E. A. Betterton*, D. Craig, "Henry's Law Coefficients of Formic and Acetic Acids", J. Atmos. Chem., 113-119, 24 (1996).

60. Barbaris, E. A. Betterton*, "Initial Snow Chemistry Survey of the Mogollon Rim in Arizona", Atmospheric Environment, 3093-3103, 30 (1996)

61. K. D. Warren, R.G. Arnold*, T. L. Bishop, L.C. Lindholm, E. A. Betterton, "Kinetics and Mechanism of Reductive Dehalogenation of Carbon Tetrachloride Using Zero-Valence Metals, "J. Hazardous Mat., 217-227, 41 (1995).

62. E.A. Betterton*, R.G. Arnold, R. J. Kuhler, G. A. Santo, "Reductive Dehalogenation of Bromoform in Aqueous Solution", Environ. Health Perspectives, 89-91, 103 (1995).

63. Y. Cao, M. Conklin*, E. Betterton, "Competitive complexation of trace metals with dissolved humic acid", Environ. Health Perspectives, 29-32, 103 (1995).

64. R. Kuhler, G. Santo, T. Caudill, E. A. Betterton*, R.G. Arnold, "Photoreductive Dehalogenation of Bromoform on $TiO_2$-Macrocycle Hybrid Catalysts", Environ. Sci. Technol., 2104-2111, 27 (1993).

65. Betterton, "On the pH-Dependent Formation Constants of Iron(III)-S(IV) Transient Complexes", J. Atmos. Chem., 307-324, 17 (1993).

66. Betterton, "Oxidation of Alkyl Sulfides by Aqueous Peroxymonosulfate", Environ. Sci. Technol., 527-532, 26 (1991).

67. Betterton, "The Partitioning of Ketones Between the Gas and Aqueous Phases", Atmos. Environ., 1473-1477, 25A (1991).

68. E. A. Betterton, "Acid Rain Experiment and Construction of a Simple Turbidity Meter", J. Chem. Educ., 254-256, 68 (1991).

69. E. A. Betterton*, M. R. Hoffmann, "Kinetics and Mechanism of the Oxidation of Aqueous Hydrogen Sulfide by Peroxymonosulfate", Environ. Sci. Technol., 1819-1824, 24 (1990).

70. P. -S. K. Leung, E. A. Betterton, M. R. Hoffmann*, "Kinetics and Mechanism of the Reduction of Co(II)-4,4',4'',4'''-Tetrasulfophthalocyanine by 2-Mercaptoethanol Under Anoxic Conditions", J. Phys. Chem., 430-433, 93 (1989).

71. E. A. Betterton*, Y. Erel, M. R. Hoffmann, "Aldehyde-Bisulfite Adducts: Prediction of Their thermodynamic and Kinetic Properties", Environ. Sci. Technol., 92-99, 22 (1988).

72. E. A. Betterton*, M. R. Hoffmann, "Henry's Law Constants for Some Environmentally Important Aldehydes", Environ. Sci. Technol., 1415-1418, 22 (1988).

73. E. A. Betterton, M. R. Hoffmann, "Oxidation of Aqueous $SO_2$ by Peroxymonosulfate", J. Phys. Chem., 5962-5965, 92 (1988).

74. S. M. Chemaly, E. A. Betterton, J. M. Pratt*, "The Chemistry of Vitamin B12 . Part 27. The Cage Phosphite Ester 4-Ethyl-2,6,7-trioxa-1-phosphabicyclo[2.2.2]octane and the Anionic Dimethyl Phosphite as Ligands for Cobalt (III) Corrinoids", J. Chem. Soc. Dalton, 761-767 (1987).

75. E. A. Betterton*, M. R. Hoffmann, "The Kinetics, Mechanism and Thermodynamics of the Reversible Reaction of Methylglyoxal $CH_3COCHO$ with S(IV)", J. Phys. Chem., 3011-3020, 91 (1987).

76. E. A. Betterton, S. M. Chemaly, J. M. Pratt*, "The Chemistry of Vitamin B12. Part 26. Coordination of the Malonitrile Anion by Co(III) Corrinoids: First Experimental Determination of Equilibrium Constants for the Coordination of a Tetrahedral Carbanion by a Transition Metal Ion", J. Chem. Soc. Dalton, 1619-1622 (1985).

77. D. A. Baldwin, E. A. Betterton, S. M. Chemaly, J. M. Pratt*, "The Chemistry of Vitamin B12. Part 25. Mechanism of the  -Elimination of Olefins from Alkylcorrinoids; Evidence for an Initial Homolytic Fission of the Co-C Bond",  J. Chem. Soc. Dalton, 1613-1618 (1985).

78. E. A. Betterton, "The Romans Did It in the Forum", ChemSA, 267-268, 10 (1984).

79. D. A. Baldwin, E. A. Betterton, J. M. Pratt*, "The Chemistry of Vitamin B12. Part 22. Steric Effects in the Coordination of Amines by Co(III) Corrinoids", J. Chem. Soc. Dalton, 2217-2222 (1983).

80. D. A. Baldwin, E. A. Betterton, J. M. Pratt*, "The Chemistry of Vitamin B12. Part 21. Ethynylaquocobinamide: Novel Reaction of Diaquocobinamide with Acetylene Catalyzed by Copper Ions", J. Chem. Soc. Dalton, 225-229 (1983).

81. D. A. Baldwin, E. A. Betterton, J. M. Pratt*, "The Chemistry of Vitamin B12. Part 20. Diaquocobinamide: pKa values and Evidence for Conformational Isomers", J. Chem. Soc. Dalton, 217-223 (1983).

82. D. A. Baldwin, E. A. Betterton, J. M. Pratt*, "The Correlation of Kinetic with Thermodynamic and Ground-State Trans-Effects in Co(III) Corrinoids", S. Afr. J. Chem., 173-175, 35 (1982).

**Book Review**

83. E. A. Betterton, "Tropospheric Ozone: Regional and Global Scale Interaction", I. S. A. Isaksen, Ed. 1988, 425 pp. Reidel Publishing Co.; Bull. Amer. Meteorl. Soc. 690, 70 (1989).

**Other Publications**

84. E. A. Betterton, "Saving a Department: the Arizona Story", UCAR Quarterly, pg. 6, Summer 2004.

**PATENTS AND CONSULTING**

**Patent Disclosures**

Eric A. Betterton , Robert G. Arnold, Wendell P. Ela, A. Eduardo Sáez,  Xiumin Ju , O. Orbay , "A Process for the Destruction of Halogenated Organic Vapors using a Catalytic Converter under Redox Conditions", patent disclosure to UA Office of Technology Transfer, 2004.

E.A. Betterton, R.G. Arnold, Z. Liu, "Carbonyl photosensitized dehalogenation of halo–organic solvents", 1999.

E.A. Betterton, R.G. Arnold, K. Warren, "Constant-potential, Continuous-phase Metallic Iron Electrode For in Situ Reductive Dehalogenation of Hazardous Organic Compounds", 1995.

R. G. Arnold and E. A. Betterton, "Solar-Assisted Hybrid Catalyst for Reductive Dehalogenation of Halogenated Organics", 1991.

E. A. Betterton, "Hydroxyl Radical Detector", 1991.

**Consulting**

U.S. Department of Justice, Capital Habeas Unit, 2016 - 2017

Pima County Department of Environmental Quality, Rosemont Mine, 2013 - 2015

Pima County Department of Environmental Quality, Beryllium oxide monitoring network, 2012-2015.

Gilbane, Inc., lead pollution at ASARCO Hayden, Arizona, 2013 – present.

U.S. Department of Justice: Sodium azide properties and fate.

U.S. EPA: Sodium azide.

Oldfather & Morris Attorneys at Law, Louisville, KY.

Law Offices of Raphael Metzger, Long Beach, CA.

Posen Enterprises, Inc., Scottsdale, AZ.

Los Angeles County Sanitation Districts.

# Exhibit B

AMERICAN JOURNAL OF INDUSTRIAL MEDICINE 30:343–350 (1996)

# Exposures and Health Effects: An Evaluation of Workers at a Sodium Azide Production Plant

**Douglas Trout,** MD, MHS, **Eric J. Esswein,** MSPH, **Thomas Hales,** MD, **Kenneth Brown,** PhD, **Gina Solomon,** MD, **and Michael Miller,** DO

*Sodium azide is the principal gas-generating agent used to inflate automobile supplemental restraint systems, more commonly called airbags. Although sodium azide is known to affect the cardiovascular system by causing peripheral vasodilation, there is no published literature describing occupational exposures to sodium azide in the rapidly growing automobile airbag industry. In 1994–1995, the National Institute for Occupational Safety and Health (NIOSH) conducted a cross-sectional study of health complaints reported by sodium azide production workers at the only continuous sodium azide production facility in the United States. The NIOSH evaluation consisted of a plant industrial hygiene survey, a symptom questionnaire, ambulatory blood pressure monitoring, and blood azide analysis. Personal breathing zone air monitoring revealed exposures to sodium azide and hydrazoic acid (a reactant product) at levels greater than the NIOSH Recommended Exposure Limits (RELs). In some cases, exposures exceeded the REL despite the use of air-supplied respirators. The questionnaire revealed that most workers reported headache (10 of 11 [91%]), episodes of low blood pressure (9 of 11 [82%]), and palpitations (8 of 11 [73%]) occurring in the production areas within the 6 months preceding the study. Mild headache (4 of 11 [36%]) was the only symptom reported during our 24-hr medical survey. Ambulatory blood pressure monitoring revealed one asymptomatic employee with a drop in blood pressure (defined as a drop in systolic [at least 20 mm Hg] and diastolic [at least 10 mm Hg] blood pressure) during a period of exposure to sodium azide at a level five times the NIOSH REL. Improvements in plant engineering controls, increased attention to employee hygiene practices, and a more comprehensive respiratory protection program were recommendations made by NIOSH to reduce exposures at the plant. All facilities handling sodium azide should be aware of the potential toxicity of sodium azide and hydrazoic acid.*   © 1996 Wiley-Liss, Inc.*

**KEY WORDS: sodium azide, hydrazoic acid, air monitoring, hypotension, ambulatory blood pressure monitoring, blood pressure, biological monitoring, airbags**

## INTRODUCTION

### Sodium Azide

National Institute for Occupational Safety and Health, Cincinnati, Ohio (D.T., E.E., T.H., K.B.).
Harvard School of Public Health, Boston, Massachusetts (G.S.).
Emory University, Rollins School of Public Health, Atlanta, Georgia (M.M.).
Address reprint requests to Dr. Douglas Trout, NIOSH, 4676 Columbia Parkway, R-10, Cincinnati, OH 45226.

Accepted for publication January 11, 1996.

© 1996 Wiley-Liss, Inc.   *This article is a US Government work and, as such, is in the public domain in the United States of America.

Sodium azide ($NaN_3$) is a white crystalline solid used as the principal gas-generating chemical in automobile supplemental restraint systems, more commonly called airbags, which are common features in new automobiles in the United State and worldwide. Additional uses for sodium azide include the production of explosives (lead azide), fun-

gicide and herbicide manufacture, and in the medical sciences as a tissue preservative and diluent in automatic blood cell counters. According to data collected by the National Institute for Occupational Safety and Health (NIOSH) during the early 1980s, nearly 55,000 workers in the United State are potentially exposed to sodium azide [NIOSH, 1990]. These data do not include potential occupational exposures to sodium azide in the rapidly growing airbag industry, which in addition to raw sodium azide production could include airbag manufacturing, installation, and recycling.

Sodium azide can affect the cardiovascular system by causing peripheral vasodilation, potentially leading to hypotension and symptoms such as headache [Frederick and Babish, 1982; Kleinhofs et al., 1978]. Because sodium azide exists in ionic equilibrium with hydrazoic acid ($HN_3$) in aqueous systems, it is difficult to assess the toxicity of sodium azide independent of hydrazoic acid; hydrazoic acid may well be the ultimate toxic agent responsible for symptoms in those exposed to sodium azide [Reinhardt and Britelli, 1981]. The mechanism of action of sodium azide and hydrazoic acid is poorly understood [Frederick and Babish, 1982; Smith and Wilcox, 1994]. Although ingestion of large amounts of sodium azide can result in a variety of adverse health effects and can be fatal [Klein-Schwartz, 1989; Abrams et al., 1987], exposure to sodium azide and hydrazoic acid at levels causing hypotension has not been associated with permanent effects [Black et al., 1954; Graham et al., 1948]. Skin absorption of sodium azide has been reported in animal studies [Bassendowska and Kowalski, 1962; Farm Chemical Handbook, 1991] but is not well understood in humans. Methods of biological monitoring are not widely available for occupational exposures to sodium azide [Howard et al., 1990; Swarin and Waldo, 1982; Hitt, 1992; Lambert et al., 1995], but methods in animals are being developed [Smith et al., 1991].

Case reports of occupational exposure to sodium azide primarily involve ingestion among laboratory workers, who subsequently report symptoms that can include lightheadedness, weakness, blurred vision, mucous membrane, eye, and respiratory tract irritation, diarrhea, abdominal complaints, headache, low blood pressure, and palpitations [Kleinhofs et al., 1978; Black et al., 1954]. Headache has been noted to be the most common symptom after exposure to sodium azide and may last longer than other symptoms [Reinhardt and Britelli, 1981]. Hypotension has been reported among lead azide workers exposed to hydrazoic acid [Abrams et al., 1987].

The NIOSH Recommended Exposure Limits (RELs) are ceiling limits of 0.1 parts per millions (ppm) hydrazoic acid vapor and 0.3 mg/m$^3$ sodium azide. These criteria are

Mention of company names or products does not constitute endorsement by the National Institute for Occupational Safety and Health.

the same as the Occupational Safety and Health Administration (OSHA) Permissible Exposure Limits (PELs) enforced in the state in which this evaluation took place, and the American Conference of Governmental Industrial Hygienists Threshold Limit Values (TLVs), which are also ceiling levels designed to provide a margin of safety from headache discomfort and to protect against significant drop in blood pressure [NIOSH, 1992; ACGIH, 1991].

## Blood Pressure

Measuring acute drops in blood pressure due to occupational exposures is difficult due to the multiple factors that can affect blood pressure. Although a number of studies have attempted to define ''normal'' ranges of blood pressure, there is no uniform definition for hypotension. Hypotension has been defined in different types of studies by (1) absolute limits, such as a blood pressure of 80/50 mm Hg [Leier, 1989]; (2) decreases of 10 mm Hg in the systolic [Einert et al., 1963] or diastolic [Einert et al., 1963; Szucs and Schneeweiss, 1992] blood pressure; (3) limits based on multiples of the standard deviation around a mean value [Master et al., 1950; NIOSH, 1976; Hoffler et al., 1974; Pickering et al., 1988; Staessen et al., 1990, 1991]; and (4) limits based on percentage changes, such as a 25% fall in mean blood pressure [Roth et al., 1956]. Many of the studies evaluating blood pressure changes among workers have been done using manual blood pressure measurements. Recently, ambulatory blood pressure monitoring (ABPM) has been used for accurate and reliable diagnosis and management of hypertension in the clinical setting [Sheps et al., 1994]. ABPM has been reported to reduce the error associated with blood pressure measurements by taking a larger number of measurements and by eliminating the ''white coat'' effect [Pickering, 1994]. ABPM has also been used in a variety of work sites, including industrial sites, hospital emergency departments, and offices, as a tool to evaluate the effects of various workplace factors and blood pressure [Theorell et al., 1991; Schnall et al., 1990; Arco-Galan et al., 1994; Fiedler et al., 1989; Green et al., 1991].

## MATERIALS AND METHODS

## Worksite Description

In 1994, NIOSH received a confidential request to perform a health hazard evaluation (HHE) at a sodium azide production facility in the southwestern United States. The request was submitted by employees at the plant and concerned health effects believed to be related to occupational exposures to sodium azide and hydrazoic acid. In response to this request, NIOSH performed a cross-sectional medical and industrial hygiene study to evaluate the employees at this facility [NIOSH, 1995].

The facility is the sole continuous sodium azide production plant in the United States. The plant was designed

as a highly automated operation and had been in production for approximately 3 years at the time of this study. Sodium azide is produced by reacting elemental sodium, anhydrous ammonia, and nitrous oxide in a multistep process, initially producing sodium amide and ultimately sodium azide. The final product is a white crystalline solid, which is gravity-screened to customer specifications and packaged into various-sized (100–1,200-pound) containers for shipment. Reblending and repackaging is done as needed to control grain size and product consistency. Engineering controls in the blending and packaging areas include a vacuum and an enclosed screw auger for transfer of sodium azide between containers. Local exhaust ventilation and high efficiency particulate arrestor (HEPA) portable vacuums are used to control azide dust during drum filling and azide transfer operations at the plant.

The plant is continuously operated by four rotating shifts of five chemical operators and two maintenance workers. An operator's work is divided between work in the control room and work in the plant. Control room work consists primarily of monitoring electronic equipment, which tracks and regulates the chemical reactions and product handling. Operations in the plant primarily involve process monitoring, product sampling, maintenance activity, product blending, transfer and reblending, and packaging operations. Personal protective equipment (PPE) worn by the operators while performing selected routine duties includes 3M 8300 Whitecap air-line respirators with helmets and hoods, safety glasses, protective gloves, coveralls, and rubber boots. An automatic blood pressure cuff was available in a central area for the employees to measure their own blood pressure (no formal blood pressure-monitoring program was in place).

## Exposure Assessment

To evaluate workers exposure to sodium azide and hydrazoic acid, area and personal breathing zone (PBZ) samples were collected during normal work practices. PPE usage and work practices were observed as employees completed their assigned tasks. Workers and work tasks were selected for PBZ air sampling based on observations and the results of area air sampling performed during an initial site visit. Air sampling was conducted using constant-flow personal sampling pumps with sampling trains calibrated on-site to a flow rate of one liter per minute. Sampling media consisted of 37-mm, 5-μm pore size polyvinyl chloride membrane filters connected in-line with 150/75-mg impregnated silica gel solid sorbent tubes (SKC 226-55). Analysis for sodium azide and hydrazoic acid was performed by ion chromatography using OSHA method ID-211 [OSHA, 1992]. The range of minimum detectable concentrations (MDCs) for sodium azide was determined to be 0.06 mg/m$^3$, for sample volumes with a mean of 54 liters

(range 21–88 liters), to 0.02 mg/m$^3$, for sample volumes with a mean of 203 liters (range 106–288). The MDCs for hydrazoic acid were calculated to be 0.02 ppm and 0.005 ppm, respectively, for mean sample volumes of 54 and 203 liters. Analytical limits of detection were reported as 3.0 μg and 2.0 μg per sample, respectively, for sodium azide and hydrazoic acid. Results are reported for sodium azide as the sum of the azide particulate and hydrazoic acid vapor concentrations [OSHA, 1992], and as the hydrazoic acid vapor concentration alone. This is consistent with OSHA Method ID-211 for air monitoring of the occupational environment for the presence of sodium azide.

## Medical Evaluation

The medical evaluation (performed over two consecutive 12-hr shifts) consisted of symptoms questionnaires, ABPM, and blood azide analysis. All production operators (determined to have greater potential for exposure to sodium azide and hydrazoic acid than other plant workers) working at the time of our site visit were asked to participate in the evaluation. Employees were informed of the evaluation by both management and NIOSH personnel and provided signed informed consent prior to participating. A symptom (including specific questions concerning headache, lightheadedness, rapid heart beat, and eye irritation) and work history questionnaire was administered to all participants at the start of the workshift, and brief symptom questionnaires were administered throughout the work shift.

## Blood Pressure Monitoring

Blood pressure was monitored with the use of ambulatory blood pressure monitors (Advanced Medical Products, model 5600, Columbia, SC). The monitors were used in the "self-activated" mode; participants were asked to activate the monitor at least every 30 min by pressing a button. The self-activated mode (rather than an automatic mode) was used due to safety concerns related to potential distraction of employees as the cuff inflated. Participants were asked to wear the monitor for one of their usual 12-hr shifts and were instructed to extend their arm and discontinue movement as the cuff inflated and the blood pressure was being measured. As each cuff was initially placed on an employee, calibration was performed comparing the blood pressure obtained by the monitor with a manual measurement obtained using a standard sphygmomanometer attached to the cuff and the monitor via a three-way valve. If either the systolic or diastolic readings from the ABP monitor were not within 5 mm Hg of the corresponding manual reading, the cuff was readjusted until the corresponding readings were within 5 mm Hg. The first three manual blood pressure measurements, taken with the standard sphygmomanometer while the participant had been seated for at least 5 min, were

346    Trout et al.

**TABLE I.** Personal Breathing Zone (PBZ) Air Samples by Operation

| Operation | No. of samples[a] | Sodium azide (mg/m³) | | Hydrazoic acid (ppm) | |
|---|---|---|---|---|---|
| | | Range | No. of samples >REL[b] | Range | No. of samples >REL[c] |
| Blending and packing | 9 | Tr[d]-1.7 | 6 | Tr-0.10 | 1 |
| Drying operation | 4 | 0.14–0.23 | 0 | Tr-1.10[e] | 1 |
| Control room | 2 | 0.05–0.19 | 0 | 0.02–0.07 | 0 |
| Area 16 | 6 | ND[f]-0.16 | 0 | ND[g]-0.03 | 0 |
| Centrifuge | 2 | 0.09–0.15 | 0 | 0.03–0.05 | 0 |
| Miscellaneous | 2 | ND-0.05 | 0 | ND-0.02 | 0 |
| Total: | 25 | | 6 | | 2 |

[a]Three PBZ samples inside the workers PPE excluded from this summary (see Table II), including one sodium azide and two hydrazoic acid exposures equal to or above the NIOSH REL.
[b]NIOSH Recommended Exposure Limit (REL) for sodium azide is 0.3 mg/m³.
[c]NIOSH REL for hydrazoic acid is 0.1 ppm.
[d]Tr = Trace (concentration between limit of detection and limit of quantitation).
[e]Analysis of one of the PBZ samples in the drying operation reported for hydrazoic acid only due to accidental separation and loss of filter cassette from sampling train during sample collection.
[f]ND = not detected (minimum detectable concentration [MDC] for sodium azide = 0.02–0.06 mg/m³.
[g]ND = not detected (MDC for hydrazoic acid = 0.005–0.02 ppm).

averaged and used as the participant's baseline blood pressure. A hypotensive episode during the work shift was defined as a drop from baseline of 20 mm Hg in systolic blood pressure (SBP) and of 10 mm Hg in diastolic blood pressure (DBP). In addition, for men, a blood pressure of 90/60 or lower would be considered hypotensive; a blood pressure of 80/50 or lower would be considered hypotensive for women. The blood pressure data were analyzed by evaluating the blood pressure changes per individual, the means of the blood pressures of the individuals in the control room versus those in the production areas, and the grouped means of blood pressures in the control room versus those in the production areas.

## Blood Azide Monitoring

Two blood samples, a pre-shift sample and a sample during work (after potential exposure to sodium azide), were collected from participants and immediately frozen. The samples were analyzed for azide content using a high-pressure ion chromatography method [Smith et al., 1991]. Twenty-seven quality-control samples (nine known concentrations in triplicate) were prepared in human blood in the NIOSH laboratory, immediately frozen, and sent to a contract laboratory with the field samples (Dartmouth Medical School, Department of Pharmacology and Toxicology, Hanover, NH). The quality control samples were prepared over a range of 0–6000 parts per billion (ppb) of sodium azide, based on the estimated levels of sodium azide in the blood after a presumed occupational exposure. Because this

method for azide analysis had not previously been validated in humans, NIOSH investigators applied for and received approval from the NIOSH Human Subjects Review Board to perform this biomonitoring.

## RESULTS

### Exposure Assessment

Twenty-nine PBZ and 10 area samples were collected; one PBZ sample was excluded from analysis due to inadequate sampling time. Area sampling results ranged from not detected (ND) to 0.69 mg/m³ for sodium azide, and from ND to 0.07 ppm for hydrazoic acid, with the greatest concentrations found in the new blender building. Results of the PBZ samples are summarized in Tables I and II. Seven (25%) of the 28 sodium azide PBZ air concentrations (total particulate and vapor azide concentrations) exceeded the NIOSH REL of 0.3 mg/m³ (ceiling limit). Four (14%) of the 28 PBZ air concentrations of hydrazoic acid exceeded, or equaled, the NIOSH REL of 0.1 ppm (ceiling limit). The majority of the exposures approaching or exceeding the NIOSH REL occurred in the new blender building, with the exceptions being a hydrazoic acid exposure of an unprotected employee in the control room (0.07 ppm) and a hydrazoic acid exposure 10 times the NIOSH REL taken on an operator wearing PPE at an azide dryer (1.1 ppm).

Three sets of PBZ samples were collected to compare sodium azide and hydrazoic acid concentrations inside and outside of the air line respirators (Table II). Particulate so-

**TABLE II.** Personal Breathing Zone Samples—Evaluation of Personal Protective Equipment on Three Workers

| Operation | Sample location | Total sodium azide[a] (mg/m³) | Hydrazoic acid[b] (ppm) |
|---|---|---|---|
| Opening dryer | Inside hood | Tr[c] | Tr |
| hatch | Lapel | 0.14 | 0.05 |
| Opening dryer | Inside hood | 0.34 | 0.13 |
| hatch | Lapel | 0.16 | 0.06 |
| Packaging | Inside hood | 0.28 | 0.10 |
|  | Lapel | ND[d] | ND[e] |

[a]NIOSH Recommended Exposure Limit (REL) for sodium azide is 0.3 mg/m³. Sodium azide is reported as the sum of the azide particulate and hydrazoic acid vapor concentrations.
[b]NIOSH REL for hydrazoic acid is 0.1 ppm.
[c]Tr = Trace (concentration between limit of detection and limit of quantitation).
[d]ND = not detected (minimum detectable concentration for sodium azide = 0.02–0.06 mg/m³).
[e]MDC for hydrazoic acid = 0.005–0.02 ppm.

dium azide was not detected in any of the samples inside the hoods of the air-line respirators. In each set of samples, however, hydrazoic acid was detected inside the hood. In fact, hydrazoic acid concentrations inside the hoods of the respirators were greater than the corresponding concentrations sampled outside the hood in two of the three pairs.

## Medical Evaluation

All 10 operators at work on the days of the study, and one maintenance worker (volunteer), participated in the medical evaluation. All participants spent at least one-half shift working in the production areas. The participants included 10 men and one woman; their mean age was 33 years (range 27–42). None of the participants reported a history of high blood pressure or any medication use.

The most common symptoms reported by the 11 participants while working in the production areas during the 6 months prior to our evaluation included headache (10 persons [91%]) and increased heart rate or palpitations (9 persons [82%]). The headaches most commonly occurred in the packaging areas of the plant. Nine of the 11 participants reported at least one instance during the preceding 6 months of ''low'' blood pressure occurring after working in a production area (blood pressures were self-measured using the automatic blood pressure cuff available at the plant). The ''low'' blood pressures reported ranged from 77/40 to 102/40.

During our medical evaluation, four workers reported mild headaches after working in the production areas. Two reported the headaches after working in the new blender building, and two reported headaches after working in other areas of the plant. PBZ sampling on one of the workers in

the new blender building approximately three hours prior to a report of headache revealed the following sodium azide levels in three consecutive samples spanning 172 min: trace (concentration between the limits of detection and limits of quantitation), 0.43 mg/m³, and 0.31 mg/m³.

## Blood Pressure Monitoring

Ten of the 11 participants took part in the blood pressure monitoring. Table III presents the data regarding the baseline blood pressure, the amount of time each participant was monitored, the number of blood pressure readings, and the mean blood pressure during the monitoring period. A total of 160 blood pressure measurements were attempted by the ten participants. Of these, in 110 (69%) a blood pressure was recorded by the ABPM (Table III). The inability of the ABPM to record a blood pressure in 50 (31%) of the attempts may be due to several factors, including excessive noise, excessive motion, or improper positioning of the arm. One employee (employee #5 in Table III) met our criteria for a hypotensive episode during a work shift when the blood pressure dropped from a baseline of 119/81 to readings of 111/76, 99/62, and 98/66, the last two measurements taken at 1 and 1½ hr, respectively, after the baseline pressure was taken. This employee was packaging sodium azide into drums for approximately 4½ hr and had three blood pressure measurements recorded by the ABPM out of five attempts. (ABPM was discontinued at the employee's request as he finished this work task). PBZ air sampling performed 1 hr after the last blood pressure measurement, while the employee continued the same packaging operation, revealed concentrations of sodium azide and hydrazoic acid of 1.7 mg/m³ and 0.06 ppm, respectively. The employee reported no symptoms throughout the work shift (including after monitoring ended). A blood pressure taken manually 1 hr after the monitoring ended, while the employee was on break, revealed a blood pressure of 116/78.

Four of the participants were monitored while working only in the production areas of the plant; seven were monitored while working in both the control room and the production areas. For each of these seven individuals, we found no significant differences in employees' mean blood pressures in the control room versus employees' mean blood pressures in the production area (Student's $t$-test, level of significance $p < 0.05$). Similarly, the grouped mean of blood pressure in the control room was not significantly different from that in the production areas.

## Biological Monitoring

Ten participants provided blood samples. Analysis of the quality control samples revealed an analytical limit of detection (LOD) of 2,800 ppb azide, with 47% recovery

**TABLE III.** Ambulatory Blood Pressure Monitoring Data on Sodium Azide Production Plant Workers

| Employee | Baseline BP | Time monitored (hr) | No. of ambulatory BP measurements | Mean ambulatory BP ± SD[a] |
|---|---|---|---|---|
| 1 | 115/80 | 10 | 11 | 119/78 ± 7/5 |
| 2 | 115/90 | 8 | 12 | 118/82 ± 7/5 |
| 3 | 131/98 | 10 | 6 | 139/97 ± 9/6 |
| 4 | 135/98 | 9 | 16 | 130/84 ± 7/7 |
| 5 | 119/81 | 5 | 3 | 103/68 ± 7/7 |
| 6 | 115/79 | 10 | 11 | 132/83 ± 11/12 |
| 7 | 136/92 | 10 | 12 | 129/87 ± 7/6 |
| 8 | 101/79 | 10 | 10 | 105/73 ± 13/8 |
| 9 | 113/82 | 9 | 15 | 129/83 ± 12/13 |
| 10 | 118/84 | 9 | 14 | 125/84 ± 10/8 |

[a]Mean ambulatory systolic blood pressure over mean ambulatory diastolic blood pressure ± SD of systolic blood pressure over standard deviation of diastolic blood pressure.

above the LOD. None of the participants' blood had detectable quantities of azide.

## DISCUSSION

This study was conducted at a highly automated chemical production facility. The plant was configured with engineering controls intended to limit the release of sodium azide into the plant environment. Personal protective equipment in the form of air-line respirators was used by employees during azide handling operations. Despite the implementation of aggressive control measures, our data show that PBZ exposures exceeding the NIOSH REL for sodium azide and hydrazoic acid were occurring at the facility. Exposures were documented primarily in the new blender building, during product transfer and packaging operations. The data suggest that the engineering controls in place at the time of this survey were inadequate to sufficiently control exposure to employees. Most of the PBZ samples were made when employees were not using respiratory PPE. Our data indicate that the use of air-line respirators appears to be effective in preventing exposure to particulate sodium azide but not hydrazoic acid vapor exposures. In fact, hydrazoic acid levels inside the protective helmets were similar to, or greater than, the levels in the workplace atmospheres. The reasons for this are not immediately clear; azide contamination of the supplied air hoods (e.g., failure to keep the equipment free of sodium azide), resulting in release of $HN_3$, is strongly suspected. Hydrazoic acid contamination of the respirator air supply is a possible explanation but appears less plausible considering limited air sampling per-

formed at the air compressor makeup air intakes (sodium azide or hydrazoic acid was not detected).

Exposure to hydrazoic acid despite the use of PPE could explain the anecdotal reports NIOSH investigators received from workers that headaches and episodes of hypotension were occurring even when workers used respiratory protection. Our finding of hydrazoic acid vapor in the control room is not completely explained but may involve azide-contaminated clothing (or even office chairs) which may release hydrazoic acid vapor when the azide hydrolyzes with perspiration. The possibility of hydrazoic acid vapor being entrained into the ventilation system of the control room building is another possibility given the close proximity to the manufacturing process.

As a result of this evaluation, recommendations were made to the production facility regarding: (1) further and continued industrial hygiene evaluation of exposures to sodium azide and hydrazoic acid among employees, specifically addressing the adequacy of engineering controls; (2) the proper use of PPE; (3) surveillance of symptoms or signs potentially related to sodium azide or hydrazoic acid exposures; and (4) modifications to several specific work tasks.

The primary goal of our blood pressure measurements was to identify significant drops of blood pressure in individuals over the course of a work shift. Our definition of a hypotensive episode, as with others used in the literature [Roth et al., 1956; Sheps et al., 1994], is somewhat arbitrary. Because of the large number of variables which can affect blood pressure, we chose very strict criteria (a drop in systolic [≥ 20 mm Hg] and diastolic [≥ 10 mm Hg] pressure) specific for detecting a drop of blood pressure. The use of other criteria for hypotension, such as using the standard deviation around the mean of another population, may not be appropriate in our descriptive study involving a small number of observations. We did not use the mean blood pressure of our small group of azide workers as a comparative standard because employees who have intermittent exposure to sodium azide could potentially have more variation in blood pressure, potentially leading to a false negative association.

There are several limitations to our blood pressure data. First, the baseline blood pressure, taken in a setting that could give rise to a ''white coat hypertension'' effect, may be artificially high. For example, although no participants reported a history of hypertension, four had baseline diastolic blood pressure readings of ≥ 90. Three of these four demonstrated drops in their diastolic pressure during ABPM. Second, four participants changed clothing and showered when changing from plant duty to control room duty; the blood pressure monitors were not re-calibrated when the cuff was placed on the arm the second time. Third, the small number (three) of blood pressure measurements taken on the operator found to have a hypotensive episode does not allow for evaluation of that person's blood pressure

during other activities in which there was no exposure to sodium azide. Fourth, the substantial variation (which was expected) observed among the many ambulatory blood pressure measurements taken makes it difficult to interpret the significance of any individual drop in blood pressure which meets our criteria for a hypotensive episode. Despite these limitations, the only drop in blood pressure which met our criteria for hypotension occurred during an operation in which, a short time later, the person was documented to have exposure to sodium azide at more than five times the NIOSH REL (the highest exposure documented during our study).

Our ability to make comparisons between mean blood pressures in the production areas versus those in the control room is limited by several factors. Air sampling documented that employees in the control room (where no PPE is worn) are potentially exposed to hydrazoic acid vapor, and therefore should not be considered a control (unexposed) population. Additionally, the contributions to an individual's blood pressure of the more physically stressful work in the production areas versus the potentially more mentally stressful work in the control rooms cannot be assessed with the data collected in our evaluation. These factors, and others among the many variables potentially affecting blood pressure, may account for the fact that we observed both decreases (not meeting our criteria for hypotension) and increases in employees' mean ambulatory blood pressure when compared to their respective baseline blood pressures (Table III).

Biological monitoring was conducted using the only known laboratory method for measuring azide available to the authors at the time of the evaluation. The method was found to be insufficiently sensitive in detecting blood azide in the parts per billion range expected to be present after workplace exposure. The lack of a method to monitor the absorbed dose of sodium azide limits the ability to correlate this parameter with symptoms or changes in blood pressure. The lack of a biological monitoring method also decreases our ability to confidently estimate the importance of dermal exposures potentially contributing to an overall sodium azide dose.

There are very few studies regarding the health effects resulting from exposure to documented levels of sodium azide or hydrazoic acid. Lead azide workers exposed to hydrazoic acid at levels between 0.3 and 3.9 ppm experienced "rapid and severe" fall in blood pressure [Graham et al., 1948]. Studies of sodium azide as a hypotensive agent revealed that 0.65–1.3 mg, administered orally, can cause hypotension among hypertensive humans [Black et al., 1954]. The basis for the current exposure criteria involves the known hypotensive action of sodium azide and hydrazoic acid at low levels, combined with a "reasonable" margin of safety [ACGIH, 1991]. During our evaluation, four persons reported mild headaches after working in the pro-

duction areas. Two of these persons reported these symptoms after performing packaging in the blender building, a procedure during which exposures above the REL were documented in our sampling. A different operator, who reported no symptoms, met our criteria for having a hypotensive episode while he was filling drums in the newly constructed blender building. This operator was found to be exposed to sodium azide at concentrations five times the NIOSH REL.

It is not apparent why, given the documented exposures to sodium azide and hydrazoic acid, relatively few symptoms were reported during our evaluation. Our evaluation was limited to a one-shift evaluation of 10 production operators. A longer, more inclusive evaluation might have been better able to document exposure-related symptoms and to address the appropriateness of current exposure guidelines but was not possible at this site. Differences in the "sensitivity" of different individuals to the effects of sodium azide [Black et al., 1954], as well as potential reporting bias among employees, could possibly explain the fact that few symptoms were reported on the day of our survey. Improved biological monitoring techniques for azide would help clarify the relative importance of airborne versus dermatologic exposures in relation to nonspecific symptoms reported by employees occupationally exposed to sodium azide and hydrazoic acid. All sodium azide production facilities, and other facilities handling sodium azide, particularly in the growing automobile air-bag industry, should be aware of the potential toxicity of sodium azide and, as this study demonstrates, the possibility of occult exposures.

## ACKNOWLEDGMENTS

The authors are grateful to Gregory Harshfield, Ph.D., and Phyllis Richey, of the University of Tennessee, Memphis, for their support and advice during this evaluation.

## REFERENCES

Abrams J, El-Mallakh RS, Meyer R (1987): Suicidal sodium azide ingestion. Ann Emerg Med 16:1378–1380.

American Conference of Governmental Industrial Hygienists (ACGIH) (1991): Sodium azide. In ACGIH, "Documentation of the Threshold Limit Values." 6th Ed. Cincinnati, OH: pp 1403–1407.

Arco-Galan C, Suarez-Fernandez C, Gabriel-Sanchez R (1994): What happens to blood pressure when on-call. Am J Hypertension 7:396–401.

Bassendowska E, Kowalski Z (1962): Investigation of the toxicity of sodium azide. Med Pracy (Poland) 12:427–442. Abstracted in: Bull Hyg 37:463.

Black MM, Zweifach BW, Speer FD (1954): Comparison of hypotensive action of sodium azide in normotensive and hypertensive patients. Proc Soc Exp Bio Med 85:11–16.

Einert C, Adams W, Crothers R, Moore H, Ottoboni F (1963): Exposure to mixtures of nitroglycerin and ethylene glycol dinitrate. Am Ind Hyg Assoc J 24:435–447.

"Farm Chemicals Handbook" (1991): Willoughby, OH: Meister, p C-32.

Fiedler N, Vivona-Vaughan E, Gochfeld M (1989): Evaluation of a worksite relaxation training program using ambulatory blood pressure monitoring. J Occup Med 31:595–602.

Frederick KA, Babish JG (1982): Evaluation of mutagenicity an other adverse effects of occupational exposure to sodium azide. Reg Toxicol Pharm 2:308–322.

Graham JDP, Rogan JM, Robertson DG (1948): Observations on hydrazoic acid. J Ind Hyg Tox 30:98–102.

Green MS, Schwartz K, Harari G, Najenson T (1991): Industrial noise exposure and ambulatory blood pressure and heart rate. J Occup Med 33:879–883.

Hitt JM (1992): Automobile air-bag industry toxic exposures. In Sullivan JB, Krieger GR (eds): "Hazardous Materials Toxicology, Clinical Principles of Environmental Health." Baltimore: Williams & Wilkins, pp 533–537.

Hoffler GW, Wolthuis RA, Johnson RL (1974): Apollo space crew cardiovascular evaluations. Aerospace Med 45:807–820.

Howard JD, Skogerboe KJ, Case GA, Raisys VA, Lacsina EQ (1990): Death following accidental sodium azide ingestion. J Forens Sci 35:193–196.

Klein-Schwartz W (1989): Three fatal sodium azide poisonings. Med Tox Adverse Drug Exp 4:219–227.

Kleinhofs A, Owais WM, Nilan RA (1978): Azide. Mutat Res 55:165–195.

Lambert WE, Piette M, Peteghem CV, De Leenheer AP (1995): Application of high-performance liquid chromatography to a fatality involving azide. J Anal Toxicol 19:261–264.

Leier CV (1989): Approach to the patient with hypotension and shock. In Kelley WN (ed): "Textbook of Internal Medicine." Philadelphia: JB Lippincott, p 393.

Master AM, Dublin LI, Marks HH (1950): The normal blood pressure range and its clinical implications. JAMA 143:1464–1470.

NIOSH (1976): HHE 75-184-356, Klamath Reforestation Inc. Cincinnati, OH: U.S. Department of Health and Human Services, Public Health Service, Centers for Disease Control and Prevention, NIOSH.

NIOSH (1990): [unpublished provisional data as of July 1, 1990] National occupational exposure survey (1981–1983). Cincinnati, OH: U.S. Department of Health and Human Services, Public Health Service, Centers for Disease Control and Prevention; NIOSH, Division of Surveillance, Hazard Evaluations and Field Studies.

NIOSH (1992): NIOSH Recommendations for Occupational Safety and Health: Compendium of Policy Documents and Statements. DHHS (NIOSH) Publication No. 92-100. Cincinnati, OH: U.S. Department of Health and Human Services, Public Health Service, Centers for Disease Control and Prevention; NIOSH.

NIOSH (1995): Hazard Evaluation and Technical Assistance report: American Azide Corporation, Cedar City, UT. HETA 95-0023-2531. Cincinnati, OH: U.S. Department of Health and Human Services, Public Health Service, Centers for Disease Control and Prevention; NIOSH.

OSHA (1992): Sodium azide and hydrazoic acid in workplace atmospheres. OSHA Salt Lake Analytical Laboratory, Branch of Inorganic Methods Development. OSHA Salt Lake Technical Center, Salt Lake City, Utah 84165-0200. Method Number ID-211, pp 1–38.

Pickering T (1994): Physiology and significance of blood pressure level and variability. In Pickering T (ed): "Ambulatory Blood Pressure." Redmond, WA: Spacelabs Medical, p 16.

Pickering TG, James GD, Boddie C, Harshfield GA, Blank S, Laragh JH (1988): How common is white coat hypertension? JAMA 259:225–228.

Reinhardt CF, Britelli MR (1981): Heterocyclic and miscellaneous compounds. In Clayton GD, Clayton FE (eds): "Patty's Industrial Hygiene and Toxicology." 3rd Ed, Vol 2A. New York: John Wiley & Sons, pp 2778–2784.

Roth FE, Schurr J, Moutis E, Govier WM (1956): Comparative hypotensive effects and toxicity of sodium azide and selected organic azides. Arch Int Pharmacodyn CVIII:473–480.

Schnall PL, Pieper C, Schwartz JE, Karasek RA, Schlussel Y, Devereux RB, Ganau A, Alderman M, Warren K, Pickering TG (1990): The relationship between "job strain," workplace diastolic blood pressure, and left ventricular mass index. JAMA 263:1929–1935.

Sheps SG, Pickering TG, White WB, Weber MA, Clement DL, Krakoff LR, Messerli FH, Perloff D (1994): Ambulatory blood pressure monitoring. J Am Coll Cardiol 23:1511–1513.

Smith RP, Wilcox DE (1994): Toxicology of selected nitric oxide-donating xenobiotics, with particular reference to azide. Crit Rev Toxicol 24:355–377.

Smith RP, Louis CA, Kruszyna R, Kruszyna H (1991): Acute neurotoxicity of sodium azide and nitric oxide. Fund App Toxicol 17:120–127.

Staessen J, Fagard R, Lijnen P, Thijs L, van Hoof R, Amery A (1990): Reference values for ambulatory blood pressure: A meta-analysis. J Hypertension 8(suppl 6):s57–s64.

Staessen J, Bulpitt CJ, Fagard R, Mancia G, O'Brien E, Thijs L, Vyncke G, Amery A (1991): Reference values for the ambulatory blood pressure and the blood pressure measured at home: a population study. J Hum Hypertension 5:355–361.

Swarin SJ, Waldo RA (1982): Liquid chromatographic determination of azide as the 3,5-dinitrobenzoyl derivative.. J Liquid Chromatogr 5:597–604.

Szucs T, Schneeweiss A (1992): Cilazapril: An overview of its efficacy and safety in hypertension. Clin Pharm 80:34–41.

Theorell T, de Faire U, Johnson J, Hall E, Perski A, Stewart W (1991): Job strain and ambulatory blood pressure profiles. Scand J Work Environ Health 17:380–385.

# Exhibit C

Forensic Science International 221 (2012) e17–e20



Contents lists available at SciVerse ScienceDirect

# Forensic Science International

journal homepage: www.elsevier.com/locate/forsciint



Case report

# Suicidal sodium azide intoxication: An analytical challenge based on a rare case

Isabelle Le Blanc-Louvry [a,*], Patrick Laburthe-Tolra [a], Valerie Massol [b], Fréderique Papin [c], Jean Pierre Goullé [d], Gérard Lachatre [e], Jean Michel Gaulier [e], Bernard Proust [a]

[a] Department of Forensic Medicine, University Hospital-Charles Nicolle, 1 rue de Germont, 76031 Rouen Cedex, France
[b] Emergency Department, CH, avenue Pasteur, 76202 Dieppe Cedex, France
[c] Department of Forensic Medicine, University Hospital Cote de Nacre, Avenue de la côte de Nacre, 14033 Caen Cedex 9, France
[d] Department of Toxicology, Group Hospitalier Jacques Monod, B.P. 24, 76083 Le Havre – Le Havre-Cedex, France
[e] Department Clinical Toxicology, University Hospital Dupuytren, 2 avenue Martin Luther King, 87000 Limoges, France

A R T I C L E   I N F O

Article history:
Received 18 May 2011
Received in revised form 4 April 2012
Accepted 7 April 2012
Available online 3 May 2012

Keywords:
Sodium azide
Poisoning
Fatal
Autopsy

A B S T R A C T

Introduction: Intentional absorption of sodium azide is exceptional but remains extremely life-threatening because death rapidly occurs when significant doses are absorbed, either due to the direct effect of sodium azide or an indirect effect due to nitric oxide, cyanide ions or hydrazoic acid production from sodium azide.
Case report: The body of a laboratory assistant, was discovered by his colleagues in the laboratory, seated on a chair located near a digital computer displaying information about sodium azide. Moreover, a half empty 99% sodium azide flask was found near the corpse. The laboratory staff confirmed that the young man was still alive 5 h prior to discovery.
Results: Postmortem examination did not show any cutaneous signs of injury due to a defensive struggle. Bilateral ungual cyanosis was observed as well as a major cerebral edema and visceral congestion on autopsy. The elevated sodium azide concentration found in the gastric sample and the amount of gastric content allowed to conclude that sodium azide intake was more than 6 g which was above the lethal dose, i.e. approximately 1 g. Surprisingly, no sodium azide was found either in blood and serum, or in hepatic and renal tissue samplings. However, major concentrations were observed in the gastric contents, bile and urinary samples, as well as in cardiac and cerebral tissues samples. No other toxic element was found. Therefore, the post-mortem findings, the autopsy and the analytical results suggested that the laboratory assistant died after an intentional sodium azide ingestion.
Conclusion: Sodium azide poisoning by ingestion has to date remained extremely rare and our case highlights the extreme lability of sodium azide as it was absent in the blood, in spite of significant concentrations in stomach content and some tissues. Therefore, the necessity of multiple tissues samples during autopsy should be underlined.

© 2012 Elsevier Ireland Ltd. All rights reserved.

## 1. Introduction

Sodium azide is a salt (NaN3) that has been mainly used as a chemical preservative in laboratories and hospitals because of its powerful biocide and disinfectant action. It is also a useful reagent in synthetic laboratory work. The salt has the capability to prevent bacteria from growing in biological fluids. It is also used as a soil sterilizing agent, fungicide, herbicide, or pesticide. Other commercial applications include its use as a component in the manufacture of rubber, latex and lead acid. Furthermore, sodium azide remains the component in many car airbag systems where an electrical charge triggered by automobile impact causes sodium azide to explode and release nitrogen gas inside the airbag.

Its severe toxicity was previously observed whatever the route of absorption, either ingestion during attempted suicide, laboratory exposure and accidents at work sites, or inhalation or skin contact during industrial production. Although industrial exposure is common, fatality remains very rare, especially after intentional ingestion [1,2]. This toxic element is known to be rapidly active after ingestion and its major effects occur some hours after oral intake, depending on the amount ingested [3,4].

Exposure to sodium azide due to ingestion can induce several major symptoms within minutes particularly nausea, vomiting, headache, restlessness, dizziness, weakness, rapid breathing and rapid heart rate [1]. High amounts of this toxic element immediately induces convulsions, loss of consciousness, low heart

* Corresponding author at: Department of Forensic Medicine, Rouen University Hospital-Charles Nicolle, 1 rue de Germont, 76031 Rouen Cedex, France.
Tel.: +33 2 32 88 82 84; fax: +33 2 32 88 83 67.
E-mail address: isabelle.leblanc@chu-rouen.fr (I. Le Blanc-Louvry).

0379-0738/$ – see front matter © 2012 Elsevier Ireland Ltd. All rights reserved.
http://dx.doi.org/10.1016/j.forsciint.2012.04.006

e18    I. Le Blanc-Louvry et al. / Forensic Science International 221 (2012) e17–e20

rate and blood pressure and respiratory failure leading eventually to death [1]. We report a fatal sodium azide poisoning that is particularly interesting because an intentional ingestion, as in our case, is extremely rare. To date, only very few cases of azide intoxications have been reported in the literature. Although, major or significant sodium azide concentrations were measured in gastric contents, bile, urine and tissues, it was not found in the victim's blood. To the best of our knowledge, this case is the first to underline that sodium azide can be absent in the blood because of the postmortem extreme lability of this salt and emphasizes the necessity to perform multiple samples in biological fluids and tissues.

## 2. Materials and methods

### 2.1. Case

#### 2.1.1. Introduction

At an institute for agricultural research, colleagues of a 35 year old lab-assistant discovered the victim's corpse in a seated position next to a computer. The screen showed technical data about sodium azide toxicity. Moreover, a 99% sodium azide flask, half empty, was discovered near the corpse. The exact amount of the ingested sodium azide was unknown. The colleagues of the young man confirmed that he was still alive 5 h prior to discovery. He had been treated for depression syndrome and had regular consultations with a psychologist. Because of the circumstances of death, a forensic post-mortem examination was performed.

The external examination of the body performed two days after death showed no lesions that could have been caused by a struggle. Weight and height were 75 kg and 172 cm, respectively. During autopsy we observed a slight cerebral edema, marked pulmonary edema with edematous and congestive lungs, as well as visceral hemorrhage and liver, kidneys and pancreas congestion indicating that asphyxia had occurred. Histologic examination showed no specific lesions. However, a wide myocardial interstitial edema dissecting myocardiocyte bundles, as well as a severe cerebral edema, were observed.

#### 2.1.2. Analytical method

Sodium azide that is not routinely searched during usual toxicological screening was analyzed because of the discovery of a sodium azide flask found next to the corpse. Blood samples were preserved by the use of 2% sodium fluoride tubes kept at −20 °C and stored in a dark place. Several other samples were analyzed: gastric content, urine, bile and various tissue samples.

A specific high-performance liquid chromatography coupled with diode array detection (HPLC-DAD) described by Marquet et al. [4] was performed. After homogenization in a buffer and deproteinization, azide derivatization with benzoyl chloride was carried out. This method was first described by Swarin and Waldo [5] and adapted to biological samples by Lambert et al. [6]. This procedure was applied to biological liquid or solid tissue. Various samples were analyzed: blood, serum, urine, bile, gastric content as well as several tissues (liver, kidney, heart, brain). The detection limit of the sodium azide was below 0.1 mg/l for the whole blood samples [4].

Initial analysis was performed in the Clinical Toxicology Department (Le Havre, France) 16 days after the autopsy, and a second analysis was carried out at an another laboratory (Limoges, France) one month later (46 days after autopsy).

#### 2.1.3. Results

At the first laboratory sodium azide was not detectable either in peripheral blood and plasma or in hepatic and renal tissues. In contrast, concentrations in the gastric content were very high (19.4 g/l) (Table 1). Significant concentrations were found in the bile, the urine samples, as well in cardiac and cerebral tissues. The gastric concentration and the quantity of gastric content measured at autopsy (300 ml) allowed to conclude that sodium azide intake was at least 6.5 g. Moreover, the cyanide concentration in peripheral blood was within the normal range (78 μg/l) and no other toxic element was found. Sodium azide analysis was performed again

**Table 1**
Sodium azide concentrations (mg/l or mg/kg) in biological and tissues.

|  | Sodium azide concentration | |
|  | First analysis (16 days) | Second analysis (46 days) |
| --- | --- | --- |
| Peripheral blood | 0 | 0 |
| Gastric content | 19,000 | 7900 |
| Bile | 80 | 40 |
| Brain | 0.9 | 2.25 |
| Heart | 4.8 | 8.5 |
| Liver | 0 | 0 |
| Kidney | 0 | 0.19 |
| Muscle | 0 | 0.82 |

one month later at a second laboratory (Limoges, France). Significant sodium azide decrease was observed in all the samples compared to the initial results (Table 1). Low concentrations were also measured in muscle and kidney.

It was stated that, the death of the young laboratory assistant was due to an intentional sodium azide intake because no injury due to a defensive struggle was observed. Furthermore, azide was only found in various biological samples. The quantity of ingested sodium azide, at least 6.5 g, considerably above the lethal dose that i.e. 700 mg [1], probably induced rapid death.

## 3. Discussion

This conclusive lethal intentional sodium azide ingestion remains an extremely rare situation as lethal occurrence has been reported in only very few cases [1,2,4,7,8]. Azide poisoning can result from different types of exposures: i.e. intentional or accidental ingestion [8], industrial accidents, plant intoxication, inhalation or skin contact [9]. In fact, this salt is not easily available and only persons with particular professional activities can obtain this toxic substance, as our laboratory-assistant who worked at an agricultural research institute. Moreover, exposure to sodium azide has recently increased due to its rapidly growing use in the automobile airbag manufacturing industry [9]. Therefore, if the toxic effects of sodium azide were relatively well documented, only a few publications have reported ante- and post-mortem concentrations of sodium azide in biological matrices.

### 3.1. Clinical effects

After oral intake, in most cases intestinal absorption is particularly fast and complete. Clinical events have been correlated with the amount of ingested dose [1]. Symptoms usually include vomiting, diarrhea, headache, restlessness, dizziness, dyspnea and rapid heart rate when a minimal dose of 0.5 mg/kg is orally ingested [1]. Also, clinical features generally include convulsions, seizure, loss of consciousness, bradycardia, hypotension, arrhythmia, as well as tachypnea or pulmonary edema. With a dose of 10 mg/kg, deep coma with metabolic acidosis and cardiorespiratory arrest may occur. Generally, a fatal occurrence is observed with an exposure of 10 mg/kg or above 700 mg [1].

### 3.2. Sodium azide mechanisms toxicity

The mechanisms of a toxic effect are not fully understood. After ingestion, clinical signs of intoxication were most frequently observed during the first hours after absorption [4,10]. Sodium azide may produce several actions due to direct mechanisms or indirect actions due to toxic substances produced by sodium azide. The direct mechanism could be linked to the inhibition of oxidative enzymes as catalases and cytochromes [10] and to a strong complex with hemoglobin that blocks oxygen transport in the blood [11]. The direct vasodilator properties of the salt probably induces hypotension [12]. In addition, blood acidosis increase, routinely observed after death, can induce high levels of components such as hydroazoic acid, nitric oxide and possibly cyanide ion production after intoxication [13]. Smith et al. in an experimental study, suggested that the lethal effect of sodium azide is due to enhanced excitatory transmission in the central nervous system perhaps after its conversion into nitric oxide [13]. The central effect of azide and the neurotoxicity could be due to modulation of the cholinergic system [14]. The possible mechanism of cyanide production is currently not clearly understood. Red blood cells, perhaps via enzyme catalases, could convert sodium azide to nitric oxide that is a potent vasodilator [15]. Lastly, sodium azide is probably an inhibitor of platelet aggregation due to its conversion into nitric oxide [13].

In our case, the victim ingested at least 6 g of sodium azide as the concentration was 20 g/l in the 300 ml stomach content. The

*I. Le Blanc-Louvry et al. / Forensic Science International 221 (2012) e17–e20*

salt ingested was at least 80 mg/kg considering a 75 kg body weight. The stomach concentration was twenty times higher than those previously reported. A lethal dose was absorbed because it has been shown that death occurs with doses higher than 10 mg/kg or exposure of more of 700 mg [1].

### 3.3. Discussion regarding the case

The laboratory assistant died at the most 5 h after sodium azide voluntary ingestion but the postmortem interval cannot be accurately determined because the young man was already dead when he was discovered. The mean interval between azide ingestion and death usually varies between 30 min and 5 h in the few reported cases [7]. In contrast, longer intervals have been reported (12 h, 25 h and 40 h) but this was due to resuscitation efforts [16,17]. To date, postmortem cases of sodium azide intoxication after ingestion have been particularly rare and to our knowledge, only approximately twenty cases have been reported after intentional or accidental ingestion [2,4,8,10,16–23].

Severe cerebral edema and visceral congestion due to major asphyxiation were observed in our victim, as in another study [16], as well as myocardial interstitial edema with dissecting myocardiocyte bundles. An other study reported myocardial ischemia as well as gastric mucosal erythema [21]. These lesions of acute tissue injury could have been due to the collapsus which is usually observed after azide poisoning.

Previous studies [3,4,11] have demonstrated that, after sodium azide poisoning, target organs were the central nervous system, the cardiovascular system, lungs and kidneys. In our case, sodium azide was present in brain and heart samples. However, our observation remains unique because no sodium azide was found in the peripheral blood while other studies have reported that azide blood concentrations after lethal ingestion were between 3 and 236 mg/l [3,4,7,12]. Therefore, it seems that sodium azide has always been measured in blood and/or serum after lethal oral intake. The absence of azide in the blood in our case where a major quantity was ingested, as shown by a high stomach concentration, demonstrates that such poisonings cannot always be discovered based on a blood sample alone. Moreover, in another case reported by Peclet and Ponton, sodium azide was not found in the urine whereas it was present in other matrices, particularly in blood and gastric contents [24]. Theses results showed that blood and urinary samples are insufficient to confirm poisoning. Sodium azide determination in the tissue remains essential. Moreover, in most cases, major concentrations were observed in the stomach (between 745 and 1036 mg/l), bile (21–1280 mg/l) and tissues (brain, liver: 14 mg/kg, kidney: 205 mg/kg, lung, muscle) [4,7,19]. The highest tissue concentration published was found in the lung [4]. Sodium azide was also reported in vitreous and cerebrospinal fluid [3].

Due to extreme lability of the sodium azide [4], in our case, it was not found in the blood [4]. In fact, acidity and enzyme activities can induce rapid poison deterioration due to secondary products from sodium azide as hydroazoic acid and nitric oxide when pH decreases. Among alive patients sodium azide was quickly cleared as the half-life period in blood was approximately 2.5 h [17] and sodium azide could be detected 12 h after intake. Sodium azide degradation was correlated with the delay between death and toxicological analysis. In our case, the autopsy was performed two days after death, and the first analysis 16 days after autopsy. Analysis must be performed as soon as possible and blood samples must be also preserved with sodium fluoride, at −20 °C and stored in a dark place. If the tubes are exposed to light, azide salt will rapidly be converted into nitrogen gas.

The blood cyanide concentration was within the normal range in our case while some previous studies have reported increased postmortem concentration after ingestion [4,19]. These concentrations could not explain the death because cyanide lethal concentration ranged between 1.5 and 3 mg/kg [25].

### 3.4. Treatment

There is no specific antidote available for this type of poisoning, and no treatment has demonstrated any efficacy after ingestion. After ingestion, gastric lavage seems to have no effect probably because sodium azide absorption in the form of small ions is very rapid. In most cases, basic life support is performed [3,20], but fails to prevent the development of circularly collapse, respiratory depression and profound metabolic acidosis [1,2]. Similarly, after azide ingestion, detoxicants for cyanide such as sodium nitrite or thiosulfate were tested, but remained ineffective. Sodium nitrite could even have been deleterious because it has been demonstrated that such treatment had worsened the hypotension caused by sodium azide [2]. Among possible sodium azide antagonists only phenobarbital (anesthetic and subanesthetic doses) improved clinical status in mice [13]. In contrast, diazepam, phenytoin, and an anesthetic dose of a ketamine/xylazine combination has no effect [13].

## 4. Conclusion

The death of the laboratory assistant was definitely attributed to intentional sodium azide oral intake because no signs of violence were discovered on the corpse. Even if sodium azide had disappeared from the peripheral blood, intragastric, biliary, urinary and tissue samples important concentrations could have validated such poisoning. This observation demonstrates that tissue samples are basically necessary to validate sodium azide poisoning and that a routine autopsy is required and remains essential to definitively incriminate this toxic substance.

## References

[1] S. Chang, S.H. Lamm, Human health effects of sodium azide exposure: a literature review and analysis, Int. J. Toxicol. 22 (2003) 175–186.

[2] M. Chiba, M. Ohmichi, Y. Inaba, Sodium azide: a review of biological effects and case reports, Nippon Eiseigaku Zasshi 53 (1999) 572–579.

[3] M. Herbold, G. Schmitt, R. Aderjan, I. Pedal, Fatal sodium azide poisoning in a hospital: a preventable accident, Arch. Kriminol. 196 (1995) 143–148.

[4] P. Marquet, S. Clement, H. Lotfi, M.F. Dreyfuss, J. Debord, D. Dumont, G. Lachatre, Analytical findings in a suicide involving sodium azide, J. Anal. Toxicol. 20 (1996) 134–138.

[5] S.J. Swarin, R.A. Waldo, Liquid chromatographic determination of azide as the 3,5-dinitrobenzoyl derivative, J. Liq. Chromatogr. 5 (1982) 597–604.

[6] W.E. Lambert, M. Piette, C. Van Peteghem, A.P. De Leenheer, Application of high-performance liquid chromatography to a fatality involving azide, J. Anal. Toxicol. (19) (1995) 261–264.

[7] R.C. Baselt, R.C. Azide, Disposition of Toxic Drugs and Chemicals in Man, Biomedical Publication Foster City, CA, 2004, pp. 95–96.

[8] J.D. Howard, K.J. Skogerboe, G.A. Case, V.A. Raisys, E.Q. Lacsina, Death following accidental sodium azide ingestion, J. Forensic Sci. 35 (1990) 193–196.

[9] D. Trout, E.J. Esswein, T. Hales, K. Brown, G. Solomon, M. Miller, Exposures and health effects: an evaluation of workers at a sodium azide production plant, Am. J. Int. Med. 30 (1996) 343–350.

[10] J. Abrams, R.S. el-Mallakh, R. Meyer, Suicidal sodium azide ingestion, Ann. Emerg. Med. (1987) 1378–1380.

[11] T. Szabados, C. Dul, K. Majtényi, J. Hargitai, Z. Pénzes, R. Urbanics, A chronic Alzheimer's model evoked by mitochondrial poison sodium azide for pharmacological investigations, Behav. Brain. Res. 1 (2004) 31–40.

[12] M. Shahidullah, A. Duncan, Role of catalase in the smooth muscle relaxant actions of sodium azide and cyanamide, Eur. J. Pharmacol. 435 (2002) 93–101.

[13] R.P. Smith, C.A. Louis, R. Kruszyna, H. Kruszyna, Acute neurotoxicity of sodium azide and nitric oxide, Fundam. Appl. Toxicol. 17 (1991) 120–127.

[14] T. Fujimura, H. Kobayashi, T. Suzuki, I. Sato, S. Hara, Neurotoxicity in sodium azide poisoning, Jpn. J. Toxicol. 15 (2002) 281–288.

[15] P.V. Kaplita, H.L. Borison, L.E. McCarthy, R.P. Smith, Peripheral and central actions of sodium azide on circulatory and respiratory homeostasis in anesthetized cats, J. Pharmacol. Exp. Ther. 231 (1984) 189–196.

[16] E.A. Emmett, J.A. Ricking, Fatal self-administration of sodium azide, Ann. Intern. Med. 83 (1975) 224–226.

[17] T. Senda, K. Nishio, Y. Hori, A. Baba, Y. Suzuki, Y. Asari, K. Tsuchimoto, A case of fatal acute sodium azide poisoning, Jpn. J. Toxicol. 14 (2001) 339–342.

[18] B. Lopacinski, Z. Kolacinski, R. Winnicka, Sodium azide-clinical course of poisoning and treatment, Przegl. Lek. 64 (2007) 326–330.

[19] W.E. Lambert, M. Piette, C. Van Peteghem, A.P. De Leenheer, Application of high-performance liquid chromatography to a fatality involving azide, J. Anal. Toxicol. 19 (1995) 261–264.

[20] T.E. Albertson, S. Reed, A. Siefkin, A case of fatal sodium azide ingestion, J. Toxicol. Clin. Toxicol. 24 (1986) 339–351.

[21] K.W. Judge, N.E. Ward, Fatal azide-induced cardiomyopathy presenting as acute myocardial infarction, Am. J. Cardiol. 64 (1989) 830–831.

[22] H. Kozlicka-Gajdzinska, J. Brzyski, A case of fatal intoxication with sodium azide, Arch. Toxicol. 22 (1966) 160–163.

[23] E. Klug, V. Schneider, Suicide with sodium azide, Z. Rechtsmed. 98 (1987) 129–132.

[24] C. Peclet, G. Ponton, Fatal azide poisoning, Bull. Int. Assoc. Forensic Toxicol. 21 (1991) 28–29.

[25] G.W. Ware (Ed.), Cyanide: United States environmental protection agency office of drinking water health advisories Rev. Environ. Contam. Toxicol. 107 (1989).

Exhibit D

FUNDAMENTAL AND APPLIED TOXICOLOGY 17, 120–127 (1991)

# Acute Neurotoxicity of Sodium Azide and Nitric Oxide[1]

ROGER P. SMITH, CLAUDINE A. LOUIS, ROBERT KRUSZYNA, AND HARRIET KRUSZYNA

*Department of Pharmacology and Toxicology, Dartmouth Medical School, Hanover, New Hampshire 03756*

*Received October 23, 1990; accepted January 31, 1991*

Acute Neurotoxicity of Sodium Azide and Nitric Oxide. SMITH, R. P., LOUIS, C. A., KRUSZYNA, R., AND KRUSZYNA, H. (1991). *Toxicol. Appl. Pharmacol.* **17**, 120–127. Sodium azide is a chemical of rapidly growing commercial importance with a high acute toxicity and an unknown mechanism of action. Although it has some chemical properties and biological effects in common with cyanide, its lethality does not appear to be due to inhibition of cytochrome oxidase. Unlike cyanide it is a potent vasodilator and inhibitor of platelet aggregation presumably by virtue of its conversion to nitric oxide *in vivo* and in isolated preparations of blood vessels and thrombocytes. It is not clear whether the high toxicity of azide is due to nitric oxide or to the parent anion. Of a number of possible azide antagonists tested in intact mice only phenobarbital in both anesthetic and subanesthetic doses afforded statistically significant protection against death. Diazepam, phenytoin, and an anesthetic dose of a ketamine/xylazine combination had no effect. Major motor seizures are sometimes seen in human azide poisoning, and these are a regular feature of azide poisoning in laboratory rodents. Solutions of nitric oxide given systemically to mice produced no signs of toxicity, but doses 1,000-fold lower placed in the cerebroventricular system of rats produced brief but violent tonic convulsive episodes. A dose of 0.61 mmol/kg azide as given systemically regularly produced convulsions whereas a dose of 6 $\mu$mol/kg given icv produced seizures in rats. The icv convulsive dose of azide was 50-fold larger than the icv dose of nitric oxide. These results suggest that azide lethality is due to enhanced excitatory transmission in the central nervous system perhaps after its conversion to nitric oxide. Both hydroxylamine and cyanide produce seizures when given systemically which are presumably secondary to hypoxia; phenobarbital did not protect against death in either case. Thus, the azide seizures cannot be not due to hypoxia, and the seizures produced by hydroxylamine when given icv may have the same mechanism as those induced by azide. © 1991 Society of Toxicology.

Sodium azide is used to provide the nitrogen for the inflation of automobile "air" bags and as a preservative for laboratory reagents. It may be embryotoxic in the golden hamster, but it is not teratogenic (Sana *et al.,* 1990). It is also a rapidly acting, highly toxic compound with a poorly understood mechanism of action (Gosselin *et al.,* 1984). It has a number of biological effects in common with cyanide and sulfide including an ability to inhibit cyto-

chrome oxidase, but it is unlikely that this accounts for its lethality (Smith *et al.,* 1977). Unlike cyanide, azide is a potent but evanescent vasodilator (Kaplita *et al.,* 1984) presumably by virtue of its conversion to nitric oxide (NO) which occurs both *in vivo* and in isolated tissues and cells (Kruszyna *et al.,* 1987, 1988). In turn, NO has biological activity very much like that of the endothelium-derived relaxing factor (EDRF), and many investigators believe that they are identical (Furchgott, 1985). A role for an EDRF-like substance in excitatory neurotransmission in rat brain has recently been described (Garthwaite *et al.,* 1988). Thus, death after azide might be secondary to its

---

[1] Preliminary reports on these findings were made at the 19th Annual Meeting of the New England Pharmacologists, Kingston, Rhode Island, and the 1990 ASPET Meeting, Milwaukee, Wisconsin. Proceedings of the latter were published in *Pharmacologist* **10,** 161 (1990).

0272-0590/91 $3.00
Copyright © 1991 by the Society of Toxicology.
All rights of reproduction in any form reserved.

cardiovascular or central nervous system effects, and these might be mediated primarily by azide itself or by NO.

Nitroprusside, nitrite, and hydroxylamine are also NO vasodilators. Death after nitroprusside overdose, however, is unequivocally due to cyanide poisoning (Smith and Kruszyna, 1974), and death after nitrite or hydroxylamine overdoses is due to an overwhelming methemoglobinemia (Smith and Layne, 1969) perhaps compounded by a stagnant hypoxia due to vasodilitation. Azide is not known to be converted to cyanide *in vivo*, and it does not generate methemoglobin. These experiments were undertaken in an attempt to determine the primary cause of death after azide and to test potential antagonists for possible use in human azide poisoning.

## MATERIALS AND METHODS

Male CD1 mice weighing 25 to 30 g and male CD1 rats weighing 250 to 300 g were obtained from Charles River Laboratories and provided with tap water and feed *ad libitum*. All chemicals were dissolved in distilled water and administered ip unless otherwise stated. Simple protection experiments based on mortality were evaluated by $\chi^2$ analyses in which a $p$ value of <0.05 was accepted as statistically significant. All agents tested for protective effects against azide (except ketamine and xylazine, see below) were given in doses and protocols taken from the literature in which significant effects against other toxic chemicals were reported.

Ketamine HCl (Ketaset, Bristol Laboratories, Syracuse, NY) and xylazine HCl (Rompun, Mobay Corp., Shawnee, KS) were administered sc in a 1:1 combination in doses determined by trial and error to produce anaesthesia of roughly the same duration as phenobarbital at 0.60 mmol/kg. Doses of 0.73 and 0.16 mmol/kg, respectively, produced anaesthesia within 2–3 min, which lasted from 70 min to more than 2 hr. These doses are 10 to 20 times greater than those recommended for use in dogs and cats, but they are below the toxic range for mice. Azide was given 5 min after the anaesthetics.

Azide levels in mouse blood taken by cardiac puncture were determined by a modification of the microdiffusion method of Feldstein and Klendshoj (1954) for cyanide except that the volatility of $HN_3$ was exploited instead of that of HCN. After diffusion from an acidified solution of blood, the $HN_3$ was trapped in a solution of ceric ammonium nitrate with which azide participates in a redox reaction. The reaction results in a decrease in the absorbance of cerric ammonium nitrate at 390 nm which is proportional to the concentration of azide (Chughtai *et al.*, 1981; Terpinski, 1985). Although this method has not been applied previously to biological materials, it appeared to give satisfactory precision and reproducibility in our hands.

Rats were prepared with indwelling cannulas in the left lateral cerebral ventricle by methods previously described (Gonsalves *et al.*, 1989). Drugs were given acutely over a 2–3-min period through these cannulas in volumes which never exceeded 30 $\mu$l, and most commonly were in a volume of 20 $\mu$l. Correct placement of the cannula was verified after experiments by injecting methylene blue and noting the area stained after surgical removal of the cerebrum. Animals were used twice in a cross-over design with controls after 1 week of drug-free rest. The results were scored unblinded as negative, tremor and agitation (including rapid but purposeful movement), or major motor seizures (consisting primarily of clonic convulsive movements).

Hydroxylamine hydrochloride in saline resulted in a distinctly acidic solution so it was prepared in a 0.1 M phosphate buffer, pH 7.4. There was no difference in the control responses between saline and phosphate buffer. Solutions of nitric oxide were prepared by exposing phosphate buffer to the gas in a tonometer. The nitric oxide concentrations in solution were verified by diazotization and spectrophotometry (Tracey *et al.*, 1990).

## RESULTS

In order to fix optimal times for the administration of antagonists to azide it was important to know something about its time course *in vivo*. Figure 1 shows the time course for azide in mouse blood after the ip administra-



FIG. 1. Azide levels in mouse blood following the ip injection of 0.3 mmol/kg of sodium azide. The point at 10 min is the mean (±SEM) for three animals. Remaining points are for single mice.

SMITH ET AL.

tion of 0.3 mmol/kg (approximately 2/3 of the LD50 dose). When given in lethal doses, most deaths occur at around 10 min. Blood levels decline fairly rapidly over the 2-hr period shown. See Kruszyna et al. (1988) for blood levels of nitrosylated hemoglobin after similar doses of azide in mice.

The results of mortality studies with azide, hydroxylamine, nitric oxide, and cyanide alone and in combination with various possible antagonists are summarized in Table 1.

It can be seen that azide is roughly four times more acutely toxic than hydroxylamine whereas nitric oxide failed to produce death or even signs of toxicity when saturated solutions were given ip in volumes of up to 1 ml.

Dicobalt edetate (Kelocyanor) has been recommended as an azide antagonist apparently on purely empirical grounds by analogy with cyanide (Richardson et al., 1975). As shown in Table 1, however, under our con-

TABLE 1

EFFECTS OF VARIOUS TREATMENTS ON THE ACUTE LETHALITY OF SODIUM AZIDE OR HYDROXYLAMINE IN MICE

| Treatment | No. dead/no. dosed |
|---|---|
| Controls | |
| $NaN_3$, 0.61 mmol/kg | 27/37 |
| $H_2NOH$, 2.05 mmol/kg | 37/57 |
| NO, 0.16 mmol/kg | 0/6 |
| NaCN, 0.13 mmol/kg | 3/4 |
| Cyanide antagonists | |
| $NaN_3$ + dicobalt edetate (0.075 mmol/kg)[a] | 7/10 |
| Treatment for methemoglobinemia | |
| $NaN_3$ + methylene blue (0.13 mmol/kg)[b] | 6/10 |
| Catalase inhibitors | |
| $NaN_3$ + aminotriazole (11.9 mmol/kg)[c] | 10/10 |
| $NaN_3$ + hydrogen cyanamide (0.31 mmol/kg)[d] | 5/10 |
| $NaN_3$ + hydrogen cyanamide (0.48 mmol/kg)[d] | 9/10 |
| $H_2NOH$ + hydrogen cyanamide (0.31 mmol/kg)[d] | 11/13 |
| Destruction of cytochrome P450 | |
| $NaN_3$ + carbon tetrachloride (0.2 ml 20% $CCl_4$)[e] | 8/10 |
| Anticonvulsant/hypnotics | |
| $NaN_3$ + diazepam (0.35 mmol/kg)[f] | 9/10 |
| $NaN_3$ + phenytoin (0.24 mmol/kg)[g] | 10/10 |
| $NaN_3$ + phenobarbital (0.20 mmol/kg)[h] | 2/11[i] |
| $NaN_3$ + phenobarbital (0.60 mmol/kg)[h] | 8/30[j] |
| $H_2NOH$ + phenobarbital (0.60 mmol/kg)[h] | 8/13 |
| NaCN + phenobarbital (0.60 mmol/kg)[h] | 3/4 |
| $NaN_3$ + ketamine/xylazine (0.73/0.16 mmol/kg)[k] | 9/11 |

[a] Given 1 hr before $NaN_3$ (Evans, 1964).
[b] Given 20 min before $NaN_3$ (Smith and Layne, 1969).
[c] Given 2 hr before $NaN_3$ (Jones and Masters, 1978).
[d] Given 1 hr before $NaN_3$ or $H_2NOH$ (DeMaster et al., 1986).
[e] Given sc in vegetable oil 24 hr before $NaN_3$ (Willhite and Smith, 1981).
[f] Given 15 min before $NaN_3$ (Kuchandy and Kulkami, 1987).
[g] Given 2 hr before $NaN_3$ (Doherty et al., 1982).
[h] Given 30 min before $NaN_3$, $H_2NOH$ or NaCN (Doherty et al., 1982).
[i] Significantly different from control group ($p < 0.01$).
[j] Significantly different from control group ($p < 0.001$).
[k] Given 5 min before $NaN_3$; see also Materials and Methods.

ditions it failed to antagonize azide poisoning. Moreover, when equimolar concentrations of sodium azide and dicobalt edetate were mixed and placed in a recording spectrophotometer, the visible absorption spectrum was identical to that for dicobalt edetate alone (maxima at 381 and 526 nm). In contrast, when equimolar concentrations of sodium cyanide and dicobalt edetate were mixed, a precipitate presumably representing an insoluble cyanide–dicobalt edetate complex formed immediately.

Methylene blue is the treatment of choice for an acquired methemoglobinemia (Gosselin *et al.*, 1984). It provided significant protection against death in mice given lethal doses of nitrite or hydroxylamine, and the protection was associated with significant reductions in the circulating levels of methemoglobin (Smith and Layne, 1969). Recently, methylene blue has come to be widely used to block the effects of NO and/or EDRF *in vitro* perhaps by inhibiting guanylate cyclase (e.g., Read and Dusting, 1987). Such an effect, if it exists, could represent an additional, unrecognized benefit in nitrite or hydroxylamine poisoning, but it would be unmasked in azide poisoning since azide does not generate methemoglobin. As shown in Table 1, however, methylene blue afforded no protection against azide.

It has been alleged that catalase is capable of converting azide (Ignarro, 1989) and perhaps hydroxylamine to NO *in vivo*. Aminotriazole and hydrogen cyanamide have been used to inhibit catalase activity *in vivo* (DeMaster *et al.*, 1986; Feinstein *et al.*, 1964). The dose of aminotriazole selected was said to decrease catalase activity in mouse liver by 80%, but it was five times the 7-day LD50. Eight animals died within the much shorter time period (10 min) consistent with azide poisoning. Two died some time later, but are included in the result in Table 1. The lower dose of hydrogen cyanamide selected was said to produce a 50% decrease in rat liver catalase activity 1 hr after injection. The higher dose tested was still well below the LD50 of 4.75 mmol/kg, but it resulted in a higher mortality than the lower dose (Table 1). Even higher

doses of hydrogen cyanamide are needed to reduce catalase activity by 50% in kidney, heart, and brain (DeMaster *et al.*, 1986), and neither inhibitor is particularly effective against catalase activity in blood. No protective effects of catalase inhibitors were obtained for either azide or hydroxylamine (Table 1).

Sodium azide was tested in mice pretreated with carbon tetrachloride to see if the liver played an important role in its biotransformation. The dose and time frames for carbon tetrachloride administration have been shown previously to be effective in blocking biotransformation reactions (Willhite and Smith, 1981). Liver damage had no effect on the lethality of azide (Table 1).

Convulsions, ascribed by some to anoxia, are sometimes noted in human victims of azide poisoning and are seen regularly in animals (Gosselin *et al.*, 1984). Rhesus monkeys pretreated with the short-acting barbiturate, thiamylal, showed a greatly reduced intensity of convulsions after iv azide (Mettler and Sax, 1972), but convulsions have been produced even in anesthetized cats with iv azide (Kaplita *et al.*, 1984). The dose of diazepam selected was more than eight-fold larger than a dose that protected mice against convulsions produced by intracerebroventricular N-methyl-D-aspartate (Moreau *et al.*, 1989), and the dose of phenytoin selected produced mild signs of toxicity in mice. The lower dose of phenobarbital protects mice against maximal electroshock seizure activity whereas the higher dose resulted in anesthesia of several hours duration (Doherty *et al.*, 1982). This anesthetic dose afforded no protection against death from cyanide or hydroxylamine. Both doses of phenobarbital significantly protected against death from azide (Table 1). The combination of ketamine and xylazine which produced anesthesia comparable to the high dose of phenobarbital failed to prevent death from azide, but it delayed death from 10 min in controls to about 40 min in treated animals. Because complete dose–response relationships were not defined in our laboratory for a few of the agents

124                                                   SMITH ET AL.

in Table 1, it is possible that certain negative results might have been positive at other doses.

Table 2 summarizes the results observed after the intracerebroventricular administration of nitric oxide, sodium azide, or hydroxylamine hydrochloride in rats. The higher dose of nitric oxide was the maximum that could be administered in terms of the limitations of solubility and volume that could be injected. A dose half that size produced the same pattern of responses so the two were combined in Table 2. For comparative purposes, the same was done with one of the sodium azide-treated groups. It regularly produced major motor seizures which sometimes started before the total dose could be given. They were of remarkably brief duration, sometimes lasting less than 1 min. The same dose of sodium azide failed to produce convulsions, but a much larger dose produced convulsions in all animals tested which may have been somewhat longer lasting than those induced by nitric oxide. Hydroxylamine was given in a dose that was in the same proportion to the systemic dose in Table 1 as was sodium azide. All animals tested showed reactions of variable intensity.

## DISCUSSION

Induced methemoglobinemia produced a small but statistically significant degree of protection against death due to sodium azide (Abbanat and Smith, 1964). This protection is due to the formation of an ionic complex between azide and ferric heme groups as is also true in the cases of cyanide and sulfide. Thus, the toxic anions are scavenged with varying degree of efficiency and bound temporarily in an inactive form. The methemoglobinemia was induced either by $p$-aminopropiophenone (PAPP) or sodium nitrite in doses adjusted to give the same peak level of circulating methemoglobin. The peak levels occurred at different times, but the azide was given at times corresponding to the respective peak methemoglobin level for each agent. Both azide and nitrite are vasodilators perhaps by virtue of their conversion to NO *in vivo* (Kruszyna *et al.,* 1988) whereas PAPP is not converted to NO and it has no effect on blood pressure. Nevertheless nitrite and PAPP provided the same degree of protection against death after azide suggesting that the effect was due only to the amount of circulating methemoglobin and that it was not influenced by

TABLE 2

CONVULSANT EFFECTS OF INTRACEREBROVENTRICULAR NITRIC OXIDE, SODIUM AZIDE, OR HYDROXYLAMINE IN RATS

| Severity | Controls[a] | NO[b] | NaN$_3$[c] | NaN$_3$[d] | H$_2$NOH[e] |
|----------|-------------|-------|------------|------------|-------------|
| No reaction | 8/9 | 1/13 | 2/4 | | |
| Mild[f] | 1/9 | 6/13 | 2/4 | | 3/5 |
| Severe[g] | | 6/13 | | 4/4 | 2/5 |
| Total reactions | 1/9 | 12/13[h] | 2/4 | 4/4[i] | 5/5[j] |

[a] Either 0.1 M phosphate buffer, pH 7.4, or physiological saline.
[b] Dose of 0.1 or 0.2 mmol/kg.
[c] Dose of 0.1 or 0.2 mmol/kg.
[d] Dose of 6 mmol/kg.
[e] Dose of 22 mmol/kg.
[f] Agitation and tremors, including brief spurts of rapid but purposeful movement.
[g] Major motor seizures consisting primarily of clonic convulsions.
[h] Significantly different from control group ($p < 0.0004$).
[i] Significantly different from control group ($p < 0.0028$).
[j] Significantly different from control group ($p < 0.0017$).

NO formation or vasodilation. Although induced methemoglobinemia protected against azide toxicity, it does not prove that the toxicity is due to azide per se since azide bound to methemoglobin cannot be converted to NO.

Induced methemoglobinemia was the only anticyanide measure tested which was also effective against azide. Dicobalt edetate is both prophylactically and antidotally effective against cyanide, but it did not protect against azide poisoning (Table 1). Prophylactic doses of sodium thiosulfate which protect against cyanide poisoning had no effect in azide poisoning (Smith et al., 1975), but sulfur is not known to be involved in azide biotransformation. Pure oxygen at one atmosphere offered no protection against azide poisoning in mice although it did appear to influence the course of the intoxication. Usually mice die in convulsions within 10 min after ip lethal doses of sodium azide, but occasionally a late death was observed in an apparent phase of collapse. Oxygen seemed to increase the proportion of early convulsive deaths (Smith et al., 1975). In any event, true tissue hypoxia does not appear to play a role in azide poisoning. Oxygen alone was also ineffective in preventing death due to cyanide (Way et al., 1966).

Catalase inhibitors failed to influence mortality after either azide or hydroxylamine (Table 1), but these results must be regarded as somewhat equivocal because of the large redundancy of the enzyme. As shown by others, substantial amounts of catalase activity persisted in some tissues even after very large doses of these agents (DeMaster et al., 1986; Jones and Master, 1978). Only the least toxic inhibitors could be tested in vivo. It would not have been possible, for example, to test cyanide under these conditions.

The protective effect against azide of phenobarbital whether given in anesthetic or subanesthetic doses in the absence of protection by diazepam or phenytoin as given in large but subanesthetic doses may be unique. We are unaware of other convulsants where this pattern has been observed. Anesthesia per se does not appear to be responsible since subanesthetic doses of phenobarbital also protected whereas anesthetic doses of ketamine/xylazine did not protect. Azide placed in the cerebroventricular system of anesthetized cats failed to produce convulsions although much larger doses as given systemically did produce them (Kaplita et al., 1984). The convulsions, however, might have been initiated by azide or by NO either as generated systemically or locally in the central nervous system. A role for the latter has been suggested in excitatory amino-acid neurotransmission in the rat. It is postulated that the activation of NMDA receptors leads to increased synthesis and release of NO (Garthwaite et al., 1988). Clearly, the basis for the convulsions was neither histotoxic- nor true hypoxia since anesthetic doses of phenobarbital did not protect against the seizures and death as produced cyanide or hydroxylamine.

The results presented here suggest that when placed in the lateral ventricles of rat brain azide is converted to nitric oxide which is responsible for the convulsive activity. Perhaps the same is true for hydroxylamine. In much larger doses azide given systemically is also capable of eliciting seizure activity. Since this was not true for nitric oxide which is unstable in the presence of oxyhemoglobin, it suggests that azide penetrates the blood–brain barrier and is converted to nitric oxide as above. Both hydroxylamine and nitrite produce convulsions when given systemically. Animals die with an overwhelming methemoglobinemia. Since methylene blue protects against death and significantly lowers methemoglobin levels, the convulsions must be secondary to hypoxia.

Azide does not generate methemoglobin and systemic methylene blue afforded no protection against death. According to the hypothesis, however, methylene blue should have protective effects against azide if it reached the brain in concentrations high enough to inhibit guanylate cyclase. Perhaps under these conditions it did not, but the dye readily penetrates the blood–brain barrier (e.g., Borison et al., 1960). Conversely, phenobarbital protects

against azide, but not against hydroxylamine. These results suggest that hydroxylamine, nitrite, and nitric oxide are inactivated in blood by virtue of their reactions with hemoglobin, and, therefore, fail to penetrate into the central nervous system in effective concentrations. However, when placed in the brain, hydroxylamine and azide produced seizures perhaps by virtue of their conversion to nitric oxide which also produced seizures in lower doses.

## ACKNOWLEDGMENTS

This work was supported by NIH Grant HL 14127 from the National Heart, Lung, and Blood Institute and NRSA ES 07104 from the National Institute of Environmental Health Sciences. We are grateful to Lipha Pharmaceuticals Ltd., Caldwell Lane, Hitchin, Herts, UK for their gift of Kelocyanor injection. Mrs. Bonnie Twitchell implanted the ventricular cannulas in rats and assisted with drug administration.

## REFERENCES

ABBANAT, R. A., AND SMITH, R. P. (1964). The influence of methemoglobinemia on the lethality of some toxic anions. I. Azide. Toxicol. Appl. Pharmacol. 6, 576–583.

BORISON, H. L., CLARK, W. G., AND ROSENSTEIN, R. (1960). Functional decerebration in the cat, comparative evaluation of cerebral ischemia and ultrasonic midbrain transection. Neurology 10, 931–941.

CHUGHTAI, A. B., ASGHAR, B., KHAN, S. A., AND BHATTY, M. K. (1981). Spectrophotometric determination of sodium azide. Part 1. Indirect colorimetry. Pakistan J. Sci. Ind. Res. 24, 182–184.

DEMASTER, E. G., REDFERN, B., SHIROTA, F. N., AND NAGASAWA, H. T. (1986). Differential inhibition of rat tissue catalase by cyanamide. Biochem. Pharmacol. 35, 2081–2085.

DOHERTY, P., SMITH, R. P., AND FERM, V. (1982). Tetramethyl substitution on succinonitrile confers pentylenetetrazole-like activity and blocks cyanide release. J. Pharmacol. Exp. Ther. 223, 635–641.

EVANS, C. L. (1964). Cobalt compounds as antidotes for hydrocyanic acid. Br. J. Pharmacol. Chemother. 23, 455–475.

FEINSTEIN, R. N., SEAHOLM, J. E., AND BALLONOFF, L. B. (1964). Effect of compounds related to aminotriazole on catalase in vivo and in vitro. Enzymologia 27, 30–40.

FELDSTEIN, M., AND KLENDSHOJ, N. C. (1954). The determination of cyanide in biological fluids by microdiffusion analysis. J. Lab. Clin. Med. 44, 166–170.

FURCHGOTT, R. F. (1985). Studies on relaxation of rabbit aorta by sodium nitrite: The basis for the proposal that the acid-activatable inhibitory factor from bovine retractor penis is inorganic nitrite and that the endothelium-derived relaxing factor is nitric oxide. In Mechanisms of Vasodilitation (P. M. VanHoutte, Ed.), Vol. 4, Raven Press, New York.

GARTHWAITE, J., CHARLES, S. L., AND CHESS-WILLIAMS, R. (1988). Endothelium-derived relaxing factor release on activation of NMDA receptors suggests a role as intercellular messenger in the brain. Nature 336, 385–388.

GONSALVES, S. F., TWITCHELL, B., HARBAUGH, R. E., KROGSGAARD-LARSEN, P., AND SCHOUSBOE, A. (1989). Anticonvulsant activity of intracerebroventricularly administered glial GABA uptake inhibitors and other GABAmimetics in chemical seizure models. Epilepsy Res. 4, 34–41.

GOSSELIN, R. E., SMITH, R. P., AND HODGE, H. C. (1984). Clinical Toxicology of Commercial Products, 5th ed., pp. II–115. Williams and Wilkins, Baltimore.

IGNARRO, L. J. (1989). Heme-dependent activation of soluble guanylate cyclase by nitric oxide: Regulation of enzyme activity by porphyrins and metalloporphyrins. Semin. Hematol. 26, 63–76.

JONES, G. L., AND MASTERS, C. J. (1978). On the synthesis and degradation of the multiple forms of catalase in mouse liver. Arch. Biochem. Biophys. 187, 431–440.

KAPLITA, P. V., BORISON, H. L., MCCARTHY, L. E., AND SMITH, R. P. (1984). Peripheral and central actions of sodium azide on circulatory homeostasis in anesthetized cats. J. Pharmacol. Exp. Ther. 231, 189–196.

KRUSZYNA, H., KRUSZYNA, R., SMITH, R. P., AND WILCOX, D. E. (1987). Red blood cells generate nitric oxide from directly acting nitrogenous vasodilators. Toxicol. Appl. Pharmacol. 91, 429–438.

KRUSZYNA, R., KRUSZYNA, H., SMITH, R. P., AND WILCOX, D. E. (1988). Generation of valency hybrids and nitrosylated species of hemoglobin in mice by nitric oxide vasodilators. Toxicol. Appl. Pharmacol. 94, 458–465.

KUCHANDY, J., AND KULKARNI, S. K. (1987). Modulatory effects of alpha-2 adrenoceptor agonists on RO 5-4864-induced convulsions in rats and mice. Psychopharmacology 93, 113–117.

METTLER, F. A., AND SAX, D. S. (1972). Cerebellar cortical degeneration due to acute azide poisoning. Brain 95, 505–516.

MOREAU, J.-L., PIERI, L., AND PRUD'HON, B. (1989). Convulsions induced by centrally administered NMDA in mice: Effects of NMDA antagonists, benzodiazepines, minor tranquilizers, and anticonvulsants. Br. J. Pharmacol. 98, 1050–1054.

READ, M. A., AND DUSTING, G. J. (1987). The inhibitory actions of anti-oxidants on endothelium-derived relaxing factor released from cultured bovine cells. Clin. Exp. Pharmacol. Physiol. 14, 409–414.

RICHARDSON, S. G. N., GILES, C., AND SWAN, C. H. J. (1975). Two cases of sodium azide poisoning by accidental ingestion of Isoton. *J. Clin. Path.* **28**, 350–351.

SANA, T. R., FERM, V. H., SMITH, R. P., KRUSZYNA, R., KRUSZYNA, H., AND WILCOX, D. E. (1990). Embryotoxic effects of sodium azide infusions in the Syrian hamster. *Fundam. Appl. Toxicol.* **15**, 754–759.

SMITH, L., KRUSZYNA, H., AND SMITH, R. P. (1977). The effect of methemoglobin on the inhibition of cytochrome *c* oxidase by cyanide, sulfide, or azide. *Biochem. Pharmacol.* **26**, 2247–2250.

SMITH, R. P., AND LAYNE, W. R. (1969). A comparison of the lethal effects of nitrite and hydroxylamine in the mouse. *J. Pharmacol. Exp. Ther.* **165**, 30–35.

SMITH, R. P., AND KRUSZYNA, H. (1974). Nitroprusside pruduces cyanide poisoning *via* a reaction with hemoglobin. *J. Pharmacol. Exp. Ther.* **191**, 557–563.

SMITH, R. P., GOSSELIN, R. E., AND KRUSZYNA, R. (1975). Sodium azide poisoning. *Ann. Intern. Med.* **83**, 739.

TERPINSKI, E. A. (1985). Spectrophotometric determination of sodium azide. *Analyst* **110**, 1403–1405.

TRACEY, W. R., LINDEN, J., PEACH, M. J., AND JOHNS, R. A. (1990). Comparison of spectrophotometric and biological assays for nitric oxide (NO) and endothelium-derived relaxing factor (EDRF): Nonspecificity of the diazotization reaction for NO and failure to detect EDRF. *J. Pharmacol. Exp. Ther.* **252**, 922–928.

WAY, J. L., GIBBON, S. L., AND SHEEHY, M. (1966). Effect of oxygen on cyanide intoxication. I. Prophylactic protection. *J. Pharmacol. Exp. Ther.* **153**, 381–385.

WILLHITE, C. C., AND SMITH, R. P. (1981). The role of cyanide liberation in the acute toxicity of aliphatic nitriles. *Toxicol. Appl. Pharmacol.* **59**, 589–602.

# EXHIBIT 29

*Andriano v. Ryan*, Case No. CV-16-01159-PHX-SRB
Motion for Evidentiary Development

## DECLARATION OF MARGARET (PEG) GREEN

I, Margaret (Peg) Green, declare under penalty of perjury, the following to be true to the best of my information and belief:

1.   I am an attorney licensed to practice law in the State of Arizona since 1987. I work at the Office of the Maricopa County Public Defender, where I have been employed since 1987. I was assigned to the trial unit for fifteen years. I handled first degree, non-capital murder cases during that time period. I handled one capital case that eventually went non-capital by the time we went to trial. I worked as a supervisor of new trial attorneys for two years before moving to the appellate unit.

2.   I was appointed to represent Wendi Andriano in her capital appeal, Case No. CR-05-0005 as second chair appellate counsel. Ms. Andriano's case was my first capital appeal. Brent Graham served as lead counsel. Brent and I collaborated on the opening brief. We both reviewed the entire record and discussed which issues to properly raise on appeal. We discussed this case on almost a daily basis. While there was plenty of give and take during these discussions, I ultimately deferred to Brent as lead counsel when we made decisions about which issues to raise on appeal.

3.   I submitted to a telephone interview with habeas counsel on two separate occasions, March 3, 2017 and November 27, 2017. At the time of those interviews I did not have access to my appellate file, therefore could not refresh my memory with notes that I made during the course of preparing the opening and reply briefs in this case. Habeas counsel provided me with a copy of my notes upon my request on November 30, 2017. The remainder of this declaration refers to the November interview.

4.   I have no independent recollection of discussing raising a claim that Ms. Andriano's rights under *Simmons v. South Carolina*, 114 S. Ct. 2187 (1994) were violated. I have no independent recollection of discussing raising claims that the trial court limited voir dire and improperly rehabilitated jurors, that the trial court allowed the State to call an unqualified expert to testify about domestic violence. I have a limited recollection of discussing the exclusion of Jeffrey Miller's testimony that he had spoken to Ms. Andriano and Joe Andriano about Joe's depression and suicidal thoughts.

My case notes generated during the review of this matter for appeal indicate the following:

That listed under "Possible Issues", I listed Motion to Preclude Evidence Re: Availability of Parole(item number 12); Motion to Preclude Counsel from Voir Dire re: views on AF or MF(item 17); Motion to Preclude Bayless(item 47 and 58); DC precluded from bringing in V's statement(item 37) and that witness counselled V re: suicide(item 40).

Listed under "Andriano Things to Do", I included "Investigate possible voir dire issues."

Listed under "Rulings on Issues", I noted the following:

State's Motion to Preclude Testimony Concerning Availability of Parole granted.  I wrote a note, "maybe" next to this entry.

Defendant's Motion to Preclude Bayless denied.   I wrote a note, "Brent" next to this entry.

5.   I do not recall discussing including in our appellate brief a specific argument that the mitigation in the case was sufficiently substantial to warrant a life sentence and that the Arizona Supreme Court should so find on its independent review. After the Arizona Supreme Court issued its opinion in this case, we began to notice a trend.  We noticed that in its written opinions or even sometimes at oral argument, the Court asked counsel to specifically address independent review.  In the following years, if independent review was an issue in a capital appeal, we tried to honor the Court's request and specifically address independent review.

6.   Brent Graham filed a Motion to Reconsider the Arizona Supreme Court's opinion affirming Ms. Andriano's conviction and death sentence.  I have no independent recollection of discussing whether to address apparent factual errors made by the Arizona Supreme Court in its opinion.  The Motion to Reconsider addressed issues raised and argued in the Opening Brief.

7.   Habeas counsel for Ms. Andriano provided me with a copy of a memorandum concerning Ms. Andriano's appeal written by Jennifer Bedier on October 18, 2006. I do not now recall this memorandum, but I confirmed that the copy I was shown has notes in my handwriting in the margins. The

presence of my notes in the margins of Ms. Bedier's memo leads me to believe that I received a copy of the memo, read it and took notes.

Signed this _____1st__ day of December, 2017.

_Pea Green_
Name (Printed)

_Peg Green_
Signature

_Phoenix, AZ_
City, State

# EXHIBIT 30

*Andriano v. Ryan*, Case No. CV-16-01159-PHX-SRB
Motion for Evidentiary Development

**DECLARATION OF JAMES WADE YOST**

I, James Wade Yost, declare under penalty of perjury the following to be true to the best of my information and belief:

1. I was a State witness in *State vs. Wendi Andriano*, Superior Court Case No. CR 2000-096032.

2. I worked with Wendi Andriano for about a year at the San Rivas Apartment Complex in Phoenix, Arizona. I was the assistant manager, and Wendi was the manager. I knew Wendi's husband, Joe Andriano, through her.

3. Wendi was the caretaker in her marriage. She worked, took care of the kids, paid the bills, and took Joe to his doctor's appointments. Because she was the manager of an apartment complex, she also had a generally authoritative personality. It may have looked like she was running her marriage, but she had more of a mothering and caretaking role, not a bossy and controlling one. This is the dynamic I was referring to when I testified at trial that Wendi was "in charge" of her relationship.

4. When Wendi told me that Joe was worth more dead than alive because their medical malpractice lawsuit would become a wrongful death lawsuit, my impression was that Wendi was recounting what an attorney had told her and that Wendi was mocking this idea. I did not think that this was Wendi's sentiment. I do not think that came across accurately in the questioning of me at trial.

5. During Wendi's trial, I was at the courthouse either right before or after testifying when members of Joe Andriano's family approached me. They showed me a photo from the night of the crime of Joe laying on the living room floor, deceased. This photo shocked and upset me.

6. After I testified, I spoke to the prosecutor, Juan Martinez, and asked him if he could tell me the entire story of what happened in the case because I still did not know entirely what had happened. Juan told me to give him a call and that we could go grab a beer and he would tell me. I tried to call him a few times after that, but he never answered or returned my calls.

7. I was not contacted by anyone working on Wendi's post-conviction team. Had I been contacted previously, I would have been willing to provide this same information.

_JAMES YOST_
Name (Printed)

_Signature_

_SAN RAFAEL, CA 94901_
City, State

# EXHIBIT 31
# (part 1)

*Andriano v. Ryan*, Case No. CV-16-01159-PHX-
SRB Motion for Evidentiary Development

Attorney Discipline
Probable Cause Committee
of the Supreme Court of Arizona
FILED

OCT  6 2016

By_____ CRamoY _____

## BEFORE THE ATTORNEY DISCIPLINE
## PROBABLE CAUSE COMMITTEE
## OF THE SUPREME COURT OF ARIZONA

IN THE MATTER OF A MEMBER OF THE
STATE BAR OF ARIZONA,

JUAN M. MARTINEZ
   Bar No. 009510

Respondent

No. 15-3363

**ORDER VACATING ADMONITION,
PROBATION, (CLE) AND COSTS**

On September 9, 2016, the Attorney Discipline Probable Cause Committee of the Supreme Court of Arizona ("Committee") issued an Order of Admonition, Probation, (CLE) and Costs to the above-named Respondent for violations of Rule 41(g), Rule 42, ER 4.4 and Rule 42, ER 8 4(d), Ariz. R. Sup  Ct

**PURSUANT TO** Rule 55(c)(4)(B), Ariz. R. Sup. Ct. the Respondent counsel filed a Notice of Appeal (the "Notice"). This Notice was filed in a timely manner

**IT IS THEREFORE ORDERED,** pursuant to Rule 55, vacating the aforementioned Order of Admonition, Probation, (CLE) and Costs

**IT IS FURTHER ORDERED** pursuant to Rules 55(c) and 58(a), Ariz. R. Sup. Ct. the State Bar shall prepare and file a complaint against the Respondent with the Disciplinary Clerk in File No  15-3363.

**DATED** this ____5th___ day of October, 2016

_____
Judge Lawrence F. Winthrop, Chair
Attorney Discipline Probable Cause Committee
of the Supreme Court of Arizona

Original filed this _**Uth**_ day
of October, 2016, with.

Attorney Discipline Probable Cause Committee
Supreme Court of Arizona
1501 West Washington Street, Suite 104
Phoenix, Arizona 85007

Copy mailed this _**Uth**_ day
of October, 2016, to·

J  Scott Rhodes
Jennings Strouss & Salmon, PLC
One E. Washington Street, Suite 1900
Phoenix, Arizona 85004-2554
Respondent's Counsel

Kathleen Erin Brody
ACLU of Arizona
P.O. Box 17148
Phoenix, Arizona 85011-0148
Complainant

Lawyer Regulation Records Department
State Bar of Arizona
4201 North 24th Street, Suite 200
Phoenix, Arizona 85016-6288

Compliance Monitor
State Bar of Arizona
4201 N  24th Street, Suite 100
Phoenix, AZ 85016

Craig D  Henley
State Bar of Arizona
4201 North 24th Street, Suite 100
Phoenix, Arizona 85016-6288

by._**C  Ramoy**_

**Supreme Court**

ADMINISTRATIVE OFFICE OF THE COURTS
1501 West Washington
Phoenix, Arizona 85007 3222
**CLD**

PRESORTED
FIRST CLASS

US POSTAGE ≫ PITNEY BOWES



ZIP 85007   $ 000.45²
02 1W
0001367489 OCT 06 2016

Craig Henley
State Bar of Arizona
4201 North 24th Street, Suite 100
Phoenix, AZ 85016-6266

HRM-IMP        85016

**BEFORE THE PRESIDING DISCIPLINARY
JUDGE**

FILED

OCT 0 4 2016

BY _H. Librium_

---

IN THE MATTER OF A MEMBER OF
THE STATE BAR OF ARIZONA,

JUAN M MARTINEZ,
Bar No 009510

           Respondent

No  PO-2016-057

**SECOND PROTECTIVE ORDER**

State Bar File  15-3363

---

The Presiding Disciplinary Judge of the Supreme Court of Arizona having reviewed Mr Martinez's Motion for Supplemental Protective Order (Motion) and there being no objection by the State Bar, accordingly

**IT IS ORDERED** granting the Motion

**IT IS FURTHER ORDERED** sealing the sections of his Initial Response dated April 8, 2016, responding to the allegations about Sergeant Egea in *State v Chrisman* (which occur on page 30) and the alleged ousting of Juror 17 in *State v Arias* (which occurs on pages 49-51) from Complainants and the general public, pursuant to Rule 70(g), Ariz R Sup Ct

Pre-complaint orders sealing material do not seal such material post-complaint if the material is sought to be used or referred to in subsequent pleadings or in any hearing   In such circumstance, the parties are reminded a formal request for protective order with specificity must be filed with the material sought to be sealed and submitted for in-camera review

Sealed material shall be opened and viewed only by an order of the committee, the presiding disciplinary judge, a hearing panel, the board or the court for use by

such body and the parties in pending proceedings, and otherwise only upon notice to and an opportunity to be heard by the parties and the witness or other person who is the subject of the information   A party aggrieved by an order relating to a request for a protective order may seek review by filing a petition for special action with the Arizona Supreme Court

**DATED** this 4th day of October, 2016

*William J O'Neil*

_____

**William O'Neil**
**Presiding Disciplinary Judge**

Copy of the foregoing sent via e-mail and
U  S  mail this _7th_ day of October, 2016,
to

Craig D  Henley, Esq
Senior Bar Counsel
4201 North 24th Street, Suite 100
Phoenix, AZ  85016-6266
Email  LRO@staff azbar org

J  Scott Rhodes, Esq
*Jennings, Strouss & Salmon, PLC*
One East Washington Street
Suite 1900
Phoenix, AZ 85004-2554
Email  srhodes@jsslaw com
Attorneys for Applicant

Lawyer Regulation Records Department
State Bar of Arizona
4201 North 24th Street, Suite 100
Phoenix, AZ  85016-6266

By _Jalise Stone_ _____

J. Scott Rhodes - 016721
srhodes@jsslaw.com
Kerry A. Hodges - 025547
khodges@jsslaw.com
**JENNINGS, STROUSS & SALMON, P.L.C.**
A Professional Limited Liability Company
One East Washington Street
Suite 1900
Phoenix, Arizona 85004-2554
Telephone (602) 262-5911

Attorneys for Respondent Juan M. Martinez

## BEFORE THE ATTORNEY DISCIPLINE
## PROBABLE CAUSE COMMITTEE
## OF THE SUPREME COURT OF ARIZONA

| | |
|---|---|
| **IN THE MATTER OF A MEMBER OF THE STATE BAR OF ARIZONA,** | No. 15-3363 |
| | **DEMAND FOR FORMAL PROCEEDING** |
| **JUAN M. MARTINEZ**<br>**Bar No. 009510** | |
| Respondent | |

Pursuant to Rule 55(c)(4)(B), Ariz. R. Sup. Ct., Respondent Juan Martinez hereby

demands that a formal proceeding be instituted against him in the above-referenced

matter and that the Order of Admonition, Probation, (CLE), and Costs be vacated

Dated this _3rd_ day of October, 2016

JENNINGS, STROUSS & SALMON, P.L.C.

By _____
J. Scott Rhodes
Kerry A. Hodges
One E. Washington Street, Suite 1400
Phoenix, Arizona 85004-2554
*Attorneys for Respondent Juan M. Martinez*

5426766v1(49286 53)

Original filed this 3rd day of October, 2016,
with

Attorney Discipline Probable Cause Committee
of the Supreme Court of Arizona
1501 West Washington Street, Suite 104
Phoenix, Arizona  85007
Email   probablecausecomm@courts az gov

Copy e-mailed and mailed this same date to

Craig D  Henley, Esq
Senior Bar Counsel
State Bar of Arizona
4201 North 24th Street, Suite 100
Phoenix, AZ  85016-6266

Lawyer Regulation Records Manager
State Bar of Arizona
4201 North 24th Street, Suite 100
Phoenix, AZ  85016-6266
E-mail   LRO@staff azbar org

Copy e-mailed this same date to

Attorney Discipline Probable Cause Committee
of the Supreme Court of Arizona
1501 West Washington Street, Suite 104
Phoenix, Arizona  85007
Email   probablecausecomm@courts az gov


By   _Mary Liska_____

neopost 
10/03/2016
**US POSTAGE**     FIRST-CLASS MAIL
**$03 04⁰**

ZIP 85004
041L11249083

# Jennings
# Strouss

J Scott Rhodes, Esq.
Jennings Strouss & Salmon P.L.C.
One East Washington Street
Suite 1900
Phoenix, Arizona 85004-2554

Craig D Henley, Esq   *(Also to Records)*
Staff Bar Counsel
State Bar of Arizona
4201 North 24th Street, Suite 100
Phoenix, AZ  85016-6266

1    J Scott Rhodes – 016721
     srhodes@jsslaw com
2    Kerry A  Hodges – 025547
     khodges@jsslaw com
3    Chase A  Bales – 030099
     cbales@jsslaw com
4    **JENNINGS, STROUSS & SALMON, P L C**
     A Professional Limited Liability Company
5    One East Washington Street, Suite 1900
     Phoenix, Arizona  85004-2554
6    Telephone  (602) 262 5911
     MinuteEntries@jsslaw com
7
     Attorneys for Respondent, Juan M  Martinez
8
9    **BEFORE THE PRESIDING DISCIPLINARY JUDGE**
     **OF THE SUPREME COURT OF ARIZONA**

10
     | | |
     |---|---|
     | **IN THE MATTER OF A MEMBER OF THE STATE BAR OF ARIZONA,** | No  PO-2016-016 |
     | | **MOTION FOR SUPPLEMENTAL PROTECTIVE ORDER** |
     | **JUAN M  MARTINEZ,** **Bar No  009510** | State Bar File  15-3363 |
     | Respondent | |

15        Pursuant to Rule 70(g), Ariz  R  Sup  Ct , Respondent, Juan M  Martinez, by and

16   through his counsel, hereby respectfully requests a supplemental protective order to seal

17   those portions of his Initial Response that discuss or otherwise relate to Exhibits 32 and

18   79-83, which exhibits were sealed by this Court's order of April 21, 2016   Specifically,

19   Respondent moves to seal  (i) the section of the Initial Response responding to the

20   allegations about Sergeant Egea in *State v  Chrisman* (page 30 of his Initial Response),

21   and (ii) the section responding to the alleged ousting of Juror 17 in *State v  Arias* (pages

22   49-51 of the Initial Response)   Such information should be sealed from the Complainants

23   and the general public, but not from the Lawyer Regulation Office of the State Bar of

24   Arizona, the Disciplinary Clerk, the Presiding Disciplinary Judge, any Hearing Panel, State

25   Bar counsel, and the Arizona Supreme Court

26

1    A copy of Respondent's Initial Response **with the relevant sections redacted is**

2    enclosed with this motion for inclusion in the public portion of the State Bar file in this

3    matter  (See Ex  "A" hereto )

4        There is good cause to seal the above-described portions of the Initial Response

5    because they relate to documents already sealed by the Presiding Disciplinary Judge, and

6    further because they relate to information concerning a nonparty, and to documents sealed

7    by court order in *State v  Arias*, Maricopa County Superior Court, Case No  CR2008-

8    031021

9        After consultation, the State Bar has stated that it does not object to this motion

10       A proposed form of order is attached hereto as Exhibit "B "

11   **RESPECTFULLY SUBMITTED** this 3rd day of October, 2016

12                                JENNINGS, STROUSS & SALMON, P L C

13

14   By _____

15       J  Scott Rhodes
         Kerry A  Hodges
16       Chase A  Bales
         One East Washington, Suite 1900
17       Phoenix, Arizona  85004-2554
         Attorneys for Respondent, Juan M  Martinez
18

19
     Original of the foregoing filed this 3rd
20   day of October, 2016, with the
21   Disciplinary Clerk of the Supreme
     Court
22
     Copy of the foregoing sent via e-mail and
23   U  S  mail this 3rd day of October, 2016, to
24
25   / / /
26   5427506v1(49286 53)

2

Craig D Henley, Esq
Staff Bar Counsel
State Bar of Arizona
4201 North 24th Street, Suite 100
Phoenix, AZ  85016-6266
craig henley@staff azbar org

Lawyer Regulation Records Manager
State Bar of Arizona
4201 North 24th Street, Suite 100
Phoenix, AZ  85016-6266
E-mail   LRO@staff azbar org

Copy of the foregoing sent via e-mail
this 3rd day of October, 2016, to

Honorable William O'Neil
Presiding Disciplinary Judge
Supreme Court of Arizona
1501 West Washington Street, Suite 104
Phoenix, AZ 85007
officepdj@courts az gov

By _Mary Lister_____

3

5427506v1(49286 53)

# Exhibit A



# Jennings Strouss

**Jennings, Strouss & Salmon, PLC**
Attorneys at Law

One East Washington Street, Suite 1900
Phoenix, Arizona 85004 2554
Telephone   602 262 5911
www jsslaw com

**J  Scott Rhodes**
Direct Dial   602 262 5862
Direct Fax   602 495 2648
srhodes@jsslaw.com

April 8, 2016

**VIA HAND DELIVERY AND E-MAIL (without Exhibits)**

Craig D  Henley, Esq
Senior Bar Counsel
State Bar of Arizona
4201 North 24th Street, Suite 100
Phoenix, AZ  85016-6266

Re      State Bar File No  15-3363
        Kathleen Erin Brody, Esq , Complainant
        Juan M  Martinez, Esq , Respondent

Dear Mr  Henley

        This is our verified initial response on behalf of Juan M  Martinez ("Mr  Martinez") in
the above-referenced matter   Thank you for giving us additional time to prepare this
response   Mr  Martinez denies that he has violated the Arizona Rules of Professional
Conduct (generally, the "Ethical Rules," or specifically, "ER __")

        **Please note that certain exhibits hereto are the subject of a Motion for
Protective Order that we have filed with the Presiding Disciplinary Judge   Such
exhibits are attached to the motion but are not attached hereto**

## INTRODUCTION

        Mr  Martinez graduated from Arizona State University College of Law[1] in 1983 and
was admitted to the State Bar of Arizona in 1984   He has no prior discipline   Since 1988,
Mr  Martinez has been a prosecutor with the Maricopa County Attorney's Office ("MCAO")
For the past 19 of his 27 years with the MCAO, Mr  Martinez has prosecuted homicide cases,
including 10 capital cases before a jury, in which six defendants received the death
sentence, three were sentenced to prison for their natural life, and one was convicted of
second-degree murder   A seventh defendant was also sentenced to death by a judge rather
than a jury   Including the capital cases, he has tried approximately 70 murder cases to a
jury verdict, resulting in approximately 68 convictions   Of these convictions, only three
have been remanded on appeal or as a result of post-conviction relief   One case was
vacated and remanded based on jury instructions, a second was remanded after the
definition of "premeditation" was narrowed, and a new trial was ordered in the third case
because the lower court was found to have erred in allowing the use of "other act" evidence
None of these cases were overturned as a result of prosecutorial misconduct

---

[1] Now Sandra Day O'Connor College of Law

**Phoenix  ▸  Peoria  ▸  Washington, DC**

Craig D  Henley, Esq
April 8, 2016
Page 2

In 2013, Mr  Martinez was awarded the "Homerun Hitters Award" by the National District Attorneys Association for outstanding prosecution  In 1998-1999, he was named Arizona Prosecutor of the Year by the Arizona Prosecuting Attorneys Advisory Council

Complainant Kathleen Erin Brody submitted her bar charge (the "Charge" or the "AACJ Charge") in her capacity as President of Arizona Attorneys for Criminal Justice (the "AACJ")  The AACJ (sometimes referred to herein as "Complainant") "is a statewide membership organization of criminal-defense lawyers, law students, and associated professionals    " (Charge, at 1 )  The AACJ Charge is an attempt, orchestrated by a trade association of criminal defense professionals, to use the offices of the State Bar of Arizona to further an agenda to impede one of Arizona's most experienced prosecutors from prosecuting some of the worst crimes committed in our state

As you will observe when you review the rest of this response (along with the exhibits), we respond herein to each and every one of the AACJ allegations, however, beyond the factual and legal defenses presented herein, an issue of public policy resides in this case that cannot be discounted  That issue is whether any public servant should be required to defend his or her professional license against a litany of allegations (some associated with prosecutions occurring over 15 years ago) by a statewide association of opposing counsel  Before submitting the Charge, it appears the AACJ performed a broad canvass of its members, asking for any "allegations" against Mr  Martinez—no matter how old, and no matter that many had already been litigated, reviewed and decided by the courts, or even by the State Bar of Arizona in regard to three of the allegations

The AACJ Charge is a collection of cardboard cut-outs  It is not a true or accurate portrait of Mr  Martinez, who has taken responsibility for prosecuting, in the name of the State, individuals who committed horrific crimes and then were defended by talented defense counsel who pursued every means available—including the AACJ Charge—to try to defend their clients and, eventually, perhaps achieve their liberty

The allegations of the Charge are not grounded in the mandatory reporting requirement of ER 8 3(a)  "If they were, the Charge would be grievously late in regard to most of the allegations  Instead, the Charge is a statewide, intentional attempt, organized by a trade association and based on a superficially forensic review of Mr  Martinez's entire career and, as demonstrated below, based also on only partial records and deceptive descriptions of events, to try to create from fragments of facts a "pattern" of conduct that does not exist and has never existed

Mr  Martinez recognizes and respects the vital role of defense counsel in our criminal justice system  Regrettably, the AACJ appears to have lost sight of the undeniable truth that criminal justice also requires dedicated prosecutors  Probably more than in any other area of law, criminal justice brings together lawyers defending the highest possible stakes, on both sides of every case  the due process rights of accused individuals, and society's interest in enforcement of our laws  In a criminal case, if either side crosses a line, or exceeds a known parameter of conduct, then courts will rule accordingly, and the matter then proceeds as justice requires for that case  The defense in a criminal case has extremely wide leeway  The State, in contrast, is held to the highest standards – standards that Mr  Martinez has always embraced, and that he embraces today

Craig D  Henley, Esq
April 8, 2016
Page 3

While a prosecutor's standards of conduct are understandably high, it does not follow that every incidental or unintentional breach of them is or should be deemed "prosecutorial misconduct" or a breach of ethical standards  As demonstrated herein, such is not the law  The terrain for prosecutors is already treacherous, but to hold prosecutors professionally responsible (at the risk of their licenses to practice law) for each time that a court, especially an appellate court in hindsight, finds that an excess occurred would create an unwarranted, even tragic, deterrent against lawyers seeking careers in prosecution

If the AACJ Charge is not dismissed for lack of probable cause (as it should be), then a chilling message will be sent to a new generation of lawyers considering a career in prosecution  The message to those young lawyers will be that years of public service—years of taking on cases so heinous that most lawyers would shirk just from the grotesque nature of the facts—will not earn them the well-deserved praise of a grateful public, but instead will garner them mob-style accusations from an association of opposing counsel, and potential prosecution by our self-regulated profession

For this important public policy reason alone, the AACJ Charge should be received by the State Bar with extreme skepticism  It should be dismissed, not only for its lack of probable cause (as demonstrated herein), but in order to uphold the integrity of our system of professional discipline, and to maintain the vitally important balance between criminal defense and criminal prosecution  The State Bar should not be used as a vehicle to dissolve that balance based on the bully tactics of a disgruntled trade association

## FACTUAL AND LEGAL DISCUSSION

For your ease of reference and analysis, we have organized this response in parallel to the AACJ Charge  With regard, in turn, to each case where the AACJ alleges misconduct, we discuss the background facts, AACJ allegations, and applicable Ethical Rules

### Standards for Prosecutorial Conduct

The AACJ Charge begins with its take on certain legal principles  Rather than discuss each such principle in an opening section, we address below the legal and ethical parameters that define the outcome of each of the AACJ s specific allegations  As a general concept, however, Arizona courts have pronounced that "[p]rosecutorial misconduct 'is not merely the result of legal error, negligence, mistake, or insignificant impropriety, but, taken as a whole, amounts to intentional conduct which the prosecutor knows to be improper and prejudicial, and which he pursues for any improper purpose with indifference to a significant resulting danger of mistrial '" *State v  Aguilar*, 217 Ariz  235, 238-39, 172 P 3d 423, 426-26 (App  2007) (*quoting Pool v  Superior Court*, 139 Ariz  98, 108 09, 677 P 2d 261, 271-72 (1984))

Craig D  Henley, Esq
April 8, 2016
Page 4

## Cases Before the Arizona Supreme Court[2]

### State v  Morris

#### Factual Background

Morris was a capital case that Mr  Martinez prosecuted involving the murders of five women between September 2002 and April 2003   During the police investigation, Morris provided two versions of each woman's death   In the first version, he claimed that each victim had died in his residence from a drug overdose   In the second version, he claimed that each one had asked him to choke her during sex and then had accidentally died as a result of that conduct   Four of the bodies were found not far from Morris's residence—the fifth was found decomposing in his residence   In 2004, the jury convicted Morris of five counts of first-degree murder and sentenced him to death   Like all capital cases that result in imposition of the death penalty, the case was automatically referred to the Arizona Supreme Court   A R S  13-755(A), Ariz R  Crim  P  31 2(b) ("Automatic Appeal When Defendant is Sentenced to Death"), State v  Guarino, 238 Ariz  437, 362 P 3d 484, 485-86 (2015)   In its decision on automatic appeal, the Supreme Court upheld the conviction and sentence  State v  Morris, 215 Ariz  324, 329-32, 160 P 3d 203, 208-11 (2007) **(Ex  "1")**

#### AACJ Allegations

The AACJ contends that Mr  Martinez committed multiple ethical violations in this case  All of the allegations in the AACJ Charge were raised and discussed in the Morris decision   The Supreme Court did not refer Mr  Martinez for a disciplinary investigation when, or after, it issued its decision

First, Complainant contends that, during his closing argument in the aggravation phase, Mr  Martinez argued to the jury, allegedly "[d]espite no supporting evidence," that Morris had sex with the victims' corpses    (Charge, at 3 )  As the Supreme Court found, however, "sufficient evidence" supported the argument   There was skin "slippage" on selective parts of the victims' bodies (specifically, the inner thighs and breasts), and the medical examiner testified that skin slippage can result from friction-  Id  at 336, 160 P 3d at 215   There were skin defects on the anus of the last victim, found decomposing in Morris's residence, and that victim's anus was level with Morris's bed  Id  Further, Morris had maintained that he wore a condom during sex with the women before their deaths, but semen was found in two of the victims' vaginas  Id  Based on this evidence, the Arizona Supreme Court held that "[w]hile the evidence in this case does not compel the conclusion that Morris engaged in intercourse with the corpses of the victims, the record includes sufficient evidence to permit the prosecutor to make such an argument "  Id

Second, Complainant contends that, during his rebuttal closing argument in the aggravation phase, Mr  Martinez "invited jurors to put themselves in the place of the victims

---

[2] The Charge alleges that Mr  Martinez committed "Ethical Violations in Cases Before the Arizona Supreme Court", however, there are no allegations in the Charge that Mr  Martinez acted unethically during the appellate phase on any case, let alone before the Supreme Court   Rather, this section of the Charge relates to decisions by the Arizona Supreme Court that pertain to specific cases that Mr  Martinez prosecuted   Mr  Martinez is not an appellate lawyer, and, consequently, he did not handle the appellate phase of any of the referenced cases   The cases at issue were all handled on appeal by the Arizona Attorney General s Office

Craig D Henley, Esq
April 8, 2016
Page 5

and singled out specific jurors based on appearance and gender " While the Arizona Supreme Court indeed did find that Mr Martinez's statement exceeded established protocols for closing arguments, the Court also held that no prejudice resulted from the argument, given the "overwhelming evidence of cruelty" presented by the State   *Id* at 337-38, 160 P 3d at 216-17

Complainant limits its allegation to the Supreme Court's characterization of Mr Martinez's rebuttal argument   The actual argument, however, placed in the context of the defense argument that Mr Martinez rebutted, reveals Mr Martinez's intent   "A prosecutor has wide latitude in presenting arguments to the jury, including commenting on the 'vicious and inhuman nature of the defendant's acts,' but cannot make arguments that appeal to the fears or passions of the jury " Ex "1," *Morris*, 215 Ariz at 337, 160 P 3d at 216 (quoting *State v Comer*, 165 Ariz 413, 426, 799 P 2d 333, 346 (1990))   Mr Martinez believed, in good faith, that his argument fell within the "wide latitude" granted to prosecutors

At issue in regard to this part of Mr Martinez's rebuttal argument was the defense's argument that the murders were not "especially cruel," because there was inadequate proof that "the victim[s] [were] conscious and suffered physical pain or mental anguish during at least some portion of the crime and that the defendant knew or should have known that the victim[s] would suffer " *Id* at 338, 160 P 3d at 217   Defense counsel, in closing argument, had argued that the jurors could not determine whether the victims had suffered, because, among other things, they were intoxicated when they were killed

> More importantly, here is the thing that we need to think about   There is absolutely no way to determine when these people fell into unconsciousness There is absolutely no way
>
> And for you to find cruelty, you have got to find that they suffered some kind of pain and suffering while they were conscious, and we simply don't know   We don't know when the magical moment is that they lapse into unconsciousness
>
> On the one hand, we cannot find or determine when these people lapsed into unconsciousness   That's fact number one   Fact number two, we don't have any trauma associated with at least—we'll address three victims now, three of these victims
>
> And lastly, all of these victims had toxicity levels of drugs in their system, alcohol and cocaine, stimulants and depressants   That is the evidence

Morris Tr , July 12, 2005, at 119 12-20, 120 4-11 (**Ex "2"**)

In his rebuttal (which drew no objection from defense counsel, Ex "1," *Morris*, 215 Ariz at 337, 160 P 3d at 216), Mr Martinez was permitted to respond to that argument *State v Duzan*, 176 Ariz 463, 468-69, 862 P 2d 223, 228-29 (App 1993)   Under Arizona law, Mr Martinez also had substantial leeway, including making emotional statements *State v Marvin*, 124 Ariz 555, 557, 606 P 2d 406, 408 (1980) (permissible for the prosecutor to state in closing that he felt sorry for the victim's family, who would not be able to see the victim again)   Thus, in his rebuttal, Mr Martinez appropriately reminded the

Craig D  Henley, Esq
April 8, 2016
Page 6

jurors of the factual circumstances of the murders, and he asked the jurors to apply common sense to those circumstances  This properly rebutted the defense's argument that the jury could not *know* whether the victims had suffered and experienced anguish before dying

The Supreme Court differed, not with the substance of Mr  Martinez's rebuttal, but with his having addressed some of the individual jurors  In his argument, he addressed those jurors as follows, always referring back to the defense's argument

Which one of you want to volunteer to come sit here and have the defendant sit himself on your chest and say, [o]h, that didn't hurt? *Because the defense attorney is saying throw common sense out of window* Which one?  I challenge anybody to say, [t]hat is something I want to do

And anyway, and on top of that, while he's sitting on my chest, which one of you, since the one lower left-hand side has the longer hair of the jurors, maybe she wants to have him grab her hair while he's sitting on her chest    to grab it and pull it around her neck

You think that's not going to hurt?  You think one of you guys is going to volunteer for that?  *You can't leave your common sense aside [Defense counsel] wants you to because he makes these arguments and says, well, we don't know what is in their heads*  We don't know what is in Juror Number 1's head  Can you tell me you don't think it's not going to hurt when he sits on you?

Hey, Juror Number 1 or Juror Number 14, whatever it is, what if we put Winnie the Pooh tie around your neck?  Are you going to enjoy that?  Are you going to like it?  Going to feel real good when you can't breathe?

There's no physical pain you have associated with it **'cause you can't tell us because you can't breathe, so there must be no physical pain associated ‾ Because all of this,‾of course, doesn't happen in a** ‾ ‾ ‾ **vacuum sort of thing**

**That's not the way it is  You don't leave your common sense behind**  And when somebody puts a tie around your neck, a strap, your hair, their hands, it's going to hurt, and you're going to react to it

Ex  "2," Morris Tr , July 12, 2005, at 130 6-131 9 (emphasis added)

Mr  Martinez believed his argument was within the leeway given to him under Arizona law for closing arguments, and within his permissive rebuttal to the defense's closing argument  The Supreme Court found non-prejudical error had occurred  There was no finding of intentional misconduct, nor violation of a court order (there was no defense objection to the rebuttal), nor prejudice to the administration of justice  Nine years ago when the *Morris* opinion was issued, the Supreme Court did not deem it necessary to refer the matter to the State Bar for review  The evidence in the case far outweighed Mr  Martinez's "heat of battle" decision on how to frame his rebuttal  Since then, Mr  Martinez has not been accused again of the same conduct

Craig D Henley, Esq
April 8, 2016
Page 7

__Finally,__ Complainant contends that, during the guilt phase, Mr  Martinez "took a
victim's jacket out of a plastic evidence bag for the jury's 'smelling pleasure '"
Complainant's suggestion is false that Mr  Martinez had no valid basis for introducing the
jacket into evidence  To the contrary, the Supreme Court found that Mr  Martinez had
properly introduced the jacket to show that it belonged to a victim  *Morris*, 215 Ariz  at
338, 160 P 3d at 217 ("There was no misconduct in introducing the jacket into evidence ")
The "smelling pleasure" comment, made during closing argument in the guilt phase,
referred to the fact that, during the trial when Mr  Martinez had asked a police witness to
remove the jacket from an evidence bag for the jury to see, a sickening odor had emanated
from the bag that no one had expected  As Mr  Martinez recalls it now (years later), the
smell was so bad that the court took a recess for the day, and fans were brought in to clear
the air in the courtroom  No one suggested at the time that release of the odor was
intentional, prejudicial, or any form of misconduct  Mr  Martinez's later "smelling pleasure"
comment during closing argument was an attempt to refer, with a touch of humor, to the
unintended disruption to the trial that the smell emanating from the jacket had caused  His
statement in full was  "But one of the things that is interesting about [the victim who
owned the jacket] is that the smell is absolutely putrid, absolutely one of the worst things
that you will ever probably experience  And you got a minimal exposure to it when the
jacket was opened up for your, if you will, smelling pleasure, for lack of a better word "  *Id*
at 338 n 7, 160 P 3d at 217 n 7  Defense counsel did not object to the comment, and the
Arizona Supreme Court held that no prejudice resulted from the comment, even assuming
for the opinion (without finding) that it was improper  *Id*  at 338, 160 P 3d at 217

### *Applicable Ethical Rules*

**ER 3 4(c) (Knowingly Disobey Court Rule), ER 3 4(e) (Allude to Matter Not
Reasonably Believed to be Relevant)**  Mr  Martinez did not disobey, much less
knowingly disobey, any court rule or allude to any matter that he did not reasonably believe
to be relevant  He presented evidence and made arguments that he believed in good faith
were warranted under the relevant facts and law

**ER 8 4(d) (Conduct Prejudicial to Administration of Justice), Rule 41(g), Ariz  R
Sup  Ct  (Unprofessional Conduct)**  Mr  Martinez's conduct did not result in prejudice to
the administration of justice  Rule 41(g) states that a lawyer has a duty and obligation "[t]o
avoid engaging in unprofessional conduct and to advance no fact prejudicial to the honor or
reputation of a party or a witness unless required by the justice of the cause with which the
member is charged "  Rule 31(a)(2)(E) defines "unprofessional conduct" as "substantial or
repeated violations of the Oath of Admission to the Bar or the Lawyer's Creed of
Professionalism of the State Bar of Arizona "  The AACJ allegations do not nearly approach
the level of conduct proscribed by these rules  The defendant was convicted, and the
conviction was upheld on appeal  In the isolated instance in which the Arizona Supreme
Court found that Mr  Martinez had made an improper argument, the Court specifically held
that no prejudice resulted  Because it was a death penalty case, the defendant's appellate
counsel had to raise every even remotely plausible argument or risk it being waived  *State
v  Blodgette*, 121 Ariz  392, 395, 590 P 2d 931, 934 (1979) (claims not raised in the
opening brief of the automatic appeal are considered "abandoned"), *State v  Smith*, 125
Ariz  412, 416, 610 P 2d 46, 50 (1980) (same), *State v  Bolton*, 182 Ariz  290, 298, 896
P 2d 830, 838 (1995) (refusing to consider issues not raised in the appellate opening brief
because "[f]ailure to argue a claim on appeal constitutes waiver of that claim ")  The
defense's decision to pursue these issues on appeal, therefore, resulted from the nature of
the proceedings and in no way establish probable cause for a violation of these rules

Craig D Henley, Esq
April 8, 2016
Page 8

### *State v Andriano*

#### *Factual Background*

In 2004, Mr Martinez prosecuted Wendi Andriano for capital murder  She was found guilty and sentenced to death  On mandatory direct appeal, the Arizona Supreme Court upheld both the conviction and sentence  *State v Andriano*, 215 Ariz  497, 161 P 3d 540 (2007) **(Ex "3")**

In October 2000, Andriano brutally murdered her terminally-ill husband after a failed attempt to poison him  The circumstances of the victim's death were exacerbated by the fact that, after incapacitating but not killing her husband, Andriano had called a neighbor for help and lied about the reasons for her husband's condition  After the neighbor arrived, Andriano finally called for medical assistance  When paramedics arrived, and after the neighbor stepped out to usher them in, Andriano barricaded herself in the apartment and refused to allow paramedics inside to treat her husband  After she sent them away, Andriano called the paramedics a second time approximately an hour later, and when they arrived, they found Andriano's husband lying in a pool of blood, stabbed and brutally beaten  Investigation revealed that, while the paramedics and neighbor had waited outside during the first response, Andriano beat her husband unconscious with a bar stool and proceeded to stab him in the neck area, severing his carotid artery

During trial, Andriano claimed that she killed her husband in self-defense, asserting that he had repeatedly victimized her over the course of their relationship  As alleged proof of this defense, Andriano solicited testimony from an expert witness who claimed that Andriano exhibited characteristics of an abused spouse  In response, Mr Martinez presented evidence from several witnesses that Andriano had a history of engaging in extramarital affairs and other activities that strongly contradicted her claimed defense

#### *AACJ Allegations*

The AACJ's allegations are narrowly focused on Mr Martinez's closing argument during the guilt phase of the trial  Specifically, the AACJ alleges that Mr Martinez repeatedly elicited marginally relevant testimony and other evidence that the defendant had engaged in "partying and man-chasing "  These assertions essentially repeat allegations addressed nine years ago in the Arizona Supreme Court opinion affirming both the conviction and sentence

#### *Applicable Ethical Rules*

**ER 3 4(e)** (prohibiting an attorney from alluding to matters which are not reasonably believed to be relevant or that will not be supported by admissible evidence)  The Supreme Court decided the sole allegation raised in the Charge in Mr Martinez's favor  *See Andriano*, 215 Ariz  at 503, 161 P 3d at 546  Andriano's appellate counsel argued that "[t]he prosecutor took every opportunity to infuse the trial with marginally relevant information about Andriano's partying and man-chasing "  The Supreme Court disagreed, holding that evidence of Andriano's extramarital affairs "was admissible under Rule 404(b) as evidence of Andriano's motive for killing her husband – to be free to pursue other relationships "  *Id*  Furthermore, the Court held that the evidence was relevant "to rebut the defense theory that Andriano was a domestic violence victim who lived in fear of her abusive husband, whom she bludgeoned to death in self defense "  *Id*  Mr Martinez's

Craig D  Henley, Esq
April 8, 2016
Page 9

statements in closing argument regarding Andriano's marital infidelity and frequent party activity were appropriately presented to the jury as fair rebuttal of Andriano's claimed defenses

### State v  Gallardo

#### Factual Background

Gallardo was a capital case that Mr  Martinez prosecuted involving the murder of Rudy Padilla, who was found dead in his parents' home by his father on December 9, 2005, his wrists and ankles bound, a pillowcase tied over his head, and a single gunshot wound through the back of his head  Gallardo was indicted for first-degree murder, burglary, and kidnapping  The first trial resulted in a mistrial due to juror misconduct  (The jurors had prematurely discussed the evidence in violation of the court's admonition )  The second trial in 2009 resulted in convictions on all counts, and Gallardo was sentenced to death  On mandatory direct appeal, the Arizona Supreme Court upheld the conviction and sentence in State v  Gallardo, 225 Ariz  560, 563-64, 242 P 3d 159, 162-63 (2010) **(Ex  "4")**

#### AACJ Allegations

Complainant contends that Mr  Martinez committed multiple violations of the Ethical Rules during his closing and rebuttal argument in the penalty phase of the case

First, Complainant contends that Mr  Martinez improperly "asked the jury to compare the victim to the defendant "  However, the AACJ ignores the context and intent of Mr  Martinez's argument, which responded to defense counsel's closing argument that a life sentence was sufficient punishment  Gallardo, 225 Ariz  at 569, 242 P 3d at 168  In that context, Mr  Martinez said in his rebuttal argument, "Do you think [the victim's father is] going to be able to call his son, Rudy?"  Id

Defense counsel objected to this statement as a comparison of the defendant to the victim, and the trial court sustained the objection  Mr  Martinez then reworded his argument in a permissible attempt to clarify that his intent was to emphasize the substance of the victim impact statements (which is proper rebuttal), not to compare the victim to the defendant

> There's no comparison  The point that's being made here is that the victim impact statement may be considered by you [the jury], and that impact statement indicated to you that they missed their son  That's not quite doing justice to how they told you, and they would love to make a call and would love to be able to talk to him  And in their victim impact statement, they told you they couldn't  In fact, Mr  Padilla told you that he goes so far as to turn on the radio in his son's room at night just to make it seem as if he were there

Gallardo Tr , June 25, 2009, at 26 21-27 4 **(Ex  "5")**  There was no objection to Mr  Martinez's clarified argument  Id

As previously observed, "[c]ounsel are allowed great latitude in closing arguments, even to the extent of making emotional statements "  Marvin, 124 Ariz  at 557, 606 P 2d at 408 (holding that it was permissible for prosecutor to state that he felt sorry for the victim's family, who would not be able to see the victim again)  Mr  Martinez believed in good faith

Craig D  Henley, Esq
April 8, 2016
Page 10

that his argument fell within the "great latitude" granted to prosecutors  On appeal, without
deciding whether the argument had been improper, the Arizona Supreme Court held that,
"[e]ven if the prosecutor's statements were improper, reversal is not required " Ex "4,"
*Gallardo*, 225 Ariz  at 569, 242 P 3d at 168  Importantly, the Court did not find
prosecutorial misconduct  Instead, it found the defense's argument on appeal was
insufficient to meet the standards for reversal

        Second, Complainant contends that Mr  Martinez mischaracterized the testimony of a
defense expert as inconsistent and then twice persisted in that line of argument after the
trial judge had sustained objections to it as misleading  As an initial matter, Mr  Martinez
did not mischaracterize the defense expert's testimony as inconsistent—the expert, in fact,
testified that he was entitled to receive two different amounts of witness fees, initially
$4,200 and later $6,500  Ex "5," Gallardo Tr , June 25, 2009, at 29 2-5  At a sidebar on
the issue, the trial judge *agreed* that the witness's testimony had been inconsistent in this
regard  *Id*  at 30 18-20 ("THE COURT  Well, the fact that the expert said two different
things can be used by Mr  Martinez to impeach his credibility ")

        Furthermore, it is not true that Mr  Martinez intentionally or knowingly ignored the
trial court's rulings  The transcript of the argument reflects that Mr  Martinez tried to
rephrase his argument *consistent with* his understanding of the trial court's rulings

        **First statement—**

                And there were some inconsistent statements, but the biggest
                one was the one involving money  Initially when I asked him
                the question, he said he really wasn't sure how much money he
                was being paid  Then he indicated, well, it was $4,200  Then
                after doing the mathematics a little bit more and fine-tuning it -
                -

                MR  MILLER  Objection to misleading argument

                        THE COURT  Sustained

        **Second attempt—**

                MR  MARTINEZ  Well, you heard, he told you $4,200,
                didn't he? Anybody not hear that? And then after questioning
                by the prosecutor, the figure changed, didn't it?

                MR  MILLER  Objection, misleading  I'm sorry, Judge
                Did I not speak loud enough? I object to misleading

                        THE COURT  Well, sustained

        **Third attempt—**

                MR  MARTINEZ  Well, he said on the stand from there,
                and that's the evidence that you are to consider  You were told
                – he said $6,500  That's what he said  And you were present
                when all of that happened, weren't you? That's something that

Craig D  Henley, Esq
April 8, 2016
Page 11

> you can consider, because it goes to his motive and his bias
> and –
>
> MR  MILLER   May we approach, Your Honor?
>
> THE COURT   Yes

*Id*  at 27 25-28 21

Initially, Mr  Martinez had argued that the defense expert had made "inconsistent statements" about the money he was being paid for his testimony, and he characterized the change in testimony as a result of "fine-tuning "  After the trial judge sustained an objection to that argument as misleading, Mr  Martinez permissibly attempted to present a more limited argument, one that merely reminded the jury that the expert had testified to receiving one amount in witness fees, then changed his testimony after questioning   Mr Martinez made this point without characterizing the change in testimony as "inconsistent," which he believed had been the basis for the sustained objection   That attempt, however, drew a second objection, which the trial court sustained, apparently with some hesitation ("Well, sustained ")   Mr  Martinez then re-cast his argument again, limiting it even more, merely reminding the jury that the expert had testified to receiving witness fees, which the jury could consider as relevant to possible motive and bias

The lengthy sidebar that followed this exchange demonstrates that Mr  Martinez, rather than disregarding or disobeying a court order, was to the contrary trying to comply with his understanding of the trial court's rulings   *Id*  at 28 24-34 4   During the sidebar, Mr  Martinez explained that he was merely trying to point out that the expert had, in fact, testified to two different amounts of witness fees   The trial judge initially ruled, as quoted above, that "the fact that the expert said two different things can be used by Mr  Martinez to impeach his credibility "  *Id*  at 30 18-20   However, after further discussion following his third attempt, the trial court changed its ruling in light of "the unique nature of the problem "  This was a reference to the fact that defense counsel could not explain the discrepancy in the expert's testimony, because any such explanation would necessarily delve into an impermissible subject area   Accordingly, the objection was sustained *based on that restriction on the defense's ability to explain the discrepancy in the expert's testimony*   During the sidebar, the trial judge did not, at any time, admonish Mr  Martinez for ignoring her rulings   Nor did the court in any way suggest that she viewed his attempts to rephrase his argument as improper   The context reflects that the parties and judge were working to find a fair solution to a unique problem   The court ruled that Mr  Martinez could not argue "anything related to the discrepancy in the figures," but he could argue that "[t]he fact that he was paid, the fact that he gave money and he gave time for free all go to motive and bias "  *Id*  at 33 15 34 4   *Mr  Martinez abided by that ruling and moved on to another issue*

The Arizona Supreme Court viewed Mr  Martinez's attempts to rephrase his argument as improper repetitions of the same argument that was the subject of the sustained objections   Ex  "4," *Gallardo*, 225 Ariz  at 569, 242 P 3d at 168   That finding, however, is not binding in a disciplinary case and cannot be equated to a finding of an ethical violation *In re Augenstein*, 178 Ariz  133, 135, 871 P 2d 254, 256 (1994)   The standard the Court applied in *Gallardo* was an objective one that bears no resemblance to the standards that govern the ethical determination   *Compare Gallardo*, 225 Ariz  at 569, 242 P 3d at 168 ("A prosecutor should not repeat an argument after it has been the subject of a sustained

Craig D Henley, Esq
April 8, 2016
Page 12

objection "), *with* ER 3 4(c) (providing that a lawyer shall not "knowingly disobey an obligation under the rules of a tribunal")   There was no finding in *Gallardo* regarding Mr Martinez's mental state, much less one supported by clear and convincing evidence   *See* Ariz R Sup Ct 48(d) (requiring disciplinary allegations to be "established by clear and convincing evidence")

       <u>Finally</u>, Complainant's reliance on isolated comments by two Arizona Supreme Court Justices during the *Gallardo* oral argument is misplaced   The Arizona Supreme Court acts as a body by majority vote, not through its individual justices   In the *Gallardo* opinion, the Arizona Supreme Court disagreed with one, isolated instance of conduct (discussed above) and rejected five other defense theories related to Mr Martinez   Ex "4," *Gallardo*, 225 Ariz at 568-70, 242 P 3d at 167-69   Indeed, the Court observed that one of the rejected defense theories rested on a "mischaracteriz[ation]" of Mr Martinez's remarks, *id* at 568, 242 P 3d at 167, and that another rested on a legal argument that the Court had "previously rejected," *id* at 570, 242 P 3d at 169   In its analysis of these issues, the Court never suggested that Mr Martinez had committed ethical violations   Arizona law is clear that "where there has been misconduct of either the prosecutor or defense counsel, but reversal is not required, the proper remedy will be affirmance, followed by institution of bar disciplinary proceedings against the offending lawyer, if such proceedings are warranted " *State v Valdez*, 160 Ariz 9, 14, 770 P 2d 313, 318 (1989), *overruled on other grounds by Krone v Hotham*, 187 Ariz 364, 366, 890 P 2d 1149, 1151 (1995)   The fact that the Arizona Supreme Court did not refer the *Gallardo* opinion to the State Bar for further investigation demonstrates that the Court did not believe that Mr Martinez's conduct warranted bar disciplinary proceedings

***Applicable Ethical Rules***

**ER 3 3(a) (Knowingly Make False Statement of Fact), ER 8 4(c) (Conduct Involving Dishonesty)**   Mr Martinez did not mischaracterize the defense expert's testimony, knowingly or otherwise

**ER 3 4(c) (Knowingly Disobey Court Rule), ER 3 4(e) (Allude to Matter Not Reasonably Believed to be Relevant)**   Mr Martinez did not knowingly disobey any court rule or allude to any matter that he did not reasonably believe to be relevant   He presented evidence and made arguments that he believed in good faith were warranted under the relevant facts and law

**ER 8 4(d) (Conduct Prejudicial to Administration of Justice), Rule 41(g), Ariz R Sup Ct (Unprofessional Conduct)**   Mr Martinez's conduct was not unprofessional and did not result in prejudice to the administration of justice   The defendant was convicted, and the conviction was upheld on appeal   In the isolated instance in which the Arizona Supreme Court found that Mr Martinez had made an improper argument, the Court specifically held that no prejudice resulted

***State v Lynch***

***Factual Background***

       In 2001, Mr Martinez was the prosecutor in the capital case of Shawn Lynch, who was charged with first-degree murder for his involvement in the death of James Panzarella   According to the evidence presented at the guilt phase of his trial, Lynch and an accomplice went to Mr Panzarella's home on the evening of March 24, 2001   While there, Lynch and

Craig D  Henley, Esq
April 8, 2016
Page 13

his associate arranged for an escort to be sent to Mr  Panzarella's home, for which Mr
Panzarella paid   The next day, Lynch and his associate attempted to use Mr  Panzarella's
American Express card at several locations, but the card was ultimately reported lost   The
next day, Mr  Panzarella was found dead in his home, tied to a chair with blood pooled
around him   The evidence at trial demonstrated that, at some point, Lynch had murdered
Mr  Panzarella by cutting his throat   In doing so, however, Lynch failed to extend the knife
wound to Mr  Panzarella's spine, and as a result, it took Mr  Panzarella several minutes to
exsanguinate

        The trial jury found Lynch guilty of first-degree murder, the case proceeded to the
penalty phase, and the jury imposed the death penalty   However, the trial court
erroneously instructed the jury that four aggravators had been found, when in fact there
were only two   *See State v  Lynch*, 225 Ariz  27, 42, 234 P 3d 595, 610 (2010) **(Ex  "6")**
The Arizona Supreme Court therefore vacated the death sentence and remanded the case
for a penalty phase re-trial   *Id*  at 43, 234 P 3d at 611

        During the second penalty trial, over the course of six weeks, the defense presented
both lay and expert witnesses who expounded on their opinion why Lynch should not
receive the death penalty   Mr  Martinez cross-examined each of these witnesses and
argued to the jury that the defense was attempting to muddle the issues by drawing
attention away from the horrific manner in which the victim had been murdered   Following
the close of evidence and arguments, the jury returned a verdict in favor of the death
penalty   On automatic appeal, the Arizona Supreme Court affirmed the death sentence
*See State v  Lynch*, 238 Ariz  84, 357 P 3d 119 (2015) ("*Lynch II*") **(Ex  "7")**

### *AACJ Allegations*

        The Charge sets forth an extensive list of Mr  Martinez's conduct during the second
penalty trial that was allegedly unethical and/or improper   In doing so, however, the
Charge fails to cite to any specific portions of the record, relying entirely on the brief
descriptions in the Arizona Supreme Court's decision   The allegations can be separated into
the following four categories of supposed misconduct  (1) improper statements and
argument during opening statements, (2) aggressive questioning of witnesses on cross-
examination, (3) improper argument during closing statements, and (4) generalized
contentions regarding Mr  Martinez's overall conduct

        The Arizona Supreme Court has reviewed each of the allegations raised in the
Charge, and, although the Court concluded that certain conduct may have been
inappropriate, it declined to reverse Lynch's death sentence   *See id*  at 92–101, 357 P 3d at
127–136   Furthermore, as evidenced by its inaction on the matter, the Arizona Supreme
Court concluded that the conduct complained of in the Charge did not warrant a referral to
the State Bar

### *Applicable Ethical Rules*

        **ER 3 3(a)(1)** (barring an attorney from making a false statement of fact or law to a
tribunal), **ER 3 4(c)** (prohibiting an attorney from knowingly disobeying an obligation under
the rules of a tribunal), **ER 8 4(d)** (barring an attorney from engaging in conduct that is
prejudicial to the administration of justice)

Craig D  Henley, Esq
April 8, 2016
Page 14

*Allegations Related to Opening Statements*

The Charge first claims that Mr  Martinez acted improperly during opening
statements by being argumentative and improperly asking the jury to place themselves in
the position of the victim   Arizona courts have been clear that, although prosecutors have
wide latitude in opening statements, they are not permitted to "make arguments that
appeal to the jury's fears or passions "  *See* Ex  "7," *Lynch II*, 238 Ariz  at 100, 357 P 3d at
135

The Charge refers to two allegedly argumentative statements   In doing so, however,
the Charge does not adequately explain the context for Mr  Martinez's statements   The first
was made while rebutting certain mitigation evidence related to an incident that occurred
approximately thirty years before Lynch committed the underlying crime   Mr  Martinez
stated

> But there is nothing to back it up   The other thing with regard
> to that is, this individual was approximately just short of 40
> years when he cut James Panzarella's throat   Why do we need
> to look at something 30 years ago – it happened 30 years ago,
> to say that is something that you should consider as mitigating?
> 30 years

Lynch Tr , July 17, 2012, at 98 21-99 3 **(Ex  "8")**

The second statement occurred in the context of characterizing the defense strategy

> They don't know who the main actor was, whereas the DNA
> evidence and the testimony of the other individual indicates this
> is the main actor   Then they want to pull at your heart strings
> by talking to you about

*Id*  at 106 8-12

Objections were interposed to both statements on the grounds they were
argumentative, and both objections were sustained   Following the sustained objections, Mr
Martinez rephrased his arguments in a manner that avoided further objections   That the
trial court sustained the objections does not render Mr  Martinez's conduct unethical   In
fact, the Arizona Supreme Court noted that, while these statements were inappropriate,
they did not affect the jury's verdict   *See* Ex  "7," *Lynch II*, 238 Ariz  at 92, 357 P 3d at
127

Next, the Charge contends that Mr  Martinez improperly asked that the jury place
themselves in the position of the victim when he stated

> So what happens is the defendant then, as Mr  Panzarella sits
> there, goes behind him and begins and cuts his throat from ear
> to ear   The problem or the unfortunate aspect of that, because
> in and of itself, cutting somebody's throat is a horrific, ghastly
> thing, you can only imagine, I don't think you can even imagine
> what it's like for somebody to approach you with a knife   You

Craig D Henley, Esq
April 8, 2016
Page 15

> cannot move and you know they're manhandling you and they
> are going to cut your throat

Ex "8," Lynch Tr , June 17, 2012, at 93 7-16   The Arizona Supreme Court concluded that Mr Martinez's aforementioned statement was improper, but nonetheless held that the objection and curative instruction remedied any issues   Ex "7," *Lynch II*, 238 Ariz  at 100, 357 P 3d at 135   As a result, Mr Martinez's statements were not so improper as to constitute conduct detrimental to the administration of justice

*Allegations Related to Mr Martinez's Cross-Examination of Witnesses*

The Charge also alleges that certain exchanges between Mr Martinez and individual witnesses during cross-examination were improper   The Charge points to two instances where objections were sustained on the grounds that the line of questioning was argumentative, one instance where Mr Martinez suggested that a witness could vouch for other witnesses, and one instance where Mr Martinez allegedly appealed to the fears of the jury   Again, these contentions are taken out of context and fail to address adequately the impetus for and ultimate effect of the questions

First, the Charge claims that Mr Martinez acted improperly because the trial court sustained objections to two questions for being "aggressive "  This allegation misrepresents the nature of the sustained objections   In fact, as noted in the Arizona Supreme Court's opinion, the trial court sustained "objections to two questions that were asked and answered      " *Id*  at 93, 357 P 3d at 128   It strains credulity to contend that, without more, it is unethical to ask a question that was previously answered

Second, the Charge claims that Mr Martinez committed an ethical violation by suggesting, during the examination of Lynch's expert witness, that she could vouch for other witnesses   The underlying statement took place in a much longer exchange between Mr Martinez and Lynch's expert witness, who purported to provide testimony related to the truthfulness of certain statements that individuals had made   While questioning the expert, Mr Martinez asked the following question

> Q     With regard to that, being an expert on recollected memories, isn t that really just vouching for what somebody is saying?  In this case, isn't – aren't you really vouching for what that client was saying, I was a juvenile   Isn't that what you're just really doing?  Because you're saying this person – the other person is not to be believed?

Lynch Tr , July 18, 2012, at 196 19–197 1 **(Ex "9")**   There was no objection   A few questions later, the following exchange took place

> Q     If that were the hypothetical you would say he's not to be believed, right because you can vouch for people?
>
> A     I would not –
>
> MR BROWN  Objection  She's –
>
> THE COURT  Sustained  Sustained

5246597v5(49286 53)

Craig D Henley, Esq
April 8, 2016
Page 16

> Q      BY MR MARTINEZ      Well, in that case given what you
> know, would you say that person was telling the truth or not
> based on the hypothetical that I posed to you involving the 49
> years and no event that sticks out in their mind?
>
> MR BROWN  Same objection
>
> THE COURT   Overruled, you may answer if you can

*Id* at 198 8-21

In discussing this line of questioning, the Arizona Supreme Court noted that it "did not encroach on the jury's evaluation of witness veracity, but rather tested [the witness's] credibility by attempting to show that she believed interviewees when their story was helpful but skeptical when their story was not helpful " Ex "7," *Lynch II*, 238 Ariz at 94, 357 P 3d at 129   Nothing about the questioning as a whole was so improper as to have denied Lynch a fair trial   *Id*

Finally, the Charge asserts a generic claim that Mr Martinez appealed to the jurors' fears when he asked a defense witness whether Lynch might "stick or prick" a corrections officer   This question occurred in the context of Mr Martinez's cross-examination of the defense's expert witness, who had previously opined as to the risk Lynch would pose if allowed to serve a life sentence in prison   The specific exchange between Mr Martinez and the witness was as follows

> Q      And there is also a possibility that this defendant here, if
> he were – could stick or prick, with a sharp object, one of the
> corrections officers, right?
>
> A      The probability of that is very miniscule but obviously,
> that is the reason why we have training and other systems
> available to ensure that the probability of that is at the lowest
> common denominator, sir
>
> Q      You say that the probability is very miniscule, do you
> think that would be comfort to the person who got stuck by a
> needle that Shawn Lynch had used, do you think that would be
> comfort to them?

Lynch Tr , July 23, 2012, at 47 22-48 9 (**Ex "10"**)   The Arizona Supreme Court held that "[t]he cross-examination was relevant rebuttal" to the testimony that the defense had solicited   Ex "7," *Lynch II*, 238 Ariz at 95, 357 P 3d at 130

*Allegations Related to Mr Martinez's Conduct During Closing Arguments*

The Charge claims that, during closing arguments in *Lynch II* (penalty phase), Mr Martinez misstated the law by suggesting that Lynch's viewing of pornographic videos reflected a debasement in his character, and by discussing certain statutory aggravators in the conjunctive rather than the disjunctive   Neither of these contentions has merit

Craig D Henley, Esq
April 8, 2016
Page 17

The statement about pornographic videos did not prejudice Lynch   In full, Mr Martinez's comments were

> MR  MARTINEZ       One of the things that you can consider is character   One of the things that we do know is that both of them were in there, both he and Mr Sehwani   Perhaps what he was doing there is he was covering his eyes with both hands while those ten adult videos were being played   Perhaps that's what he was doing   That's a mitigating factor, right?  That was Mr Sehwani   Everything is Mr Sehwani   No   That shows a debasement in the part of this individual's character   And that has already been found, because this murder has been found – his murder has been found to be especially heinous and depraved
>
> MR  BLIEDEN         Objection   The debasement and the pornography has nothing to do with that aggravator, so that's misstating—
>
> THE COURT    Sustained

Lynch Tr , August 9, 2012, at 65 16–66 5 **(Ex "11")**  Mr  Martinez did not press the issue further, but instead he moved on to an entirely separate subject matter   The Arizona Supreme Court held that the objection was properly sustained, but there was no evidence that the statement impacted the jury's determination   See Ex "7," *Lynch II*, 238 Ariz  at 98, 357 P 3d at 133   In making this argument, Mr  Martinez did not intentionally misstate the law or attempt to mislead the jury

The AACJ also alleges that Mr  Martinez misstated the law when describing the application of the (F)(6) aggravator   The relevant evidence demonstrates that these were inadvertent mistakes, not knowing or intentional misconduct   Specifically, during a handful of instances during voir dire and closing, Mr  Martinez suggested that the (F)(6) aggravator was three separate aggravators rather than one   Upon being made aware of these mistakes, however, Mr  Martinez clarified the issue to the jury   See *Id*  at 99, 357 P 3d at 134   As the Arizona Supreme Court acknowledged, these mistakes indicate only that Mr  Martinez "struggled at times   with the disjunctive 'or' and conjunctive 'and' in explaining the (F)(6) aggravator     " *Id*   Additionally, because both Mr  Martinez and the trial court clarified the issue for the jury, there was no error warranting reversal   *Id*

### Generalized Allegations of Improper Conduct

The Charge also makes a series of generalized contentions that Mr  Martinez acted improperly over the course of Lynch's sentencing trial   In particular, the Charge asserts that Mr  Martinez was "aggressive," that he misstated evidence during cross-examination of witnesses and closing arguments, and that his cumulative actions constitute misconduct None of these contentions point to any specific instance where Mr  Martinez allegedly engaged in unethical or otherwise impermissible behavior

Regarding the allegation that Mr  Martinez was "aggressive," there is no colorable basis for finding that such conduct rose to the level of an ethical violation   Without a particular example of the supposed misconduct, it is impossible to determine what conduct

Craig D Henley, Esq
April 8, 2016
Page 18

allegedly was inappropriate  The Arizona Supreme Court's recognition of Mr Martinez's aggressiveness, coupled with its decision not to refer the issue to the State Bar, demonstrates that his conduct was not unethical  *See generally Id*  at 95, 357 P 3d at 130

Regarding the allegation that Mr  Martinez misstated evidence during cross-examination and closing argument, the Charge again fails to identify any particular instance of misconduct  The Charge instead relies on a brief portion of the Arizona Supreme Court's decision that noted Mr  Martinez made some remarks for which objections were made and sustained  This fact does not demonstrate any misrepresentation of evidence, intentional or otherwise  The Arizona Supreme Court determined that such statements did not affect the jury's decision  *Id*  at 96, 357 P 3d at 131

Finally, the Charge makes a blanket allusion to Mr  Martinez's cumulative conduct during Lynch's second sentencing trial  However, Mr  Martinez's conduct, whether viewed specifically or cumulatively, was not sufficient to deny Lynch a fair trial  The Arizona Supreme Court held that "[a]lthough the prosecutor made some improper remarks, they did not amount to a persistent and pervasive misconduct that deprived Lynch of a fair trial " *Id* at 100, 357 P 3d at 135

### Conduct During Criminal Trials

#### *State v  Beemon*

##### *Factual Background*

*Beemon* involved the 2002 premeditated murder of an 18-year-old woman by strangulation  Mr  Martinez was the prosecutor assigned to the case  In 2005, a jury convicted Beemon of second-degree murder  He was sentenced to 22 years in prison

##### *AACJ Allegations*

Complainant contends that Mr  Martinez engaged in ethical misconduct by comparing, during the rebuttal closing argument of the aggravation phase of the case, defense counsel's empty rhetoric to Hitler's tactics  The challenged statements occurred on September 7, 2005, more than a decade ago  During the defense s closing argument, defense counsel stated that Mr  Martinez had accused the defense of "sneaking, lying, cheating," and then defense counsel purported to rebut that alleged accusation  Beemon Trial Tr , September 7, 2005, at 28 10-12 **(Ex "12")**  Mr  Martinez viewed the defense's argument as a gross mischaracterization of what he had actually said in his closing argument and, as such, an attempt to distract the jury from material issues  In rebuttal, therefore, Mr  Martinez attempted to respond to the defense's argument, in part, by characterizing it as a propaganda ploy aimed at obfuscating the truth, similar to the "big lie "

He argued as follows

One of the things defense counsel got up and told you was, well, the prosecutor has said that we've been sneaking, lying and cheating         And he said that at the top of his lungs

As I said, if history teaches us anything, it's that it comes around again and again  Remember Hitler?  The big lie he told you?  It was at the top of his

Craig D Henley, Esq
April 8, 2016
Page 19

lungs over and over, you are the superior people and people are going to
believe it because they heard it over and over again[ ]  [A]nd that's what he
said over and over again was about the state calling him sneaking, calling him
lying, calling him cheating          Did that ever happen by the State?  Of
course it didn't happen, but you know what?  He wants you to believe that it
did   You know, just like Hitler, that big lie  If you put it out there, even
though the prosecutor didn't say it, maybe you'll believe it   And maybe when
you go back there to decide this case, you won't decide it on the facts

But, you know, "cheating " that's the word he used   Again, he wants to
associate or put over this thoughts over onto the prosecutor   Always   It's
the prosecutor because you can't talk about the facts and the evidence in this
case because then, of course, it wouldn't be to his benefit   So it's always this
personal attack   Let's just make it up   Let's make it up as we go along   Let's
make up the lie because, as you know, people will believe lies if you raise
your voice loud enough   And if you keep saying it over and over again, some
people will begin to believe you and say, well, maybe that's true or else he
would not have pranced around here and wouldn't have run around here like
he did at the top of his lungs getting behind the prosecutor, pointing over
there, and then saying what he said

Let's ignore about what came from the witness stand   Let's keep talking
about the prosecutor   Because when you come back there, you're going to
talk about the personality of the lawyers and you'll say, well, maybe he's
right   But is that about the facts?  Is that what this is about?  You took an
oath to follow the instructions, and that's all I'm asking you to do

But you know what?  If we say the State said it, that will make it true for you
when you go back there   Again, it's nothing more than, if you will, this
creating this big lie, this whole thing up   This is about the prosecutor and not
about the facts, not about the things that came from the witness stand

He talks about America and wraps himself around the flag   Doesn't wrap
himself around the German flag when he calls somebody a cheater, a liar, and
sneaking when in fact they never even used those words

There was nothing that was said by the prosecutor that even remotely
sounded like sneaking, lying, cheating          He called him that over and over
because he wants to generate some backlash, if you will, when you go back
to decide this case

Craig D Henley, Esq
April 8, 2016
Page 20

I don't want that   The State does not want that from you   All the State
wants you to do is take a look at the facts in this case   All the State is asking
you to do is to look at the exhibits   All the State is asking you to do is
consider the evidence that came from the witness stand   Take a look at all of
that   If you take a look at all of that, even though someone calls the
prosecutor sneaking, lying, cheating, all of that stuff, attributes things like
beast and dog and all these terms to him

Even though they may do that, that's an effective argument   It has
worked through history   We have the example of Germany         I'm just
asking to you do take a look at the facts involved and the evidence that you
found         That's all I'm asking you to do         You heard all the facts, and
I'm asking you to apply the law to them   Thank you

*Id* at 43 13-44 6, 46 3-17, 47 18-24, 48 10-16, 48 25-49 3, 55 19-56 16

Defense counsel made a number of objections during Mr Martinez's closing and
rebuttal arguments   He did not, however, make a contemporaneous objection to the "big
lie" analogy   It was not until the trial court reconvened after a 20-minute recess that
followed the conclusion of Mr Martinez's rebuttal that defense counsel moved for a mistrial
based on that argument, arguing that the jury could hold defense counsel's Jewish heritage
against the defendant   Until defense counsel made that argument, Mr Martinez had not
known he was Jewish   After hearing from counsel, the court denied the motion without
explanation

Prosecutors' "wide latitude" in presenting their closing arguments to the jury includes
referencing subjects that are "common knowledge or are illustrations drawn from common
experience, history or literature " *Standard Chartered PLC v Price Waterhouse*, 190 Ariz 6,
48, 945 P 2d 317, 359 (App 1996), *see also Commonwealth v Johnson*, 719 A 2d 778, 790
(Pa Super Ct 1998) (holding that a discussion of the "big lie" as a propaganda ploy "does
not in and of itself exceed the bounds of oratorical flair," but that "comparisons between
counsel's tactics and those of Hitler and Goebbels were reprehensible, even in the heat of
closing arguments")   "In the closing argument, excessive and emotional language is the
bread and butter weapon of counsel's forensic arsenal[ ]" *State v Gonzales*, 105 Ariz 434,
437, 466 P 2d 388, 391 (1970)

During his rebuttal argument, Mr Martinez believed he was drawing a permissible
historical analogy   There was no intent to compare defense counsel (or anyone else) to
Hitler   The intent and focus of his argument—as the above excerpts illustrate—was a
comparison of the defense's argument about the impropriety of the State's position to the
"big lie" as a propaganda ploy   In a memorandum decision dated February 21, 2008,
upholding Beemon's conviction **(Ex "13")**, the Arizona Court of Appeals held that Mr
Martinez's argument was "completely inappropriate" and that closing argument "can never
be extended so far as to permit an attorney to blacken the character of a courtroom
adversary by comparing his tactics to those of Nazis," but the Court further ruled that no
prejudice resulted from the argument   Mr Martinez intended no insult to defense counsel's
character   To the contrary, he believed he had to illustrate the empty rhetorical device used
by the defense during its closing argument, that is, the creation of a nonexistent
"strawman" that the defense could purport to rebut, since it had no argument to make on
the evidence   Mr Martinez used an analogy to illustrate the historical fact that repeated

Craig D Henley, Esq
April 8, 2016
Page 21

public, falsely negative statements about a person or class of persons can become persuasive as though those false statements were the truth

Mr Martinez has not referenced Hitler or Nazi Germany in any argument in the approximately eleven years that have passed since the *Beemon* trial   That is the most important fact in regard to this allegation   In 2005, Mr Martinez had reason to believe that references to the "big lie" can be appropriate in closing argument, where the defense has elected to attack the State instead of relying on the evidence presented at trial   His statements in *Beemon* were made under a good-faith belief that his argument was legally permissible   After *Beemon*, he recognized that such arguments are too likely to engender highly emotional responses and be considered offensive, even absent any intent to offend   Mr Martinez, therefore, used that analogy once and only once – in *Beemon* – and he has not used it since

### *Applicable Ethical Rules*

**ER 3 4(c) (Knowingly Disobey Court Rule), ER 3 4(e) (Allude to Matter Not Reasonably Believed to be Relevant)**   Mr Martinez did not knowingly disobey any court rule or allude to any matter that he did not reasonably believe to be relevant   He presented evidence and made arguments that he believed in good faith were warranted under the relevant facts and law

**ER 4 4(a) (Use Means with No Substantial Purpose Other than to Embarrass)**   Mr Martinez's argument was not intended to embarrass or harass defense counsel based on his Jewish heritage   Before making the argument, Mr Martinez did not know defense counsel was Jewish   The purpose of the argument was to rebut arguments made by the defense counsel during his closing argument

**ER 8 4(d) (Conduct Prejudicial to Administration of Justice), Rule 41(g), Ariz  R Sup  Ct  (Unprofessional Conduct)**   Mr Martinez's argument caused an emotional response, which he understands (and which explains why he has not made the same argument since), but it did not rise to the level of unprofessional conduct and did not result in prejudice to the administration of justice   The defendant was convicted, and the conviction was upheld on appeal   Although the Arizona Court of Appeals held that Mr Martinez's argument was improper, the Court specifically held that no prejudice resulted

### *State v  Grant*

#### *Factual Background*

From 2006 to 2009, Mr Martinez was the prosecutor in the criminal case against Douglas Grant, who was found guilty of manslaughter for the death of his wife, Faylene Grant   The circumstances underlying the case were well-publicized, as the facts were both salacious and bizarre   Originally married in 1993, Douglas and Faylene Grant began their marriage in an apparently congenial manner, eventually having two children together   Both Grants were religious, but Faylene was a particularly devout member of the Church of Jesus Christ of Latter Day Saints   During the early part of their marriage, Douglas established and developed a successful nutritional supplement business, eventually consulting with several professional basketball teams   His apparent success came at the expense of his marriage, however, as he began having extramarital affairs and spending a substantial amount of time outside of the home   As a result, the Grants divorced in 2000

Craig D Henley, Esq
April 8, 2016
Page 22

Shortly after they divorced, Douglas started a relationship with a young receptionist at his company, Hillary Dewitt  He then allegedly received a phone call from Faylene, who said she had received divine guidance and been instructed to remarry him  The Grants then went to Las Vegas, where they were officially remarried, however, despite his outward renewal of fidelity, while he was still in Las Vegas celebrating his remarriage to Faylene, Douglas continued to engage in intimate phone calls and other communications with Ms Dewitt

Around the time of the second wedding, Douglas Grant supposedly began having premonitions of Faylene's death, which he attributed to divine intervention  Faylene's devotion to her faith caused her to adopt her husband's visions as true  Accordingly, she wrote a series of letters to friends and family members related to her imminent demise  Among the recipients of the letters was Ms  Dewitt, who later said that she corresponded with Faylene regularly about religion and her desire that Ms  Dewitt act as the mother of her children after Faylene's death

On September 27, 2001, Faylene was found unconscious in a bathtub in the Grants' home and, despite medical efforts to revive her, she eventually died  Although her death was initially determined to be accidental, a medical examiner's report listed the cause of death as uncertain  Three days after her death, Douglas Grant called a meeting at his home with several of Faylene's relatives  In addition to discussing logistics pertaining to her funeral, Douglas informed the family that, prior to her death, Faylene had authored a letter to each of the family members and had asked him to distribute the letters after her death  Douglas allegedly then distributed those letters to the individuals identified on the envelopes

Approximately three weeks after Faylene's death, Douglas married Ms  Dewitt  In addition, he received a substantial payment from Faylene's life insurance policy  Shortly thereafter, the Gilbert Police Department began investigating the circumstances of Faylene's death  Around four years later, in 2005, Douglas was charged in connection with Faylene's death

The case was initially assigned to prosecutor Frankie Grimsman with the Maricopa County Attorney's Office  In August 2005, Douglas Grant's counsel, A  Melvin McDonald, sent a letter to Ms  Grimsman requesting production of copies of the letters Mr  Grant had distributed after Faylene's death  Ms  Grimsman did not produce all of the letters  Mr  McDonald filed a motion to compel, eventually deposing the detective assigned to the case about the location and existence of the letters  Although the detective was able to confirm that letters had existed at some point, neither he nor Ms  Grimsman were able to produce any additional letters, because they were in the possession of Faylene's family

In 2006, Mr  Martinez took over the case from Ms  Grimsman, inheriting the still-ongoing dispute over production of the letters  During a hearing on February 24, 2006, Mr  Martinez truthfully informed the trial court that, after speaking with Mrs  Grant's family, he was not in possession of any additional letters than those that had previously been produced  Defense counsel pressed the issue, and it became apparent that, if more letters existed and Faylene's family refused to produce them, the case against Douglas Grant could be dismissed

In a final effort to secure the letters, Mr  Martinez contacted Faylene's family again and informed them the case would be dismissed if they did not produce any remaining

Craig D Henley, Esq
April 8, 2016
Page 23

letters they might have   The family then produced several more letters, which were promptly disclosed to defense counsel

In addition to the dispute regarding the letters, there was also a question regarding the existence of certain transcripts and/or recordings of witness interviews   In late 2006, after repeated requests to the Gilbert Police Department to produce any responsive materials, Mr Martinez informed the Court that, based on his personal knowledge following several requests to the police, there were no additional recordings to be turned over to the defense   Nonetheless, given the defense's repeated requests, the Court eventually ordered that a document inspection be permitted at the Gilbert Police Department   During this inspection, additional witness tapes were discovered for the first time

Nearly two years after the disputes concerning the letters and the witness recordings, Douglas Grant's trial began   The trial took fifty-one days between November 2008 and March 2009   Numerous witnesses testified regarding Grant's history of marital transgressions and penchant for infidelity   As evidence of the affair between Grant and Ms Dewitt, Mr Martinez entered Grant's phone records into evidence and was able to provide precise timeframes in which the two communicated   The records demonstrated that, even while he was in Las Vegas for his second wedding with Faylene, Douglas Grant had continued to engage in conversations with Ms Dewitt, likely for romantic or sexual purposes

The jury convicted Douglas Grant of manslaughter but could not reach unanimous verdicts on first- or second-degree murder   At the sentencing hearing, Grant presented a series of witnesses who opined he was a good father and had been a good husband to Faylene   In response, Mr Martinez reminded the jury that Douglas Grant had been excommunicated from the LDS church, had engaged in a series of extramarital affairs, and was convicted of manslaughter   He made the following statement concerning the love triangle involving Douglas, Faylene, and Ms Dewitt

> And then there's a phone call on July 28th, one day after the marriage   And then there's all these phone calls that go back and forth   It's just tawdry, this sort of threesome, menage à trois as the French call it, that he's going through

Grant Tr , May 15, 2009, at 75 8-12 **(Ex "14")**   Mr Martinez argued that, given the circumstances of Faylene's death, Douglas Grant should receive an aggravated sentence of twelve and a half years   He was ultimately sentenced to five years in prison

Douglas Grant did not directly appeal any of the issues involving his conviction   His appellate counsel determined that, in accordance with *Anders v California*, 386 U S 738 (1967), after searching the entire record, there were no arguable questions of law to raise on appeal   *See State v Grant*, 2011 WL 553765 (App 2011) **(Ex "15")**   The only issue that Grant directly challenged was related to his sentence, which the appellate court summarily affirmed   *Id*

### AACJ Allegations

The Charge alleges three instances of misconduct related to the *Grant* case   (1) that Mr Martinez improperly withheld copies of the letters from the defense despite allegedly having control over them, (2) that Mr Martinez made knowing misrepresentations to the

Craig D  Henley, Esq
April 8, 2016
Page 24

Court regarding the existence and whereabouts of tapes of certain witness interviews, and
(3) that Mr  Martinez improperly argued to the jury that Mr  Grant was involved in
concurrent relationships with both Faylene and Ms  Dewitt   Each allegation depends on
factual misrepresentations and lacks any substantive basis

### *Applicable Ethical Rules*

**ER 3 3(a)(1)** (prohibiting an attorney from making a false statement of fact to a
tribunal), **ER 3 4(a)** (barring an attorney from unlawfully obstructing another party's
access to evidence or concealing a document or other material having potential evidentiary
value), **3 4(d)** (proscribing an attorney from failing to make reasonably diligent efforts to
comply with a proper discovery request), **3 8(d)** (requiring a prosecutor to make timely
discovery of all evidence or information known to the prosecutor that tends to negate the
guilt of the accused), **8 4(d)** (barring an attorney from engaging in conduct that is
prejudicial to the administration of justice)

The person with the greatest motivation and opportunity to raise all of the
allegations of the AACJ Charge was Douglas Grant himself, through his appellate attorney
However, his appellate attorney concluded that, "after a thorough and conscientious review
of the record, **counsel for Defendant Douglas Grant can present no issue for review
which will support a challenge on the Court's rulings, verdict and/or sentence
imposed by the Superior Court** "  *See* Appellant's Opening Brief Pursuant to Anders v
California, 2010 WL 2355931 at *33 (App  2010) (emphasis added) **(Ex  "16")**

There is no question that, if any of the allegations of the Charge had merit, they
would have been raised in Grant's appeal   The fact that his own appellate attorney
reviewed the case and concluded there were no available issues to appeal compels the
conclusion that Mr  Martinez's conduct, before and during trial and sentencing, was
appropriate   This fact is further illustrated by the gravity of the AACJ's allegations   In
particular, withholding exculpatory evidence is a violation of the Fifth Amendment to the
United States Constitution and would constitute fundamental error, warranting a new trial
*See generally State v  O'Dell*, 202 Ariz  453, 457, 46 P 3d 1074, 1078 (App  2002)   The
fact that Mr  Grant's appellate counsel not only did not argue that Mr  Martinez withheld
evidence, but affirmatively stated that there was **"no issue for review which will
support a challenge on the Court's rulings, verdict and/or sentence imposed by
the Superior Court"** compels the conclusion that the AACJ's allegations are devoid of
merit

### *Allegations Related to the Letters*

The Charge first contends that Mr  Martinez acted unethically by failing to disclose
exculpatory evidence in the form of letters that Faylene Grant wrote to her close friends and
family   The Charge fails to present all of the relevant facts and, instead, seizes on isolated
statements by Grant's defense counsel   The issue concerning the letters originated long
before Mr  Martinez had assumed prosecutorial responsibility for the case   Indeed, the
defense's Motion to Dismiss explained that the letters were initially requested from Mr
Martinez's predecessor, Ms  Grimsman   *See* Motion to Dismiss with Prejudice at 5–6 **(Ex
"17")**   More specifically, defense counsel made the initial requests as early as August
2005, had received some letters, but had not received additional letters when Mr  Martinez
took over the case in February 2006   After he took over the case, Mr  Martinez took
appropriate steps to secure additional letters from Faylene's family, which had control over

Craig D  Henley, Esq
April 8, 2016
Page 25

them  The excerpts of the evidentiary hearing cited in the Charge confirm this precise point  (Charge, at 9-10 )  Mr Martinez is quoted as saying that he had spoken with the people in possession of the letters, but they had represented to him that all of the letters had already been produced to the State for disclosure  When Mr Martinez made that statement, it was accurate and in no respect an attempt to mislead the Court

Following his initial involvement with the letter issue, Mr  Martinez continued to press Faylene's family for any additional letters  Her family, however, continued to state that all of the relevant documents had been produced  Ultimately, after Douglas Grant's counsel had stated that, unless the additional letters were produced, he would seek dismissal of the case (and also had identified specific letters he claimed had never been turned over), Mr Martinez then approached Faylene's family again with the new information and the possibility of a dismissal of the case against Grant  After that conversation, an additional batch of letters was turned over to Mr  Martinez, and he promptly disclosed them to the defense

Mr  Martinez was truthful in his representations to the trial court and opposing counsel concerning additional letters  He continued to pursue resolution of the issue to locate the letters and was ultimately the catalyst for their production  His statements about the existence (or absence) of additional letters were based entirely on his discussions with Faylene's family, and were true and accurate reflections of his knowledge at the time

### Allegations Regarding Witness Interviews

The Charge claims that Mr  Martinez improperly stated to the trial court and defense counsel that tapes of certain witness interviews did not exist  Like the letter issue discussed above, this allegation also fails to disclose relevant facts  Like the letter issue, Mr  Martinez never possessed or controlled the witness interview tapes  The sole custodian of the tapes was the Gilbert Police Department  When defense counsel requested the witness interview tapes, Mr Martinez's only option was to request them from the Gilbert Police  He did so  Gilbert Police informed him that the tapes did not exist  Mr  Martinez then truthfully stated to the Court, based on his knowledge, that discovery of the tapes was completed

The ultimate revelation of the tapes during an April 16, 2007 document inspection at the Gilbert Police Department does not render false or misleading Mr  Martinez's prior representations to the Court  Rather, discovery of the tapes confirmed that the Gilbert Police had sole access to and control over the requested materials  Prior to the document inspection, Mr  Martinez had no knowledge of the existence of the tapes  To the contrary, he reasonably relied on representations from the Gilbert Police that there were no tapes  His statements to the Court and defense counsel that discovery of the tapes had been completed were made in good faith, even if ultimately inaccurate

The Ethical Rules do not require attorneys to be omniscient or infallible  Indeed, as stated in the Preamble to the Ethical Rules, "The Rules presuppose that disciplinary assessment of a lawyer's conduct will be made on the basis of the facts and circumstances *as they existed at the time of the conduct in question and in recognition of the fact that a lawyer often has to act upon uncertain or incomplete evidence of the situation "* Preamble ¶ [19] (emphasis added)  Over the course of discovery and trial in any case, particularly in a case spanning as much time as the *Grant* case, new evidence may emerge or prior understandings of facts can be corrected by later-discovered facts  Mr  Martinez accurately represented to the Court his understanding of the facts

Craig D  Henley, Esq
April 8, 2016
Page 26

### Comment Related to Douglas Grant's Concurrent Relationships

The Charge alleges that Mr Martinez's argument about the concurrent relationships among Douglas, Faylene and Ms Dewitt was improper  Like the preceding allegations, this allegation is premised on a misleading representation of Mr  Martinez's statements [3]  Those statements, made during the sentencing hearing, occurred after several witnesses had testified about their personal impressions of Grant as a loving father and caring husband  In response, Mr  Martinez argued that the evidence presented during trial reflected the opposite – i e , that Mr  Grant had repeatedly engaged in extramarital affairs, spent a substantial amount of time away from the home, and eventually was responsible for Faylene's death  His argument was based on evidence presented to the jury reflecting the numerous telephone calls that Grant had placed to Ms  Dewitt immediately following his remarriage to Mrs  Grant   In summarizing Grant's ongoing relationships, Mr  Martinez made the following statement

> And then there's a phone call on July 28th, one day after the
> marriage   And then there's all these phone calls that go back
> and forth   It's just tawdry, this sort of threesome, ménage à
> trois as the French call it, that he's going through

Ex  "15," Grant Tr , May 15, 2009, at 75  8–12

The AACJ alleges this argument was unethical because there was no evidence that Grant and Ms  Dewitt engaged in sexual relations or even saw each other after the remarriage   However, Mr  Martinez was free to argue, based on the evidence, that Grant, while newly re-married to Faylene, continued to have some form of a romantic relationship with Ms  Dewitt  The argument was a reasonable inference based on telephone records showing that Grant continued to have communications with Ms  Dewitt  These arguments were well within the bounds of permissible closing arguments  *See generally State v Hughes*, 193 Ariz  72, 85, 969 P 2d 1184, 1197 (1998) ("Counsel can argue all reasonable inferences from the evidence ")

### State v  Chrisman

#### Factual Background

On October 5, 2010, Chrisman, a police officer, shot and killed a suspect and the suspect's dog while responding to a call for help from the suspect's mother  Chrisman was indicted on charges of second-degree murder, aggravated assault, and cruelty to animals eight days later, on October 13, 2010  Officer Virgillo, who was present with Chrisman at the scene of the alleged crimes, claimed that neither the dog nor the victim posed any danger to the officers when Chrisman shot and killed them  On September 17, 2013, a jury convicted Chrisman of aggravated assault, but could not reach agreement on the other two

---

[3] In fact, it appears that the Charge's claims regarding Mr  Martinez s statements were taken directly from newspaper accounts of his statements during the sentencing phase of Mr  Grant's trial  *See* Paul Rubin, *Doug Grant Gets Five Years After Slain Wife's Sister Pressed for His Conviction Based on a Dream*, Phoenix New Times, May 21, 2009, available at
http //www phoenixnewtimes com/news/doug-grant-gets-five-years after slain-wifes-sister-pressed for-his-conviction based-on-a-dream-6430046

Craig D  Henley, Esq
April 8, 2016
Page 27

counts   On December 11, 2010, Chrisman pled guilty to manslaughter to resolve the
remaining two counts   He was sentenced to seven years in prison

### *AACJ Allegations*

The AACJ alleges that Mr  Martinez committed multiple violations of the Ethical Rules
at various stages of the Chrisman case   Rather than conduct any independent analysis of
the issues, the AACJ appears to have simply adopted the allegations of a motion for new
trial that Chrisman filed after the jury found him guilty of aggravated assault   Motion for
New Trial **(Ex  "18")**, Objection to Motion for New Trial **(Ex  "19" )**  There is no merit to
the allegations   The trial judge—who was in the best position to evaluate Mr  Martinez's
conduct in the context of the trial and the relevant issues at stake—rejected the arguments
in that motion and denied it without comment   Minute Entry, November 13, 2013 **(Ex
"20")**

### *Alleged Deprivation of Exculpatory Witness*

The AACJ alleges that Mr  Martinez deprived the defense of the opportunity to call
Andrew Hinz as a trial witness   This allegation is meritless   The State retained Hinz to
perform an analysis of the Taser guns that were used at the scene of the crime   He set
forth his findings and opinions in a 50-plus page report   Mr  Martinez disclosed Hinz as a
potential trial witness on November 20, 2012   Subsequently, Mr  Martinez chose not to call
him as a trial witness, but Mr  Martinez fully cooperated with the defense's efforts to
interview Hinz and to secure his testimony at trial

The AACJ's suggestion that Mr  Martinez delayed the defense's interview of Hinz is
rebutted by the relevant email correspondence   It demonstrates that the short delay
resulted from coordinating schedules and managing the logistics of an out-of-state
interview   Email Chain dated July 16-19, 2013 **(Ex  "21")**  On July 16, 2013, defense
counsel's assistant wrote to Mr  Martinez's assistant regarding certain logistics

> Ok I just spoke to the videographer and he says he just needs
> the zip code for Mr  Hines [sic] and he will find a site closest to
> him so he will have to do a little bit of travelling but not too
> much   We will need to go to the video site here in Phoenix
> Please provide me with Mr  Hines' [sic] zip code and the date
> he would like to conduct the interview and we can get it all set
> up for him
>
> Thank you, Kathie!

*Id*  Mr  Martinez's assistant responded 22 minutes later with the requested information  *Id*
The next day, defense counsel's assistant provided the specific time and location of the
interview on Hinz's date of choice and asked for confirmation that Hinz would attend  *Id*
Mr  Martinez's assistant provided confirmation two days later (after hearing from Hinz), and
the interview proceeded as planned (although Hinz arrived a little late to the interview)  *Id*

Similarly, contrary to the AACJ's allegation, Mr  Martinez (and his staff) assisted the
defense in trying to secure Hinz's testimony at trial—they did not hinder it   On July 29,
2013, the defense served a copy of a trial subpoena concerning Hinz on the Maricopa
County Attorney's Office   The subpoena ordered Hinz's appearance for July 31, 2013, the

Craig D  Henley, Esq
April 8, 2016
Page 28

trial commencement date   Mr Martinez's assistant forwarded a copy of the subpoena to
Hinz, who agreed to make himself available to testify, but he requested that his appearance
be scheduled for August 28 (to accommodate his employment obligations and travel
schedule), and further requested that the defense make his flight and hotel reservations
(because he did not want to advance those costs)   Mr Martinez communicated this
information to defense counsel, along with Hinz's statement that someone from defense
counsel's office told him that he would need to make his own flight and hotel reservations
Email dated August 22, 2013 (**Ex "22"**), *see also* Email Chain dated August 15-20, 2013
(**Ex "23"**)   Defense counsel responded shortly thereafter and accused Mr Martinez or
Hinz—the context is unclear—of telling a "bold faced lie" about defense counsel's
unwillingness to make flight and hotel reservations   Email Chain dated August 22, 2013
(**Ex "24"**)   In response, Mr Martinez provided defense counsel with all the information
needed to communicate directly with Hinz, while ending any further involvement of his
office in the matter

> Your assertion that Mr Heinz [sic] told a "bold faced lie" is
> concerning   I will not become involved in court appearance
> issues with your witness   This includes passing along your
> telephone numbers   You already have his telephone number
> and can pass that information along when you call him   The
> home address he provided to us is 461 Ellis Way, Golden,
> Colorado 80401

*Id*

### Alleged Misrepresentations to the Court

The AACJ alleges that Mr Martinez misrepresented certain facts about Chrisman
during oral argument on the defense's motion for remand to the grand jury   This allegation
is also false   In its motion for remand, the defense contended that Mr Martinez should
have permitted defense expert, Dr William Lewinski, to testify at the grand-jury proceeding
about his interview with Chrisman and the opinions he formed based on that interview   At
oral argument, Mr Martinez responded, in part, by pointing out that allowing such
testimony would turn the grand-jury presentation into a "mini trial" on Chrisman's credibility
through Dr Lewinski   Mr Martinez argued that the State would be able to examine Dr
Lewinski about specific instances where Chrisman had lied in the past, including the fact
that he had failed a polygraph and had been investigated for stealing and lied during the
course of that investigation, to demonstrate that Dr Lewinski was basing his opinions on
nothing more than the word of a proven liar   Chrisman Tr , January 28, 2011, at 7 5-9 4
(**Ex "25"**)

The AACJ now contends, years later and apparently without conducting any due
diligence of its own, that Mr Martinez falsely represented that Chrisman (i) failed a
polygraph and (ii) was investigated for stealing and lied during the course of that
investigation   To the contrary, Chrisman did, in fact, fail a polygraph   Police Applicant
Report of Polygraph Examination (**Ex "26"**)   And he was, in fact, investigated for stealing
and found to have lied during the course of that investigation   Special Investigations
Report, December 23, 2008, at 543 (**Ex "27"**)   Mr Martinez's statements, thus, were
demonstrably true, not false

Craig D  Henley, Esq
April 8, 2016
Page 29

### *Alleged Harassment in Pretrial Witness Interviews*

The AACJ alleges that Mr  Martinez harassed several witnesses during pretrial witness interviews in various ways   There is no basis for these allegations   The witnesses at issue were disclosed by the defense as possible trial witnesses, many of whom Mr  Martinez expected to be offered as character witnesses   Mr  Martinez appropriately explored and investigated the credibility of these witnesses, including their potential biases and lack of foundation for any opinions they might express about Chrisman

Responding specifically to the AACJ's allegations

1       Mr  Martinez did not badger a witness or force her to admit she was in a same-sex relationship   During the only interview in which Mr  Martinez engaged in a line of questioning about the nature of a woman's relationship with another woman, Mr  Martinez never asked if they were in a same-sex relationship, and the thought never crossed his mind   The two women were both potential witnesses, and he was exploring their potential biases   The witness's responses to Mr  Martinez's questions about her residence led Mr  Martinez to believe that she was not being entirely forthcoming   The witness being interviewed never said or "admit[ted]," in the AACJ's parlance, that she was in a same-sex relationship with the other woman   Interview with Celia Varela, at 15-21 **(Ex  "28")**

2       Mr  Martinez did ask witnesses for social security numbers   This is a standard question (like date of birth) intended to facilitate further investigation of the potential witness after the interview concludes   For example, Rule 15 1(d)(3) of the Arizona Rules of Criminal Procedure requires prosecutors to disclose, in all felony cases, a list of prior felony convictions that may be used to impeach any disclosed defense witness   Social security numbers facilitate criminal background checks

3       Mr  Martinez did ask a witness for her ex-husband's telephone number   Again, he was appropriately obtaining information to facilitate further investigation regarding the witness

4       Mr  Martinez did ask witnesses whether they had attended parties where disrobing had taken place   He had evidence of these activities from other sources   His purpose of asking certain witnesses questions about them was to explore the potential biases of character witnesses   *See, e g* , Interview with Officer A J  Buffa, at 13 **(Ex  "29")**

Mr  Martinez's questions were well within the bounds of the issues at stake in the criminal investigation

### *Alleged Harassment of Trial Witnesses*

The AACJ alleges that Mr  Martinez harassed several trial witnesses by asking untrue or irrelevant questions   These allegations also have no merit

**Officer Bartel**   Contrary to the AACJ's contention, Mr  Martinez had a valid basis to characterize Officer Bartel as a "double-dipper "  Officer Bartel testified that he was being paid by the defense for his testimony while also being paid by the City of Peoria for vacation leave   Chrisman Tr , August 26, 2013, at 228 4-231 13 **(Ex  "30")**   Mr  Martinez

Craig D  Henley, Esq
April 8, 2016
Page 30

characterized that as "double dipping " *Id*  at 229 10-11 ("[T]hat means sort of that you
are double dipping a little bit, aren't you?")

**Sergeant Mattson**   Contrary to the AACJ's suggestion, Mr  Martinez believed he
had a valid basis for examining Officer Mattson about his police-union ties   That line of
questioning, to which defense counsel did not object (*Id*  at 95 18-98 10), served as the
predicate to a broader line of questioning, in which Mr  Martinez attempted to establish
Officer Mattson's bias in favor of Chrisman   *See generally Id*  at 98 11-105 23   Defense
counsel eventually objected to the broader line of questioning   During a discussion outside
the presence of the jury, Mr  Martinez explained to the court that he was attempting to
show that Officer Mattson had "a bias in favor of the organization that is paying the
defendant's legal bills" and, thus, a bias in favor of Chrisman   *Id*  at 102 8-105 23   The
trial court sustained the objection and precluded Mr  Martinez from pursuing that line of
questioning under Rule 403, Ariz  R  Evid   *Id*  at 105 18-23   Mr  Martinez obeyed the
court's ruling

**Officer Reeson**   Mr  Martinez did not "grill[]" Officer Reeson about her maternity
leave   Rather, as part of properly demonstrating her bias in favor of Chrisman, Mr  Martinez
merely pointed out that, though she had been on maternity leave and away from work for
eight months "pursuant to a doctor's note," she did not let her medical condition prevent
her from attending her "friend" Chrisman's trial on two days and then testifying on a third
*Id*  at 174 19-179 19



**Sergeant Egea**

**(Ex "32" (subject to motion for protective
order))**

**Officer Virgilio**   The case against Chrisman largely involved a swearing contest
between Chrisman and Officer Virgilio, who were the only eyewitnesses to the shooting
Thus, the credibility of these two witnesses was one of the central issues at trial   One area
in which Mr  Martinez attacked Chrisman's credibility concerned his claim that he had
consent to enter the residence without a search warrant based on the victim's mother's
statements   *See, e g* , Chrisman Tr , September 3, 2013, at 54 13-17, 56 12-23 **(Ex
"33")**   Mr  Martinez attempted to rebut that claim by showing that the trailer was actually
titled in the victim's name, rather than the mother's name   Chrisman Tr , August 7, 2013,
at 29 2-30 24 **(Ex "34")**   After the Court sustained objections to that line of inquiry, Mr
Martinez abided by the Court's ruling

Craig D  Henley, Esq
April 8, 2016
Page 31

<em>Alleged Misrepresentations during Closing Argument</em>

The AACJ alleges that Mr  Martinez "intentionally made several false statements concerning the evidence" during closing argument   To the contrary, all of Mr  Martinez's challenged statements were based on the evidence presented at trial or reasonable inferences therefrom, and were well within the "wide latitude" afforded prosecutors during closing argument   *State v  Moody*, 208 Ariz  424, 460, 94 P 3d 1119, 1155 (2004) ("Attorneys, including prosecutors in criminal cases, are given wide latitude in their closing arguments to the jury ")

**"Hysterical" Comment**  First, when Mr  Martinez said, "You can rely on your ears, even though you're told by the *defendant* that she was hysterical," he was referring to the defense's position, not Chrisman's testimony alone   *See* Chrisman Tr , September 9, 2013, at 32 8-9 (emphasis added) (**Ex  "35"**)   Second, the defense did, in fact, suggest that the suspect's mother, Ms  Fernandez, was hysterical when the officers arrived at the scene   For example, Chrisman testified that Ms  Fernandez "was very frightened, very excited[,] she was crying, shaking   Her voice was quivering when she spoke "  Chrisman Tr , September 3, 2013, at 49 22-50 1 **(Ex  "36")**   Further, defense counsel attempted to elicit this testimony from Officer Virgillo

> Q   And your initial contact with Ms  Fernandez, in your opinion, other than yesterday, she was upset, emotional, and desperate?  Those are your words before yesterday, right?
>
> A   I would have to see a copy of the conversation that you are referring to

Chrisman Tr , August 8, 2013, at 23 14-19 **(Ex  "37")**

**Comments about Officer Bartel**  Mr  Martinez's "double-dipper" characterization had a valid evidentiary basis, as discussed above   His statement that Officer Bartel wanted jurors to believe "that SWAT members could look through walls" also had a valid evidentiary basis   It was based on the following exchange, which occurred during cross-examination

> Q   [SWAT members] can't see through walls, right?
>
> A   Um, actually, we have systems that allow us to look for heat signatures and heartbeats through walls, so that's not completely true

Chrisman Tr , August 27, 2013, at 54 8-11 **(Ex  "38")**

**"Golden Clipboard" Comment**  Mr  Martinez's argument that Sergeant Mattson and Sergeant Post returned a "golden clipboard" to Officer Virgillo "to put pressure on [him] to change his mind" had a valid evidentiary basis   On cross-examination, Sergeant Mattson admitted that he, along with Sergeant Post, paid a visit to Officer Virgillo at a golf-course driving range at 7 00 in the morning, ostensibly to deliver a clipboard, but during which they had a conversation with Officer Virgillo about "unwanted contact with him "  Ex  "30," at 98 20-100 19   Read in context, Mr  Martinez's "golden clipboard" characterization (both in closing and during Sergeant Mattson's cross-examination) was clearly meant to suggest that the ostensible reason for the visit at the golf course during the early morning hours—

Craig D Henley, Esq
April 8, 2016
Page 32

i e , to deliver a clipboard—was a sham excuse for an attempt to influence the witness   This was proper argument

**Comments about Sergeants Egea and Mattson**   Mr Martinez's characterization of Sergeant Egea as "Chrisman's friend" was a fair inference to draw from the evidence   In response to an accusation of bias on her part in favor of Chrisman, Sergeant Egea testified that she had "expressed opinions to [her] coworkers about the case" and had apologized to Chrisman on at least one occasion   Chrisman Tr , September 4, 2013, at 213 10-214 1 **(Ex "39")**   Similarly, as discussed above, his description of Sergeant Mattson as a "union organizer" was a fair characterization based on Sergeant Mattson's testimony concerning his involvement in, and support of, a Phoenix Police labor union

### Applicable Ethical Rules

**ER 3 3(a) (Knowingly Make False Statement of Fact), ER 8 4(c) (Conduct Involving Dishonesty)**   Mr Martinez did not knowingly make a false statement of fact or engage in any conduct involving dishonesty

**ER 3 4(c) (Knowingly Disobey Court Rule), ER 3 4(e) (Allude to Matter Not Reasonably Believed to be Relevant)**   Mr Martinez did not knowingly disobey any court rule or allude to any matter that he did not reasonably believe to be relevant   He complied with his disclosure obligations, presented relevant evidence through the State's witnesses, and zealously and properly cross-examined the defense's witnesses

**ER 3 8(d) (Disclosure of Exculpatory Evidence)**   Mr Martinez timely disclosed all exculpatory evidence

**ER 4 4(a) (Use Means with No Substantial Purpose Other than to Embarrass, Delay, or Burden)**   Mr Martinez did not engage in any conduct with no substantial purpose other than to embarrass, delay, or burden another person

**ER 8 4(d) (Conduct Prejudicial to Administration of Justice), Rule 41(g), Ariz R Sup Ct (Unprofessional Conduct)**   Mr Martinez's conduct was not unprofessional and did not result in any prejudice to the administration of justice

### State v  Irizarry
#### Factual Background

In 2010, Mr Martinez prosecuted Daimen Joseph Irizarry, who was charged with and convicted of eight counts of aggravated assault, four counts of drive-by shooting, and one count of unlawful flight from a law enforcement vehicle   These charges stemmed from a shooting which occurred on January 28, 2010, where Irizarry was involved in the murder of a Gilbert Police Officer, Lieutenant Eric Shuhandler   During a routine traffic stop, the passenger in Irizarry's vehicle shot Lieutenant Shuhandler in the left side of the face, killing him   After his passenger killed the officer, Irizarry attempted to flee the scene and escape the police   During the ensuing chase, Irizarry's passenger repeatedly shot at police and flung large objects from the back of the truck that Irizarry was driving   Irizarry and his accomplice were ultimately arrested after their vehicle ran out of gas

During Irizarry's trial, Mr Martinez presented testimony from Melissa Kingsley, who had been working as a Gilbert Police Department dispatcher on the night of Lieutenant

Craig D  Henley, Esq
April 8, 2016
Page 33

Shuhandler's murder  In particular, Mr  Martinez asked Ms  Kingsley whether she could
recall the timeframe in which she spoke with the victim and could provide a summary of
what was discussed  In an effort to clarify her recollection, Mr  Martinez, without objection,
introduced into evidence an audio cassette containing a recording of communications
between Ms  Kingsley and Lieutenant Shuhandler  See Audio Recording of communications
between Lieutenant Shuhandler and Ms  Kingsley **(Ex  "40")**  Defense counsel opted not to
cross-examine Ms  Kingsley regarding her testimony on direct about the recording

       Approximately two weeks after Ms  Kingsley was initially called to testify, the defense
recalled her to ask additional questions concerning the recording  Responding to questions
from defense counsel, Ms  Kingsley clarified that the recording was not verbatim – i e ,
certain radio transmissions involving her and other officers had been omitted  On re-direct
examination, however, Ms  Kingsley clarified that the recording represented an accurate
version of her communications with Lieutenant Shuhandler on the evening in question and
that, regardless of the runtime of the tape, the overall timeframe of the communications
was accurate

### *AACJ Allegations*

       The allegations relating to this case are tethered to testimony that Mr  Martinez
elicited from Ms  Kingsley on direct examination regarding her recollection of her
communications with Lieutenant Shuhandler and the recording thereof  In particular, the
Charge latches on to the otherwise insignificant time differential between the raw version of
the recording and the version that was introduced at trial  The Charge claims that, by
introducing a redacted version, Mr  Martinez lied and falsified evidence  The Charge further
intimates that Mr  Martinez, through the testimony he elicited from Ms  Kingsley, created a
"false impression that the events could not have happened as Irizarry explained " (See
Charge, at 14 )  In short, although categorized with various salacious terms, the essence
of the claimed misconduct is that Mr  Martinez improperly represented the facts of the case
and introduced a doctored exhibit without clarifying that fact to the jury

### *Applicable Ethical Rules*

       **ER 3 3(a)(1)** (prohibiting a lawyer from making a false statement of fact or failing
to correct a false statement of material fact previously made to the tribunal by the lawyer),
**ER 3 3(a)(3)** (prohibiting an attorney from offering evidence that he or she knows to be
false), **3 4(b)** (prohibiting an attorney from falsifying evidence or inducing a witness to
provide false testimony), **ER 8 4(d)** (stating that it is misconduct for any attorney to
engage in conduct that is prejudicial to the administration of justice)

       Ms  Kingsley's testimony was intended for the simple purpose of creating a timeline
explaining how the events unfolded  Moreover, the exhibit itself was merely a condensed
version of raw material, which was provided to defense counsel prior to trial, intended only
to provide a more concise summary of the evidence  There is no contention that Mr
Martinez altered the communications in a manner that would affect the substantive content
as it pertains to the underlying case  To illustrate the inaccuracy of the allegations, a more
fulsome review of the proceedings is necessary  As stated, Mr  Martinez called Ms  Kingsley
to testify regarding her knowledge of the events underlying the victim's murder  At the
time of the events, Ms  Kingsley was a dispatcher for the Gilbert Police Department and was
responsible for fielding inquiries from officers on a dedicated radio frequency known as
"Dispatch Channel 2 " See Irizarry Tr , July 8, 2010, at 74–75 **(Ex  "41")**  While she was

Craig D Henley, Esq
April 8, 2016
Page 34

working on the night of January 28, 2010, Ms Kingsley received an initial radio call from the victim indicating that he was initiating a vehicle stop  *Id*  at 78  After several minutes, Ms Kingsley again spoke with the victim, who requested information relating to a driver's license  *Id*  at 80  At the time she testified initially, Ms Kingsley was not sure how long the total communications lasted, but was aware that the discussion was recorded  *Id*  In discussing the recording, the following exchange took place between Mr Martinez and Ms Kingsley

> [MARTINEZ]  And when he made the call to you, was there a recording made?
>
> A     Yes
>
> Q     And does it include your response and why you were responding the way you do?
>
> A     Yes
>
> Q     And does it also include everything or the clip that we have here up until the time that you no longer corresponded with him, correct?
>
> A     Yes
>
> Q     And does include the time on there?  From your memory, does it include at least real time from the time he called at 10 49 with you until the communication ended is real time on the tape, correct?
>
> A     Yes
>
> Q     That will give us a definite or an exact time as to when things happened, correct?
>
> A     Yes
>
> Q     And you reviewed this Exhibit No  121?
>
> A     I have
>
> Q     Did you review it prior to coming to court?
>
> A     Yes  Multiple times
>
> Q     What does it include?
>
> A     It includes my interaction on the radio with [the victim ]
>
> Q     Does it start at 10 49?

Craig D  Henley, Esq
April 8, 2016
Page 35

A       Yes

Q       And does it end with you asking or looking for a Lincoln
1?

A       Lincoln 2

Q       Lincoln 2

MR  MARTINEZ        I move for the admission of 121

MR  SHELL           No objection

THE COURT           121 is admitted

MR  MARTINEZ        Do you know how long this tape lasts, in
other words, until you started saying Lincoln 2?  Do you know?

MS  KINGSLEY        I honestly don't

Q       Let's go ahead and play it

*Id* at 79-80  At that point, Mr  Martinez played the tape for the jury while asking Ms
Kingsley clarifying questions regarding its content

        After the tape was played, defense counsel was given the opportunity to cross-
examine Ms  Kingsley but opted against it   Nevertheless, nearly two weeks after Ms
Kingsley originally testified, the defense recalled her to undermine her recollection of how
the events had unfolded   The defense's apparent motivation for recalling Ms  Kingsley was
to establish a timeline for how the underlying events unfolded   *See* Irizarry Tr , July 20,
2010, at 32-40 **(Ex  "42")**  Specifically, defense counsel pressed Ms  Kingsley with respect
to her recollection that the tape had been made in "real time "  *See id* at 33–34  As her
testimony developed, it became clear that Ms  Kingsley and defense counsel were not on
the same page with respect to the term "real time "  That fact is illustrated by the following
exchanges between Mr  Shell and Ms  Kingsley

        Q       Did you testify that the tape was real time?

        A       I guess I am confused by what you mean   That is my
        communication with [the victim] as I recall that night

        Q       Correct   But you also know that there is other
        communication going on in between that communication,
        correct?

        A       With other officers

        Q       Correct   That aren't included in there, correct?

        A       Correct

Craig D  Henley, Esq
April 8, 2016
Page 36


       [   ]

       Q     And so it is not real time, correct?

       A     If that is your definition, yeah  I guess I am not understanding "real time " I was looking at it as being time-stamped

       Q     That tape is not in real time?

       A     Correct

*Id* at 37–38  Ms  Kingsley's confusion stems from the fact that she was communicating, not only with the victim, but also other officers  The tape, however, reflected only her communications with the victim  As a result, the total runtime of the tape was shorter than that of the complete recording  Nevertheless, because the tape was timestamped, it accurately reflected the span of the communications  Ms  Kingsley openly admitted these issues when pressed by defense counsel  *See Id*  at 39

     When permitted to follow up on defense counsel's line of questioning regarding the tape, Martinez clarified the issue regarding the span of the tape and whether it had, in fact, been edited  In particular, Martinez asked the following questions

       Q     But so that we are clear, you previously told us that the whole conversation took and the time are 10 47 to 10 53, right?

       A     Yes

       Q     And that's something that you checked, right?

       A     Yes

       Q     And that is six minutes, right?

       A     Correct

       Q     That tape may not be six minutes, but you previously testified that that's what it was, right?

*Id* at 41–42

     This line of questioning, and the attendant response, plainly elucidate the fact that the tape was not a second-for-second copy of all of Ms  Kingsley's communications, but only of her communications with the victim  Because the purpose of the tape was to help establish a timeline of the events, Ms  Kingsley's testimony regarding the start and end times of the discussion were adequate in that regard  At no point during his questioning of Ms  Kingsley did Mr  Martinez attempt to obfuscate the fact that the tape had been modified to remove superfluous communications  In fact, that issue was fully fleshed out during the defense's examination of the witness and Mr  Martinez's cross-examination  Furthermore,

Craig D  Henley, Esq
April 8, 2016
Page 37

Ms  Kingsley never presented false testimony, either of her own volition or in response to
Mr  Martinez's questions   As evidenced by her testimony, Ms  Kingsley did not understand
defense counsel's meaning in regard to the phrase "real time "  Finally, the unaltered
version of communications between Ms  Kingsley and Lieutenant Shuhandler was available
to defense counsel   Unedited Recording of communications between Ms  Kingsley and
officers on Dispatch Channel 1 **(Ex "43")**, Unedited Recording of communication between
Ms  Kingsley and officers on Dispatch Channel 2 **(Ex "44")**   At no point during the
proceedings did the defense seek to introduce that version

        The same allegations were raised to the trial court in a motion for relief from
judgment   *See* Motion to Vacate Judgment Pursuant to Rule 24 2, and Exhibits A through F,
November 1, 2010 **(Ex "45")**   With regard to the allegation that Ms  Kingsley knowingly
provided false testimony, the Court summarily noted that "there is absolutely no evidence
that the dispatcher knew of any error – that she committed perjury "  *See* Minute Entry,
November 17, 2010 **(Ex "46")**   In a footnote, the Court went on to admonish defense
counsel for making such an outlandish claim, finding that the allegations, based exclusively
on counsel's observations, were, without more, reckless   *Id*  at 2 n 1  The Court further
found that vacating the judgment was not necessary because, in any event, the evidence
was itself not relevant to the crimes for which the defendant was found guilty   *Id*  at 2
Finally, the Court noted that any issue relating to whether the recording was "real time" was
clarified in defense counsel's additional questioning when Ms  Kingsley was recalled   *Id*

        For all of the aforementioned reasons, the allegations of misconduct in this case are
without merit   The Bar should accordingly dismiss the claim

### Clemency Hearings

#### *Factual Background*

        Mr  Martinez presented arguments to the Arizona Board of Executive Clemency (the
"Board") during two hearings regarding possible commutation of death sentences

        First, in 2010, Mr  Martinez represented the State's interest in the clemency hearing
for Jeffery Landrigan, who had been convicted of murder and sentenced to death
Landrigan Clemency Hearing Video **(Ex "47")**   During that hearing, Landrigan's attorneys
presented a series of arguments in support of commutation of his sentence, focusing
primarily on his difficult upbringing and contention that he had a genetic predisposition to
commit violent crimes   In testimony at the hearing, former Maricopa County Superior Court
Judge Cheryl Hendrix opined that, if she had been made aware of the mitigation evidence
that was currently before the Board, she likely would not have sentenced Landrigan to
death in the original trial   Mr  Martinez responded to these arguments by noting that there
were no tangible records corroborating the contentions pertaining to Landrigan's upbringing
Mr  Martinez characterized Judge Hendrix as an advocate, noting that she, just like him, was
urging the Board to adopt a particular position   The Board voted to deny Landrigan's
request for commutation, and he was later executed

        Second, in 2012, Mr  Martinez represented the State's interests at a clemency
hearing for Robert Towery, who had been convicted of murder and sentenced to death
Towery Clemency Hearing Video **(Ex "48")**   Towery's counsel argued that commutation
was appropriate because Towery had been severely abused as a child   In his response, Mr
Martinez argued there had been insufficient evidence substantiating Towery's claim that he

Craig D Henley, Esq
April 8, 2016
Page 38

was abused   He recounted the manner in which Towery killed his victim, drawing particular attention to the cruel and degrading manner in which the victim was treated prior to his eventual death   After considering arguments from both sides, the Board voted to deny Towery's request for commutation, and he was executed a short time later

### AACJ Allegations

The Bar Charge levels a series of misleading and factually inaccurate allegations of misconduct regarding each of the clemency hearings   With regard to the Landrigan hearing, the Charge focuses on Mr  Martinez's characterization of the evidence presented and the nature of the defense   In particular, the Charge claims that Mr  Martinez improperly commented that there was "no police report" indicating that Landrigan's mother had been raped by his father   The most "egregious" conduct, according to the Charge, is that Mr  Martinez characterized the defense's renewed interest in the case as a "wringing of hands and gnashing of teeth "  The Charge also focuses on Mr  Martinez's characterization of Judge Hendrix as an advocate for Landrigan and his suggestion that she may have received some kind of remuneration for her services at the hearing  Finally, the Charge claims that Mr  Martinez attempted to mislead the Board regarding its authority

With regard to the Lowery hearing, the Charge again focuses on Mr  Martinez's characterization of the defense's evidence and his argument against commutation   In particular, the allegations center on Mr  Martinez's descriptions of the underlying crime, asserting that he improperly appealed to the passions and fears of the Board by describing the circumstances of the victim's death and asking how the Board would feel if put in that position   The allegations also fault Mr  Martinez for emphasizing a lack of substantiating evidence that Lowery had been the victim of physical or other abuse as a child   The Charge suggests that, by making this argument, Mr  Martinez needlessly forced Towery's sisters to testify before the Board   Finally, the Charge asserts that Mr  Martinez improperly stated the law with regard to the Board's authority

In regard to both clemency hearings, the Charge fails to allege which Ethical Rules were violated   Instead, the allegations rest on amorphous contentions of improper conduct

### Applicable Ethical Rules

**ER 8 4(d)** (barring an attorney from engaging in conduct that is prejudicial to the administration of justice)

#### Special Considerations for Proceedings in Clemency Hearings

Because the allegations of misconduct here arise from proceedings in clemency hearings, the ethical considerations are distinct from the allegations related to criminal trials   Indeed, the Arizona Board of Executive Clemency is not a "tribunal" as defined under ER 1 0(m)   That rule defines the term "tribunal" as "a court, an arbitrator in an arbitration proceeding or a legislative body, administrative agency or other body acting in an adjudicative capacity "  In order to constitute a "tribunal," the particular body must "render a legal judgment directly affecting a party's interests in a particular matter "  The Board does not meet this definition   Rather, the Board performs its function only after a case has been fully litigated at the trial and appellate levels and has proceeded through all post-conviction relief available   The Board does not render a legal judgment   It has authority to make a non-binding recommendation to the Governor for a reduced sentence   For this

Craig D  Henley, Esq
April 8, 2016
Page 39

reason, the Ethical Rules that govern an attorney's conduct before a tribunal, *see* ER 3 3, 3 4, 3 5, and 3 9, do not apply in this context

This point is further clarified by the Ninth Circuit's apt statement that a "clemency hearing is far removed from the original judicial proceeding, and is granted only as a matter of executive grace " *Woratzeck v  Ariz  Bd  of Exec  Clemency*, 117 F 3d 400, 403–04 (9th Cir  1997)  The court in *Woratzeck* went even further, holding that because Arizona's Executive Clemency Board statutes "place no substantive limitation on official discretion, [they] create no liberty interest entitled to protection under the Due Process Clause" of the United States Constitution  *Id*   And, given those legal confines, the court found that conduct that otherwise may be inappropriate – *i e*, possible conflicts of interest – may be excused so long as the defendant has the opportunity to present his or her case to the Board

In addition, the Board operates under substantially different rules than those that apply in a formal trial  This fact is evidenced by the specific provisions of the Arizona Administrative Code (the "A.A.C.") governing the manner in which Board hearings are to proceed  In particular, A C C  § R5-4-102(B) states that "[u]nless otherwise provided by law, the Board shall conduct a hearing in an informal manner, without adherence to the rules of evidence required in a judicial proceeding "  Accordingly, evidentiary considerations that may apply in the formal tribunal context are not present with the same force in hearings before the Board

### Landrigan Hearing

With regard to the Landrigan hearing, there was nothing improper about Mr Martinez's comment that the defense had failed to present a police report indicating that Landrigan's mother had been raped   That statement was factually accurate, and the defense does not contend otherwise   As to Mr  Martinez's characterization of the defense's renewed interest in the case as being a "wringing of hands and gnashing of teeth," this statement would have been appropriate even in the context of a criminal trial   This statement was proper argument and did not unfairly comment on any evidence

With respect to Mr  Martinez's discussion of Judge Hendrix, proceedings before the Board inherently involve advocacy – *i e*, those who desire commutation and those who oppose it   By appearing at the hearing and recommending that the sentence be commuted, Judge Hendrix was unquestionably an "advocate "  Mr  Martinez's statements that she was there in that capacity were objectively true and proper   The statement suggesting that Judge Hendrix may have been remunerated for her services was not improper   In fact, Mr Martinez prefaced the statement with he "would venture to say" that she "perhaps" received some compensation for her services   Mr  Martinez was not prohibited from speculating as to Judge Hendrix's potential bias

Finally, regarding Mr  Martinez's statements about the Board's legal authority, these issues were broached only as a cautionary matter, not with the intent to misstate the law to the Board   Mr  Martinez's argument was couched in the following terms

> I'm not sure, but it would seem to me, that if you do commute his sentence, as they're asking you to do, you would be commuting it to life with the possibility of parole

Craig D Henley, Esq
April 8, 2016
Page 40

Ex "47," at 11 41  Explicit in this argument was Mr Martinez's uncertainty regarding the Board's authority  Thus, contrary to the position taken by the AACJ, Mr Martinez did not affirmatively represent to the Board that they were categorically prohibited from commuting the sentence  Rather, he made that statement only to clarify that the Board's authority *may* be limited, leaving the issue squarely in its purview  After the Board addressed this issue, it correctly determined that it did have the authority to commute the sentence to life without the possibility of parole

        For these reasons, nothing about Mr Martinez's conduct during Landrigan's clemency hearing can properly be viewed as misconduct

### Towery Hearing

        In the context of the Towery hearing, the Charge claims that Mr Martinez engaged in misconduct by improperly characterizing the evidence, misleading the Board regarding its legal authority, and improperly appealing to the Board's fears and passions  First, Mr Martinez's comments about the lack of evidence were appropriate  The defense's arguments were premised on a series of allegations relating to Towery's supposedly cruel upbringing, but the specific contentions were not all sufficiently corroborated during the hearing  Accordingly, Mr Martinez was permitted to point out the lack of substantiation  His comment that the defense's reliance on Towery's past was an attempt to "shake the sympathy tree" was also a permissible commentary on the defense's strategy of painting Towery as a victim

        Regarding the contention that Mr Martinez intentionally misstated the law to the Board, the actual exchange on this topic reflects the contrary  As he mentioned in the Landrigan hearing, he merely pointed out that, when Towery was convicted, the sentence of life without the possibility of parole did not exist  Accordingly, there was a question in his mind as to whether the Board could recommend commutation of a sentence to a punishment that would not have been available at the time of the original conviction  The portion of this exchange cited in the Charge illustrates this point, because Mr Martinez agrees with the Board's position and specifically notes the prior discussion in the Landrigan hearing  Nothing about this exchange indicates a knowing misstatement to the Board regarding the law  Instead, Mr Martinez attempted to clarify an issue to ensure that the Board's decision – regardless of the outcome – was legally supportable

        Finally, the claim that Mr Martinez improperly appealed to the Board's fears and passions misapprehends the nature of the applicable standards  As discussed above, because the proceedings before the Board are not adjudicative in nature and because they are governed by separate rules, the standards that may apply in a criminal proceeding do not apply there  The prohibition against appealing to the fears and passions is limited to the context of a jury trial  *See State v Comer*, 165 Ariz 413, 436–27, 799 P 2d 333, 346–47(1990) (stating that during closing argument, counsel may not "make arguments which appeal to the passions and fears of the jury")  No similar prohibition exists in the context of a clemency hearing  Accordingly, whether these statements would have been improper if made to a jury is irrelevant

### State v Arias

        *Arias* was a highly publicized capital case involving the June 4, 2008 murder of Travis Alexander  His body was discovered days later in a shower at his home, with approximately

Craig D  Henley, Esq
April 8, 2016
Page 41

29 stab wounds, a slit throat, and a gunshot wound to the head   Mr  Martinez was the
prosecutor assigned to the case   The guilt phase trial began in December 2012   In May
2013, the jury found Arias guilty of first-degree premeditated murder   The same jury later
found that Arias qualified for the death sentence because the murder was especially cruel
See A R S  13-751(F)(6)   She was sentenced to natural life on April 13, 2015, after two
juries failed to reach a unanimous verdict on the death penalty

### Factual Background and AACJ Allegations

The AACJ alleges that Mr  Martinez committed multiple violations of the Ethical Rules
at various stages of the Arias trial proceedings

#### Alleged Obstruction of Access to Arias's Hard Drive

The AACJ alleges that, during pretrial discovery, Mr  Martinez obstructed the
defense's access to "exculpatory evidence" on Arias's hard drive   This allegation is
meritless   Police seized the hard drive at issue from Arias's home on July 15, 2008   In
March 2009, the Mesa Police Department learned that they could not view the contents of
the hard drive due to a malfunction with the drive   (It shut off immediately after being
powered on )  Mr  Martinez promptly disclosed to the defense both the existence of the hard
drive and Mesa PD's report of the problem with the hard drive   Neither the State nor Arias
took any further action with respect to the hard drive for more than three years

On May 16, 2012, Arias filed a motion seeking to conduct independent testing of the
hard drive at her cost   Motion for Independent Testing of Computer Evidence **(Ex  "49")**
The Court granted the motion without objection two days later and ordered Mr  Martinez to
deliver the hard drive to defense counsel no later than June 1, 2012   Minute Entry, May 18,
2012 **(Ex  "50")**  During the ensuing two-week period, Mesa PD sent the hard drive to a
Texas based company, TLSI Inc , for analysis to determine whether the contents of the
hard drive could be retrieved   TLSI confirmed that it could image three of the four platter
surfaces of the hard drive, but it did not make a mirror image of any portion of the hard
drive before returning it to Mesa PD in time for Mr  Martinez to comply with the Court's
order  Arias Tr , July 12, 2012, at 7 7-17, 9 8-25 **(Ex  "51")**

Mr  Martinez released the hard drive to defense counsel on May 31, 2012   Defense
counsel returned it less than a week later without conducting any testing or analysis
Defense counsel subsequently maintained that Arias had opted to forgo (or at least delay)
the contemplated independent testing based on alleged statements made by Detective
Flores of the Mesa PD when the defense investigator had picked up the hard drive   Defense
counsel claimed that Detective Flores had said that Mesa PD had sent the hard drive to TLSI
for testing and analysis and that TLSI had "made a mirror image of three of the four
sections" of the hard drive   Ex  "51," Arias Tr , July 12, 2012, at 7 18-9 6

Based on defense counsel's stated belief that TLSI had made a mirror image of the
hard drive, Arias then filed two motions seeking to obtain the results of TLSI's testing and
analysis, including the believed-to-exist mirror image   At a hearing held on July 12, 2012,
Mr  Martinez explained to the Court and defense counsel that defense counsel was mistaken
and that no mirror image had been made

MR  MARTINEZ   Again, [defense counsel's] mistaken [in] what he's
talking about quite frankly   The item was sent[] over to an outfit in Texas

Craig D  Henley, Esq
April 8, 2016
Page 42

and they were working on it   They began work on three of the images   They
hadn't begun work on the fourth image   But they hadn't been able to make a
mirror image of any of it

So rather than create a problem, they returned the item back to us
before they created anything for us to turn over   I don't have anything to
turn over   I've spoken to Detective Flores   There's nothing to turn over   It
may be that there was some conversation about the work on the first three
images   I don't deny that may have happened   But there are no image[s] to
turn over right now

Ex  "51," Arias Tr , July 12, 2012, at 9  8-20   Mr  Martinez further assured the Court that,
once he received a mirror image or test results from TLSI, he would disclose that material
to the defense  Id  at 9  21-22

On June 26, 2012, Mesa PD sent the hard drive back to TLSI to be imaged to the
extent possible   On August 2, 2012, Mr  Martinez filed a document with the Court, notifying
the Court and counsel of the status of the testing with TLSI   Notice Regarding Testing of
Computer Hard Drive **(Ex  "52")**   At a hearing held that same day, Mr  Martinez responded
to defense counsel's renewed contention that the State was withholding evidence retrieved
off the hard drive   His explanation of the source of defense counsel's mistaken belief was
consistent with his July 12, 2012 comments

[MR  MARTINEZ ]  [I]f we take a look at the history of this, the Court ordered
that the State turn that hard drive over to the defense for their inspection
And there was a two week period   During that two week period the city of
Mesa attempted to get the information from it   They weren't able to do it
because they had to send it to Texas and then get it back so that information
could be turned over to everybody

We made sure that the hard drive was available so we could turn it
over to them even though they weren't able to get the information because I
didn't want to run afoul of any Court order   We turned it over to them
Apparently they had a conversation with a detective   They claim the
detective was lying

Well, it's a thing where perhaps the investigator didn't understand
what he was saying   I don't want to get involved in that   All I know we
complied with the Court order and turned it over   They then made a decision
to give it back to us   I then spoke to the detective about it   And said, well,
then they don't want to test it, let's go ahead and test it ourselves

Arias Tr , August 2, 2012, at 6  11-7  7 **(Ex  "53")**

On September 27, 2012, TLSI returned the hard drive to Mesa PD, but without
providing a mirror image of the hard drive or any written report or analysis, and despite
indicating in previous communications that it had successfully imaged three of the four
platter surfaces of the hard drive   Notice Regarding Return of Computer Hard Drive **(Ex
"54")**, see also Objection to Defendant's Renewed Motion to Compel **(Ex  "55")**   Defense
counsel did not believe that Mesa PD had not received a mirror image of the hard drive and
again sought to compel production of the mirror image  See Defendant's Renewed Motion

Craig D  Henley, Esq
April 8, 2016
Page 43

to Compel **(Ex  "56")**  Mr Martinez again explained that he could not produce what he did not have, and he provided defense counsel with TLSI's contact information so defense counsel could deal directly with TLSI regarding the issue  Ex  "55," Objection to Defendant's Renewed Motion to Compel, Notice Regarding Contact with TLSI **(Ex  "57")**  On October 18, 2012, after discussing the status of the hard drive with counsel, the Court entered an order compelling TLSI to provide a complete copy of its work on the hard drive to Mr Martinez and defense counsel by October 23, 2012  Minute Entry, October 18, 2012 **(Ex  "58")**

Notwithstanding the Court's order, TLSI failed to comply with the imposed deadline  Consequently, Mr  Martinez did not receive the mirror image of the hard drive from TLSI until October 31, 2012  The next day, he notified defense counsel of its receipt and informed them that the State would provide a copy of the mirror image to the defense once the State received a blank terabyte hard drive from defense counsel to make the copy  Notice Regarding Receipt of Mirror Image **(Ex  "59")**  On Friday, November 2, 2012, at approximately 3 59 p m , defense counsel provided the State with the requested blank hard drive  Shortly thereafter, Mr  Martinez notified defense counsel by telephone that a copy of the mirror image would be available for pick up by 5 30 p m  that same day  Notice of Disclosure of Mirror Image **(Ex  "60")**  Defense counsel did not pick up the copy until Monday, November 5, 2012  On November 14, 2012, Mr  Martinez disclosed Mesa Police Department's report of its review of the mirror image of the hard drive  Objection to Defendant's Motion to Compel **(Ex  "61")**

Thus, the defense was aware of the hard drive and Mesa PD's inability to access its contents for more than three years before deciding to conduct any testing or analysis of its own  Then, after receiving the actual hard drive less than two weeks later, the defense chose not to conduct any testing or analysis, based on their apparent misunderstanding of the status of the State's testing  Mr  Martinez—who had no part in the events that led to that apparent misunderstanding—clarified the facts and corrected the misunderstanding no later than July 12, 2012  At that point, the defense chose to permit Mesa PD to continue to pursue a mirror image from TLSI, rather than seeking its own analysis of the hard drive  Mr  Martinez disclosed the mirror image he received from TLSI within a day of its receipt  Mr  Martinez did not obstruct the defense's access to the contents of the hard drive

At no point did Mr  Martinez misrepresent to the Court or anyone else any fact concerning the hard drive  This allegation stems from the defense s attempt to transform their misunderstanding into a basis for obtaining various forms of relief, including dismissal of the case, dismissal of the notice of intent to seek the death penalty, and a trial continuance  See Defendant's Renewed Motion to Dismiss (without exhibits) **(Ex "62")**, Defendant's Motion to Continue Trial (without exhibits) **(Ex "63")**  Rather than accept Mr Martinez's representations concerning the status of the hard drive as true, the defense maintained an unfounded belief that Mr  Martinez willfully withheld a mirror image of the hard drive that had been in Mesa PD's possession since May 2012, and then the defense attempted to manufacture inconsistent statements to support that theory [4]  For example, in

---

[4] The AACJ's claim that Mr  Martinez never delivered the actual hard drive to the defense is false  Not even the Arias defense team disputed that they received the actual hard drive in response to their May 2012 motion to compel

[MS  WILMOTT ]  [T]here s this whole issue with the hard drive that we filed a Motion to Compel  It was given to us

Craig D Henley, Esq
April 8, 2016
Page 44

Defendant's Renewed Motion to Dismiss, the defense contended that the State "changed its story" when Mr Martinez represented that TLSI had returned the hard drive without a mirror image on September 27, 2012   Ex "62," at 6   The State had never said otherwise   By email on September 13, 2012, Detective Flores had merely informed defense counsel that TLSI "said they imaged data" and "said they were going to ship the drive back to us tomorrow or Monday by the latest "  *See Id* at 5   Mesa PD, like defense counsel, expected TLSI to ship the mirror image with the hard drive, but that did not happen   There was no misrepresentation

### *Alleged Elicitation of False Testimony Concerning Alexander's Computer*

The AACJ alleges that Mr Martinez falsely elicited testimony from Detective Melendez during the penalty phase retrial that the victim's computer contained no evidence of pornography   This allegation is also meritless   Whether Alexander's computer contained evidence of pornography was a disputed factual issue at trial   Detective Melendez testified that he examined the computer and found none   Minute Entry, January 14, 2015, at 13 **(Ex "64")**   Lonnie Dworkin, one of the ***defense's*** expert witnesses, stated that he examined the computer and found "some pornography," but he then admitted that he had no present knowledge of that fact and would stand by his prior statement, made during an interview with the prosecution, that "there was no pornography "  *Id* , Arias Tr , February 4, 2013, at 54 17-55 3 **(Ex "65")**   Another defense expert, John Smith, testified that he examined the computer and found pornography links on data sites   Ex "64," Minute Entry, January 14, 2015, at 13   As the trial court correctly ruled in rejecting the defense's claim of prosecutorial conduct on this issue

> Detective Melendez was subject to cross-examination at all proceedings at which he testified and can be recalled by the defense at the penalty phase retrial   Defendant could have called witnesses to dispute his findings at the guilt phase trial   The defendant presented evidence to the penalty phase retrial jury on this issue   It is the role of the jury to resolve any factual disputes, evaluate the credibility of witnesses and determine the significance of the evidence   The Court finds no ground for dismissal of the indictment or the Notice of Intent to Seek the Death Penalty based upon this claim

*Id*

Mr Martinez did not elicit false testimony from Detective Melendez

### *Alleged Misrepresentation of Cause of Data Loss from Alexander's Computer*

> At the time that our investigator picked it up Mr Martinez's detective, Detective Flores[,] advised our investigator that they had evidence that was retrieved off that hard drive   We therefore made the decision to give it back and wait for their evidence to come

Ex "53," Arias Tr , August 2, 2012, at 4 19-25   In fact, Mr Martinez released the actual hard drive to the defense not once, but twice   *See* Notice Regarding Release of Computer Hard Drive **(Ex "66")**

Craig D Henley, Esq
April 8, 2016
Page 45

The AACJ alleges that Mr Martinez falsely accused one of Arias's defense attorneys of causing the loss of data on the victim's computer  This allegation was the subject of separate bar charges that were consolidated in State Bar File No  15-1002, filed by defense attorney, Maria Schaffer, and her boss at the Maricopa County Office of the Legal Defender, Marty Lieberman  The State Bar found that the statements at issue "were not inaccurate" and dismissed the charges  Letter of Dismissal **(Ex "67")**  After the complainants appealed that decision, the Attorney Discipline Probable Cause Committee found, by a unanimous vote, "that the State Bar did not abuse its discretion in dismissing the charge " Order Affirming Dismissal **(Ex "68")**

The AACJ has offered no new evidence or argument suggesting that the conclusions of the State Bar and Attorney Discipline Probable Cause Committee were erroneous

*Alleged Elicitation of False Testimony Concerning Sequence of Victim's Injuries*

The AACJ alleges that, during a pretrial *Chronis* hearing,[5] Mr Martinez misrepresented the testimony of the medical examiner  There is no merit to this allegation

At the *Chronis* hearing, on August 7, 2009, Mr Martinez questioned Detective Flores about, among other things, the sequence of the Travis Alexander's injuries  Detective Flores testified to his understanding of what the medical examiner had told him concerning that issue [6]  Specifically, Detective Flores testified that the medical examiner had indicated that, of the three major injuries, the gunshot wound to the head came first, followed by the stab wound to the chest, followed by the slit throat  Arias Tr , August 7, 2009, at 25 8-17, 31 9-12 **(Ex "69")**  Subsequently, during a defense interview held in June 2011, the medical examiner related a different sequence of injuries, stating that he believed the stab wound to the chest came first, followed by the slit throat, followed by the gunshot wound to the head  Interview of Dr Kevin Horn, at 16 **(Ex "70")**  At trial, Detective Flores was cross-examined on the discrepancy between his testimony and the medical examiner's subsequent statements  Detective Flores testified that his testimony at the *Chronis* hearing was the result of an innocent misunderstanding

> Q  Did you make any attempt to correct the mistaken testimony you gave in 2009?
>
> A  No  Because I told the truth and spoke to what I believed at that time  I'm not about to change my testimony
>
> Q  But it was inaccurate?
>
> A  It was not inaccurate, it was mistaken
>
> Q  Mistaken?

---

[5] The purpose of a *Chronis* hearing is to determine whether the State can establish probable cause for believing the State will be able to meet its burden of proving the alleged aggravating circumstances in support of the State s noticed intent to seek the death penalty  *See generally Chronis v Steinle*, 220 Ariz  559, 208 P 3d 210 (2009)

[6] Hearsay is admissible at a *Chronis* hearing  *Chronis*, 220 Ariz  at 562-63, 208 P 3d at 213-14

Craig D  Henley, Esq
April 8, 2016
Page 46

> A  That's my mistake   If I mistook his words or misunderstood him,
> I'm not a doctor   And I'm not about to give testimony on explaining the
> doctor –

> Q  And so what you're telling us today is that you substituted your
> judgment for his   Is that what I'm hearing you say?

> A  No   If I gave that testimony, it was a misunderstanding of what
> Dr  Horn told me

Arias Tr , January 10, 2013, at 58 25-59 10, 60 5-9 **(Ex  "71")**

Mr  Martinez had no reason to doubt the accuracy of Detective Flores's testimony at
the *Chronis* hearing   Mr  Martinez was not present for Detective Flores's conversations with
the medical examiner, and Detective Flores's testimony was consistent with the
documentation available at the time, specifically the medical examiner's July 15, 2008
autopsy report **(Ex  "72")** and Detective Flores's August 28, 2012 report of his
observations of the autopsy **(Ex  "73")**, both of which are silent concerning the sequence of
the injuries  Ex "71," Arias Tr , January 10, 2013, at 67 15-69 13, Arias Tr , January 8,
2013, at 96 23-97 12 **(Ex  "74")**

Moreover, this identical issue was the subject of argument and briefing before the
trial court   With thoughtful analysis, the trial court rejected the contention that Mr
Martinez had engaged in misconduct by eliciting Detective Flores's testimony at the *Chronis*
hearing

> During the guilt phase, the defendant cross-examined both Detective Flores
> and the medical examiner about the sequence of wounds and the detective's
> testimony at the probable cause hearing in August 2009   During the penalty
> phase retrial, the defendant examined both Detective Flores and the medical
> examiner about these issues   Detective Flores has testified and explained to
> both juries the reasons for his testimony in August 2009   The medical
> examiner has testified regarding his expert opinion on the sequence of
> wounds   It is for the jury to determine the credibility of witnesses   The
> defendant fully explored and argued her position on the sequence of wounds
> The Court finds the defendant has failed to show any State misconduct with
> regard to Detective Flores's testimony

Ex  "64," Minute Entry, January 14, 2015, at 5

*Alleged Unprofessional Conduct toward Defense Counsel*

The AACJ alleges that comments made by Mr  Martinez during two bench
conferences were unethical   This allegation is based entirely on sealed information that,
pursuant to court order, should not have been revealed to the AACJ [7]

---

[7] One can only imagine what the AACJ would have alleged if Mr  Martinez had included such
information in his book, which he did not do

Craig D  Henley, Esq
April 8, 2016
Page 47

        The comments did not violate the Ethical Rules   The trial judge, who was present for
the comments and in the best position to evaluate Mr  Martinez's tone and body language
when he made them, rejected the defense's claim of prosecutorial misconduct based on the
comments   In doing so, the judge stated

        During the trial, the Court addressed this matter with counsel   The
        prosecutor apologized to Defense Counsel   The prosecutor was quick to
        acknowledge his error and regret   Nothing inappropriate was said before the
        jury and there is no basis to find the prosecutor's comments affected the guilt
        phase verdict   The Court found no other sanction was appropriate under the
        circumstances

Ex  "64," Minute Entry, January 14, 2015, at 14

### Disclosure of Sealed Witness's Name

        The AACJ alleges that Mr  Martinez intentionally disclosed the identity of a sealed
witness in open court   This allegation was the subject of a separate bar charge filed by the
affected witness in State Bar File No  15-0957   The State Bar agreed with the trial court's
determination that Mr  Martinez's disclosure was inadvertent and dismissed the charge
Letter of Dismissal **(Ex  "75")**   After the complainant appealed that decision, the Attorney
Discipline Probable Cause Committee found, by a unanimous vote, "that the State Bar did
not abuse its discretion in dismissing the charge  " Order Affirming Dismissal **(Ex  "76")**

        The AACJ has offered no new evidence or argument suggesting that the conclusions
of the State Bar and Attorney Discipline Probable Cause Committee were erroneous

### Alleged Harassment of Defense Expert Samuels

        The AACJ alleges that Mr  Martinez improperly accused defense expert Dr  Richard
Samuels of having "a sexual or romantic interest" in Arias   This allegation has no merit
Dr  Samuels is a psychologist   At trial, he testified to certain opinions about Arias that he
said were based on an independent psychological evaluation of her, not a treatment
relationship with her   The distinction mattered  the defense was presenting Dr  Samuels as
an independent, objective witness rather than a treating psychologist with loyalties to Arias

        During Dr  Samuels' cross-examination, Mr  Martinez attacked his credibility by,
among other things, engaging in a line of questioning that demonstrated that Dr  Samuels
had bought Arias a gift because he wanted to help her and, therefore, had lost some, if not
all, of his independence and objectivity in his evaluation of her   *See generally* Arias Tr ,
March 18, 2013, at 114 20-132 15 **(Ex  "77")**   In fact, in response to Mr  Martinez's
questioning, Dr  Samuels ultimately (and reluctantly) admitted that he gave Arias a self-
help book, paid for with his own money, which created the appearance that he was trying to
help her instead of remaining independent and objective

                Q   So you had this what appears to be a relationship with this
        individual that you feel is appropriate that you buy her at least one gift,
        correct?

                A   I bought her a self-help book

Craig D  Henley, Esq
April 8, 2016
Page 48

Q  You bought her a book which is a gift, correct?

A  Well, I don't characterize it that way, but you may

Q  Well, no, I'm asking – you talked about this, you paid for it, right?

A  Yes

Q  You never got it back, right?

A  Right

Q  And it is for the purpose that you believe was to help the defendant, right?

A  Yes

Q  And when you gave her this book, your expectation was that she would get better from whatever problem you perceived, right?

A  My expectation was that she would read the book

Q  Right  And the reason you wanted her to read the book was so that she could address in a meaningful fashion whatever issues you saw?

A  Yes

Q  And that's to help her, right?

A  Yes

Q  And that is the problem  That creates an issue of your objectivity in this case, doesn't it?

A  I didn't think so

Q  I know you didn't think so  But on the one hand you can see that you are helping her to get better and on the other hand, you have to be impartial, right?

A  Yes

Q  And that creates an ethical dilemma for you, didn't it?

A  Well, it didn't at the time  And it's something I tended to routinely do  So I didn't [see] it as an ethical dilemma

Craig D Henley, Esq
April 8, 2016
Page 49

      Q  You didn't see it as a[n] ethical dilemma, but you can see that there's an appearance here that you're trying to help her, right?

      A  Yes   From your perspective, yes

      Q  Isn't it true that from whatever perspective it's taken, you are helping the defendant?

      A  Yes   By providing her with the book, yes

Ex "77," Arias Tr , March 18, 2013, at 128 25-131 14

At no time during the cross-examination did Mr Martinez say or imply that Dr Samuels had a sexual or romantic interest in Arias  The AACJ reads the words "like" and "relationship" out of context and attempts to infuse the words with a meaning that Mr Martinez never intended  Read in its actual context (as it must be), the point of Mr Martinez's questioning is clear—Dr Samuels felt enough interest in Arias on some level that he was willing to sacrifice his independence and objectivity by buying her a gift and trying to help her  There was nothing wrong with this line of questioning  It was a proper and effective attack on Dr Samuels' credibility  As the trial court stated in rejecting a claim of prosecutorial misconduct based on this conduct

> A party is entitled to explore the bias, credibility and motive of witnesses  The prosecutor zealously cross-examined the defense expert on these matters  Defense counsel questioned the witness about these issues on re-direct examination  The Court finds no basis to conclude there was prosecutorial misconduct

Ex "64," Minute Entry, January 14, 2015, at 14

--- --- --- --- --- --- --- --- --- --- --- --- --- ---
### Alleged Harassment of Defense Expert Geffner

The AACJ's alleges that Mr Martinez "had no basis for" accusing Dr Robert Geffner, a defense expert, of manipulating Arias's psychological test results  During cross-examination, even Dr Geffner admitted that he ' corrected" certain wording on an answer sheet almost a year after the test results were in  Arias Tr , January 26, 2015, at 28 7-29 14, 30 19-35 4 **(Ex "78")**  Arias's defense team tried to prevent Mr Martinez from pursuing this line of inquiry  See, e g , id  at 23 9-24 5, 122 8-126 13  The Court, which was in the best position to evaluate the basis for, and relevance of, Mr Martinez's questions, permitted him to proceed  The AACJ allegation, therefore, is meritless

### Alleged "Ousting" of Juror 17[8]



---

[8] Exhibits 79 83 are subject to a contemporaneously filed Motion for Protective Order

Craig D  Henley, Esq
April 8, 2016
Page 50



Craig D  Henley, Esq
April 8, 2016
Page 51



### *Applicable Ethical Rules*

**ER 3 3(a) (Knowingly Make False Statement of Fact), ER 8 4(c) (Conduct Involving Dishonesty)**  Mr  Martinez did not knowingly make a false statement of fact or engage in any conduct involving dishonesty

**ER 3 4(c) (Knowingly Disobey Court Rule), ER 3 4(e) (Allude to Matter Not Reasonably Believed to be Relevant)**  Mr  Martinez did not knowingly disobey any court rule or allude to any matter that he did not reasonably believe to be relevant  He complied with his disclosure obligations, presented relevant evidence through the State's witnesses, and zealously and properly cross-examined the defense's witnesses

**ER 3 6(a) (Extrajudicial Statements)**  Mr  Martinez did not make any extrajudicial statements, much less one that he knew or reasonably should have known would be disseminated by means of public communication and would have a substantial likelihood of materially prejudicing the proceeding

**ER 3 8(d) (Disclosure of Exculpatory Evidence)**  Mr  Martinez timely disclosed all exculpatory evidence

**ER 4 4(a) (Use Means with No Substantial Purpose Other than to Embarrass, Delay, or Burden)**  Mr  Martinez did not engage in any conduct with no substantial purpose other than to embarrass, delay, or burden another person

**ER 8 4(d) (Conduct Prejudicial to Administration of Justice), Rule 41(g), Ariz  R Sup  Ct  (Unprofessional Conduct)**  Mr  Martinez's conduct  was not unprofessional and did not result in any prejudice to the administration of justice

### CONCLUSION

For all of the public policy, factual and legal reasons discussed herein, we respectfully request that the State Bar dismiss the AACJ Charge for lack of probable cause

Very truly yours,

JENNINGS, STROUSS & SALMON, P L C

By

    J  Scott Rhodes

SR/mtl
Exhibits
cc    Juan M  Martinez, Esq
      Kerry A  Hodges, Esq
      Chase A  Bales, Esq

5246597v5(49286 53)

Craig D  Henley, Esq
April 8, 2016
Page 52

## <u>VERIFICATION</u>

I, Juan M Martinez, declare that I am over the age of 18 years of age and am competent to make this verification

I have reviewed the information contained in the foregoing Initial Response, and, to the extent of my personal knowledge, the information contained therein is true and correct except for those matters stated to be true upon information and belief, and as to those matters, I believe them to be true

I declare under penalty of perjury that the foregoing is true and correct

Executed this ___7___ day of April, 2016

Juan M  Martinez

# Exhibit B

**BEFORE THE PRESIDING DISCIPLINARY JUDGE
OF THE SUPREME COURT OF ARIZONA**

IN THE MATTER OF A MEMBER OF
THE STATE BAR OF ARIZONA,

JUAN M MARTINEZ,
  Bar No 009510

          Respondent

No  PO-2016-016

**SUPPLEMENTAL PROTECTIVE
ORDER**

State Bar File  15-3363

The Presiding Disciplinary Judge of the Supreme Court of Arizona having reviewed Respondent's Motion for Supplemental Protective Order and there being no objection by the State Bar, accordingly

**IT IS ORDERED** granting the Motion

**IT IS FURTHER ORDERED** sealing the sections of his Initial Response dated April 8, 2016, responding to the allegations about Sergeant Egea in *State v  Chrisman* (which occur on page 30) and the alleged ousting of Juror 17 in *State v  Arias* (which occurs on pages 49-51) from Complainants and the general public, pursuant to Rule 70(g), Ariz  R  Sup  Ct

Pre-complaint orders sealing material do not seal such material post-complaint if the material is sought to be used or referred to in subsequent pleadings or in any hearing In such circumstance, the parties are reminded a formal request for protective order with specificity must be filed with the material sought to be sealed and submitted for in-camera review

Sealed material shall be opened and viewed only by an order of the committee, the presiding disciplinary judge, a hearing panel, the board or the court for use by such body and the parties in pending proceedings, and otherwise only upon notice to and an opportunity to be heard by the parties and the witness or other person who is the subject of

the information   A party aggrieved by an order relating to a request for a protective order

may seek review by filing a petition for special action with the Arizona Supreme Court

      **DATED** this __ day of _____, 2016

_____
William O'Neil
Presiding Disciplinary Judge

Copy of the foregoing sent via e-mail and U S
mail this ___ day of _____, 2016, to

Craig D  Henley, Esq
Staff Bar Counsel
State Bar of Arizona
4201 North 24th Street, Suite 100
Phoenix, AZ  85016-6266
craig henley@staff azbar org

J  Scott Rhodes, Esq
Jennings, Strouss & Salmon, PLC
One East Washington Street
Suite 1900
Phoenix, AZ 85004-2554
Attorneys for Applicant
srhodes@jsslaw com

Lawyer Regulation Records Department
State Bar of Arizona
4201 North 24th Street, Suite 100
Phoenix, AZ  85016-6266

By _____

2

5427521v1(49286 53)



neopost
10/03/2016
US POSTAGE

FIRST-CLASS MAIL
$03 04⁰

ZIP 85004
041L11249083

# Jennings
# Strouss

J Scott Rhodes, Esq.
Jennings Strouss & Salmon P.L.C.
One East Washington Street
Suite 1900
Phoenix, Arizona 85004-2554

Craig D Henley, Esq      (ALSO TO RECORDS)
Staff Bar Counsel
State Bar of Arizona
4201 North 24th Street, Suite 100
Phoenix, AZ 85016-6266

# STATE BAR OF ARIZONA

Assistant s Direct Line   (602)340-7272

September 29, 2016

## PERSONAL AND CONFIDENTIAL

J  Scott Rhodes
Jennings Strouss & Salmon, PLC
One E  Washington Street, Suite 1900
Phoenix, AZ  85004-2554

Re  **File No**    15-3363
     **Complainant**  Kathleen Erin Brody
     **Your Client**   Juan M  Martinez

Dear Mr  Rhodes

This is to inform you that the Attorney Discipline Probable Cause Committee of the Supreme Court of Arizona has entered the enclosed Order of Admonition in connection with the above-referenced matter

An admonition is a sanction that is generally imposed in cases where the conduct is of a nature that does not necessitate formal disciplinary proceedings   Please refer to the Order for specific language of the admonition in this matter   The order may also contain additional terms such as probation or participation in remedial programs

Pursuant to Rule 55(c)(4)(B), Ariz  R  Sup  Ct , you have ten (10) days from the service of the enclosed Order in which to appeal and demand that formal proceedings be instituted   If you choose to so demand, the Order of Admonition will be vacated and proceedings will be instituted before the Presiding Disciplinary Judge pursuant to Rule 58, Ariz  R  Sup  Ct  Those procedures include the filing of a complaint, answer, discovery and a hearing on the merits   At the conclusion of the hearing, the hearing panel, consisting of the Presiding Disciplinary Judge, an attorney member and a public member, will impose a sanction for any violation proven at hearing   The recommended sanction after hearing may not be limited to admonition and may include reprimand, suspension or disbarment

Should your client decide to demand the institution of formal disciplinary proceedings and a finding of one or more violations is made, your client will be responsible for the costs of the formal proceedings  Enclosed for your review is a copy of the cost schedule adopted by the Supreme Court of Arizona, costs may be imposed in this matter pursuant to Rule 60, Ariz  R  Sup  Ct

Costs of discipline have been assessed in this order   Please forward payment in that amount by 30 days from date of this letter   An invoice has been included for your convenience

15-42974                      **Page 1 of 2**

Should you have any questions regarding this matter, please contact me at the number above

Sincerely,

Craig D. Henley
Senior Bar Counsel

CDH/kec

Enclosure



# STATE BAR OF ARIZONA

Assistant's Direct Line   (602) 340-7272

September 29, 2016

Kathleen Erin Brody
ACLU of Arizona
PO Box 17148
Phoenix, AZ  85011-0148

**Re   File No**        15-3363
      **Respondent**   Juan M  Martinez

Dear Ms  Brody

This is to inform you that your complaint has been resolved by the Attorney Discipline Probable Cause Committee of the Supreme Court of Arizona, pursuant to Rule 55(c), Ariz R  Sup  Ct

The Committee issued an Order of Admonition against Mr  Martinez, a copy of which is enclosed   The Order is a permanent part of the attorney's record with the State Bar

Mr  Martinez may reject the Order of Admonition and demand a formal hearing   I will let you know if that happens

Thank you for bringing this matter to our attention

Sincerely,

Craig D  Henley
Senior Bar Counsel

CDH/kec
Enclosure

4201 N. 24th Street   ·   Suite 100   ·   Phoenix, AZ 85016-6266
PH: 602.252.4804   ·   FAX: 602.271.4930   ·   WEBSITE: www.azbar.org

**FILED**

SEP 28 2016

BY  _A. Lebn_

**BEFORE THE ATTORNEY DISCIPLINE
PROBABLE CAUSE COMMITTEE
OF THE SUPREME COURT OF ARIZONA**

IN THE MATTER OF A MEMBER OF
THE STATE BAR OF ARIZONA,

JUAN M  MARTINEZ,
      Bar No  009510,

      Respondent

No  15-3363

**ORDER OF ADMONITION,
PROBATION, (CLE), AND COSTS**

The Attorney Discipline Probable Cause Committee of the Supreme Court of
Arizona ("Committee") reviewed this matter on September 9, 2016, pursuant to Rules
50 and 55, Ariz  R  Sup  Ct , for consideration of the State Bar's Report of
Investigation and Recommendation, Respondent's Response, and Complainant's
Response

By a vote of 6-1-2[1], the Committee finds probable cause exists that
Respondent violated the following Rules of the Supreme Court of Arizona

1  **Rule 41(g)** by engaging in unprofessional conduct

2  **Rule 42, ER 4 4** by using means that have no substantial purpose other than
to embarrass, delay, or burden any other person, or using methods of
obtaining evidence that violate the legal rights of such a person by, among
other things, improperly attacking the defendant

3  **Rule 42, ER 8 4(d)** by engaging in professional misconduct by engaging in
conduct that is prejudicial to the administration of justice

    **IT IS THEREFORE ORDERED** issuing an Order of Admonition for Respondent's
conduct pursuant to Rules 55(c)(1)(D) and 60(a)(4), Ariz  R  Sup  Ct

---

[1] Committee members Charles J  Muchmore and Karen E  Osborne did not participate in this
matter

**IT IS FURTHER ORDERED** that pursuant to Rules 55(c)(1)(D) and 60(a)(5), Ariz R Sup Ct , Respondent is placed on Probation under the following terms and conditions

(1) The probation period will begin at the time this Order is served upon Respondent, and will conclude one year from that date

(2) Respondent shall participate in and successfully complete the following program

> **CLE** In addition to annual MCLE requirements, Respondent shall complete an additional nine (9) hours of CLE on Professionalism within 90 days from the date of service of this Order    Respondent shall provide the State Bar Compliance Monitor with evidence of completion of the program(s) by providing a copy of handwritten notes   Respondent should contact the Compliance Monitor at (602) 340-7258 to make arrangements to submit this evidence Respondent will be responsible for the cost of the CLE

(3) Respondent shall commit no further violations of the Rules of Professional Conduct

(4) Respondent shall report, in writing, compliance with the terms of probation to the State Bar's Phoenix Office

(5) If Respondent fails to comply with any of the foregoing conditions and the State Bar receives information about non-compliance, bar counsel shall report material violations to the Presiding Disciplinary Judge, who may hold a hearing to determine if the terms of probation have been violated and to determine if an additional sanction should be imposed   In a probation

violation hearing, the State Bar must prove a violation by preponderance of the evidence

**IT IS FURTHER ORDERED,** pursuant to Rule 60(b), Ariz R Sup Ct , that Respondent shall pay the costs and expenses of these proceedings, as set forth in the attached Statement of Costs and Expenses, within thirty (30) days from the date of service of this Order

**PURSUANT** to Rules 60(a)(4) and 70(a)(2), Ariz R Sup Ct , this order will be entered in the Respondent's permanent record at the State Bar and is not confidential Pursuant to Rule 48(k)(3), Ariz R Sup Ct , it may be considered by the Attorney Discipline Probable Cause Committee, the Presiding Disciplinary Judge, a Hearing Panel, or the Supreme Court in recommending or imposing discipline in a subsequent disciplinary proceeding against Respondent

### NOTICE OF RIGHT

Parties may not file motions for reconsideration of this Order

**PURSUANT** to Rule 55(c)(4)(B), Ariz R Sup Ct , within ten (10) days of service of this Order, Respondent has the right to demand that a formal proceeding be instituted and issuance of an Order to Vacate this Order whereupon this order will be vacated and the matter disposed of in the same manner instituted before the Presiding Disciplinary Judge   This demand shall be filed with the Attorney Discipline Probable Cause Committee of the Supreme Court of Arizona, 1501 W Washington, Suite 104, Phoenix, AZ 85007-3231 with a copy to the State Bar of Arizona   The demand must comply with Rule 8(c), Ariz R App Proc

**DATED** this __27__ day of September, 2016

_Lawrence F. W_

Judge Lawrence F  Winthrop, Chair
Attorney Discipline Probable Cause Committee
of the Supreme Court of Arizona

Original filed this 28th day
of September, 2016, with

Lawyer Regulation Records Manager
State Bar of Arizona
4201 N  24th Street, Suite 100
Phoenix, Arizona 85016-6266

Copy mailed this 29th day
of September, 2016, to

J  Scott Rhodes
Jennings Strouss & Salmon, PLC
One E  Washington Street, Suite 1900
Phoenix, Arizona 85004-2554
Respondent's Counsel

Kathleen Erin Brody
ACLU of Arizona
P O  Box 17148
Phoenix, Arizona 85011-0148
Complainant

Copy emailed this 29th day
of September, 2016, to

Attorney Discipline Probable Cause Committee
of the Supreme Court of Arizona
1501 W  Washington Street, Suite 104
Phoenix, Arizona 85007
Email  ProbableCauseComm@courts az gov

Lawyer Regulation Records Manager
State Bar of Arizona
4201 N  24th Street, Suite 100
Phoenix, Arizona 85016-6266

Email  LRO@staff.azbar.org

Compliance Monitor
State Bar of Arizona
4201 N. 24th St., Suite 100
Phoenix, Arizona 85016

by _Karen E Caleagno_
        CDHI Rec

## Statement of Costs and Expenses

In the Matter of a Member of the State Bar of Arizona,
**JUAN M MARTINEZ**, Bar No 009510, Respondent

### File No 15-3363

### Administrative Expenses

The Supreme Court of Arizona has adopted a schedule of administrative expenses to be assessed in lawyer discipline If the number of charges/complainants exceeds five, the assessment for the general administrative expenses shall increase by 20% for each additional charge/complainant where a violation is admitted or proven

Factors considered in the administrative expense are time expended by staff bar counsel, paralegal, secretaries, typists, file clerks and messenger, and normal postage charges, telephone costs, office supplies and all similar factors generally attributed to office overhead   As a matter of course, administrative costs will increase based on the length of time it takes a matter to proceed through the adjudication process

*General Administrative Expenses*
*for above-numbered proceedings*                                **$  600 00**

Additional costs incurred by the State Bar of Arizona in the processing of this disciplinary matter, and not included in administrative expenses, are itemized below

### Staff Investigator/Miscellaneous Charges

Total for staff investigator charges                              $      0 00

**TOTAL COSTS AND EXPENSES INCURRED** _____   **$  600 00**



## STATE BAR OF ARIZONA

Assistant's Direct Line: (602) 340-7272

August 3, 2016

**PERSONAL AND CONFIDENTIAL**

J Scott Rhodes
Jennings Strouss & Salmon, PLC
One E Washington Street, Suite 1900
Phoenix, AZ 85004-2554

**Re    File No**        15-3363
**Complainant**  Kathleen Erin Brody
**Your Client**    Juan M Martinez

Dear Mr Rhodes

We have completed our investigation into the matter listed above    Attached is the investigative report that we intend to submit to the Attorney Discipline Probable Cause Committee for review    As you can see, we recommend an Order of Admonition with Probation    This report will be considered at the Committee's meeting on September 9, 2016

You have until **August 22, 2016** at **3 00 p m** , if you wish to submit a written statement of five pages or less summarizing your response to the charge to persuade the Committee that the recommended disposition is not warranted    Such a submittal will be sent to the Committee with the report of investigation    If you wish to submit such a statement, please mail or deliver it to my attention, but addressed to Members of the Attorney Discipline Probable Cause Committee    A letter format is satisfactory, and I must receive it by the date listed above    The Committee may not consider a submission of more than five pages

No extension of this time period can be made unless substantial good cause is shown in writing to me    Thank you for your cooperation

If the ADPCC imposes a sanction, you will also be charged costs pursuant to Rule 60(b), Ariz   R   Sup   Ct   The Court's schedule of costs can be found online at www azbar org/media/56131/administrative%20order%202011-17%20re%20costs pdf

Sincerely,

Craig D. Henley
Senior Bar Counsel

CDH/ts
Enclosure



STATE BAR
OF ARIZONA

Assistant's Direct Line  (602) 340-7272

August, 3, 2016

Kathleen Erin Brody
2929 N  Central Avenue, Suite 2100
Phoenix, AZ 85012-2765

**Re    File No**    15-3363
**Respondent** Juan M  Martinez

Dear Ms  Brody

We have completed our investigation into the matter listed above   After our investigation, we have decided to recommend to the Attorney Discipline Probable Cause Committee (the Committee) the following disposition of the matter  Order of Admonition with Probation

Please know that we conducted a thorough investigation in this matter which included   Bar Counsel reviewed the Complaint and attached documents along with the Response and volumes of documents, CDs and other related information as well as minute entries, pleadings, rulings and hearings in the Maricopa County Superior Court cases listed above

If you wish to object to the State Bar's recommendation, you may submit a written statement <u>not to exceed five pages</u> as the Committee may not consider any submission longer than five pages in length   Your objection statement must be addressed to the Members of the Attorney Discipline Probable Cause Committee and can be prepared in letter format   The statement must be mailed or delivered to my attention and received at the State Bar by   **August 22, 2016** at **3 00 p m**  Your objection will be provided to the Committee with other information related to the Bar s investigation into this matter

No extension of the time period for submitting your written statement can be made unless substantial good cause is shown in writing to me   Thank you for your cooperation

Sincerely,

Craig D  Henley
Senior Bar Counsel

CDH/ts



**Jennings, Strouss & Salmon, PLC**
Attorneys at Law

One East Washington Street  Suite 1900
Phoenix  Arizona  85004 2554
Telephone   602 262 5911
www jsslaw com

**J  Scott Rhodes**
Direct Dial   602 262 5862
Direct Fax   602 495 2648
srhodes@jsslaw.com

June 3, 2016

**VIA E-MAIL AND U  S  MAIL**

Craig D  Henley, Esq
Senior Bar Counsel
State Bar of Arizona
4201 North 24th Street, Suite 100
Phoenix, AZ  85016-6266

Re      State Bar File No  15-3363
        Juan M  Martinez, Respondent
        Supplement to Initial Response

Dear Mr  Henley

        This Supplement is intended to address a recent *Arizona Republic* article discussing the United States Supreme Court's decision to vacate the defendant's death sentence in *State v  Lynch*, one of the cases that was the subject of the underlying Bar Charge in this matter   For the reasons discussed below, although the *Arizona Republic* article  refers to allegations of prosecutorial misconduct, the Supreme Court s decision reversing the defendant's sentence  does not discuss those contentions   Accordingly, nothing in either the article or the decision alters our previous analysis of the allegations of misconduct stemming from the *Lynch* case

**DISCUSSION**

        On June 2, 2016, the *Arizona Republic* published an article explaining that the United States Supreme Court had issued a decision overturning the death sentence of Shawn Patrick Lynch  Michael Kiefer, <u>Justices Overturn Ariz. Death Sentence</u>, ARIZONA REPUBLIC, June 2, 2016 [1]  In that article, the author provides a basic factual background of the case and the jury s ultimate decision to sentence Lynch to death   The article then inexplicably ventures into an aside relating to the allegations Lynch made in lower court proceedings that Mr  Martinez had engaged in prosecutorial misconduct   After this detour, the article returns to the substance of the United States Supreme Court s decision, which focuses exclusively on the Court's determination that the trial court erred by not giving a particular jury instruction related to Lynch's ineligibility for parole

        The Supreme Court s decision does not refer to Lynch's allegations of prosecutorial misconduct, but instead focuses entirely on the application of its earlier decision in *Simmons*

---

[1] A copy of the article is attached to this letter as **Exhibit "A '**

**Phoenix  ▸  Peoria  ▸  Washington, DC**

RECEIVED JUN 0 6 2016 LAWYER REGULATION STATE BAR OF ARIZONA

6313786v2(49286 53)

Craig D  Henley, Esq
June 3, 2016
Page 2

*v  South Carolina*, 512 U S  154 (1994)  *Lynch v  Arizona*, 578 U S  ___ (2016) [2]  Under *Simmons*, a defendant in a death penalty case is entitled to "rebut the prosecution s argument that he posed a future danger by informing his sentencing jury that he is parole ineligible '  *Slip Opinion* at 2   The Supreme Court concluded that the trial court had erred in refusing to give an instruction consistent with *Simmons*, and accordingly reversed the sentence

The Court s decision to reverse Lynch s sentence was not without disagreement   In a strongly-worded dissent, Justices Thomas and Alito argued that the majority's opinion was based entirely on a technicality and that its ultimate conclusion was  [n]onsense   *Id*  at 4 (Thomas, J , dissenting)   The dissenting Justices focused on the fact that the instruction that Lynch had received from the trial court was consistent with the Arizona Statute governing the sentencing proceedings  *See id*  at 3 (*citing* Ariz  Rev  Stat  § 13-703(A)) The dissenters further argued that the majority's decision to reverse the sentence represented a "remarkably aggressive use of [the Court's] power to review the States' highest courts   *Id*  at 4

Nowhere in either the majority opinion or the dissent were any allegations of prosecutorial misconduct discussed or even mentioned   Instead, the only issue addressed by the Court related to the application of *Simmons* and whether the instructions given complied with the holding of that case

### CONCLUSION

For the reasons discussed above, neither the *Arizona Republic* article nor the United States Supreme Court's decision to reverse Lynch's sentence have any bearing on the allegations in this case and do not change the arguments in our Initial Response

Very truly yours,

JENNINGS, STROUSS & SALMON, P L C

By

J  Scott Rhodes

SR/mtl
Exhibits
cc     Juan M  Martinez, Esq
        Kerry A  Hodges, Esq
        Chase A  Bales, Esq

---

[2] A copy of the decision is attached hereto as **Exhibit "B "** For ease of reference, and because the U S  Reporter does not currently have page numbers for the decision, all references to the Supreme Court s Opinion shall be to "Slip Opinion" and page references shall refer to those pages on the copy attached to this letter

# EXHIBIT A

The Arizona Republic | Page A03

Thursday 2 June 2016

**◘ SHARE** ▉▉◙⊠_

## Justices overturn Ariz death sentence

Prosecutor's remarks problematic court says

**MICHAEL KIEFER**

THE REPUBLIC | AZCENTRAL COM

Click here to see this page in the eEdition



**(Login Required)**

**◘ SHARE** ▉▉◙⊠_

The U S Supreme Court on Tuesday knocked down a death sentence for an Arizona man because a Maricopa County Superior Court judge allowed a prosecutor to argue that the defendant could be potentially dangerous in the future without telling the jury that even if they sentenced him to life he would never be eligible for parole

In 2001 Shawn Patrick Lynch and an accomplice Michael Sehwani killed James Panzarella in his home in Scottsdale Lynch and Sehwani apparently met Panzarella in a Scottsdale bar and then went to where he lived a guesthouse in his parents backyard and hired an escort for a tryst with Sehwani paid for with Panzarella s money

The next day Panzarella was found bound to a chair in the home with his throat slit so severely that he was nearly decapitated Sehwani and Lynch were arrested the same day after they had stolen Panzarella s car and used his credit cards for multiple purchases and cash withdrawals

Both men were sentenced to death but Lynch s sentencing was problematic

The first jury found him guilty of first degree murder but could not reach a unanimous verdict on whether to sentence him to life or death He went back to trial for a new sentencing and though the jury sent him to death row, the sentence was overturned because prosecutor Juan Martinez had misrepresented the aggravating factor "excessively cruel heinous or depraved " as three separate aggravators

In 2012, the case went to trial a third time to determine a life or death sentence and a new jury imposed a death sentence on Lynch

In September 2015 the Arizona Supreme Court upheld that death sentence even though Lynch s attorneys alleged multiple instances of prosecutorial misconduct by Martinez who had meanwhile gained notoriety for his performance in the subsequent Jodi Arias murder trial

The Arizona Supreme Court acknowledged that Martinez had acted improperly on several occasions and disturbingly made a number of inappropriate comments prompting valid objections " but ruled that prosecutorial misconduct while present in some instances was not so pronounced or sustained as to require a new sentencing trial "

But in that same appeal to the Arizona Supreme Court Lynch also alleged that the judge in the case Maricopa County Superior Court Judge Karen O Connor had erred by not informing the jury that Lynch would never be released from prison The Arizona justices denied the allegation and let the death sentence stand

That was the basis for the U S Supreme Court overturning the sentence

**Shawn Lynch**



Powered by TECNAVIA    PART OF THE USA TODAY NETWORK Copyright © 2016 The Arizona Republic 06/02/2016

# EXHIBIT B

Per Curiam

# SUPREME COURT OF THE UNITED STATES

## SHAWN PATRICK LYNCH *v* ARIZONA

### ON PETITION FOR WRIT OF CERTIORARI TO THE SUPREME COURT OF ARIZONA

#### No 15–8366   Decided May 31 2016

PER CURIAM

Under *Simmons* v *South Carolina* 512 U S 154 (1994), and its progeny "where a capital defendant's future dan gerousness is at issue  and the only sentencing alternative to death available to the jury is life imprisonment without possibility of parole  the Due Process Clause "entitles the defendant  to inform the jury of [his] parole ineligibility either by a jury instruction or in arguments by counsel *Shafer* v *South Carolina* 532 U S 36, 39 (2001) (quoting *Ramdass* v *Angelone* 530 U S 156  165 (2000) (plurality opinion))   In the decision below, the Arizona Supreme Court found that the State had put petitioner Shawn Patrick Lynch's future dangerousness at issue during his capital sentencing proceeding  and acknowledged that Lynch s only alternative sentence to death was life impris onment without parole  238 Ariz 84  103  357 P 3d 119 138 (2015)    But the court nonetheless concluded that Lynch had no right to inform the jury of his parole ineligi bility  *Ibid*  The judgment is reversed

A jury convicted Lynch of first degree murder  kidnap ping  armed robbery  and burglary for the 2001 killing of James Panzarella   The State sought the death penalty Before Lynch's penalty phase trial began  Arizona moved to prevent his counsel from informing the jury that the only alternative sentence to death was life without the possibility of parole   App  K to Pet  for Cert   The court granted the motion

Lynch's first penalty phase jury failed to reach a unan imous verdict   A second jury was convened and sentenced

Per Curiam

Lynch to death   On appeal, the Arizona Supreme Court
vacated the sentence because the jury instructions im
properly described Arizona law   The court did not address
Lynch's alternative argument that the trial court had
violated *Simmons*   On remand, a third penalty phase jury
sentenced Lynch to death

   The Arizona Supreme Court affirmed   this time consid
ering and rejecting Lynch s *Simmons* claim   The court
agreed that during the third penalty phase   [t]he State
suggested     that Lynch could be dangerous   238 Ariz ,
at 103   357 P 3d at 138   The court also recognized that
Lynch was parole ineligible   Under Arizona law "parole is
available only to individuals who committed a felony
before January 1 1994, and Lynch committed his crimes
in 2001   *Ibid* (citing Ariz Rev Stat Ann §41–
1604 09(I))   Nevertheless, while "[a]n instruction that
parole is not currently available would be correct   the
court held that "the failure to give the *Simmons* instruc
tion was not error   238 Ariz   at 103   357 P 3d at 138

   That conclusion conflicts with this Court s precedents
In *Simmons*   as here, a capital defendant was ineligible for
parole under state law   512 U S   at 156 (plurality opin
ion)   During the penalty phase   the State argued that the
jurors should consider the defendant s future dangerous
ness when determining the proper punishment   *Id*   at
157   But the trial court refused to permit defense counsel
to tell the jury that the only alternative sentence to death
was life without parole   *Id*   at 157 160   The Court re
versed   reasoning that due process entitled the defendant
to rebut the prosecution s argument that he posed a future
danger by informing his sentencing jury that he is parole
ineligible   *Id*, at 161–162, *id*, at 178 (O Connor, J , con
curring in judgment)   The Court s opinions reiterated that
holding in *Ramdass   Shafer* and *Kelly* v *South Carolina*
534 U S   246 (2002)

   The Arizona Supreme Court thought Arizona s sentenc

Per Curiam

ing law sufficiently different from the others this Court had considered that *Simmons* did not apply  It relied on the fact that  under state law, Lynch could have received a life sentence that would have made him eligible for ' re lease' after 25 years  238 Ariz  at 103–104  357 P  3d  at 138–139  §13–751(A)  But under state law  the only kind of release for which Lynch would have been eligible—as the State does not contest—is executive clemency  See Pet for Cert 22  238 Ariz  at 103–104  357 P  3d at 138–139  And *Simmons* expressly rejected the argument that the possibility of clemency diminishes a capital defend ant s right to inform a jury of his parole ineligibility There  South Carolina had argued that the defendant need not be allowed to present this information to the jury "because future exigencies " including  commutation [and] clemency ' could one day "allow [him] to be released into society "  512 U S  at 166 (plurality opinion)  The Court disagreed  'To the extent that the State opposes even a simple parole ineligibility instruction because of hypothet ical future developments  the argument has little force Ibid  id  at 177 (opinion of O'Connor  J ) (explaining that the defendant had a right 'to bring his parole ineligibility to the jury s attention  and that the State could respond with "truthful information regarding the availability of commutation pardon and the like )

   The  State  responds  that  *Simmons*  "'applies  only  to instances where  as a legal matter  there is *no possibility* of parole "  Brief in Opposition 11 (quoting *Ramdass*  530 U S , at 169 (plurality opinion))  Notwithstanding the fact that Arizona law currently prevents all felons who com mitted their offenses after 1993 from obtaining parole, 238 Ariz  at  103  357 P  3d  at 138, Arizona reasons that nothing prevents the legislature from creating a parole system in the future for which [Lynch] would have been eligible had the court sentenced him to life with the possi bility of release after 25 years "  Brief in Opposition 12

4                          LYNCH *v* ARIZONA

Per Curiam

This Court s precedents also foreclose that argument *Simmons* said that the potential for future "legislative reform could not justify refusing a parole ineligibility instruction   512 U S   at 166 (plurality opinion)   If it were otherwise, a State could always argue that its legislature might pass a law rendering the defendant parole eligible   Accordingly, as this Court later explained 'the dispositive fact in *Simmons* was that the defendant conclusively established his parole ineligibility under state law at the time of his trial     *Ramdass, supra,* at 171 (plurality opinion)   In this case  the Arizona Supreme Court confirmed that parole was unavailable to Lynch under its law   *Simmons* and its progeny establish Lynch's right to inform his jury of that fact

The petition for writ of certiorari and the motion for leave to proceed *in forma pauperis* are granted   The judgment of the Arizona Supreme Court is reversed  and the case is remanded for further proceedings not inconsistent with this opinion

                                                  *It is so ordered*

Cite as  578 U S ___ (2016)          1

Thomas J  dissenting

# SUPREME COURT OF THE UNITED STATES

## SHAWN PATRICK LYNCH v  ARIZONA

### ON PETITION FOR WRIT OF CERTIORARI TO THE SUPREME COURT OF ARIZONA

#### No  15–8366   Decided May 31  2016

JUSTICE THOMAS, with whom JUSTICE ALITO joins dissenting

Petitioner Shawn Patrick Lynch and his co conspirator Michael Sehwani met their victim James Panzarella at a Scottsdale bar on March 24  2001  The three went back to Panzarella s house early the next morning  Around 5 a m , Sehwani called an escort service  The escort and her bodyguard arrived soon after  Sehwani paid her $300 with two checks from Panzarella's checkbook after spending an hour with her in the bedroom  Lynch and Sehwani then left the house with Panzarella s credit and debit cards and embarked on a spending spree

The afternoon of March 25  someone found Panzarella s body bound to a metal chair in his kitchen  His throat was slit  Blood surrounded him on the tile floor  The house was in disarray  Police discovered a hunting knife in the bedroom  A knife was also missing from the kitchen s knifeblock  And there were some receipts from Lynch and Sehwani s spending spree

Police found Lynch and Sehwani at a motel two days after the killing  They had spent the days with Panzarella's credit and debit cards buying cigarettes  matches  gas clothing  and Everlast shoes  renting movies at one of the motels where they spent an afternoon  and making cash withdrawals  When police found the pair Sehwani wore the Everlast shoes, and Lynch s shoes were stained with Panzarella's blood  A sweater, also stained with his blood was in the back seat of their truck  as were Panzarella s car keys

Thomas J dissenting

A jury convicted Lynch of first degree murder kidnap ing armed robbery, and burglary and ultimately sen tenced him to death * But today the Court decides that sentence is no good because the state trial court prohibited the parties from telling the jury that Arizona had abol ished parole Ante at 1 see Ariz Rev Stat Ann §41–1604 09(I) (1999) The Court holds that this limitation on Lynch s sentencing proceeding violated *Simmons* v *South Carolina* 512 U S 154 (1994) Under *Simmons* "[w]here the State puts the defendant s future dangerousness in issue and the only available alternative sentence to death is life imprisonment without possibility of parole due process entitles the defendant to inform the capital sen tencing jury—by either argument or instruction—that he is parole ineligible' *Id* at 178 (O'Connor J concurring in judgment)

Today's summary reversal perpetuates the Court's error in *Simmons* See *Kelly* v *South Carolina* 534 U S 246 262 (2002) (THOMAS, J , dissenting), *Shafer* v *South Caro lina*, 532 U S 36 58 (2001) (THOMAS J dissenting) As in *Simmons* it is the "sheer depravity of [the defendant's] crimes, rather than any specific fear for the future which induced the        jury to conclude that the death penalty was justice   512 U S at 181 (Scalia J dissenting) In *Simmons* for example the defendant beat and raped three elderly women—one of them his own grandmother—before brutally killing a fourth See *ibid* The notion that a jury s decision to impose a death sentence 'would have been altered by information on the *current state of the law* concerning parole (which could of course be amended) is
    farfetched   to say the least *Id* , at 184

---

*Sehwani ultimately pleaded guilty to first degree murder and theft and received a sentence of natural life without the possibility of early release plus one year See 225 Ariz 27 33 n 4 234 P 3d 595 601 n 4 (2010)

THOMAS J dissenting

Worse today's decision imposes a magic words require ment  Unlike *Simmons* in which there was "no instruc tion at all  about the meaning of life imprisonment except that the term should be construed according to its "'[plain] and ordinary meaning    *id*  at 160  166 (plurality opin ion) here there was an instruction about the nature of the alternative life sentences that the trial court could impose

> If your verdict is that the Defendant should be sen tenced to death  he will be sentenced to death   If your verdict is that the Defendant should be sentenced to life, he will not be sentenced to death  and the court will sentence him to either life without the possibility of release until at least 25 calendar years in prison are served  or 'natural life' which means the Defend ant would never be released from prison    App S to Pet  for Cert  18

That instruction parallels the Arizona statute governing Lynch's sentencing proceedings   That statute prescribed that defendants not sentenced to death could receive either a life sentence with the possibility of early release or a  natural life  sentence  "If the court does not sentence the defendant to natural life  the defendant shall not be released on any basis until the completion of the service of twenty five calendar years " but a defendant sentenced to 'natural life" will "not be released on any basis for the remainder of the defendant's natural life    Ariz Rev Stat Ann §13–703(A) (2001)

Even though the trial court's instruction was a correct recitation of Arizona law, the Court holds that *Simmons* requires more   The Court laments that (at least for now) Arizona's only form of early release in Arizona is executive clemency   *Ante*  at 3   So the Court demands that the Arizona instruction specify that "the possibility of release does not (at least for now) include parole  Due process  the Court holds  requires the court to tell the jury that if a

4                       LYNCH *v* ARIZONA

Thomas J  dissenting

defendant sentenced to life with the possibility of early
release *in 25 years* were to seek early release *today*  he
would be ineligible for parole under Arizona law  *Ante*  at
3–4  Nonsense  The Due Process Clause does not compel
such   micromanage[ment of]  state  sentencing  proceed
ings  *Shafer supra*  at 58 (THOMAS, J , dissenting)

Today s decision—issued without full briefing and ar
gument and based on *Simmons*  a fractured decision of
this Court that did not produce a majority opinion—is a
remarkably aggressive use of our power to review the
States' highest courts  The trial court accurately told the
jury that Lynch could receive a life sentence with or with
out the possibility of early release  and that should suffice

I respectfully dissent



neopost
06/03/2016
US POSTAGE

FIRST CLASS MAIL
$01 99⁰

ZIP 85004
041L11249083



# Jennings
# Strouss

J  Scott Rhodes, Esq
Jennings  Strouss & Salmon  P L C.
One East Washington Street
Suite 1900
Phoenix  Arizona 85004 2554

Craig D  Henley, Esq
Senior Bar Counsel
State Bar of Arizona
4201 North 24th Street, Suite 100
Phoenix, AZ  85016-6266

# STATE BAR OF ARIZONA

Assistant s Direct Line  (602) 340-7272

May 16, 2016

**PERSONAL AND CONFIDENTIAL**

J  Scott Rhodes
Jennings Strouss & Salmon, PLC
One E  Washington Street, Suite 1900
Phoenix, AZ 85004-2554

Re   **File No**      15-3363
     **Complainant**  Kathleen Erin Brody
     **Your Client**  Juan M  Martinez

Dear Mr  Rhodes

This will acknowledge receipt of your correspondence dated April 8, 2016, in which you respond to the charges of Ms  Brody   In most cases, an investigator will be contacting you shortly for more information or to schedule an interview

A copy of your response (the unsealed portions only) will be forwarded to the complainant After our investigation is completed, this matter may be dismissed by bar counsel or a recommendation for discipline or diversion made to the Attorney Discipline Probable Cause Committee   You will be advised of the recommendation and provided an opportunity for input

Sincerely,

Craig D  Henley
Senior Bar Counsel

CDH/ts

15-42974                          Page 1 of 1



**STATE BAR OF ARIZONA**

Assistant's Direct Line: (602) 340-7272

May 16, 2016

Kathleen Erin Brody
Osborn Maledon, PA
2929 N. Central Avenue, Suite 2100
Phoenix, AZ 85012-2765

**Re   File No**      15-3363
**Respondent**   Juan M. Martinez

Dear Ms. Brody

I am enclosing a copy of the response to your correspondence, received from Mr. Martinez. No further written reply is needed from you at this time.

In most cases, an investigator will contact you shortly for additional information or to schedule an interview. We appreciate your patience.

After our investigation is completed, you will be notified of our decision/recommendation.

Sincerely,

Craig D. Henley
Senior Bar Counsel

CDH/ts
Enclosure

15 42974                         Page 1 of 1



**Jennings, Strouss & Salmon, PLC**
Attorneys at Law

One East Washington Street, Suite 1900
Phoenix, Arizona  85004 2554
Telephone   602 262 5911
www jsslaw com

**J  Scott Rhodes**
Direct Dial   602 262 5862
Direct Fax    602 495 2648
srhodes@jsslaw.com

April 8, 2016

**VIA HAND DELIVERY AND E-MAIL (without Exhibits)**

Craig D  Henley, Esq
Senior Bar Counsel
State Bar of Arizona
4201 North 24th Street, Suite 100
Phoenix, AZ  85016-6266

Re     State Bar File No  15-3363
       Kathleen Erin Brody, Esq , Complainant
       Juan M  Martinez, Esq , Respondent

Dear Mr  Henley

       This is our verified initial response on behalf of Juan M  Martinez ("Mr  Martinez") in
the above-referenced matter   Thank you for giving us additional time to prepare this
response   Mr  Martinez denies that he has violated the Arizona Rules of Professional
Conduct (generally, the "Ethical Rules," or specifically, "ER __")

       **Please note that certain exhibits hereto are the subject of a Motion for
Protective Order that we have filed with the Presiding Disciplinary Judge   Such
exhibits are attached to the motion but are not attached hereto**

### INTRODUCTION

       Mr  Martinez graduated from Arizona State University College of Law[1] in 1983 and
was admitted to the State Bar of Arizona in 1984   He has no prior discipline  Since 1988,
Mr  Martinez has been a prosecutor with the Maricopa County Attorney's Office ("MCAO")
For the past 19 of his 27 years with the MCAO, Mr  Martinez has prosecuted homicide cases,
including 10 capital cases before a jury, in which six defendants received the death
sentence, three were sentenced to prison for their natural life, and one was convicted of
second-degree murder   A seventh defendant was also sentenced to death by a judge rather
than a jury  Including the capital cases, he has tried approximately 70 murder cases to a
jury verdict, resulting in approximately 68 convictions   Of these convictions, only three
have been remanded on appeal or as a result of post-conviction relief   One case was
vacated and remanded based on jury instructions, a second was remanded after the
definition of "premeditation" was narrowed, and a new trial was ordered in the third case
because the lower court was found to have erred in allowing the use of "other act" evidence
None of these cases were overturned as a result of prosecutorial misconduct

---

[1] Now Sandra Day O'Connor College of Law

**Phoenix  ▸  Peoria  ▸  Washington, DC**

Craig D  Henley, Esq
April 8, 2016
Page 2

In 2013, Mr  Martinez was awarded the "Homerun Hitters Award" by the National District Attorneys Association for outstanding prosecution   In 1998-1999, he was named Arizona Prosecutor of the Year by the Arizona Prosecuting Attorneys Advisory Council

Complainant Kathleen Erin Brody submitted her bar charge (the "Charge" or the "AACJ Charge") in her capacity as President of Arizona Attorneys for Criminal Justice (the "AACJ")   The AACJ (sometimes referred to herein as "Complainant") "is a statewide membership organization of criminal-defense lawyers, law students, and associated professionals      " (Charge, at 1 )  The AACJ Charge is an attempt, orchestrated by a trade association of criminal defense professionals, to use the offices of the State Bar of Arizona to further an agenda to impede one of Arizona's most experienced prosecutors from prosecuting some of the worst crimes committed in our state

As you will observe when you review the rest of this response (along with the exhibits), we respond herein to each and every one of the AACJ allegations, however, beyond the factual and legal defenses presented herein, an issue of public policy resides in this case that cannot be discounted   That issue is whether any public servant should be required to defend his or her professional license against a litany of allegations (some associated with prosecutions occurring over 15 years ago) by a statewide association of opposing counsel   Before submitting the Charge, it appears the AACJ performed a broad canvass of its members, asking for any "allegations" against Mr  Martinez—no matter how old, and no matter that many had already been litigated, reviewed and decided by the courts, or even by the State Bar of Arizona in regard to three of the allegations

The AACJ Charge is a collection of cardboard cut-outs   It is not a true or accurate portrait of Mr  Martinez, who has taken responsibility for prosecuting, in the name of the State, individuals who committed horrific crimes and then were defended by talented defense counsel who pursued every means available—including the AACJ Charge—to try to defend their clients and, eventually, perhaps achieve their liberty

The allegations of the Charge are not grounded in the mandatory reporting requirement of ER 8 3(a)   If they were, the Charge would be grievously late in regard to most of the allegations   Instead, the Charge is a statewide, intentional attempt, organized by a trade association and based on a superficially forensic review of Mr  Martinez's entire career and, as demonstrated below, based also on only partial records and deceptive descriptions of events, to try to create from fragments of facts a "pattern" of conduct that does not exist and has never existed

Mr  Martinez recognizes and respects the vital role of defense counsel in our criminal justice system   Regrettably, the AACJ appears to have lost sight of the undeniable truth that criminal justice also requires dedicated prosecutors   Probably more than in any other area of law, criminal justice brings together lawyers defending the highest possible stakes, on both sides of every case  the due process rights of accused individuals, and society's interest in enforcement of our laws   In a criminal case, if either side crosses a line, or exceeds a known parameter of conduct, then courts will rule accordingly, and the matter then proceeds as justice requires for that case   The defense in a criminal case has extremely wide leeway   The State, in contrast, is held to the highest standards – standards that Mr  Martinez has always embraced, and that he embraces today

Craig D  Henley, Esq
April 8, 2016
Page 3

While a prosecutor's standards of conduct are understandably high, it does not follow that every incidental or unintentional breach of them is or should be deemed "prosecutorial misconduct" or a breach of ethical standards   As demonstrated herein, such is not the law  The terrain for prosecutors is already treacherous, but to hold prosecutors professionally responsible (at the risk of their licenses to practice law) for each time that a court, especially an appellate court in hindsight, finds that an excess occurred would create an unwarranted, even tragic, deterrent against lawyers seeking careers in prosecution

If the AACJ Charge is not dismissed for lack of probable cause (as it should be), then a chilling message will be sent to a new generation of lawyers considering a career in prosecution   The message to those young lawyers will be that years of public service—years of taking on cases so heinous that most lawyers would shirk just from the grotesque nature of the facts—will not earn them the well-deserved praise of a grateful public, but instead will garner them mob-style accusations from an association of opposing counsel, and potential prosecution by our self-regulated profession

For this important public policy reason alone, the AACJ Charge should be received by the State Bar with extreme skepticism   It should be dismissed, not only for its lack of probable cause (as demonstrated herein), but in order to uphold the integrity of our system of professional discipline, and to maintain the vitally important balance between criminal defense and criminal prosecution   The State Bar should not be used as a vehicle to dissolve that balance based on the bully tactics of a disgruntled trade association

## FACTUAL AND LEGAL DISCUSSION

For your ease of reference and analysis, we have organized this response in parallel to the AACJ Charge   With regard, in turn, to each case where the AACJ alleges misconduct, we discuss the background facts, AACJ allegations, and applicable Ethical Rules

### Standards for Prosecutorial Conduct

The AACJ Charge begins with its take on certain legal principles   Rather than discuss each such principle in an opening section, we address below the legal and ethical parameters that define the outcome of each of the AACJ's specific allegations   As a general concept, however, Arizona courts have pronounced that "[p]rosecutorial misconduct 'is not merely the result of legal error, negligence, mistake, or insignificant impropriety, but, taken as a whole, amounts to intentional conduct which the prosecutor knows to be improper and prejudicial, and which he pursues for any improper purpose with indifference to a significant resulting danger of mistrial '"  *State v  Aguilar*, 217 Ariz  235, 238-39, 172 P 3d 423, 426-26 (App  2007) (*quoting Pool v  Superior Court*, 139 Ariz  98, 108-09, 677 P 2d 261, 271-72 (1984))

Craig D Henley, Esq
April 8, 2016
Page 4

## Cases Before the Arizona Supreme Court[2]

### *State v Morris*

#### *Factual Background*

Morris was a capital case that Mr Martinez prosecuted involving the murders of five women between September 2002 and April 2003  During the police investigation, Morris provided two versions of each woman's death  In the first version, he claimed that each victim had died in his residence from a drug overdose  In the second version, he claimed that each one had asked him to choke her during sex and then had accidentally died as a result of that conduct  Four of the bodies were found not far from Morris's residence—the fifth was found decomposing in his residence  In 2004, the jury convicted Morris of five counts of first-degree murder and sentenced him to death  Like all capital cases that result in imposition of the death penalty, the case was automatically referred to the Arizona Supreme Court  A R S  13-755(A), Ariz R Crim P  31 2(b) ("Automatic Appeal When Defendant is Sentenced to Death"), *State v Guarino*, 238 Ariz  437, 362 P 3d 484, 485-86 (2015)  In its decision on automatic appeal, the Supreme Court upheld the conviction and sentence  *State v Morris*, 215 Ariz  324, 329-32, 160 P 3d 203, 208-11 (2007) **(Ex  "1")**

#### *AACJ Allegations*

The AACJ contends that Mr Martinez committed multiple ethical violations in this case  All of the allegations in the AACJ Charge were raised and discussed in the *Morris* decision  The Supreme Court did not refer Mr Martinez for a disciplinary investigation when, or after, it issued its decision

First, Complainant contends that, during his closing argument in the aggravation phase, Mr Martinez argued to the jury, allegedly "[d]espite no supporting evidence," that Morris had sex with the victims' corpses    (Charge, at 3 )  As the Supreme Court found, however, "sufficient evidence" supported the argument  There was skin "slippage" on selective parts of the victims' bodies (specifically, the inner thighs and breasts), and the medical examiner testified that skin slippage can result from friction-  *Id*  at 336, 160 P 3d at 215  There were skin defects on the anus of the last victim, found decomposing in Morris's residence, and that victim's anus was level with Morris's bed  *Id*  Further, Morris had maintained that he wore a condom during sex with the women before their deaths, but semen was found in two of the victims' vaginas  *Id*  Based on this evidence, the Arizona Supreme Court held that "[w]hile the evidence in this case does not compel the conclusion that Morris engaged in intercourse with the corpses of the victims, the record includes sufficient evidence to permit the prosecutor to make such an argument "  *Id*

Second, Complainant contends that, during his rebuttal closing argument in the aggravation phase, Mr Martinez "invited jurors to put themselves in the place of the victims

---

[2] The Charge alleges that Mr Martinez committed "Ethical Violations in Cases Before the Arizona Supreme Court ', however, there are no allegations in the Charge that Mr Martinez acted unethically during the appellate phase on any case, let alone before the Supreme Court  Rather, this section of the Charge relates to decisions by the Arizona Supreme Court that pertain to specific cases that Mr Martinez prosecuted  Mr Martinez is not an appellate lawyer, and, consequently, he did not handle the appellate phase of any of the referenced cases  The cases at issue were all handled on appeal by the Arizona Attorney General s Office

Craig D Henley, Esq
April 8, 2016
Page 5

and singled out specific jurors based on appearance and gender " While the Arizona Supreme Court indeed did find that Mr Martinez's statement exceeded established protocols for closing arguments, the Court also held that no prejudice resulted from the argument, given the "overwhelming evidence of cruelty" presented by the State  *Id*  at 337-38, 160 P 3d at 216-17

Complainant limits its allegation to the Supreme Court's characterization of Mr Martinez's rebuttal argument  The actual argument, however, placed in the context of the defense argument that Mr Martinez rebutted, reveals Mr Martinez's intent  "A prosecutor has wide latitude in presenting arguments to the jury, including commenting on the 'vicious and inhuman nature of the defendant's acts,' but cannot make arguments that appeal to the fears or passions of the jury " Ex "1," *Morris*, 215 Ariz  at 337, 160 P 3d at 216 (quoting *State v  Comer*, 165 Ariz  413, 426, 799 P 2d 333, 346 (1990))  Mr Martinez believed, in good faith, that his argument fell within the "wide latitude" granted to prosecutors

At issue in regard to this part of Mr Martinez's rebuttal argument was the defense's argument that the murders were not "especially cruel," because there was inadequate proof that "the victim[s] [were] conscious and suffered physical pain or mental anguish during at least some portion of the crime and that the defendant knew or should have known that the victim[s] would suffer " *Id*  at 338, 160 P 3d at 217  Defense counsel, in closing argument, had argued that the jurors could not determine whether the victims had suffered, because, among other things, they were intoxicated when they were killed

> More importantly, here is the thing that we need to think about   There is absolutely no way to determine when these people fell into unconsciousness  There is absolutely no way
>
> And for you to find cruelty, you have got to find that they suffered some kind of pain and suffering while they were conscious, and we simply don't know   We don't know when the magical moment is that they lapse into unconsciousness
>
>
> On the one hand, we cannot find or determine when these people lapsed into unconsciousness   That's fact number one   Fact number two, we don't have any trauma associated with at least—we'll address three victims now, three of these victims
>
> And lastly, all of these victims had toxicity levels of drugs in their system, alcohol and cocaine, stimulants and depressants   That is the evidence

Morris Tr , July 12, 2005, at 119 12-20, 120 4-11 (**Ex "2"**)

In his rebuttal (which drew no objection from defense counsel, Ex "1," *Morris*, 215 Ariz  at 337, 160 P 3d at 216), Mr Martinez was permitted to respond to that argument *State v  Duzan*, 176 Ariz  463, 468-69, 862 P 2d 223, 228-29 (App  1993)  Under Arizona law, Mr Martinez also had substantial leeway, including making emotional statements *State v  Marvin*, 124 Ariz  555, 557, 606 P 2d 406, 408 (1980) (permissible for the prosecutor to state in closing that he felt sorry for the victim's family, who would not be able to see the victim again)  Thus, in his rebuttal, Mr Martinez appropriately reminded the

Craig D Henley, Esq
April 8, 2016
Page 6

jurors of the factual circumstances of the murders, and he asked the jurors to apply common sense to those circumstances  This properly rebutted the defense's argument that the jury could not *know* whether the victims had suffered and experienced anguish before dying

The Supreme Court differed, not with the substance of Mr Martinez's rebuttal, but with his having addressed some of the individual jurors  In his argument, he addressed those jurors as follows, always referring back to the defense's argument

Which one of you want to volunteer to come sit here and have the defendant sit himself on your chest and say, [o]h, that didn't hurt? *Because the defense attorney is saying throw common sense out of window* Which one?  I challenge anybody to say, [t]hat is something I want to do

And anyway, and on top of that, while he's sitting on my chest, which one of you, since the one lower left-hand side has the longer hair of the jurors, maybe she wants to have him grab her hair while he's sitting on her chest      to grab it and pull it around her neck

You think that's not going to hurt?  You think one of you guys is going to volunteer for that?  *You can't leave your common sense aside* [Defense counsel] **wants you to because he makes these arguments and says, well, we don't know what is in their heads**  We don't know what is in Juror Number 1's head  Can you tell me you don't think it's not going to hurt when he sits on you?

Hey, Juror Number 1 or Juror Number 14, whatever it is, what if we put Winnie the Pooh tie around your neck?  Are you going to enjoy that?  Are you going to like it?  Going to feel real good when you can't breathe?

There's no physical pain you have associated with it **'cause you can't tell us because you can't breathe, so there must be no physical pain associated  Because all of this, of course, doesn't happen in a vacuum sort of thing**

**That's not the way it is  You don't leave your common sense behind**  And when somebody puts a tie around your neck, a strap, your hair, their hands, it's going to hurt, and you're going to react to it

Ex  "2," Morris Tr , July 12, 2005, at 130 6-131 9 (emphasis added)

Mr Martinez believed his argument was within the leeway given to him under Arizona law for closing arguments, and within his permissible rebuttal to the defense's closing argument  The Supreme Court found non-prejudicial error had occurred  There was no finding of intentional misconduct, nor violation of a court order (there was no defense objection to the rebuttal), nor prejudice to the administration of justice  Nine years ago when the *Morris* opinion was issued, the Supreme Court did not deem it necessary to refer the matter to the State Bar for review  The evidence in the case far outweighed Mr Martinez's "heat of battle" decision on how to frame his rebuttal  Since then, Mr Martinez has not been accused again of the same conduct

Craig D Henley, Esq
April 8, 2016
Page 7

**Finally,** Complainant contends that, during the guilt phase, Mr Martinez "took a
victim's jacket out of a plastic evidence bag for the jury's 'smelling pleasure '"
Complainant's suggestion is false that Mr Martinez had no valid basis for introducing the
jacket into evidence   To the contrary, the Supreme Court found that Mr Martinez had
properly introduced the jacket to show that it belonged to a victim   *Morris*, 215 Ariz at
338, 160 P 3d at 217 ("There was no misconduct in introducing the jacket into evidence ")
The "smelling pleasure" comment, made during closing argument in the guilt phase,
referred to the fact that, during the trial when Mr Martinez had asked a police witness to
remove the jacket from an evidence bag for the jury to see, a sickening odor emanated
from the bag that no one had expected   As Mr Martinez recalls it now (years later), the
smell was so bad that the court took a recess for the day, and fans were brought in to clear
the air in the courtroom   No one suggested at the time that release of the odor was
intentional, prejudicial, or any form of misconduct   Mr Martinez's later "smelling pleasure"
comment during closing argument was an attempt to refer, with a touch of humor, to the
unintended disruption to the trial that the smell emanating from the jacket had caused   His
statement in full was   "But one of the things that is interesting about [the victim who
owned the jacket] is that the smell is absolutely putrid, absolutely one of the worst things
that you will ever probably experience   And you got a minimal exposure to it when the
jacket was opened up for your, if you will, smelling pleasure, for lack of a better word "   *Id*
at 338 n 7, 160 P 3d at 217 n 7   Defense counsel did not object to the comment, and the
Arizona Supreme Court held that no prejudice resulted from the comment, even assuming
for the opinion (without finding) that it was improper   *Id* at 338, 160 P 3d at 217

### Applicable Ethical Rules

**ER 3 4(c) (Knowingly Disobey Court Rule), ER 3 4(e) (Allude to Matter Not
Reasonably Believed to be Relevant)**   Mr Martinez did not disobey, much less
knowingly disobey, any court rule or allude to any matter that he did not reasonably believe
to be relevant   He presented evidence and made arguments that he believed in good faith
were warranted under the relevant facts and law

**ER 8 4(d) (Conduct Prejudicial to Administration of Justice), Rule 41(g), Ariz R
Sup Ct (Unprofessional Conduct)**   Mr Martinez's conduct did not result in prejudice to
the administration of justice   Rule 41(g) states that a lawyer has a duty and obligation "[t]o
avoid engaging in unprofessional conduct and to advance no fact prejudicial to the honor or
reputation of a party or a witness unless required by the justice of the cause with which the
member is charged "   Rule 31(a)(2)(E) defines "unprofessional conduct" as "substantial or
repeated violations of the Oath of Admission to the Bar or the Lawyer's Creed of
Professionalism of the State Bar of Arizona "   The AACJ allegations do not nearly approach
the level of conduct proscribed by these rules   The defendant was convicted, and the
conviction was upheld on appeal   In the isolated instance in which the Arizona Supreme
Court found that Mr Martinez had made an improper argument, the Court specifically held
that no prejudice resulted   Because it was a death penalty case, the defendant's appellate
counsel had to raise every even remotely plausible argument or risk it being waived   *State
v Blodgette*, 121 Ariz 392, 395, 590 P 2d 931, 934 (1979) (claims not raised in the
opening brief of the automatic appeal are considered "abandoned"), *State v Smith*, 125
Ariz 412, 416, 610 P 2d 46, 50 (1980) (same), *State v Bolton*, 182 Ariz 290, 298, 896
P 2d 830, 838 (1995) (refusing to consider issues not raised in the appellate opening brief
because "[f]ailure to argue a claim on appeal constitutes waiver of that claim ")   The
defense's decision to pursue these issues on appeal, therefore, resulted from the nature of
the proceedings and in no way establish probable cause for a violation of these rules

Craig D Henley, Esq
April 8, 2016
Page 8

### *State v Andriano*

#### *Factual Background*

In 2004, Mr Martinez prosecuted Wendi Andriano for capital murder  She was found guilty and sentenced to death  On mandatory direct appeal, the Arizona Supreme Court upheld both the conviction and sentence  *State v Andriano*, 215 Ariz  497, 161 P 3d 540 (2007) **(Ex "3")**

In October 2000, Andriano brutally murdered her terminally-ill husband after a failed attempt to poison him  The circumstances of the victim's death were exacerbated by the fact that, after incapacitating but not killing her husband, Andriano had called a neighbor for help and lied about the reasons for her husband's condition  After the neighbor arrived, Andriano finally called for medical assistance  When paramedics arrived, and after the neighbor stepped out to usher them in, Andriano barricaded herself in the apartment and refused to allow paramedics inside to treat her husband  After she sent them away, Andriano called the paramedics a second time approximately an hour later, and when they arrived, they found Andriano's husband lying in a pool of blood, stabbed and brutally beaten  Investigation revealed that, while the paramedics and neighbor had waited outside during the first response, Andriano beat her husband unconscious with a bar stool and proceeded to stab him in the neck area, severing his carotid artery

During trial, Andriano claimed that she killed her husband in self-defense, asserting that he had repeatedly victimized her over the course of their relationship  As alleged proof of this defense, Andriano solicited testimony from an expert witness who claimed that Andriano exhibited characteristics of an abused spouse  In response, Mr Martinez presented evidence from several witnesses that Andriano had a history of engaging in extramarital affairs and other activities that strongly contradicted her claimed defense

#### *AACJ Allegations*

The AACJ's allegations are narrowly focused on Mr Martinez's closing argument during the guilt phase of the trial  Specifically, the AACJ alleges that Mr Martinez repeatedly elicited marginally relevant testimony and other evidence that the defendant had engaged in "partying and man-chasing "  These assertions essentially repeat allegations addressed nine years ago in the Arizona Supreme Court opinion affirming both the conviction and sentence

#### *Applicable Ethical Rules*

**ER 3 4(e)** (prohibiting an attorney from alluding to matters which are not reasonably believed to be relevant or that will not be supported by admissible evidence) The Supreme Court decided the sole allegation raised in the Charge in Mr Martinez's favor *See Andriano*, 215 Ariz  at 503, 161 P 3d at 546  Andriano's appellate counsel argued that "[t]he prosecutor took every opportunity to infuse the trial with marginally relevant information about Andriano's partying and man-chasing "  The Supreme Court disagreed, holding that evidence of Andriano's extramarital affairs "was admissible under Rule 404(b)
as evidence of Andriano's motive for killing her husband – to be free to pursue other relationships "  *Id*  Furthermore, the Court held that the evidence was relevant "to rebut the defense theory that Andriano was a domestic violence victim who lived in fear of her abusive husband, whom she bludgeoned to death in self-defense "  *Id*  Mr Martinez's

Craig D Henley, Esq
April 8, 2016
Page 9

statements in closing argument regarding Andriano's marital infidelity and frequent party activity were appropriately presented to the jury as fair rebuttal of Andriano's claimed defenses

### *State v Gallardo*

#### *Factual Background*

*Gallardo* was a capital case that Mr Martinez prosecuted involving the murder of Rudy Padilla, who was found dead in his parents' home by his father on December 9, 2005, his wrists and ankles bound, a pillowcase tied over his head, and a single gunshot wound through the back of his head   Gallardo was indicted for first-degree murder, burglary, and kidnapping   The first trial resulted in a mistrial due to juror misconduct   (The jurors had prematurely discussed the evidence in violation of the court's admonition )  The second trial in 2009 resulted in convictions on all counts, and Gallardo was sentenced to death   On mandatory direct appeal, the Arizona Supreme Court upheld the conviction and sentence in *State v Gallardo*, 225 Ariz 560, 563-64, 242 P 3d 159, 162-63 (2010) **(Ex "4")**

#### *AACJ Allegations*

Complainant contends that Mr Martinez committed multiple violations of the Ethical Rules during his closing and rebuttal argument in the penalty phase of the case

<u>First</u>, Complainant contends that Mr Martinez improperly "asked the jury to compare the victim to the defendant "  However, the AACJ ignores the context and intent of Mr Martinez's argument, which responded to defense counsel's closing argument that a life sentence was sufficient punishment  *Gallardo*, 225 Ariz at 569, 242 P 3d at 168  In that context, Mr Martinez said in his rebuttal argument, "Do you think [the victim's father is] going to be able to call his son, Rudy?" *Id*

Defense counsel objected to this statement as a comparison of the defendant to the victim, and the trial court sustained the objection  Mr Martinez then reworded his argument in a permissible attempt to clarify that his intent was to emphasize the substance of the victim impact statements (which is proper rebuttal), not to compare the victim to the defendant

> There's no comparison   The point that's being made here is that the victim impact statement may be considered by you [the jury], and that impact statement indicated to you that they missed their son   That's not quite doing justice to how they told you, and they would love to make a call and would love to be able to talk to him   And in their victim impact statement, they told you they couldn't   In fact, Mr Padilla told you that he goes so far as to turn on the radio in his son's room at night just to make it seem as if he were there

Gallardo Tr , June 25, 2009, at 26 21-27 4 **(Ex "5")**  There was no objection to Mr Martinez's clarified argument  *Id*

As previously observed, "[c]ounsel are allowed great latitude in closing arguments, even to the extent of making emotional statements "  *Marvin*, 124 Ariz  at 557, 606 P 2d at 408 (holding that it was permissible for prosecutor to state that he felt sorry for the victim's family, who would not be able to see the victim again)   Mr Martinez believed in good faith

Craig D  Henley, Esq
April 8, 2016
Page 10

that his argument fell within the "great latitude" granted to prosecutors  On appeal, without
deciding whether the argument had been improper, the Arizona Supreme Court held that,
"[e]ven if the prosecutor's statements were improper, reversal is not required "  Ex  "4,"
*Gallardo*, 225 Ariz  at 569, 242 P 3d at 168  Importantly, the Court did not find
prosecutorial misconduct  Instead, it found the defense's argument on appeal was
insufficient to meet the standards for reversal

     Second, Complainant contends that Mr  Martinez mischaracterized the testimony of a
defense expert as inconsistent and then twice persisted in that line of argument after the
trial judge had sustained objections to it as misleading  As an initial matter, Mr  Martinez
did not mischaracterize the defense expert's testimony as inconsistent—the expert, in fact,
testified that he was entitled to receive two different amounts of witness fees, initially
$4,200 and later $6,500  Ex  "5," Gallardo Tr , June 25, 2009, at 29 2-5  At a sidebar on
the issue, the trial judge *agreed* that the witness's testimony had been inconsistent in this
regard  *Id*  at 30 18-20 ("THE COURT  Well, the fact that the expert said two different
things can be used by Mr  Martinez to impeach his credibility ")

     Furthermore, it is not true that Mr  Martinez intentionally or knowingly ignored the
trial court's rulings  The transcript of the argument reflects that Mr  Martinez tried to
rephrase his argument *consistent with* his understanding of the trial court's rulings

    *First statement—*

          And there were some inconsistent statements, but the biggest
          one was the one involving money   Initially when I asked him
          the question, he said he really wasn't sure how much money he
          was being paid   Then he indicated, well, it was $4,200   Then
          after doing the mathematics a little bit more and fine-tuning it -
          -

       MR  MILLER  Objection to misleading argument

          THE COURT  Sustained

    *Second attempt—*

          MR  MARTINEZ  Well, you heard, he told you $4,200,
       didn't he? Anybody not hear that? And then after questioning
       by the prosecutor, the figure changed, didn't it?

          MR  MILLER  Objection, misleading  I'm sorry, Judge
       Did I not speak loud enough? I object to misleading

          THE COURT  Well, sustained

    *Third attempt—*

          MR  MARTINEZ  Well, he said on the stand from there,
       and that's the evidence that you are to consider   You were told
       – he said $6,500   That's what he said   And you were present
       when all of that happened, weren't you? That's something that

Craig D  Henley, Esq
April 8, 2016
Page 11

> you can consider, because it goes to his motive and his bias
> and –

> MR  MILLER   May we approach, Your Honor?

> THE COURT   Yes

*Id*  at 27  25-28  21

Initially, Mr  Martinez had argued that the defense expert had made "inconsistent statements" about the money he was being paid for his testimony, and he characterized the change in testimony as a result of "fine-tuning " After the trial judge sustained an objection to that argument as misleading, Mr  Martinez permissibly attempted to present a more limited argument, one that merely reminded the jury that the expert had testified to receiving one amount in witness fees, then changed his testimony after questioning  Mr  Martinez made this point without characterizing the change in testimony as "inconsistent," which he believed had been the basis for the sustained objection  That attempt, however, drew a second objection, which the trial court sustained, apparently with some hesitation ("Well, sustained ")  Mr  Martinez then re-cast his argument again, limiting it even more, merely reminding the jury that the expert had testified to receiving witness fees, which the jury could consider as relevant to possible motive and bias

The lengthy sidebar that followed this exchange demonstrates that Mr  Martinez, rather than disregarding or disobeying a court order, was to the contrary trying to comply with his understanding of the trial court's rulings  *Id*  at 28  24-34  4  During the sidebar, Mr  Martinez explained that he was merely trying to point out that the expert had, in fact, testified to two different amounts of witness fees  The trial judge initially ruled, as quoted above, that "the fact that the expert said two different things can be used by Mr  Martinez to impeach his credibility " *Id*  at 30  18-20  However, after further discussion following his third attempt, the trial court changed its ruling in light of "the unique nature of the problem "  This was a reference to the fact that defense counsel could not explain the discrepancy in the expert's testimony, because any such explanation would necessarily delve into an impermissible subject area  Accordingly, the objection was sustained *based on that restriction on the defense's ability to explain the discrepancy in the expert's testimony*  During the sidebar, the trial judge did not, at any time, admonish Mr  Martinez for ignoring her rulings  Nor did the court in any way suggest that she viewed his attempts to rephrase his argument as improper  The context reflects that the parties and judge were working to find a fair solution to a unique problem  The court ruled that Mr  Martinez could not argue "anything related to the discrepancy in the figures," but he could argue that "[t]he fact that he was paid, the fact that he gave money and he gave time for free all go to motive and bias " *Id*  at 33  15-34  4  *Mr  Martinez abided by that ruling and moved on to another issue*

The Arizona Supreme Court viewed Mr  Martinez's attempts to rephrase his argument as improper repetitions of the same argument that was the subject of the sustained objections  Ex  "4," *Gallardo*, 225 Ariz at 569, 242 P 3d at 168  That finding, however, is not binding in a disciplinary case and cannot be equated to a finding of an ethical violation *In re Augenstein*, 178 Ariz  133, 135, 871 P 2d 254, 256 (1994)  The standard the Court applied in *Gallardo* was an objective one that bears no resemblance to the standards that govern the ethical determination  *Compare Gallardo*, 225 Ariz  at 569, 242 P 3d at 168 ("A prosecutor should not repeat an argument after it has been the subject of a sustained

Craig D  Henley, Esq
April 8, 2016
Page 12

objection "), *with* ER 3 4(c) (providing that a lawyer shall not "knowingly disobey an obligation under the rules of a tribunal")  There was no finding in *Gallardo* regarding Mr  Martinez's mental state, much less one supported by clear and convincing evidence   *See* Ariz  R  Sup  Ct  48(d) (requiring disciplinary allegations to be "established by clear and convincing evidence")

    Finally, Complainant's reliance on isolated comments by two Arizona Supreme Court Justices during the *Gallardo* oral argument is misplaced   The Arizona Supreme Court acts as a body by majority vote, not through its individual Justices   In the *Gallardo* opinion, the Arizona Supreme Court disagreed with one, isolated instance of conduct (discussed above) and rejected five other defense theories related to Mr  Martinez   Ex  "4," *Gallardo*, 225 Ariz at 568-70, 242 P 3d at 167-69   Indeed, the Court observed that one of the rejected defense theories rested on a "mischaracteriz[ation]" of Mr  Martinez's remarks, *id*  at 568, 242 P 3d at 167, and that another rested on a legal argument that the Court had "previously rejected," *id*  at 570, 242 P 3d at 169   In its analysis of these issues, the Court never suggested that Mr  Martinez had committed ethical violations   Arizona law is clear that "where there has been misconduct of either the prosecutor or defense counsel, but reversal is not required, the proper remedy will be affirmance, followed by institution of bar disciplinary proceedings against the offending lawyer, if such proceedings are warranted " *State v  Valdez*, 160 Ariz  9, 14, 770 P 2d 313, 318 (1989), *overruled on other grounds by Krone v  Hotham*, 187 Ariz  364, 366, 890 P 2d 1149, 1151 (1995)   The fact that the Arizona Supreme Court did not refer the *Gallardo* opinion to the State Bar for further investigation demonstrates that the Court did not believe that Mr  Martinez's conduct warranted bar disciplinary proceedings

### *Applicable Ethical Rules*

**ER 3 3(a) (Knowingly Make False Statement of Fact), ER 8 4(c) (Conduct Involving Dishonesty)**  Mr  Martinez did not mischaracterize the defense expert's testimony, knowingly or otherwise

**ER 3 4(c) (Knowingly Disobey Court Rule), ER 3 4(e) (Allude to Matter Not Reasonably Believed to be Relevant)**  Mr  Martinez did not knowingly disobey any court rule or allude to any matter that he did not reasonably believe to be relevant   He presented evidence and made arguments that he believed in good faith were warranted under the relevant facts and law

**ER 8 4(d) (Conduct Prejudicial to Administration of Justice), Rule 41(g), Ariz  R  Sup  Ct  (Unprofessional Conduct)**  Mr  Martinez's conduct was not unprofessional and did not result in prejudice to the administration of justice   The defendant was convicted, and the conviction was upheld on appeal   In the isolated instance in which the Arizona Supreme Court found that Mr  Martinez had made an improper argument, the Court specifically held that no prejudice resulted

### *State v  Lynch*

### *Factual Background*

    In 2001, Mr  Martinez was the prosecutor in the capital case of Shawn Lynch, who was charged with first-degree murder for his involvement in the death of James Panzarella   According to the evidence presented at the guilt phase of his trial, Lynch and an accomplice went to Mr  Panzarella's home on the evening of March 24, 2001   While there, Lynch and

Craig D  Henley, Esq
April 8, 2016
Page 13

his associate arranged for an escort to be sent to Mr  Panzarella's home, for which Mr
Panzarella paid   The next day, Lynch and his associate attempted to use Mr  Panzarella's
American Express card at several locations, but the card was ultimately reported lost   The
next day, Mr  Panzarella was found dead in his home, tied to a chair with blood pooled
around him   The evidence at trial demonstrated that, at some point, Lynch had murdered
Mr  Panzarella by cutting his throat   In doing so, however, Lynch failed to extend the knife
wound to Mr  Panzarella's spine, and as a result, it took Mr  Panzarella several minutes to
exsanguinate

     The trial jury found Lynch guilty of first-degree murder, the case proceeded to the
penalty phase, and the jury imposed the death penalty   However, the trial court
erroneously instructed the jury that four aggravators had been found, when in fact there
were only two   *See State v  Lynch*, 225 Ariz  27, 42, 234 P 3d 595, 610 (2010) **(Ex  "6")**
The Arizona Supreme Court therefore vacated the death sentence and remanded the case
for a penalty phase re-trial   *Id*  at 43, 234 P 3d at 611

     During the second penalty trial, over the course of six weeks, the defense presented
both lay and expert witnesses who expounded on their opinion why Lynch should not
receive the death penalty   Mr  Martinez cross-examined each of these witnesses and
argued to the jury that the defense was attempting to muddle the issues by drawing
attention away from the horrific manner in which the victim had been murdered   Following
the close of evidence and arguments, the jury returned a verdict in favor of the death
penalty   On automatic appeal, the Arizona Supreme Court affirmed the death sentence
*See State v  Lynch*, 238 Ariz  84, 357 P 3d 119 (2015) ("*Lynch II*") **(Ex  "7")**

### AACJ Allegations

     The Charge sets forth an extensive list of Mr  Martinez's conduct during the second
penalty trial that was allegedly unethical and/or improper   In doing so, however, the
Charge fails to cite to any specific portions of the record, relying entirely on the brief
descriptions in the Arizona Supreme Court's decision   The allegations can be separated into
the following four categories of supposed misconduct  (1) improper statements and
argument during opening statements, (2) aggressive questioning of witnesses on cross-
examination, (3) improper argument during closing statements, and (4) generalized
contentions regarding Mr  Martinez's overall conduct

     The Arizona Supreme Court has reviewed each of the allegations raised in the
Charge, and, although the Court concluded that certain conduct may have been
inappropriate, it declined to reverse Lynch's death sentence   *See id*  at 92–101, 357 P 3d at
127–136   Furthermore, as evidenced by its inaction on the matter, the Arizona Supreme
Court concluded that the conduct complained of in the Charge did not warrant a referral to
the State Bar

### Applicable Ethical Rules

     **ER 3 3(a)(1)** (barring an attorney from making a false statement of fact or law to a
tribunal), **ER 3 4(c)** (prohibiting an attorney from knowingly disobeying an obligation under
the rules of a tribunal), **ER 8 4(d)** (barring an attorney from engaging in conduct that is
prejudicial to the administration of justice)

Craig D  Henley, Esq
April 8, 2016
Page 14

### *Allegations Related to Opening Statements*

      The Charge first claims that Mr  Martinez acted improperly during opening statements by being argumentative and improperly asking the jury to place themselves in the position of the victim  Arizona courts have been clear that, although prosecutors have wide latitude in opening statements, they are not permitted to "make arguments that appeal to the jury's fears or passions "  *See* Ex  "7," *Lynch II*, 238 Ariz  at 100, 357 P 3d at 135

      The Charge refers to two allegedly argumentative statements  In doing so, however, the Charge does not adequately explain the context for Mr  Martinez's statements  The first was made while rebutting certain mitigation evidence related to an incident that occurred approximately thirty years before Lynch committed the underlying crime  Mr  Martinez stated

> But there is nothing to back it up  The other thing with regard
> to that is, this individual was approximately just short of 40
> years when he cut James Panzarella's throat  Why do we need
> to look at something 30 years ago – it happened 30 years ago,
> to say that is something that you should consider as mitigating?
> 30 years

Lynch Tr , July 17, 2012, at 98 21-99 3 **(Ex  "8")**

      The second statement occurred in the context of characterizing the defense strategy

> They don't know who the main actor was, whereas the DNA
> evidence and the testimony of the other individual indicates this
> is the main actor  Then they want to pull at your heart strings
> by talking to you about

*Id*  at 106 8-12

      Objections were interposed to both statements on the grounds they were argumentative, and both objections were sustained  Following the sustained objections, Mr  Martinez rephrased his arguments in a manner that avoided further objections  That the trial court sustained the objections does not render Mr  Martinez's conduct unethical  In fact, the Arizona Supreme Court noted that, while these statements were inappropriate, they did not affect the jury's verdict  *See* Ex  "7," *Lynch II*, 238 Ariz  at 92, 357 P 3d at 127

      Next, the Charge contends that Mr  Martinez improperly asked that the jury place themselves in the position of the victim when he stated

> So what happens is the defendant then, as Mr  Panzarella sits
> there, goes behind him and begins and cuts his throat from ear
> to ear  The problem or the unfortunate aspect of that, because
> in and of itself, cutting somebody's throat is a horrific, ghastly
> thing, you can only imagine, I don't think you can even imagine
> what it's like for somebody to approach you with a knife  You

Craig D  Henley, Esq
April 8, 2016
Page 15

> cannot move and you know they're manhandling you and they
> are going to cut your throat

Ex  "8," Lynch Tr , June 17, 2012, at 93 7-16   The Arizona Supreme Court concluded that
Mr  Martinez's aforementioned statement was improper, but nonetheless held that the
objection and curative instruction remedied any issues   Ex  "7," *Lynch II*, 238 Ariz  at 100,
357 P 3d at 135   As a result, Mr  Martinez's statements were not so improper as to
constitute conduct detrimental to the administration of justice

*Allegations Related to Mr  Martinez's Cross-Examination of Witnesses*

The Charge also alleges that certain exchanges between Mr  Martinez and individual
witnesses during cross-examination were improper   The Charge points to two instances
where objections were sustained on the grounds that the line of questioning was
argumentative, one instance where Mr  Martinez suggested that a witness could vouch for
other witnesses, and one instance where Mr  Martinez allegedly appealed to the fears of the
jury   Again, these contentions are taken out of context and fail to address adequately the
impetus for and ultimate effect of the questions

<u>First</u>, the Charge claims that Mr  Martinez acted improperly because the trial court
sustained objections to two questions for being "aggressive "  This allegation misrepresents
the nature of the sustained objections   In fact, as noted in the Arizona Supreme Court's
opinion, the trial court sustained "objections to two questions that were asked and
answered        "  *Id*  at 93, 357 P 3d at 128   It strains credulity to contend that, without
more, it is unethical to ask a question that was previously answered

<u>Second</u>, the Charge claims that Mr  Martinez committed an ethical violation by
suggesting, during the examination of Lynch's expert witness, that she could vouch for
other witnesses   The underlying statement took place in a much longer exchange between
Mr  Martinez and Lynch's expert witness, who purported to provide testimony related to the
truthfulness of certain statements that individuals had made   While questioning the expert,
Mr  Martinez asked the following question

> Q       With regard to that, being an expert on recollected
> memories, isn't that really just vouching for what somebody is
> saying?  In this case, isn't – aren't you really vouching for what
> that client was saying, I was a juvenile   Isn't that what you're
> just really doing?  Because you're saying this person – the
> other person is not to be believed?

Lynch Tr , July 18, 2012, at 196 19–197 1 (**Ex  "9"**)   There was no objection   A few
questions later, the following exchange took place

> Q       If that were the hypothetical you would say he's not to
> be believed, right because you can vouch for people?
>
> A       I would not –
>
> MR  BROWN   Objection  She's –
>
> THE COURT   Sustained  Sustained

Craig D Henley, Esq
April 8, 2016
Page 16

> Q      BY MR MARTINEZ      Well, in that case given what you
> know, would you say that person was telling the truth or not
> based on the hypothetical that I posed to you involving the 49
> years and no event that sticks out in their mind?
>
> MR BROWN   Same objection
>
> THE COURT   Overruled, you may answer if you can

*Id* at 198 8-21

In discussing this line of questioning, the Arizona Supreme Court noted that it "did not encroach on the jury's evaluation of witness veracity, but rather tested [the witness's] credibility by attempting to show that she believed interviewees when their story was helpful but skeptical when their story was not helpful " Ex "7," *Lynch II*, 238 Ariz at 94, 357 P 3d at 129   Nothing about the questioning as a whole was so improper as to have denied Lynch a fair trial   *Id*

Finally, the Charge asserts a generic claim that Mr Martinez appealed to the jurors' fears when he asked a defense witness whether Lynch might "stick or prick" a corrections officer   This question occurred in the context of Mr Martinez's cross-examination of the defense's expert witness, who had previously opined as to the risk Lynch would pose if allowed to serve a life sentence in prison   The specific exchange between Mr Martinez and the witness was as follows

> Q      And there is also a possibility that this defendant here, if
> he were – could stick or prick, with a sharp object, one of the
> corrections officers, right?
>
> A      The probability of that is very miniscule but obviously,
> that is the reason why we have training and other systems
> available to ensure that the probability of that is at the lowest
> common denominator, sir
>
> Q      You say that the probability is very miniscule, do you
> think that would be comfort to the person who got stuck by a
> needle that Shawn Lynch had used, do you think that would be
> comfort to them?

Lynch Tr , July 23, 2012, at 47 22-48 9 (**Ex "10"**)   The Arizona Supreme Court held that "[t]he cross-examination was relevant rebuttal" to the testimony that the defense had solicited   Ex "7," *Lynch II*, 238 Ariz at 95, 357 P 3d at 130

*Allegations Related to Mr Martinez's Conduct During Closing Arguments*

The Charge claims that, during closing arguments in *Lynch II* (penalty phase), Mr Martinez misstated the law by suggesting that Lynch's viewing of pornographic videos reflected a debasement in his character, and by discussing certain statutory aggravators in the conjunctive rather than the disjunctive   Neither of these contentions has merit

Craig D  Henley, Esq
April 8, 2016
Page 17

The statement about pornographic videos did not prejudice Lynch   In full, Mr  Martinez's comments were

> MR  MARTINEZ       One of the things that you can consider is character   One of the things that we do know is that both of them were in there, both he and Mr  Sehwani   Perhaps what he was doing there is he was covering his eyes with both hands while those ten adult videos were being played   Perhaps that's what he was doing   That's a mitigating factor, right?  That was Mr  Sehwani   Everything is Mr  Sehwani   No   That shows a debasement in the part of this individual's character   And that has already been found, because this murder has been found – his murder has been found to be especially heinous and depraved

> MR  BLIEDEN       Objection   The debasement and the pornography has nothing to do with that aggravator, so that's misstating—

> THE COURT   Sustained

Lynch Tr , August 9, 2012, at 65 16–66 5 **(Ex  "11")**  Mr  Martinez did not press the issue further, but instead he moved on to an entirely separate subject matter   The Arizona Supreme Court held that the objection was properly sustained, but there was no evidence that the statement impacted the jury's determination   *See* Ex  "7," *Lynch II*, 238 Ariz  at 98, 357 P 3d at 133   In making this argument, Mr  Martinez did not intentionally misstate the law or attempt to mislead the jury

The AACJ also alleges that Mr  Martinez misstated the law when describing the application of the (F)(6) aggravator   The relevant evidence demonstrates that these were inadvertent mistakes, not knowing or intentional misconduct   Specifically, during a handful of instances during voir dire and closing, Mr  Martinez suggested that the (F)(6) aggravator was three separate aggravators rather than one   Upon being made aware of these mistakes, however, Mr  Martinez clarified the issue to the jury   *See Id*  at 99, 357 P 3d at 134   As the Arizona Supreme Court acknowledged, these mistakes indicate only that Mr  Martinez "struggled at times      with the disjunctive 'or' and conjunctive 'and' in explaining the (F)(6) aggravator       "  *Id*  Additionally, because both Mr  Martinez and the trial court clarified the issue for the jury, there was no error warranting reversal   *Id*

### Generalized Allegations of Improper Conduct

The Charge also makes a series of generalized contentions that Mr  Martinez acted improperly over the course of Lynch's sentencing trial   In particular, the Charge asserts that Mr  Martinez was "aggressive," that he misstated evidence during cross-examination of witnesses and closing arguments, and that his cumulative actions constitute misconduct   None of these contentions point to any specific instance where Mr  Martinez allegedly engaged in unethical or otherwise impermissible behavior

Regarding the allegation that Mr  Martinez was "aggressive," there is no colorable basis for finding that such conduct rose to the level of an ethical violation   Without a particular example of the supposed misconduct, it is impossible to determine what conduct

Craig D  Henley, Esq
April 8, 2016
Page 18

allegedly was inappropriate  The Arizona Supreme Court's recognition of Mr  Martinez's
aggressiveness, coupled with its decision not to refer the issue to the State Bar,
demonstrates that his conduct was not unethical  *See generally id*  at 95, 357 P 3d at 130

      Regarding the allegation that Mr  Martinez misstated evidence during cross-
examination and closing argument, the Charge again fails to identify any particular instance
of misconduct  The Charge instead relies on a brief portion of the Arizona Supreme Court's
decision that noted Mr  Martinez made some remarks for which objections were made and
sustained   This fact does not demonstrate any misrepresentation of evidence, intentional or
otherwise  The Arizona Supreme Court determined that such statements did not affect the
jury's decision  *Id*  at 96, 357 P 3d at 131

      Finally, the Charge makes a blanket allusion to Mr  Martinez's cumulative conduct
during Lynch's second sentencing trial  However, Mr  Martinez's conduct, whether viewed
specifically or cumulatively, was not sufficient to deny Lynch a fair trial  The Arizona
Supreme Court held that "[a]lthough the prosecutor made some improper remarks, they did
not amount to a persistent and pervasive misconduct that deprived Lynch of a fair trial " *Id*
at 100, 357 P 3d at 135

### Conduct During Criminal Trials

**State v  Beemon**

#### Factual Background

      *Beemon* involved the 2002 premeditated murder of an 18-year-old woman by
strangulation  Mr  Martinez was the prosecutor assigned to the case  In 2005, a jury
convicted Beemon of second-degree murder  He was sentenced to 22 years in prison

#### AACJ Allegations

      Complainant contends that Mr  Martinez engaged in ethical misconduct by
comparing, during the rebuttal closing argument of the aggravation phase of the case,
defense counsel's empty rhetoric to Hitler's tactics  The challenged statements occurred on
September 7, 2005, more than a decade ago  During the defense s closing argument,
defense counsel stated that Mr  Martinez had accused the defense of "sneaking, lying,
cheating," and then defense counsel purported to rebut that alleged accusation  Beemon
Trial Tr , September 7, 2005, at 28 10 12 **(Ex  "12")**  Mr  Martinez viewed the defense's
argument as a gross mischaracterization of what he had actually said in his closing
argument and, as such, an attempt to distract the jury from material issues  In rebuttal,
therefore, Mr  Martinez attempted to respond to the defense's argument, in part, by
characterizing it as a propaganda ploy aimed at obfuscating the truth, similar to the "big
lie "

      He argued as follows

      One of the things defense counsel got up and told you was, well, the
      prosecutor has said that we've been sneaking, lying and cheating      And
      he said that at the top of his lungs

      As I said, if history teaches us anything, it's that it comes around again and
      again  Remember Hitler? The big lie he told you? It was at the top of his

Craig D  Henley, Esq
April 8, 2016
Page 19

lungs over and over, you are the superior people and people are going to
believe it because they heard it over and over again[ ]  [A]nd that's what he
said over and over again was about the state calling him sneaking, calling him
lying, calling him cheating          Did that ever happen by the State?  Of
course it didn't happen, but you know what?  He wants you to believe that it
did   You know, just like Hitler, that big lie  If you put it out there, even
though the prosecutor didn't say it, maybe you'll believe it   And maybe when
you go back there to decide this case, you won't decide it on the facts

But, you know, "cheating " that's the word he used   Again, he wants to
associate or put over this thoughts over onto the prosecutor  Always  It's
the prosecutor because you can't talk about the facts and the evidence in this
case because then, of course, it wouldn't be to his benefit  So it's always this
personal attack  Let's just make it up  Let's make it up as we go along   Let's
make up the lie because, as you know, people will believe lies if you raise
your voice loud enough   And if you keep saying it over and over again, some
people will begin to believe you and say, well, maybe that's true or else he
would not have pranced around here and wouldn't have run around here like
he did at the top of his lungs getting behind the prosecutor, pointing over
there, and then saying what he said

Let's ignore about what came from the witness stand   Let's keep talking
about the prosecutor   Because when you come back there, you're going to
talk about the personality of the lawyers and you'll say, well, maybe he's
right   But is that about the facts?  Is that what this is about?  You took an
oath to follow the instructions, and that's all I'm asking you to do

But you know what?  If we say the State said it, that will make it true for you
when you go back there   Again, it's nothing more than, if you will, this
creating this big lie, this whole thing up   This is about the prosecutor and not
about the facts, not about the things that came from the witness stand

He talks about America and wraps himself around the flag   Doesn't wrap
himself around the German flag when he calls somebody a cheater, a liar, and
sneaking when in fact they never even used those words

There was nothing that was said by the prosecutor that even remotely
sounded like sneaking, lying, cheating          He called him that over and over
because he wants to generate some backlash, if you will, when you go back
to decide this case

Craig D Henley, Esq
April 8, 2016
Page 20

> I don't want that   The State does not want that from you   All the State
> wants you to do is take a look at the facts in this case   All the State is asking
> you to do is to look at the exhibits   All the State is asking you to do is
> consider the evidence that came from the witness stand   Take a look at all of
> that   If you take a look at all of that, even though someone calls the
> prosecutor sneaking, lying, cheating, all of that stuff, attributes things like
> beast and dog and all these terms to him
>
> Even though they may do that, that's an effective argument   It has
> worked through history   We have the example of Germany        I'm just
> asking to you do take a look at the facts involved and the evidence that you
> found        That's all I'm asking you to do        You heard all the facts, and
> I'm asking you to apply the law to them   Thank you

*Id*  at 43 13-44 6, 46 3-17, 47 18-24, 48 10-16, 48 25-49 3, 55 19-56 16

Defense counsel made a number of objections during Mr Martinez's closing and
rebuttal arguments   He did not, however, make a contemporaneous objection to the "big
lie" analogy   It was not until the trial court reconvened after a 20-minute recess that
followed the conclusion of Mr Martinez's rebuttal that defense counsel moved for a mistrial
based on that argument, arguing that the jury could hold defense counsel's Jewish heritage
against the defendant   Until defense counsel made that argument, Mr Martinez had not
known he was Jewish   After hearing from counsel, the court denied the motion without
explanation

Prosecutors' "wide latitude" in presenting their closing arguments to the jury includes
referencing subjects that are "common knowledge or are illustrations drawn from common
experience, history or literature "  *Standard Chartered PLC v Price Waterhouse*, 190 Ariz 6,
48, 945 P 2d 317, 359 (App 1996), *see also Commonwealth v Johnson*, 719 A 2d 778, 790
(Pa Super Ct 1998) (holding that a discussion of the "big lie" as a propaganda ploy "does
not in and of itself exceed the bounds of oratorical flair," but that "comparisons between
counsel's tactics and those of Hitler and Goebbels were reprehensible, even in the heat of
closing arguments")   "In the closing argument, excessive and emotional language is the
bread and butter weapon of counsel's forensic arsenal[ ]"  *State v Gonzales*, 105 Ariz 434,
437, 466 P 2d 388, 391 (1970)

During his rebuttal argument, Mr Martinez believed he was drawing a permissible
historical analogy   There was no intent to compare defense counsel (or anyone else) to
Hitler   The intent and focus of his argument—as the above excerpts illustrate—was a
comparison of the defense's argument about the impropriety of the State's position to the
"big lie" as a propaganda ploy   In a memorandum decision dated February 21, 2008,
upholding Beemon's conviction (**Ex "13"**), the Arizona Court of Appeals held that Mr
Martinez's argument was "completely inappropriate" and that closing argument "can never
be extended so far as to permit an attorney to blacken the character of a courtroom
adversary by comparing his tactics to those of Nazis," but the Court further ruled that no
prejudice resulted from the argument   Mr Martinez intended no insult to defense counsel's
character   To the contrary, he believed he had to illustrate the empty rhetorical device used
by the defense during its closing argument, that is, the creation of a nonexistent
"strawman" that the defense could purport to rebut, since it had no argument to make on
the evidence   Mr Martinez used an analogy to illustrate the historical fact that repeated

Craig D  Henley, Esq
April 8, 2016
Page 21

public, falsely negative statements about a person or class of persons can become
persuasive as though those false statements were the truth

Mr  Martinez has not referenced Hitler or Nazi Germany in any argument in the
approximately eleven years that have passed since the *Beemon* trial   That is the most
important fact in regard to this allegation   In 2005, Mr  Martinez had reason to believe that
references to the "big lie" can be appropriate in closing argument, where the defense has
elected to attack the State instead of relying on the evidence presented at trial   His
statements in *Beemon* were made under a good-faith belief that his argument was legally
permissible   After *Beemon*, he recognized that such arguments are too likely to engender
highly emotional responses and be considered offensive, even absent any intent to offend
Mr  Martinez, therefore, used that analogy once and only once – in *Beemon* – and he has
not used it since

### *Applicable Ethical Rules*

**ER 3 4(c) (Knowingly Disobey Court Rule), ER 3 4(e) (Allude to Matter Not
Reasonably Believed to be Relevant)**   Mr  Martinez did not knowingly disobey any court
rule or allude to any matter that he did not reasonably believe to be relevant   He presented
evidence and made arguments that he believed in good faith were warranted under the
relevant facts and law

**ER 4 4(a) (Use Means with No Substantial Purpose Other than to Embarrass)**   Mr
Martinez's argument was not intended to embarrass or harass defense counsel based on his
Jewish heritage   Before making the argument, Mr  Martinez did not know defense counsel
was Jewish   The purpose of the argument was to rebut arguments made by the defense
counsel during his closing argument

**ER 8 4(d) (Conduct Prejudicial to Administration of Justice), Rule 41(g), Ariz  R
Sup  Ct  (Unprofessional Conduct)**   Mr  Martinez's argument caused an emotional
response, which he understands (and which explains why he has not made the same
argument since), but it did not rise to the level of unprofessional conduct and did not result
in prejudice to the administration of justice   The defendant was convicted, and the
conviction was upheld on appeal   Although the Arizona Court of Appeals held that Mr
Martinez's argument was improper, the Court specifically held that no prejudice resulted

### *State v  Grant*

### *Factual Background*

From 2006 to 2009, Mr  Martinez was the prosecutor in the criminal case against
Douglas Grant, who was found guilty of manslaughter for the death of his wife, Faylene
Grant   The circumstances underlying the case were well-publicized, as the facts were both
salacious and bizarre   Originally married in 1993, Douglas and Faylene Grant began their
marriage in an apparently congenial manner, eventually having two children together   Both
Grants were religious, but Faylene was a particularly devout member of the Church of Jesus
Christ of Latter Day Saints   During the early part of their marriage, Douglas established
and developed a successful nutritional supplement business, eventually consulting with
several professional basketball teams   His apparent success came at the expense of his
marriage, however, as he began having extramarital affairs and spending a substantial
amount of time outside of the home   As a result, the Grants divorced in 2000

Craig D  Henley, Esq
April 8, 2016
Page 22

Shortly after they divorced, Douglas started a relationship with a young receptionist at his company, Hillary Dewitt  He then allegedly received a phone call from Faylene, who said she had received divine guidance and been instructed to remarry him  The Grants then went to Las Vegas, where they were officially remarried, however, despite his outward renewal of fidelity, while he was still in Las Vegas celebrating his remarriage to Faylene, Douglas continued to engage in intimate phone calls and other communications with Ms Dewitt

Around the time of the second wedding, Douglas Grant supposedly began having premonitions of Faylene's death, which he attributed to divine intervention  Faylene's devotion to her faith caused her to adopt her husband's visions as true  Accordingly, she wrote a series of letters to friends and family members related to her imminent demise  Among the recipients of the letters was Ms  Dewitt, who later said that she corresponded with Faylene regularly about religion and her desire that Ms  Dewitt act as the mother of her children after Faylene's death

On September 27, 2001, Faylene was found unconscious in a bathtub in the Grants' home and, despite medical efforts to revive her, she eventually died  Although her death was initially determined to be accidental, a medical examiner's report listed the cause of death as uncertain  Three days after her death, Douglas Grant called a meeting at his home with several of Faylene's relatives  In addition to discussing logistics pertaining to her funeral, Douglas informed the family that, prior to her death, Faylene had authored a letter to each of the family members and had asked him to distribute the letters after her death  Douglas allegedly then distributed those letters to the individuals identified on the envelopes

Approximately three weeks after Faylene's death, Douglas married Ms  Dewitt  In addition, he received a substantial payment from Faylene's life insurance policy  Shortly thereafter, the Gilbert Police Department began investigating the circumstances of Faylene's death  Around four years later, in 2005, Douglas was charged in connection with Faylene's death

The case was initially assigned to prosecutor Frankie Grimsman with the Maricopa County Attorney's Office  In August 2005, Douglas Grant's counsel, A  Melvin McDonald, sent a letter to Ms  Grimsman requesting production of copies of the letters Mr  Grant had distributed after Faylene's death  Ms  Grimsman did not produce all of the letters  Mr  McDonald filed a motion to compel, eventually deposing the detective assigned to the case about the location and existence of the letters  Although the detective was able to confirm that letters had existed at some point, neither he nor Ms  Grimsman were able to produce any additional letters, because they were in the possession of Faylene's family

In 2006, Mr  Martinez took over the case from Ms  Grimsman, inheriting the still-ongoing dispute over production of the letters  During a hearing on February 24, 2006, Mr  Martinez truthfully informed the trial court that, after speaking with Mrs  Grant's family, he was not in possession of any additional letters than those that had previously been produced  Defense counsel pressed the issue, and it became apparent that, if more letters existed and Faylene's family refused to produce them, the case against Douglas Grant could be dismissed

In a final effort to secure the letters, Mr  Martinez contacted Faylene's family again and informed them the case would be dismissed if they did not produce any remaining

Craig D  Henley, Esq
April 8, 2016
Page 23

letters they might have   The family then produced several more letters, which were
promptly disclosed to defense counsel

        In addition to the dispute regarding the letters, there was also a question regarding
the existence of certain transcripts and/or recordings of witness interviews   In late 2006,
after repeated requests to the Gilbert Police Department to produce any responsive
materials, Mr  Martinez informed the Court that, based on his personal knowledge following
several requests to the police, there were no additional recordings to be turned over to the
defense   Nonetheless, given the defense's repeated requests, the Court eventually ordered
that a document inspection be permitted at the Gilbert Police Department   During this
inspection, additional witness tapes were discovered for the first time

        Nearly two years after the disputes concerning the letters and the witness
recordings, Douglas Grant's trial began   The trial took fifty-one days between November
2008 and March 2009   Numerous witnesses testified regarding Grant's history of marital
transgressions and penchant for infidelity   As evidence of the affair between Grant and Ms
Dewitt, Mr  Martinez entered Grant's phone records into evidence and was able to provide
precise timeframes in which the two communicated   The records demonstrated that, even
while he was in Las Vegas for his second wedding with Faylene, Douglas Grant had
continued to engage in conversations with Ms  Dewitt, likely for romantic or sexual
purposes

        The jury convicted Douglas Grant of manslaughter but could not reach unanimous
verdicts on first- or second-degree murder   At the sentencing hearing, Grant presented a
series of witnesses who opined he was a good father and had been a good husband to
Faylene   In response, Mr  Martinez reminded the jury that Douglas Grant had been
excommunicated from the LDS church, had engaged in a series of extramarital affairs, and
was convicted of manslaughter   He made the following statement concerning the love
triangle involving Douglas, Faylene, and Ms  Dewitt

                And then there's a phone call on July 28th, one day after the
                marriage   And then there's all these phone calls that go back
                and forth   It's just tawdry, this sort of threesome, ménage à
                trois as the French call it, that he's going through

Grant Tr , May 15, 2009, at 75 8–12 **(Ex  "14")**   Mr  Martinez argued that, given the
circumstances of Faylene's death, Douglas Grant should receive an aggravated sentence of
twelve and a half years   He was ultimately sentenced to five years in prison

        Douglas Grant did not directly appeal any of the issues involving his conviction   His
appellate counsel determined that, in accordance with *Anders v  California*, 386 U S  738
(1967), after searching the entire record, there were no arguable questions of law to raise
on appeal   *See State v  Grant*, 2011 WL 553765 (App  2011) **(Ex  "15")**   The only issue
that Grant directly challenged was related to his sentence, which the appellate court
summarily affirmed   *Id*

### AACJ Allegations

        The Charge alleges three instances of misconduct related to the *Grant* case   (1) that
Mr  Martinez improperly withheld copies of the letters from the defense despite allegedly
having control over them, (2) that Mr  Martinez made knowing misrepresentations to the

Craig D Henley, Esq
April 8, 2016
Page 24

Court regarding the existence and whereabouts of tapes of certain witness interviews, and (3) that Mr Martinez improperly argued to the jury that Mr Grant was involved in concurrent relationships with both Faylene and Ms Dewitt  Each allegation depends on factual misrepresentations and lacks any substantive basis

### *Applicable Ethical Rules*

**ER 3 3(a)(1)** (prohibiting an attorney from making a false statement of fact to a tribunal), **ER 3 4(a)** (barring an attorney from unlawfully obstructing another party's access to evidence or concealing a document or other material having potential evidentiary value), **3 4(d)** (proscribing an attorney from failing to make reasonably diligent efforts to comply with a proper discovery request), **3 8(d)** (requiring a prosecutor to make timely discovery of all evidence or information known to the prosecutor that tends to negate the guilt of the accused), **8 4(d)** (barring an attorney from engaging in conduct that is prejudicial to the administration of justice)

The person with the greatest motivation and opportunity to raise all of the allegations of the AACJ Charge was Douglas Grant himself, through his appellate attorney  However, his appellate attorney concluded that, "after a thorough and conscientious review of the record, **counsel for Defendant Douglas Grant can present no issue for review which will support a challenge on the Court's rulings, verdict and/or sentence imposed by the Superior Court** "  *See* Appellant's Opening Brief Pursuant to Anders v California, 2010 WL 2355931 at *33 (App  2010) (emphasis added) **(Ex  "16")**

There is no question that, if any of the allegations of the Charge had merit, they would have been raised in Grant's appeal  The fact that his own appellate attorney reviewed the case and concluded there were no available issues to appeal compels the conclusion that Mr  Martinez's conduct, before and during trial and sentencing, was appropriate  This fact is further illustrated by the gravity of the AACJ's allegations  In particular, withholding exculpatory evidence is a violation of the Fifth Amendment to the United States Constitution and would constitute fundamental error, warranting a new trial  *See generally State v. O'Dell*, 202 Ariz  453, 457, 46 P 3d 1074, 1078 (App  2002)  The fact that Mr  Grant's appellate counsel not only did not argue that Mr  Martinez withheld evidence, but affirmatively stated that there was **"no issue for review which will support a challenge on the Court's rulings, verdict and/or sentence imposed by the Superior Court"** compels the conclusion that the AACJ's allegations are devoid of merit

### *Allegations Related to the Letters*

The Charge first contends that Mr  Martinez acted unethically by failing to disclose exculpatory evidence in the form of letters that Faylene Grant wrote to her close friends and family  The Charge fails to present all of the relevant facts and, instead, seizes on isolated statements by Grant's defense counsel  The issue concerning the letters originated long before Mr  Martinez had assumed prosecutorial responsibility for the case  Indeed, the defense's Motion to Dismiss explained that the letters were initially requested from Mr  Martinez's predecessor, Ms Grimsman  *See* Motion to Dismiss with Prejudice at 5–6 **(Ex  "17")**  More specifically, defense counsel made the initial requests as early as August 2005, had received some letters, but had not received additional letters when Mr  Martinez took over the case in February 2006  After he took over the case, Mr  Martinez took appropriate steps to secure additional letters from Faylene's family, which had control over

Craig D Henley, Esq
April 8, 2016
Page 25

them   The excerpts of the evidentiary hearing cited in the Charge confirm this precise point   (Charge, at 9-10 )   Mr Martinez is quoted as saying that he had spoken with the people in possession of the letters, but they had represented to him that all of the letters had already been produced to the State for disclosure   When Mr Martinez made that statement, it was accurate and in no respect an attempt to mislead the Court

Following his initial involvement with the letter issue, Mr Martinez continued to press Faylene's family for any additional letters   Her family, however, continued to state that all of the relevant documents had been produced   Ultimately, after Douglas Grant's counsel had stated that, unless the additional letters were produced, he would seek dismissal of the case (and also had identified specific letters he claimed had never been turned over), Mr Martinez then approached Faylene's family again with the new information and the possibility of a dismissal of the case against Grant   After that conversation, an additional batch of letters was turned over to Mr Martinez, and he promptly disclosed them to the defense

Mr Martinez was truthful in his representations to the trial court and opposing counsel concerning additional letters   He continued to pursue resolution of the issue to locate the letters and was ultimately the catalyst for their production   His statements about the existence (or absence) of additional letters were based entirely on his discussions with Faylene's family, and were true and accurate reflections of his knowledge at the time

### Allegations Regarding Witness Interviews

The Charge claims that Mr Martinez improperly stated to the trial court and defense counsel that tapes of certain witness interviews did not exist   Like the letter issue discussed above, this allegation also fails to disclose relevant facts   Like the letter issue, Mr Martinez never possessed or controlled the witness interview tapes   The sole custodian of the tapes was the Gilbert Police Department   When defense counsel requested the witness interview tapes, Mr Martinez's only option was to request them from the Gilbert Police   He did so Gilbert Police informed him that the tapes did not exist   Mr Martinez then truthfully stated to the Court, based on his knowledge, that discovery of the tapes was completed

The ultimate revelation of the tapes during an April 16, 2007 document inspection at the Gilbert Police Department does not render false or misleading Mr Martinez's prior representations to the Court   Rather, discovery of the tapes confirmed that the Gilbert Police had sole access to and control over the requested materials   Prior to the document inspection, Mr Martinez had no knowledge of the existence of the tapes   To the contrary, he reasonably relied on representations from the Gilbert Police that there were no tapes His statements to the Court and defense counsel that discovery of the tapes had been completed were made in good faith, even if ultimately inaccurate

The Ethical Rules do not require attorneys to be omniscient or infallible   Indeed, as stated in the Preamble to the Ethical Rules, "The Rules presuppose that disciplinary assessment of a lawyer's conduct will be made on the basis of the facts and circumstances *as they existed at the time of the conduct in question and in recognition of the fact that a lawyer often has to act upon uncertain or incomplete evidence of the situation "* Preamble ¶ [19] (emphasis added)   Over the course of discovery and trial in any case, particularly in a case spanning as much time as the *Grant* case, new evidence may emerge or prior understandings of facts can be corrected by later-discovered facts   Mr Martinez accurately represented to the Court his understanding of the facts

Craig D  Henley, Esq
April 8, 2016
Page 26

### Comment Related to Douglas Grant's Concurrent Relationships

The Charge alleges that Mr Martinez's argument about the concurrent relationships among Douglas, Faylene and Ms Dewitt was improper  Like the preceding allegations, this allegation is premised on a misleading representation of Mr Martinez's statements [3]  Those statements, made during the sentencing hearing, occurred after several witnesses had testified about their personal impressions of Grant as a loving father and caring husband  In response, Mr Martinez argued that the evidence presented during trial reflected the opposite – *i e* , that Mr Grant had repeatedly engaged in extramarital affairs, spent a substantial amount of time away from the home, and eventually was responsible for Faylene's death  His argument was based on evidence presented to the jury reflecting the numerous telephone calls that Grant had placed to Ms Dewitt immediately following his remarriage to Mrs Grant  In summarizing Grant's ongoing relationships, Mr Martinez made the following statement

> And then there's a phone call on July 28th, one day after the
> marriage  And then there's all these phone calls that go back
> and forth  It's just tawdry, this sort of threesome, ménage a
> trois as the French call it, that he's going through

Ex "15," Grant Tr , May 15, 2009, at 75 8–12

The AACJ alleges this argument was unethical because there was no evidence that Grant and Ms Dewitt engaged in sexual relations or even saw each other after the remarriage  However, Mr Martinez was free to argue, based on the evidence, that Grant, while newly re-married to Faylene, continued to have some form of a romantic relationship with Ms Dewitt  The argument was a reasonable inference based on telephone records showing that Grant continued to have communications with Ms Dewitt  These arguments were well within the bounds of permissible closing arguments  *See generally State v Hughes*, 193 Ariz  72, 85, 969 P 2d 1184, 1197 (1998) ("Counsel can argue all reasonable inferences from the evidence ")

### *State v  Chrisman*

#### *Factual Background*

On October 5, 2010, Chrisman, a police officer, shot and killed a suspect and the suspect's dog while responding to a call for help from the suspect's mother  Chrisman was indicted on charges of second-degree murder, aggravated assault, and cruelty to animals eight days later, on October 13, 2010  Officer Virgillo, who was present with Chrisman at the scene of the alleged crimes, claimed that neither the dog nor the victim posed any danger to the officers when Chrisman shot and killed them  On September 17, 2013, a jury convicted Chrisman of aggravated assault, but could not reach agreement on the other two

---

[3] In fact, it appears that the Charge s claims regarding Mr Martinez's statements were taken directly from newspaper accounts of his statements during the sentencing phase of Mr Grant's trial  See Paul Rubin, *Doug Grant Gets Five Years After Slain Wife's Sister Pressed for His Conviction Based on a Dream*, Phoenix New Times, May 21, 2009, available at
http //www phoenixnewtimes com/news/doug-grant-gets five-years-after-slain-wifes-sister-pressed-for-his conviction based-on a dream-6430046

Craig D  Henley, Esq
April 8, 2016
Page 27

counts  On December 11, 2010, Chrisman pled guilty to manslaughter to resolve the
remaining two counts  He was sentenced to seven years in prison

### AACJ Allegations

The AACJ alleges that Mr  Martinez committed multiple violations of the Ethical Rules
at various stages of the Chrisman case  Rather than conduct any independent analysis of
the issues, the AACJ appears to have simply adopted the allegations of a motion for new
trial that Chrisman filed after the jury found him guilty of aggravated assault  Motion for
New Trial **(Ex  "18")**, Objection to Motion for New Trial **(Ex  "19" )**  There is no merit to
the allegations  The trial judge—who was in the best position to evaluate Mr  Martinez's
conduct in the context of the trial and the relevant issues at stake—rejected the arguments
in that motion and denied it without comment  Minute Entry, November 13, 2013 **(Ex
"20")**

### Alleged Deprivation of Exculpatory Witness

The AACJ alleges that Mr  Martinez deprived the defense of the opportunity to call
Andrew Hinz as a trial witness  This allegation is meritless  The State retained Hinz to
perform an analysis of the Taser guns that were used at the scene of the crime  He set
forth his findings and opinions in a 50-plus page report  Mr  Martinez disclosed Hinz as a
potential trial witness on November 20, 2012  Subsequently, Mr  Martinez chose not to call
him as a trial witness, but Mr  Martinez fully cooperated with the defense's efforts to
interview Hinz and to secure his testimony at trial

The AACJ's suggestion that Mr  Martinez delayed the defense's interview of Hinz is
rebutted by the relevant email correspondence  It demonstrates that the short delay
resulted from coordinating schedules and managing the logistics of an out-of-state
interview  Email chain dated July 16-19, 2013 **(Ex  "21")**  On July 16, 2013, defense
counsel's assistant wrote to Mr  Martinez's assistant regarding certain logistics

> Ok I just spoke to the videographer and he says he just needs
> the zip code for Mr  Hines [sic] and he will find a site closest to
> him so he will have to do a little bit of travelling but not too
> much  We will need to go to the video site here in Phoenix
> Please provide me with Mr  Hines' [sic] zip code and the date
> he would like to conduct the interview and we can get it all set
> up for him
>
> Thank you, Kathiei

*Id*  Mr  Martinez's assistant responded 22 minutes later with the requested information  *Id*
The next day, defense counsel's assistant provided the specific time and location of the
interview on Hinz's date of choice and asked for confirmation that Hinz would attend  *Id*
Mr  Martinez's assistant provided confirmation two days later (after hearing from Hinz), and
the interview proceeded as planned (although Hinz arrived a little late to the interview)  *Id*

Similarly, contrary to the AACJ's allegation, Mr  Martinez (and his staff) assisted the
defense in trying to secure Hinz's testimony at trial—they did not hinder it  On July 29,
2013, the defense served a copy of a trial subpoena concerning Hinz on the Maricopa
County Attorney's Office  The subpoena ordered Hinz's appearance for July 31, 2013, the

Craig D  Henley, Esq
April 8, 2016
Page 28

trial commencement date   Mr  Martinez's assistant forwarded a copy of the subpoena to
Hinz, who agreed to make himself available to testify, but he requested that his appearance
be scheduled for August 28 (to accommodate his employment obligations and travel
schedule), and further requested that the defense make his flight and hotel reservations
(because he did not want to advance those costs)   Mr  Martinez communicated this
information to defense counsel, along with Hinz's statement that someone from defense
counsel's office told him that he would need to make his own flight and hotel reservations
Email dated August 22, 2013 **(Ex  "22")**, *see also* Email Chain dated August 15-20, 2013
**(Ex  "23")**   Defense counsel responded shortly thereafter and accused Mr  Martinez or
Hinz—the context is unclear—of telling a "bold faced lie" about defense counsel's
unwillingness to make flight and hotel reservations   Email Chain dated August 22, 2013
**(Ex  "24")**   In response, Mr  Martinez provided defense counsel with all the information
needed to communicate directly with Hinz, while ending any further involvement of his
office in the matter

> Your assertion that Mr  Heinz [sic] told a "bold faced lie" is
> concerning   I will not become involved in court appearance
> issues with your witness   This includes passing along your
> telephone numbers   You already have his telephone number
> and can pass that information along when you call him   The
> home address he provided to us is 461 Ellis Way, Golden,
> Colorado 80401

*Id*

### Alleged Misrepresentations to the Court

The AACJ alleges that Mr  Martinez misrepresented certain facts about Chrisman
during oral argument on the defense's motion for remand to the grand jury   This allegation
is also false   In its motion for remand, the defense contended that Mr  Martinez should
have permitted defense expert, Dr  William Lewinski, to testify at the grand jury proceeding
about his interview with Chrisman and the opinions he formed based on that interview   At
oral argument, Mr  Martinez responded, in part, by pointing out that allowing such
testimony would turn the grand-jury presentation into a "mini trial" on Chrisman's credibility
through Dr  Lewinski   Mr  Martinez argued that the State would be able to examine Dr
Lewinski about specific instances where Chrisman had lied in the past, including the fact
that he had failed a polygraph and had been investigated for stealing and lied during the
course of that investigation, to demonstrate that Dr  Lewinski was basing his opinions on
nothing more than the word of a proven liar   Chrisman Tr , January 28, 2011, at 7  5-9  4
**(Ex  "25")**

The AACJ now contends, years later and apparently without conducting any due
diligence of its own, that Mr  Martinez falsely represented that Chrisman (i) failed a
polygraph and (ii) was investigated for stealing and lied during the course of that
investigation   To the contrary, Chrisman did, in fact, fail a polygraph   Police Applicant
Report of Polygraph Examination **(Ex  "26")**   And he was, in fact, investigated for stealing
and found to have lied during the course of that investigation   Special Investigations
Report, December 23, 2008, at 543 **(Ex  "27")**   Mr  Martinez's statements, thus, were
demonstrably true, not false

Craig D  Henley, Esq
April 8, 2016
Page 29

*Alleged Harassment in Pretrial Witness Interviews*

The AACJ alleges that Mr  Martinez harassed several witnesses during pretrial witness interviews in various ways   There is no basis for these allegations   The witnesses at issue were disclosed by the defense as possible trial witnesses, many of whom Mr Martinez expected to be offered as character witnesses   Mr  Martinez appropriately explored and investigated the credibility of these witnesses, including their potential biases and lack of foundation for any opinions they might express about Chrisman

Responding specifically to the AACJ's allegations

1       Mr  Martinez did not badger a witness or force her to admit she was in a same-sex relationship   During the only interview in which Mr  Martinez engaged in a line of questioning about the nature of a woman's relationship with another woman, Mr  Martinez never asked if they were in a same-sex relationship, and the thought never crossed his mind   The two women were both potential witnesses, and he was exploring their potential biases   The witness's responses to Mr  Martinez's questions about her residence led Mr Martinez to believe that she was not being entirely forthcoming   The witness being interviewed never said or "admit[ted]," in the AACJ's parlance, that she was in a same-sex relationship with the other woman   Interview with Celia Varela, at 15-21 **(Ex  "28")**

2       Mr  Martinez did ask witnesses for social security numbers   This is a standard question (like date of birth) intended to facilitate further investigation of the potential witness after the interview concludes   For example, Rule 15 1(d)(3) of the Arizona Rules of Criminal Procedure requires prosecutors to disclose, in all felony cases, a list of prior felony convictions that may be used to impeach any disclosed defense witness   Social security numbers facilitate criminal background checks

3       Mr  Martinez did ask a witness for her ex-husband's telephone number Again, he was appropriately obtaining information to facilitate further investigation regarding the witness

4       Mr  Martinez did ask witnesses whether they had attended parties where disrobing had taken place   He had evidence of these activities from other sources   His purpose of asking certain witnesses questions about them was to explore the potential biases of character witnesses   *See, e g* , Interview with Officer A J  Buffa, at 13 **(Ex '29")**

Mr  Martinez's questions were well within the bounds of the issues at stake in the criminal investigation

*Alleged Harassment of Trial Witnesses*

The AACJ alleges that Mr  Martinez harassed several trial witnesses by asking untrue or irrelevant questions   These allegations also have no merit

**Officer Bartel**   Contrary to the AACJ's contention, Mr  Martinez had a valid basis to characterize Officer Bartel as a "double-dipper "   Officer Bartel testified that he was being paid by the defense for his testimony while also being paid by the City of Peoria for vacation leave   Chrisman Tr , August 26, 2013, at 228 4-231 13 **(Ex "30")**   Mr  Martinez

Craig D  Henley, Esq
April 8, 2016
Page 30

characterized that as "double dipping "  *Id*  at 229 10-11 ("[T]hat means sort of that you are double dipping a little bit, aren't you?")

**Sergeant Mattson**   Contrary to the AACJ's suggestion, Mr  Martinez believed he had a valid basis for examining Officer Mattson about his police-union ties   That line of questioning, to which defense counsel did not object (*Id*  at 95 18-98 10), served as the predicate to a broader line of questioning, in which Mr  Martinez attempted to establish Officer Mattson's bias in favor of Chrisman   *See generally Id*  at 98 11-105 23   Defense counsel eventually objected to the broader line of questioning   During a discussion outside the presence of the jury, Mr  Martinez explained to the court that he was attempting to show that Officer Mattson had "a bias in favor of the organization that is paying the defendant's legal bills" and, thus, a bias in favor of Chrisman   *Id*  at 102 8-105 23   The trial court sustained the objection and precluded Mr  Martinez from pursuing that line of questioning under Rule 403, Ariz  R  Evid   *Id*  at 105 18-23   Mr  Martinez obeyed the court's ruling

**Officer Reeson**   Mr  Martinez did not "grill[]" Officer Reeson about her maternity leave   Rather, as part of properly demonstrating her bias in favor of Chrisman, Mr  Martinez merely pointed out that, though she had been on maternity leave and away from work for eight months "pursuant to a doctor's note," she did not let her medical condition prevent her from attending her "friend" Chrisman's trial on two days and then testifying on a third   *Id*  at 174 19-179 19



**Sergeant Egea**

**(Ex  "32" (subject to motion for protective order))**

**Officer Virgilio**   The case against Chrisman largely involved a swearing contest between Chrisman and Officer Virgilio, who were the only eyewitnesses to the shooting   Thus, the credibility of these two witnesses was one of the central issues at trial   One area in which Mr  Martinez attacked Chrisman's credibility concerned his claim that he had consent to enter the residence without a search warrant based on the victim's mother's statements   *See, e g*, Chrisman Tr, September 3, 2013, at 54 13-17, 56 12-23 **(Ex "33")**   Mr  Martinez attempted to rebut that claim by showing that the trailer was actually titled in the victim's name, rather than the mother's name   Chrisman Tr, August 7, 2013, at 29 2-30 24 **(Ex  "34")**   After the Court sustained objections to that line of inquiry, Mr  Martinez abided by the Court's ruling

Craig D  Henley, Esq
April 8, 2016
Page 31

### Alleged Misrepresentations during Closing Argument

The AACJ alleges that Mr  Martinez "intentionally made several false statements concerning the evidence" during closing argument  To the contrary, all of Mr  Martinez's challenged statements were based on the evidence presented at trial or reasonable inferences therefrom, and were well within the "wide latitude" afforded prosecutors during closing argument  *State v  Moody*, 208 Ariz  424, 460, 94 P 3d 1119, 1155 (2004) ("Attorneys, including prosecutors in criminal cases, are given wide latitude in their closing arguments to the jury ")

**"Hysterical" Comment**  First, when Mr  Martinez said, "You can rely on your ears, even though you're told by the *defendant* that she was hysterical," he was referring to the defense's position, not Chrisman's testimony alone  *See* Chrisman Tr , September 9, 2013, at 32 8-9 (emphasis added) (**Ex  "35"**)  Second, the defense did, in fact, suggest that the suspect's mother, Ms  Fernandez, was hysterical when the officers arrived at the scene  For example, Chrisman testified that Ms  Fernandez "was very frightened, very excited[,] she was crying, shaking  Her voice was quivering when she spoke "  Chrisman Tr , September 3, 2013, at 49 22-50 1 (**Ex  "36"**)  Further, defense counsel attempted to elicit this testimony from Officer Virgillo

> Q   And your initial contact with Ms  Fernandez, in your opinion, other than yesterday, she was upset, emotional, and desperate?  Those are your words before yesterday, right?
>
> A   I would have to see a copy of the conversation that you are referring to

Chrisman Tr , August 8, 2013, at 23 14-19 (**Ex  "37"**)

**Comments about Officer Bartel**  Mr  Martinez's "double-dipper" characterization had a valid evidentiary basis, as discussed above  His statement that Officer Bartel wanted jurors to believe "that SWAT members could look through walls" also had a valid evidentiary basis  It was based on the following exchange, which occurred during cross-examination

> Q   [SWAT members] can't see through walls, right?
>
> A   Um, actually, we have systems that allow us to look for heat signatures and heartbeats through walls, so that's not completely true

Chrisman Tr , August 27, 2013, at 54 8-11 (**Ex  "38"**)

**"Golden Clipboard" Comment**  Mr  Martinez's argument that Sergeant Mattson and Sergeant Post returned a "golden clipboard" to Officer Virgillo "to put pressure on [him] to change his mind" had a valid evidentiary basis  On cross-examination, Sergeant Mattson admitted that he, along with Sergeant Post, paid a visit to Officer Virgillo at a golf-course driving range at 7 00 in the morning, ostensibly to deliver a clipboard, but during which they had a conversation with Officer Virgillo about "unwanted contact with him "  Ex  "30," at 98 20-100 19  Read in context, Mr  Martinez's "golden clipboard" characterization (both in closing and during Sergeant Mattson's cross-examination) was clearly meant to suggest that the ostensible reason for the visit at the golf course during the early morning hours—

Craig D  Henley, Esq
April 8, 2016
Page 32

I e , to deliver a clipboard—was a sham excuse for an attempt to influence the witness   This was proper argument

**Comments about Sergeants Egea and Mattson**   Mr  Martinez's characterization of Sergeant Egea as "Chrisman's friend" was a fair inference to draw from the evidence   In response to an accusation of bias on her part in favor of Chrisman, Sergeant Egea testified that she had "expressed opinions to [her] coworkers about the case" and had apologized to Chrisman on at least one occasion   Chrisman Tr , September 4, 2013, at 213 10-214 1 **(Ex  "39")**   Similarly, as discussed above, his description of Sergeant Mattson as a "union organizer" was a fair characterization based on Sergeant Mattson's testimony concerning his involvement in, and support of, a Phoenix Police labor union

### Applicable Ethical Rules

**ER 3 3(a) (Knowingly Make False Statement of Fact), ER 8 4(c) (Conduct Involving Dishonesty)**   Mr  Martinez did not knowingly make a false statement of fact or engage in any conduct involving dishonesty

**ER 3 4(c) (Knowingly Disobey Court Rule), ER 3 4(e) (Allude to Matter Not Reasonably Believed to be Relevant)**   Mr  Martinez did not knowingly disobey any court rule or allude to any matter that he did not reasonably believe to be relevant   He complied with his disclosure obligations, presented relevant evidence through the State's witnesses, and zealously and properly cross-examined the defense's witnesses

**ER 3 8(d) (Disclosure of Exculpatory Evidence)**   Mr  Martinez timely disclosed all exculpatory evidence

**ER 4 4(a) (Use Means with No Substantial Purpose Other than to Embarrass, Delay, or Burden)**   Mr  Martinez did not engage in any conduct with no substantial purpose other than to embarrass, delay, or burden another person

**ER 8 4(d) (Conduct Prejudicial to Administration of Justice), Rule 41(g), Ariz  R  Sup  Ct  (Unprofessional Conduct)**   Mr  Martinez's conduct was not unprofessional and did not result in any prejudice to the administration of justice

*State v  Irizarry*

### Factual Background

In 2010, Mr  Martinez prosecuted Dalmen Joseph Irizarry, who was charged with and convicted of eight counts of aggravated assault, four counts of drive-by shooting, and one count of unlawful flight from a law enforcement vehicle   These charges stemmed from a shooting which occurred on January 28, 2010, where Irizarry was involved in the murder of a Gilbert Police Officer, Lieutenant Eric Shuhandler   During a routine traffic stop, the passenger in Irizarry's vehicle shot Lieutenant Shuhandler in the left side of the face, killing him   After his passenger killed the officer, Irizarry attempted to flee the scene and escape the police   During the ensuing chase, Irizarry's passenger repeatedly shot at police and flung large objects from the back of the truck that Irizarry was driving   Irizarry and his accomplice were ultimately arrested after their vehicle ran out of gas

During Irizarry's trial, Mr  Martinez presented testimony from Melissa Kingsley, who had been working as a Gilbert Police Department dispatcher on the night of Lieutenant

Craig D  Henley, Esq
April 8, 2016
Page 33

Shuhandler's murder   In particular, Mr  Martinez asked Ms  Kingsley whether she could
recall the timeframe in which she spoke with the victim and could provide a summary of
what was discussed   In an effort to clarify her recollection, Mr  Martinez, without objection,
introduced into evidence an audio cassette containing a recording of communications
between Ms  Kingsley and Lieutenant Shuhandler   *See* Audio Recording of communications
between Lieutenant Shuhandler and Ms  Kingsley **(Ex  "40")**   Defense counsel opted not to
cross-examine Ms  Kingsley regarding her testimony on direct about the recording

Approximately two weeks after Ms  Kingsley was initially called to testify, the defense
recalled her to ask additional questions concerning the recording   Responding to questions
from defense counsel, Ms  Kingsley clarified that the recording was not verbatim – i e ,
certain radio transmissions involving her and other officers had been omitted   On re-direct
examination, however, Ms  Kingsley clarified that the recording represented an accurate
version of her communications with Lieutenant Shuhandler on the evening in question and
that, regardless of the runtime of the tape, the overall timeframe of the communications
was accurate

### *AACJ Allegations*

The allegations relating to this case are tethered to testimony that Mr  Martinez
elicited from Ms  Kingsley on direct examination regarding her recollection of her
communications with Lieutenant Shuhandler and the recording thereof   In particular, the
Charge latches on to the otherwise insignificant time differential between the raw version of
the recording and the version that was introduced at trial   The Charge claims that, by
introducing a redacted version, Mr  Martinez lied and falsified evidence   The Charge further
intimates that Mr  Martinez, through the testimony he elicited from Ms  Kingsley, created a
"false impression that the events could not have happened as Irizarry explained " (*See*
Charge, at 14 )   In short, although categorized with various salacious terms, the essence
of the claimed misconduct is that Mr  Martinez improperly represented the facts of the case
and introduced a doctored exhibit without clarifying that fact to the jury

### *Applicable Ethical Rules*

**ER 3 3(a)(1)** (prohibiting a lawyer from making a false statement of fact or failing
to correct a false statement of material fact previously made to the tribunal by the lawyer),
**ER 3 3(a)(3)** (prohibiting an attorney from offering evidence that he or she knows to be
false), **3 4(b)** (prohibiting an attorney from falsifying evidence or inducing a witness to
provide false testimony), **ER 8 4(d)** (stating that it is misconduct for any attorney to
engage in conduct that is prejudicial to the administration of justice)

Ms  Kingsley's testimony was intended for the simple purpose of creating a timeline
explaining how the events unfolded   Moreover, the exhibit itself was merely a condensed
version of raw material, which was provided to defense counsel prior to trial, intended only
to provide a more concise summary of the evidence   There is no contention that Mr
Martinez altered the communications in a manner that would affect the substantive content
as it pertains to the underlying case   To illustrate the inaccuracy of the allegations, a more
fulsome review of the proceedings is necessary   As stated, Mr  Martinez called Ms  Kingsley
to testify regarding her knowledge of the events underlying the victim's murder   At the
time of the events, Ms  Kingsley was a dispatcher for the Gilbert Police Department and was
responsible for fielding inquiries from officers on a dedicated radio frequency known as
' Dispatch Channel 2 '  *See* Irizarry Tr , July 8, 2010, at 74–75 **(Ex  "41")**   While she was

Craig D Henley, Esq
April 8, 2016
Page 34

working on the night of January 28, 2010, Ms Kingsley received an initial radio call from the victim indicating that he was initiating a vehicle stop  *Id*  at 78  After several minutes, Ms Kingsley again spoke with the victim, who requested information relating to a driver's license  *Id*  at 80  At the time she testified initially, Ms Kingsley was not sure how long the total communications lasted, but was aware that the discussion was recorded  *Id*  In discussing the recording, the following exchange took place between Mr Martinez and Ms Kingsley

[MARTINEZ]  And when he made the call to you, was there a recording made?

A     Yes

Q     And does it include your response and why you were responding the way you do?

A     Yes

Q     And does it also include everything or the clip that we have here up until the time that you no longer corresponded with him, correct?

A     Yes

Q     And does include the time on there?  From your memory, does it include at least real time from the time he called at 10 49 with you until the communication ended is real time on the tape, correct?

A   Yes,

Q     That will give us a definite or an exact time as to when things happened, correct?

A     Yes

Q     And you reviewed this Exhibit No  121?

A     I have

Q     Did you review it prior to coming to court?

A     Yes  Multiple times

Q     What does it include?

A     It includes my interaction on the radio with [the victim ]

Q     Does it start at 10 49?

Craig D Henley, Esq
April 8, 2016
Page 35

A       Yes

Q       And does it end with you asking or looking for a Lincoln
1?

A       Lincoln 2

Q       Lincoln 2

MR  MARTINEZ       I move for the admission of 121

MR  SHELL       No objection

THE COURT       121 is admitted

MR  MARTINEZ       Do you know how long this tape lasts, In
other words, until you started saying Lincoln 2?  Do you know?

MS  KINGSLEY       I honestly don't

Q       Let's go ahead and play it

*Id* at 79-80  At that point, Mr  Martinez played the tape for the jury while asking Ms
Kingsley clarifying questions regarding its content

        After the tape was played, defense counsel was given the opportunity to cross-
examine Ms  Kingsley but opted against it  Nevertheless, nearly two weeks after Ms
Kingsley originally testified, the defense recalled her to undermine her recollection of how
the events had unfolded  The defense's apparent motivation for recalling Ms  Kingsley was
to establish a timeline for how the underlying events unfolded  *See* Irizarry Tr , July 20,
2010, at 32-40 **(Ex  "42")**  Specifically, defense counsel pressed Ms  Kingsley with respect
to her recollection that the tape had been made in "real time "  *See id* at 33–34  As her
testimony developed, it became clear that Ms  Kingsley and defense counsel were not on
the same page with respect to the term "real time "  That fact is illustrated by the following
exchanges between Mr  Shell and Ms  Kingsley

Q       Did you testify that the tape was real time?

A       I guess I am confused by what you mean   That is my
communication with [the victim] as I recall that night

Q       Correct   But you also know that there is other
communication going on in between that communication,
correct?

A       With other officers

Q       Correct   That aren't included in there, correct?

A       Correct

Craig D  Henley, Esq
April 8, 2016
Page 36

[        ]

Q        And so it is not real time, correct?

A        If that is your definition, yeah   I guess I am not
understanding "real time "  I was looking at it as being time-
stamped

Q        That tape is not in real time?

A        Correct

*Id* at 37–38   Ms  Kingsley's confusion stems from the fact that she was communicating,
not only with the victim, but also other officers   The tape, however, reflected only her
communications with the victim   As a result, the total runtime of the tape was shorter than
that of the complete recording   Nevertheless, because the tape was timestamped, it
accurately reflected the span of the communications   Ms  Kingsley openly admitted these
issues when pressed by defense counsel  *See id*  at 39

        When permitted to follow up on defense counsel's line of questioning regarding the
tape, Martinez clarified the issue regarding the span of the tape and whether it had, in fact,
been edited   In particular, Martinez asked the following questions

Q        But so that we are clear, you previously told us that the
whole conversation took and the time are 10 47 to 10 53,
right?

A        Yes

Q        And that's something that you checked, right?

A        Yes

Q        And that is six minutes, right?

A        Correct

Q        That tape may not be six minutes, but you previously
testified that that's what it was, right?

*Id* at 41–42

        This line of questioning, and the attendant response, plainly elucidate the fact that
the tape was not a second-for-second copy of all of Ms  Kingsley's communications, but only
of her communications with the victim   Because the purpose of the tape was to help
establish a timeline of the events, Ms  Kingsley's testimony regarding the start and end
times of the discussion were adequate in that regard   At no point during his questioning of
Ms  Kingsley did Mr  Martinez attempt to obfuscate the fact that the tape had been modified
to remove superfluous communications   In fact, that issue was fully fleshed out during the
defense's examination of the witness and Mr  Martinez's cross-examination   Furthermore,

Craig D  Henley, Esq
April 8, 2016
Page 37

Ms  Kingsley never presented false testimony, either of her own volition or in response to
Mr  Martinez's questions   As evidenced by her testimony, Ms  Kingsley did not understand
defense counsel's meaning in regard to the phrase "real time "   Finally, the unaltered
version of communications between Ms  Kingsley and Lieutenant Shuhandler was available
to defense counsel   Unedited Recording of communications between Ms  Kingsley and
officers on Dispatch Channel 1 **(Ex  "43")**, Unedited Recording of communication between
Ms  Kingsley and officers on Dispatch Channel 2 **(Ex  "44")**   At no point during the
proceedings did the defense seek to introduce that version

    The same allegations were raised to the trial court in a motion for relief from
judgment   *See* Motion to Vacate Judgment Pursuant to Rule 24 2, and Exhibits A through F,
November 1, 2010 **(Ex  "45")**   With regard to the allegation that Ms  Kingsley knowingly
provided false testimony, the Court summarily noted that "there is absolutely no evidence
that the dispatcher knew of any error – that she committed perjury "   *See* Minute Entry,
November 17, 2010 **(Ex  "46")**   In a footnote, the Court went on to admonish defense
counsel for making such an outlandish claim, finding that the allegations, based exclusively
on counsel's observations, were, without more, reckless   *Id*  at 2 n 1   The Court further
found that vacating the judgment was not necessary because, in any event, the evidence
was itself not relevant to the crimes for which the defendant was found guilty   *Id*  at 2
Finally, the Court noted that any issue relating to whether the recording was "real time" was
clarified in defense counsel's additional questioning when Ms  Kingsley was recalled   *Id*

    For all of the aforementioned reasons, the allegations of misconduct in this case are
without merit   The Bar should accordingly dismiss the claim

## Clemency Hearings

### Factual Background

    Mr  Martinez presented arguments to the Arizona Board of Executive Clemency (the
"Board") during two hearings regarding possible commutation of death sentences

    First, in 2010, Mr  Martinez represented the State's interest in the clemency hearing
for Jeffery Landrigan, who had been convicted of murder and sentenced to death
Landrigan Clemency Hearing Video **(Ex  "47")**   During that hearing, Landrigan's attorneys
presented a series of arguments in support of commutation of his sentence, focusing
primarily on his difficult upbringing and contention that he had a genetic predisposition to
commit violent crimes   In testimony at the hearing, former Maricopa County Superior Court
Judge Cheryl Hendrix opined that, if she had been made aware of the mitigation evidence
that was currently before the Board, she likely would not have sentenced Landrigan to
death in the original trial   Mr  Martinez responded to these arguments by noting that there
were no tangible records corroborating the contentions pertaining to Landrigan's upbringing
Mr  Martinez characterized Judge Hendrix as an advocate, noting that she, just like him, was
urging the Board to adopt a particular position   The Board voted to deny Landrigan's
request for commutation, and he was later executed

    Second, in 2012, Mr  Martinez represented the State's interests at a clemency
hearing for Robert Towery, who had been convicted of murder and sentenced to death
Towery Clemency Hearing Video **(Ex  "48")**   Towery's counsel argued that commutation
was appropriate because Towery had been severely abused as a child   In his response, Mr
Martinez argued there had been insufficient evidence substantiating Towery's claim that he

Craig D Henley, Esq
April 8, 2016
Page 38

was abused   He recounted the manner in which Towery killed his victim, drawing particular
attention to the cruel and degrading manner in which the victim was treated prior to his
eventual death   After considering arguments from both sides, the Board voted to deny
Towery's request for commutation, and he was executed a short time later

### AACJ Allegations

The Bar Charge levels a series of misleading and factually inaccurate allegations of
misconduct regarding each of the clemency hearings   With regard to the Landrigan hearing,
the Charge focuses on Mr  Martinez's characterization of the evidence presented and the
nature of the defense   In particular, the Charge claims that Mr  Martinez improperly
commented that there was "no police report" indicating that Landrigan's mother had been
raped by his father   The most "egregious" conduct, according to the Charge, is that Mr
Martinez characterized the defense's renewed interest in the case as a "wringing of hands
and gnashing of teeth "   The Charge also focuses on Mr  Martinez's characterization of Judge
Hendrix as an advocate for Landrigan and his suggestion that she may have received some
kind of remuneration for her services at the hearing   Finally, the Charge claims that Mr
Martinez attempted to mislead the Board regarding its authority

With regard to the Lowery hearing, the Charge again focuses on Mr  Martinez's
characterization of the defense's evidence and his argument against commutation   In
particular, the allegations center on Mr  Martinez's descriptions of the underlying crime,
asserting that he improperly appealed to the passions and fears of the Board by describing
the circumstances of the victim's death and asking how the Board would feel if put in that
position   The allegations also fault Mr  Martinez for emphasizing a lack of substantiating
evidence that Lowery had been the victim of physical or other abuse as a child   The Charge
suggests that, by making this argument, Mr  Martinez needlessly forced Towery's sisters to
testify before the Board   Finally, the Charge asserts that Mr  Martinez improperly stated the
law with regard to the Board's authority

In regard to both clemency hearings, the Charge fails to allege which Ethical Rules
were violated   Instead, the allegations rest on amorphous contentions of improper conduct

### Applicable Ethical Rules

**ER 8 4(d)** (barring an attorney from engaging in conduct that is prejudicial to the
administration of justice)

### Special Considerations for Proceedings in Clemency Hearings

Because the allegations of misconduct here arise from proceedings in clemency
hearings, the ethical considerations are distinct from the allegations related to criminal
trials   Indeed, the Arizona Board of Executive Clemency is not a "tribunal" as defined under
ER 1 0(m)   That rule defines the term "tribunal" as "a court, an arbitrator in an arbitration
proceeding or a legislative body, administrative agency or other body acting in an
adjudicative capacity "   In order to constitute a "tribunal," the particular body must "render
a legal judgment directly affecting a party's interests in a particular matter "   The Board
does not meet this definition   Rather, the Board performs its function only after a case has
been fully litigated at the trial and appellate levels and has proceeded through all post-
conviction relief available   The Board does not render a legal judgment   It has authority to
make a non-binding recommendation to the Governor for a reduced sentence   For this

Craig D Henley, Esq
April 8, 2016
Page 39

reason, the Ethical Rules that govern an attorney's conduct before a tribunal, *see* ER 3 3, 3 4, 3 5, and 3 9, do not apply in this context

This point is further clarified by the Ninth Circuit's apt statement that a "clemency hearing is far removed from the original judicial proceeding, and is granted only as a matter of executive grace " *Woratzeck v Ariz Bd of Exec Clemency*, 117 F 3d 400, 403–04 (9th Cir 1997) The court in *Woratzeck* went even further, holding that because Arizona's Executive Clemency Board statutes "place no substantive limitation on official discretion, [they] create no liberty interest entitled to protection under the Due Process Clause" of the United States Constitution *Id* And, given those legal confines, the court found that conduct that otherwise may be inappropriate – *i e* , possible conflicts of interest – may be excused so long as the defendant has the opportunity to present his or her case to the Board

In addition, the Board operates under substantially different rules than those that apply in a formal trial This fact is evidenced by the specific provisions of the Arizona Administrative Code (the "A.A C.") governing the manner in which Board hearings are to proceed In particular, A C C § R5-4-102(B) states that "[u]nless otherwise provided by law, the Board shall conduct a hearing in an informal manner, without adherence to the rules of evidence required in a judicial proceeding " Accordingly, evidentiary considerations that may apply in the formal tribunal context are not present with the same force in hearings before the Board

## Landrigan Hearing

With regard to the Landrigan hearing, there was nothing improper about Mr Martinez's comment that the defense had failed to present a police report indicating that Landrigan's mother had been raped That statement was factually accurate, and the defense does not contend otherwise As to Mr Martinez's characterization of the defense's renewed interest in the case as being a "wringing of hands and gnashing of teeth," this statement would have been appropriate even in the context of a criminal trial This statement was proper argument and did not unfairly comment on any evidence

With respect to Mr Martinez's discussion of Judge Hendrix, proceedings before the Board inherently involve advocacy – *i e* , those who desire commutation and those who oppose it By appearing at the hearing and recommending that the sentence be commuted, Judge Hendrix was unquestionably an "advocate " Mr Martinez's statements that she was there in that capacity were objectively true and proper The statement suggesting that Judge Hendrix may have been remunerated for her services was not improper In fact, Mr Martinez prefaced the statement with he "would venture to say" that she "perhaps" received some compensation for her services Mr Martinez was not prohibited from speculating as to Judge Hendrix's potential bias

Finally, regarding Mr Martinez's statements about the Board's legal authority, these issues were broached only as a cautionary matter, not with the intent to misstate the law to the Board Mr Martinez's argument was couched in the following terms

> I'm not sure, but it would seem to me, that if you do commute his sentence, as they're asking you to do, you would be commuting it to life with the possibility of parole

Craig D Henley, Esq
April 8, 2016
Page 40

Ex "47," at 11 41   Explicit in this argument was Mr Martinez's uncertainty regarding the Board's authority   Thus, contrary to the position taken by the AACJ, Mr Martinez did not affirmatively represent to the Board that they were categorically prohibited from commuting the sentence   Rather, he made that statement only to clarify that the Board's authority *may* be limited, leaving the issue squarely in its purview   After the Board addressed this issue, it correctly determined that it did have the authority to commute the sentence to life without the possibility of parole

        For these reasons, nothing about Mr Martinez's conduct during Landrigan's clemency hearing can properly be viewed as misconduct

### *Towery Hearing*

        In the context of the Towery hearing, the Charge claims that Mr Martinez engaged in misconduct by improperly characterizing the evidence, misleading the Board regarding its legal authority, and improperly appealing to the Board's fears and passions   First, Mr Martinez's comments about the lack of evidence were appropriate   The defense's arguments were premised on a series of allegations relating to Towery's supposedly cruel upbringing, but the specific contentions were not all sufficiently corroborated during the hearing   Accordingly, Mr Martinez was permitted to point out the lack of substantiation His comment that the defense's reliance on Towery's past was an attempt to "shake the sympathy tree" was also a permissible commentary on the defense's strategy of painting Towery as a victim

        Regarding the contention that Mr Martinez intentionally misstated the law to the Board, the actual exchange on this topic reflects the contrary   As he mentioned in the Landrigan hearing, he merely pointed out that, when Towery was convicted, the sentence of life without the possibility of parole did not exist   Accordingly, there was a question in his mind as to whether the Board could recommend commutation of a sentence to a punishment that would not have been available at the time of the original conviction   The portion of this exchange cited in the Charge illustrates this point, because Mr Martinez agrees with the Board's position and specifically notes the prior discussion in the Landrigan hearing   Nothing about this exchange indicates a knowing misstatement to the Board regarding the law   Instead, Mr Martinez attempted to clarify an issue to ensure that the Board's decision – regardless of the outcome – was legally supportable

        Finally, the claim that Mr Martinez improperly appealed to the Board's fears and passions misapprehends the nature of the applicable standards   As discussed above, because the proceedings before the Board are not adjudicative in nature and because they are governed by separate rules, the standards that may apply in a criminal proceeding do not apply there   The prohibition against appealing to the fears and passions is limited to the context of a jury trial   *See State v  Comer*, 165 Ariz  413, 436–27, 799 P 2d 333, 346–47(1990) (stating that during closing argument, counsel may not "make arguments which appeal to the passions and fears of the jury")   No similar prohibition exists in the context of a clemency hearing   Accordingly, whether these statements would have been improper if made to a jury is irrelevant

### *State v  Arias*

        *Arias* was a highly publicized capital case involving the June 4, 2008 murder of Travis Alexander   His body was discovered days later in a shower at his home, with approximately

Craig D  Henley, Esq
April 8, 2016
Page 41

29 stab wounds, a slit throat, and a gunshot wound to the head   Mr  Martinez was the
prosecutor assigned to the case   The guilt phase trial began in December 2012   In May
2013, the jury found Arias guilty of first-degree premeditated murder   The same jury later
found that Arias qualified for the death sentence because the murder was especially cruel
*See* A R S  13-751(F)(6)   She was sentenced to natural life on April 13, 2015, after two
juries failed to reach a unanimous verdict on the death penalty

### *Factual Background and AACJ Allegations*

The AACJ alleges that Mr  Martinez committed multiple violations of the Ethical Rules
at various stages of the Arias trial proceedings

#### *Alleged Obstruction of Access to Arias's Hard Drive*

The AACJ alleges that, during pretrial discovery, Mr  Martinez obstructed the
defense's access to "exculpatory evidence" on Arias's hard drive   This allegation is
meritless   Police seized the hard drive at issue from Arias's home on July 15, 2008   In
March 2009, the Mesa Police Department learned that they could not view the contents of
the hard drive due to a malfunction with the drive  (It shut off immediately after being
powered on )  Mr  Martinez promptly disclosed to the defense both the existence of the hard
drive and Mesa PD's report of the problem with the hard drive   Neither the State nor Arias
took any further action with respect to the hard drive for more than three years

On May 16, 2012, Arias filed a motion seeking to conduct independent testing of the
hard drive at her cost   Motion for Independent Testing of Computer Evidence **(Ex  "49")**
The Court granted the motion without objection two days later and ordered Mr  Martinez to
deliver the hard drive to defense counsel no later than June 1, 2012   Minute Entry, May 18,
2012 **(Ex  "50")**   During the ensuing two-week period, Mesa PD sent the hard drive to a
Texas-based company, TLSI Inc , for analysis to determine whether the contents of the
hard drive could be retrieved   TLSI confirmed that it could image three of the four platter
surfaces of the hard drive, but it did not make a mirror image of any portion of the hard
drive before returning it to Mesa PD in time for Mr  Martinez to comply with the Court's
order   Arias Tr , July 12, 2012, at 7 7-17, 9 8-25 **(Ex  "51")**

Mr  Martinez released the hard drive to defense counsel on May 31, 2012   Defense
counsel returned it less than a week later without conducting any testing or analysis
Defense counsel subsequently maintained that Arias had opted to forgo (or at least delay)
the contemplated independent testing based on alleged statements made by Detective
Flores of the Mesa PD when the defense investigator had picked up the hard drive   Defense
counsel claimed that Detective Flores had said that Mesa PD had sent the hard drive to TLSI
for testing and analysis and that TLSI had "made a mirror image of three of the four
sections" of the hard drive   Ex  "51," Arias Tr , July 12, 2012, at 7 18-9 6

Based on defense counsel's stated belief that TLSI had made a mirror image of the
hard drive, Arias then filed two motions seeking to obtain the results of TLSI's testing and
analysis, including the believed-to-exist mirror image   At a hearing held on July 12, 2012,
Mr  Martinez explained to the Court and defense counsel that defense counsel was mistaken
and that no mirror image had been made

> MR  MARTINEZ   Again, [defense counsel's] mistaken [in] what he's
> talking about quite frankly   The item was sent[] over to an outfit in Texas

Craig D  Henley, Esq
April 8, 2016
Page 42

and they were working on it   They began work on three of the images   They
hadn't begun work on the fourth image   But they hadn't been able to make a
mirror image of any of it

So rather than create a problem, they returned the item back to us
before they created anything for us to turn over   I don't have anything to
turn over   I've spoken to Detective Flores   There's nothing to turn over   It
may be that there was some conversation about the work on the first three
images   I don't deny that may have happened   But there are no image[s] to
turn over right now

Ex  "51," Arias Tr , July 12, 2012, at 9 8-20   Mr  Martinez further assured the Court that,
once he received a mirror image or test results from TLSI, he would disclose that material
to the defense  Id  at 9 21-22

On June 26, 2012, Mesa PD sent the hard drive back to TLSI to be imaged to the
extent possible   On August 2, 2012, Mr  Martinez filed a document with the Court, notifying
the Court and counsel of the status of the testing with TLSI   Notice Regarding Testing of
Computer Hard Drive **(Ex  "52")**   At a hearing held that same day, Mr  Martinez responded
to defense counsel's renewed contention that the State was withholding evidence retrieved
off the hard drive   His explanation of the source of defense counsel's mistaken belief was
consistent with his July 12, 2012 comments

[MR  MARTINEZ ]  [I]f we take a look at the history of this, the Court ordered
that the State turn that hard drive over to the defense for their inspection
And there was a two week period   During that two week period the city of
Mesa attempted to get the information from it   They weren't able to do it
because they had to send it to Texas and then get it back so that information
could be turned over to everybody

We made sure that the hard drive was available so we could turn it
over to them even though they weren't able to get the information because I
didn't want to run afoul of any Court order   We turned it over to them
Apparently they had a conversation with a detective   They claim the
detective was lying

Well, it's a thing where perhaps the investigator didn't understand
what he was saying   I don't want to get involved in that   All I know we
complied with the Court order and turned it over   They then made a decision
to give it back to us   I then spoke to the detective about it   And said, well,
then they don't want to test it, let's go ahead and test it ourselves

Arias Tr , August 2, 2012, at 6 11-7 7 **(Ex  "53")**

On September 27, 2012, TLSI returned the hard drive to Mesa PD, but without
providing a mirror image of the hard drive or any written report or analysis, and despite
indicating in previous communications that it had successfully imaged three of the four
platter surfaces of the hard drive   Notice Regarding Return of Computer Hard Drive **(Ex
"54")**, see also Objection to Defendant's Renewed Motion to Compel **(Ex  "55")**   Defense
counsel did not believe that Mesa PD had not received a mirror image of the hard drive and
again sought to compel production of the mirror image   See Defendant's Renewed Motion

Craig D Henley, Esq
April 8, 2016
Page 43

to Compel **(Ex "56")**  Mr Martinez again explained that he could not produce what he did not have, and he provided defense counsel with TLSI's contact information so defense counsel could deal directly with TLSI regarding the issue  Ex "55," Objection to Defendant's Renewed Motion to Compel, Notice Regarding Contact with TLSI **(Ex "57")**  On October 18, 2012, after discussing the status of the hard drive with counsel, the Court entered an order compelling TLSI to provide a complete copy of its work on the hard drive to Mr Martinez and defense counsel by October 23, 2012  Minute Entry, October 18, 2012 **(Ex "58")**

Notwithstanding the Court's order, TLSI failed to comply with the imposed deadline  Consequently, Mr Martinez did not receive the mirror image of the hard drive from TLSI until October 31, 2012  The next day, he notified defense counsel of its receipt and informed them that the State would provide a copy of the mirror image to the defense once the State received a blank terabyte hard drive from defense counsel to make the copy  Notice Regarding Receipt of Mirror Image **(Ex "59")**  On Friday, November 2, 2012, at approximately 3 59 p m , defense counsel provided the State with the requested blank hard drive  Shortly thereafter, Mr Martinez notified defense counsel by telephone that a copy of the mirror image would be available for pick up by 5 30 p m that same day  Notice of Disclosure of Mirror Image **(Ex "60")**  Defense counsel did not pick up the copy until Monday, November 5, 2012  On November 14, 2012, Mr Martinez disclosed Mesa Police Department's report of its review of the mirror image of the hard drive  Objection to Defendant's Motion to Compel **(Ex "61")**

Thus, the defense was aware of the hard drive and Mesa PD's inability to access its contents for more than three years before deciding to conduct any testing or analysis of its own  Then, after receiving the actual hard drive less than two weeks later, the defense chose not to conduct any testing or analysis, based on their apparent misunderstanding of the status of the State's testing  Mr Martinez—who had no part in the events that led to that apparent misunderstanding—clarified the facts and corrected the misunderstanding no later than July 12, 2012  At that point, the defense chose to permit Mesa PD to continue to pursue a mirror image from TLSI, rather than seeking its own analysis of the hard drive  Mr Martinez disclosed the mirror image he received from TLSI within a day of its receipt  Mr Martinez did not obstruct the defense's access to the contents of the hard drive

At no point did Mr Martinez misrepresent to the Court or anyone else any fact concerning the hard drive  This allegation stems from the defense's attempt to transform their misunderstanding into a basis for obtaining various forms of relief, including dismissal of the case, dismissal of the notice of intent to seek the death penalty, and a trial continuance  *See* Defendant's Renewed Motion to Dismiss (without exhibits) **(Ex "62")**, Defendant's Motion to Continue Trial (without exhibits) **(Ex "63")**  Rather than accept Mr Martinez's representations concerning the status of the hard drive as true, the defense maintained an unfounded belief that Mr Martinez willfully withheld a mirror image of the hard drive that had been in Mesa PD's possession since May 2012, and then the defense attempted to manufacture inconsistent statements to support that theory [4]  For example, in

---

[4] The AACJ's claim that Mr Martinez never delivered the actual hard drive to the defense is false  Not even the Arias defense team disputed that they received the actual hard drive in response to their May 2012 motion to compel

[MS WILMOTT ] [T]here's this whole issue with the hard drive that we filed a Motion to Compel  It was given to us

Craig D  Henley, Esq
April 8, 2016
Page 44

Defendant's Renewed Motion to Dismiss, the defense contended that the State "changed its story" when Mr  Martinez represented that TLSI had returned the hard drive without a mirror image on September 27, 2012   Ex  "62," at 6   The State had never said otherwise   By email on September 13, 2012, Detective Flores had merely informed defense counsel that TLSI "said they imaged data" and "said they were going to ship the drive back to us tomorrow or Monday by the latest "  *See id*  at 5   Mesa PD, like defense counsel, expected TLSI to ship the mirror image with the hard drive, but that did not happen   There was no misrepresentation

### Alleged Elicitation of False Testimony Concerning Alexander's Computer

The AACJ alleges that Mr  Martinez falsely elicited testimony from Detective Melendez during the penalty phase retrial that the victim's computer contained no evidence of pornography   This allegation is also meritless   Whether Alexander's computer contained evidence of pornography was a disputed factual issue at trial   Detective Melendez testified that he examined the computer and found none   Minute Entry, January 14, 2015, at 13 **(Ex  "64")**   Lonnie Dworkin, one of the *defense's* expert witnesses, stated that he examined the computer and found "some pornography," but he then admitted that he had no present knowledge of that fact and would stand by his prior statement, made during an interview with the prosecution, that "there was no pornography "  *Id* , Arias Tr , February 4, 2013, at 54 17-55 3 **(Ex  "65")**   Another defense expert, John Smith, testified that he examined the computer and found pornography links on data sites   Ex  "64," Minute Entry, January 14, 2015, at 13   As the trial court correctly ruled in rejecting the defense's claim of prosecutorial conduct on this issue

> Detective Melendez was subject to cross-examination at all proceedings at which he testified and can be recalled by the defense at the penalty phase retrial   Defendant could have called witnesses to dispute his findings at the guilt phase trial   The defendant presented evidence to the penalty phase retrial jury on this issue   It is the role of the jury to resolve any factual disputes, evaluate the credibility of witnesses and determine the significance of the evidence  The Court finds no ground for dismissal of the indictment or the Notice of Intent to Seek the Death Penalty based upon this claim

*Id*

Mr  Martinez did not elicit false testimony from Detective Melendez

### Alleged Misrepresentation of Cause of Data Loss from Alexander's Computer

> At the time that our investigator picked it up Mr  Martinez's detective, Detective Flores[,] advised our investigator that they had evidence that was retrieved off that hard drive   We therefore made the decision to give it back and wait for their evidence to come

Ex  "53," Arias Tr , August 2, 2012, at 4 19-25   In fact, Mr  Martinez released the actual hard drive to the defense not once, but twice   *See* Notice Regarding Release of Computer Hard Drive **(Ex  "66 ')**

Craig D Henley, Esq
April 8, 2016
Page 45

The AACJ alleges that Mr Martinez falsely accused one of Arias's defense attorneys of causing the loss of data on the victim's computer  This allegation was the subject of separate bar charges that were consolidated in State Bar File No 15-1002, filed by defense attorney, Maria Schaffer, and her boss at the Maricopa County Office of the Legal Defender, Marty Lieberman  The State Bar found that the statements at issue "were not inaccurate" and dismissed the charges  Letter of Dismissal **(Ex "67")**  After the complainants appealed that decision, the Attorney Discipline Probable Cause Committee found, by a unanimous vote, "that the State Bar did not abuse its discretion in dismissing the charge "  Order Affirming Dismissal **(Ex "68")**

The AACJ has offered no new evidence or argument suggesting that the conclusions of the State Bar and Attorney Discipline Probable Cause Committee were erroneous

*Alleged Elicitation of False Testimony Concerning Sequence of Victim's Injuries*

The AACJ alleges that, during a pretrial *Chronis* hearing,[5] Mr Martinez misrepresented the testimony of the medical examiner  There is no merit to this allegation

At the *Chronis* hearing, on August 7, 2009, Mr Martinez questioned Detective Flores about, among other things, the sequence of the Travis Alexander's injuries  Detective Flores testified to his understanding of what the medical examiner had told him concerning that issue [6]  Specifically, Detective Flores testified that the medical examiner had indicated that, of the three major injuries, the gunshot wound to the head came first, followed by the stab wound to the chest, followed by the slit throat  Arias Tr , August 7, 2009, at 25 8-17, 31 9-12 **(Ex "69")**  Subsequently, during a defense interview held in June 2011, the medical examiner related a different sequence of injuries, stating that he believed the stab wound to the chest came first, followed by the slit throat, followed by the gunshot wound to the head  Interview of Dr Kevin Horn, at 16 **(Ex "70")**  At trial, Detective Flores was cross-examined on the discrepancy between his testimony and the medical examiner's subsequent statements  Detective Flores testified that his testimony at the *Chronis* hearing was the result of an innocent misunderstanding

> Q  Did you make any attempt to correct the mistaken testimony you gave in 2009?
>
> A  No  Because I told the truth and spoke to what I believed at that time  I'm not about to change my testimony
>
> Q  But it was inaccurate?
>
> A  It was not inaccurate, it was mistaken
>
> Q  Mistaken?

---

[5] The purpose of a *Chronis* hearing is to determine whether the State can establish probable cause for believing the State will be able to meet its burden of proving the alleged aggravating circumstances in support of the State s noticed intent to seek the death penalty  *See generally Chronis v Steinle*, 220 Ariz  559, 208 P 3d 210 (2009)

[6] Hearsay is admissible at a *Chronis* hearing  *Chronis*, 220 Ariz  at 562 63, 208 P 3d at 213-14

Craig D Henley, Esq
April 8, 2016
Page 46

    A  That's my mistake  If I mistook his words or misunderstood him, I'm not a doctor  And I'm not about to give testimony on explaining the doctor –

    Q  And so what you're telling us today is that you substituted your judgment for his  Is that what I'm hearing you say?

    A  No  If I gave that testimony, it was a misunderstanding of what Dr Horn told me

Arias Tr , January 10, 2013, at 58 25–59 10, 60 5-9 **(Ex "71")**

Mr Martinez had no reason to doubt the accuracy of Detective Flores's testimony at the *Chronis* hearing  Mr Martinez was not present for Detective Flores's conversations with the medical examiner, and Detective Flores's testimony was consistent with the documentation available at the time, specifically the medical examiner's July 15, 2008 autopsy report **(Ex "72")** and Detective Flores's August 28, 2012 report of his observations of the autopsy **(Ex "73")**, both of which are silent concerning the sequence of the injuries  Ex "71," January 10, 2013, at 67 15-69 13, Arias Tr , January 8, 2013, at 96 23-97 12 **(Ex "74")**

Moreover, this identical issue was the subject of argument and briefing before the trial court  With thoughtful analysis, the trial court rejected the contention that Mr Martinez had engaged in misconduct by eliciting Detective Flores's testimony at the *Chronis* hearing

> During the guilt phase, the defendant cross-examined both Detective Flores and the medical examiner about the sequence of wounds and the detective's testimony at the probable cause hearing in August 2009  During the penalty phase retrial, the defendant examined both Detective Flores and the medical examiner about these issues  Detective Flores has testified and explained to both juries the reasons for his testimony in August 2009  The medical examiner has testified regarding his expert opinion on the sequence of wounds  It is for the jury to determine the credibility of witnesses  The defendant fully explored and argued her position on the sequence of wounds  The Court finds the defendant has failed to show any State misconduct with regard to Detective Flores's testimony

Ex "64," Minute Entry, January 14, 2015, at 5

### *Alleged Unprofessional Conduct toward Defense Counsel*

The AACJ alleges that comments made by Mr Martinez during two bench conferences were unethical  This allegation is based entirely on sealed information that, pursuant to court order, should not have been revealed to the AACJ [7]

---

[7] One can only imagine what the AACJ would have alleged if Mr Martinez had included such information in his book, which he did not do

Craig D  Henley, Esq
April 8, 2016
Page 47

The comments did not violate the Ethical Rules   The trial judge, who was present for the comments and in the best position to evaluate Mr  Martinez's tone and body language when he made them, rejected the defense's claim of prosecutorial misconduct based on the comments   In doing so, the judge stated

During the trial, the Court addressed this matter with counsel   The prosecutor apologized to Defense Counsel   The prosecutor was quick to acknowledge his error and regret   Nothing inappropriate was said before the jury and there is no basis to find the prosecutor's comments affected the guilt phase verdict   The Court found no other sanction was appropriate under the circumstances

Ex  "64," Minute Entry, January 14, 2015, at 14

### Disclosure of Sealed Witness's Name

The AACJ alleges that Mr  Martinez intentionally disclosed the identity of a sealed witness in open court   This allegation was the subject of a separate bar charge filed by the affected witness in State Bar File No  15-0957   The State Bar agreed with the trial court's determination that Mr  Martinez's disclosure was inadvertent and dismissed the charge Letter of Dismissal **(Ex  "75")**   After the complainant appealed that decision, the Attorney Discipline Probable Cause Committee found, by a unanimous vote, "that the State Bar did not abuse its discretion in dismissing the charge "  Order Affirming Dismissal **(Ex  "76")**

The AACJ has offered no new evidence or argument suggesting that the conclusions of the State Bar and Attorney Discipline Probable Cause Committee were erroneous

### Alleged Harassment of Defense Expert Samuels

The AACJ alleges that Mr  Martinez improperly accused defense expert Dr  Richard Samuels of having "a sexual or romantic interest" in Arias   This allegation has no merit  Dr  Samuels is a psychologist   At trial, he testified to certain opinions about Arias that he said were based on an independent psychological evaluation of her, not a treatment relationship with her   The distinction mattered  the defense was presenting Dr  Samuels as an independent, objective witness rather than a treating psychologist with loyalties to Arias

During Dr  Samuels' cross-examination, Mr  Martinez attacked his credibility by, among other things, engaging in a line of questioning that demonstrated that Dr  Samuels had bought Arias a gift because he wanted to help her and, therefore, had lost some, if not all, of his independence and objectivity in his evaluation of her   *See generally* Arias Tr , March 18, 2013, at 114 20-132 15 **(Ex  "77")**   In fact, in response to Mr  Martinez's questioning, Dr  Samuels ultimately (and reluctantly) admitted that he gave Arias a self-help book, paid for with his own money, which created the appearance that he was trying to help her instead of remaining independent and objective

Q   So you had this what appears to be a relationship with this individual that you feel is appropriate that you buy her at least one gift, correct?

A   I bought her a self-help book

Craig D Henley, Esq
April 8, 2016
Page 48

Q   You bought her a book which is a gift, correct?

A   Well, I don't characterize it that way, but you may

Q   Well, no, I'm asking – you talked about this, you paid for it, right?

A   Yes

Q   You never got it back, right?

A   Right

Q   And it is for the purpose that you believe was to help the defendant, right?

A   Yes


Q   And when you gave her this book, your expectation was that she would get better from whatever problem you perceived, right?

A   My expectation was that she would read the book

Q   Right   And the reason you wanted her to read the book was so that she could address in a meaningful fashion whatever issues you saw?

A   Yes

Q   And that's to help her, right?

A   Yes

Q   And that is the problem   That creates an issue of your objectivity in this case, doesn't it?

A   I didn't think so

Q   I know you didn't think so   But on the one hand you can see that you are helping her to get better and on the other hand, you have to be impartial, right?

A   Yes

Q   And that creates an ethical dilemma for you, didn't it?

A   Well, it didn't at the time   And it's something I tended to routinely do   So I didn't [see] it as an ethical dilemma

Craig D Henley, Esq
April 8, 2016
Page 49

> Q   You didn't see it as a[n] ethical dilemma, but you can see that there's an appearance here that you're trying to help her, right?
>
> A   Yes   From your perspective, yes
>
>
> Q   Isn't it true that from whatever perspective it's taken, you are helping the defendant?
>
> A   Yes   By providing her with the book, yes

Ex "77," Arias Tr , March 18, 2013, at 128 25-131 14

At no time during the cross-examination did Mr Martinez say or imply that Dr Samuels had a sexual or romantic interest in Arias   The AACJ reads the words "like" and "relationship" out of context and attempts to infuse the words with a meaning that Mr Martinez never intended   Read in its actual context (as it must be), the point of Mr Martinez's questioning is clear—Dr Samuels felt enough interest in Arias on some level that he was willing to sacrifice his independence and objectivity by buying her a gift and trying to help her   There was nothing wrong with this line of questioning   It was a proper and effective attack on Dr Samuels' credibility   As the trial court stated in rejecting a claim of prosecutorial misconduct based on this conduct

> A party is entitled to explore the bias, credibility and motive of witnesses The prosecutor zealously cross-examined the defense expert on these matters   Defense counsel questioned the witness about these issues on re-direct examination   The Court finds no basis to conclude there was prosecutorial misconduct

Ex "64," Minute Entry, January 14, 2015, at 14

### Alleged Harassment of Defense Expert Geffner

The AACJ's alleges that Mr Martinez "had no basis for" accusing Dr Robert Geffner, a defense expert, of manipulating Arias's psychological test results   During cross-examination, even Dr Geffner admitted that he "corrected" certain wording on an answer sheet almost a year after the test results were in   Arias Tr , January 26, 2015, at 28 7-29 14, 30 19-35 4 **(Ex "78")**   Arias's defense team tried to prevent Mr Martinez from pursuing this line of inquiry   See, e g , id   at 23 9-24 5, 122 8-126 13   The Court, which was in the best position to evaluate the basis for, and relevance of, Mr Martinez's questions, permitted him to proceed   The AACJ allegation, therefore, is meritless

### Alleged "Ousting" of Juror 17[8]

---

[8] Exhibits 79 83 are subject to a contemporaneously filed Motion for Protective Order

Craig D  Henley, Esq
April 8, 2016
Page 50



Craig D Henley, Esq
April 8, 2016
Page 51

[REDACTED]

### *Applicable Ethical Rules*

**ER 3 3(a) (Knowingly Make False Statement of Fact), ER 8 4(c) (Conduct Involving Dishonesty)**   Mr Martinez did not knowingly make a false statement of fact or engage in any conduct involving dishonesty

**ER 3 4(c) (Knowingly Disobey Court Rule), ER 3 4(e) (Allude to Matter Not Reasonably Believed to be Relevant)**   Mr Martinez did not knowingly disobey any court rule or allude to any matter that he did not reasonably believe to be relevant   He complied with his disclosure obligations, presented relevant evidence through the State's witnesses, and zealously and properly cross-examined the defense's witnesses

**ER 3 6(a) (Extrajudicial Statements)**   Mr Martinez did not make any extrajudicial statements, much less one that he knew or reasonably should have known would be disseminated by means of public communication and would have a substantial likelihood of materially prejudicing the proceeding

**ER 3 8(d) (Disclosure of Exculpatory Evidence)**   Mr Martinez timely disclosed all exculpatory evidence

**ER 4 4(a) (Use Means with No Substantial Purpose Other than to Embarrass, Delay, or Burden)**   Mr Martinez did not engage in any conduct with no substantial purpose other than to embarrass, delay, or burden another person

**ER 8 4(d) (Conduct Prejudicial to Administration of Justice), Rule 41(g), Ariz R Sup Ct (Unprofessional Conduct)**   Mr Martinez's conduct was not unprofessional and did not result in any prejudice to the administration of justice

### CONCLUSION

For all of the public policy, factual and legal reasons discussed herein, we respectfully request that the State Bar dismiss the AACJ Charge for lack of probable cause

Very truly yours,

JENNINGS, STROUSS & SALMON, P L C

By

J Scott Rhodes

SR/mtl
Exhibits
cc     Juan M Martinez, Esq
       Kerry A Hodges, Esq
       Chase A Bales, Esq

5246597v5(49286 53)

Craig D  Henley, Esq
April 8, 2016
Page 52

## <u>VERIFICATION</u>

I, Juan M  Martinez, declare that I am over the age of 18 years of age and am competent to make this verification

I have reviewed the information contained in the foregoing Initial Response, and, to the extent of my personal knowledge, the information contained therein is true and correct except for those matters stated to be true upon information and belief, and as to those matters, I believe them to be true

I declare under penalty of perjury that the foregoing is true and correct

Executed this ___7___ day of April, 2016

_____
Juan M  Martinez