# EXHIBIT 31
# (part 2)

*Andriano v. Ryan*, Case No. CV-16-01159-PHX-SRB Motion for Evidentiary Development

# EXHIBITS TO 4/8/16 RESPONSE LETTER ON SEPARATE BACKER

FILED
APR 21 2016
STATE BAR OF ARIZONA
BY

**BEFORE THE PRESIDING DISCIPLINARY JUDGE OF THE SUPREME COURT OF ARIZONA**

| | |
|---|---|
| **IN THE MATTER OF A MEMBER OF THE STATE BAR OF ARIZONA,**<br><br>**JUAN M MARTINEZ,**<br>**Bar No 009510**<br><br>Respondent | No PO-2016-016<br><br>**PROTECTIVE ORDER**<br><br>State Bar File 15-3363 |

The Presiding Disciplinary Judge of the Supreme Court of Arizona having reviewed Respondent's Motion for Protective Order and there being no objection by the State Bar, accordingly

**IT IS ORDERED** granting the Motion

**IT IS FURTHER ORDERED** sealing Exhibits 32 and 79-83 to Respondent's Initial Response dated April 8, 2016, from Complainants and the general public, pursuant to Rule 70(g), Ariz R Sup Ct

Pre-complainant orders sealing material do not seal such material post-complaint if the material is sought to be used or referred to in subsequent pleadings or in any hearing In such circumstance, the parties are reminded a formal request for protective order with specificity must be filed with the material sought to be sealed and submitted for in-camera review

Sealed material shall be opened and viewed only by an order of the committee, the presiding disciplinary judge, a hearing panel, the board or the court for use by such body and the parties in pending proceedings, and otherwise only upon notice to and an opportunity to be heard by the parties and the witness or other person who is the subject of the information A party aggrieved by an order relating to a request

for a protective order may seek review by filing a petition for special action with the Arizona Supreme Court

**DATED** this 15th day of April, 2016

*William J O'Neil*

**William O'Neil**
**Presiding Disciplinary Judge**

Copy of the foregoing sent via e-mail and U S mail this 21st day of April, 2016, to

Craig D Henley, Esq
Staff Bar Counsel
State Bar of Arizona
4201 North 24th Street, Suite 100
Phoenix, AZ 85016-6266
craig henley@staff azbar org

J Scott Rhodes, Esq
Jennings, Strouss & Salmon, PLC
One East Washington Street
Suite 1900
Phoenix, AZ 85004-2554
Attorneys for Applicant
srhodes@jsslaw com

Lawyer Regulation Records Department
State Bar of Arizona
4201 North 24th Street, Suite 100
Phoenix, AZ 85016-6266

By [signature]

J Scott Rhodes – 016721
srhodes@jsslaw com
Kerry A Hodges – 025547
khodges@jsslaw com
Chase A Bales – 030099
cbales@jsslaw com
**JENNINGS, STROUSS & SALMON, P L C**
A Professional Limited Liability Company
One East Washington Street, Suite 1900
Phoenix, Arizona 85004-2554
Telephone (602) 262 5911
MinuteEntries@jsslaw com

Attorneys for Respondent, Juan M Martinez

**BEFORE THE PRESIDING DISCIPLINARY JUDGE**
**OF THE SUPREME COURT OF ARIZONA**

| | |
|---|---|
| **IN THE MATTER OF A MEMBER OF THE STATE BAR OF ARIZONA,**<br><br>**JUAN M MARTINEZ,**<br>**Bar No 009510**<br><br>Respondent | No<br><br>**MOTION FOR PROTECTIVE ORDER**<br><br>State Bar File 15-3363 |

Pursuant to Rule 70(g), Ariz R Sup Ct , Respondent, Juan M Martinez, by and through his counsel, hereby respectfully requests a protective order to seal certain exhibits filed with his Initial Response dated April 8, 2016 Specifically, Respondent moves to seal the attached Exhibits 32 and 79-83 to the Initial Response (See Ex "A" hereto ) Such information should be sealed from the Complainants and the general public, but not from the Lawyer Regulation Office of the State Bar of Arizona, the Disciplinary Clerk, the Presiding Disciplinary Judge, any Hearing Panel, State Bar counsel, and the Arizona Supreme Court

There is good cause to seal the above-described exhibits because they contain, with respect to Exhibit 32, confidential information related to a nonparty and, with respect to Exhibits 79-83, documents that were sealed by court order in *State v Arias*, Maricopa County Superior Court, Case No CR2008-031021

After consultation with Respondent's counsel, bar counsel has stated that the State Bar does not object to this motion

A proposed form of order is attached hereto as Exhibit "B"

**RESPECTFULLY SUBMITTED** this 8th day of April, 2016

JENNINGS, STROUSS & SALMON, P L C

By [signature]
J Scott Rhodes
Kerry A Hodges
Chase A Bales
One East Washington, Suite 1900
Phoenix, Arizona 85004-2554
Attorneys for Respondent, Juan M Martinez

Original of the foregoing filed this 8th day of April, 2016, with the Disciplinary Clerk of the Supreme Court

Copy of the foregoing sent via e-mail and U S mail this 8th day of April, 2016, to

Craig D Henley, Esq
Staff Bar Counsel
State Bar of Arizona
4201 North 24th Street, Suite 100
Phoenix, AZ 85016-6266
craig henley@staff azbar org

Copy of the foregoing sent via e-mail this 8th day of April, 2016, to

Honorable William O'Neil
Presiding Disciplinary Judge
Supreme Court of Arizona
1501 West Washington Street, Suite 104
Phoenix, AZ 85007
officepdj@courts az gov

By ______________________

# Exhibit A

# DOCUMENTS SEALED PURSUANT TO PROTECTIVE ORDER DATED: 4/21/2016

# Exhibit B

**BEFORE THE PRESIDING DISCIPLINARY JUDGE OF THE SUPREME COURT OF ARIZONA**

| | |
|---|---|
| **IN THE MATTER OF A MEMBER OF THE STATE BAR OF ARIZONA,**<br><br>**JUAN M MARTINEZ,**<br>**Bar No 009510**<br><br>Respondent | No<br><br>**PROTECTIVE ORDER**<br><br>State Bar File 15-3363 |

The Presiding Disciplinary Judge of the Supreme Court of Arizona having reviewed Respondent's Motion for Protective Order and there being no objection by the State Bar, accordingly

**IT IS ORDERED** granting the Motion

**IT IS FURTHER ORDERED** sealing Exhibits 32 and 79-83 to Respondent's Initial Response dated April 8, 2016, from Complainants and the general public, pursuant to Rule 70(g), Ariz R Sup Ct

Sealed material shall be opened and viewed only by an order of the committee, the presiding disciplinary judge, a hearing panel, the board or the court for use by such body and the parties in pending proceedings, and otherwise only upon notice to and an opportunity to be heard by the parties and the witness or other person who is the subject of the information A party aggrieved by an order relating to a request for a protective order may seek review by filing a petition for special action with the Arizona Supreme Court

**DATED** this __ day of _______, 2016

______________________________

William O'Neil
Presiding Disciplinary Judge

Copy of the foregoing sent via e-mail and U S mail this ___ day of _________, 2016, to

Craig D Henley, Esq
Staff Bar Counsel
State Bar of Arizona
4201 North 24th Street, Suite 100
Phoenix, AZ 85016-6266
craig henley@staff azbar org

J Scott Rhodes, Esq
Jennings, Strouss & Salmon, PLC
One East Washington Street
Suite 1900
Phoenix, AZ 85004-2554
Attorneys for Applicant
srhodes@jsslaw com

Lawyer Regulation Records Department
State Bar of Arizona
4201 North 24th Street, Suite 100
Phoenix, AZ 85016-6266

By ______________________________

**Talese Stone**

**From** Craig Henley
**Sent:** Tuesday February 2 2016 3 26 PM
**To.** Rhodes Scott
**Cc:** Talese Stone
**Subject:** RE Juan Martinez (15 3363)

Understood and yes We are on the same page

**Craig Henley, Senior Bar Counsel**
4201 N 24th St. Suite 200 | Phoenix AZ 85016-6288
T 602 340 7272 F 602 416 7470
EMAIL craig henley@staff azbar org
www azbar org

*Serving the public and enhancing the legal profession*

---

**From** Rhodes, Scott [mailto SRhodes@jsslaw com]
**Sent** Tuesday, February 2, 2016 3 24 PM
**To** Craig Henley <craig henley@staff azbar org>
**Cc** Talese Stone <Talese Stone@staff azbar org>
**Subject** RE Juan Martinez (15 3363)

I mean to write that I was NOT asking for advance approval

---

**From** Rhodes, Scott
**Sent** Tuesday, February 02, 2016 3 19 PM
**To** 'Craig Henley'
**Cc** Talese Stone
**Subject** RE Juan Martinez (15-3363)

Thanks Craig I understand your statement about future extensions, so I ll just confirm I was asking for advance approval but was asking not have the usual caveat Therefore, thanks to you and Maret for not including the usual caveat! We re on the same page

Scott

---

**From** Craig Henley [mailto craig henley@staff azbar.org]
**Sent** Tuesday, February 02, 2016 2 58 PM
**To** Rhodes, Scott
**Cc** Talese Stone
**Subject:** RE Juan Martinez (15-3363)

Good Afternoon Scott

I just got the word seconds ago Maret has authorized the extension making the new response date March 31 2016

While the State Bar is not categorically stating that future requests will be denied we are equally unprepared to state that you will be granted any future extension(s) As I indicated in my earlier e mail, I understand the volume and extent of the allegations and would prefer to get the case resolved correctly instead of quickly Therefore we will evaluate any future requests for an extension if and when submitted

While I hope that you are able to comply with the new deadline we always work well together on these type of issues so hopefully it will not be an issue

By copy of this e-mail I will ask Talese to change the new response date to March 31, 2016

**Craig Henley Senior Bar Counsel**
4201 N 24th St Suite 200 | Phoenix AZ 85016-6288
T 602 340 7272 F 602 416 7470
EMAIL craig henley@staff azbar org
www azbar org

*Serving the public and enhancing the legal profession*

---

**From** Rhodes Scott [mailto SRhodes@jsslaw com]
**Sent** Tuesday February 2, 2016 12 37 PM
**To** Craig Henley <craig henley@staff azbar org>
**Subject** RE Juan Martinez (15 3363)

Craig, have you heard from Maret?

Scott

---

**From** Craig Henley [mailto craig henley@staff azbar org]
**Sent** Sunday, January 31, 2016 11 44 AM
**To** Rhodes, Scott
**Subject** RE Juan Martinez (15-3363)

Given the volume and extent of the allegations I am confident that Maret will authorize the extension but I will let you know the second that I do

**Craig Henley Senior Bar Counsel**
4201 N 24th St Suite 200 | Phoenix AZ 85016-6288
T 602 340 7272 F 602 416 7470
EMAIL craig henley@staff azbar org

www azbar org

*Serving the public and enhancing the legal profession*

---

**From** Rhodes, Scott [mailto SRhodes@jsslaw com]
**Sent** Sunday January 31, 2016 10 55 AM
**To** Craig Henley <craig henley@staff azbar org>
**Subject** Re Juan Martinez (15 3363)

Thanks, Craig I was going to follow up with you tomorrow

Scott

Sent from my iPad

On Jan 31 2016, at 10 26 AM Craig Henley <craig henley@staff azbar org> wrote

Good Morning Scott

I just wanted to confirm that I immediately forwarded your request to Maret but have not received a response yet By copy of this e-mail I will ask Talese to follow up with Maret Monday

<image009 gif>

---

**Craig Henley Senior Bar Counsel**
4201 N 24th St. Suite 200 | Phoenix AZ 85016-6288
T 602 340 7272 F 602 416 7470
EMAIL craig henley@staff azbar org
www azbar org

*Serving the public and enhancing the legal profession*

---

**From** Rhodes Scott [mailto SRhodes@jsslaw com]
**Sent** Thursday January 28, 2016 1 59 PM
**To** Craig Henley <craig henley@staff azbar org>
**Cc** Talese Stone <Talese Stone@staff azbar org> Liska, Mary <MLiska@jsslaw com>, Metzner, Tammy <TMetzner@jsslaw com>
**Subject** Juan Martinez (15 3363)

Dear Craig

I have been retained to represent Mr Martinez in the above-referenced matter The current due date is February 1, 2016, however, I just received the charge I'm writing to request an extension

As you know, this bar charge is very extensive, covering multiple underlying criminal cases dating back several years In contrast with the Complainant, who clearly took a long time working on the Charge, I would be unreasonably constrained to prepare a meaningful and complete response with only the typical 20-day extension I anticipate that just getting the relevant portions of the underlying files will take

several days Therefore I hop‿ ‿ie State Bar will bear the breadth and sco‿ ‿f the bar charge in mind and grant my request for an extension until **March 31, 2016**

In addition, while I m aware from experience that extensions of this length usually are granted with a caveat that no additional extensions will be allowed, I am asking that you *not* place such a caveat on this case I believe you know from other matters I have handled that I will do all I can to meet the March 31 deadline, however, until I start working on the response, I cannot be entirely confident of my estimate of the time it will take to finish it In the event I ask for an additional extension (which I will try not to do) you always have authority to deny it So all I am asking is that you not insert the usual caveat and allow me to work on the response with the intent and aim to deliver it by March 31, but the possibility that I may feel obligated to ask for more time

I understand that this extension request requires Maret's approval

Thank you, and as always, I look forward to working with you on this case

Scott

<image010 png>

**J SCOTT RHODES**

Jennings Strouss & Salmon PLC
One East Washington Street | Suite 1900
Phoenix AZ 85004-2554
t (602) 262 5862
f (602) 495-2648
srhodes@jsslaw com
website | bio | vCard | map | email

<image011 gif><image012 gif><image013 gif><image014 gif><image015 gif><image(

---

This electronic mail is intended to be received and read only by certain individuals It may contain information that is attorney client privileged or protected from disclosure by law If it has been misdirected, or if you suspect you have received this in error, please notify me by replying and then delete both the message and reply Thank you

---

This electronic mail is intended to be received and read only by certain individuals It may contain information that is attorney-client privileged or protected from disclosure by law If it has been misdirected, or if you suspect you have received this in error, please notify me by replying and then delete both the message and reply Thank you

---

This electronic mail is intended to be received and read only by certain individuals It may contain information that is attorney-client privileged or protected from disclosure by law If it has been misdirected, or if you suspect you have received this in error, please notify me by replying and then delete both the message and reply Thank you

---

This electronic mail is intended to be received and read only by certain individuals  It may contain information that is attorney-client privileged or protected from disclosure by law  If it has been misdirected, or if you suspect you have received this in error, please notify me by replying and then delete both the message and reply  Thank you



Assistant s Direct Line (602) 340-7272

January 11, 2016

**PERSONAL AND CONFIDENTIAL**

Juan M Martinez
Maricopa County Attorney s Office
301 W Jefferson Street, 4th Floor
Phoenix, AZ 85003-2191

**Re** **File No** 15 3363
**Complainant** Kathleen Erin Brody

Dear Mr Martinez

The State Bar has received information concerning your professional conduct that warrants a screening investigation pursuant to Rule 55(b), Ariz R Sup Ct At this point, the matter is not considered a formal complaint, but rather a "bar charge" that is being investigated through a "screening investigation ' Your participation in the screening investigation is extremely important, as Bar Counsel will make a recommendation at the end of the investigation as to the disposition of this matter Pursuant to ER 8 1(b) and Rule 54(d), Ariz R Sup Ct , you have a duty to cooperate with this investigation Failure to fully and honestly respond to, or cooperate with, the investigation is, in itself, grounds for discipline

A copy of the information received by the State Bar has been included with this letter Please assure that a written response to the enclosed information is in the State Bar's office, directed to my attention, by

**5 00 pm, February 1, 2016**

In addition to your written response, an investigator from our office or I may contact you to discuss this matter Do not send your written response or a copy of your response directly to the Complainant If you cannot file a timely response, you should contact my office immediately Please also include the above-referenced file number on all correspondence concerning this matter You must submit **an original and one copy** of your written response If you do not submit a copy with your response, you will be charged $ 20 per page for copying your response

The ethical rules that should be addressed in your response include, <u>but are not limited to</u> ER 3 3, 3 4, 3 6(a), 3 8, 4 4(a), 8 4 (c), 8 4(d) and Rule 41(g)

A copy of your response will be sent to the Complainant and may become public record upon disposition of the matter You may make a request that certain information in your response remain confidential pursuant to Rule 70(g) Ariz R Sup Ct **<u>Any such request must be made in a letter separate from your response</u>** and must set forth the reason for the request We will forward your request to the Presiding Disciplinary Judge who will rule on it You must specify whether you want to keep the information from the public, but not the complainant, or from both the public <u>and</u> the complainant At the time you make such a request, you must submit the information for which confidentiality is requested as part of your request You should also submit a redacted copy to remain in the public portion of the file, as the rules require some type of response to remain in the public portion of the file Requests for confidentiality are only granted sparingly and only upon good cause shown If your request for

4201 N. 24th Street · Suite 100 · Phoenix, AZ 85016-6266
PH: 602.252.4804 · FAX: 602.271.4930 · WEBSITE: www.azbar.org

confidentiality is denied, the information or documents in question will not be returned to you, but will become public upon disposition of the matter

The State Bar has a diversion program which, in some cases, may provide an alternative to traditional discipline  Diversion is a confidential rehabilitative program available to lawyers whose ethical misconduct is of a non-serious nature and who may benefit from one or more of the State Bar's remedial programs, such as the Member Assistance Program (MAP) or the Law Office Management Assistance Program (LOMAP)   Diversion is not available in cases of serious misconduct or for conduct involving dishonesty, self-dealing, or breach of a fiduciary duty  Participation in diversion is voluntary  If you would like more information about the State Bar's diversion program, you may review the Diversion Guidelines on-line at

**http.//www.azcourts gov/Portals/22/admorder/Orders10/2010-127 pdf**

If, after reviewing the guidelines, you believe your case may qualify for diversion, please submit a written request with a statement of why you believe diversion is appropriate along with your response

Thank you for your anticipated cooperation

Sincerely,

Craig D  Henley
Senior Bar Counsel

CDH/ts
Enclosure



Assistant's Direct Line (602) 340-7272

January 11, 2016

Kathleen Erin Brody
Osborn Maledon, PA
2929 N Central Avenue, Suite 2100
Phoenix, AZ 85012-2765

**Re File No** 15-3363
**Respondent** Juan M Martinez

Dear Ms Brody

We have received your correspondence dated December 22, 2015, regarding possible ethical impropriety by the above-named lawyer I, along with an investigator from our office, will be investigating your allegations A file number has been assigned to this matter Please use this number on any future communications with this office If your complaint involved more than one lawyer, you will receive separate correspondence for each

I have forwarded a copy of your correspondence to the lawyer with a request that a prompt, written response be submitted In most cases, I will send you a copy of the lawyer s response for your review An investigator may contact you for additional information and input

At the conclusion of the preliminary investigation, I will summarize the case and present it for review by all bar counsel If, after this review, a determination is made that no ethical violation can be proven by clear and convincing evidence, the charge will be dismissed and you will be notified You are entitled to appeal a dismissal decision made by bar counsel

All recommendations other than dismissal will be referred to the Attorney Discipline Probable Cause Committee, who may issue one of the following orders

- stay of the proceedings
- admonition
- probation
- diversion, or
- filing of a formal complaint

You will be notified in writing of my recommendation and provided the opportunity to object in writing if you disagree

Lawyer ethics and disciplinary procedures are governed by the Rules of the Supreme Court of Arizona The State Bar is bound by those rules in deciding whether a lawyer has committed an ethical violation and whether the lawyer can be sanctioned for that violation You, as a Complainant, are not a party to the disciplinary proceedings The State Bar does not represent you and cannot assist you in resolving ongoing legal problems You should consult your own lawyer to advise you of your rights or potential legal recourse against the lawyer

If you intend to pursue the lawyer in civil or criminal proceedings, you should not delay because State Bar proceedings are pending If you wait, you may lose important legal rights ***For example, if you believe you are entitled to recover money from the lawyer for damages you have suffered because of the lawyer's conduct, you must pursue such claims through the courts The Rules of the Arizona Supreme Court do not provide for the recovery of malpractice, contract, or other civil damages in State Bar proceedings Accordingly, statutes of limitations applicable to such claims continue to run and your claims may expire before State Bar proceedings are completed.***

At this point, your complaint is not open to the public However, the State Bar may confirm to anyone inquiring that a complaint against the above-referenced lawyer has been received and is being investigated When the State Bar has completed its investigation and a decision is made on whether to pursue formal charges, then your submissions, the lawyer's submissions and, perhaps, other documents in the file may become open to the public

Please be aware that anything you send to this office becomes the property of the State Bar of Arizona and cannot be returned to you If you do request copies of any documents not otherwise provided to you by the State Bar of Arizona, you will be required to pay a copy charge of $ 50 per page, payable in advance If you want to keep a copy of any documentation you provide to the State Bar of Arizona, it is advisable to have copies made prior to sending it to the State Bar

The State Bar receives more than 2,000 complaints every year We cannot give thorough consideration to each complaint without your patience and full cooperation Please await contact from me or our investigator before submitting additional information

Thank you for bringing this matter to the attention of the State Bar Please be assured that it will receive our careful consideration, and appropriate action will be taken within the rules and procedures established by the Supreme Court of Arizona

Sincerely,

Craig D Henley
Senior Bar Counsel

CDH/ts
Enclosure



# ARIZONA ATTORNEYS FOR CRIMINAL JUSTICE

P O Box 41213
Phoenix AZ 85080-1213
Phone 480 812 1700 Fax 480 812 1736
Email defense@aacj org Web www aacj org

President Kathleen Brody-Maricopa
President-Elect John Sears-Yavapai
Secretary Adam Bleier-Pima
Treasurer Joseph St. Louis-Pima

Board of Governors
James Belanger-Maricopa
Scott Bennett-Maricopa
Joel Chorny-Pima PD
David Euchner-Immediate Past President
Ralph Ellinwood-Pima
Louis Fidel-Pima
Kathy Field-La Paz
Thomas Holz-Cochise
Rebecca Johnson-Graham/Greenlee
Amy Kalman-Maricopa
Elizabeth Kruschek-Federal PD
Gary Kula-Maricopa
Robert McWhirter-Maricopa
Richard Miller-Maricopa PD
Kris Moe-Yuma
Anna Ortiz-Gila
Lee Phillips-Coconino
Brad Rideout-Mohave
Craig Rosenstein-Maricopa
Jeffrey Ross-Maricopa
Dawn Sinclair-Maricopa
Kelly Smith-Second Past President
Ron Wood-Apache/Navajo

Past Presidents
David Euchner 2014
Kelly Smith 2013
John Canby 2012
Judy Lutgring 2011
Steven Sherick 2010
Robert McWhirter 2009
James Belanger 2008
Christopher Dupont 2007
Joseph St. Louis 2006
Donna Elm 2005
Gregory Parzych 2004
Ralph Ellinwood 2003
Eleanor Miller 2002
Jon Sands 2001
Marty Lieberman 2000
Stephen Dichter 1999
James Logan 1998
Deborah Williams 1997
Walter Nash, III 1996
David Derickson 1995
Marc Budoff 1994
Bruce Feder 1993
Michael Piccarreta 1992
Larry Debus 1991
Robert Hirsh 1990
Clark Derrick 1988-89
Michael Kimerer 1986-87

Justice Project
Larry Hammond

Executive Director
Max Bessler

December 22, 2015

Lawyer Regulation Division
State Bar of Arizona
4201 North 24th Street, Suite 200
Phoenix, AZ 85016-6288

**Re Bar Charge Against Juan M Martinez**
**Arizona State Bar No 009510**

To Whom It May Concern

Arizona Attorneys for Criminal Justice ("AACJ"), the Arizona state affiliate of the National Association of Criminal Defense Lawyers, was founded in 1986 to give a voice to the rights of the criminally accused and to attorneys who defend the accused AACJ is a statewide membership organization of criminal-defense lawyers, law students, and associated professionals dedicated to protecting the rights of the accused in the courts and in the legislature, promoting excellence in the practice of criminal law through education, training, and mutual assistance, and fostering public awareness of citizens' rights, the criminal-justice system, and the role of the defense lawyer

AACJ lodges bar charges against attorneys in egregious cases when evidence of professional misconduct is so clear that it threatens the foundations of the criminal-justice system to allow such misconduct to go without redress That standard applies in this case

Deputy Maricopa County Attorney Juan M Martinez, an Arizona State Bar member and experienced prosecutor, has engaged in a long and continuing pattern of unethical and unprofessional conduct Martinez's misconduct has gone unpunished and uncorrected, despite its being recognized numerous times by Arizona courts, including our Supreme Court AACJ therefore requests that the State Bar initiate an investigation into Martinez's misconduct and take action to impose appropriate discipline

RECEIVED
DEC 2 2 2015
STATE BAR OF
LAWYER REGULATION

**I Introduction**

In blunt pursuit of criminal convictions, long-time prosecutor Juan Martinez repeatedly engaged in material violations of the most basic tenants of the Ethical Rules He has lacked candor to tribunals, unfairly treated opposing parties and counsel, and prejudiced the administration of justice Disturbingly, much of his misconduct has been in capital cases As outlined below, Martinez has repeatedly abdicated the prosecutorial mandate to seek justice, and the Arizona Supreme Court has repeatedly found that he engages in prosecutorial misconduct

**II Standards for Prosecutorial Conduct**

In evaluating Martinez's conduct, the Bar should take into account what courts in Arizona and elsewhere have said about the standards governing prosecutors Although "[a] prosecutor has wide latitude in presenting arguments to the jury," *State v Morris*, 215 Ariz 324, 336 ¶ 58 (2007), Martinez's conduct went beyond that latitude in many cases, including those discussed below The following case excerpts and citations are some of the standards that the Bar should take into account when evaluating Martinez's repeated misconduct

**Arguing During Opening Statements** Argument during opening statements is improper "Opening statement is not a time to argue the inferences and conclusions that may be drawn from evidence not yet admitted " *State v Bible*, 175 Ariz 549, 602 (1993)

**Appeal to Passions and Fear** Prosecutors "may not make arguments which appeal to the passions and fears of the jury " *State v Comer*, 165 Ariz 413, 426 (1990) (improper argument for prosecutor to "characteriz[e] appellant as a 'monster,' as 'filth,' and the 'reincarnation of the devil on earth'"), *In re Zawada*, 208 Ariz 232, 237 ¶ 14 (2004)

**Misstating the Evidence** Prosecutors' misstating the evidence is "a serious breach of the prosecutor's duty," *State v Cannon*, 148 Ariz 72, 77 (1985), and is prosecutorial misconduct *E g* , *United States Atcheson*, 94 F 3d 1237, 1244 (9th Cir 1996) (addressing argument outside the record as prosecutorial misconduct), *State v Mayhorn*, 720 N W 2d 776, 788 (Minn 2006) ("A prosecutor commits misconduct by intentionally misstating evidence "), *State v Leon*, 190 Ariz 159, 161 (1997) (condemning prosecutor's references to police reports and telling the jury they were not going to have the "inside information" as to what occurred)

**Misstating the Law** "The state may not misstate the law to the jury " *State v Serna*, 163 Ariz 260, 266 (1990) (citing *State v Tims*, 143 Ariz 196, 200 (1985)) ("The prosecutor should not misstate the law in closing argument "), and *State v Daymus*, 90 Ariz 294, 303-04 (1961) ("It is improper to misstate the law in argument but not necessarily prejudicial "))

**Attacking Expert Witnesses** It is improper for a prosecutor to "imply unethical conduct on the part of an expert witness" in the absence of evidentiary support *State v Velazquez*, 216 Ariz 300, 311 ¶ 48 (2007)

**Impugning the Integrity or Honesty of Opposing Counsel** It is misconduct for a prosecutor to impugn the integrity or honesty of opposing counsel This includes accusing defense counsel or a defense witness of concocting a falsehood *State v Hughes*, 193 Ariz 72, 85-86 ¶ 59 (1998), *State v Newell*, 212 Ariz 389, 403 ¶ 66 (2006), *see also United States v Sanchez*, 176 F 3d 1214, 1225 (9th Cir 1999) (prosecutor commits misconduct when denigrating the defense as a sham), *Carter v State*, 356 So 2d 67 (Fla Dist Ct App 1978) (prosecutor referred to defense counsel as a "mouthpiece"), *People v Weller*, 258 N E 2d 806, 810 (Ill App Ct 1970) (stating defense counsel could "qualify as an SS Trooper"), *State v Lundbom*, 773 P 2d 11 (Or Ct App 1989) (referring to defense counsel as "pimp" and "hired gun"), *Commonwealth v Long*, 392 A 2d 810, 813 (Pa Super Ct 1978) (prosecutor referred to defense counsel as a "not guilty machine"), *Commonwealth v Sargent*, 385 A 2d 484 (Pa Super Ct 1978) (reference to fact that defendant had a "paid attorney" hired to "acquit") *Anderson v State*, 525 S W 2d 20, 22-23 (Tex Crim Ct App 1975) (defense attorney "wants to pull the wool over your eyes," "won't argue the law, and he won't argue the facts, all he will do is get up here and lie to you"), *Thornton v State*, 852 So 2d 911, 913-15 (Fla. Ct App 2003) (reversing conviction where prosecutor accused defense attorney of scripting a story), *People v Vera*, 94 A D 2d 728, 730, 462 N Y S 2d 467, 469 (N Y Sup Ct 1983) ("While such questioning [of delay in presenting alibi to police] is permissible under certain circumstances it should not be accompanied by the improper characterization of the witness' testimony as a 'story' "), *McCarty v State*, 765 P 2d 1215, 1220-21 (Okla. Crim Ct App 1988) ("Mr Macy [the prosecutor] improperly attacked the credibility of defense counsel by accusing him of 'making up a story' ") Such arguments "impugn[] the integrity or honesty of opposing counsel " *See Hughes*, 193 Ariz at 85-85 ¶ 59

**Presenting False Testimony** "Knowing use of perjured or false testimony by the prosecution is a denial of due process and is reversible error without the necessity of a showing of prejudice to the defendant " *State v Ferrari*, 112 Ariz 324, 334 (1975) (citing *Mooney v Holohan*, 294 U S 103 (1935)), *State v Minnitt*, 203 Ariz 431, 440 ¶¶ 43-44 (2002) (suborning perjury in first two trials was so egregious that conducting a fair third trial free of misconduct could not purge the taint, necessitating dismissal under the double jeopardy clause of the state constitution)

## III Martinez's Ethical Violations in Cases Before the Arizona Supreme Court[1]

The Arizona Supreme Court has repeatedly noted instances of Martinez's misconduct

### A *State v Morris*

The Supreme Court concluded that Martinez committed misconduct in *State v Morris*, 215 Ariz 324 (2007), though it did not reverse the conviction Morris had killed five prostitutes, discarding their bodies in alleys Despite no supporting evidence, Martinez argued to the jury that Morris strangled them during sex and continued to have sex with their bodies until they

[1] The reported cases discussed in this section are included in **Attachment 2** (Reported Cases Involving Martinez)

rotted and fell apart Martinez committed misconduct when he "invited jurors to put themselves in the place of the victims and singled out specific jurors based on appearance and gender" *Id* at 337 ¶¶ 57-58 Also troubling was when Martinez took a victim's jacket out of a plastic evidence bag for the jury's "smelling pleasure" *Id* at 338 ¶ 62

**B *State v Andriano***

In *State v Andriano*, the defense argued that Martinez "took every opportunity to infuse the trial with marginally relevant information about Andriano's partying and man-chasing" 215 Ariz 497, 503 ¶ 28 (2007) As the Court noted, however, the defendant did not allege prosecutorial misconduct and reversal was unwarranted because the trial judge instructed the jury that counsel's arguments are not evidence *Id.* at 503 ¶ 28 & n 3

**C *State v Gallardo***

In *State v Gallardo*, Martinez misstated the evidence, ignored sustained objections, mischaracterized expert testimony, and asked the jury to compare the victim to the defendant 225 Ariz 560 (2010) He also "persisted in [a] line of argument"—twice—after the trial court sustained an objection that the argument was misleading *Id* at 569 ¶ 43 Although the Court did not reverse the conviction, it noted that the "repeated statements by the prosecutor were improper" *Id* at 569 ¶ 44

During the *Gallardo* oral argument, Justice Andrew Hurwitz asked about Martinez's unethical conduct

> Can I ask you a question about something that nobody's discussed so far? The conduct of the trial prosecutor It seems to me that at least on several occasions, and by and large the objections were sustained, that the trial prosecutor either ignored rulings by the trial judge or asked questions that the trial judges once ruled improper and then rephrased the question in another improper way Short of reversing a conviction, how is it that we can stop inappropriate conduct?[2]

Justice Michael Ryan then commented

> Well, this prosecutor I recollect from several cases This same prosecutor has been accused of fairly serious misconduct but ultimately we decided it did not rise to the level of requiring a reversal ***There's something about this prosecutor Mr Martinez***[3]

---

[2] **Attachment 1** (Transcript of Oral Argument in *State v Gallardo* before Arizona Supreme Court), at 16

[3] *Id* at 16-17 (emphasis added)

**D** ***State v Lynch***

In *State v Lynch*, 225 Ariz 27 (2010) (*Lynch I*), the Supreme Court confronted several instances of Martinez's misconduct but ordered a new sentencing hearing for different reasons

Despite being on notice from *Lynch I*, Martinez repeated the same tactics during the second sentencing This time, although the Supreme Court did not reverse the sentence, it specifically found that Martinez committed misconduct *State v Lynch*, 238 Ariz 84 (2015) (*Lynch II*)

- During opening, the trial court properly sustained two of Lynch's objections because Martinez "improperly made argumentative statements during opening " *Lynch II*, 238 Ariz. at --- ¶ 10

- Also during opening, Martinez improperly personalized his argument to prejudice the jury "The prosecutor's first comment was improper By telling the jurors that they could not know what it was like to be 'manhandled' by the knife-wielding defendant, the prosecutor invited the jurors to place themselves in the victim's position and appealed to their fears " Again, because "the trial court properly sustained Lynch's objection, struck the argument, and told the jury to disregard it," the Supreme Court did not reverse the conviction *Id* ¶ 49

- During cross-examination, the trial court sustained two of Lynch's objections to Martinez's "aggressive" questions, and "the court would have been well within its discretion to have sustained the objections and required the prosecutor to rephrase his questions in a more civil manner[ ]" The Supreme Court noted that "the trial court should have exercised more control over the aggressive questioning " *Id.* ¶ 12

- During another cross-examination, the trial court properly sustained an objection when Martinez mockingly suggested an expert witness "can vouch for people " *Id* ¶ 15

- The Supreme Court noted that "the prosecutor was aggressive," but did not reverse because the "trial court sustained Lynch's objections to many of the questions, and the court's instructions to disregard the statements cured any possible prejudice " *Id.* ¶ 22

- Martinez improperly appealed to juror fears during cross-examination when he asked whether Lynch "could stick or prick" a corrections officer with a sharp object, implying Lynch would be a danger if incarcerated for life The Supreme Court noted that "the cross-examination was argumentative, and the trial judge could have sustained an objection on that basis " The Court did not reverse because the defense's rebuttal cross-examination cured the problem *Id* ¶¶ 23-24

- During both cross-examination and closing Martinez misstated the evidence The Supreme Court concluded that "[a]though the prosecutor made inappropriate remarks, defense counsel's objections were sustained and the prosecutor did not argue the points further" Because of the defense's objections and trial court's curative instructions, the Supreme Court did not reverse *Id* ¶¶ 25-26

- During closing arguments, Martinez misstated the law Again, because "the trial court correctly sustained Lynch's objection to this argument, properly instructed the jury on the issue, and instructed the jury to disregard remarks to which the court sustained objections," the Supreme Court did not reverse *Id* ¶ 37

- During closing argument, Martinez misstated the law regarding the (F)(6) aggravating factor, just as he had done five years earlier in *Lynch I* The Supreme Court noted that "[t]he prosecutor struggled at times during voir dire and closing argument with the disjunctive 'or' and conjunctive 'and' in explaining the (F)(6) aggravator" Again, only defense objection and trial court clarification precluded reversal *Id* ¶ 43

- Regarding Martinez's cumulative misconduct, the Supreme Court stated that "the prosecutor disturbingly made a number of inappropriate comments" Yet again, only the "valid objections by Lynch that the trial court sustained" and the trial court's instructions prevented reversal *Id* ¶ 52

## IV Martinez's Unethical Conduct During Criminal Trials

### A *State v Beemon*

In *State v Beemon*, Maricopa County Superior Court Case No CR2002-099001, Martinez's theme for closing argument was that defense counsel was like "Hitler" telling "the big lie over and over"

> As I said, if history teaches us anything, it's that it comes around again and again Remember Hitler? The big lie he told you? It was at the top of his lungs over and over, you are the superior people and people are going to believe it because they heard it over and over again, and that's what he said over and over again was about the state calling him sneaking, calling him lying, calling him cheating, calling him a beast, calling him a dog Did that ever happen by the State? Of course it didn't happen, but you know what? He wants you to believe that it did You know, just like Hitler, that big lie If you put it out there, even though the prosecutor didn't say it, maybe you'll believe it And maybe when you go back there to decide this case, you won't decide it on the facts But if he tells you that over and over again, you're certainly going to start to believe it, aren't you?[4]

---

4 **Attachment 3** (*State v Hulsey*, Maricopa County Superior Court Case No CR 2007-111635-001-DT, Motion to Have Deputy County Attorney Juan Martinez Removed as the Trial

Martinez continued

> He [defense counsel] talks about America and wraps himself around the flag Doesn't wrap himself around the German flag when he calls somebody a cheater, a liar, and sneaking when in fact they never even used those words [5]

And continued further

> All the State is asking you to do is consider the evidence that came from the witness stand Take a look at all of that If you take a look at all of that, even though somebody calls the prosecutor sneaking, lying , cheating, all of that stuff, attributes things like beast and dog and all these terms to him
>
> Even though they may do that, that's an effective argument I[t] worked through history We have the example of Germany It worked through history [6]

Underscoring the impropriety of his argument is that defense counsel in *Beemon*, Robert Stein, is Jewish

When called on his behavior, Martinez claimed, without giving specific examples, that the defense argument justified his disparaging defense counsel

> Well, one of the things that we must keep in mind is that the personal attacks in this case have all come from the defense
>
> I was merely responding to what he said and to indicate that I didn't say those words, then they – they're [the] ones that perhaps are not telling the truth [7]

Regarding his anti-Semitic argument, Martinez again justified himself

> I never personally attacked him I never called him a liar I never called him - he raised this now, I didn't even know he was Jewish, but okay, he's Jewish Big deal I'm not No one ever called him a Jew We know, he made things up, he attributed to the state I'm entitled to respond to it If he calls us liars, cheaters and sneaky, I - we're entitled to do that
>
> I think it's a specious argument to say he read the jurors' minds now and think[s] they'll be prejudiced against him just because he's Jewish Well, they would have been prejudiced against him if they were prejudiced against Jews when he wrote

---

Prosecutor in This Case, and Various Connected Motions in Limine, filed March 6, 2009 ("Martinez Removal Motion"), at 2 (quoting *Beemon* Transcript at 43-44 "

5 *Id* (quoting *Beemon* Transcript at 48-49)

6 *Id* at 3 (quoting *Beemon* Transcript at 56)

7 *Id* (quoting *Beemon* Transcript at 58)

3/22/2011

his name up there, "Stein," and somehow attribute that when he marked that up there and wrote it I think that's a specious argument and I don't think anything he says rises to any level of misconduct on the State's part [8]

**B** ***State v Grant***

In *State v Grant*, Maricopa County Superior Court Case No CR 2005 032986-001 SE, Martinez lied to the court and opposing counsel *Grant* was a high-publicity murder trial where the state accused Grant of drugging his wife, Faylene, so she drowned in the bathtub The defense argued that her death was an accident or suicide The state possessed several exculpatory "farewell letters" Faylene wrote showing she believed God meant her imminent death During the years of preparation for Grant's trial, Martinez not only failed to disclose to the defense the "letters," he lied to the court about their existence

*Grant* began with a poor investigation of Faylene Grant's drowning in September 2001 Officers overlooked numerous "farewell letters" and notes Faylene had written contemplating her own death Some were in the bedroom including post-it notes taped to mirrors Gilbert police did not at first collect or preserve the letters Rather, days after Faylene's drowning, Grant disbursed dozens of "farewell letters" to family members and friends and Gilbert police knew of them from subsequent witness interviews

After Grant's indictment, defense counsel twice sent written requests for disclosure of all "farewell letters " The state ignored the request The defense filed a motion to compel On August 30, 2005, the court ordered the state to disclose all remaining discovery materials

On October 21, 2005, nearly two months later, the defense alerted the court that the state failed to disclose numerous items of evidence, including the critical "farewell letters " The state prosecutor avowed all discovery was complete and nothing else existed Later, a detective acknowledged he had reviewed numerous undisclosed "farewell letters" during the investigation Through November and December 2005, the defense continuously requested these "farewell letters" with no response

**1 Martinez's Failure to Disclose and Misrepresentations Regarding Exculpatory Letters**

By February 24, 2006, Martinez had taken over Grant's prosecution The County Attorney's bates-numbering system showed that the state never disclosed the letters that had been received by the Eaves family When the defense informed the court, the newly assigned Martinez represented to the court that no additional letters existed

---

[8] *Id* at 3-4 (quoting *Beemon* Transcript at 58-60 )

> Martinez "I read a lot of the letter[s] that were turned over to the defendant I've seen those letters and they have been turned over to the defendant "[9]

Martinez then accused the defense of harassment

> I believe, it borders on harassment In speaking with them (the Eaves family), they told me that they don't have any more letters I've spoken to the detective about it So what more can we do other than provide the Court the documentation that indicates those letters have been turned over and point out that they have indicated that those matters have been turned over ***We turned everything over*** [10]

Relying on Martinez's representations, the court noted in its February 24, 2006 minute entry, "States [sic] counsel advises that all discovery/letters have been turned over to defense counsel "

But two weeks after Martinez's avowals that no letters existed and his complaint that the defense was "bordering on harassment," he disclosed ***one*** of the "farewell letters" on March 7, 2006, from Terina Eaves He still failed to disclose dozens of other "farewell letters" that later surfaced

Martinez did not explain his false statement to the court on February 24, 2006, that he had already turned over all letters or how he could have interviewed the person who possessed the letter, Terina Eaves, without knowing the letter existed

Four months later, Martinez again insisted there were no additional exculpatory letters

> All I know is I've gone to all the family members They don't have any more letters I personally have gone and checked every item that's in the Gilbert Police Department There aren't any more items So I would just leave that for the court [11]

In response, the court issued a directive regarding the state's obligation to disclose the clearly exculpatory "farewell letters"

> There is still a question as to whether or not those letters, those documents are in the possession of the people that Mr McDonald has indicated in his motion And I will say, I haven't looked at your response, Mr Martinez I have considered your comments here in the courtroom I recall what was said in the past I guess

---

9 **Attachment 4** (*State v Grant*, Maricopa County Superior Court Case No CR 2005-032986-001 SE, Motion to Dismiss with Prejudice or, in the Alternative, to Depose Gilbert Police Detectives Ray and Palmer and Eaves Family Members, filed September 11, 2006, at 7-8 (quoting *Grant* Feb 24, 2006 Transcript at 8)

10 *Id* at 8 (quoting *Grant* Feb 24, 2006 Transcript at 9) (emphasis added)

11 *Id* at 11 (quoting *Grant* June 9, 2006 Transcript at 17-18 )

> the only thing I can say is that – two things
>
> Mr McDonald, through reference to interviews in his motion, has at least on its face set out a compelling argument that ***these letters do exist or did exist at one point in time, and that they were available and in possession of the people that he claims had them in their possession at a very definite point in time. There's no question about what his argument is*** If they no longer exist, they no longer exist And no one can change that fact
>
> All I will say is that if those letters do exist, and it's determined at some point in time or they're found and they're not disclosed for purposes of this grand jury remand, they surface sometime later, chances are we will all be back in the courtroom again And there will be a request at that time for, at minimum, a remand to the grand jury again for consideration of those letters, ***and there probably will be another request from Mr McDonald to dismiss this case based on withholding of evidence or information that should have been disclosed or discovered.*** If that's the case, then I will, in fact, consider the defendant's motions if they're re-urged if that occurs That's a big if
>
> I don't know if any of that is going to happen But I want everybody here to know that I will consider that if it does happen So if you don't have them, Mr Martinez, you can't disclose them and you're not being ordered to disclose them to the grand jury But *if they come up later we re all going to be here again to talk about the same things All right You have my orders* [12]

The court issued the following minute entry

> States [sic] counsel indicates no additional letters exist to the States [sic] knowledge
> COURT FINDS that if letters surface at a later date, matter may be reconsidered by the court [13]

Despite Martinez's continued avowals to the court that the "farewell letters" did not exist, they continued to appear

Under threat of dismissal, on August 10, 2006, Martinez disclosed twenty-one pages of discovery including the very letters he had denied existed for ten months Martinez blamed Detective Palmer for collecting the letters and losing them Detective Palmer, however, later testified he knew nothing of the letters

---

12 *Id* at 12 (quoting *Grant* June 9, 2006 Transcript at 18-20) (emphasis added)

13 *Id* at 13

**2 Martinez Lied to the Court and Counsel Regarding Tapes of Witness Interviews**

Through 2005 and 2006, prosecutors and detectives insisted that they had no audiotapes of key witnesses Martinez continued the deception when he avowed to Judge Talamante on November 29, 2006, that the discovery of all audiotapes had been completed

Because of the discovery disputes, Judge Talamante ordered a document inspection at the Gilbert Police Department, which occurred on April 16, 2007 Only then did the defense discover audiotaped interviews of key witnesses despite Martinez's attempts to block the defense from viewing the Gilbert property room exhibits

**3 Martinez's Unethical Argument**

In pretrial hearings, Martinez grilled Grant's new wife and another former girlfriend, Hilary, about irrelevant intimate details of their sex lives, down to whether they wore thong underwear or had performed oral sex in cars

During the trial, Martinez often postulated, with no testimony or evidence in support, that Grant engaged "in some sort of threesome" with Faylene and Hilary Martinez attempted to show that Grant was sex-obsessed

At sentencing, he continued this unsupported theme

> He is not, in our view, a wonderful father It's just tawdry this *ménage a trois*, as the French call it, that he [went] through

Martinez presented zero evidence that Grant and ex-girlfriend Hilary ever even *saw* each other, much less engaged in sexual improprieties, after Grant and Faylene remarried in July 2001

**C *State v Chrisman***

In *State v Chrisman*, Maricopa County Superior Court Case No CR 2010-153913-001-DT, Martinez caused the defense to lose testimony from a material exculpatory witness and committed repeated misconduct throughout trial

*Chrisman* was another high-publicity case where Martinez prosecuted Richard Chrisman, a Phoenix police officer charged with murder and animal cruelty after he killed a suspect and the suspect's pit bull The state charged and tried Chrisman for second-degree murder, aggravated assault, and animal cruelty [14]

---

[14] *See generally* **Attachment 5** (*State v Chrisman*, Maricopa County Superior Court Case No CR 2010-153913-001-DT, Motion for New Trial, filed Sept 27, 2013)

**1 Causing the Defense to Lose an Exculpatory Witness**

The Phoenix Police Department hired Andrew Hinz, of Taser International, to examine Tasers to show which officers fired and when He wrote a fifty-one-page report

After repeated defense requests, Martinez on November 20, 2012, disclosed his trial witnesses and listed Hinz The defense requested an interview on May 31, 2013, which Martinez did not arrange until a week before trial on July 24, 2013

After the interview, the defense sought Hinz as a witness and requested his contact information Martinez informed the defense that all contact with Hinz must be made through his office, and the state accepted the defense subpoena for Hinz The defense tried to make Hinz's travel reservations though the Maricopa County Attorney's Office Not until August 20, 2013, *after the start of trial*, did Martinez provide his phone number

The state finally provided Hinz's address on August 22, 2013, well after trial started and too late to subpoena Hinz who lives in Colorado

**2 Martinez During Pretrial Hearings**

During public pretrial hearings, Martinez committed repeated ethical violations for the benefit of the cameras to portray Chrisman in as bad a light as possible

- At oral argument on a Motion to Remand before Judge Stephens, Martinez stated that Chrisman lied, failed his employment polygraph exam, and was investigated for stealing and lied about it as well Martinez's statements were false

- Martinez badgered one witness at length to force her to admit that she was in a same-sex relationship and demanded her social security number, even though she was an employee of the Maricopa County Sheriff's Office Of another witness Martinez demanded her ex-husband's phone number He asked several witnesses if they had attended parties with Chrisman where disrobing took place This was so Martinez could argue that Chrisman's cell-phone records were important to his cross-examination of character witnesses because they showed "wife-swapping " There was no basis or foundation for these questions, and the implied assertions were false

**3 Martinez During Trial**

Martinez continued in trial with untrue and irrelevant questions

- Martinez learned that Peoria Police Officer Lon Bartel was using vacation time to testify as a defense expert Martinez presented to the jury, with no factual basis, that Officer Bartel was a "double-dipper "

- Martinez examined Sergeant Mattson on his police-union ties and alleged that taxpayers were supporting him

- Martinez grilled witness Mayra Hawkins Reesen on her maternity leave and why she had been away from work so long, yet had time to attend Chrisman's trial

- Martinez opened his cross-examination of Sergeant Julie Egea by falsely accusing her of lying to him during his unsworn interview with her

- Martinez knew that Elvira Fernandez told Detective Cisneros she lived in and owned the trailer (the scene of the alleged crime), but she had put it in Daniel Rodriguez's name after she incurred medical bills because she did not want to lose her home Martinez tried to have Officer Virgillo testify that Fernandez did not own the trailer The court sustained defense objections Unfazed, Martinez then asked Officer Virgillo whether, if he had known that the trailer belonged to Rodriguez, he would have gone about investigating the domestic violence crime differently The defense objected, and when the court asked Martinez the relevance, he answered "She doesn't own the trailer " When the court asked again, he stated "She did not own the trailer " All of this was to create the false impression in the jury that Chrisman had no valid reason to be at the trailer

**4 Martinez in Closing Argument**

Martinez in closing argument intentionally made several false statements concerning the evidence

- Four times Martinez stated that Chrisman said Elvira Fernandez was hysterical when he spoke with her, something he never said

- Martinez told the jurors that Lon Bartel was a "double-dipper" who wanted jurors to believe "that SWAT members could look through walls "

- Martinez claimed that Sergeant Mattson and Sergeant Post (who had not even testified) returned Virgillo's "golden clipboard to put pressure on Virgillo to change his mind "

- Martinez stated that Sergeant Egea was "Rich Chrisman's friend" and that Sergeant Mattson was a "union organizer "

All of the above statements were false, not in evidence, nor matters from which legitimate evidentiary inferences could be drawn [15]

---

[15] *See generally id*

**D *State v Irizarry***

In *State v Irizarry*, Maricopa County Superior Court Case No CR2010-106178-001 SE, Martinez lied to the court and defense counsel by altering an exhibit and lying about its foundation, using a willing witness to discredit the defendant

Only two living people were present when Christopher Redondo shot and killed Gilbert Police Lieutenant Shuhandler Christopher Redondo and Daimen Irizarry Redondo killed Lieutenant Shuhandler during a routine traffic stop After Irizarry heard the loud "pop," Redondo jumped in the truck and yelled "drive "

The state charged Irizarry as an accomplice under A R S § 13-301, which required Martinez to prove that Irizarry acted "with the intent to promote or facilitate" Redondo's conduct Irizarry's "objective" had to be to help Redondo commit the drive-by shootings and aggravated assaults A R S § 13-105(10)(a) (defining intent), A R S § 13-301 (defining accomplice)

After Irizarry's arrest, he cooperated with the police and for two days consistently told them that he was scared and panicked – he explained what happened and when Irizarry's consistent recounting showed that many minutes passed during the incident

Martinez knew Irizarry's trial defense would be duress and that he would testify Defense counsel confirmed this during opening statements on July 7, 2010 [16] On July 20, 2010, Irizarry consistently testified about his panic during the incident [17]

**1 Martinez's Falsified Impeachment**

To secure Irizarry's conviction, Martinez impeached him with an altered exhibit and lied about its foundation Martinez's objective was to discredit Irizarry by creating the false impression that the events could not have happened as Irizarry explained

- The day after openings, July 8, 2010, Martinez called Gilbert Police dispatcher Melissa Kingsley to introduce Exhibit 121, an audio recording of when Lieutenant Shuhandler first contacted Kingsley until he was shot by Redondo [18] Exhibit 121 is 2 minutes and 30 seconds long

- Martinez never disclosed to the defense the actual dispatch cassette tape of the communication between Shuhandler and Kingsley, which is much longer than Exhibit 121's 2 minutes and 30 seconds

---

16 **Attachment 6** (*Irizarry* Transcripts RT July 7, 2010, at 18-30)
17 **Attachment 6** (*Irizarry* Transcripts RT July 20, 2010, PM, at 33, 39-46)
18 **Attachment 6** (*Irizarry* Transcripts RT July 8, 2010, at 74, 77-80)

- Taking advantage of "laying a foundation," Martinez with leading questions and statements stated

Q [Martinez ] And does include [sic] the time on there? From your memory, does it include at least real time from the time he called at 10 49 with you until the communication ended is real time on the tape, correct?

A [Kingsley ] Yes

Q That will give us a definite or an exact time as to when things happened, correct?

A Yes [19]

Martinez's statement that Exhibit 121 was "real time from the time he called at 10 49" was shown to be false during the defense presentation of evidence

- On July 20, 2010, Irizarry testified recounting the numerous events during the traffic stop before the shooting These events took substantially longer than 2 minutes and 30 seconds [20]

- The same day, July 20, 2010, the defense recalled Kingsley, who now clarified on direct examination that she did not know Exhibit 121's length and it is not "real time" [21]

While cross-examining Kingsley, Martinez continued to obfuscate the time issue with leading questions, now essentially establishing it as "six minutes"

Q [Martinez ] With regard to the start of that tape where the officer talks to you, that was at 10 47 p m , correct?

A [Kingsley ] Yes

Q And where we hear the gurgling sounds at the end, that was at 10 53, wasn't it?

A Yes

Q And you testified to that previously as to the time, didn't you?

A Yes

Q We did the mathematics, right?

A Yes

Q Didn't we?

---

[19] *Id* at 79

[20] **Attachment 6** (*Irizarry* Transcripts RT July 20, 2010, PM, at 27-33)

[21] **Attachment 6** (*Irizarry* Transcripts RT July 20, 2010, AM, at 32-40)

A We did

Q So in terms of the amount of time from the time that this officer first called you or spoke to you to the time that we got to this gurgling sound which you heard was six minutes, right?

A Correct

Q And you testified about that last time, the amount of time, right?

A Yes

Q In terms of this case, we hear you and the lieutenant talking, right?

A Correct

Q But so that we are clear, you previously told us that the whole conversation took and the times are 10 47 to 10 53, right?

A Yes

Q And that's something that you checked, right?

A Yes

Q And that is six minutes, right?

A Correct

Q That tape may not be six minutes, but you previously testified that that's what it was, right?

A Yes [22]

Kingsley had not previously testified to the times of 10 47 or 10 53 She and Martinez had never previously done "the mathematics " Kingsley also had never previously testified that Exhibit 121 was six minutes long Rather, on both July 8 and 20, 2010, Kingsley testified that she did not know Exhibit 121's length

Exhibit 121 is irrelevant to the charges against Irizarry, which occurred at a different time and location Martinez's purpose was to impeach Irizarry's recounting of events by creating the false impression that Exhibit 121 somehow reflected "real time" or that it "will give us a definite or an exact time as to when things happened " Martinez created this impression by falsifying and lying

## V Martinez's Unethical Conduct During Clemency Hearings

Martinez also has engaged in unethical argument during at least two hearings before the Arizona Board of Executive Clemency The board's composition is mainly non-lawyers

---

22 *Id.* at 40-42

**A *Landrigan* Clemency Hearing on October 22, 2010**

Jeffrey Landrigan presented serious issues to the clemency board as to whether he should have received the death penalty

- Landrigan was convicted of felony murder, not premeditated murder
- At least twice before his trial, the state offered Landrigan a second-degree murder plea that he turned down to exercise his right to trial
- Newly discovered DNA evidence raised questions regarding Landrigan's guilt or, at the very least, relative culpability and whether he deserved the death penalty
- At Landrigan's original sentencing, his defense did not present mitigation Sentencing Judge Cheryl Hendrix appeared before the board and testified that she was going to impose a life sentence, but imposed death when she received no mitigation evidence [23]

At the clemency hearing, Landrigan's post-conviction lawyers presented numerous witness and mitigation Martinez presented none Rather, Martinez responded by misstating the record or arguing unfairly

For instance, Martinez argued that the board should not credit the testimony regarding Landrigan's under-aged mother being raped by his father because "there was no police report "[24]

But more egregious, Martinez argued that the testimony of Landrigan's witnesses, notably Judge Hendrix, was just "a wringing of hands and a gnashing of teeth "[25]

Martinez further attacked retired Judge Hendrix by suggesting bias and economic motive Martinez claimed that Judge Hendrix was now "an advocate" and Landrigan was her "client"

> What that tells you is that she is just an advocate She is an advocate just like myself She has a position to take She is no longer a judge who heard both sides of the equation It's just half of the equation That other half she did not hear [26]

---

23 **Attachment 7** (*Towery* and *Landrigan* Clemency Materials Declaration by Cheryl Hendrix)

24 **Attachment 7** (*Towery* and *Landrigan* Clemency Materials Video of *Landrigan* Clemency Hearing, Oct 22, 2010, at 11 26 a m (disc 1)) Because of their size, the videos of the *Landrigan* and *Towery* clemency hearings are provided on discs separate from the other attachments

25 *Id* at 11 09-11 10 a m

26 *Id* at 11 28 a.m

Martinez then baselessly attacked Judge Hendrix's character by asserting the defense compensated her

> I would venture to say that she didn't pay her own way here, I would venture to say that she perhaps had some assistance from the defense in presenting the affidavit that's before you [27]

Judge Hendrix had offered to pay her own way to the hearing, stayed with a friend, and received no compensation for her presentation

Martinez then argued that the Board did not have the power to grant life without possibility of parole [28] The board chair corrected Martinez on this point [29]

The State of Arizona executed Landrigan four days later on October 26, 2010

**B *Towery* Clemency Hearing on March 2, 2012**

At Robert Towery's clemency hearing, Martinez again offered no evidence or testimony

Martinez argued that if Towery's childhood abuse "was so heinous, where are all those records?"[30] Martinez knowingly misrepresented the record by arguing,

> [T]here is not one shred of corroboration for that there's no indication that anyone was prosecuted for that there is no reason for an indication that that actually happened [31]

Martinez argued the extensive evidence of physical and sexual abuse was

> [j]ust to shake the sympathy tree even a little further to see if maybe something falls to the ground and you pick it up and eat it as a fruit of this particular tree [32]

In response, Towery's sisters again had to speak and relive the weekly and even daily beatings and sexual abuse from their mother The board clarified with them that they had testified at trial [33]

---

27 *Id.* at 11 30-11 31 a.m

28 *Id* at 11 40-11 41 a.m

29 **Attachment 7** (*Towery* and *Landrigan* Clemency Materials Video of *Landrigan* Clemency Hearing, Oct 22, 2010, at 12 51-12 52 p m (disc 2))

30 **Attachment 7** (*Towery* and *Landrigan* Clemency Materials Video of *Towery* Clemency Hearing, March 2, 2012, at 10 34 a m )

31 *Id.* at 10 42-10 43 a m

32 *Id* at 10 43 a m

33 *Id* at 11 09-11 16 a m

As in Landrigan's clemency hearing, Martinez argued that the board could not consider recommending life without parole Martinez not only incorrectly argued the change in law did not apply to Towery, but alleged, with no basis, that his lawyers lied to the board

> See how reasonable we are [referring to Towery's counsel], not only did we come here and lie to you a little bit about what happened at the crime scene or maybe we didn't tell you everything, but now we want you to commute the sentence and we want you to commute the sentence to something that probably you can't But it did not become law until 1994 [34]

Martinez never clarified how Towery's counsel "didn't tell you everything" or lied to the board, even "a little bit"

When the board caught Martinez regarding the issue of its power to recommend life without parole to the governor, he responded,

> Martinez "Right, and I agree with your position, and I think we had the same discussion when we discussed Landrigan"
>
> Board member "We did"
>
> Martinez "And my point was that there was a rule in place back when he committed the killing and that is that life without the possibility of parole did not exist and I know that the board has a wide range to recommend things that may not have been available and I do agree with that"[35]

Thus, Martinez knew he was misstating the law to the board

Martinez also appealed to the passions and fears of the board

> How would you feel if somebody is holding you at gun point, nine o'clock at night, someone that you know and they start going through your stuff? Think that you would feel any terror at that time? You think you would be happy? You think you would be talking about a proportionate review at that time? And then in the midst, and in the middle of this terror, Mr Jones says, "I gotta pee, I gotta go to the bathroom guys because I'm so darn scared"[36]

Martinez did admit, "Those aren't the words, no one said that those were the words," but repeated, "but that's what happened, they scared the pee out of him That's what happened That's how scared he was"[37]

---

34 *Id* at 10 47-10 48 a.m

35 *Id* at 11 02-11 03 a m

36 *Id* at 10 53-10 54 a m

37 *Id* at 10 54 a m

Martinez went on,

> And the indignity of it We have the bathroom that just went off just now Can you imagine, let's leave the door open so that one of you members can watch The indignity of that while he relieved himself and he was not even allowed to pull his pants up Now the terror is escalating [38]

The Ethical Rules provide for a consistent standard of conduct and boundaries of proper argument If Martinez would have made the same statements to a jury, a trial judge would have either sustained an objection or stopped them on his or her own Appeals courts have overturned convictions for less Because the board consists mostly of non-lawyers, Martinez's improper arguments are just as egregious as if they would have been to a jury

The State of Arizona executed Towery six days later on March 8, 2012

## VI Martinez's Celebrated Misconduct in *State v Arias*

In *State v Arias*, Maricopa County Superior Court Case No CR 2008-031021, Martinez committed instances of highly publicized misconduct too numerous to recount here Some of the more egregious examples are detailed below

### A Martinez's Misconduct Regarding Pretrial Discovery

During the five-year pretrial phase, judges repeatedly ordered Martinez to produce emails and text messages between the defendant Jodi Arias and the victim Travis Alexander Martinez repeatedly denied that messages existed or asserted that it was impossible to retrieve them In fact, Martinez either never attempted to retrieve them or misrepresented to the court they did not exist

#### 1 Exculpatory Images on Arias's Hard Drive

In 2013, Martinez obstructed defense access to key exculpatory evidence on Arias's hard drive

- Arias advised her counsel that Alexander had sent her pictures of his penis that were on her external hard drive, which was in police possession This evidence was relevant to refute Martinez's attacks on Arias's credibility

- In court, Martinez misrepresented that it would take two weeks to arrange for the defense to have the hard drive

---

[38] *Id* at 10 54 a m

- Subsequently, the defense learned from the case officer that the reason Martinez did not have access to the hard drive was because he sent it away to Texas for analysis The defense also learned that the hard drive indeed had exculpatory information

- Later, Martinez misrepresented to the court that the hard drive lacked evidence To cover himself, he asserted that the case detective who divulged the information to the defense regarding the hard drive images was either "lying or mistaken "

- At various times the defense contacted the Texas company regarding whether it had retrieved data The information from this Texas company did not conform to Martinez's representations to the defense and the court regarding the status of the data

- Only months later, did Martinez grudgingly comply with his duty to provide the exculpatory information by turning over a copy of the hard drive, claiming it was a "mirror image " He never gave the defense the actual hard drive

**2 Travis Alexander's Computer**

After a mistrial but before the second trial, Martinez was still fighting with defense attorneys over the contents of Alexander's computer Martinez had argued in the first trial that the victim's computer hard drive did not have pornography, links to porn sites, or viruses from porn sites Martinez put Detective Melendez on the witness stand to testify that Alexander's computer contained no evidence of pornography This was false

Just before the second trial, the defense learned that someone turned on the computer in 2009 and destroyed or overwrote computer data Despite this, the defense still obtained enough information showing Alexander's pornographic voyeurism

Compounding his misrepresentations, Martinez responded by falsely accusing prior defense counsel of causing the data loss This is the subject of the Maricopa County Legal Defender's Office separate pending bar charge against Martinez

**B Martinez's Misconduct During a Pretrial *Chronis* Hearing**

At a pretrial *Chronis* hearing to determine whether the state could proceed with the death penalty, Martinez misrepresented the testimony of the medical examiner

Martinez elicited testimony from Officer Flores that the medical examiner stated that the gunshot wound came first followed by stabbings But the medical examiner later testified that the knife wounds came first followed by the gunshot Only when Martinez got caught on cross-examination did he have Officer Flores change his statement

Only a few days before the first trial did Martinez announce the new sequence as if it had been the case all along During the *Chronis* hearing, he alleged that Alexander had been

shot, then stabbed, then slit Judge Sally Duncan made a pretrial finding that Martinez's first version was the foundation of the state's allegation that Arias deserved death based on the cruelty prong of the (F)(6) aggravator

Not only did Martinez's statements relate to the foundation of whether the state could proceed with a capital case, it incorrectly contradicted Arias's testimony that the shot came first and later the stabbings as Alexander was attacking her

**C Martinez's Unethical Behavior Toward Defense Counsel**

At the bench, as the attorneys debated whether to admit a statement about whether Alexander wanted to kill himself, Martinez said he would "fucking" kill himself if he was married to opposing counsel

> But the thing is that if Ms Willmott and I were married, I certainly would say, "I f---ing want to kill myself"

Defense counsel objected Two days later at another bench conference, Martinez said to the same counsel, "Well, then, maybe you ought to go back to law school" These comments are just examples of Martinez's unprofessional conduct toward defense counsel

**D Martinez Disclosed the Name of a Witness under Seal**

Martinez disclosed the name of a witness under seal (designated Witness No 1) three times in open court within fifteen minutes of arguing a motion Each time Martinez did this, the defense objected Although this witness lives in another country, within minutes of Martinez saying the witness's name, the media publicly tweeted the name, and the witness received threatening phone calls Shortly after, the witness wrote the judge advising he would never testify because his anonymity had no protection with Martinez prosecuting the case

**E Martinez Harassed Defense Experts During Trial**

Dr Richard Samuels was a testifying expert psychologist for the defense He testified that Arias suffered from post-traumatic stress disorder ("PTSD") In front of the jury, Martinez without basis accused Dr Samuels of having a sexual or romantic interest in Arias

Q [F]or whatever reason you started to like her, right?

A No

Q Oh, so you dislike her?

A I didn't say that either

Q So you do like her then?

A I cannot answer that question yes or no

Q Why not? You spent how many -- you went to see her on 12 separate occasions, right?

A Depends what you mean by like

Q I'm asking you, isn't it true that you went to see her on 12 separate occasions?

A As part of my role to evaluate her, yes

Q Yes or no, you did go see her on 12 separate occasions, correct?

A Yes [39]

Dr Samuels repeatedly testified he never bought Arias a gift but he did send her a self-help book via Amazon as he had done with other defendants [40] Martinez continued to imply impropriety

Q So you had this what appears to be a relationship with this individual that you feel is appropriate that you buy her at least one gift, correct?

A I bought her a self-help book [41]

Another expert, Dr Robert Geffner, testified for the defense after he conducted extensive and objective psychological testing on Arias Martinez accused him in front of the jury of manipulating the test results to favor the defense Martinez had no basis for this accusation

**F Martinez "Outed" Juror 17**

After the first jury deadlocked on whether to impose the death penalty with four jurors against death, the Maricopa County Attorney elected to again seek death with a new jury

This second jury also deadlocked after sending out conflicting notes From this, Martinez knew Juror 17 was against death At a sealed hearing, Martinez targeted Juror 17 with a motion to strike Martinez attached screen shots of Juror 17's Facebook page showing Juror 17's identity and stated her name in court

Although the hearing was sealed, the victim's family was present In a past instance, the victim's sister had revealed information from a sealed hearing [42] Martinez knew this and also knew that either she or someone else connected to the prosecution would "out" Juror 17

Arizona Rules of Criminal Procedure 24 1 and 18 3, Arizona Rule of Evidence 606(b),

---

39 **Attachment 8** (*Arias* Documents Transcript of Testimony of Dr Richard Samuels at 119-120)

40 *Id.* at 114-132

41 *Id.* at 128-129

42 **Attachment 8** (*Arias* Documents Tanisha Alexander Twitter)

and other rules prohibit disclosure of juror information

Martinez's motion did not present a legal basis and the trial court did not remove Juror 17 The result was well publicized – Juror 17 held true to the oath to render a verdict without succumbing to undue pressures and voted against death Within minutes of the jurors being dismissed, the media had Juror 17's identity and personal information Contemporaneously, Juror 17 suffered death threats, including

- "Claudia Police can't/won't protect you forever! ❤ to see what WILL happen to you once the Police done protecting you're ASS!"
- "#Juror17 is a marked woman by Twitter Sold her soul to the Devil! Some people may decide she doesn't deserve to live "
- "Why not circulate pic of #Juror17? She violated laws #DP activism needs punishing "
- "someone will release #juror17 name in time once her name is public i would move or protect myself dead woman walking imo"
- "#Juror17 is the 2nd most hated woman in the world right now #jodiarias in #1 Both are cowardly liars and should rot in hell "
- "#17 better HOPE what happened to #Travis NEVER happens to s/one SHE cares about! #ShameOnYou#17"
- "How would u like to be forever known as JUROR 17 the one who had an AGENDA and single handedly STOPPED justice from the ALEXANDERS #FUSW"
- "she'll 4 ever have to look over her shoulder"[43]

Maricopa County Attorney Bill Montgomery jumped in with suggestions of Juror 17's "misconduct" and that his office was "investigating" Juror 17

Meanwhile, Martinez celebrated the end of the trial with the remaining jurors and the victim's family at a "wrap party" taking numerous photographs and "selfies "[44] This was a "victory party"

> Jurors who voted against Arias joined the family and friends of Travis Alexander, who invited a few of those who stood by them, along with detective Flores and his wife Corinna, and Prosecutor Juan Martinez, to an evening of fellowship, to

---

43 **Attachment 8** (*Arias* Documents Emailed Threats to Juror 17)

44 **Attachment 8** (*Arias* Documents Wrap Party Photos of Martinez and Jurors)

> celebrate the end of the trial of Jodi Arias and the sentencing of Arias to natural life in Prison, with no possibility of Parole [45]

The photographs show Martinez having a great time And Juror 17 remains under police protection

## VII Conclusion

To be an attorney is a privilege, not a right To retain the privilege we abide by a code of ethics Given their immense power to destroy lives, prosecutors have an even higher ethical standard Martinez repeatedly fails to meet the standard

The Arizona Supreme Court laments Martinez's behavior even though the law requires it to uphold the convictions his misconduct produces

> Reversing a conviction is a large -- is a very drastic remedy, particularly in a case where the judge sustained the objections, told the jury that they should disregard arguments and that -- how is it that -- we seem to see this [Martinez' misconduct] on a relatively recurrent basis [46]

AACJ respectfully requests that the State Bar investigate Martinez's misconduct in these cases and impose appropriate discipline because, as Justice Ryan recognized

***"There's something about this prosecutor Mr Martinez."***

Please let us know if we can provide additional information

Sincerely,

Kathleen E Brody, President
ARIZONA ATTORNEYS FOR CRIMINAL JUSTICE

---

[45] *Id*

[46] **Attachment 1** (Transcript of Oral Argument in *State v Gallardo* before Arizona Supreme Court), at 16 (statement of Justice Andrew Hurwitz)

| | |
|---|---|
| **Tracking Number** | 1326189 |
| **Origin** | Osborn Maledon<br>2929 N Central Ave Ste 2100<br>Phoenix AZ 85012 2793<br>(602) 640-9125 |
| **Destination** | State Bar of Arizona<br>4201 N 24th St STE 200<br>Phoenix AZ 85016-6295<br>Attn Lawyer Regulation Division Deliver |
| **Ordered By** | Patricia Palmer (602) 640-9125 |
| **References** | 99988 9999<br>KB |
| **Order Type** | ECONOMY Delivery |
| **Ordered** | 2015-12 22 10 58 AM |
| **Ready** | 2015-12 22 11 00 AM |
| **Due** | 2015-12 22 3 10 PM |
| **Pieces** | 0 |
| **Weight** | 0 |
| **Charges** | $9 55 |
| **Matter Name** | AACJ |

DEC 2 2 2015

State Bar Of Arizona



CD Burn Date
12/21/2015
Exhibits to Bar Charge letter re
Juan M Martinez
Robert Towery
Clemency Video
FEDERAL PUBLIC DEFENDER
DISTRICT OF ARIZONA
March 2, 2012



Jeff Landrigan

Clemency Video

1 of 2

October 22, 2010



Jeff Landrigan

Clemency Video

2 of 2





October 22, 2010

CD Burn Date
12/21/2015
Exhibits to Bar Charge letter re
Juan M Martinez

ACP

6052
12/22 LRO

2929 North Central Avenue
21st Floor
Phoenix Arizona 85012

Lawyer Regulation Division
State Bar of Arizona
4201 North 24th Street, Suite 200
Phoenix, AZ 85016-6288

238 Ariz. 84
Supreme Court of Arizona

STATE of Arizona, Appellee,
v
Shawn Patrick LYNCH Appellant

No CR-12-0359-AP | Sept 10, 2015

**Synopsis**
**Background** Defendant was convicted in the Superior Court, Maricopa County David M Talamante J, of armed robbery burglary kidnapping and murder in the first degree and, after first jury could not reach a unanimous verdict in aggravation phase of trial second jury determined that defendant should be sentenced to death. Defendant appealed. The Supreme Court, Hurwitz, V C J 234 P 3d 595 225 Ariz 27 affirmed in part and remanded. Following second penalty phase trial in the Superior Court, Maricopa County No CR2001-092032 Karen L O Connor J the jury again returned a death verdict. Appeal was automatic

**Holdings** The Supreme Court, Brutinel, J held that.

[1] prosecutor s opening statement did not deny defendant a fair trial

[2] prosecutor s statement during closing argument was not improper;

[3] cumulative effect of prosecutor s inappropriate comments did not deprive defendant of fair trial,

[4] defendant was entitled on remand only to a new penalty phase proceeding, rather than to retry the aggravation phase

[5] *Simmons* instruction that defendant would never be released if sentenced to prison was not required,

[6] fact that the State did not ask voir dire questions related to jurors hair or tattoos not establish that the strikes were pretextual and

[7] sentence of death was warranted

Affirmed.

West Headnotes (74)

[1] **Criminal Law**
Conduct of counsel in general

An appellate court will reverse a conviction for prosecutorial misconduct only when (1) misconduct is indeed present, and (2) a reasonable likelihood exists that the misconduct could have affected the jury s verdict, thereby denying the defendant a fair trial

Cases that cite this headnote

[2] **Criminal Law**
Conduct of counsel in general

Even when an instance of prosecutorial misconduct does not warrant reversal, an incident may nonetheless contribute to a finding of persistent and pervasive misconduct if the cumulative effect of the incidents shows that the prosecutor intentionally engaged in improper conduct and did so with indifference if not a specific intent, to prejudice the defendant.

Cases that cite this headnote

[3] **Sentencing and Punishment**
Arguments and conduct of counsel

Prosecutor s opening statement, which contained improper argumentative statements did not deny defendant a fair trial in penalty phase of capital murder trial where court sustained defendant s objections to some of the statements and instructed jury that it should only consider testimony exhibits, and stipulations as evidence and that attorneys remarks were not evidence, and these

instructions cured any prejudice

Cases that cite this headnote

[4] **Criminal Law**
For prosecution

Opening statement is counsel s opportunity to tell the jury what evidence they intend to introduce not a time to argue the inferences and conclusions that may be drawn from evidence not yet admitted.

Cases that cite this headnote

[5] **Criminal Law**
Custody and conduct of jury
**Criminal Law**
Opening statement

Cautionary instructions by the court generally cure any possible prejudice from argumentative comments during opening statements because a reviewing court presumes that jurors follow the court s instructions

Cases that cite this headnote

[6] **Sentencing and Punishment**
Arguments and conduct of counsel

State s cross-examination of defendant s witness in penalty phase of capital murder trial did not deny defendant a fair trial although the State s cross-examination was aggressive and the court would have been well within its discretion to have sustained the objections and required the prosecutor to rephrase his questions in a more civil manner and it should have exercised more control over the aggressive questioning where court instructed the jury to disregard questions to which objections were sustained, to only consider testimony exhibits and stipulations as evidence and that attorneys remarks were not evidence

Cases that cite this headnote

[7] **Sentencing and Punishment**
Harmless and reversible error

Jury instructions sufficiently cured any prejudice in penalty phase of capital murder trial from State s questioning of defense expert on the veracity of other witnesses statements and State s accusations that she vouched for witnesses and State s questions asking her to comment on the truthfulness of witnesses

Cases that cite this headnote

[8] **Sentencing and Punishment**
Presentation and reservation in lower court of grounds of review

Any error in prosecutor s speaking objections was not fundamental error in penalty phase of capital murder trial where state did not incorporate any inadmissible evidence into its speaking objections 17A A.R S Rules of Evid Rule 103(d)

1 Cases that cite this headnote

[9] **Sentencing and Punishment**
Arguments and conduct of counsel

Defendant was not prejudiced by State s cross-examination of and closing arguments about, its expert witnesses in penalty phase of capital murder trial although prosecutor was aggressive and the court sustained many of the defendant s objections to many of the questions where court instructed the jury to disregard the statements to which objections were sustained

Cases that cite this headnote

[10] **Criminal Law**
Cross-examination and redirect examination
**Criminal Law**
Credibility of expert witness

A prosecutor may inquire into the credentials and employment of an expert witness to show bias or motive but cannot insinuate that an expert is unethical or incompetent without properly admitted evidence to support it.

Cases that cite this headnote

[11] **Sentencing and Punishment**
Expert evidence

Prosecutor s cross-examination of defense expert regarding an unrelated incident in Arizona where convicted murderers escaped from prison and whether it was possible that defendant, who had hepatitis C could stick or prick with a sharp object one of the corrections officer was relevant in penalty phase of capital murder trial where it rebutted expert s testimony that defendant could be safely housed in prison. 17A A.R.S Rules of Evid Rules 401(a) 611(b)

Cases that cite this headnote

[12] **Sentencing and Punishment**
Arguments and conduct of counsel
**Sentencing and Punishment**
Harmless and reversible error

Defendant was not prejudiced by prosecutor s misstatements of the evidence in penalty phase of capital murder trial where defendant s objections were sustained, prosecutor did not argue those points further and trial judge instructed the jury at the beginning and end of the proceedings not to consider matters to which the court sustained objections

Cases that cite this headnote

[13] **Criminal Law**
Comments on evidence or witnesses or matters not sustained by evidence
**Criminal Law**
Matters Not Sustained by Evidence

Intentionally misstating evidence constitutes prosecutorial misconduct, however when defense counsel can correct the misstatement at trial reviewing courts are hesitant to find reversible error

Cases that cite this headnote

[14] **Sentencing and Punishment**
Arguments and conduct of counsel

Prosecutor s statements during opening statement and closing arguments in which counsel characterized defendant s mitigation evidence as a myth and fanciful and repeatedly suggested that defense was not credible were not improper in penalty phase of capital murder trial where prosecutor s criticism was directed at defense theories rather than defense counsel

Cases that cite this headnote

[15] **Criminal Law**
Appeals to sympathy or prejudice argument as to punishment
**Criminal Law**
Attacks on opposing counsel

It is always improper for the prosecutor to impugn the integrity or honesty of opposing counsel nonetheless such comments warrant reversal only if a defendant can show a reasonable likelihood that the misconduct could have tainted the jury s verdict.

Cases that cite this headnote

[16] **Criminal Law**
For prosecution

Criticism of defense theories and tactics is a proper subject of closing argument.

1 Cases that cite this headnote

[17] **Sentencing and Punishment**
Arguments and conduct of counsel
**Sentencing and Punishment**
Harmless and reversible error

Prosecutor s statements during closing argument of penalty phase of capital murder trial that, although the crime lab tried its darndest, it did not find victim s blood on accomplice and that blood spatter analysis was 'the law did not constitute sufficient misconduct to warrant reversal even though four jurors on the guilt phase jury were not convinced that defendant was the killer and prosecutor put the prestige of the government behind his evidence where the fact that four jurors on the guilt phase jury were not convinced that defendant was the killer did not make the prosecutor s comments misconduct, and the trial court cured any error by instructing the jury not to consider the attorneys arguments as evidence

Cases that cite this headnote

[18] **Criminal Law**
Matters Not Sustained by Evidence
**Criminal Law**
Personal knowledge opinion, or belief of counsel

A prosecutor improperly vouches by either placing the prestige of the government behind its evidence or suggesting that facts not before the jury support the state s evidence

Cases that cite this headnote

[19] **Criminal Law**
Comments on evidence or witnesses

Even if vouching occurs, the trial court may cure the error by instructing the jury not to consider the attorneys arguments as evidence

Cases that cite this headnote

[20] **Criminal Law**
Statements Regarding Applicable Law

A prosecutor should not misstate the law during closing argument

Cases that cite this headnote

[21] **Criminal Law**
Arguments and statements by counsel
**Criminal Law**
Discretion of court in controlling argument

Trial courts are given broad discretion in controlling closing argument, and their rulings will only be overturned for an abuse of discretion.

Cases that cite this headnote

[22] **Sentencing and Punishment**
Arguments and conduct of counsel

Prosecutor s statement during closing argument that a person can only fail to appreciate the wrongfulness of conduct if the person admits the conduct was not improper in penalty phase of

capital murder trial where State s remark was not a misstatement of law but rather an attempt to point out an inconsistency in defendant s story, and prosecutor was entitled to argue that defendant committed the murder and appreciated the wrongfulness of his conduct. A R S § 13–751(G)(1)

Cases that cite this headnote

[23] **Sentencing and Punishment**
Arguments and conduct of counsel

Prosecutor did not commit misconduct by suggesting that defendant s drug use did not warrant leniency in penalty phase of capital murder trial

Cases that cite this headnote

[24] **Sentencing and Punishment**
Substance abuse and addiction
**Sentencing and Punishment**
Arguments and conduct of counsel

Substance abuse can be a mitigating factor in capital cases but a prosecutor does not commit misconduct by arguing that a mitigating factor does not warrant leniency or that jurors should give it little consideration A R S § 13–751(G)(1)

Cases that cite this headnote

[25] **Sentencing and Punishment**
Harmless and reversible error

Defendant did not overcome presumption that jury in penalty phase of capital murder trial followed instructions to disregard prosecutor s statement that defendant s renting of pornographic videos showed a debasement in the part of defendant s character

Cases that cite this headnote

[26] **Sentencing and Punishment**
Arguments and conduct of counsel

Prosecutor s statement during closing argument that defendant s difficult childhood was so remote that it was an excuse, not a mitigating factor was not improper in penalty phase of capital murder trial where defendant was 39 years of age at the time of the murder

Cases that cite this headnote

[27] **Sentencing and Punishment**
Mitigating circumstances in general
**Sentencing and Punishment**
Childhood or familial background

Although a defendant does not have to demonstrate a connection between the mitigating circumstances and the crime the remoteness or lack of a connection between the mitigating factor and the crime may make the mitigating factor less persuasive in penalty phase of capital murder trial thus, a jury may give less consideration to a difficult childhood when a defendant is older

Cases that cite this headnote

[28] **Sentencing and Punishment**
Arguments and conduct of counsel

Prosecutor s argument that the jury should not spare defendant s life merely because he committed other crimes for which he would have to serve considerable prison time was not improper in penalty phase of capital murder trial

Cases that cite this headnote

Cases that cite this headnote

[29] **Sentencing and Punishment**
Harmless and reversible error

Any error by the prosecutor during voir dire and closing argument in characterizing heinous, atrocious and cruel (HAC) aggravator implying that it was more than one aggravator rather than a single aggravating circumstance that could be established in alternative ways was not reversible error in penalty phase of capital murder trial where defendant objected to the misstatements and court had the prosecutor clarify that it was only one aggravator A R S § 13-751(F)(6)

Cases that cite this headnote

[30] **Sentencing and Punishment**
Arguments and conduct of counsel

Prosecutor s reference to the encounter between defendant and victim immediately before the murder in which prosecutor wondered aloud if words were exchanged, was not improper in penalty phase of capital murder trial where they did not call attention to the fact that defendant did not testify but rather pointed out that the events leading up to the murder were unclear, and the jury would not have naturally and necessarily perceived the remarks as a comment on defendant s failure to testify U S C A Const.Amend 5

Cases that cite this headnote

[31] **Criminal Law**
Comments on Failure of Accused to Testify
**Criminal Law**
Indirect references

A prosecutor may not comment on a defendant s decision not to testify either directly or indirectly U S C A Const.Amend 5

Cases that cite this headnote

[32] **Criminal Law**
Comments on Failure of Accused to Testify

A prosecutor s statement is a comment on a defendant s protected silence if a jury would naturally and necessarily perceive it as a comment on a defendant s failure to testify U S C A Const.Amend 5

Cases that cite this headnote

[33] **Sentencing and Punishment**
Harmless and reversible error

Prosecutor s statement during opening statement that they could not know what it was like to be manhandled by the knife wielding defendant did not affect the verdict in penalty phase of capital murder trial although it improperly invited the jurors to place themselves in the victim s position and appealed to their fears where trial court properly sustained defendant s objection, struck the argument, and told the jury to disregard it.

Cases that cite this headnote

[34] **Criminal Law**
Appeals to Sympathy or Prejudice
**Criminal Law**
Putting jurors in place of victim golden rule arguments

A prosecutor has wide latitude in closing argument but may not make arguments that appeal to the jury s fear or passion, which includes inviting jurors to place themselves in the victim s position because doing so plays on the jurors fear of the defendant or sympathy for the victim.

Cases that cite this headnote

[35] **Criminal Law**
Necessity
**Criminal Law**
Necessity of request for correction
**Criminal Law**
Action of Court in Response to Comments or Conduct

The proper response to an improper prosecutorial comment is an objection, motion to strike and a jury instruction to disregard the stricken comment.

Cases that cite this headnote

[36] **Sentencing and Punishment**
Presentation and reservation in lower court of grounds of review

Prosecutor s reference during opening statement to line from a poem indicating that every person s death diminishes society as a whole was not fundamental error in penalty phase of capital murder trial where prosecutor did not appeal to the jury s fear of defendant or sympathy for the victim or ask the jurors to place themselves in the victim s shoes during the murder rather the prosecutor commented that murder affects society as a whole

Cases that cite this headnote

[37] **Sentencing and Punishment**
Arguments and conduct of counsel

Cumulative effect of prosecutor s inappropriate comments did not deprive defendant of fair penalty phase of capital murder trial where the trial court sustained objections to all but one of the improper comments and instructed the jury to disregard questions to which objections were sustained to only consider testimony exhibits and stipulations as evidence, and that attorneys remarks were not evidence and defendant failed to prove fundamental error in any of the statements to which he did not object.

Cases that cite this headnote

[38] **Criminal Law**
Conduct of counsel in general

A reviewing court considers whether persistent and pervasive misconduct occurred and whether the cumulative effect of the incidents shows that the prosecutor intentionally engaged in improper conduct and did so with indifference if not a specific intent, to prejudice the defendant.

Cases that cite this headnote

[39] **Sentencing and Punishment**
Determination and disposition

Defendant in capital murder trial was entitled on remand only to a new penalty phase proceeding rather than to retry the aggravation phase subsection of statute stating that, if a death sentence is overturned, the person shall be resentenced as if the original sentencing had not occurred applied only to a sentences overturned on appeal pursuant to *Ring v Arizona* (*Ring II* ) 536 U S 584 122 S Ct 2428 153 L Ed 2d 556 while subsection stating that a defendant whose sentence is overturned had to be resentenced by a jury that was specifically impaneled for that purpose was more general and pertained to sentences overturned for any reason, and defendant s original sentence was not reversed for a *Ring II*-defective sentence A R S § 13–752(N O)

Cases that cite this headnote

[40] **Criminal Law**
Review De Novo

**Criminal Law**
Reception and Admissibility of Evidence

Appellate courts review the interpretation of statutes and constitutional provisions de novo and evidentiary rulings for an abuse of discretion.

Cases that cite this headnote

[41] **Sentencing and Punishment**
Determination and disposition

Limiting the retrial to the penalty phase of capital murder trial did not deprive defendant of an individualized sentencing, where jury heard abundant testimony concerning the circumstances of the offense and the aggravating factors and defendant was free to offer additional evidence from the guilt and aggravation phases

Cases that cite this headnote

[42] **Sentencing and Punishment**
Admissibility

Precluding the guilty verdict from evidence in penalty phase of capital murder trial did not deprive defendant of an individualized sentencing where neither the guilty verdict form nor the jurors votes provided evidence of the circumstances of the murder

Cases that cite this headnote

[43] **Sentencing and Punishment**
Instructions

Judge could impose a release eligible sentence if the jury did not return a death verdict, and thus *Simmons* instruction that defendant would never be released if sentenced to prison was not required in penalty phase of capital murder trial

A.R.S § 13–703(A)

Cases that cite this headnote

[44] **Criminal Law**
Review De Novo
**Criminal Law**
Failure to instruct

An appellate court reviews jury instructions and alleged constitutional violations de novo, but it reviews a court s refusal to inform the jury of the defendant s willingness to waive parole eligibility for an abuse of discretion.

Cases that cite this headnote

[45] **Pardon and Parole**
Parole as right or privilege
**Pardon and Parole**
Discretionary nature

Parole eligibility is not a right that can be waived to the contrary the eligibility decision is within the trial court s discretion.

Cases that cite this headnote

[46] **Jury**
Peremptory challenges

Fact that the State did not ask voir dire questions related to juror s long hair and facial hair resembling ZZ Top or another juror s tattoos on his legs and arm did not establish that the strikes of those jurors were pretextual in penalty phase of capital murder trial as required for relief on the basis of *Batson*

Cases that cite this headnote

[47] **Criminal Law**
Jury selection

A denial of a *Batson* challenge will not be reversed unless clearly erroneous

Cases that cite this headnote

[48] **Criminal Law**
Review De Novo
**Criminal Law**
Jury selection

A reviewing court defers to the trial court s ruling regarding the State s motives for a peremptory strike, and reviews the trial court s application of the law de novo

Cases that cite this headnote

[49] **Jury**
Peremptory challenges

*Batson* challenges are subject to the following three step analysis (1) the party challenging the strike must make a prima facie showing of discrimination (2) the striking party must provide a race neutral reason for the strike and (3) if a race neutral explanation is provided, the trial court must determine whether the challenger has carried its burden of proving purposeful racial discrimination.

Cases that cite this headnote

[50] **Jury**
Peremptory challenges

In a *Batson* challenge, the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the peremptory strike

Cases that cite this headnote

[51] **Jury**
Peremptory challenges

A peremptory strike does not violate *Batson* where the prosecutor s explanation is facially race neutral and the defendant offers no evidence other than inference to show that the peremptory strike was a result of purposeful racial discrimination

Cases that cite this headnote

[52] **Jury**
Discharge of juror or jury pending trial

Relationship between juror and expert witness who testified about hepatitis C the liver and defendant s life expectancy was not sufficient to warrant dismissal of juror in penalty phase of capital murder trial where juror formerly worked at the same hospital as expert, who was a gastroenterologist, juror worked in medical surgical intensive care unit at the hospital and recognized the witness and her dealings were with witness s surgical residents not with him and juror assured the court that her knowledge of witness would not prevent her from examining the evidence objectively 17 A R.S Rules Crim Proc Rule 18 4(b)

Cases that cite this headnote

[53] **Jury**
Discharge of juror or jury pending trial

Defendant in penalty phase of capital murder trial bears the burden of establishing that the juror was incapable of rendering a fair and impartial verdict.

Cases that cite this headnote

[54] **Criminal Law**
Selection and impaneling

A reviewing court does not set aside a trial court s refusal to strike a juror absent a clear showing that the court abused its discretion.

Cases that cite this headnote

[55] **Jury**
Discharge of juror or jury pending trial

Courts examine three factors when determining if a juror may continue to serve after that juror s objectivity is challenged (1) the nature of the relationship between the witness and the juror (2) whether the juror will properly assess the testimony and (3) the importance of the testimony and whether the testimony was disputed

Cases that cite this headnote

[56] **Sentencing and Punishment**
Mode of execution

Punishment involving torture or a lingering death is cruel U S C A Const Amend 8

Cases that cite this headnote

[57] **Sentencing and Punishment**
Vileness heinousness or atrocity
**Sentencing and Punishment**
Childhood or familial background

Sentence of death was warranted for defendant who stole victim s credit card, and after victim reported it stolen, returned to his residence intending to steal more and murder victim, which proved pecuniary gain aggravator and bound victim to a chair with a large number of knots that were fairly secured, and cut his throat, there were ligatures abrasions and bruising on victim s wrists, hands forearm, shoulder blade, back, and chest indicating that he struggled, which proved heinous atrocious and cruel (HAC) aggravator, although defendant had hepatitis C and complications thereof and a difficult childhood, where hepatitis C was a mitigator of minor value and defendant was 39 years of age at the time of the murder A.R.S § 13–751(F)(5 6)

Cases that cite this headnote

[58] **Sentencing and Punishment**
Scope of review

For crimes occurring before 2002 Supreme Court independently reviews the trial court s findings of aggravation and mitigation and the propriety of the death sentence in doing so court reviews the record de novo considering the quality and the strength, not simply the number, of aggravating and mitigating factors A.R S § 13–755(A)

Cases that cite this headnote

[59] **Sentencing and Punishment**
Presumptions

When there is a doubt whether the death sentence should be imposed, Supreme Court will resolve that doubt in favor of a life sentence A.R S § 13–755(A)

Cases that cite this headnote

[60] **Sentencing and Punishment**
Personal or pecuniary gain

A murder must be prompted by the desire for

pecuniary gain for the pecuniary gain aggravator to apply A.R S § 13–751(F)(5)

Cases that cite this headnote

[61] **Sentencing and Punishment**
Vileness heinousness or atrocity

A murder is especially cruel such that the heinous atrocious and cruel (HAC) aggravator applies in penalty phase of capital murder trial if the victim was conscious during the violence and the defendant knew or should have known that the victim would suffer mental anguish or physical pain. A.R.S § 13–751(F)(6)

Cases that cite this headnote

[62] **Sentencing and Punishment**
Vileness heinousness or atrocity

Mental anguish as would support heinous atrocious and cruel (HAC) aggravator in penalty phase of capital murder trial includes a victim s uncertainty about his fate A R.S § 13–751(F)(6)

Cases that cite this headnote

[63] **Sentencing and Punishment**
Mitigating circumstances in general

Although there need not be a nexus between mitigation and the crime in order for mitigation to be considered in penalty phase of capital murder trial failure to establish such a causal connection may be considered in assessing the quality and strength of the mitigation evidence

Cases that cite this headnote

[64] **Sentencing and Punishment**
Physical illness or disability

Supreme Court assigns minimal mitigating value to a defendant s post murder physical health in penalty phase of capital murder trial because it does not address his pre murder character nor does it address his propensities his record, or the circumstances of the offense

Cases that cite this headnote

[65] **Sentencing and Punishment**
Other matters related to offender

Supreme Court affords minimal value in penalty phase of capital murder trial to the fact that a defendant will remain imprisoned for the rest of his life

Cases that cite this headnote

[66] **Sentencing and Punishment**
Extent of offender s personal participation

Participation in a crime may be considered as mitigation in penalty phase of capital murder trial where a defendant demonstrates that while he was legally accountable for the conduct of another his participation in the crime was relatively minor

Cases that cite this headnote

[67] **Sentencing and Punishment**
Sentence or disposition of co-participant or codefendant

A disparity in sentences between codefendants and/or accomplices can be a mitigating circumstance in penalty phase of capital murder trial, if no reasonable explanation exists for the

disparity

Cases that cite this headnote

[68] **Sentencing and Punishment**
Sentence or disposition of co-participant or codefendant

Disparity is not mitigating in penalty phase of capital murder trial if it results from factors suggesting the appropriateness of the sentences such as a difference in culpability or an appropriate plea agreement with one of the defendants

Cases that cite this headnote

[69] **Sentencing and Punishment**
Intoxication or drug impairment at time of offense

A defendant in a penalty phase of capital murder trial claiming mitigation on the basis of drug use must show some relationship between drug use and the offense A.R.S § 13–751(G)(1)

Cases that cite this headnote

[70] **Sentencing and Punishment**
Intoxication or drug impairment at time of offense

Even if a defendant establishes his drug addiction Supreme Court gives minimal value to this evidence if he fails to tie his drug abuse to the crime or to his mental functioning when the murder occurred

Cases that cite this headnote

[71] **Sentencing and Punishment**
Childhood or familial background

A difficult childhood may be a mitigating circumstance in penalty phase of capital murder trial, but Supreme Court gives it little value absent a showing that it affected the defendant s conduct in committing the crime

Cases that cite this headnote

[72] **Sentencing and Punishment**
Childhood or familial background

The amount of time that has passed since the defendant s childhood is relevant in determining what weight to give a difficult childhood as an aggravating factor in penalty phase of capital murder trial

Cases that cite this headnote

[73] **Sentencing and Punishment**
Other matters related to offender

Supreme Court accords minimal weight on review of death sentence to the prospect that a defendant will be a model prisoner because all prisoners are expected to behave in prison

Cases that cite this headnote

[74] **Sentencing and Punishment**
Purpose of statute or regulatory provision

The fact that a defendant would remain imprisoned for his natural life if he is not sentenced to death is entitled to little value in penalty phase of capital murder trial

Cases that cite this headnote

**Attorneys and Law Firms**

*126 Mark Brnovich, Arizona Attorney General John R. Lopez IV Solicitor General, Lacey Stover Gard (argued) Chief Counsel Capital Litigation Section, Jeffrey L Sparks Assistant Attorney General Tucson, Attorneys for State of Arizona

Tennie B Martin, Mikel Steinfeld (argued) Deputy Public Defenders Phoenix, Attorneys for Shawn Patrick Lynch.

Justice BRUTINEL authored the opinion of the Court, in which Chief Justice BALES Vice Chief Justice PELANDER, and Justices BERCH and TIMMER joined

**Opinion**

Justice BRUTINEL, opinion of the Court.

¶ 1 Shawn Patrick Lynch was convicted of first-degree murder kidnapping armed robbery and burglary He was sentenced to death for the murder and to twenty-one years imprisonment for the other offenses We remanded for a new penalty-phase proceeding on the murder conviction in *State v Lynch* (*Lynch I*) 225 Ariz 27 43 ¶ 89 234 P 3d 595 611 (2010) On resentencing the jury again returned a death verdict We have jurisdiction over this automatic appeal pursuant to Article 6 Section 5(3) of the Arizona Constitution and A R.S §§ 13–755 and 13–4031

## I FACTUAL BACKGROUND

¶ 2 The victim, James Panzarella, was seen at a Scottsdale bar with Lynch and Michael Sehwani on March 24 2001 Lynch, Sehwani and Panzarella went to Panzarella s residence early the next morning Later that morning, Sehwani used Panzarella s American Express card at a supermarket. Ten minutes later the card was reported lost. Sehwani again used the card at a convenience store and unsuccessfully attempted to use it at a department store The same day Panzarella s Bank One card was used at a restaurant, a convenience store and a motel The Bank One card was used the following day to make a cash withdrawal and various purchases including Everlast shoes

¶ 3 The next afternoon Panzarella was found in his home tied to a chair with his throat slit. Police also found credit card receipts from purchases made that morning at a supermarket and convenience store

¶ 4 Police arrested Lynch and Sehwani that afternoon as they entered a truck in a motel parking lot. Sehwani was wearing Everlast shoes and had Panzarella s credit cards and checks in his wallet. In the truck and a motel room, police found keys to Panzarella s car a sweater with Panzarella s blood on it, and a 45 caliber pistol belonging to Panzarella. Blood on Lynch s shoes matched Panzarella s DNA

¶ 5 A jury found Lynch guilty of first-degree murder armed robbery burglary and kidnapping In his first aggravation phase trial, the jury made separate findings that the murder was especially heinous and cruel but could not agree on whether it was especially depraved. *See* A R.S § 13–751(F)(6) The jury also could not decide if the murder was committed in expectation of pecuniary gain. *See* A.R.S § 13–751(F)(5) That jury did not reach a unanimous verdict *127 in the penalty phase A second penalty phase jury found that the murder was especially depraved and committed for pecuniary gain and that a death sentence was appropriate We remanded for a new penalty phase trial because the trial judge erroneously instructed the second penalty phase jury that the (F)(6) aggravator constituted three separate aggravating circumstances *Lynch I* 225 Ariz at 42–43 ¶¶ 82–89 234 P 3d at 610–11 Following the new penalty phase trial Lynch was again sentenced to death.

## II ISSUES ON APPEAL

### A. Prosecutorial Misconduct

[1] [2] ¶ 6 Lynch asserts that the State engaged in prosecutorial misconduct in several ways individually and in combination 'This Court will reverse a conviction for prosecutorial misconduct only when (1) misconduct is indeed present, and (2) a reasonable likelihood exists that the misconduct could have affected the jury s verdict, thereby denying [the] defendant a fair trial *State v Martinez* 218 Ariz 421 426 ¶ 15 189 P 3d 348 353 (2008) (internal quotation marks omitted) Even when an instance of prosecutorial misconduct does not warrant reversal an incident may nonetheless contribute to a finding of persistent and pervasive misconduct if the cumulative effect of the incidents shows that the prosecutor intentionally engaged in improper conduct and did so with indifference if not a specific intent, to prejudice the defendant. *State v Roque* 213 Ariz 193

228 ¶ 155 141 P 3d 368 403 (2006) (citations and internal quotation marks omitted)

¶ 7 When a defendant fails to object to an alleged incident of prosecutorial misconduct in the trial court, this Court reviews for fundamental error *Id* at 228 ¶ 154 141 P 3d at 403 To establish fundamental error Lynch must show that 'there was error that went to the foundation of his case and denied him a fair trial and that he was in fact, prejudiced by the error *State v VanWinkle* 230 Ariz 387 393 ¶ 25 285 P 3d 308 314 (2012)

**1 Argument during opening statements**

[3] ¶ 8 Lynch first asserts the prosecutor improperly presented arguments during his opening statement that largely focused on persuading the jury that little weight should be given to certain mitigating factors and expected evidence The trial court sustained two of Lynch s objections to the State s opening statement—that Lynch s childhood should not be considered a mitigating circumstance because it happened 30 years ago and that the defense wanted to 'pull at [the jury s] heart strings in its presentation of mitigating evidence The court overruled Lynch s objection to the prosecutor s remark that no medical records supported Lynch s assertion that his father intentionally burned his hand as a child. Finally, the State implied that little weight should be given to a defense expert s life-expectancy testimony because the expert relied on a Wikipedia article and Lynch had outlived the expert s prediction for his life expectancy The trial judge overruled Lynch s objection to these remarks

[4] [5] ¶ 9 Opening statement is counsel s opportunity to tell the jury what evidence they intend to introduce Opening statement is not a time to argue the inferences and conclusions that may be drawn from evidence not yet admitted *State v Bible* 175 Ariz 549 602 858 P 2d 1152 1205 (1993) (internal citation omitted) [C]autionary instructions by the court generally cure any possible prejudice from argumentative comments during opening statements because we presume that jurors follow the court s instructions *State v Manuel* 229 Ariz 1 6 ¶ 24 270 P 3d 828 833 (2011)

¶ 10 Here the court instructed the jury that it should only consider testimony exhibits and stipulations as evidence and that attorneys remarks are not evidence As to the disallowed statements listed above the trial judge sustained objections and properly instructed the jury not to consider them as evidence These instructions cured any prejudice On balance although the prosecutor improperly made argumentative statements during opening we find no reasonable likelihood that the misconduct affected the jury s verdict. *See* ***128** *Martinez* 218 Ariz at 426 ¶ 15 189 P 3d at 353 The State s opening statement did not deny Lynch a fair trial

**2 Improper witness examination**

[6] ¶ 11 Lynch argues that the prosecutor committed misconduct during his cross-examination of defense witnesses The trial court sustained Lynch s objections to two questions that were asked and answered, the State s interruption of defense witnesses on two occasions the State s comment to a defense expert that she should just answer my question for once and other argumentative questions The judge overruled Lynch s objections to combative remarks including 'No let me ask you the question

¶ 12 Although the State s cross-examination was aggressive and the court would have been well within its discretion to have sustained the objections and required the prosecutor to rephrase his questions in a more civil manner the questioning did not deny Lynch a fair trial. *See State v Bolton* 182 Ariz 290 308 896 P 2d 830 848 (1995) ('The questioning may have been argumentative Nevertheless the misconduct was not so egregious that it permeated the entire trial and probably affected the outcome ") As in *Bolton* 'the prosecutor here did not call defendant pejorative names, refer to matters not in evidence, suggest unfavorable matter for which no proof exists or abuse defendant in any other way *Id* The court instructed the jury to disregard questions to which objections were sustained, to only consider testimony exhibits and stipulations as evidence, and that attorneys remarks are not evidence We presume that jurors follow instructions *Manuel* 229 Ariz at 6 ¶ 25 270 P 3d at 833 (presuming that jury followed instructions even though the prosecutor aggressively cross-examined the defendant and another witness) We do not find fundamental error in the examination as a whole As for the remarks to which Lynch s objections were overruled, while the trial court should have exercised more control over the aggressive questioning, the court did not abuse its discretion in overruling the objections

**3 Questions related to veracity of other witnesses**

[7] ¶ 13 Lynch argues that the State improperly questioned his expert, Dr Jolie Brams a clinical psychologist, on the veracity of other witnesses statements by accusing her of vouching for witnesses and asking her to comment on the truthfulness of witnesses Arizona prohibits lay and expert testimony concerning the veracity of a statement by another witness because it is the province of the jury to determine veracity and credibility and opinions about witness credibility are nothing more than advice to jurors on how to decide the case *State v Boggs* 218 Ariz 325 335 185 P 3d 111 121 (2008) (quoting *State v Moran* 151 Ariz 378 383, 728 P 2d 248 253 (1986))

¶ 14 Brams interviewed several people who knew Lynch and, based in part on those interviews concluded that Lynch grew up in an atmosphere of violence and neglect. During cross-examination, the State asked Brams to recount her testimony in another criminal trial in which she had testified that it was highly unlikely that the witness could have remembered previous encounters with a defendant absent some meaningful event and that the witness recollections were the result of suggestions by law enforcement. The State then asked Brams if testifying about recollected memories is 'really just vouching for what somebody is saying and if she had opined that a witness was not truthful in a third case Lynch did not object to either question, and Brams answered both questions in the negative Contrasting her testimony in the previous case to Brams s interview of Lynch s uncle the prosecutor asked Brams whether a witness was not credible if he said he remembered something that happened forty nine years earlier even though it did not stand out in his mind, 'because you can vouch for people[ ] The trial court sustained Lynch s objection. The State also asked, [Y]ou are telling us that, for example [Lynch s sister] in your opinion, was telling the truth about everything? Lynch failed to object to this question and Brams replied that she did not think the sister was being purposefully deceitful

*129 ¶ 15 These questions did not deny Lynch a fair trial They related to Brams s witness interviews not the testimony of other witnesses These interviews were the foundation for Brams s testimony The prosecutor did not encroach on the jury s evaluation of witness veracity but rather tested Brams s credibility by attempting to show that she believed interviewees when their story was helpful but was skeptical when their story was not helpful The State s closing argument addressed Brams s bias and credibility, not her opinion as to the veracity of testimony The only improper remark was the suggestion that Brams can vouch for people and the trial court sustained Lynch s objection and instructed the jury that it was to disregard questions to which objections were sustained The jury instructions sufficiently cured any prejudice *See State v Hardy* 230 Ariz. 281 293–94 ¶¶ 61–62 283 P 3d 12 24–25 (2012)

**4 Speaking objections**

[8] ¶ 16 Lynch asserts that the prosecutor improperly made arguments through speaking objections While making a relevance objection, the State argued that Brams was obviously vested. After Lynch made a relevance objection to the State s cross-examination of Dr Gerald Altschuler—a hematologist, oncologist, and internist—the State responded that Altschuler is a jack of all trades and not a master of this While making a relevance objection to what a witness recalled, the State said, If he wants to just ask him what is in the transcript, I have no objection to that but what he remembers is irrelevant. The State also clarified the basis for a cumulative objection after the judge replied, I m sorry? Finally the prosecutor suggested that the jury be given an interview transcript in lieu of testimony as to what the transcript contained Lynch did not object to any of these comments at trial Lynch takes issue with the State twice objecting to his speaking objections once in the presence of the jury asserting that the State made speaking objections throughout the trial but did not allow him to do so

¶ 17 Arizona law does not explicitly prohibit speaking objections, but [t]o the extent practicable the court must conduct a jury trial so that inadmissible evidence is not suggested to the jury by any means Ariz R. Evid. 103(d) Lynch does not identify—and we have not found—any inadmissible evidence that the State incorporated into its speaking objections Further, Lynch did not object at trial and fails to demonstrate fundamental error *See State v Henderson* 210 Ariz 561 567 ¶ 19 115 P 3d 601 607 (2005)

**5 Attacks on defense experts**

[9] ¶ 18 Lynch contends that the prosecutor committed misconduct by unfairly attacking his expert witnesses During opening statements, the State told the jury that Altschuler Lynch s expert regarding his hepatitis C diagnosis would testify about the Child–Pugh standard for evaluating chronic liver disease The prosecutor opined that the Child–Pugh standard is a subjective standard that comes from Wikipedia [1] and pointed out that Lynch had already outlived the two year life

expectancy Altschuler had given. In response to a defense objection the trial court commented that the jury had been informed that the opening statement was not evidence, but did not rule on the objection. During Altschuler s cross-examination, the prosecutor asked whether Altschuler examined patients after chemotherapy or if the examination was done offsite where they actually receive the chemotherapy treatment. Lynch objected on relevance grounds and the State responded that it was attempting to show Altschuler s lack of specific expertise—that he is a jack of all trades and not a master of this The court overruled the objection.

¶ 19 As noted above during the cross-examination of Brams, the prosecutor referring to Brams s interview of Lynch s uncle asked Brams whether a witness was not credible if he said he remembered something that happened forty nine years earlier even though it did not stand out in his mind, *130 'because you can vouch for people[ ] The trial court sustained Lynch s objection. After asking whether Brams had testified in a prior case that a witness was mistaken in his memory of long past events the prosecutor then inquired, Well this is the same sort of thing here, isn t it? On this particular case you took a look at what somebody said and you reached a conclusion that perhaps they were mistaken or whatever term you want to use right? Brams explained that her testimony in the prior case was that a suggestive police interview might have influenced the interviewee s statements Finally, the prosecutor asked Brams about her refusal to produce two documents he requested Brams explained that she did not realize she had the documents The prosecutor replied, And so what you re saying is had you known that those two pages were in your binder you would have removed them before the interview? Brams began to deny the accusation, but the prosecutor interrupted. The judge sustained Lynch s objection to the interruption, and Brams explained that she would have disclosed the pages had she known she had them

¶ 20 The prosecutor also asked Brams whether being an expert on recollected memories is really just vouching for what somebody is saying but Lynch did not object. Lynch also failed to object to the prosecutor s remark during closing argument that Brams 'was able to tell the Court under oath that [a] witness was wrong without ever speaking to that witness and that she followed improper procedures such as taking written notes that 'no one can interpret The prosecutor also accused Brams of refusing to disclose her notes and slanting the truth Again, Lynch did not object. Lynch also takes issue with the State s comments during closing argument such as, That s the person they chose because in Lynch s view the comments were calculated to tie Brams s supposed disclosure violations and improper practices to defense counsel Lynch failed to object at trial

[10] ¶ 21 A prosecutor may inquire into the credentials and employment of an expert witness to show bias or motive but cannot insinuate that an expert is unethical or incompetent without properly admitted evidence to support it. *State v Bailey* 132 Ariz 472 478–79 647 P 2d 170 176–77 (1982)

¶ 22 Here, although the prosecutor was aggressive there was no reversible error *See id* The trial court sustained Lynch s objections to many of the questions and the court s instructions to disregard the statements cured any possible prejudice *See Manuel* 229 Ariz at 6 ¶ 24, 270 P 3d at 833 The court did not abuse its discretion in overruling any of the objections As to the remarks to which Lynch did not object, he fails to show prejudice Accordingly the State s remarks during closing argument did not amount to fundamental error *State v Morris* 215 Ariz 324 337 ¶ 59 160 P 3d 203 216 (2007)

### 6 Appeal to the fears of the jury

[11] ¶ 23 Lynch next contends that the prosecutor improperly appealed to the jurors fears during his cross-examination of defense expert James Aiken. While inquiring about the security designation that Lynch would receive in prison, the prosecutor asked about an unrelated incident in Arizona where convicted murderers escaped from prison. Lynch did not object to this question. The prosecutor also asked Aiken whether it was possible that Lynch could stick or prick, with a sharp object, one of the corrections officers When Aiken answered that the probability was miniscule, the prosecutor asked whether 'that would be comfort to the person who got stuck by a needle that Shawn Lynch had used The trial judge overruled Lynch s relevance objection. Lynch argues on appeal that the State did not offer any reason to believe that the escaped prisoners were in a similar position as him and that there was no evidence to support the State s assertion that he would attack an officer

¶ 24 Although the cross-examination was argumentative, and the trial judge could have sustained an objection on that basis it was relevant. The defense elicited from Aiken testimony that Lynch could be safely housed in prison The cross-examination was relevant rebuttal to that testimony *See* Ariz R Evid. 401(a) ( Evidence is relevant if [ ] it *131 has any tendency to make a fact more or less probable than it would be without the evidence ) Ariz R. Evid 611(b) ( A witness may be

cross-examined on any relevant matter ) That other offenders escaped from prison makes it less likely that Lynch could be housed safely Additionally, that Lynch s hepatitis C could be transmitted through needles makes him more of a threat in prison than one without such a disease

### 7 Misstating the evidence

[12] ¶ 25 During the cross-examination of Brams the State asked whether she had previously said it was a waste of time to go over her notes and, after Brams said she did not recall played a recording in which she said it would be a waste of time to go through every word of her notes The trial court sustained Lynch s objection to the admission of the recording on the ground that Brams s statement was taken out of context. The prosecutor also asked Brams [D]idn t you tell us about a case involving a guy named Braulio Martinez yesterday where you said that he was mistaken because you can read minds? The trial judge sustained Lynch s objection. Finally, the court sustained Lynch s objection to a statement in the State s closing argument that renting pornographic movies demonstrated Lynch s poor character

[13] ¶ 26 Intentionally misstating evidence constitutes misconduct. *See State v Cannon,* 148 Ariz 72 77 713 P 2d 273 278 (1985) When defense counsel can correct the misstatement at trial however we are hesitant to find reversible error *Id* Although the prosecutor made inappropriate remarks defense counsel s objections were sustained and the prosecutor did not argue those points further The trial judge instructed the jury at the beginning and end of the proceedings not to consider matters to which the court sustained objections We presume juries follow instructions *Manuel* 229 Ariz at 6 ¶ 25, 270 P 3d at 833 and there is no evidence that the jury failed to heed this instruction. Lynch has not shown that the prosecutor s remarks could have affected the jury s verdict. *See Martinez* 218 Ariz at 426 ¶ 15 189 P 3d at 353

### 8 Ad hominem attacks on defense counsel

[14] ¶ 27 Lynch argues that the prosecutor committed misconduct by repeatedly resorting to ad hominem attacks against defense counsel During opening statement and closing arguments the prosecutor repeatedly characterized Lynch s mitigation evidence as a myth and fanciful and made other similar comments The prosecutor also attacked the defense theory that Lynch was not the killer by stating that the DNA evidence is something that you perhaps will not consider when you are asked to speculate as they put it [ ] or try to determine who was the person who did the cutting Lynch did not object to any of these statements

[15] [16] ¶ 28 We have consistently held that prosecutors have wide latitude in closing arguments and may argue all reasonable inferences from the evidence *State v Hill* 174 Ariz 313 322 848 P 2d 1375 1384 (1993) But it is always improper for the prosecutor to impugn the integrity or honesty of opposing counsel *State v Newell* 212 Ariz 389 403 ¶ 66 132 P 3d 833 847 (2006) (holding it was improper to imply that defense counsel was arguing for a position he knew to be false) Nonetheless such comments warrant reversal only if a defendant can show a reasonable likelihood that the misconduct could have tainted the jury s verdict. *Id* Moreover [c]riticism of defense theories and tactics is a proper subject of closing argument. *State v Ramos* 235 Ariz 230 238 ¶ 25 330 P 3d 987 995 (App 2014) (quoting *United States v Sayetsitty* 107 F 3d 1405 1409 (9th Cir 1997)) In *Ramos* the court ruled that the prosecutor s accusation that the defense raised 'red herrings and asked the jury to check [their] common sense at the door' was proper criticism of defense tactics even though it suggested that defense counsel attempted to mislead the jury *Id* at 237–38 ¶¶ 24–25 330 P 3d at 994–95

¶ 29 Here, although the prosecutor repeatedly suggested that Lynch s defense was not credible his criticism was directed at defense *theories* rather than defense *counsel* *Compare State v Amaya-Ruiz* 166 Ariz 152 171 800 P 2d 1260, 1279 (1990) (no misconduct *132 where prosecutor called defense theories outrageous a smoke screen, and supported only by innuendo and inference ), *with State v Hughes* 193 Ariz 72, 86 ¶ 61 969 P 2d 1184 1198 (1998) (misconduct to argue that defense counsel and experts fabricated insanity defense without evidentiary support) The prosecutor s remarks were not improper Moreover the trial judge instructed the jury that the lawyers arguments are not evidence The prosecutor s comments did not deprive Lynch of a fair trial *See Newell* 212 Ariz at 403 ¶ 67 132 P 3d at 847

### 9 Vouching and relying on evidence outside of the record

[17] ¶ 30 During closing argument, the prosecutor

commented that 'this defendant—and he did—slash [Panzarella s] throat. Lynch contends this was improper because the prosecutor had previously objected to the introduction of the guilty verdict, which indicated that only eight of the guilt phase jurors found that Lynch had killed a person,[2] and the trial court precluded it. Lynch argues the State improperly argued that Lynch was the actual killer and interfered with his ability to dispute this point by objecting to the introduction of the guilty verdict. Lynch also contends that the prosecutor vouched for the police officers involved by saying 'the Scottsdale Police Department did its darndest' and [t]hey tried, referring to the department s attempt to find Panzarella s DNA on Sehwani s shirt. The prosecutor also referred to blood spatter evidence as 'the law' and said 'the State does not agree that [Lynch s mitigating circumstances] are mitigating circumstances Lynch did not object to any of these comments at trial

[18] [19] ¶ 31 A prosecutor improperly vouches by either placing the prestige of the government behind its evidence or suggesting that facts not before the jury support the state s evidence *Newell* 212 Ariz at 402 ¶ 62 132 P 3d at 846 *State v Vincent* 159 Ariz 418 423, 768 P 2d 150 155 (1989) Even if vouching occurs the trial court may cure the error by instructing the jury not to consider the attorneys arguments as evidence *State v Payne* 233 Ariz 484 512 ¶ 109 314 P 3d 1239, 1267 (2013)

¶ 32 Although the prosecutor said the crime lab tried its darndest and referred to blood spatter analysis as 'the law it was proper for the State to suggest that, because police did not find Panzarella s blood on Sehwani, the jury should infer that Lynch actually committed the murder Contrary to Lynch s assertion, the fact that four jurors on the guilt phase jury were not convinced that Lynch was the killer does not make the prosecutor s comments misconduct *See Bible* 175 Ariz at 602 858 P 2d at 1205 ( [D]uring closing arguments counsel may summarize the evidence make submittals to the jury urge the jury to draw reasonable inferences from the evidence and suggest ultimate conclusions ) Finally Lynch did not object to the prosecutor s reference to blood spatter evidence as the law or the prosecutor s comment that the State does not agree and he fails to show that these remarks denied him a fair trial Although the prosecutor put the prestige of the government behind his evidence by saying that 'the State does not agree, the trial court cured the error by instructing the jury not to consider the attorneys arguments as evidence The prosecutor s comments did not constitute sufficient misconduct to warrant reversal

### 10 Misstatement of the law

[20] [21] ¶ 33 Lynch contends the prosecutor committed misconduct by misstating the law A prosecutor should not misstate the law during closing argument. *State v Serna* 163 Ariz 260 266 787 P 2d 1056 1062 (1990) Trial courts are given broad discretion in controlling closing argument, and their rulings will only be overturned for an abuse of discretion. *State v Tims* 143 Ariz 196 199 693 P 2d 333 336 (1985)

#### a A.R.S § 13–751(G)(1)

[22] ¶ 34 Substantial impairment of a person s capacity to appreciate the wrongfulness *133 of his conduct is a statutorily identified mitigating circumstance A.R.S § 13–751(G) The prosecutor argued that a person can only fail to appreciate the wrongfulness of conduct if the person admits the conduct. The trial court overruled Lynch s objection The prosecutor also questioned why Lynch would leave the crime scene and take the knife if he did not think his conduct was wrong Lynch argues that this was a misstatement of the law because the mental impairment mitigating factor is a sliding consideration, and the prosecutor argued that it was a yes or no proposition

¶ 35 Under § 13–751(G)(1) jurors must consider a defendant s capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law The State s remark was not a misstatement of law but rather an attempt to point out an inconsistency in Lynch s story The prosecutor was entitled to argue that Lynch committed the murder and appreciated the wrongfulness of his conduct.

#### b History of substance abuse

[23] [24] ¶ 36 Lynch contends that the prosecutor misstated the law by arguing that Lynch s substance abuse was not a mitigating factor but rather something that made the crime worse Lynch did not object at trial Substance abuse can be a mitigating factor in capital cases *State v Kayer* 194 Ariz 423 438 ¶ 52 984 P 2d 31 46 (1999) But a prosecutor does not commit misconduct by arguing that a mitigating factor does not warrant leniency or that jurors should give it little consideration *State v Anderson* 210 Ariz 327 350 ¶ 97 111 P 3d 369 392 (2005) *supplemented* 211 Ariz 59 116 P 3d 1219

(2005) *see also State v Prince* 226 Ariz 516 538 ¶ 90 250 P 3d 1145 1167 (2011) (no fundamental error where prosecutor argued that defendant s bad temper was not sufficiently substantial to warrant leniency but rather should be aggravation where State was precluded from retrying aggravators) The prosecutor did not commit misconduct by suggesting that Lynch s drug use did not warrant leniency

**c Pornographic videos**

[25] [26] ¶ 37 Lynch claims the prosecutor misstated the law by arguing that Lynch s renting pornographic videos shows a debasement in the part of [Lynch s] character And that has already been found, because this murder has been found to be especially heinous and depraved The trial court correctly sustained Lynch s objection to this argument, properly instructed the jury on the issue and instructed the jury to disregard remarks to which the court sustained objections Lynch has not overcome the presumption that the jury followed these instructions *See Manuel* 229 Ariz at 6 ¶ 25 270 P 3d at 833

**d Dysfunctional childhood**

[27] ¶ 38 Lynch contends that the prosecutor misstated the law by arguing that Lynch s difficult childhood was so remote that it was an excuse not a mitigating factor Lynch was thirty nine years old at the time of the murder We have held that [a] difficult or traumatic childhood is a mitigating circumstance *Prince* 226 Ariz at 541 ¶ 109, 250 P 3d at 1170 Although a defendant does not have to demonstrate a connection between the mitigating circumstances and the crime the remoteness or lack of a connection between the mitigating factor and the crime may make the mitigating factor less persuasive *Id* Thus a jury may give less consideration to a difficult childhood when a defendant is older *See id* (noting on independent review that [d]ifficult childhood circumstances also receive less weight as more time passes between the defendant s childhood and the offense )

¶ 39 These remarks were not improper *See State v Villalobos* 225 Ariz 74, 83 ¶¶ 37–39 235 P 3d 227 236 (2010) (reasoning that prosecutor s remark that 'there is absolutely nothing mitigating about who he is in light of what you ve seen him do was not improper) *Anderson* 210 Ariz at 350 ¶ 97, 111 P 3d at 392 ( Once the jury has heard all of the defendant s mitigation evidence there is no constitutional prohibition against the State arguing that the evidence is not particularly relevant or that it is entitled to little weight ) Additionally, the court properly *134 instructed the jury on this mitigating factor and Lynch has not shown that the jury disregarded the instruction.

**e Life as a "free bite of the apple"**

[28] ¶ 40 Lynch argues that the prosecutor misstated the law by arguing that the jury should disregard Lynch s prison sentences As mitigation, Lynch pointed out that he would never leave prison alive because of his consecutive prison terms The prosecutor contended that this argument gave Lynch a free bite of the apple The prosecutor was not stating the law rather he was arguing that the jury should not spare Lynch s life merely because he committed other crimes for which he would have to serve considerable prison time Moreover the court properly instructed the jury on this issue

**f (F)(6) aggravator**

[29] ¶ 41 Lynch contends that the prosecutor misstated the law by characterizing the (F)(6) aggravator as involving separate aggravating factors During voir dire the prosecutor told prospective jurors

> [T]his crime and this is one aggravating factor was committed in an especially cruel especially heinous or especially depraved fashion but the prior jury has already found that he was guilty not only of it—even though it s one factor especially depraved, that s what they found, it was especially heinous

Lynch objected that the prosecutor was addressing single prongs of the aggravator The trial court denied Lynch s motion to strike the statement, but told the prosecutor to be clear that it was only one aggravator The prosecutor then told prospective jurors that the murder was found to be especially heinous especially cruel and especially depraved The trial judge sustained Lynch s objection to the use of the word and

¶ 42 In his closing argument, the prosecutor described

both especial cruelty and especial heinousness and indicated that each had already been established in this case He then told the jury [C]ompare those three aspects the murder and the aggravating circumstances but there is also this indication that [it] was for pecuniary gain. Lynch did not object in the trial court, but now asserts that the prosecutor sought to indicate three aggravators existed when there were only two Lynch argues this was not accidental, citing the prosecutor s comment that he wished to call witnesses 'to show the four factors [he] proved previously his request to include the definitions of especially cruel especially heinous, and especially depraved in the preliminary jury instructions and his proposed jury instruction indicating that Lynch committed the murder in an especially heinous cruel *and* depraved manner

¶ 43 The (F)(6) aggravator is a single aggravating circumstance that can be established in alternative ways *Lynch I* 225 Ariz at 42 ¶ 84 234 P 3d at 610 The prosecutor struggled at times during voir dire and closing argument with the disjunctive or' and conjunctive and in explaining the (F)(6) aggravator but Lynch objected to the misstatements and the trial court had the prosecutor clarify that the (F)(6) aggravator is only one aggravator The trial court also properly instructed the jury on the (F)(6) aggravator Lynch has not identified any reversible error

**11 Comment on Lynch not testifying**

[30] ¶ 44 The prosecutor, referring to the encounter between Lynch and Panzarella immediately before the murder asked the jury in closing argument, What s going on? and then asked, 'Were words exchanged? Who knows Lynch did not object, but now asserts that these comments were improper because the only people who could have answered those questions were the victim and Lynch

[31] [32] ¶ 45 A prosecutor may not comment on a defendant s decision not to testify either directly or indirectly *State v Rutledge* 205 Ariz 7 12 ¶ 26 66 P 3d 50, 55 (2003) A prosecutor s statement is a comment on a defendant s protected silence if a jury would naturally and necessarily' perceive it as a comment on a defendant s failure to testify *Payne* 233 Ariz at 514 ¶ 126 314 P 3d at 1269 (internal quotation marks omitted)

*135 ¶ 46 Here the prosecutor s statements were proper They did not call attention to the fact that Lynch did not testify but rather pointed out that the events leading up to the murder were unclear The jury would not have naturally and necessarily" perceived the remarks as a comment on Lynch s failure to testify

**12 Personalization**

[33] ¶ 47 Lynch asserts that the prosecutor improperly encouraged the jurors to put themselves in the victim s position. During his opening statement, the prosecutor said

> So what happens is the defendant then, as Mr Panzarella sits there goes behind him and begins and cuts his throat from ear to ear The problem of the unfortunate aspect of that, because in and of itself cutting somebody s throat is a horrific, ghastly thing you can only imagine I don t think you can even imagine what it s like for somebody to approach you with a knife You cannot move and you know they re manhandling you and they are going to cut your throat

The trial court sustained Lynch s objection and granted his motion to strike The prosecutor also quoted a line from a poem indicating that every person s death diminishes society as a whole so therefore send no one to find for whom the bell tolls it tolls for thee The prosecutor concluded his argument by stating that [the bell] tolls for each and every one of you in light of the evidence in this case to return a verdict of death on Shawn Patrick Lynch.

[34] [35] ¶ 48 A prosecutor has wide latitude in closing argument, but may not make arguments that appeal to the jury s fear or passion *Morris* 215 Ariz at 337 ¶ 58 160 P 3d at 216 This includes inviting jurors to place themselves in the victim s position because doing so plays on the jurors fear of the defendant or sympathy for the victim *See id* The proper response to an improper prosecutorial comment is an objection motion to strike and a jury instruction to disregard the stricken comment. *See Newell* 212 Ariz at 403 ¶ 69 132 P 3d at 847

¶ 49 The prosecutor s first comment was improper By telling the jurors that they could not know what it was like to be manhandled by the knife wielding defendant, the prosecutor invited the jurors to place themselves in the victim s position and appealed to their fears But the trial

court properly sustained Lynch s objection, struck the argument, and told the jury to disregard it Given the presumption that jurors follow instructions, we conclude that this comment did not affect the jury verdict. *See id*

[36] ¶ 50 Because Lynch did not object to the prosecutor s referencing the poem at trial we review for fundamental error *See Morris* 215 Ariz at 337 ¶ 59 160 P 3d at 216 Lynch cannot show that the references deprived him of a fair trial The prosecutor did not appeal to the jury s fear of Lynch or sympathy for the victim or ask the jurors to place themselves in the victim s shoes during the murder Rather the prosecutor commented that murder affects society as a whole

### 13 Cumulative misconduct

[37] [38] ¶ 51 Lynch argues that even if none of the individual instances of prosecutorial misconduct warrants reversal the cumulative effect requires reversal particularly given the prosecutor s experience and track record of misconduct 'We consider whether persistent and pervasive misconduct occurred and whether the cumulative effect of the incidents shows that the prosecutor intentionally engaged in improper conduct and did so with indifference if not a specific intent, to prejudice the defendant *State v Gallardo* 225 Ariz 560 570 242 P 3d 159 169 (2010) (quoting *Morris* 215 Ariz at 339 ¶ 67 160 P 3d at 218) (internal quotation marks omitted)

¶ 52 During this retrial of the penalty phase the prosecutor disturbingly made a number of inappropriate comments prompting valid objections by Lynch that the trial court sustained. Although the prosecutor made some improper remarks they did not amount to persistent and pervasive misconduct that deprived Lynch of a fair trial The trial judge sustained objections to all of the improper comments except, 'No let me ask you the question. The court instructed the *136 jury to disregard questions to which objections were sustained, to only consider testimony exhibits and stipulations as evidence and that attorneys remarks are not evidence We presume that jurors follow instructions *Manuel* 229 Ariz at 6 ¶ 25 270 P 3d at 833, and any cumulative prejudice resulting from the prosecutor s remarks is insufficient to overcome this presumption *See Gallardo* 225 Ariz at 569 ¶ 40, 242 P 3d at 168 (reasoning that similar instructions cured any prejudice) Given these instructions, and that the let me ask you the question remark was the only improper comment to which the court overruled Lynch s objection, the prosecutor s conduct did not deny Lynch a fair trial As to the statements to which Lynch did not object, we have concluded that Lynch failed to prove fundamental error We consider these statements as well in our conclusion that prosecutorial misconduct, while present in some instances was not so pronounced or sustained as to require a new sentencing trial

### B Limiting Retrial to Penalty Phase and Preclusion of Guilty Verdict

[39] [40] ¶ 53 Lynch claims that the trial court erred when it denied his motion to retry the aggravation phase and prohibited him from offering the guilty verdict as an exhibit during the penalty phase retrial He contends that these errors deprived him of an individualized sentencing because they denied the jury an adequate opportunity to evaluate the evidence supporting the aggravating circumstances and established a presumption of death. We review the interpretation of statutes and constitutional provisions de novo *State v Hansen* 215 Ariz 287 289 ¶ 6 160 P 3d 166 168 (2007) and evidentiary rulings for an abuse of discretion *State v Benson* 232 Ariz 452 466 ¶ 58 307 P 3d 19, 33 (2013)

¶ 54 Following Lynch s second penalty phase trial we reversed Lynch s death sentence and remanded for a new penalty phase proceeding *Lynch I* 225 Ariz at 43 ¶ 89 234 P 3d at 611 We ordered the trial court to instruct the jury 'that the (F)(5) and (F)(6) aggravators have been previously found and that it is not to retry those issues *Id* (citing A R.S § 13–752(K)) Relying on this language the trial court on remand denied Lynch s request for an aggravation phase retrial

¶ 55 Section 13–752(K) provides

> At the penalty phase if the trier of fact is a jury and the jury is unable to reach a verdict, the court shall dismiss the jury and shall impanel a new jury The new jury shall not retry the issue of the defendant s guilt or the issue regarding any of the aggravating circumstances that the first jury found by unanimous verdict to be proved or not proved If the new jury is unable to reach a unanimous verdict, the court shall impose a sentence of life or natural life on the defendant.

A.R S § 13–752(K) Lynch contends that § 13–752(K) only applies when a jury is unable to decide upon a

penalty and § 13–752(N) applies when a death sentence has been vacated. Under § 13–752(N) [i]f the sentence of a person who was sentenced to death is overturned, the person shall be resentenced pursuant to this section by a jury that is specifically impaneled for this purpose as if the original sentencing had not occurred. Lynch argues that because the aggravation phase is part of the sentencing proceeding A R.S § 13–752(C), both the aggravation and penalty phases should have been retried The State responds that the error this Court previously found in *Lynch I* was only in the penalty phase not the entire sentencing proceeding and reading the statute as a whole this Court properly remanded for a trial of only the penalty phase

¶ 56 There are two provisions of § 13–752 that inform our analysis As noted above, § 13–752(N) provides that, [i]f the sentence of a person who was sentenced to death is overturned, the person shall be resentenced pursuant to this section as if the original sentencing had not occurred. Based on this language Lynch argues he was entitled to an entirely new sentencing proceeding *See* A.R.S § 13–752(C), (D) (indicating that a sentencing proceeding consists of both the aggravation and penalty phases) But under § 13–752(O) a defendant whose sentence is overturned must simply be resentenced by a jury that is specifically impaneled for *137 that purpose *See* A R.S § 13–752(D) ( If the trier of fact finds that one or more of the alleged aggravating circumstances have been proven, the trier of fact shall then immediately determine whether the death penalty should be imposed. This proceeding is the penalty phase of the sentencing proceeding ) Thus the statute s text leaves it unclear when a defendant is entitled to an entirely new sentencing proceeding, and when a defendant is entitled to only a new penalty phase proceeding We conclude as we did in *Lynch I* that Lynch was entitled only to a new penalty phase proceeding

¶ 57 The history of § 13–752 suggests that subsection (N) applies only to a particular subset of sentences overturned on appeal The United States Supreme Court decided in *Ring v Arizona* (*Ring II* ) 536 U S 584 122 S Ct. 2428, 153 L Ed.2d 556 (2002) that Arizona s capital sentencing scheme violated the Sixth Amendment because judges, rather than juries, found aggravating factors that made defendants death eligible *Id* at 609 122 S Ct. 2428 This opinion left a large number of capital cases in flux particularly those cases where defendants had not exhausted their appeals *See State v Ring (Ring III* ) 204 Ariz 534 544 ¶ 5 65 P 3d 915 925 (2003) ( At the time of the *Ring II* decision, thirty one defendants sentenced to death had matters pending on direct appeal before this court. ) In response the legislature passed an emergency measure S B 1001 to bring Arizona s death penalty statutes into compliance with *Ring II Id* at 545 ¶ 13 65 P 3d at 926 By using the language a person who *was* sentenced to death, the legislature intended for subsection (N) to be a limited solution for *Ring II*-defective sentences A defendant who was sentenced to death after a judge found aggravating circumstances was entitled to an entirely new sentencing proceeding unless this Court found the *Ring* error to be harmless beyond a reasonable doubt, because an error of constitutional significance tainted the *aggravation* phase of every such case Thus the legislature instructed the courts to act as if the original sentencing simply 'had not occurred and to start the sentencing process over again A.R.S § 13–752(N)

¶ 58 Subsection (O) on the other hand, is more general and pertains to sentences overturned for any reason. This subsection does not instruct the courts that they must act as if the original sentencing had not occurred, but rather directs them to simply sentence or resentence a defendant as appropriate to remedy a sentencing error A R S § 13–752(O) This Court may reverse affirm or modify the judgment appealed from, and may grant a new trial or render any judgment or make any order which is consistent with the justice and the rights of the state and the defendant. A.R.S § 13–4036 Arizona s sentencing statute seeks to avoid retrials of proceedings untainted by error A.R S § 13–752(J) (providing that, where a jury cannot reach a verdict on aggravating circumstances, [t]he new jury shall not retry the issue of the defendant s guilt ') A R.S § 13–752(K) (providing that, where a jury cannot reach a verdict in the penalty phase [t]he new jury shall not retry the issue of the defendant s guilt or the issue regarding any of the aggravating circumstances that the first jury found by unanimous verdict to be proved or not proved ) Requiring a retrial of the entire sentencing proceeding when the error occurred only during the penalty phase would undermine the statute s purpose

¶ 59 We limited the retrial to the penalty phase because Lynch s original sentence was not reversed for a *Ring II*-defective sentence or any other error in the aggravation phase Rather the error arose from an improper penalty phase instruction *Lynch I* 225 Ariz at 42–43 ¶ 88 234 P 3d at 610–11 Limiting the retrial to the penalty phase was consistent with justice and the rights of the parties

[41] ¶ 60 Likewise, limiting the retrial to the penalty phase did not deprive Lynch of an individualized sentencing [D]uring a second penalty phase the state and the defendant may introduce evidence pertaining to the

aggravating circumstances previously found because aggravation phase evidence is directly relevant to whether the mitigation is sufficiently substantial to call for leniency " *Prince* 226 Ariz. at 526 ¶¶ 16 18 250 P 3d at 1155 (quoting A.R.S § 13–752(G)) ***138** This affords jurors sufficient opportunity to evaluate the aggravating circumstances when determining whether death is the appropriate penalty During Lynch s penalty phase retrial the jury heard abundant testimony concerning the circumstances of the offense and the aggravating factors and Lynch was free to offer additional evidence from the guilt and aggravation phases He was not entitled, however to retry the aggravation phase when no error occurred in that proceeding

[42] ¶ 61 Precluding the guilty verdict from evidence likewise did not deprive Lynch of an individualized sentencing Lynch contends the fact that most of the jurors found him guilty only of felony murder, not premeditated murder was relevant as a mitigating circumstance The trial court did not abuse its discretion in ruling that the verdict form was not related to any aspect of the defendant s character propensities or record, or circumstances of the offense Neither the guilty verdict form nor the jurors votes provided evidence of the circumstances of the murder

**C Refusal to Give *Simmons* Instruction**

[43] ¶ 62 Lynch next contends the trial court erred in refusing to instruct the jury that he would never be released if sentenced to prison He attempted to waive his right to be considered for a release-eligible sentence and requested that the jury be instructed regarding his ineligibility for release The trial court ruled that Lynch could not 'unilaterally choose which sentence should be imposed and denied his motion.

[44] ¶ 63 We review jury instructions and alleged constitutional violations de novo *State v Nelson* 229 Ariz 180 185 ¶ 21 273 P 3d 632, 637 (2012) *State v McGill* 213 Ariz. 147 157–58 ¶ 45, 140 P 3d 930 940–41 (2006) But we review a court s refusal to inform the jury of the defendant s willingness to waive parole eligibility for an abuse of discretion. *Benson* 232 Ariz at 465 ¶ 52 307 P 3d at 32

¶ 64 The United States Supreme Court has held that 'where the defendant s future dangerousness is at issue and state law prohibits the defendant s release on parole, due process requires that the sentencing jury be informed that the defendant is parole ineligible *Simmons v South Carolina* 512 U S 154 156, 114 S Ct 2187 129 L Ed 2d 133 (1994) (plurality opinion) The State suggested at trial that Lynch could be dangerous Further parole is available only to individuals who committed a felony before January 1 1994 and juveniles A.R.S § 41–1604 09(I)

[45] ¶ 65 Parole eligibility is not a right that can be waived *Benson* 232 Ariz at 465 ¶ 54 307 P 3d at 32 To the contrary the eligibility decision is within the trial court s discretion. *Id see also State v Dann* 220 Ariz 351, 373 ¶ 124 207 P 3d 604 626 (2009) (holding that defendants may not 'presentence themselves) The sentencing statute in effect at the time of the murder authorized the imposition of release-eligible sentences A.R.S § 13–703(A) (renumbered as A.R.S § 13–751(A)) The trial judge thus properly instructed the jury that she could impose a release-eligible sentence if the jury did not return a death verdict. *Simmons* applies only to instances where as a legal matter there is *no possibility* of parole if the jury decides the appropriate sentence is life in prison. *Ramdass v Angelone* 530 U S 156 169 120 S Ct 2113 147 L Ed 2d 125 (2000) (emphasis added) Because § 13–703(A) permitted the possibility of Lynch obtaining release refusing a *Simmons* instruction was not error *See Benson* 232 Ariz. at 465 ¶ 56 307 P 3d at 32 An instruction that parole is not currently available would be correct, but the failure to give the *Simmons* instruction was not error

¶ 66 Further the alternative instruction Lynch offered was inaccurate Instead of merely instructing on the unavailability of parole it would have informed the jury If your verdict is that Mr Lynch should be sentenced to life the court will sentence him to natural life which means Mr Lynch would never be released from prison for his entire life As discussed, the court could have imposed a release-eligible sentence Even if parole remained unavailable Lynch could have received another form of release ***139** such as executive clemency We have previously rejected a similarly overbroad instruction *State v Boyston* 231 Ariz 539 552–53 ¶ 67–68, 298 P 3d 887, 900–01 (2013) (rejecting instruction that defendant would never be eligible to be released from prison for any reason for the rest of his life because it 'referred more broadly to any form of release or commutation of sentence )

**D *Batson* Challenge**

[46] [47] [48] ¶ 67 Lynch next argues the trial court violated *Batson v Kentucky* 476 U S 79, 106 S Ct 1712 90 L Ed 2d 69 (1986) when it permitted the State to strike five Hispanic jurors over his objection A denial of a *Batson* challenge will not be reversed unless clearly erroneous *Newell* 212 Ariz at 400 ¶ 52 132 P 3d at

844 We defer to the trial court s ruling regarding the State s motives for a peremptory strike *State v Garcia* 224 Ariz 1 10 ¶ 22 226 P 3d 370 379 (2010) and review the trial court s application of the law de novo *Newell* 212 Ariz at 401 ¶ 52 132 P 3d at 845

¶ 68 The State used five of its ten peremptory strikes on prospective jurors 8 32 34 49 and 255 all of whom identified themselves as Hispanic The prosecutor explained that Number 255 indicated that she is philosophically opposed to the death penalty' and could not explain 'why she believed that life was preferable to death. Number 49 had previously served on two hung juries and the State argued she would cause the Lynch jury to hang which would prevent the State from retrying the case Number 34 had tattoos on his legs and arm, and one of Lynch s mitigating circumstances was that he had hepatitis C—which he contracted when he received a tattoo—and the State did not want a juror on the panel who could identify with Lynch The prosecutor claimed that Number 32 had 'facial hair resembl[ing] ZZ Top and a long ponytail like Jerry Garcia, which motivated striking that juror The State noted that it also struck a white juror with long hair and facial hair Number 8 'had a brother who was convicted of child abuse and she was pretty unhappy The State referred to Lynch's allegation that he had been abused The trial court found that the State s reasons for striking the prospective jurors were race neutral Lynch responded that the State s reasons for striking Numbers 32 (long hair and facial hair) and 34 (tattoos) did not justify the strikes

[49] [50] [51] ¶ 69 [T]he Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race *Batson* 476 U S at 89 106 S Ct. 1712 *Batson* challenges are subject to the following three step analysis

> (1) the party challenging the strike must make a prima facie showing of discrimination, (2) the striking party must provide a race-neutral reason for the strike and (3) if a race neutral explanation is provided, the trial court must determine whether the challenger has carried its burden of proving purposeful racial discrimination

*Garcia* 224 Ariz at 10 226 P 3d at 379 (quoting *State v Canez* 202 Ariz 133 146 ¶ 22 42 P 3d 564 577 (2002)) [T]he ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike *Id* (quoting *Purkett v Elem* 514 U S 765, 768 115 S Ct. 1769 131 L Ed.2d 834 (1995) (per curiam)) A peremptory strike does not violate *Batson* where the prosecutor s explanation is facially race neutral and the defendant offer[s] no evidence other than inference to show that the peremptory strike was a result of purposeful racial discrimination. *Newell* 212 Ariz at 402 ¶ 58 132 P 3d at 846

¶ 70 The trial court found that the State s proffered reasons for the strikes were race neutral implicitly ruling that Lynch did not carry his burden of proving purposeful racial discrimination. The fact that the State did not ask voir dire questions related to Juror 32 s long hair and facial hair or Juror 34 s tattoos does not establish that the strikes were pretextual *See Canez* 202 Ariz at 145 ¶ 18 42 P 3d at 576 (affirming trial court s denial of *Batson* challenge even though the defendant argued the State s justification was pretextual because it did not ask follow up questions) The court did not err

**E Denial of Motion to Strike Juror 5**

[52] [53] [54] ¶ 71 Lynch contends the trial court erred in refusing to strike Juror 5 who ***140** had previously worked at the same hospital as one of the State s witnesses Dr Vincent Honan Lynch bore the burden of establishing that the juror [wa]s incapable of rendering a fair and impartial verdict. *State v Lavers* 168 Ariz 376 390 814 P 2d 333 347 (1991) This Court does not set aside a trial court s refusal to strike a juror absent a clear showing that the court abused its discretion. *Id*

¶ 72 The State called Honan, a gastroenterologist who worked at Banner Good Samaritan Hospital to testify about hepatitis C the liver, and Lynch s life expectancy Juror 5 sent the trial judge a letter explaining that she previously worked in the medical surgical ICU at Banner Good Samaritan and recognized Honan. Juror 5 'had no direct dealings with Dr Honan, but thought 'the surgeons that work at Good Sam are excellent surgeons She indicated that she could still be fair in Lynch s case After reviewing Juror 5 s questionnaire and considering her responses in open court, the trial judge denied Lynch s motion to strike Juror 5

[55] ¶ 73 A court is obligated to excuse a juror who cannot render a fair and impartial verdict. Ariz R Crim P 18 4(b), *see also* A R.S § 21-211 We examine three factors when determining if a juror may continue to serve after that juror s objectivity is challenged (1) the nature of the relationship between the witness and the juror, (2) whether the juror will properly assess the testimony and (3) the importance of the testimony and whether the testimony was disputed *Bible* 175 Ariz at 574 858 P 2d

at 1177

¶ 74 The relationship between Juror 5 and the witness was not sufficient to warrant dismissal Although knowledge of or professional acquaintance with a witness calls a juror s objectivity into question, it does not require automatic disqualification. *See Hill* 174 Ariz at 319–20 848 P 2d at 1381–82 (finding no abuse of discretion in not dismissing juror who was professionally acquainted with prosecutor investigator, and coroner involved in the case) Here Juror 5 only recognized Honan as someone she had seen at the hospital where she no longer worked. Juror 5 stated that, although she may have worked on some of Honan s patients her dealings were with his surgical residents and not with him.

¶ 75 Second, Juror 5 assured the court that her knowledge of Honan would not prevent her from examining the evidence objectively Although this is not conclusive it weighs heavily against dismissal absent any indicia that the juror could not objectively analyze the evidence *See e g id* at 320–21 848 P 2d at 1382–83 *Bible* 175 Ariz at 574–75 858 P 2d at 1177–78 Although Juror 5 indicated that she thought all the surgeons at Good Samaritan were excellent, she repeatedly affirmed that this would not taint her decision making The trial court did not abuse its discretion in refusing to strike Juror 5

**F Constitutionality of Arizona's Death Penalty**

¶ 76 Lynch contends that Arizona s death penalty is unconstitutional because it involves torture and a lingering death He cites the 'botched lethal injection of Joseph Wood III as support for the contention that Arizona cannot humanely implement the death penalty

[56] ¶ 77 The United States and Arizona Constitutions prohibit cruel and unusual punishment. U S Const. amend VIII, Ariz Const. art 2, § 15 Punishment involving 'torture or a lingering death is cruel *In re Kemmler* 136 U S 436 447 10 S Ct. 930 34 L Ed. 519 (1890) This Court and the United States Supreme Court have rejected the argument that lethal injection is cruel and unusual punishment. *See e g Glossip v Gross* —U S —— —— 135 S Ct. 2726 2738 192 L Ed.2d 761 (2015), *Baze v Rees* 553 U S 35 41 128 S Ct. 1520 170 L Ed 2d 420 (2008) *State v Hinchey* 181 Ariz 307 315 890 P 2d 602, 610 (1995)

¶ 78 We decline to reverse our prior rulings on this issue Moreover Lynch s challenge to the current execution protocol is premature and may instead be raised in Rule 32 proceedings *State v Kiles* (*Kiles II*) 222 Ariz 25 42 ¶ 92 n 20 213 P 3d 174 191 n 20 (2009) (quoting *141 *State v Andriano* 215 Ariz 497 510 n. 9 161 P 3d 540 553 n. 9 (2007)) Lynch s objections to the current injection procedure—the lack of transparency and the protocol to be used—involve information not contained in the record on appeal and are more properly raised in a Rule 32 petition. *See State v Watton* 164 Ariz 323 328 793 P 2d 80 85 (1990) ('One of the purposes of a Rule 32 proceeding is to furnish an evidentiary forum for the establishment of facts underlying a claim for relief when such facts have not previously been established of record (quoting *State v Scrivner* 132 Ariz 52 54 643 P 2d 1022 1024 (App 1982)))

**G Independent Review**

[57] [58] [59] ¶ 79 Lynch next argues the mitigation evidence he presented is sufficiently substantial to call for leniency Because Lynch s crimes occurred before 2002 we independently review the trial court s findings of aggravation and mitigation and the propriety of the death sentence A.R.S § 13–755(A) In doing so we review the record de novo considering 'the quality and the strength, not simply the number of aggravating and mitigating factors *State v Roseberry* 210 Ariz 360 374 ¶ 77 111 P 3d 402 416 (2005) (quoting *State v Greene* 192 Ariz 431 443 ¶ 60 967 P 2d 106, 118 (1998)) When 'there is a doubt whether the death sentence should be imposed, we will resolve that doubt in favor of a life sentence *State v Carlson* 202 Ariz. 570 588 ¶ 70 48 P 3d 1180 1198 (2002)

**1 Aggravation**

**a (F)(5)**

[60] ¶ 80 An aggravating circumstance is established when [t]he defendant committed the offense as consideration for the receipt, or in expectation of the receipt, of anything of pecuniary value A.R.S § 13–751(F)(5) A murder must be 'prompted by the desire for pecuniary gain for the (F)(5) aggravator to apply *Anderson* 210 Ariz at 351 ¶ 105 111 P 3d at 393

¶ 81 After initially leaving Panzarella s residence Lynch and Sehwani used his American Express card at two stores and attempted to use it at a third Panzarella reported the card as lost, and Lynch and Sehwani returned to Panzarella s residence tied him to a chair, and killed him Panzarella s debit card and credit card were then

repeatedly used, including to secure charges at a motel room registered in Lynch s name Authorities found Panzarella s gun and magazine in Lynch s motel room and Panzarella s car keys in the truck Lynch was entering at the time of his arrest. These facts establish that Lynch and Sehwani returned to Panzarella s residence intending to steal more and to murder Panzarella to avoid detection The (F)(5) aggravator was established

b (F)(6)

[61] [62] ¶ 82 Under A R.S § 13–751(F)(6) an aggravating circumstance is established when [t]he defendant committed the offense in an especially heinous, cruel or depraved manner A murder is especially cruel if 'the victim was conscious during the violence and the defendant knew or should have known that the victim would suffer mental anguish or physical pain *State v Hargrave* 225 Ariz 1 13 ¶ 43, 234 P 3d 569 581 (2010) 'Mental anguish includes a victim s uncertainty about his fate *State v Kiles* (*Kiles I* ) 175 Ariz 358 371 857 P 2d 1212 1225 (1993)

¶ 83 Panzarella s spinal column was not cut, so his nervous system remained intact and he felt pain from the time his throat was cut until he lost consciousness Panzarella also experienced mental anguish. The evidence demonstrated that he was conscious when bound to the chair The cord used to bind Panzarella was tied in a large number of knots that were fairly secured, indicating that Panzarella had ample time to contemplate his fate Ligatures, abrasions and bruising on Panzarella s wrists hands, forearm, shoulder blade back, and chest indicate that he struggled. *See State v Djerf* 191 Ariz 583 596 ¶ 50–51 959 P 2d 1274 1287 (1998) (inferring mental anguish from contusions and abrasions on victim s wrists) The murder was especially cruel, so the (F)(6) aggravator was established

2 Mitigation

a Medical condition

¶ 84 Lynch emphasizes his medical condition as a reason for leniency Dr Altschuler *142 testified at length about Lynch s hepatitis C and complications thereof including cellulitis in his legs from a bacterial infection, the possibility that he could lose his legs his several hospitalizations for encephalopathy and his diminished life expectancy Defense counsel argued that Lynch would die in prison because of his medical condition and his 21–year sentence for the non-capital offenses The State s expert, Dr Honan, agreed that Lynch has significant chronic liver disease but did not see negative prognostic indicators to suggest that he is terminally ill

[63] [64] ¶ 85 Although there need not be a nexus between mitigation and the crime in order for mitigation to be considered, 'failure to establish such a causal connection may be considered in assessing the quality and strength of the mitigation evidence *Newell* 212 Ariz at 405 ¶ 82, 132 P 3d at 849 We assign minimal mitigating value to a defendant s post murder physical health because it does not address his pre murder character nor does it address his propensities his record, or the circumstances of the offense *Kayer* 194 Ariz at 440 ¶ 61 984 P 2d at 48

[65] ¶ 86 Here Lynch s medical condition is a mitigating circumstance of only minimal value The defense suggested that he obtained hepatitis C from receiving a tattoo in jail *after* the murder so his medical condition is not probative of his character propensities or record at the time of the murder or the circumstances of the offense Further we afford minimal value to the fact that a defendant will remain imprisoned for the rest of his life *State v Lehr* 227 Ariz. 140 155 ¶ 78 254 P 3d 379 394 (2011) (reasoning that the fact that a defendant would remain imprisoned for his natural life if he is not sentenced to death is entitled to little mitigating value)

b Killer unknown

[66] ¶ 87 [P]articipation in a crime may be considered as mitigation where a defendant demonstrates that while he was legally accountable for the conduct of another his participation in the crime was relatively minor " *State v Hoskins* 199 Ariz 127 150 ¶ 100 14 P 3d 997 1020 (2000) *supplemented* 204 Ariz 572 65 P 3d 953 (2003) The evidence demonstrated that Lynch was a major participant in the crime The American Express receipts discovered in Panzarella s residence indicate that Lynch and Sehwani returned after Panzarella reported the card lost. Property belonging to Panzarella was located in Lynch s motel room and in the truck Lynch was entering at the time of his arrest. There was also ample evidence indicating that Lynch was the killer The evidence showed that the person who cut Panzarella s throat was standing behind Panzarella, the blood on Lynch s shoes was consistent with him standing in that position and the

footwear impressions at the crime scene were consistent with Lynch s shoes Lynch s alleged minimal participation is not a mitigating circumstance

**c Disparity in sentence**

[67] [68] ¶ 88 A disparity in sentences between codefendants and/or accomplices can be a mitigating circumstance if no reasonable explanation exists for the disparity *Garcia* 224 Ariz. at 21 ¶ 98 226 P 3d at 390 (quoting *Kayer* 194 Ariz at 439 ¶ 57 984 P 2d at 47) Disparity is not mitigating if it results from factors suggesting the appropriateness of the sentences such as a difference in culpability or an appropriate plea agreement with one of the defendants *State v Detrich* 188 Ariz 57 69 932 P 2d 1328 1340 (1997) Here evidence suggested that Lynch was the killer and Sehwani received a life sentence as a result of a plea agreement. Sentencing disparity is not a mitigating circumstance here

**d Drug abuse**

[69] ¶ 89 Lynch argues that his drug use is both a statutory and non statutory mitigating circumstance A mitigating circumstance is proven if [t]he defendant s capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired, but not so impaired as to constitute a defense to prosecution. A R S § 13–751(G)(1) Lynch asserts that drug use impaired his ability to appreciate wrongfulness In such a case the *143 defendant must show some relationship between drug use and the offense to avail himself of the (G)(1) mitigating circumstance *State v Murdaugh* 209 Ariz 19 34 ¶ 74 97 P 3d 844 859 (2004) *see also State v Sansing* 206 Ariz 232 239–40 ¶¶ 28–29 77 P 3d 30 37–38 (2003) (finding failure to prove (G)(1) factor where defendant presented only minimal testimony about his drug use on the day of the murder")

¶ 90 Lynch presented evidence that he suffered from drug and alcohol abuse and that he used drugs around the time of the offense He also explained how crack cocaine use affects the brain Lynch failed to show a relationship between his drug and alcohol use and the offense, however other than merely suggesting that he used crack cocaine near the time of the murder Any drug use is therefore entitled to minimal mitigating value

[70] ¶ 91 As to non statutory mitigation, Lynch s drug abuse is entitled to minimal value Even if a defendant establishes his drug addiction, we give minimal value to this evidence if he fail[s] to tie his drug abuse to the crime or to his mental functioning when the murder occurred *Garcia* 224 Ariz at 22 ¶ 104 226 P 3d at 391 (quoting *State v Pandeli* 215 Ariz 514 532 ¶ 75 161 P 3d 557 575 (2007)) Although Lynch showed that he abused drugs he did not tie his drug abuse to the crime other than by stating generally that crack cocaine use causes delusional thinking Lynch s drug abuse deserves little value as a mitigator

**e Dysfunctional childhood and abuse**

[71] [72] ¶ 92 Lynch presented evidence that he was raised in a dysfunctional family where he was physically and emotionally abused, his parents neglected him, and his parents were alcoholics A difficult childhood may be a mitigating circumstance but we give it little value absent a showing that it affected the defendant s conduct in committing the crime *Garcia* 224 Ariz. at 22 ¶ 107 226 P 3d at 391 The amount of time that has passed since the defendant s childhood is relevant. *Prince* 226 Ariz at 541–42 ¶ 111 250 P 3d at 1170–71 ('Prince was twenty six years old when he killed Cassandra, attenuating the impact of his dysfunctional childhood on his conduct. ), *Garcia* 224 Ariz at 22 ¶ 107 226 P 3d at 391 (affording little value to difficult family background because defendant was thirty nine at the time of the murder and no evidence linked his childhood experiences to the murder') *State v Ellison* 213 Ariz 116, 144 ¶ 136, 140 P 3d 899, 927 (2006) (reasoning that childhood troubles deserve[d] little value as a mitigator for the murders [defendant] committed at age thirty three )

¶ 93 Here Lynch was thirty nine years old at the time of the murder He failed to establish that his childhood affected his conduct. Lynch s dysfunctional family background deserves little value as a mitigator

**f Brother's death**

¶ 94 Lynch also asserts that the drug-overdose death of his brother Donald is a mitigating factor Donald died after the murder so his death deserves little value as mitigation *See Newell* 212 Ariz at 405 ¶ 82 132 P 3d at

849 (reasoning that even though we do not require a nexus between the mitigation and the crime before we consider mitigation evidence the absence of such a causal connection may be considered in assessing the quality and strength of the mitigation evidence )

**g Lack of future dangerousness and other sentences**

[73] [74] ¶ 95 Lynch also presented evidence that he would not be a danger to prison staff inmates or the general public if he received a life sentence He also offered as mitigation his twenty-one year sentence for the non-capital crimes that would run consecutively to the sentence he received for the first-degree murder We accord minimal weight to the prospect that [a defendant] will be a model prisoner because [a]ll prisoners are expected to behave in prison *Lehr* 227 Ariz at 155 ¶ 78 254 P 3d at 394 The fact that a defendant 'would remain imprisoned for his natural life if he is not sentenced to death is also entitled to little value *Id* *see also Garcia* 224 Ariz at 22 ¶ 108 226 P 3d at 391 (affording minimal *144 value to defendant s argument that he posed no risk of future dangerousness because he would never be released from prison) We give Lynch s low risk of misbehavior in prison and consecutive non-capital sentences little value as mitigation

**3 Propriety of death sentence**

¶ 96 In light of the (F)(5) and (F)(6) aggravating circumstances which reflected an especially cruel murder committed for pecuniary gain, we conclude that Lynch has not identified mitigating circumstances sufficiently substantial to call for leniency

## III. CONCLUSION

¶ 97 For the reasons stated, we affirm Lynch s death sentence [3]

**All Citations**

238 Ariz 84 357 P 3d 119 721 Ariz. Adv Rep 4

Footnotes

1 Lynch offered into evidence an article about the Child–Pugh standard that had 'Wikipedia printed at the bottom of the page

2 The jury was unanimous only in finding that Lynch was a major participant in the felony and had acted with reckless indifference for human life

3 Lynch raises twenty six additional constitutional claims that he acknowledges this Court has previously rejected but that he wishes to preserve for federal review We decline to revisit these claims

End of Document

© 2015 Thomson Reuters No claim to original U S Government Works

225 Ariz 560
Supreme Court of Arizona,
En Banc

STATE of Arizona Appellee,
v
Mike Peter GALLARDO Appellant

No CR–09–0171–AP | Nov 30, 2010

**Synopsis**

**Background** Following a mistrial for juror misconduct, defendant was convicted by a second jury in the Superior Court, Maricopa County, No CR2006–175408 Sally Schneider Duncan, J of first degree murder and other offenses and was sentenced to death. Defendant appealed.

**Holdings** The Supreme Court, Bales J held that.

[1] trial court did not abuse its discretion in declaring mistrial for juror misconduct,

[2] trial court did not clearly err in overruling defendant s *Batson* challenges to state s peremptory strikes of three minority jurors,

[3] evidence supported especially cruel aggravating circumstance

[4] statements in which victim s parents spoke about his character and the impact of his murder upon their family and father played 911 call he made after finding his son murdered, were admissible victim impact evidence at penalty phase

[5] any impropriety in prosecutor s closing argument during penalty phase did not require reversal and

[6] reasonable juror could conclude that mitigation evidence about the impact of execution on defendant s family and the general conditions of confinement in state s maximum security facilities was not sufficiently substantial to call for leniency

Affirmed

West Headnotes (39)

[1] **Criminal Law**
Deliberations in General

Trial court did not abuse its discretion in capital murder prosecution in declaring a mistrial for juror misconduct, where trial court found that three jurors should be excused for violating admonition not to discuss case before deliberations and for not candidly responding to questions and that three others had formed opinions about other jurors that would affect their deliberations, striking all of those jurors would not have left 12 to deliberate while striking only those who violated admonition would leave no alternates for a case expected to last three months, and trial court also found it highly likely" that four other jurors had violated admonition despite having denied doing so

Cases that cite this headnote

[2] **Criminal Law**
Discretion of court

The decision to grant a mistrial rests within the sound discretion of the trial court.

2 Cases that cite this headnote

[3] **Double Jeopardy**
Manifest necessity other grounds

If there is manifest necessity for a mistrial the Double Jeopardy Clause does not bar retrial U S C A Const Amend 5

Cases that cite this headnote

[4] **Double Jeopardy**
Manifest necessity other grounds

Manifest necessity for a mistrial may arise, such that Double Jeopardy Clause does not bar retrial, when juror impartiality is compromised by jurors discussing evidence before deliberations U S C A Const Amend 5

Cases that cite this headnote

[5] **Criminal Law**
Otherwise irreparable error or prejudice in general

Because curative instructions or other measures will not necessarily remove the risk of bias the trial court must have the power to declare a mistrial in appropriate cases

1 Cases that cite this headnote

[6] **Jury**
Peremptory challenges

Trial court did not clearly err in overruling capital defendant s *Batson* challenges to state s peremptory strikes of three minority jurors although defendant made prima facie showing of discrimination, where state explained that it struck one juror for hardship another for her negative feelings toward police and the last for her criminal history trial court found that state s reasons were not pretexts and other minority jurors were ultimately selected for the panel

4 Cases that cite this headnote

[7] **Constitutional Law**
Peremptory challenges

Excluding a potential juror based on race violates the Equal Protection Clause of the Fourteenth Amendment U S C A Const.Amend. 14

2 Cases that cite this headnote

[8] **Jury**
Peremptory challenges

*Batson* challenges require a three-step analysis (1) the party challenging the peremptory juror strikes must make a prima facie showing of discrimination (2) the striking party must provide a race neutral reason for the strike and (3) if a race neutral explanation is provided, the trial court must determine whether the challenger has carried its burden of proving purposeful racial discrimination

7 Cases that cite this headnote

[9] **Jury**
Peremptory challenges

Whether the justifications offered for peremptorily striking a juror are pretexts for discrimination turns on the lawyer s credibility and the best evidence of discriminatory intent often will be the demeanor of the attorney who exercises the challenge

1 Cases that cite this headnote

[10] **Sentencing and Punishment**
Vileness heinousness or atrocity

Evidence supported especially cruel aggravating circumstance in capital murder case arising from fatal shooting that victim was bound hand and foot, a pillowcase was tied over his head, and he struggled to free himself indicated he had time to suffer significant uncertainty as to his fate and record supported conclusion that defendant knew or should have known that victim would suffer A R S §

13–751(F)(6)

1 Cases that cite this headnote

[11] **Criminal Law**
Construction of Evidence
**Criminal Law**
Substantial evidence

On a challenge to sufficiency of evidence the Supreme Court determines whether substantial evidence supports the jury s finding, viewing the facts in the light most favorable to sustaining the jury verdict.

2 Cases that cite this headnote

[12] **Criminal Law**
Degree of proof

Substantial evidence is such proof that reasonable persons could accept as adequate and sufficient to support a conclusion of defendant s guilt beyond a reasonable doubt.

1 Cases that cite this headnote

[13] **Sentencing and Punishment**
Vileness heinousness, or atrocity

A finding of cruelty alone is sufficient in a capital case to establish the aggravator that the defendant committed the offense in an especially heinous cruel or depraved manner A R S § 13–751(F)(6)

2 Cases that cite this headnote

[14] **Sentencing and Punishment**
Vileness heinousness or atrocity
**Sentencing and Punishment**
Degree of proof

To establish especially cruel aggravating circumstance in capital case the state must prove beyond a reasonable doubt that the victim consciously experienced physical or mental pain prior to death, and the defendant knew or should have known that suffering would occur A R.S § 13–751(F)(6)

2 Cases that cite this headnote

[15] **Sentencing and Punishment**
Aggravating or mitigating circumstances
**Sentencing and Punishment**
Instructions

Facially vague aggravator that murder was committed in especially cruel manner was remedied in death penalty case by limiting instructions that to find the aggravator the jury must find that victim consciously suffered physical or mental pain, and that defendant knew or should have known that victim would suffer A.R.S § 13–751(F)(6)

3 Cases that cite this headnote

[16] **Sentencing and Punishment**
Aggravating or mitigating circumstances
**Sentencing and Punishment**
Instructions

Aggravating circumstance, that defendant committed first degree murder in an especially heinous cruel or depraved manner is facially vague but may be remedied by appropriate limiting instructions in a capital case A R.S § 13–751(F)(6)

Cases that cite this headnote

[17] **Sentencing and Punishment**

Victim impact

Victim impact evidence should not be allowed at penalty phase of capital case if it is so unduly prejudicial that it renders the trial fundamentally unfair

4 Cases that cite this headnote

[18] **Sentencing and Punishment**
Discretion of lower court

Admission of victim impact evidence in capital sentencing proceeding is reviewed for an abuse of discretion.

Cases that cite this headnote

[19] **Sentencing and Punishment**
Victim impact

Statements in which victim s parents spoke about his character and the impact of his murder upon their family and victim s father played the 911 call he made after finding his son murdered, were admissible victim impact evidence at penalty phase of capital case, statements were not so unduly prejudicial as to render trial fundamentally unfair, and trial court appropriately instructed jury that victim impact evidence could not be considered as an aggravating circumstance and could be considered only for the limited purpose of rebutting mitigation.

3 Cases that cite this headnote

[20] **Sentencing and Punishment**
Victim impact

Admissibility of victim impact statements at penalty phase of capital case does not depend on the particular mitigation evidence presented by the defendant.

Cases that cite this headnote

[21] **Sentencing and Punishment**
Mitigating circumstances in general

Jurors may consider mitigating circumstances, whether proved by the defendant or present in the record, in determining whether death is the appropriate sentence

Cases that cite this headnote

[22] **Sentencing and Punishment**
Victim impact

Even if victim impact statements are not offered to rebut any specific mitigating fact, they are generally relevant to rebut mitigation and thus admissible in the penalty phase of a capital case

2 Cases that cite this headnote

[23] **Criminal Law**
Review De Novo

The Supreme Court reviews de novo whether jury instructions adequately state the law

4 Cases that cite this headnote

[24] **Criminal Law**
Conduct of counsel in general

The Supreme Court will reverse a conviction for prosecutorial misconduct if (1) misconduct is indeed present, and (2) a reasonable likelihood exists that the misconduct could have affected the jury s verdict, thereby denying the defendant

a fair trial

4 Cases that cite this headnote

[25] **Criminal Law**
Statements as to Facts, Comments and Arguments

The defendant seeking reversal of a conviction based on prosecutorial misconduct must show that the offending statements were so pronounced and persistent that they permeated the entire atmosphere of the trial and so infected the trial with unfairness as to make the resulting conviction a denial of due process U S C A Const Amend 14

3 Cases that cite this headnote

[26] **Criminal Law**
Arguments and conduct in general
**Criminal Law**
Conduct of counsel in general

The Supreme Court separately evaluates each instance of alleged prosecutorial misconduct, and the standard of review depends upon whether the defendant objected, if defendant objected the Supreme Court reviews for harmless error and, if not, it reviews only for fundamental error

3 Cases that cite this headnote

[27] **Criminal Law**
Conduct of counsel in general

Even if there is no error or an error is harmless and so by itself does not warrant reversal, an incident may nonetheless contribute to a finding of persistent and pervasive misconduct if the cumulative effect of the incidents shows that the prosecutor intentionally engaged in improper conduct and did so with indifference if not specific intent, to prejudice the defendant.

4 Cases that cite this headnote

[28] **Sentencing and Punishment**
Arguments and conduct of counsel

Prosecutor did not violate ruling that precluded state in rebutting mitigation evidence at penalty phase of capital case from asking witnesses about defendant s criminal or institutional history when prosecutor commented in opening statement that defendant s expert had not reviewed Department of Corrections records for defendant, which had been previously admitted, but instead would talk about the treatment of inmates generally

Cases that cite this headnote

[29] **Sentencing and Punishment**
Harmless and reversible error

Any prejudice from prosecutor s opening statement, allegedly in violation of a ruling on the scope of evidence rebutting mitigation, that jury would hear evidence regarding defendant s childhood during penalty phase of capital case was cured by preliminary and final jury instructions that attorneys remarks statements and arguments were not evidence but were intended to help jurors understand the evidence and apply the law

Cases that cite this headnote

[30] **Sentencing and Punishment**
Harmless and reversible error

The Supreme Court would reverse based on allegedly improper comments by prosecution at penalty phase of capital case only if defendant established a reasonable likelihood that the misconduct could have affected the jury s

verdict any improper comments had to be so serious that they affected the defendant s right to a fair trial

4 Cases that cite this headnote

[31] **Criminal Law**
Custody and conduct of jury

Jurors are presumed to follow the court s instructions

1 Cases that cite this headnote

[32] **Sentencing and Punishment**
Harmless and reversible error

Any impropriety in prosecutor s closing argument during penalty phase of capital case noting that maximum security inmates were allowed to watch television and receive phone calls and asking whether victim s father was going to be able to call victim, did not require reversal where trial court sustained defense objection to the comparison between defendant and victim, and trial court instructed jurors not to be swayed by mere sympathy not related to the evidence presented during that phase and to disregard any question to which the judge sustained an objection

Cases that cite this headnote

[33] **Sentencing and Punishment**
Harmless and reversible error

Any prejudice at penalty phase of capital case from closing arguments to which trial court sustained three objections in which prosecutor characterized defense expert s cross-examination testimony about his fees as an inconsistent statement, was cured by jury instruction to disregard questions that were withdrawn or to which objections were sustained.

2 Cases that cite this headnote

[34] **Criminal Law**
Other particular issues

A prosecutor should not repeat an argument after it has been the subject of a sustained objection.

Cases that cite this headnote

[35] **Sentencing and Punishment**
Manner and effect of weighing or considering factors

Under capital sentencing scheme given the findings of one or more aggravators a juror must vote to impose a sentence of death if he or she determines there is no mitigation at all or none sufficiently substantial to warrant a sentence of less than death.

1 Cases that cite this headnote

[36] **Sentencing and Punishment**
Discretion of lower court

The Supreme Court reviews whether the trier of fact abused its discretion in finding aggravating circumstances and imposing a sentence of death, even if the defendant does not argue that the jury s verdict was an abuse of discretion. A.R.S § 13-756(A)

3 Cases that cite this headnote

[37] **Criminal Law**
Discretion of Lower Court

A decision is not an abuse of discretion if there is any reasonable evidence in the record to sustain it.

Cases that cite this headnote

[38] **Sentencing and Punishment**
Vileness heinousness, or atrocity
**Sentencing and Punishment**
Nature degree or seriousness of other offense
**Sentencing and Punishment**
Existing social ties and responsibilities
**Sentencing and Punishment**
Other matters related to offender

Reasonable juror could conclude in death penalty case involving the especially cruel and 'prior serious offense aggravators that mitigation evidence about the impact of execution on defendant s family and the general conditions of confinement in state s maximum security facilities was not sufficiently substantial to call for leniency A.R.S §§ 13-751(C) (F)(2 6) 13-756(A)

6 Cases that cite this headnote

[39] **Sentencing and Punishment**
Scope of review

The Supreme Court will not reverse the jury s decision that death is the appropriate penalty if any reasonable jury could have concluded that the mitigation established by the defendant was not sufficiently substantial to call for leniency A R.S § 13-751(C)

7 Cases that cite this headnote

**Attorneys and Law Firms**

****162** Terry Goddard, Arizona Attorney General by Kent E Cattani Chief Counsel Criminal Appeals/Capital Litigation Section, Susanne Bartlett Blomo Assistant Attorney General Phoenix Attorneys for State of Arizona.

Droban & Company PC by Kerrie M Droban, Anthem, Attorneys for Mike Peter Gallardo

***563 OPINION**

BALES Justice

¶ 1 This mandatory appeal arises from Mike Peter Gallardo s conviction and death sentence for the murder of Rudy Padilla We have jurisdiction under Article 6 Section 5(3) of the Arizona Constitution and Arizona Revised Statutes ( A R S ) section 13-4031 (2010)

**FACTUAL AND PROCEDURAL BACKGROUND**

¶ 2 On December 9 2005 Rudy Padilla was murdered at his parents home in Phoenix Padilla s father returned from work and saw that a sliding glass door into the house ***564 **163** had been broken. He found his son s body in the master bedroom Padilla s wrists and ankles had been bound, a pillowcase had been tied over his head, and he had been shot once in the back of the head. The bedroom was in disarray jewelry and a revolver were missing Telephone records showed that Gallardo had called the Padilla home from his cell phone the day of the murder and DNA profiles developed from evidence at the crime scene matched Gallardo s profile Neither Rudy nor his parents knew Gallardo

¶ 3 Gallardo was indicted for first degree murder burglary and kidnapping After a mistrial for juror misconduct, a second jury was impaneled This jury convicted Gallardo on all counts In the aggravation phase the jury found two aggravating factors Gallardo had been previously convicted of a serious offense *see* A R S § 13-751(F)(2) (2010), and the murder was especially cruel, *id* § 13-751(F)(6) (Statutes are cited in their current version unless they have materially changed since the date of the offense ) In the penalty phase the jury determined Gallardo should receive a death sentence for the murder The trial court also sentenced Gallardo to concurrent prison terms of 15 75 years for the burglary

and kidnapping counts

## DISCUSSION

¶ 4 Gallardo raises six issues on appeal. For the reasons explained below we affirm his convictions and sentences

### A. Mistrial After Juror Misconduct

[1] ¶ 5 Gallardo argues that the trial court erred in declaring a mistrial after several jurors prematurely discussed the evidence

[2] [3] [4] [5] ¶ 6 The decision to grant a mistrial rests within the sound discretion of the trial court. *McLaughlin v Fahringer* 150 Ariz 274 277 723 P 2d 92 95 (1986) If there is manifest necessity' for the mistrial the Double Jeopardy Clause does not bar retrial *Id* Manifest necessity may arise when juror impartiality is compromised by jurors discussing evidence before deliberations *Cf Ross v Petro* 515 F 3d 653 658 (6th Cir 2008) (holding that state trial court exercised sound discretion in declaring mistrial based on manifest necessity where juror had engaged in misconduct) *United States v Gianakos* 415 F 3d 912 921 (8th Cir 2005) (explaining that premature deliberation by a jury is not a light matter' and that a court must carefully consider [a] legitimate concern that a juror s impartiality is suspect ) Because curative instructions or other measures 'will not necessarily remove the risk of bias the trial court must have the power to declare a mistrial in appropriate cases *Arizona v Washington* 434 U S 497 513 98 S Ct. 824 54 L Ed 2d 717 (1978)

¶ 7 At the beginning of the guilt phase the trial court admonished the jurors not to discuss the case 'until all the evidence has been presented and [you] have retired to deliberate on the verdict. You therefore may not discuss the evidence amongst yourselves until you retire to deliberate on your verdict.

¶ 8 Upon learning that some jurors had prematurely discussed the evidence the trial court individually questioned each of the sixteen impaneled jurors The parties agreed that one juror (Juror 13) should be excused for an unrelated hardship The trial court found that three other jurors should be excused for violating the admonition and not candidly responding to questions The trial court also found that three other jurors had formed opinions about other jurors that would affect their deliberations Striking all these jurors would not leave twelve to deliberate striking only those who violated the admonition would leave no alternates for a capital case expected to last three months The trial court also found it highly likely' that four other jurors had violated the admonition despite having denied doing so

¶ 9 Gallardo argues that less onerous sanctions were available all of the jurors stated they could remain fair and impartial and he was satisfied with the jurors selected But he agreed to the removal of two jurors (Jurors 11 and 13) and he offers no good reason to question the trial court s conclusions about the others The trial court carefully considered Gallardo s interest in having the trial concluded by the originally impaneled jury ***565 **164** and did not abuse its discretion in declaring a mistrial

### B *Batson* Challenge

[6] ¶ 10 Gallardo argues that the trial court erred in denying his challenges to the State s peremptory strikes of three minority jurors during selection of the second jury We review for clear error *State v Roque* 213 Ariz. 193 203 ¶ 12 141 P 3d 368 378 (2006)

[7] [8] [9] ¶ 11 Excluding a potential juror based on race violates the Equal Protection Clause of the Fourteenth Amendment. *Batson v Kentucky* 476 U S 79 89 106 S Ct. 1712 90 L Ed 2d 69 (1986) *Batson* challenges require a three step analysis (1) the party challenging the strikes must make a prima facie showing of discrimination (2) the striking party must provide a race-neutral reason for the strike, and (3) if a race neutral explanation is provided, the trial court must determine whether the challenger has carried its burden of proving purposeful racial discrimination. *State v Cañez* 202 Ariz 133 146 ¶ 22 42 P 3d 564 577 (2002) Whether the justifications offered for striking a juror are pretexts for discrimination turns on the lawyer s credibility, and 'the best evidence [of discriminatory intent] often will be the demeanor of the attorney who exercises the challenge *Snyder v Louisiana* 552 U S 472, 477, 128 S Ct. 1203 170 L Ed 2d 175 (2008) (alteration in original)

¶ 12 The trial court did not clearly err in overruling Gallardo s *Batson* challenges Although Gallardo made a prima facie showing of discrimination, the State offered an explanation for each strike 'based on something other than the race of the juror *Hernandez v New York,* 500 U S 352 365 111 S Ct. 1859 114 L Ed 2d 395 (1991) (plurality opinion) The State struck one juror for hardship another for her negative feelings toward police, and the last for her criminal history

¶ 13 The trial court found that the reasons the State articulated were not pretexts and there was no pattern or practice of discrimination Other minority jurors were ultimately selected for the panel and [a]lthough not dispositive the fact that the state accepted other [minority] jurors on the venire is indicative of a nondiscriminatory motive *Roque* 213 Ariz at 204 ¶ 15 141 P 3d at 379 (internal quotation marks omitted) (second alteration in original) The trial court did not clearly err in overruling the *Batson* challenges

**C (F)(6) Aggravator**

¶ 14 Gallardo argues that the State failed to present sufficient evidence to support the jury s finding that the murder was especially cruel He also argues that the jury instruction on the (F)(6) aggravator was unconstitutionally vague and improperly reduced the State s burden of proof

**1 Sufficiency of the Evidence**

[10] [11] [12] ¶ 15 We determine whether substantial evidence supports the jury s finding viewing the facts in the light most favorable to sustaining the jury verdict. *Id* at 218 ¶ 93 141 P 3d at 393 Substantial evidence is such proof that reasonable persons could accept as adequate and sufficient to support a conclusion of defendant s guilt beyond a reasonable doubt. *Id* (citations and internal quotation marks omitted)

[13] [14] ¶ 16 Under A R.S § 13–751(F)(6) a first degree murder is aggravated when [t]he defendant committed the offense in an especially heinous cruel or depraved manner A finding of cruelty alone is sufficient to establish the [ (F)(6) ] aggravator *State v Morris* 215 Ariz 324 341 ¶ 80 160 P 3d 203 220 (2007) To establish cruelty the State must prove beyond a reasonable doubt that 'the victim consciously experienced physical or mental pain prior to death and the defendant knew or should have known that suffering would occur *State v Martinez* 218 Ariz 421 436 ¶ 70 189 P 3d 348 363 (2008) (citation and internal quotation marks omitted)

¶ 17 The record contains substantial evidence that Rudy experienced mental anguish before death and that Gallardo knew or should have known that such suffering would occur Rudy almost certainly was conscious when bound, as there is no reason to bind an *566 **165 unconscious person *See State v Lynch* 225 Ariz 27 41 ¶ 79 234 P 3d 595 609 (2010) *State v Djerf* 191 Ariz 583 596 ¶ 49 959 P 2d 1274 1287 (1998) *see also State v Bible* 175 Ariz 549, 604–05 858 P 2d 1152 1207–08 (1993) ( The fact that [the victim s] hands were bound indicates that she was conscious and tied up to prevent struggling ) Ligature abrasions on Rudy s neck, wrists and ankles indicate that the bindings were not loose

¶ 18 Moreover, there is evidence that Rudy struggled against the ligatures attempting to free himself *See Lynch* 225 Ariz at 41 ¶ 79 234 P 3d at 609 *Djerf* 191 Ariz at 596 ¶ 51 959 P 2d at 1287 (inferring mental anguish from contusions and abrasions on victim s wrists) Rudy s right hand was folded underneath him, not behind his back like his left arm Rudy apparently had pulled his right wrist away from his left, almost freed his right hand, and pulled it in front of him

¶ 19 That Rudy was bound hand and foot, a pillowcase was tied over his head and he struggled to free himself also indicates he had time to suffer significant uncertainty as to his fate *See Lynch* 225 Ariz at 41 ¶ 79 234 P 3d at 609 *State v Ellison* 213 Ariz 116 142 ¶ 120 140 P 3d 899 925 (2006) ('Mental anguish is established if the victim experienced significant uncertainty as to her ultimate fate (citation and internal quotation marks omitted)) The record also supports the jury s conclusion that Gallardo knew or should have known that Rudy would suffer *See Lynch* 225 Ariz at 41 ¶ 80 234 P 3d at 609 (concluding that it was surely foreseeable that [the victim] would suffer significant mental anguish while being bound to the chair' )

¶ 20 The evidence supports the jury s finding that the murder was especially cruel

**2 F(6) Jury Instruction**

[15] [16] ¶ 21 Arizona s (F)(6) aggravator is facially vague but may be remedied by appropriate limiting instructions *See Walton v Arizona* 497 U S 639 654–56 110 S Ct. 3047 111 L Ed.2d 511 (1990) *overruled on other grounds by Ring v Arizona* 536 U S 584 589 122 S Ct. 2428 153 L Ed 2d 556 (2002) *Ellison* 213 Ariz at 138 ¶ 96 140 P 3d at 921 We have approved narrowing instructions for the especially cruel aggravating factor that require the jury to find that (1) 'the victim was conscious during the mental anguish or physical pain and (2) 'the defendant knew or should have known that the victim would suffer *State v Tucker* 215 Ariz 298 310 ¶ 31 160 P 3d 177, 189 (2007) (citations omitted)

¶ 22 The trial court here gave the following (F)(6) instruction

> Concerning this aggravating circumstance all first-degree murders are to some extent cruel However this aggravating circumstance cannot be found to exist unless the State has proved beyond a reasonable doubt that the murder was especially' cruel Especially' means 'unusually great or significant
>
> The term cruel focuses on the victim s pain and suffering To find that the murder was committed in an especially cruel manner you must find that the victim consciously suffered physical or mental pain, distress or anguish prior to death Mr Gallardo must know or should have known that the victim would suffer

¶ 23 The instruction contains the two essential narrowing factors identified in *Tucker* and is materially identical to instructions we have previously upheld *See e g State v Chappell* 225 Ariz 229 237–38 ¶ 27 & n 6 236 P 3d 1176 1184–85 & n. 6 (2010) *State v Villalobos* 225 Ariz 74 82 ¶ 31 & n. 4 235 P 3d 227 235 & n 4 (2010) The trial court did not err in giving this instruction

**D Victim Impact Evidence**

¶ 24 Gallardo argues that victim impact statements by Rudy s parents were unduly prejudicial and denied him due process He contends that he limited his mitigation evidence to avoid infusing irrelevant emotions into the proceeding and the parents statements caused the jury to sentence him to death based on 'raw emotion. He also argues that the victim impact evidence was irrelevant to the mitigation presented and that, absent a curative instruction, the jury was improperly allowed to make comparative judgments on the value of human life

**166 [17] *567 ¶ 25 Arizona law generally allows victim impact evidence during the penalty phase to rebut mitigation *See* Ariz Const art II § 2 1(A)(4) (entitling a victim to be heard at sentencing) A.R S § 13–752(R) (allowing victim to present information during penalty phase about the murdered person and the impact of the murder on the victim and other family members) Victim impact evidence should not be allowed, however if it is so unduly prejudicial that it renders the trial fundamentally unfair *State v Dann* 220 Ariz 351 369 ¶ 98 207 P 3d 604 622 (2009) (quoting *Payne v Tennessee* 501 U S 808 825 111 S Ct 2597 115 L Ed 2d 720 (1991)) *cert denied* — U S —, 130 S Ct. 466 175 L Ed 2d 313 (2009)

[18] ¶ 26 Gallardo did not object to the victim impact evidence until after it was presented, when he moved for a mistrial The trial court s decision whether to grant a mistrial is reviewed for an abuse of discretion, *Dann* 220 Ariz at 363 ¶ 48 207 P 3d at 616 as is the admission of victim impact evidence *State v Garza* 216 Ariz 56 69 ¶ 60, 163 P 3d 1006 1019 (2007)

[19] ¶ 27 In their statements Rudy s parents spoke of Rudy s character and the impact of his murder upon their family Mr Padilla ended his statement by playing the 911 call he made after finding his son murdered. The Padillas statements did not call for any specific sentence and were within the appropriate bounds of victim impact testimony—discussing only the kind of person Rudy was and how his death affected his family

[20] [21] [22] ¶ 28 Gallardo argues that the statements were irrelevant to the limited and truncated mitigation presented Admissibility of victim impact statements does not depend on the particular mitigation evidence presented by the defendant. Jurors may consider mitigating circumstances whether proved by the defendant or present in the record, in determining whether death is the appropriate sentence *State ex rel Thomas v Granville (Baldwin)* 211 Ariz 468 473 ¶ 18 123 P 3d 662 667 (2005) Even if victim impact statements are not offered to rebut any specific mitigating fact, they are generally relevant to rebut mitigation and thus admissible in the penalty phase *Garza* 216 Ariz at 69 ¶ 60 n 12 163 P 3d at 1019 n 12

¶ 29 Although the jurors were moved by the statements and some passed a tissue box the statements were not so unduly prejudicial as to render the trial fundamentally unfair *See State v Glassel* 211 Ariz 33 54 ¶ 86 116 P 3d 1193 1214 (2005) Moreover the trial court appropriately instructed the jury that victim impact evidence could not be considered as an aggravating circumstance and could be considered only for [the] limited purpose of rebutting mitigation. The trial court did not abuse its discretion in admitting victim impact statements or denying Gallardo s motion for mistrial

[23] ¶ 30 Gallardo also argues that the trial court failed to instruct jurors (1) not to rely on the statements for a purely emotional response, and (2) not to make comparative judgments about the value of human lives We review de novo whether jury instructions adequately state the law *Tucker* 215 Ariz at 310 ¶ 27 160 P 3d at 189

¶ 31 The cases Gallardo cites do not suggest the trial court s instructions were inadequate *State v Bocharski* states that the 'trial judge appropriately instructed the

jurors that they could consider the victim impact statement only to rebut the mitigation evidence 218 Ariz 476 488 ¶ 53 189 P 3d 403, 415 (2008) *State v Carreon* notes that the 'trial court cautioned the jury not to consider the impact statements as aggravation and not to be tainted by sympathy or prejudice 210 Ariz 54 72 ¶ 93 107 P 3d 900 918 (2005)

¶ 32 Although this Court has approved jury instructions containing the language suggested by Gallardo we have never held that such language is required *See Dann* 220 Ariz at 369–70 ¶ 101 207 P 3d at 622–23 (approving but not requiring instruction that cautioned jurors not to rely upon the statements for a purely emotional response and not to make comparative judgments about the value of human lives ) The instructions here properly informed the jury ***568 **167** of the limited purpose of the victim impact statements We find no error

**E Prosecutorial Misconduct**

¶ 33 Gallardo argues that comments made by the State during its penalty phase opening statement and closing argument constituted prosecutorial misconduct and deprived him of a fair trial and due process

[24] [25] ¶ 34 We will reverse a conviction for prosecutorial misconduct if (1) misconduct is indeed present, and (2) a reasonable likelihood exists that the misconduct could have affected the jury s verdict, thereby denying [the] defendant a fair trial *State v Velazquez* 216 Ariz 300 311 ¶ 45 166 P 3d 91 102 (2007) (alteration in original) (internal quotation marks and citation omitted) The defendant must show that the offending statements were so pronounced and persistent that they 'permeate[d] the entire atmosphere of the trial and so infected the trial with unfairness as to make the resulting conviction a denial of due process *Morris* 215 Ariz at 335 ¶ 46, 160 P 3d at 214 (citations and internal quotation marks omitted) *see also State v Newell* 212 Ariz 389 402 ¶ 60 132 P 3d 833 846 (2006)

[26] [27] ¶ 35 We separately evaluate each instance of alleged misconduct, and the standard of review depends upon whether [the defendant] objected *Morris* 215 Ariz at 335 ¶ 47 160 P 3d at 214 If Gallardo objected, we review for harmless error if not, we review only for fundamental error *See id* [E]ven if there [is] no error or an error [is] harmless and so by itself does not warrant reversal, an incident may nonetheless contribute to a finding of persistent and pervasive misconduct if the cumulative effect of the incidents shows that the prosecutor intentionally engaged in improper conduct and did so with indifference if not specific intent, to prejudice the defendant. *Id* (alteration in original) (citation and internal quotation marks omitted)

**1 Reference to Gallardo's Prison Packet**

[28] ¶ 36 Before the penalty phase, Gallardo filed a motion to limit the scope of rebuttal evidence Gallardo stated that he intended to present only two categories of mitigation expert testimony regarding the conditions of confinement in the maximum security units of Arizona prisons and testimony by members of his family about their affection for him and the impact a death sentence would have on them Gallardo asked the court to preclude the State from asking witnesses about his criminal history institutional history or any other past events and in particular an incident involving a handcuff key escape attempts or the expert s conversations with Gallardo The trial court granted the motion.

¶ 37 Gallardo contends that the prosecutor committed misconduct by suggesting in his opening statement that Gallardo s prison packet would illustrate his personal history Gallardo however mischaracterizes the prosecutor s remarks The prosecutor simply stated that Gallardo s expert had not reviewed the Arizona Department of Corrections records for Gallardo, which had been previously admitted, but instead would talk about the treatment of inmates generally By noting the limited scope of the expert s opinion, the prosecutor did not violate the trial court s ruling on the scope of rebuttal

**2 Reference to Gallardo's Childhood and Intelligence**

[29] ¶ 38 In his opening statement, the prosecutor stated that the jury would hear evidence regarding Gallardo s childhood. Gallardo objected and moved for a mistrial arguing the statement violated the court s ruling on the scope of rebuttal The trial court denied a mistrial but ruled that the prosecutor could not introduce evidence of Gallardo s childhood or intelligence unless the defense opened the door' on those issues

¶ 39 The prosecutor s statements about the anticipated evidence concerning Gallardo s childhood and intelligence did not violate the court s prior ruling on the motion in limine or otherwise constitute misconduct, given that the judge s ruling precluding such evidence came only after the opening statement. Moreover, Gallardo later offered testimony by his sister about his

family and argued in *569 **168 closing that his family members had been in the courtroom and the jury should consider that [t]hey care about him. The defense did not offer evidence regarding Gallardo's intelligence and the prosecutor did not comment on this issue again after the court s ruling

[30] [31] ¶ 40 Even if the comments by the prosecutor were improper we would reverse only if Gallardo established a reasonable likelihood that the misconduct could have affected the jury s verdict. *Newell* 212 Ariz at 403 ¶ 67 132 P 3d at 847 (quoting *State v Atwood* 171 Ariz 576 606 832 P 2d 593 623 (1992) *overruled on other grounds by State v Nordstrom* 200 Ariz 229 241 ¶ 25 25 P 3d 717, 729 (2001)) [A]ny improper comments must be so serious that they affected the defendant s right to a fair trial *Id* (citation omitted) The preliminary and final jury instructions noted that [t]he attorneys remarks statements and arguments are not evidence but are intended to help you understand the evidence and apply the law Presuming that jurors follow the court s instructions, *id* at ¶ 68 (citation omitted) we conclude that any possible prejudice from the prosecutor s statements was cured by the trial court s instructions

### 3 Comparison of Victim and Gallardo

[32] ¶ 41 In closing argument, Gallardo argued that a life sentence was sufficient punishment given the severe restriction and isolat[ion] of prison. In response, the prosecutor said that maximum security inmates are allowed to watch television, receive magazines make phone calls and see visitors Noting that victim impact statements could rebut mitigation, the prosecutor then said, 'Do you think [Rudy s father is] going to be able to call his son, Rudy The defense objected to the comparison between Gallardo and the victim, and the trial court sustained the objection

¶ 42 Even if the prosecutor s statements were improper reversal is not required *See Newell* 212 Ariz. at 403 ¶ 67 132 P 3d at 847 The trial court instructed the jurors not to be swayed by mere sympathy not related to the evidence presented during this phase and to disregard any question to which the judge sustained an objection These instructions negated the effect of the prosecutor s statements *See id* at ¶ 68 *see also Morris* 215 Ariz at 336–37 ¶ 55 160 P 3d at 215–16 ( Even if the prosecutor s comments were improper the judge s instructions negated their effect. )

### 4 Reference to Mitigation Witness's Fees

[33] ¶ 43 In the penalty phase Gallardo presented expert testimony from a retired corrections director about the conditions of maximum security facilities in Arizona. During cross examination, the prosecutor elicited testimony concerning the expert s fees and potential bias During closing argument, the prosecutor characterized this testimony as an inconsistent statement, Gallardo objected to the argument as misleading and the trial court sustained the objection. The prosecutor persisted with the line of argument and the trial court twice sustained further objections

[34] ¶ 44 A prosecutor should not repeat an argument after it has been the subject of a sustained objection. *Cf Pool v Superior Court in and for Pima County* 139 Ariz 98 104 n 7, 677 P 2d 261 267 n. 7 (1984) (noting that repetition of questions to which objection has been sustained is misconduct) *In re Gustafson* 650 F 2d 1017, 1020 (9th Cir 1981) (noting that attorney s disregard of court s limits on permissible argument constituted misbehavior for purposes of federal contempt statute) Although the repeated statements by the prosecutor were improper Gallardo s objections were sustained and the trial court instructed the jury to disregard questions that were withdrawn or to which objections were sustained Again, because 'we presume jurors follow the court s instructions *Newell* 212 Ariz at 403 ¶ 68, 132 P 3d at 847 any prejudice that may have resulted from the prosecutor s argument was cured by the trial court s instructions

### 5 Misstatement of the Law

[35] ¶ 45 Gallardo further claims that it was improper for the prosecutor to suggest in closing that the jurors must vote for death *570 **169 if they found no mitigation. We have previously rejected this argument 'Under our sentencing scheme given the findings of one or more aggravators, a juror must vote to impose a sentence of death if he or she determines there is no mitigation at all or none sufficiently substantial to warrant a sentence of less than death *Tucker* 215 Ariz at 318 ¶ 74 160 P 3d at 197

### 6 Cumulative Effect

¶ 46 Gallardo argues that even if no single incident of

misconduct warrants reversal the deliberate and persistent conduct of the prosecutor deprived him of a fair trial We consider whether 'persistent and pervasive misconduct occurred and whether the cumulative effect of the incidents shows that the prosecutor intentionally engaged in improper conduct and did so with indifference, if not a specific intent, to prejudice the defendant. *Morris* 215 Ariz at 339 ¶ 67 160 P 3d at 218 (citation and internal quotation marks omitted)

¶ 47 The record does not suggest pervasive prosecutorial misconduct that deprived Gallardo of a fair trial

**F Constitutionality of Burden of Proof at Sentencing**

¶ 48 Gallardo argues that Arizona s death penalty scheme violates the Eighth and Fourteenth Amendments because it does not require the State to prove beyond a reasonable doubt that mitigating circumstances once proved by the defendant, are not sufficiently substantial to call for leniency We rejected this argument in *State v Moore* 222 Ariz 1 20 ¶¶ 110–13 213 P 3d 150 169 *cert denied* —— U S —— 130 S Ct. 747 175 L Ed 2d 524 (2009)

**G Review of the Death Sentence**

[36] [37] ¶ 49 Because the murder occurred after August 1 2002 we determine whether the trier of fact abused its discretion in finding aggravating circumstances and imposing a sentence of death A R.S § 13–756(A) We conduct this review even if as here, the defendant does not argue that the jury s verdict was an abuse of discretion. *Morris* 215 Ariz at 340 ¶ 76 160 P 3d at 219 A decision is not an abuse of discretion if there is any reasonable evidence in the record to sustain it. *Id* at 341 ¶ 77 160 P 3d at 220 (citation and internal quotation marks omitted)

**1 Aggravating Circumstances**

¶ 50 The jury found two aggravating circumstances Gallardo had been previously convicted of a prior serious offense *see* A R S § 13–751(F)(2) and the murder was especially cruel *see id* § 13–751(F)(6) As discussed, there is sufficient evidence to support the jury s finding that Gallardo committed the murder in an especially cruel manner The jury also properly found that Gallardo had previously been convicted of a serious offense based on evidence of his prior convictions for armed robbery and burglary

**2 Death as the Appropriate Sentence**

[38] [39] ¶ 51 Once the jury finds one or more aggravating factors each juror must individually determine whether death is the appropriate penalty *See* A.R.S § 13–751(C) (stating that [e]ach juror may consider any mitigating circumstance found by that juror in determining the appropriate penalty' ) *see also Baldwin* 211 Ariz at 473 ¶ 21 123 P 3d at 667 We will not reverse the jury s decision if any reasonable jury could have concluded that the mitigation established by the defendant was not sufficiently substantial to call for leniency *Morris* 215 Ariz at 341 ¶ 81 160 P 3d at 220

¶ 52 Gallardo presented evidence about the impact of execution on his family and the general conditions of confinement in Arizona s maximum security facilities A reasonable juror could conclude that the mitigation presented was not sufficiently substantial to call for leniency *See State v Harrod* 200 Ariz 309 319 ¶ 54 26 P 3d 492 502 (2001) (minimal weight given to family support) *vacated on other grounds* 536 U S 953 122 S Ct 2653 153 L Ed.2d 830 (2002)

**H Issues Preserved for Federal Review**

¶ 53 To avoid preclusion, Gallardo raises twelve additional constitutional claims that he *571 **170 states have been rejected in previous decisions by the United States Supreme Court or this Court. The attached appendix lists the claims raised by Gallardo and the decisions he identifies as rejecting them

**CONCLUSION**

¶ 54 We affirm Gallardo s convictions and sentences

CONCURRING REBECCA WHITE BERCH Chief Justice ANDREW D HURWITZ Vice Chief Justice A JOHN PELANDER Justice and MICHAEL D RYAN Justice (Retired)

**Appendix**

Gallardo raises twelve issues to preserve them for federal appeal This Appendix lists his claims and the decisions he identifies as rejecting them

(1) Arizona s statutory scheme for considering mitigating evidence is unconstitutional under the Eighth and Fourteenth Amendments because it limits consideration of mitigating evidence to that proven by a preponderance of the evidence *State v McGill* 213 Ariz 147 161 ¶ 59 140 P 3d 930, 944 (2006)

(2) Gallardo s death sentence is in violation of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments and the Arizona Constitution because the State failed to allege the aggravating factors that made the defendant death eligible in the grand jury indictment. *McKaney v Foreman ex rel County of Maricopa* 209 Ariz 268 273 ¶ 23 100 P 3d 18 23 (2004)

(3) Application of the new death penalty law to Gallardo constitutes an impermissible *ex post facto* application of the law *State v Ring* 204 Ariz 534 547 ¶¶ 23–24 65 P 3d 915 928 (2003)

(4) Gallardo s rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments and under the Arizona Constitution were violated by the admission of victim impact evidence at the penalty phase of the trial *Lynn v Reinstein* 205 Ariz 186 191 ¶ 16 68 P 3d 412 417 (2003)

(5) The trial court improperly omitted penalty phase instructions that the jury could consider mercy or sympathy in evaluating the mitigation evidence and in determining whether to sentence the defendant to death. *State v Carreon* 210 Ariz. 54 70–71 ¶¶ 81–87 107 P 3d 900, 916–17 (2005)

(6) The death penalty is cruel and unusual punishment. *State v Harrod* 200 Ariz 309 320 ¶ 59 26 P 3d 492 503 (2001), *vacated on other grounds* 536 U S 953, 122 S Ct. 2653 153 L Ed 2d 830 (2002)

(7) The death penalty is arbitrarily imposed in violation of Gallardo s due process rights under the Fourteenth Amendment and under the Arizona Constitution. *State v Beaty* 158 Ariz 232 247 762 P 2d 519 534 (1988)

(8) The prosecutor s discretion to seek the death penalty unconstitutionally lacks standards *State v Sansing* 200 Ariz 347 361 ¶ 46 26 P.3d 1118 1131 (2001) *vacated on other grounds* 536 U S 954 122 S Ct. 2654 153 L Ed 2d 830 (2002)

(9) The death penalty in Arizona has been applied in a manner that discriminates against poor young and male defendants in violation of the Arizona Constitution. *Sansing* 200 Ariz at 361 ¶ 46, 26 P 3d at 1131

(10) The absence of proportionality review by Arizona courts of a defendant s death sentence is unconstitutional under the Fifth Eighth, and Fourteenth Amendments and Article 2 Section 15 of the Arizona Constitution *Harrod* 200 Ariz at 320 ¶ 65 26 P 3d at 503

(11) Arizona s death penalty statute unconstitutionally presumes that death is the appropriate sentence *State v Miles* 186 Ariz 10 19 918 P 2d 1028 1037 (1996)

(12) Execution by lethal injection is cruel and unusual punishment. *State v Van Adams* 194 Ariz 408 422 984 P 2d 16 30 (1999)

**All Citations**

225 Ariz. 560 242 P 3d 159 596 Ariz Adv Rep 7

**End of Document**

© 2015 Thomson Reuters No claim to original U S Government Works

IN THE
**Court of Appeals**
STATE OF ARIZONA
DIVISION ONE

FILED 8/29/08 @ 3:10 pm
MICHAEL K JEANES, Clerk
By [signature] Deputy

| STATE OF ARIZONA, Appellee, v CICERO POTTRIDGE BEEMON, Appellant | Court of Appeals Division One No 1 CA-CR 05-1161 <br> Maricopa County Superior Court No CR 2002-099001 |
|---|---|

**ORDER AND MANDATE**

Terry Goddard, The Attorney General
By Kent E Cattani, Chief Counsel, Criminal Appeals/Capital Litigation Section
And Cari McConeghy-Harris, Assistant Attorney General
Attorneys for Appellee — Phoenix

James J Haas, Maricopa County Public Defender
By Karen M Noble, Deputy Public Defender
Attorneys for Appellant — Phoenix

The MEMORANDUM DECISION of this court in the above matter was filed on February 21, 2008

The time for the filing of a motion for reconsideration has expired and no motion was filed A petition for review was filed The record was forwarded to the Arizona Supreme Court By order, dated July 28, 2008, the Arizona Supreme Court denied the petition for review Arizona Supreme Court No CR-08-0107-PR

**IT IS ORDERED** in conformity with the MEMORANDUM DECISION attached hereto

**IT IS FURTHER ORDERED** that a certified copy of the foregoing ORDER and MANDATE and a copy of the MEMORANDUM DECISION of the Court were mailed to the Clerk of Maricopa County Superior Court, Arizona, on August 28, 2008 A copy of the ORDER and MANDATE and a copy of the MEMORANDUM DECISION were mailed to the Honorable Brian K Ishikawa, Judge, and a copy of the ORDER and MANDATE was mailed on said day to each party appearing or the attorneys of record, as well as the County Attorney

1 CA-CR 05-1161

Department A

Maricopa County Superior Court
CR 2002-099001

**IT IS FURTHER ORDERED** pursuant to this Court's order of the 11th day of March, 1965 that the Clerk of this Court return to the Clerk of Superior Court, all records exhibits and other matters received from said Clerk by this Court in aid of the consideration of this matter

DATED August 28, 2008

VICE CHIEF JUDGE

All of the foregoing directives were complied with August 28, 2008

Philip G Urry, Clerk

By
Deputy Clerk

The foregoing instrument is a full true and correct copy of the original on file in this office

ATTEST 8/28/08
PHILIP G URRY Clerk of Division One
Court of Appeals State of Arizona

DIVISION 1
COURT OF APPEALS
STATE OF ARIZONA
FILED
FEB 21 2008
PHILIP G URRY, CLERK
By [signature]

**IN THE COURT OF APPEALS**
**STATE OF ARIZONA**
**DIVISION ONE**

| | | |
|---|---|---|
| STATE OF ARIZONA | ) | 1 CA-CR 05-1161 |
| | ) | |
| Appellee | ) | DEPARTMENT A |
| | ) | |
| v | ) | **MEMORANDUM DECISION** |
| | ) | (Not for Publication |
| CICERO POTTRIDGE BEEMON, | ) | - Rule 111, Rules of |
| | ) | the Arizona Supreme |
| Appellant | ) | Court) |
| | ) | |

Appeal from the Superior Court in Maricopa County

Cause No CR2002-099001

The Honorable Brian K Ishikawa, Judge

**AFFIRMED**

---

Terry Goddard, Attorney General — Phoenix
By Randall M Howe, Chief Counsel,
Criminal Appeals Section
and Cari McConeghy-Harris Assistant Attorney General
Attorneys for Appellee

James J Haas, Maricopa County Public Defender — Phoenix
By Karen M Noble Deputy Public Defender
Attorneys for Appellant

---

**H A L L**, Judge

¶1 The State charged defendant, Cicero Pottridge Beemon, with the 2002 premeditated murder[1] of eighteen-year-old Tanisha R [2] by strangulation Defendant did not contest the fact that his conduct resulted in Tanisha s death but aimed his defense at countering the premeditation allegation by testifying that he was high on cocaine and Cisco at the time of the killing

¶2 On September 8 2005, after a sixteen-day trial, a jury found defendant guilty of second-degree murder a class one dangerous felony, for causing the intentional death of Tanisha At the conclusion of a three-day trial on aggravating factors, the same jury found (1) that defendant had two prior California felony convictions in 1997 and 1984 and (2) that he committed the murder in an especially heinous and especially cruel manner [3]

¶3 On October 21 2005, the trial court sentenced defendant to an aggravated sentence of 22 years in prison and defendant timely appealed only from his sentence He claims that the trial court erred in imposing an aggravated sentence

---

[1] Initially the State also charged defendant with manslaughter for the death of Tanisha's unborn child The State dismissed the charge prior to trial

[2] We use only the first initial of the victim's last name to protect her privacy as a victim and that of her family members

[3] The jury was unable to reach a unanimous decision regarding whether defendant had also committed the murder in an especially depraved manner

because (1) it "double counted" the fact that he caused a serious physical injury to the victim (2) it improperly found that defendant had caused emotional harm to the victim's family, (3) it improperly instructed the jury on the definition of "especially cruel, heinous, and depraved", and (4) it improperly aggravated his sentence with a 1984 California robbery conviction without finding that the foreign conviction was the equivalent of a felony in Arizona He also argues that the prosecutor's misconduct in his statements during the aggravation phase deprived him of a fair trial For reasons set forth more fully below, we affirm

**DISCUSSION**

*Double Counting of "Dangerousness"*

¶4 As part of its verdict, the jury found that the second degree murder was a dangerous offense based on the "intentional or knowing infliction of serious physical injury " Ariz Rev Stat (A R S ) § 13-604(P) (Supp 2007) Defendant maintains that the trial court committed reversible error because it used the jury s dangerous finding in imposing the aggravated sentence

¶5 We review a sentence within the prescribed statutory range for an abuse of the court's discretion *State v Tschilar*, 200 Ariz 427, 435, ¶ 32, 27 P 3d 331, 339 (App

2001) However, whether a particular aggravating factor is properly used by the trial court is a question of law that we review de novo *Id* We find no error

¶6 There is no evidence whatsoever in the record that supports defendant s contention At sentencing and in its minute entry order, the trial court simply acknowledged the jury's finding that the offense was a "dangerousness" offense pursuant to A R S § 13-604 It then considered the mitigating and aggravating factors and explicitly found that the aggravating factors found by the jury - two prior felony convictions and the especially cruel and especially heinous nature of the offense - were supported by the record The trial court then used the jury's aggravating factors - to which it added the additional aggravating factor of emotional harm to the victim's immediate family - when it determined that the "aggravating circumstances are sufficiently substantial to warrant an aggravated sentence " We find no indication that the trial court used the "dangerousness" finding as an aggravating factor and no error on that basis

*Emotional Harm to Victim's Family*

¶7 Defendant next argues that the trial court committed reversible error when it found and used the additional aggravating factor of emotional harm to the victim s immediate

family to aggravate his sentence Pointing out that the factor of emotional harm to the victim's family was not included within the list of aggravating circumstances that the State supplied defendant when it filed its notice of intent to seek the death penalty, defendant claims that this aggravating element was not "noticed, charged or proven "

¶8 Defendant did not raise this objection before the trial court [4] He has therefore forfeited relief save for fundamental error *State v Henderson* 210 Ariz 561 567, ¶ 19, 115 P 3d 601 607 (2005)

¶9 Fundamental error is "error going to the foundation of the case, error that takes from the defendant a right essential to his defense, and error of such magnitude that defendant could not possibly have received a fair trial " *Id* at 567, ¶ 19, 115 P 3d at 607 (internal quotation omitted) Furthermore "[t]o prevail under this standard of review, a defendant must establish both that error exists and that the error in this case caused him prejudice " *Id* at 567, ¶ 20, 115 P 3d at 607

---

[4] Before the aggravation hearing commenced on September 6, 2005 defendant did make an "umbrella objection" regarding the submission of aggravating factors to the jury that the State had not separately noticed as noncapital aggravators should the defendant not be convicted of first degree murder However, trial counsel did not renew this objection at the sentencing hearing held October 21, 2005 when the prosecutor suggested, and the court found, the additional emotional harm factor

¶10 However, before we engage in fundamental error review, we must first find the trial court committed some error *State v Lavers* 168 Ariz 376 385 814 P 2d 333 342 (1991) We find no error, let alone fundamental error

¶11 The State must disclose aggravating circumstances on which it intends to rely in seeking the death penalty sufficiently in advance of the hearing so that a defendant will have an opportunity to prepare rebuttal *State v Ortiz* 131 Ariz 195 207, 639 P 2d 1020, 1032 (1981), *disapproved on other grounds by State v Gretzler*, 135 Ariz 42 57 n 2 659 P 2d 1, 16 n 2 (1983) [5] For purposes of this decision, we assume, without deciding, that a defendant upon whom a noncapital sentence is imposed is similarly entitled to advance notice of aggravating factors Here, the State did not allege emotional harm to the victim s family as an aggravator when it filed the notice that it intended to seek the death penalty This is not surprising given that emotional harm to the victim's family although a statutory aggravator for a noncapital offense pursuant to A R S § 13-702(C)(9) (Supp 2007), is not a death penalty aggravator *See* A R S § 13-703(F) (Supp 2007) Nor

---

[5] As a matter of procedure, Arizona now requires that a prosecutor "provide the defendant with a list of aggravating circumstances the state will rely on at the aggravation hearing" at the same time that the prosecutor files a notice of intent to seek the death penalty Ariz R Crim P 15 1(i)(2)

did the State request that the trial court submit emotional harm for the jury's consideration as a potential aggravator Nonetheless, we conclude that the trial court did not err when it found emotional harm to the victim s family as an aggravating circumstance Victims have a constitutional right 'to be heard at any proceeding involving sentencing "[6] Ariz Const Art 2, § 2 1(A)(4) Moreover, § 13-702(E) requires that "[t]he court in imposing a sentence shall consider the evidence and opinions presented by the victim or the victim's immediate family at any aggravation or mitigation proceeding " Therefore, a defendant who commits a noncapital offense involving a victim is necessarily on notice of the potential applicability of § 13-702(C)(9) as an aggravating circumstance at sentencing particularly when as here, the victim died as a result of the defendant s conduct

¶12 As to his claim that the aggravating factor was not proven, defendant argues only that the victim s father's representations to the trial court were insufficient to support the emotional harm aggravator However, the victim's aunt as well as Harley C the father of the victim's two children also testified at the sentencing hearing In asking for a "heavier

---

6 When the victim is killed, "victim" means "the person's spouse, parent child or other lawful representative " Ariz Const Art 2, § 2 1(C)

sentence," Harley noted that the loss of their mother was something that the children would feel "for the rest of their lives " The victim s aunt spoke at length about the "devastation" wreaked on the victim's family, asking the court to impose the "maximum sentence " Their testimony alone was sufficient evidence to support the trial court's finding of emotional harm to the family *See e g State v Soto-Fong*, 187 Ariz 186, 200, 928 P 2d 610, 624 (1996) (reversible error on insufficiency of evidence occurs only when there is a complete lack of probative facts) When considered with the father's additional testimony about the suffering both he and his wife experienced there was more than sufficient evidence to support the trial court s finding

*Especially Cruel and Heinous*

¶13 Defendant contends that there was insufficient evidence to support the jury s findings that the murder in this case was committed in an especially cruel and heinous manner He also maintains that the trial court improperly instructed the jury on the aggravating factors, resulting in a denial of his right to a fair trial and due process

¶14 First defendant did not object to the trial court's instructions regarding these aggravators Therefore, absent fundamental error, he has forfeited relief on this basis

*Henderson*, 210 Ariz at 567 ¶ 19 115 P 3d at 607 Moreover, because the trial court properly instructed the jury we find no error, let alone fundamental error Rarely will an improper instruction justify reversal when no objection has been made in the trial court *See e g , State v Van Adams*, 194 Ariz 408, 415 ¶ 17, 984 P 2d 16, 23 (1999) (applying principle to reversal of criminal conviction)

**¶15** The jury instructions the trial court gave in this case appropriately "gave substance to the terms 'cruel and 'heinous or depraved in accordance with the case law narrowing and defining those terms " *State v Cromwell*, 211 Ariz 181 189 ¶ 41 119 P 3d 448 456 (2005) Cruelty goes to the mental and physical anguish suffered by a victim *Id* at 189, ¶ 42, 119 P 3d at 456 To be cruel, the conduct must occur before death and while a victim is conscious *Id* Furthermore, the defendant must intend to inflict mental anguish or physical pain on the victim or reasonably foresee that there was a substantial likelihood that the manner in which the crime was committed would cause the victim to suffer mental anguish or physical pain prior to death *State v Valazquez*, 216 Ariz 300, 308, ¶ 28 166 P 3d 91 99 (2007) Heinousness goes to a defendant's mental state as reflected in his words or actions at or near the time of the offense *State v Johnson*, 212 Ariz

425, 439, ¶ 55, 133 P 3d 735, 749 (2006)   It is generally defined as "hatefully or shockingly evil  grossly bad "   *Id* (internal quotations omitted)

¶16      The trial court in this case properly instructed the jury that heinousness focused "upon the defendant s state of mind at the time of the offense as reflected by his words and acts" and that an offense is heinous "if it is shockingly evil, grossly bad "  It further instructed the jury that  in order to find heinousness, it had to find "at least one of the following actions," such as "relishing in the murder" or the "infliction of gratuitous violence on the victim beyond that necessary to kill "   The trial court also instructed the jury on specific factors, such as "gratuitous violence," "senseless murder," and the "helplessness" of the victim, that might assist it in considering whether the murder was heinous or depraved [7]  It also properly instructed the jury that cruelty involved "the infliction of pain and/or mental anguish on a victim before death "   It also instructed the jury that a crime is committed

---

[7]      Defendant appears to suggest that the jury may have found the murder to have been "especially heinous" based on the senselessness of the murder or the helplessness of the victim alone   However the trial court specifically instructed the jury that "neither  senselessness' or 'helplessness' standing alone [was] sufficient to prove that [the] murder was heinous "   The trial court's instruction was thus correct  and, without more  the jurors are presumed to have followed it   *State v  LeBlanc*, 186 Ariz  437  439, 924 P 2d 441  443 (1996)

in an "especially cruel manner" when a defendant either knows or should have known "that the manner in which the crime [was] committed could have caused the victim pain" and that the victim had to have been "conscious for at least some portion of the time when the pain and/or anguish was inflicted " This unchallenged language sufficiently and correctly gave substance and definition to the terms "cruel" and "heinous" in keeping with our case law *Cromwell*, 211 Ariz at 189 ¶ 41 119 P 3d at 456

¶17 Furthermore, there is sufficient evidence to support the jury's findings The facts of this case are comparable to those in *State v Tucker*, 215 Ariz 298, 321, ¶¶ 100-103 160 P 3d 177, 200 (2007) in which our supreme court found the additional trauma and injuries sustained by the victim while conscious and prior to being fatally shot established that the murder had been caused in an "especially cruel" manner The cause of the victim's death in this case was strangulation A witness in the motel room next door to the murder testified that she heard noises of fighting that lasted between 15 and 20 minutes a woman screaming and the repeated sounds of "slapping" and of something being either "shoved" or "hitting" the walls The evidence at trial established that the victim sustained numerous traumas and blunt force injuries to her head,

neck and body, including a broken hyoid bone, a black eye and injuries to the left temporal area caused by repeated strikes [8] a bloody nose consistent with a punch or strike, bleeding into the white of the eyes petechial hemorrhaging to her heart consistent with a blow to the chest or someone sitting on the chest, and bruising to both the left and right side of the tissue under the skull According to the medical examiner, all of these injuries occurred prior to death This evidence indicates that the victim would have suffered extreme physical pain while she was being assaulted and strangled by defendant and supports the jury's "especially cruel" finding

¶18 There is also sufficient evidence to support the jury s finding of "especially heinous " The medical evidence revealed that the victim had suffered lacerations to her vagina and anus, and that bleeding near the anal tear indicated forced anal intercourse occurring near or at the time of death but before death itself When coupled with the testimony of the next-door witness who testified that she heard fighting and struggling and then two or three male "growls" right before the noise stopped, the evidence supports the inference that

[8] At trial, defendant admitted fighting with the victim and grabbing her neck after he allegedly discovered her stealing money from his pocket He admitted having hit her at least five or six times '[m]ostly [in] the head area "

defendant was having forced sexual intercourse with the victim as he was killing her The infliction of this "gratuitous violence" or defendant's "relishing" by gratifying himself while killing support the finding that defendant committed the murder in an "especially heinous" manner The trial court therefore properly relied on these factors to aggravate defendant s sentence

*Use of 1984 California Prior Felony*

¶19 Defendant contends that the trial court improperly aggravated his sentence based on a 1984 California felony conviction without first determining whether the foreign conviction would be punishable as a felony in Arizona A R S § 13-604(N) A trial court has broad discretion in sentencing, and if the sentence imposed is within the statutory limits this court will not disturb it absent a clear abuse of discretion *State v Ward*, 200 Ariz 387 389, ¶ 5, 26 P 3d 1158, 1160 (App 2001) We find no error

¶20 The record shows that defendant's 1984 California robbery conviction was not used to enhance defendant's sentence as a "historical prior felony" pursuant to A R S § 13-604(N) It was instead given to the jury to consider as an aggravating circumstance pursuant to A R S § 13-702(C)(24), which permits the trier of fact to consider "any other factor that the state

alleges is relevant to the defendant s character or background or to the nature or circumstances of the crime " Under this subsection there is no requirement that the foreign conviction must also be a felony under Arizona law Furthermore, a trier of fact has traditionally been permitted to consider information about a defendant's past conduct to determine whether an aggravated sentence is appropriate *See, e g , State v Ellis,* 117 Ariz 329, 334, 572 P 2d 791, 796 (1977) (holding judge could properly consider prior crimes criminal character and criminal history of defendant as well as presentence report in determining sentence) *State v Schuler* 162 Ariz 19, 21, 780 P 2d 1067, 1069 (App 1989) (sentencing court may consider defendant's criminal character and history even if conduct has not resulted in conviction)

*Prosecutorial Misconduct*

¶21 Defendant argues that the prosecutor s misconduct during his arguments at the aggravation phase of the trial deprived him of a fair trial on the aggravating factors We interpret this argument as a claim that the trial court abused its discretion when it twice denied defendant's motions for mistrial Because the trial court is in a better position than we to judge the effect of a prosecutor's comments on the jury, we review the denial of a motion for mistrial for prosecutorial

misconduct for a clear abuse of discretion *See State v Lee* 189 Ariz 608 616 944 P 2d 1222 1230 (1997)

¶22 "To prevail on a claim of prosecutorial misconduct a defendant must demonstrate that the prosecutor's misconduct so infected the trial with unfairness as to make the resulting conviction a denial of due process '" *State v Hughes,* 193 Ariz 72 79 ¶ 26 969 P 2d 1184, 1191 (1998) (quoting *Donnelly v DeChristoforo,* 416 U S 637, 643 (1974)) To determine whether a prosecutor's comments constitute misconduct warranting a mistrial,

> the trial court should consider (1) whether the remarks call to the attention of the jurors matters that they would not be justified in considering in determining their verdict, and (2) the probability that the jurors under the circumstances of the particular case, were influenced by the remarks Misconduct alone will not mandate that the defendant be awarded a new trial, such an award is only required when the defendant has been denied a fair trial as a result of the actions of counsel

*State v Hansen,* 156 Ariz 291, 296-97, 751 P 2d 951, 956-57 (1988) To warrant reversal, the prosecutorial misconduct must be "so pronounced and persistent that it permeates the entire atmosphere of the trial " *United States v Blevins,* 555 F 2d 1236 1240 (5th Cir 1977)

¶23 During the guilt phase of the trial, the trial court ruled that, if the defendant testified, the State could impeach

him only with his 1997 California drug conviction but not his 1984 conviction for robbery Defendant testified at trial (but not during the aggravation hearing), and, during direct testimony admitted the 1997 California felony conviction for "sale of a controlled substance or possession of a controlled substance with the intent to sell " Defendant also admitted using crack cocaine and being in and out of several rehabilitation programs and relapsing into drug use He made no mention of his 1984 conviction

¶24 As noted above during the aggravation phase the jury had evidence of both the 1997 drug conviction and the 1984 robbery conviction The gist of the prosecutor's opening and closing argument was that defendant was manipulative, he was willing to admit to certain conduct only if it benefited him or served to elicit the jury's sympathy In so doing he pointed out that while defendant had been "quick to jump up there" during the guilt phase of the trial and reveal his prior drug conviction, he had not revealed his "other on[e] "

¶25 Defense counsel immediately objected and moved for a mistrial at a bench conference He argued that the comment was "totally unfair" because the prosecutor knew that evidence of the 1984 robbery was precluded at trial but his comment implied that defendant willfully deceived the jurors The prosecutor,

Juan Martinez acknowledged that the court had precluded the prosecutor from using the robbery conviction for impeachment at the guilt phase and had sanitized the 1997 conviction, but argued that defendant testified regarding the details surrounding his 1997 conviction in order to portray himself as a "troubled kid" in an attempt to gain sympathy from the jury Therefore, because defendant "brought that out," Mr Martinez rationalized

> [S]o he can t stand up here now and say, well, you know, I m going to pick and chose what I'm going to bring in If he picks and chooses, he has to answer for that So no, I don t think I stepped over the line He withheld information when it was to his advantage and gave him [sic] information he did not need to and that the prosecutor was forbidden to go into So, no I don't agree with them

¶26 The trial court denied the motion, choosing instead to instruct the jury that it was to "disregard [the prosecutor's] last statement "

¶27 The prosecutor's argument attacked defendant as being dishonest for failing to reveal his robbery conviction to the jury during the guilt phase This comment was clearly improper in light of the trial court s ruling precluding use of the robbery conviction for impeachment purposes Indeed, we are baffled by the prosecutor's continued insistence at the bench conference that the defendant had no right to "withhold

information" regarding the robbery conviction from the jury Nonetheless the statement was brief it was immediately corrected by the trial court's instruction to disregard it and the jurors are presumed to have done so *See*, *LeBlanc*, 186 Ariz at 439, 924 P 2d at 443 [9] In addition the prosecutor's remarks during the remainder of this portion of his argument were not improper

¶28 During his closing argument defense counsel accused the State of depicting defendant and his defense counsel as "sneaking, lying, cheating " and of implying that they had represented the victim as being "worthless" as a human being Defense counsel argued that the prosecutor, although he did not use the actual word implied that defendant was a "beast" by having sexual relations with the victim as the victim was dying or already dead

> The argument of the state is that the deceased is dead and defendant is continuing to have anal relations with her That s what he is saying to you Not once not five times, a minimum of ten times, over and over again which makes him what we would call a beast A beast on many levels

¶29 In his rebuttal argument, the prosecutor denied saying that defendant and his counsel were "sneaking, lying, and

---

[9] On appeal, defendant also claims that the statement was a comment on his failure to testify at the aggravation phase Taken in context we do not view it as such

cheating" or that he had "called [defendant] a dog and called him a beast " According to the prosecutor defense counsel had made these arguments "at the top of his lungs " In a completely inappropriate effort to refute defense counsel s arguments, Mr Martinez then analogized his tactics to those of "Adolf Hitler" and his "big lie," arguing that "if [defense counsel] tells you that over and over again, you're certainly going to start to believe it aren't you?" The Hitler analogy was a recurring theme in the prosecutor's closing argument After repeating the Hitler analogy, Mr Martinez argued

> [Defense counsel] talks about America and wraps himself around the flag Doesn't wrap himself around the German flag when he calls somebody a cheater, a liar a sneaking [sic] when in fact they never used those words And additionally, with regard to that, you don't mention the full truth because that's also not to your benefit

In concluding his remarks, the prosecutor told the jurors "[w]e have the example of Germany It has worked through history "

¶30 Defense counsel reserved his objections to the prosecutor's statements until the jury had recessed Counsel moved for a mistrial on the basis that the prosecutor's equation of his tactics with Hitler's might prejudice them against his client Stating no reasons for its decision, the trial court denied the motion

¶31 In recognition of the frequently emotional nature and sometimes rough and tumble quality of closing argument, attorneys including prosecutors, are allowed wide latitude in their arguments to the jury See *State v Gonzales* 105 Ariz 434, 437, 466 P 2d 388 391 (1970) (noting that "excessive and emotional language is the bread and butter weapon of counsel's forensic arsenal") But that latitude although not easy to quantify and however generous it might be is not limitless *See State v Gregory*, 108 Ariz 445, 448, 501 P 2d 387 390 (1972) (recognizing that "abuse of opposing counsel unwarranted by the evidence is not within the scope of proper argument and if carried too far may result in the granting of a new trial or reversal") In any event, it can never be extended so far as to permit an attorney to blacken the character of a courtroom adversary by comparing his tactics to those of Nazis [10] Under similar circumstances a Pennsylvania appellate court observed that "specific comparisons between counsel's tactics and those of Hitler and Goebbels were reprehensible, even in the heat of closing arguments " *Commonwealth v Johnson*, 719 A 2d 778 789-90 (Pa Super Ct 1998) Notwithstanding the apparent vigor of defense counsel's argument

[10] Defense counsel, Robert D Stein advised the court that he is Jewish

here, Mr Martinez s conduct was clearly both improper and unprofessional

¶32 The trial judge, who was present and able to view both the comportment of the attorneys and its effect on the jury, nonetheless determined that a mistrial was not warranted We defer to the trial court in its determination of such matters and we cannot say that the trial court clearly abused its discretion here As reprehensible as the prosecutor's analogy was, we believe any reasonable juror would have recognized the inappropriateness of this line of argument and discounted it Further the usual instruction was given the jurors during this phase of the trial advising them that counsel's arguments are not evidence Moreover the fact that despite these improper comments, the jurors were unable to reach a decision as to the "especially depraved" factor also leads us to conclude that defendant was not prejudiced by the comments and that the jurors carefully evaluated the evidence regarding the existence of aggravating factors Likewise, when we examine the entirety of counsel's conduct during this phase of the trial, we do not perceive that the cumulative misconduct so permeated the proceedings that defendant was deprived of a fair determination of the aggravating factors Therefore, we conclude that reversal for prosecutorial misconduct is unwarranted *See State*

v *Skinner* 110 Ariz 135, 149, 515 P 2d 880, 894 (1973) ("If the trial is fair, we will not reverse merely to punish the misdeeds of counsel "), *see also State v Valdez*, 160 Ariz 9 14 770 P 2d 313, 318 (1989) ("[W]here there has been misconduct of either the prosecutor or defense counsel, but reversal is not required the proper remedy will be affirmance followed by institution of bar disciplinary proceedings against the offending lawyer if such proceedings are warranted ") *overruled on other grounds by Krone v Hotham* 187 Ariz 364 366 890 P 2d 1149, 1151 (1995)

**CONCLUSION**

**¶33** For the foregoing reasons, we affirm defendant's conviction and sentence The clerk of this court is instructed to forward a copy of this decision to the Maricopa County Attorney and the disciplinary department of the State Bar of Arizona for its review

PHILIP HALL, Judge

CONCURRING

G MURRAY SNOW Judge

SUSAN A EHRLICH, Presiding Judge

Michael K Jeanes Clerk of Court
*** Electronically Filed ***
I OSUNA, Deputy
8/8/2014 8 23 28 AM
Filing ID 6035818

MICHAEL S REEVES, ESQ
State Bar Number 010420
1212 East Osborn
Phoenix, Arizona 85014
Tel [602] 604-7577
Fax [602] 604-7555
E Mail Michael Reeves@azbar org
Attorney for Defendant

MARICOPA COUNTY SUPERIOR COURT

STATE OF ARIZONA

| | |
|---|---|
| STATE OF ARIZONA,<br>Plaintiff,<br>Vs<br>BRYAN WAYNE HULSEY<br>Defendant | NO CR2007 111635-001<br>Defendant's Motion In Limine Re Prosecutor Commentary in Final Phase<br>Oral Argument Requested<br>(Honorable Joseph C Kreamer) |

Defendant Bryan Hulsey, by and through undersigned counsel, hereby requests that the Court preclude the State from making the following types of comments in **the penalty phase** either his opening statement or closing argument

Certain types of remarks are inappropriate and improper, but routinely made by prosecutors in opening remarks and in closing arguments First, the State in its opening should not be allowed to comment on the mitigators that it knows the defense will present, except in the specific instance where the State intends to rebut the mitigating factor The comment should be limited to a statement that the State will rebut mitigator A with the following rebuttal Second, examples of objectionable statements include comments that jurors should not act as advocates of mitigating factors, that jurors should not **review** the evidence or try to find mitigators, that there is a nexus requirement between mitigating factors and the crime, and that the defendant's mitigators even if proven are not worth consideration by the jury Third, that the State refrain from making as statements of facts, matters that were not brought out in the evidentiary portion of the trial Fourth, that the State should not make commentary on future dangerousness" of defendant or cross examine Defendant s expert Jim Aiken on that subject

**A Commentary During Opening**

It is not proper for the State to make comment on the quality of the defense mitigators in his opening statement. The opening statement is a preview of evidence to be presented, not of the arguments that will be made in closing arguments of the particular phase of the trial The Court should be wary of inappropriate argumentative statements by the State during opening and should on its own admonish counsel when argumentative statements are made during opening statements Even in closing argument, it is improper for the State to ridicule the mitigators presented by the defense

**B Objectionable Comments**

The State in its opening should not be allowed to comment in its opening on any of the mitigating factors the defense disclosed during discovery For example, the State should be limited to statements that the State will rebut mitigators discussed by the defense in its opening with the following rebuttal evidence In its opening, the State should not be permitted to denigrate or attempt to diminish the weight of mitigating factors as to which the State does not intend to present any evidence because so doing is argument, not a preview of the State's evidence

Examples of objectionable statements Mr Martinez has attempted to include in his final phase openings in other cases include comments that jurors should not act as advocates of mitigating factors, and that jurors should not review and investigate the evidence looking for mitigation or try to find mitigators The jurors can tell the other jurors what mitigating factors they found to exist in fact, the State insisted during jury selection in this case that the jurors are required to discuss their mitigation findings with their fellow jurors Further, the mitigating factor sufficient to call for a life sentence does not have be one that either the State or the defense raises, the jurors may make their own conclusion on what is a mitigating factor even going outside the presentation of the parties

Other objectionable points the State tries to include in its opening are that there is a

nexus requirement between mitigating factors and the crime There is no nexus requirement *Tennard v Dretke*, 542 U S 274 (2004)

The State should not be allowed to argue the purported mitigating factors are worthless because they did not cause the Defendant to commit the offense Mitigators are reasons to give life, they are not explanations for the crime and State should not be allowed to try and make it appear that the defendant by presenting mitigation is attempting to make an excuse for having committed the crime

The State should not argue that the Defendant's mitigators, even if proven, are not worth consideration by the jury The jurors have a duty to consider each and every mitigator that is proven by a preponderance of the evidence *Jones v U S*, 527 U S 373 (1999), *Penry v Lynaugh*, 492 U S 302 (1989), *Morgan v Illinois*, 504 U S 719 (1992)

The State cannot argue that the mitigators did not cause defendant to commit the murder This type of an argument is an attempt to make an improper comment on the fact that defendant has been convicted and therefore must be put to death The conviction is not a relevant consideration in mitigation The death penalty is not a mathematical formula and must not be turned into one by the prosecutor

The State should be required to refrain from making as statements of "facts," matters that were not brought out in the evidentiary portion of the trial In the trial and aggravation phases, the Court overruled the Defendant's objections to the prosecutor s claims regarding 'facts" as to which there was no evidence presented stating that it was up to the jury to decide whether the prosecutor was misstating the evidence That is not correct Early action by the Court when abuses occur serves as an ounce of prevention" that may avoid the necessity of declaring a mistrial later *State v Pool*, 139 Ariz 98, 104 and n 7, 677 P 2d 26, 267 (1984) ( 'lawyers, including prosecutors, must treat witnesses and parties with respect )

As the State has not listed a single rebuttal document or piece of evidence and as it has not given notice of but two rebuttal witnesses, the Court should be on guard for the inappropriate

comments of the State denigrating mitigation evidence without any evidence of its own

C New Evidentiary Claim

In the opening statement of the Aggravation Phase, the State made up a new claim that Officer Holly was shot while standing at the back of the Kia, that he stumbled a few steps and fell face down in the street He made the statement, not as part of any argument, but as a direct claim that the evidence had proven what happened to Officer Holly The intention in making the new claim was an attempt to convince the jury that Patsy Jones and Giota Kostas were in the zone of danger The statement was not supported by the facts that came out during the trial Mr Martinez should be admonished to not make statements of "fact" that are not supported by the evidence **If he misstates the evidence during any portion of the penalty phase, the Court should correct him in front of the jury**

D Future Dangerousness

Defendant does not plan any evidence on the issue of future dangerousness" and withdraws same from its list of mitigators previously presented This is a speculative area at best and not a statutory aggravator The State should be precluded from introducing any evidence of 'future dangerousness" or 'past violence" under the guise of cross-examination or under the auspices of rebuttal to defense expert Jim Aiken Mr Aiken will only give testimony as expressly authorized by *Skipper v North Carolina*, 476 U S 1, 106 S St 1669 (1986) *Skipper* testimony does not include future dangerousness" and such testimony is speculative and gives rise to a potential aggravating factor not recognized in Arizona

The State has provided no notice of any witness or document to rebut Mr Aiken s testimony Mr Aiken is an expert in prison management and adjustments matters He has conducted thousands of inmate classification evaluations relative to their adjustment to prison He has participated in the development of prison classification systems designed to better protect the inmate population from other more violent inmates and protect the public – including development of the prison classification system at the Arizona Department of Corrections His

opinion will be grounded partly upon Defendant s prior conduct while incarcerated and partly upon the prison s ability to effectively manage Defendant in the event the jury spares his life As *Skipper* recognized, if evidence of past behavior is precluded, the sentencing 'would not pass muster ' under *Lockett v Ohio*, 438 U S 586 (1978) and *Eddings v Oklahoma*, 455 U S 104 (1982)

Defendant moves in limine for an order precluding the State from posing questions aimed at the subject of "future dangerousness' or past violence under the guise of artful cross-examination, and calling any witness to testify that Defendant has allegedly been violent in the past, and/or arguing same The "thrust" of Defendant s mitigation proffered through Mr Aiken is that life in prison is a real and harsh penalty Any injection of 'future dangerousness" by the State is not only improper rebuttal to the "thrust of mitigation ', but also violates the Due Process Clauses of the State and Federal Constitutions As the Arizona State Supreme Court recognized in *State v Hampton*, 213 Ariz 167, 140 P 3d 950 (2006) Trial courts can and should exclude evidence that is either irrelevant to the thrust of the defendant's mitigation or otherwise unfairly prejudicial Nothing in our death penalty statutes strips courts of their authority to exclude evidence in the penalty phase if any probative value is substantially outweighed by the prejudicial nature of the evidence Trial courts should not allow the penalty phase to devolve into a limitless and standardless assault on the defendant's character and history Rather judges should exercise their broad discretion in evaluating the relevance of such bad acts evidence to any mitigation evidence offered *Hampton* 213 Ariz at 180, ¶51, *cf United States v Sanchez* 176 F 3d 1214, 1222 (9th Cir 1999), citing *Goldsmith v Witkowski*, 981 F 2d 697, 704 (4th Cir 1992)(prosecutor may not present inadmissible evidence through the back door )

Respectfully submitted this 8th day of August, 2014

__/s/ Michael S Reeves__________
Michael S Reeves,
Attorney for Brian Hulsey

_/s/ Patricia A Hubbard__________
Patricia A Hubbard,
Attorney for Brian Hulsey

CERTIFICATE OF SERVICE

Copy emailed this date
August 8th 2014, to

Honorable Joseph C Kreamer
Maricopa County Superior Court
South Court Tower
175 West Madison
Phoenix, Arizona 85003

Juan Martinez
Maricopa County Attorney's Office
301 W Jefferson
Phoenix, Az 85003

_/s/ Michael S Reeves_______

Michael K Jeanes Clerk of Court
*** Electronically Filed ***
R. Montoya, Deputy
7/22/2014 11 13 59 AM
Filing ID 6001334

Michael S Reeves (#010420)
Michael S Reeves Attorney at Law
1212 E Osborn Rd
Phoenix, Arizona 85014-5533
(602) 604-7577

Patricia A Hubbard (#013028)
Hubbard Law PLC
2000 N 7th St
Phoenix, Arizona 85006
(602) 694-2337

Attorney for Defendant

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

STATE OF ARIZONA,

Plaintiff,

vs

BRYAN WAYNE HULSEY,

Defendant

Case No CR 2007-111635-001 DT

**MOTION FOR MISTRIAL AND TO DISQUALIFY THE OFFICE OF THE MARICOPA COUNTY ATTORNEY FROM REPRESENTING THE STATE IN THIS MATTER**

(Honorable Joseph C Kreamer)

Oral Argument Requested

CAPITAL CASE

Extraordinary, improper, intentional actions by the prosecutor of this case have created a situation where the Defendant must move for a mistrial The prosecutor's improper conduct – intentional violation of this Court's order forbidding his mitigation expert from asking the Defendant questions about the charged offenses – directly violates the Defendant's federal and state constitutional rights The appropriate remedy is a mistrial The prosecutor's intentional violation of this Court's order should also disqualify County Attorney's office from representing the State in this matter See Order Granting Motion, dated 7/8/2014 (disqualifying the Pinal County Attorney's Office in a capital case), Exhibit A, attached

Pursuant to the Fifth, Sixth and Fourteenth Amendments to the United States Constitution, art 2, §§4, 11 and 24 of the Arizona Constitution, and the portions of the Rule 42 of the Rules of the Supreme Court of Arizona, the Defendant asks this Court to issue its Order declaring a mistrial, finding that jeopardy attached and barring retrial

This Motion is supported by the accompanying Memorandum Of Points And Authorities, the attached Exhibits and the court's entire file in this matter, all of which are incorporated herein by this reference

Respectfully submitted this 22nd day of July, 2014

/s/ *Michael S Reeves*
Michael S Reeves
Attorney for Defendant

/s/ *Patricia A Hubbard*
Patricia A Hubbard
Attorney for Defendant

## MEMORANDUM OF POINTS AND AUTHORITIES

### I RELEVANT FACTS

The State has had years to obtain a forensic evaluation of the Defendant by any mental health expert of its choosing to rebut the defense mitigation case, in the event Defendant was convicted of capital murder Less than a week before trial began, the State announced that its expert, Dr Hayes, was going to meet with the Defendant and evaluate him after jury selection began

Defendant filed a motion to preclude the evaluation by Dr Hayes Exhibit B, attached The motion objected to the evaluation The motion argued that subjecting the accused in a criminal case to an examination by a paid agent for the State is a violation of the privilege against self-incrimination in both the Fifth Amendment of the United States Constitution and Article 2, § 10 of the Arizona Constitution

Alternatively, should the Court allow the evaluation to proceed, the motion asked the Court to restrict Dr Hayes from asking any questions regarding the events of the case at hand Exhibit B, page 3 Defendant expressly invoked his 5th Amendment right to refuse to answer any questions about that day or the events leading up to that date and asked the Court to issue an order consistent with Arizona Supreme Court precedent

> The trial judge, however, must assure that an order subjecting a defendant to a mental health examination protects the defendant's privilege against self-incrimination The judge must fashion an order that ensures that no statement made by the defendant during the course of the examination, no testimony by the mental health expert based upon the defendant's statement, and no other fruits of the defendant's statements may be used by the prosecution or admitted into evidence against the defendant except on those issues on which the defendant introduces expert testimony during the penalty phase of the trial

*Phillips v Araneta*, 208 Ariz 280, 284 ¶ 14, 93 P 3d 480, 484 (2004) Defendant requested that his counsel be present if the evaluation was to occur pointing out that the Sixth Amendment mandates the presence of counsel at critical stages of the proceedings Exhibit B, pages 4-5 Finally, Defendant requests that the evaluation be audio and video recorded so that if there is any dispute over statements made by the Defendant or over the purpose of certain questions or testing, there is accurate documentation of what actually was said and what occurred Exhibit B, page 5

The Court denied all of the Defendant's requests except one [1] Concerned about violation of the Defendant Fifth Amendment and other constitutional rights, the Court ordered that Dr Hayes was prohibiting from asking the Defendant about the crimes with which he was charged The minute entry the Court issued in-artfully stated that "questions about the killing are off limits " Exhibit C, attached However, the Court's oral ruling at the hearing provide further guidance

The State's expert, Dr Hayes, met privately with the Defendant on July 10, July 11 and July 12, 2014, and questioned him for many, many hours Dr Hayes asked the Defendant about events that occurred during the shooting She asked him about the gunshot wound to his knee, asked him where he crawled, asked him how far he crawled, asked him what he said to the paramedics, asked him what he said to the officers who surrounded him Despite Officer Goitia's testimony that after he shot the Defendant both

[1] The Court denied the motion to preclude the evaluation, denied defense counsel's request to be present and denied defense counsel's request that the evaluation be recorded

he and the Defendant continued firing their guns, Dr Hayes believed she had cart blanche to ask about anything and everything that occurred after the Defendant was shot Further, she had Defendant draw a crime scene diagram and questioned him in detail about where the police cruisers were parked, where he was when he was shot, where the person who shot him was and so forth To obtain further details, Dr Hayes pulled up the official crime scene diagram on her computer and questioned the Defendant about that She asked him about specific items on the diagram including items E, 24 and 25 Dr Hayes acknowledged, during her in-court telephonic interview, that the Defendant told her she was not supposed to be asking him about events that occurred during the shooting and stated that, despite that, she continued to ask about events that occurred during the shooting beginning from the point where the Defendant was shot She said she did that because "no events after [the Defendant] was shot related to the capital offense " Dr Hayes said she knew there were three charges – first-degree murder, attempted first-degree murder and misconduct involving weapons – but was not asked to explain why she thought she could ask about everything except the capital offense

On July 14, 2014, defense counsel learned that Dr Hayes had violated the Court's order and questioned the Defendant about the crime and promptly brought this information to the Court's and the prosecutor's attention The prosecutor responded by asserting that defense mitigation experts asked the Defendant about the crime and challenged the Court's authority with this question **"Why can their experts ask about it but my expert can't?"** The Court responded "because there is a court order " Apparently unsatisfied with the Court's response, the prosecutor continued arguing It should be noted that the prosecutor never once argued that his expert did not violate the Court's order Rather, he argued that his expert was entitled to violate the Court's order

## II LAW & ANALYSIS

The Defendant's state and federal constitutional rights have been violated – his Fifth, Sixth and Fourteenth Amendment rights under the United States Constitution and his rights in Article 2, sections 4, 11 and 24 of the Arizona Constitution Defendant's

right to refuse to answer questions about the day of the incident and events leading up to that date has been violated Defendant's right to the assistance of counsel at all critical stages of the proceedings has been violated Defendant's rights to due process and a fair trial have been violated What happened here should never happen

What happened here was no mistake Instead, it was deliberate disregard of a court order The prosecutor never once argued that his expert, Dr Hayes, did not violate the Court's order When defense counsel learned the State's expert violated the Court's order and questioned the Defendant about events that occurred during the shooting, the prosecutor responded by asserting that defense mitigation experts asked the Defendant about the crime and challenged the Court's authority with this question **"Why can their experts ask about it but my expert can't?"** The Court responded "because there is a court order " Apparently unsatisfied with the Court's response, the prosecutor continued arguing It should be noted that the prosecutor never once argued that his expert did not violate the Court's order Rather, he argued that his expert was *entitled* to violate the Court's order – because it was wrong for the Court to preclude the State's experts from doing what the Defendant's experts can do

The issue for this Court to decide is What should the sanction be when the prosecutor intentionally violates a court order? Violating a court order is a very serious matter Doing so intentionally is "off the charts "

Recently, in Pinal County, a prosecutor intentionally violated a court order sealing certain documents the defense had filed The prosecutor in that case saw no problem in his office's disregarding the court order" because, in his view at least, the judge's order sealing the records was a "bad call," a "wrong ruling " Exhibit A, page 5 The court stated that "It is not for the County Attorney to decide that [the judge] somehow made a "bad call" or that he made a "wrong ruling " Exhibit A, page 8

When challenged with the prosecutor's question in this case – "Why can their experts ask about [the crimes] but my expert can't?" – this Court responded "because there is a court order " This Court rejected the prosecutor's argument that the defense

experts opened the door This Court emphatically told the prosecutor that **"the door is not open if the Court did not open it."**

The prosecutor in this case is by no means a rookie He is a very experienced prosecutor who has tried numerous serious felony cases including those requesting the death penalty The foregoing misconduct was not due to any mistake or negligence on his part It was done after careful discussion and limitations by this Court on the scope of his expert's questioning of the Defendant

When a prosecutor's violation of a court order, during trial, also violates the Defendant's federal and state constitutional rights, see *supra*, including his right to due process, mistrial is the appropriate sanction *See State v Trani*, 200 Ariz 383, 384 ¶ 6, 26 P 3d 1154 (App 2001) (mistrial is the appropriate sanction when prosecutorial misconduct deprives the defendant of a fair trial)

Where the prosecutor does so intentionally, a mistrial must be declared and the State should be precluded under principles of double jeopardy from retrying the Defendant *Pool v Superior Court* 139 Ariz 98, 677 P 2d 261 (1984)

The Defendant has suffered prejudice that cannot be cured by any means other than a mistrial The prosecutor is conclusively presumed to know everything that is known to his agents *See Kyle v Whitley* 514 U S 419, 438-39, 115 S Ct 1555, 1567-68, *see also Carpenter v Superior Court 176 Ariz 486* 489, 862 P 2d 246, 249 (1993)

No person shall be compelled in any criminal case to be a witness against himself *Kansas v Cheever,* 134 S Ct 596, 598 (2013) The privilege extends not only "to answers that would in themselves support a conviction but likewise embraces those which would furnish a link in the chain of evidence" *Ohio v Reiner,* 532 U S 17, 121 S Ct 1252 (2001) Now that the Defendant has been forced to sit and answer questions posed the State's agent, Dr Hayes – e g , about the crime scene, about where he crawled while he was being shot at – he has been compelled to be a witness against himself In addition, he was forced to do that without benefit of counsel at a critical stage in the proceedings

## III CONCLUSION

The prosecutor's intentional violation of this Court's order, by itself, is sufficient for a mistrial However, when the Defendant's federal and state rights are also violated, a mistrial must be declared

Respectfully submitted this 22nd day of July, 2014

/s/ *Michael S Reeves*
Michael S Reeves
Attorney for Defendant

/s/ *Patricia A Hubbard*
Patricia A Hubbard
Attorney for Defendant

Copies of the foregoing mailed/emailed/delivered on July 22, 2014, to

The Honorable Joseph C Kreamer
Maricopa County Superior Court
201 W Jefferson St
Phoenix, Arizona 85003

Juan Martinez
Deputy County Attorney
301 W Jefferson St, Ste 800
Phoenix, Arizona 85003

/s/ Patricia A Hubbard
Patricia A Hubbard



# SUPERIOR COURT OF ARIZONA

MARICOPA COUNTY

## Capital Defense Review Committee

John Canby Chair
Maricopa Public Defender s Office, 620 W Jackson, Suite 4015 Phoenix, Az 85003 602 506-7711 Ext 3-4487
canbyj@mail maricopa gov

November 19, 2015

Arizona State Bar
Attorney Discipline Records
Attn Teri Baldonado
4201 N 24th Street
Phoenix, Arizona 85016-6266
Teri baldonado@staff azbar org

Dear Teri

I am chairman of the Capital Defense Review Committee established pursuant to an administrative order of the Maricopa County Superior Court We are tasked with reviewing applicants who seek appointment to capital cases in Maricopa County I enclose endorsed releases from the following applicants which should permit the Bar to release any and all public and non-public records regarding disciplinary action as to each individual

- David Cutrer 020135
- Daniela De La Torre 021690
- Rebecca Felmly 019765
- Christopher Flores 018777
- Sandra Hamilton 019809
- Patricia Hubbard 013028
- Stacy Hyder 021832
- David Kephart 024136
- Diego Rodriguez 016733
- Jamie Sparks 022288
- Benjamin Taylor 023868

Please send the records to Maricopa Public Defender s Office, 620 W Jackson Suite 4015 Phoenix, Az 85003 or canbyj@mail maricopa gov Alternatively I can be reached at 602 506-7711, Ext 3-4487 if you would want to let me know when the documents are ready for pick up These documents have been provided to us free of charge in the past

Sincerely,

John Canby
Chair, Capital Defense Review Committee

# SECTION G

## Application Agreement

**Please read and initial each of the following agreements and sign below**

DAC 1 I authorize all persons firms officers, corporations organizations associations (including Bar Associations of other jurisdictions) State or Federal agencies and institutional to furnish to the Capital Defense Review Committee or any of its authorized representatives, all relevant documents, records or other information that may be requested in investigation of this application or in any investigation of my continuing satisfaction of Quality Assurance Plan

DAC 2 I authorize the Capital Defense Review Committee to consult with any persons who may have information relating to my professional qualifications credentials or character, ethics behavior or any other matter reasonably bearing on the criteria for initial and continued Quality Assurance review I further agree that all information received by the Committee shall be treated confidentially and that I have no right of access to information received by the Committee from third parties I specifically waive any right to review any reference or other evaluations made to the Committee whether solicited by me or the Committee In addition I agree not to seek discovery of such references and evaluations, formally or informally, in any legal proceeding or otherwise

DAC 3 I release, discharge and exonerate the Capital Defense Review Committee its members staff, agents or representatives and any person furnishing information and evaluations to the Capital Defense Review Committee, from any and all liability of every nature and kind arising from the investigation and evaluations of my application or my continued satisfaction under the Quality Assurance Plan

I David Anthony Cutrer, have carefully read the foregoing application and certify that the information therein is true or true to the best of my knowledge and belief I fully understand that failure to make a truthful disclosure of any material fact or item of information required may result in the rejection of my application

David Anthony Cutrer
Signature of Applicant

October 20th 2015
Date

## SECTION G

## Application Agreement

**Please read and initial each of the following agreements and sign below**

DD 1 I authorize all persons firms officers corporations, organizations, associations (including Bar Associations of other jurisdictions) State or Federal agencies and institutional to furnish to the Capital Defense Review Committee or any of its authorized representatives all relevant documents records or other information that may be requested in investigation of this application or in any investigation of my continuing satisfaction of Quality Assurance Plan

DD 2 I authorize the Capital Defense Review Committee to consult with any persons who may have information relating to my professional qualifications, credentials or character ethics, behavior or any other matter reasonably bearing on the criteria for initial and continued Quality Assurance review I further agree that all information received by the Committee shall be treated confidentially and that I have no right of access to information received by the Committee from third parties I specifically waive any right to review any reference or other evaluations made to the Committee, whether solicited by me or the Committee In addition, I agree not to seek discovery of such references and evaluations, formally or informally in any legal proceeding or otherwise

DD 3 I release discharge and exonerate the Capital Defense Review Committee, its members, staff agents or representatives and any person furnishing information and evaluations to the Capital Defense Review Committee, from any and all liability of every nature and kind arising from the investigation and evaluations of my application or my continued satisfaction under the Quality Assurance Plan

I Danula De La Torre, have carefully read the foregoing application and certify that the information therein is true or true to the best of my knowledge and belief I fully understand that failure to make a truthful disclosure of any material fact or item of information required may result in the rejection of my application

[signature]
Signature of Applicant

10/21/15
Date

**SECTION G**

## Application Agreement

**Please read and initial each of the following agreements and sign below**

RF 1 I authorize all persons firms officers corporations, organizations associations (including Bar Associations of other jurisdictions) State or Federal agencies and institutional to furnish to the Capital Defense Review Committee or anv of its authorized representatives all relevant documents records or other information that may be requested in investigation of this application or in any investigation of my continuing satisfaction of Quality Assurance Plan

RF 2 I authorize the Capital Defense Review Committee to consult with anv persons who may have information relating to my professional qualifications, credentials or character, ethics behavior, or any other matter reasonably bearing on the criteria for initial and continued Quality Assurance review I further agree that all information received by the Committee shall be treated confidentially and that I have no right of access to information received by the Committee from third parties I specificallv waive any right to review any reference or other evaluations made to the Committee whether solicited by me or the Committee In addition, I agree not to seek discovery of such references and evaluations formally or informally in any legal proceeding or otherwise

RF 3 I release, discharge and exonerate the Capital Defense Review Committee, its members staff, agents or representatives and any person furnishing information and evaluations to the Capital Defense Review Committee from any and all liability of every nature and kind arising from the investigation and evaluations of my application or mv continued satisfaction under the Quality Assurance Plan

I Rebecca Felmly have carefully read the foregoing application and certifv that the information therein is true or true to the best of my knowledge and belief I fully understand that failure to make a truthful disclosure of any material fact or item of information required may result in the rejection of my application

s/Rebecca Felmly
Signature of Applicant

10/23/15
Date

## SECTION G

### Application Agreement

**Please read and initial each of the following agreements and sign below**

1. I authorize all persons firms officers corporations organizations associations (including Bar Associations of other jurisdictions) State or Federal agencies and institutional to furnish to the Capital Defense Review Committee or any of its authorized representatives all relevant documents records or other information that may be requested in investigation of this application or in any investigation of my continuing satisfaction of Quality Assurance Plan

2. I authorize the Capital Defense Review Committee to consult with any persons who may have information relating to my professional qualifications credentials or character ethics behavior or any other matter reasonably bearing on the criteria for initial and continued Quality Assurance review I further agree that all information received by the Committee shall be treated confidentially and that I have no right of access to information received by the Committee from third parties I specifically waive any right to review any reference or other evaluations made to the Committee whether solicited by me or the Committee In addition I agree not to seek discovery of such references and evaluations formally or informally in any legal proceeding or otherwise

I release discharge and exonerate the Capital Defense Review Committee its members staff agents or representatives and any person furnishing information and evaluations to the Capital Defense Review Committee from any and all liability of every nature and kind arising from the investigation and evaluations of my application or my continued satisfaction under the Quality Assurance Plan

I *Chris Flores* have carefully read the foregoing application and certify that the information therein is true or true to the best of my knowledge and belief I fully understand that failure to make a truthful disclosure of any material fact or item of information required may result in the rejection of my application

*[signature]* 05772 ______________________ *10-21-15* ______________________
Signature of Applicant Date

## SECTION G

## Application Agreement

**Please read and initial each of the following agreements and sign below**

SKH 1 I authorize all persons, firms, officers, corporations, organizations, associations (including Bar Associations of other jurisdictions) State or Federal agencies and institutional to furnish to the Capital Defense Review Committee or any of its authorized representatives, all relevant documents, records or other information that may be requested in investigation of this application or in any investigation of my continuing satisfaction of Quality Assurance Plan

SKH 2 I authorize the Capital Defense Review Committee to consult with any persons who may have information relating to my professional qualifications, credentials or character ethics behavior or any other matter reasonably bearing on the criteria for initial and continued Quality Assurance review I further agree that all information received by the Committee shall be treated confidentially and that I have no right of access to information received by the Committee from third parties I specifically waive any right to review any reference or other evaluations made to the Committee, whether solicited by me or the Committee In addition, I agree not to seek discovery of such references and evaluations, formally or informally in any legal proceeding or otherwise

SKH 3 I release discharge and exonerate the Capital Defense Review Committee, its members, staff agents or representatives, and any person furnishing information and evaluations to the Capital Defense Review Committee, from any and all liability of every nature and kind arising from the investigation and evaluations of my application or my continued satisfaction under the Quality Assurance Plan

I Sandra K Hamilton, have carefully read the foregoing application and certify that the information therein is true or true to the best of my knowledge and belief I fully understand that failure to make a truthful disclosure of any material fact or item of information required may result in the rejection of my application

/s/ Sandra Hamilton
Signature of Applicant

October 18, 2015
Date

## SECTION G

### Application Agreement

**Please read and initial each of the following agreements and sign below**

ph 1. I authorize all persons firms officers corporations organizations associations (including Bar Associations of other jurisdictions) State or Federal agencies and institutional to furnish to the Capital Defense Review Committee or any of its authorized representatives all relevant documents records or other information that may be requested in investigation of this application or in any investigation of my continuing satisfaction of Quality Assurance Plan

ph 2. I authorize the Capital Defense Review Committee to consult with any persons who may have information relating to my professional qualifications credentials or character ethics behavior or any other matter reasonably bearing on the criteria for initial and continued Quality Assurance review I further agree that all information received by the Committee shall be treated confidentially and that I have no right of access to information received by the Committee from third parties I specifically waive any right to review any reference or other evaluations made to the Committee whether solicited by me or the Committee In addition I agree not to seek discovery of such references and evaluations formally or informally in any legal proceeding or otherwise

ph 3. I release discharge and exonerate the Capital Defense Review Committee its members staff agents or representatives and any person furnishing information and evaluations to the Capital Defense Review Committee from any and all liability of every nature and kind arising from the investigation and evaluations of my application or my continued satisfaction under the Quality Assurance Plan

I Patricia A Hubbard have carefully read the foregoing application and certify that the information therein is true or true to the best of my knowledge and belief I fully understand that failure to make a truthful disclosure of any material fact or item of information required may result in the rejection of my application

Signature of Applicant

11/6/15
Date

| Reference's Name | Job Title-Organization | Email Address |
|---|---|---|
| The Honorable Henry Gooday | Judge – Pinal County | HGGooday@courts az gov |

## SECTION G

## Application Agreement

**Please read and initial each of the following agreements and sign below**

SLH 1 I authorize all persons, firms, officers, corporations organizations, associations (including Bar Associations of other jurisdictions) State or Federal agencies and institutional to furnish to the Capital Defense Review Committee or any of its authorized representatives all relevant documents, records or other information that may be requested in investigation of this application or in any investigation of my continuing satisfaction of Quality Assurance Plan

SLH 2 I authorize the Capital Defense Review Committee to consult with any persons who may have information relating to my professional qualifications, credentials or character ethics, behavior or any other matter reasonably bearing on the criteria for initial and continued Quality Assurance review I further agree that all information received by the Committee shall be treated confidentially and that I have no right of access to information received by the Committee from third parties I specifically waive any right to review any reference or other evaluations made to the Committee whether solicited by me or the Committee In addition, I agree not to seek discovery of such references and evaluations, formally or informally in any legal proceeding or otherwise

SLH 3 I release discharge and exonerate the Capital Defense Review Committee its members, staff agents or representatives and any person furnishing information and evaluations to the Capital Defense Review Committee from any and all liability of every nature and kind arising from the investigation and evaluations of my application or my continued satisfaction under the Quality Assurance Plan

I Stacy L. Hyder, have carefully read the foregoing application and certify that the information therein is true or true to the best of my knowledge and belief I fully understand that failure to make a truthful disclosure of any material fact or item of information required may result in the rejection of my application

[signature] Signature of Applicant

October 23, 2015 Date

# SECTION G

## Application Agreement

**Please read and initial each of the following agreements and sign below**

___ 1 I authorize all persons, firms, officers, corporations organizations, associations (including Bar Associations of other jurisdictions) State or Federal agencies and institutional to furnish to the Capital Defense Review Committee or any of its authorized representatives all relevant documents records or other information that may be requested in investigation of this application or in any investigation of my continuing satisfaction of Quality Assurance Plan

___ 2 I authorize the Capital Defense Review Committee to consult with any persons who may have information relating to my professional qualifications, credentials or character, ethics behavior, or any other matter reasonably bearing on the criteria for initial and continued Quality Assurance review I further agree that all information received by the Committee shall be treated confidentially and that I have no right of access to information received by the Committee from third parties I specifically waive any right to review any reference or other evaluations made to the Committee whether solicited by me or the Committee In addition I agree not to seek discovery of such references and evaluations, formally or informally, in any legal proceeding or otherwise

___ 3 I release discharge and exonerate the Capital Defense Review Committee, its members, staff agents or representatives, and any person furnishing information and evaluations to the Capital Defense Review Committee from any and all liability of every nature and kind arising from the investigation and evaluations of my application or my continued satisfaction under the Quality Assurance Plan

I **David Jameson Kephart**, have carefully read the foregoing application and certify that the information therein is true or true to the best of my knowledge and belief I fully understand that failure to make a truthful disclosure of any material fact or item of information required may result in the rejection of my application

/s/ David Kephart
Signature of Applicant

10/23/2015
Date

## SECTION G

## Application Agreement

**Please read and initial each of the following agreements and sign below**

D R 1 I authorize all persons firms officers corporations organizations, associations (including Bar Associations of other jurisdictions) State or Federal agencies and institutional to furnish to the Capital Defense Review Committee or any of its authorized representatives all relevant documents, records or other information that may be requested in investigation of this application or in any investigation of my continuing satisfaction of Quality Assurance Plan

D R 2 I authorize the Capital Defense Review Committee to consult with any persons who may have information relating to my professional qualifications, credentials or character, ethics, behavior or any other matter reasonably bearing on the criteria for initial and continued Quality Assurance review I further agree that all information received by the Committee shall be treated confidentially and that I have no right of access to information received by the Committee from third parties I specifically waive any right to review any reference or other evaluations made to the Committee whether solicited by me or the Committee In addition, I agree not to seek discovery of such references and evaluations formally or informally, in any legal proceeding or otherwise

D R 3 I release, discharge and exonerate the Capital Defense Review Committee, its members staff, agents or representatives and any person furnishing information and evaluations to the Capital Defense Review Committee, from any and all liability of every nature and kind arising from the investigation and evaluations of my application or mv continued satisfaction under the Quality Assurance Plan

I, Diego Rodriguez have carefully read the foregoing application and certify that the information therein is true or true to the best of my knowledge and belief I fully understand that failure to make a truthful disclosure of any material fact or item of information required may result in the rejection of my application

/s/ Diego Rodriguez ______________________ 10/23/15

Signature of Applicant Date

## SECTION G

### Application Agreement

Please read and initial each of the following agreements and sign below

1 I authorize all persons, firms, offices, corporations, organizations, associations (including Bar Associations of other jurisdictions) State or Federal agencies and institutional to furnish to the Capital Defense Review Committee or any of its authorized representatives all relevant documents, records or other information that may be requested in investigation of this application or in any investigation of my continuing satisfaction of Quality Assurance Plan

2 I authorize the Capital Defense Review Committee to consult with any persons who may have information relating to my professional qualifications credentials or character ethics behavior or any other matter reasonably bearing on the criteria for initial and continued Quality Assurance review I further agree that all information received by the Committee shall be treated confidentially and that I have no right of access to information received by the Committee from third parties I specifically waive any right to review any reference or other evaluations made to the Committee, whether solicited by me or the Committee In addition, I agree not to seek discovery of such references and evaluations, formally or informally in any legal proceeding or otherwise

3 I release, discharge and exonerate the Capital Defense Review Committee its members staff agents or representatives, and any person furnishing information and evaluations to the Capital Defense Review Committee from any and all liability of every nature and kind arising from the investigation and evaluations of my application or my continued satisfaction under the Quality Assurance Plan

I Jamie Sparks, have carefully read the foregoing application and certify that the information therein is true or true to the best of my knowledge and belief I fully understand that failure to make a truthful disclosure of any material fact or item of information required may result in the rejection of my application

Signature of Applicant

10-23 2015
Date

## SECTION G

## Application Agreement

**Please read and initial each of the following agreements and sign below**

_BT_ 1 I authorize all persons, firms officers corporations, organizations associations (including Bar Associations of other jurisdictions) State or Federal agencies and institutional to furnish to the Capital Defense Review Committee or any of its authorized representatives all relevant documents records or other information that may be requested in investigation of this application or in any investigation of my continuing satisfaction of Quality Assurance Plan

_BT_ 2 I authorize the Capital Defense Review Committee to consult with any persons who may have information relating to my professional qualifications credentials or character, ethics behavior or any other matter reasonably bearing on the criteria for initial and continued Quality Assurance review I further agree that all information received by the Committee shall be treated confidentially and that I have no right of access to information received by the Committee from third parties I specifically waive any right to review any reference or other evaluations made to the Committee, whether solicited by me or the Committee In addition, I agree not to seek discovery of such references and evaluations formallv or informally, in any legal proceeding or otherwise

_BT_ 3 I release, discharge and exonerate the Capital Defense Review Committee, its members, staff, agents or representatives, and any person furnishing information and evaluations to the Capital Defense Review Committee, from any and all liability of every nature and kind arising from the investigation and evaluations of my application or my continued satisfaction under the Quality Assurance Plan

I, Benjamin Taylor, have carefully read the foregoing application and certify that the information therein is true or true to the best of my knowledge and belief I fully understand that failure to make a truthful disclosure of any material fact or item of information required may result in the rejection of mv application

_Esign/s/ Benjamin Taylor_ 10/21/2015

Signature of Applicant Date

John Canby
Capital Contract Review Committee
Office of the Public Defender
620 W Jackson Suite 4014
Phoenix Az 85003

Arizona State Bar
Attorney Discipline Records
Attn Teri Baldonado
4201 N 24th Street
Phoenix Arizona 85016-6266

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
Leslie King
Filing ID 16171
9/20/2006 6 57 58 PM

ANDREW P THOMAS
MARICOPA COUNTY ATTORNEY

Juan M Martinez
Deputy County Attorney
Bar Id # 009510
301 West Jefferson, 4th Floor
Phoenix, AZ 85003
Telephone (602) 506-5780
MCAO Firm # 00032000
Attorney for Plaintiff

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| THE STATE OF ARIZONA,<br><br>Plaintiff,<br><br>vs<br><br>**DOUGLAS D GRANT,**<br><br>Defendant | CR 2005-032986-001 SE<br><br>**RESPONSE TO MOTION TO DISMISS OR, IN THE ALTERNATIVE, MOTION FOR DEPOSITION**<br><br>(Assigned to the Honorable David M Talamante, Div T, Crj20) |

The State of Arizona, by the undersigned Deputy County Attorney, opposes the request for dismissal since there has been no prejudice to defendant Additionally, ordering the victims to submit to a deposition would be violative of Arizona law and that request should be denied Finally, a deposition of the detectives is not appropriate since they have not indicated a refusal to grant an interview This response is supported by the attached Memorandum of Points and Authorities

Submitted September _____, 2006

ANDREW P THOMAS
MARICOPA COUNTY ATTORNEY

BY /s/____________________________
/s/ Juan M Martinez
Deputy County Attorney

## MEMORANDUM OF POINTS AND AUTHORITIES

**FACTS**

The "premonition of her impending murder' letters written by Faylene Grant to family members were initially made available to Gilbert Police Department Detective James Palmer the first part of November, 2001 At that time, Detective Palmer made a copy of each letter and returned the originals to the family It is unknown where the detective stored those letters and it is now apparent that he lost them Neither Detective Palmer nor the Gilbert Police Department informed the State or the family that the copies of the letters were lost As far as the State and family were concerned, all letters were copied and impounded with the Gilbert Police Department

Every time an issue was raised regarding these letters, the family always responded that they had already made all letters available to Detective Palmer Eventually, in either June or July 2006, to doubly ensure that no letters were missed, the prosecutor requested that all letters, regardless of whether they had already been provided to the police, be again made available for copying Once that was accomplished, the letters were disclosed to defendant on August 7, 2006 Defendant was recently re-indicted on July 21, 2006 and no trial date has yet been set

It is worth mentioning that the letter written to Terina Eaves was disclosed twice, once on March 7, 2006 and then on August 7, 2006

**LAW AND ARGUMENT**

**A Dismissal is not an Appropriate Sanction Since Defendant has not been Prejudiced by this Disclosure**

The Arizona Supreme Court, in *State v Roque*, 141 P 3d 368, 485 Ariz Adv Rep 16, ¶50 (2000), held as follows regarding possible sanctions where there has been a disclosure violation

> Arizona Rule of Criminal Procedure 15 7 provides several sanctions that the trial court may impose for non-compliance with the rules of discovery, including "granting a continuance" or "[p]recluding a party from calling a witness, offering evidence or raising a defense not disclosed ' In selecting the appropriate sanction, the trial court should seek to apply sanctions that affect the evidence at trial and the merits of the case as little as possible since the Rules of Criminal Procedure are designed to implement, not to impede, the fair and speedy determination of cases Prohibiting the calling of a witness should be invoked only in those cases where other less stringent sanctions are not applicable to effect the ends of justice The court should also consider how vital the precluded witness is to the proponent's case, whether the opposing party will be surprised and prejudiced by the witness' testimony, whether the discovery violation was motivated by bad faith or willfulness, and any other relevant circumstances

Assuming arguendo that there has been a discovery violation, defendant has not demonstrated any prejudice since a trial date has yet to be set Additionally, these letters were made available to the grand jury to assist them in their determination of probable cause Further, defendant cannot claim he was surprised by the disclosure since he has known of their existence since the death of his wife Finally, there was no bad faith by either the prosecutor or the family since they were not aware that the letters were apparently lost by the

Gilbert Police Department Under these circumstances no sanctions should be imposed

**B The Victims' Bill of Rights Prohibits the Court From Ordering the "Victims" to Submit to an Interview or Deposition**

On November 6, 1990, the voters of the State of Arizona approved the Victims' Bill of Rights as an amendment to the Arizona Constitution Article II, § 2 1 of the Constitution of the State of Arizona states

> (A) To preserve and protect victims' rights to justice and due process, a victim of crime has a right
>
> 1 To be treated with fairness, respect, and dignity, and to be free from intimidation, harassment, or abuse, throughout the criminal justice process
>
> 5 To refuse an interview, deposition, or other discovery request by the defendant, the defendant's attorney, or other person acting on behalf of the defendant

The Victims' Bill of Rights defines a victim as

> (C) "Victim" means a person against whom the criminal offense has been committed or, if the person is killed or incapacitated, the person's spouse, parent, child or other lawful representative, except if the person is in custody for an offense or is the accused

The Arizona Revised Statutes, §13-4401(19) expands this definition to include the person's spouse, parent, child, grandparent or sibling, any other person related to the person by consanguinity or affinity to the second degree or any other lawful representative of the person " The defendant admits in his pleading that the individuals he wishes to question are family members of the decedent

The defense is requesting the court order the victims be placed under oath and questioned by defense counsel regarding a discovery issue These victims have invoked their Constitutional and statutory rights Therefore, any order by this court forcing the victims to submit to a defense interview or deposition would constitute a violation of Arizona Constitution and the Victims' Bill of Rights

**C The Court Should not Order the Deposition of Detectives James Palmer and Sy Ray since Both will Cooperate in Granting a Personal Interview**

Rule 15 3(a)(2), Arizona Rules of Criminal Procedure, requires that any individual sought to be deposed indicate an unwillingness to cooperate before the court may order a deposition That is not the case here since both detectives will agree to an interview In fact, Detective Sy Ray has already been interviewed for approximately 6 hours As such, the court should deny the request for depositions of these two detectives **CONCLUSION**

The request for a dismissal should be denied since there has been no prejudice to defendant Further, any order forcing the victims to submit to a defense interview would violate the Arizona Constitution and the Victim's Bill of Rights Lastly, the request for a deposition of Detectives James Palmer and Sy Ray should be denied since both detectives have indicated a willingness to be interviewed

Submitted September _____, 2006

ANDREW P THOMAS
MARICOPA COUNTY ATTORNEY

BY /s/
/s/ Juan M Martinez
Deputy County Attorney

Copy mailed\delivered
September _____, 2006,
to

The Honorable David M Talamante
Judge of the Superior Court

A Melvin McDonald, II
2901 North Central Avenue, Suite 800
Phoenix, AZ 85012-2703

BY /s/
/s/ Juan M Martinez
Deputy County Attorney

Michael K Jeanes Clerk of Court
*** Electronically Filed ***
11/14/2006 8 00 AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2005-032986-001 SE 11/08/2006

HONORABLE DAVID M TALAMANTE

CLERK OF THE COURT
D Ramirez
Deputy

STATE OF ARIZONA

v

DOUGLAS D GRANT (001)

JUAN M MARTINEZ

A MELVIN MCDONALD JR

PSA - SE
VICTIM SERVICES DIV-CA-SE

RULING

The Court has considered Defendant's Motion for Dismiss with Prejudice or, in the Alternative, to Depose Gilbert Police Detectives Ray and Palmer and Eaves Family Members along with State's Response and the Defendant's Reply

IT IS ORDERED denying Defendant's request for Oral Argument

For the reasons set forth in the State's Response,

IT IS ORDERED denying the Defendant's Motion to dismiss this matter

IT IS FURTHER ORDERED granting Defendant's Motion to depose Gilbert police detectives on the issues raised in Defendant's Motion

IT IS FURTHER ORDERED denying Defendant's Motion to depose family members that are 'victims' as defined by the AZ Constitution or A R S §13-4401(19)

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
11/14/2006 8 00 AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2005-032986-001 SE 11/09/2006

HONORABLE DAVID M TALAMANTE

CLERK OF THE COURT
D Ramirez
Deputy

STATE OF ARIZONA

v

DOUGLAS D GRANT (001)

JUAN M MARTINEZ

A MELVIN MCDONALD Jr

PSA - SE
VICTIM SERVICES DIV-CA-SE

ORDER

The Court has considered the State's Motion for Oral Deposition of Hilary Dewitt NKA Hilary Grant along with Defendant's Response and the Reply

Based on the memoranda submitted, the Court finds that the witness, has not yet refused the request for interview by the State However, the Court finds further that the Defendant has attempted to impermissibly restrict the State's ability to interview this witness

IT IS ORDERED denying the Motion for Oral Deposition of Hilary Dewitt NKA Hilary Grant

IT IS FURTHER ORDERED that the witness submit to an interview within 30 days of the date that this Order is filed by the Clerk of Court unless other satisfactory arrangements are stipulated to by the parties

IT IS FURTHER ORDERED that at the witness' interview that due consideration be given to the marital privilege provided by law

To the extent that Defendant is asking that the court establish further "guidelines' for the interview, that request is denied

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2005-032986-001 SE                                    11/09/2006


IT IS FURTHER ORDERED denying Defendant's request for oral argument

IT IS FURTHER ORDERED affirming Initial Pretrial Conference on November 29, 2006, at 8 30 A M

LAST DAY REMAINS  February 21, 2007

Michael K. Jeanes Clerk of Court
*** Electronically Filed ***
12/04/2013 8 00 AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2010-153913-001 DT 12/02/2013

HONORABLE WARREN J GRANVILLE

CLERK OF THE COURT
B McDonald
Deputy

STATE OF ARIZONA JUAN M MARTINEZ

v

RICHARD CHRISMAN (001) CRAIG MEHRENS
PATRICK G GANN

RULING

This Court has considered the State's Notice to use Defendant's conviction for Count 2 as a Historical Prior to enhance any sentence imposed for Count 1, Defendant's Motion to Strike, Defendant s objection (response), Defendant s reply, the case file, and the applicable case law The parties have waived oral argument Based upon the pleadings of counsel and the applicable statutes, this Court makes the following findings and rulings

On October 13, 2010, Defendant was indicted of Count 1, Second Degree Murder, Count 2, Aggravated Assault, and Count 3, Cruelty to Animals The charges stemmed from events occurring in the home of Daniel Rodriguez During what the State alleged to be approximately a five minute time span, Defendant, while serving as a Phoenix Police Officer, unlawfully pointed his service handgun at the victim, and then shot and killed the victim s dog, and then shot and killed the victim

If found guilty at trial as originally charged, Defendant would have been subject to sentencing under A R S 13-710(A) for Count 1, which means a range of 10 to 22 years, with a presumptive of 16 years

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

After a 23-day trial, the jury found Defendant guilty of Count 2, Aggravated Assault for unlawfully pointing his service handgun at the victim, but could not return a unanimous verdict with respect to Count 1, Second Degree Murder, or Count 3, Cruelty to Animals

The State intends to retry Defendant for the hung counts It has now noticed its intent to sentence Defendant as a Dangerous Repetitive offender should the jury convict him Thus, the range under 13-710(B) for Count 1 would be 15 to 25 years, with a presumptive of 20 years

The State argues that Defendant is eligible for the higher range because he now stands convicted of a Class 3 Dangerous Offense stemming from the jury's verdict on Count 2

The State's argument ignores the fact that Defendant's current posture is not the result of his conduct, but rather, the happenstance of a hung jury The State's argument is contrary to the intent expressed by Rule 26 14, '[w]here a judgment or sentence, or both, have been set aside on appeal, by collateral attack or on a post-trial motion, the court may not impose a sentence for the same offense which is more severe than the prior sentence ") Thus, if Defendant had been found guilty of all three charges in one trial but on appeal, the appellate court vacated Count 1 and remanded it for new trial on that count only, he would not be subjected to harsher punishment if convicted of Count 1 at the second trial

The State s interpretation of 13-710(B) creates the anomaly of harsher punishment for a defendant whose trial results in a mistrial as to some but not all counts, and allows the State to benefit from its failure to prove all charges at a first trial In interpreting statutes, the Court must strive to find and give effect to legislative intent, and to interpret the statute so as to give it a fair and sensible meaning *Walter v Wilkinson*, 198 Ariz 431, 10 P 3d 1218 (App 2000) Statutes must be given a sensible construction that accomplishes the legislative intent and which avoids absurd results *State v Affordable Bail Bonds*, 198 Ariz 34, 6 P 3d 339 (App 2000) Where a statute is subject to more than one interpretation, the rule of lenity requires that doubts be resolved in favor of the defendant and against imposing the harsher punishment. *State v Barnett*, 209 Ariz 352 101 P 3d 646 (App 2004)

Reading A R.S 13-710(B) in line with Rule 26 14, this Court finds that the legislative intent was to punish more severely those defendants who have committed on a separate occasion another second degree murder or class 2 or 3 dangerous felony To give effect to this intent and avoid the absurd result of punishing Defendant more severely simply because a jury could not render a verdict on all counts, this Court rules that 13-710(B) does not apply to Count 1 should a trial jury find him guilty

IT IS ORDERED striking the State's Notice pursuant to A R.S 13-710(B)

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2010 153913-001 DT                                    12/02/2013


This case is eFiling eligible  http //www clerkofcourt maricopa gov/efiling/default asp
Attorneys are encouraged to review Supreme Court Administrative Order 2011-140 to determine
their mandatory participation in eFiling through AZTurboCourt

Michael K Jeanes Clerk of Court
*** Electronically Filed ***
L Landeros Deputy
9/27/2013 3 55 35 PM
Filing ID 5472133

**MEHRENS & WILEMON, P A.**
Attorneys at Law
99 East Virginia Avenue, Suite 220
Phoenix, Arizona 85004
(602) 258-5151

CRAIG MEHRENS #001778
craig@mehrens-wilemon.com
AMY WILEMON #011141
amy@mehrens-wilemon com

Attorneys for Defendant

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| STATE OF ARIZONA<br><br>Plaintiff,<br><br>v<br><br>RICHARD CHRISMAN<br><br>Defendant | NO CR 2010-153913-001 DT<br><br>**MOTION FOR NEW TRIAL (Rule 24 1)**<br><br>Assigned to the Hon Warren J Granville<br><br>Oral Argument Requested |

Defendant Richard Chrisman, through counsel undersigned hereby moves this Court for a New Trial on the grounds that the prosecutor has been guilty of misconduct and that the verdicts are contrary to the weight of the evidence This Motion is made pursuant to the Fifth and Fourteenth Amendments to the United States Constitution Article II § 4 of the Arizona Constitution and ARCrimP Rule 24 1(c)(1) and (2)

**A. DEPRIVATION OF A MATERIAL WITNESS**

In a letter dated November 20 2012 after repeated requests from the defense, the prosecutor disclosed the witnesses he intended to use at trial Andrew Hinz,[1] who had tested the tasers in this case, was on the list The defense requested to interview

[1] The letter listed him as Hines

Mr Hinz on May 31, 2011, but the state did not arrange an interview until July 24 one week before trial Based on the interview the defense determined that Hinz' testimony was highly relevant and desired to secure his presence at trial in the event the state did not call him The defense requested from the state Hinz contact information The defense was informed that all contact with Mr Hinz must be made through their office Exhibit "A" hereto The state was subsequently served with a defense subpoena for Mr Hinz, and the state accepted said service Exhibit "B" hereto The defense attempted to make travel reservations for Mr Hinz though the County Attorney s Office without success His phone number was finally provided on August 20th, but Mr Hinz refused to cooperate with the defense Exhibit C" hereto The state finally provided Mr Hinz' address on August 22, well after trial had started and far too late to obtain Mr Hinz' presence with a subpoena since he resides in Colorado The state s actions cost Mr Chrisman a material witness [2]

**B CONTINUING PATTERN OF MISCONDUCT IN COURT**

From the beginning the state has engaged in a pattern of improper conduct beginning with Interim Maricopa County Attorney Rick Romley s release of the crack pipe incident to the media right after Mr Chrisman s arrest The prosecutor herein seized the baton and ran with it At one oral argument on a Motion to Remand before Judge Stephens the prosecutor stated that Mr Chrisman lied and failed his employment polygraph exam, and was investigated for stealing and lied about it as well The statements by the prosecutor were false Moreover, not only is this information inadmissible but also it had absolutely nothing to do with the legal or factual issues raised

[2] The importance of Andrew Hinz the Phoenix Police Department had hired Andrew Hinz, who at the time was employed by Taser International in Scottsdale Arizona He was hired to examine the Chrisman and Virgillo tasers including the cartridges and the three probes found at the scene His findings among others were the exact times that each taser was fired and that Chrisman s taser never completed the circuit He authored a 51 page report

in the Motion Instead, it was said solely because media was present in an attempt to spread false information about Mr Chrisman

Mr Martinez continued his inappropriate conduct during interviews with Mr Chrismans character witnesses For example he badgered one witness at length to force her to admit that she was in a same sex relationship and demanded her Social Security Number even though she was an employee of the Maricopa County Sheriff's Office Of another witness he demanded her ex-husband s phone number He asked several witnesses if they had attended parties with Richard Chrisman where disrobing activities had taken place

During the trial out of the presence of the jury but with the television and print media in the courtroom Mr Martinez volunteered that Mr Chrisman s cell phone records were important to his cross-examination of character witnesses because they showed "wife-swapping " Again, not true

During trial, Mr Martinez continued his inappropriate conduct in cross-examining defense witnesses For example, when he learned that Peoria Police Officer Lon Bartel was using his vacation time to testify as an expert for the defense he alleged he was a "double-dipper" and left the Peoria SWAT team without assistance He examined Sergeant Mattson on his Police Union ties and alleged the taxpayers were supporting him And with Mayra Hawkins Reesen he grilled her on her maternity leave and why she had been away from work so long yet had time to attend Mr Chrisman s trial He opened his cross with Sergeant Julie Egea by falsely accusing her of lying to him during his unsworn interview with her

Mr Martinez knew that Elvira Fernandez told Detective Cisneros that she lived in and owned the trailer but that she had put it in Daniel Rodriguez name after she

incurred some medical bills as she didnt want the trailer to be taken away from her Mr Martinez knew that basic search and seizure law gives any occupant of a residence the right to give consent to entry thereof Despite these facts he continually emphasized that Virgillo and Chrisman entered the trailer without a warrant, in an improper attempt to confuse and prejudice the jury At one point he attempted to have Virgillo testify that Ms Fernandez was not the titled owner of the trailer Several objections by defense counsel were sustained He then asked Officer Virgillo whether, if he had known that the trailer had belonged to Rodriguez, he would have gone about investigating the domestic violence crime differently Mr Martinez asked "How so?" The defense objected on relevance ground and when the Court asked Mr Martinez what the relevance was, he volunteered the answer he had been attempting to elicit from the witness "She doesnt own the trailer" And then when the Court again asked him for the relevance, he stated "She did not own the trailer"

**Mr Martinez' Closing Argument** In the beginning of his closing argument, Mr Martinez intentionally made several false statements concerning the evidence For example he stated four times that Richard Chrisman said Elvira Fernandez was hysterical when he spoke with her He told the jurors that Lon Bartel, a double-dipper testified that he wanted the jurors to believe "that SWAT members could look through walls" He stated that Sergeant Mattson and Sergeant Post (who had not even testified) returned Virgillo s "golden clipboard to put pressure on Virgillo to change his mind" He stated that Sergeant Egea was "Rich Chrisman s friend" and that Sergeant Mattson was a union organizer" All of the above statements were untrue and not in evidence nor were they reasonable inferences from the evidence

The above however was just Mr Martinez' warm up for his *pièce de*

*résistance* of duplicity Mr Martinez was unable to convince the Court **not** to give a *Willits* instruction In an attempt to neutralize this important instruction [3] he accused the defense witnesses of tampering with evidence Here is what he told the jurors He started by stating that the defense had "presented something to you that wasn t quite right " P 34 He said that Mayra Hawkins recollection of the AFIDs was a deception on her part " P 36 And then he moved to Eric Rude

> Did Eric Rude move that [evidence]? Probably Sure he did As he s the only one who had access to it There can be no other way about it P 40
>
> * * *
>
> Eric Rude moved those items He failed to preserve It wasn t Detective Porter It defendant s friend [4] P 43
>
> * * *
>
> And in light of what you have seen about things being moved by Eric Rude it is a staged scene for you Pp 46-47

And after accusing the defense witnesses of tampering with the evidence, he summed up his argument as follows

> Is that something that really you think the defendant should be given a double bonus for that just because his friend did that for him did them that favor? And because we have somebody by the name of Mayra Hawkins who wants to do him a favor to talk about something like that are you going to give him the double bonus? No that s not how it works
>
> But - - so therefore we don t have to even explain the loss destruction, or failure to preserve because it was, if you will, his friends that did it Pp 43-44

---

[3] The instruction was important for several reasons Significantly the Case Detective Kenny Porter had not known that when fired a taser ejects AFIDs which identify the taser fired Since Porter did not know AFIDs existed when he investigated the shooting he neither looked for nor seized any and more significantly did not have scene photographs taken before a storm significantly altered the crime scene

[4] There was no evidence that Officer Rude was a friend of Chrisman s

* * *

> There is a staging of the scene P 47

* * *

> We ll send Sergeant Mattson to talk to him along with Mark Post P 48

* * *

> He [Chrisman] tried to get help from his friends who were moving things around and they were talking about AFIDs P 67

Taken as a whole the conduct of this prosecutor before and during trial rises to the level of misconduct as contemplated by Rule 24 1(c)(2) entitling Chrisman to a new trial Counsel would suggest that this prosecutor has no interest in adhering to his obligation to see that "justice is done" but is only intent on obtaining convictions through intimidation, innuendo and accusations based on unreasonable inferences Arizona Supreme Court Justice Michael Ryan s statements contained in defense counsels Motion in Limine re Prosecutorial Misconduct are indeed prophetic

**C MOTION FOR NEW TRIAL ON AGGRAVATING FACTOR**

The defense incorporates the facts and argument contained in Motion to Vacate Judgment of Aggravating Factor "Emotional Harm" as reasons for a new trial on the aggravating factor as well

**D THE VERDICT IS CONTRARY TO THE WEIGHT OF THE EVIDENCE**

Assuming *arguendo* that the jury found that Chrisman pointed the gun at Rodriguez' head, the only evidence that the state has that Rodriguez was placed in "reasonable apprehension of immediate physical injury" was the testimony from Sergio Virgillo that Rodriguez "looked shocked His eyes were wide open " Rodriguez continued to argue with Chrisman immediately after that, then fought off both officers physical

attempts to subdue him fought off OC spraying and then tasing That evidence belies the finding that Rodriguez was apprehensive, or fearful, of physical injury when the gun was pointed at him If the state s theory is correct then anytime someone points a gun at another the person would be guilty of aggravated assault, which is not what the statute requires An expression of surprise for a second or two does not prove apprehension beyond a reasonable doubt

RESPECTFULLY SUBMITTED this 27th day of September, 2013

MEHRENS AND WILEMON, P A

By /s/ Craig Mehrens
Craig Mehrens
Attorney for Defendant

ORIGINAL of the foregoing e-filed
this 27th day of September, 2013, with

Clerk of the Court
*Maricopa County Superior Court*
201 W Jefferson
Phoenix, AZ 85003

COPIES of the foregoing e-mailed
this 27th day of September, 2013 to

Hon Warren J Granville
*Maricopa County Superior Court*
175 W Madison Suite 13103
Phoenix, AZ 85003
mtaube@superiorcourt maricopa gov

Juan Martinez, Esq
*Maricopa County Attorney's Office*
301 W Jefferson, 4th Floor
Phoenix, AZ 85003
martinej@mcao maricopa gov

Patrick G Gann, Esq
Law Offices of Patrick G Gann
522 W 1st Street # 104
Tempe, AZ 85281
PGGann@mac com

/s/ Amy Wilemon
Amy Wilemon

Michael K. Jeanes Clerk of Court
*** Electronically Filed ***
07/13/2010 8 00 AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2010-106178-001 SE 07/07/2010

HONORABLE CHRISTOPHER WHITTEN

CLERK OF THE COURT
A Moore
Deputy

STATE OF ARIZONA

v

DAIMEN JOSEPH IRIZARRY (001)

JUAN M MARTINEZ

CHARLES K SHELL

VICTIM SERVICES DIV-CA-SE

TRIAL MINUTE ENTRY
DAY 2

State s Exhibit 97 is marked for identification

10 25 a m Trial to Jury continues from 7/6/2010

| | |
|---|---|
| State's Attorney | Juan Martinez |
| Defendant's Attorney | Chad Shell |
| Defendant | Present |
| Court Reporter | Pamela Remus |

The jury is not present

A discussion is held regarding what statements may be allowed during opening statements

Defense counsel makes a record regarding objections made during brief opening statements

(10 30 a m ) The jury is present

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2010 106178-001 SE                                    07/07/2010

Opening statements

State's case

Christopher Toth is sworn and testifies

State's Exhibit 97 is received in evidence

State s Exhibits 3 and 4 are received in evidence

Charles Langley is sworn and testifies

State's Exhibit 8 is received in evidence

State's 5, 6 and 7 are received in evidence

Stan Wilbur is sworn and testifies

12 03 p m   Court stands at recess

1 35 p m  Court reconvenes with defendant and respective counsel present  The jury is
present

Court Reporter  Pamela Remus

Stan Wilbur retakes the stand and testifies further

Defendant's Exhibit 72, marked for identification as State s 72, is received in evidence

Defendant's Exhibit 98 is marked for identification

Ryan Churchman is sworn and testifies

State's Exhibits 60, 61 and 62 are received in evidence

State's Exhibit 92 is received in evidence

Defendant s Exhibit 99 is marked for identification

Garth McClellan is sworn and testifies

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

State's Exhibits 24 through 31 are received in evidence

State's Exhibit 100 is marked for identification and is received in evidence

State's Exhibit 101 is marked for identification

State's Exhibit 101 is received in evidence

State s 102, 103, 104 and 105 are marked for identification

State's Exhibits 102, 103, 104 and 105 are received in evidence

State s Exhibit 106 is marked for identification

State s Exhibit 106 is received in evidence

The witness is excused subject to recall

Jason Henderson is sworn and testifies

State's Exhibits 64, 65, 66 and 67 are received in evidence

State s Exhibits 68, 69, 70, 71 and 73 are received in evidence

3 04 p m Court stands at recess

3 22 p m Court reconvenes with defendant and respective counsel present The jury is not present

Court Reporter Pamela Remus

A discussion is held regarding trial schedule

(3 24 p m ) The jury is present

Jason Henderson retakes the stand and testifies further

State's Exhibits 74 through 83 are received in evidence

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2010-106178-001 SE 07/07/2010

State s Exhibits 107 and 108 are marked for identification

State's Exhibits 84 and 85 are received in evidence

State's Exhibit 109 is marked for identification

State's Exhibit 109 is received in evidence

State's Exhibits 93, 94, 95 and 96 are received in evidence

State's Exhibit 110 is marked for identification and is received in evidence

State's 109 001 is marked for identification and received in evidence

John Jolly is sworn and testifies

State s Exhibits 111, 112, 113, 114 and 115 are marked for identification

State's Exhibits 111, 112, 113, 114 and 115 are received in evidence

Stewart Raley is sworn and testifies

Jeffrey Cross is sworn and testifies

State's Exhibit 116 is marked for identification and received in evidence

The jury is directed to avoid media coverage and is excused for the evening

4 43 p m Court stands at recess until July 8, 2010 at 10 30 a m

This case is eFiling eligible http //www clerkofcourt maricopa gov/efiling/default asp

Michael K. Jeanes Clerk of Court
*** Electronically Filed ***
07/14/2010 8 00 AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2010-106178-001 SE 07/08/2010

HONORABLE CHRISTOPHER WHITTEN

CLERK OF THE COURT
S M Perez
Deputy

STATE OF ARIZONA JUAN M MARTINEZ

v

DAIMEN JOSEPH IRIZARRY (001) CHARLES K SHELL

VICTIM SERVICES DIV-CA-SE

**TRIAL MINUTE ENTRY**
**DAY (3) THREE**

| | |
|---|---|
| State's Attorney | Juan Martinez |
| Defendant's Attorney | Chad Shell |
| Defendant | Present |
| Court Reporter | Pamela Remus |

11 01 a m Trial to Jury continues from July 7, 2010

The jury is not present

Counsel for the State advises that he has found case law to support the reading of the charging document into the record

The Court advises counsel to provide this case law to the Court for further review

10 55 a m The jury is present in the courtroom

**State's case continues**

Kumari Cooper is sworn and testifies

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2010-106178-001 SE 07/08/2010

State's exhibit 117 is marked for identification

State's exhibit 117 is received in evidence

Justin Betts is sworn and testifies

Defendant's exhibit 118 is marked for identification.

The witness is excused subject to recall

William Caouette is sworn and testifies

Defendant's exhibit 119 is marked for identification

12 02 p m The jury is reminded of previous admonitions and excused from the courtroom Court remains in session

Defense counsel is admonished for muttering expletives during the course of trial

Family members within the courtroom are admonished for displaying verbal or non-verbal cues while the jurors are present

Defense counsel requests that the State provide the witness Justin Betts with a copy of the taped interview

12 04 p m Court stands at recess

1 28 p m Court reconvenes with respective counsel present The Defendant is present

Court reporter, Pamela Remus, is present.

The Court advises the parties that due to a conflict within the State's schedule, Trial shall proceed until the parties in the State s other case are all present and able to reconvene

1 30 p m The jury is returned to the courtroom

State's exhibit 120 is marked for identification

Jon Tew is sworn and testifies

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2010 106178-001 SE                                    07/08/2010


1 41 p m   The jury is reminded of previous admonitions and excused from the courtroom   Court stands at recess

1 55 p m   Court reconvenes with respective counsel present   The Defendant is present The jury is not present

Court reporter, Pamela Remus, is present

A juror note is submitted, same is discussed

The Court will take the jurors note under advisement

Counsel for the State advises that there was contact between defense counsel and Officer Betts, who is a listed victim in this case

The Court advises that this issue shall be discussed further at the conclusion of this hearing

1 58 p m   The jury is returned to the courtroom

John Tew retakes the stand and testifies further

State s exhibit 120 is unsealed by the witness

Melissa Kingsley is sworn and testifies

State's exhibit 121 is marked for identification

State's exhibit 121 is received in evidence

Kenneth Burnside is sworn and testifies

David Bishop is sworn and testifies

State's exhibits 14, 15, and 16 are received in evidence

State's exhibits 36 through 43 are received in evidence

State's exhibits 89 and 90 are received in evidence

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

Christopher Marrufo is sworn and testifies

Defendant's exhibit 122 is marked for identification

3 28 p m The jury is reminded of previous admonitions and excused from the courtroom Court remains in session

Discussion is held re defense counsel s interaction with Officer Betts

3 30 p m Court stands at recess

3 45 p m Court reconvenes with respective counsel present The Defendant is present The jury is not present.

Court reporter, Pamela Remus, is present.

Justin Betts retakes the stand and testifies re the interaction between defense counsel and himself

3 46 p m Court stands at recess

3 47 p m Court reconvenes with respective counsel present The Defendant is present The jury is not present

Court reporter, Pamela Remus, is present

The Court advises that it will be accepted that defense counsel forgot that Officer Betts was a victim in this case and that no harm was done

Discussion is held

3 51 p m The jury is returned to the courtroom

Christopher Marrufo retakes the stand and testifies further

Defendant's exhibit 122 is offered but not received in evidence

Edward Pollard is sworn and testifies

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2010 106178-001 SE 07/08/2010

Defendant's exhibit 123 is marked for identification

4 56 p m The jury is reminded of previous admonitions and excused for the evening Court remains in session

Discussion is held re testimony

4 58 p m Court stands at recess until July 19, 2010 at 10 30 a m

This case is eFiling eligible http //www clerkofcourt maricopa gov/efiling/default asp

# EXHIBITS TO 4/8/16 RESPONSE LETTER

# Exhibit 1

215 Ariz. 324
Supreme Court of Arizona.

STATE of Arizona, Appellee,
v
Cory Deonn MORRIS Appellant.

No CR-05-0267-AP
|
June 18 2007

Synopsis
**Background** Defendant was convicted in the Superior Court, Maricopa County Douglas L Rayes J of capital murders for deaths of five victims and was sentenced to death

**Holdings** On automatic appeal, the Supreme Court, McGregor C J held that

[1] independent evidence apart from defendant s incriminating statements to police was sufficient to establish corpus delicti for deaths of two victims

[2] any error in defendant s exclusion from jury prescreening process that focused on prospective jurors who felt they could not serve in trial expected to last between six to eight weeks was harmless

[3] medical examiners post autopsy receipt of copies of defendant s statements to police regarding strangulation of two victims did not constitute prosecutorial misconduct

[4] prosecutor s comments did not rise to level of fundamental error

[5] excluded photograph showing maggot infestation, kept on prosecutor s table throughout guilt phase of trial, did not rise to level of prosecutorial misconduct;

[6] autopsy photographs were not so gruesome or irrelevant such that they were admitted for sole purpose of inflaming jury

[7] 'prior serious offenses aggravator was supported by evidence that defendant had killed five victims,

[8] evidence supported finding that murders were especially cruel and

[9] mitigating factors were not sufficiently substantial to warrant leniency in sentencing.

Affirmed.

West Headnotes (46)

[1] **Criminal Law**
Homicide mayhem and assault with intent to kill

Independent evidence apart from defendant s incriminating statements to police was sufficient to establish corpus delicti for deaths of two victims in trial for capital murder despite advanced state of decomposition that precluded determination of trauma to head and neck of both victims both victims were discovered naked in same alley just north of defendant s residence drag marks near both bodies indicated that victims had been moved DNA on panties and clothing found in defendant s camper matched victims DNA, and defendant was carrying one of victim s driver's license, social security card at time of arrest.

3 Cases that cite this headnote

[2] **Criminal Law**
Evidence dependent on preliminary proofs

An appellate court reviews a ruling on the sufficiency of the evidence of corpus delicti for abuse of discretion

13 Cases that cite this headnote

[3] **Criminal Law**
Corpus delicti

The 'corpus delicti" doctrine ensures that a defendant s conviction is not based upon an uncorroborated confession or incriminating statement, therefore, the State must show that the alleged injury to the victim was caused by criminal conduct rather than by suicide or accident.

14 Cases that cite this headnote

[4] **Criminal Law**
Corpus delicti

Only a reasonable inference of the corpus delicti need exist before incriminating statements may be considered, and circumstantial evidence can support such an inference

12 Cases that cite this headnote

[5] **Criminal Law**
Proof of corpus delicti

The State need not present evidence supporting the inference of corpus delicti before it submits the defendant s statements as long as the State ultimately submits adequate proof of the corpus delicti before it rests

4 Cases that cite this headnote

[6] **Criminal Law**
Homicide, mayhem, and assault with intent to kill

The corpus delicti doctrine does not require the State to prove the cause of death

4 Cases that cite this headnote

[7] **Jury**
Competence for Trial of Cause
**Jury**
Excusing and Discharging Jurors from Attendance

Defendant was not deprived right of trial by fair and impartial jury in trial for capital murder based on claim that jury commissioner improperly released sixteen of 20 prospective jurors to other panels in light of jurors inability to serve over trial expected to last between six to eight weeks, and therefore that defendant was left only with "volunteers" to serve on jury commissioner had discretion to excuse jurors based on neutral criteria, and defendant could not show that jurors who served were not fair and impartial U S C.A. Const Amend 6 A R.S § 21-315(A)

11 Cases that cite this headnote

[8] **Jury**
Competence for Trial of Cause
**Jury**
Right to particular juror or jury

Although a defendant in a criminal case is entitled to a fair and impartial jury for the trial of his case he is not entitled to be tried by any particular jury U S C A Const.Amend 6

10 Cases that cite this headnote

[9] **Jury**
Representation of community in general

To make a prima facie showing that a jury does not represent a fair cross section of the community a defendant must show (1) that the group alleged to be excluded is a distinctive group in the community (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community and (3) that this

underrepresentation is due to systematic exclusion of the group in the jury selection process U S C A Const.Amend. 6

6 Cases that cite this headnote

[10] **Jury**
Excusing and Discharging Jurors from Attendance

Jury commissioners have broad discretion to excuse jurors from service. A R.S § 21–315(A)

Cases that cite this headnote

[11] **Criminal Law**
Absence of accused

Any error in defendant's exclusion from jury prescreening process, which focused on prospective jurors who felt they could not serve in capital murder trial expected to last between six to eight weeks in alleged violation of right to be present during all critical stages of criminal proceedings was harmless, where no prospective juror was questioned during prescreening process about facts or legal issues of case

4 Cases that cite this headnote

[12] **Criminal Law**
Prejudice to rights of party as ground of review

An error is "harmless if it appears beyond a reasonable doubt that the error did not contribute to the verdict obtained.

3 Cases that cite this headnote

[13] **Criminal Law**
Conduct of counsel in general

To prevail on a claim of prosecutorial misconduct, a defendant must demonstrate that the prosecutor s misconduct so infected the trial with unfairness as to make the resulting conviction a denial of due process U S C A Const.Amend 14

34 Cases that cite this headnote

[14] **Criminal Law**
Conduct of counsel in general

In order to prevail on a claim of prosecutorial misconduct, the misconduct must be so pronounced and persistent that it permeates the entire atmosphere of the trial

24 Cases that cite this headnote

[15] **Criminal Law**
Conduct of counsel in general

Prosecutorial misconduct constitutes reversible error only if (1) misconduct exists and (2) a reasonable likelihood exists that the misconduct could have affected the jury s verdict, thereby denying defendant a fair trial

29 Cases that cite this headnote

[16] **Criminal Law**
Necessity of Objections in General

If a defendant fails to object, then the appellate court reviews the claim only for fundamental error

1 Cases that cite this headnote

[17] **Criminal Law**
Conduct of counsel in general

Even if there is no error in the context of a claim of prosecutorial misconduct or an error is harmless and so by itself does not warrant reversal, an incident may nonetheless contribute to a finding of persistent and pervasive misconduct if the cumulative effect of the incidents shows that the prosecutor intentionally engaged in improper conduct and did so with indifference, if not a specific intent, to prejudice the defendant.

15 Cases that cite this headnote

[18] **Criminal Law**
Ex parte communications by prosecutor

Medical examiners post autopsy receipt from prosecutor of copies of defendant's statements to police regarding strangulation of two victims did not constitute prosecutorial misconduct by allegedly influencing examiners testimony regarding cause of death initially determined to be drug overdose, in trial for capital murder; police had statutory obligation to report results of investigation into facts and circumstances surrounding suspicious death, head and neck of both victims had been decomposed to extent that examiners had not been able to determine whether trauma had occurred to that region, and examiners found nothing inconsistent with asphyxiation due to strangulation as cause of death

Cases that cite this headnote

[19] **Criminal Law**
Homicide and assault with intent to kill

Prosecutor's comment during aggravation phase of capital murder trial that defendant had murdered victims in order to have sexual intercourse with their corpses was reasonable inference based on evidence presented at trial that skin slippage existed on selective body parts of victims, which resulted from friction and general decomposition process, that one victim had skin defects on her anus which was level with defendant s bed, and that defendant s semen was present in vaginas of two victims even though defendant insisted he wore condom during sex with victims before their deaths

Cases that cite this headnote

[20] **Criminal Law**
Statements as to Facts and Arguments

Prosecutors have wide latitude in presenting their arguments to the jury

13 Cases that cite this headnote

[21] **Criminal Law**
Matters Not Sustained by Evidence
**Criminal Law**
Inferences from and Effect of Evidence

The prosecutor is permitted to argue all reasonable inferences from the evidence, but cannot make insinuations that are not supported by the evidence

7 Cases that cite this headnote

[22] **Criminal Law**
Statements as to Facts, Comments and Arguments

In evaluating the propriety of a prosecutor s arguments, the appellate court considers whether the remarks called to the jurors attention matters that they should not consider, and whether under the circumstances of the particular case, the remarks probably influenced

the jurors

7 Cases that cite this headnote

[23] **Sentencing and Punishment**
Harmless and reversible error

Even if prosecutor s comment during aggravation phase of capital murder that defendant murdered victims in order to have sexual intercourse with their corpses was not reasonable inference from evidence presented at trial, any error was harmless, in that jury was instructed that arguments were not evidence jury was presumed to follow trial court s instructions and argument was directed toward establish "heinous or depraved" aggravator whereas jury found that each murder was committed in especially cruel manner

24 Cases that cite this headnote

[24] **Sentencing and Punishment**
Arguments and conduct of counsel
**Sentencing and Punishment**
Presentation and reservation in lower court of grounds of review

Prosecutor s invitation to select female jurors as to whether they thought it would hurt if defendant sat on their chests whether they would enjoy having tie around their neck, and whether they would feel good if they could not breathe although improper appeal to jurors passions and emotions, did not amount to fundamental error in trial for capital murder defendant could not show that isolated comment deprived of him of essential right, comment was directed to especially cruel" aggravator and prosecutor presented independent overwhelming evidence of cruelty, including medical examiner s testimony that all victims would have experienced pain for some period of time before losing consciousness, and evidence that at least three victims struggled with defendant before losing consciousness A R S § 13–703(F)(6)

6 Cases that cite this headnote

[25] **Criminal Law**
Statements as to Facts and Arguments
**Criminal Law**
Appeals to Sympathy or Prejudice
**Criminal Law**
Appeals to fears of jury

A prosecutor has wide latitude in presenting arguments to the jury including commenting on the vicious and inhuman nature of the defendant s acts, but cannot make arguments that appeal to the fears or passions of the jury

17 Cases that cite this headnote

[26] **Criminal Law**
Burden of showing error

On a claim of fundamental error the defendant bears the burden of persuasion and must establish both that fundamental error exists and that the error in his case caused him prejudice

1 Cases that cite this headnote

[27] **Criminal Law**
Necessity of Objections in General

"Fundamental error" is error going to the foundation of the case, error that takes from the defendant a right essential to his defense and error of such magnitude that the defendant could not possibly have received a fair trial

3 Cases that cite this headnote

[28] **Sentencing and Punishment**
⊕Arguments and conduct of counsel
**Sentencing and Punishment**
⊕Presentation and reservation in lower court of grounds of review

Prosecutor's reference during closing argument of guilt phase of capital murder trial to jury s "smelling pleasure" with respect to putrid odor emanating from jacket that was removed from evidence bag during trial, although inappropriate, did not rise to level of fundamental error that deprived defendant of fair trial jacket had been offered for permissible purpose to show that it belonged to victim, and strong odor associated with jacket resulted from its close proximity to victim s badly decomposed body at time it was discovered.

2 Cases that cite this headnote

[29] **Criminal Law**
⊕Use of exhibits and demonstrative evidence

Excluded photograph kept on prosecutor s table throughout guilt phase of capital murder trial showing maggot infestation did not rise to level of prosecutorial misconduct, there was no indication that any juror saw photograph, counsel did not ask judge to determine whether any juror had seen photograph or to instruct jurors to disregard photograph, and prosecutor complied with judge s order to remove photograph from view

Cases that cite this headnote

[30] **Criminal Law**
⊕Photographs arousing passion or prejudice, gruesomeness

Autopsy photographs of one victim s body were not so gruesome or irrelevant such that they were admitted for sole purpose of inflaming jury in trial for capital murder· four showed victim's hands or feet and one showed her body from distance and photographs were relevant to show manner of death or to corroborate State s case

10 Cases that cite this headnote

[31] **Criminal Law**
⊕Documentary evidence

The appellate court reviews a trial judge s decision to admit photographs for abuse of discretion.

Cases that cite this headnote

[32] **Criminal Law**
⊕Photographs and Other Pictures
**Criminal Law**
⊕Photographs arousing passion or prejudice, gruesomeness

A reviewing court looks to three factors to determine whether the trial judge erred in admitting photographs the photograph s relevance, its tendency to inflame the jury, and its probative value compared to its potential to cause unfair prejudice

8 Cases that cite this headnote

[33] **Criminal Law**
⊕Depiction of Injuries or Dead Bodies

Photographs of a victim s body are always relevant because the fact and cause of death are always relevant in a murder prosecution.

1 Cases that cite this headnote

[34] **Criminal Law**
⊕Purpose of admission

Photographs of a victim s body may be introduced to prove the corpus delicti to identify the victim to show the nature and location of the fatal injury, to help determine the degree or atrociousness of the crime to corroborate state witnesses, to illustrate or explain testimony and to corroborate the State s theory of how and why the homicide was committed.

1 Cases that cite this headnote

[35] **Criminal Law**
Photographs arousing passion or prejudice, gruesomeness

If photographs of a victim s body have no tendency to prove or disprove any question which is actually contested, they have little use or purpose except to inflame and would usually not be admissible

2 Cases that cite this headnote

[36] **Criminal Law**
Photographs arousing passion or prejudice gruesomeness
**Criminal Law**
Documentary and demonstrative evidence

Gruesome or inflammatory photographs may be admitted, but if they are admitted for the sole purpose of inflaming the jury the appellate court will reverse on appeal

8 Cases that cite this headnote

[37] **Sentencing and Punishment**
Discretion of lower court

The Supreme Court was required to review defendant s death sentences for capital murder for abuse of discretion regardless whether defendant raised challenge to penalty phase on appeal A R.S § 13-703 05

10 Cases that cite this headnote

[38] **Statutes**
Intent

The primary goal of statutory interpretation is to effect the intent of the legislature

1 Cases that cite this headnote

[39] **Statutes**
Plain language plain, ordinary common, or literal meaning

If the language of a statute is plain and unambiguous, the court looks no further

Cases that cite this headnote

[40] **Criminal Law**
Discretion of Lower Court

Under an abuse of discretion standard of review the appellate court upholds a decision if there is any reasonable evidence in the record to sustain it.

14 Cases that cite this headnote

[41] **Sentencing and Punishment**
Other matters related to offense

Jury s finding of prior serious offenses aggravator in sentencing for capital murder was supported by evidence that defendant had killed five victims A R.S § 13-703(F)(2)

Cases that cite this headnote

[42] **Sentencing and Punishment**
Vileness, heinousness or atrocity

Jury s finding that murders were committed in especially cruel manner as aggravating factor in sentencing for capital murder was supported by evidence indicating that each victim was conscious for period of time and suffered physical pain and mental anguish before losing consciousness, and that at least three victims had struggled with defendant prior to losing consciousness A.R.S § 13–703(F)(6)

10 Cases that cite this headnote

[43] **Sentencing and Punishment**
Vileness heinousness, or atrocity

A finding of cruelty alone is sufficient to establish the aggravating factor that the murders were especially cruel heinous, or depraved. A R.S § 13–703(F)(6)

3 Cases that cite this headnote

[44] **Sentencing and Punishment**
Childhood or familial background
**Sentencing and Punishment**
Other matters related to offender

Mitigating evidence that defendant had long standing problems with appearance and hygiene that responsibilities were placed on him at young age that he desired to improve himself, and that he had good record, was not sufficiently substantial to call for leniency sentence in sentencing for capital murder of five victims that were committed in especially cruel manner

9 Cases that cite this headnote

[45] **Sentencing and Punishment**
Evidence in mitigation in general

The fact finder in capital cases must be able to consider all relevant mitigating evidence in deciding whether to give the death penalty

Cases that cite this headnote

[46] **Sentencing and Punishment**
Aggravating or mitigating circumstances

The aggravating factor for murders committed in especially heinous, cruel or depraved" manner was unconstitutionally vague and overbroad. A.R S § 13–703(F)(6)

1 Cases that cite this headnote

**Attorneys and Law Firms**

**208 Terry Goddard Arizona Attorney General, By Kent E Cattani, Chief Counsel Capital Litigation Section, Patricia A Nigro, Assistant Attorney General, Phoenix, Attorneys for State of Arizona.

Susan M Sherwin, Maricopa County Legal Advocate, By Consuelo M Ohanesian Deputy Legal Advocate Phoenix, Attorneys for Cory Deonn Morris

***329 OPINION**

McGREGOR, Chief Justice

¶ 1 On July 19 2005 a jury determined that Cory Morris should be sentenced to death for the murders of Barbara Codman, Shanteria Davis, Jade Velasquez, Sharon Noah, and Julie Castillo Appeal to this Court is automatic Ariz R.Crim P 31.2 b We have jurisdiction pursuant to

Article 6 Section 5 Clause 3 of the Arizona Constitution and Arizona Revised Statutes (A R S ) section 13–4031 (2001)

I

A.

¶ 2 Morris lived in a camper in the backyard of his aunt and uncle s house in Phoenix and worked at a bar approximately three nights a week. In April 2003, Morris s boss noticed for the first time that Morris had a body odor problem Morris s aunt and uncle also noticed that Morris had a body odor problem that had become progressively worse since he began living with them six months earlier

¶ 3 On April 12 2003 when Morris s uncle went to the camper to find Morris, he smelled a "rotten odor" in the backyard and saw flies inside the window of the camper As he opened the door and stepped inside he saw flies and maggots "boiling on the floor" He discovered the decomposed body of Julie Castillo under a blanket.

¶ 4 On the same day police officers questioned Morris about the body in his camper as well as four other bodies that had been found nearby During this interview Morris admitted to knowing the five victims and provided two versions of each victim s death. In the first version he claimed that each victim died of a drug overdose while he was away from the camper After discussing all five victims, the detective conducting the interview told Morris that he did not believe him Morris then stated that each victim asked him to choke her during sex and that each accidentally died as a result of this conduct. Morris also claimed that he used a condom during sex with the victims We discuss each victim in turn.

**209 *330 1

¶ 5 On September 11, 2002, police discovered Barbara Codman s naked, decomposed body in an alley between East McKinley and East Pierce Streets and west of 9th Street. The alley is located just north of Morris s residence. Police found drag marks from the sidewalk crossing the alley into the alley itself Codman s body exhibited skin slippage[1] on her inner thighs and breast, and her head and neck were more decomposed than the rest of her body

[1] Skin slippage occurs when, in the postmortem phase, bacteria destroy connections between the skin and the underlying tissue so that, with pressure and movement, the skin begins to detach and slip off the body

¶ 6 Morris said that he met Codman while walking at night and, for twenty dollars, she agreed to come to his camper and have sex with him Morris first said that he went outside after he and Codman had sex and, when he returned, Codman was sitting naked on the bed using drugs Morris told her to leave after she finished, and then he stepped outside When he went back into the camper Codman was sitting on the bed panting, and she soon collapsed Morris dragged Codman out of the camper on a sleeping bag.

¶ 7 In his second version of events, Morris stated that Codman asked him to choke her with a necktie during sex. He did so and she collapsed and never regained consciousness.

¶ 8 Morris kept some of Codman s belongings including her overalls panties, and purse Analysts found Codman s DNA on some of the items When Morris was arrested, he was carrying Codman's social security card, driver s license and check card in his wallet

¶ 9 Because of the extensive decomposition of Codman's head and neck, Dr John Hu, who performed her autopsy, was unable to conduct a detailed investigation for trauma in that region Hu originally determined that the cause of death was combined toxicity of morphine and cocaine and listed the manner of death as undetermined because the circumstances surrounding Codman s death were suspicious After the police gave Hu a transcript of Morris s statements, he determined that "the cause of death is most likely asphyxia due to ligature strangulation" because the autopsy results were not inconsistent with such a determination

2.

¶ 10 On October 10, 2002 police found Shanteria Davis s naked, decomposed body in the same alley in which Codman s body had been discovered. Davis had skin slippage on her back, buttocks and the backs of her legs Police found drag marks in the alley

¶ 11 In his first version of events Morris stated that, for

five dollars, Davis agreed to come back to his camper and have sex with him After they had sex, Morris left Davis alone in the camper for about an hour because she wanted to use drugs When Morris returned, Davis was unconscious but breathing Morris covered her and left for his friend's house When he returned the next morning, Davis was dead That night he dragged her into the alley

¶ 12 In his second version of events Morris stated that Davis asked him to wrap her hair extensions around her neck while they were having sex. Davis died as a result of this conduct.

¶ 13 Police found hair extensions in Morris's camper DNA under Davis s fingernails matched Morris s DNA. DNA analysis on panties found in Morris's camper could not exclude Davis as a source of the DNA.

¶ 14 Because of the extent of decomposition Dr Kevin Horn, who performed Davis s autopsy could not determine whether Davis suffered any trauma. Based on the lack of visible trauma and the presence of cocaine and cocaine breakdown products in her spleen, Horn determined that the cause of death was cocaine intoxication. After reviewing a transcript of Morris s statements to the police, Horn stated that nothing in his autopsy was inconsistent with strangulation

3

¶ 15 On February 27 2003 police discovered the clothed body of Jade Velasquez on the west side of 9th Street, just outside the gate *331 **210 leading to the backyard where Morris s camper was located. Velasquez had ligature marks on the front and sides of her neck and bruising under her left eye Police noted some disturbance" in the ground near the gate to the backyard, which was consistent with removing the gate from its hinge and then replacing it. Police also noted grass scuff marks on the sidewalk, indicating that the body had been dragged A detective spoke with Morris s aunt during the investigation of Velasquez s death.

¶ 16 Morris first stated that Velasquez, a friend agreed to come to his camper for sex He claimed that Velasquez was drunk when she arrived at the camper and passed out before having sex with him According to Morris he realized that Velasquez was dead when she did not wake up the next morning He left for the day and moved her body to the street that night.

¶ 17 In his second version of events, Morris stated that Velasquez asked him to use his hands to choke her while they were having sex Morris did so, and Velasquez passed out and never regained consciousness Morris put Velasquez s clothes back on her before he dragged her to the street because he knew her and did not want to leave her in the street unclothed

¶ 18 DNA from semen on a vaginal swab taken from Velasquez s body matched Morris s DNA profile Dr Vladimir Shvarts who performed Velasquez s autopsy found petechial hemorrhages in her left eye and focal hemorrhagic areas inside her neck and determined that the cause of death was strangulation. Velasquez s blood tested positive for alcohol cocaine metabolites and benzodiazepines, but the combination of drugs was not sufficient to cause death.

4

¶ 19 On March 29 2003 police found Sharon Noah's naked body on the west side of 9th Street, approximately fifteen to twenty feet from the location at which Velasquez s body was discovered There were ligature marks on Noah s neck and skin slippage on her inner thighs breasts, and hips Some maggots were present on her body, and her hand and foot were mummified Some of Noah s artificial fingernails were broken

¶ 20 Morris first stated that he met Noah, who had the mental age of a ten- or eleven-year-old while out walking, and the two then went back to his camper and had sex Afterwards, Morris left because Noah wanted to use drugs Noah was dead when he returned Morris then put a belt around Noah s neck and pulled her body onto his sleeping bag He dragged her body outside that night He threw away most of her clothes but kept her shoes

¶ 21 In his second version of events Morris said that Noah suggested that he use the nylon strap attached to Morris s gym bag to choke her during sex Morris did so but when Noah s eyes closed, he stopped and noticed that she was no longer breathing Morris left the strap on Noah s neck until he dragged her outside

¶ 22 DNA on panties found in Morris s camper matched both Morris s and Noah s DNA profiles and Morris s DNA profile matched DNA on a vaginal swab taken from Noah. Police also found broken fingernails in Morris s camper

¶ 23 Noah s autopsy indicated that she died of ligature strangulation resulting in asphyxia Toxicology reports

showed that Noah had used cocaine before her death and that although she had GHB, which is often used in date rapes in her system, drug overdose was not the cause of death When asked how he would explain the extensive skin slippage on Noah s thighs, the medical examiner posited that some item may have contacted her thighs postmortem

5

¶ 24 The body discovered in Morris s camper on April 12, 2003 was that of Julie Castillo The badly decomposed body was face down and her buttocks were near the camper s fold down bed. There was a necktie around her neck.

¶ 25 Morris first stated that he brought Castillo back to his camper because it was cold and she needed a place to spend the night. Morris left the camper after Castillo asked if she could smoke crack, and when he *332 **211 returned, Castillo was unconscious on the floor He took her clothes off because she had urinated on herself The next day he went to work, and when he returned he realized that Castillo was dead Morris stayed in the camper that night. When the detective conducting the interview asked whether Morris engaged in any sexual activity while Castillo s body was in the camper Morris stated that he ejaculated in his sleep but was facing away from Castillo s body at the time Morris originally said that he never had sex with Castillo

¶ 26 In his second version of events, Morris stated that Castillo asked him to choke her with a necktie during sex. Morris did so and Castillo collapsed and never regained consciousness Morris kept Castillo s body in his camper for approximately five days before it was discovered. He claimed that he had not been in the camper during the three days before the body s discovery

¶ 27 Dr Horn, who performed Castillo s autopsy determined that Castillo had been dead "between three and seven" days at the time the body was found Based on information from the detectives, Horn determined that the cause of death was 'probable ligature strangulation" Because of the extensive decomposition, there was no visible evidence of trauma Castillo had a blood alcohol content of 0 12 and also had traces of cocaine in her system Additionally seven defects measuring up to three-eighths of an inch radiated around Castillo s anus Horn could not determine whether the defects resulted from trauma or normal decomposition.

B.

¶ 28 A grand jury indicted Morris for five counts of first degree murder During the guilt phase of the trial the prosecution played videotapes of Morris s descriptions of each woman s death Morris did not present a defense, but his counsel moved for acquittal on all counts pursuant to Arizona Rule of Criminal Procedure 20 a. The judge denied the motion. The jury then found Morris guilty on all five counts

¶ 29 At the close of the aggravation phase of the trial the jury unanimously found that Morris had been convicted of prior serious offenses A R.S § 13–703 F 2 (Supp.2004) based on the five convictions from the guilt phase of the trial, and that he committed all five murders in both an "especially cruel" and "especially heinous or depraved" manner *id.* § 13–703 F 6 With respect to the especially cruel prong, Dr Keen testified that strangulation victims are conscious for at least a short period and experience pain before they lose consciousness With respect to the heinous and depraved prong, the prosecutor argued that Morris kept the bodies after they began to decompose because he enjoyed the odor of decomposition. He also argued that Morris had sexual intercourse with all of the corpses except for Davis s The prosecutor focused on the selective skin slippage on the bodies and the presence of semen on some of the victims despite Morris s insistence that he used condoms during sex

¶ 30 In the penalty phase Morris s mitigation evidence focused on the responsibilities placed on him at a young age his problems with his appearance and hygiene, particularly his problems with body odor his desire to improve himself and his good work record [2]

2 Prior to trial, Morris declined to participate in IQ testing or psychological evaluation

¶ 31 The jury determined that Morris s mitigation evidence was not sufficiently substantial to call for leniency and that death was the appropriate sentence for each of the five murders *See* A.R.S § 13–703 01 G, H (Supp 2004) [3]

3 The trial judge also found that Morris had violated the terms of probation imposed after a 2002 theft conviction He revoked Morris s probation and imposed a presumptive sentence of one year for theft.

## II.

¶ 32 Morris raises four issues on appeal We first address his claim that the State presented insufficient evidence of the corpus delicti for the deaths of Codman and Davis Next, we consider his claim that prescreening prospective jurors to determine which *333 **212 ones could serve for the length of the trial violated his right to be present at all stages of the criminal proceeding against him We then address Morris s argument that the prosecutor engaged in misconduct Finally we evaluate the claim that the trial court abused its discretion in admitting excessively gruesome photographs

### A.

[1] [2] ¶ 33 Morris contends that the trial court erred in admitting his statements concerning the deaths of Codman and Davis because the State did not establish the corpus delicti for those murders We review a ruling on the sufficiency of the evidence of corpus delicti for abuse of discretion. *State v Gerlaugh*, 134 Ariz. 164 169–70 654 P 2d 800, 805–06 (1982) *see also State v Gillies* 135 Ariz. 500 505–06 662 P 2d 1007, 1012–13 (1983)

[3] [4] [5] [6] ¶ 34 The corpus delicti doctrine ensures that a defendant's conviction is not based upon an uncorroborated confession or incriminating statement. *State v Hall* 204 Ariz. 442 453 ¶ 43, 65 P 3d 90 101 (2003) (citing *Smith v United States* 348 U S 147 152, 75 S Ct 194 99 L Ed. 192 (1954)) Therefore, the State must show that the 'alleged injury to the victim was caused by criminal conduct rather than by suicide or accident. *Id.* "[O]nly a reasonable inference of the corpus delicti need exist" before incriminating statements may be considered, and circumstantial evidence can support such an inference *Id.* (quoting *Gillies* 135 Ariz. at 506 662 P 2d at 1013) Furthermore, the State need not present evidence supporting the inference of corpus delicti before it submits the defendant s statements "[a]s long as the State ultimately submits adequate proof of the *corpus delicti* before it rests " *Id.* (quoting *State v Jones ex rel County of Maricopa*, 198 Ariz. 18 23 ¶ 14 6 P 3d 323, 328 (App 2000)) The corpus delicti doctrine does not require the State to prove the cause of death. *State v Atwood*, 171 Ariz. 576 598–99, 832 P.2d 593, 615–16 (1992) *disapproved on other grounds by State v Nordstrom*, 200 Ariz. 229 241 ¶ 25 25 P 3d 717, 729 (2001)

¶ 35 Here sufficient evidence independent of Morris s incriminating statements establishes corpus delicti for the deaths of both Codman and Davis Both died under suspicious circumstances and were discovered naked in the same alley Drag marks near both bodies indicated that they had been moved. DNA on panties and overalls found in Morris s camper matched Codman s DNA, DNA on panties found in the camper matched Davis s DNA, and Davis had Morris s DNA under her fingernails Hair extensions similar to Davis s were found in the camper Morris was carrying Codman s driver s license social security card, and check card when he was arrested.

¶ 36 Morris argues that, despite the other evidence that these two deaths resulted from criminal conduct, the State cannot establish corpus delicti because the medical examiners believed that both deaths resulted from drug overdoses before police gave them transcripts of Morris s statements The State, however need not prove cause of death to establish corpus delicti *See id.* Instead, the State need only present evidence sufficient to raise a 'reasonable inference' that the death resulted from criminal activity *Hall* 204 Ariz. at 453 ¶ 43, 65 P 3d at 101 (quoting *Gillies* 135 Ariz at 506, 662 P 2d at 1013) Given the evidence here, the State met its burden even if we disregard the medical examiners testimony [4] Therefore, the trial court did not abuse its discretion in admitting Morris s statements as to the deaths of Codman and Davis

[4] Although Morris argues that *State v Nieves* 207 Ariz. 438, 87 P 3d 851 (App 2004), controls the resolution of this issue, we disagree. In *Nieves* the medical examiner based his conclusion about cause of death solely on the defendant s statements. *Id.* at 441 ¶¶ 14–15 87 P 3d at 854 Because there was no evidence of criminal activity other than the medical examiner s testimony the court held that the State failed to establish the corpus delicti *Id* at 444 ¶¶ 28–29 87 P.3d at 857 Here, conversely evidence independent of the medical examiners testimony supports criminal activity in the deaths of both Codman and Davis.

### B

¶ 37 We next consider whether Morris s absence during the jury commissioner s prescreening *334 **213 of prospective jurors to determine whether they could serve on a lengthy trial violated his right to be present at all

stages of the criminal proceeding. Because the trial was expected to last six to eight weeks, the judge ordered the jury commissioner to poll the jurors to identify those who claimed that they could not serve for such a long trial The jury commissioner gave those jurors one-page questionnaires on which they could state the reasons for their inability to serve The lawyers then reviewed the questionnaires for potentially invalid excuses and submitted those questionnaires to the judge for further review

¶ 38 After reviewing the questionnaires, the judge determined that approximately twenty prospective jurors had provided questionable excuses When he asked the jury commissioner to send those twenty individuals to the courtroom for further questioning, the jury commissioner informed him that only four of the twenty were available The jury commissioner had released the remaining sixteen to other panels

[7] ¶ 39 Defense counsel admitted that he could not identify any group excluded from service or show that the jury did not represent a cross-section of the community but objected to the prescreening procedure because it left only 'volunteers as prospective jurors The trial judge rejected this challenge

[8] [9] ¶ 40 Although a defendant in a criminal case is entitled to a fair and impartial jury for the trial of his case he is not entitled to be tried by any particular jury' *Atwood*, 171 Ariz. at 624 832 P.2d at 641 (quoting *State v Arnett*, 119 Ariz. 38 50, 579 P.2d 542, 554 (1978)) To make a prima facie showing that a jury does not represent a fair cross-section of the community a defendant must show each of the following

> (1) that the group alleged to be excluded is a ' distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process

*Duren v Missouri*, 439 U S 357, 364 99 S Ct. 664, 58 L Ed.2d 579 (1979)

¶ 41 Morris has neither identified a distinctive group that was excluded from his jury panel nor claimed that the jury he received was not fair and impartial Therefore, he has failed to satisfy even the first prong of *Duren*. *See State v Wooten* 193 Ariz. 357, 361–62 ¶¶ 20–24, 972 P 2d 993, 997–98 (App 1998) (rejecting claims that a jury commissioner s prescreen of prospective jurors for length of the trial excluded poor and minority jurors because the defendant failed to satisfy any of the *Duren* prongs)

[10] ¶ 42 Moreover jury commissioners have broad discretion to excuse jurors from service

> If a person s answers to a questionnaire indicate that the person is unqualified for jury service or in the opinion of the judge or ***jury commissioner*** state grounds sufficient to be excused from jury service the person s name shall not be included on the qualified juror list and the person shall be notified that he is excused from jury service

A R.S § 21-315 A (Supp 2006) (emphasis added), *see also Wooten*, 193 Ariz. at 362–63 ¶¶ 25–26, 972 P 2d at 998–99 (rejecting defendant s claim that jury commissioner s prescreening of prospective jurors violated his due process rights based in part on the jury commissioner s broad statutory power to excuse jurors from service) Because the jury commissioner decided to excuse prospective jurors solely on the basis of their ability to serve on a lengthy trial, a neutral criterion he properly exercised his discretion. *See State v Murray* 184 Ariz. 9 23–24 906 P.2d 542 556–57 (1995) (noting that "[g]ranting excuses based on the application of neutral criteria to prospective jurors individual situations" is a proper exercise of the jury commissioner's discretion (quoting *State v Sanderson* 182 Ariz 534 539 898 P.2d 483 488 (App 1995)))

¶ 43 Even if Morris could show that certain prospective jurors were wrongly excused, we would not reverse his convictions unless he *335 **214 could also show actual prejudice i e that the jurors who actually served were not fair and impartial *State v Webb* 101 Ariz. 307 309 419 P.2d 91 93 (1966), *State v Fendler* 127 Ariz. 464 470–71 622 P.2d 23 29–30 (App 1980) (extending "actual prejudice" doctrine to excusals by jury commissioner) Because Morris is unable to demonstrate any actual prejudice resulting from the jury commissioner s prescreening of prospective jurors his challenge fails

[11] [12] ¶ 44 Morris argues that his exclusion from the prescreening process violates his right to be present at all

stages of the proceeding against him We have previously held that exclusion from the entire jury selection process is structural error, but in so holding we noted that exclusion from a 'minor portion of jury selection proceedings may be harmless error *State v Garcia-Contreras* 191 Ariz. 144 148 ¶ 17 953 P 2d 536 540 (1998) (quoting *State v Ayers* 133 Ariz. 570, 571 653 P.2d 27 28 (App 1982)) An error is harmless if it appears beyond a reasonable doubt that the error did not contribute to the verdict obtained. *State v Dann*, 205 Ariz. 557 565 ¶ 18 74 P 3d 231 239 (2003) (quoting *Chapman v California*, 386 U S 18 24 87 S Ct 824 17 L Ed 2d 705 (1967))

¶ 45 Here Morris attended all aspects of jury selection except the prescreening process, which focused solely on the length of the trial and did not involve questioning the jurors about the facts or legal issues of the case Thus, even assuming that he was entitled to attend the prescreening process an issue we do not reach, any error is harmless because no basis exists on which we could conclude that Morris s exclusion from that process affected the verdict.

### C

[13] [14] [15] ¶ 46 Morris next identifies five instances of alleged prosecutorial misconduct. "To prevail on a claim of prosecutorial misconduct, a defendant must demonstrate that the prosecutor s misconduct so infected the trial with unfairness as to make the resulting conviction a denial of due process *State v Hughes* 193 Ariz. 72 79 ¶ 26 969 P 2d 1184 1191 (1998) (quoting *Donnelly v DeChristoforo* 416 U S 637 643 94 S Ct. 1868, 40 L Ed.2d 431 (1974)) The misconduct must be "so pronounced and persistent that it permeates the entire atmosphere of the trial *Id* (quoting *Atwood*, 171 Ariz. at 611 832 P.2d at 628) Prosecutorial misconduct constitutes reversible error only if (1) misconduct exists and (2) "a reasonable likelihood exists that the misconduct could have affected the jury s verdict, thereby denying defendant a fair trial *State v Anderson* (*Anderson II* ) 210 Ariz. 327 340 ¶ 45 111 P 3d 369 382 (quoting *Atwood*, 171 Ariz. at 606 832 P 2d at 623) *cert denied*, 546 U S 895 126 S Ct. 193, 163 L Ed 2d 211 (2005)

[16] [17] ¶ 47 We evaluate each instance of alleged misconduct, and the standard of review depends upon whether Morris objected If he objected, then the issue is preserved for review under the standard articulated in *Anderson II Id* at 340–41 ¶ 45 111 P 3d at 382–83 If Morris did not object, then we review only for fundamental error *State v Roque*, 213 Ariz. 193, 228 ¶ 154 141 P 3d 368 403 (2006) We also address the cumulative effect of misconduct

> [E]ven if there [is] no error or an error [is] harmless and so by itself does not warrant reversal an incident may nonetheless contribute to a finding of persistent and pervasive misconduct if the cumulative effect of the incidents shows that the prosecutor intentionally engaged in improper conduct and "did so with indifference, if not a specific intent, to prejudice the defendant."

*Id* at ¶ 155 (citation omitted) (quoting *Hughes*, 193 Ariz. at 80 ¶ 31 969 P 2d at 1192)

#### 1

[18] ¶ 48 Morris argues that the prosecutor improperly influenced the medical examiners investigating the deaths of Codman and Davis by providing them copies of the statements Morris made to the police Dr Hu, who performed Codman s autopsy and Dr Horn who performed Davis s autopsy, originally determined that the cause of death for each woman was drug overdose After police provided them transcripts of Morris s statements regarding the deaths, the medical *336 **215 examiners testified that they found nothing inconsistent with asphyxiation due to strangulation as the cause of death for both women Morris did not object at trial so we review for fundamental error *Id* at¶ 154

¶ 49 Arizona statutes permit medical examiners to receive information about the circumstances surrounding a suspicious death. Arizona Revised Statutes section 11–593.B (2001) requires a peace officer to report the results of "an investigation of the facts and circumstances surrounding [a suspicious] death" to the county medical examiner Moreover the medical examiner is statutorily required to [m]ake inquiries regarding the cause and manner of death " A R S § 11–594 A 4 (2001) *see also id* § 11–594.A 2 The prosecutor did not, therefore engage in misconduct by giving transcripts of Morris s statements to the medical examiners Moreover the record does not suggest that Morris's statements improperly influenced either of the medical examiners Both testified simply that they found nothing inconsistent with those statements in their respective autopsies of Codman and Davis, and they acknowledged that, without the statements, they would have believed that drug intoxication caused the deaths Therefore this incident

does not constitute prosecutorial misconduct

2

[19] ¶ 50 In the aggravation phase the prosecutor argued that Morris murdered the victims in order to have sexual intercourse with their corpses Morris claims that this argument had no basis in fact Morris failed to object to the argument at trial, so we review for fundamental error *Roque* 213 Ariz. at 228 ¶ 154 141 P 3d at 403

[20] [21] [22] ¶ 51 Prosecutors have "wide latitude" in presenting their arguments to the jury *State v Jones* 197 Ariz. 290 305 ¶ 37 4 P 3d 345, 360 (2000) The prosecutor is permitted to argue 'all reasonable inferences from the evidence," but cannot "make insinuations that are not supported by the evidence" *Hughes* 193 Ariz. at 85 ¶ 59 969 P.2d at 1197 In evaluating the propriety of a prosecutor s arguments we consider 'whether the remarks called to the jurors' attention matters that they should not consider and whether under the circumstances of the particular case [the remarks] probably influenced the jurors" *Roque* 213 Ariz. at 224 ¶ 128 141 P 3d at 399 (alteration in original) (quoting *Sullivan v State*, 47 Ariz. 224 238 55 P.2d 312, 317 (1936))

¶ 52 While the evidence in this case does not compel the conclusion that Morris engaged in intercourse with the corpses of the victims, the record includes sufficient evidence to permit the prosecutor to make such an argument.[5] The prosecutor relied in part on skin slippage on selective parts of the victims bodies as evidence that Morris engaged in intercourse with the corpses Selective skin slippage existed on Codman s inner thighs and breast and on Noah s inner thighs The medical examiners testified that skin slippage can result from friction and the general decomposition process

5 At trial, the State did not argue that Morris engaged in intercourse with Davis s body and made it clear to the jury that it did not have sufficient evidence to support such an inference

¶ 53 The prosecutor also relied on the skin defects on Castillo's anus, although the medical examiner was unable to determine whether those defects were caused by trauma or decomposition In his statement to police Morris also mentioned that he either masturbated or ejaculated in his sleep after Castillo died but while she was still in his camper Castillo's buttocks were level with Morris s bed.

¶ 54 Additionally the prosecutor relied on DNA evidence showing Morris s semen was present in Velasquez s and Noah's vaginas, even though Morris insisted that he wore a condom during sex with the women before their deaths Thus the proposition that Morris had intercourse with the corpses of Codman, Velasquez, Noah, and Castillo is a 'reasonable inference" to be drawn from the evidence in the record, and the prosecutor did not act improperly in making this argument.

[23] ¶ 55 Furthermore the judge instructed the jury that the lawyers arguments were not evidence to be considered in *337 **216 reaching its conclusions. *See State v Newell* 212 Ariz. 389 403 ¶¶ 67–68 132 P 3d 833 847 (holding that jury instructions stating that closing arguments are not evidence negated improper comments of prosecutor) *cert. denied*, 549 U S 1056 127 S Ct. 663 166 L Ed 2d 521 (2006) *Anderson II* 210 Ariz. at 342 ¶ 50, 111 P 3d at 384 (holding that jury instructions that the lawyer s statements are not evidence cured the prosecutor s misstatement of the law) Jurors are presumed to follow the judge s instructions *Newell* 212 Ariz. at 403 ¶ 68, 132 P 3d at 847 Therefore we presume that the jurors reached their own conclusions regarding the strength of the evidence Even if the prosecutor's comments were improper the judge s instructions negated their effect

¶ 56 Finally, the prosecutor s arguments were directed only toward establishing the 'heinous or depraved prong of the F 6 aggravator Because the jury determined that each murder was committed in an especially cruel manner and because a finding of cruelty alone is sufficient to establish the F 6 aggravator *see infra* ¶¶ 61 79–80 the prosecutor s arguments were at worst, harmless error

3

[24] ¶ 57 Morris also argues that, during rebuttal to defense counsel s closing argument in the aggravation phase the prosecutor invited jurors to put themselves in the place of the victims and singled out specific jurors based on appearance and gender The prosecutor made the challenged comments while responding to defense counsel s argument that the jurors could not determine whether the victims suffered because they were intoxicated when they were killed. Defense counsel did not object to these statements so we review for fundamental error *Roque* 213 Ariz at 228 ¶ 154 141 P 3d at 403

[25] ¶ 58 A prosecutor has wide latitude in presenting arguments to the jury, including commenting on the "vicious and inhuman nature of the defendant s acts,' but cannot make arguments that appeal to the fears or passions of the jury *State v Comer* 165 Ariz. 413 426, 799 P 2d 333, 346 (1990) Although the State argues that the prosecutor simply asked the jurors to apply common sense to the factual situation before them the prosecutor s remarks did far more than make that request. Instead, the prosecutor singled out particular jurors and addressed them personally,[6] playing on their sympathy for the victims and fears of the defendant. Such remarks constitute misconduct.

6 For example, the prosecutor asked

> [W]hich one of you wants to volunteer? I want a show of hands on this one Which one of you ladies—and we don t need guys on this one, because he didn t take guys. He only took women Which one of you want [sic] to volunteer to come sit here and have the defendant sit himself on your chest and say Oh, that didn t hurt? Because the defense attorney is saying throw common sense out of [the] window Which one? I challenge anybody to say That is something I want to do
>
> And anyway and on top of that, while he s sitting on my chest, which one of you, since the one lower left-hand side has the longer hair of the jurors, maybe she wants to have him grab her hair while he s sitting on her chest to grab it and pull it around her neck.
>
> You think that s not going to hurt? You think one of you guys is going to volunteer for that? You can t leave your common sense aside. [Defense counsel] wants you to because he makes these arguments and says, well we don t know what is in their heads. We don t know what is in Juror Number 1 s head. Can you tell me you don t think it s not going to hurt when he sits on you?
>
> Hey Juror Number 1 or Juror Number 14, whatever it is, what if we put Winnie the Pooh tie around your neck? Are you going to enjoy that? Are you going to like it? Going to feel real good when you can t breathe?

[26] [27] ¶ 59 Because Morris did not object, however we must determine whether this misconduct constitutes fundamental error Morris bears the burden of persuasion and must "establish both that fundamental error exists and that the error in his case caused him prejudice" *State v Henderson* 210 Ariz. 561 567 ¶ 20 115 P 3d 601 607 (2005) Fundamental error is "error going to the foundation of the case, error that takes from the defendant a right essential to his defense and error of such magnitude that the defendant could not possibly have received a fair trial *Id.* at ¶ 19 (quoting *State* *338 **217 *v Hunter* 142 Ariz. 88, 90 688 P 2d 980 982 (1984))

¶ 60 The prosecutor s comments here do not constitute fundamental error Morris has not shown that this isolated incident of impropriety denied him a fair trial or deprived him of a right essential to his defense

¶ 61 Additionally Morris cannot establish prejudice The prosecutor's argument was directed toward proof of cruelty To prove that a murder was especially cruel" under A R.S § 13–703 F 6, the State must show that the victim was conscious and suffered physical pain or mental anguish during at least some portion of the crime and that the defendant knew or should have known that the victim would suffer *State v Trostle,* 191 Ariz. 4, 18, 951 P.2d 869 883 (1997) Here independent of the prosecutor s improper argument, the State presented overwhelming evidence of cruelty The medical examiner testified that all of the victims would have experienced pain for some period before losing consciousness Moreover the evidence suggests that at least three of the victims struggled with Morris before losing consciousness Morris s DNA was under Davis s fingernails Noah s fingernails were broken, and the side of Velasquez's face was bruised Morris has not met his burden of showing that the argument caused prejudice

### 4

[28] ¶ 62 Morris next argues that the prosecutor committed misconduct during the guilt phase when he introduced Castillo s jacket solely to inflame the jury The prosecutor admitted his misconduct, Morris argues when he told the jury during his closing argument that he had offered the jacket for the jury s "smelling pleasure "[7] Defense counsel did not object during the prosecution's statement but did discuss the comment during his closing argument noting that the odor on the jacket resulted in part from storing the jacket in a bag for a long period. Because defense counsel did not object to the prosecutor's comments, we review for fundamental error *Roque,* 213 Ariz. at 228 ¶ 154 141 P 3d at 403

7 The prosecutor stated.

> But one of the things that is interesting about [Castillo] is that the smell is absolutely putrid, absolutely one of the worst things that you will ever probably experience And you got a minimal exposure to it when the jacket was opened up for your if you will, smelling pleasure, for lack of a better word.

> And what ended up happening—you could tell it was a very strong odor about it. So with regard to Julie Castillo one of the things that happened to her is that she was wearing that jacket, and the reason that we pulled it out to show it to you, because the sleeves were inside out, and what that means is that he killed her

¶ 63 The prosecutor originally introduced the jacket to show that it belonged to Castillo During the testimony of a police officer who investigated the scene of Castillo s death, the prosecutor introduced a booking photograph of Castillo wearing the jacket and then asked the officer to remove the jacket from its plastic bag and hold it up The prosecutor quickly asked the detective to return the jacket to the bag There was no misconduct in introducing the jacket into evidence

¶ 64 At worst, the offhand "smelling pleasure" comment was inappropriate It does not, however rise to the level of fundamental error because this single remark did not deprive Morris of a fair trial Moreover, overwhelming evidence established that the strong odor associated with the jacket resulted from its close proximity to Castillo s badly decomposed body Given this evidence, Morris cannot establish that the prosecutor's comment resulted in prejudice

5

[29] ¶ 65 Finally Morris notes that on June 15 2005 during the guilt phase of the trial the prosecutor kept on his table in view of the jury an excluded photograph showing a maggot infestation During a bench conference with the judge on another matter defense counsel objected and the court ordered the prosecutor to move the photograph from the jury s view The prosecutor did so Because of the objection, Morris preserved this incident of alleged prosecutorial misconduct *Id*

¶ 66 Nothing in the record indicates that any juror actually saw the challenged photograph *339 **218 Defense counsel did not ask the trial judge to determine whether any jurors had seen the photograph or to instruct the jurors to disregard it. The prosecutor complied with the judge s order to remove the photograph from view and nothing indicates that he intentionally left it on his desk or that he repeated this conduct at any other point in the trial Given these circumstances this incident does not constitute misconduct requiring reversal

6

¶ 67 We finally consider whether "persistent and pervasive" misconduct occurred and whether the "cumulative effect of the incidents shows that the prosecutor intentionally engaged in improper conduct and did so with indifference if not a specific intent, to prejudice the defendant. " *Id* at ¶ 155 (quoting *Hughes* 193 Ariz. at 80 ¶ 31 969 P.2d at 1192) Because Morris has described only one incident of misconduct, we cannot conclude that the prosecutor engaged in "persistent and pervasive" misconduct Moreover, given the overwhelming evidence of Morris s guilt and of the cruelty of the murders, the challenged remarks by the prosecutor did not prejudice Morris

D

[30] ¶ 68 Morris also claims that the trial judge abused his discretion by allowing the State to introduce excessively gruesome photographs of the bodies throughout the trial Morris argues that the photographs had no evidentiary value because they did not show the cause of death or the identity of the victims

[31] [32] ¶ 69 We review a trial judge s decision to admit photographs for abuse of discretion *State v Hampton,* 213 Ariz. 167, 173 ¶ 17 140 P 3d 950 956 (2006), *cert. denied,* 549 U S 1132, 127 S Ct 972 166 L Ed 2d 738 (2007) We look to three factors to determine whether the trial judge erred in admitting the photographs "the photograph s relevance, its tendency to inflame the jury and its probative value compared to its potential to cause unfair prejudice " *Id*

[33] [34] [35] [36] ¶ 70 Photographs of a victim s body are always relevant because "the fact and cause of death are always relevant in a murder prosecution " *State v Spreitz* 190 Ariz. 129 142 945 P 2d 1260 1273 (1997) (quoting *State v Chapple,* 135 Ariz. 281 288, 660 P 2d 1208 1215 (1983)) Additionally photographs of a victim s body may be introduced

> to prove the corpus delicti, to identify the victim, to show the nature and location of the fatal injury to help determine the degree or atrociousness of the crime, to corroborate state witnesses, to

> illustrate or explain testimony, and to corroborate the state s theory of how and why the homicide was committed.

*Chapple* 135 Ariz. at 288, 660 P.2d at 1215 If however the photographs have "no tendency to prove or disprove any question which is actually contested, they have little use or purpose except to inflame and would usually not be admissible " *Id.* Gruesome or inflammatory photographs may be admitted, but if they are "admitted for the sole purpose of inflaming the jury [the Court] will reverse on appeal " *Gerlaugh* 134 Ariz. at 169 654 P.2d at 805

¶ 71 None of the photographs to which Morris specifically objects on appeal all of which are of Noah s body, are gruesome [8] Four show Noah s hands or feet and one shows her nude body from a distance All of the photographs provide information about the time and manner of death or otherwise corroborate the State s case *See Anderson II* 210 Ariz. at 340 ¶ 41 111 P 3d at 382 (holding that photographs showing extensive decomposition, including skin slippage, bloating, and discoloration were relevant to "corroborate the State's theory of the case") Moreover the trial judge carefully analyzed each photograph for purposes of Arizona Rule of Evidence 403[9] and determined that *340 **219 any prejudicial effect did not substantially outweigh the probative value On this record, we cannot conclude that the trial judge abused his discretion in admitting the photographs.

8 Morris also argues that some photographs that were marked as exhibits but not admitted at trial are gruesome. Morris cannot establish prejudice from exhibits never admitted into evidence.

9 Arizona Rule of Evidence 403 states:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury or by considerations of undue delay waste of time, or needless presentation of cumulative evidence

## III.

¶ 72 If a jury imposes the death penalty for murders committed before August 1, 2002 this Court independently reviews the jury s findings of aggravating and mitigating circumstances and the propriety of the death sentence A R.S § 13–703 04 (Supp 2006), 2002 Ariz. Sess Laws 2092 2099 5th Spec Sess ch 1 § 7 B (noting that A R.S § 13–703 04 applies to offenses committed before August 1, 2002) For capital offenses committed on or after August 1, 2002, however the Court no longer conducts independent review *See* 2002 Ariz. Sess Laws 2092, 2099 5th Spec Sess ch 1 § 7 C (noting that A R.S § 13–703 05 is effective on August 1 2002 and applies to offenses committed on or after that date) Instead, A R.S § 13–703 05 (Supp.2006) which the legislature adopted as part of a larger bill addressing the constitutional defects of Arizona's capital sentencing scheme in light of *Ring v Arizona*, 536 U S 584 122 S.Ct. 2428 153 L Ed 2d 556 (2002) governs our review of these cases *See* 2002 Ariz. Sess Laws 2092, 2099 5th Spec Sess ch 1 § 9 A 1 Because Morris committed all five murders after August 1 2002 we follow the standard of review set out in section 13–703 05

### A.

[37] ¶ 73 Section 13–703 05 states

> A The supreme court shall review all death sentences to determine whether the trier of fact abused its discretion in finding aggravating circumstances and imposing a sentence of death
>
> B If the supreme court determines that an error occurred in the sentencing proceedings, the supreme court shall determine whether the error was harmless beyond a reasonable doubt. If the supreme court cannot determine whether the error was harmless beyond a reasonable doubt, the supreme court shall remand the case for a new sentencing proceeding.

[38] [39] ¶ 74 This is the first case in which we consider our role under section 13–703 05 The primary goal of statutory interpretation is to effect the intent of the legislature *State v Williams* 175 Ariz. 98 100 854 P 2d 131 133 (1993) If the language of a statute is plain and unambiguous we look no further *Id.*

¶ 75 Other than his claim of persistent and pervasive prosecutorial misconduct, Morris raises no challenges to the aggravation or penalty phases of his trial We must therefore initially determine whether the statute requires us to review the sentencing portion of the trial even when a defendant fails to raise issues related to those matters

¶ 76 The statute provides that this Court "*shall* review *all*

death sentences under the abuse of discretion standard. A R.S § 13-703 05.A (emphasis added) Because the statute contains mandatory language we conclude that we are required to determine whether the jury abused its discretion, even though Morris failed to challenge the jury s decision with regard to either the aggravating factors or the imposition of the death sentences [10] *See, e.g Ins Co of N Am v Superior Court* 166 Ariz. 82 85 800 P.2d 585 588 (1990) (noting that 'shall" is presumably mandatory)

10 Our conclusion that section 13-703 05 requires us to review the sentence regardless of Morris s failure to raise arguments against it should not be understood to relieve death penalty counsel of the duty to raise all meritorious arguments against a death sentence *See ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases* Guideline 10 11 L (2003) ("Counsel at every stage of the case should take advantage of all appropriate opportunities to argue why death is not suitable punishment for their particular client.")

**B**

[40] ¶ 77 Because we conclude that the statute mandates our review we first consider *341 **220 whether the jury abused its discretion in finding the aggravating circumstances Under this standard of review we uphold a decision if there is "any reasonable evidence in the record to sustain it." *State v Veatch* 132 Ariz. 394 396, 646 P 2d 279 281 (1982) Here, the jury found that the State proved two aggravators beyond a reasonable doubt. Morris committed prior serious offenses, A R.S § 13-703 F 2 and Morris committed each of the murders in an especially heinous, cruel or depraved manner, *id.* § 13-703 F 6

[41] ¶ 78 The jury did not abuse its discretion in finding the F 2 aggravator The State properly used the multiple murder convictions from the guilt phase as prior serious offenses. *See id.* § 13-703 F.2 ("Convictions for serious offenses not committed on the same occasion but consolidated for trial with the homicide shall be treated as a serious offense under this paragraph ") Certainly reasonable evidence supports the jury s decision that the State proved the F 2 aggravator

[42] ¶ 79 We likewise conclude that the jury did not abuse its discretion in finding that the State proved the F 6 aggravator beyond a reasonable doubt The jury made separate findings that the State had proved (1) cruelty and (2) heinousness or depravity As noted earlier the State establishes especial cruelty by showing that a victim was conscious and suffered physical pain or mental anguish before death and that the defendant knew or should have known that the victim would suffer *Trostle,* 191 Ariz. at 18 951 P 2d at 883 With respect to the cruelty prong, the State presented expert evidence that strangulation victims remain conscious and experience pain for at least some period of time Additionally the State presented evidence that Davis Velasquez, and Noah struggled with Morris Therefore the evidence in the record supports the jury s finding of cruelty in each of the five murders

[43] ¶ 80 A finding of cruelty alone is sufficient to establish the F 6 aggravator We therefore need not address whether the jury abused its discretion in finding that the murders were also heinous or depraved *Cf Newell* 212 Ariz. at 405-06 ¶¶ 84-85, 132 P 3d at 849-50 (noting, during independent review, that a finding of cruelty alone establishes the F 6 aggravator)

**C**

[44] ¶ 81 The statute also directs us to consider whether the jury abused its discretion when it imposed a sentence of death for each of the murders Although Morris presented mitigation evidence the jury necessarily determined that it was not sufficiently substantial to call for leniency *See* A R.S § 13-703 E (noting that the trier of fact imposes a death sentence if it finds at least one aggravating circumstance and determines that the mitigating circumstances are not "sufficiently substantial to call for leniency") The decision to impose the death penalty once the jury finds aggravating factors is a matter for each individual juror to consider *See id.* § 13-703 C (stating that "[e]ach juror may consider any mitigating circumstance found by that juror in determining the appropriate penalty") Therefore we will not reverse the jury s decision so long as any reasonable jury could have concluded that the mitigation established by the defendant was not sufficiently substantial to call for leniency

¶ 82 Here Morris presented mitigation evidence relating to long standing problems with his appearance and hygiene, the responsibilities placed on him at a young age his desire to improve himself, and his good work record Given the nature and strength of the aggravating factors for each murder a reasonable jury could have determined that this mitigation evidence was not sufficiently substantial to call for leniency Therefore, we cannot say that the jury abused its discretion in imposing

death sentences for each of the murders

IV

¶ 83 For purposes of federal review Morris raises the following fourteen challenges to the constitutionality of Arizona s death penalty scheme He concedes that this Court has previously rejected these arguments

[45] ¶ 84 (1) The fact finder in capital cases must be able to consider *all* relevant ***342 **221** mitigating evidence in deciding whether to give the death penalty *See Woodson v North Carolina*, 428 U S 280 304, 96 S Ct 2978 49 L Ed.2d 944 (1976) The trial court s failure to allow the jury to consider and give effect to *all* mitigating evidence in this case by limiting its consideration to that proven by a preponderance of the evidence is unconstitutional under the Eighth and Fourteenth Amendments We rejected this argument in *State v McGill* 213 Ariz 147 161 ¶ 59 140 P 3d 930 944 (2006), *cert. denied*, 549 U S 1324, 127 S Ct 1914 167 L Ed.2d 570 (2007) *See also State v Medina*, 193 Ariz 504 514–15 ¶ 43 975 P.2d 94 104–05 (1999)

¶ 85 (2) The State's failure to allege an element of the charged offense in the grand jury indictment the aggravating factors that made Morris death eligible is a fundamental defect that renders the indictment constitutionally defective because it violates the Fifth Sixth Eighth and Fourteenth Amendments and Article 2 Sections 1 4 13, 15 23 and 24 of the Arizona Constitution We rejected this argument in *McKaney v Foreman ex rel County of Maricopa*, 209 Ariz 268, 273 ¶ 23 100 P 3d 18 23 (2004)

[46] ¶ 86 (3) The F 6 "especially heinous cruel or depraved" aggravating factor is unconstitutionally vague and overbroad because the jury does not have enough experience or guidance to determine when the aggravator is met The finding of this aggravator by a jury violates the Eighth and Fourteenth Amendments because it does not sufficiently place limits on the discretion of the sentencing body the jury which has no "narrowing constructions to draw from and give "substance" to the otherwise facially vague law We rejected this argument in *State v Cromwell* 211 Ariz 181, 188–90 ¶¶ 38–45 119 P 3d 448, 455–57 (2005), *cert denied*, 547 U S 1151 126 S Ct 2291, 164 L.Ed 2d 819 (2006), and *Anderson II* 210 Ariz at 353 ¶ 114 111 P 3d at 395

¶ 87 (4) By allowing victim impact evidence at the penalty phase of the trial, the trial court violated Morris s constitutional rights under the Fifth, Sixth, Eighth and Fourteenth Amendments and Article 2, Sections 1, 4, 13 15, 23 and 24 of the Arizona Constitution We rejected challenges to the use of victim impact evidence in *Lynn v Reinstein* 205 Ariz. 186, 191 ¶ ¶ 16–17 68 P 3d 412 417 (2003)

¶ 88 (5) The trial court improperly omitted from the penalty phase jury instructions language to the effect that the jury may consider mercy or sympathy in deciding the value to assign the mitigation evidence, instead telling the jury to assign whatever value it deemed appropriate The court also instructed the jury that they "must not be influenced by mere sympathy or by prejudice in determining these facts" These instructions limited the mitigation the jury could consider in violation of the Fifth Sixth, Eighth and Fourteenth Amendments and Article 2 Sections 1 4, 15 23 and 24 of the Arizona Constitution We rejected this argument in *State v Carreon*, 210 Ariz. 54 70–71 ¶¶ 81–87 107 P 3d 900 916–17 *cert. denied*, 546 U S 854 126 S Ct 122 163 L.Ed.2d 129 (2005)

¶ 89 (6) The death penalty is cruel and unusual under any circumstances and violates the Eighth and Fourteenth Amendments, and Article 2, Section 15 of the Arizona Constitution This Court and the United States Supreme Court have rejected this argument. *Gregg v Georgia*, 428 U S 153, 186–87, 96 S Ct. 2909, 49 L Ed.2d 859 (1976) *State v Harrod*, 200 Ariz. 309, 320 ¶ 59 26 P 3d 492, 503 (2001) *vacated on other grounds* 536 U S 953 122 S Ct. 2653 153 L Ed.2d 830 (2002) (mem )

¶ 90 (7) The death penalty is irrational and arbitrarily imposed, it serves no purpose that is not adequately addressed by life in prison, in violation of the defendant s right to due process under the Fourteenth Amendment to the United States Constitution and Article 2 Sections 1 and 4 of the Arizona Constitution We rejected these arguments in *State v Smith*, 203 Ariz. 75, 82 ¶¶ 35–36 50 P 3d 825 832 (2002) and *State v Beaty* 158 Ariz. 232, 247 762 P 2d 519, 534 (1988)

¶ 91 (8) The prosecutor s discretion to seek the death penalty has no standards and therefore violates the Eighth and Fourteenth Amendments and Article 2 Sections 1 4 and 15 of the Arizona Constitution. We rejected ***343 **222** this argument in *State v Sansing*, 200 Ariz. 347 361 ¶ 46 26 P 3d 1118 1132 (2001), *vacated on other grounds* 536 U S 954, 122 S Ct 2654 153 L Ed.2d 830 (2002) (mem ) *See also State v Finch*, 202 Ariz 410 419 ¶ 50 46 P 3d 421 430 (2002)

¶ 92 (9) Arizona's death penalty is applied so as to discriminate against poor, young, and male defendants in

violation of Article 2 Sections 1 4 and 13 of the Arizona Constitution We rejected this argument in *Sansing*, 200 Ariz. at 361 ¶ 46 26 P 3d at 1132 *See also State v Stokley* 182 Ariz. 505 516 898 P 2d 454 465 (1995)

¶ 93 (10) Proportionality review serves to identify which cases are above the "norm" of first degree murder thus narrowing the class of defendants who are eligible for the death penalty The absence of proportionality review of death sentences by Arizona courts denies capital defendants due process of law and equal protection and amounts to cruel and unusual punishment in violation of the Fifth, Eighth, and Fourteenth Amendments, and Article 2 Section 15 of the Arizona Constitution We rejected this argument in *State v Gulbrandson* 184 Ariz. 46 73 906 P 2d 579 606 (1995) *See also State v Salazar* 173 Ariz. 399 417 844 P.2d 566 584 (1992)

¶ 94 (11) Arizona s capital sentencing scheme is unconstitutional because it does not require the State to prove the death penalty is appropriate or require the jury to find beyond a reasonable doubt that the aggravating circumstances outweigh the accumulated mitigating circumstances Instead, Arizona s death penalty statute requires defendants to prove their lives should be spared, in violation of the Fifth, Eighth, and Fourteenth Amendments, and Article 2, Section 15 of the Arizona Constitution We rejected this argument in *State v Fulminante* 161 Ariz. 237 258 778 P 2d 602 623 (1988) *See also Carreon* 210 Ariz. at 76 ¶ 122 107 P 3d at 922

¶ 95 (12) Arizona s death penalty scheme does not sufficiently channel the sentencing jury s discretion Aggravating circumstances should narrow the class of persons eligible for the death penalty and reasonably justify the imposition of a harsher penalty Arizona Revised Statutes section 13–703 01 is unconstitutional because it provides no objective standards to guide the jury in weighing the aggravating and mitigating circumstances The broad scope of Arizona s aggravating factors encompasses nearly anyone involved in a murder in violation of the Eighth and Fourteenth Amendments and Article 2 Section 15 of the Arizona Constitution We rejected this argument in *State v Pandeli* 200 Ariz. 365, 382 ¶ 90 26 P 3d 1136 1153 (2001) *vacated on other grounds* 536 U S 953 122 S Ct. 2654, 153 L Ed.2d 830 (2002) (mem ) *See also State v Greenway* 170 Ariz. 155 164 823 P 2d 22 31 (1991)

¶ 96 (13) Execution by lethal injection is cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments and Article 2 Section 15 of the Arizona Constitution We rejected this argument in *State v Van Adams* 194 Ariz. 408 422 ¶ 55 984 P 2d 16, 30 (1999), and *State v Hinchey* 181 Ariz. 307 315 890 P 2d 602 610 (1995)

¶ 97 (14) Arizona s death penalty scheme unconstitutionally requires imposition of the death penalty whenever at least one aggravating circumstance and no mitigating circumstances exist, in violation of the Eighth and Fourteenth Amendments, and Article 2, Section 15 of the Arizona Constitution Arizona s death penalty law cannot constitutionally presume that death is the appropriate default sentence We rejected this argument in *State v Miles* 186 Ariz. 10 19 918 P 2d 1028 1037 (1996)

V

¶ 98 For the foregoing reasons, we affirm Morris s convictions and sentences

CONCURRING REBECCA WHITE BERCH Vice Chief Justice, MICHAEL D RYAN, ANDREW D HURWITZ and W SCOTT BALES Justices

**All Citations**

215 Ariz. 324 160 P 3d 203 506 Ariz. Adv Rep 14

**End of Document**

© 2016 Thomson Reuters No claim to original U S Government Works

# Exhibit 2

DP

05-0777
Braccio

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

| | | |
|---|---|---|
| STATE OF ARIZONA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs | ) | CR 2003-011506-001 DT |
| | ) | CR 05-0267-AP |
| CORY DEONN MORRIS, | ) | |
| | ) | |
| Defendant | ) | |
| | ) | |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Trial

BEFORE THE HONORABLE DOUGLAS L RAYES, Judge

APPEARANCES

Mr Juan Martinez
Deputy County Attorney
Representing the State

Mr James Logan
Mr Randall Craig
Deputy Legal Advocates
Representing the Defendant

Phoenix, Arizona
July 12, 2005

(COPY)
PREPARED FOR APPEAL

Annette Jaycox, RPR
CR #50382

Now, for instance, regarding Jade Velasquez, God knows what she was thinking More importantly, my comment is that we don't know the pain and suffering, not what these people were thinking We don't know what kind of pain or suffering, if any, any of these people had to endure, because here's the point

Every single one of these victims, again, had toxicity levels of drugs in their system Cocaine, one of them had morphine In addition to the cocaine, all of them had depressants and stimulants in their system All of them had cocaine, and all of them had alcohol

More importantly, here is the thing that we need to think about There is absolutely no way to determine when these people fell into unconsciousness There is absolutely no way

And for you to find cruelty, you have got to find that they suffered some kind of pain and suffering while they were conscious, and we simply don t know We don't know when that magical moment is that they lapse into unconsciousness

Now, Mr Martinez also said that there is no doubt that Barbara Codman hurt Once again, we don't know that Absolutely no trauma was found in connection with her death, none

In fact, as I said during my last opening, there

was no trauma at all that was associated with Codman, Davis and Castillo, no skeletal trauma, no trauma to any sexual organs, no trauma to vital organs, i e , no trauma at all

On the one hand, we cannot find or determine when these people lapsed into unconsciousness That's fact number one Fact number two, we don't have any trauma associated with at least -- we'll address three victims now, three of these victims

And lastly, all of these victims had toxicity levels of drugs in their system, alcohol and cocaine, stimulants and depressants That is the evidence

Now, time and time again, as I alluded, Mr Martinez said that we know they suffered pain, we know this, we know this, we know what he was thinking We don't know anything What we do know is the evidence that was presented, and the evidence is what I just alluded to you

Now, other comments were made as well regarding Barbara Codman And, incidentally, let's talk about this There's no doubt that what happened here -- anytime there's a death, it's a sad ordeal We're not standing up here and we're not telling you folks that what happened to these individuals isn't sad That's not our mission

Our mission here for purposes of this phase is to determine what, if any, pain and suffering these folks endured while they were conscious And then the next two

Maybe they should consider all of the evidence instead of standing up spouting generalities

Let's talk about what did happen not only in this phase, but the other phase The prosecution keeps saying two minutes Well, the prosecutors keep echoing what the doctor said It could be two minutes or more than two There's a fight that is going on

With regard to some of the individuals he said, Well, you know, it can't be cruel, heinous, or depraved, because there wasn't any damage to them For example, he said there wasn't any damage to Barbara Codman, there wasn't any damage to Shanteria Davis, and he threw Sherri Noah in there at times

Take a look at the definition of heinous or depraved Does there have to be -- we have to prove damage, because he's mixing these two things up, and he's mixing them so you don't focus on what the issue is

The issue is the defendant's state of mind That is what we're trying to ascertain, not whether or not there was any injuries to the bodies at that point It's what he was thinking at the time, what he felt like doing, how he enjoyed himself That's what you focus in on when you look at heinous or depraved

And he said, Well, you know, he wants -- prosecutor wants you to guess as to these individuals, and

there's no indication whatsoever that any of them suffered

Really, which one of you wants to volunteer? I want a show of hands on this one Which one of you ladies -- and we don't need guys on this one, because he didn't take guys He only took women

Which one of you want to volunteer to come sit here and have the defendant sit himself on your chest and say, Oh, that didn't hurt? Because the defense attorney is saying throw common sense out of window Which one? I challenge anybody to say, That is something I want to do

And anyway, and on top of that, while he's sitting on my chest, which one of you, since the one lower left-hand side has the longer hair of the jurors, maybe she wants to have him grab her hair while he's sitting on her chest Burking her, to grab it and pull it around her neck

You think that's not going to hurt? You think one of you guys is going to volunteer for that? You can't leave your common sense aside He wants you to because he makes these arguments and says, well, we don't know what is in their heads We don't know what is in Juror Number 1's head Can you tell me you don't think it's not going to hurt when he sits on you?

Hey, Juror Number 1 or Juror Number 14, whatever it is, what if we put Winnie the Pooh tie around your neck? Are you going to enjoy that? Are you going to like it?

Going to feel real good when you can't breathe?

There's no physical pain you have associated with it `cause you can't tell us because you can't breathe, so there must be no physical pain associated Because all of this, of course, doesn't happen in a vacuum sort of thing

That's not the way it is You don't leave your common sense behind And when somebody puts a tie around your neck, a strap, your hair, their hands, it's going to hurt, and you're going to react to it

And some of you may be able, if you're strong enough, to fight the person off, and some of you may not, and that is -- but it's all going to hurt to each and every one of you

If you then combine it with the anguish that you feel, oh, yeah, it's great to do that experiment I just described here in the courtroom with all the lights on, with the Judge there and prosecutor standing here and everybody else

It's another to do in a camper where you know there is nobody to help you That's when the anguish steps in That's why you have to consider and take a look at where this happened

It isn't that we want to talk about it and cast aspersions on him and say he lived in a camper that had very little light It's because of the anguish that it caused to

# Exhibit 3

KeyCite Red Flag Severe Negative Treatment
Abrogated by State v Ferrero Ariz. April 11 2012

215 Ariz. 497
Supreme Court of Arizona,
En Banc.

STATE of Arizona, Appellee,
v
Wendi Elizabeth ANDRIANO, Appellant.

No CR–05–0005–AP
|
July 9, 2007

**Synopsis**
**Background** Defendant was convicted by a jury in the Superior Court, Maricopa County, Cause No CR2000–096032, Brian K. Ishikawa, J of first degree murder and was sentenced to death. Defendant appealed.

**Holdings** The Supreme Court, Rebecca White Berch, V CJ held that

[1] evidence of defendant's attempts to procure life insurance on her husband, the victim, was admissible

[2] trial court was not required to sua sponte instruct the jury on the lesser-included offenses of second degree murder and sudden quarrel or heat of passion manslaughter;

[3] trial court was not required to include "mercy" among the enumerated mitigating circumstances for the jury's consideration,

[4] jury impasse instruction was not provided prematurely

[5] lethal injection statute was not unconstitutionally vague and

[6] evidence supported aggravating sentencing factor that defendant committed murder in an especially cruel manner

Affirmed.

West Headnotes (23)

[1] **Criminal Law**
Construction of Evidence
The Supreme Court views the facts in the light most favorable to sustaining the verdict.

Cases that cite this headnote

[2] **Criminal Law**
Reception and Admissibility of Evidence
The Supreme Court reviews evidentiary rulings for an abuse of discretion.

7 Cases that cite this headnote

[3] **Criminal Law**
Interwoven occurrences in general
Other act evidence is intrinsic when (1) evidence of the other act and evidence of the crime charged are inextricably intertwined or (2) both acts are part of a single criminal episode or (3) the other acts were necessary preliminaries to the crime charged.

8 Cases that cite this headnote

[4] **Criminal Law**
Homicide mayhem, and assault with intent to kill
**Criminal Law**
Homicide, mayhem, and assault with intent to kill
**Homicide**
Previous hostile acts or conduct of accused
Evidence of defendant's attempts to procure life insurance on her husband, the victim, was admissible to show defendant's plan, knowledge and intent to kill in prosecution for first-degree murder, even though defendant was unable to procure any life insurance. 17A A R.S Rules of Evid. Rules 403 404(b)

2 Cases that cite this headnote

[5] **Criminal Law**
Homicide, mayhem, and assault with intent to kill
**Homicide**
Infidelity unfaithfulness or jealousy

Evidence of defendant's extramarital affairs was admissible, in prosecution for first degree murder; the evidence showed defendant's motive for killing victim, her husband, and it also rebutted the defense theory that defendant was a domestic violence victim who lived in fear of her husband. 17A A R.S Rules of Evid., Rule 404(b)

5 Cases that cite this headnote

[6] **Criminal Law**
Necessity of requests

The Supreme Court reviews a trial court's failure to give lesser-included offense instructions for fundamental error when the instructions are not requested at trial

5 Cases that cite this headnote

[7] **Criminal Law**
Failure to instruct in general

In a capital case, it is fundamental error for the trial court to fail to give a lesser-included offense instruction if one is supported by the evidence and not waived by the defendant.

6 Cases that cite this headnote

[8] **Homicide**
Degree or classification of homicide
**Homicide**
Manslaughter

Trial court was not required to sua sponte instruct the jury on the lesser included offenses of second degree murder and sudden quarrel or heat of passion manslaughter in prosecution for first degree murder evidence did not support the instructions as defendant's sole defense was self defense

Cases that cite this headnote

[9] **Constitutional Law**
Proceedings
**Sentencing and Punishment**
Instructions

Jury instruction defining cruelty, which informed the jury that cruelty involved the infliction of physical pain and/or mental anguish on the victim before death and that a crime was committed in an especially cruel manner when the defendant knew or should have known that the manner in which the crime was committed could cause the victim to experience physical pain and/or mental anguish before death, sufficiently narrowed the aggravating factor in death penalty case that murder was committed in an especially heinous cruel or depraved manner, and thus the aggravator was not unconstitutionally vague A R S § 13–703(F)(6)

4 Cases that cite this headnote

[10] **Sentencing and Punishment**
Instructions
**Sentencing and Punishment**
Presentation and reservation in lower court of grounds of review

Jury instruction, which instructed the jury that especially heinous cruel or depraved aggravating circumstance could not be found unless the circumstances of the murder raised it above the norm of other first degree murders, did not impermissibly require the jury to engage in proportionality review and did not constitute fundamental error in prosecution for first degree murder; jurors had to assess whether the murder was so cruel that it rose above the norm for first degree murders and the court assisted the jury in that inquiry by defining cruelty and explaining how to determine whether "the circumstances of the murder raise it above the norm of other first degree murders ' A.R.S § 13–703(F)(6).

2 Cases that cite this headnote

[11] **Sentencing and Punishment**
Evidence in mitigation in general

Defendant was not entitled to present evidence of residual doubt as a mitigating circumstance in the penalty phase of first degree murder prosecution, there was no constitutional right to present evidence of residual doubt at sentencing.

2 Cases that cite this headnote

[12] **Criminal Law**
Review De Novo

The Supreme Court reviews alleged constitutional violations de novo

Cases that cite this headnote

[13] **Sentencing and Punishment**
Sympathy and mercy

Trial court was not required to include "mercy" among the enumerated mitigating circumstances for the jury's consideration, when determining sentence for first degree murder a defendant had the burden of proving mitigating circumstances by a preponderance of the evidence mercy could not be proven under the standard, and defendant was free to argue and did argue, that mercy or leniency was appropriate based on the mitigation evidence presented. A.R.S § 13–703(G)

3 Cases that cite this headnote

[14] **Sentencing and Punishment**
Instructions

Jury instructions concerning jury unanimity in determining mitigating circumstances were proper in sentencing phase of first degree murder prosecution instructions as a whole informed the jurors that they were required to individually assess whether the mitigating circumstances were sufficiency substantial to call for leniency A R.S § 13–703(C)

1 Cases that cite this headnote

[15] **Criminal Law**
Construction and Effect of Charge as a Whole

**Criminal Law**
Review De Novo

The Supreme Court reviews a challenged instruction de novo and considers the instructions as a whole to ensure that the jury receives the information it needs to arrive at a legally correct decision.

Cases that cite this headnote

[16] **Criminal Law**
Urging or Coercing Agreement

In determining whether a trial court has coerced the jury's verdict, the Supreme Court views the actions of the judge and the comments made to the jury based on the totality of the circumstances and attempts to determine if the independent judgment of the jury was displaced.

Cases that cite this headnote

[17] **Criminal Law**
Allen," dynamite, or "hammer, etc , charge

Jury impasse instruction was not provided prematurely, as argued by defendant, during sentencing phase of first degree murder prosecution, the jury inquired as to what would happen if the jury could not reach a verdict. 17 A R.S Rules Crim.Proc , Rule 22 4

3 Cases that cite this headnote

[18] **Criminal Law**
Urging or Coercing Agreement

Although the Rules of Criminal Procedure give a trial judge broad discretion in dealing with juries at an impasse the rules require an affirmative indication from the jury it is in need of help before assistance may be offered. 17 A.R.S Rules Crim.Proc Rule 22 4

2 Cases that cite this headnote

[19] **Criminal Law**

⇐ Allen " "dynamite, or 'hammer etc charge

Trial court's duty to deliberate jury instruction, which was provided when jury had reached an impasse during penalty phase of first degree murder trial, was proper even though defendant argued that the instruction was proper in the guilt phase or aggravation phase of the proceedings but was not proper in the penalty phase jury was required to deliberate to be unanimous in their decision to impose a death sentence or a life sentence A.R.S §§ 13–703(C), 13–703 01(H)

4 Cases that cite this headnote

[20] **Sentencing and Punishment**
⇐ Mode of execution

The lethal injection statute was not unconstitutionally vague, even though it did not prescribe the type or dosage of drugs that must be administered, the order in which they must be administered, or the qualifications of the personnel who administer them the United States Supreme Court had never held that death by lethal injection was cruel and unusual absent specific procedures for implementation. U S C.A Const.Amend. 8 A.R.S § 13–704(A)

9 Cases that cite this headnote

[21] **Sentencing and Punishment**
⇐ Scope of review

In conducting independent review of a death sentence the Supreme Court considers the quality and the strength, not simply the number of aggravating and mitigating factors A.R.S § 13–703 04(A)

3 Cases that cite this headnote

[22] **Sentencing and Punishment**
⇐ Vileness, heinousness or atrocity

Evidence supported aggravating sentencing factor that defendant committed murder in an especially cruel manner; defendant poisoned victim, her husband, with sodium azide victim vomited at least twice, was too weak to sit or stand, and had difficulty breathing defendant pretended to call for an ambulance and stood by for 45 minutes while victim suffered from the effects of the poisoning, later defendant struck victim at least 23 times in the back of the head with a bar stool, and victim had defensive wounds to his hands and wrists A.R.S § 13–703(F)(6)

1 Cases that cite this headnote

[23] **Sentencing and Punishment**
⇐ Vileness heinousness, or atrocity

**Sentencing and Punishment**
⇐ Emotional distress or disturbance

**Sentencing and Punishment**
⇐ Other matters related to offender

Defendant's mitigation evidence was not sufficiently substantial to call for leniency in light of the cruel manner in which defendant murdered the victim, her husband defendant poisoned terminally ill victim, she beat him in the back of the head with a bar stool, and she slashed his throat, and defendant's mitigation evidence including evidence of the stress of victim's terminal cancer her missionary work, and her strong religious convictions, was minimal

Cases that cite this headnote

**Attorneys and Law Firms**

**543 Terry Goddard, Arizona Attorney General by Kent E. Cattani, Chief Counsel, Capital Litigation Section, Phoenix, Robert J Gorman, Jr , Assistant Attorney General, Tucson, Attorneys for State of Arizona.

James J Haas Maricopa County Public Defender by Brent E Graham, Margaret M Green, Deputy Public Defenders, Phoenix Attorneys for Wendi Elizabeth Andriano

***500 OPINION**

BERCH, Vice Chief Justice

¶ 1 In 2004 Wendi Andriano was found guilty of one count of first degree murder and sentenced to death. This automatic

appeal followed We have jurisdiction pursuant to Article 6 Section 5(3) of the Arizona Constitution and Arizona Revised Statutes ("A.R.S ") section 13–4031 (2001)

## I FACTS[1] AND PROCEDURAL BACKGROUND

[1] ¶ 2 Wendi Andriano her terminally ill husband, Joe and their two small children attended a barbeque on October 7 2000 They returned to their apartment around midnight and put the children to bed.

¶ 3 At about 2 15 a.m. on October 8 Andriano called Chris a coworker who also lived at the apartment complex, and asked her to watch the children while Andriano took Joe to the doctor When Chris arrived, Andriano met her outside the apartment. She told Chris "I have a problem Don't ask any questions My husband's in on the floor dying and I haven't called 911 yet. When Andriano cautioned, 'He doesn't know I haven t called 911 Chris urged her to make the call

¶ 4 Upon entering the apartment, Chris found Joe lying on the living room floor in the fetal position. He had vomited, appeared weak, and was having difficulty breathing. While Andriano was in another room calling 911 Joe told Chris that he needed help and had 'for a long time" He asked why it was taking forty-five minutes for the paramedics to arrive.

¶ 5 Andriano returned to the room and told Chris she needed to get Joe to the car so she could drive him to the hospital because the paramedics were responding to another call Joe said he could not get up, so Andriano tried to lift him. When she could not, she became irritated and yelled at Joe using profanities Hearing sirens approaching Chris went out to direct the paramedics to the apartment as Joe began to vomit again

¶ 6 As the paramedics were unloading their equipment, Andriano came out of the apartment screaming at them to go away She then slammed the door Chris and four paramedics knocked on the apartment door, but no one answered. After five to ten minutes of knocking the Phoenix Fire Department alarm room called the Andrianos home *501 **544 telephone in an attempt to get Andriano to open the door The alarm room notified the paramedics that contact had been made with someone in the apartment who would come out to speak with them Rather than coming through the front door which opened to the living room, Andriano went out through her back door climbed over the back patio wall and walked around the apartment building to the front door where Chris and the paramedics were standing. Andriano had changed her shirt and her hair was wet. She told the paramedics that Joe was dying of cancer and had a do-not-resuscitate order She explained that 'this was not the way that he wanted to go ' The paramedics and Chris left without going into the apartment.

¶ 7 Andriano called 911 again at 3 39 a.m The same paramedics responded and saw Andriano wearing a bloody shirt, standing outside the apartment talking to a police officer

¶ 8 When the paramedics entered the apartment, they found Joe lying on the floor in a pool of blood. He had a deep stab wound to the left side of his neck and lacerations on his head that exposed some brain matter A police detective observed at 3 52 a.m. that the blood surrounding Joe's head was already starting to dry A broken bar stool covered in blood was found near Joe's body, as were pieces of a lamp a kitchen knife with blood on the sharp edge, a bloody pillow, and a belt.

¶ 9 A search of the Andrianos storage unit revealed an open cardboard shipping box containing a 500–gram bottle of sodium azide, two Tupperware containers containing sodium azide, nine Q-tips, a plastic knife and fork, and two pairs of latex gloves Andriano's fingerprints were on the plastic knife and the vacuum-packed bag in which the cardboard box was shipped. During a search of the Andrianos' apartment, the police found gelatin capsules filled with sodium azide in a bottle labeled for an herbal supplement. Trace amounts of sodium azide were also discovered in the contents of a pot and two soup bowls in the kitchen. In all, 20 8 grams of sodium azide could not be accounted for

¶ 10 The medical examiner determined that Joe sustained brain hemorrhaging caused by no fewer than twenty-three blows to the back of his head, eight to ten of which independently could have rendered Joe unconscious Defensive wounds on Joe's hands and wrists indicated, however that he was conscious for at least part of the attack Joe also sustained a 3 and 3/4–inch–long by 2–inch–wide stab wound to the left side of his neck that extended to his spine and severed his carotid artery The medical examiner opined that the blows to the head were sustained before the stab wound to the neck and that Joe was still alive although likely unconscious when he was stabbed. Trace amounts of sodium azide were found in Joe's blood and gastric contents

The cause of death was attributed to blunt force trauma and the stab wound.

¶ 11 Based on the blood spatter and other evidence a Phoenix police detective opined that Joe was lying down while he was being struck and did not get up during the attack. He further opined, based on the absence of arterial spurting on the belt and the knife, that both items were placed beside Joe's body after he died. Blood spatter on the bar stool, on the other hand, suggested that the stool was present when the arterial spurting began.

¶ 12 After being taken into custody Andriano called one of her coworkers and asked her to hide certain items that were in Andriano's business office Andriano s adoptive father told a police detective on the day of the murder, "I remember [Andriano] telling me that she stabbed [Joe]"

¶ 13 Andriano was indicted on one count of first degree murder The State filed a notice of intent to seek the death penalty and subsequently alleged two aggravating factors that Andriano committed the offense in expectation of the receipt [ ] of anything of pecuniary value, in violation of A R.S § 13–703(F)(5) (Supp 2000) and that she committed the murder in an especially heinous, cruel or depraved manner" in violation of A R.S § 13–703(F)(6) The State further alleged that the offense was a dangerous felony *see id* § 13–604(P) because it "involved the intentional or knowing infliction of serious physical injury upon Joseph Andriano"

**545 *502 ¶ 14 At trial Andriano testified that after a failed assisted suicide attempt by poison, she and Joe got into a fight, during which she hit Joe with a bar stool in self defense She claimed that he ultimately slit his own throat. The jury found Andriano guilty of first degree murder and further found that the murder was a dangerous felony

¶ 15 The same jury found the (F)(6) "especially cruel aggravating factor but did not find the (F)(5) pecuniary gain aggravator Finding that the mitigating circumstances were not sufficiently substantial to call for leniency the jury returned a verdict calling for a sentence of death.

## II. DISCUSSION

¶ 16 Andriano raises eleven issues on appeal and lists an additional thirteen claims to avoid preclusion. [2]

### A. Guilt Phase Issues

1 *Admission of other act evidence*

[2] ¶ 17 Andriano claims that evidence of her extramarital affairs and her attempts to obtain insurance policies on Joe's life was unfairly prejudicial and was neither intrinsic to the charge against her nor admissible under Arizona Rule of Evidence 404(b) We review evidentiary rulings for an abuse of discretion. *State v McGill,* 213 Ariz. 147 156 ¶ 40 140 P 3d 930 939 (2006), *cert denied* 549 U S 1324 127 S Ct. 1914, 167 L.Ed.2d 570 (2007)

[3] ¶ 18 The trial court found the insurance and affairs evidence intrinsic" to the crime " Other act evidence is intrinsic when [1] evidence of the other act and evidence of the crime charged are inextricably intertwined or [2] both acts are part of a single criminal episode or [3] the other acts were necessary preliminaries to the crime charged. *State v Dickens* 187 Ariz. 1, 18–19 n. 7 926 P 2d 468 485–86 n 7 (1996) (quoting *United States v Coleman,* 78 F 3d 154, 156 (5th Cir 1996))

*a. Life insurance policies*

[4] ¶ 19 After three surgeries to remove a recurring tumor in his salivary gland and as many misdiagnoses Joe was diagnosed with metastatic adenoid cystic carcinoma in 1998 By that time the cancer had spread to his lungs and his condition was deemed terminal

¶ 20 Nevertheless during August and September of 2000, Andriano made several attempts to obtain insurance on Joe's life through various companies During the prescreening process Andriano claimed that Joe did not have cancer One agent contacted Joe on September 6 after receiving an electronic pre-application, at which time Joe indicated that he was not interested in applying. Andriano sent an email three days later from her personal email account asking that Joe s request be reinstated and directing that further contact be made with her She also asked two men to pose as Joe for a life insurance physical exam, one of whom she offered to pay as much as $50,000 Both refused. No life insurance policy was ever obtained through these efforts

¶ 21 Andriano's attempts to procure insurance on Joe's life do not fall into any of the three categories of intrinsic evidence Because she never secured insurance the attempts to procure it were not inextricably intertwined with Joe's murder, part of a single criminal episode, or a necessary preliminary to

Joe's murder *See id* The insurance procurement evidence clearly differs from, for example, evidence deemed intrinsic in *Dickens* that the defendant had stolen the gun used in the charged murders and robberies *See id. see also State v Nordstrom* 200 Ariz. 229 248 ¶ 56, 25 P 3d 717, 736 (2001) (commenting on the "necessary preliminary" prong of the intrinsic evidence inquiry)

¶ 22 Even though not intrinsic to the crime charged, other act' evidence may nonetheless be admissible under Rule 404(b) to prove "motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident," as long as its probative value is not substantially outweighed by the *503 **546 danger of unfair prejudice. Ariz. R. Evid. 403 *see also Dickens* 187 Ariz. at 19 926 P 2d at 486

¶ 23 Evidence of Andriano s attempts to obtain insurance on Joe s life was admissible to show her plan, knowledge, and intent to kill Joe, and also to show that she premeditated Joe's murder Moreover the significant probative value of such damaging evidence is not substantially outweighed by the danger of unfair prejudice to Andriano Because the evidence was admissible under Rule 404(b) the trial court did not abuse its discretion in admitting the evidence, even if it might have admitted the evidence for the wrong reason. *See State v Perez,* 141 Ariz. 459 464 687 P.2d 1214 1219 (1984) (affirming trial court s ruling even though trial judge reached the proper conclusion for the wrong reason)

*b Extramarital affairs*

[5] ¶ 24 During the summer of 2000 Andriano had a brief extramarital affair with Rick, a resident of the apartment complex where she lived and worked as the property manager That affair ended in July when Rick learned that Andriano was married and had children. Despite his rejection of her advances, Andriano aggressively pursued Rick. On one occasion, she stood outside his apartment late at night, banging on his door for five minutes, demanding to be let in, and threatening to get the master 'pass key' if he did not let her in

¶ 25 During that same summer Andriano frequented bars on a weekly basis with coworkers and friends There, she was seen dancing and flirting and even groping and kissing men On September 27 the evening after Joe's fourth chemotherapy treatment, Andriano went to a dance club and began dancing provocatively with and kissing a man she met there They ultimately returned to the Andrianos apartment and had sex During a phone conversation the following day Andriano told the man her husband had died of cancer

¶ 26 Like the insurance evidence, evidence of Andriano's extramarital affairs is not intrinsic to the first degree murder charge The affairs were not inextricably intertwined with or part of the same criminal episode as the murder, nor were they a necessary preliminary to the murder *Dickens* 187 Ariz at 18–19 n 7 926 P 2d at 485–86 n 7 The evidence was admissible under Rule 404(b) however as evidence of Andriano s motive for killing her husband—to be free to pursue other relationships Supporting this purpose was testimony from Andriano's hairdresser who testified that Andriano told her in February of 2000 that she would have divorced Joe were he not ill At a later visit, Andriano disclosed that Joe "wanted to keep the marriage together " but she was 'emotionally out of it" and 'wished he was dead so she could move on with her life. Around August of 2000 Andriano confided to the hairdresser that she was interested in another man who hesitated to get involved in a relationship because she was married.

¶ 27 The evidence was also admissible under Rule 404(b) to rebut the defense theory that Andriano was a domestic violence victim who lived in fear of her abusive husband, whom she bludgeoned to death in self-defense.

¶ 28 Andriano maintains, nonetheless, that the evidence was unfairly prejudicial because "[t]he prosecutor took every opportunity to infuse the trial with marginally relevant information about Andriano s partying and man-chasing [3] Nearly all the examples Andriano provides relate to the prosecutor's comments in the guilt phase closing arguments Comments in closing arguments, however, are not evidence, as the jury was instructed, and thus the comments do not render unfairly prejudicial evidence that is otherwise properly admitted

¶ 29 Another incident about which Andriano complains occurred during the cross-examination of defense expert Dr Sharon Murphy The prosecutor asked Dr Murphy whether Andriano used a personal lubricant during sexual intercourse with Rick. The door to this line of questioning had been opened by defense counsel s questioning on direct examination to which Dr Murphy responded *504 **547 that Andriano and Joe needed to use a lubricant' during intercourse Considered in context, the questioning was designed to rebut Dr Murphy's suggestion, elicited by defense counsel s question, that Andriano s need to use a

lubricant when she had sex with Joe showed that Joe was an abusive spouse The evidence elicited was not unfairly prejudicial.

¶ 30 The final incident relates to a comment the prosecutor made during aggravation phase closing arguments and therefore is not relevant to whether such evidence was admissible in the guilt phase. The probative value of evidence of Andriano's extramarital relationships is not substantially outweighed by the danger of unfair prejudice and thus the trial court did not abuse its discretion in admitting the evidence

¶ 31 In sum, although neither category of evidence is intrinsic to the crime charged, both categories are admissible under Rule 404(b) evidence of attempts to procure life insurance to prove plan, knowledge, intent, and premeditation, and evidence of extramarital affairs to prove motive and to rebut the defense theory that Andriano was a domestic violence victim. The trial court did not abuse its discretion in admitting the evidence

2 *Lesser included offense instructions*

[6] [7] ¶ 32 Andriano argues that the trial court was required sua sponte to instruct the jury on the lesser-included offenses of second degree murder and sudden quarrel or heat of passion" manslaughter Defense counsel did not request any lesser included offense instructions We review a trial court's failure to give lesser-included offense instructions for fundamental error when the instructions are not requested at trial *Nordstrom*, 200 Ariz at 253 ¶ 81 25 P 3d at 741 In a capital case, it is fundamental error for the trial court to fail to give a lesser-included offense instruction if one is supported by the evidence *Id.* *see also Beck v Alabama*, 447 U S 625 627, 638, 100 S Ct. 2382 65 L Ed.2d 392 (1980) and not waived by the defendant.

[8] ¶ 33 As to second degree murder Andriano contends on appeal that because sodium azide poisoning did not cause Joe s death, a reasonable jury could have found that she abandoned her plan to poison Joe Abandonment is shown, she argues by her summoning Chris to the apartment and her call to 911 She maintains that a new sequence of events began that led to an intentional or knowing—but not premeditated —death. As to manslaughter, Andriano contends that the evidence supports a conclusion that Joe provoked her when he reached for a knife and she then killed him during a sudden quarrel or in the heat of passion.

¶ 34 Andriano did not argue either of these theories at trial, however and the evidence presented does not support either theory Andriano testified that she was attempting to assist Joe in committing suicide when they got scared and decided to call for help She claimed that after 911 was called and Chris left the apartment to meet the paramedics, Joe decided that he wanted to follow through with the suicide She testified that, after the paramedics left, she admitted to Joe that she had an affair Joe then became violent and tried to choke her with a phone cord, but she was able to reach a knife, cut the cord, and free herself. When she put the knife down, Joe bent down to pick it up so she hit him with the bar stool until he stopped moving Ultimately Joe picked up the knife and said he was going to kill himself. Andriano tried to stop him, but her hand slipped off the knife Suddenly there was blood everywhere but she had not stabbed Joe

¶ 35 Despite Andriano s testimony that Joe had killed himself, in closing argument, defense counsel argued that Andriano was a domestic violence victim who acted in self-defense after an assisted suicide attempt. The jury was instructed on self-defense and told that if it found Andriano to be a domestic violence victim, "the state of mind of a reasonable person shall be determined from the perspective of a reasonable person who has been a victim of those past acts of domestic violence "

¶ 36 We held in *State v Celaya* that "where the sole defense is self-defense so that the evidence requires either conviction or acquittal, any instruction on any other grade would be impermissible *505 **548 135 Ariz. 248 255 660 P 2d 849, 856 (1983) *see also State v Wall* 212 Ariz. 1, 6, ¶ 29 126 P 3d 148 153 (2006) (noting that when defendant asserts an "all-or-nothing" defense, the record usually will not support the giving of a lesser-included offense instruction) *State v Jones* 109 Ariz. 80 81–82, 505 P 2d 251 252–53 (1973) (holding that lesser included offense instructions were not required where evidence at trial and defendant's self-defense theory presented an "either-or' situation requiring either first degree murder conviction or acquittal) We conclude that the evidence in this case did not support either a second degree murder or manslaughter instruction and that the trial court therefore did not commit fundamental error in failing to give either instruction.

**B Aggravation Phase Issues**

1 *Constitutionality of (F)(6) aggravating factor*

¶ 37 Andriano argues that the A.R.S § 13–703(F)(6) "especially heinous cruel or depraved" aggravator is both facially vague and vague as applied by juries rather than trial judges In *Walton v Arizona*, the United States Supreme Court found Arizona's (F)(6) aggravator facially vague. 497 U S 639, 654, 110 S Ct. 3047, 111 L Ed.2d 511 (1990) *overruled on other grounds by Ring v Arizona (Ring II )* 536 U S 584 122 S Ct. 2428 153 L Ed.2d 556 (2002) The Supreme Court nonetheless upheld the factor against a constitutional challenge because this Court's narrowing construction of the (F)(6) aggravator gives meaningful guidance to the sentencer *Id* at 653–55 110 S Ct. 3047

¶ 38 Because juries rather than trial judges now find the existence of aggravating factors, *see* A R S § 13–703 01(C) (Supp.2006) Andriano argues that the judge's knowledge of the narrowing construction cannot save the (F)(6) aggravator from unconstitutional vagueness We rejected this argument in *State v Cromwell*, 211 Ariz. 181 188–89 ¶¶ 40–42, 119 P 3d 448, 455–56 (2005) *cert. denied* 547 U S 1151, 126 S Ct 2291 164 L Ed.2d 819 (2006) and *State v Anderson (Anderson II )*, 210 Ariz. 327, 352–53, ¶¶ 109–14, 111 P 3d 369, 394–95 (2005) Those cases hold that the (F)(6) aggravator may be constitutionally applied if given substance and specificity by jury instructions that follow this Court's constructions *State v Hampton*, 213 Ariz. 167 176 ¶ 36 140 P 3d 950 959 (2006) *cert denied*, 549 U S 1132 127 S Ct. 972, 166 L Ed.2d 738 (2007)

¶ 39 Andriano also argues that the (F)(6) aggravating factor is unconstitutionally vague when applied by a jury because without proportionality review the jury has no way to determine whether the murder for which it has found the defendant guilty is above the norm of other first degree murders " We rejected this argument in *State v Johnson*, 212 Ariz. 425 431–32 ¶¶ 19–20 133 P 3d 735 741–42 *cert. denied* 549 U S 1022 127 S Ct 559 166 L.Ed.2d 415 (2006) We similarly reject it here

2 *(F)(6) cruelty instruction*[4]

[9] ¶ 40 The trial court provided the following (F)(6) cruelty" instruction to the jury

> Cruelty" involves the infliction of physical pain and/or mental anguish on a victim before death. A crime is committed in an especially cruel manner when a defendant either knew or should have known that the manner in which the crime is committed would cause the victim to experience physical pain and/or mental anguish before death. The victim must be conscious for at least some portion of the time when the pain and/or anguish was inflicted.

Andriano asserts that this instruction was insufficient to guide the jury and channel its discretion in applying the aggravator

¶ 41 The instruction given paraphrases this Court's statement in *State v Trostle* 191 Ariz 4 18 951 P 2d 869 883 (1997) that "[c]ruelty exists if the victim consciously experienced physical or mental pain prior to death, and the defendant knew or should have known that suffering would occur " (Internal citation omitted.) We recently reaffirmed ***506 **549** that the *Trostle* definition of "cruelty' sufficiently narrows and gives substance to the (F)(6) "especially cruel" aggravating factor to save it from constitutional infirmity *Anderson II* 210 Ariz. at 352 & n. 18, ¶ 109, 111 P.3d at 394 & n. 18 We similarly conclude here that the trial court's instruction gave sufficient substance and specificity to the term "cruelty' to channel the jury's discretion and correct any unconstitutional vagueness [5]

3 *Above the norm of other first degree murders instruction*

**[10]** ¶ 42 The trial court instructed the jury that the (F)(6) aggravating circumstance cannot be found to exist unless the murder is especially heinous cruel or depraved, that is where the circumstances of the murder raise it above the norm of other first degree murders Andriano claims that this instruction required the jury to engage in proportionality review which was improper in light of *State v Salazar* 173 Ariz. 399 416 844 P 2d 566 583 (1992) and *State v Greenway* 170 Ariz 155 171 823 P.2d 22, 38 (1991) Because Andriano did not object on this ground at trial we review only for fundamental error *See State v Henderson*, 210 Ariz. 561 567 ¶ 19 115 P 3d 601 607 (2005)

¶ 43 We have held that "the death penalty should not be imposed in every capital murder case but, rather it should be reserved for cases in which either the manner of the commission of the offense or the background of the defendant places the crime above the norm of first-degree murders ' " *State v Carlson* 202 Ariz. 570 582, ¶ 45 48 P 3d 1180, 1192 (2002) (quoting *State v Hoskins* 199 Ariz. 127, 163, ¶ 169, 14 P 3d 997 1033 (2000)) Such an instruction does not

require the jury to engage in proportionality review Instead, the jurors must assess whether the murder was so cruel that it rose above the norm of first degree murders To assist them in this inquiry the judge instructed the jurors on the definition of cruelty," explaining how to determine whether 'the circumstances of the murder raise it above the norm of other first degree murders ' Considering the instructions as a whole, the jury was properly instructed to apply the definition of "cruelty " rather than to engage in proportionality review The trial court did not err, fundamentally or otherwise, in giving the instruction.

**C Penalty Phase Issues**

1 *Residual doubt mitigation*

[11] [12] ¶ 44 The trial court denied Andriano's request to present evidence of residual doubt as a mitigating circumstance in the penalty phase Andriano claims that the trial court was constitutionally required to allow her to present such mitigation evidence for the jury's consideration. We review alleged constitutional violations de novo *McGill* 213 Ariz. at 159, ¶ 53 140 P 3d at 942

¶ 45 Both the United States Supreme Court and this Court have rejected the argument that a capital defendant must be allowed to present residual doubt evidence in mitigation In *Oregon v Guzek*, the defendant argued that the Eighth and Fourteenth Amendments granted him a constitutional right to present new alibi evidence at his sentencing proceeding 546 U S 517, ——, 126 S Ct. 1226 1230 163 L.Ed.2d 1112 (2006) The Supreme Court, although not deciding whether such a right exists, held that its previous cases do not grant capital defendants a constitutional right to present evidence of residual doubt at sentencing *Id* at —— 126 S Ct. at 1231–32 We thus noted in *State v Ellison* that "there is no constitutional requirement that the sentencing proceeding jury revisit the prior guilty verdict by considering evidence of residual doubt. " **550 *507 213 Ariz. 116 136 ¶ 82 140 P 3d 899, 919 (citing *Guzek*, 546 U S at ——, 126 S Ct. at 1230–32) *cert. denied*, —— U S ——, 127 S Ct. 506 166 L Ed 2d 377 (2006) The trial court did not err in denying Andriano's request to present residual doubt evidence in mitigation.

2 *Mercy mitigation*

[13] ¶ 46 The trial court also denied Andriano's request to include 'mercy' among the enumerated mitigating circumstances for the jury s consideration. Andriano maintains that the trial court was constitutionally required to allow her to do so We disagree.

¶ 47 Arizona Revised Statutes § 13–703(G) (Supp 2004) provides that mitigating circumstances are any factors proffered by the defendant or the state that are relevant in determining whether to impose a sentence less than death, including any aspect of the defendant's character propensities or record and any of the circumstances of the offense " The defendant bears the burden of proving mitigating circumstances by a preponderance of the evidence *Id.* § 13–703(C) The defendant cannot, however, prove "mercy" by any standard, nor does it relate to the character or propensities of the defendant or the circumstances of the crime Therefore, mercy is not a mitigating circumstance.

¶ 48 Mercy is a concept jurors may apply in evaluating the existence of mitigating circumstances and in deciding whether the death penalty is appropriate in a particular case. In this sense, 'mercy" is simply another word for "compassion or "leniency " A capital defendant is free to argue to the jury, as the defense did here, that mercy or leniency is appropriate based on the mitigation evidence presented.

¶ 49 The instructions given in this case correctly conveyed the role of mercy in determining the appropriate sentence The trial court did not err in refusing Andriano's request to include mercy among the enumerated mitigating circumstances for the jury's consideration.

3 *Jury unanimity in determining mitigating circumstances*

[14] [15] ¶ 50 The trial court instructed the jury in the penalty phase as follows

> Any verdict of death or life imprisonment must be unanimous If you unanimously find that no mitigation exists, then you must return a verdict of death *If you unanimously find that mitigation exists* each one of you must individually weigh that mitigation in light of the aggravating circumstance already found to exist, and if you unanimously find that the mitigation is not sufficiently substantial to call for leniency you must return a verdict of death. *If you unanimously find that mitigation exists* and it is sufficiently substantial to call

for leniency you must return a verdict of life

(Emphasis added.) Andriano claims that this instruction improperly required the jury to unanimously find particular mitigating circumstances before each juror could individually consider whether that mitigation was sufficiently substantial to call for leniency We review the challenged instruction de novo and consider the instructions as a whole "to ensure that the jury receives the information it needs to arrive at a legally correct decision." *State ex rel Thomas v Granville (Baldwin* ), 211 Ariz. 468 471 ¶ 8 123 P 3d 662 665 (2005)

¶ 51 Each juror in a death penalty case must individually determine whether any mitigating circumstances exist. A.R.S § 13–703(C) *see Baldwin* 211 Ariz. at 472, ¶ 13 123 P 3d at 666 *see also Ellison,* 213 Ariz. at 139 ¶ 102, 140 P 3d at 922 (discussing Supreme Court cases holding that capital sentencing statutes may not require unanimity as to mitigating circumstances) Then, in light of the aggravating circumstances the jury has already found to exist, each juror must individually determine whether the mitigation that juror has found to exist is sufficiently substantial to call for leniency *See* A.R S § 13–703(C) (E) *Baldwin* 211 Ariz. at 473 ¶ 18 123 P 3d at 667

¶ 52 Read as a whole, the instructions given here correctly advised the jurors that they did not have to agree upon the existence of any particular mitigating circumstance before ***508 **551** each juror could individually assess whether the mitigation was sufficiently substantial to call for leniency The court repeatedly advised them during the penalty phase that each juror was required to "individually" determine the existence of mitigating circumstances [6] We therefore conclude that the trial court's instruction considered in light of the other instructions, adequately informed the jury and does not require reversal

4 *Jury coercion*

**[16]** ¶ 53 Andriano argues that the trial court coerced the jury's death verdict in two ways when it gave an impasse instruction. (1) by giving the instruction before ascertaining whether the jury was truly deadlocked, and (2) by improperly instructing the jury about its duty to deliberate "In determining whether a trial court has coerced the jury's verdict, this court views the actions of the judge and the comments made to the jury based on the totality of the circumstances and attempts to determine if the independent judgment of the jury was displaced. *State v Huerstel* 206 Ariz. 93, 97, ¶ 5, 75 P 3d 698 702 (2003)

¶ 54 Near the end of the second day of penalty phase deliberations, the jury submitted the following question to the trial court "If we are unable to reach an unanimous verdict, what is the procedure that will be followed?" The court instructed the jury as follows

> It appears from your note that you are at a deadlock in your deliberations I have some suggestions to help your deliberations, not to force you to reach a verdict I am merely trying to be responsi[ve] to your apparent need for help I do not wish or intend to force a verdict. Each juror has a duty to consult with one another to deliberate with a view to reaching an agreement if it can be done without violence to individual judgment. No juror should surrender his or her honest conviction as to the weight or effect of the evidence solely because of the opinion of other jurors or for the purpose of reaching a verdict.
>
> However, you may want to identify areas of agreement and disagreement and discuss the law and the evidence as they relate to the areas of disagreement.
>
> If you still disagree you may wish to tell the attorneys and me which issues, questions law, or facts you would like us to assist you with. If you decide to follow this suggestion, please write down the issues, questions law or facts on which we can possibly help Please give your note to the bailiff We will then discuss your ***509 **552** note and try to help [7]

The jury asked no further questions and returned a death verdict two days later

a. *Prematurely given instruction*

**[17] [18]** ¶ 55 Rule 22 4 of the Arizona Rules of Criminal Procedure permits the trial court, upon being advised by the jury that it has reached an impasse in its deliberations to inquire how it can assist the jury in its deliberations Although the rule gives a trial judge broad discretion in dealing with juries at an impasse the rule requires an affirmative indication from the jury it is in need of help before assistance may be offered. *Huerstel* 206 Ariz. at 99, ¶ 17 75 P 3d at 704 In *Huerstel* the trial court sent an impasse instruction to the guilt phase jury after three days of deliberations although it had received no note or other indication that the jury had reached an impasse. *Id* at 97–

98, ¶¶ 6–8 75 P 3d at 702–03 The only questions the court had received related to the credentials of an expert witness evidentiary matters and a jury instruction. *Id* We held that the impasse instruction was prematurely given because it was given "without any clear evidence the jury needed help " *Id.* at 99, ¶ 17 75 P 3d at 704

¶ 56 In this case, unlike the situation in *Huerstel* the jury's question inquiring what would happen if the jury could not reach a verdict affirmatively indicated that the jurors were at an impasse The *Huerstel* rule does not require that the jury unequivocally state that it cannot reach a verdict only that it give an "affirmative indication' that it is deadlocked. The trial court did not err in giving the impasse instruction.

*b Duty to deliberate instruction*

[19] ¶ 57 Andriano also argues that the impasse instruction given by the trial court inaccurately stated the law regarding a capital jury's duty in penalty phase deliberations The crux of the argument is that, although the trial court's instruction would have been proper in the guilt phase or the aggravation phase of the proceedings it was not appropriate in the penalty phase because jurors have no duty to "deliberate with a view to reaching an agreement" in the penalty phase

¶ 58 In *Lowenfield v Phelps* the United States Supreme Court addressed whether an impasse instruction given to a capital sentencing jury coerced the death sentence in that case 484 U S 231 233 108 S Ct. 546 98 L Ed 2d 568 (1988) [8] The Supreme Court held that the instruction did not coerce the jury's death verdict. *Id* at 241 108 S Ct. 546 The Court quoted with approval another capital case in which it had opined that jurors must try to reach a verdict.

> The very object of the jury system is to secure unanimity by a comparison of views, and by arguments among the jurors themselves It certainly cannot be the law that each juror should not listen with deference to the arguments and with a distrust of his own judgment, if he finds a large majority of the jury taking a different view of the case from what he does himself It cannot be that each juror should go to the jury room with a blind determination that the verdict shall represent his opinion of the case at that moment; or, that he should close his ears to the arguments of men who are equally honest and intelligent as himself

*Id* at 237 108 S Ct. 546 (quoting ***510** ****553** *Allen v United States,* 164 U S 492, 501–02 17 S Ct. 154 41 L Ed. 528 (1896)) The Court emphasized that [t]he continuing validity of this Court's observations in *Allen* are beyond dispute " *Id.*

¶ 59 *Lowenfield* thus makes clear that jurors in capital cases have a duty to deliberate in sentencing proceedings Arizona's death penalty sentencing scheme does not alter this duty While jurors individually determine whether a mitigating circumstance exists, A R.S § 13–703(C) the jury must still be unanimous in its decision to impose a death sentence or a life sentence *id.* § 13–703 01(H) Therefore the jurors may be instructed that they have a duty to deliberate in the penalty phase of a capital case

¶ 60 In sum, because the impasse instruction correctly stated the law and was given after an affirmative indication from the jury that it was deadlocked, it cannot be said that the verdict was coerced.

**D Constitutionality of Lethal Injection Statute**

[20] ¶ 61 Arizona Revised Statutes § 13–704(A) (2001) provides that [t]he penalty of death shall be inflicted by an intravenous injection of a substance or substances in a lethal quantity sufficient to cause death, under the supervision of the state department of corrections " Andriano contends that this statute is unconstitutionally vague because it does not prescribe the type or dosage of drugs that must be administered, the order in which they must be administered, or the qualifications of the personnel who administer them, thereby failing to ensure that death by lethal injection is not cruel and unusual She argues that to comport with the Eighth Amendment, [t]he statute must [also] address the inherent difficulties with individual issues such as vein accessibility and chemical resistances

¶ 62 Section 13–704(A) constitutionally prescribes that the method of death shall be lethal injection. *See State v Hinchey* 181 Ariz 307 315, 890 P 2d 602 610 (1995) (considering and rejecting argument that death by lethal injection constitutes cruel and unusual punishment) *Hinchey's* pronouncement that lethal injection as a method of execution comports with the Eighth Amendment was not conditioned upon the use of particular procedures in implementing lethal injection. Moreover the United States Supreme Court has never held that death by lethal injection is cruel and unusual absent specific procedures for implementation, nor does Andriano cite any cases to that effect. Andriano has thus failed to establish an Eighth Amendment right to a particular protocol for lethal injection [9]

E. Independent Review

[21] ¶ 63 Because Andriano's offense occurred before August 1 2002 we independently review the aggravating and mitigating circumstances and the propriety of the death sentence A.R.S § 13–703 04(A) (Supp.2006), *see* 2002 Ariz Sess Laws, 5th Spec Sess, ch. 1, § 7 In conducting our independent review we consider the quality and the strength, not simply the number of aggravating and mitigating factors *State v Roque* 213 Ariz 193 230 ¶ 166, 141 P 3d 368 405 (2006) (quoting *State v Greene* 192 Ariz. 431, 443, ¶ 60 967 P 2d 106 118 (1998))

1 *Aggravation*

[22] ¶ 64 The jury found one aggravating factor—that Andriano committed the murder in an especially cruel manner A.R S § 13–703(F)(6) Andriano argues that we should find the evidence insufficient to support the "especially cruel' finding by the jury because (1) Joe experienced only distress, but not "extreme" physical pain or mental anguish after ingesting the sodium azide (2) the defensive wounds were "minor and not indicative of a great or prolonged struggle," showing that Joe was rendered unconscious 'very quickly' after the bar stool attack began, and (3) Joe's distress was not reasonably foreseeable We review the jury's finding de novo *Anderson II* 210 Ariz. at 354 ¶ 119 111 P 3d at 396 (citing A R.S § 13–703 04 (independent review))

**554 *511 ¶ 65 The cruelty prong of the (F)(6) aggravating circumstance may be proved by showing that the defendant knew or should have known that the manner in which the crime was committed would cause the victim to consciously experience either physical pain or mental anguish before death *Trostle* 191 Ariz. at 18, 951 P 2d at 883 The evidence showed that Andriano poisoned Joe with sodium azide and left him to suffer for what felt to Joe like a "long time " During that period, Joe vomited at least twice, was too weak to sit or stand, and was having difficulty breathing After pretending to call 911 Andriano stood by for approximately forty-five minutes as Joe suffered from the effects of sodium azide poisoning. Andriano's Internet research on sodium azide and the warnings accompanying the shipped chemical demonstrate that she knew or should have known that poisoning her husband with sodium azide would cause him physical pain and mental anguish. Joe, who was conscious during this time, as evidenced by his interaction with Chris undoubtedly "experienced significant uncertainty as to [his] ultimate fate *See Ellison* 213 Ariz at 142, ¶ 120, 140 P 3d at 925 (quoting *State v Van Adams* 194 Ariz. 408 421 ¶ 44 984 P 2d 16 29 (1999)) (mental anguish, and hence cruelty established upon this showing)

¶ 66 Moreover, Andriano struck her terminally ill husband at least twenty-three times in the back of the head with a bar stool Defensive wounds on Joe s hands and wrists indicate that he was conscious for at least some of the attack and thus knew his wife was attacking him as he lay on the floor unable to defend himself Andriano also knew or should have known that beating her husband with a bar stool would cause him physical pain and mental anguish. [10]

¶ 67 Andriano asks us to require that the physical or mental pain experienced by the victim be extreme' There is no such requirement for a cruelty finding. *See Trostle* 191 Ariz. at 18 951 P 2d at 883 Nonetheless, the physical pain and mental anguish Joe experienced likely were extreme" by any standards

¶ 68 Although Andriano argued at trial that she was assisting Joe in a suicide by poisoning, she argues on appeal that because Joe did not know he was being poisoned, mental anguish cannot be proved. While a victim's knowledge of the source of physical pain may be relevant to whether the victim experienced mental anguish, it is not a requisite for a finding of mental anguish And on the facts of this case, mental anguish is established even if Joe did not know he had been poisoned. Moreover cruelty can be established upon a showing of either mental anguish or physical pain. *Id.* We thus conclude that cruelty was established based on either—or both—mental anguish or physical pain.

2. *Mitigation* [11]

[23] ¶ 69 Andriano presented several mitigating circumstances for the jury's consideration, including the stress of Joe s cancer, her good grades in school, missionary and community work, and strong religious convictions In addition, she presented evidence that she was a sexual abuse and domestic violence victim, a good mother to two children, married for six years, and a good inmate

¶ 70 Although Andriano presented some evidence that she was a domestic violence victim, we assign little weight to this mitigating circumstance, in part because it is not related to the murder *See Roque* 213 Ariz at 231 ¶ 169 141 P 3d at 406 (' [T]he relationship between mitigating evidence and

the murder may affect the weight given to the mitigating evidence ") (citation omitted) *State v Newell,* 212 Ariz 389 405, ¶ 82, 132 P 3d 833, 849 *cert denied,* ***512 **555** 549 U S 1056 127 S Ct 663 166 L Ed.2d 521 (2006) The evidence established that Andriano did not kill Joe while defending against a domestic violence attack. Instead, she poisoned her terminally ill husband, struck him in the back of the head twenty-three times, and slit his throat Joe posed no threat to Andriano at the time of the attack because he was so weak from the poison and chemotherapy that he could not get up

¶ 71 Andriano was under substantial stress from having to deal with Joe's terminal cancer The record does not indicate however, that at the time of the offense the stress was any greater than it had been two years earlier when she and Joe first learned he was terminally ill, and she was pregnant with their second child. Moreover, this is not a case in which Andriano suddenly "cracked under extreme stress Andriano methodically premeditated Joe s murder, showing that her stress bore little relation to Joe s death. This mitigating circumstance thus does not warrant substantial weight.

¶ 72 Andriano also offered evidence that she 'may have been sexually abused by her biological father when she was around the age of two, although she does not recall it, and that a member of the traveling ministry to which her family belonged exposed himself to Andriano when she was between six and eight years old. Andriano also showed that she maintained good grades in school and participated in missionary and community work. We do not weigh these mitigating circumstances heavily because the events are remote in time to the offense and thus their relevance is minimal. *Cf Ellison* 213 Ariz at 144 ¶ 136 140 P 3d at 927 (finding defendant's "childhood troubles deserve little value as a mitigator for the murders he committed at age thirty-three")

¶ 73 The record contains conflicting evidence on whether Andriano was a good mother In any event, we afford this mitigating circumstance minimal value in light of the fact that Andriano murdered her children s father while the children were present in the apartment. Moreover, neither the fact of Andriano's marriage nor its six-year duration is mitigating considering that she would have remained married and the marriage would have lasted longer had she not killed her husband

¶ 74 Andriano was a good inmate in jail and helpful to staff and inmates from September 2003 until the penalty phase of her trial in December 2004 Because inmates are expected to behave however we assign this mitigating circumstance little weight. *State v Harrod* 200 Ariz. 309, 319 ¶ 53, 26 P 3d 492, 502 (2001) *vacated on other grounds* 536 U S 953 122 S Ct. 2653, 153 L Ed.2d 830 (2002)

¶ 75 Although Andriano had what might be considered a strict religious upbringing, many of her actions such as killing her husband and having extramarital affairs appear inconsistent with holding strong religious convictions We thus assign this evidence minimal value

¶ 76 Andriano also alleged as mitigating circumstances cooperation with law enforcement authorities remorse, and age. The evidence presented, however contradicts Andriano s assertion that she cooperated in the investigation of Joe's murder [12] Moreover, because Andriano continues to deny responsibility for her conduct, we reject her contention that she is remorseful *See State v Gulbrandson,* 184 Ariz 46, 70–71, 906 P 2d 579 603–04 (1995) (noting that defendant continued to deny responsibility in finding that he had not proven remorse as a mitigating circumstance) We likewise do not find her age—thirty at the time of the offense—to be mitigating, particularly in light of her above-average I Q

¶ 77 We likewise give minimal weight to the remaining mitigating circumstances urged. lack of prior convictions good candidate for rehabilitation, no future threat to the community and impact on family and friends

3 *Propriety of the death sentence*

¶ 78 The quality and strength of Andriano s mitigation evidence is not sufficiently ***513 **556** substantial to call for leniency in light of the especially cruel manner in which Andriano murdered her husband. We therefore affirm Andriano s sentence of death.

## III. CONCLUSION

¶ 79 For the foregoing reasons, we affirm Andriano s conviction and death sentence.

CONCURRING RUTH V MCGREGOR, Chief Justice MICHAEL D RYAN ANDREW D HURWITZ and W SCOTT BALES Justices

**APPENDIX**

**Claims Raised to Avoid Preclusion**

Andriano raises the following thirteen challenges to the constitutionality of Arizona's death penalty scheme to avoid preclusion

1 The death penalty is cruel and unusual punishment under any circumstances This argument was rejected by the United States Supreme Court in *Gregg v Georgia* 428 U S 153, 187, 96 S Ct. 2909 49 L.Ed.2d 859 (1976), and by this Court in *Harrod,* 200 Ariz. at 320, ¶ 59 26 P 3d at 503

2 The death penalty is imposed arbitrarily and irrationally in Arizona. We rejected this argument in *State v Beaty* 158 Ariz. 232 247 762 P 2d 519 534 (1988)

3 Application of the death penalty on the facts of this case would constitute cruel and unusual punishment. No argument or authority is presented to support this claim

4 The prosecutor's discretion to seek the death penalty is not channeled by standards We rejected this argument in *State v Sansing,* 200 Ariz. 347 361, ¶ 46 26 P 3d 1118, 1132 (2001) *vacated on other grounds* 536 U S 954 122 S Ct. 2654 153 L.Ed 2d 830 (2002)

5 The aggravating factors set forth in A.R.S § 13–703(F) are elements of capital murder and must be alleged in an indictment and screened for probable cause We rejected this argument in *McKaney v Foreman ex rel. County of Maricopa,* 209 Ariz. 268 270 ¶ 9 100 P 3d 18 20 (2004)

6 Application of the death penalty statutes promulgated after *Ring II* 536 U S at 584, 122 S Ct. 2428 violates the prohibition against ex post facto laws The changes altered the rules of evidence to permit different testimony than that permitted at the time of Andriano s offense. We rejected this argument in *State v Ring* (*Ring III* ) 204 Ariz. 534 547, ¶ 24 65 P 3d 915, 928 (2003)

7 The absence of proportionality review of death sentences by Arizona courts denies capital defendants due process of law and equal protection and amounts to cruel and unusual punishment. We rejected this argument in *Gulbrandson* 184 Ariz. at 73 906 P.2d at 606

8 Arizona's capital sentencing scheme is unconstitutional because it does not require that the State prove that the death penalty is appropriate. We rejected this argument in *Gulbrandson,* 184 Ariz. at 72 906 P 2d at 605

9 Arizona Revised Statutes § 13–703 provides no objective standards to guide the sentencer in weighing the aggravating and mitigating circumstances We rejected this argument in *State v Pandeli,* 200 Ariz. 365, 382, ¶ 90 26 P 3d 1136, 1153 (2001) *vacated on other grounds* 536 U S 953, 122 S Ct. 2654, 153 L Ed.2d 830 (2002)

10 Arizona's death penalty scheme is unconstitutional because it does not require the sentencer to find beyond a reasonable doubt that the aggravating circumstances outweigh the accumulated mitigating circumstances We rejected this argument in *State v Poyson* 198 Ariz 70 83 ¶ 59, 7 P 3d 79 92 (2000)

11 Arizona Revised Statutes § 13–703 does not sufficiently channel the sentencer's discretion Aggravating circumstances should narrow the class of persons eligible for the death penalty and reasonably justify the imposition of a harsher penalty The broad scope of Arizona s aggravating factors encompasses nearly anyone involved in a murder *514 **557 We rejected this argument in *Pandeli* 200 Ariz. at 382, ¶ 90 26 P 3d at 1153

12 Execution by lethal injection is cruel and unusual punishment. We rejected this argument in *Hinchey* 181 Ariz. at 315, 890 P 2d at 610

13 Arizona s death penalty scheme unconstitutionally requires imposition of the death penalty whenever at least one aggravating circumstance exists and there is no mitigation sufficiently substantial to call for leniency We rejected this argument in *State v Miles* 186 Ariz. 10 19, 918 P 2d 1028, 1037 (1996)

**All Citations**

215 Ariz. 497 161 P 3d 540 508 Ariz. Adv Rep 3

Footnotes

1 We view the facts in the light most favorable to sustaining the verdict. *State v Tucker* 205 Ariz. 157 160 n 1 68 P 3d 110 113 n 1 (2003)

2 The thirteen claims listed to avoid preclusion are appended to this opinion

3 Andriano does not allege prosecutorial misconduct

4 The jury found only the cruelty prong of the (F)(6) aggravating factor It did not find the murder heinous or depraved A finding of any of the three prongs is sufficient to support the (F)(6) aggravating circumstance *Cromwell* 211 Ariz at 189 ¶ 43 119 P 3d at 456

5 Andriano s brief also seems to claim that the evidence was insufficient to support the jury's finding that the murder was especially cruel Because we would review sufficiency of the evidence to determine whether substantial evidence supports the jury's finding viewing the facts in the light most favorable to sustaining the jury['s] verdict *State v Roque* 213 Ariz 193 218 ¶ 93 141 P 3d 368 393 (2006) and affirm the jury's finding if the evidence is such that reasonable persons could accept [it] as adequate and sufficient to support a conclusion of defendant's guilt beyond a reasonable doubt, *Id* (quoting *State v Roseberry* 210 Ariz 360 369 ¶ 45 111 P 3d 402 411 (2005)) the issue is subsumed in our independent review *See infra* ¶¶ 64–68

6 Before being given the instruction to which Andriano objects the jurors had been instructed as follows

> Although a final decision on a penalty of death or life imprisonment must be unanimous the determination of what circumstances are mitigat[ng] is for *each one of you to resolve individually* based upon all the evidence that has been presented to you during this phase and at any of the prior phases of the trial.

(Emphasis added ) The jurors were also given the following instruction

> You must make your decision about whether mitigation is sufficiently substantial to call for leniency based solely upon your weighing of any mitigation proven to you and the aggravating factor you have already found during the Aggravation Phase To do this, *you must individually determine the nature and extent of mitigating circumstances.* Then In light of the aggravating circumstance that has been proven to exist you must individually determine if the totality of the mitigating circumstances is sufficiently substantial to call for leniency and a life sentence

(Emphasis added )

Moreover at the outset of the penalty phase the jury was preliminarily advised that "[t]he jurors do not have to agree unanimously that a mitigating circumstance has been proven to exist. Each juror may consider any mitigating circumstance found by that juror in determining the appropriate penalty The jury was further instructed at that time to individually decide whether there is mitigation and whether it is sufficiently substantial to call for the imposition of a life sentence rather than a sentence of death

Defense counsel s closing argument in the penalty phase also correctly advised the jurors regarding their responsibilities Defense counsel told the jury [t]o clarify once again individually determine the nature and extent of the mitigating circumstances Not as a group individually What is it to me as one juror What is my moral position on that circumstance

7 This instruction contains language very similar to that set forth in the comment to the 1995 amendment to Arizona Rule of Criminal Procedure 22 4

8 In *Lowenfield* the trial court gave an instruction that said in part,

> When you enter the jury room it is your duty to consult with one another to consider each other's views and to discuss the evidence with the objective of reaching a just verdict if you can do so without violence to that individual judgment. Each of you must decide the case for yourself but only after discussion and impartial consideration of the case with your fellow jurors. You are not advocates for one side or the other Do not hesitate to reexamine your own views and to change your opinion if you are convinced you are wrong but do not surrender your honest belief as to the weight and effect of evidence solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict.

484 U S at 235 108 S Ct. 546

9 Andriano may raise in a petition filed pursuant to Arizona Rule of Criminal Procedure 32 any objections to the protocol to be used

10 The evidence established that Joe was likely unconscious when his throat was slashed We therefore do not consider whether the stabbing caused physical pain or mental anguish

11 Andriano did not argue why the Court should find in its independent review that the mitigating circumstances were sufficiently substantial to call for leniency A.R S § 13–703(E) Counsel in capital cases should take advantage of all

appropriate opportunities to argue why death is not suitable punishment for their particular client. *ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases* Guideline 10 11(L) (2003).

12 Andriano did not mention the sodium azide when she was questioned by police and later asked her coworker to hide evidence Evidence was also presented that Andriano staged the scene of the murder to make it appear as though she acted in self-defense

End of Document

© 2016 Thomson Reuters No claim to original U S Government Works

# Exhibit 4

225 Ariz. 560
Supreme Court of Arizona,
En Banc

STATE of Arizona, Appellee,
v
Mike Peter GALLARDO, Appellant.

No CR-09-0171-AP
|
Nov 30 2010

Synopsis
**Background** Following a mistrial for juror misconduct, defendant was convicted by a second jury in the Superior Court, Maricopa County No CR2006-175408 Sally Schneider Duncan J of first degree murder and other offenses and was sentenced to death Defendant appealed.

**Holdings** The Supreme Court, Bales, J, held that.

[1] trial court did not abuse its discretion in declaring mistrial for juror misconduct

[2] trial court did not clearly err in overruling defendant s *Batson* challenges to state s peremptory strikes of three minority jurors

[3] evidence supported especially cruel" aggravating circumstance,

[4] statements in which victim s parents spoke about his character and the impact of his murder upon their family and father played 911 call he made after finding his son murdered, were admissible victim impact evidence at penalty phase

[5] any impropriety in prosecutor's closing argument during penalty phase did not require reversal and

[6] reasonable juror could conclude that mitigation evidence about the impact of execution on defendant's family and the general conditions of confinement in state's maximum security facilities was not sufficiently substantial to call for leniency

Affirmed

West Headnotes (39)

[1] **Criminal Law**
Deliberations in General

Trial court did not abuse its discretion in capital murder prosecution in declaring a mistrial for juror misconduct, where trial court found that three jurors should be excused for violating admonition not to discuss case before deliberations and for not candidly responding to questions and that three others had formed opinions about other jurors that would affect their deliberations striking all of those jurors would not have left 12 to deliberate while striking only those who violated admonition would leave no alternates for a case expected to last three months, and trial court also found it "highly likely" that four other jurors had violated admonition despite having denied doing so

Cases that cite this headnote

[2] **Criminal Law**
Discretion of court

The decision to grant a mistrial rests within the sound discretion of the trial court.

2 Cases that cite this headnote

[3] **Double Jeopardy**
Manifest necessity other grounds

If there is manifest necessity for a mistrial the Double Jeopardy Clause does not bar retrial U S C A Const Amend 5

Cases that cite this headnote

[4] **Double Jeopardy**
Manifest necessity other grounds

Manifest necessity for a mistrial may arise, such that Double Jeopardy Clause does not bar retrial, when juror impartiality is compromised by jurors discussing evidence before deliberations U S C A Const Amend. 5

Cases that cite this headnote

[5] **Criminal Law**
Otherwise irreparable error or prejudice in general

Because curative instructions or other measures will not necessarily remove the risk of bias, the trial court must have the power to declare a mistrial in appropriate cases

1 Cases that cite this headnote

[6] **Jury**
Peremptory challenges

Trial court did not clearly err in overruling capital defendant's *Batson* challenges to state s peremptory strikes of three minority jurors, although defendant made prima facie showing of discrimination, where state explained that it struck one juror for hardship, another for her negative feelings toward police, and the last for her criminal history trial court found that state s reasons were not pretexts, and other minority jurors were ultimately selected for the panel

4 Cases that cite this headnote

[7] **Constitutional Law**
Peremptory challenges

Excluding a potential juror based on race violates the Equal Protection Clause of the Fourteenth Amendment. U S C A Const.Amend 14

2 Cases that cite this headnote

[8] **Jury**
Peremptory challenges

*Batson* challenges require a three-step analysis (1) the party challenging the peremptory juror strikes must make a prima facie showing of discrimination, (2) the striking party must provide a race-neutral reason for the strike and (3) if a race-neutral explanation is provided, the trial court must determine whether the challenger has carried its burden of proving purposeful racial discrimination.

7 Cases that cite this headnote

[9] **Jury**
Peremptory challenges

Whether the justifications offered for peremptorily striking a juror are pretexts for discrimination turns on the lawyer s credibility and the best evidence of discriminatory intent often will be the demeanor of the attorney who exercises the challenge

1 Cases that cite this headnote

[10] **Sentencing and Punishment**
Vileness, heinousness, or atrocity

Evidence supported "especially cruel aggravating circumstance in capital murder case arising from fatal shooting, that victim was bound hand and foot, a pillowcase was tied over his head, and he struggled to free himself indicated he had time to suffer significant uncertainty as to his fate and record supported conclusion that defendant knew or should have

known that victim would suffer A R.S § 13–751(F)(6)

1 Cases that cite this headnote

[11] **Criminal Law**
Construction of Evidence
**Criminal Law**
Substantial evidence

On a challenge to sufficiency of evidence, the Supreme Court determines whether substantial evidence supports the jury s finding, viewing the facts in the light most favorable to sustaining the jury verdict.

2 Cases that cite this headnote

[12] **Criminal Law**
Degree of proof

"Substantial evidence" is such proof that reasonable persons could accept as adequate and sufficient to support a conclusion of defendant s guilt beyond a reasonable doubt.

1 Cases that cite this headnote

[13] **Sentencing and Punishment**
Vileness heinousness or atrocity

A finding of cruelty alone is sufficient in a capital case to establish the aggravator that the defendant committed the offense in an especially heinous, cruel or depraved manner A R.S § 13–751(F)(6)

2 Cases that cite this headnote

[14] **Sentencing and Punishment**
Vileness heinousness, or atrocity
**Sentencing and Punishment**
Degree of proof

To establish "especially cruel" aggravating circumstance in capital case, the state must prove beyond a reasonable doubt that the victim consciously experienced physical or mental pain prior to death and the defendant knew or should have known that suffering would occur A R.S § 13–751(F)(6)

2 Cases that cite this headnote

[15] **Sentencing and Punishment**
Aggravating or mitigating circumstances
**Sentencing and Punishment**
Instructions

Facially vague aggravator that murder was committed in "especially cruel" manner was remedied in death penalty case by limiting instructions that to find the aggravator the jury must find that victim consciously suffered physical or mental pain, and that defendant knew or should have known that victim would suffer A R.S § 13–751(F)(6)

3 Cases that cite this headnote

[16] **Sentencing and Punishment**
Aggravating or mitigating circumstances
**Sentencing and Punishment**
Instructions

Aggravating circumstance that defendant committed first degree murder in an especially heinous cruel or depraved manner is facially vague but may be remedied by appropriate limiting instructions in a capital case. A R.S § 13–751(F)(6)

Cases that cite this headnote

[17] **Sentencing and Punishment**
Victim impact

Victim impact evidence should not be allowed at penalty phase of capital case if it is so unduly prejudicial that it renders the trial fundamentally unfair

4 Cases that cite this headnote

[18] **Sentencing and Punishment**
Discretion of lower court

Admission of victim impact evidence in capital sentencing proceeding is reviewed for an abuse of discretion.

Cases that cite this headnote

[19] **Sentencing and Punishment**
Victim impact

Statements in which victim's parents spoke about his character and the impact of his murder upon their family, and victim s father played the 911 call he made after finding his son murdered, were admissible victim impact evidence at penalty phase of capital case, statements were not so unduly prejudicial as to render trial fundamentally unfair and trial court appropriately instructed jury that victim impact evidence could not be considered as an aggravating circumstance and could be considered only for the limited purpose of rebutting mitigation

3 Cases that cite this headnote

[20] **Sentencing and Punishment**
Victim impact

Admissibility of victim impact statements at penalty phase of capital case does not depend on the particular mitigation evidence presented by the defendant.

Cases that cite this headnote

[21] **Sentencing and Punishment**
Mitigating circumstances in general

Jurors may consider mitigating circumstances, whether proved by the defendant or present in the record, in determining whether death is the appropriate sentence

Cases that cite this headnote

[22] **Sentencing and Punishment**
Victim impact

Even if victim impact statements are not offered to rebut any specific mitigating fact, they are generally relevant to rebut mitigation and thus admissible in the penalty phase of a capital case

2 Cases that cite this headnote

[23] **Criminal Law**
Review De Novo

The Supreme Court reviews de novo whether jury instructions adequately state the law

4 Cases that cite this headnote

[24] **Criminal Law**
Conduct of counsel in general

The Supreme Court will reverse a conviction for prosecutorial misconduct if (1) misconduct is indeed present, and (2) a reasonable likelihood exists that the misconduct could have affected the jury s verdict thereby denying the defendant

a fair trial

4 Cases that cite this headnote

[25] **Criminal Law**
Statements as to Facts, Comments and Arguments

The defendant seeking reversal of a conviction based on prosecutorial misconduct must show that the offending statements were so pronounced and persistent that they permeated the entire atmosphere of the trial and so infected the trial with unfairness as to make the resulting conviction a denial of due process U S C A. Const.Amend 14

3 Cases that cite this headnote

[26] **Criminal Law**
Arguments and conduct in general
**Criminal Law**
Conduct of counsel in general

The Supreme Court separately evaluates each instance of alleged prosecutorial misconduct, and the standard of review depends upon whether the defendant objected if defendant objected, the Supreme Court reviews for harmless error and, if not, it reviews only for fundamental error

3 Cases that cite this headnote

[27] **Criminal Law**
Conduct of counsel in general

Even if there is no error or an error is harmless and so by itself does not warrant reversal, an incident may nonetheless contribute to a finding of persistent and pervasive misconduct if the cumulative effect of the incidents shows that the prosecutor intentionally engaged in improper conduct and did so with indifference if not specific intent, to prejudice the defendant.

4 Cases that cite this headnote

[28] **Sentencing and Punishment**
Arguments and conduct of counsel

Prosecutor did not violate ruling that precluded state, in rebutting mitigation evidence at penalty phase of capital case, from asking witnesses about defendant s criminal or institutional history when prosecutor commented in opening statement that defendant s expert had not reviewed Department of Corrections records for defendant, which had been previously admitted, but instead would talk about the treatment of inmates generally

Cases that cite this headnote

[29] **Sentencing and Punishment**
Harmless and reversible error

Any prejudice from prosecutor s opening statement, allegedly in violation of a ruling on the scope of evidence rebutting mitigation that jury would hear evidence regarding defendant's childhood during penalty phase of capital case was cured by preliminary and final jury instructions that attorneys remarks statements and arguments were not evidence but were intended to help jurors understand the evidence and apply the law

Cases that cite this headnote

[30] **Sentencing and Punishment**
Harmless and reversible error

The Supreme Court would reverse based on allegedly improper comments by prosecution at penalty phase of capital case only if defendant established a reasonable likelihood that the misconduct could have affected the jury's

verdict any improper comments had to be so serious that they affected the defendant s right to a fair trial

4 Cases that cite this headnote

[31] **Criminal Law**
Custody and conduct of jury

Jurors are presumed to follow the court s instructions

1 Cases that cite this headnote

[32] **Sentencing and Punishment**
Harmless and reversible error

Any impropriety in prosecutor s closing argument during penalty phase of capital case, noting that maximum security inmates were allowed to watch television and receive phone calls and asking whether victim s father was going to be able to call victim, did not require reversal, where trial court sustained defense objection to the comparison between defendant and victim, and trial court instructed jurors not to be swayed by mere sympathy not related to the evidence presented during that phase and to disregard any question to which the judge sustained an objection

Cases that cite this headnote

[33] **Sentencing and Punishment**
Harmless and reversible error

Any prejudice at penalty phase of capital case from closing arguments, to which trial court sustained three objections, in which prosecutor characterized defense expert s cross-examination testimony about his fees as an inconsistent statement, was cured by jury instruction to disregard questions that were withdrawn or to which objections were sustained.

2 Cases that cite this headnote

[34] **Criminal Law**
Other particular issues

A prosecutor should not repeat an argument after it has been the subject of a sustained objection.

Cases that cite this headnote

[35] **Sentencing and Punishment**
Manner and effect of weighing or considering factors

Under capital sentencing scheme given the findings of one or more aggravators, a juror must vote to impose a sentence of death if he or she determines there is no mitigation at all or none sufficiently substantial to warrant a sentence of less than death.

1 Cases that cite this headnote

[36] **Sentencing and Punishment**
Discretion of lower court

The Supreme Court reviews whether the trier of fact abused its discretion in finding aggravating circumstances and imposing a sentence of death even if the defendant does not argue that the jury s verdict was an abuse of discretion A R S § 13–756(A)

3 Cases that cite this headnote

[37] **Criminal Law**
Discretion of Lower Court

A decision is not an abuse of discretion if there is any reasonable evidence in the record to sustain it.

Cases that cite this headnote

[38] **Sentencing and Punishment**
Vileness, heinousness, or atrocity
**Sentencing and Punishment**
Nature degree or seriousness of other offense
**Sentencing and Punishment**
Existing social ties and responsibilities
**Sentencing and Punishment**
Other matters related to offender

Reasonable juror could conclude in death penalty case involving the "especially cruel" and "prior serious offense" aggravators, that mitigation evidence about the impact of execution on defendant s family and the general conditions of confinement in state s maximum security facilities was not sufficiently substantial to call for leniency A R.S §§ 13–751(C) (F)(2, 6) 13–756(A)

6 Cases that cite this headnote

[39] **Sentencing and Punishment**
Scope of review

The Supreme Court will not reverse the jury s decision that death is the appropriate penalty if any reasonable jury could have concluded that the mitigation established by the defendant was not sufficiently substantial to call for leniency A R S § 13–751(C)

7 Cases that cite this headnote

**Attorneys and Law Firms**

****162** Terry Goddard, Arizona Attorney General by Kent E Cattani, Chief Counsel, Criminal Appeals/Capital Litigation Section, Susanne Bartlett Blomo, Assistant Attorney General Phoenix Attorneys for State of Arizona.

Droban & Company PC by Kerrie M Droban Anthem, Attorneys for Mike Peter Gallardo

***563 OPINION**

BALES Justice

¶ 1 This mandatory appeal arises from Mike Peter Gallardo s conviction and death sentence for the murder of Rudy Padilla. We have jurisdiction under Article 6 Section 5(3) of the Arizona Constitution and Arizona Revised Statutes ("A R.S ") section 13–4031 (2010)

**FACTUAL AND PROCEDURAL BACKGROUND**

¶ 2 On December 9 2005 Rudy Padilla was murdered at his parents home in Phoenix. Padilla s father returned from work and saw that a sliding glass door into the house ***564 **163** had been broken. He found his son s body in the master bedroom Padilla s wrists and ankles had been bound, a pillowcase had been tied over his head and he had been shot once in the back of the head The bedroom was in disarray jewelry and a revolver were missing. Telephone records showed that Gallardo had called the Padilla home from his cell phone the day of the murder and DNA profiles developed from evidence at the crime scene matched Gallardo s profile Neither Rudy nor his parents knew Gallardo

¶ 3 Gallardo was indicted for first degree murder burglary and kidnapping. After a mistrial for juror misconduct, a second jury was impaneled This jury convicted Gallardo on all counts In the aggravation phase the jury found two aggravating factors Gallardo had been previously convicted of a serious offense, *see* A R S § 13–751(F)(2) (2010), and the murder was especially cruel, *id.* § 13–751(F)(6) (Statutes are cited in their current version unless they have materially changed since the date of the offense ) In the penalty phase the jury determined Gallardo should receive a death sentence for the murder The trial court also sentenced Gallardo to concurrent prison terms of 15 75 years for the burglary

and kidnapping counts

## DISCUSSION

¶ 4 Gallardo raises six issues on appeal For the reasons explained below we affirm his convictions and sentences

### A Mistrial After Juror Misconduct

[1] ¶ 5 Gallardo argues that the trial court erred in declaring a mistrial after several jurors prematurely discussed the evidence

[2] [3] [4] [5] ¶ 6 The decision to grant a mistrial rests within the sound discretion of the trial court. *McLaughlin v Fahringer* 150 Ariz. 274, 277 723 P.2d 92 95 (1986) If there is "manifest necessity" for the mistrial, the Double Jeopardy Clause does not bar retrial *Id.* Manifest necessity may arise when juror impartiality is compromised by jurors discussing evidence before deliberations *Cf Ross v Petro* 515 F 3d 653 658 (6th Cir 2008) (holding that state trial court exercised sound discretion in declaring mistrial based on manifest necessity where juror had engaged in misconduct) *United States v Gianakos* 415 F 3d 912 921 (8th Cir.2005) (explaining that premature deliberation by a jury "is not a light matter" and that a court must carefully consider "[a] legitimate concern that a juror's impartiality is suspect") Because curative instructions or other measures "will not necessarily remove the risk of bias the trial court 'must have the power to declare a mistrial in appropriate cases " *Arizona v Washington* 434 U S 497 513, 98 S Ct 824, 54 L Ed.2d 717 (1978)

¶ 7 At the beginning of the guilt phase the trial court admonished the jurors not to discuss the case "until all the evidence has been presented and [you] have retired to deliberate on the verdict. You therefore may not discuss the evidence amongst yourselves until you retire to deliberate on your verdict."

¶ 8 Upon learning that some jurors had prematurely discussed the evidence the trial court individually questioned each of the sixteen impaneled jurors The parties agreed that one juror (Juror 13) should be excused for an unrelated hardship The trial court found that three other jurors should be excused for violating the admonition and not candidly responding to questions The trial court also found that three other jurors had formed opinions about other jurors that would affect their deliberations. Striking all these jurors would not leave twelve to deliberate striking only those who violated the admonition would leave no alternates for a capital case expected to last three months The trial court also found it "highly likely" that four other jurors had violated the admonition despite having denied doing so

¶ 9 Gallardo argues that less onerous sanctions were available, all of the jurors stated they could remain fair and impartial and he was satisfied with the jurors selected. But he agreed to the removal of two jurors (Jurors 11 and 13), and he offers no good reason to question the trial court s conclusions about the others The trial court carefully considered Gallardo s interest in having the trial concluded by the originally impaneled jury *565 **164 and did not abuse its discretion in declaring a mistrial.

### B. *Batson* Challenge

[6] ¶ 10 Gallardo argues that the trial court erred in denying his challenges to the State s peremptory strikes of three minority jurors during selection of the second jury We review for clear error *State v Roque* 213 Ariz. 193 203 ¶ 12 141 P 3d 368 378 (2006)

[7] [8] [9] ¶ 11 Excluding a potential juror based on race violates the Equal Protection Clause of the Fourteenth Amendment. *Batson v Kentucky* 476 U S 79, 89, 106 S Ct. 1712 90 L Ed 2d 69 (1986) *Batson* challenges require a three-step analysis "(1) the party challenging the strikes must make a prima facie showing of discrimination (2) the striking party must provide a race-neutral reason for the strike and (3) if a race-neutral explanation is provided, the trial court must determine whether the challenger has carried its burden of proving purposeful racial discrimination." *State v Cañez,* 202 Ariz. 133 146 ¶ 22 42 P 3d 564 577 (2002) Whether the justifications offered for striking a juror are pretexts for discrimination turns on the lawyer s credibility and 'the best evidence [of discriminatory intent] often will be the demeanor of the attorney who exercises the challenge " *Snyder v Louisiana,* 552 U S 472 477 128 S Ct. 1203 170 L Ed.2d 175 (2008) (alteration in original)

¶ 12 The trial court did not clearly err in overruling Gallardo s *Batson* challenges Although Gallardo made a prima facie showing of discrimination, the State offered an explanation for each strike "based on something other than the race of the juror ' *Hernandez v New York* 500 U S 352, 365 111 S Ct. 1859 114 L Ed 2d 395 (1991) (plurality opinion) The State struck one juror for hardship, another for her negative feelings toward police, and the last for her criminal history

¶ 13 The trial court found that the reasons the State articulated were not pretexts and there was no pattern or practice of discrimination. Other minority jurors were ultimately selected for the panel, and "[a]lthough not dispositive, the fact that the state accepted other [minority] jurors on the venire is indicative of a nondiscriminatory motive " *Roque*, 213 Ariz. at 204 ¶ 15, 141 P 3d at 379 (internal quotation marks omitted) (second alteration in original) The trial court did not clearly err in overruling the *Batson* challenges

C (F)(6) Aggravator

¶ 14 Gallardo argues that the State failed to present sufficient evidence to support the jury s finding that the murder was "especially cruel He also argues that the jury instruction on the (F)(6) aggravator was unconstitutionally vague and improperly reduced the State s burden of proof.

1 Sufficiency of the Evidence

[10] [11] [12] ¶ 15 We determine whether substantial evidence supports the jury s finding viewing the facts in the light most favorable to sustaining the jury verdict. *Id.* at 218 ¶ 93 141 P 3d at 393 'Substantial evidence is such proof that reasonable persons could accept as adequate and sufficient to support a conclusion of defendant s guilt beyond a reasonable doubt." *Id.* (citations and internal quotation marks omitted)

[13] [14] ¶ 16 Under A.R.S § 13–751(F)(6) a first degree murder is aggravated when "[t]he defendant committed the offense in an especially heinous, cruel or depraved manner" "A finding of cruelty alone is sufficient to establish the [ (F)(6) ] aggravator " *State v Morris* 215 Ariz. 324 341 ¶ 80 160 P 3d 203 220 (2007) To establish cruelty, the State must prove beyond a reasonable doubt that "the victim consciously experienced physical or mental pain prior to death, and the defendant knew or should have known that suffering would occur " *State v Martinez* 218 Ariz. 421 436 ¶ 70 189 P 3d 348 363 (2008) (citation and internal quotation marks omitted)

¶ 17 The record contains substantial evidence that Rudy experienced mental anguish before death and that Gallardo knew or should have known that such suffering would occur Rudy almost certainly was conscious when bound, as there is no reason to bind an *566 **165 unconscious person *See State v Lynch*, 225 Ariz. 27 41 ¶ 79 234 P 3d 595, 609 (2010) *State v Djerf* 191 Ariz. 583 596 ¶ 49 959 P 2d 1274, 1287 (1998), *see also State v Bible*, 175 Ariz 549 604–05 858 P.2d 1152, 1207–08 (1993) ("The fact that [the victim's] hands were bound indicates that she was conscious and tied up to prevent struggling. ) Ligature abrasions on Rudy s neck, wrists, and ankles indicate that the bindings were not loose.

¶ 18 Moreover there is evidence that Rudy struggled against the ligatures attempting to free himself. *See Lynch*, 225 Ariz. at 41 ¶ 79 234 P 3d at 609 *Djerf* 191 Ariz. at 596 ¶ 51 959 P.2d at 1287 (inferring mental anguish from contusions and abrasions on victim s wrists) Rudy s right hand was folded underneath him, not behind his back like his left arm Rudy apparently had pulled his right wrist away from his left, almost freed his right hand, and pulled it in front of him.

¶ 19 That Rudy was bound hand and foot, a pillowcase was tied over his head, and he struggled to free himself also indicates he had time to suffer significant uncertainty as to his fate. *See Lynch*, 225 Ariz. at 41 ¶ 79 234 P 3d at 609 *State v Ellison*, 213 Ariz. 116 142 ¶ 120 140 P 3d 899 925 (2006) ("Mental anguish is established if the victim experienced significant uncertainty as to her ultimate fate " (citation and internal quotation marks omitted)) The record also supports the jury s conclusion that Gallardo knew or should have known that Rudy would suffer *See Lynch*, 225 Ariz. at 41 ¶ 80 234 P 3d at 609 (concluding that it was "surely foreseeable that [the victim] would suffer significant mental anguish while being bound to the chair")

¶ 20 The evidence supports the jury s finding that the murder was especially cruel

2 F(6) Jury Instruction

[15] [16] ¶ 21 Arizona s (F)(6) aggravator is facially vague but may be remedied by appropriate limiting instructions *See Walton v Arizona*, 497 U S 639 654–56 110 S Ct. 3047 111 L Ed 2d 511 (1990) *overruled on other grounds by Ring v Arizona*, 536 U S 584, 589 122 S Ct. 2428 153 L Ed.2d 556 (2002) *Ellison* 213 Ariz. at 138 ¶ 96 140 P 3d at 921 We have approved narrowing instructions for the "especially cruel" aggravating factor that require the jury to find that (1) "the victim was conscious during the mental anguish or physical pain" and (2) "the defendant knew or should have known that the victim would suffer " *State v Tucker* 215 Ariz. 298 310 ¶ 31 160 P 3d 177 189 (2007) (citations omitted)

¶ 22 The trial court here gave the following (F)(6) instruction

> Concerning this aggravating circumstance, all first-degree murders are to some extent cruel However this aggravating circumstance cannot be found to exist unless the State has proved beyond a reasonable doubt that the murder was "especially" cruel "Especially" means "unusually great or significant."
>
> The term "cruel" focuses on the victim s pain and suffering. To find that the murder was committed in an "especially cruel" manner you must find that the victim consciously suffered physical or mental pain distress or anguish prior to death Mr Gallardo must know or should have known that the victim would suffer

¶ 23 The instruction contains the two essential narrowing factors" identified in *Tucker* and is materially identical to instructions we have previously upheld *See, e.g. State v Chappell* 225 Ariz. 229, 237–38 ¶ 27 & n 6 236 P 3d 1176 1184–85 & n 6 (2010) *State v Villalobos* 225 Ariz. 74, 82 ¶ 31 & n 4 235 P 3d 227 235 & n 4 (2010) The trial court did not err in giving this instruction

**D Victim Impact Evidence**

¶ 24 Gallardo argues that victim impact statements by Rudy s parents were unduly prejudicial and denied him due process He contends that he limited his mitigation evidence to avoid infusing "irrelevant emotions into the proceeding" and the parents statements caused the jury to sentence him to death based on 'raw emotion " He also argues that the victim impact evidence was irrelevant to the mitigation presented and that, absent a curative instruction, the jury was improperly allowed to make "comparative judgments on the value of human life "

**166 [17] *567 ¶ 25 Arizona law generally allows victim impact evidence during the penalty phase to rebut mitigation *See* Ariz. Const. art. II § 2 1(A)(4) (entitling a victim to be heard at sentencing), A R S § 13–752(R) (allowing victim to present information during penalty phase about the murdered person and the impact of the murder on the victim and other family members) Victim impact evidence should not be allowed however, if it is 'so unduly prejudicial that it renders the trial fundamentally unfair " *State v Dann,* 220 Ariz. 351 369 ¶ 98, 207 P 3d 604 622 (2009) (quoting *Payne v Tennessee,* 501 U S 808 825, 111 S Ct. 2597 115 L Ed.2d 720 (1991)) *cert denied,* — U S ——, 130 S Ct. 466 175 L.Ed.2d 313 (2009)

[18] ¶ 26 Gallardo did not object to the victim impact evidence until after it was presented, when he moved for a mistrial The trial court s decision whether to grant a mistrial is reviewed for an abuse of discretion, *Dann* 220 Ariz. at 363 ¶ 48 207 P 3d at 616 as is the admission of victim impact evidence *State v Garza,* 216 Ariz. 56 69 ¶ 60 163 P 3d 1006 1019 (2007)

[19] ¶ 27 In their statements Rudy's parents spoke of Rudy s character and the impact of his murder upon their family Mr Padilla ended his statement by playing the 911 call he made after finding his son murdered. The Padillas statements did not call for any specific sentence and were within the appropriate bounds of victim impact testimony—discussing only the kind of person Rudy was and how his death affected his family

[20] [21] [22] ¶ 28 Gallardo argues that the statements were irrelevant to the "limited and truncated mitigation presented Admissibility of victim impact statements does not depend on the particular mitigation evidence presented by the defendant. Jurors may "consider mitigating circumstances, whether proved by the defendant or present in the record, in determining whether death is the appropriate sentence " *State ex rel. Thomas v Granville (Baldwin)* 211 Ariz. 468, 473 ¶ 18, 123 P 3d 662 667 (2005) Even if victim impact statements are not offered to rebut any specific mitigating fact, they are generally relevant to rebut mitigation" and thus admissible in the penalty phase *Garza,* 216 Ariz. at 69 ¶ 60 n 12 163 P 3d at 1019 n. 12

¶ 29 Although the jurors were moved by the statements and some passed a tissue box, the statements were not "so unduly prejudicial as to render the trial fundamentally unfair *See State v Glassel* 211 Ariz. 33 54 ¶ 86 116 P 3d 1193 1214 (2005) Moreover the trial court appropriately instructed the jury that victim impact evidence could not be considered as an aggravating circumstance and could be considered "only for [the] limited purpose" of rebutting mitigation. The trial court did not abuse its discretion in admitting victim impact statements or denying Gallardo s motion for mistrial

[23] ¶ 30 Gallardo also argues that the trial court failed to instruct jurors (1) not to rely on the statements for "a purely emotional response and (2) "not to make comparative judgments about the value of human lives " "We review de novo whether jury instructions adequately state the law " *Tucker* 215 Ariz. at 310 ¶ 27 160 P 3d at 189

¶ 31 The cases Gallardo cites do not suggest the trial court's instructions were inadequate *State v Bocharski* states that the "trial judge appropriately instructed the

jurors that they could consider the victim impact statement only to rebut the mitigation evidence" 218 Ariz. 476 488 ¶ 53 189 P 3d 403 415 (2008) *State v Carreon* notes that the "trial court cautioned the jury not to consider the impact statements as aggravation and not to be tainted by sympathy or prejudice" 210 Ariz. 54, 72 ¶ 93 107 P.3d 900 918 (2005)

¶ 32 Although this Court has approved jury instructions containing the language suggested by Gallardo, we have never held that such language is required. *See Dann*, 220 Ariz. at 369–70 ¶ 101 207 P 3d at 622–23 (approving, but not requiring, instruction that cautioned jurors not to "rely upon the statements for a purely emotional response' " and 'not to make comparative judgments about the value of human lives") The instructions here properly informed the jury *568 **167 of the limited purpose of the victim impact statements We find no error

**E Prosecutorial Misconduct**

¶ 33 Gallardo argues that comments made by the State during its penalty phase opening statement and closing argument constituted prosecutorial misconduct and deprived him of a fair trial and due process

[24] [25] ¶ 34 We "will reverse a conviction for prosecutorial misconduct if (1) misconduct is indeed present, and (2) a reasonable likelihood exists that the misconduct could have affected the jury s verdict, thereby denying [the] defendant a fair trial" *State v Velazquez* 216 Ariz. 300, 311 ¶ 45 166 P 3d 91, 102 (2007) (alteration in original) (internal quotation marks and citation omitted) The defendant must show that the offending statements were "so pronounced and persistent" that they 'permeate[d] the entire atmosphere of the trial" and 'so infected the trial with unfairness as to make the resulting conviction a denial of due process *Morris* 215 Ariz. at 335 ¶ 46 160 P 3d at 214 (citations and internal quotation marks omitted) *see also State v Newell* 212 Ariz. 389 402 ¶ 60 132 P 3d 833 846 (2006)

[26] [27] ¶ 35 We separately "evaluate each instance of alleged misconduct, and the standard of review depends upon whether [the defendant] objected" *Morris* 215 Ariz. at 335 ¶ 47 160 P 3d at 214 If Gallardo objected, we review for harmless error if not, we review only for fundamental error *See id.* "[E]ven if there [is] no error or an error [is] harmless and so by itself does not warrant reversal an incident may nonetheless contribute to a finding of persistent and pervasive misconduct if the cumulative effect of the incidents shows that the prosecutor intentionally engaged in improper conduct and did so with indifference if not specific intent, to prejudice the defendant." *Id.* (alteration in original) (citation and internal quotation marks omitted)

**1 Reference to Gallardo's Prison Packet**

[28] ¶ 36 Before the penalty phase Gallardo filed a motion to limit the scope of rebuttal evidence Gallardo stated that he intended to present only two categories of mitigation expert testimony regarding the conditions of confinement in the maximum security units of Arizona prisons and testimony by members of his family about their affection for him and the impact a death sentence would have on them Gallardo asked the court to preclude the State from asking witnesses about his "criminal history institutional history or any other past events," and in particular an incident involving a handcuff key escape attempts or the expert s conversations with Gallardo The trial court granted the motion

¶ 37 Gallardo contends that the prosecutor committed misconduct by suggesting in his opening statement that Gallardo's prison packet would illustrate his personal history Gallardo, however mischaracterizes the prosecutor s remarks The prosecutor simply stated that Gallardo s expert had not reviewed the Arizona Department of Corrections records for Gallardo, which had been previously admitted, but instead would talk about the treatment of inmates generally By noting the limited scope of the expert s opinion, the prosecutor did not violate the trial court s ruling on the scope of rebuttal.

**2 Reference to Gallardo's Childhood and Intelligence**

[29] ¶ 38 In his opening statement, the prosecutor stated that the jury would hear evidence regarding Gallardo s childhood Gallardo objected and moved for a mistrial arguing the statement violated the court s ruling on the scope of rebuttal The trial court denied a mistrial but ruled that the prosecutor could not introduce evidence of Gallardo s childhood or intelligence unless the defense "opened the door" on those issues

¶ 39 The prosecutor's statements about the anticipated evidence concerning Gallardo s childhood and intelligence did not violate the court s prior ruling on the motion in limine or otherwise constitute misconduct, given that the judge's ruling precluding such evidence came only after the opening statement. Moreover Gallardo later offered testimony by his sister about his

family and argued in *569 **168 closing that his family members had been in the courtroom and the jury should consider that "[t]hey care about him." The defense did not offer evidence regarding Gallardo s intelligence, and the prosecutor did not comment on this issue again after the court s ruling.

[30] [31] ¶ 40 Even if the comments by the prosecutor were improper, we would reverse only if Gallardo established 'a reasonable likelihood that the misconduct could have affected the jury s verdict. *Newell* 212 Ariz. at 403 ¶ 67 132 P 3d at 847 (quoting *State v Atwood,* 171 Ariz. 576, 606 832 P 2d 593, 623 (1992), *overruled on other grounds by State v Nordstrom* 200 Ariz. 229 241 ¶ 25 25 P 3d 717 729 (2001)) "[A]ny improper comments must be so serious that they affected the defendant s right to a fair trial" *Id.* (citation omitted) The preliminary and final jury instructions noted that "[t]he attorneys' remarks, statements and arguments are not evidence, but are intended to help you understand the evidence and apply the law" Presuming that jurors follow the court s instructions *id.* at ¶ 68 (citation omitted) we conclude that any possible prejudice from the prosecutor s statements was cured by the trial court's instructions

### 3 Comparison of Victim and Gallardo

[32] ¶ 41 In closing argument, Gallardo argued that a life sentence was sufficient punishment" given the "severe restriction" and isolat[ion] of prison. In response the prosecutor said that maximum security inmates are allowed to watch television receive magazines, make phone calls and see visitors Noting that victim impact statements could rebut mitigation, the prosecutor then said, 'Do you think [Rudy s father is] going to be able to call his son, Rudy " The defense objected to the comparison between Gallardo and the victim, and the trial court sustained the objection.

¶ 42 Even if the prosecutor s statements were improper, reversal is not required. *See Newell* 212 Ariz. at 403 ¶ 67 132 P 3d at 847 The trial court instructed the jurors 'not to be swayed by mere sympathy not related to the evidence presented during this phase" and to disregard any question to which the judge sustained an objection. These instructions negated the effect of the prosecutor s statements *See id.* at ¶ 68, *see also Morris* 215 Ariz. at 336–37 ¶ 55 160 P 3d at 215–16 ('Even if the prosecutor s comments were improper the judge s instructions negated their effect.")

### 4 Reference to Mitigation Witness's Fees

[33] ¶ 43 In the penalty phase Gallardo presented expert testimony from a retired corrections director about the conditions of maximum security facilities in Arizona. During cross examination, the prosecutor elicited testimony concerning the expert s fees and potential bias During closing argument, the prosecutor characterized this testimony as an inconsistent statement, Gallardo objected to the argument as misleading, and the trial court sustained the objection. The prosecutor persisted with the line of argument and the trial court twice sustained further objections

[34] ¶ 44 A prosecutor should not repeat an argument after it has been the subject of a sustained objection. *Cf Pool v Superior Court in and for Pima County* 139 Ariz. 98 104 n 7 677 P 2d 261, 267 n. 7 (1984) (noting that repetition of questions to which objection has been sustained is misconduct), *In re Gustafson,* 650 F 2d 1017 1020 (9th Cir 1981) (noting that attorney s disregard of court s limits on permissible argument constituted misbehavior for purposes of federal contempt statute) Although the repeated statements by the prosecutor were improper Gallardo s objections were sustained and the trial court instructed the jury to disregard questions that were withdrawn or to which objections were sustained." Again, because we presume jurors follow the court's instructions, *Newell* 212 Ariz. at 403 ¶ 68 132 P 3d at 847 any prejudice that may have resulted from the prosecutor s argument was cured by the trial court s instructions

### 5. Misstatement of the Law

[35] ¶ 45 Gallardo further claims that it was improper for the prosecutor to suggest in closing that the jurors must vote for death *570 **169 if they found no mitigation We have previously rejected this argument "Under our sentencing scheme given the findings of one or more aggravators a juror must vote to impose a sentence of death if he or she determines there is no mitigation at all or none sufficiently substantial to warrant a sentence of less than death *Tucker* 215 Ariz. at 318 ¶ 74 160 P 3d at 197

### 6. Cumulative Effect

¶ 46 Gallardo argues that even if no single incident of

misconduct warrants reversal the deliberate and persistent conduct of the prosecutor deprived him of a fair trial We consider whether "persistent and pervasive' misconduct occurred and whether the "cumulative effect of the incidents shows that the prosecutor intentionally engaged in improper conduct and did so with indifference, if not a specific intent, to prejudice the defendant. *Morris* 215 Ariz. at 339 ¶ 67 160 P 3d at 218 (citation and internal quotation marks omitted)

¶ 47 The record does not suggest pervasive prosecutorial misconduct that deprived Gallardo of a fair trial

**F Constitutionality of Burden of Proof at Sentencing**

¶ 48 Gallardo argues that Arizona s death penalty scheme violates the Eighth and Fourteenth Amendments because it does not require the State to prove beyond a reasonable doubt that mitigating circumstances once proved by the defendant, are not sufficiently substantial to call for leniency We rejected this argument in *State v Moore* 222 Ariz. 1 20 ¶¶ 110–13 213 P 3d 150 169 *cert denied,* — U S ——, 130 S Ct. 747 175 L Ed.2d 524 (2009)

**G Review of the Death Sentence**

[36] [37] ¶ 49 Because the murder occurred after August 1, 2002, we "determine whether the trier of fact abused its discretion in finding aggravating circumstances and imposing a sentence of death A R.S § 13–756(A) We conduct this review even if, as here the defendant does not argue that the jury s verdict was an abuse of discretion *Morris* 215 Ariz. at 340 ¶ 76 160 P 3d at 219 A decision is not an abuse of discretion if there is "any reasonable evidence in the record to sustain it *Id* at 341 ¶ 77 160 P 3d at 220 (citation and internal quotation marks omitted)

**1 Aggravating Circumstances**

¶ 50 The jury found two aggravating circumstances Gallardo had been previously convicted of a prior serious offense *see* A R.S § 13–751(F)(2) and the murder was especially cruel *see id.* § 13–751(F)(6) As discussed, there is sufficient evidence to support the jury s finding that Gallardo committed the murder in an especially cruel manner The jury also properly found that Gallardo had previously been convicted of a serious offense based on evidence of his prior convictions for armed robbery and burglary

**2 Death as the Appropriate Sentence**

[38] [39] ¶ 51 Once the jury finds one or more aggravating factors, each juror must individually determine whether death is the appropriate penalty *See* A R.S § 13–751(C) (stating that "[e]ach juror may consider any mitigating circumstance found by that juror in determining the appropriate penalty") *see also Baldwin,* 211 Ariz at 473 ¶ 21 123 P 3d at 667 We will not reverse the jury s decision if "any reasonable jury could have concluded that the mitigation established by the defendant was not sufficiently substantial to call for leniency *Morris* 215 Ariz. at 341 ¶ 81 160 P 3d at 220

¶ 52 Gallardo presented evidence about the impact of execution on his family and the general conditions of confinement in Arizona s maximum security facilities A reasonable juror could conclude that the mitigation presented was not sufficiently substantial to call for leniency *See State v Harrod,* 200 Ariz. 309 319 ¶ 54 26 P 3d 492, 502 (2001) (minimal weight given to family support) *vacated on other grounds,* 536 U S 953 122 S Ct. 2653 153 L Ed.2d 830 (2002).

**H. Issues Preserved for Federal Review**

¶ 53 To avoid preclusion Gallardo raises twelve additional constitutional claims that he *571 **170 states have been rejected in previous decisions by the United States Supreme Court or this Court. The attached appendix lists the claims raised by Gallardo and the decisions he identifies as rejecting them

**CONCLUSION**

¶ 54 We affirm Gallardo s convictions and sentences

CONCURRING REBECCA WHITE BERCH Chief Justice ANDREW D HURWITZ, Vice Chief Justice A JOHN PELANDER, Justice and MICHAEL D RYAN, Justice (Retired)

**Appendix**

Gallardo raises twelve issues to preserve them for federal appeal. This Appendix lists his claims and the decisions he identifies as rejecting them

(1) Arizona's statutory scheme for considering mitigating evidence is unconstitutional under the Eighth and Fourteenth Amendments because it limits consideration of mitigating evidence to that proven by a preponderance of the evidence *State v McGill* 213 Ariz. 147 161 ¶ 59, 140 P 3d 930 944 (2006)

(2) Gallardo s death sentence is in violation of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments and the Arizona Constitution because the State failed to allege the aggravating factors that made the defendant death eligible in the grand jury indictment. *McKaney v Foreman ex rel County of Maricopa* 209 Ariz. 268 273 ¶ 23 100 P 3d 18 23 (2004)

(3) Application of the new death penalty law to Gallardo constitutes an impermissible *ex post facto* application of the law *State v Ring,* 204 Ariz. 534 547 ¶¶ 23–24 65 P 3d 915 928 (2003)

(4) Gallardo s rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments and under the Arizona Constitution were violated by the admission of victim impact evidence at the penalty phase of the trial *Lynn v Reinstein,* 205 Ariz. 186 191 ¶ 16, 68 P 3d 412 417 (2003)

(5) The trial court improperly omitted penalty phase instructions that the jury could consider mercy or sympathy in evaluating the mitigation evidence and in determining whether to sentence the defendant to death *State v Carreon,* 210 Ariz. 54 70–71 ¶¶ 81–87 107 P 3d 900 916–17 (2005)

(6) The death penalty is cruel and unusual punishment. *State v Harrod,* 200 Ariz. 309 320 ¶ 59 26 P 3d 492, 503 (2001) *vacated on other grounds* 536 U S 953 122 S Ct 2653 153 L Ed.2d 830 (2002)

(7) The death penalty is arbitrarily imposed in violation of Gallardo s due process rights under the Fourteenth Amendment and under the Arizona Constitution *State v Beaty* 158 Ariz. 232 247 762 P 2d 519 534 (1988)

(8) The prosecutor s discretion to seek the death penalty unconstitutionally lacks standards *State v Sansing* 200 Ariz. 347 361 ¶ 46 26 P 3d 1118, 1131 (2001) *vacated on other grounds* 536 U S 954 122 S Ct. 2654 153 L Ed.2d 830 (2002)

(9) The death penalty in Arizona has been applied in a manner that discriminates against poor young, and male defendants in violation of the Arizona Constitution. *Sansing,* 200 Ariz. at 361 ¶ 46 26 P 3d at 1131

(10) The absence of proportionality review by Arizona courts of a defendant s death sentence is unconstitutional under the Fifth, Eighth, and Fourteenth Amendments and Article 2, Section 15 of the Arizona Constitution *Harrod,* 200 Ariz. at 320 ¶ 65 26 P 3d at 503

(11) Arizona s death penalty statute unconstitutionally presumes that death is the appropriate sentence *State v Miles* 186 Ariz. 10 19, 918 P 2d 1028, 1037 (1996)

(12) Execution by lethal injection is cruel and unusual punishment. *State v Van Adams* 194 Ariz. 408, 422 984 P 2d 16 30 (1999)

**All Citations**

225 Ariz. 560 242 P 3d 159 596 Ariz. Adv Rep 7

**End of Document**

© 2016 Thomson Reuters No claim to original U S Government Works

# Exhibit 5



2004186 3 Vidal

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

| | | |
|---|---|---|
| STATE OF ARIZONA, | ) | |
| Plaintiff, | ) | CR-09-0171-AP |
| v | ) | CR2006-175408-001 DT |
| MIKE PETER GALLARDO, | ) | |
| Defendant | ) | |
| ______________________________ | ) | |

Phoenix, Arizona

June 25, 2009

BEFORE THE HONORABLE SALLY S DUNCAN

REPORTER'S TRANSCRIPT OF PROCEEDINGS

TRIAL DAY 21

(Copy)

Scott A Kindle, RPR
Certified Reporter No 50711

SUPERIOR COURT
Phoenix, Arizona

# A P P E A R A N C E S

For the Plaintiff

JUAN M MARTINEZ, Deputy County Attorney

For the Defendant

RICHARD K MILLER, Deputy Legal Defender

THOMAS MARVIN FORTNER, Deputy Legal Defender

# I N D E X

| | |
|---|---|
| Final Jury Instructions - Penalty Phase | 5 |
| Closing statement by Mr Miller | 14 |
| Closing statement by Mr Martinez | 22 |
| Closing statement by Mr Miller | 51 |

## INDEX OF EXHIBITS

| EX# | MARKED | ADMITTED |
|---|---|---|
| 213 | | 64 |

the person who worked with the Department of Corrections told that you, yep, every single inmate for one year, and only one year, because after that they can be moved out or reclassified, but for only one year does have to go to a unit, and it doesn't have to be the Browning Unit It could be the Central Unit It could also be one that they call SMU I And it could be to any of those But, of course, their expert didn't take time to go look at those, perhaps because the conditions may have been different He says that they were the same, but he says it without foundation because he wasn't there Well, it's easy for him to make that leap and want you to believe that, even though he didn't go there But it is true that they go to Florence, every single inmate, including this defendant That's where they'll end up It doesn't make him any different It's the one size fits all

He goes to -- they all go to this particular place and they tell you, you know, it's not really easy It's punishment Well, yes, their freedom is restricted in a severe way No one is denying that But it must be remembered that in that single cell that they have, they also have a television, although their expert kept saying, oh, it's just closed circuit messages, there is cable that's available for a dollar a month It's a utilities fee that's provided, and that's what they indicated

Additionally, one of the other things that's provided is they get magazines They get subscriptions to magazines

They are entitled to make a call They are entitled to have visitation And as the judge has already told you, the mitigation or the victim impact statement can be used to rebut any of the alleged mitigation that's presented to you, and so it's appropriate at this time to say even though the defendant is going to be in that position, and we know that because the person from classification told us that he's going to be at either one of those three, we know that he can have visitation given their parameters and their restrictions, and he can have telephone calls Do you think Rodolfo or Rudy, as he liked to be called, do you think he's going to be able to call his son, Rudy, to discuss --

MR MILLER Your Honor, I'm going to object to comparing my client to Mr Padilla

THE COURT Sustained

MR MARTINEZ You know the restrictions placed on Mr Padilla He does not have the opportunity to do that

MR MILLER Your Honor, I'm going to object to comparing my client to Mr Padilla

THE COURT Sustained

MR MARTINEZ There's no comparison The point that's being made here is that the victim impact statement may be considered by you, and that impact statement indicated to you that they missed their son That's not quite doing justice to how they told you, and they would love to make a call and would

love to be able to talk to him And in their victim impact statement, they told you they couldn't In fact, Mr Padilla told you that he goes so far as to turn on the radio in his son's room at night just to make it seem as if he were there

And so there is punishment that's associated with this when they go to the Department of Corrections, but there are also benefits, and those benefits were also set out by Stacey Crabtree Don't get -- and, again, the point to be made is that every single inmate in the State of Arizona that's convicted of first degree murder will go through that for the first year So that is not a mitigating circumstance That's just something that happens to inmates or to people, criminals, who actually commit the crime of first degree murder and have been convicted of that particular crime So it is not anything that's unique It's not anything that you can place, if you will, in Mr Gallardo's column, because it's placed on everybody else's column That's not unique

The other individual that testified, the advocate who believed that the death penalty should be abolished, one of the things that should trouble you, because the credibility of witnesses instruction is still in play here, and each one of you indicated that you would consider all of the jury instructions, at least those that do apply, and if they don't apply, then you put them aside But one of them indicates whether or not there are any inconsistent statements And there were some

inconsistent statements, but the biggest one was the one involving money Initially when I asked him the question, he said he really wasn't sure how much money he was being paid Then he indicated, well, it was $4,200 Then after doing the mathematics a little bit more and fine-tuning it --

MR MILLER Objection to misleading argument

THE COURT Sustained

MR MARTINEZ Well, you heard, he told you $4,200, didn't he? Anybody not hear that? And then after questioning by the prosecutor, the figure changed, didn't it?

MR MILLER Objection, misleading I'm sorry, Judge Did I not speak loud enough? I object to misleading

THE COURT Well, sustained

MR MARTINEZ Well, he said on the stand from there, and that's the evidence that you are to consider You were told -- he said $6,500 That's what he said And you were present when all of that happened, weren't you? That's something that you can consider, because it goes to his motive and his bias and --

MR MILLER May we approach, Your Honor?

THE COURT Yes

(Whereupon the following discussion is held at the bench )

MR MILLER When the Court sustains an objection, Mr Martinez ignores the Court's sustaining of the objection

So I don't know what to do now other than ask for an admonition

MR MARTINEZ Judge, he did say $4,200 And then afterwards, he said it was approximately $6,500 That's all I'm pointing out I'm not saying anything he didn't say on the stand

MR MILLER Then why it is misleading is because we cut it short because of the territory Mr Martinez could have gotten into I was asked to go outside and get a number It was $4,200 And then there was more to it if you add on what his travel and additional expenses are when he goes home So this is just -- it's misleading, and I'd ask that Mr Martinez be told not to do this

MR MARTINEZ And the $6,500 was because initially he did not -- what happened is that they went outside and they included the full amount of what was owed to him, $4,200 with regard to whether he reviewed -- somebody just stepped out, Judge, one of the jurors

THE COURT One of the jurors just stepped out Oh, a rest room break Okay Go ahead

MR MARTINEZ He indicated that the full amount that he was due and owing was $4,200 He had not included in that calculation how much he was going to charge for testifying That was a distinction, not this other distinction That's what came out

THE COURT Well, here's my ruling With respect to

mentioning of money, I understand the concern about the calculation possibly including the impermissible testimony The issue really is just there was a discrepancy between what he initially reported and what he later reported, and it included the testimony that had not been calculated So just clarify the difference in his position and upon further questioning he clarified it I mean my understanding from the testimony was if we take out the issue of the problem time, meaning the time he spent on matters that he wasn't permitted to testify, it's $4,200 plus the additional time for testimony and trial

MR MARTINEZ Well, I asked for total time how much money That way we don't have to talk about the specifics, how much money, and he said $4,200

THE COURT And that didn't include --

MR MARTINEZ That did include everything, because he said total whatever he spent in this case total time That's how I phrased it

THE COURT Well, the fact that the expert said two different things can be used by Mr Martinez to impeach his credibility

MR MILLER And I'm hamstrung, because I was told to go outside and get the number and could have cleared it up But it's deceptive to say that my witness was being not truthful at that time because of the way this went down

THE COURT I understand I understand the concern

Based on the issues with respect to the expert testimony and the curtailed -- the curtailed nature of the expert testimony, asking how much time he spent on the case, how much time he -- and how much it cost creates a potential problem, because it inflates from the jury's perspective the amount of time even though he was legitimately spending time that he didn't testify about So it's creating a potential unnecessary confusion in the jury's mind about total time versus time that was devoted to the areas he was allowed to testify about And, frankly, none of that was cleared up, because it couldn't be cleared up in front of the jury

So I am going to sustain the objection Obviously you can talk about the fact that he donated time and that creates bias and prejudice, but the total amount of time here, I think, is encroaching upon impermissible testimony and creating the appearance that he wasn't being candid when that was not a proper assumption or a conclusion that could be drawn based on how the testimony came out

MR MARTINEZ The only thing that I would say is that there was an inquiry made by you with regard to what information he was going to provide in terms of the money before he went out there, and the record will, I think, support me that you specifically said, Mr Miller -- I'm paraphrasing, obviously, Mr Miller, you ask him how much total time and how much total money is involved, and then that way Mr Martinez doesn't have

to ask him about this

I asked him that There was never any indication that he was going to exclude this amount Mr Miller never indicated that to me In response to your order, which is on the record, he responded $4,200 So I think it's a little bit, I don't know, incomplete to then come up here and argue against your order

THE COURT Hold on one second Okay I'm just looking back at my notes The original testimony totaled, after you did the math with him, totaled $6,450 The problem is that when I asked Mr Miller to go outside and get the total amount, I didn't ask for more clarification as to how that number was arrived at Did it exclude the time that he was not going to be testifying about, and because of the limited nature that you were given to cross-examine him about those impermissible topics that Mr Miller was not permitted to redirect him about those impermissible topics

MR MARTINEZ Well, he could have approached and said, Judge, at the time of the questioning and said this is improper for Mr Martinez to say -- to wait until closing argument to say these two figure amounts are something he can't mention is improper He could have just come up here and said, Judge, Mr Martinez is not doing it May I on cross-examination indicate that that amount was actually -- and we could have fashioned it any way Now to wait until the last minute, I just

don't think that that objection is well-taken, because you're hamstringing me, because now he said 4,200 Then on the stand he said 6,500 But then we're saying, well, because Mr Miller didn't say something about it, we're now going to add another layer to this trial I just don't --

THE COURT Go ahead

MR MILLER The hamstringing began with Mr Martinez when he went down this road And when I was asked to go outside, we came up with the number $4,200 It wasn't cleared up whether that would include the current testimony and travel back It is misleading to say that my witness was being deceptive at the time

MR MARTINEZ I said it went to motive and bias I didn't say deceptive

THE COURT Well, here's the bottom line This is what I'm going to rule Because of the unique nature of the problem and because of the problems in establishing how much money this witness was paid versus areas that could not be testified about, and the inability of both Mr Martinez and Mr Miller to be able to clarify that with specificity due to the prohibition that had been given about what the testimony the expert could actually testify about, I'm going to preclude you from arguing anything related to the discrepancy in the figures The fact that he was paid, the fact that he gave money and he gave time for free all go to motive and bias Those are

permissible But to argue a conclusion from a discrepancy in the figure based on all of the limits that were placed on this expert and the lawyers in clarifying the expert's payment and fee schedule is leading me to prohibit you from arguing that

(Proceedings before the jury )

MR MARTINEZ So this advocate comes in under the guise of being an expert who has gone to all these or has overseen these prisons and has been all over the United States, has talked about Hawaii, even talked about being in Southeast Asia This so-called expert then indicates to you, you know, I have a -- cross-examination for the first time, I have this bias, and I will even donate my time because I do not believe in the death penalty That goes to his motive and bias And that motive and bias that he doesn't believe in the death penalty, it can be applied to any case That is not unique to this particular case It started -- if it were a race and there were a starting point, he would be already ahead Something that that would make that race, the result of that race, something that could not be questioned And the jury instructions indicate to you both at the phase one and phase two that motive and bias can be brought in and be questioned

And, again, he said I only went to the Browning Unit This is just an opinion on the Browning Unit and not anything to do with Mr Gallardo specifically This has to do with every single inmate that has been convicted of first degree murder who

# Exhibit 6

KeyCite Yellow Flag Negative Treatment
Distinguished by State v Miller Ariz., December 27 2013

225 Ariz. 27
Supreme Court of Arizona
En Banc.

STATE of Arizona, Appellee,
v
Shawn Patrick LYNCH Appellant.

No CR-06-0220-AP
|
June 22, 2010

**Synopsis**

**Background** Defendant was convicted in the Superior Court in Maricopa County David M. Talamante J of armed robbery burglary kidnapping and first degree murder and, after first jury could not reach a unanimous verdict in aggravation phase of trial, second jury determined that defendant should be sentenced to death. Defendant appealed.

**Holdings** The Supreme Court, Hurwitz, V C J held that:

[1] trial court did not abuse its discretion by finding that defendant had been restored to competency

[2] trial court did not abuse its discretion by denying sequestered voir dire

[3] trial court did not abuse its discretion by admitting photographs depicting blood spatter and blood pools in relation to the victim s body

[4] evidence was sufficient to establish that defendant was a major participant in the predicate felonies

[5] evidence was sufficient to establish the pecuniary gain aggravator

[6] evidence was sufficient to establish the especially heinous cruel or depraved aggravator but

[7] error in instructing that the jury had found multiple aggravators when the especially heinous, cruel or depraved aggravator was just one aggravator was not harmless

Affirmed in part and remanded in part.

West Headnotes (44)

[1] **Criminal Law**
Preliminary proceedings

Rulings that a defendant has been restored to competency and denying a second competency examination are reviewed for abuse of discretion. 16A A.R S Rules Crim.Proc Rule 11 1

3 Cases that cite this headnote

[2] **Criminal Law**
Successive proceedings in general

**Criminal Law**
Evidence

Trial court did not abuse its discretion by finding that defendant had been restored to competency and denying motion by defense counsel for a second competency examination in prosecution of defendant for armed robbery burglary kidnapping and first degree murder where psychologist who conducted first examination concluded that defendant's various delusions and idiosyncratic thought processes did not significantly affect his ability to cooperate with his attorney if he chose to do so, and defense counsel on motion for a second evaluation did not offer new information to call into question the previous finding of competency 16A A.R.S Rules Crim.Proc Rule 11 1

2 Cases that cite this headnote

[3] **Criminal Law**
Summoning and impaneling jury

Trial court's allegedly limited description of the capital sentencing process to jury panel at voir dire was not plain error in capital murder prosecution, absent showing of prejudice, jury after convicting defendant, could not reach a

unanimous verdict in aggravation phase and did not return a death sentence

Cases that cite this headnote

[4] **Sentencing and Punishment**
Instructions

Trial court's remarks at voir dire properly explained the aggravating factors and mitigating factors in a death penalty decision to jury panel in trial of defendant for armed robbery burglary kidnapping and first degree murder by stating that not every murder contained aggravating factors, by stating that only those that were found to have aggravating factors were eligible for consideration for the death penalty by defining a "mitigating circumstance as any factor relevant in determining whether to impose a sentence less than death, including any aspect of the defendant's character, propensities, record or circumstances of the offense, and by explaining that each juror should consider any mitigating factors found by that juror in determining whether a death or life sentence was appropriate A R.S §§ 13–751(C E, G) 13–752(D)

Cases that cite this headnote

[5] **Jury**
Mode of examination

Trial court did not abuse its discretion by denying sequestered voir dire, in trial of defendant for armed robbery burglary kidnapping and first degree murder absent allegation by defendant that sequestered voir dire was necessary because of unusually sensitive subjects or extensive pretrial publicity, or identification of any contaminating statement by a juror that might color the entire jury's outlook 17 A R.S Rules Crim Proc Rule 18 5(d)

1 Cases that cite this headnote

[6] **Criminal Law**
Selection and impaneling

Because a trial judge has the best opportunity to assess whether a juror can be fair and impartial, appellate courts review such decisions only for abuse of discretion.

Cases that cite this headnote

[7] **Jury**
Punishment prescribed for offense

Jurors cannot be excluded in a capital case simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction.

2 Cases that cite this headnote

[8] **Jury**
Bias and Prejudice

A juror may properly be excused from a criminal trial if his views would prevent or substantially impair the performance of his duties as a juror

3 Cases that cite this headnote

[9] **Jury**
Punishment prescribed for offense

Jurors who state unequivocally that they could never impose the death penalty regardless of the facts of the particular case are properly excluded.

Cases that cite this headnote

[10] **Jury**
Punishment prescribed for offense

Trial court did not abuse its discretion by striking for cause juror in trial of defendant for armed robbery, burglary kidnapping and first degree murder who stated in voir dire several times that she was not sure she could sentence someone to death and that it would be very very difficult to make a decision to take someone s life.

2 Cases that cite this headnote

[11] **Criminal Law**
Reception and Admissibility of Evidence
**Criminal Law**
Documentary evidence

Rulings admitting evidence in general, and photographs in particular are reviewed for abuse of discretion.

Cases that cite this headnote

[12] **Criminal Law**
Photographs arousing passion or prejudice gruesomeness

The admissibility of a potentially inflammatory photograph is determined by examining (1) the relevance of the photograph, (2) its tendency to incite or inflame the jury and (3) the probative value versus potential to cause unfair prejudice.

1 Cases that cite this headnote

[13] **Criminal Law**
Photographs arousing passion or prejudice gruesomeness

Although photographs may not be introduced solely to inflame the jury there is nothing sanitary about murder and a trial judge is not required to make it so

Cases that cite this headnote

[14] **Criminal Law**
Purpose of admission

**Criminal Law**
Photographs arousing passion or prejudice gruesomeness

Trial court in trial of defendant for first degree murder did not abuse its discretion by admitting photographs depicting blood spatter and blood pools in relation to the victim s body where photographs corroborated opinion of State s expert that the person who slit victim's throat stood behind the chair on which victim s body was found, though the photographs were disturbing none were overly gruesome, and probative value of the photographs was not substantially outweighed by any prejudicial effect. 17A A.R.S Rules of Evid. Rule 403

Cases that cite this headnote

[15] **Homicide**
Degree or classification of homicide

**Indictment and Information**
Degrees of homicide

Any error of trial court in failing to instruct on lesser included offense of second degree murder in trial of defendant for armed robbery burglary kidnapping and first degree murder, did not prejudice defendant, as jury agreed only that defendant committed felony murder, jury did not reach a unanimous verdict on premeditated murder and second degree murder was not a lesser included offense of felony murder

Cases that cite this headnote

[16] **Criminal Law**
Evidence Justifying or Requiring Instructions

A trial court must give an instruction on lesser-included offenses when warranted to reduce the risk that a jury faced only with a choice between convicting for a capital crime and setting a violent criminal free might be unduly pressured to opt for the conviction on the capital offense

Cases that cite this headnote

[17] **Criminal Law**
Grade or degree of offense

A trial court is not required to instruct on a lesser offense that is unsupported by the evidence.

Cases that cite this headnote

[18] **Jury**
Mode of examination

Trial court did not impermissibly tell jurors particular facts of the case, during voir dire of second jury impaneled for aggravation phase of trial of defendant for first degree murder when court told a juror that the case did not involve children, where such juror had stated that because of her religion she did not believe in the death penalty but would go against such views in a case involving children, and the statement was appropriate to determine whether such juror's views would prevent or substantially impair the performance of her duties

2 Cases that cite this headnote

[19] **Jury**
⇐ Punishment prescribed for offense

Jury, who stated in jury questionnaire that she was adamantly anti-death-penalty and absolutely could not sit on a jury that would possibly be responsible for killing anyone was appropriately excluded for cause, during voir dire of second jury impaneled for aggravation phase of trial of defendant for first degree murder

Cases that cite this headnote

[20] **Homicide**
⇐ Recklessness wantonness or extreme indifference

Trial court properly instructed jury on the subjective reckless indifference standard, in trial of defendant for first degree murder by stating that a defendant acted with reckless indifference when the defendant knowingly engaged in criminal activities that he was aware would likely create a grave risk of death to others, as nothing in such instruction suggested an objective "reasonable person" standard.

Cases that cite this headnote

[21] **Criminal Law**
⇐ Construction of Evidence

**Criminal Law**
⇐ Substantial evidence

When a defendant contends that a jury's findings were not supported by the evidence, the Supreme Court determines whether substantial evidence supports the jury's finding, viewing the facts in the light most favorable to sustaining the jury verdict

Cases that cite this headnote

[22] **Criminal Law**
⇐ Degree of proof

Substantial evidence sustaining a jury s findings is proof that reasonable persons could accept as adequate and sufficient to support a conclusion of defendant's guilt beyond a reasonable doubt.

Cases that cite this headnote

[23] **Sentencing and Punishment**
⇐ Killing while committing other offense or in course of criminal conduct

Evidence was sufficient to establish that defendant was a major participant in the predicate felonies, in trial of defendant for armed robbery burglary kidnapping and first degree murder as required in order for the imposition of the death sentence in a felony murder case there was evidence that defendant and an associate returned to victim's residence when they learned that one of victim's credit card had been deactivated, that victim s credit cards, sweater and pistol were found in the truck that defendant was entering when arrested, and that associate needed help to bind victim to chair before victim's throat was slit.

Cases that cite this headnote

[24] **Sentencing and Punishment**
⇐ Extreme or reckless indifference

Evidence was sufficient to establish that defendant acted with reckless indifference to victim s life, in trial of defendant for armed robbery, burglary kidnapping and first degree murder as required in order for the imposition of the death sentence in a felony murder case State expert opined that victim s throat was slit by someone standing behind chair in which victim had been bound, and that blood on defendant's shoes was consistent with his having been in that position.

Cases that cite this headnote

[25] **Sentencing and Punishment**
⇐ Documentary evidence

Trial court did not abuse its discretion by admitting autopsy photographs of victim, during aggravation phase trials of prosecution of

defendant for first degree murder though photographs were close-ups of victim's neck wound depicting cut jugular vein, severed carotid artery and severed larynx, as photographs illustrated the testimony of the medical examiner

1 Cases that cite this headnote

[26] **Criminal Law**
Issues related to jury trial

Because the trial court is in the best position to determine the effect of a prosecutor's comments on a jury the Supreme Court will not disturb a trial court's denial of a mistrial for prosecutorial misconduct in the absence of a clear abuse of discretion.

1 Cases that cite this headnote

[27] **Criminal Law**
Conduct of counsel in general

Reversal on the basis of prosecutorial misconduct requires that the conduct be so pronounced and persistent that it permeates the entire atmosphere of the trial

1 Cases that cite this headnote

[28] **Sentencing and Punishment**
Discretion of lower court

Trial court did not abuse its discretion, in second aggravation phase trial of capital murder defendant, by denying defendant's motion for a mistrial after prosecution said in opening statement that defendant was a murderer though first jury in guilt phase had only convicted defendant of felony murder the reference was accurate and trial court later instructed second jury that defendant had been convicted of felony murder thus negating any suggestion that the first jury had found defendant to be the actual killer

Cases that cite this headnote

[29] **Sentencing and Punishment**
Arguments and conduct of counsel

Prosecutor did not engage in improper conduct, in second aggravation phase trial of capital murder defendant, by saying in opening statement that hunting knife found at murder scene was not consistent with that being the murder weapon as State expert's testimony though not conclusive supported prosecutor's assertion, expert subsequently testified that because he could find neither blood nor DNA on the blade, he could not conclude that it was the murder weapon.

Cases that cite this headnote

[30] **Sentencing and Punishment**
Harmless and reversible error

Misstatement by prosecutor in his opening statement in guilt phase of first degree murder trial, that defendant and his associate were found in a truck that defendant drove, did not prejudice defendant, though defendant was arresting while he was entering the passenger side of the truck, as the identity of the truck's driver was immaterial given that defendant was riding in the truck, and the misstatement was technical.

Cases that cite this headnote

[31] **Criminal Law**
Grounds in general

Reversal is required if the cumulative effect of the incidents shows that the prosecutor intentionally engaged in improper conduct and did so with indifference if not a specific intent, to prejudice the defendant.

Cases that cite this headnote

[32] **Criminal Law**
Grounds in general

Absent any finding of misconduct, there can be no cumulative effect of prosecutorial misconduct sufficient to permeate the entire atmosphere of the trial with unfairness

2 Cases that cite this headnote

[33] **Double Jeopardy**

Sentence on trial de novo two tier system

Submission of the pecuniary gain aggravator to second jury after jury which had convicted defendant of first degree murder failed to reach a unanimous verdict in the aggravation phase of defendant's first trial did not violate double jeopardy as a failure of a jury to unanimously find an aggravator was not an acquittal for Fifth Amendment purposes nor did it collaterally estop a new trier of fact from considering the issue U S C A Const.Amend 5, A.R S § 13–752(F K)

Cases that cite this headnote

[34] **Sentencing and Punishment**
Personal or pecuniary gain

A felony murder conviction predicated on robbery or burglary does not automatically establish the pecuniary gain aggravator for purposes of a death sentence, rather the murder must itself be prompted by the desire for pecuniary gain. A.R S § 13–751(F)(5)

1 Cases that cite this headnote

[35] **Sentencing and Punishment**
Personal or pecuniary gain

Evidence was sufficient to establish the pecuniary gain aggravator in aggravator phase of trial of defendant who was convicted of felony murder after victim was murdered, victim s gun and magazine clip were found in motel room used by defendant, victim s debit and credit cards were repeatedly used after the murder property belonging to victim was found in passenger compartment of truck that defendant was entering at the time of his arrest, and there was evidence that victim was murdered to avoid detection of the initial theft of one of victim's credit cards and the subsequent robbery and burglary A.R.S § 13–751(F)(5)

1 Cases that cite this headnote

[36] **Sentencing and Punishment**
Personal or pecuniary gain

A lack of subsequent control over robbery proceeds does not bar a finding of the pecuniary gain aggravator in a death penalty trial the aggravator requires only that the desire for pecuniary gain motivated the murder A.R.S § 13–751(F)(5)

1 Cases that cite this headnote

[37] **Sentencing and Punishment**
Presentation and reservation in lower court of grounds of review

Alleged error in instruction by trial court during aggravator phase of trial of defendant for first degree murder to which defendant did not object, which defendant claimed allowed jury to impute cruelty to defendant based solely on the conduct of his associate, was not fundamental error as the evidence indicated that defendant, at a minimum, helped bind the victim to a chair before the victim's throat was cut A.R.S § 13–751(F)(6)

Cases that cite this headnote

[38] **Sentencing and Punishment**
Extent of offender's personal participation

**Sentencing and Punishment**
Vileness heinousness, or atrocity

There is no vicarious liability for cruelty in capital cases absent a plan intended or reasonably certain to cause suffering A.R.S § 13–751(F)(6)

Cases that cite this headnote

[39] **Sentencing and Punishment**
Extent of offender's personal participation

**Sentencing and Punishment**
Vileness heinousness or atrocity

If the defendant neither committed the murder nor knew or should have known that the victim would suffer the cruelty aggravator cannot be found on a tort theory of culpability A R.S § 13–751(F)(6)

Cases that cite this headnote

[40] **Sentencing and Punishment**
Vileness heinousness, or atrocity

If the evidence in the aggravator phase of a first degree murder trial indicates that the murder was conducted in an especially heinous cruel or depraved manner the Supreme Court on appeal will uphold a jury's finding of the especially heinous cruel or depraved aggravator A.R S § 13–751(F)(6)

Cases that cite this headnote

[41] **Sentencing and Punishment**
Vileness, heinousness or atrocity

A murder is especially cruel, for purposes of the especially heinous cruel or depraved aggravator when the victim consciously experienced physical or mental pain prior to death, and the defendant knew or should have known that suffering would occur A.R.S § 13–751(F)(6)

2 Cases that cite this headnote

[42] **Sentencing and Punishment**
Vileness, heinousness, or atrocity

Evidence was sufficient to establish that victim's murder was especially cruel, as required to establish the especially heinous cruel or depraved aggravator in aggravator phase of trial of defendant convicted of armed robbery burglary kidnapping and first degree murder there was evidence that victim would have felt physical pain as his throat was cut and that he would have continued to feel pain thereafter for at least a minute until he lost consciousness victim was conscious when he was bound to a chair before his throat was cut as ligatures abrasions and bruising indicated that victim offered resistance and the number and complexity of the knots suggested that victim had ample time to suffer significant uncertainty as to his ultimate fate A.R.S § 13–751(F)(6)

2 Cases that cite this headnote

[43] **Sentencing and Punishment**
Vileness, heinousness, or atrocity

The especially heinous cruel or depraved aggravator in a death sentence trial is a single aggravating circumstance that can be established in alternative ways A.R.S § 13–751(F)(6)

1 Cases that cite this headnote

[44] **Sentencing and Punishment**
Instructions

**Sentencing and Punishment**
Harmless and reversible error

Error of trial court by instructing jury in penalty phase of trial for first degree murder that four rather than two aggravating circumstances had been found to exist, including an especially cruel aggravator an especially heinous manner aggravator and an especially depraved manner aggravator when the especially heinous cruel or depraved aggravator was just one aggravator was not harmless error was not cured by instruction that the jury could not consider twice any fact or aspect of the murder because each of especially heinous cruel or depraved aggravator factors required proof of different facts prosecution emphasized that four aggravating circumstances had been found when urging the death penalty and Supreme Court was not authorized to conduct an independent reweighing when a jury was improperly instructed on the number of aggravators A.R.S § 13–751(E) (F)(6)

2 Cases that cite this headnote

**Attorneys and Law Firms**

****600** Terry Goddard, Arizona Attorney General By Kent E. Cattani Chief Counsel Criminal Appeals/Capital Litigation Section, Deborah A. Bigbee Assistant Attorney General Phoenix Attorneys for State of Arizona

David Goldberg, Attorney at Law By David Goldberg, Fort Collins, CO, Attorney for Shawn Patrick Lynch.

***32 OPINION**

HURWITZ Vice Chief Justice.

¶ 1 Shawn Patrick Lynch was convicted of armed robbery burglary kidnapping, and first degree murder He was sentenced to death for the murder and to lengthy prison sentences for the other crimes An automatic notice of appeal was filed under Arizona Rules of Criminal Procedure 26 15 and 31 2 This Court has jurisdiction under Article 6 Section 5(3) of the Arizona Constitution and Arizona Revised Statutes ("A.R.S ) §§ 13–755 13–4031 and 13–4033 (2010) [1]

## I FACTS AND PROCEDURAL HISTORY [2]

¶ 2 James Panzarella lived in a guesthouse behind his parents' Scottsdale home On March 24 2001 James left his car at his brother's home and took a cab to a Scottsdale bar He was seen at the bar with two men later identified as Mike Sehwani and Shawn Patrick Lynch. James Sehwani and Lynch went to James s guesthouse early in the morning of March 25

¶ 3 At around 5 00 a.m., an escort service received a call from Sehwani and dispatched an escort and bodyguard to the guesthouse The bodyguard collected a $175 fee from James

¶ 4 The escort and Sehwani went into a bedroom, while James and Lynch talked with the bodyguard in the kitchen. Sehwani wrote two checks from James's checkbook to the escort totaling $300 The bodyguard and escort left around 6 00 a.m.

¶ 5 About 7 15 a.m Lynch and Sehwani went to a supermarket, where Sehwani bought cigarettes with James s American Express card. Ten minutes later the card was reported as lost and invalidated. Sehwani nonetheless shortly thereafter used the card to buy gas at a convenience store. Lynch then entered the store to get matches Later that morning Sehwani accompanied by Lynch, unsuccessfully attempted to use the card at a department store

¶ 6 Around noon, Sehwani used James s Bank One credit card at a restaurant. This credit card was also used twice that day at a convenience store That afternoon Lynch and Sehwani checked into a motel Lynch registered in his name and paid with cash Sehwani presented James s credit card to rent movies That evening, Lynch and Sehwani checked into another motel again registering in Lynch s name and paying cash.

¶ 7 On the afternoon of March 25 James was found bound to a metal chair in the *33 **601 guesthouse kitchen. His throat was slit and blood was pooled on the tile floor

¶ 8 The guesthouse was in disarray In a bedroom, police found a large hunting knife In the kitchen, they found a knife block with a missing knife. American Express receipts from the March 25 supermarket and convenience store purchases were also found in the guesthouse

¶ 9 Early in the morning of March 26, James s Bank One debit card was used to withdraw cash from an ATM. A later attempted withdrawal was unsuccessful. The debit card was also used later that morning to buy clothing and Everlast shoes and at least twice otherwise that same day

¶ 10 Police arrested Lynch and Sehwani that afternoon as they entered a truck in the motel parking lot. Sehwani wore white Everlast sneakers and had James's credit cards and checks in his wallet. Matches from the convenience store and the keys to James's car were in the truck. A black sweater with James's blood on it was behind the seats. A 45 caliber pistol belonging to James was later found in the motel room. Blood on Lynch s shoes tested positive for James's DNA. [3]

¶ 11 Lynch and Sehwani were charged with first degree murder (both felony and premeditated) armed robbery burglary and kidnapping. Lynch was tried first. The jury found him guilty on all counts but did not reach a unanimous verdict on premeditated murder

¶ 12 In the aggravation phase of the trial the jury could not agree on whether the murder was committed in expectation of pecuniary gain *See* A.R S § 13–751(F)(5) (2010) The jury made separate findings that the murder was both especially heinous and cruel but could not decide whether the murder was also especially depraved. *See* A.R.S § 13–751(F)(6) In the penalty phase the jury could not reach a unanimous verdict.

¶ 13 A second jury was impaneled. That jury found both the (F)(5) aggravator and the depravity prong of the (F)(6) aggravator The second jury then unanimously determined that Lynch should be sentenced to death for the murder [4]

## II ISSUES ON APPEAL

**A GUILT PHASE**

**1 Competence to Stand Trial**

¶ 14 Before trial, the court ordered a Rule 11 examination after Lynch refused to meet with his lawyers *See* Ariz R Crim. P 11 Based on that evaluation, the court found Lynch incompetent to stand trial and ordered restoration services Five months later after considering a psychologist's report that was stipulated into evidence the court found Lynch restored to competency

¶ 15 Six months later defense counsel requested a second Rule 11 evaluation, alleging that Lynch suffered from delusions and therefore could not assist in his defense He offered no other support for this motion, which the court denied.

[1] ¶ 16 Lynch argues that the trial court erred in finding that he had been restored to competency and refusing to order a second Rule 11 examination. We review these rulings for abuse of discretion. *State v Glassel,* 211 Ariz. 33 44 ¶ 27, 116 P.3d 1193 1204 (2005) *State v Romero* 130 Ariz. 142, 147 634 P 2d 954 959 (1981)

[2] ¶ 17 The psychologist's report amply supports the trial court's finding that Lynch had been restored to competency The psychologist concluded that Lynch understood the nature of the proceedings against him and could assist in his defense Although acknowledging that Lynch suffered from various delusions and idiosyncratic thought processes the psychologist noted that these "errant thoughts do not appear to significantly affect his ability to deal with relevant issues pursuant to his alleged crime and pursuant *34 **602 to a possible trial " The expert concluded that Lynch "can cooperate with his attorney should he choose to do so

¶ 18 Nor did the court err in refusing to order a second competency hearing. Lynch proffered no new information to call into question the court's previous finding of competency The earlier expert report had noted Lynch's delusions but concluded that they did not render him incompetent to assist in his defense. In the absence of any new evidence the court did not abuse its discretion in continuing to rely on that report. *See State v Kuhs* 223 Ariz 376 380 ¶ 16, 224 P 3d 192, 196 (2010)

**2. Description of Capital Case Process to First Jury**

¶ 19 Lynch argues that during voir dire of the first jury the trial court "gave no details regarding what an aggravating or mitigating circumstance might entail or how a juror would factor such information into the penalty decision." He maintains that the State was thus able to pack the first jury with pro-death penalty jurors No objection was raised below so we review only for fundamental error *Id.* at 386 ¶ 52 224 P 3d at 202

[3] ¶ 20 Because the first jury did not return a death sentence, Lynch was not prejudiced by the trial court's description of the capital sentencing process But in any event, we find no error

[4] ¶ 21 The superior court properly told the panel that [n]ot every murder contains aggravating factors and only those that are found to have aggravating factors are eligible for consideration for the death penalty" *See* A.R.S §§ 13–752(D) (2010), 13–751(E) The court also correctly defined a 'mitigating circumstance" as "any factor relevant in determining whether to impose a sentence less than death, including any aspect of the defendant's character propensities record or circumstances of the offense." *See* A R.S § 13–751(G) The court accurately explained that each juror should consider any mitigating factors found by that juror in determining whether a death or life sentence was appropriate *See* A.R.S § 13–751(C)

**3 Refusal to Conduct Sequestered Voir Dire**

¶ 22 Lynch maintains that the trial court erred by denying sequestered voir dire of the first jury We review for abuse of discretion. *State v Bible* 175 Ariz. 549 570 858 P 2d 1152, 1173 (1993)

[5] ¶ 23 Lynch does not claim that sequestered voir dire was necessary because of 'unusually sensitive subjects" or extensive pretrial publicity *See id.* (noting that in camera voir dire is "most useful" in such cases) Rather, Lynch argues that separate voir dire is required in *every* capital case. We expressly rejected that proposition in *Bible. Id.*

¶ 24 Lynch also fails to identify any "contaminating" statement by a prospective juror that "might color the entire jury's outlook." Ariz R Crim. P 18 5(d) cmt., *see Bible* 175 Ariz. at 570 858 P 2d at 1173 (noting absence of such a statement in finding no error in group voir dire) On this record, the trial court did not abuse its discretion in declining to order sequestered voir dire.

4 **Striking Juror 119 for Cause**

[6] ¶ 25 Lynch argues the trial court erred by striking Juror 119 from the first jury for cause over his objection. 'Because a trial judge has the best opportunity to assess whether a juror can be fair and impartial, appellate courts review such decisions only for abuse of discretion " *State v Hickman* 205 Ariz 192 201 ¶ 39, 68 P 3d 418 427 (2003) *see also Uttecht v Brown* 551 U S 1 22, 127 S Ct 2218 167 L Ed.2d 1014 (2007) (requiring appellate deference to the trial court, which is in a superior position to determine the demeanor and qualifications of a potential juror")

[7] [8] [9] ¶ 26 Jurors cannot be excluded simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." *Witherspoon v Illinois* 391 U S 510 522, 88 S Ct 1770 20 L Ed.2d 776 (1968), *accord State v Anderson* (*Anderson I* ) 197 Ariz 314 324 ¶ 23 4 P 3d 369, 379 (2000) A juror may properly be excused, *35 **603 however if his views would " prevent or substantially impair the performance of his duties as a juror *Wainwright v Witt* 469 U S 412, 424, 105 S Ct 844 83 L.Ed.2d 841 (1985) (quoting *Adams v Texas* 448 U S 38 45, 100 S Ct 2521, 65 L.Ed.2d 581 (1980)) "[J]urors who state unequivocally that they could never impose the death penalty regardless of the facts of the particular case" are properly excluded. *Anderson I* 197 Ariz at 318 ¶ 7 4 P 3d at 373

[10] ¶ 27 Juror 119 stated several times during voir dire that she was not certain she could sentence someone to death During questioning by defense counsel however she stated, "[w]hen you were asking [another juror] the questions I thought to myself if the circumstances—if I would hear that it were a particularly brutal or heinous murder yes I might be able to vote for the death penalty in that case."

¶ 28 Lynch contends that this statement demonstrated that Juror 119 could fairly consider the death penalty However, after making this statement, Juror 119 said that [i]t would be very difficult to make that decision to take someone's life It would be very, very difficult The trial judge excused the juror only after considering the entirety of her answers and demeanor Given Juror 119s statements and the deference we owe to the trial court, we cannot conclude that the judge abused his discretion.

5 **Admission of Crime Scene Photographs**

[11] ¶ 29 During the guilt phase, the trial court admitted six crime scene photographs over Lynch's objection. We review rulings admitting evidence in general, and photographs in particular for abuse of discretion. *State v McGill* 213 Ariz. 147 154 ¶ 30 140 P 3d 930 937 (2006)

[12] [13] ¶ 30 "The admissibility of a potentially inflammatory photograph is determined by examining (1) the relevance of the photograph, (2) its tendency to incite or inflame the jury and (3) the probative value versus potential to cause unfair prejudice." *State v Cruz*, 218 Ariz 149 168–69 ¶ 125 181 P 3d 196 215–16 (2008) (internal quotation marks omitted) Although photographs may not be introduced solely to inflame the jury, *State v Anderson* (*Anderson II* ) 210 Ariz 327 340 ¶ 40 111 P 3d 369 382 (2005), "[t]here is nothing sanitary about murder," and we do not "require[ ] a trial judge to make it so *State v Rienhardt*, 190 Ariz 579 584 951 P 2d 454 459 (1997)

[14] ¶ 31 The photographs depict blood spatter and blood pools in relation to the victim s body and thus corroborate the opinion of the State's expert that the person who slit James s throat stood behind the chair Although the photographs are disturbing, none is overly gruesome. The probative value of the photographs is not substantially outweighed by any prejudicial effect, *see* Ariz. R. Evid. 403 and the trial court did not abuse its discretion in admitting them

6. **Refusal to Give an Instruction on Second Degree Murder**

[15] ¶ 32 Lynch requested an instruction on second degree murder The trial court denied the request because it found no evidence that the murder was not premeditated.

[16] [17] ¶ 33 A trial court must give an instruction on lesser included offenses when warranted to reduce the risk that a jury faced only with a choice between convicting for a capital crime and setting a violent criminal free, might be unduly pressured to opt for the conviction on the capital offense *Beck v Alabama* 447 U S. 625 637 100 S Ct. 2382, 65 L Ed.2d 392 (1980) However *Beck* "does not require a trial court to instruct on a lesser offense that is unsupported by the evidence. *State v Bearup* 221 Ariz 163 170 ¶ 29 211 P 3d 684 691 (2009) (quoting *State v Landrigan*, 176 Ariz 1 6 859 P 2d 111 116 (1993))

¶ 34 In this case, the jury agreed only that Lynch committed felony murder· it did not reach a unanimous verdict on premeditated murder Second degree murder is not a lesser

included offense of felony murder State v Jackson 186 Ariz. 20 27 918 P 2d 1038 1045 (1996) Therefore, even if we assume that the record warranted such an instruction, Lynch suffered no prejudice from the trial court's refusal to give it.

****604 *36 B. AGGRAVATION PHASE**

**1 Exclusion of Jurors 25 and 49 (Second Jury) For Cause**

[18] ¶ 35 During voir dire of the second jury, Juror 25 stated that she was Catholic and did not believe in the death penalty but would "go against those views in a case involving children. When informed that this was not such a case, she stated that she "could not do the death penalty because of my beliefs

¶ 36 The court excluded Juror 25 for cause over Lynch s objection. Citing *State v Johnson*, 212 Ariz. 425 434–35 ¶¶ 29–35 133 P 3d 735 744–45 (2006) Lynch argues that the trial court erred in telling the juror about the specific facts of this case Lynch did not raise this argument below so fundamental error review applies *Kuhs* 223 Ariz. at 386 ¶ 52 224 P 3d at 202.

¶ 37 Contrary to Lynch s argument, *Johnson* does not prohibit telling jurors about the particular facts of the case during voir dire. Rather *Johnson* only held that the trial court may refuse to permit parties to ask jurors to speculate on or commit to how they would assess specific mitigation 212 Ariz. at 435 ¶ 33 133 P 3d at 745 *see also State v Smith*, 215 Ariz. 221 231 ¶ 42, 159 P 3d 531 541 (2007) ( [T]he same is true of voir dire focused on the assessment of specific aggravators ")

¶ 38 The trial judge s statement to Juror 25 that children were not involved in the case was appropriate to determine whether the juror's views would 'prevent or substantially impair the performance of [her] duties " *Witt* 469 U S at 424 105 S Ct. 844 (quoting *Adams* 448 U S at 45 100 S Ct 2521) And, given Juror 25 s responses the judge reasonably concluded that her religious beliefs would substantially impair her ability to impose death.

[19] ¶ 39 We also find no error in excluding Juror 49 In her questionnaire, Juror 49 stated, I am *ADAMANTLY* anti death penalty and absolutely could not sit on a jury that would possibly be responsible for killing anyone, even a guilty person. She said that she could not vote for death 'under any circumstances," that she did not know whether she would be able to follow the law and that she likened the death penalty to murder "

**2 Failure to Clarify Theory of First Degree Murder**

¶ 40 Lynch requested that prospective jurors for the second aggravation phase be told that he had not been convicted of premeditated murder but only felony murder The trial court instead initially informed the panel that Lynch had been convicted of 'first degree murder " Citing *Morgan v Illinois* 504 U S 719 112 S Ct 2222 119 L.Ed.2d 492 (1992) Lynch argues the court erred by not instructing the second jury that the first panel had unanimously found only felony murder

¶ 41 *Morgan* held that a defendant must be allowed to ask prospective jurors if they would automatically vote for death after a guilty verdict. 504 U S at 729 112 S Ct. 2222 Lynch was not prevented from so inquiring. Rather he unsuccessfully urged the trial court to describe the theory underlying the murder conviction. In any event, the second jury was told after selection that Lynch had been convicted of felony murder Thus no sitting juror was under any misapprehension that Lynch had been convicted of premeditated murder

**3 Reckless Indifference Instruction**

[20] ¶ 42 The first jury found that Lynch was a major participant in the crime and acted with reckless indifference to the grave risk of death *See Tison v Arizona*, 481 U S. 137 157–58, 107 S Ct. 1676 95 L.Ed.2d 127 (1987) (requiring such findings for imposition of death sentence in felony murder cases) Lynch contends the trial court improperly instructed the jury as to what constitutes reckless indifference.

¶ 43 *Tison* defined reckless indifference as "knowingly engaging in criminal activities known to carry a grave risk of death." 481 U S at 157 107 S Ct. 1676 The standard is subjective—whether the defendant "subjectively appreciated that [his] acts were likely to result in the taking of innocent life. *Id.* at 152 107 S Ct. 1676

**605 *37 ¶ 44 Lynch requested the following "reckless indifference instruction.

> In order to find that Shawn Lynch acted with reckless indifference to human life, it must be proven that he subjectively knew his acts were likely to result in the taking of innocent life,

> yet nonetheless engaged in criminal activities known to carry a high probability of death.

The court instead instructed the jury that "[a] defendant acts with reckless indifference when the defendant knowingly engages in criminal activities that he is aware will likely create a grave risk of death to others " Lynch acknowledges that the court's instruction correctly required subjective awareness but argues that it was not as clear" as his proposed instruction

¶ 45 The trial court's reckless indifference instruction clearly and correctly stated the law Nothing in the instruction even remotely suggests an objective or "reasonable person standard.

### 4 Sufficiency of the Evidence on the *Tison* Findings

[21] [22] ¶ 46 Lynch contends that the jury's *Tison* findings were not supported by the evidence. We determine "whether substantial evidence supports the jury's finding viewing the facts in the light most favorable to sustaining the jury verdict." *State v Roque* 213 Ariz 193 218 ¶ 93 141 P 3d 368, 393 (2006) [5] Substantial evidence is 'proof that reasonable persons could accept as adequate and sufficient to support a conclusion of defendant's guilt beyond a reasonable doubt." *Id.* (internal quotations omitted)

[23] ¶ 47 Substantial evidence supported the jury's finding that Lynch was a major participant in the predicate felonies The American Express receipts found at the guesthouse show that Lynch and Sehwani returned to the guesthouse after discovering that James had deactivated the American Express card. James s car keys, credit cards, checks, sweater, and pistol were found in the truck that Lynch was entering when arrested. *See State v Lacy* 187 Ariz. 340 351, 929 P.2d 1288 1299 (1996) (finding substantial participation in predicate burglary when defendant stole property)

¶ 48 Reasonable jurors could also conclude from the evidence that Lynch and Sehwani acted in concert to bind James to the chair and that Lynch was thus a major participant in the kidnapping Lynch probably helped tie James to the chair because Sehwani likely could not have done it alone *See State v Robinson,* 165 Ariz 51 62, 796 P.2d 853 864 (1990) (finding that actions of defendant who "was at least present" when victims hands and feet were bound and when the murder occurred met *Tison* standard)

[24] ¶ 49 Substantial evidence also supports the jury's finding that Lynch acted with reckless indifference toward James's life *See State v Ellison,* 213 Ariz. 116, 135 ¶ 73 140 P 3d 899 918 (2006) (finding reckless indifference when defendant bound victims and held pillow over one victim s face) A State expert opined that James's throat was slit by someone standing behind the chair and that the blood on Lynch's shoes was consistent with his having been in that position. [6]

### 5 "Retrial" of *Tison* Predicates

¶ 50 Lynch contends that the second jury improperly "retried" the *Tison* predicates. The trial court, however never submitted any *Tison* issues to the second jury That jury appropriately heard evidence about Lynch's participation in the crime, because it was entitled to consider the circumstances of the offense in evaluating mitigation. *See* A.R.S § 13–751(G), *State v Garza,* 216 Ariz 56, 68 ¶ 57 163 P 3d 1006 1018 (2007)

### 6. Admission of Autopsy Photos

¶ 51 During the first aggravation phase, the court admitted three autopsy photographs ***38** ****606** over Lynch s objections During the second aggravation phase, the court admitted two of those photographs over Lynch s objections We review for abuse of discretion. *McGill,* 213 Ariz at 154 ¶ 30 140 P 3d at 937

[25] ¶ 52 The photographs are close-ups of the victim's neck wound. One depicts a cut jugular vein. Another shows a completely severed carotid artery The third, admitted only in the first penalty phase, depicts the victim s torso covered in dried blood and his head tilted back, exposing a severed larynx.

¶ 53 The photographs were properly admitted to illustrate the testimony of the medical examiner Moreover, before seeing the images, both juries heard expert testimony about the neck injuries without objection. *See State v Pandeli* 215 Ariz. 514 529 ¶ 56 161 P 3d 557 572 (2007) (finding jurors were likely not shocked by photographs in light of medical examiner's prior testimony) Although these photographs were undoubtedly disturbing, the superior court did not abuse its discretion in admitting them. *See Anderson II* 210 Ariz. at 340 ¶¶ 41–42 111 P 3d at 382 (upholding admission of graphic photographs of murder victim)

**7 Prosecutorial Misconduct**

[26] [27] ¶ 54 Lynch alleges a litany of prosecutorial misconduct, arguing that either the individual instances or the cumulative effect of the purported misconduct requires a retrial of the aggravation phases "Because the trial court is in the best position to determine the effect of a prosecutor's comments on a jury we will not disturb a trial court's denial of a mistrial for prosecutorial misconduct in the absence of a clear abuse of discretion." *State v Newell* 212 Ariz 389 402 ¶ 61 132 P 3d 833 846 (2006) "Reversal on the basis of prosecutorial misconduct requires that the conduct be so pronounced and persistent that it permeates the entire atmosphere of the trial.' *State v Hughes* 193 Ariz. 72, 79 ¶ 26 969 P.2d 1184 1191 (1998) (citations and internal quotation marks omitted) *see also Anderson II* 210 Ariz. at 340–41 ¶ 45 111 P 3d at 382–83 (requiring a showing that the misconduct likely denied the defendant a fair trial).

**a. References to Lynch as the "Murderer"**

[28] ¶ 55 In his opening statement in the second aggravation phase, the prosecutor said "the person sitting here in court has already been convicted of first degree murder Shawn Patrick Lynch is a murderer" He further stated, "[James] was murdered, and the person who murdered him is sitting right here." Lynch moved for a mistrial.

¶ 56 The court denied the motion, noting that 'Mr Lynch has been convicted of first degree murder' and that referring to him "as a murderer is an accurate statement.' In any event, the court later informed the second jury that Lynch had been convicted of felony murder thus negating any suggestion that the first jury had found Lynch to be the actual killer Therefore, the trial court did not abuse its discretion in denying the mistrial motion.

**b Testimony about Hunting Knife**

[29] ¶ 57 In his second aggravation phase opening statement, the prosecutor said a witness would testify that the hunting knife found at the murder scene was "not consistent with that being the murder weapon." Lynch moved for a mistrial, arguing that the expert in question would not rule out the knife as the murder weapon but rather would only testify that no DNA was detected on the blade. The trial court denied the mistrial motion without prejudice to renewal if the expert testimony did not support the prosecutor's statement. The court then instructed the jury that opening statements are not evidence.

¶ 58 Lynch did not renew his mistrial motion after the expert's testimony Even assuming that this omission did not waive any argument of misconduct, we find no impropriety in the prosecutor's statement. The expert testified that because he could find neither blood nor DNA on the blade, he could not conclude that it was the murder weapon. Although not conclusive, that testimony supported the prosecutor's assertion

****607 *39 c. Opening Statements**

¶ 59 Lynch argues the prosecutor misstated the evidence in his opening statements in the guilt and second aggravation phases

[30] ¶ 60 In the guilt phase, the prosecutor stated that Lynch and Sehwani "rode around in a truck that Mr Sehwani—that the defendant drove." Because Lynch was entering the passenger side of a truck when he was arrested, he contends this statement was false. The identity of the truck's driver however was immaterial and, given that Lynch was riding in the truck, we can perceive no prejudice from any technical misstatement.

¶ 61 The prosecutor also asserted that Lynch and Sehwani "render[ed James] helpless and that 'there are some bruises as [James] attempted to get up" The evidence supported this statement. The medical examiner testified that James was tied to a chair and that a bruise on his shoulder may have been caused by "bang[ing] against the surface of the chair

¶ 62 The prosecutor later stated that "[t]here are keys, car keys to a Lexus [James] owns a Lexus and they also took that." Although not a model of clarity this statement can be construed as meaning that Lynch and Sehwani took the car keys not the car Moreover given the trial testimony that James had left his car at his brother's house on March 24 and never retrieved it, the jury could not have understood the statement to mean that Lynch and Sehwani stole the car

¶ 63 Lynch argues that the prosecutor also suggested that Lynch arranged the escort service transaction by stating that 'the financial terms are taking place at that table and they take place between the [bodyguard], James and

the individual the defendant, that's just sitting there." This statement is reasonably understood, however as meaning that the bodyguard and James participated in the negotiations, while Lynch was "just sitting there This statement is supported by the testimony

¶ 64 In the second aggravation phase, the prosecutor asserted that the bodyguard would testify that Lynch was "acting as if he owned the place kind of like he was in charge and that a knife was on the kitchen table. Lynch did not object. Moments later, the prosecutor stated that Lynch was kind of being the boss of things The evidence at least peripherally supported the prosecutor's statements The bodyguard testified that a knife was on the table, Lynch did most of the talking, and he offered the bodyguard a beer

### d. Cumulative Misconduct

[31] [32] ¶ 65 Lynch contends that even if each instance of alleged misconduct is individually harmless, reversal is warranted for cumulative misconduct. Reversal is required "if the cumulative effect of the incidents shows that the prosecutor intentionally engaged in improper conduct and did so with indifference, if not a specific intent, to prejudice the defendant. *Roque* 213 Ariz at 228 ¶ 155 141 P 3d at 403 (internal quotation marks and citations omitted) However [a]bsent any finding of misconduct, there can be no cumulative effect of misconduct sufficient to permeate the entire atmosphere of the trial with unfairness *State v Bocharski* 218 Ariz 476 492 ¶ 75 189 P 3d 403, 419 (2008) Even assuming that one of the cited incidents technically involved a misstatement, we find no misconduct and nothing approaching pervasive unfairness in this case

## 8. (F)(5) Aggravator

### a. Retrial of the (F)(5) Aggravator

¶ 66 Lynch argues that the trial court improperly permitted the second jury to reconsider the pecuniary gain aggravator We find neither statutory nor constitutional error

¶ 67 The governing statutes, A.R.S §§ 13–752(F) and (K) permit resubmission of the pecuniary gain aggravator to the second jury Section 13–752(F) mandates that the trial proceed directly to the penalty phase if the first jury finds at least one aggravating circumstance, even if that jury cannot reach a unanimous decision on another aggravator If the jury cannot reach a unanimous decision in the penalty phase, the court must impanel a new jury A.R.S § 13–752(K) *40 **608 The second jury is only precluded from retrying "the defendant's guilt or the issue regarding any of the aggravating circumstances that the first jury found by *unanimous* verdict to be proved or not proved." *Id.* (emphasis added) The statute thus contemplates submission to the second jury of those aggravating circumstances that were not unanimously found by the original jury

[33] ¶ 68 Contrary to Lynch's arguments, such a procedure did not subject him to double jeopardy Failure to unanimously find an aggravator is not an acquittal for Fifth Amendment purposes, *Poland v Arizona,* 476 U S 147, 155–56 106 S Ct. 1749 90 L Ed.2d 123 (1986) nor does it collaterally estop a new trier of fact from considering the issue, *Yeager v United States* —U S —— 129 S Ct. 2360 2368 174 L.Ed.2d 78 (2009)

### b Sufficiency of Evidence on the (F)(5) Aggravator

¶ 69 Lynch contends that the evidence was insufficient to support the second jury's finding that "[t]he defendant committed the offense as consideration for the receipt, or in expectation of the receipt, of anything of pecuniary value. A.R.S § 13–751(F)(5) Because the murder occurred before August 1 2002, we independently review the jury's aggravation findings A.R.S § 13–755(A) *Anderson II* 210 Ariz at 354 ¶ 119 & n 21 111 P 3d at 396 & n. 21

[34] ¶ 70 A felony murder conviction predicated on robbery or burglary does not automatically establish the (F)(5) aggravator *Anderson II* 210 Ariz. at 351 ¶ 103 111 P 3d at 393 Rather the murder must itself be 'prompted by the desire for pecuniary gain." *Id* at 351 ¶ 105 111 P 3d at 393

[35] ¶ 71 The evidence here establishes the (F)(5) aggravator beyond a reasonable doubt. After the murder James's gun and magazine clip were found in a motel room used by Lynch James's Bank One debit and credit cards were repeatedly used after the murder, among other things to secure charges at a motel room registered in Lynch's name. Property belonging to James was found in the passenger compartment of the truck that Lynch was entering at the time of his arrest.

¶ 72 The evidence also strongly supports the conclusion that the killers returned to the guesthouse intending to steal further

from James and that he was murdered to avoid detection of both the initial theft of the American Express card and the subsequent robbery and burglary *See Ellison,* 213 Ariz at 143 ¶ 125 140 P 3d at 926 (finding (F)(5) aggravator established when defendant planned a burglary and killed victims to escape and avoid identification) The record does not suggest that pecuniary gain was an originally unintended consequence of the murder *See State v Gillies* 135 Ariz. 500, 512 662 P 2d 1007 1019 (1983) (finding (F)(5) aggravator not established when defendant confessed that purpose of murdering rape victim was to eliminate her as a witness to her own rape, not to steal credit cards and cash)

[36] ¶ 73 Lynch argues that an (F)(5) finding is inappropriate because the evidence is not conclusive as to who controlled James s car keys and gun and because Sehwani used James s credit cards But a lack of subsequent control over robbery proceeds does not bar an (F)(5) finding the aggravator requires only that the desire for pecuniary gain motivated the murder *State v LaGrand* 153 Ariz. 21 36 734 P.2d 563 578 (1987) Similarly we reject Lynch's argument that upholding the (F)(5) aggravator would require imputing Sehwani's motivations to Lynch The evidence sufficiently establishes that Lynch acted with his own pecuniary motivations

**9 (F)(6) Aggravator**

**a. Absence of "Vicarious Liability" Instruction**

[37] ¶ 74 Lynch contends the trial court erred in giving the following instruction in the first aggravation phase

> Cruelty involves the infliction of physical pain and/or mental anguish on a victim before death. A crime is committed in an especially cruel manner when a defendant either knew or should have known that the manner in which the crime is committed *41 **609 would cause the victim to experience physical pain and/or mental anguish before death

Lynch argues that the instruction allowed the jury to impute cruelty to him solely because of Sehwani's actions Because Lynch neither objected to this instruction nor requested an alternative, we review for fundamental error *Kuhs* 223 Ariz. at 386 ¶ 52, 224 P 3d at 202

[38] [39] ¶ 75 "There is no vicarious liability for cruelty in capital cases absent a plan intended or reasonably certain to cause suffering." *State v Carlson* 202 Ariz. 570 583 ¶ 49 48 P 3d 1180, 1193 (2002) If the defendant neither committed the murder nor knew or should have known that the victim would suffer the cruelty aggravator cannot be found on a "tort theory of culpability " *Id*

¶ 76 *Carlson* involved a defendant who "was not present during commission of the crime, did not supply the murder weapon, and was not involved in planning the details or method of murder " 202 Ariz at 583 ¶ 47 48 P 3d at 1193 In contrast, a reasonable inference from the evidence in this case is that Lynch, at a minimum helped bind the victim before his throat was slit. Given the evidence that Lynch s own actions caused the victim mental anguish, the instruction given was not fundamental error

**b. Sufficiency of Evidence on the (F)(6) Aggravator**

[40] ¶ 77 First degree murder is aggravated when conducted "in an especially heinous, cruel or depraved manner " A.R.S § 13–751(F)(6) Although worded in the disjunctive this subsection describes but one aggravating circumstance *State v Djerf* 191 Ariz 583, 595 ¶ 44 959 P 2d 1274, 1286 (1998) If the evidence supports one of the statutory grounds we will uphold the (F)(6) finding. *See State v Cromwell* 211 Ariz. 181 189 ¶ 43 119 P 3d 448 456 (2005) (declining to consider alleged errors related to heinousness or depravity because cruelty was established)

[41] [42] ¶ 78 A murder is especially cruel when "the victim consciously experienced physical or mental pain prior to death, and the defendant knew or should have known that suffering would occur " *State v Trostle* 191 Ariz. 4 18 951 P 2d 869 883 (1997) (internal citation omitted) That standard was met here The evidence showed that James would have felt physical pain as his throat was cut. He would have continued to feel pain thereafter for at least a minute until he lost consciousness

¶ 79 The evidence also establishes that James experienced mental anguish He was almost surely conscious when bound to the chair as [t]here is no reason to bind an unconscious person who offers no resistance " *Djerf* 191 Ariz. at 596 ¶ 49 959 P.2d at 1287 Ligatures abrasions, and bruising on James s wrists hands, forearm, shoulder blade back, and chest wall establish that he struggled. *See State v Sansing*

**State v Lynch 225 Ariz. 27 (2010)**

234 P 3d 595 606 Ariz. Adv Rep 4

206 Ariz 232, 236 ¶ 10 77 P 3d 30 34 (2003) (inferring mental anguish from victim s defensive wounds). Moreover, the number and complexity of the knots suggest that James had ample time to suffer "significant uncertainty as to [his] ultimate fate " *State v Van Adams* 194 Ariz. 408, 421 ¶ 44 984 P 2d 16 29 (1999)

¶ 80 It was also "reasonably foreseeable that James would suffer physical or mental pain. *Djerf* 191 Ariz. at 595 ¶ 45, 959 P 2d at 1286 Lynch argues that physical pain was not foreseeable because the fatal wound was designed to lead to a quick death. But it is not obvious that cutting a throat will always lead to instantaneous death. In any event, it was surely foreseeable that James would suffer significant mental anguish while being bound to the chair

¶ 81 The evidence supports the jury's finding that the murder was especially cruel. Because the (F)(6) aggravator was therefore established on that ground, we need not determine whether the evidence also supports the findings of heinousness or depravity *Cromwell* 211 Ariz. at 189 ¶ 43 119 P 3d at 456 [7]

****610 *42 C PENALTY PHASE**

¶ 82 Lynch requested an instruction stating that the three separate jury findings of especial heinousness, cruelty and depravity constituted only one aggravating circumstance The court instead instructed the second penalty phase jury as follows

> The following aggravating circumstances have been found to exist
>
> 1 The defendant committed the murder in an especially cruel manner
>
> 2 The defendant committed the murder in an especially heinous manner
>
> 3 The defendant committed the murder in an especially depraved manner
>
> 4 The defendant committed the murder in expectation of the receipt of anything of pecuniary value

¶ 83 In his closing argument, the prosecutor cited this instruction and characterized the (F)(6) prongs as three aggravating factors " After the argument, Lynch unsuccessfully moved for a new trial

[43] [44] ¶ 84 Our decisions make plain that the (F)(6) aggravator is a single aggravating circumstance that can be established in alternative ways "Because this subsection is stated in the disjunctive, a finding of either cruelty or heinousness/depravity will suffice to establish this factor " *Djerf* 191 Ariz at 595 ¶ 44 959 P 2d at 1286 The court therefore erred in instructing the jury that three separate (F)(6) aggravating circumstances were proved. *State v Miles* 186 Ariz. 10, 19, 918 P 2d 1028 1037 (1996) (finding error in counting cruelty and heinousness as two separate factors)

¶ 85 The State argues that any error in the instruction was cured because the court also instructed the jury that "you shall not consider twice any fact or aspect of the murder " But this general statement did not clarify that the especially heinous, cruel, and depraved findings constituted a single aggravating circumstance, because, as the jury here was instructed, each (F)(6) theory requires proof of different facts Especial cruelty requires proof that the victim was conscious, suffered physical pain or mental anguish, and the defendant knew or should have known the victim would suffer *Trostle*, 191 Ariz. at 18 951 P.2d at 883 In contrast, under the only theory proffered by the State that would support finding heinousness or depravity—gratuitous violence—proof is required that the defendant inflicted more violence than was necessary to kill and either knew or should have known that he had done so *Bocharski* 218 Ariz. at 494 ¶¶ 85–87 189 P 3d at 421

¶ 86 Nor was the trial court's instructional error harmless An error is harmless only when the State proves beyond a reasonable doubt that the jury's decision "was surely unattributable to the error " *State v Valverde* 220 Ariz. 582 585 ¶ 11 208 P 3d 233 236 (2009) (quoting *State v Anthony* 218 Ariz. 439 446 ¶ 39 189 P 3d 366, 373 (2008)) The State has not met that burden here The jury was told incorrectly that there were four aggravating factors rather than two and the prosecution emphasized this incorrect instruction in urging the death penalty *See* A.R.S §§ 13–751(E) (requiring penalty phase jury to 'take into account the aggravating circumstances that have been proven") 13–751(F) (requiring jury to consider aggravating circumstances in determining whether to impose a sentence of death")

¶ 87 When an "error was made regarding a finding of aggravation" we are required to independently determine if the mitigation is sufficiently substantial to warrant leniency in light of the existing aggravation." A R.S § 13–755(B) When we conclude that the jury has erroneously found an aggravating circumstance we use this extraordinary statutory

**WESTLAW** © 2016 Thomson Reuters No claim to original U S Government Works 16

power of independent reweighing to determine whether a death sentence nonetheless remains appropriate. *See e.g State v Tucker* 215 Ariz. 298 320–23 ¶¶ 96–120 160 P 3d 177, 199–202 (2007) *State v Carreon,* 210 Ariz 54 73 ¶¶ 96–98, 107 P 3d 900 919 (2005)

¶ 88 The statute, however only requires independent reweighing when "an error was made regarding a *finding* of aggravation. A R.S § 13–755(B) (emphasis added) This is not such a case The jury here properly found both the (F)(5) and (F)(6) aggravators The error in this case arises not from an improper aggravation finding, but rather *43 **611 from the trial court's faulty instruction in the penalty phase that the jury should treat the case as involving four aggravators and the prosecutor's highlighting of that instruction during arguments exacerbated the error Under these circumstances § 13–755(B) does not authorize independent reweighing Rather we are constrained to remand for a new penalty phase trial before a properly instructed jury [8]

## III. CONCLUSION

¶ 89 For the reasons above we affirm the convictions and non-capital sentences but remand for a new penalty phase proceeding on the murder conviction. Any new penalty phase jury should be instructed that the (F)(5) and (F)(6) aggravators have been previously found and that it is not to retry those issues *See* A R.S § 13–752(K)

CONCURRING REBECCA WHITE BERCH, Chief Justice, MICHAEL D RYAN W SCOTT BALES and A JOHN PELANDER, Justices

**All Citations**

225 Ariz. 27 234 P 3d 595 606 Ariz. Adv Rep 4

Footnotes

1 This opinion cites the current version of statutes unless there has been a material change in the relevant law since the offenses

2 We view the facts in the light most favorable to sustaining the guilty verdicts *State v Garza* 216 Ariz. 56 61 n 1 163 P 3d 1006 1011 n 1 (2007)

3 The murder weapon could not be positively identified The handle of the hunting knife found in the guesthouse bedroom contained Sehwani s DNA but there was no blood on the blade

4 Sehwani later pleaded guilty to first degree murder and theft. He received consecutive sentences of natural life and one year respectively

5 *Tison* findings are not aggravating circumstances and therefore not subject to independent review under A R S § 13–755(A) *State v Garcia* 224 Ariz 1 20 ¶ 88 n 3 226 P 3d 370 389 n 3 (2010)

6 Another expert testified that Lynch s left shoe was a highly probable match for footwear impressions in the bathroom and living room of the guesthouse

7 Similarly we need not consider any allegations of error relating to the jury's findings of heinousness or depravity Even if those findings were vacated the (F)(6) aggravator would remain established

8 We therefore need not address Lynch s other arguments regarding imposition of the death penalty including the twenty-seven arguments submitted to avoid preclusion in future federal proceedings

End of Document © 2016 Thomson Reuters No claim to original U S Government Works