# EXHIBIT 31 (part 3)

*Andriano v. Ryan*, Case No. CV-16-01159-PHX-
SRB Motion for Evidentiary Development

# Exhibit 7

✇ KeyCite Blue Flag – Appeal Notification
Petition for Certiorari Docketed by    SHAWN PATRICK LYNCH v
ARIZONA,   U S     February 29 2016

238 Ariz 84
Supreme Court of Arizona

STATE of Arizona, Appellee,

v

Shawn Patrick LYNCH, Appellant

No CR–12–0359–AP
|
Sept. 10, 2015

**Synopsis**
**Background** Defendant was convicted in the Superior
Court, Maricopa County, David M Talamante J , of armed
robbery burglary kidnapping and murder in the first degree
and, after first jury could not reach a unanimous verdict
in aggravation phase of trial, second jury determined that
defendant should be sentenced to death. Defendant appealed.
The Supreme Court, Hurwitz V C J 234 P 3d 595, 225
Ariz. 27, affirmed in part and remanded Following second
penalty phase trial in the Superior Court, Maricopa County,
No CR2001–092032, Karen L O Connor J the jury again
returned a death verdict. Appeal was automatic

**Holdings** The Supreme Court, Brutinel J held that

[1] prosecutor's opening statement did not deny defendant a
fair trial

[2] prosecutor's statement during closing argument was not
improper

[3] cumulative effect of prosecutor's inappropriate comments
did not deprive defendant of fair trial

[4] defendant was entitled on remand only to a new penalty
phase proceeding, rather than to retry the aggravation phase

[5] *Simmons* instruction that defendant would never be
released if sentenced to prison was not required,

[6] fact that the State did not ask voir dire questions related
to jurors' hair or tattoos not establish that the strikes were
pretextual and

[7] sentence of death was warranted.

Affirmed

West Headnotes (74)

[1]     **Criminal Law**
        ☞ Conduct of counsel in general
        An appellate court will reverse a conviction
        for prosecutorial misconduct only when (1)
        misconduct is indeed present, and (2) a
        reasonable likelihood exists that the misconduct
        could have affected the jury's verdict, thereby
        denying the defendant a fair trial

        Cases that cite this headnote

[2]     **Criminal Law**
        ☞ Conduct of counsel in general
        Even when an instance of prosecutorial
        misconduct does not warrant reversal an
        incident may nonetheless contribute to a finding
        of persistent and pervasive misconduct if the
        cumulative effect of the incidents shows that
        the prosecutor intentionally engaged in improper
        conduct and did so with indifference if not a
        specific intent, to prejudice the defendant.

        Cases that cite this headnote

[3]     **Sentencing and Punishment**
        ☞ Arguments and conduct of counsel
        Prosecutor's opening statement, which contained
        improper argumentative statements, did not
        deny defendant a fair trial in penalty phase
        of capital murder trial where court sustained
        defendant s objections to some of the statements,
        and instructed jury that it should only consider
        testimony exhibits and stipulations as evidence
        and that attorneys' remarks were not evidence,
        and these instructions cured any prejudice

Cases that cite this headnote

**[4]**   **Criminal Law**
   ⊶ For prosecution
Opening statement is counsel's opportunity to tell the jury what evidence they intend to introduce, not a time to argue the inferences and conclusions that may be drawn from evidence not yet admitted.

Cases that cite this headnote

**[5]**   **Criminal Law**
   ⊶ Custody and conduct of jury
   **Criminal Law**
   ⊶ Opening statement
Cautionary instructions by the court generally cure any possible prejudice from argumentative comments during opening statements, because a reviewing court presumes that jurors follow the court's instructions

Cases that cite this headnote

**[6]**   **Sentencing and Punishment**
   ⊶ Arguments and conduct of counsel
State s cross-examination of defendant's witness in penalty phase of capital murder trial did not deny defendant a fair trial, although the State s cross-examination was aggressive, and the court would have been well within its discretion to have sustained the objections and required the prosecutor to rephrase his questions in a more civil manner and it should have exercised more control over the aggressive questioning, where court instructed the jury to disregard questions to which objections were sustained, to only consider testimony, exhibits, and stipulations as evidence, and that attorneys' remarks were not evidence

Cases that cite this headnote

**[7]**   **Sentencing and Punishment**
   ⊶ Harmless and reversible error

Jury instructions sufficiently cured any prejudice in penalty phase of capital murder trial from State's questioning of defense expert on the veracity of other witnesses' statements and State s accusations that she vouched for witnesses and State's questions asking her to comment on the truthfulness of witnesses

Cases that cite this headnote

**[8]**   **Sentencing and Punishment**
   ⊶ Presentation and reservation in lower court of grounds of review
Any error in prosecutor's speaking objections was not fundamental error in penalty phase of capital murder trial, where state did not incorporate any inadmissible evidence into its speaking objections 17A A.R.S. Rules of Evid. Rule 103(d)

1 Cases that cite this headnote

**[9]**   **Sentencing and Punishment**
   ⊶ Arguments and conduct of counsel
Defendant was not prejudiced by State s cross-examination of and closing arguments about, its expert witnesses in penalty phase of capital murder trial, although prosecutor was aggressive and the court sustained many of the defendant's objections to many of the questions, where court instructed the jury to disregard the statements to which objections were sustained

1 Cases that cite this headnote

**[10]**   **Criminal Law**
   ⊶ Cross-examination and redirect examination
   **Criminal Law**
   ⊶ Credibility of expert witness
A prosecutor may inquire into the credentials and employment of an expert witness to show bias or motive, but cannot insinuate that an expert is unethical or incompetent without properly admitted evidence to support it.

Cases that cite this headnote

**[11]**   **Sentencing and Punishment**

State v Lynch 238 Ariz. 84 (201

357 P 3d 119 721 Ariz Adv Rep 4 723 Ariz. Adv Rep 4

⬅ Expert evidence

Prosecutor's cross-examination of defense expert regarding an unrelated incident in Arizona where convicted murderers escaped from prison and whether it was possible that defendant, who had hepatitis C could stick or prick with a sharp object one of the corrections officer was relevant in penalty phase of capital murder trial, where it rebutted expert's testimony that defendant could be safely housed in prison. 17A A.R.S Rules of Evid. Rules 401(a) 611(b)

Cases that cite this headnote

[12] **Sentencing and Punishment**
⬅ Arguments and conduct of counsel
**Sentencing and Punishment**
⬅ Harmless and reversible error

Defendant was not prejudiced by prosecutor's misstatements of the evidence in penalty phase of capital murder trial, where defendant's objections were sustained, prosecutor did not argue those points further, and trial judge instructed the jury at the beginning and end of the proceedings not to consider matters to which the court sustained objections

Cases that cite this headnote

[13] **Criminal Law**
⬅ Comments on evidence or witnesses or matters not sustained by evidence
**Criminal Law**
⬅ Matters Not Sustained by Evidence

Intentionally misstating evidence constitutes prosecutorial misconduct, however, when defense counsel can correct the misstatement at trial reviewing courts are hesitant to find reversible error

Cases that cite this headnote

[14] **Sentencing and Punishment**
⬅ Arguments and conduct of counsel

Prosecutor's statements during opening statement and closing arguments in which counsel characterized defendant's mitigation

evidence as a 'myth and "fanciful and repeatedly suggested that defense was not credible, were not improper in penalty phase of capital murder trial where prosecutor's criticism was directed at defense theories, rather than defense counsel.

Cases that cite this headnote

[15] **Criminal Law**
⬅ Appeals to sympathy or prejudice argument as to punishment
**Criminal Law**
⬅ Attacks on opposing counsel

It is always improper for the prosecutor to impugn the integrity or honesty of opposing counsel, nonetheless, such comments warrant reversal only if a defendant can show a reasonable likelihood that the misconduct could have tainted the jury's verdict.

Cases that cite this headnote

[16] **Criminal Law**
⬅ For prosecution

Criticism of defense theories and tactics is a proper subject of closing argument.

1 Cases that cite this headnote

[17] **Sentencing and Punishment**
⬅ Arguments and conduct of counsel
**Sentencing and Punishment**
⬅ Harmless and reversible error

Prosecutor's statements during closing argument of penalty phase of capital murder trial that, although the crime lab tried its "darndest,' it did not find victim s blood on accomplice, and that blood-spatter analysis was 'the law did not constitute sufficient misconduct to warrant reversal, even though four jurors on the guilt-phase jury were not convinced that defendant was the killer and prosecutor put the prestige of the government behind his evidence, where the fact that four jurors on the guilt phase jury were not convinced that defendant was the killer did not make the prosecutor's comments misconduct, and the trial court cured any error by instructing

Case 2:16-cv-01159-SRB   Document 45-13   Filed 12/04/17   Page 6 of 489
State v Lynch, 238 Ariz. 84 (20

357 P 3d 119  721 Ariz Adv Rep  4  723 Ariz. Adv Rep  4

the jury not to consider the attorneys arguments as evidence.

Cases that cite this headnote

[18]   **Criminal Law**
    ⬥ Matters Not Sustained by Evidence
**Criminal Law**
    ⬥ Personal knowledge, opinion, or belief of counsel

A prosecutor improperly vouches by either placing the prestige of the government behind its evidence or suggesting that facts not before the jury support the state s evidence

Cases that cite this headnote

[19]   **Criminal Law**
    ⬥ Comments on evidence or witnesses

Even if vouching occurs the trial court may cure the error by instructing the jury not to consider the attorneys' arguments as evidence

Cases that cite this headnote

[20]   **Criminal Law**
    ⬥ Statements Regarding Applicable Law

A prosecutor should not misstate the law during closing argument

Cases that cite this headnote

[21]   **Criminal Law**
    ⬥ Arguments and statements by counsel
**Criminal Law**
    ⬥ Discretion of court in controlling argument

Trial courts are given broad discretion in controlling closing argument, and their rulings will only be overturned for an abuse of discretion.

1 Cases that cite this headnote

[22]   **Sentencing and Punishment**
    ⬥ Arguments and conduct of counsel

Prosecutor's statement during closing argument that a person can only fail to appreciate the

wrongfulness of conduct if the person admits the conduct was not improper in penalty phase of capital murder trial where State's remark was not a misstatement of law but rather an attempt to point out an inconsistency in defendant's story and prosecutor was entitled to argue that defendant committed the murder and appreciated the wrongfulness of his conduct. A R S § 13–751(G)(1)

Cases that cite this headnote

[23]   **Sentencing and Punishment**
    ⬥ Arguments and conduct of counsel

Prosecutor did not commit misconduct by suggesting that defendant's drug use did not warrant leniency in penalty phase of capital murder trial.

Cases that cite this headnote

[24]   **Sentencing and Punishment**
    ⬥ Substance abuse and addiction
**Sentencing and Punishment**
    ⬥ Arguments and conduct of counsel

Substance abuse can be a mitigating factor in capital cases, but a prosecutor does not commit misconduct by arguing that a mitigating factor does not warrant leniency or that jurors should give it little consideration. A R S § 13–751(G)(1)

Cases that cite this headnote

[25]   **Sentencing and Punishment**
    ⬥ Harmless and reversible error

Defendant did not overcome presumption that jury in penalty phase of capital murder trial followed instructions to disregard prosecutor's statement that defendant's renting of pornographic videos showed a debasement in the part of defendant's character

Cases that cite this headnote

[26]   **Sentencing and Punishment**
    ⬥ Arguments and conduct of counsel

Prosecutor's statement during closing argument that defendant's difficult childhood was so remote that it was an excuse not a mitigating factor, was not improper in penalty phase of capital murder trial, where defendant was 39 years of age at the time of the murder

Cases that cite this headnote

**[27]** **Sentencing and Punishment**
⟜ Mitigating circumstances in general
**Sentencing and Punishment**
⟜ Childhood or familial background

Although a defendant does not have to demonstrate a connection between the mitigating circumstances and the crime the remoteness or lack of a connection between the mitigating factor and the crime may make the mitigating factor less persuasive in penalty phase of capital murder trial, thus, a jury may give less consideration to a difficult childhood when a defendant is older

Cases that cite this headnote

**[28]** **Sentencing and Punishment**
⟜ Arguments and conduct of counsel
Prosecutor's argument that the jury should not spare defendant's life merely because he committed other crimes for which he would have to serve considerable prison time was not improper in penalty phase of capital murder trial

Cases that cite this headnote

**[29]** **Sentencing and Punishment**
⟜ Harmless and reversible error
Any error by the prosecutor during voir dire and closing argument in characterizing heinous atrocious, and cruel (HAC) aggravator implying that it was more than one aggravator rather than a single aggravating circumstance that could be established in alternative ways was not reversible error in penalty phase of capital murder trial, where defendant objected to the misstatements and court had the prosecutor clarify that it was only one aggravator A.R.S § 13–751(F)(6)

Cases that cite this headnote

**[30]** **Sentencing and Punishment**
⟜ Arguments and conduct of counsel
Prosecutor's reference to the encounter between defendant and victim immediately before the murder, in which prosecutor wondered aloud if words were exchanged, was not improper in penalty phase of capital murder trial where they did not call attention to the fact that defendant did not testify but rather pointed out that the events leading up to the murder were unclear, and the jury would not have naturally and necessarily perceived the remarks as a comment on defendant's failure to testify U S C A Const.Amend. 5

Cases that cite this headnote

**[31]** **Criminal Law**
⟜ Comments on Failure of Accused to Testify
**Criminal Law**
⟜ Indirect references
A prosecutor may not comment on a defendant's decision not to testify, either directly or indirectly U S C A Const.Amend. 5

Cases that cite this headnote

**[32]** **Criminal Law**
⟜ Comments on Failure of Accused to Testify
A prosecutor's statement is a comment on a defendant's protected silence if a jury would naturally and necessarily perceive it as a comment on a defendant's failure to testify U S C.A Const.Amend. 5

Cases that cite this headnote

**[33]** **Sentencing and Punishment**
⟜ Harmless and reversible error
Prosecutor's statement during opening statement that they could not know what it was like to be manhandled by the knife-wielding defendant did not affect the verdict in penalty phase of capital murder trial although it improperly invited the

Case 2:16-cv-01159-SRB   Document 45-13   Filed 12/04/17   Page 8 of 489

State v Lynch 238 Ariz. 84 (20

357 P 3d 119 721 Ariz Adv Rep 4 723 Ariz. Adv Rep 4

jurors to place themselves in the victim's position and appealed to their fears where trial court properly sustained defendant's objection struck the argument, and told the jury to disregard it.

Cases that cite this headnote

**[34]   Criminal Law**
⟱ Appeals to Sympathy or Prejudice

**Criminal Law**
⟱ Putting jurors in place of victim, "golden rule arguments

A prosecutor has wide latitude in closing argument, but may not make arguments that appeal to the jury's fear or passion, which includes inviting jurors to place themselves in the victim's position because doing so plays on the jurors' fear of the defendant or sympathy for the victim

Cases that cite this headnote

**[35]   Criminal Law**
⟱ Necessity

**Criminal Law**
⟱ Necessity of request for correction

**Criminal Law**
⟱ Action of Court in Response to Comments or Conduct

The proper response to an improper prosecutorial comment is an objection, motion to strike and a jury instruction to disregard the stricken comment.

Cases that cite this headnote

**[36]   Sentencing and Punishment**
⟱ Presentation and reservation in lower court of grounds of review

Prosecutor's reference during opening statement to line from a poem indicating that every person's death diminishes society as a whole was not fundamental error in penalty phase of capital murder trial where prosecutor did not appeal to the jury's fear of defendant or sympathy for the victim or ask the jurors to place themselves in the victim's shoes during the murder rather

the prosecutor commented that murder affects society as a whole.

Cases that cite this headnote

**[37]   Sentencing and Punishment**
⟱ Arguments and conduct of counsel

Cumulative effect of prosecutor's inappropriate comments did not deprive defendant of fair penalty phase of capital murder trial where the trial court sustained objections to all but one of the improper comments, and instructed the jury to disregard questions to which objections were sustained, to only consider testimony, exhibits and stipulations as evidence, and that attorneys' remarks were not evidence and defendant failed to prove fundamental error in any of the statements to which he did not object.

Cases that cite this headnote

**[38]   Criminal Law**
⟱ Conduct of counsel in general

A reviewing court considers whether persistent and pervasive misconduct occurred and whether the cumulative effect of the incidents shows that the prosecutor intentionally engaged in improper conduct and did so with indifference, if not a specific intent, to prejudice the defendant.

Cases that cite this headnote

**[39]   Sentencing and Punishment**
⟱ Determination and disposition

Defendant in capital murder trial was entitled on remand only to a new penalty-phase proceeding, rather than to retry the aggravation phase, subsection of statute stating that, if a death sentence is overturned, the person shall be resentenced as if the original sentencing had not occurred applied only to a sentences overturned on appeal pursuant to *Ring v Arizona (Ring II)*, 536 U S 584, 122 S Ct. 2428 153 L.Ed.2d 556 while subsection stating that a defendant whose sentence is overturned had to be resentenced by a jury that was specifically impaneled for that purpose was more general and pertained to sentences overturned for any reason, and

Case 2:16-cv-01159-SRB   Document 45-13   Filed 12/04/17   Page 9 of 489

State v Lynch, 238 Ariz. 84 (20

357 P 3d 119 721 Ariz Adv Rep 4 723 Ariz. Adv Rep 4

defendant s original sentence was not reversed for a *Ring II*-defective sentence. A.R S § 13–752(N, O)

Cases that cite this headnote

[40]   **Criminal Law**
       ⟜ Review De Novo
       **Criminal Law**
       ⟜ Reception and Admissibility of Evidence
       Appellate courts review the interpretation of statutes and constitutional provisions de novo and evidentiary rulings for an abuse of discretion.

       1 Cases that cite this headnote

[41]   **Sentencing and Punishment**
       ⟜ Determination and disposition
       Limiting the retrial to the penalty phase of capital murder trial did not deprive defendant of an individualized sentencing, where jury heard abundant testimony concerning the circumstances of the offense and the aggravating factors and defendant was free to offer additional evidence from the guilt and aggravation phases

       Cases that cite this headnote

[42]   **Sentencing and Punishment**
       ⟜ Admissibility
       Precluding the guilty verdict from evidence in penalty phase of capital murder trial did not deprive defendant of an individualized sentencing, where neither the guilty-verdict form nor the jurors' votes provided evidence of the circumstances of the murder

       Cases that cite this headnote

[43]   **Sentencing and Punishment**
       ⟜ Instructions
       Judge could impose a release-eligible sentence if the jury did not return a death verdict, and, thus *Simmons* instruction that defendant would never be released if sentenced to prison was not

required in penalty phase of capital murder trial. A.R.S. § 13–703(A)

Cases that cite this headnote

[44]   **Criminal Law**
       ⟜ Review De Novo
       **Criminal Law**
       ⟜ Failure to instruct
       An appellate court reviews jury instructions and alleged constitutional violations de novo, but it reviews a court's refusal to inform the jury of the defendant's willingness to waive parole eligibility for an abuse of discretion.

       Cases that cite this headnote

[45]   **Pardon and Parole**
       ⟜ Parole as right or privilege
       **Pardon and Parole**
       ⟜ Discretionary nature
       Parole eligibility is not a right that can be waived, to the contrary  the eligibility decision is within the trial court's discretion.

       Cases that cite this headnote

[46]   **Jury**
       ⟜ Peremptory challenges
       Fact that the State did not ask voir dire questions related to juror's long hair and facial hair resembling  ZZ Top  or another juror's tattoos on his legs and arm did not establish that the strikes of those jurors were pretextual in penalty phase of capital murder trial, as required for relief on the basis of *Batson*

       Cases that cite this headnote

[47]   **Criminal Law**
       ⟜ Jury selection
       A denial of a *Batson* challenge will not be reversed unless clearly erroneous

       Cases that cite this headnote

[48]   **Criminal Law**

↞ Review De Novo

**Criminal Law**

↞ Jury selection

A reviewing court defers to the trial court's ruling regarding the State's motives for a peremptory strike, and reviews the trial court's application of the law de novo

1 Cases that cite this headnote

[49] **Jury**

↞ Peremptory challenges

*Batson* challenges are subject to the following three-step analysis (1) the party challenging the strike must make a prima facie showing of discrimination (2) the striking party must provide a race-neutral reason for the strike, and (3) if a race-neutral explanation is provided, the trial court must determine whether the challenger has carried its burden of proving purposeful racial discrimination.

Cases that cite this headnote

[50] **Jury**

↞ Peremptory challenges

In a *Batson* challenge, the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the peremptory strike

Cases that cite this headnote

[51] **Jury**

↞ Peremptory challenges

A peremptory strike does not violate *Batson* where the prosecutor's explanation is facially race neutral and the defendant offers no evidence other than inference to show that the peremptory strike was a result of purposeful racial discrimination.

Cases that cite this headnote

[52] **Jury**

↞ Discharge of juror or jury pending trial

Relationship between juror and expert witness, who testified about hepatitis C, the liver, and defendant's life expectancy was not sufficient to warrant dismissal of juror in penalty phase of capital murder trial where juror formerly worked at the same hospital as expert, who was a gastroenterologist, juror worked in medical surgical intensive care unit at the hospital and recognized the witness and her dealings were with witness's surgical residents, not with him, and juror assured the court that her knowledge of witness would not prevent her from examining the evidence objectively 17 A.R.S Rules Crim.Proc Rule 18 4(b)

Cases that cite this headnote

[53] **Jury**

↞ Discharge of juror or jury pending trial

Defendant in penalty phase of capital murder trial bears the burden of establishing that the juror was incapable of rendering a fair and impartial verdict.

Cases that cite this headnote

[54] **Criminal Law**

↞ Selection and impaneling

A reviewing court does not set aside a trial court's refusal to strike a juror absent a clear showing that the court abused its discretion.

Cases that cite this headnote

[55] **Jury**

↞ Discharge of juror or jury pending trial

Courts examine three factors when determining if a juror may continue to serve after that juror's objectivity is challenged. (1) the nature of the relationship between the witness and the juror (2) whether the juror will properly assess the testimony and (3) the importance of the testimony and whether the testimony was disputed.

Cases that cite this headnote

[56] **Sentencing and Punishment**

State v Lynch 238 Ariz. 84 (20

357 P 3d 119 721 Ariz Adv Rep 4 723 Ariz. Adv Rep 4

⚖ Mode of execution

Punishment involving torture or a lingering death is cruel U S C.A Const.Amend. 8

Cases that cite this headnote

[57]   **Sentencing and Punishment**
⚖ Vileness heinousness, or atrocity

**Sentencing and Punishment**
⚖ Childhood or familial background

Sentence of death was warranted for defendant who stole victim's credit card, and after victim reported it stolen, returned to his residence intending to steal more and murder victim, which proved pecuniary gain aggravator and bound victim to a chair with a large number of knots that were fairly secured, and cut his throat, there were ligatures abrasions, and bruising on victim's wrists, hands, forearm shoulder blade back, and chest indicating that he struggled, which proved heinous atrocious and cruel (HAC) aggravator, although defendant had hepatitis C and complications thereof and a difficult childhood, where hepatitis C was a mitigator of minor value, and defendant was 39 years of age at the time of the murder A.R.S § 13–751(F)(5, 6)

Cases that cite this headnote

[58]   **Sentencing and Punishment**
⚖ Scope of review

For crimes occurring before 2002, Supreme Court independently reviews the trial court's findings of aggravation and mitigation and the propriety of the death sentence, in doing so, court reviews the record de novo, considering the quality and the strength, not simply the number of aggravating and mitigating factors A R S § 13–755(A)

Cases that cite this headnote

[59]   **Sentencing and Punishment**
⚖ Presumptions

When there is a doubt whether the death sentence should be imposed, Supreme Court will resolve

that doubt in favor of a life sentence. A.R.S § 13–755(A)

Cases that cite this headnote

[60]   **Sentencing and Punishment**
⚖ Personal or pecuniary gain

A murder must be prompted by the desire for pecuniary gain for the pecuniary gain aggravator to apply A.R.S § 13–751(F)(5)

Cases that cite this headnote

[61]   **Sentencing and Punishment**
⚖ Vileness, heinousness, or atrocity

A murder is especially cruel such that the heinous, atrocious, and cruel (HAC) aggravator applies in penalty phase of capital murder trial if the victim was conscious during the violence and the defendant knew or should have known that the victim would suffer mental anguish or physical pain. A.R.S § 13–751(F)(6)

Cases that cite this headnote

[62]   **Sentencing and Punishment**
⚖ Vileness, heinousness, or atrocity

Mental anguish as would support heinous, atrocious, and cruel (HAC) aggravator in penalty phase of capital murder trial includes a victim's uncertainty about his fate A.R.S § 13–751(F)(6)

Cases that cite this headnote

[63]   **Sentencing and Punishment**
⚖ Mitigating circumstances in general

Although there need not be a nexus between mitigation and the crime in order for mitigation to be considered in penalty phase of capital murder trial, failure to establish such a causal connection may be considered in assessing the quality and strength of the mitigation evidence

Cases that cite this headnote

[64]   **Sentencing and Punishment**

⟜ Physical illness or disability

Supreme Court assigns minimal mitigating value to a defendant's post-murder physical health in penalty phase of capital murder trial because it does not address his pre-murder character nor does it address his propensities his record, or the circumstances of the offense.

Cases that cite this headnote

[65]    **Sentencing and Punishment**
⟜ Other matters related to offender

Supreme Court affords minimal value in penalty phase of capital murder trial to the fact that a defendant will remain imprisoned for the rest of his life.

Cases that cite this headnote

[66]    **Sentencing and Punishment**
⟜ Extent of offender's personal participation

Participation in a crime may be considered as mitigation in penalty phase of capital murder trial where a defendant demonstrates that while he was legally accountable for the conduct of another, his participation in the crime was relatively minor

Cases that cite this headnote

[67]    **Sentencing and Punishment**
⟜ Sentence or disposition of co-participant or codefendant

A disparity in sentences between codefendants and/or accomplices can be a mitigating circumstance in penalty phase of capital murder trial, if no reasonable explanation exists for the disparity

Cases that cite this headnote

[68]    **Sentencing and Punishment**
⟜ Sentence or disposition of co-participant or codefendant

Disparity is not mitigating in penalty phase of capital murder trial if it results from factors suggesting the appropriateness of the sentences,

such as a difference in culpability or an appropriate plea agreement with one of the defendants

Cases that cite this headnote

[69]    **Sentencing and Punishment**
⟜ Intoxication or drug impairment at time of offense

A defendant in a penalty phase of capital murder trial claiming mitigation on the basis of drug use must show some relationship between drug use and the offense. A.R.S § 13–751(G)(1)

Cases that cite this headnote

[70]    **Sentencing and Punishment**
⟜ Intoxication or drug impairment at time of offense

Even if a defendant establishes his drug addiction, Supreme Court gives minimal value to this evidence if he fails to tie his drug abuse to the crime or to his mental functioning when the murder occurred.

Cases that cite this headnote

[71]    **Sentencing and Punishment**
⟜ Childhood or familial background

A difficult childhood may be a mitigating circumstance in penalty phase of capital murder trial, but Supreme Court gives it little value absent a showing that it affected the defendant's conduct in committing the crime.

Cases that cite this headnote

[72]    **Sentencing and Punishment**
⟜ Childhood or familial background

The amount of time that has passed since the defendant's childhood is relevant in determining what weight to give a difficult childhood as an aggravating factor in penalty phase of capital murder trial

Cases that cite this headnote

[73]  **Sentencing and Punishment**
      ⚏ Other matters related to offender

Supreme Court accords minimal weight on review of death sentence to the prospect that a defendant will be a model prisoner because all prisoners are expected to behave in prison

Cases that cite this headnote

[74]  **Sentencing and Punishment**
      ⚏ Purpose of statute or regulatory provision

The fact that a defendant would remain imprisoned for his natural life if he is not sentenced to death is entitled to little value in penalty phase of capital murder trial

Cases that cite this headnote

**Attorneys and Law Firms**

\*126  Mark Brnovich, Arizona Attorney General, John R. Lopez IV, Solicitor General, Lacey Stover Gard (argued), Chief Counsel, Capital Litigation Section, Jeffrey L Sparks, Assistant Attorney General, Tucson, Attorneys for State of Arizona

Tennie B Martin, Mikel Steinfeld (argued), Deputy Public Defenders, Phoenix, Attorneys for Shawn Patrick Lynch.

Justice BRUTINEL authored the opinion of the Court, in which Chief Justice BALES, Vice Chief Justice PELANDER, and Justices BERCH and TIMMER joined.

**Opinion**

Justice BRUTINEL opinion of the Court.

¶ 1 Shawn Patrick Lynch was convicted of first-degree murder kidnapping, armed robbery and burglary He was sentenced to death for the murder and to twenty-one years' imprisonment for the other offenses We remanded for a new penalty phase proceeding on the murder conviction in *State v Lynch (Lynch I )* 225 Ariz. 27, 43 ¶ 89 234 P 3d 595 611 (2010) On resentencing, the jury again returned a death verdict. We have jurisdiction over this automatic appeal pursuant to Article 6 Section 5(3) of the Arizona Constitution and A R.S §§ 13–755 and 13–4031

**I. FACTUAL BACKGROUND**

¶ 2 The victim, James Panzarella, was seen at a Scottsdale bar with Lynch and Michael Sehwani on March 24, 2001 Lynch, Sehwani and Panzarella went to Panzarella's residence early the next morning. Later that morning, Sehwani used Panzarella's American Express card at a supermarket. Ten minutes later the card was reported lost Sehwani again used the card at a convenience store and unsuccessfully attempted to use it at a department store. The same day Panzarella's Bank One card was used at a restaurant, a convenience store and a motel The Bank One card was used the following day to make a cash withdrawal and various purchases, including Everlast shoes

¶ 3 The next afternoon, Panzarella was found in his home tied to a chair with his throat slit. Police also found credit card receipts from purchases made that morning at a supermarket and convenience store.

¶ 4 Police arrested Lynch and Sehwani that afternoon as they entered a truck in a motel parking lot. Sehwani was wearing Everlast shoes and had Panzarella's credit cards and checks in his wallet. In the truck and a motel room, police found keys to Panzarella s car a sweater with Panzarella s blood on it, and a 45 caliber pistol belonging to Panzarella. Blood on Lynch's shoes matched Panzarella's DNA

¶ 5 A jury found Lynch guilty of first-degree murder armed robbery burglary and kidnapping In his first aggravation phase trial, the jury made separate findings that the murder was especially heinous and cruel, but could not agree on whether it was especially depraved *See* A R.S § 13–751(F)(6) The jury also could not decide if the murder was committed in expectation of pecuniary gain *See* A.R.S § 13–751(F)(5) That jury did not reach a unanimous verdict \*127 in the penalty phase. A second penalty-phase jury found that the murder was especially depraved and committed for pecuniary gain and that a death sentence was appropriate We remanded for a new penalty-phase trial because the trial judge erroneously instructed the second penalty-phase jury that the (F)(6) aggravator constituted three separate aggravating circumstances *Lynch I* 225 Ariz at 42–43 ¶¶ 82–89, 234 P 3d at 610–11 Following the new penalty-phase trial, Lynch was again sentenced to death.

## II. ISSUES ON APPEAL

### A. Prosecutorial Misconduct

[1]   [2]   ¶ 6 Lynch asserts that the State engaged in prosecutorial misconduct in several ways, individually and in combination "This Court will reverse a conviction for prosecutorial misconduct only when (1) misconduct is indeed present, and (2) a reasonable likelihood exists that the misconduct could have affected the jury's verdict, thereby denying [the] defendant a fair trial *State v Martinez* 218 Ariz 421, 426 ¶ 15, 189 P 3d 348 353 (2008) (internal quotation marks omitted) Even when an instance of prosecutorial misconduct does not warrant reversal, "an incident may nonetheless contribute to a finding of persistent and pervasive misconduct if the cumulative effect of the incidents shows that the prosecutor intentionally engaged in improper conduct and did so with indifference, if not a specific intent, to prejudice the defendant. *State v Roque* 213 Ariz. 193 228 ¶ 155, 141 P 3d 368 403 (2006) (citations and internal quotation marks omitted)

¶ 7 When a defendant fails to object to an alleged incident of prosecutorial misconduct in the trial court, this Court reviews for fundamental error *Id* at 228 ¶ 154 141 P 3d at 403 To establish fundamental error, Lynch must show that there was error that went to the foundation of his case and denied him a fair trial, and that he was, in fact, prejudiced by the error " *State v VanWinkle* 230 Ariz 387 393 ¶ 25 285 P 3d 308 314 (2012)

### 1 Argument during opening statements

[3]   ¶ 8 Lynch first asserts the prosecutor improperly presented arguments during his opening statement that largely focused on persuading the jury that little weight should be given to certain mitigating factors and expected evidence. The trial court sustained two of Lynch s objections to the State's opening statement—that Lynch's childhood should not be considered a mitigating circumstance because "it happened 30 years ago and that the defense wanted to pull at [the jury's] heart strings in its presentation of mitigating evidence. The court overruled Lynch's objection to the prosecutor's remark that no medical records supported Lynch s assertion that his father intentionally burned his hand as a child. Finally, the State implied that little weight should be given to a defense expert's life-expectancy testimony because the expert relied on a Wikipedia article and Lynch

had outlived the expert's prediction for his life expectancy The trial judge overruled Lynch's objection to these remarks

[4]   [5]   ¶ 9 "Opening statement is counsel's opportunity to tell the jury what evidence they intend to introduce. Opening statement is not a time to argue the inferences and conclusions that may be drawn from evidence not yet admitted." *State v Bible* 175 Ariz 549 602, 858 P.2d 1152, 1205 (1993) (internal citation omitted) [C]autionary instructions by the court generally cure any possible prejudice from argumentative comments during opening statements because we presume that jurors follow the court's instructions *State v Manuel*, 229 Ariz. 1 6 ¶ 24 270 P 3d 828, 833 (2011)

¶ 10 Here, the court instructed the jury that it should only consider testimony exhibits and stipulations as evidence and that attorneys' remarks are not evidence. As to the disallowed statements listed above, the trial judge sustained objections and properly instructed the jury not to consider them as evidence. These instructions cured any prejudice On balance, although the prosecutor improperly made argumentative statements during opening, we find no reasonable likelihood that the misconduct affected the jury's verdict. *See* **\*128** *Martinez* 218 Ariz. at 426 ¶ 15 189 P 3d at 353 The State s opening statement did not deny Lynch a fair trial.

### 2 Improper witness examination

[6]   ¶ 11 Lynch argues that the prosecutor committed misconduct during his cross-examination of defense witnesses The trial court sustained Lynch s objections to two questions that were asked and answered, the State's interruption of defense witnesses on two occasions the State's comment to a defense expert that she should "just answer my question for once," and other argumentative questions The judge overruled Lynch's objections to combative remarks including, 'No let me ask you the question."

¶ 12 Although the State s cross-examination was aggressive, and the court would have been well within its discretion to have sustained the objections and required the prosecutor to rephrase his questions in a more civil manner the questioning did not deny Lynch a fair trial *See State v Bolton*, 182 Ariz. 290 308, 896 P 2d 830 848 (1995) ("The questioning may have been argumentative Nevertheless the misconduct was not so egregious that it permeated the entire trial and probably affected the outcome.") As in *Bolton*, 'the prosecutor here did not call defendant pejorative names refer to matters not

in evidence, suggest unfavorable matter for which no proof exists or abuse defendant in any other way *Id* The court instructed the jury to disregard questions to which objections were sustained, to only consider testimony exhibits, and stipulations as evidence, and that attorneys' remarks are not evidence. We presume that jurors follow instructions *Manuel*, 229 Ariz. at 6 ¶ 25 270 P 3d at 833 (presuming that jury followed instructions even though the prosecutor aggressively cross-examined" the defendant and another witness) We do not find fundamental error in the examination as a whole As for the remarks to which Lynch's objections were overruled, while the trial court should have exercised more control over the aggressive questioning, the court did not abuse its discretion in overruling the objections

### 3 Questions related to veracity of other witnesses

[7]     ¶ 13 Lynch argues that the State improperly questioned his expert, Dr Jolie Brams a clinical psychologist, on the veracity of other witnesses statements by accusing her of vouching for witnesses and asking her to comment on the truthfulness of witnesses. "Arizona prohibits lay and expert testimony concerning the veracity of a statement by another witness" because it is the province of the jury to determine veracity and credibility, "and opinions about witness credibility are nothing more than advice to jurors on how to decide the case. ' *State v Boggs* 218 Ariz. 325 335 185 P 3d 111 121 (2008) (quoting *State v Moran* 151 Ariz. 378, 383 728 P 2d 248 253 (1986))

¶ 14 Brams interviewed several people who knew Lynch and, based in part on those interviews, concluded that Lynch grew up in an atmosphere of violence and neglect. During cross-examination, the State asked Brams to recount her testimony in another criminal trial in which she had testified that it was highly unlikely that the witness could have remembered previous encounters with a defendant absent some meaningful event and that the witness' recollections were the result of suggestions by law enforcement. The State then asked Brams if testifying about recollected memories is 'really just vouching for what somebody is saying" and if she had opined that a witness was not truthful in a third case Lynch did not object to either question, and Brams answered both questions in the negative. Contrasting her testimony in the previous case to Brams s interview of Lynch's uncle, the prosecutor asked Brams whether a witness was not credible if he said he remembered something that happened forty-nine years earlier even though it did not stand out in his

mind, 'because you can vouch for people[ ] The trial court sustained Lynch's objection The State also asked, "[Y]ou are telling us that, for example, [Lynch's sister], in your opinion, was telling the truth about everything? Lynch failed to object to this question, and Brams replied that she did not think the sister was being purposefully deceitful

*129 ¶ 15 These questions did not deny Lynch a fair trial. They related to Brams s witness interviews, not the testimony of other witnesses These interviews were the foundation for Brams s testimony The prosecutor did not encroach on the jury's evaluation of witness veracity, but rather tested Brams s credibility by attempting to show that she believed interviewees when their story was helpful but was skeptical when their story was not helpful The State s closing argument addressed Brams s bias and credibility not her opinion as to the veracity of testimony The only improper remark was the suggestion that Brams "can vouch for people," and the trial court sustained Lynch's objection and instructed the jury that it was to disregard questions to which objections were sustained. The jury instructions sufficiently cured any prejudice *See State v Hardy* 230 Ariz. 281 293–94 ¶¶ 61–62 283 P 3d 12 24–25 (2012)

### 4 Speaking objections

[8]     ¶ 16 Lynch asserts that the prosecutor improperly made arguments through speaking objections While making a relevance objection, the State argued that Brams was "obviously vested. After Lynch made a relevance objection to the State's cross-examination of Dr Gerald Altschuler—a hematologist, oncologist, and internist—the State responded that Altschuler "is a jack of all trades and not a master of this While making a relevance objection to what a witness recalled, the State said, If he wants to just ask him what is in the transcript, I have no objection to that but what he remembers is irrelevant. The State also clarified the basis for a cumulative" objection after the judge replied, 'I'm sorry?" Finally the prosecutor suggested that the jury be given an interview transcript in lieu of testimony as to what the transcript contained. Lynch did not object to any of these comments at trial Lynch takes issue with the State twice objecting to his speaking objections once in the presence of the jury, asserting that the State made speaking objections throughout the trial but did not allow him to do so

¶ 17 Arizona law does not explicitly prohibit speaking objections, but [t]o the extent practicable the court must

Case 2:16-cv-01159-SRB Document 45-13 Filed 12/04/17 Page 16 of 489

**State v Lynch 238 Ariz. 84 (20**

357 P 3d 119 721 Ariz. Adv Rep 4 723 Ariz. Adv Rep 4

conduct a jury trial so that inadmissible evidence is not suggested to the jury by any means " Ariz. R. Evid. 103(d) Lynch does not identify—and we have not found—any inadmissible evidence that the State incorporated into its speaking objections Further, Lynch did not object at trial and fails to demonstrate fundamental error *See State v Henderson* 210 Ariz. 561, 567 ¶ 19, 115 P 3d 601 607 (2005)

### 5 Attacks on defense experts

[9]  ¶ 18 Lynch contends that the prosecutor committed misconduct by unfairly attacking his expert witnesses During opening statements, the State told the jury that Altschuler Lynch's expert regarding his hepatitis C diagnosis, would testify about the Child–Pugh standard for evaluating chronic liver disease The prosecutor opined that the Child–Pugh standard is a subjective standard that comes from Wikipedia"[1] and pointed out that Lynch had already outlived the two-year life expectancy Altschuler had given In response to a defense objection, the trial court commented that the jury had been informed that the opening statement was not evidence but did not rule on the objection. During Altschuler's cross-examination the prosecutor asked whether Altschuler examined patients after chemotherapy or if the examination was done offsite where they actually receive the chemotherapy treatment." Lynch objected on relevance grounds, and the State responded that it was attempting to show Altschuler's lack of specific expertise—that he is a jack of all trades and not a master of this " The court overruled the objection.

¶ 19 As noted above during the cross-examination of Brams the prosecutor, referring to Brams s interview of Lynch s uncle, asked Brams whether a witness was not credible if he said he remembered something that happened forty nine years earlier even though it did not stand out in his mind,  *130 "because you can vouch for people[ ] ' The trial court sustained Lynch s objection After asking whether Brams had testified in a prior case that a witness was mistaken in his memory of long-past events the prosecutor then inquired, "Well, this is the same sort of thing here, isn't it? On this particular case you took a look at what somebody said and you reached a conclusion that perhaps they were mistaken or whatever term you want to use, right?" Brams explained that her testimony in the prior case was that a suggestive police interview might have influenced the interviewee s statements Finally the prosecutor asked Brams about her refusal to

produce two documents he requested Brams explained that she did not realize she had the documents. The prosecutor replied, And so what you're saying is had you known that those two pages were in your binder you would have removed them before the interview?" Brams began to deny the accusation, but the prosecutor interrupted. The judge sustained Lynch's objection to the interruption, and Brams explained that she would have disclosed the pages had she known she had them.

¶ 20 The prosecutor also asked Brams whether being an expert on recollected memories is 'really just vouching for what somebody is saying, but Lynch did not object. Lynch also failed to object to the prosecutor's remark during closing argument that Brams "was able to tell the Court under oath that [a] witness was wrong, without ever speaking to that witness" and that she followed improper procedures such as taking written notes that "no one can interpret." The prosecutor also accused Brams of refusing to disclose her notes and slanting the truth. Again, Lynch did not object. Lynch also takes issue with the State s comments during closing argument such as, "That's the person they chose," because, in Lynch's view, the comments were calculated to tie Brams's supposed disclosure violations and improper practices to defense counsel Lynch failed to object at trial

[10]  ¶ 21 A prosecutor may 'inquire into the credentials and employment of an expert witness to show bias or motive but cannot "insinuate that an expert is unethical or incompetent without properly admitted evidence to support it. *State v Bailey* 132 Ariz. 472, 478–79 647 P 2d 170 176–77 (1982)

¶ 22 Here although the prosecutor was aggressive, there was no reversible error *See id.* The trial court sustained Lynch's objections to many of the questions, and the court's instructions to disregard the statements cured any possible prejudice *See Manuel* 229 Ariz. at 6 ¶ 24 270 P 3d at 833 The court did not abuse its discretion in overruling any of the objections As to the remarks to which Lynch did not object, he fails to show prejudice Accordingly the State's remarks during closing argument did not amount to fundamental error *State v Morris* 215 Ariz. 324, 337 ¶ 59, 160 P 3d 203, 216 (2007)

### 6. Appeal to the fears of the jury

[11]  ¶ 23 Lynch next contends that the prosecutor improperly appealed to the jurors fears during his cross-

examination of defense expert James Aiken. While inquiring about the security designation that Lynch would receive in prison, the prosecutor asked about an unrelated incident in Arizona where convicted murderers escaped from prison. Lynch did not object to this question. The prosecutor also asked Aiken whether it was possible that Lynch could stick or prick, with a sharp object, one of the corrections officers ' When Aiken answered that the probability was miniscule, the prosecutor asked whether "that would be comfort to the person who got stuck by a needle that Shawn Lynch had used." The trial judge overruled Lynch's relevance objection Lynch argues on appeal that the State did not offer any reason to believe that the escaped prisoners were in a similar position as him and that there was no evidence to support the State's assertion that he would attack an officer

¶ 24 Although the cross-examination was argumentative and the trial judge could have sustained an objection on that basis it was relevant. The defense elicited from Aiken testimony that Lynch could be safely housed in prison. The cross-examination was relevant rebuttal to that testimony See Ariz R. Evid. 401(a) ("Evidence is relevant if [ ] it **131** has any tendency to make a fact more or less probable than it would be without the evidence ") Ariz. R Evid. 611(b) ( A witness may be cross-examined on any relevant matter ') That other offenders escaped from prison makes it less likely that Lynch could be housed safely Additionally, that Lynch s hepatitis C could be transmitted through needles makes him more of a threat in prison than one without such a disease.

### 7 Misstating the evidence

[12]   ¶ 25 During the cross-examination of Brams, the State asked whether she had previously said it was a waste of time to go over her notes and, after Brams said she did not recall, played a recording in which she said it would be a waste of time to go through every word of her notes The trial court sustained Lynch s objection to the admission of the recording on the ground that Brams s statement was taken out of context. The prosecutor also asked Brams, [D]idn't you tell us about a case involving a guy named Braulio Martinez yesterday where you said that he was mistaken because you can read minds? The trial judge sustained Lynch's objection Finally, the court sustained Lynch's objection to a statement in the State's closing argument that renting pornographic movies demonstrated Lynch's poor character

[13]   ¶ 26 Intentionally misstating evidence constitutes misconduct. See State v Cannon, 148 Ariz 72, 77, 713 P.2d 273 278 (1985) When defense counsel can correct the misstatement at trial, however we are hesitant to find reversible error Id. Although the prosecutor made inappropriate remarks, defense counsel's objections were sustained and the prosecutor did not argue those points further The trial judge instructed the jury at the beginning and end of the proceedings not to consider matters to which the court sustained objections We presume juries follow instructions, Manuel 229 Ariz at 6 ¶ 25 270 P 3d at 833 and there is no evidence that the jury failed to heed this instruction. Lynch has not shown that the prosecutor's remarks could have affected the jury's verdict. See Martinez 218 Ariz at 426 ¶ 15 189 P 3d at 353

### 8 Ad hominem attacks on defense counsel

[14]   ¶ 27 Lynch argues that the prosecutor committed misconduct by repeatedly resorting to ad hominem attacks against defense counsel. During opening statement and closing arguments, the prosecutor repeatedly characterized Lynch's mitigation evidence as "a myth" and "fanciful" and made other similar comments The prosecutor also attacked the defense theory that Lynch was not the killer by stating that the DNA evidence is something that you perhaps will not consider when you are asked to speculate as they put it [,] or try to determine who was the person who did the cutting." Lynch did not object to any of these statements

[15]   [16]   ¶ 28 We have consistently held that prosecutors have wide latitude in closing arguments and may argue all reasonable inferences from the evidence State v Hill 174 Ariz. 313 322, 848 P 2d 1375 1384 (1993) But it is always improper for the prosecutor to "impugn the integrity or honesty of opposing counsel State v Newell 212 Ariz 389 403 ¶ 66 132 P 3d 833 847 (2006) (holding it was improper to imply that defense counsel was arguing for a position he knew to be false) Nonetheless, such comments warrant reversal only if a defendant can show a reasonable likelihood that the misconduct could have tainted the jury's verdict. Id. Moreover, "[c]riticism of defense theories and tactics is a proper subject of closing argument." State v Ramos 235 Ariz. 230, 238 ¶ 25, 330 P 3d 987 995 (App.2014) (quoting United States v Sayetsitty 107 F 3d 1405, 1409 (9th Cir 1997)) In Ramos the court ruled that the prosecutor's accusation that the defense raised "red herrings and asked the jury to "check [their] common sense at the door' was

Case 2:16-cv-01159-SRB   Document 45-13   Filed 12/04/17   Page 18 of 489

State v Lynch 238 Ariz. 84 (20

357 P 3d 119 721 Ariz Adv Rep 4 723 Ariz. Adv Rep 4

proper criticism of defense tactics even though it suggested that defense counsel attempted to mislead the jury *Id.* at 237–38 ¶¶ 24–25 330 P 3d at 994–95

¶ 29 Here although the prosecutor repeatedly suggested that Lynch s defense was not credible, his criticism was directed at defense *theories* rather than defense *counsel. Compare State v Amaya-Ruiz*, 166 Ariz 152, 171, 800 P 2d 1260, 1279 (1990) (no misconduct *132 where prosecutor called defense theories "outrageous, a smoke screen, and supported only by innuendo and inference ') *with State v Hughes* 193 Ariz. 72, 86 ¶ 61 969 P 2d 1184 1198 (1998) (misconduct to argue that defense counsel and experts fabricated insanity defense without evidentiary support) The prosecutor's remarks were not improper Moreover the trial judge instructed the jury that the lawyers arguments are not evidence The prosecutor's comments did not deprive Lynch of a fair trial *See Newell* 212 Ariz at 403 ¶ 67, 132 P 3d at 847

### 9 Vouching and relying on evidence outside of the record

[17]   ¶ 30 During closing argument, the prosecutor commented that 'this defendant—and he did—slash [Panzarella s] throat.' Lynch contends this was improper because the prosecutor had previously objected to the introduction of the guilty verdict, which indicated that only eight of the guilt-phase jurors found that Lynch had killed a person,[2] and the trial court precluded it. Lynch argues the State improperly argued that Lynch was the actual killer and interfered with his ability to dispute this point by objecting to the introduction of the guilty verdict. Lynch also contends that the prosecutor vouched for the police officers involved by saying, 'the Scottsdale Police Department did its darndest' and [t]hey tried," referring to the department's attempt to find Panzarella s DNA on Schwani s shirt. The prosecutor also referred to blood spatter evidence as "the law and said 'the State does not agree that [Lynch s mitigating circumstances] are mitigating circumstances ' Lynch did not object to any of these comments at trial

[18]   [19]   ¶ 31 A prosecutor improperly vouches by either placing the prestige of the government behind its evidence or suggesting that facts not before the jury support the state's evidence. *Newell,* 212 Ariz at 402 ¶62, 132 P 3d at 846 *State v Vincent* 159 Ariz 418, 423 768 P 2d 150 155 (1989) Even if vouching occurs, the trial court may cure the error by

instructing the jury not to consider the attorneys arguments as evidence *State v Payne* 233 Ariz 484, 512 ¶ 109 314 P 3d 1239, 1267 (2013)

¶ 32 Although the prosecutor said the crime lab tried its darndest' and referred to blood-spatter analysis as the law it was proper for the State to suggest that, because police did not find Panzarella s blood on Schwani the jury should infer that Lynch actually committed the murder Contrary to Lynch s assertion, the fact that four jurors on the guilt-phase jury were not convinced that Lynch was the killer does not make the prosecutor's comments misconduct. *See Bible,* 175 Ariz at 602 858 P 2d at 1205 ("[D]uring closing arguments counsel may summarize the evidence, make submittals to the jury, urge the jury to draw reasonable inferences from the evidence and suggest ultimate conclusions ") Finally, Lynch did not object to the prosecutor's reference to blood-spatter evidence as the law or the prosecutor's comment that "the State does not agree " and he fails to show that these remarks denied him a fair trial Although the prosecutor put the prestige of the government behind his evidence by saying that "the State does not agree, the trial court cured the error by instructing the jury not to consider the attorneys' arguments as evidence The prosecutor's comments did not constitute sufficient misconduct to warrant reversal

### 10 Misstatement of the law

[20]   [21]   ¶ 33 Lynch contends the prosecutor committed misconduct by misstating the law A prosecutor should not misstate the law during closing argument. *State v Serna,* 163 Ariz 260 266 787 P 2d 1056 1062 (1990) Trial courts are given broad discretion in controlling closing argument, and their rulings will only be overturned for an abuse of discretion. *State v Tims* 143 Ariz 196, 199 693 P 2d 333 336 (1985)

### a. A R.S § 13–751(G)(1)

[22]   ¶ 34 Substantial impairment of a person's capacity to appreciate the wrongfulness *133 of his conduct is a statutorily identified mitigating circumstance A.R.S § 13–751(G) The prosecutor argued that a person can only fail to appreciate the wrongfulness of conduct if the person admits the conduct The trial court overruled Lynch s objection. The prosecutor also questioned why Lynch would leave the crime scene and take the knife if he did not think his conduct was

wrong. Lynch argues that this was a misstatement of the law because the mental impairment mitigating factor "is a sliding consideration," and the prosecutor argued that it "was a yes or no proposition."

¶ 35 Under § 13–751(G)(1), jurors must consider a defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law  The State s remark was not a misstatement of law but rather an attempt to point out an inconsistency in Lynch s story  The prosecutor was entitled to argue that Lynch committed the murder and appreciated the wrongfulness of his conduct.

### b  History of substance abuse

[23]  [24]  ¶ 36 Lynch contends that the prosecutor misstated the law by arguing that Lynch s substance abuse was not a mitigating factor, but rather something that made the crime worse  Lynch did not object at trial  Substance abuse can be a mitigating factor in capital cases  State v Kayer 194 Ariz 423 438 ¶ 52, 984 P 2d 31 46 (1999)  But a prosecutor does not commit misconduct by arguing that a mitigating factor does not warrant leniency or that jurors should give it little consideration. State v Anderson 210 Ariz. 327, 350 ¶ 97  111 P 3d 369, 392 (2005), supplemented 211 Ariz. 59, 116 P 3d 1219 (2005)  see also State v Prince 226 Ariz. 516, 538 ¶ 90  250 P 3d 1145  1167 (2011) (no fundamental error where prosecutor argued that defendant's bad temper was not sufficiently substantial to warrant leniency but rather "should be aggravation' where State was precluded from retrying aggravators)  The prosecutor did not commit misconduct by suggesting that Lynch's drug use did not warrant leniency

### c  Pornographic videos

[25]  [26]  ¶ 37 Lynch claims the prosecutor misstated the law by arguing that Lynch s renting pornographic videos "shows a debasement in the part of [Lynch s] character  And that has already been found, because this murder has been found  to be especially heinous and depraved  The trial court correctly sustained Lynch's objection to this argument, properly instructed the jury on the issue  and instructed the jury to disregard remarks to which the court sustained objections  Lynch has not overcome the presumption that the jury followed these instructions  See Manuel 229 Ariz. at 6 ¶ 25  270 P 3d at 833

### d. Dysfunctional childhood

[27]  ¶ 38 Lynch contends that the prosecutor misstated the law by arguing that Lynch's difficult childhood was  so remote" that it was "an excuse  not a mitigating factor "  Lynch was thirty-nine years old at the time of the murder  We have held that  [a] difficult or traumatic childhood is a mitigating circumstance " Prince 226 Ariz. at 541 ¶ 109  250 P 3d at 1170  Although a defendant does not have to demonstrate a connection between the mitigating circumstances and the crime, the remoteness or lack of a connection between the mitigating factor and the crime may make the mitigating factor less persuasive. Id. Thus  a jury may give less consideration to a difficult childhood when a defendant is older  See id. (noting on independent review that "[d]ifficult childhood circumstances also receive less weight as more time passes between the defendant's childhood and the offense")

¶ 39 These remarks were not improper  See State v Villalobos 225 Ariz. 74  83 ¶¶ 37–39  235 P 3d 227, 236 (2010) (reasoning that prosecutor's remark that "there is absolutely nothing mitigating about who he is in light of what you've seen him do  was not improper), Anderson  210 Ariz. at 350 ¶ 97, 111 P 3d at 392 ( Once the jury has heard all of the defendant's mitigation evidence  there is no constitutional prohibition against the State arguing that the evidence is not particularly relevant or that it is entitled to little weight.") Additionally, the court properly *134  instructed the jury on this mitigating factor, and Lynch has not shown that the jury disregarded the instruction.

### e  Life as a  free bite of the apple '

[28]  ¶ 40 Lynch argues that the prosecutor misstated the law by arguing that the jury should disregard Lynch's prison sentences  As mitigation, Lynch pointed out that he would never leave prison alive because of his consecutive prison terms  The prosecutor contended that this argument gave Lynch a  free bite of the apple  The prosecutor was not stating the law; rather  he was arguing that the jury should not spare Lynch's life merely because he committed other crimes for which he would have to serve considerable prison time  Moreover  the court properly instructed the jury on this issue

Case 2:16-cv-01159-SRB   Document 45-13   Filed 12/04/17   Page 20 of 489

State v Lynch 238 Ariz. 84 (20

357 P 3d 119 721 Ariz. Adv Rep 4 723 Ariz Adv Rep 4

#### f (F)(6) aggravator

[29]  ¶ 41 Lynch contends that the prosecutor misstated the law by characterizing the (F)(6) aggravator as involving separate aggravating factors During voir dire the prosecutor told prospective jurors

> [T]his crime and this is one aggravating factor was committed in an especially cruel, especially heinous or especially depraved fashion but the prior jury has already found that he was guilty not only of it—even though it's one factor, especially depraved, that's what they found, it was especially heinous.

Lynch objected that the prosecutor was addressing single prongs of the aggravator The trial court denied Lynch's motion to strike the statement, but told the prosecutor to be clear that it was only one aggravator The prosecutor then told prospective jurors that the murder 'was found to be especially heinous, especially cruel and especially depraved." The trial judge sustained Lynch's objection to the use of the word and.

¶ 42 In his closing argument, the prosecutor described both especial cruelty and especial heinousness and indicated that each had already been established in this case He then told the jury  [C]ompare those three aspects, the murder and the aggravating circumstances, but there is also this indication that [it] was for pecuniary gain  Lynch did not object in the trial court, but now asserts that the prosecutor sought to indicate three aggravators existed when there were only two Lynch argues this was not accidental citing the prosecutor's comment that he wished to call witnesses "to show the four factors [he] proved previously  his request to include the definitions of especially cruel  especially heinous and especially depraved in the preliminary jury instructions and his proposed jury instruction indicating that "Lynch committed the murder in an especially heinous cruel *and* depraved manner "

¶ 43 The (F)(6) aggravator is  a single aggravating circumstance that can be established in alternative ways ' *Lynch I* 225 Ariz. at 42 ¶ 84 234 P 3d at 610 The prosecutor struggled at times during voir dire and closing argument with the disjunctive or' and conjunctive "and  in explaining the (F)(6) aggravator but Lynch objected to the misstatements

and the trial court had the prosecutor clarify that the (F)(6) aggravator is only one aggravator The trial court also properly instructed the jury on the (F)(6) aggravator Lynch has not identified any reversible error

#### 11 Comment on Lynch not testifying

[30]  ¶ 44 The prosecutor referring to the encounter between Lynch and Panzarella immediately before the murder asked the jury in closing argument, 'What's going on?' and then asked, 'Were words exchanged? Who knows  Lynch did not object, but now asserts that these comments were improper because the only people who could have answered those questions were the victim and Lynch.

[31]  [32]  ¶ 45 A prosecutor may not comment on a defendant's decision not to testify, either directly or indirectly *State v Rutledge* 205 Ariz. 7 12 ¶ 26 66 P 3d 50, 55 (2003) A prosecutor's statement is a comment on a defendant's "protected silence  if a jury would "naturally and necessarily' perceive it as a comment on a defendant s failure to testify *Payne* 233 Ariz. at 514 ¶ 126 314 P 3d at 1269 (internal quotation marks omitted)

**135  ¶ 46 Here, the prosecutor's statements were proper They did not call attention to the fact that Lynch did not testify but rather pointed out that the events leading up to the murder were unclear The jury would not have  naturally and necessarily' perceived the remarks as a comment on Lynch's failure to testify

#### 12 Personalization

[33]  ¶ 47 Lynch asserts that the prosecutor improperly encouraged the jurors to put themselves in the victim's position During his opening statement, the prosecutor said.

> So what happens is the defendant then as Mr Panzarella sits there goes behind him and begins and cuts his throat from ear to ear The problem of the unfortunate aspect of that, because in and of itself, cutting somebody's throat is a horrific, ghastly thing you can only imagine I don't think you can even imagine what it's like for somebody to approach you with a

knife. You cannot move and you know they're manhandling you and they are going to cut your throat.

The trial court sustained Lynch's objection and granted his motion to strike The prosecutor also quoted a line from a poem indicating that every person's death diminishes society as a whole, "so therefore send no one to find for whom the bell tolls, it tolls for thee " The prosecutor concluded his argument by stating that "[the bell] tolls for each and every one of you, in light of the evidence in this case, to return a verdict of death on Shawn Patrick Lynch.

[34]   [35]   ¶ 48 A prosecutor has wide latitude in closing argument, but may not make arguments that appeal to the jury's fear or passion. *Morris* 215 Ariz. at 337 ¶ 58, 160 P 3d at 216 This includes inviting jurors to place themselves in the victim's position because doing so plays on the jurors' fear of the defendant or sympathy for the victim. *See id* The proper response to an improper prosecutorial comment is an objection, motion to strike, and a jury instruction to disregard the stricken comment *See Newell* 212 Ariz. at 403 ¶ 69 132 P 3d at 847

¶ 49 The prosecutor's first comment was improper By telling the jurors that they could not know what it was like to be "manhandled" by the knife-wielding defendant, the prosecutor invited the jurors to place themselves in the victim's position and appealed to their fears But the trial court properly sustained Lynch's objection struck the argument, and told the jury to disregard it. Given the presumption that jurors follow instructions we conclude that this comment did not affect the jury verdict. *See id*

[36]   ¶ 50 Because Lynch did not object to the prosecutor's referencing the poem at trial, we review for fundamental error *See Morris* 215 Ariz. at 337 ¶ 59 160 P 3d at 216 Lynch cannot show that the references deprived him of a fair trial The prosecutor did not appeal to the jury's fear of Lynch or sympathy for the victim or ask the jurors to place themselves in the victim's shoes during the murder Rather the prosecutor commented that murder affects society as a whole

### 13 Cumulative misconduct

[37]   [38]   ¶ 51 Lynch argues that even if none of the individual instances of prosecutorial misconduct warrants

reversal, the cumulative effect requires reversal, particularly given the prosecutor's experience and track record of misconduct. 'We consider whether persistent and pervasive misconduct occurred and whether the cumulative effect of the incidents shows that the prosecutor intentionally engaged in improper conduct and did so with indifference, if not a specific intent, to prejudice the defendant." *State v Gallardo* 225 Ariz. 560 570 242 P 3d 159, 169 (2010) (quoting *Morris* 215 Ariz. at 339 ¶ 67 160 P 3d at 218) (internal quotation marks omitted)

¶ 52 During this retrial of the penalty phase, the prosecutor disturbingly made a number of inappropriate comments, prompting valid objections by Lynch that the trial court sustained. Although the prosecutor made some improper remarks they did not amount to persistent and pervasive misconduct that deprived Lynch of a fair trial The trial judge sustained objections to all of the improper comments except, "No let me ask you the question ' The court instructed the *136 jury to disregard questions to which objections were sustained, to only consider testimony exhibits, and stipulations as evidence and that attorneys' remarks are not evidence. We presume that jurors follow instructions *Manuel* 229 Ariz. at 6 ¶ 25 270 P 3d at 833 and any cumulative prejudice resulting from the prosecutor's remarks is insufficient to overcome this presumption *See Gallardo* 225 Ariz. at 569 ¶ 40, 242 P 3d at 168 (reasoning that similar instructions cured any prejudice) Given these instructions and that the let me ask you the question remark was the only improper comment to which the court overruled Lynch's objection, the prosecutor's conduct did not deny Lynch a fair trial As to the statements to which Lynch did not object, we have concluded that Lynch failed to prove fundamental error We consider these statements as well in our conclusion that prosecutorial misconduct, while present in some instances was not so pronounced or sustained as to require a new sentencing trial

### B Limiting Retrial to Penalty Phase and Preclusion of Guilty Verdict

[39]   [40]   ¶ 53 Lynch claims that the trial court erred when it denied his motion to retry the aggravation phase and prohibited him from offering the guilty verdict as an exhibit during the penalty-phase retrial He contends that these errors deprived him of an individualized sentencing because they denied the jury an adequate opportunity to evaluate the evidence supporting the aggravating circumstances and established a presumption of death We review the interpretation of statutes and constitutional provisions de

novo *State v Hansen*, 215 Ariz. 287 289 ¶ 6 160 P 3d 166 168 (2007) and evidentiary rulings for an abuse of discretion. *State v Benson*, 232 Ariz. 452, 466 ¶ 58 307 P 3d 19, 33 (2013)

¶ 54 Following Lynch s second penalty-phase trial, we reversed Lynch's death sentence and remanded for a new penalty-phase proceeding *Lynch I* 225 Ariz. at 43 ¶ 89, 234 P 3d at 611 We ordered the trial court to instruct the jury "that the (F)(5) and (F)(6) aggravators have been previously found and that it is not to retry those issues *Id.* (citing A R.S § 13–752(K)) Relying on this language, the trial court on remand denied Lynch s request for an aggravation-phase retrial

¶ 55 Section 13–752(K) provides

> At the penalty phase, if the trier of fact is a jury and the jury is unable to reach a verdict, the court shall dismiss the jury and shall impanel a new jury The new jury shall not retry the issue of the defendant's guilt or the issue regarding any of the aggravating circumstances that the first jury found by unanimous verdict to be proved or not proved. If the new jury is unable to reach a unanimous verdict, the court shall impose a sentence of life or natural life on the defendant.

A.R.S § 13–752(K) Lynch contends that § 13–752(K) only applies when a jury is unable to decide upon a penalty and § 13–752(N) applies when a death sentence has been vacated. Under § 13–752(N), [i]f the sentence of a person who was sentenced to death is overturned, the person shall be resentenced pursuant to this section by a jury that is specifically impaneled for this purpose as if the original sentencing had not occurred." Lynch argues that because the aggravation phase is part of the sentencing proceeding, A.R.S § 13–752(C), both the aggravation and penalty phases should have been retried. The State responds that the error this Court previously found in *Lynch I* was only in the penalty phase, not the entire sentencing proceeding, and reading the statute as a whole, this Court properly remanded for a trial of only the penalty phase.

¶ 56 There are two provisions of § 13–752 that inform our analysis. As noted above, § 13–752(N) provides that, [i]f the sentence of a person who was sentenced to death is overturned, the person shall be resentenced pursuant to this

section as if the original sentencing had not occurred. Based on this language, Lynch argues he was entitled to an entirely new sentencing proceeding *See* A R.S § 13–752(C) (D) (indicating that a "sentencing proceeding" consists of both the aggravation and penalty phases) But under § 13–752(O), a defendant whose sentence is overturned must simply be "resentenced by a jury that is specifically impaneled ' for *137 that purpose *See* A.R.S § 13–752(D) ("If the trier of fact finds that one or more of the alleged aggravating circumstances have been proven, the trier of fact shall then immediately determine whether the death penalty should be imposed. This proceeding is the penalty phase of the sentencing proceeding ') Thus the statute's text leaves it unclear when a defendant is entitled to an entirely new sentencing proceeding, and when a defendant is entitled to only a new penalty-phase proceeding We conclude, as we did in *Lynch I* that Lynch was entitled only to a new penalty-phase proceeding

¶ 57 The history of § 13–752 suggests that subsection (N) applies only to a particular subset of sentences overturned on appeal. The United States Supreme Court decided in *Ring v Arizona (Ring II* ), 536 U S 584 122 S Ct. 2428, 153 L Ed 2d 556 (2002) that Arizona's capital-sentencing scheme violated the Sixth Amendment because judges, rather than juries, found aggravating factors that made defendants death eligible *Id* at 609 122 S Ct. 2428 This opinion left a large number of capital cases in flux, particularly those cases where defendants had not exhausted their appeals *See State v Ring (Ring III* ), 204 Ariz. 534, 544 ¶ 5, 65 P 3d 915, 925 (2003) ("At the time of the *Ring II* decision, thirty-one defendants sentenced to death had matters pending on direct appeal before this court.") In response, the legislature passed an emergency measure, S B 1001, to bring Arizona's death penalty statutes into compliance with *Ring II Id.* at 545 ¶ 13 65 P 3d at 926 By using the language "a person who *was* sentenced to death, the legislature intended for subsection (N) to be a limited solution for *Ring II*-defective sentences A defendant who 'was sentenced" to death after a judge found aggravating circumstances was entitled to an entirely new sentencing proceeding, unless this Court found the *Ring* error to be harmless beyond a reasonable doubt, because an error of constitutional significance tainted the *aggravation* phase of every such case Thus the legislature instructed the courts to act as if the original sentencing simply "had not occurred ' and to start the sentencing process over again A.R.S § 13–752(N)

¶ 58 Subsection (O), on the other hand, is more general and pertains to sentences overturned for any reason. This subsection does not instruct the courts that they must act as if the original sentencing had not occurred, but rather directs them to simply sentence or resentence a defendant as appropriate to remedy a sentencing error A R S § 13–752(O) This Court may reverse, affirm or modify the judgment appealed from and may grant a new trial or render any judgment or make any order which is consistent with the justice and the rights of the state and the defendant.' A R S § 13–4036 Arizona s sentencing statute seeks to avoid retrials of proceedings untainted by error A R S § 13–752(J) (providing that, where a jury cannot reach a verdict on aggravating circumstances "[t]he new jury shall not retry the issue of the defendant s guilt") A R S § 13–752(K) (providing that, where a jury cannot reach a verdict in the penalty phase "[t]he new jury shall not retry the issue of the defendant's guilt or the issue regarding any of the aggravating circumstances that the first jury found by unanimous verdict to be proved or not proved") Requiring a retrial of the entire sentencing proceeding when the error occurred only during the penalty phase would undermine the statute s purpose

¶ 59 We limited the retrial to the penalty phase because Lynch's original sentence was not reversed for a Ring II-defective sentence or any other error in the aggravation phase Rather the error arose from an improper penalty-phase instruction. Lynch I 225 Ariz. at 42–43 ¶ 88 234 P 3d at 610–11 Limiting the retrial to the penalty phase was consistent with justice and the rights of the parties

[41]    ¶ 60 Likewise, limiting the retrial to the penalty phase did not deprive Lynch of an individualized sentencing.
[D]uring a second penalty phase, the state and the defendant may introduce evidence pertaining to the aggravating circumstances previously found" because aggravation phase evidence is directly relevant to whether the mitigation is sufficiently substantial to call for leniency " Prince 226 Ariz. at 526 ¶¶ 16, 18 250 P 3d at 1155 (quoting A R S § 13–752(G)) *138 This affords jurors sufficient opportunity to evaluate the aggravating circumstances when determining whether death is the appropriate penalty During Lynch's penalty-phase retrial, the jury heard abundant testimony concerning the circumstances of the offense and the aggravating factors and Lynch was free to offer additional evidence from the guilt and aggravation phases He was not entitled, however to retry the aggravation phase when no error occurred in that proceeding

[42]    ¶ 61 Precluding the guilty verdict from evidence likewise did not deprive Lynch of an individualized sentencing. Lynch contends the fact that most of the jurors found him guilty only of felony murder not premeditated murder, was relevant as a mitigating circumstance The trial court did not abuse its discretion in ruling that the verdict form was 'not related to any aspect of the defendant's character, propensities or record, or circumstances of the offense." Neither the guilty verdict form nor the jurors votes provided evidence of the circumstances of the murder

## C. Refusal to Give Simmons Instruction

[43]    ¶ 62 Lynch next contends the trial court erred in refusing to instruct the jury that he would never be released if sentenced to prison. He attempted to waive his right to be considered for a release-eligible sentence and requested that the jury be instructed regarding his ineligibility for release The trial court ruled that Lynch could not "unilaterally choose which sentence should be imposed and denied his motion.

[44]    ¶ 63 We review jury instructions and alleged constitutional violations de novo State v Nelson 229 Ariz. 180 185 ¶ 21, 273 P 3d 632, 637 (2012) State v McGill, 213 Ariz. 147 157–58 ¶ 45, 140 P 3d 930, 940–41 (2006) But we review a court's refusal to inform the jury of the defendant s willingness to waive parole eligibility for an abuse of discretion. Benson, 232 Ariz. at 465 ¶ 52, 307 P 3d at 32

¶ 64 The United States Supreme Court has held that 'where the defendant's future dangerousness is at issue, and state law prohibits the defendant s release on parole due process requires that the sentencing jury be informed that the defendant is parole ineligible." Simmons v South Carolina, 512 U S 154 156 114 S Ct. 2187 129 L Ed 2d 133 (1994) (plurality opinion) The State suggested at trial that Lynch could be dangerous Further parole is available only to individuals who committed a felony before January 1 1994 and juveniles A R S § 41–1604 09(I)

[45]    ¶ 65 Parole eligibility is not a right that can be waived. Benson 232 Ariz. at 465 ¶ 54, 307 P 3d at 32 To the contrary, the eligibility decision is within the trial court's discretion Id see also State v Dann 220 Ariz. 351 373 ¶ 124 207 P 3d 604, 626 (2009) (holding that defendants may not 'presentence" themselves) The sentencing statute in effect at the time of the murder authorized the imposition of release-eligible sentences A R S § 13–703(A) (renumbered as A R S § 13–751(A)) The trial judge thus properly

instructed the jury that she could impose a release-eligible sentence if the jury did not return a death verdict. *"Simmons* applies only to instances where as a legal matter there is *no possibility* of parole if the jury decides the appropriate sentence is life in prison. *Ramdass v Angelone* 530 U S 156, 169  120 S Ct. 2113, 147 L Ed.2d 125 (2000) (emphasis added) Because § 13–703(A) permitted the possibility of Lynch obtaining release refusing a *Simmons* instruction was not error *See Benson* 232 Ariz. at 465 ¶ 56  307 P 3d at 32 An instruction that parole is not currently available would be correct, but the failure to give the *Simmons* instruction was not error

¶ 66 Further, the alternative instruction Lynch offered was inaccurate Instead of merely instructing on the unavailability of parole it would have informed the jury, 'If your verdict is that Mr Lynch should be sentenced to life   the court will sentence him to natural life which means Mr Lynch would never be released from prison for his entire life As discussed, the court could have imposed a release-eligible sentence Even if parole remained unavailable, Lynch could have received another form of release  *139 such as executive clemency We have previously rejected a similarly overbroad instruction. *State v Boyston* 231 Ariz. 539 552–53 ¶ 67–68, 298 P 3d 887  900–01 (2013) (rejecting instruction that defendant would "never be eligible to be released from prison for any reason for the rest of his life because it 'referred more broadly to any form of release or commutation of sentence )

**D** *Batson* Challenge

**[46]   [47]   [48]**   ¶ 67 Lynch next argues the trial court violated *Batson v Kentucky* 476 U S  79  106 S Ct. 1712 90 L Ed.2d 69 (1986), when it permitted the State to strike five Hispanic jurors over his objection   A denial of a *Batson* challenge will not be reversed unless clearly erroneous *Newell* 212 Ariz. at 400 ¶ 52  132 P 3d at 844 We defer to the trial court's ruling regarding the State's motives for a peremptory strike *State v Garcia* 224 Ariz  1  10 ¶ 22  226 P 3d 370  379 (2010) and review the trial court's application of the law de novo *Newell* 212 Ariz. at 401 ¶ 52  132 P 3d at 845

¶ 68 The State used five of its ten peremptory strikes on prospective jurors 8, 32, 34, 49, and 255  all of whom identified themselves as Hispanic  The prosecutor explained that Number 255 'indicated that she is philosophically opposed to the death penalty' and could not explain "why she believed that life was preferable to death " Number 49 had

previously served on two hung juries  and the State argued she would cause the Lynch jury to hang, which would prevent the State from retrying the case  Number 34 had tattoos on his legs and arm, and one of Lynch's mitigating circumstances was that he had hepatitis C—which he contracted when he received a tattoo—and the State did not want a juror on the panel who could identify with Lynch  The prosecutor claimed that Number 32 had 'facial hair resembl[ing] ZZ Top" and a long ponytail  like Jerry Garcia, which motivated striking that juror  The State noted that it also struck a white juror with long hair and facial hair  Number 8  'had a brother who was convicted of child abuse  and she was pretty unhappy " The State referred to Lynch's allegation that he had been abused. The trial court found that the State's reasons for striking the prospective jurors were race neutral. Lynch responded that the State's reasons for striking Numbers 32 (long hair and facial hair) and 34 (tattoos) did not justify the strikes

**[49]   [50]   [51]**   ¶ 69 [T]he Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race.  ' *Batson,* 476 U S  at 89  106 S Ct. 1712 *Batson* challenges are subject to the following three-step analysis

> (1) the party challenging the strike must make a prima facie showing of discrimination, (2) the striking party must provide a race-neutral reason for the strike  and (3) if a race-neutral explanation is provided, the trial court must determine whether the challenger has carried its burden of proving purposeful racial discrimination

*Garcia,* 224 Ariz  at 10  226 P 3d at 379 (quoting *State v Canez* 202 Ariz  133, 146 ¶ 22, 42 P 3d 564, 577 (2002))  [T]he ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike  *Id*  (quoting *Purkett v Elem* 514 U S  765, 768  115 S Ct. 1769  131 L Ed.2d 834 (1995) (per curiam)) A peremptory strike does not violate *Batson* where the prosecutor's explanation is facially race neutral and the defendant  offer[s] no evidence other than inference, to show that the peremptory strike was a result of purposeful racial discrimination  *Newell* 212 Ariz. at 402 ¶ 58, 132 P 3d at 846

¶ 70 The trial court found that the State's proffered reasons for the strikes were race neutral  implicitly ruling that Lynch did not carry his burden of proving purposeful racial

discrimination The fact that the State did not ask voir dire questions related to Juror 32's long hair and facial hair or Juror 34's tattoos does not establish that the strikes were pretextual. *See Canez*, 202 Ariz. at 145 ¶ 18 42 P 3d at 576 (affirming trial court's denial of *Batson* challenge even though the defendant argued the States justification was pretextual because it did not ask follow-up questions) The court did not err

### E. Denial of Motion to Strike Juror 5

[52]  [53]  [54]  ¶ 71 Lynch contends the trial court erred in refusing to strike Juror 5 who *140 had previously worked at the same hospital as one of the States witnesses, Dr Vincent Honan Lynch bore "the burden of establishing that the juror [wa]s incapable of rendering a fair and impartial verdict." *State v Lavers* 168 Ariz 376 390, 814 P 2d 333 347 (1991) This Court does not set aside a trial court's refusal to strike a juror "absent a clear showing that the court abused its discretion. *Id*

¶ 72 The State called Honan, a gastroenterologist who worked at Banner Good Samaritan Hospital, to testify about hepatitis C, the liver and Lynchs life expectancy Juror 5 sent the trial judge a letter explaining that she previously worked in the medical surgical ICU at Banner Good Samaritan and recognized Honan. Juror 5 had no direct dealings with Dr Honan, but thought "the surgeons that work at Good Sam are excellent surgeons." She indicated that she could still be fair in Lynch's case After reviewing Juror 5's questionnaire and considering her responses in open court, the trial judge denied Lynchs motion to strike Juror 5

[55]  ¶ 73 A court is obligated to excuse a juror who cannot render a fair and impartial verdict. Ariz. R.Crim P 18 4(b) *see also* A R.S § 21–211 We examine three factors when determining if a juror may continue to serve after that juror's objectivity is challenged (1) the nature of the relationship between the witness and the juror; (2) whether the juror will properly assess the testimony and (3) the importance of the testimony and whether the testimony was disputed. *Bible* 175 Ariz. at 574 858 P 2d at 1177

¶ 74 The relationship between Juror 5 and the witness was not sufficient to warrant dismissal Although knowledge of or professional acquaintance with a witness calls a juror's objectivity into question, it does not require automatic disqualification. *See Hill* 174 Ariz. at 319–20 848 P 2d at 1381–82 (finding no abuse of discretion in not dismissing juror who was professionally acquainted with prosecutor,

investigator and coroner involved in the case) Here, Juror 5 only recognized Honan as someone she had seen at the hospital where she no longer worked. Juror 5 stated that, although she may have worked on some of Honans patients her dealings were with his surgical residents and not with him

¶ 75 Second, Juror 5 assured the court that her knowledge of Honan would not prevent her from examining the evidence objectively Although this is not conclusive, it weighs heavily against dismissal absent any indicia that the juror could not objectively analyze the evidence. *See, e.g id.* at 320–21 848 P 2d at 1382–83 *Bible* 175 Ariz. at 574–75, 858 P.2d at 1177–78 Although Juror 5 indicated that she thought all the surgeons at Good Samaritan were "excellent," she repeatedly affirmed that this would not taint her decision-making. The trial court did not abuse its discretion in refusing to strike Juror 5

### F Constitutionality of Arizona's Death Penalty

¶ 76 Lynch contends that Arizonas death penalty is unconstitutional because it involves torture and a lingering death. He cites the "botched" lethal injection of Joseph Wood III as support for the contention that Arizona cannot humanely implement the death penalty

[56]  ¶ 77 The United States and Arizona Constitutions prohibit cruel and unusual punishment. U S Const. amend. VIII, Ariz. Const. art. 2 § 15 Punishment involving 'torture or a lingering death is cruel *In re Kemmler* 136 U S 436 447 10 S Ct 930, 34 L Ed. 519 (1890) This Court and the United States Supreme Court have rejected the argument that lethal injection is cruel and unusual punishment. *See e g Glossip v Gross* ——U S —— —— 135 S Ct. 2726 2738, 192 L Ed.2d 761 (2015) *Baze v Rees* 553 U S 35 41 128 S Ct. 1520, 170 L.Ed.2d 420 (2008), *State v Hinchey* 181 Ariz. 307, 315 890 P 2d 602 610 (1995)

¶ 78 We decline to reverse our prior rulings on this issue. Moreover Lynch's challenge to the current execution protocol is premature and may instead be raised in Rule 32 proceedings *State v Kiles (Kiles II)* 222 Ariz 25 42 ¶ 92 n 20, 213 P 3d 174 191 n 20 (2009) (quoting *141 State v Andriano* 215 Ariz 497 510 n. 9 161 P 3d 540 553 n. 9 (2007)) Lynch's objections to the current injection procedure —the lack of transparency and the protocol to be used— involve information not contained in the record on appeal and are more properly raised in a Rule 32 petition. *See State v Watton*, 164 Ariz 323 328 793 P 2d 80, 85 (1990) ("One of the purposes of a Rule 32 proceeding is to furnish an

evidentiary forum for the establishment of facts underlying a claim for relief, when such facts have not previously been established of record.' " (quoting *State v Scrivner* 132 Ariz. 52 54 643 P 2d 1022 1024 (App 1982)))

## G Independent Review

[57]   [58]   [59]   ¶ 79 Lynch next argues the mitigation evidence he presented is sufficiently substantial to call for leniency Because Lynch's crimes occurred before 2002 we 'independently review the trial court's findings of aggravation and mitigation and the propriety of the death sentence A R S § 13–755(A) In doing so we review the record de novo, considering "the quality and the strength, not simply the number, of aggravating and mitigating factors *State v Roseberry* 210 Ariz. 360 374 ¶ 77 111 P 3d 402 416 (2005) (quoting *State v Greene* 192 Ariz. 431 443 ¶ 60 967 P 2d 106 118 (1998)) When "there is a doubt whether the death sentence should be imposed, we will resolve that doubt in favor of a life sentence." *State v Carlson* 202 Ariz. 570 588 ¶ 70, 48 P 3d 1180 1198 (2002)

### 1 Aggravation

#### a (F)(5)

[60]   ¶ 80 An aggravating circumstance is established when [t]he defendant committed the offense as consideration for the receipt, or in expectation of the receipt, of anything of pecuniary value A R S § 13–751(F)(5) A murder must be 'prompted by the desire for pecuniary gain" for the (F)(5) aggravator to apply *Anderson*, 210 Ariz. at 351 ¶ 105, 111 P 3d at 393

¶ 81 After initially leaving Panzarella s residence, Lynch and Sehwani used his American Express card at two stores and attempted to use it at a third. Panzarella reported the card as lost, and Lynch and Sehwani returned to Panzarella s residence, tied him to a chair, and killed him. Panzarella s debit card and credit card were then repeatedly used, including to secure charges at a motel room registered in Lynch s name Authorities found Panzarella s gun and magazine in Lynch's motel room and Panzarella's car keys in the truck Lynch was entering at the time of his arrest. These facts establish that Lynch and Sehwani returned to Panzarella's residence intending to steal more and to murder Panzarella to avoid detection. The (F)(5) aggravator was established

#### b (F)(6)

[61]   [62]   ¶ 82 Under A R S § 13–751(F)(6) an aggravating circumstance is established when "[t]he defendant committed the offense in an especially heinous, cruel or depraved manner " A murder is especially cruel if 'the victim was conscious during the violence and the defendant knew or should have known that the victim would suffer mental anguish or physical pain.' *State v Hargrave* 225 Ariz. 1 13 ¶ 43 234 P 3d 569 581 (2010) "Mental anguish includes a victim's uncertainty about his fate *State v Kiles (Kiles I )*, 175 Ariz. 358, 371 857 P 2d 1212 1225 (1993)

¶ 83 Panzarella s spinal column was not cut, so his nervous system remained intact and he felt pain from the time his throat was cut until he lost consciousness Panzarella also experienced mental anguish. The evidence demonstrated that he was conscious when bound to the chair The cord used to bind Panzarella was tied in a large number of knots that were "fairly secured, indicating that Panzarella had ample time to contemplate his fate Ligatures abrasions and bruising on Panzarella's wrists, hands, forearm, shoulder blade, back, and chest indicate that he struggled. *See State v Djerf* 191 Ariz. 583 596 ¶ 50–51 959 P 2d 1274 1287 (1998) (inferring mental anguish from contusions and abrasions on victim s wrists) The murder was especially cruel, so the (F) (6) aggravator was established.

### 2 Mitigation

#### a. Medical condition

¶ 84 Lynch emphasizes his medical condition as a reason for leniency Dr Altschuler **142** testified at length about Lynch's hepatitis C and complications thereof, including cellulitis in his legs from a bacterial infection, the possibility that he could lose his legs his several hospitalizations for encephalopathy and his diminished life expectancy Defense counsel argued that Lynch would die in prison because of his medical condition and his 21–year sentence for the non-capital offenses The State s expert, Dr Honan, agreed that Lynch has significant chronic liver disease," but did not "see negative prognostic indicators to suggest that he is terminally ill "

[63]    [64]    ¶ 85 Although there need not be a nexus between mitigation and the crime in order for mitigation to be considered, "failure to establish such a causal connection may be considered in assessing the quality and strength of the mitigation evidence." *Newell* 212 Ariz. at 405 ¶ 82, 132 P 3d at 849 We assign minimal mitigating value to a defendant's post murder physical health because it "does not address his pre-murder character, nor does it address his propensities, his record, or the circumstances of the offense." *Kayer* 194 Ariz at 440 ¶ 61 984 P 2d at 48

[65]    ¶ 86 Here, Lynch's medical condition is a mitigating circumstance of only minimal value The defense suggested that he obtained hepatitis C from receiving a tattoo in jail *after* the murder so his medical condition is not probative of his character, propensities, or record at the time of the murder or the circumstances of the offense Further, we afford minimal value to the fact that a defendant will remain imprisoned for the rest of his life. *State v Lehr* 227 Ariz 140 155 ¶ 78 254 P 3d 379, 394 (2011) (reasoning that the fact that a defendant "would remain imprisoned for his natural life if he is not sentenced to death" is entitled to little mitigating value)

b Killer unknown

[66]    ¶ 87 "[P]articipation in a crime may be considered as mitigation where a defendant demonstrates that while he was legally accountable for the conduct of another, his participation in the crime was relatively minor *State v Hoskins* 199 Ariz. 127 150 ¶ 100 14 P 3d 997, 1020 (2000) *supplemented* 204 Ariz. 572, 65 P 3d 953 (2003) The evidence demonstrated that Lynch was a major participant in the crime. The American Express receipts discovered in Panzarella's residence indicate that Lynch and Sehwani returned after Panzarella reported the card lost. Property belonging to Panzarella was located in Lynch's motel room and in the truck Lynch was entering at the time of his arrest. There was also ample evidence indicating that Lynch was the killer The evidence showed that the person who cut Panzarella's throat was standing behind Panzarella, the blood on Lynch's shoes was consistent with him standing in that position, and the footwear impressions at the crime scene were consistent with Lynch's shoes Lynch's alleged minimal participation is not a mitigating circumstance

c Disparity in sentence

[67]    [68]    ¶ 88 "A disparity in sentences between codefendants and/or accomplices can be a mitigating circumstance if no reasonable explanation exists for the disparity" *Garcia* 224 Ariz at 21 ¶ 98, 226 P 3d at 390 (quoting *Kayer* 194 Ariz. at 439 ¶ 57, 984 P 2d at 47) Disparity is not mitigating if it results from factors suggesting the appropriateness of the sentences such as a difference in culpability or an appropriate plea agreement with one of the defendants *State v Detrich*, 188 Ariz. 57, 69 932 P 2d 1328 1340 (1997) Here, evidence suggested that Lynch was the killer and Sehwani received a life sentence as a result of a plea agreement Sentencing disparity is not a mitigating circumstance here

d. Drug abuse

[69]    ¶ 89 Lynch argues that his drug use is both a statutory and non-statutory mitigating circumstance A mitigating circumstance is proven if [t]he defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired, but not so impaired as to constitute a defense to prosecution." A.R.S § 13–751(G)(1) Lynch asserts that drug use impaired his ability to appreciate wrongfulness In such a case, the *143 defendant must show some relationship between drug use and the offense to avail himself of the (G) (1) mitigating circumstance *State v Murdaugh* 209 Ariz. 19 34 ¶ 74 97 P 3d 844 859 (2004) *see also State v Sansing* 206 Ariz. 232, 239–40 ¶¶ 28–29, 77 P 3d 30 37–38 (2003) (finding failure to prove (G)(1) factor where defendant presented only minimal testimony about his drug use on the day of the murder ')

¶ 90 Lynch presented evidence that he suffered from drug and alcohol abuse and that he used drugs around the time of the offense He also explained how crack cocaine use affects the brain. Lynch failed to show a relationship between his drug and alcohol use and the offense, however other than merely suggesting that he used crack cocaine near the time of the murder Any drug use is therefore entitled to minimal mitigating value.

[70]    ¶ 91 As to non-statutory mitigation, Lynch's drug abuse is entitled to minimal value. Even if a defendant establishes his drug addiction, we give minimal value to this evidence

Case 2:16-cv-01159-SRB   Document 45-13   Filed 12/04/17   Page 28 of 489

State v Lynch 238 Ariz. 84 (20

357 P 3d 119  721 Ariz Adv Rep 4  723 Ariz. Adv Rep 4

if he " fail[s] to tie his   drug abuse to the crime or to his mental functioning  when the murder occurred." *Garcia*, 224 Ariz. at 22 ¶ 104  226 P 3d at 391 (quoting *State v  Pandeli*, 215 Ariz. 514  532 ¶ 75  161 P 3d 557  575 (2007)) Although Lynch showed that he abused drugs  he did not tie his drug abuse to the crime other than by stating generally that crack cocaine use causes delusional thinking  Lynch's drug abuse deserves little value as a mitigator

#### e. Dysfunctional childhood and abuse

[71]    [72]    ¶ 92 Lynch presented evidence that he was raised in a dysfunctional family where he was physically and emotionally abused, his parents neglected him, and his parents were alcoholics  A difficult childhood may be a mitigating circumstance  but we give it little value  absent a showing that it affected the defendant's conduct in committing the crime " *Garcia*, 224 Ariz. at 22 ¶ 107  226 P 3d at 391 The amount of time that has passed since the defendant's childhood is relevant  *Prince*  226 Ariz. at 541–42 ¶ 111  250 P 3d at 1170–71 ( '*Prince* was twenty-six years old when he killed Cassandra, attenuating the impact of his dysfunctional childhood on his conduct."), *Garcia*, 224 Ariz. at 22 ¶ 107, 226 P 3d at 391 (affording little value to difficult family background because defendant was thirty nine at the time of the murder and "no evidence linked his childhood experiences to the murder") *State v  Ellison*, 213 Ariz. 116, 144 ¶ 136  140 P 3d 899  927 (2006) (reasoning that  childhood troubles deserve[d] little value as a mitigator for the murders [defendant] committed at age thirty three ')

¶ 93 Here, Lynch was thirty-nine years old at the time of the murder  He failed to establish that his childhood affected his conduct. Lynch s dysfunctional family background deserves little value as a mitigator

#### f  Brother's death

¶ 94 Lynch also asserts that the drug-overdose death of his brother, Donald, is a mitigating factor  Donald died after the murder  so his death deserves little value as mitigation. *See Newell*  212 Ariz. at 405 ¶ 82, 132 P 3d at 849 (reasoning that  even though we do not require a nexus between the

mitigation and the crime before we consider mitigation evidence, the absence of such a causal connection may be considered in assessing the quality and strength of the mitigation evidence ')

#### g  Lack of future dangerousness and other sentences

[73]    [74]    ¶ 95 Lynch also presented evidence that he would not be a danger to prison staff, inmates  or the general public if he received a life sentence. He also offered as mitigation his twenty-one-year sentence for the non-capital crimes that would run consecutively to the sentence he received for the first-degree murder  We  accord minimal weight to the prospect that [a defendant] will be a  model prisoner because "[a]ll prisoners are expected to behave in prison. *Lehr*  227 Ariz. at 155 ¶ 78  254 P 3d at 394 The fact that a defendant "would remain imprisoned for his natural life if he is not sentenced to death" is also entitled to little value  *Id   see also Garcia*, 224 Ariz. at 22 ¶ 108  226 P 3d at 391 (affording minimal *144 value to defendant's argument that he posed no risk of future dangerousness because he would never be released from prison) We give Lynch s low risk of misbehavior in prison and consecutive non-capital sentences little value as mitigation.

### 3  Propriety of death sentence

¶ 96  In  light  of  the  (F)(5)  and  (F)(6)  aggravating circumstances  which reflected an especially cruel murder committed for pecuniary gain, we conclude that Lynch has  not  identified  mitigating  circumstances  sufficiently substantial to call for leniency

### III  CONCLUSION

¶ 97  For  the  reasons  stated,  we  affirm  Lynch's  death sentence [3]

### All Citations

238 Ariz. 84  357 P 3d 119, 721 Ariz. Adv Rep 4, 723 Ariz. Adv Rep 4

Footnotes

**State v Lynch, 238 Ariz. 84 (201**

357 P 3d 119  721 Ariz. Adv  Rep  4  723 Ariz. Adv  Rep  4

1 Lynch offered into evidence an article about the Child–Pugh standard that had "Wikipedia  printed at the bottom of the page

2 The jury was unanimous only in finding that Lynch was a major participant in the felony and had acted with reckless indifference for human life

3 Lynch raises twenty-six additional constitutional claims that he acknowledges this Court has previously rejected but that he wishes to preserve for federal review  We decline to revisit these claims

---

**End of Document**      © 2016 Thomson Reuters  No claim to original U S  Government Works

Exhibit 8

$\mathcal{D}P$

06- 0813
Cattani

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

STATE OF ARIZONA,            )
                             )
          Plaintiff,         )
                             )     CR-12-0359-AP
     vs                      )     CR2001-092032(A)
                             )
SHAWN P  LYNCH,              )
                             )
          Defendant          )
                             )

BEFORE THE HONORABLE KAREN L  O'CONNOR

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Phoenix, Arizona
July 17, 2012

(Copy)

By   Lori Fraley
     Certified Reporter
     AZ CR No  50331

```
 1   APPEARANCES
          For the Plaintiff         MR  JUAN MARTINEZ
 2                                  Attorney at Law

 3        For the Defendant         MR  LAWRENCE BLIEDEN
                                    Attorney at Law
 4
                                    MR  JOEL BROWN
 5                                  Attorney at Law

 6

 7          BEFORE THE HONORABLE KAREN L  O'CONNOR

 8                          * * * * *

 9

10                                  Phoenix, Arizona

11                                  July 17, 2012

12

13          THE COURT   We're on the record in State v

14   Lynch, outside the presence of our jury panel

15          Mr  Brown, you may proceed

16          MR  BROWN   Part of it, Mr  Martinez said

17   he requested that the first paragraph, I think it's

18   on page ten, be deleted   We said we opposed that

19   We've had more time to think about it, we agree with

20   that, that's fine

21          THE COURT   Well, I kept it in and we've

22   already had it copied and so based upon your

23   statements in the e-mail, if you want -- I changed

24   the wording as you suggested

25          MR  BROWN   Well, it's not exactly -- it's
```

```
 1   still alive   So we know that at that point the

 2   defendant armed himself with a knife   They say,

 3   well, the knife has never been found   He's just as

 4   dead from his throat being cut even though the knife

 5   has never been found   There should be no doubt about

 6   that

 7           So what happens is the defendant then, as

 8   Mr  Panzarella sits there, goes behind him and begins

 9   and cuts his throat from ear to ear   The problem or

10   the unfortunate aspect of that, because in and of

11   itself, cutting somebody's throat is a horrific,

12   ghastly thing, you can only imagine, I don't think

13   you can even imagine what it's like for somebody to

14   approach you with a knife   You cannot move and you

15   know they're manhandling you and they are going to

16   cut your throat

17           MR  BLIEDEN   Objection, placing the jury

18   in a position that --

19           THE COURT   Sustained

20           MR  BLIEDEN   And I move to strike that

21   last portion of Mr  Martinez --

22           THE COURT   Sustained

23           MR  MARTINEZ   It was ghastly, absolutely

24   horrific that this individual would come at him with

25   a knife sitting there, helpless, unable to do
```

1    anything   This individual comes at him and it's a

2    horrific, terrible, mental anguish   And a previous

3    jury has already found that and so he's coming at him

4    and what he does then is he cuts his throat

5            The unfortunate thing about what he did

6    wasn't a quick death because this individual here,

7    what he did, is when he cut the throat, he didn't cut

8    all the way back to the spine and so what happens for

9    the next two, may be three minutes -- but it's around

10   two minutes according to go the medical examiner,

11   James Stanley Panzarella is sitting there thinking,

12   alive, gurgling blood   And this, according to

13   Exhibit number 88, is what was done to him

14           You can see that   That's his windpipe

15   right there   That's the cut that this individual

16   inflicted   But he didn't die immediately   So there

17   was extreme emotional distress   Was he crying?  Was

18   he thinking about his mother?  Or was he thinking

19   about the puppy that was licking his blood because he

20   had it all over his face?  What was he thinking about

21   for two minutes as he laid there exsanguinating,

22   bleeding to death?  That's the mental -- absolute

23   mental harshness about this particular case

24           That's what is so horrific, because of

25   that, for the two minutes that he's sitting there --

1   over the fire   They've already talked to you about

2   that   Is there a single solitary medical record that

3   backs that up?  No, not a single one   You would have

4   thought that a teacher would have done something --

5               MR  BLIEDEN   Objection, argument

6               THE COURT   Overruled   You may continue

7               MR  MARTINEZ   No teacher called   No

8   police report   No hospital report with regard to

9   that   This horrific, according to them, problem with

10  his hand healed very quickly   According to them it

11  only took two weeks to heal this horrific burn, but

12  there is nothing to back that up

13          This issue about the children perhaps being

14  beaten   No indication from a child protective

15  service that they were ever called to this location

16  at all   There is nothing to back any of these claims

17  up about this particular aspect about the defendant's

18  life   All you're going to get is people saying it,

19  but like with Paul Revere, the myth becomes the

20  truth

21          But there is nothing to back it up   The

22  other thing with regard to that is, this individual

23  was approximately just short of 40 years when he cut

24  James Panzarella's throat   Why do we need to look at

25  something 30 years ago -- it happened 30 years ago,

```
1    to say that is something that you should consider as
2    mitigating?
3              30 years --
4              MR   BLIEDEN   Objection, argumentative
5              THE COURT   Sustained
6              MR   MARTINEZ   It's been 30 years   They
7    have indicated to you that that is a mitigating
8    circumstance   It is of such quality and value that
9    is for you to consider how much time   And he asked
10   you to take a look at this   It has been 30 years
11   And during that time after the 30 years, well, they
12   say there's this baby-sitter who took care of them
13   and they claimed that there were these beatings
14   Actually, according to James, the brother, she was
15   the one who was inflicting the beatings   This
16   baby-sitter they have lionized with caring for them
17   that's one of the things their expert will tell you
18   James said she was the one who used to beat us
19              In terms of fostering, in terms of getting
20   this defendant what he needed when he was young,
21   according to her she used to play games with him, she
22   used to really care for him, she used to do
23   everything for him, used to take care of him   Of
24   course, the way she described it, she wrapped him up
25   in that golden robe and carried him around   That's
```

1   substantial circumstance that would call for a life

2   sentence unrelated to his life

3           Well, they also talked, really in terms of

4   their presentation to you, they talk about medical

5   condition, a medical condition he acquired because he

6   was violating the rules   They talk about another

7   individual, Michael Sehwani, where they claim he was

8   the main actor   They don't know who the main actor

9   was, whereas the DNA evidence and the testimony of

10  the other individual indicates this is the main

11  actor   Then they want to pull at your heart strings

12  by talking to you about --

13          MR  BLIEDEN   Objection, argumentative

14          THE COURT   Sustained

15          MR  BLIEDEN   Move to strike that last

16  remark

17          THE COURT   It will be stricken

18          MR  MARTINEZ   They told you all about his

19  childhood, didn't they, in opening statement?  They

20  told you all about how it was Mr  Sehwani, right?

21  They told you about how Mr  Lynch was raised in an

22  unstable family, he suffered physical and emotional

23  abuse from his father, 30 years ago, playing with

24  matches he was told not to do that anymore and you

25  were told about all of that

# Exhibit 9

*DP*

*06 0813*
*Caffey* 1

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| STATE OF ARIZONA, | ) |
| | ) |
| Plaintiff, | ) |
| | )     CR-12-0359-AP |
| vs | )     CR2001-092032(A) |
| | ) |
| SHAWN P LYNCH, | ) |
| | ) |
| Defendant | ) |

BEFORE THE HONORABLE KAREN L  O'CONNOR

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Phoenix, Arizona
July 18, 2012

(Copy)

By   Lori Fraley
     Certified Reporter
     AZ CR No  50331

```
 1                       I_N_D_E_X

 2

 3    WITNESS                          D     C     RD    RC

 4

 5            FOR THE DEFENDANT

 6    Kloese, Kim                      4     28    48

 7    Lynch, James                     55    81    97

 8    Brams, Jolie                     101   175

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

```
1    APPEARANCES
          For the Plaintiff        MR  JUAN MARTINEZ
2                                  Attorney at Law

3         For the Defendant        MR  LAWRENCE BLIEDEN
                                   Attorney at Law
4
                                   MR  JOEL BROWN
5                                  Attorney at Law

6

7         BEFORE THE HONORABLE KAREN L  O'CONNOR

8                          *****

9

10                                 Phoenix, Arizona

11                                 July 18, 2012

12

13           THE COURT   We are back on the record

14   outside the presence of the jury   Is there anything

15   for the record before we bring the jury in?

16           MR  MARTINEZ   No, thank you

17           MR  BROWN   No

18           THE COURT   Are you going to be proceeding

19   with the victim impact or are you done?

20           MR  MARTINEZ   No, we're done with that

21           THE COURT   All right

22           (Whereupon, the jury panel was present in

23   the courtroom )

24           THE COURT   Good morning, ladies and

25   gentlemen   Please be seated   The record will
```

1    adult, at that period before the offense he was

2    decompensating, he was using drugs, he did not have

3    the skills, the support, the guidance, the ability to

4    live a life that was functional and healthy and

5    productive and that is the point that he ended up at

6    the time prior to the offense

7              MR  BROWN   I don't have any other

8    questions

9              THE COURT   Okay   Mr  Martinez

10

11                 CROSS-EXAMINATION

12   BY MR  MARTINEZ

13       Q    Ma'am, one of the things that you indicated

14   was that you're a psychologist, correct?

15       A    That's correct

16       Q    And your main offices, if you will, are in

17   Ohio, correct?

18       A    That's correct

19       Q    In fact, they are in Columbus, Ohio, right?

20       A    That's correct

21       Q    Your CV, which is the curriculum vitae,

22   also indicates that you are licensed in Texas, right?

23       A    That's correct

24       Q    And finally, you're also licensed in

25   Oklahoma, right?

```
1        A     In that situation, yes
2        Q     So are you saying that because this
3   occurred in Ohio, that somehow you're an expert in
4   Ohio but not in Arizona --
5        A     I don't think --
6        Q     -- on recollected memories?
7        A     I've never even applied such an odd
8   conclusion, no
9        Q     Right   It's odd to say that   You are an
10  expert there and you're an expert here on recollected
11  memories, right?
12       A     I have been -- I have been given leeway in
13  the courts to testify in many different situations
14  about recollected memories but I'm not a researcher
15  or an actual expert in that area
16       Q     No one is asking you if you were a
17  researcher, did we?
18       A     No, you did not
19       Q     With regard to that, being an expert on
20  recollected memories, isn't that really just vouching
21  for what somebody is saying?
22             In this case, isn't -- aren't you really
23  vouching for what that client was saying, I was a
24  juvenile   Isn't that what you're just really doing?
25  Because you're saying this person -- the other person
```

1  is not to be believed?

2      A    No   In the Gomez Gomez case, I was not

3  vouching for anyone   I was stating -- and this court

4  does not know the history of this, it's a drug issue

5  --

6      Q    We already read it, right?  You read it to

7  us, right?  You know what you said, right?

8      A    You don't know the context in which the --

9  of the matter   I read to you, honestly, what the

10  paragraph was and I don't disagree with it

11      Q    Now, with regard to this particular case,

12  today as a matter of fact, we had an individual who

13  testified about how the Lynches were treated and I'm

14  talking about James Lynch and I'm talking about Shawn

15  Lynch and this person was asked, well, how long ago

16  was that?  Well, they must have been about four years

17  old   And how old is the defendant today?

18      A    I think he's 53   Maybe --

19      Q    If he's 53 now, when he was four years old

20  that would make it 49 years ago, would you agree?

21      A    Of course

22      Q    And what this individual indicated was,

23  well, when Riley the father, well, when he went --

24  when there was a problem, and these kids were

25  fighting, all he did was take them away   That's what

1   he said

2              And he was asked by the defense attorney,

3   is there anything that makes that stand out in your

4   mind?  Anything that makes that something that stands

5   out in your mind now 49 years year later?  He didn't

6   use the word 49 but he said that makes it stand out,

7   he said, no, it's just something that I remember

8              If that were the hypothetical you would say

9   he's not to be believed, right because you can vouch

10  for people?

11       A    I would not --

12            MR  BROWN   Objection   She's --

13            THE COURT   Sustained   Sustained

14       Q    BY MR  MARTINEZ   Well, in that case given

15  what you know, would you say that person was telling

16  the truth or not based on the hypothetical that I

17  posed to you involving the 49 years and no event that

18  sticks out in their mind?

19            MR  BROWN   Same objection

20            THE COURT   Overruled, you may answer if

21  you can

22            THE WITNESS   My role, Your Honor, and the

23  court --

24            MR  MARTINEZ   No, I'm asking you a

25  different question   You can answer that on redirect,

Exhibit 10

DP    06 08.13
Cohuni 1 

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA


STATE OF ARIZONA,          )
                           )
          Plaintiff,       )
                           )    CR-12-0359-AP
     vs                    )    CR2001-092032(A)
                           )
SHAWN P  LYNCH,            )
                           )
          Defendant        )
_____)


BEFORE THE HONORABLE KAREN L  O'CONNOR


REPORTER'S TRANSCRIPT OF PROCEEDINGS


Phoenix, Arizona
July 23, 2012


(Copy)


By   Lori Fraley
     Certified Reporter
     AZ CR No  50331

```
1                        I_N_D_E_X

2

3    WITNESS                          D      C      RD     RC

4

5           FOR THE DEFENDANT

6    Aiken, James                     12     26     49

7    Altschuler, Gerald               55     122    161

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1   and greatly reduced because of the health conditions

2   as I understand it   I'm not a doctor but from what I

3   can understand

4           MR   BLIEDEN   Just one moment   I have no

5   other questions

6           THE COURT   All right   Thank you

7           Mr   Martinez

8

9                   CROSS-EXAMINATION

10  BY MR   MARTINEZ

11      Q    So what date was he first incarcerated,

12  sir, for this crime?

13      A    Well, it was back in 2001 if I'm not

14  mistaken, sir

15      Q    What date?

16      A    I don't have the exact date

17      Q    Wasn't that your job to review all of the

18  files?

19      A    Yes, sir, but it wasn't my job to remember

20  everything about it

21      Q    But wouldn't you think that the date that a

22  person went into custody would be important?  Since

23  that's what you're talking about?

24      A    Not the date itself, sir   Like 2001 is

25  good enough for me because in a prison setting,

1  individual, a couple of individuals, convicted of

2  murder, escaped?

3      A    I do have some information on that, sir, I

4  am not -- I have evaluated a number of critical

5  events throughout the United States but I was not

6  asked to evaluate that one so I'm not up to snuff

7  with it

8      Q    Do you know what their classification was?

9      A    Not right offhand, sir

10     Q    So it does happen that individuals

11 convicted of murder can escape, right?

12     A    Sir, anybody in a prison has -- can escape

13 and anyone that thinks that it cannot escape, that's

14 when their prisons become dangerous

15     Q    Anyone can escape including the defendant,

16 correct?

17     A    The probability of that is near zero as

18 possible but I never say never and whenever you go to

19 a prison that says it's escape proof, I'm not going

20 anywhere near it because you're into a false sense of

21 reality

22     Q    And there is also a possibility that this

23 defendant here, if he were -- could stick or prick,

24 with a sharp object, one of the corrections officers,

25 right?

```
1        A      The probability of that is very miniscule

2    but obviously, that is the reason why we have

3    training and other systems available to ensure that

4    the probability of that is at the lowest common

5    denominator, sir

6        Q      You say that the probability is very

7    miniscule, do you think that that would be comfort to

8    the person who got stuck by a needle that Shawn Lynch

9    had used, do you think that would be comfort to them?

10              MR  BLIEDEN    Objection -- withdrawn

11              THE WITNESS    Please repeat the question,

12   sir

13              MR  MARTINEZ   Do you mind reading it back?

14              (Whereupon the requested testimony was read

15   back by the court reporter )

16              MR  BLIEDEN    Objection, relevance

17              THE COURT   Overruled   You may answer

18              THE WITNESS    Thank you   Certainly, if a

19   person that has contracted a communicable disease

20   obviously, they have fear, anger or a sense of

21   despair and I have talked to people that have had

22   that, not officers but certainly an individual would

23   have that and you feel very bad about situations like

24   that   But the point is is that we're not living in a

25   perfect world
```

Exhibit 11

3BX

DP

06-0813
Cattani

1              IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

2                 IN AND FOR THE COUNTY OF MARICOPA

3

4    STATE OF ARIZONA,                    )
                                          )
5                    Plaintiff,           )
                                          )
6         vs                              )    CR-12-0359-AP
                                          )    CR 2001-092032A
7    SHAWN PATRICK LYNCH,                 )
                                          )
8                    Defendant            )
9    _____ )

10

11                        Phoenix, Arizona
                          August 9, 2012
12

13

                    BEFORE   THE HONORABLE KAREN O'CONNOR
14                           Superior Court Judge

15

16

17

                    REPORTER'S TRANSCRIPT OF PROCEEDINGS
18
                                  TRIAL
19

20

21

22   PREPARED FOR APPEAL

23                                   HELENE PAUSTIAN, RPR
                                     Certified Court Reporter
24                                   No  50072

                     COPY
25

```
 1                  A P P E A R A N C E S

 2
     FOR THE STATE
 3
             JUAN MARTINEZ
 4           Deputy County Attorney

 5   FOR THE DEFENDANT

 6           JOEL BROWN
             LAWRENCE BLIEDEN
 7           Deputy Public Defenders

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1   unimaginable   And that's justice   Because for what he did,

2   Shawn Lynch forfeited his right to ever live out in society

3   again   But given the uncertainty of who actually did the

4   killing, and given the likelihood it was Michael Sehwani and

5   given the other unanswered questions, and given the

6   possibility of unequitable sentences being given, and all

7   the other mitigation that's been presented to you, I would

8   submit to you that the appropriate sentence would be to

9   spare Shawn's life and vote for life   Thank you

10         THE COURT   Thank you, Mr Brown

11               Let's go ahead and take our lunch recess

12   Please remember the admonition   Don't talk about the case

13   with anyone   Don't let anyone talk to you about the case

14   We will see you back in the jury room at 1 30

15               (The jury exits the courtroom )

16         THE COURT   We are outside the presence of the jury

17               Is there anything for the record?

18         MR  MARTINEZ   No   Thank you

19         MR  BROWN   No

20         THE COURT   Okay   We are at recess

21               (The Court stood at recess )

22         THE COURT   Thank you   Please be seated   The

23   record will reflect the presence of our jury, counsel and

24   Mr  Lynch

25               Mr  Martinez

1          MR  MARTINEZ   Good afternoon   The defendant's
2    presentation through the evidentiary portion as well as the
3    closing argument has been to take a myth, which is an
4    unfounded belief, to take a myth and present it to you as
5    fact without regard to the sunlight of the truth   What he
6    has done is he has invited you into this mythical world, if
7    you will, fanciful, darker world, in which he has presented
8    certain items to you, certain evidence to you, perhaps
9    something about his past, perhaps something about his
10   future

11               And he has asked you to take a look at all of
12   that   And he said to you, take a look at this, but do not
13   bring it out into the sunlight   Do not put it out so that
14   others can examine it   Just take a look at in here   And we
15   will give these items a different name, these facts that we
16   are presenting to you   And we will call those mitigating
17   factors or mitigating circumstances

18               Additionally, one of the things we will do
19   with you is we will talk about things that happened thirty,
20   forty years ago   They cannot be verified, but we will talk
21   to you about those things in his past   We will talk to you
22   about what happened in 2001  during the time when this
23   individual took a knife and slashed a helpless individual's
24   throat

25               Then we will talk about his future, hoping

1                    And it is an unlawful act that they're

2    telling you that he committed   I broke the law, so it's a

3    good thing   How is that a mitigating circumstance?  And you

4    need to analyze these things that are presented to you so

5    that you say how could that possibly be a mitigating

6    circumstance?  Well, it can be a mitigating circumstance

7    because I don't remember what I did   If you don't remember

8    what you did, that's a good thing   No, that's a bad thing

9    And certainly those are not mitigating circumstances   And

10   that's their, if you will, their rendition of what happened

11   on that Sunday   They don't mention -- or they do sort of in

12   passing say, well, he did go to this hotel, and there were

13   ten adult videos that were rented, somehow implying that it

14   was somehow Mr  Sehwani that he was the person that was

15   involved with those video

16                    One of the things that you can consider is

17   character   One of the things that we do know is that both

18   of them were in there, both he and Mr  Sehwani    Perhaps

19   what he was doing there is he was covering his eyes with

20   both hands while those ten adult videos were being played

21   Perhaps that's what he was doing   That's is a mitigating

22   factor, right?  That was Mr  Sehwani   Everything is

23   Mr  Sehwani   No   That shows a debasement in the part of

24   this individual's character   And that has already been

25   found, because this murder has been found -- his murder has

```
 1   been found to be especially heinous and depraved
 2           MR  BLIEDEN   Objection   The debasement and the
 3   pornography has nothing to do with that aggravator, so
 4   that's misstating --
 5           THE COURT   Sustained
 6           MR  MARTINEZ   So then what else do they want you to
 7   consider?  They want you to consider the murder and they
 8   talked to you as if it was somehow mitigating   And there is
 9   nothing mitigating about it   Then they want to take you
10   back   They want to take you back to the 1960's, late
11   1960's, early 1970's, to his childhood   And, you know, they
12   don't want you to just go back by yourself in this
13   horrifically mythical world of theirs, this fantastical
14   place
15                   They have a guide for you that's going to
16   take you back   Her name is Jolie Brams   One of the things
17   that you know about Jolie Brams is that Jolie, well, you
18   know, she's a bit biased   One of the things that Jolie
19   Brams does is that she presents classes   She presents
20   classes that are exclusive, don't you see?  Classes only
21   that defense attorneys who are defending capital cases can
22   attend   Not any prosecutors   No   No   No   That's what
23   she does   And when she was questioned about being on the
24   faculty, she said, no, no, no   You know, I'm not really on
25   the faculty   And if I am, that's my secretary's mistake
```

# Exhibit 12

05-1359 1

COPY

1    IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

2    IN AND FOR THE COUNTY OF MARICOPA

3

4    STATE OF ARIZONA,            )
                                  )
5              Plaintiff,          )
                                  )
6    v                            )    No  1 CA-CR 05-1161
                                  )    MARICOPA COUNTY
7    CICERO POTTRIDGE BEEMON,     )    No  CR 2002-099001 (A)
                                  )
8              Defendant          )
     ─────────────────────────────)

9

10

11

12         REPORTER'S TRANSCRIPT OF PROCEEDINGS

13    BEFORE   The Honorable BRIAN K  ISHIKAWA

14

15

16

17                    Mesa, Arizona
                   September 7, 2005
18

19

20

21

22

23

24    ORIGINAL Prepared for APPEAL by
      TRACI L  WHEELER, CSR, RPR
25    Certified Reporter No  50313


           TRACI L  WHEELER, CERTIFIED COURT REPORTER, CSR, RPR


                            ───

2

```
 1                        A P P E A R A N C E S

 2     FOR THE STATE         JUAN MARTINEZ,
                             Deputy County Attorney
 3
       FOR THE DEFENDANT     ROBERT STEIN,
 4                           Deputy Public Defender
                                   and
 5                           JOEL BROWN,
                             Deputy Public Defender
 6

 7     THE DEFENDANT         CICERO POTTRIDGE BEEMON

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

TRACI L  WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    are two different people   Think the prosecutor knows that?
2    He says to you the defendant is trying to sneak out of that
3    conviction and he's trying to tell you, well, you know, the
4    skin, it got pulled, it isn't right   Now, when it was to
5    his advantage, he says he's guilty
6              Now, first of all, we not only live in Arizona
7    over there, we live in that place over there   And in that
8    place, you have a right to have a lawyer   And in that
9    place, on a murder case you have a right to a defense
10   Every time that I stand up to argue something, this man
11   comes back and he says to you "sneaking"   That's what
12   they're doing   Sneaking, lying, cheating
13             Now, do you think that I am going to argue to
14   you that you should not find this 1997 case, the drug sale,
15   as an aggravator? Well, you listen carefully   You see if I
16   argue that to you.  But when a fingerprint expert of any
17   kind gets on the stand, the lawyer argues, well  how many
18   times have you been an expert? Four times? Ever do a
19   murder case before?
20             Now, let's look at the significance of that,
21   not in terms of whether this is an aggravator, but in terms
22   of something else   The 1984 robbery   Do you remember that
23   on this piece where the witness testified from, how Mr
24   Martinez got up on redirect examination and went back over
25   the same facts to argue to you they had proven beyond a

1          He doesn't have the proof   He did get up and

2    he did say he's got the proof to you, day and night   He

3    doesn't have the proof   Is it a pretty case?  No   Am I

4    arguing he's great guy?  I'm not arguing he's a great guy

5    We go back to the fact he left her there   We go back to the

6    fact he took her money   This is different   This, as they

7    say, is a horse or four horse of a different color

8          You've been honorable to your task   You've

9    been fair   I ask you to continue to be just   Thank you

10         THE COURT   Mr Martinez?

11         MR  MARTINEZ   One of the things that is interesting

12   about history is that if it teaches us anything, it repeats

13   itself over and over again   One of the things defense

14   counsel got up and told you was, well, the prosecutor has

15   said that we've been sneaking, lying and cheating, and he

16   called him a dog and called him a beast   And he said that

17   at the top of his lungs

18         As I said, if history teaches us anything,

19   it's that it comes around again and again   Remember Hitler?

20   The big lie he told you?  It was at the top of his lungs

21   over and over, you are the superior people and people are

22   going to believe it because they heard it over and over

23   again, and that's what he said over and over again was about

24   the state calling him sneaking, calling him lying, calling

25   him cheating, calling him a beast, calling him a dog   Did

TRACI L  WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1   that ever happen by the State?  Of course it didn't happen,

2   but you know what?  He wants you to believe that it did

3   You know, just like Hitler, that big lie   If you put it out

4   there, even though the prosecutor didn't say it, maybe

5   you'll believe it   And maybe when you go back there to

6   decide this case, you won't decide it on the facts   But if

7   he tells you that over and over again, you're certainly

8   going to start to believe it, aren't you?

9          And you know, if we're going to choose nice

10   words, and these are his words, these are not the

11   prosecutor's word, maybe I'll give him this, maybe there's a

12   little bit, a kernel of truth to it   Maybe he believes that

13   he's sneaking   Maybe that's why he uses that word   Maybe

14   that's what he believes   Maybe that's why he's using the

15   words   That's the adjective that he used   He's the one

16   that used it   He's the one that brought it forth for you

17   Maybe that's what he believes of his client

18          He says there's two people   We could go back

19   to his own little chart, there's two people here. Stein and

20   Beemon   Well, maybe that's what he believes   Maybe he

21   believes he is sneaking   Nobody else in this courtroom has

22   said it other than him   It's coming from his very fertile

23   imagination   That's where it comes from

24          And you know what?  The stench of it, the

25   stink of it, he wants to put it over on the prosecutor

1    That's what he wants to do   The prosecutor never said

2    anything like that

3            "Lying " He said that over and over again   I

4    said you know what?  The prosecutor said we're lying   Given

5    what you saw on direct and cross-examination of the

6    defendant, maybe that's what he thinks of his client   Using

7    you   He wrote that up here in big letters   Maybe that's 

8    what he thinks he did with you   Obviously he's the one

9    that's all happy, smiling and laughing when he misspells a

10   word like somehow that he's some high school childish

11   first-day kind of thing   He's all giggly about it   It

12   isn't the prosecutor doing that, but he's the one that's

13   making it a personal thing   And he begins to talk to you

14   more about the prosecutor more than the facts   Why does he

15   do that?  He doesn't want you to focus on the facts, and if

16   the stench isn't strong enough for him, he wants to waft it

17   over to that table, keeps walking over there   Maybe he

18   hopes the stench rubs off   Maybe he wants you to believe

19   that

20           He also talked about cheating   Nobody else

21   brought it up other than him   Perhaps maybe that's what he

22   thinks is happening here   We don't know, but he brought up

23   that word and he brought it up and said it over and over

24   again to you   Again, that's his perception   No one ever

25   said that word   No one ever used that word with regard to

TRACI L  WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

46

```
1    Mr  Beemon, if that's what wants me to do   But he is the
2    defendant   He is a convicted defendant   He can't get away
3    from that, even though somehow that's good for him   But,
4    you know, "cheating "  That's the word he used   Again, he
5    wants to associate or put over his thoughts over onto the
6    prosecutor   Always   It's the prosecutor because you can't
7    talk about the facts and the evidence in this case because
8    then, of course, it wouldn't be to his benefit   So it's
9    always this personal attack   Let's just make it up   Let's
10   make it up as we go along   Let's make up the lie because,
11   as you know, people will believe lies if you raise your
12   voice loud enough   And if you keep saying it over and over
13   again, some people will begin to believe you and say, well,
14   maybe that's true or else he would not have pranced around
15   here and he wouldn't have run around here like he did at the
16   top of his lungs getting behind the prosecutor, pointing
17   over there, and then saying  what he said
18            Why didn't he talk about the evidence?  Why
19   didn't he talk about the evidence?  Well, one of the things
20   that he said, well, Dr  Keen said that it was 15 minutes
21   before, possibly 15 minutes before, that this tear to the
22   anus happened   Actually, if you remember, and the response
23   to one of your questions, he was asked about how long in
24   your opinion is briefly or how long in your opinion do you
25   think this could have happened, reasonable degree of medical
```

```
 1    certainty, one, two, or three minutes?  No more than one
 2    But of course he puts "no" and he puts 15 minutes up here,
 3    because if you put it big enough on billboards just like
 4    they did in Germany, you have all these great rules, if you
 5    do this that way, people will begin to believe it and they
 6    won't he cans on what is truth and the reality
 7                     And he also says nothing has changed about Mr
 8    Martinez   Over and over again   What does this have to do
 9    with Mr  Martinez?  Is Mr  Martinez on trial here?  Or is it
10    the defendant that's on trial in this case?  There's no
11    doubt about it that it's the defendant that's on trial in
12    this case   But, you know, let's focus on the prosecutor
13                     I don't have anything else to argue   I could
14    only come forward and use words like 'lying" and "cheating"
15    and "sneaking" probably because he knows his defendant
16    better than we do, but that's why he uses the words   Well,
17    I'll use those words but I'll -- you know what?  I'll also
18    include the prosecutor in this   Let's ignore about what
19    came from the witness stand   Let's keep talking about the
20    prosecutor   Because when you come back there, you're going
21    to talk about the personality of the lawyers and you'll say,
22    well, maybe he's right   But is that about the facts?  Is
23    that what this is about?  You took an oath to follow the
24    instructions, and that's all I'm asking you to do
25                     The other thing he did is that it would be
```

TRACI L  WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    simple to mimic somebody up here   It's simple that he got

2    involved and started mimicking the prosecutor, but the point

3    he obviously misses here is the only person on trial here

4    with regard to these aggravating factors is the defendant

5    himself   It's not the prosecutor   But, again, he wants you

6    to get wrapped up and he wants you to believe that's what

7    it's about, so let's mimic him   Let's say things he didn't

8    say   He didn't call the defendant a "beast "  Perhaps

9    that's what he thinks   Perhaps that's what he, the

10    defendant, thinks   That's why he used the word   But you

11    know what?  If we say the State said it, that will make it

12    true for you when you go back there   Again, it's nothing

13    more than, if you will, this creating this big lie, this

14    whole thing up   This is about the prosecutor and not about

15    the facts, not about the things that came from the witness

16    stand

17            Well, then he does this and he says, well, you

18    know, don't hold it against me   I mean, don't hold it

19    against Mr  Beemon   I'm the one that's advancing these

20    arguments, that it's actually me   Well, the way it works

21    here is what the defendant -- defendant's attorney advances

22    is always on behalf of this other person here   So, of

23    course, you're going to have to look at what he says

24    That's the only thing you have to do

25            He talks about America and wraps himself

1    around the flag   Doesn't wrap himself around the German

2    flag when he calls somebody a cheater, a liar, and sneaking

3    when in fact they never even used those words   And,

4    additionally, with regard to that, you don't mention the

5    full truth because that's also not to your benefit   So what

6    you say is you must give the defendant the benefit of the

7    doubt, and then he says that, but he doesn't go on and talk

8    about what the jury instruction actually is going to say

9    What it actually tells us, and it's the same one at this

10   juncture as was before   It tells you that "proof beyond a

11   reasonable doubt is proof that leaves you firmly convinced

12   of the aggravating factors   There are very few things" --

13   or guilt, depending on which phase   "There are very few

14   things in this world that we know with absolute certainty,

15   and in criminal cases, the law does not require proof that

16   overcomes every doubt   If based on your consideration of

17   the evidence you are firmly convinced that an aggravating

18   factor has been proved, you must so find "   That's what it

19   tells you   It doesn't start out by saying to you when you

20   go back to deliberate, you must give the defendant the

21   benefit of the doubt before you start deliberating   It

22   doesn't tell you that by its own terms   It doesn't tell you

23   that   But if you scream it loud enough, if you say it over

24   and over, somebody will believe it   And if you say it and

25   scream it loud enough, somebody, even perhaps him, he'll

TRACI L  WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1   start to believe it   And when you go back there, it will
2   confuse you
3               But the jury instructions are there and
4   instead you make the argument you go forth and make that
5   argument and hopefully somebody -- somebody will get back
6   there and say, well, that's not what the jury instruction
7   says   But by it's own terms that is's exactly what it says,
8   one of the things he talks about, well, you're not going to
9   deny the 1997 prior   Well, if you deny the 1984 prior, your
10  are denying the 1997 prior   And that's easy to stand up in
11  closing arguments and say, "We never denied this incident "
12  We just heard from him earlier in his opening statement not
13  admitting, this isn't what they've told us   Well, you know,
14  all of a sudden since they're interrelated, if you deny one
15  you deny the other
16               And this thing about not having fingerprints,
17  there is no where in this jury instruction that says that in
18  order for the State to prove anything you have to have
19  fingerprints   We can have fingerprints or we you bring in
20  certified documents from the court -- these are kept by the
21  court   Back in '84, obviously they didn't have
22  fingerprints, but in '97 they did   So in '97, you have this
23  defendant, Cicero Pottridge Beemon, birthday 2/26 of 1996 --
24        MR  STEIN   Excuse me   I'm going to object   May we
25  approach for a moment


TRACI L  WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

```
 1
 2                    (The following proceedings were held at the
 3         bench )
 4
 5              MR  STEIN   I specifically want to object about a
 6         statement of vouching, back in 1984 they didn't have
 7         fingerprints   There's -- first of all, they had
 8         fingerprints in 1984   And second of all, if they didn't
 9         have it in this court, there's nothing to indicate that on
10         the record   There's no testimony
11              THE COURT   Mr  Martinez?
12              MR  MARTINEZ   I can argue reasonable inference
13         They don't have them here   That's a reasonable inference
14              THE COURT   But you didn't say it that way
15                    So what is your argument, Mr  Stein?
16              MR  STEIN   Well, my argument is that he --
17              THE COURT   What are you requesting?
18              MR  STEIN   My motion is for a mistrial   If that is
19         denied, my motion is that this Court instruct the jury to
20         disregard what the prosecutor just said
21              THE COURT   Anything further from Mr  Martinez?
22              MR  MARTINEZ   There aren't any fingerprints here,
23         there were in the other one   I'm entitled to argue
24         reasonable inferences
25              THE COURT   No, but the way you said it, you made it
```

1    sound they didn't do fingerprints in 1984    That what's you

2    implied

3                    I'm going to deny the motion for mistrial, but

4    I'll going to instruct the jury to disregard that last

5    statement

6

7                    (The following proceedings were held in open

8    court )

9

10           THE COURT    Okay    I'm going to instruct the jury to

11   disregard that last statement with regard to 1984 and

12   fingerprints

13           MR  MARTINEZ    There are no fingerprints in the 1984

14   robbery conviction    There are fingerprints with regard to

15   the 1997 sale of cocaine    They are there    They're there

16   for you to examine    If you then compare the two, there is

17   an indication in Exhibit 105 and it reads as follows, and we

18   don't need to belabor the point, but it says it in two

19   places, not just one, but in two places that they are

20   referencing another case, case number OCR 9495 and that it

21   relates to the Cicero Pottridge Beemon, same individual

22   that's here

23                    And they're telling you, well, we want you to

24   speculate    We want you to say, well, there's another person

25   by that name    What evidence was presented of that?    They

TRACI L  WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

```
 1    talked to you about the evidence coming from the witness
 2    stand   What evidence was presented that there was another
 3    Cicero Pottridge Beemon out there?
 4            MR  STEIN    Objection    That was not my statement
 5    Can we approach?
 6            THE COURT    Overruled    The -- the jury can rely
 7    upon its collective memory
 8                Continue on
 9            MR  MARTINEZ    There was no evidence presented of
10    that, but yet they make that argument because it's just that
11    an argument   The point is that these documents are in
12    evidence and you are entitled to rely upon them   And those
13    documents indicate that there are two prior felony
14    convictions   That's why when they told you, you know, we're
15    not challenging the 1997 prior, they -- they are very much
16    challenging it because they don't want this 1984 prior to be
17    found as being true
18                One of the other things that they talked about
19    is the deceased is dead and that the defendant is continuing
20    to have anal relations with her   Let's talk about what
21    Dr  Keen said   Dr  Keen indicated, obviously, that he
22    wasn't there and he doesn't know, but to a reasonable degree
23    of medical certainty it was his opinion that the anal
24    tearing occurred one, two, or three minutes, that's how he
25    phrased it, before death   And you can't take that into a
```

54

1    vacuum

2              You then put it together with what you heard

3    from the young lady that was next door, Nadine Owens, who

4    told you the sounds that emanated sounded to her like

5    intercourse went on for 10 minutes   Could have been six,

6    could have been longer could have been fifteen, could have

7    been 20 minutes   According to her, they went on longer   We

8    take that with what Ruth Kohlmeier told us that the most

9    they could be up to 5 minutes that a person dies after they

10   go into unconsciousness, that's something that you can find

11   because that's what people told you on the stand   You don't

12   just take one individual and say oh, well, let's throw

13   everything out   You consider all the evidence   You don't

14   just consider one   They say oh, this came from the witness

15   stand and anybody could listen to what came from the witness

16   stand and put it together and listen to yourself   There is

17   an instruction that tells you you could do that, and that is

18   the following jury instruction -- the on -- it's about the

19   circumstantial evidence that you were instructed upon

20   previously with regard to the first section of the -- of

21   these proceedings   And you are entitled to consider that,

22   and circumstantial evidence is you can draw inferences from

23   a set of facts   And given the facts that I told you, you

24   can find that he continued to have anal relations, to use

25   his term, after she was dead   Certainly he continued to

TRACI L  WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

55

1    have anal relations with her after she was unconscious

2                    This 15 minutes   This is about -- referring

3    to Dr  Keen, remember? -- prior to death   He said, Well,

4    it's possible, but in my opinion, to a reasonable degree of

5    medical certainty it's one, two, or three minutes   You

6    could write this as big as you want, but that doesn't

7    substitute for what happened from the witness stand   He

8    wants to make an issue that isn't one   He talks about,

9    well, the prosecutor never said that the hits were after she

10   was dead   But you know what? I'm going to say that's what

11   he said, and then he pointed this arrow this way

12                   The prosecutor never argued that, but, of

13   course, if you want to continue on with your theme of

14   cheating, lying, being sneaky, you say things like that and

15   then you attribute them to somebody else   And then he came

16   over here and then he put it in big letters   He's using you

17   because, again, it goes with your theory of the case,

18   sneaking, lying and cheating   That's what they think and

19   they're ones that brought it before you   There was nothing

20   that was said by the prosecutor that even remotely sounded

21   like sneaking, lying, cheating, beast or dog   He called him

22   that over and over because he wants to generate some

23   backlash, if you will, when you go back to decide this case

24                   I don't want that   The State does not want

25   that from you   All the State wants you to do is take a look

TRACI L  WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    at the facts in this case   All the State is asking you to

2    do is to look at the exhibits   All the State is asking you

3    to do is consider the evidence that came from the witness

4    stand   Take a look at all of that   If you take a look at

5    all of that, even though somebody calls the prosecutor

6    sneaking, lying, cheating, all of that stuff, attributes

7    things like beast and dog and all these terms to him

8           Even though they may do that, that's an

9    effective argument   It has worked through history   We have

10   the example of Germany   It has worked through history   I'm

11   just asking to you do take a look at the facts involved and

12   the evidence that you found, and there are prior felony

13   convictions here   That's all I'm asking you to do   And it

14   was in fact cruel, it was heinous, and it was depraved   You

15   heard all the facts, and I'm asking to you apply to law to

16   them   Thank you

17          THE COURT   Ladies and gentlemen, we're going to go

18   ahead and take our afternoon break at this point in time

19   We'll take a 20 minute break   When you return from the

20   break, we'll give you the final jury instructions for Phase

21   2

22          During this break, remember the entire

23   admonition I've given you, including the fact you're not to

24   discuss this case with anyone, do not let anyone discuss the

25   case with you, keep an open mind   We'll be back in 20

TRACI L  WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

# Exhibit 13

# Exhibit 13

DIVISION 1
COURT OF APPEALS
STATE OF ARIZONA
FILED

**IN THE COURT OF APPEALS**
**STATE OF ARIZONA**
**DIVISION ONE**

FEB 2 1 2008

PHILIP G URRY, CLERK
By ____

| | |
|---|---|
| STATE OF ARIZONA | ) 1 CA-CR 05-1161 |
| | ) |
| Appellee, | ) DEPARTMENT A |
| | ) |
| v | ) MEMORANDUM DECISION |
| | ) (Not for Publication |
| CICERO POTTRIDGE BEEMON, | ) - Rule 111, Rules of |
| | ) the Arizona Supreme |
| Appellant | ) Court) |
| | ) |
| | ) |

Appeal from the Superior Court in Maricopa County

Cause No  CR2002-099001

The Honorable Brian K  Ishikawa, Judge

**AFFIRMED**

Terry Goddard, Attorney General                    Phoenix
     By     Randall M Howe, Chief Counsel,
            Criminal Appeals Section
     and  Carl McConeghy-Harris, Assistant Attorney General
Attorneys for Appellee

James J  Haas, Maricopa County Public Defender        Phoenix
     By    Karen M  Noble, Deputy Public Defender
Attorneys for Appellant

H A L L  Judge

¶1      The State charged defendant, Cicero Pottridge Beemon, with the 2002 premeditated murder[1] of eighteen-year-old Tanisha R.[2] by strangulation   Defendant did not contest the fact that his conduct resulted in Tanisha's death but aimed his defense at countering the premeditation allegation by testifying that he was high on cocaine and Cisco at the time of the killing

¶2      On September 8, 2005, after a sixteen-day trial, a jury found defendant guilty of second-degree murder, a class one dangerous felony, for causing the intentional death of Tanisha  At the conclusion of a three-day trial on aggravating factors, the same jury found (1) that defendant had two prior California felony convictions in 1997 and 1984, and (2) that he committed the murder in an especially heinous and especially cruel manner[3]

¶3      On October 21, 2005, the trial court sentenced defendant to an aggravated sentence of 22 years in prison  and defendant timely appealed only from his sentence   He claims that the trial court erred in imposing an aggravated sentence

[1]      Initially  the State also charged defendant with manslaughter for the death of Tanisha's unborn child   The State dismissed the charge prior to trial

[2]      We use only the first initial of the victim's last name to protect her privacy as a victim and that of her family members

[3]      The jury was unable to reach a unanimous decision regarding whether defendant had also committed the murder in an especially depraved manner

because (1) it "double counted" the fact that he caused a serious physical injury to the victim, (2) it improperly found that defendant had caused emotional harm to the victim s family, (3) it improperly instructed the jury on the definition of "especially cruel, heinous and depraved", and (4) it improperly aggravated his sentence with a 1984 California robbery conviction without finding that the foreign conviction was the equivalent of a felony in Arizona   He also argues that the prosecutor's misconduct in his statements during the aggravation phase deprived him of a fair trial   For reasons set forth more fully below, we affirm

### DISCUSSION

### Double Counting of "Dangerousness"

¶4      As part of its verdict  the jury found that the second degree murder was a dangerous offense based on the "intentional or knowing infliction of serious physical injury '  Ariz   Rev   Stat   (A R S ) § 13-604(P) (Supp   2007)    Defendant maintains that the trial court committed reversible error because it used the jury's dangerous finding in imposing the aggravated sentence

¶5      We review a sentence within the prescribed statutory range for an abuse of the court's discretion   *State v Tschilar*, 200 Ariz   427, 435, ¶ 32, 27 P 3d 331, 339  (App

3

2001)    However, whether a particular aggravating factor is properly used by the trial court is a question of law that we review de novo    *Id*    We find no error

¶6        There is no evidence whatsoever in the record that supports defendant's contention    At sentencing and in its minute entry order, the trial court simply acknowledged the jury's finding that the offense was a "dangerousness" offense pursuant to A R S  § 13-604    It then considered the mitigating and   aggravating   factors   and   explicitly   found   that   the aggravating  factors  found  by  the  jury  –  two  prior  felony convictions  and  the  especially  cruel  and  especially  heinous nature of the offense – were supported by the record    The trial court then used the jury's aggravating factors – to which it added the additional aggravating factor of emotional harm to the victim's  immediate  family  –  when  it  determined  that  the "aggravating   circumstances   are   sufficiently   substantial   to warrant an aggravated sentence "  We find no indication that the trial court used the "dangerousness" finding as an aggravating factor and no error on that basis

<div align="center">*Emotional Harm to Victim's Family*</div>

¶7        Defendant next argues that the trial court committed reversible   error   when   it   found   and   used   the   additional aggravating factor of emotional harm to the victim's immediate

<div align="center">4</div>

family to aggravate his sentence   Pointing out that the factor of emotional harm to the victim's family was not included within the list of aggravating circumstances that the State supplied defendant when it filed its notice of intent to seek the death penalty, defendant claims that this aggravating element was not noticed  charged or proven *

¶8       Defendant did not raise this objection before the trial court [4]  He has therefore forfeited relief save for fundamental error   State v  Henderson, 210 Ariz  561, 567, ¶ 19, 115 P 3d 601, 607 (2005)

¶9       Fundamental error is *error going to the foundation of the case  error that takes from the defendant a right essential to his defense, and error of such magnitude that defendant could not possibly have received a fair trial *  Id  at 567, ¶ 19, 115 P 3d at 607 (internal quotation omitted)   Furthermore, *[t]o prevail under this standard of review, a defendant must establish both that error exists and that the error in this case caused him prejudice *  Id  at 567, ¶ 20, 115 P 3d at 607

---

[4]     Before the aggravation hearing commenced on September 6, 2005, defendant did make an *umbrella objection* regarding the submission of aggravating factors to the jury that the State had not separately noticed as noncapital aggravators should the defendant not be convicted of first degree murder   However, trial counsel did not renew this objection at the sentencing hearing held October 21, 2005 when the prosecutor suggested, and the court found, the additional emotional harm factor

¶10      However, before we engage in fundamental error review,
we must first find the trial court committed some error   *State*
*v   Lavers*, 168 Ariz  376, 385  814 P 2d 333, 342 (1991)    We
find no error  let alone fundamental error

¶11      The State must disclose aggravating circumstances on
which  it  intends  to  rely  in  seeking  the  death  penalty
sufficiently in advance of the hearing so that a defendant will
have an opportunity to prepare rebuttal   *State v  Ortiz*, 131
Ariz  195  207, 639 P 2d 1020, 1032 (1981), *disapproved on other*
*grounds by State v  Gretzler*, 135 Ariz  42, 57 n 2, 659 P 2d 1,
16 n 2 (1983) [5]   For purposes of this decision, we assume,
without  deciding,  that  a  defendant  upon  whom  a  noncapital
sentence is imposed is similarly entitled to advance notice of
aggravating factors    Here, the State did not allege emotional
harm to the victim's family as an aggravator when it filed the
notice that it intended to seek the death penalty   This is not
surprising given that emotional harm to the victim s family,
although  a  statutory  aggravator  for  a  noncapital  offense
pursuant to A R S  § 13-702(C)(9) (Supp  2007), is not a death
penalty aggravator   *See* A R S  § 13-703(F) (Supp  2007)   Nor

---

[5]      As a matter of procedure, Arizona now requires that a
prosecutor "provide the defendant with a list of aggravating
circumstances the state will rely on at the aggravation hearing"
at the same time that the prosecutor files a notice of intent to
seek the death penalty   Ariz  R  Crim  P  15 1(i)(2)
                            6

did the State request that the trial court submit emotional harm
for the jury's consideration as a potential aggravator
Nonetheless, we conclude that the trial court did not err when
it found emotional harm to the victim's family as an aggravating
circumstance   Victims have a constitutional right "to be heard
at any proceeding involving        sentencing "[6]  Ariz  Const
Art  2  § 2 1(A)(4)   Moreover, § 13-702(E) requires that "[t]he
court in imposing a sentence shall consider the evidence and
opinions presented by the victim or the victim's immediate
family at any aggravation or mitigation proceeding            "
Therefore, a defendant who commits a noncapital offense
involving a victim is necessarily on notice of the potential
applicability of § 13-702(C)(9) as an aggravating circumstance
at sentencing  particularly when, as here, the victim died as a
result of the defendant s conduct

¶12      As to his claim that the aggravating factor was not
proven  defendant argues only that the victim s father's
representations to the trial court were insufficient to support
the emotional harm aggravator   However, the victim s aunt as
well as Harley C  the father of the victim's two children  also
testified at the sentencing hearing   In asking for a "heavier

---

[6]    When the victim is killed, "victim" means "the person s
spouse, parent, child or other lawful representative "  Ariz
Const  Art  2, § 2 1(C)

7

sentence," Harley noted that the loss of their mother was something that the children would feel "for the rest of their lives " The victim's aunt spoke at length about the "devastation" wreaked on the victim's family, asking the court to impose the "maximum sentence " Their testimony alone was sufficient evidence to support the trial court's finding of emotional harm to the family   *See, e g , State v Soto-Fong*, 187 Ariz 186, 200, 928 P 2d 610, 624 (1996) (reversible error on insufficiency of evidence occurs only when there is a complete lack of probative facts)   When considered with the father's additional testimony about the suffering both he and his wife experienced, there was more than sufficient evidence to support the trial court s finding

### Especially Cruel and Heinous

¶13      Defendant contends that there was insufficient evidence to support the jury's findings that the murder in this case was committed in an especially cruel and heinous manner   He also maintains that the trial court improperly instructed the jury on the aggravating factors  resulting in a denial of his right to a fair trial and due process

¶14      First  defendant did not object to the trial court's instructions regarding these aggravators    Therefore  absent fundamental error  he has forfeited relief on this basis

8

*Henderson*, 210 Ariz at 567, ¶ 19, 115 P 3d at 607   Moreover, because the trial court properly instructed the jury, we find no error, let alone fundamental error   Rarely will an improper instruction justify reversal when no objection has been made in the trial court   *See, e g   State v   Van Adams*, 194 Ariz   408, 415   ¶ 17,   984 P 2d 16,   23   (1999) (applying principle to reversal of criminal conviction)

¶15      The jury instructions the trial court gave in this case appropriately "gave substance to the terms 'cruel' and 'heinous or depraved   in accordance with         the case law narrowing and defining those terms "   *State v   Cromwell*, 211 Ariz   181, 189   ¶ 41, 119 P 3d 448, 456 (2005)   Cruelty goes to the mental and physical anguish suffered by a victim   *Id*   at 189, ¶ 42, 119 P 3d at 456   To be cruel, the conduct must occur before death and while a victim is conscious   *Id*   Furthermore, the defendant must intend to inflict mental anguish or physical pain on the victim or reasonably foresee that there was a substantial likelihood that the manner in which the crime was committed would cause the victim to suffer mental anguish or physical pain prior to death   *State v   Valazquez*, 216 Ariz   300   308   ¶ 28   166 P 3d 91   99 (2007)   Heinousness goes to a defendant s mental state as reflected in his words or actions at or near the time of the offense   *State v   Johnson,* 212 Ariz

9

425, 439, ¶ 55, 133 P 3d 735, 749 (2006)   It is generally
defined as "hatefully or shockingly evil, grossly bad "   *Id*
(internal quotations omitted)

¶16      The trial court in this case properly instructed the
jury that heinousness focused "upon the defendant s state of
mind at the time of the offense as reflected by his words and
acts" and that an offense is heinous "if it is shockingly evil,
grossly bad "   It further instructed the jury that, in order to
find heinousness, it had to find "at least one of the following
actions," such as "relishing in the murder" or the "infliction
of gratuitous violence on the victim beyond that necessary to
kill "   The trial court also instructed the jury on specific
factors, such as "gratuitous violence," "senseless murder," and
the "helplessness" of the victim that might assist it in
considering whether the murder was heinous or depraved [7]   It also
properly instructed the jury that cruelty involved "the
infliction of pain and/or mental anguish on a victim before
death "   It also instructed the jury that a crime is committed

_____

[7]      Defendant appears to suggest that the jury may have
found the murder to have been "especially heinous" based on the
senselessness of the murder or the helplessness of the victim
alone   However the trial court specifically instructed the jury
that "neither senselessness or 'helplessness standing alone
[was] sufficient to prove that [the] murder was heinous "   The
trial court's instruction was thus correct, and, without more,
the jurors are presumed to have followed it   *State v LeBlanc*,
186 Ariz  437, 439, 924 P 2d 441, 443 (1996)

in an "especially cruel manner" when a defendant either knows or should have known "that the manner in which the crime [was] committed could have caused the victim pain" and that the victim had to have been "conscious for at least some portion of the time when the pain and/or anguish was inflicted " This unchallenged language sufficiently and correctly gave substance and definition to the terms "cruel" and "heinous" in keeping with our case law  *Cromwell*, 211 Ariz  at 189, ¶ 41, 119 P 3d at 456

¶17      Furthermore, there is sufficient evidence to support the jury's findings   The facts of this case are comparable to those in *State v  Tucker*, 215 Ariz  298, 321, ¶¶  100-103,   160 P 3d 177, 200 (2007), in which our supreme court found the additional trauma and injuries sustained by the victim while conscious and prior to being fatally shot established that the murder had been caused in an "especially cruel" manner    The cause of the victim's death in this case was strangulation   A witness in the motel room next door to the murder testified that she heard noises of fighting that lasted between 15 and 20 minutes  a woman  screaming,  and  the  repeated  sounds  of "slapping" and of something being either "shoved" or "hitting" the walls    The evidence at trial established that the victim sustained numerous traumas and blunt force injuries to her head,

11

neck and body, including a broken hyoid bone, a black eye and injuries to the left temporal area caused by repeated strikes,[8] a bloody nose consistent with a punch or strike, bleeding into the white of the eyes, petechial hemorrhaging to her heart consistent with a blow to the chest or someone sitting on the chest, and bruising to both the left and right side of the tissue under the skull  According to the medical examiner  all of these injuries occurred prior to death   This evidence indicates that the victim would have suffered extreme physical pain while she was being assaulted and strangled by defendant and supports the jury's "especially cruel" finding

¶18      There is also sufficient evidence to support the jury's finding of "especially heinous "  The medical evidence revealed that the victim had suffered lacerations to her vagina and anus  and that bleeding near the anal tear indicated forced anal intercourse occurring near or at the time of death  but before death itself   When coupled with the testimony of the next-door witness who testified that she heard fighting and struggling and then two or three male "growls" right before the noise stopped, the evidence supports the inference that

---

[8]      At trial, defendant admitted fighting with the victim and grabbing her neck after he allegedly discovered her stealing money from his pocket  He admitted having hit her at least five or six times "[m]ostly [in] the head area "

12

defendant was having forced sexual intercourse with the victim as he was killing her   The infliction of this "gratuitous violence" or defendant s "relishing" by gratifying himself while killing support the finding that defendant committed the murder in an "especially heinous" manner   The trial court therefore properly relied on these factors to aggravate defendant's sentence

### Use of 1984 California Prior Felony

¶19      Defendant contends that the trial court improperly aggravated his sentence based on a 1984 California felony conviction without first determining whether the foreign conviction would be punishable as a felony in Arizona   A R S § 13-604(N)   A trial court has broad discretion in sentencing, and, if the sentence imposed is within the statutory limits, this court will not disturb it absent a clear abuse of discretion   *State v Ward*, 200 Ariz  387, 389, ¶ 5, 26 P 3d 1158 1160 (App  2001)   We find no error

¶20      The record shows that defendant s 1984 California robbery conviction was not used to enhance defendant s sentence as a "historical prior felony" pursuant to A R S  § 13-604(N)   It was instead given to the jury to consider as an aggravating circumstance pursuant to A R S  § 13-702(C)(24), which permits the trier of fact to consider "any other factor that the state

13

alleges is relevant to the defendant's character or background
or to the nature or circumstances of the crime " Under this
subsection, there is no requirement that the foreign conviction
must also be a felony under Arizona law  Furthermore a trier
of fact has traditionally been permitted to consider information
about a defendant's past conduct to determine whether an
aggravated sentence is appropriate  See e g , *State v Ellis*,
117 Ariz 329, 334, 572 P 2d 791, 796 (1977) (holding judge
could properly consider prior crimes, criminal character and
criminal history of defendant as well as presentence report in
determining sentence), *State v Schuler*, 162 Ariz 19, 21, 780
P 2d 1067, 1069 (App 1989) (sentencing court may consider
defendant's criminal character and history even if conduct has
not resulted in conviction)

<div align="center"><i>Prosecutorial Misconduct</i></div>

¶21      Defendant argues that the prosecutor's misconduct
during his arguments at the aggravation phase of the trial
deprived him of a fair trial on the aggravating factors  We
interpret this argument as a claim that the trial court abused
its discretion when it twice denied defendant's motions for
mistrial  Because the trial court is in a better position than
we to judge the effect of a prosecutor's comments on the jury,
we review the denial of a motion for mistrial for prosecutorial

<div align="center">14</div>

misconduct for a clear abuse of discretion   *See State v Lee*, 189 Ariz  608, 616, 944 P 2d 1222, 1230 (1997)

¶22      "To prevail on a claim of prosecutorial misconduct, a defendant must demonstrate that the prosecutor's misconduct 'so infected the trial with unfairness as to make the resulting conviction a denial of due process *   State v  Hughes*, 193 Ariz  72  79, ¶ 26, 969 P 2d 1184, 1191 (1998) (quoting *Donnelly v  DeChristoforo,* 416 U S  637  643 (1974))   To determine whether a prosecutor's comments constitute misconduct warranting a mistrial,

> the trial court should consider (1) whether the remarks call to the attention of the jurors matters that they would not be justified in considering in determining their verdict, and (2) the probability that the jurors, under the circumstances of the particular case, were influenced by the remarks  Misconduct alone will not mandate that the defendant be awarded a new trial, such an award is only required when the defendant has been denied a fair trial as a result of the actions of counsel

*State v  Hansen*  156 Ariz  291, 296-97, 751 P 2d 951, 956-57 (1988)   To warrant reversal, the prosecutorial misconduct must be "so pronounced and persistent that it permeates the entire atmosphere of the trial "  *United States v  Blevins,* 555 F 2d 1236  1240 (5th Cir  1977)

¶23      During the guilt phase of the trial, the trial court ruled that, if the defendant testified, the State could impeach

15

him only with his 1997 California drug conviction but not his 1984 conviction for robbery  Defendant testified at trial (but not during the aggravation hearing), and, during direct testimony, admitted the 1997 California felony conviction for "sale of a controlled substance or possession of a controlled substance with the intent to sell "  Defendant also admitted using crack cocaine and being in and out of several rehabilitation programs and relapsing into drug use  He made no mention of his 1984 conviction

¶24     As noted above, during the aggravation phase  the jury had evidence of both the 1997 drug conviction and the 1984 robbery conviction  The gist of the prosecutor's opening and closing argument was that defendant was manipulative, he was willing to admit to certain conduct only if it benefited him or served to elicit the jury's sympathy  In so doing he pointed out that, while defendant had been "quick to jump up there" during the guilt phase of the trial and reveal his prior drug conviction, he had not revealed his "other on[e] "

¶25     Defense counsel immediately objected and moved for a mistrial at a bench conference  He argued that the comment was "totally unfair" because the prosecutor knew that evidence of the 1984 robbery was precluded at trial but his comment implied that defendant willfully deceived the jurors   The prosecutor,

16

Juan Martinez, acknowledged that the court had precluded the
prosecutor from using the robbery conviction for impeachment at
the guilt phase and had sanitized the 1997 conviction, but
argued that defendant testified regarding the details
surrounding his 1997 conviction in order to portray himself as a
"troubled kid" in an attempt to gain sympathy from the jury
Therefore because defendant "brought that out," Mr Martinez
rationalized

> [S]o he can t stand up here now and say
> well, you know, I'm going to pick and chose
> what I m going to bring in   If he picks and
> chooses, he has to answer for that
> So no, I don't think I stepped over the
> line   He withheld information when it was
> to his advantage and gave him [sic]
> information he did not need to and that the
> prosecutor was forbidden to go into   So,
> no  I don t agree with them

¶26      The trial court denied the motion, choosing instead to
instruct the jury that it was to "disregard [the prosecutor's]
last statement "

¶27      The prosecutor's argument attacked defendant as
being dishonest for failing to reveal his robbery conviction to
the jury during the guilt phase   This comment was clearly
improper in light of the trial court's ruling precluding use of
the robbery conviction for impeachment purposes   Indeed, we are
baffled by the prosecutor's continued insistence at the bench
conference that the defendant had no right to "withhold

17

information" regarding the robbery conviction from the jury
Nonetheless, the statement was brief, it was immediately
corrected by the trial court's instruction to disregard it, and
the jurors are presumed to have done so   See, LeBlanc, 186
Ariz  at 439, 924 P 2d at 443 [9]  In addition, the prosecutor's
remarks during the remainder of this portion of his argument
were not improper

¶28      During his closing argument, defense counsel accused
the State of depicting defendant and his defense counsel as
"sneaking  lying  cheating," and of implying that they had
represented the victim as being "worthless" as a human being
Defense counsel argued that the prosecutor, although he did not
use the actual word, implied that defendant was a "beast" by
having sexual relations with the victim as the victim was dying
or already dead

> The argument of the state is that the
> deceased is dead and defendant is continuing
> to have anal relations with her   That's
> what he is saying to you   Not once, not
> five times, a minimum of ten times, over and
> over again, which makes him what we would
> call a beast   A beast on many levels

¶29      In his rebuttal argument, the prosecutor denied saying
that defendant and his counsel were "sneaking  lying  and

---

[9]   On appeal, defendant also claims that the statement was a
comment on his failure to testify at the aggravation phase
Taken in context, we do not view it as such

cheating" or that he had "called [defendant] a dog and called
him a beast "  According to the prosecutor, defense counsel had
made these arguments "at the top of his lungs "  In a completely
inappropriate effort to refute defense counsel's arguments, Mr
Martinez then analogized his tactics to those of "Adolf Hitler"
and his "big lie " arguing that "if [defense counsel] tells you
that over and over again, you're certainly going to start to
believe it aren't you?"  The Hitler analogy was a recurring
theme in the prosecutor's closing argument  After repeating the
Hitler analogy, Mr  Martinez argued

>[Defense counsel] talks about America and
>wraps himself around the flag  Doesn't wrap
>himself around the German flag when he calls
>somebody a cheater, a liar  a sneaking [sic]
>when in fact they never used those words
>And additionally  with regard to that  you
>don't mention the full truth because that's
>also not to your benefit

In concluding his remarks, the prosecutor told the jurors, "[w]e
have the example of Germany  It has worked through history "

¶30     Defense counsel reserved his objections to the
prosecutor's statements until the jury had recessed  Counsel
moved for a mistrial on the basis that the prosecutor's equation
of his tactics with Hitler's might prejudice them against his
client  Stating no reasons for its decision, the trial court
denied the motion

19

¶31      In recognition of the frequently emotional nature and
sometimes rough and tumble quality of closing argument,
attorneys, including prosecutors, are allowed wide latitude in
their arguments to the jury  See *State v Gonzales*, 105 Ariz
434, 437, 466 P 2d 388, 391 (1970) (noting that "excessive and
emotional language is the bread and butter weapon of counsel's
forensic arsenal")  But that latitude, although not easy to
quantify and however generous it might be, is not limitless
See *State v Gregory*, 108 Ariz 445, 448, 501 P 2d 387,
390 (1972) (recognizing that "abuse of opposing counsel
unwarranted by the evidence is not within the scope of proper
argument and if carried too far may result in the granting of a
new trial or reversal")  In any event, it can never be extended
so far as to permit an attorney to blacken the character of a
courtroom adversary by comparing his tactics to those of
Nazis [10]  Under similar circumstances, a Pennsylvania appellate
court observed that "specific comparisons between counsel's
tactics and those of Hitler and Goebbels were reprehensible,
even in the heat of closing arguments "  *Commonwealth v
Johnson*  719  A 2d  778  789-90  (Pa  Super  Ct  1998)
Notwithstanding the apparent vigor of defense counsel's argument

---

[10]    Defense counsel, Robert D  Stein, advised the court that he
is Jewish

here, Mr Martinez's conduct was clearly both improper and unprofessional

¶32        The trial judge, who was present and able to view both the comportment of the attorneys and its effect on the jury, nonetheless determined that a mistrial was not warranted We defer to the trial court in its determination of such matters and we cannot say that the trial court clearly abused its discretion here   As reprehensible as the prosecutor's analogy was, we believe any reasonable juror would have recognized the inappropriateness of this line of argument and discounted it Further, the usual instruction was given the jurors during this phase of the trial advising them that counsel's arguments are not evidence   Moreover, the fact that  despite these improper comments, the jurors were unable to reach a decision as to the "especially depraved" factor also leads us to conclude that defendant was not prejudiced by the comments and that the jurors carefully evaluated the evidence regarding the existence of aggravating factors   Likewise, when we examine the entirety of counsel's conduct during this phase the trial, we do not perceive that the cumulative misconduct so permeated the proceedings that defendant was deprived of a fair determination of the aggravating factors    Therefore, we conclude that reversal for prosecutorial misconduct is unwarranted   See State

21

*v Skinner* 110 Ariz 135, 149, 515 P 2d 880, 894 (1973) ("If the trial is fair we will not reverse merely to punish the misdeeds of counsel "), *see also State v Valdez*, 160 Ariz 9 14, 770 P 2d 313, 318 (1989) ("[W]here there has been misconduct of either the prosecutor or defense counsel, but reversal is not required, the proper remedy will be affirmance, followed by institution of bar disciplinary proceedings against the offending lawyer, if such proceedings are warranted "), *overruled on other grounds by Krone v Hotham*, 187 Ariz 364, 366, 890 P 2d 1149, 1151 (1995)

### CONCLUSION

¶33     For the foregoing reasons, we affirm defendant s conviction and sentence   The clerk of this court is instructed to forward a copy of this decision to the Maricopa County Attorney and the disciplinary department of the State Bar of Arizona for its review

PHILIP HALL  Judge

CONCURRING

G  MURRAY SNOW  Judge

SUSAN A  EHRLICH, Presiding Judge

22

# Exhibit 14

1       IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

2            IN AND FOR THE COUNTY OF MARICOPA

3                                              FILED
                                          *1813-11  3:49PM*
STATE OF ARIZONA,                  )      MICHAEL K JEANES, Clerk
4                                  )      By_____
        Plaintiff,                 )              Deputy
5                                  )      1 CA-CR 09-0384
vs                                 )      CR2005-032986-001 DT
6                                  )
DOUGLAS D  GRANT,                  )
7                                  )
        Defendant                  )
8    _____)

9

10
                    Phoenix, Arizona
11                    May 15, 2009

12

13
     BEFORE   THE HONORABLE MARGARET R  MAHONEY, JUDGE
14

15

16
          REPORTER'S TRANSCRIPT OF PROCEEDINGS
17           SENTENCING/MITIGATION HEARING

18

19                              DIVISION ONE
                                COURT OF APPEALS
20                              STATE OF ARIZONA

21                          FILED   AUG 2 8 2009
TARA L  KRAMER, RPR
22 Certified Reporter #50439    PHILIP G URRY CLERK
                                BY____RL
23

24 Prepared for Appeal
   (ORIGINAL)
25 COPY

                    TARA L  KRAMER
                    SUPERIOR COURT
                    PHOENIX, ARIZONA

```
 1              A P P E A R A N C E S

 2  On Behalf of the State

 3          Juan M  Martinez
            Maricopa County Attorney's Office
 4

 5  On Behalf of the Defendant

 6          A  Melvin McDonald, Jr
            Attorney at Law
 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1         THE COURT   Thank you, Braven
2         MR  MC DONALD   We have no further witnesses to
3    make statements
4         THE COURT   Why don't we go ahead and take our
5    break right here, then   We will be back in 15 minutes
6         (Thereupon, proceedings are recessed and
7    thereafter resumed )
8         THE COURT   Mr  McDonald, I believe you said that
9    was everyone that you would be presenting?
10        MR  MC DONALD   Yes
11        THE COURT   Okay   Mr  Martinez, are you prepared
12    to begin?
13        MR  MARTINEZ   Yes, thank you
14        THE COURT   Begin
15        MR  MARTINEZ   It is the State's position that we
16    are not here to relitigate the conviction or the
17    underlying facts supporting the conviction   As you have
18    previously indicated in comments when individuals were
19    speaking, it is your belief also that we are here to
20    determine what is an appropriate sentence, not to delve or
21    to question or to take a really hard look as to what
22    motivated the jury to do this or what motivated the jury
23    to do that
24        And I bring that up, although I know that
25    everyone in this courtroom understands that, because of

                        TARA L  KRAMER
                        SUPERIOR COURT
                        PHOENIX, ARIZONA

1   engages in some sort of threesome with his wife and his
2   paramour   There is no other explanation for it

3           Just as an example of one of the things that they
4   touted for the jury and I believe for you is that, well,
5   Faylene knew all about him having sex with Hilary the day
6   before he got together with Faylene and then married her
7   Presumably in their marriage they had sex

8           And then there's a phone call on July 28th, one
9   day after the marriage   And then there's all these phone
10  calls that go back and forth   It's just tawdry, this sort
11  of threesome, menage a trois as the French call it, that
12  he's going through

13          And so even though he's excommunicated on
14  September 5th 2001, Faylene writes that -- you know   He's
15  told me a number of things   The biggest thing that he's
16  told me is that I'm going to die, and I have to make a
17  decision whether or not I'm going to have faith in his
18  visions, this person that is excommunicated

19          Well, that vision or those visions -- because if
20  we remember, according to the writings, Defendant had
21  those visions in church   September 17th, 2001 entry   He
22  had those visions outside in the grass, and he had them
23  when he was speaking to her   He had them every night
24  almost, according to Faylene, before he would go to bed
25          Those visions aren't complete   The reason those

Exhibit 15

Case 2:16-cv-01159-SRB   Document 45-13   Filed 12/04/17   Page 107 of 489
State v Grant, Not Reported in       (2011)
2011 WL 553765

2011 WL 553765
Only the Westlaw citation is currently available
NOTICE THIS DECISION DOES NOT
CREATE LEGAL PRECEDENT AND MAY
NOT BE CITED EXCEPT AS AUTHORIZED
BY APPLICABLE RULES See Ariz R. Supreme
Court 111(c), ARCAP 28(c), Ariz. R.Crim. P 31 24
Court of Appeals of Arizona,
Division 1, Department C

STATE of Arizona, Appellee,
v
Douglas D GRANT, Appellant

No 1 CA-CR 09-0384
|
Feb 17, 2011

Appeal from the Superior Court in Maricopa County, Cause
No CR2005-032986-001 DT The Honorable Margaret R.
Mahoney, Judge AFFIRMED

**Attorneys and Law Firms**

Thomas C Horne Attorney General by Kent E Cattani
Chief Counsel, Criminal Appeals/Capital Litigation Section,
Phoenix, Attorneys for Appellee.

Tyrone Mitchell PC by Tyrone Mitchell, Phoenix, Attorneys
for Appellant.

Douglas D Grant, Douglas Appellant.

**MEMORANDUM DECISION**

PORTLEY, Judge

*1 ¶ 1 This is appeal under *Anders v California* 386 U S.
738 (1967) *State v Leon*, 104 Ariz 297 451 P.2d 878 (1969)
and *State v Clark*, 196 Ariz. 530, 2 P 3d 89 (App 1999)
Counsel for Defendant Douglas Grant has advised us that,
after searching the entire record, he has been unable to
discover any arguable questions of law, and has filed a brief
requesting us to conduct an *Anders* review of the record.
Defendant filed a supplemental brief in which he specifically
declares he is appealing from the sentence only [1]  Thus,
although we have subject matter jurisdiction to review the
conviction for fundamental error we limit our review to the
sentence imposed. *See State v Smith*, 171 Ariz 501 502 831

P 2d 877 878 (App 1992) *State v Delgadillo* 174 Ariz. 428
430 n. 1 850 P 2d 141 143 n. 1 (App 1993) [2]  Finding no
reversible error we affirm.

**FACTS**[3]

¶ 1 Defendant's wife  F G , drowned in a bathtub on
September 27 2001 and Defendant was indicted and charged
with first degree murder After a lengthy jury trial, the jury
found Defendant guilty of the lesser included offense of
manslaughter in March 2009

¶ 2 The jury then heard evidence of three aggravating factors
(1) Defendant committed the offense in an especially cruel
manner; (2) he committed the offense for pecuniary gain
and (3) the offense caused emotional or financial harm to the
victim's immediate family [4]  The state presented testimony
from the victim s sister, brother, father, daughter and mother
Defendant also testified. The jury found the State proved all
three aggravators

¶ 3 Prior to the mitigation hearing, the adult
probation department submitted a presentence report which
recommended a sentence greater than the presumptive
Attached to the report were numerous letters from the victim s
relatives and other interested parties requesting the judge to
impose a prison sentence and, in several of these letters, to the
maximum term allowed. Defendant submitted a mitigation
packet which included letters from some of the victim s
relatives and other interested parties in support of Defendant
and requesting the judge to place Defendant on probation

¶ 4 At the start of the mitigation hearing the trial court noted
that it had read and considered all of the materials submitted.
Defendant then presented supportive testimony from relatives
and friends At the conclusion of the hearing, the court found
that Defendant's notable contributions to various people and
to the community and Defendant's lack of prior convictions
were mitigating factors The court, however found that the
'tremendous pain and loss suffered by the victim s family
was an aggravating factor The court further stated that the
mitigators and aggravators were balanced, and sentenced
Defendant to five years imprisonment, the presumptive term
for a class two felony with credit for sixty-six days of
presentence incarceration

Case 2:16-cv-01159-SRB Document 45-13 Filed 12/04/17 Page 108 of 489
State v Grant, Not Reported in (2011)
2011 WL 553765

**\*2** ¶ 5 We have jurisdiction over this appeal pursuant to Article 6, Section 9, of the Arizona Constitution, and Arizona Revised Statutes ("A.R.S") sections 12 120 21(A)(1) (2003) 13-4031 and -4033(A)(1) (2010)

### DISCUSSION

¶ 6 We have read and considered counsel s brief and Defendant s supplemental brief, and have reviewed the evidence presented at the aggravation trial, the mitigation hearing, and all the sentencing proceedings for reversible error See Leon, 104 Ariz. at 300 451 P 2d at 881 Defendant was given the opportunity to present mitigating evidence both documentary and through the testimony of witnesses and he was given an opportunity to be heard prior to the imposition of sentence The presumptive sentence imposed is the presumptive sentence for this crime a class two non-dangerous non repetitive felony See A.R.S §§ 13 701, -702(D) The aggravating factors were found by the jury, A.R.S §§ 13 701(D)(5) (6) and (9) [5] and the trial court weighed the aggravating circumstances against the mitigating circumstances as required. A.R S § 13 701(C)

¶ 7 Defendant raises one cognizable argument. [6] Relying on Blakely he contends that the aggravating circumstances were not properly re-alleged by the State after his motion to remand was granted and the grand jury returned another indictment Thus he argues, the aggravating factors should not have been submitted to the jury If the aggravating factors had not been considered and found by the jury his argument continues the court would have imposed a mitigated sentence Defendant did not object at trial to the lack of a second allegation, the submission of the aggravating factors to the jury or to the court s consideration of the aggravating factors at sentencing Therefore, we review for fundamental error State v Henderson, 210 Ariz. 561, 567 ¶ 19 115 P 3d 601, 607 (2005) Clark, 196 Ariz. at 537, ¶ 30, 2 P 2d at 96

¶ 8 At the outset, we note Defendant received the presumptive sentence, and thus Blakely is not applicable Blakely established the right to a jury trial on any fact that increases the punishment beyond the presumptive Because Defendant's sentence was not increased beyond the presumptive no error occurred.

¶ 9 Even if we assume for argument that Defendant is correct, there is nothing in the record that supports his argument that the trial court would have sentenced him to the mitigated

term. The trial judge was present throughout the trial, heard the testimony and was free to impose the presumptive term of imprisonment even with only the trial testimony, the presentence report and the mitigation hearing. Defendant's counsel concedes such in his brief when he notes that the court relied on the emotional harm to the victim s family aggravating factor State v Martinez 210 Ariz. 578 585 ¶ 26 115 P 3d 618, 625 (2005) Consequently the failure to re-allege the aggravating factors was not fundamental error See State v Johnson, 210 Ariz 438 441-42, ¶¶ 12-13 111 P.3d 1038 1041-42 (App 2005) (judicial factfinding when selecting presumptive sentence does not implicate indictment or jury trial right) See also State v Miranda Cabrera 209 Ariz. 220 227-28, ¶ 34 99 P 3d 35 42-43 (App.2004) (finding no Sixth Amendment violation when trial court weighs non-Blakely compliant aggravating circumstances against mitigating circumstances and resulting sentence is not above the presumptive)

**\*3** ¶ 10 Nevertheless the State filed an allegation of the aggravating circumstances Defendant had notice prior to the aggravation phase of the trial and testified before the jury determined the aggravators Thus the notice Defendant received satisfied due process See State v Jenkins 193 Ariz. 115, 121 ¶ 21 970 P 2d 947, 953 (App 1998)

¶ 11 Having addressed Defendant's supplemental argument, and having searched the entire record of sentencing for reversible error we find none All of the proceedings were conducted in compliance with the Arizona Rules of Criminal Procedure The record as presented, reveals that Defendant was represented by counsel at all stages of the proceedings and the sentence imposed was within the statutory limits

### CONCLUSION

¶ 12 After this decision has been filed, counsel's obligation to represent Defendant in this appeal has ended. Counsel need do no more than inform Defendant of the status of the appeal and Defendant's future options, unless counsel's review reveals an issue appropriate for submission to the Arizona Supreme Court by petition for review See State v Shattuck, 140 Ariz. 582, 585, 684 P 2d 154, 157 (1984) Defendant can if desired, file a motion for reconsideration or petition for review pursuant to the Arizona Rules of Criminal Procedure

¶ 13 Accordingly we affirm Defendant's sentence

**All Citations**

CONCURRING   MARGARET   H   DOWNIE   and
PATRICIA A OROZCO, Judges

Not Reported in P 3d, 2011 WL 553765

Footnotes

1    On page 8 of his supplemental brief Defendant states Appellant Grant is not appealing his conviction He is only
     appealing the aggravators   Three pages later he states that [h]e only concedes no error of trial conviction occurred "
     There are also other statements in his brief which clearly reflect his desire to only challenge his sentence Thus we only
     address the *Blakely v Washington* 542 U S 296 (2004) claim

2    The jury was unable to agree on the first and second degree murder verdicts If asked and if we addressed the merits
     of the conviction and reverse his manslaughter conviction Defendant could be tried again for first degree murder *See
     Lemke v Reyes,* 213 Ariz 232 141 P 3d 407 (App 2006) He however only challenges his sentence

3    We review the facts in the light most favorable to sustaining the verdict *See State v Guerra* 161 Ariz 289 293 778
     P 2d 1185 1189 (1989)

4    Counsel suggests that because the jury did not convict Defendant of first degree murder the pecuniary gain factor was
     improperly considered by the jury Although there was no objection below Arizona law permits inconsistent verdicts *See
     Lemke* 213 Ariz at 241 ¶ 26 141 P 3d at 416

5    The Arizona criminal sentencing code was renumbered *See* 2008 Ariz. Sess Laws ch 301 §§ 1 120 Because the
     renumbering included no substantive changes we refer to the current section numbers

6    Defendant also raises a claim of ineffective assistance of appellate counsel but claims of ineffective assistance of counsel
     cannot be raised on direct appeal *State ex rel Thomas v Reyes* 214 Ariz 411 415 ¶ 20 153 P 3d 1040 1044 (2007)
     (claims of ineffective assistance of counsel cannot be presented in a direct appeal) *State v Spreitz* 202 Ariz 1 3 ¶
     19 39 P 3d 525 527 (2002) (same)

**End of Document**                                  © 2016 Thomson Reuters No claim to original U S Government Works.

# Exhibit 16

2010 WL 2355931 (Ariz.App  Div  1) (Appellate Brief)
Court of Appeals of Arizona, Division 1

STATE OF ARIZONA, Appellee,

v

Douglas GRANT  Appellant.

No  1 CA-CR 09-0384
May 17, 2010

Maricopa County Superior Court No  CR-2005-032986-001 DT

**Appellant's Opening Brief Pursuant to Anders v  California, 386 U S  738,
87 S.Ct 1396 (1967) and State v  Leon, 104 Ariz 297, 451 P 2d 878 (1969)**

Tyrone Mitchell, Esq  No  016267, Tyrone Mitchell, P C   2633 E  Indian School Road, Suite 320  Phoenix, Arizona 85016
(602) 956-8200, tmitchell @tyronemitchellpc com, Attorney for Appellant, Douglas Grant.

**\*ii  *TABLE OF CONTENTS***

| | |
|---|---|
| STATEMENT OF THE CASE | 1 |
| STATEMENT OF THE FACTS | 16 |
| ISSUE PRESENTED FOR REVIEW | 26 |
| COMPLIANCE WITH ANDERS v CALIFORNIA | 27 |
| CONCLUSION | 33 |
| CERTIFICATE OF RULE 31 13(b) COMPLIANCE | 34 |
| CERTIFICATE OF SERVICE | 35 |

**\*iii  *TABLE OF CITATIONS***

*UNITED STATES SUPREME COURT CASES*
| | |
|---|---|
| *Anders v  California*, 386 U S  738  87 S Ct. 1396, 18 L Ed 2d 493 (1967) | 27 |

*ARIZONA SUPREME COURT CASES*
| | |
|---|---|
| *State v  Leon*, 104 Ariz. 297  451 P.2d 878 (1969) | 27 |
| *State v. Martinez*, 210 Ariz 578  585  115 P 3d 618  625 (2005) | 29-30 |
| *State v  Greene*, 192 Ariz. 431  443  967 P 2d 106, 118 (1998) | 29 |
| *State v  Hyde*, 186 Ariz. 252, 280  921 P 2d 655  683 (1996) | 30 |
| *State v  Henderson*, 210 Ariz 561  567  115 P 3d 601  607 (2005) | 30 |
| *State v  Carreon*, 210 Ariz  54  107 P 3d 900  913 (2005) | 30 |

*ARIZONA COURT OF APPEALS CASES*
| | |
|---|---|
| *State v  Cigarroa-Perez* 2008 WL 5149090(Ariz.App.Div  1) | 30 |

*CONSTITUTIONAL PROVISIONS*
**Arizona Constitution**
| | |
|---|---|
| Article 6  § 5(3) | 15 |

*STATUTES*
**Arizona Revised Statutes**
| | |
|---|---|
| A R S  § 13-4031 | 15 |
| A R S  § 13-4036 | 15 |
| A R S  § 13-4037 | 15 |
| A R S  § 13-701(D) | 28 |
| A R S  § 13 702 | 29 |

**\*4  *STATEMENT OF THE CASE***

On September 27 2001 Faylene Grant drowned in her bath tub An autopsy revealed excessive amounts of Ambien in Faylene's blood stream. Appellant Douglas Grant, Faylene's husband, was found guilty of manslaughter after a five month jury trial and was sentenced to five years imprisonment for recklessly causing the death of his wife Appellant challenges his five year sentence as excessive

In particular Appellant contends that the Superior Court erroneously submitted to the jury for consideration three aggravating circumstances Moreover Appellant alleges that if one or more of the aggravators would not have been submitted to the jury, Appellant would have received a lower sentence when balanced with his mitigating factors

On July 12, 2005 a one count Indictment was filed against Appellant Douglas Grant in Maricopa County, State of Arizona, charging Appellant with First Degree Murder a class one felony and domestic violence offense The Indictment alleges that on or between September 26, 2001 and September 27, 2001 Appellant Douglas Grant, intending or knowing that his conduct would cause death, with premeditation, caused the death of Faylene E Grant *(Record on \*5 Appeal Item No 1 hereinafter ROA 1)*

On July 25, 2005 an arraignment hearing was held before the Superior Court and Appellant pled not guilty to the foregoing charge *(ROA 4)*

On August 8 2005 the State of Arizona filed an Allegation of Historical Priors Pursuant to the Allegation of Historical Priors the State of Arizona disclosed that on June 13 1994 Appellant Douglas Grant was convicted of unlawful unprofessional conduct, a third degree felony, in the Third District Court, Salt Lake, Utah, in Cause No CR94-1900763 *(ROA 16)* Counsel for Appellant challenged this conviction on grounds that the State had not produced evidence of this conviction and that the offense was in actuality an "abeyance agreement" which does not serve as a prior felony conviction. *(ROA 31)*

On August 8, 2005, the State of Arizona also filed the State's Allegation of Aggravating Circumstances Other than Prior Convictions, therein listing five possible aggravating circumstances the offense involved the infliction or threatened infliction of serious physical injury· the offense involved the use, threatened use or possession of a deadly weapon or dangerous instrument during the commission of the crime, specifically water/drug, the defendant committed the offense(s) in an especially heinous, cruel, or depraved manner· the defendant committed the offense(s) as consideration for the receipt, or in the expectation of *\*6* the receipt, or anything of pecuniary value, the offense cause physical, emotional or financial harm to the victim or, if the victim died as a result of the conduct of the defendant, caused emotional or financial harm to the victim s immediate family *(ROA 15)*

In April of 2008 the parties filed a series of *motions in limine* to preclude evidence at trial

A five month jury trial of this case commenced on November 3 2008

On February 26 2009 the parties discussed the jury instructions With regard to the charges the State of Arizona requested an instruction for second degree murder as a lesser included offense of first degree murder The State of Arizona also requested an instruction for manslaughter which is the lesser included offense of second degree murder and an instruction for manslaughter by aiding suicide The Court specified that manslaughter by aiding suicide is a form of manslaughter i e another way that manslaughter is committed, rather than a separate crime *(Reporter s Transcript hereinafter RT 2/26/09 pgs 85-86)*

Counsel for Appellant argued against this instruction because manslaughter by aiding suicide is not a lesser included offense of first degree murder Counsel argued that Mr Grant was indicted for first degree murder, and therefore, the jury should not be instructed on second degree murder or its lesser included offenses *\*7* Counsel reasons that the State should not be able to have it both ways, and that Appellant is either guilty of premeditated murder or he is not. For example, counsel argued that all of the evidence presented by the State has focused on premeditating events leading up to Faylene s death, and therefore these other instructions would confuse the jury *(RT 2/26/09 pgs 86-93)*

The State of Arizona in rebuttal agreed that manslaughter by aiding suicide is not a lesser included offense of first degree murder  but argued that the instruction is applicable based on the evidence presented by Appellant. *(RT 2/26/09 pgs  93-97)*

The Superior Court allowed the parties to brief the issue, and decided to reserve its ruling to another date. On March 2  2009, the Court indicated that Rule 22 3 provides that both the defendant and prosecutor are entitled to instructions on any offense charged or any lesser included offense for which there is evidentiary support. The Court discussed the evidence presented in this case, and reasoned that no one knows what the jury will believe  and that they could believe that Mr  Grant acted reckless by leaving her in the tub  knowing that she was under the influence of an excessive amount of Ambien  After holding a lengthy discussion with the parties, the Court held that the lesser-included instructions will be given to the jury  because there is evidence from which the jury could convict Appellant of second  *8  degree murder or manslaughter  However  the Court denied the State s request for an instruction on manslaughter by aiding suicide  *(RT 3/2/09 pgs  4 17)*

On March 3, 2009  counsel for Appellant notified the Court that Douglas Grant chose not to testify on his own behalf  On this date  the Court also read the jury instructions  *(RT 3/3/09 pg  3  pgs  31-46)*

On March 24, 2009  after eighteen days of jury deliberations, Appellant Douglas Grant was found guilty of manslaughter, a class two felony, for the drowning and death of his wife  Faylene Eaves Grant. The jury returned a verdict of 'unable to agree on the conviction options of murder in the first degree or murder in the second degree  *(RT 3/24/09 pgs  4 5)*

On March 24  2009  following the verdict, the Court instructed the jury as to the aggravating circumstances jury instructions  The Court instructed that under Arizona law  every person guilty of this crime is presumed to be sentenced to a presumptive sentence, but that the sentence may be increased by the sentencing judge if aggravating factors are proven by the State  The law requires that the jury determine whether the State has proven any of the following aggravating circumstances beyond a reasonable doubt, and such findings may be considered by the Court in determining the sentence  *(RT 3/24/09 pgs  8-9)*

The aggravating circumstances provided to the jury for consideration are as  *9  follows  (1) The Defendant committed the offense in an especially cruel manner; (2) The Defendant committed the offense as consideration for the receipt, or in the expectation of the receipt, of anything of pecuniary value  and (3) The offense caused physical, emotional, or financial harm to the victim. or if the victim died as a result of the conduct of the Defendant, caused emotional or financial harm to the victim s immediate family *(RT 3/24/09 pg  9)*

The Court further instructed that to find that the manslaughter was committed in an  especially cruel" manner  the jury must find that the victim consciously suffered physical or mental pain, distress or anguish prior to death  Appellant must know or should have known that the victim would suffer  *(RT 3/24/09 pgs  10)*

On March 31  2009  the jury returned a unanimous verdict finding that the State of Arizona proved all three aggravators beyond a reasonable doubt. *(RT 3/31/09 pgs  83 84)*

On April 7  2009  Appellant filed a Motion for New Trial  *(ROA 866)*

On April 28, 2009  the Court denied Appellant s Motion for New Trial *(ROA 869)*

On May 9  2009  Appellant filed a Mitigation Packet with the Clerk of the Court. Pursuant to the Mitigation Packet, Appellant requested a sentence of  *10  probation  arguing that Mr  Grant is an excellent candidate for community supervision based on the following factors  Douglas Grant continues to run a strong community based business  he is a wonderful father; he has always met his financial obligations to his children, he is active with his LDS church and community  he never failed to appear for court appointments  he has complied with all court orders  he repeatedly traveled out-of-state without problems, and successfully complied with pretrial services monitoring  *(ROA 872)*

On May 15 2009 the probation department filed a Presentence Investigation Report. The probation officer ultimately recommended that Appellant receive a jail sentence greater than the presumptive term, in addition to a consecutive term of community supervision. In making such recommendation, the probation officer recognized that Appellant has no prior criminal record, but also considered that the jury determined that Appellant drowned his wife.

Furthermore, the probation department found the following facts significant. Appellant failed to call 9-1-1 on her behalf and lied about it. Appellant has a history of adulterous relationships which were documented and admitted to by Mr Grant. The aggravating factors found by the jury should be taken into consideration in rendering a sentence. *(ROA 873)*

Appellant Douglas Grant was sentenced on May 15 2009 The Court noted *11 that with respect to sentencing, Appellant was convicted of a nondangerous nonrepetitive offense and probation is available The Court also advised Appellant that the sentencing range for a Class 2 nondangerous, nonrepetitive felony carries a presumptive sentence of five years, an absolute minimum of three years, and an absolute maximum of 12 5 years *(RT 5/15/09 pgs 5-6)*

At the sentencing hearing, counsel for Appellant presented a number of witnesses to testify for Douglas Grant. In particular a DVD of Russell Cox, an unavailable witness, was played for the Court. Andrea Rogers, Mr Grant's neighbor, testified that he is a good father and urged that he should not be away from his kids *(RT 5/15/09 pgs 11 12)*

Vaugh Grant, Appellant's brother testified that he does not believe the life insurance policy should be considered as an aggravator Vaughn was Douglas and Faylene's agent, and testified that if Appellant was really motivated by financial gain, he would have started the process of changing Faylene's life insurance two weeks earlier or would have waited two more weeks until all the medical information was processed so that he would have received $860 000 Vaughn also opinioned that Appellant could have written him a check for $35 in order to increase the insurance benefit. *(RT 5/15/09 pgs 13 14)*

Becky Greer testified that Doug and Faylene stayed with her in Utah after *12 Faylene s accident Becky spent time alone with Faylene and believes she died as a result of untreated depression. Becky described Appellant as a person who loves helping people *(RT 5/15/09 pgs 16-17)*

In addition to the aforementioned witnesses Tammy Fuentes, Sterling Dewitt, Bowan Grant, Ione Grant, Hilary Grant, Marley Grant and Braven Grant all testified on behalf of Appellant. These witnesses described their personal relationships with Appellant, and requested leniency from the Court. *(RT 5/15/09 pgs 18-46)*

The State of Arizona then had an opportunity to make an argument for a particular sentence for Mr Grant. The State recommended the maximum sentence of 12 5 years The State pointed out the flawed mitigation testimony of many of the witnesses such as Vaughn Grant, who tried to influence the jury by signaling to them when Detective Palmer was testifying. In addition, the testimony that Mr Grant is a wonderful father was also challenged by the State, as Mr Grant was criticized for scarring his children by forcing them to present scripted testimony in addition to killing their mother The State also challenged Appellant's assertion that he is active in his church, as there were no letters submitted by a bishop or other authority head indicating his level of participation. In fact, the State points out that Appellant has been excommunicated from his church since May of 2001 *13 *(RT 5/15/09 pgs 47 58)*

The State also emphasized that Charlene Patterson testified at trial that Appellant was aching for money at the time he killed Faylene, and was at risk of not making payroll at the end of August and September of 2001 The State further argued that he was only current on his financial obligation to his children for seven months, and that he saved himself approximately $40 000 per year *(child support plus spousal maintenance)* as a result of killing Faylene The State also reminded the Court that Faylene's will left everything to Appellant, but another will contained a provision that her number one priority was for Jenna to receive braces However Appellant did not use the life insurance proceeds for Jenna's braces. Rather, he spent it on his new wife, house remodeling, and his housekeeper *(RT 5/15/09 pgs 59-68)*

With respect to the "especially cruel manner of death, the State of Arizona focused on Faylene's suffering Appellant used Faylene's faith against her and manipulated her into believing that it was Gods will for her to die It was clear that Faylene suffered and it was especially cruel that Faylene believed that another woman was chosen by God to replace her The State emphasized that Faylene's suffering was long and cruel Finally the State re-emphasized the suffering of Faylene's family which was already presented to the Court as an aggravating *14 factor *(RT 5/15/09 pgs 69-76)*

Counsel for Appellant presented arguments to the Court in support of a proposition that Appellant should receive a sentence of probation Counsel discussed the facts of Faylenes accident in Utah, and that Appellant was trying to save his wife With respect to the pecuniary gain, counsel for Appellant argued that if he had taken her life for money the jury would have convicted Appellant of first degree murder Counsel further argues that on the issue of cruelty, this aggravator should not be considered because the jury found there was no domestic violence Counsel also points out that Doug and Faylene had not slept for several days upon returning home from Utah. *(RT 5/15/09 pgs 77-89)*

With regards to mitigation, counsel argued that Mr Grant has successfully complied with all court orders and pretrial services monitoring, and has many character references Counsel discussed the flaws in the investigation and lack of evidence, which should go to the benefit of Appellant Finally, Counsel asked the Court to consider Faylene's letter to Hilary which expressed Faylenes wish for Appellant to marry Hilary and take care of her children. *(RT 5/15/09 pgs 90-95)*

Following these arguments Appellant Douglas Grant addressed the Court and expressed his grief for the loss of Faylene Appellant stated that he often talked about stories of Faylene with his children Appellant expressed that he *15 wished he could have saved her and would do anything to help the victims who mourn her loss *(RT 5/15/09 pgs 95 122)*

After hearing the arguments of all the parties, the Court discussed the mitigating and aggravating factors The Court recognized that Appellant has no prior felony convictions, and that the letters presented on his behalf evidence a very sincere sharing of personal experiences with Mr Grant where people have expressed how Appellant has helped in the community and/or helped various individuals The Court stated that the mitigation evidence is significant and credible. However the Court also recognized the tremendous pain and loss suffered by Faylene's family as well as the suffering of Faylene Given the nature and circumstances of the offense the Court found that probation was not appropriate The Court further ruled that the aggravators and mitigators balanced each other and that Defendant should be sentenced to the presumptive term of five years, followed by community supervision. *(RT 5/15/09 pgs 123-124)*

On May 26 2009, Appellant Douglas Grant filed a timely Notice of Appeal *(ROA 877)*

This Court has jurisdiction of this appeal pursuant to Article 6 § 5(3) of the Arizona Constitution, A R S §13-4031 (2001) A.R.S §13-4036 and A.R.S §13-4037

### *16 STATEMENT OF FACTS

This case involves a five month jury trial concerning the death of Faylene Grant, which occurred on or about September 27, 2001 Appellant Douglas Grant was convicted of manslaughter for the death of his wife Faylene Grant, who drowned in their bathtub after ingesting approximately five Ambien sleeping pills. Appellant denied killing his wife.

Appellant Douglas Grant was initially married to Faylene Grant from 1993 until October of 2000 Douglas and Faylene have two children together Prior to his first marriage with Faylene, Douglas Grant was married to a woman named Kimberly Towards the end of that marriage, Douglas committed adultery with Donese Worden Mumford, who was told by Douglas that she was the love of his life However, Douglas was then unfaithful to Donese and married Faylene in 1993 *(RT 2/2/09 250-253 RT 2/12/09)*

The State presented evidence that during his first marriage with Faylene Appellant was very manipulative and controlling over their relationship, and went so far as to prevent Faylene from spending time with her friends such as Sherri Stradling. During

their seven year marriage, Sherri was only allowed to see Faylene on one occasion because Appellant would not allow it. *(RT 2/17/09)*

*17  Hilary Grant, Appellant's current wife  started working for Appellant as a receptionist approximately 6 months before Faylene filed for divorce in 2000  Nevertheless, Hilary claims that she did not have intercourse with Appellant until the day after his divorce was final  *(RT 2/6/09)*

In October of 2000  Appellant commenced a serious relationship with Hilary  However  Donese Mumford testified that she was also in a relationship with Appellant at this time  and mistakenly believed as of the winter of 2000  that she was in a monogamous relationship with Appellant. In addition, the State presented evidence that at the same time he was engaged in sexual relationships with both Donese and Hilary  Appellant was seeking out other women on LDS Singles com. In May of 2001  Appellant was excommunicated from his church for his adulterous behavior

During the months preceding her death, Faylene reported to friends and family that she received a revelation from God foreshadowing her own death. Faylene wrote about these revelations in her personal diaries  Faylene also wrote farewell letters to family members, and intimated to her sister Jody that she felt as though she did not have much longer to live

During the summer of 2001, Appellant was still heavily involved in his relationship with Hilary  However  unbeknownst to Hilary, Douglas rekindled his  *18  relationship with Faylene, and proposed marriage to her  Wendy Brimhall testified that in the summer of 2001, Faylene intimated that Douglas kept asking her to marry him. According to Wendy, Faylene said that she did not want to marry him and believed that he was motivated to marry her in order to get out of paying $41 400 per year in child and spousal support. *(RT 2/24/09)*

Because she was conflicted, Faylene decided to go to her temple in Mesa, Arizona. As the Mesa temple was closed, Faylene traveled to the LDS temple in San Diego  California  Faylene then contacted Appellant on July 24, 2001, and said that she would marry him because she believed he accepted atonement. Ironically  Hilary Grant testified that she had intercourse with Appellant on this same date that Faylene accepted his marriage proposal. On the next day, Douglas Grant went to talk with his sister  Tamara Fuentes about his dilemma of being in love with two women. Tamara testifies that she advised Douglas to marry Faylene  *(RT 2/2/09 pgs  244  260  RT 2/6/09)*

On July 27  2001  Faylene and Douglas remarried in Las Vegas, Nevada.

On August 28, 2001, Faylene and Douglas Grant completed paperwork to increase their life insurance  Faylene's insurance was increased from $300,000 to $860 000 00  According to defense witness Vaughn Grant, their insurance representative  he initiated contact with Faylene and Douglas to revise their life  *19  insurance because they were eligible to receive greater insurance protection for smaller insurance premiums  However  there was also evidence presented that Appellant kept his own policy, which remained unchanged. However  the insurance policy application was not processed and approved prior to Faylene's death, and thus, Appellant received $300 000  *(RT 2/25/09 pgs  21  26) (ROA 184)*

The State of Arizona also presented evidence that even after the wedding, Appellant was still communicating with Hilary  On September 5  2001  Faylene writes that she must have faith in Douglas  visions  In other words, Douglas was telling Faylene that he had visions that she was going to die  To be sure, the jury received conflicting evidence regarding whether Faylene was having her own suicidal ideations, or homicidal ideations communicated to her by Appellant. Dr  Thomas Streed was permitted to testify as to benchmarks of suicide  (RT2/27/09 pgs  9  125)

Hilary testified that she was in contact with Faylene during the month preceding the victim's death, and that Faylene gave them her blessing and desire that Hilary and Douglas would be married before her death  Faylene was preoccupied with her revelation concerning her belief of an impending death. She purportedly planned the details of her funeral, and wrote farewell letters to some friends and family members  *(RT 2/6/09)*

*20 On September 21 2001 Douglas and Faylene traveled to Utah for a honeymoon On September 23 2001 while on her honeymoon, Faylene wrote letters to Douglas and Hilary urging them to get married prior to her funeral so that her children would not feel deserted. On the next day Faylene was injured while on her trip Faylene was taken to the hospital, where she received treatment for her injuries *(ROA 26 ROA 272)*

While the defense asserted that Faylene fell 40 to 60 feet and would have died if a tree had not broken her fall, there was other evidence from the State s witnesses evidencing that Faylene did not have any broken bones and that she suffered only bumps and bruises Dr Bradley Bently Faylene's treating physician, testified that he did not see any evidence of a collision with brush matter and that Faylene did not recall hitting any tree Dr Bently stated that if she would have fallen 40 to 60 feet, she would have suffered more damage Gennie Fulcher Becky Greer and Chad White all testify that Faylene suffered only one abrasion underneath the right breast. Faylene received prescriptions for hydrocodone and ibuprofen and was discharged. *(RT 12/17/08 pgs 2/25/09 pgs 157 186 ROA 271 272 RT 2/9/09)*

Faylene and Douglas Grant returned to their home in Arizona on the afternoon of September 26 2001 Appellant contacted his friend, Chad White, a *21 physician's assistant, who wrote several prescriptions for Faylene, including Carisoprodol, Darvocet, and Ambien According to Dr Emerson, Chad White wrote the prescription for Ambien at the request of Appellant Douglas Grant. Mr White also wrote instructions not to fill the Ambien prescription. However Douglas filled the all the prescriptions within 15 minutes of Chad's departure. *(RT 12/17/08 pgs 28 35 RT 1/14/09 pgs 63 68) (ROA 272)*

Appellant contends that Faylene told him she was going to take a bath early in the morning *(September 27 2001)* Evidence was also presented that Appellant gave Faylene approximately 5 Ambien pills at 6 00 or 7 00 am. According to Dr Mosley in his opinion, Faylene could not have gotten up or drawn a bath. Appellant told investigators that he ran a bath for Faylene and helped her into the bath. Appellant claimed he fell asleep and woke up, not realizing that Faylene had slipped under the water in the tub Mr Grant pulled her out of the tub and onto the bed. He did not call 9 1 1 Rather Appellant called Chad White, who reports that Mr Grant was not performing CPR when he arrived. Mr White called 9-1 1 *(RT 11/13/08 pg 54 RT 12/17/08 pgs 11-26) (ROA 184)*

According to the State of Arizona, the circumstantial evidence suggests that Faylene was never in the tub There was no water on the bed, and the paramedics indicated that as of 7 57 her body was dry Only her head was wet. In addition, *22 Faylene suffered a linear abrasion consistent with being dragged to the tub with bruising on her knees The evidence suggested that Appellant dragged her to the tub and held her head under the water *(RT 3/3/09 pgs 27-28)*

Over Appellant s objection, the Court allowed the jury to consider the lesser included offenses of Second Degree Murder and Manslaugher However the Court denied the State's request for an instruction on manslaughter by aiding suicide After 18 days of deliberations, the jury convicted Appellant of the lesser included offense of manslaughter *(RT 3/2/09 pgs 4-17)*

On March 24 2009 the jury found that Appellant Douglas Grant recklessly caused the death of his wife Faylene Grant, by drowning her in the bath tub There was also evidence at trial that Appellant failed to call 9 1 1 on her behalf and later lied about this fact. The victim predicted her death, and decided to write farewell letters but the jury did not believe that she took her own life *(RT 3/24/09 pgs 3 7)*

The aggravation phase of the trial commenced on March 24 2009, following the jury verdict. The aggravating circumstances submitted to the jury for consideration are as follows (1) The Defendant committed the offense in an especially cruel manner, (2) The Defendant committed the offense as consideration for the receipt, or in the expectation of the receipt, of anything of pecuniary value *23 and (3) The offense caused physical, emotional, or financial harm to the victim or if the victim died as a result of the conduct of the Defendant, caused emotional or financial harm to the victim's immediate family *(RT 3/24/09 pg 9)*

With respect to the first aggravator the State of Arizona emphasized to the jury Faylene's suffering between July 27 2001 and September 27 2001 the letters she wrote to people, and the extent of her efforts to find a substitute wife and mother for her children Appellant knew of her suffering because he was privy to the letters In addition, the State reminded the jury that Hilary was talking to Faylene during these months and Appellant was involved in these conversations According to the State s presentation of evidence, Faylene knew she was going to die and that was an especially cruel factor *(RT 3/24/09 pgs 13 14)*

With regard to the pecuniary gain aggravator the State of Arizona discussed with the jury the $41 400 in support payments that he would no longer owe, in addition to Faylene s $300 000 life insurance policy *(RT 3/24/09 pgs 14)*

Finally with respect to the emotional harm suffered by Faylene s immediate family the State called Faylene s sister brother and family members to testify as to how their lives have been impacted by Faylene's death. Jody Stratton, Faylene s sister testified that she was very close to her sister and Faylene was living with Jody prior to her remarriage for a period of time They engaged in a lot of family *24 activities together and their children were like brothers and sisters rather than cousins Jody did not get the opportunity to see Faylene often following the remarriage Jody testified as to her great love for Faylene, and that she grieves for her every day especially on holidays *(RT 3/24/09 pgs 15 18)*

Counsel for Appellant had the opportunity to cross-examine Jody Stratton During the cross-examination, Jody testified that she and Faylene have different fathers, and thus, are half-sisters Jody first learned of Faylene's revelation regarding her impending death approximately three weeks before she died. Jody testified that she never read Faylene's journals and that she was opposed to Faylene remarrying Douglas Grant. Jody conceded that she had negative feelings towards Appellant regarding a business decision, but that she supported the rest of her family no matter what business choice they made.

Jody also testified on cross-examination that she knew Faylene was traveling to the San Diego temple but did not know the specific reason. Jody confirmed that she did not like Douglas and did not want to be around him, but that she loved and respected her sister Faylene told Jody on September 7, 2001 that she thought she might not be around long enough to have another child. *(RT 3/24/09 pgs 19 37)*

On March 30, 2009 Jody Stratton submitted further testimony on the aggravation phase of this trial Jody testified on redirect regarding the grief she felt *25 at her sister's funeral, as well as the grief that she continues to feel everyday Jody also testified regarding how much she and Faylene loved each other *(RT 3/30/09 pgs 16-17)*

Following Jody Stratton s testimony Douger Eaves testified. Douger is Faylene's brother Mr Eaves described his relationship with Faylene He said that he has been close with Faylene his entire life and that his sister was very important to him. Faylene made him feel larger than life and instilled in him the belief that there was nothing he could not accomplish. Douger testified that he continues to miss his sister everyday *(RT 3/30/09 pgs 18 33)*

Joe Eaves Faylene's father also testified for the State of Arizona. Joe described his relationship with Faylene and emphasized that a day does not go by where he does not miss her or grieve over his loss *(RT 3/30/09 pgs 26-27)*

Jenna Stradling Faylene s daughter testified that she has always maintained a close relationship with her mother Jenna recalls that growing up she often felt as if Faylene was her only friend. Jenna testified that she misses Faylene and grieves over the fact that she will never see her mom again. *(RT 3/30/09 pgs 38-44)*

Glenna Eaves, mother of Faylene, was the last witness for the prosecution. Glenna described that she had a close relationship with Faylene They always talked and had fun together Glenna testified that she continues to miss Faylene *26 everyday *(RT 3/30/09 pgs 45-47)*

Douglas Grant testified on his own behalf during the aggravation phase The defense presented no other witnesses Counsel for Appellant did not object to the Court's submission of these aggravators to the jury

On March 31 2009, the jury returned a unanimous verdict that the State of Arizona proved all three aggravators beyond a reasonable doubt. *(RT 3/31/09 pgs 83-84)*

On May 15, 2009 Appellant Douglas Grant was sentenced to the presumptive term of five years imprisonment, to be followed by community supervision. *(RT 5/15/09 pgs 123-124)*

On May 26 2009 Appellant Douglas Grant filed a timely Notice of Appeal *(ROA 877)*

### ISSUE PRESENTED FOR REVIEW

This brief is submitted in compliance with *Anders v California*, 386 U S 738, 87 S Ct. 1396, 18 L.Ed.2d 493 (1967) and *State v Leon*, 104 Ariz 297 451 P 2d 878 (1969)

### *27  COMPLIANCE WITH ANDERS v CALIFORNIA

Counsel for Appellant Douglas Grant has performed a thorough and conscientious review of the entire record in this case pursuant to the dictates of *Anders v California*, 386 U S 738 87 S Ct. 1396, 18 L.Ed.2d 493 (1967) and *State v Leon*, 104 Ariz. 297, 451 P 2d 878 (1969)  but has found no arguable issues of law to assert on appeal.

Appellant challenges his sentence of five years imprisonment on grounds that the Superior Court erred by allowing the jury to consider three aggravating circumstances  Specifically  Appellant contends that if the Court had not submitted one or more of the aggravating factors to the jury for consideration, he would have received a shorter sentence due to the competing strength of his mitigating factors

In the instant case  the aggravating circumstances provided to the jury for consideration are as follows  (1) The Defendant committed the offense in an especially cruel manner  (2) The Defendant committed the offense as consideration for the receipt, or in the expectation of the receipt, of anything of pecuniary value  and (3) The offense caused physical, emotional, or financial harm to the victim or if the victim died as a result of the conduct of the Defendant, caused emotional or financial harm to the victim's immediate family *(RT 3/24/09 pg 9)*

Appellant alleges with respect to this appeal that the pecuniary gain  *28  aggravating factor should not have been submitted to the jury for consideration because if there was sufficient evidence presented at trial regarding pecuniary gain as a motive for killing his wife  Appellant would have been convicted of first degree pre-meditated murder  Accordingly  as Appellant was convicted of manslaughter  there was insufficient pre-meditation found by the jury, and therefore, pecuniary gain as a motive cannot be substantiated.

However, undersigned counsel believes in good faith that Appellant's argument cannot be supported by the law for multiple reasons

A.R S  §13 701(D) provides in pertinent part that  [f]or the purpose of determining the sentence pursuant to subsection C of this section, the trier of fact shall determine and the court shall consider the following aggravating circumstances, except that the court shall determine an aggravating circumstance under paragraph 11 of this subsection
5  Especially heinous  cruel or depraved manner in which the offense was committed.

6  The defendant committed the offense as consideration for the receipt, or in the expectation of the receipt, of anything of pecuniary value

9  The victim or  if the victim has died as a result of the conduct of the defendant, the victim's immediate family suffered physical, emotional or financial harm."


*29  "Under A R S  § 13 702  the existence of a single aggravating factor exposes a defendant to an aggravated sentence. Therefore  once a jury finds or a defendant admits a single aggravating factor, the Sixth Amendment permits the sentencing judge to find and consider additional factors relevant to the imposition of a sentence up to the maximum prescribed in that statute  State v Martinez  210 Ariz  578  585  115 P 3d 618, 625 (2005)

In determining what sentence to impose, the court shall take into account the amount of aggravating circumstances and whether the amount of mitigating circumstances is sufficiently substantial to call for the lesser term. If the court finds aggravating circumstances and does not find any mitigating circumstances  the court shall impose an aggravated sentence  Id  at 583  The courts are not to consider merely the number of aggravating and mitigating factors, but rather the quality and strength of each factor  State v  Greene, 192 Ariz  431  443  967 P 2d 106, 118 (1998)

"Under Arizona's sentencing scheme, once a jury implicitly or explicitly finds one aggravating factor  a defendant is exposed to a sentencing range that extends to the maximum punishment available under section 13 702  (citation omitted)  Under those circumstances  a trial judge has discretion to impose any sentence within the statutory sentencing range. Thus, a jury finding of a single  *30  aggravating factor establishes the facts legally essential to expose the defendant to the maximum sentence prescribed in section 13 702 " State v  Martinez, 210 Ariz  at 584

With regards to pecuniary gain, a defendant's lack of money, by itself is insufficient to establish the pecuniary gain aggravator  "A jury may find the existence of the pecuniary gain aggravating factor  if the expectation of pecuniary gain is a motive, cause or impetus for the murder and not merely a result of the murder      State v  Carreon, 210 Ariz  54, 107 P 3d 900, 913 (2005) citing to State v  Hyde, 186 Ariz  252, 280  921 P 2d 655  683 (1996)

However  where defense counsel does not object to the presentation of aggravating factors to the jury or to the form of the aggravated-circumstances verdict, the defendant forfeits his right to relief on appeal on these grounds unless he can establish that the court committed fundamental error  State v  Henderson, 10 Ariz. 561, 567  115 P 3d 601  607 (2005)  See also State v  Cigarroa-Perez  2008 WL 5149090(Ariz.App Div  1) at 3

"Fundamental error is  error going to the foundation of the case, error that takes from the defendant a right essential to his defense  and error of such magnitude that the defendant could not possibly have received a fair trial  Id  (quotation omitted.) We place the burden of persuasion on the defendant in a fundamental error review to  *31  discourage a defendant from taking his chances on a favorable verdict,    Therefore, to prevail under this standard of review  a defendant must establish that error occurred, that the error was fundamental, and that the error resulted in prejudice." Id.

In the instant case, counsel for Appellant did not object to the presentation of the aforementioned aggravating factors to the jury or to the form of the aggravated-circumstances verdict  Rather, at sentencing, counsel argued that the Court should not consider the pecuniary gain aggravator to increase Appellant s sentence, but made no timely objection that this aggravator should not have been submitted to the jury

Moreover  the Court committed no fundamental error in submitting the issue of pecuniary gain as an aggravator to the jury as there was substantial evidence presented at trial that pecuniary gain was at least one motivating factor in the manslaughter of Faylene Grant  In particular, the State produced evidence that a few weeks after Appellant remarried Faylene, the couple met with their insurance representative and Faylene filled out paperwork to increase her life insurance policy from $300,000 to $860 000, while Appellant made no changes to his policy  In addition, there was evidence presented that Faylene had prepared a will leaving everything to Appellant  The State also presented evidence regarding $41,400 in support payments that he would no longer owe upon Faylene's death.

This evidence, in conjunction with the other evidence at trial, provides **\*32** substantial evidence from which a jury could conclude that pecuniary gain was one motive for Appellant killing his wife  However, Appellant seemingly confuses pecuniary gain as a motive with premeditation. To be sure  Appellant contends that because the jury did not convict Appellant of first degree premeditated murder, he could not have killed her with the motive or expectation of receiving pecuniary gain.

Premeditation is a different and distinct issue from pecuniary gain as an aggravating circumstance  as there is no requirement that a defendant premeditate a killing for pecuniary gain for this aggravator to be applicable  In other words  pecuniary gain can be one motive for a killing, whether reckless or premeditated, and therefore, the Court did not commit fundamental error by submitting this aggravator to the jury

Finally  even if the Court committed fundamental error, there was no resulting prejudice to Appellant, as Appellant could have been sentenced to the statutory maximum 12 5 years upon finding of only *one* aggravator  There is no dispute in this case that Faylene's family suffered emotional pain as a result of the manslaughter  and thus, this aggravator was properly submitted to the jury  and there was substantial evidence to support the aggravator

Likewise, there was also substantial evidence to support the cruel means aggravator  as the Court and the jury agreed that Faylene suffered tremendously as a **\*33** result of Appellant's conduct, and that Appellant was aware of Faylene's suffering  Therefore  even without the pecuniary gain aggravator, the jury could have sentenced Appellant to 12 5 years in jail  Nevertheless  despite this discretion  the Court still gave him the presumptive five year sentence in consideration of his mitigating factors

Based on the foregoing, it is respectfully requested that this Court search the record for fundamental error  Because counsel s brief is an Anders Brief  counsel has filed a motion for leave to allow Appellant to file a supplemental brief *in propria persona*, so that Appellant will have the opportunity to raise any issues he believes to be of merit, as set forth in the accompanying motion.

### *CONCLUSION*

Based on the foregoing  after a thorough and conscientious review of the record, counsel for Appellant Douglas Grant can present no issue for review which will support a challenge on the Court's rulings, verdict and/or sentence imposed by the Superior Court  For the reasons stated, counsel requests additional time to allow Appellant to file a supplemental brief  In addition, counsel requests that this Court search the record for fundamental error

---

**End of Document**                                    © 2016 Thomson Reuters  No claim to original U S  Government Works

Exhibit 17

1   A. Melvin McDonald, Bar #002298
JONES, SKELTON & HOCHULI, P.L.C.
2   2901 North Central Avenue, Suite 800
Phoenix, Arizona 85012
3   Telephone (602) 263-1747
Fax (602) 200-7847
4   minuteentries@jshfirm.com

5   Attorneys for Defendant, Douglas Grant

6

       **SUPERIOR COURT OF THE STATE OF ARIZONA**
7
              **COUNTY OF MARICOPA**
8

| | |
|---|---|
| STATE OF ARIZONA, | NO. CR 2005-032986-001 SE |
| Plaintiff, | **MOTION FOR DISMISS WITH PREJUDICE OR, IN THE ALTERNATIVE, TO DEPOSE GILBERT POLICE DETECTIVES RAY AND PALMER AND EAVES FAMILY MEMBERS** |
| v | |
| DOUGLAS GRANT, | |
| Defendant | (Oral argument requested) |
| | |
| | (Assigned to the Honorable David M. Talamante) |

9
10
11
12
13
14
15
16
17

18        COMES NOW Douglas Grant, by and through his counsel undersigned, and
19  respectfully moves that the Court enter an order dismissing the indictment with prejudice
20  based upon continuing multiple acts of deception perpetrated on this Court arising from
21  the concealment of relevant evidence   In the alternative, and only if the Court believes
22  that further evidence is required to justify a dismissal, the defendant moves that the Court
23  postpone a ruling on the motion for dismissal and order that Detective Sy Ray and
24  Detective James Palmer, together with *all* Eaves and Stradling family members and their
25  spouses, be ordered to submit to sworn depositions, under penalty of perjury,  regarding
26  the continuing cover up and concealment of "farewell letters," and about their failure to

1   speak out when two different prosecutors, on three separate occasions, made false and
2   misleading statements to the court that such letters did not exist.

3         Recent disclosures have confirmed what defense counsel alleged in open
4   court -- that a massive cover-up and fraud was committed on the court and the defense
5   That fraud is continuing  The record now confirms that either the Eaves family or Gilbert
6   Police or both participated in a fraudulent concealment of farewell letters, and that the
7   prosecution and Gilbert police, knowing from their own interviews that such letters
8   existed, failed to aggressively pursue evidence which they knew for a certainty existed.
9   The defense has compelling evidence that Eaves family members or Gilbert police or both
10  are continuing to withhold other farewell letters that are exculpatory to the defendant and
11  in direct violation of orders of this Court.  This continuous misconduct, lasting in excess
12  of one year, mandates dismissal  This motion is supported by the attached memorandum
13  of points and authorities

14        RESPECTFULLY SUBMITTED this 11th day of September, 2006
15              JONES, SKELTON & HOCHULI, P L C

16
17        By_____
              A  Melvin McDonald
18                Attorneys for Defendant

19        **MEMORANDUM OF POINTS AND AUTHORITIES**
20        On September 30, 2001, three days after the tragic drowning of Faylene
21  Grant, a family meeting was held at Doug and Faylene's residence in Gilbert, Arizona
22  Those present at the meeting included Faylene's parents  Doug and Glenna Eaves,
23  Faylene's brother Douger Eaves and his wife Terina ,  Faylene's sister Cherlene Patterson
24  and her husband Darren, Faylene's sister Jody Stratton and her husband Shan, Randy
25  Grant, a cousin of Doug Grant, Danny Fuentes, Doug's brother-in-law, and several family
26  friends  (See Exhibit 1) The families were discussing issues relating to Faylene's funeral

1   and burial, scheduled for the next day   At the meeting, Doug revealed that Faylene had
2   written farewell letters to family members  and wanted those letters disbursed to them
3   after her funeral   The family expressed a strong desire to have the letters distributed at
4   that time   Doug Grant honored that request, handing out Faylene's letters in envelopes to
5   Glenna Eaves, Doug Eaves, Terina & Douger Eaves, Cherlene Patterson and Darren
6   Patterson, Jody Stratton and Shan Stratton.   Some letters went to Faylene's nieces and
7   nephews  There was also a zip lock baggy that had some cross stitch in it with another
8   note for Cherlene Patterson in it. There were also letters written to Jenna and Austin
9   Stradling (Faylene's oldest children) in the container, but a decision was made to hand
10  those letters over at a later date since they were not present at the September 30 meeting
11  Jenna's letter was handed to her by Doug soon after the September 30th meeting   Doug
12  spoke with Austin's father, Curt Stradling, about his letter and Mr  Stradling thought it
13  would be best to not give the letter to Austin at that time because of emotional concerns
14  Austin's farewell letter was turned over to the Gilbert police by the defendant prior to his
15  indictment.

16      When police began a criminal investigation against Mr  Grant in 2002, the
17  activities and farewell letters provided at that meeting were openly discussed by family
18  members with Gilbert detectives   Glenna Eaves described the existence of the letters to
19  Gilbert detectives

20          GLENNA EAVES  It was just on lined paper   *All of our*
21          *letters were on stationary* and *this was just kind of on lined*
            *paper*
22          DET   *Any, is there any question in your mind as to the*
23          *authenticity of Faylene actually writing that letter?*  Or are
            you
24          GLENNA EAVES  *No.  It, it, it was her writing*
25
26

3

1   Cherlene Patterson similarly admitted not only the existence of the farewell letters, but

2   acknowledged that she received one with other family members and agreed to turn it over

3   to Detective Palmer   Cherlene told Detective Palmer

4
5              PALMER.  Do  you  know  where  those  (farewell)  letters  are
              now?

6              Cherlene  In  the  different – with  the  different  people  that  she
              wrote them to during those days
7
              PALMER  Do you have any of them?
8
              Cherlene  I have one of them
9
              PALMER.  Would  it  be  possible  for  you  to  bring  those  in  so
10             that I can see them?

11             Cherlene  Uh huh

12   Jodie Stratton, Faylene's sister, similarly admitted to Gilbert investigators

13   that she too had received a letter from Faylene

14             JODY   And, and I might, I mean, I'm guessing a week, but it,
              probably no more than two weeks, but right around that time
15             frame   And she said it a lot   I mean that wasn't the only time
              she said it.  She had said it through this whole nine months
16             And so, when, I remember when we got that letter and Shan, I
              mean Shan came in and he says, Jody, you need to sit down.
17             And I said, and my heart dropped, so what's wrong?  *And he
              read me the letter and I just started bawling* because I didn't
18             understand  because  she  had  just,  I  mean,  this  whole  nine
              months that she's been divorced
19
              DET   *Was it her handwriting?*
20
              JODY   Yes   Definitely
21

22             The letter that Jody was speaking of was one that Faylene wrote when she

23   moved out of their home when re-marrying Mr Grant   That letter was one that Faylene

24   gave Jody  Mr Grant gave Jody and Shan two more letters at the family meeting  Neither

25   one of these two letters have been turned over as directed by the Court

26

4

1    **I**     **Request for the Farewell Letters**

2            Within weeks after the indictment, defense counsel wrote Frankie

3   Grimsman a simple discovery request asking Ms Grimsman to produce the farewell

4   letters referenced in Eaves family interviews   In a letter dated August 23, 2005, at

5   page 4, lines 2-3, defense counsel urged Ms Grimsman to produce these letters

6   McDonald stated "I need copies of Faylene's farewell letters to her family written in

7   anticipation of death "  When the request was ignored, a motion to compel was filed.

8   On September 30, 2005 at page 2, lines 5-10, this Court ruled

9            Oral argument is held regarding Defendant's Motion to
10            Compel Production of Disclosures and Missing and Purposely
            Withheld Police Departmental Reports   After discussion with
            counsel, IT IS ORDERED directing State's counsel to turn
11            over any discovery in the State's possession

12   When the discovery was not forthcoming, defense counsel again complained to the Court

13   This Court, on October 21, 2005, at page 24 lines 13-16  recommended that defense

14   counsel depose the detective  The transcript read

15            13    The court, I think you need to interview or

16            14    depose the detective

17            Following the Court's directive, Detective Ray was questioned about the

18   existence of these letters on November 2, 2005  He testified at page 33, lines 18-19

19            AMM  And, in fact, you, before the grand jury, there's other
            farewell letters that you've since seen, but even before the
20            grand jury, you knew that Faylene had written farewell letters
            to friends, correct?

21            RAY  Absolutely

22            AMM  To Doug and Hilary?

23            RAY  Correct

24            AMM  Hilary's mother?

25            RAY  Correct

26

1    AMM  Faylene's parents?

2    RAY  Multiple people

3    AMM  Her sisters?

4    RAY  Correct

5         With these concessions, (including the concession that "sisters" that

6    received farewell letters and not just one sister)  defense counsel wrote Detective Ray on

7    November 14, 2005 requesting these letters which he had admitted to exist   At page 3 of

8    the Sy Ray letter, defense counsel wrote "We know that there were other farewell letters

9    written to family members that have not been disclosed.  Would you please provide me

10   with all farewell letters to each Eaves family member in advance of the next interview"

11   Despite this request, the letters were not disclosed.

12        On December 7, 2005, defense counsel again asked prosecutor Frankie

13   Grimsman for these letters   At page 1, lines 8-9,  defense counsel asked Ms  Grimsman

14   for "the remaining letters that Faylene wrote to family members asking them to accept

15   Hilary"  Ms  Grimsman, like detective Ray, ignored the request.

16        On  December 21, 2005, Defense counsel again wrote Detective Ray   At

17   Page 3  #11 at lines 1-3,  Ray was questioned  " I have requested on numerous occasions

18   all "Farewell letters" written by Faylene to her family   Do I now have all the letters?

19   There was a farewell letter that Faylene wrote to Jenna Stradling   Are there any other

20   letters?"  No letters were produced.

21        A second interview was held with Detective Ray on February 3, 2006   At

22   page  44 of that interview, defense counsel again asked Detective Ray about the

23   undisclosed letters   Ray's answer marked the beginning of a fraud on defense counsel and

24   the court   Detective Ray had previously admitted the existence of the letters   It is clear in

25   February of 2006 that Detective Ray and the Eaves family had made a strategic decision

26

6

1   to keep those letters from the defense and to deny their existence   Ray responded to

2   defense counsels questions as follows (pages 44-45 of Feb 3, 2006 interview)

3           McDonald    I have asked in a number of letters for all
            additional farewell letters that Faylene wrote to family
4           members  We know there was one written to Jenna that we
            have   not received. What efforts have you made, if any, to
5           retrieve other farewell letters?

6           RAY  I have requested from the family any letters that they
            still have  They have told me that they've turned over all
7           the letters that they have.  I have made copies and
            produced the copies to you that I have in my possession
8
            AMM  Who in the family did you make the request to?
9
            RAY  Multiple people  Pretty much everybody on the Eaves
10          family  Talked to Mr  Stradling himself, I believe his wife
            was present at the same time  I've made multiple requests and
11          I've been told that I have the letters that they still have

12

13          On the date of this interview, no farewell letters written to Doug Eaves,

14   Glenna Eaves, Cherlene Patterson, Darren Patterson, Jody Stratton, Shan Stratton,

15   Douger Eaves, Terina Eaves, or Jenna Stradling had been provided to the defense   Since

16   each disclosure is assigned a Bates number, the state could have easily challenged defense

17   counsel's cover-up accusation by simply providing the court with the bates number of the

18   disclosure

19          Defense counsel was incensed at the continuing deception  On February 24,

20   2006, the issue was again brought up before the court  During the interim, Ms  Grimsman

21   had been replaced by Mr  Martinez  It was hoped that Mr  Martinez would put a stop to

22   this nonsense and provide the exculpatory documents to the defense  The February 24,

23   2006 transcript documents Mr  Martinez decision to withhold these letters from the

24   defense by denying their very existence  At page 8 lines 11-12, Martinez stated

25          Martinez.  I read a lot of the letter that were turned over to the
            defendant   I've seen those letters and they have been turned
26

7

over to the defendant    I have spoken to the people that I previously mentioned in my motion, but also because I looked at the discovery and it looks like those letters have already been turned over

At page 9, lines 5-13, Mr Martinez compounded the cover-up by accusing the defense of harassment for requesting disclosure of letters that police and prosecutors claimed had been turned over yet continued to conceal. Martinez avowed at page 9, lines 5-13

Martinez   I believe, it borders on harassment    In speaking with them (the Eaves family), *they told me that they don't have anymore letters* I've spoken to the detective   about it. So what more can we do other than provide the Court the documentation that indicates those letters have been turned over and point out that they have indicated that those matters have been turned over    We turned everything over

The only farewell letters turned over to the defense were letters that the defense had turned over  to the state in 2002, and even some of the most critical of those letters were concealed  There were no Bates numbered letters from Faylene to her parents, her sisters Jody and Cherlene, her brother Douger, his wife Terina, or Jody and Shan Stratton

This Court, at the February 24, 2006 recognized what was happening with the disclosure issue  The Court and defense counsel had the following exchange at page 12, lines 5-8

Judge Talamante    Come back to me and say, Judge  — you're going to have to tell me, basically, that somebody is withholding information.

Mr McDonald  That's what I will do  Somebody is

Judge  Or somebody is lying

Mr McDonald  Yeah.

8

1
2
3
4

> Judge   Then I will have to consider all of that in the light of the Victim's Rights statute   If I have an allegation that a victim is intentionally withholding information or is lying, that's a very serious allegation, Mr McDonald. And it would have to reach that point for me to consider anything that would infringe the Victim's Rights statute, but I may do that.

5   In fact, as this Court adeptly observed, the accusation counsel was making

6 was serious   It strikes at the very core of the criminal justice system.  It strikes at the very

7 core of the Rules of Criminal Procedure   The Court indicated that counsel could be

8 permitted to interview these family members despite the Victim's Rights statute if a

9 sufficient showing of a concealment of these letters was made to the court   After that

10 hearing, this court provided the following information in its minute entry of February 24,

11 2006

12
13

> "States counsel advises that all discovery/letters have been turned over to defense counsel"

14   Tragically, Mr  Martinez' avowals to the court were blatantly false    The

15 farewell letters had not been turned over and, according to Mr Martinez, the Eaves family

16 and Gilbert police were avowing to him that no such letters existed   After that hearing, a

17 full 11 days later, document's that were avowed did not exist began making an

18 appearance

19 **II    Terina Eaves Letter**

20
21   On March 7, 2006, almost two weeks after Mr  Martinez avowed to this

22 Court that the state had turned over all "farewell letters" prior to February 24th,  he turned

23 over one of the letters which the state had willfully concealed from the defense   There

24 was no explanation why he had avowed to the court on February 24th that all letters had

25 been turned over, and why this letter was now making an appearance   Did Mr  Martinez

26 have this letter prior to February 24th? Did Gilbert police have the letter prior to February

<center>9</center>

1   24th?  If so, why hadn't it been turned over to the defense?  If Terina Eaves had turned the

2   letter over after the February 24th hearing, what was her explanation or justification in

3   lying to Detective Ray?  Mr Martinez?  Did she decide to turn it over after hearing the

4   strong rebuke of the court?  Was it the belief of the family that possibly the pursuit of the

5   letters would stop if one of the letters was turned over?  Was the letter turned over to

6   Gilbert police in 2002 and concealed by them or misfiled by them?

7          There was no explanation why Terina Eaves would have denied the

8   existence of a farewell letter to Frankie Grimsman, Detective Sy Ray or Juan Martinez

9   Mr Martinez' disclosure statement, dated March 7, 2006, simply stated  "On March 7,

10  2006, I again disclosed all letters, memos, notes and inscriptions purportedly written by

11  Faylene Grant over an undetermined period of time   This disclosure includes Faylene's

12  "premonition letters" of her murder and her apparent acceptance of the killing a God's

13  will "  Mr Martinez, in his letter, was again misstating the history of Terina Eaves letter

14  His letter claimed he "again disclosed" Terina's letter  However, Terina's letter had never

15  been disclosed and the claim was false on its face  The prosecutor had appropriately

16  assigned a new bates number to Terina's letter   There was no other Terina letter which

17  had any bates number

18         Recognizing that Mr  Martinez had made an avowal to the Court that was

19  materially false, and recognizing that he was now disclosing a family letter that he had

20  previously avowed to the Court had been disclosed, Defense counsel wrote Mr  Martinez

21  on March 9, 2006, stating

22                     You state "On March 7, 2006, I again disclosed all letters,
                      memos, notes and inscriptions purportedly written by Faylene
23                     Grant over an undetermined period of time "  So the record is
                      clear, I have thus far found two letters not previously disclosed
24                     – a letter to Jim McElyea and a letter to Terina Eaves   Your
                      own assigned Bates Numbers,2892, show that they were not
25                     disclosed until a few days ago   I had argued for the
                      production of the McElyea letter at our last court hearing.
26                     *The problem with the state s disclosure to date is that we have*

10

1
2
3
4
5
6
7

*long known that there are other letters out there that have still not been disclosed, most specifically Cherlene Patterson, Glenna Eaves and Jody Stratton. It now appears that they intend to hold those letters back.* I will deal with that decision by an appropriate motion. *I will assume by your claim of complete disclosure that Cherlene Patterson, Glenna Eaves and Jody Stratton have made a decision not to turn over documents which we know were provided to them.* I would appreciate it if you would personally confirm from them that no such farewell letter exists. To remove any ambiguity, I am requesting letters written between April 2001 to the date of Faylene's death to Cherlene Patterson, Glenna Eaves, and Jody Stratton or any other member of the Eaves family.

8
9        There was no challenge from Mr. Martinez about the refutation of his claim.
10       Demand had been made to turn over the remaining letters - a demand that was ignored.

11       **III      The June 9, 2006 Remand Hearing - The continued "Fraud on the Court."**

12               Three months had gone by since the Terria Eaves disclosure and no further
13       farewell letters had been disclosed. Prosecutor Martinez and Detective Ray continued to
14       claim to the defense and later to the Court that all farewell letters had been disclosed.
15       Defense counsel, in open court, again demanded letters improperly withheld for almost
16       one year. As the Court will recall, Mr. McDonald read into the record Glenna Eaves
17       interview with Gilbert police acknowledge receipt and possession of her daughter's letter.
18       It was unfathomable that Glenna Eaves or any member of the Eaves family would destroy
19       or discard such a precious heirloom -- a letter from a beloved daughter or sister written
20       during the last weeks of her life. After reading Ms. Eaves statements, the state continued
21       to stonewall disclosure of the exhibits. Mr. Martinez, at page 17 18 to 18 2 avowed to the
22       Court:

23               *Additionally I will tell you the same thing I told you before. I have checked with the family about these issues. All I know is I've gone to all the family members. They don't have any more letters. I personally have gone and checked every item that's in the Gilbert Police Department. There aren't any more items. So I would just leave that for the court.*

24
25
26

11

1           The Eaves family sat in court and collectively said nothing   No one

2    approached the bar to correct Mr  Martinez' avowal even though he had just disclosed

3    Terina Eaves letter over a month after his previous avowal that no such letter existed  In

4    fact, Glenna Eaves was seen vigorously shaking her head denying the existence of

5    Faylene's letter to her during Mr  McDonald's presentation  This Court, hearing the

6    testimony and weighing that testimony against Mr  Martinez' avowal, apparently had

7    heard enough  After almost eight months of denials, this Court stated at pages 18, line 23

8    to 20, line 10

9           There is still a question as to whether or not those letters, those
10          documents are in the possession of the people that Mr
       McDonald has indicated in his motion.  And I will say, I
11          haven't looked at your response, Mr  Martinez.  I have
       considered your comments here in the courtroom.  I recall
12          what was said in the past.  I guess the only thing I can say is
       that – two things

13          Mr  McDonald through reference to interviews in his motion,
       has at least on its face set out a compelling argument *that*
14   *these letters do exist* or *did exit at one point in time*, and that
       they were available and in possession of the people that he
15          claims had them in their possession at a very definite point in
       time   There's no question about what his argument is  If they
16          no longer exist, they no longer exist.  And no on can change
       that fact  *All I will say is that if those letters do exist  and it s*
17   *determined at some point in time or they re found and they re*
       *not disclosed for purposes of this grand jury remand, they*
18   *surface sometime later  chances are we will all be back in the*
       *courtroom again.*  **And there will be a request at that time**
19   **for, at minimum, a remand to the grand jury again for**
       **consideration of those letters, and there probably will be**
20   **another request from Mr  McDonald to dismiss this case**
       **based on withholding of evidence or information that**
21   **should have been disclosed or discovered   If that's the**
       **case, then I will, in fact, consider the defendant's motions**
22   **if they're reurged if that occurs.  That's a big if**

23   **I don't know if any of that is going to happen  But I want**
       **everybody here to know that I will consider that if it does**
24   **happen  So if you don't have them, Mr  Martinez  You can't**
       disclose them and you're not being ordered to disclose them to
25   the grand jury  But if they come up later, we're all going to
       be here again to talk about the same things  All right.  You
26   have my orders "  (Emp  added)

1     The court's minute entry order of that date stated

2     States counsel indicates no additional letters exist to the States
      knowledge    COURT FINDS that if letters surface at a later
3     date, matter may be reconsidered by the court.

4     On August 10, 2006, Juan Martinez, disclosed 21 pages of documents,

5     which included some of the very letters which Detective Sy Ray, Prosecutor Frankie

6     Grimsman, Prosecutor Juan Martinez and Eaves family members had denied existed for

7     ten solid months  Those letters are attached as Exhibit 2   The farewell letters in the

8     August 10th disclosure were addressed to Doug Eaves (her father), a separate farewell

9     letter to Doug and Glenna Eaves (Faylene's parents),   a farewell letter to Cherlene

10    Patterson, a farewell letter to Darren Patterson, a note to Blake Patterson (Darren and

11    Cherlene's son), a note to Kylee Patterson (Darren and Cherlene's daughter) a note to

12    Casie Patterson (another daughter of Darren and Cherlene), and a resubmission of the

13    letter to Terina Eaves, turned over four months earlier     The state also disclosed the

14    farewell letter to Paige Dewitt   For months, prosecutors, police and family members

15    denied the existence of these letters

16    Nothing would have happened without the strong directive from the Court

17    The questions are obvious  Did Gilbert police have these letters all along?   Did they

18    conceal them from Mr Martinez?   Did he know about the letters when he made the

19    avowals in open court?   Did Eaves family members lie to Mr  Martinez, denying the

20    existence of these letters, then change their mind after hearing the order of the court?  Did

21    the Eaves family turn over the letters to Gilbert police in 2002 and the letters, like other

22    documents in this case  simply disappear? Without the Court's threats at the June 9  2006

23    hearing of possible dismissal of this case, the State and the Eaves family would have

24    continued to stonewall the letters, denying their existence    The state continues to

25    withhold letters written to Jenna Stradling, Shan Stratton, Jody Stratton, and others

26

13

1   Exhibit 1 is an affidavit of two witnesses to the September 30, 2001 family meeting  They

2   saw letters handed out to all of Faylene's sisters

3   **IV    THE LAW JUSTIFIES DISMISSAL OF THIS CASE FOR CONTINUOUS
        STATE MISCONDUCT**

4

5          It is widely recognized that the court has the authority to dismiss an

6   indictment because of prosecutorial misconduct. *Crimmins v Superior Court*, 137 Ariz. at

7   43-45, 668 P 2d at 886-88 (Feldman, J , specially concurring), *United States v Samango*,

8   450 F Supp  1097 (D Hawaii 1978), aff'd, 607 F 2d 877 (9th Cir 1979)  Dismissals with

9   prejudice occur only when the evidence is irrevocably tainted or there exists a pattern of

10  misconduct that is prevalent or continuous  *United States v Fields*, 592 F 2d 638, 648

11  (2nd Cir 1978), cert denied, 442 U S  917, 99 S Ct  2838, 61 L Ed 2d 284 (1979), *United*

12  *States v Lawson*, 502 F Supp  158, 172-73 (D Md 1980)  The continuing misconduct has

13  been going on for over a year and through multiple hearings

14         Arizona courts have long recognized that egregious and continuing state

15  misconduct can justified dismissal of a prosecution  See *State v Minnitt*, 203 Ariz  431,

16  55 P  3d 774 (2002), *Pool v Superior Court* (State), 139 Ariz. 98, 677 P  2d 261 (1984)

17  The prosecutor has an obligation to seek justice, not merely a conviction, and must refrain

18  from using improper methods to obtain a conviction  See *Bible*, 175 Ariz. at 600, 858 P 2d

19  at 1203  Pool, 139 Ariz  at 103  677 P 2d at 266  "We emphasize that the responsibilities

20  of a prosecutor go beyond the duty to convict defendants  Pursuant to its role of 'minister

21  of justice,' the prosecution has a duty to see that defendants receive a fair trial  Ariz  R

22  Sup Ct  42, E R  3 8

23         The defense believes that this continuing misconduct, extending over a full

24  year, mandates dismissal   If the Court does not dismiss the case with prejudice at this

25  time, the Court should enter an order allowing the depositions of Doug Eaves, Glenna

26  Eaves, Cherlene Patterson, Darren Patterson, Jody Stratton, Shan Stratton, Curt Stradling,

1   Mrs Curt Stradling, Jenna Stradling, Douger Eaves, Tenna Eaves, Detective James

2   Palmer and Detective Sy Ray

3           Additionally, if the motion for dismissal is denied, the defense would

4   request that the Court issue an order to police, prosecutors and the Eaves family that if any

5   farewell letter to an Eaves family member or Stradling family member continues to be

6   withheld, and the defense establishes by the evidence that such letter or letters exist, that

7   the sanction will be dismissal of the prosecution with prejudice  Douglas Grant has a due

8   process right to a fair trial  It is not for Eaves family members or Gilbert police or

9   prosecutors to decide what evidence can be considered by the defense or what evidence or

10   information they choose to conceal  The disclosure of August 10, 2006 came about only

11   because this Court had put a stop to the nonsense surrounding their denials  Such an order

12   is the only remedy available to convince the Eaves family and Gilbert police that the

13   Court, not the family, will decide what must be disclosed in this case

14           RESPECTFULLY SUBMITTED this 11th day of September, 2006

15                 JONES, SKELTON & HOCHULI, P L C

16

17                 By _____

18                    A. Melvin McDonald
                      Attorneys for Defendant

19   COPY of the foregoing hand-delivered
     this 11th day of September  2006 to
20

21   Honorable David Talamante
     222 East Javelina, 2D
     Mesa, Arizona  85210
22   Fax  602-506-202

23   Juan Martinez
     Maricopa County Attorney's Office
24   301 West Jefferson, 4th Floor
     Phoenix, Arizona 85003
25   Fax  602-506-7950

26

# Exhibit 18

Michael K Jeanes, Clerk of Court
*** Electronically Filed ***
L. Landeros, Deputy
9/27/2013 3 55 35 PM
Filing ID 5472133

# MEHRENS & WILEMON, P.A.

Attorneys at Law

99 East Virginia Avenue, Suite 220

Phoenix, Arizona 85004

(602) 258-5151

CRAIG MEHRENS  #001778
craig@mehrens-wilemon.com
AMY WILEMON  #011141
amy@mehrens-wilemon.com

Attorneys for Defendant

## IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

## IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| STATE OF ARIZONA, | NO   CR 2010-153913-001 DT |
| Plaintiff, | **MOTION FOR NEW TRIAL   (Rule 24 1)** |
| v | Assigned to the Hon  Warren J  Granville |
| RICHARD CHRISMAN, | Oral Argument Requested |
| Defendant | |

        Defendant Richard Chrisman, through counsel undersigned  hereby moves

this Court for a New Trial on the grounds that the prosecutor has been guilty of misconduct

and that the verdicts are contrary to the weight of the evidence   This Motion is made

pursuant to the Fifth and Fourteenth Amendments to the United States Constitution, Article

II  § 4 of the Arizona Constitution, and ARCrimP  Rule 24 1(c)(1) and (2)

## A.        DEPRIVATION OF A MATERIAL WITNESS

        In a letter dated November 20  2012  after repeated requests from the

defense, the prosecutor disclosed the witnesses he intended to use at trial   Andrew Hinz,[1]

who had tested the tasers in this case, was on the list   The defense requested to interview

---

[1]  The letter listed him as "Hines

Mr Hinz on May 31 2011, but the state did not arrange an interview until July 24, one week before trial Based on the interview, the defense determined that Hinz' testimony was highly relevant and desired to secure his presence at trial in the event the state did not call him The defense requested from the state Hinz' contact information The defense was informed that all contact with Mr Hinz must be made through their office Exhibit "A" hereto The state was subsequently served with a defense subpoena for Mr Hinz, and the state accepted said service Exhibit "B" hereto The defense attempted to make travel reservations for Mr Hinz though the County Attorney's Office without success His phone number was finally provided on August 20th, but Mr Hinz refused to cooperate with the defense Exhibit "C" hereto The state finally provided Mr Hinz' address on August 22, well after trial had started, and far too late to obtain Mr Hinz' presence with a subpoena since he resides in Colorado The state's actions cost Mr Chrisman a material witness [2]

**B          CONTINUING PATTERN OF MISCONDUCT IN COURT**

From the beginning, the state has engaged in a pattern of improper conduct, beginning with Interim Maricopa County Attorney Rick Romley's release of the crack pipe incident to the media right after Mr Chrismans arrest The prosecutor herein seized the baton and ran with it At one oral argument on a Motion to Remand before Judge Stephens, the prosecutor stated that Mr Chrisman lied and failed his employment polygraph exam, and was investigated for stealing and lied about it as well The statements by the prosecutor were false Moreover not only is this information inadmissible but also it had absolutely nothing to do with the legal or factual issues raised

---

[2] The importance of Andrew Hinz the Phoenix Police Department had hired Andrew Hinz, who at the time was employed by Taser International in Scottsdale Arizona He was hired to examine the Chrisman and Virgilio tasers, including the cartridges and the three probes found at the scene His findings, among others, were the exact times that each taser was fired and that Chrisman s taser never completed the circuit He authored a 51 page report

in the Motion. Instead it was said solely because media was present in an attempt to spread false information about Mr. Chrisman.

Mr. Martinez continued his inappropriate conduct during interviews with Mr. Chrisman's character witnesses. For example, he badgered one witness at length to force her to admit that she was in a same sex relationship and demanded her Social Security Number, even though she was an employee of the Maricopa County Sheriff's Office. Of another witness he demanded her ex-husband's phone number. He asked several witnesses if they had attended parties with Richard Chrisman where disrobing activities had taken place.

During the trial, out of the presence of the jury but with the television and print media in the courtroom, Mr. Martinez volunteered that Mr. Chrisman's cell phone records were important to his cross-examination of character witnesses because they showed "wife-swapping." Again, not true.

During trial, Mr. Martinez continued his inappropriate conduct in cross-examining defense witnesses. For example, when he learned that Peoria Police Officer Lon Bartel was using his vacation time to testify as an expert for the defense, he alleged he was a "double-dipper" and left the Peoria SWAT team without assistance. He examined Sergeant Mattson on his Police Union ties and alleged the taxpayers were supporting him. And with Mayra Hawkins Reesen, he grilled her on her maternity leave and why she had been away from work so long, yet had time to attend Mr. Chrisman's trial. He opened his cross with Sergeant Julie Egea by falsely accusing her of lying to him during his unsworn interview with her.

Mr. Martinez knew that Elvira Fernandez told Detective Cisneros that she lived in and owned the trailer but that she had put it in Daniel Rodriguez' name after she

3

incurred some medical bills as she didn't want the trailer to be taken away from her   Mr Martinez knew that basic search and seizure law gives any occupant of a residence the right to give consent to entry thereof   Despite these facts, he continually emphasized that Virgillo and Chrisman entered the trailer without a warrant, in an improper attempt to confuse and prejudice the jury   At one point, he attempted to have Virgillo testify that Ms Fernandez was not the titled owner of the trailer   Several objections by defense counsel were sustained   He then asked Officer Virgillo whether, if he had known that the trailer had belonged to Rodriguez, he would have gone about investigating the domestic violence crime differently   Mr  Martinez asked "How so?"  The defense objected on relevance ground, and when the Court asked Mr  Martinez what the relevance was  he volunteered the answer he had been attempting to elicit from the witness  "She doesn't own the trailer " And then, when the Court again asked him for the relevance  he stated  "She did not own the trailer "

**Mr  Martinez' Closing Argument.**  In the beginning of his closing argument, Mr  Martinez intentionally made several false statements concerning the evidence   For example, he stated four times that Richard Chrisman said Elvira Fernandez was hysterical when he spoke with her   He told the jurors that Lon Bartel  a double-dipper, testified that he wanted the jurors to believe "that SWAT members could look through walls "  He stated that Sergeant Mattson and Sergeant Post (who had not even testified) returned Virgillo's "golden clipboard      to put pressure on Virgillo to change his mind "  He stated that Sergeant Egea was "Rich Chrisman's friend" and that Sergeant Mattson was a "union organizer "  All of the above statements were untrue and not in evidence  nor were they reasonable inferences from the evidence

The above  however, was just Mr  Martinez' warm up for his *pièce de*

4

*résistance* of duplicity   Mr  Martinez was unable to convince the Court **not** to give a *Willits*

instruction   In an attempt to neutralize this important instruction,[3] he accused the defense

witnesses of tampering with evidence   Here is what he told the jurors   He started by

stating that the defense had  presented something to you that wasn t quite right."  P  34

He said that Mayra Hawkins  recollection of the AFIDs was a "deception on her part "  P

36   And then he moved to Eric Rude

> Did Eric Rude move that [evidence]?  Probably   Sure he did
> As he's the only one who had access to it   There can be no
> other way about it   P  40

> \*        \*        \*

> Eric Rude moved those items   He failed to preserve   It wasn t Detective Porter   It
> defendant's friend [4]  P  43

> \*        \*        \*

> And in light of what you have seen about things being moved
> by Eric Rude       It is a staged scene for you        Pp  46-47

And after accusing the defense witnesses of tampering with the evidence, he

summed up his argument as follows

> Is that something that really you think the defendant should be
> given a double bonus for that, just because his friend did that
> for him  did them that favor?  And because we have somebody
> by the name of Mayra Hawkins who wants to do him a favor to
> talk about something like that  are you going to give him the
> double bonus?  No  that's not how it works

> But - - so therefore we don't have to even explain the loss
> destruction  or failure to preserve because it was  if you will  his
> friends that did it   Pp  43-44

---

[3] The instruction was important for several reasons. Significantly  the Case Detective  Kenny Porter had not known that when fired, a taser ejects AFIDs which identify the taser fired  Since Porter did not know AFIDs existed when he investigated the shooting  he neither looked for nor seized any and  more significantly  did not have scene photographs taken before a storm significantly altered the crime scene

[4] There was no evidence that Officer Rude was a friend of Chrisman's

*     *     *

There is a staging of the scene  P 47   -  -

*     *     *

We'll send Sergeant Mattson to talk to him along with Mark Post   P  48

*     *     *

He [Chrisman] tried to get help from his friends who were
moving things around and they were talking about AFIDs   P
67

Taken as a whole, the conduct of this prosecutor before and during trial rises

to the level of misconduct as contemplated by Rule 24 1(c)(2), entitling Chrisman to a new

trial  Counsel would suggest that this prosecutor has no interest in adhering to his

obligation to see that "justice is done" but is only intent on obtaining convictions through

intimidation, innuendo and accusations based on unreasonable inferences  Arizona

Supreme Court Justice Michael Ryan's statements contained in defense counsels  Motion

in Limine re  Prosecutional Misconduct are indeed prophetic

C          MOTION FOR NEW TRIAL ON AGGRAVATING FACTOR

          The defense incorporates the facts and argument contained in Motion to

Vacate Judgment of Aggravating Factor  "Emotional Harm" as reasons for a new trial on

the aggravating factor as well

D          THE VERDICT IS CONTRARY TO THE WEIGHT OF THE EVIDENCE

          Assuming *arguendo* that the jury found that Chrisman pointed the gun at

Rodriguez' head  the only evidence that the state has that Rodriguez was placed in

"reasonable apprehension of immediate physical injury" was the testimony from Sergio

Virgillo that Rodriguez "looked shocked   His eyes were wide open." Rodriguez continued

to argue with Chrisman immediately after that  then fought off both officers' physical

6

attempts to subdue him, fought off OC spraying and then tasing   That evidence belies the

finding that Rodriguez was apprehensive, or fearful, of physical injury when the gun was

pointed at him   If the state's theory is correct, then anytime someone points a gun at

another, the person would be guilty of aggravated assault, which is not what the statute

requires   An expression of surprise for a second or two does not prove apprehension

beyond a reasonable doubt

RESPECTFULLY SUBMITTED this 27th day of September, 2013

MEHRENS AND WILEMON, P A

By  /s/ Craig Mehrens
   Craig Mehrens
   Attorney for Defendant

ORIGINAL of the foregoing e-filed
this 27th day of September, 2013  with

Clerk of the Court
*Maricopa County Superior Court*
201 W  Jefferson
Phoenix, AZ 85003

COPIES of the foregoing e-mailed
this 27th day of September  2013  to

Hon. Warren J  Granville
*Maricopa County Superior Court*
175 W  Madison, Suite 13103
Phoenix, AZ 85003
mtaube@superiorcourt.maricopa gov

7

Juan Martinez, Esq
*Maricopa County Attorney's Office*
301 W  Jefferson, 4th Floor
Phoenix, AZ 85003
martinej@mcao maricopa gov

Patrick G  Gann, Esq
Law Offices of Patrick G  Gann
522 W  1st Street, # 104
Tempe, AZ 85281
PGGann@mac com

--

/s/ Amy Wilemon
    Amy Wilemon

8

# EXHIBIT A

From    Taylor Katherine <taylok01@mcao maricopa.gov>
Subject  RE State v Chrisman
Date    July 25 2013 3:27:09 PM MST
To      "Kim H." <kim_gann@me.com>

Good afternoon

Mr Hinz has requested that any contact be made through our office   Thank you

*Kathie Taylor*
*Paralegal*
*Homicide Bureau*
*Maricopa County Attorney's Office*
*(602) 506-8389*

From: Kim H  [mailto:kim_gann@me.com]
Sent: Thursday July 25, 2013 1 12 PM
To: Taylor Katherine
Subject: State v Chrisman
Importance  High

Good afternoon Kathie

Could you please provide me with Andrew Hintz' current address and telephone number?

Thank you!

Kim Hewes
Legal Assistant to Patrick G  Gann
PATRICK G  GANN, ATTORNEY AT LAW
522 W  1st Street, Suite 104
Tempe, Arizona 85281
Email   Kim_gann@me.com
Phone  480 786-1919
Fax  480-786-1920

Privileged/confidential information may be contained in this message and may be subject to legal privilege  Access to this e-mail by anyone other than the intended is unauthorized  If you are not the intended recipient, you may not use, copy  distribute or deliver to anyone this message (or any part of its contents ) or take any action in reliance on it  In such case, you should destroy this message, and notify us immediately  If you have received this e-mail in error, please notify us immediately by e-mail or telephone and delete the e-mail from any computer

# EXHIBIT B

1  | PATRICK G GANN
   | 522 W 1st Street, #104
2  | Tempe, Arizona 85281
   | Arizona State Bar No 015073
3  | PGGann@mac com
   | 480-786 1919
4  | 480 786-1920 (fax)

# ORIGINAL

5

6                IN THE MARICOPA COUNTY SUPERIOR COURT

7                COUNTY OF MARICOPA  STATE OF ARIZONA

8  STATE OF ARIZONA,                )
                                     )    Case No  CR2010-153913 001
   Plaintiff,                        )
9                                    )
                                     )
10 vs                               )    SUBPOENA IN A CRIMINAL ACTION
                                     )    If you want the legal advice from a lawyer,
11                                   )    contact the Lawyer Referral Service at
   RICHARD CHRISMAN                  )
12                                   )         602-257 4434
   Defendant                        )              o
13                                   )         www.lawyerfinders.org.
                                              Sponsored by the
14 THE STATE OF ARIZONA TO    Andrew Hinz    Maricopa County Bar Association
                              c/o Maricopa County Attorney's Office
15                            301 W Jefferson 4th Floor
                              Phoenix, Arizona 85003
16
17 YOU ARE COMMANDED to appear and give testimony at a Jury Trial at the time
   and place specified  below

18 BEFORE WHOM APPEARANCE TO BE MADE  Judge of the Maricopa County Superior
   Court  Courtroom #5B
19
20 DATE AND TIME OF APPEARANCE:  Wednesday July 31, 2013 at 8:00AM

21 PLACE OF APPEARANCE        Maricopa County Superior Court
                              Courtroom #5B
22                            South Court Tower
                              175 W  Madison
23                            Phoenix, AZ 85003

24        In the event this Subpoena is for appearance before the Court  please contact the
   division of this Court stated above the determine if the trial or hearing time has been changed
25 A R S  Section 22 217, 12-2211, RCP 45(a)  53(c)

26        You have been subpoenaed by the Defendant whose attorney's name, address and
   telephone number is
27                            Patrick G  Gann
                             522 W  1st Street, #104
28                            Tempe, AZ 85281
                             (480) 786-1919

1   YOU ARE HEREBY NOTIFIED THAT ANY FAILURE TO OBEY THIS SUBPOENA
2   WITHOUT ADEQUATE EXCUSE MAY BE DEEMED A CONTEMPT OF THIS COURT,
    AND A CIVIL ARREST WARRANT MAY BE ISSUED   A CIVIL ARREST IS AN ORDER
3   DIRECTING ANY POLICE OFFICER IN ARIZONA TO ARREST YOU AND BRING YOU
    BEFORE THIS COURT FOR FUTURE PROCEEDINGS

4
5   SIGNED AND SEALED this date _____   JUL 26 2013

6                                   MICHAEL K. JEANS
                                    CLERK OF THE COURT
7
8                                   _____
9                                   Deputy Clerk of the Court

10  
11                                       S PONICKI
                                        DEPUTY CLERK
12
13
14              REQUESTS FOR REASONABLE ACCOMMODATION
15              FOR PERSONS WITH DISABILITIES MUST BE MADE
                   TO THE DIVISION ASSIGNED TO THE CASE
16               BY PARTIES AT LEAST 3 JUDICIAL DAYS IN
                ADVANCE OF A SCHEDULED COURT PROCEEDING.
17
18
19
20
21
22
23
24
25
26
27
28

MICHAEL K JEANES, CLERK
RECEIVED-SB
OUTSIDE DEPOSITORY

IN THE MARICOPA COUNTY SUPERIOR COURT
COUNTY OF MARICOPA, STATE OF ARIZONA 13 JUL 29  PH 12. 35

| | | |
|---|---|---|
| STATE OF ARIZONA, | ) | Case No  CR2010-153913-001 |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | |
| vs | ) | |
| | ) | DECLARATION OF SERVICE BY |
| RICHARD CHRISMAN | ) | PRIVATE PROCESS SERVER |
| | ) | |
| DEFENDANT | ) | |
| | ) | |

**GENERAL DESCRIPTION OF DOCUMENTS SERVED:**
SUBPOENA IN A CRIMINAL ACTION

**I SERVED TRUE COPIES OF THE ABOVE LISTED DOCUMENTS ON THE PERSON/ENTITY  LISTED BELOW IN ACCORDANCE WITH THE ARIZONA RULES OF CIVIL PROCEDURE**

**PERSON/ENTITY     ANDREW HINZ**

**MANNER'  SERVED PARALEGAL TO MARICOPA COUNTY ATTORNEY JUAN MARTINEZ, KATHERINE TAYLOR, WHO WAS AUTHORIZED TO ACCEPT SERVICE ON BEHALF OF ANDREW HINZ.**

**NOTES.     WHITE FEMALE, 41 YRS OLD  BROWN HAIR, 5'4", 150-180LBS.**

**ADDRESS.  301 W JEFFERSON ST 4TH FLOOR, MARICOPA COUNTY ATTORNEY OFFICE.**

**DATE.     7/29/2013                                    TIME.     8.15 AM**

**THE UNDERSIGNED CERTIFIES UNDER PENALTY OF PERJURY THAT I AM CERTIFIED TO SERVE PROCESS IN THIS ACTION WITHIN THE STATE OF ARIZONA, HAVING BEEN SO CERTIFIED AND REGISTERED BY THE SUPERIOR COURT OF MARICOPA COUNTY, ARIZONA, AND THAT THE ABOVE IS TRUE AND ACCURATE TO THE BEST OF MY KNOWLEDGE**

DECLARANT        *Sarah Zirakian*

SARAH ZIRAKIAN
ARIZONA PROCESS SERVICE LICENSE #7838
July 29, 2013

# EXHIBIT C

From: Taylor Katherine <taylok01@mceo.maricopa.gov>
Subject: RE. Andrew Hinz
Date: August 20, 2013 11:24:09 AM MST
To   Kim H " <kim_gann@me.com>

Kim

Mr Hinz would like your office to make all travel arrangements   He can be reached at (303) 809-8090   Thank you

*Kathie Taylor*
*Paralegal*
*Homicide Bureau*
*Maricopa County Attorney's Office*
*(602) 506-8389*

From. Kim H  [mailto kim_gann@me.com]
Sent: Thursday  August 15  2013 1 37 PM
To: Taylor Katherine
Subject: Re. Andrew Hinz

Good afternoon Kathie.

We cannot make any reservations for Mr  Hines without an address nor can we book a plane or hotel without one   We will also need Mr Hinz' phone number if there is a delay in flights or if there is a change in the Court's schedule

Please provide this to us as soon as possible so I can get things set up

Kim Hewes
Legal Assistant to Patrick G  Gann
PATRICK G  GANN, ATTORNEY AT LAW
522 W  1st Street, Suite 104
Tempe, Arizona 85281
Email  Kim_gann@me.com
Phone  480 786-1919
Fax   480-786-1920

Privileged/confidential information may be contained in this message and may be subject to legal privilege  Access to this e-mail by anyone other than the intended is

unauthorized  If you are not the intended recipient, you may not use, copy, distribute or deliver to anyone this message (or any part of its contents ) or take any action in reliance on it  In such case, you should destroy this message, and notify us immediately  If you have received this e-mail in error, please notify us immediately by e-mail or telephone and delete the e-mail from any computer

**PLEASE NOTE OUR OFFICE HAS RELOCATED TO 522 W 1st Street, #104, Tempe, AZ 85281**

On Aug 15, 2013, at 1 13 PM, Taylor Katherine wrote

Good afternoon,

I spoke with Andrew Hinz this afternoon.  He has a busy schedule the next three weeks and would like to know as soon as possible when he will be needed to testify  He will need to make arrangements with his work schedule.

Please book his flight/hotel arrangements  His driver s license has Andrew Hinz and his DOB is 02/04/73  Mr  Hinz should not have to pre-pay any costs  Thank you

*Kathie Taylor*
*Paralegal*
*Homicide Bureau*
*Maricopa County Attorney's Office*
*(602) 506-8389*

From. Kim H  [mailto.kim_gahn@me.com]
Sent  Thursday August 15, 2013 11 04 AM
To.. Taylor Katherine
Subject: Re  Andrew Hinz

Good morning Kathie.

This email serves as confirmation that we will pay for coach fare and reasonable hotel / per diem however he may want to make his own arrangements  Unfortunately, I cannot give a date yet because Mr  Martinez is still presenting his case and we don't know when he will rest

Kim Hewes
Legal Assistant to Patrick G. Gann
PATRICK G. GANN, ATTORNEY AT LAW
522 W. 1st Street, Suite 104
Tempe, Arizona 85281
Email   Kim_gann@me.com
Phone  480-786-1919
Fax    480-786-1920

Privileged/confidential information may be contained in this message and may be subject to legal privilege. Access to this e-mail by anyone other than the intended is unauthorized. If you are not the intended recipient, you may not use, copy, distribute or deliver to anyone this message (or any part of its contents ) or take any action in reliance on it. In such case, you should destroy this message, and notify us immediately. If you have received this e mail in error, please notify us immediately by e-mail or telephone and delete the e-mail from any computer.

**PLEASE NOTE OUR OFFICE HAS RELOCATED TO 522 W. 1st Street, #104, Tempe, AZ 85281**

On Aug 15 2013, at 9:38 AM, Taylor Katherine wrote:


Good morning Kim

I forwarded a copy of the subpoena on to Mr Hinz and he will make himself available for trial. Please provide me with dates and times he will be needed and I will forward the information. As a reminder you will need to make airline and hotel arrangements for him. Thank you

*Kathie Taylor*
*Paralegal*
*Homicide Bureau*
*Maricopa County Attorney's Office*
*(602) 506 8389*

From Kim H [mailto:kim_gann@me.com]
Sent: Thursday, August 15, 2013 9:19 AM

Exhibit 19

Michael K Jeanes Clerk of Court
*** Electronically Filed ***
K. Curtner, Deputy
10/7/2013 11 07 01 AM
Filing ID 5486397

WILLIAM G MONTGOMERY
MARICOPA COUNTY ATTORNEY

Juan M  Martinez
Deputy County Attorney
Bar Id #: 009510
301 West Jefferson, 4th Floor
Phoenix, AZ  85003
Telephone: (602) 506-5780
Mcaomjc1@mcao Maricopa Gov
MCAO Firm #   00032000
Attorney for Plaintiff

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| THE STATE OF ARIZONA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs | ) |
| | ) |
| RICHARD CHRISMAN, | )   CR 2010-153913-001 |
| | ) |
| Defendant | )   OBJECTION TO MOTION FOR NEW |
| | )   TRIAL (RULE 24 1) |
| | ) |
| | ) |
| | )   (Assigned to the  Honorable |
| | )   Warren J  Granville) |

The  State  of  Arizona,  by  the  undersigned  Deputy  County
Attorney,  objects  to  defendant's  request  for  a  new  trial   This
response  is  supported  by  the  attached  Memorandum  of  Points  and
Authorities

Submitted October ___7___, 2013

WILLIAM G MONTGOMERY
MARICOPA COUNTY ATTORNEY

BY /s/ _____
/s/ Juan M  Martinez
Deputy County Attorney

## MEMORANDUM OF POINTS AND AUTHORITIES

**I   FACTS**

On October 13, 2010, Richard Chrisman, a police officer, was indicted on charges of second degree murder, aggravated assault and cruelty to animals   Defendant was alleged to have assaulted and killed Daniel Frank Rodriguez  when responding to a call for assistance from the victim s mother, Elvira Fernandez, on October 5, 2010

The aggravated assault charge arose from defendant's act of placing his weapon to the victim's head when first entering the residence   Defendant also shot and killed the victim's dog before killing the victim   Officer Sergio Virgillo was present when the offenses occurred

On January 3, 2011, the State alleged four aggravating circumstances other than prior convictions, including that the offenses caused emotional harm to the victim's immediate family

On September 17, 2013, a jury convicted defendant of aggravated assault but was unable to reach agreement on the other two counts   A mistrial was declared on those counts

The alleged aggravating factors other than emotional harm were implicit in the guilty verdict   Later on September 17, the emotional harm factor was tried to the jury   The State called Ms  Fernandez, who testified that she and the victim's father suffered emotional harm from defendant's act of putting his gun to the victim's head   The jury then returned its verdict that the State had proven the offense caused emotional harm to the victim's family   This court set the time for entry of judgment and sentencing for October 18, 2013

2

(                (

Defendant now seeks a new trial for the reasons set forth in Rule 24 1(c)(1) and (2), Ariz R Crim P   He fails to present any valid argument to support a new trial for those reasons

## II   LAW AND ARGUMENT

Rule 24 1(c) includes the following grounds on which a court may grant a new trial:  "(1) The verdict is contrary to law or to the weight of the evidence; (2) The prosecutor has been guilty of misconduct "

"As has been stated many times, motions for a new trial are not looked upon with favor and are to be granted with great caution       Trial by jury is one of the most treasured guarantees of the Bill of Rights   Any interference with the jury's province must be exercised punctiliously "   *State v Clifton*, 134 Ariz  345, 349, 656 P 2d 634, 638 (App  1982), *accord, State v Rankovich*, 159 Ariz  116, 121, 765 P 2d 518, 523 (1988)   Defendant here has not met the high standard required to overturn the jury's verdicts

Defendant also has not provided any legal authority in his motion, as required by Rule 35 1

### A   Deprivation of a material witness

A copy of a subpoena compelling the appearance of Andrew Hinz was served on the Maricopa County Attorney's Office on July 29, 2013   It ordered his appearance for Wednesday, July 31, 2013, the trial commencement date   A copy of the subpoena was forwarded to Mr  Hinz who agreed to make himself available to testify at trial   However, he requested that his appearance be scheduled for Wednesday, August 28, since he already had a court appearance in Phoenix the following day   This date also

3

accommodated his employment obligations   Defense counsel was provided the witness' telephone number and address   According to Mr  Hinz, defense counsel did not confirm a definite date and time for his appearance either telephonically or in writing Attached is a copy of the electronic correspondence confirming Mr  Hinz' willingness to appear for trial

The court also offered to assist defense counsel in securing the attendance of this witness for trial   The court's offer was refused

Defendant s argument that he was deprived of a "material witness" does not fall under Rule 24 1(c)(1) and (2)   Defendant indicates that Mr  Hinz would have testified about the officers' use of their Tasers during the incident, and such   testimony would have been "highly relevant "   However, defendant was convicted only of aggravated assault, which arose when defendant pointed his service weapon — not his Taser — at the victim's head

Whether or not Mr   Hinz testified about Tasers had no relevance to the aggravated assault verdict   A motion for new trial applies to the verdict rendered, not to other counts on which the jury could not agree   Contrary to defendant's argument "state's actions" did not "cost Mr  Chrisman a material witness" relating to the aggravated assault count   He is not entitled to a new trial on that basis

**B   Continuing pattern of misconduct in court**

Defendant first alleges "improper conduct" that occurred long before trial and was previously addressed by the court   The motion to remand was filed on November 2, 2010, and denied on

4

(                          (

February 2, 2011   The alleged conduct by former County Attorney Richard M Romley and other alleged conduct by the undersigned prosecutor was raised in a motion to disqualify the Maricopa County Attorney's Office filed on February 23, 2011, and denied on May 17, 2011   Defendant also filed a form motion in limine regarding some type of anticipated prosecutorial misconduct on July 25, 2013, which was denied on August 1, 2013

Defendant acknowledges that alleged "inappropriate conduct" during witness interviews did not occur during trial   He further acknowledges that comments about his cell phone records occurred out of the presence of the jury   None of these actions would be considered "prosecutorial misconduct," nor would they have affected the jury's verdict

"Prosecutorial misconduct 'is not merely the result of legal error, negligence, mistake, or insignificant impropriety, but, taken as a whole, amounts to intentional conduct which the prosecutor knows to be improper and prejudicial, and which he pursues for any improper purpose with indifference to a significant resulting danger of mistrial '  *Pool v Superior Court*, 139 Ariz  98, 108-09, 677 P 2d 261, 271-72 (1984) (footnote omitted) "  *State v Aguilar*, 217 Ariz  235, 238-239, ¶ 11  172 P 3d 423, 426-427 (App  2007)

A defendant's conviction will be reversed for prosecutorial misconduct only if "misconduct is indeed present " and "a reasonable likelihood exists that the misconduct could have affected the jury's verdict, thereby denying defendant a fair trial "  *State v Anderson*, 210 Ariz  327, 340  ¶ 45  111 P 3d 369, 382 (2005)   The conduct also must be "so pronounced and

5

(                    (

persistent that it permeates the entire atmosphere of the trial "
*State v Hughes*, 193 Ariz  72, 79, ¶ 26, 969 P 2d 1184, 1191
(1998); *accord, State v Gallardo*, 225 Ariz  560, 568  ¶ 34, 242
P 3d 159, 167 (2010)

As to conduct that occurred during the trial, defendant
fails to explain how it affected the aggravated assault verdict
He alleges that cross-examination of certain police witnesses was
"inappropriate," although their testimony did not relate to
aggravated assault   Defendant also complains about examination
on the issue of who owned the trailer   Again, no connection is
made to the charge on which defendant was convicted   General
complaints about minor pretrial and trial issues are not grounds
for granting a new trial, nor is this evidence of prosecutorial
misconduct

Regarding the State's closing argument, the prosecutor did
not make "several false statements "  Defendant also opened the
door to rebuttal argument on who may have been responsible for
"missing" evidence at the scene   It must be noted once again,
however, that none of defendant's allegations have anything to do
with the aggravated assault verdict   Although defendant spends
considerable time arguing about AFIDs from Tasers, the aggravated
assault was not committed with a Taser   Therefore, the jury's
verdict could not have been affected by comments during closing
about Taser evidence

> Prosecutors have "wide latitude in their closing
> arguments to the jury " *State v  Comer*, 165 Ariz
> 413, 426, 799 P 2d 333, 346 (1990)  When one party
> raises an argument that is improper or irrelevant,
> "the other party may have a right to     respond [
> ] with comments     on the same subject " *Pool v
> Superior Court*, 139 Ariz  98, 103, 677 P 2d 261,
> 266 (1984)  We will not reverse  a  conviction

6

(                              (

> because of a prosecutor's improper comments during
> closing argument unless there is a " 'reasonable
> likelihood' that the 'misconduct could have
> affected the jury's verdict ' " *State v Newell*,
> 212 Ariz 389, ¶ 67 132 P 3d 833  847 (2006),
> quoting *State v Atwood*, 171 Ariz 576, 606, 832
> P 2d 593, 623 (1992)

*State v Edmisten*, 220 Ariz 517, 524, ¶ 23, 207 P 3d 770, 777 (App 2009)

C    Motion for new trial on aggravating factor

Defendant incorporates the facts and argument contained in his Motion to Vacate Judgment of Aggravating Factor Emotional Harm, filed on September 20, 2013  He argues that those facts and argument are "reasons for a new trial on the aggravating factor as well "  The grounds to vacate a judgment under Rule 24 2 are different than the grounds for a new trial under Rule 24 1  Because defendant has failed to develop his argument under the applicable rule, the State can only guess what argument he is making

During rebuttal closing, the prosecutor argued that no one from the defense took the stand to testify that the defense did not intend to embarrass Ms Fernandez by raising her prior felony conviction  Defense counsel had simply stated in his closing that "we" did not mean to embarrass her  After objecting that the State was "shifting the burden," defense counsel moved for a mistrial  The court denied the motion, stating that the court did "not believe that it's such a manifest injustice that will require mistrial "

The prosecutor did not commit any misconduct in closing, because defendant opened the door to the argument, and because a general comment on failure to present evidence is not "burden

7

shifting *.*  *State v Moody*, 208 Ariz  424, 464,  ¶ 180,  94 P 3d
1119, 1159 (2004);  *State v  Sarullo*, 219 Ariz  431  437,  ¶¶ 23-
24, 199 P 3d 686, 692 (App  2008)   Furthermore, in denying the
motion for mistrial, the court already determined that defendant
did not suffer prejudice

        As  to  any  argument  that  the  verdict  on  the  aggravating
factor  was  contrary  to  the  weight  of  the  evidence,  Ms
Fernandez's testimony provided sufficient evidence for the jury
to find that the victim's family suffered emotional harm

        D    The verdict is contrary to the weight of the evidence

        Defendant argues that the guilty verdict on the aggravated
assault count is contrary to the weight of the evidence    He
acknowledges, however, that Officer Virgillo testified that the
victim "looked shocked" when the gun was placed to his head
Defendant does not dispute that a gun was used   He then argues
that the victim could not have been fearful, because the victim
"fought off" the officers    On the contrary, the victim's attempt
to get away indicates that he was in fact fearful

        "A new trial under rule 24 is required only if 'the evidence
was insufficient to support a finding beyond a reasonable doubt
that the defendant committed the crime ' *Landrigan*, 176 Ariz  at
4   859 P 2d at 114   In determining the sufficiency of the
evidence, we view the evidence in the light most favorable to
sustaining the verdict, and we resolve all inferences against
defendant " *State v Spears*,  184 Ariz  277, 290, 908 P 2d 1062,
1075 (1996)   "To set aside a  jury verdict for insufficient
evidence it must clearly appear that upon no hypothesis whatever
is there sufficient evidence to support the conclusion reached by

the jury " *State v Arredondo*, 155 Ariz 314, 316, 746 P 2d 484, 486 (1987)  "If reasonable men could differ as to whether the evidence establishes a fact in issue, that evidence is substantial "  *State v Mincey*, 141 Ariz  425, 432, 687 P 2d 1180, 1187 (1984)

Both Officer Virgillo and defendant testified about defendant pointing the gun at the victim and the victim's reaction   The jury apparently believed Officer Virgillo Sufficient evidence existed that the victim was placed in reasonable apprehension of immediate physical injury when a police officer entered his residence, yelled at him and placed a gun to his head   The verdict is not contrary to the weight of the evidence

## III   CONCLUSION

Defendant has failed to provide any factual or legal grounds to support overturning the jury's guilty verdict   Therefore, defendant's motion for new trial should be denied

Submitted October _7_ , 2013

WILLIAM G MONTGOMERY
MARICOPA COUNTY ATTORNEY

BY /s/
/s/ Juan M Martínez
Deputy County Attorney

9

Copy mailed\delivered
October __7__, 2013,
to:

The Honorable Warren J  Granville
Judge of the Superior Court

Craig Mehrens
99 E  Virginia Ave , Suite 220
Phoenix, AZ  85004

BY /s/ _____
     /s/ Juan M  Martinez
         Deputy County Attorney

10

# ATTACHMENT

## CR 2010-153913-001

**Taylor Katherine**

| | |
|---|---|
| From: | Martinez Juan |
| Sent: | Thursday, August 22 2013 3 08 PM |
| To | Craig Mehrens (craig@mehrens-wliemon.com) |
| Cc: | Taylor Katherine |
| Subject: | Andrew Heinz |

I spoke with Andrew Heinz this afternoon and he confirmed that he spoke with someone from you or Mr Gann's office regarding his trip to Phoenix on Wednesday evening  He was told that he would need to pay for his own hotel room and make his own flight arrangements.  He indicated that would be unacceptable  Additionally, he explained to the person that he had other employment commitments that prevented him from appearing this coming Monday  However, he offered to testify on Wednesday since he already had a court appearance in Phoenix on Thursday

It appears that he is willing to testify as long as appropriate travel arrangements are made that do not require him to pay his own expenses up front.  Additionally, he is asking for reasonable accommodations involving employment conflicts  I'm not sure how you want to handle the apparent conflict.

1

Taylor Katherine

| | |
|---|---|
| **From:** | Martinez Juan |
| **Sent:** | Thursday  August 22  2013 3 47 PM |
| **To** | Patrick Gann |
| **Cc:** | kim_gann@me com; Taylor Katherine |
| **Subject:** | RE  Andrew Hinz |

Your assertion that Mr  Heinz told a "bold face lie" is concerning    I will not become involved in court appearance issues with your witness    This includes passing along your telephone numbers  You already have his telephone number and can pass that information along when you call him  The home address he provided us is 461 Ellis Way, Golden, Colorado 80401

-----Original Message-----
From  Patrick Gann [mailto pggann@mac.com]
Sent  Thursday  August 22, 2013 3 25 PM
To  Martinez Juan
Cc  kim_gann@me com
Subject  Andrew Hinz

Juan,

My assistant Kim spoke to Andrew Hinz  He was told she was calling because she was going to make his flight and hotel reservations. We are paying for them

This is a bold faced lie - not a misunderstanding

We will make and pay for the travel arrangements but he needs to contact us  My office number is 480-786-1919 / my personal cell is 480-786-5151

I still need his address

Patrick

1

Exhibit 20

Michael K. Jeanes  Clerk of Court
*** Electronically Filed ***
11/19/2013 8 00 AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2010-153913-001 DT                                    11/13/2013

                                          CLERK OF THE COURT
HONORABLE WARREN J  GRANVILLE                  B  McDonald
                                               Deputy


STATE OF ARIZONA                          JUAN M MARTINEZ

v

RICHARD CHRISMAN (001)                    CRAIG MEHRENS
                                          PATRICK G GANN



HEARING



11 45 a m

Courtroom SCT 6A

State's Attorney            Juan Martinez
Defendant's Attorney        Craig Mehrens and Patrick Gann
Defendant                   Present

Court Reporter, Elva Cruz-Lauer  is present.

A record of the proceeding is also made by audio and/or videotape

    This is the time set for Oral Argument on Defendant's Motion for New Trial and
Defendant s Motion to Vacate Judgment of Aggravating Factor

    Argument is presented to the Court regarding Defendant's Motion for New Trial

Docket Code 005                    Form R000D                    Page 1

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2010-153913-001 DT                                          11/13/2013

Defendant's objection to the State's admitting exhibit of documentation pertaining to Taser is addressed

IT IS ORDERED sustaining Defendant's objection

IT IS ORDERED denying Defendant's Motion for New Trial with respect to allegations regarding Mr Hinz.

IT IS ORDERED denying Defendant's Motion for New Trial with respect to allegations of prosecutorial misconduct.

Argument is presented to the Court regarding Defendant's Motion to Vacate Judgment of Aggravating Factor

IT IS ORDERED denying Defendant's Motion to Vacate Judgment of Aggravating Factor as the Court finds sufficient evidence to prove beyond a reasonable doubt emotional harm suffered by the victim's mother

Defendant's Motion to Strike State's Allegation of Historical Prior Conviction is addressed

IT IS ORDERED setting oral argument on Defendant's Motion on December 11, 2013 at 8 30 a.m before Judge Granville at which the Defendant's presence is waived

Defendant's motion to continue sentencing is addressed

Over the victim's objection,

IT IS ORDERED granting Defendant's motion to continue Sentencing as to Count 2 from November 22 2013 to December 20 2013 at 1 30 p m before Judge Granville

Defendant's Motion to Continue Retrial Past Last Day is addressed

No objection from the State,

IT IS ORDERED granting Defendant's Motion and setting Trial as to Counts 1 and 3 on January 27, 2014 at 10 30 a.m before Judge Granville

Upon agreement of the parties,

Docket Code 005                           Form R000D                           Page 2

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2010-153913-001 DT                                        11/13/2013


     IT IS ORDERED designating the new last day as February 28, 2014 as to Counts 1 and 3

     12 27 p m   Matter concludes

     This case is eFiling eligible  http //www clerkofcourt maricopa.gov/efiling/default.asp
Attorneys are encouraged to review Supreme Court Administrative Order 2011-140 to determine
their mandatory participation in eFiling through AZTurboCourt.

Exhibit 21

**Taylor Katherine**

| | |
|---|---|
| **From** | Kim H <kim_gann@me com> |
| **Sent:** | Friday July 19, 2013 10 56 AM |
| **To** | Taylor Katherine |
| **Subject** | Re State v Chrisman |

Good morning Kathie

We estimate the interview will be approximately 1 hour in length.


**Kim Hewes**
**Legal Assistant to Patrick G Gann**
**PATRICK G GANN, ATTORNEY AT LAW**
**522 W 1st Street, Suite 104**
**Tempe, Arizona 85281**
**Email  Kim_gann@me com**
**Phone  480-786-1919**
**Fax   480-786-1920**

Privileged/confidential information may be contained in this message and may be subject to legal privilege  Access to this e-mail by anyone other than the intended is unauthorized If you are not the intended recipient, you may not use, copy, distribute or deliver to anyone this message (or any part of its contents ) or take any action in reliance on it  In such case, you should destroy this message, and notify us immediately  If you have received this e-mail in error, please notify us immediately by e-mail or telephone and delete the e-mail from any computer

On Jul 19, 2013, at 10 54 AM, Taylor Katherine wrote


Good morning Kim

Andrew Hinz has confirmed the interview for Wednesday, July 24, 2013 at 10 00 am (Arizona time)  Mr Hinz has indicated that his rate is $250 hour and $0 56 cents a mile for travel   How long do you estimate the interview will be?

Thank you

*Kathie Taylor*
*Paralegal*
*Homicide Bureau*
*Maricopa County Attorney's Office*
*(602) 506-8389*

1

**From** Kim H [mailto:kim_gann@me.com]
**Sent:** Wednesday, July 17, 2013 1 49 PM
**To.** Taylor Katherine
**Subject:** Re  State v  Chrisman
**Importance**  High

Good afternoon Kathie

Ok I have the video conference set up for Mr  Hines' interview for July 24, 2013 at 9am (Arizona time) which I believe would be 10AM Colorado time (you'll probably want to double check that with Mr  Hines)  Mr  Hines will have to appear at the following location for the video interview   Agren Blando Court Reporting, 216 16th St., Suite 600  Denver, CO 80202, 303 296-0017  However counsel will need to appear at Legal Video Specialists, LLC  at 3033 N  Central Ave, Set 100, in Phoenix

Please let me know once you have confirmed this with Mr  Hines

If you have any questions or concerns please let me know


**Kim Hewes**
**Legal Assistant to Patrick G  Gann**
**PATRICK G  GANN, ATTORNEY AT LAW**
**522 W  1st Street, Suite 104**
**Tempe, Arizona 85281**
**Email   Kim_gann@me com**
**Phone  480-786-1919**
**Fax   480-786-1920**


Privileged/confidential information may be contained in this message and may be subject to legal privilege  Access to this e-mail by anyone other than the intended is unauthorized If you are not the intended recipient, you may not use, copy, distribute or deliver to anyone this message (or any part of its contents ) or take any action in reliance on it  In such case, you should destroy this message, and notify us immediately  If you have received this e-mail in error, please notify us immediately by e-mail or telephone and delete the e-mail from any computer

On Jul 16, 2013, at 11 30 AM, Taylor Katherine wrote


Good morning,

July 24, 2013 will work for Mr  Hines   His zip code is 80401   Thank you

*Kathie Taylor*
*Paralegal*
*Homicide Bureau*
*Maricopa County Attorney's Office*

2

*(602) 506-8389*

**From** Kim H [mailto:kim_gann@me.com]
**Sent** Tuesday, July 16, 2013 11 08 AM
**To** Taylor Katherine
**Subject:** State v Chrisman

Good morning Kathie

Ok I just spoke to the videographer and he says he just needs the zip code for Mr Hines and he will find a site closest to him so he will have to do a little bit of traveling but not too much   We will need to go to the video site here in Phoenix   Please provide me with Mr Hines' zip code and the date he would like to conduct the interview and we can get it all set up for him.

Thank you Kathiel


**Kim Hewes**
**Legal Assistant to Patrick G  Gann**
**PATRICK G  GANN, ATTORNEY AT LAW**
**522 W  1st Street, Suite 104**
**Tempe, Arizona 85281**
**Email   Kim_gann@me com**
**Phone  480-786-1919**
**Fax   480-786-1920**


Privileged/confidential information may be contained in this message and may be subject to legal privilege  Access to this e-mail by anyone other than the intended is unauthorized  If you are not the intended recipient, you may not use, copy, distribute or deliver to anyone this message (or any part of its contents ) or take any action in reliance on it  In such case, you should destroy this message, and notify us immediately  If you have received this e-mail in error, please notify us immediately by e-mail or telephone and delete the e-mail from any computer

# Exhibit 22

**Taylor Katherine**

| | |
|---|---|
| **From.** | Martinez Juan |
| **Sent:** | Thursday, August 22, 2013 3.08 PM |
| **To** | Craig Mehrens (craig@mehrens-wilemon.com) |
| **Cc:** | Taylor Katherine |
| **Subject:** | Andrew Heinz |

I spoke with Andrew Heinz this afternoon and he confirmed that he spoke with someone from you or Mr Gann's office regarding his trip to Phoenix on Wednesday evening   He was told that he would need to pay for his own hotel room and make his own flight arrangements.  He indicated that would be unacceptable  Additionally, he explained to the person that he had other employment commitments that prevented him from appearing this coming Monday  However, he offered to testify on Wednesday since he already had a court appearance in Phoenix on Thursday

It appears that he is willing to testify as long as appropriate travel arrangements are made that do not require him to pay his own expenses up front.   Additionally, he is asking for reasonable accommodations involving employment conflicts   I'm not sure how you want to handle the apparent conflict.

1

# Exhibit 23

From: Taylor Katherine <taylok01@mcao.maricopa.gov>
Subject: RE: Andrew Hinz
Date: August 20 2013 11:24:09 AM MST
To: "Kim H" <kim_gann@me.com>

---

Kim

Mr Hinz would like your office to make all travel arrangements   He can be reached at (303) 809-8090   Thank you

*Kathie Taylor*
*Paralegal*
*Homicide Bureau*
*Maricopa County Attorney's Office*
*(602) 506-8389*

---

From: Kim H [mailto:kim_gann@me.com]
Sent: Thursday, August 15 2013 1.37 PM
To: Taylor Katherine
Subject: Re: Andrew Hinz

Good afternoon Kathie

We cannot make any reservations for Mr Hines without an address nor can we book a plane or hotel without one.  We will also need Mr Hinz' phone number if there is a delay in flights or if there is a change in the Court's schedule

Please provide this to us as soon as possible so I can get things set up

Kim Hewes
Legal Assistant to Patrick G  Gann
PATRICK G  GANN, ATTORNEY AT LAW
622 W  1st Street, Suite 104
Tempe, Arizona 85281
Email  Kim_gann@me.com
Phone  480-786-1919
Fax  480-786 1920

Privileged/confidential information may be contained in this message and may be subject to legal privilege  Access to this e mail by anyone other than the intended is

unauthorized  If you are not the intended recipient, you may not use, copy, distribute or deliver to anyone this message (or any part of its contents ) or take any action in reliance on it  In such case, you should destroy this message, and notify us immediately  If you have received this e-mail in error, please notify us immediately by e-mail or telephone and delete the e-mail from any computer

**PLEASE NOTE OUR OFFICE HAS RELOCATED TO 522 W 1st Street, #104, Tempe, AZ 85281**

On Aug 15, 2013, at 1:13 PM, Taylor Katherine wrote

Good afternoon,

I spoke with Andrew Hinz this afternoon.  He has a busy schedule the next three weeks and would like to know as soon as possible when he will be needed to testify.  He will need to make arrangements with his work schedule.

Please book his flight/hotel arrangements.  His driver's license has Andrew Hinz and his DOB is 02/04/73   Mr Hinz should not have to pre-pay any costs   Thank you

*Kathie Taylor*
*Paralegal*
*Homicide Bureau*
*Maricopa County Attorney's Office*
*(602) 506-8389*

From: Kim H  [mailto:kim_gann@ma.com]
Sent: Thursday, August 15, 2013 11:04 AM
To: Taylor Katherine
Subject: Re  Andrew Hinz

Good morning Kathie

This email serves as confirmation that we will pay for coach fare and reasonable hotel / per diem however he may want to make his own arrangements  Unfortunately, I cannot give a date yet because Mr  Martinez is still presenting his case and we don't know when he will rest.

Kim Hewes
Legal Assistant to Patrick G Gann
PATRICK G GANN, ATTORNEY AT LAW
522 W 1st Street, Suite 104
Tempe, Arizona 85281
Email   Kim_gann@me.com
Phone  480-786-1919
Fax   480-786-1920

Privileged/confidential information may be contained in this message and may be
subject to legal privilege  Access to this e-mail by anyone other than the intended is
unauthorized  If you are not the intended recipient, you may not use, copy, distribute or
deliver to anyone this message (or any part of its contents ) or take any action in
reliance on it. In such case, you should destroy this message, and notify us immediately
If you have received this e-mail in error, please notify us immediately by e-mail or
telephone and delete the e-mail from any computer

**PLEASE NOTE OUR OFFICE HAS RELOCATED TO 522 W 1st Street, #104,
Tempe, AZ 85281**

On Aug 15, 2013, at 9:38 AM, Taylor Kathorpe wrote

Good morning Kim,

I forwarded a copy of the subpoena on to Mr. Hinz and he will make himself available for
trial  Please provide me with dates and times he will be needed and I will forward the
information  As a reminder you will need to make airline and hotel arrangements for him.
Thank you.

*Kathie Taylor*
*Paralegal*
*Homicide Bureau*
*Maricopa County Attorney's Office*
*(602) 506 8389*

From  Kim H  [mailto:kim_gann@me.com]
Sent: Thursday, August 15, 2013 9 19 AM

Exhibit 24

**Taylor Katherine**

| | |
|---|---|
| From: | Martinez Juan |
| Sent: | Thursday, August 22, 2013 3.47 PM |
| To | Patrick Gann' |
| Cc: | kim_gann@me com; Taylor Katherine |
| Subject: | RE. Andrew Hinz |

Your assertion that Mr Heinz told a "bold face lie" is concerning    I will not become involved in court appearance issues with your witness    This includes passing along your telephone numbers You already have his telephone number and can pass that information along when you call him The home address he provided us is 461 Ellis Way, Golden, Colorado 80401

-----Original Message-----
From  Patrick Gann [mailto pggann@mac.com]
Sent  Thursday, August 22, 2013 3 25 PM
To  Martinez Juan
Cc  kim_gann@me com
Subject  Andrew Hinz

Juan,

My assistant Kim spoke to Andrew Hinz  He was told she was calling because she was going to make his flight and hotel reservations  We are paying for them.

This is a bold faced lie - not a misunderstanding

We will make and pay for the travel arrangements but he needs to contact us  My office number is 480-786-1919 / my personal cell is 480-786-5151

I still need his address

Patrick

1

Exhibit 25

1                IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

2                   IN AND FOR THE COUNTY OF MARICOPA

3

4   STATE OF ARIZONA,                    )
                                         )
5                      Plaintiff,        )
                                         )
6              vs                        )        CR 2010-153913
                                         )
7   RICHARD CHRISMAN,                    )
                                         )
8                      Defendant         )
                                         )
9   _____)

10

11

12            REPORTER'S TRANSCRIPT OF PROCEEDINGS

13

14

15

16                      Phoenix, Arizona
                        January 28, 2011
17

18
            Before The Hon  Sherry K  Stephens
19

20       REPORTED BY

21       MICHAEL A  BABICKY, RPR
         Certified Court Reporter
22       Certificate No  50361

23       PREPARED FOR

24       MR  JUAN MARTINEZ
         DEPUTY COUNTY ATTORNEY
25       COPY

1   terms of their letter, they indicated that he had spoken

2   to him already   What's so difficult about making a copy

3   of a statement, turning it over to the State and saying,

4   look, Lewinski talked to him   Here's the statement   We

5   want you to present it   I don't even think the law

6   requires me to do that, but at least he would have to be

7   on firmer ground when he stands in front of you   No, we

8   don't even have that

9          He wanted me, the State, to present somebody's

10   impressions, and that by any other name is vouching   It's

11   improper   And it's something that's not allowed anywhere

12   It's not allowed at a trial   And it shouldn't be allowed

13   at the Grand Jury proceedings

14          Specifically Lewinski's statement that he

15   thought that the defendant was acting reasonably   Well,

16   isn't that -- aren't those his impressions?  That's

17   exactly what he wanted to be presented, not the

18   defendant's statement, but Lewinski's impressions

19          And again I go back to Rule 15 2 and note for

20   the Court that I'm making a formal request for that

21   statement   And I have no doubt that any court of appeal

22   that looks at this and says, the defendant wanted you to

23   present a statement and yet you had, months later at the

24   end of January, when this occurred in October of the

25   previous year, you are still requesting from the Court an

1    order that they produce that statement

2              I know that I am on firm ground when I believe

3    that that is not something that is a reason, if you will,

4    to remand this to the Grand Jury   But let's assume that

5    vouching is allowed   And let's assume that Lewinski,

6    pursuant to your order, that you ordered him to go there

7    Let's assume that's something you decide is proper    If

8    Lewinski is ordered to appear there, and since again it's

9    the State's belief that the only reason they want us to

10   present Lewinski is to vouch because if they had the

11   statement, they would have given it to us

12             But if you order that Lewinski appear, then he

13   is bound to and he will be subject to an examination, if

14   you will, of his motives   He will be subject to, for

15   example, this questioning of his bias   According to his

16   own statements in previous cases, he's indicated he's

17   never testified against the State or for the State   He's

18   just a hack that they hired to come on in and he gives his

19   opinion based on that

20             And so you can envision, for example, that the

21   State as part of showing this bias would say to him, did

22   you know Mr  Lewinski -- and again, I'm only bringing this

23   up to show it would turn into a mini trial, that's what

24   they're asking you to do or a trial -- did you know that

25   the defendant lied when he applied to be a police officer

1    with the City of Phoenix, that he flunked his first

2    polygraph   Did you know that?  And did you know that he

3    practiced his answers?  Did you know that?  That makes it

4    a trial

5           And additionally, during the time that he was a

6    police officer, did you know that during an investigation

7    where the defendant was being investigated for taking

8    money when he wasn't working, stealing is what they call

9    it, did you know that he lied during that investigation?

10   For two times over we have somebody whose view you have

11   taken and is a liar

12          Well, what about this third thing that we have

13   out there that's on video tape where the defendant lied to

14   a suspect that they arrested   Told that suspect, hey, I

15   found this drug paraphernalia on you   That's on

16   videotape   And the question -- the bigger question is why

17   is this officer walking around carrying drug

18   paraphernalia?  It's there on the video   He goes to the

19   trunk of his car and gets that drug paraphernalia and then

20   he plants it on that woman   That woman would say this

21   person is lying

22          And so, Mr  Lewinski, you have at least three

23   instances, and there are more, where this officer lied to

24   you   And the reason that I point that out is not to

25   embarrassed anybody and not to try the case in front of

1    you, but to point out what the defendant is asking you is

2    that we, if it's remanded, go back and do nothing more

3    than present a trial   And it is the State's position that

4    that's against the law

5             He also says, well -- when there's this juror

6    that asks, are there any other statements, Bland is the

7    name of the juror, this other juror asks, well, aren't

8    there any other statements?  And the prosecutor, according

9    to them, didn't answer that question   Well, how could the

10   prosecutor answer that question when today there's a Rule

11   15 2 motion for discovery pending for that exact

12   statement?

13            How could the State -- because the defendant

14   failed to provide it to us, it's not my obligation to call

15   him up and say, look, let me tell you how to run your

16   case   If you really want me to present this to the Grand

17   Jury, why don't you give me at least an audiotape of this

18   thing so that I can review it and then I can play it for

19   the Grand Jury   So that when a Grand Juror like Bland

20   says to me, hey, are there any other statements?  I can

21   then turn around and say, yes, there are   And this is

22   what the statement said   I can't do that now because he

23   has secreted that, if it does exist, it's my view it

24   doesn't exist   And that is based on the reading of the

25   letter

Exhibit 26

# PHOENIX POLICE DEPARTMENT

## POLICE APPLICANT REPORT OF POLYGRAPH EXAMINATION

EXAMINER     Joseph Dobbels

APPLICANT     CHRISMAN, RICHARD

DATE     5/23/00          TIME     8:00 A.M.

POSITION     POLICE RECRUIT     EXAM #     00-0441-A

During the pre-test interview, Mr. Chrisman related the following summarized information:

**FINANCIAL**
The applicant related that his bills are as follows: the applicant stated that he pays $730 a month mortgage and has a total credit card balance of $2,400. The applicant related the following regarding his financial past. The applicant stated that he owed taxes for the tax years of 1997 and 1998 and that he made payment plans and finally paid them off in March of 2000. The applicant owed a total of $1,300 for those two tax years. The applicant stated that about five years ago he had a doctor bill and a dentist bill that went to collections and he paid that in February of 2000. The applicant also had a collection agency notice from Cox cable about the same time period, which he also recently paid off. The applicant estimated that he has had about $700 to $800 in bills that went to collections in the last 5 to 7 years, but all have been paid as far as he knows. The applicant stated that he was recently a victim of a check theft and had about 16 different checks that did not arrive at their destination, but thinks that he has caught up on those due to the theft of his checks.

**ILLEGAL DRUG INVOLVEMENT**
The applicant stated that the only illegal drug that he has ever experimented with is marijuana. The applicant stated that the first time he tried was when he was about 6 or 7 years of age when he and his brother sucked on a bong that belonged to his Dad. The applicant could not remember if they actually lit the bull on the bong or just inhaled fumes from the leftover marijuana debris. The applicant stated that between the ages of 15 and 18 years of age (1988-1991) that he tried marijuana no more than 20 occasions. The applicant estimated that it was somewhere between 15 to 20 times that he tried marijuana. The applicant stated that he tried to grow marijuana on one occasion when he was in high school, but he was unsuccessful. The applicant currently does not drink alcohol and never driven under the influence of alcohol where he would have registered .10 blood alcohol level or greater.

**MOTOR VEHICLES**
Sometime in 1993 the applicant received a speeding ticket from DPS and did not pay that speeding ticket. When he was pulled over in October of 1993, he was cited for driving on a suspended license due to failing to pay his speeding ticket. The applicant went to court because of the suspended license and was ordered to pay a fine. The applicant did not pay the entire fine and was later picked up on January of 1994 for a bench warrant on failure to pay. In 1996, the applicant was stopped by DPS and was cited for five different violations: license not in possession, non-current registration, no proof of insurance, no seat belt, and a suspended registration. The suspended registration was dismissed, but applicant paid a fine for all the other charges. The applicant stated he actually did not have insurance for that vehicle, but the officer gave him a break and wrote him up for no current registration.

0010

## ARRESTS

In December of 1991, the applicant was arrested for assault and had to pay a fine and was given 6 months of unsupervised probation. What had happened was applicant had witnessed three males driven by in a car and they waved to him and he yelled to him and waved to him also and threw something to him as they drove by. The applicant stated that he went over to the vehicle and punched all three of the individuals inside the car several times. The applicant stated that he does not think that any serious injuries occurred. When applicant was about 13 or 14 years of age he was picked up by the Phoenix Police Department for a curfew violation and taken home. In 1995 the applicant went to court and was sued by his landlord for breaking a lease. The applicant stated that he still owes $500 because of that settlement.

## THEFT

When the applicant was about 6 years of age, he recalled stealing some candy and also when he was about 10 or 12 years of age. The applicant also stated that he has maybe eaten about $200 worth of food from Dairy Queen when he worked there, but he did not pay for. When applicant was about 12 or 13 years of age, he broke into a vacant house and he and his friend stole a garden hose and a broken exercise bicycle. The applicant purchased a set of car speakers for $15 in 1988 from a friend whom he knew to be a thief.

## UNDETECTED CRIMES

The applicant has his father purchase a 38 caliber revolver for him when he was 18 years of age. The applicant stated that he and his friends made a pipe bomb in 1985 or 1986 and they tried to lit it off, but it didn't work so they threw it in the fire to make it blow up.

A polygraph examination was conducted and deception was noted the area of illegal possession. The applicant provided no new information during the polygraph post-test interview.

## SUMMARY

The results of this polygraph examination are that DECEPTION WAS INDICATED to the area of illegal possession.

machrisman

# Exhibit 27

STATE OF ARIZONA
OFFICE OF THE ATTORNEY GENERAL
SPECIAL INVESTIGATIONS SECTION
REPORT

DATE WRITTEN BY AGENT   December 23, 2008   AGI/LF NUMBER.  P002 2007-003090

DOC #363615

CASE NAME   Police Officer Misconduct

REPORT TYPE   Investigation---Richard Chrisman

AGENT   M Hinchey          SUPERVISOR.  A Rubalcava          PAGE 1 OF 3 PAGE(S)

On about August 25, 2008, Special Agent R. Gibson accompanied me to attempt to contact and interview Phoenix Police Officer Richard Chrisman #7371 at his residence While at this location, I served Officer Chrisman with a Grand Jury Subpoena at about 1328 hours  The original subpoena was returned to AGO Grand Jury Clerk, Marty Buck for processing  The interview with Officer Chrisman was audio recorded  Refer to the transcript for details

On November 20, 2008, and November 25, 2008, I reviewed the spreadsheet provided by Phoenix Police Department Professional Development Bureau with PPD Sgt. P  Veach. Each line of the sheet represents a shift at the Cotton Center Off-Duty Jobs on the respective dates identified  The columns further identify activity and log times as a result of the officer(s) working on those respective dates

Per the interview of Officer Chrisman, he stated he knows George Contreras and of his business, Raptor Services  He stated the only time he would leave the property when scheduled was to go to the "station" to do "paperwork"  He could think of no other reason not to be on the property when scheduled  It should be noted, there were available on-site, an office for report writing, a restroom, and phones for the use of the officers working at the Cotton Center  He denied getting paid for hours that he was not on-site

A summary of the review of the PPD produced spreadsheet is as follows

January 21, 2006
- This shift was worked with Sgt. Chris Scranton #7207
- Shift was reported to be 1500 hours to 0100 hours
- MDT in vehicle was logged in from 1607 hours to 0010 hours, which is approximately one (1) hour 7 minutes after the start of the shift and approximately 50 minutes before the end of the shift.

000541

AGI P002 2007-003090
Investigation—Richard Chrisman
December 23 2008
Page 2 of 3

- There was activity for both officers to include a report and voice writer activity, which reflect an ending time of approximately 0047 hours, which is later than the MDT listed time.

March 18, 2006
- This shift was worked with Sgt. Chris Scranton #7207
- Shift time was not reported to 400 Precinct.
- MDT in vehicle was logged in from 1511 hours to 0013 hours
- This shift took place on a Saturday, thereby making this a ten (10) hour shift
- Assuming a start time of 1511 hours, based on the MDT log-in time, the ending time for this shift would be 0111 hours  The MDT log-off time was 0013 hours, which approximately 58 minutes before the end of shift based on the MDT log-in time
- There was activity for both officers to include report(s), PACE activity, an arrest(s), and voice writer activity, which took place between 1815 hours and 2225 hours, which all falls within the MDT listed times

July 1, 2006
- This shift was worked with Sgt. Ben Sywarungsymun #7094
- Shift was reported to 400 Precinct to be 0600 hours to 1600 hours
- MDT in vehicle was logged in from 0746 hours to 1600 hours, which is approximately one (1) hour 46 minutes after the start of the shift
- There was activity for both officers to include report(s), and PACE activity time which took place between 1513 hours and 1556 hours, which all falls within the MDT listed times

August 24, 2006
- This shift was worked with Sgt. Ben Sywarungsymun #7094
- Shift was reported to 400 Precinct to be 1630 hours to 0030 hours
- MDT in vehicle was logged in from 1647 hours to 2319 hours, which is approximately 17 minutes after the start of the shift and approximately one (1) hour 11 minutes before the end of shift.
- There was activity for both officers to include report(s), and PACE activity time which took place between 2125 hours and 2155 hours, which all falls within the MDT listed times

August 31, 2006
- This shift was worked with Sgt  Ben Sywarungsymun #7094
- Shift was reported to 400 Precinct to be 1630 hours to 0030 hours
- MDT in vehicle was logged in from 1654 hours to 2331 hours, which is approximately 24 minutes after the start of the shift and approximately 59 minutes before the end of shift

000542

AGI P002 2007-003090
Investigation—Richard Chrisman
December 23  2008
Page 3 of 3

- There was no activity for either officer
- The log book had an entry that stated, "Very Quiet"
- Sgt  Sywarungsymun's radio was deactivated at 2331  hours, the same time the MDT was signed off

While Officer Chrisman denied leaving early or being paid for hours not worked, records and evidence support he was paid in advance of his scheduled shifts, and that he did in fact start some shifts late and did leave some shifts early, for a total of approximately 7 53 hours, and this job paid $45 00 per hour, it appears Officer Chrisman benefited by receiving approximately $311 40 of pay for time not worked  It should be noted that the client understood that the start time of shift would be the time the officers were on property, providing the benefit of the doubt for the officers, and adjusting for 15 minutes of prep time at the beginning of each shift, for 3 shifts appearing to have started after the start time, the net hours of pay for hours not worked is 6 78, resulting in a net extra pay of $305 10

No further at this time

**000543**

Exhibit 28

```
 1
 2
 3
 4
 5
 6
 7                    INTERVIEW WITH CELIA VARELA
 8                            Q=Man
 9                            Q1=Man
10                         A=Celia Varela
11
12
13   Q        Your name please?
14
15   A        My name is Celia Varela.
16
17   Q:       And what was the first name again?
18
19   A        Celia.
20
21   Q        C-E-L-I-A?
22
23   A        Mm-hm.
24
25   Q:       And V- Varela?
26
27   A        Mm-hm.
28
29   Q:       Okay. What is, ah, your date of birth?
30
31   A.       September 24, 1968
32
33   Q:       And wha- what do you do for a living, ma'am?
34
35   A.       I'm a detention officer. Detention
36
37   Q:       And how long have you been a DO with
38
39   A        Since just, um, in a month
40
41   Q:       Oh –
42
43   A.       Start regular
44
45   Q:       Okay. What did you do before that?
```

628
629   Q         Okay
630
631   A.        When, ah, you know, they talk about when they work in the day but nothing -
632             maybe I don't pay attention.
633
634   Q         Right. Wh- where did you live when you first met him?
635
636   A.        I work in Laveen?
637
638   Q         No, where did you live? Live?
639
640   A.        Live in Laveen.
641
642   Q         Oh you - okay
643
644   A.        Mm-hm.
645
646   Q         Okay  Do you have an address where you li- lived in Laveen? I mean.
647
648   A         Did I have what?
649
650   Q         What was the address?
651
652   A.        Yeah.
653
654   Q         No
655
656   A.        5614 South 53rd Avenue in Laveen, Arizona.
657
658   Q         Okay  And, um, are you still living there?
659
660   A         Yes, sir
661
662   Q         Okay  When you met him were you living with anybody back then?
663
664   A.        Yeah, my son and, um, Officer (Punyeta)
665
666   Q         Oh, so - so you were living with her?
667
668   A.        Mm-hm
669
670   Q         Okay  Um, it was her house I guess?
671
672   A         No, it's my house.

| 673 | | |
|---|---|---|
| 674 | Q | It was your house that she. |
| 675 | | |
| 676 | A | At that time |
| 677 | | |
| 678 | Q | Was she renting from you? |
| 679 | | |
| 680 | A. | No, um, what happened is that, um, she - she had a house in Avondale  And |
| 681 | | then they wanted 4- 400 and, um, and then like, you know, just came over to |
| 682 | | stay |
| 683 | | |
| 684 | Q | And I gonna have to stop you because I think I missed something, you said |
| 685 | | they were - they were 400 something, I don't - I don't. |
| 686 | | |
| 687 | A. | Mm-hm. |
| 688 | | |
| 689 | Q | I don't under- I didn't understand what - I don't know what that means. |
| 690 | | |
| 691 | A | Four-hundred's the station, it was 400 |
| 692 | | |
| 693 | Q | Oh, okay - okay |
| 694 | | |
| 695 | A | So 400 |
| 696 | | |
| 697 | Q | So she was working at 400? |
| 698 | | |
| 699 | A. | Mm-hm. |
| 700 | | |
| 701 | Q | That's yes, right? |
| 702 | | |
| 703 | A | Mm-hm. |
| 704 | | |
| 705 | Q | Okay, go ahead. So you were telling me the story about how he - she came to |
| 706 | | live with you? |
| 707 | | |
| 708 | A. | Yeah, um, because it was far for her to go to Avondale and I offered, you |
| 709 | | know, you can always just stay here  Like, you know, if you just get off, or if |
| 710 | | you guys need anything, because I work and I live in 51th Avenue and |
| 711 | | Southern. And the station isn't farther  So, um |
| 712 | | |
| 713 | Q | Do you where - where the station was located back then? |
| 714 | | |
| 715 | A. | Yeah. |
| 16 | | |
| 717 | Q | Southern and what? |

718
719  A        I think, to, Southern and, ah, (Santon)
720
721  Q        All right
722
723  A.       It was - it was, on ah, (unintelligible) Street.
724
725  Q        Okay  All right. And so go ahead. So
726
727  A        And this is what, ah, she, ah, he knows if she - she decided, okay, I wanna -
728           like six months but I stay with you in - and she saw me, and like I say I'm a
729           single mom, and I help you really good - help me
730
731  Q        Di- di- did, ah, she rent a room from you or did she just stay with you?
732
733  A.       No, she help me but I no ask like, ah, especially a month because, ah, you
734           know, we friends so - I no ask her for - exactly rent.
735
736  Q        Okay  So she was living with you rent free but she helped?
737
738  A        Mm-hm
 39
740  Q        Eh- is that yes?
741
742  A        Yeah, the beginning
743
744  Q        In the beginning?
745
746  A.       Mm-hm
747
748  Q        A- at the end did she - did she pay rent.
749
750  A.       Yeah.
751
752  Q        or not?
753
754  A.       Mm-hm, yeah.
755
756  Q        Ho- how much rent did you charge?
757
758  A.       What, ah, after that, I no charge because we ended it to, um, ah, I put, um, we
759           decided to move her name in the house after? And now
760
'61  Q        The - the - the- Miss (Pinyata)'s name to -- you decided to put it on the house?
762

INTERVIEW WITH CELIA VARELA
Interviewer: Juan Martinez
Case # CR201015391
Page 18

| | | |
|---|---|---|
| 763 | A. | Mm-hm. |
| 764 | | |
| 765 | Q | Is that yes? |
| 766 | | |
| 767 | A. | Yeah. |
| 768 | | |
| 769 | Q | Wha- what. |
| 770 | | |
| 771 | A. | I decided because she's been helping me in - in with not talking and I said, |
| 772 | | you know what, um, I think it's for - I will put the - your name in the house  In |
| 773 | | fact, the house and is my son and me only  And, ah, and yeah, we tell - we do |
| 774 | | that. |
| 775 | | |
| 776 | Q | Wha- when did that happen that you put that house in. |
| 777 | | |
| 778 | A. | Oh, about. |
| 779 | | |
| 780 | Q | both of your names? |
| 781 | | |
| 782 | A. | I'd say seven years ago? |
| 783 | | |
| 84 | Q | Seven years ago? |
| 785 | | |
| 786 | A. | I - I'm not completely the time and the month but I can. |
| 787 | | |
| 788 | Q | Did - did you buy the house before. |
| 789 | | |
| 790 | A. | Yes, I did. |
| 791 | | |
| 792 | Q | Officer (Punyeta) moved in? |
| 793 | | |
| 794 | A. | Yes, I did |
| 795 | | |
| 796 | Q | Um, how much did you -- did she give you any money to be on the house? |
| 797 | | |
| 798 | A. | No |
| 799 | | |
| 800 | Q- | So you just allowed her to be on your house without. |
| 801 | | |
| 802 | A. | Mm-hm |
| 803 | | |
| 804 | Q | her paying any money? Is that yes? |
| 805 | | |
| 06 | A. | Um, yeah. |
| 807 | | |

| 808 | Q | Ah, you have to say yes or no because |
|-----|---|---|
| 809 | | |
| 810 | A | Yes |
| 811 | | |
| 812 | Q | the recorder, I'm sorry, okay? |
| 813 | | |
| 814 | A | Oh, no - no, absolutely |
| 815 | | |
| 816 | Q | Okay Um, wer- wer- wer- wer- were you like giving her a gift or something |
| 817 | | or - or? |
| 818 | | |
| 819 | A | No, because, ah, she was, you know, um, at that time we, ah, meet more and |
| 820 | | more personal and I decided to do that because um, I don't have nobody |
| 821 | | here |
| 822 | | |
| 823 | Q | Uh huh. |
| 824 | | |
| 825 | A. | all my family, you know, my family is in Mexico City |
| 826 | | |
| 827 | Q | Right. |
| 828 | | |
| 29 | A | So I told her and then |
| 830 | | |
| 831 | Q | Di- did you - did you and she have an agreement that if your son needed |
| 832 | | money or something that Miss (Punyeta) would give her that or - or — I'm |
| 833 | | trying to see what - wha- what benefit you got. |
| 834 | | |
| 835 | A. | Ah, well, I understanding the - like, ah, agreement of - of document on paper? |
| 836 | | |
| 837 | Q | Oh, no, wha- what. |
| 838 | | |
| 839 | A. | The verbally? |
| 840 | | |
| 841 | Q | Wha- okay, what was your agreement verbal? What was your verbal |
| 842 | | agreement? |
| 843 | | |
| 844 | A. | No, we never did agree - agreement and I know if something happens to me, I |
| 845 | | know she's gonna be there for my son. |
| 846 | | |
| 847 | Q | Okay Ha- how old is she? How old is Miss (Punyeta)? |
| 848 | | |
| 849 | A. | She's 41 |
| 850 | | |
| 51 | Q | Forty-one? |
| 852 | | |

INTERVIEW WITH CELIA VARELA
Interviewer Juan Martinez
Case # CR201015391
Page 20

| | | |
|---|---|---|
| 853 | A. | Mm-hm. |
| 854 | | |
| 855 | Q | Okay Um. |
| 856 | | |
| 857 | A. | Like I say, I don't have nobody here |
| 858 | | |
| 859 | Q | Okay |
| 860 | | |
| 861 | A. | I'm only -- my son and me  And in the United States I have two cousins and |
| 862 | | all my family is in Mexico City and they no speak English |
| 863 | | |
| 864 | Q | Right. |
| 865 | | |
| 866 | A. | So I trust her 100% that whatever she (unintelligible) my son or me I have to |
| 867 | | do, I know truthfully, I know she's gonna be able to - to feed my family |
| 868 | | |
| 869 | Q | (Unintelligible)  Do you still in that same house? |
| 870 | | |
| 871 | A. | Yep |
| 872 | | |
| 873 | Q | And is she still on the title? |
| 74 | | |
| 875 | A. | Yes |
| 876 | | |
| 877 | Q | Um, when you guys -- but is your - is your name on the title too or just. |
| 878 | | |
| 879 | A | Yeah |
| 880 | | |
| 881 | Q | her's? |
| 882 | | |
| 883 | A | My name is in the title. |
| 884 | | |
| 885 | Q | Um, and are there any written papers that talk about any money exchanging |
| 886 | | hands or anything for that or not? |
| 887 | | |
| 888 | A | No |
| 889 | | |
| 890 | Q | So - so it was just - you just decided to do it? |
| 891 | | |
| 892 | A. | Yes, sir |
| 893 | | |
| 894 | Q | Okay and does Miss (Punyeta) still have the other house that she had in. |
| 895 | | |
| 96 | A. | No |
| 897 | | |

| 898 | Q | No? Did she sell it or what happened to it? |
| 899 | | |
| 900 | A | I don't know what she did. |
| 901 | | |
| 902 | Q | Is she still - so is she still livin' with you or |
| 903 | | |
| 904 | A. | Yeah. |
| 905 | | |
| 906 | Q | Oh, okay Um, have you and - and Miss (Punyeta) talked about any- anything |
| 907 | | involving work? Her work and Mr Chrisman? |
| 908 | | |
| 909 | A. | No, not specific to him and, um, when I hear, um, on the news ah, (Sergio) |
| 910 | | was like surprised, you know, and then. |
| 911 | | |
| 912 | Q | Right. |
| 913 | | |
| 914 | A | and then she's killed somebody and the news is up all night long, and um, |
| 915 | | this week and - after that, you know, obviously I had questions and they said I |
| 916 | | don't think she's had - I don't know I said, so I couldn't - so nobody knows |
| 917 | | now and we can't talk about it and - okay |
| 918 | | |
| 919 | Q | Right. Do you know if  if - if Miss (Punyeta) and Mr. Chrisman are really |
| 920 | | good friends or not? Do you know if they're friends? |
| 921 | | |
| 922 | A | Yes - yes they're friends. |
| 923 | | |
| 924 | Q | Ha- how do you know that they're good friends? |
| 925 | | |
| 926 | A | Because, um, we like, we get together, you know, we go out to bowling ball |
| 927 | | games Um, we have our dinners, um, barbecues and like, um couple |
| 928 | | Mondays when they came for the football we make in the house. But I know |
| 929 | | we shared dinner - the meal |
| 930 | | |
| 931 | Q | Right. |
| 932 | | |
| 933 | A | more than once or two but not like, ah, four, it was more like two or three |
| 934 | | |
| 935 | Q | All right, um, so - so you had this birthday party thing where you see him |
| 936 | | holding hands with his wife, do you. |
| 937 | | |
| 938 | A | That wasn't a birthday party |
| 939 | | |
| 940 | Q | It was |
| 941 | | |
| 942 | A. | we met at. |

Exhibit 29

| | | |
|---|---|---|
| 1 | | |
| 2 | | |
| 3 | | |
| 4 | | |
| 5 | | |
| 6 | | |
| 7 | | **INTERVIEW WITH OFC. AJ BUFFA** |
| 8 | | **Q=Juan Martinez** |
| 9 | | **Q1=Craig Mehrens** |
| 10 | | **Q2=Patrick Gann** |
| 11 | | **A=Ofc. AJ Buffa** |
| 12 | | |
| 13 | | |
| 14 | Q | Your name, sir? |
| 15 | | |
| 16 | A | I'm sorry? |
| 17 | | |
| 18 | Q | Your name? |
| 19 | | |
| 20 | A | My name is (Albert) Buffa. I go by AJ |
| 21 | | |
| 22 | Q | And your date of birth? |
| 23 | | |
| 24 | A | Is 9-21-74 |
| 25 | | |
| 26 | Q | And what do you do for a living? |
| 27 | | |
| 28 | A. | I'm a police officer |
| 29 | | |
| 30 | Q | And which agency? |
| 31 | | |
| 32 | A | Phoenix |
| 33 | | |
| 34 | Q | How long have you been a police officer with Phoenix? |
| 35 | | |
| 36 | A | Over 13 years. |
| 37 | | |
| 38 | Q | And are you a detective or |
| 39 | | |
| 40 | A | No, I'm assigned, uh, to the Estrella Mountain Precinct right now as a |
| 41 | | neighborhood enforcement team officer |
| 42 | | |
| 43 | Q | That's - that's patrol I guess? (Unintelligible) th- you're just - not just, but |
| 44 | | you're not a detective, you're a patrol officer or |
| 45 | | |

| | | |
|---|---|---|
| 496 | A. | Probably |
| 497 | | |
| 498 | Q | And, um, w- w- w- when - when did that come about that - that - that you |
| 499 | | developed this closer relationship? |
| 500 | | |
| 501 | A | Uh, when I initially went to the squad. |
| 502 | | |
| 503 | Q | In 1999? |
| 504 | | |
| 505 | A. | In - no - no  In (unintelligible) |
| 506 | | |
| 507 | Q | (Unintelligible) 2009? |
| 508 | | |
| 509 | A | to 2009, yeah. |
| 510 | | |
| 511 | Q | Uh-huh. |
| 512 | | |
| 513 | A | Uh, we became close friends. We found out that we leave (unintelligible) in |
| 514 | | the same area and he brought his kids over and his kids loved our house, they |
| 515 | | loved our pool. And from then on, he w- been a frequent visit and we became |
| 516 | | really good friends and developed a good relationship |
| 517 | | |
| 518 | Q | And, um, you saw each other  did you go to parties (unintelligible)? |
| 519 | | |
| 520 | A | Uh, yeah. Parties, get-togethers, barbeques. We frequently had barbeques over |
| 521 | | at our house and he was constantly over there |
| 522 | | |
| 523 | Q | Do you know of somebody named (Mark Concannon)? |
| 524 | | |
| 525 | A | Yes, I do |
| 526 | | |
| 527 | Q | And would he be at these parties or how do you know (Mark)? |
| 528 | | |
| 529 | A | Uh, I know (Mark) because he works South Mountain Precinct so I met him |
| 530 | | early on. Uh, (Mark) is - is, uh, was on the squad at the same time that we all |
| 531 | | were |
| 532 | | |
| 533 | Q | How 'bout (Eric Ruby)? Do you know him? |
| 534 | | |
| 535 | A | I know him but I'm not friends with him |
| 536 | | |
| 537 | Q | Okay  Are you - are - are you friends with Mr  (Concannon)? |
| 538 | | |
| 539 | A | Uh, yeah, but we don't - he lives on the other side of town so, you know, we |
| 540 | | don't hang out. |

541

542  Q      In terms of whether - how close you are to Mr , um, Chrisman, did you ever
543         attend a party where perhaps people - women were takin' off their clothing?
544         Do you know anything about that?
545

546  A      Uh, yeah. I - sometimes jokes and, you know, things get a little bit frisky
547         sometimes

548

549  Q      Okay  Um, and pictures were taken of that?
550

551  A      Yes
552

553  Q      You know, uh, who would take those pictures?
554

555  A      Uh, any one of us
556

557  Q      Do you know any of the women that, uh, actually took their clothes off?
558

559  A      Yes.
560

561  Q      Who a- who are they?
562

563  A      Um, (Maria), his wife, would show - uh, take off her top sometimes  Uh, my
564         wife would. Um, we have another close friend named (Sherry)  She
565         sometimes would.
566

567  Q      Okay  Um, and - and these  these are parties that you guys would have, right?
568

569  A      Yes
570

571  Q      Okay  Um, do you know anything about some video where somebody maybe
572         engaged in some sexual con- conduct? Do you know anything about that?
573

574  A.     No
575

576  Q      Okay  Um, when - w- when was the last time that you spoke to Mr  Chrisman?
577

578  A.     Uh, yesterday afternoon.
579

580  Q      And was it about this matter or was it about something else?
581

582  A      Uh, no, not this matter  It was  I was gettin' off of work. I'd been training and
583         me and my wife were gonna meet her co-workers for some dinner and some
584         drinks and he was close by so I killed some time there  I talk about my
585         personal issues with him and vent and.

Exhibit 30

1

1    IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

2         IN AND FOR THE COUNTY OF MARICOPA

3

4

5  STATE OF ARIZONA,            )
                                )
6                  Plaintiff,   )
                                )
7                                )
   vs                           )   CR2010-153913-001DT
8                                )
                                )
9  RICHARD CHRISMAN,            )
                                )
10                 Defendant    )
   _____ )

11

12

13

14        REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                    (Trial)

16               Phoenix, Arizona
                 August 26, 2013
17               10 30 a m

18

19   Before   The Honorable Warren J  Granville, Judge

20

21

22

23  (Copy)

24  PREPARED BY   Elva Cruz-Lauer, RMR, CRR
               Arizona Certified Reporter No  50390
25

2

1 | APPEARANCES

2 | For the State                    MR   JUAN MARTINEZ,
                                     Deputy County Attorney,
3 |

4 | For the Defendant                MR   CRAIG MEHRENS,
                                     MS   AMY WILEMON,
5 |                                  MR   PATRICK GANN,
                                     Attorneys at Law,
6 |

7 |

8 |          (Whereupon, Elva Cruz-Lauer, was first duly

9 | sworn to act as the Official Reporter herein )

10 |

11 |

12 |

13 |

14 |

15 |

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

3

1                          INDEX

2

3   DEFENDANT'S WITNESSES      D      C     RD     VD

4   Katherine Black           16     21    37

5   Norman A  Wade            39     44    59

6   Sean Mattson             65     94    126

7   Lon Bartel               130                  155

8   Mayra Reeson             169    174   202

9   Lon Bartel               156    228

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

95

1      A      Yes, sir

2      Q      If you hadn't looked at it, you wouldn't
3  have known, right?

4      A      That is correct

5      Q      There's a difference between receiving a
6  telephone call and actually looking at who is calling
7  you, isn't there?

8      A      There is, yes, sir

9      Q      And in fact, somebody could call and they
10 could be on their way to a call, some sort of police
11 matter and may not look at the phone and just answer
12 it, right?

13     A      Absolutely

14     Q      And just because they receive a call, it
15 doesn't mean that they are able to see who is calling
16 them -- or they know who's calling, right?

17     A      Right

18     Q      Sir, one of the things that you told us is
19 that you are working where?

20     A      The -- currently, sir?

21     Q      Yeah, uh-huh

22     A      The Phoenix Police Sergeants and
23 Lieutenants Association

24     Q      And what is that?  Explain to me what that
25 is

96

1      A      That's the labor organization identified as
2  representing sergeants and lieutenants
3      Q      It is a labor organization who you work
4  for, right?
5      A      Yes, sir
6      Q      And the City of Phoenix taxpayers are
7  paying you for working there, right?
8      A      Yes -- our contract is, yes
9      Q      Right   Well, it is the City of Phoenix
10  taxpayers that are paying that contract, right?
11      A      That's under review right now by another
12  court
13      Q      It may be under review, but that -- you get
14  a paycheck every, what, two weeks?
15      A      Yes, sir
16      Q      It never misses, every two weeks you get
17  that paycheck, right?
18      A      Certainly do
19      Q      And in fact, though, you are not out on the
20  street patrolling, are you?
21      A      I am not
22      Q      And in fact, what you are doing is you are
23  talking to people about any issues involving the
24  union, right?
25      A      Among other duties, yes, sir

97

1      Q    And even though you talk about sergeants
2  and all that, it is really you are working for PLEA,
3  the Phoenix Law Enforcement Association, right?
4      A    Absolutely not
5      Q    Well, it is related to PLEA, isn't it?
6      A    No
7      Q    So it has nothing to do with Phoenix Law
8  Enforcement Association?
9      A    Other than the fact that we are one of
10  seven unions in the City of Phoenix and they too are
11  another union
12      Q    And so this union that you work for,
13  though, is still a police -- it involves the police
14  department, right?
15      A    Yes, sir
16      Q    And instead of being out on the street, you
17  are actually, what, do you have an office somewhere?
18      A    I have two offices
19      Q    Okay   The office that involves the job
20  that you have now, where is it?
21      A    I have one office in police headquarters
22  and one office in Sunnyslope
23      Q    And before, when you used to back on
24  October 5th of 2010, one of the things that you had
25  was an office back at the station, right?

98

1      A    Yes, sir

2      Q    That would be the South Mountain Precinct,
3   right?

4      A    Yes, sir

5      Q    And the other place that you could be found
6   would be your car, right?

7      A    Yes, sir

8      Q    And that would be because you were out
9   there patrolling, right?

10     A    Yes

11     Q    One of the things that happened after
12  October 5th, was that you and somebody else paid a
13  visit to Sergio Virgillo, didn't you?

14     A    I am sorry, could you repeat the question?

15     Q    After October 5th of 2010, you and another
16  officer paid a visit to Mr  Virgillo, didn't you?

17     A    If you are referring to the --

18     Q    Yes or no?

19     A    No

20     Q    You never paid him a visit out at the golf
21  course?

22     A    I did, yes, I did

23     Q    So you did pay him a visit while he was out
24  there on the driving range, right?

25     A    I did

99

1     Q    And it was sometime around 7 00 o'clock in

2 the morning, wasn't it?

3     A    It was, yeah, that sounds accurate

4     Q    And you were with somebody else, weren't

5 you?

6     A    I was

7     Q    You were with Sergeant Mark Post, right?

8     A    I was

9     Q    The same guy that you were having lunch

10 with, right, at the time that this 998 came out,

11 right?

12    A    Yes, sir

13    Q    And in fact, Sergeant Mark Post and the

14 defendant have a special relationship, don't they?

15    A    Um, not that I am aware of

16    Q    You are not aware of anything in their past

17 that links them together at all?  You are not aware

18 of anything like that?

19    A    No, not -- no

20    Q    Okay  One of the other things that

21 happened -- one of the things that happened when you

22 went out there is that -- one of the ostensible

23 reasons that you guys were out there was to deliver

24 Sergio Virgillo's clipboard, right?

25    A    That sounds accurate

100

1    Q    This clipboard, was it made out of gold?

2         It wasn't, was it?

3    A    Oh, no, it wasn't made out of gold

4    Q    It wasn't any sort of special clipboard,

5  was it?

6    A    No

7    Q    The City of Phoenix has lots of clipboards,

8  right?

9    A    Not -- I don't know   I don't know the

10  answer to that question

11   Q    Well, if you wanted a clipboard, the City

12  of Phoenix Police Department would be able to get you

13  one, wouldn't they?

14   A    Probably

15   Q    And sir, you and this other sergeant are

16  out there and one of the things that happens is that

17  you and this other sergeant have a conversation with

18  Mr  Virgillo about unwanted contact with him, right?

19   A    Yes, sir

20   Q    And it was by a councilman and the vice

21  mayor, right?

22        MR  MEHRENS   Objection, Your Honor,

23  relevance

24        THE COURT   Sustained

25  ///

101

1 BY MR MARTINEZ

2      Q    Well, with regard to that contact, isn't it

3 true, sir, that as a result of that, there was an

4 e-mail that was generated, right?

5      A    Yes, sir

6      Q    And the day that you generated that e-mail,

7 isn't it true, that it appeared in the Phoenix Law

8 Enforcement Association's website, didn't -- isn't

9 that true?

10           MR  MEHRENS   Objection, relevancy

11           THE COURT   Sustained

12 BY MR  MARTINEZ

13      Q    Well, sir, you have an association, or a

14 view that favors unions, don't you?

15      A    Uh, that's accurate

16      Q    And you have no way of knowing how it was

17 that an internal document was obtained the next day,

18 you have -- your internal --

19           MR  MEHRENS   Objection, relevancy

20           THE COURT   Sustained

21 BY MR  MARTINEZ

22      Q    Sir, this document, there was a complaint

23 by Mr  Virgillo about not wanting to be influenced,

24 right?

25           MR  MEHRENS   Objection, relevancy, Your

```
                                                    102
 1  Honor
 2          THE COURT   Ladies and gentlemen, there's a
 3  legal issue that we will take care of   It is better
 4  if we do that if you guys go back to the jury room,
 5  we will be right with you
 6          (Whereupon, the jury leaves the courtroom )
 7          THE COURT   Please be seated
 8          Mr  Martinez, what are you intending to
 9  proffer?
10          MR  MARTINEZ   Well, one of the things that
11  it appears that this officer leaked that document to
12  the Phoenix Law Enforcement Association through Larry
13  Jacobs   And that -- those are the people that are
14  representing the defendant now
15          In other words, the Phoenix Law Enforcement
16  Association are the ones that are paying the bill
17  He had an affinity back then with the association
18  that is representing the defendant   Therefore, I am
19  allowed to explore that bias
20          THE COURT   Well, what's the relevance of
21  whether Mr  Chrisman acted in self-defense or not on
22  October 5th?
23          MR  MARTINEZ   That this individual is
24  coming in here and testifying on behalf of the
25  defendant and saying, there are all these calls that
```

103
1  I received on his behalf, um, to, if you will,
2  disparage what Officer Virgillo said when, on the
3  other hand, he's attempting to disparage or hurt
4  Officer Virgillo with his actions in leaking a
5  document

6          THE COURT   I haven't heard any of that
7          MR  MARTINEZ   About leaking?
8          THE COURT   Well, I am hearing that now
9  But I hadn't heard any disparaging comments   He just
10 listed a bunch of phone calls he has had with Officer
11 Virgillo over the course of two weeks

12         MR  MARTINEZ   Well, globally speaking, he
13 doesn't know about that, but he is coming in here and
14 assisting the defense when they are saying that
15 Officer Virgillo, according to his account, was
16 following Chrisman at the time that they were going
17 to this trailer

18         There was this telephone call that came
19 through, their indications are that Officer Virgillo
20 is lying because when he said, I didn't know who was
21 calling me, I just picked up the phone and answered
22 it   And he is coming in and assisting that theory

23         THE COURT   Well, the only testimony I have
24 heard so far are actions between the sergeant and
25 Officer Virgillo before October 5th   You are talking

104

1  about things that happened after that as evidence of

2  bias   I don't see the 402 relevance or the 403 if we

3  have to go into a mini hearing as to who leaked what,

4  when, where

5          MR  MARTINEZ   Are you indicating that I

6  should question him about the --

7          THE COURT   Well, I am asking you -- it is

8  your evidence   I want to know why you think it is

9  relevant and why you think it is not 403

10          MR  MARTINEZ   When someone has indicated

11  that -- or has shown that they have a bias in favor

12  of the organization that is paying the defendant's

13  legal bills, that in fact, the ethical rules that

14  govern lawyers indicate that if somebody else is

15  paying the bills, that's going to be an ethical issue

16  for that lawyer and that that's something that he has

17  to be careful   That's the same analogy that applies

18  here

19          This is the individual that ostensibly was

20  leaking information to the people that are actually

21  defending the defendant or paying his bills

22          MR  MEHRENS   Judge, he has no evidence

23  that this man leaked anything   In fact, he has just

24  the contrary   And as I said earlier this morning,

25  this is the person, this guy right here, who was

105
1  allowed to conduct a criminal investigation and call
2  in people like Sergeant Mattson and grill them and
3  then use that in this particular trial

4          And as I said before, Judge, if he can sell
5  that, that's no problem  And now, and he -- and they
6  said there was no evidence of anything that happened
7  And there is -- even if he had leaked something, it
8  wouldn't matter, but there is no evidence  And I
9  just had to stand up and say, that's not true what he
10 is saying  And secondly, it has no relevancy

11          And finally, the Phoenix Law Enforcement
12 Agency is not paying my legal bills  They have an
13 insurance -- whatever it is, it's different than what
14 he says and I don't know what relevancy that has to
15 him, to this case other -- any more than us
16 taxpayers, including me, unfortunately, are paying
17 some of his fees

18          THE COURT  Having heard your proffer,
19 Mr Martinez, I don't think it is relevant under 402,
20 and the whole issue of who leaked what, where, I
21 think would be confusing and cause a trial on issues
22 unrelated to this case  So under 403, I would
23 preclude it

24          Let's bring the jurors back
25          (Whereupon, the jury enters the courtroom )

```
                                                   106
 1            THE COURT   The record should reflect the
 2   return of the jurors
 3            Mr  Martinez
 4   BY MR  MARTINEZ
 5       Q   Sir, back on October 5th of 2010, when you
 6   were out at the scene, you attempted to speak with
 7   Officer Virgillo, didn't you?
 8       A   Yes, sir
 9       Q   And he indicated to you that he wasn't
10   going to talk to you, right?
11            MR  MEHRENS   Objection, hearsay
12            THE COURT   Overruled on that
13   BY MR  MARTINEZ
14       Q   Right?
15       A   There was a point when he said that, yes,
16   sir
17       Q   Right   And in fact, you got upset with
18   him, didn't you?
19       A   I did, yes, sir
20       Q   And in fact, you were so upset that while
21   Officer Virgillo was sitting away from the scene, you
22   got on the telephone and called him, didn't you?
23       A   I did not call him, no
24       Q   You never spoke to him on the telephone?
25       A   I did speak with him on the telephone, yes,
```

174

1  Can you kind of show us where you saw this taser

2  confetti?

3      A    In this area here

4      Q    Okay   Do you know if -- did you happen to

5  know whether there was taser confetti other places

6  outside on this porch when you were there?

7      A    I don't know

8      Q    Okay   And there's no question, you were

9  there before it was wet there?

10     A    Yeah, it didn't look like that when I was

11  there

12     Q    Okay   Thank you

13          MR  MEHRENS   That's all I have

14          THE COURT   Mr  Martinez

15

16          C R O S S - E X A M I N A T I O N

17

18  BY MR  MARTINEZ

19     Q    Ma'am, you have indicated that you were on

20  maternity leave, right?

21     A    Yes

22     Q    But actually, when did it start?  When did

23  the maternity leave start?

24     A    My maternity leave?

25     Q    Yes

175

1      A      I have been at home for a while   I had a

2   very difficult pregnancy

3      Q      I understand it may have been a difficult

4   pregnancy   How long have you been at home with this

5   difficult pregnancy?

6      A      Oh, um, the doctor took me out of work --

7      Q      No, no, no, give me a date   Please just a

8   date?

9      A      I don't have the exact date, in January

10     Q      So January of when?

11     A      This year

12     Q      So since January of this year, for about

13  eight months you have been on maternity -- or nine

14  months -- eight months you have been on maternity

15  leave?

16     A      Yes

17     Q      And during the time that you have been on

18  maternity leave, this has been pursuant to a doctor's

19  note, right?

20     A      Yes

21     Q      And during that -- and this has been

22  approved by the Phoenix Police Department, right?

23     A      Yes

24     Q      And although it has been -- it was -- it's

25  very difficult and you have a doctor's note, it

176

1  didn't stop you from coming to the trial though, did

2  it?

3       A    Oh, I am no longer on doctor's bed rest

4       Q    Okay   When -- okay   Well, you said you

5  are on maternity leave and you have been out of work

6  since January --

7       A    Right

8       Q    Did you go to work in -- sometime after

9  January?

10      A    No   Now I am considered on bonding time

11 with my child

12      Q    I understand that   So basically, from

13 January until now you have not been to work, right?

14      A    Right

15      Q    And during the time that you haven't been

16 going to work, you have been paid, right?

17      A    No

18      Q    You haven't been paid anything at all?

19      A    No, I have been without pay for several

20 months now

21      Q    And that's because your time has run out,

22 right?

23      A    Right   Because of my difficult pregnancy

24      Q    But during the time that you have been out

25 of work from January to the present, that didn't stop

177

1  you from coming to court to watch the proceedings,

2  correct?

3      A    Um, I was here, yes

4      Q    So the answer is yes, you did come to

5  court, didn't you?

6      A    Yes

7      Q    And you came on two days, didn't you?

8      A    Yes

9      Q    And you came during the two days that

10 Officer Sergio Virgillo testified, right?

11     A    Yes

12     Q    You were here and you heard everything he

13 had to say, right?

14     A    Yes

15     Q    So are you familiar with the fact that

16 there's a Rule of Exclusion of witnesses?

17          MR  MEHRENS   Objection, Your Honor

18          THE COURT    Sustained

19 BY MR  MARTINEZ

20     Q    Well, you have been a police officer for

21 how long?

22     A    Um, since September of 2007

23     Q    And you know since 2007, that -- have you

24 testified before?

25     A    Yes

178

1      Q     In other cases, right?

2      A     Yes

3      Q     And when somebody is testifying and they

4   are going to be a witness, you are not allowed to be

5   in the courtroom, right?

6            MR  MEHRENS   Objection, that is not a

7   fact   And it's not a fact in this case

8            THE COURT   Sustained

9   BY MR  MARTINEZ

10     Q     So you came in but you were able to listen

11  to what Officer Virgillo had to say, right?

12     A     Yes

13     Q     And you heard what he said about the taser

14  and where he fired it, right?

15     A     Um, yes

16     Q     You were here for that day, right?

17     A     Yes

18     Q     And ma'am, when you were here and he was

19  talking about it, you were on the other side of the

20  room, and I am talking about the side behind

21  Mr  Chrisman, right?

22     A     Yes, that's where I was seated

23     Q     And in fact, before you took the witness

24  stand you actually went over to his wife, right?

25     A     Yes

179

1    Q    And you kind of shook her hand or as a way

2  of support, didn't you?

3    A    Yeah, she's -- yes

4    Q    Right   You have a -- apparently you have

5  some sort of close connection with her, right?

6    A    Yes

7    Q    And how long have you had this close

8  connection with his wife?

9    A    Um, some time

10   Q    How long is some time?

11   A    Um, I have known her for a couple of years

12   Q    And during that time, you have become her

13 friend, right?

14   A    Yes

15   Q    And during that time, you associated with

16 the defendant, Richard Chrisman, haven't you?

17   A    Yes

18   Q    And you are also his friend, right?

19   A    Yes

20   Q    And you guys are on a social basis, right?

21   A    Um, okay, yes

22   Q    The answer is yes, correct?

23   A    (No oral response )

24   Q    How often do you socialize with them?

25   A    Not often

1          C R O S S - E X A M I N A T I O N

2

3  BY MR  MARTINEZ

4      Q      Sir, one of the things that you told us was

5  that you are getting paid for your time, to come in

6  and testify, right?

7      A      Correct

8      Q      And additionally, you also are working for

9  the Peoria Police Department, right?

10     A      Correct

11     Q      And for the Peoria Police Department you

12  do -- you told us that you did a number of things,

13  right?

14     A      Correct

15     Q      And while you are here, one of the things

16  that we know is that you are not at the Peoria Police

17  Department, right?

18     A      Correct

19     Q      You are taking vacation, right?

20     A      Correct

21     Q      And what that means is you are getting $150

22  an hour to testify today, right?

23     A      Correct

24     Q      There's nothing wrong with that, is there?

25     A      No

229

1    Q    Do you see any problem with somebody

2 getting $300 an hour if they deserve it?

3    A    If they deserve it, no

4    Q    You see any problem with $350 an hour?

5    A    It's not my area of expertise, but, no

6    Q    And so as you sit here though, you work for

7 the Peoria Police Department, though, right?

8    A    Correct

9    Q    And working for the Peoria Police

10 Department, that means sort of that you are double

11 dipping a little bit, aren't you?

12    A    No

13    Q    Well, you are getting paid your daily wage

14 today from the Peoria Police Department because you

15 took vacation, right?

16    A    I am exercising a benefit, yes

17    Q    Okay   And how much is that benefit on a

18 daily basis, then?   How much do you make per hour

19 there?

20    A    $36 an hour

21    Q    And so if you took 8 hours for that, how

22 much is that?

23    A    Without a calculator, I would be rough

24 guessing   I don't know

25    Q    Well, let's say times four, just rough

1 guessing?

2      A    I'm sorry?

3      Q    8 times 4?

4           THE COURT    32

5 BY MR  MARTINEZ

6      Q    So it is approximately $300, right?

7      A    About, yes, sir

8      Q    And then for this, you also get paid too,

9 don't you?

10      A    Correct

11      Q    $150 an hour, right?

12      A    Correct

13      Q    And did the meter start running this

14 morning or did it run when you took the stand?

15      A    It started when I got here this morning

16      Q    And what time did you get here this

17 morning?

18      A    10 30

19      Q    So from 10 30 to 12 -- or 12 30 that's two

20 hours, right?

21      A    Correct

22      Q    And if we get down to 4 30, how much time

23 would you have spent if you came here at 10 30?

24      A    About four hours total

25      Q    And four hours to -- times one -- is it 150

```
                                                              231
 1  or not?

 2       A    No, it is 150

 3       Q    So that's a total of about $600, right?

 4       A    Approximately, yes

 5       Q    So 600 plus 300, you are getting about $900

 6  a day, today, right?

 7       A    Correct

 8       Q    There's nothing wrong with any money that

 9  you are getting, is there?

10       A    No

11       Q    So if anybody indicates that, you don't see

12  anything wrong with it though, right?

13       A    No

14       Q    And sir, the other thing that you indicated

15  is that you have testified in Superior Court, do you

16  remember telling us that?

17       A    I have testified in Superior Court, yes

18       Q    With regard to these issues?

19       A    No

20       Q    In fact, you have testified in Superior

21  Court -- or court, not as an expert on these issues,

22  isn't that true?

23       A    I haven't testified in Superior Court as an

24  expert, no

25       Q    And in fact, you have never testified as an
```

Exhibit 31

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

State of Arizona,               ) No  CR2010-153913-001
                                )
                                )
                Plaintiff,      )
                                )
vs                              )
                                )
Richard Chrisman,               )
                                )
                                )
                Defendant       )
_____)


**INTERVIEW OF JULIE EGEA**

Phoenix, Arizona
August 28, 2013
1 00 p m


**REPORTED BY**
DONNA DELAVINA, RPR
Certified Reporter
Certificate No  50468

**PREPARED FOR**
MR  JUAN MARTINEZ

(COPY)

*DONNA DELAVINA REPORTING*
365 East Coronado Road
Suite 210
Phoenix, Arizona 85004
P (602) 230-5454
F (602) 230-8444
donnadelavina@live com

JULIE EGEA   8/28/2013

2

```
1                    INDEX TO EXAMINATIONS
2    WITNESS                                      PAGE
3    JULIE EGEA
4        Examination by Mr  Martinez                4
5
6
7
8
9
10                   INDEX TO EXHIBITS
11   No      DESCRIPTION                        MARKED
12   1       Hand-drawn Diagram                    54
13
14
15
16
17
18
19
20
21
22
23
24
25
```

DONNA DELAVINA REPORTING   (602) 230-5454

JULIE EGEA     8/28/2013

3

```
 1          THE INTERVIEW OF JULIE EGEA was taken on

 2   August 28, 2013, commencing at 1 00 p m , at the Law

 3   Offices of MEHRENS & WILEMON, P A , 99 East Virginia

 4   Avenue, Suite 220, Phoenix, Arizona, before DONNA

 5   DELAVINA, Certified Court Reporter No  50468 for the

 6   State of Arizona

 7                    * * * * * *

 8

 9   APPEARANCES

10

11        FOR PLAINTIFF

12        MARICOPA COUNTY ATTORNEY'S OFFICE
          301 West Jefferson
13        4th Floor
          Phoenix, Arizona 85003
14        BY   JUAN MARTINEZ

15

16        FOR DEFENDANT

17        MEHRENS & WILEMON, P A
          99 East Virginia Avenue
18        Suite 220
          Phoenix, Arizona 85004
19        BY   CRAIG MEHRENS

20

21        LAW OFFICE OF PATRICK G  GANN
          522 West First Avenue
22        Suite 104
          Tempe, Arizona 85281
23        BY   PATRICK G  GANN

24

25
```

DONNA DELAVINA REPORTING   (602) 230-5454

1  other people?

2      A    I have

3      Q    And, again, people not part of the

4  investigation?

5      A    Right

6      Q    And this was after you were removed?

7      A    Uh-huh

8      Q    Did you discuss your impressions?

9      A    I have

10     Q    About how many times, would you say?

11     A    Oh, I don't know

12     Q    Have you ever been disciplined for anything?

13     A    I have

14     Q    And what have you been disciplined for?

15     A    I have a written for insubordination   I have a

16  written --

17     Q    Let me stop you there

18          What is the insubordination about?

19     A    We were on a pursuit and we were headed -- we

20  were heading up to Cordes Junction

21     Q    Okay

22     A    And we were told to discontinue   The vehicles

23  around me did not   I was not able to   So I continued

24  in the pursuit

25     Q    And what ultimately ended up happening in terms

1    of the pursuit and the person?

2        A    Oh, we caught the guy

3        Q    Was anybody injured?

4        A    No

5        Q    How was it that this came about to be something

6    that was an issue, a personnel issue, for lack of a

7    better term?

8        A    The -- I don't know if she was a sergeant or a

9    lieutenant at the time -- but Renteria, Sandra Renteria

10   cleared on the radio

11       Q    "Cleared on the radio" means what?  I don't

12   know what that means

13       A    You know how officers all carry radios?

14       Q    Sure

15       A    And she was communicating through the radio to

16   all the officers involved in the situation that all

17   except the front -- I don't remember how many -- to

18   discontinue

19       Q    And you were not amongst the group?

20       A    I was not in that front part, no

21       Q    And so then what happened?  Did you get the

22   notice -- what did you call it, notice of --

23       A    Oh, an NOI, a notice of investigation

24       Q    Did you get that or not?

25       A    I did, yes

1     Q    And when was this?  What year, if you remember?
2  What date?
3     A    It was in the '90s, may be 1997-ish
4     Q    Any other discipline?
5     A    Yep   I got a written for telling a lady she
6  did not deserve to have her F-ing kids
7              So for swearing
8     Q    Did you use, my term, "fucking kids" or did you
9  just say F-ing?
10    A    Well, it was alleged I said fucking
11    Q    Okay   And did you get the NOA thing again?
12    A    NOI
13    Q    NOI?
14    A    Yes, I did
15    Q    And who was the sergeant or who was the person
16 that turned you in?
17    A    Well, it was Sergeant Renteria, was the one
18 again
19    Q    How did she know about it?  Did the lady call
20 in?
21    A    I think the lady made a complaint because she
22 was a -- we went to her house quite a bit   So I knew
23 her quite well
24    Q    And what year was it?
25    A    I think that was about '97 too   I might not be

```
 1  exact on my years
 2       Q    Sure, I understand that   That I understand
 3             Any other discipline?
 4       A    Yep
 5       Q    Okay
 6       A    I got a written for leaving a seminar early and
 7  coming in late
 8       Q    Describe that for me   What is it -- did you
 9  also receive NOI?
10       A    NOI
11       Q    Yes
12             Tell me about that
13       A    Yes, I did
14             This was probably -- maybe in 2000 or
15  1999, around there
16       Q    Okay   And was it still Sergeant Renteria or
17  was it somebody else?
18       A    No   I was under Sergeant Kendall Moreland at
19  the time
20       Q    All right
21       A    And it was a gang seminar   And we had some
22  child care issues   I was carpooling
23       Q    All right
24       A    And I arrived late and I left early
25       Q    Any -- and that's all with that one   That's it
```

JULIE EGEA   8/28/2013

54

```
 1   with that one?
 2       A    Yeah, that's it
 3       Q    Any other ones?
 4       A    For some reason I think there's one more, but
 5   it was like prior to everything and I don't remember
 6   it
 7       Q    Okay   I understand that there may be another
 8   one
 9       A    Yeah   I mean, that's it   I don't have
10   anything else
11       Q    Based on --
12              MR  MARTINEZ   You know, that's all I
13   have   Thank you
14              THE WITNESS   Okay
15          (Whereupon, a brief off-the-record discussion
16   ensued )
17          (Whereupon, Exhibit Number 1 was marked for
18   identification )
19              MR  MARTINEZ   We're going to have the
20   sketch drawn by Sergeant Egea as Exhibit Number 1
21          (Whereupon, the interview was concluded at
22   2 19 p m )
23                 *  *  *  *  *  *
24
25
```

Subject to Motion for
Protective Order

# Exhibit 32

# Exhibit 33

1

1          IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

2              IN AND FOR THE COUNTY OF MARICOPA

3

4

5   STATE OF ARIZONA,              )
                                   )
6                   Plaintiff,     )
                                   )
7   vs                             )   CR2010-153913-001DT
                                   )
8                                  )
                                   )
9   RICHARD CHRISMAN,              )
                                   )
10                  Defendant      )
    _____)

11

12

13

14          REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                      (Trial)

16                  Phoenix, Arizona
                    September 3, 2013
17                   10 30 a m

18

19   Before   The Honorable Warren J  Granville, Judge

20

21

22

23   (Copy)

24   PREPARED BY   Elva Cruz-Lauer, RMR, CRR
                   Arizona Certified Reporter No  50390
25

2

```
1   APPEARANCES

2   For the State                    MR  JUAN MARTINEZ,
                                     Deputy County Attorney,
3

4   For the Defendant                MR  CRAIG MEHRENS,
                                     MS  AMY WILEMON,
5                                    MR  PATRICK GANN,
                                     Attorneys at Law,
6

7

8            (Whereupon, Elva Cruz-Lauer, was first duly

9   sworn to act as the Official Reporter herein )

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

```
 1                        INDEX
 2
 3  DEFENDANT'S WITNESS      D      C     FE    FE
 4  Mayra Reeson                        16    18
 5  Richard Chrisman        19    110
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

54

1    A   No, I knocked on the window, too

2    Q   Any answer?

3    A   No, sir

4    Q   So what did you do?

5    A   Returned to space 50

6    Q   With -- did you go with Officer Virgillo?

7    A   Yes

8    Q   And when you go back to space 50, who do

9 you speak to?

10    A   Elvira

11    Q   And how does she appear this time?

12    A   She's still crying

13    Q   What do you ask her?

14    A   I asked her if she was sure he was home

15 And she said yes   She told us that she knew he was

16 home   He was in his bedroom   She said the door is

17 unlocked and gave us permission to enter

18    Q   Do you then leave trailer 50?

19    A   No

20    Q   What happened?

21    A   Well, I asked her a couple more questions

22    Q   What else did you ask her?

23    A   I asked her if there was any weapons in the

24 house

25    Q   What did she tell you?

56

1  and either waited for him or told him to hang up the

2  phone, we are on a call

3      Q    Neither one of those things happened?

4      A    No, sir

5      Q    Is there any response to your knocking and

6  your direction, Phoenix police, come on outside?

7      A    No, sir

8      Q    What do you do?

9      A    I open the door and announced again,

10 Phoenix police and called into him and asked him to

11 come out and talk to us

12     Q    Now, at this particular point, Officer

13 Chrisman, you are up at the doorway, you've actually

14 opened it, do you have a search warrant?

15     A    No

16     Q    Do you need a search warrant?

17     A    No

18     Q    Why not?

19     A    We have been given permission by one of the

20 occupants of the trailer, whether she's the owner or

21 not, she's an occupant of the trailer, a resident

22     Q    Ms  Fernandez?

23     A    We have been given permission to enter

24          THE COURT   Excuse me, Mr  Gann

25          MR  GANN    This is a good point

Exhibit 34



1

1    IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

2         IN AND FOR THE COUNTY OF MARICOPA

3

4

5   STATE OF ARIZONA,                    )
                                         )
6                     Plaintiff,         )
                                         )
7                                        )    CR2010-153913-001DT
    vs                                   )
8                                        )
                                         )
9   RICHARD CHRISMAN,                    )
                                         )
10                    Defendant          )
                                         )
11  _____

12

13

14    REPORTER'S EXCERPTED TRANSCRIPT OF PROCEEDINGS

15         (Testimony of Sergio Virgillo)

16              Phoenix, Arizona
                August 7, 2013
17              1 30 p m

18

19   Before   The Honorable Warren J  Granville, Judge

20

21

22

23  (Copy)

24  PREPARED BY   Elva Cruz-Lauer, RMR, CRR
                  Arizona Certified Reporter No  50390
25

```
                                                                2
 1  APPEARANCES
 2  For the State              MR  JUAN MARTINEZ,
                               Deputy County Attorney,
 3
 4  For the Defendant          MR  CRAIG MEHRENS,
                               MS  AMY WILEMON,
 5                             MR  PATRICK GANN,
                               Attorneys at Law,
 6
 7
 8            (Whereupon, Elva Cruz-Lauer, was first duly
 9  sworn to act as the Official Reporter herein )
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

3

1

2                          INDEX

3

4   STATE'S WITNESS            D

5   Sergio Virgillo           4

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

29

1  like that

2      Q    Did you subsequently find out whether or

3  not she was the owner of the trailer?

4          MR  MEHRENS   Objection, foundation

5          THE COURT   Sustained

6  BY MR  MARTINEZ

7      Q    You have reviewed other documents

8  subsequent to this, haven't you, involving who was

9  the owner of the trailer, haven't you?

10     A    Yes

11     Q    And with regard to that, have you formed an

12 opinion based on your review as to whether or not she

13 owned the trailer?

14         MR  MEHRENS   Objection, hearsay

15         THE COURT   Sustained

16 BY MR  MARTINEZ

17     Q    So you then continue on, right?

18     A    Yes

19     Q    Did you decide to go back or not?

20     A    Yes

21     Q    If she had not been the owner of the

22 trailer, whether you know that or not, would the

23 process have been the same as if she was the owner of

24 the trailer?

25     A    The process would have been completely

different

Q How so?

A I would have told her that she --

MR MEHRENS Objection, not relevant, speculation

THE COURT Relevance, Mr Martinez?

MR MARTINEZ She doesn't own the trailer

MR MEHRENS Yes, she does Actually, she --

THE COURT Time out

MR MEHRENS Actually what happened is she --

THE COURT Time out

MR MEHRENS Yes, sir

THE COURT I understood the objection I am just asking the relevance

MR MARTINEZ The relevance is that, as I indicated, she did not own the trailer

MR MEHRENS Your Honor

THE COURT Objection is sustained

MR MEHRENS Can that be stricken? He's not --

THE COURT There's no question, there's no answer The jurors have been told it's not evidence

///

31

1  BY MR  MARTINEZ

2       Q     So then what happened, sir?

3       A     Chrisman and I walked back to trailer 51

4       Q     What was the purpose of you going there?

5       A     To try to make contact with her son

6       Q     And do you do anything in preparation of

7  contacting her son?  Do you do anything?

8       A     No

9       Q     Well, do you get a pamphlet out or anything

10 like that?

11      A     Um, yes, I carry my steno pad and my

12 pamphlet with me

13      Q     Why did you get the pamphlet out?

14      A     To save time

15      Q     What do you mean to save time?  How could

16 the pamphlet have saved you time?

17      A     Well, eventually, if this was an allegation

18 of a domestic violence criminal damage, a report was

19 going to be taken, and rather than going -- keep

20 going back to the vehicle, I take a shortcut and I

21 carry my pamphlet with me to give to the individuals

22 before we leave

23      Q     And on the way to the door, did -- was

24 there an occasion where your telephone rang?

25      A     Yes

Exhibit 35

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

STATE OF ARIZONA                    )
                                    )
                                    )
                Plaintiff,          )
                                    )
        vs                          )   No   CR 2010-153913-001
                                    )
RICHARD CHRISMAN                    )
                                    )
                                    )
                Defendant           )
                                    )

Phoenix, Arizona
September 9, 2013

BEFORE    THE HONORABLE WARREN GRANVILLE
          Superior Court Judge

REPORTER'S TRANSCRIPT OF PROCEEDINGS

In Chambers Proceeding
Trial (AM Session)

Cindy L  Lineburg, RPR, CR, CSR(CA)
Official Certified Reporter
CR No   50031

SUPERIOR COURT

```
 1                    A P P E A R A N C E S

 2

 3            For the State

 4            JUAN M  MARTINEZ, Deputy County Attorney

 5

 6            For the Defendant

 7            CRAIG MEHRENS, Attorney at Law
             AMY WILEMON, Attorney at Law
 8            PATRICK G  GANN, Attorney at Law

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

SUPERIOR COURT

1    love is what her son needed at this point

2              At that point, according to their own witness,

3    Ms Fernandez was not going to call the police in the

4    situation  So, she does do that  She makes the call, and

5    after she makes the call you're able to hear on the 911 tape

6    what she sounded like, what her voice was like, whether or

7    not you could understand her

8              You can rely on your ears, even though you're

9    told by the defendant that she was hysterical  You listened

10   to it  You were able to hear what she was able to say  You

11   were able to hear how clear she was on that 911 call

12   Nothing excitable about it

13             No one needs to tell you what she sounded like

14   You have the recording, the recording that they made

15   available  So they can't not now turn around and say, well

16   no, don't listen to that recording  That recording is to be

17   listened to, and you have the opportunity to do that, and

18   you have done so on two separate occasions, during their

19   opening statement, as well as during the presentation of

20   their case

21             And you can use your own ears, your own common

22   sense as the jury instructions tell you, to determine

23   whether that person was hysterical or not, whether Elvira

24   Fernandez in that telephone call was upset or hysterical

25   You can make that judgment for yourself

SUPERIOR COURT

Exhibit 36

1

1    IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

2         IN AND FOR THE COUNTY OF MARICOPA

3

4

5    STATE OF ARIZONA,                )
                                      )
6                    Plaintiff,       )
                                      )
7                                     )
     vs                               )    CR2010-153913-001DT
8                                     )
                                      )
9    RICHARD CHRISMAN,                )
                                      )
10                   Defendant        )
     _____)

11

12

13

14        REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                      (Trial)

16                 Phoenix, Arizona
                   September 3, 2013
17                   10 30 a m

18

19    Before   The Honorable Warren J  Granville, Judge

20

21

22

23    (Copy)

24    PREPARED BY   Elva Cruz-Lauer, RMR, CRR
                    Arizona Certified Reporter No  50390
25

```
                                                                    2
 1  APPEARANCES
 2  For the State                  MR  JUAN MARTINEZ,
                                    Deputy County Attorney,
 3
 4  For the Defendant              MR  CRAIG MEHRENS,
                                    MS  AMY WILEMON,
 5                                  MR  PATRICK GANN,
                                    Attorneys at Law,
 6
 7
 8          (Whereupon, Elva Cruz-Lauer, was first duly
 9  sworn to act as the Official Reporter herein )
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

3

| | | | | |
|---|---|---|---|---|
| DEFENDANT'S WITNESS | D | C | FE | FE |
| Mayra Reeson | | | 16 | 18 |
| Richard Chrisman | 19 | 110 | | |

INDEX

49

```
 1  stopped where it was when you first got to this call?
 2       A    To the best of my knowledge, yes
 3       Q    When you pull up, where is Officer
 4  Virgillo?
 5       A    He's walking behind his Tahoe
 6       Q    So a couple of steps out of the door?
 7       A    Yes
 8       Q    And what do you do?
 9       A    I got out of the vehicle and caught up with
10  him
11       Q    And where do you go?
12       A    We walked to space 50
13       Q    And there, do you have contact with anyone?
14       A    We did
15       Q    And now, again, why do you go to space 50
16  as opposed to 51?
17       A    Because that's where the victim had sought
18  refuge and called police from
19       Q    And you ended up speaking to, I'm sorry,
20  who?
21       A    Elvira Fernandez
22       Q    When you first saw her, how did she appear?
23  Tell us
24       A    She was very, um, -- she was very
25  frightened, very excited, she was crying, shaking
```

50

1 Her voice was quivering when she spoke

2     Q    And did she in fact relate to you what had

3 occurred?

4     A    She did

5     Q    What did she tell you?

6     A    She told us --

7         MR  MARTINEZ  Objection, hearsay

8         THE COURT  Overruled

9     A    She told us that her son Danny goes out

10 for -- he leaves the house for several days at a

11 time   When he comes home he gets real violent and

12 angry and starts destroying stuff and hurts her

13         She said that he had been gone for several

14 days   He came home and he was getting very angry

15 He was in his room and she heard the dog crying   He

16 later turned up the music and she went to talk to him

17 about that and he got angry and threw something sharp

18 at her and hit the wall

19     Q    Did it cause any damage to the wall?

20     A    She said it put a hole in the wall

21     Q    At that point, do you ask her any other

22 question?

23     A    Um, I did   I asked if he had been using

24 drugs or alcohol

25     Q    What did she tell you?

# Exhibit 37

1

1    IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

2         IN AND FOR THE COUNTY OF MARICOPA

3

4

5   STATE OF ARIZONA,              )
                                   )
6                 Plaintiff,       )
                                   )
7                                  )
    vs                             )   CR2010-153913-001DT
8                                  )
                                   )
9   RICHARD CHRISMAN,              )
                                   )
10                Defendant        )
    ―――――――――――――――――――――――――――――  )
11

12

13

14        REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                   (Trial)

16              Phoenix, Arizona
                 August 8, 2013
17               10 30 a m

18

19   Before   The Honorable Warren J  Granville, Judge

20

21

22

23   (Copy)

24   PREPARED BY   Elva Cruz-Lauer, RMR, CRR
                   Arizona Certified Reporter No  50390
25

```
                                                        2
1  APPEARANCES                    --
2  For the State              MR  JUAN MARTINEZ,
                              Deputy County Attorney,
3
4  For the Defendant          MR  CRAIG MEHRENS,
                              MS  AMY WILEMON,
5                             MR  PATRICK GANN,
                              Attorneys at Law,
6
7
8           (Whereupon, Elva Cruz-Lauer, was first duly
9  sworn to act as the Official Reporter herein )
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

3

INDEX

| STATE'S WITNESSES | D | C | RD |
|---|---|---|---|
| Sergio Virgillo | | 4 | 93 |
| Kenneth Porter | 148 | | |


PROCEEDINGS HELD OUTSIDE OF THE PRESENCE OF THE JURY

| | |
|---|---|
| Examination of Virgillo by Mr Mehrens | 56 |
| Examination of Virgillo by Mr Martinez | 57 |
| Examination of Virgillo by Mr Martinez | 69 |

4

1           THE COURT    The record should reflect the

2   presence of Mr  Chrisman, counsel, the jurors    Good

3   morning

4           I have to tell you, I am selfishly relieved

5   and none of you won the lottery

6           Officer Chrisman is still on the stand,

7   still under oath, now beginning cross-examination

8           Mr  Mehrens

9

10           C R O S S - E X A M I N A T I O N

11

12  BY MR  MEHRENS

13      Q    Good morning

14      A    Good morning

15      Q    You indicated that you have been working in

16  the domestic violence area or unit currently?

17      A    Yes

18      Q    And you're working out on Central there, an

19  office on Central?

20      A    Yes

21      Q    And your duties are to do follow-up on

22  domestic violence calls, for example?

23      A    Yes

24      Q    In other words, the call that you and Rich

25  Chrisman went out on, on October 5th, 2010, you

23

1  BY MR  MEHRENS

2      Q    Did you not tell Detective Porter on

3  October 5th, 2010, when you were discussing this

4  matter with him, that you contacted Elvira Fernandez

5  in trailer 50 where, quote -- your words -- she

6  sought refuge?

7      A    Yes

8      Q    And she told you that her son was out of

9  control at this point?

10         MR  MARTINEZ   Objection, hearsay

11         THE COURT   Overruled

12     A    Yes

13  BY MR  MEHRENS

14     Q    And your initial contact with

15  Ms  Fernandez, in your opinion, other than yesterday,

16  she was upset, emotional, and desperate?  Those are

17  your words before yesterday, right?

18     A    I would have to see a copy of the

19  conversation that you are referring to

20     Q    All right   Come back to that in a minute

21         You told us yesterday that Officer Chrisman

22  went in and then you went in right after him,

23  correct?

24     A    Yes

25     Q    And you told us yesterday that while you

Exhibit 38

1

1   IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

2   IN AND FOR THE COUNTY OF MARICOPA

3

4

5   STATE OF ARIZONA,                    )
                                         )
6                   Plaintiff,           )
                                         )
7                                        )    CR2010-153913-001DT
    vs                                   )
8                                        )
                                         )
9   RICHARD CHRISMAN,                    )
                                         )
10                  Defendant            )
    ─────────────────────────────       )

11

12

13

14          REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                      (Trial)

16                  Phoenix, Arizona
                    August 27, 2013
17                  10 30 a m

18

19    Before   The Honorable Warren J  Granville, Judge

20

21

22

23   (Copy)

24   PREPARED BY   Elva Cruz-Lauer, RMR, CRR
                   Arizona Certified Reporter No  50390
25

```
                                                          2
 1  APPEARANCES

 2  For the State                 MR   JUAN MARTINEZ,
                                  Deputy County Attorney,
 3

 4  For the Defendant             MR   CRAIG MEHRENS,
                                  MS   AMY WILEMON,
 5                                MR   PATRICK GANN,
                                  Attorneys at Law,
 6

 7

 8              (Whereupon, Elva Cruz-Lauer, was first duly

 9  sworn to act as the Official Reporter herein )

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

1                            INDEX

2

3    DEFENDANT'S WITNESS    D    C    RD   FE   FE   FE   FE

4    Lon Bartel                  17   60   80   86   87   90

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

54

1  sort of activities that the police officers engage

2  in, right?

3      A    Correct

4      Q    Um, but even though they are specialized in

5  their training, in that fashion, they don't have, for

6  example, x-ray eyes, do they?

7      A    No

8      Q    They can't see through walls, right?

9      A    Um, actually, we have systems that allow us

10 to look for heat signatures and heartbeats through

11 walls, so that's not completely true

12     Q    I am asking about seeing   I am not asking

13 about looking for a heartbeat   I am asking about

14 with the two eyes, these officers, do you know of any

15 officer that can look through a wall?

16     A    No

17     Q    So if something is in another room and

18 whatever officer may come in, in your department,

19 they are not going to be able to see what's in that

20 other room, right?

21     A    Correct

22     Q    The other thing that we talked about, sir,

23 is that this exhibit here, Number 172   You see that?

24     A    I do

25     Q    We talked about it yesterday, right?

Exhibit 39

1

1   IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

2        IN AND FOR THE COUNTY OF MARICOPA

3

4

5   STATE OF ARIZONA,              )
                                   )
6               Plaintiff,         )
                                   )
7   vs                            )    CR2010-153913-001DT
                                   )
8                                  )
                                   )
9   RICHARD CHRISMAN,             )
                                   )
10              Defendant         )
    _____)

11

12

13

14        REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                   (Trial)

16              Phoenix, Arizona
                September 4, 2013
17               10 30 a m

18

19    Before   The Honorable Warren J  Granville, Judge

20

21

22

23  (Copy)

24  PREPARED BY   Elva Cruz-Lauer, RMR, CRR
                  Arizona Certified Reporter No  50390
25

```
                                                           2
 1  APPEARANCES
 2  For the State                MR  JUAN MARTINEZ,
                                 Deputy County Attorney,
 3
 4  For the Defendant            MR  CRAIG MEHRENS,
                                 MS  AMY WILEMON,
 5                               MR  PATRICK GANN,
                                 Attorneys at Law,
 6
 7
 8          (Whereupon, Elva Cruz-Lauer, was first duly
 9  sworn to act as the Official Reporter herein )
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

3

1
2                                     INDEX
3
4     104 ISSUE
5     Examination of Richard Chrisman by Mr  Martinez     4
6
7
8     DEFENDANT'S WITNESSES  D   C   RD   FE  FE  FE  FE
9     Richard Chrisman          19  147  175 185 190 190
10    Julie Egea            193 198 221  223
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

213

1  removed from this case?

2      A    Yes, I did

3      Q    And you were removed from this case in

4  December of 2010, right?

5      A    I stated I did not know the exact date    It

6  might have been December, I don't know for sure

7      Q    You were removed from this case by the

8  Phoenix Police Department, correct?

9      A    Yes, I was

10     Q    Ma'am, isn't it true that you have

11 expressed a bias in favor of Richard Chrisman?

12          MR  MEHRENS   Objection, Your Honor

13          THE COURT   Overruled   If the witness can

14 answer, she may

15 BY MR  MARTINEZ

16     Q    Yes or no?

17     A    I have expressed opinions to my coworkers

18 about the case

19     Q    Isn't it true that at some point you have

20 even apologized to Richard Chrisman about this case?

21     A    Not about the case, no

22     Q    You have told him, I am sorry, haven't you

23 told him that?

24     A    Not in regards to the case

25     Q    But you have told him, I am sorry, correct?

214

1    A    That is correct

2    Q    One of the other things, ma'am, that you

3 told us was that when you went out there on October

4 5th of 2010, there was -- you were one of the people

5 that was out there standing before the storm hit?

6    A    Yes

7    Q    And one of the things that we also know is

8 that you went up to the door, the front door before

9 the storm hit, right?

10    A    Correct

11    Q    Who were you with?

12    A    I don't remember

13    Q    Do you remember that we had a conversation

14 about this just recently on August 28, do you

15 remember?

16    A    Yes

17    Q    And you told me who you were with, do you

18 remember?

19    A    I don't remember at this time, no

20    Q    Well, let me go ahead and mark this   Let's

21 see if this refreshes your recollection

22         Take a look at Exhibit 387   See if that

23 refreshes your recollection as to who you told me

24 that you went up to the front of the trailer with

25    A    I stated I believe --

# Exhibit 40





State Bar File No  15-3363
In the Matter of Juan Martinez
Initial Response – Exhibit A-

Exhibit 41

1

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA


| | |
|---|---|
| THE STATE OF ARIZONA, | ) |
| | ) |
| Appellee, | ) |
| | ) |
| vs | ) No  CR 2010-106178-001 SE |
| | ) No  1 CA CR 10-0866 |
| DAIMEN JOSEPH IRIZARRY, | ) |
| | ) |
| Appellant | ) |
| | ) |


Phoenix, Arizona
July 8, 2010
11 00 a m


BEFORE   The Honorable CHRISTOPHER T  WHITTEN, Judge

REPORTER'S TRANSCRIPT OF PROCEEDINGS

JURY TRIAL


APPEARANCES

FOR THE APPELLEE
Mr  Juan M  Martinez

FOR THE APPELLANT
Mr  Charles K  Shell


PREPARED BY:

Pamela D  Remus, RPR
Official Court Reporter
Certificate No  50399

PREPARED FOR APPEAL

(COPY)

PUBLIC DEFENDER

MAR 1 0 2011

APPEALS RECEIVED

1

2

# I N D E X

| WITNESS | Page |
|---|---|
| COOPER, Kumari | |
| Direct Examination by Mr  Martinez | 4 |
| Cross Examination by Mr  Shell | 11 |
| Redirect Examination by Mr  Martinez | 13 |
| | |
| BETTS, Justin | |
| Direct Examination by Mr  Martinez | 13 |
| Cross Examination by Mr  Shell | 30 |
| Redirect Examination by Mr  Martinez | 35 |
| | |
| CAOUETTE, William | |
| Direct Examination by Mr  Martinez | 36 |
| Cross Examination by Mr  Shell | 46 |
| Redirect Examination by Mr  Martinez | 55 |
| | |
| TEW, John | |
| Direct Examination by Mr  Martinez | 58 |
| | |
| KINGSLEY, Meslissa | |
| Direct Examination by Mr  Martinez | 74 |
| | |
| BURNSIDE, Kenneth | |
| Direct Examination by Mr  Martinez | 84 |
| | |
| BISHOP, David | |
| Direct Examination by Mr  Martinez | 91 |
| Cross Examination by Mr  Shell | 103 |
| | |
| MARRUFO, Christopher | |
| Direct Examination by Mr  Martinez | 105 |
| Cross Examination by Mr  Shell | 125 |
| Redirect Examination by Mr  Martinez | 147 |
| | |
| POLLARD, Edward | |
| Direct Examination by Mr  Martinez | 155 |
| Cross Examination by Mr  Shell | 169 |
| Redirect Examination by Mr  Martinez | 177 |

74

1          MR   MARTINEZ    I don't have any other questions

2          THE COURT    Cross

3          MR   SHELL    I don't have any questions

4          THE COURT    Does the jury have any questions for

5    this witness?  All right    Thank you, sir    Mr   Martinez,

6    your next witness

7          MR   MARTINEZ    The State calls Melissa Kingsley

8

9                         MELISSA KINGSLEY,

10   called as a witness herein, having been first duly sworn,

11   was examined and testified as follows

12

13                     DIRECT EXAMINATION

14   BY MR   MARTINEZ

15          Q     May I have your name, please?

16          A     Melissa Kingsley

17          Q     Who do you work for?

18          A     The Gilbert Police Department

19          Q     What do you do for them?

20          A     Dispatcher

21          Q     And, generally speaking, as dispatcher what

22   are your duties?  What do they include?

23          A     Checking for valid driver's license on a

24   traffic stop, valid vehicle information and warrants

25          Q     Are you the person who actually answers the

75

10

1    911 calls, or do you do another sorts of functions?

2         A    We can do both

3         Q    I am not asking you specifically, but do you

4    answer 911 calls?

5         A    Not typically

6         Q    But have you done that in the past?

7         A    Yes

8         Q    Drawing your attention back to January 28th

9    of 2010, were you working sometime after 10:30 in the

10   evening?

11        A    Yes

12        Q    And what were you working on or what area

13   were you working in?

14        A    It was Dispatch Channel 2, which is our

15   information channel

16        Q    When you tell me Channel 2, it appears that

17   there is a Channel 1   Is there a Channel 1?

18        A    Yes

19        Q    What does Channel 1 do?

20        A    The primary function is for to send officers

21   to calls and to take officers when they pull traffic, to

22   put them on their traffic stops

23        Q    So, for example, let's say an officer is

24   about to pull somebody over for whatever reason, traffic

25   violation of some sort, would they call in necessarily to

76

10

1    the Dispatch center to let the Dispatch center know what

2    they are doing?

3         A    Yes

4         Q    That call that they initially make, would

5    that come in on Channel 1 or Channel 2?

6         A    Typically it is Channel 1

7         Q    I am talking typically, generally   How is

8    it then that if a call into Channel 1 -- how is it then

9    that you become involved?

10        A    The officer then switches his radio to

11   Channel 2 to run the people in the vehicle or the vehicle

12   to look for warrants and valid information

13        Q    So it is a different function that you do on

14   Channel 2 then?

15        A    Yes

16        Q    When you say that he calls in, is it a cell

17   phone kind of call, or is it some other kind of way that

18   he communicates?

19        A    It is via his radio

20        Q    And these radio calls, are they recorded

21   every time that they come in?

22        A    Yes

23        Q    And as part of doing business for the

24   Gilbert Police Department, is that something that they do

25   on an ongoing basis all the time?

77

```
A      The recordings?

Q      Yes

A      Yes

Q      Is it done with regard to every call?

A      Yes

Q      Are they then stored in the normal course of
business after every time that they call -- after a call
is made?

A      Yes

Q      And the information that's provided on these
calls, is it being recorded at the time that the officer
is calling and at the time that you, for example, are
providing the information?

A      Yes

Q      In this case you told us you were not
operating Channel 1, right?

A      Correct

Q      But you are familiar with it as it applies
to this case; right?

A      Yes

Q      And with regard to officer or Lieutenant
Shoehandler, what time did he call in initially on Channel
1?

A      10 42

Q      And what kind of call was it that he called
```

78

1    in on?

2            A    A traffic stop

3            Q    Any other information that he provided?  Did

4    he provide any other information?

5            A    Only that he couldn't read the plate

6            Q    Okay  And after that, did he then switch

7    over to your channel?

8            A    He did

9            Q    When did he switch over to your channel?

10   What time?

11           A    10:49

12           Q    So initially he made the stop or the call at

13   what time again?

14           A    10 42

15           Q    If you know this, and if you don't let me

16   know  Do the officers typically make the call on Channel

17   1 of the stop before they make the stop, during the stop,

18   or after the stop?

19           A    It would be an assumption

20           Q    So, anyway, he made the call to you at

21   10 42, correct?

22           A    Correct

23           Q    And then you get involved at what time

24   again?

25           A    10 49

79

1    Q    So that's how many minutes later?

2    A    Seven

3    Q    And when he made the call to you, was

4    there a recording made?

5    A    Yes

6    Q    And does it include your responses and why

7    you were responding the way you do?

8    A    Yes

9    Q    And does it also include everything or the

10   clip that we have here up until the time that you no

11   longer corresponded with him, correct?

12   A    Yes

13   Q    And does include the time on there?  From

14   your memory, does it include at least real time from the

15   time he called at 10 49 with you until the communication

16   ended is real time on the tape, correct?

17   A    Yes

18   Q    That will give us a definite or an exact

19   time as to when things happened, correct?

20   A    Yes

21   Q    And you reviewed this Exhibit No  121?

22   A    I have

23   Q    Did you review it prior to coming to court?

24   A    Yes   Multiple times

25   Q    What does it include?

80

11

  1        A     It includes my interaction on the radio with

  2  Lieutenant Shoehandler

  3        Q     Does it start at 10 49?

  4        A     Yes

  5        Q     And does it end with you asking or looking

  6  for a Lincoln 1?

  7        A     Lincoln 2

  8        Q     Lincoln 2

  9      MR  MARTINEZ   I move for the admission of 121

10      MR  SHELL   No objection

11      THE COURT:  121 is admitted

12        Q   BY MR  MARTINEZ  Do you know how long this

13  tape lasts, in other words, until you started saying

14  Lincoln 2?  Do you know?

15        A     I honestly don't

16        Q    Let's go ahead and play it   And if you

17  could hold it up to the microphone   Let me get it

18  started

19         (Playing the tape )

20        Q    Who was that?

21        A    That was Lieutenant Shoehandler

22        Q    What is he asking you?

23        A    To run a driver's license or a person, I

24  don't know, if he had a driver's license

25        Q    And what person is he asking you to run?

81

11       1        A      Daimen -- sorry

         2               (Playing the tape further )

         3        Q      What is he asking you to run there?

         4        A      Christopher Aredondo

         5        Q      And he asked for it at the same time?

         6        A      Yes

         7               (Playing the tape further )

         8        Q      What did you ask him?

         9        A      If he had a 28, which is the license plate

        10               (Playing the tape further )

        11        Q      Is that related to this call?

        12        A      Yes

        13        Q      And what's going on here?

        14        A      I am telling him that the first subject he

        15   ran which was, I am sorry, had a valid driver's license,

        16   and gave him the expiration date

        17               (Playing the tape further )

        18        Q      What was that blurb?  Did you hear that?

        19        A      Yeah

        20               (Playing the tape further )

        21        A      Oh   He was acknowledging me, 104, okay, I

        22   believe is what that is

        23               (Playing the tape further )

        24        Q      What did you just say?  What are you doing?

        25   What are you telling him?

82

11

( )

1      A    I am telling him that there is a sound alike

2   which means the computer shows me a record that indicates

3   there is a possible warrant for a person who has similar

4   name or date of birth to somebody that I ran

5          (Playing the tape further )

6      Q    And that's his response, correct?

7      A    Yes    10-4

8          (Playing the tape further )

9      Q    What is that?  What are you saying there?

10      A    I am telling him that the sound alike is for

11   a Cruz Redondo, and then I give him the physical

12   descriptors of the person that has the warrant, their date

13   of birth, and then tell them what the warrant is for    It

14   is non-extraditable out of DPS   I think it is Casa

15   Grande, and I think failure to appear for window tint

16      Q    But, again, that's not Christopher   That's

17   a sound alike?

18      A    Correct

19          (Playing the tape further )

20      Q    What is that?

21      A    He's telling me he doesn't know if the sound

22   alike matches the person he has   He said he's going to

23   pull him out of the vehicle   Send him a backup

24          (Playing the tape further )

25      Q    What's this with the open mics?  What does

( )

83

that mean?

A    It means the button that they press to talk to us was being held down, but he wasn't talking to me

Q    And does this require a volitional movement on the part of the officer or somebody at the other end to actually push it?

A    Yes

Q    So it's not a situation where it does it on its own or anything like that?

A    No

Q    And with regard to you cutting in, is that something that the dispatchers only have the ability to do?  In other words, if he's got a mic, how is it that you are cutting in?  Do you see what I am saying?

A    It is a two-way radio   We can still go out over the top of their radio

Q    Can they go over the top of you or not?

A    They can   I am not quite certain how that works

MR   MARTINEZ   Okay   Thank you   I have no further questions

THE COURT   Any cross?

MR   SHELL   No

THE COURT   Does the jury have any questions for this witness?  Thank you, ma'am   The State can call its

Exhibit 42

1

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

| | | |
|---|---|---|
| THE STATE OF ARIZONA, | ) | |
| | ) | |
| Appellee, | ) | |
| | ) | |
| vs | ) No  CR 2010-106178-001 SE |
| | ) No  1 CA CR 10-0866 |
| DAIMEN JOSEPH IRIZARRY, | ) | |
| | ) | |
| Appellant | ) | |

Phoenix, Arizona
July 20, 2010
10 34 a m

BEFORE   The Honorable CHRISTOPHER T  WHITTEN, Judge

REPORTER'S TRANSCRIPT OF PROCEEDINGS

JURY TRIAL

APPEARANCES

FOR THE APPELLEE
Mr  Juan M  Martinez

FOR THE APPELLANT:
Mr  Charles K  Shell

PREPARED BY:

Pamela D  Remus, RPR
Official Court Reporter
Certificate No  50399

PREPARED FOR APPEAL

(COPY)

PUBLIC DEFENDER

MAR 1 0 2011

APPEALS RECEIVED

1

2

# I N D E X

WITNESS                                                      Page

VANKILSDONK, Jason

        Direct Examination by Mr  Martinez              4
        Cross Examination by Mr  Shell                  9
        Redirect Examination by Mr  Martinez           11

GARCIA, David

        Direct Examination by Mr  Martinez             12
        Cross Examination by Mr  Shell                 18
        Redirect Examination by Mr  Martinez           20

KINGSLEY, Melissa

        Direct Examination by Mr  Shell                32
        Cross Examination by Mr  Martinez              40
        Redirect Examination by Mr  Shell              43

1   the record

2          THE COURT   No   I wanted to remind you

3   Camille, will you guys put on the one that he's giving you

4   now a little dot on the top right-hand corner?  We will do

5   it after we get the jury -- we will do it some other time

6   Go ahead and bring them in   I want to the make sure we

7   don't have any folks who are in here testifying for the

8   defense for character witnesses or who have been in here

9          MS   SHELL   What's that?

10          THE COURT   We don't have anyone here that's

11   testifying as a character witness for the defendant?

12          MR   SHELL   No

13              (The jurors entered the courtroom )

14          THE COURT   Go ahead and and take a seat, please

15   The record ought to reflect the presence of counsel, the

16   defendant, and our jury has joined us

17              Mr   Shell, will you call your first witness,

18   please?

19          MR   SHELL   We will recall Melissa Kingsley

20

21                  MELISSA KINGSLEY,

22   recalled as a witness herein, having been previously duly

23   sworn, was examined and testified as follows

24

25          THE COURT   Ms   Kingsley, you are still under

33

3

1    oath   I will remind you and the jury of that   Go ahead

2    and take a seat   Pull the microphone up to your face

3

4                       DIRECT EXAMINATION

5    BY MR  SHELL

6            Q    All right   Back on July 8th of this year

7    you testified in this case; correct?

8            A    Yes

9            Q    And you testified about Exhibit 121,

10   correct?

11           A    Yes

12           Q    Did you make that tape?

13           A    No

14           Q    Who made the tape?  Do you know?

15           A    I don't know

16           Q    You testified that all of the radio

17   communications are recorded, correct?

18           A    Yes

19           Q    And they are recorded in real time, correct?

20           A    I am not exactly sure how the system works

21           Q    Did you testify that this was -- did you

22   testify that it was real time?

23           A    Yes   It's live, if that's what you are

24   asking

25           Q    Is it your testimony that that tape is in

3

1    real time?

2              A    I didn't make that tape

3              Q    Ma'am, the communications are recorded   Do

4    you know how they are recorded?

5              A    No

6              Q    Do you know whether they are on a computer

7    or not?

8              A    I don't have anything to do with the

9    recordings   I don't know how they work

10             Q    So you don't know whether or not that tape

11   you listened to is real time or not?

12             A    No, I don't

13             MR   SHELL   Your Honor, I am going to play a tape

14   or a CD, I mean

15             Q    Do you know whether or not that tape that

16   was played the other day whether anything has been cut out

17   of it or whether it's missing Dispatch communications?

18             A    I didn't edit it   I don't know how it was

19   edited

20             Q    Do you believe it was edited?

21             A    There are communications between myself and

22   other officers that weren't in there

23             Q    That should have been in there?

24             MR   MARTINEZ   Objection

25             THE COURT   Go ahead and rephrase the question,

35

3

1   please

2         Q    BY MR  SHELL   Ma'am, if that tape was real

3   time, correct, there would be other communications on that

4   tape that we didn't hear, correct?

5         A    Yes

6         Q    So if somebody edited the communications

7   that took place at the time you were also communicating

8   with Lieutenant Shoehandler?

9         A    If they are not on there --

10        Q    Did you hear them?

11        A    No

12        Q    When it was played for you, I think it was

13  about maybe a minute long, the communications, correct?

14        A    I don't know how long  I don't recall how

15  long it was

16        Q    Right  But all that was on that tape are

17  communications between you and Lieutenant Shoehandler,

18  correct?

19        A    That I heard  My first time testifying,

20  yes

21        Q    Right  But you know that also in between

22  those communications that we heard, you are having

23  communications with other officers, correct?

24        A    Yes

25        Q    And those aren't on the tape, correct?

36

3

1     A    I can't answer what's on that tape   I don't

2  know if I heard that tape the first time in its entirety

3        Q    Did you testify that that tape was real

4  time?

5        A    Yes   I don't understand what you mean by

6  "real time "  It's time-stamped

7        Q    The tape is time-stamped?

8        A    No, no   When we are recording it, it's

9  time-stamped

10       Q    And that's all stored somewhere, correct,

11 that information?

12       A    Yeah   I don't know where it is

13       Q    And it's not on an audiotape, correct?

14       A    I don't know how it's stored

15            (Playing tape )

16       Q    Do you want to listen to it anymore?

17       A    No

18       Q    No?

19       A    No

20            THE COURT   For the record, you just played

21 Exhibit No  121?

22            MR  SHELL   Yes, Your Honor

23       Q    Did you testify that that tape was real

24 time?

25       A    I guess I am confused by what you mean

37

3      1    That is my communication with Lieutenant Shoehandler as I

       2    recall that night

       3           Q    Correct   But you also know that there is

       4    other communications going on in between that

       5    communication, correct?

       6           A    With other officers

       7           Q    Correct   That aren't included in there;

       8    correct?

       9           A    Correct

      10           Q    That take up time?

      11           A    Right

      12           Q    So that tape is missing time, correct?

      13    Those communications that you had with Lieutenant

      14    Shoehandler didn't happen in the amount of time that you

      15    heard on that tape   There was a longer period of time,

      16    correct?

      17           A    Without hearing the original one -- I

      18    mean -- I couldn't tell you what happened between there

      19           Q    But you know that there is other

      20    communications that you are having with other officers

      21    that aren't included?

      22           A    Yes

      23           Q    And they are happening between the

4     24    communications that we hear on that tape?

      25           A    Yes

38

4    1        Q    So, logically, if you put those

2    communications into that tape, where they belong, that

3    tape would be longer?

4        A    Potentially   I don't know how many of them

5    there were

6        Q    Right   You don't know, correct?

7        A    Correct

8        Q    Because you didn't make the tape, correct?

9        A    Correct

10        Q    All you know is that tape has been edited,

11    and the communications that you were having with other

12    officers are not included, correct?

13        A    Yes

14        Q    And so it is not real time, correct?

15        A    If that's your definition, yeah   I guess I

16    am not understanding "real time "  I was looking at it as

17    being time-stamped

18        Q    That tape is not in real time?

19        A    Correct

20        Q    We are missing time on that tape that --

21        MR  MARTINEZ   Objection, asked and answered

22        THE COURT   Overruled   Go ahead

23        Q    BY MR  SHELL:  We are missing time on that

24    tape   We are missing other communications that would take

25    up time, and you don't know how much time?

```
                                                            39
  4        1            A      I don't   I mean, I know what time I spoke
           2    with him, and I know the time I got the open link, but
           3    other than that, no
           4            Q      So it is longer than what we hear on the
           5    tape?
           6            A      Yes
           7            Q      Did anybody ask you to testify that this was
           8    real time?
           9            A      No
          10            Q      But you were asked while on direct
          11    examination, and you testified that that was real time
          12            MR   MARTINEZ    Objection, asked and answered
          13            THE COURT:   Overruled    You can go ahead and
          14    answer
          15            THE WITNESS    I am sorry, can you ask the
          16    question again?
          17            Q     BY MR  SHELL   I guess ultimately the
          18    question is   These communications that we are hearing, we
          19    don't know actually how long it took for those
          20    communications to occur because we are missing time out of
          21    that tape; correct?  We are missing other communications
          22    that take up time   Because he runs the two people, gives
          23    you information about Mr  Irizarry and Mr  Redondo,
          24    correct?
          25            A     Yes
```

4

1         Q    And when you listen to the tape, it sounds

2  like you come right back within seconds and give him

3  information about Irizarry and Redondo; correct?

4         A    Correct

5         Q    But, in reality, you could have been talking

6  to another officer for 30, 40 seconds between what we

7  hear, we hear on the tape, and you don't get back to

8  Lieutenant Shoehandler for a minute even though you got

9  back to him within seconds on the tape, correct?

10        A    You are making that assumption?

11        Q    We are missing things out of there; correct?

12        A    Potentially

13        Q    And we don't know what they are, do we?

14        A    Not according to that tape, I guess, if

15  that's what you are asking me

16        Q    I guess what I am asking you, ma'am, is that

17  the communications did not occur in the time frame that we

18  hear on that tape, so it is not, quote, real time,

19  correct?

20        A    Correct

21        MR  SHELL   Nothing further

22

23                    CROSS EXAMINATION

24  BY MR  MARTINEZ

25        Q    With regard to the start of that tape where

41

1   the officer talks to you, that was at 10 47 p m ; correct?

2         A     Yes

3         Q     And where we hear the gurgling sounds at the

4   end, that was at 10 53, wasn't it?

5         A     Yes

6         Q     And you testified to that previously as to

7   the time, didn't you?

8         A     Yes

9         Q     We did the mathematics, right?

10        A     Yes

11        Q     Didn't we?

12        A     We did

13        Q     So in terms of the amount of time from the

14  time that this officer first called you or spoke to you to

15  the time that we got to this gurgling sound which you

16  heard was six minutes; right?

17        A     Correct

18        Q     And you testified about that last time, the

19  amount of time, right?

20        A     Yes

21        Q     In terms of this case, we hear you and the

22  lieutenant talking, right?

23        A     Correct

24        Q     But so that we are clear, you previously

25  told us that the whole conversation took and the times are

42

1   10 47 to 10:53, right?

2          A     Yes

3          Q     And that's something that you checked,

4   right?

5          A     Yes

6          Q     And that is six minutes; right?

7          A     Correct

8          Q     That tape may not be six minutes, but you

9   previously testified that that's what it was, right?

10         A     Yes

11         Q     There were other conversations with

12  Lieutenant Shoehandler that you did not handle; right?

13         A     Yes

14         Q     For example, there were other, I guess,

15  dispatchers, if that's the word?

16         A     It is

17         Q     There were other dispatchers that also

18  talked to him; right?

19         A     Yes

20         Q     You were not here to tell us about what they

21  may have said and how long that took, right?

22         A     Correct

23         Q     Your involvement in this case, which began

24  with that first call that we heard until the end, was a

25  total of six minutes; right?

43

1    A    Yes

2    Q    And it's contained in that tape; right?

3    A    Yes

4    MR  MARTINEZ    Nothing else

5    THE COURT    Redirect

6

7                    REDIRECT EXAMINATION

8    BY MR  SHELL

9    Q    When you originally testified on July 8th,

10   you never said anything about 10 47 and 10 53 like he just

11   got you to say, correct?

12   THE COURT    Hold on

13   Q    BY MR  SHELL    Is that correct?

14   A    I don't remember

15   Q    If you don't remember, then how can you

16   answer his question?  What you testified to --

17   THE COURT    Wait    Wait    Stop    If you ask her a

18   question, let her answer

19   THE WITNESS    What he asked me was did he talk to

20   me at 10 47?

21   Q    BY MR  SHELL    Right

22   A    Yes    I know that for a fact    I know the

23   exact timeline that I spoke with him that night

24   Q    The only two times that were mentioned back

25   on July 8th of 2010 were 10 42 when the initial call came

44

```
5      1    in on Channel 1, and then you testified that it got

       2    switched to Channel 2 at 10 49?

       3            MR  MARTINEZ   Objection, misstates testimony

       4            THE COURT   That's a -- do you know if that's

       5    right or wrong?

       6            THE WITNESS:  I have no idea

       7            Q   BY MR  SHELL   And you were never asked on

       8    July 8th of 2010 whether or not this tape is actually

       9    should be six minutes long, were you?

      10            A    I don't remember, sir

      11            Q    Mr  Martinez stood up there and played that

      12    tape for you standing right next to you, correct?

      13            A    Yes, he did

      14            Q    And he asked you is this real time?  And you

      15    said what?

      16            A    Honestly, sir, I don't remember

      17            MR  SHELL   I don't have anything further

      18            THE COURT   Does the jury have any questions for

      19    this witness?  Thank you   You are excused, ma'am

      20            The defense can call its next witness,

      21    please

      22            MR  SHELL   We will call Justin Betts

      23

      24                    JUSTIN BETTS,

      25    recalled as a witness herein, having been previously duly
```

# Exhibit 43



# Jennings
# Strouss
### ATTORNEYS AT LAW

State Bar File No  15-3363
In the Matter of Juan Martinez
~itial Response – Exhibit 4~

Exhibit 44



# Jennings Strouss

ATTORNEYS AT LAW

State Bar File No  15-3363
In the Matter of Juan Martinez
Initial Response – Exhibit

Exhibit 45

**SHELL & NERMYR, PLLC**
Chad Shell, Bar No 17051
90 S Kyrene Road, Suite 1
Chandler, AZ 85226
480-775-4800 (telephone)
480-456-0920 (facsimile)
Attorney for Defendant

MICHAEL K JEANES CLERK
BY S Keunan DEP
FILED
10 NOV -1 PM 1 31

## SUPERIOR COURT

## MARICOPA COUNTY, ARIZONA

| | |
|---|---|
| STATE OF ARIZONA, | Case Number: CR2010-106178-001 SE |
| Plaintiff, | **MOTION TO VACATE JUDGMENT PURSUANT TO RULE 24 2, AND EXHIBITS A THROUGH F** |
| v | (Evidentiary Hearing Requested) |
| DAIMEN JOSEPH IRIZARRY, | (HON CHRISTOPHER T WHITTEN) |
| Defendant. | |

Rule 24 2(a)(3), Motion to Vacate Judgment, states

a. Grounds for Motion  Upon motion made no later than 60 days after the entry of judgment and sentence but before the defendant's appeal, if any, is perfected, the court may vacate the judgment on any of the following grounds

(3) That the conviction was obtained in violation of the United States or Arizona Constitutions

Mr Irizarry argues the convictions in this case were obtained in violation of

his constitutional rights   Specifically, the State of Arizona intentionally used

perjured testimony and false evidence to convict him

## FACTS

1   According to law enforcement analysis of ATM video from January 28, 2010

   a.  Lt Shuhandler, at 10 38 42 approached Mr Irizarry as he sat in the driver's seat of a work truck (Exhibit A, relevant portion of Investigator Roger Cain's report)   [Full report introduced during Sentencing Hearing on October 14, 2010 ]

   b  Lt Shuhandler was standing by Mr Irizarry for 1 minute and 50 seconds when he walked towards the back of truck at 10 40 32 (Exhibit A)

   c  Lt Shuhandler then approached the passenger side of the truck at 10 42 40, returns towards the rear of the truck at 10 43 30, re-approaches the passenger side at 10 47 55, and thirteen seconds later at 10 48 08, the truck begins to leave the scene (Exhibit A)

2   Defense counsel has reviewed the ATM video disclosed by the State (See Exhibit B, 1st Approach Videos, Exhibit C, 2nd Approach Videos, and Exhibit D, 3rd Approach Videos ) Based on this review the defense contends that the video is of very poor quality, and the only facts clearly proved by the ATM video are

2

a. When Lt. Shuhandler first leaves the driver's side of the truck at 10 40 32 and moves towards the back of the truck (See Exhibit E, ATM video files reflecting Lt Shuhandler leaving the driver's side of the truck and moving towards the back of the truck at 10 40 32)

b  When Mr Irizarry drives the truck from the scene at 10 48 08 (See Exhibit F, ATM video reflecting the truck leaving the scene)

c  From the time when Lt. Shuhandler first leaves the driver's side of the truck and walks towards the back of the truck at 10 40 32, and when the truck leaves the scene (right after Lt. Shuhandler was shot) at 10 48 08 is a total of 7 minutes 36 seconds

3  For 2 days after Lt. Shuhandler was shot, Mr Irizarry was interrogated by law enforcement officers  During these interrogations Mr Irizarry consistently stated

a. Lt. Shuhandler approached the driver's side of the truck and asked for his driver's license, registration and insurance

b  Mr Redondo took the registration and insurance out of the glove box and handed it to Mr Irizarry, who then handed the documents and his driver's license to Lt  Shuhandler

3

c  Lt. Shuhandler explained the reason for the stop—a tie-down strap was covering the truck's license plate   Mr  Redondo stated he could fix it and Lt. Shuhandler told him to wait a minute and asked for his identification.

d  Mr  Redondo stated he did not have identification and Lt Shuhandler asked him for his name and date of birth   Mr  Inzarry heard Mr Redondo tell Lt  Shuhandler his correct name and DOB

e.  Lt. Shuhandler walked towards the back of the truck and Mr Inzarry lost sight of him because of the large toolboxes surrounding the bed of the truck.  Moments after walking to the back of the truck, Mr  Inzarry heard Lt Shuhandler begin radio communications with Gilbert PD dispatch   Mr  Inzarry heard parts of Lt  Shuhandler's communications with dispatch

f.  Several minutes after Lt  Shuhandler walked to the back of the truck and communicated with dispatch, he requested Mr  Redondo exit the truck and fix the tie-down strap

g   Mr  Inzarry heard parts of the discussions between Lt. Shuhandler and Mr  Redondo, including Lt. Shuhandler helping Mr  Redondo tie the strap down correctly, and asking Mr  Redondo the correct spelling of his name   Mr Inzarry heard Mr  Redondo correctly spell his name and heard Lt. Shuhandler tell Mr  Redondo to go sit back in the truck.

4

'

h. Mr Redondo came back to the cab and sat in the passenger seat. There was some small talk between Mr Irizarry and Mr Redondo  After a few minutes Mr Redondo asked what was taking so long, Mr Irizarry looked into the driver's door rearview mirror to see if Lt. Shuhandler was returning, as soon as he glanced at the mirror he heard a loud explosion. Mr Irizarry, under the influence of methamphetamine, panicked and fled the scene.

(See CD of all 8 interrogations of Mr Irizarry by law enforcement officials, introduced into evidence during Sentencing Hearing on October 14, 2010 )

4  On July 8, 2010, during trial, the State called Gilbert Police Officer Justin Betts as a witness  Ofc Betts testified that Mr Irizarry stopped the truck in the crosswalk at the U S  60 eastbound onramp at Higley Rd., so Mr Redondo could shoot at him.

5  Defense counsel has been unable to locate any State disclosure (police reports, transcripts, CDs, DVDs, computer files), which reflects Ofc Betts had— prior to trial—ever claimed that Mr Irizarry stopped the truck in the crosswalk so Mr Redondo could shoot at him  (See Exhibit G, transcript of January 29, 2010 interview of Ofc Betts ) The defense contends this borders on impossible.  If Mr Irizarry had drove the truck in a fashion to help Mr Redondo shoot at Ofc Betts, it would be documented somewhere in the thousands of pages and hundreds of

CDs, DVDs, and computer files disclosed by the State—it isn't

6   On July 8, and 19, 2010 the State called 5 law enforcement officers—Christopher Marrufo, Edward Pollard, Nathan Schlitz, Brian Jutting, and Jamie Bernau—as trial witnesses  These officers all testified that they saw Mr  Redondo getting in and out of the cab and bed of the truck—numerous times—while Mr Irizarry was driving  This evidence would reflect that Mr  Irizarry was communicating with Mr  Redondo and perhaps helping him  It also impeaches Mr  Irizarry, as he has always stated that once Mr  Redondo left the cab and went to the bed of the truck, he did not return to the cab until the truck was running out of gas.

7   Defense counsel has been unable to locate any State disclosure (police reports, transcripts, CDs, DVDs, computer files) which reflects that Ofc  Marrufo, Ofc  Pollard, Ofc. Schlitz, Ofc  Jutting, or Ofc  Bernau, prior to their trial testimony, had ever claimed they witnessed Mr  Redondo getting in out of the cab and bed of the truck more than once  In fact, the opposite is true, see Exhibit H, partial transcripts of Arizona Department of Public Safety interviews with Ofc. Marrufo and Ofc  Pollard

8   On July 8, 2010 the State called Melissa Kingsley, Gilbert Police dispatcher, as a witness  Mrs  Kingsley, with the help of leading questions by the

6

State, testified

      a.  She was the Channel 2 dispatcher—"information channel"—when Lt Shuhandler was shot.  (See Exhibit I, Transcript of Melissa Kingsley's July 8, 2010 testimony, page 4 )

      b   Lt  Shuhandler contacted her over the police radio at 10 49 p m (Exhibit I, page 7 and 8 )

      c   Her radio communications with Lt. Shuhandler were recorded. (Exhibit I, page 7 )

      d   The recording was "real time" and would "give us a definite or an exact time as to when things happened "  (Exhibit I, page 8—testimony obtained via leading questions by the State )

      e   She had reviewed the recording (Trial Exhibit No  121, an audiocassette tape containing her Channel 2 dispatch communications) "multiple times" prior to testifying   (Exhibit I, page 8 )

    9   Trial Exhibit No  121—the "real time" audiocassette tape recording of Mrs  Kingsley's Channel 2 dispatch communications—was introduced into evidence by the State and played for the jury to hear   It is 2 minutes and 30 seconds long.

10   During and after Mrs Kingsley's testimony, defense counsel wondered why Mrs Kingsley seemed nervous while she was testifying, and why the State was introducing the "real time-Channel 2" dispatch recording?  What is the recording relevant too?  The "real time-Channel 2" dispatch recording introduced by the State as Trial Exhibit 121 has no relevancy to the crimes Mr Irizarry was charged with.  All crimes Mr Irizarry was charged with occurred at a different place and later time than the "real time" dispatch recording introduced by the State as Trial Exhibit 121   The only possible relevancy would be to impeach Mr Irizarry's testimony and/or prior statements about how and when things happened during the traffic stop   Why else would the State, with clear purpose and intent, claim Trial Exhibit 121 was "real time" and would "give us a definite or an exact time as to when things happened?"

11   After Mrs Kingsley testified, defense counsel returned to his office and was told by his partner, Mark Nermyr (who had also watched Mrs Kingsley testify), that she looked nervous while testifying.  Mr Nermyr also wondered why the dispatch recording introduced as Trial Exhibit 121 was on an audiocassette tape when no cassette tapes were disclosed by the State prior to trial   (See Exhibit J, Affidavit of Mark Nermyr )

12   Because of the issues noticed by defense counsel and his partner,

defense counsel reviewed the CD disclosed by the State, which contains the

Gilbert Police Department dispatch recording introduced as Trial Exhibit 121

(See Exhibit K, CD of State disclosed dispatch audio files) Defense counsel

loaded the CD (Exhibit K) into a computer and noticed the following

  a. The CD had two playable files

    i  *R10000001685 Lt Shuhandler Shooting Chnl 2 224200 233000*

    ii  *R10000001685 Lt Shuhandler Shooting Chnl 2 233000 001500*

  b  Opening *R10000001685 Lt Shuhandler Shooting Chnl 2 224200*

*23300*, loads a screen for "VPI" with a "Login" link.

  c. Opening the "Login" link loads a message screen stating

## "! CAUTION
## This Voice Print Pack 'n Go file has either
## been corrupted or tampered with.
## Invalid File Size'
## Abort          Continue"

When clicking on the "Continue" link a media player loads Gilbert Police

Department dispatch recordings  These recordings reflect that on January 28, 2010

  a. At 10 48 57 Lt. Shuhandler contacted Mrs  Kingsley and requested

information on Mr  Irizarry and a Christopher Arredondo (Exhibit K, File

*R10000001685 Lt Shuhandler Shooting Chnl 2 224200 233000*, 10 48 39 recording + 18

seconds before Lt. Shuhandler begins communication, equals 10 48 57 )

9

b  At 10 52 27 Lt  Shuhandler's radio microphone opens and remains open—immediately after he was shot by Christopher Redondo (Exhibit K, File *R10000001685 Lt Shuhandler Shooting Chnl 2 224200 233000*, 10 52 14 recording + 13 seconds before Lt. Shuhandler's microphone opens, 10 52 27 )

c  The time between when Lt  Shuhandler first radios Mrs  Kingsley for information on Mr  Irizarry and Mr  Redondo (10 48 57) and when he is shot (10 52 27), is 3 minutes and 30 seconds

d  There are relevant dispatch communications involving Mrs  Kingsley on Exhibit K, File *R10000001685 Lt Shuhandler Shooting Chnl 2 224200 233000*, which were not included on the State's Trial Exhibit No  121, audiocassette tape of dispatch communications  This, at a minimum, reflects that the State's "real time" cassette tape introduced as Trial Exhibit No  121, is not "real time "

[At the October 14th Sentencing Hearing, defense counsel attempted to introduce into evidence, the original CD of Exhibit K which had been disclosed by the State. The State's attorney argued that he didn't trust defense counsel, and there was no authenticity evidence for admission of the CD  The Court refused to admit it. After the Sentencing Hearing defense counsel attempted to retrieve the original CD but was told by the Court Clerk that she would retain it as an un-admitted

exhibit.]

13   On July 20, 2010 the defense recalled Mrs Kingsley as a witness (Exhibit L, transcript of Melissa Kingsley's testimony)   During questioning by the defense she admitted that she did not make the audiocassette tape of her dispatch communication introduced by the State as Trial Exhibit No  121   She believes Exhibit 121 was edited  She did not edit Exhibit 121 nor does she "know how it was edited."  She also testified that Exhibit 121 was not "real time"—a direct contradiction to her July 8, 2010 testimony  (Exhibit L, pages 4, 5, 8, 9 and 11 )

14   On July, 20 2010, during cross-examination of Mrs  Kingsley, and with leading questions, the State had Mrs  Kingsley commit more perjury when she testified

*CROSS EXAMINATION*
*BY MR. MARTINEZ*

*Q  With regard to the start of that tape where the officer talks to you, that was at 10 47 p m , correct?*

*A  Yes*

*Q  And where we hear the gurgling sounds at the end, that was at 10 53, wasn't it?*

*A  Yes*

*Q  And you testified to that previously as to the time, didn't you?*

11

*A   Yes*

*Q   We did the mathematics, right?*

*A   Yes*

*Q   Didn't we?*

*A   We did.*

*Q   So in terms of the amount of time from the time that this officer first called you or spoke to you to the time that we got to this gurgling sound which you heard was six minutes, right?*

*A   Correct.*

*Q   And you testified about that last time, the amount of time, right?*

*A   Yes*

*Q   In terms of this case, we hear you and the lieutenant talking, right?*

*A   Correct*

*Q   But so that we are clear, you previously told us that the whole conversation took and the times are 10 47 to 10 53, right?*

*A   Yes*

*Q   And that's something that you checked, right?*

*A   Yes*

*Q   And that is six minutes, right?*

*A   Correct*

12

*Q  That tape may not be six minutes, but you previously testified that that's what it was, right?*

*A  Yes*

(Exhibit L, pages 11 & 12.)

The above testimony is intentional perjury with leading questions  A review of Mrs  Kingsley's testimony from July 8, 2010 (Exhibit I) clearly reflects she did not testify to anything like what the State elicited from her with leading questions on July 20, 2010  On July 8, 2010 Mrs  Kingsley never testified to the times of 10 47 and 10 53  She never testified on July 8th that the time from when Lt. Shuhandler first radioed her, to the time his radio microphone opens ("gurgling sound") was 6 minutes  This 6 minute fabrication by the State does not conform with the "corrupted or tampered with" Exhibit K, File *R10000001685 Lt Shuhandler Shooting Chnl 2 224200 233000*, which reflects the initial communication between Mrs  Kingsley and Lt. Shuhandler begins at 10 48 57 (or 10 49 as Mrs  Kingsley testified to on July 8, 2010), and ends at 10 52 27—a difference of 3 minutes and 30 seconds, not 6 minutes

15  At trial on July 20, 2010 Mr  Irizarry testified consistently with his statements documented above in paragraphs 3 and 6

16   On October 14, 2010 during Mr Irizarry's Sentencing Hearing the State

claimed that all audio files downloaded from the Gilbert Police Department

Dispatch recording system contain the message

## "! CAUTION
## This Voice Print Pack 'n Go file has either
## been corrupted or tampered with.
## Invalid File Size!
## Abort          Continue"

This is not a true claim   Defense counsel has had no problems opening and playing

the 2nd file in Exhibit K, File *R10000001685 Lt Shuhandler Shooting Chnl 2 233000*

*001500*  After logging in from the "VPI" screen, unlike the State claims, there is no

message that reads "! CAUTION        file has either been corrupted or tampered

with " File *R10000001685 Lt Shuhandler Shooting Chnl 2 233000 001500* loads in the

VPI player and becomes ready to play without any error messages

## LEGAL ARGUMENT

"Knowing use of perjured or false testimony by the prosecution is a
denial of due process and is reversible error without the necessity of a
showing of prejudice to the defendant " State v  Ferran, 112 Ariz. 324,
334, 541 P 2d 921 (1975), citing Mooney v  Holohan, 294 U S  103,
55 S Ct. 340, 79 L Ed  791 (1935)

"[I]t is established that a conviction obtained through use of false evidence,

known to be such by representatives of the State, must fall under the Fourteenth

Amendment " Napue v. Illinois, 360 U S  264, 269, 79 S Ct. 1173 (1959)

In order to prevail on a <u>Mooney-Napue</u> claim a defendant must show

1   The testimony and/or evidence was false

2   The prosecution knew or should have known the testimony and/or evidence was false.

3   The false testimony/evidence was material

See <u>Hayes v. Brown</u>, 399 F 3d 972, para  11, (9th Cir  2005)  Mr  Irizarry can prove all three

    <u>1 & 2   The State knew the testimony and evidence was false</u>

Melissa Kingsley committed perjury while testifying on both July 8, and 20, 2010, and the audiocassette tape introduced through her testimony, Trial Exhibit 121, was false evidence.

Mrs Kingsley, on July 8, 2010 testified that she had "reviewed" Trial Exhibit 121 "multiple times" prior to testifying, and it was a "real time" recording of her radio communications with Lt. Shuhandler   The State fictitiously made the dispatch communications—Trial Exhibit 121—relevant by eliciting the false testimony of Mrs  Kingsley that Trial Exhibit 121 "will give us a definite or an exact time as to when things happened "  (See Exhibit I, page 8 )

The due process violations against Mr  Irizarry's right to a fair trial by the purposefully false testimony of Mrs  Kingsley and the false evidence of Trial

15

Exhibit 121, was drastically compounded when the State elicited completely untrue testimony from her during cross-examination on July 20, 2010  (Read and compare Exhibit I with Exhibit L )  The differences between Mrs  Kingsley testimony on July 8th and July 20th clearly reflects the State knew her testimony was false and that Trial Exhibit 121 had been edited, altered, corrupted, tampered with      before they introduced it as "real time" evidence

We know without a doubt that Trial Exhibit 121 is not what it was purported to be—a "real-time" recording of "when things happened "  Trial Exhibit 121 reflects that the time from when Lt. Shuhandler first contacts Ms  Kingsley for information on Mr  Irizarry and Mr  Redondo, to the time when he was shot, is 2 minutes and 30 seconds

Exhibit K is the disclosed CD of alleged relevant Channel 2 dispatch recordings and it reflects that the time from when Lt. Shuhandler first radios for information on Mr  Irizarry and Mr  Redondo, until the time he is shot, is 3 minutes and 30 seconds   However, the relevant file—Exhibit K, File *R10000001685 Lt Shuhandler Shooting Chnl 2 224200 233000*—reflects that it has "been corrupted or tampered with "  While the irrelevant file, Exhibit J, File *R10000001685 Lt Shuhandler Shooting Chnl 2 233000 001500* is fine and has not "been corrupted and tampered with "

16

On July 20, 2010 the State, through the testimony of Mrs. Kingsley, admitted that the relevant dispatch recordings should be at least 6 minutes long. (See Exhibit L, page 12.)

Finally, The ATM video, Exhibits B, C, D, E, and F, reflects that the time between when Lt. Shuhandler would have first walked away from Mr. Irizarry at the driver's side of the truck (10 40 32) and began radio communications, to the time he was shot (10 47 55 to 10 48 08) is 7 and a half minutes long.

Comparing the relevant times of the ATM video with either Trial Exhibit 121 or Exhibit K, File *R10000001685 Lt Shuhandler Shooting Chnl 2 224200 233000*, it is clear we are missing four to five minutes of Channel 2 radio/dispatch communications. Further, the State through the trial testimony of Mrs. Kingsley, admits that the real undisclosed dispatch recordings are at least 6 minutes long.

The reason why the State introduced this perjured testimony and false evidence proves the 3rd prong of the <u>Mooney-Napue</u> test.

<u>3. The false testimony/evidence was material</u>

Mr. Irizarry has always maintained that he was under the influence of methamphetamine, scared, and panicked when he left the scene of Lt. Shuhandler's shooting. Further, over 2 days of interrogation by law enforcement officers, Mr. Irizarry's statements about what happened remained consistent and reflected he had

17

no intent to facilitate any crimes by Mr Redondo  The State, in order to get the

jury to believe Mr Irizarry was not truthful, needed ways to impeach his testimony

and prior statements  The State attempted to impeach Mr Irizarry in 3 known

ways.

First, through the testimony of Ofc. Betts, who at trial alleges for the first

time that Mr Irizarry stopped the truck in a crosswalk so Mr Redondo could shoot

at him  Prior to testifying, Ofc  Betts had given at least one highly detailed

statement about what had happened (Exhibit G)  In this statement he never

mentioned anything about the truck stopping so the passenger could shoot at him

If Mr Irizarry had supposedly stopped the truck in the crosswalk to help Mr

Redondo shoot at Ofc  Betts, that alleged fact would be documented somewhere in

the thousands of pages of reports and transcripts, and the hundreds of CDs, DVDs,

and computer files involved in this case—again, it isn't

Second, with the testimony of Ofc  Marrufo, Ofc  Pollard, Ofc. Schlitz, Ofc.

Jutting, and Ofc  Bernau, the State claimed that Mr Redondo was moving from the

cab of the truck to the bed, and back, numerous times, reflecting that Mr  Irizarry

was communicating with and helping Mr Redondo  Also reflecting that Mr

Irizarry hasn't been truthful when he consistently stated that when Mr Redondo left

the cab for the bed of the truck, he did not return to the cab until the truck began to

18

run out of gas   However, none of the above 5 officers ever documented the allegation of Mr Redondo going in and out of the truck numerous times prior to their trial testimony, and in fact Ofc Marrufo and Ofc Pollard had previously stated the exact opposite (Exhibit H)

Finally, with the perjured testimony of Mrs Kingsley and the introduction of the maliciously edited audiocassette as Trial Exhibit 121, the State was able to introduce evidence that would impeach Mr Irizarry regarding his consistent statements about what happened during the stop   The State was able to get the jury to believe there is no way that everything Mr Inzarry said happened, could have happened in the 2 minutes and 30 seconds that Trial Exhibit 121 allows for it to happen in   There is no way Lt. Shuhandler could have radioed to dispatch Mr Irizarry's and Mr Redondo's information, received information back from dispatch, asked Mr Redondo to exit the truck, helped him fix the strap, asked him how to spell his name, told him to get back in the truck, have a few minutes pass by, hear a loud explosion, and Mr Inzarry panics and flees the scene—all within 2 minutes and 30 seconds.

The dispatch recordings reflected in Trial Exhibit 121 are not admissible for any purpose—except to impeach Mr Inzarry   All crimes Mr Inzarry was charged

19

with occurred at a different time and place than what the dispatch recordings in Trial Exhibit 121 are relevant too

Impeachment evidence reflecting that Mr Irizarry did not testify truthfully or that his prior statements are not truthful, has to be material to this case   According to the length of Trial Exhibit 121, there is no way that Mr Irizarry can be telling the truth about what happened.  It is impossible for everything he said happened, to happen in 2 minutes and 30 seconds   If Mr Irizarry is unwilling to tell the truth about what happened, how can a juror believe anything he says?  Impeachment evidence against a testifying defendant has to be material to the case

Since the State intentionally used perjured testimony and false evidence to convict Mr Irizarry, and since the false testimony and evidence was material to the State's prosecution and Mr Irizarry's defense, Mr Irizarry's constitutional rights to due process were denied   This requires that the judgments against him be vacated pursuant to Rule 24 2, Arizona Rules of Criminal Procedure

RESPECTFULLY SUBMITTED this ___1st___ day of November, 2010

By _____

Chad Shell
Attorney for Damen Irizarry

20

Copies delivered this _____/ᶜ___ day of
November, 2010 to

HON  CHRISTOPHER T  WHITTEN
Maricopa County Superior Court
201 W  Jefferson
Phoenix, Arizona 85003

JUAN MARTINEZ
Deputy County Attorney
301 West Jefferson, Ste  800
Phoenix, Arizona 85003


By _____

Exhibit 46

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
11/23/2010 8 00 AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2010-106178-001 SE                                      11/17/2010


HONORABLE CHRISTOPHER WHITTEN              CLERK OF THE COURT
                                                          A Moore
                                                          Deputy


STATE OF ARIZONA                           JUAN M MARTINEZ

v

DAIMEN JOSEPH IRIZARRY (001)               CHARLES K SHELL

                                           VICTIM SERVICES DIV-CA SE


MINUTE ENTRY


        The Court has received the Defendant's "Motion to Vacate Judgment Pursuant to Rule
24.2," filed November 1, 2010, with supporting exhibits A through F, and the State's response,
filed November 12, 2010

        A portion of the motion asserts impeaching facts related to the testimony of Officers
Justin Betts, Christopher Marrufo, Edward Pollard, Nathan Schlitz, Brian Jutting and Jamie
Bernau – specifically that their trial testimony was not the same as had been documented in pre-
trial disclosure   Each was, in fact, impeached at trial by use of this same absence of information
(or arguments that the information was absent in pre-trial disclosure).   The credibility of these
witnesses was a jury function and will not be reviewed by the Court in this motion   *State v
Ferrari,* 112 Ariz. 324, 334, 541 P.2d 921, 931 (1975)

        Another section of Defendant's motion argues that the audio recording of police radio
traffic which was disclosed by the State differed in length that the actual "real time" recording of
that radio traffic   Defendant claims the radio dispatcher, who testified about the recording, has
perjured herself and that the State knowingly presented this perjured testimony   Based upon this
argument, Defendant seeks a new trial

        This argument fails for at least two reasons.   First, there is no evidence that, even
assuming the radio dispatcher's testimony was incorrect as to the amount of time between
Lieutenant Shuhandler asking her for information about the Defendant and Mr Redondo (his co-

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2010-106178-001 SE                                        11/17/2010

defendant) and Lieutenant Shuhandler's microphone being stuck "open" (whether that amount of time is two and a half minutes, four minutes, six minutes, or seven minutes), there is absolutely no evidence that the dispatcher knew of any error – that she committed perjury [1]

Another reason that Defendant's argument fails is that, in order to require a new trial, the perjured testimony must be material  Material evidence, the false presentation of which would be a constitutional violation requiring a new trial, is only that which would probably have changed the outcome of the trial  *State v Spears*, 184 Ariz. 277, 287, 908 P 2d 1062, 1072 (1996)  There is no reasonable likelihood that this evidence changed the outcome of the trial

The Defendant was not charged with any criminal conduct at the scene of Lieutenant Shuhandler's murder  Instead, he was charged with, and convicted by a jury of, crimes committed to assist in escaping from the scene, including assisting in assaults on police officers. The time between Lieutenant Shuhandler contacting a dispatcher and his radio being stuck "open," even if that time is knowingly presented in an inaccurate manner, is not particularly relevant or material to these convictions

In considering whether Defendant's contention that the presentation of the exhibit 121 as a "real time" recording of Lieutenant Shuhandler's radio transmissions were "material" to verdict, the Court notes that, on July 20, 2010, the Defendant recalled the radio dispatcher and pointed out that any earlier testimony that exhibit 121 represented a "real time" recording was incorrect.

Based upon the foregoing, Defendant's "Motion to Vacate Judgment Pursuant to Rule 24 4 " filed November 1, 2010 is denied

This case is eFiling eligible  http.//www clerkofcourt.maricopa gov/efiling/default.asp

---

[1] The only argument offered that the witness *knowingly* offered perjured testimony is defense counsel s observations, and those of his law partner  that she looked nervous when testifying  The jump from these observations to allegation such as those made in Defendant s present motion, without more, is reckless.

Docket Code 019                          Form R000A                              Page 2

Exhibit 47



**Jennings Strouss**
ATTORNEYS AT LAW

State Bar File No  15-3363
In the Matter of Juan Martinez
Response – Exhibit 47 (2



**Jennings Strouss**
ATTORNEYS AT LAW

State Bar File No  15-3363
In the Matter of Juan Martinez
Response – Exhibit 47 (

Exhibit 48



# Jennings Strouss

ATTORNEYS AT LAW



State Bar File No  15-3363
In the Matter of Juan Martinez
ʔtial Response – Exhibit 48

# Exhibit 49

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
Mary Martin
Filing ID 1287986
5/16/2012 9:24:13 AM

L KIRK NURMI #020900
LAW OFFICES OF L KIRK NURMI
2314 East Osborn
Phoenix, Arizona 85016
602-285-6947
nurmilaw@gmail.com

JENNIFER WILLMOT #016826
Willmott & Associates, PLC
845 N 6th Ave
Phoenix, AZ 85006
602-344-0034
jwillmott@willmottlaw.com

## THE SUPERIOR COURT OF THE STATE OF ARIZONA

## IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| STATE OF ARIZONA,<br><br>        Plaintiff,<br><br>JODI ARIAS<br><br>        Defendant. | No CR2008-031021-001<br><br>MOTION FOR INDEPENDENT TESTING OF COMPUTER EVIDENCE<br><br>(Hon. Sherry Stephens) |

Ms Arias through counsel undersigned, hereby requests the state transfer custody of the Western Digital laptop drive and/or Accomdata drive contained in Mesa Police Department item number 402873 to Ms Arias so that she can conduct her own testing on said item. This motion is made pursuant to pursuant to Arizona Rule of Criminal Procedure Rule, 15 1 (e), 15 1(g), 15 9(b), the Fourth, Fifth, Sixth, Eighth, and Fourteenth amendments of the United States Constitution, and corresponding Arizona articles This motion is also made pursuant to Washington v Texas, 388 U S 14 (1967)

and <u>Webb v. Texas,</u> 409 U S  95 (1972) regarding a defendant's right to present and establish a defense as well as <u>Lockett v. Ohio,</u> 438 U S  586 (1978) and <u>Eddings v Oklahoma</u> 455 U S  104 (1982) which together establish that a jury should not be precluded from hearing evidence that could call for a sentence less than death    Ms Arias will expound upon this assertion in the attached Memorandum of Points and Authorities that is incorporated herein by reference

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.  RELEVANT FACTS

On March 9, 2009, Mesa Police Detective Michael Melendez attempted to recover evidence from the  what he referred to as a Western Digital drive  (listed as item # 402873) at issue his report documents that he "was unable to process the drive because it powers on and shuts off immediately "   Of further note and in an attempt to provide greater specificity, Ms  Arias would also note that in the Mesa Police Department Impound records this hard drive is listed as item # 402873 as an Accomadata IDE hard drive upon which the following verbiage is written "Inside this drive is the record of my life! Please handle with care!  Thanks, Jodie Arias." To date, Ms  Arias has not received any supplemental reports from the State which would lead her to believe that any further testing has been done upon this item.

### II.  LAW AND ARGUMENT

Ms Arias' right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies  Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense  This right is a fundamental element of due process of law  *Washington v Texas*, 388 U S  14, 19 (1967), See Also, *Webb v Texas*, 409 U S 95, 97 (1972)  Of further note is that fact as a sentence of death is a possible outcome of the case against Ms Arias  Thus, her ability to present mitigating evidence that could call for a sentence less than death must not be compromised, <u>Lockett v Ohio</u>, 438 U S 586 (1978)

Rule 15 1(g) of the Rules of Criminal Procedure allows, upon motion of the defendant, showing defendant has substantial need in the preparation of his case, for material or information not otherwise covered by Rule 15 1, and that the defendant is unable without undue hardship to obtain the substantial equivalent by any other means, the court in its discretion may order any person to make it available to the defendant  Counsel proposes the following protections as it relates to the custody and transfer of the items of evidence

- Counsel has chosen DriveSavers Data Recovery, Inc  400 Bel Marin Keys Blvd Novato, CA 94949 as the laboratory who will examine the evidence.

- Ms Arias shall have her investigator, retrieve the item at issue from the Mesa Police Department on an agreed upon date and will send the evidence by overnight mail to DriveSavers by the next day

- Ms Arias will be responsible for paying DriveSavers for independent testing

- At any subsequent proceeding in this matter, Ms Arias will not raise any claim that there was a break in the chain of custody of the item at issue

- Drivesavers will complete all testing of the above listed items and transfer all items back to Ms Arias who will return the item back to the Mesa Police Department within 3 weeks of it being picked up

RESPECTFULLY SUBMITTED this 16th day of May, 2012

LAW OFFICES OF L KIRK NURMI

By   _s/ L. Kirk Nurmi_____
L Kirk Nurmi
Attorney at Law
Attorney for the Defendant

Copy of the forgoing filed/Delivered
this 16th  day of
May, 2012, to

Honorable Sherry Stephens
Judge of the Superior Court

Juan Martinez
Deputy County Attorney

By S/ L. Kirk Nurmi
     L Kirk Nurmi
     Attorney for the Defendant

# Exhibit 50

Michael K Jeanes  Clerk of Court
*** Electronically Filed ***
05/21/2012 8 00 AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2008-031021-001 DT                           05/18/2012

CLERK OF THE COURT
HON  SHERRY K  STEPHENS                        K  Molina
                                               Deputy

STATE OF ARIZONA                        JUAN M MARTINEZ

v

JODI ANN ARIAS (001)                    KIRK NURMI
                                        JENNIFER L WILLMOTT

                                        CAPITAL CASE MANAGER


MINUTE ENTRY


10 55 a m

Courtroom SCT, 8C

State's Attorney          Juan Martinez
Defendant's Attorney      Kirk Nurmi and Jennifer Willmott
Defendant                 Present

Court Reporter, Mike Babicky, is present.

A record of the proceeding is also made by audio and/or videotape.

Defense counsel advises that they will be calling Alyce Laviolette at the mitigation phase of the trial

The State is on notice of defense counsel's intent to call Alyce Laviolette at the mitigation phase of the trial

Docket Code 085          Form R000D                       Page 1

## SUPERIOR COURT OF ARIZONA
## MARICOPA COUNTY

CR2008-031021 001 DT                                          05/18/2012

     Counsel for the State requests a complete copy of Alyce Laviolette's file.

     Defense advises they will contact Alyce Laviolette to obtain a copy of her notes to provide to counsel for the State.

     Counsel for the State urges that he would like a complete copy of Alyce Laviolette's entire file, not just her notes

     Discussion is held.

     The Court has received the Motion for Independent Testing of Computer Evidence filed by defense counsel

     IT IS ORDERED granting the Motion for Independent Testing of Computer Evidence Counsel for the State shall provide defense counsel with the material(s) as mentioned in the Motion no later than 5:00 p.m. on 6/01/2012.

     IT IS FURTHER ORDERED setting Capital Case Management Conference on 7/12/2012 at 8:30 a.m. before this division

     IT IS FURTHER ORDERED affirming prior custody orders

     11 01 a.m   Matter concludes

     This case is eFiling eligible  http://www.clerkofcourt.maricopa.gov/efiling/default.asp. Attorneys are encouraged to review Supreme Court Administrative Order 2011-140 to determine their mandatory participation in eFiling through AZTurboCourt.

Docket Code 085                    Form R000D                         Page 2

Exhibit 51

1

1          IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

2              IN AND FOR THE COUNTY OF MARICOPA

3

4     STATE OF ARIZONA,                    )
                                           )
5                     Plaintiff,           )
                                           )
6              vs                          )   No   CR 2008-031021
                                           )
7     JODI ANN ARIAS                       )
                                           )
8                     Defendant            )
                                           )
9     ─────────────────────────────────   )

10

11

12              REPORTER'S TRANSCRIPT OF PROCEEDINGS

13

14

15

16                       Phoenix, Arizona
                          July 12, 2012
17

18
                  Before The Hon  Sherry K  Stephens
19

20         REPORTED BY:

21         MICHAEL A  BABICKY, RPR
           Certified Reporter
22         Certificate No  50361

23         PREPARED FOR:

24         MS  JENNIFER WILLMOTT
           Attorney at Law
25

2

1                                    EXHIBITS

2

3

4              EXHIBIT NO                          PAGE NO

5

6

7

8              None marked

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1          REPORTER'S TRANSCRIPT OF PROCEEDINGS,

2          was taken on July 12, 2012 at the SUPERIOR

3   COURT, MARICOPA COUNTY, 175 W  Madison, Phoenix,

4   Arizona, before MICHAEL A  BABICKY, a Certified

5   Reporter in the State of Arizona

6

7          COUNSEL APPEARING

8

                For the Plaintiff
9

                DEPUTY COUNTY ATTORNEY
10              BY   MR  JUAN M  MARTINEZ, Esq

11

12              For the Defendant

13

                BY   MR  KIRK NURMI, Esq
14              BY   MS  JENNIFER WILLMOTT, Esq

15

16

17

18

19

20

21

22

23

24

25

6

1   those concerns because then we would have not just

2   Ms Arias's possible testimony at trial saying this wasn't

3   premeditated, but instead objective evidence, scientific,

4   if you will, scientific enough for the sentencing phase of

5   the capital proceedings, for lack of a better way of

6   putting it, that we believe the jury should consider in

7   that life or death decision

8           So that is something I think the Court should

9   consider before finalizing its ruling   And that's all I

10  have to say on that motion, Judge

11          THE COURT   Mr Martinez?

12          MR MARTINEZ:  The law is clear that we do not

13  allow that sort of vouching at any phase of the

14  proceeding   So I would ask that the Court deny the

15  defendant's request

16          THE COURT   All right   Anything on the other

17  motion, the Spanish only speaking jurors?

18          MR NURMI   No, Your Honor, I'll simply submit

19  on the pleadings on that

20          THE COURT:  Anything from the State on that

21  motion?

22          MR MARTINEZ:  No, thank you

23          THE COURT   All right   Then there's a motion

24  for disclosure deadline, forensic testing conducted by

25  State on evidence Item Number 402873   I didn't see a

7

1   response to this motion

2          MR  MARTINEZ   I can address it orally   There

3   really isn't anything to say other than that I'm familiar

4   with the disclosure provisions under Rule 15 and Brady and

5   all that   If I had something I would turn it over to

6   them

7          The etiology of this should be familiar to the

8   Court   This is the item that they requested be released

9   to them for testing   That's exactly what we did   Within

10  a couple of days they returned it back to us

11         What occurred before the item was turned over

12  was that there was an attempt by the Mesa police

13  department to get it analyzed   They didn't get it done in

14  time to comply with the Court's order to turn it over to

15  them   So there is nothing to turn over to them right now

16  That doesn't mean we're not going to get it analyzed, just

17  means we don't have anything to turn over right now

18         MR  NURMI   Judge, that stands in direct

19  contrast to the information Detective Flores gave to

20  Mrs  Arias's agent when she went to pick it up   He

21  advised the investigator working for Ms  Arias that

22  testing had been done, and that a certain amount of

23  sectors of the hard drive, I believe it was three out the

24  four sectors of the hard drive had in fact come back   So

25  I believe that they may be doing further testing, they may

8

1    be breaking down what was on there

2            But to educate the Court a little more on this,

3    this hard drive was corrupt, corrupt is probably not the

4    right word, malfunctioning is the right word   The

5    internal -- our assessment of this at this point any way

6    is the internal workings of this hard drive, not

7    necessarily the computer components, but the internal

8    workings of the hard drive might   for lack of a better way

9    of saying it, move the data that is on the computer

10   elements to the other computer are malfunctioning   And

11   that was the subject of our attempt to recover it

12           Once we found out that they had, according to

13   the detective, made a mirror image of three of the four

14   sections, that mirror image alone was exactly the item

15   that we wished to obtain, the mirror image   and we can do

16   our analysis from there

17           Now, what the State may be saying is they

18   haven't analyzed the mirror image yet, they're not done

19   they don't have results   That's not what we're talking

20   about here

21           Unless Detective Flores was completely lying to

22   the investigator, then there is   in fact, an image of

23   three or four of the sections, what we call a flash image

24   or mirror image of that for analysis that can be broken

25   down into components where evidentiary items such as

1   pictures, e-mails, that sort of thing can you discovered

2           So what we're asking for in this motion is in

3   fact that image -- that it was purported to exist   I

4   can't say -- I can't tell Court I have seen it   But the

5   lead detective on this case purported that it existed   So

6   we want it

7           THE COURT   Mr Martinez?

8           MR MARTINEZ   Again, he's mistaken what he's

9   talking about quite frankly   The item was sentence over

10  to an outfit in Texas and they were working on it   They

11  began work on three of the images   They hadn't begun work

12  on the fourth image   But they hadn t been able to make a

13  mirror image of any of it

14          So rather than create a problem, they returned

15  the item back to us before they created anything for us to

16  turn over   I don't have anything to turn over   I've

17  spoken to Detective Flores   There's nothing to turn over

18  It may be that there was some conversation about the work

19  on the first three images   I don't deny that may have

20  happened   But there are no image to turn over right now

21          Once these people in Texas turn this over to us,

22  I'll turn it over to him   And if he wants to go through

23  the disclosure process and ask them when it was done, he

24  can find that out and see that what the State is saying is

25  actually accurate

1              THE COURT   Based upon the avowal of the

2     prosecutor there's nothing to turn over at this time

3     It's ordered denying the motion for disclosure deadline

4     forensic testing conducted by State on evidence item

5     Number 402873   That motion having been filed June 25

6     2012

7              MR  NURMI   Judge, if I may be heard before we

8     move topics?

9              THE COURT   Yes

10             MR  NURMI   I guess my other question now we're

11    all here for the record, we returned the item under the

12    belief that the testing that we -- Detective Florez

13    advised that the testing had been done, then we would

14    certainly want the motion to do our own testing upon that

15    item to remain open until such time that Mr  Martinez

16    receives his results   If they're not forthcoming then we

17    would ask that the item -- we have the same opportunity to

18    test the item that we had back a few weeks ago

19             MR  MARTINEZ:  Just to flesh it out  after I was

20    told defense Counsel had returned the item, I asked them

21    to re-send the item back to Texas   They said, well, we're

22    going to have to get the money and we have to go through

23    the process of getting it done again   So that's where it

24    stands

25             Now, it's my understanding and belief, although

1   I don't have any confirmation, is that the item may have

2   been re-sent   But I don't know the specifics of it   I

3   don't know when it was sent, if it was sent, and I don't

4   know when we're going to get results back because that

5   depends on the person that's actually working on it if

6   they are working on it now

7          THE COURT   Based on that information, you need

8   to file a motion in the future if there's an issue   You

9   made your record   There's a Motion to Continue trial

10  Has the State responded to that motion?

11         MR  MARTINEZ:  No   But I would like to do it in

12  writing   Obviously we're going to object

13         THE COURT   Okay   I'll set a hearing on that

14  Motion to Continue the trial in about three weeks   And

15  we'll set another case management conference at that time

16  Are there will any other issues for the Court today?

17         MR  MARTINEZ:  No

18         MR  SKWRAO   No, Your Honor

19         THE COURT:  All right   Let's set hearing on the

20  Motion to Continue Trial and case management conference

21  for August 1st is three weeks

22         MR  MARTINEZ   That's fine

23         THE COURT   August 2nd is three weeks

24         MR  MARTINEZ   Either one works

25         MR  NURMI   August 2nd is fine, Judge

# Exhibit 52

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
Isabel Osuna
Filing ID 1384644
8/2/2012 4 09 44 PM

WILLIAM G  MONTGOMERY
MARICOPA COUNTY ATTORNEY

Juan M  Martinez
Deputy County Attorney
Bar Id #  009510
301 West Jefferson, 4th Floor
Phoenix, AZ  85003
Telephone  (602) 506-5780
Mcaomjcl@mcao Maricopa Gov
MCAO Firm #   00032000
Attorney for Plaintiff

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| THE STATE OF ARIZONA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs ) | |
| ) | |
| **JODI ANN ARIAS,** ) | CR 2008-031021-001 |
| ) | |
| Defendant ) | **NOTICE REGARDINIG TESTING** |
| ) | **OF COMPUTER HARD DRIVE, ITEM** |
| ) | **NUMBER 402873** |
| ) | |
| ) | (Assigned to the  Honorable |
| ) | Sherry K  Stephens) |

The  State  of  Arizona,  by  the  undersigned  Deputy  County
Attorney,  gives  notice  that  the  computer  hard  drive,  item  number
402873,  was  mailed  out  for  testing  on  June  26,  2012,  after  it  was
returned  to  the  Mesa  Police  Department  by  defendant   The  testing
agency,  TLSI  Incorporated  in  Arlington,  Texas,  has  yet  to  provide
any  examination  results   Detective  Esteban  Flores  of  the  Mesa
Police  Department  left  a  telephone  message  on  August  1,  2012,
asking  for  an  update   His  telephone  call  has  not  yet  been
returned

Submitted August _____, 2012

WILLIAM G  MONTGOMERY
MARICOPA COUNTY ATTORNEY

BY /s/ _____
    /s/ Juan M  Martinez
    Deputy County Attorney

Copy mailed\delivered
August _____, 2012,
to

The Honorable Sherry K  Stephens
Judge of the Superior Court

Laurence Kirk Nurmi
2314 East Osborn Road
Phoenix, AZ  85016

BY /s/ _____
    /s/ Juan M  Martinez
    Deputy County Attorney

2

Exhibit 53

1

1    IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

2         IN AND FOR THE COUNTY OF MARICOPA

3

4    STATE OF ARIZONA,                )
                                      )
5                  Plaintiff,         )
                                      )
6             vs                      )   No  CR 2008-031021
                                      )
7    JODI ANN ARIAS,                  )
                                      )
8             Defendant               )
                                      )
9    _____)

10

11

12        REPORTER'S TRANSCRIPT OF PROCEEDINGS

13

14

15

16              Phoenix, Arizona
                August 2, 2012
17

18
         Before The Hon  Sherry K  Stephens
19

20    REPORTED BY:

21    MICHAEL A  BABICKY, RPR
      Certified Reporter
22    Certificate No  50361

23    PREPARED FOR:

24    MS  JENNIFER WILLMOTT
      Attorney at Law
25

2

1                          EXHIBITS

2

3

4        EXHIBIT NO                        PAGE NO

5

6

7

8        None marked

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

```
 1              REPORTER'S TRANSCRIPT OF PROCEEDINGS,

 2              was taken on August 2, 2012 at the

 3   SUPERIOR COURT, MARICOPA COUNTY, 175 W  Madison,

 4   Phoenix, Arizona  before MICHAEL A  BABICKY, a

 5   Certified Reporter in the State of Arizona

 6

 7              COUNSEL APPEARING

 8

 9                   For the Plaintiff

10              DEPUTY COUNTY ATTORNEY
                BY   MR  JUAN M  MARTINEZ, Esq

11

12                   For the Defendant

13

14              BY   MR  KIRK NURMI, Esq
                BY   MS  JENNIFER WILLMOTT, Esq

15

16

17

18

19

20

21

22

23

24

25
```

4

```
1                        PROCEEDINGS

2

3

4              THE COURT   This is CR 2008-031021, State of

5     Arizona versus Jodi Ann Arias   This is the time set for

6     case management conference   Appearances for the record

7              MR  MARTINEZ   Juan Martinez on behalf of the

8     State

9              MS  WILLMOTT   Jennifer Willmott and Kirk Nurmi

10    on behalf of Ms  Arias who is present in custody

11             MR  NURMI   Kirk Nurmi

12             THE COURT   Okay   First things first   The

13    Motion to Continue the trial, the Court has reviewed the

14    motion and its the its states object up to the motion to

15    continue trial is there anything else either Counsel would

16    like to say about this motion

17             MS  WILLMOTT   Yes, Your Honor, there actually

18    is additional information   As of the last court date when

19    we were here  there's this whole issue with the hard drive

20    that we filed a Motion to Compel   It was given to us

21             At the time that our investigator picked it up

22    Mr  Martinez's detective, Detective Flores advised our

23    investigator that they had evidence that was retrieved off

24    that hard drive   We therefore made the decision to give

25    it back and wait for their evidence to come   We have yet
```

1    to receive anything

2         At the last hearing Mr  Martinez said that

3    Mr  Flores or Detective Flores either was lying or just

4    wasn't telling -- was wrong and that there was no

5    evidence  He also said that he didn't know where the hard

6    drive was  So at least at the last court date we weren't

7    able to go and get it back to get our own evidence and

8    testing on it because he didn't know where it was   I

9    asked him this morning  He still didn't know where it

10   was  He apparently didn't ask anybody where it was  So

11   that's another issue that now we're having because now

12   there's this hard drive that we have been told by a

13   detective that information has been received off this hard

14   drive, then we're told by the prosecutor that's not true

15   We want to do our own testing  but the prosecutor, the

16   State is telling us they don't know where the hard drive

17   is  So now with that additional information, this is

18   additional investigation that I don't see being completed

19   by October 17th

20        The other issue with my trial that I'm currently

21   in, it should finish by August 16th, that doesn't include

22   deliberation days, but should be finished by August 16th

23   which is longer than I thought

24        My request for the continuance was just to

25   continue it to December 1st which is only barely a month

1    and a half   And that's what I'm still requesting   My

2    only issue with that is what's happening with the hard

3    drive because I don't know what's ultimately going to

4    happen since we don't have it and Mr  Martinez doesn't

5    know where it is

6              THE COURT   Mr  Martinez?

7              MR  MARTINEZ   I don't know what fantasy world

8    defense Counsel is living in   And certainly I'm glad

9    there's a record of these proceedings that is made, I

10   understand both orally as well as by a court reporter

11             But the last time -- and if we take a look at

12   the history of this, the Court ordered that the State turn

13   that hard drive over to the defense for their inspection

14   And there was a two week period   During that two week

15   period the city of Mesa attempted to get the information

16   from it   They're weren't able to do it because they had

17   to sent it to Texas and then get it back so that

18   information could be turned over to everybody

19             We made sure that the hard drive was available

20   so we could turn it over to them even though they weren't

21   able to get the information because I didn't want to run

22   afoul of any Court order   We turned it over to them

23   Apparently they had a conversation with a detective   They

24   claim the detective was lying

25             Well  it's a thing where perhaps the

7

1   investigator didn't understand what he was saying    I

2   don't want to get involved in that    All I know we

3   complied with the Court order and turned it over    They

4   then made a decision to give that back to us    I then

5   spoke to the detective about it    And said, well, then

6   they don't want to test it, let's go ahead and test it

7   ourselves

8           The detective indicated   well, as I previously

9   said   since we already sent it, we're going to have a

10  little bit of a problem where it's going to take a little

11  bit longer or I don't know exactly how it's going to work

12  because now I have to get permission to send it again

13  because it's not something that I can do two times in a

14  row    That's where we left it    That's what I informed the

15  Court

16          We still don't have anything    And the reason

17  that we don't have anything is either it isn't completed,

18  hasn't been sent or I haven't been notified    I suspect

19  it s probably still being examined but that's a guess on

20  my part

21          Do I think that's a reason to continue this

22  trial? Absolutely not    They were given an opportunity

23  Once this hearing is over I'll call and I'm sure we'll

24  have the hard drive for them to look at in short order,

25  whatever that may be    I don't have any dates    Had

8

1    defense Counsel indicated this was an issue  she could

2    have called me and I would have made the call   We

3    wouldn't have been standing here having to argue against

4    ourselves with a lack of information

5           So, no  I don't believe that's a good reason to

6    continue the trial   In terms of her trial, if she is

7    finished by August 16th, she knew about the other trial

8    that she had and it is a retrial   There are two lawyers

9    on that case  So, no, I don't believe that this case that

10   she's doing is calling for so much of her attention such

11   that it requires that we continue it to a longer period of

12   time

13          She indicated she would be ready   In my view if

14   the Court is inclined to continue it, she claims that

15   she's behind a month, give her that month to November

16   19th   But this situation where defense Counsel -- and

17   specifically in this case, it just seems that's the way it

18   is   Defense Counsel has been driving the bus and has been

19   putting up road blocks to get this thing to trial

20          It's unfortunately and the States asks that you

21   not grant the Motion to Continue but if you do, do not

22   grant it beyond November 19th, enough time is enough time

23   Thank you

24          THE COURT  All right   Just so I'm clear, Mr

25   Martinez, you're indicating to the Court that you will

9

1    make a telephone call when this hearing is completed?

2              MR MARTINEZ   Sure

3              THE COURT   And find out the status of that --

4              MR MARTINEZ   Right

5              THE COURT   -- examination

6              MR MARTINEZ:   And I'll call defense Counsel and

7    let them know what they tell me

8              THE COURT   Okay

9              MS WILLMOTT   Judge, do want us to file another

10   motion to compel the hard drive or can we just go get it

11   if they actually have it?

12             THE COURT   Why don't you talk to Mr Martinez

13   first, find out what the status is, where it is  if you

14   think you need to file a motion, then file a motion

15             I'm going to set another status conference in

16   about three weeks to four weeks because we're getting

17   closer to trial   I think there are a number of issues

18   that need to be resolved   So I did not it put on the

19   record but I did receive a letter dated July 26th from the

20   defendant's mother

21             Counsel, have you seen this?

22             MR NURMI   No

23             THE COURT   I wanted to give you both an

24   opportunity to review that and give it to the clerk for

25   filing   Okay   Thank you   Yes?

Exhibit 54

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
Isabel Osuna
Filing ID 1477926
10/2/2012 12 56 52 PM

WILLIAM G  MONTGOMERY
MARICOPA COUNTY ATTORNEY

Juan M  Martinez
Deputy County Attorney
Bar Id #  009510
301 West Jefferson, 4th Floor
Phoenix, AZ  85003
Telephone  (602) 506-5780
Mcaomjc1@mcao Maricopa Gov
MCAO Firm #   00032000
Attorney for Plaintiff

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| THE STATE OF ARIZONA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs | ) |
| | ) |
| **JODI ANN ARIAS**, | ) CR 2008-031021-001 |
| | ) |
| Defendant | ) **NOTICE REGARDING RETURN OF** |
| | ) **COMPUTER HARD DRIVE, ITEM** |
| | ) **402873** |
| | ) |
| | ) (Assigned to the  Honorable |
| | ) Sherry K  Stephens) |

The  State  of  Arizona,  by  the  undersigned  Deputy  County
Attorney,  gives  notice  that  the  computer  hard  drive,  item  number
402873,  was  returned  to  the  Mesa  Police  Department  on  September
27,  2012   The  testing  agency,  TLSI  Incorporated,  did  not  provide
any examination results

Submitted October _____, 2012

WILLIAM G  MONTGOMERY
MARICOPA COUNTY ATTORNEY

BY /s/ _____
    /s/ Juan M  Martinez
    Deputy County Attorney

Copy mailed\delivered
October _____, 2012,
to

The Honorable Sherry K  Stephens
Judge of the Superior Court

Laurence Kirk Nurmi
2314 East Osborn Road
Phoenix, AZ  85016


BY  /s/ _____
      /s/ Juan M  Martinez
      Deputy County Attorney

2

Exhibit 55

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
Isabel Osuna
Filing ID 1498772
10/16/2012 4 58 34 PM

WILLIAM G MONTGOMERY
MARICOPA COUNTY ATTORNEY

Juan M Martinez
Deputy County Attorney
Bar Id #: 009510
301 West Jefferson, 4th Floor
Phoenix, AZ  85003
Telephone  (602) 506-5780
Mcaomjc1@mcao Maricopa Gov
MCAO Firm #   00032000
Attorney for Plaintiff

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| THE STATE OF ARIZONA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs | ) |
| | ) |
| JODI ANN ARIAS, | ) CR 2008-031021-001 |
| | ) |
| Defendant | ) OBJECTION TO DEFENDANT'S |
| | ) RENEWED MOTION TO COMPEL, |
| | ) MIRROR IMAGE OF ITEM NUMBER |
| | ) 402873 AND FORENSIC TESTING |
| | ) CONDUCTED BY STATE UPON |
| | ) EVIDENCE ITEM NUMBER 402873 |
| | ) |
| | ) (Assigned to the Honorable |
| | ) Sherry K  Stephens) |

The State of Arizona by the undersigned Deputy County Attorney, objects to defendant's request "for examination and reproduction [of] the results of any and all testing conducted by the State and/or it's (sic) agents upon the Western Digital laptop drive and/or Accomdata drive contained in Mesa Police Department item number 402873 "  The State also objects to defendant's request "for a mirror image of said hard drive "  The State has no testing results or mirror image of the referenced hard drive and cannot produce what is not available

Submitted October _16_, 2012

WILLIAM G  MONTGOMERY
MARICOPA COUNTY ATTORNEY

BY /s/ _____
/s/ Juan M  Martinez
Deputy County Attorney

Copy mailed\delivered
October _16_, 2012,
to

The Honorable Sherry K  Stephens
Judge of the Superior Court

Laurence Kirk Nurmi
2314 East Osborn Road
Phoenix, AZ  85016

BY /s/ _____
/s/ Juan M  Martinez
Deputy County Attorney

2

# Exhibit 56

r

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
Isabel Osuna
Filing ID 1495100
10/14/2012 5 31 05 PM

L  KIRK NURMI #020900
LAW OFFICES OF L  KIRK NURMI
2314 East Osborn
Phoenix, Arizona 85016
602-285-6947
nurmilaw@gmail com

JENNIFER WILLMOT #016826
Willmott & Associates, PLC
845 N  6th Ave
Phoenix, AZ 85006
602-344-0034
jwillmott@willmottlaw com

### THE SUPERIOR COURT OF THE STATE OF ARIZONA

### IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| STATE OF ARIZONA,<br><br>Plaintiff,<br><br>JODI ARIAS<br><br>Defendant. | No. CR2008-031021-001<br><br>DEFENDANT'S RENEWED MOTION TO COMPEL,  MIRROR IMAGE OF ITEM NUMBER 402873 AND FORENSIC TESTING CONDUCTED BY STATE UPON EVIDENCE ITEM NUMBER 402873<br><br>**(ORAL ARGUMENT REQUESTED)**<br><br>(Hon. Sherry Stephens) |

Ms  Arias, pursuant to Rule 15 1, Arizona Rules Of Criminal Procedure,
hereby moves that the prosecutor make available to the defendant for examination and
reproduction  the results of any and all testing conducted by the State and/or it's agents
upon the Western Digital laptop drive and/or Accomdata drive contained in Mesa Police
Department item number 402873   This request also includes a request for a mirror image

of said hard drive  Given that the item at issue and the forensics  testing of said item

could provide Ms  Arias with exculpatory and/or mitigating information, pursuant to both

Rule 15 1 and Brady v  Maryland, 373 U S  667 (1963), Ms. Arias, is entitled to the at

issue.

As an initial matter, consideration of this motion must seemingly begin with the

assertion the State made in there recently filed "Notice of Testing regarding Computer

Hard Drive Item number 402873  Wherein the State asserts that "[t]he testing agency,

TLSI incorporated in Arlington, Texas, has yet to provide any examination results "

Seemingly, such notice was given to induce the court to believe that the State was not in

possession of any item of evidence that would be discoverable pursuant to the authorities

cited above  However, this is not the end of the story for as the e-mail sent to Ms  Arias

by the State's agent Detective Esteban Flores describes the fact that TLSI is sending the

data back to the Mesa Police Department.

**Esteban Flores< Esteban Flores**                                    Thu  Sep 13  2012 at 12.43 PM
**To  Laurence Nurmi**

I just spoke to the representative of TLSI Inc. in Texas and he said they were going to ship the drive
back to us tomorrow or Monday by the latest. As far as what they recovered, he couldn t say  He
said they imaged data  but doesn't know what the data is  Once we get the data back to Mesa  my
computer forensics unit will attempt to interpret the data  I ll update you as soon as I have more
info

On that same day, Ms  Arias, via an e-mail to Detective Flores (as counsel for the

State was on vacation and he encouraged the contact) requested a copy of the data, which

she assumes is a mirror image, that e-mail is incorporated below

Laurence Nurmi Sep 13
to Esteban, Jennifer

Thank you for the information, once received could you please have a copy of the Image/data that you receive from TLSI made for us before your CPU forensics unit attempts to interpret the data. In turn, could you please advise me of when that copy will be ready
Thanks
Kirk

It has now been over two weeks and Ms Arias has not received a copy of the "data" or mirror image at issue so she can conduct her own testing, nor has she received the results of the testing conducted by the Mesa Police Department that Detective Flores referenced in his e-mail to Ms Arias Thus, Ms Arias herby comes before this court to again request that the State provide Ms Arias with the data that TLSI sent to the Mesa Police Department as well as the result of the testing done by the Mesa Police Department. Finally, Ms Arias while not specifically asking for any materials or documents from TLSI at this time, she does so assuming the State's claim to be valid, however, she would assert that once said results are obtained by the State that pursuant to the authorities mentioned above she is entitled to them

RESPECTFULLY SUBMITTED this 11th day October, 2012

LAW OFFICES OF L KIRK NURMI

By   _s/ L. Kirk Nurmi_____
L  Kirk Nurmi
Attorney at Law
Attorney for the Defendant

Copy of the forgoing filed/Delivered

this 11th day of
October, 2012, to

Honorable Sherry Stephens
Judge of the Superior Court

Juan Martinez
Deputy County Attorney


By ~~S/ L  Kirk Nurmi~~
    L  Kirk Nurmi
    Attorney for the Defendant

Exhibit 57

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
Isabel Osuna
Filing ID 1498771
10/16/2012 4 58 34 PM

WILLIAM G  MONTGOMERY
MARICOPA COUNTY ATTORNEY

Juan M  Martinez
Deputy County Attorney
Bar Id #  009510
301 West Jefferson, 4th Floor
Phoenix, AZ  85003
Telephone  (602) 506-5780
Mcaomjc1@mcao Maricopa Gov
MCAO Firm #   00032000
Attorney for Plaintiff

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| THE STATE OF ARIZONA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs | ) |
| | ) |
| JODI ANN ARIAS, | ) CR 2008-031021-001 |
| | ) |
| Defendant | ) NOTICE REGARDING CONTACT WITH |
| | ) TLSI INCORPORATED |
| | ) |
| | ) (Assigned to the  Honorable |
| | ) Sherry K  Stephens) |
| | ) |

The  State  of  Arizona,  by  the  undersigned  Deputy  County
Attorney,  gives  notice  regarding  the  only  individual  contacted  by
the Mesa Police Department at TLSI Incorporated

            Eddie Wiechman
            1220 Corporate Drive West
            Arlington  Texas 76006

            eddie@TLSI net
            (972) 263-0707

Submitted October  _16_ , 2012

            WILLIAM G  MONTGOMERY
            MARICOPA COUNTY ATTORNEY

BY /s/ _Juan M Martinez_
   /s/ Juan M  Martinez
   Deputy County Attorney

Copy mailed\delivered
October __16__, 2012,
to

The Honorable Sherry K  Stephens
Judge of the Superior Court

Laurence Kirk Nurmi
2314 East Osborn Road
Phoenix  AZ  85016

BY /s/ _____
   /s/ Juan M  Martinez
   Deputy County Attorney

2

Exhibit 58

Michael K. Jeanes  Clerk of Court
*** Electronically Filed ***
10/24/2012 8 00 AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2008-031021-001 DT                          10/18/2012


                                   CLERK OF THE COURT
HON  SHERRY K  STEPHENS                  C  McCain
                                          Deputy


STATE OF ARIZONA                     JUAN M MARTINEZ

v

JODI ANN ARIAS (001)                 KIRK NURMI
                                     JENNIFER L WILLMOTT

                                     EDDIE WIECHMAN
                                     TLSI INCORPORATED
                                     1220 CORPORATE DRIVE WEST
                                     ARLINGTON TX  76006



                COMPLEX CASE MANAGEMENT CONFERENCE

        9 42 a m

        Courtroom SCT8C

        State's Attorney        Juan Martinez
        Defendant's Attorney    Kirk Nurmi and Jennifer Willmott
        Defendant               Present

        Court Reporter, Mike Babicky, is present.

        A record of the proceeding is also made by audio and/or videotape

        LET THE RECORD REFLECT Detective Esteban Flores of the Mesa Police Department
is present and responds to questions from Court and Counsel

        Court and counsel discuss pretrial matters

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2008-031021-001 DT                                    10/18/2012

**IT IS ORDERED TLSI Incorporated shall provide a complete copy of its records regarding all work performed on computer hard drive #402873, including records of work that was not completed, to counsel for the State of Arizona, Juan Martinez and counsel for the defendant, Kirk Nurmi and / or Jennifer Willmott no later than 5 00 p m  on October 23, 2012  These records may be provided to counsel by e-mail or registered mail.**

IT IS FURTHER ORDERED Detective Flores shall release the hard drive to counsel for the defendant or a representative for counsel for the defendant  The parties' shall arrange the date and time of such transfer

IT IS FURTHER ORDERED affirming the Firm Trial Date of 11/19/2012 at 8 00 a m before the Master Calendar Assignment Judge in Courtroom 5B in the South Court Tower   All subpoenaed witnesses are to report to Courtroom 5B in the South Court Tower for trial and will be directed to the trial court from there

IT IS ORDERED setting next Status Conference on 10/30/2012 at 9 00 a.m  in this division

IT IS ORDERED setting time for hearing on motions for 10/30/2012 at 9 00 a.m  in this division

IT IS FURTHER ORDERED affirming prior custody orders

9 57 a.m   Matter concludes

This case is eFiling eligible  http //www clerkofcourt maricopa gov/efiling/default.asp Attorneys are encouraged to review Supreme Court Administrative Order 2011 140 to determine their mandatory participation in eFiling through AZTurboCourt

Exhibit 59

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
Isabel Osuna
Filing ID 1520637
11/1/2012 11 04 50 AM

WILLIAM G MONTGOMERY
MARICOPA COUNTY ATTORNEY

Juan M Martinez
Deputy County Attorney
Bar Id # 009510
301 West Jefferson, 4th Floor
Phoenix, AZ 85003
Telephone (602) 506-5780
Mcaomjc1@mcao Maricopa Gov
MCAO Firm # 00032000
Attorney for Plaintiff

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| THE STATE OF ARIZONA, | ) |
| Plaintiff, | ) |
| vs | ) CR 2008-031021-001 |
| JODI ANN ARIAS, | ) |
| Defendant | ) NOTICE REGARDING RECEIPT OF THE MIRROR IMAGE HARD DRIVE FROM TLSI INCORPORATED |
| | ) (Assigned to the Honorable Sherry K Stephens) |

    The State of Arizona, by the undersigned Deputy County
Attorney, gives notice that on October 31, 2012, the Mesa Police
Department received a hard drive sent by TLSI Incorporated
purportedly containing the mirror image of the three platter
surfaces from Item No 402873  The State will disclose a copy of
this hard drive immediately upon receipt of a blank terabyte hard
drive to be provided by defense counsel  On November 1, 2012, the
State notified defense counsel of the receipt of this item and the
need for the blank terabyte hard drive  *Exhibit A*

Submitted November ___/___  2012

WILLIAM G   MONTGOMERY
MARICOPA COUNTY ATTORNEY

BY /s/_____
/s/ Juan M  Martinez
Deputy County Attorney

Copy mailed\delivered
November ___/___, 2012,
to:

The Honorable Sherry K  Stephens
Judge of the Superior Court

Laurence Kirk Nurmi
2314 East Osborn Road
Phoenix, AZ  85016

BY /s/ _____
/s/ Juan M  Martinez
Deputy County Attorney

2

Exhibit A

CR 2008-031021

**Martinez Juan**

| | |
|---|---|
| **From:** | Martinez Juan |
| **Sent:** | Thursday November 01, 2012 8:16 AM |
| **To** | Jennifer Willmott (jwillmott@willmottlaw.com)  Laurence Nurmi' (nurmilaw@gmail.com) |
| **Subject:** | State v Arias, CR 2008-031021 |

On October 31 2012, the Mesa Police Department received a hard drive sent by TLSI containing what I assume is the mirror image of the three platter surfaces.  They will make a copy of that hard drive for my disclosure to you   However, in order to accomplish the duplication they will need a blank terabyte drive  Let me know when you can provide that blank terabyte to me so that the State can immediately disclose a copy of what was provided by TLSI

1

Exhibit 60

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
Isabel Osuna
Filing ID 1523868
11/4/2012 7 23 19 PM

WILLIAM G  MONTGOMERY
MARICOPA COUNTY ATTORNEY

Juan M  Martinez
Deputy County Attorney
Bar Id # 009510
301 West Jefferson, 4th Floor
Phoenix, AZ  85003
Telephone  (602) 506-5780
Mcaomjc1@mcao Maricopa Gov
MCAO Firm #  00032000
Attorney for Plaintiff

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| THE STATE OF ARIZONA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs | ) |
| | ) |
| **JODI ANN ARIAS,** | ) CR 2008-031021-001 |
| | ) |
| Defendant | ) **NOTICE OF DISCLOSURE OF MIRROR** |
| | ) **IMAGE HARD DRIVE FROM TLSI** |
| | ) **INCORPORATED (ITEM NO  402873)** |
| | ) |
| | ) (Assigned to the Honorable |
| | )  Sherry Stephens) |

The State of Arizona, by the undersigned Deputy County

Attorney, gives notice that on Friday, November 2, 2012, at 3 59

p m  defense counsel Jennifer Willmot provided the State with a

blank '2 TB external hard drive'  The prosecutor called Ms

Willmot to inform her that a copy of the hard drive sent by TLSI

Incorporated purportedly containing the mirror image of the three

platter surfaces would be available by approximately 5 30 p m  The

prosecutor offered to meet Ms  Willmot that afternoon to disclose

the hard drive  Ms  Willmot indicated that her schedule would not

allow her to meet with the undersigned prosecutor   The defendant's investigator was similarly unavailable making the disclosure impossible on November 2, 2012   Ms  Willmot indicated she would make arrangements on Monday, November 5, 2012, to obtain the hard drive from the prosecutor

Submitted November  4 , 2012

WILLIAM G MONTGOMERY
MARICOPA COUNTY ATTORNEY


BY /s/ _____
   /s/ Juan M  Martinez
   Deputy County Attorney


Copy mailed\delivered
November  4  , 2012,
to

The Honorable Sherry Stephens
Judge of the Superior Court

Jennifer Willmot
845 N  6th Avenue
Phoenix, Arizona 85006


BY /s/ _____
   /s/ Juan M  Martinez
   Deputy County Attorney

2

Exhibit 61

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
Isabel Osuna
Filing ID 1539565
11/15/2012 11 34 11 AM

WILLIAM G  MONTGOMERY
MARICOPA COUNTY ATTORNEY

Juan M  Martinez
Deputy County Attorney
Bar Id #  009510
301 West Jefferson, 4th Floor
Phoenix, AZ  85003
Telephone  (602) 506-5780
Mcaomjc1@mcao Maricopa Gov
MCAO Firm #  00032000
Attorney for Plaintiff

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| THE STATE OF ARIZONA, | ) |
| Plaintiff, | ) |
| vs | ) |
| JODI ANN ARIAS, | ) CR 2008-031021-001 |
| Defendant | ) **OBJECTION TO DEFENDANT'S** |
| | ) **MOTION TO COMPEL: RESULTS OF** |
| | ) **THE FORENSIC EXAMINATION** |
| | ) **CONDUCTED BY THE MESA POLICE** |
| | ) **DEPARTMENT CONDUCT (SIC) UPON** |
| | ) **ITEM NUMBER 402873 SINCE IT** |
| | ) **WAS REPAIRED BY TLSI** |
| | ) |
| | ) (Assigned to the  Honorable |
| | ) Sherry K  Stephens) |

The  State  of  Arizona,  by  the  undersigned  Deputy  County
Attorney,  objects  to  defendant's  request  that  the  court  order  the
State  to  disclose  "a  copy  of  results  of  the  Forensic  Examination
conducted  by  the  Mesa  Police  Department  upon  Item  Number  402873"
Defendant  is  asking  the  court  to  rule  on  an  issue  which  is  moot
and  the  court  should  deny  her  request   The  forensic  examination
report  of  the  mirror  image  from  TLSI  Incorporated,  Mesa  Police
Department  Item  No   402873,  was  already  disclosed  on  November  14,
2012,  one  day  before  defendant  filed  her  latest  pleading  seeking
its  production   *Exhibit A*

It is concerning that defendant fails to provide a complete record of the communication between counsel on this issue when she only attaches an excerpt of their conversation   She omits the portion of the State's electronic correspondence on November 13, 2012, at 3 12 p m  indicating "[t]here is a report prepared by Detective Brown which I will disclose once it is approved and provided to me " *Exhibit B*

It appears that defendant will stop at nothing in her quest for a continuance of the trial including stooping to a misrepresentation regarding disclosure   The court should allow this case to proceed to trial as scheduled on November 19, 2012

Submitted November  _15_ , 2012

WILLIAM G  MONTGOMERY
MARICOPA COUNTY ATTORNEY

BY  /s/ _____
    /s/ Juan M  Martinez
    Deputy County Attorney

Copy mailed\delivered
November  _15_ , 2012,
to

The Honorable Sherry K  Stephens
Judge of the Superior Court

Laurence Kirk Nurmi
2314 East Osborn Road
Phoenix, AZ  85016

BY  /s/ _____
    /s/ Juan M  Martinez
    Deputy County Attorney

2

# *Exhibit A*

## CR 2008-031021



# Maricopa County Attorney
### BILL MONTGOMERY

November 14  2012

(Please return to Phillip Quihuis, Homicide Bureau)
Juan Martinez

## RECEIPT OF DISCOVERY MATERIALS

On behalf of Jennifer Willmot, court appointed attorney  I accept the following as part of disclosure in <u>State v Jodi Arias</u>, CR2008-031021-001 DT

| Bates # | <u>Description</u> |
|---------|---------|
|         | One (1) CD containing report by Det. Brown on the examination of the mirror image of the three platter surfaces from TLSI incorporated |

Signature _____   Date _Nov 14, 2012_

Please Print Name _Jennifer Willmott_

<u>NOTE</u>  If any discovery consists of video or audio tapes  or compact discs, there <u>must</u> be a video  audio  or CD exchange brought in before discovery can be received

# *Exhibit B*

## CR 2008-031021

**Martinez Juan**

| | |
|---|---|
| **From** | Martinez Juan |
| **Sent** | Tuesday November 13 2012 4 25 PM |
| **To** | Jennifer Willmott |
| **Cc:** | Kirk Nurmi esteban flores@mesaaz.gov robert.brown@mesaaz gov' |
| **Subject:** | RE Review of Mirror Image |

As I have already indicated in my previous e mail sent today at 3 21 p m , there "is a report (analysis) prepared by Detective Brown which I will disclose once it is approved and provided to me " I am hopeful that I will be provided a copy tomorrow morning which will allow me to disclose it to you immediately

You have yet to respond to my request that you disclose the unredacted notes of Alyce LaViolette by bringing them tomorrow when we meet at the Mesa Police Department I previously attempted to pick those notes up on Friday November 9 at approximately 3 00 p m but your office was closed

---

**From** Jennifer Willmott [mailto:jwillmott@willmottlaw.com]
**Sent** Tuesday, November 13, 2012 4 08 PM
**To** Martinez Juan
**Cc:** Kirk Nurmi, esteban.flores@mesaaz.gov, robert.brown@mesaaz.gov'
**Subject:** Re Review of Mirror Image

## We have a mirror image of the hard drive, but we do not have a copy of the analysis conducted by Mesa PD to which we are entitled

Willmott & Associates PLC
845 N 6th Ave
Phoenix, AZ 85003
(t) 602 344 0034
(f) 602 344 0043

---

**From** Martinez Juan <MARTINEJ@mcao maricopa gov>
**To** Jennifer Willmott' <jwillmott@willmottlaw com>
**Cc** Kirk Nurmi <nurmilaw@gmail.com> "esteban.flores@mesaaz.gov" <esteban flores@mesaaz.gov>
"robert brown@mesaaz gov" <robert brown@mesaaz.gov>
**Sent:** Tuesday November 13 2012 4 03 PM
**Subject.** RE Review of Mirror Image

You have already been provided with a **mirror** image of the hard drive which contains **all** of the data

---

**From** Jennifer Willmott [mailto:jwillmott@willmottlaw.com]
**Sent** Tuesday November 13 2012 3 27 PM
**To** Martinez Juan
**Cc** Kirk Nurmi esteban.flores@mesaaz.gov 'robert.brown@mesaaz gov
**Subject** Re Review of Mirror Image

Why is it that Mesa will not be making a copy of what was found?

Willmott & Associates PLC
845 N 6th Ave
Phoenix, AZ 85003
(t) 602 344-0034

(f) 602 344-0043

---

From  Martinez Juan <MARTINEJ@mcao maricopa.gov>
To  Jennifer Willmott' <jwillmott@willmottlaw.com>
Cc  Kirk Nurmi <nurmilaw@t.mail.com> "esteban.flores@mesaaz.gov" <esteban.flores@mesaaz.gov>
   'robert brown@mesaaz.gov' <robert.brown@mesaaz.gov>
Sent. Tuesday November 13 2012 3 21 PM
Subject  RE  Review of Mirror Image

I have scheduled your request to view   the mirror image that Mesa PD was able to retrieve  for tomorrow (Wednesday),
November 14 at 9 00 a m   This will be conducted at the Mesa Police Department, 225 East First Street, Mesa  Arizona

As I have already indicated in court  the Mesa Police Department will not make a  disc/hard drive  copy of the data
contained in the hard drive for either you or the State   The reason we are meeting tomorrow is to allow you the
opportunity to view the Encase and FTK data located by Detective Robert Brown during his examination of the hard
drive   There is a report  prepared by Detective Brown which I will disclose  once it is approved and provided to me

---

From  Jennifer Willmott [mailto.jwillmott@willmottlaw.com]
Sent  Tuesday November 13  2012 2 06 PM
To  Martinez Juan
Cc  Kirk Nurmi
Subject  Review of Mirror Image

Juan

We are available to view the data from the mirror image that Mesa PD was able to retrieve on

Nov 14th in the morning
Nov 16th at any time

Of course we would like disc/hard drive copies once Mesa has made copies

Jennifer


Willmott & Associates  Pl C
845 N  6th Ave
Phoenix, AZ 85003
(t) 602 344-0014
(f) 602 344-0043


2

Exhibit 62

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
Isabel Osuna
Filing ID 1521419
11/1/2012 3 55 12 PM

L KIRK NURMI #020900
LAW OFFICES OF L KIRK NURMI
2314 East Osborn
Phoenix, Arizona 85016
602-285-6947
nurmilaw@gmail.com

JENNIFER WILLMOTT #016826
Willmott & Associates, PLC
845 N 6th Ave
Phoenix, AZ 85006
602-344-0034
jwillmott@willmottlaw com


## THE SUPERIOR COURT OF THE STATE OF ARIZONA

## IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| STATE OF ARIZONA, | CR- 2008-031021-001 |
| Plaintiff, | DEFENDANT'S RENEWED MOTION TO DISMISS AND/OR IN THE ALTERNATIVE TO DISMISS THE STATE'S NOTICE OF INTENT TO SEEK THE DEATH PENALTY DUE TO CONTINUED BRADY VIOLATIONS AND CONTINUED PROSECUTORIAL MISCONDUCT |
| JODI ARIAS | |
| Defendant. | (ORAL ARGUMENT REQUESTED) |
| | (Hon Sherry Stephens) |

Ms Arias, by and through, counsel and pursuant to the 5th, 6th, 8th and 14th Amendments to the United States Constitution, Article 2 § 4,15 and 24 of the Arizona Constitution and Rule 15 1, 15 6 and 15 7 of the Arizona Rules of Criminal Procedure herby requests that the charges against her be dismissed, or in the alternative, that the

State's Notice of Intent to Seek the Death Penalty and Notice of Aggravating Factors and Witnesses be dismissed.   In making this renewed assertion Ms Arias would assert that the State's recent misinformation regarding the item listed in Mesa Police Department reports as item #402873, amounts to a violation of the dictates of *Brady v Maryland*, 373 U S 83 (1963)  Ms Arias would further assert that this "Brady Violation" combined with other previous "Brady Violations' committed by the State combine to constitute prosecutorial misconduct that should be sanctioned and sanctioned harshly  To that end, Ms Arias asks that this court to dismiss the charges against her, or, in the alternative, dismiss the State's Notice of Intent to Seek the Death Penalty and Notice of Aggravating Factors and Witnesses  As this motion is based both upon violations that occurred months ago as well as those of more recent vintage, Ms Arias would request that this court view this request as cumulative and as an supplement to the "Motion to Dismiss Charges or in the Alternative, Motion to Dismiss Death Due to Brady Violations" (attached as Exhibit A) as well as Ms Arias' "Defendant's Renewed Motion To Dismiss Charges Or In The Alternative, Motion To Dismiss Death Due To Prosecutorial Misconduct And Recently Discovered Brady Violations" (attached as Exhibit B) which was argued in front of Judge Duncan on February 25, 2011 (transcript of the argument attached as Exhibit C)  Judge Duncan denied Ms Arias' motion on February 25, 2011 (Minute Entry attached as Exhibit D)  However, Ms Arias would assert that while these past violations might not have motivated Judge Duncan to impose sanctions, that there can be little doubt that the more recent misdeeds committed by the State warrant

2

sanctions   Support for this motion can be found in the attached Memorandum of Points and Authorities that is incorporated herein by reference

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   RELEVANT FACTS

A review of the motions filed during the pendency of this case will show that Ms Arias, despite the automatic disclosure provisions of Rule 15, Arizona Rules of Criminal Procedure, has been forced to file several motions to compel evidence   The subject matter of most, if not all of these motions, was Ms. Arias' desire to obtain evidence that was on the various computers owned by Mr Alexander and Ms Arias, their cell phones and their personal e-mail accounts   Ms Arias will not recount every detail in every motion as the Court can review the previous Motions to Compel and Attachments   Most significantly is that regardless of what Ms. Arias requested, the State objected, most often claiming that it was not in possession of the evidence at issue   Just months away from trial, the State took a similar position since Ms Arias requested a chance to test the hard drive in May of 2012   During previous Motions to Compel, the State ultimately was forced to turn over several e-mail messages and instant message conversations, during which Mr Alexander, amongst other things referred to Ms Arias as a "three whole wonder"   As well as text messages in which Mr Alexander continuously orders Ms Arias to send him lewd pictures of herself   These messages and other exculpatory

3

information found as a result of judicial action in defiance of the State's obstructionist efforts to prevent Ms Arias from obtaining this clearly exculpatory evidence are attached (Exhibit D)  Also of note is the fact that on October 30, 2012, this court failed to order disclosure of the hard drive. Further, this Court expressed an inclination to deny Ms Arias' Motion to Continue, despite the fact that the State has failed to disclose guilt phase evidence to which Ms Arias is entitled per *Brady* and sentencing phase evidence which also could be mitigating, making it evidence she has an absolute right to present should her case reach a sentencing phase *Eddings v Oklahoma* 455 U S 104, 102 S Ct. 869 (1982)

## II.   LAW AND ARGUMENT

### A.   THE STATE'S CONDUCT VIOLATES THE DICTATES OF *BRADY V MARYLAND*, 373 U S. 83 (1963) AS WELL AS RULE 15 1, OF THE ARIZONA RULES OF CRIMINAL PROCEDURE

As the saying goes, history often repeats itself  Since Ms Arias requested the opportunity to conduct her own testing upon item number 402873, in May of 2012, the history of obstructionist tactics that the State employed, in violation of *Brady* and Rule 15 1, Arizona Rules of Criminal Procedure, has in fact repeated itself  As Ms Arias pointed out in her recently filed Defendant's Motion To Continue Trial Currently Scheduled For November 19, 2012,

In May of 2012, Ms Arias filed a motion seeking to obtain possession of this hard drive so that she could conduct here own testing  On May 19, 2012, this Court ordered the State to make the hard drive available by June 1, 2012  The state claimed it needed approximately two weeks to find and make arrangements to have the hard drive available  At no time on May 19, 2012 did the state advise this Court or counsel that it intended to have the hard drive tested prior to making it available for the defense. On or about June 1,

4

{                                        (

2012, Ms Arias' agent went to the Mesa Police Department to obtain the hard drive While at the Mesa Police Department he was advised by Detective Flores that testing had been done on the hard drive and that images were obtained on 3 of the 4 parts of the hard drive  Based on this assertion, Ms Arias decided not to conduct her own testing until she had the results of the work that the State had purportedly performed because if the information listed above was already available, there would be no need for her to conduct further work.

To that end, on or about June 25, 2012, Ms Arias filed another motion to obtain "the results of any and all testing conducted by the State and/or its agents upon the Western Digital laptop drive and/or Accomdata drive contained in Mesa Police Department item number 402873  On July 12, 2012, this motion was discussed in court and the State informed the court and Ms Arias that "the item was sentenced over to an outfit in Texas and they were working on it  They began working on three of the images They hadn't begun work on the fourth image  But they hadn't been able to make a mirror image of any of it."(*See* Attachment A)  The State then claimed "I don't have anything to turn over "

Subsequent to this hearing based on the record made by the State on August 2, 2012, the State asserted, after claiming that defense counsel lived in a fantasy world, seemingly for believing Detective Flores, that "We still don't have anything.  And the reason I don't have anything is either that it isn't completed, hasn't been sent or I haven't been notified.  I suspect it's still probably being examined but that's a guess on my part." (*See* Attachment B)

On September 6, 2012, the State advised the court "Judge, there was an issue about the hard drive last time I checked on it  And as you know it was sent out to Texas I was told that there was a problem in getting a part in order to image the hard drive so that we could make it available to everybody  As of Tuesday, I believe, of this week they still had it and had not completed the work  So I indicated to the detective that he was to let them know that even if the part hadn't arrived or for whatever reason the part had arrived and they couldn't get the work done that they were to return it to the Mesa police department  And once the Mesa police department has it, defense Counsel could come by and pick it up '  *See* Attachment C, pgs 5-6

On September 13, 2012, the State, via Detective Flores, advised Ms Arias that TLSI had in fact imaged data as evidenced by the e-mail included below

**Esteban Flores< Esteban.Flores**                                    Thu, Sep 13, 2012 at 12 43 PM
**To Laurence Nurmi**

I just spoke to the representative of TLSI Inc. In Texas and he said they were going to ship the drive back to us tomorrow or Monday by the latest  As far as what they recovered  he couldn t say  He said they imaged data, but doesn t know what the data is. Once we get the data back to Mesa, my computer forensics unit will attempt to interpret the data. I ll update you as soon as I have more info.

On that same day Ms Arias asked for a copy of the imaged data, she received no response and assumed that the Mesa Police Department was still working on the imaged data and that disclosure would be forthcoming

Then, on October 16, 2012, the State changed its story and claimed that they received no imaged data or anything from TLSI and again made this assertion on October 18, 2012  Thus, months after making her motion Ms Arias has no results from the testing of the hard drive nor any information regarding what, if any, testing was done on this hard drive

On October 18, 2012 undersigned counsel contacted Mr Weichman at TLSI, Inc to request all records regarding TLSI's involvement with the hard drive pursuant to the this Court's order   On October 19, 2012, receiving no response from Mr Weichman, undersigned counsel called and left a voice mail message for him. On October 23, 2012, Ms Arias heard back from Mr Weichman via e-mail wherein he indicates, as Detective Flores had on June 1, 2012, that copies were made of three portions of the hard drive and that a fourth image was something that he was not able to obtain. Mr Weichman further indicated that the he had sent a copy of the hard drive to the State on October 23, 2012 Thus it seems that the fact that images were obtained from this hard drive were obtained in the real world as opposed to in the fantasy world that the State accused Ms Arias of being in when she accepted Detective Flores assertions as true, which they turned out to be (Attachments omitted)

The point of detailing these events being, had Ms Arias not made contact with TLSI there is no guarantee that the State would have complied with Rule 15 1, Arizona Rules of Criminal Procedure nor the dictates of *Brady v Maryland,* 373 U S  83 (1963) In fact, to date the evidence from TLSI has not been given to Ms Arias    Instead it seems that the State is continuing to engage in conduct that obstructs Ms Arias from gaining access to exculpatory evidence with the hope that this court will not continue the trial and thus leave Ms Arias in a position where she will still be investigating her case and formulating a theory of defense and mitigation during her trial  In this regard, Ms Arias would remind the court that on May 31, 2012, Detective Flores told Ms Arias that TLSI had imaged 3 of 4 sections of the hard drive  Ms Arias would further remind the court that in a "shocking" coincidence after Ms Arias made contact with TLSI 5 months later she learned that 3 of 4 of the drive's "platters" had been imaged  As it now stands,

6

Ms Arias is not aware of when these 3 images were obtained as she does not have the records this Court ordered TLSI to disclose that details their work. However, given what Detective Flores advised Ms. Arias of on May 31, 2012, she would assume that the images were made before May 31, 2012   It should be noted that when Ms Arias refers to images she is not referring to a singular image but instead an image of a hard drive which could contain thousands of photos, e-mails or other documents

Not satisfied with preventing Ms Arias from accessing these images sufficiently in advance of trial so that she could exercise the rights due her pursuant to the 5th, 6th, 8th and 14th Amendments to the United States Constitution, Article 2 § 4,15 and 24 of the Arizona Constitution, once Ms Arias learned that these images existed the State has still failed to provide Ms Arias with a copy pursuant to Rule 15 1, Arizona Rules of Criminal Procedure   The question then becomes, What if any sanctions should be imposed upon the State for its choice to prevent Ms Arias from gaining access to potentially exculpatory information that is in its possession in the manner detailed above?

Answering that question should seemingly begin with the reality that Ms Arias is entitled to the evidence at issue   In *Brady* the United States Supreme Court held that the prosecution must turn over to the defense any evidence within its possession that relates to the defendant's innocence or punishment.   Even though the hard drive and the imaged platters were in the physical custody of TLSI, the duty to disclose extends to any information within the possession of any attorney or agent of the prosecutor's office *Giglio v United States,* 405 U S  150 (1972), thus the law dictates that any arguments that assert that no violation occurred because the results were not physically located at

7

either the Mesa Police Department or the Maricopa County Attorney's Office be ignored. The question is not, if a *Brady* violation occurred but what response, if any is warranted.

Bearing in mind that, the prosecutor's duty to disclose information is especially great when specific information is requested by the defense   *Argus v  United States,* 427 U S  97 (1976)  Ms  Arias made several requests for the testing results obtained by TLSI, she asks this Court to bear in mind that Rule 15 7, Arizona Rules of Criminal Procedure dictates that sanctions for the failure to make disclosure include, (a)(2) dismissing the case with or without prejudice or  (a)(6) any other appropriate sanction.  Now admittedly, sanctions that limit the evidence are rarely imposed sanctions  *State v  Fischer*  141 Ariz. 227, 246, 686 P 2d 750 (1984), *Barrs v  Wilkinson,* 186 Ariz. 514, 924 P 2d 1033 (1996) The same can be said for the standards enumerated in the State's response for as *Barrs* points out;

> '[E]liminating a sentencing alternative is not the same as precluding a witness or other evidence from trial   Because the exclusion of proof can profoundly impact a case on its merits we have held such action to be suitable "only where other less stringent sanctions are not applicable to effects the ends of justice.'

*Barrs* at 516, *citing  State v  Fisher 141 Ariz  227, 246  686 P 2d 750  769(1984)*

Furthermore, as *Barrs* goes on to point out '[s]imilar concerns, however, are not present where the only potential "loss" to the criminal proceeding is a sentencing option." *Id at* 516,1035

8

(                                (

## B  THE STATE'S ACTIONS CONSTITUTE PROSECUTORIAL MISCONDUCT

The duty of a prosecutor "is not that shall win a case, but that justice is done " *In Re Peasley* 208 Ariz. 27, 90 P 3d 964 (2004) citing *Pool v Superior Court* 139 Ariz. 98, 103, 677 P 2d 261, 266 (1984)  Of further import is the fact that "a law enforcement agency investigating a criminal action operates as an arm of the prosecutor for the proposes of obtaining information that falls within the provisions of Rule 15 1" *Carpenter v Superior Court* 176 Ariz. 486, 490 862 P.2d 246, 250 (1993)  Thus, a *Brady* violation can occur even when the evidence is known only to the police investigators and not the prosecutor *Kyles v Whitley,* 514 U S 419 (1995) Additionally, an "individual prosecutor has a duty to learn of any favorable evidence known to others acting on the government's behalf in the case, including police *Id. at 437*  Furthermore, the State is required to disclose information in possession of any person who participated in the investigation. *State v Krone,* 182 Ariz. 319, 321 n.3, 897 P 2d 621, 623 n. 3 (1995)

## C. DISMISSAL OF THE INDICTMENT AND OF THE STATE'S NOTICE OF INTENT TO SEEK THE DEATH PENALTY AND NOTICE OF AGGRAVATING FACTORS AND WITNESSES IS APPROPRIATE GIVE THE VIOLATIONS COMMITTED BY THE STATE

Any sanction available to this court may be imposed if the failure to disclose can be attributable to any State actor involved in the prosecution. *State v Meza* 203 Ariz. 50, 50 P 3d 407 (2002)  In this regard it does not matter if the violation occurred based upon

9

the actions of the Maricopa County Attorney's Office, the Mesa Police Department or TLSI Incorporated. *Meza* is instructive on this point. *Meza* involved law enforcement officials hiding the ball relating to computer evidence over which they had exclusive domain. In *Meza* the trial court ordered suppression of the evidence at issue, evidence which was a key component to the State's case. Ms. Arias is not asking for the evidence to be suppressed as said evidence is exculpatory, thus, Ms. Arias would assert that the sanction imposed should be targeted at the State's misconduct that has affected Ms. Arias' ability to defend herself from the charges at issue as well as the State's Notice of Intent to Seek the Death Penalty and Notice of Aggravating Factors and Witnesses. To that end, Ms. Arias would assert that based on the nature of the violations and the fact that they are still occurring weeks before trial that dismissal of either the Indictment or the State's Notice of Intent to Seek the Death Penalty and Notice of Aggravating Factors and Witnesses is the appropriate remedy for the State's continuing misconduct.

### III    CONCLUSION

For the reasons mentioned above Ms. Arias would assert that pursuant to the 5th, 6th, 8th and 14th Amendments to the United States Constitution, Article 2 § 4,15 and 24 of the Arizona Constitution and Rule 15 1, 15 6 and 15 7 of the Arizona Rules of Criminal Procedure herby requests that the charges against her should be dismissed, or in the alternative, that the State's Notice of Intent to Seek the Death Penalty and Notice of Aggravating Factors and Witnesses be dismissed.

RESPECTFULLY SUBMITTED this 1ᵗ  day November, 2012

LAW OFFICES OF L  KIRK NURMI

By  _s/ L. Kirk Nurmi_
    L  Kirk Nurmi
Attorney for the Defendant

Copy of the forgoing filed/Delivered
this 1st  day of
November, 2012, to

Honorable Sherry Stephens
Judge of the Superior Court

Juan  Martinez
Deputy County Attorney

By S/ L. Kirk Nurmi
    L  Kirk Nurmi
Attorney for the Defendant

11

Exhibit 63

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
Isabel Osuna
Filing ID 1507761
10/23/2012 4 11 16 PM

L  KIRK NURMI #020900
LAW OFFICES OF L  KIRK NURMI
2314 East Osborn
Phoenix, Arizona 85016
602-285-6947
nurmilaw@gmail.com

JENNIFER WILLMOTT  #016826
Willmott & Associates, PLC
845 N  6th Ave.
Phoenix, AZ 85006
602-344-0034
jwillmott@willmottlaw.com

THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| STATE OF ARIZONA, | No  CR2008-031021-001 |
| | **DEFENDANT'S MOTION TO CONTINUE TRIAL CURRENTLY SCHEDULED FOR NOVEMBER 19, 2012** |
| Plaintiff, | |
| JODI ARIAS | (Hon. Sherry Stephens) |
| Defendant. | |

COMES NOW, Ms. Arias, by and through counsel, to request that, pursuant to the

Fifth, Sixth and Fourteenth amendments to the United States Constitution as well as Article

2 § 4 of the Arizona Constitution, hereby requests that her trial be continued for

approximately 6 weeks, to January 3, 2013, so that Ms Arias can conduct her own testing

upon the  Western Digital laptop drive and/or Accomdata drive contained in Mesa Police

Department item number 402873, so that the results of said testing can be analyzed by expert whom will be offering testimony on Ms. Arias behalf. The current last day is January 6, 2013, so the request at issue is within this time frame. Support for this motion can be found in the attached Memorandum of Points and Authorities that is incorporated herein by reference.

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   RELEVANT FACTS

Ms. Arias and the alleged victim, Mr. Alexander, were involved in a relationship, which lasted approximately two years. During the course of this relationship the two had a clandestine sexual relationship. As the sexual aspect of their relationship was clandestine, many aspect of that relationship cannot be offered as evidence other than through the testimony of Ms. Arias. However, Ms. Arias has reason to believe that support for the assertions she will make during trial can be found on the Western Digital laptop drive and/or Accomdata drive contained in Mesa Police Department item number 402873. In that Ms. Arias has a good faith belief that the item at issue contains, amongst other items, photos taken the day Ms. Arias and Mr. Alexander met, photos of the Christmas gifts that Mr. Alexander gave Ms. Arias in his effort to convince her to join the Mormon Church, photos from a vacation that Mr. Alexander took with Ms. Arias while he was dating another woman, pictures from other trips Mr. Alexander and Ms. Arias took together including a clandestine trip to Ehrenberg, Arizona, during which sexual encounters took place, text messages between the Ms. Arias and Mr. Alexander and pictures that Mr. Alexander sent to

2

Ms  Arias that contained images of his erect penis

In May of 2012, Ms  Arias filed a motion seeking to obtain possession of this hard drive so that she could conduct here own testing. On May 19, 2012, this Court ordered the State to make the hard drive available by June 1, 2012   The state claimed it needed approximately two weeks to find and make arrangements to have the hard drive available At no time on May 19, 2012 did the state advise this Court or counsel that it intended to have the hard drive tested prior to making it available for the defense. On or about June 1, 2012, Ms  Arias' agent went to the Mesa Police Department to obtain the hard drive   While at the Mesa Police Department he was advised by Detective Flores that testing had been done on the hard drive and that images were obtained on 3 of the 4 parts of the hard drive. Based on this assertion, Ms  Arias decided not to conduct her own testing until she had the results of the work that the State had purportedly performed because if the information listed above was already available, there would be no need for her to conduct further work.

To that end, on or about June 25, 2012, Ms. Arias filed another motion to obtain "the results of any and all testing conducted by the State and/or its agents upon the Western Digital laptop drive and/or Accomdata drive contained in Mesa Police Department item number 402873   On July 12, 2012, this motion was discussed in court and the State informed the court and Ms. Arias that "the item was [sentenced] over to an outfit in Texas and they were working on it   They began working on three of the images   They hadn't begun work on the fourth image.  But they hadn't been able to make a mirror image of any of it "(See Attachment A)  The State then claimed "I don't have anything to turn over "

3

Subsequent to this hearing based on the record made by the State on August 2, 2012, the State asserted, after claiming that defense counsel lived in a fantasy world, seemingly for believing Detective Flores, that "We still don't have anything. And the reason I don't have anything is either that it isn't completed, hasn't been sent or I haven't been notified. I suspect it's still probably being examined but that's a guess on my part." (*See* Attachment B)

On September 6, 2012, the State advised the court "Judge, there was an issue about the hard drive last time I checked on it. And as you know it was sent out to Texas. I was told that there was a problem in getting a part in order to image the hard drive so that we could make it available to everybody. As of Tuesday, I believe, of this week they still had it and had not completed the work. So I indicated to the detective that he was to let them know that even if the part hadn't arrived or for whatever reason the part had arrived and they couldn't get the work done that they were to return it to the Mesa police department. And once the Mesa police department has it, defense Counsel could come by and pick it up." *See* Attachment C, pgs 5-6

On September 13, 2012, the State, via Detective Flores, advised Ms Arias that TLSI had in fact imaged data as evidenced by the e-mail included below

Esteban Flores< Esteban.Flores                                    Thu, Sep 13  2012 at 12.43 PM
To  Laurence Nurmi

I just spoke to the representative of TLSI Inc. In Texas and he said they were going to ship the drive back to us tomorrow or Monday by the latest. As far as what they recovered, he couldn't say. He said they imaged data, but doesn't know what the data is. Once we get the data back to Mesa, my computer forensics unit will attempt to interpret the data. I'll update you as soon as I have more info

On that same day Ms. Arias asked for a copy of the imaged data, she received no

4

response and assumed that the Mesa Police Department was still working on the imaged data and that disclosure would be forthcoming.

Then, on October 16, 2012, the State changed its story and claimed that they received no imaged data or anything from TLSI and again made this assertion on October 18, 2012 Thus, months after making her motion Ms Arias has no results from the testing of the hard drive nor any information regarding what, if any, testing was done on this hard drive

On October 18, 2012 undersigned counsel contacted Mr Weichman at TLSI, Inc to request all records regarding TLSI's involvement with the hard drive pursuant to the this Court's order   On October 19, 2012, receiving no response from Mr Weichman, undersigned counsel called and left a voice mail message for him  On October 23, 2012, Ms Arias heard back from Mr Weichman via e-mail wherein he indicates, as Detective Flores had on June 1, 2012, that copies were made of three portions of the hard drive and that a fourth image was something that he was not able to obtain.  Mr Weichman further indicated that the he had sent a copy of the hard drive to the State on October 23, 2012  Thus it seems that the fact that images were obtained from this hard drive were obtained in the real world as opposed to in the fantasy world that the State accused Ms Arias of being in when she accepted Detective Flores assertions as true, which they turned out to be. *See* Attachment D

## II.    LAW AND ARGUMENT

Ms Arias is not in a position to determine if the representation made to her since she sought to test this hard drive back in May of 2012, approximately 5 months before trial, were intentionally misleading, but regardless of the intent several months have passed since Ms Arias made her initial request and during those months, Ms Arias was consistently led to believe that testing had been done and that images had been obtained. Now approximately one month before trial, the State asserted that they have no results, no paperwork, absolutely nothing However, on October 23, 2012, a representative from TLSI let the cat out of the bag and advised Ms. Arias that they had obtained images from three out of four areas of the hard drive  Thus, as it now stands, based on these misrepresentations, Ms. Arias is in a position where she will be forced to go to trial without her experts being able to analyze potentially exculpatory information, information that was in possession of the State and thus information she is entitled to pursuant to Rule 15 1, Arizona Rules of Criminal Procedure and <u>Brady v Maryland</u>, 373 U S  667 (1963)  Thus, Ms. Arias comes before the court seeking the time she needs to fulfill the request she made back in May of 2012  Of course, thanks to the misrepresentations that have been made in the past and the information Ms Arias obtained on October 23, 2012, now Ms. Arias is in a position where she is not sure, what was recovered and if she needs to do further work on the hard drive itself or simply the mirror image  That will be something for which expert assistance will be needed.

In ruling on this motion this court should be mindful of the rights due Ms Arias

6

pursuant to the Sixth Amendment to the United States Constitution which dictates that;

In all criminal prosecutions the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the state and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and caused of the accusation, to be confronted with the witnesses against him, to have compulsory process for obtaining witnesses in his favor, and to have the assistance of counsel for his defense.

This 6th Amendment right to counsel has been interpreted to mean the right to the effective assistance of counsel *See Generally* Strickland v. Washington 466 U S 668 (1984)   In this regard Ms. Arias would assert that she cannot claim the benefits due her pursuant to Strickland and its progeny if her attorneys are placed into a position that they cannot present the type of evidence that may be on this hard drive

Ms. Arias would also point out that  pursuant to the 5th and 14th Amendments to the United States Constitution are also of relevance here as pursuant to California v. ▓▓▓▓▓▓, 467 U S  479 (1984), Ms. Arias has the right to present a full and complete defense   Thus, she has the right to present the evidence at issue should she be able to obtain it.  Certainly, Ms Arias concedes that she does not know if any or all of the items listed above can be recovered from this hard drive when she tests the item at issue but in so conceding she would assert that not granting a continuance of minimal length so that the attempt can be made would violate the rights due her as mentioned above

Finally when considering the request at issue this Court must also be mindful that as the State is seeking the death penalty against Ms  Arias, the potential value of any evidence

7

must also be assessed for its value at any potential sentencing phase in that the 8th Amendment to the United States Constitution guarantees Ms Arias' ability to present any and all mitigating evidence that she sees fit to present. Eddings v. Oklahoma 455 U S 104, 102 S Ct. 869 (1982)

Pursuant to the minute entry dated September 24, 2012, the current last day for the case at hand is January 6, 2013  What Ms. Arias is then asking for is the minimal amount of time needed to be properly prepared for trial, a request that is within the timeframe at issue.

Should this request be denied, Ms. Arias would be denied the rights mentioned above simply because of the misinformation that the State has given Ms Arias since she made her initial request to test the hard drive at issue  In this regard any objection to this motion offered by the State should be placed in the proper context, in that the State's conduct has caused the need for this continuance

## III.   CONCLUSION

For the reasons mentioned above, not continuing the trial at issue for approximately 6 weeks until January 3, 2013 to a point in time at which Ms Arias can receive the full benefit of the rights she is due pursuant to the Fifth, Sixth and Fourteenth amendments to the United States Constitution as well as Article 2 § 4 of the Arizona Constitution, will result in a clear violation of these rights  Thus, Ms Arias asks this court, to ensure that she receives the full benefit of these rights by continuing the trial currently set for November 19,

2012

RESPECTFULLY SUBMITTED this 23rd day of October, 2011

By _/s/ L. Kirk Nurmi_____
L  KIRK NURMI
Counsel for Ms  Arias

Copy of the foregoing
Filed/Delivered this 23rd
day of October, 2012, to

THE HONORABLE SHERRY STEPHENS
Judge of the Superior Court

JUAN MARTINEZ
Deputy County Attorney

By _/s/ L. Kirk Nurmi_
L  Kirk Nurmi
Counsel for Ms  Arias

9

Exhibit 64

Michael K Jeanes Clerk of Court
*** Electronically Filed ***
01/15/2015 8 00 AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2008-031021-001 DT                                01/14/2015


                                        CLERK OF THE COURT
HON SHERRY K STEPHENS                        K Schermerhorn
                                             Deputy


STATE OF ARIZONA                        JUAN M MARTINEZ

v

JODI ANN ARIAS (001)                    KIRK NURMI
                                        JENNIFER L WILLMOTT

                                        CAPITAL CASE MANAGER


RULING

        The Court has considered the defendant's Motion to Dismiss the State's Notice of Intent
to Seek the Death Penalty Due to Defendant's Inability to Present a Complete Case for Life filed
September 26 2014 (with attachments), the defendant's Motion to Dismiss State's Notice of
Intent to Seek the Death Penalty Due to Continued Misconduct filed October 1, 2014, the State's
Objection to Motion to Dismiss State's Notice of Intent to Seek the Death Penalty Due to
Defendant's Inability to Present a Complete Case for Life filed October 6, 2014 the State s
Objection to Defendant's Motion to Dismiss Notice to Intent to Seek Death Penalty Due to
Continue State Misconduct filed October 10 2014, Motion to Dismiss State's Notice of Intent to
Seek the Death Penalty Due to Continue State Misconduct Supplement #1 filed October 24,
2014, the defendant's Motion to Dismiss All Charges with Prejudice and/or in the Alternative to
Dismiss the State's Notice of Intent to Seek the Death Penalty due to Recently Discovered
Purposeful and Egregious Prosecutorial Misconduct and Supplemental Containing Exhibit "A",
both filed on November 10, 2014, the State's Motion for Discover (Compaq Presario Computer)
filed November 13, 2014, the State's Motion for Sanctions (Compaq Presario Computer) filed
November 16, 2014, the State's Motion to Strike (Compaq Presario Computer) filed November
18, 2014, the State's Objection to Defendant's Motion to Dismiss All Charges with Prejudice
and/or in the Alternative to Dismiss the State's Notice of Intent to Seek the Death Penalty Due to
Recently Discovered Purposeful and Egregious Prosecutorial Misconduct filed on November 20,
2014 the Defendant's Response to State's Motion for Sanctions and State's Motion to Strike
filed November 20, 2014, the Defendant's Motion for Reconsideration Motion to Dismiss

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2008-031021-001 DT                                    01/14/2015

State's Notice of Intent to Seek the Death Penalty Due to Defendant's Inability to Present a
Complete Case for Life filed November 26, 2014, Objection to Defendant's Motion for
Reconsideration Motion to Dismiss State's Notice of Intent to Seek the Death Penalty Due to
Defendant's Inability to Present a Complete Case for Life filed December 1, 2014, the
Defendant's Supplemental Motion to Dismiss all Charges with Prejudice and/or in the
Alternative to Dismiss the State's Notice of Intent to Seek the Death Penalty Due to Recently
Discovered Purposeful and Egregious Prosecutorial Misconduct filed December 14 2014, the
evidence presented at the evidentiary hearings conducted on November 21 2014 and December
11, 2014, the exhibits admitted at the evidentiary hearing (Exhibits 1, 2, 3, 4  6, 7, 8, 9, 10, 11,
and 12), the oral argument conducted on December 11, 2014, the Objection to Defendant's
Supplemental Motion to Dismiss All Charges with Prejudice and/or in the Alternative to Dismiss
the State's Notice of Intent to Seek the Death Penalty Due to Recently Discovered Purposeful
and Egregious Prosecutorial Misconduct filed on December 22, 2014, the supplemental exhibit
to the Defendant s Motion for Reconsideration Motion to Dismiss State's Notice of Intent to
Seek the Death Penalty Due to Defendant's Inability to Present a Complete Case for Life filed
November 26, 2014 (filed under seal on January 5, 2015), the Supplement to State's Objection to
Defendant's Motion for Reconsideration  Motion to Dismiss State s Notice of Intent to Seek the
Death Penalty Due to Defendant's Inability to Present a Complete Case for Life (with
attachment) filed January 7, 2015 the Reporter's Transcript of Proceedings for Testimony of
Lonnie Dworkin dated February 4, 2013, the testimony of John Smith at the penalty phase retrial
on January 8, 2015 and January 14, 2015, the testimony of Detective Esteban Flores at the
penalty phase retrial on January 12, 2015, and the oral argument conducted on January 9, 2015

        Defendant seeks dismissal of all charges against her or, alternatively, the dismissal of the
Notice of Intent to Seek the Death Penalty, claiming there has been purposeful and egregious
prosecutorial misconduct.

        Prosecutorial misconduct is not merely the result of legal error  negligence  mistake  or
insignificant impropriety, but, taken as a whole  amounts to intentional conduct which the
prosecutor knows to be improper and prejudicial  *State v Aguilar*, 217 Ariz 235, 172 P 3d 423
(App  2007)  To prove prosecutorial misconduct, the proponent must show   (1) the State's
action was improper, and (2) a reasonable likelihood exists that the misconduct could have
affected the jury's verdict, thereby denying the defendant a fair trial  *State v Ramos*  235 Ariz
230, 330 P 3d 987 (App  2014), *State v Montano*, 204 Ariz. 413, 65 P 3d 61 (2003), *State v
Atwood*, 171 Ariz  576, 832 P 2d 593 (1992)  To prevail upon a claim of prosecutorial
misconduct, a defendant must demonstrate that the prosecutor's misconduct so infected the trial
with unfairness as to make the resulting conviction a denial of due process  Prosecutorial
misconduct sufficient to justify reversal must be so pronounced and persistent that it permeates
the entire atmosphere of the trial  *State v Edmisten*, 220 Ariz. 517, 207 P 3d 770 (2009)  There
is a distinction between simple prosecutorial error and misconduct that is so egregious that it

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2008-031021-001 DT                                01/14/2015

raises concerns over the integrity and fundamental fairness of the trial  *State v Minnitt*  203
Ariz  431, 438, 55 P 3d774 (2002), *Pool v Superior Court*, 139 Ariz  98, 105, 677 P 2d 261, 268
(1984)  Conduct is egregious when the material at issue was highly significant to the primary
jury issue with the potential to have an important effect on the jury's determination  *Donnelly v
DeChristoforo*, 416 U S  637, 647 (1974)  The prosecutor has a duty to learn of any favorable
evidence known to others acting on the government's behalf in the case, including the police  It
is the duty of the State as a whole to conduct prosecutions honorably and in compliance with the
law  *Kyles v Whitley*, 514 U S  419, 437 (1995)  The trial judge is in the best position to
determine the atmosphere of the trial, the circumstances surrounding the incident, the manner in
which any objectionable statement was made, and its possible effect on the jury and trial  *State
v Nelson*, 229 Ariz  180, 273 P 3d 632 (2012)  *State v Koch*, 138 Ariz  99, 673 P 2d 297 (1983)

The prosecutor has wide discretion in deciding whether to seek the death penalty
Allowing prosecutors the discretion to seek the death penalty is constitutional  *State v Roque*,
213 Ariz  193, 226, 141 P 3d 368 (2006), *State v Spears*, 184 Ariz  277, 291, 908 P 2d 1062
(1996)

Each allegation of prosecutorial misconduct claimed by Defendant Arias will be
discussed below

 1 Potential mitigation witnesses will not testify Defendant claims possible mitigation
witnesses will not speak with defense counsel and others will not testify at the penalty
phase retrial for fear of reprisal and/or "cyber-bullying"  Defendant provided
affidavits to support her claim in the attachments to the Motion to Dismiss State's
Notice of Intent to Seek the Death Penalty Due to Defendant's Inability to Present a
Complete Case for Life filed under seal on September 26, 2014  In addition, the
Court has reviewed the information provided in the sealed supplements filed on
January 5  2015 and January 7  2015  In the defendant's motion to reconsider filed
November 26, 2014, Defendant Arias argues the decision made by the Court of
Appeals on the special action has inhibited her ability to present a complete defense
of her life since potential defense witnesses cannot testify in sealed proceedings  This
Court disagrees  The ruling issued by the Court of Appeals does not address the
testimony of any witness other than the defendant.

There are many ways to address the concerns expressed by these potential witnesses
For example, it is possible that testimony of a potential defense witness could be
provided through the testimony of another witness  (See A R.S  § 13-751 (C), which
provides the prosecution or defendant may present any information that is relevant to
any mitigating circumstance regardless of its admissibility under the rules governing
the admissibility of evidence in criminal trials )  In fact, that has occurred during the

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2008-031021-001 DT                                     01/14/2015

penalty phase retrial   During the testimony of the defense expert witnesses, Dr
Miccio Fonsecca and Dr Robert Geffner, the defendant elicited information obtained
from some of the witnesses listed in the Motion to Dismiss State's Notice of Intent to
Seek the Death Penalty Due to Defendant's Inability to Present a Complete Case for
Life, filed under seal on September 26, 2014   Other options are available if a witness
is reluctant or refuses to appear and testify   Defendant could subpoena a witness to
appear in court   See A R S § 13-4071(A)(D)   The name of a witness could be sealed
to protect the privacy interests of that witness   Defendant could present information
from potential witnesses through the mitigation specialist   The testimony of
witnesses who testified at the first trial could be provided to the penalty phase jury
through transcripts or the video-recording made by the court's For the Record (FTR)
system   Alternatively, affidavits and video-taped statements of a witness could be
presented to the penalty phase retrial jury

The Court finds the defendant has failed to establish any misconduct by the State
throughout the course of these proceedings that has impaired or hindered the
defendant's ability to present mitigating evidence and/or prove mitigating factors
pursuant to A R.S § 13-751(C)   The Court finds no ground for dismissal of the
indictment or the Notice of the Intent to Seek the Death Penalty based upon this
claim

2   Text messages were not timely disclosed.   The State provided text messages sent or
received by the victim in October 2010 after initially indicating to the defendant that
these text messages were not available   Defendant argues there was exculpatory
content within these electronic messages which was contrary to the testimony of
Detective Flores at a hearing conducted in June 2010   As noted in the defendant's
motion filed October 1, 2014, many of the victim s text messages and e-mails were
admitted in evidence during the first trial   The defendant has reviewed many of the
victim s e-mails, text messages and g-mail messages in great detail with her expert
witnesses during the penalty phase retrial   Defendant has failed to establish the
failure to provide the victim's electronic messages earlier than October 2010 was for
any reason other than the messages were not available due to technological issues
The Court finds no ground for dismissal of the indictment or the Notice of the Intent
to Seek the Death Penalty based upon this claim

3   Defendant's rights were violated by the Maricopa County Sheriff's Office
Specifically, Defendant alleges three incidents support her claim   First, Defendant
alleges her jail cell was searched by jail personnel in February 2014   Second, in
February 2014, the mitigation specialist was denied entrance to the jail after taking
the defendant's drawings with her after a jail visit   Jail personnel deemed the

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2008-031021-001 DT                                    01/14/2015

drawings to be contraband   Finally, in May 2014, a legal document (a photocopy of a book) was taken from the defendant's cell during a jail search   Defendant "suspects" the book was copied and provided to the prosecutor

These matters were previously addressed by the Court.  Defendant cannot show the searches were other than routine searches conducted as part of security protocols at the jail   Defendant cannot show any prejudice to her case as a result of these jail searches   Defendant failed to provide any evidence to support her allegation that the book taken from her cell was photocopied and/or provided to the prosecutor   With regard to the mitigation specialist, the matter was resolved within a one week period and the mitigation specialist was permitted to resume visits with the defendant.  See minute entry dated May 27  2014   The Court finds no ground for dismissal of the indictment or the Notice of the Intent to Seek the Death Penalty based upon these claims

4   <u>Inconsistent testimony was given by Detective Flores regarding the sequence of injuries sustained by the victim</u>   The defendant argues it was prosecutorial misconduct for the prosecutor to elicit testimony from the case agent, Detective Esteban Flores  regarding the sequence of injuries sustained by the victim at the *Chronis* hearing knowing his testimony was inconsistent with the testimony of the medical examiner   In January 2013, the defendant sought a new probable causing hearing (*Chronis* hearing) arguing that the testimony of Detective Flores at trial warranted a new probable cause finding on the aggravating factor alleged by the State   The Court denied the request for a new finding of probable cause by minute entry dated January 10, 2013   Defendant filed a special action with the Arizona Court of Appeals   The Court of Appeals declined jurisdiction

During the guilt phase, the defendant cross-examined both Detective Flores and the medical examiner about the sequence of wounds and the detective's testimony at the probable cause hearing in August 2009   During the penalty phase retrial  the defendant cross-examined both Detective Flores and the medical examiner about these issues   Detective Flores has testified and explained to both juries the reasons for his testimony in August 2009   The medical examiner has testified regarding his expert opinion on the sequence of wounds   It is for the jury to determine the credibility of witnesses   The defendant fully explored and argued her position on the sequence of wounds   The Court finds the defendant has failed to show any State misconduct with regard to Detective Flores' testimony   The Court finds no ground for dismissal of the indictment or the Notice of the Intent to Seek the Death Penalty based upon this claim

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2008-031021-001 DT                                    01/14/2015

5    There was a delay in providing the defendant with the mirror image of the hard drive
     to the victim's Compaq Presario computer created on June 11, 2008   The victim's
     body was discovered in his home on June 9, 2008   The victim's Compaq Presario
     laptop computer was found in the office of his home during the search that followed
     Detective Flores touched a key on the computer with a pen which awakened it from
     sleep mode   The computer was impounded as evidence on June 10, 2008   On June
     11, 2008, the Mesa Police Department made a mirror image of the Toshiba hard drive
     that was on that laptop computer   The State disclosed the laptop computer to the
     defense   On June 19, 2009  the laptop computer was turned on and accessed at the
     Mesa Police Department during a review-of-evidence meeting attended by attorneys
     representing the defendant   The case agent, prosecutor  and defense investigator were
     also present during that meeting

     On January 31, 2013, Lonnie Dworkin, an expert witness for the defendant, testified
     at the guilt phase trial that he had reviewed items at the Mesa Police Department,
     including item #390633, the Compaq Presario laptop computer that belonged to the
     victim   Mr  Dworkin testified he received a mirror image of the Toshiba hard drive
     for that computer from the Mesa Police Department.  According to Detective Perry
     Smith, who testified at the evidentiary hearing on December 11, 2014, that mirror
     image was created in December 2009  This mirror image contained changes made to
     the hard drive when it was awakened from sleep mode by Detective Flores on June
     10, 2008 and changes that occurred when it was turned on for review by defense
     counsel on June 19, 2009   At the guilt phase trial, Mr  Dworkin explained to the jury
     the procedure he followed to forensically examine the hard drive he received in the
     E01 file format, including the steps he took to recover lost or deleted folders   He also
     explained the method he used to retrieve the internet history   Mr  Dworkin provided
     testimony regarding when the laptop computer was accessed on June 4, 2008   See
     R T  January 31, 2013   On February 4, 2013  during cross-examination at the guilt
     phase trial, Mr  Dworkin testified he recalled seeing some pornography on the
     victim's computer but he was not asked to look for that type of information   See R T
     February 4, 2013, page 52, line 3 through page 54, line 3

     During an interview with a Mesa Police Department detective on December 10, 2014,
     reference was made to a mirror image of the victim's hard drive made by the Mesa
     Police Department on June 11, 2008   Defense counsel requested a copy of that mirror
     image   The State provided a copy of that mirror image to the defendant in December
     2014  According to one of the defendant s expert witnesses, Bryan Neumeister, when
     the victim's laptop computer was awakened from sleep mode on June 10, 2008, the
     computer downloaded updates that were not installed until it was turned on again
     This did not occur until June 19, 2009   Thus, the mirror image created on June 11,

Docket Code 019                        Form R000A                          Page 6

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2008-031021-001 DT                                          01/14/2015

2008 should contain the changes made to the hard drive after it was awakened from
sleep mode on June 10, 2008 prior to those changes being installed   There is also an
issue regarding files being over-written   The computer experts working with the
parties are still analyzing the mirror image of the victim's hard drive made in June
2008

On January 8, 2015, John Smith, a computer forensic expert witness hired by the
defendant, testified at the penalty phase retrial   Mr   Smith examined the mirror
images of the hard drive created on June 11, 2008 and December 12, 2009 as well as
the original hard drive seized by the Mesa Police Department on June 10, 2008   He
testified he had only 3 or 4 days to conduct a review of the June 11, 2008 mirror
image of the hard drive   He testified he found data sites containing pornographic
links to websites on the Toshiba hard drive.  Mr   Smith testified if he had more time
to analyze the hard drive it was possible he could have found more pornography
links   Mr   Smith testified that none of the images he reviewed were an exact image
of the Toshiba hard drive before it was awakened from sleep mode on June 10, 2008
However, the June 11, 2008 hard drive is the closest exact image.  The source
evidence and mirror images of the hard drive created on June 11   2008 and December
12, 2009 contained the same pornographic data sites   These data sites provide the
historical record to the pornographic sites visited or accessed by that computer   Mr
Smith testified he found artifacts or remnants of porn in the logs and history files   He
testified he found no pornographic photographs, videos or other pornographic media
on the hard drive   There was no indication data had been manipulated on that hard
drive   Mr   Smith also testified the mirror images of the hard drive he reviewed were
automatically modified or altered by the computer on June 10, 2008 and June 19,
2009 but the data files containing the pornographic links were still present after the
alterations   Mr   Smith testified that the victim's laptop computer contained numerous
cleaner programs   The goal of these programs is to clean the computer and make it
run more efficiently   These programs clean the registry and internet history and can
be set to run at a regularly scheduled time or can be run manually

On January 14, 2015, Mr   Smith testified that a modification to a hard drive does not
change the data on the registry tables   No evidence files were deleted and the history
or cookies were not affected when the hard drive was accessed on June 10, 2008 or
June 19, 2009   The files that were modified or overwritten were the operating files

Defendant claims the failure to provide the defendant with a copy of the mirror image
created on June 11, 2008 prior to December 2014 was an intentional disclosure
violation   Further, Defendant claims that mirror image contains exculpatory
evidence   No testimony was provided at the evidentiary hearing to explain why the

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2008-031021-001 DT                                        01/14/2015

Mesa Police Department provided Mr Dworkin with a hard drive of the victim's
computer created on December 12, 2009  The Court has no basis to find the Mesa
Police Department withheld evidence or refused to provide a copy of any evidence to
Mr Dworkin  To the contrary, a mirror image of the victim's computer was given to
Mr Dworkin  As he testified at the trial, the focus of the defense at that time was not
on the pornography contained on the victim's computer  Rather, the focus was on the
timeline of events that occurred on June 4, 2008  Mr Dworkin was able to testify
about those matters at the guilt phase trial  During cross-examination at the guilt
phase trial, Mr Dworkin testified he had been interviewed by the prosecutor about
the pornography on the victim s computer but it had been two years earlier and he
could not recall specific details or what he had stated during that interview  Exhibit
9 from the evidentiary hearing conducted on December 4, 2014, the Chain of Custody
log maintained by the Mesa Police Department, shows that Detective Melendez and
Detective Rios removed the computer from the evidence room on June 11, 2008,
stating the evidence was out for investigation  Defense counsel and their expert
witnesses received a copy of this log  Mr Dworkin discussed protocols he followed
for examining hard drives  As a computer forensic expert, he would have been aware
that it is routine for law enforcement to make a mirror image of the hard drive

Detective Melendez was interviewed by defense counsel prior to trial and testified at
the guilt phase trial and the penalty phase retrial  He was examined about his review
of the laptop computer hard drive  There is no evidence he intentionally hid the
existence of the June 11, 2008 mirror image or failed to provide a copy of the mirror
image created in June 2008  According to the defense expert, John Smith, the content
on the original hard drive (the "source evidence ") and all mirror images is the same
with regard to the pornographic data sites to which Mr Smith testified  In fact, the
source evidence and June 11, 2008 mirror image are the same

Defendant argues that failure to provide the June 11, 2008 mirror image could have
affected the jury's verdict in the guilt phase trial because the State argued during
closing argument that there was no corroboration for the defendant s claim that she
saw the victim viewing child pornography on his laptop computer  That issue is not
properly before this Court. However, Mr Dworkin testified at the guilt phase trial he
had seen pornography on the laptop  Thus the defendant had the opportunity to
pursue the issue during the guilt phase trial  The defendant has an expert witness who
testified at the penalty phase retrial about the pornography links he found on the
victim's computer  The State may present evidence disputing the findings of that
expert. However, the penalty phase retrial jury will have the benefit of the testimony
about the contents found on the victim's computer hard drive in evaluating the

Docket Code 019                       Form R000A                        Page 8

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2008-031021-001 DT                                    01/14/2015

defendant's testimony about what she says she observed the victim doing on January 21, 2008 as well as the testimony of the defendant's expert witnesses

The original laptop computer and hard drive were disclosed by the State and available for analysis by defense expert witnesses   The evidence at issue was on the source evidence (the original hard drive) and mirror images created from the source evidence   The penalty phase retrial is ongoing   If the defense expert finds additional evidence after further review of the 2008 mirror image, he can be recalled as a witness   Dismissal of the notice of intent to seek the death penalty is not an appropriate sanction for a discovery violation of this nature   The Court finds no ground for dismissal of the indictment or the Notice of the Intent to Seek the Death Penalty based upon this claim

6   <u>Social media postings by the case agent's wife prejudiced the defendant</u>   Defendant alleges the case agent, Detective Flores   provided non-public details about the case to his wife who "tweeted" her opinions on social media.   In addition, Detective Flores' wife supposedly posted a video on You Tube which Defendant Arias describes as a mock movie trailer about the case   Defendant also provided copies of other social media exchanges in which the parties discussed trial matters including a claim that the defendant had a buddy write for her "in prison to create evidence for her story "   See attachments to Motion to Dismiss State's Notice of Intent to Seek the Death Penalty Due to Continued State Misconduct, Supplement #1 filed October 24  2014   No testimony was provided at the evidentiary hearing regarding these claims   Defendant relies on the attachments to her motion filed on October 1, 2014 as support for her allegations   The Court has reviewed those attachments

The Court finds the defendant has failed to establish that Detective Flores provided information to his wife about the case that was not public information   The attachments to the motion indicate Ms Flores stated there "was much condemning evidence and situations that most ppl (sic) never heard by watching the trial, discusses the dismissal of a juror, and discusses a court assistant who allegedly made a derogatory statement about the prosecutor   The Court previously made a record about the matter involving the court assistant   The statement supposedly occurred in the courtroom, not a sealed proceeding   The court assistant denied making the statement   Whether there is any truth to the other statements purportedly made by the detective's wife in her posts is unclear   The Court does not take lightly the allegation that Detective Flores provided non-public information to his wife about the case   Detective Flores has testified numerous times about a variety of issues related to this case   Defense counsel has not questioned him about these matters or provided any other evidence that would permit this Court to find he violated any court orders

Docket Code 019                        Form R000A                        Page 9

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2008-031021-001 DT                                    01/14/2015

Additionally, some of the information referenced in the attachments may have been
discussed in open court and thus there was no violation   There have been numerous
court hearings on this case, including hearings in chambers and sealed hearings   This
Court cannot recall all of the details of those hearings   Without transcripts or
testimony by individuals present at those hearings, this Court has insufficient
information to find a violation of the court's orders

The Court is unaware of any legal reason the detective s wife should be restricted
from providing her opinion or commenting about the case on social media.  Even if
the court had evidence that Detective Flores had discussed matters from a sealed
proceeding with his wife, Defendant has failed to show that it affected her case in any
way   The penalty phase retrial jurors were questioned about any prior knowledge of
the case including information obtained through the media.  None of the jurors
indicated any knowledge about these social media exchanges   Defendant does not
allege how her case was prejudiced by these incidents   The Court finds no ground for
dismissal of the indictment or the Notice of the Intent to Seek the Death Penalty
based upon this claim

7   <u>Detective Flores allegedly commented or provided information to the press about the
    dismissal of a juror</u>   No testimony was provided at the evidentiary hearing about this
    claim   Exhibit G to the defendant's motion filed on October 1, 2014 contains a social
    media message allegedly from the detective s wife referencing a conversation with a
    juror that occurred in chambers   It is unknown how the information was provided to
    Ms Flores.  Defendant presumes the information came from the detective   Defendant
    does not allege how her case was affected by the social media statement.  Even if the
    detective had discussed a sealed matter with his wife, Defendant has not shown that
    her case was affected in any way   The jurors empanelled for the penalty phase retrial
    were questioned about any knowledge about the case and none of them referenced
    any knowledge of this incident.  Based upon the information provided, the Court
    finds no ground for dismissal of the indictment or the Notice of the Intent to Seek the
    Death Penalty based upon this claim

8   <u>The Maricopa County Sheriff made harassing comments about the defendant to the
    media.</u>   Defendant claims the Maricopa County Sheriff responded to media inquiries
    about a pleading allegedly filed by the defendant and those responses were intended
    to harass the defendant   A document was filed with the federal court alleging
    violations of law relating to Defendant Arias   The document, purportedly filed by or
    on behalf of the defendant, alleged various ways Defendant Arias had been
    improperly treated while in custody   The media apparently contacted the Maricopa
    County Sheriff seeking his response to the allegations   The sheriff denied the

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2008-031021-001 DT                                                01/14/2015

allegations in the document. It is unclear whether the sheriff viewed any document prior to speaking with the media  However, the sheriff told the media that inmates are not required to state the pledge of allegiance in order to receive meals  The sheriff also stated he had no knowledge of a Hepatitis C infection at the jail  He denied that the defendant was videotaped while in the restroom and that he or his staff had intercepted letters from or to the defendant and provided them to the media  The sheriff also denied the allegation that the defendant was denied medical treatment while in the jail

Defendant now asserts she was harassed by the sheriff's comments  This situation occurred after the first trial and before the penalty phase retrial began  Defendant does not suggest that any information provided by the sheriff was inaccurate or misleading  During jury selection, the potential jurors for the penalty phase retrial were questioned about their knowledge of the case and any media coverage of the case  The defendant had an opportunity to question each potential juror about this incident. Knowledge of this incident was not reported by any of the jurors selected for the penalty phase retrial  Defendant has not shown any prejudice to her case from this incident  The Court finds no ground for dismissal of the indictment or the Notice of the Intent to Seek the Death Penalty based upon this claim

9   Detective Flores "awakened" the victim's computer from sleep mode on June 10,
    2008 resulting in the destruction of potential evidence   Defendant alleges that
    Detective Flores' actions in waking the computer from sleep mode at the crime scene
    caused changes to the hard drive of the victim s computer, destroyed potential
    evidence, and violated the written policy of the Mesa Police Department regarding
    handling seized computers  See paragraph 5 above  The State is required to disclose
    any exculpatory evidence that is favorable to the defendant and which may create a
    reasonable doubt in juror's minds regarding the defendant's guilt  See *Strickler v
    Greene*, 527 U S  263, 281 (1999), *State v Montano*, 204 Ariz  413, 424, 65 P 3d 61,
    72 (2003), *Brady v Maryland*, 373 U S  83 (1963), *Giglio v United States*, 405 U S
    150 (1972)  Failure to adhere to this requirement whether willfully or inadvertently
    by suppressing favorable evidence violates a defendant s due process rights  See
    *Brady* 373 U S  at 86 and *Giglio*, 405 U S  at 155  Based upon the testimony
    provided at the evidentiary hearing, the Court finds the defendant failed to establish
    that any exculpatory evidence was withheld or intentionally destroyed by the State
    when Detective Flores awakened the victim's computer from sleep mode at the scene
    of the crime  Detective Smith testified at the evidentiary hearing that changes to files
    made when a computer is brought out of sleep mode may go to unallocated space on
    the computer  Some files may be over-written  In this case, the State made a mirror
    image of the victim's computer the day after it was seized and again in December

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2008-031021-001 DT                                          01/14/2015

2009   A copy of the mirror images has been provided to the defendant   At the
penalty phase retrial, John Smith testified that the victim's computer contained
numerous anti-virus programs that regularly erased files from the victim s computer
The relevance of the victim's computer at the penalty phase retrial, according to the
defendant, is to corroborate the defendant's claim that she saw the victim viewing
pornography in January 2008   Mr Smith was able to locate such links on data sites
found on the victim's computer

There is no evidence establishing relevant, material data was deleted from the
victim's computer or that material evidence was destroyed   Some files may have
been updated and/or over-written   (Computer files for I-tunes and Southwest Airlines
were used as examples at the evidentiary hearing   Mr Smith testified that the
overwritten files were operating files)   Defendant failed to show how she was
prejudiced by the computer updating these files   As discussed above, at the guilt
phase trial, the testimony elicited by the defendant related to the events of June 4,
2008   The computer contained the information necessary to establish those facts   The
parties are still in the process of analyzing the mirror image of the victim s hard drive
made on June 11, 2008   Defendant has already presented such evidence to this
penalty phase retrial jury   Regarding the effect on the guilt phase trial, that issue is
not appropriately before the court at this time

Regarding the violation of Mesa Police Department Policy, Detective Flores and
Detective Smith testified that it was not a violation of policy for Detective Flores to
awaken the computer at the crime scene   However, Detective Smith acknowledged
the better practice would have been to remove the power source since cache files can
be deleted when a computer is awakened from sleep mode   See testimony of
Detective Perry Smith, December 11, 2014   Detective Flores testified on January 12,
2015 that it was common practice in 2008 for police seizing a computer to awaken it
from sleep mode   He was unaware that doing so could result in the modification of
files on the computer   Even if there was a violation of Mesa Police Department
policy, dismissal of the charges is not the appropriate sanction under the
circumstances of this case   The Court finds no ground for dismissal of the indictment
or the Notice of the Intent to Seek the Death Penalty based upon these claims

10 Evidence was possibly destroyed when the victim's computer was accessed on June
19, 2009   Detective Flores and the prosecutor were present when former defense
counsel for the defendant viewed the victim's computer on June 19, 2009   Turning
on the computer at that time changed the hard drive on the victim's computer   The
Mesa Police Department made a mirror image of the victim's computer on June 11,
2008, the day after the victim's computer was seized   Any changes that were made to

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2008-031021-001 DT                                          01/14/2015

the hard drive as a result of turning on the computer without a write blocker on June 19, 2009 will not affect the content of the mirror image created on June 11, 2008 The Court finds no ground for dismissal of the indictment or the Notice of the Intent to Seek the Death Penalty based upon this claim

11   Prior attorneys for the defendant were ineffective   Defendant claims her former attorneys were ineffective on June 19, 2009 when they permitted the victim's computer to be turned on without proper precautions being taken to preserve evidence on that computer   As noted in paragraphs 5 and 10 above  a mirror image of the victim's computer hard drive was made on June 11, 2008   Any error that occurred because defense counsel accessed the computer on June 19, 2009 was harmless since the information on the victim's computer was preserved on that mirror image   The defendant has not established any prejudice to her case   The Court finds no ground for dismissal of the indictment or the Notice of the Intent to Seek the Death Penalty based upon this claim

12   Detective Melendez testified at trial and the penalty phase retrial that he found no pornography or viruses on the victim's computer   Detective Melendez testified at the guilt phase trial on April 23, 2013 that he examined the internet history on the victim's computer and found no adult sites   He testified he looked at the computer files and found no images of children   At the penalty phase retrial, Detective Melendez testified he found no pornography or viruses on the victim s computer The defendant has one or more expert witnesses who analyzed the mirror image of the hard drive to the victim's laptop computer   Lonnie Dworkin examined the hard drive to the victim's laptop computer and testified on behalf of the defendant at the guilt phase trial   See paragraph 5 above   John Smith testified at the penalty phase retrial that there were pornography links found on data sites   In addition, he found viruses or malware on the victim's computer

Detective Melendez was subject to cross-examination at all proceedings at which he testified and can be recalled by the defense at the penalty phase retrial   Defendant could have called witnesses to dispute his findings at the guilt phase trial   The defendant presented evidence to the penalty phase retrial jury on this issue   It is the role of the jury to resolve any factual disputes, evaluate the credibility of witnesses and determine the significance of the evidence   The Court finds no ground for dismissal of the indictment or the Notice of Intent to Seek the Death Penalty based upon this claim

13   Comments by the prosecutor during a bench conference were insulting and unprofessional   Defendant alleges the prosecutor made a comment to Defense

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2008-031021-001 DT                              01/14/2015

Counsel during a bench conference that was insulting and unprofessional   After the
verdicts were returned from the first trial, bench conferences were unsealed and
information from those bench conferences was publicized by the media   The specific
comment by the prosecutor was publicized

During the trial, the Court addressed this matter with counsel   The prosecutor
apologized to Defense Counsel   The prosecutor was quick to acknowledge his error
and regret   Nothing inappropriate was said before the jury and there is no basis to
find the prosecutor's comments affected the guilt phase verdict.  The Court found no
other sanction was appropriate under the circumstances   The penalty phase jurors
were questioned about their knowledge of the case and the media coverage   No juror
indicated any knowledge about this incident.  The Court finds no ground for dismissal
of the indictment or the Notice of the Intent to Seek the Death Penalty based upon this
claim

14   The prosecutor harassed a defense witness   Defendant alleges the prosecutor
harassed an expert witness at the guilt phase trial by suggesting the witness had
inappropriate feelings toward the defendant.   This matter was addressed during the
guilt phase trial   The State suggested an expert witness for the defendant had
developed personal feelings toward the defendant and lost his professional
objectivity   The prosecutor referred to a gift the witness gave to the defendant and
the number of visits (12) the witness made to see her as the basis for his questions
See cross-examination of Dr  Samuels on March 18, 2013   A party is entitled to
explore the bias, credibility and motive of witnesses   The prosecutor zealously cross-
examined the defense expert on these matters   Defense Counsel questioned the
witness about these issues on re-direct examination   The Court finds no basis to
conclude there was prosecutorial misconduct.  The Court finds no ground for
dismissal of the indictment or the Notice of the Intent to Seek the Death Penalty
based upon this claim

15   The prosecutor signed an autograph in front of the courthouse   Defendant claims the
prosecutor's action in signing the autograph prior to the jury returning with a verdict
during the guilt phase trial was misconduct   This matter was address by the Court
during the guilt phase trial   The prosecutor stated he walked outside the courthouse
and was unexpectedly confronted by someone who asked for an autograph   He was
surprised and complied without thinking about the significance   A photographer
captured the incident and it was published   The prosecutor stated he was no longer
using public entrances to the courthouse to avoid the situation recurring   While it was
a lapse of judgment for the prosecutor to provide an autograph under those
circumstances, there was no evidence this incident affected the verdict   The jurors in

Docket Code 019                    Form R000A                         Page 14

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2008-031021-001 DT                                      01/14/2015

the guilt phase trial were questioned regularly about media coverage of the trial   No juror acknowledged seeing or hearing anything about the incident.

The Court finds the defendant failed to demonstrate that the prosecutor's misconduct so infected the trial with unfairness as to make the resulting conviction a denial of due process (*State v Edmisten*, 220 Ariz 517, 524) or that the misconduct was so egregious that it raises concerns over the integrity and fundamental fairness of the trial (*State v Minnitt* 203 Ariz. 431, 438)   The Court finds no ground for dismissal of the indictment or the Notice of the Intent to Seek the Death Penalty based upon this claim

16   <u>Reluctance of witnesses to testify at penalty phase retrial</u>   Defendant claims that potential defense witnesses have refused to participate in the penalty phase retrial because they fear the prosecutor may make "improper personal attacks in court and inspire others to attack them outside court "  See page 19, defendant's October 1, 2014 Motion to Dismiss   A party has the right to challenge the credibility, bias and motive of a witness unless the court determines the probative value of the evidence is outweighed by the danger of unfair prejudice or will confuse the issues   See Rule 403, *Arizona Rules of Evidence*   If the challenge is objectionable, the opposing party has the right to object and the court will rule   In this case, the prosecutor has zealously cross-examined the witnesses.   The courtroom is open to the public   The court cannot control what the public and media report about what they observe in the courtroom   The Court has stated the defendant may request accommodations be made for witnesses who have concerns about testifying in this case   The Court has indicated it is willing to consider creative ways to protect the privacy interests of potential witnesses.   For example, the Court has previously permitted the defendant's expert witnesses to refer to individuals by their relationship to the defendant without using proper names   If a witness is unwilling to testify voluntarily  the defendant may subpoena that witness to testify to assure the jury has the benefit of the testimony   Alternatively, that testimony could be provided through an affidavit, videotaped statement or the testimony of the mitigation specialist or another witness   See paragraph 1 above     The Court finds no ground for dismissal of the indictment or the Notice of the Intent to Seek the Death Penalty based upon this claim

17   <u>The cumulative effect of the prosecutorial misconduct resulted in an unfair trial</u>   Defendant alleges that the cumulative effective of the prosecutor's misconduct has created an atmosphere in which the defendant cannot receive a fair trial in the penalty phase retrial thus requiring dismissal of the charges and/or dismissal of the Notice of Intent to Seek the Death Penalty   The defendant has filed numerous motions to

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2008-031021-001 DT                                01/14/2015

dismiss and made numerous motions for mistrial in this case   Many of those motions
alleged prosecutorial misconduct. The Court ruled on each motion  None of the
motions were granted  Since none of the motions were granted, the cumulative effect
of those allegations does not require dismissal of the charges or the Notice of Intent to
Seek the Death Penalty  This was a long trial, covered by the media from gavel to
gavel  Every action of the defendant, the attorneys, the victim family members, the
witnesses, the court, and court staff were subjected to intense and constant scrutiny
There may have been errors made, but those errors were not so egregious that they
create concerns about the integrity or fundamental fairness of the trial  See *State v
Minnitt* 203 Ariz  431, 438, 55 P 3d774 (2002), *Pool v Superior Court*, 139 Ariz  98,
105, 677 P 2d 261, 268 (1984)  The Court finds no ground for dismissal of the
indictment or the Notice of the Intent to Seek the Death Penalty based upon this
claim

**IT IS ORDERED** denying the defendant's Motion to Dismiss State's Notice of Intent to
Seek the Death Penalty Due to Continued Misconduct filed October 1, 2014, the defendant s
Motion to Dismiss the State's Notice of Intent to Seek the Death Penalty Due to Defendant s
Inability to Present a Complete Case for Life filed September 26, 2014, the defendant's  Motion
to Dismiss State's Notice of Intent to Seek the Death Penalty Due to Continue State Misconduct
Supplement #1 filed October 24, 2014, the defendant's Motion to Dismiss All Charges with
Prejudice and/or in the Alternative to Dismiss the State's Notice of Intent to Seek the Death
Penalty due to Recently Discovered Purposeful and Egregious Prosecutorial Misconduct filed on
November 10 2014, the Defendant's Motion for Reconsideration  Motion to Dismiss State's
Notice of Intent to Seek the Death Penalty Due to Defendant's Inability to Present a Complete
Case for Life filed November 26 2014, and the Defendant s Supplemental Motion to Dismiss all
Charges with Prejudice and/or in the Alternative to Dismiss the State s Notice of Intent to Seek
the Death Penalty Due to Recently Discovered Purposeful and Egregious Prosecutorial
Misconduct filed December 14, 2014

**IT IS FURTHER ORDERED** denying the State s Motion for Sanctions (Compaq
Presario Computer) filed November 16, 2014 and the State s Motion to Strike (Compaq Presario
Computer) filed November 18, 2014

Exhibit 65

1



1    IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

2    IN AND FOR THE COUNTY OF MARICOPA

3

4    STATE OF ARIZONA,

5                    Plaintiff,

6    vs                                    CR2008-031021-001

7                                          DT

8    JODI ANN ARIAS,

9                    Defendant

10

11

12

13                    Phoenix, Arizona
                      February 4, 2013

14

15

16    BEFORE    THE HONORABLE SHERRY K  STEPHENS,  JUDGE

17

18            REPORTER'S TRANSCRIPT OF PROCEEDINGS

19            TESTIMONY OF LONNIE DWORKIN
                      (Jury Trial)

20

21

22

23

24    JANELL ROSE, RPR, CSR
      Certified Court Reporter #50455
25    Prepared for   Juan Martinez
                     Maricopa County Attorney


SUPERIOR COURT

2

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

SUPERIOR COURT

3

APPEARANCES

On Behalf of the State

        Juan Martinez
        Maricopa County Attorney's Office


On Behalf of the Defendant

        Kirk Nurmi and Jennifer Willmott
        Attorney at Law




INDEX

| WITNESS | DIRECT | CROSS | REDIRECT |
|---|---|---|---|
| LONNIE DWORKIN | 3 | 42 | |

SUPERIOR COURT

54

1    A        Not without reviewing my notes    I would have to

2    review my notes    If you'd like I could

3    Q    You're now telling me that this may be in your

4    notes, or before you told me that you didn't review the

5    data, which one is it?

6    A        When I'm asked to provide --

7    Q    Sir, my question is which one is it, not a long

8    answer, if you don't mind

9    A        Can you reask the question?

10    Q    Sure

11        Is it that you didn't look in this computer for

12    any nudes, or is it that there weren't any?

13    A        I recall there was some pornography on the

14    computer   I don't recall if they were specifically just

15    women's breasts or if there was more pornography than that

16    or of a different nature than --

17    Q    Do you remember that we had an interview about

18    this issue and that we discussed it?

19    A        I remember we did have an interview a couple

20    years ago, yes

21    Q    And isn't it true that at that time you told me

22    that there was no pornography?

23    A        If I said that at that time, then I would stand

24    by that statement   I just don't have a specific knowledge

25    at this time

SUPERIOR COURT

55

1    Q    All right   So, you don't have any knowledge at
2  all at this time, is what you're trying to tell me?
3       A    Correct
4    Q    Okay   The hard drive, not the -- the one that
5  was broken, right?  I want to talk about that
6         That one you linked up to the defendant, Jodi
7  Arias, correct?
8       A    Yes
9    Q    So when we talk about that, let's talk about that
10 as the defendant's hard drive
11        With regard to that, you said it was damaged,
12 right?
13      A    Yes
14   Q    You don't know who damaged it, right?
15      A    Correct
16   Q    You don't know if it was the defendant who
17 damaged it, right?
18      A    I don't know who damaged it
19   Q    And you don't know what kind of damage it
20 sustained, right?
21      A    Correct
22   Q    And you don't know -- do you know that it was
23 seized up in Yreka, or do you even know does your records
24 reflect any of that?
25        Do you know where it was taken from by the

SUPERIOR COURT

Exhibit 66

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
Mary Martin
Filing ID 1514512
10/29/2012 9 46 55 AM

WILLIAM G MONTGOMERY
MARICOPA COUNTY ATTORNEY

Juan M Martinez
Deputy County Attorney
Bar Id # 009510
301 West Jefferson, 4th Floor
Phoenix, AZ 85003
Telephone (602) 506-5780
Mcaomjcl@mcao Maricopa Gov
MCAO Firm # 00032000
Attorney for Plaintiff

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| THE STATE OF ARIZONA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs | ) |
| | ) |
| JODI ANN ARIAS, | ) CR 2008-031021-001 |
| | ) |
| Defendant | ) **NOTICE REGARDING RELEASE OF** |
| | ) **COMPUTER HARD DRIVE, ITEM NO** |
| | ) **402873** |
| | ) |
| | ) (Assigned to the Honorable |
| | ) Sherry K Stephens) |

The State of Arizona, by the undersigned Deputy County Attorney, gives notice that the Mesa Police Department has again released the computer hard drive, item no 402873, to defendant's investigator  The item was turned over on October 25, 2012

Submitted October _____, 2012

WILLIAM G MONTGOMERY
MARICOPA COUNTY ATTORNEY

BY /s/ _____
/s/ Juan M Martinez
Deputy County Attorney

Copy mailed\delivered
October _____, 2012,
to

The Honorable Sherry K  Stephens
Judge of the Superior Court

Laurence Kirk Nurmi
2314 East Osborn Road
Phoenix, AZ  85016


BY /s/ _____
    /s/ Juan M  Martinez
    Deputy County Attorney

Exhibit 67



**STATE BAR OF ARIZONA**

Assistant's Direct Line  (602) 340-7272

January 7, 2016

**PERSONAL AND CONFIDENTIAL**

Carl F  Mariano
Lewis Brisbois Bisgaard & Smith, LLP
Phoenix Plaza Tower II
2929 N  Central Avenue, Suite 1700
Phoenix, AZ 85012-2761

**FILED**

JAN 0 7 2016

STATE BAR OF ARIZONA
BY _Sandra G Montoya_

**Re   File No**        15-1002
**Complainants** Marty Lieberman and Maria Schaffer
**Your Client**   Juan M  Martinez

Dear Mr  Mariano

Pursuant to Rule 55(b), Ariz  R  Sup  Ct , the charges filed against your client by Mr Lieberman and Ms  Schaffer have been investigated and, upon review by bar counsel, have been dismissed

This matter is being dismissed at this time as there is no clear and convincing evidence of an ethical violation by your client or his office  However, please be aware that the State Bar reserves the right to reopen this case in the event that new or additional evidence of misconduct becomes available regarding the *Arias* case

As your client knows, he was present for the entire June 19, 2009, defense inspection of evidence and did not witness any intentional tampering of evidence   While your client's statements in the subject motion in limine were not inaccurate, a reasonable reading of the pleading may leave the impression that the defense attorneys did have unsupervised access to the victim's computer   In the future, your client is reminded of the importance of ensuring that his statements, while accurate, do not leave an inaccurate impression of known facts.

Pursuant to Rule 53(b)(2), Ariz  R  Sup  Ct , the Complainants may object to this decision within ten (10) days of receipt of the dismissal letter  Any such objection will be referred to the Attorney Discipline Probable Cause Committee for a decision  You will be notified if an objection is filed

Sincerely,

Craig D  Henley
Senior Bar Counsel

CDH/ts

Exhibit 68

FILED

MAR 1 6 2016

STATE BAR OF ARIZONA

BY

**BEFORE THE ATTORNEY DISCIPLINE
PROBABLE CAUSE COMMITTEE
OF THE SUPREME COURT OF ARIZONA**

IN THE MATTER OF A MEMBER OF
THE STATE BAR OF ARIZONA,

JUAN M  MARTINEZ,
    Bar No  009510

        Respondent.

No  15-1002

**ORDER AFFIRMING DISMISSAL**

The Attorney Discipline Probable Cause Committee of the Supreme Court of Arizona ("Committee"), having reviewed this matter on February 12, 2016, upon Complainant's appeal pursuant to Rule 55(b)(2)(A)(ii), Ariz  R  Sup  Ct.

By a vote of 9-0-0, the Committee finds that the State Bar did not abuse its discretion in dismissing the charge in File No  15-1002

The Committee provides an explanation for its determination in the attached document

**IT IS ORDERED** affirming the dismissal of this matter

**DATED** this ___4th___ day of March, 2016

Lawrence F Wh___

Judge Lawrence F  Winthrop, Chair
Attorney Discipline Probable Cause Committee
of the Supreme Court of Arizona

Original filed this ___16th___ day
of March, 2016, with

Lawyer Regulation Records Manager
State Bar of Arizona
4201 N  24th Street, Suite 100
Phoenix, Arizona 85016-6266

Copy mailed this _17TH_ day of
March, 2016, to

Carl F  Mariano
Lewis Brisbois Bisgaard & Smith, LLP
Phoenix Plaza Tower II
2929 N  Central Avenue Suite 1700
Phoenix, AZ 85012-2761
Respondent's Counsel

Marty Lieberman
Maricopa Legal Defenders Office
222 N  Central Avenue Suite 8100
Phoenix, Arizona 85004-2531
Complainant

Maria L. Schaffer
Maricopa Legal Defenders Office
222 N  Central Avenue Suite 8100
Phoenix, Arizona 85004-2531
Complainant

Copy emailed this _17TH_ day
of March, 2016, to

Attorney Discipline Probable Cause Committee
of the Supreme Court of Arizona
1501 West Washington Street, Suite 104
Phoenix, Arizona 85007
E-mail  ProbableCauseComm@courts az.gov

Lawyer Regulation Records Manager
State Bar of Arizona
4201 N  24th Street, Suite 100
Phoenix, Arizona 85016-6266
E-mail  LRO@staff.azbar org

by _Chloe Stone_

# ATTORNEY DISCIPLINE PROBABLE CAUSE COMMITTEE

## COMMENT

## IN THE MATTER OF JUAN M. MARTINEZ

### FILE NO. 15-1002

The Supreme Court of Arizona Probable Cause Committee ("Committee"), established by Rule 50, Ariz. R. Sup. Ct., consists of six attorney and three public members appointed by the Chief Justice of the Supreme Court. Pursuant to Rule 55(b)(2)(A)(ii), the Committee provides the following comment.

The State Bar investigated Complainant's charge that Respondent engaged in misconduct during a trial including conspiring with the Mesa Police Department to tamper with a computer. The Committee carefully reviewed the information provided in the Report of Investigation and your response. The Committee concluded that there is not sufficient facts to demonstrate by clear and convincing evidence that Respondent's conduct is evidence of a rule violation or misconduct warranting discipline. Therefore, the Committee determined that an Order Affirming Dismissal is the appropriate disposition of this matter.

Exhibit 69

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

STATE OF ARIZONA,                )

            Plaintiff,        )   1 CA-CR 15-0302

        v                        )   CR2008-031021-001 DT

JODI ANN ARIAS,                  )

            Defendant         )

_____)

Phoenix, Arizona

August 7, 2009

BEFORE   THE HONORABLE SALLY S  DUNCAN

REPORTER'S TRANSCRIPT OF PROCEEDINGS

EVIDENTIARY HEARING

(Copy)

Scott A  Kindle, RPR
Certified Reporter No  50711

SUPERIOR COURT
Phoenix, Arizona

2

# A P P E A R A N C E S

For the Plaintiff

        JUAN M  MARTINEZ, Deputy County Attorney

For the Defendant

        MARIA L  SCHAFFER, Deputy Legal Defender

        GREGORY T  PARZYCH, Deputy Legal Defender

SUPERIOR COURT
Phoenix, Arizona

3

## INDEX OF EXHIBITS

| EX# | | MARKED | ADMITTED |
|---|---|---|---|
| 1 | | 4 | 8 |
| 2 | | 4 | 8 |
| 3 | | 4 | 8 |
| 4 | | 4 | 8 |
| 5 | | 4 | 8 |
| 6 | | 4 | 8 |
| 7 | | 4 | 8 |
| 8 | | 4 | 8 |
| 9 | | 4 | 8 |
| 10 | | 4 | 8 |
| 11 | | 4 | 8 |
| 12 | | 4 | 8 |
| 13 | | 4 | 8 |
| 14 | | 4 | 8 |
| 15 | | 4 | 8 |
| 16 | | 4 | 8 |
| 17 | | 4 | 8 |
| 18 | | 4 | 8 |
| 19 | | 4 | 8 |
| 20 | | 4 | 8 |
| 21 | | 4 | 8 |
| 22 | | 4 | 8 |
| 23 | | 4 | 8 |
| 24 | | 4 | 8 |
| 25 | | 4 | 8 |
| 26 | | 4 | 8 |
| 27 | | 4 | 8 |

## INDEX OF WITNESSES                    PAGE

ESTEBAN FLORES

Direct by Mr  Martinez                    6
Cross by Mr  Parzych                     33
Redirect by Mr  Martinez                 38
Recross by Mr  Parzych                   40

SUPERIOR COURT
Phoenix, Arizona

25

1     additional foundation for me right now is a different issue

2                    MR  PARZYCH   Okay

3                    THE COURT   I'm going to let this witness testify

4     Q    (By Mr  Martinez)  In terms of the anguish, did he

5     also indicate that this person was experiencing anguish at that

6     point?

7     A    Yes, he did

8     Q    There was discussion as to whether or not detective --

9     not -- but Dr  Horn believed in any sequence of the injuries,

10    correct?

11    A    Yes

12    Q    He did indicate that he was not certain as to which

13    came first, correct?

14    A    Correct

15    Q    But he did indicate that he believed that which of the

16    injuries came first?

17    A    Yes   The gunshot wound to the head

18                   MR  PARZYCH   Judge, I don't know if you want me to

19    continue to object to any opinion given without basis of his

20    opinion, the doctor's basis of the opinion   But what I guess

21    I'd like to make a record of is it's a continuing objection for

22    any -- with regard to foundation for any opinion the doctor gave

23    as hearsay through this witness without a basis of that opinion

24    Did that make sense?

25                   THE COURT   It does   But I'm going to ask you a

SUPERIOR COURT
Phoenix, Arizona

31

1    wound?

2         A    The one fatal stab wound is the one in the center

3    chest   There's one above it, and then there's a slice across

4    the neck

5         Q    And Dr  Fischione, did he indicate if he could tell

6    whether -- well, what's the one on top?  What is that?

7         A    That is a cut completely across the neck, a cut

8    carotid artery

9         Q    Did he indicate whether or not the -- sort of the

10   cutting of the throat from ear to ear was done before the stab

11   to the heart?

12        A    He indicated that the cut across the throat was last

13        Q    And would that also have been fatal?

14        A    Yes, it was

15        Q    As well as the one to the chest, correct?

16        A    Yes, it was

17        Q    Did he indicate that the stab wound to the chest that

18   although that was fatal, it did take some time -- he didn't know

19   exactly how much time -- for this individual to die?

20        A    Yes

21        Q    And during that time, he didn't know if he was

22   conscious or not, but if he was conscious, he would experience

23   pain and mental anguish?

24        A    Absolutely

25        Q    Exhibit 23 shows the chest but also the right part of

Exhibit 70

1  *2NT&RVIEW CONDUCTED ON 5/26/2011*
2
3
4
5
6
7        **INTERVIEW WITH DR. KEVIN HORN**
8              **Q=Kirk Nurmi**
9           **Q1=Victoria Washington**
10            **Q2=Juan Martinez**
11            **A=Dr Kevin Horn**
12
13
14  Q    I was expecting you to start start. Okay, uh, this is the defense interview with
15       Doctor Kevin Horn in State v Arias, 2008031021 Uh, counsel Kirk Nurmi is
16       here with co-counsel Victoria Washington, as well as Juan Martinez from the
17       county attorney's office and if you could just state your name for the tape.
18
19  A    Kevin Horn.
20
21  Q    Um, Dr Horn I kind of just, in terms of my questions, wanted to just kind of
22       follow along with your, uh, report, just kind of, um, talk about the different
23       wounds you observed.
24
25  A.   Okay
26
27  Q    On the victim All right. Um, we begin talking about the, um, wounds on the
28       head. We're just going to start from the top and make your way down. You
29       mentioned there are two oblique, linear, um, wounds on the head. Um,
30       actually if I could find your, um, for purposes of the tape, uh, I'll be showing
31       the doctor, uh, what has been Bates stamped 283  You mentioned in the, uh,
32       first, um, examination or, um, the - the - the, uh, head wounds  knife wounds
33       - to the left posterior  We're talking about the back of the head, correct?
34
35  A.   Uh huh. Yes
36
37  Q    And are we referring to these two here specifically in the upper, uh, left hand
38       corner diagram?
39
40  A.   Yes
41
42  Q    Okay Um, is there, um, anyway, uh, for you to determine, um, the angle
43       which those wounds were made? Were they made, you know, from behind?
44       Were they made.
45

| | | |
|---|---|---|
| 675 | | bit more speculative as compared to the wounds of the neck and the wound of |
| 676 | | the chest. |
| 677 | | |
| 678 | Q | And the decomposition affects your ability to assess the brain injury, is that. |
| 679 | | |
| 680 | A. | The brain is decomposed, yes. It becomes very soft, hemorrhage is a little less |
| 681 | | obvious in those sort of situations but usually if you've been shot through the |
| 682 | | skull you're going to see some hemorrhage associated with that just from the |
| 683 | | bullet passing near the brain, even if it doesn't actually go through it. And |
| 684 | | those are the things that cause concussion and loss of consciousness and brain |
| 685 | | contusion. And all those things become less visible in a decomposed body |
| 686 | | |
| 687 | Q | Okay  So based on the medical evidence before you then, do you have an |
| 688 | | assessment of - we've mentioned three wounds now this morning that could |
| 689 | | have possibly been fatal- the chest, the neck, and the gunshot  Do you have a, |
| 690 | | based on the medical evidence, do you have an opinion on the series in which |
| 691 | | those occurred? |
| 692 | | |
| 693 | A. | The, um, like I said, I think a shot to the head would have been incapacitating |
| 694 | | I don't think that person would have been struggling after being shot in the |
| 695 | | head so it's far more likely in my opinion that the stab wounds happened, um, |
| 696 | | while the person was still alive and moving, um, and probably culminated in |
| 697 | | the throat wound which would have been rapidly fatal  Um, the head shot may |
| 698 | | have been an afterthought. May have been a final act. |
| 699 | | |
| 700 | Q | Do you have any medical ev- so you believe that Mr  Alexander was dead |
| 701 | | when the body was shot? Is that what you're saying? |
| 702 | | |
| 703 | A. | That's possible. Or - or - or dying |
| 704 | | |
| 705 | Q· | Okay and what medical evidence is that based on? |
| 706 | | |
| 707 | A. | Just on the fact that he's got defensive injuries, um, which indicate the use of a |
| 708 | | knife at the same time and I think the gunshot to the head would have been |
| 709 | | incapacitating. So he wouldn't have been able to make - have those injuries on |
| 710 | | his hands unless they were deliberately made by the assailant. |
| 711 | | |
| 712 | Q | Okay  Let's talk about the, um, trajectory  You mentioned it being from right |
| 713 | | to left and downwards |
| 714 | | |
| 715 | A. | Yes |
| 716 | | |
| 717 | Q | Uh, and maybe if you need the pictures  What do you mean? I guess I have a |
| 718 | | tough time visualizing - visualizing left to right and downward. |
| 719 | | |

# Exhibit 71

1

1          IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

2              IN AND FOR THE COUNTY OF MARICOPA

3

4    STATE OF ARIZONA,                    )
                                          )
5                    Plaintiff,           )
                                          )
6               vs                        )   No   CR 2008-031021
                                          )
7    JODI ANN ARIAS,                      )
                                          )
8                    Defendant            )
                                          )
9    _____ )

10

11

12          REPORTER'S TRANSCRIPT OF PROCEEDINGS

13

14

15

16                    Phoenix, Arizona
                      January 10, 2013
17

18
              Before The Hon  Sherry K  Stephens
19

20          REPORTED BY

21          MICHAEL A  BABICKY, RPR
            Certified Reporter
22          Certificate No  50361

23          PREPARED FOR

24          MS  JENNIFER WILLMOTT
            COPY
25

2

1                              EXHIBITS

2

3

4          EXHIBIT NO                        PAGE NO

5

6          None marked

7

8                              WITNESSES

9

10         NATHAN MENDEZ

11                                                    Page

12         Direct examination                          4

13

14         ESTEBAN FLORES

15

16         Direct examination                          40

17

18

19

20

21

22

23

24

25

3

1              REPORTER'S TRANSCRIPT OF PROCEEDINGS,

2              was taken on January 10, 2013 at the

3    SUPERIOR COURT, MARICOPA COUNTY, 175 W  Madison,

4    Phoenix, Arizona, before MICHAEL A  BABICKY, a

5    Certified Reporter in the State of Arizona

6

7              COUNSEL APPEARING

8
                 For the Plaintiff
9
                 DEPUTY COUNTY ATTORNEY
10               BY   MR  JUAN M  MARTINEZ, Esq

11

12               For the Defendant

13
                 BY   MR  KIRK NURMI, Esq
14               BY   MS  JENNIFER WILLMOTT, Esq

15

16

17

18

19

20

21

22

23

24

25

1              MR  MARTINEZ   Objection, misstates his

2      testimony   He said he didn't know

3              THE COURT   Sustained

4      BY MR  NURMI

5          Q    You heard him also testify to some of the things

6      that we just talked about, about not losing consciousness,

7      how that was something that he would never have said   You

8      heard him say that?

9          A    Yes

10         Q    Okay   But that's what you testified to at the

11     hearing?

12         A    Yes

13         Q    Okay   And so this change of story is something

14     that you first heard about at trial?

15         A    No   It's not the first I heard of it

16         Q    Okay   When was the first time you heard this

17     story changed?

18         A    I don't remember   It might be several months

19     ago or a year ago

20         Q    What was the context?

21         A    I don't recall exactly but I know Dr  Horn had

22     gone and given an interview, I guess, with you and defense

23     Counsel   And something came out to me informing me of

24     what he stated during the interview

25         Q    Okay   Did you make any attempt to correct the

1   mistaken testimony you gave in 2009?

2       A    No   Because I told the truth and spoke to what

3   I believed at that time   I'm not about to change my

4   testimony

5       Q    But it was inaccurate?

6       A    It was not inaccurate   it was mistaken

7       Q    Mistaken?

8       A    That's my mistake   If I mistook his words or

9   misunderstood him, I'm not a doctor   And I'm not about to

10  give testimony on explaining the doctor --

11      Q    I'm not saying you're a doctor, Detective   I'm

12  not saying that at all

13           What I'm saying, we just talked about it,

14  about the importance of giving accurate testimony   And in

15  this hearing you were asked specifically if you talked to

16  Dr  Horn   You said, yes   You were asked if Dr  Horn had

17  an opinion of the sequencing of the injuries, right?

18      A    Yes

19           MR  MARTINEZ   Objection, asked and answered

20           THE COURT   Overruled

21  BY MR  NURMI

22      Q    They didn't ask you what do you think, Detective

23  Flores, what's your medical opinion, they didn't ask you

24  that, did they?

25      A    No

60

1    Q    They asked you, what was Dr  Horn's opinion?

2    And that's a pretty simple question, straightforward,

3    right?

4         A    Yes

5         Q    Okay   And so what you're telling us today is

6    that you substituted your judgment for his   Is that what

7    I'm hearing you say?

8         A    No   If I gave that testimony, it was a

9    misunderstanding of what Dr  Horn told me

10        Q    Okay   So it's inaccurate is what you're saying

11   today?

12        A    Yes

13        Q    Okay   And that's what I asked you a few moments

14   ago, did you take any steps to correct your inaccurate

15   testimony?  And you said, no, it wasn't inaccurate   It

16   was a misunderstanding?

17        A    Yes

18        Q    I'm confused   Well, is it inaccurate or is it a

19   misunderstanding, which is it?

20        A    Well, it's a misunderstanding of what Dr  Horn

21   told me

22        Q    Okay   It's a pretty big one, isn't it?

23        A    No   I don't believe so

24        Q    You don't believe so?  Okay   Judge, if we could

25   take a break at this point in time?

1    A    Yes

2    Q    And the second time under oath and giving sworn

3    testimony, you perpetrated the same misunderstanding, is

4    that correct?

5    A    Yes

6    Q    And then again you did it while being

7    interviewed on national television, is that correct?

8    A    Yes   That's what I believed

9    Q    Okay   Thank you, Detective

10    THE COURT   Redirect?

11

12                    REDIRECT EXAMINATION

13

14   BY MR  MARTINEZ

15    Q    Sir, with regard to the police report that was

16   shown to you in terms of the sequencing of the shots, take

17   a look at it again see whether or not anywhere in Exhibit

18   290 starting with DA 00018 and then going to the previous

19   page which is 17, whether or not you ever indicate a

20   sequencing of anything ever

21    A    No

22    Q    It doesn't indicate that does it?

23    A    No, it does not

24    Q    In fact with regard to that, do you talk about

25   the wounds that the victim received, yes or know?

1       A     Yes, I do

2            Q     Do you talk about the lacerations and the

3       puncture wounds and the length that they might be?

4       A     Yes

5            Q     Do you talk about whether or not there was

6       stippling to those wounds?

7       A     Yet

8            Q     Do you talk about a report as to which injuries

9       may have been fatal or not?

10      A     Yes

11           Q     Do you also talk about the knife wounds in the

12      back and how far they went in?

13      A     Yes, I did

14           Q     Do you talk about whether or not those were

15      fatal?

16      A     Yes

17           Q     Do you talk about whether or not the victim had

18      any defensive wounds to him?

19      A     Yes

20           Q     Do you talk about whether or not he attempted to

21      protect himself during the attack?

22      A     I did

23           Q     Do you talk about whether the fatal wounds

24      consisted of stab wounds to the center of the chest, did

25      you talk about that?

69

1    A    Yes

2    Q    Did you talk about what damage that wouldn't

3    caused?

4    A    Yes, I did

5    Q    And did you talk about whether or not the wound

6    to the throat was fatal?

7    A    Yes

8    Q    And then you also talk about the manner of

9    defendant, whatever it may have been, right?

10    A    Correct

11    Q    And anywhere there do you talk about sequencing

12    at all?

13    A    There's no sequencing in there at all

14    Q    This was written when?  Why don't you tell me

15    when this was written?

16    A    It was written in August of that year

17    Q    2008?

18    A    Yes

19    Q    Why don't you take a look at it and see what

20    date it was actually written?

21    A    It was written and submitted August 27th of 2008

22    at 4 29 p m

23    Q    And nowhere do you indicate any sequencing, do

24    you?

25    A    No