# EXHIBIT 31
# (part 4)

*Andriano v. Ryan*, Case No. CV-16-01159-PHX-
SRB Motion for Evidentiary Development

Exhibit 72



PROPERTY OF
MARICOPA COUNTY
DO NOT DUPLICATE

## OFFICE OF THE MEDICAL EXAMINER
**701 W Jefferson St.**
**Phoenix, AZ 85007**

## REPORT OF AUTOPSY

**DECEDENT**  Travis Victor Alexander            **CASE**  08-03532

**DATE OF EXAMINATION**  06/12/2008            **TIME**  0930 Hours

**PERSONS PRESENT AT EXAMINATION**
**Mesa Police Department.**
        Detective Esteban Flores #10477
        Detective Lisa Barientos #9221

---

### PATHOLOGICAL DIAGNOSES

I       Sharp force injuries, multiple
        A.      Stab and incised wounds of head, neck, and torso, multiple with
                penetration and hemorrhagic injury of superior vena cava near cardiac
                base
        B       Deeply incised wound of upper neck, with transection of airway and
                right jugular vein / carotid artery
        C       Multiple incised wounds of hands

II      Gunshot wound of head, without exit
        A.      Gunshot wound of entrance, right forehead, indeterminate range
        B       Perforation of inferior skull base, anterior fossa, and facial skeleton

**PATHOLOGIC DIAGNOSES CONTINUED**

---

**CAUSE OF DEATH**  Sharp force trauma of neck and torso
        **MANNER**  Homicide

07/15/08
**Date Signed**

KEVIN D HORN, MD
**MEDICAL EXAMINER**

100274

TRAVIS VICTOR ALEXANDER                                             08-03532

**PATHOLOGIC DIAGNOSES CONTINUED**

> C      No gunshot wound of exit
> D      Small caliber deformed projectile recovered from left cheek
> E      Wound track trajectory right to left and downwards

III     Blunt force trauma
>    A      Abrasions and contusions of extremities

IV      Decomposition, moderate

**REPORTED CIRCUMSTANCES OF DEATH**

According to reports, this man was discovered deceased in a state of decomposition in a shower stall in his residence with multiple apparent inflicted injuries. He was pronounced dead at the scene   He had no significant reported past medical history

**EXTERNAL EXAMINATION**

The body is received in a zippered body pouch secured by evidence seal #0282712

**CLOTHING AND PERSONAL EFFECTS**

None

**EVIDENCE OF MEDICAL INTERVENTION**

None

**EVIDENCE OF TRAUMA**

<u>SHARP FORCE INJURIES</u>

There are very numerous incised and stab wounds of the head, neck, torso, and extremities

Examination of the head reveals the following sharp force injuries.
- Two (2) oblique linear full thickness incised wounds of the right and left posterior scalp, each measuring 2 inches in length
- A 1 ¼ inch oblique stab wound of the lower scalp (over the mastoid process) below the earlobe of the right ear, with an apparent blunt 1/32 inch wide end posteriorly, with penetration into scalp and superficial upper right sternocleido-mastoid muscle
- A ¼ inch shallow incised wound of the anteromedial upper left forehead, within the hairline

,00275

TRAVIS VICTOR ALEXANDER                                          08-03532

- Incised and roughly triangular cortical defects of the right and left portions of the skull calvarium  corresponding to the incised defects described above

Examination of the neck reveals the following sharp force injuries·
- A gaping oblique deep incised wound across the anterior upper neck, 6 x 1 ½ inches with a lower right side (within 2 ½ inches inferior to the right external auditory meatus and 2 inches inferior to the left external auditory meatus), and transection/perforation of the entire upper airway  strap muscles of neck, right jugular vein, and right carotid artery
- A ¼ inch shallow stab wound of the anteromedial upper right neck, with penetration of subcutaneous adipose tissue only
- A 1 ¼ inch oblique stab wound of the lower anteromedial left neck, with penetration of lower medial attachment of left sternocleidomastoid muscle to manubrium
- A 1 inch oblique stab wound of the posterior left neck, with penetration of superficial posterior paraspinal neck muscles.

Examination of the torso reveals the following sharp force injuries
- A cluster of nine (9) stab wounds of the upper paramidline right and left sides of the back, ranging in size from ¾ to 1 ½ inches, within a 6 x 5 ½ inch area, all wounds display blunt and sharply incised ends, all wounds penetrate soft tissue of back and impact upon ribs and lateral aspects of vertebral bone (transverse laminae and vertebral bodies) without penetration of chest cavity
- A 1 inch oblique stab wound of the right paramidline neck base / upper back, with penetration into trapezius muscle
- A 1 inch horizontal stab wound of the upper paramidline left chest, which terminates at the level of the sternum
- A 1 ½ inch oblique stab wound of the paramidline right chest, with penetration / perforation of the costochondral junction near the sternum at the level of the 3rd and 4th right ribs, the wound extends to a maximal depth of approximately 3 ½ inches with penetration of the superior vena cava near the base of the heart, with a small amount of surrounding hemorrhagic in the mediastinal soft tissues and the pericardial sac of the heart  a portion of the costochondral cartilage encompassing the stab wound is excised and retained at the FSC for potential further analysis
- A deep transverse 2 inch incised wound across the lower right chest, below the nipple, with penetration of the lower portion of the right pectoralis muscle
- A 1 ¾ inch oblique stab wound of the left upper abdominal quadrant, with a near-tangential subcutaneous adipose tissue wound track (5 ¾ inches long), terminating in adipose tissue of the right lower abdominal quadrant; the abdominal cavity is not penetrated
- Two (2) very shallow parallel oblique incised wounds of the anterior right shoulder, measuring up to 1 ¾ inch

The hands were enclosed in paper bags prior to autopsy examination, removal of the bags and examination of the palmar and dorsal aspects of both hands does not reveal

00276

TRAVIS VICTOR ALEXANDER                                                08-03532

the presence of grossly apparent fine blood spatter or grossly apparent gunpowder
fragments  Nails are short and none appear acutely broken  apart from a cut portion of
the right thumbnail, as described below  Examination of the hands reveals several sharp
force injuries

- A ¼ inch incised wound of the palmar distal pad of the right thumb, with incision
  and loss of the lateral portion of the right thumbnail
- A deep 1 ½ inch incised wound across the left thenar eminence (palmar, with
  extension onto the dorsal left hand)  with deep penetration and partial severing of
  the musculature and tendons of the thumb base
- A 1 ¾ inch incised wound of the palmar webbing between the left thumb and
  index finger, with an adjacent separate ¾ inch linear incised wound
- A 1 inch incised wound across the dorsal surface of the distal inter-phalangeal
  joint of the left thumb

## GUNSHOT WOUND OF HEAD

There is a 1/8 inch circular gunshot wound of entrance over the anterolateral lower right
forehead, above the eyebrow  The wound is located 3 inches inferior to the crown of the
head and 1 ½ inches to the right of the midline forehead. There is a 1/8 inch wide equal
rim of marginal abrasion surrounding the wound  No soot, gunpowder stippling, or intact
gunpowder particles surround the wound

The wound track perforates the anterior frontal skull near the superior orbital bone and
traverses the right anterior fossa, without gross evidence of significant intracranial
hemorrhage or apparent cerebral injury (although examination of brain tissue is
somewhat limited by the decomposed nature of the remains)  The projectile re-enters
the facial skeleton near the midline and the wound track terminates in the left cheek

Palpation and incision of the left cheek reveals the presence of a deformed apparent
small caliber projectile  which is located 6 inches inferior to the crown of the head and 4
½ inches to the left of the anterior facial midline  The projectile is recovered,
photographed, and retained as evidence

There is no gunshot wound of exit.

The wound track trajectory is right to left and downwards

## BLUNT FORCE INJURIES

In addition to the injuries described above, the following blunt force injuries are
observed
- A ¼ inch abrasion of the proximal volar right forearm
- Two (2) blue-purple contusions of the right lower leg and knee
- Two (2) abraded lacerations of the lower lateral left heel and ankle
- A 2 inch blue-purple contusion of the medial malleolus of the left ankle

J00277

TRAVIS VICTOR ALEXANDER                                          08-03532

EVIDENCE COLLECTION

In addition to the projectile noted above fingernails and head hair are collected A modified sexual assault kit is collected (swabs of penis including urethra and swabs/smears of the oral cavity and the anus/rectal vault) No trauma or other abnormalities of the mouth, anus, or genitalia are observed grossly

**SCARS, TATTOOS AND OTHER IDENTIFYING BODY FEATURES**

None apparent

**GENERAL EXTERNAL EXAMINATION**

The unembalmed body is that of a slightly heavy-set Caucasian male 69 inches in length and weighing 189 pounds Rigor mortis is absent and livor mortis is red-purple and fixed over the posterior surface of the body   There is evidence of moderate decomposition as indicated by bloating, green discoloration, and multifocal skin slippage with purge exuding from the nose and mouth  The scalp hair is brown  The irides are brown  There are no lesions of the sclerae or conjunctivae  Facial hair is absent Dentition is natural and in adequate condition  The trachea is in the midline  The thorax is well developed and symmetrical. The abdomen is protuberant with no palpable intra-abdominal masses  The external genitalia are those of normal male  The pubic hair has been previously shaved  The testicles are bilaterally distended within the scrotum  The anus is atraumatic and unremarkable   The extremities are well developed and symmetrical with no significant cyanosis, clubbing, edema or deformity  The posterior aspects of the torso are symmetrical and display extensive trauma as previously described   General appearance is compatible with the reported age of 30

**INTERNAL EXAMINATION**

The body is opened by a standard Y-shaped thoracoabdominal incision   All viscera occupy their appropriate anatomic relationships   Subcutaneous adipose tissue ranges up to 3 5 cm in thickness over the abdominal wall   Serous surfaces are smooth and glistening throughout  In addition to the previously described right hemothorax, no other scant accumulations of decompositional fluids in all other body cavities

**CARDIOVASCULAR SYSTEM**

The 300-gram heart occupies its usual mediastinal site  The external configuration is unremarkable   The epicardial surfaces are smooth and glistening   All major vessels arise in their appropriate anatomic relationships   The coronary arteries arise normally and are distributed in a right dominant pattern with no significant atherosclerotic stenosis   The myocardium is diffusely soft, green-gray due to decomposition without areas of hemorrhage of gross scarring    No abnormal communications exist between the cardiac chambers   The cardiac valves have thin, pliable leaflets   The valve

J00278

TRAVIS VICTOR ALEXANDER                                                08-03532

circumferences are appropriate to the caliber of the cardiac chambers  The valve cusps and surfaces are free of fusion or vegetations

The aorta is of normal caliber with all major arterial branches arising in their appropriate anatomic relationship   Elasticity is normal  The intimal surfaces are smooth, without aneurysm formation or dissection   Apart from previously described traumatic injury of the superior vena cava and the carotid artery, no other vascular abnormalities are identified   No venous thrombi are present.

## RESPIRATORY SYSTEM

The lungs weigh 340 grams left and 280 grams right   The upper and lower airways are patent and of normal caliber   The pleural surfaces are smooth and glistening  The parenchyma is autolyzed dark red-purple, exuding moderate amounts of blood and intermixed frothy decompositional fluid   There are no areas of induration, consolidation, hemorrhage or gross scarring  The pulmonary vessels are patent and of normal caliber

## DIGESTIVE/HEPATOBILIARY SYSTEM

The oropharynx is grossly normal and unobstructed   The esophagus is of normal caliber with a smooth, white mucosal lining  The gastroesophageal junction is well defined  The stomach has diffusely flattened mucosal surfaces due to decomposition and the lumen contains approximately 25 mL of brown partially digested food fragments. No areas of ulceration, erosion, or hemorrhage or scarring are present  The small and large intestines are unremarkable  The appendix is present  The lobular tan pancreas is diffusely soften due to decomposition without areas of fat necrosis  gross hemorrhage or space-occupying lesions   The pancreatic ducts are indistinct due to the decompositional process

The 950-gram liver has a smooth intact capsule covering variegated brown to black autolyzed parenchyma   No localizing masses, lesions or areas of hemorrhage are evident on external or cut surfaces  The intrahepatic and extrahepatic ducts are patent and of normal caliber   The gallbladder is collapsed and empty   The gallbladder mucosa is autolyzed

## GENITOURINARY SYSTEM

The symmetric kidneys weigh left 150 grams and right 125 grams   They are similar  The capsules strip with ease from the smooth, softened red-brown autolyzed cortical surfaces.  The cortices are sharply delineated from the medullary pyramids.   The calyces, pelves and ureters are unremarkable   The renal vessels are patent and of normal caliber

The urinary bladder contains no urine   The mucosal surfaces are flat and pink-tan  The prostate and seminal vesicles are unremarkable

000279

TRAVIS VICTOR ALEXANDER                                    08-03532

## HEMATOPOIETIC SYSTEM

The 150-gram spleen occupies its usual anatomic site with an intact, smooth and glistening capsule covering predominantly liquified autolyzed dark purple to brown parenchyma  Regional lymph nodes have their usual distribution and appearance  Rib bone marrow is beefy, red, and unremarkable

## ENDOCRINE SYSTEM

The pituitary, thyroid, and adrenal glands are grossly not remarkable apart from autolysis

## NECK

The cervical spine is structurally intact.  The hyoid bone and thyroid cartilage are intact. There is extensive sharp force injury of the upper airway as previously described  Due to decomposition, there are no demonstrable remaining hemorrhages in the strap muscles or soft tissues of the neck  The upper airway is traumatized but patent.

## MUSCULOSKELETAL SYSTEM

The bony framework, supporting musculature and soft tissues are unremarkable  except as previously described

## NERVOUS SYSTEM

The scalp is reflected in the usual fashion revealing previously described injuries. The 1525-gram brain is covered by thin, clear, delicate leptomeninges  The dura mater and falx cerebri are intact  There is good preservation of cerebral symmetry with diffuse green-gray softening of parenchyma due to decomposition  Multiple serial sections of autolyzed brain do not reveal the presence of grossly apparent trauma, foreign bodies or previously existing natural disease  The atlanto-occipital articulation is grossly normal

## EVIDENCE

The following items of evidence are collected and inventoried and released to Conner #16166 of the Mesa Police Department  fingernail clippings and scrapings (right and left hands)  blood specimens  paper bags from right and left hands  known head hair, projectile from face, sexual assault kit (penile/urethral swabs  anal swabs and smears, oral swabs and smears), and body bag (including plastic tarp used to wrap body at scene)

A portion of the costochondral junction between the left ribs and the sternum includes a perforating stab wound in this location  This portion of the rib cage and sternal bone is

100280

TRAVIS VICTOR ALEXANDER                                      08–03532

excised and retained in formalin for potential further analysis   This piece of evidence is retained at the Office of the Medical Examiner

## TOXICOLOGY SPECIMENS

Samples of the following are collected and submitted for toxicological testing    pleural blood, gastric contents, kidneys, spleen, liver, thigh muscle, and brain

## MICROSCOPIC DESCRIPTIONS

**Ventricular myocardium (left, right, and septal), lung, liver, kidney**  Multiple microscopic sections are reviewed  There is marked postmortem autolysis artefact in all sections  limiting interpretation  The findings are consistent with the gross autopsy impressions and contribute no further significant pathologic diagnoses

## FINAL SUMMARY

Based on the autopsy findings and investigative history  as available to me, it is my opinion that Travis Victor Alexander  a 30-year-old Caucasian male, died as a result of sharp force trauma of the neck and torso

According to reports, this man was discovered deceased in a state of decomposition in a shower stall in his residence with multiple apparent inflicted injuries   He was pronounced dead at the scene   He had no significant reported past medical history

Examination revealed the decomposed remains of an adult male with numerous sharp force injuries (incised and stab wounds) of the head, neck, torso, and extremities, with significant injuries of the throat, jugular vein, carotid artery, and a major vein (superior vena cava) in the chest  There was a single penetrating gunshot wound of the head with injuries of the skull and face  Other injuries are detailed in the above report  There were no findings of significant natural disease

No alcohol (beyond a trace amount associated with decomposition), drugs of abuse, or other significant medications were detected on toxicologic analyses

The manner of death is homicide

KDH/gz
D6/12/08
T6/17/08

J00281



**Maricopa County Office of the Medical Examiner**
**Forensic Science Center**
701 W Jefferson Street  Phoenix, AZ  85007 - (602) 506-3322

**Maricopa County Forensic Science Center**
701 West Jefferson St - Phoenix, AZ 85007 - (602) 506-3322



PROPERTY OF
MARICOPA COUNTY
DO NOT DUPLICATE

08-03532        06/10/2008
ALEXANDER, TRAVIS
KEVIN D HORN MD
MESA PD

j00283

**Maricopa County Office of the Medical Examiner**
**Forensic Science Center**
701 W Jefferson St. – Phoenix, AZ 85007 – (602) 506-3322

PROPERTY OF
MARICOPA COUNTY
DO NOT DUPLICATE



.00284

08-03532          06/10/2008
ALEXANDER, TRAVIS
KEVIN D. HORN MD
MESA PD

## MARICOPA COUNTY OFFICE OF THE MEDICAL EXAMINER

### REPORT OF TOXICOLOGICAL EXAMINATION

Case Number    08-03532
Decedent:    TRAVIS VICTOR ALEXANDER
Date Submitted    06/12/2008
Report Date    07/12/2008

PROPERTY OF
MARICOPA COUNTY
DO NOT DUPLICATE

Specimens Collected  PLEURAL BLOOD, BLOT/FILTER PAPER, GASTRIC, KIDNEY, SPLEEN, LIVER, THIGH MUSCLE, BRAIN

Medical Examiner  KEVIN D  HORN, MD

### RESULTS*

| | |
|---|---|
| Pleural Blood | Positive for<br>    Ethyl alcohol 0 01 g%<br>None detected for methanol  isopropanol  acetone, amphetamine, methamphetamine  phencyclidine, cocaine  benzoylecgonine, methadone, morphine, codeine, benzodiazepines, barbiturates, antihistamines, phenothiazines, tricyclic antidepressants, and fentanyl |
| Gastric | None detected for amphetamine, methamphetamine, phencyclidine, cocaine, methadone, codeine, antihistamines phenothiazines, and tricyclic antidepressants |

If results are not listed for any specimen(s), that/those specimen(s) is/are deemed to be on "HOLD"

Norman A  Wade
Laboratory Director

KDH
07/15/08

Jurisdictional Agency    MESA PD
By:gz:    Tox. 1/2000;    DAWN

,00285

# Exhibit 73

| Supplement Date | Supplement Type | | Officer | |
|---|---|---|---|---|
| 08/27/2008 16.29 47 | INVESTIGATION | | (10477) FLORES B | |
| **Approving Officer** | | **Date/Time** | **Approving Supervisor** | **Date/Time** |
| (10477) FLORES B | | 08/28/2008 14 00 53 | (10005) MCBRIDE, D | 09/03/2008 09 15.21 |

### SUPPLEMENT NARRATIVE

She found out about Travis death from a mutual friend named Dan Freeman Dan had called her late last night on 6-9-08 to tell her about what was going on

On 6-11-08, I met with Travis brothers, Greg Alexander and Gary Alexander They had traveled from        to Mesa after hearing of their brother s death I provided them with the little information I could at that time without compromising the investigation. They both said they hadn t been very close to Travis ever since he moved to Mesa. They had no idea who could have done this to him

Telephone tip

On 6-11 08, I received a tip through the Apache Junction Police Department. They had received an anonymous phone call from a female who stated we needed to look at a person named Dustin Thompson as someone who might have something to do with or might have information regarding the death of Travis Alexander The message was short but they were able to trace the phone number Utilizing the phone number provided by A.J.P.D we were able to get subscriber information on that number which returned to a cellular phone owned by Dustin Thompson

A records check revealed that Dustin Thompson was married to a female named Ashley Thompson who worked at the Dillard s distribution center located in Gilbert AZ. On 6 12-08 at 1530 hours Detective D Kaufman #11674 and I met with Ashley at her work for a brief interview Ashley had a cellular phone with her during the interview We asked for her cell phone number and confirmed it was the same number that had called in the tip to A J P D We did not confront her about the phone tip, because we were still in the process of gathering intelligence on her husband, Dustin.

Ashley confirmed she and Travis were close friends and mentioned they had known each other for about three years She said her husband also knew Travis During the interview, she kept referring to her husband, Dustin, as her ex husband She explained that they were currently in the process of a divorce and is currently living separately from him. She said they were having financial issues and it was causing stress in their marriage.

Ashley gave us basic information regarding her relationship with Travis saying they were just friends and nothing else. The last time she actually saw him or talked with him was at his last UFC (Ultimate Fighting Champion) party about three weeks ago She said Travis would have UFC parties about every Wednesday where they would watch the fights She said she tried to call him on Monday the 9th of June, but she didn t get an answer She stated that she first heard about Travis death the day after he was found She heard from another mutual friend named Deanna. Ashley said her husband Dustin found out about Travis that first night. When she talked to Dustin, he told her he found out that first night and went over to see what was going on. Ashley gave us information about her husband Dustin, including his work address and work schedule She never mentioned during the entire interview that she was the one who called in with the anonymous phone tip We finished the interview and asked if we could contact her again if we had any additional questions She said that was fine

I received a CD copy of the phone recording from Sergeant Jeff Robinson of the AJ P.D The original CD and a Copy were later placed into Mesa Police evidence.

Autopsy

JF 0017

I attended the autopsy on 6-12 08 at 0935 hours. Dr Horn found that Travis had multiple lacerations and punctures and one

Homicide Investigation Supplement Report

| Supplement Date | Supplement Type | Officer | |
|---|---|---|---|
| 08/27/2008 16:29 47 | INVESTIGATION | (10477) FLORES  E | |
| **Approving Officer** | **Date/Time** | **Approving Supervisor** | **Date/Time** |
| (10477) FLORES  E | 08/28/2008 14:00 53 | (10005) MCBRIDE, D | 09/03/2008 09 15.21 |

### SUPPLEMENT NARRATIVE

gunshot wound   The wounds are listed as follows

1. Eleven punctures to his upper back between the shoulder blades
2. Two large lacerations to the top and back of his head.
3. One puncture to the back of his neck and ear
4. Four punctures and lacerations to chest
5. Three lacerations to belly
6. One laceration across throat, which severed the right carotid artery and airway
7. Four incised lacerations to the left hand (defensive wounds)
8. One incised laceration to right thumb (defensive wound)
9. One single gunshot wound to right brow   Projectile recovered in left check of victim

The lacerations and puncture wounds were consistent with a single edged weapon at least 5 inches in length.  Lack of stippling or gunshot residue or soot around the gunshot wound indicated the gunshot was taken no closer than two to three feet away

The initial report from Dr  Horn was that the gunshot wound to Travis  head would not have been fatal.  The gunshot would have possibly disabled him temporarily   The knife wounds to his back did not enter the chest cavity  therefore they were not fatal either   He also had obvious defensive wounds to his hands tending to show he did attempt to protect himself during the attack.  The fatal wounds consisted of a single stab wound to the center of his chest, which punctured his superior vena cava.  This wound along with the final throat slicing were the cause of death   Manner of death would be listed as homicide.

Initial interview with Chris and Skylar Hughes

On 6-12 08  I conducted a telephonic interview with Travis  closest friend and business partner  Chris Hughes and his wife Sky Hughes   Chris stated he last had contact with Travis on Wednesday 6-4-08 at around noon.  This was via phone text message  Travis had a very important telephone conference call on Wednesday 6-4-08 at 1900 hours  which he had missed   Travis was supposed to be hosting the conference call, but no one was able to get a hold of him.  This information matched what we had found on Travis  phone on the day of the search warrant.  The last outgoing text by Travis was to Chris Hughes and that was the last known contact he had with anyone

They had been scheduled meet in Cancun, Mexico on 6-10-08 for a Prepaid Legal paid seminar/vacation  He tried to contact Travis on several occasions  but his cell phone messages were full   Chris figured he was just busy   While in route to Mexico  they heard about what happened and thought of Jodi Arias immediately   They knew both Jodi and Travis very well and stated that Jodi had been extremely obsessed with Travis even after their break up   They believed she was very capable of doing harm to him  When asked if Travis might have any other enemies  they said he did not.  They said Travis was liked by everyone and could not think of anyone else who would do anything to him

Interview with Clancy Talbot

On 6-16-08  I returned a phone message left in my office.  The message was from a woman named Clancy Talbot that I received on 6-11 08   Clancy stated she lived in Salt Lake City Utah and saw Jodi Arias during a Prepaid Legal seminar on 6-5-08   She stated that Jodi had been in contact with a person by the name of Ryan Byrnes while she was on the road from northern CA to Utah for the conference. She mentioned that Ryan had told her during a conversation that Jodi had left CA on Tuesday the 3rd of June, but didn t get to Utah until Thursday the 5th of June

000318

# Exhibit 74

Arias 1-8-13 txt

1

1        IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

2             IN AND FOR THE COUNTY OF MARICOPA

3

4    STATE OF ARIZONA,                )

5                    PLAINTIFF,       )

6               VS                    )   NO  CR 2008-031021

7    JODI ANN ARIAS,                  )

8                    DEFENDANT        )

9    ___                              )

10

11

12          REPORTER'S TRANSCRIPT OF PROCEEDINGS

13

14

15

16                  PHOENIX, ARIZONA
                    JANUARY 10, 2013
17

18
            BEFORE THE HON  SHERRY K  STEPHENS
19

20          REPORTED BY

21          MICHAEL A  BABICKY, RPR
            CERTIFIED REPORTER
22          CERTIFICATE NO  50361

23          PREPARED FOR

24          MR  JUAN M  MARTINEZ
            DEPUTY COUNTY ATTORNEY
25

2

1                    EXHIBITS

2

Page 1

,

Arias 1-8-13 txt

3

4     EXHIBIT NO                        PAGE NO

5

6

7

8     NONE MARKED

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

0

3

1          REPORTER'S TRANSCRIPT OF PROCEEDINGS,

2          WAS TAKEN ON JANUARY 8, 2013 AT THE

3     SUPERIOR COURT, MARICOPA COUNTY, 175 W  MADISON,

4     PHOENIX, ARIZONA  BEFORE MICHAEL A  BABICKY  A

5     CERTIFIED REPORTER IN THE STATE OF ARIZONA

6

7          COUNSEL APPEARING

Page 2

Arias 1-8-13 txt

```
 8              FOR THE PLAINTIFF
 9              DEPUTY COUNTY ATTORNEY
10              BY    MR  JUAN M  MARTINEZ, ESQ
11
12              FOR THE DEFENDANT
13
                BY    MR  KIRK NURMI, ESQ
14              BY    MS  JENNIFER WILLMOTT, ESQ
15
16
17
18
19
20
21
22
23
24
25
```

0

   4

```
 1          THE COURT   PLEASE BE SEATED   THE RECORD WILL
 2   SHOW THE PRESENCE OF THE JURY, THE DEFENDANT AND ALL
 3   COUNSEL
 4          LADIES AND GENTLEMEN, I APOLOGIZE FOR THE DELAY
 5   IN STARTING THIS AFTERNOON   THE STATE IS REQUESTING TO
 6   TAKE A WITNESS OUT OF ORDER
 7          MR  MARTINEZ, THE STATE MAY CALL ITS NEXT
 8   WITNESS
 9          MR  MARTINEZ   THE STATE CALLS KEVIN HORN
10
11                  KEVIN HORN, M D ,
```

Page 3

Arias 1-8-13 txt

12    Q    BUT IF THEY DO WANT TO TALK TO YOU, HOW DOES IT

13  HAPPEN?

14    A    THEY HAVE A HAND SET THEY CAN PICK UP   I CAN

15  HEAR THEM IN THE AUTOPSY AREA   AND THEN I'LL COME TO THE

16  DOOR OR THE WINDOW AND I'LL TALK TO THEM

17    Q    AS YOU'RE CONDUCTING THIS EXAMINATION IS IT YOUR

18  PRACTICE TO IMMEDIATELY FORM AN OPINION AS TO WHICH INJURY

19  IS FIRST AND WHICH IS SECOND, WHICH IS THIRD, IF THERE'S

20  THREE OF THEM?

21    A    NO

22    Q    WHY NOT?  WHY WOULD YOU NOT IMMEDIATELY TELL

23  THEM, I KNOW THIS IS THE FIRST ONE, THIS IS THE SECOND

24  ONE, THIS IS THE THIRD?  WHY WOULDN'T YOU DO IT THAT WAY?

25    A    WHY?  BECAUSE WE CAN NEVER ESTABLISH THAT   BUT

96

1  I DO WANT TO HAVE AN OPPORTUNITY TO LOOK AT THE WHOLE

2  CASE, GET INVESTIGATIVE REPORTS BACK, GET TOXICOLOGY,

3  HISTOLOGY AND THEN COME TO A FINAL REPORT

4    Q    AND THIS REPORT THAT YOU PREPARE, WHEN IS IT

5  DUE?  IN OTHER WORDS, HOW LONG DOES IT TAKE YOU TO PREPARE

6  THE RECORD WITH YOUR IMPRESSIONS?

7    A    IT VARIES, A MINIMUM OF A MONTH, MAXIMUM OF FOUR

8  TO FIVE MONTHS, DEPENDING

9    Q    IN THIS CASE YOU CONDUCTED THE AUTOPSY JUNE

10  16TH, I THINK?

11    A    JUNE 12TH

12    Q    JUNE 12TH?  AND WHAT DATE IS YOUR REPORT DATED?

13    A    JULY 15TH

14    Q    AND HOW MANY -- SO THAT'S ROUGHLY, WHAT, A MONTH

15  LATER?

16    A    FIVE WEEKS, YEAH

Page 82

Arias 1-8-13 txt

17    Q    AND HOW MANY PAGES IS YOUR REPORT?

18    A    EIGHT PAGES

19    Q    AND IN THAT REPORT IS THERE ANY PLACE THAT

20 INDICATES THAT THE GUNSHOT WOUND OR WHICH INJURY WAS FIRST

21 OR LAST, ANYWHERE DOES IT INDICATE THAT?

22    A    NO

23    Q    IN TERMS OF YOU BEING ASKED ABOUT THE SEQUENCE

24 OF EVENTS IN TERMS OF THESE FATAL INJURIES WHEN, ACCORDING

25 TO YOUR RECORDS, WAS THE FIRST TIME THAT YOU WERE ASKED

97

1  ABOUT THE SEQUENCING OF EVENTS?

2    A    ACCORDING TO MY RECOLLECTION IT WOULD HAVE BEEN

3  AT THE DEFENSE INTERVIEW

4    Q    AND BEFORE THAT, DIDN'T WRITE IN YOUR REPORT,

5  RIGHT?

6    A    THAT'S RIGHT

7    Q    AND IS IT YOUR PRACTICE TO WRITE THE SEQUENCING

8  OF EVENTS IN YOUR REPORT?

9    A    NO

10    Q    WHY NOT?

11    A    IT WOULD BE SPECULATIVE   AND I'M SIMPLY

12 PROVIDING INFORMATION ABOUT THE INJURIES THAT I SEE

13    Q    AND THEN YOU HAVE A CHANCE TO HAVE ALL THIS

14 INFORMATION BEFORE YOU MAKE THE DETERMINATION?

15    A    YES

16    Q    YOU WERE ASKED ABOUT THE PHOTOGRAPH HERE WHICH

17 IS EXHIBIT NUMBER 162   LET ME HAVE IT MARKED, SINCE IT IS

18 IN EVIDENCE

19               ONE OF THE THINGS THAT YOU WERE ABLE TO SEE

20 IS THERE'S A DATE AND TIME ASSOCIATED WITH THAT, CORRECT?

Page 83

Exhibit 75



**STATE BAR OF ARIZONA**

Assistant's Direct Line  (602) 340-7272

December 10, 2015

**PERSONAL AND CONFIDENTIAL**

Carl F  Mariano
Lewis Brisbois Bisgaard & Smith, LLP
Phoenix Plaza Tower II
2929 N  Central Avenue, Suite 1700
Phoenix, AZ 85012 2761

> **FILED**
>
> DEC 1 0 2015
>
> STATE BAR OF ARIZONA
> BY

**Re   File No**       15-0957
    **Complainant**  Marc C. McGee
    **Your Client.**    Juan M  Martinez

Dear Mr  Mariano

Pursuant to Rule 55(b), Ariz  R.  Sup  Ct , the charges filed against you by Mr  McGee have been investigated and, upon review by bar counsel, have been dismissed

The State Bar is dismissing this matter as the purposes of lawyer regulation are served with the following educational comment

> While your disclosure of the previously "sealed" identity of Mr  McGee in open court appears to have been inadvertent and the product of your fast-paced questioning, you should have used a more consistent method of identifying Mr  McGee and the other witnesses (i e  Mr  M, Ms  R , etc )   While your disclosures were not intentionally made, you should be aware that could have caused unintended consequences for Mr  McGee   Please ensure that you question witnesses in a way that complies with all Court directives in the future

Pursuant to Rule 53(b)(2), Ariz  R  Sup  Ct., the Complainant may object to this decision within ten (10) days of receipt of the dismissal letter  Any such objection will be referred to the Attorney Discipline Probable Cause Committee for a decision  You will be notified if an objection is filed

Sincerely,

Craig D  Henley
Senior Bar Counsel

CDH/ts

# Exhibit 76



FILED

MAR 1 6 2016

STATE BAR OF ARIZONA
BY

**BEFORE THE ATTORNEY DISCIPLINE
PROBABLE CAUSE COMMITTEE
OF THE SUPREME COURT OF ARIZONA**

IN THE MATTER OF A MEMBER OF
THE STATE BAR OF ARIZONA,

**JUAN M MARTINEZ,**
Bar No. 009510

Respondent.

No 15-0957

**ORDER AFFIRMING DISMISSAL**

The Attorney Discipline Probable Cause Committee of the Supreme Court of Arizona ("Committee"), having reviewed this matter on February 12, 2016, upon Complainant's appeal pursuant to Rule 55(b)(2)(A)(ii), Ariz R Sup Ct

By a vote of 9-0-0, the Committee finds that the State Bar did not abuse its discretion in dismissing the charge in File No  15-0957

The Committee provides an explanation for its determination in the attached document

**IT IS ORDERED** affirming the dismissal of this matter

**DATED** this ___4th___ day of March, 2016

Lawrence F Winthrop

Judge Lawrence F  Winthrop, Chair
Attorney Discipline Probable Cause Committee
of the Supreme Court of Arizona

Original filed this 11th day
of March, 2016, with

Lawyer Regulation Records Manager
State Bar of Arizona
4201 N  24th St., Suite 100
Phoenix, Arizona 85016-6266

Copy mailed this __17th__ day of
March, 2016, to

Carl F Mariano
Lewis Brisbois Bisgaard & Smith LLP
2929 N Central Ave Ste 1700
Phoenix Plaza Tower II
Phoenix, AZ  85012-2761
Respondent's Counsel

Marc C  McGee
30 Eden Terrace
Kamo, Whangeri
New Zealand
Complainant


Copy emailed this __17th__ day
of March, 2016, to

Attorney Discipline Probable Cause Committee
of the Supreme Court of Arizona
1501 West Washington Street, Suite 104
Phoenix, Arizona 85007
E-mail  ProbableCauseComm@courts.az.gov

Lawyer Regulation Records Manager
State Bar of Arizona
4201 N  24th St , Suite 100
Phoenix, Arizona 85016-6266
E-mail  LRO@staff.azbar.org


by _____

**ATTORNEY DISCIPLINE PROBABLE CAUSE COMMITTEE**

**COMMENT**

**IN THE MATTER OF JUAN M  MARTINEZ**

**FILE NO. 15-0957**

The Supreme Court of Arizona Probable Cause Committee ("Committee"), established by Rule 50, Ariz  R. Sup  Ct , consists of six attorney and three public members appointed by the Chief Justice of the Supreme Court   Pursuant to Rule 55(b)(2)(A)(ii), the Committee provides the following comment

The State Bar investigated Complainant's charge Respondent disclosed the name of a "sealed" witness  The Committee carefully reviewed the information provided in the Report of Investigation including statements by the Trial Court that Respondent's statements were unintentional and your response  The Committee concluded that the Respondent's conduct did not present clear and convincing evidence of a rule violation or misconduct warranting discipline  Therefore, the Committee determined that an Order Affirming Dismissal is the appropriate disposition of this matter

Exhibit 77

1

1      IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

2          IN AND FOR THE COUNTY OF MARICOPA

3

4   STATE OF ARIZONA,            )
                                 )
5           PLAINTIFF,      )
                                 )
6        VS          )  NO  CR 2008-031021
                                 )
7   JODI ANN ARIAS            )
                                 )
8          DEFENDANT      )
                                 )
9   ___                )

10

11

12      REPORTER S TRANSCRIPT OF PROCEEDINGS

13

14

15

16          PHOENIX  ARIZONA
            MARCH 18  2013
17

18
        BEFORE THE HON  SHERRY K. STEPHENS
19

20      REPORTED BY

21      MICHAEL A  BABICKY  RPR
        CERTIFIED REPORTER
22      CERTIFICATE NO  50361

23      PREPARED FOR

24       MS  JENNIFER WILLMOTT  ESQ
         COPY

25

2

```
1              EXHIBITS

2

3

4    EXHIBIT NO          PAGE NO

5    NONE MARKED

6

7

8              WITNESSES

9

10   DIRECT EXAMINATIONN (CONT )      PAGE

11   DR  RICHARD SAMUELS            6

12

13

14

15

16

17

18

19

20

21

22
```

23

24

25

3

1      REPORTER'S TRANSCRIPT OF PROCEEDINGS,

2      WAS TAKEN ON MARCH 18 2013 AT THE

3  SUPERIOR COURT  MARICOPA COUNTY  175 W  MADISON

4  PHOENIX  ARIZONA, BEFORE MICHAEL A  BABICKY  A

5  CERTIFIED REPORTER IN THE STATE OF ARIZONA.

6

7      COUNSEL APPEARING

8
        FOR THE PLAINTIFF
9
        DEPUTY COUNTY ATTORNEY
10       BY  MR  JUAN M  MARTINEZ, ESQ

11

12       FOR THE DEFENDANT

13
        BY  MR  KIRK NURMI  ESQ
14       BY  MS  JENNIFER WILLMOTT  ESQ

15

16

17

18

19

20

21

22

23

24

25

114

1  THE BENCH, THE COPY OF THE INTERVIEW  MR NURMI?

2       MR NURMI  OH YES

3       THE COURT  DETECTIVE FLORES  DO YOU HAVE A COPY

4  OF AN INTERVIEW THAT WAS CONDUCTED LAST THURSDAY

5  RECORDING?

6       DETECTIVE FLORES  YES I'LL PROVIDE THAT

7  TOMORROW

8       THE COURT  FIRST THING TOMORROW MORNING

9       DETECTIVE FLORES  YES  FIRST THING

10       THE COURT  ALL RIGHT  IS THERE ANYTHING ELSE

11  BEFORE THE BREAK?

12       MR NURMI  NOTHING, YOUR HONOR

13       THE COURT  WE'RE AT RECESS

14       (A RECESS WAS HELD)

15       THE COURT  THE RECORD WILL SHOW THE PRESENCE OF

16  THE JURY  THE DEFENDANT AND ALL COUNSEL

17       MR MARTINEZ, YOU MAY CONTINUE WITH

18  CROSS-EXAMINATION

19  BY MR MARTINEZ.

20    Q  SIR  ISN'T IT TRUE THAT ON A SEPARATE OCCASION

21  YOU ACTUALLY PROVIDED THE DEFENDANT WITH A GIFT?

22    A  NO

23    Q   WELL, SIR, DO YOU REMEMBER PROVIDING HER WITH A

24  BOOK CALLED ERRONEOUS ZONES?

25    A.  YES

115

1     Q   AND THAT WAS SOMETHING THAT YOU PROVIDED TO HER

2  RIGHT?

3     A.  IT WAS MAILED TO HER, YES

4     Q   WHICH MEANS YOU PROVIDED IT TO HER  CORRECT?

5     A.  YES

6     Q   AND YOU PROVIDED IT TO HER BECAUSE AT THAT POINT

7  YOU BELIEVED THAT SHE WAS DEPRESSED  RIGHT?

8     A.  NO

9     Q   WELL  LET'S TAKE A LOOK AT WHAT YOUR TESTIMONY

10  WAS AND SEE IF THIS REFRESHES YOUR RECOLLECTION   THIS IS

11  EXHIBIT 532   TAKE A LOOK AT THE HIGHLIGHTED PORTION

12     A.  YES   THAT IS WHAT I SAID BUT ACTUALLY --

13     Q   WELL  SIR  THAT WAS THE QUESTION  ISN'T IT TRUE

14  THAT YOU SAID THAT THE REASON YOU PROVIDED IT TO HER WAS

15  BECAUSE SHE WAS DEPRESSED?

16     A.  I SAID THIS HERE

17     Q   OKAY  THANK YOU

18     A.  OKAY

19     Q   YOU'RE CONDUCTING AN EVALUATION OF THIS WOMAN

20  CORRECT?

21     A   YES

22     Q   AND PROVIDING AN EVALUATION, AS PART OF

23   PROVIDING AND EVALUATION  YOU'RE ALSO PROVIDING A

24   SELF-HELP BOOK, RIGHT?

25      A   YES

116

1    Q   AND THIS SELF-HELP BOOK TALKS ABOUT POSITIVE AND

2   PRACTICAL ADVICE FOR BREAKING FREE FROM THE TRAP OF

3   NEGATIVE THINKING AND ENJOYING LIFE TO THE FULLEST  RIGHT?

4    A.  YES   THAT WAS FOR HER LOW SELF ESTEEM

5    Q   RIGHT   AND THIS IS BY SOMEBODY NAMED DR

6   WAYNE -- OR WRITTEN BY SOMEBODY NAMED DR  WAYNE W  DYER

7   CORRECT?

8    A.  YES

9    Q   ALSO TALKS ABOUT IF YOU ARE PLAGUED BY GUILT OR

10  WORRY AND FIND YOURSELF UNWITTINGLY FALLING INTO THE SAME

11  OLD DISRUPTIVE PATTERNS THEN ERRONEOUS ZONES IS THE BOOK

12  FOR YOU, RIGHT?

13   A.  YES

14   Q   HOW IS PROVIDING -- WELL  PROVIDING A SELF-HELP

15  BOOK REALLY DOESN'T COME UNDER THE AUSPICES OR UNDER THE

16  COVERAGE  IF YOU WILL  OF AN EVALUATION  DOES IT?

17   A.  NOT NECESSARILY

18   Q   WELL  NO  NOT NECESSARILY MEANS IT DOESN'T

19  RIGHT?

20   A.  NO

21   Q   AND -- BUT YOU WERE THERE TO TRY TO ASSESS HER

22  OR EVALUATE HER AS IT PERTAINED TO THIS PARTICULAR CASE

23  RIGHT?

24     A   YES

25     Q   AND YOU WOULD AGREE THAT IF YOU WERE THERE TO DO

117

1   THAT AND NOW YOU'RE TRYING TO HELP HER, THERE SEEMS TO BE

2   A LITTLE BIT OF THE BLURRING OF THE LINES THERE, DON'T YOU

3   AGREE?

4       A   NO  I DON'T

5       Q   WELL, ON THE ONE HAND  YOU WANT TO HELP HER,

6   DON'T YOU  BY GIVING HER THAT SELF-HELP BOOK  YES OR NO?

7       A   YES  IT WOULDN'T BE BAD  YES  I HELPED HER

8       Q   AND ON THE OTHER HAND  YOU'RE TO PROVIDE AN

9   IMPARTIAL EVALUATION IN THIS CASE THAT'S WHAT THE CODE

10  SAYS  RIGHT?

11      A   I DIDN'T READ THE BOOK TO HER  I SENT HER THE

12  BOOK

13      Q   BUT YOU WERE THE ONE THAT ACTUALLY PROVIDED TO

14  HER SO THAT SHE COULD READ IT  RIGHT?

15      A   YES  SHE WAS UNABLE TO GET IT ON HER OWN

16      Q   I'M NOT ASKING WHETHER OR NOT SHE COULD GET IT

17  ON HER OWN  THE FACT THAT SHE COULDN'T GET IT ON HER OWN

18  THAT MADE YOU UPSET ENOUGH TO GO OUT AND BUY IT FOR HER

19  RIGHT?

20      A   NO  IT DIDN'T MAKE ME UPSET  I DID WHAT I DID

21  FOR MANY PEOPLE AND RECOMMENDED A BOOK.

22      Q   I'M NOT ASKING ABOUT MANY PEOPLE  I'M ASKING

23   ABOUT THIS PARTICULAR CASE BECAUSE YOU SAID THAT SHE

24   COULDN'T GET IT, YOU WENT OUT OF YOUR WAY TO GET IT AND

25   THEN SEND IT TO HER  RIGHT?

118

1    A.  CORRECT

2    Q   THAT REQUIRED YOU TO GO BUY THE BOOK, RIGHT?

3    A.  YES

4    Q   THAT REQUIRED YOU TO PUT IT IN WHATEVER

5  CONTAINER THERE WAS AND MAIL IT TO HER, RIGHT?

6    A.  NO  I ORDERED IT ON LINE

7    Q   YOU ORDERED IT ON LINE  ONCE YOU RECEIVED IT

8  IT WENT TO HER  CORRECT?

9    A.  IT WAS SENT DIRECTLY TO HER THROUGH AMAZON

10    Q   AND WHEN YOU ORDERED IT ON LINE, THAT'S MONEY

11  COMING OUT OF YOUR POCKET  RIGHT?

12    A.  YES

13    Q   SO NOW NOT ONLY ARE YOU SENDING HER SOMETHING

14  YOU RE IN A SENSE GIVING HER MONEY  AREN'T YOU?

15    A.  NOT — DIDN'T LOOK AT IT THE WAY  I GAVE HER A

16  BOOK.

17    Q   WELL, YOU'RE NOT LOOKING AT IT THAT WAY  BUT

18  THAT'S WHAT HAPPENED  YOU GAVE HER MONEY  YOU GAVE HER A

19  BOOK THAT COST YOU MONEY  RIGHT?

20    A   YES

21    Q   HOW MUCH DID THAT BOOK COST YOU?

22    A.  NINE DOLLARS

23   Q   SO HERE YOU ARE BUYING HER A GIFT THAT'S NINE

24  DOLLARS  RIGHT?

25     A.  NO  IT WAS NOT A GIFT

119

1    Q   DID SHE GIVE IT BACK TO YOU?

2    A   SHE OFFERED IT BACK TO ME

3    Q   NO  I M NOT ASKING YOU IF SHE OFFERED IT BACK

4  TO YOU  SHE NEVER GAVE IT BACK TO YOU  RIGHT?

5    A.  I DIDN'T ASK FOR IT BACK.

6    Q   DID I ASK YOU WHETHER OR NOT YOU ASKED FOR IT

7  BACK?

8    A   SO WHAT ARE YOU ASKING?

9    Q   I M ASKING YOU WHETHER OR NOT -- ISN'T IT TRUE

10  THAT SHE NEVER GAVE IT BACK TO YOU  RIGHT?

11    A.  SHE OFFERED IT BACK TO ME

12    Q   I'M NOT ASKING WHETHER OR NOT SHE OFFERED IT TO

13  YOU UNDERSTAND THAT'S NOT MY QUESTION?

14       MS  WILLMOTT  OBJECTION  ARGUMENTATIVE

15       THE COURT  OVERRULED

16  BY MR  MARTINEZ

17    Q   YOU UNDERSTAND THAT  RIGHT?

18    A   YES

19    Q   MY QUESTION IS ISN T TRUE THAT THE BOOK WAS

20  NEVER RETURNED TO YOU?

21    A.  CORRECT

22    Q   AND SO YOU DID THIS BECAUSE YOU BELIEVED OR FOR

23  WHATEVER REASON YOU STARTED TO LIKE HER  RIGHT?

24      A   NO

25      Q   OH  SO YOU DISLIKE HER?

120

1    A.  I DIDN'T SAY THAT EITHER

2    Q.  SO YOU DO LIKE HER THEN?

3    A.  I CANNOT ANSWER THAT QUESTION YES OR NO

4    Q.  WHY NOT? YOU SPENT HOW MANY -- YOU WENT TO SEE

5  HER ON 12 SEPARATE OCCASIONS, RIGHT?

6    A.  DEPENDS WHAT YOU MEAN BY LIKE

7    Q.  I'M ASKING YOU  ISN'T IT TRUE THAT YOU WENT TO

8  SEE HER ON 12 SEPARATE OCCASIONS?

9    A.  AS PART OF MY ROLE TO EVALUATE HER  YES

10    Q.  YES OR NO, YOU DID GO SEE HER ON 12 SEPARATE

11  OCCASIONS  CORRECT?

12    A.  YES

13    Q.  AND YOU SPENT MANY HOURS WITH HER, RIGHT?

14    A.  YES

15    Q.  YOU TALKED ABOUT A VARIETY OF THINGS  RIGHT?

16    A.  YES

17    Q.  YOU SPOKE ABOUT HER RELATIONSHIP  RIGHT  WITH

18  MR ALEXANDER?

19    A.  YES

20    Q.  YOU SPOKE ABOUT PREVIOUS RELATIONSHIPS  RIGHT?

21    A.  YES

22    Q.  AND YOU SPOKE ABOUT SOME SEXUAL ISSUES THAT WERE

23  INVOLVED WITH HER AND MR  ALEXANDER  CORRECT?

24      A  YES

25      Q   YOU SPOKE ABOUT A LOT OF THING DURING THOSE 12

121

1   VISITS  RIGHT?

2      A.   RIGHT

3      Q    HOW MANY HOURS DID YOU SPEND WITH HER?

4      A.   BETWEEN 25 AND 30 HOURS

5      Q    AND DURING THAT TIME  YOU'RE SAYING THAT IT WAS

6   JUST A MERE PASSAGE OF TIME, IT WASN'T BECAUSE YOU LIKED

7   HER, THAT YOU DECIDED TO GET THAT BOOK FOR HER?

8      A.   TYPICALLY WHEN I --

9      Q    YES OR NO  IS THAT WHY YOU DECIDED TO GET HER

10   THE BOOK?

11      A.   COULD YOU REPEAT YOUR QUESTION AGAIN?

12      Q    ISN'T IT TRUE THAT THE ONLY -- EVEN AFTER ALL

13   THIS TIME  AFTER ALL THESE VISITS  THE REASON YOU GOT HER

14   THIS BOOK, YOU RE SAYING IS JUST BECAUSE THERE WAS NO

15   REASON?

16      A.   THERE WAS A REASON

17      Q    AND THE REASON WAS THAT YOU WANTED TO GIVE HER

18   SOMETHING  RIGHT?

19      A    NO

20      Q    WELL, YOU DID GIVE HER SOMETHING  DIDN'T YOU?

21      A    YES

22      Q    AND THERE IS A CODE OF ETHICS, CORRECT?

23    A   YES

24       Q   AND THAT CODE OF ETHICS PROHIBITS YOU FROM

25  PROVIDING GIFTS TO SOMEBODY LIKE THE DEFENDANT  DOESN'T

122

1  IT?

2     A.  IT WASN'T A GIFT

3     Q   SIR, ISN'T IT TRUE THAT IT WENT AND IT GOT TO

4  HER  DIDN T IT?

5     A.  SHE WAS SUICIDAL.

6     Q   I'M NAME ASKING WHETHER OR NOT SHE WAS SUICIDAL

7  RIGHT? AM I ASKING YOU THAT?

8     A.  NO, YOU'RE NOT

9     Q   IF SHE WAS SUICIDAL, YOU RE NOT THE TREATING

10  PHYSICIAN  ARE YOU?

11    A.  I'M NOT TREATING HER

12    Q   WELL  IF SHE WAS SUICIDAL, IT WAS SOMEBODY

13  ELSE S RESPONSIBILITY TO TAKE CARE OF IT, RIGHT?

14       MS  WILLMOTT  JUDGE  OBJECTION  CAN WE ASK THE

15  STATE NOT TO YELL AT THE WITNESS  IT'S NOT NECESSARY

16       THE COURT  APPROACH  PLEASE

17       (SIDEBAR DISCUSSION )

18       MS  WILLMOTT  WHAT'S GOING ON IS UNPROFESSIONAL

19  CONDUCT AND IT DOESN'T COME ACROSS IN THE COURT REPORTER S

20  NOTES  BUT FOR THE RECORD  HE IS YELLING  HE IS RAISING

21  HIS VOICE   HE S SLAPPING HIS HANDS TOGETHER IN A LOUD

22  FASHION TO MAKE DRAMA OR FOR WHATEVER REASON, BUT IT'S

23  UNPROFESSIONAL CONDUCT

24       THE COURT  MR MARTINEZ?

25       MR MARTINEZ  IT'S MY STYLE  I DON'T THINK

123

1  THAT MY VOICE IS RAISED OR IS SO HIGH THAT IT DISTURBS THE

2  WITNESS  HE HASN T SHOWN ANY INDICATION THAT HE'S

3  BOTHERED BY IT  NOBODY ELSE IS BOTHERED BY IT  YOU HEARD

4  WHAT WAS GOING ON AND I LL DEFER TO YOU

5      MS  WILLMOTT  THAT'S NOT NECESSARILY TRUE

6  JUDGE  FOR THE RECORD  DR  SAMUELS RAISED HIS VOICE BACK

7  AT ONE POINT BECAUSE OF THE FRUSTRATION  AND I'M BOTHERED

8  BY IT BECAUSE IT'S UNPROFESSIONAL

9      MR  MARTINEZ  WELL  WE DON'T REALLY CARE WHY

10  YOU RE BOTHERED BY IT  WE DON'T KNOW THAT HE WAS

11  FRUSTRATED  HE RAISED HIS VOICE JUST AS MUCH AS I DID

12  SO IT'S TIT FOR TAT

13      MR  NURMI  JUDGE  I THINK WHAT IS REALLY

14  DISPOSITIVE HERE AND I CAN T THINK OF THE NAME OF THE

15  CASE  THIS SORT OF CONDUCT  THIS YELLING  THIS ROLLING OF

16  EYES WAS RECENTLY FROWNED UPON IN CASE LAW  AND I HAVEN'T

17  SEEN MR  MARTINEZ ROLL HIS EYES BUT OBVIOUSLY IT'S BEEN A

18  GREAT DEAL OF YELLING  IT'S FROWNED UPON  IT'S

19  MISCONDUCT  AND I WILL ONCE AGAIN MOVE FOR A MISTRIAL

20  BASED ON THIS CONTINUED CONDUCT OF YELLING AT WITNESSES

21      MR  MARTINEZ  AND I DISPUTE THAT THERE WAS ANY

22  YELLING

23        THE COURT   ALL RIGHT   I DO NOT FIND THAT MR

24   MARTINEZ'S CONDUCT RAISES TO THE LEVEL THAT WOULD REQUIRE

25   ANY KIND OF ADMONITION FROM THE COURT   I BELIEVE THAT A

124

1  CALMER TONE COULD BE APPROPRIATE   CERTAINLY THIS IS

2  CROSS-EXAMINATION AND DIFFERENT STYLES ARE PERMITTED

3      THE MOTION FOR MISTRIAL IS DENIED   LET'S SEE IF

4  WE CAN TAKE IT DOWN JUST A TAD

5      (OPEN COURT )

6      THE COURT   YOU MAY CONTINUE

7  BY MR MARTINEZ

8   Q   YOU WERE NOT HER TREATING PSYCHOLOGIST  RIGHT?

9   A   THAT'S CORRECT

10   Q   SOMEBODY ELSE WAS WHERE SHE WAS RESIDING, RIGHT?

11   A   I DON'T KNOW

12   Q   YOU RE NOT FAMILIAR WITH -- WE'VE BEEN TOLD THAT

13  SHE WAS AT THE JAIL   YOU'RE NOT FAMILIAR WITH THE CARE

14  THAT WAS -- PSYCHOLOGICAL CARE THAT'S PROVIDED IN THE

15  JAIL?

16   A   WE NEVER TALKED ABOUT TREATMENT FOR HER

17   Q   SIR YOU'RE NOT -- YOU'RE TELLING US AS YOU SIT

18  HERE TODAY YOU'RE NOT FAMILIAR WITH THE CARE THAT WAS

19  PROVIDED BY THE MARICOPA COUNTY JAIL?

20   A   I AM FAMILIAR  BUT I DON'T KNOW --

21   Q   THAT'S NOT MY QUESTION  YES OR NO  YOU ARE

22  FAMILIAR  RIGHT?

23    A   NOT WITH EVERY ASPECT  NO

24    Q   WELL  YOU ARE FAMILIAR WITH WHEN THERE'S A

25   SUICIDE — ISSUE OF SUICIDE  YOU KNOW WHAT IS REQUIRED OF

125

1  YOU AT THAT POINT, ISN'T THERE?

2    A.  TO SOME DEGREE

3    Q   WELL, NO, YOU RE THE PSYCHOLOGIST WHO KNOWS THE

4  RULES, RIGHT?

5    A.  YES  MOST OF THEM

6    Q   WELL  WITH REGARD TO THE FACT THAT SOMEBODY IS

7  SUICIDAL  YOU DON'T -- JUST BECAUSE YOU RE THE

8  PSYCHOLOGISTS, YOU TAKE THAT THREAT SERIOUSLY  YOU DON T

9  JUST WALK AWAY  IF IT WERE JUST A PATIENT THAT YOU WERE

10  TREATING, YOU WOULD MAKE ARRANGEMENTS, WOULDN'T YOU?

11    A.  OF COURSE

12    Q   IF NECESSARY YOU WOULD CALL THE POLICE  RIGHT?

13  RIGHT?

14    A.  WELL  IF THERE WAS AN IMMINENT THREAT

15    Q   SURE  YOU WOULD CALL THE POLICE  RIGHT?

16    A.  YES

17    Q    IN THIS PARTICULAR CASE  YOU BELIEVED -- YOU

18  TOLD US THAT YOU THOUGHT THAT DEFENDANT WAS SUICIDAL

19  RIGHT?

20    A.  SHE WAS TELLING US THAT SHE WAS GOING TO KILL

21  HERSELF

22    Q   NO  SIR, NOW YOU'RE CHANGING THE STORY BECAUSE

23  NOW YOU RE SAYING SHE S WAS TELLING YOU --

24      MR  NURMI  OBJECTION  MISCHARACTERIZATION OF

25  CHANGING HIS STORY

126

1      THE COURT   SUSTAINED

2  BY MR  MARTINEZ.

3    Q   SIR  DIDN'T YOU TELL US JUST MINUTES AGO THAT

4  SHE WAS SUICIDAL?

5    A.  SHE TOLD US SHE WAS SUICIDAL

6    Q   I UNDERSTAND THAT'S WHAT YOU'RE SAYING NOW   I'M

7  ASKING YOU TO THINK -- YOU DON'T HAVE MEMORY PROBLEMS  DO

8  YOU?

9    A.  NO

10    Q   I M ASKING YOU TO THINK BACK TO MAYBE FIVE

11  MINUTES AGO  AND FIVE MINUTES AGO  ISN'T IT TRUE THAT YOU

12  TOLD US  WHEN I WAS ASKING YOU ABOUT THE GIFT  YOU TOLD

13  US  WELL, SHE WAS SUICIDAL   DO YOU REMEMBER THAT

14  SPONTANEOUS STATEMENT COMING FROM YOU?

15    A.  YES   BUT I DIDN'T MEAN THAT SHE WAS GOING TO

16  KILL HERSELF RIGHT THERE   SHE HAD TOLD EVERYONE

17    Q   SIR  I'M ASKING YOU IF YOU REMEMBER?

18       MS  WILLMOTT  OBJECTION  YOUR HONOR

19    A   YOU RE NOT ALLOWING ME TO EXPLAIN THIS

20       THE COURT   ALL RIGHT   COUNSEL, ONE AT A TIME

21  THE COURT REPORTER CAN ONLY TAKE ONE PERSON SPEAKING AT A

22  TIME  DR  SAMUELS, YOU MAY COMPLETE YOUR RESPONSE

23  OBJECTION SUSTAINED   YOU MAY CONTINUE

24      A   REPEAT YOUR QUESTION, PLEASE

25  BY MR  MARTINEZ.

127

1   Q   ISN'T IT TRUE, SIR, THAT WITH REGARD TO THIS

2   ISSUE INVOLVING THE SUICIDE  YOU TOLD US PREVIOUSLY THAT

3   QUOTE, OR WORDS TO THAT AFFECT  THAT SHE WAS SUICIDAL WHEN

4   WE WERE DISCUSSION IT  DO YOU REMEMBER TELLING US THAT,

5   YES OR NO?

6   A.  YES

7   Q   AND IF YOU DID BELIEVE THAT SHE WAS SUICIDAL,

8   YOU HAD A DUTY THEN AT THAT POINT TO NOTIFY SOMEBODY,

9   DIDN'T YOU?

10   A   YES  HER ATTORNEY WAS INFORMED

11   Q   BUT YOU ALSO HAD A DUTY TO LET OTHER MEDICAL OR

12   PSYCHOLOGICAL CARE WORKERS KNOW ABOUT IT, RIGHT?

13   A.  I ONLY -- MY ONLY CONTACT WITH MS ARIAS WAS

14   THROUGH THE ATTORNEY  I DON'T HAVE CONTACTS IN THE JAIL

15   AND I DON'T HAVE ANY AUTHORIZATION TO CONTACT ANYONE IN

16   THE JAIL

17   Q   SO LET'S -- YOU'RE SAYING THAT WITH REGARD TO

18   THIS PARTICULAR SITUATION IF A PERSON IS UNREPRESENTED AND

19   THEY TELL YOU THAT THEY'RE SUICIDAL  WHAT YOU ARE GOING TO

20   DO IS WALK AWAY BECAUSE YOU HAVE NO CONTACTS IN THE JAIL?

21       MS WILLMOTT  OBJECTION  RELEVANCE

22       THE COURT  OVERRULED

23  BY MR MARTINEZ

24     Q    IS THAT WHAT YOU RE SAYING?

25     A.   I'D LIKE TO EXPLAIN WHAT THE WORD SUICIDAL MEANT

128

1   IN THIS PARTICULAR CONTEXT

2      Q   SIR, YOU USED THE WORD  DID NOT YOU?

3      A   I DID

4      Q   THAT'S ALL I WANT   WHEN SOMEBODY IS SUICIDAL

5   ISN'T IT TRUE THAT THE GUIDELINES REQUIRE YOU TO MAKE A

6   TELEPHONE CALL OR LET SOMEBODY ELSE KNOW, RIGHT?

7      A   SUICIDAL, THE WORD SUICIDAL WAS MY ABBREVIATION

8   AND MY SHORTHAND FOR EXPLAINING THE FACT THAT MS  ARIAS

9   HAD TOLD ME THAT SHE HAD BEEN PLANNING TO KILL HERSELF

10  PRIOR TO HER ARREST AND EVEN DURING HER INCARCERATION

11  THAT'S WHAT I USED WHEN I WROTE SUICIDAL  THAT WAS MY

12  NOTE  THOSE ARE THE WORDS THAT I USED

13     Q   AND YOU DIDN'T INFORM ANYBODY IN THE JAIL TO

14  GIVE THEM A CAUTIONARY NOTE THAT YOU BELIEVE  BASED ON

15  YOUR CONVERSATIONS WITH HER, THAT SHE WAS SUICIDAL  RIGHT?

16     A   I CONTACTED HER THROUGH THE ATTORNEY WHICH IS

17  ALL OF MY CONTACTS THROUGH THE JAIL ARE DONE THROUGH THE

18  ATTORNEY  I'M NOT ASKING ABOUT THAT  I'M ASKING WHETHER

19  ISN T IT TRUE  THAT YOU DIDN T TELL ANYBODY IN THE JAIL

20  THAT YOU BELIEVE THAT THIS INDIVIDUAL WAS SUICIDAL

21        MS  WILLMOTT  OBJECTION  ASKED AND ANSWERED

22        THE COURT  OVERRULED

23    A   NO  I DID NOT CONTACT ANYONE WITHIN THE JAIL

24  BY MR  MARTINEZ

25    Q   SO YOU HAD THIS WHAT APPEARS TO BE A

129

1  RELATIONSHIP WITH THIS INDIVIDUAL THAT YOU FEEL IS

2  APPROPRIATE THAT YOU BUY HER AT LEAST ONE GIFT  CORRECT?

3      A.  I BOUGHT HER A SELF HELP BOOK.

4      Q   YOU BOUGHT HER A BOOK WHICH IS A GIFT  CORRECT?

5      A   WELL  I DON'T CHARACTERIZE IT THAT WAY  BUT YOU

6  MAY

7      Q   WELL  NO  I M ASKING -- YOU TALKED ABOUT THIS

8  YOU PAID FOR IT, RIGHT?

9      A   YES

10     Q   YOU NEVER GOT IT BACK, RIGHT?

11     A   RIGHT

12     Q   AND IT IS FOR A PURPOSE THAT YOU BELIEVE WAS TO

13  HELP THE DEFENDANT  RIGHT?

14     A.  YES

15     Q   AND SO IF YOU ARE NOW HELPING THE DEFENDANT

16  YOU RE THERE ASSISTING HER  AREN'T YOU?

17     A.  I DID NOT CONDUCT THERAPY

18     Q   I'M NOT ASKING IF YOU CONDUCTED THERAPY  I'M

19  ASKING -- THE QUESTION IS  ISN T IT TRUE THAT YOU WERE

20  THEN THERE TO ASSIST HER?  YOU'RE ASSISTING HER  AREN'T

21  YOU  BY GIVING HER THIS BOOK, RIGHT?

22     A.  OKAY

23    Q   IS THAT A YES?

24    A.  YES

25    Q   NO   NOT A GUESS   WAS THAT A YES?

130

1    A.  YES

2    Q   AND WHEN YOU GAVE HER THIS BOOK  YOUR

3   EXPECTATION WAS THAT SHE WOULD GET BETTER FROM WHATEVER

4   PROBLEM YOU PERCEIVED  RIGHT?

5    A.  MY EXPECTATION WAS THAT SHE WOULD READ THE BOOK

6    Q   RIGHT  AND THE REASON YOU WANTED HER TO READ

7   THE BOOK WAS SO THAT SHE COULD ADDRESS IN A MEANINGFUL

8   FASHION WHATEVER ISSUES YOU SAW?

9    A   YES

10    Q   AND THAT'S TO HELP HER  RIGHT?

11    A.  YES

12    Q   AND THAT IS THE PROBLEM   THAT CREATES AN ISSUE

13   OF YOUR OBJECTIVITY IN THIS CASE  DOESN'T IT?

14    A   I DIDN'T THINK SO

15    Q   I KNOW YOU DIDN'T NOT THINK SO   BUT ON THE ONE

16   HAND YOU CAN SEE THAT YOU ARE HELPING HER TO GET BETTER

17   AND ON THE OTHER HAND  YOU HAVE TO BE IMPARTIAL, RIGHT?

18    A.  YES

19    Q   AND THAT CREATES AN ETHICAL DILEMMA FOR YOU

20   DIDN'T IT?

21    A.  WELL, IT DIDN'T AT THE TIME   AND IT'S SOMETHING

22   I TENDED TO ROUTINELY DO   SO I DIDN'T SAY IT AS AN

23  ETHICAL DILEMMA

24     Q   YOU DIDN'T SEE IT AS A ETHICAL DILEMMA, BUT YOU

25  CAN SEE THAT THERE'S AN APPEARANCE HERE THAT YOU RE TRYING

131

1  TO HELP HER, RIGHT?

2     A   YES   FROM YOUR PERSPECTIVE   YES

3     Q   NOT FROM MY PERSPECTIVE   FROM ANYBODY'S

4  PERSPECTIVE   ISN T IT TRUE FROM ANYBODY'S PERSPECTIVE YOU

5  ARE TRYING TO HELP THE DEFENDANT GET BETTER WITH REGARD TO

6  WHATEVER ISSUE SHE HAS?

7        MS  WILLMOTT  OBJECTION  SPECULATION AS TO

8  WHAT OTHER PEOPLE MAY THINK.

9        THE COURT  OVERRULED

10     A   COULD YOU REPEAT YOUR QUESTION?

11  BY MR  MARTINEZ

12     Q   ISN'T IT TRUE THAT FROM WHATEVER PERSPECTIVE

13  IT'S TAKEN, YOU ARE HELPING THE DEFENDANT?

14     A   YES  BY PROVIDING HER WITH THE BOOK, YES

15     Q   AND SO THEN THAT CREATES THIS ISSUE THAT MAY

16  AFFECT -- INDICATE THAT IT MAY AFFECT THE WAY YOU VIEW

17  YOUR EVALUATION IN THIS CASE  DOESN'T IT?

18     A   NO  IT DOES NOT

19     Q   THERE IS NO APPEARANCE OF THAT HERE AT ALL?

20     A.  THERE MAYBE AN APPEARANCE TO YOU BUT --

21     Q   NO  I M NOT ASKING TO ME

22        MS  WILLMOTT  OBJECTION TO LET HIM FINISH THE

23  ANSWER THAT HE HAD  THERE MAY BE AN APPEARANCE TO YOU

24  BUT -- AND THEN HE WAS INTERRUPTED

25      THE COURT  SUSTAINED  YOU MAY FINISH YOUR

132

1  RESPONSE

2     Q   GO AHEAD

3     A   IT MAY APPEAR THAT WAY TO YOU  BUT BASED UPON

4  HER LOW SELF ESTEEM, AND THE FACT THAT SHE WAS THREATENING

5  TO HARM HERSELF, AT LEAST CONTEMPLATING HARMING HERSELF, I

6  FELT THAT PROVIDING HER WITH THAT BOOK, IT WOULD ALLOW MY

7  EVALUATION TO GO ON

8     Q   AND SO IT'S BETTER FOR YOU TO PROVIDE HER WITH A

9  SELF-HELP BOOK, IN YOUR PERSPECTIVE NOW, AS OPPOSED TO

10  MINE  THAN TO GO TO THE AUTHORITIES AND SAY, THERE'S A

11  BIGGER ISSUE OF THREATENED SUICIDE  THAT'S WHAT YOU

12  BELIEVE?

13     A   THAT WAS COMMUNICATED TO HER ATTORNEY

14     Q   SURE  THAT'S WHAT YOU BELIEVE?

15     A   YES

16     Q   SIR  ONE OF THE THINGS THAT YOU TOLD US ABOUT

17  WAS THIS ISSUE THAT YOU HAD IN NEW JERSEY  DO YOU

18  REMEMBER --

19     A   YES

20     Q   -- TALKING WITH THE DEFENSE ATTORNEY ABOUT THAT?

21     A   YES

22     Q   YOU SAID, WELL, WHEN I WAS HERE IN ARIZONA THERE

23  WAS SOME SORT OF APPEAL OR SOME SORT OF -- I DON'T KNOW

24  SOME PROCEEDINGS  AND YOU SEEMED TO INDICATE THAT WHATEVER

25  HAPPENED IN NEW JERSEY REALLY WAS NO BIG DEAL?

Exhibit 78

1                IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

2                    IN AND FOR THE COUNTY OF MARICOPA

3

4     STATE OF ARIZONA,                )
                                       )
5                      Plaintiff,      )
                                       )
6              vs                      )      CR 2008-031021
                                       )
7     JODI ANN ARIAS,                  )
                                       )
8                      Defendant       )
                                       )
9     _____     )

10

11

12

13              REPORTER'S TRANSCRIPT OF PROCEEDINGS

14

15              (Cross-examination of Dr  Geffner)

16

17                      Phoenix, Arizona
                        January 26, 2015
18

19
                Before The Hon  Sherry K  Stephens
20

21              REPORTED BY

22              MICHAEL A  BABICKY, RPR
                Certified Court Reporter
23              Certificate No  50361

24              PREPARED FOR

25              MR  JUAN MARTINEZ
                DEPUTY COUNTY ATTORNEY

1                              EXHIBITS

2

3

4          None marked

5

6

7

8

9

10

11

12

13

14

15

16

17                  ~

18

19

20

21

22

23

24

25

3

```
 1            REPORTER'S TRANSCRIPT OF PROCEEDINGS,

 2            was taken on January 26, 2015 commencing

 3  at 10 30 a m , at the SUPERIOR COURT, MARICOPA

 4  COUNTY, 175 W  Madison, Phoenix, Arizona, before

 5  MICHAEL A  BABICKY, a Certified Reporter in the

 6  State of Arizona

 7

 8            COUNSEL APPEARING

 9
                 For the Plaintiff
10
                 DEPUTY COUNTY ATTORNEY
11               BY   MR  JUAN MARTINEZ, Esq

12

13               For the Defendant

14
                 BY   MR  KIRK NURMI, Esq
15
                 BY   MS  JENNIFER WILLMOTT, Esq
16

17

18

19

20

21

22

23

24

25
```

1    it?

2         A    Yes, sir

3         Q    And isn't that -- except for the items that are

4    deleted that you don't want to show, isn't that a true and

5    accurate duplicate of what you have in your file?

6         A    It's a duplicate of one of the things

7         Q    Is that yes or no?

8         A    Yes, it is

9         Q    Thank you   Move for the admission of Exhibit

10   836

11             MS  WILLMOTT   Judge, may we approach?

12             THE COURT   You may

13             (Sidebar discussion )

14             THE COURT   Okay?

15             MS  WILLMOTT   Objection as to relevance   The

16   relevance of this has nothing -- and secondly, foundation,

17   Dr  Geffner said it's a duplicate of one of the things in

18   the file, which one and what?

19             THE COURT   Are you going to have him explain

20   that?

21             MR  MARTINEZ   Yeah, I can't have him explain it

22   without showing it to him

23             THE COURT   All right   That's your only

24   objection?

25             MS  WILLMOTT   Well, and relevance, what's the

```
 1   relevance?
 2              THE COURT   It's part of the DAPS test?
 3              MR  MARTINEZ   It's part the DAPS test and the
 4   instructions
 5              THE COURT   Overruled
 6              (Open court )
 7              THE COURT   836 is admitted
 8   BY MR  MARTINEZ
 9        Q   Let's take a look at this
10        A   Yes, sir
11        Q   It does give the name of Jodi Arias on it,
12   right?
13        A   Yes
14        Q   Gives the age of 33, right?
15        A   Yes
16        Q   Sex, female?
17        A   Say again?
18        Q   The sex is female?
19        A   Yes
20        Q   And says the race or ethnicity is Caucasian,
21   correct?
22        A   Yes
23        Q   The date is 10/9 of 2013, correct?
24        A   Yes
25        Q   That's the date when you administered this test
```

1    administered the test, right?

2         A    Yes

3         Q    At the bottom of this test we have something

4    else   You have here, Number One for 2008, prior to the

5    murder DV, et cetera, right?

6         A    Yes

7         Q    This says domestic violence, that's what that

8    means, right?

9         A    Yes

10        Q    You put that on there afterwards right?

11        A    No    That is what was put on -- well,

12   afterwards, yes, later the same -- at the end of that day

13        Q    So you put that in   And then on Number Two, now

14   in jail after 2008, but is what that says, right?

15        A    Yes

16        Q    But including of the day of the murder, right?

17        A    Yes

18        Q    Those were the parameters of the two tests,

19   right?

20        A    No

21        Q    That's what you wrote were the parameters of the

22   two tests, right?

23        A    That's correct   That's what I wrote at the end

24   of that day

25        Q    And isn't it true that after you saw the

1    results, that's when you went back and you changed them,

2    didn't you?

3         A    No

4              MS  WILLMOTT   Objection, argumentative

5              THE COURT   Overruled

6    BY MR  MARTINEZ

7         Q    Sir, didn't you tell us on direct examination

8    that it was in September of 2014 during the interview with

9    me that you noticed an error?  Do you remember telling us

10   that?

11        A    Yes

12        Q    So you changed it after the results were in,

13   didn't you?

14        A    Oh, that's not what you said the first time

15        Q    Yes or no?

16        A    After I read the results

17        Q    Forget the first time

18        A    Yes   It was after -- long after the results

19   were already done

20        Q    Right   And after you knew what the results were

21   then you decided to change what was here?

22        A    No

23             MS  WILLMOTT   Objection, argumentative

24             MR  MARTINEZ   Exhibit 837?

25        A    No   That's misrepresenting --

```
 1              THE COURT    Hold on    There's an objection
 2       A     Oh
 3              MS  WILLMOTT    Argumentative
 4              THE COURT    Overruled
 5       A     No    That's misrepresenting, as I told you that
 6   day, the results were already in    We knew the results    I
 7   caught it that day that the wording of that was wrong,
 8   told you that, and we corrected it    And it had nothing to
 9   do with the results, had to do with realizing that I wrote
10   the wrong thing which is what I was corrected
11   BY MR  MARTINEZ
12       Q     But the correction was made almost a year after
13   the results were in, right?
14       A     Almost, correct
15       Q     Take a look at Exhibit 838
16       A     Yes, sir
17       Q     You recognize that, right?
18       A     Yes
19       Q     And that's another answer sheet for the DAPS?
20       A     It's not the other one, it's the same one
21   That's the corrected -- on the bottom it's the same sheet
22       Q     It's different than Exhibit 837 that we're
23   looking at, right?
24       A     The sheet is not different, the wording is
25       Q     The wording is different than what we're looking
```

1    at in 837, right?

2         A    Yes, sir

3         Q    But it's a true and accurate copy of what you

4    have in your file, right?

5         A    Yes, sir

6              MR  MARTINEZ   Move for the admission of Exhibit

7    838

8              THE COURT   Any objection?

9              MS  WILLMOTT   No objection

10             THE COURT   838 is admitted

11   BY MR  MARTINEZ

12        Q    This is what it looks like, correct, at the top?

13        A    Yes   That's the same

14        Q    838, right?

15        A    Yes   And the top is the same as the one you

16   just showed

17        Q    It does look the same, right?

18        A    Yes, sir

19        Q    Then go down to the bottom   And then this is

20   the one that you changed, right?

21        A    Yes, sir

22        Q    And now what you're saying is on the first test

23   for 2008, including the day of murder and then you put DV,

24   et cetera, pre jail, right?

25        A    Yes

1       Q    And then two, now in jail after 2008, but not

2   just including the day of the murder, and then you also

3   added something else, though, beyond the time limit,

4   didn't you?

5       A    Beyond what?

6       Q    Beyond the time limitations, you added something

7   else, didn't you?

8       A    Yes

9       Q    And you added, DV in general, post jail, right?

10      A    Yes

11      Q    That has nothing to do with the time period,

12  does it?

13      A    I'm not sure what you're saying

14      Q    DV in general is talking about domestic violence

15  in general it's not talking about the time period?

16      A    No   It's talking about 2008, that's what she

17  identified in the part I showed you that were not --

18  doesn't show here is the notes on the left that I wrote

19      Q    Sir, this talks about -- and this I'm talking

20  about Exhibit 838 --

21      A    Yes

22      Q    -- the letters DV which is domestic violence in

23  general, are not included in the other answer sheet,

24  right?

25      A    That is correct

1    Q   Sir, and in this one here you changed it so that

2   when we're talking about the post traumatic stress, you're

3   looking at a traumatic event, right?

4    A   Or yes, yes

5    Q   Well, when we were looking at Exhibit 540, we

6   were looking at a traumatic event, right?

7    A   You switched back to PDS

8    Q   I'm just talking about it

9    A   Yes, that's correct

10    Q   Correct?  And in this particular case in the

11   second one which is 838, the one I'm point to --

12    A   Yes

13    Q   -- isn't it true you tell her what the traumatic

14   event is don't you?

15    A   No, she --

16    Q   Let's read it   In Number One you say for 2008,

17   including the day of the murder, right?

18    A   Yes

19    Q   That's what you're referencing, right?

20    A   Yes

21    Q   That's what the cut off including the day of the

22   murder, right?

23    A   Yes

24    Q   Number Two, now in jail after 2008, but not just

25   including the day of the murder, again, you're referencing

1    the murder, aren't you?

2        A    As part of it, yes

3        Q    But what you're doing there is you're not

4    allowing her to pick what the traumatic event is, are you?

5    You're picking it for her?

6        A    No    This is after she picked it    In other

7    words, the way you administer that test is similar to what

8    you showed with the PDS, based on filling out

9    questionnaire, they indicate what the different traumas

10   are

11              Then they indicate which is important    So

12   the first time, what she indicated was the primary one

13   which you're seeing up here was -- I'm sorry, didn't mean

14   to do that -- was the day of the murder    So she filled

15   out that questionnaire because she said that was the

16   primary one    Then we talked to her afterwards, I did, and

17   asked her, well, if you think about the way things are

18   today and in general since you've been incarcerated, what

19   are the things that are most traumatic?  And she indicated

20   two things are together    And those are what my notes are

21   on the left side of that page that I showed you on

22   Thursday which she then said was the time Travis choked

23   her

24       Q    Without telling me the answer, we're not talking

25   about that

1       A      Okay   She told me --

2       Q      All right

3       A      -- that   And I wrote this down based on what --

4    I didn't tell her what to do   She did   And I labeled it

5    later

6       Q      But --

7       A      As you pointed out, a year later, I realized I

8    said, day of murder instead of jail because I was

9    confused   At the time we were talking about the murder

10   and she was incarcerated later after the murder   And so

11   that's when I caught the error of what I labeled, not what

12   she said, not what I told her to do

13                    It's what she told us and then I labeled it

14   incorrectly

15      Q      So you say that you committed an error in these

16   answer sheets, right, that's what you just said, right?

17      A      On the labels of the answer sheets, that is

18   correct

19      Q      Right   Actually isn't it true that you were

20   afraid that because of what the answers had been in

21   Exhibit Number 540, that she might again be less than

22   truthful, isn't that --

23                    MS  WILLMOTT   Objection   Vouching,

24   argumentive

25                    THE COURT   Sustained

```
1    BY MR  MARTINEZ
2       Q    You went back relabeled them about a year later,
3    didn't you?
4       A    Yes
5            MS  WILLMOTT   Objection   Asked and answered
6       A    I'm sorry
7            THE COURT   Overruled
8    BY MR  MARTINEZ
9       Q    Sir, in terms of the credibility issue, you're
10   familiar with other times where the defendant has
11   attempted to change what is to be presented in this case,
12   aren't you?
13      A    I'm --
14           MS  WILLMOTT   Objection, vague
15   BY MR  MARTINEZ
16      Q    All right   Let's take a look   Are you familiar
17   with Exhibit Number 465?
18           MS  WILLMOTT   Objection   Judge, may we
19   approach?
20           THE COURT   You may
21           (Sidebar discussion )
22           THE COURT   465 was previously admitted?
23           MR  MARTINEZ   It was
24           MS  WILLMOTT   Yes, Judge   And this doctor has
25   never seen it   He doesn't know what it's about   It
```

1    give their qualifications, whatever they may be, right?

2        A    Yes

3        Q    And then they testify

4        A    The Judge determines whether they're qualified

5    to testify

6        Q    Are you licensed in the state of Arizona?

7        A    No, I'm not

8            MR  MARTINEZ    Judge, I would like to approach

9    with the next area if I may?

10            THE COURT    You may

11            (Sidebar discussion )

12            MR  MARTINEZ    They are not marked as exhibits

13   So I'll describe them    One is a confidentiality

14   agreement, this is the agreement he requested I give to

15   DeMarte when we had our interview on September 2014    The

16   other is a sealed minute entry form October 1, 2014 in

17   which you ordered he produce the raw data to Dr  DeMarte

18   And there's a letter that he wrote, December 23rd, 2014,

19   to Dr  DeMarte

20            This is the area involving the raw data that he

21   refused to turn over and I'll characterize it, there's a

22   threat here, December 23, 2014 letter, and I'd like to

23   start asking him questions about this area to show his

24   bias

25            MR  NURMI    Doesn't sound at all relevant,

```
 1    doesn't have anything to do with bias and simply confuses
 2    the jury  You're talking about psychological ethics and
 3    the disclosure of copyrighted material  Are we going to
 4    have a symposium on that for the next several days?
 5    Because again it's totally irrelevant, it's confusing the
 6    jury from the issues
 7            THE COURT  So your point is that he did not
 8    provide the raw data because he had concerns about the
 9    issues?
10            MR  MARTINEZ   No   Because he had concerns
11    about what was in it because he didn't want people to find
12    out   For example, I just went through the CTS and there
13    was a problem with it where he said -- she said was it a
14    gun or knife that was involved that she ever used, he
15    didn't want people to look -- he didn't want other people,
16    for example, a lawyer, me, to look at it  And that he
17    said at 42 CFR, part two, which has nothing to do with
18    this, threatening her with release of this information
19    So --
20            MR  NURMI   We had a hearing on this outside the
21    presence of the jury before talking about disclosure of
22    this evidence   And both parties agreed that how this was
23    handled -- it's mind boggling how this is not confusing to
24    the jury  And again, the relevance of any of this --
25            MR  MARTINEZ   It goes to his bias because he
```

1    didn't want to disclose this -- these items because he

2    doesn't want people to look at some of the errors that he

3    made, for example, the labeling that we have on the DAPS

4    and he had a problem with the CTS where he -- she gives

5    these answers that are problematic, he doesn't want people

6    to see that   And specifically he doesn't want it

7    communicated so it comes out   And that's why I want to

8    ask him about that   And I can do it   This letter where

9    he threatens sanctions that are not appropriate

10             MS  WILLMOTT   Judge --

11             THE COURT   Hold on   Let me make sure I

12   understand the State's argument   So you're saying that

13   because he's refusing to turn over the raw data and she

14   signed the disclosure notice or was that an order of the

15   Court?

16             MR  MARTINEZ   Right

17             THE COURT   It indicates that he did not want

18   this information to come out?

19             MR  MARTINEZ   Right   Um-hum   So that we can

20   explore it at trial because as you can see he's having a

21   real --

22             THE COURT   Okay   You can ask him that question

23   generally   But I prefer not to reference any of those

24   documents and see what he says with respect to the

25   question   And if he denies it, then perhaps it's

1  appropriate to explore with some of these issues, some of
2  these documents

3          MS  WILLMOTT   Judge, the State has no good
4  faith basis to ask these questions   He was here during
5  the hearing when we discussed it   The issue was not
6  disclosing the material, period   The issue was disclosing
7  it to a doctor who has previously disclosed raw data to
8  the prosecutor which is unethical, and not allowed
9  pursuant to the copyright law

10         The only issue that was -- we have with Dr
11  Geffner was that he wasn't willing to disclose it to the
12  same doctor who had previously violated her ethics   Once
13  that was taken care of because the Court ordered him and
14  then also Dr  DeMarte promised she wouldn't disclose the
15  questions which apparently she has, then Dr  Geffner was
16  relieved of any ethical issues because the Court had
17  ordered him              -

18         So it doesn't -- the question makes no sense
19  because all that information was given to Dr  DeMarte
20  without hesitation except for the fact that it should not
21  be disclosed to anybody else   And the Court relieved him
22  of any responsibility of it being -- if she breached her
23  ethical duties and she disclosed it, the Court relieved
24  him of any issues

25         So it's not true and there's no good faith basis

1    for him to explore the fact that Dr  Geffner actually

2    didn't want to release the raw data   He was always

3    willing to release it as he's supposed to   It's just he

4    was concerned and about the ethical issues that Dr

5    DeMarte presented during the first trial

6              MR  MARTINEZ   The problem with that Dr  DeMarte

7    did not disclose, for example, the PDS, that was disclosed

8    by the other expert

9              THE COURT   I'm going to allow you to get into

10   it generally with regard to why his reluctance to provide

11   the raw data so you can pursue it from there   But the

12   specifics and the actual documents do not show those until

13   we discuss it further

14             MR  MARTINEZ   I understand

15             THE COURT   We're going to take the lunch

16   recess

17             MS  WILLMOTT _ Okay   Just for the record, it

18   was not Dr  Samuels who disclosed the PDF and the reason

19   why that PDF was disclosed is because the State was asking

20   him questions and the first part there was the questions

21   about what was contained in the PDS

22             The only reason why the State would have known

23   those specific questions is because Dr  DeMarte told him

24   Then this it the State who asked Dr  Samuels to mark the

25   PDF raw data as an exhibit   We objected   And over

Subject to Motion for
Protective Order

# Exhibit 79

Subject to Motion for
Protective Order

# Exhibit 80

Subject to Motion for
Protective Order

# Exhibit 81

Subject to Motion for
Protective Order

# Exhibit 82

Subject to Motion for
Protective Order

Exhibit 83

# Juan Martinez

# 15-3363

Exhibits to initial charge
Attachment 01
(Gallardo OA Transcripts)

1

2

3    State                        )

4    v.                           )        CR-09-0171-AP

5    Mike Peter Gallardo          )

6    ———————————————— )

7

8

9

10

11

12                              ORAL ARGUMENT

13                    State of Arizona v. Michael Gallardo

14

15

16

17

18

19

20

21    Prepared for:

22    Jeremy Bogart and John Canby

23

24    Prepared by:

25    Linda J. Lok

26

27

28

| | |
|---|---|
| 1 | PRESENT:   Kerrie M Droban |
| 2 | Susanne Blomo |
| 3 | Justice John Pelander |
| 4 | Vice Justice Andrew Hurwitz |
| 5 | Chief Justice Rebecca White Berch |
| 6 | Justice Scott Bales |
| 7 | Justice Michael Ryan |

8

9    JUSTICE BERCH: Thank you all. Please be seated. Good afternoon. This is

10    the time set for oral argument in State of Arizona versus Mike Peter Gallardo, case

11    number 09-0171-AP. We have with us Justice Michael Ryan. For those of you who

12    follow supreme court business, you'll know Justice Ryan retired in August of this

13    year so he's now sitting with us as a judge-by-designation. We thank him for

14    joining us. Counsel, are you ready to proceed?

15    MS. DROBAN: Yes, thank you. May it please the court counsel, my name is

16    Kerrie Droban and I represent Mike Gallardo. On December 9th of 2005, Rudy

17    Padilla, a young college Freshman who was living at home with his parents, was

18    tragically shot to death during a burglary. The State charged and ultimately

19    convicted my client of that murder, and his second jury condemned him to death.

20    This court should reverse that sentence because the trial judge committed a

21    reversible error when he declared sua sponte over appellant's objection, and

22    purportedly for a manifest necessity he declared a mistrial. The record, Your

23    Honors, does not support the judge's decision. My client was entitled to have his

24    case heard by a jury he chose.

25    Now, the facts were simply this: During the second day of Gallardo's first

26    trial, a jury submitted a note to the judge at a lunch recess that essentially

27    implicated seven of the sixteen jurors in misconduct. The judge conducted

28    extensive voir dire of each and every one of those jurors. And of the seven

1    implicated, the main culprit was actually dismissed for unrelated reasons. An

2    addition two, who are also designated as the ring leaders, were struck by

3    stipulation. That left four. Of the four, one of them denied having any

4    conversations at all, the three remaining insisted emphatically to the judge that

5    they could remain fair and impartial. They advised the judge that while they had

6    discussions, the upshot of that was they were unspecific, they were innocuous,

7    and at best they were joking. And what that evidence was, Your Honors—we know

8    because we have a solid record in this case—was that they were, for want of a

9    better word, poking fun at some of the photographs. They were identifying a Bud

10   Light can in one of the photographs. They were discussing amongst themselves

11   how difficult it was to view some of those photographs. They talked about how

12   this case was not at all like Law and Order. They made general comments that

13   were basically remarks.

14          Now, the law does allow for a judge to declare a mistrial sua sponte only if

15   it's a manifest necessity, and there have been numerous case law that has

16   designated what that is. That's for illness, for prosecutorial misconduct, for a case

17   where the court decides that's the impact of the evidence that came out is going

18   to necessarily compromise the integrity of the case.

19          JUDGE PELANDER: How much deference should this court give to the trial

20   judge on the issue of manifest necessity?

21          MS. DROBAN: Well, Your Honor, we have a case here that I think is fairly

22   unique in that we have a solid record and not a silent record. We know exactly

23   what the judge asked these jurors.

24          JUDGE PELANDER: Did the trial court make some credibility determinations

25   when questioning the jurors?

26          MS. DROBAN: The trial judge said the reason that he declared a mistrial

27   was because he believed that the jurors were not being candid.

28          JUSTICE BERCH: Isn't that a credibility assessment, though? We have a

-2-

1   trial judge whose given us a very detailed minute entry and then he says part of

2   this is based on my assessment of the credibility of the witnesses. You know, some

3   of them said I didn't see anything, I didn't hear anything, I wasn't participating.

4   Others suggested that some of those were participating.

5        JUSTICE HURWITZ: I'm looking here, for example, at Judge Duncan's

6   finding that the court found that it was highly likely, particularly based on Juror

7   Number 13's responses that more than three identified jurors were involved in

8   discussing the case even though they didn't admit to having done so. So didn't this

9   -- didn't Judge Duncan on the scene make a credibility determination that more

10  people were involved in this case than -- in this improper discussion than fessed

11  up to it in court?

12       MS. DROBAN: Well, he made a credibility --

13       JUSTICE HURWITZ: She.

14       MS. DROBAN: She. She. But it was based on nothing contained in the

15  record. And in the three cases that are illustrative on this point, and one of which

16  this court actually reversed in Jories v. Kieger (phonetic).

17       JUSTICE RYAN: Well, trial judges assess credibility in many different ways

18  and not just simply what the words that a juror may say. It's the way they say it,

19  their demeanor and so forth and so on. And we're not there and we can't see what

20  she saw so shouldn't we defer to her discretion in her assessment of the juror's

21  credibility as to whether or not they obeyed the admonition not to discuss this

22  case?

23       MS. DROBAN: Well, the other part of that equation is that the judge had a

24  obligation to consider appellant's position and the case law says that. She can't

25  just make a determination that just based on nothing in the record -- in this

26  record.

27       JUSTICE RYAN: She had a hearing as opposed to some other cases, like

28  State v. Miller where there was no hearing. Here the judge had a hearing and voir

1    dired each juror individually, correct?

2         MS. DROBAN: Correct.

3         JUSTICE RYAN: So how can we substitute our judgment for her judgment

4    that there was a manifest necessity here when she's basing it on credibility

5    determination?

6         MS. DROBAN: Well, because we have some case law that is illustrative on

7    this. And the three that I cited in my brief, the first one in Jones versus -- I'm sorry

8    Jones v. Keiger the judge did not take into consideration the defendant's position.

9    The defendant -- appellant in this case said to the judge you can still keep your

10   finger on the chess piece, implored the judge not to do this because --

11        JUSTICE BALES: Well, let's take this in steps, because you acknowledged

12   early on that the defendant agreed to the dismissal of the person you

13   characterized as the ring leader. Now, I believe the judge otherwise found that

14   three jurors, 11, 12 and 15, had both violated the admonition and lied to the judge

15   about it. Do you think that was somehow clearly erroneous—her determinations in

16   that regard?

17        MS. DROBAN: No, because those three were gone.

18        JUSTICE BALES: All right. If that's correct, that then means there would

19   have been twelve jurors left for a capital trial expected to last several months.

20   Wasn't there manifest necessity just at that point to at least have some alternates?

21        MS. DROBAN: Well, there wasn't anything in the record that indicated that

22   Gallardo had been injured by any of the jurors' misconduct. And --

23        JUSTICE BALES: Well, perhaps the State had been injured by the jurors'

24   misconduct. Isn't that manifest necessity?

25        MS. DROBAN: Well, but this is different that some of the cases that this

26   court has found that to be the situation. For example, there wasn't in Gory v.

27   United States the appellant did not object there but that's because the prosecutor

28   was about to illicit comments from a witness that would have revealed the

-4-

1    defendant's prior convictions.

2         JUSTICE HURWITZ: But when we talk about jurors ignoring the admonition

3    and discussing the evidence on the second day of trial, that is the kind of conduct

4    from which manifest necessity can generically arise, can't it?

5         MS. DROBAN: It could but it didn't under the facts of this case.

6         JUSTICE HURWITZ: Because you don't think the discussion were meaty

7    enough?

8         MS. DROBAN: They didn't rise to the level that this court has determined

9    manifest necessity existed.

10        JUSTICE HURWITZ: Well, have we ever discussed violating the admonition

11   in that -- in the context of manifest necessity?

12        MS. DROBAN: Well, they -- in Reynolds, for example, the jurors had read a

13   newspaper article that implicated the defendant in some contemptuous conduct in

14   an unrelated matter. And even though the appellant objected in that case, the

15   judge and the prosecutor determined that it was going to severely compromise the

16   integrity of that case, and so in that situation, even though the appellant objected,

17   it would have done that. In this case we don't have that.

18        JUSTICE HURWITZ: But I guess I'm still -- I'm still troubled by -- you agree

19   three jurors should have been dismissed.

20        MS. DROBAN: Well, one was dismissed for unrelated reasons.

21        JUSTICE HURWITZ: Right, and the other two should have been dismissed.

22        MS. DROBAN: The other --

23        JUSTICE HURWITZ: You challenge the judge's finding that the other two

24   should have been dismissed for violating the admonitions.

25        MS. DROBAN: Correct.

26        JUSTICE HURWITZ: Let's get back to Justice Bales' question. We're now

27   left with twelve jurors for a six-week trial in which the absence of any juror would

28   mean we'd have to start all over again. Isn't -- why isn't that manifest necessity?

-5-

1    MS. DROBAN: Because it's not -- it's not something that's been outlined in

2    the cases that deal with manifest necessity and those are pretty specific. When

3    there's a hung jury, when there's an illness, when there's prosecutorial

4    misconduct, when there's court marshal --

5    JUSTICE BALES: Or something that taints juror impartiality. And I think the

6    case law does suggest that if the jurors right out of the box are ignoring the

7    judges instructions and prematurely discussing the evidence, that does call into

8    question the jury's impartiality.

9    MS. DROBAN: Well, I would agree with you if the facts supported it. We

10   are lucky in this case that we have a solid record. We know exactly what the jurors

11   said they discussed. And the upshot of it was they couldn't even be specific with

12   the judge in terms of what they discussed.

13   JUSTICE BERCH: But we also have a situation where the judge said I don't

14   necessarily believe that this is what happened. So given that our standard is abuse

15   of discretion review, is there enough here to overturn, to find that the judge

16   actually abused discretion?

17   MS. DROBAN: Well, I believe in this case there is, because the judge did

18   not even consider appellant's position at all.

19   MS. BERCH: I don't see where -- where in the record do you see that the

20   judge didn't consider the defendant's position?

21   MS. DROBAN: Well, the defendant when he says to the judge you can still

22   keep your finger on this chess piece, and implores the judge don't do this. This is

23   the jury we selected, we're on the second day of trial. When he says that, the

24   judge disregards that.

25   JUSTICE HURWITZ: Well, the judge didn't buy the argument, if you will.

26   But is there any indication in the record that the judge didn't fairly consider that

27   argument? She certainly heard it and then she did more. She says defendant --

28   you know, defendant makes this argument but I find it would be a manifest

-6-

1    injustice, and I also think that more than the three jurors were involved in this

2    discussion; I've listened to these people's testimony and I think one of them or

3    more is not telling me the truth. Wasn't that enough for her under these

4    circumstances to say let's avoid a conviction that we might have to overturn on

5    appeal because of jury problems. Let's give the state and the defendant a fair trial.

6    Let's get another fair jury in front of me and do this right.

7        MS. DROBAN: If we don't consider the relevant facts of each and every

8    case, then what is to give a judge any type of line in the sand, if you will, for any

9    case where you have -- a capital case where one juror has committed misconduct

10    or had a perception of impropriety? What is to stop that judge in any of these

11    cases to just declare a mistrial sua sponte? There's got to be some kind of line in

12    the sand and I submit to you that this case was it. There isn't anything in the

13    record. If you look carefully at what the jurors responded to, there's nothing that

14    suggests they weren't candid with the court. In fact the ones that -- that I think

15    both sides agreed were not candid were let go.

16        JUSTICE BERCH: But isn't that the problem with the credibility

17    determination, that there's -- maybe nothing in the record but there may have

18    been facial expressions or body behavior or other things that caused the judge to

19    believe of disbelieve one of these jurors as a witness?

20        MS. DROBAN: Well, perhaps it should have been stated more clearly on the

21    record, then. But there isn't -- there needs to be some kind of bright line. I think

22    our case law says that there is and that's why there are specific instances for

23    manifest necessity; that's why we have cases where they've outlined exactly what

24    has occurred.

25        JUSTICE PELANDER: The point's been made already a couple times. I just

26    haven't heard a good explanation as to how you would get around this, and that is

27    at the end of the day there are twelve jurors left in a capital case that ultimately

28    took six weeks to try. How can we say it was abuse of discretion under those

-7-

1    circumstances? And given the credibility determinations that have been mentioned

2    for the trial court to say this is not going well, we have a lot -- many more weeks

3    to go in this trial and the chances of finishing with twelve jurors may not be great.

4    How can we say that the court erred under those circumstances in finding manifest

5    necessity?

6        MS. DROBAN: Well, I think you can make that argument for any case,

7    that's it's a long trial, they may be out of --

8        JUSTICE PELANDER: They're all fact intensive; they're all, you know, fact

9    specific, if you will. It's not real helpful. But unless you can find a case exactly like

10   this, we didn't find one that says this was an abuse of discretion. They're all going

11   to depend upon the facts and circumstances and the determination's made by the

12   trial judge who's sitting there hearing the witnesses or in this case, the jurors. So,

13   you know, given the six-week trial, second day of trial this happens, the trial court

14   has a hearing, there's a full -- there's a very full minute entry explaining her

15   reasoning --

16       MS. DROBAN: Well, I think that's where you have to look at the case law

17   that we do have and distinguish this one. If there isn't one directly on point, I

18   think you have to distinguish the facts of this case from Reynolds and Keiger and

19   Gory versus United States and see exactly what the jurors did in that case and the

20   appellant's position.

21       JUSTICE BALES: Well, I'm not sure I understand exactly the argument. Are

22   you saying that the combination here of the jurors only talking jokingly about part

23   of the evidence early on, along with the defendant's wanting to retain this

24   particular jury, that that should have in essence required the trial judge to go

25   forward without requiring a mistrial?

26       MS. DROBAN: I believe it was -- it did not rise to the level of a manifest

27   necessity, not under these facts. I want to move on to my second argument for

28   why I believe this court should vacate this sentence. This was an interesting case

-8-

1    in that the appellant moved to get rid of the F6 -- or I'm sorry, the State withdrew

2    the F5 aggravator for pecuniary gain. We're left with the F2 aggravator, which is

3    the serious prior offense committed in 1981. We have a case with very truncated

4    and I would argue no mitigation at all. And then we have the F6. And, you know,

5    was this murder tragic? Yes. Was it senseless? Yes. But did it rise to the level

6    where it was especially cruel? And this court has to determine whether the jury

7    abused it's discretion in finding that it rose to that level.

8         JUSTICE HURWITZ: We're not engaged in independent review here. This

9    is --

10        MS. DROBAN: Correct.

11        JUSTICE HURWITZ: The question is whether there was -- whether a

12   reasonable jury could have reached this conclusion --

13        MS. DROBAN: Right.

14        JUSTICE HURWITZ: -- not whether we could reach it.

15        MS. DROBAN: Right, whether there was sufficient evidence to

16   support this. And in order to find especial cruelty, you have to find that the victim

17   consciously experienced either physical or mental anguish prior to death and the

18   defendant either intended or knew or should have known that his actions caused

19   that suffering. And we have a situation where uncertainty as to an ultimate fate

20   can establish mental anguish in some cases. But when there's an inference of it

21   without something further, and Prince (phonetic) tell us this, when there's no

22   witness that can quantify the length of time between the point at which the victim

23   may experience the mental anguish and the moment the fatal wound is inflicted

24   can't find (Inaudible).

25        JUSTICE HURWITZ: Can't we infer from this record that it was not a

26   relatively instantaneous matter? The victim was bound.

27        MS. DROBAN: Correct.

28        JUSTICE HURWITZ: A pillow case was put over his head and then he was

-9-

1    shot. We don't know how long in total that took but the amount of time it would

2    have had to take to bound the victim and then place the pillow case over his head

3    means that it wasn't an instantaneous or simultaneous thing. The victim certainly

4    had a period of time in which he was uncertain about his fate. Don't you think

5    that's a fair inference from this record?

6            MS. DROBAN: I think this case bears a striking similarity to the case this

7    court recently reversed -- or vacated, excuse me, vacated the death sentence in

8    State v. Snelling. The set of facts are very similar and I just want to highlight for

9    the court this is a case where you have Gallardo who is a stranger to the victim.

10   He's an intruder. Shatters the glass to their arcadia door. He startles Rudy who is

11   still in his pajamas. In Snelling, I think the defendant may have known the victim

12   briefly. But he enters the townhome, startles the 64-year-old woman who is

13   disrobed so she's also vulnerable. And we know from our case law that shock and

14   surprise does not necessarily equate to cruelty.

15           JUSTICE RYAN: Well, that case there was little or no evidence that she

16   struggled or whatever. And here there's evidence that even though he's bound, he

17   was able to get -- the victim was able to one arm out and it was underneath his

18   body and there were abrasion marks on his wrists and so forth. And so that is an

19   indication that he did suffer a period of time mental anguish.

20           MS. DROBAN: Well, Your Honor, I would disagree with that, because the

21   fact -- one very critical detail from your analysis is missing, which is that the

22   ligatures, according to the M.E., were loose.

23           JUSTICE HURWITZ: But it is reasonable inference, is it not, that the victim

24   was bound before he was shot. There'd be no reason -- there's no good reason to

25   bind somebody after you shoot them.

26           MS. DROBAN: Except that we can't suppose what happened. We have a --

27           JUSTICE HURWITZ: Well, we can -- we know for a matter of fact the victim

28   was bound.

1          MS. DROBAN: He was bound in his wrists and ankles and --

2          JUSTICE HURWITZ: And we know for a matter of fact the victim was shot

3      after a pillow case was put over his head --

4          MS. DROBAN: Right.

5          JUSTICE HURWITZ: -- because the bullet hole's through the pillow case.

6      And from those facts that we do know, surely a jury is entitled to conclude that the

7      victim was bound before he was shot, because it would be unreasonable for

8      somebody to shoot somebody first and then bind them. So wouldn't -- isn't that a

9      reasonable inference from this record?

10         MS. DROBAN: Well, I suppose you can infer that. But you could also infer

11     that he -- the -- since the ligatures were not tight on him, according to the M.E.,

12     the --

13         JUSTICE BALES: Didn't the M.E. also testify that the -- there were

14     abrasions at each site of the ligature and the abrasions on his wrist were self

15     indicative of possible struggle?

16         MS. DROBAN: Yes, but I would submit to you --

17         JUSTICE BALES: And it's permissible to infer, as you said in response to

18     Justice Hurwitz's question, that he was conscious. How could we conclude that the

19     jury had abused it's discretion in making the finding of conscious suffering by the

20     victim?

21         MS. DROBAN: Well, the abrasions that were found on his wrists and ankles,

22     how can -- why can't we argue at the same time that that could be a reflexive

23     thing as a result of being shot in the back of the head?

24         JUSTICE BERCH: Well, you can argue it, but isn't the question really

25     whether there's enough evidence to support the jury's verdict? And the verdict --

26     their -- the facts seem to show that the person was tied up and he struggled

27     enough to cause abrasions and get one hand free, which was then found under

28     him. Why is it unreasonable to say that's sufficient evidence to support the jury's

1    conclusion that he must have been suffering and worrying about his fate?

2         MS. DROBAN: Well, in Snelling, which this case vacated, you have a

3    situation of a single ligature mark on a woman's neck. She is also (Inaudible) but

4    she's bound, so strangulation in and of itself as we know is not per se cruelty.

5         JUSTICE HURWITZ: What was the standard review in Snelling?

6         MS. DROBAN: Independent review.

7         JUSTICE HURWITZ: And that was one where we said we weren't convinced

8    beyond a reasonable doubt on this evidence that mental cruelty had occurred.

9         MS. DROBAN: Correct.

10        JUSTICE HURWITZ: We have a different issue here, which is whether a

11   jury could reasonably conclude from this evidence that mental suffering had

12   occurred and that strikes me as a different question than the one in Snelling.

13        MS. DROBAN: Well, the case laws seem to suggest in order to find cruelty

14   -- especial cruelty there has to be some evidence in addition to the strangulation.

15   There has to be some evidence of defensive wounds, a plea for help, struggle.

16   Numerous cases have suggested that bruising and abrasions can be injuries other

17   than the strangulation itself. In this case we have a pillow case over his head.

18   Now, I know that this court's also -- this court also heard Chappel (phonetic) which

19   was drowning situation. The baby had a -- was being choked and drowned. But

20   what's strikingly different about that case from this case is that the baby actually

21   stared up into the defendant's eyes before he died, which is indicative of

22   apprehension. He was able to register that ultimate terror before he died. We don't

23   have that in this case. We have a pillow case over his head. At best he can see

24   light and shadow. We don't know when the pillow case was put over his head and

25   he's shot from the back so there isn't that oppression. There are loose ligatures so

26   he's able to free at least one arm, and he's positioned I guess on his side when the

27   police arrive. We have a ransacked crime scene. We don't have a sequence of

28   events. We don't have a witness.

-12-

1          JUSTICE PELANDER: This person was bound with things such as the

2    electric cord from a hair curler, the cord from a blow dryer, some other type of

3    string from a sweat pants or something like this. This is not something that clearly

4    was done in a rapid fashion. It would have taken time to do all that. And I think

5    you agree that there'd be no reason to bind somebody who's unconscious or

6    already shot. And so, again, getting back to the questions from the entire panel

7    here, viewing the evidence and reasonable inferences there from in the light most

8    favorable to the State, which we have to do, how can it be said that the no

9    reasonable jury could have found the F6 factor here?

10         MS. DROBAN: Because I would submit that it's missing several of the

11    components where you have found where the F6 factor is supported. Newell

12    (phonetic), for example, is a great comparison. In Newell there was a struggle.

13    You can actually see fingernail clippings from the girl who's trying to pull the

14    ligature off her neck. She had other bruises and abrasions. Some related to the

15    strangulation, some related to the sexual assault activity. In that case it's strikingly

16    -- there you have more than just the strangulation.

17         JUSTICE PELANDER: But the fact that some other cases involved more or

18    different facts, whether it be a struggle, or what have you, to support the F6

19    finding in those cases certainly doesn't mean that in this case the evidence by

20    necessity is insufficient.

21         MS. DROBAN: Well, I --

22         JUSTICE PELANDER: These cases are all different obviously in their facts.

23         MS. DROBAN: Right, they are. However, there are criteria in some of these

24    where the F6 is supported and --

25         JUSTICE PELANDER: A person who's bound in the manner this victim was

26    with a pillow case over his head, how can it be said that this person did not

27    contemplate and fear for his or -- his fate?

28         MS. DROBAN: Because bindings and strangulation alone is not per se

-13-

1   cruelty. There has to be something more, and our case law has said there has to

2   be something more. And the abrasions, again, are -- they're not -- the M.E.

3   testified these were loose ligatures so the abrasions could have caused a reflexive

4   motion from having been shot in the back of the head. I'd like to reserve my one

5   minute for rebuttal. Thank you.

6          MS. BLOMO: May it please the court, counsel, my name is Susanne Blomo.

7   I'm with the Arizona Attorney General's Office and I represent the State in this

8   appeal. I'll turn my comments briefly to the issue of mistrial. I think some of the

9   comments by the court were on point. This court does have to give difference to

10  the trial court's findings. Ms. Droban had focused on that we have such a great

11  record here. Well, the reason we have such a great record here is that the trial

12  court judge made a record of her specific findings—factual findings, credibility

13  findings. But what you're never going to find in a record is her findings about

14  demeanor, tenor and tone, much of the context. We know logistically the timing

15  but the feeling of the timing of this happening on the -- really the morning of the

16  second day of trial, and these were not innocuous references.

17         The trial court judge found in her minute entry that this was a serious

18  breech of the admonition because these jurors had discussed everything that had

19  been presented to them up until that point, including the prosecutor's opening

20  statement, the witnesses testimony, the contents of the photographic exhibits. And

21  it wasn't just joking comments about whether there was a, you know, Bud Light in

22  the picture. There were comments about what they would have done, that they

23  thought some of the testimony by the witnesses struck them as strange, that they

24  wouldn't have done that. Comments about if they were a criminal trying to commit

25  a crime what they would have done. These are not innocuous references. They are

26  judging what has been presented before them before the case has been given to

27  them for deliberation. And the reason why this is important is because we want

28  them to keep an open mind not just for the defendant's case, but for the

-14-

1    completion of the prosecutor's case as well. She talked about the manifest

2    necessity and the defendant's right to have a particular jury, and that's important.

3    But she's left out that these cases also discuss the public's right to a just outcome

4    and those things have to be balanced. And going all the way back to United States

5    v. Perez, the United States Supreme Court has discussed the public's interest in

6    just outcomes through Simmons v. United States, Wade v. Hunter, and through

7    Arizona v. Washington. Each one of those cases did not deal with a mistrial that

8    was precipitated by perceived harm to the defendant, but a mistrial that was

9    precipitated by perceived harm to the public's right to a just outcome, and

10    arguably to the prosecution's right to a full and fair hearing.

11    　　　JUSTICE BERCH: (Audio cuts out).

12    　　　UNIDENTIFIED: (Audio cuts out) of the jury discussion of evidence

13    occurred. This was early on in the trial, correct?

14    　　　MS. BLOMO: It was -- I think the jury was sworn the first day. They had an

15    opening statements and a couple of witnesses testified. The next morning Juror 9

16    overheard the conversation. She didn't report it until after the lunch break, but she

17    reported overhearing the conversations the following morning. And as the trial

18    court judge pointed out, they were discussing everything that had been presented

19    up until that point. And it wasn't just logistical things about the trial or, Wow, this

20    doesn't seem like Law and Order or this wasn't like I thought it would be, or as in

21    other cases, how do you think they're going to pick the alternate or who do you

22    think's allowed to sit in the courtroom. This is about the evidence.

23    　　　JUSTICE HURWITZ: Given the findings that the trial judge made in this

24    case, among which were that she didn't believe several of the jurors who said they

25    hadn't discussed the evidence, if she had not granted a mistrial and this case came

26    up on appeal, would this be a reversible error?

27    　　　MS. BLOMO: She made a finding that it would be fundamental error, even

28    despite the fact that not only did the defendant not object, but they didn't want

-15-

1    the mistrial. She made a finding in that minute entry that there was manifest

2    necessity and that it would in fact be fundamental error not to grant the mistrial.

3    So although that particular attorney was saying we don't want the mistrial, that

4    doesn't mean that on appeal there won't be an argument made that he should

5    have objected, and it was fundamental error for her to fail to grant the mistrial.

6         JUSTICE HURWITZ: Can I ask you a question about something that

7    nobody's discussed so far? The conduct of the trial prosecutor. It seems to me that

8    at least on several occasions, and by and large the objections were sustained, that

9    the trial prosecutor either ignored rulings by the trial judge or asked questions that

10   the trial judge once ruled improper and then rephrased the question in another

11   improper way. And I take your argument from your brief that even if there was

12   error it wasn't -- it didn't rise to the level of reversible error. But I've asked this

13   question in several cases so far so I'm interested in your reaction to it. Short of

14   reversing a conviction, how is it that we can -- we can stop inappropriate conduct?

15   I understand you may argue that it wasn't inappropriate but assume for a second

16   that it was. Reversing a conviction is a large -- is a very drastic remedy,

17   particularly in a case where the judge sustained the objections, told the jury that

18   they should disregard arguments and that -- how is it that -- we seem to see this

19   on a relatively recurrent basis. I'm wondering if the State can help us out and how

20   we should deal with these issues.

21        MS. BLOMO: Well, I can just tell you personally as a former prosecutor, if a

22   trial court or an appellant court had found that I had acted inappropriately but that

23   it didn't rise to the level of reversal and named me in their opinion and said that

24   they didn't think that I had behaved appropriately, that would have had a

25   tremendous impact on me and it would have had a tremendous impact on

26   everybody in the prosecuting agency I work for. And it's happened before. I think

27   prosecutors take it very, very seriously.

28        JUSTICE RYAN: Well, this prosecutor I recollect from several cases. This

-16-

1    same prosecutor has been accused of fairly serious misconduct but ultimately we

2    decided it did not rise to the level of requiring a reversal.

3        MS. BLOMO: Well, I can't --

4        JUSTICE RYAN: There's something about this prosecutor and about Mr.

5    Martinez.

6        MS. BLOMO: Right. I can't speak to the other cases. I haven't reviewed the

7    other appellant cases where perhaps this court found that he had behaved

8    appropriately (sic) but it didn't rise to the level of reversal. Reading the transcript,

9    I think it's arguments were impassioned. I don't think that they crossed the line to

10   misconduct. We expect impassioned arguments from prosecutors. It's really the

11   bread and butter of --

12       JUSTICE RYAN: I'm not -- the judge sustained an objection to a question.

13   Then he re-asked the question. Not once, but twice more. Three times. I mean it

14   was an objectionable question.

15       MS. BLOMO: The issues that were raised on appeal had to do with the

16   opening statement and the penalty phase and a closing argument in the penalty

17   phase. So when you say that he asked a question, at least that's my understanding

18   unless I've missed something. So when you say he asked questions and they were

19   sustained, and he basically asked the same question, I'm not entirely sure what

20   part of the record you're alluding to. I can --

21       JUSTICE RYAN: It was the expert's fee.

22       JUSTICE HURWITZ: His argument, to be fair, was referring to questions

23   that he'd asked during trial. And as I understand it, his argument was, well, the

24   expert changed his view while he was under examination. And the judge quite

25   appropriately sustained that objection saying, no, no, what the record reflects is

26   your first question was how much have you charged so far. Your next question

27   was how much will you eventually charge. You got two different answers to that

28   quite naturally. But you can't then argue from that to the jury that the expert was

-17-

1   waffling on how much they charge and the judge made that quite clear I think

2   three times during the -- during the argument.

3       MS. BLOMO: But a sidebar when they discussed it and the prosecutor

4   explained his position more fully, the judge backed off and indicated, well, the fact

5   that he's given two different amounts can go to impeachment of the witness. But

6   because of how complex this issue has become, and how intertwined it is to other

7   evidence that can or cannot come in, I'm going to ask you just to drop it and he

8   did drop it.

9       JUSTICE HURWITZ: What about -- what about the argument about

10  comparing the defendant to the victim? I think we've said any number of times

11  that's not an appropriate argument.

12      MS. BLOMO: I don't think that here a comparison was being made between

13  the victim and the defendant. What was happing here is there were victim impact

14  statements which naturally went to the loss that the survivors felt.

15      JUSTICE HURWITZ: And quite appropriately under our case law

16  (Inaudible).

17      MS. BLOMO: Yes, completely appropriate, okay? And they go to the loss

18  that they felt, what they missed about the victim, the harm that that has done to

19  their life. The defense then proceeds to essentially put forth as mitigation things

20  that even Ms. Droban has admitted were not mitigation, which is not things that

21  went to the defendant, but things that went to the defendant's family. The

22  defendant's family is going to miss him if he's in prison. The defendant's family is

23  going to be devastated if he's executed. And then things that, again, didn't go to

24  the defendant but this sort of general prison-is-a-really-bad-place argument, it's

25  isolating, he won't get to see his kids, you know, this and that.

26      JUSTICE BALES: Well, in fairness, I thought the defendant's argument was

27  more that the restraints that exist in a maximum security facility should be

28  sufficient, not that that's necessarily a nice place to be.

-18-

1       MS. BLOMO: Well, prison is bad enough, I guess. A bad enough

2   punishment.

3       JUSTICE HURWITZ: Well, anything -- our case law indicates that anything

4   can be mitigating. The jury considers --

5       MS. BLOMO: The defendant had (Inaudible) mitigating, yes.

6       JUSTICE HURWITZ: -- considers it to be such. But as I understand it, the

7   response to that was, well, yes, the defendant will be locked up and denied some

8   access to his family, but the victim is dead and has no access to his. It seems to

9   me that's a comparison of the victim to the defendant, isn't it?

10      MS. BLOMO: I don't think it's a comparison of the victim to the defendant. I

11  think it's rebutting what they're putting forth as mitigation with the victim impact

12  evidence, which is completely permissible under the law. Victim impact evidence

13  can be used and is generally intended to be used to rebut mitigation. So if they're

14  going to put forth mitigation that he's isolated from his family and separated from

15  his family, it makes sense to rebut it with the mitigation (Inaudible).

16      JUSTICE HURWITZ: Well, again -- again, I'm not sure it rises to the level of

17  reversible error in this case. But it seems to me that reasonably allowed victim

18  impact evidence is to allow the jury to know that in rebuttal to the mitigation

19  there's a family that's suffered or there are people that have suffered from this

20  crime. It seems to me not at all relevant to that victim impact evidence to say -- to

21  say that the victim is in a different circumstance than the defendant. It doesn't

22  rebut the family's loss or grief to point out that the victim -- that the defendant is

23  still alive and the victim is not. That doesn't go to the --

24      MS. BLOMO: Well, as the court pointed out, there was an objection. The

25  objection was sustained. The jurors were instructed that the comments of the

26  lawyers were not evidence. The jurors -- jurors are presumed to follow those

27  instructions. There was also -- there were also instructions on how the jurors could

28  consider the victim impact evidence. The jurors were instructed not to be swayed

-19-

1   by passion or prejudice. So not to make just a purely emotional response to

2   (Inaudible).

3        JUSTICE HURWITZ: That all I think -- but that all I think supports your

4   argument that even if there was improper statement here by the prosecutor it

5   wasn't a reversible error. And I tend to think you're right abut that but I'm not

6   sure I'd buy the argument that the statement was proper because it rebutted the

7   impact evidence. It seems to me the impact evidence goes to something very

8   specific—what's the family's loss from this crime. And it -- I don't think it rebuts

9   that to say and the defendant is still alive. It seems to me that's -- that's not --

10  that doesn't meet the impact evidence at all.

11       MS. BLOMO: Well, I think it's also important to point out that they have

12  alleged a comment -- another comment that followed that was sort of a flippant,

13  derogatory remark. And I think it's important to note that the case law indicates

14  that we don't presume the most negative damaging meanings from the

15  prosecutor's statements, and we don't presume that the jurors take those

16  comments as their most damaging meanings. From a cold record, it's, you know,

17  not hearing the tenor or tone of the comment, it's hard to know how the jury

18  would have taken that. But certainly based on the instructions that were given to

19  the jurors, and based on the circumstances, this does not rise to the level of

20  reversible error.

21       JUSTICE HURWITZ: Remind me. Was a motion for mistrial made after

22  those statements?

23       MS. BLOMO: There was a motion for mistrial and I'm not sure at what point

24  in the penalty phase it was made.

25       JUSTICE HURWITZ: But if we reviewed that we would review the judge's

26  ruling for an abuse of discretion.

27       MS. BLOMO: That's correct. Right, that's correct. I don't know if there are

28  any other questions on the -- on the prosecutorial misconduct claim. I'll just

-20-

1    quickly go to the F6. As this court knows, I'm probably more familiar with the
2    Snelling case than I would like to be. Snelling was very, very different. The body
3    there was so badly decomposed that there was — it was impossible to determine
4    any sort of defensive wounds, any sort of injuries. And the testimony was that the
5    victim could have lost consciousness within seconds and was probably attacked
6    and the choking began almost immediately. Here, that's not the case. As Justice
7    Pelander pointed out, these bindings would have taken time not only to get the
8    different cords and things that were used to do the binding, but to do the binding
9    itself. These ligatures were not all loose. Some of them were loose but some of
10   them were tight enough to cause bruising, abrasions. And as you pointed out, it
11   also appears that the victim struggled against them, tried to free himself. So
12   clearly during that time he's contemplating his fate. And there also cases, I think
13   State v. Moody, that talk about these sort of abrasions being evidence of physical
14   pain. And here the Medical Examiner characterized the pressure from the ligatures
15   causing abrasions as pain. So there's not only mental anguish, there's also physical
16   pain.

17        JUSTICE PELANDER: And the F2 aggravator was also found and there's no
18   contest about that, correct?

19        MS. BLOMO: That's right. And I think it's interesting just from a legal
20   standpoint that Ms. Droban has stood up and said there was absolutely no
21   mitigation presented. Well, even if this court found that the F6 wasn't sufficient,
22   we still have an F2 and the standard would be harmless error. If there's absolutely
23   no mitigation and there's an F2, then the lack of F6 would be harmless error.

24        JUSTICE HURWITZ: Well, I didn't understand her to say there was
25   absolute. If she did then I think she probably mischaracterized the record. Some
26   mitigation was presented. It was relatively minimal. But if in fact -- and I think
27   you're right. I think the F6 should not be struck in this case. But if the F6 were
28   struck, under Brown v. Saunders, wouldn't we have to conclude that no reasonable

-21-

1  jury in the world would have sentenced this defendant to anything but death

2  under this set of facts?

3       MS. BLOMO: The standard under the statute is harmless error, and recently

4  this court decided (Inaudible) in the standard would be with the death verdict

5  surely unattributable to the (Inaudible-over talking).

6       JUSTICE HURWITZ: Right. And in a recent case we said when the judge

7  inappropriately told the jury that there were three aggravators rather than one, we

8  couldn't find that. Under the supposition that Justice Pelander posed here, I'm now

9  posing if you found that the judge had erroneously told the jury that there were

10  two aggravators rather than one, how could we conclude that the error was

11  harmless?

12       MS. BLOMO: I'm not sure of your question saying there were two

13  aggravators rather than one. If the jury (Inaudible-over talking).

14       JUSTICE HURWITZ: No, if the F6 were -- if the F6 were inappropriate, then

15  the jury was in the penalty -- in the penalty phase laboring under misapprehension

16  that it was supposed to weigh whatever mitigation there was, and I agree there

17  wasn't much in this case, against two aggravating circumstances or at least

18  considered against two when in fact there should have only been one.

19       MS. BLOMO: Well, I guess I'm struggling to find a circumstance in which

20  then there could be harmless error.

21       JUSTICE HURWITZ: Well, I think -- I think under Brown v. Saunders, as

22  long as you've done away with independent review, as the legislature has done, it

23  will be very difficult to find harmless error when an aggravator is inappropriately

24  submitted to the jury. At least -- I don't think we have to confront that issues in

25  this case, but I think my -- that's my -- that's my sense of what Brown tell us,

26  given that we're a state where the jury is told to consider the number of the

27  aggravators. If it were just a gateway, as in California, it wouldn't be a problem.

28  But when you have to engage in some sort of balancing process, I think when you

1    take half of the aggravators off the scale it's going to be very difficult to do that.

2    MS. BLOMO: Well, and I'm not as familiar with Brown v. Saunders as I

3    guess I should be. But you would have an F2 and you would have the facts and

4    circumstances of the crime, which include all the evidence that went to the F6

5    even if the F6 can't be considered an aggravator. And then on the other side of

6    the scale, you would have what she phrased no mitigation at all or what may be

7    more properly phrased mitigation that was presented but that carried no weight.

8    So if you have mitigation that carries no weight, and you have an F2 and the facts

9    and circumstances of the crime, I would think this court could see a case in which

10    it would be harmless error. But, as you've -- as you've indicated, it's not -- that

11    question isn't presented in this particular case.

12    JUSTICE PELANDER: Just out of curiosity since you have time left, does the

13    record show why the pecuniary gain F5 factor was dismissed?

14    MS. BLOMO: The best that I could tell from the record, the defense was

15    arguing that it wasn't there. I think -- I think the argument was that the motivation

16    for the murder was not strictly pecuniary gain. Now, of course there are cases that

17    say you can have multiple -- multiple motivations. But I think the prosecutor was

18    concerned about, you know, possible reversal and just said, you know what, we'll

19    just take it off the table.

20    JUSTICE PELANDER: The defendant was found guilty of both of

21    premeditated first degree murder and felony murder, correct? I think that's true.

22    MS. BLOMO: I think that's true.

23    JUSTICE PELANDER: All right.

24    MS. BLOMO: If there are no further questions, I'll sit down.

25    JUSTICE BERCH: Thank you, counsel. Ms. Droban.

26    MS. DROBAN: Well, I suppose I should set the record straight that the

27    mitigation was truncated in this case.

28    JUSTICE HURWITZ: And we didn't understand. You can see that there was

-23-

1    not --

2         MS. DROBAN: Right.

3         JUSTICE HURWITZ: Well, I have a question. I don't want to use up much

4    of your time, but what should defense counsel do in these situations where the

5    defendant says I don't want mitigation presented? Should there be an offer of

6    proof, should a record be made of what -- of what mitigation would be presented

7    had the defendant not --

8         MS. DROBAN: Well, you know, that's exactly what the court faced in this

9    case where they tried to make them put it on and then they rescinded that

10    requirement. And, you know, defense counsel said that was a strategic decision.

11    We won't -- we don't know whether it was or it wasn't. That's for another court,

12    another day. But I think there's a fine line in terms of (End of recording).

-24-

# Juan Martinez

# 15-3363

Exhibits to initial charge
Attachment 02
(state v. andriano)

**State v. Andriano, 215 Ariz. 497 (2007)**

161 P.3d 540, 508 Ariz. Adv. Rep. 3

KeyCite Red Flag - Severe Negative Treatment
Abrogated by State v. Ferrero, Ariz., April 11, 2012
215 Ariz. 497
Supreme Court of Arizona,
En Banc.

STATE of Arizona, Appellee,
v.
Wendi Elizabeth ANDRIANO, Appellant.

No. CR–05–0005–AP. | July 9, 2007.

**Synopsis**
**Background:** Defendant was convicted by a jury in the Superior Court, Maricopa County, Cause No. CR2000–096032, Brian K. Ishikawa, J., of first degree murder and was sentenced to death. Defendant appealed.

**Holdings:** The Supreme Court, Rebecca White Berch, V.C.J., held that:

[1] evidence of defendant's attempts to procure life insurance on her husband, the victim, was admissible;

[2] trial court was not required to sua sponte instruct the jury on the lesser-included offenses of second degree murder and sudden quarrel or heat of passion manslaughter;

[3] trial court was not required to include "mercy" among the enumerated mitigating circumstances for the jury's consideration;

[4] jury impasse instruction was not provided prematurely;

[5] lethal injection statute was not unconstitutionally vague; and

[6] evidence supported aggravating sentencing factor that defendant committed murder in an especially cruel manner.

Affirmed.

West Headnotes (23)

[1]   **Criminal Law**
      ⚖═Construction of Evidence

      The Supreme Court views the facts in the light most favorable to sustaining the verdict.

      Cases that cite this headnote

[2]   **Criminal Law**
      ⚖═Reception and Admissibility of Evidence

      The Supreme Court reviews evidentiary rulings for an abuse of discretion.

      7 Cases that cite this headnote

[3]   **Criminal Law**
      ⚖═Interwoven occurrences in general

      Other act evidence is intrinsic when (1) evidence of the other act and evidence of the crime charged are inextricably intertwined or (2) both acts are part of a single criminal episode or (3) the other acts were necessary preliminaries to the crime charged.

      8 Cases that cite this headnote

[4]   **Criminal Law**
      ⚖═Homicide, mayhem, and assault with intent to kill
      **Criminal Law**
      ⚖═Homicide, mayhem, and assault with intent to kill
      **Homicide**
      ⚖═Previous hostile acts or conduct of accused

      Evidence of defendant's attempts to procure life insurance on her husband, the victim, was admissible to show defendant's plan,

**State v. Andriano, 215 Ariz. 497 (2007)**

161 P.3d 540, 508 Ariz. Adv. Rep. 3

knowledge, and intent to kill, in prosecution for first-degree murder, even though defendant was unable to procure any life insurance. 17A A.R.S. Rules of Evid., Rules 403, 404(b).

2 Cases that cite this headnote

[5] **Criminal Law**
⇐Homicide, mayhem, and assault with intent to kill
**Homicide**
⇐Infidelity, unfaithfulness, or jealousy

Evidence of defendant's extramarital affairs was admissible, in prosecution for first degree murder; the evidence showed defendant's motive for killing victim, her husband, and it also rebutted the defense theory that defendant was a domestic violence victim who lived in fear of her husband. 17A A.R.S. Rules of Evid., Rule 404(b).

5 Cases that cite this headnote

[6] **Criminal Law**
⇐Necessity of requests

The Supreme Court reviews a trial court's failure to give lesser-included offense instructions for fundamental error when the instructions are not requested at trial.

5 Cases that cite this headnote

[7] **Criminal Law**
⇐Failure to instruct in general

In a capital case, it is fundamental error for the trial court to fail to give a lesser-included offense instruction if one is supported by the evidence and not waived by the defendant.

6 Cases that cite this headnote

[8] **Homicide**
⇐Degree or classification of homicide
**Homicide**
⇐Manslaughter

Trial court was not required to sua sponte instruct the jury on the lesser-included offenses of second degree murder and sudden quarrel or heat of passion manslaughter, in prosecution for first degree murder; evidence did not support the instructions as defendant's sole defense was self defense.

Cases that cite this headnote

[9] **Constitutional Law**
⇐Proceedings
**Sentencing and Punishment**
⇐Instructions

Jury instruction defining cruelty, which informed the jury that cruelty involved the infliction of physical pain and/or mental anguish on the victim before death and that a crime was committed in an especially cruel manner when the defendant knew or should have known that the manner in which the crime was committed could cause the victim to experience physical pain and/or mental anguish before death, sufficiently narrowed the aggravating factor in death penalty case that murder was committed in an especially heinous, cruel or depraved manner, and thus the aggravator was not unconstitutionally vague. A.R.S. § 13–703(F)(6).

4 Cases that cite this headnote

[10] **Sentencing and Punishment**
⇐Instructions
**Sentencing and Punishment**
⇐Presentation and reservation in lower court of grounds of review

State v. Andriano, 215 Ariz. 497 (2007)
161 P.3d 540, 508 Ariz. Adv. Rep. 3

Jury instruction, which instructed the jury that especially heinous, cruel or depraved aggravating circumstance could not be found unless the circumstances of the murder raised it above the norm of other first degree murders, did not impermissibly require the jury to engage in proportionality review, and did not constitute fundamental error, in prosecution for first degree murder; jurors had to assess whether the murder was so cruel that it rose above the norm for first degree murders, and the court assisted the jury in that inquiry by defining cruelty and explaining how to determine whether "the circumstances of the murder raise it above the norm of other first degree murders." A.R.S. § 13–703(F)(6).

2 Cases that cite this headnote

[11]  **Sentencing and Punishment**
       ⬥Evidence in mitigation in general

Defendant was not entitled to present evidence of residual doubt as a mitigating circumstance in the penalty phase of first degree murder prosecution; there was no constitutional right to present evidence of residual doubt at sentencing.

2 Cases that cite this headnote

[12]  **Criminal Law**
       ⬥Review De Novo

The Supreme Court reviews alleged constitutional violations de novo.

Cases that cite this headnote

[13]  **Sentencing and Punishment**
       ⬥Sympathy and mercy

Trial court was not required to include "mercy" among the enumerated mitigating circumstances

for the jury's consideration, when determining sentence for first degree murder; a defendant had the burden of proving mitigating circumstances by a preponderance of the evidence, mercy could not be proven under the standard, and defendant was free to argue, and did argue, that mercy or leniency was appropriate based on the mitigation evidence presented. A.R.S. § 13–703(G).

3 Cases that cite this headnote

[14]  **Sentencing and Punishment**
       ⬥Instructions

Jury instructions concerning jury unanimity in determining mitigating circumstances were proper, in sentencing phase of first degree murder prosecution; instructions, as a whole, informed the jurors that they were required to individually assess whether the mitigating circumstances were sufficiency substantial to call for leniency. A.R.S. § 13–703(C).

1 Cases that cite this headnote

[15]  **Criminal Law**
       ⬥Construction and Effect of Charge as a Whole
       **Criminal Law**
       ⬥Review De Novo

The Supreme Court reviews a challenged instruction de novo and considers the instructions as a whole to ensure that the jury receives the information it needs to arrive at a legally correct decision.

Cases that cite this headnote

[16]  **Criminal Law**
       ⬥Urging or Coercing Agreement

In determining whether a trial court has coerced the jury's verdict, the Supreme Court views the

actions of the judge and the comments made to the jury based on the totality of the circumstances and attempts to determine if the independent judgment of the jury was displaced.

Cases that cite this headnote

[17]    **Criminal Law**
⬅"Allen," "dynamite," or "hammer," etc., charge

Jury impasse instruction was not provided prematurely, as argued by defendant, during sentencing phase of first degree murder prosecution; the jury inquired as to what would happen if the jury could not reach a verdict. 17 A.R.S. Rules Crim.Proc., Rule 22.4.

3 Cases that cite this headnote

[18]    **Criminal Law**
⬅Urging or Coercing Agreement

Although the Rules of Criminal Procedure give a trial judge broad discretion in dealing with juries at an impasse, the rules require an affirmative indication from the jury it is in need of help before assistance may be offered. 17 A.R.S. Rules Crim.Proc., Rule 22.4.

2 Cases that cite this headnote

[19]    **Criminal Law**
⬅"Allen," "dynamite," or "hammer," etc., charge

Trial court's duty to deliberate jury instruction, which was provided when jury had reached an impasse during penalty phase of first degree murder trial, was proper, even though defendant argued that the instruction was proper in the guilt phase or aggravation phase of the proceedings but was not proper in the penalty phase; jury was required to deliberate to be

unanimous in their decision to impose a death sentence or a life sentence. A.R.S. §§ 13–703(C), 13–703.01(H).

4 Cases that cite this headnote

[20]    **Sentencing and Punishment**
⬅Mode of execution

The lethal injection statute was not unconstitutionally vague, even though it did not prescribe the type or dosage of drugs that must be administered, the order in which they must be administered, or the qualifications of the personnel who administer them; the United States Supreme Court had never held that death by lethal injection was cruel and unusual absent specific procedures for implementation. U.S.C.A. Const.Amend. 8; A.R.S. § 13–704(A).

9 Cases that cite this headnote

[21]    **Sentencing and Punishment**
⬅Scope of review

In conducting independent review of a death sentence, the Supreme Court considers the quality and the strength, not simply the number, of aggravating and mitigating factors. A.R.S. § 13–703.04(A).

3 Cases that cite this headnote

[22]    **Sentencing and Punishment**
⬅Vileness, heinousness, or atrocity

Evidence supported aggravating sentencing factor that defendant committed murder in an especially cruel manner; defendant poisoned victim, her husband, with sodium azide, victim vomited at least twice, was too weak to sit or stand, and had difficulty breathing, defendant pretended to call for an ambulance and stood by for 45 minutes while victim suffered from the

State v. Andriano, 215 Ariz. 497 (2007)
161 P.3d 540, 508 Ariz. Adv. Rep. 3

effects of the poisoning, later defendant struck victim at least 23 times in the back of the head with a bar stool, and victim had defensive wounds to his hands and wrists. A.R.S. § 13–703(F)(6).

1 Cases that cite this headnote

[23]  **Sentencing and Punishment**
  ⇐ Vileness, heinousness, or atrocity
  **Sentencing and Punishment**
  ⇐ Emotional distress or disturbance
  **Sentencing and Punishment**
  ⇐ Other matters related to offender

Defendant's mitigation evidence was not sufficiently substantial to call for leniency in light of the cruel manner in which defendant murdered the victim, her husband; defendant poisoned terminally ill victim, she beat him in the back of the head with a bar stool, and she slashed his throat, and defendant's mitigation evidence, including evidence of the stress of victim's terminal cancer, her missionary work, and her strong religious convictions, was minimal.

Cases that cite this headnote

**Attorneys and Law Firms**

**543 Terry Goddard, Arizona Attorney General by Kent E. Cattani, Chief Counsel, Capital Litigation Section, Phoenix, Robert J. Gorman, Jr., Assistant Attorney General, Tucson, Attorneys for State of Arizona.

James J. Haas, Maricopa County Public Defender by Brent E. Graham, Margaret M. Green, Deputy Public Defenders, Phoenix, Attorneys for Wendi Elizabeth Andriano.

***500 OPINION**

BERCH, Vice Chief Justice.

¶ 1 In 2004, Wendi Andriano was found guilty of one count of first degree murder and sentenced to death. This automatic appeal followed. We have jurisdiction pursuant to Article 6, Section 5(3), of the Arizona Constitution and Arizona Revised Statutes ("A.R.S.") section 13–4031 (2001).

**I. FACTS[1] AND PROCEDURAL BACKGROUND**

[1] ¶ 2 Wendi Andriano, her terminally ill husband, Joe, and their two small children attended a barbeque on October 7, 2000. They returned to their apartment around midnight and put the children to bed.

¶ 3 At about 2:15 a.m. on October 8, Andriano called Chris, a coworker who also lived at the apartment complex, and asked her to watch the children while Andriano took Joe to the doctor. When Chris arrived, Andriano met her outside the apartment. She told Chris, "I have a problem. Don't ask any questions. My husband's in on the floor dying and I haven't called 911 yet." When Andriano cautioned, "He doesn't know I haven't called 911," Chris urged her to make the call.

¶ 4 Upon entering the apartment, Chris found Joe lying on the living room floor in the fetal position. He had vomited, appeared weak, and was having difficulty breathing. While Andriano was in another room calling 911, Joe told Chris that he needed help and had "for a long time." He asked why it was taking forty-five minutes for the paramedics to arrive.

¶ 5 Andriano returned to the room and told Chris she needed to get Joe to the car so she could drive him to the hospital because the paramedics were responding to another call. Joe said he could not get up, so Andriano tried to lift him. When she could not, she became irritated and yelled at Joe, using profanities. Hearing sirens approaching, Chris went out to direct the paramedics to the apartment as Joe began to vomit again.

¶ 6 As the paramedics were unloading their equipment, Andriano came out of the apartment screaming at them to go away. She then slammed the door. Chris and four paramedics knocked on the apartment door, but no one answered. After five to ten minutes of knocking, the Phoenix Fire Department alarm room called the Andrianos' home *501 **544 telephone in an attempt to get Andriano to open the door. The alarm room notified the paramedics that contact had been made with someone

in the apartment who would come out to speak with them. Rather than coming through the front door, which opened to the living room, Andriano went out through her back door, climbed over the back patio wall, and walked around the apartment building to the front door, where Chris and the paramedics were standing. Andriano had changed her shirt and her hair was wet. She told the paramedics that Joe was dying of cancer and had a do-not-resuscitate order. She explained that "this was not the way that he wanted to go." The paramedics and Chris left without going into the apartment.

¶ 7 Andriano called 911 again at 3:39 a.m. The same paramedics responded and saw Andriano, wearing a bloody shirt, standing outside the apartment talking to a police officer.

¶ 8 When the paramedics entered the apartment, they found Joe lying on the floor in a pool of blood. He had a deep stab wound to the left side of his neck and lacerations on his head that exposed some brain matter. A police detective observed at 3:52 a.m. that the blood surrounding Joe's head was already starting to dry. A broken bar stool covered in blood was found near Joe's body, as were pieces of a lamp, a kitchen knife with blood on the sharp edge, a bloody pillow, and a belt.

¶ 9 A search of the Andrianos' storage unit revealed an open cardboard shipping box containing a 500–gram bottle of sodium azide, two Tupperware containers containing sodium azide, nine Q-tips, a plastic knife and fork, and two pairs of latex gloves. Andriano's fingerprints were on the plastic knife and the vacuum-packed bag in which the cardboard box was shipped. During a search of the Andrianos' apartment, the police found gelatin capsules filled with sodium azide in a bottle labeled for an herbal supplement. Trace amounts of sodium azide were also discovered in the contents of a pot and two soup bowls in the kitchen. In all, 20.8 grams of sodium azide could not be accounted for.

¶ 10 The medical examiner determined that Joe sustained brain hemorrhaging caused by no fewer than twenty-three blows to the back of his head, eight to ten of which independently could have rendered Joe unconscious. Defensive wounds on Joe's hands and wrists indicated, however, that he was conscious for at least part of the attack. Joe also sustained a 3 and 3/4–inch–long by 2–inch–wide stab wound to the left side of his neck that extended to his spine and severed his carotid artery. The medical examiner opined that the blows to the head were sustained before the stab wound to the neck and that Joe was still alive, although likely unconscious, when he was stabbed. Trace amounts of sodium azide were found in

Joe's blood and gastric contents. The cause of death was attributed to blunt force trauma and the stab wound.

¶ 11 Based on the blood spatter and other evidence, a Phoenix police detective opined that Joe was lying down while he was being struck and did not get up during the attack. He further opined, based on the absence of arterial spurting on the belt and the knife, that both items were placed beside Joe's body after he died. Blood spatter on the bar stool, on the other hand, suggested that the stool was present when the arterial spurting began.

¶ 12 After being taken into custody, Andriano called one of her coworkers and asked her to hide certain items that were in Andriano's business office. Andriano's adoptive father told a police detective on the day of the murder, "I remember [Andriano] telling me that she stabbed [Joe]."

¶ 13 Andriano was indicted on one count of first degree murder. The State filed a notice of intent to seek the death penalty and subsequently alleged two aggravating factors: that Andriano committed the offense "in expectation of the receipt [ ] of anything of pecuniary value," in violation of A.R.S. § 13–703(F)(5) (Supp.2000), and that she committed the murder "in an especially heinous, cruel or depraved manner," in violation of A.R.S. § 13–703(F)(6). The State further alleged that the offense was a dangerous felony, *see id.* § 13–604(P), because it "involved the intentional or knowing infliction of serious physical injury upon Joseph Andriano."

**\*\*545 \*502** ¶ 14 At trial, Andriano testified that after a failed assisted suicide attempt by poison, she and Joe got into a fight, during which she hit Joe with a bar stool in self-defense. She claimed that he ultimately slit his own throat. The jury found Andriano guilty of first degree murder and further found that the murder was a dangerous felony.

¶ 15 The same jury found the (F)(6) "especially cruel" aggravating factor, but did not find the (F)(5) "pecuniary gain" aggravator. Finding that the mitigating circumstances were not sufficiently substantial to call for leniency, the jury returned a verdict calling for a sentence of death.

## II. DISCUSSION

¶ 16 Andriano raises eleven issues on appeal and lists an additional thirteen claims to avoid preclusion.[2]

State v. Andriano, 215 Ariz. 497 (2007)
161 P.3d 540, 508 Ariz. Adv. Rep. 3

**A. Guilt Phase Issues**

**1. *Admission of other act evidence***
[2] ¶ 17 Andriano claims that evidence of her extramarital affairs and her attempts to obtain insurance policies on Joe's life was unfairly prejudicial and was neither intrinsic to the charge against her nor admissible under Arizona Rule of Evidence 404(b). We review evidentiary rulings for an abuse of discretion. *State v. McGill*, 213 Ariz. 147, 156, ¶ 40, 140 P.3d 930, 939 (2006), *cert. denied*, 549 U.S. 1324, 127 S.Ct. 1914, 167 L.Ed.2d 570 (2007).

[3] ¶ 18 The trial court found the insurance and affairs evidence "intrinsic" to the crime. " 'Other act' evidence is 'intrinsic' when [1] evidence of the other act and evidence of the crime charged are 'inextricably intertwined' or [2] both acts are part of a 'single criminal episode' or [3] the other acts were 'necessary preliminaries' to the crime charged." *State v. Dickens*, 187 Ariz. 1, 18–19 n. 7, 926 P.2d 468, 485–86 n. 7 (1996) (quoting *United States v. Coleman*, 78 F.3d 154, 156 (5th Cir.1996)).

*a. Life insurance policies*
[4] ¶ 19 After three surgeries to remove a recurring tumor in his salivary gland and as many misdiagnoses, Joe was diagnosed with metastatic adenoid cystic carcinoma in 1998. By that time, the cancer had spread to his lungs and his condition was deemed terminal.

¶ 20 Nevertheless, during August and September of 2000, Andriano made several attempts to obtain insurance on Joe's life through various companies. During the prescreening process, Andriano claimed that Joe did not have cancer. One agent contacted Joe on September 6 after receiving an electronic pre-application, at which time Joe indicated that he was not interested in applying. Andriano sent an email three days later from her personal email account asking that Joe's request be reinstated and directing that further contact be made with her. She also asked two men to pose as Joe for a life insurance physical exam, one of whom she offered to pay as much as $50,000. Both refused. No life insurance policy was ever obtained through these efforts.

¶ 21 Andriano's attempts to procure insurance on Joe's life do not fall into any of the three categories of intrinsic evidence. Because she never secured insurance, the attempts to procure it were not inextricably intertwined with Joe's murder, part of a single criminal episode, or a necessary preliminary to Joe's murder. *See id.* The insurance procurement evidence clearly differs from, for example, evidence deemed intrinsic in *Dickens* that the

defendant had stolen the gun used in the charged murders and robberies. *See id.; see also State v. Nordstrom*, 200 Ariz. 229, 248, ¶ 56, 25 P.3d 717, 736 (2001) (commenting on the "necessary preliminary" prong of the intrinsic evidence inquiry).

¶ 22 Even though not intrinsic to the crime charged, "other act" evidence may nonetheless be admissible under Rule 404(b) to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident," as long as its probative value is not substantially outweighed by the *503 **546 danger of unfair prejudice. Ariz. R. Evid. 403; *see also Dickens*, 187 Ariz. at 19, 926 P.2d at 486.

¶ 23 Evidence of Andriano's attempts to obtain insurance on Joe's life was admissible to show her plan, knowledge, and intent to kill Joe, and also to show that she premeditated Joe's murder. Moreover, the significant probative value of such damaging evidence is not substantially outweighed by the danger of unfair prejudice to Andriano. Because the evidence was admissible under Rule 404(b), the trial court did not abuse its discretion in admitting the evidence, even if it might have admitted the evidence for the wrong reason. *See State v. Perez*, 141 Ariz. 459, 464, 687 P.2d 1214, 1219 (1984) (affirming trial court's ruling even though trial judge reached the proper conclusion for the wrong reason).

*b. Extramarital affairs*
[5] ¶ 24 During the summer of 2000, Andriano had a brief extramarital affair with Rick, a resident of the apartment complex where she lived and worked as the property manager. That affair ended in July when Rick learned that Andriano was married and had children. Despite his rejection of her advances, Andriano aggressively pursued Rick. On one occasion, she stood outside his apartment late at night, banging on his door for five minutes, demanding to be let in, and threatening to get the master "pass key" if he did not let her in.

¶ 25 During that same summer, Andriano frequented bars on a weekly basis with coworkers and friends. There, she was seen dancing and flirting and even groping and kissing men. On September 27, the evening after Joe's fourth chemotherapy treatment, Andriano went to a dance club and began dancing provocatively with and kissing a man she met there. They ultimately returned to the Andrianos' apartment and had sex. During a phone conversation the following day, Andriano told the man her husband had died of cancer.

¶ 26 Like the insurance evidence, evidence of Andriano's

extramarital affairs is not intrinsic to the first degree murder charge. The affairs were not inextricably intertwined with or part of the same criminal episode as the murder, nor were they a necessary preliminary to the murder. *Dickens,* 187 Ariz. at 18–19 n. 7, 926 P.2d at 485–86 n. 7. The evidence was admissible under Rule 404(b), however, as evidence of Andriano's motive for killing her husband—to be free to pursue other relationships. Supporting this purpose was testimony from Andriano's hairdresser, who testified that Andriano told her in February of 2000 that she would have divorced Joe were he not ill. At a later visit, Andriano disclosed that Joe "wanted to keep the marriage together," but she was "emotionally out of it" and "wished he was dead so she could move on with her life." Around August of 2000, Andriano confided to the hairdresser that she was interested in another man who hesitated to get involved in a relationship because she was married.

¶ 27 The evidence was also admissible under Rule 404(b) to rebut the defense theory that Andriano was a domestic violence victim who lived in fear of her abusive husband, whom she bludgeoned to death in self-defense.

¶ 28 Andriano maintains, nonetheless, that the evidence was unfairly prejudicial because "[t]he prosecutor took every opportunity to infuse the trial with marginally relevant information about Andriano's partying and man-chasing."[3] Nearly all the examples Andriano provides relate to the prosecutor's comments in the guilt phase closing arguments. Comments in closing arguments, however, are not evidence, as the jury was instructed, and thus the comments do not render unfairly prejudicial evidence that is otherwise properly admitted.

¶ 29 Another incident about which Andriano complains occurred during the cross-examination of defense expert Dr. Sharon Murphy. The prosecutor asked Dr. Murphy whether Andriano used a personal lubricant during sexual intercourse with Rick. The door to this line of questioning had been opened by defense counsel's questioning on direct examination, to which Dr. Murphy responded *504 **547 that Andriano and Joe "needed to use a lubricant" during intercourse. Considered in context, the questioning was designed to rebut Dr. Murphy's suggestion, elicited by defense counsel's question, that Andriano's need to use a lubricant when she had sex with Joe showed that Joe was an abusive spouse. The evidence elicited was not unfairly prejudicial.

¶ 30 The final incident relates to a comment the prosecutor made during aggravation phase closing arguments and therefore is not relevant to whether such evidence was admissible in the guilt phase. The probative

value of evidence of Andriano's extramarital relationships is not substantially outweighed by the danger of unfair prejudice, and thus the trial court did not abuse its discretion in admitting the evidence.

¶ 31 In sum, although neither category of evidence is intrinsic to the crime charged, both categories are admissible under Rule 404(b): evidence of attempts to procure life insurance to prove plan, knowledge, intent, and premeditation, and evidence of extramarital affairs to prove motive and to rebut the defense theory that Andriano was a domestic violence victim. The trial court did not abuse its discretion in admitting the evidence.

## 2. *Lesser-included offense instructions*

[6] [7] ¶ 32 Andriano argues that the trial court was required sua sponte to instruct the jury on the lesser-included offenses of second degree murder and "sudden quarrel or heat of passion" manslaughter. Defense counsel did not request any lesser-included offense instructions. We review a trial court's failure to give lesser-included offense instructions for fundamental error when the instructions are not requested at trial. *Nordstrom,* 200 Ariz. at 253, ¶ 81, 25 P.3d at 741. In a capital case, it is fundamental error for the trial court to fail to give a lesser-included offense instruction if one is supported by the evidence, *id.; see also Beck v. Alabama,* 447 U.S. 625, 627, 638, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980), and not waived by the defendant.

[8] ¶ 33 As to second degree murder, Andriano contends on appeal that because sodium azide poisoning did not cause Joe's death, a reasonable jury could have found that she abandoned her plan to poison Joe. Abandonment is shown, she argues, by her summoning Chris to the apartment and her call to 911. She maintains that a new sequence of events began that led to an intentional or knowing—but not premeditated—death. As to manslaughter, Andriano contends that the evidence supports a conclusion that Joe provoked her when he reached for a knife, and she then killed him during a sudden quarrel or in the heat of passion.

¶ 34 Andriano did not argue either of these theories at trial, however, and the evidence presented does not support either theory. Andriano testified that she was attempting to assist Joe in committing suicide when they got scared and decided to call for help. She claimed that after 911 was called and Chris left the apartment to meet the paramedics, Joe decided that he wanted to follow through with the suicide. She testified that, after the paramedics left, she admitted to Joe that she had an affair. Joe then became violent and tried to choke her with a

State v. Andriano, 215 Ariz. 497 (2007)

161 P.3d 540, 508 Ariz. Adv. Rep. 3

phone cord, but she was able to reach a knife, cut the cord, and free herself. When she put the knife down, Joe bent down to pick it up, so she hit him with the bar stool until he stopped moving. Ultimately, Joe picked up the knife and said he was going to kill himself. Andriano tried to stop him, but her hand slipped off the knife. Suddenly there was blood everywhere, but she had not stabbed Joe.

¶ 35 Despite Andriano's testimony that Joe had killed himself, in closing argument, defense counsel argued that Andriano was a domestic violence victim who acted in self-defense after an assisted suicide attempt. The jury was instructed on self-defense and told that if it found Andriano to be a domestic violence victim, "the state of mind of a reasonable person ... shall be determined from the perspective of a reasonable person who has been a victim of those past acts of domestic violence."

¶ 36 We held in *State v. Celaya* that "where the sole defense is self-defense so that the evidence requires either conviction or acquittal, any instruction on any other grade would be impermissible." **505 **548 135 Ariz. 248, 255, 660 P.2d 849, 856 (1983); *see also State v. Wall*, 212 Ariz. 1, 6, ¶ 29, 126 P.3d 148, 153 (2006) (noting that when defendant asserts an "all-or-nothing" defense, the record usually will not support the giving of a lesser-included offense instruction); *State v. Jones*, 109 Ariz. 80, 81–82, 505 P.2d 251, 252–53 (1973) (holding that lesser-included offense instructions were not required where evidence at trial and defendant's self-defense theory presented an "either-or" situation requiring either first degree murder conviction or acquittal). We conclude that the evidence in this case did not support either a second degree murder or manslaughter instruction and that the trial court therefore did not commit fundamental error in failing to give either instruction.

## B. Aggravation Phase Issues

### 1. *Constitutionality of (F)(6) aggravating factor*

¶ 37 Andriano argues that the A.R.S. § 13–703(F)(6) "especially heinous, cruel or depraved" aggravator is both facially vague and vague as applied by juries rather than trial judges. In *Walton v. Arizona*, the United States Supreme Court found Arizona's (F)(6) aggravator facially vague. 497 U.S. 639, 654, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990), *overruled on other grounds by Ring v. Arizona (Ring II )*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). The Supreme Court nonetheless upheld the factor against a constitutional challenge because this Court's narrowing construction of the (F)(6) aggravator "gives meaningful guidance to the sentencer." *Id.* at 653–55, 110 S.Ct. 3047.

¶ 38 Because juries rather than trial judges now find the existence of aggravating factors, *see* A.R.S. § 13–703.01(C) (Supp.2006), Andriano argues that the judge's knowledge of the narrowing construction cannot save the (F)(6) aggravator from unconstitutional vagueness. We rejected this argument in *State v. Cromwell*, 211 Ariz. 181, 188–89, ¶¶ 40–42, 119 P.3d 448, 455–56 (2005), *cert. denied*, 547 U.S. 1151, 126 S.Ct. 2291, 164 L.Ed.2d 819 (2006), and *State v. Anderson (Anderson II )*, 210 Ariz. 327, 352–53, ¶¶ 109–14, 111 P.3d 369, 394–95 (2005). "Those cases hold that the (F)(6) aggravator may be constitutionally applied if given substance and specificity by jury instructions that follow this Court's constructions." *State v. Hampton*, 213 Ariz. 167, 176, ¶ 36, 140 P.3d 950, 959 (2006), *cert. denied*, 549 U.S. 1132, 127 S.Ct. 972, 166 L.Ed.2d 738 (2007).

¶ 39 Andriano also argues that the (F)(6) aggravating factor is unconstitutionally vague when applied by a jury because without proportionality review the jury has no way to determine whether the murder for which it has found the defendant guilty is "above the norm of other first degree murders." We rejected this argument in *State v. Johnson*, 212 Ariz. 425, 431–32, ¶¶ 19–20, 133 P.3d 735, 741–42, *cert. denied*, 549 U.S. 1022, 127 S.Ct. 559, 166 L.Ed.2d 415 (2006). We similarly reject it here.

### 2. *(F)(6) "cruelty" instruction*[4]

[9] ¶ 40 The trial court provided the following (F)(6) "cruelty" instruction to the jury:

> "Cruelty" involves the infliction of physical pain and/or mental anguish on a victim before death. A crime is committed in an especially cruel manner when a defendant either knew or should have known that the manner in which the crime is committed would cause the victim to experience physical pain and/or mental anguish before death. The victim must be conscious for at least some portion of the time when the pain and/or anguish was inflicted.

Andriano asserts that this instruction was insufficient to guide the jury and channel its discretion in applying the aggravator.

¶ 41 The instruction given paraphrases this Court's statement in *State v. Trostle*, 191 Ariz. 4, 18, 951 P.2d 869, 883 (1997), that "[c]ruelty exists if the victim consciously experienced physical or mental pain prior to death, and the defendant knew or should have known that suffering would occur." (Internal citation omitted.) We recently reaffirmed *506 **549 that the *Trostle* definition of "cruelty" sufficiently narrows and gives substance to the (F)(6) "especially cruel" aggravating factor to save it from constitutional infirmity. *Anderson II*, 210 Ariz. at 352 & n. 18, ¶ 109, 111 P.3d at 394 & n. 18. We similarly conclude here that the trial court's instruction gave sufficient substance and specificity to the term "cruelty" to channel the jury's discretion and correct any unconstitutional vagueness.[5]

**3. *"Above the norm of other first degree murders" instruction***

[10] ¶ 42 The trial court instructed the jury that the (F)(6) aggravating circumstance "cannot be found to exist unless the murder is especially heinous, cruel or depraved, that is, where the circumstances of the murder raise it above the norm of other first degree murders." Andriano claims that this instruction required the jury to engage in proportionality review, which was improper in light of *State v. Salazar*, 173 Ariz. 399, 416, 844 P.2d 566, 583 (1992), and *State v. Greenway*, 170 Ariz. 155, 171, 823 P.2d 22, 38 (1991). Because Andriano did not object on this ground at trial, we review only for fundamental error. *See State v. Henderson*, 210 Ariz. 561, 567, ¶ 19, 115 P.3d 601, 607 (2005).

¶ 43 We have held that "the death penalty should not be imposed in every capital murder case but, rather, it should be reserved for cases in which either the manner of the commission of the offense or the background of the defendant places the crime 'above the norm of first-degree murders.' " *State v. Carlson*, 202 Ariz. 570, 582, ¶ 45, 48 P.3d 1180, 1192 (2002) (quoting *State v. Hoskins*, 199 Ariz. 127, 163, ¶ 169, 14 P.3d 997, 1033 (2000)). Such an instruction does not require the jury to engage in proportionality review. Instead, the jurors must assess whether the murder was so cruel that it rose above the norm of first degree murders. To assist them in this inquiry, the judge instructed the jurors on the definition of "cruelty," explaining how to determine whether "the circumstances of the murder raise it above the norm of other first degree murders." Considering the instructions as a whole, the jury was properly instructed to apply the definition of "cruelty," rather than to engage in proportionality review. The trial court did not err, fundamentally or otherwise, in giving the instruction.

**C. Penalty Phase Issues**

**1. *Residual doubt mitigation***

[11] [12] ¶ 44 The trial court denied Andriano's request to present evidence of residual doubt as a mitigating circumstance in the penalty phase. Andriano claims that the trial court was constitutionally required to allow her to present such mitigation evidence for the jury's consideration. We review alleged constitutional violations de novo. *McGill*, 213 Ariz. at 159, ¶ 53, 140 P.3d at 942.

¶ 45 Both the United States Supreme Court and this Court have rejected the argument that a capital defendant must be allowed to present residual doubt evidence in mitigation. In *Oregon v. Guzek*, the defendant argued that the Eighth and Fourteenth Amendments granted him a constitutional right to present new alibi evidence at his sentencing proceeding. 546 U.S. 517, ——, 126 S.Ct. 1226, 1230, 163 L.Ed.2d 1112 (2006). The Supreme Court, although not deciding whether such a right exists, held that its previous cases do not grant capital defendants a constitutional right to present evidence of residual doubt at sentencing. *Id.* at ——, 126 S.Ct. at 1231–32. We thus noted in *State v. Ellison* that "there is no constitutional requirement that the sentencing proceeding jury revisit the prior guilty verdict by considering evidence of 'residual doubt.' " **550 *507 213 Ariz. 116, 136, ¶ 82, 140 P.3d 899, 919 (citing *Guzek*, 546 U.S. at ——, 126 S.Ct. at 1230–32), *cert. denied*, — U.S. ——, 127 S.Ct. 506, 166 L.Ed.2d 377 (2006). The trial court did not err in denying Andriano's request to present residual doubt evidence in mitigation.

**2. *Mercy mitigation***

[13] ¶ 46 The trial court also denied Andriano's request to include "mercy" among the enumerated mitigating circumstances for the jury's consideration. Andriano maintains that the trial court was constitutionally required to allow her to do so. We disagree.

¶ 47 Arizona Revised Statutes § 13–703(G) (Supp.2004) provides that mitigating circumstances are "any factors proffered by the defendant or the state that are relevant in determining whether to impose a sentence less than death, including any aspect of the defendant's character, propensities or record and any of the circumstances of the offense." The defendant bears the burden of proving mitigating circumstances by a preponderance of the evidence. *Id.* § 13–703(C). The defendant cannot, however, prove "mercy" by any standard, nor does it relate to the character or propensities of the defendant or

State v. Andriano, 215 Ariz. 497 (2007)

161 P.3d 540, 508 Ariz. Adv. Rep. 3

the circumstances of the crime. Therefore, mercy is not a mitigating circumstance.

¶ 48 Mercy is a concept jurors may apply in evaluating the existence of mitigating circumstances and in deciding whether the death penalty is appropriate in a particular case. In this sense, "mercy" is simply another word for "compassion" or "leniency." A capital defendant is free to argue to the jury, as the defense did here, that mercy or leniency is appropriate based on the mitigation evidence presented.

¶ 49 The instructions given in this case correctly conveyed the role of mercy in determining the appropriate sentence. The trial court did not err in refusing Andriano's request to include mercy among the enumerated mitigating circumstances for the jury's consideration.

### 3. *Jury unanimity in determining mitigating circumstances*

[14] [15] ¶ 50 The trial court instructed the jury in the penalty phase as follows:

> Any verdict of death or life imprisonment must be unanimous. If you unanimously find that no mitigation exists, then you must return a verdict of death. *If you unanimously find that mitigation exists,* each one of you must individually weigh that mitigation in light of the aggravating circumstance already found to exist, and if you unanimously find that the mitigation is not sufficiently substantial to call for leniency, you must return a verdict of death. *If you unanimously find that mitigation exists* and it is sufficiently substantial to call for leniency, you must return a verdict of life.

(Emphasis added.) Andriano claims that this instruction improperly required the jury to unanimously find particular mitigating circumstances before each juror could individually consider whether that mitigation was sufficiently substantial to call for leniency. We review the challenged instruction de novo and consider the instructions as a whole "to ensure that the jury receives the information it needs to arrive at a legally correct decision." *State ex rel. Thomas v. Granville (Baldwin* ),

211 Ariz. 468, 471, ¶ 8, 123 P.3d 662, 665 (2005).

¶ 51 Each juror in a death penalty case must individually determine whether any mitigating circumstances exist. A.R.S. § 13–703(C); *see Baldwin,* 211 Ariz. at 472, ¶ 13, 123 P.3d at 666; *see also Ellison,* 213 Ariz. at 139, ¶ 102, 140 P.3d at 922 (discussing Supreme Court cases holding that capital sentencing statutes may not require unanimity as to mitigating circumstances). Then, in light of the aggravating circumstances the jury has already found to exist, each juror must individually determine whether the mitigation that juror has found to exist is sufficiently substantial to call for leniency. *See* A.R.S. § 13–703(C), (E); *Baldwin,* 211 Ariz. at 473, ¶ 18, 123 P.3d at 667.

¶ 52 Read as a whole, the instructions given here correctly advised the jurors that they did not have to agree upon the existence of any particular mitigating circumstance before *508 **551 each juror could individually assess whether the mitigation was sufficiently substantial to call for leniency. The court repeatedly advised them during the penalty phase that each juror was required to "individually" determine the existence of mitigating circumstances.[6] We therefore conclude that the trial court's instruction, considered in light of the other instructions, adequately informed the jury and does not require reversal.

### 4. *Jury coercion*

[16] ¶ 53 Andriano argues that the trial court coerced the jury's death verdict in two ways when it gave an impasse instruction: (1) by giving the instruction before ascertaining whether the jury was truly deadlocked; and (2) by improperly instructing the jury about its duty to deliberate. "In determining whether a trial court has coerced the jury's verdict, this court views the actions of the judge and the comments made to the jury based on the totality of the circumstances and attempts to determine if the independent judgment of the jury was displaced." *State v. Huerstel,* 206 Ariz. 93, 97, ¶ 5, 75 P.3d 698, 702 (2003).

¶ 54 Near the end of the second day of penalty phase deliberations, the jury submitted the following question to the trial court: "If we are unable to reach an unanimous verdict, what is the procedure that will be followed?" The court instructed the jury as follows:

> It appears from your note that you are at a deadlock in your deliberations. I have some suggestions to help your deliberations, not to force you to reach a verdict. I am merely trying to be responsi[ve] to your apparent need for help. I do not wish or intend to force a verdict.

State v. Andriano, 215 Ariz. 497 (2007)

161 P.3d 540, 508 Ariz. Adv. Rep. 3

Each juror has a duty to consult with one another, to deliberate with a view to reaching an agreement if it can be done without violence to individual judgment. No juror should surrender his or her honest conviction as to the weight or effect of the evidence solely because of the opinion of other jurors or for the purpose of reaching a verdict.

However, you may want to identify areas of agreement and disagreement and discuss the law and the evidence as they relate to the areas of disagreement.
If you still disagree, you may wish to tell the attorneys and me which issues, questions, law, or facts you would like us to assist you with. If you decide to follow this suggestion, please write down the issues, questions, law or facts on which we can possibly help. Please give your note to the bailiff. We will then discuss your *509 **552 note and try to help.[7]

The jury asked no further questions and returned a death verdict two days later.

*a. Prematurely given instruction*

[17] [18] ¶ 55 Rule 22.4 of the Arizona Rules of Criminal Procedure permits the trial court, upon being advised by the jury that it has reached an impasse in its deliberations, to inquire how it can assist the jury in its deliberations. "Although the rule gives a trial judge broad discretion in dealing with juries at an impasse, the rule requires an affirmative indication from the jury it is in need of help before assistance may be offered." *Huerstel*, 206 Ariz. at 99, ¶ 17, 75 P.3d at 704. In *Huerstel*, the trial court sent an impasse instruction to the guilt phase jury after three days of deliberations although it had received no note or other indication that the jury had reached an impasse. *Id.* at 97–98, ¶¶ 6–8, 75 P.3d at 702–03. The only questions the court had received related to the credentials of an expert witness, evidentiary matters, and a jury instruction. *Id.* We held that the impasse instruction was prematurely given because it was given "without any clear evidence the jury needed help." *Id.* at 99, ¶ 17, 75 P.3d at 704.

¶ 56 In this case, unlike the situation in *Huerstel*, the jury's question inquiring what would happen if the jury could not reach a verdict affirmatively indicated that the jurors were at an impasse. The *Huerstel* rule does not require that the jury unequivocally state that it cannot reach a verdict, only that it give an "affirmative indication" that it is deadlocked. The trial court did not err in giving the impasse instruction.

*b. Duty to deliberate instruction*

[19] ¶ 57 Andriano also argues that the impasse instruction given by the trial court inaccurately stated the law regarding a capital jury's duty in penalty phase deliberations. The crux of the argument is that, although the trial court's instruction would have been proper in the guilt phase or the aggravation phase of the proceedings, it was not appropriate in the penalty phase because jurors have no duty to "deliberate with a view to reaching an agreement" in the penalty phase.

¶ 58 In *Lowenfield v. Phelps*, the United States Supreme Court addressed whether an impasse instruction given to a capital sentencing jury coerced the death sentence in that case. 484 U.S. 231, 233, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988).[8] The Supreme Court held that the instruction did not coerce the jury's death verdict. *Id.* at 241, 108 S.Ct. 546. The Court quoted with approval another capital case in which it had opined that jurors must try to reach a verdict:

The very object of the jury system is to secure unanimity by a comparison of views, and by arguments among the jurors themselves. It certainly cannot be the law that each juror should not listen with deference to the arguments and with a distrust of his own judgment, if he finds a large majority of the jury taking a different view of the case from what he does himself. It cannot be that each juror should go to the jury room with a blind determination that the verdict shall represent his opinion of the case at that moment; or, that he should close his ears to the arguments of men who are equally honest and intelligent as himself.
*Id.* at 237, 108 S.Ct. 546 (quoting *510 **553 *Allen v. United States*, 164 U.S. 492, 501–02, 17 S.Ct. 154, 41 L.Ed. 528 (1896)). The Court emphasized that "[t]he continuing validity of this Court's observations in *Allen* are beyond dispute." *Id.*
¶ 59 *Lowenfield* thus makes clear that jurors in capital cases have a duty to deliberate in sentencing proceedings. Arizona's death penalty sentencing scheme does not alter this duty. While jurors individually determine whether a mitigating circumstance exists, A.R.S. § 13–703(C), the jury must still be unanimous in its decision to impose a death sentence or a life sentence, *id.* § 13–703.01(H). Therefore, the jurors may be instructed that they have a duty to deliberate in the penalty phase of a capital case.

¶ 60 In sum, because the impasse instruction correctly stated the law and was given after an affirmative indication from the jury that it was deadlocked, it cannot be said that the verdict was coerced.

State v. Andriano, 215 Ariz. 497 (2007)

161 P.3d 540, 508 Ariz. Adv. Rep. 3

## D. Constitutionality of Lethal Injection Statute

[20] ¶ 61 Arizona Revised Statutes § 13–704(A) (2001) provides that "[t]he penalty of death shall be inflicted by an intravenous injection of a substance or substances in a lethal quantity sufficient to cause death, under the supervision of the state department of corrections." Andriano contends that this statute is unconstitutionally vague because it does not prescribe the type or dosage of drugs that must be administered, the order in which they must be administered, or the qualifications of the personnel who administer them, thereby failing to ensure that death by lethal injection is not cruel and unusual. She argues that to comport with the Eighth Amendment, "[t]he statute must [also] address the inherent difficulties with individual issues ... such as vein accessibility and chemical resistances."

¶ 62 Section 13–704(A) constitutionally prescribes that the method of death shall be lethal injection. *See State v. Hinchey*, 181 Ariz. 307, 315, 890 P.2d 602, 610 (1995) (considering and rejecting argument that death by lethal injection constitutes cruel and unusual punishment). *Hinchey's* pronouncement that lethal injection as a method of execution comports with the Eighth Amendment was not conditioned upon the use of particular procedures in implementing lethal injection. Moreover, the United States Supreme Court has never held that death by lethal injection is cruel and unusual absent specific procedures for implementation, nor does Andriano cite any cases to that effect. Andriano has thus failed to establish an Eighth Amendment right to a particular protocol for lethal injection.⁹

## E. Independent Review

[21] ¶ 63 Because Andriano's offense occurred before August 1, 2002, we independently review the aggravating and mitigating circumstances and the propriety of the death sentence. A.R.S. § 13–703.04(A) (Supp.2006); *see* 2002 Ariz. Sess. Laws, 5th Spec. Sess., ch. 1, § 7. In conducting our independent review, we "consider the quality and the strength, not simply the number, of aggravating and mitigating factors." *State v. Roque*, 213 Ariz. 193, 230, ¶ 166, 141 P.3d 368, 405 (2006) (quoting *State v. Greene*, 192 Ariz. 431, 443, ¶ 60, 967 P.2d 106, 118 (1998)).

## 1. *Aggravation*

[22] ¶ 64 The jury found one aggravating factor—that Andriano committed the murder in an especially cruel manner. A.R.S. § 13–703(F)(6). Andriano argues that we should find the evidence insufficient to support the

"especially cruel" finding by the jury because (1) Joe experienced only "distress," but not "extreme" physical pain or mental anguish after ingesting the sodium azide; (2) the defensive wounds were "minor and ... not indicative of a great or prolonged struggle," showing that Joe was rendered unconscious "very quickly" after the bar stool attack began; and (3) Joe's distress was not reasonably foreseeable. We review the jury's finding de novo. *Anderson II*, 210 Ariz. at 354, ¶ 119, 111 P.3d at 396 (citing A.R.S. § 13–703.04 (independent review)).

**554 *511 ¶ 65 The cruelty prong of the (F)(6) aggravating circumstance may be proved by showing that the defendant knew or should have known that the manner in which the crime was committed would cause the victim to consciously experience either physical pain or mental anguish before death. *Trostle*, 191 Ariz. at 18, 951 P.2d at 883. The evidence showed that Andriano poisoned Joe with sodium azide and left him to suffer for what felt to Joe like a "long time." During that period, Joe vomited at least twice, was too weak to sit or stand, and was having difficulty breathing. After pretending to call 911, Andriano stood by for approximately forty-five minutes as Joe suffered from the effects of sodium azide poisoning. Andriano's Internet research on sodium azide and the warnings accompanying the shipped chemical demonstrate that she knew or should have known that poisoning her husband with sodium azide would cause him physical pain and mental anguish. Joe, who was conscious during this time, as evidenced by his interaction with Chris, undoubtedly "experienced significant uncertainty as to [his] ultimate fate." *See Ellison*, 213 Ariz. at 142, ¶ 120, 140 P.3d at 925 (quoting *State v. Van Adams*, 194 Ariz. 408, 421, ¶ 44, 984 P.2d 16, 29 (1999)) (mental anguish, and hence cruelty, established upon this showing).

¶ 66 Moreover, Andriano struck her terminally ill husband at least twenty-three times in the back of the head with a bar stool. Defensive wounds on Joe's hands and wrists indicate that he was conscious for at least some of the attack and thus knew his wife was attacking him as he lay on the floor, unable to defend himself. Andriano also knew or should have known that beating her husband with a bar stool would cause him physical pain and mental anguish.¹⁰

¶ 67 Andriano asks us to require that the physical or mental pain experienced by the victim be "extreme." There is no such requirement for a cruelty finding. *See Trostle*, 191 Ariz. at 18, 951 P.2d at 883. Nonetheless, the physical pain and mental anguish Joe experienced likely were "extreme" by any standards.

¶ 68 Although Andriano argued at trial that she was assisting Joe in a suicide by poisoning, she argues on appeal that because Joe did not know he was being poisoned, mental anguish cannot be proved. While a victim's knowledge of the source of physical pain may be relevant to whether the victim experienced mental anguish, it is not a requisite for a finding of mental anguish. And on the facts of this case, mental anguish is established even if Joe did not know he had been poisoned. Moreover, cruelty can be established upon a showing of either mental anguish or physical pain. *Id.* We thus conclude that cruelty was established based on either—or both—mental anguish or physical pain.

**2. *Mitigation*[11]**
[23]   ¶ 69 Andriano presented several mitigating circumstances for the jury's consideration, including the stress of Joe's cancer, her good grades in school, missionary and community work, and strong religious convictions. In addition, she presented evidence that she was a sexual abuse and domestic violence victim, a good mother to two children, married for six years, and a good inmate.

¶ 70 Although Andriano presented some evidence that she was a domestic violence victim, we assign little weight to this mitigating circumstance, in part because it is not related to the murder. *See Roque,* 213 Ariz. at 231, ¶ 169, 141 P.3d at 406 ("[T]he relationship between mitigating evidence and the murder may affect the weight given to the mitigating evidence.") (citation omitted); *State v. Newell,* 212 Ariz. 389, 405, ¶ 82, 132 P.3d 833, 849, *cert. denied,* \*512 \*\*555 549 U.S. 1056, 127 S.Ct. 663, 166 L.Ed.2d 521 (2006). The evidence established that Andriano did not kill Joe while defending against a domestic violence attack. Instead, she poisoned her terminally ill husband, struck him in the back of the head twenty-three times, and slit his throat. Joe posed no threat to Andriano at the time of the attack because he was so weak from the poison and chemotherapy that he could not get up.

¶ 71 Andriano was under substantial stress from having to deal with Joe's terminal cancer. The record does not indicate, however, that at the time of the offense, the stress was any greater than it had been two years earlier when she and Joe first learned he was terminally ill, and she was pregnant with her second child. Moreover, this is not a case in which Andriano suddenly "cracked" under extreme stress. Andriano methodically premeditated Joe's murder, showing that her stress bore little relation to Joe's death. This mitigating circumstance thus does not warrant substantial weight.

¶ 72 Andriano also offered evidence that she "may have been" sexually abused by her biological father when she was around the age of two, although she does not recall it, and that a member of the traveling ministry to which her family belonged exposed himself to Andriano when she was between six and eight years old. Andriano also showed that she maintained good grades in school and participated in missionary and community work. We do not weigh these mitigating circumstances heavily because the events are remote in time to the offense and their relevance is minimal. *Cf. Ellison,* 213 Ariz. at 144, ¶ 136, 140 P.3d at 927 (finding defendant's "childhood troubles deserve little value as a mitigator for the murders he committed at age thirty-three").

¶ 73 The record contains conflicting evidence on whether Andriano was a good mother. In any event, we afford this mitigating circumstance minimal value in light of the fact that Andriano murdered her children's father while the children were present in the apartment. Moreover, neither the fact of Andriano's marriage nor its six-year duration is mitigating considering that she would have remained married and the marriage would have lasted longer had she not killed her husband.

¶ 74 Andriano was a good inmate in jail and helpful to staff and inmates from September 2003 until the penalty phase of her trial in December 2004. Because inmates are expected to behave, however, we assign this mitigating circumstance little weight. *State v. Harrod,* 200 Ariz. 309, 319, ¶ 53, 26 P.3d 492, 502 (2001), *vacated on other grounds,* 536 U.S. 953, 122 S.Ct. 2653, 153 L.Ed.2d 830 (2002).

¶ 75 Although Andriano had what might be considered a strict religious upbringing, many of her actions, such as killing her husband and having extramarital affairs, appear inconsistent with holding strong religious convictions. We thus assign this evidence minimal value.

¶ 76 Andriano also alleged as mitigating circumstances cooperation with law enforcement authorities, remorse, and age. The evidence presented, however, contradicts Andriano's assertion that she cooperated in the investigation of Joe's murder.[12] Moreover, because Andriano continues to deny responsibility for her conduct, we reject her contention that she is remorseful. *See State v. Gulbrandson,* 184 Ariz. 46, 70–71, 906 P.2d 579, 603–04 (1995) (noting that defendant continued to deny responsibility in finding that he had not proven remorse as a mitigating circumstance). We likewise do not find her age—thirty at the time of the offense—to be mitigating, particularly in light of her above-average I.Q.

¶ 77 We likewise give minimal weight to the remaining mitigating circumstances urged: lack of prior convictions, good candidate for rehabilitation, no future threat to the community, and impact on family and friends.

### 3. Propriety of the death sentence

¶ 78 The quality and strength of Andriano's mitigation evidence is not sufficiently *513 **556 substantial to call for leniency in light of the especially cruel manner in which Andriano murdered her husband. We therefore affirm Andriano's sentence of death.

### III. CONCLUSION

¶ 79 For the foregoing reasons, we affirm Andriano's conviction and death sentence.

CONCURRING: RUTH V. MCGREGOR, Chief Justice, MICHAEL D. RYAN, ANDREW D. HURWITZ and W. SCOTT BALES, Justices.

### APPENDIX

### Claims Raised to Avoid Preclusion

Andriano raises the following thirteen challenges to the constitutionality of Arizona's death penalty scheme to avoid preclusion:

1. The death penalty is cruel and unusual punishment under any circumstances. This argument was rejected by the United States Supreme Court in *Gregg v. Georgia,* 428 U.S. 153, 187, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), and by this Court in *Harrod,* 200 Ariz. at 320, ¶ 59, 26 P.3d at 503.

2. The death penalty is imposed arbitrarily and irrationally in Arizona. We rejected this argument in *State v. Beaty,* 158 Ariz. 232, 247, 762 P.2d 519, 534 (1988).

3. Application of the death penalty on the facts of this case would constitute cruel and unusual punishment. No argument or authority is presented to support this claim.

4. The prosecutor's discretion to seek the death penalty is not channeled by standards. We rejected this argument in *State v. Sansing,* 200 Ariz. 347, 361, ¶ 46, 26 P.3d 1118, 1132 (2001), *vacated on other grounds,* 536 U.S. 954, 122 S.Ct. 2654, 153 L.Ed.2d 830 (2002).

5. The aggravating factors set forth in A.R.S. § 13–703(F) are elements of capital murder and must be alleged in an indictment and screened for probable cause. We rejected this argument in *McKaney v. Foreman ex rel. County of Maricopa,* 209 Ariz. 268, 270, ¶ 9, 100 P.3d 18, 20 (2004).

6. Application of the death penalty statutes promulgated after *Ring II,* 536 U.S. at 584, 122 S.Ct. 2428, violates the prohibition against ex post facto laws. The changes altered the rules of evidence to permit different testimony than that permitted at the time of Andriano's offense. We rejected this argument in *State v. Ring (Ring III ),* 204 Ariz. 534, 547, ¶ 24, 65 P.3d 915, 928 (2003).

7. The absence of proportionality review of death sentences by Arizona courts denies capital defendants due process of law and equal protection and amounts to cruel and unusual punishment. We rejected this argument in *Gulbrandson,* 184 Ariz. at 73, 906 P.2d at 606.

8. Arizona's capital sentencing scheme is unconstitutional because it does not require that the State prove that the death penalty is appropriate. We rejected this argument in *Gulbrandson,* 184 Ariz. at 72, 906 P.2d at 605.

9. Arizona Revised Statutes § 13–703 provides no objective standards to guide the sentencer in weighing the aggravating and mitigating circumstances. We rejected this argument in *State v. Pandeli,* 200 Ariz. 365, 382, ¶ 90, 26 P.3d 1136, 1153 (2001), *vacated on other grounds,* 536 U.S. 953, 122 S.Ct. 2654, 153 L.Ed.2d 830 (2002).

10. Arizona's death penalty scheme is unconstitutional because it does not require the sentencer to find beyond a reasonable doubt that the aggravating circumstances outweigh the accumulated mitigating circumstances. We rejected this argument in *State v. Poyson,* 198 Ariz. 70, 83, ¶ 59, 7 P.3d 79, 92 (2000).

11. Arizona Revised Statutes § 13–703 does not sufficiently channel the sentencer's discretion. Aggravating circumstances should narrow the class

State v. Andriano, 215 Ariz. 497 (2007)
161 P.3d 540, 508 Ariz. Adv. Rep. 3

of persons eligible for the death penalty and reasonably justify the imposition of a harsher penalty. The broad scope of Arizona's aggravating factors encompasses nearly anyone involved in a murder *514 **557 We rejected this argument in *Pandeli*, 200 Ariz. at 382, ¶ 90, 26 P.3d at 1153.

12. Execution by lethal injection is cruel and unusual punishment. We rejected this argument in *Hinchey*, 181 Ariz. at 315, 890 P.2d at 610.

13. Arizona's death penalty scheme unconstitutionally requires imposition of the death penalty whenever at least one aggravating circumstance exists and there is no mitigation sufficiently substantial to call for leniency. We rejected this argument in *State v. Miles*, 186 Ariz. 10, 19, 918 P.2d 1028, 1037 (1996).

**All Citations**

215 Ariz. 497, 161 P.3d 540, 508 Ariz. Adv. Rep. 3

Footnotes

1   We view the facts in the light most favorable to sustaining the verdict. *State v. Tucker,* 205 Ariz. 157, 160 n. 1, 68 P.3d 110, 113 n. 1 (2003).

2   The thirteen claims listed to avoid preclusion are appended to this opinion.

3   Andriano does not allege prosecutorial misconduct.

4   The jury found only the cruelty prong of the (F)(6) aggravating factor. It did not find the murder heinous or depraved. A finding of any of the three prongs is sufficient to support the (F)(6) aggravating circumstance. *Cromwell,* 211 Ariz. at 189, ¶ 43, 119 P.3d at 456.

5   Andriano's brief also seems to claim that the evidence was insufficient to support the jury's finding that the murder was "especially cruel." Because we would review sufficiency of the evidence to "determine whether substantial evidence supports the jury's finding, viewing the facts in the light most favorable to sustaining the jury['s] verdict," *State v. Roque,* 213 Ariz. 193, 218, ¶ 93, 141 P.3d 368, 393 (2006), and affirm the jury's finding if the evidence is such that "reasonable persons could accept [it] as adequate and sufficient to support a conclusion of defendant's guilt beyond a reasonable doubt," *id.* (quoting *State v. Roseberry,* 210 Ariz. 360, 369, ¶ 45, 111 P.3d 402, 411 (2005)), the issue is subsumed in our independent review. *See infra* ¶¶ 64–68.

6   Before being given the instruction to which Andriano objects, the jurors had been instructed as follows:
    Although a final decision on a penalty of death or life imprisonment must be unanimous, the determination of what circumstances are mitigati[ng] is for *each one of you to resolve, individually,* based upon all the evidence that has been presented to you during this phase and at any of the prior phases of the trial.
    (Emphasis added.) The jurors were also given the following instruction:
    You must make your decision about whether mitigation is sufficiently substantial to call for leniency based solely upon your weighing of any mitigation proven to you and the aggravating factor you have already found during the Aggravation Phase. To do this, *you must individually determine the nature and extent of mitigating circumstances.* Then, in light of the aggravating circumstance that has been proven to exist, you must individually determine if the totality of the mitigating circumstances is sufficiently substantial to call for leniency and a life sentence.
    (Emphasis added.)
    Moreover, at the outset of the penalty phase, the jury was preliminarily advised that "[t]he jurors do not have to agree unanimously that a mitigating circumstance has been proven to exist. Each juror may consider any mitigating circumstance found by that juror in determining the appropriate penalty." The jury was further instructed at that time to "individually decide whether there is mitigation and whether it is sufficiently substantial to call for the imposition of a life sentence rather than a sentence of death."
    Defense counsel's closing argument in the penalty phase also correctly advised the jurors regarding their responsibilities. Defense counsel told the jury, "[t]o clarify once again, individually determine the nature and extent of the mitigating circumstances. Not as a group, individually. What is it to me, as one juror. What is my moral position on that circumstance."

7   This instruction contains language very similar to that set forth in the comment to the 1995 amendment to Arizona Rule of Criminal Procedure 22.4.

**State v. Andriano, 215 Ariz. 497 (2007)**

161 P.3d 540, 508 Ariz. Adv. Rep. 3

8       In *Lowenfield,* the trial court gave an instruction that said in part,

When you enter the jury room it is your duty to consult with one another to consider each other's views and to discuss the evidence with the objective of reaching a just verdict if you can do so without violence to that individual judgment.

Each of you must decide the case for yourself but only after discussion and impartial consideration of the case with your fellow jurors. You are not advocates for one side or the other. Do not hesitate to reexamine your own views and to change your opinion if you are convinced you are wrong but do not surrender your honest belief as to the weight and effect of evidence solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict.

484 U.S. at 235, 108 S.Ct. 546.

9       Andriano may raise in a petition filed pursuant to Arizona Rule of Criminal Procedure 32 any objections to the protocol to be used.

10      The evidence established that Joe was likely unconscious when his throat was slashed. We therefore do not consider whether the stabbing caused physical pain or mental anguish.

11      Andriano did not argue why the Court should find in its independent review that the mitigating circumstances were "sufficiently substantial to call for leniency." A.R.S. § 13–703(E). Counsel in capital cases "should take advantage of all appropriate opportunities to argue why death is not suitable punishment for their particular client." *ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases* Guideline 10.11(L) (2003).

12      Andriano did not mention the sodium azide when she was questioned by police and later asked her coworker to hide evidence. Evidence was also presented that Andriano staged the scene of the murder to make it appear as though she acted in self-defense.

---

**End of Document**                                             © 2015 Thomson Reuters. No claim to original U.S. Government Works.

---

# Juan Martinez

# 15-3363

Exhibits to initial charge
Attachment 02
(state v. gallardo)

**State v. Gallardo, 225 Ariz. 560 (2010)**

242 P.3d 159, 596 Ariz. Adv. Rep. 7

225 Ariz. 560
Supreme Court of Arizona,
En Banc.

STATE of Arizona, Appellee,
v.
Mike Peter GALLARDO, Appellant.

No. CR–09–0171–AP. | Nov. 30, 2010.

**Synopsis**
**Background:** Following a mistrial for juror misconduct, defendant was convicted by a second jury in the Superior Court, Maricopa County, No. CR2006–175408, Sally Schneider Duncan, J., of first degree murder and other offenses and was sentenced to death. Defendant appealed.

**Holdings:** The Supreme Court, Bales, J., held that:

[1] trial court did not abuse its discretion in declaring mistrial for juror misconduct;

[2] trial court did not clearly err in overruling defendant's *Batson* challenges to state's peremptory strikes of three minority jurors;

[3] evidence supported "especially cruel" aggravating circumstance;

[4] statements in which victim's parents spoke about his character and the impact of his murder upon their family, and father played 911 call he made after finding his son murdered, were admissible victim impact evidence at penalty phase;

[5] any impropriety in prosecutor's closing argument during penalty phase did not require reversal; and

[6] reasonable juror could conclude that mitigation evidence about the impact of execution on defendant's family and the general conditions of confinement in state's maximum security facilities was not sufficiently substantial to call for leniency.

Affirmed.

West Headnotes (39)

[1]    **Criminal Law**
       ⬩=Deliberations in General

       Trial court did not abuse its discretion in capital murder prosecution in declaring a mistrial for juror misconduct, where trial court found that three jurors should be excused for violating admonition not to discuss case before deliberations and for not candidly responding to questions and that three others had formed opinions about other jurors that would affect their deliberations, striking all of those jurors would not have left 12 to deliberate while striking only those who violated admonition would leave no alternates for a case expected to last three months, and trial court also found it "highly likely" that four other jurors had violated admonition despite having denied doing so.

       Cases that cite this headnote

[2]    **Criminal Law**
       ⬩=Discretion of court

       The decision to grant a mistrial rests within the sound discretion of the trial court.

       2 Cases that cite this headnote

[3]    **Double Jeopardy**
       ⬩=Manifest necessity; other grounds

       If there is manifest necessity for a mistrial, the Double Jeopardy Clause does not bar retrial. U.S.C.A. Const.Amend. 5.

       Cases that cite this headnote

**State v. Gallardo, 225 Ariz. 560 (2010)**

242 P.3d 159, 596 Ariz. Adv. Rep. 7

[4]   **Double Jeopardy**
      ⊕=Manifest necessity; other grounds

Manifest necessity for a mistrial may arise, such that Double Jeopardy Clause does not bar retrial, when juror impartiality is compromised by jurors discussing evidence before deliberations. U.S.C.A. Const.Amend. 5.

Cases that cite this headnote

[5]   **Criminal Law**
      ⊕=Otherwise irreparable error or prejudice in general

Because curative instructions or other measures will not necessarily remove the risk of bias, the trial court must have the power to declare a mistrial in appropriate cases.

1 Cases that cite this headnote

[6]   **Jury**
      ⊕=Peremptory challenges

Trial court did not clearly err in overruling capital defendant's *Batson* challenges to state's peremptory strikes of three minority jurors, although defendant made prima facie showing of discrimination, where state explained that it struck one juror for hardship, another for her negative feelings toward police, and the last for her criminal history, trial court found that state's reasons were not pretexts, and other minority jurors were ultimately selected for the panel.

4 Cases that cite this headnote

[7]   **Constitutional Law**
      ⊕=Peremptory challenges

Excluding a potential juror based on race violates the Equal Protection Clause of the Fourteenth Amendment. U.S.C.A. Const.Amend. 14.

2 Cases that cite this headnote

[8]   **Jury**
      ⊕=Peremptory challenges

*Batson* challenges require a three-step analysis: (1) the party challenging the peremptory juror strikes must make a prima facie showing of discrimination; (2) the striking party must provide a race-neutral reason for the strike; and (3) if a race-neutral explanation is provided, the trial court must determine whether the challenger has carried its burden of proving purposeful racial discrimination.

7 Cases that cite this headnote

[9]   **Jury**
      ⊕=Peremptory challenges

Whether the justifications offered for peremptorily striking a juror are pretexts for discrimination turns on the lawyer's credibility, and the best evidence of discriminatory intent often will be the demeanor of the attorney who exercises the challenge.

1 Cases that cite this headnote

[10]  **Sentencing and Punishment**
      ⊕=Vileness, heinousness, or atrocity

Evidence supported "especially cruel" aggravating circumstance in capital murder case arising from fatal shooting; that victim was bound hand and foot, a pillowcase was tied over his head, and he struggled to free himself indicated he had time to suffer significant uncertainty as to his fate, and record supported conclusion that defendant knew or should have known that victim would suffer. A.R.S. §

**State v. Gallardo, 225 Ariz. 560 (2010)**

242 P.3d 159, 596 Ariz. Adv. Rep. 7

13–751(F)(6).

1 Cases that cite this headnote

[11]    **Criminal Law**
⬅=Construction of Evidence
**Criminal Law**
⬅=Substantial evidence

On a challenge to sufficiency of evidence, the Supreme Court determines whether substantial evidence supports the jury's finding, viewing the facts in the light most favorable to sustaining the jury verdict.

2 Cases that cite this headnote

[12]    **Criminal Law**
⬅=Degree of proof

"Substantial evidence" is such proof that reasonable persons could accept as adequate and sufficient to support a conclusion of defendant's guilt beyond a reasonable doubt.

1 Cases that cite this headnote

[13]    **Sentencing and Punishment**
⬅=Vileness, heinousness, or atrocity

A finding of cruelty alone is sufficient in a capital case to establish the aggravator that the defendant committed the offense in an especially heinous, cruel or depraved manner. A.R.S. § 13–751(F)(6).

2 Cases that cite this headnote

[14]    **Sentencing and Punishment**
⬅=Vileness, heinousness, or atrocity

**Sentencing and Punishment**
⬅=Degree of proof

To establish "especially cruel" aggravating circumstance in capital case, the state must prove beyond a reasonable doubt that the victim consciously experienced physical or mental pain prior to death, and the defendant knew or should have known that suffering would occur. A.R.S. § 13–751(F)(6).

2 Cases that cite this headnote

[15]    **Sentencing and Punishment**
⬅=Aggravating or mitigating circumstances
**Sentencing and Punishment**
⬅=Instructions

Facially vague aggravator, that murder was committed in "especially cruel" manner, was remedied in death penalty case by limiting instructions that to find the aggravator, the jury must find that victim consciously suffered physical or mental pain, and that defendant knew or should have known that victim would suffer. A.R.S. § 13–751(F)(6).

3 Cases that cite this headnote

[16]    **Sentencing and Punishment**
⬅=Aggravating or mitigating circumstances
**Sentencing and Punishment**
⬅=Instructions

Aggravating circumstance, that defendant committed first degree murder in an especially heinous, cruel or depraved manner, is facially vague but may be remedied by appropriate limiting instructions in a capital case. A.R.S. § 13–751(F)(6).

Cases that cite this headnote

[17]    **Sentencing and Punishment**

**State v. Gallardo, 225 Ariz. 560 (2010)**

242 P.3d 159, 596 Ariz. Adv. Rep. 7

◈=Victim impact

Victim impact evidence should not be allowed at penalty phase of capital case if it is so unduly prejudicial that it renders the trial fundamentally unfair.

4 Cases that cite this headnote

[18]     **Sentencing and Punishment**
         ◈=Discretion of lower court

Admission of victim impact evidence in capital sentencing proceeding is reviewed for an abuse of discretion.

Cases that cite this headnote

[19]     **Sentencing and Punishment**
         ◈=Victim impact

Statements in which victim's parents spoke about his character and the impact of his murder upon their family, and victim's father played the 911 call he made after finding his son murdered, were admissible victim impact evidence at penalty phase of capital case; statements were not so unduly prejudicial as to render trial fundamentally unfair, and trial court appropriately instructed jury that victim impact evidence could not be considered as an aggravating circumstance and could be considered only for the limited purpose of rebutting mitigation.

3 Cases that cite this headnote

[20]     **Sentencing and Punishment**
         ◈=Victim impact

Admissibility of victim impact statements at penalty phase of capital case does not depend on the particular mitigation evidence presented by

the defendant.

Cases that cite this headnote

[21]     **Sentencing and Punishment**
         ◈=Mitigating circumstances in general

Jurors may consider mitigating circumstances, whether proved by the defendant or present in the record, in determining whether death is the appropriate sentence.

Cases that cite this headnote

[22]     **Sentencing and Punishment**
         ◈=Victim impact

Even if victim impact statements are not offered to rebut any specific mitigating fact, they are generally relevant to rebut mitigation and thus admissible in the penalty phase of a capital case.

2 Cases that cite this headnote

[23]     **Criminal Law**
         ◈=Review De Novo

The Supreme Court reviews de novo whether jury instructions adequately state the law.

4 Cases that cite this headnote

[24]     **Criminal Law**
         ◈=Conduct of counsel in general

The Supreme Court will reverse a conviction for prosecutorial misconduct if (1) misconduct is indeed present; and (2) a reasonable likelihood exists that the misconduct could have affected the jury's verdict, thereby denying the defendant

**State v. Gallardo, 225 Ariz. 560 (2010)**

242 P.3d 159, 596 Ariz. Adv. Rep. 7

a fair trial.

4 Cases that cite this headnote

[25]     **Criminal Law**
         ⬥Statements as to Facts, Comments, and
         Arguments

The defendant seeking reversal of a conviction based on prosecutorial misconduct must show that the offending statements were so pronounced and persistent that they permeated the entire atmosphere of the trial and so infected the trial with unfairness as to make the resulting conviction a denial of due process. U.S.C.A. Const.Amend. 14.

3 Cases that cite this headnote

[26]     **Criminal Law**
         ⬥Arguments and conduct in general
         **Criminal Law**
         ⬥Conduct of counsel in general

The Supreme Court separately evaluates each instance of alleged prosecutorial misconduct, and the standard of review depends upon whether the defendant objected; if defendant objected, the Supreme Court reviews for harmless error, and, if not, it reviews only for fundamental error.

3 Cases that cite this headnote

[27]     **Criminal Law**
         ⬥Conduct of counsel in general

Even if there is no error or an error is harmless and so by itself does not warrant reversal, an incident may nonetheless contribute to a finding of persistent and pervasive misconduct if the cumulative effect of the incidents shows that the prosecutor intentionally engaged in improper conduct and did so with indifference, if not

specific intent, to prejudice the defendant.

4 Cases that cite this headnote

[28]     **Sentencing and Punishment**
         ⬥Arguments and conduct of counsel

Prosecutor did not violate ruling that precluded state, in rebutting mitigation evidence at penalty phase of capital case, from asking witnesses about defendant's criminal or institutional history, when prosecutor commented in opening statement that defendant's expert had not reviewed Department of Corrections records for defendant, which had been previously admitted, but instead would talk about the treatment of inmates generally.

Cases that cite this headnote

[29]     **Sentencing and Punishment**
         ⬥Harmless and reversible error

Any prejudice from prosecutor's opening statement, allegedly in violation of a ruling on the scope of evidence rebutting mitigation, that jury would hear evidence regarding defendant's childhood during penalty phase of capital case, was cured by preliminary and final jury instructions that attorneys' remarks, statements, and arguments were not evidence, but were intended to help jurors understand the evidence and apply the law.

Cases that cite this headnote

[30]     **Sentencing and Punishment**
         ⬥Harmless and reversible error

The Supreme Court would reverse based on allegedly improper comments by prosecution at penalty phase of capital case only if defendant established a reasonable likelihood that the misconduct could have affected the jury's

State v. Gallardo, 225 Ariz. 560 (2010)
242 P.3d 159, 596 Ariz. Adv. Rep. 7

verdict; any improper comments had to be so serious that they affected the defendant's right to a fair trial.

4 Cases that cite this headnote

[31]     **Criminal Law**
         ⟨⟨Custody and conduct of jury

Jurors are presumed to follow the court's instructions.

1 Cases that cite this headnote

[32]     **Sentencing and Punishment**
         ⟨⟨Harmless and reversible error

Any impropriety in prosecutor's closing argument during penalty phase of capital case, noting that maximum security inmates were allowed to watch television and receive phone calls and asking whether victim's father was going to be able to call victim, did not require reversal, where trial court sustained defense objection to the comparison between defendant and victim, and trial court instructed jurors not to be swayed by mere sympathy not related to the evidence presented during that phase and to disregard any question to which the judge sustained an objection.

Cases that cite this headnote

[33]     **Sentencing and Punishment**
         ⟨⟨Harmless and reversible error

Any prejudice at penalty phase of capital case from closing arguments, to which trial court sustained three objections, in which prosecutor characterized defense expert's cross-examination testimony about his fees as an inconsistent statement, was cured by jury instruction to disregard questions that were withdrawn or to which objections were

sustained.

2 Cases that cite this headnote

[34]     **Criminal Law**
         ⟨⟨Other particular issues

A prosecutor should not repeat an argument after it has been the subject of a sustained objection.

Cases that cite this headnote

[35]     **Sentencing and Punishment**
         ⟨⟨Manner and effect of weighing or considering factors

Under capital sentencing scheme, given the findings of one or more aggravators, a juror must vote to impose a sentence of death if he or she determines there is no mitigation at all or none sufficiently substantial to warrant a sentence of less than death.

1 Cases that cite this headnote

[36]     **Sentencing and Punishment**
         ⟨⟨Discretion of lower court

The Supreme Court reviews whether the trier of fact abused its discretion in finding aggravating circumstances and imposing a sentence of death, even if the defendant does not argue that the jury's verdict was an abuse of discretion. A.R.S. § 13–756(A).

3 Cases that cite this headnote

[37]     **Criminal Law**
         ⟨⟨Discretion of Lower Court

State v. Gallardo, 225 Ariz. 560 (2010)
242 P.3d 159, 596 Ariz. Adv. Rep. 7

A decision is not an abuse of discretion if there is any reasonable evidence in the record to sustain it.

Cases that cite this headnote

[38]    **Sentencing and Punishment**
⟜Vileness, heinousness, or atrocity
**Sentencing and Punishment**
⟜Nature, degree, or seriousness of other offense
**Sentencing and Punishment**
⟜Existing social ties and responsibilities
**Sentencing and Punishment**
⟜Other matters related to offender

Reasonable juror could conclude, in death penalty case involving the "especially cruel" and "prior serious offense" aggravators, that mitigation evidence about the impact of execution on defendant's family and the general conditions of confinement in state's maximum security facilities was not sufficiently substantial to call for leniency. A.R.S. §§ 13–751(C), (F)(2, 6), 13–756(A).

6 Cases that cite this headnote

[39]    **Sentencing and Punishment**
⟜Scope of review

The Supreme Court will not reverse the jury's decision that death is the appropriate penalty if any reasonable jury could have concluded that the mitigation established by the defendant was not sufficiently substantial to call for leniency. A.R.S. § 13–751(C).

7 Cases that cite this headnote

**Attorneys and Law Firms**

**162** Terry Goddard, Arizona Attorney General by Kent E. Cattani, Chief Counsel, Criminal Appeals/Capital Litigation Section, Susanne Bartlett Blomo, Assistant Attorney General, Phoenix, Attorneys for State of Arizona.

Droban & Company, PC by Kerrie M. Droban, Anthem, Attorneys for Mike Peter Gallardo.

**563 OPINION**

BALES, Justice.

¶ 1 This mandatory appeal arises from Mike Peter Gallardo's conviction and death sentence for the murder of Rudy Padilla. We have jurisdiction under Article 6, Section 5(3) of the Arizona Constitution and Arizona Revised Statutes ("A.R.S.") section 13–4031 (2010).

**FACTUAL AND PROCEDURAL BACKGROUND**

¶ 2 On December 9, 2005, Rudy Padilla was murdered at his parents' home in Phoenix. Padilla's father returned from work and saw that a sliding glass door into the house **564 **163 had been broken. He found his son's body in the master bedroom. Padilla's wrists and ankles had been bound, a pillowcase had been tied over his head, and he had been shot once in the back of the head. The bedroom was in disarray; jewelry and a revolver were missing. Telephone records showed that Gallardo had called the Padilla home from his cell phone the day of the murder, and DNA profiles developed from evidence at the crime scene matched Gallardo's profile. Neither Rudy nor his parents knew Gallardo.

¶ 3 Gallardo was indicted for first degree murder, burglary, and kidnapping. After a mistrial for juror misconduct, a second jury was impaneled. This jury convicted Gallardo on all counts. In the aggravation phase, the jury found two aggravating factors: Gallardo had been previously convicted of a serious offense, *see* A.R.S. § 13–751(F)(2) (2010), and the murder was especially cruel, *id.* § 13–751(F)(6). (Statutes are cited in their current version unless they have materially changed since the date of the offense.) In the penalty phase, the jury determined Gallardo should receive a death sentence for the murder. The trial court also sentenced Gallardo to concurrent prison terms of 15.75 years for the burglary

State v. Gallardo, 225 Ariz. 560 (2010)
242 P.3d 159, 596 Ariz. Adv. Rep. 7

and kidnapping counts.

## DISCUSSION

¶ 4 Gallardo raises six issues on appeal. For the reasons explained below, we affirm his convictions and sentences.

### A. Mistrial After Juror Misconduct

[1] ¶ 5 Gallardo argues that the trial court erred in declaring a mistrial after several jurors prematurely discussed the evidence.

[2] [3] [4] [5] ¶ 6 The decision to grant a mistrial rests within the sound discretion of the trial court. *McLaughlin v. Fahringer,* 150 Ariz. 274, 277, 723 P.2d 92, 95 (1986). If there is "manifest necessity" for the mistrial, the Double Jeopardy Clause does not bar retrial. *Id.* Manifest necessity may arise when juror impartiality is compromised by jurors discussing evidence before deliberations. *Cf. Ross v. Petro,* 515 F.3d 653, 658 (6th Cir.2008) (holding that state trial court exercised sound discretion in declaring mistrial based on manifest necessity where juror had engaged in misconduct); *United States v. Gianakos,* 415 F.3d 912, 921 (8th Cir.2005) (explaining that premature deliberation by a jury "is not a light matter" and that a court must carefully consider "[a] legitimate concern that a juror's impartiality is suspect"). Because curative instructions or other measures "will not necessarily remove the risk of bias," the trial court "must have the power to declare a mistrial in appropriate cases." *Arizona v. Washington,* 434 U.S. 497, 513, 98 S.Ct. 824, 54 L.Ed.2d 717 (1978).

¶ 7 At the beginning of the guilt phase, the trial court admonished the jurors not to discuss the case "until all the evidence has been presented and [you] have retired to deliberate on the verdict. You therefore may not discuss the evidence amongst yourselves until you retire to deliberate on your verdict."

¶ 8 Upon learning that some jurors had prematurely discussed the evidence, the trial court individually questioned each of the sixteen impaneled jurors. The parties agreed that one juror (Juror 13) should be excused for an unrelated hardship. The trial court found that three other jurors should be excused for violating the admonition and not candidly responding to questions. The trial court also found that three other jurors had formed opinions about other jurors that would affect their deliberations. Striking all these jurors would not leave

twelve to deliberate; striking only those who violated the admonition would leave no alternates for a capital case expected to last three months. The trial court also found it "highly likely" that four other jurors had violated the admonition despite having denied doing so.

¶ 9 Gallardo argues that less onerous sanctions were available, all of the jurors stated they could remain fair and impartial, and he was satisfied with the jurors selected. But he agreed to the removal of two jurors (Jurors 11 and 13), and he offers no good reason to question the trial court's conclusions about the others. The trial court carefully considered Gallardo's interest in having the trial concluded by the originally impaneled jury *565 **164 and did not abuse its discretion in declaring a mistrial.

### B. *Batson* Challenge

[6] ¶ 10 Gallardo argues that the trial court erred in denying his challenges to the State's peremptory strikes of three minority jurors during selection of the second jury. We review for clear error. *State v. Roque,* 213 Ariz. 193, 203 ¶ 12, 141 P.3d 368, 378 (2006).

[7] [8] [9] ¶ 11 Excluding a potential juror based on race violates the Equal Protection Clause of the Fourteenth Amendment. *Batson v. Kentucky,* 476 U.S. 79, 89, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). *Batson* challenges require a three-step analysis: "(1) the party challenging the strikes must make a prima facie showing of discrimination; (2) the striking party must provide a race-neutral reason for the strike; and (3) if a race-neutral explanation is provided, the trial court must determine whether the challenger has carried its burden of proving purposeful racial discrimination." *State v. Cañez,* 202 Ariz. 133, 146 ¶ 22, 42 P.3d 564, 577 (2002). Whether the justifications offered for striking a juror are pretexts for discrimination turns on the lawyer's credibility, and "the best evidence [of discriminatory intent] often will be the demeanor of the attorney who exercises the challenge." *Snyder v. Louisiana,* 552 U.S. 472, 477, 128 S.Ct. 1203, 170 L.Ed.2d 175 (2008) (alteration in original).

¶ 12 The trial court did not clearly err in overruling Gallardo's *Batson* challenges. Although Gallardo made a prima facie showing of discrimination, the State offered an explanation for each strike "based on something other than the race of the juror." *Hernandez v. New York,* 500 U.S. 352, 365, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991) (plurality opinion). The State struck one juror for hardship, another for her negative feelings toward police, and the last for her criminal history.

¶ 13 The trial court found that the reasons the State articulated were not pretexts and there was no pattern or practice of discrimination. Other minority jurors were ultimately selected for the panel, and, "[a]lthough not dispositive, the fact that the state accepted other [minority] jurors on the venire is indicative of a nondiscriminatory motive." *Roque,* 213 Ariz. at 204 ¶ 15, 141 P.3d at 379 (internal quotation marks omitted) (second alteration in original). The trial court did not clearly err in overruling the *Batson* challenges.

**C. (F)(6) Aggravator**
¶ 14 Gallardo argues that the State failed to present sufficient evidence to support the jury's finding that the murder was "especially cruel." He also argues that the jury instruction on the (F)(6) aggravator was unconstitutionally vague and improperly reduced the State's burden of proof.

**1. Sufficiency of the Evidence**

[10] [11] [12] ¶ 15 We determine whether substantial evidence supports the jury's finding, viewing the facts in the light most favorable to sustaining the jury verdict. *Id.* at 218 ¶ 93, 141 P.3d at 393. "Substantial evidence is such proof that reasonable persons could accept as adequate and sufficient to support a conclusion of defendant's guilt beyond a reasonable doubt." *Id.* (citations and internal quotation marks omitted).

[13] [14] ¶ 16 Under A.R.S. § 13–751(F)(6), a first degree murder is aggravated when "[t]he defendant committed the offense in an especially heinous, cruel or depraved manner." "A finding of cruelty alone is sufficient to establish the [ (F)(6) ] aggravator." *State v. Morris,* 215 Ariz. 324, 341 ¶ 80, 160 P.3d 203, 220 (2007). To establish cruelty, the State must prove beyond a reasonable doubt that "the victim consciously experienced physical or mental pain prior to death, and the defendant knew or should have known that suffering would occur." *State v. Martinez,* 218 Ariz. 421, 436 ¶ 70, 189 P.3d 348, 363 (2008) (citation and internal quotation marks omitted).

¶ 17 The record contains substantial evidence that Rudy experienced mental anguish before death and that Gallardo knew or should have known that such suffering would occur. Rudy almost certainly was conscious when bound, as there is no reason to bind an *566 **165 unconscious person. *See State v. Lynch,* 225 Ariz. 27, 41 ¶

79, 234 P.3d 595, 609 (2010); *State v. Djerf,* 191 Ariz. 583, 596 ¶ 49, 959 P.2d 1274, 1287 (1998); *see also State v. Bible,* 175 Ariz. 549, 604–05, 858 P.2d 1152, 1207–08 (1993) ("The fact that [the victim's] hands were bound indicates that she was conscious and tied-up to prevent struggling."). Ligature abrasions on Rudy's neck, wrists, and ankles indicate that the bindings were not loose.

¶ 18 Moreover, there is evidence that Rudy struggled against the ligatures attempting to free himself. *See Lynch,* 225 Ariz. at 41 ¶ 79, 234 P.3d at 609; *Djerf,* 191 Ariz. at 596 ¶ 51, 959 P.2d at 1287 (inferring mental anguish from contusions and abrasions on victim's wrists). Rudy's right hand was folded underneath him, not behind his back like his left arm. Rudy apparently had pulled his right wrist away from his left, almost freed his right hand, and pulled it in front of him.

¶ 19 That Rudy was bound hand and foot, a pillowcase was tied over his head, and he struggled to free himself also indicates he had time to suffer significant uncertainty as to his fate. *See Lynch,* 225 Ariz. at 41 ¶ 79, 234 P.3d at 609; *State v. Ellison,* 213 Ariz. 116, 142 ¶ 120, 140 P.3d 899, 925 (2006) ("Mental anguish is established if the victim experienced significant uncertainty as to her ultimate fate." (citation and internal quotation marks omitted)). The record also supports the jury's conclusion that Gallardo knew or should have known that Rudy would suffer. *See Lynch,* 225 Ariz. at 41 ¶ 80, 234 P.3d at 609 (concluding that it was "surely foreseeable that [the victim] would suffer significant mental anguish while being bound to the chair").

¶ 20 The evidence supports the jury's finding that the murder was especially cruel.

**2. F(6) Jury Instruction**

[15] [16] ¶ 21 Arizona's (F)(6) aggravator is facially vague but may be remedied by appropriate limiting instructions. *See Walton v. Arizona,* 497 U.S. 639, 654–56, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990), *overruled on other grounds by Ring v. Arizona,* 536 U.S. 584, 589, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002); *Ellison,* 213 Ariz. at 138 ¶ 96, 140 P.3d at 921. We have approved narrowing instructions for the "especially cruel" aggravating factor that require the jury to find that (1) "the victim was conscious during the mental anguish or physical pain" and (2) "the defendant knew or should have known that the victim would suffer." *State v. Tucker,* 215 Ariz. 298, 310 ¶ 31, 160 P.3d 177, 189 (2007) (citations omitted).

¶ 22 The trial court here gave the following (F)(6) instruction:

> Concerning this aggravating circumstance, all first-degree murders are to some extent cruel. However, this aggravating circumstance cannot be found to exist unless the State has proved beyond a reasonable doubt that the murder was "especially" cruel. "Especially" means "unusually great or significant."

> The term "cruel" focuses on the victim's pain and suffering. To find that the murder was committed in an "especially cruel" manner you must find that the victim consciously suffered physical or mental pain, distress or anguish prior to death. Mr. Gallardo must know or should have known that the victim would suffer.

¶ 23 The instruction contains the two "essential narrowing factors" identified in *Tucker* and is materially identical to instructions we have previously upheld. *See, e.g., State v. Chappell*, 225 Ariz. 229, 237–38 ¶ 27 & n. 6, 236 P.3d 1176, 1184–85 & n. 6 (2010); *State v. Villalobos*, 225 Ariz. 74, 82 ¶ 31 & n. 4, 235 P.3d 227, 235 & n. 4 (2010). The trial court did not err in giving this instruction.

**D. Victim Impact Evidence**

¶ 24 Gallardo argues that victim impact statements by Rudy's parents were unduly prejudicial and denied him due process. He contends that he limited his mitigation evidence to avoid infusing "irrelevant emotions into the proceeding" and the parents' statements caused the jury to sentence him to death based on "raw emotion." He also argues that the victim impact evidence was irrelevant to the mitigation presented and that, absent a curative instruction, the jury was improperly allowed to make "comparative judgments on the value of human life."

**166 [17] *567 ¶ 25 Arizona law generally allows victim impact evidence during the penalty phase to rebut mitigation. *See* Ariz. Const. art. II, § 2.1(A)(4) (entitling a victim to be heard at sentencing); A.R.S § 13–752(R) (allowing victim to present information during penalty phase about the murdered person and the impact of the murder on the victim and other family members). "Victim impact evidence should not be allowed, however, if it is 'so unduly prejudicial that it renders the trial fundamentally unfair.'" *State v. Dann*, 220 Ariz. 351, 369 ¶ 98, 207 P.3d 604, 622 (2009) (quoting *Payne v. Tennessee*, 501 U.S. 808, 825, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991)), *cert. denied*, —— U.S. ——, 130 S.Ct. 466, 175 L.Ed.2d 313 (2009).

[18] ¶ 26 Gallardo did not object to the victim impact evidence until after it was presented, when he moved for a mistrial. The trial court's decision whether to grant a mistrial is reviewed for an abuse of discretion, *Dann*, 220 Ariz. at 363 ¶ 48, 207 P.3d at 616, as is the admission of victim impact evidence, *State v. Garza*, 216 Ariz. 56, 69 ¶ 60, 163 P.3d 1006, 1019 (2007).

[19] ¶ 27 In their statements, Rudy's parents spoke of Rudy's character and the impact of his murder upon their family. Mr. Padilla ended his statement by playing the 911 call he made after finding his son murdered. The Padillas' statements did not call for any specific sentence and were within the appropriate bounds of victim impact testimony—discussing only the kind of person Rudy was and how his death affected his family.

[20] [21] [22] ¶ 28 Gallardo argues that the statements were irrelevant to the "limited and truncated" mitigation presented. Admissibility of victim impact statements does not depend on the particular mitigation evidence presented by the defendant. Jurors may "consider mitigating circumstances, whether proved by the defendant or present in the record, in determining whether death is the appropriate sentence." *State ex rel. Thomas v. Granville (Baldwin)*, 211 Ariz. 468, 473 ¶ 18, 123 P.3d 662, 667 (2005). Even if victim impact statements are not offered to rebut any specific mitigating fact, they are "generally relevant to rebut mitigation" and thus admissible in the penalty phase. *Garza*, 216 Ariz. at 69 ¶ 60 n. 12, 163 P.3d at 1019 n. 12.

¶ 29 Although the jurors were moved by the statements, and some passed a tissue box, the statements were not "so unduly prejudicial" as to render the trial fundamentally unfair. *See State v. Glassel*, 211 Ariz. 33, 54 ¶ 86, 116 P.3d 1193, 1214 (2005). Moreover, the trial court appropriately instructed the jury that victim impact evidence could not be considered as an aggravating circumstance and could be considered "only for [the] limited purpose" of rebutting mitigation. The trial court did not abuse its discretion in admitting victim impact statements or denying Gallardo's motion for mistrial.

[23] ¶ 30 Gallardo also argues that the trial court failed to instruct jurors (1) not to rely on the statements for "a purely emotional response," and (2) "not to make comparative judgments about the value of human lives." "We review de novo whether jury instructions adequately state the law." *Tucker*, 215 Ariz. at 310 ¶ 27, 160 P.3d at 189.

¶ 31 The cases Gallardo cites do not suggest the trial court's instructions were inadequate. *State v. Bocharski* states that the "trial judge appropriately instructed the

jurors that they could consider the victim impact statement only to rebut the mitigation evidence." 218 Ariz. 476, 488 ¶ 53, 189 P.3d 403, 415 (2008). *State v. Carreon* notes that the "trial court cautioned the jury not to consider the impact statements as aggravation and not to be tainted by sympathy or prejudice." 210 Ariz. 54, 72 ¶ 93, 107 P.3d 900, 918 (2005).

¶ 32 Although this Court has approved jury instructions containing the language suggested by Gallardo, we have never held that such language is required. *See Dann,* 220 Ariz. at 369–70 ¶ 101, 207 P.3d at 622–23 (approving, but not requiring, instruction that cautioned jurors not to "rely upon the statements for a 'purely emotional response' " and "not to make comparative judgments about the value of human lives"). The instructions here properly informed the jury \*568 \*\*167 of the limited purpose of the victim impact statements. We find no error.

**E. Prosecutorial Misconduct**

¶ 33 Gallardo argues that comments made by the State during its penalty phase opening statement and closing argument constituted prosecutorial misconduct and deprived him of a fair trial and due process.

[24]  [25]  ¶ 34 We "will reverse a conviction for prosecutorial misconduct if (1) misconduct is indeed present; and (2) a reasonable likelihood exists that the misconduct could have affected the jury's verdict, thereby denying [the] defendant a fair trial." *State v. Velazquez,* 216 Ariz. 300, 311 ¶ 45, 166 P.3d 91, 102 (2007) (alteration in original) (internal quotation marks and citation omitted). The defendant must show that the offending statements were "so pronounced and persistent" that they "permeate[d] the entire atmosphere of the trial" and "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Morris,* 215 Ariz. at 335 ¶ 46, 160 P.3d at 214 (citations and internal quotation marks omitted); *see also State v. Newell,* 212 Ariz. 389, 402 ¶ 60, 132 P.3d 833, 846 (2006).

[26]  [27]  ¶ 35 We separately "evaluate each instance of alleged misconduct, and the standard of review depends upon whether [the defendant] objected." *Morris,* 215 Ariz. at 335 ¶ 47, 160 P.3d at 214. If Gallardo objected, we review for harmless error; if not, we review only for fundamental error. *See id.* "[E]ven if there [is] no error or an error [is] harmless and so by itself does not warrant reversal, an incident may nonetheless contribute to a finding of persistent and pervasive misconduct if the cumulative effect of the incidents shows that the prosecutor intentionally engaged in improper conduct and did so with indifference, if not specific intent, to prejudice

the defendant." *Id.* (alteration in original) (citation and internal quotation marks omitted).

**1. Reference to Gallardo's Prison Packet**

[28]  ¶ 36 Before the penalty phase, Gallardo filed a motion to limit the scope of rebuttal evidence. Gallardo stated that he intended to present only two categories of mitigation: expert testimony regarding the conditions of confinement in the maximum security units of Arizona prisons and testimony by members of his family about their affection for him and the impact a death sentence would have on them. Gallardo asked the court to preclude the State from asking witnesses about his "criminal history, institutional history, or any other past events," and in particular an incident involving a handcuff key, escape attempts, or the expert's conversations with Gallardo. The trial court granted the motion.

¶ 37 Gallardo contends that the prosecutor committed misconduct by suggesting in his opening statement that Gallardo's prison packet would illustrate his personal history. Gallardo, however, mischaracterizes the prosecutor's remarks. The prosecutor simply stated that Gallardo's expert had not reviewed the Arizona Department of Corrections' records for Gallardo, which had been previously admitted, but instead would talk about the treatment of inmates generally. By noting the limited scope of the expert's opinion, the prosecutor did not violate the trial court's ruling on the scope of rebuttal.

**2. Reference to Gallardo's Childhood and Intelligence**

[29]  ¶ 38 In his opening statement, the prosecutor stated that the jury would hear evidence regarding Gallardo's childhood. Gallardo objected and moved for a mistrial, arguing the statement violated the court's ruling on the scope of rebuttal. The trial court denied a mistrial but ruled that the prosecutor could not introduce evidence of Gallardo's childhood or intelligence unless the defense "opened the door" on those issues.

¶ 39 The prosecutor's statements about the anticipated evidence concerning Gallardo's childhood and intelligence did not violate the court's prior ruling on the motion in limine or otherwise constitute misconduct, given that the judge's ruling precluding such evidence came only after the opening statement. Moreover, Gallardo later offered testimony by his sister about his

State v. Gallardo, 225 Ariz. 560 (2010)
242 P.3d 159, 596 Ariz. Adv. Rep. 7

family and argued in *569 **168 closing that his family members had been in the courtroom and the jury should consider that "[t]hey care about him." The defense did not offer evidence regarding Gallardo's intelligence, and the prosecutor did not comment on this issue again after the court's ruling.

[30] [31] ¶ 40 Even if the comments by the prosecutor were improper, we would reverse only if Gallardo established "a 'reasonable likelihood' that the 'misconduct could have affected the jury's verdict.'" *Newell*, 212 Ariz. at 403 ¶ 67, 132 P.3d at 847 (quoting *State v. Atwood*, 171 Ariz. 576, 606, 832 P.2d 593, 623 (1992), *overruled on other grounds by State v. Nordstrom*, 200 Ariz. 229, 241 ¶ 25, 25 P.3d 717, 729 (2001)). "[A]ny improper comments must be so serious that they affected the defendant's right to a fair trial." *Id.* (citation omitted). The preliminary and final jury instructions noted that "[t]he attorneys' remarks, statements, and arguments are not evidence, but are intended to help you understand the evidence and apply the law." Presuming that jurors follow the court's instructions, *id.* at ¶ 68 (citation omitted), we conclude that any possible prejudice from the prosecutor's statements was cured by the trial court's instructions.

### 3. Comparison of Victim and Gallardo

[32] ¶ 41 In closing argument, Gallardo argued that a life sentence was "sufficient punishment" given the "severe restriction" and "isolat[ion]" of prison. In response, the prosecutor said that maximum security inmates are allowed to watch television, receive magazines, make phone calls, and see visitors. Noting that victim impact statements could rebut mitigation, the prosecutor then said, "Do you think [Rudy's father is] going to be able to call his son, Rudy...." The defense objected to the comparison between Gallardo and the victim, and the trial court sustained the objection.

¶ 42 Even if the prosecutor's statements were improper, reversal is not required. *See Newell*, 212 Ariz. at 403 ¶ 67, 132 P.3d at 847. The trial court instructed the jurors "not to be swayed by mere sympathy not related to the evidence presented during this phase" and to disregard any question to which the judge sustained an objection. These instructions negated the effect of the prosecutor's statements. *See id.* at ¶ 68; *see also Morris*, 215 Ariz. at 336–37 ¶ 55, 160 P.3d at 215–16 ("Even if the prosecutor's comments were improper, the judge's instructions negated their effect.").

### 4. Reference to Mitigation Witness's Fees

[33] ¶ 43 In the penalty phase, Gallardo presented expert testimony from a retired corrections director about the conditions of maximum security facilities in Arizona. During cross examination, the prosecutor elicited testimony concerning the expert's fees and potential bias. During closing argument, the prosecutor characterized this testimony as an inconsistent statement, Gallardo objected to the argument as misleading, and the trial court sustained the objection. The prosecutor persisted with the line of argument and the trial court twice sustained further objections.

[34] ¶ 44 A prosecutor should not repeat an argument after it has been the subject of a sustained objection. *Cf. Pool v. Superior Court in and for Pima County,* 139 Ariz. 98, 104 n. 7, 677 P.2d 261, 267 n. 7 (1984) (noting that repetition of questions to which objection has been sustained is misconduct); *In re Gustafson,* 650 F.2d 1017, 1020 (9th Cir.1981) (noting that attorney's disregard of court's limits on permissible argument constituted misbehavior for purposes of federal contempt statute). Although the repeated statements by the prosecutor were improper, Gallardo's objections were sustained and the trial court instructed the jury to "disregard questions ... that were withdrawn or to which objections were sustained." Again, because "we presume jurors follow the court's instructions," *Newell,* 212 Ariz. at 403 ¶ 68, 132 P.3d at 847, any prejudice that may have resulted from the prosecutor's argument was cured by the trial court's instructions.

### 5. Misstatement of the Law

[35] ¶ 45 Gallardo further claims that it was improper for the prosecutor to suggest in closing that the jurors must vote for death *570 **169 if they found no mitigation. We have previously rejected this argument: "Under our sentencing scheme ... given the findings of one or more aggravators, a juror must vote to impose a sentence of death if he or she determines there is no mitigation at all or none sufficiently substantial to warrant a sentence of less than death." *Tucker,* 215 Ariz. at 318 ¶ 74, 160 P.3d at 197.

### 6. Cumulative Effect

¶ 46 Gallardo argues that even if no single incident of

misconduct warrants reversal, the deliberate and persistent conduct of the prosecutor deprived him of a fair trial. We consider whether "persistent and pervasive" misconduct occurred and whether the "cumulative effect of the incidents shows that the prosecutor intentionally engaged in improper conduct and did so with indifference, if not a specific intent, to prejudice the defendant." *Morris,* 215 Ariz. at 339 ¶ 67, 160 P.3d at 218 (citation and internal quotation marks omitted).

¶ 47 The record does not suggest pervasive prosecutorial misconduct that deprived Gallardo of a fair trial.

**F. Constitutionality of Burden of Proof at Sentencing**
¶ 48 Gallardo argues that Arizona's death penalty scheme violates the Eighth and Fourteenth Amendments because it does not require the State to prove beyond a reasonable doubt that mitigating circumstances, once proved by the defendant, are not sufficiently substantial to call for leniency. We rejected this argument in *State v. Moore,* 222 Ariz. 1, 20 ¶¶ 110–13, 213 P.3d 150, 169, *cert. denied,* —— U.S. ——, 130 S.Ct. 747, 175 L.Ed.2d 524 (2009).

**G. Review of the Death Sentence**
[36] [37] ¶ 49 Because the murder occurred after August 1, 2002, we "determine whether the trier of fact abused its discretion in finding aggravating circumstances and imposing a sentence of death." A.R.S. § 13–756(A). We conduct this review even if, as here, the defendant does not argue that the jury's verdict was an abuse of discretion. *Morris,* 215 Ariz. at 340 ¶ 76, 160 P.3d at 219. A decision is not an abuse of discretion if there is "any reasonable evidence in the record to sustain it." *Id.* at 341 ¶ 77, 160 P.3d at 220 (citation and internal quotation marks omitted)

**1. Aggravating Circumstances**

¶ 50 The jury found two aggravating circumstances: Gallardo had been previously convicted of a prior serious offense, *see* A.R.S. § 13–751(F)(2), and the murder was especially cruel, *see id.* § 13–751(F)(6). As discussed, there is sufficient evidence to support the jury's finding that Gallardo committed the murder in an especially cruel manner. The jury also properly found that Gallardo had previously been convicted of a serious offense based on evidence of his prior convictions for armed robbery and

burglary.

**2. Death as the Appropriate Sentence**

[38] [39] ¶ 51 Once the jury finds one or more aggravating factors, each juror must individually determine whether death is the appropriate penalty. *See* A.R.S. § 13–751(C) (stating that "[e]ach juror may consider any mitigating circumstance found by that juror in determining the appropriate penalty"); *see also Baldwin,* 211 Ariz. at 473 ¶ 21, 123 P.3d at 667. We will not reverse the jury's decision if "any reasonable jury could have concluded that the mitigation established by the defendant was not sufficiently substantial to call for leniency." *Morris,* 215 Ariz. at 341 ¶ 81, 160 P.3d at 220.

¶ 52 Gallardo presented evidence about the impact of execution on his family and the general conditions of confinement in Arizona's maximum security facilities. A reasonable juror could conclude that the mitigation presented was not sufficiently substantial to call for leniency. *See State v. Harrod,* 200 Ariz. 309, 319 ¶ 54, 26 P.3d 492, 502 (2001) (minimal weight given to family support), *vacated on other grounds,* 536 U.S. 953, 122 S.Ct. 2653, 153 L.Ed.2d 830 (2002).

**H. Issues Preserved for Federal Review**
¶ 53 To avoid preclusion, Gallardo raises twelve additional constitutional claims that he *571 **170 states have been rejected in previous decisions by the United States Supreme Court or this Court. The attached appendix lists the claims raised by Gallardo and the decisions he identifies as rejecting them.

**CONCLUSION**

¶ 54 We affirm Gallardo's convictions and sentences.

CONCURRING: REBECCA WHITE BERCH, Chief Justice, ANDREW D. HURWITZ, Vice Chief Justice, A. JOHN PELANDER, Justice and MICHAEL D. RYAN, Justice (Retired).

**Appendix**

**State v. Gallardo, 225 Ariz. 560 (2010)**

242 P.3d 159, 596 Ariz. Adv. Rep. 7

Gallardo raises twelve issues to preserve them for federal appeal. This Appendix lists his claims and the decisions he identifies as rejecting them.

(1) Arizona's statutory scheme for considering mitigating evidence is unconstitutional under the Eighth and Fourteenth Amendments because it limits consideration of mitigating evidence to that proven by a preponderance of the evidence. *State v. McGill*, 213 Ariz. 147, 161 ¶ 59, 140 P.3d 930, 944 (2006).

(2) Gallardo's death sentence is in violation of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments and the Arizona Constitution because the State failed to allege the aggravating factors that made the defendant death eligible in the grand jury indictment. *McKaney v. Foreman ex rel. County of Maricopa*, 209 Ariz. 268, 273 ¶ 23, 100 P.3d 18, 23 (2004).

(3) Application of the new death penalty law to Gallardo constitutes an impermissible *ex post facto* application of the law. *State v. Ring*, 204 Ariz. 534, 547 ¶¶ 23–24, 65 P.3d 915, 928 (2003).

(4) Gallardo's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments and under the Arizona Constitution were violated by the admission of victim impact evidence at the penalty phase of the trial. *Lynn v. Reinstein*, 205 Ariz. 186, 191 ¶ 16, 68 P.3d 412, 417 (2003).

(5) The trial court improperly omitted penalty phase instructions that the jury could consider mercy or sympathy in evaluating the mitigation evidence and in determining whether to sentence the defendant to death. *State v. Carreon*, 210 Ariz. 54, 70–71 ¶¶ 81–87, 107 P.3d 900, 916–17 (2005).

(6) The death penalty is cruel and unusual punishment. *State v. Harrod*, 200 Ariz. 309, 320 ¶ 59, 26 P.3d 492, 503 (2001), *vacated on other grounds*, 536 U.S. 953, 122

S.Ct. 2653, 153 L.Ed.2d 830 (2002).

(7) The death penalty is arbitrarily imposed in violation of Gallardo's due process rights under the Fourteenth Amendment and under the Arizona Constitution. *State v. Beaty*, 158 Ariz. 232, 247, 762 P.2d 519, 534 (1988).

(8) The prosecutor's discretion to seek the death penalty unconstitutionally lacks standards. *State v. Sansing*, 200 Ariz. 347, 361 ¶ 46, 26 P.3d 1118, 1131 (2001), *vacated on other grounds*, 536 U.S. 954, 122 S.Ct. 2654, 153 L.Ed.2d 830 (2002).

(9) The death penalty in Arizona has been applied in a manner that discriminates against poor, young, and male defendants in violation of the Arizona Constitution. *Sansing*, 200 Ariz. at 361 ¶ 46, 26 P.3d at 1131.

(10) The absence of proportionality review by Arizona courts of a defendant's death sentence is unconstitutional under the Fifth, Eighth, and Fourteenth Amendments and Article 2, Section 15 of the Arizona Constitution. *Harrod*, 200 Ariz. at 320 ¶ 65, 26 P.3d at 503.

(11) Arizona's death penalty statute unconstitutionally presumes that death is the appropriate sentence. *State v. Miles*, 186 Ariz. 10, 19, 918 P.2d 1028, 1037 (1996).

(12) Execution by lethal injection is cruel and unusual punishment. *State v. Van Adams*, 194 Ariz. 408, 422, 984 P.2d 16, 30 (1999).

**All Citations**

225 Ariz. 560, 242 P.3d 159, 596 Ariz. Adv. Rep. 7

---

**End of Document**                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

# Juan Martinez

# 15-3363

Exhibits to initial charge
Attachment 02
(state v. lynch I)

**State v. Lynch, 225 Ariz. 27 (2010)**

234 P.3d 595, 606 Ariz. Adv. Rep. 4

KeyCite Yellow Flag - Negative Treatment

**Distinguished by** State v. Miller, Ariz., December 27, 2013

225 Ariz. 27

Supreme Court of Arizona,

En Banc.

STATE of Arizona, Appellee,

v.

Shawn Patrick LYNCH, Appellant.

No. CR–06–0220–AP. | June 22, 2010.

**Synopsis**

**Background:** Defendant was convicted in the Superior Court in Maricopa County, David M. Talamante, J., of armed robbery, burglary, kidnapping and first degree murder, and, after first jury could not reach a unanimous verdict in aggravation phase of trial, second jury determined that defendant should be sentenced to death. Defendant appealed.

**Holdings:** The Supreme Court, Hurwitz, V.C.J., held that:

[1] trial court did not abuse its discretion by finding that defendant had been restored to competency;

[2] trial court did not abuse its discretion by denying sequestered voir dire;

[3] trial court did not abuse its discretion by admitting photographs depicting blood spatter and blood pools in relation to the victim's body;

[4] evidence was sufficient to establish that defendant was a major participant in the predicate felonies;

[5] evidence was sufficient to establish the pecuniary gain aggravator;

[6] evidence was sufficient to establish the especially heinous, cruel or depraved aggravator; but

[7] error in instructing that the jury had found multiple aggravators, when the especially heinous, cruel or depraved aggravator was just one aggravator, was not harmless.

Affirmed in part and remanded in part.

West Headnotes (44)

[1]     **Criminal Law**
        ⟜Preliminary proceedings

        Rulings that a defendant has been restored to competency and denying a second competency examination are reviewed for abuse of discretion. 16A A.R.S. Rules Crim.Proc., Rule 11.1.

        3 Cases that cite this headnote

[2]     **Criminal Law**
        ⟜Successive proceedings in general
        **Criminal Law**
        ⟜Evidence

        Trial court did not abuse its discretion by finding that defendant had been restored to competency and denying motion by defense counsel for a second competency examination, in prosecution of defendant for armed robbery, burglary, kidnapping and first degree murder, where psychologist who conducted first examination concluded that defendant's various delusions and idiosyncratic thought processes did not significantly affect his ability to cooperate with his attorney if he chose to do so, and defense counsel on motion for a second evaluation did not offer new information to call into question the previous finding of competency. 16A A.R.S. Rules Crim.Proc., Rule 11.1.

        2 Cases that cite this headnote

[3]     **Criminal Law**
        ⟜Summoning and impaneling jury

        Trial court's allegedly limited description of the

**State v. Lynch, 225 Ariz. 27 (2010)**
234 P.3d 595, 606 Ariz. Adv. Rep. 4

capital sentencing process to jury panel at voir dire was not plain error, in capital murder prosecution, absent showing of prejudice; jury, after convicting defendant, could not reach a unanimous verdict in aggravation phase and did not return a death sentence.

Cases that cite this headnote

[4]     **Sentencing and Punishment**
        ⊨Instructions

Trial court's remarks at voir dire properly explained the aggravating factors and mitigating factors in a death penalty decision to jury panel, in trial of defendant for armed robbery, burglary, kidnapping and first degree murder, by stating that not every murder contained aggravating factors, by stating that only those that were found to have aggravating factors were eligible for consideration for the death penalty, by defining a "mitigating circumstance" as any factor relevant in determining whether to impose a sentence less than death, including any aspect of the defendant's character, propensities, record or circumstances of the offense, and by explaining that each juror should consider any mitigating factors found by that juror in determining whether a death or life sentence was appropriate. A.R.S. §§ 13–751(C, E, G), 13–752(D).

Cases that cite this headnote

[5]     **Jury**
        ⊨Mode of examination

Trial court did not abuse its discretion by denying sequestered voir dire, in trial of defendant for armed robbery, burglary, kidnapping and first degree murder, absent allegation by defendant that sequestered voir dire was necessary because of unusually sensitive subjects or extensive pretrial publicity, or identification of any contaminating statement by a juror that might color the entire jury's outlook. 17 A.R.S. Rules Crim.Proc., Rule

18.5(d).

1 Cases that cite this headnote

[6]     **Criminal Law**
        ⊨Selection and impaneling

Because a trial judge has the best opportunity to assess whether a juror can be fair and impartial, appellate courts review such decisions only for abuse of discretion.

Cases that cite this headnote

[7]     **Jury**
        ⊨Punishment prescribed for offense

Jurors cannot be excluded in a capital case simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction.

2 Cases that cite this headnote

[8]     **Jury**
        ⊨Bias and Prejudice

A juror may properly be excused from a criminal trial if his views would prevent or substantially impair the performance of his duties as a juror.

3 Cases that cite this headnote

[9]     **Jury**
        ⊨Punishment prescribed for offense

Jurors who state unequivocally that they could never impose the death penalty regardless of the facts of the particular case are properly

State v. Lynch, 225 Ariz. 27 (2010)
234 P.3d 595, 606 Ariz. Adv. Rep. 4

excluded.

Cases that cite this headnote

[10]     **Jury**
         ⟡═Punishment prescribed for offense

Trial court did not abuse its discretion by
striking for cause juror, in trial of defendant for
armed robbery, burglary, kidnapping and first
degree murder, who stated in voir dire several
times that she was not sure she could sentence
someone to death and that it would be very, very
difficult to make a decision to take someone's
life.

2 Cases that cite this headnote

[11]     **Criminal Law**
         ⟡═Reception and Admissibility of Evidence
         **Criminal Law**
         ⟡═Documentary evidence

Rulings admitting evidence in general, and
photographs in particular, are reviewed for
abuse of discretion.

Cases that cite this headnote

[12]     **Criminal Law**
         ⟡═Photographs arousing passion or prejudice;
         gruesomeness

The admissibility of a potentially inflammatory
photograph is determined by examining: (1) the
relevance of the photograph; (2) its tendency to
incite or inflame the jury; and (3) the probative
value versus potential to cause unfair prejudice.

1 Cases that cite this headnote

[13]     **Criminal Law**
         ⟡═Photographs arousing passion or prejudice;
         gruesomeness

Although photographs may not be introduced
solely to inflame the jury, there is nothing
sanitary about murder, and a trial judge is not
required to make it so.

Cases that cite this headnote

[14]     **Criminal Law**
         ⟡═Purpose of admission
         **Criminal Law**
         ⟡═Photographs arousing passion or prejudice;
         gruesomeness

Trial court in trial of defendant for first degree
murder did not abuse its discretion by admitting
photographs depicting blood spatter and blood
pools in relation to the victim's body, where
photographs corroborated opinion of State's
expert that the person who slit victim's throat
stood behind the chair on which victim's body
was found; though the photographs were
disturbing none were overly gruesome, and
probative value of the photographs was not
substantially outweighed by any prejudicial
effect. 17A A.R.S. Rules of Evid., Rule 403.

Cases that cite this headnote

[15]     **Homicide**
         ⟡═Degree or classification of homicide
         **Indictment and Information**
         ⟡═Degrees of homicide

Any error of trial court in failing to instruct on
lesser included offense of second degree murder,
in trial of defendant for armed robbery, burglary,
kidnapping and first degree murder, did not
prejudice defendant, as jury agreed only that
defendant committed felony murder, jury did not
reach a unanimous verdict on premeditated
murder, and second degree murder was not a

State v. Lynch, 225 Ariz. 27 (2010)
234 P.3d 595, 606 Ariz. Adv. Rep. 4

lesser included offense of felony murder.

Cases that cite this headnote

[16]   **Criminal Law**
       *Evidence Justifying or Requiring Instructions*

A trial court must give an instruction on lesser-included offenses when warranted to reduce the risk that a jury, faced only with a choice between convicting for a capital crime and setting a violent criminal free, might be unduly pressured to opt for the conviction on the capital offense.

Cases that cite this headnote

[17]   **Criminal Law**
       *Grade or degree of offense*

A trial court is not required to instruct on a lesser offense that is unsupported by the evidence.

Cases that cite this headnote

[18]   **Jury**
       *Mode of examination*

Trial court did not impermissibly tell jurors particular facts of the case, during voir dire of second jury impaneled for aggravation phase of trial of defendant for first degree murder, when court told a juror that the case did not involve children, where such juror had stated that because of her religion she did not believe in the death penalty but would go against such views in a case involving children, and the statement was appropriate to determine whether such juror's views would prevent or substantially impair the performance of her duties.

2 Cases that cite this headnote

[19]   **Jury**
       *Punishment prescribed for offense*

Jury, who stated in jury questionnaire that she was adamantly anti–death–penalty and absolutely could not sit on a jury that would possibly be responsible for killing anyone, was appropriately excluded for cause, during voir dire of second jury impaneled for aggravation phase of trial of defendant for first degree murder.

Cases that cite this headnote

[20]   **Homicide**
       *Recklessness, wantonness, or extreme indifference*

Trial court properly instructed jury on the subjective reckless indifference standard, in trial of defendant for first degree murder, by stating that a defendant acted with reckless indifference when the defendant knowingly engaged in criminal activities that he was aware would likely create a grave risk of death to others, as nothing in such instruction suggested an objective "reasonable person" standard.

Cases that cite this headnote

[21]   **Criminal Law**
       *Construction of Evidence*
       **Criminal Law**
       *Substantial evidence*

When a defendant contends that a jury's findings were not supported by the evidence, the Supreme Court determines whether substantial evidence supports the jury's finding, viewing the facts in the light most favorable to sustaining the jury verdict.

Cases that cite this headnote

**State v. Lynch, 225 Ariz. 27 (2010)**

234 P.3d 595, 606 Ariz. Adv. Rep. 4

[22]   **Criminal Law**
⬅Degree of proof

Substantial evidence sustaining a jury's findings is proof that reasonable persons could accept as adequate and sufficient to support a conclusion of defendant's guilt beyond a reasonable doubt.

Cases that cite this headnote

[23]   **Sentencing and Punishment**
⬅Killing while committing other offense or in course of criminal conduct

Evidence was sufficient to establish that defendant was a major participant in the predicate felonies, in trial of defendant for armed robbery, burglary, kidnapping and first degree murder, as required in order for the imposition of the death sentence in a felony murder case; there was evidence that defendant and an associate returned to victim's residence when they learned that one of victim's credit card had been deactivated, that victim's credit cards, sweater and pistol were found in the truck that defendant was entering when arrested, and that associate needed help to bind victim to chair before victim's throat was slit.

Cases that cite this headnote

[24]   **Sentencing and Punishment**
⬅Extreme or reckless indifference

Evidence was sufficient to establish that defendant acted with reckless indifference to victim's life, in trial of defendant for armed robbery, burglary, kidnapping and first degree murder, as required in order for the imposition of the death sentence in a felony murder case; State expert opined that victim's throat was slit by someone standing behind chair in which victim had been bound, and that blood on defendant's shoes was consistent with his having been in that position.

Cases that cite this headnote

[25]   **Sentencing and Punishment**
⬅Documentary evidence

Trial court did not abuse its discretion by admitting autopsy photographs of victim, during aggravation phase trials of prosecution of defendant for first degree murder, though photographs were close-ups of victim's neck wound depicting cut jugular vein, severed carotid artery and severed larynx, as photographs illustrated the testimony of the medical examiner.

1 Cases that cite this headnote

[26]   **Criminal Law**
⬅Issues related to jury trial

Because the trial court is in the best position to determine the effect of a prosecutor's comments on a jury, the Supreme Court will not disturb a trial court's denial of a mistrial for prosecutorial misconduct in the absence of a clear abuse of discretion.

1 Cases that cite this headnote

[27]   **Criminal Law**
⬅Conduct of counsel in general

Reversal on the basis of prosecutorial misconduct requires that the conduct be so pronounced and persistent that it permeates the entire atmosphere of the trial.

1 Cases that cite this headnote

**State v. Lynch, 225 Ariz. 27 (2010)**

234 P.3d 595, 606 Ariz. Adv. Rep. 4

[28] **Sentencing and Punishment**
☞ Discretion of lower court

Trial court did not abuse its discretion, in second aggravation phase trial of capital murder defendant, by denying defendant's motion for a mistrial after prosecution said in opening statement that defendant was a murderer, though first jury in guilt phase had only convicted defendant of felony murder; the reference was accurate, and trial court later instructed second jury that defendant had been convicted of felony murder, thus negating any suggestion that the first jury had found defendant to be the actual killer.

Cases that cite this headnote

[29] **Sentencing and Punishment**
☞ Arguments and conduct of counsel

Prosecutor did not engage in improper conduct, in second aggravation phase trial of capital murder defendant, by saying in opening statement that hunting knife found at murder scene was not consistent with that being the murder weapon, as State expert's testimony, though not conclusive, supported prosecutor's assertion; expert subsequently testified that because he could find neither blood nor DNA on the blade, he could not conclude that it was the murder weapon.

Cases that cite this headnote

[30] **Sentencing and Punishment**
☞ Harmless and reversible error

Misstatement by prosecutor in his opening statement in guilt phase of first degree murder trial, that defendant and his associate were found in a truck that defendant drove, did not prejudice defendant, though defendant was arresting while he was entering the passenger side of the truck, as the identity of the truck's driver was immaterial given that defendant was riding in the truck, and the misstatement was technical.

Cases that cite this headnote

[31] **Criminal Law**
☞ Grounds in general

Reversal is required if the cumulative effect of the incidents shows that the prosecutor intentionally engaged in improper conduct and did so with indifference, if not a specific intent, to prejudice the defendant.

Cases that cite this headnote

[32] **Criminal Law**
☞ Grounds in general

Absent any finding of misconduct, there can be no cumulative effect of prosecutorial misconduct sufficient to permeate the entire atmosphere of the trial with unfairness.

2 Cases that cite this headnote

[33] **Double Jeopardy**
☞ Sentence on trial de novo; two tier system

Submission of the pecuniary gain aggravator to second jury, after jury which had convicted defendant of first degree murder failed to reach a unanimous verdict in the aggravation phase of defendant's first trial, did not violate double jeopardy, as a failure of a jury to unanimously find an aggravator was not an acquittal for Fifth Amendment purposes, nor did it collaterally estop a new trier of fact from considering the issue. U.S.C.A. Const.Amend. 5; A.R.S. § 13–752(F, K).

Cases that cite this headnote

**State v. Lynch, 225 Ariz. 27 (2010)**

234 P.3d 595, 606 Ariz. Adv. Rep. 4

---

[34]   **Sentencing and Punishment**
⟠=Personal or pecuniary gain

A felony murder conviction predicated on robbery or burglary does not automatically establish the pecuniary gain aggravator for purposes of a death sentence; rather, the murder must itself be prompted by the desire for pecuniary gain. A.R.S. § 13–751(F)(5).

1 Cases that cite this headnote

[35]   **Sentencing and Punishment**
⟠=Personal or pecuniary gain

Evidence was sufficient to establish the pecuniary gain aggravator, in aggravator phase of trial of defendant who was convicted of felony murder; after victim was murdered, victim's gun and magazine clip were found in motel room used by defendant, victim's debit and credit cards were repeatedly used after the murder, property belonging to victim was found in passenger compartment of truck that defendant was entering at the time of his arrest, and there was evidence that victim was murdered to avoid detection of the initial theft of one of victim's credit cards and the subsequent robbery and burglary. A.R.S. § 13–751(F)(5).

1 Cases that cite this headnote

[36]   **Sentencing and Punishment**
⟠=Personal or pecuniary gain

A lack of subsequent control over robbery proceeds does not bar a finding of the pecuniary gain aggravator in a death penalty trial; the aggravator requires only that the desire for pecuniary gain motivated the murder. A.R.S. § 13–751(F)(5).

1 Cases that cite this headnote

[37]   **Sentencing and Punishment**
⟠=Presentation and reservation in lower court of grounds of review

Alleged error in instruction by trial court during aggravator phase of trial of defendant for first degree murder, to which defendant did not object, which defendant claimed allowed jury to impute cruelty to defendant based solely on the conduct of his associate, was not fundamental error, as the evidence indicated that defendant, at a minimum, helped bind the victim to a chair before the victim's throat was cut. A.R.S. § 13–751(F)(6).

Cases that cite this headnote

[38]   **Sentencing and Punishment**
⟠=Extent of offender's personal participation
**Sentencing and Punishment**
⟠=Vileness, heinousness, or atrocity

There is no vicarious liability for cruelty in capital cases absent a plan intended or reasonably certain to cause suffering. A.R.S. § 13–751(F)(6).

Cases that cite this headnote

[39]   **Sentencing and Punishment**
⟠=Extent of offender's personal participation
**Sentencing and Punishment**
⟠=Vileness, heinousness, or atrocity

If the defendant neither committed the murder nor knew or should have known that the victim would suffer, the cruelty aggravator cannot be found on a tort theory of culpability. A.R.S. § 13–751(F)(6).

Cases that cite this headnote

---

State v. Lynch, 225 Ariz. 27 (2010)
234 P.3d 595, 606 Ariz. Adv. Rep. 4

[40]
**Sentencing and Punishment**
☞ Vileness, heinousness, or atrocity

If the evidence in the aggravator phase of a first degree murder trial indicates that the murder was conducted in an especially heinous, cruel or depraved manner, the Supreme Court on appeal will uphold a jury's finding of the especially heinous, cruel or depraved aggravator. A.R.S. § 13–751(F)(6).

Cases that cite this headnote

[41]
**Sentencing and Punishment**
☞ Vileness, heinousness, or atrocity

A murder is especially cruel, for purposes of the especially heinous, cruel or depraved aggravator, when the victim consciously experienced physical or mental pain prior to death, and the defendant knew or should have known that suffering would occur. A.R.S. § 13–751(F)(6).

2 Cases that cite this headnote

[42]
**Sentencing and Punishment**
☞ Vileness, heinousness, or atrocity

Evidence was sufficient to establish that victim's murder was especially cruel, as required to establish the especially heinous, cruel or depraved aggravator in aggravator phase of trial of defendant convicted of armed robbery, burglary, kidnapping and first degree murder; there was evidence that victim would have felt physical pain as his throat was cut and that he would have continued to feel pain thereafter for at least a minute until he lost consciousness, victim was conscious when he was bound to a chair before his throat was cut as ligatures, abrasions and bruising indicated that victim offered resistance, and the number and complexity of the knots suggested that victim had ample time to suffer significant uncertainty

as to his ultimate fate. A.R.S. § 13–751(F)(6).

2 Cases that cite this headnote

[43]
**Sentencing and Punishment**
☞ Vileness, heinousness, or atrocity

The especially heinous, cruel or depraved aggravator in a death sentence trial is a single aggravating circumstance that can be established in alternative ways. A.R.S. § 13–751(F)(6).

1 Cases that cite this headnote

[44]
**Sentencing and Punishment**
☞ Instructions
**Sentencing and Punishment**
☞ Harmless and reversible error

Error of trial court by instructing jury, in penalty phase of trial for first degree murder, that four rather than two aggravating circumstances had been found to exist, including an especially cruel aggravator, an especially heinous manner aggravator and an especially depraved manner aggravator when the especially heinous, cruel or depraved aggravator was just one aggravator, was not harmless; error was not cured by instruction that the jury could not consider twice any fact or aspect of the murder because each of especially heinous, cruel or depraved aggravator factors required proof of different facts, prosecution emphasized that four aggravating circumstances had been found when urging the death penalty, and Supreme Court was not authorized to conduct an independent reweighing when a jury was improperly instructed on the number of aggravators. A.R.S. § 13–751(E), (F)(6).

2 Cases that cite this headnote

**Attorneys and Law Firms**

**State v. Lynch, 225 Ariz. 27 (2010)**

234 P.3d 595, 606 Ariz. Adv. Rep. 4

**\*\*600** Terry Goddard, Arizona Attorney General By Kent E. Cattani, Chief Counsel, Criminal Appeals/Capital Litigation Section, Deborah A. Bigbee, Assistant Attorney General, Phoenix, Attorneys for State of Arizona.

David Goldberg, Attorney at Law By David Goldberg, Fort Collins, CO, Attorney for Shawn Patrick Lynch.

## \*32 OPINION

HURWITZ, Vice Chief Justice.

¶ 1 Shawn Patrick Lynch was convicted of armed robbery, burglary, kidnapping, and first degree murder. He was sentenced to death for the murder and to lengthy prison sentences for the other crimes. An automatic notice of appeal was filed under Arizona Rules of Criminal Procedure 26.15 and 31.2. This Court has jurisdiction under Article 6, Section 5(3) of the Arizona Constitution and Arizona Revised Statutes ("A.R.S.") §§ 13–755, 13–4031, and 13–4033 (2010).[1]

### I. FACTS AND PROCEDURAL HISTORY[2]

¶ 2 James Panzarella lived in a guesthouse behind his parents' Scottsdale home. On March 24, 2001, James left his car at his brother's home and took a cab to a Scottsdale bar. He was seen at the bar with two men later identified as Mike Sehwani and Shawn Patrick Lynch. James, Sehwani, and Lynch went to James's guesthouse early in the morning of March 25.

¶ 3 At around 5:00 a.m., an escort service received a call from Sehwani and dispatched an escort and bodyguard to the guesthouse. The bodyguard collected a $175 fee from James.

¶ 4 The escort and Sehwani went into a bedroom, while James and Lynch talked with the bodyguard in the kitchen. Sehwani wrote two checks from James's checkbook to the escort totaling $300. The bodyguard and escort left around 6:00 a.m.

¶ 5 About 7:15 a.m. Lynch and Sehwani went to a supermarket, where Sehwani bought cigarettes with James's American Express card. Ten minutes later, the card was reported as lost and invalidated. Sehwani nonetheless shortly thereafter used the card to buy gas at a convenience store. Lynch then entered the store to get

matches. Later that morning, Sehwani, accompanied by Lynch, unsuccessfully attempted to use the card at a department store.

¶ 6 Around noon, Sehwani used James's Bank One credit card at a restaurant. This credit card was also used twice that day at a convenience store. That afternoon, Lynch and Sehwani checked into a motel. Lynch registered in his name and paid with cash; Sehwani presented James's credit card to rent movies. That evening, Lynch and Sehwani checked into another motel, again registering in Lynch's name and paying cash.

¶ 7 On the afternoon of March 25, James was found bound to a metal chair in the \*33 \*\*601 guesthouse kitchen. His throat was slit and blood was pooled on the tile floor.

¶ 8 The guesthouse was in disarray. In a bedroom, police found a large hunting knife. In the kitchen, they found a knife block with a missing knife. American Express receipts from the March 25 supermarket and convenience store purchases were also found in the guesthouse.

¶ 9 Early in the morning of March 26, James's Bank One debit card was used to withdraw cash from an ATM. A later attempted withdrawal was unsuccessful. The debit card was also used later that morning to buy clothing and Everlast shoes, and at least twice otherwise that same day.

¶ 10 Police arrested Lynch and Sehwani that afternoon as they entered a truck in the motel parking lot. Sehwani wore white Everlast sneakers and had James's credit cards and checks in his wallet. Matches from the convenience store and the keys to James's car were in the truck. A black sweater with James's blood on it was behind the seats. A .45 caliber pistol belonging to James was later found in the motel room. Blood on Lynch's shoes tested positive for James's DNA.[3]

¶ 11 Lynch and Sehwani were charged with first degree murder (both felony and premeditated), armed robbery, burglary, and kidnapping. Lynch was tried first. The jury found him guilty on all counts, but did not reach a unanimous verdict on premeditated murder.

¶ 12 In the aggravation phase of the trial, the jury could not agree on whether the murder was committed in expectation of pecuniary gain. *See* A.R.S. § 13–751(F)(5) (2010). The jury made separate findings that the murder was both especially heinous and cruel, but could not decide whether the murder was also especially depraved. *See* A.R.S. § 13–751(F)(6). In the penalty phase, the jury could not reach a unanimous verdict.

¶ 13 A second jury was impaneled. That jury found both the (F)(5) aggravator and the depravity prong of the (F)(6) aggravator. The second jury then unanimously determined that Lynch should be sentenced to death for the murder.[4]

## II. ISSUES ON APPEAL

### A. GUILT PHASE

#### 1. Competence to Stand Trial

¶ 14 Before trial, the court ordered a Rule 11 examination after Lynch refused to meet with his lawyers. *See* Ariz. R.Crim. P. 11. Based on that evaluation, the court found Lynch incompetent to stand trial and ordered restoration services. Five months later, after considering a psychologist's report that was stipulated into evidence, the court found Lynch restored to competency.

¶ 15 Six months later, defense counsel requested a second Rule 11 evaluation, alleging that Lynch suffered from delusions and therefore could not assist in his defense. He offered no other support for this motion, which the court denied.

[1] ¶ 16 Lynch argues that the trial court erred in finding that he had been restored to competency and refusing to order a second Rule 11 examination. We review these rulings for abuse of discretion. *State v. Glassel*, 211 Ariz. 33, 44 ¶ 27, 116 P.3d 1193, 1204 (2005); *State v. Romero*, 130 Ariz. 142, 147, 634 P.2d 954, 959 (1981).

[2] ¶ 17 The psychologist's report amply supports the trial court's finding that Lynch had been restored to competency. The psychologist concluded that Lynch understood the nature of the proceedings against him and could assist in his defense. Although acknowledging that Lynch suffered from various delusions and idiosyncratic thought processes, the psychologist noted that these "errant thoughts ... do not appear to significantly affect his ability to deal with relevant issues pursuant to his alleged crime and pursuant **34 **602 to a possible trial." The expert concluded that Lynch "can cooperate with his attorney, should he choose to do so."

¶ 18 Nor did the court err in refusing to order a second competency hearing. Lynch proffered no new information to call into question the court's previous finding of competency. The earlier expert report had noted Lynch's delusions but concluded that they did not render him incompetent to assist in his defense. In the absence of any

new evidence, the court did not abuse its discretion in continuing to rely on that report. *See State v. Kuhs*, 223 Ariz. 376, 380 ¶ 16, 224 P.3d 192, 196 (2010).

#### 2. Description of Capital Case Process to First Jury

¶ 19 Lynch argues that during voir dire of the first jury, the trial court "gave no details regarding what an aggravating or mitigating circumstance might entail or how a juror would factor such information into the penalty decision." He maintains that the State was thus able to pack the first jury with pro-death penalty jurors. No objection was raised below, so we review only for fundamental error. *Id.* at 386 ¶ 52, 224 P.3d at 202.

[3] ¶ 20 Because the first jury did not return a death sentence, Lynch was not prejudiced by the trial court's description of the capital sentencing process. But in any event, we find no error.

[4] ¶ 21 The superior court properly told the panel that "[n]ot every murder contains aggravating factors and only those that are found to have aggravating factors are eligible for consideration for the death penalty." *See* A.R.S. §§ 13–752(D) (2010), 13–751(E). The court also correctly defined a "mitigating circumstance" as "any factor relevant in determining whether to impose a sentence less than death, including any aspect of the defendant's character, propensities, record or circumstances of the offense." *See* A.R.S. § 13–751(G). The court accurately explained that each juror should consider any mitigating factors found by that juror in determining whether a death or life sentence was appropriate. *See* A.R.S. § 13–751(C).

#### 3. Refusal to Conduct Sequestered Voir Dire

¶ 22 Lynch maintains that the trial court erred by denying sequestered voir dire of the first jury. We review for abuse of discretion. *State v. Bible*, 175 Ariz. 549, 570, 858 P.2d 1152, 1173 (1993).

[5] ¶ 23 Lynch does not claim that sequestered voir dire was necessary because of "unusually sensitive subjects" or extensive pretrial publicity. *See id.* (noting that in camera voir dire is "most useful" in such cases). Rather, Lynch argues that separate voir dire is required in *every* capital case. We expressly rejected that proposition in *Bible. Id.*

¶ 24 Lynch also fails to identify any "contaminating" statement by a prospective juror that "might color the entire jury's outlook." Ariz. R.Crim. P. 18.5(d), cmt.; *see*

*Bible*, 175 Ariz. at 570, 858 P.2d at 1173 (noting absence of such a statement in finding no error in group voir dire). On this record, the trial court did not abuse its discretion in declining to order sequestered voir dire.

**4. Striking Juror 119 for Cause**

[6] ¶ 25 Lynch argues the trial court erred by striking Juror 119 from the first jury for cause over his objection. "Because a trial judge has the best opportunity to assess whether a juror can be fair and impartial, appellate courts review such decisions only for abuse of discretion." *State v. Hickman*, 205 Ariz. 192, 201 ¶ 39, 68 P.3d 418, 427 (2003); *see also Uttecht v. Brown*, 551 U.S. 1, 22, 127 S.Ct. 2218, 167 L.Ed.2d 1014 (2007) (requiring appellate "deference to the trial court, which is in a superior position to determine the demeanor and qualifications of a potential juror").

[7] [8] [9] ¶ 26 Jurors cannot be excluded "simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." *Witherspoon v. Illinois*, 391 U.S. 510, 522, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968); *accord State v. Anderson (Anderson I )*, 197 Ariz. 314, 324 ¶ 23, 4 P.3d 369, 379 (2000). A juror may properly be excused, **\*35 \*\*603** however, if his views would " prevent or substantially impair the performance of his duties as a juror." *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985) (quoting *Adams v. Texas*, 448 U.S. 38, 45, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980)). "[J]urors who state unequivocally that they could never impose the death penalty regardless of the facts of the particular case" are properly excluded. *Anderson I*, 197 Ariz. at 318 ¶ 7, 4 P.3d at 373.

[10] ¶ 27 Juror 119 stated several times during voir dire that she was not certain she could sentence someone to death. During questioning by defense counsel, however, she stated, "[w]hen you were asking [another juror] the questions, I thought to myself if the circumstances—if I would hear that it were a particularly brutal or heinous murder, yes. I might be able to vote for the death penalty in that case."

¶ 28 Lynch contends that this statement demonstrated that Juror 119 could fairly consider the death penalty. However, after making this statement, Juror 119 said that "[i]t would be very difficult to make that decision to take someone's life. It would be very, very difficult." The trial judge excused the juror only after considering the entirety of her answers and demeanor. Given Juror 119's statements and the deference we owe to the trial court, we cannot conclude that the judge abused his discretion.

**5. Admission of Crime Scene Photographs**

[11] ¶ 29 During the guilt phase, the trial court admitted six crime scene photographs over Lynch's objection. We review rulings admitting evidence in general, and photographs in particular, for abuse of discretion. *State v. McGill*, 213 Ariz. 147, 154 ¶ 30, 140 P.3d 930, 937 (2006).

[12] [13] ¶ 30 "The admissibility of a potentially inflammatory photograph is determined by examining (1) the relevance of the photograph, (2) its tendency to incite or inflame the jury, and (3) the probative value versus potential to cause unfair prejudice." *State v. Cruz*, 218 Ariz. 149, 168–69 ¶ 125, 181 P.3d 196, 215–16 (2008) (internal quotation marks omitted). Although photographs may not be introduced solely to inflame the jury, *State v. Anderson (Anderson II )*, 210 Ariz. 327, 340 ¶ 40, 111 P.3d 369, 382 (2005), "[t]here is nothing sanitary about murder," and we do not "require[ ] a trial judge to make it so," *State v. Rienhardt*, 190 Ariz. 579, 584, 951 P.2d 454, 459 (1997).

[14] ¶ 31 The photographs depict blood spatter and blood pools in relation to the victim's body and thus corroborate the opinion of the State's expert that the person who slit James's throat stood behind the chair. Although the photographs are disturbing, none is overly gruesome. The probative value of the photographs is not substantially outweighed by any prejudicial effect, *see* Ariz. R. Evid. 403, and the trial court did not abuse its discretion in admitting them.

**6. Refusal to Give an Instruction on Second Degree Murder**

[15] ¶ 32 Lynch requested an instruction on second degree murder. The trial court denied the request because it found no evidence that the murder was not premeditated.

[16] [17] ¶ 33 A trial court must give an instruction on lesser-included offenses when warranted to reduce the risk that a jury, faced only with a choice between convicting for a capital crime and setting a violent criminal free, might be unduly pressured to opt for the conviction on the capital offense. *Beck v. Alabama*, 447 U.S. 625, 637, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980). However, *Beck* "does not require a trial court to instruct on a lesser offense that is unsupported by the evidence." *State v. Bearup*, 221 Ariz. 163, 170 ¶ 29, 211 P.3d 684, 691 (2009) (quoting *State v. Landrigan*, 176 Ariz. 1, 6, 859 P.2d 111, 116 (1993)).

**State v. Lynch, 225 Ariz. 27 (2010)**

234 P.3d 595, 606 Ariz. Adv. Rep. 4

¶ 34 In this case, the jury agreed only that Lynch committed felony murder; it did not reach a unanimous verdict on premeditated murder. Second degree murder is not a lesser included offense of felony murder. *State v. Jackson,* 186 Ariz. 20, 27, 918 P.2d 1038, 1045 (1996). Therefore, even if we assume that the record warranted such an instruction, Lynch suffered no prejudice from the trial court's refusal to give it.

**\*\*604 \*36 B. AGGRAVATION PHASE**

**1. Exclusion of Jurors 25 and 49 (Second Jury) For Cause**

[18] ¶ 35 During voir dire of the second jury, Juror 25 stated that she was Catholic and did not believe in the death penalty, but would "go against" those views in a case involving children. When informed that this was not such a case, she stated that she "could not do the death penalty because of my beliefs."

¶ 36 The court excluded Juror 25 for cause over Lynch's objection. Citing *State v. Johnson,* 212 Ariz. 425, 434–35 ¶¶ 29–35, 133 P.3d 735, 744–45 (2006), Lynch argues that the trial court erred in telling the juror about the specific facts of this case. Lynch did not raise this argument below, so fundamental error review applies. *Kuhs,* 223 Ariz. at 386 ¶ 52, 224 P.3d at 202.

¶ 37 Contrary to Lynch's argument, *Johnson* does not prohibit telling jurors about the particular facts of the case during voir dire. Rather, *Johnson* only held that the trial court may refuse to permit parties to ask jurors to speculate on or commit to how they would assess specific mitigation. 212 Ariz. at 435 ¶ 33, 133 P.3d at 745; *see also State v. Smith,* 215 Ariz. 221, 231 ¶ 42, 159 P.3d 531, 541 (2007) ("[T]he same is true of voir dire focused on the assessment of specific aggravators.").

¶ 38 The trial judge's statement to Juror 25 that children were not involved in the case was appropriate to determine whether the juror's views would "prevent or substantially impair the performance of [her] duties." *Witt,* 469 U.S. at 424, 105 S.Ct. 844 (quoting *Adams,* 448 U.S. at 45, 100 S.Ct. 2521). And, given Juror 25's responses, the judge reasonably concluded that her religious beliefs would substantially impair her ability to impose death.

[19] ¶ 39 We also find no error in excluding Juror 49. In her questionnaire, Juror 49 stated, "I am *ADAMANTLY* anti death penalty and absolutely could not sit on a jury that would possibly be responsible for killing anyone,

even a guilty person." She said that she could not vote for death "under any circumstances," that she did not know whether she would be able to follow the law, and that she likened the death penalty to "murder."

**2. Failure to Clarify Theory of First Degree Murder**

¶ 40 Lynch requested that prospective jurors for the second aggravation phase be told that he had not been convicted of premeditated murder, but only felony murder. The trial court instead initially informed the panel that Lynch had been convicted of "first degree murder." Citing *Morgan v. Illinois,* 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992), Lynch argues the court erred by not instructing the second jury that the first panel had unanimously found only felony murder.

¶ 41 *Morgan* held that a defendant must be allowed to ask prospective jurors if they would automatically vote for death after a guilty verdict. 504 U.S. at 729, 112 S.Ct. 2222. Lynch was not prevented from so inquiring. Rather, he unsuccessfully urged the trial court to describe the theory underlying the murder conviction. In any event, the second jury was told after selection that Lynch had been convicted of felony murder. Thus, no sitting juror was under any misapprehension that Lynch had been convicted of premeditated murder.

**3. Reckless Indifference Instruction**

[20] ¶ 42 The first jury found that Lynch was a major participant in the crime and acted with reckless indifference to the grave risk of death. *See Tison v. Arizona,* 481 U.S. 137, 157–58, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987) (requiring such findings for imposition of death sentence in felony murder cases). Lynch contends the trial court improperly instructed the jury as to what constitutes reckless indifference.

¶ 43 *Tison* defined reckless indifference as "knowingly engaging in criminal activities known to carry a grave risk of death." 481 U.S. at 157, 107 S.Ct. 1676. The standard is subjective—whether the defendant "subjectively appreciated that [his] acts were likely to result in the taking of innocent life." *Id.* at 152, 107 S.Ct. 1676.

**\*\*605 \*37** ¶ 44 Lynch requested the following "reckless indifference" instruction:

> In order to find that Shawn Lynch acted with reckless indifference to human life, it must be proven that he subjectively knew his acts were

likely to result in the taking of innocent life, yet nonetheless engaged in criminal activities known to carry a high probability of death.

The court instead instructed the jury that "[a] defendant acts with reckless indifference when the defendant knowingly engages in criminal activities that he is aware will likely create a grave risk of death to others." Lynch acknowledges that the court's instruction correctly required subjective awareness, but argues that it was "not as clear" as his proposed instruction.

¶ 45 The trial court's reckless indifference instruction clearly and correctly stated the law. Nothing in the instruction even remotely suggests an objective or "reasonable person" standard.

**4. Sufficiency of the Evidence on the *Tison* Findings**
[21] [22] ¶ 46 Lynch contends that the jury's *Tison* findings were not supported by the evidence. We determine "whether substantial evidence supports the jury's finding, viewing the facts in the light most favorable to sustaining the jury verdict." *State v. Roque,* 213 Ariz. 193, 218 ¶ 93, 141 P.3d 368, 393 (2006).5 Substantial evidence is "proof that reasonable persons could accept as adequate and sufficient to support a conclusion of defendant's guilt beyond a reasonable doubt." *Id.* (internal quotations omitted).

[23] ¶ 47 Substantial evidence supported the jury's finding that Lynch was a major participant in the predicate felonies. The American Express receipts found at the guesthouse show that Lynch and Sehwani returned to the guesthouse after discovering that James had deactivated the American Express card. James's car keys, credit cards, checks, sweater, and pistol were found in the truck that Lynch was entering when arrested. *See State v. Lacy,* 187 Ariz. 340, 351, 929 P.2d 1288, 1299 (1996) (finding substantial participation in predicate burglary when defendant stole property).

¶ 48 Reasonable jurors could also conclude from the evidence that Lynch and Sehwani acted in concert to bind James to the chair and that Lynch was thus a major participant in the kidnapping. Lynch probably helped tie James to the chair because Sehwani likely could not have done it alone. *See State v. Robinson,* 165 Ariz. 51, 62, 796 P.2d 853, 864 (1990) (finding that actions of defendant who "was at least present" when victims' hands and feet were bound and when the murder occurred met *Tison* standard).

[24] ¶ 49 Substantial evidence also supports the jury's finding that Lynch acted with reckless indifference toward James's life. *See State v. Ellison,* 213 Ariz. 116, 135 ¶ 73, 140 P.3d 899, 918 (2006) (finding reckless indifference when defendant bound victims and held pillow over one victim's face). A State expert opined that James's throat was slit by someone standing behind the chair and that the blood on Lynch's shoes was consistent with his having been in that position.6

**5. "Retrial" of *Tison* Predicates**
¶ 50 Lynch contends that the second jury improperly "retried" the *Tison* predicates. The trial court, however, never submitted any *Tison* issues to the second jury. That jury appropriately heard evidence about Lynch's participation in the crime, because it was entitled to consider the circumstances of the offense in evaluating mitigation. *See* A.R.S. § 13–751(G); *State v. Garza,* 216 Ariz. 56, 68 ¶ 57, 163 P.3d 1006, 1018 (2007).

**6. Admission of Autopsy Photos**
¶ 51 During the first aggravation phase, the court admitted three autopsy photographs *38 **606 over Lynch's objections. During the second aggravation phase, the court admitted two of those photographs over Lynch's objections. We review for abuse of discretion. *McGill,* 213 Ariz. at 154 ¶ 30, 140 P.3d at 937.

[25] ¶ 52 The photographs are close-ups of the victim's neck wound. One depicts a cut jugular vein. Another shows a completely severed carotid artery. The third, admitted only in the first penalty phase, depicts the victim's torso covered in dried blood and his head tilted back, exposing a severed larynx.

¶ 53 The photographs were properly admitted to illustrate the testimony of the medical examiner. Moreover, before seeing the images, both juries heard expert testimony about the neck injuries without objection. *See State v. Pandeli,* 215 Ariz. 514, 529 ¶ 56, 161 P.3d 557, 572 (2007) (finding jurors were likely not shocked by photographs in light of medical examiner's prior testimony). Although these photographs were undoubtedly disturbing, the superior court did not abuse its discretion in admitting them. *See Anderson II,* 210 Ariz. at 340 ¶¶ 41–42, 111 P.3d at 382 (upholding admission of graphic photographs of murder victim).

**State v. Lynch, 225 Ariz. 27 (2010)**

234 P.3d 595, 606 Ariz. Adv. Rep. 4

**7. Prosecutorial Misconduct**

[26] [27] ¶ 54 Lynch alleges a litany of prosecutorial misconduct, arguing that either the individual instances or the cumulative effect of the purported misconduct requires a retrial of the aggravation phases. "Because the trial court is in the best position to determine the effect of a prosecutor's comments on a jury, we will not disturb a trial court's denial of a mistrial for prosecutorial misconduct in the absence of a clear abuse of discretion." *State v. Newell*, 212 Ariz. 389, 402 ¶ 61, 132 P.3d 833, 846 (2006). "Reversal on the basis of prosecutorial misconduct requires that the conduct be so pronounced and persistent that it permeates the entire atmosphere of the trial." *State v. Hughes*, 193 Ariz. 72, 79 ¶ 26, 969 P.2d 1184, 1191 (1998) (citations and internal quotation marks omitted); *see also Anderson II*, 210 Ariz. at 340–41 ¶ 45, 111 P.3d at 382–83 (requiring a showing that the misconduct likely denied the defendant a fair trial).

**a. References to Lynch as the "Murderer"**

[28] ¶ 55 In his opening statement in the second aggravation phase, the prosecutor said "the person sitting here in court has already been convicted of first degree murder. Shawn Patrick Lynch is a murderer." He further stated, "[James] was murdered, and the person who murdered him is sitting right here." Lynch moved for a mistrial.

¶ 56 The court denied the motion, noting that "Mr. Lynch has been convicted of first degree murder" and that referring to him "as a murderer is an accurate statement." In any event, the court later informed the second jury that Lynch had been convicted of felony murder, thus negating any suggestion that the first jury had found Lynch to be the actual killer. Therefore, the trial court did not abuse its discretion in denying the mistrial motion.

**b. Testimony about Hunting Knife**

[29] ¶ 57 In his second aggravation phase opening statement, the prosecutor said a witness would testify that the hunting knife found at the murder scene was "not consistent with that being the murder weapon." Lynch moved for a mistrial, arguing that the expert in question would not rule out the knife as the murder weapon but rather would testify that no DNA was detected on the blade. The trial court denied the mistrial motion without prejudice to renewal if the expert testimony did not

support the prosecutor's statement. The court then instructed the jury that opening statements are not evidence.

¶ 58 Lynch did not renew his mistrial motion after the expert's testimony. Even assuming that this omission did not waive any argument of misconduct, we find no impropriety in the prosecutor's statement. The expert testified that because he could find neither blood nor DNA on the blade, he could not conclude that it was the murder weapon. Although not conclusive, that testimony supported the prosecutor's assertion.

**\*\*607 \*39 c. Opening Statements**

¶ 59 Lynch argues the prosecutor misstated the evidence in his opening statements in the guilt and second aggravation phases.

[30] ¶ 60 In the guilt phase, the prosecutor stated that Lynch and Sehwani "rode around in a truck that Mr. Sehwani—that the defendant drove." Because Lynch was entering the passenger side of a truck when he was arrested, he contends this statement was false. The identity of the truck's driver, however, was immaterial and, given that Lynch was riding in the truck, we can perceive no prejudice from any technical misstatement.

¶ 61 The prosecutor also asserted that Lynch and Sehwani "render[ed] James] helpless" and that "there are some bruises as [James] attempted to get up." The evidence supported this statement. The medical examiner testified that James was tied to a chair and that a bruise on his shoulder may have been caused by "bang[ing] against the surface" of the chair.

¶ 62 The prosecutor later stated that "[t]here are keys, car keys to a Lexus. [James] owns a Lexus and they also took that." Although not a model of clarity, this statement can be construed as meaning that Lynch and Sehwani took the car keys, not the car. Moreover, given the trial testimony that James had left his car at his brother's house on March 24 and never retrieved it, the jury could not have understood the statement to mean that Lynch and Sehwani stole the car.

¶ 63 Lynch argues that the prosecutor also suggested that Lynch arranged the escort service transaction by stating that "the financial terms are taking place at that table ... and they take place between the [bodyguard]; James ... and the individual, the defendant, that's just sitting there." This statement is reasonably understood, however, as

State v. Lynch, 225 Ariz. 27 (2010)

234 P.3d 595, 606 Ariz. Adv. Rep. 4

meaning that the bodyguard and James participated in the negotiations, while Lynch was "just sitting there." This statement is supported by the testimony.

¶ 64 In the second aggravation phase, the prosecutor asserted that the bodyguard would testify that Lynch was "acting as if he owned the place ... kind of like he was in charge" and that a knife was on the kitchen table. Lynch did not object. Moments later, the prosecutor stated that Lynch was "kind of being the boss of things." The evidence at least peripherally supported the prosecutor's statements. The bodyguard testified that a knife was on the table, Lynch did most of the talking, and he offered the bodyguard a beer.

### d. Cumulative Misconduct

[31] [32] ¶ 65 Lynch contends that even if each instance of alleged misconduct is individually harmless, reversal is warranted for cumulative misconduct. Reversal is required "if the cumulative effect of the incidents shows that the prosecutor intentionally engaged in improper conduct and did so with indifference, if not a specific intent, to prejudice the defendant." *Roque*, 213 Ariz. at 228 ¶ 155, 141 P.3d at 403 (internal quotation marks and citations omitted). However, "[a]bsent any finding of misconduct, there can be no cumulative effect of misconduct sufficient to permeate the entire atmosphere of the trial with unfairness." *State v. Bocharski*, 218 Ariz. 476, 492 ¶ 75, 189 P.3d 403, 419 (2008). Even assuming that one of the cited incidents technically involved a misstatement, we find no misconduct and nothing approaching pervasive unfairness in this case.

### 8. (F)(5) Aggravator

#### a. Retrial of the (F)(5) Aggravator

¶ 66 Lynch argues that the trial court improperly permitted the second jury to reconsider the pecuniary gain aggravator. We find neither statutory nor constitutional error.

¶ 67 The governing statutes, A.R.S. §§ 13–752(F) and (K), permit resubmission of the pecuniary gain aggravator to the second jury. Section 13–752(F) mandates that the trial proceed directly to the penalty phase if the first jury finds at least one aggravating circumstance, even if that jury cannot reach a unanimous decision on another

aggravator. If the jury cannot reach a unanimous decision in the penalty phase, the court must impanel a new jury. A.R.S. § 13–752(K). **\*40 \*\*608** The second jury is only precluded from retrying "the defendant's guilt or the issue regarding any of the aggravating circumstances that the first jury found by *unanimous* verdict to be proved or not proved." *Id.* (emphasis added). The statute thus contemplates submission to the second jury of those aggravating circumstances that were not unanimously found by the original jury.

[33] ¶ 68 Contrary to Lynch's arguments, such a procedure did not subject him to double jeopardy. Failure to unanimously find an aggravator is not an acquittal for Fifth Amendment purposes, *Poland v. Arizona*, 476 U.S. 147, 155–56, 106 S.Ct. 1749, 90 L.Ed.2d 123 (1986), nor does it collaterally estop a new trier of fact from considering the issue, *Yeager v. United States*, ——U.S. ——, 129 S.Ct. 2360, 2368, 174 L.Ed.2d 78 (2009).

#### b. Sufficiency of Evidence on the (F)(5) Aggravator

¶ 69 Lynch contends that the evidence was insufficient to support the second jury's finding that "[t]he defendant committed the offense as consideration for the receipt, or in expectation of the receipt, of anything of pecuniary value." A.R.S. § 13–751(F)(5). Because the murder occurred before August 1, 2002, we independently review the jury's aggravation findings. A.R.S. § 13–755(A); *Anderson II*, 210 Ariz. at 354 ¶ 119 & n. 21, 111 P.3d at 396 & n. 21.

[34] ¶ 70 A felony murder conviction predicated on robbery or burglary does not automatically establish the (F)(5) aggravator. *Anderson II*, 210 Ariz. at 351 ¶ 103, 111 P.3d at 393. Rather, the murder must itself be "prompted by the desire for pecuniary gain." *Id.* at 351 ¶ 105, 111 P.3d at 393.

[35] ¶ 71 The evidence here establishes the (F)(5) aggravator beyond a reasonable doubt. After the murder, James's gun and magazine clip were found in a motel room used by Lynch. James's Bank One debit and credit cards were repeatedly used after the murder, among other things to secure charges at a motel room registered in Lynch's name. Property belonging to James was found in the passenger compartment of the truck that Lynch was entering at the time of his arrest.

¶ 72 The evidence also strongly supports the conclusion that the killers returned to the guesthouse intending to steal further from James and that he was murdered to

State v. Lynch, 225 Ariz. 27 (2010)
234 P.3d 595, 606 Ariz. Adv. Rep. 4

avoid detection of both the initial theft of the American Express card and the subsequent robbery and burglary. *See Ellison,* 213 Ariz. at 143 ¶ 125, 140 P.3d at 926 (finding (F)(5) aggravator established when defendant planned a burglary and killed victims to escape and avoid identification). The record does not suggest that pecuniary gain was an originally unintended consequence of the murder. *See State v. Gillies,* 135 Ariz. 500, 512, 662 P.2d 1007, 1019 (1983) (finding (F)(5) aggravator not established when defendant confessed that purpose of murdering rape victim was to eliminate her as a witness to her own rape, not to steal credit cards and cash).

[36]  ¶ 73 Lynch argues that an (F)(5) finding is inappropriate because the evidence is not conclusive as to who controlled James's car keys and gun and because Sehwani used James's credit cards. But a lack of subsequent control over robbery proceeds does not bar an (F)(5) finding; the aggravator requires only that the desire for pecuniary gain motivated the murder. *State v. LaGrand,* 153 Ariz. 21, 36, 734 P.2d 563, 578 (1987). Similarly, we reject Lynch's argument that upholding the (F)(5) aggravator would require imputing Sehwani's motivations to Lynch. The evidence sufficiently establishes that Lynch acted with his own pecuniary motivations.

## 9. (F)(6) Aggravator

### a. Absence of "Vicarious Liability" Instruction

[37]  ¶ 74 Lynch contends the trial court erred in giving the following instruction in the first aggravation phase:

> Cruelty involves the infliction of physical pain and/or mental anguish on a victim before death. A crime is committed in an especially cruel manner when a defendant either knew or should have known that the manner in which the crime is committed *41 **609 would cause the victim to experience physical pain and/or mental anguish before death.

Lynch argues that the instruction allowed the jury to impute cruelty to him solely because of Sehwani's actions. Because Lynch neither objected to this instruction nor requested an alternative, we review for fundamental error. *Kuhs,* 223 Ariz. at 386 ¶ 52, 224 P.3d at 202.

[38] [39]  ¶ 75 "There is no vicarious liability for cruelty in capital cases absent a plan intended or reasonably certain to cause suffering." *State v. Carlson,* 202 Ariz. 570, 583 ¶ 49, 48 P.3d 1180, 1193 (2002). If the defendant neither committed the murder nor knew or should have known that the victim would suffer, the cruelty aggravator cannot be found on a "tort theory of culpability." *Id.*

¶ 76 *Carlson* involved a defendant who "was not present during commission of the crime, did not supply the murder weapon, and was not involved in planning the details or method of murder." 202 Ariz. at 583 ¶ 47, 48 P.3d at 1193. In contrast, a reasonable inference from the evidence in this case is that Lynch, at a minimum, helped bind the victim before his throat was slit. Given the evidence that Lynch's own actions caused the victim mental anguish, the instruction given was not fundamental error.

### b. Sufficiency of Evidence on the (F)(6) Aggravator

[40]  ¶ 77 First degree murder is aggravated when conducted "in an especially heinous, cruel or depraved manner." A.R.S. § 13–751(F)(6). Although worded in the disjunctive, this subsection describes but one aggravating circumstance. *State v. Djerf,* 191 Ariz. 583, 595 ¶ 44, 959 P.2d 1274, 1286 (1998). If the evidence supports one of the statutory grounds, we will uphold the (F)(6) finding. *See State v. Cromwell,* 211 Ariz. 181, 189 ¶ 43, 119 P.3d 448, 456 (2005) (declining to consider alleged errors related to heinousness or depravity because cruelty was established).

[41] [42]  ¶ 78 A murder is especially cruel when "the victim consciously experienced physical or mental pain prior to death, and the defendant knew or should have known that suffering would occur." *State v. Trostle,* 191 Ariz. 4, 18, 951 P.2d 869, 883 (1997) (internal citation omitted). That standard was met here. The evidence showed that James would have felt physical pain as his throat was cut. He would have continued to feel pain thereafter for at least a minute until he lost consciousness.

¶ 79 The evidence also establishes that James experienced mental anguish. He was almost surely conscious when bound to the chair, as "[t]here is no reason to bind an unconscious person who offers no resistance." *Djerf,* 191 Ariz. at 596 ¶ 49, 959 P.2d at 1287. Ligatures, abrasions, and bruising on James's wrists, hands, forearm, shoulder blade, back, and chest wall establish that he struggled. *See State v. Sansing,* 206 Ariz. 232, 236 ¶ 10, 77 P.3d 30, 34 (2003) (inferring mental anguish from victim's defensive

wounds). Moreover, the number and complexity of the knots suggest that James had ample time to suffer "significant uncertainty as to [his] ultimate fate." *State v. Van Adams,* 194 Ariz. 408, 421 ¶ 44, 984 P.2d 16, 29 (1999).

¶ 80 It was also "reasonably foreseeable" that James would suffer physical or mental pain. *Djerf,* 191 Ariz. at 595 ¶ 45, 959 P.2d at 1286. Lynch argues that physical pain was not foreseeable because the fatal wound was designed to lead to a quick death. But it is not obvious that cutting a throat will always lead to instantaneous death. In any event, it was surely foreseeable that James would suffer significant mental anguish while being bound to the chair.

¶ 81 The evidence supports the jury's finding that the murder was especially cruel. Because the (F)(6) aggravator was therefore established on that ground, we need not determine whether the evidence also supports the findings of heinousness or depravity. *Cromwell,* 211 Ariz. at 189 ¶ 43, 119 P.3d at 456.[7]

**\*\*610 \*42 C. PENALTY PHASE**
¶ 82 Lynch requested an instruction stating that the three separate jury findings of especial heinousness, cruelty, and depravity constituted only one aggravating circumstance. The court instead instructed the second penalty phase jury as follows:

The following aggravating circumstances have been found to exist:

1. The defendant committed the murder in an especially cruel manner.

2. The defendant committed the murder in an especially heinous manner.

3. The defendant committed the murder in an especially depraved manner.

4. The defendant committed the murder in expectation of the receipt of anything of pecuniary value.

¶ 83 In his closing argument, the prosecutor cited this instruction and characterized the (F)(6) prongs as "three aggravating factors." After the argument, Lynch unsuccessfully moved for a new trial.

[43] [44] ¶ 84 Our decisions make plain that the (F)(6) aggravator is a single aggravating circumstance that can be established in alternative ways: "Because this

subsection is stated in the disjunctive, a finding of either cruelty or heinousness/depravity will suffice to establish this factor." *Djerf,* 191 Ariz. at 595 ¶ 44, 959 P.2d at 1286. The court therefore erred in instructing the jury that three separate (F)(6) aggravating circumstances were proved. *State v. Miles,* 186 Ariz. 10, 19, 918 P.2d 1028, 1037 (1996) (finding error in counting cruelty and heinousness as two separate factors).

¶ 85 The State argues that any error in the instruction was cured because the court also instructed the jury that "you shall not consider twice any fact or aspect of the murder." But this general statement did not clarify that the especially heinous, cruel, and depraved findings constituted a single aggravating circumstance, because, as the jury here was instructed, each (F)(6) theory requires proof of different facts. Especial cruelty requires proof that the victim was conscious, suffered physical pain or mental anguish, and the defendant knew or should have known the victim would suffer. *Trostle,* 191 Ariz. at 18, 951 P.2d at 883. In contrast, under the only theory proffered by the State that would support finding heinousness or depravity—gratuitous violence—proof is required that the defendant inflicted more violence than was necessary to kill and either knew or should have known that he had done so. *Bocharski,* 218 Ariz. at 494 ¶¶ 85–87, 189 P.3d at 421.

¶ 86 Nor was the trial court's instructional error harmless. An error is harmless only when the State proves beyond a reasonable doubt that the jury's decision "was surely unattributable to the error." *State v. Valverde,* 220 Ariz. 582, 585 ¶ 11, 208 P.3d 233, 236 (2009) (quoting *State v. Anthony,* 218 Ariz. 439, 446 ¶ 39, 189 P.3d 366, 373 (2008)). The State has not met that burden here. The jury was told incorrectly that there were four aggravating factors rather than two, and the prosecution emphasized this incorrect instruction in urging the death penalty. *See* A.R.S. §§ 13–751(E) (requiring penalty phase jury to "take into account the aggravating ... circumstances that have been proven"); 13–751(F) (requiring jury to "consider ... aggravating circumstances in determining whether to impose a sentence of death").

¶ 87 When an "error was made regarding a finding of aggravation" we are required to "independently determine if the mitigation ... is sufficiently substantial to warrant leniency in light of the existing aggravation." A.R.S. § 13–755(B). When we conclude that the jury has erroneously found an aggravating circumstance, we use this extraordinary statutory power of independent reweighing to determine whether a death sentence nonetheless remains appropriate. *See, e.g., State v. Tucker,* 215 Ariz. 298, 320–23 ¶¶ 96–120, 160 P.3d 177,

State v. Lynch, 225 Ariz. 27 (2010)
234 P.3d 595, 606 Ariz. Adv. Rep. 4

199–202 (2007); *State v. Carreon,* 210 Ariz. 54, 73 ¶¶ 96–98, 107 P.3d 900, 919 (2005).

¶ 88 The statute, however, only requires independent reweighing when "an error was made regarding a *finding* of aggravation." A.R.S. § 13–755(B) (emphasis added). This is not such a case. The jury here properly found both the (F)(5) and (F)(6) aggravators. The error in this case arises not from an improper aggravation finding, but rather *43 **611 from the trial court's faulty instruction in the penalty phase that the jury should treat the case as involving four aggravators and the prosecutor's highlighting of that instruction during arguments exacerbated the error. Under these circumstances, § 13–755(B) does not authorize independent reweighing. Rather, we are constrained to remand for a new penalty phase trial before a properly instructed jury.[8]

### III. CONCLUSION

¶ 89 For the reasons above, we affirm the convictions and non-capital sentences, but remand for a new penalty phase proceeding on the murder conviction. Any new penalty phase jury should be instructed that the (F)(5) and (F)(6) aggravators have been previously found and that it is not to retry those issues. *See* A.R.S. § 13–752(K).

CONCURRING: REBECCA WHITE BERCH, Chief Justice, MICHAEL D. RYAN, W. SCOTT BALES and A. JOHN PELANDER, Justices.

**All Citations**

225 Ariz. 27, 234 P.3d 595, 606 Ariz. Adv. Rep. 4

Footnotes

1   This opinion cites the current version of statutes unless there has been a material change in the relevant law since the offenses.

2   We view the facts in the light most favorable to sustaining the guilty verdicts. *State v. Garza,* 216 Ariz. 56, 61 n. 1, 163 P.3d 1006, 1011 n. 1 (2007).

3   The murder weapon could not be positively identified. The handle of the hunting knife found in the guesthouse bedroom contained Sehwani's DNA, but there was no blood on the blade.

4   Sehwani later pleaded guilty to first degree murder and theft. He received consecutive sentences of natural life and one year, respectively.

5   *Tison* findings are not aggravating circumstances and therefore not subject to independent review under A.R.S. § 13–755(A). *State v. Garcia,* 224 Ariz. 1, 20 ¶ 88 n. 3, 226 P.3d 370, 389 n. 3 (2010).

6   Another expert testified that Lynch's left shoe was a "highly probable" match for footwear impressions in the bathroom and living room of the guesthouse.

7   Similarly, we need not consider any allegations of error relating to the jury's findings of heinousness or depravity. Even if those findings were vacated, the (F)(6) aggravator would remain established.

8   We therefore need not address Lynch's other arguments regarding imposition of the death penalty, including the twenty-seven arguments submitted to avoid preclusion in future federal proceedings.

End of Document                                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

# Juan Martinez

# 15-3363

Exhibits to initial charge
Attachment 02
(state v. lynch II)

238 Ariz. 84
Supreme Court of Arizona.

STATE of Arizona, Appellee,
v.
Shawn Patrick LYNCH, Appellant.

No. CR–12–0359–AP. | Sept. 10, 2015.

**Synopsis**
**Background:** Defendant was convicted in the Superior Court, Maricopa County, David M. Talamante, J., of armed robbery, burglary, kidnapping and murder in the first degree, and, after first jury could not reach a unanimous verdict in aggravation phase of trial, second jury determined that defendant should be sentenced to death. Defendant appealed. The Supreme Court, Hurwitz, V.C.J., 234 P.3d 595, 225 Ariz. 27, affirmed in part and remanded. Following second penalty phase trial in the Superior Court, Maricopa County, No. CR2001–092032, Karen L. O'Connor, J., the jury again returned a death verdict. Appeal was automatic.

**Holdings:** The Supreme Court, Brutinel, J., held that:

[1] prosecutor's opening statement did not deny defendant a fair trial;

[2] prosecutor's statement during closing argument was not improper;

[3] cumulative effect of prosecutor's inappropriate comments did not deprive defendant of fair trial;

[4] defendant was entitled on remand only to a new penalty-phase proceeding, rather than to retry the aggravation phase;

[5] *Simmons* instruction that defendant would never be released if sentenced to prison was not required;

[6] fact that the State did not ask voir dire questions related to jurors' hair or tattoos did not establish that the strikes were pretextual; and

[7] sentence of death was warranted.

Affirmed.

West Headnotes (74)

[1]     **Criminal Law**
        ⬤=Conduct of counsel in general

        An appellate court will reverse a conviction for prosecutorial misconduct only where: (1) misconduct is indeed present; and (2) a reasonable likelihood exists that the misconduct could have affected the jury's verdict, thereby denying the defendant a fair trial.

        Cases that cite this headnote

[2]     **Criminal Law**
        ⬤=Conduct of counsel in general

        Even when an instance of prosecutorial misconduct does not warrant reversal, an incident may nonetheless contribute to a finding of persistent and pervasive misconduct if the cumulative effect of the incidents shows that the prosecutor intentionally engaged in improper conduct and did so with indifference, if not a specific intent, to prejudice the defendant.

        Cases that cite this headnote

[3]     **Sentencing and Punishment**
        ⬤=Arguments and conduct of counsel

        Prosecutor's opening statement, which contained improper argumentative statements, did not deny defendant a fair trial in penalty phase of capital murder trial, where court sustained defendant's objections to some of the statements, and instructed jury that it should only consider testimony, exhibits, and stipulations as evidence and that attorneys' remarks were not evidence, and these

**State v. Lynch, 238 Ariz. 84 (2015)**

357 P.3d 119, 721 Ariz. Adv. Rep. 4

instructions cured any prejudice.

Cases that cite this headnote

[4]     **Criminal Law**
        For prosecution

Opening statement is counsel's opportunity to tell the jury what evidence they intend to introduce, not a time to argue the inferences and conclusions that may be drawn from evidence not yet admitted.

Cases that cite this headnote

[5]     **Criminal Law**
        Custody and conduct of jury
        **Criminal Law**
        Opening statement

Cautionary instructions by the court generally cure any possible prejudice from argumentative comments during opening statements, because a reviewing court presumes that jurors follow the court's instructions.

Cases that cite this headnote

[6]     **Sentencing and Punishment**
        Arguments and conduct of counsel

State's cross-examination of defendant's witness in penalty phase of capital murder trial did not deny defendant a fair trial, although the State's cross-examination was aggressive, and the court would have been well within its discretion to have sustained the objections and required the prosecutor to rephrase his questions in a more civil manner, and it should have exercised more control over the aggressive questioning, where court instructed the jury to disregard questions to which objections were sustained, to only consider testimony, exhibits, and stipulations as evidence, and that attorneys' remarks were not

evidence.

Cases that cite this headnote

[7]     **Sentencing and Punishment**
        Harmless and reversible error

Jury instructions sufficiently cured any prejudice in penalty phase of capital murder trial from State's questioning of defense expert on the veracity of other witnesses' statements and State's accusations that she vouched for witnesses and State's questions asking her to comment on the truthfulness of witnesses.

Cases that cite this headnote

[8]     **Sentencing and Punishment**
        Presentation and reservation in lower court of grounds of review

Any error in prosecutor's speaking objections was not fundamental error in penalty phase of capital murder trial, where state did not incorporate any inadmissible evidence into its speaking objections. 17A A.R.S. Rules of Evid., Rule 103(d).

1 Cases that cite this headnote

[9]     **Sentencing and Punishment**
        Arguments and conduct of counsel

Defendant was not prejudiced by State's cross-examination of, and closing arguments about, its expert witnesses in penalty phase of capital murder trial, although prosecutor was aggressive and the court sustained many of the defendant's objections to many of the questions, where court instructed the jury to disregard the statements to which objections were sustained.

Cases that cite this headnote

State v. Lynch, 238 Ariz. 84 (2015)
357 P.3d 119, 721 Ariz. Adv. Rep. 4

Cases that cite this headnote

[10]    **Criminal Law**
⟜Cross-examination and redirect examination
**Criminal Law**
⟜Credibility of expert witness

A prosecutor may inquire into the credentials and employment of an expert witness to show bias or motive, but cannot insinuate that an expert is unethical or incompetent without properly admitted evidence to support it.

Cases that cite this headnote

[11]    **Sentencing and Punishment**
⟜Expert evidence

Prosecutor's cross-examination of defense expert regarding an unrelated incident in Arizona where convicted murderers escaped from prison and whether it was possible that defendant, who had hepatitis C, could stick or prick with a sharp object one of the corrections officer was relevant in penalty phase of capital murder trial, where it rebutted expert's testimony that defendant could be safely housed in prison. 17A A.R.S. Rules of Evid., Rules 401(a), 611(b).

Cases that cite this headnote

[12]    **Sentencing and Punishment**
⟜Arguments and conduct of counsel
**Sentencing and Punishment**
⟜Harmless and reversible error

Defendant was not prejudiced by prosecutor's misstatements of the evidence in penalty phase of capital murder trial, where defendant's objections were sustained, prosecutor did not argue those points further, and trial judge instructed the jury at the beginning and end of the proceedings not to consider matters to which the court sustained objections.

[13]    **Criminal Law**
⟜Comments on evidence or witnesses, or matters not sustained by evidence
**Criminal Law**
⟜Matters Not Sustained by Evidence

Intentionally misstating evidence constitutes prosecutorial misconduct; however, when defense counsel can correct the misstatement at trial, reviewing courts are hesitant to find reversible error.

Cases that cite this headnote

[14]    **Sentencing and Punishment**
⟜Arguments and conduct of counsel

Prosecutor's statements during opening statement and closing arguments in which counsel characterized defendant's mitigation evidence as a "myth" and "fanciful" and repeatedly suggested that defense was not credible, were not improper in penalty phase of capital murder trial, where prosecutor's criticism was directed at defense theories, rather than defense counsel.

Cases that cite this headnote

[15]    **Criminal Law**
⟜Appeals to sympathy or prejudice; argument as to punishment
**Criminal Law**
⟜Attacks on opposing counsel

It is always improper for the prosecutor to impugn the integrity or honesty of opposing counsel; nonetheless, such comments warrant reversal only if a defendant can show a reasonable likelihood that the misconduct could have tainted the jury's verdict.

**State v. Lynch, 238 Ariz. 84 (2015)**

357 P.3d 119, 721 Ariz. Adv. Rep. 4

Cases that cite this headnote

[16]   **Criminal Law**
       ⚖=For prosecution

Criticism of defense theories and tactics is a proper subject of closing argument.

1 Cases that cite this headnote

[17]   **Sentencing and Punishment**
       ⚖=Arguments and conduct of counsel
       **Sentencing and Punishment**
       ⚖=Harmless and reversible error

Prosecutor's statements during closing argument of penalty phase of capital murder trial that, although the crime lab tried its "darndest," it did not find victim's blood on accomplice, and that blood-spatter analysis was "the law," did not constitute sufficient misconduct to warrant reversal, even though four jurors on the guilt-phase jury were not convinced that defendant was the killer and prosecutor put the prestige of the government behind his evidence, where the fact that four jurors on the guilt-phase jury were not convinced that defendant was the killer did not make the prosecutor's comments misconduct, and the trial court cured any error by instructing the jury not to consider the attorneys' arguments as evidence.

Cases that cite this headnote

[18]   **Criminal Law**
       ⚖=Matters Not Sustained by Evidence
       **Criminal Law**
       ⚖=Personal knowledge, opinion, or belief of counsel

A prosecutor improperly vouches by either placing the prestige of the government behind its evidence or suggesting that facts not before the jury support the state's evidence.

Cases that cite this headnote

[19]   **Criminal Law**
       ⚖=Comments on evidence or witnesses

Even if vouching occurs, the trial court may cure the error by instructing the jury not to consider the attorneys' arguments as evidence.

Cases that cite this headnote

[20]   **Criminal Law**
       ⚖=Statements Regarding Applicable Law

A prosecutor should not misstate the law during closing argument.

Cases that cite this headnote

[21]   **Criminal Law**
       ⚖=Arguments and statements by counsel
       **Criminal Law**
       ⚖=Discretion of court in controlling argument

Trial courts are given broad discretion in controlling closing argument, and their rulings will only be overturned for an abuse of discretion.

Cases that cite this headnote

[22]   **Sentencing and Punishment**
       ⚖=Arguments and conduct of counsel

Prosecutor's statement during closing argument that a person can only fail to appreciate the wrongfulness of conduct if the person admits the conduct was not improper in penalty phase of

**State v. Lynch, 238 Ariz. 84 (2015)**

357 P.3d 119, 721 Ariz. Adv. Rep. 4

capital murder trial, where State's remark was not a misstatement of law, but rather an attempt to point out an inconsistency in defendant's story, and prosecutor was entitled to argue that defendant committed the murder and appreciated the wrongfulness of his conduct. A.R.S. § 13–751(G)(1).

Cases that cite this headnote

[23]    **Sentencing and Punishment**
        ⬥Arguments and conduct of counsel

Prosecutor did not commit misconduct by suggesting that defendant's drug use did not warrant leniency in penalty phase of capital murder trial.

Cases that cite this headnote

[24]    **Sentencing and Punishment**
        ⬥Substance abuse and addiction
        **Sentencing and Punishment**
        ⬥Arguments and conduct of counsel

Substance abuse can be a mitigating factor in capital cases; but a prosecutor does not commit misconduct by arguing that a mitigating factor does not warrant leniency or that jurors should give it little consideration. A.R.S. § 13–751(G)(1).

Cases that cite this headnote

[25]    **Sentencing and Punishment**
        ⬥Harmless and reversible error

Defendant did not overcome presumption that jury in penalty phase of capital murder trial followed instructions to disregard prosecutor's statement that defendant's renting of pornographic videos showed a debasement in the part of defendant's character.

Cases that cite this headnote

[26]    **Sentencing and Punishment**
        ⬥Arguments and conduct of counsel

Prosecutor's statement during closing argument that defendant's difficult childhood was so remote that it was an excuse, not a mitigating factor, was not improper in penalty phase of capital murder trial, where defendant was 39 years of age at the time of the murder.

Cases that cite this headnote

[27]    **Sentencing and Punishment**
        ⬥Mitigating circumstances in general
        **Sentencing and Punishment**
        ⬥Childhood or familial background

Although a defendant does not have to demonstrate a connection between the mitigating circumstances and the crime, the remoteness or lack of a connection between the mitigating factor and the crime may make the mitigating factor less persuasive in penalty phase of capital murder trial; thus, a jury may give less consideration to a difficult childhood when a defendant is older.

Cases that cite this headnote

[28]    **Sentencing and Punishment**
        ⬥Arguments and conduct of counsel

Prosecutor's argument that the jury should not spare defendant's life merely because he committed other crimes for which he would have to serve considerable prison time was not improper in penalty phase of capital murder trial.

Cases that cite this headnote

State v. Lynch, 238 Ariz. 84 (2015)
357 P.3d 119, 721 Ariz. Adv. Rep. 4

Cases that cite this headnote

[29]     **Sentencing and Punishment**
         ⟸Harmless and reversible error

Any error by the prosecutor during voir dire and
closing argument in characterizing heinous,
atrocious, and cruel (HAC) aggravator implying
that it was more than one aggravator, rather than
a single aggravating circumstance that could be
established in alternative ways, was not
reversible error in penalty phase of capital
murder trial, where defendant objected to the
misstatements and court had the prosecutor
clarify that it was only one aggravator. A.R.S. §
13–751(F)(6).

Cases that cite this headnote

[30]     **Sentencing and Punishment**
         ⟸Arguments and conduct of counsel

Prosecutor's reference to the encounter between
defendant and victim immediately before the
murder, in which prosecutor wondered aloud if
words were exchanged, was not improper in
penalty phase of capital murder trial, where they
did not call attention to the fact that defendant
did not testify, but rather pointed out that the
events leading up to the murder were unclear,
and the jury would not have naturally and
necessarily perceived the remarks as a comment
on defendant's failure to testify. U.S.C.A.
Const.Amend. 5.

Cases that cite this headnote

[31]     **Criminal Law**
         ⟸Comments on Failure of Accused to Testify
         **Criminal Law**
         ⟸Indirect references

A prosecutor may not comment on a defendant's
decision not to testify, either directly or
indirectly. U.S.C.A. Const.Amend. 5.

Cases that cite this headnote

[32]     **Criminal Law**
         ⟸Comments on Failure of Accused to Testify

A prosecutor's statement is a comment on a
defendant's protected silence if a jury would
naturally and necessarily perceive it as a
comment on a defendant's failure to testify.
U.S.C.A. Const.Amend. 5.

Cases that cite this headnote

[33]     **Sentencing and Punishment**
         ⟸Harmless and reversible error

Prosecutor's statement during opening statement
that they could not know what it was like to be
manhandled by the knife-wielding defendant did
not affect the verdict in penalty phase of capital
murder trial, although it improperly invited the
jurors to place themselves in the victim's
position and appealed to their fears, where trial
court properly sustained defendant's objection,
struck the argument, and told the jury to
disregard it.

Cases that cite this headnote

[34]     **Criminal Law**
         ⟸Appeals to Sympathy or Prejudice
         **Criminal Law**
         ⟸Putting jurors in place of victim; "golden
         rule" arguments

A prosecutor has wide latitude in closing
argument, but may not make arguments that
appeal to the jury's fear or passion, which
includes inviting jurors to place themselves in
the victim's position because doing so plays on
the jurors' fear of the defendant or sympathy for
the victim.

State v. Lynch, 238 Ariz. 84 (2015)
357 P.3d 119, 721 Ariz. Adv. Rep. 4

Cases that cite this headnote

[35]    **Criminal Law**
        ☞Necessity
        **Criminal Law**
        ☞Necessity of request for correction
        **Criminal Law**
        ☞Action of Court in Response to Comments or
        Conduct

        The proper response to an improper
        prosecutorial comment is an objection, motion
        to strike, and a jury instruction to disregard the
        stricken comment.

        Cases that cite this headnote

[36]    **Sentencing and Punishment**
        ☞Presentation and reservation in lower court of
        grounds of review

        Prosecutor's reference during opening statement
        to line from a poem indicating that every
        person's death diminishes society as a whole
        was not fundamental error in penalty phase of
        capital murder trial, where prosecutor did not
        appeal to the jury's fear of defendant or
        sympathy for the victim or ask the jurors to
        place themselves in the victim's shoes during
        the murder, rather, the prosecutor commented
        that murder affects society as a whole.

        Cases that cite this headnote

[37]    **Sentencing and Punishment**
        ☞Arguments and conduct of counsel

        Cumulative effect of prosecutor's inappropriate
        comments did not deprive defendant of fair
        penalty phase of capital murder trial, where the
        trial court sustained objections to all but one of
        the improper comments, and instructed the jury
        to disregard questions to which objections were
        sustained, to only consider testimony, exhibits,

and stipulations as evidence, and that attorneys'
remarks were not evidence, and defendant failed
to prove fundamental error in any of the
statements to which he did not object.

Cases that cite this headnote

[38]    **Criminal Law**
        ☞Conduct of counsel in general

        A reviewing court considers whether persistent
        and pervasive misconduct occurred and whether
        the cumulative effect of the incidents shows that
        the prosecutor intentionally engaged in improper
        conduct and did so with indifference, if not a
        specific intent, to prejudice the defendant.

        Cases that cite this headnote

[39]    **Sentencing and Punishment**
        ☞Determination and disposition

        Defendant in capital murder trial was entitled on
        remand only to a new penalty-phase proceeding,
        rather than to retry the aggravation phase;
        subsection of statute stating that, if a death
        sentence is overturned, the person shall be
        resentenced as if the original sentencing had not
        occurred applied only to a sentences overturned
        on appeal pursuant to *Ring v. Arizona* (*Ring II* ),
        536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556,
        while subsection stating that a defendant whose
        sentence is overturned had to be resentenced by
        a jury that was specifically impaneled for that
        purpose was more general and pertained to
        sentences overturned for any reason, and
        defendant's original sentence was not reversed
        for a *Ring II*-defective sentence. A.R.S. §
        13–752(N, O).

        Cases that cite this headnote

[40]    **Criminal Law**
        ☞Review De Novo

State v. Lynch, 238 Ariz. 84 (2015)

357 P.3d 119, 721 Ariz. Adv. Rep. 4

**Criminal Law**
⚖=Reception and Admissibility of Evidence

Appellate courts review the interpretation of statutes and constitutional provisions de novo and evidentiary rulings for an abuse of discretion.

Cases that cite this headnote

[41]   **Sentencing and Punishment**
⚖=Determination and disposition

Limiting the retrial to the penalty phase of capital murder trial did not deprive defendant of an individualized sentencing, where jury heard abundant testimony concerning the circumstances of the offense and the aggravating factors, and defendant was free to offer additional evidence from the guilt and aggravation phases.

Cases that cite this headnote

[42]   **Sentencing and Punishment**
⚖=Admissibility

Precluding the guilty verdict from evidence in penalty phase of capital murder trial did not deprive defendant of an individualized sentencing, where neither the guilty-verdict form nor the jurors' votes provided evidence of the circumstances of the murder.

Cases that cite this headnote

[43]   **Sentencing and Punishment**
⚖=Instructions

Judge could impose a release-eligible sentence if the jury did not return a death verdict, and, thus, *Simmons* instruction that defendant would never be released if sentenced to prison was not required in penalty phase of capital murder trial.

A.R.S. § 13–703(A).

Cases that cite this headnote

[44]   **Criminal Law**
⚖=Review De Novo
**Criminal Law**
⚖=Failure to instruct

An appellate court reviews jury instructions and alleged constitutional violations de novo; but it reviews a court's refusal to inform the jury of the defendant's willingness to waive parole eligibility for an abuse of discretion.

Cases that cite this headnote

[45]   **Pardon and Parole**
⚖=Parole as right or privilege
**Pardon and Parole**
⚖=Discretionary nature

Parole eligibility is not a right that can be waived; to the contrary, the eligibility decision is within the trial court's discretion.

Cases that cite this headnote

[46]   **Jury**
⚖=Peremptory challenges

Fact that the State did not ask voir dire questions related to juror's long hair and facial hair resembling "ZZ Top" or another juror's tattoos on his legs and arm did not establish that the strikes of those jurors were pretextual in penalty phase of capital murder trial, as required for relief on the basis of *Batson*.

Cases that cite this headnote

**State v. Lynch, 238 Ariz. 84 (2015)**

357 P.3d 119, 721 Ariz. Adv. Rep. 4

[47]   **Criminal Law**
☞Jury selection

A denial of a *Batson* challenge will not be reversed unless clearly erroneous.

Cases that cite this headnote

[48]   **Criminal Law**
☞Review De Novo
**Criminal Law**
☞Jury selection

A reviewing court defers to the trial court's ruling regarding the State's motives for a peremptory strike, and reviews the trial court's application of the law de novo.

Cases that cite this headnote

[49]   **Jury**
☞Peremptory challenges

*Batson* challenges are subject to the following three-step analysis: (1) the party challenging the strike must make a prima facie showing of discrimination; (2) the striking party must provide a race-neutral reason for the strike; and (3) if a race-neutral explanation is provided, the trial court must determine whether the challenger has carried its burden of proving purposeful racial discrimination.

Cases that cite this headnote

[50]   **Jury**
☞Peremptory challenges

In a *Batson* challenge, the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the peremptory strike.

Cases that cite this headnote

[51]   **Jury**
☞Peremptory challenges

A peremptory strike does not violate *Batson* where the prosecutor's explanation is facially race neutral and the defendant offers no evidence, other than inference, to show that the peremptory strike was a result of purposeful racial discrimination.

Cases that cite this headnote

[52]   **Jury**
☞Discharge of juror or jury pending trial

Relationship between juror and expert witness, who testified about hepatitis C, the liver, and defendant's life expectancy was not sufficient to warrant dismissal of juror in penalty phase of capital murder trial, where juror formerly worked at the same hospital as expert, who was a gastroenterologist, juror worked in medical surgical intensive care unit at the hospital and recognized the witness, and her dealings were with witness's surgical residents, not with him, and juror assured the court that her knowledge of witness would not prevent her from examining the evidence objectively. 17 A.R.S. Rules Crim.Proc., Rule 18.4(b).

Cases that cite this headnote

[53]   **Jury**
☞Discharge of juror or jury pending trial

Defendant in penalty phase of capital murder trial bears the burden of establishing that the juror was incapable of rendering a fair and impartial verdict.

Cases that cite this headnote

State v. Lynch, 238 Ariz. 84 (2015)
357 P.3d 119, 721 Ariz. Adv. Rep. 4

[54] **Criminal Law**
⬥ Selection and impaneling

A reviewing court does not set aside a trial court's refusal to strike a juror absent a clear showing that the court abused its discretion.

Cases that cite this headnote

[55] **Jury**
⬥ Discharge of juror or jury pending trial

Courts examine three factors when determining if a juror may continue to serve after that juror's objectivity is challenged: (1) the nature of the relationship between the witness and the juror; (2) whether the juror will properly assess the testimony; and (3) the importance of the testimony and whether the testimony was disputed.

Cases that cite this headnote

[56] **Sentencing and Punishment**
⬥ Mode of execution

Punishment involving torture or a lingering death is cruel. U.S.C.A. Const.Amend. 8.

Cases that cite this headnote

[57] **Sentencing and Punishment**
⬥ Vileness, heinousness, or atrocity
**Sentencing and Punishment**
⬥ Childhood or familial background

Sentence of death was warranted for defendant who stole victim's credit card, and after victim reported it stolen, returned to his residence intending to steal more and murder victim, which proved pecuniary gain aggravator, and bound victim to a chair with a large number of knots that were fairly secured, and cut his throat, there were ligatures, abrasions, and bruising on victim's wrists, hands, forearm, shoulder blade, back, and chest indicating that he struggled, which proved heinous, atrocious, and cruel (HAC) aggravator, although defendant had hepatitis C and complications thereof and a difficult childhood, where hepatitis C was a mitigator of minor value, and defendant was 39 years of age at the time of the murder. A.R.S. § 13–751(F)(5, 6).

Cases that cite this headnote

[58] **Sentencing and Punishment**
⬥ Scope of review

For crimes occurring before 2002, Supreme Court independently reviews the trial court's findings of aggravation and mitigation and the propriety of the death sentence; in doing so, court reviews the record de novo, considering the quality and the strength, not simply the number, of aggravating and mitigating factors. A.R.S. § 13–755(A).

Cases that cite this headnote

[59] **Sentencing and Punishment**
⬥ Presumptions

When there is a doubt whether the death sentence should be imposed, Supreme Court will resolve that doubt in favor of a life sentence. A.R.S. § 13–755(A).

Cases that cite this headnote

[60] **Sentencing and Punishment**
⬥ Personal or pecuniary gain

A murder must be prompted by the desire for

**State v. Lynch, 238 Ariz. 84 (2015)**
357 P.3d 119, 721 Ariz. Adv. Rep. 4

pecuniary gain for the pecuniary gain aggravator to apply. A.R.S. § 13–751(F)(5).

Cases that cite this headnote

[61]     **Sentencing and Punishment**
         ⟲Vileness, heinousness, or atrocity

A murder is especially cruel such that the heinous, atrocious, and cruel (HAC) aggravator applies in penalty phase of capital murder trial if the victim was conscious during the violence and the defendant knew or should have known that the victim would suffer mental anguish or physical pain. A.R.S. § 13–751(F)(6).

Cases that cite this headnote

[62]     **Sentencing and Punishment**
         ⟲Vileness, heinousness, or atrocity

Mental anguish as would support heinous, atrocious, and cruel (HAC) aggravator in penalty phase of capital murder trial includes a victim's uncertainty about his fate. A.R.S. § 13–751(F)(6).

Cases that cite this headnote

[63]     **Sentencing and Punishment**
         ⟲Mitigating circumstances in general

Although there need not be a nexus between mitigation and the crime in order for mitigation to be considered in penalty phase of capital murder trial, failure to establish such a causal connection may be considered in assessing the quality and strength of the mitigation evidence.

Cases that cite this headnote

[64]     **Sentencing and Punishment**
         ⟲Physical illness or disability

Supreme Court assigns minimal mitigating value to a defendant's post-murder physical health in penalty phase of capital murder trial because it does not address his pre-murder character, nor does it address his propensities, his record, or the circumstances of the offense.

Cases that cite this headnote

[65]     **Sentencing and Punishment**
         ⟲Other matters related to offender

Supreme Court affords minimal value in penalty phase of capital murder trial to the fact that a defendant will remain imprisoned for the rest of his life.

Cases that cite this headnote

[66]     **Sentencing and Punishment**
         ⟲Extent of offender's personal participation

Participation in a crime may be considered as mitigation in penalty phase of capital murder trial where a defendant demonstrates that while he was legally accountable for the conduct of another, his participation in the crime was relatively minor.

Cases that cite this headnote

[67]     **Sentencing and Punishment**
         ⟲Sentence or disposition of co-participant or codefendant

A disparity in sentences between codefendants and/or accomplices can be a mitigating circumstance in penalty phase of capital murder trial, if no reasonable explanation exists for the

**State v. Lynch, 238 Ariz. 84 (2015)**

357 P.3d 119, 721 Ariz. Adv. Rep. 4

---

disparity.

Cases that cite this headnote

[68]   **Sentencing and Punishment**
⬚ Sentence or disposition of co-participant or codefendant

Disparity is not mitigating in penalty phase of capital murder trial if it results from factors suggesting the appropriateness of the sentences, such as a difference in culpability or an appropriate plea agreement with one of the defendants.

Cases that cite this headnote

[69]   **Sentencing and Punishment**
⬚ Intoxication or drug impairment at time of offense

A defendant in a penalty phase of capital murder trial claiming mitigation on the basis of drug use must show some relationship between drug use and the offense. A.R.S. § 13–751(G)(1).

Cases that cite this headnote

[70]   **Sentencing and Punishment**
⬚ Intoxication or drug impairment at time of offense

Even if a defendant establishes his drug addiction, Supreme Court gives minimal value to this evidence if he fails to tie his drug abuse to the crime or to his mental functioning when the murder occurred.

Cases that cite this headnote

[71]   **Sentencing and Punishment**
⬚ Childhood or familial background

A difficult childhood may be a mitigating circumstance in penalty phase of capital murder trial, but Supreme Court gives it little value absent a showing that it affected the defendant's conduct in committing the crime.

Cases that cite this headnote

[72]   **Sentencing and Punishment**
⬚ Childhood or familial background

The amount of time that has passed since the defendant's childhood is relevant in determining what weight to give a difficult childhood as an aggravating factor in penalty phase of capital murder trial.

Cases that cite this headnote

[73]   **Sentencing and Punishment**
⬚ Other matters related to offender

Supreme Court accords minimal weight on review of death sentence to the prospect that a defendant will be a model prisoner because all prisoners are expected to behave in prison.

Cases that cite this headnote

[74]   **Sentencing and Punishment**
⬚ Purpose of statute or regulatory provision

The fact that a defendant would remain imprisoned for his natural life if he is not sentenced to death is entitled to little value in penalty phase of capital murder trial.

Cases that cite this headnote

---

State v. Lynch, 238 Ariz. 84 (2015)

357 P.3d 119, 721 Ariz. Adv. Rep. 4

**Attorneys and Law Firms**

*126 Mark Brnovich, Arizona Attorney General, John R. Lopez IV, Solicitor General, Lacey Stover Gard (argued), Chief Counsel, Capital Litigation Section, Jeffrey L. Sparks, Assistant Attorney General, Tucson, Attorneys for State of Arizona.

Tennie B. Martin, Mikel Steinfeld (argued), Deputy Public Defenders, Phoenix, Attorneys for Shawn Patrick Lynch.

Justice BRUTINEL authored the opinion of the Court, in which Chief Justice BALES, Vice Chief Justice PELANDER, and Justices BERCH and TIMMER joined.

**Opinion**

Justice BRUTINEL, opinion of the Court.

¶ 1 Shawn Patrick Lynch was convicted of first-degree murder, kidnapping, armed robbery, and burglary. He was sentenced to death for the murder and to twenty-one years' imprisonment for the other offenses. We remanded for a new penalty-phase proceeding on the murder conviction in *State v. Lynch* (*Lynch I* ), 225 Ariz. 27, 43 ¶ 89, 234 P.3d 595, 611 (2010). On resentencing, the jury again returned a death verdict. We have jurisdiction over this automatic appeal pursuant to Article 6, Section 5(3) of the Arizona Constitution and A.R.S. §§ 13–755 and 13–4031.

## I. FACTUAL BACKGROUND

¶ 2 The victim, James Panzarella, was seen at a Scottsdale bar with Lynch and Michael Sehwani on March 24, 2001. Lynch, Sehwani, and Panzarella went to Panzarella's residence early the next morning. Later that morning, Sehwani used Panzarella's American Express card at a supermarket. Ten minutes later, the card was reported lost. Sehwani again used the card at a convenience store and unsuccessfully attempted to use it at a department store. The same day, Panzarella's Bank One card was used at a restaurant, a convenience store, and a motel. The Bank One card was used the following day to make a cash withdrawal and various purchases, including Everlast shoes.

¶ 3 The next afternoon, Panzarella was found in his home tied to a chair with his throat slit. Police also found credit card receipts from purchases made that morning at a supermarket and convenience store.

¶ 4 Police arrested Lynch and Sehwani that afternoon as they entered a truck in a motel parking lot. Sehwani was wearing Everlast shoes and had Panzarella's credit cards and checks in his wallet. In the truck and a motel room, police found keys to Panzarella's car, a sweater with Panzarella's blood on it, and a .45 caliber pistol belonging to Panzarella. Blood on Lynch's shoes matched Panzarella's DNA.

¶ 5 A jury found Lynch guilty of first-degree murder, armed robbery, burglary, and kidnapping. In his first aggravation-phase trial, the jury made separate findings that the murder was especially heinous and cruel, but could not agree on whether it was especially depraved. *See* A.R.S. § 13–751(F)(6). The jury also could not decide if the murder was committed in expectation of pecuniary gain. *See* A.R.S. § 13–751(F)(5). That jury did not reach a unanimous verdict *127 in the penalty phase. A second penalty-phase jury found that the murder was especially depraved and committed for pecuniary gain and that a death sentence was appropriate. We remanded for a new penalty-phase trial because the trial judge erroneously instructed the second penalty-phase jury that the (F)(6) aggravator constituted three separate aggravating circumstances. *Lynch I*, 225 Ariz. at 42–43 ¶¶ 82–89, 234 P.3d at 610–11. Following the new penalty-phase trial, Lynch was again sentenced to death.

## II. ISSUES ON APPEAL

### A. Prosecutorial Misconduct

[1] [2] ¶ 6 Lynch asserts that the State engaged in prosecutorial misconduct in several ways, individually and in combination. "This Court will reverse a conviction for prosecutorial misconduct only when (1) misconduct is indeed present; and (2) a reasonable likelihood exists that the misconduct could have affected the jury's verdict, thereby denying [the] defendant a fair trial." *State v. Martinez*, 218 Ariz. 421, 426 ¶ 15, 189 P.3d 348, 353 (2008) (internal quotation marks omitted). Even when an instance of prosecutorial misconduct does not warrant reversal, "an incident may nonetheless contribute to a finding of persistent and pervasive misconduct if the cumulative effect of the incidents shows that the prosecutor intentionally engaged in improper conduct and did so with indifference, if not a specific intent, to prejudice the defendant." *State v. Roque*, 213 Ariz. 193,

State v. Lynch, 238 Ariz. 84 (2015)

357 P.3d 119, 721 Ariz. Adv. Rep. 4

228 ¶ 155, 141 P.3d 368, 403 (2006) (citations and internal quotation marks omitted).

¶ 7 When a defendant fails to object to an alleged incident of prosecutorial misconduct in the trial court, this Court reviews for fundamental error. *Id.* at 228 ¶ 154, 141 P.3d at 403. To establish fundamental error, Lynch must show that "there was error that went to the foundation of his case and denied him a fair trial, and that he was, in fact, prejudiced by the error." *State v. VanWinkle*, 230 Ariz. 387, 393 ¶ 25, 285 P.3d 308, 314 (2012).

### 1. Argument during opening statements

[3] ¶ 8 Lynch first asserts the prosecutor improperly presented arguments during his opening statement that "largely focused on persuading the jury that little weight should be given to certain mitigating factors and expected evidence." The trial court sustained two of Lynch's objections to the State's opening statement—that Lynch's childhood should not be considered a mitigating circumstance because "it happened 30 years ago" and that the defense wanted to "pull at [the jury's] heart strings" in its presentation of mitigating evidence. The court overruled Lynch's objection to the prosecutor's remark that no medical records supported Lynch's assertion that his father intentionally burned his hand as a child. Finally, the State implied that little weight should be given to a defense expert's life-expectancy testimony because the expert relied on a Wikipedia article and Lynch had outlived the expert's prediction for his life expectancy. The trial judge overruled Lynch's objection to these remarks.

[4] [5] ¶ 9 "Opening statement is counsel's opportunity to tell the jury what evidence they intend to introduce. Opening statement is not a time to argue the inferences and conclusions that may be drawn from evidence not yet admitted." *State v. Bible*, 175 Ariz. 549, 602, 858 P.2d 1152, 1205 (1993) (internal citation omitted). "[C]autionary instructions by the court generally cure any possible prejudice from argumentative comments during opening statements," because we presume that jurors follow the court's instructions. *State v. Manuel*, 229 Ariz. 1, 6 ¶ 24, 270 P.3d 828, 833 (2011).

¶ 10 Here, the court instructed the jury that it should only consider testimony, exhibits, and stipulations as evidence and that attorneys' remarks are not evidence. As to the disallowed statements listed above, the trial judge sustained objections and properly instructed the jury not to consider them as evidence. These instructions cured

any prejudice. On balance, although the prosecutor improperly made argumentative statements during opening, we find no reasonable likelihood that the misconduct affected the jury's verdict. *See*    ***128** *Martinez*, 218 Ariz. at 426 ¶ 15, 189 P.3d at 353. The State's opening statement did not deny Lynch a fair trial.

### 2. Improper witness examination

[6] ¶ 11 Lynch argues that the prosecutor committed misconduct during his cross-examination of defense witnesses. The trial court sustained Lynch's objections to two questions that were asked and answered, the State's interruption of defense witnesses on two occasions, the State's comment to a defense expert that she should "just answer my question for once," and other argumentative questions. The judge overruled Lynch's objections to combative remarks, including, "No, let me ask you a question."

¶ 12 Although the State's cross-examination was aggressive, and the court would have been well within its discretion to have sustained the objections and required the prosecutor to rephrase his questions in a more civil manner, the questioning did not deny Lynch a fair trial. *See State v. Bolton*, 182 Ariz. 290, 308, 896 P.2d 830, 848 (1995) ("The questioning may have been argumentative. Nevertheless, the misconduct was not so egregious that it permeated the entire trial and probably affected the outcome."). As in *Bolton*, "the prosecutor here did not call defendant pejorative names, refer to matters not in evidence, suggest unfavorable matter for which no proof exists, or abuse defendant in any other way." *Id.* The court instructed the jury to disregard questions to which objections were sustained; to only consider testimony, exhibits, and stipulations as evidence; and that attorneys' remarks are not evidence. We presume that jurors follow instructions. *Manuel*, 229 Ariz. at 6 ¶ 25, 270 P.3d at 833 (presuming that jury followed instructions even though the prosecutor "aggressively cross-examined" the defendant and another witness). We do not find fundamental error in the examination as a whole. As for the remarks to which Lynch's objections were overruled, while the trial court should have exercised more control over the aggressive questioning, the court did not abuse its discretion in overruling the objections.

### 3. Questions related to veracity of other witnesses

State v. Lynch, 238 Ariz. 84 (2015)
357 P.3d 119, 721 Ariz. Adv. Rep. 4

[7] ¶ 13 Lynch argues that the State improperly questioned his expert, Dr. Jolie Brams, a clinical psychologist, on the veracity of other witnesses' statements by accusing her of vouching for witnesses and asking her to comment on the truthfulness of witnesses. "Arizona prohibits lay and expert testimony concerning the veracity of a statement by another witness" because it is the province of the jury to determine veracity and credibility, "and opinions about witness credibility are 'nothing more than advice to jurors on how to decide the case.' " *State v. Boggs*, 218 Ariz. 325, 335, 185 P.3d 111, 121 (2008) (quoting *State v. Moran*, 151 Ariz. 378, 383, 728 P.2d 248, 253 (1986)).

¶ 14 Brams interviewed several people who knew Lynch and, based in part on those interviews, concluded that Lynch grew up in an atmosphere of violence and neglect. During cross-examination, the State asked Brams to recount her testimony in another criminal trial in which she had testified that it was highly unlikely that the witness could have remembered previous encounters with a defendant absent some meaningful event and that the witness' recollections were the result of suggestions by law enforcement. The State then asked Brams if testifying about recollected memories is "really just vouching for what somebody is saying" and if she had opined that a witness was not truthful in a third case. Lynch did not object to either question, and Brams answered both questions in the negative. Contrasting her testimony in the previous case to Brams's interview of Lynch's uncle, the prosecutor asked Brams whether a witness was not credible if he said he remembered something that happened forty-nine years earlier even though it did not stand out in his mind, "because you can vouch for people[.]" The trial court sustained Lynch's objection. The State also asked, "[Y]ou are telling us that, for example, [Lynch's sister], in your opinion, was telling the truth about everything?" Lynch failed to object to this question, and Brams replied that she did not think the sister was being purposefully deceitful.

*129 ¶ 15 These questions did not deny Lynch a fair trial. They related to Brams's witness interviews, not the testimony of other witnesses. These interviews were the foundation for Brams's testimony. The prosecutor did not encroach on the jury's evaluation of witness veracity, but rather tested Brams's credibility by attempting to show that she believed interviewees when their story was helpful but was skeptical when their story was not helpful. The State's closing argument addressed Brams's bias and credibility, not her opinion as to the veracity of testimony. The only improper remark was the suggestion that Brams "can vouch for people," and the trial court sustained Lynch's objection and instructed the jury that it was to disregard questions to which objections were sustained.

The jury instructions sufficiently cured any prejudice. *See State v. Hardy*, 230 Ariz. 281, 293–94 ¶¶ 61–62, 283 P.3d 12, 24–25 (2012).

### 4. Speaking objections

[8] ¶ 16 Lynch asserts that the prosecutor improperly made arguments through speaking objections. While making a relevance objection, the State argued that Brams was "obviously vested." After Lynch made a relevance objection to the State's cross-examination of Dr. Gerald Altschuler—a hematologist, oncologist, and internist—the State responded that Altschuler "is a jack of all trades and not a master of this." While making a relevance objection to what a witness recalled, the State said, "If he wants to just ask him what is in the transcript, I have no objection to that but what he remembers is irrelevant." The State also clarified the basis for a "cumulative" objection after the judge replied, "I'm sorry?" Finally, the prosecutor suggested that the jury be given an interview transcript in lieu of testimony as to what the transcript contained. Lynch did not object to any of these comments at trial. Lynch takes issue with the State twice objecting to his speaking objections, once in the presence of the jury, asserting that the State made speaking objections throughout the trial but did not allow him to do so.

¶ 17 Arizona law does not explicitly prohibit speaking objections, but "[t]o the extent practicable, the court must conduct a jury trial so that inadmissible evidence is not suggested to the jury by any means." Ariz. R. Evid. 103(d). Lynch does not identify—and we have not found—any inadmissible evidence that the State incorporated into its speaking objections. Further, Lynch did not object at trial and fails to demonstrate fundamental error. *See State v. Henderson*, 210 Ariz. 561, 567 ¶ 19, 115 P.3d 601, 607 (2005).

### 5. Attacks on defense experts

[9] ¶ 18 Lynch contends that the prosecutor committed misconduct by unfairly attacking his expert witnesses. During opening statements, the State told the jury that Altschuler, Lynch's expert regarding his hepatitis C diagnosis, would testify about the Child–Pugh standard for evaluating chronic liver disease. The prosecutor opined that the Child–Pugh standard is a subjective standard that "comes from Wikipedia"[1] and pointed out that Lynch had already outlived the two-year life

expectancy Altschuler had given. In response to a defense objection, the trial court commented that the jury had been informed that the opening statement was not evidence, but did not rule on the objection. During Altschuler's cross-examination, the prosecutor asked whether Altschuler examined patients after chemotherapy or if the examination was "done offsite where they actually receive the chemotherapy treatment." Lynch objected on relevance grounds, and the State responded that it was attempting to show Altschuler's lack of specific expertise—that he "is a jack of all trades and not a master of this." The court overruled the objection.

¶ 19 As noted above, during the cross-examination of Brams, the prosecutor, referring to Brams's interview of Lynch's uncle, asked Brams whether a witness was not credible if he said he remembered something that happened forty-nine years earlier even though it did not stand out in his mind, *130 "because you can vouch for people[.]" The trial court sustained Lynch's objection. After asking whether Brams had testified in a prior case that a witness was mistaken in his memory of long-past events, the prosecutor then inquired, "Well, this is the same sort of thing here, isn't it?" On this particular case you took a look at what somebody said and you reached a conclusion that perhaps they were mistaken or whatever term you want to use, right?" Brams explained that her testimony in the prior case was that a suggestive police interview might have influenced the interviewee's statements. Finally, the prosecutor asked Brams about her refusal to produce two documents he requested. Brams explained that she did not realize she had the documents. The prosecutor replied, "And so what you're saying is had you known that those two pages were in your binder, you would have removed them before the interview?" Brams began to deny the accusation, but the prosecutor interrupted. The judge sustained Lynch's objection to the interruption, and Brams explained that she would have disclosed the pages had she known she had them.

¶ 20 The prosecutor also asked Brams whether being an expert on recollected memories is "really just vouching for what somebody is saying," but Lynch did not object. Lynch also failed to object to the prosecutor's remark during closing argument that Brams "was able to tell the Court under oath that [a] witness was wrong, without ever speaking to that witness" and that she followed improper procedures such as taking written notes that "no one can interpret." The prosecutor also accused Brams of refusing to disclose her notes and slanting the truth. Again, Lynch did not object. Lynch also takes issue with the State's comments during closing argument such as, "That's the person they chose," because, in Lynch's view, the comments were calculated to tie Brams's supposed

disclosure violations and improper practices to defense counsel. Lynch failed to object at trial.

[10] ¶ 21 A prosecutor may "inquire into the credentials and employment of an expert witness to show bias or motive," but cannot "insinuate that an expert is unethical or incompetent without properly admitted evidence to support it." *State v. Bailey*, 132 Ariz. 472, 478–79, 647 P.2d 170, 176–77 (1982).

¶ 22 Here, although the prosecutor was aggressive, there was no reversible error. *See id.* The trial court sustained Lynch's objections to many of the questions, and the court's instructions to disregard the statements cured any possible prejudice. *See Manuel*, 229 Ariz. at 6 ¶ 24, 270 P.3d at 833. The court did not abuse its discretion in overruling any of the objections. As to the remarks to which Lynch did not object, he fails to show prejudice. Accordingly, the State's remarks during closing argument did not amount to fundamental error. *State v. Morris*, 215 Ariz. 324, 337 ¶ 59, 160 P.3d 203, 216 (2007).


### 6. Appeal to the fears of the jury

[11] ¶ 23 Lynch next contends that the prosecutor improperly appealed to the jurors' fears during his cross-examination of defense expert James Aiken. While inquiring about the security designation that Lynch would receive in prison, the prosecutor asked about an unrelated incident in Arizona where convicted murderers escaped from prison. Lynch did not object to this question. The prosecutor also asked Aiken whether it was possible that Lynch "could stick or prick, with a sharp object, one of the corrections officers." When Aiken answered that the probability was miniscule, the prosecutor asked whether "that would be comfort to the person who got stuck by a needle that Shawn Lynch had used." The trial judge overruled Lynch's relevance objection. Lynch argues on appeal that the State did not offer any reason to believe that the escaped prisoners were in a similar position as him and that there was no evidence to support the State's assertion that he would attack an officer.

¶ 24 Although the cross-examination was argumentative, and the trial judge could have sustained an objection on that basis, it was relevant. The defense elicited from Aiken testimony that Lynch could be safely housed in prison. The cross-examination was relevant rebuttal to that testimony. *See Ariz. R. Evid. 401(a)* ("Evidence is relevant if [ ] it *131 has any tendency to make a fact more or less probable than it would be without the evidence...."); Ariz. R. Evid. 611(b) ("A witness may be

State v. Lynch, 238 Ariz. 84 (2015)

357 P.3d 119, 721 Ariz. Adv. Rep. 4

cross-examined on any relevant matter."). That other offenders escaped from prison makes it less likely that Lynch could be housed safely. Additionally, that Lynch's hepatitis C could be transmitted through needles makes him more of a threat in prison than one without such a disease.

### 7. Misstating the evidence

[12] ¶ 25 During the cross-examination of Brams, the State asked whether she had previously said it was a waste of time to go over her notes and, after Brams said she did not recall, played a recording in which she said it would be a waste of time to go through every word of her notes. The trial court sustained Lynch's objection to the admission of the recording on the ground that Brams's statement was taken out of context. The prosecutor also asked Brams, "[D]idn't you tell us about a case involving a guy named Braulio Martinez yesterday where you said that he was mistaken because you can read minds?" The trial judge sustained Lynch's objection. Finally, the court sustained Lynch's objection to a statement in the State's closing argument that renting pornographic movies demonstrated Lynch's poor character.

[13] ¶ 26 Intentionally misstating evidence constitutes misconduct. *See State v. Cannon*, 148 Ariz. 72, 77, 713 P.2d 273, 278 (1985). When defense counsel can correct the misstatement at trial, however, we are hesitant to find reversible error. *Id.* Although the prosecutor made inappropriate remarks, defense counsel's objections were sustained and the prosecutor did not argue those points further. The trial judge instructed the jury at the beginning and end of the proceedings not to consider matters to which court sustained objections. We presume juries follow instructions, *Manuel*, 229 Ariz. at 6 ¶ 25, 270 P.3d at 833, and there is no evidence that the jury failed to heed this instruction. Lynch has not shown that the prosecutor's remarks could have affected the jury's verdict. *See Martinez*, 218 Ariz. at 426 ¶ 15, 189 P.3d at 353.

### 8. Ad hominem attacks on defense counsel

[14] ¶ 27 Lynch argues that the prosecutor committed misconduct by repeatedly resorting to ad hominem attacks against defense counsel. During opening statement and closing arguments, the prosecutor repeatedly characterized Lynch's mitigation evidence as "a myth"

and "fanciful" and made other similar comments. The prosecutor also attacked the defense theory that Lynch was not the killer by stating that the DNA evidence "is something that you perhaps will not consider when you are asked to speculate, as they put it [,] or try to determine who was the person who did the cutting." Lynch did not object to any of these statements.

[15] [16] ¶ 28 We have consistently held that prosecutors have wide latitude in closing arguments and may argue all reasonable inferences from the evidence. *State v. Hill*, 174 Ariz. 313, 322, 848 P.2d 1375, 1384 (1993). But it is always improper for the prosecutor to "impugn the integrity or honesty of opposing counsel." *State v. Newell*, 212 Ariz. 389, 403 ¶ 66, 132 P.3d 833, 847 (2006) (holding it was improper to imply that defense counsel was arguing for a position he knew to be false). Nonetheless, such comments warrant reversal only if a defendant can show a reasonable likelihood that the misconduct could have tainted the jury's verdict. *Id.* Moreover, "[c]riticism of defense theories and tactics is a proper subject of closing argument." *State v. Ramos*, 235 Ariz. 230, 238 ¶ 25, 330 P.3d 987, 995 (App.2014) (quoting *United States v. Sayetsitty*, 107 F.3d 1405, 1409 (9th Cir.1997)). In *Ramos*, the court ruled that the prosecutor's accusation that the defense raised "red herrings" and asked the jury to "check [their] common sense at the door" was proper criticism of defense tactics even though it suggested that defense counsel attempted to mislead the jury. *Id.* at 237–38 ¶¶ 24–25, 330 P.3d at 994–95.

¶ 29 Here, although the prosecutor repeatedly suggested that Lynch's defense was not credible, his criticism was directed at defense *theories* rather than defense *counsel*. Compare *State v. Amaya–Ruiz*, 166 Ariz. 152, 171, 800 P.2d 1260, 1279 (1990) (no misconduct *132 where prosecutor called defense theories "outrageous," a "smoke screen," and supported only by "innuendo and inference"), *with State v. Hughes*, 193 Ariz. 72, 86 ¶ 61, 969 P.2d 1184, 1198 (1998) (misconduct to argue that defense counsel and experts "fabricated" insanity defense without evidentiary support). The prosecutor's remarks were not improper. Moreover, the trial judge instructed the jury that the lawyers' arguments are not evidence. The prosecutor's comments did not deprive Lynch of a fair trial. *See Newell*, 212 Ariz. at 403 ¶ 67, 132 P.3d at 847.

### 9. Vouching and relying on evidence outside of the record

[17] ¶ 30 During closing argument, the prosecutor

commented that "this defendant—and he did—slash [Panzarella's] throat." Lynch contends this was improper because the prosecutor had previously objected to the introduction of the guilty verdict, which indicated that only eight of the guilt-phase jurors found that Lynch had killed a person,[2] and the trial court precluded it. Lynch argues the State improperly argued that Lynch was the actual killer and interfered with his ability to dispute this point by objecting to the introduction of the guilty verdict. Lynch also contends that the prosecutor vouched for the police officers involved by saying, "the Scottsdale Police Department did its darndest" and "[t]hey tried," referring to the department's attempt to find Panzarella's DNA on Sehwani's shirt. The prosecutor also referred to blood-spatter evidence as "the law" and said "the State does not agree that [Lynch's mitigating circumstances] are mitigating circumstances." Lynch did not object to any of these comments at trial.

[18] [19] ¶ 31 A prosecutor improperly vouches by either placing the prestige of the government behind its evidence or suggesting that facts not before the jury support the state's evidence. *Newell*, 212 Ariz. at 402 ¶ 62, 132 P.3d at 846; *State v. Vincent*, 159 Ariz. 418, 423, 768 P.2d 150, 155 (1989). Even if vouching occurs, the trial court may "cure the error by instructing the jury not to consider the attorneys' arguments as evidence." *State v. Payne*, 233 Ariz. 484, 512 ¶ 109, 314 P.3d 1239, 1267 (2013).

¶ 32 Although the prosecutor said the crime lab tried its "darndest" and referred to blood-spatter analysis as "the law," it was proper for the State to suggest that, because police did not find Panzarella's blood on Sehwani, the jury should infer that Lynch actually committed the murder. Contrary to Lynch's assertion, the fact that four jurors on the guilt-phase jury were not convinced that Lynch was the killer does not make the prosecutor's comments misconduct. *See Bible*, 175 Ariz. at 602, 858 P.2d at 1205 ("[D]uring closing arguments counsel may summarize the evidence, make submittals to the jury, urge the jury to draw reasonable inferences from the evidence, and suggest ultimate conclusions."). Finally, Lynch did not object to the prosecutor's reference to blood-spatter evidence as the law or the prosecutor's comment that "the State does not agree," and he fails to show that these remarks denied him a fair trial. Although the prosecutor put the prestige of the government behind his evidence by saying that "the State does not agree," the trial court cured the error by instructing the jury not to consider the attorneys' arguments as evidence. The prosecutor's comments did not constitute sufficient misconduct to warrant reversal.

## 10. Misstatement of the law

[20] [21] ¶ 33 Lynch contends the prosecutor committed misconduct by misstating the law. A prosecutor should not misstate the law during closing argument. *State v. Serna*, 163 Ariz. 260, 266, 787 P.2d 1056, 1062 (1990). Trial courts are given broad discretion in controlling closing argument, and their rulings will only be overturned for an abuse of discretion. *State v. Tims*, 143 Ariz. 196, 199, 693 P.2d 333, 336 (1985).

### a. A.R.S. § 13–751(G)(1)

[22] ¶ 34 Substantial impairment of a person's capacity to appreciate the wrongfulness *133 of his conduct is a statutorily identified mitigating circumstance. A.R.S. § 13–751(G). The prosecutor argued that a person can only fail to appreciate the wrongfulness of conduct if the person admits the conduct. The trial court overruled Lynch's objection. The prosecutor also questioned why Lynch would leave the crime scene and take the knife if he did not think his conduct was wrong. Lynch argues that this was a misstatement of the law because the mental impairment mitigating factor "is a sliding consideration," and the prosecutor argued that it "was a yes or no proposition."

¶ 35 Under § 13–751(G)(1), jurors must consider a "defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law." The State's remark was not a misstatement of law, but rather an attempt to point out an inconsistency in Lynch's story. The prosecutor was entitled to argue that Lynch committed the murder and appreciated the wrongfulness of his conduct.

### b. History of substance abuse

[23] [24] ¶ 36 Lynch contends that the prosecutor misstated the law by arguing that Lynch's substance abuse was not a mitigating factor, but rather something that made the crime worse. Lynch did not object at trial. Substance abuse can be a mitigating factor in capital cases. *State v. Kayer*, 194 Ariz. 423, 438 ¶ 52, 984 P.2d 31, 46 (1999). But a prosecutor does not commit misconduct by arguing that a mitigating factor does not warrant leniency or that jurors should give it little consideration. *State v. Anderson*, 210 Ariz. 327, 350 ¶ 97, 111 P.3d 369, 392 (2005), *supplemented* 211 Ariz. 59, 116 P.3d 1219

State v. Lynch, 238 Ariz. 84 (2015)
357 P.3d 119, 721 Ariz. Adv. Rep. 4

(2005); *see also State v. Prince,* 226 Ariz. 516, 538 ¶ 90, 250 P.3d 1145, 1167 (2011) (no fundamental error where prosecutor argued that defendant's bad temper was not sufficiently substantial to warrant leniency but rather "should be aggravation" where State was precluded from retrying aggravators). The prosecutor did not commit misconduct by suggesting that Lynch's drug use did not warrant leniency.

### c. Pornographic videos

[25] [26] ¶ 37 Lynch claims the prosecutor misstated the law by arguing that Lynch's renting pornographic videos "shows a debasement in the part of [Lynch's] character. And that has already been found, because this murder has been found ... to be especially heinous and depraved." The trial court correctly sustained Lynch's objection to this argument, properly instructed the jury on the issue, and instructed the jury to disregard remarks to which the court sustained objections. Lynch has not overcome the presumption that the jury followed these instructions. *See Manuel,* 229 Ariz. at 6 ¶ 25, 270 P.3d at 833.

### d. Dysfunctional childhood

[27] ¶ 38 Lynch contends that the prosecutor misstated the law by arguing that Lynch's difficult childhood was "so remote" that it was "an excuse, not a mitigating factor." Lynch was thirty-nine years old at the time of the murder. We have held that "[a] difficult or traumatic childhood is a mitigating circumstance." *Prince,* 226 Ariz. at 541 ¶ 109, 250 P.3d at 1170. Although a defendant does not have to demonstrate a connection between the mitigating circumstances and the crime, the remoteness or lack of a connection between the mitigating factor and the crime may make the mitigating factor less persuasive. *Id.* Thus, a jury may give less consideration to a difficult childhood when a defendant is older. *See id.* (noting on independent review that "[d]ifficult childhood circumstances also receive less weight as more time passes between the defendant's childhood and the offense").

¶ 39 These remarks were not improper. *See State v. Villalobos,* 225 Ariz. 74, 83 ¶¶ 37–39, 235 P.3d 227, 236 (2010) (reasoning that prosecutor's remark that "there is absolutely nothing mitigating about who he is in light of what you've seen him do" was not improper); *Anderson,* 210 Ariz. at 350 ¶ 97, 111 P.3d at 392 ("Once the jury has heard all of the defendant's mitigation evidence, there is

no constitutional prohibition against the State arguing that the evidence is not particularly relevant or that it is entitled to little weight."). Additionally, the court properly *134 instructed the jury on this mitigating factor, and Lynch has not shown that the jury disregarded the instruction.

### e. Life as a "free bite of the apple"

[28] ¶ 40 Lynch argues that the prosecutor misstated the law by arguing that the jury should disregard Lynch's prison sentences. As mitigation, Lynch pointed out that he would never leave prison alive because of his consecutive prison terms. The prosecutor contended that this argument gave Lynch a "free bite of the apple." The prosecutor was not stating the law; rather, he was arguing that the jury should not spare Lynch's life merely because he committed other crimes for which he would have to serve considerable prison time. Moreover, the court properly instructed the jury on this issue.

### f. (F)(6) aggravator

[29] ¶ 41 Lynch contends that the prosecutor misstated the law by characterizing the (F)(6) aggravator as involving separate aggravating factors. During voir dire, the prosecutor told prospective jurors:

> [T]his crime and this is one aggravating factor, was committed in an especially cruel, especially heinous or especially depraved fashion but the prior jury has already found that he was guilty not only of it—even though it's one factor, especially depraved, that's what they found, it was especially heinous.

Lynch objected that the prosecutor was addressing single prongs of the aggravator. The trial court denied Lynch's motion to strike the statement, but told the prosecutor to be clear that it was only one aggravator. The prosecutor then told prospective jurors that the murder "was found to be especially heinous, especially cruel and especially depraved." The trial judge sustained Lynch's objection to the use of the word "and."

¶ 42 In his closing argument, the prosecutor described

both especial cruelty and especial heinousness and indicated that each had already been established in this case. He then told the jury, "[C]ompare these three aspects, the murder and the aggravating circumstances, but there is also this indication that [it] was for pecuniary gain." Lynch did not object in the trial court, but now asserts that the prosecutor sought to indicate three aggravators existed when there were only two. Lynch argues this was not accidental, citing the prosecutor's comment that he wished to call witnesses "to show the four factors [he] proved previously," his request to include the definitions of especially cruel, especially heinous, and especially depraved in the preliminary jury instructions, and his proposed jury instruction indicating that "Lynch committed the murder in an especially heinous, cruel *and* depraved manner."

¶ 43 The (F)(6) aggravator is "a single aggravating circumstance that can be established in alternative ways." *Lynch I*, 225 Ariz. at 42 ¶ 84, 234 P.3d at 610. The prosecutor struggled at times during voir dire and closing argument with the disjunctive "or" and conjunctive "and" in explaining the (F)(6) aggravator, but Lynch objected to the misstatements and the trial court had the prosecutor clarify that the (F)(6) aggravator is only one aggravator. The trial court also properly instructed the jury on the (F)(6) aggravator. Lynch has not identified any reversible error.

### 11. Comment on Lynch not testifying

[30] ¶ 44 The prosecutor, referring to the encounter between Lynch and Panzarella immediately before the murder, asked the jury in closing argument, "What's going on?" and then asked, "Were words exchanged? Who knows." Lynch did not object, but now asserts that these comments were improper because the only people who could have answered those questions were the victim and Lynch.

[31] [32] ¶ 45 A prosecutor may not comment on a defendant's decision not to testify, either directly or indirectly. *State v. Rutledge*, 205 Ariz. 7, 12 ¶ 26, 66 P.3d 50, 55 (2003). A prosecutor's statement is a comment on a defendant's "protected silence" if a jury would "naturally and necessarily" perceive it as a comment on a defendant's failure to testify. *Payne*, 233 Ariz. at 514 ¶ 126, 314 P.3d at 1269 (internal quotation marks omitted).

*135 ¶ 46 Here, the prosecutor's statements were proper. They did not call attention to the fact that Lynch did not testify, but rather pointed out that the events leading up to

the murder were unclear. The jury would not have "naturally and necessarily" perceived the remarks as a comment on Lynch's failure to testify.

### 12. Personalization

[33] ¶ 47 Lynch asserts that the prosecutor improperly encouraged the jurors to put themselves in the victim's position. During his opening statement, the prosecutor said:

> So what happens is the defendant then, as Mr. Panzarella sits there, goes behind him and begins and cuts his throat from ear to ear. The problem of the unfortunate aspect of that, because in and of itself, cutting somebody's throat is a horrific, ghastly thing, you can only imagine. I don't think you can even imagine what it's like for somebody to approach you with a knife. You cannot move and you know they're manhandling you and they are going to cut your throat.

The trial court sustained Lynch's objection and granted his motion to strike. The prosecutor also quoted a line from a poem indicating that every person's death diminishes society as a whole, "so therefore send no one to find for whom the bell tolls, it tolls for thee." The prosecutor concluded his argument by stating that "[the bell] tolls for each and every one of you, in light of the evidence in this case, to return a verdict of death on Shawn Patrick Lynch."

[34] [35] ¶ 48 A prosecutor has wide latitude in closing argument, but may not make arguments that appeal to the jury's fear or passion. *Morris*, 215 Ariz. at 337 ¶ 58, 160 P.3d at 216. This includes inviting jurors to place themselves in the victim's position because doing so plays on the jurors' fear of the defendant or sympathy for the victim. *See id.* The proper response to an improper prosecutorial comment is an objection, motion to strike, and a jury instruction to disregard the stricken comment. *See Newell*, 212 Ariz. at 403 ¶ 69, 132 P.3d at 847.

¶ 49 The prosecutor's first comment was improper. By telling the jurors that they could not know what it was like to be "manhandled" by the knife-wielding defendant, the prosecutor invited the jurors to place themselves in the victim's position and appealed to their fears. But the trial

court properly sustained Lynch's objection, struck the argument, and told the jury to disregard it. Given the presumption that jurors follow instructions, we conclude that this comment did not affect the jury verdict. *See id.*

[36] ¶ 50 Because Lynch did not object to the prosecutor's referencing the poem at trial, we review for fundamental error. *See Morris,* 215 Ariz. at 337 ¶ 59, 160 P.3d at 216. Lynch cannot show that the references deprived him of a fair trial. The prosecutor did not appeal to the jury's fear of Lynch or sympathy for the victim or ask the jurors to place themselves in the victim's shoes during the murder. Rather, the prosecutor commented that murder affects society as a whole.

### 13. Cumulative misconduct

[37] [38] ¶ 51 Lynch argues that even if none of the individual instances of prosecutorial misconduct warrants reversal, the cumulative effect requires reversal, particularly given the prosecutor's experience and track record of misconduct. "We consider whether persistent and pervasive misconduct occurred and whether the cumulative effect of the incidents shows that the prosecutor intentionally engaged in improper conduct and did so with indifference, if not a specific intent, to prejudice the defendant." *State v. Gallardo,* 225 Ariz. 560, 570, 242 P.3d 159, 169 (2010) (quoting *Morris,* 215 Ariz. at 339 ¶ 67, 160 P.3d at 218) (internal quotation marks omitted).

¶ 52 During this retrial of the penalty phase, the prosecutor disturbingly made a number of inappropriate comments, prompting valid objections by Lynch that the trial court sustained. Although the prosecutor made some improper remarks, they did not amount to persistent and pervasive misconduct that deprived Lynch of a fair trial. The trial judge sustained objections to all of the improper comments except, "No, let me ask you the question." The court instructed the \*136 jury to disregard questions to which objections were sustained, to only consider testimony, exhibits, and stipulations as evidence, and that attorneys' remarks are not evidence. We presume that jurors follow instructions, *Manuel,* 229 Ariz. at 6 ¶ 25, 270 P.3d at 833, and any cumulative prejudice resulting from the prosecutor's remarks is insufficient to overcome this presumption. *See Gallardo,* 225 Ariz. at 569 ¶ 40, 242 P.3d at 168 (reasoning that similar instructions cured any prejudice). Given these instructions, and that the "let me ask you the question" remark was the only improper comment to which the court overruled Lynch's objection, the prosecutor's conduct did not deny Lynch a fair trial.

As to the statements to which Lynch did not object, we have concluded that Lynch failed to prove fundamental error. We consider these statements as well in our conclusion that prosecutorial misconduct, while present in some instances, was not so pronounced or sustained as to require a new sentencing trial.

### B. Limiting Retrial to Penalty Phase and Preclusion of Guilty Verdict

[39] [40] ¶ 53 Lynch claims that the trial court erred when it denied his motion to retry the aggravation phase and prohibited him from offering the guilty verdict as an exhibit during the penalty-phase retrial. He contends that these errors deprived him of an individualized sentencing because they denied the jury an adequate opportunity to evaluate the evidence supporting the aggravating circumstances and established a presumption of death. We review the interpretation of statutes and constitutional provisions de novo, *State v. Hansen,* 215 Ariz. 287, 289 ¶ 6, 160 P.3d 166, 168 (2007), and evidentiary rulings for an abuse of discretion. *State v. Benson,* 232 Ariz. 452, 466 ¶ 58, 307 P.3d 19, 33 (2013).

¶ 54 Following Lynch's second penalty-phase trial, we reversed Lynch's death sentence and remanded for a new penalty-phase proceeding. *Lynch I,* 225 Ariz. at 43 ¶ 89, 234 P.3d at 611. We ordered the trial court to instruct the jury "that the (F)(5) and (F)(6) aggravators have been previously found and that it is not to retry those issues." *Id.* (citing A.R.S. § 13–752(K)). Relying on this language, the trial court on remand denied Lynch's request for an aggravation-phase retrial.

¶ 55 Section 13–752(K) provides:

> At the penalty phase, if the trier of fact is a jury and the jury is unable to reach a verdict, the court shall dismiss the jury and shall impanel a new jury. The new jury shall not retry the issue of the defendant's guilt or the issue regarding any of the aggravating circumstances that the first jury found by unanimous verdict to be proved or not proved. If the new jury is unable to reach a unanimous verdict, the court shall impose a sentence of life or natural life on the defendant.

A.R.S. § 13–752(K). Lynch contends that § 13–752(K) only applies when a jury is unable to decide upon a

penalty, and § 13–752(N) applies when a death sentence has been vacated. Under § 13–752(N), "[i]f the sentence of a person who was sentenced to death is overturned, the person shall be resentenced pursuant to this section by a jury that is specifically impaneled for this purpose as if the original sentencing had not occurred." Lynch argues that because the aggravation phase is part of the sentencing proceeding, A.R.S. § 13–752(C), both the aggravation and penalty phases should have been retried. The State responds that the error this Court previously found in Lynch I was only in the penalty phase, not the entire sentencing proceeding, and reading the statute as a whole, this Court properly remanded for a trial of only the penalty phase.

¶ 56 There are two provisions of § 13–752 that inform our analysis. As noted above, § 13–752(N) provides that, "[i]f the sentence of a person who was sentenced to death is overturned, the person shall be resentenced pursuant to this section ... as if the original sentencing had not occurred." Based on this language, Lynch argues he was entitled to an entirely new sentencing proceeding. See A.R.S. § 13–752(C), (D) (indicating that a "sentencing proceeding" consists of both the aggravation and penalty phases). But under § 13–752(O), a defendant whose sentence is overturned must simply be "resentenced ... by a jury that is specifically impaneled" for **137 that purpose. See A.R.S. § 13–752(D) ("If the trier of fact finds that one or more of the alleged aggravating circumstances have been proven, the trier of fact shall then immediately determine whether the death penalty should be imposed. This proceeding is the penalty phase of the sentencing proceeding."). Thus, the statute's text leaves it unclear when a defendant is entitled to an entirely new sentencing proceeding, and when a defendant is entitled to only a new penalty-phase proceeding. We conclude, as we did in Lynch I, that Lynch was entitled only to a new penalty-phase proceeding.

¶ 57 The history of § 13–752 suggests that subsection (N) applies only to a particular subset of sentences overturned on appeal. The United States Supreme Court decided in Ring v. Arizona (Ring II ), 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), that Arizona's capital-sentencing scheme violated the Sixth Amendment because judges, rather than juries, found aggravating factors that made defendants death eligible. Id. at 609, 122 S.Ct. 2428. This opinion left a large number of capital cases in flux, particularly those cases where defendants had not exhausted their appeals. See State v. Ring (Ring III ), 204 Ariz. 534, 544 ¶ 5, 65 P.3d 915, 925 (2003) ("At the time of the Ring II decision, thirty-one defendants sentenced to death had matters pending on direct appeal before this

court."). In response, the legislature passed an emergency measure, S.B. 1001, to bring Arizona's death penalty statutes into compliance with Ring II. Id. at 545 ¶ 13, 65 P.3d at 926. By using the language "a person who was sentenced to death," the legislature intended for subsection (N) to be a limited solution for Ring II-defective sentences. A defendant who "was sentenced" to death after a judge found aggravating circumstances was entitled to an entirely new sentencing proceeding, unless this Court found the Ring error to be harmless beyond a reasonable doubt, because an error of constitutional significance tainted the aggravation phase of every such case. Thus, the legislature instructed the courts to act as if the original sentencing simply "had not occurred" and to start the sentencing process over again. A.R.S. § 13–752(N).

¶ 58 Subsection (O), on the other hand, is more general and pertains to sentences overturned for any reason. This subsection does not instruct the courts that they must act as if the original sentencing had not occurred, but rather directs them to simply sentence or resentence a defendant as appropriate to remedy a sentencing error. A.R.S. § 13–752(O). This Court "may reverse, affirm or modify the judgment appealed from, and may grant a new trial or render any judgment or make any order which is consistent with the justice and the rights of the state and the defendant." A.R.S. § 13–4036. Arizona's sentencing statute seeks to avoid retrials of proceedings untainted by error. A.R.S. § 13–752(J) (providing that, where a jury cannot reach a verdict on aggravating circumstances, "[t]he new jury shall not retry the issue of the defendant's guilt"); A.R.S. § 13–752(K) (providing that, where a jury cannot reach a verdict in the penalty phase, "[t]he new jury shall not retry the issue of the defendant's guilt or the issue regarding any of the aggravating circumstances that the first jury found by unanimous verdict to be proved or not proved"). Requiring a retrial of the entire sentencing proceeding when the error occurred only during the penalty phase would undermine the statute's purpose.

¶ 59 We limited the retrial to the penalty phase because Lynch's original sentence was not reversed for a Ring II-defective sentence or any other error in the aggravation phase. Rather, the error arose from an improper penalty-phase instruction. Lynch I, 225 Ariz. at 42–43 ¶ 88, 234 P.3d at 610–11. Limiting the retrial to the penalty phase was consistent with justice and the rights of the parties.

[41] ¶ 60 Likewise, limiting the retrial to the penalty phase did not deprive Lynch of an individualized sentencing. "[D]uring a second penalty phase, the state and the defendant may introduce evidence pertaining to the

State v. Lynch, 238 Ariz. 84 (2015)
357 P.3d 119, 721 Ariz. Adv. Rep. 4

aggravating circumstances previously found" because aggravation-phase evidence is "directly relevant to whether the mitigation is 'sufficiently substantial to call for leniency.' " *Prince*, 226 Ariz. at 526 ¶¶ 16, 18, 250 P.3d at 1155 (quoting A.R.S. § 13–752(G)). **\*138** This affords jurors sufficient opportunity to evaluate the aggravating circumstances when determining whether death is the appropriate penalty. During Lynch's penalty-phase retrial, the jury heard abundant testimony concerning the circumstances of the offense and the aggravating factors, and Lynch was free to offer additional evidence from the guilt and aggravation phases. He was not entitled, however, to retry the aggravation phase when no error occurred in that proceeding.

[42] ¶ 61 Precluding the guilty verdict from evidence likewise did not deprive Lynch of an individualized sentencing. Lynch contends the fact that most of the jurors found him guilty only of felony murder, not premeditated murder, was relevant as a mitigating circumstance. The trial court did not abuse its discretion in ruling that the verdict form was "not related to any aspect of the defendant's character, propensities or record, or circumstances of the offense." Neither the guilty-verdict form nor the jurors' votes provided evidence of the circumstances of the murder.

**C. Refusal to Give *Simmons* Instruction**
[43] ¶ 62 Lynch next contends the trial court erred in refusing to instruct the jury that he would never be released if sentenced to prison. He attempted to waive his right to be considered for a release-eligible sentence and requested that the jury be instructed regarding his ineligibility for release. The trial court ruled that Lynch could not "unilaterally choose which sentence should be imposed" and denied his motion.

[44] ¶ 63 We review jury instructions and alleged constitutional violations de novo. *State v. Nelson*, 229 Ariz. 180, 185 ¶ 21, 273 P.3d 632, 637 (2012); *State v. McGill*, 213 Ariz. 147, 157–58 ¶ 45, 140 P.3d 930, 940–41 (2006). But we review a court's refusal to inform the jury of the defendant's willingness to waive parole eligibility for an abuse of discretion. *Benson*, 232 Ariz. at 465 ¶ 52, 307 P.3d at 32.

¶ 64 The United States Supreme Court has held that "where the defendant's future dangerousness is at issue, and state law prohibits the defendant's release on parole, due process requires that the sentencing jury be informed that the defendant is parole ineligible." *Simmons v. South Carolina*, 512 U.S. 154, 156, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994) (plurality opinion). The State suggested at trial

that Lynch could be dangerous. Further, parole is available only to individuals who committed a felony before January 1, 1994, and juveniles. A.R.S. § 41–1604.09(I).

[45] ¶ 65 Parole eligibility is not a right that can be waived. *Benson*, 232 Ariz. at 465 ¶ 54, 307 P.3d at 32. To the contrary, the eligibility decision is within the trial court's discretion. *Id.; see also State v. Dann*, 220 Ariz. 351, 373 ¶ 124, 207 P.3d 604, 626 (2009) (holding that defendants may not "presentence" themselves). The sentencing statute in effect at the time of the murder authorized the imposition of release-eligible sentences. A.R.S. § 13–703(A) (renumbered as A.R.S. § 13–751(A)). The trial judge thus properly instructed the jury that she could impose a release-eligible sentence if the jury did not return a death verdict. "*Simmons* applies only to instances where, as a legal matter, there is *no possibility* of parole if the jury decides the appropriate sentence is life in prison." *Ramdass v. Angelone*, 530 U.S. 156, 169, 120 S.Ct. 2113, 147 L.Ed.2d 125 (2000) (emphasis added). Because § 13–703(A) permitted the possibility of Lynch obtaining release, refusing a *Simmons* instruction was not error. *See Benson*, 232 Ariz. at 465 ¶ 56, 307 P.3d at 32. An instruction that parole is not currently available would be correct, but the failure to give the *Simmons* instruction was not error.

¶ 66 Further, the alternative instruction Lynch offered was inaccurate. Instead of merely instructing on the unavailability of parole, it would have informed the jury, "If your verdict is that Mr. Lynch should be sentenced to life ... the court will sentence him to natural life which means Mr. Lynch would never be released from prison for his entire life." As discussed, the court could have imposed a release-eligible sentence. Even if parole remained unavailable, Lynch could have received another form of release, **\*139** such as executive clemency. We have previously rejected a similarly overbroad instruction. *State v. Boyston*, 231 Ariz. 539, 552–53 ¶ 67–68, 298 P.3d 887, 900–01 (2013) (rejecting instruction that defendant would "never be eligible to be released from prison for any reason for the rest of his life" because it "referred more broadly to any form of release or commutation of sentence").

**D. *Batson* Challenge**
[46] [47] [48] ¶ 67 Lynch next argues the trial court violated *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), when it permitted the State to strike five Hispanic jurors over his objection. "A denial of a *Batson* challenge will not be reversed unless clearly erroneous." *Newell*, 212 Ariz. at 400 ¶ 52, 132 P.3d at

844. We defer to the trial court's ruling regarding the State's motives for a peremptory strike, *State v. Garcia*, 224 Ariz. 1, 10 ¶ 22, 226 P.3d 370, 379 (2010), and review the trial court's application of the law de novo. *Newell*, 212 Ariz. at 401 ¶ 52, 132 P.3d at 845.

¶ 68 The State used five of its ten peremptory strikes on prospective jurors 8, 32, 34, 49, and 255, all of whom identified themselves as Hispanic. The prosecutor explained that Number 255 "indicated that she is philosophically opposed to the death penalty" and could not explain "why she believed that life was preferable to death." Number 49 had previously served on two hung juries, and the State argued she would cause the Lynch jury to hang, which would prevent the State from retrying the case. Number 34 had tattoos on his legs and arm, and one of Lynch's mitigating circumstances was that he had hepatitis C—which he contracted when he received a tattoo—and the State did not want a juror on the panel who could identify with Lynch. The prosecutor claimed that Number 32 had "facial hair resembl[ing] ZZ Top" and a long ponytail "like Jerry Garcia," which motivated striking that juror. The State noted that it also struck a white juror with long hair and facial hair. Number 8 "had a brother who was convicted of child abuse, and she was pretty unhappy." The State referred to Lynch's allegation that he had been abused. The trial court found that the State's reasons for striking the prospective jurors were race neutral. Lynch responded that the State's reasons for striking Numbers 32 (long hair and facial hair) and 34 (tattoos) did not justify the strikes.

[49] [50] [51] ¶ 69 "[T]he Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race...." *Batson*, 476 U.S. at 89, 106 S.Ct. 1712. *Batson* challenges are subject to the following three-step analysis:

> (1) the party challenging the strike must make a prima facie showing of discrimination; (2) the striking party must provide a race-neutral reason for the strike; and (3) if a race-neutral explanation is provided, the trial court must determine whether the challenger has carried its burden of proving purposeful racial discrimination.

*Garcia*, 224 Ariz. at 10, 226 P.3d at 379 (quoting *State v. Canez*, 202 Ariz. 133, 146 ¶ 22, 42 P.3d 564, 577 (2002)). "[T]he ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." *Id.* (quoting *Purkett v. Elem*, 514 U.S. 765,

768, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995) (per curiam)). A peremptory strike does not violate *Batson* where the prosecutor's explanation is facially race neutral and the defendant "offer[s] no evidence, other than inference, to show that the peremptory strike was a result of purposeful racial discrimination." *Newell*, 212 Ariz. at 402 ¶ 58, 132 P.3d at 846.

¶ 70 The trial court found that the State's proffered reasons for the strikes were race neutral, implicitly ruling that Lynch did not carry his burden of proving purposeful racial discrimination. The fact that the State did not ask voir dire questions related to Juror 32's long hair and facial hair or Juror 34's tattoos does not establish that the strikes were pretextual. *See Canez*, 202 Ariz. at 145 ¶ 18, 42 P.3d at 576 (affirming trial court's denial of *Batson* challenge even though the defendant argued the State's justification was pretextual because it did not ask follow-up questions). The court did not err.

## E. Denial of Motion to Strike Juror 5

[52] [53] [54] ¶ 71 Lynch contends the trial court erred in refusing to strike Juror 5, who *140 had previously worked at the same hospital as one of the State's witnesses, Dr. Vincent Honan. Lynch bore "the burden of establishing that the juror [wa]s incapable of rendering a fair and impartial verdict." *State v. Lavers*, 168 Ariz. 376, 390, 814 P.2d 333, 347 (1991). This Court does not set aside a trial court's refusal to strike a juror "absent a clear showing that the court abused its discretion." *Id.*

¶ 72 The State called Honan, a gastroenterologist who worked at Banner Good Samaritan Hospital, to testify about hepatitis C, the liver, and Lynch's life expectancy. Juror 5 sent the trial judge a letter explaining that she previously worked in the medical surgical ICU at Banner Good Samaritan and recognized Honan. Juror 5 "had no direct dealings with Dr. Honan," but thought "the surgeons that work at Good Sam are excellent surgeons." She indicated that she could still be fair in Lynch's case. After reviewing Juror 5's questionnaire and considering her responses in open court, the trial judge denied Lynch's motion to strike Juror 5.

[55] ¶ 73 A court is obligated to excuse a juror who cannot render a fair and impartial verdict. Ariz. R.Crim. P. 18.4(b); *see also* A.R.S. § 21-211. We examine three factors when determining if a juror may continue to serve after that juror's objectivity is challenged: (1) the nature of the relationship between the witness and the juror; (2) whether the juror will properly assess the testimony; and (3) the importance of the testimony and whether the testimony was disputed. *Bible*, 175 Ariz. at 574, 858 P.2d

State v. Lynch, 238 Ariz. 84 (2015)
357 P.3d 119, 721 Ariz. Adv. Rep. 4

at 1177.

¶ 74 The relationship between Juror 5 and the witness was not sufficient to warrant dismissal. Although knowledge of or professional acquaintance with a witness calls a juror's objectivity into question, it does not require automatic disqualification. *See Hill,* 174 Ariz. at 319–20, 848 P.2d at 1381–82 (finding no abuse of discretion in not dismissing juror who was professionally acquainted with prosecutor, investigator, and coroner involved in the case). Here, Juror 5 only recognized Honan as someone she had seen at the hospital where she no longer worked. Juror 5 stated that, although she may have worked on some of Honan's patients, her dealings were with his surgical residents and not with him.

¶ 75 Second, Juror 5 assured the court that her knowledge of Honan would not prevent her from examining the evidence objectively. Although this is not conclusive, it weighs heavily against dismissal absent any indicia that the juror could not objectively analyze the evidence. *See, e.g., id.* at 320–21, 848 P.2d at 1382–83; *Bible,* 175 Ariz. at 574–75, 858 P.2d at 1177–78. Although Juror 5 indicated that she thought all the surgeons at Good Samaritan were "excellent," she repeatedly affirmed that this would not taint her decision-making. The trial court did not abuse its discretion in refusing to strike Juror 5.

**F. Constitutionality of Arizona's Death Penalty**
¶ 76 Lynch contends that Arizona's death penalty is unconstitutional because it involves torture and a lingering death. He cites the "botched" lethal injection of Joseph Wood III as support for the contention that Arizona cannot humanely implement the death penalty.

[56] ¶ 77 The United States and Arizona Constitutions prohibit cruel and unusual punishment. U.S. Const. amend. VIII; Ariz. Const. art. 2, § 15. Punishment involving "torture or a lingering death" is cruel. *In re Kemmler,* 136 U.S. 436, 447, 10 S.Ct. 930, 34 L.Ed. 519 (1890). This Court and the United States Supreme Court have rejected the argument that lethal injection is cruel and unusual punishment. *See, e.g., Glossip v. Gross,* ——U.S. ——, ——, 135 S.Ct. 2726, 2738, 192 L.Ed.2d 761 (2015); *Baze v. Rees,* 553 U.S. 35, 41, 128 S.Ct. 1520, 170 L.Ed.2d 420 (2008); *State v. Hinchey,* 181 Ariz. 307, 315, 890 P.2d 602, 610 (1995).

¶ 78 We decline to reverse our prior rulings on this issue. Moreover, Lynch's challenge to the current execution protocol is premature and may instead be raised in Rule 32 proceedings. *State v. Kiles (Kiles II ),* 222 Ariz. 25, 42 ¶ 92 n. 20, 213 P.3d 174, 191 n. 20 (2009) (quoting *141

*State v. Andriano,* 215 Ariz. 497, 510 n. 9, 161 P.3d 540, 553 n. 9 (2007)). Lynch's objections to the current injection procedure—the lack of transparency and the protocol to be used—involve information not contained in the record on appeal and are more properly raised in a Rule 32 petition. *See State v. Watton,* 164 Ariz. 323, 328, 793 P.2d 80, 85 (1990) ("One of the purposes of a Rule 32 proceeding 'is to furnish an evidentiary forum for the establishment of facts underlying a claim for relief, when such facts have not previously been established of record.' " (quoting *State v. Scrivner,* 132 Ariz. 52, 54, 643 P.2d 1022, 1024 (App.1982))).

**G. Independent Review**
[57] [58] [59] ¶ 79 Lynch next argues the mitigation evidence he presented is sufficiently substantial to call for leniency. Because Lynch's crimes occurred before 2002, we "independently review the trial court's findings of aggravation and mitigation and the propriety of the death sentence." A.R.S. § 13–755(A). In doing so, we review the record de novo, considering "the quality and the strength, not simply the number, of aggravating and mitigating factors." *State v. Roseberry,* 210 Ariz. 360, 374 ¶ 77, 111 P.3d 402, 416 (2005) (quoting *State v. Greene,* 192 Ariz. 431, 443 ¶ 60, 967 P.2d 106, 118 (1998)). When "there is a doubt whether the death sentence should be imposed, we will resolve that doubt in favor of a life sentence." *State v. Carlson,* 202 Ariz. 570, 588 ¶ 70, 48 P.3d 1180, 1198 (2002).

**1. Aggravation**

**a. (F)(5)**
[60] ¶ 80 An aggravating circumstance is established when "[t]he defendant committed the offense as consideration for the receipt, or in expectation of the receipt, of anything of pecuniary value." A.R.S. § 13–751(F)(5). A murder must be "prompted by the desire for pecuniary gain" for the (F)(5) aggravator to apply. *Anderson,* 210 Ariz. at 351 ¶ 105, 111 P.3d at 393.

¶ 81 After initially leaving Panzarella's residence, Lynch and Sehwani used his American Express card at two stores and attempted to use it at a third. Panzarella reported the card as lost, and Lynch and Sehwani returned to Panzarella's residence, tied him to a chair, and killed him. Panzarella's debit card and credit card were then

repeatedly used, including to secure charges at a motel room registered in Lynch's name. Authorities found Panzarella's gun and magazine in Lynch's motel room and Panzarella's car keys in the truck Lynch was entering at the time of his arrest. These facts establish that Lynch and Sehwani returned to Panzarella's residence intending to steal more and to murder Panzarella to avoid detection. The (F)(5) aggravator was established.

### b. (F)(6)

[61] [62] ¶ 82 Under A.R.S. § 13–751(F)(6), an aggravating circumstance is established when "[t]he defendant committed the offense in an especially heinous, cruel or depraved manner." A murder is especially cruel if "the victim was conscious during the violence and ... the defendant knew or should have known that the victim would suffer mental anguish or physical pain." *State v. Hargrave*, 225 Ariz. 1, 13 ¶ 43, 234 P.3d 569, 581 (2010). "Mental anguish" includes a victim's uncertainty about his fate. *State v. Kiles (Kiles I )*, 175 Ariz. 358, 371, 857 P.2d 1212, 1225 (1993).

¶ 83 Panzarella's spinal column was not cut, so his nervous system remained intact and he felt pain from the time his throat was cut until he lost consciousness. Panzarella also experienced mental anguish. The evidence demonstrated that he was conscious when bound to the chair. The cord used to bind Panzarella was tied in a large number of knots that were "fairly secured," indicating that Panzarella had ample time to contemplate his fate. Ligatures, abrasions, and bruising on Panzarella's wrists, hands, forearm, shoulder blade, back, and chest indicate that he struggled. *See State v. Djerf*, 191 Ariz. 583, 596 ¶ 50–51, 959 P.2d 1274, 1287 (1998) (inferring mental anguish from contusions and abrasions on victim's wrists). The murder was especially cruel, so the (F)(6) aggravator was established.

### 2. Mitigation

### a. Medical condition

¶ 84 Lynch emphasizes his medical condition as a reason for leniency. Dr. Altschuler *142 testified at length about Lynch's hepatitis C and complications thereof, including cellulitis in his legs from a bacterial infection, the possibility that he could lose his legs, his several

hospitalizations for encephalopathy, and his diminished life expectancy. Defense counsel argued that Lynch would die in prison because of his medical condition and his 21–year sentence for the non-capital offenses. The State's expert, Dr. Honan, agreed that Lynch has "significant chronic liver disease," but did not "see negative prognostic indicators to suggest that he is terminally ill."

[63] [64] ¶ 85 Although there need not be a nexus between mitigation and the crime in order for mitigation to be considered, "failure to establish such a causal connection may be considered in assessing the quality and strength of the mitigation evidence." *Newell*, 212 Ariz. at 405 ¶ 82, 132 P.3d at 849. We assign minimal mitigating value to a defendant's post-murder physical health because it "does not address his pre-murder character, nor does it address his propensities, his record, or the circumstances of the offense." *Kayer*, 194 Ariz. at 440 ¶ 61, 984 P.2d at 48.

[65] ¶ 86 Here, Lynch's medical condition is a mitigating circumstance of only minimal value. The defense suggested that he obtained hepatitis C from receiving a tattoo in jail *after* the murder, so his medical condition is not probative of his character, propensities, or record at the time of the murder or the circumstances of the offense. Further, we afford minimal value to the fact that a defendant will remain imprisoned for the rest of his life. *State v. Lehr*, 227 Ariz. 140, 155 ¶ 78, 254 P.3d 379, 394 (2011) (reasoning that the fact that a defendant "would remain imprisoned for his natural life if he is not sentenced to death" is entitled to little mitigating value).

### b. Killer unknown

[66] ¶ 87 "[P]articipation in a crime may be considered as mitigation where a defendant demonstrates that while he was legally accountable for the conduct of another, his participation in the crime was relatively minor." *State v. Hoskins*, 199 Ariz. 127, 150 ¶ 100, 14 P.3d 997, 1020 (2000), *supplemented* 204 Ariz. 572, 65 P.3d 953 (2003). The evidence demonstrated that Lynch was a major participant in the crime. The American Express receipts discovered in Panzarella's residence indicate that Lynch and Sehwani returned after Panzarella reported the card lost. Property belonging to Panzarella was located in Lynch's motel room and in the truck Lynch was entering at the time of his arrest. There was also ample evidence indicating that Lynch was the killer. The evidence showed that the person who cut Panzarella's throat was standing behind Panzarella, the blood on Lynch's shoes was consistent with him standing in that position, and the

footwear impressions at the crime scene were consistent with Lynch's shoes. Lynch's alleged minimal participation is not a mitigating circumstance.

### c. Disparity in sentence

[67] [68] ¶ 88 "A disparity in sentences between codefendants and/or accomplices can be a mitigating circumstance if no reasonable explanation exists for the disparity." *Garcia*, 224 Ariz. at 21 ¶ 98, 226 P.3d at 390 (quoting *Kayer*, 194 Ariz. at 439 ¶ 57, 984 P.2d at 47). Disparity is not mitigating if it results from factors suggesting the appropriateness of the sentences, such as a difference in culpability or "an appropriate plea agreement with one of the defendants." *State v. Detrich*, 188 Ariz. 57, 69, 932 P.2d 1328, 1340 (1997). Here, evidence suggested that Lynch was the killer, and Sehwani received a life sentence as a result of a plea agreement. Sentencing disparity is not a mitigating circumstance here.

### d. Drug abuse

[69] ¶ 89 Lynch argues that his drug use is both a statutory and non-statutory mitigating circumstance. A mitigating circumstance is proven if "[t]he defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired, but not so impaired as to constitute a defense to prosecution." A.R.S. § 13–751(G)(1). Lynch asserts that drug use impaired his ability to appreciate wrongfulness. In such a case, the **\*143** defendant must show some relationship between drug use and the offense to avail himself of the (G)(1) mitigating circumstance. *State v. Murdaugh*, 209 Ariz. 19, 34 ¶ 74, 97 P.3d 844, 859 (2004); *see also State v. Sansing*, 206 Ariz. 232, 239–40 ¶¶ 28–29, 77 P.3d 30, 37–38 (2003) (finding failure to prove (G)(1) factor where defendant presented "only minimal testimony about his drug use on the day of the murder").

¶ 90 Lynch presented evidence that he suffered from drug and alcohol abuse and that he used drugs around the time of the offense. He also explained how crack cocaine use affects the brain. Lynch failed to show a relationship between his drug and alcohol use and the offense, however, other than merely suggesting that he used crack cocaine near the time of the murder. Any drug use is therefore entitled to minimal mitigating value.

[70] ¶ 91 As to non-statutory mitigation, Lynch's drug abuse is entitled to minimal value. Even if a defendant establishes his drug addiction, we give minimal value to this evidence if he " 'fail[s] to tie his ... drug abuse to the crime or to his mental functioning' when the murder occurred." *Garcia*, 224 Ariz. at 22 ¶ 104, 226 P.3d at 391 (quoting *State v. Pandeli*, 215 Ariz. 514, 532 ¶ 75, 161 P.3d 557, 575 (2007)). Although Lynch showed that he abused drugs, he did not tie his drug abuse to the crime other than by stating generally that crack cocaine use causes delusional thinking. Lynch's drug abuse deserves little value as a mitigator.

### e. Dysfunctional childhood and abuse

[71] [72] ¶ 92 Lynch presented evidence that he was raised in a dysfunctional family where he was physically and emotionally abused, his parents neglected him, and his parents were alcoholics. A difficult childhood may be a mitigating circumstance, but we give it little value "absent a showing that it affected the defendant's conduct in committing the crime." *Garcia*, 224 Ariz. at 22 ¶ 107, 226 P.3d at 391. The amount of time that has passed since the defendant's childhood is relevant. *Prince*, 226 Ariz. at 541–42 ¶ 111, 250 P.3d at 1170–71 ("Prince was twenty-six years old when he killed Cassandra, attenuating the impact of his dysfunctional childhood on his conduct."); *Garcia*, 224 Ariz. at 22 ¶ 107, 226 P.3d at 391 (affording little value to difficult family background because defendant was thirty-nine at the time of the murder and "no evidence linked his childhood experiences to the murder"); *State v. Ellison*, 213 Ariz. 116, 144 ¶ 136, 140 P.3d 899, 927 (2006) (reasoning that "childhood troubles deserve[d] little value as a mitigator for the murders [defendant] committed at age thirty-three").

¶ 93 Here, Lynch was thirty-nine years old at the time of the murder. He failed to establish that his childhood affected his conduct. Lynch's dysfunctional family background deserves little value as a mitigator.

### f. Brother's death

¶ 94 Lynch also asserts that the drug-overdose death of his brother, Donald, is a mitigating factor. Donald died after the murder, so his death deserves little value as mitigation. *See Newell*, 212 Ariz. at 405 ¶ 82, 132 P.3d at

**State v. Lynch, 238 Ariz. 84 (2015)**

357 P.3d 119, 721 Ariz. Adv. Rep. 4

849 (reasoning that even though we do not require a nexus between the mitigation and the crime before we consider mitigation evidence, the absence of "such a causal connection may be considered in assessing the quality and strength of the mitigation evidence").

### g. Lack of future dangerousness and other sentences

[73] [74] ¶ 95 Lynch also presented evidence that he would not be a danger to prison staff, inmates, or the general public if he received a life sentence. He also offered as mitigation his twenty-one-year sentence for the non-capital crimes that would run consecutively to the sentence he received for the first-degree murder. We "accord minimal weight to the prospect that [a defendant] will be a 'model prisoner' " because "[a]ll prisoners are expected to behave in prison." *Lehr*, 227 Ariz. at 155 ¶ 78, 254 P.3d at 394. The fact that a defendant "would remain imprisoned for his natural life if he is not sentenced to death" is also entitled to little value. *Id.; see also Garcia*, 224 Ariz. at 22 ¶ 108, 226 P.3d at 391 (affording minimal *144 value to defendant's argument that he posed no risk of future dangerousness because he would never be released from prison). We give Lynch's low risk of misbehavior in prison and consecutive

non-capital sentences little value as mitigation.

### 3. Propriety of death sentence

¶ 96 In light of the (F)(5) and (F)(6) aggravating circumstances, which reflected an especially cruel murder committed for pecuniary gain, we conclude that Lynch has not identified mitigating circumstances sufficiently substantial to call for leniency.

### III. CONCLUSION

¶ 97 For the reasons stated, we affirm Lynch's death sentence.[3]

### All Citations

238 Ariz. 84, 357 P.3d 119, 721 Ariz. Adv. Rep. 4

Footnotes

1    Lynch offered into evidence an article about the Child–Pugh standard that had "Wikipedia" printed at the bottom of the page.

2    The jury was unanimous only in finding that Lynch was a major participant in the felony and had acted with reckless indifference for human life.

3    Lynch raises twenty-six additional constitutional claims that he acknowledges this Court has previously rejected but that he wishes to preserve for federal review. We decline to revisit these claims.

---

**End of Document**                                      © 2015 Thomson Reuters. No claim to original U.S. Government Works.

# Juan Martinez

# 15-3363

Exhibits to initial charge
Attachment 02
(state v. morris)

State v. Morris, 215 Ariz. 324 (2007)

160 P.3d 203, 506 Ariz. Adv. Rep. 14

215 Ariz. 324
Supreme Court of Arizona.

STATE of Arizona, Appellee,
v.
Cory Deonn MORRIS, Appellant.

No. CR–05–0267–AP. | June 18, 2007.

**Synopsis**
**Background:** Defendant was convicted in the Superior Court, Maricopa County, Douglas L. Rayes, J., of capital murders for deaths of five victims and was sentenced to death.

**Holdings:** On automatic appeal, the Supreme Court, McGregor, C.J., held that:

[1] independent evidence apart from defendant's incriminating statements to police was sufficient to establish corpus delicti for deaths of two victims;

[2] any error in defendant's exclusion from jury prescreening process that focused on prospective jurors who felt they could not serve in trial expected to last between six to eight weeks was harmless;

[3] medical examiners' post-autopsy receipt of copies of defendant's statements to police regarding strangulation of two victims did not constitute prosecutorial misconduct;

[4] prosecutor's comments did not rise to level of fundamental error;

[5] excluded photograph showing maggot infestation, kept on prosecutor's table throughout guilt phase of trial, did not rise to level of prosecutorial misconduct;

[6] autopsy photographs were not so gruesome or irrelevant such that they were admitted for sole purpose of inflaming jury;

[7] "prior serious offenses" aggravator was supported by evidence that defendant had killed five victims;

[8] evidence supported finding that murders were especially cruel; and

[9] mitigating factors were not sufficiently substantial to warrant leniency in sentencing.

Affirmed.

West Headnotes (46)

[1]     **Criminal Law**
        ⬤=Homicide, mayhem, and assault with intent to kill

        Independent evidence apart from defendant's incriminating statements to police was sufficient to establish corpus delicti for deaths of two victims, in trial for capital murder, despite advanced state of decomposition that precluded determination of trauma to head and neck of both victims; both victims were discovered naked in same alley just north of defendant's residence, drag marks near both bodies indicated that victims had been moved, DNA on panties and clothing found in defendant's camper matched victims' DNA, and defendant was carrying one of victim's driver's license, social security card at time of arrest.

        3 Cases that cite this headnote

[2]     **Criminal Law**
        ⬤=Evidence dependent on preliminary proofs

        An appellate court reviews a ruling on the sufficiency of the evidence of corpus delicti for abuse of discretion.

        12 Cases that cite this headnote

[3]     **Criminal Law**
        ⬤=Corpus delicti

        The "corpus delicti" doctrine ensures that a

State v. Morris, 215 Ariz. 324 (2007)
160 P.3d 203, 506 Ariz. Adv. Rep. 14

defendant's conviction is not based upon an uncorroborated confession or incriminating statement; therefore, the State must show that the alleged injury to the victim was caused by criminal conduct rather than by suicide or accident.

14 Cases that cite this headnote

[4]    **Criminal Law**
⟞Corpus delicti

Only a reasonable inference of the corpus delicti need exist before incriminating statements may be considered, and circumstantial evidence can support such an inference.

12 Cases that cite this headnote

[5]    **Criminal Law**
⟞Proof of corpus delicti

The State need not present evidence supporting the inference of corpus delicti before it submits the defendant's statements, as long as the State ultimately submits adequate proof of the corpus delicti before it rests.

4 Cases that cite this headnote

[6]    **Criminal Law**
⟞Homicide, mayhem, and assault with intent to kill

The corpus delicti doctrine does not require the State to prove the cause of death.

4 Cases that cite this headnote

[7]    **Jury**
⟞Competence for Trial of Cause
**Jury**
⟞Excusing and Discharging Jurors from Attendance

Defendant was not deprived right of trial by fair and impartial jury in trial for capital murder based on claim that jury commissioner improperly released sixteen of 20 prospective jurors to other panels in light of jurors' inability to serve over trial expected to last between six to eight weeks, and therefore, that defendant was left only with "volunteers" to serve on jury; commissioner had discretion to excuse jurors based on neutral criteria, and defendant could not show that jurors who served were not fair and impartial. U.S.C.A. Const. Amend. 6; A.R.S. § 21–315(A).

11 Cases that cite this headnote

[8]    **Jury**
⟞Competence for Trial of Cause
**Jury**
⟞Right to particular juror or jury

Although a defendant in a criminal case is entitled to a fair and impartial jury for the trial of his case, he is not entitled to be tried by any particular jury. U.S.C.A. Const. Amend. 6.

10 Cases that cite this headnote

[9]    **Jury**
⟞Representation of community, in general

To make a prima facie showing that a jury does not represent a fair cross-section of the community, a defendant must show: (1) that the group alleged to be excluded is a distinctive group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection

State v. Morris, 215 Ariz. 324 (2007)

160 P.3d 203, 506 Ariz. Adv. Rep. 14

process. U.S.C.A. Const. Amend. 6.

6 Cases that cite this headnote

[10]     **Jury**
⬥═Excusing and Discharging Jurors from
Attendance

Jury commissioners have broad discretion to
excuse jurors from service. A.R.S. § 21–315(A).

Cases that cite this headnote

[11]     **Criminal Law**
⬥═Absence of accused

Any error in defendant's exclusion from jury
prescreening process, which focused on
prospective jurors who felt they could not serve
in capital murder trial expected to last between
six to eight weeks, in alleged violation of right
to be present during all critical stages of
criminal proceedings was harmless, where no
prospective juror was questioned during
prescreening process about facts or legal issues
of case.

4 Cases that cite this headnote

[12]     **Criminal Law**
⬥═Prejudice to rights of party as ground of
review

An error is "harmless" if it appears beyond a
reasonable doubt that the error did not contribute
to the verdict obtained.

3 Cases that cite this headnote

[13]     **Criminal Law**

⬥═Conduct of counsel in general

To prevail on a claim of prosecutorial
misconduct, a defendant must demonstrate that
the prosecutor's misconduct so infected the trial
with unfairness as to make the resulting
conviction a denial of due process. U.S.C.A.
Const. Amend. 14.

34 Cases that cite this headnote

[14]     **Criminal Law**
⬥═Conduct of counsel in general

In order to prevail on a claim of prosecutorial
misconduct, the misconduct must be so
pronounced and persistent that it permeates the
entire atmosphere of the trial.

24 Cases that cite this headnote

[15]     **Criminal Law**
⬥═Conduct of counsel in general

Prosecutorial misconduct constitutes reversible
error only if (1) misconduct exists and (2) a
reasonable likelihood exists that the misconduct
could have affected the jury's verdict, thereby
denying defendant a fair trial.

29 Cases that cite this headnote

[16]     **Criminal Law**
⬥═Necessity of Objections in General

If a defendant fails to object, then the appellate
court reviews the claim only for fundamental
error.

1 Cases that cite this headnote

**State v. Morris, 215 Ariz. 324 (2007)**

160 P.3d 203, 506 Ariz. Adv. Rep. 14

[17]     **Criminal Law**
         ⟜Conduct of counsel in general

Even if there is no error in the context of a claim of prosecutorial misconduct or an error is harmless and so by itself does not warrant reversal, an incident may nonetheless contribute to a finding of persistent and pervasive misconduct if the cumulative effect of the incidents shows that the prosecutor intentionally engaged in improper conduct and did so with indifference, if not a specific intent, to prejudice the defendant.

15 Cases that cite this headnote

[18]     **Criminal Law**
         ⟜Ex parte communications by prosecutor

Medical examiners' post-autopsy receipt from prosecutor of copies of defendant's statements to police regarding strangulation of two victims did not constitute prosecutorial misconduct by allegedly influencing examiners' testimony regarding cause of death initially determined to be drug overdose, in trial for capital murder; police had statutory obligation to report results of investigation into facts and circumstances surrounding suspicious death, head and neck of both victims had been decomposed to extent that examiners had not been able to determine whether trauma had occurred to that region, and examiners found nothing inconsistent with asphyxiation due to strangulation as cause of death.

Cases that cite this headnote

[19]     **Criminal Law**
         ⟜Homicide and assault with intent to kill

Prosecutor's comment during aggravation phase of capital murder trial that defendant had murdered victims in order to have sexual intercourse with their corpses was reasonable inference based on evidence presented at trial that skin slippage existed on selective body parts of victims, which resulted from friction and general decomposition process, that one victim had skin defects on her anus, which was level with defendant's bed, and that defendant's semen was present in vaginas of two victims, even though defendant insisted he wore condom during sex with victims before their deaths.

Cases that cite this headnote

[20]     **Criminal Law**
         ⟜Statements as to Facts and Arguments

Prosecutors have wide latitude in presenting their arguments to the jury.

13 Cases that cite this headnote

[21]     **Criminal Law**
         ⟜Matters Not Sustained by Evidence
         **Criminal Law**
         ⟜Inferences from and Effect of Evidence

The prosecutor is permitted to argue all reasonable inferences from the evidence, but cannot make insinuations that are not supported by the evidence.

7 Cases that cite this headnote

[22]     **Criminal Law**
         ⟜Statements as to Facts, Comments, and Arguments

In evaluating the propriety of a prosecutor's arguments, the appellate court considers whether the remarks called to the jurors' attention matters that they should not consider, and whether, under the circumstances of the particular case, the remarks probably influenced the jurors.

**State v. Morris, 215 Ariz. 324 (2007)**

160 P.3d 203, 506 Ariz. Adv. Rep. 14

7 Cases that cite this headnote

[23] **Sentencing and Punishment**
⟐═Harmless and reversible error

Even if prosecutor's comment during aggravation phase of capital murder that defendant murdered victims in order to have sexual intercourse with their corpses was not reasonable inference from evidence presented at trial, any error was harmless, in that jury was instructed that arguments were not evidence, jury was presumed to follow trial court's instructions, and argument was directed toward establish "heinous or depraved" aggravator, whereas jury found that each murder was committed in especially cruel manner.

24 Cases that cite this headnote

[24] **Sentencing and Punishment**
⟐═Arguments and conduct of counsel
**Sentencing and Punishment**
⟐═Presentation and reservation in lower court of grounds of review

Prosecutor's invitation to select female jurors as to whether they thought it would hurt if defendant sat on their chests, whether they would enjoy having tie around their neck, and whether they would feel good if they could not breathe, although improper appeal to jurors' passions and emotions, did not amount to fundamental error, in trial for capital murder; defendant could not show that isolated comment deprived of him of essential right, comment was directed to "especially cruel" aggravator, and prosecutor presented independent overwhelming evidence of cruelty, including medical examiner's testimony that all victims would have experienced pain for some period of time before losing consciousness, and evidence that at least three victims struggled with defendant before losing consciousness. A.R.S. § 13–703(F)(6).

6 Cases that cite this headnote

[25] **Criminal Law**
⟐═Statements as to Facts and Arguments
**Criminal Law**
⟐═Appeals to Sympathy or Prejudice
**Criminal Law**
⟐═Appeals to fears of jury

A prosecutor has wide latitude in presenting arguments to the jury, including commenting on the vicious and inhuman nature of the defendant's acts, but cannot make arguments that appeal to the fears or passions of the jury.

17 Cases that cite this headnote

[26] **Criminal Law**
⟐═Burden of showing error

On a claim of fundamental error, the defendant bears the burden of persuasion and must establish both that fundamental error exists and that the error in his case caused him prejudice.

1 Cases that cite this headnote

[27] **Criminal Law**
⟐═Necessity of Objections in General

"Fundamental error" is error going to the foundation of the case, error that takes from the defendant a right essential to his defense, and error of such magnitude that the defendant could not possibly have received a fair trial.

3 Cases that cite this headnote

[28] **Sentencing and Punishment**
⟐═Arguments and conduct of counsel

State v. Morris, 215 Ariz. 324 (2007)

160 P.3d 203, 506 Ariz. Adv. Rep. 14

**Sentencing and Punishment**
⬅Presentation and reservation in lower court of grounds of review

Prosecutor's reference during closing argument of guilt phase of capital murder trial to jury's "smelling pleasure" with respect to putrid odor emanating from jacket that was removed from evidence bag during trial, although inappropriate, did not rise to level of fundamental error that deprived defendant of fair trial; jacket had been offered for permissible purpose to show that it belonged to victim, and strong odor associated with jacket resulted from its close proximity to victim's badly decomposed body at time it was discovered.

2 Cases that cite this headnote

[29]   **Criminal Law**
⬅Use of exhibits and demonstrative evidence

Excluded photograph kept on prosecutor's table throughout guilt phase of capital murder trial showing maggot infestation did not rise to level of prosecutorial misconduct; there was no indication that any juror saw photograph, counsel did not ask judge to determine whether any juror had seen photograph or to instruct jurors to disregard photograph, and prosecutor complied with judge's order to remove photograph from view.

Cases that cite this headnote

[30]   **Criminal Law**
⬅Photographs arousing passion or prejudice; gruesomeness

Autopsy photographs of one victim's body were not so gruesome or irrelevant such that they were admitted for sole purpose of inflaming jury, in trial for capital murder; four showed victim's hands or feet and one showed her body from distance, and photographs were relevant to show manner of death or to corroborate State's

case.

10 Cases that cite this headnote

[31]   **Criminal Law**
⬅Documentary evidence

The appellate court reviews a trial judge's decision to admit photographs for abuse of discretion.

Cases that cite this headnote

[32]   **Criminal Law**
⬅Photographs and Other Pictures
**Criminal Law**
⬅Photographs arousing passion or prejudice; gruesomeness

A reviewing court looks to three factors to determine whether the trial judge erred in admitting photographs: the photograph's relevance, its tendency to inflame the jury, and its probative value compared to its potential to cause unfair prejudice.

8 Cases that cite this headnote

[33]   **Criminal Law**
⬅Depiction of Injuries or Dead Bodies

Photographs of a victim's body are always relevant because the fact and cause of death are always relevant in a murder prosecution.

1 Cases that cite this headnote

[34]   **Criminal Law**
⬅Purpose of admission

State v. Morris, 215 Ariz. 324 (2007)
160 P.3d 203, 506 Ariz. Adv. Rep. 14

Photographs of a victim's body may be introduced to prove the corpus delicti, to identify the victim, to show the nature and location of the fatal injury, to help determine the degree or atrociousness of the crime, to corroborate state witnesses, to illustrate or explain testimony, and to corroborate the State's theory of how and why the homicide was committed.

1 Cases that cite this headnote

[35]     **Criminal Law**
⚷Photographs arousing passion or prejudice; gruesomeness

If photographs of a victim's body have no tendency to prove or disprove any question which is actually contested, they have little use or purpose except to inflame and would usually not be admissible.

2 Cases that cite this headnote

[36]     **Criminal Law**
⚷Photographs arousing passion or prejudice; gruesomeness
**Criminal Law**
⚷Documentary and demonstrative evidence

Gruesome or inflammatory photographs may be admitted, but if they are admitted for the sole purpose of inflaming the jury, the appellate court will reverse on appeal.

8 Cases that cite this headnote

[37]     **Sentencing and Punishment**
⚷Discretion of lower court

The Supreme Court was required to review defendant's death sentences for capital murder for abuse of discretion, regardless whether defendant raised challenge to penalty phase on appeal. A.R.S. § 13–703.05.

10 Cases that cite this headnote

[38]     **Statutes**
⚷Intent

The primary goal of statutory interpretation is to effect the intent of the legislature.

1 Cases that cite this headnote

[39]     **Statutes**
⚷Plain language; plain, ordinary, common, or literal meaning

If the language of a statute is plain and unambiguous, the court looks no further.

Cases that cite this headnote

[40]     **Criminal Law**
⚷Discretion of Lower Court

Under an abuse of discretion standard of review, the appellate court upholds a decision if there is any reasonable evidence in the record to sustain it.

14 Cases that cite this headnote

[41]     **Sentencing and Punishment**
⚷Other matters related to offense

Jury's finding of prior serious offenses aggravator, in sentencing for capital murder, was supported by evidence that defendant had killed five victims. A.R.S. § 13–703(F)(2).

State v. Morris, 215 Ariz. 324 (2007)
160 P.3d 203, 506 Ariz. Adv. Rep. 14

Cases that cite this headnote

[42]    **Sentencing and Punishment**
        ⬤⎯Vileness, heinousness, or atrocity

        Jury's finding that murders were committed in
        especially cruel manner, as aggravating factor in
        sentencing for capital murder, was supported by
        evidence indicating that each victim was
        conscious for period of time and suffered
        physical pain and mental anguish before losing
        consciousness, and that at least three victims had
        struggled with defendant prior to losing
        consciousness. A.R.S. § 13–703(F)(6).

        10 Cases that cite this headnote

[43]    **Sentencing and Punishment**
        ⬤⎯Vileness, heinousness, or atrocity

        A finding of cruelty alone is sufficient to
        establish the aggravating factor that the murders
        were especially cruel, heinous, or depraved.
        A.R.S. § 13–703(F)(6).

        3 Cases that cite this headnote

[44]    **Sentencing and Punishment**
        ⬤⎯Childhood or familial background
        **Sentencing and Punishment**
        ⬤⎯Other matters related to offender

        Mitigating evidence that defendant had
        long-standing problems with appearance and
        hygiene, that responsibilities were placed on him
        at young age, that he desired to improve himself,
        and that he had good record, was not sufficiently
        substantial to call for leniency sentence in
        sentencing for capital murder of five victims that
        were committed in especially cruel manner.

        9 Cases that cite this headnote

[45]    **Sentencing and Punishment**
        ⬤⎯Evidence in mitigation in general

        The fact-finder in capital cases must be able to
        consider all relevant mitigating evidence in
        deciding whether to give the death penalty.

        Cases that cite this headnote

[46]    **Sentencing and Punishment**
        ⬤⎯Aggravating or mitigating circumstances

        The aggravating factor for murders committed
        in "especially heinous, cruel or depraved"
        manner was unconstitutionally vague and
        overbroad. A.R.S. § 13–703(F)(6).

        1 Cases that cite this headnote

**Attorneys and Law Firms**

**208 Terry Goddard, Arizona Attorney General, By
Kent E. Cattani, Chief Counsel, Capital Litigation
Section, Patricia A. Nigro, Assistant Attorney General,
Phoenix, Attorneys for State of Arizona.

Susan M. Sherwin, Maricopa County Legal Advocate, By
Consuelo M. Ohanesian, Deputy Legal Advocate,
Phoenix, Attorneys for Cory Deonn Morris.

**\*329 OPINION**

McGREGOR, Chief Justice.

¶ 1 On July 19, 2005, a jury determined that Cory Morris
should be sentenced to death for the murders of Barbara
Codman, Shanteria Davis, Jade Velasquez, Sharon Noah,
and Julie Castillo. Appeal to this Court is automatic. Ariz.
R.Crim. P. 31.2.b. We have jurisdiction pursuant to

Article 6, Section 5, Clause 3 of the Arizona Constitution and Arizona Revised Statutes (A.R.S.) section 13–4031 (2001).


## I.

### A.

¶ 2 Morris lived in a camper in the backyard of his aunt and uncle's house in Phoenix and worked at a bar approximately three nights a week. In April 2003, Morris's boss noticed for the first time that Morris had a body odor problem. Morris's aunt and uncle also noticed that Morris had a body odor problem that had become progressively worse since he began living with them six months earlier.

¶ 3 On April 12, 2003, when Morris's uncle went to the camper to find Morris, he smelled a "rotten odor" in the backyard and saw flies inside the window of the camper. As he opened the door and stepped inside, he saw flies and maggots "boiling on the floor." He discovered the decomposed body of Julie Castillo under a blanket.

¶ 4 On the same day, police officers questioned Morris about the body in his camper, as well as four other bodies that had been found nearby. During this interview, Morris admitted to knowing the five victims and provided two versions of each victim's death. In the first version, he claimed that each victim died of a drug overdose while he was away from the camper. After discussing all five victims, the detective conducting the interview told Morris that he did not believe him. Morris then stated that each victim asked him to choke her during sex and that each accidentally died as a result of this conduct. Morris also claimed that he used a condom during sex with the victims. We discuss each victim in turn.


**\*\*209 \*330 1.**

¶ 5 On September 11, 2002, police discovered Barbara Codman's naked, decomposed body in an alley between East McKinley and East Pierce Streets and west of 9th Street. The alley is located just north of Morris's residence. Police found drag marks from the sidewalk crossing the alley into the alley itself. Codman's body exhibited skin slippage[1] on her inner thighs and breast, and her head and neck were more decomposed than the

rest of her body.

¶ 6 Morris said that he met Codman while walking at night and, for twenty dollars, she agreed to come to his camper and have sex with him. Morris first said that he went outside after he and Codman had sex and, when he returned, Codman was sitting naked on the bed using drugs. Morris told her to leave after she finished, and then he stepped outside. When he went back into the camper, Codman was sitting on the bed panting, and she soon collapsed. Morris dragged Codman out of the camper on a sleeping bag.

¶ 7 In his second version of events, Morris stated that Codman asked him to choke her with a necktie during sex. He did so, and she collapsed and never regained consciousness.

¶ 8 Morris kept some of Codman's belongings, including her overalls, panties, and purse. Analysts found Codman's DNA on some of the items. When Morris was arrested, he was carrying Codman's social security card, driver's license, and check card in his wallet.

¶ 9 Because of the extensive decomposition of Codman's head and neck, Dr. John Hu, who performed her autopsy, was unable to conduct a detailed investigation for trauma in that region. Hu originally determined that the cause of death was combined toxicity of morphine and cocaine and listed the manner of death as undetermined because the circumstances surrounding Codman's death were suspicious. After the police gave Hu a transcript of Morris's statements, he determined that "the cause of death is most likely asphyxia due to ligature strangulation" because the autopsy results were not inconsistent with such a determination.


### 2.

¶ 10 On October 10, 2002, police found Shanteria Davis's naked, decomposed body in the same alley in which Codman's body had been discovered. Davis had skin slippage on her back, buttocks, and the backs of her legs. Police found drag marks in the alley.

¶ 11 In his first version of events, Morris stated that, for five dollars, Davis agreed to come back to his camper and have sex with him. After they had sex, Morris left Davis alone in the camper for about an hour because she wanted to use drugs. When Morris returned, Davis was unconscious but breathing. Morris covered her and left for his friend's house. When he returned the next morning,

Davis was dead. That night, he dragged her into the alley.

¶ 12 In his second version of events, Morris stated that Davis asked him to wrap her hair extensions around her neck while they were having sex. Davis died as a result of this conduct.

¶ 13 Police found hair extensions in Morris's camper. DNA under Davis's fingernails matched Morris's DNA. DNA analysis on panties found in Morris's camper could not exclude Davis as a source of the DNA.

¶ 14 Because of the extent of decomposition, Dr. Kevin Horn, who performed Davis's autopsy, could not determine whether Davis suffered any trauma. Based on the lack of visible trauma and the presence of cocaine and cocaine breakdown products in her spleen, Horn determined that the cause of death was cocaine intoxication. After reviewing a transcript of Morris's statements to the police, Horn stated that nothing in his autopsy was inconsistent with strangulation.

### 3.

¶ 15 On February 27, 2003, police discovered the clothed body of Jade Velasquez on the west side of 9th Street, just outside the gate *331 **210 leading to the backyard where Morris's camper was located. Velasquez had ligature marks on the front and sides of her neck and bruising under her left eye. Police noted "some disturbance" in the ground near the gate to the backyard, which was consistent with removing the gate from its hinge and then replacing it. Police also noted grass scuff marks on the sidewalk, indicating that the body had been dragged. A detective spoke with Morris's aunt during the investigation of Velasquez's death.

¶ 16 Morris first stated that Velasquez, a friend, agreed to come to his camper for sex. He claimed that Velasquez was drunk when she arrived at the camper and passed out before having sex with him. According to Morris, he realized that Velasquez was dead when she did not wake up the next morning. He left for the day and moved her body to the street that night.

¶ 17 In his second version of events, Morris stated that Velasquez asked him to use his hands to choke her while they were having sex. Morris did so, and Velasquez passed out and never regained consciousness. Morris put Velasquez's clothes back on her before he dragged her to the street because he knew her and did not want to leave her in the street unclothed.

¶ 18 DNA from semen on a vaginal swab taken from Velasquez's body matched Morris's DNA profile. Dr. Vladimir Shvarts, who performed Velasquez's autopsy, found petechial hemorrhages in her left eye and focal hemorrhagic areas inside her neck and determined that the cause of death was strangulation. Velasquez's blood tested positive for alcohol, cocaine metabolites, and benzodiazepines, but the combination of drugs was not sufficient to cause death.

### 4.

¶ 19 On March 29, 2003, police found Sharon Noah's naked body on the west side of 9th Street, approximately fifteen to twenty feet from the location at which Velasquez's body was discovered. There were ligature marks on Noah's neck and skin slippage on her inner thighs, breasts, and hips. Some maggots were present on her body, and her hand and foot were mummified. Some of Noah's artificial fingernails were broken.

¶ 20 Morris first stated that he met Noah, who had the mental age of a ten- or eleven-year-old, while out walking, and the two then went back to his camper and had sex. Afterwards, Morris left because Noah wanted to use drugs. Noah was dead when he returned. Morris then put a belt around Noah's neck and pulled her body onto his sleeping bag. He dragged her body outside that night. He threw away most of her clothes but kept her shoes.

¶ 21 In his second version of events, Morris said that Noah suggested that he use the nylon strap attached to Morris's gym bag to choke her during sex. Morris did so, but when Morris's eyes closed, he stopped and noticed that she was no longer breathing. Morris left the strap on Noah's neck until he dragged her outside.

¶ 22 DNA on panties found in Morris's camper matched both Morris's and Noah's DNA profiles, and Morris's DNA profile matched DNA on a vaginal swab taken from Noah. Police also found broken fingernails in Morris's camper.

¶ 23 Noah's autopsy indicated that she died of ligature strangulation resulting in asphyxia. Toxicology reports showed that Noah had used cocaine before her death and that although she had GHB, which is often used in date rapes, in her system, drug overdose was not the cause of death. When asked how he would explain the extensive skin slippage on Noah's thighs, the medical examiner posited that some item may have contacted her thighs

postmortem.


5.

¶ 24 The body discovered in Morris's camper on April 12, 2003, was that of Julie Castillo. The badly decomposed body was face down and her buttocks were near the camper's fold-down bed. There was a necktie around her neck.

¶ 25 Morris first stated that he brought Castillo back to his camper because it was cold and she needed a place to spend the night. Morris left the camper after Castillo asked if she could smoke crack, and when he *332 **211 returned, Castillo was unconscious on the floor. He took her clothes off because she had urinated on herself. The next day, he went to work, and when he returned, he realized that Castillo was dead. Morris stayed in the camper that night. When the detective conducting the interview asked whether Morris engaged in any sexual activity while Castillo's body was in the camper, Morris stated that he ejaculated in his sleep but was facing away from Castillo's body at the time. Morris originally said that he never had sex with Castillo.

¶ 26 In his second version of events, Morris stated that Castillo asked him to choke her with a necktie during sex. Morris did so, and Castillo collapsed and never regained consciousness. Morris kept Castillo's body in his camper for approximately five days before it was discovered. He claimed that he had not been in the camper during the three days before the body's discovery.

¶ 27 Dr. Horn, who performed Castillo's autopsy, determined that Castillo had been dead "between three and seven" days at the time the body was found. Based on information from the detectives, Horn determined that the cause of death was "probable ligature strangulation." Because of the extensive decomposition, there was no visible evidence of trauma. Castillo had a blood alcohol content of 0.12, and also had traces of cocaine in her system. Additionally, seven defects measuring up to three-eighths of an inch radiated around Castillo's anus. Horn could not determine whether the defects resulted from trauma or normal decomposition.


B.

¶ 28 A grand jury indicted Morris for five counts of first

degree murder. During the guilt phase of the trial, the prosecution played videotapes of Morris's descriptions of each woman's death. Morris did not present a defense, but his counsel moved for acquittal on all counts pursuant to Arizona Rule of Criminal Procedure 20.a. The judge denied the motion. The jury then found Morris guilty on all five counts.

¶ 29 At the close of the aggravation phase of the trial, the jury unanimously found that Morris had been convicted of prior serious offenses, A.R.S. § 13–703.F.2 (Supp.2004), based on the five convictions from the guilt phase of the trial, and that he committed all five murders in both an "especially cruel" and "especially heinous or depraved" manner, id. § 13–703.F.6. With respect to the especially cruel prong, Dr. Keen testified that strangulation victims are conscious for at least a short period and experience pain before they lose consciousness. With respect to the heinous and depraved prong, the prosecutor argued that Morris kept the bodies after they began to decompose because he enjoyed the odor of decomposition. He also argued that Morris had sexual intercourse with all of the corpses except for Davis's. The prosecutor focused on the selective skin slippage on the bodies and the presence of semen on some of the victims despite Morris's insistence that he used condoms during sex.

¶ 30 In the penalty phase, Morris's mitigation evidence focused on the responsibilities placed on him at a young age; his problems with his appearance and hygiene, particularly his problems with body odor; his desire to improve himself; and his good work record.[2]

¶ 31 The jury determined that Morris's mitigation evidence was not sufficiently substantial to call for leniency and that death was the appropriate sentence for each of the five murders. See A.R.S. § 13–703.01.G, . H (Supp.2004).[3]


II.

¶ 32 Morris raises four issues on appeal. We first address his claim that the State presented insufficient evidence of the corpus delicti for the deaths of Codman and Davis. Next, we consider his claim that prescreening prospective jurors to determine which *333 **212 ones could serve for the length of the trial violated his right to be present at all stages of the criminal proceeding against him. We then address Morris's argument that the prosecutor engaged in misconduct. Finally, we evaluate the claim that the trial court abused its discretion in admitting excessively gruesome photographs.

**A.**

[1] [2] ¶ 33 Morris contends that the trial court erred in admitting his statements concerning the deaths of Codman and Davis because the State did not establish the corpus delicti for those murders. We review a ruling on the sufficiency of the evidence of corpus delicti for abuse of discretion. *State v. Gerlaugh*, 134 Ariz. 164, 169–70, 654 P.2d 800, 805–06 (1982); *see also State v. Gillies*, 135 Ariz. 500, 505–06, 662 P.2d 1007, 1012–13 (1983).

[3] [4] [5] [6] ¶ 34 The corpus delicti doctrine ensures that a defendant's conviction is not based upon an uncorroborated confession or incriminating statement. *State v. Hall*, 204 Ariz. 442, 453 ¶ 43, 65 P.3d 90, 101 (2003) (citing *Smith v. United States*, 348 U.S. 147, 152, 75 S.Ct. 194, 99 L.Ed. 192 (1954)). Therefore, the State must show that the "alleged injury to the victim ... was caused by criminal conduct rather than by suicide or accident." *Id.* "[O]nly a reasonable inference of the corpus delicti need exist" before incriminating statements may be considered, and circumstantial evidence can support such an inference. *Id.* (quoting *Gillies*, 135 Ariz. at 506, 662 P.2d at 1013). Furthermore, the State need not present evidence supporting the inference of corpus delicti before it submits the defendant's statements "[a]s long as the State ultimately submits adequate proof of the *corpus delicti* before it rests." *Id.* (quoting *State v. Jones ex rel. County of Maricopa*, 198 Ariz. 18, 23 ¶ 14, 6 P.3d 323, 328 (App.2000)). The corpus delicti doctrine does not require the State to prove the cause of death. *State v. Atwood*, 171 Ariz. 576, 598–99, 832 P.2d 593, 615–16 (1992), *disapproved on other grounds by State v. Nordstrom*, 200 Ariz. 229, 241 ¶ 25, 25 P.3d 717, 729 (2001).

¶ 35 Here, sufficient evidence independent of Morris's incriminating statements establishes corpus delicti for the deaths of both Codman and Davis. Both died under suspicious circumstances and were discovered naked in the same alley. Drag marks near both bodies indicated that they had been moved. DNA on panties and overalls found in Morris's camper matched Codman's DNA, DNA on panties found in the camper matched Davis's DNA, and Davis had Morris's DNA under her fingernails. Hair extensions similar to Davis's were found in the camper. Morris was carrying Codman's driver's license, social security card, and check card when he was arrested.

¶ 36 Morris argues that, despite the other evidence that these two deaths resulted from criminal conduct, the State

cannot establish corpus delicti because the medical examiners believed that both deaths resulted from drug overdoses before police gave them transcripts of Morris's statements. The State, however, need not prove cause of death to establish corpus delicti. *See id.* Instead, the State need only present evidence sufficient to raise a "reasonable inference" that the death resulted from criminal activity. *Hall*, 204 Ariz. at 453 ¶ 43, 65 P.3d at 101 (quoting *Gillies*, 135 Ariz. at 506, 662 P.2d at 1013). Given the evidence here, the State met its burden even if we disregard the medical examiners' testimony.[4] Therefore, the trial court did not abuse its discretion in admitting Morris's statements as to the deaths of Codman and Davis.

**B.**

¶ 37 We next consider whether Morris's absence during the jury commissioner's prescreening *334 **213 of prospective jurors to determine whether they could serve on a lengthy trial violated his right to be present at all stages of the criminal proceeding. Because the trial was expected to last six to eight weeks, the judge ordered the jury commissioner to poll the jurors to identify those who claimed that they could not serve for such a long trial. The jury commissioner gave those jurors one-page questionnaires on which they could state the reasons for their inability to serve. The lawyers then reviewed the questionnaires for potentially invalid excuses and submitted those questionnaires to the judge for further review.

¶ 38 After reviewing the questionnaires, the judge determined that approximately twenty prospective jurors had provided questionable excuses. When he asked the jury commissioner to send those twenty individuals to the courtroom for further questioning, the jury commissioner informed him that only four of the twenty were available. The jury commissioner had released the remaining sixteen to other panels.

[7] ¶ 39 Defense counsel admitted that he could not identify any group excluded from service or show that the jury did not represent a cross-section of the community, but objected to the prescreening procedure because it left only "volunteers" as prospective jurors. The trial judge rejected this challenge.

[8] [9] ¶ 40 Although a "defendant in a criminal case is entitled to a fair and impartial jury for the trial of his case, ... he is not entitled to be tried by any particular jury." *Atwood*, 171 Ariz. at 624, 832 P.2d at 641 (quoting *State*

*v. Arnett*, 119 Ariz. 38, 50, 579 P.2d 542, 554 (1978)). To make a prima facie showing that a jury does not represent a fair cross-section of the community, a defendant must show each of the following:

> (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*Duren v. Missouri*, 439 U.S. 357, 364, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979).

¶ 41 Morris has neither identified a distinctive group that was excluded from his jury panel nor claimed that the jury he received was not fair and impartial. Therefore, he has failed to satisfy even the first prong of *Duren. See State v. Wooten*, 193 Ariz. 357, 361–62 ¶¶ 20–24, 972 P.2d 993, 997–98 (App.1998) (rejecting claims that a jury commissioner's prescreen of prospective jurors for length of the trial excluded poor and minority jurors because the defendant failed to satisfy any of the *Duren* prongs).

[10] ¶ 42 Moreover, jury commissioners have broad discretion to excuse jurors from service:

> If a person's answers to a questionnaire indicate that the person is unqualified for jury service or, in the opinion of the judge or *jury commissioner*, state grounds sufficient to be excused from jury service, the person's name shall not be included on the qualified juror list and the person shall be notified that he is excused from jury service.

A.R.S. § 21–315.A (Supp.2006) (emphasis added); *see also Wooten*, 193 Ariz. at 362–63 ¶¶ 25–26, 972 P.2d at 998–99 (rejecting defendant's claim that jury commissioner's prescreening of prospective jurors violated his due process rights based in part on the jury commissioner's broad statutory power to excuse jurors from service). Because the jury commissioner decided to excuse prospective jurors solely on the basis of their ability to serve on a lengthy trial, a neutral criterion, he

properly exercised his discretion. *See State v. Murray*, 184 Ariz. 9, 23–24, 906 P.2d 542, 556–57 (1995) (noting that "[g]ranting excuses based on the application of neutral criteria to prospective jurors' individual situations" is a proper exercise of the jury commissioner's discretion (quoting *State v. Sanderson*, 182 Ariz. 534, 539, 898 P.2d 483, 488 (App.1995))).

¶ 43 Even if Morris could show that certain prospective jurors were wrongly excused, we would not reverse his convictions unless he **\*335 \*\*214** could also show actual prejudice, i.e., that the jurors who actually served were not fair and impartial. *State v. Webb*, 101 Ariz. 307, 309, 419 P.2d 91, 93 (1966); *State v. Fendler*, 127 Ariz. 464, 470–71, 622 P.2d 23, 29–30 (App.1980) (extending "actual prejudice" doctrine to excusals by jury commissioner). Because Morris is unable to demonstrate any actual prejudice resulting from the jury commissioner's prescreening of prospective jurors, his challenge fails.

[11] [12] ¶ 44 Morris argues that his exclusion from the prescreening process violates his right to be present at all stages of the proceeding against him. We have previously held that exclusion from the entire jury selection process is structural error, but in so holding we noted that exclusion from a "minor portion" of jury selection proceedings may be harmless error. *State v. Garcia–Contreras*, 191 Ariz. 144, 148 ¶ 17, 953 P.2d 536, 540 (1998) (quoting *State v. Ayers*, 133 Ariz. 570, 571, 653 P.2d 27, 28 (App.1982)). "An error is harmless if it appears 'beyond a reasonable doubt that the error ... did not contribute to the verdict obtained.' " *State v. Dann*, 205 Ariz. 557, 565 ¶ 18, 74 P.3d 231, 239 (2003) (quoting *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)).

¶ 45 Here, Morris attended all aspects of jury selection except the prescreening process, which focused solely on the length of the trial and did not involve questioning the jurors about the facts or legal issues of the case. Thus, even assuming that he was entitled to attend the prescreening process, an issue we do not reach, any error is harmless because no basis exists on which we could conclude that Morris's exclusion from that process affected the verdict.

## C.

[13] [14] [15] ¶ 46 Morris next identifies five instances of alleged prosecutorial misconduct. "To prevail on a claim of prosecutorial misconduct, a defendant must

State v. Morris, 215 Ariz. 324 (2007)
160 P.3d 203, 506 Ariz. Adv. Rep. 14

demonstrate that the prosecutor's misconduct 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' " *State v. Hughes,* 193 Ariz. 72, 79 ¶ 26, 969 P.2d 1184, 1191 (1998) (quoting *Donnelly v. DeChristoforo,* 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)). The misconduct must be "so pronounced and persistent that it permeates the entire atmosphere of the trial." *Id.* (quoting *Atwood,* 171 Ariz. at 611, 832 P.2d at 628). Prosecutorial misconduct constitutes reversible error only if (1) misconduct exists and (2) "a reasonable likelihood exists that the misconduct could have affected the jury's verdict, thereby denying defendant a fair trial." *State v. Anderson* (*Anderson II* ), 210 Ariz. 327, 340 ¶ 45, 111 P.3d 369, 382 (quoting *Atwood,* 171 Ariz. at 606, 832 P.2d at 623), *cert. denied,* 546 U.S. 895, 126 S.Ct. 193, 163 L.Ed.2d 211 (2005).

[16] [17] ¶ 47 We evaluate each instance of alleged misconduct, and the standard of review depends upon whether Morris objected. If he objected, then the issue is preserved for review under the standard articulated in *Anderson II. Id.* at 340–41 ¶ 45, 111 P.3d at 382–83. If Morris did not object, then we review only for fundamental error. *State v. Roque,* 213 Ariz. 193, 228 ¶ 154, 141 P.3d 368, 403 (2006). We also address the cumulative effect of misconduct:

[E]ven if there [is] no error or an error [is] harmless and so by itself does not warrant reversal, an incident may nonetheless contribute to a finding of persistent and pervasive misconduct if the cumulative effect of the incidents shows that the prosecutor intentionally engaged in improper conduct and "did so with indifference, if not a specific intent, to prejudice the defendant."

*Id.* at ¶ 155 (citation omitted) (quoting *Hughes,* 193 Ariz. at 80 ¶ 31, 969 P.2d at 1192).

## 1.

[18] ¶ 48 Morris argues that the prosecutor improperly influenced the medical examiners investigating the deaths of Codman and Davis by providing them copies of the statements Morris made to the police. Dr. Hu, who performed Codman's autopsy, and Dr. Horn, who performed Davis's autopsy, originally determined that the cause of death for each woman was drug overdose. After police provided them transcripts of Morris's statements regarding the deaths, the medical *336 **215 examiners testified that they found nothing inconsistent with

asphyxiation due to strangulation as the cause of death for both women. Morris did not object at trial, so we review for fundamental error. *Id.* at ¶ 154.

¶ 49 Arizona statutes permit medical examiners to receive information about the circumstances surrounding a suspicious death. Arizona Revised Statutes section 11–593.B (2001) requires a peace officer to report the results of "an investigation of the facts and circumstances surrounding [a suspicious] death" to the county medical examiner. Moreover, the medical examiner is statutorily required to "[m]ake inquiries regarding the cause and manner of death." A.R.S. § 11–594.A.4 (2001); *see also id.* § 11–594.A.2. The prosecutor did not, therefore, engage in misconduct by giving transcripts of Morris's statements to the medical examiners. Moreover, the record does not suggest that Morris's statements improperly influenced either of the medical examiners. Both testified simply that they found nothing inconsistent with those statements in their respective autopsies of Codman and Davis, and they acknowledged that, without the statements, they would have believed that drug intoxication caused the deaths. Therefore, this incident does not constitute prosecutorial misconduct.

## 2.

[19] ¶ 50 In the aggravation phase, the prosecutor argued that Morris murdered the victims in order to have sexual intercourse with their corpses. Morris claims that this argument had no basis in fact. Morris failed to object to the argument at trial, so we review for fundamental error. *Roque,* 213 Ariz. at 228 ¶ 154, 141 P.3d at 403.

[20] [21] [22] ¶ 51 Prosecutors have "wide latitude" in presenting their arguments to the jury. *State v. Jones,* 197 Ariz. 290, 305 ¶ 37, 4 P.3d 345, 360 (2000). The prosecutor is permitted to argue "all reasonable inferences from the evidence," but cannot "make insinuations that are not supported by the evidence." *Hughes,* 193 Ariz. at 85 ¶ 59, 969 P.2d at 1197. In evaluating the propriety of a prosecutor's arguments, we consider "whether the remarks called to the jurors' attention matters that they should not consider, and whether, 'under the circumstances of the particular case, [the remarks] probably influenced' the jurors." *Roque,* 213 Ariz. at 224 ¶ 128, 141 P.3d at 399 (alteration in original) (quoting *Sullivan v. State,* 47 Ariz. 224, 238, 55 P.2d 312, 317 (1936)).

¶ 52 While the evidence in this case does not compel the conclusion that Morris engaged in intercourse with the

State v. Morris, 215 Ariz. 324 (2007)
160 P.3d 203, 506 Ariz. Adv. Rep. 14

corpses of the victims, the record includes sufficient evidence to permit the prosecutor to make such an argument.[5] The prosecutor relied in part on skin slippage on selective parts of the victims' bodies as evidence that Morris engaged in intercourse with the corpses. Selective skin slippage existed on Codman's inner thighs and breast and on Noah's inner thighs. The medical examiners testified that skin slippage can result from friction and the general decomposition process.

¶ 53 The prosecutor also relied on the skin defects on Castillo's anus, although the medical examiner was unable to determine whether those defects were caused by trauma or decomposition. In his statement to police, Morris also mentioned that he either masturbated or ejaculated in his sleep after Castillo died but while she was still in his camper. Castillo's buttocks were level with Morris's bed.

¶ 54 Additionally, the prosecutor relied on DNA evidence showing Morris's semen was present in Velasquez's and Noah's vaginas, even though Morris insisted that he wore a condom during sex with the women before their deaths. Thus, the proposition that Morris had intercourse with the corpses of Codman, Velasquez, Noah, and Castillo is a "reasonable inference" to be drawn from the evidence in the record, and the prosecutor did not act improperly in making this argument.

[23] ¶ 55 Furthermore, the judge instructed the jury that the lawyers' arguments were not evidence to be considered in *337 **216 reaching its conclusions. See State v. Newell, 212 Ariz. 389, 403 ¶¶ 67–68, 132 P.3d 833, 847 (holding that jury instructions stating that closing arguments are not evidence negated improper comments of prosecutor), cert. denied, 549 U.S. 1056, 127 S.Ct. 663, 166 L.Ed.2d 521 (2006); Anderson II, 210 Ariz. at 342 ¶ 50, 111 P.3d at 384 (holding that jury instructions that the lawyer's statements are not evidence cured the prosecutor's misstatement of the law). Jurors are presumed to follow the judge's instructions. Newell, 212 Ariz. at 403 ¶ 68, 132 P.3d at 847. Therefore, we presume that the jurors reached their own conclusions regarding the strength of the evidence. Even if the prosecutor's comments were improper, the judge's instructions negated their effect.

¶ 56 Finally, the prosecutor's arguments were directed only toward establishing the "heinous or depraved" prong of the F.6 aggravator. Because the jury determined that each murder was committed in an especially cruel manner and because a finding of cruelty alone is sufficient to establish the F.6 aggravator, see infra ¶¶ 61, 79–80, the prosecutor's arguments were, at worst, harmless error.

**3.**

[24] ¶ 57 Morris also argues that, during rebuttal to defense counsel's closing argument in the aggravation phase, the prosecutor invited jurors to put themselves in the place of the victims and singled out specific jurors based on appearance and gender. The prosecutor made the challenged comments while responding to defense counsel's argument that the jurors could not determine whether the victims suffered because they were intoxicated when they were killed. Defense counsel did not object to these statements, so we review for fundamental error. Roque, 213 Ariz. at 228 ¶ 154, 141 P.3d at 403.

[25] ¶ 58 A prosecutor has wide latitude in presenting arguments to the jury, including commenting on the "vicious and inhuman nature of the defendant's acts," but cannot make arguments that appeal to the fears or passions of the jury. State v. Comer, 165 Ariz. 413, 426, 799 P.2d 333, 346 (1990). Although the State argues that the prosecutor simply asked the jurors to apply common sense to the factual situation before them, the prosecutor's remarks did far more than make that request. Instead, the prosecutor singled out particular jurors and addressed them personally,[6] playing on their sympathy for the victims and fears of the defendant. Such remarks constitute misconduct.

[26] [27] ¶ 59 Because Morris did not object, however, we must determine whether this misconduct constitutes fundamental error. Morris bears the burden of persuasion and must "establish both that fundamental error exists and that the error in his case caused him prejudice." State v. Henderson, 210 Ariz. 561, 567 ¶ 20, 115 P.3d 601, 607 (2005). Fundamental error is "error going to the foundation of the case, error that takes from the defendant a right essential to his defense, and error of such magnitude that the defendant could not possibly have received a fair trial." Id. at ¶ 19 (quoting State *338 **217 v. Hunter, 142 Ariz. 88, 90, 688 P.2d 980, 982 (1984)).

¶ 60 The prosecutor's comments here do not constitute fundamental error. Morris has not shown that this isolated incident of impropriety denied him a fair trial or deprived him of a right essential to his defense.

¶ 61 Additionally, Morris cannot establish prejudice. The prosecutor's argument was directed toward proof of cruelty. To prove that a murder was "especially cruel" under A.R.S. § 13–703.F.6, the State must show that the

State v. Morris, 215 Ariz. 324 (2007)
160 P.3d 203, 506 Ariz. Adv. Rep. 14

victim was conscious and suffered physical pain or mental anguish during at least some portion of the crime and that the defendant knew or should have known that the victim would suffer. *State v. Trostle*, 191 Ariz. 4, 18, 951 P.2d 869, 883 (1997). Here, independent of the prosecutor's improper argument, the State presented overwhelming evidence of cruelty. The medical examiner testified that all of the victims would have experienced pain for some period before losing consciousness. Moreover, the evidence suggests that at least three of the victims struggled with Morris before losing consciousness: Morris's DNA was under Davis's fingernails, Noah's fingernails were broken, and the side of Velasquez's face was bruised. Morris has not met his burden of showing that the argument caused prejudice.

#### 4.

[28] ¶ 62 Morris next argues that the prosecutor committed misconduct during the guilt phase when he introduced Castillo's jacket solely to inflame the jury. The prosecutor admitted his misconduct, Morris argues, when he told the jury during his closing argument that he had offered the jacket for the jury's "smelling pleasure."[7] Defense counsel did not object during the prosecution's statement, but did discuss the comment during his closing argument, noting that the odor on the jacket resulted in part from storing the jacket in a bag for a long period. Because defense counsel did not object to the prosecutor's comments, we review for fundamental error. *Roque*, 213 Ariz. at 228 ¶ 154, 141 P.3d at 403.

¶ 63 The prosecutor originally introduced the jacket to show that it belonged to Castillo. During the testimony of a police officer who investigated the scene of Castillo's death, the prosecutor introduced a booking photograph of Castillo wearing the jacket and then asked the officer to remove the jacket from its plastic bag and hold it up. The prosecutor quickly asked the detective to return the jacket to the bag. There was no misconduct in introducing the jacket into evidence.

¶ 64 At worst, the offhand "smelling pleasure" comment was inappropriate. It does not, however, rise to the level of fundamental error because this single remark did not deprive Morris of a fair trial. Moreover, overwhelming evidence established that the strong odor associated with the jacket resulted from its close proximity to Castillo's badly decomposed body. Given this evidence, Morris cannot establish that the prosecutor's comment resulted in prejudice.

#### 5.

[29] ¶ 65 Finally, Morris notes that on June 15, 2005, during the guilt phase of the trial, the prosecutor kept on his table, in view of the jury, an excluded photograph showing a maggot infestation. During a bench conference with the judge on another matter, defense counsel objected and the court ordered the prosecutor to move the photograph from the jury's view. The prosecutor did so. Because of the objection, Morris preserved this incident of alleged prosecutorial misconduct. *Id.*

¶ 66 Nothing in the record indicates that any juror actually saw the challenged photograph *339 **218 Defense counsel did not ask the trial judge to determine whether any jurors had seen the photograph or to instruct the jurors to disregard it. The prosecutor complied with the judge's order to remove the photograph from view, and nothing indicates that he intentionally left it on his desk or that he repeated this conduct at any other point in the trial. Given these circumstances, this incident does not constitute misconduct requiring reversal.

#### 6.

¶ 67 We finally consider whether "persistent and pervasive" misconduct occurred and whether the "cumulative effect of the incidents shows that the prosecutor intentionally engaged in improper conduct and 'did so with indifference, if not a specific intent, to prejudice the defendant.' " *Id.* at ¶ 155 (quoting *Hughes*, 193 Ariz. at 80 ¶ 31, 969 P.2d at 1192). Because Morris has described only one incident of misconduct, we cannot conclude that the prosecutor engaged in "persistent and pervasive" misconduct. Moreover, given the overwhelming evidence of Morris's guilt and of the cruelty of the murders, the challenged remarks by the prosecutor did not prejudice Morris.

#### D.

[30] ¶ 68 Morris also claims that the trial judge abused his discretion by allowing the State to introduce excessively gruesome photographs of the bodies throughout the trial. Morris argues that the photographs had no evidentiary value because they did not show the cause of death or the identity of the victims.

State v. Morris, 215 Ariz. 324 (2007)

160 P.3d 203, 506 Ariz. Adv. Rep. 14

[31] [32] ¶ 69 We review a trial judge's decision to admit photographs for abuse of discretion. *State v. Hampton*, 213 Ariz. 167, 173 ¶ 17, 140 P.3d 950, 956 (2006), *cert. denied*, 549 U.S. 1132, 127 S.Ct. 972, 166 L.Ed.2d 738 (2007). We look to three factors to determine whether the trial judge erred in admitting the photographs: "the photograph's relevance, its tendency to inflame the jury, and its probative value compared to its potential to cause unfair prejudice." *Id.*

[33] [34] [35] [36] ¶ 70 Photographs of a victim's body are always relevant because "the fact and cause of death are always relevant in a murder prosecution." *State v. Spreitz*, 190 Ariz. 129, 142, 945 P.2d 1260, 1273 (1997) (quoting *State v. Chapple*, 135 Ariz. 281, 288, 660 P.2d 1208, 1215 (1983)). Additionally, photographs of a victim's body may be introduced

> to prove the corpus delicti, to identify the victim, to show the nature and location of the fatal injury, to help determine the degree or atrociousness of the crime, to corroborate state witnesses, to illustrate or explain testimony, and to corroborate the state's theory of how and why the homicide was committed.

*Chapple*, 135 Ariz. at 288, 660 P.2d at 1215. If, however, the photographs have "no tendency to prove or disprove any question which is actually contested, they have little use or purpose except to inflame and would usually not be admissible." *Id.* Gruesome or inflammatory photographs may be admitted, but if they are "admitted for the sole purpose of inflaming the jury, [the Court] will reverse on appeal." *Gerlaugh*, 134 Ariz. at 169, 654 P.2d at 805.

¶ 71 None of the photographs to which Morris specifically objects on appeal, all of which are of Noah's body, are gruesome.⁸ Four show Noah's hands or feet and one shows her nude body from a distance. All of the photographs provide information about the time and manner of death or otherwise corroborate the State's case. *See Anderson II*, 210 Ariz. at 340 ¶ 41, 111 P.3d at 382 (holding that photographs showing extensive decomposition, including skin slippage, bloating, and discoloration were relevant to "corroborate the State's theory of the case"). Moreover, the trial judge carefully analyzed each photograph for purposes of Arizona Rule of Evidence 403⁹ and determined that **\*340 \*\*219** any prejudicial effect did not substantially outweigh the probative value. On this record, we cannot conclude that

the trial judge abused his discretion in admitting the photographs.

### III.

¶ 72 If a jury imposes the death penalty for murders committed before August 1, 2002, this Court independently reviews the jury's findings of aggravating and mitigating circumstances and the propriety of the death sentence. A.R.S. § 13–703.04 (Supp.2006); 2002 Ariz. Sess. Laws 2092, 2099, 5th Spec. Sess., ch. 1, § 7.B (noting that A.R.S. § 13–703.04 applies to offenses committed before August 1, 2002). For capital offenses committed on or after August 1, 2002, however, the Court no longer conducts independent review. *See* 2002 Ariz. Sess. Laws 2092, 2099, 5th Spec. Sess., ch. 1, § 7.C (noting that A.R.S. § 13–703.05 is effective on August 1, 2002 and applies to offenses committed on or after that date). Instead, A.R.S. § 13–703.05 (Supp.2006), which the legislature adopted as part of a larger bill addressing the constitutional defects of Arizona's capital sentencing scheme in light of *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), governs our review of these cases. *See* 2002 Ariz. Sess. Laws 2092, 2099, 5th Spec. Sess., ch. 1, § 9.A.1. Because Morris committed all five murders after August 1, 2002, we follow the standard of review set out in section 13–703.05.

### A.

[37] ¶ 73 Section 13–703.05 states:

> A. The supreme court shall review all death sentences to determine whether the trier of fact abused its discretion in finding aggravating circumstances and imposing a sentence of death.

> B. If the supreme court determines that an error occurred in the sentencing proceedings, the supreme court shall determine whether the error was harmless beyond a reasonable doubt. If the supreme court cannot determine whether the error was harmless beyond a reasonable doubt, the supreme court shall remand the case for a new sentencing proceeding.

[38] [39] ¶ 74 This is the first case in which we consider our role under section 13–703.05. The primary goal of statutory interpretation is to effect the intent of the legislature. *State v. Williams*, 175 Ariz. 98, 100, 854 P.2d 131, 133 (1993). If the language of a statute is plain and

unambiguous, we look no further. *Id.*

¶ 75 Other than his claim of persistent and pervasive prosecutorial misconduct, Morris raises no challenges to the aggravation or penalty phases of his trial. We must therefore initially determine whether the statute requires us to review the sentencing portion of the trial even when a defendant fails to raise issues related to those matters.

¶ 76 The statute provides that this Court "*shall review all* death sentences" under the abuse of discretion standard. A.R.S. § 13–703.05.A (emphasis added). Because the statute contains mandatory language, we conclude that we are required to determine whether the jury abused its discretion, even though Morris failed to challenge the jury's decision with regard to either the aggravating factors or the imposition of the death sentences.[10] *See, e.g., Ins. Co. of N. Am. v. Superior Court,* 166 Ariz. 82, 85, 800 P.2d 585, 588 (1990) (noting that "shall" is presumably mandatory).

### B.

[40] ¶ 77 Because we conclude that the statute mandates our review, we first consider *341 **220 whether the jury abused its discretion in finding the aggravating circumstances. Under this standard of review, we uphold a decision if there is "any reasonable evidence in the record to sustain it." *State v. Veatch,* 132 Ariz. 394, 396, 646 P.2d 279, 281 (1982). Here, the jury found that the State proved two aggravators beyond a reasonable doubt: Morris committed prior serious offenses, A.R.S. § 13–703.F.2, and Morris committed each of the murders in an especially heinous, cruel or depraved manner, *id.* § 13–703.F.6.

[41] ¶ 78 The jury did not abuse its discretion in finding the F.2 aggravator. The State properly used the multiple murder convictions from the guilt phase as prior serious offenses. *See id.* § 13–703.F.2 ("Convictions for serious offenses ... not committed on the same occasion but consolidated for trial with the homicide ... shall be treated as a serious offense under this paragraph."). Certainly, reasonable evidence supports the jury's decision that the State proved the F.2 aggravator.

[42] ¶ 79 We likewise conclude that the jury did not abuse its discretion in finding that the State proved the F.6 aggravator beyond a reasonable doubt. The jury made separate findings that the State had proved (1) cruelty and (2) heinousness or depravity. As noted earlier, the State establishes especial cruelty by showing that a victim was

conscious and suffered physical pain or mental anguish before death and that the defendant knew or should have known that the victim would suffer. *Trostle,* 191 Ariz. at 18, 951 P.2d at 883. With respect to the cruelty prong, the State presented expert evidence that strangulation victims remain conscious and experience pain for at least some period of time. Additionally, the State presented evidence that Davis, Velasquez, and Noah struggled with Morris. Therefore, the evidence in the record supports the jury's finding of cruelty in each of the five murders.

[43] ¶ 80 A finding of cruelty alone is sufficient to establish the F.6 aggravator. We therefore need not address whether the jury abused its discretion in finding that the murders were also heinous or depraved. *Cf. Newell,* 212 Ariz. at 405–06 ¶¶ 84–85, 132 P.3d at 849–50 (noting, during independent review, that a finding of cruelty alone establishes the F.6 aggravator).

### C.

[44] ¶ 81 The statute also directs us to consider whether the jury abused its discretion when it imposed a sentence of death for each of the murders. Although Morris presented mitigation evidence, the jury necessarily determined that it was not sufficiently substantial to call for leniency. *See* A.R.S. § 13–703.E (noting that the trier of fact imposes a death sentence if it finds at least one aggravating circumstance and determines that the mitigating circumstances are not "sufficiently substantial to call for leniency"). The decision to impose the death penalty once the jury finds aggravating factors is a matter for each individual juror to consider. *See id.* § 13–703.C (stating that "[e]ach juror may consider any mitigating circumstance found by that juror in determining the appropriate penalty"). Therefore, we will not reverse the jury's decision so long as any reasonable jury could have concluded that the mitigation established by the defendant was not sufficiently substantial to call for leniency.

¶ 82 Here, Morris presented mitigation evidence relating to long-standing problems with his appearance and hygiene, the responsibilities placed on him at a young age, his desire to improve himself, and his good work record. Given the nature and strength of the aggravating factors for each murder, a reasonable jury could have determined that this mitigation evidence was not sufficiently substantial to call for leniency. Therefore, we cannot say that the jury abused its discretion in imposing death sentences for each of the murders.

State v. Morris, 215 Ariz. 324 (2007)
160 P.3d 203, 506 Ariz. Adv. Rep. 14

## IV.

¶ 83 For purposes of federal review, Morris raises the following fourteen challenges to the constitutionality of Arizona's death penalty scheme. He concedes that this Court has previously rejected these arguments.

[45] ¶ 84 (1) The fact-finder in capital cases must be able to consider *all* relevant *342 **221 mitigating evidence in deciding whether to give the death penalty. *See Woodson v. North Carolina*, 428 U.S. 280, 304, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976). The trial court's failure to allow the jury to consider and give effect to *all* mitigating evidence in this case by limiting its consideration to that proven by a preponderance of the evidence is unconstitutional under the Eighth and Fourteenth Amendments. We rejected this argument in *State v. McGill*, 213 Ariz. 147, 161 ¶ 59, 140 P.3d 930, 944 (2006), *cert. denied*, 549 U.S. 1324, 127 S.Ct. 1914, 167 L.Ed.2d 570 (2007). *See also State v. Medina*, 193 Ariz. 504, 514–15 ¶ 43, 975 P.2d 94, 104–05 (1999).

¶ 85 (2) The State's failure to allege an element of the charged offense in the grand jury indictment-the aggravating factors that made Morris death eligible-is a fundamental defect that renders the indictment constitutionally defective because it violates the Fifth, Sixth, Eighth, and Fourteenth Amendments and Article 2, Sections 1, 4, 13, 15, 23, and 24 of the Arizona Constitution. We rejected this argument in *McKaney v. Foreman ex rel. County of Maricopa*, 209 Ariz. 268, 273 ¶ 23, 100 P.3d 18, 23 (2004).

[46] ¶ 86 (3) The F.6 "especially heinous, cruel or depraved" aggravating factor is unconstitutionally vague and overbroad because the jury does not have enough experience or guidance to determine when the aggravator is met. The finding of this aggravator by a jury violates the Eighth and Fourteenth Amendments and it does not sufficiently place limits on the discretion of the sentencing body, the jury, which has no "narrowing constructions" to draw from and give "substance" to the otherwise facially vague law. We rejected this argument in *State v. Cromwell*, 211 Ariz. 181, 188–90 ¶¶ 38–45, 119 P.3d 448, 455–57 (2005), *cert. denied*, 547 U.S. 1151, 126 S.Ct. 2291, 164 L.Ed.2d 819 (2006), and *Anderson II*, 210 Ariz. at 353 ¶ 114, 111 P.3d at 395.

¶ 87 (4) By allowing victim impact evidence at the penalty phase of the trial, the trial court violated Morris's constitutional rights under the Fifth, Sixth, Eighth and Fourteenth Amendments and Article 2, Sections 1, 4, 13, 15, 23, and 24 of the Arizona Constitution. We rejected challenges to the use of victim impact evidence in *Lynn v. Reinstein*, 205 Ariz. 186, 191 ¶¶ 16–17, 68 P.3d 412, 417 (2003).

¶ 88 (5) The trial court improperly omitted from the penalty phase jury instructions language to the effect that the jury may consider mercy or sympathy in deciding the value to assign the mitigation evidence, instead telling the jury to assign whatever value it deemed appropriate. The court also instructed the jury that they "must not be influenced by mere sympathy or by prejudice in determining these facts." These instructions limited the mitigation the jury could consider in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments and Article 2, Sections 1, 4, 15, 23, and 24 of the Arizona Constitution. We rejected this argument in *State v. Carreon*, 210 Ariz. 54, 70–71 ¶¶ 81–87, 107 P.3d 900, 916–17, *cert. denied*, 546 U.S. 854, 126 S.Ct. 122, 163 L.Ed.2d 129 (2005).

¶ 89 (6) The death penalty is cruel and unusual under any circumstances and violates the Eighth and Fourteenth Amendments, and Article 2, Section 15 of the Arizona Constitution. This Court and the United States Supreme Court have rejected this argument. *Gregg v. Georgia*, 428 U.S. 153, 186–87, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); *State v. Harrod*, 200 Ariz. 309, 320 ¶ 59, 26 P.3d 492, 503 (2001), *vacated on other grounds*, 536 U.S. 953, 122 S.Ct. 2653, 153 L.Ed.2d 830 (2002) (mem.).

¶ 90 (7) The death penalty is irrational and arbitrarily imposed; it serves no purpose that is not adequately addressed by life in prison, in violation of the defendant's right to due process under the Fourteenth Amendment to the United States Constitution and Article 2, Sections 1 and 4 of the Arizona Constitution. We rejected these arguments in *State v. Smith*, 203 Ariz. 75, 82 ¶¶ 35–36, 50 P.3d 825, 832 (2002), and *State v. Beaty*, 158 Ariz. 232, 247, 762 P.2d 519, 534 (1988).

¶ 91 (8) The prosecutor's discretion to seek the death penalty has no standards and therefore violates the Eighth and Fourteenth Amendments, and Article 2, Sections 1, 4, and 15 of the Arizona Constitution. We rejected *343 **222 this argument in *State v. Sansing*, 200 Ariz. 347, 361 ¶ 46, 26 P.3d 1118, 1132 (2001), *vacated on other grounds*, 536 U.S. 954, 122 S.Ct. 2654, 153 L.Ed.2d 830 (2002) (mem.). *See also State v. Finch*, 202 Ariz. 410, 419 ¶ 50, 46 P.3d 421, 430 (2002).

¶ 92 (9) Arizona's death penalty is applied so as to discriminate against poor, young, and male defendants in violation of Article 2, Sections 1, 4, and 13 of the Arizona Constitution. We rejected this argument in *Sansing*, 200 Ariz. at 361 ¶ 46, 26 P.3d at 1132. *See also State v. Stokley*, 182 Ariz. 505, 516, 898 P.2d 454, 465 (1995).

State v. Morris, 215 Ariz. 324 (2007)
160 P.3d 203, 506 Ariz. Adv. Rep. 14

¶ 93 (10) Proportionality review serves to identify which cases are above the "norm" of first degree murder, thus narrowing the class of defendants who are eligible for the death penalty. The absence of proportionality review of death sentences by Arizona courts denies capital defendants due process of law and equal protection and amounts to cruel and unusual punishment in violation of the Fifth, Eighth, and Fourteenth Amendments, and Article 2, Section 15 of the Arizona Constitution. We rejected this argument in *State v. Gulbrandson,* 184 Ariz. 46, 73, 906 P.2d 579, 606 (1995). *See also State v. Salazar,* 173 Ariz. 399, 417, 844 P.2d 566, 584 (1992).

¶ 94 (11) Arizona's capital sentencing scheme is unconstitutional because it does not require the State to prove the death penalty is appropriate or require the jury to find beyond a reasonable doubt that the aggravating circumstances outweigh the accumulated mitigating circumstances. Instead, Arizona's death penalty statute requires defendants to prove their lives should be spared, in violation of the Fifth, Eighth, and Fourteenth Amendments, and Article 2, Section 15 of the Arizona Constitution. We rejected this argument in *State v. Fulminante,* 161 Ariz. 237, 258, 778 P.2d 602, 623 (1988). *See also Carreon,* 210 Ariz. at 76 ¶ 122, 107 P.3d at 922.

¶ 95 (12) Arizona's death penalty scheme does not sufficiently channel the sentencing jury's discretion. Aggravating circumstances should narrow the class of persons eligible for the death penalty and reasonably justify the imposition of a harsher penalty. Arizona Revised Statutes section 13–703.01 is unconstitutional because it provides no objective standards to guide the jury in weighing the aggravating and mitigating circumstances. The broad scope of Arizona's aggravating factors encompasses nearly anyone involved in a murder, in violation of the Eighth and Fourteenth Amendments, and Article 2, Section 15 of the Arizona Constitution. We rejected this argument in *State v. Pandeli,* 200 Ariz. 365, 382 ¶ 90, 26 P.3d 1136, 1153 (2001), *vacated on other grounds,* 536 U.S. 953, 122 S.Ct. 2654, 153 L.Ed.2d 830

(2002) (mem.). *See also State v. Greenway,* 170 Ariz. 155, 164, 823 P.2d 22, 31 (1991).

¶ 96 (13) Execution by lethal injection is cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments, and Article 2, Section 15 of the Arizona Constitution. We rejected this argument in *State v. Van Adams,* 194 Ariz. 408, 422 ¶ 55, 984 P.2d 16, 30 (1999), and *State v. Hinchey,* 181 Ariz. 307, 315, 890 P.2d 602, 610 (1995).

¶ 97 (14) Arizona's death penalty scheme unconstitutionally requires imposition of the death penalty whenever at least one aggravating circumstance and no mitigating circumstances exist, in violation of the Eighth and Fourteenth Amendments, and Article 2, Section 15 of the Arizona Constitution. Arizona's death penalty law cannot constitutionally presume that death is the appropriate default sentence. We rejected this argument in *State v. Miles,* 186 Ariz. 10, 19, 918 P.2d 1028, 1037 (1996).

**V.**

¶ 98 For the foregoing reasons, we affirm Morris's convictions and sentences.

CONCURRING: REBECCA WHITE BERCH, Vice Chief Justice, MICHAEL D. RYAN, ANDREW D. HURWITZ and W. SCOTT BALES, Justices.

**All Citations**

215 Ariz. 324, 160 P.3d 203, 506 Ariz. Adv. Rep. 14

Footnotes

1    Skin slippage occurs when, in the postmortem phase, bacteria destroy connections between the skin and the underlying tissue so that, with pressure and movement, the skin begins to detach and slip off the body.

2    Prior to trial, Morris declined to participate in IQ testing or psychological evaluation.

3    The trial judge also found that Morris had violated the terms of probation imposed after a 2002 theft conviction. He revoked Morris's probation and imposed a presumptive sentence of one year for theft.

4    Although Morris argues that *State v. Nieves,* 207 Ariz. 438, 87 P.3d 851 (App.2004), controls the resolution of this issue, we disagree. In *Nieves,* the medical examiner based his conclusion about cause of death solely on the

**State v. Morris, 215 Ariz. 324 (2007)**

160 P.3d 203, 506 Ariz. Adv. Rep. 14

defendant's statements. *Id.* at 441 ¶¶ 14–15, 87 P.3d at 854. Because there was no evidence of criminal activity other than the medical examiner's testimony, the court held that the State failed to establish the corpus delicti. *Id.* at 444 ¶¶ 28–29, 87 P.3d at 857. Here, conversely, evidence independent of the medical examiners' testimony supports criminal activity in the deaths of both Codman and Davis.

5    At trial, the State did not argue that Morris engaged in intercourse with Davis's body and made it clear to the jury that it did not have sufficient evidence to support such an inference.

6    For example, the prosecutor asked:

>[W]hich one of you wants to volunteer? I want a show of hands on this one. Which one of you ladies—and we don't need guys on this one, because he didn't take guys. He only took women.
>
>Which one of you want [sic] to volunteer to come sit here and have the defendant sit himself on your chest and say, Oh, that didn't hurt? Because the defense attorney is saying throw common sense out of [the] window. Which one? I challenge anybody to say, That is something I want to do.
>
>And anyway, and on top of that, while he's sitting on my chest, which one of you, since the one lower left-hand side has the longer hair of the jurors, maybe she wants to have him grab her hair while he's sitting on her chest ... to grab it and pull it around her neck.
>
>You think that's not going to hurt? You think one of you guys is going to volunteer for that? You can't leave your common sense aside. [Defense counsel] wants you to because he makes these arguments and says, well, we don't know what is in their heads. We don't know what is in Juror Number 1's head. Can you tell me you don't think it's not going to hurt when he sits on you?
>
>Hey, Juror Number 1 or Juror Number 14, whatever it is, what if we put Winnie the Pooh tie around your neck? Are you going to enjoy that? Are you going to like it? Going to feel real good when you can't breathe?

7    The prosecutor stated:

>But one of the things that is interesting about [Castillo] is that the smell is absolutely putrid, absolutely one of the worst things that you will ever probably experience. And you got a minimal exposure to it when the jacket was opened up for your, if you will, smelling pleasure, for lack of a better word.
>
>And what ended up happening—you could tell it was a very strong odor about it. So with regard to Julie Castillo, one of the things that happened to her is that she was wearing that jacket, and the reason that we pulled it out to show it to you, because the sleeves were inside out, and what that means is that he killed her.

8    Morris also argues that some photographs that were marked as exhibits but not admitted at trial are gruesome. Morris cannot establish prejudice from exhibits never admitted into evidence.

9    Arizona Rule of Evidence 403 states:

>Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

10    Our conclusion that section 13–703.05 requires us to review the sentence regardless of Morris's failure to raise arguments against it should not be understood to relieve death penalty counsel of the duty to raise all meritorious arguments against a death sentence. *See ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases* Guideline 10.11.L (2003) ("Counsel at every stage of the case should take advantage of all appropriate opportunities to argue why death is not suitable punishment for their particular client.").

---

**End of Document**                                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

# Juan Martinez

# 15-3363

Exhibits to initial charge
Attachment 03
(Hulsey removal motion)

MICHAEL K. JEANES, CLERK
BY S. Keinow DEP
FILED

08 MAR -6  PM 4: 07

ROBERT D. STEIN
Bar No. 016769
BILLY L. LITTLE
Bar No. 019874
Deputy Public Defenders
620 West Jackson, Suite 4015
Phoenix, Arizona
(602) 506-7711
Attorneys for Defendant

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
IN AND FOR THE COUNTY OF MARICOPA

STATE OF ARIZONA,

No. CR 2007-111635-001-DT

**MOTION TO HAVE DEPUTY
COUNTY ATTORNEY JUAN
MARTINEZ REMOVED AS THE
TRIAL PROSECUTOR IN THIS
CASE; and**

Plaintiff,

v.

BRYAN WAYNE HULSEY (001) DT,

Defendant.

**VARIOUS CONNECTED MOTIONS
IN LIMINE**

(Oral Argument  Requested)

(HONORABLE ARTHUR ANDERSON)

Counsel, Robert Stein, moves this court for an order to remove Deputy

County Attorney Juan Martinez as the trial prosecutor in this case and for orders in

various motions in limine concerning Mr. Martinez.

**THE REMOVAL MOTION:**

**THE GROUNDS FOR REMOVAL:**

In February, 2008 counsel received a copy of the transcript of proceedings

in the case of State of Arizona v. Cicero Pottridge Beemon  CR 2002-099001. A

1

copy of the transcript will be delivered to chambers. Beemon like Hulsey was a capital case. As in the Hulsey case, the prosecutor was Mr. Martinez and the defense lawyer was Robert Stein.

The jury did not convict Mr. Beemon of murder in the first degree. Mr. Martinez' closing referred to in this motion concerned whether the jury would find an aggravator following a conviction for murder in the second degree.

At pages 43-44 of the transcript Mr Martinez stated to the jury:

> As I said, if history teaches us anything, it's that it comes around again and again. Remember Hitler? The big lie he told you? It was at the top of his lungs over and over, you are the superior people and people are going to believe it because they heard it over and over again, and that's what he said over and over again was about the state calling him sneaking, calling him lying, calling him cheating, calling him a beast, calling him a dog. Did that ever happen by the State? Of course it didn't happen, but you know what? He wants you to believe that it did. You know, just like Hitler, that big lie: If you put it out there, even though the prosecutor didn't say it, maybe you'll believe it. And maybe when you go back there to decide this case, you won't decide it on the facts. But if he tells you that over and over again, you're certainly going to start to believe it, aren't you?

At page 47 of the transcript Mr. Martinez stated to the jury:

> But of course he puts "no" he puts 15 minutes up here, because if you put it big enough on billboards just like they did in Germany, you have all these great rules, if you do this that way, people will begin to believe it and they won't he cans (concentrate?) on what is truth and reality.

At pages 48-49 of the transcript Mr. Martinez stated to the jury:

> He talks about America and wraps himself around the flag. Doesn't wrap himself around the German flag when he calls somebody a cheater, a liar, and sneaking when in fact they never even used those words.

2

At page 56 of the transcript Mr. Martinez stated to the jury:

> All the State is asking you to do is consider the evidence
> that came from the witness stand.  Take a look at all of that.
> If you take a look at all of that, even though somebody calls the
> prosecutor sneaking, lying , cheating, all of that stuff, attributes
> things like beast and dog and all these terms to him.
>
> Even though they may do that, that's an effective argument.
> I worked through history.  We have the example of Germany.
> It worked through history.

At Page 58 of the transcript, <u>outside</u> the presence of the jury, the Court gave

Mr. Martinez an opportunity to explain his remarks to the jury.  At pages 58-60 of

the transcript Mr. Martinez gave his explanation to Judge Ishikawa:

The Court:   Mr. Martinez?

Mr. Martinez:

> Well, one of the things that we must keep in mind is that the
> personal attacks in this case have all come from the defense.
> They not only came during closing arguments at Phase 1, but
> they also came during the closing arguments of phase –
> of this particular phase, the aggravation phase, and he attributed to
> the State the words "sneaking," "lying," "cheating."  He also
> attributed to the State the words indicating the defendant was
> a beast.  He over and over kept calling him "dog," words to that
> effect, attributing those to the state.  I was merely responding to
> what he said and to indicate that I didn't say those words, then
> they – they're ones that perhaps are not telling the truth.
>
> I never personally attacked him.  I never called him a liar.  I never
> called him – he raised this now, I didn't even know he was Jewish,
> but okay, he's Jewish. Big deal.  I'm not.  No one ever called him a
> Jew.  Big deal.  I'm not.  No one ever called him a Jew No one ever
> called him anything.  No one called him a disparaging remark.  We
> know, he made things up, he attributed to the state.  I'm entitled to
> respond to it.  If he calls us liars, cheaters and sneaky, I – we're
> entitled to do that.

3

Additionally he has no compunction about running to you every time that he feels something is wrong. He has done it throughout this trial. He knows how to do it and he has done it, I don't know, 60, 100 times, who's – I haven't been counting, but it's been many, many times. He's waived it now, and for him to – it's something that he thought about over the break.

And I do think there's a lack of candor here because I do think he has no problem running to you whenever there's a chance, but now I think it's a specious argument to say he read the jurors minds now and think they'll be prejudiced against him just because he's Jewish. Well, they would have been prejudiced against him if they were prejudiced against Jews when he wrote his name up there, "Stein," and somehow attribute that when he marked that up there and wrote it. I think that's a specious argument and I don't think anything he says rises to any level of misconduct on the State's part.

All of the words above are Mr. Martinez' words. They are the words he uttered to a jury and the words of explanation he uttered to Judge Ishikawa.

Counsel has not added emphasis to any word or group of words. This court can read the words and draw its own conclusion without help from counsel.

Counsel next quotes from *State v. Cory Deonn Morris*, 215 Ariz. 324, 160 P.3d 203 (2007) a Supreme Court opinion that commented upon the conduct of the prosecutor during trial. That prosecutor was Juan Martinez. At page 337 the Court stated:

¶57 Morris also argues that, during rebuttal to defense counsel's closing argument in the aggravation phase, the prosecutor invited jurors to put themselves in the place of the victims and singled out specific jurors based on appearance and gender. The prosecutor made the challenged comments while responding to defense counsel's argument that the jurors could not determine whether the victims suffered because they were intoxicated when they were killed.

4

Defense Counsel did not object to these statements, so we review for fundamental error. *Roque*, 213 Ariz. At 228 ¶ 154, 141 P.3d at 403.

Mr. Martinez' words to the jury were captured in footnote 6 at the bottom of page 337:

For example, the prosecutor asked:

[W]hich one of you wants to volunteer? I want a show of hands on this one. Which one. Which one of you ladies—and we don't need guys on this one, because he didn't take guys. He only took women.

Which one of you want [sic] to volunteer to come sit here and have the defendant sit himself on your chest and say, Oh, that didn't hurt? Because the defense attorney is saying throw common sense out of [the] window. Which one? I challenge anybody to say, That is something I want to do. And anyway, and on top of that, while he's sitting on my chest, which one of you, since the one lower left-hand side has the longer hair of the jurors, maybe she wants to have him grab her hair while he's sitting on her chest . . . to grab it and pull it around her neck.

You think that's not going to hurt? You think one of you guys is going to volunteer for that? You can't leave your common sense aside. [Defense counsel] wants you to because he makes these arguments and says, well, we don't know what is in their heads. We don't know what is in Juror Number 1's head. Can you tell me you don't think it's not going to hurt when he sits on you?

Hey, Juror Number 1 or Juror Number 14, whatever it is, what if we put Winnie the Pooh tie around your neck? Are you going to enjoy that? Are you going to like it? Going to feel real good when you can't breathe?

In paragraph 58 on page 337, the Court continued:

¶58 <u>A prosecutor has wide latitude in presenting arguments to the jury, including commenting on the "vicious and inhuman nature of the defendant's acts," but cannot make arguments that appeal to the fears or passions of the jury. *State v. Comer*, 165 Ariz. 413, 426, 799 P.2d 333, 346 (1990). Although the State argues that the prosecutor simply asked the jurors to apply common sense to the factual situation before them, the prosecutor's remarks did far more than make that request. Instead, the prosecutor singled out particular jurors and addressed them personally, playing on their sympathy for the</u>

5

**victims and fears of the defendant. Such remarks constitute misconduct.**

(Emphasis added).

However, in paragraph 60 at page 338 the Court stated, "**The prosecutor's comments here do not constitute fundamental error.**" (Emphasis added).


## ARGUMENT

This Court can judge for itself whether the words uttered by Mr. Martinez in State v. Beemon were mere slips of the tongue. This Court can determine whether calling opposing counsel Hitler or equating opposing counsel, or anyone, to Adolf Hitler is acceptable conduct. Counsel's belief is that the Hitler tag is outrageous attached to the character of *any* person no matter their background or religion. That label is especially egregious if the recipient is Jewish.

Counsel is Jewish.

Although Mr. Martinez, equated Hitler to the big lie, Counsel equates the Hitler to the killing of Jews—about 8 million Jews. But we must remember that Mr. Martinez told Judge Ishikawa, (referring to counsel) "I didn't even know he was Jewish, but okay, he's Jewish. Big Deal." Knowing that Mr. Martinez denied knowing that counsel was/is Jewish, counsel submits the following:

Mr. Mr. Martinez is a very smart man.

Mr. Martinez knew counsel's name was and is "Stein". Looking above the court can see in Mr. Martinez' statement to Judge Ishikawa that the jury knew counsel was Jewish when he wrote the name "Stein". Now if the jury would know

6

counsel was Jewish because of the name "Stein," where does that leave Mr.

Martinez?  It doesn't take a very smart man to conclude that counsel is or might

be Jewish.  Beyond his acumen Mr. Martinez was told personal information by

counsel long before the trial of Cicero Beemon.   Mr. Martinez was told by

counsel that counsel was a lawyer from  New York City.  Counsel presents quotes

from a website entitled The Urban Dictionary concerning Jews and New York

City:

## 1. Jew York

A clever name for the state or city of New York used as a dig on the Jews, due to its
exceptionally large Jewish population?

*I'm off on Thursday for some holiday whose name I can't pronounce. Yep, this is sumpin that
only happens in Jew York.*

by ▓▓▓▓▓▓▓ Feb 2, 2005 ▓▓▓▓

permalink:

Send to a friend

your email:

their email:

send me the word of the day (it's free)

Send message

## 2. jew york

Used by anti-semites to describe New York. Refers to the high Jewish population.

*"How can you stand living in Jew York", said the neo-nazi.*

Mr. Martinez also commented on the loudness of counsel's voice.  "Loud

Jews" are a stereotype in anti-Semitic literature.

Mr. Martinez will deny any such knowledge or he may again say "big deal." However, adding these matters up any intelligent person (and Mr. Martinez is a very intelligent person) would think, at the very least, "**Stein, just might be Jewish**. To be 'on the safe side' I should avoid the Hitler and German flag references."

Anti-Semitism is a politically correct expression. The practice has common expressions such as "Jew Baiting" and "Jew Hating." Mr. Martinez crossed the line of dignity.

The connection between what Mr. Martinez said in the Beemon closing concerning counsel, and this motion to have him removed in the Hulsey case is clear. The connection is fundamental fairness to Mr. Hulsey. Mr. Hulsey is represented by a Jewish lawyer. That's permitted. What is not permitted is for a prosecutor to prosecute a case where she/he has a publicly displayed disparagement for opposing counsel based upon race or religion.

Mr. Hulsey life is literally on the line. He should not be prosecuted by a state lawyer who has attacked and indicated a hatred for Mr. Hulsey's counsel—a hatred based upon race and religion. In such a setting, Bryan Hulsey cannot be guaranteed that Juan Martinez will prosecute this case justly and fairly. Every prosecutorial decision will be marked by the issue of religious intolerance.

## IF THE MOTION TO REMOVE MR. MARTINEZ IS DENIED, COUNSEL SUBMITS THE FOLLOWING MOTIONS IN LIMINE:

Now that the court knows what Mr. Martinez is capable of stating to a jury,

8

counsel requests this court to rule upon the following requested motions in

advance of trial:

(1)    That prosecutor Juan Martinez be ordered by this court not to equate counsel to Adolf Hitler.

(2)    That prosecutor Juan Martinez be ordered by this court not to equate counsel to any other member of the National Socialist Party.

(3)    That prosecutor Juan Martinez be ordered by this court not to equate counsel to any other fascist political leader e.g. Benito Mussolini, Juan Peron, Marshall Tito, Francisco Franco etc.

(4)    That prosecutor Juan Martinez be ordered by this court not to state to the jury that counsel has or has not wrapped himself in the German flag.

(5)    That prosecutor Juan Martinez be ordered by this court not to state to the jury that counsel has or has not wrapped himself in the flag of any despotic country.

(6)    That prosecutor Juan Martinez be ordered by this court not to state to the jury that counsel is or is not German.

(7)    That prosecutor Juan Martinez be ordered by this court not to bring up the issue of Counsel's religion to the jury either directly or obliquely.

(8)    That prosecutor Juan Martinez be ordered by this court not to call or refer to counsel in any disparaging manner personally or characterize counsel or his arguments in any improper manner.

(9)    That prosecutor Juan Martinez be ordered by this court not to address jurors individually in his closing.

**LEGAL SUPPORT**:

Jury argument that impugns the integrity or honesty of opposing counsel is also improper.  State v. Hughes  193 Ariz. 72, 86, 969 P.2d 1184, 1198 (Ariz.,1998)

In *State v. Denny,* 119 Ariz. 131, 134, 579 P.2d 1101, 1104 (1978) the Supreme

Court stated:

> However, we are concerned with some of the phrasing
> of the prosecutor's objections which seem to impugn the
> integrity of defense counsel and suggest to the jury
> that defense counsel is being deceitful.

In *State v. Gonzales,* 105 Ariz. 434, 436, 466 P.2d 388, 390 (1970) the Supreme

Court stated:

> The prosecutor's remarks were, to say the least, improper.  He
> accused defense counsel of talking "out of both sides of his
> mouth or as the Indian might say a forked tongue."

So if it is Mr. Martinez' position that calling counsel Hitler etc. was "only"

to point out that counsel was a liar rather than to impugn counsel's religion, it

appears the courts in Arizona do not favor that conduct either.

Further, it is Counsel's position that Bryan Hulsey's right to a fair trial is a

fundamental right, and that right will be violated if counsel's motions in limine

above are denied.

**The United States Constitution guarantees the following:**

Amendment V states in part that:

[N]nor shall any person be deprived of life, liberty, or property,
without due process of law.

Amendment VI states in part that:

10

In all criminal prosecutions, the accused shall enjoy the right to an impartial jury.

Amendment XIV states in part that:

[n]or shall any state deprive any person of life, liberty, or property, without due process of law

**II) The Constitution of the State of Arizona guarantees the following:**

Article 2 Section 3 states:

The Constitution of the United States is the supreme law of the land.

Article 2 Section 4 states:

No person shall be deprived of life, liberty or property with due process of law.

RESPECTFULLY SUBMITTED this **6th** day of March, 2008

MARICOPA COUNTY PUBLIC DEFENDER

By _Robert Stein_

ROBERT D. STEIN
Deputy Public Defender

11

Copy of the foregoing
mailed/delivered this
6th day of March
2008, to:

HONORABLE ARTHUR ANDERSON
Judge of the Superior Court
Central Court Building, 11th Floor
201 West Jefferson
Phoenix, Arizona

JUAN MARTINEZ
Deputy County Attorney
Office of the County Attorney Maricopa County
301 West Jefferson
Phoenix, Arizona

Deputy Public Defender

By *Robert Stein*

ROBERT D. STEIN
Deputy Public Defender

12

# Juan Martinez

# 15-3363

Exhibits to initial charge
Attachment 04
(grant motion to dismiss)

1   A. Melvin McDonald, Bar #002298
    JONES, SKELTON & HOCHULI, P.L.C.
2   2901 North Central Avenue, Suite 800
    Phoenix, Arizona 85012
3   Telephone: (602) 263-1747
    Fax: (602) 200-7847
4   minuteentries@jshfirm.com

5   Attorneys for Defendant, Douglas Grant

6

                **SUPERIOR COURT OF THE STATE OF ARIZONA**
7
                        **COUNTY OF MARICOPA**
8

9   STATE OF ARIZONA,                    NO. CR 2005-032986-001 SE

10                         Plaintiff,    **MOTION FOR DISMISS WITH
                                         PREJUDICE OR, IN THE
                                         ALTERNATIVE, TO DEPOSE**
11          v.                           **GILBERT POLICE DETECTIVES
                                         RAY AND PALMER AND EAVES**
12  DOUGLAS GRANT,                       **FAMILY MEMBERS**

                          Defendant.
13                                       **(Oral argument requested)**

14

15                                       (Assigned to the Honorable David M.
                                         Talamante)
16

17

18          COMES NOW Douglas Grant, by and through his counsel undersigned, and

19  respectfully moves that the Court enter an order dismissing the indictment with prejudice

20  based upon continuing multiple acts of deception perpetrated on this Court arising from

21  the concealment of relevant evidence.  In the alternative, and only if the Court believes

22  that further evidence is required to justify a dismissal, the defendant moves that the Court

23  postpone a ruling on the motion for dismissal and order that Detective Sy Ray and

24  Detective James Palmer, together with *all* Eaves and Stradling family members and their

25  spouses, be ordered to submit to sworn depositions, under penalty of perjury,  regarding

26  the continuing cover up and concealment of "farewell letters," and about their failure to

1    speak out when two different prosecutors, on three separate occasions, made false and
2    misleading statements to the court that such letters did not exist.

3         Recent disclosures have confirmed what defense counsel alleged in open
4    court -- that a massive cover-up and fraud was committed on the court and the defense.
5    That fraud is continuing. The record now confirms that either the Eaves family or Gilbert
6    Police or both participated in a fraudulent concealment of farewell letters, and that the
7    prosecution and Gilbert police, knowing from their own interviews that such letters
8    existed, failed to aggressively pursue evidence which they knew for a certainty existed.
9    The defense has compelling evidence that Eaves family members or Gilbert police or both
10   are continuing to withhold other farewell letters that are exculpatory to the defendant and
11   in direct violation of orders of this Court.  This continuous misconduct, lasting in excess
12   of one year, mandates dismissal. This motion is supported by the attached memorandum
13   of points and authorities.

14         RESPECTFULLY SUBMITTED this 11th day of September, 2006.

15         JONES, SKELTON & HOCHULI, P.L.C.

16

17   By_____
     A. Melvin McDonald
18   Attorneys for Defendant

19              **MEMORANDUM OF POINTS AND AUTHORITIES**

20         On September 30, 2001, three days after the tragic drowning of Faylene
21   Grant, a family meeting was held at Doug and Faylene's residence in Gilbert, Arizona.
22   Those present at the meeting included Faylene's parents, Doug and Glenna Eaves,
23   Faylene's brother Douger Eaves and his wife Terina , Faylene's sister Cherlene Patterson
24   and her husband Darren, Faylene's sister Jody Stratton and her husband Shan, Randy
25   Grant, a cousin of Doug Grant, Danny Fuentes, Doug's brother-in-law, and several family
26   friends. (See Exhibit 1) The families were discussing issues relating to Faylene's funeral

2

1   and burial, scheduled for the next day.  At the meeting, Doug revealed that Faylene had
2   written farewell letters to family members, and wanted those letters disbursed to them
3   after her funeral.  The family expressed a strong desire to have the letters distributed at
4   that time.  Doug Grant honored that request, handing out Faylene's letters in envelopes to
5   Glenna Eaves, Doug Eaves, Terina & Douger Eaves, Cherlene Patterson and Darren
6   Patterson, Jody Stratton and Shan Stratton.   Some letters went to Faylene's nieces and
7   nephews. There was also a zip lock baggy that had some cross stitch in it with another
8   note for Cherlene Patterson in it. There were also letters written to Jenna and Austin
9   Stradling (Faylene's oldest children) in the container, but a decision was made to hand
10  those letters over at a later date since they were not present at the September 30 meeting.
11  Jenna's letter was handed to her by Doug soon after the September 30th meeting.  Doug
12  spoke with Austin's father, Curt Stradling, about his letter and Mr. Stradling thought it
13  would be best to not give the letter to Austin at that time because of emotional concerns.
14  Austin's farewell letter was turned over to the Gilbert police by the defendant prior to his
15  indictment.

16          When police began a criminal investigation against Mr. Grant in 2002, the
17  activities and farewell letters provided at that meeting were openly discussed by family
18  members with Gilbert detectives.   Glenna Eaves described the existence of the letters to
19  Gilbert detectives:

20              GLENNA EAVES: It was just on lined paper.  *All of our
                *letters were on stationary* and *this was just kind of on lined
21              paper*....

22              DET:  *Any, is there any question in your mind as to the
                authenticity of Faylene actually writing that letter*?  Or are
23              you ...

24              GLENNA EAVES: *No.  It, it, it was her writing* ...

25

26

                                        3

1    Cherlene Patterson similarly admitted not only the existence of the farewell letters, but

2    acknowledged that she received one with other family members and agreed to turn it over

3    to Detective Palmer.  Cherlene told Detective Palmer:

4

5            PALMER: Do you know where those (farewell) letters are
        now?

6            Cherlene: In the different – with the different people that she
        wrote them to during those days.

7

8            PALMER: Do you have any of them?

9            Cherlene: I have one of them.

10           PALMER: Would it be possible for you to bring those in so
        that I can see them?

11           Cherlene: Uh huh.

12           Jodie Stratton, Faylene's sister, similarly admitted to Gilbert investigators

13   that she too had received a letter from Faylene.

14           JODY: And, and I might, I mean, I'm guessing a week, but it,
        probably no more than two weeks, but right around that time

15           frame.  And she said it a lot.  I mean that wasn't the only time
        she said it.  She had said it through this whole nine months.

16           And so, when, I remember when we got that letter and Shan, I
        mean Shan came in and he says, Jody, you need to sit down.

17           And I said, and my heart dropped, so what's wrong? ***And he
        read me the letter and I just started bawling*** because I didn't

18           understand because she had just, I mean, this whole nine
        months that she's been divorced ...

19           DET: ***Was it her handwriting?***

20           JODY: Yes.  Definitely.

21

22           The letter that Jody was speaking of was one that Faylene wrote when she

23   moved out of their home when re-marrying Mr. Grant.  That letter was one that Faylene

24   gave Jody.  Mr. Grant gave Jody and Shan two more letters at the family meeting.  Neither

25   one of these two letters have been turned over as directed by the Court.

26

## I.    Request for the Farewell Letters

Within weeks after the indictment, defense counsel wrote Frankie Grimsman a simple discovery request asking Ms. Grimsman to produce the farewell letters referenced in Eaves family interviews. In a letter dated August 23, 2005, at page 4, lines 2-3, defense counsel urged Ms. Grimsman to produce these letters. McDonald stated "I need copies of Faylene's farewell letters to her family written in anticipation of death." When the request was ignored, a motion to compel was filed. On September 30, 2005 at page 2, lines 5-10, this Court ruled:

> Oral argument is held regarding Defendant's Motion to Compel Production of Disclosures and Missing and Purposely Withheld Police Departmental Reports. After discussion with counsel, IT IS ORDERED directing State's counsel to turn over any discovery in the State's possession.

When the discovery was not forthcoming, defense counsel again complained to the Court. This Court, on October 21, 2005, at page 24:lines 13-16: recommended that defense counsel depose the detective. The transcript read:

> 13.   The court; I think you need to interview or
>
> 14.    depose the detective

Following the Court's directive, Detective Ray was questioned about the existence of these letters on November 2, 2005. He testified at page 33, lines 18-19:

> AMM: And, in fact, you, before the grand jury, there's other farewell letters that you've since seen, but even before the grand jury, you knew that Faylene had written farewell letters to friends, correct?
>
> RAY: Absolutely.
>
> AMM: To Doug and Hilary?
>
> RAY: Correct.
>
> AMM: Hilary's mother?
>
> RAY: Correct.

5

1      AMM: Faylene's parents?

2      RAY: Multiple people.

3      AMM: Her sisters?

4      RAY: Correct.

5          With these concessions, (including the concession that "sisters" that

6   received farewell letters and not just one sister) defense counsel wrote Detective Ray on

7   November 14, 2005 requesting these letters which he had admitted to exist.   At page 3 of

8   the Sy Ray letter, defense counsel wrote: "We know that there were other farewell letters

9   written to family members that have not been disclosed.   Would you please provide me

10   with all farewell letters to each Eaves family member in advance of the next interview"

11   Despite this request, the letters were not disclosed.

12          On December 7, 2005, defense counsel again asked prosecutor Frankie

13   Grimsman for these letters.   At page 1, lines 8-9,  defense counsel asked Ms. Grimsman

14   for "the remaining letters that Faylene wrote to family members asking them to accept

15   Hilary" Ms. Grimsman, like detective Ray, ignored the request.

16          On  December 21, 2005, Defense counsel again wrote Detective Ray.   At

17   Page 3, #11 at lines 1-3,  Ray was questioned: " I have requested on numerous occasions

18   all "Farewell letters" written by Faylene to her family.   Do I now have all the letters?

19   There was a farewell letter that Faylene wrote to Jenna Stradling.   Are there any other

20   letters?" No letters were produced.

21          A second interview was held with Detective Ray on February 3, 2006.   At

22   page 44 of that interview, defense counsel again asked Detective Ray about the

23   undisclosed letters. Ray's answer marked the beginning of a fraud on defense counsel and

24   the court. Detective Ray had previously admitted the existence of the letters.   It is clear in

25   February of 2006 that Detective Ray and the Eaves family had made a strategic decision

26

6

1   to keep those letters from the defense and to deny their existence.   Ray responded to

2   defense counsels questions as follows (pages 44-45 of Feb 3, 2006 interview):

3          McDonald:   I have asked in a number of letters for all
             additional farewell letters that Faylene wrote to family
4           members. We know there was one written to Jenna that we
             have not received. What efforts have you made, if any, to
5           retrieve other farewell letters?

6          RAY: I have requested from the family any letters that they
             still have. **They have told me that they've turned over all**
7           **the letters that they have. I have made copies and**
             **produced the copies to you that I have in my possession.**
8

9          AMM: Who in the family did you make the request to?

10         RAY: Multiple people. **Pretty much everybody on the Eaves**
             **family. Talked to Mr. Stradling himself,** I believe his wife
             was present at the same time. I've made multiple requests and
11         I've been told that I have the letters that they still have.

12

13        On the date of this interview, no farewell letters written to Doug Eaves,

14   Glenna Eaves, Cherlene Patterson, Darren Patterson, Jody Stratton, Shan Stratton,

15   Douger Eaves, Terina Eaves, or Jenna Stradling had been provided to the defense.  Since

16   each disclosure is assigned a Bates number, the state could have easily challenged defense

17   counsel's cover-up accusation by simply providing the court with the bates number of the

18   disclosure.

19        Defense counsel was incensed at the continuing deception.  On February 24,

20   2006, the issue was again brought up before the court. During the interim, Ms. Grimsman

21   had been replaced by Mr. Martinez.  It was hoped that Mr. Martinez would put a stop to

22   this nonsense and provide the exculpatory documents to the defense. The February 24,

23   2006 transcript documents Mr. Martinez decision to withhold these letters from the

24   defense by denying their very existence.  At page 8: lines 11-12, Martinez stated:

25          Martinez:  I read a lot of the letter that were turned over to the
             defendant.  I've seen those letters and they have been turned
26

7

over to the defendant ... I have spoken to the people that I previously mentioned in my motion, but also because I looked at the discovery and it looks like those letters have already been turned over ...

At page 9, lines 5-13, Mr. Martinez compounded the cover-up by accusing the defense of harassment for requesting disclosure of letters that police and prosecutors claimed had been turned over yet continued to conceal.  Martinez avowed at page 9, lines 5-13:

**Martinez**: I believe, it borders on harassment ... In speaking with them (the Eaves family), *they told me that they don't have anymore letters*. I've spoken to the detective   about   it. So what more can we do other than provide the Court the documentation that indicates those letters have been turned over and point out that they have indicated that those matters have been turned over ... We turned everything over.

The only farewell letters turned over to the defense were letters that the defense had turned over  to the state in 2002, and even some of the most critical of those letters were concealed. There were no Bates numbered letters from Faylene to her parents, her sisters Jody and Cherlene, her brother Douger, his wife Terina, or Jody and Shan Stratton.

This Court, at the February 24, 2006 recognized what was happening with the disclosure issue.  The Court and defense counsel had the following exchange at page 12, lines 5-8:

Judge Talamante:     Come back to me and say, Judge  -- you're going to have to tell me, basically, that somebody is withholding information.

Mr. McDonald:  That's what I will do.  Somebody is.

Judge:  Or somebody is lying.

Mr. McDonald:  Yeah.

8

1

2

3

4

> Judge:  Then I will have to consider all of that in the light of the Victim's Rights statute.  If I have an allegation that a victim is intentionally withholding information or is lying, that's a very serious allegation, Mr. McDonald.  And it would have to reach that point for me to consider anything that would infringe the Victim's Rights statute, but I may do that.

5          In fact, as this Court adeptly observed, the accusation counsel was making

6   was serious.  It strikes at the very core of the criminal justice system.  It strikes at the very

7   core of the Rules of Criminal Procedure. The Court indicated that counsel could be

8   permitted to interview these family members despite the Victim's Rights statute if a

9   sufficient showing of a concealment of these letters was made to the court.  After that

10  hearing, this court provided the following information in its minute entry of February 24,

11  2006:

12

13

> "States counsel advises that all discovery/letters have been turned over to defense counsel"

14          Tragically, Mr. Martinez' avowals to the court were blatantly false.    The

15  farewell letters had not been turned over and, according to Mr. Martinez, the Eaves family

16  and Gilbert police were avowing to him that no such letters existed.  After that hearing, a

17  full 11 days later, document's that were avowed did not exist began making an

18  appearance.

19  **II.     Terina Eaves Letter**

20

21          On March 7, 2006, almost two weeks after Mr. Martinez avowed to this

22  Court that the state had turned over all "farewell letters" prior to February 24th,  he turned

23  over one of the letters which the state had willfully concealed from the defense.  There

24  was no explanation why he had avowed to the court on February 24th that all letters had

25  been turned over, and why this letter was now making an appearance.  Did Mr. Martinez

26  have this letter prior to February 24th?  Did Gilbert police have the letter prior to February

1   24th?  If so, why hadn't it been turned over to the defense?  If Terina Eaves had turned the

2   letter over after the February 24th hearing, what was her explanation or justification in

3   lying to Detective Ray?  Mr. Martinez?  Did she decide to turn it over after hearing the

4   strong rebuke of the court?  Was it the belief of the family that possibly the pursuit of the

5   letters would stop if one of the letters was turned over?  Was the letter turned over to

6   Gilbert police in 2002 and concealed by them or misfiled by them?

7            There was no explanation why Terina Eaves would have denied the

8   existence of a farewell letter to Frankie Grimsman, Detective Sy Ray or Juan Martinez.

9   Mr. Martinez' disclosure statement, dated March 7, 2006, simply stated: "On March 7,

10  2006, I again disclosed all letters, memos, notes and inscriptions purportedly written by

11  Faylene Grant over an undetermined period of time.  This disclosure includes Faylene's

12  "premonition letters" of her murder and her apparent acceptance of the killing a God's

13  will."  Mr. Martinez, in his letter, was again misstating the history of Terina Eaves letter.

14  His letter claimed he "again disclosed" Terina's letter.  However, Terina's letter had never

15  been disclosed and the claim was false on its face. The prosecutor had appropriately

16  assigned a new bates number to Terina's letter.  There was no other Terina letter which

17  had any bates number …

18            Recognizing that Mr. Martinez had made an avowal to the Court that was

19  materially false, and recognizing that he was now disclosing a family letter that he had

20  previously avowed to the Court had been disclosed, Defense counsel wrote Mr. Martinez

21  on March 9, 2006, stating:

22            You state "On March 7, 2006, I again disclosed all letters,
            memos, notes and inscriptions purportedly written by Faylene
23            Grant over an undetermined period of time."  So the record is
            clear, I have thus far found two letters not previously disclosed
24            – a letter to Jim McElyea and a letter to Terina Eaves.  Your
            own assigned Bates Numbers,2892, show that they were not
25            disclosed until a few days ago.  I had argued for the
            production of the McElyea letter at our last court hearing.
26            *The problem with the state's disclosure to date is that we have*

1
2
3
4
5
6
7

> *long known that there are other letters out there that have still not been disclosed, most specifically Cherlene Patterson, Glenna Eaves and Jody Stratton. It now appears that they intend to hold those letters back.* I will deal with that decision by an appropriate motion. *I will assume by your claim of complete disclosure that Cherlene Patterson, Glenna Eaves and Jody Stratton have made a decision not to turn over documents which we know were provided to them.* I would appreciate it if you would personally confirm from them that no such farewell letter exists. To remove any ambiguity, I am requesting letters written between April 2001 to the date of Faylene's death to Cherlene Patterson, Glenna Eaves, and Jody Stratton or any other member of the Eaves family.

8

9      There was no challenge from Mr. Martinez about the refutation of his claim.

10   Demand had been made to turn over the remaining letters - a demand that was ignored.

11   **III.      The June 9, 2006 Remand Hearing - The continued "Fraud on the Court."**

12          Three months had gone by since the Terina Eaves disclosure and no further

13   farewell letters had been disclosed.  Prosecutor Martinez and Detective Ray continued to

14   claim to the defense and later to the Court that all farewell letters had been disclosed.

15   Defense counsel, in open court, again demanded letters improperly withheld for almost

16   one year.  As the Court will recall, Mr. McDonald read into the record Glenna Eaves

17   interview with Gilbert police acknowledge receipt and possession of her daughter's letter.

18   It was unfathomable that Glenna Eaves or any member of the Eaves family would destroy

19   or discard such a precious heirloom -- a letter from a beloved daughter or sister written

20   during the last weeks of her life.   After reading Ms. Eaves statements, the state continued

21   to stonewall disclosure of the exhibits. Mr. Martinez, at page 17:18 to 18:2 avowed to the

22   Court:

23
24
25

> *Additionally, I will tell you **the same thing I told you before.** I have checked with the family about these issues...All I know is **I've gone to all the family members.  They don't have any more letters**.  I personally have gone and checked every item that's in the Gilbert Police Department. There aren't any more items.  So I would just leave that for the court.*

26

The Eaves family sat in court and collectively said nothing.   No one approached the bar to correct Mr. Martinez' avowal even though he had just disclosed Terina Eaves letter over a month after his previous avowal that no such letter existed. In fact, Glenna Eaves was seen vigorously shaking her head denying the existence of Faylene's letter to her during Mr. McDonald's presentation. This Court, hearing the testimony and weighing that testimony against Mr. Martinez' avowal, apparently had heard enough.   After almost eight months of denials, this Court stated at pages 18, line 23 to 20, line 10:

> There is still a question as to whether or not those letters, those documents are in the possession of the people that Mr. McDonald has indicated in his motion.   And I will say, I haven't looked at your response, Mr. Martinez.   I have considered your comments here in the courtroom.   I recall what was said in the past.   I guess the only thing I can say is that – two things.
>
> Mr. McDonald through reference to interviews in his motion, has at least on its face set out a compelling argument *that these letters do exist* or *did exit at one point in time*, and that they were available and in possession of the people that he claims had them in their possession at a very definite point in time.   There's no question about what his argument is.   If they no longer exist, they no longer exist.   And no on can change that fact.   *All I will say is that if those letters do exist, and it's determined at some point in time or they're found and they're not disclosed for purposes of this grand jury remand, they surface sometime later, chances are we will all be back in the courtroom again.*   **And there will be a request at that time for, at minimum, a remand to the grand jury again for consideration of those letters, and there probably will be another request from Mr. McDonald to dismiss this case based on withholding of evidence or information that should have been disclosed or discovered.   If that's the case, then I will, in fact, consider the defendant's motions if they're reurged if that occurs.   That's a big if.**
>
> **I don't know if any of that is going to happen.   But I want everybody here to know that I will consider that if it does happen.   So if you don't have them, Mr. Martinez.   You can't disclose them and you're not being ordered to disclose them to the grand jury.   But if they come up later, we're all going to be here again to talk about the same things. All right.   You have my orders.**" (Emp. added)

12

1      The court's minute entry order of that date stated:

2      States counsel indicates no additional letters exist to the States
        knowledge   COURT FINDS that if letters surface at a later
3      date, matter may be reconsidered by the court.

4      On August 10, 2006, Juan Martinez, disclosed 21 pages of documents,

5  which included some of the very letters which Detective Sy Ray, Prosecutor Frankie

6  Grimsman, Prosecutor Juan Martinez and Eaves family members had denied existed for

7  ten solid months. Those letters are attached as Exhibit 2.   The farewell letters in the

8  August 10th disclosure were addressed to Doug Eaves (her father), a separate farewell

9  letter to Doug and Glenna Eaves (Faylene's parents),   a farewell letter to Cherlene

10 Patterson, a farewell letter to Darren Patterson, a note to Blake Patterson (Darren and

11 Cherlene's son), a note to Kylee Patterson (Darren and Cherlene's daughter) a note to

12 Casie Patterson (another daughter of Darren and Cherlene), and a resubmission of the

13 letter to Terina Eaves, turned over four months earlier.   The state also disclosed the

14 farewell letter to Paige Dewitt.   For months, prosecutors, police and family members

15 denied the existence of these letters.

16      Nothing would have happened without the strong directive from the Court.

17 The questions are obvious: Did Gilbert police have these letters all along?   Did they

18 conceal them from Mr. Martinez?   Did he know about the letters when he made the

19 avowals in open court?   Did Eaves family members lie to Mr. Martinez, denying the

20 existence of these letters, then change their mind after hearing the order of the court?   Did

21 the Eaves family turn over the letters to Gilbert police in 2002 and the letters, like other

22 documents in this case, simply disappear? Without the Court's threats at the June 9, 2006

23 hearing of possible dismissal of this case, the State and the Eaves family would have

24 continued to stonewall the letters, denying their existence.   The state continues to

25 withhold letters written to Jenna Stradling, Shan Stratton, Jody Stratton, and others.

26

1   Exhibit 1 is an affidavit of two witnesses to the September 30, 2001 family meeting. They

2   saw letters handed out to all of Faylene's sisters.

3   **IV.    THE LAW JUSTIFIES DISMISSAL OF THIS CASE FOR CONTINUOUS**
         **STATE MISCONDUCT**

4

5           It is widely recognized that the court has the authority to dismiss an

6   indictment because of prosecutorial misconduct. *Crimmins v. Superior Court*, 137 Ariz. at

7   43-45, 668 P.2d at 886-88 (Feldman, J., specially concurring); *United States v. Samango*,

8   450 F.Supp. 1097 (D.Hawaii 1978), aff'd, 607 F.2d 877 (9th Cir.1979). Dismissals with

9   prejudice occur only when the evidence is irrevocably tainted or there exists a pattern of

10  misconduct that is prevalent or continuous. *United States v. Fields*, 592 F.2d 638, 648

11  (2nd Cir.1978), cert. denied, 442 U.S. 917, 99 S.Ct. 2838, 61 L.Ed.2d 284 (1979); *United*

12  *States v. Lawson*, 502 F.Supp. 158, 172-73 (D.Md.1980). The continuing misconduct has

13  been going on for over a year and through multiple hearings.

14          Arizona courts have long recognized that egregious and continuing state

15  misconduct can justified dismissal of a prosecution. See *State v. Minnitt*, 203  Ariz. 431,

16  55 P. 3d 774 (2002); *Pool v. Superior Court* (State), 139 Ariz. 98, 677 P. 2d 261 (1984)

17  The prosecutor has an obligation to seek justice, not merely a conviction, and must refrain

18  from using improper methods to obtain a conviction. See *Bible*, 175 Ariz. at 600, 858 P.2d

19  at 1203; Pool, 139 Ariz. at 103, 677 P.2d at 266. "We emphasize that the responsibilities

20  of a prosecutor go beyond the duty to convict defendants. Pursuant to its role of 'minister

21  of justice,' the prosecution has a duty to see that defendants receive a fair trial. Ariz. R.

22  Sup.Ct. 42, E.R. 3.8.

23          The defense believes that this continuing misconduct, extending over a full

24  year, mandates dismissal.  If the Court does not dismiss the case with prejudice at this

25  time, the Court should enter an order allowing the depositions of Doug Eaves, Glenna

26  Eaves, Cherlene Patterson, Darren Patterson, Jody Stratton, Shan Stratton, Curt Stradling,

14

1   Mrs. Curt Stradling, Jenna Stradling, Douger Eaves, Terina Eaves, Detective James

2   Palmer and Detective Sy Ray.

3           Additionally, if the motion for dismissal is denied, the defense would

4   request that the Court issue an order to police, prosecutors and the Eaves family that if any

5   farewell letter to an Eaves family member or Stradling family member continues to be

6   withheld, and the defense establishes by the evidence that such letter or letters exist, that

7   the sanction will be dismissal of the prosecution with prejudice. Douglas Grant has a due

8   process right to a fair trial.  It is not for Eaves family members or Gilbert police or

9   prosecutors to decide what evidence can be considered by the defense or what evidence or

10  information they choose to conceal. The disclosure of August 10, 2006 came about only

11  because this Court had put a stop to the nonsense surrounding their denials. Such an order

12  is the only remedy available to convince the Eaves family and Gilbert police that the

13  Court, not the family, will decide what must be disclosed in this case.

14          RESPECTFULLY SUBMITTED this 11th day of September, 2006.

15                              JONES, SKELTON & HOCHULI, P.L.C.

16

17          By _____

18             A. Melvin McDonald
               Attorneys for Defendant

19  COPY of the foregoing hand-delivered
    this 11th day of September, 2006, to:

20

21  Honorable David Talamante
    222 East Javelina, 2D
    Mesa, Arizona  85210

22  Fax: 602-506-202

23  Juan Martinez
    Maricopa County Attorney's Office

24  301 West Jefferson, 4th Floor
    Phoenix, Arizona 85003

25  Fax: 602-506-7950

26

                              15