# EXHIBIT 31 (part 5)

*Andriano v. Ryan*, Case No. CV-16-01159-PHX-
SRB Motion for Evidentiary Development

# Juan Martinez

# 15-3363

Exhibits to initial charge
Attachment 05
(chirsman motion for new trial)

Michael K Jeanes, Clerk of Court
*** Electronically Filed ***
L. Landeros, Deputy
9/27/2013 3:55:35 PM
Filing ID 5472133

# MEHRENS & WILEMON, P.A.

Attorneys at Law

99 East Virginia Avenue, Suite 220

Phoenix, Arizona 85004

(602) 258-5151

CRAIG MEHRENS - #001778
craig@mehrens-wilemon.com
AMY WILEMON - #011141
amy@mehrens-wilemon.com

Attorneys for Defendant

## IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

## IN AND FOR THE COUNTY OF MARICOPA

| | | |
|---|---|---|
| STATE OF ARIZONA, | ) | NO. CR 2010-153913-001 DT |
| | ) | |
| Plaintiff, | ) | **MOTION FOR NEW TRIAL   (Rule 24.1)** |
| | ) | |
| v. | ) | Assigned to the Hon. Warren J. Granville |
| | ) | |
| RICHARD CHRISMAN, | ) | Oral Argument Requested |
| | ) | |
| Defendant. | ) | |
| | ) | |

Defendant Richard Chrisman, through counsel undersigned, hereby moves

this Court for a New Trial on the grounds that the prosecutor has been guilty of misconduct

and that the verdicts are contrary to the weight of the evidence.  This Motion is made

pursuant to the Fifth and Fourteenth Amendments to the United States Constitution, Article

II, § 4 of the Arizona Constitution, and ARCrimP. Rule 24.1(c)(1) and (2).

**A.**       **DEPRIVATION OF A MATERIAL WITNESS**

In a letter dated November 20, 2012, after repeated requests from the

defense, the prosecutor disclosed the witnesses he intended to use at trial.  Andrew Hinz,[1]

who had tested the tasers in this case, was on the list.  The defense requested to interview

---

[1] The letter listed him as "Hines."

Mr. Hinz on May 31, 2011, but the state did not arrange an interview until July 24, one week before trial. Based on the interview, the defense determined that Hinz' testimony was highly relevant and desired to secure his presence at trial in the event the state did not call him. The defense requested from the state Hinz' contact information. The defense was informed that all contact with Mr. Hinz must be made through their office. Exhibit "A" hereto. The state was subsequently served with a defense subpoena for Mr. Hinz, and the state accepted said service. Exhibit "B" hereto. The defense attempted to make travel reservations for Mr. Hinz though the County Attorney's Office without success. His phone number was finally provided on August 20th, but Mr. Hinz refused to cooperate with the defense. Exhibit "C" hereto. The state finally provided Mr. Hinz' address on August 22, well after trial had started, and far too late to obtain Mr. Hinz' presence with a subpoena since he resides in Colorado. The state's actions cost Mr. Chrisman a material witness.[2]

**B.      CONTINUING PATTERN OF MISCONDUCT IN COURT**

From the beginning, the state has engaged in a pattern of improper conduct, beginning with Interim Maricopa County Attorney Rick Romley's release of the crack pipe incident to the media right after Mr. Chrisman's arrest. The prosecutor herein seized the baton and ran with it. At one oral argument on a Motion to Remand before Judge Stephens, the prosecutor stated that Mr. Chrisman lied and failed his employment polygraph exam, and was investigated for stealing and lied about it as well. The statements by the prosecutor were false. Moreover, not only is this information inadmissible, but also it had absolutely nothing to do with the legal or factual issues raised

---

[2] The importance of Andrew Hinz: the Phoenix Police Department had hired Andrew Hinz, who at the time was employed by Taser International in Scottsdale Arizona. He was hired to examine the Chrisman and Virgillo tasers, including the cartridges and the three probes found at the scene. His findings, among others, were the exact times that each taser was fired and that Chrisman's taser never completed the circuit. He authored a 51 page report.

2

in the Motion.  Instead, it was said solely because media was present in an attempt to spread false information about Mr. Chrisman.

Mr. Martinez continued his inappropriate conduct during interviews with Mr. Chrisman's character witnesses.  For example, he badgered one witness at length to force her to admit that she was in a same sex relationship and demanded her Social Security Number, even though she was an employee of the Maricopa County Sheriff's Office.  Of another witness he demanded her ex-husband's phone number.  He asked several witnesses if they had attended parties with Richard Chrisman where disrobing activities had taken place.

During the trial, out of the presence of the jury but with the television and print media in the courtroom, Mr. Martinez volunteered that Mr. Chrisman's cell phone records were important to his cross-examination of character witnesses because they showed "wife-swapping."  Again, not true.

During trial, Mr. Martinez continued his inappropriate conduct in cross-examining defense witnesses.  For example, when he learned that Peoria Police Officer Lon Bartel was using his vacation time to testify as an expert for the defense, he alleged he was a "double-dipper" and left the Peoria SWAT team without assistance.  He examined Sergeant Mattson on his Police Union ties and alleged the taxpayers were supporting him.  And with Mayra Hawkins Reesen, he grilled her on her maternity leave and why she had been away from work so long, yet had time to attend Mr. Chrisman's trial. He opened his cross with Sergeant Julie Egea by falsely accusing her of lying to him during his unsworn interview with her.

Mr. Martinez knew that Elvira Fernandez told Detective Cisneros that she lived in and owned the trailer but that she had put it in Daniel Rodriguez' name after she

3

incurred some medical bills as she didn't want the trailer to be taken away from her.  Mr. Martinez knew that basic search and seizure law gives any occupant of a residence the right to give consent to entry thereof.  Despite these facts, he continually emphasized that Virgillo and Chrisman entered the trailer without a warrant, in an improper attempt to confuse and prejudice the jury.  At one point, he attempted to have Virgillo testify that Ms. Fernandez was not the titled owner of the trailer.  Several objections by defense counsel were sustained.  He then asked Officer Virgillo whether, if he had known that the trailer had belonged to Rodriguez, he would have gone about investigating the domestic violence crime differently.  Mr. Martinez asked "How so?"  The defense objected on relevance ground, and when the Court asked Mr. Martinez what the relevance was, he volunteered the answer he had been attempting to elicit from the witness: "She doesn't own the trailer." And then, when the Court again asked him for the relevance, he stated: "She did not own the trailer."

   **Mr. Martinez' Closing Argument.**  In the beginning of his closing argument, Mr. Martinez intentionally made several false statements concerning the evidence.  For example, he stated four times that Richard Chrisman said Elvira Fernandez was hysterical when he spoke with her.  He told the jurors that Lon Bartel, a double-dipper, testified that he wanted the jurors to believe "that SWAT members could look through walls."  He stated that Sergeant Mattson and Sergeant Post (who had not even testified) returned Virgillo's "golden clipboard . . . to put pressure on Virgillo to change his mind."  He stated that Sergeant Egea was "Rich Chrisman's friend" and that Sergeant Mattson was a "union organizer."  All of the above statements were untrue and not in evidence, nor were they reasonable inferences from the evidence.

   The above, however, was just Mr. Martinez' warm up for his *pièce de*

4

*résistance* of duplicity.  Mr. Martinez was unable to convince the Court **not** to give a *Willits*

instruction.  In an attempt to neutralize this important instruction,[3] he accused the defense

witnesses of tampering with evidence.  Here is what he told the jurors.  He started by

stating that the defense had "presented something to you that wasn't quite right."  P. 34.

He said that Mayra Hawkins' recollection of the AFIDs was a "deception on her part."  P.

36.  And then he moved to Eric Rude:

> Did Eric Rude move that [evidence]?  Probably.  Sure he did.
> As he's the only one who had access to it.  There can be no
> other way about it.  P. 40.

Eric Rude moved those items.  He failed to preserve.  It wasn't Detective Porter.  It

defendant's friend.[4]  P. 43.

> And in light of what you have seen about things being moved
> by Eric Rude . . . it is a staged scene for you .  .  . .  Pp. 46-47.

And after accusing the defense witnesses of tampering with the evidence, he

summed up his argument as follows:

> Is that something that really you think the defendant should be
> given a double bonus for that, just because his friend did that
> for him, did them that favor?  And because we have somebody
> by the name of Mayra Hawkins who wants to do him a favor to
> talk about something like that, are you going to give him the
> double bonus?  No, that's not how it works.

> But - - so therefore we don't have to even explain the loss,
> destruction, or failure to preserve because it was, if you will, his
> friends that did it.  Pp. 43-44.

---

[3]  The instruction was important for several reasons.  Significantly, the Case Detective, Kenny Porter,
had not known that when fired, a taser ejects AFIDs which identify the taser fired.  Since Porter did not know
AFIDs existed when he investigated the shooting, he neither looked for nor seized any and, more
significantly, did not have scene photographs taken before a storm significantly altered the crime scene.

[4]  There was no evidence that Officer Rude was a friend of Chrisman's:

*     *     *

There is a staging of the scene.  P. 47

*     *     *

We'll send Sergeant Mattson to talk to him along with Mark Post.  P. 48.

*     *     *

He [Chrisman] tried to get help from his friends who were
moving things around and they were talking about AFIDs.  P.
67.

Taken as a whole, the conduct of this prosecutor before and during trial rises
to the level of misconduct as contemplated by Rule 24.1(c)(2), entitling Chrisman to a new
trial.  Counsel would suggest that this prosecutor has no interest in adhering to his
obligation to see that "justice is done" but is only intent on obtaining convictions through
intimidation, innuendo and accusations based on unreasonable inferences.  Arizona
Supreme Court Justice Michael Ryan's statements contained in defense counsels' Motion
in Limine re: Prosecutorial Misconduct are indeed prophetic.

**C.**     **MOTION FOR NEW TRIAL ON AGGRAVATING FACTOR**

The defense incorporates the facts and argument contained in Motion to
Vacate Judgment of Aggravating Factor: "Emotional Harm" as reasons for a new trial on
the aggravating factor as well.

**D.**     **THE VERDICT IS CONTRARY TO THE WEIGHT OF THE EVIDENCE**

Assuming *arguendo* that the jury found that Chrisman pointed the gun at
Rodriguez' head, the only evidence that the state has that Rodriguez was placed in
"reasonable apprehension of immediate physical injury" was the testimony from Sergio
Virgillo that Rodriguez "looked shocked.  His eyes were wide open." Rodriguez continued
to argue with Chrisman immediately after that, then fought off both officers' physical

6

attempts to subdue him, fought off OC spraying and then tasing. That evidence belies the finding that Rodriguez was apprehensive, or fearful, of physical injury when the gun was pointed at him. If the state's theory is correct, then anytime someone points a gun at another, the person would be guilty of aggravated assault, which is not what the statute requires. An expression of surprise for a second or two does not prove apprehension beyond a reasonable doubt.

RESPECTFULLY SUBMITTED this 27th day of September, 2013.

MEHRENS AND WILEMON, P.A.

By: /s/ Craig Mehrens
    Craig Mehrens
    Attorney for Defendant

ORIGINAL of the foregoing e-filed
this 27th day of September, 2013, with:

Clerk of the Court
*Maricopa County Superior Court*
201 W. Jefferson
Phoenix, AZ 85003

COPIES of the foregoing e-mailed
this 27th day of September, 2013, to:

Hon. Warren J. Granville
*Maricopa County Superior Court*
175 W. Madison, Suite 13103
Phoenix, AZ 85003
mtaube@superiorcourt.maricopa.gov

7

Juan Martinez, Esq.
*Maricopa County Attorney's Office*
301 W. Jefferson, 4th Floor
Phoenix, AZ 85003
martinej@mcao.maricopa.gov


Patrick G. Gann, Esq.
Law Offices of Patrick G. Gann
522 W. 1st Street, # 104
Tempe, AZ 85281
PGGann@mac.com



/s/ Amy Wilemon
    Amy Wilemon

EXHIBIT A

From:    Taylor Katherine <taylok01@mcao.maricopa.gov>
Subject: RE: State v. Chrisman
Date:    July 25, 2013 3:27:09 PM MST
To:      "Kim H." <kim_gann@me.com>

Good afternoon,

Mr. Hinz has requested that any contact be made through our office.  Thank you.

*Kathie Taylor*
*Paralegal*
*Homicide Bureau*
*Maricopa County Attorney's Office*
*(602) 506-8389*

**From:** Kim H. [mailto:kim_gann@me.com]
**Sent:** Thursday, July 25, 2013 1:12 PM
**To:** Taylor Katherine
**Subject:** State v. Chrisman
**Importance:** High

Good afternoon Kathie:

Could you please provide me with Andrew Hintz' current address and telephone number?

Thank you!


Kim Hewes
Legal Assistant to Patrick G. Gann
PATRICK G. GANN, ATTORNEY AT LAW
522 W. 1st Street, Suite 104
Tempe, Arizona 85281
Email:  Kim_gann@me.com
Phone: 480-786-1919
Fax:  480-786-1920


Privileged/confidential information may be contained in this message and may be subject to legal privilege. Access to this e-mail by anyone other than the intended is unauthorized. If you are not the intended recipient, you may not use, copy, distribute or deliver to anyone this message (or any part of its contents ) or take any action in reliance on it. In such case, you should destroy this message, and notify us immediately. If you have received this e-mail in error, please notify us immediately by e-mail or telephone and delete the e-mail from any computer

# EXHIBIT B

1  PATRICK G. GANN
   522 W. 1st Street, #104                    ORIGINAL
2  Tempe, Arizona 85281
   Arizona State Bar No. 015073
3  PGGann@mac.com
   480-786-1919
4  480-786-1920 (fax)

5

6                  IN THE MARICOPA COUNTY SUPERIOR COURT

7                   COUNTY OF MARICOPA, STATE OF ARIZONA

8  STATE OF ARIZONA,                  )
                                      )        Case No. CR2010-153913-001
           Plaintiff,                 )
9                                     )
                                      )
10          vs.                       )        SUBPOENA IN A CRIMINAL ACTION
                                      )        If you would like legal advice from a lawyer,
11                                    )        contact the Lawyer Referral Service at
   RICHARD CHRISMAN,                  )
12                                    )               602-257-4434
           Defendant                  )                   or
13                                    )        www.lawyerfinders.org.
                                               Sponsored by the
14 THE STATE OF ARIZONA TO:   Andrew Hinz      Maricopa County Bar Association
                              c/o Maricopa County Attorney's Office
15                            301 W. Jefferson, 4th Floor
                              Phoenix, Arizona 85003
16
   YOU ARE COMMANDED to appear and give testimony at a Jury Trial at the time
17 and place specified below:

18 BEFORE WHOM APPEARANCE TO BE MADE: Judge of the Maricopa County Superior
   Court, Courtroom #5B
19
   DATE AND TIME OF APPEARANCE:   Wednesday, July 31, 2013 at 8:00AM
20
   PLACE OF APPEARANCE:           Maricopa County Superior Court
21                                Courtroom #5B
                                  South Court Tower
22                                175 W. Madison
                                  Phoenix, AZ 85003
23
        In the event this Subpoena is for appearance before the Court, please contact the
24 division of this Court stated above the determine if the trial or hearing time has been changed.
   A.R.S. Section 22-217, 12-2211; RCP 45(a), 53(e).
25
        You have been subpoenaed by the Defendant whose attorney's name, address and
26 telephone number is:
                              Patrick G. Gann
27                            522 W. 1st Street, #104
                              Tempe, AZ 85281
28                            (480) 786-1919

1    YOU ARE HEREBY NOTIFIED THAT ANY FAILURE TO OBEY THIS SUBPOENA
     WITHOUT ADEQUATE EXCUSE MAY BE DEEMED A CONTEMPT OF THIS COURT,
2    AND A CIVIL ARREST WARRANT MAY BE ISSUED. A CIVIL ARREST IS AN ORDER
     DIRECTING ANY POLICE OFFICER IN ARIZONA TO ARREST YOU AND BRING YOU
3    BEFORE THIS COURT FOR FUTURE PROCEEDINGS.

4
     SIGNED AND SEALED this date: _____   JUL 26 2013
5
6                                    MICHAEL K. JEANS
                                     CLERK OF THE COURT
7

8
                                     _____
9                                    Deputy Clerk of the Court

10

11                                          S. PONICKI
                                            DEPUTY CLERK
12

13

14           REQUESTS FOR REASONABLE ACCOMMODATION
             FOR PERSONS WITH DISABILITIES MUST BE MADE
15              TO THE DIVISION ASSIGNED TO THE CASE
               BY PARTIES AT LEAST 3 JUDICIAL DAYS IN
16            ADVANCE OF A SCHEDULED COURT PROCEEDING.

17

18

19

20

21

22

23

24

25

26

27

28

MICHAEL K. JEANES, CLERK
RECEIVED SB
OUTSIDE DEPOSITORY

IN THE MARICOPA COUNTY SUPERIOR COURT
COUNTY OF MARICOPA, STATE OF ARIZONA 13 JUL 29 PH 12: 35

STATE OF ARIZONA,                    )        Case No. CR2010-153913-001
                                     )
          PLAINTIFF,                 )
                                     )
     vs.                             )
                                     )        DECLARATION OF SERVICE BY
RICHARD CHRISMAN,                    )        PRIVATE PROCESS SERVER
                                     )
          DEFENDANT                  )
                                     )

---

**GENERAL DESCRIPTION OF DOCUMENTS SERVED:**
SUBPOENA IN A CRIMINAL ACTION

I SERVED TRUE COPIES OF THE ABOVE LISTED DOCUMENTS ON THE PERSON/ENTITY LISTED BELOW
IN ACCORDANCE WITH THE ARIZONA RULES OF CIVIL PROCEDURE:

**PERSON/ENTITY:**      ANDREW HINZ

**MANNER:**  SERVED PARALEGAL TO MARICOPA COUNTY ATTORNEY JUAN MARTINEZ, KATHERINE TAYLOR, WHO
            WAS AUTHORIZED TO ACCEPT SERVICE ON BEHALF OF ANDREW HINZ.

**NOTES:**    WHITE FEMALE, 41 YRS OLD, BROWN HAIR, 5'4", 150-180LBS.

**ADDRESS:** 301 W JEFFERSON ST 4TH FLOOR, MARICOPA COUNTY ATTORNEY OFFICE.

**DATE:**     7/29/2013                           **TIME:**      8:15 AM

THE UNDERSIGNED CERTIFIES UNDER PENALTY OF PERJURY THAT I AM CERTIFIED TO SERVE PROCESS IN THIS
ACTION WITHIN THE STATE OF ARIZONA; HAVING BEEN SO CERTIFIED AND REGISTERED BY THE SUPERIOR
COURT OF MARICOPA COUNTY, ARIZONA, AND THAT THE ABOVE IS TRUE AND ACCURATE TO THE BEST OF
MY KNOWLEDGE.

                    DECLARANT        _Sarah Zirakian_

                    SARAH ZIRAKIAN
                    ARIZONA PROCESS SERVICE LICENSE #7838
                    July 29, 2013

# EXHIBIT C

From: Taylor Katherine <taylok01@mcao.maricopa.gov>
Subject: RE: Andrew Hinz
Date: August 20, 2013 11:24:09 AM MST
To: "Kim H." <kim_gann@me.com>

Kim,

Mr. Hinz would like your office to make all travel arrangements.  He can be reached at (303) 809-8090.  Thank you.

*Kathie Taylor*
*Paralegal*
*Homicide Bureau*
*Maricopa County Attorney's Office*
*(602) 506-8389*

From: Kim H. [mailto:kim_gann@me.com]
Sent: Thursday, August 15, 2013 1:37 PM
To: Taylor Katherine
Subject: Re: Andrew Hinz

Good afternoon Kathie:

We cannot make any reservations for Mr. Hines without an address nor can we book a plane or hotel without one.  We will also need Mr. Hinz' phone number if there is a delay in flights or if there is a change in the Court's schedule.

Please provide this to us as soon as possible so I can get things set up.

Kim Hewes
Legal Assistant to Patrick G. Gann
PATRICK G. GANN, ATTORNEY AT LAW
522 W. 1st Street, Suite 104
Tempe, Arizona 85281
Email: Kim_gann@me.com
Phone: 480-786-1919
Fax: 480-786-1920

Privileged/confidential information may be contained in this message and may be subject to legal privilege. Access to this e-mail by anyone other than the intended is

unauthorized. If you are not the intended recipient, you may not use, copy, distribute or deliver to anyone this message (or any part of its contents ) or take any action in reliance on it. In such case, you should destroy this message, and notify us immediately. If you have received this e-mail in error, please notify us immediately by e-mail or telephone and delete the e-mail from any computer

**PLEASE NOTE OUR OFFICE HAS RELOCATED TO 522 W. 1st Street, #104, Tempe, AZ 85281**

On Aug 15, 2013, at 1:13 PM, Taylor Katherine wrote:

Good afternoon,

I spoke with Andrew Hinz this afternoon. He has a busy schedule the next three weeks and would like to know as soon as possible when he will be needed to testify. He will need to make arrangements with his work schedule.

Please book his flight/hotel arrangements. His driver's license has Andrew Hinz and his DOB is 02/04/73. Mr. Hinz should not have to pre-pay any costs. Thank you.

Kathie Taylor
Paralegal
Homicide Bureau
Maricopa County Attorney's Office
(602) 506-8389

From: Kim H. [mailto:kim_gann@me.com]
Sent: Thursday, August 15, 2013 11:04 AM
To: Taylor Katherine
Subject: Re: Andrew Hinz

Good morning Kathie:

This email serves as confirmation that we will pay for coach fare and reasonable hotel / per diem however he may want to make his own arrangements. Unfortunately, I cannot give a date yet because Mr. Martinez is still presenting his case and we don't know when he will rest.

Kim Hewes
Legal Assistant to Patrick G. Gann
PATRICK G. GANN, ATTORNEY AT LAW
522 W. 1st Street, Suite 104
Tempe, Arizona 85281
Email: Kim_gann@me.com
Phone: 480-786-1919
Fax:  480-786-1920

Privileged/confidential information may be contained in this message and may be
subject to legal privilege. Access to this e-mail by anyone other than the intended is
unauthorized. If you are not the intended recipient, you may not use, copy, distribute or
deliver to anyone this message (or any part of its contents ) or take any action in
reliance on it. In such case, you should destroy this message, and notify us immediately.
If you have received this e-mail in error, please notify us immediately by e-mail or
telephone and delete the e-mail from any computer

**PLEASE NOTE OUR OFFICE HAS RELOCATED TO 522 W. 1st Street, #104,
Tempe, AZ 85281**

On Aug 15, 2013, at 9:38 AM, Taylor Katherine wrote:

Good morning Kim,

I forwarded a copy of the subpoena on to Mr. Hinz and he will make himself available for
trial. Please provide me with dates and times he will be needed and I will forward the
information. As a reminder you will need to make airline and hotel arrangements for him.
Thank you.

Kathie Taylor
Paralegal
Homicide Bureau
Maricopa County Attorney's Office
(602) 506-8389

From: Kim H. [mailto:kim_gann@me.com]
Sent: Thursday, August 15, 2013 9:19 AM

# Juan Martinez

# 15-3363

Exhibits to initial charge
Attachment 06
(Irizarry transcripts 7-20-10)

1

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

THE STATE OF ARIZONA,          )
                               )
            Appellee,          )
                               )
        vs.                    )  No. CR 2010-106178-001 SE
                               )  No. 1 CA CR 10-0866
DAIMEN JOSEPH IRIZARRY,        )
                               )
            Appellant.         )
_____)

Phoenix, Arizona
July 20, 2010
10:34 a.m.

BEFORE:  The Honorable CHRISTOPHER T. WHITTEN, Judge

REPORTER'S TRANSCRIPT OF PROCEEDINGS

JURY TRIAL

APPEARANCES:

FOR THE APPELLEE:
Mr. Juan M. Martinez

FOR THE APPELLANT:
Mr. Charles K. Shell

PREPARED BY:

Pamela D. Remus, RPR
Official Court Reporter
Certificate No. 50399

PREPARED FOR APPEAL

(COPY)

PUBLIC DEFENDER

MAR 1 0 2011

APPEALS RECEIVED

1

2

# I N D E X

WITNESS:                                                    Page

VANKILSDONK, Jason

       Direct Examination by Mr. Martinez          4
       Cross Examination by Mr. Shell              9
       Redirect Examination by Mr. Martinez       11

GARCIA, David

       Direct Examination by Mr. Martinez         12
       Cross Examination by Mr. Shell             18
       Redirect Examination by Mr. Martinez       20

KINGSLEY, Melissa

       Direct Examination by Mr. Shell            32
       Cross Examination by Mr. Martinez          40
       Redirect Examination by Mr. Shell          43

3

15

P R O C E E D I N G S

THE COUR:  Go ahead and take a seat.  The record ought to reflect the presence of counsel and the defendant but not the jury.

Mr. Shell, have you seen the Motion to Quash the Subpoena?

MR. SHELL:  I did see that.

THE COURT:  Any objection?

MR. SHELL:  No.

THE COURT:  Okay.  That's granted.  Anything else to do before we bring the jury in?

MR. MARTINEZ:  No.

THE COURT:  Mr. Shell?

MR. SHELL:  I have glanced at the jury instructions.  I think the only thing you are missing is accomplice.

THE COURT:  Okay.  Good.  I will add that in and we will talk about them more.  I think we will probably have a break if you finish this morning.  What I plan is if you finish this morning earlier, we can do the motions, directed verdict motions, and do the jury instructions then to the extent that we can do them.  I will add that one.  Anything else?

MR. SHELL:  No.

4

1      THE COURT:  Okay.  Go ahead and bring them in.

2              (The jurors entered the courtroom.)

3      THE COURT:  Everyone, go ahead and take a seat.

4  The record ought to reflect that we have been joined by

5  the jury.  Mr. Martinez, will you call your next witness?

6      MR. MARTINEZ:  The State calls Jason VanKilsdonk.

7

8              JASON VANKILSDONK,

9  called as a witness herein, having been first duly sworn,

10  was examined and testified as follows:

11

12              DIRECT EXAMINATION

13  BY MR. MARTINEZ:

14      Q.   Your name, sir?

15      A.   Jason Brian VanKilsdonk.

16      Q.   Who do you work for?

17      A.   Shamrock Farms.

18      Q.   What do you do for Shamrock Farms?

19      A.   I drive trucks and deliver replying milk for

20  them.

21      Q.   Drawing your attention to January 28th of

22  2010, did you also work for the same company?

23      A.   Yes, sir.

24      Q.   You say you drive trucks.  Back then on

25  January 28th, what kind of truck were you driving?

5

16

1      A.    I was driving an 18-wheeler.

2      Q.    And on that particular day, what time did

3  you start work?

4      A.    Roughly around 8:00 o'clock at night or so.

5      Q.    And what did your duties call or where were

6  you going?  What was going on?

7      A.    I was dispatched from Phoenix on my way

8  eastbound on U.S. 60 to Globe, and then from there

9  eastbound to Safford.

10     Q.    When you say you were dispatched, you were

11 driving an 18-wheeler, I guess?

12     A.    Yes, sir.

13     Q.    And you were carrying items somewhere;

14 right?

15     A.    Yes, sir.

16     Q.    And about 11:00 o'clock at night or maybe

17 about that time or a little after, where were you?

18     A.    I was in between Safford and Globe heading

19 eastbound on U.S. 60.

20     Q.    Did there come a come a time where there was

21 some activity behind?

22     A.    Yes, sir.

23     Q.    Tell me about that.

24     A.    As I was driving through the canyon walls, I

25 got past the passing lane, you know, a decent amount of

6

time past that, and I noticed out of my have left mirror
some headlights coming up on me fairly quick which kind of
alarmed me.   We were in a section where it was only a
two-lane highway, and we were coming up on a blind corner.

Q.   When you say it is a blind corner, what's
that mean?

A.   What that means is by the time you saw
oncoming traffic, you would have no time to respond.

Q.   And if you are in that -- and if you are
passing in that other lane you will get hit?

A.   Absolutely.

Q.   Go ahead.

A.   So as the vehicle came up passing me, I
noticed at a very high rate of speed and kind of alarmed
me going around that corner if there was another vehicle
coming that direction it would have been real bad.   It
would have hit the other vehicle probably hitting me and
along the side was a guardrail which would have dropped us
down into a creek.

Q.   So then what happened?

A.   I had noticed that there was a passenger who
was hanging out of the door rummaging through one of the
utility boxes.

Q.   Before we get there, did this car, as it's
coming up towards you, did it actually pass you?

7

16

1          A.    Absolutely, yes.

2          Q.    Where did it pass you?  At the blind corner

3    or before it or --

4          A.    Just before it.

5          Q.    Okay.

6          A.    It was well after the passing lanes coming

7    up around the blind corner.

8          Q.    So there wasn't a passing lane, if you will,

9    at the blind corner?

10         A.    Absolutely not.

11         Q.    So he goes around you and is he going much

12   faster than you?

13         A.    Yes, sir.

14         Q.    And then what happens?  What do you see?

15         A.    I noticed that the passenger was hanging out

16   of the door rummaging through the utility box on the

17   truck.

18         Q.    Describe for me how was he hanging out when

19   you say he was hanging out?

20         A.    He had the passenger door open.  It looked

21   like he was hanging on the inside of the cab with one arm

22   leaning around outside the truck with the other arm going

23   through the utility box.

24         Q.    And the utility box was on the side of the

25   truck?

8

16

1      A.    Yes, sir.

2      Q.    Then what happened?

3      A.    And then he proceeded to pull out a

4   high-lift jack.

5      Q.    What is a high-lift jack?

6      A.    It is a large jack used to pick up heavy

7   objects, very large piece of metal.   They weigh about 40

8   pounds or so.

9      Q.    And what did he do with that high-lift jack?

10     A.    He pulled it out of the utility bed and

11   proceeded to throw it in my direction.

12     Q.    As he threw it at you, what did you do?

13     A.    I started to move towards the inside of the

14   lane trying to avoid it.   If I did hit it, it could have

15   blown out my tires.

16     Q.    Did you move to the right or the left as you

17   were driving eastbound?

18     A.    I moved over to the left more.

19     Q.    Why not to the right?

20     A.    Because there is a guardrail on that side.

21     Q.    So then what happens?

22     A.    And then as I am moving to the left to avoid

23   the jack, I see the police lights in my mirror.

24     Q.    Do they catch up to you?

25     A.    Absolutely, yes.

16

17

1        Q.   And then what happens?

2        A.   Well, with the police coming up on my left

3    side, I had no choice but to move back to the right, run

4    over part of the jack, and then I see the passenger.  He's

5    got a handgun, and he's firing at the police.

6        Q.   And when he is firing at the police, how far

7    is the truck from you?

8        A.   The truck is probably about 20 feet in front

9    of me on the left side.

10       Q.   And is it still driving fast when the shots

11   were fired?

12       A.   Yes.

13       MR. MARTINEZ:   I don't have any another

14   questions.

15       THE COURT:   Cross.

16

17                   CROSS EXAMINATION

18   BY MR. SHELL:

19       Q.   How fast were you going?

20       A.   On that section of highway I was probably

21   going around 40 miles an hour.

22       Q.   And this truck goes past you and at a higher

23   rate of speed?

24       A.   Yes.

25       Q.   And then the first thing that you see is

1    somebody throwing a jack out of a utility box on the side?

2            A.    Yes.

3            Q.    And then that same person is firing a gun?

4            A.    Yes.

5            Q.    And that happens 20 feet in front of you?

6            A.    Yes.

7            Q.    Was the truck slowing down?

8            A.    My truck or his?

9            Q.    His.

10           A.    Not that I could tell.

11           Q.    So the truck passes you at a high rate of

12   speed; correct?

13           A.    Yes.

14           Q.    And the first thing that you see while the

15   truck -- after the truck passing you is the passenger

16   throws something out of one of the side utility boxes on

17   the truck?

18           A.    Yes.

19           Q.    Correct?

20           A.    Yes.

21           Q.    Then the next thing that you see the

22   passenger do is fire a gun?

23           A.    Uh-huh.

24           Q.    Yes?

25           A.    Yes.

11

17

1    Q. And that all happens 20 feet in front of

2 you.

3    A. Yes.

4    MR. SHELL: I don't have any other questions.

5    THE COURT: Redirect.

6

7       REDIRECT EXAMINATION

8 BY MR. MARTINEZ:

9    Q. With regard to this truck, you said that it

10 passed you at that time at a high rate of speed, and when

11 all of this is happening did the truck ever come to a stop

12 as you recall?

13    A. Yes. When I pumped over to a safe area of

14 the truck stop at 75 yards or so in front of me.

15    Q. And what did you do then?

16    A. At that point I pulled over and I sunk the

17 driver's seat of my truck down as low as it could go so I

18 could get behind the engine as I could to avoid any stray

19 bullets.

20    MR. MARTINEZ: No further questions.

21    THE COURT: Does the jury have any questions for

22 this witness? Thank you. You are excused.

23    MR. MARTINEZ: The State calls David Garcia.

24

25

17

12

                          DAVID GARCIA,

1

2    called as a witness herein, having been first duly sworn,

3    was examined and testified as follows:

4

5                        DIRECT EXAMINATION

6    BY MR. MARTINEZ:

7         Q.    Your name, sir?

8         A.    David Garcia.

9         Q.    And you work for the Mesa Police Department?

10        A.    Yes, sir.

11        Q.    How long have you been with them?

12        A.    13 and a half years.

13        Q.    Drawing your attention back to January 28th

14   of 2010, did you have a chance to be on duty sometime

15   around 10:45 in the evening?

16        A.    Yes, sir.

17        Q.    And specifically about that time or a little

18   later did you have a call that prompted you to respond?

19        A.    Yes, sir.

20        Q.    And about about what time was the call?

21        A.    Oh, I would say about 10:40 to -- between

22   10:40 and 11:00 o'clock.

23        Q.    And what kind of call was it?

24        A.    I just started my shift, and I hear a hot

25   tone which means there is emergency traffic, and it came

13

out as an agency assist that a Gilbert officer had been shot.

Q.   So how did you become involved?

A.   I was listening to the radio.  I heard that the suspect vehicle had fled from the scene.  That it was a white work truck and that it was last seen, I believe, by a Gilbert officer on U.S. 60 going eastbound, so I jumped on the freeway at Power Road.

Q.   And when you jumped on the freeway were you able to see the truck?

A.   Yes, sir.

Q.   Where was it in relationship to you?

A.   As I was getting off the ramp on to the 60, the truck passed by me going eastbound with two other marked patrol units behind it.

Q.   And so you then got behind them; correct?

A.   Yes, sir.

Q.   As you are traveling along, in terms of the truck, are you able to -- how close are you to it at that point?

A.   Seemed fairly close, easily within half a mile.

Q.   And at any time did you see anybody in the bed of the truck?

A.   Yes.

14

17

1          Q.     When did you notice that?

2          A.     Numerous times throughout the pursuit.  Once

3    I got on the freeway I probably recognized that someone

4    was in the truck maybe within the first four, five miles.

5          Q.     And what was that person doing?

6          A.     He was throwing items out of the bed of the

7    truck.

8          Q.     What items were you able to see that were

9    being thrown?

10         A.     Pickaxes, shovels, saws, reciprocating saw,

11   a box of one-foot by one-foot nails, something that looked

12   like a flagpole.  It had a flat base and a pole sticking

13   up out of it, and several other items.

14         Q.     So it appears that you were there in the

15   number two and three position when you first got into the

16   chase; right?

17         A.     Yes, sir.

18         Q.     At some point did you become number two or

19   number one?  What happened?

20         A.     Both.  As we were pursuing the vehicle, it

21   was a Mesa officer, I believe, and then a Gilbert vehicle.

22   The Gilbert vehicle -- I was behind it.  Not flames, but

23   sparks started coming out from the bottom of the car.  It

24   pulled over to the right-hand-side of the road, and then I

25   was second in the pursuit, and I was calling out the

18

15

18

1   pursuit on the Mesa radio.

2        Q.   And did you have occasion as you are calling

3   out the pursuit to get all the way into Superior?

4        A.   Yes, sir.

5        Q.   What happened when you got into Superior?

6        A.   By the time we were maybe four, five miles,

7   I would guess, estimate, outside of Superior, the lead

8   vehicle was also taken out of the pursuit with a flat

9   tire, I believe.  I became the first one in the line of

10  the pursuit following the suspect vehicle.

11       Q.   Then what happened?

12       A.   As we were entering into Superior we were

13  still going eastbound entering Superior right at about

14  where the Superior city limits begin.  The road drops off

15  kind of a little way that it goes down into the town of

16  Superior.  The suspect had attempted to throw a double

17  cylinder gas engine compressor out of the bed of the

18  truck.  It hung up on the towball the truck.  As it was

19  dragging end at the end of the truck it caught on fire.

20  As I came over the hill the compressor loose, and I hit it

21  with my patrol car.

22       Q.   Did you actually see the compressor being

23  thrown or not?

24       A.   Yes.

25       Q.   And how was the individual driving this

16

18

1  truck at the time the compressor was thrown out?  Was he

2  speeding up or how was he driving?

3       A.   He was driving steady.  The guy was in the

4  back of the car and at this point the truck was sitting in

5  both lanes right in the middle of the road just going

6  really fast down the road.

7       Q.   And what would you estimate the speed was at

8  that time?

9       A.   I think he was probably going in the 80s.

10      Q.   And so you hit this compressor?

11      A.   Yes.

12      Q.   And this compressor hits you, in terms of

13  your belief, were you scared?  Were you in reasonable

14  apprehension of imminent physical injury?  Or explain to

15  me what you felt.

16      A.   Oh, absolutely.  The weather -- it was

17  raining.  It was real foggy.  The roads were wet.  I came

18  up on a compressor.  At the speed I was going I knew I

19  might try to drive to avoid the compressor.  I thought I

20  could hit it, so I held onto the steering while and hit

21  it.

22      Q.   So were you scared?

23      A.   Absolutely, yes.

24      Q.   And did you continue on to the ultimate

25  location where the person was apprehended, or was that it

17

18

1    for you?

2           A.    After my car came to rest on the right side

3    of the road, I jumped out and I got into the car with some

4    other Mesa officers.  I don't know who they were.  I got

5    in the back seat, and I continued up to the I guess that's

6    the 60 up to where the suspect vehicle finally came to

7    stop.

8           Q.    Did you have anything to do with any of the

9    arrests in this case?

10          A.    No.  As the arrests were being affected, I

11   stayed back at the marked patrol cars.

12          Q.    it looks like the TV is on video, but

13   Exhibits 19 through 23 are already in evidence.  Take a

14   look at those and see if you recognize the car there?

15          A.    Yes, sir.

16          Q.    Whose car is that?

17          A.    That was my assigned marked patrol car.

18          Q.    And is that the car that was damaged?

19          A.    Yes, sir.

20          Q.    And Exhibits 14, 15 and 16, what do they

21   show?  They are already in evidence.

22          A.    That's the double tank air compressor that I

23   hit.

24          MR. MARTINEZ:  I don't have any other questions.

25          THE COURT:  Cross.

18

```
 1                        CROSS EXAMINATION

 2   BY MR. SHELL:

 3         Q.   Officer Garcia, it was dark that night?

 4         A.   Yes, sir.

 5         Q.   And foggy and rainy?

 6         A.   Yes.

 7         Q.   You did make it up to the scene; correct?

 8         A.   Yes, sir.

 9         Q.   And up to the scene where the suspects were

10   apprehended?

11         A.   Correct.

12         Q.   And you were interviewed about this case;

13   correct?

14         A.   No, sir.

15         Q.   You didn't give an interview to an --

16         A.   Oh, yes, with DPS, yes, sir.

17         Q.   And you told them that Mr. Irizarry, the

18   driver of the vehicle, once you got up to the scene he was

19   being cooperative and he crawled out away from the truck?

20         A.   I did not say that.

21         Q.   Did you have a chance to review your

22   transcript in this case?

23         A.   No, sir.

24         Q.   Let me show you what's been marked as

25   Exhibit No. 134.  Do you recognize that?
```

19

19

1          A.    No.   This is the first time that I have seen

2     it.

3          Q.    Okay.   You did give an interview, though,

4     with some detectives from the Department of Public Safety?

5          A.    Correct.

6          Q.    Review that.   Does that look like the

7     interview that you gave?

8          A.    Do you want me to read throughout the whole

9     thing?

10          Q.    No.   Just to enough where you can either say

11     yes or no.

12          A.    Yes.

13          Q.    It looks like your interview?

14          A.    Yes.

15          Q.    Go to page Bates Stamp No. the bottom

16     numbers on the bottom that are Bates stamped.   Go to 5478

17     and 5479.   Read the bottom of 5478 and the top of 5479 and

18     see if that refreshes your memory about whether the driver

19     was cooperative or not.

20          A.    [Witness complied.]

21          A.    You said 79 also?

22          Q.    Yeah, the top, I think.

23          A.    [Witness complied.]

24          Q.    Okay.   Does that refresh your memory about

25     what you talked about with the detectives from DPS?

20

19

1        A.    Yes.

2        Q.    And did you tell them that Mr. Irizarry, the

3    driver, was cooperative and crawled out away from the

4    truck?

5        A.    I said of the two, that he was the one that

6    was somewhat cooperative at that point.

7        Q.    And crawled out?

8        A.    Followed orders and moved out from under the

9    truck.  Moved out, yes.

10        MR. SHELL:  Nothing else.

11        THE COURT:  Redirect.

12

13                REDIRECT EXAMINATION

14   BY MR. MARTINEZ:

15        Q.    You didn't say cooperataive.  You said he

16   was somewhat cooperative?

17        A.    Correct.

18        MR. MARTINEZ:  Nothing else.

19        THE COURT:  Any questions from the jury?  Okay.

20   You are excused.

21        MR. MARTINEZ:  The State rests.

22        THE COURT:  We are going to take a short break,

23   probably about 15 minutes.  We will call you back in in

24   about 15 minutes.  Remember the admonition.

25                (The jurors exited the courtroom.)

21

19

1      THE COURT:  Please be seated.  The record ought

2   to reflect the presence of counsel and the defendant and

3   not the jury.  Mr. Shell?

4      MR. SHELL:  Your Honor, pursuant to Rule 20, I am

5   going to ask the Court to dismiss all of the aggravated

6   assault and all of the drive-by shooting counts.  There

7   has been absolutely no evidence introduced that Mr.

8   Irizarry ever fired a weapon or that he ever threw

9   anything out of the truck that would have committed these

10   assaults.  At this point I do not have an argument about

11   the unlawful flight.  I think the State has introduced

12   evidence that he did commit unlawful flight.

13      THE COURT:  The motion is denied.  Anything else

14   that we need to take up now?

15      MR. SHELL:  No.

16      THE COURT:  I have copies of the jury

17   instructions.  I added the accomplice liability theory.

18   Is there anything else that you saw in there that either

19   shouldn't be in there or that was missing?

20      MR. MARTINEZ:  I believe we should add

21   5.03(1)(a), the RAJI.  That's the one that talks

22   specifically about --

23      THE COURT:  5.03?

24      MR. MARTINEZ:  Dash (1)(a).  And that's the jury

25   instruction that indicates that it's no defense to any

22

1   recquisite state of mind or criminal act if the criminal

2   acts were committed due to temporary intoxication

3   resulting from the voluntary ingestion of any illegal

4   substance.   And there has been evidence in this case that

5   the defendant was at 704 nanograms per millileter of

6   methamphetamine, so I think that that's what makes this

7   appropriate.

8                The other jury instruction, just a

9   modification of one that you have here, it involves the

10   crime of aggravated assault.   The charge is an aggravated

11   assault, but is -- I am looking at 12.04.   It involves the

12   assault was aggravated by at least one of the following

13   factors.   The defendant knew or had reason to know that

14   the person assaulted was a peace officer performing

15   official duties.   We charged that.   The difference is one

16   is a Class 3 and one is a Class 2.

17                THE COURT:   So all the ag assaults because of the

18   knew or should known it was a police officer?

19                MR. MARTINEZ:   Correct.

20                THE COURT:   Okay.   Any objection to either that

21   addition of the voluntary intoxication or the change to

22   the ag assaults?

23                MR. SHELL:   Yes.   The voluntary intoxication

24   still requires the State to prove a requisite mental

25   state.   Voluntary intoxication or temporary intoxication

23

is not a defense to any requisite mental state.  The State

still has to prove mental state.  Their argument can't be

because he may have been impaired, therefore, we don't

have to prove a mental state.  What it says is I cannot

use or a defendant cannot use intoxication as a defense to

a mental state.  We have absolutely no intention of using

intoxication as a defense to any mental state.

The State still has the burden of proving

the mental state, and under 13-503, it says that temporary

intoxication does not constitute insanity and is not a

defense for any criminal act or requisite state of mind,

so it's not a defense.  We are not using it as a defense.

THE COURT:  The RAJI doesn't talk about it, act

or state of mind.  It talks to it about being it is to a

criminal act.  It says it is not a defense to any criminal

act.  If the criminal act -- it should be criminal acts.

If the criminal acts were committed due to the temporary

intoxication resulting from the voluntary ingestion

consumption in the inhalation, injection of illegal

substance.  It doesn't talk about it being a defense to a

mental state, but it's not a defense to the criminal act.

MR. SHELL:  I would ask the Court to look at the

Statute 13-503.

THE COURT:  Okay.  All right.

MR. SHELL:  It clearly states it is not a defense

24

for, I agree, any criminal act or requisite state of mind.

THE COURT:  So that seems to be in harmony with the jury instruction.

MR. SHELL:  You are saying the -- all the jury instruction says criminal acts.  It doesn't have anything about the requisite state of mind.

THE COURT:  Well, it is a conjunctive, I mean, dysjunction.  I mean, do you want me to add that it's not a defense to a requisite state of mind as well?

MR. SHELL:  Is it in the jury instructions here?

THE COURT:  No.  Why don't I print it out with the RAJI so you can have the benefit of looking at it?  How about the change to the ag assault section?  Any objection to that?

MR. SHELL:  No.  It looks like that's the way it is charged in the Indictment.

THE COURT:  Okay.

MR. SHELL:  I do want to make a record again about the Portillo instruction, Your Honor.

THE COURT:  Okay.

MR. SHELL:  Can I do that now?

THE COURT:  Go ahead while I am making this change.

MR. SHELL:  Okay.  Starting on Page 2 of the final instructions at the bottom it says proof beyond a

25

20

1  reasonable doubt is proof that leaves you firmly convinced

2  of the defendant's guilt.  There are very few things in

3  this world that we know with absolute certainty, and in

4  criminal cases the law does not require proof that

5  overcomes every doubt.  If based on your consideration of

6  the evidence you are firmly convinced that the defendant

7  is guilty of the crime charged, you must find him guilty.

8  If, on the other hand, you think there is a real

9  possibility that he is not guilty, you must give him the

10  benefit of the doubt and find him not guilty.

11          The way that reads it shifts the burden.  It

12  makes it seem like there should be a real possibility that

13  he's not guilty.  No.  The State has the burden of proving

14  beyond a reasonable doubt that he's guilty.  The

15  defendant -- there doesn't have to be any real possibility

16  that he's not guilty.  So I object to that language "a

17  real possibility."

18          THE COURT:  Okay.  I am going to make the change

19  to Subsection 2 in the definition of ag assault, that

20  change.  The objection to the Portillo definition of

21  reasonable doubt is denied or overruled.

22          Camille is bringing out the RAJI with the

23  proposed additional recommended -- or not the recommended.

24  What do they call them now?  What's the R stands for in

25  the RAJI.  They are not recommended anymore?  The RAJI has

26

1    to do with the voluntary intoxication defense.  So we can

2    talk about that one.  If you look on page 4 of this draft

3    that I am just giving you now now, the aggravated assault

4    Subsection 2 is at the top of the page, the second time a

5    Subsection 2 appears there.  Did I get that right?

6            MR. MARTINEZ:  Yes, sir.

7            THE COURT:  Then the other one that we need to

8    talk about is on page 5.  The third full paragraph from

9    the bottom starting it is not a defense.  Mr. Shell, I

10   will give you a second to read that.

11           MR. SHELL:  I would request that it read it is

12   not a defense to any criminal act or requisite state of

13   mind.  I would request that they be instructed pursuant to

14   13-503.  Temporary intoxication does not constitute

15   insanity, and is not a defense for any criminal act or

16   requisite state of mind.

17                 See, this is the issue with this, Judge.

18   And I have seen the State do it in other cases.  We are

19   not going to argue that he committed these acts or he

20   didn't have the requisite state of mind because he was

21   impaired or intoxicated.  That's not our defense.  And we

22   are not using it as a defense.  So we are not using it to

23   say that he committed these acts because he was

24   temporarily intoxicated.  What I have seen the State do

25   with this instruction is argue to the jury they don't now

27

have to prove their burden of what the requisite state of

mind is because he was impaired, and that's not what the

law says.  And that's what I am concerned Mr. Martinez is

getting in front of the jury.  I will say, look, we don't

have to prove -- I was impaired, therefore, we have met

our burden on the requisite state of mind.  I am not

arguing to the State that his intoxication if he was

intoxicated is a defense to anything.

THE COURT:  I understand that point.  I mean,

whether you are arguing it or not a jury might -- there is

evidence from which a jury could conclude that that fact

exists.

MR. SHELL:  There is no doubt, but it doesn't

relieve the State of their burden to still prove beyond a

reasonable doubt the requisite state of mind.  And so I

don't want the State arguing to the jury that, look, we

proved to you he was intoxicated, therefore, we don't have

to prove that he intended to do this.

THE COURT:  I think that clearly that would be an

improper argument, and I would sustain an objection in

closing to that.  I don't know how your proposed

instruction which further defines what isn't a defense and

broadens the scope of what isn't a defense prevents them

from making that same inappropriate argument.

MR. SHELL:  Meaning the language of requisite

28

1    state of mind?

2            THE COURT:  If you want me to add, it is either

3    not a defense to a criminal act or a state of mind.  I

4    don't know how expanding what it's not an offense to

5    prohibit from making an appropriate -- if they make an

6    inappropriate argument, that would because we have shown

7    he was intoxicated.  They have met our burden.  We can

8    make it with the one that you are proposing or the RAJI

9    one.

10           MR. SHELL:  I think the requisite state of mind

11   needs to be in there.  What the law is saying is not a

12   defense to either the mens rea or the actis rea.

13           THE COURT:  I don't imagine that you are going to

14   have any objection to me including that language in there.

15   I think it probably is favorable to the State that you

16   don't want me to, but if you want me to I will do that.  I

17   will add that it's neither a defense to the act or the

18   mental state.

19           MR. SHELL:  Right.

20           THE COURT:  If you want me to.  Is there an

21   objection to that.

22           MR. MARTINEZ:  No, sir.

23           THE COURT:  Do you want to think about that over

24   the break for a couple more minutes?

25           MR. SHELL:  Is what is here -- is this the RAJI?

1          THE COURT:  Yes.  I have the RAJIs right here.

2          MR. SHELL:  It doesn't say anything about the

3    requisite state of mind.

4          THE COURT:  Word-for-word I have taken out

5    "inject" and I have taken out some of the many other ways

6    that you can get drugs in your body, and I have taken out

7    "alcohol," but the part that you are concerned with is

8    word-for-word from the RAJI.

9          MR. MARTINEZ:  But the one that I am looking at

10   it says it is not a defense to any requisite state of mind

11   or criminal act.  If the criminal acts were committed due

12   to -- and then it goes on with the rest.

13         THE COURT:  What is the RAJI number?

14         MR. MARTINEZ:  5.03-1.

15         THE COURT:  Do you want me to print that out for

16   you, Mr. Shell?  It doesn't say anything about the State

17   of mind in that RAJI.

18         MR. MARTINEZ:  I can show you mine.

19         THE COURT:  This is the most up-to-date one from

20   the Internet base.  5.03-1 effective non-prescribed

21   alcohol or drug use or abuse, a prescribed medication.

22   Not an insanity case.  It is not a defense to any criminal

23   act if a criminal act, acts was or were committed due to

24   temporary intoxication resulting from voluntary ingestion,

25   consumption, inhalation, injection of alcohol, illegal

30

1   substance, substances, psycho-active substance, substance,

2   abuse of prescribed medications.  That's ARS -- source is

3   ARS 13-503 statutory language.  There is a use note that I

4   would be happy to print this up.  I will do that and let

5   you take a look at it.

6            MR. MARTINEZ:  Mine says the same thing.  Source

7   is 13-503, and the date of January 2, '94.  I don't know

8   why it is changed here.

9            THE COURT:  This is text approved by the

10  committee as October 28th of 2004.  So I am going to print

11  that out.  Mr. Shell, if you want me to modify that to

12  include more things that aren't a defense, I will do that.

13           MR. MARTINEZ:  Judge, the other thing that

14  appears that we might want to include is there is an

15  instruction involving separate counts.  I think we should

16  include that, that each one should be found on its own.  I

17  didn't see it.  The other one is that tey are not to guess

18  about the absence of anybody else who may or may not have

19  been involved.  And the third one is the instruction

20  indicating that they are not to consider the penalty.

21           THE COURT:  Okay.  Absent other participants

22  separate count -- and what was the other thing?

23           MR. MARTINEZ:  That the jury is not to consider

24  any possible penalty.

25           THE COURT:  Is that not there?

31

1          MR. MARTINEZ:  I don't believe so.  I looked at

2     it, and I didn't see it.

3          THE COURT:  Okay.  What I am doing is printing it

4     off for both of you a copy of the jury instruction, the

5     RAJI instruction for the defense -- for the intoxication

6     is not a defense.  So you can read that.  I am also

7     printing out the proposed final instructions which include

8     everything that we have just talked about.  There will be

9     a new draft of that.  I will put a dot up in the top

10    corner of each one of these so we don't confuse them with

11    the prior drafts.  We will talk more about those at the

12    end of the day.  Anything else that we need to do outside

13    the presence of the jury this morning before we bring them

14    back in?

15         MR. MARTINEZ:  No, sir.

16         THE COURT:  Mr. Shell?

17         MR. SHELL:  No.

18         THE COURT:  Do you have any witnesses?

19         MR. SHELL:  I need to call Melissa Kingsley and

20    Officer Betts.  Let me go out to see if they are here.

21    Yeah, we are ready, Judge.

22         THE COURT:  Okay.  Mr. Martinez, yesterday you

23    were going to give me some script for that distinguishes

24    the drive-by shootings.

25         MR. MARTINEZ:  I will do that.  We can do that on

32

1  the record.

2  THE COURT:  No.  I wanted to remind you.

3  Camille, will you guys put on the one that he's giving you

4  now a little dot on the top right-hand corner?  We will do

5  it after we get the jury -- we will do it some other time.

6  Go ahead and bring them in.  I want to the make sure we

7  don't have any folks who are in here testifying for the

8  defense for character witnesses or who have been in here.

9  MS. SHELL:  What's that?

10  THE COURT:  We don't have anyone here that's

11  testifying as a character witness for the defendant?

12  MR. SHELL:  No.

13  (The jurors entered the courtroom.)

14  THE COURT:  Go ahead and and take a seat, please.

15  The record ought to reflect the presence of counsel, the

16  defendant, and our jury has joined us.

17  Mr. Shell, will you call your first witness,

18  please?

19  MR. SHELL:  We will recall Melissa Kingsley.

20

21  MELISSA KINGSLEY,

22  recalled as a witness herein, having been previously duly

23  sworn, was examined and testified as follows:

24

25  THE COURT:  Ms. Kingsley, you are still under

33

oath.  I will remind you and the jury of that.  Go ahead
and take a seat.  Pull the microphone up to your face.


                    DIRECT EXAMINATION

BY MR. SHELL:

        Q.   All right.  Back on July 8th of this year
you testified in this case; correct?

        A.   Yes.

        Q.   And you testified about Exhibit 121;
correct?

        A.   Yes.

        Q.   Did you make that tape?

        A.   No.

        Q.   Who made the tape?  Do you know?

        A.   I don't know.

        Q.   You testified that all of the radio
communications are recorded; correct?

        A.   Yes.

        Q.   And they are recorded in real time; correct?

        A.   I am not exactly sure how the system works.

        Q.   Did you testify that this was -- did you
testify that it was real time?

        A.   Yes.  It's live, if that's what you are
asking.

        Q.   Is it your testimony that that tape is in

34

1   real time?

2          A.   I didn't make that tape.

3          Q.   Ma'am, the communications are recorded.  Do

4   you know how they are recorded?

5          A.   No.

6          Q.   Do you know whether they are on a computer

7   or not?

8          A.   I don't have anything to do with the

9   recordings.  I don't know how they work.

10          Q.   So you don't know whether or not that tape

11   you listened to is real time or not?

12          A.   No, I don't.

13          MR. SHELL:  Your Honor, I am going to play a tape

14   or a CD, I mean.

15          Q.   Do you know whether or not that tape that

16   was played the other day whether anything has been cut out

17   of it or whether it's missing Dispatch communications?

18          A.   I didn't edit it.  I don't know how it was

19   edited.

20          Q.   Do you believe it was edited?

21          A.   There are communications between myself and

22   other officers that weren't in there.

23          Q.   That should have been in there?

24          MR. MARTINEZ:  Objection.

25          THE COURT:  Go ahead and rephrase the question,

35

1    please.

2              Q.    BY MR. SHELL:    Ma'am, if that tape was real

3    time, correct, there would be other communications on that

4    tape that we didn't hear; correct?

5              A.    Yes.

6              Q.    So if somebody edited the communications

7    that took place at the time you were also communicating

8    with Lieutenant Shoehandler?

9              A.    If they are not on there --

10             Q.    Did you hear them?

11             A.    No.

12             Q.    When it was played for you, I think it was

13   about maybe a minute long, the communications; correct?

14             A.    I don't know how long.    I don't recall how

15   long it was.

16             Q.    Right.    But all that was on that tape are

17   communications between you and Lieutenant Shoehandler;

18   correct?

19             A.    That I heard.    My first time testifying,

20   yes.

21             Q.    Right.    But you know that also in between

22   those communications that we heard, you are having

23   communications with other officers; correct?

24             A.    Yes.

25             Q.    And those aren't on the tape; correct?

36

1          A.    I can't answer what's on that tape.  I don't

2    know if I heard that tape the first time in its entirety.

3          Q.    Did you testify that that tape was real

4    time?

5          A.    Yes.  I don't understand what you mean by

6    "real time."  It's time-stamped.

7          Q.    The tape is time-stamped?

8          A.    No, no.  When we are recording it, it's

9    time-stamped.

10         Q.    And that's all stored somewhere, correct,

11   that information?

12         A.    Yeah.  I don't know where it is.

13         Q.    And it's not on an audiotape; correct?

14         A.    I don't know how it's stored.

15               (Playing tape.)

16         Q.    Do you want to listen to it anymore?

17         A.    No.

18         Q.    No?

19         A.    No.

20               THE COURT:  For the record, you just played

21   Exhibit No. 121?

22               MR. SHELL:  Yes, Your Honor.

23         Q.    Did you testify that that tape was real

24   time?

25         A.    I guess I am confused by what you mean.

37

1    That is my communication with Lieutenant Shoehandler as I

2    recall that night.

3            Q.    Correct.  But you also know that there is

4    other communications going on in between that

5    communication; correct?

6            A.    With other officers.

7            Q.    Correct.  That aren't included in there;

8    correct?

9            A.    Correct.

10           Q.    That take up time?

11           A.    Right.

12           Q.    So that tape is missing time; correct?

13   Those communications that you had with Lieutenant

14   Shoehandler didn't happen in the amount of time that you

15   heard on that tape.  There was a longer period of time;

16   correct?

17           A.    Without hearing the original one -- I

18   mean -- I couldn't tell you what happened between there.

19           Q.    But you know that there is other

20   communications that you are having with other officers

21   that aren't included?

22           A.    Yes.

23           Q.    And they are happening between the

24   communications that we hear on that tape?

25           A.    Yes.

38

Q. So, logically, if you put those communications into that tape, where they belong, that tape would be longer?

A. Potentially. I don't know how many of them there were.

Q. Right. You don't know; correct?

A. Correct.

Q. Because you didn't make the tape; correct?

A. Correct.

Q. All you know is that tape has been edited, and the communications that you were having with other officers are not included; correct?

A. Yes.

Q. And so it is not real time; correct?

A. If that's your definition, yeah. I guess I am not understanding "real time." I was looking at it as being time-stamped.

Q. That tape is not in real time?

A. Correct.

Q. We are missing time on that tape that --

MR. MARTINEZ: Objection; asked and answered.

THE COURT: Overruled. Go ahead.

Q. BY MR. SHELL: We are missing time on that tape. We are missing other communications that would take up time, and you don't know how much time?

39

         A.   I don't.  I mean, I know what time I spoke

with him, and I know the time I got the open link, but

other than that, no.

         Q.   So it is longer than what we hear on the

tape?

         A.   Yes.

         Q.   Did anybody ask you to testify that this was

real time?

         A.   No.

         Q.   But you were asked while on direct

examination, and you testified that that was real time.

         MR. MARTINEZ:  Objection; asked and answered.

         THE COURT:  Overruled.  You can go ahead and

answer.

         THE WITNESS:  I am sorry, can you ask the

question again?

         Q.   BY MR. SHELL:  I guess ultimately the

question is:  These communications that we are hearing, we

don't know actually how long it took for those

communications to occur because we are missing time out of

that tape; correct?  We are missing other communications

that take up time.  Because he runs the two people, gives

you information about Mr. Irizarry and Mr. Redondo;

correct?

         A.   Yes.

40

1          Q.    And when you listen to the tape, it sounds

2    like you come right back within seconds and give him

3    information about Irizarry and Redondo; correct?

4          A.    Correct.

5          Q.    But, in reality, you could have been talking

6    to another officer for 30, 40 seconds between what we

7    hear, we hear on the tape, and you don't get back to

8    Lieutenant Shoehandler for a minute even though you got

9    back to him within seconds on the tape; correct?

10         A.    You are making that assumption?

11         Q.    We are missing things out of there; correct?

12         A.    Potentially.

13         Q.    And we don't know what they are, do we?

14         A.    Not according to that tape, I guess, if

15   that's what you are asking me.

16         Q.    I guess what I am asking you, ma'am, is that

17   the communications did not occur in the time frame that we

18   hear on that tape, so it is not, quote, real time;

19   correct?

20         A.    Correct.

21         MR. SHELL:  Nothing further.

22

23                    CROSS EXAMINATION

24   BY MR. MARTINEZ:

25         Q.    With regard to the start of that tape where

41

1    the officer talks to you, that was at 10:47 p.m.; correct?

2        A.    Yes.

3        Q.    And where we hear the gurgling sounds at the

4    end, that was at 10:53, wasn't it?

5        A.    Yes.

6        Q.    And you testified to that previously as to

7    the time, didn't you?

8        A.    Yes.

9        Q.    We did the mathematics; right?

10       A.    Yes.

11       Q.    Didn't we?

12       A.    We did.

13       Q.    So in terms of the amount of time from the

14   time that this officer first called you or spoke to you to

15   the time that we got to this gurgling sound which you

16   heard was six minutes; right?

17       A.    Correct.

18       Q.    And you testified about that last time, the

19   amount of time; right?

20       A.    Yes.

21       Q.    In terms of this case, we hear you and the

22   lieutenant talking; right?

23       A.    Correct.

24       Q.    But so that we are clear, you previously

25   told us that the whole conversation took and the times are

42

1     10:47 to 10:53; right?

2              A.    Yes.

3              Q.    And that's something that you checked;

4     right?

5              A.    Yes.

6              Q.    And that is six minutes; right?

7              A.    Correct.

8              Q.    That tape may not be six minutes, but you

9     previously testified that that's what it was; right?

10             A.    Yes.

11             Q.    There were other conversations with

12    Lieutenant Shoehandler that you did not handle; right?

13             A.    Yes.

14             Q.    For example, there were other, I guess,

15    dispatchers, if that's the word?

16             A.    It is.

17             Q.    There were other dispatchers that also

18    talked to him; right?

19             A.    Yes.

20             Q.    You were not here to tell us about what they

21    may have said and how long that took; right?

22             A.    Correct.

23             Q.    Your involvement in this case, which began

24    with that first call that we heard until the end, was a

25    total of six minutes; right?

43

1    A.  Yes.

2    Q.  And it's contained in that tape; right?

3    A.  Yes.

4    MR. MARTINEZ:  Nothing else.

5    THE COURT:  Redirect.

6

7         REDIRECT EXAMINATION

8 BY MR. SHELL:

9    Q.  When you originally testified on July 8th,

10 you never said anything about 10:47 and 10:53 like he just

11 got you to say; correct?

12    THE COURT:  Hold on.

13    Q.  BY MR. SHELL:  Is that correct?

14    A.  I don't remember.

15    Q.  If you don't remember, then how can you

16 answer his question?  What you testified to --

17    THE COURT:  Wait.  Wait.  Stop.  If you ask her a

18 question, let her answer.

19    THE WITNESS:  What he asked me was did he talk to

20 me at 10:47?

21    Q.  BY MR. SHELL:  Right.

22    A.  Yes.  I know that for a fact.  I know the

23 exact timeline that I spoke with him that night.

24    Q.  The only two times that were mentioned back

25 on July 8th of 2010 were 10:42 when the initial call came

44

1  in on Channel 1, and then you testified that it got

2  switched to Channel 2 at 10:49?

3          MR. MARTINEZ:  Objection; misstates testimony.

4          THE COURT:  That's a -- do you know if that's

5  right or wrong?

6          THE WITNESS:  I have no idea.

7          Q.   BY MR. SHELL:  And you were never asked on

8  July 8th of 2010 whether or not this tape is actually

9  should be six minutes long, were you?

10         A.   I don't remember, sir.

11         Q.   Mr. Martinez stood up there and played that

12 tape for you standing right next to you; correct?

13         A.   Yes, he did.

14         Q.   And he asked you is this real time?  And you

15 said what?

16         A.   Honestly, sir, I don't remember.

17         MR. SHELL:  I don't have anything further.

18         THE COURT:  Does the jury have any questions for

19 this witness?  Thank you.  You are excused, ma'am.

20              The defense can call its next witness,

21 please.

22         MR. SHELL:  We will call Justin Betts.

23

24                   JUSTIN BETTS,

25 recalled as a witness herein, having been previously duly

46

1   truck stopping in the crosswalk?

2          A.   I don't.

3          Q.   Okay.  However, you do mention as you are

4   talking to him about every time the truck turns its

5   blinker on; correct?

6          A.   Right.

7          Q.   Every time it makes a turn; correct?

8          A.   Correct.

9          Q.   You go through details with the officer

10  about how the truck turns on its right blinker, makes a

11  right turn?  You explain all of that; correct?

12         A.   Correct.

13         Q.   Nowhere in that interview do you say the

14  truck stops in the crosswalk and the passenger starting to

15  walk in the crosswalk?

16         A.   I was never asked.

17         Q.   You were never asked that the passenger was

18  in the crosswalk?  Were you asked about every time the

19  truck turned on its blinker?

20         A.   I don't remember.

21         Q.   Take a look.

22         A.   I was asked if the truck obeyed all traffic

23  laws, and I said yes.

24         Q.   And then you went ahead and talked about

25  every time it turned on its blinker.

47

1        A.    I will have to read the whole entire

2   Indictment to answer that question.

3        Q.    Did he ask you on July 8th the last time to

4   read it before you came back here?

5        A.    You requested that I do that, but I don't

6   have to.

7        Q.    Well, let's go ahead and read it.

8        THE COURT:  We will take our lunch break.  We

9   will resume at 1:30.  Please remember the admonition.

10             (The jurors exited the courtroom.)

11        THE COURT:  Go ahead and take a seat.  The record

12   reflects the presence of counsel and the defendant but not

13   the jury.  Mr. Shell?

14        MR. SHELL:  I request that the officer stay here

15   and read that so we can get through this.

16        THE COURT:  As opposed to taking up our time,

17   read the transcript.  I will ask you to read it during the

18   lunch break at your convenience.

19             Mr. Shell, if you comment anymore about what

20   you have asked this officer to do, other than what you

21   asked him to do on the stand, I am going to explain to the

22   jury what the Victims' Bill of Rights provides with

23   respect to his not being required to submit to interviews.

24   But just so we are not sitting here for 20 minutes

25   watching you read it when the jury comes back, I will ask

48

1   you to take a look at it over lunch; otherwise, what will

2   happen is he will ask you to read it after lunch and we

3   will all sit here and watch you read it for 20 minutes.

4   Anything else?

5            MR. MARTINEZ:  No, Your Honor.

6            MR. SHELL:  No, Your Honor.

7            THE COURT:  Okay.

8                 (The proceedings concluded at 11:45 a.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# Juan Martinez

# 15-3363

Exhibits to initial charge
Attachment 06
(Irizarry transcripts 7-7-10)

1

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA


| | |
|---|---|
| THE STATE OF ARIZONA,          ) | |
| )| |
| Appellee,      ) | |
| )| |
| vs.          ) | No. CR 2010-106178-001 SE |
| )| No. 1 CA CR 10-0866 |
| DAIMEN JOSEPH IRIZARRY,       ) | |
| )| |
| Appellant.    ) | |
| ————————————————————————)| |


Phoenix, Arizona
July 7, 2010
10:25 a.m.


BEFORE:  The Honorable CHRISTOPHER T. WHITTEN, Judge

REPORTER'S TRANSCRIPT OF PROCEEDINGS

JURY TRIAL


APPEARANCES:

FOR THE APPELLEE:
Mr. Juan M. Martinez

FOR THE APPELLANT:
Mr. Charles K. Shell


PREPARED BY:

Pamela D. Remus, RPR
Official Court Reporter
Certificate No. 50399

PREPARED FOR APPEAL

(COPY)

PUBLIC DEFENDER

MAR 1 0 2011

APPEALS RECEIVED

1

2

I N D E X

WITNESS:                                                          Page

TOTH, Christopher
        Direct Examination by Mr. Martinez              30
        Cross Examination by Mr. Shell                  41
        Redirect Examination by Mr. Martinez            42

LANGLEY, Charles
        Direct Examination by Mr. Martinez              43
        Cross Examination by Mr. Shell                  50

WILBUR, Stan
        Direct Examination by Mr. Martinez              53
        Cross Examination by Mr. Shell                  71
        Redirect Examination by Mr. Martinez            82

CHURCHMAN, Ryan
        Direct Examination by Mr. Martinez              87
        Cross Examination by Mr. Shell                  100
        Redirect Examination by Mr. Martinez            106

McCLELLAN, Garth
        Direct Examination by Mr. Martinez              110
        Cross Examination by Mr. Shell                  127

HENDERSON, Jason
        Direct Examination by Mr. Martinez              128
        Cross Examination by Mr. Shell                  156
        Redirect Examination by Mr. Martinez            163

JOLLY, John
        Direct Examination by Mr. Martinez              165
        Cross Examination by Mr. Shell                  178
        Redirect Examination by Mr. Martinez            180

RALEY, Stewart
        Direct Examination by Mr. Martinez              180
        Cross Examination by Mr. Shell                  187

CROSS, Jeffrey M.
        Direct Examination by Mr. Martinez              188

3

13   1                    P R O C E E D I N G S

     2

     3          THE COURT:  The record reflects the presence of

     4   counsel and the defendant but not the jury.  I recall

     5   somebody handed me -- the behave handed me from one of you

     6   three cases and said there was an issue we need to take

     7   care of before the jury comes in.

     8          MR. SHELL:  A couple things.  State v. Strong and

     9   I highlighted everything in the copies.  Starting on page

    10   3 of 4.  In this case, this officer testified that a

    11   female said something along the lines is Ricky is in the

    12   house?  The officer then went into the house.  The defense

    13   had tried to keep that statement out.  The Court said

    14   that --

    15          THE COURT:  Let me stop you.  What do you want?

    16          MR. SHELL:  I want to be able to say Redondo was

    17   calling -- to call his dad, call his dad.  You said I

    18   couldn't get into that yesterday.  But that statement fits

    19   into this.  It goes to show why he did what he did.

    20          THE COURT:  I will read it.  You can't do it in

    21   your opening.  You can't tell me four minutes beforehand

    22   and expect to do that in the opening.

    23          MR. SHELL:  I also want to make the record.  Case

    24   law is clear in regard to the statements that was made in

    25   front of the jury are not even hearsay so I shouldn't have

4

1    been sustained on any of those.   I have a concern that the

2    jury -- when you sustained those objections improperly,

3    made it look like I was trying to pull a fast one on them,

4    and I wasn't following the law.   Case law is clear.   None

5    of this is hearsay.   I shouldn't have been sustained in

6    those objections yesterday.   And because of that, it makes

7    it look like to the jury that I am not playing by the

8    rules.   Because the second time I did it you scolded me in

9    front of them and told me not to even do, and I was shut

10   down improperly.   And because of that I think that we may

11   have been denied a right to a fair jury.   The people that

12   I had hoped won't take that into consideration, but all of

13   those people out there saw yesterday, potential jurors, me

14   getting shut down on improper objections, and the case law

15   is clear the statements that I was making are not even

16   hearsay.

17          THE COURT:   Okay.   I disagree with you.   I think

18   your objections were.   I think the objections were well

19   made.   The items were hearsay.   If you were worried about

20   it, you should have filed a motion in limine and we could

21   have addressed those issues before and you could have

22   explained the exceptions in the vacuum that I had to rule

23   on them when you were giving a mini opening.   There didn't

24   appear to be an exception to the hearsay rule.   That's why

25   I sustained the objection.   Your record is made.   Camille,

5

14

1   will you get the jury?

2        MR. SHELL:  I object.  I object.  I do not

3   believe that my record is made.

4            (The jurors entered the courtroom.)

5        THE COURT:  The record reflects the fact that we

6   have been joined by the jury.  This is the time set for

7   opening statement.  Mr. Martinez.

8        MR. MARGINEZ:  Thank you.  Good morning.  As

9   Lieutenant Eric Shoehandler of the Gilbert Police

10  Department layed in that Taco Bell parking lot gasping for

11  breath after being shot in the face, this individual here,

12  the defendant, Daimen Irizarry immediately began to help.

13  He began to help the shooter, not the officer.  He

14  immediately began to help his friend Christopher Redondo,

15  and immediately he took off away from the scene so that

16  the police could not apprehend his friend.

17            How is it that this individual here assumed

18  such a role of helper back on January 28th of 2010 earlier

19  this year?  How is that at around 10:45 in the evening he

20  turned out to be such a helper to a person who had just

21  shot and ultimately killed a Gilbert Police Department

22  officer?  Well, to understand his role as a helper, we

23  need to go back a little bit.  We need to go back to

24  earlier that day, because earlier that day this

25  individual, this individual decided, made the decision

6

14

1    that he was going to ingest, use or put into his system

2    something called crystal methamphetamine, Whatever you

3    want to call it, speed, and, in fact, he took such a

4    quantity of speed that later that evening about 1:00

5    o'clock in the morning when he was being treated at

6    Scottsdale Healthcare Osborn, the records indicate that

7    this individual, they would not even get his history

8    because of his altered mental status.  And that's the

9    person that decided to get behind the wheel of this truck,

10   a truck that was nothing more a utility truck.  It had a

11   number of items in the back.  It had an air compressor.  It

12   had rakes.  It had jacks.  It had shovels.  It had a

13   number of things in the back of that utility truck, and it

14   wasn't his truck.  But he got behind the wheel.  He was

15   the driver.  This person who had such an altered mental

16   state, and he got behind the wheel of that truck.  And

17   what is it that he was going to do?  You were told

18   yesterday he was going to help his friend move.  One of

19   the things that you will see from that truck is that, yes,

20   it had all of these items on it, but it didn't have room

21   to move anything at 11:00 o'clock at night.

22              Well, what else do we know about it?  Well,

23   we know that he has his altered mental state per the

24   mental health professionals.  We also know that he is

25   driving a truck in that fashion, and we know that the

7

truck is not equipped to move anything.  Well, they also

came prepared.  There were some other things in that

truck, and two of those items were two handguns.  One was

a .380 long-barreled revolver.  It's called a long-barrel

because of what it means, what it says.  It has a longer

end to it.  It allows people to sight or shoot more

accurately.  Also in that cab of that truck was a .380

revolver, also a short-barrel.  And for those of you who

don't know what a revolver is, basically it has a cylinder

where you actually put the bullets in there and then you

begin to shoot.  So there were these two guns.  There were

these two individuals.  There was a truck that was full of

items, a utility truck, and then you have an individual

driving and he's driving impaired.  He gets as far as Val

Vista and Baseline, and there Detective Eric Shoehandler

makes a traffic stop, and the defendant pulls into this

parking area right to the side of this Taco Bell.  For

directional purposes it is to the east of the Taco Bell.

The officer comes up to him and begins to ask him for

identification, and the defendant does produce a driver's

license.  Well, there at the point it's clear because

there is an insurance document that is found in Lieutenant

Eric Shoehandler's wallet in the parking lot that this

document was turned over at some point by the occupants of

the car, the car that this defendant was driving, turned

8

15

1   it over, and on it is written the name Redondo, and this

2   is the first time you will be able to see it.   It is

3   somewhat coated with blood so you cannot.   So it would be

4   obscured to a certain extent the items that were written

5   down.   Well, Detective Shoehandler then decided to follow

6   police protocol and run the individual, by "run

7   something," to check whether or not they have any warrants

8   or any reason why he should look further into their past.

9   Well, as he told initially that, well, Mr. Irizarry there

10   is nothing that would call for a warrant.   But he's also

11   told, well, this Redondo, this sounds like it may or may

12   not have a warrant.   As it turned out Redondo did not have

13   a warrant.   So Redondo isn't too happy, but the police

14   officer says I need you to go over there.   And then as he

15   approached the passenger side, Redondo took out the

16   shot-barreled .380, and from the cab sitting in the cab,

17   inches away from this individual who was of such an

18   altered mental state, that he didn't see anything, that

19   anything as you were told yesterday, didn't see a thing.

20   Do you remember that?   All he did was he heard something,

21   inches away, didn't see anything.   He heard something.

22   Didn't even see the police officer.   Remember that.   So he

23   doesn't see the police officer and yet immediately he guns

24   away and leaves.   Why is he leaving if he didn't see

25   anything?   All he did was hear a noice.   But away he goes

eastbound on Baseline. He's going that way because he

he's helping his friend. He doesn't want the police to

apprehend his friend. He certainly doesn't stop to help

the officer.

Well, there are two sergeants from the Mesa

Police Department that are just across the street in this

area that would be north, and they happened to be outside.

And when these two sergeants are standing there, Langley

and Toth, when they are standing there they hear what they

know without a doubt that it is a shot. And so

immediately they radio in and say, you know, it's Gilbert,

but we need to check something across the street on

Baseline because we just heard a shot. So they get into

their respective cars and they go across the street. One

of the sergeants, as he's coming in, he is ahead. Toth is

ahead of Langley. As he goes in, he sees an individual,

an African-American without a shirt screaming at him.

He's been shot. He has been shot. One of yours is down.

Is down. He doesn't know if this is a person that

actually had anything to do with it, and so he jumps out

of his car and just lets it keep going because he doesn't

know if this is the person that actually did the shooting

because he is in a very excited state.

Sergeant Langley then at gunpoint calls the

person down, and then they both go over to where the

15

16

10

1    lieutenant is.  And they will tell you that he's not dead

2    at that point.  He's still there and they begin CPR, and

3    he's just making sounds.  And everybody is called to come

4    in and help, but as part of that investigation one of the

5    things that sergeant Toth does he gets on Baseline Road

6    because he's been told by the individual that's running

7    out that, hey, I saw this white truck, and this white

8    truck was traveling or going eastbound.  It left no more

9    than 30 seconds ago.  It just left.  And so Sergeant Toth

10   begins to go down Baseline.  And to show you how fast the

11   truck was going, as he looks, but he doesn't see any

12   actual lights but he continues on anyway.  And he will

13   admit that his vehicle is one of those that's equipped

14   with natural gas, and it could not go very fast, but he's

15   floored it as fast as he can go, and he goes all the way

16   to Greenfield.  But this defendant has already beat him to

17   the punch.  He's already taken off.  He's already

18   secreted.  He already fled so that they could not catch

19   his friend, his passenger.  And so sergeant Toth returns

20   back, but there are many police officers in this area,

21   including Justin Betts of the Gilbert Police Department,

22   and he happoens to be going westbound towards the scene on

23   Baseline Road.  There is another officer, a Stan Wilbur,

24   who hears about this, knows what's going on, hears that it

25   is a white truck, and so he gets on the overpass because

16

1    US 60 goes underneath Higley.  He gets on at Higley.  He

2    gets on the overpass going southbound from Baseline to

3    Southern, and he just sort of sits there with his car

4    watching.  You never know what's going to happen.  And so

5    he isn't direct traffic.  He doesn't have his lights on.

6    He just sits there on the overpass watching to see if he

7    sees this white utility truck.

8                    At the same time or about the same time,

9    Justin Betts with the Gilbert Police Department is going

10   eastbound and he notices and he starts to go northbound on

11   Higley when he notices that there is this white truck and

12   he thinks, well, it is a white truck.  We don't have

13   anything of informational purposes over other than that

14   the license plate starts with the letter C because

15   Lieutenant Shoehandler was able to indicated that it

16   started with the letter C and begins to follow it.  The

17   defendant then goes through a residential/commercial area

18   to the east of Higley.  The officer begins to follow him

19   there until the defendant then makes his way up onto

20   Baseline again and then starts to go west.  Officer Betts

21   keeps following him.  He does not have his lights

22   operating overhead.  He does not have a siren.  He is not

23   sure that that's the truck.  It turns out to be the truck

24   but he is not sure.  And there is no speeding that's going

25   on.  There is no go, go, go, no.  The only speeding and

12

16

1    the only quick maneuvers that occurred was when the

2    defendant was taking his friend away so that the police

3    would not apprehend the friend.  Now, he's just going what

4    you would call the speed limit.  Well, he gets on

5    Baseline, goes westbound, and then takes a right which is

6    northbound on Higley.  And if you remember there is

7    another police officer now up there, Officer Stan Wilbur

8    of the Mesa Police Department, and he's just standing

9    there or sitting there with his car.  The car is on, but

10   he's just sitting there and there slowing of traffic if

11   you were watching to see if he somehow was going to see

12   this truck.  And he notices that there is this truck

13   that's approaching, and that there is a Gilbert police

14   officer.  Behind the Gilbert police officer is following

15   very closely behind.  Of course, the overhead lights are

16   not on.  There is no siren.  The reason he doesn't think

17   it is a truck is because the front is yellow, is a a

18   yellow front with a white back.  So he thinks, well, it is

19   a yellow truck.  I will keep watching it.  But it doesn't

20   appear to be the car or the truck that we are looking for.

21   Well, the truck then is beginning to take a turn to get

22   onto the on-ramp to go eastbound on the US 60.  But the

23   one thing that calls his attention to it now is that he's

24   able to see the back now, and he's able to see that it's

25   white.  Additionally, the other thing that begins to

13

17

1    really call his attention to this truck is that this truck

2    that's supposed to be going and that truck that's supposed

3    to be really in a hurry as it goes to turn onto the

4    on-ramp there is a crosswalk there for pedestrians to

5    walk.  There is a light there.  As it goes to take a

6    right, the defendant pulls over so much for hurrying up

7    and moving.  So much for getting out of there.  He pulls

8    the truck over.  And the push of him pulling the truck

9    over is Officer Betts is following, and it appears to

10   Officer Stand Wilbur that the truck wants the officer to

11   get closer and, sure enough, the officer gets within about

12   a car length of the truck.  At that point Officer Wilbur

13   says something is not right here.  Either they are going

14   to jump out or something is just not right here.  And even

15   though Officer Betts does not have his overheads on, does

16   not have his siren on, Officer Wilbur says something is

17   not right here, and he flips on his emergency lights, puts

18   on the siren.  Immediately upon him doing that, the

19   passenger who has been sitting there with the defendant,

20   apparently from Officer Wilbur's perspective waiting for

21   the officer to approach hangs out of the window with a

22   .380 long-barrel, the one that allows you to sight

23   somebody, and takes two shots at Officer Justin Betts.

24   He's a pretty good shot because he actually hits the

25   radiator of Officer Betts' car.  And immediately that's

17

1    when the defendant floors it again.  Now, he's on his way.

2    Now, he's being a helper again.  He stopped the car,

3    helped them do that, and now he's taking off and he is

4    taking off eastbound on US 60.  Immediately Officer Justin

5    Betts also turns on his overheads, turns on his sirens,

6    but his car is no good.  He begins for a while a couple

7    miles to engage in a chase he is in his number one

8    position as they say, but he won't go very far because his

9    car begins to overheat.  But then Stan is behind and other

10   officers from the Mesa Police Department who have joined

11   this chase.  Now this chase of this individual who has

12   this mind, if you will, this altered state of mind highly

13   on methamphetamine, driving down the road amongst the

14   traffic being followed by officers who are indicating to

15   him by their lights and by their sirens that they want him

16   to stop.  And it's not that it's just one police car

17   that's doing it, so that there is an indication that

18   perhaps he didn't see it.  No.  At some point there was 75

19   police officers that were following this, so, yes, he saw

20   it.  He chose not to stop.  And so as Officer Betts

21   continues on, his car stops.  He can't go any further, and

22   he pulls over.  The other officer from the Mesa Police

23   Department begins to follow along with a number of

24   officers from the Gilbert Police Department.  And what

25   ends up happening is that the defendant pulls that truck

15

steady and he holds that truck steady to help his friend

some more.   And he holds that truck steady because what he

allows his friend to do, the pasenger, is to get out of

the truck, not once, not twice, but perhaps three or four

times during this whole chase that ends up near Superior

approximately 50 to 55 miles from where it started.   What

he does, he holds the truck steady so that the passenger

gets out, climbs into the bed of this truck as it's

traveling down the freeway and he begins to throw things

out of the back to disable the police officers who are

coming after him.   For example, he threw a hydraulic, a

red hydraulic jack and disabled one of the police cars.

He ran over it and that he was as far as he could go.   He

threw a generator.   Various police cars were disabled.   He

was going by throwing all of this all the way until he

gets up near Superior.   And all the time this defendant

holds the truck steady as he is driving along.   He holds

it steady so that his friend so he can help his friend.

Along the way his friend even takes some shots at the

police officers as they are driving along.   One of the

cars even takes one of the bullets.   Well, they are

driving along and they keep driving along.   He won't

stop.   He just will not stop.   And they just keep driving

and driving.   The speeds are maybe close to 90, maybe 99

miles per hour.   It is a high-speed chase all the way up

16

18

1    going eastbound.

2              Well, at some point they get near the town

3    of Superior.  And as they get near the town of Superior,

4    Milepost 234, 235, there is a truck driver that's there.

5    And as the truck driver is being passed by this truck,

6    there is some maneuvers that are being undertaken by the

7    driver.  And it's interesting that all the way here you

8    would have think that the police could stop them with stop

9    sticks.  They tried on at least two occasions to put stop

10   sticks out.  On one occasion the defendant drove onto the

11   median to avoid that because he didn't want to stop.  He

12   wanted to help his friend get away.  At another time the

13   stop sticks are there.  The defendant is able to avoid

14   them and gets up to Milepost 234, 235 or once his truck is

15   off the road and once he gets there he can go no more.

16   His role as the helper cannot be carried on any further,

17   and it can't be carried on any further because the truck

18   has run out of fuel, and so the truck comes to a stop.

19   And rather than sitting there, rather than doing that,

20   what the defendant does is he gets out.  And in a final

21   act, if you will, of comradery, goes to the front with

22   this individual who has been shooting at police officers.

23   Has already killed one, and then stands in front of the

24   truck.  You heard the phrase something about hell breaking

25   loose.  Well, the problem is that as the two of them stand

17

18

1    in front of the truck, the other individual points and

2    begins to shoot at the police officers.   The police

3    officers, quite frankly, cannot shoot back and strike them

4    because the truck has formed a shield for the both of

5    them.   So as they stand there the police officers shoot.

6    They strike the truck and nothing happoens.   Can't hit

7    them.   It is a huge truck.   Finally, after some point the

8    officers then shoot the only way that they know how.   They

9    shoot underneath and they strike the defendant in the foot

10   or the leg.   They also strike Mr. Redondo in the foot or

11   the leg.   And when they go up there the defendant is taken

12   into custody and he's air lifted to Scottsdale Healthcare

13   Osborn.   The defendant is also treated there.   Mr. Redondo

14   is also treated there.   But when Mr. Irizarry gets to

15   Scottsdale Healthcare Osborn, they want to take a history

16   of him.   They want to talk to him.   And he has this,

17   according to them, an altered mental state due to

18   methamphetamine intoxication.   And so this altered state

19   or methamphetamine intoxication, as you will see, is the

20   reason for him seeing the devil or him perceiving what he

21   tells you that he perceives because according to

22   healthcare professionals, he's not perceiving reality.

23   All he is is being a helper to his friend.   That and under

24   the accomplice liability statutes of the State of Arizona

25   he is guilty as a helper of four counts of drive-by

18

shooting because on four separate occasions there were

shots that were taken.   There is eight counts of

aggravated assault for the eight police officers that were

placed in reasonable apprehension and there is one count

of unlawful flight because certainly all of those cars,

all of those lights overhead, and all of those sirens

certainly means that you have to stop.   Thank you.

        THE COURT:   Thank you, Mr. Martinez.

          Mr. Shell, whenever you are ready.

        MR. SHELL:   Good morning.   Yesterday you were

instructed to determine the facts only from the evidence

produced in court.   When I say "evidence" I mean the

testimony of witnesses and the exhibits introduced in

court.   You should not guess about any fact.   You must not

be influenced by sympathy or prejudice.   This whole case

isn't based upon facts.   It is going to be a case based

upon sympathy and prejudice.   Sympathy for the poor

officer that lost his life that he had nothing to do with,

absolutely nothing to do with.   Didn't even know Redondo

had a gun.   It's going to be the prejudice that he had

smoked some methamphetamine earlier in the day.

Methamphetamine had nothing to do with this.   When you

listen to the facts and you see what happened and you put

yourself in his situation, completely sober, you are going

to do exactly what he did.   The meth has nothing to do

19

19

1    with it.  Those are the two things that they want you to

2    focus on.  The absolute senseless shooting of the officer.

3    And I was looking at all of these exhibits that they have

4    here this morning that I think that they are going to

5    introduce, and they are just loaded with the shooting

6    scene, and he has nothing to do with that.  All they want

7    want you to do certainly is prejudice us.

8                    Let's go over the facts of what happened.

9    January 28, 2010.  Daimen is at his girlfriend's, Melissa

10   Martinez.  It's actually his girlfriend's father's house

11   who is Freddy Martinez.  Freddy Martinez has a Dodge

12   Durango that has radiator problems.  Daimen's father,

13   Frank Vella, has a good friend Angel Redondo who is a

14   mechanic who lives in Globe.  Daimen's father had asked

15   Angel Redondo to come down and take a look at this and see

16   if they could get it fixed.  Angel had previously loaned a

17   pickup truck to his brother-in-law, his son-in-law that

18   lives down here in the Valley.  So he got his son Angel,

19   had gotten his son Christopher and drove down from Globe

20   to, one, pick up the pickup truck that he had owned and to

21   go over to Freddy Martinez' house and see if they could

22   fix his Dodge Durango.  They get to Freddy Martinez' house

23   about 6:00 o'clock at night.  Daimen is there.  Melissa is

24   there, Freddy Martinez, the owner of the house and the

25   Durango is there.  Daimen's father Frank Vella is there

1   and Angel shows up and Christian Redondo shows up in the

2   two trucks, the work truck and the other pickup that they

3   picked up from the brother-in-law -- son-in-law.  They are

4   there for a couple hours.  They are working on the

5   Durango.  It's obvious they can't get it fixed that night.

6   They make plaNs to come back in a couple days down from

7   Globe with the right parts and the right equipment and get

8   it fixed.  During that time frame, Christopher Redondo,

9   who is not a friend of his, he's six years older than him.

10  Their fathers are good friends.  Angel Redondo and Frank

11  Vella are very close friends.  But he doesn't know, really

12  know Christopher Redondo other than it is the son of one

13  of his dad's best friends.  Christopher asks Daimen and --

14  Christopher had injured his hand.  He had a cut or

15  something and it had stitches on his hand.  He asked if

16  Daimen would be willing to come to Globe to help him move.

17  Angel Redondo also asked if Daimen would be willing to

18  come to Globe to help them move.  Daimen agreed.  Probably

19  between 9:00 and 9:30 they leave Mr. Martinez' house,

20  Freddy Martinez' house.  Angel takes off in the pickup

21  that they had picked up from the son-in-law and heads up

22  to Globe.  Daimen, Melissa and Christopher gets into the

23  work truck and they got to go to Daimen's house because

24  he's showing up in Globe.

25          January 28th.  This is a cold, rainy night.

21

19

1   It was raining through this time.  It was cold.  It was

2   snowing in Globe.  He has to go by his house to get his

3   jacket and his work boots and they do.  They go over into

4   Gilbert where Daimen lives.  And Melissa stays there.  He

5   gets his jacket and his work boots and they get back in

6   the truck.  Daimen is driving.  Christopher is in the

7   passenger seat.  They come down Val Vista heading to the

8   60.  They get on the 60 and head up to Globe.  As they

9   approach Baseline, a car gets right on their bumper.  And

10  you will see pictures of the truck.  It has a huge work

11  box all the way around it, and the even the mirrors that

12  you can see, used to see, are on the side.  The one that

13  sits up on the windshield is no good because of that work

14  box.  You can't see who is right behind him and he is

15  traveling down the middle lane, so he pulls over in the

16  curb lane thinking that maybe the person just wants to get

17  by.  The car follows right behind him.  He makes a right

20

18  onto Baseline concerned about this vehicle on his bumper

19  and there is also a Fry's there and they had talked about

20  stopping and getting something to munch on to eat.  So he

21  decides to go ahead and make a right onto Baseline and

22  then go into the Fry's and get away from this car that's

23  on his bumper.  He didn't know.  He doesn't know who it

24  is.  As he is making a right from Val Vista to about

25  Baseline, he is able to see out the passenger side mirror

22

and he sees it is a police car.  He gets into the turn

lane to the shopping center.  As soon as he does that

Shoehandler lights him, stops him in the parking lot.

Shoehandler approaches.  He doesn't think anything of it.

He is not concerned about anythign.  He has a valid

driver's license.  He is not doing anything wrong.

Shoehandler comes up to the window asking for the driver's

license, the registration and the insurance.  They get

that stuff together, hand it to him.  In that time frame

element Shoehandler tells them the reason why he pulled

him over.  There is something blocking the license plate.

He couldn't read the license plate.  When he said that,

Redondo immediately says, well, I can fix that.

Lieutenant Shoehandler says, hold on a second.  Where is

your ID?  Redondo says he doesn't have an ID.  So he asks

for his name.  Daimen is sitting right there listening to

it all.  He gives him his right name.  He said Christopher

Angel Redondo.  The officer writes it down, walks around

to the back of the truck.  A few moments later he tells

Mr. Redondo to come back out and fix the strap that's

hanging over the plate.  Redondo gets out of the truck and

goes back there.  Daimen hears it all.  Nothing out of the

ordinary at all.  He hears Chris working on it and

Shoehandler saying maybe you should do it this way so it

doesn't fall down.  He recalls that Shoehandler asking him

23

for the spelling of his last name, and he hears Redondo

give the spelling of the last name, and it is the right

spelling.  Nothing out of the ordinary.  Redondo comes

back up to sit down.  There is some small talk, you know,

that's a silly, stupid reason to get pulled over.  I hope

this doesn't take long because it's getting late.

Nothing.  Nothing at all causing any concern for Daimen at

all.  Sitting there for a few minutes.  Then all of a

sudden Redondo says something along the lines of, what the

hell is taking so long?

        MR. MARGINEZ:  Objection; hearsay.

        THE COURT:  Overruled.

        MR. SHELL:  At that point Daimen looks into the

mirror.  And what what the officer done, and they do it

all the time, which I think they are trained to do it, is

that he got behind the truck and he put a spotlight onto

the car on the driver's side, so there is a spotlight

there so Daimen couldn't see.  But the light was blinding.

He was looking for somebody to break the light, so he

knows the officer is coming towards him so he glances down

to see if the officer is approaching.  At that point in

time there is a vehicle that's in his vision that's kind

of coming towards him, and that's when, bam, it goes off.

And he jumps.  He has got no idea where it came from.  He

knows it's close but he doesn't know what happened.  He

24

jumps.  He is startled.  He turns to look at Redondo to

ask him what the hell was that?  And when he does, Redondo

looks at him -- and he's going to testify -- and tell you

it was like looking at the devil.  And Redondo just

started screaming at him:  "Drive, mother fucker, drive.

Go, go, go."  He didn't see the gun.  He didn't see the

gun.  The best thing for Daimen to say is I saw a gun, but

he's honest and he told the police I never saw the gun.

        MR. MARTINEZ:  Objection; argument.

        THE COURT:  Sustained.

        MR. SHELL:  He never saw the gun, but the guy is

freaked out.  He's yelling and screaming at me, and it

sounded like a gunshot.  And as soon as he's yelled at and

told, "drive, mother fucker, drive," a million things are

running through his mind.  What the hell is going on?  One

of the things that crosses his mind is that Redondo has a

gun.  So he takes off.  He goes down Baseline.  This whole

time Redondo is freaking out on him screaming at him

yelling at him.  He gets down to Greenfield and makes a

left gets up on the 60 goes to Higley and he is trying to

calm Redondo down, trying to figure out what happened.  He

gets off on Higley, and Redondo starts freaking out again.

Redondo is yelling this is not the way to Globe.  This is

not how we will get there.  He makes a right and he

sayings -- he is trying to tell Redondo, let's go to my

25

1   mom's house.  There is a lot of let's go to the hospital.

2   Let's figure out what happened.  He is doing everything to

3   calm Redondo down.  Redondo will have nothng to do with

4   it.  He is yelling and screaming, demanding him to get to

5   Globe fast.  Call my dad.  Call my dad.  He starts telling

6   him where to turn and he's following Redondo's direction.

7   Turn left here.  Turn right here.  And it takes him around

8   and bringing him onto Higley.  Redondo orders that he goes

9   back to the 60.  He's doing exactly what Redondo says.  He

10  gets up onto the on-ramp, and he's heading down the 60 to

11  Globe as he's being ordered to do.  At that point they

12  both see and they both notice there is an officer behind

13  him.  REdondo goes out the window.  The truck isn't

14  stopped.  It's moving.  It's driving up the on-ramp.  He

15  gets about three-fourths of the way out of the window and

16  he fires two more shots.  Thjat's when he realized 100

17  percent beyond a reasonable doubt at that point that

18  Redondo has a gun.  Redondo jumps back in and starts

19  yelling at him:  "Hurry, hurry, call my dad, call my dad."

20  Gets to Globe.  He gets tunnel vision.  He's driving up

21  there.  He's been commanded by a guy that has a gun that's

22  just fired at police officers in a car.  He's scared.

23  He's panicked.  He doesn't know what to do.  He gets on

24  the phone.  Redondo goes out and he doesn't stop the truck

25  for Redondo to go out.  He's going down the freeway.

26

1    Redondo climbs out the truck and gets in the back and he

2    has nmo idea what Redondo is doing back there.  He can't

3    see.  This huge mental box.  He has no idea.  He doesn't

4    know that he's throwing stuff out.  He is scared.  He's

5    trying to call Angel who is Redondo's father, trying to

6    get him because he was told to do that.  He can't get

7    ahold of him.  He tries calling his dad.  He does get

8    ahold of his dad.  He has, I think two, maybe three

9    conversations with his dad.  His dad tells him to pull

10   over.

11            MR. MARTINEZ:  Objection; hearsay.

12            THE COURT:  Mr. Shell, the objection is

13   sustained.

14            MR. SHELL:  He tells his dad I can't.

15            MR. MARTINEZ:  Hearsay.

16            THE COURT:  Mr. Martinez, when there is an

17   objection would you stand up so we know when there is an

18   objection?

19            MR. MARTINEZ:   Okay.

20            THE COURT:  When there is an objection give me

21   time to rule on it.  The objection is sustained as to what

22   Irizarry said.

23            MR. SHELL:  Daimen has a conversation with his

24   dad.  He will testify what he told his dad and he will

25   testify that he told his dad I don't think I can pull

1

1   over.  The guy has a gun.  I am scared.  I don't know what

2   to do.  He's then able to get ahold of Angel's girlfriend

3   at Angel's house.  He can't get ahold of Angel on the

4   phone, but he gets ahold of the girlfriend at the house,

5   and Angel's girlfriend Angela, her father was a police

6   officer.  Daimen will testify that he asked her what to

7   do?  He know that Angel's father was a police officer, and

8   he's trying to find out what I can do, again, based upon

9   what Angela says he says.

10          MR. MARTINEZ:  Objection; hearsay.

11          THE COURT:  Hold on.  Please give me time to rule

12   on the objection.  The objection is overruled.

13          MR. SHELL:   They don't want you to hear the

14   truth.

15          MR. MARTINEZ:  Objection; argumentataive.

16          MR. SHELL:  They want you to focus on --

17          THE COURT:  Hold on.  Approach.

18              (Bench discussion was had off the record.)

19          THE COURT:  The objection is sustained.

20          MR. SHELL:  The evidence will show that they want

21   you to focus on sympathy and prejudice and not on the

22   truth.

23          MR. MARTINEZ:  Objection; argumentative.

24          THE COURT:  The objection is sustained.

25          MR. SHELL:  He tells Angela, and he will testify

28

1    that he told Angela, "I don't think that I can pull over.

2    I don't know what to do." He keeps driving. He is so

3    altered that he's able to hold the truck steady. He's

4    driving. He's scared. He doesn't know what to do. He

5    gets up past Superior. He gets past the tunnel right past

6    the Queen Creek bridge, and it runs out of gas at about

7    top of the world. He is sitting there in the truck.

8    Redondo comes back in and starts screaming at him. Daimen

9    says, "It's out of gas. I can't do anything." Redondo

10   gets out of the truck, walks around to the front of the

11   truck. Daimen stays in the truck. Redondo slams his head

12   on the hood and tells Daimen to get out here. Daimen puts

13   his hands out the window. There is police officers all

14   back there. He gets out of the truck with his hands in

15   the air, walks around to the front of the truck as he was

16   ordered. And as soon as he does, all hell breaks loose.

17   He gets shot, two, maybe three times. They air-evac'd

18   him. Gets down to the hospital in Scottsdale. That night

19   detectives are in his hospital room and they are asking him

20   questions and he answers every single question. For three

21   days he never asked to talk to a lawyer. For three days

22   they are constantly asking him questions, and he's telling

23   them the truth. He is telling you what --

24        MR. MARTINEZ: Objection; vouching.

25        THE COURT: Mr. Shell, you cannot vouch for the

29

witnesses, please.

MR. SHELL:   Mr. Irizarry constantly for three days tell the truth.

MR. MARTINEZ:   Objection; vouching.

THE COURT:   Mr. Shell,, please don't vouch for the witnesses.

MR. SHELL:   Mr. Irizarry will testify that he told the officers the truth for three days.   He didn't ask to talk to an attorney.   They were in and out of his hospital room all the time asking him questions.   He would always answer their questions.   He would volunteer all of the information and everything that I just told you is what he he's going to testify to.   And it's what he told the officer.   He had no criminal intent and he has no criminal liabilities.   Did he make some mistakes?   He shouldn't have smoked methamphetamine, but meth has nothing to do with this.   You put yourself in that situation.   Nothing is --

MR. MARTINEZ:   Objection; improper argument.

THE COURT:   Mr. Shell, it is argument and it's improper.   Would you continue your opening statements, please?

MR. SHELL:   He did what he had to do.   He was scared.   He will testify he was scared.   He was in a panic.   He didn't have any other options.   You can Monday

30

morning quarterback this thing and you can think of a lot

of different things that he might have done, but the fact

that he didn't do those things does not make him a

criminal.  He's innocent.

THE COURT:  Thank you, Mr. Shell.

Mr. Martinez, will you call your first

witness?

MR. MARTINEZ:  The State calls Christopher Toth.


CHRISTOPHER TOTH,

called as a witness herein, having been first duly sworn,

was examined and testified as follows:


DIRECT EXAMINATION

BY MR. MARTINEZ:

Q.    Your name, sir?

A.    First name is Christopher, last name is

Toth, T-o-t-h.  I now work for the City of Mesa Police

Department.

Q.    What do you do for them?

A.    I am a patrol sergeant.

Q.    How long have you been in that capacity?

A.    I have been a sergeant for almost four

years.  I have been an officer for 15 and a half.

Q.    Drawing your attention back to January 28th

31

1    of 2010, sometime after 10:00 o'clock, 10:30 in the

2    evening, did you happen to be on duty?

3           A.    I was.

4           Q.    What was your shift that day?

5           A.    My shift that day was 3:00 in the afternoon

6    to 1:00 o'clock in the morning.

7           Q.    At about 10:30 in the evening what were you

8    doing?

9           A.    I was meeting Sergeant Langley at the corner

10   of Val Vista and Baseline behind some commercial buildings

11   there.

12          Q.    Was this sort of a break, or what was going

13   on?

14          A.    A little bit of a break.  Had some things

15   that had happened through the day and we were discussing

16   kind of bouncing ideas off each other.

17          Q.    And while you and he were talking did there

18   come a time when you and he decided to just go about begin

19   patrolling?

20          A.    We were getting ready to go ahead and go

21   back actually sitting back from the doorframes of our car.

22          Q.    And what are your duties?  I know you are a

23   sergeant and I suspect that you supervise, but what are

24   your duties generally?

25          A.    My duties, I go ahead and supervise the

32

1  patrol squad.  My beat call is eight people.  I respond to

2  calls for service, handle supervisory paperwork, run

3  emergency traffic.

4          Q.   So in this particular day you and he are,

5  you said, you were at the doors to your cars?

6          A.   Yes.  We had been discussing for a while.

7  We were there a little later than usual.  It had been a

8  busy evening.  We were were actually getting ready -- we

9  were actually walking back to our cars, and I was opening

10  my car door and he was in his car door.  They were side by

11  side.

12          Q.   And in relationship to the Taco Bell, is

13  there a Taco Bell there on the corner of Val Vista and

14  Baseline?

15          A.   Yes, there is.  There's one on the south

16  corner, on the southeast corner.  We were on the northeast

17  corner.

18          Q.   And how far away would you say that you were

19  from that corner that we have just talked about?

20          A.   Maybe a hundred yards.

21          Q.   And you are standing there getting ready to

22  leave, and does anything happen?

23          A.   We heard a single gunshot ring out.

24          Q.   And from where did it come from?

25          A.   It came from the south.

33

Q.   Okay.  Were you able to tell generally speaking where it came from?

A.   We knew it was from the south.  It was distinctly from that direction.

Q.   Okay.  And so what do you do?

A.   We go ahead and radio in that we had heard a shot, and a couple minutes previous I had seen a Gilbert PD officer conduct a traffic stop between the buildings. Between the buildings you could see Baseline Road, and I did see the Gilbert police officer do a traffic stop in the parking lot, so I assumed it came from that direction.

Q.   And was it an evening where there was a lot of noise or was it quiet?

A.   Actually it was fairly quiet that evening evening.

Q.   This was a a super loud gunshot or it was a lower gunshot?

A.   It was a sharp, distinct shot.  If you ever heard a gunshot, you know what it sounds like.

Q.   So it wasn't like it was extremely loud.  It was just very distinct?

A.   Very distinct.  Very different from fireworks.  It was definitely a shot.

Q.   All right.  And so to the south, is that still Mesa or is that a different town?

34

A.   As you go ahead and go south across Baseline it becomes Gilbert.

Q.   Do you have any -- I know you are a sergeant, but do you have any jurisdiction or any power to conduct or do anything in Gilbert?

A.   Absolutely.  I am authorized by the State of Arizona.  I can conduct enforcement activity anywhere in the state.

Q.   That location on the corner of Val Vista and Baseline, is that in Gilbert, Maricopa County, Arizona?

A.   Yes it is.

Q.   So what happens then?

A.   We go ahead and hop in our cars.  We cut through the parking lot, Filibertos.  I know there is a raised median across Baseline.  There is a cut-through right there, and we cut through and go into the shopping center there.

Q.   Who is the lead vehicle, if you will?

A.   I am.

Q.   And into which entrance do you go?  You said the southeast corner?

A.   Southeast corner actually on Baseline about a hundred yards or so east of Baseline on the south side of the road.  It is the first turn-in that you can go.

Q.   And you go in.  You are the lead vehicle and

1   what happens?

2        A.   I did not get probably more than a car

3   length or two in the parking lot.  I could see the Gilbert

4   car there.  And there is a black male that came

5   frantically running towards us.

6        Q.   The car that you see there, does it have its

7   overheads on?

8        A.   Yeah.  Yes.  I can tell it is a Gilbert

9   police car.  Their lights are sequenced differently than

10  ours, and I could see it was a supervisor car.

11       Q.   So it's not one of those that's the

12  so-called undercover vehicle.  It is actually --

13       A.   It is very clearly marked.

14       Q.   And so you turned in and you see this male.

15  What do you here?  What does he say.

16       A.   He is frantically running screaming at us

17  hysterically.  He didn't have a shirt on, and he was

18  running at us, so I went ahead and I jumped out of my car

19  and went ahead and confronted the male.

20       Q.   When you say you jumped out of your car, did

21  you have enough time to put in into park or whatever, or

22  what happened?

23       A.   I did not.  I had radioed that I have a male

24  in front of me, possibly the suspect, and for officer

25  safety, and that was a possible suspect, I jumped out of

36

1    the car and it was still moving.

2           Q.    What happened to the car?

3           A.    The car rolled forward, hit a curb and kind

4    of stayed there.

5           Q.    So you jump out.  Where do you go?

6           A.    Sergeant Langley was right behind me.  We

7    were opposite our cars like a -- I was trying to get my

8    gun out and we started talking to him.  It was obviously

9    right away, and he draws his gun.  He just went in a

10   way -- he just went that way.

11          MR. SHELL:  Objection; hearsay.

12          THE COURT:  Mr. Martinez.

13          MR. MARTINEZ:  His demeanor from the case.  This

14   is an excited utterance.  He was an excited male.

15          THE COURT:  The objection is sustained.

16          Q.    BY MR. MARTINEZ:  So he says something;

17   right?

18          A.    Yes, he does.

19          Q.    And what happens then as a result of what he

20   tells you do you do something?

21          A.    Absolutely.  When he said there was an

22   officer down, an officer had been shot, and that I needed

23   to come.  He also gave us information that the suspect

24   vehicle was a white Ford type work truck and it was

25   eastbound on Baseline and it had just left.

37

Q.   And so what do you do?

A.   I go running, obviously left my car by then. I go running towards the car with its lights on.

Q.   What do you see?

A.   I see an officer, a Gilbert officer laying down just to the west of the car.

Q.   Did you later learn that officer's identity?

A.   Right.  Yes.

Q.   Who was that?

A.   Lieutenant Shoehandler.

Q.   What did you see?

A.   Obviously, this was -- it was an officer down.  He was laying down.  His head was facing to the south, and it looked like his head had been blown off.  It it was a gunshot wound right in the jaw, face area.

Q.   Were there any sounds coming from this officer?

A.   Yes, there were.

MR. SHELL:  Objection; relevancy.

THE COURT:  Sustained.

Q.   BY MR. MARTINEZ:  So then what did you do?

A.   There was three males that were there.  I contacted to get some information to see if they had witnessed what had happened. .  I tried to communicate with the downed officer, and I could not comprehend what

38

1    he was trying to say.

2         Q.   What did you do as part of your

3    investigation?

4         A.   I went ahead and tried to elicit more

5    information from the witnesses.  A further description on

6    the truck.  I asked for paramedics to go ahead and come to

7    tend to the officer's wounds.

8         Q.   At some point did you look about the

9    officer's person or clothing?

10        A.   I did.  I had been on a couple shootings

11   before.  Went ahead and in the his uniform were his gun

12   was still in the holster.  It did not look like there was

13   any scuffle or tussle.  I was worried about the security

14   of weapons.  We went through and tried to ascertain more

15   of his medical condition which was grave.

16        Q.   After that did you again look to see if he

17   had anything that would assist in the investigation?

18        A.   Absolutely.  As the paramedics tended to

19   him -- how we will do traffic stops is we retrieve the

20   identification from those that we pull over.  Tucked in

21   his gunbelt I noticed an ID.

22        Q.   I am going to show you Exhibit No. 97.  Do

23   you recognize this?  Go ahead and look at what's inside.

24        A.   Yes, I do.

25        Q.   Okay.  What is it?

39

A.   It is the driver's license that I retrieved from Lieutenant Shoehandler's body.

MR. MARTINEZ:  If I may have that, please.  I move for the admission of Exhibit No. 97.

THE COURT:  Any objection?

MR. SHELL:  No.

THE COURT:  97 is admitted.

Q.   BY MR. MARTINEZ:   Let's take a look at it. Once you had this information, did you do anything about it?

A.   I immediately went ahead and told our dispatcher the identification, the name, date of birth of the driver's license that I had in my hand.  When I first grabbed it, it was covered in blood.  I had to wipe the blood off of it in which to go ahead and read it.

Q.   With regard to your involvement itself, what did you actually do more of the scene, or did you do more with the investigation of it?  What did you do?

A.   Sergeant Langley had gone down the street and looked for the individuals.  He came back.  A shooting is very involved.  We kind of split the duties that needed to be accomplished.  I primarily went ahead and tended to the downed officer.  We had other officers respond.  We were were attempting CPR.  I was in charge of that portion of it in seeing to make sure that the fire department went

40

1    ahead and responded to tend to his medical while Sergeant

2    Langley was more with the crime scene and security of it.

3            Q.    Take look at Exhibits 3 and 4 and see if you

4    recognize what's depicted there?

5            A.    I do recognize these.

6            Q.    What does it show?

7            A.    It is pictures of the crime scene that I

8    responded to.

9            Q.    And do they show the police car?

10           A.    Yes.

11           Q.    Is that a true and accurate depiction of the

12   scene as it existed back on January 28th when you got

13   there?

14           A.    Yes, ma'am.

15           MR. MARTINEZ:   Move for the admission of Exhibits

16   3 and 4.

17           MR. SHELL:   No objection.

18           THE COURT:   3 and 4 are admitted.

19           Q.    BY MR. MARTINEZ:   Go ahead and take a look

20   at these.   Exhibit 3.   What are we looking at here?

21           A.    You are looking north on the corner of Val

22   Vista and Baseline in the parking lot facing north, and it

23   is the southeast corner.

24           Q.    You indicaed previously that there was an

25   intent to get into this area?

41

1          A.    Yes.

2          Q.    Would it be over here on the right or the

3    left, the one that you used?

4          A.    The one that I used is directly to the right

5    of that.  If you go past the little enclosure there is for

6    dumpsters.  My car was just to the right of that.

7          Q.    Do you see this automobile here?

8          A.    Yes.

9          Q.    And do you know if that's the other

10   sergeant's car?

11         A.    No.  We both were driving white Crown

12   Victoria's that evening.

13         Q.    Exhibit No. 4.  What are we looking at here?

14         A.    That's a depiction of the same crime scene

15   facing to the south and slightly to the west.  That's the

16   motorcycle in it.  That's what it looks like when I was

17   running it.

18         Q.    You didn't do the crime scene, or you did do

19   the crime scene?

20         A.    We went ahead and secured the scene, but did

21   not go ahead and do any processing of it.

22         MR. MARTINEZ:  No other questions.

23         THE COURT:  Okay.  Cross.

24

25                     CROSS EXAMINATION

42

BY MR. SHELL:

         Q.   Sergeant, these pictures 3 and 4, do you
know whether they were taken with added lights or maybe
with an aperture to draw in more light?

         A.   I don't know.  I didn't take the pictures.

         Q.   Is it your memory that's how bright it is
when you showed up there?

         A.   It seemed to be darker.

         Q.   It was darker, you think?

         A.   It's difficult to see.

         Q.   Well here, let me give them to you.  Is
there a chance that those pictures are taken with either
added light or with the aperture opened on the camera so
that it draws in more light?

         A.   I am not a camera expert.  It's possible.

         Q.   So those pictures would reflect it being
lighter than what you actually saw that night?

         A.   There is a possibility.

         MR. SHELL:  Nothing further.

         THE COURT:  Redirect.


                  REDIRECT EXAMINATION

BY MR. MARTINEZ:

         Q.   In terms of your ability to see, did you
need extra enhanced light to go see the police car?

43

A.   No.   It was evident it had its lights activated.   The headlights were on and there was a car behind it that was adequate lighting in the parking lot.

Q.   Did you need any other lighting, for example, to take a look at Officer Shoehandler when you went to look at him?

A.   No.

Q.   And did you shiney a light on him, for example, a bright spotlight or anything like that?

A.   No.   It was quite obvious what it was.

MR. MARTINEZ:   Okay.   Thank you.

THE COURT:   Does the jury have any questions for this witness?   I don't see.   Thank you.   You are excused.

THE COURT:   The State can call its next witness.

MR. MARTINEZ:   The State calls Charles Langley.


CHARLES LANGLEY,

called as a witness herein, having been first duly sworn, was examined and testified as follows:


DIRECT EXAMINATION

BY MR. MARTINEZ:

Q.   Your name, sir?

A.   My name is Sergeant Charles Langley.

Q.   And who do you work for?

44

1          A.    I work for the Mesa Police Department.

2          Q.    And how long have you worked for them?

3          A.    I have worked for the Mesa Police Department

4    for 16 years and my prior department for 5.

5          Q.    Drawing your attention back to January 28th

6    of this year, did you hve occasion to be on duty sometime

7    after 10:30?

8          A.    Yes, I did.

9          Q.    And specifically while you were there, were

10   you in the presence of or at 10:30 were you in the

11   presence or somebody else?

12         A.    Yes.   I was with sergeant Christopher Toth.

13         Q.    And while you were with him, did you hve

14   occasion to hear something that called your attention?

15         A.    Yes.   As I was standing in the parking lot I

16   heard a gunshot to my immediate south.

17         Q.    And approximately what time did you hear

18   that?

19         A.    I believe it was approximately about 10:45.

20         Q.    And so you hear the shot.   What do you do?

21         A.    What I did in this case was I checked off

22   with our communications advising them that I heard a

23   gunshot to my south and advised them I was on the

24   northeast corner of Val Vista and Baseline, and that I was

25   going to be checking the location where the shot had come

45

1    from.

2         Q.    Did you go over to the location where you

3    thought the shot came from?

4         A.    Yes, I did.

5         Q.    And was there a Taco Bell there where you

6    went?

7         A.    Yes, there was.

8         Q.    And so what did you see as you got there?

9         A.    As myself and as Sergeant Toth were

10   approaching, we appropached in a tactical over-watch

11   position.  His vehicle was immediately to my right front.

12   I was in the over-watch to the left rear.  As we

13   approached we saw a male with no shirt on fleeing from

14   where I saw the overhead lights of a marked patrol car.

15   The lights were on, the male was fleeing our direction

16   from there.  He was waving his arms and he was yelling.

17        Q.    Okay.  How long did it take you to get over

18   to that location where this person was yelling from the

19   time that you heard the shot until the time that you got

20   there?  How much time passed?

21        A.    Probably less than two minutes elapsed.

22        Q.    And during the time that you were going over

23   there, were you able to watch or see Baseline Road or

24   obviously you were driving being careful but were you able

25   to see?

46

A.    I was not.  We were clearing the parking lot

between us and, excuse me, I will describe it.  On the

northeast there is a parking lot and there is stores

there.  We slowly rode through there to make sure that we

weren't driving into in case I had the distance incorrect.

To answer your question, I didn't see any traffic until I

actually reached Baseline Road.

Q.    And then what happened?

A.    We checked traffic on both sides east and

west on Baseline, crossed over.  As I described, either we

were in a tactical over-watch position.  Sergeant Toth was

on the front.  I was to his left rear.  As we made entry

into the the driveway, I could look to my south and over

the barricade surrounding a dumpster, I could see the

overhead lights of a patrol car.  They were on.  And I

could see the blue and reds.

Q.    At some point did you develop information

about the persons or the vehicles that may have been

involved?

A.    Yes.  Blue and reds.  As soon as we rolled

in there, the male I previously described, he ran out

towards us.  We contacted him.  He described me that a

white truck with -- he used the words "they," plural, had

driven eastbound on Baseline.  I asked him how long they

had been gone?  He said about 30 seconds.

47

1    Q.   So what did you do in response to that?

2    A.   Heading to the scene.  I immediately

3  transmitted I was going to be looking for a suspect

4  vehicle for a possible officer-involved shooting on

5  Baseline.

6    Q.   And so when you began to go on eastbound on

7  Mesa Drive, were you able to quickly and expeditiously --

8  or describe for me what it was that you did?

9    A.   Actually in my case not as quickly as I

10 would like.  The vehicle that I was assigned at the time

11 was a very old natural gas powered Crown Victoria.  I am

12 unable to accelerate very rapidly in that car.  It is

13 difficult for me to get past 60 miles an hour.  So to

14 answer your question, it was a rather moderate drive down

15 Baseline.  But what I was looking for was to see if I

16 could see any red taillights in front of me because there

17 was no traffic on Baseline as I was going east.  I cleared

18 eastbound on Baseline all the way down to Greenfield, went

19 through that intersection and could see no actual lights

20 to my immediate east, either.  So I transmitted to

21 dispatch I was going to be returning to the scene.

22   Q.   Between Val Vista and Greenfield, how many

23 miles is that?

24   A.   One mile.

25   Q.   And then you returned; correct?

48

1        A.    That is correct.

2        Q.    Did you then have occasion to, if you will,

3    work on the scene, work on the scene there?

4        A.    Yes.  At the time I was a sergeant, so I

5    took over the scene and established a crime scene.

6        Q.    With regard to these photographs, please

7    take a look at them.  Exhibits No. 5 through 8.  Take a

8    look at them.  Are they true and accurate depictions of

9    some portion of the scene as it existed back when you were

10   there?

11       A.    Yes, they are.

12       Q.    Let me have those back.  These are taken in

13   the daylight, though; correct?

14       A.    Yes.  The time of day was obviously much

15   different than when I saw them.

16       MR. MARTINEZ:  Move for the admission of Exhibits

17   5 through 8.

18       MR. SHELL:  5 I object to relevancy, and 6 and 7

19   object to relevancy.

20       THE COURT:  8, no objection?

21       MR. SHELL:  Object to -- yeah.  Object to

22   relevancy of 5, 6 and 7.  No objection to 8.

23       THE COURT:  8 is admitted.  Can I see 5, 6 and 7?

24   5, 6 and 7 are admitted.

25       Q.    BY MR. MARTINEZ:  Take a look at this.

49

1   First of all, where is south on this photograph?

2           A.   South would be the bottom part of that

3   picture.

4           Q.   And what is this right here?

5           A.   That right there is the patrol car.

6           Q.   And where is the Taco Bell here?

7           A.   The Taco Bell is to the east.

8           Q.   Would that be this building here?

9           A.   Yes, I believe so.

10          Q.   And there are some items here?  Do you see

11  this?

12          A.   Yes.

13          Q.   Did you see where Lieutenant Shoehandler

14  was?

15          A.   Yes.

16          Q.   Does that tell you where he was or not?

17          A.   Yes.  He was proned out on his back when I

18  first had contact with him.

19          Q.   Exhibit No. 6 shows a cone and some other

20  items here; correct.

21          A.   Yes.

22          Q.   And Exhibit No. 7 is the same cone.  And

23  then some numbered items there; right?

24          A.   Yes.

25          Q.   Some numbered.  I can bring this in.  What

50

1  number is that?

2           A.    No. 1.

3           Q.    And let me have you take look at Exhibit No.

4  8.  What is that?

5           A.    That is No. 1.

6           MR. MARTINEZ:  I don't have any other questions.

7           THE COURT:  Thank you.  Cross.

8

9                      CROSS EXAMINATION

10  BY MR. SHELL:

11          Q.    All right.  It is sergeant; right?

12          A.    That's correct.

13          Q.    Sergeant, you are north in the parking lot

14  north of where you hear the shot, correct, on the other

15  side of Baseline?

16          A.    That's correct.

17          Q.    Are you standing outside your vehicle with

18  Sergeant Toth?

19          A.    That is correct.

20          Q.    You guys are talking about, I think he

21  testified you guys were talking about some issues that

22  occurred during that day.

23          A.    Yes.  We had a really busy night.

24          Q.    And you hear a shot?

25          A.    Yes, ma'am.

51

1        Q.    You walk and get into your car, and I think

2   your testimony is that you radioed communications; is that

3   correct?

4        A.    Correct.

5        Q.    To find out if anybody had reported a shot

6   or if there was any police officers over that way?

7        A.    No.  I believe that part across the street

8   south where my position is that's inside the City of

9   Gilbert.  My request was to check with the Gilbert PD to

10   see if they had received any shots-fired calls.

11        Q.    So you called your dispatcher or your

12   communications officer to see if they would check with the

13   PO emergency to see if they had any reports?

14        A.    That's correct.

15        Q.    And I believe your testimony is you all were

16   headed over that way?

17        A.    Yes.

18        Q.    When you got near there I think you said it

19   was a slow road.  You didn't want to just go flying into

20   something that you didn't know what was going on?

21        A.    That would be accurate.

22        Q.    You wanted to make sure that you are safe

23   and Sergeant Toth is safe; correct?

24        A.    Correct.

25        Q.    So and I think you said it was at least two

52

7

1 minutes to get over to this area?

2    A. It may have been a less.  It was under two

3 minutes.

4    Q. Under two minutes?

5    A. Correct.  It didn't take that long to get

6 over there.

7    Q. All right.  So roughly two minutes to get

8 over there; correct?

9    A. Right.

10    Q. And when you get there you see somebody

11 running at you with no shirt on in an excited state.  That

12 person gives you information; correct?

13    A. Correct.

14    Q. And then you you have got an old, slow car.

15 You go over onto Baseline and you start heading east?

16    A. That's correct.

17    Q. About how long do you think that you were

18 there talking to the gentleman that was waving at you and

19 told you that he saw a truck go east?

20    A. Probably, once again, it would be

21 approximately two minutes or less.  It was not a lengthy

22 conversation.  It was simply he told us an officer is

23 down.  One of your guys has been shot.  And I asked them

24 where did they go?  And he provided a description, and I

25 immediately went out after them.

53

Q.   And so it was from the time that you heard
the shot until the time that you started heading east was,
I think you say, less than four minutes?

A.   Correct.

Q.   So between three and four minutes, roughly?

A.   Yeah, approximately.

Q.   All right.  So by the time you started
heading east down Baseline at least three minutes before
you are going down Baseline looking for a white truck?

A.   Very much possible.

MR. SHELL:  Thank you.  Nothing further.

THE COURT:  Redirect.

MR. MARTINEZ:   No.  I have nothing.

THE COURT:  Does the jury have any questions for
this witness?  I don't see any.  Thank you.  You are
excused.  The State can call its next witness.

MR. MARTINEZ:   The State calls Stan Wilbur.


STAN WILBUR,
called as a witness herein, having been first duly sworn,
was examined and testified as follows:


DIRECT EXAMINATION
BY MR. MARTINEZ:

Q.   Your name, sir?

54

A.    Officer Stan Wilbur.

Q.    And from your uniform it looks like you work for the Mesa Police Department?

A.    I do.

Q.    Back on January 28th of this year, did you also work for the Mesa Police Department?

A.    Yes, sir.

Q.    What were you duties?

A.    At the time I was employed as a patrol officer.

Q.    And as a patrol officer, what is it that you recall being called to do on a day-to-day basis?

A.    Basically, take calls on various different instances, different types of calls; traffic stops, accidents, family fights.  Things of that sort.

Q.    On January 28th sometime around 10:30, what were you doing?

A.    I was actually at our Red Mountain Station which is located at Gilbert Road and University in my vehicle writing paperwork.

Q.    And there is a call that came out; correct?

A.    Yes.

Q.    As a result of that call -- well, what were your hours of work?

A.    I was working until midnight.

55

8

Q.   Okay.  And so you hear this call and what happens?

A.   Actually the original call was Officer Langley getting on the radio and just notifying us only of the same channel.  I was on the same radio as Sergeant Langley.  He notified us that there had just been a shot in the area, and that's, unfortunately, it's kind of routine where people maybe hear firecrackerers or gunshots and or like that and report it.  Just notified dispatch that there was a loud sound in the area of Val Vista and Baseline.  At that time I really perked my ears up.  I continued to write my peper until maybe 45 seconds later when our dispatcher got on the radio and said that she was notified by the Gilbert dispatch that there had been an officer-involved shooting in the area.

Q.   So that was a very, according to your statement, about 45 seconds?

A.   Yeah.  It was a very short time between the two.

Q.   So what did you do?

A.   At that time my papers were scattered across the dash as I was writing on the computer, scattered everything to the side as best I could and took off to the area of Val Vista and Baseline.

Q.   So it appears you were will already in your

56

1    car?

2            A.    Yes.

3            Q.    You were just sitting there writing

4    whatever?

5            A.    Yes.

6            Q.    How far away were you from where this

7    occurred at Val Vista and Baseline?

8            A.    Greenfield and University.  It may be four

9    miles away from the freeway, US 60.  Baseline is just on

10   the other side maybe another half mile to a mile, so I was

11   maybe six to seven miles away from the shooting.

12           Q.    And so did you start to drive toward that

13   area?

14           A.    Yes.

15           Q.    And as you are driving, are you driving

16   slowly or fast, or what's going on?

17           A.    At that point I was driving fast.  Code 3.

18   I had my lights and siren on.

19           Q.    And what happened then?

20           A.    I go to the area of Greenfield and Southern

21   so maybe each driven three miles.

22           Q.    Is southern north or south of U.S. 60?

23           A.    It is north of 60, but it was south of where

24   I was because I was coming from University.

25           Q.    And Baseline, is it north or south of US 60?

57

1        A.    It is south of US 60.

2        Q.    Then what happens?

3        A.    I get to Greenfield and Southern and Langley

4    gets on the radio and says that he had a sufficient number

5    of people at the scene but that the vehicle left.  It was

6    a white work truck that we were looking for the suspects,

7    and not to come to the scene but kind of respond to the

8    area around the scene to see if we could find the vehicle.

9        Q.    At that point did you have a license plate

10   or not?

11       A.    At that point I didn't have a license plate.

12   The opnly description that I had is it was two occupants

13   and itw as a white work truck like maybe like a Cox

14   Communications truck or something of that effect.

15       Q.    Okay.  And then what happened?  What did you

16   do?

17       A.    At that point everybody started checking off

18   at all different areas.

19       Q.    When you say "checking off," what does that

20   mean?

21       A.    Basically, the officers basically just pick

22   a certain area and they tell the dispatcher I will be at

23   Greenfield and Southern.  I will be at Val Vista and

24   Baseline.  So everybody starts assigning themselves an

25   area of responsibility.  And I had checked off at

58

1    Greenfield and Southern looking for that vehicle.  About

2    maybe 30 seconds after I checked off I thought, do you

3    know what, it's better if I drive to the freeway and sit

4    on an overpass and see if I can see any vehicles coming

5    east or west down US 60.

6              Q.    So where did you go?

7              A.    So at that point I drove east on Southern to

8    Higley Road.  Because Higley has an overpass, Greenfield

9    Road has an underpass so I could see the traffic and

10   pulled my marked police car up on Higley Road and sat off

11   on the overpass just to watch traffic going both ways on

12   the freeway.

13             Q.    So we can ge an understanding, we have been

14   talking about Val Vista.  To the easts of on Baseline Road

15   what is te next major cross street?

16             A.    It's going to be Val Vista is 3600 east.

17   Between Greenfield is the next street one mile just east

18   of Val Vista and Higley is yet another mile east of

19   Greenfield.

20             Q.    So where were you approximately if we are

21   talking just the eastern direction, approximately two

22   miles away?

23             A.    Yes, plus the distance to Baseline north or

24   south.

25             Q.    The freeway -- where you were parked, is it

1    an overpass over US 60?

2         A.   Yeah, on Higley.  Higley Road actually goes

3    over U.S. 60, so that allowed me a bird's eye view of all

4    the cars coming and going both ways.

5         Q.   So were you watching primarily U.S. 60, or

6    what was your intent in going there?

7         A.   My intent in going there, really, I was

8    expecting to see maybe not the suspect vehicle but a work

9    truck.  It is amazing how many work trucks you start

10   seeing when something like that comes out, but I imagined

11   seeing a work truck on U.S. 60 going east or west.

12        Q.   All right.  And so as you are there, do you

13   have your lights on?  Or describe for me how is it that

14   you pulled over?  What is it that you are doing?

15        A.   Higley wasn't a really well-traveled road.

16   It was maybe 11:30 at night or close to midnight.

17   Basically turned my overhead blue and red lights off.  I

18   still had the running lights on, so I had headlights and

19   tail lights.  There is a small lane to the right of Higley

20   Road on the overpass, and I kind of stooped over to the

21   car and I remember and put my car in park just to watch.

22        Q.   Which direction was your car headed?

23        A.   I was facing south towards the hospital.

24        Q.   Where is the hospital at?

25        A.   It is like Higley Road and Baseline.

60

9

10

Q.    All right.   On the east side or the west side?

A.    It is on the west side but the road kind of jogs, I guess, to the west, so it's not necessarily in my view.

Q.    When you got there, how much time had elapsed from the time that -- if you can give us an estimate from the time that you heard the shot fired call?

A.    Wow.   You know, I couldn't really tell. There is a lot of talk on the radio.   There is a lot of communications, and it's kind of controlled chaos in a way, and I really couldn't estimate, you know, was it five minutes?   Was it maybe ten minutes?   I would say less than ten minutes, but I don't know exactly how long.

Q.    So you are standing there and what happens next?

A.    AS I am sitting there I look primarily to the east.   I was thinking that maybe I would see a vehicle traveling eastbound on US 60 under the bridge.   As I am sitting there I see like a white work truck.   At the time I thought I saw like a yellow logo on the driver's door. So I thought, well, do you know what, this most likely isn't going to be the vehicle, but it's got some type of yellow marking or something on the front door.   But at the moment I thought that I saw there was a black and white

61

1    Gilbert police car immediately behind that vehicle.

2         Q.   So where were they in relationship to the

3    on-ramp when you first saw this truck?

4         A.   They were coming northbound on Higley Road

5    past the hospital there a couple street lights up there.

6    And the black and white Gilbert police car was immediately

7    behind this work truck, and I thought, you know, the

8    Gilbert officer, I had no means of communicating with them

9    because we are on two different frequencies.  But at the

10   point I thought that he is attempting to pull this vehicle

11   over because it was a possible suspect vehicle.

12        Q.   Did the Gilbert police officer have his

13   lights on on top or not?

14        A.   No.

15        Q.   Did he have his sirens on?

16        A.   No.

17        Q.   Where you saw or from where you were

18   sitting, if you will, in looking at them drive, could you

19   tell if they were both cars, I guess, if they were

20   exceeding the speed limit, normal slow?  Could you tell

21   anything?

22        A.   I didn't -- nothing perked my senses of

23   where they were speeding or anything of that sort.  It

24   just appeared to be routine driving on both people's part.

25        Q.   Okay.  Then what happened?

62

10

1      A.   I had my -- I had actually when I pulled on

2  to the off-ramp I had rolled all my windows down so I

3  could hear what was going on as well as what was going on

4  on the radio.   At that point I start to pull forward

5  slowly to wait until the work truck gets onto the Higley

6  on-ramp to go eastbound on US 60.   I see the Gilbert

7  officer make the turn with the work truck.   And as I start

8  to proceed into the turn, I got maybe halfway down the

9  on-ramp many and I see the work truck just automatically

10  start to pull over to the right of the road.   The Gilbert

11  officer at that point slowed down and started to pull as

12  well.

13      Q.   Did the truck ever come to a stop?

14      A.   No.   I didn't see a stop.

15      Q.   How fast was it going at its slowest speed?

16      A.   From the top of the on-ramp after I made my

17  turn I started observing the car, I would say maybe 30

18  miles an hour, and it slowed down maybe to 10.

19      Q.   Okay.   And then what happened?

20      A.   At that point once the vehicle pulled over

21  to the right, I flipped on my overhead lights and siren.

22      Q.   When you say pulled over to the right, did

23  it stay on the cement, or it did it pull way off?

24      A.   The passenger side tires, there is a little

25  bit of a -- there is not much of a curb on the on-ramp,

63

but there is gravel right next to the on-ramp, and the pasenger side tires had hit the gravel, but the entire vehicle hadn't pulled onto the gravel.  To me, it looked like, you know, in my mind what I was thinking was this could be a possible truck because if someone were to pull over and jump out of the car and run, that's typically how I have seen people, you know, jump out of the car and start running.

Q.    So it was going that slow that it would allow them --

A.    Yeah.  So that's what was on my mind.

Q.    What happened then?

A.    At that point before I turned my lights and sirens on, I actually heard two to three gunshots.  And then I realized, well, obviously this is the suspect vehicle.  I lit my lights and siren, and the truck took off still down US 60.

Q.    And what did you do?

A.    At that point I got right behind the Gilbert officer who, after the gunshots occurred, he flipped his lights on and siren, and I was immediately behind him for several miles on the freeway.

Q.    And as you are following, does anything happen?  Are you watching with what the Gilbert police officer is doing, or are you just following him?

64

A.   At that point we are seeing and hearing.  I can't hear what he is saying on his radio.  He can't hear what I am saying on mine, but I am observing him.  He was in the lane immediately behind the white truck.

Q.   So what lane was the white truck in?

A.   The white truck started out in the curb lane which is the slow lane on the freeway.  And then at one point during the chase had moved to the number two lane which is the lane next to the one on the freeway.  But then it had moved back to the curb lane, so it kind of danced around those two lanes.

Q.   As it got on the freeway, did it accelerate?  Slowing?  Fast.  Normal?

A.   As soon as I had hit my lights and siren on the on-ramp it accelerated, I would say at least 80 miles an hour.

Q.   Is that how fast it was going on the freeway?

A.   That's about as fast as I was going and I was keeping up by keeping a distance.

Q.   All right.  Were you first in line or were you second in line?

A.   I was second in line, but I was, I guess, staggered.  I was not immediately behind the Gilbert officer.  He was immediately behind the work truck.  I was

65

11

1    in the lane next to the Gilbert officer a little bit

2    further back.

3           Q.    And what was the weather like?

4           A.    It had rained earlier that evening so the

5    roads were wet.  It started raining pretty heavily.  It

6    was really weird for maybe two miles it rained cats and

7    dogs.  It was pretty thick, very difficult to see

8    visibility-wise, and then it subsided.  But the roads were

9    wet all the way up until I stopped.

10          Q.    And you say up until you stopped.  Until you

11   stopped, did you maintain your second position?

12          A.    No.  Actually, part of our difficulty with

13   communicating with the other officers even in our own city

14   is we all have different channels.  Since we were

15   traveling east, Higley Road is actually the border between

16   the areasaerials that I work, and the area that all the

17   other officers in the Superstition district work.  So they

18   were on a different channel.  As myself and the Gilbert

19   officer were pursuing the white work truck, I think three

20   or four Mesa police cars, black and white cars, passed us

21   in the HOV lane going lights and sirens, you know, 90 to a

22   hundred miles miles an hour trying to catch up to us, but

23   they actually pased us.  I think they slowed down and

24   merged in with us, and at that point I was maybe three or

25   four.  I couldn't really tell.

66

Q.   Were you in front of the group?

A.   Yeah.  I was in the front group.  I couldn't really tell exactly how far from the truck I was at that point.

Q.   You indicated that at some point you stopped or something.  Where was that?

A.   That was beyond the turnover to the Renaissance festival.  Once we get beyond out of the city, you know, an area where I am not really familiar with and work all the time, all they have are mile markers, and obviously I had no idea what a mile marker was, but the big thing I could see was the Renaissance festival sign. So it was maybe three-fourths of a mile beyond the Renaissance festival.

Q.   Why did you stop?

A.   I had a flat front tire.

Q.   And why is that?

A.   Around Ironwood maybe, maybe three to four miles before I ended up stopping, and on the radio I could hear --

MR. SHELL:  Objection; hearsay.

THE COURT:  Any exception?

MR. MARTINEZ:  It will show why he did what he did and why he believes what he believes.  It goes to his state of mind.

67

1          THE COURT:   The objection it is sustained.

2          Q.   BY MR. MARTINEZ:   Don't tell us what the

3   radio said.

4          A.   All right.   I observed there was a bunch of

5   debris on the roadway.   At one point I observed somebody

6   in the back of the work truck actually throwing items out

7   of the bed of the truck onto the freeway.   The officers in

8   front of me were swerving to avoid hitting anything, and I

9   saw what looked like a snake in the road, really long, and

10  it ended up being like a metal chain of sorts, and that

11  ended up getting -- I think I hit that with my tire, but

12  when I hit it, I hit maybe two or three other items with

13  my vehicle, so I am not sure if the chain actually

14  flattened the tire or disabled the tire or one of the

15  other metal things.

16         Q.   You talked about your tire.   Did your car

17  sustain further damage other than the tire?

18         A.   Yes.

19         Q.   You indicated that you -- at least you saw a

20  chain; correct?   How far was the individual that was

21  throwing these items from the back?   How far was the truck

22  away from you?

23         A.   I couldn't really give you an estimate in

24  feet.   There was the unit immediately behind the work

25  truck was maybe three to four car lengths.   And then I was

68

1    three or four cars back from that unit.  So I don't know

2    what that is in feet.

3         Q.    And you could see the individual in the back

4    of the truck?

5         A.    I could see that there was an individual in

6    the back, but I could not see, you know make out any type

7    of face or, you know, description of him.

8         Q.    Okay.  And when you see these items coming

9    towards you, this chain or all of these other items that

10   this person is throwing, were you placed in reasonable

11   apprehension?  In other words, were you scared?

12        A.    Yes.  I guess, you know, maybe concerned

13   obviously.  The speeds that we were traveling so close

14   together evenly with the other officers.  You know, my

15   biggest concern was that one of us is going to swerve into

16   another officer.  So that was a huge concern of mine.

17   When my left tire, my left front tire started to go flat,

18   it obviously started changing the handling of the vehicle.

19   And at that speed the only option that I had -- I was in

20   the left lane, the high-speed lane.  I had to pull off

21   into the median of the road in the middle of the desert,

22   and I had no real clue on exactly where my vehicle was

23   actually pulling off.  I just aimed for a clearing area.

24        Q.    And as I said, were you placed in reasonable

25   apprehension of something?

69

1          MR. SHELL:  Objection; leading.

2          THE COURT:  Overruled.

3          Q.  BY MR. MARTINEZ:  That something may happen

4    to you, i.e., that you may get physical injuries as a

5    result of what was happening?

6          A.    Oh, yeah.  The whole span.  Pursuant -- even

7    before the Higley on-ramp incident, you know, obviously I

8    heard the Gilbert officer had been shot, and I believe

9    somebody had said that he had been shot in the head.  So,

10   you know, in my line of work you realize that's obviously

11   not, you know, something that's good and you automatically

12   start putting yourself in that officer's shoes and

13   thinking about your family and thinking about --

14         MR. SHELL:  Relevancy.

15         THE COURT:  I think he's done with his answer.

16   Go ahead.  The objection is overruled.

17         Q.    BY MR. MARTINEZ:  So when you see this

18   person in the back of the truck, how was the truck

19   driving?  Was it swerving from side to side?  Was it

20   hitting the brakes or somebody might fall off?  How was

21   the truck driving?

22         A.    The truck pretty much stayed consistent and

23   steady, didn't really change any lanes that I observed.

24   The speed -- I didn't see the brake lights come on at all.

25   It pretty much maintained consistent speed.

70

12

1          Q.    Do you know how the individual got into the

2    back of the truck?

3          A.    No.

4          Q.    Did the truck stop at any time between the

5    time it accelerated off the Higley and the US 60 until the

6    time that you were hit and had to pull off?

7          A.    No.

8          MR. MARTINEZ:   No other questions.

9          THE COURT:   We are going to take the lunch break

10   until 1:30.   Please remember the admonition and be ready

11   to come back in at 1:30.

12         THE COURT:   Go ahead and take a seat.   The record

13   ought to reflect the presence of counsel and the defendant

14   but not the jury.   Does anybody need to put anything on

15   the record?

16         MR. MARTINEZ:   No thank you.

17         MR. SHELL:   No, sir.

18         THE COURT:   See you at 1:30.

19              (Lunch recess.)

20         THE COURT:   Go ahead and take a seat.   We are on

21   the record.   The record ought to reflect the presence of

22   counsel and the defendant but not the jury.   Does anybody

23   need to put anything on the record before we bring in the

24   jury?

25         MR. MARTINEZ:   No.

71

12

1          MR. SHELL:  No, sir.

2          THE COURT:  Okay.

3               (The jurors entered the courtroom.)

4          THE COURT:  All right.  Take a seat, everyone.

5     The record ought to reflect we have been joined by the

6     jury.

7               Officer Wilbur, go ahead and retake the

8     stand.  I will remind you, you are still under oath, you

9     don't need to retake the oath.

10

11                    CROSS EXAMINATION

12    BY MR. SHELL:

13         Q.   All right.  Officer Wilbur, my understanding

14    is you set up on Higley and the 60; right?

15         A.   Yes.

16         Q.   There is an easel behind you.  Can you draw

17    that intersection?  It's right at the north of the

18    intersection.  Higley goes over 60?

19         A.   Yeah.  It is an up bridge.

20         Q.   If possible, can you -- just draw the 60,

21    Higley and then put a spot where your car is?

22         A.   Okay.  So just the bridge at Higley?  The

23    Higley bridge?

24         Q.   Yeah.

25         A.   Okay.

13

1           Q.    And will you designate the on-ramp that you

2  witnessed?

3           A.    Yeah.

4           Q.    And so what you just drew there is the

5  vehicle that you were sitting in?

6           A.    Yes.

7           Q.    So you are facing up.  Is south in this

8  diagram?

9           A.    Yeah.

10          Q.    So you are facing southbound?

11          A.    Huh-uh.

12          Q.    And you see coming north down Higley towards

13  you a truck and a Gilbert police officer, police vehicle

14  following that truck; correct?

15          A.    Yes.

16          Q.    All right.  Do you know the length of the

17  on-ramp roughly from the time that you make the turn off

18  of Higley and head down the 60, about how long it is?

19          A.    You know, I don't know how many feet.  I

20  wouldn't say it is an exceptionally long off-ramp.

21          Q.    One football field, two football fields?

22          A.    I would say about a football field.

23          Q.    About 300 feet?

24          A.    Yeah.

25          Q.    Estimation?

13

1         A.    I am not sure.   I haven't measured it, but

2    it is about 300 feet.

3         Q.    Right.   And do you ever play football?

4         A.    No.

5         Q.    But you have been to football games?

6         A.    I was in the band.

7         Q.    Okay.   So up know the length of a football

8    field?

9         A.    Yeah.

10        Q.    All right.

11        Q.    All right.   I believe it is your testimony

12   that these vehicles that you see, the truck and the

13   Gilbert police car, they are not speeding; correct?

14        A.    Correct.

15        Q.    Do you remember whether the light was green

16   for the truck to make the turn?

17        A.    That I don't know.   As soon as I saw the

18   possible truck and the Gilbert unit behind it, I wasn't

19   even focused on any of the streetlights or anything.   My

20   attention was directed right at listening to the radio.

21        Q.    About how far south down Higley was it this

22   that you saw them?

23        A.    There is a stoplight at the hospital which

24   is maybe up in the upper right corner of my diagram.

25        Q.    Okay.

74

13

1        A.    And it would be an estimation, but maybe

2    that stoplight is maybe a thousand feet, 600 feet to a

3    thousand feet.  I am not really sure.

4        Q.    So maybe two, three football fields?

5        A.    Yes, somewhere in between there.

6        Q.    So you saw him about two to three football

7    fields down?

8        A.    Yes.

9        Q.    The truck is in the curb lane heading north?

10        A.    Yes.

11        Q.    Police officer right behind it?

12        A.    Yes.

13        Q.    It gets up to the on-ramp.  The truck makes

14    a turn and goes down the on-ramp?

15        A.    Yes.

16        Q.    And the police officer follows it?

17        A.    Yes, sir.

18        Q.    And then you at that point are you already

19    moving or are you moving or you do you make that turn?

20        A.    I was waiting to make the turn before I

21    moved.

22        Q.    So you are sitting in the car.  You see them

23    go and then you go?

24        A.    Yes.

25        Q.    And do you know whether you had to run the

75

light or was traffic light or heavy?

     A.   Traffic is really light on Higley road.  I know there were a few headlights that I saw in and around where the Gilbert unit was.  I couldn't really tell if they were behind the Gilbert car or in front of it, but there were maybe two to three headlights that I noticed after I noticed the truck.

     Q.   Do you know whether or not you had to wait for them to clear the intersection or --

     A.   That I am not sure.

     Q.   Okay.  Let me show you what's been marked as Exhibit No. 72.  Does Exhibit No. 72 look familiar?

     A.   Yes.

     Q.   What is Exhibit No. 72?

     A.   It is a picture of a white work truck with, I guess, a double axle.  Maybe not a double axle, but double tires on each side on the rear and a yellow cab.

     Q.   So a dualy?

     A.   A dualy.

     Q.   A dualy pickup?

     A.   Yeah.

     MR. SHELL:  Move for the admission of Exhibit 72.

     THE COURT:  Do you have an objection?

     MR. MARTINEZ:  I do.  Lack of foundation.  He wasn't there when it was taken.

76

13

1        THE COURT:  Overruled.  It is admitted.

2        Q.  BY MR. SHELL:  That's the truck you saw from

3 the on-ramp?

4        A.  I did see the truck from the side, but I was

5 behind the truck for a few miles on the freeway.

6        Q.  Do you know the make and model?

7        A.  No.

8        Q.  1990 truck?  Sound right?

9        A.  The report came out that it was maybe a '90s

10 model when they were initially looking for the vehicle.

11       Q.  All right.  Dualy, four-wheel drive truck,

12 or do you know?

13       A.  I knew that it had the two sets of tires on

14 the rear.

15       Q.  Right.

16       A.  I don't know if it was four-wheel drive or

17 not.

18       Q.  All right.  I believe it was your testimony

19 that you saw the truck go down the on-ramp and get to

20 about 30 miles an hour.  And then -- did you testify to

21 that?

22       A.  The truck was traveling -- I don't know how

23 fast truck was traveling when it made the turn.  At no

24 point did it stop while he was making the turn, so I would

25 estimate it was going maybe 25 to 30 as it was making the

14

77

14

1    turn, so I wouldn't really say that the truck was

2    accelerating to 30 or going to slow down to 30.   The speed

3    pretty much around the turn and everything was between 20

4    and 30 miles an hour.

5              Q.   But it looked like a perfectly fine turn?

6              A.   Yes.

7              Q.   Nothing out of the ordinary?

8              A.   No.

9              Q.   It wasn't like he went screeching around the

10   corner?

11             A.   Yeah.   If that had occurred I would have

12   known that maybe this is obviously somebody that we need

13   to stop.

14             Q.   And I believe it is your testimony, correct

15   me if I am wrong, my notes say that you tetified it was

16   doing 30 miles an hour and then slowed down to 10 miles an

17   hour.

18             A.   Yes.

19             Q.   And that it went over into the gravel?

20             A.   On the passenger side, yes.

21             Q.   Right.   And that you made an assumption that

22   somebody might try to bail?

23             A.   Yes.

24             Q.   You wrote a police report in this case;

25   right?

78

1    A.    A supplement report, yes.

2    Q.    Did you write a police report in this case?

3    A.    Yeah.

4    Q.    All right.  Do you have that with you?

5    A.    Not with me.

6    Q.    Why do you write police reports?

7    A.    We have an officer that takes the initial

8    report, basically describes the overall scene, the overall

9    condition, the factors concerning the crime.  We also have

10   officers that take supplemental reports which basically

11   just dictate what they did, what they saw.

12   Q.    Right.  And you write down everything that's

13   important that happened; correct?

14   A.    We write down everything that at the time

15   that we think is important to be included in the case,

16   yes.

17   Q.    So you do that so you can later refresh your

18   memory; correct?

19   A.    Yes.

20   Q.    Let me show you what's been marked as

21   Exhibit No. 98.  Do you recognize that?

22   A.    Yes.  This is a printout of my supplement.

23   Q.    All right.  You don't mention anything about

24   the truck slowing down and going off the road, do you?

25   A.    No.

79

14

1          Q.     You mentioned that you see the truck.  You

2     see it go down the on-ramp; correct?

3          A.     Let me see what I wrote here.

4          A.     Yeah.  I observed the truck going down the

5     on-ramp of US 60.

6          Q.     You observed a black and white Gilbert PD

7     unit following the truck; correct?

8          A.     Yes.

9          Q.     And then you state that as you followed the

10    Gilbert PD unit eastbound down the on-ramp for US 60, you

11    heard two or three gunshots?

12         A.     Yes.

13         Q.     Okay.  You don't mention anywhere in there

14    that the truck went off into the gravel and that somebody

15    may have tried to jump out or was getting ready to jump

16    out?

17         A.     That's right.

18         Q.     And then you say that as soon as those

19    gunshots go off, that's when the Gilbert PD officer turns

20    his overhead lights on?

21         A.     Correct.

22         Q.     And then you turned your overhead lights on

23    after that?

24         A.     No.  Actually I turned my overhead lights on

25    as soon as I got onto the on-ramp, after the gunshots.

82

15

1    an hour?

2           A.    Yeah.   80 to 90.

3           MR. SHELL:   Okay.   I don't have anything anything

4    else.

5           THE COURT:   Redirect.

6

7                      REDIRECT EXAMINATION

8    BY MR. MARTINEZ:

9           Q.    With regard to this issue of the lane change

10   and whether or not there was any, did it always stay in

11   that one lane, or did it at some point switch over to over

12   lanes?

13          A.    There were -- at one point we had the police

14   helicopter following, I think.   I think they joined the

15   pursuit around Ironwood which is maybe five miles beyond

16   what I saw.   I can't really discern what I heard over the

17   radio.   People were advising how fast the vehicle was

18   going and where it was at.   Things of that sort.   But from

19   what I observed, I observed it in the curb lane traveling

20   a pretty consistent speed.

21          Q.    Okay.   Now, with regard to the speed that it

22   was on the on-ramp whether you said that it was 10 miles

23   an hour, do you remember saying that it slowed down to

24   that?

25          A.    Yeah.   It did slow down.

14

1        Q.   So after the gunshots you turned your lights

2  on, too?

3        A.   Lights and siren, yeah.

4        Q.   All right.  So after the gunshot, both you

5  and the Gilbert police unit turned on your lights and

6  sirens?

7        A.   Yes.

8        Q.   And I believe it is your testimony that the

9  truck stayed consistently in the same lane and

10  consistently the same speed?

11        A.   Yeah.  Well, from what I observed on the

12  freeway during the pursuit.

13        Q.   Well, Higley out to the Renaissance fair,

14  the Renaissance place is probably about, what, 20 miles?

15        A.   I know based on discussing it with some of

16  the other officers where the location is.  The Renaissance

17  fair, I think, is at mile marker 205.  I am not sure what

18  mile marker Higley Road is.  It may be around 191.

19        Q.   So 16 miles?

20        A.   Approximately.

21        Q.   14 miles?

22        A.   Right.

23        Q.   Because you have to go all the way out

24  through the exists that go into Apache Junction?

25        A.   Yes.

81

1    Q.   Then you have to go out into Gold Canyon?

2    A.   Yes.

3    Q.   And then just before you hit Apache

4  junction, that then takes you over to Florence?

5    A.   Or Florence junction.

6    Q.   Yeah, Florence Junction is the the

7  Renaissance?

8    A.   Okay.

9    Q.   And that's where are you broke down?

10   A.   Yeah.  Right after maybe about a mile after

11 is where I stopped.

12   Q.   That's a distance of 16, 15, 14 where

13 that -- the truck stayed at the consistent speed from its

14 lane?

15   A.   From what I observed, there were around

16 Power Road when the four other Mesa officers actually

17 passed us, passed us and kind of slowed down and scooted

18 in with us there were points at which I no longer had an

19 eye on the truck because there was a police car with

20 lights and sirens flashing in front of me, but from what I

21 observed it stayed in the slow lane of the freeway pretty

22 much the whole time.

23   Q.   All right.  At a consistent speed?

24   A.   At a consistent speed.

25   Q.   Which was, I think you said, about 80 miles

83

Q.    Did it slow down to 10 miles an hour after it made the turn before it made the turn, or right before it got on the freeway?  Where on that diagram did it slow down to 10 miles an hour?

A.    Actually after the work truck and the Gilbert police unit actually made the turn, like I said, it was going about 20 to 30 miles an hour fairly consistently past the hospital and through the turn, and as it got maybe I would say about a hundred feet down the on ramp is when it slowed down to 10 miles an hour and pulled over to the right.

Q.    When you say a hundred feet down the on-ramp and then it pulled over to the right, are you meaning the on-ramp on the way towards the US 60?

A.    Yes.

Q.    Was there any obstructions that you saw there that would have caused it to slow down to 10 miles an hour?

A.    No.

Q.    If a person is going to get onto the on-ramp and they are going to go on the US 60, based on your training and experience and what you have seen out there, is it customary that if a person is going to merge onto a freeway that they would slow down rather than speed up?

A.    No.

15

1  Q. What would they do?

2  A. They would speed up.

3  Q. Why?

4  A. everybody in Arizona drives, you know 50, 60

5 miles an hour on the freeway, maybe even more.

6  Q. So for them to stop somewhere afterwards --

7  MR. SHELL:  Objection; misstating the testimony.

8  THE COURT:  Finish your question.

9  Q. BY MR. MARTINEZ:  So to stop afterwards

10 where was it that they slowed down?  Tell me where they

11 slowed down.

12  A. They slowed down -- like I said, I don't

13 know exactly where they began to slow down, but I noticed

14 them pull to the right and slowing about a third of the

15 way down the on-ramp.

16  Q. All right.  And did all of the wheels stay

17 on the pavement or did they not?

18  A. No.  Two of the passenger tires went off

19 into the gravel as it was pulling to the right of the

20 road.

21  Q. You were asked about your report there and

22 whether or not you put this issue of the speeds on there.

23 You were asked about that.  Do you remember that?

24  A. Yes.

25  Q. What did you say the purpose of a report

15

1   was?

2        A.   The purpose of the report is to document

3   what we observe and what they think is pertinent to.

4        Q.   You said at that time; right?

5        A.   Yeah.

6        Q.   Do you know what's going to be pertinent

7   later?

8        A.   No.

9        Q.   With regard to the speeds at how everybody

10  was going and the turns, that sort of thing, is it

11  indicated anywhere in your report?

12       A.   I think the only thing I indicated per

13  policy if we are involved in a pursuit is the speed of the

14  other vehicle and my speed, and I think I put it in excess

15  of 80 miles an hour.

16       Q.   Why didn't you put anything about the speed

17  of the vehicles as they were turning?

18       A.   I didn't think it was pertinent at the time.

19       Q.   But do you have any independent recollection

20  of that?

21       A.   Yes.  I was there.  I observed it.

22       Q.   With regard to reports, do you write every

23  single thing down that you see?

24       A.   No.

25       Q.   Why not?

86

15

1      A.    It's impossible.

2      A.    I mean -- you could document -- your report

3  could be 10 pages long and it might be full of stuff that

4  may or may not be pertinent.

5      Q.    One of the things that you were asked about

6  was this Exhibit 72.   Were you there?

7      A.    Not at the stop, no.

8      Q.    So the answer is yes or no?

9      A.    No.

10      Q.    Do you know how the truck got there?

11      A.    No.

12      Q.    Do you know why the sides of it are open?

13      A.    No.

14      Q.    Do you know whether it stopped there?

15      A.    I heard on the radio.

16      Q.    No.   I am asking you if you were there?   By

17  your own knowledge, do you know?

18      A.    No.

19      Q.    With regard to this photograph, do you know

20  whether it was taken?

21      A.    No.

22      MR. MARTINEZ:   I have no other questions.

23      THE COURT:   Does the jury have any questions for

24  this witness?   I don't see any.   Thank you.   You can be

25  excused.   The State can call its next witness.

87

16

1          MR. MARTINEZ:   The State calls Ryan Churchman.

2

3                    RYAN CHURCHMAN,

4    called as a witness herein, having been first duly sworn,

5    was examined and testified as follows:

6

7                    DIRECT EXAMINATION

8    BY MR. MARTINEZ:

9          Q.    Your name, sir?

10         A.    Ryan Churchman.

11         Q.    Who do you work for?

12         A.    The town of Gilbert.

13         Q.    What do you do for them?

14         A.    I am a police officer.

15         Q.    And did you have occasion to be working back

16   on January 28th of this year?

17         A.    I did.

18         Q.    And did you have occasion to be working

19   sometime after 10:30 in the evening?

20         A.    Yes, sir.

21         Q.    And specifically with regard to a truck that

22   may have been on the freeway, did you have anything to do

23   with that?

24         A.    Yes, sir.

25         Q.    And what is it that -- first of all, what

88

16

1    were you doing when you first got the call that got you

2    involved in that?

3           A.    I was finishing an unrelated call for

4    service in the area of Recker and Guadalupe within the

5    town of Gilbert.

6           Q.    What happened?  What did you do?

7           A.    I heard on the primary channel an officer

8    had been shot in the head and was down.  I got in my car

9    and proceeded to the location that I was dispatched.  I

10   was at Val Vista and Baseline.

11          Q.    Did you ever make it to the victim?

12          A.    No.

13          Q.    What happened on the way?

14          A.    On the way I had heard there was enough

15   units on the scene and they broadcase a suspect vehicle

16   which was a white pickup utility-type truck, and that

17   truck was last seen eastbound on Baseline Road, and I was

18   heading westbound on Baseline Road, and I was attempting

19   to find the vehicle at that time.

20          Q.    What happened then?

21          A.    About a mile away another Officer, Gilbert

22   officer, Officer Betts stated that he probably located

23   that vehicle in the area of Baseline and Higley which was

24   past, behind my location, so I made a U-turn and started

25   back to Higley and Baseline.

16

1         Q.   And what happened?

2         A.   I got towards Higley and Baseline.  I had

3 heard on the radio again on Channel 1, I believe, Officer

4 Betts stated that he was shot at his -- his vehicle was

5 shot at.  He got on the US 60 and started heading

6 eastbound.  At some point his vehicle got disabled.  And I

7 got on US 60 eastbound to get up to where the suspect

8 vehicle was last seen heading.

9         Q.   And did you get up to that point?

10        A.   I did, sir.

11        Q.   And where is it that you caught up to the

12 vehicle?

13        A.   In the area of about Tomahawk or Ironwood,

14 cross streets on the US 60 eastbound.

15        Q.   How far is that from US 60 and Higley?

16        A.   About seven or eight miles, sir.

17        Q.   Were there other officers there already?

18        A.   Yes, sir, there was several behind me.

19        Q.   Okay.  Were you part of the lead group in

20 front, or where were you located?

21        A.   At one point I was the lead pursuing

22 officer.

23        Q.   And how fast were you going?

24        A.   At speeds varied anywhere between a hundred

25 miles an hour down to about 70 or 80.

16

17

1    Q.    And during the time that you were pursuing

2    that vehicle, did you ever see anybody get into the bed of

3    the truck or not?

4    A.    No, sir.  I was unable to see that clearly.

5    And given the darkness, and at that point in time it was

6    raining so heavy that I had my wipers going as fast as

7    they possibly could, and it was extremely hard to see.

8    Q.    And so the vehicle that you were pursuing,

9    did it stay in the same lane or did it change lanes or

10   what happened?

11   A.    It changed lanes periodically, but as it was

12   driving it maintained its lane.  And when it changed lanes

13   it was going around other civilians' vehicles that were on

14   the roadway.

15   Q.    Where did you see this changing lanes?

16   A.    After I first saw the vehicle, like I said,

17   in the area of about Ironwood, Tomahawk area on the US 60

18   still eastbound.

19   Q.    How many times did you see the lane changes?

20   A.    I would say there was about four or five

21   that I mentioned, Tomahawk.

22   Q.    And the reason for the lane changes, could

23   you see whether or not there was any -- what reason may

24   have been for the lane changes?

25   A.    Like I said, there was other civilian

17

1  vehicles on the roadway that was going around, going

2  around those vehicles.   I don't know exactly what the

3  driver was thinking at that time, but that's what I saw.

4          Q.   And how long did your pursuit continue?

5          A.   My pursuits?

6          Q.   Yes.   Uh-huh.

7          A.   Around marker 203, which is slightly past

8  the Renaissance fair on the US 60 freeway, my vehicle was

9  disabled at that point, and the primary vehicle that I was

10 in I was not able to continue.   I got out of my vehicle

11 and got back into another officer's vehicle, continued on

12 in the pursuit in the passenger seat.

13         Q.   When you say that your car was disabled,

14 where were you -- in terms of the truck, where were you

15 when it was disabled?

16         A.   I was behind the pickup approximately two 2

17 car lengths behind.   Out of the back of the pickup there

18 was several items of debris that was coming out towards

19 me, and I was able to avoid some of them.   One of them I

20 was not which was a red, big red jack that hit me direct

21 in the front of my vehicle underneath and disabled it.

22         Q.   Could you tell whether or not there was

23 somebody in the back portion of the truck or not?

24         A.   No, sir, I could not.

25         Q.   Why not?

92

A.   Because of the weather because of the

darkness and other variables and other -- and avoiding

other debris, I was not able to see.

Q.   Let me show you some photographs.   Take a

look at Exhibit Nos. 60 to 62.   Do you recognize the item

there?

A.   Yes, sir, I do.

Q.   What is it?

A.   It looks like the jack that came out of the

back of the pickup towards my vehicle.

MR. MARTINEZ:   Okay.   I move for the admission of

Exhibits 60, 61 and 62.

MR. SHELL:   No objection.

THE COURT:   60, 61 and 62 are admitted.

Q.   BY MR. MARTINEZ:   Let's take a look at

these.   That's the item that we are looking at; correct?

The color isn't very good.

A.   Yes, sir.

Q.   And on 61 that's a closer view of it;

correct?

A.   Yes, sir.

Q.   And, 62, what are we looking at?

A.   That's the jack, sir.

Q.   You indicated something about you became

disabled.   What did you do then?

93

17

1        A.    I attempted to maintain my speed in the

2   vehicle.  I pretty much had it floored and, the vehicle

3   was only able to go about 70 miles an hour.  There was

4   sparks coming out from behind, obviously.  The jack was

5   lodged under the vehicle, and I wasn't able to control it

6   given the weather and the speeds and whatnot.  I had to

7   pull over the side of the road.  I looked underneath the

8   car to see where the jack was.  I secured the vehicle and

9   I jumped into another officer's vehicle.

10        Q.    Whose other vehicle did you jump in?

11        A.    Officer Caouette.

12        Q.    And what happened?

13        A.    I got in his vehicle.  We continued in the

14   pursuit.  At that time we were beginning to lose radio

15   communication given how far away we were at that point.

16        Q.    Let me stop you there.  Were there more than

17   just the -- was there more than just the Gilbert Police

18   Department involved?

19        A.    Yes.

20        Q.    Who else was involved?

21        A.    I know there was Mesa units there.  There

22   was county units there, Maricopa County units.  There was

23   DPS units there, various other agencies.

24        Q.    How is it that the units, if you were

25   traveling along and you heard the radio, how is it that

94

17

1   they communicate?  Do you know do they communicate amongst

2   themselves or what?

3        A.    There is a station called USA-1 which we

4   were eventually able to change over to which is a change

5   channel that we can all talk together, but that wasn't

6   happening.  That was later up near Globe and Superior.

7        Q.    When you were driving along, how much range

8   does the Gilbert system have?  In other words, on and

9   around Gilbert you can communicate with the dispatcher;

10  right?

11       A.    Yes, sir.

12       Q.    What's the range?  Or can you communicate

13  with a Gilbert business dispatcher throughout the State?

14       A.    I can't give you an exact answer distance

15  for the range.

16       Q.    Right.

17       A.    Most of it is line of sight communication.

18       Q.    No.  I mean, for example, if you are in

19  Superior, can you still communicate with the dispatcher in

20  Gilbert?

21       A.    No.

22       Q.    When did you lose your communication with

23  the Gilbert dispatcher exactly?

24       A.    Exactly when I could not tell you.  It was

25  past the point that I jumped into the other vehicle

95

18

1    because I cleared on the radio and was able to get a

2    response when I hit the jack to let them know that it

3    occurred, and this was about with further communication.

4         Q.   At some point you lost communication with

5    the dispatcher?

6         A.   Yes.

7         Q.   So you are in with Officer Caouette.   Then

8    what happened?   Were you first in line or second?

9         A.   There were several units ahead of us.   I am

10   not sure how many.   Several, at least.   I started working

11   the radio to get communication and he focused on driving.

12        Q.   And what happened then?

13        A.   We turned eastbound on the US 60 through

14   several other obstacles, over debris that day with several

15   other police units.

16        Q.   Were you able to see what was going on with

17   the truck?

18        A.   No.   It was too far ahead.

19        Q.   So at that point you guys were way back?

20        A.   Correct.

21        Q.   What happened then?

22        A.   We ended up on top of the world is the

23   location where we actually stopped.

24        Q.   What's the mile marker there?

25        A.   At the top of the world?

96

18

1      Q.    Yeah.

2      A.    I do not know, sir.

3      Q.    Okay.  So in terms of miles, how many miles

4   is it?

5      A.    I would have to guess.  I would say anywhere

6   between 20 and 30 as a guess.

7      Q.    All right.  And when you arrived there, were

8   there already police officers there?

9      A.    Yes, there was.

10     Q.    In the vehicle that you were in, did you

11  have your lights and sirens on?

12     A.    Yes, the entire time.

13     Q.    When you got up to the top of the world, is

14  this where the truck stopped?

15     A.    Yes.

16     Q.    Did you also have your lights and sirens on?

17     A.    Yes, sir.

18     Q.    And did other vehicles have their lights and

19  sirens on?

20     A.    Yes, sir.

21     Q.    And so what happened?

22     A.    Well, when we got up to the top of the world

23  I got out of the passenger side.  Officer Caouette got out

24  of the driver's side, and it sounded to me like

25  continuance of gunfire.  Machine gunfire is what it

18

1    sounded like.  I got as low as I could and ran around the

2    front of the vehicle over to the left side of what was

3    occurring because we parked on the ride side of the road

4    behind several other vehicles.  When I got to the left

5    side there was a line formed on the front line where the

6    police cars were stopped, and in front of that was the

7    suspect's vehicle, and by the time I reached the front I

8    heard somebody, I don't know actually who, "hold fire,

9    hold fire."

10        Q.   Did you ever fire any rounds?

11        A.   No, sir, I did not.

12        Q.   Go ahead.

13        A.   Got up to the line when they were yelling

14   "hold fire," and I could see the white pickup.  I could

15   see someone was on the driver's side.  From the left side

16   I could see the door open.  I saw a guy laying on the

17   ground.  He wasn't moving.  He wasn't responding to verbal

18   commands given to him to show his hands.

19        Q.   And this individual, do you know what he was

20   wearing?

21        A.   If what I remember correctly he was wearing

22   a red colored jacket.

23        Q.   Was he on the left side or the right side of

24   the vehicle?

25        A.   He was on the left side, just outside of the

98

18

1   driver's side door.

2       Q.   Did you get close enough to him to look at

3   him or not, or did you stay a ways away?

4       A.   The initial part I was not close to them.   I

5   as behind, but eventually we did walk up to take custody

6   of him.

7       Q.   When you say "we," who would that be?

8       A.   Other officers and the Gilbert Officers DPS

9   officers and Mesa officers.   Everybody was there.

10      Q.   All right.

11      A.   I am holding security which means that I am

12  watching for any movement any kind of additional fire, any

13  kind of safety risks, and there were other officers that

14  went up and secured that subject, that guy, on the ground.

15      Q.   How far away were you from the subject on

16  the ground when you secured him?

17      A.   About five feet.

18      Q.   Look at Exhibit No. 92.   Do you recognize

19  that?

20      A.   Yes, I do.

21      Q.   What does it depict?

22      A.   It depicts Mr. Irizarry laying on the

23  ground.

24      Q.   And was there at the time that he was placed

25  under arrest?

99

1      A.   It was either the time he was placed under

2  arrest or after he was moved, because after he was

3  handcuffed he was moved out to the side of the road.

4      Q.   So this was shortly after his arrest?

5      A.   Yes.

6      Q.   Is that true and accurate depiction of his

7  clothing?

8      A.   Yes.

9      MR. MARTINEZ:  Move for the admission of Exhibit

10  No. 92.

11      MR. SHELL:  No objection.

12      THE COURT:  92 is admitted.

13      Q.   BY MR. MARTINEZ:  You said that he was

14  moved.  Where was he taken into custody, and where was he

15  moved from, I guess is the point?

16      A.   He was initially taken into custody where he

17  was laying on the ground next to the side of the pickup.

18      Q.   And in terms of the pickup, if you just flip

19  that over, why don't you just draw us where he was laying

20  when he was taken into custody?

21      A.   [Witness complied.]  This would be the main

22  road.  There was mountainous terrain or either side.  This

23  would be the line of the police cars down here.  This

24  would be the pickup truck.  The front of the pickup truck

25  is towards the top, and he was laying approximately in

100

19

1    that area right there.

2          Q.   Is that when he was first taken into

3    custody?

4          A.   Yes.

5          Q.   Where was he taken to when this photograph

6    was taken?

7          A.   Approximately in this area here.

8          Q.   Put an X there also.

9          A.   Okay.

10         Q.   Go ahead and take your seat.

11         MR. MARTINEZ:   I don't have any other questions.

12         THE COURT:   Cross.

13

14                    CROSS EXAMINATION

15   BY MR. SHELL:

16         Q.   Okay.  At what point did you first see the

17   truck?

18         A.   In the area of about Tomahawk, Ironwood on

19   the US 60 freeway eastbound.

20         Q.   That's the first time that you saw it?

21         A.   Yes, sir.

22         Q.   And according to your police report the

23   vehicle is doing 70, 80 miles an hour?

24         A.   That's correct, sir.

25         Q.   Where did it go a hundred miles an hour?

101

19

1          A.   I never said the vehicle went a hundred.  At

2     one point I was traveling a hundred miles an hour.

3          Q.   So you never testified that the vehicle ever

4     was going a hundred miles per hour?

5          A.   No.  I was going between a hundred and 80

6     and 70.  Depending on the location of the vehicle was

7     going about 80 to 70 once I caught up with it.

8          Q.   And the road that this vehicle was traveling

9     on are two lanes in each direction; correct?

10          A.   At the time that I located him, yes.

11          Q.   And you said that you saw the truck change

12     lanes four or five times?

13          A.   Correct.

14          Q.   And it changed lanes in the lanes that it

15     had the proper amount to be in, correct, passing lanes?

16          A.   Into a thru lane, yes, sir.

17          Q.   The road all the way out to -- well, just

18     before Superior, right, all the roads all the way out from

19     the freeway all the way out to just before Superior is a

20     divided highway?

21          A.   Correct.

22          Q.   Two lanes on each side?

23          A.   Yes, sir.

24          Q.   Okay.  And the whole distance that you were

25     following the vehicle before it got disabled it was a

102

19

1    divided highway the whole way?

2         A.   Yes, sir, it was.

3         Q.   So when it was changing lanes and passing

4    other vehicles it was doing so in a proper lane?

5         A.   Yes, a proper thru lane around other

6    vehicles, yes.

7         Q.   Right.  So if you wanted to pass a vehicle

8    the lane that he went into to pass the vehicle, he wasn't

9    going into oncoming traffic?

10        A.   No, sir, he was not.

11        Q.   All right.  Your car gets disabled.  You

12   jump in another car and you head on up?

13        A.   Yes, sir.

14        Q.   Did you get permission from your supervisor

15   to do that?

16        A.   I did ask for permission.

17        Q.   Did you get permission?

18        A.   No.  I never asked for permission.

19        Q.   Is it standard procedure just to leave

20   unattended law enforcement vehicles by the side of the

21   road?

22        A.   Well, this wasn't standard procedure, sir.

23        Q.   I understand, but is it standard procedure

24   to leave unattended law enforcement vehicles by the side

25   of the road?

19

1        A.    I can't answer that.  I don't know if there

2    was a procedure against it or for it.

3        Q.    At the time I think there was testimony or

4    statements that there is 75 different police cars involved

5    in this thing, so there was numerous other officers on

6    their way; right?

7        A.    Yes, sir.

8        Q.    And you decided to leave your vehicle and

9    jump in another vehicle?

10       A.    That is correct.

11       Q.    All right.  Have you reviewed your police

12   report in this case?

13       A.    I have, sir.

14       Q.    When was the last time?

15       A.    Before I came to this courtroom.

16       Q.    Okay.  Did you testify that when you got up

17   to the scene Mr. Irizarry was not moving?

18       A.    From what I could see, I don't believe he

19   was moving, no, sir.

20       Q.    Does your police report reflect that, quote,

21   the suspect was still moving and officers were giving him

22   commands to move?

23       A.    If that's what it says, that's what it says.

24       Q.    Well, do you know?

25       A.    I can look at it and review it if you would

104

1    like me to.

2           Q.    While she is doing that -- your police

3    report reflects when you got up there you noticed that

4    he's been shot?

5           A.    It looks like he has been shot, yeah.

6           Q.    So it looked like he had been shot?

7           A.    Yes.

8           Q.    In the legs?

9           A.    Yes, possibly.

10          Q.    All right.  Do you know how he got all of

11   these injuries on him?

12          A.    I don't know.  I have no idea, sir.

13          Q.    When you got there were there other officers

14   beating the crap out of him?

15          A.    No, sir.

16          Q.    Let me show you Exhibit No. 99.

17          A.    Okay, sir.

18          Q.    He was moving?

19          A.    I have written down there he was.

20          Q.    And he was moving because officers were

21   telling him to move.

22          A.    There were commands being given, yes, sir.

23          Q.    So by the first time you get up there he is

24   already out by the driver's door?

25          A.    Correct.  He is on the ground.

20

1      Q.   All right.   If the evidence reflects that

2  initially when he's shot he's up here, you wouldn't know

3  how he got from there to there?

4      A.   I have no idea, sir.

5      Q.   It's possible, though, that he got from that

6  point -- I pointed out in front of the truck to the X

7  where you first saw him because I was following officers'

8  commands to crawl out?

9      A.   I can't make that assumption.   I didn't see

10  what happened.

11      Q.   But when you first saw him, he was moving

12  and he was moving at the direction of officers?

13      A.   When I first saw him, he was on the ground.

14      Q.   Moving?

15      A.   Yes.   As in the report I did state he was

16  moving.

17      Q.   And your report also says at that point in

18  time officers are giving him commands to move?

19      A.   Yes.

20      Q.   So he is following the officers' commands?

21      A.   I can't really say if he was following their

22  commands.

23      Q.   Well, officers are ordering him to move;

24  correct?

25      A.   Uh-huh.

106

Q.    Yes?

A.    Yes, sir.

Q.    Is that what your police report says?

A.    Yes.

Q.    And at the same time he's moving?

A.    Yes, sir, he is.

Q.    And you don't know how he got any of those injuries on his face?

A.    No, sir, I have no idea.

MR. SHELL:   Nothing further.

THE COURT:   Redirect.

REDIRECT EXAMINATION

BY MR. MARTINEZ:

Q.    When you got up there, you indicated that you saw him by the door; correct?

A.    Correct.

Q.    And when you saw him there, had any officers approached him?

A.    No, sir.

Q.    So do you know whether or not those injuries were sustained before he got out of the truck or after he got out of the truck and then got to that position?   In other words, can you tell when he got those injuries?

A.    No, sir, I can't.

20

1       Q.  Do you know if it's something that happened

2  while he was in front of the truck?  Should he be in front

3  of the truck as you were asked?

4       A.  There is a possibility.  I do not know how

5  he got the injuries.

6       Q.  And then after he was moving, that's when

7  officers approched; correct?

8       A.  Correct.

9       Q.  The area was lit up, wasn't it?

10      A.  It was lit up by our police cars, yes, sir.

11      Q.  So, in other words, there was plenty of

12  light to see; correct?

13      A.  Yes.

14      Q.  And you saw the actual, if you will, arrest,

15  didn't you?

16      A.  Yes.

17      Q.  Where did that arrest take place?

18      A.  Only the ground as depicted on the X here on

19  the diagram behind me.

20      Q.  And how far away were you from there while

21  the arrest was, of course, affected?

22      A.  About five feet, like I say.

23      Q.  And lights were on; right?

24      A.  Yes.

25      Q.  How many officers were near him when the

108

20

1    arrest was affected?   The actual arrest time of officers

2    was about four or five?

3              A.   I do not know for sure.

4              Q.   How long did it take for them to place him

5    under arrest?

6              A.   Seconds.

7              Q.   And after he was placed under arrest did

8    those four officers mill around there or was he moved?

9              A.   He was moved because we still had another

10   individual that we needed to assess.

11             Q.   How was he moved?

12             A.   I don't know how he was moved.   I didn't

13   help in any way, shape or form.

14             Q.   Did they pick him up?

15             A.   They picked him up, yes.

16             Q.   How did they pick him up?   Did they pick him

17   up from his legs, or were you looking at that time?

18             A.   I wasn't looking directly at him because he

19   was secured.   There was another individual that I saw at

20   that point that I was looking at and keeping my focus on.

21             Q.   And then he was moved to this other

22   location; correct?

23             A.   Correct.

24             Q.   The truck -- when you said it was traveling

25   up there and it was staying in its lane and that sort of

109

thing, was it ever passing any other traffic that was
traveling in that direction, or was it the fastest
vehicle?

A.    When I saw it, it was the fastest vehicle.
No other vehicle was passing it.

Q.    At any time did you ever see any other
vehicle pass it?

A.    No, sir.

Q.    At any time did the officers pass it?

A.    No, sir.

Q.    How come you guys didn't try to pass it?

A.    I can't speak for other officers, but I
definitely wasn't trying to pass the vehicle and get in
front of it to get in the line of fire.

Q.    In the beginning at first you were in the
beginning part of it?

A.    Yes.

Q.    Why didn't you get in front of it?

A.    It's not procedure on how we will --

Q.    You just told me.  Aren't you afraid you are
going to get shot if you do?

A.    Yes.

Q.    Is that something that would you want to do,
put yourself in front of it?

A.    No.

110

        MR. MARTINEZ:   I don't have any other questions.

        THE COURT:   Does the jury have any questions for
this witness?   Thank you.   You can step down.   You can
call your next witness.

        MR. MARTINEZ:   The State calls Garth McClellan.


                    GARTH McCLELLAN,

called as a witness herein, having been first duly sworn,
was examined and testified as follows:


                    DIRECT EXAMINATION

BY MR. MARTINEZ:

        Q.   May I have your name, sir?

        A.   Garth McClellon.

        Q.   Who do you work for?

        A.   Gilbert Police Department.

        Q.   What do you do for them?

        A.   Currently a detective assigned to property
crimes.

        Q.   Drawing your attention back to January 28th
of this year, what were you assigned to?

        A.   Homicide investigation.

        Q.   And did you have occasion to participate in
the investigation of the killing of Lieutenant
Shoehandler?

111

1

    1        A.    Yes.

    2        Q.    What was your assignment back then?

    3        A.    I was still in property crimes, but in that

    4    investigation I went to top of the world up above Superior

    5    and assisted with some of the vehicles up there.

    6        Q.    What did you do up there?

    7        A.    Counted bullets from all of the involved

    8    officers that were involved in the pursuant.

    9        Q.    How long were you there?

   10        A.    10, 12 hours.

   11        Q.    What what time did you get up there?

   12        A.    Around quarter to 12:00.

   13        Q.    That would be at night?

   14        A.    Yes.

   15        Q.    And how is it that this procedure was

   16    undertaken?  You start the counting; just get a feel for

   17    what's going on?

   18        A.    Well, once all the officers -- the whole

   19    incident was over with by the time I got up there.  They

   20    were all brought back to a senior center in Superior.  All

   21    officers involved and we had them all separated and took

   22    all of their bullets or their weapons and all of that.

   23        Q.    So when you say you counted the bullets, you

   24    didn't count the bullets at the scene.  You actually

   25    counted them from the police officers?

112

1          A.    Correct.

2          Q.    And you counted them what they had left in

3    their guns.  Is that how it works?

4          A.    Correct.  That's it.

5          Q.    Then did you do anything else up there?

6          A.    No.

7          Q.    As part of the investigation, what else did

8    you do after that?

9          A.    On January 30th I was requested to inspect

10   one of our Gilbert police vehicles that had been stricken

11   by a bullet.

12         Q.    And you knew this to be the vehicle of

13   Justin Betts, an officer?

14         A.    Yes.

15         Q.    And he is the individual that was involved

16   at the Higley off-ramp?

17         A.    That's correct.

18         Q.    And where did this take plaCe?

19         A.    At our property facility.

20         Q.    Were you the one actually conducting this,

21   or was it somebody else?

22         A.    It was me.

23         Q.    And tell me what you found or what you do.

24   What happened?

25         A.    Well, the reports have been that he had

113

thought there were two shots fired at his vehicle.  I went

to inspect the vehicle.  I found damage from one bullet

hole.

Q.    You found damage?  So you look at the

damage.  Why don't you tell me what you did is what I am

asking?

A.    I inspected the vehicle from the front, the

back, the sides.  I found a point of entry in one round in

the front right passenger grille area of the car.

Q.    So what else did you do?  Were you by

yourself or were you with somebody else?

A.    I was by myself.

Q.    And then what happened?

A.    Well, when I saw the damage to the plastic

grille I followed that through, saw where a hole was in

the AC condenser, Looked through, could see where it

exited the AC condenser, so I opened the hood and saw it

went in the radiator and out the radiator and hit the fan

blade.

Q.    Then what did you do?

A.    I tried finding where it came to a rest

somewhere in the engine.  Couldn't find it.  Crawled

underneath the vehicle and found a bullet fragment on a

cross member beam directly underneath the fan blade.

Q.    Let me show you some photographs real quick.

114

1    Take a look at Exhibits 24 through 31.  Do you recognize

2    what's there?

3              A.    Yes.

4              Q.    What is it?

5              A.    Picture by picture?

6              Q.    No, just general.

7              A.    A picture of Officer Betts' patrol vehicle

8    he was driving the night of the incident.

9              Q.    As it relates to the bullet hole that you

10   have talked to us about; correct?

11             A.    Correct.

12             Q.    Are these true and accurate depictions of

13   the vehicle and the items involved in the vehicle when you

14   conducted your examination?

15             A.    Yes, it is.

16             Q.    And what date was that again?

17             A.    On January 30th.

18        MR. MARTINEZ:  Move for the admission of

19   Exhaibits 24 through 31.

20        MR. SHELL:  No objection.

21        THE COURT:  24 through 31 inclusive are all

22   admitted.

23             Q.    BY MR. MARTINEZ:  Let's go ahead and take a

24   look at it.  This shows us the car, right, the back of it?

25             A.    Yes, it does.

115

Q.   Okay.   It gives us the identification
information; right?

A.   Correct, sir, the vehicle number, our own
department vehicle number, and license plate.

Q.   One of the things that we have heard is that
some of the cars may not be as fast as they possibly could
be.   Do you know the capabilities of this car?   In other
words, could it go faster than a hundred miles or not or
do you know?

A.   It should be able to.

Q.   It should, all right.   Exhibit No. 25, what
are we looking at here now?

A.   The front grille of that vehicle.

Q.   And as we look at this, what part of the
grille were you interested in?

A.   From this view it would be the left part of
the grille.

Q.   Right around here?

A.   Correct.

Q.   So once you saw that, what did you do?

A.   Well, I got often my knees and looked
through and saw that the chunk of the grille was missing,
and then at an angle there was a hole in the AC condenser.

Q.   And, 26, what are we looking at there?

A.   That's just a frontal view of the vehicle.

116

Q.   The hood is up here.  Is that how the car was at that time, or is it something that you did?

A.   That's what I did.

Q.   And Exhibit No. 27 we are now looking at a different angle; correct?

A.   Correct.

Q.   Exhibit No. 28.  That's a close-up of what?

A.   The missing part of the grille.

Q.   And Exhibit No. 29, what is this?

A.   That's a rod that we put in to show an angle.

Q.   Did you put that in there or did somebody else put that that in there?

A.   No.  The crime scene technician from Chandler PD.

Q.   Was somebody out there with you on this particular day?

A.   This photo was taken on the 4th.

Q.   The 4th of what?

A.   February.

Q.   So you said that you went out there and that you took a look at this vehicle; correct?

A.   Correct.

Q.   And that you found the bullet where?

A.   On a crossbeam underneath the fan in the

117

radiator.

Q.   And the vehicle, was it kept in a secure location from the time that you looked at it until this photograph was taken?

A.   Yes.

Q.   And why is it that you look at it and then waiting until the first part of February to do this sort of work and get the photographs?  What's going on?

A.   Well, when I went out there on the 30th and located around, I advised my supervisors and had Chandler come out because we contract with Chandler for crime scene photos and investigation through them.

Q.   So, in other words, there is no crime scene technicians that Gilbert has; correct?

A.   Correct.

Q.   And that's why they came out?

A.   That's correct.

Q.   And this road, were you there when this rod was placed there?

A.   Yes, I was.

Q.   And describe what's going on.  Are you telling them how to do it, or are you telling them this is the bullet?  Why don't you explain to me what's going on?

A.   When Chandler got there, the technician, Technician Wilkins, she took more photographs all the way

118

around the car, and then she got out her instruments, and
I just basically kind of stood by as she placed the rods,
and she had an angle meter and all of this stuff.

Q.   But this rod that was placed there, was it
placed through the hole that you found into the bullet
where it came to rest?

A.   Correct.  It was placed through the holes
that I had previously located, how much the bullet had
fallen down, so it went down.  It went through all the
way.

Q.   Exhibit No. 30, does that give us an angle
of the rods?

A.   Yes, it does.

Q.   And Exhibit No. 31 from here it shows us the
angle; right?

A.   Correct.

Q.   Let me show you another photograph.  This is
Exhibit No. 100 hundred.  Take a look at it and tell me
what we are looking at.

A.   Let's see.  That's the crossbeam that I
located the round on underneath the vehicle.

Q.   And is that a true and accurate depiction of
where you found the round?

A.   Yes, it is.

MR. MARTINEZ:  Move for the admission of No. 100.

119

1          MR. SHELL:   No objection.

2          THE COURT:   100 is admitted.

3          Q.   BY MR. MARTINEZ:   And, first of all, what

4   this right here in the corner?   Do you see that?

5          A.   That's the right front tire.

6          Q.   And what's this right here?

7          A.   That's the round that I found.

8          Q.   Take a look at Exhibit No. -- I will have it

9   marked 101.

10         Q.   Do you need to open it up?

11         A.   Yes, sir.

12         Q.   I will give you some scissors.   What is

13  this?

14         A.   This is the round depicted in that photo.

15         Q.   Why don't you open it up to make sure?

16         A.   [Witness complied.]   All right.

17         Q.   All right.   You can put it back in the

18  envelope.

19         A.   [Witness complied.]

20         MR. MARTINEZ:   Move for the admission of Exhibit

21  101.

22         MR. SHELL:   That's the round?

23         MR. MARTINEZ:   It is Exhibit 101.

24         MR. SHELL:   No objection.

25         THE COURT:   101 is admitted.

120

3

1          Q.    BY MR. MARTINEZ:   Let's take a look at it.

2    As part of this investigation, did you have anything to do

3    with the actual shooting scene at the southeast corner of

4    Val Vista and Baseline?

5          A.    Yes, I did.

6          Q.    And what did you have to do with regard to

7    that?

8          A.    I assisted situated other Gilbert detectives

9    in searching for a round that was fired from that

10   location.

11         Q.    And when did you begin your search of that

12   particular area?   What date?

13         A.    February 2nd.

14         Q.    And this happened on what date?

15         A.    The 28th.

16         Q.    You were going there a couple days, four or

17   five days later.   What is it that you were looking or

18   hoping to find?

19         A.    We were hoping to --

20         Q.    What were you hoping to find?

21         A.    The rest of the round that had been fired.

22         Q.    When you say "the rest of the round," are

23   you talking about?

24         A.    The part of the bullet that was fired at

25   that scene was already recovered, but the rest of it had

121

1    been broken off.

2            Q.   Where was it recovered, the part of the

3    bullet, the original one that you guys had found?

4            A.   I don't know.  I wasn't at the scene when

5    they recovered it.

6            Q.   You just knew that part of it had been

7    located?

8            A.   Correct.

9            Q.   And you were out looking for another

10   portion.  Explain to me how you started to look and what

11   happened?

12           A.   Well, we strung up crime scene tape around

13   the whole area to not allow any more foot traffic.

14           Q.   Had the crime scene tape already been taken

15   down from the previous -- from the time of the shooting or

16   not?

17           A.   Yes, it had.

18           Q.   Okay.

19           A.   And then we strung up string or roll in the

20   direction of where we thought it may have traveled.

21           Q.   And what gave you an idea as to where it had

22   traveled, or how did that work?

23           A.   Based on the original investigation from the

24   28th and into the 29th morning hours, they were trying to

25   piece together where the vehicles were positioned and in

122

which way it would have gone.

Q.   So you started to do that.   What happened?

A.   We got on line and started from the corner by a pond and worked our way back.

Q.   You say the corner.   Where.

A.   On the southeast corner there is a bank, a Taco Bell, and a pond.

Q.   Let's take a look at some photographs so we know what you are talking about.   These are already in evidence.   Take a look at Exhibit No. 5.   This is the Taco Bell.   I will move it this way.   Okay.   Where is this pond that you are talking about?

A.   It would be --

Q.   Top?   Bottom?   Left?   Right?

A.   Top left.

Q.   There is a pond?

A.   I am sorry, top right.

Q.   Top right.   Okay.

A.   Yeah.

Q.   This bank that you are talking aobut, where would it be?

A.   From that photo it would be directly to the right.

Q.   So then let's take a take a look at Exhibit No. 7.   Okay.   Where is the pond that you talked about

123

1    here?

2         A.    Well, the building in that picture is the

3    bank, so it would be top left.

4         Q.    All right.  So tell me what you did.

5         A.    We started back near the pond, and we had a

6    string lined up going basically dissecting from the bank

7    to the Taco Bell drive-thru which is that street.  You can

8    see that lane.

9         Q.    Right here.

10        A.    Just to the right of that.  We had a string,

11   basically cut that down the middle.  We all started at the

12   pond, and we did a line search where we all stayed on line

13   and moved back toward the parking lot.

14        Q.    How many officers were out there?

15        A.    Ten.

16        Q.    And then what happened?

17        A.    And then once we got back to the center of

18   the parking lot we switched and moved back towards the

19   pond from the center of that parking lot back towards the

20   middle of the intersection.

21        Q.    And how long were you guys out there?

22        A.    Maybe an hour or so.

23        Q.    And as part of doing this, were you able to

24   find anything?

25        A.    Yes.  I found a jacketed round frag.

124

Q.   Let me show you some photographs.   Take a
look at Exhibits 102, 103, 104 and 105.   Do you recognize
what's there?

A.   Yes, I do.

Q.   And what is it?

A.   One picture is angled towards where we
located the round.   Two are the round, and one is of the
driveway through the area of the bank.

Q.   When you say we located a round, did you
locate it?

A.   I located it.

Q.   These were true and accurate depictions of
the scene what date?

A.   February 2nd.

MR. MARTINEZ:   Offer 101 through 105.

MR. SHELL:   No objection.

THE COURT:   101 through 105 are admitted.

Q.   BY MR. MARTINEZ:   Take a look at Exhibit No.
102.   Do you see that?

A.   Yes.

Q.   What's the name of the bank?

A.   Mid First Bank.

Q.   And you said there was a light somewhere
here?

A.   It's to the left of those palm trees.

125

Q.    When you take a look at exhibit No. 103,
what are we looking at there?

A.    Those are the driver-thru teller lanes for
the Mid First Bank.

Q.    Take a look.  Do you see this right here?

A.    Yes.

Q.    What's that right here?

A.    That's a yellow placard had that we put down
for where we recovered the round.

Q.    Did you put the yellow placard down or did
somebody else?

A.    I did not, no.

Q.    Take a look at Exhibit No. 104.  Is that the
same yellow placard?

A.    Yes, it is.

Q.    What's this right here?

A.    That's the round.

Q.    And Exhibit No. 105, what is that?

A.    That's the jacketed round that I recovered.

Q.    Take a look at this exhibit here.  You
brought these in today; right?

A.    Yes, I did.

Q.    Please take a look -- open it and see if
that's the round that we have seen in this exhibit.

A.    [Witness complied.] I think I need the

126

1    scissors again.

2              Q.    Okay.

3              Q.    Is that the round that you found?

4              A.    Yes, it is.

5              Q.    Okay.  You can go ahead and package it up

6    for me.

7              A.    [Witness complied.]

8              MR. MARTINEZ:   Move for the admission of Exhibit

9    No. 106.

10             MR. SHELL:   No objection.

11             THE COURT:   106 is admitted.

12             Q.    BY MR. MARTINEZ:   Let's just take a look at

13   it.  There is a bunch of notations on there.  Did you put

14   those on there?

15             A.    No.

16             Q.    Was this maybe for analysis?

17             A.    Yes, it was.

18             Q.    You indicated previously you don't have

19   technicians that you contract with the City of Chadler to

20   assist you.  Do you remember telling us that?

21             A.    Yes.

22             Q.    With regard to DNA analysis, does that go to

23   Chandler, or somewhere else?

24             A.    That goes to the Department of Public

25   Safety.

127

1          MR. MARTINEZ:  Thank you.

2          THE COURT:  Cross.

3

4                    CROSS-EXAMINATION

5    BY MR. SHELL:

6          Q.   Do you know how many rounds were fired by

7    officers at the top of the world?

8          A.   Yes.

9          Q.   You counted bullets; right?

10         A.   Yes.

11         Q.   Do you know how many officers you counted

12   bullets for?

13         A.   If I can refer to my report.

14         Q.   Do you have that?

15         A.   No, I do not.

16         Q.   Do you know how many reports you wrote?

17         A.   I believe five.

18         Q.   Is it possible that you only wrote four?

19         A.   I believe there is five.

20         Q.   Five.

21         A.   There was several of us counting, so I don't

22   know.  I only did a handful of them.

23         Q.   When is the last time you looked at your

24   reports?

25         A.   That portion I haven't looked at for a

128

couple months.

Q.   Do you remember if that was the first report that you wrote in your supplements?

A.   No, it was not.

Q.   What was the first report that you wrote?

A.   I don't remember.

Q.   So without looking at your report you are unable to remember how many rounds were fired from the guns that you counted?

A.   That's correct.

MR. SHELL:   I don't have anything else.

THE COURT:   Redirect?

MR. MARTINEZ:   I have no questions.

THE COURT:   Does the jury have any questions? You are excused.

MR. SHELL:   Your Honor, I don't want him excused. I want to recall him.

THE COURT:   You are excused for today.

MR. MARTINEZ:   The State calls Jason Henderson.


JASON HENDERSON,

called as a witness herein, having been first duly sworn, was examined and testified as follows:


DIRECT EXAMINATION

BY MR. MARTINEZ:

Q.   Your name, sir?

A.   Jason Henderson.

Q.   Who do you work for?

A.   I work for the Department of Public Safety.

Q.   What do you do for them?

A.   I am a detective with the Special
Investigations Unit.

Q.   How long have you been with the Arizona
Department of Public Safety?

A.   Since 1999.

Q.   And what were your duties in January of this
year?

A.   Duties?  In January of this year I was
assigned to the Special Investigations Unit as a
detective.

Q.   And specifically what kind of crimes would
you investigate?

A.   Special Investigations Unit, our primary
responsibility is to investigate DPS critical incidents
which involve injury, serious physical injury or death.
In addition to that, we also assist city, county, state
and federal agencies with both administrative and criminal
investigations which can range from homicide to
prescription fraud to a simple theft.

130

Q.    Did you have occasion to assist in the
investigation involving a homicide of an officer by the
name of Eric Shoehandler?

A.    Yes, I did.

Q.    When did you first get involved in it, and
what were you assigned to do?

A.    On sat January 29th at approximately 1:00
o'clock in the morning I received a telephone call from my
immediate supervisor advising me that there had been an
officer-involved shooting involving many agencies and
asked me to respond out to US 60 and Milepost 235 at which
time I did drive out there and arrived on-scene
approximately 3:30 in the morning.

Q.    And as you drove, where did you drive from,
I guess?

A.    I left from my residence.

Q.    Which is what town?

A.    It is actually unincorporated up in north
Phoenix.

Q.    Did you drive on the US 60 out there?

A.    Yes, I did.

Q.    And did you get from the -- from the 202, do
you know where that is?

A.    Yes, I do.

Q.    To the US 60 up to Milepost 235, how far

131

1   would you say that is?

2           A.   I would estimate that to be probably 50 to

3   60 miles, I believe.

4           Q.   And what were the conditions when you were

5   driving up there?

6           A.   The conditions were both in some areas there

7   was I got rained on.  Some areas there was no rain.  When

8   I arrived on-scene near Milepost 235 there was snow on the

9   ground.

10          Q.   And when you arrived at Milepost 235, what

11  did you see?

12          A.   numerous, numerous police vehicles, parked.

13  Both officers and detecives were on-scene, a command van

14  was there.  There was police crime scene tape put up.

15          Q.   And so what were you assigned to do?  What

16  did you do up there?

17          A.   I was assigned to process the crime scene.

18          Q.   And what does it mean to process a crime

19  scene?

20          A.   When we process it first we identify we are

21  going to mark and collect items of evidence as well as

22  diagram where they are at and take measurements.  For this

23  particular case, I began identifying items of evidence

24  from the west and worked to the east and marked

25  non-collected evidence items.

132

Q.   Let me stop you here.  Let's say we have a
photograph here of the truck in evidence, and you are
taking it from the west to the east.  On this photograph,
where is the west and where is the east?

A.   East would be in front of the truck that you
see.  West would be behind the truck.

Q.   Okay.  So you started processing from where
to where?

A.   From west to east.

Q.   So from the back to the front?

A.   Yeah.  From behind the truck moving towards
the truck.

Q.   How far behind the truck did you start
processing?  It would be this yellow thing here?

A.   No, no.  It was further back probably
approximately 75 to 80 yards back I would say behind the
truck is where we began the scene.

Q.   Why did you begin so far back?

A.   The truck was right there.  The truck is
there, but there was numerous police vehicles that were
parked that were involved.  As you worked your way forward
there were many shell casings on the ground, items <EPLTS>
that were going to be collected and part of the scene.

Q.   Let's clear that up.  What is a shell
casing?

133

A.   A shell casing is a bullet casing in which the bullet has been fired from the gun, so it's just the brass cartridge in which the bullet or the tip of it would be missing because it would have been fired through the gun.

Q.   And if we have -- first of all, do you know what a revolver is?

A.   Yes, I do.

Q.   And if you have a revolver and it is fired, are the shell casings going to be deposited out on the ground or wherever they go, or is that a different situation?

A.   That's a different situation.   And in a revolver the casings stay within the cylinder of the weapon.   With a semi-automatic weapon, as most police officers carry, the bullet casings or bullets are extracted out as each round is fired and it doesn't stay within the gun.

Q.   So you were out there documenting all the casings that you found?

A.   That's correct.

Q.   And that was up to 75 feet from the back of this truck; right?

A.   Yes, sir.

Q.   How long did that take you?

134

A.   We processed that scene for, I would say I remember we started probably about 8:00 o'clock in the morning.  8:00, 8:30 in the morning.  I don't remember leaving the scene until it was afternoon sometime around 2:00 p.m., so it was a good six to eight hours.

Q.   So you start the processing.  And any idea about how many casings that you found out there?

A.   Exact number I don't know.  I would say upwards of 60 to 70 casings.

Q.   So then you do that, and what else do you do?

A.   Well, we mark both collected and non-collected evidence items at the scene.

Q.   When you say "uncollected items," what would that be?

A.   When we are marking items of evidence for like the casings and items that we are going to pick up and remove from the scene, we mark those with numerical numbers, in this case 1 through 107 that were used in this case.

Q.   And the ones that you are not numerical, what would they be?

A.   Non-numerical alphabet A through V.  The patrol officers' patrol cars where they were marked we would mark them where they were.  Some that we would not

135

6

1    take that.

2            Q.    So you said A through V as in Victor?

3            A.    That's correct.

4            Q.    So you are moving up and getting chose to

5    the truck, do you at some point get to the truck?

6            A.    Yes, we do.

7            Q.    I will show you some photographs, A through

8    V.  You said that you got there about 3:00 o'clock in the

9    morning, I think you said?

10           A.    Correct.  3:30.

11           Q.    When you got there, how many police cars

12   would you say were there?

13           A.    When I initially arrived, I would have to

14   say probably close to 60 to 70 both marked and unmarked

15   police vehicles.

16           Q.    Did they have their overhead lights on?

17           A.    I didn't know that any of the vehicles

18   on-scene had any lights on.

19           Q.    At that time if they had them on, they had

20   already been turned off?

21           A.    That's correct.

22           Q.    Let's take a look at Exhibits 64 through 67.

23   What are we looking at there?

24           A.    What we are looking at is looking from the

25   west to the east.  These are pictures detailing how the

. 136

1   vehicles were parked when I arrived at 3:30 in the morning

2   and where they were left.   This is how I viewed them.

3          Q.   And were these photographs taken immediately

4   upon you arriving or were they taken at some other time?

5          A.   They were taken at some other time.

6          Q.   Was it earlier that day?   When were they

7   taken?

8          A.   When we started processing the scene,

9   probably 8:00, 8:30 in the morning.

10         MR. MARTINEZ:   I move for the admission of

11  Exhibits 64 through 67.

12         MR. SHELL:   No objection.

13         THE COURT:   64 through 67 inclusive are admitted.

14         Q.   BY MR. MARTINEZ:   Let's take a look at them.

15  What are we looking at here?

16         A.   Looking at a picture that's taken from the

17  west looking east.   It's taken from -- it looks like

18  standing somewhere near the westbound shoulder of the

19  traffic lane on US 60 looking to the back of some of the

20  police vehicles that were parked and marked.

21         Q.   Is the truck even visible in this

22  photograph?

23         A.   Not that I can see from here, no.

24         Q.   What is that?   That appears to be white

25  trash on the side of the road here.

137

A.   I honestly can't see.

Q.   Why don't you look at this photograph itself, Exhibit No. 64?  What is that?

A.   Those were folded index cards that were there when I arrived covering up some of the casings that were on the ground.

Q.   So they are basically markers?

A.   Yes.

Q.   Exhibit No. 65.  What do we have here?

A.   Again, another picture looking from the west to the east showing the patrol cars that were parked at the scene.

Q.   And, again, can we see the truck from here?

A.   No, you cannot.

Q.   Exhibit No. 66.  What is that?

A.   Again, another photograph taken from the west to the east.  This time from the eastbound shoulder of US 60.

Q.   And are you moving forward now?

A.   Yes, we are.

Q.   And what's this right here?

A.   That is the pickup truck.

Q.   And what is this right here?

A.   That is a closer view of the earlier photograph that you showed me showing it more clear of the

138

7

1    folded index cards marking shell casings on the ground.

2         Q.   And Exhibit 67, what are we looking at?

3         A.   This is another photograph, again,  shot

4    from the west to the east.  This is further east looking

5    forward -- excuse me -- from northbound.

6         Q.   What is this?

7         A.   That's the pickup track.

8         Q.   How far is this from the truck?  Any idea?

9         A.   I don't know off the top of my head, no.

10        Q.   Let's take a look at Exhibits 68 through 73.

11   What do they show?

12        A.   These are photographs taken at the scene.

13   They are taken showing some of the overalls of vehicles

14   parked, overalls of where evidence items were on the

15   ground.  They kind of move from the west to the east and

16   ultimately ending up at the pickup truck.

17        Q.   Now, they are closer than the ones that we

18   saw before?

19        A.   That's correct.

20        MR. MARTINEZ:  I move for the admission of

21   Exhibits 68 through 73.

22        MR. SHELL:  No objection.

23        THE COURT:  68 through 73 are admitted.

24        Mr. Martinez, when you get a convenient spot

25   for a break, we will take our afternoon break.

139

1    MR. MARTINEZ:  Now would be a good time.

2    THE COURT:  Let's take a 15-minute break.

3    Remember the admonition and be able to return in 15

4    minutes.

5              (The jurors exited the courtroom.)

6    THE COURT:  Take a seat.  The record reflects the

7    presence of counsel but none of the jurors.  Anybody want

8    to put anything on the record?

9    MR. MARTINEZ:  No, sir.  Thank you.

10   MR. SHELL:  What I am concerned about if they go

11   to Wednesday and Thursday.

12   THE COURT:  We can talk about that in chambers.

13   Come on back.

14             (Recess taken.)

15   THE COURT:  Back on the record without the jury.

16   Anybody need to put anything on the record?

17   MR. MARTINEZ:  No, sir.

18   MR. SHELL:  No.

19   THE COURT:  We ought to put on the record we had

20   a conference in my chambers outside the presence of

21   everybody else.  We agreed that our trial -- remind

22   everyone what our trial schedule was.  The State is going

23   to wrap up their case by Tuesday the 20th of July, giving

24   us enough time finish the trial on time.  In anything

25   changes and that's not possible, Mr. Martinez will let me

140

1    know.

2            MR. MARTINEZ:  Yes.

3            THE COURT:  Camille, can you grab the jury?

4                (The jurors entered the courtroom.)

5            THE COURT:  The record should reflect we have

6    been joined by our jury.  Detective Henderson is still on

7    the stand, and it's under Mr. Martinez when you are ready.

8            Q.   BY MR. MARTINEZ:  Sir, Exhibit 68, what are

9    we looking at here?

10           A.   A picture taken looking from west to east.

11   It looks like the center of US 60.  Look at the backs of

12   the patrol cars.

13           Q.   What is this light here?

14           A.   That's the truck.

15           Q.   Exhibit N. 69?

16           A.   Again, just moving forward, this time taken

17   from approximately the eastbound shoulder of the roadway

18   looking from west to east.

19           Q.   And what appears to be here, what's that?

20           A.   Those are index card marking items, casings.

21           Q.   Do you see this car here?

22           A.   Yes.

23           Q.   Take a look at Exhibit No. 70.  Do you see

24   this right here?

25           A.   That would be the driver's front quarter

141

panel of that vehicle that we just saw on the previous

picture.

       Q.    And that's this right here?

       A.    That's the pickup truck.

       Q.    Exhibit No. 71?

       A.    Again, just the other vehicles out of sight,

but taken from the westbound shoulder of the roadway

looking west to east at the pickup truck.

       Q.    Exhibit No. 72?

       A.    Closer to the truck, again, looking from

west to east, a picture of the truck.

       Q.    And Exhibit No. 73.

       A.    Almost right up on the truck right behind

the truck.

       Q.    What is this right here?

       A.    Those are utility box doors on the bed of

the pickup truck that were open.

       Q.    Is that the condition that you found them in

when you got up there?

       A.    Yes, it is.

       Q.    Did you have occasion to look at these

utility boxes to see if there was any items there?

       A.    There were items in there.  It just appeared

to be, you could see sockets, tools, type work tools.

       Q.    How about in here?

142

8

1       A.   It was almost emptied out completely.  There

2  was some minor little nuts and bolts, things like that.

3  It is a wooden-type bed in the bottom there.

4       Q.   How is it that the items in here are

5  protected?

6       A.   It's open right now, but across what would

7  be in between the two side boxes of that truck and across

8  the top there is a big metal sliding door that is slid

9  backwards and open, so about half of the bed, roughly half

10  of that bed is still covered, and then it would be covered

11  all the way by pulling the metal box forward.

12       Q.   So to cover it, I think you said you would

13  grab this up here and bring it all the way to the front?

14       A.   That's correct.

15       Q.   And can it be lodged here?

16       A.   Yes.

17       Q.   So when this is closed is there a well there

18  or is it just covered up?

19       A.   No.  It can be completely covered.

20       Q.   Okay.  And there right here is -- is that

21  the inside of the truck?

22       A.   Yes, it is.  That's the back window of the

23  truck.

24       Q.   Describe for me the inside of the truck.

25       A.   The truck was a 1990 Ford F 250 standard cab

143

8

type of truck.  It had a single bench seat in the truck.

       Q.   Okay.   Take a look at some other exhibits.
Look at Exhibits No. 74 through 83.

       A.   [Witness complied.]

       Q.   What do they show?

       A.   They show different angles of the pickup
truck and the surrounding area around the truck.

       MR. MARTINEZ:  Move 74 and 83 for admission.

       MR. SHELL:  No. objection.

       THE COURT:  73 to 83 are admitted.

       Q.   BY MR. MARTINEZ:  As part of your
investigation, did you find out who the registered owner
of that truck was?

       A.   Yes, I did.

       Q.   Who was that?

       A.   It was I believe a Joseph --

       Q.   Would it be Redondo?

       A.   Yes.  Joseph Redondo is the registered
owner.

       Q.   I am going to ask you about these doors
here.  There is a little chain here that holds this one
open; right?

       A.   That's correct.

       Q.   If a person climbed on the top here would
they be able to reach over and open this up right here?

144

A.   I believe so.   I would be able to.

Q.   And how about this right here?

A.   Side door -- again, I could do it.

Q.   And this is the sliding part that you talked to us about; right?

A.   That's correct.

Q.   And Exhibit No. 75, this shows the other side.   What are these items here?   Do you know?

A.   The items there again just look like construction-type equipment and stuff, and the truck box door is open on the driver's side of the truck.

Q.   Exhibit No. 76 -- why is this one dark and the other ones are light?   Can you tell me about that?

A.   I would have to say that that was probably taken prior to our arrival and prior to our photographer taking the overall pictures.   It might have been taken by a different agency.

Q.   And this door that's open, is that how you found it?

A.   That's how I found it, correct.

Q.   Were there any items in this when you opened it up?

A.   Just some miscellaneous items such as nuts bolts and sockets.

Q.   And Exhibit No. 77, what are we looking at

145

there?

    A.    Just a closer view of it.

    Q.    And how about that there?

    A.    I am sorry -- right.

    Q.    Right here is -- is there a way to open the back window to crawl in the back or if a person wants to get in the back, what's the only way to get there?

    A.    The only way to get in the back would be to open up a door and crawl out or come through a passenger window.  It was a solid rear window.

    Q.    So what you are talking about is they could climb out through here or could climb out through the other window; correct?

    A.    That's correct.

    Q.    Exhibit No. 78, what is that?

    A.    This is a photograph taken of just the plane view looking into the truck.

    Q.    And in what direction?

    A.    This would be taken from the driver's door looking in.

    Q.    Were the keys in the truck?

    A.    Yes, they were.

    Q.    As part of your investigation, were you able to determine whether or not there was any fuel or gasoline in the truck?

146

1    A.    When we tried to start the truck it did not

2    start.  I also knocked on the gas tank underneath and got

3    a hollow sound indicating to me through my training that

4    the gas tank was empty.

5         Q.    And Exhibit No. 80, what is that?

6         A.    A photograph of the registration and license

7    plate on the vehicle.

8         Q.    And it does start with that letter?

9         A.    Charles, Frank.

10        Q.    C.F.; correct?

11        A.    That's correct.

12        Q.    Exhibit No. 31 shows us what?

13        A.    That's the inside of the truckbed, the wood

14   that I was describing earlier.

15        Q.    And Exhibit No. 82?

16        A.    Again, another just closer picture of the

17   wood bed.

18        Q.    Nothing in there; right?

19        A.    That's correct.

20        Q.    And Exhibit No. 83 is what?

21        A.    That is just a view of the truck looking

22   from east to west showing the front of the truck.

23        Q.    Okay.  Take a look at Exhibits 84, 85

24   through 88.  So 84 through 88.

25        Q.    [Witness complied.]

147

Q.   Do you recognize what's there?

A.   Yeah.  It looks like it was taken around the time of the arrest that would have occurred showing the truck, the surrounding area as well as the subjects.

Q.   Were you there at the time of the arrest?

A.   No, I was not.

Q.   But the area in the front you are familiar with that, though; right?

A.   That's correct.

MR. MARTINEZ:  So I move for the admission of Exhibits 84 and 85.

MR. SHELL:  No objection.

THE COURT:  84 and 85 are admitted.

Q.   BY MR. MARTINEZ:  Take a look at Exhibits 107 and 108.  Do you recognize what's there?

A.   Yes, I do.

Q.   What is it?

A.   In the picture is a handgun that I collected and identified as JMH 85 during my investigation.  It was a six-shot revolver.  HWN was the brand.  It was a .38 special, slash, .357 Magnum.

Q.   So it wasn't a .380.  It was a .38?

A.   That's correct.  It was a .38 and it was capable of holding six bullets.

MR. MARTINEZ:  I move for the admission of

148

9

1    Exhibits 107 and 108.

2            MR. SHELL:  No objection.

3            THE COURT:  107 and 108 are admitted.

4            Q.   BY MR. MARTINEZ:  Taking a look at Exhibits

5    84 and then 85.  84, what are we looking at there?

6            A.   That is a front view of the truck.  If you

7    zoom in, the gun that we were just describing is on the

8    ground right in front of the truck there.

9            Q.   Exhibit No. 85, what does that show us?

10           A.   Just another angle of the same showing of

11   the gun lying in the roadway in front of the truck.

12           Q.   And Exhibit 107 is what?

13           A.   A close-up view of the gun.

14           Q.   And 108?

15           A.   Again, just an even closer view of the gun.

16           Q.   There is some red substance there; correct?

17           A.   Yes, there is.  Apparent blood.

18           Q.   You have something here.  Let me have this

19   marked as an exhibit.  Take a look at exhibit No. 109.

20   What's inside, and tell me if you recognize it?

21           A.   Yes.

22           Q.   What is it?

23           A.   This exhibit is going to be the handgun that

24   we were looking at here in these pictures.

25           Q.   And that's the one that you collected?

149

A.    Yes.

Q.    What's the exhibit number?

A.    Exhibit No. 109.

MR. MARTINEZ:   I more for the admission of 109.

MR. SHELL:   No objection.

THE COURT:   109 is admitted.

Q.    BY MR. MARTINEZ:   I want you -- are you familiar with the term processing?   Has the gun been processed?

A.    I believe so.   It has been looked at by our latents DNA as well as our firearms unit.

Q.    Why don't you go ahead and bring it out so we can see the size of it and that sort of thing and how it operates; okay?

A.    Okay.

Q.    While you are doing that when you found the gun, is it a revolver or is it it a semiautomatic?

A.    It is a revolver in which the cartridges or bullets casings will stay inside the gun when they are fired until the operator or the handler removers them.

Q.    And what is the capacity?   How many bullets can it take?

A.    It is capable of holding six rounds.

Q.    And when you found it, how many live -- do you know what a live round is?

150

10

1    A.   Yes.

2    Q.   What is that?

3    A.   A live round would be one that's yet to be

4    fired through the weapon or a projectile sent from it.

5    Q.   And how many lives rounds, if any, did this

6    weapon have?

7    A.   This weapon had three3 live rounds in it.

8    Q.   And you said it held six.  Did it have any

9    casings in the other three holes?

10   A.   Yes, it did.  It had three casings and of

11   the six rounds, five were .357 Winchester and one was a

12   .38 special round.

13   Q.   You mentioned .357.  Does a .38 fire a .357?

14   A.   Yes, it will.  This particular model and

15   maybe it is labeled, is it?

16   Q.   Why don't you take out and hold it so we can

17   see how big it is and that sort of thing?

18   A.   [Witness complied.]

19   Q.   Would you hold it pointing up?  And the

20   cylinder, how does one load it?

21   A.   The cylinder you would release it by

22   bringing this outward like this and you can.  As you can

23   see, there is openings and holes to hold six bullets

24   inside here, and the only way to reload or load it would

25   be to open this up and then place either new cartridges in

151

10

1    there and remove the old.

2         Q.   So you close it and you put rounds in it and

3    it's ready to go?

4         A.   That's correct.

5         Q.   So by pointing it up -- how do you fire it?

6         A.   You pull the trigger and you will see the

7    hammer comes back or you can do a single action; single/

8    double action mode in which it takes the trigger pull of

9    the firearm much easier.  It lessens the amount of weight

10   it would take to pull it.

11        Q.   Go ahead and pull it.

12        A.   [Witness complied.]

13        Q.   You indicated you had casings and rounds.

14   Why don't you show us?  They are packaged; correct?

15        A.   Yes, these are packaged separately.  This

16   would be a live round that was found.  One of the three

17   live rounds.  As you can see, the corner jacketed tip here

18   and the casing.  The casing would be just this without the

19   actual bullet on top.

20        Q.   And I think you told us there were how many

21   casings?

22        A.   Three.

23        Q.   So it is three and three then?

24        A.   That's correct.

25        Q.   You can close that up for me.

152

10

1        THE COURT:  Before he does that, if we have a

2    zip-tie can I ask ask the Detective to make that

3    inoperable?

4        A.    [Witness complied.]

5        THE COURT:   Thank you.

6        Q.    BY MR. MARTINEZ:   And that's the gun in

7    Exhibit No. 108; correct?

8        A.    That's correct.   Or 109.   Exhibit 109.

9        Q.    Well, what they have there on the table.

10       A.    Okay.   I am sorry.

11       Q.    So you have this truck up there and now you

12   have collected these items.   Did you conduct any more

13   processing of the truck looking at it, or is that it?

14       A.    No.   What we do, our unit in the way we

15   handle, process the vehicles are involved in these types

16   of incidents, we don't go through them at the scene.   We

17   will secure them at the scene.   I wrapped them with Saran

18   wrap and later followed it to the DPS crime lab where it

19   was put in a secured storage van, and later we write a

20   search warrant to go black in and process the vehicle.

21       Q.    Who was involved in this particular case in

22   the processing?

23       A.    With the search warrant?

24       Q.    Yes.

25       A.    Both Gilbert Police Department as well as

153

10

1    DPS, primarily DPS and our Special Investigations Unit.

2         Q.    Do you know somebody by the name of John

3    Jolly?  Was he involved?

4         A.    I do.  He was one of our finger latent

5    prints.

6         Q.    And did he, if you will, look to the truck

7    to see if there was any latent fingerprints?

8         A.    Yes.

9         Q.    You did not do that?

10        A.    I did not.

11        Q.    Was there a DNA person there?

12        A.    He was there, was a DNA serology person.

13        Q.    Do you know his name?

14        A.    I don't know him off the top of my head but

15   he was there.

16        Q.    In regard to seeing biological substances,

17   that was not done by you; correct?

18        A.    That's correct.

19        Q.    Take a look at Exhibits 93 through 96.  See

20   if you recognize that?

21        A.    Yes, I do.

22        Q.    What is it?

23        A.    What it is is pictures of the vehicle inside

24   our evidence bay as well as some photographs taken just

25   looking inside the vehicle under the front seat.

154

11

Q.   And these photographs were taken as part of the search warrant?

A.   That's correct.

Q.   What date?

A.   That would have been done on the 30th, Sunday the 30th.

Q.   Of January?

A.   January.

MR. MARTINEZ:  Move for the admission of Exhibits 93 through 96.

MR. SHELL:  No objection.

THE COURT:   93 through 96 are all admitted.

Q.   BY MR. MARTINEZ:  Okay.  Let's take a look at that.  What's all of that plastic on there?

A.   That's the plastic wrap that I used when we removed it from the scene trying to secure, keep all the doors closed and everything while we transported it back in the tow truck.

Q.   Exhibit No. 94, what are we looking at there?

A.   That's a photograph taken of the interior compartment of the truck through the passenger door.

Q.   Exhibit No. 95?

A.   Again, another photograph just showing a closer view of the bench seat and interior compartment on

155

11

1     the passenger side of the truck.

2              Q.   Did you take close-up view of Item 15?

3              A.   Yes, we did.

4              Q.   And what is Item 15?

5              A.   It is a nylon gun holster.

6              Q.   And you brought it as an exhibit with you

7     here today?

8              A.   That's correct.

9              Q.   Is that how you found it?

10             A.   Yes, it is.

11             Q.   I will have you take a look at Exhibit No.

12    110.  Do you recognize it?

13             A.   Yes, I do.

14             Q.   What -- you opened it before you came here;

15    right?

16             A.   It is my evidence item containing the

17    holster that we were viewing in the Photograph No. 15.

18             MR. MARTINEZ:  Move for admission of 110.

19             MR. SHELL:   No objection.

20             THE COURT:   110 is admitted.

21             Q.   BY MR. MARTINEZ:  Sir, just visually

22    speaking, if we take Exhibit No. 109 and compare it to 110

23    and, again, I am just doing this visually.  I may be wrong

24    but it appears that this is a little bit longer or a lot

25    longer than the gun in Exhibit No. 109, isn't it?

156

A.    I would completely agree.

Q.    Did you try to place that in there to see whether or not it fit or not?

A.    I never did that, no.

Q.    Is it your opinion that this Exhibit 109 does not correspond with that?

A.    That would be my opinion.

Q.    And you are aware that another handgun was found in relationship with this case; correct?

A.    That's correct.

Q.    Do you know what kind of gun it was?

A.    I believe that one was a .38 Special.

Q.    And are you familiar with the terms long barrel?

A.    Yeah.  It would be -- obviously, just like you said a longer barrel.  Some you call snub-nose.  Some have like anywhere a three-inch barrel all the way up to very large barrels probably 10, 12 inches on some guns, but a long barrel to me would indicate something probably six inches or over, I would think.

MR. MARTINEZ:  I have no other questions.

THE COURT:  Thank you.  Cross.


CROSS-EXAMINATION

BY MR. SHELL:

157

Q.   It is Detective; correct?

A.   Correct.

Q.   Detective Henderson.   The night of the 28th
or early morning hours of the 29th I think you testified
you lived up north Scottsdale, north phoenix?

A.   North Phoenix.

Q.   You got a call to head up to top of the
world; correct?

A.   That's correct.

Q.   Did you get on the 202 head down to the 60,
take the 60 east from the 202?

A.   That's correct.

Q.   Okay.   So you went all the way through Mesa
on the 60 up through Apache Junction through Gold Canyon,
through Queen Valley, you went --

A.   That would be the way I took to get there.

Q.   All the way up through Superior over to here
and then bring you through the tunnel and to the top of
the world?

A.   Yes.

Q.   Let's say from Gold Canyon to where the
truck was, numerous dirt roads that go off to the side?

A.   Correct.

Q.   And this is a 1990 Ford F-250 with dualies,
four tires in the back, and it's also four-wheel drive;

158

11

1    correct?

2          A.    I am trying to think back.  I believe it is.

3    If you have a picture of the interior I could see the

4    four-wheel drive on the floor I am sure.

5          Q.    Well, let me show you 83.  Do you see

6    anything up near the front that leads you to believe that?

7          A.    Yes.  It appears to be the axle housing

8    there that would have the capabilities of four-wheel

9    drive.

10         Q.    Let me show you Exhibit No. 95.  Does that

11   help verify?

12         A.    Yes.  It does indicate that it would be

13   capable and have had four-wheel drive.

14         Q.    Okay.  Now, when you showed up there on the

15   scene, there were numerous police vehicles parked behind

16   that Ford truck; correct?

17         A.    That's correct.

18         Q.    And as far as you know, none of those had

19   been moved by anybody between the time of the incident

20   that occurred up there and the time that you got there;

21   correct?

22         A.    No.  That's incorrect.

23         Q.    Some were moved?

24         A.    Yes.

25         Q.    Let me show you Exhibit No. 68.  There are

159

12

1    quite a few police cars behind the truck here; correct?

2         A.   That's correct.

3         Q.   All right.  Any of those police cars have

4    four-wheel drive?

5         A.   No, they don't.

6         Q.   Did you see any police vehicles at all on

7    the scene that had four-wheel drive?

8         A.   Not other than probably detectives' vehicles

9    such as mine that would have arrived later.

10        Q.   So as far as you know, all the vehicles that

11   were chasing this truck were just standard police Crown

12   Vics?

13        A.   The ones ones that I marked on-scene, yes.

14        Q.   Were all two-wheel drive police cars?

15        A.   Correct.

16        Q.   Let me ask you:  Do you ever go

17   four-wheeling?

18        A.   Yes, I do.

19        Q.   It was a rainy night; correct?

20        A.   Correct.

21        Q.   So that must mean all the dirt roads that

22   are leading off of here are muddy.  Safe to assume?

23        A.   Safe to assume.

24        Q.   Ask you a hypothetical.  Assume I am driving

25   that truck and I want to flee from 20, 30 police cars.  If

160

12

1   if I decided to get a way from those cars I could just

2   take off through the desert anywhere and those cars

3   couldn't follow me, could they?

4          A.   I don't know that all the conditions out

5   there.  There are many pursuits that we investigate where

6   vehicles do flee off the road and that we do still chase

7   after them and do apprehend people.

8          Q.   You had four-wheel drive; correct?

9          A.   That's correct.

10          Q.   That's a four-wheel drive truck?

11          A.   That's correct.

12          Q.   Dualy tires in the back.  None of those

13   police cars are four-wheel drive or dualy tires; correct?

14          A.   Correct.

15          Q.   It was a wet, rainy night; correct?

16          A.   Correct.

17          Q.   And from Gold Canyon up to the top of the

18   world there is numerous dirt roads that go off to the

19   side; correct?

20          A.   I do believe that that would be correct.  I

21   am not super familiar with the area, but it is a long

22   stretch and there is a lot of open area in Arizona.

23          Q.   And a lot of BLM.  Do you remember seeing

24   any forest service land?

25          A.   I don't remember seeing the signs.

161

12

1    Q.   But numerous open desert areas?

2    A.   That's correct.

3    Q.   All right.  The owner of that truck his full

4    name is Joseph Angel Redondo; is that right?

5    A.   Okay.  I believe that's correct.  Yep.

6    Q.   All right.  Let me show you Exhibit No. 109.

7    There were three live rounds and three empty rounds;

8    right?

9    A.   That's correct.

10   Q.   Now, there were five Winchester .357 rounds?

11   A.   That's correct.

12   Q.   Okay.  Of those, which were ones were live

13   and which ones were spent?

14   A.   There were three .357 Winchester mags that

15   were live, two .357 Winchester mags that were not live,

16   and one .38 Special round which was not live.

17   Q.   So when that gun was fired, if that gun

18   fired those rounds it fired the one .38 Special round?

19   A.   Correct.

20   Q.   And it fired two of the .357 rounds?

21   A.   That's correct.  That's what it would

22   indicate.

23   Q.   When you got the truck over to the DPS crime

24   lab, got the Saran wrap off of it, prints were found;

25   correct?

162

12

13

1        A.    They were taken by John Jolly, yes.

2        Q.    Okay.  And DNA.  Do you know whether or not

3   any DNA was found?

4        A.    Many items were swabbed for DNA.

5        Q.    Do you know whether or not any of Daimen's

6   prints were found on any of the guns?

7        A.    I do not.

8        Q.    Okay.  Do you know if any of Daimen's DNA

9   was found on any of the guns?

10        A.    I do not.

11        Q.    Do you know if any of Daimen's prints were

12   found on the passenger side of the truck?

13        A.    I do not.

14        Q.    Do you know if any of Daimen's prints were

15   found in the back area of the truck around the tool boxes?

16        A.    I do not.

17        Q.    Do you know if any of Daimen's prints were

18   found on the driver's side on the driver's area of the

19   vehicle?

20        A.    I do not.

21        MR. SHELL:  OKAY.  I have nothing further.

22        THE COURT:  Redirect.

23

24                    REDIRECT EXAMINATION

25   BY MR. MARTINEZ:

163

13

Q.    The issue of the DNA that's handled by somebody else, not you?

A.    That's correct.

Q.    It's not your job to know whether or not that's what they did; right?

A.    No, it's not.

Q.    The latent prints, somebody was there; correct.

A.    Yes, he was.

Q.    And they did their job and whatever they found they found?

A.    They find and they retain the cards that they do in their custody, and they take them back and do whatever the fingerprint guys.  With regard to the three live rounds and the three empty or the three non-live rounds, just by looking at that, you can't tell whether or not that gun was loaded and reloaded, can you?

A.    No, I can't.

Q.    So it could have been that it was loaded and then six fired and then loaded again; right?

A.    That's correct.

Q.    You don't know how many times that that may or may not have happened?

A.    Yes.

Q.    You were asked about four-wheel driving.  Do

164

13

1    you remember that?

2         A.    Yes.

3         Q.    And roads to the side -- are you familiar or

4    aware of -- well, does a helicopter have those same

5    restricctions about going off-road?

6         A.    No, they don't.

7         Q.    In fact, there were two helicopters

8    following the chase here; correct?

9         A.    Yes.

10         Q.    One was from the Mesa Police Department and

11    one from the Maricopa County Sheriff's Office; right?

12         A.    That's correct there.

13         Q.    And so if in the hypothetical that you were

14    asked defense counsel wants to go off-roading and the cars

15    that are following him or the police cars if they can't go

16    go there can the helicopters go follow?

17         A.    Yes, they can.

18         MR. MARTINEZ:  No further questions.

19         THE COURT:  Does the jury have any questions for

20    this witness?  Thank you, sir.  You are excused.  Counsel,

21    can you call your next witness?

22         MR. MARTINEZ:  Yes.  The State calls John Jolly.

23    While Mr. Jolly is coming in, we are going to re-mark 109

24    so all the lives will be 109.001 so they won't go back to

25    the jury at the same time as the gun, not that we don't

165

13

1    trust you.

2

3                         JOHN JOLLY,

4    called as a witness herein, having been first duly sworn,

5    was examined and testified as follows:

6

7                       DIRECT EXAMINATION

8    BY MR. MARTINEZ:

9           Q.    Your name, sir?

10          A.    My name is John Jolly.

11          Q.    And who do you work for?

12          A.    I am employed as a latent print examiner for

13   the Arizona Department of Public Safety Crime Laboratory

14   here in Phoenix.

15          Q.    And did you have occasion to assist in the

16   investigation of a homicide involving Lieutenant Eric

17   Shoehandler?

18          A.    Yes, I did.

19          Q.    What was your role with regard to that

20   investigation?

21          A.    What we do as latent print examiners in the

22   crime laboratory, we have a variety of functions that we

23   perform.  We will respond to a crime scene if requested to

24   assist the investigator in processing that crime scene.

25   Or evidence items for latent print evidence.  We will

166

13

1    collect the latent print evidence and compare it later on.

2    We will also process in our laboratory different items of

3    evidence that are submitted by different agencies.   We

4    will process those items for latent prints, collect those

5    latent prints for comparison later on.   We will provide

6    training to different agencies.   We will do a variety of

7    related duties geared towards the latent print end of what

8    we do.

9         Q.    In this particular case did you have occasion

10   to work with -- let me show you Exhibit No. 93, this right

11   here.

12        A.    Yes, I did.

13        Q.    What is it that you were asked to do with

14   regard to Exhibit No. 93?

15        A.    Exhibit No. 93 appears to be a photograph of

16   the yellow and white truck that's in the DPS crime lab

17   garage area.   I was asked to process different areas of

18   that vehicle for latent prints, and also there was a

19   laptop computer, I believe in the front cab area that I

20   was also requested to process.

21        Q.    Have you take a look at Exhibit No. 94.   Do

22   you see that laptop there?

23        A.    Yes, I do.

24        Q.    Is that the laptop that you processed?

25        A.    To the best of my knowledge, yes, it is.

167

Q.    Now, you are talking about latent
fingerprints.  What is a latent fingerprint?

A.    A latent print is a recording of the
friction ridge detail on the palm or surfaces of the
fingers or the palms.  Also the friction ridge detail on
the the bottoms of the toes and feet.  Latent prints are
typically made by a transfer of perspiration of various
things meaning as other contaminants or debris from that
ridge detail to an object when it's touched.  Kind of like
a rubber stamp you have all a rubber stamp with ink and
you place it somewhere there is a transfer of that
immediate number to the item that you touch.  Latent
prints are invincible.  That means you can't see them.
You have to develop them to make them visible so they can
be photographed, lifted or collected for further use down
the road.  Latent fingerprints are taken by -- left under
controled circumstances.  They are typically fragmentory
or partial impressions, and they are usually left
unintentionally.

Q.    And does every time a person touches a
surface, for example, if I were to touch this photograph,
would I leave a latent fingerprint behind every time?

A.    Not always.  There is a number of factors
that go into the leaving of a latent print.  One of those
factors is the condition of the hand and on the bottoms of

168

14

1    the feet has to be such that there is something there to

2    transfer to the item.  Another factor that goes into the

3    leaving and retention of latent prints is the surface

4    itself.  If I touch a surface like the top of the witness

5    stand here, I would expect that to be a moderately good

6    type of surface where the print residue would reside on

7    top of the surface.  If I touched the carpeting in the

8    courtroom here, I would expect that type of surface to be

9    a very poor surface.  I would not expect to see latent

10   prints deposited or developed on a poor type of surface,

11   and there is a range of if surfaces in between those

12   extreme fingerprint surface is real clean that would tend

13   to be a better type of surface than a surface that was

14   dirty, greasy or oily or something like that.

15        Q.    How about the situation -- well, how about

16   environmental factors?  Will those effect affectwhether or

17   not a latent fingerprint will be left?

18        A.    Depending on the possible environmental

19   factors it can enter into that.  There is a range of

20   environmental factors that we deal with from a latent

21   print standpoint.  If it's very hot, then there is a

22   tendency for a person to perspire a lot, so there could

23   tend to be a lot of perspiration moisture on the hand.  If

24   it's very cold there can be a tendency to not perspire a

25   whole lot.  On pens, there would not be a lot of

14

1    perspiration or whatever to transfer to the item.  If

2    someone washed their hands and washed the moisture off or

3    dried them on something or they were covered with dirt,

4    things like those type of environmental factors could

5    enter into the leaving of a latent print.

6         Q.   How about if, for example, a handgun.  If

7    it's left out in the rain and it's raining on it, will

8    that have a tendency to be conducive to or not conducive

9    to leaving a latent fingerprint?

10        A.   It depends on a couple of factors.  Most

11   latent print deposits tend to be water-based perspiration.

12   If you have rain come down on a perspiration-based print

13   there would probably be a tendency for the rain water to

14   wash the print off the surface.  If you have more of an

15   oil-based print, then there could be a tendency for that

16   print to be a little bit stronger if it is a non-water

17   soluble.  If the example of a handgun, if the surface is

18   rough, then that would tend to not be as good a surface in

19   general.  If ot was rained on or something like that, that

20   would probably tend to wash away the prints more than if

21   it were say a shiny object or a shiny chromed finished

22   handgun will would be a better surface from a latent print

23   standpoint to start with.

24        Q.   How about, for example, the trigger itself,

25   the fact that it's very small-- you are familiar with

170

14

15

1    triggers; correct?

2         A.    Yes, I am.

3         Q.    Are they conducive to leaving behind a

4    latent print?

5         A.    Again, it depends on the actual surface of

6    the actual trigger.  If it is a flat, shiny type of

7    trigger surface -- we have a couple of cases in our

8    laboratory where latent prints have been developed on

9    those triggers.  If it is a ribbed or rough type of

10   surface, then that would fall more into the less optimum

11   type of surface.

12        Q.    How about handles, the grip?

13        A.    The hand grips, again, they are smooth and

14   glossy, that would tend to be a better type of surface for

15   a latent print.  If they are rough with a checkerboard

16   type of patterning or if it was a molding plastic of some

17   sort that had a trip on it like a rubber grip, that would

18   tend to be not as good a surface.

19        Q.    To get back to the truck here, what areas

20   did you check for latent prints?  I know you said there

21   was a computer or a laptop.  Anything else that you

22   checked in there?

23        A.    Generally on the vehicle I processed the

24   driver's door area inside and outside, I processed the

25   passenger door area inside and outside.  I processed the

171

15

1  windshield on the inside, and by the windshield posts on

2  the exterior.  I processed portions of the utility box or

3  tool bed, the fold-down tool box door handles, some of the

4  areas on the tool box doors surrounding those handles.

5  There was a sheeting cover as I recall on the top of that

6  utility bed.  I processed that area.  I also processed the

7  rear portion of the cab on the outside.

8        Q.  Did you process any handguns associated with

9  this case for latent fingerprints?

10        A.  Yes.  I processed two handguns relative to

11  this case.

12        Q.  And the firsthand gun, did you process

13  exhibit what we call 109, this handgun here?

14        A.  Per Exhibit No. 109, the evidence box has

15  our case number on it.  It also has our evidence tape with

16  my initials badge number and the date that I sealed this

17  box.  Within the box per Exhibit No. 109 there is a

18  plastic evidence bag containing several expended and live

19  cartridges.  That evidence bag has our case number, the

20  item number, my initials and badge number on it.  The

21  handgun is loose in the box; however, there is a plastic

22  bag that's had the top cut off of it that has the item

23  number JMH 85 which is te number, I believe, assigned to

24  this handgun.

25        Q.  Were you able to obtain any latent

172

15

1   fingerprints that were suitable for comparison and

2   identification?

3        A.   On this particular handgun, there were a

4   fragmentory group of ridge detail developed on the right

5   side of the frame just in front of the cylinder and below

6   the barrel.  It was not sufficient for comparison.

7        Q.   So you were not able to identify that to

8   anybody?

9        A.   I could not compare it or identify it or

10  exclude it to anyone.

11       Q.   Did you compare it to anyone by the name of

12  Christopher Redondo?

13       A.   Again, the ridge detail that was developed

14  on this handgun was not sufficient for comparison, so I

15  did not compare it to anybody neither identified or nor

16  excluded.

17       Q.   So what you are saying is -- what you are

18  telling me is if you had pristine known samples you

19  wouldn't have compared it because your comparison, it

20  isn't suitable for comparison to anyone?

21       A.   That's correct.

22       Q.   The other one that you indicated that you

23  compared it to -- go ahead and look at your report and

24  give me the item number and the type of gun it is, that

25  sorted of thing.

173

15

1      A.    Is that Exhibit Item JMH 85?

2      Q.    Yes, sir.

3      A.    Thank you.   TRhe other handgun that I

4  processed was submitted as Exhibit No. MT 19.

5      Q.    Do you know had who Michael Tamguma is?

6      A.    Not that I know of.

7      Q.    Go ahead.

8      A.    Item MT 19 is a Smith & Wesson model 18-5,

9  .357 Magnum revolver, serial number A like Adam, F in

10  Frank, M like in Mary 5869.   Also there were five

11  cartridges or cartridge cases in that item.

12     Q.    The casings, were they empty casings or were

13  they live rounds?

14     A.    In Item MT 18 there were had four loose

15  federal brand .38 Special expended cartridge casings.

16  They had been fired.   Also in that item there was a loose

17  Winchester brand .35 Special live cartridge which had not

18  been fired.

19     Q.    So that was also a .38; correct?

20     A.    Yes.

21     Q.    Were you able to develop any fingerprints

22  from that?

23     A.    There were no -- I don't recall specifically

24  whether I developed latents on them.   If I did, they were

25  not of value of comparison to anybody.

16

174

16

1    Q.   And it is the same response for that one as

2  it was with regard to TMH 85, which is Exhibit No. 109,

3  that even if you would had samples of anything, you

4  wouldn't be able to compare it because of the items that

5  you lifted were not suitable for comparison?

6    A.   That's correct.

7    Q.   With a regard to the truck, where did you

8  go, and did you lift any usable fingerprints?

9    A.   Yes, I did.

10   Q.   Tell me where.

11   A.   There were latent prints of value for

12 comparison on the truck developed on the outside rearview

13 mirror, on the passenger door, on the outside the

14 passenger door window, and the side of the rear utility

15 bed cover on the passenger side.

16   Q.   Any other fingerprints at all found on this

17 particular truck?

18   A.   There were several latent prints that were

19 developed.  I don't recall the specific number that are

20 not of value to for comparison so, yes, there were some

21 developed, but they were not sufficient for comparison.

22   Q.   With regard to the interior did you find any

23 fingerprints in there suitable for comparison?

24   A.   Suitable for comparison, no, I did not.

25   Q.   How about, for example, on the laptop?

175

16

1      A.   On the laptop, on the screen I did develop

2  two latent prints of value for comparison.

3      Q.   And so as I understand it there was a total

4  of five fingerprints that you found suitable for

5  comparison?

6      A.   There are five lifts.   There were a total of

7  six latents.

8      Q.   And one of them -- one you were not able to

9  identify.   Is that my understanding?

10     A.   Actually, I believe I identified all six of

11  them.

12     Q.   All six?

13     A.   Yes.

14     Q.   Why don't you tell me where the sixth one

15  was from the one that I didn't ask you about?

16     A.   On the side of the rear utility bed cover I

17  identified that one of on the outside of the passenger

18  door window there are two latents which I identified.   On

19  the outside of the rearview mirror on the passenger door

20  there is one latent that I identify, and there are two

21  latents that I identified on the laptop for a total of

22  six.

23     Q.   Let me go ahead and have these marked.

24          Sir, Exhibits No. 111 through 115, do they

25  contain those lifts and your conclusions as to who may

176

16

1    have left those fingerprints?

2           A.    Yes, they do.

3           Q.    If I may have those back?  Move for the

4    admission of exhibits --

5           MR. SHELL:  No objection.

6           THE COURT:  111 to 115?

7           MR. MARTINEZ:  Is that what you are going to say?

8           THE COURT:  Yes.  111 to 115 are admitted.

9           Q.    BY MR. MARTINEZ:  Let's start with Exhibit

10   No. 111.  This one was lifted from where?

11          A.    That's the lift that was from the outside of

12   the rearview mirror on the passenger door.

13          Q.    And what was your conclusion on the rearview

14   mirror of the passenger door?

15          A.    That was identified as having been made by

16   the left ring finger of Christopher Redondo.

17          Q.    Item No. 112, where was this lifted from?

18          A.    Item No. 112 is a photograph of the latent

19   lift from the outside of the passenger door window.

20          Q.    And who were they left by?

21          A.    Those two latents were identified as having

22   been made by the right middle and right ring finger of Mr.

23   Redondo.

24          Q.    Item No. 113, where is that from?

25          A.    Exhibit 113, that latent was lifted from the

177

16

1    side of the rear utility bed on the passenger side.

2          Q.   And that was identified to who?

3          A.   That was identified as the right ring finger

4    of Mr. Redondo.

5          Q.   Exhibit No. 114, where was that lifted from?

6          A.   Exhibit No. 114 was lifted from the laptop

7    screen.

8          Q.   And there is an X there.  What appears to be

9    on the laptop, is that where it was lifted from?

10         A.   That would correspond to the lower right

11   corner area of that laptop screen.

12         Q.   And who is identified as having left that?

13         A.   That latent was identified as the right

14   thumb of Mr. Irizarry.

15         Q.   What's the full name on that one?

16         A.   Pardon?

17         Q.   What's the full name?

18         A.   That I have on the report is Daimen

19   Irizzary.

17

20         Q.   And Exhibit No. 115, where is that from?

21         A.   Exhibit No. 115 is also from the laptop

22   screen.  It was on the right side of that screen about

23   halfway up or so.

24         Q.   And who left that one?

25         A.   That was also identified as the right thumb

178

17

1    of Mr. Irizarry.

2              MR. MARTINEZ:   I hve no other questions.

3              THE COURT:   Thank you.   Cross.

4

5                         CROSS EXAMINATION

6    BY MR. SHELL:

7              Q.    Two prints found on the laptop screen.   No

8    idea when those were left there?

9              A.    There is no scientific way to sustain the

10   age of a latent, so I do not know when those were made.

11             Q.    That they could have been on that laptop

12   screen for a week?

13             A.    Conceivably, they could have.

14             Q.    The prints that are on the vehicle, they are

15   all on the passenger side; correct?

16             A.    That's correct.

17             Q.    And they are all from Mr. Redondo?

18             A.    That's correct.

19             Q.    And there has been evidence that that was

20   that it was raining that night.   It is more possible that

21   these prints were left more recently than further back in

22   time?

23             A.    And you don't know of any evidence of any

24   rain before, during or after.   And, again, scientifically

25   I cannot tell you whether those prints were left sooner or

179

17

1    later.  They were just there.

2          Q.    Understood.  There has been evidence

3    introduced, though, that this was rain that night, so

4    assume for the question that it was raining that night;

5    okay?  Is it more likely then that those prints were left

6    that night rather than at sometime farther back in the

7    past because there has been testimony by officers it was

8    raining cats and dogs at one point.  Is it more likely

9    those prints were left either after it had rained or more

10   close in time than farther back in time from the night of

11   this incident January 28th?

12         A.    I don't know that I can answer that

13   question.  I don't recall having seen any like water run

14   marks.  Fingerprint powder or latent print power has a

15   tendency to stick to that residue and kind of outline

16   those marks.  Also when I processed the truck, as I

17   recall, the passenger window was down or open.  So I don't

18   know whether it was rolled down or when it was opened.  So

19   if it was open during the rain, then what I would expect

20   to see is the door should tend to protect that, but I

21   don't know that I can give you affirm before, during or

22   after the rain answer.

23         MR. SHELL:  All right.  Thank you.

24         THE COURT:  Redirect.

25

180

REDIRECT EXAMINATION

BY MR. MARTINEZ:

     Q.   With regard to dating an item, can you date it whether it is on a laptop, can you give it a date?

     A.   Scientifically, no, there is no way to establish when that latent print was placed there.

     MR. MARTINEZ:  No other questions.

     THE COURT:  Does the jury have any questions for this witness?  I don't see any.  Okay.  Thank you.  You are excused.  You can call your next witness.

     MR. MARTINEZ:  The State calls Stewart Raley.


                STEWART RALEY,

called as a witness herein, having been first duly sworn, was examined and testified as follows:


                DIRECT EXAMINATION

BY MR. MARTINEZ:

     Q.   Your name, sir?

     A.   My name is Stewart Raley.

     Q.   Who do you work for?

     A.   I work for the Arizona Department of Public Safety Crime Lab.

     Q.   What do you do for them?

     A.   I am a DNA analyst in the DNA case work

181

17

1    section.

2         Q.    How long have you been in the DNA section?

3         A.    With Arizona DNA, DPS since August of 2008.

4         Q.    It seems to imply that you were in a DNA

5    section elsewhere?

6         A.    Yes.

7         Q.    Where was that?

8         A.    In 2000 I was employed from the North

9    Louisiana crime lab in Shreveport in July of 2008.

10         Q.    In regard to Exhibit No. 93, the truck, did

11    you have occasion to assist in the processing of this

12    truck for possible biological evidence?

13         A.    Not the truck itself, no.

14         Q.    Did you do anything with items that your

15    records indicate were gained from the truck?

16         A.    Yes.

17         Q.    And specifically what parts of the truck

18    were they gained from?

19         A.    May I refer to my notes?

20         Q.    Sure.

21         A.    Specifically, we or I analyzed swabs that

22    were taken from the passenger mirror, sideview mirror, and

23    also swabs that were taken from the steering wheel.

24         Q.    And with regard to DNA, is that just a test

25    for biological substances?  DNA cells is a test for

182

17

18

1  biological substances; is that correct?

2      A.   Yes.

3      Q.   What is DNA, very briefly?

4      A.   Well, generally, DNA is your genetic

5  blueprint.   Almost every cell in your body has DNA in it,

6  and it is unique to you.   What I will and my

7  responsibility is to take DNA from an unknown origin from

8  a scene, crime scene or where they don't know the origin

9  of where the DNA came from and compare it to DNA from

10  known origins or persons of interest in a case.

11      Q.   In this particular case, did you develop a

12  known profile for somebody by the name of Daimen Irizarry?

13      A.   I personally didn't, but the lab did.

14      Q.   Your lab did.   And when we talk about a

15  profile, what are we talking about?

16      A.   DNA profile is a collection of 14 locations.

17  Each location tells you a little bit about the person's

18  DNA.

19      Q.   If you could just turn that easel.   If you

20  could turn the page over.   With regard to Daimen Irizarry,

21  if you could write out for us the 14 locations profile

22  that you developed?

23      A.   Okay.

24      Q.   And those are the profiles; right?

25      A.   Yes.

183

Q.   Is that the known profile of Daimen
Irizarry?

A.   Yes.

Q.   I noticed on this you had a line through the
12 and 13.  That was just a mistake today, correct, that
you made?

A.   When I flipped the page over I started on a
different line.  That was my mistake.

Q.   If you would take a look at No. 4, is that
amelogenin or sex marker?

A.   Yes.

Q.   We can see that's a male; right?

A.   Yes.

Q.   With regard to the sample from the steering
wheel on the truck pictured in Exhibit No. 93, were you
able to develop a profile?

A.   Yes.

Q.   Which is what you have up there.  That's a
profile; right?

A.   Yes.

Q.   And did the profile that you developed from
the steering wheel, did it match or not match the profile
of the known profile of Daimen Irizarry?

A.   It matched.

Q.   It matched at every single one of those

184

18

1     locations 1 through 14?

2          A.   Yes.

3          Q.   If we go through 1 through 14 and at the

4     bottom you see the 11 and the 12 and loci 14, had there

5     been one number that didn't match up, would that then be

6     an exclusion?

7          A.   That would be an inconclusive loci.  We

8     would have to account for different genetic possibilities.

9          Q.   But if you, for example, No. 11, if you have

10    an 8 and 9 now and it comes back a 6 or a 7, that would

11    not match then; right?

12         A.   Yes.  That would be an exclusion.

13         Q.   My point is I guess in order for you to say

14    there is a match between the profiles, all of the numbers

15    have to match, correct, as well as the sex marker?

16         A.   Yes.

17         Q.   And in this case they did match to Daimen

18    Irizarry; correct?

19         A.   Yes.

20         Q.   The other profile that you developed, did

21    you develop a known profile of Christopher Redondo?

22         A.   Yes.

23         Q.   And you said that on the passenger side

24    where was that sample garnered from?

25         A.   It was garnered from the sideview mirror

185

18

1    passenger sideview mirror.

2            Q.    And did you develop a full profile for that?

3            A.    I believe so, yes.

4            Q.    And the profile from the sideview mirror

5    matched the known DNA profile of Christopher Redondo?

6            A.    Yes.

7            Q.    And you said those are the only two items

8    that were submitted for analysis in this case; correct?

9            A.    In regards to the vehicle.

10           Q.    How about guns?  Were they submitted to you

11    for analysis?

12           A.    Yes.

13           Q.    And with with regard to what we are calling

14    JMH 85 which is Exhibit No. 109, were you able to develop

15    any DNA from that?

16           A.    Yes.

17           Q.    And did you develop a full profile?

18           A.    On some parts of the gun a full profile.   On

19    other parts, no.

20           Q.    With regard to the parts, how many parts did

21    you develop a full profile?

22           A.    We developed a profile, a full profile from

23    one swab from the gun, and then also a swab from one of

24    the cartridge cases that was in the evidence.

25           Q.    Okay.  And the gun, the full profile that

186

18

1    you got, who did that DNA profile match?

2             A.    Christopher Redondo.

3             Q.    How about the casings?  Whose profile did

4    that match?

5             A.    Christopher Redondo.

6             Q.    How about another -- did you have occasion

7    to work with another .38?

8             A.    Another gun?

9             Q.    Yes.

10            A.    Yes.

11            Q.    What is the number?

19

12            A.    MT 19.

13            Q.    MT 19.  And usually the way that DPS marks

14    them is the initials of the officer who impounded them

15    plus a number; correct?

16            A.    I don't know that.

17            Q.    Don't know that.  Okay.  So MT, what is it,

18    19?

19            A.    19.

20            Q.    And did you develop any profiles on that

21    one?

22            A.    Yes.

23            Q.    And where did you develop the profile from?

24            A.    MT 19 was a swab on the gun.  And then there

25    were other profiles from the gun as well.

187

19

1        Q.    Okay.  And the profile that you developed

2   from the gun, the one full profile, did you compare it to

3   the known profile of Christopher Redondo?

4        A.    Yes.

5        Q.    And did it match?

6        A.    Yes.

7        Q.    You mentioned something about other

8   profiles.  Can you tell me about that?

9        A.    There was also another profile obtained from

10  the gun, and it was a mixture of at least two individuals.

11       Q.    And did you compare that to the known

12  profile of Daimen Irizarry to see whether or not he was

13  part of that mixture?

14       A.    Yes.

15       Q.    Was he included or excluded?

16       A.    He was excluded.

17       MR. MARTINEZ:  I don't have any other questions.

18       THE COURT:  Any cross?

19

20                  CROSS EXAMINATION

21  BY MR. SHELL:

22       Q.    Let's make it simple.  None of Mr.

23  Irizarry's DNA is on the gun?

24       A.    Yeah.

25       Q.    The only DNA of Mr. Irizarry is on the

188

19

1    steering wheel of that truck.

2         A.   Yes.

3         Q.   The DNA on the gun belongs -- all the DNA on

4    the gun belongs to Redondo and one other person, but that

5    other person is not him.

6         A.   That's correct.

7         MR. SHELL:   Nothing further.

8         THE COURT:   Any redirect?

9         MR. MARTINEZ:   No.

10        THE COURT:   Any questions from the jury on this

11   witness?   Thank you.   You can stand down.

12             Can you call your next witness?

13        MR. MARTINEZ:   The State calls Jeffrey Cross.

14

15                  JEFFREY M. CROSS,

16   called as a witness herein, having been first duly sworn,

17   was examined and testified as follows:

18

19                  DIRECT EXAMINATION

20   BY MR. MARTINEZ:

21        Q.   State your name, sir.

22        A.   My name is Jeffrey M. Cross.

23        Q.   And who do you work for?

24        A.   I work for the Gilbert Police Department.

25        Q.   What do you do for them?

189

19

1          A.    Currently I am working patrol.  I just came

2     out of accident reconstruction.

3          Q.    drawing your attention back to January 28th

4     of this year, what were you doing for the Gilbert Police

5     Department?

6          A.    I was on the collision reconstruction team.

7          Q.    And did you have occasion to work at the

8     scene on the corner of Val Vista and Baseline involving

9     the killing of Lieutenant Eric Shoehandler?

10         A.    Yes.

11         Q.    What did you do with regard to that?

12         A.    I actually went out with a survey system,

13    plotted the scene and then took those points back to my

14    office, downloaded them on the computer and did a scaled

15    diagram.

16         Q.    Why don't you flip that page there and draw

17    us a diagram of the area, please, and include Baseline and

18    Val Vista and perhaps the Mid First Bank as well as Taco

19    Bell.

20         A.    Okay.  Using north as up, this would be Val

21    Vista.  Here is Baseline.  Here you have Taco Bell.  Here

22    you have Mid First Bank.  There are some restaurants and

23    other businesses here.  I believe one is a Subway.  One is

24    an Italian restaurant.  Another street and some other

25    businesses over here, mostly restaurants.

19

1    Q.    Up on the north side, is there a entrance to

2    that area near the Mid First Bank?

3    A.    There is an entrance right here that goes

4    out to Baseline Road and you have an entrance into the

5    parking lot here, and another one here.   That comes into

6    this parking lot.

7    Q.    And Lieutenant Shoehandler's car, where was

8    it?

9    A.    It was parked -- we have some dumpsters here

10   and his vehicle was here pointing that direction.

11   Q.    We have seen some of the photographs.

12   Apparently there is an area of red substance to the west

13   of that.   Did you plot that or not?

14   A.    Area of -- what is it.

15   Q.    Of a red substance.   Did you plot that or

16   not?

17   A.    Yes.   It was approximately in this area.

18   Q.    Go ahead and take a look at some

19   photographs.

20   A.    Okay.

21   Q.    Did you seize any of the items that were

22   there?

23   A.    No, sir, I did not.

24   Q.    Were you there on the night this occurred?

25   A.    No, sir.   I was there the next day.

191

Q. Okay. Take a look at Exhibits 3 and 4. Was the scene in this condition when you were there? Was the car there, that sort of thing? Were the items there or not?

A. Yes, sir, they were.

Q. And how far was the car from, let's say, this point or did you measure any points off? Did you measure any distances?

A. I didn't measure any distances.

Q. But from here to here you see those items that are there?

A. Yes.

Q. Were they there when you were making your scene diagram?

A. Yes, they were.

Q. How far would you estimate it was from this car over to there?

A. I would estimate probably about 10, 15 feet.

MR. MARTINEZ: I don't have any other questions. And if I may have that marked as an exhibit and move it into evidence.

THE COURT: The diagram?

MR. MARTINEZ: Yes, sir.

THE COURT: Any objection?

MR. SHELL: No, sir.

192

20

1          THE COURT:  I think we are at 116.  116 is

2    admitted.  Cross?

3          MR. SHELL:  No, sir.

4          THE COURT:  Does the jury have any questions for

5    this witness?  Is that your last witness?

6          MR. MARTINEZ:  Yes.

7          THE COURT:  That's our last witness for today.

8    We will start tomorrow at 10:30.  We will try to start

9    right at 10:30.  Remember the admonition over the evening.

10          Let me say a couple of words before we leave

11    about the media.  You probably noticed there is a camera

12    in the back of the courtroom.  The Court rules prohibit

13    the camera from taking images of any of you, so none of

14    you should worry about being on camera or shown on camera.

15    But I would ask you to avoid television news, Arizona

16    Central, reading the Arizona Republic Valley and State

17    section during the course of this trial because there may

18    be coverage of it, and it may include things that you

19    shouldn't be considering.  So try and avoid those things

20    if you would, please, and we will see you tomorrow morning

21    at 10:30.

22          (The jurors exited the courtroom.)

23          THE COURT:  Everyone, go ahead and take a seat.

24    The record ought to reflect the presence of counsel and

25    defendant but none of the jurors.  Anybody need to put

193

20

1    anything on the record?

2            MR. MARTINEZ:   No, sir.

3            MR. SHELL:  No, sir.

4            THE COURT:  Okay.  See you tomorrow at 10:30.

5                (The proceedings concluded at 4:43 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# Juan Martinez

# 15-3363

Exhibits to initial charge
Attachment 06
(Irizarry transcripts 7-8-10 am)

1

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

THE STATE OF ARIZONA,       )
                               )
           Appellee,     )
                               )
      vs.                 )  No. CR 2010-106178-001 SE
                               )  No. 1 CA CR 10-0866
DAIMEN JOSEPH IRIZARRY,     )
                               )
          Appellant.    )
                               )

Phoenix, Arizona
July 8, 2010
11:00 a.m.

BEFORE:  The Honorable CHRISTOPHER T. WHITTEN, Judge

REPORTER'S TRANSCRIPT OF PROCEEDINGS

JURY TRIAL

APPEARANCES:

FOR THE APPELLEE:
Mr. Juan M. Martinez

FOR THE APPELLANT:
Mr. Charles K. Shell

PREPARED BY:

Pamela D. Remus, RPR
Official Court Reporter
Certificate No. 50399

PREPARED FOR APPEAL

(COPY)

PUBLIC DEFENDER

MAR 1 0 2011

APPEALS RECEIVED

1

2

# I N D E X

WITNESS:                                                        Page

COOPER, Kumari
        Direct Examination by Mr. Martinez              4
        Cross Examination by Mr. Shell                  11
        Redirect Examination by Mr. Martinez            13

BETTS, Justin
        Direct Examination by Mr. Martinez              13
        Cross Examination by Mr. Shell                  30
        Redirect Examination by Mr. Martinez            35

CAOUETTE, William
        Direct Examination by Mr. Martinez              36
        Cross Examination by Mr. Shell                  46
        Redirect Examination by Mr. Martinez            55

TEW, John
        Direct Examination by Mr. Martinez              58

KINGSLEY, Meslissa
        Direct Examination by Mr. Martinez              74

BURNSIDE, Kenneth
        Direct Examination by Mr. Martinez              84

BISHOP, David
        Direct Examination by Mr. Martinez              91
        Cross Examination by Mr. Shell                  103

MARRUFO, Christopher
        Direct Examination by Mr. Martinez              105
        Cross Examination by Mr. Shell                  125
        Redirect Examination by Mr. Martinez            147

POLLARD, Edward
        Direct Examination by Mr. Martinez              155
        Cross Examination by Mr. Shell                  169
        Redirect Examination by Mr. Martinez            177

13

3

1        P R O C E E D I N G S

2

3        THE COURT:  Go ahead and take a seat.  The record

4   ought to reflect the presence of counsel and the

5   defendant.  Is there anything that anybody needs to put on

6   the record?

7        MR. MARTINEZ:  The only thing that I am we didn't

8   read the charging document.  I read somewhere case law

9   indicates that something has to be done.  We can do it

10  before the afternoon.

11       THE COURT:  I know that is case law.  I made a

12  habit of not reading it.  I think it is a waste of time.

13  Nobody understands the legalise.  But if there is a

14  requirement I haven't seen, show it to me, please.

15       MR. MARTINEZ:  I will pull it up.  I read it

16  somewhere.

17       THE COURT:  Okay.  Camille, go ahead and grab the

18  jury.

19            (The jurors entered the courtroom.)

20       THE COURT:  Good morning.  Go ahead and take a

21  seat.  The record should reflect we have been joined by

22  the jury.

23            I am aware of the fact that you have been

24  sitting there for 25 minutes.  I apologize.  If we could

25  have avoided it, we would have.  We will try not to let it

4

13

1  happen again.  Mr. Martinez, can you call your first

2  witness?

3          MR. MARTINEZ:  The State calls Kumari Cooper.

4

5                      KUMARI COOPER,

6  called as a witness herein, having been first duly sworn,

7  was examined and testified as follows:

8

9                    DIRECT EXAMINATION

10  BY MR. MARTINEZ:

11          Q.    Your name, sir?

12          A.    My name is Kumari Cooper.

13          Q.    Drawing your attention back to January 28,

14  2010, did you have occasion to be in the area of Val Vista

15  and Baseline in Gilbert sometime around 10:30 in the

16  evening?

17          A.    Yes.

18          Q.    And were you by yourself or were you with

19  others?

20          A.    I was with a group.

21          Q.    And what is it that you were going?  Where

22  were you going, or what were you going to do?

23          A.    On our way to a recording session.

24          Q.    On the way to the recording session, did you

25  guys stop anywhere?

5

13

14

1    A.    Yeah.    We stopped at a Taco Bell.

2    Q.    And where this was Taco Bell located?

3    A.    It was located in the parking lot on

4    Baseline and Val Vista.

5    Q.    And were you driving that day?

6    A.    Yes.

7    Q.    Were you alone or were you with somebody

8    else?

9    A.    No.    I had one passenger.

10    Q.    What's his or her name?

11    A.    Joshua Hart.

12    Q.    And about what time would you -- well, when

13    you arrived at the area of the Taco Bell, did you come in

14    off of Baseline, or did you come off of Val Vista?

15    A.    Came off of Baseline.

16    Q.    And had you came from -- did you see

17    anything?

18    A.    As you make the right into the parking lot

19    you see the officer's vehicle, and you see another vehicle

20    which was a white pickup truck, utility truck.

21    Q.    So you saw the officer vehicle and the

22    pickup truck.  Was it well-lit when you drove by?

23    A.    As you pull into it, it was like lit, but it

24    wasn't very bright.

25    Q.    Did the officer have his front lights on?

6

14

1          A.    Yes.

2          Q.    And in terms of where the vehicles were

3    located, were those lights shining on the truck or not?

4          A.    Yes.

5          Q.    Do you know whether or not he had the

6    spotlight on?

7          A.    Yes.   The spotlight was on.

8          Q.    And the truck, from the back, did you go to

9    the left of it or to the right of it?

10          A.    As you come in -- to me, it would be my

11    right.

12          Q.    Let me get a pen so that we can --

13          MR. SHELL:   There is one up there.

14          Q.    BY MR. MARTINEZ:   Take one of those pens and

15    why don't you draw the corner of Val Vista and Baseline?

16          A.    [Witness complied.]

17          Q.    Go ahead and make it kind of big so that

18    everybody can see it.

19          A.    [Witness complied.] Over here is Baseline.

20          Q.    Before do you that, go ahead on the

21    left-hand side of that and write down Baseline next to

22    that road that you just mentioned.

23          THE COURT:   Are you right-handed or left-handed?

24          THE WITNESS   Right-handed.

25          THE COURT:   You can move the board so over to

7

14

1   that side so your body is not blocking their view, and

2   just stand to the side of it.

3        THE WITNESS:  I was coming off Baseline and

4   making a right.  The truck was -- the police car was here

5   and the truck was here.

6        Q.   BY MR. MARTINEZ:  Before we go on, what is

7   this square that's right there?

8        A.   That's the trash can area as you come in.

9        Q.   And then there is kind of a triangle here.

10  What's that?

11       A.   That's the officer's vehicle.

12       Q.   And this right here?

13       A.   That would be the truck.

14       Q.   Okay.  So you came in and then in a broken

15  line can you show us where you went?

16       A.   Right there.

17       Q.   And once you were at that area, were you

18  parked there or what were you doing?

19       A.   We were sitting right here parked.

20       Q.   And if you could keep your voice up.  You

21  are very low.

22       A.   Sorry.

23       Q.   What happened?

24       A.   I was sitting here.  At the vehicle we were

25  following, they went to the top of the parking lot or to

8

14

1    the drive-thru.

2         Q.   Let me stop you there.  We talked previously

3    that you were with a friend of yours.  Was there another

4    group of friends that you were with that night?

5         A.   Yeah.

6         Q.   Were they in a different car?

7         A.   Yeah, they were in another car.  They went

8    to the Taco drive-thru.  We are waiting for them to come

9    out.  As they come out, they go by us and they go up here

10   which would be the stop sign.  The stop sign is here, and

11   there is a light here to go to Val Vista.  Just as they

12   came out and they passed us here, you hear a pop.

13        Q.   Let me stop you there.  When you drove past

14   the officer's vehicle and the truck, did you see the

15   officer anywhere?

16        A.   No.  I didn't see him.

17        Q.   Did you see anybody other than the other

18   officer walking around anybody else?

19        A.   No.

20        Q.   So nobody was out of their cars at least

21   that you saw?

22        A.   I didn't see anybody.

23        Q.   Then you hear the pop.  Then what happens?

24        A.   You hear the truck take off squealing its

25   tires, jumped the curb here and there is a curb here.  You

9

hear it jump the curb and go back out on Baseline.  So as
I pull over I --

Q.   Let me stop you there.  Why don't you go
ahead and take a seat and pull the microphone up to your
mouth.  You said that you heard the pop; right?

A.   Yes.

Q.   When you heard the pop, and I will stand
over here, I think you indicated that you were right here.
It would be the end of the broken line?

A.   Yeah.  Like the edge of this and the trash
can thing is right there.  So I am parked a little bit --
a little ways above that where I can see out the side
mirror.  You can see the vehicle but you can't see anybody
else out of the right driver's mirror.

Q.   Immediately upon hearing the pop, did you
see what, if anything, the driver of the truck did?

A.   I seen the truck take off and hear tires
squealing and you hear him jump the curb.  I started the
vehicle and I was going to take off.  I was looking out
the mirror to see if I could see somebody crossing from
the spotlight.  And I never see the spotlight.  Like a
body passing it, the light disappearing, as I drive off I
get over by the -- there is a Subway in the parking lot.

Q.   The Subway, is that right here?

A.   Right up there by the stop sign.

10

15

1      Q.    Right here the X is where the Subway is.

2  Okay.

3      A.    So as you get right there it is like, whoa,

4  I don't see no one.  My passenger is talking was that a

5  shot or was that -- or was that a car backfiring?  I

6  thought maybe I should go back and see.  So I put my

7  vehicle in reverse, a car pulls up behind me.  I go around

8  him.  And as we were turning around the passenger said

9  speed up, speed up.  As we get there he jumps out.  I

10  double park and jump out, and that's when we come to

11  Officer Shoehandler's body is laying there.  Blood was

12  coming out the back of his head.  There is a puddling

13  growing.  I take my shirt off.  I get to him.  I ask him

14  can you hear me?  He was somewhat respondent but he was

15  gurgling blood.  I said, hey, man, can you move your

16  fingers?  He was laying on his utility belt.  That's when

17  my passenger starts like -- she is grabbing for his mic

18  and grabs the mic and says officer down, officer down.  At

19  the outer corner of my eyes I see the Mesa police officers

20  coming out of the parking lot across Baseline.  And I tell

21  my passenger -- I took off my shirt already so I was

22  trying to find the wound.  He was bleeding.  The best we

23  can do, I take off running across the street to get the

24  police and they come.  They come over to chase me back

25  across the street, and I tell them you need to go down

11

15

1    Baseline.  The officer sits there for a minute trying to

2    get it altogether, and after that, that's when they took

3    over the scene.  They made us stand to the side and

4    whatnot.

5         Q.    Okay.  Let me go ahead and mark that as an

6    exhibit exhibit.  I marked this as 117 and move for the

7    admission of Exhibit No. 117.

8         MR. SHELL:  No objection.

9         THE COURT:  117 is admitted.

10        MR. MARTINEZ:  I don't have any other questions.

11        THE COURT:  Cross.

12

13                    CROSS EXAMINATION

14   BY MR. SHELL:

15        Q.    Mr. Cooper, after the incident you stuck

16   around and you were interviewed?

17        A.    Yes, sir.

18        Q.    Okay.  And the car that you were driving, is

19   it a red car?

20        A.    Yes.

21        Q.    And the car that was also there with you is

22   that also a red car?

23        A.    No.  That as an employee of Taco Bell's car.

24        Q.    Was there another red car in the area?

25        A.    Yeah.  It was just someone in the parking

12

15

1    lot.

2            Q.    So there was two red cars in that area --

3            A.    Yeah.

4            Q.    -- where this happened.  And you heard the

5    pop?

6            A.    Yes.

7            Q.    Correct?

8            A.    Yes.

9            Q.    And I believe you initially told the police

10   officers that interviewed you that you thought -- your

11   first thought is that it was a tire?

12           A.    Yeah, it was a tire.

13           Q.    You thought either a tire blew up?

14           A.    Yeah.

15           Q.    Or a backfire?

16           A.    Yeah.

17           Q.    And then you said you said, well, we better

18   go check.  Now, after you heard that pop, how long after

19   that did you see the truck take off?

20           A.    Like a split second.

21           Q.    So, pop, and then the truck takes off?

22           A.    Yeah.

23           MR. SHELL:   Nothing further.

24           THE COURT:   Redirect.

25

13

15

1          REDIRECT EXAMINATION

2     BY MR. MARTINEZ:

3          Q.    When the truck took off you said it made a

4     sound?

5          A.    Tires squealing as it took off.

6          Q.    And did it go over any bumps or did it go in

7     a designated roadway?

8          A.    It went over the curb there.

9          MR. MARTINEZ:  I don't have any other questions.

10         THE COURT:  Does the jury have any questions for

11    this witness?  I don't see any.  Thank you very much.  You

12    can be excused.

13         MR. MARTINEZ:  The State calls Justin Betts.

14

15                    JUSTIN BETTS,

16    called as a witness herein, having been first duly sworn,

17    was examined and testified as follows:

18

19                  DIRECT EXAMINATION

20    BY MR. MARTINEZ:

21         Q.    Your name, sir?

22         A.    Justin Betts.

23         Q.    Who do you work for?

24         A.    The Gilbert Police Department.

25         Q.    What do you do for them?

14

15

16

1      A.    I am a police officer.

2      Q.    How long have you been a police officer with

3   the Gilbert Police Department?

4      A.    Since September of 2008.

5      Q.    Did you have occasion to be on duty on

6   January 28, 2010?

7      A.    I did.

8      Q.    And what as your position with the Gilbert

9   Police Department on that date that I just referenced?

10      A.    I was a patrol officer on the patrol team 7

11   working Beat 16.

12      Q.    And specifically sometime around 10:15,

13   10:30 of January 28th, were you working?

14      A.    I was.

15      Q.    And where were you working?

16      A.    I was in the area of Morrison Park Ranch

17   Parkway and Higley.  I was in the southeast corner of that

18   neighborhood on patrol doing a patrol watch.  It is a

19   residential neighborhood that's been having some burglary

20   problems with the housing in that area.

21      Q.    How far is the location that you were at

22   which I think you said Morrison way?

23      A.    Morrison Ranch Park.

24      Q.    Ranch.  How far is that and Higley from

25   Higley and Baseline?

15

16

1    A.    Four miles.

2    Q.    So you are there and around sometime after

3    10:30 do you receive a call that prompts you to do

4    something?

5    A.    Correct.

6    Q.    What is that?

7    A.    Well, I first heard about Lieutenant

8    Shoehandler conducted a traffic stop at Val Vista and

9    Baseline.

10   Q.    About what time was that?

11   A.    10:45 p.m.

12   Q.    Was there any information that you provided

13   about the vehicle that you used later in your

14   investigation?

15   A.    Yeah.  I listened to him make the traffic

16   stop and he said he was pulling over a white Ford truck

17   with a partially obstructed plate, and the first character

18   of the license plate was C, Charles.

19   Q.    So you hear that.  And do you do anything in

20   response to that?

21   A.    At that time, no.  I continued my patrol

22   watch.

23   Q.    About what time was that?

24   A.    10:45.

25   Q.    All right.  Then what happens?

16

A.   One of the dispatchers gets on the radio and says that Lieutenant Shoehandler needs an assisting officer on the traffic stop.

Q.   There is a number that you assigned to that; right.

A.   Right.  It is 906.

Q.   Okay.

A.   I looked at the matter on my computer and I saw that I was far away.  I also saw there was several units in the area that were tied up on other calls.  I began to clear my patrol watch which we can do on the computer and to start heading that direction.  When I was doing that, another officer got on the radio and said that he was going to take the 906.  He was going to back up Lieutenant Shoehandler.

Q.   Then what happened?

A.   A few moments ago after that --

Q.   So you heard another officer was going?

A.   Yes.

Q.   So were you going do the 906 or not?

A.   No.

Q.   Go ahead.

A.   I already cleared my patrol watch and decided to move on to a different neighborhood.

Q.   Okay.

17

16

1      A.   While moving on, I was westbound on Morrison

2  Ranch Parkway.  The dispatcher got on the radio and said

3  they were hearing reports from Mesa police stating that an

4  officer had been shot at Val Vista and Baseline.  That

5  they were calling for a 999 which is an officer down.

6  Officer needs emergency backup.  And it was possibly

7  Lieutenant Shoehandler.

8      Q.   What did you do in response to that?

9      A.   Any 999 calls that are coming on the radio,

10  all officers are immediately to drop what they are doing

11  and resond.  I activated my lights and siren and responded

12  Code 3.

13      Q.   Code 3 means lights and sirens?

14      A.   Right.

15      Q.   999, is that the most serious call?

16      A.   That's the most serious call and that police

17  officers hear and we dread to hear it.

18      Q.   What happened then?

19      A.   I was westbound.  Morrison Ranch Parkway and

20  turned right onto Higley and proceeded northbound on

21  Higley, Code 3, until I got to Baseline Road.

22      Q.   And Higley?

23      A.   And Higley, correct.

24      Q.   And what happened there?

25      A.   Well, the two miles it takes me to get from

18

16

1    Morrison Ranch Parkway and Higley to Baseline I had been

2    hearing a lot of officers responding to the scene.

3    Officers arrived to the scene sending a lot of different

4    pieces of information.  One of the pieces of information

5    was that the vehicle that was seen leaving the area was a

6    white Ford truck, and it was last seen heading eastbound

7    on Baseline.  Higley Road is two miles east of Val Vista,

8    so I knew that it was heading the direction that I was

9    going.

10         Q.    So what did you do?

11         A.    I got to Higley and Baseline, looked at the

12   map and I realized there was a lot of people already at

13   the scene.  There wasn't much I could do at the scene and

14   started looking for the white truck.

15         Q.    What happened?

16         A.    I got to Higley and Baseline, turned off my

17   lights and siren, continued northbound through the

18   intersection just past Baseline, slowed down, and looked

19   to my right and saw a white utility truck in the No. 3

20   lane going northbound on Higley.

21         Q.    No. 3, for those of us that uninitiated, is

22   that the fast or slow down?

23         A.    The slow lane, the far right lane.

24         Q.    From Baseline to the U.S. 60 on Higley, is

25   that a straight road or a road that curves?

17

19

17

1        A.    If curves to the right.

2        Q.    If you are going northbound on Higley you

3   naturally go to the right?

4        A.    Yes.

5        Q.    And then get to the freeway?

6        A.    Correct.

7        Q.    So you said that you saw the truck where

8   now?

9        A.    Saw it on the No. 3 lane  northbound on

10  Higley just north of Baseline.

11       Q.    Then what happened?

12       A.    I moved over to No. 2 lane, and then the No.

13  3 lane to get behind the truck to see if I could read the

14  license plate.

15       Q.    How close did you get?

16       A.    Approximately four car lengths.

17       Q.    And did you have your lights or sirens

18  activated at that time?

19       A.    No, I didn't.

20       Q.    Your car, is it a fully marked patrol car?

21       A.    Yes, it is a fully marked Gilbert police

22  vehicle.

23       Q.    What happened then?

24       A.    I noticed that the license plate, the first

25  character was Charles.  At that time I didn't know if it

20

17

1   was a Ford truck or not because I couldn't see the front,

2   only the back.   It was a utility truck, so it doesn't have

3   the normal brake lights that a normal truck would have.

4   So I continued to follow it for a ways up until Higley and

5   Inverness.

6           Q.   Let me stop you there.   Is Inverness before

7   or after U.S. 60?

8           A.   It is just prior to the U.S. 60 on-ramp.

9           Q.   And in which direction did you go?

10          A.   Right.   Eastbound.

11          Q.   Before it turned right onto Inverness, could

12   you tell whether or not the individual that was driving

13   whether or not he was following the speed limit or --

14          A.   He was obeying all traffic laws at that

15   time.

16          Q.   When it turned right, did it signal or not?

17          A.   It did.   It made a signal to the right-hand

18   and moved into the right-hand turn lane and turned

19   eastbound.

20          Q.   Then what happened?

21          A.   I followed it, continued down Inverness.   I

22   got to Sunnyvale.   My thought was that at the time I

23   thought it could just be a worker going home from a job or

24   whatever.   I had no idea other than that it was

25   obviously -- he was obeying all traffic laws.   I thought

17

1    it was just somebody going home, but it was the only white

2    utility truck.  I continued it.

3        Q.   Then what happened?

4        A.   Got to Sunnyvale, turned right, and

5    continued south on Sunnyvale.

6        Q.   That area that it's going through, is it

7    commercial or residential?

8        A.   There is open fields.  There is some

9    residential further eastbound, but there is no residential

10   directly off that street.

11       Q.   And so mostly commercial then?

12       A.   Right, yeah, commercial area.  Continued

13   southbound, got down to Baseline, stopped, turned the

14   right turn signal, turned right onto Baseline.

15       Q.   There was a light there or was it a

16   controlled intersection?

17       A.   It is a stop sign.

18       Q.   And, again, anything unusual about the way

19   the driver is driving?

20       A.   Well, they are driving fine obeying traffic

21   laws.  There was something in my gut that was telling me

22   could possibly be the vehicle.  One thing that was

23   interesting to me is in my own personal experience on the

24   job when someone is trying to get away from a crime scene

25   or from an area that they don't want to be in, they

22

17

1    continually make right-hand turns simply because it is the

2    quickest turning that they can make.

3         Q.    And that's what this truck was doing?

4         A.    It as continually making right-hand turns

5    which I found interesting, and I advised on the radio it

6    was probably the license plate, first character a C.  And

7    I wanted a backup unit, 906, to start heading my

8    direction.

9         Q.    Did you ask that it come with lights and

10   sirens or just --

11        A.    No, just a normal backup at that time.

12        Q.    Now, you are going westbound on Baseline?

13        A.    Correct, westbound on Baseline.

14        Q.    How far is it from Sunnyvale to Higley?

15        A.    It is less than a quarter mile.

16        Q.    What happened then?

17        A.    Get to Baseline, the truck made a right-hand

18   turn again onto northbound Higley.  Immediately I felt a

19   little concerned because it continued to make right-hand

20   turns, and --

21        Q.    They are actually back where they started.

22        A.    They are back where they started, and I am

23   feeling at this point that they are either -- this could

24   quite possibly be the vehicle.  They are trying to find a

25   way too leave or either lose or trying to find a way to

23

1    leave and either run on foot looking for a place to bail

2    out or a place to ambush me.

3         Q.   So what happened then?

4         A.   I got on the radio and called for backup 905

5    which is a Code 3 response backup.

6         Q.   And does that mean lights and sirens?

7         A.   Lights and sirens.  I need you for backup

8    now.

9         Q.   What happened then?

10        A.   Continued north on Higley.  I was waiting

11   for backup to get thre.  We got all the way northbound

12   staying in the No. 3 lane past Inverness, got up to the

13   intersection of Higley and the eastbound on-ramp of U.S.

14   60.

15        Q.   And what did the driver of the truck do?

16        A.   Signaled to the right, pulled to the

17   right-had turn lane and began to make a right-hand turn.

18        Q.   Is there a stoplight there?

19        A.   There is a stoplight and it was green.

20        Q.   When the driver starts to make a right, how

21   far is your patrol car from the truck?

22        A.   About 30 feet.

23        Q.   Okay.

24        A.   Roughly.

25        Q.   Then what happens?

24

18

1      A.   I will say that one thing that I found also

2  interesting was when I saw the truck make the right-hand

3  turn at Higley and Baseline, I could see the corner lenses

4  of the front of the truck, and just based on my experience

5  with automobiles, I could see the corner lens housing of

6  what I would say a mid '90s Ford truck.  So that was

7  another reason why I felt this could possibly be it.  So

8  knowing that this is probably the vehicle, I continued to

9  follow it until it came to a stop.

10      Q.   How far after making the turn did the truck

11  come to a stop?

12      A.   It was about halfway through the turn.  It

13  would be in the lane of the on-ramp, but it hadn't

14  completed its turn yet.

15      Q.   And is it stopped?

16      A.   And it came to a complete stop.

17      Q.   Was the light red, yellow or green?

18      A.   The light was green.

19      Q.   So --

20      A.   It stopped just inside the crosswalk of the

21  intersection.

22      Q.   Okay.

23      A.   I started slowing down.

24      Q.   How fast are you going now as you are

25  approaching?

25

18

1          A.     10, 15 miles an hour.

2          Q.     Okay.

3          A.     I slowed down.  I look up at the truck, and

4     I see somebody hanging out of the passenger side window

5     that had been rolled down.   Somebody hanging outside the

6     window.

7          Q.     And the truck is now stopped?

8          A.     The truck is stopped.

9          Q.     And could you tell any facial features of

10    the person?

11         A.     I believe that they had facial hair, but I

12    couldn't tell you if it was a full, long beard or

13    mustache, but they had facial hair.

14         Q.     Clothing?

15         A.     Dark clothing.  It was a dark jacket or

16    sweatshirt of some sort.

17         Q.     Anything else that you noticed?

18         A.     Well, as I look up I could feel my vision

19    being kind of sucked in because all I saw was the barrel

20    of a gun pointing directly at me.

21         Q.     Okay.

22         A.     And thought, holy crap, this is it.  I am

23    going to get shot right here.

24         Q.     Did you take any evasive maneuvers?

25         A.     I hit my brakes, turned to the right.  I hit

26

18

1   the brakes hard.  I was already on the brakes, stopped,

2   and sort of ducked down a little bit, but with our

3   uniforms we can't really duck too far.

4          Q.   When you say the uniform --

5          A.   I mean the bulletproof vest you can't

6   slouch.  It holds you up right when you are seated.  You

7   can't slouch.

8          Q.   When you did that how far was your car from

9   the back of the truck if you know?

10         A.   About 30 feet.

11         Q.   And then what happened?

12         A.   I saw two puffs come out the front of the

13  gun that was pointed at me.  It was like seeing two clouds

14  of smoke coming out.  I heard two pops, and I felt one

15  like, clink, in the front of the car, and I thought it

16  came from either the engine or the hood or somewhere.

17  Somewhere in the front, and I could feel the clink, the

18  pop.  The clink hit it.

19         Q.   You felt at least one shot hit the car?

20         A.   Right.

21         Q.   And you were trying to duck down?

22         A.   Right.

23         Q.   Then what happens?  And the truck is stopped

24  at the time?

25         A.   The truck is stopped, yeah.  And I am

27

18

1   thinking, I think I paused for a second because I am

2   looking down like am I hit?  I don't know.  Obviously, I

3   am scared to death.  I don't know if I have been shot.  I

4   can't tell.  The adrenaline is flowing, and I thought holy

5   crap.  Somebody just shot at me.  Someone is trying to

6   kill me.

7        Q.   So then what happened?

8        A.   The truck took off on the eastbound on-ramp.

9        Q.   It took off at a slow rate of speed?

10       A.   No.  It flat took off, sped off.

11       Q.   What did you do?

12       A.   I turned on my lights and siren and took off

13  after it, got on the radio and advised that I had been

14  shot at that I was pursuing a vehicle on eastbound 60.

15       Q.   Was anybody following you if you were paying

16  attention to the back of you?

17       A.   I don't know.  I remember lights, but I

18  don't know if it was my lights or someone else's lights

19  because there was so much -- there was antifreeze and oil

20  and stuff going all over the place.  I thought that they

21  probably hit my engine or radiator or something, and I

22  could see steam and smoke coming out from the car.  It was

23  crazy.  The motor was red-hot, so I knew they hit the

24  engine or radiator.

25       Q.   Did you make it onto the freeway?

28

19

1     A.    I did.

2        Q.    Did you see what the truck was doing?

3        A.    Yeah.   The truck was driving in the far

4    right lane for a while and then started to move over into

5    the fast lane.   I continued to follow it.   There was heavy

6    traffic still.   It was difficult as well as my vehicle was

7    struggling to accelerate and it was already overheating,

8    and it wasn't running very well, so I tried to accelerate

9    to keep up.   I followed it while I was in the fast lane

10   for a while.   Then it started, putting on his right signal

11   and started to move over to the right lane and started

12   moving in and around traffic for a while, and I was

13   advising radio that I as still in pursuit and had a visual

14   of it.

15       Q.    You are saying that he's weaving in and out

16   of traffic.   Where were you on the U.S. 60 when this

17   happened?   What were the cross streets, if you will, for

18   lack of a better term if you remember?

19       A.    Well, it started at Higley and U.S. 60.   By

20   the time we were in the fast lane it was probablye

21   somewhere by Power Road.   I remember he was signaling to

22   the right, but we were passing exits.

23       Q.    So then what happened?

24       A.    I continued to pursue it until all the other

25   units got there.   I advised them that my vehicle was

29

19

1    toast, and that they needed to step in and get behind the

2    vehicle because I wasn't going to make it any further.

3    The helicopter already arrived and my engine --

4         Q.    How do you know the helicopter arrived?

5         A.    The Mesa police got on our Gilbert police

6    channel and said that they found the truck and they were

7    following it.

8         Q.    All right.

9         A.    My vehicle seized at around U.S. 60 just

10   before Crismon, and then I just coasted into the exit at

11   Crismon and U.S. 60.

12        Q.    Let me show you some photographer.   Take a

13   look at Exhibits No. 24 through 31.   Just take a look at

14   them and see if you are familiar with what's in those

15   photographs.

16        A.    [Witness complied.] Vehicle 104 is the

17   vehicle that I was driving that night.

18        Q.    Is this the vehicle that you believed was

19   the one that took the round in the front end of the car?

20        A.    Absolutely.   It is the vehicle that I was

21   driving that night.   That's my better car.   I try to take

22   care of it.   I drive it every night.

23        Q.    Okay.   Just so that we can see what car we

24   are talking about -- can't turn the TV on.   We will so

25   that later.   This is your car; correct?

30

19

1          A.   Or was my car.

2          MR. MARTINEZ:  Oh, now it's on.  The Elmo is on.

3     This is the front and overall Exhibit No. 26.  I don't

4     have any other questions.

5          THE COURT:  Cross.

6

7                    CROSS EXAMINATION

8     BY MR. SHELL:

9          Q.   Officer Betts, did you write a police

10    report?

11         A.   No.

12         Q.   But you were interviewed; correct?

13         A.   Correct.

14         Q.   And that interview took place right after

15    this incident?

16         A.   Correct.

17         Q.   And you gave the person that interviewed you

18    all the information; correct?

19         A.   Correct.

20         Q.   But never said anything about the vehicle

21    stopping, did you?

22         A.   In the police report?

23         Q.   You didn't write a police report.

24         A.   Correct.

25         Q.   In the interview.

31

19

1      A.   Right.

2      Q.   You never said anything about the vehicle

3 stopping?

4      A.   I don't remember.

5      Q.   Let me show you an exhibit.

6      A.   Okay.

7      Q.   Let me show you what's marked as Exhibit No.

8 118.  Take a look at that.  Do you recognize that?

9      A.   Never seen it before.

10      Q.   Well, read it.

11      A.   [Witness complied.]

12      A.   Okay.

13      Q.   Does that look like a transcript of your

14 interview right after this incident?

15      A.   Yes.

16      Q.   Okay.  Prior to testifying today, how many

17 times have you talked to the State about what you are

18 going to testify about?

19      A.   We had a meeting once.

20      Q.   When was that?

21      A.   Approximately a week ago.

22      Q.   A week ago you talked to -- who did you talk

23 to from the government about what you were going to

24 testify about?

25      A.   I talked to Juan Martinez.

32

20

Q.   And did you guys discuss the importance of that truck stopping to Mr. Irizarry's case?

A.   I talked about the importance of everything.

Q.   My question to you is:  Did you talk about the importance of the truck stopping?

A.   I don't recall that being a specific topic of conversation.

Q.   Go through that transcript and you show me -- and I think it starts where you are discussing this incidents as the vehicle is getting on the on-ramp on about page 69 -- 226923, in that area.  Read that.

A.   [Witness complied.]

Q.   Is that the area where you were discussing with whoever it is that's interviewing you the vehicle getting over on the freeway?

A.   Yes.

Q.   And where do you tell the person interviewing you that the truck came to a stop in the crosswalk and the passenger got out and shot at you?

A.   I don't see it.

Q.   Because you never told him that?

A.   I don't remember if I did or didn't.

Q.   Well, read the whole transcript then and I want you to tell me where you told the person that you were being interviewed that night that the truck stopped

33

20

1    in the crosswalk and the passenger got out and shot you --

2    shot at you.  That's important information, isn't it?

3            THE COURT:  Hold on.  Give him a chance to answer

4    your last question.

5            THE WITNESS:  It's not in here.

6            Q.  BY MR. SHELL:  Right, because you never told

7    them.  Right after this incident you never said the truck

8    stopped; correct?

9            A.  I don't remember if I did or didn't, but

10   it's not in there.

11           Q.  Is that a complete transcript of what you

12   told them that night?

13           A.  I don't know.

14           Q.  This is what we are going to do.

15           MR. MARTINEZ:  Objection.  He can't make a

16   statement, he has to ask a question.

17           Q.  BY MR. SHELL:  Now, your interview was

18   transcribed off of a recording; correct?

19           A.  I doesn't know.

20           THE COURT:  Hold on.  Let me rule on the

21   objections if you would, please, Mr. Shell.  The objection

22   is overruled.

23           Q.  BY MR. SHELL:  Okay.  When you were sitting

24   down and being interviewed right after this incident, you

25   were talking to another police officer and you were

34

20

1    telling him everything that happened; correct?

2          A.    Correct.

3          Q.    And it was being tape recorded; correct?

4          A.    Correct.

5          Q.    And that transcript was made from that tape

6    recording; correct?

7          A.    I don't know.  I didn't make it.

8          Q.    Are you willing to go back and listen to

9    that interview and read the transcript at the same time

10   and then come back later to this courtroom and testify?

11         A.    If you need me to.

12         Q.    Are you willing to?

13         A.    If I need to.

14         MR. MARTINEZ:  Objection; asked and answered.

15         THE COURT:  Sustained.

16         Q.    BY MR. SHELL:  Do you think that you are

17   going to be able to get a copy of it?  Do you know who has

18   a copy of that?

19         A.    No.

20         Q.    If you can't get it from them, will you get

21   ahold of me so I can get it to you?

22         MR. MARTINEZ:  Objection; irrelevant.

23         THE COURT:  Sustained.

24         Q.    BY MR. SHELL:  As you sit here today and

25   looking at the transcript, you never say anything about

35

20

the truck stopping, do you?

          MR. MARTINEZ:  Asked and answered.

          THE COURT:  He's answered that, Mr. Shell.

          MR. SHELL:  I am done, but I am expecting to go

recall him.

          THE COURT:  Any redirect?


                    REDIRECT EXAMINATION

BY MR. MARTINEZ:

          Q.   With regard to this issue of what is

important to you -- are you a lawyer?

          A.   No.

          Q.   Do you know what's going to be, quote

unquote, important at a trial when you were talking to the

investigator?

          A.   Just the truth.

          Q.   Did you ever tell him, look, it's going to

be important that I tell you that the truck stopped.  Did

you think of the interview in those terms?

          A.   No.

          Q.   You were just being asked questions, weren't

you?

          A.   Yes.

          Q.   And whatever he asked you, you answered;

correct.

36

20

1      A.   Right.

2      Q.   Did he ever ask you if the truck stopped?

3      A.   No.

4      Q.   He didn't ask you that; right?

5      A.   No.

6      Q.   So you didn't answer that then; right?

7      A.   No.

8      MR. MARTINEZ:   No other questions.

9      THE COURT:   Does the jury have any questions for

10     this witness?  I don't see any.  Thank you.  You are

11     excused.

12     SHELL:   Subject to recall, Your Honor.

13     THE COURT:   I got that.  Call your next witness,

14     please.

15     MR. MARTINEZ:   The State calls William Caouette.

16

17                    WILLIAM CAOUETTE,

18     called as a witness herein, having been first duly sworn,

19     was examined and testified as follows:

20

21                    DIRECT EXAMINATION

22     BY MR. MARTINEZ:

23     Q.   Your name, sir?

24     A.   William Caouette.

25     Q.   Who do you work for?

37

20

1

          A.    Gilbert Police Department.

          Q.    And what do you do for them?

          A.    I am a patrol officer assigned to midnights.

          Q.    Drawing your attention back to January 28th

of 2010, were you on duty sometime around 10:30 to 11:00

o'clock at night?

          A.    Yes.

          Q.    And did you participate in the investigation

involving the slaying of Lieutenant Eric Shoehandler?

          A.    Yes.

          Q.    What was your role?

          A.    My role was I was one of the initial

responding officeers when the call went out for an officer

down which we have as 999.

          Q.    Did you actually go to Val Vista and

Baseline?

          A.    Yes.

          Q.    How long were you there?

          A.    For a few seconds.  I was still -- actually

my vehicle was still moving when I arrived at Val Vista

and Baseline.

          Q.    Did you direct your attention elsewhere?

          A.    Yes, at which time an officer came over the

radio informing me that they had enough officers at the

scene and they wanted officers to start looking for what

38

they believe was a white pickup truck which was somehow
related to the incident.

Q.    And what did you do?

A.    I then just started proceeding eastbound on
Baseline Road from Val Vista.  At this time I had shut my
lights and siren off and was looking around for a white
pickup truck.

Q.    And then what happened?

A.    A short time later Officer Betts over the
radio had announced he was following behind a pickup truck
and just was given out his location, so at that time I
just started driving fairly normal towards that area.  He
hadn't really called out anything suspicious at that time
yet.

Q.    And then what happened?

A.    While I was driving he just started saying
the vehicle was making right turns.  Just like right turn
after right turn.  So just based on my training and
experience it just wasn't normal thing so I started to
kind of pick up my response to that area.  I am not sure
on the time.  A few minutes later is when he had called
out that now he had taken shots fired was the next thing I
heard over my radio.

Q.    When you heard that he had taken shots or
that there were shots fired, where were you?

39

A.   I was at Baseline.   I think I was just coming up on Greenfield, in that area.

Q.   So what did you do?

A.   At that time he had called the shots fired, said he was in pursuit, so I was thinking, okay, he's okay.  His car is working.  He informed that he was now getting on the 60 eastbound.  So at that time I got on the 60 eastbound from the Greenfield on-ramp.  It was my closest ramp.

Q.   And as you were getting on the freeway and Greenfield, Were you able for see this truck that was being pursued?

A.   Not at the time.  When I first got on the 60 I wasn't able to see the vehicle.  I was just traveling the direction.  He was giving out his directions and speed as he was going.

Q.   Was the truck behind you or in front of you?

A.   It was in front of me because they got on on the Higley area.

Q.   I see.  Then what happened?

A.   At that time I just proceeed 60 eastbound with lights and sirens.  I am not sure of the speed.  I started to see some other cars.  I could see the back of their lights and stuff as I was going on the 60 eastbound. I had a few different other patrol cars from different

40

1    agencies that were passing me.

2         Q.   Then what happened?

3         A.   Within a couple minutes I heard Officer

4    Betts go over the radio that he was now out of the pursuit

5    due to his vehicle was damaged.  I said I had radioed,

6    fluid and stuff, he could no longer stay.  He was calling

7    for another officer for someone else to take up the lead

8    in the pursuit.

9         Q.   Were you close enough to take up the lead or

10   not?

11        A.   Not a position to take up the lead.  I was

12   probably about a quarter mile still behind.  So I wasn't

13   in a position to take up the lead.

14        Q.   Then what happened?

15        A.   I stayed in the pursuit probably behind the

16   main bulk of the cars that were in the lead behind the

17   white truck, and I just stayed in that.  I heard a second

18   Gilbert officer went out with a flat tire so at that time

19   I just kind of was what we consider in the pack of the

20   vehicles, following behind him.

21        Q.   Then what happened?

22        A.   At sometime we were on the 60.  We left and

23   started going down to like no longer like a highway.  It

24   was more like two-lane roads with a grass median in the

25   middle.  I heard Officer Churchman told me his vehicle was

41

1     incapacitated.  He had run over a jack that had been

2     thrown out at him.

3         Q.   What happened then?

4         A.   Then I saw Officer Churchman off to the

5     right side of the road.  I quickly came in and had officer

6     Churchman jump in my vehicle, and we were able to get back

7     in the pack of the pursuit.

8         Q.   And do you know more or less where that was?

9         A.   I am not really sure.  I wasn't familiar

10     with the area.  I never been that far out east before.

11         Q.   Then what happened?

12         A.   We stayed in the pursuit.  The entire time

13     we could see the lights of the main group of cars that

14     were behind the vehicle.  Officer Churchman was using his

15     cell phone because we lost our radio communication with

16     our dispatch so he was using his cell phone to give them

17     updates where we were passing if we had saw like another

18     car off the side of the road.  He would say we just went

19     by another patrol car that hit something that was in the

20     roadway.

21         Q.   Were you close enough to be able to see what

22     was going on with the truck or not?

23         A.   No.  Just -- just the bounce back from

24     lights and stuff you really couldn't see.  Mostly the back

25     of the patrol vehicles is what we could see.

42

Q.    Then what happened?

A.    At one point we enter Superior.  I am really not familiar with the town.  At one point we went around an accident.  A patrol car got into some type of an accident with another vehicle.  We went around that.  I remember we went up a -- as we started to go up a large hill we lost sight of the main pack of cars for a few seconds as we went up this large hill.  We started coming down the bottom of this hill which I guess is the Top Of The World park or something.  And at that time as we came down then we got a visual of the main pack of the vehicles behind.  That's the first time I could see the white truck then.

Q.    So what did you do then?

A.    At that time we proceeed down and as we started to today get near the bottom of the hill that's when we saw the truck had stopped and basically you were getting a mass of patrol cars all stopping.  Officers were getting out taking positions behind lead vehicles.

Q.    What did you do?

A.    Once we got to the main group I got out of the drivers way and I went towards the left side of the roadway we call the number one lane.  As I was running up I started hearing numerous gunshots coming from in front of me.  I started to duck.

43

Q.    What did you do then?

A.    Made my way up to the road where the road and grass meet.  I met up with Officer Bates from my agency that I recognized, and we kind of behind lead vehicle that was all waiting over to the right.

Q.    And then what happened?

A.    At which time Officer Betts and numerous other officers started yelling to cease fire, stop firing and stuff.  The firing kind of stopped so we kind of re-evaluated, okay, what do we have going on or what happened.

Q.    So in terms of what happened next, what as your role?

A.    My role was once we realized we had -- I saw one person was on the ground near the driver's side of the vehicle, was yelling something like that at which time Sergeant Baker and some other officers said we are going to make what we call the immediate reaction team what we call it, will go as far as we can and try to get the one person that we could see in custody on the ground.

Q.    And what side of the car was that?

A.    That was the driver's side of the white truck.

Q.    So it is three of you?

A.    Yes.  There was myself, Officer Betts, I

44

1   believe Sergeant Barker.   There was some other officers

2   but it was kind of staggered.   We couldn't get a perfect

3   line like we would just because of the way the cars were

4   laid out.

5          Q.   Then what happened?

6          A.   We just started moving up.   Like I said I

7   was -- Sergeant Baker was off to my right.   He was holding

8   a ballistics shield what we call it.   I was trying to stay

9   even with him.   Officer Betts had a long rifle what we

10  call the long where you could see between eight to ten

11  feet from this person laying on the ground.

12         Q.   Did you subsequently identify him or did you

13  find out who it was?

14         A.   Yes.

15         Q.   Who was it?

16         A.   Later told this was the driver of the

17  vehicle.

18         Q.   Do you know a name or just the driver?

19         A.   Just the driver at that time.   We didn't

20  have any names.

21         Q.   Subsequent to that did you find out his

22  name?

23         A.   It was not until many hours later where we

24  got back down to Gilbert when they start, kind of started

25  telling us.   They didn't want to give us any information

45

1    at the debriefing.

2           Q.    So you aren't getting much information, but

3    then what happens.

4           A.    At that point when I got from about eight to

5    ten feet at that time I had told Officer Betts I was going

6    to holster my weapon and go place cuffs on the person that

7    we had on the ground.

8           Q.    What was that person wearing?

9           A.    It was like dark colored clothing.

10          Q.    Okay.

11          A.    The standard thing is went up to the subject

12   using -- what we do I will put one knee on the back and

13   one knee near their shoulder and we get one arm between

14   their legs.  That way they can't move.  I got the other

15   armed and handcuff him at which time they said we need to

16   get him out of here.

17          Q.    When you were doing this maneuver were you

18   worried about anything at that point?

19          A.    Yeah.  At that point I could see legs

20   sticking out from the front of the truck.  Someone's feet

21   and legs.

22          Q.    Were you concerned about that?

23          A.    At that time I said I can't see the driver's

24   hands.  I can't see anything front of the truck.

25          Q.    But you came to the left?

46

1        A.    Left side, yes.

2        Q.    Whether that guy is the driver or passenger

3   you don't know?

4        A.    They just said there is a subject on the

5   driver side of the vehicle we could see.

6        Q.    Then what happened?

7        A.    At that time once the subject was cuffed --

8        Q.    So did you do it or -

9        A.    I handcuffed him, yes, at which time I think

10  Sergeant Barker just said we need to get him out of there

11  because we still couldn't see what the person in front of

12  the truck was doing.  We couldn't see any hands or

13  anything.  So what I did I just hooked one of his arms

14  into mine and just started to pull over off to the side of

15  the roadway so we could get behind the vehicle or get out

16  of the line of fire.

17        Q.    After that were you assisted by other

18  officers?

19        A.    After a few more minutes officers came over

20  and we got the subject to where the grass and the roadway

21  meet.

22        MR. MARTINEZ:  No other questions.

23        THE COURT:  Cross.

24

25                      CROSS EXAMINATION

47

BY MR. SHELL:

Q.   Okay.   The night that happened you are working in the Gilbert area; correct?

A.   Yes.

Q.   And during that time frame you hear some radio communications about what had happened over at Baseline and Val Vista; correct?

A.   Yes.

Q.   And then you hear some radio communications from Officer Betts; right?

A.   After I had already arrived in that area of Val Vista and Baseline.

Q.   After that you heard some radio communication from Officer Betts; correct?

A.   Yes.

Q.   And what Officer Betts says on the radio is that, quote, he's in pursuit and he's taking fire.   Yes?

A.   I heard him say he was taking fire.   I didn't hear him say he was in pursuit.

Q.   Did you write a police report?

A.   Yeah.   I wrote a supplement.

Q.   Is that a police report?

A.   Yes.

THE COURT:   Counsel, can you approach real quick?

(Bench discussion was had off the record.)

48

Q.   BY MR. SHELL: Let me show you what's marked Exhibit 119.   Do you recognize that?

A.   Yes, sir.

Q.   First page.   Does your police record report reflects that Officer Betts radios that he is in pursuit and taking fire?

A.   Yes.

Q.   All right.   And whether somebody says they are in pursuit, that means that they are chasing the vehicle; correct?

A.   Yes.

Q.   Both the vehicles are moving; correct?

A.   Yes.

Q.   And your report reflects that he radios he is in pursuit of the vehicle and he is taking fire; correct?

A.   Yes.

Q.   He didn't say we are stopped and I am taking shots?

A.   No.

Q.   You get on this chase.   You go up.   You are at the Top Of The World; correct?

A.   Yes.

Q.   When you first get there you get out of your car; correct?

49

A.   Yes.

Q.   And one of the first things that you see is the driver with his hands out the window; correct?

A.   Yeah.  I saw a subject, yeah.  I didn't know if it was the driver.  I just saw a subject on the driver side.

Q.   In the driver's seat?

A.   Yes.

Q.   Sticking his hands out the window?

A.   Yes.

Q.   Like he's giving up; correct?

A.   Yes.

Q.   And then you start approaching?

A.   Yes.  Well, at that time we were still behind cover.

Q.   Understood.  But you started working your way up?

A.   Once he was outside on the ground.  But we were taking back behind positions of cover.

Q.   When you first get on the scene you see somebody in the driver's seat looked like they are giving up?

A.   Yeah.  I saw hands out the window.

Q.   Like they don't want anything more to do with this?

50

1        MR. MARTINEZ:  Objection; speculation.

2        THE COURT:  The objection is sustained.

3        Q.   BY MR. SHELL:  At what point do you hear the

4   gunfire?

5        A.   As I was making my way up to the front is

6   when I heard the gunfire.

7        Q.   And that's after you saw the person in the

8   driver's seat stick their hands out the window?

9        A.   I didn't see that until I got up to the line

10  and they started yelling cease fire.

11       Q.   When you get up, is this the person that you

12  saw sitting there on the driver's side that you arrested

13  and put into handcuffs?

14       A.   I wasn't able to recognize anything until I

15  got closer.

16       Q.   Is this the person that you put the

17  handcuffs off and pulled off to the side the road?

18       A.   Yes.

19       Q.   Did he put up any fight?

20       A.   Just we had to numerals times to tell him to

21  turn away from us to try to get his hand out to where

22  would could see him in plain sight.  Numerous commands

23  were given.

24       Q.   And he was following all of those; correct?

25       A.   First he wouldn't turn away.  We kept

51

1    ordering him to turn his face away from us which is

2    standard when we take a suspect into custody like that the

3    training what we do.

4           Q.   Where do you say that in your police report?

5           A.   I don't believe it s in my report.

6           Q.   Well, read it.

7           A.   Yeah, I didn't write it in mine.

8           Q.   Right.  What you say is that as you are

9    moving up, you can see his hands; correct?

10          A.   His hands were off to his sides at first.

11   I couldn't see what would be his right arm.  I wasn't able

12   to see that based on where I was.

13          Q.   Does your police report say, quote, I was

14   able to observe his hands and did not see a weapon at this

15   time?

16          A.   No.  I just put in there I was not able to

17   see the suspect or if he had a weapon.

18          Q.   All right.  Go to the second page, fourth

19   paragraph down.  It is actually the third complete

20   paragraph.  Does it start out by saying, quote, I was able

21   to observe his hands?

22          A.   Yes.  That's what I was --

23          Q.   And did not see a weapon?

24          A.   That's when I was five feet away from him.

25   As we were moving up I couldn't.

52

Q.   All right.   And there was officers yelling at him; correct?

A.   Yes.

Q.   Telling him to crawl out.

A.   There was numerous officers yelling different commands.

Q.   So there was all kinds of officers telling him to do different things?

A.   Most of the officers first were yelling just to turn away and face away from.   Officer Betts was yelling because he was to my left.

Q.   Was the officers yelling at him to crawl?

A.   That I am not aware of.

Q.   When you first get on the scene and you see him with his hands out the window he's yelling; correct? Do you hear him screaming things?

A.   Yes.

Q.   What was he screaming?

A.   It was hard to hear over the sirens and stuff like that.   At one point I believe I might have heard him yell "don't shoot."

Q.   "Don't shoot"?

A.   But other than that I couldn't hear anything over the numerous sirens that we had behind me.

Q.   So you get up to him.   You can see his

53

1    hands.

2              A.    He doesn't have a weapon.   You run up to him

3    and you, according to your report, put your knee on his

4    neck; correct?

5              A.    Yes, ma'am.

6              Q.    Then you handcuff him.   And at any time did

7    he try to pull his arms away from you?

8              A.    No.   At that time his one arm was locked in

9    between my legs and I as able to get his left arm.

10             Q.    So he didn't struggle with you?

11             A.    We kept saying get your hands behind your

12   back and that he wasn't.

13             Q.    Where is that in your report?

14             A.    I didn't place it in there.

15             Q.    He didn't struggle with you?

16             A.    When I first got his arm he wouldn't and it

17   took a couple seconds to get his other arm behind his

18   back.

19             Q.    You handcuffed him?

20             A.    Yes.

21             Q.    At that point so there is somebody else on

22   the other side of the truck; correct?

23             A.    Yes.

24             Q.    And you dragged him.

25             A.    Yes.   We pulled him off to the side of the

54

4

5

1    road behind the first patrol car that we had moved off.

2            Q.    The police report reflects that as you

3    approached the vehicle the suspect was ordered to climb

4    out of the vehicle and lay on the ground.

5            A.    Climb away from it or we are trying

6    basically ato get him farther away from the vehicle.   We

7    knew there was another suspects in front of the vehicle so

8    we were trying to separate him from the vehicle.

9            Q.    Go to page 3 of your report, third paragraph

10   last sentence.  Does your police report say, quote, as I

11   approached the vehicle the suspect was ordered to climb

12   out the vehicle and lay flat on the ground.

13           A.    Yes.   There was officers yelling commands at

14   him.

15           Q.    So now officers were yelling at him to climb

16   away from the truck?   Crawling away?

17           A.    Crawl away, climb towards us.

18           Q.    And that's what he did?

19           A.    From what I could see.   I was still behind

20   the cover.   I wasn't yelling the commands.

21           Q.    Well, when you went up an and arrested him

22   and put the handcuffs on him, was he still where he was

23   originally?

24           A.    Approximately three, four feet away.

25           Q.    So he crawled?

55

A.    Yes.   He had moved away from the vehicle.

MR. SHELL:   Nothing further.

THE COURT:   Redirect.


REDIRECT EXAMINATION

BY MR. MARTINEZ:

Q.    With regard to the police report, is it the purpose to write down every single eyelash movement that you saw?

A.    No.

Q.    What is the purpose of a report?

A.    Just for our memory and stuff.   The point we were actually -- at first we were not told to write a report.

Q.    Just, again, what is a report?

A.    Just information that I observed or what I did.

Q.    Is if more of a summary?

A.    Yes.

Q.    With regard to what Officer Betts may have said, do you recall what he told you at that time that prompted you to begin going Code 3 with lights and siren?

A.    The first thing is when I heard he said he was saying shots fired.   My first thing was start heading --

56

Q.    Immediately after that, did he tell you something else?

A.    He had notified dispatch he was now in pursuit and where he was going and at what speeds.

MR. MARTINEZ:  No further questions.

THE COURT:  Does the jury have any questions for this witness.  Thank you.  You are excused.  We are going to take our lunch break.  Please be ready to come back into the courtroom at 1:30.  Remember the admonitino over the lunch hour.

(The jurors exited the courtroom.)

THE COURT:  Everyone, go ahead and take a seat, please.  The record will reflect the presence of counsel and the defendant.  Before we break for lunch I want to make a record.  Mr. Shell, I asked you at bench not to mutter expletives loud enough for me to hear when you are muttering them under your breath from counsel table.  I want to put that on the record because I don't want it to happen again.

MR. SHELL:  I apologize.  I didn't think I said it out loud.

THE COURT:  You did.  I also going to talk to the folks sitting behind you.  I undersatnd that this is an emotional trial for you.  If I hear you say again that doesn't make sense or nodding or shaking the head, every

57

1    time somebody says something adding to testimony, I am

2    going to not let you stay in the courtroom.

3            MR. SHELL:  Your Honor, I would like the record

4    to be clear.  I am going to request that the State provide

5    Officer Betts with a copy of his recording of his

6    interview and a copy of his transcript so he can review

7    that so that when they rest I can call him in my case and

8    we can go through this transcript and the recording to

9    make sure that the issue that I think is very relevant to

10   this case is firmly in front of the jury.

11           THE COURT:  You made the record.  Whether he

12   agrees to do that or not I will leave t to the two of you

13   informally to decide, or if you aren't able to formally

14   decide to show me some authority that he has to do that, I

15   will read that.  Thanks.

16                   (Lunch recess.)

17           THE COURT:  The record should reflect the

18   presence of counsel and the defendant but not the jury.

19               I don't know if our entire jury is here.  I

20   think our entire jury is here.  We are ready to go.  Mr.

21   Martinez in the case he's got going in Judge Barton I know

22   they are waiting for everybody to arrive so they can take

23   a verdict in that case.  Someone from her staff is going

24   to stick their head in here when everybody is here except

25   for you, we will take a break, whether that's five minutes

58

1    or whatever an hour from now.  But I want to start as

2    quick as possible.

3          MR. MARTINEZ:  Thank you.

4              (The jurors entered the courtroom.)

5          THE COURT:  Go ahead and take a set.  Good

6    afternoon.  The record ought to reflect we have been

7    re-joined by the jury.  I expect we are going to be a

8    little bit -- we have a conflict in our schedule so we are

9    going to go for a few minutes maybe a half hour, and then

10   we will need to take another break and then we will have

11   our normal longer regular afternoon break in a while but

12   we are doing our best with the schedule.  Please forgive

13   us of our shortcomings.  Mr. Martinez, will you call your

14   next witness?

15         MR. MARTINEZ:  The State calls John Tew.

16

17              JOHN TEW,

18   called as a witness herein, having been first duly sworn,

19   was examined and testified as follows:

20

21              DIRECT EXAMINATION

22   BY MR. MARTINEZ:

23         Q.   Your name, sir?

24         A.   John Tew.

25         Q.   Who do you work for?

1          A.   I work for the Arizona Department of Public

2     Safety in the crime laboratory.

3          Q.   And specifically what area of the crime lab

4     do you work in?

5          A.   I work in the fire and tool mark unit.

6          Q.   And how long have you been in that unit?

7          A.   With DPS now just a little over seven years.

8          Q.   And with regard to handguns, if a handgun

9     fires a bullet, is there away to compare, number one, the

10    bullet that is expended out of the barrel of the gun?

11         A.   Yes, sir.

12         Q.   Would that be more common with what is known

13    as the jacket portion or the led portion of the bullet and

14    then explain to me what each are.

15         A.   It depends on how the bullets actually is

16    designed.  Many bullets are designed with a head core and

17    if has copper jacket.  So, it's the exterior portion of

18    the bullet that I am looking at that is engaged or taken

19    the ortion of the riffling on the barrel so it's generally

20    the jacket.  However, there are some bullets that are just

21    led only, so then you would just look at the led portion.

22         Q.   With regard to the identification work that

23    you may do, is it in the barrel that actually leaves the

24    unique imprint on the either jacket or the core as it's

25    leaving the barrel that allows you to make that comparison

60

and identification?

A.   specifically the bullets, yes.   The barrel is going to leave its markings on the projectile or bullet.

Q.   How about casings?   What is a casing?

A.   A cartridge case or a casing is the portion that's actually holding the bullet.   But also in the cartridge case there as primer which is a small little area on the back of the cartridge case.   It has a little built of explosive in it that when the firing pin that explodes, ignites powder which the cartridge case also holds that gives as a generated pushing the bllets down. So many the cartridge casing has multiple parts to it. Powder and the primer as well as it's going to hold the projectile there or the cartridge casing has also markings that the gun, depending upon the type of gun, markings that the gun will impart on the cartridge casing.

Q.   Let's take a look at an exhibit already in evidence.   It is Exhibit No. 109.   Take a look at Exhibit No. 109 and 109.001.   Are you familiar with that?

A.   Yes, sir, I am.

Q.   And is this something that you worked with?

A.   This is something that was submitted and I worked with.

Q.   What is it?

61

A.     It is a single item.   There is two items
within it.   One is the revolver that was submitted to me
as an empty JMH 85, and the other are both cartridge cases
as well as cartridges.   A cartridge is a full unit of
ammunition and it has all of the parts.   It has the bullet
the powder and the primer and unfired.   The cartridge case
is the empty which it's been burned and the bullet is down
here or wherever it went.   So I have both of those items
here that were submitted to me plea.

Q.     Are you familiar with the term single
action?

A.     Yes.

Q.     What does that mean?

A.     Single action what occurs with firearms when
you pull the trigger, the hammer falls.   There is only a
single action occurring.   The hammer has been either
previously cocked, manually or by function of how the
firearm operation rates.   You pull the triger and the
hammer falls.

Q.     Double action, what's that?

A.     Double action, the pull of the trigger early
actually performs two actions.   It both cocks the hammer
and fires it.

Q.     The gun that you have in front of you, is
that a revolver?

62

A.   Yes, that's a revolver.

Q.   Is that a single action or a double action or both?

A.   It is both.

Q.   Why don't you show us the mechanisms and as you do that single action and double action?

A.   With this specific firearm?

Q.   Yes.

A.   Okay.  I am going put on gloves.

Q.   All right.  With regard to this item being single action, why don't you show us what that's about?

A.   A single action with this firearm is again a single pull of the trigger only does one function.  It drops the hammer.  So on this firearm you have to manually cock it so I am going to do that.  I have previously examined it.  It's unloaded, pulling the trigger now.  is a single function so that's a single action just pulling the trigger.

Q.   With regard to the single action, can you tell me how much pressure it takes to pull the trigger on that gun in the single action mode?

A.   This firearm in single action mode takes between 4 and a half and five pounds of pressure in order to fire this firearm.

Q.   All right.  Nowm contrast that with double

63

action?

A.   Double action again when I pull the trigger two things are going to happen.  I manually -- I cocked the hammer and fires it.  That does require more poundage because it's not pre-cocked.  So a double action trigger pull is me pulling the trigger.  You will notice the hammer cocking.  I will need to rotate the cylinder first.  This prevents my normal function.  So as I pull the trigger you will see the hammer cocking and fire.  So that requires more of a trigger pull.

Q.   And how much pressure or trigger pull is required for that?

A.   With this firearm it takes between 12 and 12 and a half pounds in order to pull the trigger in double action.

Q.   So, in other words, what you are saying double action unless somebody puts between a minimum of 12 pounds of pressure on the trigger that gun is not going to fire?

A.   That's correct.

Q.   Does that have a safety on it if you are familiar with that?

A.   If this firearm has rebound safety but that only goes into effect after I have pulled the trigger.  Basically, the firing pin rebounds out so that it is no

64

7

1    longer poking through but the safety mechanism on this is

2    basically the user.

3           Q.    All right.  Go ahead and put that back.  Did

4    you have occasion to -- to compare Item 106 to that gun to

5    see whether or not this was fired in that gun?  And again

6    tell us what it is and whether or not it was fired.

7           A.    Yes, sir.  I do recognize this.

8           Q.    First of all, what is it?

9           A.    This is a fired projectile or a bullet that

10   was submitted to me as Item 213008.

11          Q.    Previously we talked about the core and the

12   jacket.  And you said bullet.  Is that the core or the

13   jacket or is it both?

14          A.    This is both.  The jacket is the external

15   copper colored exterior, and then there is a core that you

16   can see on the bottom that's led or gray in color core

17   interior portion, so the core is in here as well as the

18   jacket.

19          Q.    If, for example, a bullet is fired and it

20   goes through a medium, whatever that medium may be, is

21   there a possibility or is it consistent with breaking up

22   portions of it and then still continuing on as bullet?  Is

23   that possible?

24          A.    Absolutely, yes, sir.

25          Q.    Can you tell by looking at that bullet

65

1    whether or not there is any pieces of it I guess that

2    broke off upon impact?

3        A.    Yes.   Visually you can see that it is

4    apparent that pieces are missing.

5        Q.    With regard to that bullet that you have in

6    your hand, were you able to compare it to the one that we

7    just looked at?

8        A.    Yes, I was.

9        Q.    And were you able to make a deerminatin

10   whether or not that bullet was fired in that gun?

11       A.    I was.

12       Q.    And what was your conclusion?

13       A.    My conclusion is that this bullet was fired

14   from this firearm.

15       Q.    This firearm.   What's the caliber of it?

16       A.    It is a .357 Magnum or a .38 Special.   It

17   will fire both of those.

18       Q.    And equally as well without malfunctioning?

19       A.    That's correct.

20       Q.    If you don't mind repackaging those.

21       THE COURT:   Mr. Martinez, when you get to a

22   stopping point.

23       MR. MARTINEZ:   I think this is a good point.

24       THE COURT:   We are going to take a break for

25   probably 10 or 15 minutes.   Remember the admonition.   We

66

1    will start up again as soon as we are able to.

2                    (The jurors exited the courtroom.)

3                    (Recess taken.)

4            THE COURT:  Go ahead and take a seat.  The record

5    reflects the pesence of counsel and the defendant and not

6    the jury.

7                    I got a note from Camille.  One of our

8    jurors has a doctor's appointment on Monday the 19th of

9    July, can't be here until 11:00 o'clock.  Given our tight

10   schedule, my suggestion would be that we -- and the fact

11   that we have got three alternates, my suggestion would be

12   that we wait until that Monday the 19th and then at that

13   point we still have three alternates that she be

14   dismissed.

15           MR. MARTINEZ:  I agree.

16           MR. SHELL:  If she is not here at 10:30.

17           THE COURT:  Right.  Any objection?

18           MR. SHELL:  No.

19           THE COURT:  Tell her we will take it under

20   advisement and let her know as soon as we can.

21           THE BAILIFF:  Okay.

22           THE COURT:  Anything to put on the record.

23           MR. MARTINEZ:  Something did happen and I do need

24   to put it on the record.  It was Officer Betts testified.

25   He's a victim, and there was this issue involving whether

67

8

1    or not he should read that transcript. As we broke,

2    defense counsel Mr. Shell, walked out, and I heard while I

3    was sitting here I heard him say, Betts. He didn't say

4    Officer Betts. He just said Betts. When he went out

5    there I didn't hear what he said, but now I am getting it

6    from Officer Betts, but I did go out there.

7                Mr. Shell gave Officer Betts, who is the

8    victim under Rule 39, a card, his card, and indicated to

9    him that he should call him so that they can get together

10   ostensibly to work on this discovery issue.

11               THE COURT: Okay. This is something that doesn't

12   sound like it needs to have immediate attention of the

13   Court right now since we have a jury out. It is something

14   that I would like to take up a little later.

15               MR. MARTINEZ: Thank you.

16               THE COURT: Go ahead and bring them in.

17                   (The jurors entered the courtroom.)

18               THE COURT: Please be seated. The record should

19   reflect we have been re-joined by the jury. The witness

20   is still on the stand under oath.

21               Mr. Martinez, when you are ready.

22          Q.   BY MR. MARTINEZ: Sir want you to take a

23   look at Exhibit No. 120. Why don't you open it and see if

24   you had occasion to work with that?

25          A.   Yes, sir, I have had occasion to work with

68

this item.

Q.   What is it?

A.   This is what was submitted to me as Item MT 19.   It is a Smith & Wesson Model 19-5, .357 Magnum caliber revolver.

Q.   Could it also be called a .38?

A.   A .38, yes, sir.

Q.   And with regard to this one did you also conduct the same test that we talked about specifically a single action trigger pull?

A.   Yes, I did.

Q.   And what was the weight?

A.   The single action trigger pull again manually cocked, so it is just a pulling the trigger.   The hammer follows.   The weight was 3 to 3 and a half pounds.

Q.   How about double action?

A.   Double action again pulling the trigger both cocks and fires.   The double action trigger pull on this firearm was 10 to 10 and a half pounds.

Q.   With regard to that did you have occasion to compare Item 101 to see whether or not this handgun fired it?

A.   Let me look at this.   Yes, I did compare this to that.

Q.   What is that that you have in your hand?

8

1          A.    This is a led projectile.  This is a solid

2    led.  There never was copper jacketed on this.  This was

3    obviously a mangled version, a heavily damaged version of

4    what a led projectile.  Obviously would be like if it was

5    not jacketed.

6          Q.    Did you compare it to that gun to see

7    whether or not it had been fired?

8          A.    Yes.

9          Q.    What was your conclusion?

10          A.    My conclusion is that the class

11    characteristics meaning how many different riffling are

12    there five or are there 6, the width, the caliber of it.

13    The class characteristics matched but the bullet is just

14    so damaged there are no individual characteristics which

15    would say this is the firearm that fired it.  It is just

16    general characteristics.  They all matched, but there were

17    no individual characteristics.  So my ultimate conclusion

18    is inconclusive.  I cannot come up with if it was or it

19    was not.

20          Q.    But you say it could have been fired from

21    that?

22          A.    That's one of the options.

23          Q.    And you are also saying it could not have

24    been fired from that?

25          A.    That's correct.

70

8

Q.   And you say there is a matching, if you

will, but they are of class characteristics associated

with the type of handgun that you have there; right?

A.   That's correct.

Q.   And the class characteristics that we are

talking about are the lands and groovs that are in the

barrel?

A.   Lands and grooves, the direction that they

twist.  You can twist them to the left or the right.  The

manufacturer just chooses this, yes, and also the caliber.

Q.   And this one, how many lands and grooves

does it have?

A.   On this actually projectile it was too

damaged.  You could just see a single one.  However, the

actual measurement and caliber is consistent with the

pistol MT 19.  It has five lands and grooves, right-hand

twist, and this projectile is consistent with that.

Q.   Can you tell by the weight of that

projectile the caliber was or not?

A.   It will definitely help you narrow things

down.  Different calibers have different weights of

bullets, so it will help narrow it down.  But just a

single weight I can't guarantee that I am going to get the

caliber, correct.

Q.   So as I understand it, you can include it

71

9

1  and you can't exclude?  You can't include it or you can't

2  exclude it?

3          A.   That's correct.

4          Q.   Take a look at Exhibit No. 110.  Have you

5  had occasion to deal with that at all?

6          A.   I do not recall.  None of my marks are on

7  this, and this is not familiar to me.

8          Q.   If you take what you have -- owe what's the

9  exhibit for the gun there?

10          A.   120.

11          Q.   Is that a sort or a long barrel?

12          A.   This is a long barrel.

13          Q.   If you could take it out and see, does that

14  long barrel fit or is able to be placed inside of that

15  holster that I have in front of me?

16          A.   Shall I take the gun out and place it in

17  there or are you just saying in general?

18          Q.   Sure.  Is it consistent with being carried

19  by that holster?

20          A.   This firearm fits properly in this holster.

21          Q.   It appears there is a little strap there.

22  Do you see that?

23          A.   Yes, sir.

24          Q.   Does that strap have the ability to come

25  down and buckle?

72

9

1        A.    Yes, it does.

2        Q.    The other item that we had, the Exhibit No.

3  109, the other handgun, in terms of the holster, given

4  your expertise and experience, which are the two most

5  closely is consistent with that holster?

6        A.    Oh.   Clearly, this one just due to the

7  barrel length.   The other one is a short two-inch barrel.

8        Q.    And what's the length of that barrel?

9        A.    The actual length of this barrel is 5 and

10  7/8 inches so a 6-inch barrel.

11       Q.    If you could sort of take it apart and place

12  that back in the box.

13             With regard to the gun that's Exhibit No.

14  120, in terms of the cylinder itself, did you get occasion

15  to look at that to see what the condition of that cylinder

16  was?

17       A.    Yes, I did.

18       Q.    And what were you able to determine?

19       A.    The cylinder as well as the gun in general

20  had fairly extensive, you know, some sort of rash damage

21  to it.   The cylinder itself I took photographs and I

22  documented it as well as on the actual gun itself I took a

23  silver sharpie and it indicates there is an area where

24  where mental was actually plowed up and actually the

25  cylinder rotates as you cock the hammer and pull the

73

9

10

1    trigger to the point where it actually comes underneath

2    the top trap.   Normally that stops there.   You can

3    manually cock it if you remember pulling the trigger it

4    would hesitate in there.   So I documented that there was

5    plowed metal in this area and took a photograph to show

6    there was some sort of physical damage to the cylinder.

7         Q.   Is that consistent with a strike of some

8    sort on the cylinder?

9         A.   Yeah.   Something would have had to struck

10   the metal.   It is made of steel, fairly hard in order to

11   plow that metal up.

12        Q.   Is that consistent -- for example, would be

13   either thrown or dropped out of a moving vehicle onto for

14   example asphalt freeway kind of material?

15        A.   Yes.   As well as all the other significant

16   damage on the firearm, yes.

17        Q.   And when you say all the other damage are

18   you talking about the tumbling sort of effect or what?

19        A.   Well, there is damage all the way from the

20   butt of the gun all with the way to the muzzle of the gun

21   visually apparent as well as on the actual rubber grip you

22   can see there is some sort of shearing rash-type damage as

23   if it was either tumbling or some sort of significant

24   damage to that firearm.

25        Q.   Go ahead and close it up for me, please.   .

74

MR. MARTINEZ:  I don't have any other questions.

THE COURT:  Cross.

MR. SHELL:  I don't have any questions.

THE COURT:  Does the jury have any questions for this witness?  All right.  Thank you, sir.  Mr. Martinez, your next witness.

MR. MARTINEZ:  The State calls Melissa Kingsley.


MELISSA KINGSLEY,

called as a witness herein, having been first duly sworn, was examined and testified as follows:


DIRECT EXAMINATION

BY MR. MARTINEZ:

Q.   May I have your name, please?

A.   Melissa Kingsley.

Q.   Who do you work for?

A.   The Gilbert Police Department.

Q.   What do you do for them?

A.   Dispatcher.

Q.   And, generally speaking, as dispatcher what are your duties?  What do they include?

A.   Checking for valid driver's license on a traffic stop, valid vehicle information and warrants.

Q.   Are you the person who actually answers the

75

10

1    911 calls, or do you do another sorts of functions?

2         A.   We can do both.

3         Q.   I am not asking you specifically, but do you

4    answer 911 calls?

5         A.   Not typically.

6         Q.   But have you done that in the past?

7         A.   Yes.

8         Q.   Drawing your attention back to January 28th

9    of 2010, were you working sometime after 10:30 in the

10   evening?

11        A.   Yes.

12        Q.   And what were you working on or what area

13   were you working in?

14        A.   It was Dispatch Channel 2, which is our

15   information channel.

16        Q.   When you tell me Channel 2, it appears that

17   there is a Channel 1.  Is there a Channel 1?

18        A.   Yes.

19        Q.   What does Channel 1 do?

20        A.   The primary function is for to send officers

21   to calls and to take officers when they pull traffic, to

22   put them on their traffic stops.

23        Q.   So, for example, let's say an officer is

24   about to pull somebody over for whatever reason, traffic

25   violation of some sort, would they call in necessarily to

76

10

1   the Dispatch center to let the Dispatch center know what

2   they are doing?

3        A.   Yes.

4        Q.   That call that they initially make, would

5   that come in on Channel 1 or Channel 2?

6        A.   Typically it is Channel 1.

7        Q.   I am talking typically, generally.  How is

8   it then that if a call into Channel 1 -- how is it then

9   that you become involved?

10       A.   The officer then switches his radio to

11  Channel 2 to run the people in the vehicle or the vehicle

12  to look for warrants and valid information.

13       Q.   So it is a different function that you do on

14  Channel 2 then?

15       A.   Yes.

16       Q.   When you say that he calls in, is it a cell

17  phone kind of call, or is it some other kind of way that

18  he communicates?

19       A.   It is via his radio.

20       Q.   And these radio calls, are they recorded

21  every time that they come in?

22       A.   Yes.

23       Q.   And as part of doing business for the

24  Gilbert Police Department, is that something that they do

25  on an ongoing basis all the time?

77

A.   The recordings?

Q.   Yes.

A.   Yes.

Q.   Is it done with regard to every call?

A.   Yes.

Q.   Are they then stored in the normal course of business after every time that they call -- after a call is made?

A.   Yes.

Q.   And the information that's provided on these calls, is it being recorded at the time that the officer is calling and at the time that you, for example, are providing the information?

A.   Yes.

Q.   In this case you told us you were not operating Channel 1; right?

A.   Correct.

Q.   But you are familiar with it as it applies to this case; right?

A.   Yes.

Q.   And with regard to officer or Lieutenant Shoehandler, what time did he call in initially on Channel 1?

A.   10:42.

Q.   And what kind of call was it that he called

78

10

1    in on?

2         A.    A traffic stop.

3         Q.    Any other information that he provided?  Did

4    he provide any other information?

5         A.    Only that he couldn't read the plate.

6         Q.    Okay.  And after that, did he then switch

7    over to your channel?

8         A.    He did.

9         Q.    When did he switch over to your channel?

10   What time?

11        A.    10:49.

12        Q.    So initially he made the stop or the call at

13   what time again?

14        A.    10:42.

15        Q.    If you know this, and if you don't let me

16   know.  Do the officers typically make the call on Channel

17   1 of the stop before they make the stop, during the stop,

18   or after the stop?

19        A.    It would be an assumption.

20        Q.    So, anyway, he made the call to you at

21   10:42; correct?

22        A.    Correct.

23        Q.    And then you get involved at what time

24   again?

25        A.    10:49.

79

11

1     Q.   So that's how many minutes later?

2     A.   Seven.

3     Q.   And when he made the call to you, was

4  there a recording made?

5     A.   Yes.

6     Q.   And does it include your responses and why

7  you were responding the way you do?

8     A.   Yes.

9     Q.   And does it also include everything or the

10 clip that we have here up until the time that you no

11 longer corresponded with him; correct?

12    A.   Yes.

13    Q.   And does include the time on there?  From

14 your memory, does it include at least real time from the

15 time he called at 10:49 with you until the communication

16 ended is real time on the tape; correct?

17    A.   Yes.

18    Q.   That will give us a definite or an exact

19 time as to when things happened; correct?

20    A.   Yes.

21    Q.   And you reviewed this Exhibit No. 121?

22    A.   I have.

23    Q.   Did you review it prior to coming to court?

24    A.   Yes.  Multiple times.

25    Q.   What does it include?

80

A.   It includes my interaction on the radio with Lieutenant Shoehandler.

Q.   Does it start at 10:49?

A.   Yes.

Q.   And does it end with you asking or looking for a Lincoln 1?

A.   Lincoln 2.

Q.   Lincoln 2.

MR. MARTINEZ:  I move for the admission of 121.

MR. SHELL:  No objection.

THE COURT:  121 is admitted.

Q.   BY MR. MARTINEZ:  Do you know how long this tape lasts, in other words, until you started saying Lincoln 2?  Do you know?

A.   I honestly don't.

Q.   Let's go ahead and play it.  And if you could hold it up to the microphone.  Let me get it started.

(Playing the tape.)

Q.   Who was that?

A.   That was Lieutenant Shoehandler.

Q.   What is he asking you?

A.   To run a driver's license or a person, I don't know, if he had a driver's license.

Q.   And what person is he asking you to run?

81

11

1    A.    Daimen -- sorry.

2          (Playing the tape further.)

3    Q.    What is he asking you to run there?

4    A.    Christopher Aredondo.

5    Q.    And he asked for it at the same time?

6    A.    Yes.

7          (Playing the tape further.)

8    Q.    What did you ask him?

9    A.    If he had a 28, which is the license plate.

10         (Playing the tape further.)

11   Q.    Is that related to this call?

12   A.    Yes.

13   Q.    And what's going on here?

14   A.    I am telling him that the first subject he

15   ran which was, I am sorry, had a valid driver's license,

16   and gave him the expiration date.

17         (Playing the tape further.)

18   Q.    What was that blurb?  Did you hear that?

19   A.    Yeah.

20         (Playing the tape further.)

21   A.    Oh.  He was acknowledging me, 104, okay, I

22   believe is what that is.

23         (Playing the tape further.)

24   Q.    What did you just say?  What are you doing?

25   What are you telling him?

11

1      A.   I am telling him that there is a sound alike

2   which means the computer shows me a record that indicates

3   there is a possible warrant for a person who has similar

4   name or date of birth to somebody that I ran.

5           (Playing the tape further.)

6      Q.   And that's his response; correct?

7      A.   Yes.   10-4.

8           (Playing the tape further.)

9      Q.   What is that?   What are you saying there?

10      A.   I am telling him that the sound alike is for

11   a Cruz Redondo, and then I give him the physical

12   descriptors of the person that has the warrant, their date

13   of birth, and then tell them what the warrant is for.   It

14   is non-extraditable out of DPS.   I think it is Casa

15   Grande, and I think failure to appear for window tint.

16      Q.   But, again, that's not Christopher.   That's

17   a sound alike?

18      A.   Correct.

19           (Playing the tape further.)

20      Q.   What is that?

21      A.   He's telling me he doesn't know if the sound

22   alike matches the person he has.   He said he's going to

23   pull him out of the vehicle.   Send him a backup.

24           (Playing the tape further.)

25      Q.   What's this with the open mics?   What does

83

11

1    that mean?

2           A.    It means the button that they press to talk

3    to us was being held down, but he wasn't talking to me.

4           Q.    And does this require a volitional movement

5    on the part of the officer or somebody at the other end to

6    actually push it?

7           A.    Yes.

8           Q.    So it's not a situation where it does it on

9    its own or anything like that?

10          A.    No.

12

11          Q.    And with regard to you cutting in, is that

12   something that the dispatchers only have the ability to

13   do?  In other words, if he's got a mic, how is it that you

14   are cutting in?  Do you see what I am saying?

15          A.    It is a two-way radio.  We can still go out

16   over the top of their radio.

17          Q.    Can they go over the top of you or not?

18          A.    They can.  I am not quite certain how that

19   works.

20          MR. MARTINEZ:  Okay.  Thank you.  I have no

21   further questions.

22          THE COURT:  Any cross?

23          MR. SHELL:  No.

24          THE COURT:  Does the jury have any questions for

25   this witness?  Thank you, ma'am.  The State can call its

84

12

1        next witness.

2                MR. MARTINEZ:   The State calls Kenneth Burnside.

3

4                        KENNETH BURNSIDE,

5        called as a witness herein, having been first duly sworn,

6        was examined and testified as follows:

7

8                        DIRECT EXAMINATION

9        BY MR. MARTINEZ:

10               Q.   Your name, sir?

11               A.   Kenneth Burnside.

12               Q.   Who do you work for?

13               A.   The Superior Police Department.

14               Q.   What do you do for them?

15               A.   I am their K-9 officer.

16               Q.   Do you go your attention back to January

17       28th of 2010, were you on duty sometime around 11:00

18       o'clock in the evening?

19               A.   Yes, sir.

20               Q.   And did you have occasion to assist in a

21       pursuit that involved a number of vehicles going up on

22       U.S. 60?

23               A.   Yes.

24               Q.   And where were you when you became part of

25       this incident?

85

12

1      A.   When I became part of it I was at the
2   Superior airport mile marker 225.6.

3      Q.   And what is it that you were asked to do, or
4   what is it that you did?

5      A.   I was requested to put out stopsticks for
6   the vehicle being pursued.

7      Q.   Did you know what kind of car was being
8   pursued?

9      A.   I was just told a white and yellow truck.

10      Q.   What are stopsticks?

11      A.   Stopsticks are basically kind of like long
12   plastic triangle and inside the long plastic triangle have
13   holes in so when you run over them they embed in the tires
14   and stop the vehicle.

15      Q.   So a way to stop a vehicle?

16      A.   Yes.

17      Q.   Did you have some stopsticks that day?

18      A.   I got them from another patrol vehicle when
19   I found out about the pursuit.

20      Q.   And the stopsticks that you have, describe
21   for me how they work or how far they can be thrown and
22   specifically about yours.

23      A.   The ones that I retrieved from the here they
24   come in three, three-foot sections, so it is is an eight-
25   foot length that are connected together.  They are

86

12

1   supposed to be a pullcord at one end, but these did not

2   have one on them.

3          Q.   If we are talking about at that area that

4   you are, how wide was a one-way area, if you will?  Do you

5   know how many feet it was?

6          A.   Standard, I would say about 10 feet.

7          Q.   So as to the sticks if you use them will

8   only get one side of the road?

9          A.   Correct.

10         Q.   So you have these stopsticks and you say

11  there is no pullring to it --

12         A.   Usually there is a pullcord, but for some

13  reason the ones I grabbed did not.

14         Q.   What's the function of it?

15         A.   If you throw it out you can pull it back

16  right away so that pursuing vehicles get out of the way of

17  the other vehicles.

18         Q.   So if you don't have a pullcord, how can you

19  get it out of the way?

20         A.   I would have to go out and retrieve it from

21  the highway.

22         Q.   So, in other words, you have to make sure

23  that it is a careful exercise; correct?

24         A.   Correct.

25         Q.   So you get these and you go over to mile

87

12

1    marker I think you said 225?

2          A.    225.6.

3          Q.    .6

4          A.    Yes.

5          Q.    And why did you choose 225?

6          A.    I was actually going to go to mile marker

7    222 which is right where the U.S. 60 splits so there

8    wouldn't be any westbound traffic.  I contacted my chief

9    because he is the one who notified me of this in the first

10   place and he said stay near the airport just because of

11   the area involved.

12         Q.    And so what happened then?

13         A.    Because there was westbound traffic also and

14   there were pursuing vehicles I radioed dispatch that the

15   stopsticks would only be in the eastbound lane assuming

16   the pursued vehicle would be in that lane, and I had them

17   notify the other officers that were in the pursuit.

18         Q.    So you put them out and then you only put

19   them on the eastbound lane I think you said?

20         A.    Correct.

21         Q.    And how long after you put these out does

22   something happen?

23         A.    Actually I positioned my vehicle and because

24   I was being notified that they were shooting, I positioned

25   my vehicle so you couldn't really tell it was a police

88

12

1    vehicle, no lights or anything.  I stood behind it and

2    just waited for them for the pursuit to come in rain, and

3    at the last second I threw it out in in the road.  I

4    waited until the last second.

5         Q.    Why did you wait until the last second?

6         A.    Because I had no way of moving them once he

7    was through.

13

8         Q.    What happened then?

9         A.    I threw them out there, and at the last

10   second they swerved into the left lane and off to the

11   shoulder on the oposite side.

12        Q.    So, for example, as we are talking about a

13   road you were on the right-hand side of the road, correct.

14   if you are driving eastbound?

15        A.    If you are driving eastbound he was on the

16   south side.

17        Q.    As you put the stopsticks there, the truck

18   you said veered.  It didn't veer to the right.  It veered

19   which would be the south.  Did it veer to the north?

20        A.    Yes.

21        Q.    So would that include oncoming traffic?

22        A.    Yes.  He went into the oncoming traffic

23   lane, the westbound lane of traffic leading eastbound.

24        Q.    Are they shiny, these stopsticks?

25        A.    No.

89

13

Q.    I am talking about visually being able to see them.  Are they shiny or describe their appearnce.

A.    They are not shiny.  They are mainly black. They do have red and white stripes kind of like a barbers sign with the word stop in the center, but they are not reflective.

Q.    Oh, that's not reflective?

A.    No.

Q.    And when the vehicle went by, was it such a quick maneuver that it went careening over, or was it a controlled kind of evasive move as you saw it?

A.    It was pretty quick.  I didn't hear any tires screeching like he as out of control, but it was a quick movement to the westbound lane.

Q.    And then it came back to the eastbound lane?

A.    Correct.

Q.    As it went by did you notice anything unusual about it?

A.    Trailing behind the truck was an object, a large object that was on fire.

Q.    And did you then begin to follow the truck or what?

A.    I waited until there was a break in the pursuing vehicles.  They all went to the westbound lane and I went and and grabbed the stopsticks, and once I was

90

13

1   able to jump in the pursuit I did.

2       Q.   You know where the pursuit ended; right?

3       A.   Correct.

4       Q.   Were you able to make it all the way there?

5       A.   I made it all the way there.

6       Q.   And did you have anything to do with the

7   arrest or anything like that?

8       A.   Because I am K-9 I went up and I was going

9   to assist with the arresting -- with the person lying in

10  front of the truck, but another arrest team who had taken

11  one just to the left of the driver's side, they had a

12  better advantage so they continued on to arrest the second

13  subject.

14      Q.   So you were going a significance arresting

15  the person in the front of the truck, not the one to the

16  side?

17      A.   Correct.

18      MR. MARTINEZ:   I don't have any other questions.

19      THE COURT:   Cross.

20      MR. SHELL:   No questions.

21      THE COURT:   Does the jury have any questions for

22  this witness?  Thank you, sir.  The State can call its

23  next witness.

24      MR. MARTINEZ:   The State calls David Bishop.

25

91

13

DAVID BISHOP,

called as a witness herein, having been first duly sworn,

was examined and testified as follows:


DIRECT EXAMINATION

BY MR. MARTINEZ:

Q.   Your name, sir?

A.   Officer David Bishop.

Q.   Where do you work.

A.   I currently work for the town of Gilbert

Police Department.

Q.   And back in January 28th of this year who

were you working for then?

A.   Town of Gilbert Police Department.

Q.   What were your duties back on January 28th?

A.   On January 28th I was an acting sergeant,

and I am currently lead Officer.

Q.   And did you have occasion to assist in an

investigation involving the killing of Lieutenant Eric

Shoehandler?

A.   Yes, sir, I did.

Q.   Where were you when you first had a call to

this case or involving this case, to be involved in this

case?

A.   I was at the Gilbert Police Department

92

13

1    station.

2         Q.    And what happened?

3         A.    I was at the station and I was listening to

4    the lieutenant's traffic stop.  I was in my vehicle at the

5    time, so I was able to listen to both channels, Channel 1

6    and Channel 2.  When I heard the officer down call I

7    responded to his location.

8         Q.    And what location was that?

9         A.    Val Vista and Baseline.

10        Q.    Did you like make it there or what happened?

11        A.    While en route an officer on-scene with the

12   lieutenant advised he had enough units there just as I had

13   arrived, so I began attempting to locate the suspect.

14        Q.    When you say that you had an ATL, which

15   is -- that's an acronym.

16        A.    Attempt to locate.

17        Q.    And how were you going to go about

18   attempting to locate the suspects?

19        A.    Basically just look the surface streets

20   nearest the freeways in the area.  You just patrol in an

21   orderly fashion where you think the suspect may have gone.

22        Q.    And what happened next?

23        A.    While looking for the suspect I had heard

24   Officer Betts on his radio come up staying that he may

25   have found the suspects' vehicle.

93

14

Q.    And where were you when this radio call came out?

A.    I was in the area of Baseline going eastbound from Val Vista towards Greenfield.

Q.    And is Greenfield east of Higley?

A.    I believe it is west of Higley.

Q.    Then what happened?

A.    I heard Officer Betts give a description, and I recall from listening he gave a description of the suspects' vehicle and a license plate, and I had recalled while listening to the lieutenant's traffic stop, he had also given a description of the vehicle and an initial character of the license plate. After hearing Officer Betts give the description, I told on the radio that that sounds to be the same vehicle that the lieutenant had stopped as well as the initial character of the license plate Officer Betts gave matched that of what the lieutenant gave.

Q.    And what was that character?

A.    C, Charles.

Q.    All right. What happens then for you?

A.    Well, while Officer Betts gave his location, so I started to head to his area to assist him. While doing so he had called out that shots fired and that the suspects had opened fire on him, and then he gave a

94

14

1    description location saying they got on the freeway

2    heading eastbound on the 60.

3           Q.    What did you do?

4           A.    I pursued.   I went only the freeway and

5    began pursuing as well.

6           Q.    And where did you get on the freeway?

7           A.    I got on the freeway at Greenfield.

8           Q.    And I believe you told us that's west of

9    Higley?

10          A.    Yes.

11          Q.    When you got on the freeway, what did you

12   see?

13          A.    I saw lots of police vehicles from multiple

14   sits, what we call Code 3 eastbound after the suspects as

15   well.

16          Q.    Did you see the truck with the letter C on

17   the license plate?

18          A.    I did not see it.

19          Q.    What happened then?

20          A.    I continued in the pursuit monitoring.   I

21   asked for an air unit to assist us in the pursuit, and I

22   just basically tried to gain ground on the suspect

23   vehicle.

24          Q.    How fast were you traveling?

25          A.    It would vary depending on the conditions.

95

14

It would go anywhere from 75 to over a hundred miles an hour at times.

Q.   And then what happened?

A.   The pursuit lasted quite a long time.   We began to enter into the town of Superior.   And while pursuing I had managed to gain ground on the suspect vehicle given the destruction of police vehicles during the pursuit from items being thrown out of the suspects' vehicle.

Q.   Were you riding by yourself or with somebody?

A.   I was by myself.

Q.   Okay.

A.   Given the multiple police vehicles that were being damaged I as able to gain.   I had gotten somewhat close to the front of the pack during the pursuit.   AS we enter the town of Superior I saw a Mesa police vehicle in front of me do a quick evasive maneuver.   When he did this I saw the large metal item bouncing towards me.   I wasn't able to avoid it, and it struck my vehicle rendering it undriveable.

Q.   What was it?

A.   At that time I thought it was a generator. I found out later it was a large air compressor.

Q.   What color was it?

96

14

1        A.    I believe blue.

2        Q.    And your vehicle was disabled then?

3        A.    Yes, sir.

4        Q.    Let me show you some photographs.   Take a

5    look at Exhibits 14, 15 and 16.   Do you recognize what's

6    in that photograph?

7        A.    Yes, sir.

8        Q.    What is it that's in that photograph?

9        A.    That would be the items that was in the

10   roadway that I struck.

11       Q.    In what part of your car hit it?

12       A.    The front driver's side portion.

13       MR. MARTINEZ:   Move for the admission of Exhibits

14   14, 15 and 16.

15       MR. SHELL:   No. objection.

16       THE COURT:   14, 15 and 16 are admitted.

17       Q.    BY MR. MARTINEZ:   Let's go ahead and take a

18   look at this.   This is Exhibit No. 14.   Are we talking

19   about this item that's right here?

20       A.    Yes.

21       Q.    And Exhibit No. 15.   Is this just a closeup

22   of that item?

23       A.    Yes, sir.

24       Q.    And finally Exhibit 16 shows a placard

25   there; right?

97

14

15

1    A.    Yes.

2    Q.    Does that indicate to you whether or not it

3    was actually picked up or impounded?

4    A.    Yes.

5    Q.    And what does that mean to you.

6    A.    That means to me it was impounded as

7    possible evidence.

8    Q.    Let me show you a couple of other pictures.

9    Take a look at Exhibits 36 through 43.  See if you

10   recognize what's there.

11   A.    Yes, I recognize what's there.

12   Q.    What's there?

13   A.    That's the supervisor police vehicle that I

14   was driving that night.

15   Q.    And does it show the damage that it

16   sustained?

17   A.    Yes.

18   MR. MARTINEZ:  Move for the admission of Exhibits

19   36 through 43.

20   MR. SHELL:  No objection.

21   THE COURT:  36 through 43 inclusive are admitted.

22   Q.    BY MR. MARTINEZ:  Go ahead and take a look

23   at them.  Is that how your vehicle came to rest out in the

24   middle of the street?

25   A.    Yes, sir.