# EXHIBIT 31
# (part 6)

*Andriano v. Ryan*, Case No. CV-16-01159-PHX-
SRB Motion for Evidentiary Development

15

1          Q.   Didn't you tell me there were all of these

2    other vehicles that were coming and that sort of thing?

3          A.   Yes, sir, there were.

4          Q.   And so you see that stuff.  My question is

5    in terms of your safety, what happens?

6          A.   Actually after striking the object in the

7    roadway it actually made my vehicle leave the roadway and

8    it came down after making the contacts the front end

9    collapsed and it pretty much dug in right there.  I looked

10   in the rearview mirror and I saw a line of police officers

11   behind me and hoped they didn't hit me.

12         Q.   Did you wait until then gone or what

13   happened?

14         A.   I waited there until the majority went

15   around me and oncoming traffic, and most officers were

16   following the leader.  Once I saw they were doing that as

17   soon as I saw an opportunity and went to the shoulder.

18         Q.   Exhibit No. 37 shows us a truck there.  Do

19   you see that?

20         A.   Yes.

21         Q.   Was there another frontage road there, or

22   what was going on there?

23         A.   I don't know if there was a frontage road.

24   I don't know.

25         Q.   Exhibit No. 38, we are looking at what?

15

1      A.   That's the front driver's side portion of my

2  vehicle.

3      Q.   And then Exhibit No. 40?

4      A.   The front end of my vehicle.

5      Q.   And then Exhibit No. 41?

6      A.   Another angle front end of my vehicle.

7      Q.   That also shows the right side; correct?

8      A.   Yes, passenger side.

9      Q.   And Exhibit 42 shows us that; right?

10      A.   Yes.

11      Q.   What's that?

12      A.   That would be what appears to be the

13  passenger side of the vehicle, the front passenger tire.

14      Q.   And Exhibit No. 43?

15      A.   The front passenger area.

16      Q.   So you are now out of the chase, and so what

17  happens?

18      A.   Well, my vehicle is immobile.  Another

19  officer stopped to check and make sure that I was okay at

20  which time I said I was, and then I am getting in with you

21  and continued in the pursuit with the other officer.

22      Q.   Who was that?

23      A.   That was Officer Vic Perez.

24      Q.   By this time were you were way at the end of

25  the chase, or what's going on?

100

15

1      A.    Towards the end, yes.

2      Q.    What happens?

3      A.    We continue following the other emergency

4 vehicles until I guess outside of Superior where they came

5 to a stop.

6      Q.    What happens with regard to your role in

7 this?

8      A.    As soon as the vehicles came to a stop I

9 immediately ran up to the front of the scene to see what

10 was happening over there.

11      Q.    When you say the front of the scene are you

12 talking about where the lead vehicles were?

13      A.    Yes, sir.

14      Q.    Did it take you a while to get up there?

15      A.    It was a pretty fast run.  It didn't take

16 too long to get there.

17      Q.    When you got there what was going on?

18      A.    They had just secured two individuals that

19 were in the truck and were in the process of clearing the

20 vehicle and made sure it was safe.

21      Q.    When you say securing two individuals, what

22 does that mean?

23      A.    They were placing handcuffs on them.

24      Q.    Okay.  And what was your role with regard to

25 the scene, I guess, if you will?

15

1      A.    While the truck was getting secured, as soon

2  as the truck was cleared and I knew there were no more

3  threats, the two individuals were in handcuffs, I yelled

4  as loud as I could that I was in command of the scene and

5  I assigned two officers per individual per suspect.  I

6  ordered everybody else who was not involved out of the

7  scene and assigned Officer Perez to set up tape and begin

8  a crime scene.

9      Q.    Did you get close to the individual if you

10  are looking at the back of the truck to the left or the

11  passenger side of the truck -- I mean the driver's side of

12  the truck?

13      A.    Yes, sir.

14      Q.    Let me show you some photographs.  Take a

15  look at Exhibits 89 and 90, see if you recognize the

16  individual there.

17      A.    Okay.  I recognize these photos or this

18  individual.

19      Q.    And which person is that?

20      A.    That is the driver of the vehicle.

21      Q.    And Exhibit No. 92, which is already in

22  evidence, is that the same person that you have described

23  as the driver of the vehicle in the other photographs?

24      A.    Yes, sir.

25      Q.    That person, were you able to see what kind

102

15

16

1    of injuries he had?

2            A.    Yes.

3            Q.    And what injuries did he have?

4            A.    It a period he had an injury to his leg and

5    ankle, possibly ankle.

6            Q.    And did he have any injury, for example, to

7    his upper extremities?

8            A.    No.

9            MR. MARTINEZ:   Move for the admission of 89 and

10   and 90.

11           MR. SHELL:   No objection.

12           THE COURT:   Exhibits 89 and 90 are admitted.

13           Q.    BY MR. MARTINEZ:   Exhibit 89, what are we

14   looking at here?

15           A.    89 is the driver of the vehicle in the

16   secured position.

17           Q.    And it does indicate or show his right leg.

18   Do you see that?

19           A.    Yes, sir.

20           Q.    Why is that?

21           A.    That as where I believe officers were

22   checking and tending to whatever medical needs he needed.

23           Q.    And did you ever see them tend or check

24   anything other than his right foot area?

25           A.    I believe that they checked and asked if he

103

16

1    was okay but the only area they actually needed or saw

2    blood coming from was the leg.

3            Q.    And Exhibit No. 90, what are we looking at

4    there?

5            A.    That is his ankle, the driver's ankle and

6    feet.

7            Q.    Was this individual saying anything while

8    you were out there at any time?

9            A.    He was.

10           Q.    And were you able to discern what he was

11   saying?

12           A.    Yes, some of it.

13           Q.    Were you able to discern everything?

14           A.    Most of it was just profanity.

15           MR. MARTINEZ:   I don't have any other questions.

16           THE COURT:   Cross.

17

18                    CROSS EXAMINATION

19   BY MR. SHELL:

20           Q.    How did you secure the truck?

21           A.    I did not secure the truck.  I secured the

22   scene.

23           Q.    Were officers securing the truck going

24   through the truck and making sure that there was nothing

25   in there that could hurt them?

104

16

1        A.    They did a visual check for people.

2        Q.    Okay.  So these pictures that you just

3   looked at, it is your testimony that he only had an injury

4   to his right leg?

5        A.    Yes, sir.

6        Q.    So you don't know whether or not he was shot

7   in both legs?

8        A.    I don't believe he was shot in both legs.

9   I don't recall him being shot in both legs.

10        Q.    And at the time that you saw this, did you

11   ever see Mr. Irizarry sticking his hands out the window?

12        A.    I wasn't there when they removed him or he

13   was removed from the vehicle.  However he got out, I

14   wasn't there for that.

15        Q.    So all of that happened, the shooting and

16   all of that happened before you got up there?

17        A.    Yes, sir.

18        Q.    All right.

19        MR. SHELL:  I don't have any other questions.

20        THE COURT:  Redirect.

21        MR. MARTINEZ:  I don't have any.

22        THE COURT:  Does the jury have any questions for

23   this witness?  Okay.  Thank you.

24        MR. MARTINEZ:  The State calls Christopher

25   Marrufo.

105

16

1

2                        CHRISTOPHER MARRUFO,

3    called as a witness herein, having been first duly sworn,

4    was examined and testified as follows:

5

6                        DIRECT EXAMINATION

7    BY MR. MARTINEZ:

8             Q.    Your name, sir?

9             A.    Christopher Marrufo.

10            Q.    Who do you work for?

11            A.    Mesa Police Department.

12            Q.    What do you do do for them?

13            A.    I am a police officer.

14            Q.    How long have you been a police officer with

15   Mesa?

16            A.    It will be four years in August.

17            Q.    Were you on duty back on January 28th of

18   this year?

19            A.    Yes, sir.

20            Q.    What were your work hours back then?

21            A.    Work hours from 3:00 p.m. to 1:00 a.m.

22            Q.    Did you have occasion to have a call, if you

23   will, sometime around 10:45 to 11:00 p.m. that evening?

24            A.    Yes, sir.

25            Q.    And what kind of call was it?

16

106

1      A.    It was a report of an officer that had been

2 shot in the area of Baseline and Val Vista.

3      Q.    Where were you when you got the call?

4      A.    I was at Dobson and Broadway on an alarm

5 call.

6      Q.    So once you heard that call what happened?

7      A.    I cleared the call that I was on and started

8 to head in the direction of Baseline and Val Vista.

9      Q.    And then what happened?

10     A.    I am going eastbound on the U.S. 60.   I

11 heard that over the radio that they didn't need any more

12 units at the scene, just canvassing the area to look for

13 the vehicle.

14     Q.    So what did you do?

15     A.    I stayed on the U.S. 60 going eastbound.

16     Q.    And then what happened?

17     A.    And then it came over the radio that they

18 had the truck at Higley and the U.S. 60 getting on at 60

19 and Higley and it had shot at a Gilbert officer and one of

20 our Mesa officers was behind that vehicle as well.

21     Q     When this transmission came out, where were

22 you?

23     A.    I was at Mesa Drive and the U.S. 60.

24     Q.    How far is Mesa drive and U.S. 60 from

25 Higley and U.S. 60?

107

16

1      A.    That's probably about 10 miles.

2      Q.    So what did you do next?

3      A.    I just continued eastbound on the freeway.

4  U.S. 60.

5      Q.    How fast were you going?  Do you know?

6      A.    At that time approximately a 110.

7      Q.    What was traffic like?

8      A.    It was steady.

9      Q.    And so what happened next?

10     A.    As I was heading eastbound I did catch up to

11 other officers that were behind the vehicle.

17

12     Q.    When you first caught up, how many other

13 officers would you estimate were there?

14     A.    Probably about 20 to 30.

15     Q.    So you were about 20 to 30, behind something

16 like that?

17     A.    Yes, sir.

18     Q.    And then what happened?

19     A.    Continued eastbound on the 60.

20     Q.    And then?

21     A.    It started to rain, and just kept on

22 following the vehicle on the 60.

23     Q.    Did there come a time when you began to

24 grasp, if you will, in terms of how close you were to the

25 vehicle?

108

17

A.    Yes.

Q.    How did that happen?

A.    There were transmissions over the radios for I am not sure if it was our department or the air unit or ground units that were saying to slow down, but there were transmissions to slow down.  And other officers, I remember in particular Gilbert officers and DPS officers were slowing down, but I kept on going past them.

Q.    And as a result of doing that, were you able to at least visually see the truck?

A.    Yes, sir.

Q.    And what position were you in?

A.    At that time maybe 12 or 15 cars behind.

Q.    About where was that?

A.    Right outside of Gold Canyon.

Q.    And Gold Canyon is that on the north or the south side?  As you are traveling is it on your left or right or both?

A.    I believe it's both.

Q.    And what is Gold Canyon?  Is it a residential area?

A.    I believe so.

Q.    So at Gold Canyon you are getting closer, and what happens then?

A.    You hear over the radio that somebody was

17

1    throwing something out, tools or various items.  At that

2    time we didn't know what it was but that they were

3    throwing things out of the truck.

4         Q.    Were you close enough to be able to see the

5    back of the truck or not at that point?

6         A.    At that point, no.

7         Q.    What happened then?

8         A.    I remember hearing transmissions over the

9    radio to be careful and to swerve right or swerve left

10   because someone was throwing things out and they were

11   hitting the cars.

12        Q.    At that time were your radios still work,

13   i.e, could you still communicate with other officers via

14   the radio?

15        A.    Yes, sir.

16        Q.    What happened then?  Were you able to see

17   any of these items as they were talking about as they

18   affected or not?

19        A.    I do remember a couple of items.  Other than

20   that we were going too fast to see what the items were,

21   but I do remember a couple of items.

22        Q.    So then what happened?

23        A.    Continued to go eastbound, saw several

24   vehicles that were disabled to the side of the road.

25        Q.    And then?

17

110

A.    Just kept going eastbound and then ended up getting closer and closer because of the vehicles that were being disabled by these items.

Q.    Did you ever get to, let's say, Items 3, 4 or 5?

A.    I did.  Close to right before Superior I ended up to number probably about four or five car back.

Q.    And was that the first time that you were able to see the truck, or were you able to see the truck before?

A.    I was able to see the truck a little before, but at that point I was able to see the truck clearly.

Q.    And when you saw the truck, were you able to see whether or not there was anybody in the back area of the truck?

A.    I did.

Q.    What did you see?

A.    A male individual in dark clothing grabbing items and throwing them out of the back of the truck.

Q.    And do you know what items he was throwing, or was it just him throwing items out there?

A.    Like I said, I don't remember items in particular, but I do remember at one point seeing a pitchfork on the right of the road or in the middle of the road.

111

17

1        Q.    Did you then continue following and moving

2   up, or what happened?

3        A.    I did.  Something was thrown out of the

4   vehicle, a generator type from the back of the truck that

5   caught on fire.

6        Q.    What color was that item?  What as the color

7   of the item, the generator or whatever air compressor or

8   whatever it was?  Do you remember or not?

9        A.    I don't remember.

10        Q.    So something was on fire; right?

11        A.    Yes, sir.

12        Q.    And what happened then?

13        A.    I remember it was somehow hooked to the

14   truck and it was sliding back and forth in the road.

15        Q.    So it was like fishtailing?

16        A.    Uh-huh.

17        Q.    Is that yes?

18        A.    Yes.

19        Q.    As this thing is back there and fishtailing,

20   what's the person in the back part of the truck doing?

21        A.    Still throwing other items out.

22        Q.    Then what happened?

23        A.    Eventually that item broke off somehow and

24   it hit the car in front which caused me to end up taking

25   the lead in the pursuit.

112

17
18

1        Q.    When you took the lead in the pursuit, were

2   you able to see the back of the truck?

3        A.    I was.

4        Q.    And were you able to see what the individual

5   that was in the back of the truck?

6        A.    I was.

7        Q.    And with regard to him being out there,

8   where was he grabbing the stuff to throw it from?

9        A.    Well, the truck was a utility truck with the

10  side drawers.  He was grabbing from the side drawers and

11  also the actual bed of the truck.

12       Q.    And how well fast would you -- at that point

13  how fast would you estimate that you were traveling?

14       A.    At that point we were going about 80 or 90

15  miles an hour.

16       Q.    Before that had you seen the individual --

17  had there been a time when you saw the truck and the

18  individuals not in the bed of the truck throwing things or

19  the first time that you saw the truck the individual was

20  back there?

21       A.    Can you repeat the question?

22       Q.    Sure.  When you first saw the truck and if

23  came into view, was this individual already propped up in

24  the back?

25       A.    Yes, he was.

18

1      Q.   So this was just a continuation of seeing

2  him.   And now you are in the lead; right?

3      A.   Yes, sir.

4      Q.   What do you see?

5      A.   Just him throwing stuff out of the back of

6  the truck, but he would also get back into the truck into

7  the cab.   He climbed from the back while they were driving

8  into the front of the truck.

9      Q.   How would he do it?

10     A.   I mean, he would.   I don't know.   I mean, he

11 went from the back, climbed over, would grab the door,

12 open the door, and then grab onto the door and get into

13 the cab.

14     Q.   And so he did that -- how many times did you

15 see him do that?

16     A.   Three or four times.

17     Q.   And do you know what he was doing when he

18 was -- were any items coming out of the truck when he

19 would go back in the cab?

20     A.   Yes.

21     Q.   So other items were also being thrown at

22 that point?

23     A.   From inside the cab, yes.

24     Q.   After throwing what appeared -- after this

25 ball of fire or whatever, when he came back out, do you

114

18

1    know anything that he might have thrown, specifically?

2          A.    I couldn't tell you specifically what else.

3          Q.    How far were you behind him?

4          A.    I would say about 50 feet.  50, 60 feet.

5          Q.    It would be fair to say, I guess, that you

6    were watching for what was going on not so much for what

7    he was throwing?

8          A.    Yes.

9          Q.    And because you said he did it three times,

10    every time he would climb out and climb back in, did you

11    notice whether this person was having any difficulty doing

12    that, or was it something that didn't seem too difficult

13    what you saw?

14          A.    From what I saw, it didn't look too

15    difficult when he was climbing from the cab to the back of

16    the truck, no.

17          Q.    So he would actually open the door each time

18    then?

19          A.    Yes, sir.

20          Q.    And this continued while you were in

21    Superior?

22          A.    Through Superior, yes.

23          Q.    As you were there in the lead vehicle, were

24    you able to take a look behind to see if there were other

25    vehicles there or the parties still continuing or what was

115

18

1    going on?

2         A.    Yeah.   When I would look in my rearview

3    mirror I did see -- I don't know how many police cars, but

4    I did see lights behind me.

5         Q.    Then what happened?

6         A.    We continued through Superior, ended up

7    going through a tunnel which was lit up pretty well.

8         Q.    And in terms of being lit up, did that

9    assist you in seeing what was going on on the truck?

10        A.    I was able to see the individual better.

11        Q.    He was in the back of the truck?

12        A.    In the back of the truck, yeah.

13        Q.    What can you tell us about his physical

14   description?

15        A.    Hispanic male, dark clothing.

16        Q.    And was he still throwing items in that

17   tunnel?

18        A.    Yes.

19        Q.    What was he throwing?   Could you see any of

20   that?

21        A.    I could not see.

22        Q.    Could you tell what he was holding onto or

23   how he could keep his balance on the truck?

24        A.    At that point he was holding onto the door.

25        Q.    When you say he was holding onto the door,

116

18

1    how was he holding onto the door?

2           A.    If this were the top of the door frame and

3    the window, he was holding onto it like this.

4           Q.    Was The door open?

5           A.    Yes.

6           Q.    And so it was sort of swinging, and he's

7    holding onto it?

8           A.    Yes.

9           Q.    And which direction was he looking?  WAs he

10   looking in the direction of travel as he was holding on,

11   or was he looking back?

12          A.    Both.  I mean, looking back towards us

13   and --

14          Q.    I guess the way you describe it, it seems

15   built precarious.  Is that a wrong characterization on my

16   part?  Didn't it seem little precarious to you?

17          A.    What do you mean?

18          Q.    In other words, didn't it sort of seem that

19

19   based on how he was holding on that he might fall in the

20   road?

21          A.    Yes.

22          Q.    Where were his feet when he was holding on

23   like that?

24          A.    I don't remember.

25          Q.    So then what happened?

117

19

1          A.    We began to slow down because of the
2     terrain, ended up going around close to a semi that was
3     pulled over to the side of the road.
4          Q.    And can you tell me what the driver's
5     actions were in relationship to that semi?  Did he honk at
6     it?  Go around it?
7          A.    He went around it.
8          Q.    Did he stop or hit his brakes?
9          A.    No.  He just went around it.
10          Q.    Was there oncoming traffic?
11          A.    Yes.
12          Q.    What did you do?
13          A.    Continued to follow it.
14          Q.    And then what happened?
15          A.    And then I heard two shots.
16          Q.    While the truck was still moving you heard
17     two shots?
18          A.    I did.
19          Q.    Did you hear two shots, or do you know where
20     they came from?
21          A.    They came from the vehicle, from the truck.
22          Q.    Which side of the vehicle did these two
23     shots come from?
24          A.    They came from the passenger side.
25          Q.    Did you actually see a gun, or did you just

118

19

1   see a flash, or describe that for me.

2        A.   I heard two distinct shots, and I remember

3   calling over the radio that he's firing at us.

4        Q.   And this is while the truck was still

5   moving?

6        A.   While the truck was still moving.

7        Q.   It came from the passenger side?

8        A.   Yes, sir.

9        Q.   Then what happened?  Well, in terms of the

10  shots and hearing them, were you placed in reasonable

11  apprehension of imminent physical injury when these shots

12  were fired?

13       A.   I was.

14       Q.   Were you the lead vehicle?

15       A.   I was.

16       Q.   Were there any other vehicles around you at

17  the time?

18       A.   Well, there were the patrol vehicles behind

19  me, and also the item that we had just passed.

20       Q.   But you were definitely the lead person?

21       A.   Yes.

22       Q.   How far away were you from the semi when the

23  shots rang out?

24       A.   Maybe about 20 to 30 feet past the semi.

25       Q.   And had how close were you to the white

19

119

1   truck?

2           A.    Still about 50 feet.

3           Q.    So then what happened?

4           A.    I continued eastbound on the road, and then

5   the vehicle -- or the truck started to slow down, so I

6   started to slow down to keep distance.  I wouldn't get too

7   close to the vehicle.

8           Q.    And was it an abrupt slowing down or was it

9   fast?

10          A.    No.  Slow.

11          Q.    What was the incline, if you will?  Was it a

12  flat surface, a little bit of hill, or what was it?

13          A.    It was a little bit of a hill.

14          Q.    What's that place called?  Is it Top Of The

15  World?

16          A.    Top Of The World, I believe.

17          Q.    Is that the name of the town or just the

18  location?

19          A.    I don't know.  I didn't know what it was

20  until somebody said, yeah, this is Top Of The World.

21          Q.    Okay.  And so the truck is slowing down.

22  You are slowing down.  Do you know whether or not there

23  was any unmarked police vehicle there, or were you not

24  even paying attention?

25          A.    Behind me there was an unmarked.

120

19

1          Q.     Then what happened?

2          A.     I started to veer to the left because I

3     figured it would be a what we call a high-risk stop which

4     when we set up on a high-risk stop we try to fan out our

5     vehicles so we can --

6          Q.     Let me show you some photographs.   Take a

7     look at Exhibit No. 67.   This is the truck up here.   Where

8     did you go?   You said the left would be like right around

9     here, or what ended up happening?

10         A.     No.   My vehicle actually isn't there because

11    directly or right after the shooting they needed to shut

12    down traffic coming westbound on the freeway, so I don't

13    know who but someone because of my car was the first one

14    there, got into my car and drove it to the other side to

15    block traffic coming westbound.

16         Q.     But in relationship -- let's just take a

17    look at Exhibit No. 68.   Do you see that unmarked vehicle

18    there?

19         A.     Yes, I do.

20         Q.     Was that there when you pulled up?

21         A.     Yes.   I was in front of it, and when we

22    stopped I pulled to the left and the red or the unmarked

23    vehicle right there pulled to the right of me.

24         Q.     So you pulled to the left.   The unmarked

25    vehicle goes to the right.   Then what happens?

121

19

1          A.    I opened my door, and I see the passenger

2   open his door,

3          Q.    What's he doing?

4          A.    He gets out of the vehicle and looks at us

5   and points a gun at us.

6          Q.    Okay.

7          A.    How about the driver?  What happens there?

8          A.    I don't remember seeing the driver get out

9   of the truck.

10          Q.    You were focused on the person with the gun;

11   correct?

12          A.    Yes.

13          Q.    That's the passenger?

14          A.    Yes.

20

15          Q.    So he gets out.  Was he all the way out on

16   the ground, or was he still in the truck when the gun was

17   pointed, or what happened?

18          A.    He was out on the ground.

19          Q.    Is this the same individual that you saw in

20   the back of the truck throwing things?

21          A.    Yes.

22          Q.    He points the gun and what happens?

23          A.    I hear two shots.

24          Q.    Are these the same two shots you heard

25   before, or are these different shots?

122

20

1          A.   Well, they are different shots from

2     different locations.

3          Q.   How many officers were there when these two

4     shots rang out?

5          A.   I couldn't even tell you.  Several officers

6     to the right and left of me.

7          Q.   Fair to say you weren't watching them;

8     right?

9          A.   No, I wasn't.

10          Q.   What happens when the shots ring out?  What

11     do you do?

12          A.   I pulled my duty weapon from my holster and

13     I aim at the threat which is the individual that was

14     looking at us, and I fired rounds towards him.

15          Q.   You indicated that you were to the left.

16     Did you stay to the left or because the way that we see

17     this you can see that the truck is up here.  Do you see

18     that?

19          A.   Yes.

20          Q.   Where was the person when he was shooting?

21          A.   He was directly by the door, the passenger

22     side door.

23          Q.   And where were you standing?  Were you

24     standing more this direction or to the right?

25          A.   No.  My vehicle was in front of those two

123

cars that are right there.

Q.   It was much closer than these?

A.   Much closer.  While it's right by the red car, the red unmarked car right there.  Mine is to the left of it.  The way it worked out is my car was -- if the truck is right here, my car was pretty much cutting in the middle of the truck.

Q.   All right.  And so shots ring out and you fired your shot, and did anybody else?  Did you hear anybody else fire, or were you the only one?

A.   Yeah, I heard several other officers fire.

Q.   Is that when the shooting started, if you will, at that point?

A.   Yes, ma'am.

Q.   And how long does the shooting last?

A.   I mean, no more than two minutes, one minute.  I don't remember.

Q.   All right.  And when this is going on, what are you focused on?  Are you focused on the driver or the passenger?  What are you looking at?

A.   At that time I was focused on the passenger with the gun.

Q.   At some point does the shooting end or what happens?

A.   Yes.

124

20

1    Q.    And what was at that point?

2    A.    At that time one of the officers to my right

3    yells out cease fire, cease fire.  We ended up devising a

4    plan to scoot or to move a vehicle closer to the truck to

5    assess what had happened or if they were injured or

6    anything like that.  So several officers get to both sides

7    of my car and they tell me to get in the driver's seat and

8    slowly roll towards the truck -- roll closer towards the

9    truck.

10    Q.    And then what happens?

11    A.    We must have.  I put it in drive and we must

12    have road maybe 10 feet, 5 to 10 feet.

13    Q.    Okay.

14    A.    And we stopped the vehicle, and then

15    officers to my left start giving commands to both

16    individuals.

17    Q.    And then what happens?

18    A.    The driver, they ended up giving commands to

19    the driver to lay down on the ground.

20    Q.    Okay.

21    A.    And then a team goes up to the driver and

22    places him into custody.

23    Q.    How about the passenger?  What happens

24    there?

25    A.    At that time I had switched my focus to the

125

driver, so I don't know what happened.  I don't know if

they moved up or were giving commands to the passenger,

but my focus was on the driver at that time.

MR. MARTINEZ:  I don't have any other questions:

THE COURT:  Cross.


CROSS EXAMINATION

BY MR. SHELL:

Q.   You were interviewed about this case;

correct?

A.   Yes.

Q.   Did you write a police report?

A.   No, I did not.

Q.   And you were interviewed by a Detective

Cates of the Department of Public Safety?

A.   I don't remember exactly the individual's

name who interviewed me, but I know that they worked for

DPS.

Q.   In that interview you were asked if you saw

the person in the back of the truck; correct?  Do you

remember being asked that question?

A.   I would have to look -- I would have to

review my interview.

Q.   You don't have that with you?

A.   No, I don't.

126

20

1

```
 1          Q.    When is the last time you looked at it?

 2          A.    I never looked at it.

 3          Q.    Did you ever listen to it?

 4          A.    No, I did not.

 5          Q.    Did you ever tell Detective Cates,

 6    Department of Public Safety, that the only time that you

 7    saw the person that was in the back of the truck climb

 8    back into the truck was a quarter mile before the truck

 9    stopped?

10          A.    I don't remember.

11          Q.    When did this interview take place?

12          A.    I don't remember the exact date.

13          Q.    It was close after the incident though;

14    correct?

15          A.    Maybe about a week, two weeks.

16          Q.    Let me show you what's been marked as

17    Exhibit No. 122.  Do you recognize that?

18          A.    It's my interview.

19          Q.    Go to page 5611, Bates stamp 5611.  review

20    5611, 5612.

21          A.    [Witness complied.] Okay.

22          Q.    Back then right after this incident you were

23    interviewed; right?  Correct?

24          A.    Correct.

25          Q.    And you never say anything about the
```

127

passenger going in and out of the truck, do you?

A.    At that time, no.

Q.    Right.  In fact, the Detective Cates specifically asked you -- let's go through it.  He says starting on 5622.  He says so pretty much from Superior you are the lead vehicle and your response is uh-huh; correct?

A.    Yes.

Q.    And then he asks you, okay, so you were directly behind that, and what do you say?

A.    Correct.

Q.    And he says the suspects' truck and you said correct again; right?

A.    Yes.

Q.    All right.  And then he asks you, okay, did you see the person who was standing in the bed of the vehicle climb back into the passenger compartment; right?

A.    Yes.

Q.    And what is your response?

A.    I did.

Q.    And then he asks you, okay, do you know roughly what location that was?  And what do you say?

A.    Probably like a quarter of a mile or a mile, yeah, maybe like a quarter of a mile before the vehicle came to a complete stop.

128

1      Q.   Okay.   And then Cates says to you, okay, so

2  not very far before meaning you saw him get back in the

3  vehicle just before the vehicle stopped; right?   That's

4  what you are telling him; correct?

5      A.   Correct.

6      Q.   And then he asks you:  Okay.  Was the person

7  who was in the back of the vehicle during this entire time

8  that you were the lead vehicle, right, from the time that

9  you saw the suspect vehicle until the time he climbed in I

10  guess a quarter mile before stopping was he out there the

11  entire time?  And what as your response?

12      A.   Yeah.

13      Q.   Uh-huh.   So right after this incident you

14  tell a lead detective at the Department of Public Safety

15  that as soon as you become the lead vehicle, you see the

16  guy in the back of the truck and he's in the back of the

17  truck the whole time until just before the truck stops;

18  correct?

19      A.   Yes.

20      Q.   That's what you tell him; right?

21      A.   Yes.

22      Q.   And then you come into this courtroom today

23  and you say you see him go in and out of the truck, what,

24  3, 4, 5 times?

25      A.   I said three or four.

129

1      Q.    Which one is the truth?

2      A.    As time goes on you start remembering more

3    and more.

4      Q.    Oh.  Have you ever, since this incident,

5    have you sat down with the State and discussed your

6    testimony?

7      A.    We discussed my part in the pursuit.

8      Q.    And when was that?

9      A.    Last Saturday.

10     Q.    So within a week.  And did you discuss how

11   important it would be for you to be able to say east he's

12   going in and out of the truck?

13     A.    No.

14     Q.    So right after this incident you are talking

15   to Detective Cates, and it's clear what you are talking

16   about; correct?  You didn't have any questions.  You

17   weren't asking him questions when he was asking you

18   questions; correct?

19     A.    Correct.

20     Q.    And you didn't write a report?

21     MR. MARTINEZ:  Objection; asked and answered.

22     THE COURT:  Sustained.

23     Q.    BY MR. SHELL:  What's the reason why police

24   officers write reports?

25     A.    To remember things later on in court.

130

Q.    And you didn't write one?

A.    When you are involved in an officer-involved shooting, you don't write a report.  They interview you.

Q.    Do you lie in those interviews?

A.    No.

Q.    Go to page 5626:  Start on page 5625 and start at the bottom of 5625 and read to the top part of 5626.

A.    [Witness complied.]

Q.    What was he doing when all of this was going down, the shooting?

A.    I mean --

Q.    What do you tell Detective Cates he's doing right after the incident?

MR. MARTINEZ:  Objection; lack of foundation.

THE WITNESS:  Which shooting?  What time are you talking about?

THE COURT:  It is improper impeachment.

Q.    BY MR. SHELL:  From what I told you to read we are talking about after the vehicle has stopped; correct?

A.    Okay.

Q.    The vehicle is stopped; correct?

A.    Yes.

Q.    What's he doing after the vehicle is

131

1   stopped?  He's got his hands out the window; correct?

2          A.    Yes.

3          Q.    And you tell him, Detective Cates, that's

4   he's got his hands out the window because he, quote, is

5   giving up?

6          A.    Yes.

7          MR. SHELL:  Your Honor, this might be a good time

8   to take a break.  That's the only copy that I have of

9   that.

10         THE COURT:  Okay.  Please remember the admonition

11  and come back in 15 minutes.

12              (The jurors exited the courtroom.)

13         THE COURT:  Go ahead and take a seat.  The record

14  ought to reflect the presence of counsel, the defendant,

15  not the jury.  Anybody need to make a record?

16         MR. MARTINEZ:  Just on that issue I indicated out

17  in the hall.

18         THE COURT:  I want to look at the statute before.

19  are you aware of any cases that talk about -- I know I am

20  aware of the rule but the sanctions.

21         MR. MARTINEZ:  I did not look at the case for

22  sanctions.  I just looked at Rule 39(B)(1), but other than

23  that, I didn't do further research, but I wanted to make a

24  factual basis while the officer is here and put on the

25  record, and also to note he does have the business card

132

that this defense attorney gave him.

THE COURT:   Mr. Shell, do you dispute the facts?

MR. SHELL:   I dispute what he said happened.
This is what happened.   I walked outside.   I saw him
walking down the hall.   I say, Officer Betts?   He turned
around and looked at me.   I walked up to him and handed my
card.   If you have any trouble getting the CD or
transcript, please get ahold of me and I will get those
for you, and that's all that was said.

THE COURT:   Why did you have contact with the
victim directly?

MR. SHELL: I forgot he was a victim am.

THE COURT:   Is Officer Betts here?

MR. MARTINEZ:   He is here.   I asked him to step
outside, but he is here.

THE COURT:   Why don't we take a couple minutes
and we will get back on the record about that.

MR. MARTINEZ:   All right.

(Recess taken.)

THE COURT:   Take a seat.   The record ought to
reflect the presence of counsel and the defendant but not
the jury.

Officer Betts, come on up.   You are still
under oath.   You don't need to be re-sworn.   You can sit
on the witness stand.   Tell me what happened.

133

A.     In regards to after recess?

THE COURT:  Yes.

A.     After we broke for recess I was walking down the hall and got about to the water fountain and heard somebody called my name, Officer Betts, Officer Betts.  I turned around and looked.  It was the defendant's attorney.  He reached into his pocket or in his wallet and pulled out a business card and handed it to me and said this is my number for you to call me, and I will help you get ahold of that interview tape.

THE COURT:  Okay.

A.     And then Mr. Martinez came running out yelling, you can't do that, you can't do that.  He is a victim.  And the defendant's defense attorney said, well, go and just tell the Judge then, and that was all I heard.

THE COURT:  Okay.  Counsel, why don't we talk in the back?

(A discussion was had off the record.)

THE COURT:  Go ahead and take a seat.  Okay.  We have already heard from Mr. Shell that he had forgotten, officer, that you were a victim in the case, and that in the haste of all that was going on -- when you are in trial you have so many things going on in your head.  I am going to accept that, and I know he's apologized to you for contacting you, so we will let it stand at that.

134

Anything else on that issue?

MR. MARTINEZ:  No.

THE COURT:  Okay.  Anything else that we need to put on the record before we begin again with the jury?

MR. MARTINEZ:  No.

THE COURT:  How many more witnesses do you have lined up for today?

MR. MARTINEZ:  I have four more if need be.  I know we won't get to all of them.

THE COURT:  Okay.  How are we doing on your schedule?

MR. MARTINEZ:  We are fine.  We are good.

THE COURT: I want to make sure my notes aren't messed up because we have some time.  Officer Marrufo who was testifying you had asked him some questions about whether he as in apprehension of injury.  In my notes I don't have him as the victim of an aggravated assault.  Is there an amended indictment or something that I am not seeing?

MR. MARTINEZ:  I believe so.  Let me take a look.

THE COURT:  My notes are off of the original indictment.

MR. SHELL:  I have it as Count 8, but against Redondo only.

THE COURT:  Count 8 doesn't apply to this

135

1    defendant.

2          MR. MARTINEZ:  Right.  He was standing when he

3    fired the gun.  The car wasn't moving I think is what he

4    said.

5          THE COURT:  I wasn't sure what he said.  So I

6    only asked because that's a question you customarily hear

7    in an aggravate assault charge, and I wanted to make sure

8    that I am looking at the right thing.  I am.

9          MR. SHELL:  I am not sure I understand your

10   question.

11         THE COURT:  There is not an amended indictment

12   here.

13         MR. SHELL:  I haven't scene one.

14         MARTINEZ:  No.  There isn't an amended indictment

15   here.

16         THE COURT:  Go ahead and grab the jury.

17              (The jurors entered the courtroom.)

18         THE COURT:  Take a seat.  The record ought to

19   reflect we have been re-joined by the jury.  Officer

20   Marrufo is still on the stand and under oath.

21              Mr. Shell, you can continue your

22   cross-examination when you are ready.

23         MR. SHELL:  Thank you, Judge.

24         Q.   I want to clarify.  When did you become the

25   lead vehicle?

136

3

1          A.   Just before we entered Superior.

2          Q.   Okay.  So just before you entered Superior

3    you are the lead vehicle.  From the time just before

4    Superior through Superior, did you see the truck making

5    any evasive moves at all from just before Superior until

6    you get on the other side the other side of Superior, or

7    is he staying in his lane?

8          A.   No, he's not staying in his lane.

9          Q.   Okay.  So through the town of Superior he's

10   not in his lane?

11         A.   Correct.

12         Q.   Where is he going?

13         A.   He's weaving in the middle of the road.

14         Q.   Did you tell Detective Cates anything

15   different?

16         A.   No.

17         Q.   At the time -- where was it that he passed

18   the semi?

19         A.   I don't know the exact mile marker.

20         Q.   Was it after Superior?

21         A.   Yes.

22         Q.   As you are going up the hill?

23         A.   It was after Superior.

24         Q.   And was it before the tunnel or after the

25   tunnel?

137

A.   It was after the tunnel.

Q.   Do you know how far after the tunnel?

A.   I do not recall.

Q.   Could it have been right after the tunnel?

A.   I don't remember.  I don't know the exact spot.

Q.   Do you know whether or not there is a very long passing lane from just before the tunnel until way on the other side of the tunnel?

A.   I don't know.

Q.   So you don't even know if there is a passing lane?  Do you know where the Queen Creek bridge is?

A.   No.

Q.   As you are kind of coming out of Superior there is a church and you go over a long bridge.

A.   I remember the bridge.

Q.   And what runs underneath there is Queen Creek?

A.   Yes.

Q.   And it goes around and it swerves this way and then there is the turn; right?

A.   Yes.

Q.   And then you go past one of those big run-away ramps --

A.   Yes.

138

Q.   -- For trucks that have lost their brakes to slow down on?

A.   Yes.

Q.   And right there do you know whether or not a passing lane starts?

A.   I believe so before the tunnel.

Q.   Uh-huh.  And it goes on for quite a ways; correct?

A.   I don't know how far it goes on, no.

Q.   Is it possible he passed the semi in the passing lane right past the tunnel there?

A.   No.

Q.   But you don't remember where he passed the semi?

A.   No.

Q.   Did you previously just testify that as the vehicle is going down the road and you are the lead vehicle you are getting shot at?

A.   Yes, I did.

Q.   Let me show you again what's marked as Exhibit No. 122.  Start on page 5610 and read through to 5611.

A.   [Witness complied.]

A.   Okay.

Q.   Did you tell Detective Cates right after

139

this incident that no shots were fired until the vehicle
was stopped?

    A.   I would have to read through this entire
transcript.

    Q.   Then go ahead and do so.

    A.   I remember telling him that I heard two
specifics shots near the semi that was parked to the side.

    Q.   You know -- and you mentioned that.  Go to
page 5615 where you and Detective Cates are drawing the
diagram together.

    A.   I told Detective Cates that as I passed the
semi, I heard two shots being fired.

    Q.   Okay.  We will come back to that.  My
question to you is this:  Do you see on that page 5615
where you are talking about where vehicles are at you guys
are drawing a diagram?

    A.   Yes.

    Q.   And Detective Cates asks you:  And you are
indicating that on the map with the red marker; correct?

    A.   Yes.

    Q.   Where is that diagram?

    A.   What do you mean where is it?

    Q.   Where is it?  Do you know?

    A.   No, I do not.

    Q.   All right.  Let's go back to page 5610 and

140

4

1    let's start fourth line -- fourth question from Cates.  He

2    asks you, okay, so at the time you were at the back of the

3    vehicle -- what do you say?

4         A.   Yes, sir.

5         Q.   And then Cates says, okay.  While you are

6    behind the vehicle and, well, we will get to when they

7    stopped in a little bit, but -- and then what do you say?

8         A.   Uh-huh.

9         Q.   As in yes; correct?

10        A.   I would have to read prior or what they are

11   talking about.  I don't know what we are -- I don't know

12   what we were talking about at the time.

13        Q.   Isn't he asking you, okay, throughout the

14   time that you are behind the vehicle, and you say yes,

15   sir; correct?

16        A.   I don't know what it is in reference to

17   throughout the time that you are behind the vehicle.  I I

18   don't know what they are talking about.

19        Q.   Who all is talking?

20        A.   Who?  Detective Cates?  I don't know if

21   another detective --

22        Q.   Do you see anywhere where this detective is

23   saying anything on this transcript?

24        A.   I don't know -- if I don't remember if they

25   were both talking.  I know Detective Cates was talking.

4

1        Q.    And that's what we are talking about.

2        A.    Okay.

3        Q.    The names that are on the transcript as I am

4   reading them only 5610 and 5611 are whose names?

5        A.    Myself, Marrufo and Cates.

6        Q.    So Cates asks you:   Throughout the time you

7   are behind the vehicle, and you say yes; correct?

8        A.    Yes.   It was in reference to having my

9   lights and sirens if they were -- the question before that

10  is did you have your lights and sirens activated?   And I

11  said I did.   And Detective Cates says, okay.   Throughout

12  the time that you are behind the vehicle, and I said yes,

13  reference to my lights and sirens being activated.

14       Q.    Let's go up a little further then.

15       A.    Okay.

16       Q.    Starting at the sign line where Cates, oh,

17  did you at the time, were you able to see any other

18  occupant of the vehicle?   Obviously, somebody had to be

19  driving.   And your response?

20       A.    Uh-huh.

21       Q.    As in yes; correct?

22       A.    Yes.

23       Q.    But did you see any other occupants inside

24  the vehicle?   And what was your response?

25       A.    And I said I did not.

142

4

1        Q.   Okay.  And this is what Cates says.  Okay.

2   I forgot to ask you before, but did you have your lights

3   and sirens activated?  And what was your response?

4        A.   I did.

5        Q.   And then Cates asks you:  Okay.  Throughout

6   the time that you are behind the vehicle you say yes, sir;

7   right?

8        A.   Yes.

9        Q.   And ten he goes on.  Okay.  At the time

10  while you are behind the vehicle, and I am not -- we will

11  get to when they stopped in a little.  And then you say

12  uh-huh like you are understanding what he is asking you;

13  correct?

14       A.   Yes.

15       Q.   And he says from the time that you saw the

16  suspect vehicle until the time it stopped, did you see

17  anybody fire a weapon in your direction?  And you said

18  what?

19       A.   Yes.

20       Q.   Okay.  And when was that or at what location

21  was that?  And what was your response?

22       A.   When we like -- as we stopped.

23       Q.   And what else did you say?

24       A.   I said did you say before or after?

25       Q.   And what do you mean by that?  You are

143

4

1    trying to clarify whether he is asking you -- are you

2    talking about before we stopped when vehicles are still

3    moving?

4           A.   Yes.

5           Q.   Or after stopped; correct?  You are trying

6    to get Cates to -- that's what you are trying to get Cates

7    to tell you; correct?

8           A.   Yes.

9           Q.   And Cates says I am not talking about -- and

10   then I apologize because it looks like there is confusion;

11   correct?

12          A.   Yes.

13          Q.   And then he says when he stopped we will get

14   to that in a second.  And you said yes; right?

15          A.   Yes.

16          Q.   And then he goes on and he asks you:  But

17   as, as far as throughout the pursuit and, again, what do

18   you say?

19          A.   Throughout the pursuit, no.

20          Q.   All right.  And then he says okay, and you

21   say --?

22          A.   No.

23          Q.   Right.  So he's asking you.  Throughout the

24   pursuit did anybody shoot at you; correct?

25          A.   He's asking if I saw anyone throughout the

144

pursuit shoot at me.

Q.   Okay.  And you said --

A.   No.  I heard two shots at the semi as we passed.  As we passed the semi I heard two shots.

Q.   You heard two shots at the semi?

A.   Yes.

Q.   If you hear, how do you know where they are going?

A.   I don't.

Q.   So when you say you heard them is he telling -- how do you know he's shooting at the semi?

A.   I didn't say he was shooting at the semi.  I said I heard two shots.

Q.   At the semi.

A.   In the vicinity of the semi is when I heard the two shots.

Q.   Right.  And, again --

A.   I wasn't saying that he was shooting at the semi.  I am saying that when we were in the vicinity of the semi is when I heard two shots.

Q.   But that's not what you tell him.

MR. MARTINEZ:  Objection; asked and answered. This has already been gone over.

THE COURT:  Overruled.

Q.   BY MR. SHELL:  He specifically asked you

145

throughout the pursuit; correct?  Look at the line there.
Start at the line where Cates says as far as throughout
the pursuit.  What do you say?  Isn't it true you say
throughout the pursuit, no?

     A.    Correct.

     A.    But to clarify, again, it was at the
vicinity of the semi is when I heard two distinct shots
being fired.

     Q.    Go to page 5614 near the bottom there.  You
guys were talking about a video.  Do you see that?  What
video are you talking about?

     A.    The DPS in car video.

     Q.    All right.  So during the interview you had
with Detective Cates you guys were watching a video?

     A.    No, we weren't.

     Q.    But you had watched the video just before
the interview?

     A.    Yes.

     Q.    So you had atched the video, and then you
guys were talking about the video?

     A.    No, we weren't talking about -- we weren't
talking about the video, in particular.  They were asking
me about my part in the pursuit.

     Q.    Okay.  Go to page 5620, top line.  You were
asked if you ever saw any muzzle flash; correct?

146

5

1      A.   Correct.

2      Q.   And you say no?

3      A.   Correct.

4      Q.   How many rounds did you fire?

5      A.   I don't remember.

6      Q.   Did you fire as your vehicle was moving?

7      A.   No.

8      Q.   So you waited until you had come to a

9  complete stop and then you fired?

10     A.   Yes.

11     Q.   And at that time you remember seeing Mr.

12  Irizarry's hands outside of the window like he was giving

13  up?

14          MR. MARTINEZ:  Objection; asked and answered.

15          THE COURT:  Sustained.

16          MR. SHELL:  Your Honor, I don't think it was

17  asked and answered.  I want to know if at the time he was

18  shooting is that when he saw Mr. Irizarry's hands?  It

19  hasn't been clarified.

20          THE COURT:  I thought you asked it, but if you

21  don't think so, go ahead.

22     Q.   BY MR. SHELL:  AT the time that you are

23  firing, is Mr. Irizarry's hands outside the window?

24     A.   No.

25     Q.   Were his hands outside of the window?

147

1      A.    After the shooting had ceased and we were

2    giving commands to the driver and the passenger.

3      Q.    So Mr. Irizarry was inside of the truck the

4    whole time the shooting was going on?

5      A.    That's what I remember.

6      Q.    Is that what you remember now?

7      A.    Yes.

8      Q.    Did you have any contact with Mr. Irizarry?

9      A.    No or, excuse me, yes, I did when we were

10   taking him into custody.

11     Q.    And was he already out of the vehicle when

12   you took him into custody?

13     A.    I didn't actually take him into custody.

14   Another officer did.  I just assisted because he was by

15   himself.

16         MR. SHELL:  No other questions.

17         THE COURT:  Redirect.

18

19              REDIRECT EXAMINATION

20   BY MR. MARTINEZ:

21     Q.    Let me have that exhibit, please, so I can

22   take a look at it.  With regard to 5611 at the very top

23   let's just look at what he was asking you.

24         MR. SHELL:  It hasn't been admitted into

25   evidence, Your Honor.

148

THE COURT:  The whole thing hasn't been admitted
into evidence and you are probably going to show more than
what's been read.   To the extent you can show only what's
been read, you can go ahead and show it.

Q.   BY MR. MARTINEZ:  Okay.  Cates, from the
time you saw the suspects' vehicle until the time it
stopped, did you see anybody fire a weapon in your
direction.   That's the question that was asked, wasn't it?

A.   Yes.

Q.   Is it asking you whether you heard, or is it
asking whether you saw?

A.   Whether I saw.

Q.   And so when defense counsel says, well, you
never told him about the second time while you were
driving, what's the explanation for that?   Did you
actually see the shots as you were driving along or is it
something else?

A.   Something else.

Q.   What is it?

A.   If I heard.

Q.   And did you hear these shots?

A.   Yes.

Q.   And where did you hear them?

A.   I heard them when we were near the semi.

Q.   Is that different to you than seeing?

149

A.   Yes.

Q.   You were asked about a diagram.   Where is the diagram?  Do you remember that?

A.   Yes.

Q.   Are you responsible for the county attorney's office and all of the items that are turned over to the defense, are you responsible for that?

A.   No.

Q.   Do you even know what items have been turned over to the defense?

A.   I do not.

Q.   Does anybody at the Mesa Police Department, if you know, responsible for turning anything over to them?

A.   I do not know.

Q.   It's not your job to know that, is it?

A.   No.

Q.   So he could have -- he is just asking you. It could be just that; right?

A.   Correct.

Q.   And you wouldn't know either way, would you?

A.   Right.

Q.   In terms of this issue about seeing the person in the back of the truck, you were asked questions about the conversation that you had with Detective Cates?

6

1 A. And, first of all, what did you see about the

2 individual in the back of the truck?  How many times did

3 you see him get in and out?

4 A. I saw him get in and out of the truck about

5 three or four times.

6 Q. And with regard to the question that was

7 being asked to you by Detective Cates, what was he asking

8 you at that point when you were being questioned by him?

9 Do you remember?

10 A. I don't remember.

11 Q. He was asking you about one time, in other

12 words, specifically, he's asking you.

13 A. Okay.

14 Q. Did you see the person who was standing in

15 the bed of the vehicle?  And he's asking you when you were

16 the lead vehicle.  In the bed of the vehicle climb back in

17 the passenger compartment, and you said I did.  At that

18 time did you tell him how many times you actually saw him,

19 or did you just tell him that you saw him go back there?

20 A. That I saw him.

21 Q. Did he at that point say tell me two or

22 three times?  Was he hanging on?

23 A. No.

24 MR. SHELL:  Objection; misstating what as said.

25 THE COURT:  I heard your objection.  The

151

1    objection is overruled.

2              Q.   BY MR. MARTINEZ:   Did he ask you that?

3              A.   No.

4              Q.   And then after he asked you that, if you saw

5    him climb back, if you could just see that part.

6                   Okay.   Did you see the person who was

7    standing in the bed of the vehicle climb back in the

8    passenger compartment?

9              MR. SELL:   I request he flip over and show the

10   rest of the conversation.   I move for the admission of

11   Exhibit No. 122.

12             THE COURT:   Hold on.   Let me rule on one

13   objection at a time.   Let me see the interview.

14             MR. MARTINEZ:   It is at the bottom.

15             THE COURT:   Read down here.

16             MR. MARTINEZ:   I was going to get to that.

17             THE COURT:   Okay.

18             MR. SHELL:   Your Honor, move for the admission of

19   Exhibit No. 122 into evidence.   I believe it is 122.

20             THE COURT:   Mr. Martinez?

21             MR. MARTINEZ:   I object on the grounds of

22   improper impeachment and irrelevant.

23             THE COURT:   It is.   The exhibit is not admitted.

24             Q.   BY MR. MARTINEZ:   You saw that's what it

25   says, right, and what was your answer, at the top?

152

A.   I did.

Q.   So as you are driving down there, did you see him get into the back -- did you see him get back into the back of the truck?

A.   Yes.

Q.   At that point he is asking you how many times?

A.   No.

Q.   And then it goes on and says, okay, you know roughly what location was that?  He is asking you what location he got back in the truck.  Does he say the last time?  Does he say the first time or the third time?  Does he ask you in what instance that he got back into the truck?

A.   No.

Q.   And when you were answering the question do you know what you were thinking at that time?  What time or the last time?

A.   No.

Q.   Well, you answered there -- it says --

MR. SHELL:   Your Honor, I request that he go further

MR. MARTINEZ:   That's what I am going to do.

THE COURT:   Why don't you finish your question?

Q.   BY MR. MARTINEZ:   Let's take a look at what

153

you then say next.  Okay.  You know, roughly, what
location was that?  And you answered probably like a
quarter of a mile.  Yeah.  Like maybe like a quarter of a
mile before the vehicle came to a complete stop.  What was
happening a quarter of a mile before that vehicle came to
a complete stop?  Is the person getting back into the
truck at that point?

       A.    Yes.

       Q.    And then Cates says:  Okay.  So not very far
before?  And you answered correct.  Then you do say okay.
At any time did you -- was the person who was in the back
of the vehicle were they out there the entire time from
the time that you saw the -- you first saw the vehicle
until the time he climbed in, I guess, a quarter mile
before stopping, was he out there for the entire time?  Do
you see that and you see your answer; right?

       A.    Yes.

       Q.    In light of what's being said and you are
being asked, when he got back into the vehicle, what do
you mean when you say, yeah, he was out there the entire
time?  What do you mean when you say, yeah, he was out
there -- he is asking you when got into the vehicle and
you said, oh, the very last time quarter mile?

       A.    Right.

       Q.    And then he asked you these other questions

154

7

1    about was he out there, and you said he was out there the

2    whole time.  Was that the whole time before he got in?

3          A.   Correct.

4          Q.   You were asked about, well, how many rounds

5    did you fire?  Do you remember?  And you said I don't

6    remember or words to that effect.  Do you remember that?

7          A.   Yes.

8          Q.   You were sitting there -- as you were

9    standing there firing, what are you focused on?

10         A.   The person that's shooting at us, that's

11   shooting at me.

12         Q.   Are you focused on the number of rounds that

13   you are firing?

14         A.   No.

15         Q.   At that point are you focused in on the

16   person that's on the passenger side?

17         A.   Yes.

18         Q.   Are you also at the same time focused on the

19   person in the driver's side?

20         A.   At that time, no.

21         Q.   So when if ever did you come or begin to

22   focus on the driver?

23         A.   When the firing ceased and we started to

24   give commands.  When we started to yell commands.

25         Q.   Was it your job to yell commands at that

155

1    point, or was that somebody else?

2           A.    No.

3           Q.    And at that point you did assist or help in

4    the sense that you walked up to the arrest the individual,

5    didn't you?

6           A.    Yes.

7           Q.    And what was your role with regard to that?

8           A.    I just stayed with the suspect or stayed

9    with the suspect while he was handcuffed.

10          MR. MARTINEZ:  I don't have any other questions.

11          THE COURT:  Thank you.  Does the jury have any

12   questions for this witness?  I don't see any.  Thank you,

13   sir.  Thank you.  Call your next witness, please.

14          MR. MARTINEZ:   The State calls Edward Pollard.

15

16                      EDWARD POLLARD,

17   called as a witness herein, having been first duly sworn,

18   was examined and testified as follows:

19

20                   DIRECT EXAMINATION

21   BY MR. MARTINEZ:

22          Q.    Your name, sir?

23          A.    Edward Pollard.

24          Q.    Who do you work for?

25          A.    City of Mesa.

156

```
 1          Q.   What do you do for them?
 2          A.   I am a gang detective with the City of Mesa.
 3          Q.   Drawing your attention back to January 28th
 4   of this year, did you have occasion to be on duty around
 5   10:45 in the evening?
 6          A.   Yes.
 7          Q.   What were you doing about that time?
 8          A.   I was actually at our main station writing
 9   reports.
10          Q.   And where is the main station locaed?
11          A.   130 North Robson.
12          Q.   And that's in Mesa?
13          A.   Yes, sir.
14          Q.   And did anything from the radio draw your
15   attention?
16          A.   Yes, sir.
17          Q.   What was that?
18          A.   There was a call of an emergency call
19   reference an officer that had possibly been shot.
20          Q.   So what did you do?
21          A.   I immediately ran to my patrol car along
22   with two other detectives on my squad.
23          Q.   Were they inside with you or outside?  How
24   did that work?
25          A.   I was actually standing outside in the
```

157

parking garage because my cell phone didn't get reception

inside the building, and I had walked out to call my wife.

My two partners were inside the building.  I heard the

call come over the radio.  I stood there for a couple

seconds.  My partner come running out of the vehicle and

we all three headed to my vehicle.

Q.   What kind of car?

A.   It was an unmarked Crown Victoria.

Q.   Does it have lights that flash on and off?

A.   Yes, it does.

Q.   Does it also have a siren?

A.   Yes, sir, it does.

Q.   And did you and the other two individuals

get in the same car?

A.   Yes, sir, we did.

Q.   And what are the two other individuals'

names?

A.   Detective Brian Judding and Detective Nate

Schlitz.

Q.   And you said that you were driving; correct?

A.   Yes, sir.

Q.   Where do you go?

A.   We proceeded southbound on Country Club

towards U.S. 60.

Q.   And then what happens?

8

1      A.   As we approached U.S. 60, we heard over the

2  radio that the suspect vehicle had been located in the

3  shooting and was seen getting on U.S. 60 eastbound, I

4  believe, on Greenfield.

5      Q.   Could it have been Higley, do you know?

6      A.   It could have been Higley, yeah.

7      Q.   So what do you do then?

8      A.   We get on U.S. 60 eastbound and proceed to

9  go that direction and try to locate the suspect vehicle.

10      Q.   What is the first thing as it applies to

11  this case that you come up against or that you find?

12      A.   Immediately as we got to the first overpass,

13  I observed probably I am going to guess probably 20, 25

14  police cars en route in that direction.

15      Q.   Did you continue on?

16      A.   Yes, sir we did.

17      Q.   What happened then?

18      A.   As we proceeded eastbound I know I passed a

19  few patrol cars.  There were many, many many civilian

20  vehicles on the freeway which was quite scary for all of

21  us in my vehicle especially, and I am sure for all the

22  rest of the officer passing these vehicles, passing at

23  speeds to try to keep up with the suspect vehicle.

24  Eventually we caught up to the pack following the suspect

25  vehicle.

159

Q.      When you caught up to the pack were you able
to see the truck initially?

A.      Initially, no, sir.

Q.      So you keep driving.  And when do you then
see the truck?

A.      We saw the truck on U.S. 60 and it kind of
makes a slight turn to the right at Gold Canyon, both
myself, Detective Judding and Detective Schlitz all
noticed the truck at that point.

Q.      What position were you in at that time
point?

A.      At that point we had passed quite a few
cars.  We were probably maybe tenth in the stack.

Q.      I notice the truck is still traveling at a
high rate of speed.  The patrol cars and all the cars
involved in the chase were kind of staggered in case
something happened.  We don't want to be too close to the
car in front of us.  At that point you could see the
suspect vehicle and you could see an individual from the
passenger side getting out of the passenger side and
climbing into the rear of the truck.

Q.      When was the first time -- when was the time
that this event that you are describing about the
passenger getting out, where were you in terms of location
on U.S. 60 when you saw that?

160

8

1          A.    That was right around Gold Canyon.

2          Q.    All right.   Then what do you see or hear at

3    that point?

4          A.    We see the individual in the bed of the

5    truck tossing items out of the bed up truck.   I remember

6    seeing a pitchfork being tossed out.   I remember passing a

7    pitchfork.   I remember passing a flagpole with a base

8    attached to it standing in the middle of the road and a

9    rake.   We hit several items that sounded like I had run

10   over a steel box.   We hit certainly several items.   I

11   don't know what they were.   I kept waiting for my car to

12   be disabled, but it wasn't.

13         Q.    So then were you then able to move up in

14   this lead pack, if you will?

15         A.    Cars -- I remember a car to my left the tire

16   blew out.   It went off into the center median.   We passed

17   a few more cars that were being disabled, I guess hitting

18   an object or their tires blowing out.   By the time we got

19   past Gold Canyon and started making our way up to Superior

20   we imagined to get probably, oh, maybe third in the stack.

21         Q.    You indicated that I guess it was near Gold

22   Canyon when you first saw the individual get out and get

23   into the back of the truck.   Did he stay there

24   continuously or what happened?

25         A.    No, sir.   That gentleman got in and out of

161

the bed of the truck several times.

Q.   And do you remember -- you said several times.  Do you remember after that initial time seeing him, do you remember him going back into the truck?

A.   Yes, sir.

Q.   Where was the truck traveling?

A.   We had gone where I remember him getting back into the truck was passed Superior.  I believe just past the tunnel is when he was attempting to get back into the truck.  He was having some difficulty, but he was trying to get back into the truck.

Q.   You indicaetd he was getting in and out?

A.   Yes, before Superior he had gotten back into the truck and was actually in the truck as we were going through Superior.

Q.   Then he got out again?

A.   Yes, sir, he did.

Q.   Were you able to actually -- was there ever any area where he was in the bed of the truck that was well lit?

A.   Going throughout through the tunnel as we passed Superior, the tunnel was very well lit.  We had a very good look at him when he was in the bed of the truck going through the tunnel.  Going through Superior there were street lights there, but at that time he was in the

162

9

1    vehicle -- actually, I take that back.  Going through

2    Superior, that's when he had thrown the generator out of

3    the truck just prior to getting into Superior.

4         Q.   And this generator, did you actually see it

5    come off the truck?

6         A.   Absolutely.

7         Q.   And what happened.

8         A.   The gentleman in the bed of the truck threw

9    this generator out of the bed.  I am surely hoping that it

10   would fall into the street.  I don't think he realized it

11   was attached to a chain so the generator fell about five

12   or six feet out of the back of the truck and was

13   physically dragging back and forth behind the truck.

14   Sparks were flying.  And at that point, you know, I

15   realized that this thing was going to probably break loose

16   pretty quick.

17        Q.   And what happened then in terms of that

18   generator or that's sparking behind you?

19        A.   The generator actually caught fire, so there

20   was a ball of fire behind this truck swinging back and

21   forth.  I remember telling my partner Detective Judding

22   that this thing is going to break loose, and I am hoping

23   this doesn't hit one of our patrol cars or hit one of the

24   cars followin the suspect vehicle.  Shortly thereafter she

25   is saying that it did break loose and the patrol car to my

163

9

1    right hit it head-on.

2         Q.   After that happened, any reasonable

3    apprehension that something may happen to you?

4         A.   Absolutely.  Yeah.  I was terrified.

5         Q.   So then what happened?  That tears off?

6         A.   That tears off.  The car to my right, like I

7    said, hit the generator head-on.  We proceed on.  At that

8    time we become second in the stack, and I believe there is

9    one other car behind us.  We proceed past Superior, go

10   over the bridge, and then through the tunnel.

11        Q.   Once you get past the tunnel what happens?

12   Well, in the tunnel, the individual, could you tell what

13   he was wearing?

14        A.   Dark clothing.

15        Q.   And was he getting in the truck?  Out of the

16   truck?  Inside the truck?

17        A.   He was attempting to as we entered the

18   tunnel he was -- it appeared he had run out of things to

19   throw at us.  He was throwing paper items.  So at that

20   point I realized, okay, he doesn't have anything that's

21   going to damage my vehicle or stop my vehicle.  I think he

22   realized he was out of items to throw.  He made an attempt

23   to get back into the cab of the vehicle.  It appeared he

24   lost his footing.  He was holding onto the door as the

25   vehicle was proceeding and attempting to get back into the

164

cab of the vehicle.  I actually thought he was going to

fall out of the truck, but he did manage to climb back

into the cab of the vehicle.

Q.   Then what happened?

A.   The truck proceeded down the highway.  A

short time after the tunnel we caught up to a semi truck.

The patrol car in front of us -- the vehicle proceeded

around the semi truck without any caution from any

vehicles coming from any direction.  I mean, I even made a

comment to my partner.  I hope to God I hope nobody is

coming the other way.  But when he went around the other

vehicle the officer in front of us proceeded to follow him

around the semi, and then we followed shortly thereafter.

Q.   What happened then?

A.   As we were going around the vehicle, I

remember hearing loud pops.

Q.   So we are clear, did you see any shooting?

A.   I did not see the shooting, but I heard the

rounds going off.

Q.   Then what happened?

A.   We continued down the highway probably for

another four or five miles up to the top of the hill where

it's known sa the Top Of The World.  The vehicle proceeded

to slow down.  I noticed there were no brake lights, so it

appeared to me that the vehicle was running out of gas or

165

9

10

1  that the engine had stopped working.

2      Q.    What happened then?

3      A.    The vehicle slowed down to about 20 miles an

4  hour.  At that point the passenger in the truck stuck his

5  arm out of the truck and started firing rounds in our

6  direction.

7      Q.    What did you do?

8      A.    I scrunched down as low at I could go in my

9  patrol car, looking underneath the steering wheel and

10  trying to see through the windowshield.  My partner,

11  Detective Judding, had scrunched himself down.  We both

12  made comments to each other.  He is shooting at us.  He is

13  shooting at us.  I screamed to my partner.  We need to

14  start shooting back.

15      Q.    Were you in reasonable apprehension at that

16  point?

17      A.    Again, I was terrified that either myself

18  was going to be shot, the officer in front of us,

19  Detective Judding.  I mean, Detective Schlitz in the back.

20  All of us were in harm's way wondering where these rounds

21  you were going to hit.

22      Q.    Were you in the right the middle or where

23  were you?

24      A.    The truck came to a stop.  The patrol

25  officers moved toward the left of the driving side of the

166

10

1    truck.  We proceeded over to his passenger side and we

2    were positioned more on the passenger side of the suspect

3    vehicle.

4              Q.   So now you are getting shot at.  What

5    happens?  What do you do?

6              A.   I immediately opened my door.  He isshooting

7    at us.  I pull out my firearm.  I immediately fire four or

8    five rounds from my handgun.  The suspect immediately

9    turns around and runs to the front of the truck to hide

10   behind the front of the truck.

11             Q.   When he gets to the front of the truck, what

12   do you see?

13             A.   I see a truck, and I realized at that point

14   because the distance my handgun was not going to be an

15   effective weapon in dealing with this.

16             Q.   At any time do you see the passenger who has

17   gone to the front banging on the hood or anything like

18   that?

19             A.   No, sir.

20             Q.   Do you hear him screaming anything at all?

21             A.   No, sir.

22             Q.   Were you close enough to be able to hear it?

23             A.   Initially, no, we were too far away when the

24   shooting initiated.  Couldn't hear anything at that point.

25             Q.   But you see him get to the front, but are

167

you able to see where he's standing or what he's doing?

A.   He immediately moved to the front of the truck.  Like I said, he was peeking up.  He had fired a couple rounds, moved to the front of the truck.  He was peeking up and down.  I took that as he was trying to get focused on us as far as where he was going to shoot more rounds, and that's when I decided to open my trunk and get my rifle out of the trunk.

Q.   I think you said Detective Judding was next to you?

A.   Yes, sir.

Q.   What is he doing?

A.   He is in his car.

Q.   It is your car, though?

A.   Correct, my car.  He was sitting on the side and immediately fired two rounds, I believe two rounds, at the suspect.

Q.   So you got your rifle now and what happens?

A.   I go over to Detective Judding's side of the vehicle because it had a better line of sight on the suspect.  I see him peeking up and down.  I fire seven, eight rounds with my rifle.  I realized I am not going to catch him looking up, and I start firing towards his legs.

Q.   And you are still by the vehicle, or where are you?

168

A.   I am right on the passenger side of my

vehicle.

Q.   Where is Detective Schlitz at this point?
We talked about Judding, but where was Schlitz?

A.   Detective Schlitz is still locked in the
back of my back vehicle.

Q.   What do you mean locked in the back of the
Patrol vehicle?

A.   I have a caged car, and we had developed a
plan initially to let him out of the vehicle when we had
come to a stop.  Initially we were quite a ways back, and
we didn't think that we would be involved in anything that
actually occurred, but we wound up being the second car in
the stack, and when the shooting started neither myself
nor detective Judding remembered to let him out of the car
so he was stuck in the rear of mt patrol car.

Q.   Throughout this whole thing?

A.   Throughout the whole thing, yeah.  He was
not real happy.

Q.   When was he finally let out?

A.   I remember after I fired the rounds from my
rifle the shooting finally subsided.  Everybody said cease
fire.  Everybody stopped shooting.  And I remember hearing
yelling and kind of in a distance behind me.  And I
remember telling myself who was yelling behind us?  My

169

10

1  God, who is yelling behind us?  And at that point it

2  clicked that Detective Schlitz were still in the rear of

3  my patrol car, and I told Detective Judding to let him

4  out.

5        Q.  Did you have anything to do with the arrest

6  of the individual -- with the arrest of the passenger?

7        A.  Not the physical arrest.  We did walk up on

8  the passenger side of the vehicle as they were forming the

9  arrest, but we didn't actual him assist in making it.

11

10        Q.  With regard to the passenger you did not

11  assist?

12        A.  Correct.  I was there and aided but did not

13  assist.

14        THE COURT:  Cross.

15

16                    CROSS-EXAMINATION

17  BY MR. SHELL:

18        Q.  When was the first time that you got a

19  visual on this truck?

20        A.  Right around Gold Canyon.

21        Q.  Okay.  And did you write a report in this

22  case?

23        A.  No, sir, I did not.

24        Q.  But you were interviewed; correct?

25        A.  Yes, I was.

170

11

1    Q.   And that was by Detective Cates with the

2 Department of Public Safety?

3    A.   I know it was with DPS, but I don't remember

4 the detective's name.

5    Q.   And that interview took place shortly after

6 this incident?

7    A.   I believe a couple days, correct.

8    Q.   Okay.  When everything was still fresh in

9 your mind?

10   A.   I guess you could say that, yeah.

11   Q.   Did you tell Detective Cates that the person

12 in the back of the truck was always in the back of the

13 truck until near the end?

14   A.   I don't remember saying that.

15   Q.   Have you reviewed your transcript of that

16 interview?

17   A.   No, sir, I have not.

18   Q.   Have you discussed your testimony with the

19 prosecutor in this case?

20   A.   No, sir, I have not.

21   Q.   This is the first time that you have talked

22 to the prosecutor about this case?

23   A.   We met last week.

24   Q.   And you guys didn't discuss --

25   A.   Well, we discussed what my role was in this

171

11

1  case, correct.

2        Q.  And what you would testify to?

3        A.  I know I just told him what I did in the

4  case.

5        Q.  Let me show you what's been marked as

6  Exhibit No. 123.  Take a look at that, and let's fold that

7  over.  Take a look at that.  Do you recognize that?

8        A.  I am assume this is my interview.

9        Q.  Well, I don't want you to assume.

10       A.  Yeah, that's what it says here.

11       Q.  Is that your interview?

12       A.  Yes.

13       Q.  Is that a transcript of the conversation

14  that you had with Detective Cates of the Department of

15  Public Safety a couple days after this incident?

16       A.  I am sorry, I am trying to read and make

17  sure.

18       Q.  That's fine.

19       A.  What was your question again, sir?

20       Q.  Is that a transcript of your interview?

21       A.  Yes, it is.

22       Q.  With Detective Cates a couple days after

23  this incident?

24       A.  Yes, sir.

25       Q.  All right.  Go to page 5661.  Look near the

172

bottom there.

        A.    Page 5661?

        Q.    Bates stamp.

        A.    Okay.

        Q.    Isn't it true a couple days after this
incident you told Detective Cates that you first saw the
suspect vehicle and the suspects in the back of that truck
around Gold Canyon?

        A.    Yes, sir.

        Q.    And that the suspect was in the back of the
truck the whole time?

        A.    That's what I said here, yes.

        Q.    Is that what you told him right after the
incident?

        A.    That's what I said in this interview,
correct.

        Q.    Okay.  And now you are saying he was going
in and out of the vehicle?

        A.    Yes.

        Q.    Of the truck?

        A.    Yes, I am.

        Q.    Which one is the truth?

        A.    Having been in the shooting -- having been
in the shooting before I can tell you as days go by you
remember things that you initially do not remember when

173

```
1    you give the interview.

2              Q.    How long was your interview there?

3              A.    I don't know.

4              MR. MARTINEZ:  Objection.  He is not allowing him

5    time to respond.

6              THE COURT:  Let him finish.

7              THE WITNESS:  I am not.  I don't.  You mean when

8    it took place after the shooting?

9              Q.    BY MR. SHELL:  How long is the interview

10   there?  How many pages?

11             A.    42.

12             Q.    And how long did it take?  Do you know about

13   how long you were with Detective Cates?

14             A.    Roughly a couple hours.

15             Q.    And he asked you a lot of questions;

16   correct.

17             A.    Yes, he did.

18             Q.    And back after the incident you told him

19   that the suspect that was throwing things out of the

20   vehicle was in the back of the vehicle until the vehicle

21   stopped?

22             MR. MARTINEZ:  Objection; asked and answered.

23             THE COURT:  Overruled.

24             THE WITNESS:  Yes.

25             Q.    BY MR. SHELL:  All right.  Go to page 5664
```

174

11

1    and read the bottom of 5664 to the top of 5665?

2         A.   What part or where do you want me to start?

3         Q.   Just start where you say on 5664 and I heard

4    probably two or three shots.

5         A.   I said and I heard probably two or three

6    shots.

7         Q.   Just read it to yourself.

8         A.   Oh, okay.

9         Q.   And then read the next page, the first

10   paragraph.

11        A.   Okay.

12        Q.   There you tell Detective Cates that you told

13   your partner as you guys were driving down the road to

14   start firing shots at the truck; correct?

15        A.   Start firing shots at the individual that

16   was shooting on the truck, correct.

17        Q.   That was in the back of the truck?

18        A.   Well, what I meant to say was shooting from

19   the bed of the truck.

12

20        Q.   Right.  And you told --

21        A.   Excuse me, the cab of the truck.  I

22   apologize.

23        Q.   Is that what you said?

24        A.   In here it says bed.  Get him back in the

25   truck.

175

12

1          Q.   So what you tell Detective Cates is that you

2    told your partner to start shooting at the truck to try to

3    get the guy that's in the back of the truck.

4          A.   To get him back in the truck.

5          Q.   Meaning he is out in the bed of the truck.

6          A.   Meaning he is in the bed of the truck.

7    Excuse me, the cab of the truck.

8          Q.   Do you say that you told the Detective, told

9    Detective Cates that you told your partner to shoot

10   towards the truck to get him, quote, get him back in the

11   truck?

12         A.   Get him back in the truck, correct.

13         Q.   So you wanted your partner to shoot at the

14   truck to try to get the person in the bed of the truck

15   back into the truck?

16         A.   No, sir.

17         Q.   What do you mean then when you say that?

18         A.   I mean the pasenger was leaning out of the

19   cab of the truck shooting in our direction.

20         Q.   Where do you tell him that?

21         A.   I say that trying to get him back in the

22   truck, trying to get the individual to stop leaning out of

23   the cab of the truck and get him back into the cab of the

24   truck to stop shooting.

25         Q.   That was right before the vehicle stopped,

176

12

1    though; correct?

2         A.    Correct.

3         Q.    That's when the shooting took place right

4    before the vehicle started?

5         A.    That's when it started.

6         Q.    That's when he crawled back in and started

7    shooting at you?

8         A.    He started shooting hanging out of the cab

9    of the truck.

10        Q.    When did you see him crawl back into the

11   truck?

12        A.    Just as we passed through the tunnel.  Like

13   I said, he was dragging on the door trying to get his back

14   way back into the cab of the truck.

15        Q.    And how many cars back were you?

16        A.    Probably seven car lengths.

17        Q.    So there was six other cars in front of you?

18        A.    No, sir.  There was one patrol car.

19        Q.    One patrol car in front of you?

20        A.    Yes, sir.

21        Q.    Explain to me then what you mean when you

22   tell him Detective Cates, Cates asks you -- let's go

23   through it on page 5661 because I am confused, and I will

24   read you what Cates says and then I want you to say what

25   you say.  Cates says: Quote:  Okay.  So during the

177

12

1    pursuit for how much of the pursuit -- or let me put it

2    this way.  For how much of the pursuit while you had eyes

3    on the vehicle was there someone in the back of that bed

4    throwing things out?

5         A.    From the minute I caught eyes on him at Gold

6    Canyon I believe he stayed in the bed until we came to a

7    stop.

8         Q.    Okay.  So he was out that whole time?

9         A.    Like I said, he was in the bed of the truck.

10        Q.    Let's just read what you say.  Cates asks

11   you after you tell him -- once you lay eyes on him you

12   believe he is in the bed of the truck the whole time, and

13   Cates qualifies it again and says to you, okay, so he was

14   out that whole time?  And you say what?

15        A.    Yes, yes.

16        MR. SHELL:  Nothing further.

17        THE COURT:  Redirect.

18

19                    REDIRECT EXAMINATION

20   BY MR. MARTINEZ:

21        Q.    With regard to this issue about the bed of

22   the truck you were going to explain to us what you meant

23   by that?

24        A.    What I tried to relay to the DPS Detective

25   when the shooting started he was leaning out of the cab of

178

12

1    the truck, physically leaning out of the cab of the truck

2    and shooting at our vehicle.  I told the detective next to

3    me start shooting back at the truck to get him back inside

4    the truck so he's no longer shooting in our direction, so

5    that we do not get hit.

6         Q.    Is this while you were already stopped, or

7    is while you are still moving?

8         A.    We were still moving but we were coming to a

9    stop.

10        Q.    And he has already stopped then?

11        A.    He fired a couple shots, and then he

12   stopped.  When the truck stopped he immediately got out of

13   the bed of the truck -- excuse me -- the cab of the truck,

14   turned in our direction, and started firing again.

15        Q.    How about this issue of being in the bed of

16   the truck in Gold Canyon.  Can you tell us about that?

17        A.    He was in the bed of the truck several

18   times.  He got in the bed of the truck.  He climbed back

19   into the cab of the truck.  This happened a couple times

13

20   before we reached Superior where he was still in the bed

21   of the truck throwing stuff out at us.  Once we got past

22   Superior when we got into the tunnel where it was lit and

23   I could see him great at that point.  I observed him

24   climbing back into the cab of the truck, like I said,

25   hanging from the door losing his footing and almost

179

13

1    falling out of the truck.

2         Q.   So basically, as I understand it, him going

3    in and out of the truck how many times or other times

4    three or four or several.   It appears from the thumb you

5    saw him at Gold Canyon he kept getting out of the cab of

6    the truck onto the bed?

7         A.   Correct.

8         Q.   The whole time?

9         A.   He made several changes.   He went back and

10   forth correct.

11        Q.   It appears the whole time he was getting in

12   the bed of the truck?

13        A.   Absolutely.

14        MR. MARTINEZ:   No further questions.

15        THE COURT:   Does the jury have any questions for

16   this witness?   I don't see any.   Thank you.   We are ging

17   to take our evening break.   Remember we don't have trial

18   Thursday.   We don't have trial next week.   So the next

19   time we will get together is July 19th.   Not the Monday

20   coming up but the one after that.   July 19, 10:30 in the

21   morning in this division.   Have a good weekend.   I know it

22   is a long time so I want you to be very cognizant and

23   remember the admonition.   Don't do any Interet research.

24   We had a couple cases blow up because of that.   Hate to

25   see that happen here.   Don't talk to anyone about the case

180

13

1    try and avoid any media exposure.  Have a good extended

2    weekend.

3                    (The jurors exited the courtroom.)

4            THE COURT:  Okay.  Take a seat, everybody.  The

5    record ought to reflect the presence of counsel and the

6    defendant but not the jury.  Is there anything that

7    anybody wants to put on the record?

8            MR. MARTINEZ:  No.

9            MR. SHELL:  Just that I want to make sure since I

10   can't have contact with the victim that the State makes

11   sure that they get Officer Betts the copy of the audio of

12   his interview and a copy of the transcript since I can't

13   do it.

14           MR. MARTINEZ:  I believe he has to read Rule 39

15   that indicates that I don't do that.  I don't have to do

16   that, and I am not going to do that unless some authority

17   indicates that I do.

18           THE COURT:  I don't know if I can order him.

19   File the motion and we will litigate the issue.

20           MR. SHELL:  No need to.  I will just recall him

21   and ask him if he did it.

22           THE COURT:  Okay.  See you on the 19th.  If there

23   is anything between now and then I will be available by

24   phone because I am not in the State.

25                    (The proceedings concluded at 5:00 p.m.)

# Juan Martinez

# 15-3363

Exhibits to initial charge
Attachment 07
(towery & landrigan clem materials)(decltn c hendrix)

## Declaration by Cheryl Hendrix

I, Cheryl Hendrix, declare under penalty of perjury the following to be true to the best of my information and belief.

1. I am over the age of nineteen, and I currently reside in Port St. Lucie, Florida. I am a retired member of the Arizona State Bar.

2. From 1982 to 2001, I was a Superior Court Judge in Maricopa County, Arizona.

3. During my tenure as a superior court judge, I presided over at least seven capital cases at the trial level, and imposed a sentence of death on a number of occasions.

4. In 1990, I presided over the capital case *State v. Landrigan*, CR 90-00066. At that time, judges, not juries, imposed sentences in capital cases by weighing aggravating circumstances against mitigating circumstances. Under the statute, a judge was required to impose a sentence of death if the state proved one or more aggravating circumstances, and if the mitigating circumstances were insufficient to call for leniency.

5. At Jeffrey Landrigan's sentencing hearing, he engaged in a number of inappropriate outbursts and interrupted his trial attorney, who was trying to present testimonial evidence from two witnesses – Mr. Landrigan's ex-wife and

1

birth mother.  It was clear Mr. Landrigan did not want to have either his ex-wife or his birth mother testify.

6.   In spite of Mr. Landrigan's refusal to allow his birth mother and ex-wife to testify, I asked his trial attorney to proffer any evidence he had in support of mitigation.

7.   In Mr. Landrigan's case, the evidence proffered at the sentencing hearing by his trial attorney was not sufficient to show leniency.  The law required that I impose the death penalty.

8.   The paucity of the evidence proffered by trial counsel surprised me.  I had given him all the time he requested to prepare for the sentencing hearing.  I even remarked on the record in open court that I received very little information about Mr. Landrigan's difficult family history.

9.   In addition, Mr. Landrigan's unexplained belligerence, contradictions of defense counsel's avowals in mitigation and prior criminal history led me to conclude he was an amoral person.  His outbursts, combined with the summary presentation of potentially mitigating circumstances by his trial attorney, left me with no alternative; that I was required by law to impose the death penalty for what otherwise was a case in which I would have imposed a life sentence.

10.   Recently, I reviewed documents submitted in support of Mr. Landrigan's

2

federal habeas corpus proceedings, including: a Declaration by Thomas C. Thompson, Ph.D.; a pre-trial report prepared by Mickey McMahon, Ph.D., as well as a Declaration he signed; family trees of Mr. Landrigan's birth and adoptive families; Declarations by Phil Hill, Josephine Snyder, Darrel Hill, Shannon Sumter, Robert Forrest, Arthur Athens, Donna Clark, Kevin Clark, Joe Harris, Jane Shannon, Sandra Martinez, Otis Schellstede, Robert Martinez, George LaBash, and David Stebbins; medical records pertaining to Mr. Landrigan from the Jane Phillip Medical Center; the trial investigator's time logs, an undated letter signed by Virginia Gipson; the Special Verdict in *State v. Eastlack*; and an article written in the ARIZONA REPUBLIC newspaper about Mr. Landrigan's case after he was sentenced to death.

11. I also reviewed parts of Mr. Landrigan's federal habeas corpus petition, parts of the briefs filed by Mr. Landrigan in the United States Court of Appeals for the Ninth Circuit and United States Supreme Court, and the opinions issued by those courts.

12. I viewed a copy of the February 10, 1999, 60 MINUTES II television broadcast about Mr. Landrigan and his birth father.

13. I was surprised to learn that Mr. Landrigan met with psychologist Mickey McMahon, Ph.D., before the sentencing hearing, and that Dr. McMahon

3

submitted a report to Mr. Landrigan's trial attorney that discussed Mr. Landrigan's mental health issues. I was dismayed to learn that Dr. McMahon recommended further psychological testing but that trial counsel never authorized Dr. McMahon or any other mental health expert to conduct the recommended psychological/psychiatric evaluation.

14.   If the information outlined above that I have reviewed, especially the evidence of Mr. Landrigan's organic brain damage, the impact of fetal alcohol syndrome on his behavior, his genetic predispositions and the apparent abandonment by his birth mother, had been presented at the sentencing hearing, I would have concluded that the mitigating factors outweighed the aggravators presented by the state.

15.   The Declaration by Dr. Thompson, which was not presented at sentencing, most impressed me. If I had heard testimony from Dr. Thompson, or a similar expert, at the time of sentencing, I would have had no choice but to find that the statutory mitigating circumstances had been established and were sufficient to call for leniency.

16.   Information about Mr. Landrigan's biological family and his genetic background would be relevant and mitigating to the extent there is a genetic predisposition to non-conforming conduct, that is to commit criminal activities.

4

17.    In sum, had trial counsel presented any of the mitigating information that I have reviewed – which was available at the time of sentencing – Mr. Landrigan would not have been sentenced to death.

18.    Up until now, I always believed that if any constitutional errors occurred in Mr. Landrigan's case then a higher court would correct them. Since the courts have not corrected this injustice, I am compelled to submit this declaration on Mr. Landrigan's behalf.

I declare under penalty of perjury that the foregoing is true and correct.

Signed this 11th day of October, 2007, in Port St. Lucie, Florida.

_Cheryl K Hendrix_

Cheryl Hendrix

5

# Juan Martinez

# 15-3363

Exhibits to initial charge
Attachment 06
(Irizarry transcripts 7-8 -10 pm)

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA


STATE OF ARIZONA         )
                       )
                       )
          Plaintiff,    )
                       )
         vs.           )   No. CR2010-106178-001
                       )
                       )
DAIMEN J. IRIZARRY      )
                       )
         Defendant.   )
                       )


Phoenix, Arizona
July 20, 2010
1:30 P.M.


BEFORE:  THE HONORABLE CHRISTOPHER WHITTEN
Superior Court Judge


REPORTER'S TRANSCRIPT OF PROCEEDINGS

Afternoon session

Testimony of:  Justin Betts
Daimen J. Irizarry

PUBLIC DEFENDER  DEC 09 2010  APPEALS RECEIVED



Cindy L. Lineburg, RPR, CR, CSR(CA)
Official Certified Reporter
CR No. 50031

SUPERIOR COURT

2

1                          A P P E A R A N C E S

2

3              For the State:

4                  JUAN M. MARTINEZ, Deputy County Attorney

5

6              For the Defendant:

7                  CHARLES K. SHELL, Attorney at Law

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SUPERIOR COURT

3

1                              I N D E X

2    WITNESS              EXAMINATION BY              PAGE

3    JUSTIN BETTS

4                         Mr. Shell                  5

5                         Mr. Martinez               6

6                         Mr. Shell                  9

7    DAIMEN J. IRIZARRY

8                         Mr. Shell                  12

9                         Mr. Martinez               59

10                        Mr. Shell                  151

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                         SUPERIOR COURT

```
 1                                    Phoenix, Arizona
                                      July 20, 2010
 2

 3          (The following is a transcript of proceedings held

 4   before the Honorable Christopher Whitten, Superior Court

 5   Judge:)

 6

 7       THE COURT:  The record ought to reflect the presence of

 8   counsel and the defendant, but not the jury.

 9              I've received the State's request for an

10   instruction to the jury on the Victim's Bill of Rights.

11              I'm going to take that under consideration.  I'm

12   not going to give an instruction right now.

13              It is fair game, I think, on cross-examination

14   for you to explore that area, but I'm not going to instruct

15   right now.

16              I think I've already talked about I may change my

17   mind on that depending on how we go from here.

18              Anything else anybody wants to put on the record?

19       MR. MARTINEZ:  No, sir.

20       THE COURT:  Mr. Shell?

21       MR. SHELL:  No, sir.

22       THE COURT:  Okay.

23              (Jury enters the courtroom.)

24       THE COURT:  The record should reflect that we've been

25   joined by the jury.
```

SUPERIOR COURT

1          Officer Betts, come on up.  You're still under

2     oath.

3          Mr. Shell, whenever you're ready.

4

5               DIRECT EXAMINATION (RESUMED)

6     BY MR. SHELL:

7     Q.    Officer Betts, you've had a chance to review your

8     transcript of your interview --

9     A.    Yes, sir.

10    Q.    -- shortly after this incident.

11          Again, anywhere in there where -- now that you've

12    had a chance to review the whole thing, anywhere in there

13    where you tell the officer that's interviewing you that the

14    truck stopped in the crosswalk?

15    A.    No.

16    Q.    Okay.  And, in fact, you tell them that you were

17    in the process of making your turn, correct, when the

18    passenger leaned out of the truck and shot at you?

19    A.    I was -- yeah, that's correct.

20    Q.    So you're following him trying to get on to the

21    on ramp, and that's when the guy leaned out of the truck and

22    shot at you?

23    A.    Right.  The truck stopped and then just --

24    Q.    And I believe you also told them that just prior,

25    as you were coming up on Higley approaching the freeway, it

```
 1    started to rain?

 2         A.    Correct.

 3         Q.    And that you had turned your wipers on, and that

 4    your wipers weren't really all that good, and that it kind

 5    of smeared and that it was blurry looking out of your

 6    window.

 7         A.    Correct.

 8         MR. SHELL:   I don't have any other questions.

 9         THE COURT:   Redirect.   I'm sorry, it's not redirect,

10    it's cross.

11         MR. MARTINEZ:   Right.

12         THE COURT:   Go ahead.

13

14                        CROSS-EXAMINATION

15    BY MR. MARTINEZ:

16         Q.    With regard to that particular transcript, before

17    we broke one of the things that you were asked about was

18    your conversations that you had with the interviewer,

19    correct?

20         A.    Correct.

21         Q.    And one of the areas that was brought up or that

22    you were questioned on was the turning of the signals; do

23    you remember that?

24         A.    I do.

25         Q.    And Defense counsel said to you:   Well, in that
```

1    transcript it does say that you indicated that the person

2    was following directions and was using turn signals?   Right?

3          A.    Correct.

4          Q.    Doesn't appear anywhere in that transcript, does

5    it?

6          A.    No, it does not.

7          Q.    The question included information that was not in

8    that transcript, was it?

9          A.    Correct.

10         Q.    And you were asked about it, right?

11         A.    Right.

12         Q.    And you were asked whether or not you had

13   reviewed that particular information, weren't you?

14         A.    Yes.

15         Q.    With regard to reviewing what's in that

16   transcript, you said I don't have to.   That's what you said,

17   right?

18         A.    Right.

19         Q.    And that's because you're a victim in this case,

20   aren't you?

21         A.    That's correct.

22         Q.    There's a constitutional right not to be asked to

23   do that sort of stuff, right?

24         A.    That's correct.

25         Q.    And specifically, with regard to those types of

1    things, as a victim you have a right to refuse, right?

2        A.    Right.

3        Q.    That is a right that was convened upon you both

4    by statute as well as the Constitution, correct?

5        A.    That's correct.

6        Q.    The other issue that you were asked about was,

7    well, you never indicate in that transcript that the truck

8    stopped, right?

9        A.    Right.

10       Q.    And that's true, it doesn't indicate that, right?

11       A.    That's correct.

12       Q.    But also true in that transcript, isn't it, that

13   person never asked you that, right?

14       A.    No, they didn't.

15       Q.    And in terms of who's guiding the conversation,

16   is it you?  It's him, isn't it?

17       A.    It is him.

18       Q.    And when he would ask you a question, you would

19   answer it, right?

20       A.    That's right.

21       Q.    So if he didn't ask you about whether or not the

22   truck stopped, you didn't answer that, right?

23       A.    Right.

24       Q.    But you did tell him that you were following

25   behind, right?

1      A.     Right.

2      Q.     You indicate that the truck went on to get on the

3 on ramp, right?

4      A.     Right.

5      Q.     And then you -- then the shots were fired, right?

6      A.     Right.

7      Q.     You included that in there, right?

8      A.     Correct.

9      Q.     Nobody ever asked you whether or not the truck

10 had stopped, right?

11      A.     No.

12      Q.     But, whether or not it's in that transcript, did

13 the truck stop?

14      A.     It did.

15      Q.     Did it allow the person who was shooting -- the

16 fact that it stopped, did it facilitate the person shooting

17 at you?

18      A.     Yes.

19      MR. MARTINEZ:   I don't have any other questions.

20      THE COURT:   Redirect?

21

22                    REDIRECT EXAMINATION

23 BY MR. SHELL:

24      Q.     Go to page six -- Bates stamp 6922, starting at

25 Line 113 through Line 128.  Will you review that, please?

1      A.    Okay.

2      Q.    There you tell the officer that the truck turned

3   on its blinker and made a turn; correct?

4      A.    Correct.

5      Q.    And then go to Page 6925 and read Lines 229

6   through 248.

7      A.    You said 239?

8      Q.    229.

9      A.    Okay.

10     Q.    There you're specifically asked, quote, "When

11   they fired, you were still -- you hadn't started your turn

12   yet, or had you started your turn yet?"

13           And what's your response?

14     A.    I said:  I just barely started it -- that I had

15   just barely started it.  I was still somewhat straight

16   compared to their vehicle.

17     Q.    And then you go on and you tell them, quote,

18   "Right, that, you know, they see me, but they're still kind

19   of in their turn."

20     A.    Uh-huh.

21     Q.    Correct?  And you're talking about when he fired

22   at you?

23     A.    Yeah.  Correct.

24     Q.    And you tell them that they fire at you when the

25   truck is in the process of making its turn, in the turn.

SUPERIOR COURT

1        A.      No, I never said that.  I said the truck was at a

2     70-degree angle to me.

3        Q.      Okay.  Then read the next line.

4        A.      That I was about approximately 30 feet behind

5     them.  Is that -- I'm not sure what line you want me to

6     read.

7        Q.      241 to 242.

8        A.      I said, quote, "Enough to where they could, um,

9     you know, see me, but they were still kind of in their

10    turn."

11       Q.      Right.  And that's when they fired at you?

12       A.      It doesn't say here that's where they fired at

13    me.

14       Q.      Well, a few lines up he asked you when they fired

15    at you, had you started your turn yet or not, correct?

16       A.      Correct.

17       Q.      And you go on and you say the following, quote,

18    "Uh, I had just barely started it so I was still somewhat

19    straight compared to their being approximately about -- they

20    were probably more like a 70-degree angle or so."

21             Then you say, "Enough to where they could, um,

22    you know, see me, but they were still kind of in their

23    turn."  Correct?

24       A.      Right.

25       Q.      And that's when you're answering when they fired

1    at you.

2        A.    Right.

3        Q.    And you don't say anything about the truck

4    stopping right in the middle of the crosswalk and the

5    passenger get out and shoot.

6        A.    I think I've made it quite clear that I've

7    answered that question.

8        MR. SHELL:  I don't have anything further.

9        THE COURT:  The jury have any more questions -- or any

10   questions at all for this witness?

11           Okay.  Thank you, sir.

12           Mr. Shell, call your next witness, please.

13       MR. SHELL:  Call Daimen.

14           (Witness sworn.)

15

16                    DAIMEN JOSEPH IRIZARRY

17   called as a witness herein, having been first duly sworn,

18   was examined and testified as follows:

19

20                    DIRECT EXAMINATION

21   BY MR. SHELL:

22       Q.    Daimen, state your full name for the record.

23       A.    Daimen Joseph Irizarry.

24       Q.    How old are you?

5        A.    Thirty-one.

SUPERIOR COURT

| | | |
|---|---|---|
| 1 | Q. | Where were you born? |
| 2 | A. | Chandler, Arizona. |
| 3 | Q. | Have you always lived in Arizona your whole life? |
| 4 | A. | Yes. |
| 5 | Q. | Where at? |
| 6 | A. | Chandler, Mesa, Gilbert areas. |
| 7 | Q. | East Valley? |
| 8 | A. | East Valley. |
| 9 | Q. | Have you ever been in any trouble before? |
| 10 | A. | Once.  I have a misdemeanor. |
| 11 | Q. | For? |

12   A.   My oldest son smacked one of -- my younger son a
13  couple times in the back of the head.  I went to correct
14  him, he went to bump chests with me and get loud, I went to
15  smack him in his cheek for talking to me that way.  He
16  turned his head and my hand hit him in his nose.

| | | |
|---|---|---|
| 17 | Q. | Bloodied his nose? |
| 18 | A. | Bloodied his nose. |
| 19 | Q. | How old was he at the time? |
| 20 | A. | About 16. |
| 21 | Q. | Okay.  And you got a misdemeanor for that? |
| 22 | A. | Right. |
| 23 | Q. | Other than that, you got any prior felonies? |
| 24 | A. | No. |
| 25 | Q. | Ever been involved in gangs? |

SUPERIOR COURT

```
 1      A.     No.

 2      Q.     Got any gang tattoos?

 3      A.     No.

 4      Q.     Do you have any tattoos?

 5      A.     I have one.

 6      Q.     What?

 7      A.     It's a D on my shoulder.

 8      Q.     What shoulder?

 9      A.     My left.

10      Q.     What's it stand for?

11      A.     Daimen.

12      Q.     Other than that, no other tattoos?

13      A.     None.

14      Q.     What's your relationship like -- explain to us

15   your relationship with the Redondo family?

16      A.     It's a -- a long 30-year relationship between

17   Angel Redondo and my dad.

18      Q.     Okay.  What type of relationship is it?

19      A.     They were pretty close.

20      Q.     What do you mean by that?

21      A.     They were close enough that you could say they

22   were like brothers.

23      Q.     What did you call Angel?

24      A.     Uncle.

25      Q.     Okay.  And who is Christopher Redondo to Angel?
```

1      A.    It's Angel's son.

2      Q.    And how do you know Christopher?

3      A.    Through my dad.

4      Q.    Okay.  And what's your relationship like with

5   Christopher?

6      A.    There hasn't been much of a relationship for the

7   past 15 years.

8      Q.    So you haven't really had any relationship with

9   Christopher Redondo for 15 years?

10      A.    Right.

11      Q.    Okay.  Prior to that, prior to the 15 years prior

12   to that, what was your relationship like?

13      A.    As young kids, maybe about six to eight years

14   old.

15      Q.    How old are you?

16      A.    Thirty-one.

17      Q.    How old is he?

18      A.    I believe he's five years older than I am.

19      Q.    So he's 36.

20      A.    Thirty-six.

21      Q.    So when you're younger, you're six, seven?

22      A.    Right.

23      Q.    So that would have made him, what, 11?

24      A.    Eleven, 12.

25      Q.    Okay.  What was your relationship like back then?

SUPERIOR COURT

1       A.      His family and my family would get together and

2   we would go to the river.  My dad had an off roading

3   vehicle, his dad had an off roading vehicle, so we, you

4   know, drive right up to the lake there, we go swimming, you

5   know.

6       Q.      And that was until when, you're about 15 or so?

7       A.      There was a distance in between there, a breaking

8   apart, probably about from seven to eight, until -- I didn't

9   have a relationship with him until about 14 years old,

10  again.

11      Q.      Okay.  And then from January 28th of this year

12  back, it had been about 15 years that you really had

13  anything to do with him?

14      A.      Yes.

15      Q.      Seen him.  You went 15 years without seeing him?

16      A.      I have seen him one time at church.

17      Q.      Okay.  But for 15 years you really only saw him

18  once and that was at a church function, yes?

19      A.      Yes.

20      Q.      Okay.  All right.  Let's go to January 28, 2010.

21  Well, let me back up here for a second.

22              Since January 28th, 2010, to now, something

23  happened to your father?

24      A.      Yeah.

25      MR. MARTINEZ:  Objection, relevance.

1    Q.    BY MR. SHELL:  Is there a reason why you started

2  crying --

3    A.    Yeah.

4    Q.    -- a little bit ago?

5    MR. MARTINEZ:  Objection, relevance.

6    THE COURT:  Let me rule on the objections, if you

7  would.  What's the relevance of this?

8    MR. SHELL:  Explain why he's crying.

9    THE COURT:  I'll allow it.

10    Q.    BY MR. SHELL:  What happened to your father

11  between January 28th, 2010, and now?

12    A.    He had a massive heart attack.

13    Q.    And what happened to him?

14    A.    He died.

15    Q.    Okay.  So when you talk about your father, it

16  brings emotions up?

17    MR. MARTINEZ:  Objection, leading.

18    THE COURT:  It is leading.  Sustained.

19    MR. SHELL:  All right.

20    Q.    BY MR. SHELL:  Let's go to January 28, 2010.

21  What were you doing that day?

22    A.    Just hanging out with my fiance.

23    Q.    Where at?

24    A.    At her dad's.

25    Q.    And who's her dad?

SUPERIOR COURT

1       A.      Freddie Martinez.

2       Q.      And where is this at?

3       A.      In Chandler.

4       Q.      Okay.  What time did you get up that day?

5       A.      About -- somewhere about four, 4:30 in the

6  morning.

7       Q.      Why?

8       A.      To take Freddie to work.

9       Q.      Where does he work?

10      A.      City of Tempe.

11      Q.      So you took him to work and then came back?

12      A.      Yes.

13      Q.      What did you do after that?

14      A.      I went back and I went back to sleep for a little

15  bit, woke up a few hours later.  I looked at his vehicle a

16  little bit.

17      Q.      What vehicle is that?

18      A.      It's a Dodge Durango.

19      Q.      Okay.  Was there problems with that?

20      A.      Yeah.

21      Q.      Okay.  What else did you do?

22      A.      I couldn't figure out how to get the radiator out

23  of it.  It's really a weird set up on those vehicles.

24      Q.      Okay.

25      A.      And I've never worked on one of those before.

SUPERIOR COURT

1    Q.    What else did you do?

2    A.    I don't understand.   What else?

3    Q.    You had lunch?

4    A.    I ate lunch.

5    Q.    Who were you with?

6    A.    With Melissa.

7    Q.    Okay.   Did you do anything that afternoon?

8    A.    Yes.

9    Q.    What did you do?

10   A.    Meth.

11   Q.    Explain that.   Explain what happened.

12   A.    Prior to picking Freddie back up at work I --
13   well, he got out of work and he went to his girlfriend's
14   house.   I was picking him up from his girlfriend's house
15   later that afternoon.   I made a stop.

16   Q.    Where at?

17   A.    At this guy's house that I had met.

18   Q.    Okay.   And what did you do?

19   A.    I smoked meth.

20   Q.    How much?

21   A.    It was three hits.

22   Q.    Okay.   About what time was that?

23   A.    Had to be in between 4:30 and 5 o'clock.

24   Q.    Okay.   After you did that, what did you do?

25   A.    I picked Freddie up and we drove back to his

```
 1   house.

 2        Q.    Okay.

 3        A.    At that time Melissa and her sister --

 4        Q.    Who's Melissa?

 5        A.    She was my fiance.

 6        Q.    What do you mean she was?

 7   MR. MARTINEZ:  Objection, relevance.

 8   THE COURT:  Sustained.

 9        Q.    BY MR. SHELL:  Melissa and her sister did what?

10        A.    They were making dinner.

11        Q.    Okay.  So what did you do?

12        A.    I ate.

13        Q.    All right.  Did you receive any phone calls?

14        A.    Yes, I did.

15        Q.    Who from?

16        A.    My uncle, Angel Redondo.

17        Q.    Okay.  And based upon that phone call, were any

18   plans made?

19        A.    Yes.

20        Q.    What?

21        A.    He was going to come by and take a look at the

22   Durango as well to see if we could figure out how to get the

23   radiator out so we could fix it.

24        Q.    Okay.  Did that happen?

25        A.    Yes.
```

1       Q.      About what time?

2       A.      I'm not sure exactly the time.  It had to be

3   about seven, 7:30.

4       Q.      Okay.  How did Angel show up?

5       A.      He showed up in a pickup truck.

6       Q.      Was anybody with him?

7       A.      Yes.

8       Q.      Who?

9       A.      Christopher Redondo.

10      Q.      What was Christopher --

11      A.      He was in a different truck.

12      Q.      So Angel and Christopher showed up in two

13  different trucks?

14      A.      Yes.

15      Q.      Angel had a pickup and Christopher was driving

16  the truck that we've seen pictures of and were involved in

17  this case?

18      A.      Yes.

19      Q.      Okay.  What did you guys do?

20      A.      We -- then we were looking at the truck, we

21  started -- started what we thought was taking it apart to

22  get the radiator out.

23      Q.      How long did you guys work on it?

24      A.      I would say it had to be about an hour and a half

25  to two hours.

1      Q.    Okay.  While you guys were working on it, was

2    there any conversation?

3      A.    Yes.

4      Q.    Based upon that conversation, were you asked to

5    do anything?

6      A.    Yeah.

7      Q.    What were you asked to do?

8      A.    I was asked if I could help Chris move.

9      Q.    Okay.  And what was your understanding about

10   helping him move?

11     A.    Going to Globe, going to sleep, waking up early

12   the next morning, moving his furniture off of a trailer into

13   his house.

14     Q.    So the stuff that needed to be moved was already

15   on a trailer?

16     A.    Yes.

17     Q.    And it needed to be taken to his house and moved

18   off the trailer into the house?

19     A.    Yes.

20     Q.    And you agreed to do that?

21     A.    Yes.

22     Q.    At some point do you leave Freddie Martinez's

23   house?

24     A.    Yeah.

25     Q.    Do you remember what time?

1      A.    I don't remember the exact time, but it had to be

2    about two hours after by the time we put everything together

3    and put the tools away.

4      Q.    So roughly --

5      A.    Two hours, about 9:15, 9:30.

6      Q.    Okay.  You left.  Who did you leave with?

7      A.    I left with Chris and Melissa.

8      Q.    Okay.  What did Angel do?

9      A.    He left.

10      Q.    Okay.  What did he leave in?

11      A.    In one of the pickups.

12      Q.    Okay.  And you left in that utility truck that

13    we've seen?

14      A.    Yes.  Yes.

15      Q.    At the time you leave, who's driving?

16      A.    Chris was driving.

17      Q.    Okay.  And where do you guys go?

18      A.    Around the block.  He stopped at a stop sign and

19    asked would you like -- he asked would you like to drive and

20    I said I would if you need me to.  So he crossed the stop

21    sign, pulled over, over on -- we were on Hartford heading

22    northbound, in Chandler.  We just passed Galveston, there's

23    an apartment complex there and a convenience store to the

24    west side of it.

25      Q.    So what do you guys do?

SUPERIOR COURT

24

1      A.    We switched seats.

2      Q.    Okay.  And then were you driving now?

3      A.    Now I'm driving.

4      Q.    Where do you guys go?

5      A.    We go to my house.

6      Q.    Where is that at?

7      A.    In Gilbert, Arizona.

8      Q.    Why did you go there?

9      A.    So I could change out of my tennies into some

10   boots and get a jacket.

11     Q.    Okay.  How long are you at that house?  Who all

12   is at that house when you get there?

13     A.    My mom, her husband, me, Melissa and Chris.

14     Q.    Okay.  Does everybody get out of the truck and go

15   in the house?

16     A.    I don't recall everybody getting out all at one

17   time, you know, all entering at the same time, but at one

18   time we were all in the house.

19     Q.    Okay.  How long were you there for?

20     A.    Maybe 15 minutes, 20 minutes.

21     Q.    Okay.  You leave?

22     A.    Yes.

23     Q.    What do you take with you?

24     A.    I take my jacket, my laptop.

25     Q.    Okay.  And where do you go?

```
1      A.    I got back into the truck.

2      Q.    Where at?

3      A.    The driver's side.

4      Q.    Okay.  Who else -- who gets in the truck with

5   you?

6      A.    Chris.

7      Q.    Anybody else?

8      A.    No.

9      Q.    When you get back in the truck, what all is in

10   the truck that you see?

11      A.    My jacket, my computer, I might have had a

12   Rubik's cube with me.

13      Q.    Anything else?

14      A.    Not that I can see.  It was dark right there.

15      Q.    Okay.  You see any guns?

16      A.    No.

17      Q.    All right.  Where do you go?

18      A.    I cut through the neighborhood, I come out on

19   Juniper and Val Vista, so I'm -- I stop at a light.  I make

20   a left-hand turn heading northbound on Val Vista Road.

21      Q.    Okay.  Where are you heading?

22      A.    We were heading toward the 60.

23      Q.    Okay.  What happens next?

24      A.    We had a conversation about getting something to

25   eat.  We then -- at that point in time I had noticed there
```

1    was a car behind me and it was really close so I figured let

2    me get out of the guy's way.

3         Q.    Okay.   What lane are you in?

4         A.    I'm in the center lane.

5         Q.    How many lanes on Val Vista heading north?

6         A.    In that area there's three.

7         Q.    Okay.   So there's somebody right on you, now can

8    you see who it is?

9         A.    No.

10        Q.    Why is that?

11        A.    You've seen the pictures of the truck, it's got a

12   big toolbox in the back.   There's no rearview mirror, so I

13   can't see directly behind me.

14             I have my driver's side mirror that I could see

15   the next lane in, and the passenger mirror, it was too far

16   turned outwards that I couldn't see that lane, so I put my

17   blinker on, I kind of like glanced over to see if I seen any

18   lighting coming up on that side.   I made my lane switch.

19   The car followed directly behind me.

20        Q.    Okay.   So you go from the middle lane to what

21   lane?

22        A.    To the curb lane.

23        Q.    Okay.

24        A.    I then -- at that time I missed my turn into the

25   Fry's parking lot where there's, I think there's a Subway in

```
1    that area too.  I missed that turn, so I proceeded with a
2    right-hand turn onto Baseline.
3         Q.    Going where?
4         A.    Heading eastbound.
5         Q.    And where were you going to go?
6         A.    I was going to get the next turn into that
7    parking lot for Fry's.
8         Q.    Okay.  What happens?
9         A.    As I got into -- as I was getting ready to make
10   my right into the parking lot, I could see out my mirror
11   that it was a cop car.
12        Q.    Okay.
13        A.    Then as I was turning right into the parking lot,
14   the police lights came on.
15        Q.    Okay.
16        A.    I then stopped right in the parking lot.
17        Q.    All right.  Then what happened?
18        A.    The officer came up to the truck.
19        Q.    Where at of the truck?
20        A.    To the driver's side.
21        Q.    Okay.  What happened?
22        A.    He asked me for my driver's license, registration
23   and insurance.
24        Q.    Okay.
25        A.    I gave him my driver's license.  I asked Chris,
```

1    do you know where your dad keeps his registration and his

2    insurance.  He opened the glove box, he got the paperwork

3    out, shut the glove box, handed me the paperwork.  I then

4    handed it to the officer.

5         Q.   Okay.  Did you have any conversation with the

6    officer?

7         A.   Yes.

8         Q.   Did the officer ask you if you were impaired?

9         A.   No.

10        Q.   Had you been drinking?

11        A.   No.

12        Q.   Did he ask you any questions about whether you

13   were safe to drive because of impairment or intoxication or

14   anything?

15        A.   No.

16        Q.   Why did he say he pulled you over?

17        A.   He told me that I had an obstructed plate.

18        Q.   Okay.

19        A.   He said that there was a strap blocking it.

20        Q.   At that point in time, did you feel the effects

21   of the methamphetamine you had smoked?

22             About what time is this, do you think, best of

23   your memory?

24        A.   It was somewhere between 10:30, 11 o'clock.

25        Q.   Okay.  So five, six hours before.  Are you still

1  feeling the effects of the methamphetamine that you had

2  smoked?

3      A.    No.

4      Q.    All right.  He tells you that the plate was

5  obstructed?

6      A.    Right.

7      Q.    And what happens?

8      A.    Chris said, "I can fix that."  And the officer

9  said do you have your ID, and he said I don't have an ID on

10  me.

11     Q.    Okay.

12     A.    He then asked Chris:  What is your name?  Chris

13  told him Chris Angel Redondo.  And then he asked him his

14  birth date and he gave him his birth date.

15     Q.    All right.  And as far as you know, he gave him

16  his correct name?

17     A.    Right.

18     Q.    Gave him his correct date of birth?

19     A.    From what I know.

20     Q.    Okay.  Then what happened?

21     A.    Then he walked towards the back of the truck.

22     Q.    Who's that?

23     A.    The lieutenant.

24     Q.    Okay.  And what happens?

25     A.    He crossed the spotlight that was shining on my

SUPERIOR COURT

1    side of the truck, and I can hear him running -- I guess

2    he's running the names, something, either Robert --

3    something.

4         Q.    What we've heard on the tape where they used a

5    phonetic?

6         A.    Right.

7         Q.    He's running your name and Christopher's name?

8         A.    Yeah.

9         Q.    Okay.  What's Redondo's -- is there anything

10   going on in the truck that's causing you any concern?

11        A.    No.

12        Q.    Seemed like just a normal traffic stop?

13        A.    Very normal.

14        Q.    Okay.

15        A.    Then I heard the officer say go ahead and come on

16   back.

17              Chris got out, he walked to the back of the

18   truck.

19              At that point I seen that the light wasn't

20   shining as bright on me no more, it looked like somebody was

21   blocking part of it.

22        Q.    So do you see somebody standing back there?

23        A.    Yes.

24        Q.    And that's through where?

25        A.    Through my driver -- the driver's side mirror.

```
 1      Q.   Okay.  Can you tell who it is?

 2      A.   I can't.

 3      Q.   All right.

 4      A.   I hear Chris say, "How's this?"  And the officer

 5   said, "Why don't you tie it off over there so that way if it

 6   comes lose, it doesn't block the plate again."

 7           Chris, I guess, then did that.

 8      Q.   You didn't see it?

 9      A.   I didn't see it.  It was behind the truck, I

10   couldn't see.

11      Q.   Okay.

12      A.   Then I heard Officer -- Lieutenant -- the

13   lieutenant ask Chris what's the correct spelling of your

14   name, and I heard Chris tell him.

15      Q.   Did he spell it correctly?

16      A.   Yes.

17      Q.   Okay.

18      A.   He said, "Okay.  Why don't you go ahead and get

19   back in the truck."

20           Chris came, he got in the truck.

21      Q.   All right.  Then he's sitting back in the

22   passenger seat?

23      A.   Yes.

24      Q.   Okay.  You guys -- is he doing anything?

25      A.   Just sitting there.
```

1    Q.    All right.   What are you doing?

2    A.    I was eating some mini Oreos that I grabbed from

3    the house, my house.

4    Q.    When you say mini Oreos, little packets?

5    A.    It's a little package, you know, the thing has a

6    zip lock on it.

7    Q.    Okay.

8    A.    I remember hearing something about how long you

9    think this is going to take, we need to hurry up and get to

10   Globe.

11   Q.    Now, who says that?

12   A.    Chris.

13   Q.    Okay.

14   A.    I then told him, I don't know, there was a

15   statement, seems kind of dumb to get stopped for a strap

16   over a plate, and I was like, well, he's just doing his job.

17   And then I heard, "He's taking a long time, you think?"

18         At that time --

19   Q.    Now how long had Chris been back in the truck?

20   A.    Maybe a couple minutes.

21   Q.    Okay.

22   A.    I then looked into my mirror.

23   Q.    What mirror?

24   A.    The driver's side mirror.

25   Q.    Why?

SUPERIOR COURT

1       A.      To see if the officer was coming up to give me my

2   ticket or my warning or whatever he was going to do.

3       Q.      Okay.

4       A.      And then I heard a bang.

5       Q.      What kind of bang?

6       A.      Like a gunshot.

7       Q.      Okay.

8       A.      I then --

9       Q.      What do you do?

10      A.      I then jerked, my whole body jerked.

11      Q.      Like it startled you?

12      A.      It startled me a whole lot.

13      Q.      Okay.

14      A.      I then leaned forward holding the wheel, kind of

15  had my head down, and really quick, I looked out my mirror,

16  out my window.  I crossed my mirror, crossed the windshield,

17  and as I was getting ready to look out the passenger window,

18  I was saying, "What was that?"  And before I finished,

19  Redondo was staring, like he was staring like right through

20  me and he had this weird look in his eye.  It scared me.

21  And I heard, "Go, fucker.  Go get the fuck out of here."

22      Q.      What do you do?

23      A.      I started to drive.

24      Q.      Okay.  At that point in time, do you have any

25  idea what had happened?

```
1       A.    No.

2       Q.    How was Redondo acting?

3       A.    Insane.  Crazy.

4       Q.    Had you ever seen him act like that before?

5       A.    Never.  I've never seen anybody act like that.

6       Q.    And what's he saying?

7       A.    He's yelling at me to go call his dad and get him

8  to his dad as fast as I can.

9       Q.    All right.  What's running through your mind?

10      A.    That sounded like a gunshot.

11      Q.    Had you seen a gun?

12      A.    No.  Ran through my mind, there's a red car,

13  there's the truck on me, there's me, Chris, and there's an

14  officer.  I know the officer has a gun.

15            As those things are running through my mind, I'm

16  thinking why is he yelling at me like this, and it came to

17  my mind he might have a gun.

18      Q.    Okay.  So where do you go?  Who's he?

19      A.    Chris.  I then -- I get onto Baseline, and he's

20  yelling at me to take him to Globe.

21      Q.    What are you trying to do?

22      A.    I'm trying to call his dad and just trying to

23  figure out in my head what was it -- what really happened,

24  what's going on.

25      Q.    Okay.  Are you asking any questions?
```

SUPERIOR COURT

1       A.      Yes, I'm asking what happened back there, what

2   was that noise.

3       Q.      And are you getting any responses?

4       A.      I'm getting yelled at to just drive and don't

5   stop.

6       Q.      Okay.

7       A.      And get a hold of my dad.

8       Q.      All right.  So where do you drive to?

9       A.      I come up to Greenfield.

10      Q.      Off of what?

11      A.      Off of Baseline.

12      Q.      Okay.

13      A.      I heard, "Turn."

14      Q.      Who's saying "turn"?

15      A.      Chris.  I then made a left-hand turn, going

16   northbound on Greenfield, towards the U.S. 60.  I get on the

17   U.S. 60, and as I'm going down the down ramp, I'm thinking

18   in my head, what happened, what happened.  He's just yelling

19   at me.

20               I was trying to call Angel still.

21               I look in my mirror and I didn't see nobody

22   there, nobody following us or anything.

23               So I was like, there's a hospital on Higley and

24   the 60, I'll get off and pull in the parking lot and try to

25   figure out what happened.

1           As I went to get off, get on the off ramp, he

2    started yelling at me, "Where the fuck are you going?

3    Globe's that way.  Stay on the 60."

4           And it was already too late, I was already on the

5    off ramp.

6           And at that time I -- it came to my mind you

7    can't stop at the hospital.

8      Q.   Are you trying to calm him down or anything?

9      A.   Yeah.

10     Q.   What are you telling him?

11     A.   I told him my mom's house is closer, we could go

12   there, it's safe, we can figure out what happened.

13          He just yelled at me, "No, fuck that.  Take me to

14   my dad."

15     Q.   Okay.  So what do you do?

16     A.   I then found myself on the inside lane for a

17   left-hand turn.

18     Q.   Where at?

19     A.   On Higley, and right where you get off the

20   freeway there's a light, it's not that far.  I don't even

21   know the distance.  There's a little light there.

22          And I was there at that right arrow, and as I was

23   looking down south and Higley, I seen police lights, and I

24   seen one vehicle that didn't have its lights on.

25     Q.   What do you mean?

1       A.      There was a vehicle, a police vehicle coming

2    northbound towards that light.  He didn't have his lights

3    on.

4       Q.      Okay.  So what do you do?

5       A.      The light, the arrow turned green, I made my

6    left-hand turn, I was thinking the officer was catching back

7    up to us.

8       Q.      He follows you?

9       A.      He followed us.  There was a little street that

10   came up on the right, and I heard, "Turn here, turn here."

11   I then turned, heading southbound on that street.

12              I approached Baseline, there's a stop sign.  I

13   stopped.

14              I heard, "Turn.  Take me to my dad.  Get back on

15   the 60."

16              I then made a right-hand turn, got to Higley,

17   made another right-hand turn, got up to the U.S. 60 and I

18   got on the on ramp.

19      Q.      Okay.  As you get on the on ramp, what happens?

20      A.      About halfway down --

21      Q.      It's a down ramp.

22      A.      It's a down ramp.  About halfway down, I heard a

23   thump, so I took a quick glance to the side, and I see maybe

24   about the knee area or lower of Redondo in the window.

25      Q.      Where is the rest of his body?

1      A.    Outside of the truck.

2      Q.    Okay.

3      A.    I then hear two more bangs that sound just like

4 the one, the first one.

5      Q.    What goes through your mind then?

6      A.    Chris has a gun.

7      Q.    And do you have any idea what he's doing with it?

8      A.    Obviously shooting it.

9      Q.    Okay.  Then what happens?

10      A.    He got back in the truck and he started yelling

11 at me, "Go faster, and don't stop until you get to my

12 dad's."

13      Q.    And you know where his dad lives?

14      A.    Yes.

15      Q.    So what do you do?

16      A.    I tried to give him what he wanted.

17      Q.    Are you using your phone?

18      A.    Yes.

19      Q.    Who are you trying to call?

20      A.    His dad.

21      Q.    Did you ever get ahold of his dad?

22      A.    No.

23      Q.    Okay.  So you get on the freeway at Higley and

24 you're heading east?

25      A.    Right.

```
1     Q.    How fast are you going?

2     A.    By then I was -- say I was doing about 80.

3     Q.    Okay.  Why?

4     A.    Because he told me to go as fast as I could.

5     Q.    All right.  And at that point in time what's your

6   thought process?

7     A.    Get him to his dad.

8     Q.    Why?

9     A.    I just had this picture stuck in my head that

10  once we got there, his dad would grab him and say:  Son

11  what's wrong with you, why are you acting like that?  And

12  then everything would become calm.

13    Q.    Were you scared of Redondo?

14    A.    Yeah.

15    Q.    Why?

16    A.    Because I believed he had a gun at that time.

17    Q.    Any other reasons?

18    A.    I was afraid that if I didn't give him what he

19  wanted that there was a chance of being shot.

20    Q.    And how was he acting?

21    A.    Insane.  Crazy.  Just in a manner that I have

22  never seen.

23    Q.    Okay.  So what did you focus on?

24    A.    Getting him to his dad.

25    Q.    And that would be in Globe?
```

SUPERIOR COURT

1       A.      In Globe.

2       Q.      Okay.  As you're going down the freeway, what

3  happens?

4       A.      I say -- I say, "Stop yelling at me."  And he

5  climbed out of the truck and got in the back.

6       Q.      Can you see what's going on back there?

7       A.      I can't, cuz there's no rearview mirror, the

8  toolbox is pretty high.  I think there's maybe three to

9  four inches of the window towards the top that -- I mean

10  you'd have to look, look back in order to see.

11      Q.      Do you have any idea what he's doing back there?

12      A.      I have no idea.

13      Q.      Do you see the police cars behind you?

14      A.      I then see police cars behind me.

15      Q.      They got their lights and sirens on?

16      A.      Lights and sirens.

17      Q.      Why don't you pull over?

18      A.      I was afraid.

19      Q.      Of?

20      A.      Of being shot.

21      Q.      By?

22      A.      Chris.

23      Q.      Do you see Chris again, as you're driving down

24  the freeway?

25      A.      Not until the end.

1      Q.    Okay.  Do you remember him ever getting back into

2   the truck until near the end?

3      A.    No.

4      Q.    Do you hear him fire the gun anymore?

5      A.    No.

6      Q.    What do you think -- you think you're focused on

7   something?

8      A.    Yeah, I'm focused on the road, my phone and

9   getting to his dad.

10     Q.    Who are you trying to call?

11     A.    I was calling his dad.

12     Q.    Did you try to call other people?

13     A.    Yes.

14     Q.    Who all did you call?

15     A.    My dad.

16     Q.    Anybody else?

17     A.    Angela, Angel Redondo's girlfriend.

18     Q.    So Angel Redondo's girlfriend is Angela?

19     A.    Yes.

20     Q.    Do you get a hold of any of them?

21     A.    Yes.

22     Q.    Do you have conversations with them?

23     A.    Yes.

24     Q.    And what do you tell them?

25     A.    I told them that I was scared and that there was

1    police, a lot of police following me.

2         Q.   Tell them anything else?

3         A.   I told them I didn't know what was going on, what

4    do I do.  My dad and Angela both told me --

5         MR. MARTINEZ:  Objection, hearsay.

6         THE COURT:  Sustained.

7         Q.   BY MR. SHELL:  Did you follow their direction?

8         A.   I told them I couldn't.

9         Q.   You couldn't what?

10        A.   I didn't think it was safe.

11        Q.   You couldn't do what?

12        A.   I couldn't stop.

13        Q.   So you kept going?

14        A.   I kept going.

15        Q.   At some point do you see Redondo in the back of

16   the truck?

17        A.   Yeah, I see -- I heard another thump and I seen

18   his foot.

19        Q.   Where was his foot?

20        A.   Right there pressed up against the window.

21        Q.   The back window?

22        A.   The back window.

23        Q.   Above the toolbox?

24        A.   Above the toolbox.

25        Q.   Okay.  Do you get a chance to see him any other

1    times?

2        A.    One time approaching Superior.

3        Q.    Okay.   What do you see?

4        A.    I seen out of my, out of the mirror on the

5    driver's side, I seen him leaned over and he was just

6    pulling stuff out and letting it fall into the street.

7        Q.    Pulling stuff out of what?

8        A.    Out of the toolbox.

9        Q.    Okay.   What are you focused on?

10       A.    Getting him to his dad.   Trying to get a hold of

11   his dad.

12       Q.    Were you trying to help him escape from the

13   police?

14       A.    No.

15       Q.    You get through Superior?

16       A.    I went through Superior.

17       Q.    Get up, go through the tunnel?

18       A.    I went through the tunnel.

19       Q.    Did you ever try to run other vehicles off the

20   road?

21       A.    No.

22       Q.    Did you ever try to, in any way, help Redondo do

23   anything to the police officers?

24       A.    Not at all.

25       Q.    What are you focused on?

1     A.    I'm focused on getting him what he wanted.

2     Q.    You heard an officer testify yesterday about

3  what's called tunnel vision.

4     A.    Yes.

5     Q.    Do you think that you had tunnel vision?

6     A.    Yes.

7     Q.    At some point the truck stops.

8     A.    Yeah.

9     Q.    Why?

10    A.    I really didn't know at the time, I just figured

11  it was out of gas.

12    Q.    What happens?

13    A.    As it was coming to a rolling stop, Chris climbed

14  in through the window and he was yelling at me, "Why the

15  fuck are you stopping?"

16          And I told him the truck doesn't want to go.  And

17  he's yelling at me, "Just get out and walk away, start

18  walking away.  They ain't going to do nothing to you if

19  we're not doing nothing to them."

20    Q.    Did you get out?

21    A.    Yes.

22    Q.    But at that point in time when he's telling you

23  to walk away they won't do nothing to you.

24    A.    At that point in time I was sitting there shaking

25  my head like, no.  I stuck my hands out the window.

SUPERIOR COURT

1       Q.    Why?

2       A.    To let the officers know that I had nothing to do

3   with it and I'm going to surrender.

4       Q.    Okay.

5       A.    I then yelled out, "Don't shoot."

6       Q.    Now -- let's stop.  At this point in time had you

7   ever seen Redondo with a gun?

8       A.    No.

9       Q.    But what was your belief?

10      A.    I believed he had a gun.

11      Q.    And that was because of?

12      A.    The way he was yelling at me, and then the way,

13  the sounds of the three gunshots that I heard were so close.

14      Q.    Let me ask you a hypothetical question.  Let's

15  assume with 100 percent absolute certainty you know Redondo

16  does not have a gun, do you go on this high speed chase?

17      A.    No.

18      Q.    If he's yelling at you and you know with absolute

19  certainty he does not have a gun, are you willing to take

20  him on fist to fist?

21      A.    Oh, yeah.

22      Q.    You're not scared of him?

23      A.    No.

24      Q.    So the only reason why you drove this truck as

25  fast as you could to get to Globe was why?

1      A.      Because I believed he had a gun, and I was afraid

2    of being shot if I didn't give him what he ordered.

3      Q.      All right.   The truck comes to a rolling stop,

4    out of gas?

5      A.      Out of gas, yes.

6      Q.      Redondo's yelling at you?

7      A.      Yes.

8      Q.      What do you do?

9      A.      I stick my hands out the window and I yell out,

10   "Don't shoot."

11     Q.      Who are you yelling that to?

12     A.      To the cops.

13     Q.      Okay.

14     A.      I then --

15     Q.      What's Redondo doing?

16     A.      He jumped out the vehicle and he was running

17   around.

18     Q.      Now, do you hear him or see him fire the gun

19   again?

20     A.      No.

21     Q.      Doesn't mean he didn't, you just didn't hear or

22   see it?

23     A.      Yeah, I didn't hear it or see it.

24     Q.      Okay.   What did Redondo --

25     A.      He ran around the front of the truck, and he was

1   yelling at me, "What are you waiting for?  Let's go."  And I

2   kind of just sat there.

3          Q.    Where are your hands?

4          A.    Out the window.  Then he smacked the hood and

5   told me hurry up.

6                I then reached for the handle of the truck on the

7   outside, and I swung the door open.

8                I started to climb out, and the truck started to

9   roll back.  Being halfway out of the truck, I pushed the

10  brake in, I put the truck in park, and then I proceeded to

11  get out of the truck.

12               When I got out of the truck, I had my hands up

13  near my head.

14         Q.    Do you have anything in your hands?

15         A.    I have my phone in my hand.  I was still pushing

16  the talk button trying to -- trying to get a hold of his

17  dad, somebody.

18         Q.    Okay.

19         A.    I had my head ducked down a little, I had my

20  hands near it.  I kept hearing him, "Come on, let's go,

21  let's go."

22               And I kind of slowly walked towards the front of

23  the truck.  And as soon as I made the right in front of the

24  driver's side of the truck, there was just a lot of gunfire,

25  a lot.

1       Q.      What do you do?

2       A.      I like squatted down sitting on my heels, so I'm

3   up on my toes.  I lean up against the bumper for a shield.

4       Q.      How long is this gunfire going on for?

5       A.      Long enough for me to be screaming, "Stop

6   shooting.  Stop shooting.  Help me.  I need help."

7               It was a lot of gunfire.

8               I then felt my leg get hit.  I felt my foot get

9   hit, it almost knocked me to the ground.  I grabbed the

10  bumper, and I was just holding it.  I was screaming, "Stop

11  shooting.  Please stop shooting.  Help me.  I need help."  I

12  screamed out, "God help me."

13              The helicopter came around, put its lights on me.

14  Having my phone still in my hand, the light was lit on my

15  phone, I held it upwards towards the helicopter, and I waved

16  it and I threw it out into the open, and there was still

17  gunfire.

18      Q.      Was it slowing down yet?

19      A.      I don't know how long it was, but it began to

20  slow down after that.

21      Q.      At some point it stops?

22      A.      Yes.

23      Q.      And what do you do?

24      A.      I heard, "Get on the floor.  Get on the ground."

25              I then laid down with my hands stretched in front

1    of me.

2              And I heard, "Crawl out from in front of the

3    truck."

4              I then went to push with my feet and I couldn't,

5    so I began doing what I would call an Army crawl --

6        Q.    On your elbows?

7        A.    Shift my body back and forth, kind of on my

8    elbows.  Then an officer started yelling at me, "Keep your

9    hands where I can see it."

10             And I told him, "It's hard to crawl, I've been

11   shot in my legs and my feet."

12             And he was yelling at me, "Don't look at me,

13   piece of shit."

14             And I then started just trying to grip the

15   asphalt with my fingers and pull, and I felt somebody jump

16   on my back, I felt some punches, some kicks --

17        MR. MARTINEZ:  Objection, relevance.

18        THE COURT:  Overruled.

19        THE WITNESS:  Then I was handcuffed.  They drug me to

20   the side of the street, and then I was continued to be hit.

21        Q.    BY MR. SHELL:  Are you being asked any questions,

22   anything?

23        A.    Yeah, one officer asked me --

24        MR. MARTINEZ:  Objection, hearsay.

25        THE COURT:  Sustained.

1       Q.      BY MR. SHELL:  Did you try to answer the

2    questions?

3       A.      Yes.

4       Q.      What happened when you tried to answer it?

5       A.      I got kicked.

6       Q.      Where?

7       A.      In my face.

8       Q.      So what did you do after that?

9       A.      I tried to turn my head the other way and I got

10   punched.

11      Q.      Did you say anything after that?

12      A.      I stayed quiet after that.

13      Q.      Eventually you got to the hospital, correct?

14      A.      Yes.

15      Q.      Do you remember how you got to the hospital?

16      A.      I remember hearing an EMT while I was on the

17   floor.

18      Q.      On the ground by the truck?

19      A.      Yes, on the ground.  I wasn't by the truck, I was

20   to the other side of the street.

21      Q.      Okay.

22      MR. MARTINEZ:  Objection, hearsay.

23      THE COURT:  Overruled.  And I'm not sure that I --

24   there's not a question pending yet.

25      MR. SHELL:  No, he's talking about --

1        THE COURT:  Go ahead and ask a question.

2        Q.    BY MR. SHELL:   Okay.  Do you know how you got to

3   the hospital?

4        A.    By Air Evac.

5        Q.    Okay.  What do you remember?

6        A.    I remember getting put on a stretcher.

7        Q.    Okay.  Do you remember getting put on the

8   helicopter?

9        A.    No.

10       Q.    Do you remember the helicopter ride?

11       A.    No.

12       Q.    What's the next thing you remember?

13       A.    I remember waking up in a hospital room, an

14   officer or a detective waking me up calling my name.

15       Q.    Okay.  You know who that was?

16       A.    His name was Detective Van Horn.

17       Q.    Okay.  Did you learn what your injuries were?

18       A.    Yes.

19       Q.    What were they?

20       A.    Gunshot wounds.

21       Q.    How many?

22       A.    Three.

23       Q.    Where at?

24       A.    One underneath my right calf, one to the right

25   ankle on the inside, and one that blew a section of my foot

SUPERIOR COURT

1    off.

2         Q.    Okay.  Was it painful?

3         A.    Very.

4         Q.    When the officer woke you up, it was Detective

5    Van Horn?

6         A.    Yes.

7         Q.    Did you have a chance to talk with Detective Van

8    Horn quite a bit over the next few days?

9         A.    I remember talking to him.

10        Q.    How many times?

11        A.    One time by himself, one time with another

12   detective, and then a little later, there was another

13   detective he came in with.

14        Q.    And ultimately you remember three times that you

15   talked to him?

16        A.    Yes.

17        Q.    Since then you've had a chance to review

18   documents and information, how many total times were you

19   interviewed?

20        A.    I believe there's six or seven.

21        Q.    Okay.  Did you ever ask to talk to an attorney?

22        A.    No.

23        Q.    Did you always answer all their questions?

24        A.    Yes.

25        Q.    You say you remember three interviews, but you

```
 1    don't remember the other three or four.
 2         A.    Right.
 3         Q.    When you were at the hospital, did you have IV's
 4    in you?
 5         A.    Yes.
 6         Q.    Were you being given medications?
 7         A.    Yes.
 8         Q.    Including pain medications?
 9         A.    Yes.
10         Q.    Were you sleeping a lot?
11         A.    Yes.
12         Q.    The interviews that you do remember, did you
13    always try to tell officers the truth?
14         A.    Yes.
15         Q.    Did you ever lie to them?
16         A.    No.
17         Q.    How far did you go in school?
18         A.    I completed the ninth grade.
19         Q.    Why didn't you finish?
20         MR. MARTINEZ:  Objection, relevance.
21         THE COURT:  Overruled.
22         Q.    BY MR. SHELL:  Did you have problems in school?
23         A.    Yes.
24         Q.    What kind of problems?
25         A.    Reading and English.
```

1    Q.    Were you in any special classes?

2    A.    Yes.

3    Q.    And how long were you in special classes?

4    A.    Since elementary school.

5    Q.    So you had special education?

6    A.    Yes.

7    Q.    For all the way through the ninth grade?

8    A.    Yes.

9    Q.    And you didn't complete the tenth grade?

10   A.    No.

11   Q.    What you've told us here today, is that what you

12   tried to tell the officers?

13   A.    Yes.

14   Q.    It's been roughly six months since this happened.

15   You've had a lot of time to think about it?

16   A.    Yep.   Many nights without sleep.

17   Q.    You've gone back over it and over it?

18   A.    Yep.

19   Q.    Is there anything that you would have done

20   different now that you've had a good chance to think about

21   it?

22   A.    Yeah.

23   Q.    What would you have done different?

24   MR. MARTINEZ:   Objection, relevance.

25   THE COURT:   Sustained.

SUPERIOR COURT

1        Q.    BY MR. SHELL:   You and me have discussed what
2    happened?
3        A.    Right.
4        Q.    From the point you hear that first gunshot, the
5    loud bang, all the way up until where you are at top of the
6    world and the truck runs out gas, and you get the front of
7    truck and then the gunfire goes off, do you believe you had
8    any options other than doing what you did?
9        A.    No.
10        Q.    Would you have done anything different?
11        MR. MARTINEZ:   Objection, relevance.
12        THE COURT:   Sustained.
13        Q.    BY MR. SHELL:   As you're doing what you were
14    doing that night, what was your intent?
15        A.    To give Redondo what he commanded.
16        Q.    Why?
17        A.    Because I was afraid.
18        Q.    Was it your intent to try to help him escape?
19        A.    No.
20        Q.    Did you have any plan with him to help him
21    escape?
22        A.    No.
23        Q.    Did you even discuss any plans with him?
24        A.    No.
25        Q.    Was there any discussions with him?

```
 1      A.    No.

 2      Q.    What was going on?

 3      A.    Just yelling.

 4      Q.    Who was doing the yelling?

 5      A.    Chris.

 6      Q.    Did you ever touch a gun that night?

 7      A.    No.

 8      Q.    When's the last time you've ever touched a

 9  firearm?

10      MR. MARTINEZ:   Objection, relevance.

11      THE COURT:   Sustained.

12      Q.    BY MR. SHELL:   Do you have a gun?

13      A.    No.

14      Q.    Did you carry guns?

15      A.    No.

16      Q.    And that night you never had anything to do with

17  any guns?

18      A.    No.

19      Q.    And, in fact, when is it that you finally saw a

20  gun for the first time that night?

21      A.    When I was crawling away and the officer yelled

22  at me, "Don't look at me you piece of shit."  I turned my

23  head the other way.  I tried to look at my foot.  And

24  several feet away, Chris was laying on the floor, and there

25  was a gun by his foot.
```

1      Q.    That's the only time you saw a gun that night?

2      A.    That I recall, yes.

3      Q.    And you never had anything to do with any guns?

4      A.    No.

5      Q.    At any time, from the point in time where you're

6    stopped by Lieutenant Shuhandler, all the way up to top of

7    the world, did you feel the effects in any way, shape or

8    form of the meth that you had smoked at 4:30, 5 o'clock?

9      A.    No.

10     Q.    Do you believe that the meth had anything to do

11   with your actions that night?

12     A.    No.

13     Q.    Assume, hypothetically, that you didn't smoke

14   meth that day, would you have done anything different?

15     MR. MARTINEZ:  Objection, relevance.

16     THE COURT:  Sustained.

17     Q.    BY MR. SHELL:  Again, how many days were the

18   police officers interviewing you for?

19     MR. MARTINEZ:  Objection, asked and answered.

20     THE COURT:  Start again.  I'll probably sustain the

21   objection.

22     Q.    BY MR. SHELL:  How many times -- how many days

23   were you questioned by the police?

24     MR. MARTINEZ:  Objection, asked and answered.

25     THE COURT:  Sustained.

1       Q.    BY MR. SHELL:   You told the police about

2    everything we've talked about?

3       MR. MARTINEZ:   Objection, asked and answered.

4       THE COURT:   Sustained.

5       Q.    BY MR. SHELL:   In your conversations with the

6    police throughout these nights, you told them who you had

7    talked to, gave them your phone number, told them who was

8    your phone provider?

9       A.    Yes.

10      MR. MARTINEZ:   Objection, hearsay.

11      THE COURT:   It's leading.   You've gone over that

12   already.   I don't know whether it's hearsay or not, but we

13   won't even get to that.

14      Q.    BY MR. SHELL:   Anything else that you want to

15   tell us --

16      MR. MARTINEZ:   Objection, relevance.

17      THE COURT:   Sustained.

18      Q.    BY MR. SHELL -- about what happened that night?

19      THE COURT:   Still sustained.

20      MR. MARTINEZ:   Objection.

21      MR. SHELL:   I don't have any other questions.

22      THE COURT:   Thank you.

23          Cross.

24

25

1                        CROSS-EXAMINATION

2     BY MR. MARTINEZ:

3          Q.    Sir, one of the things that you told us here in

4     court today was that, well, when the officers were in your

5     room you told them the whole truth, right?

6          A.    Yes.

7          Q.    You didn't lie to them, right?

8          A.    Yes.

9          Q.    Just like you did here in this court today,

10    right?

11         A.    Yes, sir.

12         Q.    Just like you were telling us about this incident

13    that happened involving you and some child, right?

14         A.    Yes.

15         Q.    Remember you told us that there was -- you've

16    never really been in trouble except for that incident,

17    right?

18         A.    Yes, sir.

19         Q.    And you told us that with this incident basically

20    what happened is you hit a kid, right, that's all that you

21    told us, right?

22         A.    Yes, sir.

23         Q.    You left some things out, though, didn't you?

24         A.    What's that?

25         Q.    Well, do you know who Ortencia Ramirez is?

```
 1      A.    Yes, I do.

 2      Q.    That was your wife, right?

 3      A.    That's my ex-wife.

 4      Q.    Right.  And back then she was known as Ortencia

 5  Irizarry, correct?

 6      A.    She's always been Ramirez.

 7      Q.    And with regard to her, she had a child, right?

 8      A.    Yes.

 9      Q.    His name was Angelo Orosco, right?

10      A.    Yes.

11      Q.    And that's the person that you said that you hit

12  once, right?

13      A.    Yes.

14      Q.    Actually, the police came out, didn't they?

15      A.    Yes.

16      Q.    This was up in Pinal County, wasn't it?

17      A.    Yes, it was.

18      Q.    And the date of that was October of 2004,

19  correct?

20      A.    Yes, sir.

21      Q.    And with regard to that, you didn't just hit him

22  one time, you hit him five times, didn't you?

23      A.    I'm not real sure.

24      Q.    Well, you said you told us the whole truth, and

25  you said you only hit him once.  Now you're telling us
```

SUPERIOR COURT

1    you're not sure.  You did hit him five times, didn't you?

2         A.    I don't believe I said I hit him one time.

3         Q.    You hit him five times, didn't you?

4         A.    I don't believe it was five.

5         Q.    You hit him more than once.

6         MR. SHELL:  Objection, relevancy.

7         THE COURT:  Overruled.

8         THE WITNESS:  I did hit him more than one time.

9         Q.    BY MR. MARTINEZ:  You also threw a hair brush at

10   him, right?

11        A.    Not directly at him.

12        Q.    Well, you got it out of the bed of the truck,

13   didn't you?

14        A.    I don't believe I did.

15        Q.    The police were there, right?

16        A.    The police showed up.

17        Q.    And you were arrested as a result of that, right?

18        A.    Yes, I was.

19        Q.    The other thing that you did is that you knocked

20   everything on the counter from the counter onto the floor,

21   right?

22        A.    I knocked some paperwork that had a cup on it.

23        Q.    Is that "yes" or "no", you knocked some things

24   off the counter?

25        A.    Yes.

SUPERIOR COURT

1       Q.     And with regard to this, you said, well, I've

2   never really been in trouble before.   With regard to

3   Ortencia, you've also choked her out, haven't you?

4       A.     No.

5       Q.     Isn't it true that that's what she told the

6   police on that particular day?

7       MR. SHELL:   Who told the police?

8       THE COURT:   I'm sorry, I just didn't hear.   I didn't

9   hear the question.   Could you repeat it?

10      Q.     BY MR. MARTINEZ:   Isn't it true that Ortencia

11  also told that to the police on that day?   Right?   You were

12  there.

13      A.     I don't know.

14      MR. SHELL:   Objection, hearsay.   How does he know what

15  was said?

16      THE COURT:   I'll overrule the objection.   The objection

17  is hearsay.   The hearsay objection is sustained.

18      Q.     BY MR. MARTINEZ:   But you did choke her out

19  before, didn't you?

20      A.     No, sir.

21      Q.     And with regard to this issue, when the police

22  arrive, you didn't want to be taken into custody, did you?

23      A.     Well, I surrendered to the cop.

24      Q.     No, actually you were talking to your mother on

25  the telephone, weren't you?

1      A.      Yeah, seven houses down from where Ortencia and

2   Angelo were.

3      Q.      Right.  So you --

4      MR. SHELL:  Objection, relevancy, to this whole line of

5   questions.

6      THE COURT:  Why don't you approach?

7             (Bench conference.)

8      Q.      BY MR. MARTINEZ:  You were at your mother's

9   house, right?

10     A.      Yes.

11     Q.      And the police were telling you get off the

12  phone, right?

13     MR. SHELL:  Objection, hearsay.

14     THE COURT:  Sustained.

15     Q.      BY MR. MARTINEZ:  You refused to get off the

16  phone, didn't you?

17     A.      I told the officer --

18     Q.      "Yes" or "no", you refused to get off the phone?

19     A.      No, I ended up hanging up with my mother.

20     Q.      You were talking to her when they came over,

21  right?

22     A.      Yes.

23     Q.      There were other times when the police were

24  called, so this wasn't just the only time --

25     MR. SHELL:  Objection.

1          THE COURT:   I'm sorry -- objection's sustained.

2          Q.    BY MR. MARTINEZ:   Sir, and you said to us, well,

3     I'm going to tell you the whole truth, right, that's what

4     you told us previously, right?

5          A.    Yes.

6          Q.    Here.   One of the things that I noticed was that

7     when you started to talk about Lieutenant Shuhandler, you

8     started to tear up, right?

9          A.    Yes.

10         Q.    And that was in this courtroom here, right?

11         A.    Yes, sir.

12         Q.    With regard to the time that you were out there

13    and this was actually happening and he was actually there on

14    the ground gurgling, you weren't crying at that time, were

15    you?

16         A.    I didn't see him on the ground.

17         Q.    Sir, were you crying back then, "yes" or "no"?

18         A.    I was scared, sir.

19         Q.    Were you crying, "yes" or "no"?   I'm not asking

20    you if you were scared.

21         A.    No, sir.

22         Q.    What's that?

23         A.    No, sir.

24         Q.    Were you crying back then?

25         A.    No, sir.

```
 1        Q.     You got in your car, right, when you heard this

 2   pow, right?

 3        A.     I was already in the vehicle.

 4        Q.     Well, you were in your car when you heard this

 5   pow, according to you, right?

 6        A.     Yes.

 7        Q.     Off you go, right?

 8        A.     As I was commanded, yes.

 9        Q.     Did you go?  "Yes" or "no".

10        A.     Yes.

11        Q.     And in that car with you was this individual,

12   Christopher Redondo, right?

13        A.     Yes.

14        Q.     Somebody that you know, right?

15        A.     Yes.

16        Q.     And it's somebody that, according to you, your

17   parents are as close as can be, right?

18        A.     Yes.

19        Q.     And, in fact, you considered his father to be

20   your uncle, right?

21        A.     Yes, sir.

22        Q.     You grew up with this individual, didn't you?

23        A.     Some.  Several years out of my life, yes.

24        Q.     Sir, when you were younger, didn't you spend a

25   period of time with this individual?  "Yes" or "no".
```

1      A.    Yes.

2      Q.    And you were very close to him when you were

3  young, right?

4      A.    Yes, sir.

5      Q.    And, in fact, you lived -- did you live in Globe

6  back then?

7      A.    No, sir.

8      Q.    But you were still close with him, right?

9      A.    Yes, sir.

10      Q.    And with regard to this individual you said,

11  well, there was a period of time for about 15 years where I

12  didn't see him, right?

13      A.    Yes, sir.

14      Q.    In fact, you said you only saw him one time,

15  right?

16      A.    Yes, sir.

17      Q.    In church.

18      A.    Yes, sir.

19      Q.    And, in fact, you indicated that you really had

20  no contact with him, right?

21      A.    Yes, sir.

22      Q.    No contact whatsoever with him, right?

23      A.    Yes, sir.

24      Q.    Actually you and he would text message each

25  other, wouldn't you?

1        A.      For a couple of months.

2        Q.      "Yes" or "no", would you?

3        A.      Yes.

4        Q.      So when you told us before that you didn't have

5   any contact with him, that wasn't true, right?

6        A.      I didn't have contact with him for about 15

7   years, sir, right.

8        Q.      Then after that you started to text message with

9   him, right?

10       A.      Yes, sir.

11       Q.      So for the two months before this happened, you

12  were text messaging, correct?

13       A.      Here and there, yes.

14       Q.      And in order for you to text message him, you

15  needed to have his phone number, right?

16       A.      Yes, sir.

17       Q.      And he needed to have your number in order for

18  you to be corresponding, correct?

19       A.      Yes, sir.

20       Q.      So it would be fair to say that at least in terms

21  of text messaging, this person that you had known for a long

22  time when you were young, you kept in touch, i.e., or albeit

23  through text messaging, right?

24       A.      After a 15-year period, yes.

25       Q.      You did keep in touch with him at or near the

1  time of this murder, right?

2      A.    Yes, sir.

3      Q.    The other thing that we know about this is that

4  this individual showed up, or his father showed up with a

5  truck, right?

6      A.    Yes, sir.

7      Q.    And one of the things that you were asked to do,

8  according to you, is to go up to Globe, right?

9      A.    Yes, sir.

10     Q.    Even though you haven't seen this individual for

11  a long period of time, you were asked to do him a favor,

12  right?

13     A.    Yes, sir.

14     Q.    He's the one that asked you to do that favor,

15  right?

16     A.    He was the first one to ask me, yes.

17     Q.    That's what you just told us, right?

18     A.    Yes.

19     Q.    When he asked you to do this favor, you had no

20  problem, any reason to say no, I'm not going to go with you,

21  right?

22     A.    I had a few reasons.

23     Q.    Well, you agreed to do it though, right?

24     A.    Yes.

25     Q.    You didn't say to him, no, I don't want to go,

1  right?

2       A.    I told him I --

3       Q.    Sir, you agreed to do it, right?

4       A.    Yes.

5       Q.    And after you agreed to do it, you even agreed to

6  go up to Globe to do this favor for him, right?

7       A.    That's where the favor was at.

8       Q.    So you agreed to go up to Globe, right?

9       A.    Yes.

10       Q.    And you agreed to go up to Globe in his truck,

11  right?

12       A.    In his dad's truck, yes.

13       Q.    The truck that he was driving, right?

14       A.    Yes.

15       Q.    And, in fact, one of the things that we know

16  about the truck is that it's got a number of items in the

17  back, doesn't it?

18       A.    Yes.

19       Q.    It's got a bunch of tools back there, right?

20       A.    I figured he had a bunch of tools, my uncle used

21  it for mechanic work.

22       Q.    Had an acetylene tank back there, didn't it?

23       A.    Yes, it did.

24       Q.    And this was a truck that you, the two of you

25  were going to use to go back up to Globe, right?

SUPERIOR COURT

1      A.    Yes.

2      Q.    You were going to spend the night up there with

3   him in Globe, right?

4      A.    Yes.

5      Q.    And this was just because you were being a good

6   guy or a friend to him, right?

7      A.    Yes.

8      Q.    And so when you go up there, it's even very late,

9   isn't it?

10     A.    Yes.

11     Q.    It's closer to ten than it is to nine, isn't it?

12     A.    When I left my mother's house, yes.

13     Q.    And it's going to take a drive to get up to

14   Globe, right?

15     A.    Yes.

16     Q.    It's going to take approximately an hour, isn't

17   it?

18     A.    Yes.

19     Q.    And you agreed to do that, to go to those lengths

20   to do this favor, right?

21     A.    Yes, sir.

22     Q.    And when you're going to get there, you're going

23   to sleep in his trailer, is that what's going to happen?

24     A.    No, we were going to sleep at his dad's.

25     Q.    And so, again, you're going to then get up in the

1    morning and then help him move, right?

2         A.    Yes.

3         Q.    Because it's something that you wanted to do,

4    right?

5         A.    Yes.

6         Q.    He didn't put a gun to your head and say let's do

7    that, right?

8         A.    No.

9         Q.    Something that you said, that's something that

10   I'm going to do, right?

11        A.    Yes.

12        Q.    You didn't expect to get paid for that, did you?

13        A.    No.

14        Q.    And at that point you didn't see any look in his

15   eye at all, right?

16        A.    No.

17        Q.    Everything was okay between the two of you,

18   right?

19        A.    Yes.

20        Q.    And so the two of you then get going, and he

21   begins to drive, right, as you tell the story, right?

22        A.    Yes.

23        Q.    When he is driving, at some point you decide that

24   you are going to be a better friend and you decide at that

25   point when he asks you to accommodate him and you decide to

1    help him by driving, right?

2         A.    Yes, at that time.

3         Q.    Because he was a friend and he was also a

4    relative, in your view, right?

5         A.    Yes.

6         Q.    When I say that he was a relative in your view,

7    you just told us here in court that your father and his

8    father were like brothers, right?

9         A.    Right.

10        Q.    And so that you considered him a relative, didn't

11   you?

12        A.    Somewhat, yes.

13        Q.    And he was also a friend, never caused you any

14   problem?

15        A.    Yes.

16        Q.    This truck that you were in, it's got a bench

17   seat on it, right?

18        A.    Yes.

19        Q.    And what that means is that there is nothing

20   that -- a space between where he's sitting and where you're

21   seated, right?

22        A.    It means the bench goes all the way across from

23   the driver's side to the passenger's side.

24        Q.    That's right.  And so that there is nothing, for

25   example, in between that impedes or stops you from being

1    able to see him at any time, right?

2        A.    If you look in that direction, yes.

3        Q.    Sure.   That if you're looking that direction.   Do

4    you know what peripheral vision is, sir, do you know what

5    that means?

6        A.    Yes.

7        Q.    Yes.   You could see things out of the corner of

8    your eye, right?

9        A.    Yes.

10       Q.    And you don't have to be looking at them, like,

11   for example, right now you could see the jury out of the

12   corner of your eye, you don't have to be looking at them

13   directly, do you?

14       A.    I can see some of them, yes.

15       Q.    Sure you can.   Just like when you're driving, if

16   you're sitting there in the driver's side, if you look, you

17   can see somebody at the -- out of the periphery, or out of

18   the corner of your eye, right?

19       A.    Yes.

20       Q.    And you could see him, right?

21       A.    Yes -- well -- while I was looking straight, yes.

22       Q.    And then if you were looking to the right,

23   there's a mirror there, isn't there, on that side, isn't it?

24       A.    Yes.

25       Q.    And you told us that this truck was very big,

1    right?

2          A.    Yes.

3          Q.    It didn't have a mirror, a rearview mirror, did

4    it?

5          A.    No.

6          Q.    So that in order for you to navigate turns, you

7    would have to look to your left in that mirror there, right?

8          A.    Yes.

9          Q.    Or look to the right where he was to see things

10   there, right?

11         A.    Yes.

12         Q.    So that if you were looking to the right at that

13   mirror, you would be able to see him, right?

14         A.    Yes, if I was looking at that mirror.

15         Q.    Right.  And the purpose of that mirror is to look

16   to the back to see what's going on on that side, right?

17         A.    Yes.

18         Q.    You also told us that, well, one of the things I

19   did is I stopped at my mom's before I left to get a coat,

20   right?

21         A.    Yes.

22         Q.    Change your shoes.

23         A.    Yes.

24         Q.    And take your computer, right?

25         A.    Yes, sir.

1      MR. MARTINEZ:  Judge, may we approach?

2      THE COURT:  You may.

3             (Bench conference.)

4      THE COURT:  We're going to take our lunch break -- I'm

5  sorry -- our lunch break -- our mid-afternoon break.  About

6  15 minutes.  Please remember the admonition.

7             (Jury exited the courtroom.)

8      THE COURT:  Go ahead and take a seat.

9             The record should reflect the presence of

10  counsel, the defendant, not the jury.

11     MR. MARTINEZ:  Judge, one of the things that the

12  defendant testified to today was that, he grabbed or took my

13  jacket, is what he said, and my laptop, and then I put them

14  in the car along with my Rubik's cube -- or the truck -- and

15  then they had headed out.

16            Well, that's not his laptop, that's actually --

17  it was taken in a burglary that includes information from

18  other individuals, not his.  He never bought it, so I would

19  like -- or I'm seeking permission to ask him about that.

20     THE COURT:  What do you want to ask him, specifically,

21  if it was stolen?

22     MR. MARTINEZ:  Isn't it true that that was a stolen

23  computer, and isn't it true that it had images that belong

24  to somebody else on there.

25     THE COURT:  Have you given notice of your intent to use

SUPERIOR COURT

1   other acts?

2        MR. MARTINEZ:  I believe that I have.  In the police

3   reports I have.  We have disclosed a police report that

4   indicates that this computer was taken in a burglary.

5            I don't have the specifics, and I don't intend to

6   ask him about which house it was taken from, but yes, I have

7   disclosed that police report.

8        MR. SHELL:  You never filed a 404, but that's beside

9   the point.  If he asks him, he'll tell him he bought the

10  computer at a yard sale for 150 bucks.

11       THE COURT:  Well, if I let him -- if I let it be

12  inquired into at all, it's going -- you're going to be stuck

13  with his answer whatever it is.

14           And frankly, I think it leads us down a rabbit

15  hole that the probative value of which is way minimal

16  compared to the danger that it creates, so I'm not going to

17  let you ask him about that.

18       MR. MARTINEZ:  Okay.  Thank you.

19       THE COURT:  Anything else you want to put on the

20  record, either of you?

21       MR. SHELL:  No.

22       THE COURT:  Take 15 minutes.

23           (Brief recess.)

24       THE COURT:  We are back on the record which should

25  reflect presence of counsel, defendant, without the jury.

1          Does anybody need to put anything on the record?

2      MR. MARTINEZ:  No, thank you.

3      MR. SHELL:  I would just request that that computer be

4  turned the other way, I don't want the screen facing the

5  jury.

6      THE COURT:  Okay.

7      MR. MARTINEZ:  It doesn't have anything on the screen

8  but I'll put it down right now.

9      MR. SHELL:  Appreciate it.  Thank you.

10      THE COURT:  Before we bring the jury in, I know that

11  this is emotional, there's a lot of emotion that's obviously

12  going to be present.  I'm going to caution everyone in the

13  back, don't do anything that might be misperceived as

14  coaching, like nodding or shaking your head when there's a

15  question pending, okay?  Thanks.

16          Go ahead and bring them in.

17          (Jury enters the courtroom.)

18      THE COURT:  Go ahead and take a seat, again.

19          The record should reflect the presence of the

20  jury now with us.

21          Mr. Martinez.

22

23              CROSS-EXAMINATION (RESUMED)

24  BY MR. MARTINEZ:

25      Q.    Sir, when we left off, we were talking about your

SUPERIOR COURT

1   computer, right?

2       A.      Yes.

3       Q.      Laptop.  What kind of laptop is it?

4       A.      It's a Toshiba.

5       Q.      And what kind of functions does it have on it?

6       A.      It had Windows on it.

7       Q.      What is Windows for, to send e-mail, that sort of

8   thing, right?

9       A.      You could use it for e-mails.

10      Q.      And you use it for e-mail, right?

11      A.      I've used it for e-mail.

12      Q.      What else have you used your computer for?

13      A.      Pictures.

14      Q.      What's that?

15      A.      Pictures.

16      Q.      To send to other people, right?

17      A.      Pretty much just to store them.

18      Q.      Pardon?

19      A.      To store them.

20      Q.      To store them.  And they come from a camera, I

21  guess, right?

22      A.      Yes.

23      Q.      And you know how that computer functions, right?

24      A.      Yes.

25      Q.      So that even though you told us that well, I only

1    finished the ninth grade, I think is what you told us,

2    right?

3        A.    Yes.

4        Q.    And that maybe you have been involved in some

5    Special Ed classes, you remember telling us that?

6        A.    Yes.

7        Q.    It's not a situation where even though you only

8    had that amount of schooling, you could still operate a

9    computer, right?

10       A.    Yes.

11       Q.    And you, although sporadic, you've held jobs at

12   some point, right?

13       A.    Yes.

14       Q.    You've been married before, right?

15       A.    Yes.

16       Q.    So it's -- you've been a functioning individual

17   in society, even though you indicate that perhaps you didn't

18   graduate high school, right?

19       A.    Yes.

20       Q.    Really hasn't held you back, you can still do the

21   computer, can't you?

22       A.    Yeah.

23       Q.    And in fact, it's something that you like because

24   you took it with you, right?

25       A.    Yes.  Played a lot of games on it.

1      Q.     You can play games on it too, correct.  That's
2  something that obviously you like to do and that's probably
3  why you took it, right?
4      A.     Yes.
5      Q.     One of the other things that we know is that you
6  said that you took a jacket, right?
7      A.     Yes.
8      Q.     And the jacket, it was between you and
9  Mr. Redondo; is that right?
10     A.     Yes.
11     Q.     Was it there along with the computer?
12     A.     Yes.
13     Q.     Along with the Rubik's Cube, I think you said.
14     A.     Yes.
15     Q.     And you like to do the Rubik's Cube then I guess,
16  right?
17     A.     Yes.
18     Q.     And you're -- while you're in there, you're
19  within arm's distance of the passenger, correct?
20     A.     If I stretched my arm out, I could probably touch
21  him, yes.
22     Q.     Sure you could touch.  And if he said something,
23  you could hear it, right?
24     A.     Yes.
25     Q.     The windows were up, right?

SUPERIOR COURT

1       A.      No.

2       Q.      Wasn't it cold back on January 28th of 2010?

3       A.      Yes, it was cold.

4       Q.      Didn't you tell me that, in fact, you even

5  changed your shoes so that you could -- when you went up

6  north, you could deal with the weather, right?

7       A.      Yes, they say it snowed.

8       Q.      It snowed.  And in fact, down here it was cold

9  that day, wasn't it?

10      A.      It was cold.

11      Q.      And so the windows would be up, right?

12      A.      They were up at one point, but then they were

13  down at another point.

14      Q.      Well, when you got into it and you began driving,

15  the windows were up, weren't they?

16      A.      My window was up for sure, yes.

17      Q.      And so that you could hear whatever it was that

18  he was saying, right?

19      A.      Yes.

20      Q.      You guys may have exchanged some pleasantries,

21  you may have talked, right?

22      A.      Yes.

23      Q.      The radio wasn't on, right?

24      A.      No.

25      Q.      And so there was -- and there was, even though

1    you had a jacket, even though you had the computer, there

2    was really nothing in your way, physically speaking, that

3    prevented you from seeing or looking over and seeing your

4    passenger, right?

5        A.    Correct.

6        Q.    There was nothing obstructing the back of the

7    window, was there, to look in the back, right?

8        A.    Yes, there is a toolbox.

9        Q.    Well, but the toolbox only goes up to the window,

10   doesn't it?

11       A.    It goes almost to the top, maybe about four

12   inches from the top of that window.

13       Q.    So you're saying you can't -- the box is all the

14   way so that you can't see in the back.

15       A.    Sitting in the seat with a straight turn around,

16   you cannot see over that.

17       Q.    Okay.  You can't see there, but you can see over

18   to where the person's sitting, right?

19       A.    Yes.

20       Q.    And so you begin driving that night, right?

21       A.    Yes.

22       Q.    And as you're driving along, you get on Val Vista

23   and you're driving northbound towards the freeway, right?

24       A.    Yes.

25       Q.    The ostensible reason is that you're going to go

SUPERIOR COURT

1    to Globe, right?

2        A.    Yes.

3        Q.    And when you get to the area of Val Vista and

4    Baseline, that's when an officer gets behind you, right?

5        A.    He was already behind me.

6        Q.    Well, at some point on Val Vista, he gets behind

7    you, correct?

8        A.    Yes.

9        Q.    And with regard to the time that this was

10   happening, you had already ingested some methamphetamine,

11   right?

12       A.    Yes.

13       Q.    And you told us here in court that well, it was

14   around 5 or 6 o'clock in the afternoon, right?

15       A.    I said around four or five.

16       Q.    Four or five in the afternoon that you ingested

17   this methamphetamine.  And according to what you told us, it

18   was two or three hits, right?

19       A.    Yes.

20       Q.    Do you remember that you -- you told us also that

21   you had a conversation with the detective at the hospital,

22   right?

23       A.    Yes.

24       Q.    Even gave us his name, Van Horn, right?

25       A.    Yes.

1          Q.     And during this conversation, Defense counsel

2     asked you if you freely answered his questions; do you

3     remember that?

4          A.     Yes.

5          Q.     And you said that you did, right?

6          A.     Yes, I did.

7          Q.     So it was voluntary, right?

8          A.     Yes.

9          Q.     He didn't force you to answer any questions, did

10    he?

11         A.     No.

12         Q.     And, in fact, before this conversation was had,

13    he read you your Miranda warnings, didn't he?

14         A.     I believe so.

15         Q.     When you say you believe so, do you want to hear

16    the tape of him reading them to you, or not?

17         A.     That's fine.

18         Q.     So you do agree that he did read you your Miranda

19    warnings, right?

20         A.     I believe he did.

21         Q.     Well, let's go ahead and listen to it just so

22    that you don't have any doubt, okay?

23                Sir, take a listen at Exhibit 135 and see if you

24    recognize your voice in response to the reading of the

25    Miranda warnings.

1          MR. SHELL:  Are we admitting this?

2          MR. MARTINEZ:  We're refreshing his recollection.

3          THE COURT:  Hasn't been moved to be admitted yet.

4          MR. SHELL:  Well, then I don't think we can play it in

5     front of the jury.

6          MR. MARTINEZ:  I -- I believe that we can.

7          THE COURT:  Okay.  Actually, I agree with Defense

8     counsel.  He has said, he's admitted that he was read the

9     Miranda rights, and I don't think there's anything to

10    impeach him with.

11         MR. MARTINEZ:  I agree if he says that.

12         THE COURT:  Why don't you ask him again.

13         Q.    BY MR. MARTINEZ:  You were read your Miranda

14    warnings, weren't you?

15         A.    I believe so.

16         Q.    Okay.  And then you had a conversation with that

17    officer, didn't you?

18         A.    Yes, I did.

19         Q.    Isn't it true that you told him that you had the

20    methamphetamine around 8 o'clock in the evening?

21         A.    I don't remember.

22         Q.    Well, let's go ahead and play that portion of it

23    so that you can see if you remember it.

24         MR. SHELL:  I move for the admission of all of his

25    interview statements with the police.  They just can't pick

1   and choose if they're going to play it.

2       THE COURT:  I understand your objection, you've made it

3   before.  It's overruled.

4       MR. MARTINEZ:  Let's go ahead and play this and see if

5   you -- it's Exhibit 136.

6       MR. SHELL:  Has this been admitted now?

7       THE COURT:  Do you have an objection?  If you have an

8   objection, stand up and tell me what the objection is.  If

9   you don't, you don't have a right to be saying anything.

10      MR. SHELL:  My objection is you cannot play things in

11  front of the jury or give the jury evidence unless it's been

12  admitted.  That's my objection.

13      THE COURT:  Thank you.  You can use this to impeach.

14      MR. MARTINEZ:  Go ahead and play it.

15          (Audio tape played.)

16      Q.   BY MR. MARTINEZ:  Did you hear that?  That's your

17  voice, right?

18      A.   Yes.

19      Q.   And you did hear yourself saying that to the

20  detective that you used it around 8 o'clock or 9 o'clock in

21  the evening, right?

22      A.   Yeah, I said "I think" after that.

23      Q.   Pardon me?

24      A.   I believe I said "I think" after that.

25      Q.   But the word 8 o'clock came from your mouth to

1    this recording, didn't it?

2         A.    Yes.

3         Q.    Additionally, the detective -- you also told him

4    that you actually smoked it twice, didn't you?

5         A.    Yeah, a couple hits.

6         Q.    No.  Didn't you actually tell him that you smoked

7    it on two occasions rather than just one?

8         A.    I'm not sure.

9         Q.    Okay.  Let's go ahead and play the tape to see if

10   you did or not.

11        THE COURT:  Hold on just a second.  Either we need to

12   have these marked so that they become part of the record and

13   we can reference which part we are reading, or the court

14   reporter's going to have to type down everything that's

15   being said when we play the interview.

16        MR. MARTINEZ:  I would just recommend that we leave

17   them as part of the record that way.

18        THE COURT:  That's fine.  Give us at our next break

19   some indication of which portions or time stamp or something

20   that you're playing.

21             What was the -- have you marked these already?

22        MR. MARTINEZ:  Yes, I have.

23        THE COURT:  What is the exhibit number?

24        MR. MARTINEZ:  This exhibit number is 136.

25        THE COURT:  What was the previous one?

SUPERIOR COURT

1      MR. MARTINEZ:  135.

2      THE COURT:  Okay.

3              (Audio tape playing.)

4      Q.    BY MR. MARTINEZ:  So, sir, that is your voice on

5  that, correct?

6      A.    Yes.

7      Q.    And you did hear yourself say that you smoked

8  methamphetamine on two occasions, didn't you?

9      A.    That's what it says.

10     Q.    That's what you said, right?

11     A.    Yes.

12     Q.    So you also said that you smoked it at somebody

13  by the name of Rich's, right?

14     A.    Yes.

15     Q.    And with regard to you, your view is that well,

16  you only smoked it a -- you only took a couple of hits,

17  right?

18     A.    Yes.

19     Q.    Do you remember when the officer asked you about

20  what had happened over at Rich's house, that you told him a

21  different story?

22     A.    No.

23     Q.    Do you remember telling him that:  Hey, when I

24  went over there, I actually just -- all I did was just talk

25  about car parts.  Do you remember telling him that?

```
1        A.     No, I don't remember a lot of this.

2        Q.     Well, then let's see what else you told him.

3        MR. SHELL:  Objection, improper impeachment.  He said

4   he doesn't remember.

5        THE COURT:  There's nothing to impeach right now,

6   specifically.

7        Q.     BY MR. MARTINEZ:  So are you denying that you

8   told the officer -- are you denying that you told the

9   officer that you just went over there and talked about --

10  are you denying that you told the officer that you went over

11  there just to talk about car parts?

12       A.     No, I went over there to talk to him about car

13  parts.

14       Q.     Oh, so this is in addition then to the

15  methamphetamine, right?

16       A.     I didn't go over with plans to talk to him about

17  meth.

18       Q.     You went over there with plans to use

19  methamphetamine?

20       A.     No, I went over there with plans to talk about

21  parts.

22       Q.     Did you provide the methamphetamine?

23       A.     No.

24       Q.     He provided it to you?

25       A.     Yes.
```

1      Q.    And two or three hits is a really small amount,

2   isn't it?

3      A.    I'm not too sure.

4      Q.    Well, you're the one that used it that day,

5   right?

6      A.    Right.

7      Q.    You smoked it, right?

8      A.    Right.

9      Q.    And did you have a glass pipe?

10     A.    I didn't personally.

11     Q.    Well, did you suck on a glass pipe to ingest the

12   methamphetamine?

13     A.    Yes, I did.

14     Q.    And according to you, you took two or three hits,

15   right?

16     A.    Yes.

17     Q.    That's all you took, that whole day, right?

18     A.    Yes.

19     Q.    And at the time that you were driving northbound

20   on Val Vista, you indicated that it wasn't affecting you in

21   the slightest, right?

22     A.    I didn't feel it affecting me, no.

23     Q.    So the answer is it wasn't affecting you in the

24   slightest, right?

25     A.    Right.

1        Q.      Wasn't affecting your perception of traffic.

2        A.      No.

3        Q.      Wasn't affecting your perception of what you saw

4    next to you with regard to the passenger?

5        A.      No.

6        Q.      And it wasn't affecting you such that when the

7    officer pulled in behind you you noticed him, right?

8        A.      Right.

9        Q.      And, in fact, when that officer pulled in behind

10   you, you followed the law and you pulled into the parking

11   lot, right?

12       A.      Yes, I was pulling in.

13       Q.      You pulled into this Taco Bell parking lot,

14   didn't you?

15       A.      I don't believe it's Taco Bell, it's Fry's.

16       Q.      There is no Taco Bell there?

17       A.      I didn't say there wasn't a Taco Bell there, I

18   said I pulled into a Fry's parking lot.

19       Q.      Oh, so you said that you -- okay, but there is a

20   Taco Bell there, right in front where you pulled in, isn't

21   it?

22       A.      There is a Taco Bell off to the west side of the

23   vehicle, yes.

24       Q.      There is a Fry's there also to the east side

25   though, right?

1        A.      Yes.

2        Q.      And you parked sort of in between there, right?

3        A.      Yes.

4        Q.      And at that point you weren't worried, you

5    weren't scared, were you?

6        A.      At that point, no.

7        Q.      In fact, you complied with the officer, right?

8        A.      Yes.

9        Q.      There was no reason for you at that point to be

10   afraid of police, was there?

11       A.      No.

12       Q.      And, in fact, he was very nice and polite to you,

13   wasn't he?

14       A.      He was very polite.

15       Q.      And basically all he was doing was doing his job,

16   right?

17       A.      Yes.

18       Q.      And you never saw what happened to him, right?

19       A.      I didn't see what happened to him.

20       Q.      And you're saying that the methamphetamine did

21   not affect you in the slightest as to what was happening

22   behind you, right?

23       A.      No.

24       Q.      Well, at that time there were no frantic phone

25   calls, right, you didn't call anybody about that, right,

1    when you were pulled over by Lieutenant Shuhandler, right?

2        A.    No.

3        Q.    Didn't call your mother, right?

4        A.    No.

5        Q.    Didn't call your father?

6        A.    No.

7        Q.    Didn't call your uncle or Redondo's father,

8    right?

9        A.    No.

10       Q.    And while you're there, something happens, right,

11   according to you?

12       A.    Yes, sir.

13       Q.    And you don't know what happened is what you're

14   telling us, right?

15       A.    I didn't know what happened.

16       Q.    I'm not asking you did not, I'm asking you to go

17   back.  You told us that at the time that happened you did

18   not know what happened, right?

19       A.    Right.

20       Q.    All you know is that you heard a noise, right?

21       A.    Right.

22       Q.    And as a result of that noise -- and let's put it

23   in perspective.  You didn't know it was a gunshot, right?

24       A.    Right.

25       Q.    You didn't know it came from your car, right?

```
 1      A.    Right.

 2      Q.    You didn't know it was Redondo, right?

 3      A.    Right.

 4      Q.    You didn't see anything, right?

 5      A.    Right.

 6      Q.    You didn't smell any gun powder, right?

 7      A.    Right.

 8      Q.    You didn't see any flash, right?

 9      A.    Right.

10      Q.    You didn't see any police officer coming after

11   you, right?

12      A.    No.

13      Q.    You didn't see anything, did you?

14      A.    No.

15      Q.    Yet even though you didn't see anything, you

16   leave immediately, don't you?

17      A.    I left because he was yelling at me to.

18      Q.    Sir, isn't it true that you left immediately?

19      A.    I wouldn't say it was immediately.

20      Q.    You didn't sit around, did you?

21      A.    I sat long enough to ask a question.

22      Q.    Isn't it true, sir, that you had a conversation

23   with the police?  Isn't it true that you told them that you

24   left because you freaked out?

25            Do you remember telling them that?
```

1        A.    Yes, I got scared.

2        Q.    So the answer is you left because you freaked

3   out, right?

4        A.    Yes, I was afraid.

5        Q.    It wasn't because anybody was yelling at you,

6   right?

7        A.    Well, there was yelling at me, yes, there was.

8        Q.    Sir -- so it's -- you're claiming that it was

9   because somebody was yelling at you, right?  And then you

10  gave us some very graphic detail of what you say that person

11  was screaming at you, right?

12       A.    Yes.

13       Q.    And it included some obscenities, didn't it?

14       A.    Yes.

15       Q.    Quite frankly -- but you remember having a

16  conversation about that with the detective.

17       A.    Yes.

18       Q.    And, in fact, you told him, you know what, I

19  didn't hear anything, I just left.  Do you remember telling

20  him that?

21       A.    No, I don't.

22       Q.    And in terms of this, go get my father and all

23  this, isn't it true that when you spoke to the detective,

24  you said, you know what, he was yelling but I couldn't hear

25  a word because I just freaked out and left.

1      A.     There was some point that --

2      Q.     "Yes" or "no", isn't that what you told the

3   detective?

4      A.     I'm not sure.

5      Q.     Well, let's listen.

6      THE COURT:  Go ahead if you want to make an objection.

7      MR. SHELL:  I want to object.  If they want to refresh

8   his memory, that's fine, but you got to do it outside the

9   presence of the jury.

10      THE COURT:  It's been denied to enough of an extent to

11   allow impeachment.

12      MR. MARTINEZ:  We'll go ahead and play a couple of

13   exhibits for you, see if that refreshes your recollection.

14      MR. SHELL:  Can we approach, Your Honor?

15          (Bench conference.)

16      MR. MARTINEZ:  This one is 4504 on and 4505.

17      THE COURT:  Bate stamp also.

18      MR. MARTINEZ:  Bates.

19      THE COURT:  Okay.  Thanks.

20      MR. MARTINEZ:  What exhibit number is it?  139.

21      THE COURT:  The one we're playing now is 139.

22      MR. MARTINEZ:  Uh-huh.

23      THE COURT:  I'm sorry, repeat the Bate stamp for me

24   again.

25      MR. MARTINEZ:  It is 4504 and 4505.

```
 1        THE COURT:  Go ahead.

 2        MR. SHELL:  What about the last one?

 3        THE COURT:  We'll deal with that.  There was no

 4   objection to that.  There now is.  We've set a rule, so --

 5        MR. MARTINEZ:  Okay.

 6             (Audio tape playing.)

 7        MR. SHELL:  Your Honor, can we approach?

 8        THE COURT:  Sure.

 9        MR. SHELL:  I found it.

10        MR. MARTINEZ:  The next one is Exhibit No. 140, Bates

11   4513.  This is Exhibit No. 140.

12        Q.   BY MR. MARTINEZ:  Did you hear those?

13        A.   Yes.

14        Q.   Those were your voice, right?

15        A.   Yes.

16        Q.   And you're saying you don't know what Chris said,

17   right?

18        A.   There were some things I didn't understand what

19   he was saying.

20        Q.   But -- well, you want to hear them again?  Do you

21   want to hear them again?

22        MR. SHELL:  Your Honor, I request that he go on and

23   play more of that because the next question --

24        THE COURT:  Approach.  You wanted to hear the

25   transcript of it?
```

1        MR. SHELL:  Yes.

2             (Bench conference.)

3        THE COURT:  Did you see where he wanted you to read to?

4        MR. MARTINEZ:  Yeah.

5        THE COURT:  Or play?

6        MR. MARTINEZ:  I'll have him read it.

7        THE COURT:  Bates 4513.

8        Q.    BY MR. MARTINEZ:  Take a look at that and see if

9   that refreshes your recollection.  This is Exhibit No. 141.

10  You done reading it?

11       A.    Yes.

12       Q.    Let's take a look at it.

13            Transcript does say:  Okay, what happened when

14  you guys fled?  What Chris say?  You answered, which is on

15  the tape:  He was just -- like, well, I couldn't even really

16  tell you what he was saying cause he was yelling in my ears

17  and I don't know.

18            That's what you said, right?

19       A.    Yes.

20       Q.    And that's what it says on the transcript, right?

21       A.    Yes.

22       Q.    Then you are asked further about a different time

23  what's going on and you answered -- the question was:  Was

24  he okay?  And when the -- when you heard the -- he told me

25  to call his dad.

SUPERIOR COURT

```
1              That's what you said, right?

2      A.     Yes.

3      Q.     Bates 4509.

4      MR. SHELL:  Is there a question in front of the --

5      MR. MARTINEZ:  It's with regard to the same issue about

6  whether or not -- there's a --

7      THE COURT:  It's not a question.  He's just -- I think

8  he's just referring to the transcript that you asked him to

9  tell you what he's reading from.  This is marked -- this is

10  going to be 142?

11      MR. MARTINEZ:  Yes, sir.

12      THE COURT:  Okay.

13             (Audio tape played.)

14      Q.     BY MR. MARTINEZ:  You heard yourself there,

15  right?  That's you, right?

16      A.     I heard my voice, yes.

17      Q.     And that's saying that you freaked out, right?

18      A.     Yeah, I just freaked out.

19      Q.     Yeah.  I freaked out, which means you freaked out

20  because of the shot that you heard, right?

21      A.     Yes.

22      Q.     And I thought you told us before you didn't know

23  it was a shot.

24      A.     When before did I say that?

25      Q.     Here in court.  I just asked you, you didn't know
```

1    it was a shot, and you told me no, I didn't.  You didn't

2    know where it came from.  Remember telling me that?  You

3    didn't see any or didn't smell any gun powder, remember

4    telling me that?

5         A.    Yes.

6         Q.    Remember telling me you didn't see anybody fire?

7         A.    Yes.

8         Q.    Remember that all you heard was a pow, right?

9         A.    Right.

10        Q.    If all you hear is a pow, why are you freaking

11   out?

12        A.    Because it was loud.  It scared me.

13        Q.    And if you're sitting in a car and there's a pow

14   and it scares you, you immediately take off and lead police

15   on a chase; is that what you do?

16        A.    I would think -- I think I just went to get

17   cover, just to get out of whatever that sound was.

18        Q.    You could have gone to the Fry's parking lot,

19   couldn't you?

20        A.    I was already in the Fry's parking lot.

21        Q.    Okay.  You could have gone to the Del Taco

22   parking lot, right?

23        A.    I didn't know there was a Del Taco there.

24        Q.    Taco Bell.  You could have gone to the Taco Bell

25   parking lot, couldn't you?

SUPERIOR COURT

1    A.    I wouldn't have any --

2    Q.    Yes or no, you could have, couldn't you?

3    A.    I still would have had to leave, though.

4    Q.    Right.  And you could have stopped, right?

5    A.    I could have.

6    Q.    Right.  But you chose not to stop, right?

7    A.    At that point I didn't, I couldn't stop after

8  that.

9    Q.    Well, you freaked out, right?

10    A.    Yes.

11    Q.    And while you are driving, the Fry's is right to

12  the east of that, right?

13    A.    Right.

14    Q.    And there's sort of a road between there that you

15  could have driven over, right, to get to the Fry's?

16    A.    I would have had to go southbound and then turn

17  left.

18    Q.    Sure.  You could have done that, you were at the

19  wheel, right?

20    A.    Yes.

21    Q.    You had control of the car, right?

22    A.    Yes.

23    Q.    And you could have parked the car over there at

24  the Fry's to get away from whatever loud noise you heard,

25  right?

```
1      A.    Yes.

2      Q.    You had your telephone with you, right?

3      A.    Yep.

4      Q.    You told us that you were calling uncle, right?

5      A.    Yes.

6      Q.    Which would be Redondo's father, right?

7      A.    Yes.

8      Q.    Told us that you called your father, right?

9      A.    Yes.

10     Q.    And you also told us that you called, I guess it

11  was Redondo's father's girlfriend, right?

12     A.    Yes.

13     Q.    You had time to make these calls, right?

14     A.    Yes.

15     Q.    And instead of using -- and you know how to use

16  that telephone, right?

17     A.    Yes.

18     Q.    And, in fact, you're much better at using it than

19  Redondo, right?

20     A.    Yes.

21     Q.    In fact, during this whole thing, he didn't want

22  to use it because he didn't know how, right?

23     A.    Yes.

24     Q.    Because it's kind of sophisticated because it's a

25  Blackberry, right?
```

1       A.    Right.

2       Q.    And you know how to use it, right?

3       A.    Yeah.  I've had it for a year.

4       Q.    And you know, one of the things that you know

5  about is 911, don't you?

6       A.    Yes.

7       Q.    It's an emergency response system, isn't it?

8       A.    Yes.

9       Q.    It goes straight to the police department, right?

10      A.    Yes.

11      Q.    You know how to dial that, right?

12      A.    Yes.

13      Q.    You didn't do that, did you?

14      A.    No, I didn't.

15      Q.    Instead, you just freaked out and drove, right?

16      A.    Yes.

17      Q.    There was somebody there talking to you, as you

18  indicated, right, at some point, right?

19      A.    Yes.

20      Q.    And you never asked him what happened, did you?

21      A.    Yes, I did.

22      Q.    Well, when the police talked to you, you told

23  them you didn't know what happened, right?

24      A.    I didn't know what happened at the time, no.

25      Q.    And when you're going, you don't know that he has

1    a gun, do you?

2         A.    Not a hundred percent sure.

3         Q.    Well, you don't even know that it's a gunshot,

4    right?

5         A.    It ran through my head that it could be a

6    gunshot.

7         Q.    But it's a gunshot that could be outside, right?

8         A.    Could have been.

9         Q.    Yeah, and it could be that the red car that was

10   going in front of you, remember that, that you testified

11   about?

12        A.    Yes.

13        Q.    It could have been from in there, right?

14        A.    Yes.

15        Q.    So there's really nothing, based on everything

16   that you have in front of you, that tells you it's coming

17   from Redondo, is it?

18        A.    Just that it ran through my mind.

19        Q.    It ran through your mind, but it ran through your

20   mind quickly so that you didn't give it much heed, did you?

21        A.    I didn't give much of any heed.

22        Q.    That's because you were high, right?

23        A.    No.

24        Q.    Well --

25        A.    That's because I was scared.

SUPERIOR COURT

1       Q.      And you were scared, because one of the effects

2   of methamphetamine is that it alters your mind, isn't it?

3       A.      I'm not sure.

4       Q.      Well, you take it because it makes you feel good,

5   doesn't it?

6       A.      Yes.

7       Q.      And that day it made you feel good, didn't it?

8       A.      That day, yes.

9       Q.      That's why you took it, right?

10      A.      Yes.

11      Q.      It makes you feel stronger, faster, right?

12      A.      I wouldn't say stronger and faster, but --

13      Q.      Gets you awake and makes you feel good, right?

14      A.      Yes.

15      Q.      And so as you're driving away, nobody threatened

16  you, did they, sir?

17      A.      I never said I was threatened.

18      Q.      Well, you said you were scared.

19      A.      Yes, I was scared.

20      Q.      You have to be scared in response to something,

21  don't you?

22      A.      Yeah.  A --

23      Q.      A threat --

24      A.      -- loud bang.

25      Q.      Hold on.  You have to be scared in response to a

```
 1   threat, don't you?

 2        A.    Not necessarily.

 3        Q.    Well, something out there has to be scaring you,

 4   right, in order for you to be scared, right?

 5        A.    Yes.

 6        Q.    And you have always maintained, and you maintain

 7   it in this courtroom that you never saw the gun on Redondo

 8   until you were already shot, right?

 9        A.    Yes.

10        Q.    And they were asking you to crawl, right?

11        A.    Yes.

12        Q.    You turned your head and that's the first time

13   you ever saw a gun, right?

14        A.    Yes.

15        Q.    And so if that's the first time that you ever see

16   the gun, and everybody's following you -- well, if you go

17   back to the first instance, you couldn't have known it was a

18   gun, could you?

19        A.    Yes.

20        Q.    Well, if you didn't know it was a gunshot, how

21   could you even know it was a gun?

22        A.    I don't understand what you're saying.

23        Q.    Well, you say that you didn't -- you went into

24   the house with Redondo to get your stuff, right, you went

25   over to your mom's house, right?
```

SUPERIOR COURT

```
1       A.    Yes.

2       Q.    He was with you, right?

3       A.    Yes.

4       Q.    You didn't see him get a gun there, right?

5       A.    No.

6       Q.    Earlier in the night you had been with him over

7    at Melissa's house -- father's house, right?

8       A.    Yes.

9       Q.    Didn't see him with a gun there, right?

10      A.    No.

11      Q.    Didn't see him with any bulges, right?

12      A.    He had a big jacket on, no.

13      Q.    So, you didn't see any bulges at all, right?

14      A.    No.

15      Q.    And, in fact, from what you have known of him,

16    you never knew him to carry a gun either, did you?

17      A.    No.

18      Q.    And so neither you nor he carry a gun, right?

19      A.    Right.

20      Q.    You'd been with him the evening, right?

21      A.    For a couple of hours, yes.

22      Q.    And you haven't seen him with a gun, right?

23      A.    No.

24      Q.    And you're telling us that, for example, Exhibit

25    No. 120, you didn't see this on him, right, you didn't see
```

SUPERIOR COURT

1    this on him, right?

2         A.    No, I didn't.

3         Q.    Never saw it at all, did you?

4         A.    No.

5         Q.    That whole night you never saw this, right?

6         A.    No.

7         Q.    So if you didn't see this gun at night, there

8    would be nothing to be scared of when you heard the pop,

9    right?

10        A.    Yeah, cross fire.

11        Q.    Okay.  If there was cross fire, wouldn't you

12   think that the -- if you do think it's cross fire, which is

13   the first thing we've heard here, you would have called 911

14   if you had thought it was cross fire?

15        A.    I would have got safety first.

16        Q.    Sure, you would have gone to safety first which

17   could have been the Fry's parking lot, right?

18        A.    Yes.

19        Q.    So because you didn't go to the Fry's parking

20   lot, then you didn't think it was cross fire, did you?

21        A.    Fry's parking lot wasn't that far, so how do you

22   get out of cross fire, somebody shooting at you, from there?

23        Q.    Well, you could have gone further than the Fry's

24   parking lot, and stopped, right?  Away from the cross fire,

25   right?

```
 1        A.    Yes, that's what my intention was.

 2        Q.    Then at some point you do get on the freeway,

 3   right?

 4        A.    Yes.

 5        Q.    But you get off the freeway, right?

 6        A.    Yes.

 7        Q.    So you were in control of that car, weren't you?

 8        A.    Yes.

 9        Q.    Or truck.  If you wanted to get on the freeway,

10   you were the one that was manning that vehicle, right?

11        A.    Yes.

12        Q.    If somebody wanted to go to Globe -- you didn't

13   go straight to Globe, did you?  Did you?

14        A.    I never made it to Globe.

15        Q.    No, you didn't go straight to Superior, then,

16   right?

17        A.    No.

18        Q.    Because --

19        A.    I made an attempt to stop and figure out what

20   happened.

21        Q.    And in your trying to stop and figuring out what

22   happened, you weren't scared, you were the -- you were the

23   person that was in charge, you were able to get off the

24   freeway, weren't you?

25        A.    I was in charge of the vehicle.
```

SUPERIOR COURT

1        Q.     Well, you're telling us that he's telling you

2   drive to Globe, whatever, screaming at you these expletives,

3   drive to Globe, drive to Globe, immediately after this

4   happened, right?  Isn't that what you just told us?

5        A.     He started screaming at me, yes.

6        Q.     Sir, "yes" or "no", before you --

7        A.     He told me to go, mother fucker, go.  Get the

8   fuck out of here.

9        Q.     Right.

10       A.     I then got out of there.

11       Q.     You did get out of there and he, as part of that

12  he also told you to drive to Globe, didn't he, you told us

13  that?

14       A.     Yes, he did, he commanded me to go to Globe.

15       Q.     So you get on that freeway, right?

16       A.     Yes, I got on the freeway.

17       Q.     Right.  But you didn't keep going on that

18  freeway, did you?

19       A.     No, I got off trying to figure out what was going

20  on.

21       Q.     That's right.  You got off the freeway, didn't

22  you?

23       A.     Yes, I did.

24       Q.     And you got off of that freeway at Higley, didn't

25  you?

1      A.     Yes, I did, sir.

2      Q.     And nothing happened to you when you got off the

3   freeway at Higley, did it?

4      A.     There was more screaming.

5      Q.     There was screaming to boot, fine.  But nothing

6   happened.  Did you get a little owie on you at all?  Did you

7   get hurt physically in any way, shape or form for

8   disobeying?

9      A.     No, but in my mind --

10     Q.     "Yes" or "no"?

11     A.     I just answered you.

12     Q.     The answer is no, right, you didn't get hurt?

13     A.     No.

14     Q.     And you disobeyed what he was telling you, right?

15     A.     I was already making those actions when he

16   started yelling at me not to do that.

17     Q.     And you still did it anyway, right?

18     A.     I had to get off the off ramp, there was no

19   continuing to go on to 60 once you're on the off ramp.

20     Q.     Wait a minute.  You said it was Higley, isn't it?

21     A.     I was on the 60 when we were going off, getting

22   on the off ramp, there's no way to get back onto the

23   freeway.

24     Q.     You can't make a U-turn there, sir?  Is there

25   something wrong with that?

SUPERIOR COURT

1        A.    No.  Off ramp, no, you can't.

2        Q.    Sir, you can go right and then make a U-turn

3   immediately, can't you?

4        A.    You -- that's where I --

5        Q.    Sure you can.

6        A.    -- in the --

7        THE COURT:  Hold on.  Hold on.  I'm sorry.  I'm going

8   to stop you.  I know you want to repeat it, but I want you

9   to give him time to finish his answers.  I want you to

10  answer his questions "yes" or "no" if that's what it calls

11  for.  But if you can't answer them one of those ways, tell

12  me you cannot.

13       Q.    BY MR. MARTINEZ:  Isn't it true, sir, that once

14  you got off at Higley, you could have made a U-turn, right?

15       A.    I could have.

16       Q.    And then gotten back on the freeway and continued

17  to follow the commands, right?

18       A.    Yes.

19       Q.    You didn't do that, right?

20       A.    I ended up making a left-hand turn.

21       Q.    You didn't do that, "yes" or "no"?

22       A.    No.

23       Q.    And nothing happened to you, did it?

24       A.    Physically, no.

25       Q.    Right.  Physically, no.  So now you have two

```
 1    instances where you get off the freeway, nothing happens.

 2    You don't get back on the freeway and nothing happens to you

 3    physically, right?

 4         A.    Right.

 5         Q.    And he's screaming at you, you say, right?  He's

 6    screaming out these things, right?

 7         A.    Yes.

 8         Q.    Even though he's screaming these things at you,

 9    you're pretty cool, you're driving the speed limit, aren't

10    you?

11         A.    Yes.

12         Q.    You're signaling, right?

13         A.    Yes.

14         Q.    You have this guy screaming at you in your ear,

15    don't you?

16         A.    Yes.

17         Q.    That doesn't affect you at all, doesn't get you

18    excited at all to even exceed the speed limit, does it?

19         A.    No.

20         Q.    And he doesn't live down here, does he?

21         A.    No.

22         Q.    He lives up in Globe, right?

23         A.    Yes.

24         Q.    But as you told us, you're a life long resident

25    of this area, right?
```

1       A.      Yes.

2       Q.      If anybody is more familiar with that area, it's

3   you, not him, right?

4       A.      I don't know because he did live in Mesa at one

5   point.

6       Q.      Fifteen years ago, right?  Right?

7       A.      I guess so.

8       Q.      Well, no, you're the one -- I want you to know,

9   you're the one that said 15 years.

10      A.      I don't know what he knows.

11      Q.      Well, he hasn't been here for 15 years, right?

12      A.      I don't know that.

13      Q.      You haven't seen him for 15 years, right?

14      A.      I haven't had a relationship with him for 15

15  years.

16      Q.      But you do know he's lived in Globe most of that

17  time, correct?

18      A.      Yes, I think he has.

19      Q.      "Yes" or "no"?

20      A.      I just said yes.

21      Q.      Okay.  And so you're the one that's making the

22  decisions to drive through that area, aren't you?

23      A.      I was being told to turn here, turn there, so I

24  did.

25      Q.      Even though you have been a life long resident

SUPERIOR COURT

1    here, that's what you started to do, right?

2         A.    That's what I did.

3         Q.    And nothing happened to you when you got to

4    Baseline, right?

5         A.    No.

6         Q.    Never pulled a gun on you throughout, even though

7    you were not following his directive, according to you,

8    right?

9         A.    I was following his directive.

10        Q.    You were following his directive?

11        A.    Yes.

12        Q.    Did he want you to get off on Higley?  I thought

13   you told us he didn't.

14        A.    When I got to the off ramp, he was, started

15   yelling at me, "What the hell are you doing?"

16        Q.    Did he pull a gun?

17        A.    No, he didn't.

18        Q.    When you didn't make a U-turn, did he pull a gun?

19        A.    He told me to turn left.

20        Q.    Did he pull a gun?

21        A.    No.

22        Q.    So then you get on Higley going northbound,

23   right?

24        A.    Yes.

25        Q.    You're going the speed limit, right?

1       A.      I believe so.

2       Q.      He wants to get out of there, right, based on his

3   words, right, he wants to get out of there, right?

4       A.      He wants to get to his dad.

5       Q.      He wants to desperately get to his dad, right,

6   when he's screaming at you obscenities, right?

7       A.      He's screaming at me.

8       Q.      He's very, very upset, he wants to go over there,

9   right?

10      A.      Yes.

11      Q.      Never pulled a gun on you at Higley, did he?

12      A.      No.

13      Q.      And you're driving the speed limit, right?

14      A.      I believe so.

15      Q.      In fact, when you take a right on the -- onto the

16  Higley on ramp, the light is green, right; you remember

17  that?

18      A.      Yes.

19      Q.      And you're going slowly around there, right?

20  Right?

21      A.      Around --

22      Q.      Onto Higley, right?

23      A.      Right-hand turn, yes, I slowed down to make the

24  turn.

25      Q.      Right.  At that time you've already seen the

```
 1    police officer, that's what you told us, right?

 2         A.    The officer was behind us.

 3         Q.    Right.  And you had already seen him, right?

 4         A.    I seen the police officer, the car, yes.

 5         Q.    He was bumper to bumper with you, right?

 6         A.    I wouldn't say he was bumper to bumper.

 7         Q.    Isn't that what you told the detective?

 8         A.    The Gilbert police officer was bumper to bumper

 9    with me, yes.

10         Q.    Yeah, he was very, very close, right?  And you --

11         A.    That was at Val Vista and Baseline, not at Higley

12    on the off ramp.

13         Q.    Okay.  So on the on ramp he was close to you,

14    then, right?

15         A.    The officer that was by the on ramp was not that

16    close to me.

17         Q.    But you were able to see him, though, right?

18         A.    I seen a police vehicle, yes.

19         Q.    Even though you may have had problems seeing out

20    of the mirror in the back because you didn't have a rearview

21    mirror, you were able to see him, right?

22         A.    His car, yes.

23         Q.    Right.  And then you take a right, correct?

24         A.    Yes.

25         Q.    You're not looking back at him when you're taking
```

SUPERIOR COURT

1  the right, are you?

2      A.    When I made my right, no.

3      Q.    You're intent on getting on the freeway, right?

4      A.    My intent?

5      Q.    Yeah, is to get on --

6      A.    It wasn't my intent, it was what I was being

7  commanded to do.

8      Q.    I understand that you want to tell us it's what

9  you've been, were commanded to, but it's what you were

10 doing, isn't it?  He didn't have a gun to your head, right?

11     A.    No.

12     Q.    And so as you go to turn, it's northbound, right,

13 and to turn eastbound you have to look to the right,

14 correct, to make the turn, right?

15     A.    Yes.

16     Q.    And to look to the right, if you are going to

17 make that right, you necessarily have to look to see where

18 the passenger is, don't you?

19     A.    The passenger was there in the seat.

20     Q.    Yeah.  And so you're able to see him, you don't

21 even have to look out of the periphery, now you can even

22 see, right?

23     A.    Well, no, cuz I didn't do this number to him, I

24 just -- you could see -- you could see in front of you that

25 the -- you know, you're making your right-hand turn, you see

1    the on ramp.

2         Q.    So when you're turning and you're going like

3    this, you never look to the right to look at the on ramp,

4    you just turn?

5         A.    I did not turn my head like this, I might have

6    glanced my eyes that way.

7         Q.    And at no time did you see a gun at that point,

8    did you?

9         A.    I did not see a gun at that point, correct.

10        Q.    So you're still safe in your belief there's no

11   gun involved here, right?

12        A.    In my belief it was a 50/50 chance.

13        Q.    Well, you've told us that you didn't see a gun on

14   him, right?  Right?

15        A.    I didn't see him with a gun.

16        Q.    And you were with him all afternoon, right?

17        A.    I was with him for a couple of hours.

18        Q.    It's a big gun, isn't it?  It's a big gun,

19   wouldn't you agree, I mean as far as guns go?  It's pretty

20   large, wouldn't you say?

21        A.    It's a gun.

22        Q.    It's a long barrel on there, right?

23        A.    I guess so.

24        Q.    You didn't see that, right?

25        A.    I didn't see that.  It was dark.

SUPERIOR COURT

1    Q.    Wasn't there a street light there?

2    A.    There were street lights.

3    Q.    There was a street light where you turned, right?

4    A.    I believe there is.

5    Q.    And so when you're getting on the freeway, you

6    don't accelerate, do you?

7    A.    Yes, I did.

8    Q.    Well, not initially you don't, do you?

9    A.    After I made my turn I did.

10   Q.    And while you're making your turn, you don't know

11   what's going on to your right, do you?

12   A.    No, I don't.

13   Q.    You don't know what this guy is doing over here

14   on the right, do you?

15   A.    No.

16   Q.    And all you know is that you hear something,

17   right?

18   A.    About halfway down the ramp I heard something.

19   Q.    You heard something, right?

20   A.    Yes.

21   Q.    And at that point when you're going up the ramp,

22   you're not going -- you don't have it floored, do you?

23   A.    No, I was picking up speed to enter the freeway.

24   Q.    Yeah.  It was a normal entry into the freeway,

25   right?

SUPERIOR COURT

1        A.     Yes.

2        Q.     You were not speeding, right?

3        A.     No.

4        Q.     That's because you were not in a hurry at that

5    point, were you?

6        A.     That was just driving.

7        Q.     Right.  And you didn't --

8        A.     I was trying to make phone calls and drive.

9        Q.     Right.  And in fact, your attention was diverted

10   to the phone, you were holding the wheel of the car -- of

11   the truck with the other, right?

12       A.     Right.  I was holding my phone in my right hand.

13       Q.     Right.  Okay.  You have the phone in your right

14   hand, you were driving with the left.  It was an automatic,

15   right?

16       A.     Yes.

17       Q.     All you had to do was push the gas, right?

18       A.     Correct.

19       Q.     And so you're looking forward, it's raining a

20   little bit, right?

21       A.     Yep.

22       Q.     And so you're focused on this and you're focused

23   on -- you weren't scared at all, were you?

24       A.     Yes, I was.

25       Q.     If you were scared, why didn't you speed?

SUPERIOR COURT

```
 1        A.    I did.

 2        Q.    Not at that point.  You just told us you weren't,

 3   that you were driving normally.  Didn't you just --

 4        A.    Approaching -- approaching the freeway, I was

 5   picking up speed on the freeway.

 6        Q.    Didn't you tell us that you were getting on the

 7   freeway at a normal rate of speed?  You just told us that,

 8   right?

 9        A.    I believe I was driving at a decent rate, yes.

10        Q.    That's what you told us, right?

11        A.    Yes.

12        Q.    That it was a normal rate of speed --

13        A.    Yes.

14        Q.    -- right?  And then you get on the freeway,

15   right?

16        A.    Yes.

17        Q.    At some point you do see that there are some

18   police officers after you, right?

19        A.    Yes.

20        Q.    You do have a driver's license, right?

21        A.    Yes.

22        Q.    You did take a test, right?

23        A.    Yes.

24        Q.    Even though you say that you had issues with your

25   schooling, you can pass that test, right, the test to drive,
```

SUPERIOR COURT

1    right?

2        A.    Yes.

3        Q.    And you know the rules of the road, right?

4        A.    Yes.

5        Q.    And you know that if there is a police vehicle

6    behind you, you are going to -- you're supposed to stop,

7    right?

8        A.    Yes.

9        Q.    You didn't do it here, right?

10       A.    No, I was told not to stop.

11       Q.    Sir, you didn't do it here.

12       A.    I answered you no.

13       Q.    Okay.  And so you're driving along and at some

14   point this guy gets out, doesn't he?

15       A.    At some point he did.

16       Q.    Yeah.  In fact, didn't you also say that he got

17   out there on Higley and then crawled back in?

18       A.    Halfway down the on ramp.

19       Q.    Yeah, he crawled out, didn't he?

20       A.    He crawled partially out.

21       Q.    Right.  Right.  And then something happened and

22   then he crawled back in, right?

23       A.    And started yelling at me again, yes.

24       Q.    Started yelling at you again.  Never touched you,

25   though, did he?

1      A.    No.

2      Q.    Never took a gun and swung it at you in any way,

3   shape or form, did he?

4      A.    No.

5      Q.    Never went, for example, to any of his pockets to

6   scare you while you're driving along, right?

7      A.    Not that I seen him.

8      Q.    Well, you're the one that's there.  If you didn't

9   see him, it didn't happen in your mind, did it, right?

10     A.    What's that?

11     Q.    Well, if you didn't see it, then it didn't

12  happen, right?

13     A.    If I didn't see it, it didn't happen?

14     Q.    Right.  Well, it wouldn't affect you then if you

15  didn't see it, right?

16     A.    See what?

17     Q.    Well, did he go to his pockets?

18     A.    I'm not sure.  He was sitting.

19     Q.    He was sitting there, right?  Did he go to any

20  other place where he could have gotten a gun, his jacket?

21     A.    I'm not sure.  I was with my phone and trying to

22  pay attention to the road.

23     Q.    When he got back into the truck and you heard

24  some pops, right?

25     A.    Yes.

```
1      Q.    Where did he put the gun?

2      A.    I have no idea.

3      Q.    So you didn't see it, did you?

4      A.    I never seen a gun until the end.

5      Q.    Right.  Right.  So if he had a gun and he was

6   shooting, and he comes sitting in, you hear some pops from

7   that direction, though, don't you?

8      A.    Yes.

9      Q.    And you never -- even though there are pops over

10  there, you never think to look in that direction?

11     A.    I looked in that direction one time when I heard

12  the thump, when I seen him part way out of the vehicle.

13     Q.    You never thought to look -- there was actually

14  more than one thump that you heard, isn't there?

15     A.    There was a second one when he was outside the

16  vehicle.

17     Q.    And when he's out there, you never think to

18  look -- when you say he's outside of the vehicle, is he on

19  the back of the truck, is that --

20     A.    There was one point where he was on the back.

21     Q.    When you're going up on Higley?

22     A.    No.

23     Q.    That was some other time, right?

24     A.    That was further down the road.

25     Q.    So we're clear, when you're going on Higley, he
```

1    just has sort of his body out at that point, right?

2        A.    Yeah, it's at least three-quarters of his body

3    out.

4        Q.    And it's a quick movement out and then it's a

5    quick movement back in, isn't it?

6        A.    By the time he came back in, he -- well, I was

7    already off the off ramp.

8        Q.    And you said you --

9        A.    Or on ramp.

10       Q.    This is when you were telling us that you were

11   going at a normal rate of speed, right?

12       A.    I was entering the freeway at a pretty normal

13   rate.

14       Q.    And the reason that you were entering the freeway

15   at a normal rate of speed was because you were helping him

16   to allow him to get back into the car; isn't that true?

17       A.    No.

18       Q.    You weren't helping him at all, right?

19       A.    No, I wasn't.

20       Q.    Well, later on you're going 80 miles an hour,

21   aren't you?

22       A.    Cuz he commanded me to, and after those two pops

23   I believed he had the gun for sure.

24       Q.    Yes, you were going 80 or 90 miles an hour,

25   right?

SUPERIOR COURT

127

1       A.    Yes.

2       Q.    And then as you're traveling, he gets out into

3  the back, right?

4       A.    Yes.

5       Q.    And he's there for most of the ride up there,

6  isn't he?

7       A.    Yes.

8       Q.    And when he's there, you are making calls, aren't

9  you?

10      A.    Yes.

11      Q.    You call, I think you told us, your father,

12  right?

13      A.    Yes.

14      Q.    You called his uncle I think or his father,

15  Redondo's father, right?

16      A.    Yes.

17      Q.    You didn't get an answer, right, is what I

18  think --

19      A.    Got his voice mail.

20      Q.    Right.  You could have called 911, right,

21  couldn't you?

22      A.    I could have, but they were already --

23      Q.    Yes -- yes or no, you could have called 911,

24  right?

25      A.    I just answered you.  I could have, sir.

SUPERIOR COURT

1     Q.    And if you would have called 911, you would have

2  gotten immediate response because they were already behind

3  you, weren't they?

4     A.    Yes, they were right behind me.

5     Q.    And they could have picked him off or done

6  whatever it is that police officers do when people call,

7  right?

8     A.    Yes.

9     Q.    Didn't do it, did you?

10    A.    No, I was in a panic.

11    Q.    And it was -- you were in a panic because you

12  were high on methamphetamine.

13    A.    No, I was in a panic because I've never been in a

14  situation before, and I don't have training to deal with

15  stuff like that.

16    Q.    You said something about having tunnel vision; do

17  you remember saying that?

18    A.    Yes.

19    Q.    And that you had tunnel vision for 50 miles, sir?

20    A.    I had a vision of my uncle grabbing him and

21  saying --

22    Q.    "Yes" or "no", did you have tunnel vision for

23  50 miles?

24    A.    Yes.

25    Q.    Even though during those 50 miles you kept going

1   to your phone to dial and not looking at the road, you still

2   say you had tunnel vision?

3        A.   Yes.

4        Q.   Even though you kept trying to call all these

5   people and you were getting all this advice and you're still

6   saying you had tunnel vision?

7        A.   Yes.

8        Q.   You remember what those people told you, right?

9        A.   Yes.

10        Q.   And you remember that well.  That, you know, for

11   whatever reason then you called somebody else, right?

12        A.   I tried to call the next person that would be

13   able to get ahold of my uncle.

14        Q.   Sure.  Sure.  And through all that time, you're

15   saying that all you had was focused on one thing, right?

16        A.   I was focused on getting him to his dad's.

17        Q.   You were focused -- well, that's not how tunnel

18   vision works, it's that you're looking at something, if you

19   remember, right?

20        A.   Right.

21        Q.   And you said that yours was kind of like the

22   police officer's, right?  Right?  Your tunnel vision was

23   kind of like --

24        A.   I had a picture of my uncle's house.

25        Q.   Right.  And you saw it right in front of the cab

1    every time you looked, right?

2         A.    Pretty much.

3         Q.    And you said that this tunnel vision was kind of

4    like what the police officer had, right, that's the point I

5    want to make, that's what you think, right?

6         A.    I'm not sure it was just like the police

7    officer's.

8         Q.    Well, he wasn't as far -- you were high on

9    methamphetamine though, right?

10        A.    Yeah, and he has training to deal with tunnel

11   vision and I don't.

12        Q.    I'm not asking you about his training.  You were

13   high on methamphetamine, weren't you?

14        A.    During that day, yes.

15        Q.    You were really high on methamphetamine, weren't

16   you?

17        A.    No, I wasn't.

18        Q.    Even though you told us that it was only two or

19   three hits, you heard the testimony of the criminalist,

20   didn't you?

21        A.    Yes.

22        Q.    You heard that you had 704 nanograms per

23   milliliter of methamphetamine, you heard that, right?

24        A.    Yes.

25        Q.    You heard that it was a very large amount.  You

1    heard that, right?

2         A.    Yes, I heard that.

3         Q.    And yet you're telling us that that didn't affect

4    you in the slightest?

5         A.    Yes.

6         Q.    But you're telling us, though, that the morphine

7    that you were given, which was an analgesic and in very

8    therapeutic forms, that did affect you, right?

9         A.    Yes.

10        Q.    And it affected you to the point that you don't

11   even remember the trip back on the helicopter, right?

12        A.    Right.

13        Q.    Methamphetamine doesn't affect you, but this

14   morphine, this medicinal morphine does, right?

15        A.    Yes.

16        Q.    That you're driving and most of the time

17   Mr. Redondo's in the back, right?

18        A.    Yes.

19        Q.    It's raining, right?

20        A.    Yes.

21        Q.    You're traveling fast, 80 miles an hour, I think

22   is what you said, right?

23        A.    Yes.

24        Q.    You go as high as 90?

25        A.    I don't remember.

132

1       Q.    Well, but you do remember that you go at least as

2    high as 80, right?

3       A.    Eighty.

4       Q.    And you say that you have this tunnel vision,

5    right?

6       A.    Yes.

7       Q.    If you have this tunnel vision, sir, how is it

8    that you're so able to avoid the stop sticks?  I thought you

9    were just looking at something over there and not paying

10   attention to the road?

11      A.    I didn't -- I didn't see stop sticks.

12      Q.    You went around them, didn't you?

13      A.    I swerved one time.

14      Q.    Yeah, you did swerve to avoid a stop stick,

15   didn't you?

16      A.    Yeah, but I didn't see the stop sticks.

17      Q.    You just happened to coincidentally swerve at the

18   time that the stop sticks were on the road is what you're

19   telling us, right?

20      A.    That's not what I'm saying.

21      Q.    Well, you did swerve at the time the stop sticks

22   were there, right?

23      A.    I swerved around where there was a vehicle parked

24   off to the side of the road.  I swerved away from it.

25      Q.    Because you could see the vehicle, right?

SUPERIOR COURT

1      A.     Right.

2      Q.     It was a police officer, right?

3      A.     I'm not sure if there was a police officer --

4   well, obviously there was one there, but I didn't know where

5   he was at.

6      Q.     Well, did you hear that he had reflective -- he

7   had a reflective area off of him that indicated he was a

8   police officer?

9      A.     Off of his vehicle, yes.

10     Q.     Well, you saw the car, right?

11     A.     Yes.

12     Q.     And you're telling us you didn't see the

13  reflection enough to know that it was a police officer's

14  vehicle?

15     A.     I knew it was a police officer's vehicle.

16     Q.     And if it's a police officer's vehicle, you could

17  ask him for help too, can't you?

18     A.     And pass him at 80?  I guess, if that's what you

19  want to say.

20     Q.     Well, you could have hit your brakes pretty hard,

21  right?

22     A.     I could have.

23     Q.     And, in fact, that was at the time that

24  Mr. Redondo was in the back, right?

25     A.     Yes.

1        Q.     And at that time if you had hit your brakes

2    pretty hard, something would have happened to Mr. Redondo,

3    wouldn't it?

4        A.     He might have fell?

5        Q.     Pardon?

6        A.     He might have fell?

7        Q.     That's right.  It was raining out there, wasn't

8    it?

9        A.     Yes, there was rain.

10       Q.     It was slippery back there, right?

11       A.     Yes.

12       Q.     So you didn't even try to hit your brakes,

13    though, did you?

14       A.     I had hit my brakes at one point, yes.

15       Q.     And, in fact, when you -- he wasn't screaming at

16    you.  Because you said for the most of the way he was in the

17    back, right, you just told us that, right?

18       A.     Yes.

19       Q.     So for most of the way nobody's screaming at you,

20    right?

21       A.     After he left the vehicle, no.

22       Q.     So he wasn't screaming at you -- just -- the

23    point is this, for a lot of the time that you're driving,

24    Mr. Redondo is in the back, right?

25       A.     Yes.

1    Q.    90 percent of the trip, would you say?

2    A.    Yes.

3    Q.    And so for 90 percent of this trip, he's not

4    saying or doing anything to you, is he?

5    A.    He's outside of the vehicle.

6    Q.    Right.

7    A.    I had no idea what he was doing.

8    Q.    Right.

9    A.    For all I knew, he was sitting there watching

10   what I was doing.

11   Q.    Well, wait a minute.  Didn't you tell the police

12   that you saw him throw stuff out the side?

13   A.    As we were entering Superior.

14   Q.    Yeah, you did tell them that, didn't you?

15   A.    Yes, I did.

16   Q.    And you told them that he was throwing the stuff

17   out the side so that he could stop the vehicles from

18   catching up with you, right?  You told them that, right?

19   A.    I mean that's the only thing I could think of why

20   he would be throwing stuff out of the vehicle.

21   Q.    Sure.  Right?  And while he's doing -- and you

22   seen some of the items that he was throwing, right?

23   A.    I didn't see exact items, I just seen him

24   dropping stuff into the road from the side.

25   Q.    Right.  So for sure at that point he wasn't

SUPERIOR COURT

136

1   watching you, right?

2        A.    At that moment, no.

3        Q.    And you're saying that, well, during the trip he

4   was out there, but he may have gone out there to get some

5   fresh air to watch me from the outside, right?

6        A.    That's not what I said.

7        Q.    Well, that's what you implied, that he was out

8   there watching you.  If he's going to watch you from the

9   outside, wouldn't it be better for him, to really keep a

10  good watch on you, from the inside?

11       A.    I'm not sure.

12       Q.    Well, what would -- if he's out there being

13  buffeted by the wind and the rain, you think it's easier for

14  him to watch you from there than it is from inside the truck

15  where he's protected from the elements and the herky and

16  jerky of the freeway?

17       A.    From behind me he would be able to see what I'm

18  doing with my phone, yes.

19       Q.    Well, as he's sitting right next you, you said

20  you had the phone in your right hand, you just --

21       A.    My right hand, yes.

22       Q.    Right.  And that's right next to the passenger,

23  right?

24       A.    There's a space between us, yes.

25       Q.    But you told me that passenger is within arm's

SUPERIOR COURT

1    length, didn't you?

2         A.    Yes, a couple of feet away.

3         Q.    Right.  And you said that if he was watching you

4    he'd be able to see that hand, couldn't he?

5         A.    He'd be able to see.

6         Q.    Yeah.

7         A.    He wouldn't be able to see what's on my screen.

8         Q.    Well, he wouldn't be able to see what's on your

9    screen when he's in back either, could he?

10        A.    If he was looking through the small section of

11   the window, yes.

12        Q.    Okay.  I see.  So what you're telling us is that

13   you believe that he actually went to the back of the truck

14   so that he could look through the window, this window that

15   you say is covered, is covered by this storage bin, right?

16        A.    It's not completely covered.

17        Q.    How much of an opening is there?

18        A.    About four inches, six inches.

19        Q.    So he -- you're telling us that you want us to

20   believe that he goes outside so he can look at you through

21   these four inches that are out -- from the outside to watch

22   what you were dialing on the telephone?

23        A.    It ran through my mind.

24        Q.    And that's because you were high on

25   methamphetamine, right?

                        SUPERIOR COURT

1      A.     No.

2      Q.     Well, does it make sense to you that if

3  somebody's going to watch you and they're going to hurt you,

4  isn't it a lot easier to hurt you from inside?

5      A.     Not when you believe they have a gun.

6      Q.     Because -- but you don't know he has a gun.  You

7  just told me you didn't never see him with a gun.

8      A.     After the second and third shot, I believed he

9  was the one with the gun.

10     Q.     One of the things that you also told us was as

11 you're driving, you're focused on the driving, you've got

12 the phone in the right hand, your left hand is on the wheel,

13 right?

14     A.     Yes.

15     Q.     And you did tell us, well, you know, and if I

16 didn't think he had a gun I could have taken him, right?

17     A.     If I knew a hundred percent that he didn't have a

18 gun, yes.

19     Q.     And so if he's sitting next to you, sir, and

20 you're so intent on driving -- because you tell us now that

21 you have this tunnel vision, right, that's what you told us,

22 right?

23     A.     Yes.

24     Q.     And looking down on the phone but you're looking

25 up, two different tunnels, right?

SUPERIOR COURT

1      A.     No, I had my -- my hand up here so that way I

2   could keep an eye on the road as well.

3      Q.     And if he is sitting right next to you, sir, and

4   if he's worried about that cell phone and who you're

5   calling, he could have just reached up and grabbed it,

6   couldn't he?

7      A.     Yes, he could have.

8      Q.     And you're powerless to do anything because

9   you've got your other hand here driving, don't you?

10     A.     Yes.

11     Q.     And you got your foot on the accelerator, right?

12     A.     Yes.

13     Q.     And you got tunnel vision, right?

14     A.     Yes.

15     Q.     That would have been easy for him to do if he was

16   really worried about what you were doing, right?

17     A.     If he was worried about what I was doing?

18     Q.     Yeah.

19     A.     I guess so.

20     Q.     So, this drive, you're not yelled at throughout

21   this whole drive, right?

22     A.     After he left the -- after he left the vehicle to

23   get to the back, I didn't hear anymore yelling.

24     Q.     And, actually, he jumped out of there a couple of

25   times I think, is what you told the police, right?

```
 1        A.    I'm not sure.

 2        Q.    And you're telling us the reason you didn't stop

 3   was because you thought maybe he had a gun, right?

 4        A.    I didn't stop after getting on the freeway

 5   because I believed he had -- that he was the one with the

 6   gun and he was the one doing the shooting.

 7        Q.    Actually, I think that -- isn't it true that you

 8   told the police that the reason you didn't stop was because

 9   you thought the officers were going to shoot you?

10        A.    I had that go through my mind.

11        Q.    Sure.

12        A.    After, I seen many --

13        Q.    That's another thought that went through your

14   mind, right?

15        A.    Yes.

16        Q.    You thought that the police officers were going

17   to shoot you, and actually, you were the one that wanted to

18   go to Globe.  Do you remember that you told the officers

19   that?

20        A.    No, I don't.

21        Q.    Well, didn't you tell them that you wanted to go

22   to Globe so that other people could see the arrest --

23        A.    That was the point of my phone calls.

24        Q.    Right, so they could -- right, so they could see

25   the arrest, so that the police, they could see what the
```

SUPERIOR COURT

1    police officers were doing, right?

2        A.    So that way there was somebody who seen the whole

3    thing, yes.

4        Q.    Sure.  So there would be witnesses to the arrest,

5    right?

6        A.    Right.

7        Q.    That was in your head, right?

8        A.    Yes.

9        Q.    Not Redondo's, because all he cared about was

10   seeing his dad, right, that's all he cared about?

11       A.    I have no idea what he cared about.

12       Q.    Well, yes, you do because you told us he said

13   hey, dude or whatever words, obscenities he used, drive,

14   drive, drive, I want to go to my dad's, or something that

15   indicates to you what he wants, right?

16       A.    Yes.

17       Q.    He never said he wanted witnesses, did he?

18       A.    He didn't want them, I wanted them.

19       Q.    You wanted them.  And he didn't say that he was

20   afraid of being shot by the police, did he, that was you,

21   you just told us that, right?

22       A.    Yes.

23       Q.    If -- well, let's back up then.  If you didn't

24   see anything on the corner of Val Vista and Baseline, why

25   would the police shoot you?

SUPERIOR COURT

1      A.      Because as I was entering the freeway there was

2   two more gunshots.

3      Q.      Well, but you said that you were afraid of the

4   police, that's why you left the Val Vista and Baseline area.

5   Why would you be afraid?

6      MR. SHELL:   Objection, that's not what he said.

7      THE COURT:   The objection is sustained.

8      Q.      BY MR. MARTINEZ:   Well, were you afraid that they

9   were going to shoot you after you left the Val Vista and

10  Baseline area?

11     A.      No, I wasn't.

12     Q.      That you just freaked out, right?

13     A.      I just -- I left the area as I was told.

14     Q.      But when you're getting on Baseline -- I'm sorry,

15  on Higley and U.S. 60, that's when you start freaking out

16  and you're worried about the police shooting you, right?

17     A.      After I heard the two gunshots and entered

18  completely onto the freeway and I seen more cop cars behind

19  me, yes.

20     Q.      If you are afraid that the police officers are

21  going to shoot you, why don't you get on the phone, on the

22  911 and say -- because now it has nothing to do with the

23  guy, and say:   Look, I'm afraid that you guys are going to

24  shoot me.   I will stop if you guys promise me you're not

25  going to shoot me, and I'm going to throw everything out,

1    and -- you know, there's no guns here.  Or whatever.

2              You didn't do that -- if you were really afraid

3    of that, right?

4         A.   After entering the freeway, sir, and I heard two

5    more gunshots.  If I was to stop that vehicle, I believed in

6    my mind that I was going to be shot.

7         Q.   And that was not my question, was it?  My

8    question was why didn't you just call the police and tell

9    them:  I'm on the freeway, I'm afraid that you are going to

10   shoot and kill me.  I will stop if you don't shoot and kill

11   me.

12             Did you do that?

13        A.   No, I didn't do that.

14        Q.   Could you have done it?

15        A.   I don't believe I could have.

16        Q.   Well, why not?  Do you not know how to dial 911?

17        A.   I do know how to dial 911, but if I brought that

18   truck to a stop on my own --

19        Q.   Sir, you do know how to dial 911, right?

20        A.   Yes, sir.

21        Q.   And you do know that that communicates with the

22   police.

23        A.   Yes, sir.

24        Q.   You could have done that, right?

25        A.   If you want to quarterback it that way, yes.

1     Q.    It's a choice you made not to call 911 because

2   the person that's next to you, or the person that's Redondo,

3   he's not even really paying attention to who you're calling,

4   is he?

5     A.    I have no idea what he was doing.

6     Q.    If you have no idea what he's doing --

7     A.    I don't know what he's thinking.  I don't know.

8     Q.    No, I'm not asking you what he's thinking.  If

9   you have no idea what he's doing, then he's not a threat to

10   you, is he?

11     A.    When you --

12     Q.    Ever.

13     A.    When you hear gunshots that close and there's

14   only two people --

15     Q.    You just said you had no idea what he was doing,

16   right?  You said that, right?

17     A.    Yes.

18     Q.    If you have no idea what he's doing, then he

19   can't be a threat to you.  He can't possibly be a threat

20   because you don't know, right?

21     A.    I think you're -- your misconception with how

22   everything happened.  I don't know if you've ever been in a

23   situation like that.

24     Q.    Sir --

25         MR. MARTINEZ:  Judge, he's being non-responsive.  This

```
 1    calls for a "yes" or "no".

 2         THE COURT:  If there's a "yes" or "no" question, try to

 3    answer "yes" or "no".  If you can't answer "yes" or "no",

 4    tell Mr. Martinez you can't answer the question "yes" or

 5    "no".  But it's not a chance for you to give a narrative.

 6         Q.    BY MR. MARTINEZ:  Well, what's your answer, "yes"

 7    or "no"?

 8         A.    Can you repeat your question?

 9         MR. MARTINEZ:  Could you read it back, please?

10              (Read back.)

11         THE WITNESS:  I can't answer that.

12         Q.    BY MR. MARTINEZ:  And so you continue driving and

13    you come up against a truck over there near Superior, or

14    past Superior, right?

15         A.    Yeah, a little after the tunnel.

16         Q.    Pardon?

17         A.    A little after the tunnel.

18         Q.    Right.  And you're still driving, right?

19         A.    Yes.

20         Q.    And you're driving recklessly, right?

21         A.    No.

22         Q.    Well, there is a truck that's there on the

23    right-hand side going about 40, 45 miles an hour, isn't it?

24         A.    There was a truck there, and as I was approaching

25    him, he pulled to the side.
```

SUPERIOR COURT

1    Q.    And you went around him on what is called a

2    suicide curve, didn't you?

3    A.    I didn't have to go around him.  He pulled off to

4    the side of the road.

5    Q.    Do you also remember that he said there were

6    guard rails that prevented him from pulling over to the side

7    of the road; do you remember that portion of the testimony?

8    A.    I don't.

9    Q.    You don't remember that part?

10    A.    I don't remember that part.

11    Q.    You go around him, though, even if he pulls over

12    to the right, around a curve, don't you?

13    A.    I believe the road did curve there.

14    Q.    It's raining, right?

15    A.    It's raining.

16    Q.    Foggy, right?

17    A.    Foggy.

18    Q.    And you still do it anyway, right?

19    A.    Yes.

20    Q.    Even though you could have hit an oncoming car.

21    A.    I -- I wouldn't have to hit any oncoming car

22    because there was enough room for me to pass that truck.

23    Q.    There is an oncoming car, remember?  But you

24    could have, given the way you did it, right?

25    A.    No.

SUPERIOR COURT

1      Q.    You never stopped that truck out of your own free

2  will, right?

3      A.    No.

4      Q.    You chose not to stop that truck, right?

5      A.    Yes.

6      Q.    You chose to get into that truck and drive,

7  didn't you?

8      A.    Yes, I did.

9      Q.    And after you hear this pop that you don't know

10  what it's about, you chose to take off, didn't you?  Because

11  according to you the methamphetamine is not affecting you,

12  so you made a choice, right?

13      A.    Yes.

14      Q.    You made a choice to get off on Higley after you

15  got on the freeway, right?

16      A.    Yes.

17      Q.    And then you made a choice to get back onto that

18  freeway, didn't you?

19      A.    Yes.

20      Q.    And you made that choice to go at a normal rate

21  of speed, right?

22      A.    As much as possible, yes.

23      Q.    You made a choice to make some calls as you're

24  driving along, correct?

25      A.    Yes.

SUPERIOR COURT

1     Q.    You chose to speed along, right?

2     A.    Yes.

3     Q.    And then at the very end you ran out of gas,

4  right?

5     A.    Yes.

6     Q.    And that was the reason that you stopped, right?

7     A.    That's the reason why we came to a stop, yes.

8     Q.    No, not we, you, you're driving.  Mr. Redondo's

9  not driving, is he?

10    A.    No.

11    Q.    That was you and you alone, right?

12    A.    Yes.

13    Q.    And these choices were made, these choices that

14  you made helped this other individual, didn't it?

15    A.    That wasn't my intent.

16    Q.    I'm not asking if that was your intent.  I'm

17  asking you, didn't they help this individual?

18    A.    I'm not sure.

19    Q.    Well, didn't your choice to leave Val Vista and

20  Baseline help Mr. Redondo get away, at least partially for a

21  period of time, from where the shooting happened?

22    A.    If you want to quarterback it that way, yes.

23    Q.    Sure, I want to quarterback it that way.  That's

24  what happened, right?  And your choice to go right on Higley

25  rather than call the police allowed Mr. Redondo to then take

SUPERIOR COURT

1   a couple of shots, right?  It helped him, right?

2        A.    If you want to continue to quarterback it that

3   way, yes.

4        Q.    I want you to answer my question.

5        A.    Yes.

6        Q.    Did it help him "yes" or "no"?

7        A.    I guess so.

8        Q.    And as you're driving down the road and he's

9   throwing things, and you're driving the way you're driving

10  and all these cars are getting disabled, that also, the fact

11  that you're not slowing down, the fact that you're going

12  around stop sticks, that helped Mr. Redondo, didn't it?

13       A.    If you want to put it that way, yes.

14       Q.    That's what you were doing, right?

15       A.    That's not what I was intending to do.

16       Q.    But that's what you were doing.  That's the

17  effect of it, right?

18       A.    I'm not sure.

19       Q.    Well --

20       A.    Like I say, if you want to keep quarterbacking it

21  that way, then --

22       Q.    You keep saying quarterbacking.  You were there

23  and you were driving, weren't you?

24       A.    Yes, I was there.

25       Q.    And I understand that you keep saying that, but

SUPERIOR COURT

1   there was no gun there.  We have to -- we've established

2   that, haven't we, that you never saw a gun, right?

3   Throughout that whole trip you never saw a gun?

4        A.   I seen a gun at the end.

5        Q.   Right at the end, when the truck had already run

6   out of gas, right?

7        A.   Yes.

8        Q.   And so because of your actions, all of these

9   police officers, partially because of your actions, these

10  police officers' cars were disabled, right?

11       A.   Not because of my actions, no.

12       Q.   You were driving.

13       A.   I wasn't the one disabling them.

14       Q.   But you were driving, right?

15       A.   I was driving.

16       Q.   And because of your actions, shots were taken at

17  them, right?

18       A.   Not because of my driving, because somebody else

19  made those decisions to shoot at them.

20       Q.   While you were driving, right?

21       A.   I was driving.

22       Q.   And while you were slowly -- while you were

23  stopping the car on the side to allow them to cite somebody,

24  right?

25       A.   I never stopped the car.

SUPERIOR COURT

1       Q.    And this all happened while you had a large

2    amount of methamphetamine in your system, right?

3       A.    Yes.

4       MR. MARTINEZ:  I don't have anything else.

5       THE COURT:  Mr. Shell.

6

7                       REDIRECT EXAMINATION

8    BY MR. SHELL:

9       Q.    Do you know it was a large amount?

10      A.    No.

11      MR. SHELL:  You want to get that off of there, please?

12      Q.    BY MR. SHELL:  Let's go back.  At the time you're

13   driving -- well, let's go to the stop.  Did the police

14   officer question you and ask you if you were impaired?

15      A.    No.

16      Q.    Did you feel -- when you were driving down the

17   road, did you feel the effects of the methamphetamine?

18      A.    No.

19      Q.    All right.  When you were interviewed by the

20   police -- you've had a chance to review those interviews,

21   correct?

22      A.    Yes.

23      Q.    And they had lasted for hours.

24      A.    Yes.

25      Q.    Did you ever attempt to lie to them?

                       SUPERIOR COURT

1       A.      No.

2       Q.      During those interviews -- do you remember all of

3   them?

4       A.      No.

5       Q.      Do you know why?

6       A.      I slept.  Just tired.  A lot of pain and I was on

7   medications.

8       Q.      All right.  You were asked about the incident

9   that involved your stepson, correct?

10      A.      Yes.

11      Q.      Is that a felony?

12      A.      No.

13      Q.      What is it?

14      A.      It's a misdemeanor.

15      Q.      Do you have any other criminal convictions other

16  than that?

17      A.      No.

18      Q.      You were asked -- you didn't cry when Shuhandler

19  was shot, right?  Lieutenant Shuhandler --

20      A.      When he was shot?

21      Q.      He asked you, you didn't cry then, right?

22      A.      No, I didn't know he was shot.

23      Q.      When you were told by the police officer at the

24  hospital that he was shot, did you cry then?

25      A.      Yes.  Many times.

SUPERIOR COURT

1      Q.     You testified that you had lost touch with Chris

2    for about 15 years, correct?

3      A.     Yes.

4      Q.     There was a 15-year period that you didn't have

5    any contact with him.

6      A.     Yes.

7      Q.     All right.  Prior to January 28, 2010, how much

8    time frame was it that you began having contact with him?

9      A.     Couple of months.

10     Q.     And that's -- explain to us why that contact

11   occurred.

12     MR. MARTINEZ:  Objection, relevance.

13     THE COURT:  Overruled.

14     THE WITNESS:  I'd got my uncle's phone number, called

15   him.  I went up to see him.  Chris was there.  My uncle was

16   explaining to me --

17     MR. MARTINEZ:  Objection, hearsay.

18     THE WITNESS:  There was a shop --

19     THE COURT:  The objection is sustained.  You understand

20   you can't talk to us about what other people told you?

21     THE WITNESS:  Okay.

22     THE COURT:  Go ahead.

23     Q.     BY MR. SHELL:  When you were asked to help Chris

24   move, was Chris the only one that asked you?

25     A.     No.

SUPERIOR COURT

1       Q.      Angel asked you too, correct?

2       A.      Yes.

3       Q.      And you wanted to do a favor --

4       A.      Yes.

5       Q.      -- for your uncle?

6       A.      Yes.

7       Q.      Angel?

8       A.      Yes.

9       Q.      Why?

10      MR. MARTINEZ:  Objection, relevance.

11      THE COURT:  Overruled.

12      THE WITNESS:  He was injured at work.  He had metal

13   plates in his hand so he was unable to help Chris, and he

14   also -- I was going to help him with the mechanic shop up

15   there in Globe.

16      Q.      BY MR. SHELL:  You were hoping to get a job with

17   your uncle?

18      A.      Yes.

19      Q.      And that was at a mechanics shop that he was

20   going to open up?

21      MR. MARTINEZ:  Objection, leading.

22      THE COURT:  Sustained.

23      Q.      BY MR. SHELL:  You were asked about the windows

24   being up, it was cold.

25      A.      Yes.

```
 1        Q.    Go through everything that happened and tell us
 2   when the windows were up and when the windows were down,
 3   what windows were up, what windows were down, to the best of
 4   your recollection.
 5        A.    I think both windows were up as we were heading
 6   northbound on Val Vista.  When we came to the stop, I rolled
 7   my window down.
 8        Q.    Do you know if Chris rolled his window down or
 9   not?
10        A.    I -- I -- he had to have because the window was
11   down.
12        Q.    Okay.  So both windows are up.  The police
13   officer stops you, both windows go down.
14        A.    Yes.
15        Q.    Do the windows stay down during the stop?
16        A.    Yes.
17        Q.    Okay.  Do the windows get rolled back up ever?
18        A.    My window does.
19        Q.    Why?
20        A.    Because I couldn't hear on the phone.
21        Q.    So as you're driving down the road trying to call
22   people and trying to get to Globe, you roll your window up?
23        MR. MARTINEZ:  Objection, leading.
24        THE COURT:  Sustained.
25        Q.    BY MR. SHELL:  Did you roll your window up?
```

SUPERIOR COURT

1       A.      Yes, I did.

2       Q.      When?

3       A.      When I was going down the road.

4       Q.      All right.  The first little tape that they

5  played for you had to do with you supposedly saying to the

6  police -- I need to get something marked.

7       THE COURT:  Here.  We'll mark it as 143.

8       MR. SHELL:  142.

9       Q.      BY MR. MARTINEZ:  Let me show you what's been

10  marked as Exhibit 143.

11          Remember hearing the tape or the CD where they

12  ask you when you used meth?

13      A.      Yes, I remember that.

14      Q.      And you remember hearing it.  Do you remember

15  actually being asked that question or answering that

16  question?

17      A.      No.

18      Q.      And your voice on that tape, you heard your

19  voice?

20      A.      Yes.

21      Q.      Did it sound like you were conscious?

22      A.      No.

23      Q.      All right.  Reviewing Exhibit 143 there, that's a

24  transcription of that interview with the detective, correct?

25      MR. MARTINEZ:  Objection, leading.

1          THE COURT:  Overruled.  I think for foundation

2     purposes, I'll let him lead a little bit.

3          THE WITNESS:  Yes.

4          Q.    BY MR. SHELL:  What is it that you say?

5          A.    To what part?

6          Q.    About when asked when did you smoke meth?

7          A.    I said:  I don't know.  Uh, at eight, nine.  I

8     don't know.

9          Q.    So you told them you didn't know.

10         A.    Right.

11         Q.    And at that point in time -- what time does that

12    interview take place?

13         A.    At 1:45 a.m.

14         Q.    On what day?

15         A.    1/29 of 2010.

16         Q.    Okay.  So you heard yesterday that you were

17    admitted at 1:08 in the morning on 1/29, correct --

18         A.    Right.

19         Q.    -- to the hospital?

20         A.    Right.

21         Q.    You saw a document from a nurse that documented

22    at 1:25 that you're answering some questions, correct?

23         A.    Yes.

24         Q.    And then you're answering questions by a police

25    officer at what time?

SUPERIOR COURT

1      A.    At 1:45 a.m.

2      Q.    So within less than an hour being admitted with

3  three gunshot wounds?

4      MR. MARTINEZ:  Objection, leading.

5      THE COURT:  Sustained.

6      Q.    BY MR. SHELL:  Correct?

7      MR. MARTINEZ:  Leading -- objection.

8      THE COURT:  It's leading, a leading question.  Move on

9  to your next question.

10      Q.    BY MR. SHELL:  You were asked about supposedly

11  freaking out when you heard a pow.

12      A.    Yes.

13      Q.    Correct?  During the hours of interviews with the

14  police, did you tell them what you thought that pow was?

15      A.    Yes.

16      Q.    What did you tell them?

17      A.    Gunshot.

18      Q.    So through all those interviews that you gave to

19  the police, you didn't deny or say that you didn't know what

20  it was, correct?

21      MR. MARTINEZ:  Objection, leading.

22      THE COURT:  These are leading questions.

23      MR. SHELL:  It's based upon what he said.

24      THE COURT:  Well, then put it in a non-leading form and

25  you can ask it.

SUPERIOR COURT

1       Q.      BY MR. SHELL:   You remember when the State asked

2    you about a small little snippet of these interviews where

3    you tell them that you heard a pow, remember when he asked

4    you about that?

5       A.      Yes.

6       Q.      Did you ever say that that was not a gunshot?

7       A.      No.

8       Q.      What did you tell the police you thought it was?

9       A.      I told them I thought it was a gunshot.

10      Q.      And what did you tell the police about where you

11   thought it ultimately came from?

12      A.      From nearby.

13      Q.      But ultimately when you were driving down the

14   road -- and let me back up a little bit.  Did you leave Val

15   Vista and Baseline just because of that pow?

16      A.      No.

17      Q.      Why else did you leave?

18      A.      Because I was being screamed at to go.

19      Q.      Okay.  So did you tell the police that you put

20   those two things together?

21      A.      I'm not sure.

22      Q.      Okay.  As you sit here today and you thought

23   about it, have you ever put those two things together?

24      A.      Yes.

25      Q.      All right.  Remember on direct I tried to ask

SUPERIOR COURT

1    you -- you thought about this a lot over the last six

2    months, correct?

3         A.    Yes.

4         MR. MARTINEZ:  Objection, relevance, beyond the scope

5    of my questioning.

6         THE COURT:  Well, I don't know what the question is

7    yet.

8         Q.    BY MR. SHELL:  And you've thought about it and

9    thought about it and there's one thing that you would do

10   differently, correct?

11        MR. MARTINEZ:  Objection, beyond the scope, relevance.

12        THE COURT:  Sustained.

13        Q.    BY MR. SHELL:  What would you do differently?

14        MR. MARTINEZ:  Judge --

15        THE COURT:  Sustained.  The objection is sustained.

16   It wasn't relevant on direct, it's not relevant now.

17        Q.    BY MR. SHELL:  You were asked numerous times,

18   "Why didn't you call 911?  Didn't you call 911?"  Correct?

19        A.    Correct.

20        Q.    On that night, January 28, 2010, did it cross

21   your mind to call 911?

22        A.    No.

23        Q.    Why?

24        A.    Because they were -- there was police officers

25   behind me already.

SUPERIOR COURT

```
1        Q.    All right.  Why did you get off the freeway again
2   at Higley?
3        A.    To pull into the hospital to try to figure out
4   what happened.
5        Q.    Did you make suggestions about what you guys
6   should be doing?
7        A.    Yes.
8        Q.    And what were those?
9        A.    To go to my mom, my house, because it was closer
10  and it's safe there.
11       Q.    Okay.  And did you -- in these interviews that
12  you gave to the police, did you tell them anything else
13  about what you wanted to do when you got off at Higley?
14       A.    I wanted to get out of the truck.
15       Q.    And you told them that you wanted out of the
16  truck, correct?
17       A.    Yes.
18       Q.    Why didn't you get out of the truck?
19       A.    I was afraid.
20       Q.    Why?
21       A.    I believed that I would have been shot.
22       Q.    By?
23       A.    Chris.
24       Q.    All right.  And the State tried to make a big
25  deal out of that Chris doesn't live in Mesa, so he didn't
```

1   supposedly know how to tell you where to go, correct?

2        MR. MARTINEZ:  Objection, improper question about the

3   big deal.

4        THE COURT:  Yeah.  Let's not characterize it.  If you

5   have a question, ask the question.

6        Q.    BY MR. SHELL:  Did Redondo ever live in Mesa?

7        A.    Yes.

8        Q.    He's lived down here in the East Valley --

9   Christopher Redondo.

10       A.    Yes.

11       Q.    Okay.  And this area that you are driving at

12  where he's telling you to make a left here, make a right

13  here, make these turns, correct?

14       A.    Yes.

15       Q.    The roads in the Valley, which ways do they go?

16       A.    North, south, east and west.

17       Q.    And it's all pretty much parallel?

18       A.    Right.

19       MR. MARTINEZ:  Objection, leading.

20       Q.    BY MR. SHELL:  Correct?

21       A.    Yes.

22       THE COURT:  You got to stop asking leading questions.

23  The objection is sustained.

24       Q.    BY MR. SHELL:  So when you're driving, when you

25  get off of Higley and you're making these turns and coming

1   back around and getting back on the freeway, are you doing

2   that by your own choice?

3       A.    Doing that because that's what I was being

4   commanded to do.

5       Q.    This tunnel vision -- what do you mean when you

6   use the term tunnel vision?

7       A.    I mean it's like when you're coming up to a

8   tunnel, you see, you can see the light at the other end.

9       Q.    And you're focused on that?

10      A.    And you're focused on that.

11      Q.    What were you focused on when you're driving?

12      A.    Seeing Angel's house.

13      Q.    Getting to Globe?

14      A.    Yes.

15      MR. MARTINEZ:  Objection, leading.

16      THE COURT:  Mr. Shell, please don't ask any more

17  leading questions.

18      Q.    BY MR. SHELL:  Where's Angel's house?

19      THE COURT:  Let me finish what I'm saying, please.

20  Don't ask any more leading questions, don't suggest the

21  answers to your client.

22      Q.    BY MR. SHELL:  Where's Angel's house?

23      A.    In Globe.

24      Q.    As you're going down the freeway, what's going on

25  behind you after you get back on the freeway at Higley?

1    A.    There's cop cars, police --

2    Q.    How many?

3    A.    -- officers.  After entering the freeway, there
4    was probably about four, five.

5    Q.    As you keep going down the freeway, what do you
6    see?

7    A.    More.

8    Q.    You were asked about being afraid of the police
9    officers as you're going down the freeway, correct?

10   A.    Yes.

11   Q.    Explain that to us.

12   A.    After hearing the second and third gunshot, I
13   believed that my life then was in danger by Redondo and by
14   police officers.

15   Q.    Why do you think the police?

16   A.    Because the gunshots came from the truck.

17   Q.    Okay.  When you were asked about wanting somebody
18   to witness the arrest, talk about that, explain to us what
19   you meant.

20   A.    I wanted somebody to see exactly what was going
21   on.  That way it's seen by somebody who sees both sides.

22   Q.    Okay.  Now, did you try to arrange that?

23   A.    Yes.

24   Q.    How?

25   A.    When I talked to Angela, I had asked her if she

1    could come to me and possibly meet me.

2          Q.    And where did you ask her to meet you?

3          A.    She stated --

4    MR. MARTINEZ:  Objection, hearsay.

5          Q.    BY MR. SHELL:  Where did you ask her to meet you?

6    THE COURT:  The objection's overruled.  Go ahead.

7    THE WITNESS:  I told her I was near Superior.

8          Q.    BY MR. SHELL:  So you asked her to do what?

9          A.    To meet me.

10         Q.    Where?

11         A.    Superior.

12         Q.    Do you remember passing a semi as you were going

13   up past the tunnel?

14         A.    After the tunnel, yes.

15         Q.    Did you believe -- how did you pass it?

16         A.    I believe there's two lanes there.

17         Q.    It's a passing lane and a --

18         A.    When you come out of the tunnel, there's two

19   lanes.

20         Q.    And is that where you passed the semi?

21         A.    It was a little bit after that.

22         Q.    Okay.  When you pass the semi, did you have to go

23   into the other lane, into that -- what would be the

24   westbound lane -- you're heading in the eastbound lanes,

25   correct?

1      A.      Yes.

2      Q.      Did you ever go into the westbound lanes?

3      A.      No.

4      Q.      From the time you leave the scene at Val Vista

5  and Baseline until you're in the hospital, was any of that

6  done by your choice?

7      A.      No.

8      Q.      Did you make any decisions that night that you

9  felt you had choices with?

10     A.      No.

11     Q.      Once you left the scene until top of the world.

12     A.      No.

13     Q.      Why didn't you believe you had a choice, choices?

14     A.      Because I believed that if I was to do something

15  different, that I would be shot.

16     Q.      By?

17     A.      Chris.

18     Q.      Now, is it your belief as you're going down the

19  freeway, that he's sitting in the back of the truck watching

20  you?

21     A.      Yes, there was a time I believed that.

22     Q.      But is that the only thing that you believed?

23     A.      Yes.

24     Q.      Well, didn't you see him doing other stuff?

25     A.      Yes.

1          Q.     What was the other stuff you saw him doing?

2          A.     I seen him lean over the toolbox and he was

3     pulling tools and just dropping them into the street.

4          Q.     And then I think you testified that at some point

5     you saw his foot on the back window area.

6          A.     Yes.

7          Q.     Do you know what he was doing then?

8          A.     I have no idea.

9          Q.     Was it your goal or plan in any way to try to

10    help him?

11         MR. MARTINEZ:   Objection, leading.

12         THE COURT:   Overruled.

13         THE WITNESS:   No.

14         Q.     BY MR. SHELL:   Did you really have any goals or

15    plans that night?

16         A.     No.

17         MR. SHELL:   I don't have any other questions.

18         THE COURT:   Does the jury have any questions for this

19    witness?

20              I don't see any.

21              We are going to take our evening break.

22              Counsel, can you approach, please?

23              (Bench conference.)

24         THE COURT:   Okay.  We are going to begin tomorrow -- we

25    have a -- I'm trying to think of a polite way to say this --

1    a monster of a calendar tomorrow morning before you all get

2    here.  So instead of starting tomorrow at 10:30, we're going

3    to begin at 1:30 tomorrow.  And I expect that we will have

4    closing arguments tomorrow in the afternoon.  It's not a

5    promise, but that's what we're expecting at this point.

6             Please remember the admonition.  Again, if

7    there's television coverage, I want you to try to avoid it

8    tonight.  That's it.  See you tomorrow, 1:30, not 10:30, so

9    1:30 ready to come.

10            (Jury exited the courtroom.)

11       THE COURT:  Everyone go ahead and take a seat.

12            The record ought to reflect the presence of

13   counsel and the defendant, but not the jury.

14            Couple of housekeeping matters.

15            Mr. Martinez, will you get together with Alyson

16   and give her the time references for Exhibits 135 and 136

17   which were played for the jury?

18       MR. MARTINEZ:  Judge, if I could -- and by time

19   references, you mean the Bates number?

20       THE COURT:  If you can give me a Bates.

21       MR. MARTINEZ:  I will do that.

22       THE COURT:  -- number of a transcript --

23       MR. MARTINEZ:  I will do that.

24       THE COURT:  And either highlight on that and mark it as

25   an exhibit.

SUPERIOR COURT

1            MR. MARTINEZ:  Okay.  I'll do that.

2            THE COURT:  So for the record then, if you mark those

3    as the next two, 144 and 145, 144 will correspond to the

4    portion of Exhibit 135 which was read, and 145 will

5    correspond with the portion of Exhibit 136.  I said, "which

6    was read".  Which was played.  Each of those was played for

7    the defendant in impeachment on cross-examination.

8            You have some more specifics as to Exhibit -- as

9    to Counts 2, 7, 9, 12, for me?

10           MR. MARTINEZ:  I do.

11           THE COURT:  And I give you both now what I promised to

12   give you earlier, which is the -- that RAJI.

13           MR. MARTINEZ:  Right.  Two refers to Officer Justin

14   Betts.

15           THE COURT:  So that's on the Higley on ramp, I-60?

16           MR. MARTINEZ:  Yes, sir.

17           THE COURT:  Okay.

18           MR. MARTINEZ:  I think the next one you asked me

19   about --

20           THE COURT:  Seven.

21           MR. MARTINEZ:  Seven.  Was Officer Christopher Marrufo,

22   he was actually at the Mile Post 234 when he was going

23   around the tractor-trailer.  You remember the -- be 234.

24   Yeah, it's not 235 because he hadn't stopped yet.

25           THE COURT:  If I refer to that as after passing truck

SUPERIOR COURT

1    Officer Chris Marrufo, is that specific enough for

2    everybody?

3         MR. MARTINEZ:  Yes, sir.

4         THE COURT:  Okay.

5              Nine.

6         MR. MARTINEZ:  It's Scott Bagwell.

7         THE COURT:  Same instance?

8         MR. MARTINEZ:  Right.  Uh-huh.

9         THE COURT:  He didn't introduce himself as Scott

10   Bagwell.

11        MR. MARTINEZ:  I think he said Robert or something --

12   Richard.

13        THE COURT:  Richard.  Okay.  Twelve.

14        MR. MARTINEZ:  Refers to Pollard and Jetting and

15   Schlitz is all part of that shot that he took.

16        THE COURT:  That's after the truck stopped?

17        MR. MARTINEZ:  Exactly, uh-huh.  He and Marrufo were in

18   the same area, along with Bagwell.  And then the shot was

19   taken, according to the --

20        THE COURT:  Does drive-by shooting require that the

21   shot come from the car?

22        MR. MARTINEZ:  It does while it's moving.

23             Judge, this was after the -- as they are passing

24   the semi truck, if you remember, VanKilsdonk indicated that

25   he saw the two shots at the three police cars that were

SUPERIOR COURT

1    right there.

2         THE COURT:  Okay.  I'm getting it mixed up.  You're not

3    talking about when the defendant is stepping out of the

4    car --

5         MR. MARTINEZ:  No.  No.  This is before.

6         THE COURT:  So this is after the passing truck, and

7    it's Officers Pollard, Jetting and Schlitz?

8         MR. MARTINEZ:  Yes.

9         THE COURT:  Or detectives.  Okay.

10            Our jury instructions you'll have in the morning.

11   We'll make those "to wit" references, so the jury will know

12   which counts of drive-by shooting refer to which instances.

13            Any objection to those as described, Mr. Shell?

14        MR. SHELL:  No.

15        THE COURT:  Okay.  Anything else either of you would

16   like to put on the record?

17        MR. MARTINEZ:  No, sir.  Thank you.

18        MR. SHELL:  No.

19        THE COURT:  Okay.  See you tomorrow.

20            Can I see counsel tomorrow at 11:00 to finalize

21   instructions?

22        MR. MARTINEZ:  Okay.

23        THE COURT:  So we can have an idea of what our schedule

24   will be.  Does that work for you, Mr. Shell?  Mr. Shell?

25        MR. SHELL:  I'm looking at my calendar, Your Honor.

                         SUPERIOR COURT

1          THE COURT:  Well, I expect until a couple minutes ago

2    your calendar had you here at 10:30.

3          MR. SHELL:  Right.

4          THE COURT:  So if I give you an extra half hour, does

5    that work?

6          MR. SHELL:  Yeah.

7          THE COURT:  Okay.  Good answer.  See you at 11:00.

8                              ***

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# Juan Martinez

# 15-3363

Exhibits to initial charge
Attachment 08
(Arias docs)(01 wrap party pics)



# Juan Martinez

# 15-3363

Exhibits to initial charge
Attachment 08
(Arias docs)(05 wrap party pics)

**trial is on Facebook.** To connect with The State vs Jodi Arias ~ Travis Alexander murder trial, join Facebook today.

**Join**   Log In




**Haakon Liknes** @HLiknes · Apr 14
Had the GREAT honor to meet two role models for justice: Juan Martinez & Det. Flores, and #ToSeeTanishaSmile!



## The State vs Jodi Arias ~ Travis Alexander murder trial
#JodiArias jury foreman, Haakon Liknes, with Juan Martinez at the wrap party

# Juan Martinez

# 15-3363

Exhibits to initial charge
Attachment 08
(Arias docs)(04 wrap party pics)





# Juan Martinez

# 15-3363

Exhibits to initial charge
Attachment 08
(Arias docs)(03 wrap party pics)



Jurors who hated porn ad Antonio and his GF(?) who listened to
Travis Alexander who testified at trial and had his head to their
phone (left) detective Flores(left) Chris Connor, and Prosecutor
Juan Martinez (right) never Kay Judge(?) is turns (from the top of
the list of list of the list(?) the list of old law(?) turns list of(?)
Phoenix with no possibility of cheese



# Juan Martinez

# 15-3363

Exhibits to initial charge
Attachment 08
(Arias docs)(02 wrap party pics)





Jurors who voted against Arias joined the family and friends of Travis Alexander, who invited a few of those who stood by them, along with detective Flores and his wife Cortina, and Prosecutor Juan Martinez to an evening of fellowship, to celebrate the end of the trial of Jodi Arias and the sentencing of Arias to natural life in Prison, with no possibility of Parole.



Jurors who voted against Arias joined the family and friends of Travis Alexander, who invited a few of those who stood by them, along with detective Flores and his wife Cortina, and Prosecutor Juan Martinez, to an evening of fellowship, to celebrate the end of the trial of Jodi Arias and the sentencing of Arias to natural life in Prison, with no possibility of Parole.

# Juan Martinez

# 15-3363

Exhibits to initial charge
Attachment 08
(Arias docs)(07 wrap party pics)

 **Lynn Cun..mings**
@lynnanne57



Here's another one. I couldn't resist. Look at the smiles. I love Juan & Det. Flores almost laughing. Been a lng time



11:45 PM - 15 Apr 2015

   

# Juan Martinez

# 15-3363

Exhibits to initial charge
Attachment 08
(Arias docs)(06 wrap party pics)




**Sign up**

**Log in**



**Lynn Cummings**
@lynnanne57



@cshughes here's something that I put together from your Victory party



# Juan Martinez

# 15-3363

Exhibits to initial charge
Attachment 08
(Arias docs)(Email 04 threats Juror 17)



**WakeUpThankful** @WakeUpThankful                    59s
#juror17 "liked" hodis lifetime movie because
of the positive quotes?
pic.twitter.com/sltBk2Rjyn





**joanne** @pebbles_1969                              4m
Thank **#juror17** #claudiasuchta for give
narsasistic murderer chance to further
corrupt our young influential children
m.facebook.com/WilliamPittsNe...



**Doxing-Rx** @DoxingRx                               10m
Det Flores was ALREADY investigating
#Juror17 March 4, 2015 #jodiarias

# Juan Martinez

# 15-3363

Exhibits to initial charge
Attachment 08
(Arias docs)(Email 03 threats Juror 17)

 Tweet   

Sign up    Install app

pictureof #17. It's time 2focus on Travis
Alexander legacy now. #jodiarias

 **Serr8d** @serr8d                         3d
Why not circulate pic of #Juror17?
She violated laws. #DP activism needs
punishing.
@AquariusinAZ @HodiH081
@laurenpaige1985 @Tammybaby65

 **Tony Silva**
@silva1982                              

@serr8d @AquariusinAZ @HodiH081
@laurenpaige1985 @Tammybaby65
you can say that again! Let's do it!
Everyone RT
pic.twitter.com/wxa51QK8FB

7:57pm - 5 Mar 15 from Orlando, FL

# Juan Martinez

# 15-3363

Exhibits to initial charge
Attachment 08
(Arias docs)(Email 02 threats Juror 17)

↑ 7 New Tweets

 **EmaleeGrayce** @EmaleeGrayce                1d
AZ judicial system needs to screen their
jurors & make sure neither of them r or have
been married to a convicted felon #juror17


                                              ★ 5

 **Carolyn M** @CarolynMar                      1d
#Juror17 is a marked woman by Twitter. Sold
her soul to the Devil! Some people may
decide she doesn't deserve to live.  #jodiarias

                                              ★ 6

 **Magen Eliza...** @magensBills3              1d
People need to stop harassing #Juror17 she
is a human being and has a family of her
own, she has every right to her opinion.
#JodiArias

                                              ★ 4

 **Tracie Beers** @tracienjames              1d

# An Excerpt from MENDACITY: Jodi Arias: Secret Witness

The following is an excerpt from the chapter **The 17th Juror:**

*Claudia claimed she didn't remember Martinez from her first husband's trial. Do you believe that? Here's what she said during Excerpt 4 of her interview with Brahm Resnik from 12news.com:*





*"No, I didn't... I... I honestly when I saw the name come up, when I saw it on social media and that link, like I didn't... I don't... I didn't remember him. I, um... "*

*"I wanna say that I saw it... I'm not sure if I saw it Friday" (meaning after the conclusion of trial)...*

*Resnick seems surprised 17 wasn't aware of who he was. 17 tries to explain herself but starts stuttering and then goes all over the place:*

*"I didn't remember that he did, if you know like... I saw that it was there and when I walked into the courtroom and I saw him at the initial jury selection, the only time that... the only memory that I have of recognizing him is from TV. Nothing beyond that. Nothing like past that. You know, my husband, my husband, my ex-husband got out of jail in '99... no I'm sorry, in 2000. And then he ended up, our relationship was you know very tumultuous. We got married in 2001, not in 2000, the date that's being circulated. It was in 2001. And it just like, I mean... I didn't remember him. I don't want to say that I didn't know him because now I don't know, you know... I just know*

Starr (not C Stark) @starknightz                    5h

# Juan Martinez

# 15-3363

Exhibits to initial charge
Attachment 08
(Arias docs)(Tanisha Alexander twitter)



**Juan Martinez Prosecutor Support Page**

23 minutes ago ·

Henri DelRey @Producer_Henri · 1m1 minute ago

Just spoke briefly with Travis' sister Tanisha Sorenson outside of courthouse. She Said "I believe the "secret witness" was #JodiArias.

 Like     Comment     Share



# Juan Martinez

# 15-3363

Exhibits to initial charge
Attachment 08
(Arias docs)(Email 07 threats Juror 17)



**Carla Leichtenberger** @KarlaMNL   2d
How would u like to be forever known as
JUROR 17 the one who had an AGENDA and
single handedly STOPPED justice for the
ALEXANDERS #FUSW



**Sheamus AL**
@Alfred47412469



@KarlaMNL she'll 4 ever have to look
over her shoulder

8:31am - 10 Mar 15

   

Reply to @Alfred47412469 @KarlaMNL

# Juan Martinez

# 15-3363

Exhibits to initial charge
Attachment 08
(Arias docs)(Email 06 threats Juror 17)

# Tweet

  

Sign up | Install app



**vance slater** @vance_slater  5d
someone will release #juror17 name in time.
once her name is public. i would move or
protect myself. dead woman walking. imo.
#jodiarias



**Jennifer Novak** @Str8legit1  5d
@vance_slater #Juror17 is the 2nd most
hated woman in the world right now.
#jodiarias in #1. Both are cowardly liars and
should rot in hell.



**barrieblonde** @barrieblonde  5d
@Str8legit1 @suzie_patterson @vance_slater
#17 better HOPE what happened to #Travis
NEVER happens to s/one SHE cares about!
#ShameOnYou#17



**vance slater**
@vance_slater



# Juan Martinez

# 15-3363

Exhibits to initial charge
Attachment 08
(Arias docs)(Email 05 threats Juror 17)



 **Amanda Henderson**
@ASSAYA



Claudia... Police can't/won't protect you forever!  to see what WILL happen to you once the Police done protecting you're ASS!   #jodiarias

9:14pm - 7 Mar 15

Reply to @ASSAYA

 @PitchingAFit                    2d
@ASSAYA It's unwise to post stuff that could be viewed as threats via Twitter. Authorities do sometimes act on it.