# Juan Martinez

# 15-3363

Exhibits to initial charge
Attachment 08
(Arias docs)(Transcripts Dr. R. Samuels)

Transcript of Testimony of Dr. Richard Samuels

1

```
 1          IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

 2              IN AND FOR THE COUNTY OF MARICOPA

 3

 4   STATE OF ARIZONA,              )
                                    )
 5              PLAINTIFF,          )
                                    )
 6          VS.                     )   NO. CR 2008-031021
                                    )
 7   JODI ANN ARIAS,               )
                                    )
 8              DEFENDANT.          )
                                    )
 9   ___                            )

10

11

12          REPORTER'S TRANSCRIPT OF PROCEEDINGS

13

14

15

16                  PHOENIX, ARIZONA
                    MARCH 18, 2013
17

18
            BEFORE THE HON. SHERRY K. STEPHENS
19

20          REPORTED BY:

21          MICHAEL A. BABICKY, RPR
            CERTIFIED REPORTER
22          CERTIFICATE NO. 50361

23          PREPARED FOR:

24          MS. JENNIFER WILLMOTT, ESQ.
            COPY
25
```

2

```
 1                  EXHIBITS

 2
```

Page 1

Transcript of Testimony of Dr. Richard Samuels

3

4          EXHIBIT NO.                    PAGE NO.

5          NONE MARKED.

6

7

8                              WITNESSES

9

10         DIRECT EXAMINATIONN (CONT.)           PAGE

11         DR. RICHARD SAMUELS                    6

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1              REPORTER'S TRANSCRIPT OF PROCEEDINGS,

2              WAS TAKEN ON MARCH 18, 2013 AT THE

3     SUPERIOR COURT, MARICOPA COUNTY, 175 W. MADISON,

4     PHOENIX, ARIZONA, BEFORE MICHAEL A. BABICKY, A

5     CERTIFIED REPORTER IN THE STATE OF ARIZONA.

6

7              COUNSEL APPEARING:

Page 2

Transcript of Testimony of Dr. Richard Samuels

8

                FOR THE PLAINTIFF:

9

                DEPUTY COUNTY ATTORNEY

10             BY:  MR. JUAN M. MARTINEZ, ESQ.

11

12             FOR THE DEFENDANT:

13

14             BY:  MR. KIRK NURMI, ESQ.
                BY:  MS. JENNIFER WILLMOTT, ESQ.

15

16

17

18

19

20

21

22

23

24

25

                                                  4

1                      PROCEEDINGS

2

3

4         THE COURT:  ALL RIGHT.  THIS IS TIME SET FOR

5 EVIDENTIARY HEARING ON THE STATE'S OBJECTION TO TESTIMONY

6 BY DR. SAMUELS REGARDING INSTRUMENTAL HOMICIDE AND

7 EXPRESSIVE HOMICIDE.  WHERE IS DR. SAMUELS?

8        MS. WILLMOTT:  JUDGE, HE'S OUT OF THE COURTROOM

9 BECAUSE WE'RE GOING TO ASK ASK TO VACATE THE HEARING.

10 WE'LL AGREE NOT TO PRESENT THE SIDES WITH REGARD TO

11 EXPRESSIVE VERSUS INSTRUMENTAL.

Transcript of Testimony of Dr. Richard Samuels

12        MR. NURMI:  CAN WE APPROACH, YOUR HONOR, BEFORE

13   --

14        THE COURT:  YOU MAY.  WE DID TELL THE JURY NOT

15   TO BE HERE UNTIL 11:00 O'CLOCK BECAUSE WAS THOUGHT THE

16   HEARING WOULD TAKE UNTIL 11:00 O'CLOCK TO COMPLETE.  SO

17   I'M NOT SURE THAT EVERYONE'S HERE.  SO WE WILL NOT BE ABLE

18   TO START THE TRIAL UNTIL 11:00.

19        MR. NURMI:  OKAY.

20        THE COURT:  BUT YOU MAY APPROACH.

21        (SIDEBAR DISCUSSION.)

22        MR. NURMI:  AS IT RELATES TO THE E-MAIL THAT

23   CONTAINED THE THREAT THAT I FORWARD TO YOU ON FRIDAY --

24        THE COURT:  YES.

25        MR. NURMI:  I WOULD ASK FOR THE PURPOSES OF

                                                          5


1    RECORD THAT BE FILED --

2         THE COURT:  OKAY.

3         MR. NURMI:  -- UNDER SEAL FOR APPELLATE PURPOSES

4    OR WHAT HAVE YOU.  I DON'T KNOW IF THE COURT'S AWARE AND

5    I'M JUST MAKING FURTHER RECORD OF THIS, THE PROCEDURE NOW

6    IS THAT WE'RE PARKING UNDERNEATH THE COURTROOM.  THEY'RE

7    CHECKING THE CAR FOR BOMBS AND PATTING DOWN.  SO HE IS

8    ACTUALLY IN THE ROOM IN THE ATTORNEY/CLIENT ROOM SO MCSO

9    CAN KEEP AN EYE ON HIS MOVEMENTS AND WHEREABOUTS.  SO WE

10   JUST NEED TO DO THE SAME THING, I GUESS, WHEN WE LEAVE AT

11   4:30.

12        THE COURT:  MY UNDERSTANDING IS THAT SECURITY

13   HAS AGREED TO PROVIDE THE SAME CIRCUMSTANCES FOR DOCTOR OR

14   MS. LAVIOLETTE.  SHE'S NOT A DOCTOR.

15        MR. NURMI:  THEY HAVE NOT ADVISED ME OF THAT,

16   BUT I THINK THAT WOULD BE PRUDENT FOR THE REST OF THE

Transcript of Testimony of Dr. Richard Samuels

17    TRIAL.

18          THE COURT:  THEY TOLD ME THEY WERE WILLING TO DO

19    THAT.

20          MR. NURMI:  OKAY.  I JUST TALKED TO JESSIE OVER

21    THE WEEKEND AND WE JUST TALKED ABOUT THE PROCEDURES FOR

22    DR. SAMUELS.  I HADN'T GONE BEYOND THAT.  BUT I THINK,

23    LIKE I SAY, GIVEN -- IT ALMOST SEEMS LIKE AN INEVITABILITY

24    THAT THAT PROCEDURE WILL HAVE TO CONTINUE.

25          THE COURT:  OKAY.  ANYTHING ELSE?

                                                      6


1          MS. WILLMOTT:  NO.

2          THE COURT:  SO HOW MUCH LONGER DO YOU HAVE WITH

3    DR. SAMUELS ON DIRECT?

4          MS. WILLMOTT:  ONLY THE REST OF THIS MORNING AND

5    MAYBE A LITTLE BIT INTO THE AFTERNOON.

6          THE COURT:  OKAY.  EXCELLENT.  WE'LL TAKE A

7    RECESS UNTIL THEN.

8          (OPEN COURT.)

9          THE COURT:  COURT IS IN RECESS UNTIL 11:00 A.M.

10          (A RECESS WAS HELD).

11          THE COURT:  PLEASE BE SEATED.  THE RECORD WILL

12    SHOW THE PRESENCE OF THE JURY, THE DEFENDANT AND ALLL

13    COUNSEL.  WE NEED DR. SAMUELS BACK ON THE STAND.

14          DR. SAMUELS, YOU ARE STILL UNDER OATH.  DO YOU

15    UNDERSTAND?

16    A.    YES.

17          THE COURT:  GIVE YOU A MOMENT TO GET SITUATED.

18    YOU MAY PROCEED.

19

20              DIRECT EXAMINATION (CONT.)

Page 5

Transcript of Testimony of Dr. Richard Samuels

21

22    BY MS. WILLMOTT:

23        Q.    THANK YOU.  GOOD MORNING, DR. SAMUELS.

24        A.    MORNING.

25        Q.    ALL RIGHT.  I WANTED TO BEGIN OUR DISCUSSION

7

1    TODAY ABOUT AMNESIA.

2        A.    OKAY.

3        Q.    I KNOW WE TALKED A LITTLE BIT ABOUT IT LAST WEEK

4    BUT I HAVE SOME THINGS I WANT TO CLEAR UP WITH YOU.

5        A.    SURE.

6        Q.    CAN WE TALK FIRST ABOUT THE TRANSIENT GLOBAL

7    AMNESIA?

8        A.    YES.

9        Q.    CAN YOU TELL US WHAT THAT IS?

10        A.    WELL, IT'S A TYPE OF AMNESIA THAT CAN OCCUR WITH

11    A RELATIVELY MODEST STIMULUS.  IT MAY LAST FOR A SHORT

12    PERIOD OF TIME, SOMEWHAT LONGER, USUALLY IS NOT PERMANENT.

13    THERE ARE NUMEROUS THINGS THAT CAN BRING IT ABOUT

14    APPARENTLY.

15        Q.    ALL RIGHT.  LAST WEEK WE SHOWED ON THE SLIDE

16    SOMETHING THAT -- AN ARTICLE.  IT WAS A REVIEW ARTICLE, I

17    BELIEVE?

18        A.    YES.

19        Q.    AND IN THAT REVIEW ARTICLE IT TALKED ABOUT SOME

20    OF THE DIFFERENT THINGS THAT CAN CAUSE TRANSIENT GLOBAL

21    AMNESIA?

22        A.    YES.

23        Q.    CAN YOU FIRST TELL US WHAT IS A REVIEW ARTICLE?

24        A.    THAT PARTICULAR ARTICLE -- A REVIEW ARTICLE IS

25    ONE WHERE THE AUTHORS GO TO THE BOTHER OF DOING A GLOBAL

Transcript of Testimony of Dr. Richard Samuels

8

1    RESEARCH ON A PARTICULAR AREA.  THEY READ ALL OF THESE

2    ARTICLES.  THEY SYNTHESIZE SOME CONCLUSIONS FROM THOSE

3    ARTICLES AND THEN THEY WRITE A SUMMARY ARTICLE WHICH IS

4    WHAT I READ.

5        Q.   SO YOU READ THE SUMMARY ARTICLE?

6        A.   I READ THE SUMMARY ARTICLE.  THERE ARE 119

7    ARTICLES THAT WERE REVIEWED IN THERE.

8        Q.   ALL RIGHT.  AND IN THAT SUMMARY ARTICLE DID IT

9    TALK ABOUT SOME OF THE THINGS THAT CAN CAUSE TRANSIENT

10   GLOBAL AMNESIA?

11       A.   YES.

12       Q.   AND ON THE SLIDE LAST WEEK, ONE OF THE SLIDES

13   TALKED ABOUT THINGS LIKE BEING -- EMERSED IN HOT WATER OR

14   COLD WATER?

15       A.   YES.

16       Q.   CAN THAT REALLY CAUSE TRANSIENT GLOBAL AMNESIA?

17       A.   WELL, APPARENTLY IT CAN.  THESE WERE DOCUMENTED

18   FROM PATIENT REPORTS AND OTHER EXAMINATION OF CASES THAT

19   APPEARED IN THE ARCHIVES OF PEOPLE WHO STUDIED THESE.

20       Q.   ALL RIGHT.  SO WHAT'S THE POINT OF TALKING ABOUT

21   TRANSIENT GLOBAL AMNESIA?

22       A.   I WANTED TO POINT OUT TO THE JURY THAT AMNESIA

23   IS NOT NECESSARILY A FAKE OR MADE UP KIND OF EXPERIENCE.

24   IT OCCURS FAIRLY COMMONLY IN THE POPULATION, THREE TO

25   EIGHT PERCENT -- THREE TO EIGHT PERCENT OF EVERY 100,000

9

1    CASES, YEAH, THREE TO EIGHT PERCENT OF EVERY 100,000

2    CASES.  IT'S A SMALL PERCENTAGE.

Page 7

Transcript of Testimony of Dr. Richard Samuels

3          BUT THE FACT OF THE MATTER IS IT'S

4    REGULARLY REPORTED.  AND SO IT IS NOT AS IF AMNESIA IS --

5    CAN ONLY BE MADE UP AS TO COVER UP SOMETHING.

6          Q.    AND NOW THIS TRANSIENT GLOBAL AMNESIA, WHAT

7    WE'RE TALKING ABOUT RIGHT NOW THAT CAN BE CAUSED BY --

8    WOULD YOU CHARACTERIZE THEM AS MINOR TYPE?

9          A.    RELATIVELY MINOR.

10         Q.    AND THESE RELATIVELY MINOR TYPE ACTIONS LIKE

11   EMERSION IN HOT WATER OR CONTROL WATER IS IT'S BASIS FOR

12   AM ME SHAW BECAUSE IT'S A SHOCK?

13         A.    PROBABLY SO.

14         Q.    OKAY.

15         A.    THE ETIOLOGY IS NOT COMPLETELY UNDERSTOOD.

16         Q.    ALL RIGHT.  AND WHEN I SAY SHOCK, I'M SAYING

17   LIKE SHOCK TO THE SYSTEM?

18         A.    YES, SHOCK TO THE SYSTEM.

19         Q.    OKAY.  IS THAT SOMETHING THAT JODI SUFFERED

20   FROM?

21         A.    NO.

22         Q.    AND WHAT IS IT THAT YOU SAY JODI -- WHAT TYPE OF

23   AMNESIA DOES SHE HAVE?

24         A.    THE TYPE OF AMNESIA THAT SHE HAS --

25               MR. MARTINEZ:  OBJECTION.  BEYOND THE SCOPE,

                                                          10


1    RULE 703, 702 ULTIMATE ISSUE.

2               MS. WILLMOTT:  JUDGE, MAY WE APPROACH?

3               THE COURT:  YOU MAY.

4               MR. MARTINEZ:  MY CONCERN IS THAT HE'S GOING TO

5    START TALKING ABOUT WHAT THE DEFENDANT SUFFERED FROM AT

6    THE TIME OF THE KILLING.  WE ALREADY HAVE A RULING THAT HE

7    CANNOT.  AND THAT'S PRETTY CLEAR.  NOW HE WANTS TO TALK

Transcript of Testimony of Dr. Richard Samuels

8  ABOUT WHAT APPEARS IF THAT SO I'M OBJECTION TO THAT.  HE

9  CAN TALK ABOUT HER MENTAL STATE.

10      MS. WILLMOTT:  JUDGE, IT'S NOT NECESSARILY

11  TALKING ABOUT HER MENTAL STATE.  WE'RE NOT TALKING ABOUT A

12  LEGAL CONCLUSION, SOMETHING THAT JURY WOULD HAVE.  THIS IS

13  ABOUT HER MEDICAL WHICH IS WHAT -- IS WELL WITHIN HIS

14  EXPERTISE.  DISASSOCIATIVE AMNESIA IS WHAT HE'S ABOUT TO

15  TALK ABOUT AND THAT'S WHAT CAUSES SOMEONE TO NOT REMEMBER

16  A VERY TRAUMATIC EVENT.

17      SO THERE WAS MUCH CROSS-EXAMINATION ON THE FACT

18  THE SHE COULDN'T REMEMBER THINGS AND HOW CONVENIENT IT IS.

19  THIS IS WHAT HE WOULD SAY SHE IS SUFFERING FROM WITH

20  REGARD TO THAT SPECIFIC EVENT.

21      THE COURT:  WELL, HE'S MAKING OR DRAWING

22  CONCLUSIONS BASED UPON HEARING HER TESTIMONY DURING THE

23  TRIAL OR INTERVIEWING HER?

24      MS. WILLMOTT:  NO.  OVER INTERVIEWING HER, THE

25  30 HOURS HE SPENT WITH HER.

                                    11


1      THE COURT:  AND HIS OPINION WILL BE THAT SHE HAS

2  THAT KIND OF AMNESIA BASED UPON WHAT SHE'S REPORTING TO

3  HIM; IS THAT CORRECT?

4      MS. WILLMOTT:  YES.

5      MR. MARTINEZ:  WHEN?  HE'S GOING TO SAY THAT SHE

6  HAS IT AT THE TIME OF THE KILLING, THAT'S THE PROBLEM.

7      MR. NURMI:  NO.

8      MR. MARTINEZ:  WELL, HOLD ON, THAT'S WHAT HE'S

9  GOING TO SAY.  I KNOW WHAT HE'S GOING TO SAY.

10      MS. WILLMOTT:  WHY IS THAT A PROBLEM?  I'M NOT

11  UNDERSTANDING WHY IT'S A PROBLEM.  IT'S HIS MEDICAL

Transcript of Testimony of Dr. Richard Samuels

12   OPINION.  IT'S HIS EXPERTISE.  IT'S BASED ON WHAT SHE'S

13   TOLD HIM.  AND SO THE FACT THAT SHE SUFFERS FROM SOME SORT

14   OF AMNESIA WHICH IS WHAT SHE'S TESTIFIED TO THAT SHE CAN'T

15   REMEMBER.  AND OVER AND OVER AGAIN SHE WAS ASKED WHY SHE

16   CAN'T REMEMBER THIS AND HOW CONVENIENT IT IS.  BUT IN

17   REALITY THERE'S A MEDICAL EXPLANATION FOR IT.  AND HE

18   SHOULD BE ALLOWED TO DISCUSS WHAT THE MEDICAL EXPLANATION

19   IS.

20           MR. NURMI:  AND NOT NECESSARILY THE TIME OF THE

21   EVENT, PART OF IT IS THE PROCESS.  IT'S NOT JUST A MATTER

22   OF THE TIMING, THE STATE OF MIND AT EVENTS, BUT IT'S THE

23   PROCESSING AFTERWARDS, THE ABILITY TO PROCESS, THE ABILITY

24   TO REMEMBER.

25           MR. MARTINEZ:  WELL, THEY'RE TALKING ABOUT A

                                                    12

1   STATE OF MIND.  THEY'RE TALKING ABOUT AN ISSUE THAT NO ONE

2   CAN OPINE ON.  THEY JUST CAN'T SAY, THIS IS HOW SHE WAS

3   THINKING, THIS IS HOW SHE WAS FEELING IMMEDIATELY AFTER

4   THE MURDER.  THEY CAN'T SAY THAT.  THEY CAN SAY SHE HAS

5   PTSD.  AND ONE OF THE CHARACTERISTICS OF PTSD IS BLAH,

6   BLAH, BLAH, WHATEVER THAT IS.  BUT THEY CAN'T SAY:  JODI

7   WAS SUFFERING FROM.  YOU JUST CAN'T SAY THAT BECAUSE HE'S

8   PROGNOSTICATING OR TRYING TO GET INTO SOMEBODY'S HEAD AND

9   YOU CAN'T DO THAT.  YOU CAN TALK ABOUT THE GENERAL

10   CHARACTERISTICS OF PTSD.  HE CAN TALK ABOUT AMNESIA.  HE

11   CAN TALK ABOUT WHAT TRIGGERS IT AND ALL THAT, BUT HE CAN'T

12   SAY, THIS CASE, THEY'RE BRINGING IT DIRECTLY HOME WITH

13   HER.

14           MS. WILLMOTT:  ALL I'M HEARING IS THAT WE CAN'T

15   SAY IT BUT THERE'S GIVEN NO REASON FOR IT.  THE FACT THAT

16   SHE IS SUFFERING FROM DIS-ASSOCIATIVE AMNESIA WHICH IS WHY

Transcript of Testimony of Dr. Richard Samuels

17    SHE CAN'T REMEMBER CERTAIN EVENTS AND VERY SPECIFIC TIME

18    PERIODS AND WHY HER MEMORY IS HAZY COMING OUT OF IT AND

19    HAZY GOING INTO IT, THERE'S A MEDICAL EXPLANATION FOR

20    THAT.

21        THERE'S ABSOLUTELY -- WE CAN SEE THAT BASED ON

22    HIS EXPERTISE.  HE'S NOT GUESSING.  IT'S BASED ON WHAT

23    HE'S INTERVIEWED HER ABOUT.  IT'S BASED ON THE FACT OF HER

24    TEST SCORES AND THINGS LIKE THAT THAT SHE'S -- AND IT IS

25    BASED AND LINKED TO THE PTSD.

                                                        13

1        THE COURT:  OKAY.  LAY MORE FOUNDATION.  I KNOW

2    IT'S BEEN SEVERAL DAYS SINCE WE WERE HER.  SO LAY SOME

3    FOUNDATION REGARDING THE BASIS FOR HIS OPINION.  AND IF

4    YOU HAVE AN OBJECTION AFTER THAT I WILL HEAR THE

5    OBJECTION.

6        MS. WILLMOTT:  OKAY.

7        (OPEN COURT.)

8    BY MS. WILLMOTT:

9        Q.    ALL RIGHT, DR. SAMUELS, BEFORE WE GET TO TALKING

10    ABOUT SO MUCH ABOUT JODI, LET'S TALK A LITTLE BIT MORE

11    ABOUT DISASSOCIATIVE AMNESIA?

12        A.    OKAY.

13        Q.    CAN YOU TELL US WHAT IT IS?

14        A.    DISASSOCIATIVE AMNESIA IS A FORM OF AMNESIA --

15    THERE ARE SEVERAL DIFFERENT TYPES OF AMNESIA.  THIS IS A

16    FORM OF AMNESIA THAT APPEARS TO BE BASED UPON THE FACT

17    THAT MEMORIES WERE NOT INITIALLY ESTABLISHED DUE TO AND

18    INTERFERENCE WITH THE HIPPOCAMPUS AND USUALLY HAS A

19    SPECIFIC BEGINNING AND A SPECIFIC END OR PERIOD OF TIME

20    WHEN MEMORIES ARE NOT BEING FORMED.  AND THE INDIVIDUAL

Transcript of Testimony of Dr. Richard Samuels
21    CANNOT RETRIEVE MEMORIES FOR THAT PERIOD OF TIME.

22        Q.    AND IS THERE SOMETHING THAT TRIGGERS THIS --

23    THAT TRIGGERS THESE MEMORIES NOT BEING FORMED?

24        A.    THAT'S RIGHT.  GENERALLY SPEAKING THEY WOULD BE

25    A VERY SEVERE TRAUMA, SOME SEVERE INCIDENT.  IT COULD BE A

                                                          14


 1    KILLING, IT COULD BE A BOMB GOING OFF.  IT COULD BE A

 2    NUMBER OF DIFFERENT FACTORS.

 3                WHATEVER IT IS, LIKELY PRODUCING AN ACUTE

 4    STRESS DISORDER WHERE THE PHYSIOLOGICAL CHANGES THAT OCCUR

 5    CREATE A FLOW OF CHEMICALS TO THE HIPPOCAMPUS WHICH BLOCKS

 6    IT FROM STORING MEMORY.

 7                MS. WILLMOTT:  JUDGE, MAY I APPROACH?

 8                THE COURT:  YES.

 9    BY MS. WILLMOTT:

10        Q.    DR. SAMUELS, I'M SHOWING YOU WHAT IS MARKED AS

11    EXHIBIT 529.  DO YOU RECOGNIZE THAT?

12        A.    I DO.

13        Q.    IS THAT A PICTURE OF THE BRAIN THAT WE USED LAST

14    WEEK ON THE SLIDE?

15        A.    YES.

16        Q.    AND DOES THIS HELP YOU TO EXPLAIN WHEN WE'RE

17    TALKING ABOUT THE HIPPOCAMPUS AND THE DIFFERENT PARTS OF

18    THE BRAIN THAT ARE AFFECTED DURING ACUTE STRESS AND

19    CAUSING THIS DISASSOCIATIVE AMNESIA?

20        A.    YES.

21                MS. WILLMOTT:  DEFENSE WOULD MOVE IN EXHIBIT

22    529?

23                MR. MARTINEZ:  I DO BELIEVE WE HAVE A RULING ON

24    THAT FROM LAST WEEK, A MOTION FOR RECONSIDERATION.  I

25    WOULD ASK THAT IT BE DENIED.

Transcript of Testimony of Dr. Richard Samuels

15

1          MS. WILLMOTT:  JUDGE, MAY WE APPROACH?

2          THE COURT:  YES, APPROACH, PLEASE.

3          (SIDEBAR DISCUSSION.)

4          MR. MARTINEZ:  THE WAY IT HAPPENS, IF I REMEMBER

5    CORRECTLY, THE STATE WAS SURPRISED OR AMBUSHED IS A BETTER

6    WORD TO USE, THE SLIDES THAT WERE PREPARED ON BEHALF OF

7    THE DEFENDANT.  AT THAT TIME THERE WAS A REPRESENTATION

8    THAT THEY WERE GOING TO ONLY BE USED FOR DEMONSTRATIVE

9    PURPOSES NOT TO GO BACK TO THE JURY.  AND THAT WAS THE

10   RULING OF THE COURT.

11         NOW WE HAVE THIS DRAWING WHICH IS A DRAWING OF

12   THE HIPPOCAMPUS, I GUESS IT'S A MOTION FOR

13   RE-CONSIDERATION AND THERE'S A RULE 15 VIOLATION.  HE CAN

14   EXPLAIN IT.  I JUST DON'T BELIEVE THAT WE SHOULD BE IN A

15   POSITION WHERE SOMEBODY SAYS, OKAY, WE'LL MOVE IT IN ANY

16   WAY.  I DON'T SEE ANY GOOD CAUSE.

17         MS. WILLMOTT:  FIRST OF ALL, JUDGE, IT'S NOT A

18   MOTION FOR RECONSIDER.  THOSE WERE BEFORE WITH REGARD TO

19   ALL OF THE SLIDES WHICH INCLUDED QUOTES FROM DIFFERENT

20   ARTICLES AND THINGS LIKE THAT.  AND THE STATE'S OBJECTED

21   TO THE QUOTES.

22         WITH REGARD TO THE PICTURE OF THE BRAIN, IT IS

23   NO DIFFERENT THAN ANY PICTURE THAT THE STATE HAS BROUGHT

24   IN THROUGHOUT THIS TRIAL.  IT IS SOMETHING THAT IS

25   DEMONSTRATIVE.  BUT IT ALSO HELPS DR. SAMUELS TO EXPLAIN

16

1    WHAT IS HAPPENING.  THERE'S NO REASON WHY IT SHOULDN'T GO

2    BACK TO THE JURY.  BECAUSE AS FAR AS PART OF THE RULINGS

Transcript of Testimony of Dr. Richard Samuels

3    LAST WEEK, THAT HAD TO DO WITH THE ENTIRE SLIDE SHOW, THAT

4    HAD TO DO WITH QUOTES AND EVERYTHING.  I'M NOT

5    UNDERSTANDING WHY A PICTURE OF A BRAIN COULD NOT BE SENT

6    BACK TO THE JURY.  WHAT POSSIBLE PREJUDICE WOULD THAT BE?

7         THE COURT:  IS THIS THE EXACT SAME DIAGRAM THAT

8    WAS ON THE --

9         MS. WILLMOTT:  YES.

10        THE COURT:  -- POWER POINT?

11        MS. WILLMOTT:  IT WAS JUST PRINTED.

12        THE COURT:  WHY WAS THIS DIAGRAM NOT PREVIOUSLY

13   PROVIDED TO THE STATE?

14        MS. WILLMOTT:  I JUST DIDN'T HAVE IT PRINTED IN

15   PRINTED FORM LAST WEEK.  AND I IMMEDIATELY E-MAILED IT TO

16   HIM LAST THURSDAY WHEN WE GOT OUT OF COURT.  SO HE'S HAD

17   IT ALL WEEKEND LONG.  IT'S ALSO, JUDGE, JUST A PICTURE OF

18   A BRAIN.  I MEAN, IT'S NOTHING SPECIAL.  ANYBODY COULD

19   FIND IT IF YOU GOOGLE BRAIN AND HIPPOCAMPUS.

20        THE COURT:  AND THAT COULD VERY WELL BE TRUE.

21   I'M JUST TRYING TO UNDERSTAND WHY IT WASN'T PREVIOUSLY

22   DISCLOSED UNTIL LAST THURSDAY AFTER COURT?

23        MS. WILLMOTT:  THERE WAS NO REASON TO DISCLOSE

24   IT.  I MEAN, IT'S JUST A DEMONSTRATIVE PICTURE OF THE

25   BRAIN.  THERE WAS NOTHING SPECIAL ABOUT IT.  THERE'S

                                                  17


1    NOTHING UNIQUE ABOUT IT.

2         MR. NURMI:  WE DECIDED TO USE IT.  RULE 15 SAYS

3    WE DISCLOSED AT THE TIME OF USE.  IF YOU RECALL LAST WEEK

4    THE POWER POINT WAS JUST PUT TOGETHER THE EVENING BEFORE

5    IT WAS SHOWN.  AND IT WAS DISCLOSED THAT SAME DAY.

6         THE COURT:  WELL, I'M TROUBLED ABOUT THE LATE

7    DISCLOSURE.  I HAVEN'T HEARD AN EXPLANATION THAT SATISFIES

Transcript of Testimony of Dr. Richard Samuels

8  THE COURT THAT THIS SHOULD NOT HAVE BEEN DISCLOSED

9  PREVIOUSLY.  WITH THAT UNDERSTANDING, IT DOES APPEAR TO BE

10  A DIAGRAM OF THE BRAIN.  THERE'S NOTHING SPECIFIC ABOUT

11  THIS CASE.  I DO BELIEVE IT COULD ASSIST THE JURY IN

12  UNDERSTANDING THE TESTIMONY OF THIS WITNESS AND OTHERS.

13  MR. MARTINEZ, DO YOU AGREE YOU DID HAVE THIS OVER THE

14  WEEKEND?

15          MR. MARTINEZ:  I RECEIVED IT THURSDAY, CORRECT.

16          THE COURT:  ALL RIGHT.  ALL RIGHT.  WELL, I WILL

17  OVERRULE THE OBJECTION ON 529.  BUT LET ME MAKE CLEAR THAT

18  THIS IS AN EXCEPTION THAT IF THERE ARE ANY OTHER DOCUMENTS

19  THAT WERE LATE DISCLOSED THAT DOESN'T MEAN I'M GOING TO

20  ALLOW ALL OF THEM.  THIS ONE I AM ALLOWING BECAUSE OF THE

21  GENERIC NATURE OF THE MATERIAL ON EXHIBIT 529.

22          MS. WILLMOTT:  THERE'S NOTHING ELSE FROM THE

23  POWER POINT THAT I'M BRINGING IN.

24          MR. MARTINEZ:  SO WE DON'T HAVE TO KEEP COMING

25  UP HERE, IT LOOKS LIKES THIS DOCTOR'S JUST REPEATING

18

1  EVERYTHING THAT HE TOLD US ON THURSDAY.  RATHER THAN

2  STANDING UP AND OBJECTING AS TO THE ANSWER I'M MAKING THE

3  OBJECTION RIGHT NOW BECAUSE NOW HE'S GOING TO TALK ABOUT

4  SOMETHING HE ALREADY TALKED ABOUT.  NOW HE'S USING THIS

5  STUFF.  HE'S GOING TO SAY THE SAME THING AS LAST WEEK.  I

6  DON'T SEE HOW IT'S ANY DIFFERENT.

7          THE COURT:  WELL, I DID ASK HER TO LAY SOME

8  FOUNDATION.  I ASSUME THAT'S WHAT YOU WERE DOING.

9          MS. WILLMOTT:  THAT'S WHAT I'M DOING IS TALKING

10  ABOUT --

11          THE COURT:  JUST TO REFRESH EVERYONE'S MEMORY

Transcript of Testimony of Dr. Richard Samuels

12  ABOUT THIS PARTICULAR -- THE NATURE OF THIS PARTICULAR

13  AREA OF QUESTIONING.

14       MS. WILLMOTT:  RIGHT.  AND WHILE I'M UP HERE, I

15  GUESS, HAS THERE BEEN ENOUGH FOUNDATION LAID ABOUT HIS

16  KNOWLEDGE -- I HAVEN'T TALKED ABOUT HIS DISCUSSION WITH

17  MS. ARIAS, I GUESS, BUT I WILL DO THAT NEXT.

18       THE COURT:  OKAY.  YOU NEED TO DO THAT.

19       (OPEN COURT.)

20       THE COURT:  EXHIBIT 529 IS ADMITTED.

21  BY MS. WILLMOTT:

22     Q.  ALL RIGHT.  DR. SAMUELS, HERE'S THE PICTURE OF

23  THE BRAIN THAT WE LOOKED AT.  OKAY?  SO YOU WERE

24  DISCUSSING WHAT HAPPENS WHEN SOMEBODY GOES INTO ACUTE

25  STRESS WHICH THEN CAN CAUSE DISASSOCIATIVE AMNESIA; IS

                                                    19

1  THAT CORRECT?

2     A.  YES.

3     Q.  CAN YOU TELL US THEN THE ACUTE STRESS, WHAT IS

4  HAPPENING IN THE BRAIN?

5     A.  WELL, SIGNALS FIRST FLOW INTO THE AMYGDALA WHICH

6  IS THE SEAT OF EMOTION AND THAT IN TURN PLACES THE BODY IN

7  A FIGHT OR FLIGHT SITUATION IF THERE'S A THREAT.  THAT

8  PRODUCE A FLOOD OF ADRENALINE, A CONSTRICTION OF

9  PERIPHERAL CAPILLAIRES TO REDUCE THE LIKELIHOOD OF

10  BLEEDING OUT IF YOU ARE ATTACKED, INCREASES THE BLOOD

11  PRESSURE, INCREASES THE AWARENESS OF THE SURROUNDINGS, AND

12  ALSO TENDS TO SHUT DOWN THE GRAY MATTER.  IT'S ACTUALLY

13  SORT OF THE YELLOWISH MATTER UP THERE.

14            THE SURROUNDING -- THE AREA THAT SURROUNDS

15  THE BRAIN WHICH IS GENERALLY THOUGHT TO BE RESPONSIBLE FOR

16  OUR EXECUTIVE CAPABILITIES, OUR THINKING, OUR CREATIVITY

                    Page 16

Transcript of Testimony of Dr. Richard Samuels

17    AND SO ON.  THE PURPOSE OF THAT REACTION OCCURRING IS TO

18    SAVE THE LIFE OF AN INDIVIDUAL WHO IS UNDER THREAT.

19              THE CHEMICALS ALSO HAVE A NEGATIVE IMPACT

20    ON THE HIPPOCAMPUS WHICH IS THAT LIGHT GREEN AREA ADJACENT

21    TO THE BLUE AREA WHICH IS THE AMYGDALA.  YES, THAT'S IT.

22    THE HIPPOCAMPUS IS THE SEAT OF MEMORY.  WITHOUT A PROPERLY

23    FUNCTIONING HIPPOCAMPUS, MEMORIES ARE NOT FORMED AND ARE

24    NOT CODED INTO LONG-TERM MEMORY.

25              NOW LONG-TERM MEMORY DOESN'T RESIDE IN THE

                                                         20

1    HIPPOCAMPUS.  BUT INSTEAD IS SOMEHOW, WE'RE NOT SURE,

2    CODED INTO THE PROTEIN, WE THINK, OF THE GENERAL BRAIN.

3    WHICH IS WHY IF A PERSON HAS A BRAIN INJURY TO A

4    RELATIVELY SMALL AREA OF THE BRAIN, THEY STILL HAVE

5    MEMORIES.  IT'S NOT AS IF THEY LOSE CERTAIN MEMORIES DUE

6    TO AN ACCIDENT LIKE THAT.  IT'S SORT OF A REDUNDANCY

7    THAT'S BUILT INTO THE CODING.  AND SO IF A MEMORY IS NOT

8    FORMED, WE CALL THAT THE INABILITY TO REMEMBER THOSE

9    THINGS AND AMNESIA.

10              NOW, DISASSOCIATIVE AMNESIA IS USUALLY

11    ASSOCIATED WITH CRIMINAL BEHAVIOR.  AND ACCORDING TO THE

12    RESEARCH, THE MORE INTENSE THE TRAUMA, THE MORE LIKELY AND

13    MORE COMPLETE THE AMNESIA.  THE AMNESIA HAS A FINITE

14    PERIOD, RATHER THE LOSS OF MEMORY COVERS A FINITE PERIOD

15    OF TIME USUALLY AS LONG AS THE STRESSFUL SITUATION IS

16    OCCURRING.  PERHAPS I COULD DRAW A DIAGRAM.

17         Q.   WOULD THAT MAKE IT EASIER?

18         A.   I THINK IT MIGHT BE EASIER IF I COULD JUST SHOW

19    THAT.

20         Q.   SURE.

Page 17

Transcript of Testimony of Dr. Richard Samuels

21      A.   I'LL HAND THIS TO YOU OBVIOUSLY.   OKAY.

22      Q.   DID YOU SIGN IT?

23      A.   OH, SURE.

24           MS. WILLMOTT:   MAY I APPROACH, JUDGE?

25           THE COURT:   YOU MAY.

                                                    21


1       A.   I'M NOT A GOOD ARTIST HERE SO --

2    BY MS. WILLMOTT:

3       Q.   DR. SAMUELS, YOU DREW US A DIAGRAM THAT'S BEEN

4    MARKED FOR IDENTIFICATION AS EXHIBIT 530.   AND THE

5    DIAGRAM -- HOW DOES IS IT HELP YOU EXPLAIN WHAT WE'RE

6    TALKING ABOUT?

7       A.   BASICALLY WHAT IT DOES IS THAT IT SHOWS THE

8    FUNCTION OF NORMAL MEMORY AND INTERFERENCE WITH THE

9    CAPACITY TO REMEMBER WHICH PRODUCES A DECLINE IN THE

10   ABILITY TO STORE MEMORIES AND THEN A GRADUAL RETURN TO

11   MORE NORMAL MEMORY DEVELOPMENT.

12           MS. WILLMOTT:   ALL RIGHT.   JUDGE, DEFENSE WOULD

13   MOVE TO ENTER EXHIBIT 530 INTO EVIDENCE.

14           MR. MARTINEZ:   NO OBJECTION.

15           THE COURT:   530 IS ADMITTED.

16           MS. WILLMOTT:   ALL RIGHT.

17      A.   IF YOU START OFF ON THE LEFT HAND SIDE.

18      Q.   ALL RIGHT.   YOU CAN ACTUALLY TOUCH YOUR SCREEN.

19      A.   GREAT.   OKAY.   TERRIFIC.   SO WE HAVE A MEMORY --

20   THIS IS MEMORY FUNCTION.   NOW, THIS IS VERY ARBITRARY AND

21   PICTORIAL.   THIS IS NOT EXACTLY WHAT GOES ON IN THE BRAIN

22   BUT THIS IS THE EASIEST WAY TO DESCRIBE IT.

23           OUR CAPACITY FOR MEMORY, LET'S SAY IT'S 100

24   PERCENT, DOESN'T LOOK LIKE 100 PERCENT ALL BUT, OKAY.   SAY

25   THAT'S 100 PERCENT.   UNTIL A TRAUMA OR STRESSFUL SITUATION

Transcript of Testimony of Dr. Richard Samuels

22

1    OCCURS, AT THAT POINT THE CHEMICALS START FLOODING INTO

2    THE HIPPOCAMPUS INTERFERING WITH ITS ABILITY TO STORE

3    MEMORIES.  AND THE CAPACITY FOR MEMORY BEGINS TO DECLINE

4    TILL IT REACHES SOME LOWER LEVEL.

5                 WHEN THE STRESSFUL SITUATION IS OVER OR THE

6    PERSON IS REMOVED FROM THE CIRCUMSTANCES THAT CREATE THE

7    STRESS, THE CHEMICALS STOP FLOWING INTO THE HIPPOCAMPUS

8    THEY ARE EVENTUALLY WASHED OUT BY OTHER CHEMICALS.  AND

9    THE CAPACITY FOR THE HIPPOCAMPUS TO CREATE NEW MEMORIES

10   BEGINS TO RETURN AND YOU CAN SEE A GRADUAL INCREASE.  NOW

11   THIS INCREASE IS NOT NECESSARILY COMPLETE.  IT'S NOT

12   100 PERCENT.  IT'S NOT LIKE IT WAS A LIGHT SWITCH, ONE

13   MOMENT ON, ONE MOMENT OFF AND THEN ON AGAIN.  BUT IT'S A

14   GRADUAL AND A FAIRLY SLOPPY RETURN.  THAT REPRESENTS THE

15   LOSS OF MEMORY THAT WE REFER TO AS DISASSOCIATIVE AMNESIA.

16      Q.    AND WHEN SOMEBODY HAS THIS LOSS OF MEMORY WHEN

17   THEY'RE DOWN HERE AT THE BOTTOM OF THE SCALE OR BOTTOM OF

18   YOUR DRAWING, THOSE MEMORIES, DO THINK EVER COME BACK?

19      A.    IN THEY'RE NOT THERE THEY CAN'T COME BACK.

20   THEY'RE SIMPLY NOT THERE.  NOW WHAT MIGHT HAPPEN IS THAT

21   IT'S POSSIBLE THAT IN THE COURSE OF THIS THERE ARE SLIGHT

22   HILLS AND VALLEYS WITHIN THIS LOSS OF CAPACITY.  SO

23   FLASHES OF EVENTS MAY BE VAGUELY REMEMBERED.  BUT THERE'S

24   NO WAY OF KNOWING IN ADVANCE WHETHER THAT'S GOING TO

25   HAPPEN.

23

1                 THE KEY IS EITHER ALL OF THE MEMORY OR THE

2    BULK OF THE MEMORY IS LOST AND INDEED DISASSOCIATIVE

Page 19

Transcript of Testimony of Dr. Richard Samuels

3    AMNESIA IS ASSOCIATED WITH CRIMES THAT OCCUR IN A STATE OF

4    EXTREME EMOTIONAL CIRCUMSTANCES.  AND THE MORE INTENSE THE

5    CRIME OR INTENSE THE DISTRESS THE MORE COMPLETE THE

6    AMNESIA TENDS TO BE.

7         Q.   WHEN YOU SAY MORE COMPLETE, WHAT DO YOU MEAN?

8         A.   THE LOSS IS GREATER, THE LOSS IS MORE PERMANENT.

9    MOST OF WHAT'S OCCURRED IS NOT REMEMBER AS OPPOSED TO

10   PERHAPS SOME OF IT BEING REMEMBERED.

11        Q.   ALL RIGHT.  NOW LAST WEEK YOU TALKED -- YOU SAID

12   THAT YOU HAD MET WITH MS. ARIAS SEVERAL TIMES; IS THAT

13   RIGHT?

14        A.   YES.

15        Q.   ABOUT HOW MANY TIME DID YOU MEET WITH HER?

16        A.   I THINK WE MET ABOUT 12 TIMES.

17        Q.   AND DO YOU HAVE AN IDEA ABOUT HOW MANY HOURS YOU

18   SPENT WITH HER?

19        A.   PROBABLY BETWEEN 25 AND 30 HOURS ALL TOLD.  BUT

20   THAT DID NOT INCLUDE THE TIME THAT I TOOK TO TEST HER.  I

21   DIDN'T ADD THAT TIME IN.

22        Q.   OKAY.  SO 25 OR 30 HOURS OF JUST SPEAKING WITH

23   HER?

24        A.   SPEAKING WITH HER.

25        Q.   AND THEN ADDITIONAL TIME WHEN YOU DID THE

                                                        24


1    TESTING?

2         A.   THAT'S RIGHT.

3         Q.   DURING THAT TIME DID YOU DISCUSS -- DID SHE TALK

4    TO YOU ABOUT WHAT HAPPENED AND WHAT SHE COULD REMEMBER?

5         A.   YES.  THE FIRST FEW TIMES I MET WITH HER, AS I

6    MENTIONED THURSDAY -- I GUESS THURSDAY.

7         Q.   THURSDAY.

Transcript of Testimony of Dr. Richard Samuels

8        A.    THURSDAY.  OKAY.  SHE DID NOT REVEAL WHAT

9   ACTUALLY HAPPENED SHE WAS TELLING THIS STORY ABOUT

10  INTRUDERS.

11              MR. MARTINEZ:  OBJECT TO HIS CHARACTERIZATION OF

12  WHAT REALLY HAPPENED.  HE'S NOW VOUCHING.  HE CAN TELL US

13  WHAT SHE TOLD HIM.

14              THE COURT:  SUSTAINED.

15  BY MS. WILLMOTT:

16       Q.    GO AHEAD.  YOU CAN CONTINUE.

17       A.    OKAY.  SO THAT WAS THE STORY THAT SHE WAS

18  TELLING ME.  AND AT SOME POINT MR. NURMI AND I WENT TO

19  VISIT HER AND WE ENCOURAGED HER TO REVEAL THE TRUTH.  AND

20  FINALLY --

21              MR. MARTINEZ:  AGAIN, I'M GOING TO OBJECT TO HIS

22  CHARACTERIZATION.  IT'S A CHANGE IN STORY.  HE CAN'T SAY

23  IT'S THE TRUTH.

24              THE COURT:  SUSTAINED.  WHY DON'T YOU RESTATE --

25       A.    OKAY.  I UNDERSTAND.

                                                        25


1   BY MS. WILLMOTT:

2        Q.    WE'RE TALKING ABOUT --

3        A.    I UNDERSTAND.  SHE CHANGED HER STORY AND

4   ADMITTED TO US THAT SHE HAD DONE THE KILLING.

5        Q.    OKAY.  AND THEN AFTER THAT POINT IN TIME, DID

6   YOU DISCUSS WITH HER WHAT HAD HAPPENED AND THE POINTS THAT

7   SHE REMEMBERED?

8        A.    YES.

9        Q.    AND DID YOU DISCUSS WITH HER THE POINTS -- THE

10  GAP IN TIME THAT SHE DID NOT REMEMBER?

11       A.    SHE REMEMBERED -- AND THIS WAS FAIRLY CONSISTENT

                         Page 21

Transcript of Testimony of Dr. Richard Samuels

12   IN THE NUMEROUS TIMES THAT I ASKED HER THIS BECAUSE PART

13   OF THE EXAMINATION PROCESS IS TO BRING UP THE SAME AREA IN

14   SEVERAL DIFFERENT WAYS.  SO IT SEEMED PRETTY CONSISTENT TO

15   ME THAT SHE REMEMBERED THE POINT WHEN SHE DROPPED THE

16   CAMERA.  MR. ALEXANDER, ACCORDING TO HER STORY --

17        MR. MARTINEZ:  AGAIN, I'M GOING TO OBJECT.  HE'S

18   SAYING IT WAS CONSISTENT.  AND AGAIN, HE'S VOUCHING.  HE

19   CAN TELL WHAT THE STORIES ARE.  HE JUST CAN'T TELL US --

20        THE COURT:  SUSTAINED.

21   BY MS. WILLMOTT:

22   Q.   MAY I, JUDGE --

23        THE COURT:  APPROACH, PLEASE.

24        (SIDEBAR DISCUSSION.)

25        MS. WILLMOTT:  THIS IS IMPORTANT BECAUSE IT HAS

                                                         26

1    TO DO WITH HER MEMORY LOSS, NOT TALKING ABOUT THE TRUTH OR

2    NOT, BUT IT HAS TO DO WITH THE MEMORY LOSS.  IN OTHER

3    WORDS, SHE REMEMBERS THE SAME THINGS AND THAT'S WHAT SHE

4    KEEPS REPORTING TO HIM RATHER THAN REMEMBERING SOMETHING

5    AND NOT OTHER THINGS BUT THEN CHANGING THAT LATER ON.

6    THAT'S WHY THE CONSISTENCY IS IMPORTANT.

7         MR. MARTINEZ:  HE CAN SAY, I TALKED TO HER ON

8    ONE OCCASION AND SHE SAID X.  I TALKED TO HER THE SECOND

9    OCCASION SHE SAID X OR WHATEVER.  HE'S USING THESE TERMS

10   LIKE TRUTH, CONSISTENCY THAT HELPED TO CHANGE HER MIND.

11   HE CAN'T SAY THAT.

12        THE COURT:  I DON'T HAVE ANY PROBLEM YOU WITH

13   ASKING IF THAT IT WAS CONSISTENT AS LONG AS YOU MAKE CLEAR

14   THAT'S THE QUESTION AND HE DOESN'T JUST VOLUNTEER.

15        MS. WILLMOTT:  SURE.  OKAY.  I'LL ASK HIM.

16        THE COURT:  YES.

Page 22

Transcript of Testimony of Dr. Richard Samuels

17          (OPEN COURT.)

18          THE COURT:   YOU MAY CONTINUE.

19   BY MS. WILLMOTT:

20      Q.   DR. SAMUELS, YOU TALKED ABOUT THE CONSISTENCY.

21   SO WHEN YOU'RE TALKING ABOUT THAT, ARE YOU -- THAT HAS TO

22   DO WITH WHAT SHE REMEMBERS?   IN OTHER WORDS, WHEN SHE'S

23   TALKING TO YOU ON DIFFERENT OCCASIONS, IS SHE REPORTING TO

24   YOU THAT SHE'S REMEMBERING THE SAME THINGS?

25      A.   YES.

                                                27


1       Q.   OKAY.  SO IS SHE CONSISTENT IN THAT MANNER TO

2    YOU?

3       A.   YES.

4       Q.   AND THE GAPS THAT SHE DOES NOT REMEMBER ARE

5    THOSE GAPS -- HAVE THEY BEEN CONSISTENT WITH YOU?

6       A.   YES.

7       Q.   AND WHERE HER MEMORY PICKS UP AGAIN HAS HER

8    MEMORY WITH REGARD TO WHERE IT PICKS UP AGAIN HAS THAT

9    BEEN CONSISTENT?

10      A.   YES.

11      Q.   OKAY.  ALL RIGHT.  SO WHEN YOU'RE SPEAKING WITH

12   MS. ARIAS ABOUT THESE THINGS, DOES IT ULTIMATELY LEAD YOU

13   TO A CONCLUSION ABOUT THE TYPE OF AMNESIA SHE MIGHT HAVE?

14      A.   YES.

15      Q.   AND WHAT IS THAT?

16      A.   IT APPEARS AS IF SHE SUFFERS FROM DISASSOCIATIVE

17   AMNESIA.

18      Q.   ALL RIGHT.  AND THAT'S WHAT WE'RE TALKING ABOUT

19   HERE, RIGHT, WITH THE MEMORY FUNCTION AND THE TIME?

20      A.   THAT'S CORRECT.  THIS AREA HERE IS THE PERIOD

Page 23

Transcript of Testimony of Dr. Richard Samuels
21   DISASSOCIATION.

22       Q.   OKAY.

23       A.   I MIGHT POINT OUT --

24       Q.   SURE.

25       A.   -- THAT THE BEGINNINGS SUCH AS HERE AND THE ENDS

28

1   TEND TO BE FOGGY AND HAZY.  AND THAT'S CLASSICALLY HOW IT

2   GOES.  BECAUSE AS THE MEMORY FUNCTION IS EITHER GRADUALLY

3   DETERIORATING OR GRADUALLY BEING RESTORED, MEMORIES CAN

4   BEGIN TO OCCUR, BUT OFTENTIMES THEY'RE REPORTED AS BEING

5   FOGGY OR FUZZY.

6       Q.   OKAY.  AND SO THE FOGGY OR HAZY MEMORY IS

7   OCCURRING AS THE BRAIN IS GOING INTO A COMPLETE LOSS?

8       A.   YES.

9       Q.   AND AS THE BRAIN'S CLIMBING OUT OF THE COMPLETE

10   LOSS, IT'S ALSO FOGGY AND HAZY?

11       A.   YES.

12       Q.   OKAY.  ALL RIGHT.  AND WITH DISASSOCIATIVE

13   AMNESIA, ARE THERE EVER A CHANCE OF PIECES OF MEMORY

14   COMING BACK?

15       A.   SOMETIMES BITS AND PIECES --

16           MR. MARTINEZ:  ASKED AND ANSWERED.

17           THE COURT:  OVERRULED.

18       A.   SOMETIMES BITS AND PIECES OF MEMORY CAN BE

19   RETRIEVED.  I HAVE DONE A GOOD DEAL OF HYPNOSIS WORK

20   LOOKING FOR RESTORED MEMORIES WITH POLICE DEPARTMENTS OF

21   OFFICERS WHO WERE SUFFERING FROM POST TRAUMATIC STRESS

22   DISORDER.  IT IS GENERALLY NOT TOO EFFECTIVE.  VERY RARELY

23   SOME PIECE OF DETAIL WILL BE RECALLED.  BUT IT'S NOT --

24   IT'S RARELY PRODUCTIVE.

25       Q.   ALL RIGHT.  AND IS THAT ULTIMATELY, SHOWING YOU

Page 24

Transcript of Testimony of Dr. Richard Samuels

29

1    EXHIBIT 529, IS THAT ULTIMATELY BECAUSE THERE'S NO

2    MEMORIES STORED IN THE GRAY MATTER FROM THE TRAUMATIC

3    EVENT?

4         A.   THAT'S CORRECT.   THE MEMORY HAS NEVER BEEN

5    ENCODED INTO A FORM THAT THE BRAIN CAN STORE LONG TERM.

6         Q.   OKAY.

7         A.   AND ONCE GONE, IT'S GONE.

8         Q.   OKAY.   NOW, WE TALKED -- ONE OF THE CRITERIA FOR

9    POST TRAUMATIC STRESS WAS INTRUSIVE THOUGHTS?

10        A.   YES.

11        Q.   IS THAT RIGHT?   AND INTRUSIVE THOUGHTS ARE WHAT?

12        A.   THESE ARE THOUGHTS USUALLY ABOUT THE TRAUMA THAT

13   POP UP INTO THE -- THE ACTORS OR THE INDIVIDUAL

14   UNDERSTUDY'S THINKING.   THEY CAN'T CONTROL IT.   THEY COME

15   IN SORT OF RANDOM TIMES, SOMETIMES MAY BE AT NIGHT,

16   SOMETIMES THE MORNING, SOMETIMES THEY MAY HEAR SOMETHING

17   THAT TRIGGERS AN INTRUSIVE THOUGHT.   BUT THOSE ARE WHAT WE

18   CALL INTRUSIVE THOUGHTS.

19        Q.   ALL RIGHT.   AND DID MS. ARIAS SUFFER FROM

20   INTRUSIVE THOUGHTS?

21        A.   YES.

22        Q.   NOW, LET ME ASK YOU, HOW CAN IT BE THAT SHE

23   DOESN'T REMEMBER A BIG GAP OF WHAT HAPPENED?

24        A.   THE INTRUSIVE THOUGHTS THAT WERE REFERRED TO ME,

25   THAT WERE MENTIONED TO ME, INVOLVE THE BEGINNING OF THIS

30

1    TRAUMATIC EVENT.   SHE RECALLED HERSELF BEING CHASED.

2              MR. MARTINEZ:   AGAIN, I'M GOING TO OBJECT ON THE

Transcript of Testimony of Dr. Richard Samuels

3   GROUNDS OF VOUCHING.

4        THE COURT:  OVERRULED.

5        A.   SHE REPORTED REMEMBERING THAT HE WAS THREATENING

6   HER LIFE.  AND THEN AT THE END SHE BEGAN TO REMEMBER

7   BECOMING RECONNECTED TO HER ENVIRONMENT WHILE ON THAT ROAD

8   IN ARIZONA COVERED WITH BLOOD.

9             THAT'S THE OTHER PART OF THE INTRUSIVE

10  MEMORIES.  SO THE INTRUSIVE MEMORIES APPEAR TO BE THOSE

11  THAT OCCUR AT THE VERY BEGINNING OF THIS TRAUMA AND AS SHE

12  WAS COMING OUT OF THAT HOURS LATER.  SO THOSE WERE THE

13  INTRUSIVE MEMORY THAT WERE REPEATED TO ME.

14       Q.   SO ARE THOSE THINGS THAT POP UP INTO HER MEMORY

15  WITHOUT CONTROL?

16       A.   YES.

17       Q.   AND IS THAT -- I GUESS IS THAT WHAT MAKES THEM

18  INTRUSIVE?

19       A.   YES.  BECAUSE YOU CAN'T REALLY CONTROL THEM.

20  THEY JUST POP UP.

21       Q.   OKAY.  I FORGOT TO ASK YOU LAST WEEK, WITH

22  REGARD TO WHEN WE WERE TALKING ABOUT YOUR EDUCATION AND

23  WORK AND PROFESSION, ARE THERE -- WITH REGARD TO

24  PSYCHOLOGY AND MEDICAL DOCTORS, ARE THEIR COMPLAINTS THAT

25  CAN BE MADE?

31

1        A.   YES.  COMPLAINTS CAN YOU BE MADE TO THE

2   EXAMINATION BOARD BY JUST ABOUT ANYONE ACTUALLY.

3        Q.   AND IS THERE A SPECIFIC AREA WHERE DOCTORS

4   RECEIVE COMPLAINTS MORE OFTEN THAN OTHERS?

5        A.   WELL, OBVIOUSLY DEPENDS ON YOUR SPECIALTY, BUT

6   IN THE FIELD OF PSYCHOLOGY COMPLAINTS TEND TO CLUSTER

7   AROUND CUSTODY DISPUTES AND INDEED THAT DID HAPPEN.

Transcript of Testimony of Dr. Richard Samuels

8            MR. MARTINEZ:  I'M GOING TO OBJECT.  LACK OF

9  FOUNDATION.  HOW HE KNOWS THAT THESE COMPLAINTS ARE

10  CLUSTERED IN THAT AREA.

11            THE COURT:  SUSTAINED.

12  BY MS. WILLMOTT:

13      Q.    WELL, JUDGE, HE JUST WAS FINISHING A SENTENCE

14  WHERE HE SAID THEY OCCUR BECAUSE IT HAPPENED TO HIM.

15            THE COURT:  I'M GOING TO SUSTAIN THE OBJECTION.

16  BY MS. WILLMOTT:

17      Q.    DR. SAMUELS, DO YOU KNOW OTHER PSYCHOLOGISTS?

18      A.    I KNOW PSYCHOLOGISTS.  I KNOW PEOPLE WHO ARE

19  MEMBERS OF THE BOARD.  I READ THE BOARD LISTINGS.  AND IT

20  IS VERY CLEAR AND WELL KNOWN --

21      Q.    BEFORE YOU SAY THAT.

22      A.    YES.

23      Q.    KNOWING ALL THE OTHER DOCTORS THAT YOU KNOW, YOU

24  SAID YOU READ THE BOARD LISTINGS?

25      A.    THE VARIOUS -- THE BOARD OF PSYCHOLOGY

                                                    32

1  PRODUCES -- WELL, THEY USED TO DO NEWS LETTERS, NOW IT'S

2  ON THE INTERNET, INDICATING BOARD ACTIONS AGAINST CERTAIN

3  PEOPLE.

4      Q.    AND IS THERE A GENERAL THOUGHT THAT COMPLAINTS

5  AGAINST DOCTORS OCCUR IN MORE AREAS OF -- DIFFERENT AREAS

6  THAN OTHERS, MORE OFTEN IN DIFFERENT AREAS?

7      A.    YES.

8      Q.    AND DO YOU KNOW THAT BASED ON THE FACT THAT YOU

9  KNOW ALL THESE DIFFERENT DOCTORS AND YOU READ THESE

10  PUBLICATIONS?

11      A.    YES.  AND IT'S COMMONLY DISCUSSED AMONGST

Transcript of Testimony of Dr. Richard Samuels

12    PROFESSIONALS.

13        Q.    WHAT IS THAT AREA?

14        A.    CUSTODY EVALUATIONS.

15        Q.    OKAY.  AND IN CUSTODY EVALUATIONS, DO YOU HAVE

16    AN IDEA AS TO WHY THIS IS A SOMETHING THAT IS RIPE FOR

17    COMPLAINTS?

18            MR. MARTINEZ:  OBJECTION.  RELEVANCE, LACK OF

19    FOUNDATION.

20            THE COURT:  APPROACH PLEASE.

21            (SIDEBAR DISCUSSION.)

22            MR. MARTINEZ:  WHY PEOPLE CHOOSE TO COMPLAIN IS

23    IRRELEVANT TO THIS PARTICULAR CASE.  HE REALLY DOESN'T

24    KNOW WHY PEOPLE CHOOSE TO COMPLAIN.  HE HASN'T TALKED TO

25    ANY OF THE -- YOU KNOW, THE THOUSANDS OF COMPLAINANTS, SO

33

1    HE WOULDN'T KNOW.

2            MS. WILLMOTT:  JUDGE, HE JUST STATED HOW HE

3    WOULD KNOW BECAUSE IT'S SOMETHING THAT'S COMMONLY KNOWN IN

4    THE PROFESSIONAL WORLD WHAT HAPPENS.  IT'S THE SAME THING

5    WITH ATTORNEYS IN DIVORCE LAW, EVERYBODY KNOWS DIVORCE

6    ATTORNEYS GET COMPLAINTS.  IT'S SOMETHING THAT THE

7    PROFESSION ITSELF KNOWS BECAUSE IT'S SOMETHING THEY TALK

8    ABOUT AMONGST THEMSELVES AND IN DIFFERENT PUBLICATIONS.

9            THE COURT:  WHERE ARE YOU GOING WITH -- WHAT ARE

10    YOU EXPECTING HIM TO ANSWER IN RESPONSE TO THE QUESTION?

11            MS. WILLMOTT:  WITH REGARD TO -- WELL EVENTUALLY

12    HE'S GOING TO GO TO THE FACT THAT HE RECEIVED A COMPLAINT

13    IN 1995.  SO THAT'S WHAT WE'RE TALKING ABOUT.  AND IT WAS

14    IN THE AREA OF CUSTODY DISPUTES.

15            SO HIS ANSWER TO MY QUESTION WITH REGARD TO WHY

16    BECAUSE THERE'S ALWAYS SOMEBODY UNHAPPY IN CUSTODY BATTLES

Page 28

Transcript of Testimony of Dr. Richard Samuels

17   BECAUSE ONE PERSON GETS THE KID AND ONE PERSON DOESN'T.

18         THE COURT:  BUT YOU'RE ASKING HIM TO PROVIDE

19   INFORMATION ABOUT THAT AREA IN GENERAL OR BASED UPON HIS

20   OWN PERSONAL EXPERIENCE?

21         MS. WILLMOTT:  HE CAN -- EITHER ONE, HE'S

22   QUALIFIED TO SAY EITHER ONE BASED ON HIS CONVERSATIONS IN

23   THE FIELD THAT -- WITH OTHER DOCTORS AND THINGS LIKE THAT.

24         MR. MARTINEZ:  WELL, THERE'S LACK OF FOUNDATION

25   THE OTHER DOCTORS, FRANKLY WHOEVER THE HECK HE'S TALKING

                                                          34

1   TO MAY HAVE A SECONDARY GAIN ISSUE, SAY, WELL, I REALLY

2   DIDN'T DO IT.  THESE PEOPLE SAID THAT.  QUITE FRANKLY,

3   THERE'S JUDGES WHO DON'T WANT TO SIT ON FAMILY BECAUSE

4   THERE'S SOMEBODY THAT IS ALWAYS FILING COMPLAINTS.  BUT

5   THAT DOESN'T MEAN THAT THEY'RE EXPERTS AS TO WHY THE

6   PERSON FILES A COMPLAINT.

7         MS. WILLMOTT:  IT'S NOT AN EXPERT OPINION,

8   JUDGE, JUST GENERALLY SPEAKING WHAT HE KNOWS IN HIS

9   PROFESSION.

10         THE COURT:  WHY DON'T YOU ASK HIM HIS OPINION

11   BASED ON HIS EXPERIENCES ABOUT -- IN THE AREA WITHOUT

12   REFERENCING OTHER CASES AND WHAT OTHER PEOPLE TOLD HIM.

13         MS. WILLMOTT:  SURE.

14         (OPEN COURT.)

15         THE COURT:  YOU MAY PROCEED.

16   BY MS. WILLMOTT:

17     Q.    THANK YOU.  OKAY.  DR. SAMUELS, GENERALLY

18   SPEAKING WITH -- IN YOUR AREA WITH REGARD TO CUSTODY

19   SITUATIONS, IS THAT SOMETHING THAT IS -- THAT HAS ISSUES

20   WITH REGARD TO GETTING COMPLAINTS OF DOCTORS, YOU OR OTHER

Page 29

Transcript of Testimony of Dr. Richard Samuels

21  DOCTORS IN THAT AREA?

22      A.   WELL, SURE, THERE'S ALWAYS ONE WINNER AND ONE

23  LOSER IN CUSTODY EVALUATIONS.  SO INVARIABLY YOU'RE ONLY

24  SATISFYING 50 PERCENT OF YOUR CLIENTELE.  AND SO THOSE

25  TYPES OF COMPLAINTS ARE NOT AT ALL UNCOMMON.

                                                35

1       Q.   AND DID YOU EVER HAVE A COMPLAINT AGAINST YOU?

2       A.   I DID.

3       Q.   AND COULD YOU TELL US WHEN THAT WAS?

4       A.   YES.  IT INVOLVED A 1994 OR 1995 CUSTODY

5   EVALUATION THAT I WAS ASKED TO CONDUCT.  IT WAS AN

6   EXTRAORDINARILY ACRIMONIOUS DIVORCE.  THERE WERE MUTUAL

7   MULTIPLE LAWSUITS BETWEEN PARTNERS, ATTORNEYS,

8   PSYCHOLOGISTS, PSYCHIATRISTS.  IT WAS A BIG MESS.

9       Q.   WHAT WAS YOUR ROLE IN IT?

10      A.   MY ROLE INITIALLY WAS TO BE THE JOINT CUSTODY

11  EVALUATOR.  AND A GENTLEMAN CAME TO SEE ME AND I TESTED

12  HIM AND EVALUATED HIM, SAW HIM WITH HIS CHILDREN AND SO

13  ON.  BUT THE MOTHER REFUSED TO ATTEND.

14           HIS ATTORNEY ASKED ME INSTEAD TO PROVIDE A

15  LETTER TO HER OFFICE INDICATING WHETHER OR NOT I VIEWED

16  HIM AS A COMPETENT PARENT.  I DID.  BUT IT WAS NOT A FULL

17  FLEDGED CUSTODY EVALUATION BECAUSE I NEVER EVALUATED THE

18  WOMAN.

19      Q.   OKAY.

20      A.   I WAS THEN TOLD THAT THIS WAS NO LONGER A CASE

21  OF CUSTODY AND THAT THE ONLY ISSUE WAS VISITATION.  ABOUT

22  FOUR WEEKS LATER, THE WIFE CALLS MY OFFICE AND ASKED TO

23  MAKE AN APPOINTMENT.  I CALLED THE ATTORNEY OF THIS

24  GENTLEMAN AND TELL HIM THAT SHE'S FINALLY COME IN.

25           SHE ASKS ME TO PLEASE TEST HER BUT THAT THE

Transcript of Testimony of Dr. Richard Samuels

36

1  EVIDENCE AND INFORMATION WOULD NOT BE USED IN A CUSTODY
2  DETERMINATION BECAUSE I WAS NO LONGER DOING CUSTODY.
3          I EXPLAINED THAT TO THE WOMAN WHO DECIDED
4  TO COME IN WITH HER CHILDREN AND I OBSERVED HER.  AND
5  MAYBE THE OBSERVATION THAT SHE TOO WAS A COMPETENT PARENT,
6  NO CONTRAINDICATIONS TO EITHER ONE OF THEM PARENTING THE
7  CHILDREN.
8      Q.    DID YOU ALSO TESTIFY IN THAT CASE?
9      A.    I DID NOT TESTIFY AS A CUSTODY PERSON.  I DID
10  NOT TESTIFY AS CUSTODY EVALUATOR.
11          THE GENTLEMAN THEN CALLED ME UP IN TEARS,
12  BEGGING ME TO SEE HIM AS A PATIENT BECAUSE HE WAS HAVING
13  TERRIBLE TROUBLES.  HIS BUSINESS WENT BANKRUPT.  HIS WIFE,
14  OF COURSE, THEY HAD SPLIT.  HE WAS HAVING TREMENDOUS
15  PROBLEMS.  HE WAS A DENTIST.  AND HE ASKED ME TO SEE HIM
16  FOR THERAPY.
17      Q.    ARE YOU ALLOWED TO DO THAT WHEN YOU'RE A CUSTODY
18  EVALUATOR.  WELL, I'LL FORMALLY CONTACTED HIS ATTORNEY AND
19  I RESIGNED AS CUSTODY EVALUATOR.  AND I STATED THAT I
20  WOULD NOT TESTIFY AS A CUSTODY EVALUATOR.  AND SINCE
21  CUSTODY WAS NO LONGER THE ISSUE, I FELT APPROPRIATE WITH
22  THAT.  AND OF COURSE I OBTAINED LETTERS FROM THE ATTORNEY
23  RELEASING ME FROM THAT ROLE AND SO ON.
24          SO I STARTED SEEING THIS GENTLEMAN.  AND AT
25  SOME POINT HE OWED ME A GOOD DEAL OF MONEY AND HE TOLD ME

37

1  THAT HE WAS GOING BANKRUPT.  HE HAD NO MONEY.  AND HE
2  OFFERED -- BECAUSE HE WANTED TO CONTINUE SEEING ME FOR ME

Transcript of Testimony of Dr. Richard Samuels

3   TO SEE HIM.  AND I LOOKED IN THE AMERICAN PSYCHOLOGICAL

4   ASSOCIATION ETHICAL GUIDELINES, AND IT SAID THAT BARTERING

5   WAS PERMITTED AS LONG AS IT DID NOT -- WHAT WAS

6   TERMINOLOGY -- DID NOT COMPROMISE THE RELATIONSHIP, THE

7   PROFESSIONAL TO PROFESSIONAL WAS PERFECTLY FINE, WHICH IS

8   WHAT WE DID.

9       Q.   OKAY.

10      A.   AND SOMEWHERE DOWN THE LINE I WENT TO COURT TO

11  TESTIFY ONLY AS TO HIS MENTAL STATE BECAUSE HE WAS NOW A

12  PATIENT, AND THAT THE CONDITION HE WAS SUFFERING FROM

13  WHICH WAS AN ANXIETY DISORDER AND SOME DEPRESSION WOULD

14  NOT IMPEDE HIS ABILITY TO SPEND VISITATION TIME WITH HIS

15  CHILDREN.

16      Q.   ALL RIGHT.  SO AT THE POINT THAT YOU'RE

17  TESTIFYING DOWN THE LINE, YOU WEREN'T SUPPOSED TO BE FOR

18  THE HUSBAND AND THE WIFE?

19      A.   THAT'S RIGHT.  AT THIS POINT I WAS SIMPLY HIS --

20  I TESTIFIED AS A THERAPIST.

21      Q.   OKAY.

22      A.   AND THERE ARE OTHER COMPLICATIONS I WON'T GO

23  INTO IT.  AT ANY RATE, ABOUT A YEAR LATER A COMPLAINT WAS

24  FILED TO THE NEW JERSEY BOARD OF PSYCHOLOGICAL EXAMINERS,

25  AND THEY BROUGHT UP THIS CASE.  AND PART OF THE CASE

                                                        38

1   INVOLVED THE FACT THAT I BARTERED.  UNBEKNOWNST TO ME, NEW

2   JERSEY PASSED A RULING THAT DID NOT PERMIT BARTER AS A

3   PART OF THE PSYCHOLOGICAL GUIDELINES.  THERE WAS A THREE

4   MONTH OVERLAP BETWEEN THE TIME I STARTED BARTERING WITH

5   HIM WHICH WAS PERMITTED NATIONALLY BUT NOT PERMITTED BY

6   THE STATE.

7       Q.   LET ME GET THAT STRAIGHT.  SO IN THE BEGINNING

Transcript of Testimony of Dr. Richard Samuels

8    WHEN YOU WERE GOING TO HIM AS A DENTIST --

9         A.    RIGHT.

10        Q.    -- THAT WAS OKAY?

11        A.    THAT WAS OKAY.

12        Q.    BUT THERE WAS THREE MONTHS THAT YOU WERE

13   CONTINUING TO SEE HIM AS A DENTIST AND NEW JERSEY HAD

14   CHANGED THE --

15        A.    NEW JERSEY HAD CHANGED THE RULING.  AND I WAS

16   NOT MADE AWARE -- I DIDN'T KNOW THAT.  THEY MAY HAVE SENT

17   OUT A BULLETIN.  THERE WAS NO INTERNET IN THOSE DAYS.

18   THEY MAY SENT OUT A BULLETIN.  I MAY HAVE MISSED IT.  I

19   WAS NOT AWARE OF IT.

20              AT ANY RATE, THE WIFE AND HER ATTORNEY,

21   BOYFRIEND FOUND SOME RECORDS THAT WE DONE THIS EXCHANGE.

22   AND DECIDED TO FILE A COMPLAINT THAT I WAS BARTERING

23   INAPPROPRIATELY.

24              THE NEW JERSEY BOARD EXAMINED THIS MATERIAL

25   AND DECIDED TO FINE ME $2,500 FOR HAVING DONE THAT.  AND

                                                       39


1    NO LICENSE WAS TAKEN AWAY, NOTHING WAS SUSPENDED, JUST THE

2    FINE.  THE NEXT STEP WAS THAT IN PSYCHOLOGY AND IN THE

3    FIELD OF MEDICINE, IF SOMEONE MAKES A COMPLAINT TO ONE

4    BOARD, EVERY BOARD THAT YOU'RE ON IS NOTIFIED.  SO THEY

5    CAN DO THEIR OWN INDEPENDENT EXAMINATIONS.  THE LETTER

6    WENT OUT TO THE AMERICAN PSYCHOLOGICAL ASSOCIATION IN

7    WHICH I AM A FELLOW OF TWO DIVISIONS.  AND THEY DECIDED TO

8    NOT TO TAKE IT UP.  IT WAS TRIVIAL.  THE AMERICAN BOARD OF

9    PROFESSIONAL PSYCHOLOGY, WHERE I AM A DIPLOMATE DECIDED

10   NOT TO TAKE IT UP.  THE ARIZONA BOARD, TWO YEARS LATER,

11   DECIDED TO TAKE IT UP, AND I WAS EXONERATED IN A VOTE OF

Page 33

Transcript of Testimony of Dr. Richard Samuels

12    13 TO NOTHING AND THE COMPLAINT WAS DISMISSED.

13                 AND THAT WAS THE ONE AND ONLY TIME IN

14    DEALING WITH THOUSANDS OF PATIENTS AT LEAST OVER A

15    THOUSAND EVALUATIONS THAT ANYONE EVER LODGED A COMPLAINT.

16    AND AS I SAID, BOTH THE ATTORNEY AND THE PSYCHIATRIST

17    INVOLVED IN THE CASE WERE ALSO COMPLAINED ABOUT BY THIS

18    PARTICULAR PARTY.

19        Q.    SO YOU WEREN'T THE ONLY ONE WHO GOT A COMPLAINT

20    FROM THIS?

21        A.    NO.   IT WAS A MESSY CASE.

22        Q.    ALL RIGHT.   AND SO IS THAT WHAT YOU MEAN BY --

23    DO YOU DO CUSTODY EVALUATION?

24        A.    NO.   AFTER THAT I DECIDED NOT TO DO CUSTODY

25    EVALUATIONS ANY MORE.   IT JUST DIDN'T PAY.

                                                        40

1        Q.    ALL RIGHT.   YOU TALKED -- WELL, BESIDES WORKING

2    WITH THE PHAENOMENON OF PTSD QUITE A BIT, YOU MENTIONED

3    EARLIER THAT YOU ALSO WORKED WITH SEXUALLY VIOLENT

4    PERPETRATORS AND HAVE DONE PSYCHO SEXUAL RISK ASSESSMENT?

5        A.    YES.   WHEN COMING TO ARIZONA IN 1988, '89 OR

6    THEREABOUTS, ARIZONA HAD PASSED A NEW LAW CALLED THE --

7                 MR. MARTINEZ:   OBJECTION.   MAY WE APPROACH?

8                 THE COURT:   YES.

9                 (SIDEBAR DISCUSSION.)

10                 MR. MARTINEZ:   HE'S NOW TALKING ABOUT HIS WORK

11    WITH SEX OFFENDERS.   WE HAVE ALREADY TALKED ABOUT THE

12    ISSUE THAT NO ONE CAN OPINE AS TO MR. ALEXANDER'S ISSUES

13    OR NON-ISSUES WITH THAT.   WE TALKED ABOUT IT IN TERMS OF

14    THE SARA.   NOW HE'S NOW HEADED DOWN THE PATH WHERE HE

15    WANTS TO TALK ABOUT WHETHER OR NOT MR. ALEXANDER IS A SEX

16    OFFENDER OR NOT.   HE CAN'T DO IT BECAUSE HE NEVER

Page 34

Transcript of Testimony of Dr. Richard Samuels

17   INTERVIEWED MR. ALEXANDER.

18        MS. WILLMOTT:  HE WILL SPECIFICALLY SAY THAT HE

19   CANNOT DIAGNOSE MR. ALEXANDER AS ANYTHING BECAUSE HE'S NOT

20   HERE.  SO HE WOULDN'T ATTEMPT TO DO THAT.  HOWEVER, WHAT

21   HE CAN DISCUSS IS CERTAIN THINGS THAT HE REVIEWED IN THE

22   DISCOVERY, IN THE TEXT MESSAGES, IN THE PHONE CALLS, THAT

23   SUPPORT WHAT JODI SAYS ABOUT WALKING IN ON TRAVIS ON

24   JANUARY 21ST.  IT BASICALLY CORROBORATES WHAT SHE SAYS.

25        MR. MARTINEZ:  THAT'S CALLED VOUCHING.  HE'S

41

1    LOOKING AT THE EVIDENCE AND SAYING, BASED ON WHAT I'M

2    READING, JODI'S TELLING THE TRUTH.  HE CAN'T DO THAT

3    BECAUSE MY EXPERT WILL COME IN AND SAY, NO, SHE'S LYING.

4    SHE CAN'T SAY THAT.

5        MS. WILLMOTT:  JUDGE, FIRST OF ALL, IT'S NOT

6    VOUCHING.  VOUCHING -- THAT'S NOT A PROPER OBJECTION.

7    VOUCHING IS FOR THE STATE.

8        SECOND OF ALL, HE ABSOLUTELY CAN TALK ABOUT

9    THINGS THAT CORROBORATE WHAT MS. ARIAS HAS SAID AND DON'T

10   CORROBORATE BECAUSE IF NOT, THE STATE'S SPENT THE ENTIRE

11   TIME CROSS-EXAMINING MS. ARIAS THAT SHE DIDN'T TELL

12   ANYBODY ELSE, NOBODY ELSE -- IT'S NOT IN HER JOURNAL.

13       SO THE STATE THEN WOULD BE ABLE TO THEORETICALLY

14   GET TO TALK BUT NOTHING CORROBORATES WHAT SHE SAYS BUT

15   THEN THE DEFENSE NOT BE ALLOWED TO SAY THE THINGS THAT DO

16   CORROBORATE WHAT SHE SAYS.

17       THE COURT:  OKAY.  SO YOU HAVE HAD AN

18   OPPORTUNITY TO SPEAK WITH DR. SAMUELS ABOUT THIS ISSUE; IS

19   THAT CORRECT?

20       MR. MARTINEZ:  NO.

Page 35

Transcript of Testimony of Dr. Richard Samuels

21          THE COURT:  YOU HAVE NOT?

22          MR. NURMI:  THAT'S NOT --

23          MR. MARTINEZ:  WAIT A MINUTE.  I HAVE AN

24  INTERVIEW.  IF YOU WANT I CAN PROVIDE THE CD TO THE COURT

25  AND SHOW THAT YOU'RE ABSOLUTELY WRONG.  I TALKED TO HIM

42

1   ABOUT IT.  HE NEVER INDICATED ANYTHING LIKE THIS.  HE DOES

2   HAVE A REPORT AND HIS NOTES DO INDICATE THAT HE IS A HYPER

3   SEXUAL INDIVIDUAL.  BUT AGAIN SINCE WE HAVE THIS RULING IN

4   PLACE ABOUT -- THAT YOU CAN'T GIVE THAT OPINION ABOUT AN

5   INDIVIDUAL, IT'S MY VIEW THAT HE CANNOT TALK ABOUT IT.

6          THE COURT:  SO LET ME JUST ASK THIS.  WHAT

7   YOU'RE PLANNING TO DO NOW IS HAVE HIM DESCRIBE WHAT

8   CONDITION?

9          MS. WILLMOTT:  HE'S NOT GOING TO DESCRIBE A

10  CONDITION.  WE'RE GOING TO TALK ABOUT THE FACT THAT WHAT

11  MS. ARIAS TOLD HIM HAPPENED ON JANUARY 21ST.  AND IS THERE

12  ANYTHING IN THE RECORDS THAT HE'S REVIEWED THAT WOULD

13  CORROBORATE WHAT SHE SAYS HAPPENED.  JANUARY 21ST IS THE

14  DAY SHE WALKED IN ON HIM.

15          SO THERE IS THERE ANYTHING THAT CAN CORROBORATE

16  WHAT SHE SAYS?  SO HE CAN TALK ABOUT THE FACT THAT, YES,

17  HE READ IN TEXT MESSAGES THAT SHE WORE BOY'S UNDERWEAR FOR

18  HIM.  THE FACT -- ALL THESE DIFFERENT THINGS THAT

19  CORROBORATE -- IT DOESN'T MEAN THAT SHE'S NECESSARILY --

20  HE CAN'T OPINE THAT SHE'S TELLING THE TRUTH.  HE CAN JUST

21  SAY THAT THESE THINGS CORROBORATE THE POSSIBILITY THAT IT

22  DID HAPPEN.

23          THE COURT:  THAT WHAT HAPPENED?

24          MS. WILLMOTT:  THAT SHE WALKED IN ON HIM

25  MASTURBATING TO PICTURES OF LITTLE BOYS.

Page 36

Transcript of Testimony of Dr. Richard Samuels

43

1          THE COURT:  AND HIS OPINION IS THAT HE IS A

2  HYPER SEXUAL INDIVIDUAL?

3          MS. WILLMOTT:  NO.  HE'S NOT GOING TO STATE THAT

4  OPINION.  YES.  THAT WAS HIS OPINION BUT HE'S NOT GOING TO

5  STATE THAT OPINION.  HE'S NOT GOING TO GIVE ANY OPINION.

6  IN FACT I'M GOING TO SPECIFICALLY ASK HIM CAN YOU EVEN

7  DIAGNOSE MR. ALEXANDER?  AND HE'S GOING TO TELL ME, NO, I

8  CAN'T.

9          THE COURT:  THEN WHY IS THIS TESTIMONY RELEVANT

10  AT ALL IF IT'S NOT GOING TO BE TIED TO SOME CONDITION

11  PSYCHOLOGICAL CONDITION?

12          MS. WILLMOTT:  BECAUSE BASED ON THE INFORMATION

13  THAT HE KNOWS IN READING THROUGH ALL THE REPORTS AND

14  EVERYTHING AND HIS EXPERTISE WITH REGARD TO SEX THERAPY,

15  HE CAN SAY THAT CERTAIN THINGS THAT GIVE HIM PAUSE THAT

16  CAN CORROBORATE WHAT MS. ARIAS TOLD US.  HE CAN TALK ABOUT

17  CERTAIN THINGS THAT TRAVIS DID THAT CORROBORATE WHAT MS.

18  ARIAS TOLD HIM.

19          MR. MARTINEZ:  TO GIVE AN EXAMPLE, HOW CAN THE

20  FACT THAT -- JUST TO USE YOUR EXAMPLE -- THAT HE MAY HAVE

21  HAD ORAL SEX WITH HER AT ONE TIME CORROBORATE ANYTHING

22  ABOUT A JANUARY 21ST, 2008 INCIDENT?

23          ADDITIONALLY, WITH REGARD TO THAT INCIDENT, I

24  ASKED HIM IN THE INTERVIEW WHETHER OR NOT HE WOULD

25  REMEMBER THE DATE.  HE SAID, I DON'T EVEN HAVE A DATE FOR

44

1  THIS PARTICULAR INCIDENT.  SO HOW CAN HE SAY THERE'S

2  ANYTHING CORROBORATING IT?

Page 37

Transcript of Testimony of Dr. Richard Samuels

3      MS. WILLMOTT:  WELL, FIRST OF ALL, I WASN'T

4   GOING TO MENTION ORAL SEX BECAUSE THAT DOESN'T CORROBORATE

5   WHAT JODI SAYS.  BUT I WAS GOING TO ASK HIM ABOUT WHAT --

6   THE THINGS THAT DO CORROBORATE AND THE FACT THAT IN 2011

7   HE WASN'T SURE OF WHAT THE DATE WAS AND THE FACT THAT HE'S

8   BEEN PREPARING TO TESTIFYING AND GOING THROUGH HIS NOTES,

9   NOW HE KNOWS THE DATE.  THAT MEANS NOTHING.  AND DURING

10   THE INTERVIEW THAT HE HAD WITH MR. MARTINEZ, THEY DID

11   DISCUSS ANAL SEX AND WHAT HE THOUGHT THAT MEANT.

12          THE COURT:  ALL RIGHT.  I'M STILL CONFUSED BY

13   WHAT YOU MEAN BY CORROBORATE, CORROBORATE TO WHAT END?

14          MS. WILLMOTT:  OKAY.  WELL, OKAY, BASICALLY WE

15   KNOW THAT JODI TESTIFIED THAT SHE WALKED IN ON TRAVIS ON

16   JANUARY 21ST.

17          THE COURT:  RIGHT.

18          MS. WILLMOTT:  THERE WAS A LOT MADE -- AND IT

19   HASN'T HAPPENED YET BECAUSE IT HAPPENED DURING AN

20   EVIDENTIARY HEARING, BUT I EXPECT IT ON REBUTTAL THAT THE

21   STATE'S DETECTIVES WILL SAY WE SEARCHED THE COMPUTERS.  WE

22   SEARCHED EVERYWHERE.  THERE'S NO PORN IN THE HOUSE, MAKING

23   IT UNLIKELY, MAKING IT MORE LIKELY THAT MS. ARIAS IS

24   MAKING THIS UP.  THERE'S ALSO BEEN TESTIMONY OR DURING

25   CROSS-EXAMINATION THAT SHE DIDN'T WRITE ANYTHING ABOUT IT

                                                        45


1   IN HER JOURNALS, THAT SHE DIDN'T TELL ANYBODY, THAT SHE

2   DIDN'T CALL THE POLICE, THAT SHE DIDN'T DO THESE THINGS.

3          DR. SAMUELS CAN TELL US IN HIS EXPERIENCE IT IS

4   NOT UNUSUAL OR SURPRISING FOR SOMEBODY TO NOT CALL THE

5   POLICE AND NOT TELL ON THE PERSON THAT THEY LOVE.  THAT'S

6   NOT AT ALL SURPRISING.  HE CAN TELL US THAT --

7          THE COURT:  AND THAT'S BASED ON HIS WORK WITH --

Transcript of Testimony of Dr. Richard Samuels

8          MS. WILLMOTT:  WITH SEX OFFENDERS.  ALL

9   DIFFERENT KINDS OF -- EITHER POTENTIAL SEX OFFENDERS, OR

10  PEOPLE COMING IN FOR SEX THERAPY BECAUSE THEY'RE CONCERNED

11  IF THERE'S THIS PROBLEM WITH REGARD TO SEX.

12          THE COURT:  BUT THAT DOESN'T EXPLAIN WHY SHE

13  DIDN'T REPORT IT BECAUSE SHE WAS NOT THE SEX OFFENDER.

14          MS. WILLMOTT:  NO.  HIS WORK WITH THE FAMILIES,

15  THOUGH.  AND --

16          THE COURT:  OKAY.  SO NOW IT'S THE FAMILY.

17  OKAY.

18          MS. WILLMOTT:  RIGHT.  HE'S HAD CONTACT WITH THE

19  WOMAN, THE WIFE, THEY'RE COMING IN FOR COUNSELING OR

20  WHATEVER AND THEY TALK ABOUT THAT THESE THINGS -- THESE

21  WOMAN AREN'T CALLING, NECESSARY CALLING THE POLICE AND

22  IT'S NOT UNUSUAL AT ALL BECAUSE YOU'RE NOT -- YOU DON'T

23  WANT TO TELL YOU ON SOMEBODY YOU LOVE AND CAUSE ALL THESE

24  PROBLEMS, RATHER YOU'D RATHER GET THEM HELP.  SO HE KNOWS

25  THAT BECAUSE HE'S TREATING THESE PEOPLE.

                                                46


1          THE COURT:  OKAY.  WELL, FIRST YOU HAVE TO LAY

2   FOUNDATION.

3          MS. WILLMOTT:  I WAS DOING THAT.

4          THE COURT:  OKAY.  SO IF YOU'RE GOING TO BE

5   ASKING THE FOLLOW UP QUESTIONS REGARDING HIS ANALYSIS OF

6   THE FACTS AS HE HAS REVIEWED THEM, IT HAS TO RELATE TO

7   SOMETHING IN PARTICULAR.

8          MS. WILLMOTT:  YES.

9          THE COURT:  THAT HAS EXPERT OPINION.

10         MS. WILLMOTT:  I AGREE.

11         THE COURT:  EXPERT KNOWLEDGE ABOUT SO --

Transcript of Testimony of Dr. Richard Samuels

12          MR. MARTINEZ:  I GUESS WHAT WE HAVE HERE IS THE

13   SITUATION WHERE DR. DEMARTE CAN TESTIFY THAT HE WAS NOT A

14   SEX OFFENDER AND HE DID NOT COMMIT THIS ON JOHN 21ST OF

15   2008.  THAT'S THE ISSUE THAT THEY'RE PRESENTING.

16          NOW, THEY'RE SAYING THAT BECAUSE HE REVIEWED

17   SOME STUFF, WHATEVER STUFF HE'S GOING TO SAY HE REVIEWED,

18   HE GO BACK TO A TIME, A DATE THAT HE CAN'T EVEN REMEMBER

19   AND SAY THAT THIS HAPPENED ON A CERTAIN DATE.  AND IT'S

20   BASED ON SOMETHING THAT THE DEFENDANT TOLD HIM.  THAT

21   OPENS THE DOOR TO MY EXPERT COMING IN AND SAYING, NO, IT

22   DIDN'T HAPPEN ON THAT DATE.  IT NEVER EVEN HAPPENED.  AND

23   I KNOW BECAUSE I LOOKED AT THIS, I LOOKED AT THAT.  AND I

24   LOOKED AT THAT.  AND IT'S NOT CORROBORATIVE.  WE'RE HEADED

25   DOWN AREA HERE WHERE THERE'S GOING TO BE SOME ERROR.

                                                        47

1           MS. WILLMOTT:  I DISAGREE THAT HIS EXPERT CAN

2    ACTUALLY OPINE THAT IT DIDN'T HAPPEN.  I'M NOT ASKING DR.

3    SAMUELS, DID IT HAPPEN OR DID IT NOT HAPPEN?  I'M ASKING

4    IS THERE ANYTHING TO CORROBORATE WHAT JODI SAID?  HE CAN

5    CERTAINLY DO THAT WITH HIS EXPERT AND TALK ABOUT THE

6    THINGS THAT DON'T CORROBORATE.

7           HOWEVER, SHE'S NOT ALLOW EITHER TO GIVE THE

8    FINAL OPINION IT DOES HAPPEN OR DIDN'T HAPPEN.  ALSO THIS

9    IS NOT A SARA TEST.  THIS IS NOT A SCIENTIFIC TEST.

10   THAT'S WHAT WE DISCUSSED.  SO WHAT DR. DEMARTE DID WAS A

11   SCIENTIFIC TEST THAT SHOULDN'T HAVE BEEN DONE.  IT WAS

12   DONE INCORRECTLY.  SHE CAN TALK ABOUT OTHER THINGS BUT SHE

13   CAN'T GO INTO THE SARA BECAUSE THAT'S A SCIENTIFIC TEST.

14          MR. MARTINEZ:  IF MY EXPERT COMES IN AND SAYS, I

15   LOOKED AT XYZ, WHATEVER IT IS THAT SHE LOOKS AT, AND BASED

16   ON THAT, THIS NEVER HAPPENED.  I BELIEVE THAT INVADES THE

Transcript of Testimony of Dr. Richard Samuels

17    PROVINCE OF THE JURY.  THEY'RE THE ONES THAT HAVE TO --
18              THE COURT:  IT DOES.
19              MR. MARTINEZ:  BUT WHAT THEY'RE SAYING IS IT'S
20    OKAY FOR HIM TO INVADE THE PROVINCE OF JURY TO SAY, YES,
21    IT DID HAPPEN BECAUSE I SEE THIS CORROBORATION, THAT'S
22    WHAT THEY'RE GOING TO SAY.
23              THE COURT:  OKAY.  YOU'RE NOT GOING TO BE ASKING
24    HIM, DID THIS HAPPEN?  YOU'RE GOING TO ASK HIM BASED ON
25    HIS REVIEW ON HIS REVIEW THERE ARE EVENTS THAT

                                                         48


1     CORROBORATE --
2               MS. WILLMOTT:  RIGHT.
3               THE COURT:  -- WHAT SHE SAID.
4               MS. WILLMOTT:  YES.
5               THE COURT:  AND THAT'S BASED UPON HIS WORK WITH
6     SEX OFFENDERS.
7               MS. WILLMOTT:  YES.
8               THE COURT:  AND YOUR EXPERT GETS TO SAY IN HER
9     EXPERT OPINION IT DOES NOT CORROBORATE.  IS THAT WHAT
10    YOU'RE EXPECTING TO HAPPEN HERE?
11              MS. WILLMOTT:  THAT'S WHAT I'M SAYING.
12              MR. MARTINEZ:  I THINK THAT'S PROBLEMATIC,
13    JUDGE, EVEN IF YOU ALLOW ME TO DO THAT.  I JUST HAVE A
14    PROBLEM WITH THAT AND I KNOW --
15              THE COURT:  OKAY.  THIS IS ALL NEW.  I NEED A
16    MINUTE TO THINK ABOUT THIS.  AND I WOULD LIKE TO TALK TO
17    THE ATTORNEYS ABOUT THIS IN MORE DETAIL BECAUSE I WAS
18    UNAWARE THIS WAS GOING TO BE AN ISSUE TODAY.
19              SO I'M GOING TO RELEASE THE JURY FOR LUNCH AND
20    HAVE A CONVERSATION ABOUT THIS IN CHAMBERS.

                          Page 41

Transcript of Testimony of Dr. Richard Samuels

21      (OPEN COURT.)

22          THE COURT:  LADIES AND GENTLEMEN, WE ARE GOING

23  TO TAKE THE NOON RECESS AT THIS TIME.  PLEASE BE BACK IN

24  THE DESIGNATED AREA AT 1:25.  PLEASE REMEMBER THE

25  ADMONITION.  YOU'RE EXCUSED.

                                                49


1           (JURY RETIRED.)

2           THE COURT:  THE RECORD WILL SHOW THE JURY LEFT

3   THE COURTROOM.  DR. SAMUELS, YOU MAY STEP DOWN.  WE'RE IN

4   RECESS UNTIL 1:25.

5           COUNSEL, I'LL SEE YOU IN CHAMBERS.

6           (EX PARTE HEARING SEALED BY ORDER OF THE COURT.)

7           (RECESS HELD.)

8           THE COURT:  I HAVE CONSIDERED THE OBJECTION BY

9   THE STATE.  I WANTED TO RULE AT THE BENCH BECAUSE MY

10  CONCERN IS THAT YOU MAY NOT WANT IT PUBLIC, FOR A VARIETY

11  OF REASONS, WHAT MY RULING WOULD BE.  SO I'M DOING IT AT

12  THE BENCH.

13          MY RULING IS I'M GOING TO SUSTAIN THE OBJECTION

14  UNTIL SUCH TIME AS WE HAVE TESTIMONY FROM MS. LAVIOLETTE

15  REGARDING THE RELEVANCE OF THE PEDOPHILIA EVIDENCE.  UNTIL

16  SUCH TIME I FIND THAT THE RELEVANCE HAS NOT BEEN

17  ESTABLISHED AND THAT SUCH EVIDENCE WOULD BE MORE

18  PREJUDICIAL THAN PROBATIVE.  IF MS. LAVIOLETTE ESTABLISHES

19  THE RELEVANCE OF THE EVIDENCE THEN YOU CAN RE-URGE THE

20  EVIDENCE AND BRING DR. SAMUELS BACK TO TESTIFY ON THESE

21  ISSUES, SUBJECT TO CERTAIN LIMITATIONS WHICH WE'LL DISCUSS

22  AT THAT TIME IN THE EVENT THAT YOU DO DECIDE TO RECALL

23  HIM.  AND I THINK THAT'S ALL.

24          MR. NURMI:  I MIGHT POINT OUT THAT

25  MS. LAVIOLETTE IN PRIOR HEARINGS HAS TESTIFIED TO THE

Page 42

Transcript of Testimony of Dr. Richard Samuels

50

1   IMPORTANCE OF MATERIAL AND WILL DO SO -- ALSO DO SO AT
2   TRIAL.
3          THE COURT:  I DID ALLOW MS. ARIAS TO TESTIFY
4   ABOUT THE ISSUE WITH THE AVOWAL BY COUNSEL.  AND MY
5   UNDERSTANDING IS THAT SHE WILL TESTIFY CONSISTENT WITH
6   WHAT SHE'S PREVIOUSLY STATED ON THIS ISSUE.
7          BUT I THINK FOR THE JURY TO HEAR EVIDENCE ABOUT
8   PEDOPHILIA WITHOUT FIRST HEARING FROM HER REGARDING THE
9   SIGNIFICANCE OF THE EVIDENCE AND HER EXPERT OPINION, FOR
10  ALL THE REASONS I JUST STATED, WOULD BE MORE PREJUDICIAL
11  THAN PROBATIVE.
12         MR. NURMI:  IF I SAID MS. ARIAS, I MEANT MS.
13  LAVIOLETTE.  IF YOU RECALL THE COURT -- MS. LAVIOLETTE
14  GAVE TESTIMONY TO THAT AFFECT.
15         THE COURT:  RIGHT.  I UNDERSTAND.
16         MR. NURMI:  OKAY.
17         THE COURT:  I UNDERSTAND.
18         MS. WILLMOTT:  JUDGE, I GUESS I JUST WANT TO
19  PLACE ON THE RECORD THAT I BELIEVE IT IS RELEVANT AT THIS
20  TIME BASED ON THE FACT THAT THE STATE HAS BEEN ALLOWED TO
21  CROSS-EXAMINE MS. ARIAS WITH REGARD TO HAVING NO
22  CORROBORATION FOR WHAT SHE SAYS HAPPENED, BASICALLY
23  IMPEACH HER, AND THE JURY HAS BEEN LEFT WITH THAT, LEFT
24  WITH THE IDEA THAT MS. ARIAS SOMEHOW MAKING THESE THINGS
25  UP TO SOMEHOW BETTER SERVE HERSELF.

51

1          IN REALITY WE HAVE A WITNESS WHO WOULD DIRECTLY
2   FOLLOW NOW MS. ARIAS' TESTIMONY TO SAY THERE ACTUALLY IS

Transcript of Testimony of Dr. Richard Samuels

3   CORROBORATIVE EVIDENCE TO SOMEWHAT CORROBORATE WHAT SHE

4   SAYS OCCURS ON JANUARY 21ST.

5           SO I UNDERSTAND THAT MS. LAVIOLETTE WILL FURTHER

6   TESTIFY ABOUT THE RELEVANCE WITH REGARD TO THE ABUSE AND

7   HOW IT'S RELEVANT TO MS. ARIAS STAYING IN THE RELATIONSHIP

8   AND TO THE ABUSE -- ABUSIVE NATURE OF THE RELATIONSHIP.

9   BUT I DO BELIEVE AT THIS POINT IT'S RELEVANT IN THE SENSE

10  THE FACT THAT WE SHOULD BE ALLOWED TO BASICALLY CONTRADICT

11  WHAT THE STATE HAS DONE WHICH IS TO TRY AN IMPEACH MS.

12  ARIAS WITH REGARD TO THE FACT THAT THERE'S NO

13  CORROBORATIVE EVIDENCE TO WHAT SHE SAID.

14          THE COURT:  DID YOU WANT TO BE HEARD ON THIS?

15          MR. MARTINEZ:  NO.  YOU MADE YOUR RULING.

16          THE COURT:  WELL, LET ME JUST SAY THIS, I THINK

17  ALLOWING EXPERT TESTIMONY ON THIS ISSUE TAKES IT TO A

18  DIFFERENT LEVEL AND THAT'S WHY I'M NOT GOING TO ALLOW IT

19  AT THIS TIME.  OBVIOUSLY THERE'S BEEN IMPEACHMENT ON THAT

20  ISSUE.  AND I THINK THAT IN THE EVENT THAT MS. LAVIOLETTE

21  DOES TESTIFY AND MAKES THIS EVIDENCE ABOUT PEDOPHILIA

22  RELEVANT, THEN YOU WOULD BE PERMITTED TO ASK LIMITED

23  QUESTIONS REGARDING THE DEFINITION OF WHAT PEDOPHILIA LIKE

24  BEHAVIOR IS, BUT CERTAINLY NOT TO PROVIDE EXAMPLES FROM

25  HIS REVIEW.  HE CAN DEFINE IT, HE CAN PERHAPS GIVE AN

                                                    52


1   EXAMPLE OF WHAT IT'S LIKE, BUT HE CAN'T COMMENT ON THE

2   EVIDENCE THAT'S BEEN PRESENTED.  THAT'S SOMETHING YOU CAN

3   DO IN ARGUMENT.

4           I WILL, HOWEVER, ALLOW HIM TO -- ASSUMING THAT

5   IT'S MADE RELEVANT THROUGH MS. LAVIOLETTE, I WILL ALLOW

6   DR. SAMUELS TO TESTIFY CONSISTENT WITH A BLIND EXPERT AND

7   DESCRIBE HOW, BASED UPON HIS EXPERIENCES, VICTIMS OR

Transcript of Testimony of Dr. Richard Samuels

8   FAMILY MEMBERS DO NOT DISCLOSE AND THEY DO NOT STOP

9   CONTACT WITH THE PERPETRATOR.  I THINK THAT COULD BE

10  RELEVANT.

11          I'M NOT ADMITTING IT NOW, BUT I'M JUST GIVING

12  YOU AN INDICATION OF WHAT I THINK COULD BE RELEVANT

13  DEPENDING ON MS. LAVIOLETTE'S TESTIMONY.

14          MS. WILLMOTT:  OKAY.  JUST TO BE CLEAR, IS THAT

15  RELEVANT NOW OR AFTER MS. LAVIOLETTE?

16          THE COURT:  NO.  I'M JUST SUSTAINING THE

17  OBJECTION TO ALL OF THE TESTIMONY REGARDING PEDOPHILIA OR

18  PEDOPHILIC LIKE BEHAVIOR AT THIS TIME.

19          MS. WILLMOTT:  OKAY.  SO -- BUT WITH REGARDS TO

20  CATCHING SOMEONE DOING SOMETHING THAT'S ILLEGAL WHETHER

21  BASICALLY CATCHING MR. ALEXANDER MASTURBATING TO PICTURES

22  OF LITTLE BOYS, GIVEN THAT DR. SAMUELS HAS ALREADY

23  EXPLAINED TO US HIS EXPERIENCE WORKING WITH FAMILIES AND

24  WORKING WITH DIFFERENT PEOPLE ON THAT, IT'S NOT A SURPRISE

25  THAT SHE DIDN'T CALL THE POLICE.  I'M NOT ALLOWED TO SAY

                                                    53


1   THAT NOW?

2           THE COURT:  IS THERE AN OBJECTION TO THAT?

3           MR. MARTINEZ:  YES.

4           MS. WILLMOTT:  I GUESS, WHAT'S THE OBJECTION?

5   BECAUSE I DON'T UNDERSTAND THE OBJECTION TO THAT.  THAT

6   HAS NOTHING TO DO WITH CALLING HIM -- LINKING HIM AT ALL

7   TO PEDOPHILIA ITSELF.  IT'S JUST BASICALLY TALKING ABOUT

8   MS. ARIAS' BEHAVIOR.

9           MR. MARTINEZ:  IT'S RELEVANT FOR THE REASONS

10  THAT YOU MENTIONED ONCE LAVIOLETTE COMES IN AND MAKES IT

11  RELEVANT, THAT'S ANOTHER ISSUE.

Page 45

Transcript of Testimony of Dr. Richard Samuels

12          MS. WILLMOTT:  JUDGE, I BELIEVE IT'S COMPLETELY

13    RELEVANT NOW BASED ON THE ENTIRE TRIAL THAT HER WHOLE WORD

14    HAS BEEN IMPEACHED THIS ENTIRE TRIAL.  THE STATE HAS

15    CONSISTENTLY TALKED ABOUT NO CORROBORATION.

16          THE COURT:  HOW DO YOU INTEND TO PHRASE THE

17    QUESTION?

18          MS. WILLMOTT:  THAT MS. ARIAS DISCUSSED WITH YOU

19    WHAT HAPPENED ON JANUARY 21ST, WHAT HER REACTION WAS, WHAT

20    WAS HER REACTION?  WHAT DID SHE DO?  AND IS THAT A --

21    GIVEN YOUR EXPERIENCE IN THIS AREA WORKING WITH FAMILIES

22    AND TREATING PEOPLE AND COUNSELING IS THAT -- WAS HER

23    REACTION A SURPRISE?

24          THE COURT:  ARE YOU GOING TO OBJECT?

25          MR. MARTINEZ:  YES.  AND THE OTHER THING TOO IS

                                                        54


1     I'M OBJECTING NOT ONLY FOR THE REASON PREVIOUSLY STATED

2     BUT ALSO IF YOU ALLOW THAT ON LEADING, HE DOESN'T EVEN

3     KNOW THE DATE SO --

4           MS. WILLMOTT:  JUDGE, THAT'S NOT TRUE.  HE DOES

5     KNOW THE DATE.  HE DIDN'T KNOW THE DATE IN 2011.

6           THE COURT:  ALL RIGHT.  THE DATE IS NOT THE

7     BASIS FOR MY RULING.  THE BASIS FOR MY RULING IS THAT I

8     BELIEVE THE APPROPRIATE WAY TO ESTABLISH WHAT YOU'RE

9     TRYING TO ESTABLISH IS TO ALLOW HIM TO TESTIFY CONSISTENT

10    WITH A BLIND EXPERT AND TALK ABOUT GENERICALLY WHAT FAMILY

11    MEMBERS OR VICTIMS DO IN CIRCUMSTANCES LIKE THIS, BUT NOT

12    TO TALK ABOUT WHAT HAPPENED IN THIS PARTICULAR CASE.

13          THE JURY HAS HEARD THE EVIDENCE.  THEY CAN LINK

14    IT TO HIS EXPERT INFORMATION THAT HE'S PROVIDING.  BUT I'M

15    NOT GOING TO ALLOW YOU TO ASK HIM IF HE'S SURPRISED.

16          MS. WILLMOTT:  OKAY.  SO JUST IN HIS EXPERIENCE

Page 46

Transcript of Testimony of Dr. Richard Samuels

17    THAT OTHER PEOPLE, OTHER PATIENTS OF HIS -- NOT PATIENTS,

18    FAMILY MEMBERS HAVE NOT CALLED THE POLICE.  IS THAT WHAT

19    YOU MEAN?

20          THE COURT:  RIGHT, OR DISCLOSED.

21          MS. WILLMOTT:  MADE DISCLOSURES AND THINGS LIKE

22    THAT.

23          THE COURT:  BUT IN GENERIC FORM.

24          MS. WILLMOTT:  RIGHT.  I WON'T ASK THAT.  I WANT

25    TO BE SURE.  I THINK I UNDERSTAND.  BASICALLY THE COURT

                                                        55

1    WANTS US TO RECALL DR. SAMUELS AFTER MS. LAVIOLETTE?

2          THE COURT:  I DON'T WANT YOU TO DO THAT.  IF YOU

3    BELIEVE IT'S RELEVANT AFTER SHE TESTIFIES AND YOU THINK HE

4    HAS SOMETHING ELSE TO ADD, TO ME THAT WOULD BE APPROPRIATE

5    AFTER SHE'S ESTABLISHED THE RELEVANCE OF THE INFORMATION.

6          MR. MARTINEZ:  BUT NOW SHE CAN ASK GENERALLY OR

7    NOT?

8          THE COURT:  SHE CAN ASK GENERALLY ONLY ABOUT HOW

9    FAMILY MEMBERS RESPOND OR VICTIMS MAY RESPOND.

10          MS. WILLMOTT:  OKAY.

11          (OPEN COURT.)

12          THE COURT:  DR. SAMUELS, PLEASE TAKE THE STAND.

13    PLEASE BRING IN THE JURY.

14          (JURY ENTERED.)

15          THE COURT:  THE RECORD WILL SHOW THE PRESENCE OF

16    THE JURY, THE DEFENDANT AND ALL COUNSEL.  LADIES AND

17    GENTLEMEN, THANK YOU FOR YOUR PATIENCE.

18          MS. WILLMOTT, YOU MAY CONTINUE WITH DIRECT

19    EXAMINATION.

20

                      Page 47

Transcript of Testimony of Dr. Richard Samuels
21                    DIRECT EXAMINATION (CONT.)

22

23   BY MS. WILLMOTT:

24       Q.   THANK YOU, YOUR HONOR.  ALL RIGHT.  DOCTOR, I

25   BELIEVE THAT WE WERE TALKING ABOUT YOUR EXPERIENCE WITH

                                                          56


1    REGARD TO -- YOUR GENERAL EXPERIENCE WITH REGARDS TO

2    SEXUALLY VIOLENT PERPETRATORS AND PSYCHO SEXUAL RISK?

3        A.   YES.

4        Q.   COULD YOU TELL US, KIND OF EXPLAIN TO US WHAT

5    YOUR EXPERIENCE IN THAT AREA?

6        A.   WELL, BACK EAST BEFORE I CAME OUT HERE, I WAS

7    OFTEN REFERRED THROUGH THE COURTS CASES OF SEXUAL ABUSE OR

8    SEXUAL MOLESTATION THAT I WAS ASKED TO DO AN EVALUATION OF

9    TO HELP DETERMINE THE RELATIVE RISK OF THE PERPETRATOR.  I

10   ALSO DEALT WITH VICTIMS OF CHILD SEXUAL ABUSE.  AND ALSO

11   WITH RAPE VICTIMS AS PART OF MY REGULAR ROUTINE.

12              WHEN I CAME OUT TO ARIZONA, ARIZONA HAD

13   RECENTLY PASSED A SEXUALLY VIOLENT PERPETRATOR LAW.  AND

14   THAT INVOLVED THE JURY DECIDING ON WHETHER OR NOT SOMEONE

15   WHO HAS ALREADY SERVED THEIR TERM AND IS BEING RELEASED --

16   IT MEETS A CERTAIN CRITERIA THAT WOULD INVOLUNTARILY

17   COMMIT THEM TO THE STATE HOSPITAL FOR TREATMENT OF THEIR

18   DEVIANT SEXUAL PROCLIVITY, USUALLY CASES OF PEDOPHILIA OR

19   RAPE OR VOYEURISM OR EXHIBITIONISM.  THESE ARE FAIRLY

20   COMMON SEXUAL DEVIANCIES.

21              AND I TOOK THE TRAINING THAT WAS GIVEN HERE

22   AND THERE WAS QUITE A BIT OF IT BACK IN 1990 OR

23   THEREABOUTS.  AND I BEGAN TO RECEIVE CASES FROM FIRST THE

24   PUBLIC DEFENDER AND THEN PRIVATE ATTORNEYS AND SO ON.  AND

25   SINCE THAT TIME I HAVE DONE ABOUT 660, PSYCHO SEXUAL RISK

Transcript of Testimony of Dr. Richard Samuels

57

1   ASSESSMENTS OR SEXUALLY VIOLENT PERPETRATORS EVALUATIONS,

2   ROUGHLY MAYBE 60 PERCENT RISK ASSESSMENTS AND THE OTHER

3   SVP.  AND I'VE ALSO TESTIFIED NUMEROUS TIME IN THE SVP

4   TRIAL PROCESS.

5      Q.   ALL RIGHT.  AND DID YOU EVER WORK WITH PEOPLE

6   WHO WERE ACCUSED OF SUCH THINGS?

7      A.   OH, YES, ABSOLUTELY.

8      Q.   AND WHAT KIND OF WORK DID YOU DO WITH THEM

9   BESIDES THESE EVALUATIONS?

10      A.   WELL, HERE IN ARIZONA I DON'T DO THERAPY ANY

11   LONGER BUT BACK EAST, I WAS ROUTINELY REFERRED CASES

12   THROUGH THE COURT FOR OUTPATIENT SEX OFFENDER TREATMENT.

13          THE NEW JERSEY SYSTEM IS A BIT DIFFERENT

14   FROM HERE.  AND THERE IS A FIXED -- THERE WAS AT LEAST AT

15   THE TIME, A FIVE YEAR SENTENCE THAT INCLUDED ATTENDANCE OR

16   INCARCERATION AT A SPECIAL HOSPITAL THAT WAS ALSO A

17   PRISON.  AND THEY WOULD BE THERE FOR UP TO A FIVE YEAR

18   PERIOD WHERE THEY WOULD RECEIVE BOTH TREATMENT AND BE

19   INCARCERATED AT THE SAME TIME.  THEN THEY WERE RELEASED.

20   AND IF IT WAS FELT THEY NEEDED MORE THERAPY, I WOULD BE

21   COURT ORDERED TO TREAT THEM, CONTINUING IN SEX OFFENDER

22   TREATMENT.

23      Q.   OKAY.  AND IS THERE LITERATURE THAT YOU WOULD

24   HAVE READ OR STUDIED WITH REGARD TO THE AREA?

25      A.   TREMENDOUS AMOUNT.

58

1      Q.   BASED ON ALL THIS INFORMATION WHEN YOU WOULD

2   READ THE LITERATURE OR IN DEALING WITH THE PEOPLE THAT YOU

Transcript of Testimony of Dr. Richard Samuels

3   WORKED WITH, DID YOU FIND THAT THERE WAS ANY TYPE OF

4   BEHAVIOR WITH REGARD TO THE FAMILY MEMBERS AND HOW THEY

5   WOULD TREAT THE PERSON WHO WAS ACCUSED?

6        A.   IF THE RELATIONSHIP WAS INTACT, THERE WOULD BE A

7   TENDENCY, ON THE PART OF THE FAMILY TO TRY TO PROTECT THE

8   ONE WHO WAS ACCUSED EXCEPT IN CASES OF PEDOPHILIA WHERE

9   THERE OWN BIOLOGICAL OR STEP CHILDREN WERE INVOLVED.  THEN

10  IT WOULD BECOME MORE COMPLICATED AND SOMETIMES THE REPORTS

11  WERE MADE --

12       Q.   WHEN YOU SAY --

13       A.   -- TO POLICE.  SORRY.

14       Q.   WHEN YOU SAY IN CASES OF PEDOPHILIA, DO YOU MEAN

15  THAT THE CHILD WAS ACTUALLY TOUCHED OR HARMED?

16       A.   CHILD MOLESTATION IS PERHAPS A BETTER WAY.

17  BECAUSE PEDOPHILIA IS A SPECIALIZED DIAGNOSIS.  BUT CHILD

18  MOLESTATION CASES, THERE WOULD BE A TENDENCY ON THE PART

19  OF THE FAMILIES TO PROTECT THE PERPETRATOR.

20            AND SO MANY TIMES THE SUPPORTIVE WORK HAD

21  TO BE DONE WITH FAMILY MEMBERS AS WELL.  OBVIOUSLY THEY

22  WERE VICTIMS WITHIN THE FAMILY, THE LIKELIHOOD OF

23  PROTECTING THE PERPETRATOR WOULD BE LESS.

24       Q.   OKAY.  SO WHEN YOU TALK ABOUT PROTECTING THE

25  PERSON WHO HAS BEEN ACCUSED, WHAT DO YOU MEAN BY

                                                      59

1   PROTECTION?

2        A.   THERE MAY NOT BE A PHONE CALL MADE TO THE

3   AUTHORITIES TO THE POLICE TO REPORT IT.  THERE MAY BE A

4   TENDENCY ON THE PART OF A SPOUSE, FOR EXAMPLE, TO MAKE UP

5   EXCUSES, EVEN SOMETIMES TO DENY THE FACT THAT THEIR OWN

6   CHILD WAS MOLESTED AND WE SEE THIS HAPPENING FAIRLY

7   REGULARLY.  AND IT'S A NATURAL TENDENCY TO WANT TO PROTECT

Transcript of Testimony of Dr. Richard Samuels

8    TO WANT TO COVER UP SOMETHING SUCH AS CHILD MOLESTATION.

9         Q.   OKAY.  NOW SWITCHING TO A DIFFERENT AREA, I KNOW

10   YOU'VE TALKED BEFORE WITH US ABOUT JODI'S JOURNALS?

11        A.   YES.

12        Q.   AND HAVE YOU READ THEM ALL?

13        A.   I BELIEVE I DID, YES.

14        Q.   AND THEY STARTED ABOUT WHEN?

15        A.   EITHER JUNIOR HIGH SCHOOL OR HIGH SCHOOL.

16        Q.   OKAY.  AND FROM THERE DID SHE PRETTY MUCH

17   CONSISTENTLY JOURNAL?

18        A.   YES.

19        Q.   AND IN HER JOURNAL YOU MENTIONED BEFORE THAT I

20   THINK SHE SEEMED TO TAKE A LOOK AT LIFE THROUGH ROSE

21   COLORED GLASSES?

22        A.   YES, SHE DID.

23        Q.   DID SHE ACCENTUATE THE POSITIVE?

24        A.   ALWAYS.

25        Q.   ONE OF THE ISSUES -- WELL, DID MS. ARIAS EVER

                                                        60


1    SPEAK TO YOU ABOUT WHEN MR. ALEXANDER BROKE HER FINGER?

2         A.   YES.

3         Q.   AND DID THIS HAPPEN IN JANUARY OF 2008?

4         A.   YES.

5         Q.   I'M GOING TO SHOW YOU WHAT IS IN EVIDENCE AS

6    EXHIBIT NUMBER 456.  DO YOU SEE THAT'S A JOURNAL ENTRY

7    FROM JANUARY 24TH, 2008?

8         A.   YES, I DO.

9         Q.   AND BASED ON YOUR INFORMATION IS THAT A FEW DAYS

10   AFTER MR. ALEXANDER BROKE HER FINGER?

11             MR. MARTINEZ:  OBJECTION, LEADING.

**Page 51**

Transcript of Testimony of Dr. Richard Samuels

12          THE COURT:  OVERRULED.

13   BY MS. WILLMOTT:

14        Q.   I'M SORRY.  WHAT IS ANSWER YOUR, DOCTOR?

15        A.   YES.

16        Q.   NOW, THIS IS JUST PART OF THE JOURNAL ENTRY THAT

17   WE HAVE BUT WE SEE IN THE BEGINNING --

18             MR. MARTINEZ:  OBJECTION.  MISSTATES THE

19   EVIDENCE.  IT IS THE JOURNAL ENTRY OF THURSDAY JANUARY 24,

20   2008 AND IT'S ACTUALLY INITIALED AT THE END.

21             MS. WILLMOTT:  JUDGE, IT'S NOT THE COMPLETE

22   ENTRY OF JANUARY 24TH OF 2008.  THAT'S WHAT I SAID.

23             THE COURT:  ALL RIGHT.  OVERRULED.  YOU MAY

24   CONTINUE.

25   BY MS. WILLMOTT:

                                                    61


1        Q.   ALL RIGHT.  SO WE HAVE THIS PARTIAL SPREE OF

2    JANUARY -- OF JANUARY 24, 2008.  WE SEE IN THE BEGINNING

3    SHE SAY THAT THERE HAS BEEN NOTHING NOTEWORTHY TO REPORT.

4    DO YOU SEE THAT?

5        A.   I DO.

6        Q.   OKAY.  NOW, IF WE LOOK AT THE ENTIRE ENTRY FROM

7    JANUARY 24TH, 2008, SHE ACTUALLY DOES GOES ON TO SPEAK OF

8    TRAVIS.

9        A.   YES.

10       Q.   YOU SEE THE HIGHLIGHTED PART?

11       A.   I DO.

12       Q.   AND SHE SAYS IN THE HIGHLIGHTED PART, WELL,

13   SPEAKING OF TRAVIS, HE FRUSTRATES ME AND HE THRILLS ME.  I

14   LOVE, LOVE, LOVE HIM AND HE SINGS TO ME.  HE GOES OUT OF

15   HIS WAY FOR ME.  DISPLAYS MASSIVE AMOUNTS OF UNCONDITIONAL

16   LOVE FOR ME IN COUNTLESS WAYS.  DO YOU SEE THAT?

Transcript of Testimony of Dr. Richard Samuels

17        A.   I DO.

18        Q.   AND SO SHE'S SPEAKING VERY POSITIVELY ABOUT HIM,

19   RIGHT?

20        A.   YES.

21        Q.   IS THIS SOMETHING SHE DID OFTEN?

22        A.   REGULARLY.

23        Q.   AND THEN SHE GOES ON TO TALK ABOUT HOW SHE'S

24   ALMOST HAUNTED BY IT.  BUT IT STILL REMAIN THAT SHE CANNOT

25   MARRY HIM.  AND SHE GOES ON TO SAY I DON'T HAVE -- SHE

                                                          62


1    MUST -- I THINK SHE CUTS IT OUT.  I CAN'T QUITE PUT MY

2    FINGER ON IT.  BUT SOMETHING IS JUST OFF WITH THAT BOY.

3    WE'VE ALL GOT HEAD PROBLEMS AND THAT'S FOR SURE.  BUT

4    THERE ARE CERTAIN THINGS THAT WILL NEVER SIT RIGHT WITH ME

5    ABOUT HIM.  DO YOU SEE THAT?

6         A.   I DO.

7         Q.   ALL RIGHT.  AND BASED ON YOUR INFORMATION, THIS

8    WAS DAYS AFTER HE BROKE HER FINGER, RIGHT?

9         A.   YES.

10        Q.   AND THIS INFORMATION, THIS JOURNAL ENTRY IS

11   ALTOGETHER PART OF JANUARY 24TH OF 2008.

12        A.   YES.

13        Q.   IN THIS JOURNAL ENTRY IS THAT SOMETHING -- IS

14   THAT CONSISTENT WITH THE WAY SHE WOULD WRITE THINGS,

15   NEGATIVE THINGS?

16        A.   YES.  THEY WERE VERY MILD.

17             MR. MARTINEZ:  OBJECTION.  LACK OF FOUNDATION.

18   WHAT OTHER NEGATIVE THINGS HAS HE SEEN.

19             MS. WILLMOTT:  JUDGE, THE FOUNDATION IS HE'S

20   READ THROUGH ALL OF HER JOURNALS.  HE'S AWARE OF THE

Transcript of Testimony of Dr. Richard Samuels

21    DIFFERENT JOURNAL ENTRIES WHEN SHE WOULD SPEAK NEGATIVELY

22    ABOUT MR. ALEXANDER.

23          THE COURT:  ALL RIGHT.  OVERRULED.  YOU MAY

24    ANSWER.

25          A.    WHENEVER SHE WOULD BE WRITING ABOUT MR.

63

1    ALEXANDER IT WAS GENERALLY VERY, VERY POSITIVE.  IF THERE

2    WERE ANY PROBLEMS, SHE WOULD USUALLY COUCH IT IN TERMS OF

3    SOMEHOW SHE DID SOMETHING TO DISPLEASE HIM.  AND SHE WAS

4    JUST VERY EFFUSIVE AND POSITIVE ABOUT HIM.  I DON'T

5    REMEMBER SEEING A NEGATIVE THING WRITTEN ABOUT HIM.

6          Q.    AND WHEN YOU SAY NEGATIVE, DO YOU MEAN SOMETHING

7    THAT'S DETAIL NEGATIVE?

8          A.    THAT'S DETAILED NEGATIVE, THAT'S RIGHT.  GOOD

9    POINT.

10          Q.    ALL RIGHT.  AND DID SHE EVER TALK TO YOU ABOUT

11    THE LAW OF ATTRACTION?

12          A.    YES.

13          Q.    AND WHAT IS THAT?

14          A.    WELL, THE LAW OF ATTRACTION IS --

15          MR. MARTINEZ:  OBJECTION.  LACK OF FOUNDATION.

16          THE COURT:  SUSTAINED.

17    BY MS. WILLMOTT:

18          Q.    DO YOU KNOW WHAT THE LAW OF ATTRACTION IS?

19          A.    WELL, I HAVE AN IDEA.  MAY NOT BE THE EXACTLY

20    WHAT SHE'S THINKING ABOUT IT, BUT YEAH.

21          Q.    BASED ON WHAT MS. ARIAS TOLD YOU, DO YOU KNOW

22    WHAT SHE BELIEVED IT TO BE?

23          A.    SHE BELIEVED --

24          MR. MARTINEZ:  OBJECTION.  RELEVANCE AS TO HIS

25    OPINION.

**Page 54**

Transcript of Testimony of Dr. Richard Samuels

64

 1          THE COURT:  COUNSEL APPROACH, PLEASE.

 2          (SIDEBAR DISCUSSION.)

 3          THE COURT:  WHAT'S YOUR OBJECTION?

 4          MR. MARTINEZ:  RELEVANCE.  HE'S TALKING ABOUT

 5   THE LAW OF ATTRACTION.  AND HE SAID HE MAY KNOW ABOUT NOT

 6   IT, HE MAY NOT KNOW ABOUT IT.  WHO CARES WHETHER HE MAY OR

 7   MAY NOT KNOW ABOUT IT.  NOW HE'S COMING IN HE WANTS TO

 8   VOUCH ABOUT THE LAW OF ATTRACTION, SOMETHING THAT HE

 9   DIDN'T KNOW ABOUT AND HE'S GOING TO TAKE WHATEVER SHE SAY

10   S AND BASED ON HIS LIMITED KNOWLEDGE, BECAUSE HE SAYS HE

11   DOESN'T KNOW WHAT IT IS, THEN SAY XYZ ABOUT IT, WHENEVER

12   IS HE'S GOING TO SAY.

13          THE COURT:  WHERE ARE YOU GOING WITH THIS?

14          MS. WILLMOTT:  HE DIDN'T SAY THAT HE DIDN'T KNOW

15   ABOUT IT.  HE SAID BASED ON WHAT MS. ARIAS TOLD HIM, HE

16   KNOW WHAT SHE BELIEVES ABOUT IT.

17          WHERE I'M GOING WITH THIS IS THE FACT THAT WE

18   JUST REVIEWED A JOURNAL ARTICLE AND HOW THAT IT'S NOT VERY

19   NEGATIVE WHEN IT'S TALKING ABOUT THE FACT THAT HE JUST

20   BROKE HER FINGER AND THE OTHER PART OF THAT ARTICLE IS THE

21   FACT THAT SHE WALKED IN ON HIM.  SO WHAT I WAS ASKING

22   ABOUT THE LAW OF ATTRACTION IS THAT'S PART OF THE REASON

23   WHY SHE WAS SO POSITIVE IN HER JOURNAL WRITING LATER ON IN

24   LIFE.

25          THE COURT:  THAT'S WHAT SHE TOLD HIM?

65

 1          MS. WILLMOTT:  UM-HUM.  AND THAT'S WHAT HE

 2   OBSERVE IN THE JOURNAL ARTICLES.  THAT'S ALL PART OF THE

Page 55

Transcript of Testimony of Dr. Richard Samuels

3    IDEA OF THE PSYCHOLOGY OF WHEN YOU ARE ALWAYS POSITIVE

4    ABOUT SOMETHING, YOU'RE BASICALLY BURYING IT INSIDE RATHER

5    THAN ACTUALLY DEALING WITH YOUR EMOTIONS.

6              THE COURT:  ARE YOU -- IS HE GOING TO BE

7    TESTIFYING TO THAT?

8              MS. WILLMOTT:  I WASN'T GOING TO GO THAT FAR BUT

9    I CAN IF YOU WANT ME TO.

10             THE COURT:  OKAY.  SO YOU'RE TRYING TO GET HIM

11   TO EXPLAIN THAT HE BELIEVES THAT WHAT HE READ WAS

12   CONSISTENT WITH HER THEORY OF THE LAW OF ATTRACTION?

13             MS. WILLMOTT:  THAT'S IT.  I WASN'T GOING VERY

14   FAR.

15             THE COURT:  ARE YOU OBJECTING THAT SHE -- IF THE

16   DEFENSE ASKS --

17             MR. MARTINEZ:  WELL --

18             THE COURT:  -- IF THE DEFENDANT EXPLAINED WHAT

19   THE LAW OF ATTRACTION WAS?

20             MR. MARTINEZ:  BUT THEN I WANT HIM TO TELL US

21   WHAT SHE TOLD HIM ABOUT THE LAW OF ATTRACTION.

22             THE COURT:  I THINK THAT'S FAIR.

23             MR. MARTINEZ:  AND THEN HE CAN SAY --

24             THE COURT:  ALL RIGHT.  THAT'S FAIR.

25             (OPEN COURT.)

                                            66

1              THE COURT:  YOU MAY CONTINUE.

2    BY MS. WILLMOTT:

3         Q.   ALL RIGHT.  DR. SAMUELS, WITH REGARD TO THE LAW

4    OF ATTRACTION, DID MS. ARIAS SPEAK TO YOU ABOUT IT?

5         A.   SHE DID.  SHE TALKED ABOUT IT FAIRLY FREQUENTLY.

6         Q.   WHAT DID SHE TALK ABOUT THAT IT MEANT TO HER?

7         A.   IT MEANT IF YOU PUT POSITIVE STATEMENTS OUT

Transcript of Testimony of Dr. Richard Samuels

8   THERE, IF YOU HAVE A POSITIVE ATTITUDE TOWARDS LIFE, THEN
9   LIFE WILL TREAT YOU TO POSITIVE EXPERIENCES AND YOU WILL
10  GROW THROUGH THAT.  SO YOU HAVE TO SORT OF CREATE YOUR OWN
11  FUTURE BY PUTTING OUT POSITIVE VIBES AND BY EXPRESSING THE
12  GOALS THAT YOU HAVE IN LIFE AND SO FORTH.
13                 APPARENTLY IT WAS PART OF WHAT SHE WAS
14  LEARNING WITH THE PRE-PAID LEGAL PLAN.
15       Q.   OKAY.  AND DID SHE -- DID SHE TALK TO YOU ABOUT
16  HER JOURNAL WRITING WITH REGARD TO THE LAW OF ATTRACTION?
17       A.   YES, SHE DID.
18       Q.   AND IN YOUR READING OF HER JOURNALS, DID YOU SEE
19  THAT SHE WOULD MENTION THE LAW OF ATTRACTION?
20       A.   OH, MANY, MANY TIMES.
21       Q.   AND SO WHEN WE'RE TALKING ABOUT SOMETHING WHERE
22  SHE TALKS ABOUT THAT THERE WAS JUST SOMETHING WRONG WITH
23  THAT BOY, IS THAT CONSISTENT WITH SOMEBODY FOLLOWING THE
24  LAW OF ATTRACTION BY BEING NOT TOO NEGATIVE?
25       A.   YES.

                                              67

1        Q.   ALL RIGHT.  I WANTED TO TALK TO YOU ABOUT PTSD
2   AND IT'S AFFECT ON -- THE AFFECTS THAT IT HAS ON PEOPLE?
3        A.   OKAY.
4        Q.   FIRST I WANT TO ASK, DOES EVERYBODY WHO
5   EXPERIENCES A TRAUMA LIKE SOMETHING THAT PUTS THEM INTO
6   ACUTE STRESS, A SEVERE TRAUMA, DOES EVERYONE WHO
7   EXPERIENCES A SEVERE TRAUMA OFTEN THEN LEAD TO PTSD?
8        A.   NO.
9        Q.   HOW DOES THAT WORK?
10       A.   WELL, TYPICALLY -- MAYBE I SHOULDN'T USE THE
11  WORD TYPICALLY, ONE OF THE CHARACTERISTICS OF POST

Transcript of Testimony of Dr. Richard Samuels

12   TRAUMATIC STRESS DISORDER IS THAT PEOPLE WHO ARE SO

13   DIAGNOSED SHARE A COMMON SET OF SYMPTOMS.  THE SYMPTOMS

14   ARE LISTED IN THE DSM.  AND ONE OF THE CHARACTERISTICS

15   THAT REMAINS CONSISTENT IS THE FACT THAT THEY HAVE

16   UNDERGONE ATYPICAL STRESSOR.  IN OTHER WORDS --

17        Q.   YOU SAID ATYPICAL?

18        A.   ATYPICAL.  ATYPICAL MEANING NOT TYPICAL.

19        Q.   OKAY.

20        A.   MEANING THAT IT'S A STRESSOR OUT THE REALM OF

21   NORMAL EXPERIENCE.  SO IT'S LESS LIKELY TO DEVELOP IF A

22   PERSON HAS A MILD AUTOMOBILE ACCIDENT.  IT'S MORE LIKELY

23   TO OCCUR IF THEY'RE INVOLVED IN A KILLING SITUATION.

24             NOT EVERYONE WHO SUFFERS FROM AN ACUTE

25   STRESS DISORDER OR FROM EVEN MILDER FORMS OF STRESS WILL

                                                            68


1   DEVELOP PTSD AND THE CRITERIA OF VERY SPECIFIC.  BUT IF

2   YOU'VE BEEN DIAGNOSED WITH PTSD THEN THERE ARE A SERIES OF

3   REPETITIVE, CONSISTENT STIMULI SHARED BY A GROUP OF THOSE

4   THAT RECEIVE THAT DIAGNOSIS.

5             AND NOT EVERYONE WHOSE DIAGNOSED WITH PTSD

6   SHARES THE EXACT SAME SYMPTOMS EITHER.  BECAUSE THE

7   CRITERIA THAT ARE PLACED IN THE DSM, FOR EXAMPLE, IN ONE

8   CRITERIA, I'M NOT GOING TO GO INTO IT, THERE ARE FIVE

9   POSSIBILITIES.  AND IF ONE OF THOSE EXISTS THEN IT MEETS

10   THAT PARTICULAR CRITERIA OR IN ANOTHER CASE, THREE OUT OF

11   SEVEN.

12             SO NOT EVERYBODY IS EXACTLY THE SAME BUT

13   THEY DO SHARE A LIST OF COMMON EXPERIENCES, SYMPTOMS I

14   SHOULD SAY, AND THEY ALL HAVE EXPERIENCE IN ATYPICAL OR

15   UNUSUAL STRESSOR.

16        Q.   WHAT IF THEY'RE THE PERSON WHO CAUSED THE

                           Page 58

Transcript of Testimony of Dr. Richard Samuels

17    STRESS?  SO TAKE FOR EXAMPLE YOU SAID A KILLING.   FOR

18    EXAMPLE, IF SOMEBODY GETS INTO A CAR ACCIDENT AND RUN

19    SOMEONE OVER AND ACTUALLY KILLS THE PEDESTRIAN?

20         A.   YES.

21         Q.   CAN THE PERSON WHO IS DRIVING --

22         A.   THAT PERSON COULD DEVELOP POST TRAUMATIC STRESS

23    DISORDER.  THERE IS MUCH CURRENT RESEARCH, NEW RESEARCH

24    THAT HAS EXPLORED THE AREA OF CAN SOMEONE WHO IS INVOLVED

25    IN HARMING ANOTHER DEVELOP POST TRAUMATIC STRESS DISORDER

                                                        69


1    SYMPTOMS.

2                   AND EVEN THOUGH I SAW THAT REGULARLY

3    WORKING WITH POLICE OFFICERS THAT I WAS TREATING AND

4    DEALING WITH FOR ACCIDENTAL SHOOTING INCIDENTS, THE AREA

5    WAS NEVER REALLY STUDY UNTIL THE PAST TEN YEARS OR SO.

6    BUT OF THE EVIDENCE THAT DOES EXIST DOES SUGGEST THAT

7    PEOPLE WHO ARE INVOLVED IN CAUSING HARM TO ANOTHER CAN

8    DEVELOP PTSD AS A RESULT OF THE HARM THEY HAVE CAUSED.

9         Q.   ALL RIGHT.  AND ACTUALLY BEFORE WE GET ALL WAIT

10    INTO PTSD AGAIN, WHEN YOU FIRST MET MS. ARIAS, DID YOU

11    HAVE AN OPINION WITH REGARD TO HER SELF-ESTEEM?

12         A.   YES, I DID.

13         Q.   WHAT WAS THAT?

14         A.   THAT IT WAS VERY LOW.

15         Q.   AND HOW YOU DO YOU FORM SUCH A THING?  HOW DO

16    YOU KNOW THAT?

17         A.   WELL, BASED UPON HER HISTORY, WHAT SHE WAS

18    TELLING ME AT THE TIME ABOUT HER PAST RELATIONSHIP ABOUT

19    HER CHILDHOOD, HOW SHE WAS REARED, CERTAIN INTERACTIONS

20    SHE HAD WITH HER PARENTS, ALMOST CRIED OUT TO ME THAT THIS

                              Page 59

Transcript of Testimony of Dr. Richard Samuels

21  IS A YOUNG WOMAN WHOSE SUFFERING FROM VERY LOW

22  SELF-ESTEEM.

23      Q.   AND WHEN SOMEBODY SUFFERS FROM LOW SELF-ESTEEM,

24  CAN THAT MAKE YOU MORE LIKELY TO SUFFER FROM OTHER

25  DIAGNOSES?

70

1       A.   WELL, WE FIND THAT LOW SELF-ESTEEM IS A

2   CHARACTERISTIC OF MANY DIFFERENT KINDS OF PSYCHOLOGICAL

3   DISORDERS.  SO THE ANSWER TO THAT WOULD BE, YES.

4       Q.   OKAY.  AND THROUGHOUT THE TIME THAT YOU MET WITH

5   MS. ARIAS, DID YOU EVER NOTICE A CHANGE IN HER

6   SELF-ESTEEM?

7       A.   YES.  OVER THE YEARS I FOUND THAT HER

8   PERSONALITY SEEMED TO STRENGTHEN.  SHE BECAME SOMEWHAT

9   MORE SELF-CONFIDENT, MORE ASSERTIVE, WAS ABLE TO

10  COMMUNICATE MORE FREELY AND OPENLY.  AND I SAW THAT AS A

11  POSITIVE INDICATION.

12      Q.   ALL RIGHT.  WAS THAT ALWAYS THE CASE?

13      A.   WITH HER YOU MEAN?

14      Q.   LATER ON WHEN YOU SEE THAT SHE BECAME STRONGER

15  OR MORE CONFIDENT, WAS SHE ALWAYS LIKE THAT?

16      A.   NO, SHE WAS NOT.  PEOPLE HAVE THEIR UPS AND

17  DOWNS.  SOME DAYS SHE WOULD BE DEPRESSED.  SOME DAYS SHE

18  WOULD BE MORE OUTGOING.  OTHER DAYS SHE WOULD BE MORE

19  APPREHENSIVE.

20              BUT IN THE TYPICAL COURSE OF WORKING WITH

21  SOMEONE OVER TIME, YOU DO SEE THOSE CHANGES.

22      Q.   AND THAT BRINGS UP ANOTHER ISSUE TOO.  YOU SAY

23  WORKING WITH SOMEONE OVER TIME.  THE TIME THAT YOU SPENT

24  WITH MS. ARIAS WAS FOR WHAT PURPOSE?

25      A.   THE PURPOSE WAS TO CONDUCT A THOROUGH EVALUATION

Transcript of Testimony of Dr. Richard Samuels

71

1    AND DEVELOP A REPORT WITH A DIAGNOSIS.  AND THE APPROACH

2    THAT I TOOK WAS TO SPEND SEVERAL INTERVIEW SESSIONS

3    DEVELOP RAPPORT, I THINK I MAY HAVE MENTIONED THIS THE

4    LAST TIME.

5                        AND THEN, OF COURSE, IN MS. ARIAS' CASE, WE

6    HAD TO OVERCOME THE FACT THAT SHE WAS STILL IN AN ACUTE

7    STATE OF DENIAL AND WAS NOT ABLE TO DEAL WITH THE REALITY

8    OF WHAT HAD HAPPENED.  ALTHOUGH SHE FINALLY CAME ABOUT AND

9    SHARED THE -- WHAT WE BELIEVED TO BE THE TRUE STORY.

10                  MR. MARTINEZ:  OBJECTION.  VOUCHING, WHAT HE

11   BELIEVES TO BE THE TRUE STORY.

12                  THE COURT:  SUSTAINED.

13   BY MS. WILLMOTT:

14        Q.   OKAY.  GO ON.

15        A.   OKAY.  SHE TOLD A DIFFERENT ALTERNATIVE VERSION.

16   AND SO THAT ALLOWED ME TO SPEND MORE TIME DELVING INTO THE

17   FACTS OR TO THE BEST OF HER RECOLLECTION OF WHAT ACTUALLY

18   HAPPENED ON THAT FATEFUL NIGHT, YEAH.

19        Q.   ALL RIGHT.  AND SO DO YOU SPEND TIME -- WHEN

20   YOU'RE SPENDING THAT TIME WITH HER IS IT -- IS THERE EVER

21   A PURPOSE FOR THERAPY?

22        A.   WELL, NOT WHEN YOU'RE DOING AN EVALUATION.  AND

23   I WOULD VERY OFTEN ALMOST HAVE TO RESTRAIN MYSELF AND NOT

24   DO THERAPY BECAUSE THAT WASN'T MY ROLE.  BUT I DID SEE A

25   GROWTH WITHIN HER AS SHE BECAME MORE COMFORTABLE WITH THE

72

1    STORY THAT SHE ULTIMATELY CHANGED TO WHICH SHE TOLD US AND

2    SO, NO, NO THERAPY THAT I WOULD CALL THERAPY WAS

Page 61

Transcript of Testimony of Dr. Richard Samuels

3   CONDUCTED.

4        Q.   OKAY.  AND IF YOU WERE TREATING HER, IF SHE WAS

5   ACTUALLY A PATIENT OF YOURS AND YOU WERE CONDUCTING SOME

6   SORT OF THERAPY, WOULD YOU SEE HER MORE OFTEN?

7        A.   OH, YES.  ABSOLUTELY.  OF COURSE THINGS ARE

8   DIFFERENT NOW IN PSYCHOTHERAPY THAN THEY WERE WHEN I FIRST

9   STARTED BECAUSE OF INSURANCE LIMITATIONS AND INSURANCE

10   COMPANIES CHANGING THE RULES.

11             BUT ON A REGULAR BASIS SOMEONE LIKE MS.

12   ARIAS WOULD PROBABLY BE SEEN A COUPLE OF TIMES A WEEK, IF

13   WE LIVED IN AN IDEAL WORLD, FOR THE FIRST FEW MONTHS, AND

14   THEN PERHAPS ONCE A WEEK.  OVER A PERIOD OF TIME IT WOULD

15   TITRATE DOWN TO TWICE MONTHLY AND ONCE A MONTH THEN SIX

16   MONTHS UNTIL THEY KNOW LONGER FELT THEY NEEDED IT.

17        Q.   BUT LIKE I SAID IT WAS NOT YOUR GOAL YOU WERE

18   DOING EVALUATIONS?

19        A.   I WAS DOING ONLY EVALUATIONS.

20        Q.   OKAY.  ALL RIGHT.  SO WHEN SOMEBODY IS DIAGNOSED

21   WITH POST TRAUMATIC STRESS SYNDROME, DOES IT HAVE AN

22   EFFECT ON THEIR ABILITY TO EXPRESS EMOTIONS?

23        A.   IT CAN BECAUSE ONE OF THE CHARACTERISTICS.  ONE

24   OF THE CRITERIA FOR POST TRAUMATIC STRESS SYNDROME IS

25   BLUNTED EFFECT.

                                           73


1        Q.   WHAT IS A BLUNTED AFFECT?

2        A.   BLUNTED AFFECT MEANS A CONSTRICTION IN THEIR

3   ABILITY TO SHOW AND EXPRESS EMOTION.  SO WE WILL SEE AN

4   EMOTIVE STATE THAT DOESN'T SEEM TO JIVE WITH WHAT THEY'RE

5   TALKING ABOUT.  THERE'S A DISCONNECT SOMETIMES BETWEEN THE

6   EMOTION CONNECTED TO THE STATEMENT AND THE STATEMENT.

7        Q.   AND DO WE KNOW WHY THAT HAPPENS?

Transcript of Testimony of Dr. Richard Samuels

 8        A.   IT MAY HAVE TO DO WITH EMOTIONAL CONSTRICTION.
 9   RIGHT NOW I'M VENTURING INTO OTHER PSYCHOTHERAPEUTIC
10   JARGON.  I CAN'T TELL YOU WHAT STRUCTURE IN THE BRAIN IS
11   RESPONSIBLE FOR THAT.  BUT WE KNOW THAT IT'S NOT ATYPICAL.
12   IT HAPPENS WHEN THE PERSON SUFFERS FROM THIS PARTICULAR
13   DISORDER.  THERE'S A RESTRICTED RANGE OF AFFECT, WE SEE
14   THAT HAPPEN, A FEELING OF DETACHMENT, A DISCONNECTION
15   SOMETIMES TO RELATIONSHIPS, SOMETIMES TO SITUATIONS.
16        Q.   DO THEY HAVE THAT DETACHMENT WHEN THEY'RE
17   TALKING ABOUT THE SITUATION THAT CAUSED THE TRAUMA THAT
18   CAN BE RESPONSIBLE FOR THE PTSD?
19        A.   SOMETIMES IT'S SO HORRIFIC THAT YOU CAN'T DEAL
20   WITH IT OPENLY.  YOU HAVE TO SKIRT THE ISSUE.  YOU HAVE TO
21   CUSHION YOURSELF BECAUSE ONCE YOU START TALKING ABOUT WHAT
22   REALLY -- WHAT YOU EXPERIENCED, IT CAN BREAK YOU DOWN, AND
23   IT'S ALMOST LIKE A RE-EXPERIENCING OF THE ACTUAL TRAUMA.
24   SO, YES, THAT'S QUITE COMMON IN THIS TYPE OF DISORDER.
25        Q.   WHAT ABOUT IF THE PERSON IS UNDER STRESS AT THE

                                                  74


 1   TIME THAT THEY'RE DISCUSSING -- THAT THEY'RE TALKING, DOES
 2   ADDITIONAL STRESS, CAN THAT AFFECT SOMEBODY WHOSE BEEN
 3   DIAGNOSED WITH PTSD?
 4        A.   WELL IT CAN.  IT DEPENDS UPON THE TOPIC THAT'S
 5   BEING DISCUSSED AS WELL.  BUT WE KNOW, FOR EXAMPLE, THAT
 6   IT CAN BE VERY DIFFICULT FOR A SOLDIER TO TALK ABOUT A
 7   PARTICULARLY BAD EXPERIENCE THAT THEY'VE HAD AND PART OF
 8   THE THERAPY HELPS THEM TO GET TO THE POINT WHERE IT CAN BE
 9   BROUGHT OUT IN THE OPEN.
10             BUT ONE WOULD NOT JUST DIVE RIGHT IN THERE
11   AND START PRESENTING THEM, HAMMERING THEM WITH THIS

Transcript of Testimony of Dr. Richard Samuels

12    EXPERIENCE AGAIN BECAUSE THAT COULD BE VERY DETRIMENTAL TO

13    THEIR TREATMENT.

14        Q.    SO IF THE PERSON IS, FOR EXAMPLE, WITH MS. ARIAS

15    IF SHE'S TESTIFYING IS THAT CONSIDERED, GENERALLY

16    SPEAKING, STRESSFUL SITUATION?

17        A.    YES.

18            MR. MARTINEZ:  OBJECTION.  RELEVANCE, LACK OF

19    FOUNDATION.

20        Q.    HE TESTIFIED TO THE FOUNDATION AND IT'S RELEVANT

21    AS TO HER --

22            THE COURT:  OVERRULED.  YOU MAY ANSWER.

23        A.    YES.  TESTIFYING FOR ANYONE CAN BE STRESSFUL AND

24    SO, YES, TESTIFYING FOR HER PROBABLY WOULD HAVE BEEN

25    STRESSFUL.

                                                    75

1        Q.    AND SO WHEN YOU AT THAT STRESS UPON HER, BEING

2    DIAGNOSED WITH PTSD, DOES THAT CAUSE ANY ADDITIONAL ISSUES

3    WITH REGARD TO THE BLUNTED AFFECT?  DOES IT MAKE IT MORE

4    OR LESS LIKELY OR THINGS LIKE THAT?

5        A.    WELL, I CAN'T SAY EXACTLY WHAT WOULD HAPPEN TO A

6    PARTICULAR PERSON.  IT HAS THE POTENTIAL FOR DOING THAT.

7        Q.    OKAY.

8        A.    HAS THE POTENTIAL FOR CONFUSING THEM, HAS THE

9    ATTENTION -- THE POSSIBILITY, RATHER, OF ELICITING

10    INTRUSIVE THOUGHTS THAT DISTRACT THE PERSON FROM ANSWERING

11    THE PARTICULAR QUESTION.  BUT I CANNOT SAY FOR SURE.

12        Q.    GENERALLY SPEAKING?

13        A.    GENERALLY SPEAKING IS WHAT -- I AM SURE ABOUT

14    THAT.

15        Q.    OKAY.  PART OF THIS DETACHMENT THAT YOU TALK

16    ABOUT, IS THAT A DEFENSE MECHANISM?

                        Page 64

Transcript of Testimony of Dr. Richard Samuels

17          A.   IT CAN BE A DEFENSE MECHANISM TO BLOCK THE

18   INDIVIDUAL'S CONTACT, PSYCHOLOGICAL CONTACT WITH THE

19   INITIAL STRESSOR.

20                SO IN SOME CASES IT CAN -- SOMETIMES

21   AMNESIA CAN ACTUALLY BE A HELP BY PROTECTING THAT PERSON

22   ALTHOUGH IT'S NOT CAUSED BY THAT NECESSARILY.  IT'S CAUSED

23   BY THE FACT THAT THE MEMORIES AREN'T ACTUALLY INSCRIBED IN

24   THE BRAIN.  BUT, YES, BY CREATING AN ALTERNATIVE -- AN

25   ALTERNATIVE REALITY WHICH WE CALL DEREALIZATION, A PERSON

76

1   PUTS DISTANCE BETWEEN THEMSELVES AND THE ACTUAL EVENT

2   WHICH MAY HAVE BEEN VERY HORRIFIC.

3          Q.   IS THAT SOMETHING THAT YOU HAVE SEEN IN YOUR

4   PRACTICE?

5          A.   OH, YES.

6          Q.   DOES THAT HAPPEN FREQUENTLY OR NORMALLY OR --

7          A.   IT'S HARD TO GIVE A PERCENTAGE BUT I HAVE SEEN

8   IT ENOUGH TO BE AWARE THAT IT DOES EXIST AS A POSSIBILITY,

9   YES.

10          Q.   ALL RIGHT.  AND DID YOU SEE ANY EVIDENCE OF MS.

11   ARIAS DOING THINGS -- YOU SAID DEREALIZATION?

12          A.   YES.

13          Q.   DID YOU SEE ANY EVIDENCE OF THAT?

14          A.   WELL, INITIALLY WHEN THE STORY WAS TOLD ABOUT

15   THESE INTRUDERS THAT TO ME WAS A DISCONNECT FROM REALITY.

16          Q.   OKAY.  AND WHAT ABOUT -- WE KNOW THAT SHE CALLED

17   AND LEFT A VOICE MAIL FOR -- MESSAGE FOR TRAVIS AFTER SHE

18   LEFT HIS HOUSE ON JUNE 4TH.  WHAT DOES THAT TELL YOU?

19          A.   AGAIN -- AND AGAIN, I WOULD HAVE TO SAY THAT

20   THIS IS TYPICAL.  I'M TALKING ABOUT EXAMPLES HERE.  BUT IT

Transcript of Testimony of Dr. Richard Samuels

21  COULD VERY WELL HAVE BEEN THE RESULT OF HER NEED TO

22  DISTANCE HERSELF EMOTIONALLY FROM THE HORROR THAT OCCURRED

23  ON THAT DAY.  AND BY PRETENDING BUT NOT NECESSARILY ON A

24  CONSCIOUS LEVEL, BUT BY CREATING HER ALTERNATIVE REALITY,

25  IT'S AS IF IT DIDN'T HAPPEN AND IT REDUCES THE LEVEL OF

77

1   STRESS.  STRANGE AS IT SOUNDS THESE THINGS DO OCCUR.

2       Q.   WE KNOW THAT AFTER THAT SHE WENT ON TO UTAH AND

3   SPENT SOME TIME WITH A PERSON NAMED RYAN BURNS.  AND TO

4   ALL ACCOUNTS THINGS SEEMED NORMAL FOR HER, NOT FROM HER

5   BUT BY OTHER PEOPLE EXPLAINING HER BEHAVIOR.  IS THERE A

6   PSYCHOLOGICAL EXPLANATION FOR THAT?

7       MR. MARTINEZ:  OBJECTION.  SPEAKING TO THE

8   DEFENDANT'S MENTAL STATE.

9       THE COURT:  OVERRULED.

10      A.   WELL, IT'S ANOTHER WAY OF THE MIND TRYING TO PUT

11  PSYCHOLOGICAL DISTANCE BETWEEN THE HORROR OF THE EVENT AND

12  THE REALITY THAT THAT PERSON HAS TO LIVE WITH KEEPING IN

13  MIND IN MS. ARIAS' CASE THAT SHE APPARENTLY HAD NO ONE

14  THAT SHE COULD CONFIDE IN, NOT A MOTHER, NOT A FATHER, NOT

15  A FRIEND.  SHE WAS DOING THIS ALL BY HERSELF.  AND THE

16  STRESS MUST HAVE BEEN INCREDIBLE.

17      Q.   WE KNOW THAT SHE SPOKE TO A FRIEND, LESLY UDY,

18  AND MADE STATEMENTS ABOUT THE WISH FOR HER TO -- HER

19  CHILDREN SOME DAY TO PLAY WITH TRAVIS' CHILDREN SOME DAY.

20  WE ALL KNOW THAT WAS NOT GOING TO HAPPEN NOW.  IS THAT THE

21  SAME TYPE OF BEHAVIOR YOU'RE TALKING ABOUT?

22      A.   YES, IT IS.  IT ALMOST BOARDERS ON THE

23  DELUSIONAL, BUT SHE DID NOT MEET THAT PARTICULAR

24  DIAGNOSTIC CRITERIA.

25      Q.   SO TO BE CLEAR, YOU'RE SAYING SHE WAS

Transcript of Testimony of Dr. Richard Samuels

78

1    DELUSIONAL?

2         A.   NO, I'M NOT.

3         Q.   OKAY.  ALL RIGHT.  SO WHAT DO YOU MEAN THEN?

4         A.   WELL, WHAT I MEAN IS THE ALTERNATIVE REALITY

5    THAT IS CREATED IS SO CONTRARY TO WHAT ACTUALLY HAPPENED,

6    THAT IT WOULD BE VERY DIFFICULT FOR A PERSON TO EVEN MAKE

7    THOSE STATEMENTS IF THEY GENUINELY -- SOME PART OF THEM

8    DIDN'T BELIEVE THAT OR WEREN'T FUNCTIONING AS IF THE

9    ALTERNATIVE REALITY WAS REALITY.

10        Q.   OKAY.  WE KNOW THAT SHE SENT FLOWERS TO TRAVIS'

11   GRANDMOTHER AFTERWARDS ONCE THE NEWS BROKE THAT HE PASSED

12   AWAY.  IS THAT ALONG THE SAME TYPE OF BEHAVIOR?

13        A.   IT'S ALONG THE SAME TYPE OF BEHAVIOR.  THERE MAY

14   HAVE BEEN SOME GENUINE SORROW ON HER PART TOO.  BUT IT

15   WOULD BE CONSISTENT WITH THIS CONCEPT THAT I WAS

16   DISCUSSING PREVIOUSLY.

17        Q.   OKAY.  AND LET'S MOVE ON FOR A SECOND.  LET'S

18   TALK ABOUT TREMORS AND SHAKING?

19        A.   UM-HUM.

20        Q.   OKAY?  WHEN YOU WERE MEETING WITH MS. ARIAS, YOU

21   EVER NOTICE HER HAVING ANY TREMORS OR SHAKING?

22        A.   I DID.  THERE WERE TIMES AND SOMETIMES IT WAS

23   CONTENT RELATED THAT I WOULD SEE HER HAND SHAKING LIKE

24   THIS.  AND -- BUT THAT'S ONE OF THE CRITERIA OF POST

25   TRAUMATIC STRESS DISORDER, IN FACT IT'S CALLED -- THE

79

1    CHARACTERISTIC IS PHYSIOLOGIC REACTIVITY UPON EXPOSURE TO

2    INTERNAL OR EXTERNAL CUES THAT SYMBOLIZE OR RESEMBLE AN

Transcript of Testimony of Dr. Richard Samuels

3    ASPECT --

4         MR. MARTINEZ:  JUDGE, I THINK HE'S READING FROM

5    SOMEWHERE.  IF WE CAN FIND OUT WHAT HE'S READING FROM.

6         THE COURT:  SUSTAINED.

7         MS. WILLMOTT:  WHAT ARE YOU READING FROM?

8    A.    I'M READING FROM THE DIAGNOSTIC AND STATISTICAL

9    MANUAL WHICH I REPRODUCED ON THIS PAGE.  BUT IT'S THE

10   CRITERIA FROM THE DIAGNOSTIC AND STATISTICAL MANUAL.

11   Q.    OKAY.

12         MR. MARTINEZ:  IF WE CAN MARK IT THEN?

13   BY MS. WILLMOTT:

14   Q.    WELL, ACTUALLY IT'S ALREADY BEEN MARKED.

15   DOCTOR, DO YOU HAVE THE DSM WITH THE --

16   A.    I DON'T HAVE THE RED BOOK TODAY.  I BROUGHT MY

17   LITTLE PORTABLE VERSION.

18   Q.    THEN WE HAVE TO MARK THAT.

19   A.    OKAY.  BUT I DO NEED IT BACK.  YEAH, HERE IT IS.

20   Q.    IT'S MARKED AS EXHIBIT 531.  HOW DOES THAT

21   DIFFERENT FROM THE BIG RED BOOK YOU HAVE UP THERE TODAY?

22   A.    THIS IS JUST A PORTABLE VERSION.  IT DOESN'T

23   HAVE A LOT OF THE EXPLANATORY TEXT IN IT.  BUT IT DOES

24   HAVE ALL THE CRITERIA FOR ALL THE DISORDERS.  WE CARRY IT

25   AROUND.  IT'S EAST TO CARRY.

                                            80


1    Q.    ALL RIGHT.  SO YOU WERE EXPLAINING TO US WHAT

2    THE SPECIFIC CRITERIA IS IN THE PTSD?

3    A.    YES.

4    Q.    WITH REGARD TO HOW SHAKING OR TREMORS FALLS INTO

5    THAT?

6    A.    IT WOULD FALL INTO THAT PARTICULAR CRITERIA.

7    Q.    ALL RIGHT.  AND YOU WERE READING IT.  DID YOU

Transcript of Testimony of Dr. Richard Samuels

8    FINISH READING IT?

9         A.   I DID.

10        Q.   OKAY.  CAN YOU TELL US WHAT THAT MEANT?

11        A.   WHAT IT MEANS IS THAT A PERSON RESPONDS

12   PHYSIOLOGICALLY HOW -- IT COULD MEAN A DIFFERENT

13   PHYSIOLOGIC OR PHYSICAL CHANGES, BUT IN THIS CASE I VIEWED

14   THE SHAKING OR THE TREMOR AS BEING THE PHYSIOLOGIC

15   REACTIVITY.

16             SO WHEN WE WERE TALKING ABOUT CERTAIN

17   ISSUES, I CAN'T SAY FOR SURE IT WAS ONLY WHEN I WOULD

18   SPEAK TO HER ABOUT THE INCIDENT, BUT THERE MAY HAVE BEEN

19   INTERNAL OR OTHER INTERNAL CUES THAT WERE TRIGGERING THAT.

20   I DID OBSERVER HER SHAKING ON A NUMBER OF OCCASIONS.

21        Q.   ALL RIGHT.  WHEN YOU OBSERVED HER SHAKING, IS IT

22   SOMETHING THAT IS LIKE EPILEPTIC TYPE SHAKING OR IS IT

23   MORE MILD?

24        A.   NO.  IT'S MUCH MILDER.

25        Q.   IS IT SOMETHING THAT IF YOU WEREN'T LOOKING FOR

                                                    81

1    IT, WOULD YOU NECESSARILY NOTICE IT?

2         A.   NO.  YOU MIGHT NOT NOTICE IT.

3         Q.   AND SOMETIMES YOU SAID -- YOU GAVE US AN EXAMPLE

4    BEFORE, YOU RAISED YOUR HAND AND --

5         A.   YEAH.

6         Q.   -- AND YOU SAY IT SHAKE?

7         A.   RIGHT.

8         Q.   IF HER HAND WAS DOWN IS THAT SOMETHING YOU WOULD

9    NOTICE?

10        A.   PROBABLY WOULDN'T NOTICE IT AS MUCH.

11        Q.   OKAY.  AND WHAT IS THIS -- DID SHE TALK TO YOU

Page 69

Transcript of Testimony of Dr. Richard Samuels

12   ABOUT THE SHAKING?

13        A.   SHE DID TELL ME ON A COUPLE OF OCCASIONS THAT

14   SHE WOULD SHAKE.  IN FACT, I INQUIRED FURTHER WHEN I SAW

15   THAT.  AND SHE EXPLAINED HOW THE SHAKING BEGAN.  I THINK

16   IT WAS AROUND -- I DON'T WANT TO GIVE A DATE AND NOT BE

17   SURE.  BUT I THINK IT WAS 2007 OR SOMETHING.  I'M JUST

18   VENTURING A GUESS HERE.

19                  AND WHEN MR. ALEXANDER WOULD GET ANGRY AT

20   HER, SHE WOULD NOTICE THAT SHE BEGAN TO SHAKE.  SO IF HE

21   WOULD LOSE HIS TEMPER AT HER, SHE REPORT IT TO ME THAT SHE

22   WOULD HAVE THAT SHAKING REACTION.

23        Q.   OKAY.  AND THE TIME THAT YOU SAW HER SHAKING,

24   WAS IT DURING TIMES THAT YOU WERE SPEAKING OF THE INCIDENT

25   OR --

82

1         A.   I DON'T KNOW IMMEDIATELY, I DIDN'T PLAY AROUND

2    WITH THAT.  IT CAME AND WENT.  I DIDN'T WANT TO GET INTO

3    AREAS THAT WOULD NECESSARILY CAUSE THE SHAKING SO MY TIME

4    WAS LIMITED WITH HER.  SO I DIDN'T DO AN EXPERIMENT --

5         Q.   OKAY.

6         A.   -- YOU KNOW, TO SEE.  BUT I DID NOTICE THERE

7    WERE TIMES DURING CERTAIN PARTS OF THE CONVERSATION THAT

8    SHE WOULD BEGIN TO SHAKE AND EVENTUALLY AT SOME POINT SHE

9    MENTIONED TO ME THAT SHE WAS EXPERIENCING THE SHAKING.

10        Q.   OKAY.  THE SHAKING IS THAT A FORM OF AN ELEVATED

11   ANXIETY?

12        A.   YES.  IT COULD VERY WELL BE THE RESULT OF

13   ELEVATED ANXIETY.

14        Q.   AND ANXIETY IS SOMETHING THAT IS PART OF THAT

15   PTSD, IS THAT CORRECT?

16        A.   IT'S A CHARACTERISTIC OF PTSD.

Page 70

Transcript of Testimony of Dr. Richard Samuels

17      Q.   WE KNOW THAT MS. ARIAS HAS SAID THAT WHEN MEN IN

18   PARTICULAR YELL AT HER OR RAISE THEIR VOICE TO HER OR ARE

19   AGGRESSIVE WITH HER IN ANY WAY THAT THAT CAUSES HER

20   ADDITIONAL STRESS, BASICALLY ANXIETY?

21      A.   SHE TOLD ME THAT, YES.

22      Q.   OKAY.  WELL, DID SHE TALK ABOUT THAT WITH YOU?

23      A.   YES.  WE TALKED ABOUT THAT.

24      Q.   ALL RIGHT.  WHAT ABOUT IT?

25      A.   WELL, SHE SAID THAT IF A MAN ESPECIALLY IS

                                                    83


1   YELLING AT HER OR UPSET WITH HER, THAT'S WHEN HE BEGINS TO

2   FEEL MOST TENSE, MOST ANXIOUS AND ALSO INDICATED THAT

3   SOMETIMES SHE SHAKES.

4      Q.   OKAY.  AND WHEN SOMEBODY IS UNDER -- HAVING

5   ANXIETY -- NOW THIS -- I GUESS THIS TYPE OF ANXIETY OR

6   STRESS, I GUESS, THIS WOULD BE FAR DIFFERENT FROM THE TYPE

7   OF STRESS THERE WAS ON JUNE 4TH?

8      A.   RIGHT.  WHAT I'M TALKING ABOUT HERE IS TYPICAL,

9   NORMAL ANXIETY THAT MOST PEOPLE EXPERIENCE AT ONE TIME OR

10   ANOTHER.

11      Q.   AND WHEN PEOPLE EXPERIENCE WHAT YOU SAY TYPICAL

12   NORMAL ANXIETY, WHAT TYPE OF RESULTS DO YOU SEE?

13      A.   WELL, WE MAY SEE IN SOME PEOPLE A JITTERY KNEE.

14   THEY START BOUNCING THEIR KNEE UP AND DOWN.  THEY MIGHT

15   SCRATCH THEIR HEAD, THERE'S DISPLACEMENT ACTIVITIES.  THEY

16   MIGHT FEEL WARM, THEIR SKIM MAY TURN RED, THEIR HEART RATE

17   MAY GO UP, THEIR HANDS MAY GET COLD AND CLAMMY.  THESE ARE

18   TYPICAL SYMPTOMS OF AN ELEVATED STATE OF ANXIETY.

19      Q.   DO YOU EVER FIND PEOPLE HAVE A PROBLEM WITH

20   FINDING THEIR WORDS OR REMEMBERING THEM?

                            Page 71

Transcript of Testimony of Dr. Richard Samuels

21      A.   WELL, YES, MANY PEOPLE EXPERIENCE A COGNITIVE

22   DISRUPTION WHEN THEY'RE EXTREMELY ANXIOUS.  AND THEY MAY

23   HAVE DIFFICULTY CONCENTRATING.  THEY MAY HAVE DIFFICULTY

24   IN WORD FINDING.  THEY MAY HAVE DIFFICULTY REMEMBERING

25   CERTAIN THINGS.  THIS IS A FAIRLY COMMON OCCURRENCE WHICH

84

 1   WE ALSO KNOW AS STAGE FRIGHT.  EVEN SKILLED AND EXPERIENCE

 2   ACTORS AND ACTRESSES WILL GO ON TO THE STAGE AND REPORT

 3   THAT PRIOR TO THEIR PERFORMANCE THEY BEGIN TO EXPERIENCE

 4   STAGE FRIGHT WHICH IS REALLY JUST A FORM OF ANXIETY

 5   RELATED TO THE PERFORMANCE ANXIETY -- THE PERFORMANCE

 6   STRESSES THAT ARE ABOUT TO OCCUR TO THEM.

 7      Q.   SO LIKE SOMEBODY WHO WOULD FORGET THEIR LINES?

 8      A.   THEY MIGHT FORGET THEIR LINES, EXACTLY.

 9      Q.   IS THIS SOMETHING THAT WOULD BE CONSIDERED --

10   ASSUMING IT HAPPENED ONCE IN A WHILE, IS THIS SOMETHING

11   THAT A PERSON SHOULD GET MENTAL TREATMENT FOR?

12      A.   IT DEPENDS.  ONE OF THE CHARACTERISTICS OF A

13   ISSUE THAT REQUIRES MENTAL TREATMENT IS IF IT INTERFERE

14   WITH THE LIFE OF THE INDIVIDUAL.  SO MOST PEOPLE GO

15   THROUGH LIFE WITHOUT EXPERIENCING PSYCHOTHERAPY BECAUSE

16   THEY CAN SORT OF DEAL WITH IT.  SOME PEOPLE MORE

17   EFFECTIVELY THAN OTHERS.

18           BUT WHEN THE ISSUE INTERRUPTS YOUR FLOW OF

19   LIFE OR CREATES PROBLEMS FOR YOU, YOU FIND YOU CAN'T GET

20   ON A BUS TO GO TO WORK OR THE LIGHT RAIL AND YOU CAN'T DO

21   THAT OR CAN'T GET IN YOUR CAR, YOU CAN'T GET IN TRAFFIC,

22   THEN OBVIOUSLY THAT SHOULD RECEIVE THE ATTENTION OF AN

23   APPROPRIATE THERAPIST.

24      Q.   BUT THE NORMAL EVERYDAY STAGE FRIGHT THAT PEOPLE

25   MIGHT HAVE, LIKE A KID TAKING A PLAY AND GETTING AFRAID TO

Transcript of Testimony of Dr. Richard Samuels

85

1    STAND UP IN FRONT OF PEOPLE, IS THAT SOMETHING YOU WOULD
2    CONSIDER MENTAL HEALTH TREATMENT IF NEEDED?
3         A.   NO.   IN FACT, HAVING SOME ANXIETY IS PROBABLY
4    HEALTHY BECAUSE YOU BEGIN TO LEARN HOW TO TOLERATE IT,
5    ACCEPT IT, OVERCOME IT.   SO EXPERIENCING ANXIETY IS
6    ACTUALLY HELPFUL IN SOME RESPECTS FOR MAKING A PERSON MORE
7    CONFIDENT IN THEIR LIFE.
8         Q.   SO I GUESS AS LONG AS IT DOESN'T INTERRUPT YOUR
9    LIFE?
10        A.   THAT'S BASICALLY THE DIFFERENCE, YES, THAT'S
11   BASICALLY IT.
12        Q.   OKAY.   ALL RIGHT.   I WANT TO TALK TO YOU ABOUT
13   THE CRIME SCENE.   OKAY?   SO THESE ARE -- BASICALLY WHAT DO
14   YOU KNOW?   WHAT YOU KNOW OF WHAT HAPPENED ON JUNE 4TH IS
15   BASED ON WHAT?
16        A.   IT'S BASED UPON THE CRIME SCENE PHOTOGRAPHS THAT
17   I WAS SHOWN, POLICE REPORTS, INTERVIEWS WITH AT LEAST ONE
18   DETECTIVE AND WHAT LATER ON I WAS TOLD BY MS. ARIAS TO THE
19   DEGREE THAT SHE WAS ABLE TO REMEMBER.
20        Q.   OKAY.   WHEN YOU SAY INTERVIEWS WITH THE
21   DETECTIVE, DO YOU MEAN YOU READ INTERVIEWS?
22        A.   NO.   THERE WAS A VIDEO RECORDING OF SOME
23   INTERVIEWS.
24        Q.   SO YOU DIDN'T CONDUCT THE INTERVIEW?
25        A.   OH, NO, I DID NOT.

86

1         Q.   BUT YOU WATCHED INTERVIEWS OF THE DETECTIVE?
2         A.   YES.

Transcript of Testimony of Dr. Richard Samuels

3      Q.    AND LOOKING AT THE PHOTOS AND THE INFORMATION

4  THAT YOU KNOW THAT YOU GATHERED FROM ALL OF THIS --

5            MR. MARTINEZ:  JUDGE, MAY WE APPROACH, PLEASE?

6            THE COURT:  YES.

7            (SIDEBAR DISCUSSION.)

8            MR. MARTINEZ:  THIS IS THE ISSUE THAT WE TALKED

9  ABOUT BEFORE, LOOKING AT THE PHOTOS, HE'S GOING TO TELL US

10 SOMETHING THAT'S NOT HIS AREA OF EXPERTISE.  AGAIN, THAT

11 WOULD GO TO THE ULTIMATE ISSUE WHETHER IT WAS PREMEDITATED

12 OR NOT PREMEDITATED, PSYCHOLOGISTS CANNOT LOOK AT

13 PHOTOGRAPHS AND MAKE ANY PSYCHOLOGICAL ASSESSMENTS.

14           THERE AGAIN GOING INTO THAT AREA THAT WE TALKED

15 ABOUT WHETHER OR NOT THIS WAS PREMEDITATED, HEAT OF

16 PASSION, THAT SORT OF THING.  SO I WOULD OBJECT.

17           MS. WILLMOTT:  HE'S NOT GOING TO TALK ABOUT IT

18 BEING PREMEDITATED OR NOT PREMEDITATED.  THAT'S NOT WHAT

19 THIS LINE OF QUESTIONING IS GOING TO.  WHAT IT'S GOING TO

20 IS THAT IT DOES SUPPORT HIS DIAGNOSIS OF -- ULTIMATE

21 DIAGNOSIS OF PTSD AND SHE WAS LIKELY UNDER ACUTE STRESS.

22           AND THAT'S BASED ON LOOKING AT THE CRIME SCENE

23 PHOTOS, KNOWING THAT SHE HAD TO HAVE THE STRENGTH TO TAKE

24 MR. ALEXANDER'S BODY AND PUT IT INTO THE SHOWER.  THAT

25 ONLY HAPPENS WHEN PEOPLE HAVE SEVERE ADRENALINE RUSHES

                                                        87


1  WHICH OCCURS DURING ACUTE STRESS MOMENTS.

2            ALSO THE FRENZIEDNESS OF THE SCENE ITSELF, THE

3  FACT THAT IT'S NOT -- THAT THERE'S BLOOD ALL OVER.  AND SO

4  IT'S VERY DISORGANIZED AND THAT THERE'S A CAMERA IN THE

5  WASHER BUT YET THE GUN IS MISSING.  IT'S VERY DISORGANIZED

6  BEHAVIOR WHICH SUPPORTS SOMEBODY WHO IS EXPERIENCING ACUTE

7  STRESS.

Transcript of Testimony of Dr. Richard Samuels

8          MR. MARTINEZ:  ISN'T THAT THE ISSUE HE JUST
9   WROTE UPON THAT -- HE CAN'T OPINE TO THAT, THERE WAS ACUTE
10  STRESS.  HE CAN'T TALK ABOUT HER MIND AT THE TIME OF THE
11  KILLING JUST BY LOOKING AT PHOTOGRAPHS.  HE'S SAYING,
12  WELL, JUST BECAUSE I SEE A CAMERA IN A WASHER, SHE WAS
13  UNDER ACUTE STRESS.  THAT'S A STATE OF MIND.  HE CAN'T SAY
14  THAT.  HOWEVER YOU DISGUISE IT, IT'S IT SAME ISSUE OF HIM
15  WANTING TO SAY THIS IS A HEAT OF PASSION KILLING.  THEY
16  CAN'T SAY THAT.
17         MS. WILLMOTT:  THAT'S NOT WHAT HE'S SAYING,
18  JUDGE.  AND IT'S NOT -- HE'S NOT SAYING THAT HE'S LOOKING
19  INTO JODI'S MIND JUST BECAUSE -- AND SAYING SHE
20  EXPERIENCED ACUTE STRESS JUST BY LOOKING INTO HER MIND.
21  HE'S ACTUALLY LOOKING AT THE FACTS THAT WE KNOW TO BE
22  TRUE.
23         WE KNOW THAT HIS BODY HAD TO SOMEHOW GET IN THAT
24  SHOWER.  WE KNOW THAT IN ORDER FOR HER -- I MEAN, UNLESS
25  THE STATE WANTS TO CONCEDE SOMEBODY ELSE WAS NOW INVOLVED,

                                                       88

1   IF NOBODY ELSE WAS INVOLVED THEN JODI HAD TO DO IT.  AND
2   THE ONLY WAY SHE CAN DO IT IS WITH THIS LARGE ADRENALINE
3   SURGE WHICH MEANS SOMETHING TO A PSYCHOLOGIST.
4          MR. MARTINEZ:  BUT IF SHE HAD THE LARGE
5   ADRENALINE RANGE THAT COULD MEAN SHE LOVED THE PLANNING.
6   SHE WAS JUST ENJOYING THE HECK OUT OF PLANNING GETTING
7   THIS MAN THAT WAS DOING WHATEVER TO HER.
8          THE COURT:  IF YOU WANT TO ASK HIM IF HE HAS AN
9   EXPLANATION FOR HOW A PERSON OF HER SIZE COULD MOVE A
10  BODY, THAT MIGHT BE APPROPRIATE.  BUT TO HAVE HIM LOOK AT
11  PHOTOGRAPHS AND RENDER AN OPINION, I GUESS I DON'T

Transcript of Testimony of Dr. Richard Samuels

12    UNDERSTAND WHAT YOU'RE HOPING TO ACCOMPLISH WITH THAT.

13          MS. WILLMOTT:  BECAUSE IT SUPPORTS HIS -- HIS

14    DIAGNOSIS OF PTSD THAT FOLLOWS FROM ACUTE STRESS.  THAT'S

15    THE REASON.  IT SUPPORTS HIS -- SOMEBODY WHO IS UNDER

16    ACUTE STRESS IS EXPERIENCING A HIGH LEVEL OF ADRENALINE,

17    ALL OF THESE HORMONES THAT WE'VE DISCUSSED THAT ARE COMING

18    OUT, FLOODING THE BRAIN, THAT'S WHAT CAUSES THE ABILITY TO

19    PUT HIM IN THE SHOWER.  BUT IT ALSO CAUSES THE

20    FRENZIEDNESS OF THE SCENE, THE FACT THAT THERE IS NOT

21    NECESSARILY LOGICAL THINGS DONE LIKE THE CAMERA IS IN THE

22    DRYER (SIC) AND THE GUN IS MISSING SO --

23          THE COURT:  SO ASK HIM GENERICALLY ABOUT THOSE

24    KINDS OF SITUATIONS AND IF THEY FOLLOW FROM ACUTE STRESS.

25    IF YOU HAVE AN ADRENALINE RUSH, DOES IT GIVE YOU GREATER

                                                        89


1     STRENGTH THAN YOU WOULD HAVE OTHERWISE OR DOES IT RESULT

2     IN YOU DOING THINGS THAT MAY BE DISORGANIZED.  YOU CAN

3     TALK ABOUT THAT BUT NOT COMMENT ON THE EVIDENCE.  THAT'S

4     SOMETHING FOR THE JURY TO DECIDE.

5          MS. WILLMOTT:  WELL --

6          MR. NURMI:  JUDGE, THIS RELATES DIRECTLY TO THE

7     DIAGNOSIS OF ACUTE STRESS DISORDER AND A COOPERATION FOR

8     THE ACUTE STRESS DISORDER.  THE STATE HAS OFFERED YOU, AS

9     IS CUSTOMARY, NO CASE LAW AND/OR NO LAW TO SUPPORT THEIR

10    OBJECTION.

11          THIS IS NOT OPINING ON AN ULTIMATE FACT WHICH

12    THE JURY HAS TO DETERMINE WHICH IS WHETHER OR NOT IT WAS

13    PREMEDITATED.  THIS RELATES TO ANYTHING THAT SUPPORTS DR.

14    SAMUELS' DIAGNOSIS OF POST TRAUMATIC STRESS DISORDER THAT

15    ARISE FROM ACUTE STRESS DISORDER.  IT IS EVIDENCE RELATED

16    TO HIS DIAGNOSIS THAT EXPLAINS OBVIOUSLY ISSUES THAT ARE

Transcript of Testimony of Dr. Richard Samuels

17    RELEVANT.

18          FOR THIS COURT TO NEUTER THAT OR ALTER THE

19    TESTIMONY IN ANY WAY IS INAPPROPRIATE AS IT RELATES TO THE

20    RULES AND THE CASE LAW BECAUSE AN EXPERT IS ALLOWED TO

21    OPINE ON THE THINGS THAT SUPPORT HIS PARTICULAR DIAGNOSIS

22    THAT ARE EXPLANATORY OF HERE BEHAVIOR.  HE HAD EXTENSIVE

23    TESTIMONY AS IT RELATES TO HER BEHAVIOR AFTER THE CRIME,

24    THE ACUTE STRESS.  AND THIS IS SIMILAR TESTIMONY.

25          THE FACT THAT IT HAPPENED AT THE CRIME SCENE

90

1    DOES NOT MAKE IT ANY MORE -- IT'S STILL POST CRIMINAL

2    BEHAVIOR UNDER THE SIXTH AMENDMENT AND TROMBETTA SHE HAS A

3    RIGHT TO PRESENT A COMPLETE AND FULL DEFENSE.  NO RULES

4    ARE BEING VIOLATED HERE BECAUSE THE EXPERT IS NOT OPINING

5    ON PREMEDITATION.

6          MR. MARTINEZ:  HE INDICATES THAT THE STATE HAS

7    NOT PROVIDED ANY AUTHORITY.  WE HAVE PROVIDED AUTHORITY IN

8    THE FORM OF A MOTION IN LIMINE.  SO I'LL STAND ON THAT.

9          ADDITIONALLY, IF HE IS ALLOWED TO OPINE THAT BY

10    LOOKING AT A PHOTOGRAPH THAT WAS FRENZIED, MY EXPERT'S

11    GOING TO COME BACK AND SAY IT WAS PLANNED, THAT THERE'S NO

12    INDICATION THAT THERE WAS ANY FRENZY HERE.  I'M JUST USING

13    THAT AS AN EXAMPLE TO SHOW YOU THAT IF WE OPEN THAT DOOR,

14    I DO BELIEVE WE'LL HAVE ERROR NOT SO MUCH WHEN THEY SAY IT

15    BUT THEN FAIRNESS WOULD ALLOW ME TO SAY -- REBUT WHAT HE'S

16    SAYING.

17          MY EXPERT'S WILLING TO SAY THAT BASED ON TALKING

18    TO THE DEFENDANT, SHE DOES NOT HAVE PTSD, AND THIS WAS ALL

19    ORGANIZED AND THAT THIS WAS A STAGED SCENE AND THAT THAT

20    INDICATES THERE'S NO PTSD AND SHE PREMEDITATED IT.  THAT'S

Transcript of Testimony of Dr. Richard Samuels

21    WHAT HE'S GOING TO SAY THAT IT WAS A HEAT OF PASSION KIND

22    OF THING.  SO I DO NOT BELIEVE THAT WE SHOULD GO THERE.

23          MS. WILLMOTT:  JUST FOR THE RECORD, FRENZIED

24    DOES NOT EQUAL UNPLANNED.  SO JUST BECAUSE IF HE WERE TO

25    SAY THAT IT WAS FRENZIED OR DISORGANIZED SCENE, IT DOESN'T

91

1     IN TURN MEAN THAT THE OPPOSITE IS PLANNED, THAT IT WAS A

2     PLANNED OUT SCENE.  EITHER WAY WE'RE NOT OPENING THE DOOR

3     TO THEM SAYING IT WAS PREMEDITATED VERSUS US SAYING IT'S

4     UNPREMEDITATED.  THAT'S NOT WHAT HE'S SAYING.  IT'S

5     SUPPORTING HIS DIAGNOSES OF PTSD.  THESE ARE THE THINGS HE

6     SPECIFICALLY LOOKED AT THAT SUPPORTED HIS DIAGNOSIS.  IT'S

7     SOMETHING THAT AN EXPERT IS ALLOWED TO TESTIFY ABOUT WHAT

8     SUPPORTS HIS DIAGNOSIS SPECIFIC TO THE FACTS OF THIS CASE.

9           THE COURT:  WELL, HE'S ALREADY TESTIFIED ABOUT,

10    GENERALLY SPEAKING, WHAT SUPPORTED HIS DIAGNOSIS.  I THINK

11    IF THE STATE CROSS-EXAMINES HIM ABOUT THE SPECIFICS, HE

12    CERTAINLY CAN GO INTO THE SPECIFICS BUT YOU'RE ASKING HIM

13    TO TESTIFY ABOUT -- ONE MORE TIME, WHAT IS IT YOU THINK HE

14    WILL SPECIFICALLY SAY IN RESPONSE TO YOUR QUESTION?

15          MS. WILLMOTT:  HE'LL SAY THAT THERE'S ASPECTS OF

16    THE SCENE THAT SUPPORT HIS DIAGNOSIS, ULTIMATE DIAGNOSIS

17    OF PTSD THAT CAME FROM ACUTE STRESS.  THAT THE ASPECTS OF

18    THE SCENE ARE SIGNS OF A PERSON BEING UNDER ACUTE STRESS.

19          MR. MARTINEZ:  SPECIFICALLY WHAT IS THE PROBLEM?

20    SHE'S NOT TELLING YOU THAT.

21          MS. WILLMOTT:  I ALREADY SAID, ONE OF THE THINGS

22    IS THE FACT THAT SHE HAD THE STRENGTH TO PUT HIM IN THE

23    SHOWER.  THE OTHER THING IS THE FACT THAT THE DISCONNECT

24    BETWEEN A PHOTOGRAPHER LEAVING A CAMERA AT THE SCENE

25    VERSUS KNOWING ENOUGH TO TAKE THE ROPE.  I MEAN, THIS IS

Transcript of Testimony of Dr. Richard Samuels

92

1   SOMETHING THE STATE WENT ON TO ON CROSS WITH HER WITH

2   REGARD TO THE CAMERA, THAT SHE'S DELETED THE PHOTOS, THAT

3   SHE HAD THE ABILITY TO DELETE THE PHOTOS.  I DON'T SEE --

4          THE COURT:  SO HE'S GOING TO TESTIFY THAT CRIME

5   SCENE PHOTOGRAPHS SUPPORT HIS DIAGNOSIS OF PTSD OR ACUTE

6   ANXIETY DISORDER.

7          MS. WILLMOTT:  PART OF IT.  IT'S NOT JUST THE

8   CRIME SCENE PHOTOGRAPHS.  I MEAN, IT'S THE FACT WHAT OF

9   WHAT HE CAN GATHER FROM THE PHOTOGRAPHS, HE KNOWS THAT

10  TRAVIS WAS PUT INTO THE SHOWER.  HE ALSO KNOWS THAT FROM

11  READING THROUGH THE POLICE REPORTS THAT THE GUN WAS NOT

12  FOUND.  HE KNOWS THAT THE CAMERA WAS FOUND IN THE WASHER.

13  SO THAT THERE'S THIS DISCONNECT BETWEEN KNOWING TO TAKE

14  THE GUN, BUT NOT KNOWING TO TAKE THE CAMERA.  THAT'S WHAT

15  HE'S GOING TO TALK ABOUT.  IT'S NOT JUST NECESSARILY THE

16  CRIME SCENE PHOTOGRAPHS.  IT'S EVERYTHING THAT HE KNOWS.

17         THE COURT:  AND HE'LL TESTIFY THAT THESE THINGS

18  SUPPORT HIS DIAGNOSIS?

19         MS. WILLMOTT:  YES.

20         MR. MARTINEZ:  AND WHEN MY EXPERT COMES UP HERE

21  AND SAYS THESE ARE INDICATIVE OF PLANNED, THEN THE DOOR IS

22  WIDE OPEN -- WELL, HOLD ON.

23         SHE WILL SAY THAT THIS WAS PLANNED.  SHE WILL

24  SAY THIS WAS WHATEVER WORD WE CAN USE FOR PREMEDITATED

25  THAT ISN'T PREMEDITATED, THAT'S WHAT WE CAN REBUT IT WITH.

93

1          MS. WILLMOTT:  BASICALLY WHAT THE STATE'S SAYING

2   IS THEY'RE OKAY IF THEY VIOLATE THE RULES.  BUT I'M NOT

Page 79

Transcript of Testimony of Dr. Richard Samuels

3    ALLOWED TO USE A WORD THAT IS LIKE EXPRESSIVE OR

4    INSTRUMENTAL WHICH MEANS PREMEDITATED AND VERSUS NOT

5    PREMEDITATED.  BUT YET THEY'RE ALLOWED TO DO THAT.

6          THE COURT:  I'M NOT GOING TO COMMENT ON WHAT THE

7    STATE'S EXPERT CAN OR CANNOT DO BECAUSE DON'T KNOW WHAT IS

8    GOING TO HAPPEN IN THE INTERIM.  BUT I'LL ALLOW YOU TO ASK

9    HIM QUESTIONS ABOUT WHAT THE CRIME SCENE PHOTOGRAPHS

10   SUPPORT HIS DIAGNOSIS IF THAT'S WHAT HE'S GOING TO SAY.

11         MS. WILLMOTT:  ALL RIGHT.

12         MR. MARTINEZ:  AND AGAIN I'M GOING TO BE ABLE TO

13   ASK MY EXPERT, WHAT IN THE CRIME SCENE DID NOT SUPPORT

14   THAT AND THE SUPPORT THAT IT WAS PLANNED.  IF THAT'S WHAT

15   THEY WANT TO DO, THEY'RE WELL ADVISED YOU CAN'T HAVE IT

16   BOTH WAYS.

17         MR. NURMI:  WELL YOU CAN'T CREATE -- YOU KNOW,

18   THERE'S A BLATANT MISCHARACTERIZATION OF WHAT'S GOING ON

19   HERE.  THIS IS AGAIN CUSTOMARY.  HE TAKES WHAT WE'RE

20   TRYING TO TESTIFY TO AND TURNS IT INTO SOMETHING ELSE.

21         THE COURT:  I'M NOT GOING TO DO A TIT FOR TAT

22   HERE I'M GOING TO ALLOW HIM TO TESTIFY.  IF HIS TESTIMONY

23   IS GOING TO BE THAT THESE CRIME SCENE PHOTOGRAPHS SUPPORT

24   HIS DIAGNOSIS, I'LL ALLOW THEM TO TESTIFY ABOUT THAT IF

25   YOU ARE AVOWING THAT'S WHAT HE'S GOING TO SAY.

94

1          MR. NURMI:  RIGHT.  BUT IF THE COURT'S SAYING

2    YOU'RE GOING TO LET THE STATE'S EXPERT COME IN AND WITH --

3    SHE COULD SAY THAT IT'S NOT ACUTE ANXIETY DISORDER THAT'S

4    WHAT WE'RE TALKING ABOUT HERE, ACUTE ANXIETY DISORDER,

5    WE'RE NOT TALKING ABOUT PREMEDITATION.  IF THE STATE'S

6    GOING TO LET THE DOCTOR COME IN, THE STATE'S DOCTOR COME

7    IN WHO HAS NO EXPERIENCE AS A CRIMINOLOGIST AND VERY

Transcript of Testimony of Dr. Richard Samuels

```
 8   LITTLE AS PSYCHOLOGIST TO COME IN AND SAY THIS WAS A
 9   PRE-PLANNED MURDER BASED ON WHAT, SHE DOESN'T KNOW THEN --
10           THE COURT:  WELL, I'M NOT GOING TO ALLOW THAT.
11           MR. NURMI:  OKAY.  THAT'S WHAT IT STATE IS
12   INDICATING THEY'RE PLANNING ON DOING.
13           MR. MARTINEZ:  LET'S JUST HEAR WHAT HE HAS TO
14   SAY.  I'M JUST PUTTING THEM ON NOTICE SO THAT LATER ON
15   WHEN WE'RE HERE ARGUING ABOUT THE STATE IS BEYOND THE
16   SCOPE OF WHAT THIS INDIVIDUAL TESTIFIES TO.
17           THE COURT:  ALL RIGHT.
18           (OPEN COURT.)
19           THE COURT:  OBJECTION OVERRULED.  YOU MAY
20   CONTINUE.  YOU MAY CONTINUE.
21       A.   COULD YOU REPEAT THE QUESTION?
22   BY MS. WILLMOTT:
23       Q.   YES.  BECAUSE I DON'T EVEN REMEMBER WHAT IT WAS.
24   OKAY.
25              WHAT I WANT TO TALK TO YOU ABOUT -- WE
                                                        95


 1   TALKED ABOUT WHAT YOU LOOKED AT IN TERMS OF THE POLICE
 2   REPORTS AND LISTENED TO THE INTERVIEWS; IS THAT CORRECT?
 3       A.   YES.
 4       Q.   AND YOU LOOKED AT THE CRIME SCENE PHOTOS?  IS
 5   THAT A YES?
 6       A.   YES.  THAT'S, YES, SORRY.
 7       Q.   I SAW YOU SHAKING YOUR HEAD.
 8              AND YOU ALSO SPOKE WITH MS. ARIAS?
 9       A.   I DID.
10       Q.   OKAY.  AND BASED ON ALL THIS INFORMATION IS
11   THERE SOMETHING ABOUT THIS CRIME SCENE THAT TELLS YOU MORE
```

Page 81

Transcript of Testimony of Dr. Richard Samuels

12    ABOUT OR SUPPORTS YOUR DIAGNOSIS FOR PTSD AND THE

13    LIKELIHOOD OF ACUTE STRESS?

14         A.   CERTAINLY.  PTSD WAS NOT DIAGNOSED UNTIL AFTER

15    THE EVENT.  BUT THERE IS SOME INDICATION THAT SHE WAS IN A

16    STATE OF ACUTE STRESS.

17         Q.   OKAY.  THAT'S WHAT I WANT TO TALK ABOUT, THE

18    INDICATIONS THAT SHE WAS IN A STATE OF ACUTE STRESS.

19         A.   YES.

20         Q.   OKAY.  SO WHAT IS IT, BASED ON YOUR REVIEW OF

21    THINGS, WHAT IS IT THAT INDICATED THAT SHE WOULD BE IN A

22    STATE OF ACUTE STRESS?

23         A.   WELL, THERE WAS A CERTAIN IRRATIONALITY TO --

24              MR. MARTINEZ:  OBJECTION.  STATE OF MIND,

25    IRRATIONALITY.

                                              96


 1              THE COURT:  SUSTAINED.

 2    BY MS. WILLMOTT:

 3         Q.   LET ME ASK YOU SPECIFICALLY, I THINK I KNOW

 4    WHERE YOU WERE GOING.  IS THERE --

 5              MR. MARTINEZ:  OBJECTION AS TO COUNSEL'S

 6    STATEMENTS OR WHERE HE WAS GOING.

 7              THE COURT:  SUSTAINED.

 8    BY MS. WILLMOTT:

 9         Q.   OKAY.  THERE WAS -- ARE YOU AWARE WHETHER OR NOT

10    A GUN WAS FOUND AT THE SCENE?

11         A.   NO.  NO GUN WAS FOUND AT THE SCENE.

12         Q.   OKAY.  AND ARE YOU AWARE THAT MS. ARIAS HAS A

13    VAGUE MEMORY OF GETTING RID OF IT?

14         A.   YES.

15         Q.   AND ARE YOU AWARE THAT THE CAMERA WAS FOUND AT

16    THE SCENE?

Transcript of Testimony of Dr. Richard Samuels

17      A.   YES.

18      Q.   AND ARE YOU AWARE THAT MS. ARIAS IS A

19  PHOTOGRAPHER?

20      A.   YES.

21      Q.   ARE YOU AWARE THAT WHEN THE CAMERA WAS FOUND, IT

22  WAS FOUND IN A WASHER?

23      A.   YES.

24      Q.   AND ARE YOU AWARE THAT AS PART OF THE CAMERA,

25  THE SD CARD WAS STILL INSIDE?

                                                        97


1       A.   YES.  I WAS AWARE OF THAT.

2       Q.   AND ARE YOU AWARE THE SD CARD WAS NOT TRAMPLED

3   ON OR RUINED IN ANY WAY?

4       A.   YES.

5       Q.   ARE YOU AWARE MS. ARIAS TOOK THE ROPE THAT WAS

6   USED TO TIE HER UP EARLIER IN THE DAY?

7       A.   YES.

8       Q.   AND ULTIMATELY LEFT THE CAMERA?

9       A.   YES.

10      Q.   WHAT ABOUT IN THE CRIME SCENE PHOTOS, BASED

11  ON -- BASED ON THE BLOOD IN DIFFERENT AREAS OF THE

12  BATHROOM AND IN HALLWAY, WHAT DOES THAT TELL YOU ABOUT A

13  STRUGGLE OCCURRING?

14          MR. MARTINEZ:  OBJECTION.  LACK OF FOUNDATION.

15  HE'S NOT A BLOOD SPATTER EXPERT.  AND STATE OF MIND, WHERE

16  THE STRUGGLE MAY HAVE HAPPENED, HE DOESN'T KNOW.

17          THE COURT:  SUSTAINED AS PHRASED.

18  BY MS. WILLMOTT:

19      Q.   THE FACT THAT THERE'S BLOOD IN MORE THAN ONE

20  AREA, DOES THAT MEAN THAT, TO YOU, THAT THERE WAS MOVEMENT

Page 83

Transcript of Testimony of Dr. Richard Samuels

21   IN THE BATHROOM?

22          MR. MARTINEZ:  OBJECTION.  HE'S NOT AN EXPERT IN

23   BLOOD SPATTER INDICATING HOW THE BLOOD GOT THERE.

24          MS. WILLMOTT:  JUDGE, YOU DON'T NEED TO BE AN

25   EXPERT TO KNOW IF BLOOD IS IN DIFFERENT AREAS THAT THE

                                                      98


1    PERSON MOVED?

2           THE COURT:  COUNSEL, APPROACH PLEASE.

3           (SIDEBAR DISCUSSION.)

4           MR. MARTINEZ:  I DON'T KNOW ANY PSYCHOLOGISTS

5    THAT HAS ANY TRAINING THAT CAN TELL YOU THAT THERE'S BLOOD

6    HERE AND THERE'S BLOOD THERE, HOW IT GOT THERE OR ANYTHING

7    LIKE THAT.  HE CAN BE TOLD THERE WAS BLOOD HERE AND THERE

8    WAS BLOOD THERE, BUT HE CAN'T OPINE AS TO THAT.

9           THE COURT:  WHAT ARE YOU TRYING TO GET TO?

10          MS. WILLMOTT:  JUST THE FACT THERE WAS A LOT OF

11   MOVEMENT IN THE BATHROOM, BASICALLY, THAT'S ALL, THAT

12   THERE WAS A LOT OF MOVEMENT GOING ON.  IT WASN'T JUST --

13   WHICH IS PART OF A FRENZIED ACT BASICALLY OR NOT AN ACT

14   BUT FRENZIED MOVEMENT.

15          THE COURT:  WELL, ESSENTIALLY YOU'RE ASKING IF

16   HE'S AWARE OF THE STATE'S THEORY OF HOW THE CRIME

17   OCCURRED, RIGHT?

18          MS. WILLMOTT:  NO.

19          THE COURT:  OKAY.  WHAT ARE YOU ASKING HIM?

20          MS. WILLMOTT:  JUST WHETHER OR NOT THE BASIS

21   THAT THERE THERE'S BLOOD CONTAINED IN THE BATHROOM AND

22   DOWN THE HALLWAY THAT THERE'S BLOOD IN DIFFERENT AREAS

23   THAT THAT MEANS THAT THERE WAS MOVEMENT BETWEEN THE

24   CHARACTERS INVOLVED.

25          MR. MARTINEZ:  SHE USED THE WORD FRENZIED WHICH

                         Page 84

Transcript of Testimony of Dr. Richard Samuels

99

1    GOES TO STATE OF MIND.  IF SHE USED IT, THAT'S WHAT HE'S
2    GOING TO SAY.
3            MS. WILLMOTT:  I CAN SPECIFICALLY ASK HIM, DOES
4    IT INDICATE A FRENZIED MOVEMENT?
5            MR. MARTINEZ:  THAT GOES TO STATE OF MIND.
6    BECAUSE THEN THAT INDICATES THAT IT'S HEAT OF PASSION.
7            THE COURT:  I'M TRYING TO UNDERSTAND THE POINT.
8    HOW DOES IT RELATE TO ACUTE ANXIETY?
9            MS. WILLMOTT:  WELL BECAUSE IT GOES TO
10   DISORGANIZATION BASICALLY.
11           THE COURT:  THEN ASK HIM IF THE SCENE WAS
12   DISORGANIZED.
13           MS. WILLMOTT:  OKAY.
14           (OPEN COURT.)
15           THE COURT:  YOU MAY CONTINUE.
16   BY MS. WILLMOTT:
17       Q.   OKAY.  BASED ON THE CRIME SCENE PHOTOS THAT YOU
18   REVIEWED DID THE CRIME SCENE -- DID THE BATHROOM AREA AND
19   THE HALLWAY, DID IT SEEM DISORGANIZED TO YOU?
20       A.   YES, IT DID.
21       Q.   ARE YOU AWARE THAT MS. ARIAS' HANDPRINT WAS LEFT
22   ON THE WALL?
23       A.   YES.
24       Q.   AND ARE YOU AWARE THAT HER HAIR WAS FOUND?
25       A.   YES.

100

1        Q.   ARE YOU AWARE THAT ON THE CAMERA IN THE WASHER
2    WERE PICTURES OF MS. ARIAS?

Transcript of Testimony of Dr. Richard Samuels

3      A.   YES.

4      Q.   AND THEN --

5           MR. MARTINEZ:  OBJECTION.  MISSTATES TESTIMONY,

6   PICTURES THAT WERE DELETED.

7           THE COURT:  OVERRULED.

8   BY MS. WILLMOTT:

9      Q.   THANK YOU.  ULTIMATELY MR. ALEXANDER'S BODY

10  WAS -- WHERE WAS IT FOUND?

11     A.   HE WAS FOUND IN THE TUB.

12     Q.   IN THE TUB OR SHOWER?

13     A.   THE SHOWER.

14     Q.   OKAY.  AND FOUND IN THE SHOWER, BASED ON YOUR

15  READING OF THE REPORT AND EVERYTHING THAT YOU KNEW WAS

16  THAT -- WAS HE PUT THERE?

17     A.   YES.

18     Q.   AND BASED ON WHAT WE KNOW, IT WOULD HAVE BEEN

19  MS. ARIAS THAT WOULD HAVE HAD TO DO IT, RIGHT?

20     A.   YES.

21     Q.   SO WHAT DOES IT TAKE FOR SOMEONE THE SIZE OF MS.

22  ARIAS TO PUT SOMEONE THE SIZE OF MR. ALEXANDER INTO A

23  SHOWER?

24          MR. MARTINEZ:  OBJECTION.  LACK OF FOUNDATION.

25  HE'S NOT A SCENE RECONSTRUCTIONIST.  HE DOESN'T KNOW WHERE

                                                        101

1   SHE'S WORKED OUT.  HE DOESN'T KNOW WHAT SHE LOOKED LIKE AT

2   THAT TIME, CAN'T POSSIBLY KNOW THAT.

3           THE COURT:  SUSTAINED AS PHRASED.

4   BY MS. WILLMOTT:

5      Q.   DO YOU KNOW IF IT WOULD TAKE A GREAT DEAL OF

6   STRENGTH FOR SOMEONE TO LIFT UP SOMEONE HEAVIER THAN THEY

7   ARE?

Transcript of Testimony of Dr. Richard Samuels

8          MR. MARTINEZ:  OBJECTION.  RELEVANCE AND BEYOND

9   THE SCOPE OF HIS TEACHINGS AS A PSYCHOLOGIST.

10          THE COURT:  OVERRULED.  YOU MAY ANSWER.

11      A.   YES.  IT WOULD TAKE A GREAT DEAL OF STRENGTH, OF

12   EXCESSIVE STRENGTH FOR SOMEONE MS. ARIAS' SIZE.

13          MR. MARTINEZ:  OBJECTION.  LACK OF FOUNDATION AS

14   TO WHAT MS. ARIAS' SIZE WAS.  OBJECTION.  LACK OF

15   FOUNDATION AS TO HOW MUCH MR. ALEXANDER WEIGHED.

16          THE COURT:  SUSTAINED AS TO FOUNDATION.

17   BY MS. WILLMOTT:

18      Q.   DR. SAMUELS, WHEN YOU MET MS. ARIAS THIS WAS,

19   WHAT, IN DECEMBER OF 2009?

20      A.   NINE, YES.

21      Q.   OKAY.  AND HAVE YOU SEEN PHOTOS OF WHAT MS.

22   ARIAS LOOKED LIKE IN 2008?

23      A.   YES.

24      Q.   AND DID YOU SEE PHOTOS OF WHAT MR. ALEXANDER

25   LOOKED LIKE IN 2008?

                                              102

1      A.   YES.

2      Q.   WAS BASED ON THOSE PHOTOS WAS MR. ALEXANDER

3   BIGGER THAN MS. ARIAS?

4      A.   YES, YES.

5      Q.   AND SO IN ORDER FOR SOMEONE WHO IS SMALLER LIKE

6   MS. ARIAS TO PICK UP OR MOVE SOMEONE WHO IS BIGGER LIKE

7   MR. ALEXANDER, DOES THAT REQUIRE STRENGTH?

8          MR. MARTINEZ:  OBJECTION.  LACK OF FOUNDATION.

9   AGAIN, THAT'S BEYOND HIS EXPERTISE.  HE MAY HAVE SEEN

10   PHOTOGRAPHS.  HE DOESN'T HAVE WEIGHTS.  HE DOESN'T HAVE

11   HEIGHTS.

Transcript of Testimony of Dr. Richard Samuels

12          MS. WILLMOTT:  JUDGE, CAN WE NOT HAVE SPEAKING

13   OBJECTIONS?

14          THE COURT:  SUSTAINED.  APPROACH, PLEASE.

15          (SIDEBAR DISCUSSION.)

16          MS. WILLMOTT:  JUDGE, WITH REGARD TO THE

17   EXPERTISE IT DOESN'T TAKE AN EXPERT TO SAY WHETHER OR NOT

18   SOMEONE SMALLER NEEDS STRENGTH TO LIFT UP SOMEONE BIGGER.

19          THE COURT:  ALL RIGHT.  I THINK A LAY PERSON CAN

20   OPINE ABOUT THAT IF HE AS GENERAL INFORMATION ABOUT THE

21   SIZE OF INDIVIDUALS.  DO YOU HAVE ANOTHER OBJECTION?

22          MR. MARTINEZ:  THAT WAS IT.

23          THE COURT:  OKAY.

24          (OPEN COURT.)

25          THE COURT:  YOU MAY CONTINUE.

                                            103

1   BY MS. WILLMOTT:

2       Q.   OKAY.  YOU WERE ALLOWED TO ANSWER THAT QUESTION.

3   I DON'T THINK YOU DID?

4       A.   NO.  TO ME IT WOULD TAKE A GREAT DEAL OF

5   STRENGTH.

6          MR. MARTINEZ:  OBJECTION.  LACK OF FOUNDATION,

7   GREAT DEAL OF STRENGTH.  LACK OF FOUNDATION.

8          MS. WILLMOTT:  I THINK WE JUST WENT OVER

9   FOUNDATION.

10          THE COURT:  OVERRULED.  YOU MAY CONTINUE.

11      A.   YES.  TO ME IT WOULD TAKE SOMEONE WITH A GREAT

12   DEAL OF STRENGTH TO MAKE A -- MOVE A BODY UNDER THOSE

13   CONDITIONS.

14   BY MS. WILLMOTT:

15      Q.   AND EARLIER YOU TALKED ABOUT -- AND THIS MIGHT

16   HAVE BEEN THURSDAY, EARLIER YOU HAD TALKED ABOUT PEOPLE

                          Page 88

Transcript of Testimony of Dr. Richard Samuels

17    WHO HAVE A GREAT DEAL OF STRENGTH LIKE THE STORIES WE HEAR

18    OF MOTHERS BEING ABLE TO LIFT A CAR OFF THEIR CHILD IN

19    GREAT PERIODS OF STRESS; IS THAT CORRECT?

20         A.   YES.

21         Q.   AND SO WHAT DOES IT TELL YOU THEN WHEN YOU HAVE

22    SOMEBODY IN PICTURES THAT YOU HAVE SEEN MS. ARIAS' SIZE

23    BEING ABLE TO LIFT UP SOMEONE THE SIZE OF MR. ALEXANDER

24    AND ACTUALLY PUT HIM INTO THE SHOWER?

25         A.   IT WOULD SUGGEST TO ME THAT SHE WAS INDEED IN A

                                                      104


1     STATE OF ACUTE STRESS AND THAT THE ADRENALINE WAS PUMPING

2     AND GLUCOSE WAS GOING INTO HER BODY.

3              SHE WAS -- IT SEEMED TO ME THAT SHE WAS IN

4     A FLIGHT OR FIGHT MODE.

5              MS. WILLMOTT:  THANK YOU, DOCTOR.  NO FURTHER

6     QUESTIONS.

7              THE COURT:  CROSS-EXAMINATION?

8

9                        CROSS-EXAMINATION

10

11    BY MR. MARTINEZ:

12         Q.   SIR, ONE OF THE THINGS THAT WE KNOW YOU TOLD US

13    THAT YOU WERE HIRED TO CONDUCT A PSYCHOLOGICAL EVALUATION,

14    RIGHT?

15         A.   YES.

16         Q.   AND THAT'S DIFFERENT THAN BEING HIRED FOR

17    THERAPEUTIC PURPOSES, RIGHT?

18         A.   YES.

19         Q.   YOU HAVE DONE BOTH OF THEM, HAVEN'T YOU?

20         A.   NO.

Transcript of Testimony of Dr. Richard Samuels

21    Q.   WELL, YOU HAVEN'T DONE ANY THERAPY?  I THOUGHT

22  IN THE COMPLAINT THAT YOU HAD YOU TREATED SOME PEOPLE?

23    A.   IN THIS CASE.

24    Q.   NOT IN THIS CASE, EVER, HAVE YOU EVER DONE ANY

25  THERAPY?

                                                        105


1     A.   SURE, YES.

2     Q.   SO THERE IS A DIFFERENCE, RIGHT?

3     A.   OH, YES.

4     Q.   AND IN THIS CASE THE FOCUS IS ON TRYING TO

5   REACH, IF YOU WILL, A DIAGNOSIS WITH REGARD TO A CERTAIN

6   EVENT, CERTAIN FACTS THAT ARE PRESENT, RIGHT?

7     A.   YES.

8     Q.   AND WITH TREATMENT, IT'S DIFFERENT, ISN'T IT?

9     A.   YES.

10    Q.   WITH TREATMENT YOU'RE TRYING TO HELP THE

11  INDIVIDUAL, CORRECT?

12    A.   USUALLY THERE'S A PROCESS OF DIAGNOSIS.

13    Q.   ARE YOU TRYING TO HURT THEM OR HELP THEM?

14         MS. WILLMOTT:  JUDGE, I WOULD ASK THAT HE BE

15  ALLOWED TO ANSWER THE QUESTION.

16         THE COURT:  SUSTAINED.

17    A.   COULD YOU PLEASE REPEAT YOUR QUESTION?

18  BY MR. MARTINEZ:

19    Q.   ARE YOU TRYING TO HELP THEM OR HURT THEM WHEN

20  YOU'RE TREATING THEM?

21    A.   OF COURSE, I'M TRYING TO HELP THEM.

22    Q.   AND IN THIS PARTICULAR CASE, SIR, ONE OF THE

23  THINGS THAT YOU DID WAS THAT YOU TOOK ON A LITTLE -- NOT A

24  LITTLE BIT, BUT YOU TOOK ON A TREATMENT WITH REGARD TO THE

25  DEFENDANT, DIDN'T YOU?

Page 90

Transcript of Testimony of Dr. Richard Samuels

106

1        A.    NO.  I DID NOT.

2        Q.    WELL, DO YOU REMEMBER THAT WE TALKED ABOUT A

3    SITUATION --

4              MS. WILLMOTT:  OBJECTION, YOUR HONOR.  MAY WE

5    APPROACH?

6              THE COURT:  YES, YOU MAY.

7              (SIDEBAR DISCUSSION.)

8              MS. WILLMOTT:  JUDGE, MY CONCERN IS THAT THIS

9    QUESTION IS GOING INTO MR. NURMI'S ATTEMPT TO WITHDRAW

10   FROM THE CASE EARLIER, A COUPLE OF YEARS AGO.

11             MR. MARTINEZ:  I'M NOT GOING TO TALK ABOUT

12   SPECIFICALLY ABOUT MR. NURMI'S ATTEMPT TO WITHDRAW FROM

13   THE CASE, IT DOES INVOLVE THAT CIRCUMSTANCE, BUT NOWHERE

14   DOES IT MENTION WHY SHE WAS DEPRESSED.  IF YOU WANT I CAN

15   SHOW YOU THE CLIP.  I'M GOING TO PLAY IT FOR HIM RIGHT

16   NOW.  IT HAS NOTHING TO DO WITH IT.  I CAN ASK HIM WHY HE

17   WENT TO TREAT HER AND I'M NOT GOING TO ASK WHY HE WENT TO

18   TREAT HER.  ALL I KNOW IS HE WENT TO TREAT HER.

19             MS. WILLMOTT:  WHAT CLIP IS THAT?

20             MR. MARTINEZ:  OKAY.  HIS STATEMENT TO ME WHEN

21   WE WERE HAVING AN INTERVIEW.

22             MR. NURMI:  THE INTERVIEW THE OTHER DAY?

23             MR. MARTINEZ:  NO.

24             THE COURT:  OKAY.

25             MR. NURMI:  WHILE I'M UP HERE, JUDGE, I WANT TO

107

1    MAKE AN ORAL MOTION.  I REQUESTED A COPY OF THE INTERVIEW,

2    THE TAPE RECORDING OF THE INTERVIEW THAT MR. MARTINEZ DID

Transcript of Testimony of Dr. Richard Samuels

3    WITH DR. SAMUELS.  I BELIEVE IT WAS LAST THURSDAY.  AND I

4    HAVE YET TO RECEIVE A COPY OF THAT.

5         MR. MARTINEZ:  ONCE I GET IT, YOU CAN GET.  I

6    DIDN'T TAKE IT.  I DIDN'T HAVE THE TAPE RECORDER.  WHEN

7    YOU PULLED THE STUNT IN THE INTERVIEW, THE ONLY PERSON

8    WITH THE TAPE RECORDER WAS DETECTIVE FLORES.  HOLD ON.

9    I'M NOT DONE.  WHEN I GET IT, I'LL TURN IT OVER.

10         MS. WILLMOTT:  THAT'S NOT TRUE.  THERE WERE TWO

11    RECORDERS ON THE TABLE.

12         MR. MARTINEZ:  AND ONE OF THEM MALFUNCTIONED.

13         MS. WILLMOTT:  THAT'S WHAT YOU'RE SAYING SO

14    THERE WERE TWO RECORDERS BUT YOURS DIDN'T WORK.

15         MR. MARTINEZ:  NO.  THAT WAS NOT MY TAPE

16    RECORDER.  THAT WAS DETECTIVE FLORES'S TAPE RECORDER AND

17    THAT WAS HIS TELEPHONE.  AND THAT'S NOT THE ISSUE THAT

18    WE'RE HERE ABOUT.

19         MR. NURMI:  IT'S IMMATERIAL, IT'S IN POSSESSION

20    OF THE STATE.  THE CASE LAW SAYS THAT SOMEONE WORKING FOR

21    THE STATE -- IT'S JUST AS IF MARTINEZ -- MR. MARTINEZ HAS

22    IT HIMSELF.

23         THE COURT:  WE CAN RECESS EARLY AND RESOLVE

24    THESE ISSUES.

25         (OPEN COURT.)

                                        108


1         THE COURT:  LADIES AND GENTLEMEN, WE'RE GOING TO

2    TAKE AN EARLY RECESS.  PLEASE BE BACK IN THE DESIGNATED

3    AREA AT 10 MINUTES AFTER 3:00.  PLEASE REMEMBER THE

4    ADMONITION.  YOU'RE EXCUSED.

5         (JURY RETIRED.)

6         THE COURT:  THE RECORD WILL SHOW THE JURY HAS

7    LEFT THE COURTROOM.  MR. NURMI?

Transcript of Testimony of Dr. Richard Samuels

8            MR. NURMI:  YOUR HONOR, THE STATE KNOWS THAT
9    THERE'S A MOTION IN LIMINE FILED REGARDING MY WITHDRAWAL
10   AND ALL THE CIRCUMSTANCES AROUND IT.  IT IS TRYING TO
11   PARSE AROUND THIS IDEA BY SAYING THAT DR. SAMUELS WENT
12   THERE BECAUSE MS. ARIAS WAS DEPRESSED, STILL NOT IN A
13   THERAPEUTIC ROLE, BUT HE KNOWS THE FULL EXPLANATION OF
14   WHICH GETS INTO AN AREA FOR WHICH THERE IS NO RETORT
15   WITHOUT VIOLATING THE MOTION IN LIMINE.
16           SO OBVIOUSLY THE STATE IS TRYING TO SET UP A
17   SITUATION OF AN UNFAIRNESS TO MS. ARIAS.  UNDER THE SIXTH
18   AMENDMENT AND TROMBETTA TO KEEP GOING INTO AN AREA WHICH
19   HE KNOWS THE RESPONSE WOULD GO INTO A PROHIBITED AREA.
20   PUTTING THAT -- DOING THAT WHILE CLEVER IS NOT CONSISTENT
21   WITH HER SIXTH AMENDMENT RIGHTS AND HER DUE PROCESS RIGHTS
22   TO A FAIR TRIAL.
23           SO YOUR HONOR, BASED ON THAT, GOING INTO AN AREA
24   WOULD WITH THE EXPLANATION OF WHICH VIOLATES A PRE-TRIAL
25   RULING OF THIS COURT IS JUST AS AGREGES AS -- IF NOT MORE
                                                         109


1    SO THAN GOING INTO THE AREA ITSELF.
2            WE ASK THIS COURT TO HOLD THE STATE ACCOUNTABLE
3    IN THIS INSTANCE TO NOT HAVE THEM VIOLATE MS. ARIAS'
4    RIGHTS IN THIS MANNER AND UPHOLD ITS PRE-TRIAL RULING.
5            THE COURT:  ALL RIGHT.  ON THAT ISSUE?
6            MR. MARTINEZ:  THE CLIP THAT I WANT TO PLAY AND
7    THE BACKGROUND OF IT IS THAT, THIS IS AN INDIVIDUAL WHO IS
8    HIRED AT TAXPAYER MONEY TO GO IN AND CONDUCT AN ASSESSMENT
9    WHEN THE DEFENDANT IS DEPRESSED, I THINK IN VIOLATION OF
10   THAT MANDATE THAT HE GO AND ASSESS HER.  WHAT HAPPENS IS
11   THIS IS THE EXCHANGE THAT HE AND I HAD WITH REGARD TO THAT

Transcript of Testimony of Dr. Richard Samuels

12   ISSUE.  HIS ANSWER WAS, AND, UM, THAT WAS A BIG ISSUE.

13   AND I SAID, OKAY.  AND THEN HE SAID, SHE WAS VERY UPSET, I

14   DON'T -- THIS WAS NOT REALLY PLANNED.  I SAID, OKAY.  AND

15   MY ANSWER -- HIS ANSWER WAS, BUT I, IN RESPONSE TO HER

16   DEPRESSION AND BEING UPSET, I WAS ASKED TO GO IN TO TALK

17   TO HER.  AND I SAID, OKAY, AND THEN DID -- AND HE SAID, SO

18   I DON'T KNOW HOW MUCH RELATIVE TO THE CASE.  I'M ALLOWED

19   TO GO INTO THIS PARTICULAR AREA WHERE HE HAS ASSUMED A

20   TREATMENT ROLE, NOT ONLY DID HE DO THAT WITH REGARD TO

21   THIS PARTICULAR ISSUE, HE ALSO SENT HER GIFTS AND THAT

22   SORT OF THING.

23            THIS IS JUST PART OF THAT WHERE HE CROSSED THE

24   LINE AGAIN, WHERE HE BLURRED THE LINE BETWEEN BEING

25   SOMEONE WHO TREATS AND SOMEONE WHO IS THERE TO EVALUATE.

                                                    110


 1            THE COURT:  MS. WILLMOTT?

 2            MS. WILLMOTT:  JUDGE, AT THE TIME THAT -- I

 3   BELIEVE THAT THAT MR. MARTINEZ IS TALKING ABOUT, IT'S NOT

 4   A COMPLETE TRANSCRIPT.  WHAT THEY'RE DOING DURING THAT

 5   INTERVIEW IS HE'S GOING THROUGH DR. SAMUELS' NOTES.  MR.

 6   MARTINEZ IS GOING THROUGH DR. SAMUELS' NOTES ASKING HIM

 7   WHAT HE MEANS BY THAT.  HE SAYS IN RESPECT -- TALKING

 8   ABOUT -- NO, KIRK LEAVES AROUND THE 28TH, THIS IS WHEN

 9   KIRK'S STATUS CHANGED AND SO THAT WAS A BIG ISSUE.  SHE

10   WAS VERY UPSET.  I DON'T -- THIS WAS NOT REALLY PLANNED,

11   RIGHT?  AND THEN MR. MARTINEZ SAYS, RIGHT.  AND THEN THE

12   FULL PARAGRAPH IS, DR. SAMUELS SAYS, IN RESPECT TO HER

13   DEPRESSION AND BEING UPSET, I WAS ASKED TO GO AND TALK TO

14   HER, DON'T KNOW HOW MUCH RELEVANCE TO THE CASE IT IS.  SHE

15   SAID THAT SHE FELT NO HOPE AFTER KIRK ANNOUNCED THAT HE

16   WAS -- AND MR. MARTINEZ INTERRUPTS HIM.  WHAT IS THIS

                          Page 94

Transcript of Testimony of Dr. Richard Samuels

17  SERVED A CARD AT THE TOP?  AND THEY A TALK ABOUT SEND A

18  CARD -- OH, SEND A CARD AND HE'S LOOKING AT HIS NOTES.

19  HE'S ASKING DR. SAMUELS TO GIVE HIS NOTES -- EXPLAIN WHAT

20  HIS NOTES MEAN.  THAT'S ALL THAT'S SAID ABOUT IT.

21          BUT IT IS CLEARLY SPECIFICALLY ABOUT MR. NURMI,

22  WHEN THERE WAS A POSSIBILITY THAT HE WAS GOING TO LEAVE

23  THE CASE AND NOW -- AND THAT'S SPECIFICALLY AS TO HER

24  DEPRESSION.  IT DOESN'T TALK ABOUT HIM TREATING HER

25  DEPRESSION.  IT WAS JUST THAT HE WAS ASKED TO GO AND SPEAK

                                                    111


1   WITH HER.

2           THERE'S NO THERAPY INVOLVED.  I CAN'T FOLLOW UP

3   ON THIS THAT THERE WAS -- ADEQUATELY FOLLOW UP ON THIS

4   WITH HIM ON REDIRECT BECAUSE OF WHAT IT GOES INTO.  IT'S

5   COMPLETELY IRRELEVANT.

6           MR. MARTINEZ:  JUDGE, HE CAN TELL US THAT THERE

7   WAS NO THERAPY INVOLVED.  HE JUST DOESN'T HAVE TO TELL US

8   WHAT THE SUBJECT WAS.  I'M NOT ASKING HIM WHAT THE SUBJECT

9   WAS.  HE CAN SAY, NO, THERE WASN'T ANY THERAPY INVOLVED.

10  I JUST SPENT AN HOUR, TWO HOURS, HOWEVER LONG HE SPENT

11  THERE AND, YOU KNOW, THAT'S THE KIND OF THING THAT IS

12  ALLOWABLE IN CROSS-EXAMINATION.

13          ADDITIONALLY, THE FACT THAT HE'S SENDING HER

14  CARDS AND THAT SORT OF THING, AGAIN THAT GOES TO THE

15  TREATMENT ASPECT NOT AN ASSESSMENT ASPECT AND GOES TO SHOW

16  HIS BIAS.

17          MS. WILLMOTT:  JUDGE, THEREIN LIES THE PROBLEM.

18  IF HE'S NOT GOING TO ASK HIM AND HE SHOULDN'T BE ALLOWED

19  TO ASK HIM WHAT THE DEPRESSION WAS OVER AND WHY HE WAS

20  ASKED TO GO TALK TO HER, THAT'S THE PROBLEM IS HE CAN'T

Transcript of Testimony of Dr. Richard Samuels

21   ASK THAT QUESTION BECAUSE THAT QUESTION IS COMPLETELY

22   IRRELEVANT AND PREJUDICIAL TO MS. ARIAS.

23          SO WE CAN'T GO INTO THAT.  SO THEN THE JURY IS

24   LEFT WITH THIS CONFUSION AND PREJUDICIAL INFORMATION THAT

25   SHE WAS HAVING DEPRESSION AND THAT HE WAS ASKED TO GO

112

1    SPEAK WITH HER.  THAT'S NOT THE TRUTH.  THAT'S NOT THE

2    CASE.

3          THE COURT:  MR. MARTINEZ?

4          MR. NURMI:  AND JUDGE, I HAVE TO SAY AS IT GOES

5    ON BECAUSE I KNOW MS. WILLMOTT WASN'T PRESENT DURING THIS

6    INTERVIEW.  AS DR. SAMUELS COULD EXPLAIN AND WOULD HAVE TO

7    EXPLAIN, YOU KNOW, MR. MARTINEZ COMPLETELY

8    MISCHARACTERIZED WHAT WAS SAID.

9          THE CARD WAS INTENDED FOR ME, NOT MS. ARIAS.

10   AND HE'S SAYING THAT HE'S SENDING HER CARDS.  AGAIN,

11   THAT'S COMPLETELY INAPPROPRIATE AND IT WOULD GO RIGHT INTO

12   THAT AREA OF ME LEAVING THE CASE.  SO IT'S AGAIN A

13   MISCHARACTERIZATION WHICH IS HABITUAL, BUT CERTAINLY

14   ILLUSTRATIVE OF THE IDEA THAT RETORT ON THIS OPENS UP A

15   PREVIOUSLY PRECLUDED AREA.  AND THE SIN IS JUST AS GREAT,

16   WHAT THE STATE IS ATTEMPTING TO DO.

17         MR. MARTINEZ:  I WAS THERE.  THE CARD WAS SENT

18   TO HELP HER FEEL BETTER, HAD NOTHING TO DO WITH HIM.

19   SO --

20         THE COURT:  ALL RIGHT.  MR. MARTINEZ, THE POINT

21   IS THAT YOU'RE TRYING TO MAKE THAT THERAPY WAS PROVIDED --

22         MR. MARTINEZ:  RIGHT.

23         THE COURT:  -- BY DR. SAMUELS?

24         MR. MARTINEZ:  UM-HUM.  YES.  AND HE DID.  HE

25   WENT TO SEE HER ABOUT HER DEPRESSION.  AND THEN HE

Page 96

Transcript of Testimony of Dr. Richard Samuels

113

1    PROVIDED A CARD.  AND IT'S NOT THE ONLY OCCASION THAT HE'S
2    DONE IT.  HE'S DONE IT ON ANOTHER OCCASION.
3           THE COURT:  FROM THE DEFENSE, WHY IS IT
4    NECESSARY TO TALK ABOUT THE SUBJECT MATTER DISCUSSED IF
5    THE POINT IS ONLY THAT DR. SAMUELS PROVIDED THERAPY TO THE
6    DEFENDANT.
7           MS. WILLMOTT:  THAT'S THE POINT.  HE DIDN'T
8    PROVIDE THERAPY BECAUSE THIS WASN'T A DEPRESSION IN THE
9    SENSE THAT AN ACTUAL DEPRESSION WHERE SHE'S GOING TO BE
10   DIAGNOSED WITH DEPRESSION, AND THEREFORE, NEEDS THERAPY.
11   IT'S THE FACT THAT THIS NEWS CAUSED GREAT PROBLEMS FOR MS.
12   ARIAS AND HOW SHE FELT ABOUT HERSELF AND HOW SHE FELT
13   ABOUT THE CASE.  AND IT CAUSES PROBLEMS THEN WITH
14   COMMUNICATION BETWEEN CLIENT AND ATTORNEY.  AND SO THAT'S
15   THE GREATER ISSUE, JUDGE.
16          IT HAS ABSOLUTELY NO RELEVANCE TO THERAPY
17   BECAUSE THERE WAS NO THERAPY.  AND AGAIN, WITH THIS CARD
18   ISSUE, THE REST OF THE TRANSCRIPT BEARS OUT THAT THE
19   CARD'S TALKING ABOUT MR. NURMI.
20          THE COURT:  DR. SAMUELS, DID YOU PROVIDE THERAPY
21   TO THE DEFENDANT IN THIS INSTANCE?
22      A.   NO.  OF COURSE NOT.
23          THE COURT:  ALL RIGHT.  I'M GOING TO SUSTAIN THE
24   OBJECTION TO THAT QUESTION.
25          NOW, WITH REGARD TO THE OTHER ISSUE DISCUSSED AT

114

1    THE BENCH, THE COPY OF THE INTERVIEW.  MR. NURMI?
2           MR. NURMI:  OH, YES.

Transcript of Testimony of Dr. Richard Samuels

3    THE COURT:  DETECTIVE FLORES, DO YOU HAVE A COPY

4   OF AN INTERVIEW THAT WAS CONDUCTED LAST THURSDAY,

5   RECORDING?

6    DETECTIVE FLORES:  YES, I'LL PROVIDE THAT

7   TOMORROW.

8    THE COURT:  FIRST THING TOMORROW MORNING.

9    DETECTIVE FLORES:  YES, FIRST THING.

10    THE COURT:  ALL RIGHT.  IS THERE ANYTHING ELSE

11   BEFORE THE BREAK?

12    MR. NURMI:  NOTHING, YOUR HONOR.

13    THE COURT:  WE'RE AT RECESS.

14    (A RECESS WAS HELD).

15    THE COURT:  THE RECORD WILL SHOW THE PRESENCE OF

16   THE JURY, THE DEFENDANT AND ALL COUNSEL.

17    MR. MARTINEZ, YOU MAY CONTINUE WITH

18   CROSS-EXAMINATION.

19   BY MR. MARTINEZ:

20    Q.   SIR, ISN'T IT TRUE THAT ON A SEPARATE OCCASION

21   YOU ACTUALLY PROVIDED THE DEFENDANT WITH A GIFT?

22    A.   NO.

23    Q.   WELL, SIR, DO YOU REMEMBER PROVIDING HER WITH A

24   BOOK CALLED ERRONEOUS ZONES?

25    A.   YES.

                                                115

1    Q.   AND THAT WAS SOMETHING THAT YOU PROVIDED TO HER,

2   RIGHT?

3    A.   IT WAS MAILED TO HER, YES.

4    Q.   WHICH MEANS YOU PROVIDED IT TO HER, CORRECT?

5    A.   YES.

6    Q.   AND YOU PROVIDED IT TO HER BECAUSE AT THAT POINT

7   YOU BELIEVED THAT SHE WAS DEPRESSED, RIGHT?

**Page 98**

Transcript of Testimony of Dr. Richard Samuels

8      A.   NO.

9      Q.   WELL, LET'S TAKE A LOOK AT WHAT YOUR TESTIMONY

10  WAS AND SEE IF THIS REFRESHES YOUR RECOLLECTION.   THIS IS

11  EXHIBIT 532.   TAKE A LOOK AT THE HIGHLIGHTED PORTION.

12     A.   YES.   THAT IS WHAT I SAID BUT ACTUALLY --

13     Q.   WELL, SIR, THAT WAS THE QUESTION.   ISN'T IT TRUE

14  THAT YOU SAID THAT THE REASON YOU PROVIDED IT TO HER WAS

15  BECAUSE SHE WAS DEPRESSED?

16     A.   I SAID THIS HERE.

17     Q.   OKAY.   THANK YOU.

18     A.   OKAY.

19     Q.   YOU'RE CONDUCTING AN EVALUATION OF THIS WOMAN,

20  CORRECT?

21     A.   YES.

22     Q.   AND PROVIDING AN EVALUATION, AS PART OF

23  PROVIDING AND EVALUATION, YOU'RE ALSO PROVIDING A

24  SELF-HELP BOOK, RIGHT?

25     A.   YES.

                                              116


1      Q.   AND THIS SELF-HELP BOOK TALKS ABOUT POSITIVE AND

2   PRACTICAL ADVICE FOR BREAKING FREE FROM THE TRAP OF

3   NEGATIVE THINKING AND ENJOYING LIFE TO THE FULLEST, RIGHT?

4      A.   YES.   THAT WAS FOR HER LOW SELF ESTEEM.

5      Q.   RIGHT.   AND THIS IS BY SOMEBODY NAMED DR.

6   WAYNE -- OR WRITTEN BY SOMEBODY NAMED DR. WAYNE W. DYER,

7   CORRECT?

8      A.   YES.

9      Q.   ALSO TALKS ABOUT IF YOU ARE PLAGUED BY GUILT OR

10  WORRY AND FIND YOURSELF UNWITTINGLY FALLING INTO THE SAME

11  OLD DISRUPTIVE PATTERNS THEN ERRONEOUS ZONES IS THE BOOK

Page 99

Transcript of Testimony of Dr. Richard Samuels

12  FOR YOU, RIGHT?

13     A.   YES.

14     Q.   HOW IS PROVIDING -- WELL, PROVIDING A SELF-HELP

15  BOOK REALLY DOESN'T COME UNDER THE AUSPICES OR UNDER THE

16  COVERAGE, IF YOU WILL, OF AN EVALUATION, DOES IT?

17     A.   NOT NECESSARILY.

18     Q.   WELL, NO, NOT NECESSARILY MEANS IT DOESN'T,

19  RIGHT?

20     A.   NO.

21     Q.   AND -- BUT YOU WERE THERE TO TRY TO ASSESS HER

22  OR EVALUATE HER AS IT PERTAINED TO THIS PARTICULAR CASE,

23  RIGHT?

24     A.   YES.

25     Q.   AND YOU WOULD AGREE THAT IF YOU WERE THERE TO DO

117

1  THAT AND NOW YOU'RE TRYING TO HELP HER, THERE SEEMS TO BE

2  A LITTLE BIT OF THE BLURRING OF THE LINES THERE, DON'T YOU

3  AGREE?

4     A.   NO, I DON'T.

5     Q.   WELL, ON THE ONE HAND, YOU WANT TO HELP HER,

6  DON'T YOU, BY GIVING HER THAT SELF-HELP BOOK, YES OR NO?

7     A.   YES.   IT WOULDN'T BE BAD.   YES, I HELPED HER.

8     Q.   AND ON THE OTHER HAND, YOU'RE TO PROVIDE AN

9  IMPARTIAL EVALUATION IN THIS CASE THAT'S WHAT THE CODE

10  SAYS, RIGHT?

11     A.   I DIDN'T READ THE BOOK TO HER.   I SENT HER THE

12  BOOK.

13     Q.   BUT YOU WERE THE ONE THAT ACTUALLY PROVIDED TO

14  HER SO THAT SHE COULD READ IT, RIGHT?

15     A.   YES.   SHE WAS UNABLE TO GET IT ON HER OWN.

16     Q.   I'M NOT ASKING WHETHER OR NOT SHE COULD GET IT

Page 100

Transcript of Testimony of Dr. Richard Samuels

17    ON HER OWN.  THE FACT THAT SHE COULDN'T GET IT ON HER OWN,

18    THAT MADE YOU UPSET ENOUGH TO GO OUT AND BUY IT FOR HER,

19    RIGHT?

20         A.   NO.  IT DIDN'T MAKE ME UPSET.  I DID WHAT I DID

21    FOR MANY PEOPLE AND RECOMMENDED A BOOK.

22         Q.   I'M NOT ASKING ABOUT MANY PEOPLE.  I'M ASKING

23    ABOUT THIS PARTICULAR CASE BECAUSE YOU SAID THAT SHE

24    COULDN'T GET IT, YOU WENT OUT OF YOUR WAY TO GET IT AND

25    THEN SEND IT TO HER, RIGHT?

                                                      118


1          A.   CORRECT.

2          Q.   THAT REQUIRED YOU TO GO BUY THE BOOK, RIGHT?

3          A.   YES.

4          Q.   THAT REQUIRED YOU TO PUT IT IN WHATEVER

5     CONTAINER THERE WAS AND MAIL IT TO HER, RIGHT?

6          A.   NO.  I ORDERED IT ON LINE.

7          Q.   YOU ORDERED IT ON LINE.  ONCE YOU RECEIVED IT,

8     IT WENT TO HER, CORRECT?

9          A.   IT WAS SENT DIRECTLY TO HER THROUGH AMAZON.

10         Q.   AND WHEN YOU ORDERED IT ON LINE, THAT'S MONEY

11    COMING OUT OF YOUR POCKET, RIGHT?

12         A.   YES.

13         Q.   SO NOW NOT ONLY ARE YOU SENDING HER SOMETHING,

14    YOU'RE IN A SENSE GIVING HER MONEY, AREN'T YOU?

15         A.   NOT -- DIDN'T LOOK AT IT THE WAY.  I GAVE HER A

16    BOOK.

17         Q.   WELL, YOU'RE NOT LOOKING AT IT THAT WAY, BUT

18    THAT'S WHAT HAPPENED.  YOU GAVE HER MONEY, YOU GAVE HER A

19    BOOK THAT COST YOU MONEY, RIGHT?

20         A.   YES.

Transcript of Testimony of Dr. Richard Samuels

21      Q.   HOW MUCH DID THAT BOOK COST YOU?

22      A.   NINE DOLLARS.

23      Q.   SO HERE YOU ARE BUYING HER A GIFT THAT'S NINE

24   DOLLARS, RIGHT?

25      A.   NO.  IT WAS NOT A GIFT.

                                                   119


1       Q.   DID SHE GIVE IT BACK TO YOU?

2       A.   SHE OFFERED IT BACK TO ME.

3       Q.   NO.  I'M NOT ASKING YOU IF SHE OFFERED IT BACK

4    TO YOU.  SHE NEVER GAVE IT BACK TO YOU, RIGHT?

5       A.   I DIDN'T ASK FOR IT BACK.

6       Q.   DID I ASK YOU WHETHER OR NOT YOU ASKED FOR IT

7    BACK?

8       A.   SO WHAT ARE YOU ASKING?

9       Q.   I'M ASKING YOU WHETHER OR NOT -- ISN'T IT TRUE

10   THAT SHE NEVER GAVE IT BACK TO YOU, RIGHT?

11      A.   SHE OFFERED IT BACK TO ME.

12      Q.   I'M NOT ASKING WHETHER OR NOT SHE OFFERED IT TO.

13   YOU UNDERSTAND THAT'S NOT MY QUESTION?

14           MS. WILLMOTT:  OBJECTION.  ARGUMENTATIVE.

15           THE COURT:  OVERRULED.

16   BY MR. MARTINEZ:

17      Q.   YOU UNDERSTAND THAT, RIGHT?

18      A.   YES.

19      Q.   MY QUESTION IS ISN'T TRUE THAT THE BOOK WAS

20   NEVER RETURNED TO YOU?

21      A.   CORRECT.

22      Q.   AND SO YOU DID THIS BECAUSE YOU BELIEVED OR FOR

23   WHATEVER REASON YOU STARTED TO LIKE HER, RIGHT?

24      A.   NO.

25      Q.   OH, SO YOU DISLIKE HER?

Page 102

Transcript of Testimony of Dr. Richard Samuels

120

1        A.    I DIDN'T SAY THAT EITHER.

2        Q.    SO YOU DO LIKE HER THEN?

3        A.    I CANNOT ANSWER THAT QUESTION YES OR NO.

4        Q.    WHY NOT?   YOU SPENT HOW MANY -- YOU WENT TO SEE

5   HER ON 12 SEPARATE OCCASIONS, RIGHT?

6        A.    DEPENDS WHAT YOU MEAN BY LIKE.

7        Q.    I'M ASKING YOU, ISN'T IT TRUE THAT YOU WENT TO

8   SEE HER ON 12 SEPARATE OCCASIONS?

9        A.    AS PART OF MY ROLE TO EVALUATE HER, YES.

10       Q.    YES OR NO, YOU DID GO SEE HER ON 12 SEPARATE

11  OCCASIONS, CORRECT?

12       A.    YES.

13       Q.    AND YOU SPENT MANY HOURS WITH HER, RIGHT?

14       A.    YES.

15       Q.    YOU TALKED ABOUT A VARIETY OF THINGS, RIGHT?

16       A.    YES.

17       Q.    YOU SPOKE ABOUT HER RELATIONSHIP, RIGHT, WITH

18  MR. ALEXANDER?

19       A.    YES.

20       Q.    YOU SPOKE ABOUT PREVIOUS RELATIONSHIPS, RIGHT?

21       A.    YES.

22       Q.    AND YOU SPOKE ABOUT SOME SEXUAL ISSUES THAT WERE

23  INVOLVED WITH HER AND MR. ALEXANDER, CORRECT?

24       A.    YES.

25       Q.    YOU SPOKE ABOUT A LOT OF THING DURING THOSE 12

121

1   VISITS, RIGHT?

2        A.    RIGHT.

Page 103

Transcript of Testimony of Dr. Richard Samuels

3      Q.    HOW MANY HOURS DID YOU SPEND WITH HER?

4      A.    BETWEEN 25 AND 30 HOURS.

5      Q.    AND DURING THAT TIME, YOU'RE SAYING THAT IT WAS

6   JUST A MERE PASSAGE OF TIME, IT WASN'T BECAUSE YOU LIKED

7   HER, THAT YOU DECIDED TO GET THAT BOOK FOR HER?

8      A.    TYPICALLY WHEN I --

9      Q.    YES OR NO, IS THAT WHY YOU DECIDED TO GET HER

10  THE BOOK?

11     A.    COULD YOU REPEAT YOUR QUESTION AGAIN?

12     Q.    ISN'T IT TRUE THAT THE ONLY -- EVEN AFTER ALL

13  THIS TIME, AFTER ALL THESE VISITS, THE REASON YOU GOT HER

14  THIS BOOK, YOU'RE SAYING IS JUST BECAUSE THERE WAS NO

15  REASON?

16     A.    THERE WAS A REASON.

17     Q.    AND THE REASON WAS THAT YOU WANTED TO GIVE HER

18  SOMETHING, RIGHT?

19     A.    NO.

20     Q.    WELL, YOU DID GIVE HER SOMETHING, DIDN'T YOU?

21     A.    YES.

22     Q.    AND THERE IS A CODE OF ETHICS, CORRECT?

23     A.    YES.

24     Q.    AND THAT CODE OF ETHICS PROHIBITS YOU FROM

25  PROVIDING GIFTS TO SOMEBODY LIKE THE DEFENDANT, DOESN'T

                                                        122


1   IT?

2      A.    IT WASN'T A GIFT.

3      Q.    SIR, ISN'T IT TRUE THAT IT WENT AND IT GOT TO

4   HER, DIDN'T IT?

5      A.    SHE WAS SUICIDAL.

6      Q.    I'M NAME ASKING WHETHER OR NOT SHE WAS SUICIDAL,

7   RIGHT?  AM I ASKING YOU THAT?

                        Page 104

Transcript of Testimony of Dr. Richard Samuels

8    A.    NO, YOU'RE NOT.

9    Q.    IF SHE WAS SUICIDAL, YOU'RE NOT THE TREATING

10   PHYSICIAN, ARE YOU?

11   A.    I'M NOT TREATING HER.

12   Q.    WELL, IF SHE WAS SUICIDAL, IT WAS SOMEBODY

13   ELSE'S RESPONSIBILITY TO TAKE CARE OF IT, RIGHT?

14        MS. WILLMOTT:   JUDGE, OBJECTION, CAN WE ASK THE

15   STATE NOT TO YELL AT THE WITNESS.   IT'S NOT NECESSARY.

16        THE COURT:   APPROACH, PLEASE.

17        (SIDEBAR DISCUSSION.)

18        MS. WILLMOTT:   WHAT'S GOING ON IS UNPROFESSIONAL

19   CONDUCT AND IT DOESN'T COME ACROSS IN THE COURT REPORTER'S

20   NOTES, BUT FOR THE RECORD, HE IS YELLING.   HE IS RAISING

21   HIS VOICE.   HE'S SLAPPING HIS HANDS TOGETHER IN A LOUD

22   FASHION TO MAKE DRAMA OR FOR WHATEVER REASON, BUT IT'S

23   UNPROFESSIONAL CONDUCT.

24        THE COURT:   MR. MARTINEZ?

25        MR. MARTINEZ:   IT'S MY STYLE.   I DON'T THINK

                                                      123

1    THAT MY VOICE IS RAISED OR IS SO HIGH THAT IT DISTURBS THE

2    WITNESS.   HE HASN'T SHOWN ANY INDICATION THAT HE'S

3    BOTHERED BY IT.   NOBODY ELSE IS BOTHERED BY IT.   YOU HEARD

4    WHAT WAS GOING ON AND I'LL DEFER TO YOU.

5         MS. WILLMOTT:   THAT'S NOT NECESSARILY TRUE,

6    JUDGE.   FOR THE RECORD, DR. SAMUELS RAISED HIS VOICE BACK

7    AT ONE POINT BECAUSE OF THE FRUSTRATION.   AND I'M BOTHERED

8    BY IT BECAUSE IT'S UNPROFESSIONAL.

9         MR. MARTINEZ:   WELL, WE DON'T REALLY CARE WHY

10   YOU'RE BOTHERED BY IT.   WE DON'T KNOW THAT HE WAS

11   FRUSTRATED.   HE RAISED HIS VOICE JUST AS MUCH AS I DID.

Transcript of Testimony of Dr. Richard Samuels

12    SO IT'S TIT FOR TAT.

13         MR. NURMI:  JUDGE, I THINK WHAT IS REALLY

14    DISPOSITIVE HERE AND I CAN'T THINK OF THE NAME OF THE

15    CASE.  THIS SORT OF CONDUCT, THIS YELLING, THIS ROLLING OF

16    EYES WAS RECENTLY FROWNED UPON IN CASE LAW.  AND I HAVEN'T

17    SEEN MR. MARTINEZ ROLL HIS EYES BUT OBVIOUSLY IT'S BEEN A

18    GREAT DEAL OF YELLING.  IT'S FROWNED UPON, IT'S

19    MISCONDUCT.  AND I WILL ONCE AGAIN MOVE FOR A MISTRIAL

20    BASED ON THIS CONTINUED CONDUCT OF YELLING AT WITNESSES.

21         MR. MARTINEZ:  AND I DISPUTE THAT THERE WAS ANY

22    YELLING.

23         THE COURT:  ALL RIGHT.  I DO NOT FIND THAT MR.

24    MARTINEZ'S CONDUCT RAISES TO THE LEVEL THAT WOULD REQUIRE

25    ANY KIND OF ADMONITION FROM THE COURT.  I BELIEVE THAT A

                                                        124

1     CALMER TONE COULD BE APPROPRIATE.  CERTAINLY THIS IS

2     CROSS-EXAMINATION AND DIFFERENT STYLES ARE PERMITTED.

3          THE MOTION FOR MISTRIAL IS DENIED.  LET'S SEE IF

4     WE CAN TAKE IT DOWN JUST A TAD.

5          (OPEN COURT.)

6          THE COURT:  YOU MAY CONTINUE.

7     BY MR. MARTINEZ:

8          Q.   YOU WERE NOT HER TREATING PSYCHOLOGIST, RIGHT?

9          A.   THAT'S CORRECT.

10         Q.   SOMEBODY ELSE WAS WHERE SHE WAS RESIDING, RIGHT?

11         A.   I DON'T KNOW.

12         Q.   YOU'RE NOT FAMILIAR WITH -- WE'VE BEEN TOLD THAT

13    SHE WAS AT THE JAIL.  YOU'RE NOT FAMILIAR WITH THE CARE

14    THAT WAS -- PSYCHOLOGICAL CARE THAT'S PROVIDED IN THE

15    JAIL?

16         A.   WE NEVER TALKED ABOUT TREATMENT FOR HER.

Page 106

Transcript of Testimony of Dr. Richard Samuels

17          Q.   SIR, YOU'RE NOT -- YOU'RE TELLING US AS YOU SIT

18  HERE TODAY YOU'RE NOT FAMILIAR WITH THE CARE THAT WAS

19  PROVIDED BY THE MARICOPA COUNTY JAIL?

20          A.   I AM FAMILIAR, BUT I DON'T KNOW --

21          Q.   THAT'S NOT MY QUESTION.   YES OR NO, YOU ARE

22  FAMILIAR, RIGHT?

23          A.   NOT WITH EVERY ASPECT, NO.

24          Q.   WELL, YOU ARE FAMILIAR WITH WHEN THERE'S A

25  SUICIDE -- ISSUE OF SUICIDE, YOU KNOW WHAT IS REQUIRED OF

                                                        125

1   YOU AT THAT POINT, ISN'T THERE?

2           A.   TO SOME DEGREE.

3           Q.   WELL, NO, YOU'RE THE PSYCHOLOGIST WHO KNOWS THE

4   RULES, RIGHT?

5           A.   YES.   MOST OF THEM.

6           Q.   WELL, WITH REGARD TO THE FACT THAT SOMEBODY IS

7   SUICIDAL, YOU DON'T -- JUST BECAUSE YOU'RE THE

8   PSYCHOLOGISTS, YOU TAKE THAT THREAT SERIOUSLY.   YOU DON'T

9   JUST WALK AWAY.   IF IT WERE JUST A PATIENT THAT YOU WERE

10  TREATING, YOU WOULD MAKE ARRANGEMENTS, WOULDN'T YOU?

11          A.   OF COURSE.

12          Q.   IF NECESSARY YOU WOULD CALL THE POLICE, RIGHT?

13  RIGHT?

14          A.   WELL, IF THERE WAS AN IMMINENT THREAT.

15          Q.   SURE.   YOU WOULD CALL THE POLICE, RIGHT?

16          A.   YES.

17          Q.   IN THIS PARTICULAR CASE, YOU BELIEVED -- YOU

18  TOLD US THAT YOU THOUGHT THAT DEFENDANT WAS SUICIDAL,

19  RIGHT?

20          A.   SHE WAS TELLING US THAT SHE WAS GOING TO KILL

Transcript of Testimony of Dr. Richard Samuels

21   HERSELF.

22        Q.   NO, SIR, NOW YOU'RE CHANGING THE STORY BECAUSE

23   NOW YOU'RE SAYING SHE'S WAS TELLING YOU --

24             MR. NURMI:  OBJECTION.  MISCHARACTERIZATION OF

25   CHANGING HIS STORY.

                                                    126


1             THE COURT:  SUSTAINED.

2    BY MR. MARTINEZ:

3         Q.   SIR, DIDN'T YOU TELL US JUST MINUTES AGO THAT

4    SHE WAS SUICIDAL?

5         A.   SHE TOLD US SHE WAS SUICIDAL.

6         Q.   I UNDERSTAND THAT'S WHAT YOU'RE SAYING NOW.  I'M

7    ASKING YOU TO THINK -- YOU DON'T HAVE MEMORY PROBLEMS, DO

8    YOU?

9         A.   NO.

10        Q.   I'M ASKING YOU TO THINK BACK TO MAYBE FIVE

11   MINUTES AGO.  AND FIVE MINUTES AGO, ISN'T IT TRUE THAT YOU

12   TOLD US, WHEN I WAS ASKING YOU ABOUT THE GIFT, YOU TOLD

13   US, WELL, SHE WAS SUICIDAL.  DO YOU REMEMBER THAT

14   SPONTANEOUS STATEMENT COMING FROM YOU?

15        A.   YES.  BUT I DIDN'T MEAN THAT SHE WAS GOING TO

16   KILL HERSELF RIGHT THERE.  SHE HAD TOLD EVERYONE.

17        Q.   SIR, I'M ASKING YOU IF YOU REMEMBER?

18             MS. WILLMOTT:  OBJECTION, YOUR HONOR.

19        A.   YOU'RE NOT ALLOWING ME TO EXPLAIN THIS.

20             THE COURT:  ALL RIGHT.  COUNSEL, ONE AT A TIME.

21   THE COURT REPORTER CAN ONLY TAKE ONE PERSON SPEAKING AT A

22   TIME.  DR. SAMUELS, YOU MAY COMPLETE YOUR RESPONSE.

23   OBJECTION SUSTAINED.  YOU MAY CONTINUE.

24        A.   REPEAT YOUR QUESTION, PLEASE.

25   BY MR. MARTINEZ:

                         Page 108

Transcript of Testimony of Dr. Richard Samuels

127

1      Q.   ISN'T IT TRUE, SIR, THAT WITH REGARD TO THIS
2   ISSUE INVOLVING THE SUICIDE, YOU TOLD US PREVIOUSLY THAT,
3   QUOTE, OR WORDS TO THAT AFFECT, THAT SHE WAS SUICIDAL WHEN
4   WE WERE DISCUSSION IT.  DO YOU REMEMBER TELLING US THAT,
5   YES OR NO?
6      A.   YES.
7      Q.   AND IF YOU DID BELIEVE THAT SHE WAS SUICIDAL,
8   YOU HAD A DUTY THEN AT THAT POINT TO NOTIFY SOMEBODY,
9   DIDN'T YOU?
10      A.   YES.  HER ATTORNEY WAS INFORMED.
11      Q.   BUT YOU ALSO HAD A DUTY TO LET OTHER MEDICAL OR
12   PSYCHOLOGICAL CARE WORKERS KNOW ABOUT IT, RIGHT?
13      A.   I ONLY -- MY ONLY CONTACT WITH MS. ARIAS WAS
14   THROUGH THE ATTORNEY.  I DON'T HAVE CONTACTS IN THE JAIL
15   AND I DON'T HAVE ANY AUTHORIZATION TO CONTACT ANYONE IN
16   THE JAIL.
17      Q.   SO LET'S -- YOU'RE SAYING THAT WITH REGARD TO
18   THIS PARTICULAR SITUATION IF A PERSON IS UNREPRESENTED AND
19   THEY TELL YOU THAT THEY'RE SUICIDAL, WHAT YOU ARE GOING TO
20   DO IS WALK AWAY BECAUSE YOU HAVE NO CONTACTS IN THE JAIL?
21           MS. WILLMOTT:  OBJECTION, RELEVANCE.
22           THE COURT:  OVERRULED.
23   BY MR. MARTINEZ:
24      Q.   IS THAT WHAT YOU'RE SAYING?
25      A.   I'D LIKE TO EXPLAIN WHAT THE WORD SUICIDAL MEANT

128

1   IN THIS PARTICULAR CONTEXT.
2      Q.   SIR, YOU USED THE WORD, DID NOT YOU?

Transcript of Testimony of Dr. Richard Samuels

3          A.    I DID.

4          Q.    THAT'S ALL I WANT.  WHEN SOMEBODY IS SUICIDAL,

5   ISN'T IT TRUE THAT THE GUIDELINES REQUIRE YOU TO MAKE A

6   TELEPHONE CALL OR LET SOMEBODY ELSE KNOW, RIGHT?

7          A.    SUICIDAL, THE WORD SUICIDAL WAS MY ABBREVIATION

8   AND MY SHORTHAND FOR EXPLAINING THE FACT THAT MS. ARIAS

9   HAD TOLD ME THAT SHE HAD BEEN PLANNING TO KILL HERSELF

10  PRIOR TO HER ARREST AND EVEN DURING HER INCARCERATION.

11  THAT'S WHAT I USED WHEN I WROTE SUICIDAL.  THAT WAS MY

12  NOTE.  THOSE ARE THE WORDS THAT I USED.

13         Q.    AND YOU DIDN'T INFORM ANYBODY IN THE JAIL TO

14  GIVE THEM A CAUTIONARY NOTE THAT YOU BELIEVE, BASED ON

15  YOUR CONVERSATIONS WITH HER, THAT SHE WAS SUICIDAL, RIGHT?

16         A.    I CONTACTED HER THROUGH THE ATTORNEY WHICH IS

17  ALL OF MY CONTACTS THROUGH THE JAIL ARE DONE THROUGH THE

18  ATTORNEY.  I'M NOT ASKING ABOUT THAT.  I'M ASKING WHETHER,

19  ISN'T IT TRUE, THAT YOU DIDN'T TELL ANYBODY IN THE JAIL

20  THAT YOU BELIEVE THAT THIS INDIVIDUAL WAS SUICIDAL.

21              MS. WILLMOTT:  OBJECTION.  ASKED AND ANSWERED.

22              THE COURT:  OVERRULED.

23         A.    NO.  I DID NOT CONTACT ANYONE WITHIN THE JAIL.

24  BY MR. MARTINEZ:

25         Q.    SO YOU HAD THIS WHAT APPEARS TO BE A

                                              129


1   RELATIONSHIP WITH THIS INDIVIDUAL THAT YOU FEEL IS

2   APPROPRIATE THAT YOU BUY HER AT LEAST ONE GIFT, CORRECT?

3          A.    I BOUGHT HER A SELF-HELP BOOK.

4          Q.    YOU BOUGHT HER A BOOK WHICH IS A GIFT, CORRECT?

5          A.    WELL, I DON'T CHARACTERIZE IT THAT WAY, BUT YOU

6   MAY.

7          Q.    WELL, NO, I'M ASKING -- YOU TALKED ABOUT THIS,

                          Page 110

Transcript of Testimony of Dr. Richard Samuels

8    YOU PAID FOR IT, RIGHT?

9         A.   YES.

10        Q.   YOU NEVER GOT IT BACK, RIGHT?

11        A.   RIGHT.

12        Q.   AND IT IS FOR A PURPOSE THAT YOU BELIEVE WAS TO

13   HELP THE DEFENDANT, RIGHT?

14        A.   YES.

15        Q.   AND SO IF YOU ARE NOW HELPING THE DEFENDANT

16   YOU'RE THERE ASSISTING HER, AREN'T YOU?

17        A.   I DID NOT CONDUCT THERAPY.

18        Q.   I'M NOT ASKING IF YOU CONDUCTED THERAPY.  I'M

19   ASKING -- THE QUESTION IS, ISN'T IT TRUE THAT YOU WERE

20   THEN THERE TO ASSIST HER?  YOU'RE ASSISTING HER, AREN'T

21   YOU, BY GIVING HER THIS BOOK, RIGHT?

22        A.   OKAY.

23        Q.   IS THAT A YES?

24        A.   YES.

25        Q.   NO.  NOT A GUESS, WAS THAT A YES?

                                            130


1         A.   YES.

2         Q.   AND WHEN YOU GAVE HER THIS BOOK, YOUR

3    EXPECTATION WAS THAT SHE WOULD GET BETTER FROM WHATEVER

4    PROBLEM YOU PERCEIVED, RIGHT?

5         A.   MY EXPECTATION WAS THAT SHE WOULD READ THE BOOK.

6         Q.   RIGHT.  AND THE REASON YOU WANTED HER TO READ

7    THE BOOK WAS SO THAT SHE COULD ADDRESS IN A MEANINGFUL

8    FASHION WHATEVER ISSUES YOU SAW?

9         A.   YES.

10        Q.   AND THAT'S TO HELP HER, RIGHT?

11        A.   YES.

Transcript of Testimony of Dr. Richard Samuels

12      Q.    AND THAT IS THE PROBLEM.   THAT CREATES AN ISSUE

13  OF YOUR OBJECTIVITY IN THIS CASE, DOESN'T IT?

14      A.    I DIDN'T THINK SO.

15      Q.    I KNOW YOU DIDN'T NOT THINK SO.   BUT ON THE ONE

16  HAND YOU CAN SEE THAT YOU ARE HELPING HER TO GET BETTER

17  AND ON THE OTHER HAND, YOU HAVE TO BE IMPARTIAL, RIGHT?

18      A.    YES.

19      Q.    AND THAT CREATES AN ETHICAL DILEMMA FOR YOU,

20  DIDN'T IT?

21      A.    WELL, IT DIDN'T AT THE TIME.   AND IT'S SOMETHING

22  I TENDED TO ROUTINELY DO.   SO I DIDN'T SAY IT AS AN

23  ETHICAL DILEMMA.

24      Q.    YOU DIDN'T SEE IT AS A ETHICAL DILEMMA, BUT YOU

25  CAN SEE THAT THERE'S AN APPEARANCE HERE THAT YOU'RE TRYING

                                                          131

1   TO HELP HER, RIGHT?

2       A.    YES.   FROM YOUR PERSPECTIVE, YES.

3       Q.    NOT FROM MY PERSPECTIVE.   FROM ANYBODY'S

4   PERSPECTIVE, ISN'T IT TRUE FROM ANYBODY'S PERSPECTIVE YOU

5   ARE TRYING TO HELP THE DEFENDANT GET BETTER WITH REGARD TO

6   WHATEVER ISSUE SHE HAS?

7           MS. WILLMOTT:   OBJECTION.   SPECULATION AS TO

8   WHAT OTHER PEOPLE MAY THINK.

9           THE COURT:   OVERRULED.

10      A.    COULD YOU REPEAT YOUR QUESTION?

11  BY MR. MARTINEZ:

12      Q.    ISN'T IT TRUE THAT FROM WHATEVER PERSPECTIVE

13  IT'S TAKEN, YOU ARE HELPING THE DEFENDANT?

14      A.    YES.   BY PROVIDING HER WITH THE BOOK, YES.

15      Q.    AND SO THEN THAT CREATES THIS ISSUE THAT MAY

16  AFFECT -- INDICATE THAT IT MAY AFFECT THE WAY YOU VIEW

Transcript of Testimony of Dr. Richard Samuels

17    YOUR EVALUATION IN THIS CASE, DOESN'T IT?

18          A.    NO, IT DOES NOT.

19          Q.    THERE IS NO APPEARANCE OF THAT HERE AT ALL?

20          A.    THERE MAYBE AN APPEARANCE TO YOU BUT --

21          Q.    NO.  I'M NOT ASKING TO ME.

22                MS. WILLMOTT:  OBJECTION TO LET HIM FINISH THE

23    ANSWER THAT HE HAD, THERE MAY BE AN APPEARANCE TO YOU

24    BUT -- AND THEN HE WAS INTERRUPTED.

25                THE COURT:  SUSTAINED.  YOU MAY FINISH YOUR

                                                    132


1     RESPONSE.

2           Q.    GO AHEAD.

3           A.    IT MAY APPEAR THAT WAY TO YOU, BUT BASED UPON

4     HER LOW SELF ESTEEM, AND THE FACT THAT SHE WAS THREATENING

5     TO HARM HERSELF, AT LEAST CONTEMPLATING HARMING HERSELF, I

6     FELT THAT PROVIDING HER WITH THAT BOOK, IT WOULD ALLOW MY

7     EVALUATION TO GO ON.

8           Q.    AND SO IT'S BETTER FOR YOU TO PROVIDE HER WITH A

9     SELF-HELP BOOK, IN YOUR PERSPECTIVE NOW, AS OPPOSED TO

10    MINE, THAN TO GO TO THE AUTHORITIES AND SAY, THERE'S A

11    BIGGER ISSUE OF THREATENED SUICIDE, THAT'S WHAT YOU

12    BELIEVE?

13          A.    THAT WAS COMMUNICATED TO HER ATTORNEY.

14          Q.    SURE.  THAT'S WHAT YOU BELIEVE?

15          A.    YES.

16          Q.    SIR, ONE OF THE THINGS THAT YOU TOLD US ABOUT

17    WAS THIS ISSUE THAT YOU HAD IN NEW JERSEY.  DO YOU

18    REMEMBER --

19          A.    YES.

20          Q.    -- TALKING WITH THE DEFENSE ATTORNEY ABOUT THAT?

Page 113

Transcript of Testimony of Dr. Richard Samuels

21      A.    YES.

22      Q.    YOU SAID, WELL, WHEN I WAS HERE IN ARIZONA THERE

23  WAS SOME SORT OF APPEAL OR SOME SORT OF -- I DON'T KNOW,

24  SOME PROCEEDINGS, AND YOU SEEMED TO INDICATE THAT WHATEVER

25  HAPPENED IN NEW JERSEY REALLY WAS NO BIG DEAL?

133

1       A.    NO.   WHAT I SAID WAS THAT RELATIVE TO ARIZONA,

2   THEY REVIEWED THE ENTIRE CASE AND I WAS EXONERATED BY A

3   VOTE OF THIRTEEN TO NOTHING.

4       Q.    SO YOU WERE EXONERATED BY ARIZONA WHICH

5   INDICATES THAT FROM YOUR POINT OF VIEW THAT YOU DID

6   NOTHING WRONG IN NEW JERSEY, RIGHT?

7       A.    NO.

8       Q.    IN FACT DIDN'T YOU SIGN AN AGREEMENT WITH THE

9   STATE OF NEW JERSEY AGREEING TO DESIST AND CEASING FROM

10  CROSSING BOUNDARIES WITH CLIENTS AND ENTERING INTO

11  RELATIONSHIPS WHICH MAY CREATES CONFLICT OF INTEREST WITH

12  THE CLIENT?

13      A.    AND THAT HAD TO DO WITH THE BARTERING ISSUE.

14      Q.    YES OR NO, DID YOU ENTER INTO THAT AGREEMENT?

15      A.    YES.

16      Q.    AND THAT'S THE SAME KIND OF CONDUCT THAT WE HAVE

17  HERE BECAUSE NOW YOU CROSSED A BOUNDARY INVOLVING THE

18  DEFENDANT, HAVEN'T YOU?

19      A.    NO, I HAVE NOT.

20      Q.    SIR, DURING THIS WHOLE TIME THAT YOU -- WELL,

21  AND WITH REGARD TO THIS ISSUE INVOLVING WHAT HAPPENED IN

22  NEW JERSEY, YOU INDICATED THAT YOU PAID A FINE, RIGHT?

23      A.    YES.

24      Q.    $2,500, RIGHT?

25      A.    YES.

Transcript of Testimony of Dr. Richard Samuels

134

1     Q.   AND IN ADDITION TO PAYING THE FINE OF $2,500,
2  YOU SAID THAT WAS ALL THAT WAS INVOLVED.   THERE WAS MORE
3  THAT WAS INVOLVED IN THIS, WASN'T THERE?
4     A.   I HAD TO READ A BOOK.
5     Q.   PARDON?
6     A.   I HAD TO READ A BOOK.
7     Q.   WELL, ISN'T IT TRUE THAT YOU HAD TO SUCCESSFULLY
8  COMPLETE CONTINUING EDUCATION CONCERNING ETHICS AND
9  BOUNDARY ISSUES?
10    A.   YES.
11    Q.   AND IT INDICATED FURTHER THAT THESE COURSES
12 SHOULD BE COMPLETED WITHIN SIX MONTHS OF THE ENTRY OF THE
13 CONSENT ORDER, ISN'T THAT WHAT YOU HAD TO DO?
14    A.   WHICH WAS RESOLVED BY READING A BOOK AND TAKING
15 THE TEST.
16    Q.   AND THIS CONTINUING EDUCATION COULD OCCUR EITHER
17 IN NEW JERSEY OR ARIZONA, CORRECT?
18    A.   CORRECT.
19    Q.   AN EVALUATION SUCH AS THE ONE THAT YOU CONDUCTED
20 IS ACTUALLY A SORT OF A TWO PRONG APPROACH, ISN'T IT?
21    A.   I DON'T KNOW WHAT YOU MEAN BY THAT.
22    Q.   WELL, YOU DO WHAT YOU CALLED AN INTERVIEW, A
23 CLINICAL INTERVIEW, RIGHT, THAT'S CORRECT?
24    A.   YES.
25    Q.   THAT'S ONE BIG AREA, CORRECT?

135

1     A.   YES.
2     Q.   THAT WAS PART OF VISITING HER IN WHEREVER SHE

Transcript of Testimony of Dr. Richard Samuels

3    WAS AND TALKING TO HER, RIGHT?

4         A.    YES.

5         Q.    AND THIS IS THE ONE WHERE YOU PREVIOUSLY

6    TESTIFIED THAT YOU WOULD SIT THERE AND TRY TO TAKE NOTES

7    AS QUICKLY AND AS ACCURATELY AS COULD, RIGHT?

8         A.    YES.

9         Q.    YOU DON'T TAPE RECORD, RIGHT?

10        A.    NEVER, NO.

11        Q.    YOU WOULD AGREE THOUGH THAT TAPE RECORDING IS

12   PROBABLY MORE ACCURATE, RIGHT?

13        A.    PROBABLY MORE ACCURATE.

14        Q.    AND IN ADDITION TO THAT APPROACH, IN ADDITION TO

15   THAT, THERE'S SOMETHING ELSE THAT YOU DO AND THAT IS YOU

16   ADMINISTER TESTS, RIGHT?

17        A.    YES.

18        Q.    AND ONE OF THE TESTS THAT YOU ADMINISTERED WAS

19   THE PSD, RIGHT?

20        A.    YES.

21        Q.    WHAT DOES PSD STAND FOR?

22        A.    WELL, IT REFERS TO THE --

23        Q.    NO, NO, WITHOUT REFERRING --

24        A.    YEAH.

25        Q.    JUST THE MATERIAL.

                                         136


1         A.    IT REFERS TO THE POST TRAUMATIC STRESS

2    INVENTORY.

3         Q.    IS THAT THE EXACT NAME OF THAT TEST OR IS THAT

4    SOMETHING THAT YOU USE?

5         A.    POSE TRAUMATIC STRESS INVENTORY, PDI.

6         Q.    ALL RIGHT.  YOU LOOKED AT SOMETHING WHEN YOU

7    GAVE US THE NAME.  SO WHAT IS IT THAT YOU'RE LOOKING AT TO

Transcript of Testimony of Dr. Richard Samuels

8    GIVE US THAT NAME?

9          A.    THE MANUAL --

10         Q.    ALL RIGHT.

11         A.    -- THAT HAS THE EXACT NAME POST TRAUMATIC STRESS

12   SCALE, DIAGNOSTIC SCALE, THAT'S WHAT IT IS.

13         Q.    HOW MANY TIMES HAVE YOU ADMINISTERED THAT TEST?

14         A.    PROBABLY 15 TIMES.

15         Q.    AND WHAT YOU SAID TO US WAS THAT YOU ACTUALLY

16   SCORED THAT TEST YOURSELF, RIGHT?

17         A.    YES.

18         Q.    AND THIS TEST BECAUSE YOU SEEM TO HAVE ONLY AT

19   ADMINISTERED IT 15 TIMES, YOU'RE HAVING TROUBLE WITH THE

20   NAME, RIGHT?

21         A.    WELL, YES.

22         Q.    YES AND NO?

23         A.    YES AND NO.   RIGHT.   YES, POST TRAUMATIC STRESS

24   DIAGNOSTIC SCALE.   IT'S PDS.   BUT IT LEAVES OUT THE S IN

25   THE THING, SO I WAS THINKING PSD TEST, BUT IT'S POST

                                                          137

1    TRAUMATIC STRESS DIAGNOSTIC SCALE, PDS.

2          Q.    RIGHT.   AND THIS FACT THAT YOU CAN'T EVEN

3    REMEMBER THE TITLE SEEMS TO INDICATE THAT YOU REALLY ARE

4    NOT FAMILIAR WITH THIS PARTICULAR TEST, RIGHT?

5          A.    I USE IT.

6          Q.    WELL, YOU USED IT HOW MANY TIMES?

7          A.    ABOUT 15 TIMES.

8          Q.    RIGHT.   AND YOU HAD MUCH MORE CASES THAN THAT,

9    HAVEN'T YOU?

10         A.    YES.

11         Q.    AND THIS TEST HAS 49 QUESTIONS, RIGHT?

                          Page 117

Transcript of Testimony of Dr. Richard Samuels

12      A.    YES.

13      Q.    AND IT HAS A VALIDITY SCALE IN IT YOU SAID?

14      A.    YES.

15      Q.    SO IF AN INDIVIDUAL IS MAKING THINGS UP, THIS

16  WILL PICK IT UP, RIGHT?

17      A.    IT DOESN'T ALWAYS.  BUT IT'S DESIGNED TO TRY AND

18  DO SO, YES.

19      Q.    AND SO IN THIS PARTICULAR CASE THAT'S ONE OF THE

20  THINGS THAT YOU ADMINISTER, RIGHT?

21      A.    YES.

22      Q.    YOU ALSO ADMINISTERED AND YOU CALLED IT THE MY

23  MILAN TEST.  DO YOU REMEMBER TELLING US THAT?

24      A.    NO, I DIDN'T SAY THAT.

25      Q.    OKAY.  WHAT TEST -- IS THAT THE OTHER TEST

138

1   THAT --

2       A.    IT WAS THE MILAN CLINICAL MULTI AXLE INVENTORY,

3   THE MCMI DASH THREE.

4       Q.    AND HOW MANY ITEMS ARE IN THIS PARTICULAR TEST?

5       A.    175.

6       Q.    AND WITH REGARD TO THE ADMINISTERING THIS

7   PARTICULAR TEST, THE WAY IT WORKS IS THERE ARE QUESTIONS

8   AND THE INDIVIDUAL THEN MAKES A MARK, CORRECT?

9       A.    YES.

10      Q.    AND THIS IS THE ONE THAT YOU ACTUALLY SENT TO BE

11  SCORED, RIGHT?

12      A.    YES.

13      Q.    THE OTHER ONE, THE P --

14      A.    PDS.

15      Q.    POST TRAUMATIC STRESS DIAGNOSTIC SCALE TEST,

16  THAT'S THE ONE THAT YOU SCORED YOURSELF, RIGHT?

Page 118

Transcript of Testimony of Dr. Richard Samuels

17        A.    YES.

18        Q.    YOU SAT DOWN AND YOU LOOKED -- AND THE WAY THAT

19   ONE WORKS IS THAT THERE ARE 49 QUESTIONS, RIGHT?

20        A.    YES.

21        Q.    AND THEN THERE'S AN ANSWER SHEET, RIGHT?

22        A.    YES.

23        Q.    AND THEN THERE'S A ROUND CIRCLE FILLED IN FOR

24   THE ANSWER, RIGHT?

25        A.    YES.

                                                     139


1         Q.    AND THEN AGAIN THE VALIDITY OF THAT TEST DEPENDS

2    ON THE PERSON ANSWERING THAT TEST ACCURATELY, RIGHT?

3         A.    RIGHT.

4         Q.    AND SO, FOR EXAMPLE, LET'S SAY THAT PERSON LIED

5    ON THAT TEST.  LET'S ASSUME THAT'S WHAT HAPPENED.  OKAY?

6         A.    YES.

7         Q.    WITH REGARD TO THE PDS TEST.  WOULDN'T YOU AGREE

8    THAT WOULD INVALIDATE THE RESULTS OF THE PDS TEST?

9         A.    YES.

10        Q.    AND IF IT WERE USED FOR THE POST TRAUMATIC

11   STRESS DISORDER DIAGNOSIS, THAT WOULD BE A FAULTY

12   DIAGNOSIS, RIGHT?

13        A.    YES.

14        Q.    BECAUSE IT IS USED, IF YOU WILL, AS A WAY TO

15   CONFIRM, RIGHT?

16        A.    YES.

17        Q.    WELL, IN THIS CASE, ISN'T IT TRUE, SIR, THAT

18   WITH REGARD TO THIS PDS, THE DEFENDANT LIED ON IT?

19        A.    NO.  THAT'S NOT TRUE.

20        Q.    SIR, WHEN WAS THE LAST TIME THAT YOU REVIEWED

                       Page 119

Transcript of Testimony of Dr. Richard Samuels

21 YOUR RAW DATA INVOLVING THIS PARTICULAR TEST?

22     A.   A COUPLE OF DAYS AGO, LAST WEEK.

23     Q.   SIR, LET ME HAVE SOMETHING HERE MARKED.  THIS IS

24 EXHIBIT NUMBER 533.  AND WHAT A DEFENDANT FILLS OUT, BOTH

25 THE TEST AND THE RESULTS, THEY'RE CALLED THE RAW DATA,

140

1 CORRECT?

2     A.   YES.

3     Q.   AND THE RAW DATA IS NOT PROVIDED TO ATTORNEYS,

4 IS IT?  IS IT?

5     A.   IT CAN BE.

6     Q.   IT CAN BE.  BUT THE CODE GENERALLY CALLS FOR IT

7 TO BE PROVIDED OR TO BE TRANSFERRED BETWEEN PSYCHOLOGISTS,

8 RIGHT?

9     A.   RIGHT.

10     Q.   AND SPEAKING OF PSYCHOLOGY, YOU'RE A

11 PSYCHOLOGIST NOT A PSYCHIATRIST, RIGHT?

12     A.   I'M A PSYCHOLOGIST.

13     Q.   WHICH MEANS THAT YOU DID NOT GO -- THERE'S NO

14 M.D. AFTER YOUR NAME, CORRECT?

15     A.   NO, THERE IS NOT.

16     Q.   SO YOU SHOWED US A DIAGRAM OR SOMETHING ABOUT

17 THE HEAD, IT'S NOT LIKE YOU CAN GO IN AND DO SURGERY, CAN

18 YOU?

19     A.   NO.

20     Q.   AND YOU CANNOT PRESCRIBE, RIGHT?

21     A.   THAT'S CORRECT.

22     Q.   SO TAKE A LOOK AT EXHIBIT 533 AND SEE WHETHER OR

23 NOT THIS CORRESPONDS TO THE ACTUAL PDS, PART ONE AND TWO,

24 AS WELL AS THE RESPONSES BY THE DEFENDANT.  TAKE A LOOK AT

25 THAT.  IF IT DOESN'T TELL ME HOW IT DOESN'T?

Page 120

Transcript of Testimony of Dr. Richard Samuels

141

1      A.    WELL, I HAVE TO LOOK AT MY NOTES.

2      Q.    SURE.  AND IN FACT, WHEN YOU TAKE IT OUT, IF YOU

3  DON'T MIND GIVING IT TO ME SO I CAN MARK IT.

4      A.    SORRY?

5      Q.    TAKE IT OUT OF YOUR FOLDER SO I CAN MARK THE PDS

6  TEST ALONG WITH THE RAW DATA.

7      A.    OH, OKAY.

8      Q.    DO YOU HAVE IT OUT NOW, SIR?

9      A.    I HAVE IT OUT, YES.

10      Q.    IF I MAY HAVE IT.  SO THIS IS THE -- THIS IS THE

11  WORK SHEET, ISN'T IT?

12      A.    THAT'S THE WORK SHEET.

13      Q.    OKAY.  BUT THERE'S ALSO A PART OF THIS TEST THAT

14  INCLUDES THE QUESTIONS, DOESN'T IT?

15      A.    YES.

16      Q.    IF I COULD HAVE THAT.

17      A.    HOLD ON ONE MOMENT.  HERE IT IS.

18      Q.    WELL, SIR, WHERE ARE THE DIRECTIONS FOR

19  QUESTIONS ONE THROUGH 15?

20      A.    OH, I DON'T HAVE THE ACTUAL -- WELL, IT'S ALL IN

21  HERE ACTUALLY.

22      Q.    WELL, LET'S --

23      A.    SAMPLE OF THE TEST IS IN HERE WITH THE QUESTIONS

24  AND SO FOURTH.

25      Q.    OKAY.  BUT WHERE IS THE ANSWER SHEET TO

142

1  QUESTIONS ONE THROUGH 15?

2      A.    AT THE TIME THAT I WENT, I DIDN'T HAVE AN ANSWER

Page 121

Transcript of Testimony of Dr. Richard Samuels

3   SHEET SO I HAD HER FILL IT OUT ON A PIECE OF BLANK PAPER

4   WHICH I TRANSCRIBE TO AN ANSWER SHEET.

5       Q.   SIR, DO YOU REMEMBER PROVIDING THE RAW DATA TO

6   SOMEBODY BY THE NAME OF JANEEN DEMARTE?

7       A.   YES.

8       Q.   AND YOU'RE SAYING THAT WHAT YOU PROVIDED TO HER

9   IS A COPY OF THE YELLOW SHEET THAT YOU HAVE THERE?

10      A.   NO.  I PROVIDED TO HER THE TRANSFERRED SHEET.

11      Q.   RIGHT.  IN OTHER WORDS YOU PROVIDED HER A WHITE

12  SHEET WITH LITTLE ROUND CIRCLES THAT WERE FILLED IN,

13  CORRECT?

14      A.   THAT'S RIGHT.  THAT'S CORRECT, YES.

15      Q.   WHERE IS THAT?

16      A.   I DON'T HAVE IT WITH ME APPARENTLY.

17      Q.   WELL, WHY DON'T YOU HAVE IT WITH YOU?

18      A.   I MUST HAVE LEFT IT ON MY DESK.

19           MS. WILLMOTT:  OBJECTION.

20           THE COURT:  SUSTAINED.

21      A.   MUST HAVE LEFT IT ON THE MY DESK.

22  BY MR. MARTINEZ:

23      Q.   SIR, ISN'T IT IMPORTANT TO HAVE A COMPLETE FILE

24  SO THAT YOU CAN ANSWER WHATEVER QUESTIONS COME UP?

25      A.   WELL, I HAVE THE ANSWERS OVER HERE.

                                              143

1       Q.   I'M NOT ASKING ABOUT THE ANSWERS.  I'M ASKING

2   ABOUT THE OTHER PORTION OF THE TEST, THE ONE THAT'S GOT

3   THE LITTLE ROUND CIRCLES THAT YOU PROVIDED TO SOMEBODY

4   ELSE?

5       A.   YES.  I DID NOT BRING THAT.  WHAT I BROUGHT WAS

6   THE ORIGINAL THAT SHE FILLED OUT THAT I LATER TRANSFERRED

7   TO THE QUESTION BECAUSE I DIDN'T HAVE THE ANSWER SHEET

Transcript of Testimony of Dr. Richard Samuels

8   WITH ME WHEN I WENT TO SEE HER.

9        Q.   WHAT YOU'RE SAYING IS THAT YOU'RE THE PERSON

10  THEN WHO FILLED OUT THE ANSWERS TO QUESTIONS ONE THROUGH

11  15?

12       A.   NO.  I HAVE HER ANSWERS HERE.  WHAT I DID WAS

13  TRANSPOSE HER ANSWERS ON TO THE SHEET FOR SCORING.

14       Q.   I UNDERSTAND WHAT YOU'RE TRYING TO TELL ME, BUT

15  MY QUESTION IS MUCH MORE DIRECT THAN THAT.

16            IN TERMS OF THE ANSWER SHEET ITSELF, THE

17  LITTLE MARKS, THE PENCIL MARKS THAT ARE DONE ON THERE THAT

18  WAS DONE BY YOU, NOT THE DEFENDANT?

19       A.   THAT'S CORRECT.

20       Q.   AND, SIR, IF IT WAS DONE BY YOU AND YOU WERE

21  GOING TO SECURE IT YOURSELF, WHY DID YOU USE TO PENCIL?

22       A.   WHY DID I USE PENCIL.

23       Q.   YES, INSTEAD OF A PEN?

24       A.   WELL, WE HAVE TRADITIONALLY USE PENCILS WHEN

25  FILLING OUT FORMS SUCH AS THAT.

                                        144


1        Q.   NO, NO, THE REASON YOU TRADITIONALLY USED

2   PENCILS IS BECAUSE IT'S GOING TO GO THROUGH A COMPUTER AND

3   THEY'RE EASILY RED THAT WAY, CORRECT?

4        A.   YES.  THAT'S TRUE.

5        Q.   AND THEY DON'T -- YOU CAN'T USE A PENS OR YOU

6   DON'T USE PENS BECAUSE IT'S DIFFICULT FOR THE COMPUTER TO

7   READ THEM, RIGHT?

8        A.   AND ALSO IF YOU MAKE AN ERROR, IT'S HARDER TO

9   CHANGE YOUR ANSWER.

10       Q.   BUT IN THIS PARTICULAR CASE, YOU WERE GOING TO

11  SCORE IT, RIGHT?

Transcript of Testimony of Dr. Richard Samuels

12        A.   YES.

13        Q.   SO WHY GO THROUGH ALL THIS TROUBLE OF USING A

14   PENCIL IF YOU ARE GOING TO SCORE IT WHEN A PEN PROVIDES

15   BETTER MARKINGS?

16             MS. WILLMOTT:  OBJECTION.  ASKED AND ANSWERED.

17   HE ALREADY ANSWERED THAT IT'S TYPICAL FOR HIM TO USE THE

18   PENCIL.

19             THE COURT:  OVERRULED.  YOU MAY ANSWER.

20        A.   I PREFER TO USE A PENCIL.

21   BY MR. MARTINEZ:

22        Q.   AND THAT'S SO THAT YOU CAN MAKE SOME CHANGES ON

23   IT?

24             MS. WILLMOTT:  OBJECTION.  ARGUMENTATIVE.

25             THE COURT:  OVERRULED.

                                            145


 1        A.   ARE YOU IMPLYING THAT I CHEATED ON THAT TEST?

 2   BY MR. MARTINEZ:

 3        Q.   NO, SIR.  I'M ASKING YOU SOME QUESTIONS.

 4   HOWEVER YOU WANT TO TAKE THEM IS UP TO YOU.  I'M JUST

 5   ASKING YOU --

 6        A.   ASK ME THE QUESTIONS AGAIN.

 7        Q.   SO THE QUESTION, SIR, IS YOU DID CHOSE NOT TO

 8   USE A PEN INSTEAD YOU CHOSE TO USE A PENCIL WHICH IS

 9   NORMALLY WHAT A PERSON WAS TAKING THIS TEST USES, RIGHT?

10        A.   YES.

11        Q.   AND YOU THEN SAT DOWN AND YOU DID CONDUCT THIS

12   PARTICULAR CASE, RIGHT?

13        A.   YES.

14        Q.   LET ME GO AHEAD AND HAVE THE YELLOW SHEET,

15   PLEASE, AND IF I MAY HAVE THE BOOK, PLEASE.  THIS IS

16   EXHIBIT 527.  WHAT DOES THIS CONTAIN, SIR?

Transcript of Testimony of Dr. Richard Samuels

17      A.    THAT IS THE MANUAL THAT IS ASSOCIATED WITH THAT

18  TEST.  IT INCLUDES INSTRUCTION MANUALS FOR SCORING, SAMPLE

19  ANSWER SHEET, SAMPLE WORK SHEET, AND SOME VALIDATION

20  INFORMATION.

21           MR. MARTINEZ:  I MOVE FOR THE ADMISSION OF

22  EXHIBIT 527.

23           MS. WILLMOTT:  OBJECTION, YOUR HONOR.  MAY WE

24  APPROACH?

25           THE COURT:  YOU MAY.

                                              146


1           (SIDEBAR DISCUSSION.)

2           MS. WILLMOTT:  IT CONTAINS A PLETHORA OF HEARSAY

3   AND INFORMATION THAT WOULD BE EXTREMELY CONFUSING TO THE

4   JURY IF THEY WERE TO HAVE IT AND TRY TO READ THROUGH IT ON

5   THEIR OWN WITHOUT HAVING AN EXPLANATION.

6           MR. MARTINEZ:  THIS --

7           THE COURT:  I CAN'T HEAR YOU, SORRY.

8           MR. MARTINEZ:  THIS INDIVIDUAL FABRICATED A

9   RESULT.  I JUST WANT TO USE THAT TO SHOW THAT HE DID.

10           THE COURT:  ALL RIGHT.

11           MR. MARTINEZ:  IF YOU WANT WE CAN GIVE IT BACK

12  TO HIM AFTER -- FOR PURPOSES OF THIS INQUIRY, I WANT TO BE

13  ABLE TO ASK HIM QUESTIONS FROM IT.

14           MS. WILLMOTT:  YOU CAN ASK HIM QUESTIONS FROM

15  IT.  IT'S ALREADY MARKED AS AN EXHIBIT.  BUT IT DOES NOT

16  NEED TO GO BACK TO THE JURY.  AND I TAKE ISSUE WITH THE

17  FACT THAT HE'S ACCUSING HIM OF FABRICATING THE TEST

18  RESULTS.

19           THE COURT:  WELL, HE SPECIFICALLY SAID, NO WHEN

20  DOCTOR -- HE WANTS TO ASK HIM, ARE YOU ACCUSING ME OF

Transcript of Testimony of Dr. Richard Samuels

21    THAT?  HE SAID, NO.

22              MS. WILLMOTT:  JUDGE --

23              THE COURT:  MAY I SEE 527, PLEASE?  I'M GOING TO

24    SUSTAIN THE OBJECTION ON 403 GROUNDS.  I FIND IT COULD BE

25    CONFUSING TO THE JURY WITHOUT EXPERT TESTIMONY TO ASSIST

                                                      147


1     THEM.  OBVIOUSLY THE WITNESS MAY USE IT TO EXPLAIN HIS

2     ANSWER.

3              (OPEN COURT.)

4     BY MR. MARTINEZ:

5         Q.   SIR, LET ME SHOW YOU A COUPLE MORE EXHIBITS.

6     TAKE A LOOK AT EXHIBIT NUMBER 534.  WHAT IS IT?

7         A.   534 IS A SHEET OF RESPONSES THAT MS. ARIAS

8     FILLED IN WHICH I THEN TRANSFERRED TO THE ACTUAL SCORE

9     SHEET.

10        Q.   WHAT DATE WAS THAT?

11        A.   THIS DATE HERE?

12        Q.   YES, SIR.

13        A.   THE DAY THAT I ADMINISTERED --

14        Q.   NO, NO, JUST HOLD ON.  JUST SHOW ME WHERE THE

15    DATE IS.  OKAY?

16        A.   OKAY.  OH, 1/15/10.

17        Q.   ALL RIGHT.  THAT'S JANUARY 15TH OF 2010,

18    CORRECT?

19        A.   YES.

20        Q.   AND THIS IS YOURS, RIGHT?

21        A.   I BELIEVE, YES.

22             MR. MARTINEZ:  JUDGE, IF I MAY HAVE IT STAPLED

23    AGAIN?

24             THE COURT:  YES.

25             MR. MARTINEZ:  I MOVE FOR THE ADMISSION OF

                              Page 126

Transcript of Testimony of Dr. Richard Samuels

148

1    EXHIBIT 534.

2             MS. WILLMOTT:  NO OBJECTION.

3             THE COURT:  534 IS ADMITTED.

4             MS. WILLMOTT:  WHAT NUMBER WAS THAT?

5    BY MR. MARTINEZ:

6        Q.   534.  SIR, THIS TEST HERE WHICH WAS ADMINISTERED

7    ON JANUARY 15TH OF 2010 WAS BEFORE SHE -- THIS WAS DURING

8    THE TIME THAT SHE WAS TELLING YOU THE STORY ABOUT THESE

9    TWO MEN, THESE TWO INDIVIDUALS, A MAN AND A WOMAN COMING

10   IN AND DOING HARM TO MR. ALEXANDER, CORRECT?

11       A.   ONE MOMENT.  I'D JUST LIKE TO CHECK SOMETHING

12   OUT.

13       Q.   ALL RIGHT.  WHY DON'T I HAVE IT MARKED SO YOU

14   CAN TAKE A LOOK AT YOUR NOTES AND MAYBE MAKE IT A LITTLE

15   QUICKER?

16       A.   OKAY.

17       Q.   SIR, TAKE A LOOK AT EXHIBIT 536 AND SEE IF THAT

18   REFRESHES YOUR RECOLLECTION AS TO ADMINISTERING THE PDS

19   AND THE FACT THAT AT THE TIME THAT YOU ADMINISTERED THE

20   PDS, SHE WAS STILL TELLING YOU THAT IT HAD BEEN THE

21   INTRUDERS WHO KILLED MR. ALEXANDER?

22       A.   YES.

23       Q.   OKAY.  IF I MAY HAVE THAT BACK.  AND THIS TEST,

24   THIS PDS TEST THAT YOU ADMINISTERED, THE ONE THAT WE HAVE

25   HERE WITH THE ANSWERS, THIS TEST REFLECTS THE FACT THAT

149

1    HER STORY IS STILL THE FACT THAT IT WAS TWO INTRUDERS THAT

2    ACTUALLY KILLED MR. ALEXANDER, DOESN'T THAT REFLECT THAT?

Page 127

Transcript of Testimony of Dr. Richard Samuels

3      A.   YES.   IF IT WAS TAKEN AT THAT TIME, IT WOULD.

4      Q.   IT DID DIDN'T IT?   AND IN FACT, THE PORTION THAT

5    YOU DON'T HAVE IN FRONT OF YOU WOULD SHOW US THAT THAT WAS

6    IN FACT THE CASE, RIGHT?

7      A.   YES.

8      Q.   LET'S TAKE A LOOK AT -- YOU HAVE MINE UP THERE,

9    CORRECT?

10      A.   YES.

11      Q.   AND THAT -- HAVE YOU TAKEN A LOOK AT IT?   IS

12    THAT A COPY THAT ACCURATELY REFLECTS THE ANSWERS IN

13    EXHIBIT 534 AS TO QUESTIONS ONE THROUGH 15 AND I'LL GIVE

14    THIS TO YOU?

15      A.   PLEASE.   YES.

16      Q.   OKAY.   IF I MAY HAVE THAT BACK?   I MOVE FOR

17    ADMISSION OF EXHIBIT NUMBER 533.

18          MS. WILLMOTT:   JUDGE, IS THIS -- IS 533 THE

19    ACTUAL -- SOMETHING THAT DR. SAMUELS TYPED UP OR SOMETHING

20    THAT THE STATE TYPED UP?

21          MR. MARTINEZ:   IT'S A TRUE AND ACCURATE COPY OF

22    THAT PARTICULAR PART OF THE TESTIMONY AND THE DEFENDANT'S

23    RESPONSES ACCORDING TO DR. SAMUELS.

24          THE COURT:   THAT WAS HIS TESTIMONY.

25          MS. WILLMOTT:   OKAY.   WELL, I WOULD OBJECT

                                                          150


1    UNLESS IT'S AN ACTUAL COPY DR. SAMUELS HAD.

2          THE COURT:   OVERRULED.   EXHIBIT 533 WILL BE

3    ADMITTED.

4    BY MR. MARTINEZ:

5      Q.   OKAY.   SIR, LET'S TAKE A LOOK AT EXHIBIT NUMBER

6    533.   THERE ARE SOME INSTRUCTIONS THAT GO WITH THIS,

7    RIGHT?

Transcript of Testimony of Dr. Richard Samuels

8      A.   YES.

9      Q.   AND THE INSTRUCTIONS ARE PART OF THIS MANUAL

10   HERE, EXHIBIT 527, RIGHT?

11     A.   YES.

12     Q.   AND THEY'RE THE ONE THAT INDICATE WHAT QUESTIONS

13   THERE ARE TO BE ASKED?

14     A.   YES.

15     Q.   AND WHATEVER THE ANSWERS ARE, THE ANSWERS ARE,

16   RIGHT?

17     A.   YES.

18     Q.   SO WITH REGARD TO THE FIRST QUESTION, THE PERSON

19   WHO IS TAKING THIS, IN THIS CASE THE DEFENDANT, IS ASKED

20   TO IDENTIFY WHETHER OR NOT ANY OF THESE EVENTS, SERIOUS

21   EVENTS, HAVE OCCURRED IN THEIR LIFE?

22     A.   THROUGHOUT THEIR LIFETIME, CORRECT.

23     Q.   RIGHT.  BUT BECAUSE THESE KINDS OF EVENTS ARE

24   THE KINDS OF EVENTS THAT TRIGGER THESE RESPONSES THAT

25   WE'VE BEEN TALKING ABOUT, LOSS OF MEMORY, RIGHT?

151

1      A.   YES.

2      Q.   THAT TRIGGER THE FOGGY MEMORY, RIGHT?

3      A.   YES.

4      Q.   AND, FOR EXAMPLE, THE FIRST ONE SAYS, SERIOUS

5   ACCIDENT, FIRE OR EXPLOSION, FOR EXAMPLE, INDUSTRIAL,

6   FARM, CAR, PLANE OR BOATING ACCIDENT AND THE DEFENDANT

7   ANSWERED YES TO THAT ONE, RIGHT?

8      A.   CORRECT.

9      Q.   WITH REGARD TO NUMBER 2, NATURAL DISASTER, FOR

10   EXAMPLE, TORNADO HURRICANE, FOOD OR MAJOR EARTHQUAKE, THE

11   DEFENDANT ALSO ANSWERED YES TO THAT ONE, RIGHT?

Transcript of Testimony of Dr. Richard Samuels

12       A.    YES.

13       Q.    NUMBER 3, SHE'S ASKED ABOUT NON-SEXUAL ASSAULT

14   BY A FAMILY MEMBER OR SOMEONE YOU KNOW.  WHEN IT TALKS

15   ABOUT SOMEONE YOU KNOW, IT ISN'T TALKING ABOUT YOU, IT'S

16   TALKING ABOUT SOMEBODY THE DEFENDANT KNOWS, RIGHT?

17       A.    YES.

18       Q.    AND IT SAYS, FOR EXAMPLE, BEING MUGGED,

19   PHYSICALLY ATTACKED, SHOT, STABBED OR HELD AT GUNPOINT BY

20   SOMEONE YOU KNOW, RIGHT?

21       A.    YES.

22       Q.    AND SHE SAID WITH REGARD TO THAT, YES, RIGHT?

23       A.    YES.

24       Q.    AND THEN SHE SAYS ON NUMBER 4, NON-SEXUAL

25   ASSAULT BY A STRANGER, RIGHT?

                                                    152


1        A.    YES.

2        Q.    FOR EXAMPLE, BEING MUGGED, PHYSICALLY ATTACKED,

3    SHOT, STABBED OR HELD AT GUNPOINT, IT'S THE SAME QUESTION

4    AS ABOVE, NUMBER THREE, ONLY THIS ONE TALKS ABOUT A

5    STRANGER, RIGHT?

6        A.    CORRECT.

7        Q.    AND SHE ANSWERED, YES, RIGHT?

8        A.    YES.

9        Q.    NUMBER 5, SEXUAL ASSAULT BY A FAMILY MEMBER OR

10   SOMEONE YOU KNOW, FOR EXAMPLE, RAPE OR ATTEMPTED RAPE, SHE

11   SAID NO TO THAT, DIDN'T SHE?

12       A.    YES.

13       Q.    WE HEARD TESTIMONY ABOUT ISSUES FROM THE

14   DEFENDANT PREVIOUSLY THAT SHE INDICATED SOMETHING ABOUT A

15   SITUATION -- I'M ASKING YOU WHETHER YOU'RE FAMILIAR WITH

16   THE SITUATION WHERE SHE CLAIMS MR. ALEXANDER MAY HAVE

                          Page 130

Transcript of Testimony of Dr. Richard Samuels

17    TAKEN SOME -- HER CLOTHES OFF AND MAY HAVE PENETRATED HER.

18    ARE YOU FAMILIAR WITH THAT?

19         A.    YES.

20         Q.    AND YOU CHARACTERIZED THAT ONE AS A RAPE, DIDN'T

21    YOU?

22         A.    YES.

23         Q.    WHEN WE HAD OUR INTERVIEW?

24         A.    YES.

25         Q.    BUT HERE, NUMBER 5, SHE SAY, NO, IT WASN'T THAT,

                                                                153

1    RIGHT.

2         A.    YES.

3         Q.    AND BETWEEN THE TWO OF YOU, SHE WAS THERE,

4    RIGHT?

5         A.    YES.

6         Q.    AND SHE WOULD KNOW BETTER THAN YOU, RIGHT?

7         A.    CORRECT.

8              MS. WILLMOTT:  OBJECTION.  SPECULATION.

9              THE COURT:  OVERRULED.

10    BY MR. MARTINEZ:

11        Q.    SIX, SEXUAL ASSAULT BY A STRANGER, FOR EXAMPLE,

12    RAPE OR ATTEMPTED RAPE AND SHE SAID NO TO THAT, RIGHT?

13        A.    YES.

14        Q.    SEVEN, MILITARY COMBAT OR A WAR ZONE, SHE SAID

15    NO, RIGHT?

16        A.    CORRECT.

17        Q.    NUMBER 8, SEXUAL CONTACT WHEN YOU WERE YOUNGER

18    THAN 18 WITH SOMEONE WHO WAS FIVE OR MORE YEARS OLDER THAN

19    YOU, FOR EXAMPLE, CONTACT WITH GENITALS, BREASTS, AND SHE

20    SAID NO, RIGHT?

Transcript of Testimony of Dr. Richard Samuels

21     A.   YES.

22     Q.   AND SAYS, IMPRISONMENT, FOR EXAMPLE, PRISON

23  INMATE, PRISONER OF WAR, HOSTAGE, AND SHE SAID NO, RIGHT.

24     A.   CORRECT.

25     Q.   IT CONTINUES ON WITH QUESTION 10.  AND QUESTION

154

1   10 ASKS ABOUT TORTURE AND SHE SAID NO, RIGHT?

2      A.   YES.

3      Q.   NUMBER 11, LIFE THREATENING ILLNESS, SHE SAID

4   NO, RIGHT?

5      A.   CORRECT.

6      Q.   WITH REGARD TO 12, SHE DOES -- THERE IS OTHER

7   TRAUMATIC EVENT AND SHE SAYS YES, RIGHT?

8      A.   YES.

9      Q.   AND THEN SHE SAYS, NUMBER 13, IF YOU ANSWERED

10  YES TO ITEM 13, SPECIFICALLY, I'M SORRY, SPECIFY THE

11  TRAUMATIC EVENT ON THE ANSWER SHEET, RIGHT?

12     A.   YES.

13     Q.   AND SHE SAID, REPEATED EMOTIONAL AND

14  PSYCHOLOGICAL ABUSE, RIGHT?

15     A.   YES.

16     Q.   THEN THIS TEST GOES ON TO PART TWO, RIGHT?

17     A.   YES.

18     Q.   AND IT IS ASKING THE INDIVIDUAL WHOSE TAKING

19  THIS TEST, IN THIS CASE THE DEFENDANT, A QUESTION, RIGHT?

20     A.   YES.

21     Q.   AND THIS IS ONE OF THE GUIDING QUESTIONS THAT

22  DETERMINES OR SUBSTANTIATES OR CONFIRMS OR HELPS YOU

23  CONFIRM THE PRESENCE OF PTSD, RIGHT?

24     A.   YES.

25     Q.   AND IN FACT THE WAY YOU INDICATED WERE THAT --

Transcript of Testimony of Dr. Richard Samuels

155

1   IN YOUR REPORT, WERE THAT HER SCORES ON THE POST TRAUMATIC

2   STRESS DISORDER SCALE CONFIRM THE PRESENCE OF PTSD, RIGHT?

3        A.   YES.

4        Q.   SAYS HERE, IF YOU MARKED YES FOR MORE THAN ONE

5   TRAUMATIC EVENT IN PART ONE, INDICATE WHICH ONE BOTHERS

6   YOU THE MOST.  IF YOU MARKED YES FOR ONLY ONE TRAUMATIC

7   EVENT IN PART ONE, MARK THE SAME ONE ON THE ANSWER SHEET,

8   RIGHT?

9        A.   YES.

10       Q.   AND SHE'S ASKED ABOUT THE SAME 12 QUESTIONS THAT

11  WE'VE JUST GONE OVER, RIGHT?

12       A.   YES.

13       Q.   AND THE ONE THAT -- AND THE ONE THAT SHE

14  INDICATED WAS THE TRAUMATIC EVENT IN HER LIFE THAT

15  TRIGGERS THIS POST TRAUMATIC STRESS DISORDER IS WHAT?  WHY

16  DON'T YOU READ NUMBER 4?

17       A.   NON-SEXUAL ASSAULT, STRANGER.

18       Q.   NOT SOMEBODY THAT SHE KNOWS, RIGHT?

19       A.   CORRECT.

20       Q.   YOU SAID THAT YOU REVIEWED THE PHOTOGRAPHS OF

21  THE CRIME SCENE, RIGHT?

22       A.   YES.

23       Q.   AND YOU TALKED ABOUT MR. ALEXANDER BEING IN THAT

24  SHOWER, RIGHT?

25       A.   YES.

156

1        Q.   HE'S NOT A STRANGER IS HE?

2        A.   NO.

Transcript of Testimony of Dr. Richard Samuels

3      Q.   HE'S SOMEBODY THAT SHE KNEW, RIGHT?

4      A.   YES.

5      Q.   AND IT'S TALKING ABOUT THAT THE THING THAT

6   TRIGGERS IT FOR HER THIS PTSD IS NON-SEXUAL ASSAULT BY A

7   STRANGER, CORRECT?

8      A.   CORRECT.

9      Q.   AND THE REST OF THE QUESTIONS THAT YOU HAVE HERE

10   IN EXHIBIT 534, ALL OF THE ANSWERS HERE ARE BASED ON THE

11   FACT THAT SHE HAD AN ASSAULT BY A STRANGER, RIGHT?

12      A.   THAT'S WHAT SHE SAID IN THAT TEST, YES.

13      Q.   WELL, NO, LET'S GO BACK TO THIS JUST SO WE MAKE

14   SURE, 533, IT SAYS -- WHY DON'T YOU READ IT FOR ME?

15      A.   BELOW --

16      Q.   TO MAKE SURE I CAN BRING IT IN, THE WHOLE THING,

17   OKAY?

18      A.   BELOW ARE SEVERAL QUESTIONS ABOUT THE TRAUMATIC

19   EVENT YOU MARKED IN ITEM 14.  NON-SEXUAL ASSAULT,

20   STRANGER.

21      Q.   AND THESE ARE THE QUESTIONS THAT I HAVE IN MY

22   RIGHT HAND, RIGHT?  THESE ARE THE ANSWERS, RIGHT?

23      A.   YES.

24      Q.   THIS IS HER WORK SHEET, RIGHT?

25      A.   THAT'S RIGHT.

                                            157


1      Q.   DID YOU TURN THIS WORK SHEET, A COPY OF THIS

2   WORK SHEET OVER TO JANEEN DEMARTE?

3      A.   YES.

4      Q.   AND THIS IS A TRUE AND ACCURATE -- OR THIS IS

5   THE ACTUAL ITEM THAT THE DEFENDANT FILLED OUT, RIGHT?

6      A.   YES.

7      Q.   TAKE A LOOK AT 535?

Transcript of Testimony of Dr. Richard Samuels

8      A.    YES.

9            MR. MARTINEZ:  I MOVE FOR ADMISSION OF EXHIBIT

10     535?

11           MS. WILLMOTT:  JUDGE, MAY WE APPROACH?

12           THE COURT:  YOU MAY.

13           (SIDEBAR DISCUSSION.)

14           MS. WILLMOTT:  WE WOULD OBJECT TO EXHIBIT 535

15     ENTERING INTO EVIDENCE FOR THE SAME REASONS THAT THE TEST

16     WE OBJECTED TO.  THIS TEST WORK SHEET ITSELF IS NOT

17     EXPLANATORY.  IT'S SOMETHING THAT THE JURY CAN -- MIGHT

18     TRY AND EXPLAIN THEMSELVES WITHOUT EXPLANATION WITH IT.

19           IT'S ALSO BASED ON INFORMATION THAT A

20     PSYCHOLOGIST IS ABLE TO UNDERSTAND, BUT THAT HAVING THEM

21     TO READ THIS BACK IN THE JURY ROOM WITH NO EXPLANATION IS

22     GOING TO BE PREJUDICIAL AND CONFUSING.

23           THE COURT:  DO YOU INTEND TO WALK HIM THROUGH

24     WHAT EACH AND EVERY CATEGORY MEANS?

25           MR. MARTINEZ:  RIGHT.

                                          158


1            THE COURT:  IN DETAIL?

2            MR. MARTINEZ:  IN DETAIL TO SHOW THAT SHE LIED

3      WITH REGARD TO EVERY SINGLE ONE OF THEM.  IF YOU TAKE A

4      LOOK AT EXHIBIT 533 --

5            THE COURT:  SO IT'S YOUR INTENTION -- THIS IS

6      HER HANDWRITING, CORRECT?

7            MR. MARTINEZ:  THIS IS HER WRITING, HER

8      STATEMENT AND SHE ALSO TALKS ABOUT -- YOU CAN SEE WHAT IT

9      SAYS THERE, I THINK IT --

10           THE COURT:  YOU INTEND TO COVER A THROUGH F IN

11     DETAIL WHAT EACH PORTION OR EACH SECTION MEANS?

Transcript of Testimony of Dr. Richard Samuels

12      A.   RIGHT.

13          MS. WILLMOTT:  JUDGE, I THINK THAT WOULD BE

14   DEMONSTRATIVE AND HE CAN CERTAINLY SHOW IT BUT HAVING IT

15   ULTIMATELY GO BACK TO THE JURY DAYS FROM NOW IS STILL

16   GOING TO BE CONFUSING AND PREJUDICIAL TO THE JURY.

17          MR. MARTINEZ:  I THINK THOSE ARE HER WORDS.

18   THOSE ARE HER ANSWERS.  AND I BELIEVE I'M ENTITLED TO ASK.

19   IT'S AN ADMISSION BY A PARTY OPPONENT, I'M ENTITLED TO ASK

20   IT, ESPECIALLY SINCE HE SAYS THAT THOSE ARE -- THESE ARE

21   THE DEFENDANT'S OWN WRITINGS.  AND IT ALSO APPEARS IN 534.

22   HE'S MAKING IT UP AS TO WHICH ONE IT IS.

23          THE COURT:  OKAY.  WITH THE UNDERSTANDING THAT

24   YOU'RE GOING TO COVER THIS EXHIBIT IN DETAIL WITH THE

25   WITNESS, I'M GOING TO ADMIT EXHIBIT 535.

159

1          (OPEN COURT.)

2          THE COURT:  535 IS ADMITTED.

3   BY MR. MARTINEZ:

4      Q.   SIR, WITH REGARD TO EXHIBIT 535, YOU SAID THIS

5   IS WHAT THE DEFENDANT FILLED OUT, RIGHT?

6      A.   CAN I SEE THAT?  I'M NOT SURE WHETHER SHE DID OR

7   I DID.

8      Q.   SURE.

9      A.   NO, I DID.

10      Q.   AND --

11          MS. WILLMOTT:  JUDGE, MAY WE APPROACH?

12          THE COURT:  YES.

13          (SIDEBAR DISCUSSION.)

14          MS. WILLMOTT:  MY OBJECTION AS TO THAT ENTERING

15   INTO EVIDENCE, HE JUST SAID THAT HE WROTE IT.

16          THE COURT:  LAY MORE FOUNDATION REGARDING IF HE

Page 136

Transcript of Testimony of Dr. Richard Samuels

17    WROTE IT, WHAT HE USED TO WRITE IT, AND THEN I'LL HEAR

18    ADDITIONAL OBJECTIONS.

19              MR. MARTINEZ:  OKAY.

20              (OPEN COURT.)

21    BY MR. MARTINEZ:

22        Q.    SIR, WITH REGARD TO EXHIBIT 534, THIS CONTAINS

23    THE ANSWERS TO IT, RIGHT?

24        A.    YES.

25        Q.    FOR EXAMPLE, 534, YOU SAID THIS IS THE ONE THAT

160

1     THE DEFENDANT FILLED OUT, RIGHT?

2         A.    NO.  I DON'T REMEMBER --

3         Q.    WELL, SIR, LET ME DO IT THIS WAY?

4         A.    OKAY.

5         Q.    ISN'T IT TRUE THAT PREVIOUSLY YOU TOLD US THIS

6     IS THE ONE THAT THE DEFENDANT FILLED OUT, RIGHT?

7         A.    I BELIEVE SO.

8         Q.    AND ISN'T IT TRUE THAT YOU SAID THAT WHATEVER

9     MARKINGS ON HERE ARE THOSE OF THE DEFENDANT, RIGHT?

10        A.    THOSE ARE IN MY HAND, I BELIEVE, AT LEAST PART

11    OF IT IS.

12        Q.    SO, FOR EXAMPLE, PART TWO WHERE IT SAYS CIRCLE

13    NUMBERS THAT APPLY --

14        A.    UM-HUM.

15        Q.    -- THAT'S YOUR WRITING, CIRCLE NUMBERS THAT

16    APPLY, RIGHT?

17        A.    YES.  THAT'S MY WRITING.

18        Q.    AND UNDER 14 IT DOES CIRCLE NUMBER 4, RIGHT?

19        A.    YES.

20        Q.    DID YOU CIRCLE THAT OR DID SHE CIRCLE THAT?

Transcript of Testimony of Dr. Richard Samuels

21       A.   I HONESTLY DON'T RECALL.  BUT I THINK SHE

22  CIRCLED IT OR SHE GAVE ME THE NUMBER AND I CIRCLED IT.  I

23  DON'T RECALL.

24       Q.   AND THEN DOWN AT THE BOTTOM OF IT YOU SAY

25  EXPANDS FOR ASSAULT, LIFE THREATENING, RIGHT?

161

1       A.   RIGHT.

2       Q.   THAT WAS IMPORTANT TO YOU.  THAT'S WHY YOU WROTE

3  IT, RIGHT?

4       A.   RIGHT.

5       Q.   SHE DIDN'T WRITE THAT?

6       A.   NO.  I WROTE THAT.

7       Q.   AND THIS IS AN ASSAULT THAT'S LIFE THREATENING

8  BY A STRANGER, RIGHT?

9       A.   THAT'S WHAT SHE SAID AT THE TIME.

10       Q.   WELL, THAT'S WHEN YOU FILLED OUT THIS TEST,

11  RIGHT, SO THAT'S WHAT --

12       A.   YES.  THAT'S WHAT SHE WAS SAYING AT THE TIME.

13       Q.   ONE OF THE THINGS YOU TOLD US PREVIOUSLY ON

14  DIRECT EXAMINATION WAS THAT, WELL, IN TERMS OF WHAT SHE

15  WAS TELLING YOU, YOU BELIEVED THAT SHE WASN'T TELLING YOU

16  THE TRUTH INITIALLY.  DO YOU REMEMBER TELLING US THAT?

17       A.   YES.  THAT'S CORRECT.

18       Q.   YET YOU ADMINISTERED THIS TEST AND YOU WRITE

19  THIS -- THESE NOTATIONS DOWN EVEN THOUGH YOU BELIEVE THOSE

20  ARE NOT TRUE, RIGHT?

21       A.   THAT'S TRUE.

22       Q.   WHY WERE YOU WRITING DOWN UNTRUTHS?

23       A.   BECAUSE THIS WAS HER PERCEPTION AT THE TIME.

24  THIS WAS HER STORY OF WHAT WENT ON AT THE TIME.  THE TEST

25  WAS ADMINISTERED.  THESE WERE HER RESPONSES.

Page 138

Transcript of Testimony of Dr. Richard Samuels

162

1      Q.   BUT YOU USED IT KNOWING -- YOU JUST SAID,
2  KNOWING THAT THIS WAS A LIE, YOU USED IT AND THEN
3  CONCLUDED THAT THOSE SCORES ON THAT PDS CONFIRM THE
4  PRESENCE OF PTSD EVEN THOUGH YOU JUST NOW TOLD US THAT
5  THIS IS BASED ON A LIE.
6      A.   PERHAPS I SHOULD HAVE RE-ADMINISTERED THAT TEST.
7      Q.   BECAUSE THIS IS ONE OF THE FOUNDATIONS FOR YOUR
8  FINDING OF POST TRAUMATIC STRESS DISORDER ON THE
9  DEFENDANT, RIGHT?
10     A.   CORRECT.
11     Q.   AND THE OTHER ONE IS THE MCMI, RIGHT?
12     A.   CORRECT.
13     Q.   RIGHT.  AS WELL AS YOUR CONVERSATION WITH HER,
14 RIGHT?
15     A.   CORRECT.
16     Q.   SO LET'S TAKE A LOOK AT THE ONE YOU HAVE UP
17 THERE?
18     A.   THE WORKSHEET?
19     Q.   YES, SIR?
20     A.   OKAY.
21     Q.   MY QUESTION IS WITH REGARD TO 535, WHY ARE YOU
22 FILLING THIS OUT AND NOT HER?  WHY DO YOU FEEL THAT YOU
23 HAVE THE NEED TO, FOR EXAMPLE, ITEM 16 THROUGH 19, LET'S
24 TALK ABOUT THOSE.  WHY DO YOU HAVE TO FILL IN THE NUMBERS
25 HERE?  DO YOU SEE THAT?

163

1      A.   YES.
2      Q.   COULDN'T SHE DO THAT HERSELF?

Page 139

Transcript of Testimony of Dr. Richard Samuels

3      A.    NO.  THIS IS FOR THE EXAMINER TO FILL OUT AFTER

4  REVIEWING THE ANSWER SHEET.  THIS IS CALL A HAND SCORING

5  WORKSHEET.

6      Q.    OH, SO THIS IS THE SCORE THAT YOU ACTUALLY DID

7  ON IT?

8      A.    THAT'S RIGHT.  THAT'S OF THE SCORING OF HER RAW

9  DATA.

10     Q.    SO WHEN YOU TOLD ME BEFORE THAT THIS WAS

11 ACTUALLY HER ANSWERS, THAT WAS A MISTAKE THEN?

12     A.    WELL, THERE'S AN ANSWER SHEET WHICH I HAVE.

13 IT'S PROBABLY ON MY DESK, BUT THAT IS VERY SIMILAR IN

14 APPEARANCE.  BUT IT'S A PRINTED FORM WHICH IS WHAT I

15 TRANSFER HER DATA TO.  AND THEN I SCORED FROM MY

16 TRANSFERRED SHEET.

17     Q.    AND THIS SCORING IS DONE WITH REFERENCE TO A

18 GUIDE, CORRECT?

19     A.    A REFERENCE TO A SCORING GUIDE, YES.

20     Q.    RIGHT.  AND YOU GIVE IT A NUMBER, RIGHT?

21     A.    YES.

22     Q.    AND BASED ON THAT NUMBER THAT TELLS YOU, YES,

23 THIS IS A MEASURE THAT CAN BE USED IN SUPPORT OF PTSD OR

24 NOT, RIGHT?

25     A.    CORRECT.

                                        164


1      Q.    EXHIBIT NUMBER 534, QUESTION NUMBER 22, DO YOU

2  SEE THAT?  THERE'S A NUMBER THERE, RIGHT?

3      A.    YES.

4      Q.    WHERE IS THE GUIDE THAT TELLS YOU WHAT YOU WOULD

5  HAVE TO -- QUESTION NUMBER 22, YOU GIVE HER A THREE?

6      A.    WELL, I DIDN'T GIVE HER A THREE.  SHE SCORED A

7  THREE.  AND THERE'S A SCALE ON THE ACTUAL ANSWER SHEET

Transcript of Testimony of Dr. Richard Samuels

8  WHERE YOU CIRCLE ZERO, ONE, TWO OR THREE.  IN THE MANUAL

9  THAT YOU HAVE OVER THERE IT EXPLAINS PRECISELY HOW TO DO

10  THIS.

11      Q.   SO WHAT YOU TALKING ABOUT IS EXHIBIT 527, RIGHT?

12      A.   THAT'S CORRECT.

13      Q.   SO SHE PUT A THREE IN RESPONSE TO THE QUESTION

14  WHATEVER THE QUESTION WAS?

15      A.   WHATEVER THE ITEM WAS, YES.

16      Q.   THE QUESTION THAT YOU DON'T HAVE IN FRONT OF

17  YOU?

18      A.   YEAH.  THE QUESTIONS ARE IN THE BOOK.

19      Q.   OKAY.  EXHIBIT 527, QUESTION 22, READS THAT FOR

20  US?

21      A.   THE INSTRUCTIONS ARE FOR ITEM NUMBER 22.

22      Q.   UM-HUM, YES.

23      A.   THERE'S IS A -- THE EXACT DIRECTIONS ARE HERE.

24  OKAY.  THAT'S NOT THE RIGHT ONE.  OKAY.  I GUESS MAYBE

25  THIS DOESN'T HAVE THE QUESTION -- HOLD ON ONE SECOND.

                                                165


1          I GUESS THE ACTUAL TEST IS NOT HERE AND I

2  HAD EVERYTHING TOGETHER.  WAIT, HOLD ON.  ALL RIGHT.

3  THERE'S A QUESTION BOOKLET, A BOOKLET THAT COMES WITH THIS

4  WHICH I THOUGHT WAS ATTACHED IN THIS BOOK BUT IT ISN'T.

5  AND IT EXPLAINS TO THE INDIVIDUAL HOW TO SCORE THESE

6  PARTICULAR ITEMS.

7          AND THEN IT HAS A SEPARATE ANSWER SHEET.

8  IF I DON'T HAVE THAT WITH ME HERE, I APOLOGIZE.  I CAN

9  CERTAINLY BRING IT TOMORROW.  BUT I DON'T HAVE --

10  APPARENTLY I DON'T HAVE IT HERE.  SOME PAGES MUST HAVE

11  GOTTEN LOST FROM --

**Page 141**

Transcript of Testimony of Dr. Richard Samuels

12      Q.   SO THAT'S NOT -- WHAT YOU HAVE IN FRONT OF YOU

13   IS NOT THE GUIDE TO SCORE ON NUMBER 535?

14      A.   RIGHT.   IT'S NOT THE ACTUAL QUESTION SHEET THAT

15   IS USED FOR THIS.

16      Q.   RIGHT.

17      A.   I THOUGH IT WAS IN HERE, BUT APPARENTLY IT'S

18   NOT.

19      Q.   SO WHAT IS NOT THAT THEN THAT YOU HAVE IN FRONT

20   OF YOU?  WHAT IS THIS?

21      A.   THIS IS THE MANUAL.  IT TELLS YOU HOW TO SCORE

22   IT.  IT TELLS YOU ABOUT THE VALIDITY OF THE TEST.  IT

23   DESCRIBES SAMPLE REPORTS.  BUT APPARENTLY IT DOESN'T HAVE

24   THE ACTUAL QUESTIONS.  AND I HAD THAT TOGETHER WITH THE

25   ORIGINAL ANSWER SHEET.  AND I'M AFRAID I LEFT IT HOME.

166

1      Q.   ALL RIGHT.  IF I MAY HAVE THAT BACK?

2      A.   YES.

3      Q.   IF YOU TAKE A LOOK AT PAGE NUMBER 2 OF EXHIBIT

4   NUMBER 534?

5      A.   UM-HUM.

6      Q.   QUESTION NUMBER 16?

7      A.   YES.

8      Q.   SEVENTEEN, 18 AND 19, DO YOU SEE THAT?

9      A.   YES.

10      Q.   THOSE YESES, RIGHT?

11      A.   CORRECT.

12      Q.   SO 16, 17, 18 AND 19, THOSE ARE FOUR CHECK

13   MARKS, RIGHT?

14      A.   YES.

15      Q.   HOW COME ON THIS -- AND YOU FILLED OUT 535?

16      A.   THAT IS THE HAND SCORING SHEET.

Page 142

Transcript of Testimony of Dr. Richard Samuels

17      Q.   THIS IS THE ONE YOU SAID YOU FILLED OUT?

18      A.   MAY I?  YES.  THIS THE HAND SCORING SHEET.

19      Q.   IF I MAY HAVE IT BACK.  WHY WAS THERE A SIX

20   THERE PRESENT AT FIRST, THEN YOU CHANGED IT?

21      A.   I ADDED THEM UP INCORRECTLY.

22      Q.   THIS TEST, SIR, LIKE ALL TESTS, IS A SITUATION

23   WHERE YOU SIT DOWN, INVOLVES A SITUATION WHERE YOU SIT

24   DOWN WITH THE DEFENDANT AND YOU INDICATE TO THEM THAT

25   YOU'RE GOING TO ADMINISTER A TEST, RIGHT?

                                                    167

1       A.   CORRECT.

2       Q.   AND YOU PROVIDE THEM THE MATERIALS WITH WHICH TO

3    MAKE ANSWERS, CORRECT?

4       A.   CORRECT.

5       Q.   YOU GIVE THEM THE INSTRUCTION, RIGHT?

6       A.   YES.

7       Q.   AND THEN THERE'S A PERIOD OF TIME WITH WHICH --

8    WITHIN WHICH THIS TEST MUST BE ANSWERED, RIGHT?

9       A.   WELL, THERE'S NO TIME LIMIT ON THIS TEST.

10      Q.   HOW LONG DID THE DEFENDANT TAKE TO FILL IT OUT?

11      A.   20 MINUTES OR SO.

12      Q.   AND -- BUT IF SHE WANTED TO TAKE MORE, SHE COULD

13   HAVE, CORRECT?

14      A.   CORRECT.

15      Q.   AND DURING THAT TIME, SHE NEVER MANIFESTED ANY

16   INDICATION TO YOU THAT SHE DIDN'T UNDERSTAND ANY OF THE

17   QUESTIONS, CORRECT?

18      A.   THAT'S CORRECT.

19      Q.   FOR EXAMPLE, EXHIBIT NUMBER 533 THAT TALKS ABOUT

20   THE TRAUMATIC EVENT, NON-SEXUAL ASSAULT BY STRANGER, NEVER

Page 143

Transcript of Testimony of Dr. Richard Samuels

21     INDICATED ANY COMPUNCTION OR ANY RESERVATION OR

22     RELUCTANCE, WHILE YOU WERE THERE ADMINISTERING IT, IN

23     FILLING THAT OUT, CORRECT?

24          A.   CORRECT.

25          Q.   AND WHAT YOU ARE TELLING ME IS THAT THE

                                                          168


1      VALIDITY -- OR THIS TEST REALLY IS ONLY AS GOOD AS THE

2      PERSON WHO IS TELLING OR FILLING IT OUT, RIGHT?

3           A.   THAT'S TRUE.

4           Q.   SO IF THEY'RE LYING, THEN THE TEST IS NOT VERY

5      GOOD?

6           A.   THAT'S CORRECT.

7           Q.   AND IN THIS CASE WE DO HAVE A CIRCUMSTANCE WHERE

8      YOU KNOW THAT DEFENDANT'S LYING AND SHE LIED ON THE TEST,

9      RIGHT?

10          A.   WELL, HER ANSWERS DIDN'T REFLECT WHAT WE

11     ULTIMATELY DISCOVERED.

12          Q.   RIGHT.  SO SHE LIED, RIGHT?

13          A.   YES.  OR HER ANSWERS MAY HAVE BEEN CONSISTENT

14     WITH THE STORY THAT SHE WAS TELLING.

15          Q.   WELL, 533, QUESTION NUMBER 14, THE ANSWER,

16     THAT'S A LIE?

17          A.   QUESTION NUMBER 4 OR 14 DID YOU SAY?

18          Q.   WELL, IT'S QUESTION 14?

19          A.   OH, 14 ABOVE, I SEE, OKAY.  YES.

20          Q.   AND SHE WAS GIVEN MANY CHOICES, INCLUDING RIGHT

21     ABOVE THERE BUT NON-SEXUAL ASSAULT BY SOMEONE SHE KNEW,

22     RIGHT?

23          A.   YES.

24          Q.   SO THAT IS A LIE, RIGHT?

25          A.   YES.

                              Page 144

Transcript of Testimony of Dr. Richard Samuels

169

1          MS. WILLMOTT:  OBJECTION, SPECULATION.

2      A.   WELL, AGAIN --

3          THE COURT:  HOLD ON, SIR, FOR A MOMENT.

4  APPROACH PLEASE.

5          (SIDEBAR DISCUSSION.)

6          MS. WILLMOTT:  JUDGE, THE SPECULATION IS WHETHER

7  OR NOT DR. SAMUELS KNOWS IF MS. ARIAS WAS LYING.  HE HAS

8  NO IDEA WHETHER SHE HAD SOME ASSAULT IN THE PAST BY A

9  STRANGER.  AND SO SHE COULD HAVE BEEN REPORTING THAT

10  ASKING DR. SAMUELS TO COMMENT ON THE ULTIMATE ISSUE OF

11  WHETHER OR NOT THAT MS. ARIAS IS LYING, IS NOT -- HE'S NOT

12  THE APPROPRIATE PERSON TO ASK.  IT WOULD HAVE BEEN MS.

13  ARIAS AND HE DIDN'T ASK HER.

14          MR. MARTINEZ:  THEY CAN CLEAR THAT UP ON

15  REDIRECT.  I MEAN, HE JUST SAID THAT HE BELIEVES THAT SHE

16  WAS LYING AT THE TIME AND THAT HIM AND MR. NURMI -- AND

17  WHILE WE'RE HERE, I WANT TO MAKE THAT POINT.  I'M NOT

18  GOING TO ASK HIM ANYTHING ABOUT THE OCCASION HE SAID THAT

19  HE AND MR. NURMI CHANGED THE DEFENDANT'S MIND OR CHANGED

20  THE DEFENDANT'S STORY AND TO -- THE WAY HE PHRASED IT IS

21  WE GOT TOGETHER AND HE TALKED HER INTO IT.  THAT'S MY

22  CHARACTERIZATION.

23          I'M NOT GOING TO ASK HIM ANYTHING ABOUT THAT

24  MEETING SO THAT IF HE BLURTS THAT OUT, I'M NOT GOING TO --

25  I DON'T WANT TO BE HELD RESPONSIBLE FOR THAT.  I WANT TO

170

1  BE CAREFUL BY POINTING THAT OUT.

2          MS. WILLMOTT:  JUDGE, THAT IS A COMPLETE

Page 145

Transcript of Testimony of Dr. Richard Samuels

3   MISCHARACTERIZATION AGAIN OF WHAT DR. SAMUELS SAID.  HE

4   ONLY COMMENTED THAT HE BROUGHT MR. NURMI WITH HIM.  THEY

5   CONFRONTED HER.  HE WOULD USE THE TERM CONFRONTED UNTIL

6   SHE FINALLY TOLD THE TRUTH.

7            THE COURT:  THEN HE SHOULD RESPOND, IF IT WAS A

8   MISCHARACTERIZATION, THEN THERE SHOULD BE NO ISSUE WITH

9   HIM RESPONDING IN THAT FASHION.

10           MS. WILLMOTT:  WELL, THAT'S TRUE.

11           THE COURT:  MY NEXT QUESTION IS, WAS THERE

12   FOLLOW UP DISCUSSION REGARDING WHAT SHE MEANT WHEN SHE

13   PROVIDED THIS ANSWER?

14           MR. MARTINEZ:  WHEN SHE PROVIDED THIS ANSWER,

15   NO.

16           THE COURT:  WHEN THE DEFENDANT GAVE THIS

17   ANSWER --

18           MR. MARTINEZ:  ABOUT NON-SEXUAL?

19           THE COURT:  RIGHT.

20           MR. MARTINEZ:  THERE WAS NO FOLLOW UP.  HE JUST

21   SCORED IT.

22           THE COURT:  ALL RIGHT.  THEN I'M GOING TO

23   SUSTAIN THE OBJECTION.

24           (OPEN COURT.)

25           THE COURT:  YOU MAY CONTINUE.

                                                 171


1   BY MR. MARTINEZ:

2        Q.   AND AFTER THIS TESTING WAS DONE AND AFTER THIS

3   ANSWER WAS GIVEN, AND I'M JUST ASKING ABOUT YOU, NOT

4   ASKING ABOUT ANYBODY ELSE, THERE WAS A SUBSEQUENT MEETING,

5   YES OR NO, RIGHT?

6        A.   COULD YOU REPEAT THAT?

7        Q.   AFTER THIS WAS ADMINISTERED, THIS TEST, 533 --

                         Page 146

Transcript of Testimony of Dr. Richard Samuels

8      A.    YES.

9      Q.    -- THERE WAS A SUBSEQUENT MEETING, RIGHT?

10     A.    AFTERWARDS, YES.

11     Q.    YES.  AND DURING THIS SUBSEQUENT MEETING IS WHEN

12 THE STORY CHANGED, CORRECT?

13     A.    CORRECT.

14     Q.    AND DURING THAT STORY CHANGE, ONE OF THE THINGS

15 THAT THE DEFENDANT -- OR WHAT THE DEFENDANT TOLD YOU WAS

16 THAT THIS STORY ABOUT THIS STRANGERS WAS FICTION, CORRECT?

17     A.    THAT'S CORRECT.

18     Q.    AND THAT, IN FACT, SHE HAD BEEN THE ONE WHO HAD

19 ACTUALLY KILLED MR. ALEXANDER, CORRECT?

20     A.    YES.

21     Q.    AND YET YOU DID NOT ADMINISTER ANOTHER PDS?

22     A.    THAT WAS OVERSIGHT AND I SHOULD HAVE DONE THAT.

23     Q.    AND, SIR, ONE OF THE OTHER THINGS IS THAT DURING

24 THIS CONVERSATION OR DURING YOUR MEETINGS WITH THE

25 DEFENDANT, YOU AND SHE TALKED ABOUT A NUMBER OF THINGS,

                                                    172

1  DIDN'T YOU?

2      A.    SURE.

3      Q.    IN FACT, ONE OF THE THINGS THAT YOU TALKED TO US

4  ABOUT DURING DIRECT EXAMINATION WAS SPECIFICALLY THE ROPE

5  AT THE CRIME SCENE.  DO YOU REMEMBER ANSWERING QUESTIONS

6  ABOUT THAT?

7      A.    YES.

8      Q.    ISN'T THE TRUE, SIR, THAT ONE OF THE THINGS THAT

9  THE DEFENDANT TOLD YOU ABOUT THAT ROPE WAS THAT SHE WAS

10 TIED AT THE HANDS, RIGHT?

11     A.    YES.

                      Page 147

Transcript of Testimony of Dr. Richard Samuels

12      Q.   AND SHE ALSO TOLD YOU THAT SHE WAS TIED AT THE

13   ANKLES, DIDN'T SHE TELL YOU THAT?

14      A.   WELL, THAT'S WHAT I HAD IN MY NOTES.

15      Q.   NO.  I'M NOT ASKING WHAT YOU HAD IN YOUR NOTES.

16   I'M ASKING YOU WHETHER OR NOT THAT'S WHAT SHE TOLD YOU?

17      A.   I DON'T REMEMBER WHAT SHE TOLD ME.  WHAT MY --

18      Q.   YOU HAVE NOTES, RIGHT?

19      A.   BUT I DO HAVE NOTES.

20      Q.   AND THOSE NOTES ARE MADE AT EXACTLY THE TIME

21   THAT SHE IS RELATING THAT TO YOU, CORRECT?

22      A.   THAT'S CORRECT.

23      Q.   AND THOSE NOTES REFLECT ON TWO OCCASIONS, ON TWO

24   SEPARATE PARTS, THAT SHE WAS TIED DOWN AT THE HANDS AND

25   THE ANKLES, RIGHT?

173

1      A.   THAT'S WHAT MY NOTES REFLECT, YES.

2      Q.   AND THERE'S NO REASON FOR US TO DOUBT YOUR

3   NOTES, RIGHT?

4      A.   NO, THERE AREN'T.  THE ONE THING -- THE FACT IS

5   THAT MOST OF THE TIME OVER THE YEARS WHEN PEOPLE HAVE SAID

6   THEY USED ROPE, THEY TIED THE HANDS AND THE ANKLES.

7             IT IS CONCEIVABLE THAT IN MY ATTEMPT TO

8   WRITE DOWN QUICKLY AS SHE'S TALKING, I MAY HAVE ADDED THAT

9   BY MISTAKE BUT I DON'T REMEMBER.  SO YOU HAVE TO GO WITH

10   WHAT I WROTE.

11      Q.   SO ARE YOU CONFESSING OR SAYING THAT YOU'RE

12   WRONG IN WRITING THAT DOWN?

13      A.   I DON'T KNOW.

14      Q.   SO BUT ISN'T THAT -- THE NOTES ISN'T THAT WHAT

15   BROUGHT PARTLY -- ISN'T THAT PART OF THE CLINICAL

16   INTERVIEW?

Transcript of Testimony of Dr. Richard Samuels

17        A.   YES, IT IS.

18        Q.   AND ISN'T THAT PART OF WHAT HAS FORMED YOUR

19   CONCLUSIONS THAT SHE WAS -- THAT SHE WAS AFFLICTED WITH

20   POST TRAUMATIC STRESS DISORDER?

21        A.   YES.

22        Q.   AND SO DON'T YOU THINK THAT THAT WOULD BE

23   IMPORTANT TO MAKE SURE THAT YOU WERE ACCURATE?

24        A.   THE FORMULATION OF THE POST TRAUMATIC STRESS

25   DISORDER CAME ABOUT AFTER A CAREFUL ANALYSIS OF THE NOTES,

                                              174


 1   THE CRIME SCENE MATERIAL AND HER CHANGED STORY.

 2             THESE TESTS WHICH I HAD ADMINISTERED

 3   EARLIER DID CONFIRM THE PRESENCE OF POST TRAUMATIC STRESS

 4   DISORDER.  ALTHOUGH I WAS IN ERROR BY NOT RE-ADMINISTERING

 5   THE PDS.

 6        Q.   AND THAT I'M TALKING ABOUT THOSE TESTS.  WE'LL

 7   TALK ABOUT THAT PROBABLY TOMORROW.  BUT I'M TALKING ABOUT

 8   THE STATEMENT TO YOU FROM HER THAT SHE WAS TIED AT BOTH

 9   HANDS AND ALSO AT THE ANKLES?

10        A.   YES.  WELL, THAT'S WHAT I WROTE.

11        Q.   AND THERE'S NO REASON, AS YOU SIT HERE TODAY, TO

12   DOUBT THAT, RIGHT?

13        A.   NO.

14        Q.   AND ONE OF THE OTHER THINGS THAT SHE TOLD YOU

15   WAS THAT EVEN THOUGH SHE -- WHEN THIS WAS GOING ON AND SHE

16   WAS TIED DOWN, THAT IT WAS ACTUALLY MR. ALEXANDER, WHEN

17   THIS WAS APPEARING, THAT HE ACTUALLY CUT THE ROPES AS HE

18   APPROACHED CLIMAX, CORRECT?

19        A.   YES.

20        Q.   AND HE USED A KNIFE TO CUT THE ROPES, RIGHT?

                          Page 149

Transcript of Testimony of Dr. Richard Samuels

21    A.   YES.

22        Q.   AND THEN AS HE APPROACHED CLIMAX, HE GOT OR SHE

23    STRADDLED HIM OR GOT ON TOP OF HIM, RIGHT?

24    A.   YES.

25        Q.   AND WHILE SHE WAS ON TOP OF HIM, THAT'S WHEN MR.

                                                                175

1    ALEXANDER TOOK THE PHOTOGRAPHS, THE NUDE PHOTOGRAPHS,

2    RIGHT?

3         A.   THAT'S CORRECT, YES.

4         Q.   OKAY.   I WANT YOU TO TAKE A LOOK AT EXHIBITS

5    164, 165, 168 AND 169?

6         A.   OKAY.

7         Q.   THOSE ARE PHOTOGRAPHS OF MS. ARIAS, CORRECT?

8         A.   YES.

9         Q.   AND THOSE ARE THE PHOTOGRAPHS OF HER SPRAWLED OR

10   LAYING BACK ON THE BED, CORRECT?

11        A.   YES.

12        Q.   IT ALSO SHOWS A PICTURE OF HER VAGINAL AREA,

13   CORRECT?

14        A.   YES.

15        Q.   AND IT ALSO SHOWS A PICTURE OF HER BACK SIDE,

16   RIGHT?

17        A.   YES.

18        Q.   IN NONE OF THOSE PICTURES -- MR. ALEXANDER

19   APPEARS IN NONE OF THOSE PICTURE, CORRECT?

20        A.   CORRECT.

21        Q.   THAT ARE THE PICTURE, SIR, THAT WERE -- WELL,

22   DID YOU EVER SEE OR LOOK AT THESE PICTURES AFTER YOU

23   TALKED TO MS. ARIAS AND YOU RECEIVED THE STORY ABOUT THE

24   PICTURES BEING TAKEN WHILE SHE WAS STRADDLING HIM?

25        A.   I SAW SOME PICTURES.   BUT I DON'T BELIEVE I'VE

Page 150

Transcript of Testimony of Dr. Richard Samuels

176

1    SEEN ALL OF THEM.

2         Q.   SO DON'T YOU THINK IT WOULD HAVE BEEN IMPORTANT

3    TO LOOK AT THOSE PHOTOGRAPHS SO THAT YOU COULD SEE IF YOU

4    COULD CORROBORATE WHAT SHE WAS TELLING YOU AT THAT TIME

5    WHAT'S HAPPENING?

6         A.   ACTUALLY I HAD THE PHOTOGRAPHS WHEN I FIRST

7    BEGAN THE CASE.  IT WOULD HAVE BEEN HELPFUL TO

8    CORROBORATE, YES.

9         Q.   AND THAT WASN'T DONE IN THIS CASE, CORRECT?

10        A.   NO.

11        Q.   AND IF YOU WOULD HAVE LOOKED AT THOSE, THAT

12   WOULD HAVE PROVIDED YOU AN OPPORTUNITY TO ASK HER ABOUT

13   THIS PARTICULAR ISSUE, RIGHT?

14        A.   YES.

15        Q.   SINCE THAT IS PART OF WHAT GOES INTO THIS POST

16   TRAUMATIC STRESS DISORDER DIAGNOSIS, LOOKING AT WHAT

17   SOMEBODY TELLS YOU AND WHETHER OR NOT IT CAN BE

18   CORROBORATED, RIGHT?

19        A.   WELL, I DIDN'T SEE A MAJOR CONTRIBUTION TO HER

20   POSE TRAUMATIC STRESS DISORDER AS A FUNCTION OF THE SEXUAL

21   LIFE THAT THEY WERE HAVING.

22        Q.   BUT IF SOMEBODY IS A LIAR OVER AND OVER WITH

23   SOMETHING LIKE THAT, DON'T YOU THINK THAT THAT'S SOMETHING

24   YOU WOULD CONSIDER?

25             MS. WILLMOTT:  OBJECTION.  AS THE

177

1    CHARACTERIZATION OR SOMEONE BEING A LIAR.  THAT'S

2    CERTAINLY NOT WHAT DR. SAMUELS HAS AGREED TO.

Page 151

Transcript of Testimony of Dr. Richard Samuels

3        THE COURT:  APPROACH PLEASE.

4        (SIDEBAR DISCUSSION.)

5        MS. WILLMOTT:  HE IS USING HIS STATEMENT TO

6   TESTIFY IF SOMEONE IS A LIAR OVER AND OVER AGAIN.  HE'S

7   TALKING ABOUT MS. ARIAS.  THAT'S NOT WHAT DR. SAMUELS HAS

8   AGREED TO.  HE'S NOT SAID THAT.  SO IT'S AN UNFAIR

9   QUESTION.  IT'S CONFUSING.  AND IT'S UNFAIR TO BE ABLE TO

10  ASK HIM THAT BECAUSE HE CAN'T ANSWER THAT.  THAT'S NOT

11  SOMETHING HE'S PREVIOUSLY AGREED TO.

12       THE COURT:  WELL, ARE YOU ASKING ABOUT THIS

13  DEFENDANT?  ARE YOU ASKING HYPOTHETICALLY IN TERMS OF

14  SCORING?

15       MR. MARTINEZ:  HYPOTHETICALLY.

16       THE COURT:  THEN YOU NEED TO CLARIFY YOUR

17  QUESTION.

18       MR. NURMI:  JUDGE IT'S --

19       THE COURT:  I KNOW.  I'M GOING TO LET HIM

20  CLARIFY THIS QUESTION AND THEN I WILL --

21       MR. NURMI:  OKAY.

22       MR. MARTINEZ:  MAY I ASK ONE MORE QUESTION?

23       THE COURT:  YES, YOU MAY.

24       MS. WILLMOTT:  HE NEEDS TO CLEAR UP THAT HE'S

25  TALKING HYPOTHETICALLY.

                                        178

1        THE COURT:  RIGHT.

2        MR. MARTINEZ:  I'LL CLEAR IT UP AND THEN I'LL

3   ASK ONE MORE QUESTION.

4        (OPEN COURT.)

5   BY MR. MARTINEZ:

6    Q.  SIR, HYPOTHETICALLY SPEAKING, ISN'T IT IMPORTANT

7   IF YOU HAVE SOMEONE WHO YOU ARE ASSESSING, IF THEY LIE TO

                   Page 152

Transcript of Testimony of Dr. Richard Samuels

8    YOU OVER AND OVER AGAIN, ISN'T IT IMPORTANT TO CORROBORATE

9    THINGS?

10        A.   I DIDN'T VIEW THE STORY SHE WAS TELLING AS A

11   LIE.

12        Q.   NO, NO, NO, I'M NOT ASKING YOU ABOUT THIS CASE.

13   I'M ASKING GENERALLY SPEAKING, SIR?

14        A.   THE INFORMATION THAT I GET IN A CASE CAN BE

15   CORROBORATED TO SOME DEGREE.

16        Q.   NO, NO.  MY QUESTION IS, SIR, IF SOMEONE, NOT

17   THIS CASE, GENERALLY SPEAKING, IN YOUR EXPERIENCE ALL

18   THESE YEARS THAT YOU HAVE, IF SOMEONE IS CONSTANTLY LYING

19   TO YOU, NOT THIS CASE, IF SOMEONE IS CONSTANTLY LYING TO

20   YOU, DON'T YOU THINK IT'S IMPORTANT TO ATTEMPT TO

21   CORROBORATE WHAT THEY'RE TELLING YOU?

22        A.   IF I KNEW SOMEONE WAS CONSTANTLY LYING TO ME, I

23   DISCONTINUE THE EVALUATION BECAUSE IT WOULDN'T BE

24   WORTHWHILE IN CONTINUING IT.

25        Q.   SO YOU WOULDN'T CORROBORATE?  YOU WOULD JUST

                                                    179


1    DISCONTINUE IT, RIGHT?

2         A.   IF I KNEW SOMEBODY WAS LYING CONSISTENTLY, WHAT

3    WOULD BE THE POINT OF ME TO CONTINUE EITHER WITH THERAPY

4    OR WITH AN EVALUATION?

5         Q.   WHAT IF THEY ONLY LIED THREE OR FOUR TIMES THAT

6    YOU KNEW OF?

7         A.   IF I WAS ABLE TO CORROBORATE THAT OF COURSE I

8    WOULD.

9         Q.   WITH REGARD TO THESE PHOTOGRAPHS OUR

10   INFORMATION -- OR YOU CAN SEE ON THERE THE DATE AND THE

11   TIME --

                        Page 153

Transcript of Testimony of Dr. Richard Samuels

12    A.    RIGHT.

13    Q.    -- GIVE ME A DATE?

14    A.    6/4/08.

15    Q.    AT WHAT TIME?  GIVE US A TIME?

16    A.    1:42 P.M.

17    Q.    AT THAT TIME, SIR, ACCORDING TO YOUR ASSESSMENT,

18    SHE WAS NOT SUFFERING ANY OF THESE FOGGY MEMORIES THEN,

19    WAS SHE?

20    A.    TO MY KNOWLEDGE, THAT'S TRUE.

21    Q.    WELL, NO, YOU'RE THE ONE THAT TOLD US WHEN SHE

22    WAS.  DO YOU REMEMBER, YOU DID THE GRAPH?

23    A.    THE FOGGY MEMORY OCCURRED AT THE TIME OF THE

24    KILLING.

25    Q.    RIGHT.  SO AT THAT POINT SHE WAS NOT HAVING ANY

                                                    180

1     MEMORY PROBLEMS -- ANY MEMORY PROBLEMS, RIGHT?

2     A.    CORRECT.

3     Q.    AND SHE WASN'T FOGGY, RIGHT?

4     A.    CORRECT.

5     Q.    SO IF THAT'S AN INCONSISTENCY, IT CANNOT BE

6     ATTRIBUTED TO HER HAVING HAD A FOGGY MEMORY, CORRECT?

7     A.    THAT'S TRUE.

8          THE COURT:  OBJECTION.  SPECULATION.

9          MR. MARTINEZ:  I DON'T HAVE ANY THING ELSE.

10    WELL, I MEAN, PURSUANT TO WHAT WE TALKED ABOUT, I DON'T

11    HAVE ANYTHING ELSE TODAY.

12         THE COURT:  ALL RIGHT.  THE OBJECTION IS

13    OVERRULED.  THE ANSWER WILL STAND.

14         LADIES AND GENTLEMEN, WE ARE GOING TO TAKE THE

15    EVENING RECESS.  PLEASE BE BACK IN THE DESIGNATED AREA.

16    CAN EVERYONE BE HERE AT 10:00 O'CLOCK TOMORROW MORNING?

                        Page 154

Transcript of Testimony of Dr. Richard Samuels

17   10:00 O'CLOCK.  HAVE A NICE EVENING.  YOU'RE EXCUSED.

18   PLEASE REMEMBER THE ADMONITION.

19            (A RECESS WAS HELD).

20            THE COURT:  THE RECORD WILL SHOW THE JURY LEFT

21   THE COURTROOM.  WE'RE IN RECESS.  DR. SAMUELS, YOU MAY

22   STEP DOWN.

23        A.    THANK YOU.

24                (A RECESS WAS HELD).

25

                                             181

 1

 2

 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

Transcript of Testimony of Dr. Richard Samuels

21

22

23

24

25

182

1

2

3

4

5

6          I, MICHAEL A. BABICKY, DO HEREBY CERTIFY THAT

7   THE FOREGOING PAGES CONSTITUTE A TRUE AND ACCURATE

8   TRANSCRIPT OF MY STENOGRAPHIC NOTES, TAKEN AT SAID TIME

9   AND PLACE, ALL DONE TO THE BEST OF MY SKILL AND ABILITY.

10          DATED THIS 6TH DAY OF AUGUST,

11      2013.

12

13

14

15

16                    MICHAEL A. BABICKY /S/

17                    _____

18                    CERTIFIED REPORTER

19                    AZ. CERTIFICATE NO. 50361

20

21

22

23

24

25

Page 156

Transcript of Testimony of Dr. Richard Samuels

# EXHIBIT 32

*Andriano v. Ryan*, Case No. CV-16-01159-PHX-SRB
Motion for Evidentiary Development

OFFICE OF THE
PRESIDING DISCIPLINARY JUDGE
SUPREME COURT OF ARIZONA

APR 7 2017

FILED

BY_____

Craig D. Henley, Bar No. 018801
Senior Bar Counsel - Litigation
State Bar of Arizona
4201 N. 24th Street, Suite 100
Phoenix, Arizona 85016-6266
Telephone (602) 340-7272
Email: LRO@staff.azbar.org

## BEFORE THE PRESIDING DISCIPLINARY JUDGE

IN THE MATTER OF A
CURRENT MEMBER OF
THE STATE BAR OF ARIZONA,

**JUAN M. MARTINEZ,**
    **Bar No. 009510,**

        Respondent.

PDJ 2017-9044

**COMPLAINT**

[State Bar No. 15-3363]

Complaint is made against Respondent as follows:

**GENERAL ALLEGATIONS**

1.    On May 12, 1984, Respondent was licensed to practice law in the State

of Arizona.

**COUNT ONE (File no. 15-3363/Brody)**

3.     Complainant is the President of the Arizona Attorneys for Criminal Justice, a statewide organization for criminal defense attorneys, law students and other law-related professionals.

4.     Respondent is a prosecutor with the Maricopa County Attorney's Office (hereinafter referred to as "MCAO") and has been since 1988.

5.     During his tenure with the MCAO, and described in greater detail below, Respondent engaged in a pattern of conduct which violated his ethical duties and was deemed unprofessional by various courts.

### *State v. Morris*, 215 Ariz. 324 (2007)

6.     In the underlying criminal case, Respondent prosecuted Morris for the 2002 and 2003 murders of five women.

7.     During his closing argument in the aggravation phase of the case, Respondent argued that Morris had sex with four of the victims' corpse and kept the bodies because he enjoyed the odor of the decomposition.

8.     During his rebuttal closing argument in the aggravation phase, Respondent responded to opposing counsel's argument by singling out individual members of the jury and asking them to put themselves in place of the victims.

9.     Respondent's statements include the following:

"Which one of you want to volunteer to come sit here and have the defendant sit himself on your chest and say, [o]h, that didn't hurt? Because the defense attorney is saying throw common sense out of window. Which one? I challenge anybody to say, [t]hat is something I want to do.

And anyway, and on top of that, while he's sitting on my chest, which one of you, since the lower left-hand side has the longer hair of the jurors, maybe she wants to have him grab her hair while he's sitting on her chest…to grab it and pull it around her neck.

You think that's not going to hurt?  You think one of you guys is going to volunteer for that? You can't leave your common sense aside. (Defense counsel) wants you to because he makes these arguments and says, well, we don't know what is in their heads. We don't know what is in Juror Number 1's head. Can you tell me you don't think it's not going to hurt when he sits on you?

Hey, Juror Number 1 or Juror Number 14, whatever it is, what if we put Winnie the Pooh tie around your neck? Are you going to enjoy that? Are you going to like it? Going to feel real good when you can't breathe?"

10.     During their appellate review of the case, the Supreme Court held that "[a]lthough the State argues that the prosecutor simply asked the jurors to apply

3

common sense to the factual situation before them, the prosecutor's remarks did far more than make that request. Instead, the prosecutor singled out particular jurors and addressed them personally, playing on their sympathy for the victims and fears of the defendant. Such remarks constitute misconduct."

11.    During the guilt phase of the underlying case, Respondent introduced the victim's jacket and later stated during his closing argument the following:

"But one of the things that is interesting about [the victim] is that the smell is absolutely putrid, absolutely one of the worst things that you will ever probably experience. And you got a minimal exposure to it when the jacket was opened up for your, if you will, smelling pleasure, for lack of a better word."

12.    During their appellate review of the case, the Supreme Court held that "[a]t worst, the offhand 'smelling pleasure' comment was inappropriate."

## *State v. Cicero Pottridge Beemon*, 1 CA-CR 05-1161 (2008)

## CR2002-099001

13.    In the underlying criminal case, Respondent prosecuted Beemon for a 2002 murder.

14.    During the guilt phase of the case, the trial court ruled that, if the defendant testified, the State could impeach him with a certain 1997 drug conviction but not a certain 1984 robbery conviction.

15.    The defendant testified and admitted the 1997 drug conviction during direct examination, but did not mention his 1984 robbery conviction.

16.    In his opening and closing argument during the aggravation phase of the case, Respondent stated that the defendant was manipulative and only willing to admit to certain conduct if it benefited him or served to elicit jury sympathy.

17.    Respondent stated that while defendant was "quick to jump up there" and reveal his drug conviction, he had not revealed his "other on[e]".

18.    Defense counsel objected and Respondent responded:

"[S]o he can't stand up here now and say, well, you know, I'm going to pick and chose what I'm going to bring in.  If he picks and chooses, he has to answer for that....So no, I don't think I stepped over the line.  He withheld information when it was to his advantage and gave him [sic] information he did not need to and that the prosecutor was forbidden to go into.  So, no, I don't agree with them."

19.    During the appellate review of the case, the Court of Appeals (Division One) held that "[t]he prosecutor's argument attacked defendant as being dishonest

for failing to reveal his robbery conviction to the jury during the guilt phase. This comment was clearly improper in light of the trial court's ruling precluding use of the robbery conviction for impeachment purposes. Indeed, we are baffled by the prosecutor's continued insistence at the bench conference that the defendant had no right to 'withhold information' regarding the robbery conviction from the jury. Nonetheless, the statement was brief, it was immediately corrected by the trial court's instruction to disregard it, and the jurors are presumed to have done so."

20.    In his closing argument during the aggravation phase of the case, defense counsel accused Respondent of making certain statements depicting the defendant and defense counsel as, among other things, "sneaking, lying, cheating".

21.    In his rebuttal closing argument during the aggravation phase of the case, Respondent stated the following:

"One of the things defense counsel got up and told you was, well, the prosecutor has said that we've been sneaking, lying cheating…And he said that at the top of his lungs.

As I said, if history teaches us anything, it's that it comes around again and again. Remember Hitler?  The big lie he told you?  It was at the top of his lungs over and over, you are the superior people and people are going to believe it because

they heard it over and over again[.]  [A]nd that's what he said over and over again was about the state calling him sneaking, calling him lying, calling him cheating…Did that ever happen by the State?  Of course it didn't happen, but you know what?  He wants you to believe that it did.  You know, just like Hitler, that big lie:  If you put it out there, even though the prosecutor didn't say it, maybe you'll believe it.  And maybe when you go back there to decide this case, you won't decide it on the facts.

*    *    *

He talks about America and wraps himself around the flag.  Doesn't wrap himself around the German flag when he calls somebody a cheater, a liar, and sneaking when in fact they never even used those words.  And additionally, with regard to that, you don't mention the full truth because that's also not to your benefit."

22.     During their appellate review of the case, the Court of Appeals held that "[i]n a completely inappropriate effort to refute defense counsel's arguments, Mr. Martinez then analogized his tactics to those of 'Adolf Hitler' and his 'big lie'…[t]he Hitler analogy was a recurring theme in the prosecutor's closing argument."

23.     The Court of Appeals also stated "[a]s reprehensive as the prosecutor's analogy was, we believe any reasonable jury would have recognized the inappropriateness of this line of argument and discounted it...Moreover, the fact that, despite these improper comments, the jurors were unable to reach a decision as to the 'especially depraved' factor also leads us to conclude that defendant was not prejudiced by the comments and that the jurors carefully evaluated the evidence regarding the existence of aggravating factors."

### *State v. Gallardo*, 225 Ariz. 560 (2010)

24.     In the underlying criminal case, Respondent prosecuted Gallardo for a 2005 high profile murder.

25.     In his closing argument, Respondent responded to defense counsel's argument that a life sentence was sufficient given the "severe restriction" and isolation of incarceration by stating that inmates are allowed to watch television, receive magazines, make phone calls and see visitors by stating "[d]o you think [Victim's Father is] going to be able to call his son, Rudy?"

26.     Defense counsel objected and the trial court sustained the objection.

27.    Respondent then reworded his argument, without objection, to highlight the Victim Impact Statement stating, in pertinent part:

"There's no comparison.  The point that's being made here is that the victim impact statement may be considered by you [the jury], and that impact statement indicated to you that they missed their son.  That's not quite doing justice to how they told you, and they would love to make a call and would love to be able to talk to (their son).  And in their victim impact statement, they told you they couldn't."

28.    During their appellate review of the case, the Supreme Court held that "[e]ven if the prosecutor's statements were improper, reversal is not required."

29.    Based upon the expert's trial testimony which originally stated that he was entitled to receive $4,200.00 and later indicated that he was entitled to receive $6,500.00, Respondent made the following statements during his closing argument:

R1:  "And there were some inconsistent statements, but the biggest one was the one involving money.  Initially when I asked him the question, he said he really wasn't sure how much money he was being paid.  Then he indicated, well, it was $4200.  Then after doing the mathematics a little bit more and fine-tuning it –"

R2: "Well, you heard, he told you $4200, didn't he?  Anybody not hear that? And then after questioning by the prosecutor, the figure changed, didn't it?"

R3:   "Well, he said on the stand from there, and that's the evidence that you are to consider.  You were told – he said $6500.  That's what he said.  And you were present when all of that happened, weren't you?  That's something that you can consider, because it goes to his motive and his bias and –"

30.     Following each statement, defense counsel objected as misleading and the trial sustained each objection.

31.     The parties approached the bench for a sidebar after Respondent's third attempt wherein the Court stated "[w]ell, the fact that the expert said two different things can be used by Mr. Martinez to impeach his credibility."

32.     When the defense counsel explained that he could not explain the difference in the expert's testimony without delving into an impermissible subject area, the trial court then ruled that Respondent could not argue "anything related to the discrepancy in the figures", but he could argue "[t]he fact that he was paid, the fact that he gave money and he gave time for free all go to motive and bias."

33.     During appellate oral argument, Justice Andrew Hurwitz asked:

"Can I ask you a question about something that nobody's discussed so far?  The conduct of the trial prosecutor.  It seems to me that at least on several occasions, and by and large the objections were sustained, that the trial prosecutor either

10

ignored rulings by the trial judge or asked questions that the trial judges once ruled improper and then rephrased the question in another improper way...Short of reversing a conviction, how is it that we can...stop inappropriate conduct?"

34.     Justice Michael Ryan then commented:

"Well, this prosecutor I recollect from several cases.  This same prosecutor has been accused of fairly serious misconduct but ultimately we decided it did not rise to the level of requiring a reversal...There's something about this prosecutor...".

35.     Upon appellate review for prosecutorial misconduct, the Supreme Court held that "[a] prosecutor should not repeat an argument after it has been the subject of a sustained objection...Although the repeated statements by the prosecutor were improper, Gallardo's objections were sustained and the trial court instructed the jury...".

### *State v. Lynch (I)*, 225 Ariz. 27 (2010) &
### *State v. Lynch (II)*, 238 Ariz. 84 (2015)

36.     In the underlying criminal cases, Respondent prosecuted Lynch for a 2001 murder.

37.    During their appellate review in *Lynch (I)*, the Supreme Court affirmed the convictions and non-capital sentences, but remanded the case for a new penalty phase for the capital sentence based upon a trial court jury instruction error.

38.    During the case, Respondent frequently and inaccurately referred to the aggravating factor "excessively cruel, heinous or depraved" as three separate aggravators instead of the one.

39.    The trial court conducted a new penalty phase and defendant appealed primarily based upon allegations of prosecutorial misconduct.

40.    During the appellate review in *Lynch (II)*, the Supreme Court found that Respondent made improper statements, described in greater detail below, and "that prosecutorial misconduct, while present in some instances, was not so pronounced or sustained as to require a new sentencing trial."

Argumentative Opening Statements:

41.    The Supreme Court found that "(Respondent) improperly made argumentative statements during opening" by making statements that:

   a. Defendant's childhood should not be considered a mitigating circumstance because "it happened 30 years ago" and that the defense was "pull(ing) at [the jury's] heart strings";

b. An incident when Lynch's father purportedly burned Lynch's hand should not be considered as there were no medical records supporting the purported incident;

c. A life-expectancy expert's testimony should be given little weight because the expert relied upon a Wikipedia article and Lynch outlived the expert's prediction.

Improper Witness/Expert Examination:

42.  The "combative remarks" and "argumentative questions" primarily reviewed by the Supreme Court include, but are not limited to:

a. "[T]he State's comment to a defense expert that she should 'just answer my question for once'";

b. Respondent interrupting the witness stating "[n]o, let me ask you the question; and

c. Respondent's "improper remark" in closing argument "that (a defense expert) 'can vouch for people'".

43.  The Supreme Court found that "[a]lthough (Respondent's) cross-examination was aggressive" and "while the trial court should have exercised more

13

control over the aggressive questioning", there was no fundamental error in the examination as a whole.

44.   The Supreme Court also found that "the court would have been well within its discretion to have sustained the objections and required the prosecutor to rephrase his questions in a more civil manner".

Misstating Evidence:

45.   The Supreme Court found that Respondent made "inappropriate remarks" when:

a.   During his cross-examination of a defense expert, Respondent asked whether the expert had previously stated that it was a waste of time to go over her notes and, in an apparent attempt to impeach the expert, played a recording wherein the expert said that it would be a waste of time to go through every word of her notes;

b.   Respondent asked the same expert "[D]idn't you tell us about a case involving a guy...where you said that he was mistaken because you can read minds?"

14

c. During his closing argument, Respondent stated that renting pornographic movies "shows a debasement in the part of [Lynch's] character".

Personalization:

46.   The Supreme Court found that Respondent improperly "invited the jurors to place themselves in the victim's position and appealed to their fears" when Respondent made the following remarks during opening statement:

"So what happens is the defendant then, as Mr. Panzarella sits there, goes behind him and begins and cuts his throat from ear to ear. The problem of the unfortunate aspect of that, because in and of itself, cutting somebody's throat is a horrific, ghastly thing, you can only imagine. I don't think you can even imagine what it's like for somebody to approach you with a knife. You cannot move and you know they're manhandling you and they are going to cut your throat."

**_State v. Jodi Arias_, CR2008-031021 (2015)**

**and 1 CA-CR 15-0302**

47.   On July 9, 2008, the State filed an Indictment initiating the Maricopa County Superior Court criminal case of *State v. Arias*, CR2008-031021.

48.     Over the course of the next six years, the case was heavily litigated with a significant motion practice by both the State and Defendant.

49.     On May 8, 2013, the Defendant was convicted of first degree murder but the jury was unable to reach a verdict during the penalty phase.

50.     The Court declared a mistrial and, on October 21, 2014, a re-trial of the penalty phase commenced.

### Unprofessional Conduct Allegations Toward Opposing Counsel

51.     During a bench conference about the admissibility of certain purported statements by the Victim, Respondent stated at the bench "[b]ut the thing is that if Ms. Wilmott and I were married, I certainly would say, 'I f'ing want to kill myself'."

52.     When Wilmott objected, Respondent apologized.

53.     During a subsequent bench conference, Respondent stated to Wilmott "[w]ell, then, maybe you ought to go back to law school."

54.     On January 14, 2015, the trial court found the following:

"Comments by the prosecutor during a bench conference were insulting and unprofessional...Defendant alleges the prosecutor made a comment to Defense Counsel during a bench conference that was insulting and unprofessional. After the verdicts were returned from the first trial, bench conferences were unsealed and

information from those bench conferences were publicized by the media. The specific comment by the prosecutor was publicized. During the trial, the Court addressed this matter with counsel. The prosecutor apologized to Defense Counsel. The prosecutor was quick to acknowledge his error and regret. Nothing inappropriate was said before the jury and there is no basis to find the prosecutor's comments affected the guilt phase verdict. The Court found no other sanction was appropriate under the circumstances."

55.    The matter is currently before the Court of Appeals, Division One in the case of *State v. Arias*, 1 CA-CR 15-0302. As of the date of this Report of Investigation, the Court of Appeals has not set a briefing schedule as they still have not received all of the transcripts of the proceedings.

56.    By engaging in the above-referenced conduct, Respondent violated the following ethical rules:

***State v. Morris*, 215 Ariz. 324 (2007):**

    a.    Rule 41(g), Ariz. R. Sup. Ct. – Respondent engaged in unprofessional conduct during his closing argument by, among other things, making an unprofessional comment about presenting a stale piece of evidence for the juror's "smelling pleasure"; and

b.  Rule 42, Ariz. R. Sup. Ct., ER 8.4(d) – Respondent engaged in professional misconduct by engaging in conduct that is prejudicial to the administration of justice by, among other things, singling out and personally addressing certain jurors during closing argument.

*State v. Cicero Pottridge Beemon*, **1 CA-CR 05-1161 (2008):**

a.  Rule 41(g), Ariz. R. Sup. Ct. - Respondent engaged in unprofessional conduct during his closing argument by, among other things, using a "Hitler" analogy during closing argument to disparage opposing counsel; and

b.  Rule 42, Ariz. R. Sup. Ct:

1.  ER 4.4(a) – In representing a client, a lawyer shall not use means that have no substantial purpose other than to embarrass, delay, or burden any other person, or use methods of obtaining evidence that violate the legal rights of such a person by, among other things, improperly attacking the defendant during the aggravation phase of the case in light of the trial court's ruling precluding use of the robbery conviction for impeachment purposes in the guilt phase; and

2. ER 8.4(d) – Respondent engaged in professional misconduct by engaging in conduct that is prejudicial to the administration of justice by, among other things, continuing to insist at the bench conference during the aggravation phase that the defendant had no right to 'withhold information' regarding the robbery conviction from the jury during the guilt phase.

**_State v. Gallardo_, 225 Ariz. 560 (2010):**

a. Rule 42, Ariz. R. Sup. Ct., ER 8.4(d) – Respondent engaged in professional misconduct by engaging in conduct that is prejudicial to the administration of justice by, among other things, personalizing his closing argument and repeating segments of his closing argument after it has been the subject of a sustained objection.

**_State v. Lynch (I)_, 225 Ariz. 27 (2010) & _State v. Lynch (II)_, 238 Ariz. 84 (2015):**

a. Rule 42, Ariz. R. Sup. Ct., ER 8.4(d) – Respondent engaged in professional misconduct by engaging in conduct that is prejudicial to the administration of justice by, among other things, a) asking whether an expert had previously stated that it was a waste of time to go over her notes and, in an apparent attempt to impeach the expert, playing a

recording wherein the expert said that it would be a waste of time to go through every word of her notes and b) personalizing his closing argument and improperly inviting the jurors to place themselves in the victim's position.

### *State v. Jodi Arias*, CR2008-031021 (2015):

a.    Rule 41(g), Ariz. R. Sup. Ct. – Respondent has repeatedly engaged in unprofessional conduct by, among other things, demeaning opposing counsel at a bench conference.

**DATED** this _7th_ day of April, 2017.

**STATE BAR OF ARIZONA**

Craig D. Henley
Senior Bar Counsel – Litigation

Original filed with the Disciplinary Clerk of
the Office of the Presiding Disciplinary Judge
of the Supreme Court of Arizona
this _7th_ day of April, 2017.

by:

CDH:nr

Attorney Discipline
Probable Cause Committee
of the Supreme Court of Arizona
FILED

OCT **6** 2016

By _CRamoS_

**BEFORE THE ATTORNEY DISCIPLINE
PROBABLE CAUSE COMMITTEE
OF THE SUPREME COURT OF ARIZONA**

IN THE MATTER OF A MEMBER OF THE
**STATE BAR OF ARIZONA,**

**JUAN M. MARTINEZ
Bar No. 009510**

Respondent

No. 15-3363

**ORDER VACATING ADMONITION,
PROBATION, (CLE) AND COSTS**

On September 9, 2016, the Attorney Discipline Probable Cause Committee of the Supreme Court of Arizona ("Committee") issued an Order of Admonition, Probation, (CLE) and Costs to the above-named Respondent for violations of Rule 41(g), Rule 42, ER 4.4 and Rule 42, ER 8 4(d), Ariz. R. Sup Ct

**PURSUANT TO** Rule 55(c)(4)(B), Ariz. R. Sup. Ct. the Respondent counsel filed a Notice of Appeal (the "Notice"). This Notice was filed in a timely manner

**IT IS THEREFORE ORDERED,** pursuant to Rule 55, vacating the aforementioned Order of Admonition, Probation, (CLE) and Costs

**IT IS FURTHER ORDERED** pursuant to Rules 55(c) and 58(a), Ariz. R. Sup. Ct. the State Bar shall prepare and file a complaint against the Respondent with the Disciplinary Clerk in File No 15-3363.

**DATED** this ___5th___ day of October, 2016

_Lawrence F W___

Judge Lawrence F. Winthrop, Chair
Attorney Discipline Probable Cause Committee
of the Supreme Court of Arizona

Original filed this _____ day
of October, 2016, with.

Attorney Discipline Probable Cause Committee
Supreme Court of Arizona
1501 West Washington Street, Suite 104
Phoenix, Arizona 85007

Copy mailed this _____ day
of October, 2016, to:

J  Scott Rhodes
Jennings Strouss & Salmon, PLC
One E. Washington Street, Suite 1900
Phoenix, Arizona 85004-2554
Respondent's Counsel

Kathleen Erin Brody
ACLU of Arizona
P.O. Box 17148
Phoenix, Arizona 85011-0148
Complainant

Lawyer Regulation Records Department
State Bar of Arizona
4201 North 24th Street, Suite 200
Phoenix, Arizona 85016-6288

Compliance Monitor
State Bar of Arizona
4201 N  24th Street, Suite 100
Phoenix, AZ 85016

Craig D  Henley
State Bar of Arizona
4201 North 24th Street, Suite 100
Phoenix, Arizona 85016-6288

by. _____

J. Scott Rhodes - 016721
srhodes@jsslaw.com
Kerry A. Hodges – 025547
khodges@jsslaw.com
**JENNINGS, STROUSS & SALMON, P.L.C.**
A Professional Limited Liability Company
One East Washington Street
Suite 1900
Phoenix, Arizona 85004-2554
Telephone: (602) 262-5911
MinuteEntries@jsslaw.com

OFFICE OF THE
PRESIDING DISCIPLINARY JUDGE
SUPREME COURT OF ARIZONA

MAY 1 2 2017

FILED

BY _____

Attorneys for Respondent, Juan M. Martinez

## BEFORE THE PRESIDING DISCIPLINARY JUDGE

IN THE MATTER OF A MEMBER
OF THE STATE BAR OF
ARIZONA,

**JUAN M. MARTINEZ,**
  Bar No. 009510,

                    Respondent.

PDJ 2017-9044

**RESPONDENT'S ANSWER**

[State Bar No. 15-3363]

Pursuant to Arizona Supreme Court Rule 58(b), Juan M. Martinez ("Respondent"), through his counsel, hereby submits his Answer to the April 7, 2017 Complaint in this matter. All allegations in the Complaint not specifically admitted herein are denied.

### CONFIRMATION OF ADDRESS

Pursuant to Rule 58(b), Ariz. R. Sup. Ct., Respondent confirms that the following is his current address of record with the State Bar of Arizona: Juan M. Martinez, 301 W. Jefferson Street, 4th Floor, Phoenix, AZ 85003.

### GENERAL ALLEGATIONS

1.    Respondent admits the allegations in **Paragraph 1** of the Complaint.

5642182v1(49286.53)

## COUNT ONE (File no. 15-3363/Brody)

2.     In response to the allegations in **Paragraph 3**[1] of the Complaint, Respondent denies knowledge or information sufficient to form a belief as to the truth of the allegations contained therein.

3.     Respondent admits the allegations in **Paragraph 4** of the Complaint.

4.     Respondent denies the allegations in **Paragraph 5** of the Complaint.

### *State v. Morris, 215 Ariz. 324 (2007)*

5.     Respondent admits the allegations in **Paragraph 6** of the Complaint.

6.     In response to the allegations in **Paragraph 7** of the Complaint, Respondent admits that he made a closing argument in the aggravation phase of the case. Respondent further asserts that the transcript of the closing argument speaks for itself and should be considered for its proper interpretation and effect. Respondent denies the allegations in Paragraph 7 to the extent they contradict, modify, or add to his closing argument.

7.     In response to the allegations in **Paragraph 8** of the Complaint, Respondent admits that he made a rebuttal closing argument in the aggravation phase of the case. Respondent further asserts that the transcript of the rebuttal closing argument speaks for itself and should be considered for its proper interpretation and effect. Respondent denies the allegations in Paragraph 8 to the extent they contradict, modify, or add to his rebuttal closing argument.

8.     In response to the allegations in **Paragraph 9** of the Complaint, Respondent admits that he made a rebuttal closing argument in the aggravation phase of the case. Respondent further asserts that the transcript of the rebuttal

---

[1] The copy of the Complaint served on Respondent does not contain a Paragraph 2.

- 2 -

closing argument speaks for itself and should be considered for its proper interpretation and effect.  Respondent denies the allegations in Paragraph 9 to the extent they contradict, modify, or add to his rebuttal closing argument.

9.     In response to the allegations in **Paragraph 10** of the Complaint, Respondent admits that the Arizona Supreme Court reviewed the case.  Respondent further asserts that the Arizona Supreme Court's opinion speaks for itself and should be considered for its proper interpretation and effect.  Respondent denies the allegations in Paragraph 10 to the extent they contradict, modify, or add to the contents of that opinion.

10.     In response to the allegations in **Paragraph 11** of the Complaint, Respondent admits that he introduced a victim's jacket into evidence and made a closing argument during the guilt phase of the case.  Respondent further asserts that the transcript of the closing argument speaks for itself and should be considered for its proper interpretation and effect.  Respondent denies the allegations in Paragraph 11 to the extent they contradict, modify, or add to his closing argument.

11.     In response to the allegations in **Paragraph 12** of the Complaint, Respondent admits that the Arizona Supreme Court reviewed the case.  Respondent further asserts that the Arizona Supreme Court's opinion speaks for itself and should be considered for its proper interpretation and effect.  Respondent denies the allegations in Paragraph 12 to the extent they contradict, modify, or add to the contents of that opinion.

### *State v. Cicero Pottridge Beemon, 1 CA-CR 05-1161 (2008)*

12.     Respondent admits the allegations in **Paragraph 13** of the Complaint.

13.     In response to the allegations in **Paragraph 14** of the Complaint, Respondent admits that the trial court made evidentiary rulings during the guilt

- 3 -

phase of the case.  Respondent further asserts that the transcript of the evidentiary rulings speak for themselves and should be considered for their proper interpretation and effect.  Respondent denies the allegations in Paragraph 14 to the extent they contradict, modify, or add to the evidentiary rulings.

14.    In response to the allegations in **Paragraph 15** of the Complaint, Respondent admits that the defendant testified during the guilt phase of the case. Respondent further asserts that the transcript of the defendant's testimony speaks for itself and should be considered for its proper interpretation and effect.  Respondent denies the allegations in Paragraph 15 to the extent they contradict, modify, or add to the defendant's testimony.

15.    In response to the allegations in **Paragraph 16** of the Complaint, Respondent admits that he made opening and closing arguments during the aggravation phase of the case.  Respondent further asserts that the transcripts of the opening and closing arguments speak for themselves and should be considered for their proper interpretation and effect.  Respondent denies the allegations in Paragraph 16 to the extent they contradict, modify, or add to his opening and closing arguments.

16.    In response to the allegations in **Paragraph 17** of the Complaint, Respondent admits that he made opening and closing arguments during the aggravation phase of the case.  Respondent further asserts that the transcripts of the opening and closing arguments speak for themselves and should be considered for their proper interpretation and effect.  Respondent denies the allegations in Paragraph 17 to the extent they contradict, modify, or add to his opening and closing arguments.

/ / /

- 4 -

17.    In response to the allegations in **Paragraph 18** of the Complaint, Respondent admits that he made opening and closing arguments during the aggravation phase of the case. Respondent further asserts that the transcripts of the opening and closing arguments speak for themselves and should be considered for their proper interpretation and effect. Respondent denies the allegations in Paragraph 18 to the extent they contradict, modify, or add to his opening and closing arguments.

18.    In response to the allegations in **Paragraph 19** of the Complaint, Respondent admits that the Arizona Court of Appeals reviewed the case. Respondent further asserts that the Arizona Court of Appeals' memorandum decision speaks for itself and should be considered for its proper interpretation and effect. Respondent denies the allegations in Paragraph 19 to the extent they contradict, modify, or add to the contents of that memorandum decision.

19.    In response to the allegations in **Paragraph 20** of the Complaint, Respondent admits that defense counsel made a closing argument during the aggravation phase of the case. Respondent further asserts that the transcript of the closing argument speaks for itself and should be considered for its proper interpretation and effect. Respondent denies the allegations in Paragraph 20 to the extent they contradict, modify, or add to defense counsel's closing argument.

20.    In response to the allegations in **Paragraph 21** of the Complaint, Respondent admits that he made a rebuttal closing argument during the aggravation phase of the case. Respondent further asserts that the transcript of the rebuttal closing argument speaks for itself and should be considered for its proper interpretation and effect. Respondent denies the allegations in Paragraph 21 to the extent they contradict, modify, or add to his rebuttal closing argument.

- 5 -

21.    In response to the allegations in **Paragraph 22** of the Complaint, Respondent admits that the Arizona Court of Appeals reviewed the case. Respondent further asserts that the Arizona Court of Appeals' memorandum decision speaks for itself and should be considered for its proper interpretation and effect.  Respondent denies the allegations in Paragraph 22 to the extent they contradict, modify, or add to the contents of that memorandum decision.

22.    In response to the allegations in **Paragraph 23** of the Complaint, Respondent admits that the Arizona Court of Appeals reviewed the case. Respondent further asserts that the Arizona Court of Appeals' memorandum decision speaks for itself and should be considered for its proper interpretation and effect.  Respondent denies the allegations in Paragraph 23 to the extent they contradict, modify, or add to the contents of that memorandum decision.

### *State v. Gallardo, 225 Ariz.560 (2010)*

23.    Respondent admits the allegations in **Paragraph 24** of the Complaint.

24.    In response to the allegations in **Paragraph 25** of the Complaint, Respondent admits that he made a closing argument during the penalty phase of the case.  Respondent further asserts that the transcript of the closing argument speaks for itself and should be considered for its proper interpretation and effect. Respondent denies the allegations in Paragraph 25 to the extent they contradict, modify, or add to his closing argument.

25.    In response to the allegations in **Paragraph 26** of the Complaint, Respondent admits that an objection was made and sustained during his closing argument in the penalty phase of the case.  Respondent further asserts that the transcript of the closing argument speaks for itself and should be considered for its proper interpretation and effect.  Respondent denies the allegations in Paragraph 26

to the extent they contradict, modify, or add to the closing argument or any objections and evidentiary rulings made therein.

26.     In response to the allegations in **Paragraph 27** of the Complaint, Respondent admits that he made a closing argument during the penalty phase of the case. Respondent further asserts that the transcript of the closing argument speaks for itself and should be considered for its proper interpretation and effect. Respondent denies the allegations in Paragraph 27 to the extent they contradict, modify, or add to his closing argument.

27.     In response to the allegations in **Paragraph 28** of the Complaint, Respondent admits that the Arizona Supreme Court reviewed the case.  Respondent further asserts that the Arizona Supreme Court's opinion speaks for itself and should be considered for its proper interpretation and effect.  Respondent denies the allegations in Paragraph 28 to the extent they contradict, modify, or add to the contents of that opinion.

28.     In response to the allegations in **Paragraph 29** of the Complaint, Respondent admits that an expert testified at trial and that Respondent commented on that testimony during his closing argument.  Respondent further asserts that the transcripts of the expert's testimony and Respondent's closing argument speak for themselves and should be considered for their proper interpretation and effect. Respondent denies the allegations in Paragraph 29 to the extent they contradict, modify, or add to the expert's testimony or his closing argument.

29.     In response to the allegations in **Paragraph 30** of the Complaint, Respondent admits that objections were made and sustained during his closing argument.  Respondent further asserts that the transcript of the closing argument speaks for itself and should be considered for its proper interpretation and effect.

- 7 -

Respondent denies the allegations in Paragraph 30 to the extent they contradict, modify, or add to his closing argument or any objections and evidentiary rulings made therein.

30.     In response to the allegations in **Paragraph 31** of the Complaint, Respondent admits that a sidebar was held during his closing argument. Respondent further asserts that the transcript of the closing argument speaks for itself and should be considered for its proper interpretation and effect. Respondent denies the allegations in Paragraph 31 to the extent they contradict, modify, or add to his closing argument or the sidebar held therein.

31.     In response to the allegations in **Paragraph 32** of the Complaint, Respondent admits that a sidebar was held during his closing argument. Respondent further asserts that the transcript of the closing argument speaks for itself and should be considered for its proper interpretation and effect. Respondent denies the allegations in Paragraph 32 to the extent they contradict, modify, or add to the closing argument or the sidebar held therein.

32.     In response to the allegations in **Paragraph 33** of the Complaint, Respondent admits that the Arizona Supreme Court reviewed the case and held an oral argument thereon. Respondent further asserts that the transcript of the oral argument speaks for itself and should be considered for its proper interpretation and effect. Respondent denies the allegations in Paragraph 33 to the extent they contradict, modify, or add to the statements made during that oral argument.

33.     In response to the allegations in **Paragraph 34** of the Complaint, Respondent admits that the Arizona Supreme Court reviewed the case and held an oral argument thereon. Respondent further asserts that the transcript of the oral argument speaks for itself and should be considered for its proper interpretation and

5642182v1(49286.53))

effect.  Respondent denies the allegations in Paragraph 34 to the extent they contradict, modify, or add to the statements made during that oral argument.

34.    In response to the allegations in **Paragraph 35** of the Complaint, Respondent admits that the Arizona Supreme Court reviewed the case.  Respondent further asserts that the Arizona Supreme Court's opinion speaks for itself and should be considered for its proper interpretation and effect.  Respondent denies the allegations in Paragraph 35 to the extent they contradict, modify, or add to the contents of that opinion.

### *State v.Lynch (I), 225 Ariz. 27 (2010) &*
### *State v. Lynch (II), 238 Ariz. 84 (2015)*

35.    Respondent admits the allegations in **Paragraph 36** of the Complaint.

36.    In response to the allegations in **Paragraph 37** of the Complaint, Respondent admits that the Arizona Supreme Court reviewed *Lynch (I)*. Respondent further asserts that the Arizona Supreme Court's opinion speaks for itself and should be considered for its proper interpretation and effect.  Respondent denies the allegations in Paragraph 37 to the extent they contradict, modify, or add to the contents of that opinion.

37.    In response to **Paragraph 38** of the Complaint, Respondent admits that he referred to the aggravating factor "excessively cruel, heinous or depraved," and asserts the transcript of each such instance speaks for itself and should be considered for its proper interpretation and effect.  Respondent denies the allegations in Paragraph 38 to the extent they contradict, modify, or add to Respondent's statements in this regard.

38.    In response to the allegations in **Paragraph 39**, Respondent admits that the trial court conducted a new penalty phase and that the defendant appealed.

Respondent further asserts that the Arizona Supreme Court's opinion in *Lynch (II)* speaks for itself with respect to the basis for the appeal and should be considered for its proper interpretation and effect.

39.    In response to the allegations in **Paragraph 40** of the Complaint, Respondent admits that the Arizona Supreme Court reviewed *Lynch (II)*. Respondent further asserts that the Arizona Supreme Court's opinion speaks for itself and should be considered for its proper interpretation and effect.  Respondent denies the allegations in Paragraph 40 to the extent they contradict, modify, or add to the contents of that opinion.

40.    In response to the allegations in **Paragraph 41** of the Complaint, Respondent admits that the Arizona Supreme Court reviewed *Lynch (II)*. Respondent further asserts that the Arizona Supreme Court's opinion speaks for itself and should be considered for its proper interpretation and effect.  Respondent denies the allegations in Paragraph 41 to the extent they contradict, modify, or add to the contents of that opinion.

41.    In response to the allegations in **Paragraph 42** of the Complaint, Respondent admits that the Arizona Supreme Court reviewed *Lynch (II)*. Respondent further asserts that the Arizona Supreme Court's opinion speaks for itself and should be considered for its proper interpretation and effect.  Respondent denies the allegations in Paragraph 42 to the extent they contradict, modify, or add to the contents of that opinion.

42.    In response to the allegations in **Paragraph 43** of the Complaint, Respondent admits that the Arizona Supreme Court reviewed *Lynch (II)*. Respondent further asserts that the Arizona Supreme Court's opinion speaks for itself and should be considered for its proper interpretation and effect.  Respondent

5642182v1(49286.53))

denies the allegations in Paragraph 43 to the extent they contradict, modify, or add to the contents of that opinion.

43.     In response to the allegations in **Paragraph 44** of the Complaint, Respondent admits that the Arizona Supreme Court reviewed *Lynch (II)*. Respondent further asserts that the Arizona Supreme Court's opinion speaks for itself and should be considered for its proper interpretation and effect.  Respondent denies the allegations in Paragraph 44 to the extent they contradict, modify, or add to the contents of that opinion.

44.     In response to the allegations in **Paragraph 45** of the Complaint, Respondent admits that the Arizona Supreme Court reviewed *Lynch (II)*. Respondent further asserts that the Arizona Supreme Court's opinion speaks for itself and should be considered for its proper interpretation and effect.  Respondent denies the allegations in Paragraph 45 to the extent they contradict, modify, or add to the contents of that opinion.

45.     In response to the allegations in **Paragraph 46** of the Complaint, Respondent admits that the Arizona Supreme Court reviewed *Lynch (II)*. Respondent further asserts that the Arizona Supreme Court's opinion speaks for itself and should be considered for its proper interpretation and effect.  Respondent denies the allegations in Paragraph 46 to the extent they contradict, modify, or add to the contents of that opinion.

### *State v. Jodi Arias, CR2008-031021 (2015)*
### *and 1 CA-CR 15-0302*

46.     Respondent admits the allegations in **Paragraph 47** of the Complaint.

47.     Respondent admits the allegations in **Paragraph 48** of the Complaint.

48.     Respondent admits the allegations in **Paragraph 49** of the Complaint.

- 11 -

49.     In response to the allegations in **Paragraph 50** of the Complaint, Respondent admits that the trial court declared a mistrial and that opening statements in the retrial of the penalty phase commenced on October 21, 2014. Respondent denies any remaining allegations in Paragraph 50.

50.     In response to the allegations in **Paragraph 51** of the Complaint, Respondent admits that bench conferences were held during the retrial of the penalty phase of the case. Respondent further asserts that the transcript of the bench conferences speaks for itself and should be considered for its proper interpretation and effect. Respondent denies the allegations in Paragraph 51 to the extent they contradict, modify, or add to the transcript of the bench conferences.

51.     In response to the allegations in **Paragraph 52** of the Complaint, Respondent admits that bench conferences were held during the retrial of the penalty phase of the case. Respondent further asserts that the transcript of the bench conferences speaks for itself and should be considered for its proper interpretation and effect. Respondent denies the allegations in Paragraph 52 to the extent they contradict, modify, or add to the transcript of the bench conferences.

52.     In response to the allegations in **Paragraph 53** of the Complaint, Respondent admits that bench conferences were held during the retrial of the penalty phase of the case. Respondent further asserts that the transcript of the bench conferences speaks for itself and should be considered for its proper interpretation and effect. Respondent denies the allegations in Paragraph 53 to the extent they contradict, modify, or add to the transcript of the bench conferences.

53.     In response to the allegations in **Paragraph 54** of the Complaint, Respondent admits that the trial court issued a January 15, 2015 minute entry. Respondent further asserts that the minute entry speaks for itself and should be

5642182v1(49286.53))

considered for its proper interpretation and effect.  Respondent denies the allegations in Paragraph 54 to the extent they contradict, modify, or add to the minute entry.

54.     In response to the allegations in **Paragraph 55** of the Complaint, Respondent admits that the case is currently on appeal before the Arizona Court of Appeals.  Respondent denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained therein.

55.     Respondent denies as legal conclusions the allegations in **Paragraph 56** of the Complaint.

**RESPECTFULLY SUBMITTED** this 12th day of May, 2017.

JENNINGS, STROUSS & SALMON, P.L.C.

By: _____
    J. Scott Rhodes
    Kerry A. Hodges
    One East Washington, Suite 1900
    Phoenix, Arizona  85004-2554
    Attorneys for Respondent, Juan M. Martinez

**ORIGINAL** of the foregoing filed
this 12th day of May, 2017, with the
Disciplinary Clerk of the Supreme Court.

**COPY** of the foregoing sent via e-mail and
U.S. mail this 12th day of May, 2017, to:

Craig D. Henley, Esq.
Senior Bar Counsel
STATE BAR OF ARIZONA
4201 North 24th Street, Suite 100
Phoenix, AZ 85016-6266
Craig.henley@staff.azbar.org

- 13 -

5642182v1(49286.53))

**COPY** of the foregoing sent via e-mail
this 12th day of May, 2017, to:

Honorable William J. O'Neill
Presiding Disciplinary Judge
Supreme Court of Arizona
1501 West Washington Street, Suite 104
Phoenix, AZ  85007
officepdj@courts.az.gov

By _____

- 14 -

Craig D. Henley, Bar No. 018801
Senior Bar Counsel
State Bar of Arizona
4201 N. 24th Street, Suite 100
Phoenix, Arizona 85016-6266
Telephone: (602) 340-7272
Email: LRO@staff.azbar.org

J. Scott Rhodes, Bar No. 016721
Kerry A. Hodges, Bar No. 025547
Jennings Strouss & Salmon, PLC
One E. Washington Street, Suite 1900
Phoenix, AZ 85004-2554
Telephone: (602) 262-5862
Email: srhodes@jsslaw.com
Respondent's Counsel

OFFICE OF THE
PRESIDING DISCIPLINARY JUDGE
SUPREME COURT OF ARIZONA

SEP   1 2017

BY _____ FILED _____

## BEFORE THE PRESIDING DISCIPLINARY JUDGE

| | |
|---|---|
| IN THE MATTER OF A MEMBER OF THE STATE BAR OF ARIZONA, | PDJ 2017-9044 |
| **JUAN M. MARTINEZ,** Bar No. 009510, | **JOINT PRE-HEARING STATEMENT** |
| Respondent. | State Bar No. 15-3363 |

The State Bar of Arizona, by undersigned counsel, and Respondent, Juan M

Martinez, who is represented in this matter by counsel, J. Scott Rhodes and Kerry

A. Hodges, submit this Joint Pre-Hearing Statement.

## I.   THE STIPULATED FACTS DEEMED MATERIAL

1.    On May 12, 1984, Respondent was licensed to practice law in the State of Arizona.

2.    Respondent is a prosecutor with the Maricopa County Attorney's Office (hereinafter referred to as "MCAO") and has been since 1988.

### *State v. Morris*, 215 Ariz. 324 (2007)

3.    In the underlying criminal case, Respondent prosecuted Morris for the 2002 and 2003 murders of five women.

4.    In 2004, Morris was convicted of five counts of first-degree murder and sentenced to death.

5.    On mandatory direct appeal, the Arizona Supreme Court reviewed the case and issued an opinion on June 18, 2007, affirming the convictions and sentences.

### *State v. Cicero Pottridge Beemon*, 1 CA-CR 05-1161 (2008)

### CR2002-099001

6.    In the underlying criminal case, Respondent prosecuted Beemon for a 2002 murder.

7.     In 2005, Beemon was convicted of second-degree murder and sentenced to 22 years in prison.

8.     The Arizona Court of Appeals reviewed the case and issued a memorandum decision on February 21, 2008, affirming the conviction and sentence.

### *State v. Gallardo*, 225 Ariz. 560 (2010)

9.     In the underlying criminal case, Respondent prosecuted Gallardo for a 2005 high profile murder.

10.     In 2009, Gallardo was convicted of first-degree murder and sentenced to death.

11.     On mandatory direct appeal, the Arizona Supreme Court reviewed the case and issued an opinion on November 30, 2010, affirming the conviction and sentence.

### *State v. Lynch (I)*, 225 Ariz. 27 (2010) &

### *State v. Lynch (II)*, 238 Ariz. 84 (2015)

12.     In the underlying criminal cases, Respondent prosecuted Lynch for a 2001 murder.

///

13.     In 2006, Lynch was convicted of first-degree murder and sentenced to death.

14.     On mandatory direct appeal, the Arizona Supreme Court reviewed the case and issued an opinion on June 22, 2010, affirming the conviction but reversing the sentence and remanding the case for a new penalty phase proceeding due to an erroneous jury instruction.

15.     On remand, in 2012, Lynch was again sentenced to death.

16.     On mandatory direct appeal, the Arizona Supreme Court reviewed the case and issued an opinion on September 10, 2015, affirming the death sentence.

### *State v. Jodi Arias*, CR2008-031021 (2015)

17.     On July 9, 2008, the State filed an Indictment initiating the Maricopa County Superior Court criminal case of *State v. Arias*, CR2008-031021.

18.     Over the course of the next six years, the case was heavily litigated with a significant motion practice by both the State and the defense.

19.     On May 8, 2013, Arias was convicted of first degree murder but the jury was unable to reach a verdict during the penalty phase.

20.     The Court declared a mistrial and, on October 21, 2014, opening statements in the re-trial of the penalty phase commenced.

21.     On April 13, 2015, after the jury was unable to reach a verdict during the retrial of the penalty phase, Arias was sentenced to natural life in prison.

22.     The case is currently on appeal before the Arizona Court of Appeals.

## II.     CONTESTED FACTS DEEMED MATERIAL BY THE STATE BAR

1.     During his tenure with the MCAO, and described in greater detail below, Respondent engaged in a pattern of conduct which violated his ethical duties and was deemed unprofessional by various courts.

### *State v. Morris*, 215 Ariz. 324 (2007)

2.     During his closing argument in the aggravation phase of the case, Respondent argued that Morris had sex with four of the victims' corpse and kept the bodies because he enjoyed the odor of the decomposition.

3.     During his rebuttal closing argument in the aggravation phase, Respondent responded to opposing counsel's argument by singling out individual members of the jury and asking them to put themselves in place of the victims.

4.     Respondent's statements include the following:

"Which one of you want to volunteer to come sit here and have the defendant sit himself on your chest and say, [o]h, that didn't hurt? Because the

defense attorney is saying throw common sense out of window. Which one? I challenge anybody to say, [t]hat is something I want to do.

And anyway, and on top of that, while he's sitting on my chest, which one of you, since the lower left-hand side has the longer hair of the jurors, maybe she wants to have him grab her hair while he's sitting on her chest…to grab it and pull it around her neck.

You think that's not going to hurt?  You think one of you guys is going to volunteer for that? You can't leave your common sense aside. (Defense counsel) wants you to because he makes these arguments and says, well, we don't know what is in their heads. We don't know what is in Juror Number 1's head. Can you tell me you don't think it's not going to hurt when he sits on you?

Hey, Juror Number 1 or Juror Number 14, whatever it is, what if we put Winnie the Pooh tie around your neck? Are you going to enjoy that? Are you going to like it? Going to feel real good when you can't breathe?"

5.     During their appellate review of the case, the Supreme Court held that "[a]lthough the State argues that the prosecutor simply asked the jurors to apply common sense to the factual situation before them, the prosecutor's remarks did far more than make that request. Instead, the prosecutor singled out particular jurors

and addressed them personally, playing on their sympathy for the victims and fears of the defendant. Such remarks constitute misconduct."

6.    During the guilt phase of the underlying case, Respondent introduced the victim's jacket and later stated during his closing argument the following:

"But one of the things that is interesting about [the victim] is that the smell is absolutely putrid, absolutely one of the worst things that you will ever probably experience. And you got a minimal exposure to it when the jacket was opened up for your, if you will, smelling pleasure, for lack of a better word."

7.    During their appellate review of the case, the Supreme Court held that "[a]t worst, the offhand 'smelling pleasure' comment was inappropriate."

***State v. Cicero Pottridge Beemon*, 1 CA-CR 05-1161 (2008)**

**CR2002-099001**

8.    During the guilt phase of the case, the trial court ruled that, if the defendant testified, the State could impeach him with a certain 1997 drug conviction but not a certain 1984 robbery conviction.

9.    The defendant testified and admitted the 1997 drug conviction during direct examination, but did not mention his 1984 robbery conviction.

10.     In his opening and closing argument during the aggravation phase of the case, Respondent stated that the defendant was manipulative and only willing to admit to certain conduct if it benefited him or served to elicit jury sympathy.

11.     Respondent stated that while defendant was "quick to jump up there" and reveal his drug conviction, he had not revealed his "other on[e]".

12.     Defense counsel objected and Respondent responded:

"[S]o he can't stand up here now and say, well, you know, I'm going to pick and choose what I'm going to bring in.  If he picks and chooses, he has to answer for that....So no, I don't think I stepped over the line.  He withheld information when it was to his advantage and gave him [sic] information he did not need to and that the prosecutor was forbidden to go into.  So, no, I don't agree with them."

13.     During the appellate review of the case, the Court of Appeals (Division One) held that "[t]he prosecutor's argument attacked defendant as being dishonest for failing to reveal his robbery conviction to the jury during the guilt phase.  This comment was clearly improper in light of the trial court's ruling precluding use of the robbery conviction for impeachment purposes.  Indeed, we are baffled by the prosecutor's continued insistence at the bench conference that the defendant had no right to 'withhold information' regarding the robbery

conviction from the jury. Nonetheless, the statement was brief, it was immediately corrected by the trial court's instruction to disregard it, and the jurors are presumed to have done so."

14.   In his closing argument during the aggravation phase of the case, defense counsel accused Respondent of making certain statements depicting the defendant and defense counsel as, among other things, "sneaking, lying, cheating".

15.   In his rebuttal closing argument during the aggravation phase of the case, Respondent stated the following:

"One of the things defense counsel got up and told you was, well, the prosecutor has said that we've been sneaking, lying cheating…And he said that at the top of his lungs.

As I said, if history teaches us anything, it's that it comes around again and again. Remember Hitler? The big lie he told you? It was at the top of his lungs over and over, you are the superior people and people are going to believe it because they heard it over and over again[.] [A]nd that's what he said over and over again was about the state calling him sneaking, calling him lying, calling him cheating…Did that ever happen by the State? Of course it didn't happen, but you know what? He wants you to believe that it did. You know, just like Hitler, that

big lie:  If you put it out there, even though the prosecutor didn't say it, maybe

you'll believe it.  And maybe when you go back there to decide this case, you

won't decide it on the facts.

       *     *     *

He talks about America and wraps himself around the flag.  Doesn't wrap

himself around the German flag when he calls somebody a cheater, a liar, and

sneaking when in fact they never even used those words.  And additionally, with

regard to that, you don't mention the full truth because that's also not to your

benefit."

16.     During their appellate review of the case, the Court of Appeals held

that "[i]n a completely inappropriate effort to refute defense counsel's arguments,

Mr. Martinez then analogized his tactics to those of 'Adolf Hitler' and his 'big

lie'...[t]he Hitler analogy was a recurring theme in the prosecutor's closing

argument."

17.     The Court of Appeals also stated "[a]s reprehensive as the

prosecutor's analogy was, we believe any reasonable jury would have recognized

the inappropriateness of this line of argument and discounted it...Moreover, the

fact that, despite these improper comments, the jurors were unable to reach a

decision as to the 'especially depraved' factor also leads us to conclude that defendant was not prejudiced by the comments and that the jurors carefully evaluated the evidence regarding the existence of aggravating factors."

***State v. Gallardo*, 225 Ariz. 560 (2010)**

18.    In his closing argument, Respondent responded to defense counsel's argument that a life sentence was sufficient given the "severe restriction" and isolation of incarceration by stating that inmates are allowed to watch television, receive magazines, make phone calls and see visitors by stating "[d]o you think [Victim's Father is] going to be able to call his son, Rudy?"

19.    Defense counsel objected and the trial court sustained the objection.

20.    Respondent then reworded his argument, without objection, to highlight the Victim Impact Statement stating, in pertinent part:

"There's no comparison.  The point that's being made here is that the victim impact statement may be considered by you [the jury], and that impact statement indicated to you that they missed their son.  That's not quite doing justice to how they told you, and they would love to make a call and would love to be able to talk to (their son).  And in their victim impact statement, they told you they couldn't."

///

21.   During their appellate review of the case, the Supreme Court held that "[e]ven if the prosecutor's statements were improper, reversal is not required."

22.   Based upon the expert's trial testimony which originally stated that he was entitled to receive $4,200.00 and later indicated that he was entitled to receive $6,500.00, Respondent made the following statements during his closing argument:

R1:  "And there were some inconsistent statements, but the biggest one was the one involving money.  Initially when I asked him the question, he said he really wasn't sure how much money he was being paid.  Then he indicated, well, it was $4200.  Then after doing the mathematics a little bit more and fine-tuning it –"

R2:  "Well, you heard, he told you $4200, didn't he?  Anybody not hear that?  And then after questioning by the prosecutor, the figure changed, didn't it?"

R3:  "Well, he said on the stand from there, and that's the evidence that you are to consider.  You were told – he said $6500.  That's what he said.  And you were present when all of that happened, weren't you?  That's something that you can consider, because it goes to his motive and his bias and –"

23.   Following each statement, defense counsel objected as misleading and the trial sustained each objection.

24.     The parties approached the bench for a sidebar after Respondent's third attempt wherein the Court stated "[w]ell, the fact that the expert said two different things can be used by Mr. Martinez to impeach his credibility."

25.     When the defense counsel explained that he could not explain the difference in the expert's testimony without delving into an impermissible subject area, the trial court then ruled that Respondent could not argue "anything related to the discrepancy in the figures", but he could argue "[t]he fact that he was paid, the fact that he gave money and he gave time for free all go to motive and bias."

26.     During appellate oral argument, Justice Andrew Hurwitz asked:

"Can I ask you a question about something that nobody's discussed so far? The conduct of the trial prosecutor.   It seems to me that at least on several occasions, and by and large the objections were sustained, that the trial prosecutor either ignored rulings by the trial judge or asked questions that the trial judges once ruled improper and then rephrased the question in another improper way...Short of reversing a conviction, how is it that we can...stop inappropriate conduct?"

27.     Justice Michael Ryan then commented:

"Well, this prosecutor I recollect from several cases.  This same prosecutor has been accused of fairly serious misconduct but ultimately we decided it did not

rise to the level of requiring a reversal…There's something about this prosecutor…".

28.    Upon appellate review for prosecutorial misconduct, the Supreme Court held that "[a] prosecutor should not repeat an argument after it has been the subject of a sustained objection…Although the repeated statements by the prosecutor were improper, Gallardo's objections were sustained and the trial court instructed the jury…"

***State v. Lynch (I)*, 225 Ariz. 27 (2010) &**

***State v. Lynch (II)*, 238 Ariz. 84 (2015)**

29.    During their appellate review in *Lynch (I)*, the Supreme Court affirmed the convictions and non-capital sentences, but remanded the case for a new penalty phase for the capital sentence based upon a trial court jury instruction error.

30.    During the case, Respondent frequently and inaccurately referred to the aggravating factor "excessively cruel, heinous or depraved" as three separate aggravators instead of the one.

31.    The trial court conducted a new penalty phase and defendant appealed primarily based upon allegations of prosecutorial misconduct.

32.    During the appellate review in *Lynch (II)*, the Supreme Court found that Respondent made improper statements, described in greater detail below, and "that prosecutorial misconduct, while present in some instances, was not so pronounced or sustained as to require a new sentencing trial."

Argumentative Opening Statements:

33.    The Supreme Court found that "(Respondent) improperly made argumentative statements during opening" by making statements that:

   a. Defendant's childhood should not be considered a mitigating circumstance because "it happened 30 years ago" and that the defense was "pull(ing) at [the jury's] heart strings";

   b. An incident when Lynch's father purportedly burned Lynch's hand should not be considered as there were no medical records supporting the purported incident;

   c. A life-expectancy expert's testimony should be given little weight because the expert relied upon a Wikipedia article and Lynch outlived the expert's prediction.

Improper Witness/Expert Examination:

///

34.    The "combative remarks" and "argumentative questions" primarily reviewed by the Supreme Court include, but are not limited to:

    a.  "[T]he State's comment to a defense expert that she should 'just answer my question for once'";

    b.  Respondent interrupting the witness stating "[n]o, let me ask you the question; and

    c.  Respondent's "improper remark" in closing argument "that (a defense expert) 'can vouch for people'".

35.    The Supreme Court found that "[a]lthough (Respondent's) cross-examination was aggressive" and "while the trial court should have exercised more control over the aggressive questioning", there was no fundamental error in the examination as a whole.

36.    The Supreme Court also found that "the court would have been well within its discretion to have sustained the objections and required the prosecutor to rephrase his questions in a more civil manner".

Misstating Evidence:

37.    The Supreme Court found that Respondent made "inappropriate remarks" when:

a. During his cross-examination of a defense expert, Respondent asked whether the expert had previously stated that it was a waste of time to go over her notes and, in an apparent attempt to impeach the expert, played a recording wherein the expert said that it would be a waste of time to go through every word of her notes;

b. Respondent asked the same expert "[D]idn't you tell us about a case involving a guy…where you said that he was mistaken because you can read minds?"

c. During his closing argument, Respondent stated that renting pornographic movies "shows a debasement in the part of [Lynch's] character".

Personalization:

38.     The Supreme Court found that Respondent improperly "invited the jurors to place themselves in the victim's position and appealed to their fears" when Respondent made the following remarks during opening statement:

"So what happens is the defendant then, as Mr. Panzarella sits there, goes behind him and begins and cuts his throat from ear to ear.  The problem of the unfortunate aspect of that, because in and of itself, cutting somebody's throat is a

horrific, ghastly thing, you can only imagine. I don't think you can even imagine what it's like for somebody to approach you with a knife. You cannot move and you know they're manhandling you and they are going to cut your throat."

### *State v. Jodi Arias*, CR2008-031021 (2015) and 1 CA-CR 15-0302

Unprofessional Conduct Allegations Toward Opposing Counsel

39.   During a bench conference about the admissibility of certain purported statements by the Victim, Respondent stated at the bench "[b]ut the thing is that if Ms. Wilmott and I were married, I certainly would say, 'I f'ing want to kill myself'."

40.   When Wilmott objected, Respondent apologized.

41.   During a subsequent bench conference, Respondent stated to Wilmott "[w]ell, then, maybe you ought to go back to law school."

42.   On January 14, 2015, the trial court found the following:

"Comments by the prosecutor during a bench conference were insulting and unprofessional...Defendant alleges the prosecutor made a comment to Defense Counsel during a bench conference that was insulting and unprofessional.  After the verdicts were returned from the first trial, bench conferences were unsealed and information from those bench conferences were publicized by the media. The

specific comment by the prosecutor was publicized.   During the trial, the Court addressed this matter with counsel. The prosecutor apologized to Defense Counsel. The prosecutor was quick to acknowledge his error and regret.   Nothing inappropriate was said before the jury and there is no basis to find the prosecutor's comments affected the guilt phase verdict. The Court found no other sanction was appropriate under the circumstances."

43.    The matter is currently before the Court of Appeals, Division One in the case of *State v. Arias*, 1 CA-CR 15-0302. As of the date of this Report of Investigation, the Court of Appeals has not set a briefing schedule as they still have not received all of the transcripts of the proceedings.

44.    By engaging in the above-referenced conduct, Respondent violated the following ethical rules:

**State v. Morris, 215 Ariz. 324 (2007):**

a.     Rule 41(g), Ariz. R. Sup. Ct. – Respondent engaged in unprofessional conduct during his closing argument by, among other things, making an unprofessional comment about presenting a stale piece of evidence for the juror's "smelling pleasure"; and

b.    Rule 42, Ariz. R. Sup. Ct., ER 8.4(d) – Respondent engaged in professional misconduct by engaging in conduct that is prejudicial to the administration of justice by, among other things, singling out and personally addressing certain jurors during closing argument.

***State v. Cicero Pottridge Beemon*, 1 CA-CR 05-1161 (2008):**

a.    Rule 41(g), Ariz. R. Sup. Ct. - Respondent engaged in unprofessional conduct during his closing argument by, among other things, using a "Hitler" analogy during closing argument to disparage opposing counsel; and

b.    Rule 42, Ariz. R. Sup. Ct:

1. ER 4.4(a) – In representing a client, a lawyer shall not use means that have no substantial purpose other than to embarrass, delay, or burden any other person, or use methods of obtaining evidence that violate the legal rights of such a person by, among other things, improperly attacking the defendant during the aggravation phase of the case in light of the trial court's ruling precluding use of the robbery conviction for impeachment purposes in the guilt phase; and

2. ER 8.4(d) – Respondent engaged in professional misconduct by engaging in conduct that is prejudicial to the administration of justice by, among other things, continuing to insist at the bench conference during the aggravation phase that the defendant had no right to 'withhold information' regarding the robbery conviction from the jury during the guilt phase.

***State v. Gallardo*, 225 Ariz. 560 (2010):**

a.   Rule 42, Ariz. R. Sup. Ct., ER 8.4(d) – Respondent engaged in professional misconduct by engaging in conduct that is prejudicial to the administration of justice by, among other things, personalizing his closing argument and repeating segments of his closing argument after it has been the subject of a sustained objection.

***State v. Lynch (I)*, 225 Ariz. 27 (2010) & *State v. Lynch (II)*, 238 Ariz. 84 (2015):**

a.   Rule 42, Ariz. R. Sup. Ct., ER 8.4(d) – Respondent engaged in professional misconduct by engaging in conduct that is prejudicial to the administration of justice by, among other things, a) asking whether an expert had previously stated that it was a waste of time to go over

her notes and, in an apparent attempt to impeach the expert, playing a recording wherein the expert said that it would be a waste of time to go through every word of her notes and b) personalizing his closing argument and improperly inviting the jurors to place themselves in the victim's position.

***State v. Jodi Arias*, CR2008-031021 (2015):**

a.    Rule 41(g), Ariz. R. Sup. Ct. – Respondent has repeatedly engaged in unprofessional conduct by, among other things, demeaning opposing counsel at a bench conference.

## III.   CONTESTED FACTS DEEMED MATERIAL BY RESPONDENT

1.    Respondent's conduct and mental state must be viewed in the context of the entire underlying trials at issue, all of which occurred many years ago with the exception of the more recent *Arias* case.

2.    Viewed in the context of the entire underlying trials at issue, Respondent's conduct did not violate any of the alleged Ethical Rules.

3.    Lawyers are not perfect. Even conscientious lawyers sometimes make mistakes, especially in the context of split-second decisions made in the heat of trial.

4.     Mr. Martinez did not knowingly or intentionally violate any constitutional or legal requirements in his prosecution of the cases at issue.

5.     Mr. Martinez did not engage in substantial or repeated violations of the Oath of Admission to the Bar or the Lawyer's Creed of Professionalism of the State Bar of Arizona.  Ariz. Sup. Ct. R. 31(a)(2)(E).

## IV.   STIPULATED ISSUES OF LAW DEEMED MATERIAL

The findings of the Arizona Supreme Court and the Arizona Court of Appeals, though admissible, are not binding on the hearing panel in this matter. *In re Augenstein*, 178 Ariz. 133, 135, 871 P.2d 254, 256 (1994); *In re Levine*, 174 Ariz. 146, 154-56, 847 P.2d 1093, 1101-03 (1993).

## V.   CONTESTED ISSUES OF LAW DEEMED MATERIAL BY THE STATE BAR

1.     Whether Respondent violated Rule 41(g), Ariz. R. Sup. Ct.?

2.     Whether Respondent violated Rule 42, Ariz. R. Sup. Ct., ER 4.4(a)?

3.     Whether Respondent violated Rule 42, Ariz. R. Sup. Ct., ER 8.4(d)?

## VI.   CONTESTED ISSUES OF LAW DEEMED MATERIAL BY RESPONDENT

1.     Respondent generally denies that the facts support the legal requirements of each alleged violation of the Ethical Rules.

2.     An appellate finding that a prosecutor committed misconduct does not equate to a finding that, from the appellate court's perspective, the prosecutor violated the Ethical Rules. To prevail on a claim of "prosecutorial misconduct," a defendant must show, first, that "misconduct exists," and second, that "a reasonable likelihood exists that the misconduct could have affected the jury's verdict, thereby denying defendant a fair trial." *State v. Morris*, 215 Ariz. 324, 335, 160 P.3d 203, 214 (2007). The first prong—the existence of misconduct— can be satisfied when a prosecutor knowingly or intentionally violates a constitutional or legal requirement ***and*** when a prosecutor makes an inadvertent or innocent mistake.

3.     A mere mistake, without more, does not rise to the level of ethical misconduct. *See* Preamble to Arizona Rules of Professional Conduct, ¶ [14] ("The Rules of Professional Conduct are rules of reason. They should be interpreted with reference to the purposes of legal representation and of the law itself.").

4.     Mr. Martinez's conduct at issue, most of which occurred many years ago, must be evaluated "on the basis of the facts and circumstances as they existed at the time of the conduct in question and in recognition of the fact that a lawyer

often has to act upon uncertain or incomplete evidence of the situation." Preamble

to Arizona Rules of Professional Conduct, ¶ [19].

## VII.  WITNESSES

### State Bar's Witnesses

The State Bar expects to call its witnesses in the order listed below.

| Witness Name | Expected amount of time of testimony |
|---|---|
| Day 1: | |
| 1.   Juan M. Martinez, Adversely | **2.0** |
| 2.   Robert Stein | **.5** |
| 3.   Joel Brown | **.5** |
| 4.   Jennifer Willmott | **.5** |
| 5.   Lawrence Blieden | **.5** |
| 6.   Richard Miller | **.5** |
| 7.   Paul K. Charlton | **2.0** |
| 8.   Kathleen Brody (Foundation/Rebuttal), if necessary | **.5** |
| 9.   Foundation, Rebuttal and/or Impeachment Witnesses, if necessary | **.5** |

### Respondent's Objections to State Bar's witnesses:

1.     Respondent objects to Kathleen Brody on the ground that she does not have personal knowledge of any matter of relevance in this case.

2.     Respondent reserves all testimonial objections to all witnesses.

### Respondent's Witnesses

Respondent expects to call his/her witnesses in the order listed below.

| | Witness Name | Expected amount of time of testimony |
|---|---|---|
| A. | Juan M. Martinez | **2.0-4.0** |
| B. | Thomas Zlaket | **1.5** |
| C. | Foundation, rebuttal and/or impeachment witnesses, if necessary | **.5** |

Additionally, Respondent reserves the right to call any of the witnesses listed by the State Bar.

**State Bar's Objections to Respondent's witnesses:**

A.    The State Bar reserves all testimonial objections to all witnesses.

# VIII. EXHIBITS

**Stipulated Exhibits (subject to Presiding Disciplinary Judge approval)**

| Exhibit No. | Bates No. SBA000... | Date | Document Description |
|---|---|---|---|
| 1 | | 6/18/07 | *State v. Morris*, 215 Ariz. 324, 329-32, 160 P.3d 203, 208-11 (2007) |
| 2 | | 7/12/05 | *Morris* Transcript |
| 3 | | 9/7/05 | *Beemon* Trial Transcript |
| 4 | | 2/21/08 | *Beemon* Memorandum Decision |
| 5 | | 11/30/10 | *State v. Gallardo*, 225 Ariz. 560, 563-64, 242 P.3d 159, 162-63 (2010) |
| 6 | | 6/25/09 | *Gallardo* Transcript |
| 7 | | 6/22/10 | *State v. Lynch*, 225 Ariz. 27, 42, 234 P.3d 595, 610 (2010) ("*Lynch I*") |
| 8 | | 9/10/15 | *State v. Lynch*, 238 Ariz. 84, 357 P.3d 119 (2015) ("*Lynch II*") |

| Exhibit No. | Bates No. SBA000 ... | Date | Document Description |
|---|---|---|---|
| 9 | | 7/17/12 | *Lynch II* Transcript |
| 10 | | 7/18/12 | *Lynch II* Transcript |
| 11 | | 7/23/12 | *Lynch II* Transcript |
| 12 | | 8/9/12 | *Lynch II* Transcript |
| 13 | | 5/17/06 | *Lynch I* Transcript |
| 14 | | 1/15/15 | Minute Entry |
| 15 | | 4/2/13 | *Arias* Transcript |
| 16 | | 5/21/13 | *Arias* Transcript (sealed) |

### State Bar's Exhibits

| Exhibit No. | Bates No. SBA000 ... | Date | Document Description |
|---|---|---|---|
| 17 | | 12/22/15 | Letter from Kathleen Erin Brody, President. Arizona Attorneys for Criminal Justice, bar charge with attachments |
| 18 | | | • Undated, CD Exhibits to bar charge letter re Juan M. Martinez |

In addition, the following may be submitted as evidence:

1.    Respondent's answer filed in this proceeding, and disclosure statements and responses to discovery requests, including responses to requests for production of documents and responses to requests for admissions, and responses to non-uniform interrogatories.

2.    The State Bar may offer deposition transcripts, in the Bar's case in chief, or as rebuttal and/or for impeachment purposes.

3.     Certified court documents may be used in the Bar's case in chief, or as rebuttal and/or for impeachment purposes.

4.     Any and all non-objectionable exhibits identified and disclosed by Respondent.

**Respondent's Exhibits**

| Exhibit No. | Bates No. SBA000 ... | Date | Document Description |
|---|---|---|---|
| 19 | | 8/2010 | ABA Resolution |

Additionally, Respondent reserves the right to offer:

1.     Any and all non-objectionable exhibits identified and disclosed by the State Bar.

2.     Court documents from the underlying cases at issue as rebuttal evidence or for impeachment purposes.

3.     The State Bar's complaint filed in this proceeding, and disclosure statements and responses to discovery requests, including formal or informal responses to requests for production of documents and responses to requests for admissions, and responses to non-uniform interrogatories.

## IX.   DEPOSITIONS

Paul Charlton is scheduled to be deposed in this matter on September 7, 2017. Respondent reserves the right to use deposition transcripts at the hearing for any purpose authorized by the Arizona Rules of Evidence and the Arizona Rules of

Civil Procedure, as incorporated by Rule 48 of the Arizona Rules of the Supreme Court.

## X.   TECHNICAL   EQUIPMENT   NEEDED   OR   INTERPRETER REQUIREMENT

The parties may want the ability to electronically display exhibits or PowerPoint presentations at the hearing.  If the parties elect to use electronic exhibits or PowerPoint presentations, the parties will contact court staff in advance of the hearing to make the necessary arrangements for any required technical equipment.

## XI.   EXCLUSION OF WITNESSES FROM HEARING ROOM

The parties will be invoking Rule 615 of the Arizona Rules of Evidence regarding exclusion of witnesses from the hearing room.

## XII.  SETTLEMENT EFFORTS

The parties attended a settlement conference before the Honorable Robert Myers on July 5, 2017, but were unsuccessful in reaching a settlement.

///

///

///

**DATED** this _18t_ day of September, 2017.

STATE BAR OF ARIZONA

Craig D. Henley
Senior Bar Counsel

___/s/ J. Scott Rhodes_____
J. Scott Rhodes
Kerry Hodges
Respondent's Counsel

Original filed with the Disciplinary Clerk of
the Office of the Presiding Disciplinary Judge
of the Supreme Court of Arizona
this _18t_ day of September, 2017.

Copy of the foregoing emailed
this _18t_ day of September, 2017, to:

The Honorable William J. O'Neil
Presiding Disciplinary Judge
Supreme Court of Arizona
1501 West Washington Street, Suite 102
Phoenix, Arizona 85007
E-mail:  officepdj@courts.az.gov

Copy of the foregoing mailed/emailed
this _____ day of September, 2017, to:

J. Scott Rhodes
Kerry Hodges
Jennings Strouss & Salmon, PLC
One E. Washington Street, Suite 1900
Phoenix, AZ  85004-2554
Email: srhodes@jsslaw.com
Respondent's Counsel

Copy of the foregoing hand-delivered
this _____ day of September, 2017, to:

Lawyer Regulation Records Manager
State Bar of Arizona
4201 N. 24th Street, Suite 100
Phoenix, Arizona 85016-6266

by

CDH:nr

## BEFORE THE PRESIDING DISCIPLINARY JUDGE

| | |
|---|---|
| IN THE MATTER OF A MEMBER OF THE STATE BAR OF ARIZONA,<br><br>**JUAN M. MARTINEZ,**<br>  **Bar No. 009510**<br><br> Respondent. | **PDJ-2017-9044**<br><br>**ORDERS RE: FINAL CASE MANAGEMENT CONFERENCE**<br><br>[State Bar No. 15-3363]<br><br>**FILED SEPTEMBER 5, 2017** |

The Presiding Disciplinary Judge (PDJ), held a final case management conference on September 5, 2017.  Craig D. Henley, Senior Bar Counsel, appeared on behalf of the State Bar of Arizona. Juan M. Martinez, appeared with counsel, J. Scott Rhodes and Kerry Hodges, *Jennings, Strouss & Salmon, PLC*.  The complaint was filed on April 7, 2017. The answer was filed on May 12, 2017. At the request of the parties, time was expanded for the scheduling of the hearing by order of the PDJ.

The parties announced they are ready to proceed to hearing.  The three (3) day hearing of **September 12-14, 2017**, was confirmed. The hearing shall commence at the Arizona State Courts Building, 1501 W. Washington Street, Room 109, Phoenix, AZ 85007-3231 at 9:00 a.m.

**DATED** this 5th day of September 2017.

*William J. O'Neil*
_____
**William J. O'Neil, Presiding Disciplinary Judge**

1

COPY of the foregoing e-mailed/mailed
on this 5th day of September, 2017, to:

Craig D. Henley
State Bar of Arizona
4201 N. 24th Street, Suite 100
Phoenix, AZ  85016-6266
Email:  lro@staff.azbar.org

J. Scott Rhodes
Kerry A. Hodges
Jennings, Strouss & Salmon, PLC
One E. Washington St., Suite 1900
Phoenix, AZ 85004-2554
Emails: SRhodes@jsslaw.com &
         KHodges@jsslaw.com

by:  AMcQueen

**BEFORE THE PRESIDING DISCIPLINARY JUDGE**

| | |
|---|---|
| IN THE MATTER OF A MEMBER OF THE STATE BAR OF ARIZONA, | **PDJ-2017-9044** |
| | **DECISION AND ORDER DISMISSING COMPLAINT** |
| **JUAN M. MARTINEZ,** **Bar No. 009510** | |
| Respondent. | [State Bar No. 15-3363] |
| | **FILED NOVEMBER 27, 2017** |

This matter was tried before the hearing panel ("Panel") pursuant to Rule 58(j)[1], Ariz. R. Sup. Ct., on September 12, 2017. The Panel, was comprised of Teri M. Rowe, Volunteer Attorney Member, Archer Shelton, Volunteer Public Member, and the Presiding Disciplinary Judge, ("PDJ"), William J. O'Neil. Craig D. Henley, Senior Bar Counsel, appeared on behalf of the State Bar of Arizona. Juan M. Martinez, appeared with counsel, J. Scott Rhodes and Kerry Hodges, *Jennings, Strouss & Salmon, PLC*.

Exhibits 1 through 16 were admitted by stipulation of the parties in their Joint Prehearing Statement, ("JPS"), which were approved by the PDJ and given to the Panel in advance of the hearing. Exhibit 19 was admitted over the objection of the

---

[1] Unless otherwise stated, all Rule references are to the Ariz. R. Sup. Ct.

State Bar. The Panel also considered the testimony of the witnesses,[2] and the respective positions stated in each prehearing memorandum.

# I.    <u>PROCEDURAL HISTORY</u>

Under Rule 46(f)(4), attorney discipline proceedings begin with a charge. "Charge means any allegation or other information of misconduct" that comes to the attention of the State Bar. Under Rule 46(f), "Complainant means a person who initiates a charge against a lawyer or later joins in a charge to the state bar regarding the conduct of a lawyer." According to the complaint, the "Complainant is the President of the Arizona Attorneys for Criminal Justice, a statewide organization for criminal defense attorneys, law students and other law-related professionals." [Complaint, ¶ 3.]

Under Rule 53(a), a complainant is not a party to a discipline proceeding. The bringer of any charge is typically neither material nor relevant to an attorney discipline proceeding. The State Bar itself may also initiate a charge against an attorney. In this proceeding, there was no evidence offered identifying the complainant. Who the complainant is in this proceeding has no tendency to make any fact in this proceeding more or less probable than it would be without that identification.

---

[2] The witnesses included Robert Stein, Lawrence Blieden, Jennifer Willmott, Paul K. Charlton and Thomas Zlaket.

Evaluating all charges brought to the attention of the State Bar is mandatory. "The state bar shall evaluate all information coming to its attention, in any form, by charge or otherwise, alleging unprofessional conduct, misconduct or incapacity." *See* Rule 55(a). If the state bar determines the referred attorney is subject to its jurisdiction, it may refer the matter for a screening investigation, as done in this proceeding. If after investigation the State Bar determines admonition is appropriate, it shall file a report with the Attorney Discipline Probable Cause Committee, ("Committee").

The Committee is a permanent committee of the Supreme Court, comprised of nine members. There are six lawyers who are active members of the State Bar and three public, nonlawyer members appointed by the Chief Justice. *See* Rule 50(a). The meetings of the Committee are not open to respondent, respondent's counsel or the public under Rule 50(f). Instead, Bar Counsel shall inform the respondent attorney of the right to submit a summary of any response to the charges for submission to the Committee under Rule 55(b)(2)(B).

"Any recommendation by the State Bar for disposition, other than dismissal, shall be reviewed by the Committee." *See* Rule 55(c). The Committee must review the state bar report, and the summary of the respondent. Bar Counsel appears before the Committee. A respondent may not appear before the Committee. It then determines how to proceed.

Based on the State Bar report, the summary by the respondent, and any statements by Bar Counsel, the Committee found probable cause and ordered an admonition and probation against Mr. Martinez under Rule 55(c)(1)(D) for violations of Rule 41(g), and ERs 4.4 and 8.4(d) under Rule 42.  Its decision was filed with the Records Manager of the Lawyer Regulation Office of the State Bar. Under Rule 55(c)(3), the State Bar served the decision on Mr. Martinez.

"Sanctions imposed shall be determined in accordance with the American Bar Association *Standards for Imposing Lawyer Sanctions." See* Rule 58(k). *Standard* 2.6 defines an admonition. "Admonition, also known as private reprimand, is a form of non-public discipline which declares the conduct of the lawyer improper, but does not limit the lawyer's right to practice." The Commentary to *Standard* 2.6 states, "Admonition is the least serious of the formal disciplinary sanctions, and is the only private sanction."

A decision of the Committee is final unless the respondent, within ten (10) days, rejects the decision by demanding that formal proceedings be instituted, ("appeal"). *See* Rule 55(c)(4)(A). On September 9, 2016, Mr. Martinez timely filed an appeal from the order of admonition. On October 5, 2016, pursuant to Rule 55, the Committee vacated the order of admonition and authorized the State Bar to prepare and file a complaint against Mr. Martinez. [Order Vacating Admonition, attached to Complaint.]

4

The single count complaint filed against Mr. Martinez was filed on April 7, 2017. We are unaware of any prior complaints filed against Mr. Martinez. There have been no complaints previously filed against him since the inception of the Office of the Presiding Discipline Judge at the beginning of 2011. Notice of service of that complaint was filed on April 12, 2017. The case was assigned to the PDJ on April 13, 2017. The unopposed motion of Mr. Martinez for additional time to file his answer was granted on April 28, 2017. The answer was timely filed on May 12, 2017.

Under Rule 58(c), a mandatory initial case management conference was telephonically held on May 23, 2017. Written scheduling orders were issued the same day. The parties requested additional time to file the JPS. The request was granted August 7, 2017.  The JPS was filed on September 1, 2017. A telephonic final case management conference was held on September 5, 2017. Each party filed an individual prehearing memorandum on September 6, 2017. The hearing was held on September 12, 2017. Having already considered the stipulated exhibits, the Panel dismissed the case. In determining whether to issue an order of dismissal or general comments on the dismissal, the Panel directed a transcript of the hearing be prepared. The 235 page transcript was filed on October 27, 2017.

## II.   DISCUSSION[3] AND CONCLUSIONS OF LAW

Mr. Martinez has been licensed to practice law in Arizona since May 12, 1984. He has been a prosecutor with the Maricopa County Attorney's Office ("MCAO") since 1988. [JPS Stipulated Facts, ("Stip. Fact") 1-2.] In allegation 5 of the complaint, the State Bar alleged that during his tenure with the Maricopa County Attorney's Office, that Mr. Martinez "engaged in a pattern of conduct which violated his ethical duties and was deemed unprofessional by various courts."

The parties stipulated that the findings of the Arizona Supreme Court and the Arizona Court of Appeals, though admissible, are not binding on the Panel in this proceeding. *In re Augenstein*, 178 Ariz. 133, 135, 871 P.2d 254, 256 (1994); *In re Levine*, 174 Ariz, 146, 154-56, 847 P.2d 1093, 1101-1103 (1993). We agree. Rule 48(a) states "Discipline and disability proceedings are neither civil nor criminal, but are *sui generis"* or unique or particular to itself.

The conduct by which the State Bar alleges Mr. Martinez engaged in a pattern of conduct which violated his ethical duties and was deemed unprofessional by various courts involved five cases. *State v. Morris*, *State v. Beemon*, *State v. Gallardo, State v. Lynch* (I and II), and *State v. Arias*.

---

[3] Where not otherwise indicated, these facts are drawn from the testimony provided at the hearing.

The complaint alleged Mr. Martinez violated Rule 41(g) in three cases. Rule 41(g) states, "The duties and obligations of members shall be to avoid engaging in unprofessional conduct *and* to advance no fact prejudicial to the honor or reputation of a party or a witness unless required by the duties to a client or the tribunal." Thomas Zlaket Esq. was the expert witness offered by Mr. Martinez. He opined that Rule 41(g) was a two-part rule. The first part relating to unprofessional conduct was "aspirational." The second part requires the advancement of no fact prejudicial to the honor or reputation of either a party or a witness "unless required by the duties to a client or the tribunal." [Tr. 187:20-189:2.]

The complaint alleges a violation of ER 4.4(a) in one case. E.R. 4.4(a) states "In representing a client, a lawyer shall not use means that have no *substantial* purpose other than to embarrass, delay, or burden any other person, or use methods of obtaining evidence that violate the legal rights of such a person." (Emphasis added.) The wording replaces that of the predecessor Model Code provision DR 7-102(A)(1).  It prohibited a lawyer from doing that which would serve *merely* to harass or maliciously injure another. Rule 4.4(a) focuses on the purpose rather than the effect. *Idaho State Bar v. Warrick*, 44 P.3d 1141 (Idaho 2002). Otherwise its application would be entirely subjective. If there is a "substantial purpose" there is rarely a violation of ER 4.4(a).

The complaint alleges a violation of ER 8.4(d) in four cases. ER 8.4(d) states, "It is professional misconduct for a lawyer to engage in conduct that is *prejudicial* to the administration of justice." (Emphasis added.) The comment to ER 8.4(d) states, "A lawyer who, in the course of representing a client, knowingly manifests by words or conduct, bias or prejudice based upon race, sex, religion, national origin, disability, age, sexual orientation or socioeconomic status, violates paragraph (d)."

ER 8.4(d) has withstood constitutional challenges for vagueness and overbreadth for a reason. *See, Howell v. State Bar*, 843 F.2d 205 (5th Cir. 1988). There the court denied the vagueness challenge because lawyers "have the benefit of guidance provided by case law, court rules and the law of the profession." The cases demonstrate ER 8.4(d) properly sets a high requirement for conduct to be found to be "prejudicial" to the administration of justice.

A violation of ER 8.4(d), "requires proof of some nexus between the conduct charged and an adverse effect upon the administration of justice." *People v. Jaramillo*, 35 P.3d 723 (Colo. 2001). For a violation of Rule 8.4(d) to occur the conduct must not only be improper and bear directly on the judicial process. It must also "taint the judicial process in more than a *de minimus* way." *In re Carter*, 11 A.3d 1219 (D.C. 2011). In Arizona, it is clear there is no mental state other than negligence required, as the lawyer's motive is "immaterial." *In re Alexander*, 300 P.3d 536 (Ariz. 2013).

While there are cases discussing abusive or disruptive conduct that impedes the proper functioning of the legal system can violate Rule 8.4(d), it appears those cases relate to statements that demean the judiciary or using threats and intimidation tactics towards opposing counsel, judges, and disciplinary authorities. *See In re Small*, 294 P.3d 1165 (Kan. 2013).

### *State v. Morris*

It was stipulated that Mr. Martinez prosecuted Morris for the 2002 and 2003 murders of five women; Morris was convicted of five counts of first-degree murder and sentenced to death; and on mandatory direct appeal the Arizona Supreme Court reviewed the case and issued an opinion on June 18, 2007, affirming the conviction and sentences. [Stip. Facts 3-4.] The complaint alleged Mr. Martinez violated Rule 41(g) and 8.4(d). [Complaint, *Morris* allegation 56(a-b) and Contested Fact Deemed Material by the State Bar, 44(a-b).]

### *State v. Beemon*

It was stipulated that Mr. Martinez prosecuted Beemon for a 2002 murder; in 2005, Beemon was convicted of second-degree murder and sentenced to 22 years in prison; the Arizona Court of Appeals reviewed the case and issued a memorandum decision on February 21, 2008, affirming the conviction and sentence. [Stip. Facts 6-8.] The complaint alleged Mr. Martinez violated Rule 41(g), ER 4.4(a) and 8.4(d

[Complaint, *Beemon* allegation 56(a-b) and JPS Contested Fact Deemed Material by the State Bar, *Beemon* 44(a-b).]

### ***State v. Gallardo***

It was stipulated that Mr. Martinez prosecuted Gallardo for a 2005 high profile murder; in 2009, he was convicted of first-degree murder and sentenced to death; and on mandatory appeal the Arizona Supreme Court reviewed the case and issued an opinion on November 30, 2010, affirming the conviction and sentence. [Stip. Facts, 9-11.] The complaint alleged Mr. Martinez violated ER 8.4(d). [Complaint, *Gallardo* allegation 56(a), and JPS Contested Fact Deemed Material by the State Bar, *Gallardo*, 44(a).]

### ***State v. Lynch*** (***I***) **and** (***II***)

It was stipulated, that Mr. Martinez prosecuted Lynch for a 2001 murder; he was convicted of first-degree murder in 2006, and sentenced to death; on mandatory direct appeal, the Arizona Supreme Court reviewed the case and issued an opinion on June 22, 2010, affirming the conviction but reversing the sentence and remanding the case for a new penalty phase proceeding due to an erroneous jury instruction; on remand, in 2012, Lynch was again sentence to death; on mandatory direct appeal, the Arizona Supreme Court reviewed the case and issued an opinion on September 10, 2015, affirming the death sentence. [Stip. Facts, 12-16.] The complaint alleged

Mr. Martinez violated ER 8.4(d). [Complaint, *Lynch* allegation 56(a) & JPS Contested Fact Deemed Material by the State Bar, *Lynch*, 44(a).]

### State v. Jodi Arias

It was stipulated that on July 9, 2008, the Stated filed an Indictment initiating the Maricopa County Superior Court criminal case of *State v. Arias*, CR2008-031021; during the next six years, the case was heavily litigated with a significant motion practice by both the State and the defense; on May 8, 2013, Arias was convicted of first degree murder but the jury was unable to reach a verdict during the penalty phase; the Court declared a mistrial and, on October 21, 2014, opening statements in the re-trial of the penalty phrase commenced; on April 13, 2015, after the jury was unable to reach a verdict during the retrial of the penalty phase, Arias was sentenced to natural life in prison; and the case is on appeal before the Arizona Court of Appeals. [Stip. Facts, 17-22.]

The complaint alleged Mr. Martinez violated Rule 41(g) as he "repeatedly engaged in unprofessional conduct, by among other things, demeaning opposing counsel at a bench conference." [Complaint, *Arias* allegation 56(a) & JPS Contested Fact Deemed Material by the State Bar, *Arias* 44(a).]

### The Hearing

In the complaint, the State Bar affirmatively alleged, Mr. Martinez "engaged in a pattern of conduct which violated his ethical duties *and* was deemed

unprofessional by various courts." (Emphasis added.) [Complaint, allegation 5 & JPS Contested Fact Deemed Material by the State Bar, 1.] In its opening memorandum, the State Bar acknowledged that broad allegation was not sustainable, stating, "While none of the appellate courts found that Respondent's actions and statements rose to the level of 'prosecutorial misconduct' justifying reversal, *some* of the appellate courts deemed Respondent's actions and statements unprofessional misconduct." [State Bar Prehearing Memorandum p. 2.] In its opening statement, the State Bar asserted that most of the factual comments and statements were admitted. But a review of the complaint and the JPS demonstrate that of the fifty-five allegations in the complaint,[4] only ten allegations were admitted to by Mr. Martinez.

"Allegations in a complaint…shall be established by clear and convincing evidence." Rule 48(d). "Clear and convincing evidence" requires the panel "to be persuaded that the truth of the contention is 'highly probable.'" *In re Neville*, 147 Ariz. 106, 708 P.2d 1297, (1985).  Law is a process of persuasion. While persuasion may rely on techniques and figures of speech, if it lacks in meaningful content, it should not prevail. Rhetoric can be useful, but it cannot be the whole of it. The decision sought in a legal proceeding should be a ruling for the right reasons and in the right way. Rulings in attorney discipline must be based on a meritorious

---

[4] There is no allegation 2 stated in the complaint.

argument that correctly accounts for the facts established with clear and convincing evidence, correctly interprets the law and applying the law to those established facts. After the hearing, the Panel found the State Bar had failed to meet its burden of proof and dismissed the complaint with prejudice.

Each party offered expert testimony. Experts should be impartial. They are not to be advocates. The duty of the expert differs from that of the attorney representing a party. The expert is to assist the trier-of-fact. While it is not objectionable for an expert to express an opinion on the ultimate issues before the hearing panel, expert witnesses are not experts on how the hearing panel should decide the case. The State Bar first requested its expert to consider offering an opinion in this proceeding on August 22, 2017, three weeks prior to the hearing. The State Bar disclosed that expert's opinion the same day. We found the expert called by Mr. Martinez to be credible and insightful. The cross examination of the expert witness called by the State Bar called into question his impartiality and credibility.

Every hearing panel addresses the specific allegations within the complaint. It is that pleading that gives fair notice of the basis of the claim. Those allegations may be clarified through discovery and clarified in the JPS. There were virtually no such clarifications in the JPS.  The State Bar must prove each of its allegations. It is bound by its pleadings and is entitled to no greater or different relief than arise from those allegations.

Many of the complaint allegations were taken out of context or did not fall within the Rules alleged to be violated. "The Rules of Professional Conduct are rules of reason. They should be interpreted with reference to the purposes of legal representation and the law itself." *See* Preamble to Arizona Rules of Professional Conduct. While there is no statute of limitations that applies to discipline, most of the events alleged occurred many years ago. Four of the five case events occurred over a decade ago. The Preamble to the Arizona Rules of Professional Conduct direct that such matters must be evaluated "on the basis of the facts and circumstances as they existed at the time of the conduct in question and in recognition of the fact that a lawyer often has to act upon uncertain or incomplete evidence of the situation."

An example is in the Arias allegation that Mr. Martinez stated at the bench "[b]ut the thing is that if Ms. Wilmott and I were married, I certainly would say, 'I f'ing want to kill myself.'" [Complaint 51, p. 16.] Without context, the comment appears to be an *ad hominem* attack. The State Bar expert believed it was such an attack and was both unprofessional and unnecessary offering no context or basis for that opinion, other than the statement standing alone. [Hearing Tr. 127:1-9.]

The context of the statement is in the partial transcript of Exhibit 15. There Ms. Wilmott told the Judge she wanted her client to testify about a statement. Ms. Wilmott argued, "What she wants to say is that how Mr. Alexander threatened to commit suicide because he said – he used the F word, that he wanted to F'g kill

himself." [Ex. 15 Tr. 85:23-86:1.] Mr. Wilmott later argued, "[I]t's about Ms. Arias and what she would have perceived when Mr. Alexander said, I F'n wanted to kill himself, that what he says, he threatened suicide." [Id. Tr. 86:11-15.]

Mr. Martinez then argued to the court,

But the thing is that if Ms. Willmott and I were married, I certainly would say I F'g want to kill myself. That doesn't mean I want to kill myself. It just means there's a bad relationship and I want you to leave me alone. She's talking about somebody's state of mind. Just because somebody says that, that doesn't mean that he wants to commit suicide.

[Id. Tr. 86:23-87:5.]

The State Bar was required to prove by clear and convincing evidence that these statements were a *substantial* violation or a *repeated* violation. In context, it was neither. The expert witness called by the State Bar did not put this exchange in the same category as the other allegations. He opined, "I don't believe it's deserving of a sanction." [Hearing Tr. 162:12-13.]

Rule 58(k) requires findings of fact, and conclusions of law when there is an order regarding discipline. Because the evidence regarding the alleged violations was not clear and convincing there is no order regarding discipline Because there is no order regarding discipline, we need not make further detailed findings of fact and conclusions of law.

Now therefore,

**IT IS ORDERED** dismissing the complaint with prejudice.

DATED this 27th day of November, 2017.

_William J. O'Neil_
**William J. O'Neil, Presiding Disciplinary Judge**

_Teri M. Rowe_
**Teri M. Rowe, Volunteer Attorney Member**

_Archer Shelton_
**Archer Shelton, Volunteer Public Member**

COPY of the foregoing e-mailed
on this 27th day of November 2017, and
mailed November 28, 2017, to:

Craig D. Henley
State Bar of Arizona
4201 N. 24th Street, Suite 100
Phoenix, AZ  85016-6266
Email:  lro@staff.azbar.org

J. Scott Rhodes
Kerry A. Hodges
One E. Washington St., Suite 1900
Phoenix, AZ 85004-2554
Emails: SRhodes@jsslaw.com &
        KHodges@jsslaw.com

by:  AMcQueen

# EXHIBIT 33

*Andriano v. Ryan*, Case No. CV-16-01159-PHX-SRB
Motion for Evidentiary Development

**Ann B Sullivan**

| | |
|---|---|
| **From:** | Phx Court Mailbox MCC |
| **Sent:** | Wednesday, November 22, 2017 7:59 AM |
| **To:** | Rebecca Postyeni |
| **Subject:** | RE: Attn: Records |

Dear Ms Postyeni,

Thank you for your correspondence.

Your request has been forwarded to our Records Department for follow up. They will contact you with any questions or to notify you of any possible costs associated with your request. Please allow 3 – 5 days for a response. Requests will be processed in the order they are received.

If you have additional questions, you may contact the Records Section at 602-262-4010.
Thank you,

Phoenix Court Mailbox
AR


**From:** Rebecca Postyeni [mailto:Rebecca_Postyeni@fd.org]
**Sent:** Tuesday, November 21, 2017 5:05 PM
**To:** Phx Court Mailbox MCC <court@phoenix.gov>
**Subject:** Attn: Records


Hello I am an investigator with the Federal Public Defender trying to obtain the following records that are important to one of my cases:

St of Az vs. MARTINEZ
Juan M. Martinez
DOB: 08/31/1955
Case number: M-0741-2826562
Filing Date: 12/31/2002

I am requesting a copy of the court file documents (non-certified) and they can either be mailed to me at the address below, or I would prefer to pick them up when they are ready.

Thank you so much.

Rebecca Postyeni, M.A.
Investigator
Capital Habeas Unit
Office of the Federal Public Defender
850 W. Adams St., Suite 201
Phoenix, Arizona 85007
Phone: (602) 382-2875

```
City of Phoenix Court Management System            11/22/17 03:58PM
RPT52427 Defendant Pending/Concluded Information         Page #  1


  I
MARTINEZ, JUAN M                          # 2192178  DOB 08/24/55

Sex M  Wt 160  Ht 508  Eyes BR   Hair BK   Origin H  Lang SPANISH
  Total Due           Warrants        Boot & Tow
$         0.00    $         0.00    $         0.00
Drivers License AZ NONE                  User ID KCRUZ2
Comments:



-------------------------------------------------------------------
CONCLUDED CASES
  I C
Case: 2826562  MJ  Hearing: SRH   Fri 07/18/03 08:30AM  Ctrm: 703      Loc: RECC
    Charge       Viol                Viol Date Stat Find AOC Conc Dt SA Drug Acc
609884401      28-1381A1 DUI         12/21/02 CONC  FG  2100 03/27/09          N
609884402      28-1381A2 DUI         12/21/02 CONC  FG  2100 03/27/09          N
609884403      28-1382A EXTR DUI     12/21/02 CONC  FG  2100 03/27/09          N
609884404      28-922 EQUIPMNT       12/21/02 CONC  FR  2000 03/06/03          N
609884405      28-751.1 RT TURN      12/21/02 CONC  FR  2000 03/06/03          N



  EXPLANATION OF CODES:
    Stat  CONC   CONCLUDED

    Find  FR     Responsible By Judicial Finding
          FG     Guilty By Judicial Finding

                ****END OF REPORT****
```

JAN 2 '03

 

**City of Phoenix**

MARICOPA COUNTY
**ARIZONA TRAFFIC TICKET AND COMPLAINT**

STATE OF ARIZONA

*A certified copy of an official and original Phoenix Municipal Court electronic record.*

| COMPLAINT NO. 6098844 | Report No | | ACC | FATAL/SER PHYS INJURY | | CMV | | HAZ MAT | | Grid DG31 |
|---|---|---|---|---|---|---|---|---|---|---|

| Driver License Number NONE | State | Class D | Endorsements M H N P T X D | Restriction | Military |
|---|---|---|---|---|---|

| DEFENDANT | First JUAN | Middle M. ( ONLY ) | Last MARTINEZ | Social Security No — — |
|---|---|---|---|---|

| Sex M | Weight 160 | Height 5-8 | Eyes BR | Hair BK | Origin H | DOB Mo 08 / Day 24 / Yr 55 | Other ID Type/No |
|---|---|---|---|---|---|---|---|

| Residential Address | Apt # | City/Town 6434 W. VAN BUREN | State/Province | Country (if other than U S) PHOENIX AZ | ZIP 85002 | Phone No |
|---|---|---|---|---|---|---|

| Business Name/Address | Apt # | City/Town | State/Province | Country (if other than U S) | ZIP | Phone No |
|---|---|---|---|---|---|---|

| VEHICLE | Year 88 | Make TOTY | Model 4D | Color WHITE | License Plate No EWM-598 | State AZ | Exp 03 |
|---|---|---|---|---|---|---|---|

The undersigned certifies that defendant named herein did commit the following:

| ON | Month 12 | Day 02 | Year 01 | Time 20 | AM | Radar ☐ Yes | Direction NB | A C Reading .179 .174 | Prior No Insurance Conviction W/I 3 Years ☐ Yes | Prior DUI Conviction W/I 5 Years ☐ Yes |
|---|---|---|---|---|---|---|---|---|---|---|

**LIST CRIMINAL CHARGE FIRST, IF APPLICABLE**

**1**
in violation of: 28-1381A1  ☒ ARS  ☐ City Code  SPEED  Alleged 30  Lawful 35
as follows: **DUI**
at location, Intersection ☐  2300 -1300 N. 35 AVE  In Phoenix, Maricopa County, AZ
☐ Civil Traffic (VT) / ☒ Criminal Traffic (CT) / ☐ Criminal (CR) / ☐ Petty Offense (PO)

**2**
in violation of: 28-1381A2  ☒ ARS  ☐ City Code  SPEED  Alleged 30  Lawful 35
as follows: **DUI W/A.C. OF .08 OR HIGHER**
at location, Intersection  2300 -1300 N. 35 AVE  In Phoenix, Maricopa County, AZ
☐ Civil Traffic (VT) / ☒ Criminal Traffic (CT) / ☐ Criminal (CR) / ☐ Petty Offense (PO)

**3**
in violation of: 28-1382A  ☒ ARS  ☐ City Code  SPEED  Alleged 30  Lawful 35
as follows: **EXTREME D.U.I .15 % OR HIGHER**
at location Intersection  2300 -1300 N. 35 AVE  In Phoenix, Maricopa County, AZ
☐ Civil Traffic (VT) / ☒ Criminal Traffic (CT) / ☐ Criminal (CR) / ☐ Petty Offense (PO)

**4**
in violation of: 28-922  ☒ ARS  ☐ City Code  SPEED  Alleged 30  Lawful 35
as follows: **VIOLATION OF LIGHTED LAMPS REQUIREMENT**
at location Intersection  2300 -1300 N. 35 AVE  In Phoenix, Maricopa County, AZ
☒ Civil Traffic (VT) / ☐ Criminal Traffic (CT) / ☐ Criminal (CR) / ☐ Petty Offense (PO)

**5**
in violation of: 28-751.1  ☒ ARS  ☐ City Code  SPEED  Alleged 10  Lawful 35
as follows: **IMPROPER POSITION - RIGHT TURN**
at location Intersection ☒  I10 / N. 35 AVE  In Phoenix, Maricopa County, AZ
☒ Civil Traffic (VT) / ☐ Criminal Traffic (CT) / ☐ Criminal (CR) / ☐ Petty Offense (PO)

Additional Complaint/s: ☐ Yes  Complaint Number/s:

| You Must Appear At: | ☒ CITY OF PHOENIX MUNICIPAL COURT 300 West Washington Street Phoenix, AZ 85003-2103 Phone - (602) 262-6421 | BRING ONE PARENT | MARICOPA COUNTY JUVENILE COURT CENTER 3125 West Durango Phoenix, AZ 85009 (602) 506-4500 |
|---|---|---|---|

| Your Court Date Is: | Month JAN | Day 03 | Year 2003 | Time 3:00 PM | PM ☐ | Victim/s? ☐ Yes ☒ No | Victim/s Notified? (All) ☐ Yes ☐ No ☐ N/A | Booking No |
|---|---|---|---|---|---|---|---|---|

☒ CRIMINAL - Without admitting guilt, I promise to appear on the court date listed above
☒ CIVIL - Without admitting responsibility, I acknowledge receipt of this complaint

I hereby certify that I have reasonable grounds to believe and do believe that the person cited herein committed the offense described herein contrary to law, and by signature, has promised to appear if so signed, and I have served a copy of this complaint upon the defendant

X _____ Signature

Finger Printed ☐

| Complainant(s) M/. HENDERSON | Serial No 4575 |
|---|---|
| Issued on 122102 Date | Serial No |

**COURT**

30-171 Rev 3/01

COMMITTED MAR 0 6 2003
CONVICTED (10)
Mar 0 6 2003

☐ Interpreter Required ☐ Spanish ☐ Other _____ ☐ Attorney N O A _____ Ph # ____

| ARRAIGNMENT CHARGE 1 | ARRAIGNMENT CHARGE 2 | ARRAIGNMENT CHARGE 3 | ARRAIGNMENT CHARGE 4 | ARRAIGNMENT CHARGE 5 |
|---|---|---|---|---|
| ☐ not responsible ☐ responsible ☐ not guilty ☐ guilty ☐ DDP/☐ declined ☐ no contest ☐ dismiss W/WO prejudice | ☐ not responsible ☐ responsible ☐ not guilty ☐ guilty ☐ DDP/☐ declined ☐ no contest ☐ dismiss W/WO prejudice | ☐ not responsible ☐ responsible ☐ not guilty ☐ guilty ☐ DDP/☐ declined ☐ no contest ☐ dismiss W/WO prejudice | ☐ not responsible ☐ responsible ☐ not guilty ☐ guilty ☐ DDP/☐ declined ☐ no contest ☐ dismiss W/WO prejudice | ☐ not responsible ☐ responsible ☐ not guilty ☐ guilty ☐ DDP/☐ declined ☐ no contest ☐ dismiss W/WO prejudice |

*By my signature below, I hereby waive my right to trial, enter a plea of guilty or responsible for the violation and consent to judgment imposing the prescribed fine or civil sanction.*

DEFENDANT SIGNATURE _____ Date _____ Judge's Initials _____

**SETTINGS**

| Date of Action | Chg # | Date set to | For | Ct Rm | Time | Initials | Date of Action | Chg # | Date set to | For | Ct Rm | Time | Initials |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |  |  |  |

**JUDGMENTS AND ORDERS OF THE COURT**

| | | | | |
|---|---|---|---|---|
| ☐ COP ☐ Civil Hearing/Trial held ☐ not responsible ☐ responsible ☐ not guilty ☐ guilty ☐ dismiss W/WO prejudice ☐ default ☐ no contest | ☐ COP ☐ Civil Hearing/Trial held ☐ not responsible ☐ responsible ☐ not guilty ☐ guilty ☐ dismiss W/WO prejudice ☐ default ☐ no contest | ☐ COP ☐ Civil Hearing/Trial held ☐ not responsible ☐ responsible ☐ not guilty ☐ guilty ☐ dismiss W/WO prejudice ☐ default ☐ no contest | ☐ COP ☐ Civil Hearing/Trial held ☐ not responsible ☐ responsible ☐ not guilty ☐ guilty ☐ dismiss W/WO prejudice ☐ default ☐ no contest | ☐ COP ☐ Civil Hearing/Trial held ☐ not responsible ☐ responsible ☐ not guilty ☐ guilty ☐ dismiss W/WO prejudice ☐ default ☐ no contest |
| ☐ *SEE LOG ENTRY FOR SENTENCE DETAILS* TAPE NO(S) | | | | |
| ☐ Fine/Sanction $ ____ ☐ Suspend ☐ Reduce ☐ Only if requirements are met Suspend ☐ Driving priv ☐ Vehicle regis ☐ Driving priv AND vehicle regis for ____ months | ☐ Fine/Sanction $ ____ ☐ Suspend ☐ Reduce ☐ Only if requirements are met Suspend ☐ Driving priv ☐ Vehicle regis ☐ Driving priv AND vehicle regis for ____ months | ☐ Fine/Sanction $ ____ ☐ Suspend ☐ Reduce ☐ Only if requirements are met Suspend ☐ Driving priv ☐ Vehicle regis ☐ Driving priv AND vehicle regis for ____ months | ☐ Fine/Sanction $ ____ ☐ Suspend ☐ Reduce ☐ Only if requirements are met Suspend ☐ Driving priv ☐ Vehicle regis ☐ Driving priv AND vehicle regis for ____ months | ☐ Fine/Sanction $ ____ ☐ Suspend ☐ Reduce ☐ Only if requirements are met Suspend ☐ Driving priv ☐ Vehicle regis ☐ Driving priv AND vehicle regis for ____ months |
| ☐ PAY $ ____ ☐ Today at Windows 25-28 ☐ Report immediately to Windows 16-17 to arrange a payment plan | | | | |
| ☐ Or show proof of ☐ Community Service Total hours ____ by ____ ☐ Insurance by ____ ☐ Registration by ____ ☐ ____ by ____ ☐ With proof, reduce fine amount to $ ____ ☐ DDP | ☐ Or show proof of ☐ Community Service Total hours ____ by ____ ☐ Insurance by ____ ☐ Registration by ____ ☐ ____ by ____ ☐ With proof, reduce fine amount to $ ____ ☐ DDP | ☐ Or show proof of ☐ Community Service Total hours ____ by ____ ☐ Insurance by ____ ☐ Registration by ____ ☐ ____ by ____ ☐ With proof, reduce fine amount to $ ____ ☐ DDP | ☐ Or show proof of ☐ Community Service Total hours ____ by ____ ☐ Insurance by ____ ☐ Registration by ____ ☐ ____ by ____ ☐ With proof, reduce fine amount to $ ____ ☐ DDP | ☐ Or show proof of ☐ Community Service Total hours ____ by ____ ☐ Insurance by ____ ☐ Registration by ____ ☐ ____ by ____ ☐ With proof, reduce fine amount to $ ____ ☐ DDP |
| COMMENTS: Default ☐ Stands ☐ Set Aside | COMMENTS: Default ☐ Stands ☐ Set Aside | COMMENTS: Default ☐ Stands ☐ Set Aside | COMMENTS: Default ☐ Stands ☐ Set Aside | COMMENTS: Default ☐ Stands ☐ Set Aside |
| Disposition Code | Disposition Code | Disposition Code | Disposition Code | Disposition Code |
| Disposition Date | Disposition Date | Disposition Date | Disposition Date | Disposition Date |
| Judge's Initials | Judge's Initials | Judge's Initials | Judge's Initials | Judge's Initials |

☐ Bond/Deposit Amount $ ____ ☐ Bond Forfeited ☐ Bond Exonerated ☐ Fine(s) from bond/deposit Date/Initials ____
☐ Appeal Bond Ordered Amount $ ____ ☐ Appeal Bond Forfeited ☐ Appeal Bond Exonerated ☐ Fine(s) from bond Date/Initials ____

*A certified copy of an official and original Phoenix Municipal Court electronic record.*

A certified copy of an official and original Phoenix Municipal Court electronic record.

A certified copy of an official and original Phoenix Municipal Court electronic record.

Martinez        Juan                    M    8-24-88

Last Name              First            M I        D O B

609844401,02,03

Complaint Numbers              Charge#                        M/F

| SENTENCES | | START/DUE | AMENDED | STATUS | INT |
|---|---|---|---|---|---|
| FINE | $ 455 | 2/28/03 | 8/26/03 | | |
| RESTITUTION | $ | | | | |
| EXTREME DUI FEE | $ 250 | / | | | |
| PD FEE | $ | / | | | |
| SASS FEE | $ 85 | | / | | |
| JAIL FEE | $ 478 | | / | | |
| COMMUNITY SERVICE | | | | | |
| JAIL: S/H: 30S 30sus() 10A | | 4/05/03 | | Ps | 900 |
| WORK ALTERNATIVE | | @ 3/16/03 | | | |
| SUBSTANCE ABUSE SCREENING | | | | 3/06/03 | 900 |
| SUBSTANCE ABUSE PROGRAM | | 3/16/03 | | 7/8/03 | 900 |
| TRAFFIC SAFETY PROGRAM | | | | | |
| SENTENCE REVIEW | | | | | |
| OTHER | | | | | |

Prepared By                          Date. 3-6-03

## COURT LOG

| DATE | TAPE | ACTION TAKEN | JUDGE |
|---|---|---|---|
| 7/8/03 | | FTP Signed Sandene NFFA | |
| | | OGS/UPDATES (10) | |
| | MAR 27 JUL 18 2003 | | |
| | | | |

FDR SENT  3-6-03

PCN #  L06016978

## CITY OF PHOENIX MUNICIPAL COURT

| RECORD OF PROCEEDINGS | | BOOKING # | | COMPLAINT # | 6098844 | |
|---|---|---|---|---|---|---|

| DATE | TAPE # | ACTION TAKEN | | | | JUDGE |
|---|---|---|---|---|---|---|
| | | SET FOR | ON | IN CT.# | AT | |
| 2/27/03 | | D CFTA | State ready | On Standby 9:30 | | |
| 3/4/03 | | ct 703 300 | | | | |
| 3-4-3 | | jury selected — ora; admonition instruction given — advised to return at 9:00 a.m. D advised trial will cont. + warrant may be issued if he doesn't appear | | | | Davis |
| BOX 44 CD 14 | | | | | | |
| 3/5/03 | | JT Continues recess | | | | |
| 3/6/03 | | JT Verdict 1C-guilty 2C guilty 3C -guilty 4U -resp 5U -resp | | | | |
| BOX 44 CD 23 | | | | | | |
| | | J-50 SK 7-18-03 703 8:30 | | | | |

CONSOLIDATED (10)

MAR 0 6 2003

RICARD                    Page ___2___                    30-25.2D Rev 2/96

# CITY OF PHOENIX MUNICIPAL COURT

**RECORD OF PROCEEDINGS**     BOOKING #     COMPLAINT # 6098844

JAIL COURT USE ONLY:
1 Appearance by Prosecutor ___,
  Officer___, Victim___, or Witness___
2 Arresting Officer opposes release
  (per Form IV) Yes__ No__

ARRAIGNMENT RELEASE STATUS?   ☐ BOND $ _____   ☐ OWN RECOGNIZANCE

Known AKAs:

| DATE | TAPE # | ACTION TAKEN | JUDGE |
|------|--------|--------------|-------|
| | | SET FOR Arr ON 01/03/03 IN CT.# 207 AT | |
| 1-3-03 | | N6 Set PDC 1-31-03 703/18° CAA | |
| 1-31-03 | | Set to Jury Trial | |
| | | ST 3.4.03 600/830 | |
| | | Cr 2.27.03 607/230 | |
| | | | |
| | | | |

| Change of Judge | ☐ State | Date: | Judge: |
|-----------------|---------|-------|--------|
| | ☐ Defense | Date: | Judge: |

| DATE BOND POSTED | AMOUNT | BOND RECEIPT NUMBER | EXONERATED – FINE FROM BAIL DATE   INIT | EXONERATED DATE   INIT | FORFEITED DATE   INIT | COMMENTS |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |

| MOTION TYPE Excludes motions to continue and for discovery | MOVING PARTY | DATE FILED | DISPOSITION GRANTED | DENIED | SEE LOG | RULING DATE | JUDGE'S INITIALS |
|---|---|---|---|---|---|---|---|
| | | | ☐ | ☐ | ☐ | | |
| | | | ☐ | ☐ | ☐ | | |
| | | | ☐ | ☐ | ☐ | | |
| | | | ☐ | ☐ | ☐ | | |
| | | | ☐ | ☐ | ☐ | | |

Counsel Appointed? ☐ Yes ☐ No   Contribution $ _____
Attorney Name: Michael Ricard   Phone: 275-3200
Attorney Address. _____
Interpreter Needed  ☐ Spanish ☐ Other _____

FDR SENT _____
PCN # _____

Page _____

30-25 1D Rev 10/02

A certified copy of an official and original Phoenix Municipal Court electronic record.

A certified copy of an official and original Phoenix Municipal Court electronic record.

**PHOENIX MUNICIPAL COURT     300 West Washington Street,     Phoenix, Arizona 85003-2103     602-262-6421**

| STATE OF ARIZONA                  Plaintiff | COMPLAINT NO. | JUDGMENT AND SENTENCE ORDER |
|---|---|---|
| -vs- *Juan M Martinez* | | ☐ Amended |
| (FIRST, MI, LAST)                  Defendant | | ☐ Probation Violation |
| DOB: _8-24-55_                    (M/F) | Bail Receipt # _____ | ☐ Notify Victim |

1. ☐ The Court having made findings and rendered judgment that the defendant is in violation of terms(s)
   _____ of probation imposed on _____ .

   ☑ The Court having made findings and rendered judgment on the following charges:

2. CHARGES(S)       01)      02       03      04      05
   Root # 6098844

3. VIOLATION CODE(S)   28-1381A1   28-1381A2   28-1382A   28-922   28-751

Guilty/Responsible

|  | 01 | 02 | 03 | 04 | 05 |
|---|---|---|---|---|---|
| Plea (guilty/resp.) | ☐ | ☐ | ☐ | ☐ | ☐ |
| Plea (no contest/submission) | ☐ | ☐ | ☐ | ☐ | ☐ |
| Finding at trial | ☒ | ☒ | ☒ | ☒ | ☐ |
| Default Set Aside | ☐ | ☐ | ☐ | ☐ | ☐ |
| Default Stands | ☐ | ☐ | ☐ | ☐ | ☐ |
| Not Guilty/Not Responsible | ☐ | ☐ | ☐ | ☐ | ☐ |
| Dismissal w/o prejudice | ☐ | ☐ | ☐ | ☐ | ☐ |
| Dismissal w/prejudice | ☐ | ☐ | ☐ | ☐ | ☐ |
| DUI Dism: ☐ Factual   ☐ Legal | | | | | |

**IMPORTANT: Only those orders that are marked apply to you.**

☐ 4. All orders contained within this Judgment and Sentence Order are conditions of probation for charge(s):
   (See Item No. 7)     ☐     ☐     ☐     ☐     ☐

☑ 5. IT IS ORDERED that defendant serve _30_ days in jail (with _____ days time served and with
   _30_ days to be suspended upon successful completion of ☐ WAP, ☐ Community Service, ☒ SASS,
   ☐ Counseling, ☐ Other _____ to be served for charge(s):
   Jail Time     _30_ days  _30_ days  _30_ days  _____ days  : _____ days
   *concurrent*

☑ 6. IT IS FURTHER ORDERED that the defendant pay the following fines/sanctions, fees or restitution amounts:

| | 01 | 02 | 03 | 04 | 05 |
|---|---|---|---|---|---|
| A. Fine/sanction w/surcharge* | $ 455 | $ 455 | $ 455 | $ 0 | $ 0 |
| B. Amount Concurrent | $ | $ | $ | $ | $ |
| C. Amount Suspended | $ 455 | $ 455 | $ | $ | $ |
| D. SASS Screening Fee | $ | $ | $ 25 | $ | $ |
| E. 28-1382 Assessment | $ | $ | $ 250 | $ | $ |
| F. CAA (Attorney) Fee | $ | $ | $ | $ | $ |
| G. Other | $ | $ | $ | $ | $ |
| H. Jail ( Mandatory) | $ | $ | $ 420 | $ | $ |
| I. Restitution Ordered* | $ | $ | $ | $ | $ |
| J. Restitution from Fine | $ | $ | $ | $ | $ |

* The amounts listed on lines A and I include any "Restitution from Fine" listed on line J.

A COURT TECHNOLOGY ENHANCEMENT FEE of $10 plus surcharge per case will be added pursuant to P.C.C. 2-98.  A $20 FEE PER CASE will be added if payment in full is not made on the day of sentencing.  A $25 FEE will be added to EACH CHARGE ON DEFAULT STATUS.  COLLECTION COSTS may be ADDED for all balances referred to collection agencies.

DISTRIBUTION     WHITE – COURT     CANARY – PROSECUTOR     PINK – DEFENDANT     GOLDENROD – FEO UNIT     Pg _1_ of _1_     30-188 1D Rev 7/02

NAME: _Juan M Martinez_   DOB: _8-24-55_   COMPL. #: _6058644D_

*A certified copy of an official and original Phoenix Municipal Court electronic record.*

7. ☐ IT IS ORDERED that the defendant be placed on probation starting today and ending after
☐ 6 mo , ☐ 1 yr., ☐ 2 yr., ☐ 3 yr., ☐ 5 yr. (DUI only), or ☐ ending on _____
☐ The defendant is placed on Domestic Violence Supervised Probation (see attached special terms)
☐ for 1 year starting today OR ☐ Amended _____ months starting today.
☐ IT IS ORDERED that the defendant's probation be ☐ revoked ☐ terminated ☐ continued to original
ending date ☐ extended 12 months (Restitution only) and/or ☐ exclude _____ to _____
probation will end on _____
☐ New sentencing orders are contained in Items 4-15. ☐ Original sentencing orders remain in effect.

In addition to all orders contained within this sentence,
☑ a   Defendant shall at all times be a law-abiding citizen.
☑ b   The defendant shall notify the Court immediately, in writing, of any change of address or telephone number.
☐ c.  Defendant shall abide by travel restrictions as indicated on the accompanying Addendum
☐ d.  Defendant shall not harm, threaten or harass _____ .
☐ e.  Probation is to terminate upon completion of all orders contained in Items No  5-15

☐ 8   IT IS FURTHER ORDERED that restitution shall be paid to the victim(s) through the Court.  The Court shall forward payment to the victim(s) in the following amounts:

Victim #1 $ _____      Victim #2 $ _____      Victim #3 $ _____
Name _____           Name _____           Name _____

☐ By the sentence review date in Item No. 15, defendant is to provide proof of all restitution payments made by insurance company(ies) or proof of liability insurance coverage in effect at the time of violation

☑ 9   The amounts assessed in Section 6 of this Judgment and Sentence Order are due and payable today and shall be paid in the following manner:

☐ a.  THE DEFENDANT IS HEREBY ORDERED to pay the full sum today at **Assistance Windows 9-20** (First Floor Lobby.)

☐ b.  THE DEFENDANT IS HEREBY ORDERED to report immediately to Financial Screening located at **Financial Screening Windows 33 & 34** (First Floor Lobby) and provide any necessary financial information requested by the Financial Enforcement Officer

The Officer will review and verify the defendant's financial status to determine whether the amounts ordered shall be paid today, or whether the defendant shall be eligible for specific time payment terms, and/or whether the defendant shall be eligible to satisfy the financial obligation through the Work Alternative Program, or, if ineligible for Work Alternative, through Community Service

FURTHER, the defendant shall comply with the specific payment terms or Community Service requirements established by the Financial Enforcement Officer and/or the work alternative schedule established by the Work Alternative Clerk and as approved by the Court

☐ c.  $ _____ cash bail posted. Use ☐ ALL ☐ $ _____ toward restitution/fees/fines/sanctions

☑ 10. IT IS FURTHER ORDERED that the defendant report immediately to Substance Abuse Screening Services and participate and fully cooperate in any program(s) of assistance and/or counseling and/or rehabilitation, as directed by the Substance Abuse Screening Service.
☐ Screening Only

**DOMESTIC VIOLENCE CONVICTION WARNINGS APPEAR ON BACK OF THIS PAGE**



A certified copy of an official and original Phoenix Municipal Court electronic record.

## DOMESTIC VIOLENCE CONVICTION WARNINGS

You have been convicted of a crime that is considered domestic violence according to A.R.S. 13-3601A based on the nature of the crime and your relationship to the victim. If the crime involves the use or attempted use of physical force or the threatened use of a deadly weapon, you are prohibited by federal law from possessing a firearm or ammunition. This prohibition is permanent unless the conviction is set aside pursuant to A.R.S. 13-907. A conviction may not be set aside if the criminal offense involved the infliction of serious physical injury or the use or exhibition of a deadly weapon or dangerous instrument or if the victim is under fifteen years of age. A conviction is not automatically set aside upon request. Any decision is within the discretion of the judge.

The mandatory minimum sentencing requirement for a domestic violence conviction is a counseling program. Additionally, if you are convicted of a second offense, you may be placed on supervised probation with a term of jail as a condition of that probation. A third or subsequent charge may be filed as a felony and a conviction for that offense will result in a term of incarceration.

A certified copy of an official and original Phoenix Municipal Court electronic record.



NAME _Susan m Martinez_ DOB: _8-24-55_ COMPL. #: _609884403_

☐ 11.  IT IS FURTHER ORDERED that:

☐  The defendant's driving privileges/registration be suspended for _____ days/month(s).
     (MVD Abstract accompanies file.)

☑  **IGNITION INTERLOCK ORDERED**
    (No box need be checked in this section.)

    ☐ MVD or the Court has ordered a certified ignition interlock for 12 months.

    ☐ The Court orders an additional _____ months.

    **Notice to the Defendant: The certified ignition interlock is required for the number of months
    indicated starting from the date your driving privileges are reinstated or from the date
    of conviction, whichever is last. Even if no box is checked, MVD may still require the device.
    You should contact MVD prior to the installation of any device.  If you have any questions, please
    call MVD: Phoenix (602) 255-0072, Tucson (520) 629-9808, elsewhere in Arizona (800) 251-5866,
    TTY Speech/Hearing Impaired: Phoenix (602) 712-3222, elsewhere (800) 324-5425.**

    ☐  JUVENILE Defendant  (If license restrictions are ordered, MVD Abstract accompanies file.)

    DRUGS:   ☐ YES   ☐ NO   ☐ UNKNOWN
    NOTE: If "Drugs YES" is marked, MVD will revoke the defendant's license for 1 year.

    **Required for DUI and Domestic Violence Offenses:**
    Defendant knowingly, voluntarily, and intelligently, after being
    apprised of these rights, waived the right to ☐ counsel, ☐ trial by
    judge/jury, and/or ☐ all pertinent rights.

    Defense Counsel: _RICHARD MICHAEL RICARD_

    I hereby certify that at the time of sentencing and in open court, the
    Defendant's fingerprint was permanently affixed to this document.
    DUI Only:  The Court finds that the offense was not of a dangerous or
    repetitive nature pursuant to A.R.S. Section 13-604 or 13-604.02.

    Clerk: _E McDougal_ Date: _3-6-03_

    Fingerprint

☐ 12.  IT IS FURTHER ORDERED that the defendant report for Counseling to _____ within
       3 working days or within 3 working days after release from jail, pay required fees, and participate
       and fully cooperate in any assigned programs, completing such programs by _____ .

☐ 13.  The Court finds that the defendant and the victim, _____ ,
       have a relationship as defined in A.R.S. 13-3601A.   ☐ 13-3601M – No judgment of guilt.

☐ 14.  IT IS FURTHER ORDERED that the defendant complete _____ hours of Community Service by
       the sentence review date in Item No. 16.   ☐ $ _____ to be suspended upon completion
       of Community Service;
       ☐ At the following organization: _____ .
       ☐ At a community service organization of the defendant's choice.

A certified copy of an official and original Phoenix Municipal Court electronic record.

## NOTICE OF RIGHT OF SETTING ASIDE JUDGMENT
### A.R.S. § 13-907

*Setting aside judgment of convicted person on discharge; making of application; release from disabilities; exceptions*

A. Except as provided in subsection B of this section, every person convicted of a criminal offense may, upon fulfillment of the conditions of probation or sentence and discharge by the court, apply to the judge, justice of the peace or magistrate who pronounced sentence or imposed probation or such judge, justice of the peace or magistrate's successor in office to have the judgment of guilt set aside. The convicted person shall be informed of this right at the time of discharge. The application to set aside the judgment may be made by the convicted person or by the convicted person's attorney or probation officer authorized in writing. If the judge, justice of the peace or magistrate grants the application, the judge, justice of the peace or magistrate shall set aside the judgment of guilt, dismiss the accusations or information and order that the person be released from all penalties and disabilities resulting from the conviction other than those imposed by the department of transportation pursuant to section 28-3304, 06, 07 or 28-3308, except that the conviction may be used as a conviction if such conviction would be admissible had it not been set aside and may be pleaded and proved in any subsequent prosecution of such person by the state or any of its subdivisions for any offense or used by the department of transportation in enforcing the provisions of section 28-3304, 28-3307 or 28-3308 as if the judgment of guilt had not been set aside.

B. This section does not apply to a person convicted of a criminal offense:

1.  Involving the infliction of serious physical injury.

2.  Involving the use or exhibition of a deadly weapon or dangerous instrument.

3.  For which the person is required or ordered by the court to register pursuant to A.R.S. § 13-3821.

4.  For which there has been a finding of sexual motivation pursuant to A.R.S. § 13-118.

5.  In which the victim is a minor under fifteen years of age.

6.  In violation of A.R.S. § 28-3473, any local ordinance relating to stopping, standing or operation of a vehicle, or title 28, chapter 3 except A.R.S. § 28-693.

**NOTE:** Pursuant to **A.R.S.** § 13-907, an Application to Set Aside Judgment does not mean that the Municipal Court will destroy records of your arrest or conviction. The Municipal Court does not seal the Record of Conviction or arrest, restrict inspection of your record, nor respond to inquiries relating to your conviction as though the conviction never occurred. You may be required to disclose a conviction which has been set aside in applications for certain licenses. The Court cannot deny anyone the right to look at the court file or obtain a copy of the original citation, sentence or conviction.

The Motor Vehicle Department has no authority to suppress convictions and suspensions from the driving record. The Motor Vehicle Department will not remove any points from your driving record, and the information is obtainable by an insurance agency.



A certified copy of an official and original Phoenix Municipal Court electronic record.



A certified copy of an official and original Phoenix Municipal Court electronic record.

Scan both sides

NAME _Juan M Martinez_ DOB: _8-24-55_ COMPL. #: _609882,4_

☐ 15. IT IS FURTHER ORDERED that _____

_____

☐ 16. IT IS FURTHER ORDERED that the defendant must appear at a sentence review hearing on _7-28-03_ in courtroom _700_ at _8:30_ a.m./p.m. to provide proof of _Sens of DOT_

IT IS FURTHER ORDERED that payments made pursuant to this ORDER shall be made to the Phoenix Municipal Court, 300 West Washington Street, Phoenix, Arizona 85003-2103. **The defendant shall notify the Court immediately, in writing at the above address, of any change of address or telephone number.**

In the event that any payment is required as a condition of probation and is not paid or is paid after the scheduled payment date, defendant is ordered to submit to the supervision of the Court by reporting in person no later than 10 days after the scheduled payment date and report every 30 days thereafter until any delinquent payments are paid in full.

**Failure to comply with all sentence requirements will result in an order of contempt of court and/or a warrant being issued for your arrest and/or an entry of default on any civil complaints. Costs of collection will be added to all balances referred to collection agencies. If placed on probation, all sentence requirements must be completed no less than 90 days before the end of probation unless otherwise specified above.**

The victim(s), if any, received opportunity to address the Court and/or statement(s) submitted by the victim(s) have been reviewed by the court prior to sentencing.

- The prosecuting attorney advised the Court that reasonable efforts were made to confer with the victim.
- The prosecuting attorney advised the Court that reasonable efforts were made to give the victim notice of the plea proceeding and to inform the victim that the victim has a right to be present and to be heard.
- The prosecuting attorney advised the Court that to the best of the prosecutor's knowledge, notice requirements have been met, and the prosecutor informed the Court of the victim's position, if known, regarding the negotiated plea.

_3-6-03_         _703_
DATED              COURTROOM              JUDGE OF THE PHOENIX MUNICIPAL COURT

I hereby acknowledge receipt of a copy of the foregoing JUDGMENT AND SENTENCE ORDER. I understand that, if I violate any of said orders, the Court may issue a warrant for my arrest and direct my confinement in jail pending further proceedings. If I am placed on probation, the Court may revoke and terminate my probation and impose sentence upon me in accordance with the law.

I understand that if I entered a plea of guilty or no contest or admitted a probation violation, I have no right to appeal. For other judgments, I understand that my right to appeal from the judgment will end 10 calendar days after TODAY's date. NOTICE OF RIGHTS OF REVIEW AFTER CONVICTION explaining my right to appeal, my right to seek post-conviction relief, and the procedures I must follow to exercise these rights appears on the back of this page. NOTICE OF RIGHT OF SETTING ASIDE JUDGMENT and DOMESTIC VIOLENCE CONVICTION WARNINGS appear on the back of other pages of this document.

I hereby affirm that the address listed below is accurate and I acknowledge that all correspondence regarding this JUDGMENT AND SENTENCE ORDER will be mailed to the address below.

_Juan M Martinez_ _434 W Van Buren #3_ _PHX_ _85043_
Defendant's Signature    Mailing Address         City       State    Zip

_(623) 329-0508_
Telephone #    Driver's License # / State    Soc. Sec. #                    Interpreter

**NOTICE OF RIGHTS OF REVIEW AFTER CONVICTION APPEARS ON THE BACK OF THIS PAGE**

DISTRIBUTION    WHITE – COURT    CANARY – PROSECUTOR    PINK – DEFENDANT    GOLDENROD – FEO UNIT    Pg _4_ of _4_    30-188 4D Rev 5/02

A certified copy of an official and original Phoenix Municipal Court electronic record.

A certified copy of an official and original Phoenix Municipal Court electronic record.

## NOTICE OF RIGHTS OF REVIEW AFTER CONVICTION

**RIGHT TO APPEAL**

You have a right to appeal from a final judgment of conviction, from an order denying a post-trial motion or from a sentence which is illegal or excessive. Arizona Constitution art. 2, sec. 24; Arizona Revised Statutes annotated sec. 13-4031 (1978). **YOU DO NOT HAVE A RIGHT TO APPEAL IN THIS COURT IF YOU HAVE PLEADED GUILTY OR NO CONTEST OR HAVE ADMITTED A VIOLATION OF CONDITIONS OF PROBATION. IN THAT CASE, RELIEF MAY BE SOUGHT ONLY BY PETITION FOR POST-CONVICTION RELIEF.** Rules 17.1, 17.2 and 27.8, Rules of Criminal Procedures, 17 A.R.S. Arizona Revised Statutes Annotated sec. 13-4033 (B) (1992).

In order to exercise your right to appeal:

1) You must file a written Notice of Appeal with the Municipal Court within ten (10) calendar days of the entry of judgment. IF YOU DO NOT FILE A WRITTEN NOTICE OF APPEAL WITH THIS COURT WITHIN TEN (10) CALENDAR DAYS, YOU WILL LOSE THE RIGHT TO APPEAL THIS CASE. All necessary forms for the filing of your appeal will be executed by the Appeals clerk, and you may file your appeal at this time if you wish.

2) Since a record was made at the hearing or trial, the appeal will be heard by the Superior Court on the official record. The appeal will be determined on the legal issues resulting from your hearing or trial and no additional testimony will be allowed unless ordered by the Superior Court judge.

3) Within five (5) days after filing the Notice of Appeal, you are required to make arrangements with the Municipal Court to pay the cost of preparing the record for appeal. IF YOU FAIL TO MAKE SATISFACTORY ARRANGEMENTS FOR PAYING THE COST, YOUR APPEAL MAY BE DISMISSED.

4) Within twenty (20) days after the record is filed with The Superior Court, you or your attorney must submit a memorandum to the Superior Court setting forth the legal issues and legal reasons which serve as the basis for your appeal.

**RIGHT TO POST-CONVICTION RELIEF**

You also have a right to petition the Phoenix Municipal Court for post-conviction relief. Rule 32, Rules of Criminal Procedure, 17 A.R.S.

In order to exercise your post-conviction relief right:

1) You must file a **Notice of Post-Conviction Relief within 90 days of the entry of judgment and sentence** if you do not file, or do not have the right to file, a Notice of Appeal. If you do appeal, the time you have to file a Notice of Post-Conviction Relief is extended to **within 30 days of the order and mandate affirming the judgment and sentence on direct appeal.** If you do not timely file a Notice of Post-Conviction Relief you may never have another opportunity to have any errors made in your case corrected by another court.

2) To file for post-conviction relief, get a copy of the **NOTICE OF POST-CONVICTION RELIEF** form, either from the clerk of the court or jail, fill it out and file or send it to the clerk of the Phoenix Municipal Court. The notice must be **received by the court** within 90 days after you were sentenced or within 30 days of the order and mandate affirming the judgment and sentence on direct appeal.

---

**ADDITIONAL RIGHTS THAT APPLY TO EITHER PROCEDURE ABOVE**

- You have the right to have an attorney represent you.

- If you are determined to be indigent, then you may be entitled to have an attorney appointed by the court to represent you in <u>CRIMINAL</u> cases only. You must fill out a request to proceed as an indigent which includes a sworn financial questionnaire. Not all criminal cases are eligible for court appointed counsel.

- If you appeal, you are required by law to pay the cost of the transcript or recording of the record. If you feel that this payment will cause substantial hardship to yourself or family, you may file a request with this court to proceed as an indigent. This request includes a sworn financial questionnaire that you must complete.

(05/02)

A certified copy of an official and original Phoenix Municipal Court electronic record.

A certified copy of an official and original Phoenix Municipal Court electronic record.



# EXHIBIT 34

*Andriano v. Ryan*, Case No. CV-16-01159-PHX-SRB
Motion for Evidentiary Development



LEARN MORE NOW

YOUR
"FEMALE FRIENDS IN THE INDUSTRY"
AT
LEXUS OF GLENDALE

News  »  Arizona  »  Article

# Prosecutorial misconduct alleged in half of capital cases

**SHARE URL**     **EMAIL**     FONT: A A A          Tweet

**By Michael Kiefer**
The Republic | azcentral.com
Mon Oct 28, 2013 11:09 AM

0 Comments



The fu
energ

Learn more

**Updated on Nov. 25, 2013:** This story was corrected to indicate that there were 16, not 18, findings of misconduct or other inappropriate behavior among the 82 death-penalty cases that underwent direct review by the Arizona Supreme Court from 2002 to the present. The 16 findings represent nearly 40 percent of the cases in which misconduct or other inappropriate behavior was alleged.

Exclusive selections

Mauling of Phoenix

Battle over Arizona

Petite Maison, 4 sta

Trevor Cahill's knee

Expert: U.S. near 'cr

## RELATED INFO



Part 1: Facing questi     Part 2: Under scrutiny     Part 3: Juan Martinez     Part 4: Solutions

Follow Michael Kiefer on **Twitter** or e-mail him **here.**

Join the conversation on Twitter using the hashtag **#ProsecutionAZ.**

## About this series

Michael Kiefer has watched the sometimes contentious interplay among prosecutors, judges and defense attorneys for more than 10 years while covering courts and the death penalty for *The Arizona*

N oel Levy was Arizona Prosecutor of the Year in 1990 when he convinced a jury to convict Debra Milke of first-degree murder for allegedly helping to plan the murder of her 4-year-old son.

A year later, he convinced a judge to send her to death row.

It was a scandalous case: Prosecutors charged that in December 1989, Milke asked her roommate and erstwhile suitor to kill the child.

The roommate and a friend told the boy he was going to the mall to see Santa Claus. Instead, they took him to the desert in northwest Phoenix and shot him in the head.

But neither man would agree to testify against Milke, and the state's case depended on a supposed confession Milke made to a Phoenix police detective.

Most Popular     T

Quiz: Can you pa

Doug Kinneard:

Holy sightings: J
in unusual place

102 things you

8 fun facts abou

Haboobs roll in

Bikers Against C
safe

Teen dies in 8-st

Year in Review 2
stunned U.S.

New child custo

*Republic.*

He has sat through some of the decade's biggest court cases, including those against Jodi Arias, Serial Shooter Dale Hausner and Baseline Killer Mark Goudeau.

He also has covered many of the cases detailed in the project.



**Check out our database**

*This series was researched and written as part of a fellowship with The Guggenheim Foundation and the John Jay College of Criminal Justice in New York City.*

---

### RELATED NEWS

Prosecutors of the year

Milke denied confessing.

The detective had not recorded the interview, and there were no witnesses to the confession.

When Milke's defense attorneys tried to obtain the detective's personnel record to show that he was an unreliable witness with what a federal court called a "history of misconduct, court orders and disciplinary action," the state got the judge to quash the subpoena.

"I really thought the detective was a straight shooter, and I had no idea about all the stuff that allegedly came out," Levy recently told *The Arizona Republic.*

But in March of this year, after Milke, now 49, had spent nearly 24 years in custody, the 9th U.S. Circuit Court of Appeals threw out her conviction and sentence because of the state's failure to turn over the detective's personnel record so that Milke's defense team could challenge the questionable confession.

The 9th Circuit put the onus on the prosecution.

"(T)he Constitution requires a fair trial," the ruling said, "and one essential element of fairness is the prosecution's obligation to turn over exculpatory evidence."

The 9th Circuit judges ordered that Milke be retried within 90 days or be released.

The chief circuit judge referred the case to the U.S. Attorney General's Office to investigate civil-rights infringements. Under the 9th Circuit order, prosecutors must allow the detective's personnel record into evidence if they use the contested confession.

Prosecutors are responsible for the testimony of the law-enforcement officers investigating their cases. Cops and prosecutors are the good guys. They put criminals in prison, sometimes on death row. Juries tend to believe them when they say someone is guilty. They don't expect them to exaggerate or withhold evidence. They don't expect their witnesses to present false testimony.



The fu
energ

Learn mo

Teach your
stop bullyir
be more th

**Learn How**

Ad
Council   WAYT INSTI

## TOP JOBS

POWER

**Clinical Supervisory Po**
Mohave Mental Heal

**HIPAA Compliance Co**
Confidential

**Multiple Positions**
Union Elementary Sch
Distric

**Debt Collectors**
Progressive Financial

**Supervisor, Accounts**
Mesa Public Schools

**Emplo**

---

Yet The Arizona Republic found that, when the stakes are highest — when a trial involves a possible death sentence — that's exactly what can happen.

In half of all capital cases in Arizona since 2002, prosecutorial misconduct was alleged by appellate attorneys. Those allegations ranged in seriousness from being over emotional to encouraging perjury.

Nearly 40 percent of those allegations were validated by the Arizona Supreme Court.

Only two death sentences were thrown out — one for a prosecutor's tactics that were considered overreaching but not actual misconduct because a judge had allowed him to do it.

Two prosecutors were punished, one with disbarment, the other with a short suspension.

There seldom are consequences for prosecutors, regardless of whether the miscarriage of justice occurred because of ineptness or misconduct.

In fact, they are often congratulated.

Since 1990, six different prosecutors who were named prosecutor of the year by the Arizona Prosecuting Attorneys Advisory Committee also were later found by appeals courts to have engaged in misconduct or inappropriate behavior during death-penalty trials, according to The Republic's examination of court documents.

GET AZCENTR

And when prosecutors push the limits during criminal trials, whether crossing the line into misconduct or just walking up to it, there are risks: Convictions like Milke's get overturned, even if it takes 24 years, and innocent people, like Ray Krone, go to prison.

mobile

Get azce
phones
latest ne
photos :
from aze
Arizona
News.
» Get az
mobile!
» Androi
| iPhone

From our s

Banner

TOTA
KI

In 1992, Levy helped send Krone to death row for a murder he did not commit.

Krone's conviction and death sentence were thrown out three years later because the court had allowed Levy to present a videotape about matching bite marks into evidence that the defense had not had time to review.

Krone was dubbed the "Snaggletooth Killer" because of his twisted front teeth, and Levy found experts who said that those teeth matched bites on the victim's breast and neck.

"The State's discovery violation related to critical evidence in the case against the accused," the Arizona Supreme Court ruled when it tossed the case.

"Discovery" refers to evidence that the opposing attorneys are supposed to make available to the other side before trial.

At retrial, Levy got another first-degree murder conviction for Krone, though at the second trial Krone was sentenced to life in prison, where he spent another seven years.



Photo by: Heidi Huber/AP

In 2002, Ray Krone was exonerated by a true DNA match.

In 2002, Krone was exonerated by a true DNA match; another man was convicted of the murder.

"It never came out that one expert said it (the bite mark) wasn't a match," Krone told The Republic.

There were footprints that didn't match, DNA that was sketchy.

And, as Krone said, other evidence was disregarded: an eyewitness account about a man seen near the crime scene who turned out to be the real killer, for example.

Krone sued Maricopa County and the city of Phoenix for his conviction and settled for more than $4 million.

Levy retired from the Maricopa County Attorney's Office in 2009 for medical reasons while in the middle of another capital murder trial with accusations of prosecutorial misconduct.

That was the trial of Marjorie Orbin, who was charged with killing her husband and cutting his body into pieces, one of which was found in a giant plastic storage tub left in a desert lot in north Phoenix.

During Orbin's trial, Levy was twice accused of misconduct by Orbin's defense attorneys.

The first allegation was for denying Levy had spoken at the sentencing hearing of a jailhouse snitch who testified against Orbin, when he had.

Then, Levy was accused of threatening another snitch who had recanted her story; during a break in her testimony, while the judge and the jury were out of the courtroom, he asked her and her attorney if they knew the maximum penalty for perjury, according to appeals court records.

Levy told the court that he was only "kibitzing" with the witness' attorney and not actually speaking to the witness herself.

The judge made a special instruction to the jury as a remedy, essentially telling them what had happened, and denied the motions for misconduct.

Levy was stricken ill before the trial ended and another prosecutor took over.

Orbin was found guilty, but the jury did not impose the death sentence.

There were no repercussions for Levy in that case, just as there were none in the Krone or Milke cases.

The Maricopa County Attorney's Office refused to turn over his personnel file to The Republic, despite a request under the state's public-records laws, saying it was in "the best interests of justice."

"I just did my job, and I did it ethically," Levy said.

"I'm fully aware of my ethical obligation to present evidence. It's up to the jury to make a decision."

As for how he feels now that a man spent 10 years in prison because of one of those jury decisions, Levy answered, "I don't look back and judge myself to say I did something wrong to Ray Krone.

"Did I commit some kind of sin? Should I go to confession and confess to you?"

---

P rosecutors, not judges, not police, determine what, if any, charges to file, and they obtain indictments from the grand jury.

They, more than a jury, determine whether a defendant acted in self-defense.

They have enormous discretion over how the case unfolds, and judges grant them great latitude in their arguments.

"Prosecutors wield an enormous amount of power, including the ability to seek someone's death," said former Maricopa County Attorney Rick Romley.



Photo by: Charles Krejscki

Debra Milke spent nearly 24 years in custody before the U.S. 9th Circuit Court of Appeals threw out her conviction in March.

"Considering the magnitude of this power, prosecutors have an obligation to exercise good judgment, and they must temper their powers with wisdom.

Winning at all costs should play no role in being a prosecutor.

Then and only then, will justice be ensured."

But that doesn't necessarily happen, and Romley's 16-year tenure as county attorney was not free of allegations of misconduct by his line prosecutors in capital cases: Krone's and Milke's, for example.

The way the justice system really works is that if you are charged with a crime, you are likely to be found guilty of something.

In Maricopa County Superior Court, for example, of 2,700 felony cases terminated in July of this year, 1,706 ended in plea agreements, according to sources.

Only 2 percent of felony cases went to trial. Of the 65 trials that ended that same month, 59 ended in guilty verdicts, four in mistrial and two in acquittals.

"You indicted somebody, now you've got to win," said defense attorney and former Watergate prosecutor Larry Hammond.

"Prosecutors really don't take seriously the ministry of justice," Hammond said. "They see themselves as adversaries."

And they often fight their battles in the gray areas of the law.

On a recent afternoon, a Maricopa County Superior Court judge was talking about prosecutors.

She drew a line on the table with her finger and then placed an eating utensil there to mark the line.

"That's misconduct," said the judge, who asked that her name not be used.

Judges are loath to comment on cases for ethical reasons — and because they need to remain impartial to the attorneys who come before them.

Then she placed another utensil an inch away and parallel to the first on the table.

"That's reversible error," she said, referring to the level of misconduct that can get a sentence or conviction thrown out.

She put her finger in the space between the utensils and said, "That's where a lot of prosecutors operate."

Maricopa County Attorney Bill Montgomery had a quick counter.

"If courts are not enforcing the Rules of Professional Responsibility as they pertain to the conduct of defense attorneys and prosecutors, they are then responsible for what goes on in court," he said. "However, mere differences of opinion as to how a case should be tried cannot be the standard either."

---

As in any profession, there are tricks of the prosecutorial trade, ways to sway a jury without crossing the line.

You ask compound questions and then demand yes or no answers, for example. When the witness can't answer, you accuse him of being argumentative. When the defense attorney is making a good case, you might accuse her of unethical conduct. You make objections in the same way football coaches call timeouts to slow a drive to the end zone.

accuse him of being argumentative.



Photo by: U. Frank Williams Jr.

Noel Levy was named Arizona Prosecutor of the Year in 1990, the year he convinced a jury to convict Debra Milke of first-degree murder.

And sex not only sells, it convicts.

"A good way to turn a questionable capital case into a definite capital case is to inject the sex component," said Tucson attorney Rick Lougee, "very often with little or no proof of the allegation."

You might also drag your feet on disclosing evidence and witness lists.

"Every piece of evidence is a fight, even if it doesn't matter to them," said Alan Tavassoli of the Maricopa County Public Defender's Office.

When does trickery become misconduct?

The most frequently cited instances in appeals are withholding evidence that could aid the defendant, presenting false evidence, excluding jurors for racial reasons, making over-the-top statements, letting slip information that has deliberately been kept from the jury and disobeying a court order.

There have been few studies of prosecutorial misconduct.

The cases are hard to identify, because they are simply not tracked in court databases.

Instead, researchers have to rely on prominent cases memorialized in case law or anecdotal information.

According to a Pulitzer Prize-winning study by Ken Armstrong and Maurice Possley at *The Chicago Tribune*, between 1963 and 1999, at least 381 homicide convictions nationwide were thrown out for those infractions, including 67 where the defendant had been sentenced to death.

And according to The Tribune, though the appellate courts frequently excoriated the prosecutors' actions, only five were punished, but not by any state lawyer disciplinary agency.

More frequently, The Tribune reporters wrote, the offending prosecutors were rewarded for getting the convictions.

A similar study conducted in 2010 by Possley and Santa Clara University law professor Kathleen Ridolfi on behalf of the Northern California Innocence Project identified 707 instances of prosecutorial misconduct between 1997 and 2009 in California courts.

But only 159 of those cases resulted in a mistrial or a reversed conviction or sentence.

The study found that prosecutors were disciplined in only 1 percent of those cases.

Ridolfi and Possley also took a look at Arizona and found 20 state and federal cases between 2004 and 2008 in which prosecutors were found to have committed misconduct.

Only five of the convictions were reversed. No prosecutors were disciplined.

---

I n Arizona, all death sentences are subject to a mandatory "direct" appeal to the Arizona Supreme Court.

*The Arizona Republic* reviewed all direct appeals of death sentences issued by the court between 2002 and the present.

Among those 82 direct appeals, there were 42 in which the defendants alleged prosecutorial misbehavior or outright misconduct, 33 of them from Maricopa County, which, as the largest county, has the busiest Superior Court.

The Supreme Court justices found that impropriety or misconduct had occurred in 16 of those 42 cases.

But only two were reversed and remanded because of the behavior (in one case characterized only as overreaching). Two prosecutors were disciplined. The offenses varied in seriousness from rolling eyes and sarcasm to introducing false testimony and failing to disclose evidence that might have helped the defendant.

But, overwhelmingly, even when misconduct was found, the high court determined that it was "harmless error," the defendant would have been convicted anyway, or the judge had cured the problem by making a jury instruction.

Some of the most egregious instances do not show up in The Republic's study because the misconduct triggered a mistrial or caused the prosecution to offer a sweetheart plea deal; for instance, when a prosecutor had improper contact with a disgruntled member of the defense team or when it appeared as if the state had been listening in on a defendant's jail calls from his attorney.

According to case law, in order to declare a mistrial for prosecutorial misconduct, a trial must be "permeated" with bad behavior on the part of the prosecutor that "so infects the trial with unfairness as to make the resulting conviction a denial of due process."

Judges are reluctant to risk such drastic measures.

If a judge or appellate court were to reverse a case because of misconduct, the defense could claim it amounts to double jeopardy, making it impossible to retry the suspect.

Prosecutors are allowed great latitude during closing arguments, the justices wrote over and over in the death-sentence direct appeals.

Or because a defense attorney didn't object at the time of the alleged infraction, the defendant forfeited the option of appellate scrutiny.

"There are no consequences," said Susan Corey of the Office of the Legal Advocate, one of the county's three indigent defense agencies. "There's absolutely no repercussion."

The majority of attorneys disciplined by the state Bar are attorneys who handle money: divorce attorneys, probate attorneys, civil attorneys.

More defense attorneys than prosecutors are referred to the Bar, partly because the County Attorney's Office has an ethics committee.

It was established by former Maricopa County Attorney Romley.

His successor, Andrew Thomas, focused on attacking defense attorneys.

Thomas was later disbarred.

Montgomery said the ethics committee "only looked at possible referrals (to the disciplinary agencies) of judges and defense attorneys."

He said that it now looks at prosecutors as well, though he would not reveal any details or if anyone had been referred.

"Sometimes defense attorneys are hesitant to file Bar complaints against prosecutors because they're afraid for their next case," said John Canby from the Maricopa County Office of the Legal Defender, another of the three county defense agencies. "Playing nice and getting a good plea is usually the way to go."

"Lawyers in general don't like filing Bar charges," said Karen Clark, who represents other attorneys charged with ethical violations and has served as a prosecutor for the Bar.

"Nobody likes a rat," Clark said.

---

Filing a complaint, in fact, can have more repercussions for a defense attorney than unethical conduct has for prosecutors, as Rick Lougee discovered when he referred a prominent Pima County prosecutor named Ken Peasley to the state Bar.

Peasley was Arizona Prosecutor of the Year in 1994, the year after he got death penalties imposed against two men and a teenager charged with murdering three people in a South Tucson mom-and-pop store called the El Grande Market.

During his career, Peasley prosecuted 140 murder cases, about 60 of them capital cases. He was a death-penalty machine, charming, forceful, well-respected — by judges and lawyers alike.

Except that he cheated.

"Prosecutors like Peasley have learned that you try people, not facts," Lougee said.

They go after the defense attorneys, the witnesses. They convince the jury that regardless of the facts, the defendant is a bad person and must be guilty of something.

Peasley got all three of the El Grande Market defendants sent to death row, largely on the testimony of an informant.



Photo by: Jim Davis/Arizona Daily Star

In 2004, Ken Peasley was disbarred by the Arizona Supreme Court.

But Peasley misrepresented the informant's knowledge, claiming that police knew nothing of the defendants until the informant brought them up.

In fact, police were already aware of them.

Nonetheless, Peasley lied to the judge and the jury and encouraged a witness to commit perjury.

Two of the three convicted murderers were granted a new trial because the jury foreman in their joint trial wavered on whether he supported the verdict when the jurors were polled. The two defendants granted retrials were tried separately the next time.

Peasley brought in the same perjured testimony during the retrials.

One of the defendants was sent back to death row.

Lougee got the other defendant acquitted in 1997, but he had figured out the deception.

He filed his Bar charge that Peasley conspired to present false testimony and had repeated the perjury in the retrials. The complaint made no difference at first, and Peasley was promoted shortly after the complaint was filed.

He was named Prosecutor of the Year again in 1996.

Judges rallied around him. He traveled the state to train other prosecutors. He won national awards.

Lougee said he was shunned by the legal community for having made the accusation.

But the state Bar took the complaint and passed the investigation to Karen Clark.

It took Clark seven years to work out the case, but it ended, in 2004, with Peasley being disbarred by the Arizona Supreme Court.

He has since died.

After his disbarment, the death penalty from the retrial was thrown out because of Peasley's behavior. The third defendant remains in prison, though his death sentence was commuted to life in prison when the U.S. Supreme Court ruled that killers cannot be executed for murders they committed before the age of 18.

"Ken Peasley corrupted the system for 15 years," Lougee said. "That puts the system at risk for more than just my clients."

**Part 2: Prosecutors under scrutiny**

## YOU MIGHT BE INTERESTED IN

SPONSORED LINKS

7 Little Things That Almost Everyone Steals *(Wall St. Cheat Sheet)*

The 13 Most Dangerous Cities In America *(TheStreet)*

Teen Sentenced to Prison for Texting-While-Driving Death *(Web2Carz)*

5 States (And One City) Ready to Legalize Marijuana *(Wall St. Cheat Sheet)*

Texas Widow Says Funeral Home Left Her Husband's Body to Rot *(Latest.com)*

17 Celebs Who Have Been Accused Of Murder *(Styleblazer)*

Jessica Simpson's Honeymoon Swimsuit Selfie Is Beyond Glamorous (PHOTO) *(Stirring Daily)*

5 People Who Didn't Deserve To Win The Lottery *(Answers.com)*

Heartbreaking: Man Tapes Chained Dog's Muzzle Shut, Leaving It to Starve Outside and Alone *(Latest.com)*

Forced child marriage leads to a lifetime of slavery *(walkfree.org)*

An Army of Juan

Written by Paul Rubin      Phoenix Magazine, July 2015

Maricopa County prosecutor Juan Martinez seized the international spotlight during the Jodi Arias trial. Is he destined for greater things, or will his controversial methods prove his undoing?

Years before the Jodi Arias trial lifted him to news TV stardom, veteran Maricopa County prosecutor Juan Martinez found himself locked in another stirring courtroom drama – the 2009 murder trial of Phoenix Suns nutritionist Douglas Grant.

Grant was charged with first-degree murder in the death of his wife Faylene. Specifically, the state accused Grant of drugging Faylene at their Gilbert home and watching her drown in a bathtub before perfunctorily calling for help.

The trial was desperate and nasty, a street fight. Bolstered by the discovery of several notes and letters that convincingly painted Faylene as suicidal, the defense seemed to have a fighting chance at an acquittal, or at least a hung jury.

Martinez knew the score. So, in his closing argument, the prosecutor sprung a brand-new theory on jurors. In a dramatic quasi-recreation, he demonstrated to jurors how Grant, whom he dubbed a "black angel of death," had knelt next to his drugged wife and held her head underwater in the tub to ensure her end.

Trouble was, Martinez had no bona fide evidence, nada, to prove it. Courtroom theatrics and overkill had worked for him in the past, but this time didn't pass muster with jurors. The panel deliberated for days before returning with a guilty verdict for manslaughter, much less serious than the first-degree murder count Martinez had urged.

Afterward, some jurors expressed confusion over the prosecutor's 11th-hour ploy. "I didn't get it," a female juror told me at the time. "None of us liked Grant and we thought he was guilty of something. But only a few of us bought what Juan said at the end. It was weird."

Six years later, in the blessed aftermath of America's murder trial of the century – and a life sentence for Arias – Martinez is far more famous than he was at the time of the Grant trial.

But little else has changed. He remains the most reviled – and revered – person at the Maricopa County courthouse.

Not surprisingly, Martinez's haters include of a slew of criminal-defense attorneys who view him as a rabid, self-aggrandizing junkyard dog. With a quarter century of service at the Maricopa County Attorney's Office, he long has been one of the agency's go-to options for prosecutorial heavy lifting, ever ready to run the grueling long-distance race that is a first-degree murder trial. Martinez has been front-and-center in some of the county's highest profile and most intriguing capital trials – the sleepwalker case of Scott Falater, the killer lady case of Wendi Andriano, the Doug Grant murder trial. He has outwitted and outworked many defense attorneys along the way.

But he's a polarizing figure even at his own shop, the MCAO, where he operates as a proud loner, according to several inside sources. In hushed tones and off-the-record comments, colleagues past and present talk about his monumental ego and pathological disdain for plea bargaining – how he uses his influence and clout to insist on trials on slam-dunk cases of guilt, sucking up time, money and limited resources while making victims' loved ones relive horrors in court. All to get another notch on his estimable belt.

Martinez's supporters inside the criminal justice system point to his tenacity and smarts, and willingness to take on powerful institutions, even law enforcement. Martinez's naysayers – both in and out of his agency – give him credit for being formidable in court, but object to his proclivity for salacious yarn-spinning and below-the-belt tactics, concerns that existed before Jodi Arias butchered Travis Alexander at his Mesa apartment in June 2008, and before the ensuing media circus transformed him into the unimpeachable cable news matinee idol known as "Mr. Juanderful."

Illustration by Ian Keltie; Photography provided by Associated press Mark Henle, Tom Tingle & David WallaceFor Martinez, an old-school capital case prosecutor in an era when death-eligible cases are shrinking in Maricopa County and elsewhere, the Arias case was tailor-made on many levels. It was a perfect storm – one that may yet gust Martinez clean out of the MCAO.

Juan Martinez hardly fits the mold of a matinee idol, or even of a dime-store TV talking head: No pretty boy, he is a small man in his 50s with a prominent nose, L'Oreal-dark dyed hair, a high-pitched voice and narrow, burrowing eyes. But he has a great skill-set for a trial lawyer, including a near-photographic memory for dates, times and places, and he's super-fast on his feet.

Martinez's backstory is admirable, even inspiring. Born in Mexico, he is the second-youngest of seven siblings and immigrated to the States as a youngster not knowing any English. (Martinez, who can be as soft-spoken out of court as he is combative inside of it, declined to speak with PHOENIX magazine for this story.)

Martinez and his family settled in California, where he learned the language, adapted to the new culture and became the first of his family to attend college, much less graduate.

He ran cross-country in high school and was a fine student, determined to make something of himself in his adopted country. After completing his undergraduate work, Martinez was accepted at Arizona State University's law school, and graduated in 1984.

Like many career prosecutors, Martinez worked as a criminal-defense attorney for a short spell after law school. The Maricopa County Attorney's Office hired him in 1988, and he soon proved himself as a workhorse in the trenches of the local justice system.

Over time, Martinez honed the combative courtroom style that would prove so effective with juries – and maddening to his opponents. He habitually interrupts contrary witnesses and opposing counsel, throwing off their rhythm and shifting the discussion where he wishes – and he usually gets away with it.

"Judges and opposing attorneys seem to be a little slow on the switch with the guy," says Phoenix lawyer Robert McWhirter. "He has a way of getting what he wants in the courtroom, and he is truly relentless. This is not necessarily a compliment."

In the early 1990s, Martinez moved over to the agency's homicide unit, where he worked under Bob Shutts, a respected deputy county attorney who tried three murder cases with him. "Juan grabs onto a case and won't let go until it's over," says Shutts, who now heads his office's cold-case unit. "He works and works and works, and fights for the payoff. Yes, he's a bulldog."

Shutts sat mutely at the prosecution table for the entirety of Arias' recent resentencing trial, but he won't discuss his odd role or any aspect of the case, citing the convicted woman's pending appeal.

Asked why Martinez has such a negative reputation with so many at the courthouse, Shutts says: "Why don't you ask them?"

PHOENIX magazine did.

"Juan is a victory-at-any-cost prosecutor driven by his own ego," says Mel McDonald, a onetime judge and United States Attorney for the District of Arizona now working as a criminal-defense attorney. "He lies easily and he always overreaches, always plays to the mob mentality."

McDonald would know as well as anyone – he battled Martinez in the aforementioned Doug Grant murder trial.

The motive for the crime – as theorized by the prosecution – was Grant's desire to reconnect with a younger woman named Hilary whom he had dated while divorced from Faylene (the couple remarried two months before her death).

But evidence of Grant's guilt was scant. McDonald argued Faylene died either accidentally or intentionally by her own hand. As a suggestion of suicide, McDonald pointed to a slew of poignant and troubling letters Faylene penned shortly before her death.

"I know I will be here with my body until it is buried," Faylene wrote to Doug and Hilary, "and I have held a secret hope for several weeks that I would be able to see you married that I could be there!"

For months, Martinez denied the existence of Faylene's relevant writings (other than the few already disclosed). When finally forced to concede their existence, Martinez blamed a Gilbert police detective for having "lost" them. The detective denied it under oath.

As often is his modus operandi at trial, Martinez tried to exploit Doug Grant's sexual sins no matter how tangential to the charges. Without a lick of evidence, he told jurors that Grant had arranged "some kind of threesome" with Faylene and Hilary (whom he married shortly after Faylene died). Sensing that his argument of

premeditated murder was on shaky footing, Martinez concocted the story about Grant drugging his wife, which the jury rejected.

McDonald says he loves a good battle in the courtroom, and usually remains collegial with the other side. Not this time.

"I haven't spoken to Martinez since he jetted out of court after the jury shot him down," McDonald says, referring to the lesser manslaughter verdict. "He doesn't play clean, and he is far too devious for me to have any respect for him. He is dangerous."

Even when Martinez convincingly wins a conviction, his methods often come under scrutiny. One such instance was Martinez's prosecution of Wendi Andriano, an Ahwatukee woman who murdered her husband in an Arias-like frenzy in 2000.

Like Arias, Andriano was a woman in her 30s who claimed self-defense, and testified at trial. A jury sentenced her to death. In 2007, the Arizona Supreme Court upheld the verdict, but noted Martinez had taken "every opportunity to infuse the trial with marginally relevant information about Andriano's partying and man-chasing." (Andriano remains on death row pending years of appeals.)

Do these tactics serve the greater justice? Some say yes – and Martinez will deploy them against any defendant, from hardened criminal to career cop. Consider Martinez's successful prosecution of former Phoenix police officer Richard Chrisman, who was charged with second-degree murder in the October 2010 shooting death of an unarmed south Phoenix man during a domestic-violence call. The key witness against Chrisman was a fellow officer named Sergio Vergillo, who was an eyewitness to the shooting.

A jury convicted Chrisman of aggravated assault amid the inevitable cries of the defense attorney that Martinez had committed "prosecutorial misconduct" during the case. Chrisman later pled guilty to manslaughter before his retrial on the second-degree murder charge, and was sentenced to seven years in prison, the minimum. His appeal is pending.

"I can honestly tell you that the case wouldn't have happened without Juan's persistence," says Alex Femenia, a retired Phoenix police detective who now is an investigator at the MCAO. "You had a powerful police union that was behind Chrisman all the way, and a lot of people at our office who thought there was no chance in hell at a conviction. Juan just did the right thing and went for it."

Illustration by Ian Keltie; Photography provided by Associated press Mark Henle, Tom Tingle & David WallaceStill, many who've watched Martinez in the courtroom over the years attest to his chronically vindictive behavior toward witnesses and defendants. One notorious instance occurred in the late 1990s, during the well-publicized capital murder case against Scott Falater, a curious and tragic crime that garnered national attention. The defendant was a devoutly religious Motorola design engineer who, one awful night, repeatedly stabbed his wife in the backyard of their north Phoenix home and dumped her body in the swimming pool.

Falater had no known motive to kill Yarmila, the mother of his two teenage children, who were asleep in the home at the time. Without corroboration, Martinez suggested it may have been Yarmila's supposed lack of enthusiasm with the Church of Jesus Christ of Latter-day Saints – evidently, Falater was more involved with the church than his wife – or perhaps it was the defendant's allegedly unrequited desire to have another child with her.

Falater claimed from the start – and still does – to have been in a sleepwalking state when the killing happened. The jury convicted him of first-degree murder.

Martinez sought the death penalty, which in those days was considered by judges, not juries. Falater's trial attorney, Mike Kimerer, says he was appalled by his opponent's courtroom overkill.

"Juan prepares well and he knows how to pick his expert witnesses," says the veteran Kimerer, sounding like he's damning with faint praise, "but he has a cruel streak that doesn't always work. I just don't think he can help himself."

Case in point: Martinez's cross-examination of the Falaters' daughter Megan, 17 at the time. Megan was trying to save her dad from death row even knowing he had killed her beloved mother.

A few perfunctory questions from Martinez would have sufficed, but he couldn't resist going for the jugular in an attempt to discredit her testimony. During his cross-examination, Martinez grilled Megan about how well she really had known her parents. (His tone: Sarcastic, biting, shrill, mean.)

Martinez: "And basically it was really [your mother's] job to do the dinner, the pool, the laundry. Anything else?"

Megan: "Well, I don't know. I think that was it."

Martinez: "Would she help you with your homework at times?"

Megan: "No. I do that on my own."

That's when Megan Falater broke down in tears. Reporters in court that day remember the moment as cruel, pitiless and unnecessary.

Judge Reinstein, a former prosecutor not known for being soft on criminals, didn't buy Martinez's argument for a death sentence. Instead, he sentenced Falater in January 2000 to life in prison, without the possibility of parole.

Just like Arias.

"Love that smile!" someone named "Angela" wrote on the Juan Martinez Prosecutor Support Page in 2013, one of many Facebook pages devoted to the Arias case. It was in reference to a photo of a grinning Martinez posing with a much taller, attractive blonde female just outside the courthouse. "Damn, could u be any sexier, Mr. Juanderful?!"

Martinez's fame grew exponentially as the Arias case went global – it may have been the first trial by Twitter. Certainly, the prosecutor didn't create the creepy, Salem-like bloodlust that pervaded the case – or its surreal celebrity underpinnings. But he thrived playing the zealous white knight to Arias' monstrous vixen, a role that underscored both his strengths and liabilities as a prosecutor.

From the outset, Arias – fighting a mountain of damning evidence – seemed outmatched. Martinez's interminable cross-examination of Arias was like watching a shark playing in a fishbowl. The pair circled each other like an odd couple in purgatory, bickering endlessly about everything, especially Arias' myriad sexual adventures with the late Alexander.

The match-up amounted to a 50 Shades of Grey rough-love scene for the legion of Arias trial junkies who tingled joyously when "their" Juan pummeled her time and again.

Did he enjoy the spotlight? Absolutely. In a pretrial hearing, an attorney for Arias asked Judge Sherry Stephens to order potential witnesses not to speak with media.

"Apparently the [national TV] folks are pursuing everyone," the lawyer said. "They're pursuing Ms. Arias' family. I don't know all of them they're pursuing. I am sure if a witness was contacted by [cable courtroom show] In Session… they'd talk to Mr. Martinez."

Martinez disagreed, telling the judge, "I wish I had control over In Session. I'd make myself [appear] on their show every day."

Some of the Juanettes claim to have taken matters into their own hands, literally. At least one woman, a trial watcher who became a regular "commentator" on national shows, bragged to other groupies and to at least one reporter about having bedded Martinez. Untold others in the blogosphere fantasized in writing about doing just that. (For the record, Martinez has a longtime partner with whom he co-owns a home.)

Even seasoned members of the media who should have known better were in thrall of Martinez during Arias. "His first name has been co-opted by the Web," local crime author Camille Kimball fawned in a blog post, "as fans frequently refer to him as 'Juanderful,'  'Juantastic,' and other clever puns showing enthusiastic admiration for the short, slender man who displays the cerebral machismo of a Captain Kirk, with an identically equal commitment to justice and to winning." Martinez became the latest in a hallowed American tradition: the hotshot attorney working a high-profile murder case who hits the fame jackpot. Johnnie Cochran in O.J. Simpson, Vincent Bugliosi in Manson, F. Lee Bailey in Sam Sheppard.

Though he didn't win the death sentence he craved, Martinez at the end of the day did his job, which was to keep Arias locked up for the rest of her days. He went to trial – two trials, actually – for months on end. It was a lot of work.

That said, Arias was no whodunit. It was a slam dunk. Investigators had quickly exposed her as a liar and a murderess, and Martinez could have authored a plea deal of life imprisonment with no chance of parole, or none until she was very old. Gotten the same result, essentially. But that's not how Martinez operates.

According to insiders at the MCAO, Martinez pushed hard, first to make Arias a capital murder case, then to take it to trial. Winning a "spirited debate" within the agency, Martinez convinced his supervisors that jurors would surely send Arias to death row in a heartbeat. He overreached. And the result was familiar: A guilty verdict, yes, but amid accusations of lying and misconduct.

For once, it wasn't just opposing counsel saying nasty things about him. Audio/visual forensic expert Bryan Neumeister testified last December at a hearing requested by Arias' defense lawyers concerning alleged "prosecutorial misconduct" by Martinez.

Technically, the lawyers were asking Judge Stephens without jurors present to declare a mistrial. Odds of that happening were nil, but attorneys were making a record for Arias' future court appeal.

Mesa police witnesses and Martinez long had avowed that no pornography existed on victim Travis Alexander's home computer, as Arias claimed. More to the point, she claimed to have seen child porn on the computer, and said it had revolted her.

If the porn wasn't there, it bolstered Martinez's repeat talking point about Arias being a liar; she was, but not necessarily about the porn. Neumeister told the judge he had uncovered vast amounts of pornography and related viruses on Alexander's home computer – however not the kiddie porn Arias said she'd seen.

How the porn angle ultimately may have helped Arias' cause is uncertain. Surely, Neumeister's testimony spoke more to the credibility of the Mesa police investigation and of prosecutor Martinez than to anything else.

Neumeister told Judge Stephens that prosecutor Martinez and the Mesa P.D. case agent "either are stunningly incompetent or they are lying [by insisting there was no porn]. There is no gray area."

Martinez on cross-examination snappily accused Neumeister of at best being the incompetent one, a charlatan in cahoots with a desperate defense team. Neumeister retorted, "You are lying, straight-out lying, prosecutorial misconduct."

That had to be a first, a witness striking back at Martinez on the prosecutor's home court. "The data is the data," Neumeister says. "It was clear-cut. This prosecutor is smart, and he had to know what the data showed. But his style is to throw everything against the wall in attack mode and see what sticks."

Neumeister doesn't testify often. But he regularly freelances for police agencies, the U.S. military, criminal and civil attorneys and, yes, for Juan Martinez's office. "Lawyers are officers of the court and are not supposed to lie," he says. "He lied. He shouldn't be able to do that in a court of law, should he?"

In the end, Arias was sentenced to life, not death, and no matter how Martinez and County Attorney Bill Montgomery later spun it, that counts as a loss.

Keeping their client off death row was the only realistic goal of Arias' attorneys. Whether one or all 12 jurors voted for "life" (just one did, a woman quickly hounded by media as if she, too, had committed a crime) didn't matter.

The defense won the day in Arias, not Martinez.

How much longer Martinez remains at the MCAO remains to be seen. More than one source in and out of the agency says he is angling for a national media forum akin to Nancy Grace's, a kindred "they're-all-guilty" sort with a knack for overstatement. He's also said to be doing a book about Arias with a ghostwriter.

But Martinez still has a caseload, and more theatrics at more murder trials may be in the offing, something local defense attorneys are keenly aware of.

Attorney Robert McWhirter is now completing a sweeping complaint against Martinez that he plans to submit to the State Bar of Arizona. McWhirter, the supervising attorney at the ASU Alumni Law Group, never has gone up against Martinez in court, but is working on behalf of the Arizona Attorneys for Criminal Justice, a group that despises the prosecutor's tactics.

He knows the Bar rarely punishes prosecutors, but says he is hopeful that Martinez's "troubling body of work" will lead to serious scrutiny. (A State Bar of Arizona spokesperson says Martinez has no history of being disciplined by that agency.)

"At least four or five Arizona Supreme Court cases list Juan by name as a problem," McWhirter says. "He's brazen and has a remarkable willingness to game the system for tactical advantage. And so far he's gotten away with getting what he wants in court, and just how he wants to get it. "

But McWhirter concedes Martinez is a slippery target, someone who "works in very gray areas of the law. He's shrewd, and a survivor."

The latter surely is something on which, finally, most everyone can agree.

**Jodi Arias prosecutor accused of 'inappropriate relationships' that may have affected trial**

[Tonight at 10, a 12 News exclusive -- an ethics complaint filed against the high-profile prosecutor in the Jodi Arias case -- alleging misconduct during her trial.]

Brahm Resnik, KPNX 10:41 PM. MST June 29, 2017

An ethics complaint filed against the high-profile prosecutor in the Jodi Arias case alleges he engaged in misconduct that may have compromised her trial, 12 News has learned.

The complaint was filed with the State Bar of Arizona on behalf of Arias herself, now serving a life sentence for the brutal murder of her ex-boyfriend.

At the center of the accusation of misconduct against Deputy Maricopa County Attorney Juan Martinez is an alleged relationship with a woman who was blogging and providing TV commentary on the Arias case, according to a police report obtained by 12 News.

The woman, Jen Wood, was one of the two self-named "Trial Divas," who dished about the Arias case on TV and online.

A State Bar of Arizona spokesman confirmed to 12 News it is "investigating an ethics complaint alleging that Martinez had inappropriate relationships that may have compromised the Arias case."

Tammy Rose, a free-lance reporter who covered the Arias trial, filed a sworn statement with the ethics complaint.

Rose said she and Wood became friends while they were covering the trial's death-penalty phase in 2015.

They would car pool to the Maricopa County Courthouse and trade text messages through the day.

"She told me this shocking secret that I was – so shocked when she told me – that she said she was having an affair with Juan Martinez," Rose said in an interview from her Wisconsin home.

After the ethics complaint was filed, Rose told a sheriff's officer at her Wisconsin home that she had been harassed via text message and phone calls, according to a report filed by the Sheboygan County, Wis., Sheriff's Department.

Rose told the officer about the allegation that Wood had an affair with Martinez, according to the report. But Rose said she didn't know who was responsible for the text messages and calls.

Martinez is a deputy Maricopa County attorney now involved in another high-profile case - the trial of the accused serial street shooter.

Martinez lawyer Scott Rhodes provided this statement on the ethics complaint:

"Mr. Martinez prosecuted Jodi Arias in compliance with lawyers' rules of professional conduct. The Arias allegations consist of rumor and innuendo spread by a convicted murderer trying to seek revenge against the public servant who put her behind bars for the rest of her natural life. They do not warrant any attention at all."

Martinez is currently appealing an Arizona Supreme Court discipline committee's finding that he engaged in unprofessional conduct as a prosecutor in several other cases.

A State Bar letter obtained by 12 News shows Martinez formally denied any professional misconduct in the Arias matter.

Both Wood and a second woman denied participating in any of the alleged misconduct by Martinez, according to the Bar letter. 12 News is not identifying the other woman because details of the allegation involving her could not be independently confirmed.

Wood did not respond to numerous requests for comment by 12 News.

The Bar complaint against Martinez was filed on Arias' behalf by attorney Karen Clark, a former ethics counsel at the State Bar.

Clark acted as Arias' attorney last year in an ethics complaint against Arias defense attorney Kirk Nurmi. That complaint led to Nurmi's voluntary disbarment.

Clark declined to comment on the Martinez complaint.

A letter to Tammy Rose from the State Bar says the ethics complaint "involves communication between Mr. Martinez and a Ms. Wood."

Experts on legal ethics say a relationship in itself wouldn't violate Arizona Supreme Court rules governing conduct by attorneys.

But if Martinez shared non-public trial information with a blogger and commentator like Wood, ethics experts say, that could be a problem.

"Attorneys in those kind of proceedings have to be especially careful to mind their ethical obligations," said Keith Swisher, professor of legal ethics at the University of Arizona.

"They can't (share information) themselves and, importantly, they can't do it through a third party, including people with whom they're associated romantically or otherwise."

Concerns about Wood's contacts with Martinez during the Arias trial led to the breakup of the Trial Divas, according to Wood's former business partner, Sharee Ruiz.

"I told Jen that we couldn't continue to cover a trial that he was involved with," Ruiz said in an interview. "And I wanted to separate the business from any trial that he was involved in."

The State Bar is continuing to investigate the Arias ethics complaint

Newspapers™

Arizona Republic (Phoenix, Arizona) · Sun, Aug 15, 1999 · [First] FINAL EDITION · Page 32

https://www.newspapers.com/image/124478839

Downloaded on Nov 22, 2017



Copyright © 2017 Newspapers.com. All Rights Reserved.

POWERED BY
Newspapers™